**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |

**RESPONSE TO THE MOTION OF WHATLEY, DRAKE & KALLAS, LLC
FOR APPOINTMENT AS INTERIM LEAD CLASS COUNSEL
AND ROGER M. ADELMAN AS LIAISON CLASS COUNSEL**

Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein") and Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel"), joined by all undersigned counsel, respectfully submit this memorandum in response to the Motion for Appointment of Whatley Drake & Kallas, LLC as Interim Lead Class Counsel and Roger M. Adelman as Liaison Class Counsel (hereafter, the "Whatley Drake Motion") (Docket No. 41).

The undersigned plaintiffs and firms respectfully submit that (i) Cohen Milstein and Quinn Emanuel should be appointed co-lead Interim Class Counsel on behalf of the proposed direct purchaser class, and (ii) the Whatley Drake Motion should be denied.

**I.      SUMMARY OF ARGUMENT**

As set forth in the undersigned's previously-filed Motion for Appointment of Cohen Milstein and Quinn Emanuel as Co-Lead Interim Class Counsel (hereafter, the "Cohen Milstein / Quinn Emanuel Motion") (Docket No. 49), and the Memorandum in support thereof (Docket No. 50), the best interests of the proposed class would be served by the appointment of Cohen

Milstein and Quinn Emanuel as co-lead Interim Class Counsel under Federal Rule of Civil Procedure 23(g), for the following reasons:

*First*, Quinn Emanuel and Cohen Milstein have spearheaded the identification and investigation of the proposed class's claims in this matter, developing the legal theories of the case and unearthing the factual allegations pled by all plaintiffs, including Whatley Drake's client, West Alabama Sand & Gravel, Inc.[1]

*Second*, Quinn Emanuel and Cohen Milstein have the superior experience, knowledge, and resources to prosecute this case in the class's best interests.[2]

*Third*, Quinn Emanuel and Cohen Milstein have the support of nearly every plaintiff and plaintiff's counsel in this case, including many of the nation's most experienced antitrust class action litigators.

*Fourth*, Quinn Emanuel and Cohen Milstein have already demonstrated their ability to lead this case on behalf of plaintiffs by, for example, informally representing *all* plaintiffs in negotiations with defendants on preliminary matters.

In apparent recognition of these and other factors overwhelmingly supporting the appointment of Cohen Milstein and Quinn Emanuel as co-lead Interim Class Counsel, the Whatley Drake Motion seeks only to add Whatley Drake as a *third* Interim Class Counsel.  (*See, e.g.*, Memo in Support of Whatley Drake Motion (Docket No. 42) at 2) (advocating "a leadership structure consisting of three interim lead class counsel").  Notwithstanding that Whatley Drake is a reputable firm with certain strengths, there is simply no reason to add Whatley Drake to the leadership structure in this particular case.

---

[1]    *See* Fed. R. Civ. P. 23(g)(1)(A)(i) (directing courts to consider "the work counsel has done in identifying and or investigating potential claims in the action").

[2]    *See* Fed. R. Civ. P. 23(g)(1)(A)(ii), (iii), and (iv).

Whatley Drake has not played any leadership role in identifying or investigating the proposed class's claims in this matter. Rather, as discussed below, Whatley Drake filed a complaint that merely copied the factual allegations and legal theories contained in the previously-filed complaints by plaintiffs that had retained, respectively, Quinn Emanuel and Cohen Milstein.

Moreover, there are compelling reasons not to add Whatley Drake to the proposed two-firm leadership structure jointly proposed by all undersigned firms. Of the over fifty law firms that have filed cases in this proceeding, many have at least as much experience in prosecuting nationwide antitrust class actions as Whatley Drake (and some have significantly more experience). Several of these experienced firms have already made substantial contributions to the investigation and advancement of the class's claims in this case. These firms, however, chose not to seek appointment as lead Interim Class Counsel, and instead reached consensus on the designation of Cohen Milstein and Quinn Emanuel – and *only* those two firms – to serve as co-lead Interim Class Counsel. There is a strong consensus here that the best interests of the alleged class will be served by the proposed structure set forth in the Cohen Milstein / Quinn Emanuel Motion, and Whatley Drake does not present any reason why the interests of the class would be better served by burdening the proposed structure with a third co-lead firm and an unnecessary "liaison" counsel.

## II.    ARGUMENT

Notwithstanding that Cohen Milstein and Quinn Emanuel were able to obtain the support of nearly all plaintiffs and their counsel (*i.e.*, over fifty law firms representing over twenty plaintiffs), Whatley Drake has filed a competing application for Interim Class Counsel. Thus, the Court must weigh the competing applications. *See* Fed. R. Civ. 23(g)(1)(A)(2) and (3). The

factors Rule 23(g)(1)(A) directs courts to consider in evaluating class counsel applications all

overwhelmingly favor granting the Cohen Milstein / Quinn Emanuel Motion, and denying the

Whatley Drake Motion.

> ### A. Quinn Emanuel and Cohen Milstein Identified and Investigated the Class's Claims.

The first factor courts are directed to consider in weighing class counsel applications is:

"the work counsel has done in identifying or investigating potential claims in the action."  Fed.

R. Civ. P. 23(g)(1)(A)(i).  This factor decisively favors Quinn Emanuel and Cohen Milstein.

These firms (and their co-counsel) developed the legal theories and *all* substantive factual

allegations contained in the complaints filed by *all* plaintiffs in these cases.

As discussed in the Memorandum in Support of the Cohen Milstein / Quinn Emanuel

Motion, Quinn Emanuel filed the first complaint in this action, which reflected the firm's trail-

blazing identification and five-month investigation of the potential claims of the class in this

action.[3]  Cohen Milstein filed the first actions in this District, which were the first to name the

Association of American Railroads ("AAR") as a Defendant.  Thereafter, Quinn Emanuel and

Cohen Milstein both independently filed amended class action complaints on behalf of their

respective clients, reflecting their further investigation of the proposed class's claims.  No other

complaint filed in this matter – including the complaint filed by Whatley Drake – contains any

substantive factual allegation supporting the proposed class's claims that did not first appear in a

Quinn Emanuel or Cohen Milstein complaint.

---

[3]       Quinn Emanuel's Dust Pro complaint built upon a ruling by the Surface Transportation Board in January, 2007, but substantially developed the facts and antitrust theories applicable the class's claims.  *See* Dust Pro, Inc. Complaint, attached hereto as Exhibit A.

This is evident when one compares the Whatley Drake (West Alabama Sand & Gravel, Inc.) complaint to the earlier-filed Quinn Emanuel (Dust Pro, Inc.) and Cohen Milstein (McIntyre Group, Ltd.) complaints. These three complaints are attached hereto as Exhibits A-C.

Thus, the Quinn Emanuel and Cohen Milstein complaints set the template for this action. However, as noted, Quinn Emanuel and Cohen Milstein (and their co-counsel) continued to develop the class's claims after filing their original complaints, yielding amended class action complaints which reflect the fruits of Quinn Emanuel's and Cohen Milstein's *ongoing* independent investigations of the class's claims.[4] These amended complaints contain additional important factual allegations. They also correct certain factual matters (such as the date of key collective action by defendants regarding fuel surcharges). This erroneous date remains uncorrected in the Whatley Drake copycat complaint.[5]

Quinn Emanuel and Cohen Milstein were assisted in their investigations by co-counsel, including, in particular, the firms that Quinn Emanuel and Cohen Milstein intend to include (subject to the Court's approval) on an executive committee of plaintiff's counsel. These firms have worked closely over the past several months with industry experts, who have assisted counsel in identifying facts supporting the plaintiffs' claims. In contrast, the complaint of West Alabama Sand and Gravel and its attorneys does not evince any independent identification or development of any fact for the class's benefit, either pre-filing or afterwards.[6]

---

[4]     *See* Dust Pro, Inc. Consolidated First Amended Class Action Complaint, attached hereto as Exhibit D; McIntyre Group, Ltd. Amended Class Action Complaint, attached hereto as Exhibit E.

[5]     *See* West Alabama Sand & Gravel Complaint (Exhibit C) at ¶ 35 (referring to "fourth quarter 2002").

[6]     Whatley Drake represents that the firm has "Completed Substantial Work in Identifying or Investigating Potential Claims in the Action," but, respectfully, the only work identified – discussing the case with their client and collecting invoices – is the type of work (footnote continued)

Thus, this factor – "the work counsel has done in identifying or investigating the potential claims in the action," Fed. R. Civ. P. 23(g)(1)(A)(i) – overwhelmingly favors granting the Cohen Milstein / Quinn Emanuel Motion, and denying the Whatley Drake Motion.

### B.  Quinn Emanuel and Cohen Milstein Have the Experience, Knowledge, and Resources to Prosecute this Case in the Class's Best Interests.

In determining lead counsel, courts should also consider "counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(ii), (iii), and (iv). These factors also compellingly favor granting the Cohen Milstein / Quinn Emanuel Motion.

Cohen Milstein and Quinn Emanuel present a combination that will uniquely benefit the proposed class. Cohen Milstein has unparalleled experience in the plaintiffs' antitrust bar, and offers the resources of the largest antitrust class action practice in the bar. Quinn Emanuel is the largest firm in the United States with a practice devoted exclusively to business litigation, and offers the insights gained by representing both plaintiffs and defendants in complex class action litigation. Both firms boast numerous trial successes. Quinn Emanuel lawyers have tried over 1175 cases, and won approximately 92 percent of them. When representing plaintiffs, Quinn Emanuel's lawyers have garnered over $6.2 billion in judgments and settlements. The firm has won three 9-figure verdicts in the last five years, and secured three other 9-figure settlements during the same period. Quinn Emanuel has substantial experience litigating antitrust actions and other complex litigation, including class actions. Cohen Milstein successfully tried a recent

---

done as a matter of course in price-fixing cases. (Memo in Support of Whatley Drake Motion (Docket No. 42) at 4.) Whatley Drake does not appear to dispute that it has merely copied all substantive allegations on behalf of its client from Quinn Emanuel and Cohen Milstein complaints.

large antitrust class action in this very District. *See In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.). Cohen Milstein is also based in the District, which renders appointment of any separate liaison counsel unnecessary.[7]

Aside from their demonstrated expertise in antitrust and class action law, both firms also have demonstrated a sophisticated understanding of the legal issues particular to the railroad industry generally and fuel surcharges specifically. As discussed in the Memorandum in Support of the Cohen Milstein / Quinn Emanuel Motion, Quinn Emanuel has worked closely with a law firm with significant experience in railroad matters, and has retained a consultant with knowledge of the rail industry and the role of fuel surcharges within the industry. (*See* Docket No. 50 at 5.) Cohen Milstein's amended complaints similarly reflect sophistication with legal issues particular to the railroad industry. Additionally, Cohen Milstein offers the proposed class insights gained from experience in leading the prosecution of antitrust class cases involving fuel surcharges imposed by shippers of freight and cargo. For example, Cohen Milstein currently serves as lead counsel on behalf of proposed classes in antitrust cases involving fuel surcharges in the air cargo[8] and air passenger[9] industries. The knowledge gained from Cohen Milstein's

---

[7]     As addressed further below, Whatley Drake provides no justification for adding Roger M. Adelman as a liaison counsel in this case, particularly given that Whatley Drake does not appear to contest Cohen Milstein's appointment as Interim Class Counsel.

[8]     *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 58-59 (E.D.N.Y. 2006) (appointing Cohen Milstein as one of four Co-Lead Counsel).

[9]     In *In re Int'l Air Transportation Surcharge Antitrust Litigation*, Cohen Milstein was appointed as one of two interim class counsel. *See* Docket No. 42, M:06-cv-01793-CRB (N.D. Cal. Dec. 18, 2006) (attached as Exhibit F).

involvement in related litigation involving fuel surcharges will contribute to its effective representation of the proposed class in this case.[10]

In stark contrast, although Whatley Drake has antitrust experience, Whatley Drake has not demonstrated any significant expertise regarding the legal issues relevant to this particular case. It bears note in this regard that numerous undersigned firms that have assisted Cohen Milstein and Quinn Emanuel in their investigations in this case – including firms that would serve on the executive committee – have demonstrated sophistication with the railroad industry generally and fuel surcharges specifically.[11]

### C.   Cohen Milstein and Quinn Emanuel have the Support of Nearly Every Plaintiff and Firm in the Case.

As the signature block to this brief attests, Cohen Milstein and Quinn Emanuel have the support of nearly all of the plaintiffs and plaintiff's firms in the case. In contrast, Whatley Drake and Roger M. Adelman have only the support of their client and RB Rubber Products, Inc., a plaintiff that only recently filed a tag-along action in this Court, and its counsel.[12]

This support of nearly all plaintiffs and counsel is a compelling reason to (i) appoint Cohen Milstein and Quinn Emanuel as co-lead Interim Class Counsel, and (ii) deny the Whatley

---

[10]     In appointing Cohen Milstein Interim Class Counsel in *In re Int'l Air Transportation Surcharge Antitrust Litigation*, Judge Breyer observed that Cohen Milstein's "involvement in and knowledge of related litigation will be an asset to the plaintiff class in this litigation." *See id.* at 1.

[11]     Kaplan Fox & Kilsheimer LLP ("Kaplan Fox"), for example, also serves as co-lead counsel in the air cargo fuel surcharge litigation. *In re Air Cargo*, 240 F.R.D. at 58. Kaplan Fox is a proposed member of the executive committee.

[12]     RB Rubber Products, Inc. is represented by a firm that appears to specialize in personal injury cases. *See* Schlichter Bogard & Denton website at: http://www.uselaws.com/. Matthew H. Armstrong, the attorney signing the Whatley Drake Motion on behalf of RB Rubber Products, Inc., holds himself out as specializing in "ERISA pension cases for retirees and employees." *See* http://www.uselaws.com/attorney/attorney.php?id=7.

Drake Motion to be added as a third Interim Class Counsel. *Cf. In re Aluminum Phosphide Antitrust Litig.*, Civ. A Nos. 93-2452, *et al.*, 1994 WL 4818487, at *5, 7 (D. Kan. May 17, 1994) ("In designating lead counsel, the court will also give due consideration to the preferences expressed by the parties themselves, through their counsel … Absent persuasive evidence to the contrary, the court assumes that nominations and votes for lead counsel are made in good faith for reasons that benefit the client.").

Most importantly, the near-universal support of plaintiffs and counsel reflects the judgment of class members and prominent counsel that Cohen Milstein and Quinn Emanuel – and these two firms alone – have demonstrated that they will co-lead the prosecution of this case in the proposed class's best interests. These plaintiffs and their counsel have an incentive to place this case in the hands of counsel who will prosecute the case most effectively for the class, and thus their judgment should be credited.[13] On the other hand, the lack of support for the Whatley Drake Motion undermines Whatley Drake's assertion that its addition as a third co-lead is in the proposed class's interests.

> **D.    Quinn Emanuel and Cohen Milstein have Demonstrated Their Leadership Abilities in this Case.**

Quinn Emanuel and Cohen Milstein have already distinguished themselves in this case by representing plaintiffs' counsel in negotiations with defense counsel on preliminary matters. The efforts of Quinn Emanuel and Cohen Milstein have led to: (i) the submission of the Joint Motion for Entry of Pretrial Order No. 1 (Docket No. 5), a consensus proposal agreed to by all plaintiffs

---

[13]    Numerous Plaintiffs supporting Quinn Emanuel and Cohen Milstein, including US Magnesium LLC and Zinifex-Taylor Chemical, Inc., have very significant monetary claims at issue in this litigation. (*See* Memo in Support of Cohen Milstein / Quinn Emanuel Motion (Docket No. 50) at 15.)

and all defendants; and (ii) the submission of the Parties' Joint Statement Pursuant to the Court's

Initial Practice and Procedure Order (Docket No. 45).

Quinn Emanuel and Cohen Milstein acted on behalf of all plaintiffs in developing

plaintiffs' positions regarding the preliminary matters addressed in these submissions and in

negotiating with defendants.  No plaintiff or firm objected to Quinn Emanuel and Cohen Milstein

serving in this leadership role.  Indeed, Whatley Drake expressly authorized Cohen Milstein to

sign and file both submissions on behalf of its client.

This demonstrated leadership ability confirms that Quinn Emanuel and Cohen Milstein

are able to work with all plaintiffs' counsel in the case in an effective manner.  *See In re Payment*

*Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. MDL 05-1720, 2006 WL

2038650, at *2 (E.D.N.Y. Feb. 24, 2006) ("The members of the group [appointed lead interim

class counsel] have already demonstrated their ability to work cooperatively with each other,

with the court, and, most importantly, with the numerous non-lead counsel representing plaintiffs

with very significant interests in this litigation.").  Additionally, the ability of these firms to reach

consensus with defense counsel on these preliminary matters indicates that they will prosecute

the case in an effective and vigorous, yet civil, manner and avoid needless contention.  In

contrast, Whatley Drake has not demonstrated any similar leadership in this case.

**E.    Adding a Third Interim Class Counsel Would Undermine
        Plaintiffs' Counsel's Efforts to Reach Consensus.**

It is widely recognized that it is desirable for plaintiffs' counsel to reach consensus

among themselves about which firm or firms should be proposed for appointment as Interim

Class Counsel.  *See Manual for Complex Litigation* (Fourth) ("Manual") §10.22 (2007);

*Newberg on Class Actions* (4th) ("Newberg") § 9:35 (2002).  This approach, if successful, is best

for all involved.  It allows plaintiffs to begin prosecuting the case on behalf of the proposed class

without delay and allows parties and lawyers with experience and interests in the litigation to determine what is in the best interests of the class.

There are numerous, prominent class action firms in this case. Indeed, it may fairly be said that the firms in this case collectively have led the majority of the significant nationwide antitrust class actions in federal courts in the past few decades. There are several firms in this case that could have chosen to file their own motions for appointment as lead Interim Class Counsel and would have been able to rely on relevant experience that at least matches, and often exceeds, the experience of Whatley Drake. However, these firms agreed not to pursue such competing applications in recognition of the fact that Cohen Milstein and Quinn Emanuel had demonstrated that they were best equipped to prosecute this particular case, in this particular District, in the proposed class's best interests.

It is no small matter that several dozen law firms here – many of them highly prominent and experienced in the antitrust field – have agreed to work cooperatively for the good of their clients and this multidistrict litigation. To award Whatley Drake a leadership position over these firms would not only reward a firm that has played no identifiable role in developing the facts or legal theories supporting this case (*i.e.*, a firm that filed suit based on work product developed painstakingly by others), but would also establish strong motivation for similar conduct in future cases. This would make it increasingly difficult for plaintiffs' counsel to achieve the laudable goal of reaching case management consensus in multidistrict litigation.

Cohen Milstein and Quinn Emanuel have proposed an executive committee of counsel that would assist interim co-lead counsel in the fulfillment of their responsibilities as class counsel. These five firms represent the counsel that Cohen Milstein and Quinn Emanuel believe are best prepared to assist the prosecution of the class's claims in this case, based on their

participation in the case so far and their relevant experience, knowledge, and resources in general:

Freed Kanner London & Millen LLC;[14]

Kaplan Fox & Kilsheimer, LLP;[15]

Heins Mills & Olson, P.L.C.;[16]

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein;[17] and

Gold Bennett Cera & Sidener LLP.[18]

As the attached firm resumes reflect, these firms have the experience, knowledge, and resources to assist lead counsel in prosecuting this case on behalf of the proposed class. This is potentially a very large case and defendants are represented by able counsel with substantial resources. There will certainly be roles for more than just co-leads and executive committee members to play on behalf of plaintiffs.[19] Cohen Milstein and Quinn Emanuel are committed to including multiple firms to work in this case while still prosecuting the claims as efficiently as possible.

Accordingly, Cohen Milstein and Quinn Emanuel respectfully request that, if the Court grants the Cohen Milstein / Quinn Emanuel Motion, the Court also appoint the five firms

---

[14]     *See* Firm Resume at Exhibit G.

[15]     *See* Firm Resume at Exhibit H.

[16]     *See* Firm Resume at Exhibit I.

[17]     *See* Firm Resume at Exhibit J.

[18]     *See* Firm Resume at Exhibit K.

[19]     As noted in the undersigned's opening papers, Cohen Milstein and Quinn Emanuel contemplate a litigation structure that would include counsel serving on major substantive committees. (*See* Memo in Support of Cohen Milstein / Quinn Emanuel Motion (Docket No. 50) at 16.) Cohen Milstein and Quinn Emanuel never intended, and still do not intend, to exclude Whatley Drake from playing a role in the case.

identified above to the executive committee of plaintiffs' counsel.  The composition of this executive committee, which reflects the judgment of Cohen Milstein and Quinn Emanuel as to the five firms best suited to serve on that committee, is also supported by undersigned plaintiffs and counsel.[20]

### F.    Cohen Milstein Can Perform Any Necessary Liaison Responsibilities.

As noted in the undersigned's opening memorandum, Cohen Milstein's appointment as lead counsel would remove any need for appointing a separate liaison counsel, thus eliminating inefficiencies and duplicative efforts.  (*See* Memo in Support of Cohen Milstein / Quinn Emanuel Motion (Docket No. 50) at 10.)   The responsibilities of liaison counsel are primarily administrative, and Cohen Milstein is more than capable of handling such responsibilities in the course of serving as co-lead counsel.  *See* Manual, § 10.221 (noting that liaison counsel is "[c]harged with essentially administrative matters, such as communications between the court and other counsel …, convening meetings of counsel, advising parties of developments, and otherwise assisting in the coordination of activities and positions.").  It would be inefficient and is unnecessary in this case to introduce a separate firm (or lawyer) to stand between co-lead counsel and the Court and between co-lead counsel and other plaintiffs' counsel.

Whatley Drake has made no serious attempt to support its proposal that Roger M. Adelman be appointed as a separate liaison counsel.  Although Mr. Adelman undoubtedly is a fine lawyer, he appears to have limited experience in complex antitrust actions such as this one.

---

[20]    For the reasons set forth herein, it would also be unfair to the undersigned firms, particularly those proposed as executive committee members, which have contributed to the case to date and chosen to work toward a consensus proposal, if Whatley Drake were added to the executive committee as a result of its motion.

Accordingly, to the extent the Court finds that a formal designation of liaison counsel is warranted, Cohen Milstein should be so designated.

## III.    CONCLUSION

For the foregoing reasons, undersigned counsel respectfully request that the Cohen Milstein / Quinn Emanuel Motion be granted, and the Whatley Drake Motion denied.

Dated: February 29, 2008                              Respectfully submitted:

| | |
|---|---|
| By: /s/ Stephen Neuwirth<br>Stephen Neuwirth<br>Daniel Brockett<br>Sami H. Rashid<br>QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>(212) 849-7000 | By: /s/ Michael D. Hausfeld<br>Michael D. Hausfeld (D.C. Bar #153742)<br>Benjamin D. Brown (D.C. Bar #495836)<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>1100 New York Avenue NW<br>Suite 500, West Tower<br>Washington, DC 20005<br>(202) 408-4600 |
| Paul M. Donovan (D.C. Bar # 105189)<br>LAROE, WINN, MOERMAN & DONOVAN<br>1250 Connecticut Avenue, NW, Suite 200<br>Washington, DC 20036<br>(202) 298-8100 | Vincent J. Esades<br>Scott W. Carlson<br>HEINS MILLS & OLSON, P.L.C.<br>3550 IDS Center<br>80 South Eighth Street<br>Minneapolis, MN 55402<br>(612) 338-4605 |
| James E. Cecchi<br>Lindsey H. Taylor<br>CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN<br>5 Beeker Farm Road<br>Roseland, New Jersey 07068<br>(973) 994-1700 | Christian M. Sande<br>CHRISTIAN SANDE LLC<br>2751 Hennepin Avenue South, No. 232<br>Minneapolis, MN 55408<br>(612) 387-1430 |
| *Attorneys for Plaintiff Dust Pro, Inc.*<br>*Attorneys for Plaintiff US Magnesium LLC* | Timothy J. Peters<br>PETERS LAW FIRM<br>2116 Second Avenue South<br>Minneapolis, MN 55404<br>(612) 746-1475 |

Robert N. Kaplan
Gregory Arenson
Linda Nussbaum
KAPLAN FOX & KILSHEIMER
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Lisa J. Rodriquez
TRUJILLO RODRIGUEZ & RICHARDS
8 Kings Highway West
Haddonfield, NJ 08033
(856) 795-9002

*Attorneys for Plaintiff Isaac Industries, Inc.*
H. Laddie Montague, Jr.
Eric Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Anthony J. Bolognese
BOLOGNESE & ASSOCIATES
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
(215) 814-6751

*Attorneys for Plaintiff United Co-operative Farmers, Inc.*

Theodore J. Leopold
Diana Martin
RICCI~LEOPOLD, P.A.
2925 PGA Blvd., Suite 200
Palm Beach Gardens, FL 33410
(561) 684-6500

*Attorneys for Plaintiff Carter Distributing Company*

*Attorneys for Plaintiff Dakota Granite Company*

Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak, Jr.
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500

Mark S. Goldman
GOLDMAN, SCARLATO & KARON, P.C.
101 West Elm Street, Suite 360
Conshohocken, PA 19428
(484) 342-0700

Andrew B. Sacks
SACKS & WESTON
114 Old York Road
Jenkintown, PA 19046
(215) 925-8200

James Shedden
Lawrence W. Schad
SCHAD, DIAMOND & SHEDDEN, P.C.
332 S. Michigan Avenue, Suite 1000
Chicago, IL 60604-4398
(312) 939-6280

*Attorneys for Plaintiff McIntyre Group, Ltd.*

Donald Perelman
FINE, KAPLAN & BLACK R.P.C.
1835 Market Street, 28th Floor
Philadelphia, PA 19103
(215) 567-6565

Tim J. Moore
LAW OFFICES OF MORRIS LAING
Old Town Square
300 N. Mead, Suite 200
Wichita, KS 67202
(316) 262-2671

Stanley D. Bernstein
Mel E. Lifshitz
Ronald J. Aranoff
BERNSTEIN LIEBHARD & LIFSHITZ
10 E. 40th Street, 22nd Floor
New York, New York
(212) 779-1414

*Attorneys for Plaintiff Somerset Industries, Inc.*

Mary Jane Fait
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLC
55 West Monroe Street
Suite 1111
Chicago, IL  60603

*Attorneys for Plaintiff Zinifex Taylor
Chemicals, Inc.*

Robert N. Kaplan
Gregory Arenson
Linda Nussbaum
KAPLAN FOX & KILSHEIMER
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Anthony J. Bolognese
BOLOGNESE & ASSOCIATES
1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
(215) 814-6750

Joseph C. Kohn
KOHN SWIFT & GRAF
One South Broad Street
Suite 2100
Philadelphia, PA
(215) 238-1700

*Attorneys for Plaintiff Lancaster Foundry
Supply Co.*

Steven A. Asher
Robert S. Kitchenoff
WEINSTEIN, KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 545-7200

Joseph Goldberg
FREEDMAN BOYD DANIELS
HOLLANDER GOLDBERG & IVES, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
(505) 842-9960

Simon B. Paris
Patrick Howard
SALTZ, MONGELUZZI, BARRETT &
BENDESKY, P.C.
1650 Market Street
One Liberty Place, 52nd Floor
Philadelphia, PA 19103
(215) 496-8282

Thomas A. Muzilla
THE MUZILLA LAW FIRM, LLC
Tower at Erieview
1301 East 9th Street, Suite 1100
Cleveland, OH 44114
(216) 458-5880

Christopher Hayes, Esq.
225 South Church Street
West Chester, PA 19382
(610) 431-9505

*Attorneys for Plaintiff GVL Pipe & Demolition,
Inc.*

Mark A. Griffin
Raymond Farrow
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

James E. Cecchi, Esq.
Lindsey H. Taylor, Esq.
CARELLA, BYRNE, BAIN, GILFILLAN,
    CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Christopher A. Seeger
Stephen A. Weiss
Jonathan Shub
SEEGER WEISS LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102
(215) 564-2300

*Attorneys for Plaintiff Blue Grass Tobacco
Company*

Joseph T. Piscitello
LAW OFFICES OF JOSEPH T. PISCITELLO
234 Delancey Street
Philadelphia, PA 19106
(215) 636-9988

*Attorneys for Plaintiff Ferraro Foods of North
Carolina, LLC*

Michael J. Boni
Joanne Zack
Joshua D. Snyder
BONI & ZACK LLC
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
(610) 822-0200

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street
Suite 4500
Jamestown, NY   14701
(716) 483-3732

*Attorneys for Plaintiff Strates Shows, Inc.*

James C. Dodge
SHARP McQUEEN, P.A.
207 S. Inman
P.O. Box 935
Sublette, KS 67877
(620) 675-2272

Isaac L. Diel
SHARP McQUEEN, P.A.
Financial Plaza
6900 College Blvd. – Suite 285
Overland Park, KS 66211
(913) 661-9931, Ext. 102

*Attorneys for Plaintiff Sublette Cooperative,
Inc.*

Barry Nace (D.C. Bar #130724)
PAULSON & NACE
1615 New Hampshire Avenue, N.W.
Washington, DC 20009-2520
(202) 463-1999

Bruce L. Simon
Esther L. Klisura
PEARSON, SIMON, SOTER, WARSHAW &
PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
(415) 433-9000

Clifford H. Pearson
Gary S. Soter
Daniel L. Warshaw
PEARSON, SIMON, SOTER, WARSHAW &
PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
(818) 788-8300

Thomas V. Girardi
GIRARDI KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017-1904
(213) 977-0211

*Attorneys for Plaintiff Donnelly Commodities
Inc.*

Steig D. Olson
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
(212) 838-7797

*Attorney for Dad's Products Company, Inc.*

Paul F. Bennett
Steven O. Sidener
Joseph M. Barton
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
(415) 777-2230

*Attorneys for Plaintiff Bar-Ale, Inc.*

Eugene A. Spector
Jay S. Cohen
William G. Caldes
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300

Philip A. Steinberg
124 Rockland Avenue
Bala Cynwyd, PA 19004
(610) 664-0972

John Phillip McCarthy, Esquire
217 Bay Avenue
Somers Point NJ 08244
(609) 653-1094

Jeffrey A. Brodkin, Esquire
1601 Market Street
Suite 2300
Philadelphia, PA 19103
(215) 567-1234

John C. Murdock
Theresa Groh
MURDOCK GOLDENBERG SCHNEIDER &
GROH, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
(513) 345-8291

*Attorneys for Plaintiff Quality Refractories
Installation, Inc.*

Gerard J. Rodos
Mark R. Rosen
Jeffrey B. Gittleman
Beth R. Targan
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600

Williams J. Schifino, Jr.
Daniel P. Dietrich
WILLIAMS, SCHIFINO, MANGIONE &
STEADY, PA.
One Tampa City Center, Suite 3200
201 North Franklin St.
Tampa Fl. 33602
(813) 221-2626

*Attorneys for Plaintiff Cedar Farms Co., Inc.*

Terry Gross
Adam C. Belsky
Monique Alonso
GROSS & BELSKY LLP
180 Montgomery Street, Suite 2200
San Francisco, California 94104
(415) 544-0200

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine St., Suite 1700
San Francisco, California 94111-5618
(415) 544-0200

Robert G. Pahlke
PAHLKE, SMITH, SNYDER, PETITT &
EUBANKS
1904 First Avenue
Post Office Box 1204
Scottsbluff, Nebraska 69363-1204

*Attorneys for Plaintiff Stateline Bean
Producers*

James R. Malone
Michael D. Gottsch
Joseph G. Sauder
Benjamin F. Johns
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
(610) 642-8500

Bernard Persky
Christopher J. McDonald
LABATON SUCHAROW & RUDOFF LLP
100 Park Avenue
New York, New York, 10017
(212) 907-0700

Robert Schachter
Joseph Lipofsky
Paul Kleidman
ZWERLING, SCHACHTER & ZWERLING
LLP
41 Madison Avenue
New York, N.Y. 10010
(212) 223-3900

Marvin A. Miller
Lori A. Fanning
Matthew E. Van Tine
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
(312) 332-3400

L. Kendall Satterfield
FINKELSTEIN THOMPSON LLP
The Duvall Foundry
1050 30th Street, N.W.
Washington, D.C. 20007
(202) 337-8000

|  | Bryan L. Clobes<br>Ellen Meriwether<br>Jennifer Winter Sprengel<br>CAFFERTY FAUCHER LLP<br>1717 Arch Street<br>Philadelphia, PA 19103<br>(215) 864-2800<br><br>*Attorneys for Plaintiff Nizhnekamskneftekhim USA, Inc.*<br><br>Steven A. Skalet<br>Craig L. Briskin<br>MEHRI & SKALET, PLLC<br>1250 Connecticut Ave. NW, Suite 300<br>Washington, DC 20036<br>(202) 822-5100<br><br>*Attorneys for Plaintiff M.C. Dixon Lumber Company, Inc.* |
|---|---|

# EXHIBIT A

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Daniel Brockett
David Azar
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Richard Scruggs
Sidney Backstrom
SCRUGGS LAW FIRM, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Attorneys for Plaintiff

Stephen Neuwirth
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Paul Donovan
LAROE, WINN, MOERMAN &
DONOVAN
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DUST PRO, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND KANSAS CITY SOUTHERN RAILWAY COMPANY,<br><br>Defendants. | Civil Action No.<br><br><br><br>**CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Dust Pro, Inc. ("Dust Pro" or "Plaintiff"), an Arizona corporation located in Phoenix, Arizona, individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

## NATURE OF THE ACTION

1.    This is an antitrust class action charging five United States based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiff brings this action on behalf of itself and an alleged class of direct purchasers who purchased unregulated rail freight transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period," which will also include the period from the date of this filing to the date of class notice) and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law. Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2.    Plaintiff alleges that during the Class Period, defendant railroads conspired to fix, raise, maintain, or stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Throughout the Class Period, Defendants maintained uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

3.    As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for unregulated rail freight transportation services and injured plaintiff and each Class member in their business and property. Plaintiff and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4.    Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

5.    Plaintiff Dust Pro, Inc. is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona, 85034.

6.    During the class period, Dust Pro manufactured and distributed soil stabilizers.

7.    Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on plaintiff in connection with that unregulated rail freight transportation. The prices plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations. Plaintiff asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

8.      Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. In New Jersey, CSX maintains business offices at 1 Pennsylvania Ave, Kearny, New Jersey 07032. CSX also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield, through which it originates and terminates rail traffic within this District. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

9.      Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. In New Jersey, NS maintains business offices at 125 County Road, Jersey City, New Jersey 07307. NS also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

10.      Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region is Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark.

11.      Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the Newark area tens

4

of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

12.    Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. In New Jersey, BNSF's wholly-owned subsidiary, BNSF Logistics, LLC, maintains business offices at 375 N. Main Street, Suite C-1, Williamstown, New Jersey 08094. BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

13.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. In New Jersey, UP maintains at least one employee or agent, though the business address is currently unknown. UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

14.    Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. In New Jersey, KCS maintains business offices at 1 Executive, Somerset, New Jersey 08873. It also originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. KCS operates a major freight railroad in ten central and southeastern states.

## JURISDICTION AND VENUE

15.    This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15 , to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.    Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

17.    Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391. Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

18.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of

the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated. The "Class"

is defined as:

> All purchasers of rail freight transportation services from Defendants
> (the "Class"), through use of private railroad-shipper contracts or
> through other means exempt from rate regulation under federal law,
> as to which Defendants assessed a Rail Fuel Surcharge, at any time
> from at least as early as July 2003 to the present (the "Class Period").
> Excluded from the Class are Defendants, any subsidiaries or affiliates
> of Defendants, and any of Defendants' co-conspirators, whether or
> not named as a Defendant in this Complaint.

20.    The Class is so numerous that joinder of all members is impracticable. Given the

magnitude of the commerce involved, the members of the Class are geographically dispersed, and

joinder of all class members would be impracticable. While the exact number of Class members is

unknown to plaintiff at this time, plaintiff believes that there are, at a minimum, thousands of

members of the Class and that their identities can be readily ascertained from Defendants' books and

records.

21.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff

and all members of the Class directly purchased unregulated rail freight transportation from

Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges

established and maintained by the actions of Defendants in connection with the restraint of trade

alleged herein. Plaintiff and the members of the Class have all sustained damage in that they paid

inflated prices for the unregulated rail freight transportation services at issue as a result of

Defendants' conduct in violation of federal law.

22.    Plaintiff will fairly and adequately protect the interests of the members of the Class

and have retained counsel competent and experienced in class action and antitrust litigation.

23.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.      Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services  purchased by the Class;

      b.      Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

      c.      Whether Defendants' conduct violated the federal antitrust laws; and

      d.      Whether Defendants' conduct caused injury to the business and property of plaintiff and the Class and, if so, the proper measure of damages.

24.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.   The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

25.    The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable.  The

amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

26.    During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The US market for rail transportation services is estimated at more than $51 billion in 2006.

27.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

28.    The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

29.    Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980. This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

30.    Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC. Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

31.    Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). Five of these railroads -- the Defendants in this case -- operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total revenue.

32.    Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

33.    The railroad industry today does not behave like a competitive market at all. Instead, it is dominated by the Defendants in this case. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids." Frank N. Wilner, *A Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

### THE RAILROADS INTRODUCE FUEL SURCHARGES

34.    By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review. Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a stark choice: build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity. The railroads chose the latter course and seized on the rail fuel surcharge as the means to implement their price fixing conspiracy.

35.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. In fourth quarter 2002, the AAR -- which is controlled by the major Class I railroads -- published, for the first time, a RCAF without fuel (i.e., a cost escalation index without fuel as a component). This was not done by accident or mistake. It was a conscious decision made by the AAR to remove fuel costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

36.     Predictably, that is what happened. Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill. When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

## DEFENDANTS' PRICE FIXING CONSPIRACY

37.     Commencing in or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments. The key element of this price fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (i.e., revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

11

38.    Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

39.    Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites. They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

40.    As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels throughout the Class Period.

41.    On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

42.    The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

43.     Defendants applied the same unreasonable fuel surcharge practices to the private rail

freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE FIXING CONSPIRACY

44.     The essential element of Defendants' conspiracy was an agreement to compute Rail

Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was

applied, but as a multiplier percentage of the base rate charged for the rail freight transportation

involved.  Defendants applied these surcharges not only to published tariff rates, but to private

contracts, and other traffic, not subject to rate regulation under federal law (i.e., the unregulated rates

at issue here).

45.     Defendants began to implement their conspiracy at least as early as June 2003 when

the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices

relative to Rail Fuel Surcharges.    Prior to this time, the UP carload fuel surcharge was adjusted

monthly based on the West Texas Intermediate ("WTI") Crude Oil Index.  The BNSF carload fuel

surcharge was based on the US Department of Energy (DOE) On-Highway Diesel Fuel Price Index

("HDF").  In or about June 2003, however, the UP switched to the HDF Index pursuant to an

agreement with the BNSF.    From that point on, the Western Railroads moved in lockstep and

charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

46.     The Western Railroads agreed to administer the HDF index in precisely the same

way.  Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was

lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35 per

gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent

increase above $1.35 per gallon.  So, for example, if the HDF Index rose to $1.55 per gallon, the

Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

47.    The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

48.    The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

49.    Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

50.    The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the class period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |

| MONTH | BNSF | UP |
|-------|------|-----|
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |

| MONTH | BNSF | UP |
|-------|------|-----|
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

51.    Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier.  (Defendants CSX, NS and KCS collectively are the "Eastern Railroads").  The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*.  Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

52.    Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel.  When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel.  So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent.  The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

53.    The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby adopting fuel surcharge price timing used by the Western Railroads.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same

16

fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

54.    The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

55.    The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period. KCS has different operations and fuel consumption patterns from the larger US railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

56.    The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the class period, but were identical starting in February 2004, and they also were identical to those of the KCS starting in June 2005, when the KCS joined the conspiracy:

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |
| Nov-03 | 2.4% | 2.0% | |

| MONTH | CSX | NS | KCS |
|-------|-----|-----|-----|
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |

57.     In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a

percentage of operating cost and fuel efficiency differs widely among the Defendant railroads.

Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

independently price their Rail Fuel Surcharges to arrive at the identical percentage month after

month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

## ADDITIONAL EVIDENCE OF A CONSPIRACY

58.     Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.     The railroad industry is highly concentrated. Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic. Such high concentration facilitates the possibility of a price fixing cartel.

b.     There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c.      Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

d.      The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e.      The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).[1] The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

---

[1]      A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line Railroad Co.; and (7) UP.  The Soo Line Railroad is owned by Canadian Pacific Railway.  The Grand Trunk Corporation is owned by the Canadian National Railway.

59.     Apart from these structural market features, Defendants did not behave as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

60.     Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Defendants refused to address the concerns of their customers.

61.     At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

62.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

63.     Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, Defendants moved to what is known

in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

64.     Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

65.     Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

66.     Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

**ANTITRUST INJURY TO PLAINTIFF AND THE CLASS**

67.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

      a.    The Rail Fuel Surcharges charged to plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

      b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation;  and

      c.    competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

68.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT I**

**(Violation Of § 1 Of The Sherman
Act And § 4 Of The Clayton Act)**

69.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

70.     Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.     The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.     Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

73.     The contract, combination or conspiracy has had the following effects:

    a.     Prices charged to plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

    b.     Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

    c.     competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

74.    As a proximate result of Defendants' unlawful conduct, plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be denominated as class representative, and that plaintiff's counsel be appointed as counsel for the Class;

(2)    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)    That plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of plaintiff and each and every member of the Class;

(4)    That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5)    That plaintiff and the Class recover treble damages, as provided by law;

(6)    That plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7)    For such further relief as the Court may deem just and proper.

> CARELLA, BYRNE, BAIN, GILFILLAN,
> CECCHI, STEWART & OLSTEIN
> Attorneys for Plaintiff
>
> By:____/s/ James E. Cecchi_____
>          JAMES E. CECCHI

Dated:  May 14, 2007

Stephen Neuwirth
Quinn Emanuel Urquhart Oliver
        & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Daniel Brockett
David Azar
Quinn Emanuel Urquhart Oliver
      & Hedges, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

Richard Scruggs
Sidney Backstrom
Scruggs Law Firm, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury

trial as to all issues triable by a jury.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff


By:____/s/ James E. Cecchi_____
     JAMES E. CECCHI

Dated:  May 14, 2007

## CERTIFICATION

Counsel for Plaintiff hereby certifies that, to the best of their knowledge, there are no other

civil actions or arbitration proceedings pending regarding the subject matter hereof and that none are

contemplated, and that all parties who should be joined have been joined.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff


By:____/s/ James E. Cecchi_____
     JAMES E. CECCHI

Dated:  May 14, 2007

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr>
<td>

MCINTYRE GROUP, LTD.,
24601 Governors Highway,
University Park, IL 60466,
on behalf of itself and all others similarly
situated,

Plaintiff,

v.

ASSOCIATION OF AMERICAN
RAILROADS, BNSF RAILWAY
COMPANY, CSX TRANSPORTATION,
INC., KANSAS CITY SOUTHERN
RAILWAY COMPANY, NORFOLK
SOUTHERN RAILWAY COMPANY, AND
UNION PACIFIC RAILROAD
COMPANY,

Defendants.

</td>
<td>

Civil Action No. _____


CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

</td>
</tr>
</table>

Plaintiff McIntyre Group, Ltd. ("McIntyre" or "Plaintiff"), individually and on behalf of

a class of all those similarly situated, brings this action for damages under the antitrust laws of

the United States against Defendants Association of American Railroads, BNSF Railway

Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern

Railway Company, and Union Pacific Railroad Company, alleging as follows:

### DEFINITIONS

1.      "Class I Railroads" are line haul freight railroads with 2005 operating revenue in

excess of $319.3 million.  There are currently seven Class I railroads operating in the United

States: (1) BNSF Railway Company, (2) CSX Transportation, Inc., (3) Grand Trunk

Corporation, (4) Kansas City Southern Railway Company, (5) Norfolk Southern Railway

Company, (6) Soo Line Railroad Company, and (7) Union Pacific Railroad Company. The Soo

Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned

by the Canadian National Railway.

2.      "Defendants" refers to all six named Defendants in this action, while "Railroad

Defendants" refers to the five railroad company Defendants (BNSF, CXS, Kansas City Southern,

Norfolk Southern, and Union Pacific).

3.      "Rail Fuel Surcharge" or "Surcharge" is a separate fee charged to shippers by the

Railroad Defendants for agreed-upon freight transportation, ostensibly to compensate for

unforeseen increases in the cost of fuel.

4.      "Unregulated freight" means rail freight transportation services where the rates

are set by private contracts or through other means exempt from rate regulation under federal

law.

## NATURE OF THE ACTION

5.      This is an antitrust class action alleging that Defendants conspired to fix, raise,

maintain, or stabilize prices of unregulated rail freight transportation services sold in the United

States by imposing agreed upon "Rail Fuel Surcharges" (as defined above) on rail freight

shipments from July 1, 2003 to the present (the "Class Period"), in violation of Section 1 of the

Sherman Antitrust Act.

6.      Plaintiff alleges that Defendants computed the Rail Fuel Surcharges as a

percentage of the customers' base freight rate, rather than actual fuel consumption, and agreed

upon the use of common indices and trigger points for adjusting the percentages monthly.

Defendants published Rail Fuel Surcharges on the Internet to facilitate coordination and the

detection of any deviation from collusive pricing. Defendants maintained uniformity of Rail

2

Fuel Surcharges throughout the Class Period by agreeing to compute the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices, timing, and trigger points for adjusting the percentages.

7.    Although the purported purpose of a Rail Fuel Surcharge is to allow recovery by a railroad of an unanticipated fuel cost increase, Defendants, by working in concert, were able to use Rail Fuel Surcharges as revenue generators and profit centers.

8.    The Railroad Defendants would not have naturally implemented and adjusted the Rail Fuel Surcharges independently.  By working in concert, Defendants were able to set and maintain Rail Fuel Surcharges at inflated levels.

9.    During the Class Period, railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Railroad Defendants.  For example, after concluding in 2003 that Rail Fuel Surcharges charged by the Railroad Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives."  The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition."

10.    As a result of this price-fixing conspiracy, Defendants restrained competition for unregulated rail freight transportation services and caused injury to the business and property of Plaintiff and members of the proposed Class.  Plaintiff and the Class members paid higher prices for unregulated rail freight transportation than would have been the case in the absence of Defendants' unlawful activities alleged herein.

11.    Plaintiff seeks damages on behalf of itself and the proposed Class for Rail Fuel Surcharges imposed on rail freight shipments made pursuant to private transportation contracts

and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from any fuel surcharges imposed on rate-regulated freight transportation.

## JURISDICTION AND VENUE

12.     Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13.     Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

14.     Venue is proper in this district pursuant 28 U.S.C. § 1391(b) and (c) and by Section 12 of the Clayton Act, 15 U.S.C. § 22.

15.     Defendants maintain offices, have agents, or transact business within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

16.     This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PARTIES

17.     Plaintiff McIntyre Group, Ltd. is a corporation organized under the laws of the State of Illinois, with its principal place of business at 24601 Governors Highway, University Park, IL 60466. McIntyre is a leading manufacturer of high quality surficants, polymers, chemical specialties, and cosmetic preservatives for the formulation of personal care, household, industrial, and institutional products

18.     McIntyre purchased unregulated rail freight transportation service directly from one or more of the Defendants during the Class Period and was assessed a Rail Fuel Surcharge.

19.     Defendant Association of American Railroads ("AAR") is a trade association located in Washington, D.C.  Among other things, AAR publishes key indexes used to compute unregulated rail freight charges, engages in lobbying on behalf of its members, gathers and maintains a variety of information relating to rail freight service, and issues publications.  AAR offers various tiers of membership, with "full membership" being available only to Class I railroads.  It is governed by a board of directors that includes the top executives of each Class I railroad in the United States.  According to AAR's Internet site:  "Full membership offers the broadest array of AAR member benefits, including legislative and legal matters, safety, operations, research, and communications.  Benefits include all those provided to Associate Members, as well as additional information provided through AAR committees.  Full member assessments are set on a sliding scale based on the member's gross freight service revenues (or passenger revenues, in the case of passenger railroads). Full member railroads with gross freight revenues exceeding certain thresholds are eligible for a seat on AAR's Board of Directors."  The Railroad Defendants named in this action are all full members of the AAR and their chief executive officers are members of the AAR board of directors.

20.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

21.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

22.     Defendant Kansas City Southern Railway Company ("KCSR") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. KCSR owns and operates major freight railroad in ten states across the central and south central United States.

23.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Vandorn St., Washington, D.C. 20001 and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

6

24.     Defendant Union Pacific Railroad Company ("UP") has its principal place of

business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in

the United States. UP serves primarily the western two-thirds of the United States and maintains

coordinated schedules with other rail carriers to handle freight to and from other parts of the

country. UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on behalf of itself and all others similarly situated (the

Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3). The Class is

defined as follows:

> All purchasers of rail freight transportation services from
> Defendants, through use of private railroad-shipper contracts or
> through other means exempt from rate regulation under federal
> law, as to which Defendants assessed a Rail Fuel Surcharge, at any
> time from at least as early as July 2003 to the present (the "Class
> Period"). Excluded from the Class are Defendants, any subsidiaries
> or affiliates of Defendants, any of Defendants' co-conspirators,
> whether or not named as a Defendant in this Complaint, and all
> governmental entities (the "Class").

26.     Plaintiff does not know the exact size of the Class, since such information is in the

exclusive control of the Defendants. Due to the nature of the trade and commerce involved,

however, Plaintiff believes that the Class is so numerous and geographically dispersed

throughout the United States as to render joinder of all Class members impracticable. Plaintiff

further believes the member of the Class can be readily ascertained from Defendants' books and

records.

27.     Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and all members of the Class directly purchased unregulated rail freight transportation

from Defendants, on which Defendants imposed the artificially inflated Rail Fuel Surcharges.

Plaintiff and Class members sustained damages by paying inflated prices for the unregulated rail freight transportation as a result of Defendants' illegal conduct.

28.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

29.    There are questions of law or fact common to the Class, including but not limited to the following:

      a.    Whether Defendants conspired, contracted, or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

      b.    Whether Defendants' conduct violated the federal antitrust laws; and

      c.    Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

30.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

31.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons

similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

## FACTUAL ALLEGATIONS

### The Heavily Regulated Railroad Industry Is Deregulated, Beginning In The Late 1970s

32.    In the 1970s, the freight railroad industry—then closely regulated by the federal government—was experiencing serious economic trouble with rising operating costs, financial losses, and corporate bankruptcies. In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980, which together largely deregulated the industry.

33.    As a result of this legislation, railroads and shippers could enter into private rail freight contracts. In contracts for rail freight transportation in markets where railroads faced effective competition or in contracts where rates were privately negotiated between the railroad and the shipper, the freight rates are unregulated by government agencies. Because shippers in some areas may not have competitive alternatives ("captive shippers"), Congress gave the Interstate Commerce Commission ("ICC") authority to establish a process under which captive shippers could obtain relief from unreasonably high rates. The ICC was later abolished by the Interstate Commerce Commission Termination Act of 1995, and its relevant rail freight regulatory functions were transferred to the Surface Transportation Board ("STB").

34.    The STB continues to regulate certain aspects of the freight railroad industry. Railroads, for example, have a common carrier obligation to provide rail service upon reasonable request. 49 U.S.C. 11101(a). They can provide that service under rates and terms agreed to in a confidential contract with the shipper, 49 U.S.C. 10709, or under openly available common carriage rates and service terms. 49 U.S.C. 11101. Rates and service terms established by

9

contract are generally not subject to STB regulation, except for limited protections against discrimination involving agricultural goods.   49 U.S.C. 10709(b), (c).

35.    This lawsuit deals only with rail freight not regulated by the STB, which comprises approximately 80 percent of the rail freight market.

### After Deregulation, The Rail Freight Industry Became Highly Concentrated

36.    The railroad freight industry became highly concentrated after Congress deregulated railroads.  In 1976, there were 63 Class I railroads operating in the United States.  By early 2000, the railroad industry had become so concentrated that further consolidation was unlikely if not impossible.  On March 17, 2000, the STB imposed a moratorium on any major railroad merger proposals.

37.    Currently, the five Railroad Defendants named in this action operate more than 90 percent of all domestic railroad track and are responsible for more than 90 percent of the total ton-miles of Class I rail freight shipped in the United States.

### The Railroads Abandoned Freight Contracts With Fuel-Cost-Escalation Provisions, Thereby Facilitating Their Conspiracy To Fix Rail Freight Transportation Prices Using Agreed Upon Rail Fuel Surcharges.

38.    As railroads contracted for freight transportation services, they increasingly required shippers to enter freight contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF").  The RCAF is published by Defendant AAR's Policy and Economics committee based in Washington, D.C., and includes fuel prices as a component of the cost escalation factor.  In the fourth quarter of 2002, the AAR—which is controlled by the major Class I railroads—published a RCAF without fuel as a component, which they called the "All Inclusive Index Less Fuel ("ALL-LF").  The ALL-LF facilitated Defendants' ability to assess separate Rail Fuel Surcharges and to coordinate that practice.

39.     Following publication of the ALL-LF, the Railroad Defendants instituted Rail Fuel Surcharges as a separate line item on bills submitted to shippers.  When the price of oil rose in late 2003 and early 2004, Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues without having to renegotiate individual contracts.  Of course, success was only possible if all the Railroad Defendants played along and did not undercut each other.

40.     In or about late March 2003, top executives of the five Railroad Defendants attended the Spring 2003 National Freight Transportation Association ("NFTA") meeting at the Greenbrier Resort in West Virginia, which is owned by Defendant CSX.  According to its Internet site, the "object of the [NFTA] is to provide a forum for transportation executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry.

41.     NFTA meetings facilitate the development of personal relationships amongst the attendees.  The Spring NFTA 2003 meeting allowed Defendants' top executives ample cover to meet and conspire at meals, on the golf course, and at other resort facilities.  Thus, the meeting provided numerous opportunities for Defendants' top executives to discuss and agree upon the specifics of the Rail Fuel Surcharges that were then implemented in or around July 2003.

42.     The key element of Defendants' price-fixing conspiracy was an agreement by the Railroad Defendants to act in concert with one another in demanding Rail Fuel Surcharges from shippers and by agreeing to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate paid by customers.

43.     Such a revenue-based fuel surcharge bore no direct relationship to actual increases in fuel costs.  According to the STB, the Railroad Defendants have essentially

conceded that the Surcharges are not a means of recovering increased fuel costs associated with the movement of freight, but are rather a "revenue enhancement measure" intended to achieve across-the-board increases in the prices charged by Defendants for rail freight transportation. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 at 7 (Jan. 25, 2007).

44.     The Railroad Defendants implemented and maintained their agreement by publicly announcing surcharge increases and posting the monthly fuel surcharge percentages on their Internet sites. This allowed them to monitor and enforce Rail Fuel Surcharge levels.

45.     As a result of Defendants' concerted action, prices of rail freight transportation services charged to Class members were raised to or maintained at supracompetitive levels throughout the Class Period.

46.     Further, AAR meetings and events provided cover for the Railroad Defendants to discuss, agree upon, and maintain a common course of action with respect to Rail Fuel Surcharge.

### Implementation Of The Rail Fuel Surcharge Agreement

47.     As early as June of 2003, BNSF and UP agreed to coordinate their Rail Fuel Surcharge prices. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index while the BNSF carload fuel surcharge was based on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June of 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From then on BNSF and UP moved in lockstep with each other both charging the exact same Rail Fuel Surcharge for each month of the Class Period.

48.     BNSF and UP agreed to administer the HDF index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose 50 cents to $1.85 per gallon, BNSF and UP would apply a surcharge of 5 percent. The surcharge would increase/decrease 10 percent for every $1 dollar increase/decrease in the HDF Index and corresponding increments thereof.

49.     BNSF and UP also coordinated when they would change their fuel surcharge. They agreed that the Surcharge would be announced the first day of the month following a change in the Index and would become effective the month after that. So, for example, if the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

50.     Using the HDF index, BNSF and UP moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

51.     The Fuel Surcharge Percentages charged by BNSF and UP for carload shipments varied before the Class Period began, but were identical starting in July, 2003.

52.     The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary were the decisions to set the trigger point at $1.35 per gallon, announce the surcharges on the first day of the month following a change in the Index, and to apply the surcharge in the second calendar month after the change in the Index. It is not plausible to suggest that such conduct

stems from independent decision-making. Rather, the parallel conduct in conjunction with other factors evidences the existence of an agreement in violation of Section 1 of the Sherman Act. It defies reason to suggest that BNSF and UP, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would be announced, (6) the dates on which Surcharges would become effective, and (7) the amount of the Surcharges.

53.    In short, the fact that BNSF and UP both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

54.    In February 2004 or earlier, Defendants CSX and NS agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*. Indeed, not only did these railroads agree to use the WTI index (as opposed to many other available indices); they too agreed to administer the index in precisely the same way.

55.    Specifically, after an initial period in which their selected WTI trigger price differed, CSX and NS agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel

Surcharge would be adjusted upward/downward by 2 percent for every $5 increase/decrease in the WTI average price.

56.    CSX and NS also coordinated when they would change their fuel surcharge—two calendar months after the WTI index had adjusted, thereby using the fuel surcharge price timing used by BNSF and UP. For example, if the WTI average price exceeded $23 per barrel in January, the CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, CSX and NS could apply exactly the same fuel surcharge percentage month after month. CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

57.    The net result is that there was uniformity among CSX and NS in the monthly surcharge percentages they charged customers for most of the Class Period.

58.    The Fuel Surcharge Percentages charged by CSX and NS for carload shipments varied before the Class Period, but were identical starting in February 2004, and they also were identical to those of KCSR starting in June of 2005, when KCSR joined the conspiracy.

59.    The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. Given Defendants' convergence on such arbitrary conclusions, Defendants' conduct cannot stem from independent decision. Rather, Defendants' conduct is evidence of an agreement in violation of § 1. It defies logic that Defendants, facing myriad differences in economic factors and business demands and requirements, would independently make the same decisions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for

15

application of the Surcharges, (5) the dates on which Surcharges would become effective, and (6)
the amount of the Surcharges.

60.      In short, the fact that CSX and NS both chose and adhered to this same
combination of features for their Rail Fuel Surcharge programs shows that they coordinated their
behavior.  The similarities are too precise and too comprehensive to have been arrived at
independently.

61.      The Railroad Defendants operate geographically dispersed, multibillion dollar
corporations with thousands of locomotives, and other pieces of heavy railroad equipment, and
have massive fuel requirements.  The Railroad Defendants acquire fuel at different prices at
different times to meet their various business requirements.  The specific minutiae of
Defendants' parallel behavior as described herein could not have resulted from chance,
coincidence, independent responses to common stimuli, or mere interdependence unaided by an
advanced understanding among the parties.

62.      The Railroad Defendants' use of the Rail Fuel Surcharges was not routine free
market conduct.  In addition to the practical impossibility that each Railroad Defendant would
make so many of the very same Rail Fuel Surcharge business decisions, such a convergence
would simply not occur in an free market.  In a truly competitive market, the levying of
surcharges by one or a few railroads based on a percentage of a customer's base rate—bearing no
relation to the actual costs of fuel consumed—should create competition on surcharges by other
railroads seeking to gain business.  Here, the Railroad Defendants did not compete and the only
plausible explanation for that lack of competition is that the Railroad Defendants had entered
into an unlawful agreement.

**Defendants Used Surcharges To Fix Rail Freight Prices
And Increase Profits, Not To Recover Costs**

63.     Defendants, from the beginning of the Class Period and before, fixed the price of

the Rail Fuel Surcharges in order to artificially increase the prices of rail freight transportation

services. The surcharges were not a cost recovery mechanism, they were a revenue generating

profit center. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to

the shipper, the Railroad Defendants ensured that there would be no real correlation between the

rate increase and the increase in fuel costs for the particular shipment to which the surcharge was

applied.

64.     By using the price-fixed Rail Fuel Surcharges to set prices for rail freight

transportation services, the Railroad Defendants realized billions of dollars in extra revenues

during the Class Period from Plaintiff and members of the proposed Class.

**The STB Ruled That Defendants' Surcharges Constitute An "Unreasonable Practice"**

65.     In January 2007, the STB served an administrative decision concluding that the

railroads' practice of computing Rail Fuel Surcharges as a percentage of base rates for regulated

rail freight transport was "a misleading and ultimately unreasonable practice" because the fuel

surcharges are not tied to the fuel consumption associated with the individual movements to

which they are applied. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex

Parte No. 661 (Jan. 25, 2007). The STB directed railroads to stop this unreasonable practice. *Id.*

66.     Although the STB's decision applied only to regulated freight, the Railroad

Defendants followed the same unreasonable practices with regard to the unregulated freight that

is the subject of this complaint.

67.    The STB has also issued a Notice of Proposed Rulemaking in which it has

proposed rules to monitor the freight railroads' monthly fuel costs, consumption, and revenue

from Rail Fuel Surcharges.

## ANTITRUST "PLUS FACTORS"

68.    Antitrust "plus factors" further support the allegation that Defendants agreed to

fix prices for Rail Fuel Surcharges.  The rail transportation industry is marked by certain

structural and other characteristics that make a price-fixing cartel feasible:

    a.    The railroad industry is highly concentrated.  The Railroad Defendants in

this case are the five largest remaining domestic Class I railroads following decades of

mergers and consolidation.  The Railroad Defendants account for more than 90 percent of

the nation's rail freight traffic.  Such high concentration facilitates the possibility of a

price-fixing cartel.

    b.    There are significant barriers to entry into the railroad industry.  To

compete, railroads must invest in a vast network of tracks, stations, yards, and switching

facilities.  Such infrastructure takes decades to develop and requires onerous regulatory

and environmental reviews and approval.  Land or easements are often needed,

necessitating the involvement of multiple local governments and the exercise of eminent

domain power.  Because rail infrastructure is of minimal value for other purposes, and

rail networks are difficult to assemble, the fixed costs are largely sunk, creating

significant entry barriers.  Entry also requires that a new entrant capture a significant

market share from existing carriers.  Entry is thus both expensive and risky.

    c.    The Rail Fuel Surcharges were highly standardized.  The Railroad

Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then

published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

    d.    The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate-making committees." Although these bodies disappeared from public view after deregulation, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

    e.    The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to Class I railroads operating in the United States, five of which are Defendants in this action. The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

    f.    Defendants acted in contravention of their individual economic interests. The Railroad Defendants did not behave as if they were in a competitive market:

    i)    Defendants failed to compete on the Surcharges. In a truly competitive market, rational railroads levying surcharges based on a percentage of a customer's freight rate—bearing no relation to the actual costs of fuel consumed and therefore not

actually crucial to cost recovery—would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Railroad Defendants that the Rail Fuel Surcharges were "not negotiable." Several national shipper organizations met with each of the Railroad Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Railroad Defendants refused to address the concerns of their customers.

ii)    Defendants' behavior alienated customers. At or about the time Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, the Railroad Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether. The Railroad Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Railroad Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

iii)   <u>Defendants changed billing practices to expose each other's prices</u>. The

Railroad Defendants sometimes stopped offering "through rates," in which a shipper

would receive a single bill from either the originating shipper or the termination railroad

and a single fee would be allocated among the railroads that shipped. Instead, the

Railroad Defendants moved to what is known in the industry as "Rule 11 pricing."

Under Rule 11 pricing, where a shipment requires movement on more than one carrier,

the two rates are stated separately rather than as one quote for the entire shipment. The

Railroad Defendants made this change as part of their conspiracy for two reasons: to

provide transparency as to what each railroad was charging on multiple line shipments

and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own

territory.

g.   <u>During the Class Period, rail freight demand grew, but each Defendant's</u>

<u>market share remained stable</u>. Finally, demand for rail freight transportation services

grew substantially during the period of the conspiracy, and yet the Railroad Defendants'

market shares remained relatively stable and constant. The fact that market shares did

not did not fluctuate significantly during a period of demand growth is further indication

that the Railroad Defendants agreed to price fix rather than to compete for new sales.

## INTERSTATE TRADE AND COMMERCE

69.   During the Class Period, the Railroad Defendants transported more than 90

percent of all rail freight shipments within the United States. According to the STB, railway

operating revenues for all Class I freight railroads was more than $52 billion in 2006.

70.   The activities of Defendants and their co-conspirators were within the flow of,

and substantially affected, interstate and international commerce. During the Class Period,

21

Defendants and their co-conspirators sold and carried out rail shipments in a continuous and

uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the

United States. Each Defendant and their co-conspirators used instrumentalities of interstate or

foreign commerce, or both, to sell and market rail freight transportation services.

71.    The unlawful activities of Defendants and the unnamed co-conspirators have had

a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

### ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

72.    The unlawful conduct, combination or conspiracy alleged herein had and is

having the following effects, among others:

a.    The prices paid by Plaintiff and the Class for unregulated rail freight

transportation services were fixed or stabilized at supracompetitive levels;

b.    The Rail Fuel Surcharges charged to Plaintiff and the Class for

unregulated rail freight transportation were been fixed or stabilized at supracompetitive

levels;

c.    Plaintiff and the Class have been deprived of the benefits of free, open,

and unrestricted competition in the market for unregulated rail freight transportation; and

d.    Competition in establishing the prices paid in the United States for

unregulated rail freight transportation has been unlawfully restrained, suppressed and

eliminated.

73.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the

Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or

property. The injury sustained by the plaintiff and the Class is the payment of supracompetitive

prices for unregulated rail freight transportation as a result of Defendants' illegal contract,

22

combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)

74.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

75.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

76.    The contract, combination, or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

77.    Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

78.    The contract, combination or conspiracy has had the following effects:

    a.    Prices charged to Plaintiff and the Class for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

23

   b.  Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied

to unregulated rail freight transportation were fixed and/or maintained at

supracompetitive levels;

   c.  Plaintiff and the Class have been deprived of the benefits of free, open and

unrestricted competition in the market for rail freight transportation services; and

   d.  Competition in establishing the prices paid, customers of, and territories

for rail freight transportation services has been unlawfully restrained, suppressed and

eliminated.

  79.  As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class

have suffered injury in that they have paid supracompetitive prices for unregulated rail freight

transportation services during the Class Period.

  WHEREFORE, Plaintiff prays for relief as follows:

A.  That the Court determine that this action may be maintained as a class action
under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that
Plaintiff be denominated as class representative, and that Plaintiff's counsel be
appointed as counsel for the Class;

B.  That the unlawful contract, combination, and conspiracy alleged in Count I be
adjudged and decreed to be an unreasonable restraint of trade or commerce in
violation of Section 1 of the Sherman Act;

C.  That Plaintiff and the Class recover compensatory damages, as provided by law,
determined to have been sustained as to each of them, and that judgment be
entered against Defendants on behalf of Plaintiff and each and every member of
the Class;

D.  That each of the Defendants' respective officers, directors, agents, and employees,
and all other persons acting on behalf of or in concert with them, be permanently
enjoined and restrained from, directly or indirectly, continuing or maintaining the
combination, conspiracy, or agreement alleged in this case;

E.  That Plaintiff and the Class recover treble damages, as provided by law;

F.  That Plaintiff and the Class recover their costs of the suit, including attorney's
fees, as provided by law; and

G.    For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated: June 19, 2007          By: _Benjamin D. Brown_

Michael D. Hausfeld (D.C. Bar #153742)
Benjamin D. Brown (D.C. Bar #495836)
**COHEN MILSTEIN HAUSFELD & TOLL, P.L.L.C.**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Phone: (202) 408-4600
Fax: (202) 408-4699
Email: mhausfeld@cmht.com, bbrown@cmht.com

Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak, Jr. (D.D.C. Bar #475609)
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Phone: (224) 632-4500
Fax: (224) 632-4521
Email: skanner@fklmlaw.com, dmillen@fklmlaw.com
         rwozniak@fklmlaw.com

Mark S. Goldman
**GOLDMAN, SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Phone: (484) 342-0700
Fax: (484) 342-0701
Email: Goldman@gsk-law.com

Andrew B. Sacks
**SACKS & WESTON**
114 Old York Road
Jenkintown, PA 19046
Phone: (215) 925-8200
Fax: (215) 925-0508
Email: ABS@sackslaw.com

James Shedden
Lawrence W. Schad
**SCHAD, DIAMOND & SHEDDEN, P.C.**
332 S. Michigan Avenue
Suite 1000
Chicago, Illinois 60604-4398
Phone: (312) 939-6280
Fax: (312) 939-4661
Email: jshedden@lawsds.com
        lschad@lawsds.com

***Attorneys for Plaintiff McIntyre Group, Ltd. and the Proposed Class***

# EXHIBIT C

Case 1:07-mc-00489-PLF    Document 64-4    Filed 02/29/2008    Page 2 of 27

Case 7:07-cv-01191-LSC    Document 1    Filed 06/22/2007    Page 1 of 26

FILED

2007 Jun-26  AM 09:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| WEST ALABAMA SAND & GRAVEL, INC.<br>on behalf of itself and all others<br>similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: |
| CSX TRANSPORTATION, INC.,<br>BNSF RAILWAY COMPANY,<br>UNION PACIFIC RAILROAD COMPANY,<br>NORFOLK SOUTHERN RAILWAY<br>COMPANY, AND KANSAS CITY<br>SOUTHERN RAILWAY COMPANY, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL

Plaintiff West Alabama Sand & Gravel, Inc. ("West Alabama" or "Plaintiff"), an Alabama

corporation located in Fayette, Alabama, individually and on behalf of a class of all those

similarly situated, brings this action for damages under the antitrust laws of the United States

against Defendants, and alleges as follows:

## NATURE OF THE ACTION

1.    This is a class action brought under pursuant to antitrust laws alleging that five

United States based Class I railroads have engaged in a pattern of price fixing in violation of

Section I of the Sherman Act.

2.    Plaintiff brings this action on behalf of itself and an alleged class of direct

purchasers who purchased unregulated rail freight transportation services from Defendants and

their co-conspirators from July 1, 2003 to the present (the "Class Period," which will also include

the period from the date of this filing to the date of class notice) and who were assessed a rail

fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers

to rail freight transportation services where the rates are set by private contracts or through other

means exempt from rate regulation under federal law.

3.    Defendants collectively control over 90 percent of the rail freight traffic in the

United States.

4.    Plaintiff alleges that during the Class Period, defendant railroads conspired to fix,

raise, maintain, or stabilize prices of rail freight transportation services sold in the United States

through use of rail fuel surcharges added to customers' bills. A rail fuel surcharge ("Rail Fuel

Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon

transportation, purportedly to compensate for increases in the cost of fuel.   However, rather than

using independent and reliable mechanisms to recover unanticipated additional fuel costs, the

Defendants coordinated their activity to allow for these fuel surcharges to become profit centers.

5.    Throughout the Class Period, Defendants maintained uniformity of prices in Rail

Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base

rate and by agreeing upon common indices and trigger points for adjusting the percentages

monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate

coordination and the detection of any deviation from collusive pricing.

6.    As a direct and proximate result of this price fixing conspiracy, Defendants have

restrained competition in the market for unregulated rail freight transportation services and

injured plaintiff and each Class member in their business and property. Plaintiff and the members

of the Class each have paid a higher price for unregulated rail freight transportation than they

would have paid absent the concerted unlawful activity alleged herein.

7.    Plaintiff seeks treble damages on behalf of itself and the Class for Rail Fuel

Surcharges imposed on rail freight shipments made under private transportation contracts and

through other means exempt from rate regulation under federal law. Plaintiff does not seek, on

behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-

regulated freight transportation.

### PARTIES

8.    Plaintiff West Alabama Sand & Gravel, Inc., is a corporation organized under the

laws of the State of Alabama, with its principal place of business in Fayette, Alabama.

9.    During the class period, West Alabama operated a quarry for the production and

distribution of sand and gravel.

10.    West Alabama purchased unregulated rail freight transportation directly from one

or more of the Defendants during the Class Period, and during the Class Period one or more of

the Defendants assessed Rail Fuel Surcharges on plaintiff in connection with that unregulated

rail freight transportation. The prices plaintiff paid to Defendants for unregulated rail freight

transportation services on which Rail Fuel Surcharges were imposed were greater than the prices

plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has therefore been

injured in its business and property by reason of Defendants' antitrust violations. Plaintiff asserts

its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation

services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel

Surcharges, during the Class Period.

11.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at

500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily

in the eastern United States and Canada. CSX links commercial markets in 23 states, the District

of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

12.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

13.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

14.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.

15.     Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. KCS operates a major freight railroad in ten central and southeastern states.

**JURISDICTION AND VENUE**

16.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained

by Plaintiff and members of the Class by reasons of Defendants' violations of Section I of the Sherman Act, 15 V.S.C. § I.

    17.    Jurisdiction of this Court is founded on 15 V.S.C. § 15 and 28 V.S.C. §§ 1331 and 1337.

    18.    Venue is proper in the Northern District of Alabama pursuant to 15 V.S.C. § 15(a) and 22 and 28 V.S.C. § 1391. Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

    19.    This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price- fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

### CLASS ACTION ALLEGATIONS

    20.    Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b )(3) of the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated. The "Class" is defined as:

> All purchasers of rail freight transportation services from Defendants (the "Class"), through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and governmental entities.

21.    While the exact number of class members is exclusively in the control of the Defendants, the Class is so numerous that joinder of all members is impracticable. Given the magnitude of the commerce involved, the members of the Class are geographically dispersed, and joinder of all class members would be impracticable. Plaintiff believes that there are, at a minimum, thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

22.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein. Plaintiff and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

23.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

24.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b.   Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c.   Whether Defendants' conduct violated the federal antitrust laws; and

d.   Whether Defendants' conduct caused injury to the business and property of plaintiff and the Class and, if so, the proper measure of damages.

25.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

26.    The interests of members of the Class  individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

27.    During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The US market for rail transportation services is estimated at more than $51 billion in 2006.

7

28.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

29.    The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

### DEREGULATION OF THE RAILROAD INDUSTRY

30.    More than two decades ago, Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

31.    Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC. Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

32.    Since 1980, there has been remarkable consolidation in the railroad industry. The number of Class I railroads has declined from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). Five of these railroads -- the

Defendants in this case -- operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total revenue.

33.     Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true - railroads are collectively charging shippers supracompetitive rates.

## THE DEFENDANTS INTRODUCE FUEL SURCHARGES

34.     By the early 2000' s, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review. Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a choice: build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity. The railroads chose the latter and seized on the rail fuel surcharge as the means to implement their price fixing conspiracy.

35.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAP was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. In fourth quarter 2002, the AAR -- which is controlled by the major Class I railroads -- published, for the first time, a RCAF without fuel (i.e., a cost escalation index without fuel as a

component). This was not done by accident or mistake. It was a conscious decision made by the AAR to remove fuel costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

36.    Predictably, that is what happened. Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill. When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand - so long as all the Defendants participated and did not undercut each other.

37.    In or about late March 2003, top executives of the five Railroad Defendants attended the Spring 2003 National Freight Transportation Association ("NFTA") meeting at the Greenbrier Resort in West Virginia, which is owned by Defendant CSX. According to its Internet site, the "object of the [NFTA] is to provide a forum for transportation executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry.

38.    NFTA meetings facilitate the development of personal relationships amongst the attendees. The Spring NFTA 2003 meeting allowed Defendants' top executives ample cover to meet and conspire at meals, on the golf course, and at other resort facilities. Thus, the meeting provided numerous opportunities for Defendants' top executives to discuss and agree upon the specifics of the Rail Fuel Surcharges that were then implemented in or around July 2003.

39.    The key element of Defendants' price-fixing conspiracy was an agreement by the Railroad Defendants to act in concert with one another in demanding Rail Fuel Surcharges from

shippers and by agreeing to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate paid by customers.

## DEFENDANTS' PRICE FIXING CONSPIRACY

40.     Commencing in or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments. The key element of this price fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (i. e. , revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

41.     Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the board increases in the prices charged by Defendants for unregulated rail freight transportation.

42.     Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites. They did so for purposes of monitoring and enforcing the agreed upon Rail Fuel Surcharge levels.

43.     As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supracompetitive levels throughout the Class Period.

44.    On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. Rail Fuel Surcharges, STB Ex Parte No. 661 (Jan. 25, 2007).

45.    The STB also found that the railroads had been "double dipping" - applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

46.    Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE FIXING CONSPIRACY

47.    The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved. Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other traffic, not subject to rate regulation under federal law (i.e., the unregulated rates at issue here).

48.    Defendants began to implement their conspiracy at least as early as June 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate

their prices relative to Rail Fuel Surcharges. Prior to this time, the UP carload fuel surcharge was

adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index. The BNSF

carload fuel surcharge was based on the US Department of Energy (DOE) On-Highway Diesel

Fuel Price Index ("HDF"). In or about June 2003, however, the UP switched to the HDF Index

pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in

lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class

period.

49.    The Western Railroads agreed to administer the HDF index in precisely the same

way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or

was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded

$1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for

every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55

per gallon, the Western Railroads would apply a surcharge of percent. The surcharge would

increase 2 percent for every 20 cents increase in the HDF Index.

50.    The Western Railroads also coordinated when they would change their fuel

surcharge. They agreed that the Fuel Surcharge would be applied to shipments beginning the

second month after the month in which there was a change in the HDF average price calculation.

So, for example, if the HDF Index average price changed in January, the Western Railroads

would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day

of the month), and then apply the surcharge to shipments in March. The Western Railroads

published their monthly fuel surcharge percentages on their websites, making any deviation from

cartel pricing easily detectable.    48.    The choice to use the HDF Index for fuel

surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per

gallon and to apply the surcharge in the second calendar month after the HDF average price had

changed. The fact that the Western Railroads both chose and adhered to this same combination

of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior.

The similarities are both too precise and too comprehensive to have been arrived at

independently.

51.    Using the HDF index, the two Western Railroads moved in lockstep and charged

virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

52.    The chart below shows that the Fuel Surcharge Percentages charged by the

Western Railroads for carload shipments varied before the class period began, but were identical

starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES – WETERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun – 02 | 1 | 0 |
| Jul – 02 | 1 | 0 |
| Aug – 02 | 0 | 0 |
| Sep – 02 | 0 | 0 |
| Oct – 02 | 1% | 0 |
| Nov – 02 | 2% | 0 |
| Dec – 02 | 2.5% | 0 |
| Jan – 03 | 2% | 2 |
| Feb – 03 | 2% | 2 |
| Mar – 03 | 2.5% | 2 |
| Apr – 03 | 4.5% | 2 |
| May - 03 | 2.0% | 2 |
| Jun – 03 | 3.0% | 2.0% |
| Jul – 03 | 2.5% | 2.5% |
| Aug – 03 | 2.0% | 2.0% |
| Sep – 03 | 2.5% | 2.0% |
| Oct – 03 | 2.5% | 2.5% |
| Nov – 03 | 2.5% | 2.5% |
| Dec – 03 | 2.5% | 2.5% |
| Jan -04 | 2.5% | 2.5% |
| Feb – 04 | 2.5% | 2.5% |
| Mar – 04 | 3.5% | 3.5% |
| Apr - 04 | 3.5% | 3.5% |

| May - 04 | 4.0% | 4.0% |
|---|---|---|
| Jun - 04 | 4.5% | 4.5% |
| Jul - 04 | 5.0% | 5.0% |
| Aug - 04 | 5.0% | 5.0% |
| Sep - 04 | 5.0% | 5.0% |
| Oct - 04 | 6.0% | 6.0% |
| Nov - 04 | 7.0% | 7.0% |
| Dec - 04 | 9.0% | 9.0% |
| Jan -05 | 9.0% | 9.0% |
| Feb – 05 | 8.0% | 8.0% |
| Mar – 05 | 7.5% | 7.5% |
| Apr – 05 | 8.0% | 8.0% |
| May – 05 | 10.0% | 10.0% |
| Jun – 05 | 10.5% | 10.5% |
| Jul – 05 | 9.5% | 9.5% |
| Aug – 05 | 10.5% | 10.5% |
| Sep – 05 | 11.5% | 11.5% |
| Oct – 05 | 13.0% | 13.0% |
| Nov – 05 | 16.0% | 16.0% |
| Dec - 05 | 18.5% | 18.5% |
| Jan -06 | 13.5% | 13.5% |
| Feb – 06 | 12.0% | 12.5% |
| Mar – 06 | 12.5% | 12.5% |
| Apr - 06 | 12.5% | 12.5% |
| May - 06 | 13.5% | 13.5% |
| Jun - 06 | 15.0% | 15.0% |
| Jul - 06 | 16.5% | 16.5% |
| Aug - 06 | 16.5% | 16.5% |
| Sep - 06 | 17.0% | 17.0% |
| Oct - 06 | 18.0% | 18.0% |
| Nov - 06 | 15.5% | 15.5% |
| Dec – 06 | 13.0% | 13.0% |
| Jan - 07 | 13.0% | 13.0% |
| Feb - 07 | 14.0% | 14.0% |
| Mar - 07 | 12.5% | 12.5% |

53.    Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier. (Defendants CSX, NS and KCS collectively are the "Eastern Railroads").

The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the Wall Street Journal. Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

54.    Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

55.    The Eastern Railroads also coordinated when they would change their fuel surcharge - two calendar months after the WTI index had adjusted, thereby adopting fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

56.    The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants CSX,

NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel

Surcharge programs indicates that they coordinated their behavior. The similarities are too

precise and too comprehensive to have been arrived at independently.

57.    The net result is that there was uniformity among the Eastern Railroads in the

monthly surcharge percentages they charged customers for most of the Class Period. Although

KCS used different fuel surcharge percentages for certain months of the Class Period, in June

2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step

with them for the remainder of the Class Period. KCS has different operations and fuel

consumption patterns from the larger US railroads, making it unlikely that the KCS would adopt

the same fuel surcharge percentages as the other railroads absent a conspiracy.

58.    The chart below shows that the Fuel Surcharge Percentages charged by

Defendants CSX and NS for carload shipments varied before the class period, but were identical

starting in February 2004, and they also were identical to those of the KCS starting in June 2005,

when the KCS joined the conspiracy:

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | MS | KCSR |
|-------|-----|-----|------|
| Jun – 03 | 2.4% | 2% | |
| Jul – 03 | 2.4% | 2% | |
| Aug – 03 | 3.2% | 2% | |
| Sep – 03 | 3.2% | 2% | |
| Oct – 03 | 3.6% | 2% | |
| Nov – 03 | 2.4% | 2.0% | |
| Dec – 03 | 3.2% | 2.0% | |
| Jan -04 | 3.6% | 2.0% | |
| Feb – 04 | 4.0% | 2% | |
| Mar – 04 | 4.8% | 4.8% | |
| Apr - 04 | 4.8% | 4.8% | |
| May - 04 | 5.6% | 5.6% | |
| Jun - 04 | 5.6% | 5.6% | |
| Jul - 04 | 7.2% | 7.2% | |
| Aug - 04 | 6.4% | 6.4% | |

| | | | |
|---|---|---|---|
| Sep - 04 | 7.2% | 7.2% | |
| Oct - 04 | 8.8% | 8.8% | |
| Nov - 04 | 9.2% | 9.2% | |
| Dec - 04 | 12.4% | 12.4% | 10.0% |
| Jan -05 | 10.4% | 10.4% | 10.0% |
| Feb – 05 | 8.4% | 8.4% | 10.0% |
| Mar – 05 | 9.5% | 9.5% | 10.0% |
| Apr – 05 | 10.0% | 10.0% | 10.0% |
| May – 05 | 12.8% | 12.8% | 10.0% |
| Jun – 05 | 12.4% | 12.4% | 12.4% |
| Jul – 05 | 10.8% | 10.8% | 10.8% |
| Aug – 05 | 13.6% | 13.6% | 13.6% |
| Sep – 05 | 14.4% | 14.4% | 14.4% |
| Oct – 05 | 16.8% | 16.8% | 16.8% |
| Nov – 05 | 17.2% | 17.2% | 17.2% |
| Dec - 05 | 16.0% | 16.0% | 16.0% |
| Jan -06 | 14.4% | 14.4% | 14.4% |
| Feb – 06 | 14.8% | 14.8% | 14.8% |
| Mar – 06 | 17.2% | 17.2% | 17.2% |
| Apr - 06 | 15.6% | 15.6% | 15.6% |
| May - 06 | 16.0% | 16.0% | 16.0% |
| Jun - 06 | 18.8% | 18.8% | 18.8% |
| Jul - 06 | 19.2% | 19.2% | 19.2% |
| Aug - 06 | 19.2% | 19.2% | 19.2% |
| Sep - 06 | 20.8% | 20.8% | 20.8% |
| Oct - 06 | 20.4% | 20.4% | 20.4% |
| Nov - 06 | 16.4% | 16.4% | 16.4% |
| Dec – 06 | 14.4% | 14.4% | 14.4% |
| Jan - 07 | 14.8% | 14.8% | 14.8% |
| Feb - 07 | 16.0% | 16.0% | 16.0% |
| Mar - 07 | 12.8% | 12.8% | 12.8% |

59.    In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In a competitive

18

environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to

obtain a competitive advantage.

## ADDITIONAL EVIDENCE OF A CONSPIRACY

60.    Apart from this direct evidence of price fixing, "plus factors" further support the

allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation

industry is marked by certain structural and other characteristics that make a price fixing cartel

feasible:

    a.  The railroad industry is highly concentrated. Defendants in this case are the five

remaining domestic Class I railroads following decades of mergers and

consolidation. Defendants account for well over 90 percent of the nation's rail

traffic. Such high concentration facilitates the possibility of a price fixing cartel.

    b.  There are significant barriers to entry into the railroad industry. To compete,

railroads must invest in a vast network of tracks, stations, yards, and switching

facilities. These take decades to develop, and require onerous regulatory and

environmental reviews and approval. Land or easements are often needed,

necessitating the involvement of multiple local governments and the exercise of

eminent domain power. Because rail infrastructure is of minimal value for other

purposes, and rail networks are difficult to assemble, the fixed costs are largely

sunk, creating significant entry barriers. Entry also requires that a new entrant

capture a significant market share from existing carriers. Entry is thus both

expensive and risky.

    c.  Rail Fuel Surcharges, when computed as a percentage of revenue, are highly

standardized. Defendants structured their Rail Fuel Surcharges as a percentage of

base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

d.  The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, United States v. Trans- Missouri Freight Ass 'n, 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e.  The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies). The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.  A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven

Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line Railroad Co.; and (7) UP. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

61.    Apart from these structural market features, Defendants did not behave as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

62.    Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Defendants refused to address the concerns of their customers.

63.    At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

64.    Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all

21

Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

65.    Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

66.    Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

### DEFENDANTS PROFITED FROM THE SURCHARGES

67.    Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real

22

correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

68.    Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

69.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

    a.    The Rail Fuel Surcharges charged to plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

    b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

    c.    competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

70.    By reason of the violations of Section I of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the plaintiff and the Class is the payment of supra-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation of § 1 of The Sherman Act And § 4 of The Clayton Act)

71.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

72.    Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

73.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

74.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

75.    The contract, combination or conspiracy has had the following effects:

   a.    Prices charged to plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

   b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c.  Competition in establishing the prices paid, customers of, and territories for rail

freight transportation services has been unlawfully restrained, suppressed and

eliminated.

76.     As a proximate result of Defendants' unlawful conduct, plaintiff and the Class

have suffered injury in that they have paid supra-competitive prices for Rail Fuel Surcharges

applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action

under Rules 23(b )(2) and (b )(3) of the Federal Rules of Civil Procedure, that plaintiff be

denominated as class representative, and that plaintiff's counsel be appointed as counsel for the

Class;

(2)     That the unlawful contract, combination and conspiracy alleged in Count I be

adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of

Section I of the Sherman Act;

(3)     That plaintiff and the Class recover compensatory damages, as provided by law,

determined to have been sustained as to each of them, and that judgment be entered against

Defendants on behalf of plaintiff and each and every member of the Class;

(4)     That each of the Defendants' respective officers, directors, agents and employees,

and all other persons acting on behalf of or in concert with them, be permanently enjoined and

restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or

agreement alleged in this case;

(5)     That plaintiff and the Class recover treble damages, as provided by law;

25

(6)     That plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7)     For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

Respectfully submitted,

WHATLEY, DRAKE & KALLAS, LLC

Joe R. Whatley, Jr.
Richard P. Rouco
Othni J. Lathram

WHATLEY DRAKE & KALLAS, LLC
2001 Park Place North, Suite 1000
P O Box 10647
Birmingham, AL 35203
Telephone:  205.328.9576
Facsimile:  205.328.9669

# EXHIBIT D

Stephen Neuwirth
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7100

James E. Cecchi
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Richard Scruggs
SCRUGGS LAW FIRM, P.A.
120A Courthouse Square, P.O. Box 1136
Oxford, MS  38655
(662) 281-1212

Robert Kaplan
KAPLAN FOX & KILSHEIMER L.L.P.
850 Third Avenue
New York, New York  10022
(212) 687-1980

Coordinating Counsel for Plaintiffs In All New Jersey Cases

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DUST PRO, INC., on behalf of itself and all others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND KANSAS CITY SOUTHERN RAILWAY COMPANY,<br><br>    Defendants. | Civil Action No. 07-2251 (DMC)<br><br>**AND ALL CONSOLIDATED ACTIONS**<br><br>**CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

61042/2170716.1

Plaintiffs Dust Pro, Inc. ("Dust Pro"), Isaac Industries, Inc. ("Isaac Industries"), Bar-Ale,

Inc. ("Bar-Ale"), United Co-Operative Farmers, Inc. ("United Co-Operative Farmers"), Carter

Distributing Company ("Carter Distributing"), Blue Grass Tobacco Company ("Blue Grass"),

Lancaster Foundry Supply Company, Inc. ("Lancaster Foundry Supply"), and Somerset

Industries, Inc. ("Somerset") (collectively, "Plaintiffs"), individually and on behalf of a class of

all those similarly situated, bring this action for damages under the antitrust laws of the United

States against Defendants, and allege as follows:

## NATURE OF THE ACTION

1.     This is an antitrust class action charging five United States-based Class I railroads

with price fixing in violation of Section 1 of the Sherman Act.  Plaintiffs bring this action on

behalf of themselves and an alleged class of direct purchasers who purchased unregulated rail

freight transportation services from Defendants from July 1, 2003 to the present (the "Class

Period," which will also include the period from the date of this filing to the date of class notice)

and who were assessed a rail fuel surcharge for the agreed-upon transportation.  As used herein,

the term "unregulated" refers to rail freight transportation services where the rates are set by

private contracts or through other means exempt from rate regulation under federal law.

Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2.     The defendant railroads conspired to fix, raise, maintain, and/or stabilize prices of

rail freight transportation services sold in the United States through use of rail fuel surcharges

added to customers' bills.  A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified

fee that is charged by the railroads, purportedly to compensate for increases in the cost of fuel,

for the agreed-upon transportation.

3.     The Rail Fuel Surcharges imposed by the Defendants, however, can be explained

only as a means to supracompetitively enhance revenue by levying charges in excess of actual

fuel costs. The Rail Fuel Surcharges were not intended to recover actual fuel costs. Significant

revenue enhancement was the motive and the goal of the collective effort by Defendants to fix

and maintain fuel surcharges. The Defendants, who in the current era of railroad deregulation

could no longer ask the now-defunct Interstate Commerce Commission ("ICC") to raise rates for

all private rail freight, colluded to use the fuel surcharge program as the means to impose such an

across-the-board rate increase.

      4.      The Defendants implemented their conspiracy through a number of collective

actions.

      5.      First, the two major western railroads – Defendants BNSF Railway Company and

the Union Pacific Railroad Company – in mid-2003 both started charging the exact same fuel

surcharge. Up until this time, fuel surcharges were only intermittently applied, and the

Defendants had different fuel surcharge rates, reflecting (among other things) that each

Defendant had different fuel costs. In July 2003, however, BNSF and Union Pacific, began to

move in lockstep, each now basing their fuel surcharge on the U.S. Department of Energy (DOE)

On-Highway Diesel Fuel Price Index (the "HDF Index"). At this time, the HDF Index was at a

higher rate than the West Texas Intermediate Crude Oil Index (the "WTI Index") that Union

Pacific previously had been using. BSNF and Union Pacific have remained in lockstep, using

the HDF Index, through the present. These actions by defendants BNSF and Union Pacific,

however, were not sufficient to permit widespread use of fuel surcharges as a revenue-raising

mechanism, because most private contracts still had cost escalation provisions that included fuel

costs as a factor – meaning that a separate fuel surcharge could not also readily be used.

      6.      In late 2003, the Defendants solved this problem through collective action: they

caused the Association of American Railroads (the "AAR"), a trade organization that is

controlled by Defendants and can act only with the *agreement* of the Defendants, to develop and publish a new index with fuel removed as an element of cost escalation. In contrast, the then-existing standard cost escalation indexes – the AAR's All-Inclusive Index (the "AII"), and the Rail Cost Adjustment Factor (the "RCAF") based on the AII – each accounted for a variety of cost factors, including fuel. Furthermore, the RCAF and AII weighted these different factors so that each index would account accurately for the impact of particular cost increases (e.g., for fuel). Thus, prior to late 2003, any actual increase or decrease in fuel costs, no matter how large, could be captured in the RCAF and AII. In other words, *there was no need to remove fuel from the existing indexes in order to recover any fuel cost increases.*

7.     In a December 2003 announcement – which could only have been made with the *agreement* of the Defendants – the AAR stated that a new index, the All Inclusive Index Less Fuel ("AIILF"), was being established. This new index was unlike the RCAF and AII in that the new index excluded fuel. Also unlike the RCAF, the new AIILF was not subject to review by the Surface Transportation Board. The AAR's official publication, entitled "AAR Railroad Cost Indexes," announced: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, *with the exception of the exclusion of the fuel component.*" (emphasis added). This announcement, and the underlying removal of fuel from the AII and RCAF, were the *collective action* of the Defendants, which dominate and control the AAR. The AAR could not have taken these steps without collective action by the Defendants.

8.      The AAR's action in December 2003 meant that the Defendants could now apply
– and in fact did apply – Rail Fuel Surcharges more broadly than before, since fuel would no
longer automatically be covered by standard rate escalation clauses.

9.      Almost immediately after the AAR announcement, the two major eastern
railroads – Defendants CSX Transportation, Inc. and Norfolk Southern Railway, Inc., each of
which had different fuel costs – in early 2004 made the identical decision that they would now
use the same fuel surcharge rates and that these surcharges would be based on the WTI Index
(which in early 2004 was at a higher rate than the HDF Index that the Western Railroads
simultaneously started to use in July 2003).  As with the Western Railroads, the Eastern
Railroads previously had different fuel surcharges (reflecting, among other things, their different
fuel costs).  This identical decision by the Eastern Railroads, coming on the heels of the
Defendants' collective action in late 2003 to remove fuel from the AII and RCAF, eliminates any
reasonable possibility that the Eastern Railroads decided independently to use the WTI Index in
early 2004.

10.     Like the Western Railroads, the Eastern Railroads remained in complete lockstep,
applying the exact same fuel surcharges, through the present.  Defendant Kansas City Southern
put itself into lockstep with the Eastern Railroads in June 2005, and remained in lockstep from
that point forward.

11.     With the AIILF in place, the Defendants were able to use the Rail Fuel
Surcharges as a revenue raising, rather than cost-recovery, mechanism, because the Defendants
each applied the fuel surcharge the same way:  as a percentage multiplier of the *total* base rate
for the rail freight transportation.  That is, while the fuel factor in the AII and RCAF had been
"weighted" to reflect the relative impact of fuel costs as compared to other cost factors, when

fuel was removed from the new AIILF index, the Defendants applied the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, if the percentage increase triggered by the applicable fuel index was, for example, 15 %, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by 15% – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF had been designed to reflect).

12.     Defendants were able to maintain their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

13.     The Defendants also took other collective action to enforce the conspiracy and make it effective. For example, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30 day cancellation provisions – making it easier to implement the fuel surcharges, which were adjusted monthly. The Defendants also limited the previously prevailing practice, in circumstances where more than one railroad was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, the Defendants increasingly used so-called "Rule 11 pricing," whereby each railroad on a multi-railroad trip would send a separate bill (and thus could separately impose its own fuel surcharge). This facilitated each Defendant recouping its share of the supracompetitive profits. Such a switch to "Rule 11 pricing" could be accomplished only through collective action of the Defendants. The Defendants also began refusing to

negotiate discounts on rail freight rates – even in circumstances where individual railroads had previously been willing to do so.

14.    The collective actions of the Defendants, including effectively removing fuel from the AII and RCAF by creating the new AIILF, and moving into lockstep on fuel surcharges, cannot be explained as the result of routine market conduct to collect increasing fuel costs or even to do so more efficiently.  The fuel cost component in the AII and RCAF was fully effective for recovering *actual* fuel costs.  Indeed, the AII had been designed to ensure that fuel and other cost increases could be recovered, regardless of the size of the fuel cost increase.  Rather, by creating a new cost index without fuel (the AIILF), and through their other collective actions, the Defendants devised and implemented a means to impose an across-the-board rate increase for rail freight transportation.  Instead of competing on fuel prices given their differing fuel costs, the Defendants collectively created the type of across-the-board rate increase that they had been able to ask the now-disbanded ICC to impose during the pre-1980 period of complete rate regulation and then lawful collective railroad pricing activities.

15.    The Surface Transportation Board, in a ruling in early 2007 that addressed only the rail fuel surcharges at issue as applied to rate-regulated freight transport, held that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates.  Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism.  Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6. *See also id.* at 7 ("the term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled.").

16.    As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs and each Class member in their business and property. Plaintiffs and the members of the Class each has paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

17.    Plaintiffs seek damages on behalf of themselves and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiffs do not seek, on behalf of themselves or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

18.    Plaintiff Dust Pro is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona, 85034.

19.    During the Class Period, Dust Pro manufactured and distributed soil stabilizers.

20.    Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Dust Pro in connection with that unregulated rail freight transportation. The prices Dust Pro paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices

Dust Pro would have paid absent the conspiracy alleged herein. Dust Pro has therefore been injured in its business and property by reason of Defendants' antitrust violations. Dust Pro asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

21.     Plaintiff Isaac Industries is a corporation organized under the laws of the State of Florida, with its principal place of business located at 7330 N.W. 36th Avenue, Miami, Florida 33147.

22.     Isaac Industries purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Isaac Industries in connection with that unregulated rail freight transportation. The prices Isaac Industries paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Isaac Industries would have paid absent the conspiracy alleged herein. Isaac Industries has therefore been injured in its business and property by reason of Defendants' antitrust violations. Isaac Industries asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants' imposed Rail Fuel Surcharges, during the Class Period.

23.     Plaintiff Bar-Ale is a corporation organized under the laws of the State of California, with its principal place of business located in Williams, California.

24.     Bar-Ale purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Bar-Ale in connection with that unregulated rail

freight transportation. The prices Bar-Ale paid to Defendants for unregulated rail freight

transportation services on which Rail Fuel Surcharges were imposed were greater than the prices

Bar-Ale would have paid absent the conspiracy alleged herein. Bar-Ale has therefore been

injured in its business and property by reason of Defendants' antitrust violations. Bar-Ale asserts

its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation

services from one or more of the Defendants, and as to which Defendants' imposed Rail Fuel

Surcharges, during the Class Period.

      25.     Plaintiff United Co-Operative Farmers is a corporation organized under the laws

of the Commonwealth of Massachusetts, with its principal place of business located at 22

Kimball Place, Fitchburg, Massachusetts 01420.

      26.     United Co-Operative Farmers purchased unregulated rail freight transportation

directly from one or more of the Defendants during the Class Period, and during the Class Period

one or more of the Defendants assessed Rail Fuel Surcharges on United Co-Operative in

connection with that unregulated rail freight transportation. The prices United Co-Operative

Farmers paid to Defendants for unregulated rail freight transportation services on which Rail

Fuel Surcharges were imposed were greater than the prices United Co-Operative Farmers would

have paid absent the conspiracy alleged herein. United Co-Operative has therefore been injured

in its business and property by reason of Defendants' antitrust violations. United Co-Operative

asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight

transportation services from one or more of the Defendants, and as to which Defendants'

imposed Rail Fuel Surcharges, during the Class Period.

27.    Plaintiff Carter Distributing is a corporation organized under the laws of the State of Tennessee, with its principal place of business located at 1305 Broad St. Chattanooga, Tennessee 37402.

28.    During the Class Period, Carter Distributing distributed beer.

29.    Carter Distributing purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Carter Distributing in connection with that unregulated rail freight transportation.  The prices Carter Distributing paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Carter Distributing would have paid absent the conspiracy alleged herein.  Carter Distributing has therefore been injured in its business and property by reason of Defendants' antitrust violations.  Carter Distributing asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants' imposed Rail Fuel Surcharges, during the Class Period.

30.    Plaintiff Blue Grass is a corporation organized under the laws of the State of New Jersey, with its principal place of business located at 307 Ocean Avenue, Avon, New Jersey 07717.

31.    During the Class Period, Blue Grass imported and distributed cigarettes.

32.    Blue Grass purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Blue Grass in connection with that unregulated rail freight transportation.  The prices Blue Grass paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices

Blue Grass would have paid absent the conspiracy alleged herein. Blue Grass has therefore been injured in its business and property by reason of Defendants' antitrust violations. Blue Grass asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants' imposed Rail Fuel Surcharges, during the Class Period.

33.    Plaintiff Lancaster Foundry Supply is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 2314 Norman Road, Lancaster, Pennsylvania 17601.

34.    During the Class Period, Lancaster Foundry Supply sold foundry supplies, services and equipment to foundry customers located predominantly in South Central Pennsylvania.

35.    Lancaster Foundry Supply purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Lancaster Foundry Supply in connection with that unregulated rail freight transportation. The prices Lancaster Foundry Supply paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Lancaster would have paid absent the conspiracy alleged herein. Lancaster Foundry Supply has therefore been injured in its business and property by reason of Defendants' antitrust violations. Lancaster Foundry Supply asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants' imposed Rail Fuel Surcharges, during the Class Period.

36.     Plaintiff Somerset is a corporation organized under the laws of the State of

Nevada, with its principal place of business at 901 North Bethlehem Pike, Spring House,

Pennsylvania 19477.

37.     During the Class Period, Somerset purchased large quantities of overstock food,

which is then distributed to correctional facilities and food banks around the country.  In

addition, Somerset offers services in food processing, packing, and re-packaging.

38.     Somerset purchased unregulated rail freight transportation directly from one or

more of the Defendants during the Class Period, and during the Class Period one or more of the

Defendants assessed Rail Fuel Surcharges on Somerset in connection with that unregulated rail

freight transportation.  The prices Somerset paid to Defendants for unregulated rail freight

transportation services on which Rail Fuel Surcharges were imposed were greater than the prices

Somerset would have paid absent the conspiracy alleged herein.  Somerset has therefore been

injured in its business and property by reason of Defendants' antitrust violations.  Somerset

asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight

transportation services from one or more of the Defendants, and as to which Defendants'

imposed Rail Fuel Surcharges, during the Class Period.

39.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at

500 Water St., Jacksonville, Florida 32202.  In New Jersey, CSX maintains business offices at 1

Pennsylvania Ave, Kearny, New Jersey 07032.  CSX also operates and/or serves rail terminals in

the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield,

through which it originates and terminates rail traffic within this District.  CSX is a major freight

railroad operating primarily in the eastern United States and Canada.  CSX links commercial

markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

40.    Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. In New Jersey, NS maintains business offices at 125 County Road, Jersey City, New Jersey 07307. NS also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

41.    Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region is Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark, New Jersey.

42.    Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the Newark area tens of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

43.    Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. In New Jersey, BNSF maintains business offices at 345 State Rt. 17, Upper Saddle River, New Jersey 07458. BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

44.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. In New Jersey, UP maintains at least one employee or agent, including an agent for service of process. UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

45.    Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. In this New Jersey, KCS maintains an office at 1 Executive Drive, Somerset, New Jersey 08873. KCS originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. KCS operates a major freight railroad in ten central and southeastern states.

## JURISDICTION AND VENUE

46.    This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15 , to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained

by Plaintiffs and members of the Class by reasons of Defendants' violations of Section 1 of the

Sherman Act, 15 U.S.C. § 1.

47.    Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and

1337.

48.    Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and

22 and 28 U.S.C. § 1391. Defendants maintain offices, have agents, transact business, and are

found within this judicial District; a substantial part of the events giving rise to the claim for

relief occurred in this District; and Defendants regularly and continuously conduct business in

interstate commerce that is carried out in part in this District.

49.    This Court has personal jurisdiction over each Defendant because, inter alia, each:

(a) transacted business in this District; (b) directly or indirectly sold and delivered rail

transportation services in this District; (c) has substantial aggregate contacts with this District;

and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended

effect of causing injury to, persons and entities residing in, located in, or doing business in this

District.

## CLASS ACTION ALLEGATIONS

50.    Plaintiffs bring this action as a class action under Rules 23(a), (b)(2) and 23(b)(3)

of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated.

The proposed "Class" is defined as:

> All purchasers of rail freight transportation services from
> Defendants (the "Class"), through use of private railroad-shipper
> contracts or through other means exempt from rate regulation
> under federal law, as to which Defendants assessed a Rail Fuel
> Surcharge, at any time from at least as early as July 2003 to the
> present (the "Class Period"). Excluded from the Class are
> Defendants, any subsidiaries or affiliates of Defendants, and any of
> Defendants' co-conspirators, whether or not named as a Defendant
> in this Complaint.

51.     The Class is so numerous that joinder of all members is impracticable.  Given the magnitude of the commerce involved, the members of the Class are geographically dispersed, and joinder of all class members would be impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are, at a minimum, thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

52.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein.  Plaintiffs and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

53.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

54.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

> a.     Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b.  Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c.  Whether Defendants' conduct violated the federal antitrust laws; and

d.  Whether Defendants' conduct caused injury to the business and property of Plaintiffs and the Class and, if so, the proper measure of damages.

55.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

56.  The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

### INTERSTATE TRADE AND COMMERCE

57.  During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The U.S. market for rail transportation services is estimated at more than $51 billion in 2006.

58.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

59.     The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

60.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980. This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

61.     Prior to the Staggers Act, railroads generally would only charge for freight transport the published tariff rates filed by the railroads with the ICC. During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

62.     Today, by contrast, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are free of rate regulation. For all of this unregulated traffic, the railroads cannot turn to some agency – like the old ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

63.     Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian

entities). Five of these railroads – the Defendants in this case – operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total annual revenue.

64.    Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

65.    The railroad industry today does not behave like a competitive market. Instead, it is dominated by the Defendants. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids." Frank N. Wilner, *A Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

### THE DEFENDANTS INTRODUCE FUEL SURCHARGES

66.    By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a stark choice: build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity. The railroads chose the latter course and seized on the Rail Fuel Surcharge as the means to implement what in effect became across-the-board rate increases.

67.    Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the RCAF and the AII on

which the RCAF is based. Both the RCAF and the AII are published by the AAR, and both

Indexes include fuel costs as a factor. The RCAF and AII weight a number of cost factors,

including fuel, so that the impact of particular cost increases (e.g., for fuel) is reflected in the

index. Any actual increase in fuel costs – no matter how large – would be reflected in the RCAF

and AII.

68.    In December 2003, the AAR – which is controlled and dominated by the

Defendants – announced, for the first time, the creation of a new All Inclusive Index Less Fuel

(the AIILF) – *i.e.*, a cost escalation index without fuel as a component. This new index was

calculated using the same components and methods as the AII uses for the RCAF, except that it

excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue

of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This

index is calculated using the same components and methods as the All-Inclusive Index uses for

the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."

This announcement, and the underlying decision to create the new index, were the *collective*

*action* of the Defendants, and could not have been accomplished without such collective action.

The new AIILF specified the fourth quarter of 2002 as its base period.

69.    The Defendants jointly decided to cause the AAR to inaugurate the AIILF so that

Defendants, which controlled the AAR, could begin assessing separate, stand-alone Rail Fuel

Surcharges and coordinating that practice. The creation of this new index was an important,

carefully-planned step taken collectively by the railroads to allow implementation and

continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to

impose price increases on the entire cost of rail freight transport.

21

70.     Following publication of the AIILF, Defendants seized the opportunity and began increasingly to apply a Rail Fuel Surcharge as a separate item on the shipper's bill.

71.     There is no legitimate business justification for the collective action of the Defendants to cause the AAR to adopt and publish the AIILF. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. Indeed, as an empirical matter, the fuel component of the AII closely tracks both the WTI Index and the HDF Index used by the railroads, and the AII is equally effective as those Indexes for recovering fuel costs. However, because the AII weights the various cost factors, the total AII percentage reflects actual cost increases for each of the cost factors, including fuel. Thus, Defendants' motivation in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery. Rather, by effectively removing fuel from the AII, the Defendants could proceed collectively to apply the fuel cost increase percentage to the *entire cost of the freight shipment* (notwithstanding that fuel only accounts for a portion of the cost of the shipment). This allowed the Rail Fuel Surcharge to be used to increase revenue, rather than simply recover actual costs.

72.     These actions by the Defendants were not independent responses to a common problem of increasing fuel costs. Rather, the Defendants' only purpose in taking these collective actions was to begin assessing a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs, and to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers. Through this collective action, Defendants sought to use the stand-alone fuel surcharge as an easy way to dramatically increase revenues without having to wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

## DEFENDANTS' FUEL SURCHARGES

73.     The key elements of the Defendants' price fixing conspiracy were agreements by Defendants to act in concert with one another in establishing the new AIILF, applying the Rail Fuel Surcharges to the total cost of freight shipments, using common trigger points for adjusting the Rail Fuel Surcharges on a monthly basis,  moving away from long-term contracts to more effectively impose the monthly Rail Fuel Surcharges,  moving increasingly to Rule 11 pricing to allow each Defendant to collect its own share of the Rail Fuel Surcharge revenues, and not departing from the Rail Fuel Surcharges reflected in the agreed-upon index.  Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (*i.e.*, revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

74.     Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs.  Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure.  The program has been intended to achieve – and has succeeded in achieving – across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

75.     Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites.  They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

76.     As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels during the Class Period.

77.     On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

78.     The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint).  The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

79.     Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE FIXING CONSPIRACY

80.     The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved.  Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

81.     Defendants began to implement their conspiracy at least as early as July 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges.  Prior to this time, the UP fuel surcharge was adjusted monthly based on the WTI Index.  The BNSF fuel surcharge was based on the HDF Index.  In or about July 2003, however, the UP switched to the HDF Index pursuant to an

agreement with the BNSF. At the time, the HDF Index yielded a higher percentage than did the WTI Index. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

82. The Western Railroads agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, the Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

83. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

84. The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF Index average price had changed. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both

too precise and too comprehensive to have been independent responses to any common market

phenomenon that the Defendants were facing.

85.    Using the HDF index, the two Western Railroads moved in lockstep and charged

virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

86.    The chart below shows that the Fuel Surcharge Percentages charged by the

Western Railroads for freight shipments varied before the Class Period began, but were identical

starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |

| MONTH | BNSF | UP |
|-------|------|------|
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

87.    Almost immediately after the announcement in December 2003 of the new All

Inclusive Index Less Fuel, Defendants CSX and NS, located in the east, suddenly moved into

lockstep with fuel surcharges based on the WTI Index.  In early 2004, the WTI Index yielded a

higher fuel surcharge than the HDF Index in use by the Western Railroads.  KCS, located in the

Midwest, agreed to join the lockstep pricing in June 2005.  (Defendants CSX, NS and KCS

collectively are the "Eastern Railroads").  Indeed, not only did these railroads all agree to use the

WTI Index (as opposed to many other available indices), they also agreed to administer the chosen index in precisely the same way.

88.    Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel.  When that happened, Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel.  So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent.  The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

89.    The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same fuel surcharge percentage month after month.  The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

90.    The choice to use the WTI Index for fuel surcharges was arbitrary.  Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed.  The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior.  The similarities are too

precise and too comprehensive to have been independent responses to any common market

phenomenon that the Defendants were facing.

91.    The net result is that there was uniformity among the Eastern Railroads in the

monthly surcharge percentages they charged customers for most of the Class Period.  KCS

adopted the same WTI Index in June 2005, and moved in lockstep with them for the remainder

of the Class Period.  KCS has different operations and fuel consumption patterns from the larger

U.S. railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages

as the other railroads absent a conspiracy.

92.    The chart below shows that the Fuel Surcharge Percentages charged by

Defendants CSX and NS for carload shipments varied before the Class Period, but were identical

starting in March 2004, and KCS also had identical Fuel Surcharge Percentages starting in June

2005:

## MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |
| Nov-03 | 2.4% | 2.0% | |
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |

| MONTH | CSX | NS | KCS |
|-------|------|------|------|
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% | 16.4% |

93.     In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a

percentage of operating cost and fuel efficiency differs widely among the Defendant railroads.

Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

independently price their Rail Fuel Surcharges to arrive at the identical percentage month after

month, year after year, for a period of more than three years. The fact that Defendants have

moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were

coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges.

94.    In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge in an effort to increase their market share. Rather than engage in competitive behavior, Defendants instead restricted their freedom to price competitively and instead adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than a three year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. It could only have been achieved by an express agreement – first, to decouple fuel prices from the historical railroad cost indices and, second, to agree upon new indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what was, in effect, across-the-board rate increases.

95.    Thus, as detailed above, including in paragraphs 1-16 and 59-93, when fuel prices were rising significantly in 2003, the Defendants seized the opportunity and collectively created a new AIILF, specifically excluding.. From July 2003 to the present in the case of Defendants BNSF and UP, and from March 2004 to the present in the case of CSX and NS, the Defendants remained in *complete lockstep* with respect to fuel surcharges. Defendant KCS got into lockstep with the Eastern Railroads in June 2005, and remained in exact lockstep from that point forward. In addition, the Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the total base rate for the rail freight transportation. That is, Defendants applied the fuel surcharge percentage to the *entire* cost of the freight transport (even though fuel only accounted for a portion of that total cost). The Defendants also all used the exact same fuel

surcharge price timing to coordinate implementation of their agreed-upon fuel surcharge rates.

Defendants were thus able to maintain the uniformity of prices in Rail Fuel Surcharges by

computing the surcharges as a percentage of the rail freight transport base rate and by agreeing

upon common indices and trigger points for adjusting the percentages monthly. Defendants also

published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection

of any deviation from collusive pricing.

96.     In their conduct related to Rail Fuel Surcharges, the Defendants thus imposed

restrictions on their own freedom of competitive action. In circumstances where price

competition should have existed, the Defendants ignored the concerns of their rail freight

customers and were willing to tell significant customers that the Rail Fuel Surcharges were not

negotiable. The Defendants used their websites to provide each other with advance detailed

information regarding their Rail Fuel Surcharge practices; the Defendants used the same timing

triggers for their Rail Fuel Surcharges; and the Defendants all applied the Rail Fuel Surcharges

to the entire cost of the freight transport. All of this, combined with the Defendants' arbitrary

refusals to go after profitable business, and their rigid refusals to make sales by lowering prices

even slightly, confirms that the Defendants were bound by commitments to one another

regarding their Rail Fuel Surcharge practices.

### ADDITIONAL EVIDENCE OF A CONSPIRACY

97.     Apart from this direct evidence of price fixing, there is further support that

Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is

marked by certain structural and other characteristics that make a price fixing conspiracy

feasible:

a.     Defendants had a motive to enter into a price fixing conspiracy because

conditions existed in the railroad industry that were conducive to collusion. The railroad

industry is highly concentrated. Defendants are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic, and there is no fringe or niche market of smaller carriers. There are also high fixed costs in the industry. Such high concentration and fixed costs facilitate a price fixing cartel. Indeed, the railroad industry today is a textbook example of an industry susceptible to efforts to maintain a price fixing conspiracy.

b.      There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c.      Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services, such as rail freight transportation services, are susceptible to price fixing.

     d.     The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." The Rail Fuel Surcharge program engaged in by the Defendants is strikingly similar to those collective rate-making practices of the past.

     e.     The CEO's of Defendants are all board members of the AAR, which facilitated transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).[1] The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

98.     Apart from these structural market features, Defendants did not behave as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

99.     Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the

---

[1]  A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line (footnote continued)

Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices. The other Defendants refused to address the concerns of their customers.

100.    At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

101.    Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. The Defendants, however,

---

Railroad Co.; and (7) UP. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior, hardly routine market conduct, gives rise to an inference of price fixing.

102. Defendants also decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, Defendants moved increasingly to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one railroad, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge..

103. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not fluctuate significantly during the Class Period is further indication that Defendants agreed to fix prices rather than to compete for new sales.

### DEFENDANTS PROFITED FROM THE SURCHARGES

104. Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

105.    Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result
of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharges.
Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during
the Class Period in excess of their actual increase in fuel costs from the specific customers on
whom they imposed the surcharge.  During the period of the conspiracy (July 2003 to the
present), Defendants increased their market capitalization from approximately $40 billion to
approximately $105 billion, or an increase of about 160 percent  This dramatic increase is in part
attributable to fuel surcharge revenue realized by the railroads from their price fixing conspiracy.

### ANTITRUST INJURY TO PLAINTIFFS AND THE CLASS

106.    The unlawful conduct, combination or conspiracy alleged herein had and is
having the following effects, among others:

    a.    The Rail Fuel Surcharges charged to Plaintiffs and the Class for
unregulated rail freight transportation have been fixed or stabilized at
supra-competitive levels;

    b.    Plaintiffs and the Class have been deprived of the benefits of free, open
and unrestricted competition in the market for unregulated rail freight
transportation; and

    c.    competition in establishing the prices paid in the United States for
unregulated rail freight transportation has been unlawfully restrained,
suppressed and eliminated.

107.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the
Clayton Act, Plaintiffs and the members of the Class have sustained injury to their business or
property.  The injury sustained by the Plaintiffs and the Class is the payment of supracompetitive
prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of

Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation Of Section 1 Of The Sherman Act And Section 4 Of The Clayton Act)

108.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

109.    Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

110.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

111.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

112.    The contract, combination or conspiracy has had the following effects:

a.    Prices charged to Plaintiffs and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra competitive levels;

    b.     Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

    c.     competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

113.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be denominated as class representative, and that Plaintiffs' counsel be appointed as counsel for the Class;

(2)    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)    That Plaintiffs and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and each and every member of the Class;

(4)    That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5)    That Plaintiff and the Class recover treble damages, as provided by law;

(6)    That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

(7)    For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury

trial as to all issues triable by a jury.

Dated:  July 17, 2007

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN

By: _____
JAMES E. CECCHI

Stephen Neuwirth
Quinn Emanuel Urquhart Oliver
    & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7100

James E. Cecchi
Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart &
    Olstein
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Richard Scruggs
Scruggs Law Firm, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS  38655
(662) 281-1212

Robert N. Kaplan
Kaplan Fox & Kilsheimer L.L.P.
805 Third Avenue, 14th Floor
New York, New York  10022
(212) 687-1980

***Coordinating Counsel for Plaintiffs***
***In All New Jersey Cases***

Stephen Neuwirth
Philippe Selendy
Sami H. Rashid
Quinn Emanuel Urquhart Oliver
    & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7100

Daniel Brockett
Quinn Emanuel Urquhart Oliver
    & Hedges, LLP
865 S. Figueroa Street
Los Angeles, California  90017
(213) 443- 3000

James E. Cecchi
Lindsey H. Taylor
Carella, Byrne, Bain, Gilfillan, Cecchi,
    Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C.  20007
(202) 298-8100

Richard Scruggs
Sidney Backstrom
Scruggs Law Firm, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS  38655
(662) 281-1212

*Attorneys for Plaintiff Dust Pro, Inc.*

Lisa J. Rodriguez
Trujillo Rodriguez & Richards L.L.C.
8 Kings Highway West
Haddonfield, New Jersey 08033
(856) 795-9002

Robert N. Kaplan
Linda P. Nussbaum
Kaplan Fox & Kilsheimer L.L.P.
805 Third Avenue, 14th Floor
New York, New York 10022
(212) 687-1980

Michael E. Criden
Kevin B. Love
Hanzman, Criden & Love, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
(305) 357-9000

*Attorneys for Plaintiff Isaac Industries, Inc.*

Lisa J. Rodriguez
Trujillo Rodriguez & Richards L.L.C.
8 Kings Highway West
Haddonfield, New Jersey 08033
(856) 795-9002

Paul F. Bennett
Steven O. Sidener
Joseph M. Barton
Gold Bennett Cera & Sidener LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
(415) 777-2230

*Attorneys for Plaintiff Bar-Ale, Inc.*

Lisa J. Rodriguez
Trujillo Rodriguez & Richards L.L.C.
8 Kings Highway West
Haddonfield, New Jersey  08033
(856) 795-9002

H. Laddie Montague, Jr.
Ruthanne Gordon
Eric L. Cramer
Mathew P. McCahill
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania  19103
(215) 875-4604

Anthony J. Bolognese
Bolognese & Associates, LLC
1617 JFK Boulevard, Suite 650
Philadelphia, Pennsylvania  19103
(215) 814-6751

***Attorneys for Plaintiff United Co-Operative Farmers, Inc.***

James E. Cecchi
Lindsey H. Taylor
Carella, Byrne, Bain, Gilfillan, Cecchi,
     Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Theodore J. Leopold, Esq.
Ricci~Leopold, P.A.
2925 PGA Blvd., Suite 200
Palm Beach Gardens, FL 33410
(561) 684-6500

***Attorneys for Plaintiff Carter Distributing Company***

James E. Cecchi
Lindsey H. Taylor
Carella, Byrne, Bain, Gilfillan, Cecchi,
    Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Attorneys for Plaintiff Blue Grass Tobacco Company*

William J. Pinilis
Kaplan Fox & Kilsheimer L.L.P.
237 South Street
Morristown, New Jersey  08033
(973) 656-0222

Robert N. Kaplan
Linda P. Nussbaum
Susan R. Schwaiger
Kaplan Fox & Kilsheimer L.L.P.
805 Third Avenue, 14th Floor
New York, New York  10022
(212) 687-1980

Anthony J. Bolognese
Bolognese & Associates, LLC
1617 JFK Boulevard, Suite 650
Philadelphia, Pennsylvania  19103
(215) 814-6751

Joseph C. Kohn
Kohn Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
(215) 238-1968

*Attorneys for Plaintiff Lancaster Foundry Supply Company, Inc.*

Stanley D. Bernstein, Esq.
Mel E. Lifshitz, Esq.
Ronald J. Aranoff, Esq.
Bernstein Liebhard & Lifshitz, LLP
10 East 40th Street - 22nd Floor
New York, New York 10016
(212) 779-1414

Jan Meyer
Law Offices of Jan Meyer
1029 Teaneck Road
2nd Floor
Teaneck, New Jersey 07666
(201) 862-9500

*Attorneys for Plaintiff Somerset Industries, Inc.*

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **McINTYRE GROUP, LTD.,**<br>24601 Governors Highway,<br>University Park, IL 60466,<br>on behalf of itself and all others similarly<br>situated,<br><br>        **Plaintiff,**<br><br>        v.<br><br>**ASSOCIATION OF AMERICAN<br>RAILROADS, BNSF RAILWAY<br>COMPANY, CSX TRANSPORTATION,<br>INC., KANSAS CITY SOUTHERN<br>RAILWAY COMPANY, NORFOLK<br>SOUTHERN RAILWAY COMPANY, AND<br>UNION PACIFIC RAILROAD<br>COMPANY,**<br><br>        **Defendants.** | **Civil Action No. 07-cv-01101 (PLF)**<br><br><br><br><br>**AMENDED CLASS ACTION<br>COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff McIntyre Group, Ltd. ("McIntyre" or "Plaintiff"), individually and on behalf of

a class of all those similarly situated, brings this action for damages under the antitrust laws of

the United States against Defendants Association of American Railroads, BNSF Railway

Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern

Railway Company, and Union Pacific Railroad Company.

Plaintiff, by and through undersigned counsel, complains and alleges as follows upon

information and belief except as to paragraphs applicable to Plaintiff individually, which are

based upon personal knowledge:

## NATURE OF THE ACTION

1.      This antitrust class action charges that Defendants – the nation's Class I railroads and the trade association they control – have engaged in price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. "Class I Railroads" are line haul freight railroads with 2005 operating revenue in excess of $319.3 million.

2.      Plaintiff brings this action on behalf of itself and a class of entities who purchased unregulated rail freight shipping services from Defendants from July 1, 2003 to the present (the "Class Period") and who were assessed a so-called "fuel surcharge" for the shipping services (hereafter, "Rail Fuel Surcharge").

3.      Defendants conspired and combined to fix the prices of Rail Fuel Surcharges added to customers' bills during the Class Period.

4.      Defendants used rising fuel costs as cover for their collusive efforts to boost revenues through fuel surcharge programs shielded from normal competitive forces.  Defendants portrayed their Rail Fuel Surcharges as necessary to recoup unexpected fuel cost increases.  However, pursuant to their agreement, Defendants employed Rail Fuel Surcharges as revenue generators and profit centers.

5.      Defendants jointly implemented their conspiracy by working through the Defendant Association of American Railroads ("AAR"), a trade association that Defendant Railroads control.  The AAR had for years published an inflation index known as the Rail Cost Adjustment Factor ("RCAF"), which was used to modify shipping rates for regulated and unregulated freight shipments.  The RCAF relied upon a cost index known as the All-Inclusive Index ("AII"), which closely tracked seven input costs to the railroads, including fuel.  These

seven inputs were weighted according to their respective contribution to total cost. The RCAF, therefore, provided a mechanism by which Defendant Railroads could increase their rates based on actual increases in the price of fuel.

6.    Defendants' customers were accustomed to the RCAF, which was generally considered an accurate cost-inflation index. The Defendant Railroads, however, determined that they could achieve not merely cost recovery, but significant revenue gains, by collectively moving from solely adjusting rates by the RCAF to adding a separate fuel surcharge calculated as a percentage of the total rates charged to shippers.

7.    In 2003, Defendants worked together through the AAR to create and publish a new index – the All Inclusive Index Less Fuel ("AII-LF") – which *removed* fuel as a cost component from the RCAF. After jointly "de-coupling" fuel from the RCAF, Defendants then coordinated their fuel surcharge programs, brought them into lockstep, and began to impose them on customers as contracts expired and were renewed.

8.    The Defendant Railroads published their Rail Fuel Surcharges on the Internet to facilitate coordination and maintenance of collusive pricing. Defendants continued to do so even after the Antitrust Division of the Department of Justice raised concerns about the public disclosure of rates in their industry.

9.    Prior to the beginning of the conspiracy, Defendants' rail freight operating income had been essentially flat for several years. Following implementation of the conspiracy in 2003, Defendants' revenues rose sharply and continued to rise throughout the Class Period.

10.    Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Railroad Defendants. For example, after concluding in 2003 that Rail Fuel Surcharges charged by the Railroad Defendants were "not supported" by fuel

cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition."

11.     As a result of their price-fixing conspiracy, Defendants restrained competition for unregulated rail freight transportation services and caused injury to the business and property of Plaintiff and members of the proposed Class. Plaintiff and the Class paid higher prices for Rail Fuel Surcharges and unregulated rail freight transportation than would have been paid absent Defendants' unlawful activities.

12.     Plaintiff seeks damages on behalf of itself and the proposed Class for Rail Fuel Surcharges imposed on rail freight shipments made pursuant to private transportation contracts and through other means exempt from rate regulation under federal law.

## JURISDICTION AND VENUE

13.     Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15.     Venue is proper in this district pursuant 28 U.S.C. § 1391(b) and (c) and by Section 12 of the Clayton Act, 15 U.S.C. § 22.

16.     Defendants maintain offices, have agents, or transact business within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District;

and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

17.    This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PARTIES

18.    Plaintiff McIntyre Group, Ltd. is a corporation organized under the laws of the State of Illinois, with its principal place of business at 24601 Governors Highway, University Park, IL 60466. McIntyre is a leading manufacturer of high quality surficants, polymers, chemical specialties, and cosmetic preservatives for the formulation of personal care, household, industrial, and institutional products.

19.    McIntyre purchased unregulated rail freight transportation service directly from one or more of the Defendants during the Class Period and was assessed a Rail Fuel Surcharge.

20.    Defendant Association of American Railroads ("AAR") is a trade association located in Washington, D.C. Among other things, AAR publishes indexes used to compute unregulated rail freight charges, engages in lobbying on behalf of its members, gathers and maintains a variety of information relating to rail freight service, and issues publications. AAR offers various tiers of membership, with "full membership" being available to any Class I railroad. It is governed by a board of directors that includes the top executives of each United States Class I railroad. According to AAR's Internet site: "Full membership offers the broadest

array of AAR member benefits, including legislative and legal matters, safety, operations, research, and communications. Benefits include all those provided to Associate Members, as well as additional information provided through AAR committees. Full member assessments are set on a sliding scale based on the member's gross freight service revenues (or passenger revenues, in the case of passenger railroads). Full member railroads with gross freight revenues exceeding certain thresholds are eligible for a seat on AAR's Board of Directors." The Railroad Defendants named in this action are all full members of the AAR and their chief executive officers are members of the AAR board of directors.

21.    Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

22.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

23.      Defendant Kansas City Southern Railway Company ("KCSR") has its principal

place of business at 427 W. 12th St., Kansas City, Missouri 64105.  KCSR owns and operates

major freight railroad in ten states across the central and south central United States.

24.      Defendant Norfolk Southern Railway Company ("NS") has its principal place of

business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad

operating primarily in the eastern United States.  NS serves all major eastern ports and connects

with rail partners in the West, linking customers to markets around the world.  NS operates an

intermodal terminal at 1000 S. Vandorn St., Washington, D.C. 20001 and maintains a

government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

25.      Defendant Union Pacific Railroad Company ("UP") has its principal place of

business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in

the United States.  UP serves primarily the western two-thirds of the United States and maintains

coordinated schedules with other rail carriers to handle freight to and from other parts of the

country.  UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## CLASS ACTION ALLEGATIONS

26.      Plaintiff brings this action on behalf of itself and all others similarly situated (the

Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Class is

defined as follows:

> All purchasers of rail freight transportation services from
> Defendants, through use of private railroad-shipper contracts or
> through other means exempt from rate regulation under federal
> law, as to which Defendants assessed a Rail Fuel Surcharge, at any
> time from at least as early as July 2003 to the present (the "Class
> Period").
> Excluded from the Class are Defendants, any subsidiaries or
> affiliates of Defendants, any of Defendants' co-conspirators,
> whether or not named as a Defendant in this Complaint, and all
> governmental entities.

27.    Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of the Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable.  Plaintiff further believes that the members of the Class can be readily ascertained from Defendants' books and records.

28.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, on which Defendants imposed the artificially inflated Rail Fuel Surcharges. Plaintiff and Class members sustained damages by paying inflated prices for the unregulated rail freight transportation as a result of Defendants' illegal conduct.

29.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

30.    There are questions of law or fact common to the Class, including but not limited to the following:

a.    Whether Defendants conspired or combined with others for the purpose and with the effect of fixing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b.    Whether Defendants' conduct violated the federal antitrust laws; and

c.    Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

31.    These and other questions of law and fact are common to the Class, and
predominate over any questions affecting only individual Class members.

32.    A class action is superior to other available methods for the fair and efficient
adjudication of this controversy since joinder of all Class members is impracticable.  The
prosecution of separate actions by individual members of the Class would impose heavy burdens
upon the courts and Defendants and would create a risk of inconsistent or varying adjudications
of the questions of law and fact common to the Class.  A class action would achieve substantial
economies of time, effort, and expense and would assure uniformity of decision as to persons
similarly situated without sacrificing procedural fairness or bringing about other undesirable
results.

## FACTUAL ALLEGATIONS

### BACKGROUND

**The Once Heavily Regulated Railroad Industry Became Largely Deregulated**

33.    In the 1970s, the freight railroad industry – then closely regulated by the federal
government – was experiencing serious economic trouble with rising operating costs, financial
losses, and corporate bankruptcies.  In response, Congress passed the Railroad Revitalization and
Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980 (the "Staggers Act"), which
together largely deregulated the industry.

34.    As a result of the Staggers Act, railroads and shippers could enter into private rail
freight contracts.  In markets where railroads face effective competition and where rates and
service terms are in privately negotiated rail transportation contracts between the railroad and the
shipper, the freight rates are unregulated by government agencies.  Because shippers in some
areas may not have competitive alternatives to a single railroad ("captive shippers"), Congress

gave the Interstate Commerce Commission ("ICC") authority to establish a process under which captive shippers could obtain relief from unreasonably high rates. The ICC was later abolished by the Interstate Commerce Commission Termination Act of 1995, and its relevant rail freight regulatory functions were transferred to the Surface Transportation Board ("STB").

35.    The STB continues to regulate certain aspects of the freight railroad industry. Railroads, for example, have a common carrier obligation to provide rail service upon reasonable request. 49 U.S.C. 11101(a). They can provide that service under rates and terms agreed to in a confidential contract with the shipper, 49 U.S.C. 10709, or under openly available common carriage rates and service terms. 49 U.S.C. 11101. Rates and service terms established by contract are generally not subject to STB regulation, except for limited protections against discrimination involving agricultural goods. 49 U.S.C. 10709(b), (c). The STB has also exempted certain categories of freight traffic from regulation.

36.    This lawsuit deals only with rail freight not regulated by the STB, which comprises approximately 80 percent of the rail freight market.

### After Deregulation, the Rail Freight Industry Became Concentrated; Collusion Became Feasible and Attractive

37.    The railroad freight industry became highly concentrated after deregulation. In 1976, there were 63 Class I railroads operating in the United States. By early 2000, the railroad industry had become so concentrated that further consolidation was unlikely if not impossible. On March 17, 2000, the STB imposed a moratorium on any major railroad merger proposals.

38.    By 2003, the five Railroad Defendants were the only remaining U.S.-based Class I railroads. This concentration made collusion on rates and/or fuel surcharges feasible.

39.    Currently, the five Railroad Defendants named in this action operate more than 90 percent of all domestic railroad track and are responsible for more than 90 percent of the total ton-miles of Class I rail freight shipped in the United States.

40.    In the AAR, which the Railroad Defendants control, the Railroad Defendants had a ready-made forum in which to collude.

41.    The Railroad Defendants also had an incentive to collude.  Because of a variety of factors – including mismanagement and inefficiencies associated with integrating acquired railroads – the Railroads Defendants had witnessed relatively flat or declining operating income in the several years prior to 2003.

## THE FUEL SURCHARGE CONSPIRACY

### Defendants Implement the Conspiracy in 2003

42.    In 2003, the Railroad Defendants worked together to implement fuel surcharge programs pursuant to which Rail Fuel Surcharges would serve as revenue generators.

**A.    The Railroads jointly remove fuel from their cost-adjustment index.**

43.    The Rail Cost Adjustment Factor ("RCAF") measures the rate of inflation in railroad inputs such as labor and fuel.  It was created for regulatory purposes and is overseen by the STB.  Defendant AAR calculates the RCAF, submits it to the STB for approval, and it is used in part to adjust regulated rate tariffs (which are not at issue in this case).

44.    For many years prior to 2003, the Railroad Defendants had also been using the RCAF in rate-adjustment provisions in unregulated contracts with customers (which are at issue in this case).  Railroads and shippers sometimes disagreed about such things as what percentage of the change in the RCAF to use in contracts and whether to include a productivity adjustment.

However, the RCAF was generally accepted by many of Defendants' customers and considered a reasonably reliable measure of changes in costs, including fuel costs.

45.    The price index that primarily underlies the RCAF is known as the All-Inclusive Index ("AII"). Seven component indices are weighted together to comprise the AII: Labor, Fuel, Materials & Supplies, Equipment Rents, Depreciation, Interest, and Other Expenses. Each component index, and the weights applied to each, are calculated based on freight operating expenses plus fixed charges, from data supplied to the STB by the Class I railroads in their annual reports.

46.    The fuel component index of the AII represents the change in the average price per gallon of No. 2 diesel fuel paid by the largest railroads. The price includes Federal excise taxes, transportation, and handling charges. The index, which is adjusted quarterly, reflects the original purchase price of fuel charged to railroad operating expenses during the middle month of the quarter.

47.    The fuel component index of the AII is, in short, a measure based on actual cost data from the Defendant Railroads designed to adjust rates to capture changes in fuel costs – exactly what Defendants claim their fuel surcharge programs are designed to do. Indeed, since 1984, the ICC (now the STB) has issued a standing invitation to the Defendant Railroads, and other parties, to petition for a change in the RCAF if they feel that it does not accurately reflect fuel prices.

48.    In 2003, Defendant Railroads decided that the use of the RCAF to adjust rates in unregulated shipping contracts was not allowing them to generate as much revenue as the Railroads could generate if they divorced Rail Fuel Surcharges from actual fuel cost and instead applied Rail Fuel Surcharges to the prices they charged for shipping freight.

49.     Accordingly, in 2003, Defendants worked together through the AAR to create and publish an index without a fuel component that Defendants could use when negotiating new contracts.  The creation and use of such an index was intended to allow Defendants to impose on their customers a Rail Fuel Surcharge applied to total revenue, without regard to actual fuel cost.

50.     Defendant BNSF has acknowledged that it worked through the AAR (*i.e.*, with the other Railroad Defendants) to accomplish this revenue-generating measure in 2003.  In a 4th Quarter 2003 earnings presentation, BNSF executives revealed that they had worked actively during the year with the AAR to publish an RCAF index without fuel.  The executives stated that they had "looked hard" at the component of the RCAF covering fuel and "felt it was inadequate."  They planned to look at their customers in the "next two to five years as contracts expire" in order to "de-couple" the fuel component from the cost-escalation provisions in the contracts, so they could replace them with a fuel-surcharge program tied to revenue.

51.     In December of 2003, the AAR announced the "All-Inclusive Index Less Fuel" ("AII-LF").  As its name indicates, this index is merely the AII without the fuel component.  It was the product of Defendants' collective action and a key to the effectiveness of their conspiracy.

52.     Following publication of the AII-LF, the Railroad Defendants instituted Rail Fuel Surcharges as a separate line item in contracts and bills submitted to shippers.  When the price of oil rose in late 2003 and early 2004, Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues.

53.     In a July, 2004 earnings conference call, John Lanigan, BNSF's Chief Marketing Officer, was asked how BNSF planned to introduce revenue-based fuel surcharges into contracts with coal shippers, who were used to using the RCAF as a cost-adjustment provision.  Lanigan

responded that BNSF would be able to do so because of changes made to the RCAF through the

AAR.  Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated:

"What happened last year, and Matt led the charge on there, is that there's a new index that

[AAR] has that's basically an index without fuel. ... So we'll do RCAF less fuel plus a direct

fuel surcharge in the future."

54.     At about the same time, UP also was stating that it too was abandoning the fuel

component of the RCAF in favor its direct surcharge program, noting that although the RCAF

"looks at actual costs through the industry," the move to a fuel surcharge program was "a good

model" that is "much more current and that's our direction where we want to go over time here."

55.     The creation and publication of an RCAF without a fuel component was not

required by any regulatory body, nor was it necessary for any Railroad Defendant to institute

independently its own individual fuel surcharge program.  Instead, it was the product of joint

action by Defendants to achieve their collective goal of generating additional profits through

implementing revenue-based fuel surcharges.

**B.     Defendants' meetings outside the AAR**

56.     The AAR was not the only place at which Defendants were able to meet and

coordinate their surcharge programs.  Defendants' executives, many of whom have long personal

and professional relationships, met during and just before the Class Period in forums conducive

to reaching and maintaining agreement about their fuel surcharge programs.

57.     For example, in or about late March 2003, top executives of the five Railroad

Defendants attended the Spring, 2003 National Freight Transportation Association ("NFTA")

meeting at the Greenbrier Resort in West Virginia, which is owned by Defendant CSX.

According to its Internet site, the "object of the [NFTA] is to provide a forum for transportation

executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry.

58.    NFTA meetings facilitate the development of personal relationships among the attendees.  The NFTA Spring 2003 meeting allowed Defendants' top executives ample cover to meet and conspire at meals, on the golf course, and at other resort facilities.  The meeting provided numerous opportunities for Defendants to discuss and agree upon the coordination of their fuel surcharge programs that began in mid-2003.

59.    Defendants' coordination at such meetings and events is facilitated by the fact that, in the insular culture of the railroad industry, many of Defendants' executives have personal and professional connections that span decades.  Some of Defendants' executives entered the railroad business together.  For example, Richard K. Davidson (Chairman, President, and CEO of UP until January 31, 2007) and Michael Haverty (President and CEO of KCSR) began their careers in the same Missouri Pacific Management Training Program.  (Missouri Pacific was acquired by UP in 1982.)

60.    Matthew Rose of BNSF also later attended the Missouri Pacific Management Training Program.  Rose, who purportedly "led the charge" to have the AAR publish the AII-LF, has been referred to in the railroad trade press as a "leading proponent of industry pricing discipline."

**C.    Defendants coordinate their Rail Fuel Surcharge programs and bring them into lockstep.**

61.    At the same time Defendants were working together through the AAR to "de-couple" fuel from the standard cost-escalation indices used in the industry, and meeting at the NFTA and otherwise, Defendants began to bring their fuel surcharge programs into lockstep.

62.    The Railroad Defendants acted in concert in demanding Rail Fuel Surcharges from shippers and by agreeing to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate paid by customers.

63.    Such a revenue-based fuel surcharge bore no direct relationship to actual increases in fuel costs. According to the STB, the Railroad Defendants have essentially conceded that the Surcharges are not a means of recovering increased fuel costs associated with the movement of freight, but are rather a "revenue enhancement measure" intended to achieve across-the-board increases in the prices charged by Defendants for rail freight transportation. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 at 7 (Jan. 25, 2007).

64.    In June of 2003, BNSF and UP (the two railroads based in the western United States) began to coordinate their Rail Fuel Surcharge prices. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index, while the BNSF carload fuel surcharge was based on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June of 2003, however, UP switched to the HDF Index. From then on BNSF and UP moved in lockstep with each other both charging the exact same Rail Fuel Surcharge for each month of the Class Period.

65.    UP's move to the same fuel price index used by BNSF in June of 2003 is striking evidence of concerted conduct in light of the fact that just *two months before*, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and

began charging exactly the same surcharges as BNSF is evidence that this switch was the result of concerted conduct.

66.    BNSF and UP agreed to apply the HDF index to their fuel surcharge programs in precisely the same way.  Whenever the U.S. average retail price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon.  So, for example, if the HDF Index rose 50 cents to $1.85 per gallon, BNSF and UP would apply a surcharge of 5 percent.  The surcharge would increase/decrease 10 percent for every $1 dollar increase/decrease in the HDF Index and corresponding increments thereof.

67.    BNSF and UP also coordinated when they would change their fuel surcharges. They agreed that the surcharge would be announced the first day of the month following a change in the Index and would become effective the month after that.  So, for example, if the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

68.    Using the HDF index, BNSF and UP moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

69.    The Fuel Surcharge Percentages charged by BNSF and UP for carload shipments varied before the Class Period began, but were identical starting in July, 2003.

70.    It defies reason to suggest that BNSF and UP, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the

same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index,

(3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel

consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on

which Surcharges would be announced, (6) the dates on which Surcharges would become

effective, and (7) the amount of the Surcharges.

71.     In short, the fact that BNSF and UP both chose and adhered to this same

combination of features for their Rail Fuel Surcharge programs shows that they coordinated their

behavior.  The similarities are both too precise and too comprehensive to have been arrived at

independently.

72.     CSX announced its new "fuel cost recovery program" on March 20, 2003, which

is about the same time it hosted the NFTA meeting attended by the Railroad Defendants.  As part

of its new program, CSX began to apply its fuel surcharges in "smaller increments," adjusting

them to the thirty-day average price of West Texas Intermediate ("WTI") crude oil.

73.     CSX and NS are based in the eastern United States.  Shortly after the AAR

announced the new AII-LF, NS announced its "modified" surcharge program, which yielded the

exact same surcharges as CSX's program.

74.     Defendants CSX and NS agreed to base their fuel surcharge programs on the

average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall

Street Journal*.  Indeed, not only did these railroads agree to use the WTI index (as opposed to

many other available indices); they too agreed to administer the index in precisely the same way.

75.     Specifically, CSX and NS agreed to apply a fuel surcharge whenever the monthly

average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were

increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel.  So,

for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward/downward by 2 percent for every $5 increase/decrease in the WTI average price.

76.     CSX and NS also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby using the same fuel surcharge price timing used by BNSF and UP.  For example, if the WTI average price exceeded $23 per barrel in January, the CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, CSX and NS could apply exactly the same fuel surcharge percentage month after month.  CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

77.     The net result is that there was uniformity among CSX and NS in the monthly surcharge percentages they charged customers for almost all of the Class Period.

78.     The Fuel Surcharge Percentages charged by CSX and NS for shipments varied before the Class Period, but were identical starting in March of 2004, and they also were identical to those of KCSR starting in June of 2005, when KCSR joined the conspiracy.

79.     It defies logic that Defendants, facing myriad differences in economic factors and business demands and requirements, would independently make the same decisions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would become effective, and (6) the amount of the Surcharges.

80.     In short, the fact that CSX, NS, and KCSR chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their

behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

81.     The Railroad Defendants operate geographically dispersed, multibillion dollar corporations with thousands of locomotives, and other pieces of heavy railroad equipment, and have massive fuel requirements. The Railroad Defendants acquire fuel at different prices at different times to meet their various business requirements. The specific minutiae of Defendants' parallel behavior as described herein could not have resulted from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advanced understanding among the parties.

### Defendants Used Surcharges to Fix Rail Freight Prices and Increase Profits, Not to Recover Costs

82.     The Railroad Defendants' use of the Rail Fuel Surcharges was not routine free market conduct. In addition to the practical impossibility that each Railroad Defendant would make so many of the same Rail Fuel Surcharge business decisions independently, such a convergence would simply not occur in a free market. In a competitive market, the levying of surcharges by one or a few railroads based on a percentage of a customer's base rate – bearing no relation to the actual costs of fuel consumed – should result in competitive moves by other railroads seeking to gain business. Here, the Railroad Defendants did not compete, even in the presence of discontented customers, and the only plausible explanation for that lack of competition is that the Railroad Defendants had entered into an unlawful agreement.

83.     Defendants, from the beginning of the Class Period and before, fixed the price of the Rail Fuel Surcharges in order to increase artificially the prices of rail freight transportation services. The surcharges were not a cost recovery mechanism, they were a revenue generating profit center. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to

the shipper, the Railroad Defendants ensured that there would be no real correlation between the

rate increase and the increase in fuel costs for the particular shipment to which the surcharge was

applied.

84.    The fuel indices used by the Railroad Defendants clearly overestimate the price

Defendants paid for fuel.  The HDF and WTI are retail price indices, but railroads do not

purchase fuel on the retail market.  Defendants purchase diesel fuel in bulk and pay wholesale

prices.

85.    Defendants' use of retail price indices allowed them to over-recover their actual

fuel costs.  For example, BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per

gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon.  Thus,

BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004.  In contrast, the HDF 3rd

Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a

25.3% increase.  Due to this disparity in increase percentages, shippers purchasing from BNSF

paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004.  Shippers

of unregulated freight from the other Railroad Defendants similarly over-paid during this and

other periods.

86.    Another reason why Defendants' Rail Fuel Surcharges were divorced from actual

cost increases is that the surcharge levels disregarded gains in fuel efficiency.  As explained in a

2007 AAR publication, the Railroad Defendants' fuel efficiency is "constantly improving."

BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency

over the prior ten years.  In 2006, the railroads could, on average, move one ton of freight 423

miles on one gallon of diesel fuel.  By calculating fuel surcharges as a percentage of the shipping

rate, the Railroads deflected attention from the cost savings they achieved through fuel efficiency

gains. Additionally, all gains from fuel efficiency were kept as profit. In a competitive market,
Defendants would have used such cost advantages to compete on price.

87.    Similarly, Defendants previously reduced the prices they paid for diesel fuel by
engaging in large-scale price hedging activities. Railroads are in a unique position of being able
to perform large scale physical hedging because of the substantial amounts of fuel they use.
However, Defendants have reduced or eliminated their fuel hedging programs as their Rail Fuel
Surcharge programs became ever more successful at generating revenue. In a competitive
market, Railroads would not have foregone seeking cost advantages through active fuel hedging
programs.

88.    Another aspect of Defendants' conspiracy is that the Railroad Defendants
maintained low initial trigger points for their fuel surcharge programs, which were well below
the cost of fuel they were incorporating into their rates. For example, UP maintained during the
Class Period an initial trigger point of $1.35 per gallon – meaning that fuel surcharges would be
instituted when the HDF index exceeded $1.35 per gallon. The HDF has not been below $1.35
per gallon since September, 2002. However, UP never rebased its minimum threshold for
triggering application of a fuel surcharge, even as it raised rates to shippers that reflected, in part,
increases in fuel costs. The other Railroad Defendants similarly maintained low trigger points.

**The STB Ruled That Defendants' Surcharges Constitute an "Unreasonable Practice" as**
**Applied to Regulated Freight Shipments**

89.    In January of 2007, the STB served an administrative decision concluding that the
Railroads' practice of computing Rail Fuel Surcharges as a percentage of base rates for regulated
rail freight transport was "a misleading and ultimately unreasonable practice" because the fuel
surcharges are not tied to the fuel consumption associated with the individual movements to

which they are applied. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex

Parte No. 661 (Jan. 25, 2007). The STB directed railroads to stop this unreasonable practice. *Id.*

90.    Although the STB's decision applied only to regulated freight, the Railroad

Defendants followed the same unreasonable practices with regard to the unregulated freight that

is the subject of this complaint.

**Defendants Published Their Fuel Surcharges on their Websites to Facilitate Coordination
and Implementation of the Conspiracy**

91.    Throughout the Class Period, the Railroad Defendants published their fuel

surcharges on their websites to facilitate collusion and to police the conspiracy.

92.    The Railroad Defendants did this even though they were aware that concerns were

raised by members of the Congress of the United States and the Antitrust Division of the

Department of Justice about the public disclosure of pricing information by railroads.

93.    In July of 2004, Representative F. James Sensenbrenner, Jr., Chairman of the

House of Representatives' Committee on the Judiciary, wrote a letter to the Antitrust Division of

the Department of Justice raising several potential concerns with railroad industry activities.

Among these concerns was that the "major western Class I railroads" (*i.e.*, BNSF and UP) were

attempting to disclose prospective shipping rates publicly in non-confidential pricing circulars.

94.    On September 27, 2004, the Antitrust Division responded, stating:

> Under the antitrust laws, the public disclosure of pricing information among
> competitors can, under some circumstances, facilitate collusion and result in
> increased prices, in violation of section 1 of the Sherman Act. *See, e.g., United
> States v. Airline Tariff Publishing Co.*, 1994 Trade Cas. (CCH) ¶ 70,687 (D.D.C.
> 1994). **Publicly announcing prospective rates outside the confines of a rate
> approval proceeding at the Surface Transportation Board is likely to be
> subject to review under the antitrust laws.** If you know of anyone who has
> information that you believe might be useful for evaluating this practice under the
> antitrust laws, please encourage them to contact the Antitrust Division.
> (Emphasis added.)

95.    In February of 2005, the Antitrust Division began a probe of UP and BNSF's

pricing practices for coal shipments from the southern Powder River Basin in Wyoming and

Montana.

**Specific Concerns Were Raised About Defendants' Fuel Surcharge Practices**

96.    On October 19, 2005, Senator Tim Johnson wrote to the Federal Trade

Commission ("FTC") expressing concern about the "skyrocketing costs of rail transportation

during th[e] fall season," and specifically urging the FTC to investigate the fuel surcharges being

imposed by Defendants on the shipment of commodities.  As Senator Johnson observed, "We've

seen a steady increase in the fuel surcharge for the shipment of commodities this fall, and while

the high price of fuel may excuse some additional expenses for transportation this fall, producers

are concerned that this surcharge may in fact be excessive."

97.    Even in the face of such concern, and the growing outcry from customers, no

Defendant made any significant effort to modify its fuel surcharge program on unregulated

freight to attract customers and gain market share during the Class Period, and the Defendants

only made changes to their regulated traffic after being forced to do so by the STB.  This

disregard of normal competitive behavior strongly indicates the operation of anticompetitive

conduct.

**ANTITRUST "PLUS FACTORS"**

98.    Additional antitrust "plus factors" further support the allegation that Defendants

agreed to fix prices for Rail Fuel Surcharges.

99.    <u>The railroad industry is highly concentrated</u>.  The Railroad Defendants in this

case are the five largest remaining domestic Class I railroads following decades of mergers and

consolidation. The Railroad Defendants account for more than 90 percent of the nation's rail freight traffic. Such high concentration facilitates the possibility of a price-fixing cartel.

100.    There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. Such infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

101.    The Rail Fuel Surcharges were highly standardized. The Railroad Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications.

102.    The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate-making committees."

103.    The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating

and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

104.    Defendants acted in contravention of their individual economic interests. The Railroad Defendants did not behave as if they were in a competitive market:

i)    Defendants failed to compete on the Surcharges. In a competitive market, railroads levying surcharges based on a percentage of a customer's freight rate – bearing no relation to the actual costs of fuel consumed and therefore not actually crucial to cost recovery – would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Railroad Defendants that the Rail Fuel Surcharges were not negotiable. Several national shipper organizations met with each of the Railroad Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where BNSF is the only carrier. Aside from this, the Railroad Defendants refused to address the concerns of their customers.

ii)    Defendants' behavior alienated customers. At or about the time Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly, or monthly. Previously, the Railroad Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel

surcharges altogether. The Railroad Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Railroad Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

iii)    <u>Defendants changed billing practices to expose each other's prices</u>. The Railroad Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, the Railroad Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. The Railroad Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

105.    <u>During the Class Period, rail freight demand grew, but each Defendant's market share remained stable</u>. Demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet the Railroad Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during a

307049.1                                    27

period of demand growth is further indication that the Railroad Defendants agreed to price fix rather than to compete for new sales.

## INTERSTATE TRADE AND COMMERCE

106.    During the Class Period, the Railroad Defendants transported more than 90 percent of all rail freight shipments within the United States. According to the STB, railway operating revenues for all Class I freight railroads was more than $52 billion in 2006.

107.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market rail freight transportation services.

108.    The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

109.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a.    The prices paid by Plaintiff and the Class for unregulated rail freight transportation services were fixed or stabilized at supracompetitive levels;

b.    The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels;

c.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

d.    Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, and eliminated.

110.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by Plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges and unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

### COUNT I

**(Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)**

111.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

112.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

113.    The contract, combination, or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

114.    Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

115.    The contract, combination or conspiracy has had the following effects:

a.    Prices charged to Plaintiff and the Class for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

b.    Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

c.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

d.    Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

116.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges and unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C.    That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and each and every member of the Class;

D.    That each of the Defendants' respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

E.    That Plaintiff and the Class recover treble damages, as provided by law;

F.    That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

G.    For such further relief as the Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.


Dated:  September 25, 2007

/s/  Benjamin D. Brown
Michael D. Hausfeld (D.C. Bar #153742)
Benjamin D. Brown (D.C. Bar #495836)
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699
Email:  mhausfeld@cmht.com
         bbrown@cmht.com

Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak, Jr. (D.D.C. Bar #475609)
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130

307049.1

31

Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile:  (224) 632-4521
Email: skanner@fklmlaw.com,
      dmillen@fklmlaw.com,
      rwozniak@fklmlaw.com

Mark S. Goldman
**GOLDMAN, SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone: (484) 342-0700
Facsimile:  (484) 342-0701
Email: goldman@gsk-law.com

Andrew B. Sacks
**SACKS & WESTON**
114 Old York Road
Jenkintown, PA 19046
Telephone:  (215) 925-8200
Facsimile: (215) 925-0508
Email: ABS@sackslaw.com

James Shedden
Lawrence W. Schad
**SCHAD, DIAMOND & SHEDDEN, P.C.**
332 S. Michigan Avenue, Suite 1000
Chicago, IL 60604-4398
Telephone: (312) 939-6280
Facsimile:  (312) 939-4661
Email: jshedden@lawsds.com
      lschad@lawsds.com


***Attorneys for Plaintiff McIntyre Group, Ltd.  and
the Proposed Class***

# EXHIBIT F

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE INTERNATIONAL AIR
TRANSPORTATION SURCHARGE
ANTITRUST LITIGATION

_____/

This document relates to: ALL ACTIONS

_____/

No. M 06-01793 CRB

**ORDER APPOINTING INTERIM
CLASS COUNSEL**

**MDL 1793**

Now pending before the Court are several applications pursuant to Federal Rule of Civil Procedure 23(g) for appointment of interim class counsel. After carefully considering the applications of the distinguished and experienced counsel, and the requirements of Rule 23(g)(1)(C), the Court concludes that two law firms can effectively represent the class, and that the law firms of Cotchett, Pitre, Simon & McCarthy, Cohen and Millstein, Hausfeld & Toll, P.L.L.C. are "best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2)(B).

Cotchett, Pitre, Simon & McCarthy ably represented a plaintiff class before this Court in a previous MDL antitrust consolidated class action. Moreover, the Court is not concerned that Cohen, Millstein has a conflict of interest; rather, the Court believes its involvement in and knowledge of related litigation will be an asset to the plaintiff class in this litigation. Finally, not all the class counsel law firms are from California; Cohen, Millstein has offices around the country.

**United States District Court**

For the Northern District of California

1    Class counsel shall meet and confer with defendants' counsel and submit a stipulation

2   as to the filing of a consolidated amended complaint.  In the meantime, if class counsel

3   believe that it is appropriate for the Court to consider certain proposed settlements, they shall

4   file a motion for approval in accordance with Civil Local Rule 7, keeping in mind the

5   objections, including legal objections, that parties have previously raised.

6       **IT IS SO ORDERED.**

7

8   Dated: December 18, 2006                                   CHARLES  R. BREYER
                                                                UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G



# FREED  KANNER  LONDON & MILLEN LLC

2201 WAUKEGAN ROAD
SUITE 130
BANNOCKBURN, IL  60015
TELEPHONE (224) 632-4500
FACSIMILE (224) 632-4521

www.fklmlaw.com



FREED  KANNER  LONDON & MILLEN LLC

Freed Kanner London & Millen LLC ("FKLM") engages in a contingent fee class action practice throughout the United States. The firm's practice involves all aspects of complex antitrust, consumer fraud, securities, whistleblower, unlawful business practices and insurance fraud cases. The firm was founded on January 1, 2007, but its attorneys are among the pioneers and leaders in the class action field.

Previously, as members of Much Shelist Freed Denenberg Ament & Rubenstein, P.C. ("Much Shelist Freed"), the founding partners of FKLM successfully prosecuted class action cases for more than 30 years. Moreover, FKLM attorneys have served in leadership positions (as lead counsel, co-lead counsel, members of steering and executive committees, and co-chairs of discovery) in some of the largest class action cases in the United States, including the following:

> ***In re Brand Name Prescription Drugs Antitrust Litigation*, MDL 997 (N.D. Ill.)**

FKLM attorneys were co-lead counsel in this antitrust price-fixing class action. Settlements totaling approximately $715 million were recovered on behalf of the plaintiff class.

> ***In re The Prudential Ins. Co. of America Sales Practice Litigation*, MDL 1061 (D.N.J.)**

FKLM attorneys were co-lead counsel in this insurance fraud class action. The case resulted in a settlement of over $410 million for the class.

> ***In re High Fructose Corn Syrup Antitrust Litigation*, MDL 1087 (N.D. Ill.)**

FKLM attorneys were co-lead counsel in this antitrust price-fixing class action against major manufacturers of high fructose corn syrup. The case was settled for $531 million for the class. At the close of the hearing where counsel fees were approved, Judge Michael M. Mihm stated:

> I've said many times during this litigation that you and the attorneys who represent the defendants here are as good as it gets. Very professional. At least in my presence or in my contacts with you, you've always been civil. You've always been cutting to the chase and not wasting my time or each other's time or adding to the cost of the litigation.



FREED  KANNER  LONDON & MILLEN LLC

> ***In re Linerboard Antitrust Litigation*, MDL 1261 (E.D. Pa.)**

FKLM attorneys served as co-lead counsel in this antitrust price-fixing case, which resulted in total settlements of over $200 million for the plaintiff class.

> ***In re Vitamins Antitrust Litigation*, MDL 1285 (D.D.C.)**

FKLM attorneys served as co-chairs of discovery in this antitrust price-fixing action, which resulted in over $1.3 billion in settlements.

> ***In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, MDL 1486 (N.D. Cal.)**

FKLM attorneys served as co-chairs of discovery in this nationwide antitrust price-fixing action which resulted in settlements of over $300 million for class members.

> ***In re Rubber Chemicals Antitrust Litigation*, MDL 1648 (N.D. Cal.)**

FKLM attorneys served on the Executive Committee in this nationwide antitrust price-fixing action, which resulted in settlements of over $300 million for class members.

> ***In re Waste Management, Inc. Securities Litigation*, Master File 97-CV-7709 (N.D. Ill.)**

FKLM attorneys were actively involved in litigating the case and served as liaison counsel. A settlement for the plaintiff class of $220 million was obtained.

> ***In re Infant Formula Antitrust Litigation*, MDL 878 (N.D. Fla.)**

FKLM attorneys were appointed co-lead counsel in this antitrust price-fixing class action against the major manufacturers of infant formula.  The case settled for over $125 million.

> ***In re Chubb Drought Insurance Litigation*, MDL 782 (S.D. Ohio)**

FKLM attorneys were co-lead counsel in this class action filed on behalf of farmers who purchased drought insurance that Chubb refused to honor.  The settlement exceeded $110 million



FREED  KANNER  LONDON  &  MILLEN LLC

and was achieved in less than 9 months.  This sum, together with $8 million recovered at trial against Chubb's general agent, resulted in complete recovery for the affected farmers.

  ➢  *In re Ocean Shipping Antitrust Litigation*, **MDL 395 (S.D.N.Y.)**

    FKLM attorneys were co-lead counsel in this antitrust price-fixing class action, which resulted in a $79 million recovery for thousands of U.S. and European shippers.  Distributions were made to claimants in the United States and throughout a number of European countries.

  ➢  *In re Isostatic Graphite Antitrust Litigation*, **Master File 00-CV-1857 (E.D. Pa.)**

    FKLM attorneys were appointed co-lead counsel in this antitrust price-fixing class action. The case resulted in combined settlements of over $11 million for the class.

  ➢  *Blinder Robinson Securities Litigation* **(E.D. Pa.)**

    FKLM attorneys were members of the steering committee in this securities fraud action in which an injunction was obtained preventing a transfer of assets; judgment of $71 million was later entered.

  ➢  *In re Carbon Dioxide Antitrust Litigation*, **MDL 940 (M.D. Fla.)**

    FKLM attorneys were co-lead counsel in this antitrust price-fixing class action in which the plaintiff class recovered $53 million and achieved significant therapeutic relief for the class.

  ➢  *In re Drill Bits Antitrust Litigation*, **CA No. H-91-627 (S.D. Tex.)**

    FKLM attorneys were members of the Steering Committee in this antitrust price-fixing class action and were instrumental in achieving a settlement for the class in excess of $52 million.



FREED  KANNER  LONDON & MILLEN LLC

> ### *In re Industrial Gas Antitrust Litigation*, CA No. 80 C. 3479 (N.D. Ill.)

FKLM attorneys were members of the executive committee in this antitrust price-fixing class action, which ultimately recovered more than $50 million dollars for the class.  The settlement included assignable purchase certificates which the court found increased the competitive value of the settlement.

> ### *In re Morrison Knudson Securities Litigation*, CA No. 94-CV-3345 (D. Idaho)

FKLM attorneys were co-lead counsel in this securities class action where the plaintiff class received $43 million and approximately 3 million shares of Morrison Knudson common stock in settlement of their claims.

> ### *In re M-L Lee Acquisition Fund Securities Litigation* (D. Del.)

FKLM attorneys served as co-lead counsel in this securities class action case against a syndicate of partnerships and its general partners involving Merrill Lynch and its affiliates and a leveraged buy-out specialty firm overseen by Thomas H. Lee.  The case resulted in a settlement on behalf of the limited partners of $33 million.

> ### *In re Public Service Company of New Mexico* (S.D. Cal.)

FKLM attorneys were lead counsel in this derivative action and obtained $33 million dollars in a joint settlement together with class plaintiffs in a related securities fraud class action.  Judge Harry R. McCue, District Court Judge for the Southern District of California stated:

> The petitioners in this case are members of respected law firms which specialize in class action litigation.  These attorneys brought considerable legal talents together, and were able to achieve the successful completion of this litigation.  They are entitled to fair and reasonable compensation.

- 4 -



FREED  KANNER  LONDON & MILLEN LLC

> ➤ *Piggly Wiggly Antitrust Litigation* **(E.D. Tex.)**

FKLM attorneys were co-lead counsel in this statewide Texas antitrust price-fixing action which resulted in total settlements of approximately $32 million for class members.

> ➤ *In re Records and Tapes Antitrust Litigation* **(N.D. Ill.)**

FKLM attorneys were members of the executive committee in this antitrust price-fixing class action. The class recovered $26 million dollars in settlement in cash and assignable purchase certificates.

> ➤ *Kaufman v. Motorola, Inc.* **(N.D. Ill.)**

FKLM attorneys were actively involved in litigating the case and served as liaison counsel. A settlement of $25 million was obtained for the plaintiff class.

> ➤ *In re Unisys Securities Litigation*, **CA No. 99-5333 (E.D. Pa.)**

FKLM attorneys were members of the executive committee in this derivative action. Plaintiffs recovered $20 million for corporation.

> ➤ *Koch Gathering Systems, Inc. Oil Spill Litigation* **(Dist. Ct. of Nueces County, Tex.)**

FKLM attorneys were co-lead counsel in this case concerning a marine oil spill in which a class consisting of commercial fisherman and shrimpers recovered over $10 million.

*   *   *



FREED  KANNER  LONDON ₳ MILLEN ᴸᴸᶜ

FKLM attorneys are presently involved in the following cases, which are currently in varying stages of litigation:

> ***In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, MDL 1542 (D. Conn.)**

FKLM attorneys serve as co-chairs of discovery in this pending nationwide antitrust price-fixing action, which has resulted in partial settlements of over $87 million for class members.

> ***In re Parcel Tanker Shipping Antitrust Litigation*, MDL 1568 (D. Conn.)**

FKLM attorneys are co-lead counsel in nationwide antitrust price-fixing action, which is currently pending as a consolidated arbitration.

> ***In re Urethane Chemicals Antitrust Litigation*, MDL 1616 (D. Kan.)**

FKLM attorneys are co-lead counsel in this antitrust price-fixing action.  The case has thus far resulted in settlements of $33 million for the class.

> ***In re Cotton Yarn Antitrust Litigation*, MDL 1622 (M.D.N.C.)**

FKLM attorneys are co-lead lead counsel in this antitrust price-fixing action.  A partial settlement of $7.75 million has been obtained for the class.

> ***In re Hydrogen Peroxide Antirust Litigation*, MDL 1682 (E.D. Pa.)**

FKLM attorneys are co-lead counsel in this nationwide antitrust price-fixing action against hydrogen peroxide producers.

> ***In re Intel Corp. Microprocessor Antitrust Litigation*, MDL 1717 (D. Del.)**

FKLM attorneys are serving as co-chairs of discovery in this pending nationwide antitrust action.

FREED  KANNER  LONDON & MILLEN LLC

> ➤ *In re Methyl Methacrylate (MMA) Antitrust Litigation*, MDL 1768 (E.D. Pa.)

FKLM attorneys have been appointed interim Co-Lead Counsel in this nationwide antitrust price-fixing action against producers of methyl methacrylate and polymethyl methacrylate.

> ➤ *In re Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y.)

FKLM attorneys are serving as co-chairs of discovery in this pending antitrust price-fixing action.

\*   \*   \*

Other large class action cases in which FKLM attorneys had been involved in a leadership position include *In re Folding Cartons Antitrust Litigation*, *In re Plywood Antitrust Litigation*, *In re Standard Screws Antitrust Litigation*, *In re Glass Containers Antitrust Litigation*, *In re Aluminum Siding Antitrust Litigation*, *Rusty Jones Warranty Litigation*, *NPA Securities Litigation*, *In re Chlor-alkali and Caustic Soda Antitrust Litigation*, and *In re Potash Antitrust Litigation*.



FREED KANNER LONDON & MILLEN LLC

### *ATTORNEY PROFILES*

**Michael J. Freed**

Mr. Freed has been in private practice for over 40 years and has litigated class action cases for over 30 years. He has served as co-lead counsel in many prominent antitrust cases, including *In re Brand Name Prescription Drugs Antitrust Litigation*, *In re High Fructose Corn Syrup Antitrust Litigation* and *In re Linerboard Antitrust Litigation*. To date, cases in which Mr. Freed has served as co-lead counsel have recovered over $2 billion for the plaintiff classes. Mr. Freed has been named an Illinois Super Lawyer by *Chicago Magazine*, an Illinois Leading Lawyer by the Leading Lawyer's Network, and one of the top plaintiffs' antitrust lawyers in Illinois by *Chamber's International*. In addition, he was honored in March 2007 by the Chicago Appleseed Fund for Justice for his exceptional *pro bono* efforts. Mr. Freed was formerly a trial and appellate attorney with the United States Department of Justice, Antitrust Division (Honors Program). He is a graduate of the University of Pennsylvania (B.S., 1959) and University of Chicago Law School (J.D., 1962).

**Steven A. Kanner**

Mr. Kanner has over 20 years experience in complex antitrust matters and previously led the class action practice at Much Shelist Freed. His experience includes investigation, discovery, trial and appeal of antitrust, securities and other complex cases. With respect to antitrust matters, Mr. Kanner has also been involved in a leadership capacity in many of the cases described above. Cases in which Mr. Kanner is currently serving as co-lead counsel or interim co-lead counsel include *In re Methyl Methacrylate (MMA) Antitrust Litigation,* MDL No. 1768 (E.D. Pa.); *In re*

- 8 -



*Hydrogen Peroxide Antitrust Litigation*, MDL 1682 (E.D. Pa.); *In re Cotton Yarn Antitrust Litigation*, MDL 1622 (M.D.N.C.); and *In re Urethane Chemicals Antitrust Litigation*, MDL 1616 (D. Kan.).  A 1979 graduate of DePaul University Law School, Mr. Kanner is admitted to the Bars of Illinois, Fourth Circuit Court of Appeals, Seventh Circuit Court of Appeals, Tenth Circuit Court of Appeals, and Northern District of Illinois (member of the trial bar). He is also a member of the Chicago Bar Association (Committees on Litigation and Antitrust Law), the Illinois State Association (Sections on Antitrust Law and Litigation), the American Bar Association (Sections on Antitrust Law and Litigation), the Illinois Trial Lawyers Association, and the Decalogue Society where he previously served on the Editorial Board of the Society's Law Journal.  Prior to entering private practice, Mr. Kanner was employed by the Federal Trade Commission.


**William H. London**

        Mr. London has been litigating class action cases for over 15 years.  He recently served as trial counsel for the plaintiff class in *In re High Pressure Laminates Antitrust Litig.*, a case that was tried before a jury in the Southern District of New York.  He is actively involved in several cases in which FKLM is co-lead counsel, including *In re Methyl Methacrylate (MMA) Antitrust Litigation,* MDL No. 1768 (E.D. Pa.); *In re Hydrogen Peroxide Antitrust Litigation*, MDL 1682 (E.D. Pa.), *In re Cotton Yarn Antitrust Litigation*, MDL 1622 (M.D.N.C.), and *In re Urethane Chemicals Antitrust Litigation*, MDL 1616 (D. Kan.).  Mr. London graduated *Magna Cum Laude* from Syracuse University in 1984 and received his law degree in 1987 graduate from IIT Chicago-Kent College of Law.  In 1987, he was admitted to the Illinois Bar and the Federal Bar; and in 1988, he was admitted to practice before the United States Court of Appeals for the Seventh Circuit.  Mr. London

- 9 -



FREED KANNER LONDON & MILLEN LLC

is a member of the American Bar Association and Chicago Bar Association and is a past-Chairman

of the Chicago Bar Association Class Litigation Committee.  He was formerly an Assistant Attorney

General for the State of Illinois, during which time he argued cases in the United States Court of

Appeals for the Seventh Circuit and the Illinois Supreme Court.  Since 1990, Mr. London has

concentrated on complex and commercial litigation, with an emphasis on class action litigation

involving antitrust, securities and consumer fraud claims. Mr. London practiced with Much Shelist

Freed from March 1993 through December 31, 2006.


**Douglas A. Millen**

Mr. Millen has represented plaintiffs in a variety of class action cases for over 12 years.  He

has extensive experience litigating complex commercial matters, with an emphasis on cases

involving antitrust, consumer protection, securities and contract law claims.  Mr. Millen also has

substantial experience in electronic discovery matters and the leveraging of technology to achieve

effective and efficient client advocacy.  He formerly chaired the Technology Committee at Much

Shelist Freed and has handled many complicated electronic discovery issues.  Mr. Millen has

played a prominent role in many of the largest antitrust cases in recent history – including *In re*

*Dynamic Random Access Memory (DRAM) Antitrust Litig.*, MDL 1486 (N.D. Cal.), *In re Vitamins*

*Antitrust Litigation,* MDL 1285 (D.D.C.), and *In re Rubber Chemicals Antitrust Litigation*, MDL 1648

(N.D. Cal.) – and his efforts have assisted in the recovery of billions of dollars for class members.

Among other cases, Mr. Millen is presently involved in *In re Static Random Access Memory*

*(SRAM) Antitrust Litigation*, MDL 1819 (N.D. Cal.), *In re Methyl Methacrylate (MMA) Antitrust*

*Litigation*, MDL 1768 (E.D. Pa.), *In re Hydrogen Peroxide Antitrust Litigation*, MDL 1682 (E.D. Pa.),

- 10 -



and *In re Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y.). Mr. Millen is a graduate of the University of Michigan (B.G.S., 1991) and University of Illinois College of Law (J.D. *magna cum laude*, 1994). In 1994, he was admitted to the New York and Connecticut State Bars; and in 1995 he was admitted to the Illinois State Bar. He is also admitted to practice in the Northern District of Illinois. Mr. Millen is a member of the American Bar Association, Antitrust Section and the Chicago Bar Association. Prior to starting FKLM, Mr. Millen was a partner at Much Shelist Freed, where he practiced with the class action group from November 1995 through December 31, 2006.

**Michael E. Moskovitz**

Michael E. Moskovitz is a partner at Freed Kanner London & Millen LLC and has been involved in trial and appellate litigation for more than 10 years. Since 2000, he has concentrated on complex commercial litigation, with a primary emphasis on class action litigation involving antitrust, securities fraud, and consumer fraud claims. Mr. Moskovitz previously played a key role in the class action practice of Much Shelist Freed. He is significantly involved in several pending antitrust class actions, including *In re Hydrogen Peroxide Antitrust Litigation* (E.D. Pa.), *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* (N.D. Cal.), and *In re Urethane Chemicals Antitrust Litigation* (D. Kan.). Mr. Moskovitz is a graduate of Indiana University (B.A., 1993) and New York University School of Law (J.D., 1996).



FREED  KANNER  LONDON & MILLEN LLC

**Robert J. Wozniak**

Robert J. Wozniak is an associate attorney at FKLM.  Since 2001, Mr. Wozniak has been involved in complex commercial litigation, with a primary emphasis on antitrust class action cases. Prior to engaging in private law practice, Mr. Wozniak worked as a trial attorney for the United States Department of Justice, Antitrust Division (Honors Program).  Before joining the class action practice of Much Shelist Freed in 2004, Mr. Wozniak practiced class action litigation at Cohen Milstein Hausfeld & Toll in Washington, D.C.  The complex antitrust class actions in which Mr. Wozniak has had significant involvement include:  *In re Hydrogen Peroxide Antitrust Litigation* (E.D. Pa.), *In re Dynamic Random Access Memory (DRAM) Litigation* (N.D. Cal.), *In re Buspirone Antitrust Litigation* (S.D.N.Y.), and *In re Terazosin Hydrochloride Antitrust Litigation* (S.D. Fla.).  Mr. Wozniak is a graduate of the University of Michigan (B.A., 1988), University of Minnesota (M.A., 1994), and Wayne State University Law School (J.D., 2000, *cum laude*, Order of the Coif).  He is a member of the State Bar of Illinois, State Bar of Michigan and Bar of the District of Columbia.

# EXHIBIT H

# KAPLAN*FOX*

Kaplan Fox & Kilsheimer LLP
805 Third Avenue, 22nd Floor
New York, New York 10022
phone 212.687.1980
fax    212.687.7714
email  mail@kaplanfox.com
www.kaplanfox.com

## KAPLAN FOX & KILSHEIMER LLP

Over the past three decades, Kaplan Fox has been at the forefront of some of the most significant private antitrust class actions, securities class actions, derivative actions, and consumer class actions in the United States. Members of the firm have been appointed by federal and state courts as lead counsel, co-lead counsel or as a member of an executive committee in numerous actions. We have recovered more than $2 billion for our clients in the past 10 years. The following describes some of Kaplan Fox's major practice areas and its most significant recoveries.

### ANTITRUST LITIGATION

For more than 30 years, the antitrust attorneys at Kaplan Fox have represented on a contingent fee basis businesses and individuals, on both a class and non-class basis, who have been injured as a result of price-fixing, customer allocation or other anti-competitive behavior, by sellers of a broad array of products and services.

Kaplan Fox is frequently at the forefront of significant private antitrust actions, and we have been appointed by courts as lead counsel or member of an executive committee for plaintiffs in some of the largest antirust cases throughout the United States. Members of the firm have argued before Federal Courts of Appeals some of the most significant decisions in the antitrust field in recent years. Robert Kaplan argued the appeal in **In re Flat Glass Antitrust Litigation**, 385 F. 3d 350 (3d Cir. 2004), and Greg Arenson argued the appeal in **In re High Fructose Corn Syrup Antitrust Litigation**, 295 F. 3d 651 (7th Cir. 2002).

Over the years, Kaplan Fox has recovered over $2 billion for our clients. Some of the larger more recent antitrust recoveries include:

## ANTITRUST RECOVERIES

**In re High Fructose Corn Syrup Antitrust Litigation,** MDL No. 1087, Master File No. 95-1477 (C.D. Ill) ($531 million recovered)

**In re Brand Name Prescription Drugs Antitrust Litigation**, MDL 997 (N.D. Ill.) ($720 plus million recovered)

**In re Infant Formula Antitrust Litigation**, MDL 878 (N.D.Fla.) ($126 million recovered)

**In re Flat Glass Antitrust Litigation**, MDL 1200 (W.D.P) ($122 plus million recovered)

**In re Ocean Shipping Antitrust Litigation**, MDL 395 (S.D.N.Y.) ($51 million recovered)

**In re Medical X-Ray Film Antitrust Litigation**, CV 93-5904 (E.D.N.Y.) ($39.6 million recovered)

**In re NBR Antitrust Litigation**, MDL 1684 (E.D.P.A.) ($34.3 million recovered)

**In re Plastics Additives Antitrust Litigation**, 03-CV-1898 (W.D.P.A.) ($46.8 million recovered case still pending)

# ATTORNEY BIOGRAPHIES

## PARTNERS

**ROBERT N. KAPLAN** widely recognized as a leading antitrust litigator, Robert Kaplan has led the prosecution of numerous antirust class actions. He also has earned a reputation as a leading litigator in securities fraud class actions. Mr. Kaplan has been with Kaplan Fox for 35 years, joining in 1971.

Mr. Kaplan honed his litigation skills as a trial attorney with the Antitrust Division of the Department of Justice. There, he gained significant experience litigating both civil and criminal actions. He also served as law clerk to the Hon. Sylvester J. Ryan, then chief judge of the U.S. District Court for the Southern District of New York.

Mr. Kaplan's published articles include: "Complaint and Discovery In Securities Cases," *Trial*, April 1987; "Franchise Statutes and Rules," *Westchester Bar Topics*, Winter 1983; "Roots Under Attack: *Alexander v. Haley* and *Courlander v. Haley*," *Communications and the Law*, July 1979; and "Israeli Antitrust Policy and Practice," *Record of the Association of the Bar*, May 1971.

In addition, Mr. Kaplan served as an acting judge of the City Court for the City of Rye, N.Y., from 1990 to 1993.

Mr. Kaplan sits on the boards of several community organizations, including the Board of Directors of the Carver Center in Port Chester, N.Y., and the Board of Directors of the Rye Free Reading Room in Rye, N.Y.

**Education:**
- B.A., Williams College (1961)
- J.D., Columbia University Law School (1964)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1964)
- U.S. Supreme Court
- U.S. Courts of Appeals for the Second, Third, Seventh, Ninth, and Eleventh Circuits
- U.S. District Courts for the Southern, Eastern, and Northern Districts of New York, the Central District of Illinois, and the District of Arizona

**Professional Affiliations:**
- Committee to Support the Antitrust Laws (past President)
- National Association of Securities and Commercial Law Attorneys (past President)
- Advisory Group of the U.S. District Court for the Eastern District of New York
- American Bar Association
- Association of Trial Lawyers of America (Chairman, Commercial Litigation Section, 1985-86)
- Association of the Bar of the City of New York (served on the Trade Regulation Committee; Committee on Federal Courts)

Mr. Kaplan can be reached by email at: RKaplan@kaplanfox.com

**GREGORY K. ARENSON** is a seasoned business litigator with experience representing clients in a variety of areas, including antitrust, securities, employee termination, fraud, contract, and unfair competition. His economics background provides unique insights on antitrust liability and damages issues. Mr. Arenson has been a partner in the firm since 1993.

Prior to joining Kaplan Fox, Mr. Arenson was a partner with Proskauer Rose. Earlier in his career, he was a partner with Schwartz Klink & Schreiber, and an associate with Rudnick &

Wolfe (now DLA Piper).

Mr. Arenson writes frequently on discovery issues and the use of experts. His published articles include: "Report of the Commercial and Federal Litigation Section on the Lawsuit Abuse Reduction Act of 2005," 11 NY Litigator 26 (2006); "Report Seeking To Require Party Witnesses Located Out-Of-State Outside 100 Miles To Appear At Trial Is Not A Compelling Request," 11 NY Litigator 41 (2006); "Eliminating a Trap for the Unwary: A Proposed Revision of Federal Rule of Civil Procedure 50," 9 NY Litigator 67 (2004); "Committee Report on Rule 30(b)(6)" 9 NY Litigator 72 (2004); "Who Should Bear the Burden of Producing Electronic Information?" 7 Federal Discovery News, No. 5, at 3 (April 2001); "Work Product vs. Expert Disclosure – No One Wins," 6 Federal Discovery News, No. 9, at 3 (August 2000); "Practice Tip: Reviewing Deposition Transcripts," 6 Federal Discovery News, No. 5, at 13 (April 2000); and "The Civil Procedure Rules: No More Fishing Expeditions," 5 *Federal Discovery News*, No. 9, at 3 (August 1999). He was also co-author of "The Good, the Bad and the Unnecessary: Comments on the Proposed Changes to the Federal Civil Discovery Rules," 4 NYLitigator 30 (December 1998); co-author of "The Search for Reliable Expertise: Comments on Proposed Amendments to the Federal Rules of Evidence," 4 NYLitigator 24 (December 1998); co-editor of Federal Rules of Civil Procedure, 1993 Amendments, A Practical Guide, published by the New York State Bar Association; and a co-author of "Report on the Application of Statutes of Limitation in Federal Litigation," 53 Albany Law Review 3 (1988).

Mr. Arenson's pro bono activities include service as a mediator in the U.S. District Court for the Southern District of New York. In addition, he is an active alumnus of the Massachusetts Institute of Technology, having served as a member of the Corporation, a member of the Corporation Development Committee, vice president of the Association of Alumni/ae, and member of the Alumni/ae Fund Board (of which he was a past chair).

**Education:**
- S.B., Massachusetts Institute of Technology (1971)
- J.D., University of Chicago (1975)

**Bar Affiliations and Court Admissions:**
- Bar of the State of Illinois (1975)
- Bar of the State of New York (1978)
- U.S. Supreme Court
- U.S. Courts of Appeals for the Second and Seventh Circuits
- U.S. District Courts for the Northern and Central Districts of  Illinois, and the Southern and Eastern Districts of New York
- U.S. Tax Court

**Professional Affiliations:**
- New York State Bar Association, Federal Litigation Section, Committee on Federal Procedure  (Chairman since 1997)
- Association of the Bar of the City of New York

- American Bar Association
- Member, advisory board, Federal Discovery News (1999 – present)

Mr. Arenson can be reached by email at: GArenson@kaplanfox.com

**LINDA P. NUSSBAUM** joined Kaplan Fox in February 2007 as a partner. She previously was the resident Partner of the New York City office of Cohen Milstein Hausfeld & Toll, P.L.L.C.

She is presently in a lead counsel position in a number of significant antitrust class actions pending throughout the United States including: In re Plastics Additives Antitrust Litigation (E.D., Pa); In re DDAVP Litigation (S.D.N.Y.); In re Ovcon Litigation (D.D.C.); In re Plavix Litigation (S.D. Oh.); In re Metoprolol Succinate Direct Purchaser Antitrust Litigation (U.S.D.C., Delaware); and Meijer, Inc. et al v. Braintree Laboratories (U.S.D.C. Delaware).

She has recently served as lead counsel in a number of antitrust class actions that have resolved favorably for the plaintiff class including In re Lozazepam nd Clorazepate Antitrust Litigation (D.D.C,) where, in approving the $35 million settlement, Chief Judge Hogan commented, "Obviously, the skill of the attorneys, and I'm not going to spend the time reviewing it, I'm familiar with counsel, and they, as I said, are among the best antitrust litigators in the country;" In re Relafen Antitrust Squibb Co. (D. Mass); and Oncology Radiation Associates, P.A. v. Bristol Myers Squibb Co. (D.D.C.) ($65 million settlement).

Ms. Nussbaum is a member of the American Law Institute. She has lectured at the ABA Antitrust Section Spring Meeting on several occasions, including the 2007 55th Annual Antitrust Law Spring Meeting, at the University of San Francisco Pharmaceutical Antitrust Seminar, at a 2007 ABA Antitrust Group presentation in Philadelphia, PA and recently at the New York State Bar Antitrust Law Section 2007 and 2008 Annual Meetings,

Ms. Nussbaum is admitted to practice in New York and the District of Columbia.

**Education:**
- B.A., Brooklyn College (1974)
- J.D., George Washington University (1977)
- LL.M., Degree in Taxation from New York University School of Law (1984)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1974)
- Bar of the District of Columbia
- U.S. District Courts for the Southern, Eastern and Northern Districts of New York and the District of Columbia
- Supreme Court of the United States

**Professional Affiliations:**
- American Bar Association
- New York State Bar Association

Ms. Nussbaum can be reached by email at LNussbaum@kaplanfox.com

**RICHARD J. KILSHEIMER** first associated with Kaplan Fox in 1976 and became a partner in the firm in 1983. His practice is concentrated in the area of antitrust litigation, and he has played significant roles in several of the largest antitrust class actions in the country. He also practices in the areas of securities fraud and commercial litigation.

Prior to joining the firm, Mr. Kilsheimer served as law clerk to the Hon. Lloyd F. MacMahon (1975-76), formerly Chief Judge of the U.S. District Court for the Southern District of New York.

Mr. Kilsheimer is co-author of "Secondary Liability Developments," ABA Litigation Section, Subcommittee on Secondary Liability, 1991-1994.

**Education:**
- A.B., University of Notre Dame (1972)
- J.D., cum laude, St. John's University (1975)

**Bar Affiliations and Court Admissions:**
- State of New York (1976)
- U.S. Court of Appeals for the Second Circuit (1983)
- U.S. District Courts for the Southern and Eastern Districts of New York (1976) and the Northern District of Indiana (1987)

**Professional Affiliations:**
- Association of the Bar of the City of New York
- Federal Bar Council
- Committee to Support the Antitrust Laws
- Association of Trial Lawyers of America

Mr. Kilsheimer can be reached by email at: RKilsheimer@kaplanfox.com

**FREDERIC S. FOX** first associated with Kaplan Fox in 1984, and became a partner in the firm in 1991. He has concentrated his work in the area of securities fraud litigation. Mr. Fox has played important roles in many major securities fraud cases. He was one of the lead trial lawyers in two recent securities class actions, one of which was the first case tried to verdict under the Private Securities Litigation Reform Act of 1995.

Mr. Fox is the author of "Current Issues and Strategies in Discovery in Securities Litigation," ATLA, 1989 Reference Material; "Securities Litigation: Updates and Strategies," ATLA, 1990 Reference Material; and "Contributory Trademark Infringement: The Legal Standard after *Inwood Laboratories, Inc. v. Ives Laboratories,*" University of Bridgeport Law Review, Vol. 4, No. 2.

During law school, Mr. Fox was the notes and comments editor of the University of Bridgeport Law Review.

**Education:**
- B.A., Queens College (1981)

6

- J.D., Bridgeport School of Law (1984)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1985)
- U.S. Courts of Appeals for the Fourth, Fifth, and Sixth Circuits
- U.S. District Courts for the Southern and Eastern Districts of New York

**Professional Affiliations:**
- American Bar Association
- Association of the Bar of the City of New York
- Association of Trial Lawyers of America (Chairman, Commercial Law Section, 1991-92)

Mr. Fox can be reached by email at: FFox@kaplanfox.com

**LAURENCE D. KING** first associated with Kaplan Fox in 1994 and became a partner in the firm in 1998. Mr. King, who practices in the areas of securities and consumer litigation, is a resident partner in the firm's San Francisco office. Mr. King has played a substantial role in cases that have resulted in some of the largest recoveries obtained by Kaplan Fox and was one of the lead trial lawyers in two recent securities class actions, one of which was the first case tried to verdict under the Private Securities Litigation Reform Act of 1995.

Prior to joining Kaplan Fox, Mr. King honed his litigation skills as an assistant district attorney for New York County, where he tried numerous felony prosecutions to a jury verdict.

**Education:**
- B.S., Wharton School of the University of Pennsylvania (1985)
- J.D., Fordham University School of Law (1988)

**Bar Affiliations and Court Admissions:**
- Bar of the State of Connecticut (1988)
- Bar of the State of New York (1989)
- Bar of the State of New Jersey (1993)
- Bar of the Commonwealth of Pennsylvania (1993)
- Bar of the State of California (2000)
- U.S. District Courts for the District of New Jersey, the Eastern District of Pennsylvania, the Southern and Eastern Districts of New York, and the Central District of California

**Professional Affiliations:**
- New York State Bar Association
- New Jersey State Bar Association
- San Francisco Bar Association
- American Bar Association

Mr. King can be reached by email at: LKing@kaplanfox.com

**JOEL B. STRAUSS** first associated with Kaplan Fox in 1992 and became a partner in the firm in 1999. He practices in the area of securities and consumer fraud class action litigation, with a special emphasis on accounting and auditing issues.

Prior to joining Kaplan Fox, Mr. Strauss served as a senior auditor with one of the former "Big Eight" accounting firms. Combining his accounting background and legal skills, he has played a critical role in successfully prosecuting numerous securities class actions across the country on behalf of shareholders. Mr. Strauss was one of the lead trial lawyers for the plaintiffs in the first case to go to trial and verdict under the Private Securities Litigation Reform Act of 1995.

Although currently practicing exclusively in the area of law, Mr. Strauss is a licensed Certified Public Accountant in the State of New York.

Mr. Strauss has also been a guest lecturer on the topics of securities litigation, auditors' liability and class actions for seminars sponsored by the Practicing Law Institute and the National Consumer Law Center.

**Education:**
- B.A., Yeshiva University (1986)
- J.D., Benjamin N. Cardozo School of Law (1992)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New Jersey
- Bar of the State of New York
- U.S. District Courts for the Southern and Eastern Districts of New York and the District of New Jersey
- U.S. Court of Appeals for the Third Circuit

**Professional Affiliations:**
- American Bar Association (member, Litigation Section, Rule 23 Subcommittee)
- Association of the Bar of the City of New York
- New York State Bar Association
- American Institute of Certified Public Accountants

Mr. Strauss can be reached by email at: JStrauss@kaplanfox.com

**HAE SUNG NAM** first associated with Kaplan Fox in 1999 and became a partner in the firm in 2005. She practices in the areas of securities and antitrust litigation.

Prior to joining the firm, Ms. Nam was an associate with Kronish Lieb Weiner & Hellman LLP, where she trained in corporate securities law and mergers and acquisitions. She also served as an intern for the U.S. Department of Justice, Antitrust Division.

During law school, Ms. Nam was a member of the George Washington University Law Review. She is the author of a case note, "Radio – Inconsistent Application Rule," 64 Geo. Wash. L. Rev. (1996).

**Education:**

- B.A., magna cum laude, Syracuse University (1994)
- J.D., with honors, George Washington University School of Law (1997)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1998)
- U.S. District Court for the Eastern District of Wisconsin

**Professional Affiliations:**
- New York State Bar Association
- American Bar Association

Ms. Nam can be reached by email at: HNam@kaplanfox.com

**DONALD R. HALL** first associated with Kaplan Fox in 1998 and became a partner in the firm in 2005. He practices in the areas of antitrust, securities, and civil litigation.

During law school, Mr. Hall was a member of the Fordham Urban Law Journal and a member of the Fordham Moot Court Board. He also participated in the Criminal Defense Clinic, representing criminal defendants in federal and New York State courts on a pro-bono basis.

**Education:**
- B.A., College of William and Mary (1995)
- J.D., Fordham University School of Law (1998)

**Bar Affiliations and Court Admissions:**
- Bar of the State of Connecticut (2001)
- Bar of the State of New York (2001)
- U.S. District Court for the Southern District of New York

**Professional Affiliations:**
- American Bar Association
- Association of Trial Lawyers of America
- New York State Bar Association

Mr. Hall can be reached by email at: DHall@kaplanfox.com

**JASON A. ZWEIG** joined Kaplan Fox in January of 2003 and became a partner in the firm in 2007. He practices in the areas of securities, antitrust, and other areas of civil litigation.

Prior to joining the firm, Mr. Zweig was an associate with Proskauer Rose LLP in New York where he practiced in all areas of civil and criminal litigation.

During law school, Mr. Zweig was Executive Editor for the Columbia Journal of Environmental Law.

**Education:**
- B.S., Indiana University (1995)
- J.D., Columbia University School of Law (1998)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1999)

- U.S. Dist. Court for the Southern District of New York (2000)
- U.S. Dist. Court for the Eastern District of New York (2000)
- United States Court of Appeals for the Third Circuit (2001)

**Professional Affiliations:**
- Association of the Bar of the City of New York

Mr. Zweig can be reached by email at: JZweig@kaplanfox.com

## OF COUNSEL

**GARY L. SPECKS** practices primarily in the area of complex antitrust litigation. He has represented plaintiffs and class representatives at all levels of litigation, including appeals to the U.S. Courts of Appeals and the U.S. Supreme Court. In addition, Mr. Specks has represented clients in complex federal securities litigation, fraud litigation, civil RICO litigation, and a variety of commercial litigation matters. Mr. Specks is resident in the firm's Chicago office.

During 1983, Mr. Specks served as special assistant attorney general on antitrust matters to Hon. Neil F. Hartigan, then Attorney General of the State of Illinois.

**Education:**
- B.A., Northwestern University (1972)
- J.D., DePaul University College of Law (1975)

**Bar Affiliations and Court Admissions:**
- Bar of the State of Illinois (1975)
- U.S. Courts of Appeals for the Third, Fifth, Seventh, Ninth and Tenth Circuits
- U.S. District Court for the Northern District of Illinois, including Trial Bar

**Professional Affiliations:**
- American Bar Association
- Illinois Bar Association
- Chicago Bar Association

Mr. Specks can be reached by email at: GSpecks@kaplanfox.com

**W. MARK MCNAIR** practices in the area of securities litigation with a special emphasis on institutional investor involvement. He associated with the firm in 2003, and is resident in Washington, D.C. Prior to entering private practice, he was an attorney at the Securities and Exchange Commission and the Municipal Securities Rulemaking Board.

**Education:**
- B.A. with honors, University of Texas at Austin (1972)
- J.D. University of Texas at Austin (1975)
- L.L.M. (Securities) Georgetown University (1989)

Mr. McNair can be reached at MMcnair@kaplanfox.com

**LINDA M. FONG** practices in the areas of general business and consumer protection class action litigation. She has been associated with Kaplan Fox since 2001, and is resident in the firm's San Francisco office. Ms. Fong serves on the Board of the San Francisco Trial Lawyers Association and is active in its Women's Caucus.

**Education:**
- J.D., University of San Francisco School of Law (1985)
- B.S., with honors, University of California, Davis
- Elementary Teaching Credential, University of California, Berkeley

**Bar Affiliations and Court Admissions:**
- Bar of the State of California (1986)
- U.S. District Courts for the Northern and Eastern Districts of California
- U.S. Court of Appeals for the Ninth Circuit

**Professional Affiliations:**
- San Francisco Trial Lawyers Association
- Asian American Bar Association
- Bar Association of San Francisco
- Trial Lawyers for Public Justice
- Consumer Attorneys of California

**Awards:**
- Presidential Award of Merit
- Consumer Attorneys of California, 2000

Ms. Fong can be reached by email at: LFong@kaplanfox.com

**WILLIAM J. PINILIS** practices in the areas of commercial, consumer and securities class action litigation.

He has been associated with Kaplan Fox since 1999, and is resident in the firm's New Jersey office.

In addition to his work at the firm, Mr. Pinilis has served as an adjunct professor at Seton Hall School of Law since 1995, and is a lecturer for the New Jersey Institute for Continuing Legal Education. He has lectured on consumer fraud litigation and regularly teaches the mandatory continuing legal education course Civil Trial Preparation.

Mr. Pinilis is the author of "Work-Product Privilege Doctrine Clarified," *New Jersey Lawyer*, Aug. 2, 1999; "Consumer Fraud Act Permits Private Enforcement," *New Jersey Law Journal*, Aug. 23, 1993; "Lawyer-Politicians Should Be Sanctioned for Jeering Judges," *New Jersey Law Journal*, July 1, 1996; "No Complaint, No Memo – No Whistle-Blower Suit," *New Jersey Law Journal*, Sept. 16, 1996; and "The *Lampf* Decision: An appropriate Period of Limitations?" *New Jersey Trial Lawyer*, May 1992.

**Education:**
- B.A., Hobart College (1989)

11

- J.D., Benjamin Cardozo School of Law (1992)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New Jersey (1992)
- Bar of the State of New York (1993)
- U.S. District Courts for the District of New Jersey, and the Southern and Eastern Districts of New York

**Professional Affiliations:**
- Morris County Bar Association
- New Jersey Bar Association
- Graduate, Brennan Inn of Court

Mr. Pinilis can be reached by email at: WPinilis@kaplanfox.com


**CHARLES J. MOXLEY, JR.**    Charles Moxley practices in the areas of securities, insurance, commercial, corporate, and general civil litigation, as well as performing arbitration and appellate work. He has been associated with Kaplan Fox since 1994.

Mr. Moxley started his career as an associate at Davis Polk & Wardwell, and thereafter was a member of several New York City law firms. He has also served as a law professor at St. John's University School of Law and as an adjunct professor at New York Law School, teaching courses in the litigation area, including federal and New York practice, evidence, and professional responsibility. Mr. Moxley has been an arbitrator on numerous substantial arbitrations before the American Arbitration Association in the securities, contract, intellectual property, employment, construction, and other areas. He has also served extensively as a special master in New York Supreme Court.

He is the author of *International Law and Nuclear Weapons in the Post Cold War World* (Austin & Winfield, 2000) (with forewords by Robert S. McNamara, David W. Leebron, and Kosta Tsipis).

Mr. Moxley's pro bono activities include service as Chair of the Independent Judicial Screening Committee for the designation of candidates for New York City Civil Judge. He is also a member of the board of the Lawyers' Committee for Nuclear Policy and a former board member of the Lawyers Alliance for World Security. In addition, he has served as New York City Law Industry Chair for the March of Dimes Walkathon.

During law school, Mr. Moxley served as managing editor of the Columbia Journal of Transnational Law. He then served as law clerk to the Hon. Thomas F. Croake of the U.S. District Court for the Southern District of New York.


**Education:**
- B.A., Fordham University (1965)
- M.A., Fordham University (1966)
- J.D., Columbia University School of Law (1969)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1969)
- U.S. Supreme Court
- U.S. Courts of Appeals for the Second and Seventh Circuits
- U.S. District Courts for the Southern and Eastern Districts of New York

**Professional Affiliations:**
American Bar Association
- Association of the Bar of the City of New York
- New York State Bar Association
- New York County Lawyers Association

Mr. Moxley can be reached by email at: CMoxley@kaplanfox.com

**SUSAN R. SCHWAIGER** joined Kaplan Fox in February 2007. She practices in the area of antitrust law. Prior to joining the firm, Ms. Schwaiger was Of Counsel with Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Pomerantz Haudek Block Grossman & Gross LLP, practicing in the antitrust area, and an associate with Shearman & Sterling, where she practiced in all areas of litigation. During law school, Ms. Schwaiger was a member of the Brooklyn Law Review.

**Education:**
- B.S., University of Tennessee (1971)
- M.A., University of Kentucky (1973)
- J.D., Brooklyn Law School (1992)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1993)
- U.S. District Courts for the Southern, Eastern and Northern Districts of New York

**Professional Affiliations:**
- American Bar Association
- New York State Bar Association

Ms. Schwaiger can be reached by email at: SSchwaiger@kaplanfox.com

## ASSOCIATES

**CHRISTINE FOX** has been associated with Kaplan Fox since 1995. She practices in the areas of antitrust and securities litigation.

**Education:**
- B.S., Cornell University (1992)
- J.D., University of Michigan Law School (1994)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1995)

13

- U.S. District Courts for the Southern and Eastern Districts of New York

**Professional Affiliations:**
- American Bar Association
- New York State Bar Association
- New York County Lawyers Association
- Bar Association of the City of New York

Ms. Fox can be reached by email at: CFox@kaplanfox.com

**LORI S. BRODY** practices in the area of complex litigation. She first became associated with Kaplan Fox in 2001, and is resident in the firm's Los Angeles office.

**Education:**
- B.A, University of California, Berkeley (1987)
- J.D., University of California, Los Angeles (1990)

**Bar Affiliations and Court Admissions:**
- Bar of the State of California (1990)
- U.S. District Courts for the Northern, Central and Southern Districts of California

Ms. Brody can be reached by email at: LBrody@kaplanfox.com

**JEFFREY P. CAMPISI** became associated with Kaplan Fox in February 2004. He practices in the areas of securities, antitrust, and other areas of civil litigation.

Prior to joining the firm, Mr. Campisi served as law clerk to the Hon. Herbert J. Hutton. Also, Mr. Campisi was an associate with Dewey Ballantine LLP in New York where he practiced in all areas of civil litigation.

During law school, Mr. Campisi was a member of the Villanova Law Review.

**Education:**
- B.A., cum laude, Georgetown University (1996)
- J.D., summa cum laude, Villanova University School of Law (2000)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (2001)
- U.S. Dist. Court for the Southern District of New York (2001)
- U.S. Dist. Court for the Eastern District of New York (2001)

**Professional Affiliations:**
- American Bar Association

Mr. Campisi can be reached by email at: JCampisi@kaplanfox.com

**LOUIS A. KESSLER** joined the firm's San Francisco office in 2005. Mr. Kessler focuses his practice on Antitrust, Securities Fraud and Consumer Fraud class actions. Prior to joining the Firm, Mr. Kessler was an associate at Much Shelist Freed Denenberg Ament & Rubenstein PC in Chicago, Illinois. He also has worked for the Enforcement Division of the

United States Securities and Exchange Commission and for Equal Rights Advocates, a public interest law firm, in San Francisco.

**Education:**
- B.A., Physics and Philosophy, Amherst College (1997)
- J.D., The Law School, The University of Chicago (2002)

**Bar Affiliations and Court Admissions:**
- State Bar of Illinois (2002)
- United States District  Court for the Northern District of Illinois (2002)
- United States District  Court for the Eastern District of Wisconsin (2003)
- State Bar of California (pending)

**Professional Affiliations:**
- American Bar Association
- Chicago Bar Association

Mr. Kessler can be reached by email at: LKessler@kaplanfox.com

**JOHN D. RADICE** became associated with Kaplan Fox in May 2008.  He practices in the areas of antitrust, False Claims Act, and other areas of civil litigation.  Prior to joining the firm, Mr. Radice was an associated with major plaintiffs' class action firms in New York and Philadelphia, where he primarily represented clients pursuing antitrust, False Claims Act, and international human rights cases.

**Education:**
- A.B., magna cum laude, Princeton University (1997)
- J.D.,  New York University School of Law (2003)

**Bar Affiliations:**
- Bar of the State of New Jersey (2004)
- Bar of the State of New York (2005)
- U.S. District Courts for the Southern and Eastern Districts of New York and the District of New Jersey

Mr. Radice can be reached by email at: JRadice@kaplanfox.com

**WHITNEY E. STREET** became associated with Kaplan Fox in May 2006.  She practices in the areas of antitrust, securities and other areas of civil litigation.  During law school, Ms. Street was a member of the Virginia Journal of Social Policy and the Law and the Virginia

15

Journal of Law and Technology **and provided pro bono legal services to the Charlottesville community through the Legal Aid Justice Center.**
Prior to joining the firm, Ms. Street was an associate with Pillsbury Winthrop Shaw Pittman LLP in San Francisco where she practiced in all areas of civil litigation.

**Education:**
- B.A., Economics and English Literature, University of Virginia (1999)
- J.D., University of Virginia School of Law (2002)

**Bar Affiliations:**
- Bar of the State of California (2002)
- Bar of the State of Texas (2004)
- Bar of the State of New York (2007)

Ms. Street can be reached by email at: WStreet@kaplanfox.com

**MELINDA RODON** has been associated with Kaplan Fox since September 2004. She practices in the areas of antitrust, securities and other areas of civil litigation.

While attending law school, Ms. Rodon provided pro bono legal services to the Philadelphia community through the Civil Practice Clinic of the University of Pennsylvania Law School as well as the Homeless Advocacy Project. She also conducted pro bono legal research for the Southern Poverty Law Center.

**Education:**
- B.A., University of Missouri (2000)
- J.D., University of Pennsylvania Law School (2004)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York, *admission pending*

Ms. Rodon can be reached by email at: MRodon@kaplanfox.com

**AVIAH COHEN PIERSON** has been associated with Kaplan Fox since September 2005. She practices in the areas of antitrust, securities, and other areas of civil litigation.
During law school, Ms. Pierson interned for Judge Mark D. Fox in the Southern District of New York. In addition, she was a member of the Fordham Law Review.

**Education:**
- B.A., summa cum laude, University of Pennsylvania (2000)
- J.D., Fordham University, School of Law (2005)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (2006)
- U.S. District Courts for the Southern and Eastern Districts of New York

Ms. Pierson can be reached by email at: Acohenpierson@kaplanfox.com

**ELANA KATCHER** has been associated with Kaplan Fox since July 2007. She practices on complex commercial litigation.

**Education:**
- B.A. Oberlin College (1994)
- J.D., New York University (2003)

**Bar Affiliations and Court Admissions:**
- New York State Bar Association
- New York City Bar Association

Ms. Katcher can be reached by email at: ekatcher@kaplanfox.com

# EXHIBIT I

# HEINS MILLS & OLSON, P.L.C.
### 310 Clifton Avenue
### Minneapolis, MN 55403
### Website: heinsmills.com

## Firm Résumé

The law firm of Heins Mills & Olson, P.L.C., located in Minneapolis, Minnesota, is a leader in the field of complex litigation. The focus of the firm's practice is representing plaintiffs and plaintiff classes in a variety of class actions, primarily in the areas of securities fraud, antitrust violations, and deceptive trade practices and consumer fraud. We frequently serve as lead counsel for national classes of shareholders, consumers and businesses. Our lawyers collectively have many decades of experience in complex litigation.

The firm is especially proud of the results it has obtained for its institutional investor clients. We have successfully represented numerous state pension funds managing billions of dollars in assets. Among them are the Minnesota State Board of Investment, Utah State Retirement Board, Teachers' Retirement System of Alabama, Employees' Retirement System of Alabama, Judicial Retirement Fund of Alabama, Public Employees' Retirement Association of Colorado, as well as a number of Taft-Hartley health, welfare and pension funds.

### Antitrust

In antitrust litigation, Heins Mills & Olson recently served as co-lead counsel and co-lead trial counsel for purchasers of laminated cabinetry in In re High Pressure Laminates Antitrust Litigation (S.D.N.Y.), which alleged price-fixing by manufacturers on behalf of a class of business purchasers. A majority of the defendants settled for $40.5 million.

We are co-lead counsel in Behrend v. Comcast Corp. (E.D. Pa) challenging on behalf of cable subscribers alleged unlawful restraint of trade and monopoly practices in several cable TV

markets.  The United States District Court for the Eastern District of Pennsylvania certified both

a Philadelphia and a Chicago area class and the United States Court of Appeals for the Third

Circuit affirmed its decisions.  In related antitrust cases in which we represent the plaintiff cable

subscribers, the United States Court of Appeals for the First Circuit struck down class action

bans contained in arbitration clauses in Comcast's cable subscriber agreements in the Boston

area.  In a significant victory for consumers, the First Circuit held that the class action bans are

unenforceable because they prevent consumer plaintiffs from vindicating their rights under

federal antitrust laws.  See Kristian v. Comcast Corp. and Rogers v. Comcast Corp., 446 F.3d 25

(1st Cir. 2006).

The firm is currently co-lead counsel in In re Polyester Staple Antitrust Litigation

(W.D.N.C.), a price-fixing action against manufacturers of polyester staples, which is scheduled

for trial in April 2008 against the last remaining defendant.  Settlements with the other

defendants totaled $30 million.  Heins Mills & Olson is one of two lead counsel firms

representing a class of purchasers of food additives in In re Monosodium Glutamate Antitrust

Litigation (D. Minn.).  The firm has negotiated settlements, totaling $123.4 million, with most of

the defendants.

The firm served as lead trial counsel representing travel agents against major domestic

airlines in In re Travel Agency Commission Antitrust Litigation (D. Minn.), which resulted in

eve-of-trial settlements totaling $86 million.  The firm also was co-lead counsel for classes of

consumers of infant formula in price-fixing actions brought in seventeen states against infant

formula manufacturers.  The cases were settled collectively for $64 million in cash and infant

formula products.  We recently served as a co-chair of the plaintiffs' discovery committee in In

re Vitamins Antitrust Litigation (D.D.C.).

## Securities Fraud

In securities litigation, the firm is counsel for the Minnesota State Board of Investment (MSBI), lead plaintiff in In re AOL Time Warner, Inc. Securities Litigation (S.D.N.Y.). As lead counsel in that case, we recently achieved a $2.65 billion settlement on behalf of purchasers of securities of America Online and media-giant Time Warner. The settlement is one of the five largest securities fraud class settlements in history. The firm was also lead counsel in In re Broadcom Corp. Securities Litigation (C.D. Cal.), a securities fraud case brought on behalf of a class of Broadcom shareholders. The firm reached a $150 million settlement, which was recently approved by the court. This settlement also ranks as one of the largest in history. As lead counsel for a class of securities investors in In re Mercury Finance Company Securities Litigation (N.D. Ill.), we negotiated a settlement with Mercury's auditing firm for $40.5 million, one of the largest amounts ever recovered from an accounting firm for violations of the securities laws. In addition, we obtained recoveries of more than $15 million from Mercury's officers and directors, and from Mercury itself, even though the company was in bankruptcy.

## Consumer Protection

Heins Mills & Olson has represented consumers injured by violations of a wide variety of deceptive trade practices and consumer protection laws. The firm has brought claims on behalf of all types of consumers, including purchasers of prescription drugs, long distance telephone service, air compressors, smoke detectors, and hearing aids. As an advocate for consumer rights, the firm is one of three co-lead counsel in In re Universal Service Fund Telephone Billing Practices Litigation (D. Kan.), brought on behalf of business and residential customers to challenge USF surcharges collected by long-distance telephone companies. The firm also is lead counsel in several statewide and national class actions brought on behalf of landowners against

telecommunications companies that have laid fiber-optic cable in railroad rights of way without compensating the owners of the adjacent or underlying land. The firm also represents individual parties in other commercial cases, primarily in the areas of patent and trademark infringement, unfair competition, and deceptive trade practices.

## Attorneys

### Samuel D. Heins

An Equity Member and governor of the firm, Samuel D. Heins has extensive experience in complex litigation, particularly in securities fraud and antitrust class actions, and has served as lead or co-lead counsel in a number of major class actions. He served as lead trial counsel in In re Travel Agency Commission Antitrust Litig. (D. Minn.) (antitrust claims on behalf of travel agents against major domestic airlines), and now is or recently has been involved in numerous other cases, among them In re AOL Time Warner Securities Litig. (S.D.N.Y.) (securities fraud claims on behalf of AOL and Time Warner shareholders); In re Pharmaceutical Industry Average Wholesale Price Litig. (E.D. Mass.) (price-fixing, RICO and other claims against pharmaceutical companies on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors); In re Monosodium Glutamate Antitrust Litig. (D. Minn.) (price-fixing claims on behalf of business purchasers of MSG against manufacturers); In re High Pressure Laminates Antitrust Litig. (S.D.N.Y.) (price fixing claims by businesses against manufacturers of high pressure laminates); In re Polyester Staple Antitrust Litig. (W.D.N.C.) (price fixing claims against polyester staple manufacturers on behalf of business purchasers); In re Universal Service Fund Telephone Billing Practices Litig. (D. Kan.) (consumer fraud and antitrust claims against AT&T, MCI and Sprint for USF telephone charges); In re Fiber Optic Cable Litig. (N.D. Ill.) (claims on behalf of property owners alleging that telecoms installed

4

facilities within rights of way without consent); In re Broadcom Corp. Securities Litig. (C.D. Cal.)
(securities fraud claims on behalf of Broadcom shareholders); In re Green Tree Financial Stock
Litig. (D. Minn.) (securities fraud claims against Green Tree); and In re Vitamins Antitrust Litig.
(D.D.C.) (antitrust claims against domestic vitamin producers and distributors on behalf of
foreign direct purchasers).

    In addition, Mr. Heins represented several state public pension funds in private litigation
to recover the funds' securities losses related to their purchases of McKesson HBOC common
stock. These funds include the Utah State Retirement Board, the Public Employees' Retirement
Association of Colorado, and the Minnesota State Board of Investment. Other cases in which he
has participated in the representation of plaintiff classes include: In re Mercury Finance Co. Sec.
Litig. (N.D. Ill.); In re Stucco Litig. (E.D.N.C.); In re Olympic Financial Sec. Litig. (D. Minn.);
American Carriers Sec. Litig. (D. Kan.); Archer Communications Sec. Litig. (C.D. Cal.); In re
Grand Casinos Securities Litig. (D. Minn.); Bulk Popcorn Antitrust Litig. (D. Minn.);
Charterhouse Sec. Litig. (D. Minn.); Comserv Sec. Litig. (D. Minn.); Craig-Hallum Sec. Litig.
(D. Minn.); Daisy Systems Corp. Sec. Litig. (N.D. Cal.); Damson Oil & Gas Limited
Partnerships Sec. Litig. (S.D.N.Y); Diamonds Antitrust Litig. (S.D.N.Y.); EECO Sec. Litig.
(C.D. Cal.); Embassy Suites Sec. Litig. (C.D. Cal.); Endotronics Sec. Litig. (D. Minn.); Fidelity
Medical Inc. Sec. Litig. (D.N.J.); Harcourt Brace Jovanovich, Inc. Sec. Litig. (S.D.N.Y.); In re
HMOA Sec. Litig. (N.D. Ill.); Jan Bell Sec. Litig. (S.D. Fla.); K-tel Corp. Sec. Litig. (D. Minn.);
Kirschner Medical Corp. Sec. Litig. (D. Md.); L.A. Gear Sec. Litig. (C.D. Cal.); Miniscribe Sec.
Litig. (D. Colo.); In re Molybdenum Antitrust Litig. (W.D. Pa.); Mortgage & Realty Trust Sec.
Litig. (E.D. Pa.); Netteburg v. Cheyenne Land Co. (D. Minn.); Pinnacle West Sec. Litig. (D.
Ariz.); Residential Resources Sec. Litig. (D. Ariz.); Saxon Industries Sec. Litig. (S.D.N.Y.);

Simmons Co. ERISA Litig. (W.D. Wis.); Tandon Corp. Sec. Litig. (C.D. Cal.); Thousand Trails,

Inc. Sec. Litig. (W.D. Wash.); and Wirebound Boxes Antitrust Litig. (D. Minn.).

Mr. Heins graduated from the University of Minnesota and received his J.D. degree from

the University of Minnesota Law School. He served as a law clerk to the Honorable Earl R.

Larson, United States District Judge, District of Minnesota. He has been a visiting professor at

the University of Minnesota's School of Architecture. He is a member of the Federal Advisory

Committee to the Judicial Council of the Eighth Circuit, was a member of the Minneapolis

Charter Commission, and has served as president of both the Minnesota Advocates for Human

Rights and the Minnesota Center for Victims of Torture. He also is a member of the Hennepin

County, Minnesota State (Member, Board of Governors, 1978-1984) and American Bar

Associations.

**Stacey L. Mills**

After recently ending her tenure as a member of the firm, Stacey L. Mills is now of

counsel to the firm. She has a wealth of experience litigating class and other complex litigation.

She was one of the lead lawyers most actively involved on behalf of the plaintiff class in In re

Travel Agency Commission Antitrust Litig. (D. Minn.) (antitrust claims on behalf of travel

agents against major domestic airlines). Most recently, she has been involved in In re AOL Time

Warner Securities Litig. (S.D.N.Y.) (securities fraud claims on behalf of AOL and Time Warner

shareholders); In re High Pressure Laminates Antitrust Litig. (S.D.N.Y.) (price fixing claims by

businesses against manufacturers of high pressure laminates); In re Fiber Optic Cable Litig.

(N.D. Ill.) (claims on behalf of property owners alleging that telecoms installed facilities within

rights of way without consent); and In re Broadcom Corp. Securities Litig. (C.D. Cal.) (securities

fraud claims on behalf of Broadcom shareholders).

Among other cases in which Ms. Mills has been involved are <u>In re Green Tree Financial Stock Litig.</u> (D. Minn.); <u>In re Grand Casinos, Inc. Sec. Litig.</u> (D. Minn.); <u>In re Buffets, Inc. Sec. Litig.</u> (D. Minn.); <u>In re Mercury Finance Co. Sec. Litig.</u> (N.D. Ill.); <u>In re Digi International, Inc. Sec. Litig.</u> (D. Minn.); <u>In re Olympic Financial Sec. Litig.</u> (D. Minn.); <u>In re Policy Management Systems Corp. Secs. Litig.</u> (D.S.C.); <u>In re High-Fructose Corn Syrup Antitrust Litig.</u> (C.D. Ill.); <u>Jong Lee v. Summit Medical Systems, Inc.</u> (D. Minn.); <u>In re Tricord Systems, Inc. Sec. Litig.</u> (D. Minn.); and <u>In re NASDAQ Market-Makers Antitrust Litig.</u> (S.D.N.Y.); <u>In re Scimed Life Sec. Litig.</u> (D. Minn.), <u>A & J Deutscher Family Fund v. Bullard</u> (C.D. Cal.); <u>In re Unioil Sec. Litig.</u> (C.D. Cal.); <u>In re Cousins Sec. Litig.</u> (S.D. Cal.); <u>In re Daisy Systems</u> (N.D. Cal.); <u>In re HMOA Sec. Litig.</u> (N.D. Ill.); <u>In re Employee Benefit Plans Sec. Litig.</u> (D. Minn.); <u>Guenther v. Cooper Life Sciences</u> (N.D. Cal.); <u>In re Tera Sec. Litig.</u> (N.D. Cal.); <u>In re Technical Equities Sec. Litig.</u> (N.D. Cal.); <u>Krasner v. Mitchell</u> (Cal. Super. Ct. Los Angeles); <u>Kurgen v. Boise</u> (C.D. Cal.); <u>Levy v. Eletr</u> (N.D. Cal.); <u>Mirochnick v. Glasky</u> (C.D. Cal.); <u>Shields v. Smith</u> (N.D. Cal.); <u>Steiner v. Whittaker Corp.</u> (Cal. Super. Ct. Los Angeles); <u>Thau v. Johnson</u> (S.D. Cal.); <u>The Clothestime Sec. Litig.</u> (C.D. Cal.); <u>Weinberger v. Kwiker</u> (C.D. Cal.); and <u>Weinberger v. Liebel</u> (S.D. Cal.).

Ms. Mills has also represented plaintiffs asserting derivative claims on behalf of corporations in complex civil actions, including <u>Goldman v. Belzberg</u> (Cal. Super. Ct. Los Angeles) (on behalf of FarWest Savings & Loan Association); <u>Grobow v. Dingman,</u> (S.D. Cal.) (on behalf of The Henley Group, Inc.); <u>In re Lockheed Corp. Sec. Litig.</u> (C.D. Cal.); <u>Pacific Gas & Elec. Shareholder Derivative Litig.</u> (Cal. Super. Ct. San Francisco); and <u>Seaman v. Pratt,</u> (Cal. Super. Ct. Orange Co.) (on behalf of Pfizer Inc.).

7

Ms. Mills received her undergraduate degree from the University of Nebraska and her J.D. from California Western School of Law. Ms. Mills is admitted to practice in the Minnesota state courts, the United States District Courts for the Southern, Central and Northern Districts of California and the District of Minnesota, and the United States Court of Appeals for the Ninth Circuit. She is a member of the California and Minnesota State Bar Associations.

**Vincent J. Esades**

Vincent J. Esades is an Equity Member of the firm. He is a cum laude graduate of the University of North Dakota (B.A.) and received his J.D. from the University of North Dakota School of Law. He is admitted to practice in Minnesota and North Dakota and in the U.S. District Court for the District of Minnesota. He has a national practice in the field of complex litigation, primarily in the areas of antitrust, consumer fraud and securities fraud. He is currently working as lead plaintiffs' counsel on several nationwide class actions, including Phillips v. Sears Roebuck, et. al. (consumer fraud and RICO claims against manufacturers of lawnmowers); In re Polyester Staple Antitrust Litig. (W.D.N.C.) (price fixing claims against polyester staple manufacturers on behalf of business purchasers); In Re Bulk Graphite Antitrust Litig. (D.N.J.) (price fixing claims against manufacturers of bulk graphite on behalf of business purchasers); In re High Pressure Laminates Antitrust Litig. (S.D.N.Y.) (price fixing claims against manufacturers of high pressure laminates on behalf of business purchasers); Carlson v. A.L.S. Enterprises, Inc. (D. Minn.) (Minnesota consumer fraud claims against manufacturers and sellers of Scent-Lok hunting apparel); In re Universal Service Fund Telephone Billing Practices Litig. (D. Kan.) (consumer fraud and antitrust claims against AT&T, MCI and Sprint for USF telephone charges) and In re Publication Paper Antitrust Litig. (D. Conn.) (Executive

Committee) (price-fixing claims against paper manufacturers); and is also involved in numerous

other nationwide class actions including In re TFT-LCD (Flat Panel) Antitrust Litig. (N.D. Cal.)

(price-fixing claims against producers of Thin Film Transistor Liquid Crystal Displays); In re

Hydrogen Peroxide Antitrust Litig. (E.D. Pa.); In re Air Cargo Antitrust Litig. (E.D.N.Y); In re

Intel Corp. Microprocessor Antitrust Litig. (D. Del).  Mr. Esades has actively participated in

numerous other class actions, including In re Vitamins Antitrust Litig. (D.D.C.); Howe v.

Microsoft Corp. (N.D.); Gordon v. Microsoft Corp. (Minn., 4th Jud. Dist.); In re NASDAQ

Market-Makers Antitrust Litig. (S.D.N.Y.); and In re Motorsports Merchandise Antitrust Litig.

(N.D. Ga.).

### Dylan J. McFarland

Dylan J. McFarland is an officer of the firm.  He is a graduate of the University of

Minnesota (B.A. summa cum laude) and the Harvard Law School (J.D. cum laude).  While

attending Harvard, Mr. McFarland was an editor of the Harvard Civil Rights-Civil Liberties Law

Review.  He is admitted to practice in the Minnesota state courts, the U.S. District Court for the

District of Minnesota, and the U.S. Court of Appeals for the Second and Eighth Circuits.  He is a

member of the Minnesota State and Hennepin County Bar Associations.  From 1998-2002, he

was an Adjunct Professor of Law at William Mitchell College of Law, where he taught Legal

Writing, Trial Skills, and Appellate Advocacy.

Mr. McFarland practiced in the area of complex commercial litigation as an associate

with Gray Plant Mooty before attending the University of Minnesota Medical School.  As a

partner of Burstein Hertogs Olson & McFarland, P.A., he continued to represent corporations

and municipalities in complex litigation, including shareholder derivative actions.  In a case of

first impression, he represented the defendant in Skoglund v. Brady (Minn.), which defined the

scope of derivative claims and the authority of special litigation counsel under Minnesota law.

Since joining the firm, Mr. McFarland has worked on class actions such as In re AOL Time Warner Sec. Litig. (S.D.N.Y.) (securities fraud claims against AOL and Time Warner on behalf of shareholders), Good, et al. v. Ameriprise Financial, Inc., et al. (D. Minn.) (contractual claims against financial services provider on behalf of employee and independent financial advisors), In re Broadcom Corp. Sec. Litig. (C.D. Cal.) (securities fraud claims against semiconductor manufacturer on behalf of shareholders), Behrend v. Comcast Corp. (E.D. Pa.) (antitrust claims against cable services provider on behalf of subscribers); and In re New Motor Vehicle Canadian Export Antitrust Litig. (D. Me.) (antitrust claims against vehicle manufacturers on behalf of consumers).

**David Woodward**

David Woodward is an officer of the firm. After graduating with highest honors from St. Cloud State University (B.A.), he obtained his J.D. from the School of Law of the University of California in Los Angeles, where he was admitted to the Order of the Coif and was a member of the UCLA Law Review. He was also awarded a Masters of Law with highest honors from the National Law Center, Washington, D.C.

From 1987-2003, Mr. Woodward served as an Assistant Attorney General in the Civil Enforcement Unit of the Minnesota Attorney General's Office. Mr. Woodward has extensive experience representing the State of Minnesota in lawsuits enforcing statutory prohibitions against false advertising, deceptive trade practices and consumer fraud. Mr. Woodward's consumer protection litigation areas of emphasis included health frauds, mortgage related enforcement matters and deceptive practices particularly impacting vulnerable consumers. On behalf of the Minnesota Attorney General's Office, Mr. Woodward helped to create a multi-state

health fraud litigation group, which he co-chaired from 1994-1996. He served as lead counsel on behalf of the State of Minnesota in numerous multi-state enforcement efforts involving the application of state consumer protection statutes to nationwide drug advertising and promotional practices within the pharmaceutical industry, as well as a multi-state settlement with a large food company involving application of federal and state food laws and state consumer laws to the advertising and sale of a combination food/toy product marketed to young children.

Mr. Woodward has extensive consumer protection litigation experience. He has represented the State of Minnesota in both state and federal courts. He represented the State of Minnesota in State v. American Family Mut. Ins. Co., 609 N.W.2d 1 (Minn. Ct. App. 2000), a consumer and insurance law enforcement matter benefiting homeowners statewide in a case confirming the Attorney General's authority to sue insurers to enforce Minnesota consumer and insurance laws. Mr. Woodward has represented the State in numerous false advertising, deceptive trade practices and consumer fraud cases, including litigation challenging advance fee loan schemes; college financial aid services companies; credit repair frauds; usurious credit card charges; home mortgage escrow overcharges; false advertising for bogus yellow page directories; the sale of bogus cancer treatment devices; the marketing to young consumers of an unapproved, dangerous drug misrepresented as a safe and natural product; misrepresentations in the sale of hearing aids; travel promotion schemes; deceptive practices affecting small businesses; and deceptive sweepstakes practices by major national sweepstakes companies.

From 1976-1979 and 1980-1987, Mr. Woodward served as a staff attorney for a non-profit legal services corporation providing legal representation in civil matters, including litigation, to low-income persons in south central Pennsylvania. He was counsel before the Pennsylvania Supreme Court in Pugh v. Holmes, 405 A.2d 897 (Pa. 1979), a seminal case which

established on a statewide basis the implied warranty of habitability in residential lease transactions.

Mr. Woodward is admitted to practice before Minnesota, Pennsylvania and California state courts, United States District Court for the Districts of Minnesota and the Middle District of Pennsylvania, the United States Courts of Appeals for the Third, Fifth, Eighth and Ninth Circuits, and the United States Supreme Court. Mr. Woodward has provided pro bono representation to persons seeking asylum. In 2000, he received the Pro Bono Volunteer Annual Attorney Award from Minnesota Advocates for Human Rights.

Mr. Woodward works on antitrust, consumer fraud and securities fraud class litigation in which the Heins Mills & Olson firm serves as plaintiffs' counsel. For example, since joining the firm, Mr. Woodward has worked on such cases as Behrend v. Comcast Corp., Kristian v. Comcast Corp., and Rogers v. Comcast Corp. (E.D. Pa.) (antitrust claims on behalf of cable subscribers); In re McKesson HBOC Sec. Litig. (N.D. Cal.) (securities fraud claims); In re New Motor Vehicles Canadian Export Antitrust Litig. (D. Maine) (antitrust action on behalf of consumers against automobile manufacturers); Phillips v. Sears Roebuck, et. al. (S.D. Ill.) (consumer fraud and RICO claims against manufacturers of lawn mowers); and Nogosek v. Carrier Corp. (D. Minn.) (consumer fraud and breach of warranty action against furnace manufacturer).

**Barbara J. Felt**

Barbara J. Felt is an officer of the firm. She received her undergraduate degree from the University of Minnesota (B.A. magna cum laude) and her law degree from William Mitchell College of Law (J.D.). She has a broad range of experience in civil litigation matters, including handling commercial litigation and products liability claims. Ms. Felt has been involved in all

aspects of the litigation and appellate process, and has participated in several significant trials and appeals involving cases of first impression.

Ms. Felt was named a "Super Lawyer" by Minnesota Law & Politics in 2004, 2003 and 2002, and a "Rising Star" in 2002 and 2001, recognitions based on attorney polling across Minnesota. She is admitted to practice in the State of Minnesota, the U.S. District Court for the District of Minnesota, and the U.S. Court of Appeals for the Eighth Circuit. Ms. Felt is a member of the Minnesota State, Hennepin County, and American Bar Associations, American Association for Justice, and Minnesota Women Lawyers. She has authored several articles and chapters for publications, and has spoken at a number of legal education seminars on litigation topics.

Ms. Felt is currently working on, or has recently been involved in, several class actions, including Good, et al. v. Ameriprise Financial, Inc., et al. (D. Minn.) (contractual claims against financial services provider on behalf of employee and independent financial advisors), In re Universal Service Fund Telephone Billing Practices Litig. (D. Kan.) (consumer fraud and antitrust claims against AT&T, MCI and Sprint for USF telephone charges), In re AOL Time Warner, Inc. Securities Litig. (S.D.N.Y.) (securities fraud claims against AOL and Time Warner on behalf of shareholders) and In re Pharmaceutical Industry Average Wholesale Price Litig. (D. Mass.) (price-fixing, RICO and other claims against pharmaceutical companies on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors).

**Lori A. Johnson**

Lori A. Johnson is an associate of the firm. She is a graduate of Concordia College (B.A.) and a cum laude graduate of the University of Minnesota Law School (J.D.), where she

served as a member of the Minnesota Law Review. Ms. Johnson served as a law clerk to the Honorable Kevin S. Burke, Chief Judge, Fourth Judicial District of Minnesota. She is admitted to practice in the U.S. District Court for the District of Minnesota, the U.S. Courts of Appeals for the Second and Eighth Circuits, and in the state courts of Minnesota. Ms. Johnson is currently working on Good, et al. v. Ameriprise Financial, Inc., et al. (D. Minn.) (contractual claims against financial services provider on behalf of employee and independent financial advisors) and In re AOL Time Warner, Inc. Sec. Litig. (S.D.N.Y.) (securities fraud claims against AOL and Time Warner on behalf of shareholders). In the past, Ms. Johnson has worked on In re McKesson HBOC Sec. Litig. (N.D. Cal.), In re Magnetic Audiotape Antitrust Litig. (S.D.N.Y.), and Ellerbrake v. Campbell-Hausfeld (Ill.).

**Troy J. Hutchinson**

Troy J. Hutchinson, an associate of the firm, is a graduate of the University of Wisconsin-Madison (B.A. summa cum laude) and the University of Minnesota Law School (J.D. cum laude). Mr. Hutchinson served as a law clerk to the Honorable Raymond L. Erickson, United States Magistrate Judge, District of Minnesota. He is admitted to practice in the state courts of Minnesota, and the United States District Court for the District of Minnesota. Mr. Hutchinson is currently working on complex civil litigation matters, including In re Bulk Graphite Antitrust Litig. (D.N.J.) (price fixing claims against manufacturers of bulk graphite), In re Intel Corp. Microprocessor Antitrust Litig. (D. Dela.) (antitrust claims against Intel on behalf of consumers), In re MMA/PMMA Antitrust Litig. (E.D. Pa.) (antitrust claims on behalf of purchasers against suppliers of acrylates) and In re New Motor Vehicles Canadian Export Antitrust Litig. (D. Maine) (antitrust claims against vehicle manufacturers on behalf of consumers); Phillips v. Sears Roebuck, et. al. (consumer fraud and RICO claims against manufacturers of lawnmowers);

14

Nogosek v. Carrier (consumer fraud and breach of warranty claims against furnace manufacturer); In re Air Passenger Antitrust Litig. (N.D.Ca.) (price-fixing by British Airways and Virgin Atlantic airlines of surcharges added to the price of passenger tickets for long-haul flights); and Carlson v. A.L.S. Enterprises Inc., et al. (D. Minn.) (consumer fraud claims against manufacturers and sellers of Scent-Lok hunting apparel).  In the past he has been involved in other complex civil litigation matters, including In re Monosodium Glutamate Antitrust Litig. (D. Minn.) (price-fixing claims on behalf of business purchasers of MSG against manufacturers); In re Fiber Optic Cable Litig. (N.D. Ill.); and In re AOL Time Warner Securities Litig. (S.D.N.Y.) (securities fraud claims against AOL and Time Warner on behalf of shareholders).

**Jessica N. Servais**

Jessica N. Servais is an associate of the firm.  She was awarded a B.A. magna cum laude by Macalester College and her J.D. by the University of Minnesota Law School, where she was the Executive Editor of the Minnesota Intellectual Property Review.  Ms. Servais served as a law clerk to the Honorable Michael J. Davis, U.S. District Court Judge, District of Minnesota.  She is admitted to practice in the state courts of Minnesota and Wisconsin, and in the U.S. District Court for the District of Minnesota.  She currently is or had recently been working on complex litigation, including Behrend v. Comcast Corp. (E.D. Pa.), Kristian v. Comcast Corp. (E.D. Pa.) and Rogers v. Comcast Corp. (E.D. Pa.) (antitrust claims against cable services provider on behalf of subscribers); In re Korean Air Lines Co., Ltd. Antitrust Litig.; In re Ready-Mixed Antitrust Litig. (S.D. Ind.) (price-fixing claims against ready-mixed concrete suppliers on behalf of purchasers); In re Universal Service Fund Telephone Billing Practices Litig. (D. Kan.) (consumer fraud and antitrust claims against AT&T, MCI and Sprint for USF telephone charges); and In re Relafen Antitrust Litig. (N.D. Cal.) (antitrust claims on behalf of consumers

15

against manufacturers of brand name nabumetone tablets);  In addition, she is one of the lawyers who represented Colorado, Minnesota and Utah State employee pension funds in private litigation regarding losses suffered in connection with their purchases of McKesson HBOC securities.

**Matthew W. Ruan**

Matthew Ruan is an associate in the firm.  He is a graduate of the University of Chicago and the University of Michigan Law School, where he was an editor of the Michigan Journal of International Law.  Mr. Ruan served as a judicial extern to the Honorable Blanche M. Manning, U.S. District Court Judge, Northern District of Illinois.  He is admitted to practice in the state courts of Minnesota and the U.S. District Court for the District of Minnesota.  Mr. Ruan is currently working on complex civil cases, including In re New Motor Vehicle Canadian Export Antitrust Litig. (D. Me.) (antitrust claims against vehicle manufacturers on behalf of consumers), In re Intel Corp. Microprocessor Antitrust Litig. (D. De.) (antitrust claims against Intel on behalf of consumers), In re AOL Time Warner Securities Litig. (S.D.N.Y.) (securities fraud claims against AOL and Time Warner on behalf of shareholders) and In re Pharmaceutical Industry Average Wholesale Price Litig. (D. Mass.) (price-fixing, RICO and other claims against pharmaceutical companies on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors).

**Scott W. Carlson**

Scott W. Carlson is an associate of the firm.  He is a graduate of the Honors Program at Minot State University (B.A.) and a cum laude graduate of the University of Minnesota Law

School (J.D.), where he served as a Managing Editor of the Minnesota Law Review, as the first

Chairman of the Minnesota Law Review Technology Committee, and was a recipient of the

Legal Writing & Research Program's "Best Oralist Award." Mr. Carlson served as a judicial

extern to the Honorable United States Chief Magistrate Judge Franklin L. Noel, United States

District Court, District of Minnesota.

In his previous professional experience, Mr. Carlson served as a Senior Analyst on the

staff of the U.S. Senate Budget Committee (2000-01), as a Legislative Assistant (1997-2000) and

Legislative Correspondent (1993-94) to U.S. Senator Kent Conrad (D-N.D.), as the

Communications Director of the Lee Kaldor for Governor of North Dakota campaign (1996),

and as the Policy & Communications Director of the N.D. Department of Agriculture (1994-96).

Mr. Carlson is admitted to practice in the U.S. District Court for the District of Minnesota

and in the state courts of Minnesota. He is currently working on several class actions, including

In re AOL Time Warner Securities Litig. (S.D.N.Y.) (securities fraud claims against AOL and

Time Warner on behalf of shareholders), In re High Pressure Laminates Antitrust Litig.

(S.D.N.Y.) (price fixing claims against manufacturers of high pressure laminates), In re Guidant

Corp. Implantable Defibrillators Products Liability Litig. (D. Minn.) (product liability claims on

behalf of patients with implanted defibrillators); In re Korean Air Lines Co., Ltd., Antitrust Litig.

(claims against Korea's major airlines alleging price-fixing of fuel surcharges); In re Methyl

Methacrylate (MMA) Antitrust Litig. (E.D. Pa.) (price-fixing action against manufacturers of a

chemical used to produce plastic); In re Polyester Staple Antitrust Litig. (W.D.N.C.) (price-

fixing action against manufacturers of polyester staples); In re Rail Freight Fuel Surcharge

Antitrust Litig. (fuel surcharge price-fixing action against the five U.S. Class I railroads); In re

Ready-Mixed Concrete Antitrust Litig. (S.D. Ind.) (price-fixing claims against ready-mixed

concrete suppliers on behalf of purchasers); In re TFT-LCD (Flat Panel) Antitrust Litig. (N.D. Cal.) (price-fixing claims against producers of Thin Film Transistor Liquid Crystal Displays); and Hoffman, et al. v. Northern States Power Company d/b/a Xcel Energy (Minn. Ct. App.) (breach of contract class action alleging increased fire risk due to electric company's failure to maintain residential meter boxes); and other complex litigation.  Class actions in which Mr. Carlson has previously been involved include In re Monosodium Glutamate Antitrust Litig. (D. Minn.) (price-fixing claims on behalf of business purchasers of MSG against manufacturers); In re Relafen Antitrust Litig. (N.D. Cal.) (antitrust claims on behalf of consumers against manufacturers of brand name nabumetone tablets); and In re Fiber Optic Cable Litig. (N.D. Ill.) (claims on behalf of property owners alleging that telecoms installed facilities within rights of way without consent).

**Katherine T. Kelly**

Katherine Kelly is an associate of the firm.  She is a graduate of the University of Minnesota (B.S.) and William Mitchell College of Law (J.D.), where she was an Assistant Editor of the William Mitchell Law Review.  Ms. Kelly is admitted to practice in the state courts of Minnesota and before the United States Patent and Trademark office.  Ms. Kelly is currently working on complex civil cases, including Phillips v. Sears Roebuck, et. al. (consumer fraud and RICO claims against manufacturers of lawnmowers); Good, et al. v. Ameriprise Financial, Inc., et al. (D. Minn.) (contractual claims against financial services provider on behalf of employee and independent financial advisors); Behrend v. Comcast Corp. (E.D. Pa.) (antitrust claims against cable services provider on behalf of subscribers); and  In re Guidant Corporation Implantable Defibrillators Products Liability Litigation (D. Minn.) (product liability claims on

behalf of patients with implanted defibrillators).  She has also worked on In re AOL Time

Warner Securities Litig. (S.D.N.Y).

# EXHIBIT J

# CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN

**5 Becker Farm Road**
**Roseland, New Jersey 07068**
**Telephone No.:  (973)994-1700**
**Telephone Fax: (973)994-1744**
**www.carellabyrne.com**

**Carella, Byrne**

---

### AN INTRODUCTION TO
### *CARELLA, BYRNE*

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, with offices in Roseland, New Jersey, had its origins in a partnership created in 1976 by Charles C. Carella, John N. Bain and John G. Gilfillan, III. Since then, the firm has grown from four attorneys to fifty. In 1990, the firm merged with two others: Bozonelis and Woodward of Chatham, New Jersey, and Cecchi, Brody & Agnello, of Lyndhurst, New Jersey.

Throughout our history, our goal has not been growth for growth's sake, but to be a diversified full-service firm that offers our clients a depth of experience that is virtually unmatched. Most importantly, our growth has been a studied one: an approach which has enabled us to maintain the energy and cooperative spirit of a small practice, allowing us to respond quickly and creatively to our clients' problems.

We have significant strength in complex litigation, federal class action litigation, intellectual property, corporate, health care, public financing, environmental, labor, tax and administrative law. This level of experience offers our corporate clients very broad-based legal representation.

We have long been recognized as one of the leading New Jersey law firms, a reputation that has helped us attract a wide spectrum of clients -- from individuals to multinational corporations; from small businesses to non-profit organizations; from zoning boards to state governments.

Today, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein is an established and successful law firm that is ready to serve you or your organization with a breadth and depth of experience rare in a firm our size.

To help us serve our clients' promptly and in a cost effective manner, we have a full complement of law clerks, paralegals, word processors and support staff, and state-of-the-art computer and word processing systems, including optical scanners, laser printers, and Westlaw.

We are committed to quality and diversity in our practice areas. Diversity allows our firm to remain a competitive force in the legal marketplace. The firm's commitment to the highest quality of legal work walks hand-in-hand with its commitment to employ the highest quality of diverse people so that we can best serve all of the needs of our clients.

# Carella, Byrne

---

## GENERAL LITIGATION

The Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein litigation department participates in a broad range of contested matters. We represent corporations in derivative suits and with respect to allegations of breach of federal and state securities regulations. Additionally, we represent institutions and national companies in warranty, franchise and dealer termination actions; medical malpractice defense claims; and real estate matters, including planning board, board of adjustment proceedings and fair-share housing cases.

### Technical Litigation

We are uniquely staffed to handle complex technical litigation. In addition to legal training, a number of attorneys have degrees and experience in chemical, electrical, mechanical and biomedical engineering. Litigation cases involve patents, trademarks, trade secrets, copyrights, unfair competition and construction, as well as architectural and engineering malpractice.

### Environmental Litigation

We handle environmental cases involving current owner liability and third-party common law claims, plus cases under federal and state statutes such as the Federal Water Pollution Control Act, ECRA, the Spill Act, the Resource Conservation Recovery Act (as amended by the Hazardous and Solid Waste Amendments of 1984), the Clean Water Act, the Toxic Substances Control Act, the Comprehensive Environmental Response Compensation Liability Act of 1980 (as amended by the Superfund Amendment and Reauthorization Act of 1986), and many others. We have attorneys expertly trained in environmental matters with a background uniquely suitable to rendering appropriate advice to our corporate and individual clients.

### Medical Malpractice Defense

Medical malpractice defense work is one of the busiest areas of our litigation practice. We represent a number of major health care institutions, and serve as primary defense counsel for insureds of major insurance companies. During our history, we have represented physicians, dentists, podiatrists, chiropractors, nurses, nurse midwives, and hospitals in a variety of complex litigated matters throughout the state courts.

### Intellectual Property Expertise

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein is nationally recognized in the fields of patent, trademark, copyright, unfair competition, trade secret law and antitrust law as applied domestically and internationally. We have broad technical expertise in chemical, mechanical and electrical engineering; physics; organic chemistry; biochemistry; commercial and industrial building construction, and road and bridge construction; sewage and waste management, including toxic and hazardous waste, radwaste and environmental control. A number of our partners and associates are registered to practice before the U.S. Patent and Trademark Office.

## Carella, Byrne

Our particular litigation expertise is in U.S. District Courts and Circuit Courts of Appeal in California, Illinois, Texas, New York, Pennsylvania, Florida and New Jersey, as well as the Court of Appeals for the Federal Circuit.

We also maintain close ties with associate counsel in the United Kingdom, Japan, West Germany, Canada, Italy, France, Austria, Taiwan, Korea, Australia and the Peoples Republic of China. We have controlled and/or participated in patent and other intellectual property litigation in Japan, West Germany, the United Kingdom, Canada, Australia, New Zealand and Austria.

What's more, we offer many other intellectual property services, including licensing and preparation and prosecution of patent applications around the world.

### Corporate and Financial

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein provides all legal services involving the sale, purchase and reorganization of a business, including creation of corporations, partnerships and limited partnerships, mergers and acquisitions, public and private corporate financing, and representation in regulatory compliance cases.

### Banking

We have broad experience in commercial lending matters (secured and unsecured), representing both lenders and borrowers; and have counseled banks in all aspects of operations. We have represented institutions in both state and federal regulatory compliance, and in all phases of loan work-outs and financial restructurings. Our experience also extends to commercial litigation and foreclosures.

All too often, financial institutions face breach of both secured and unsecured loan agreements. So to help our clients preserve their banking relationships with their customers, we regularly handle work-outs, no matter how simple or complex. We've handled multiparty and multistate transactions involving construction, apartment complexes, warehouse lines of credit and inventory financing.

### Savings and Loan Conversions

We have helped savings and loan associations convert from mutual ownership to stock ownership. These include standard conversions, modified conversions, supervisory conversions and holding company formations. Services range from contract negotiation and completion, to regulatory authority application preparation and follow-up. And after conversion, we provide general counsel.

### Mergers and Acquisitions

Our firm has counseled corporate clients on mergers and acquisitions, with a special emphasis on the acquisition or divestiture of stand-alone businesses. Clients have included large corporations filling in product lines; small, privately held corporations which are liquidating; and large corporate division managers involved in a management buy-out. We counsel clients on

3

# Carella, Byrne

employee issues, environmental concerns, liability and contractual issues, regulatory matters and tax issues.

## Creditors' Rights and Bankruptcy

Our firm provides comprehensive legal expertise for clients involved in both corporate and individual insolvencies. We have represented corporate debtors-in-possession, corporate trustees, creditors committees and secured and priority parties in reorganizations and liquidations.

We have expertise in those areas impacting on current bankruptcies including tax (including ERISA), environmental (including state and federal regulations), labor, admiralty, intellectual property, general corporate transactions and commercial and corporate litigation.

## Public Finance

We are a nationally recognized Bond Counsel firm. This means that the investment community looks to us as an expert in public finance law, and that our approving legal opinions are relied on by investors as to the legality and enforceability of tax-exempt obligations.

We have served as Bond Counsel for the issuance of hundreds of millions of dollars of tax-exempt financings for municipalities and local, county and state authorities. And in this capacity, we have assisted in financing everything from the purchase of a town's computer system to the building of a resource recovery facility, to the repair of the Garden State Parkway.

In addition, we have served as underwriters' counsel and counsel to national investment banking firms, and as general counsel to companies obtaining tax-exempt loans for industrial development.

## Class Action Litigation

### Exxon Dealer Class Action

In 2002 Carella Byrne began representing the State of New Jersey in a nationwide class-action brought on behalf of a class of Exxon dealers against Exxon in the Southern District of Florida. Eventually, Carella Byrne's representation included not only the State of New Jersey, but also the Commonwealth of Virginia and the State of Maryland.

In 2005, Exxon and Class Counsel reached a settlement which required Exxon to pay $1,000,070,000 into a settlement fund which would then be utilized to pay claims submitted to a Special Master by over 10,000 class members. On behalf of the State of New Jersey, Carella, Byrne participated in the settlement negotiations and assisted class counsel achieve an overwhelming victory for the class.

Further, in connection with the settlement of the class' case, the Honorable Alan Gold, U.S.D.J., appointed Carella, Byrne (and co-counsel Wicker, Smith) to represent the interests of 34 States as "States' Counsel", in the post-settlement claims administration process. In particular, our charge was to insure that only valid claims are paid to actual victims, and that the residuary estate

4

# Carella, Byrne

left after the distribution of valid claims, is paid over to the various State Governments whom we represent. That assignment is ongoing.

### AOL/Time-Warner Class Action

Carella Byrne also represented the State of New Jersey as co-lead counsel in a class action entitled *Treasurer of New Jersey, John E. McCormac, on behalf of the State of New Jersey, Department of Treasury, Division of Investment, The Common Pension Fund, DCP Equity Fund, NJ Best Pooled Equity Fund, The Supplemental Annuity Collective Trust And The Trustees for the Support of Public Schools v. AOL Time Warner Inc., et al.,* Superior Court of New Jersey, Law Division, Mercer County, Docket No. MER-L-1349-03 (the "AOL" class action).

The AOL class action sought to compensate the New Jersey pension fund for losses sustained as a result of the merger between Time Warner and AOL. Significantly, this complex securities case involved the production and management of more than fifteen million pages of documents, as well the review and coding of the materials for use during trial. As a result of our efforts, as well as our co-counsel, this complex securities action was mediated and settled for in excess of $50,000,000 for the State pension fund.

### KPMG Tax Shelter Class Action

Carella Byrne was also co-counsel for the class with respect to a class action entitled *MARVIN SIMON, as Authorized Representative for The Marvin Simon Trust, as amended, for Palm Investors, LLC and for The Jeffrey Markman 1993 Irrevocable Trust, MARILYN SIMON, CLAUSE HARRIS, ANN HARRIS, BEN SIMON, HEIDI SIMON, BRITT SIMON, KIM FINK, AMY GOLDBERG, STEFAN RESSING, Individually and as Trustee of The S. Ressing 1999 Trust, FITZROY VENTURES, LLC, MICHAEL LE, Individually and as Trustee of the ML Le 1999 Trust, and MACKENZIE VENTURES, LLC v. KPMG LLP and SIDLEY AUSTIN BROWN & WOOD LLP,* United States District Court, District of New Jersey, Civil Action No. 05-3189(DMC).

The *Simon* class action involved allegations against KPMG, and the law firm of Sidley Austin Brown & Wood, stemming out of their role in the promotion of fraudulent off-shore tax shelters. The case settled for approximately $200,000,000, and was approved by the United States District Court, District of New Jersey. Carella Byrne was instrumental in achieving this significant settlement over vigorous objections from certain class members. Indeed, to achieve the settlement three full days of plenary hearings were held before the District Court, where both fact witnesses and expert witnesses testified. Carella, Byrne handled all aspects of the plenary hearing..

### Merck/Vioxx Securities Class Action

In September 2006, Carella Byrne was appointed Co-Liaison counsel for the class in the multi-billion dollar securities class action against Merck & Co. arising out of the withdrawal of Vioxx from the market in 2004. This significant securities class action is ongoing and is presently on appeal before the United States Court of Appeals for the Third Circuit.

# Carella, Byrne

### Wachovia ERISA Class Action

Carella Byrne is co-counsel on behalf of the class in *Serio, et al. v. Wachovia Securities LLC*, Civil Action No. 06-4681(DMC), which was brought on behalf of former Prudential Financial financial advisors and branch managers whose deferred compensation contributions were forfeited when they left employment with Wachovia Securities. The plaintiffs argue that the respective deferred compensation plans are, in fact, "retirement plans" under ERISA and, as a result, the employee contributions should not have been forfeited. Alternatively, the plaintiffs argue that they were constructively discharged as a result of adverse employment conditions which made it impossible for them to perform their jobs and, as a result, their accounts should not have been forfeited under the terms of the respective plans.

### Verizon ETF Class Action

On February 15, 2008, Carella, Byrne, was appointed, along with three other firms, to act as Interim Class Counsel for a nationwide class of individuals who were charged an early termination fee by Verizon Wireless. This action, which is pending in the District of New Jersey, alleges that Verizon's Early Termination Fee violated Section 201 of the Federal Communications Act as well as the New Jersey Consumer Fraud act.

### In Re Virgin Mobil IPO Litigation

On November 21, 2007, Carella, Byrne filed the first securities class action lawsuit against Virgin Mobile USA alleging that Virgin created and distributed a materially false and misleading Registration Statement and Prospectus in connection with its October 2007 IPO. Carella, Byrne and its co-counsel anticipate, based upon the principals governing the appointment of lead plaintiff under the PSLRA, that they will be appointed Class Counsel to lead the nationwide class in this significant securities class action.

### Other Class Actions

Carella Byrne is also currently prosecuting, either as co-lead counsel or co-counsel, numerous other class actions in the District of New Jersey including:

- *Sampang, et al. v. AT&T Mobility LLC, et al.*, Civil Action No. 07-5324(JLL)(ETF fees)
- *Monday v. Locus Telecommunications, Inc.*, Civil Action No. 07-02659(PGS) (calling card fees)
- *Ramirez v. Lycatel, LLC*, Civil Action  No. 07-05533(FSH)(calling card fees)
- *Ramirez v. Friendly Telecom, Inc.*, Civil Action No. 07-5589(FSH)
- *Ramirez v. Roslyn Telco Group*, Civil Action No. 07-5590(FSH)(calling card fees)
- *Ramirez v. SDIcard.com, Inc.*, Civil Action No. 07-5591(FSH)(calling card fees)
- *St. Louis Park Chiropractic v. Federal Insurance, et al.*, Civil Action No. 07-3110(JAP)(MedPay)
- *Allied Medical, P.A.  v. American International Insurance Company, et. al.*, Civil Action No. 07-4622(JAP)(MedPay)

- *Advanced Acupuncture Clinic, Inc. v. Allstate Insurance Co., et. al.*, Civil Action No. 07-4925 (JAP)(MedPay)
- *Advanced Acupuncture Clinic, Inc. v. Farmers Insurance Exchange*, Civil Action No. 07-5445(JAP)(MedPay)
- *Innovative Physical Therapy v. MetLife Auto & Home, et al.*, Civil Action No. 07-5446(JAP)(MedPay)
- *Casey OIE, D.C. v. Travelers Indemnity Company*, Civil Action No. 07-5447(JAP)(MedPay)
- *William J. Langeland, D.C. v. Government Employee Insurance Company*, Civil Action No. 07-5448(JAP)(MedPay)
- *Davis Landscape v. Hertz Equipment Rental Corporation*, Civil Action No. 06-3830(DMC)(loss damage waiver fees)
- *Shiflet v. Mercedes Benz USA, LLC*, Civil Action No. 07-5750(DRD)(consumer fraud)
- *Jackson v. Alpharma*, Civil Action 07-3250(GEB)(unpaid overtime)
- *In re N.J. Affordable Homes*, 05-60442(DHS)(defendant class of lenders in over 100 fraudulent conveyance suits brought by bankruptcy trustee)

**Other Complex Litigation**

Carella Byrne also has extensive experience managing far flung litigations involving extensive damages such as this one. In 1990, Carella Byrne was appointed Trustee/Receiver by the United States District Court, District of New Jersey, in connection with securities law violations by Eddie Antar, founder of the defunct consumer electronics chain Crazy Eddie, *Securities and Exchange Commission v. Eddie Antar et al.*, Civil Action No. 89-3773 (JCL).

The Antar Receivership required Carella Byrne to work with the Securities and Exchange Commission ("SEC"), and to commence litigation in numerous foreign jurisdictions, including Switzerland, Canada, Liechtenstein and Israel, in an effort to repatriate and recover millions of dollars in illegally obtained assets which Mr. Antar had diverted from the Crazy Eddie chain.

In its capacity as Trustee/Receiver, Carella Byrne recovered over $80,000,000, which was paid to Mr. Antar's victims. The SEC has reported that the *Antar* case represented the largest asset recovery in a contested case as of that time. The investment of the assets fully funded all expenses of the receivership and contributed a substantial amount to the settlement fund, even though the receivership extended from 1990 to 2005.

In addition to its other responsibilities Carella Byrne undertook administration of the settlement fund, including addressing tax and lien issues on behalf of the funds and harmed investors, participating in obtaining a tax exempt ruling on fund income from the New Jersey Division of Taxation, and working closely with the claims administrator and the SEC. Notably, in the claims evaluation and payment process, Carella Byrne personally reviewed and evaluated each claim for payment or denial of payment, and communicated the decisions to investors, the SEC and the Court, and appeared in response to any objection or appeal of the claims decisions, none of which was reversed or modified. Carella Byrne also oversaw the distribution process consisting of payments of thousands of checks to investors in a two-tier distribution process administered by the claims

# Carella, Byrne

administrator and the bank. Finally, investor contact information was maintained and updated for future distributions in a related case.

Carella, Byrne has also appeared either as trustee, receiver or counsel in: *Federal Trade Commission v. Oak Tree Numismatics, et al.* (D.N.J.) (control and operation of a rare coin dealer, distributions to customers, and turn-back of the enterprise to the defendants without exception); *United States v. Sheelan* (D.N.J.) (liquidation of Rule 144 restricted stock as restitution); *Harvey, Attorney General v. Clover Merchant Group et al.* (Superior Court of New Jersey, Essex County Chancery Division) (equitable receivership for fraudulent securities dealer).

Carella Byrne appeared for the bankruptcy trustee in *In Re Robert E. Brennan, Debtor*, Case No. 95-35502(KCF) and *Conway v. Pirates Associates et al.*, Adv. Pro. No. 98-3245(KCF). The *Brennan* matter arose out of claims by the SEC against Robert Brennan, formerly of First Jersey Securities, for securities law violations. Litigation was pursued in various domestic and foreign jurisdictions for the recovery of assets. We were successful in identifying and piercing various off-shore trusts and recovering millions of dollars for the bankruptcy estate, which was used in part to satisfy the SEC's judgment against Brennan.

Further, Carella Byrne is currently actively engaged in the representation of numerous publicly traded pharmaceutical companies in sophisticated patent infringement cases, some of which involve drug sales in the multi-billion dollar range. Representative clients in the patent litigation field include: (1) Apotex, Inc.; (2) Barr Laboraties; (3) Watson Pharmaceuticals; (4) Lupin Pharmaceuticals; (5) Sonofi-Aventis; (6) Aurobindo; and (7) Ivax Corp.

Carella Byrne attorneys have also advised and represented clients with respect to numerous antitrust issues relating to restraint of trade, price fixing and monopolization, both in court and in connection with FTC investigations. Those cases include: *Biovail Corporation International v. Hoechst AG*, 49 F.Supp.2d 750 (D.N.J. 1999); *Grace Consulting, Inc. v. Geac Computer Systems, Inc. et al.*, Civil Action No. 02-1252(KSH)(D.N.J.) and *Golden Bridge Technologies v. Nokia, et al.*, Docket No. 2:05-CV-170 (E.D.Tex).

# Carella, Byrne

## REAL ESTATE, LAND USE AND RESORT DEVELOPMENT

The Firm handles all aspects of transactions involving residential, commercial and industrial properties for both corporate and individual clients. Such transactions involve the preparation and review of real estate and financial documentation, environmental matters, land use regulations, and other related matters. Condominium transactions, including the formation of the condominium project and its approval by the regulatory authorities, and the preparation of the registration statement are included within this area.

The Firm's representation of land developers includes the preparation with the developer of Planning Board Applications, and the appearance before such Boards in connection with applications for subdivisions, variances and site plans. In this connection, the Firm works with the developer's experts in such areas as architecture, engineering, environmental, and traffic.

The Firm has been engaged in extensive litigation in real estate and related environmental matters, and has both represented and opposed major title companies in complex litigation.

### Regulatory Practice

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein is uniquely qualified to guide its clients through the proliferation of governmental regulation in a number of different areas of the law, from the regulation of casinos, to hospitals, from resource recovery facilities to public utilities.

### Health Care Law

In order to effectively operate in today's competitive environment, hospitals and other health care delivery systems must keep pace with technological advances and changes in law and insurance. We do.

Currently we represent and advise a variety of health care clients, from rehabilitation facilities and nursing homes to general acute care hospitals. And our primary concern is to help each organization achieve workable solutions to operational problems. To accomplish this, we identify problems and then offer both short- and long-term recommendations to prevent exposure to legal and financial risks. Most importantly, we provide up-to-date knowledge in a constantly changing regulatory system.

We'll handle all legal matters relevant to operation; policy and regulatory requirement correction; risk management review; and efficient, effective management plan development. And we do it all with a sensitive approach to our clients' concerns.

We have extensive experience representing fiscally distressed hospitals in turn around situations. Our team of experts provides needed direction in the areas of affiliation, corporate restructuring, general workouts, and vendor negotiations, while overseeing crucial day-to-day financial and system operations.

# Carella, Byrne

## Public Utilities

Our firm has a well-earned reputation for excellence in litigation and negotiation of public utility matters, with special emphasis on rate applications, alternative energy and cogeneration projects, solid waste litigation, and utility-related public issue negotiation.

In fact, we took the lead in drafting and passage of the "McEnroe Legislation" for resource recovery facilities; we have served as senior counsel in numerous cases before the Board of Public Utilities; and we have worked with major investment banks to provide financing for utility and cogeneration projects.

## Environmental Law

We have a broad range of experience in guiding clients through the increasingly complex web of federal and state laws designed to clean up and preserve the environment. We offer counsel on compliance with all government statutes and regulations, as well as their application to commercial and real estate transactions. We can help businesses obtain the needed air, water and waste permits. And our litigation attorneys have extensive trial and appellate experience in a variety of cases, including toxic tort, hazardous waste, products liability, insurance law, and more.

## Tax

Our firm has sophisticated experience in New Jersey State tax matters. We represent multi-national and multi-state corporations in planning, compliance, and litigation cases involving corporate income tax, sales and use tax, and other state and local taxes, including property taxes. We also provide services in federal, corporation, partnership, individual and non-profit association tax matters. This includes providing representation before the U.S. Tax Court and Administrative offices of the IRS.

## Labor Relations

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein handle all aspects of labor relations matters in the public and private sectors. Our labor relations practice encompasses representation of management in collective bargaining negotiations, including preparation of management's contract proposals, acting as management's chief spokesperson at negotiations, and preparation and finalization of negotiated collective bargaining agreements. In addition, we represent management in the public and private sectors in grievance, disciplinary and binding arbitration proceedings.

We also have extensive experience in handling matters before the New Jersey Public Employment Relations Commission and the National Labor Relations Board and in representing management in labor related litigation in both the state and federal courts.

## Government Affairs

Recognizing the need for both adversarial and negotiation excellence in the modern government arena, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein has developed an extensive public issues practice. Our members have testified before Congress, State Legislatures,

# Carella, Byrne

plus state, county and local governmental and regulatory agencies. To help us retain our leadership role, we are active in a public policy consortium -- the State Capital Law Firm Group -- working within a network of prestigious firms located in every state and throughout the world.

We first work to help our clients focus their concerns, then to develop strategies for implementing their proposals, and finally to act as their representative in every forum of public policy development.

With a strong emphasis on administrative law proceedings and municipal law, we have been successful in representing major national clients in government-related matters. This strength enables us to provide full-service public policy programs for clients, ranging from specific issue representation to integrated crisis management.

**International Law**

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein has valuable expertise in various aspects of international law.

Areas of note include airline transportation and trademark litigation involving gray market or parallel imports. Our foreign litigation experience is in the United Kingdom, Canada, Japan, West Germany, Austria, Australia, New Zealand and Italy.

The firm has particular expertise in taking foreign discovery for use in domestic litigation under the Hague Convention as well as Consular Treatises. Additionally, we have special expertise in the international overreach of the U.S. Antitrust Laws and the international transfer of technology. To accomplish this, we maintain a close working relationship with associate counsel in many foreign countries. These firms have special competence in dealing with economic and financial issues, both in their own countries and in regional economic blocks in their region, such as the Common Market.

In connection with our intellectual property law expertise, we file and prosecute patent and trademark applications throughout the world, including the European Patent. And we handle the sale and licensing of technology and trademarks.

# Carella, Byrne

## PARTNERS

### CHARLES C. CARELLA
CCCarella@CarellaByrne.com

**CHARLES C. CARELLA** has been a member of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein since 1976 and is Chairman of the Executive Committee. He has extensive experience in many areas of corporate practice, including mergers and acquisitions, bank finance, both state and federal administrative matters, plus environmental and solid waste matters. He has appeared on numerous occasions before the Board of Public Utilities in all forms of utility matters, and has served as a Trustee/Receiver in matters initiated by the Federal Trade Commission, Securities and Exchange Commission, the Federal District Court for the District of New Jersey and has served as Provisional Director upon appointment by the Superior Court of the State of New Jersey, Chancery Division.

Mr. Carella graduated from Fordham University with a B.S. degree in 1955 (Cum Laude) and received an LL.B. degree from Rutgers University in 1958. He was admitted to the New Jersey Bar in 1959 and the New York Bar in 1983.

He has served as an Assistant Prosecutor as well as Special Prosecutor of Essex County; Director of the New Jersey State Lottery Commission, Executive Secretary to the Governor, State of New Jersey, 1975-1976; Member of the Ethical Standards Commission for the State of New Jersey; as well as Chairman, New Jersey State Racing Commission, 1976-1980. He has served as Chief Counsel to the Passaic Valley Sewerage Commissioners.

Mr. Carella is a member of the Essex County, New Jersey State, New York State and American Bar Associations, the Association of Trial Lawyers of America, and the American Judicature Society. He is a member of the Finance Board of the Archdiocese of Newark, and a Trustee Fellow of Fordham University. He was formerly Chairman of the Board of Trustees of The University of Medicine and Dentistry of New Jersey; a member of the Board of Trustees of Robert Wood Johnson University Hospital; a member of the Board of Trustees of University Health System of New Jersey; a member of the Board of Bally Gaming International, Inc., and a member of The Board of Carteret Savings Bank.

Mr. Carella has been named to *Who's Who in American Law*.

### BRENDAN T. BYRNE
BByrne@CarellaByrne.com

**BRENDAN T. BYRNE** graduated from Princeton University with an A.B. degree in 1949 and received an LL.B. degree from Harvard Law School in 1950.

He served as Prosecutor of Essex County, New Jersey; as President of the New Jersey Public Utility Commission; as Assignment Judge of the New Jersey Superior Court; and then as Governor of New Jersey from 1974-1982.

Mr. Byrne is a former Vice President of the National District Attorney's Association; Chairman of the National Commission on Criminal Justice Standards and Goals; Chairman, National

# Carella, Byrne

Governors Association on International Trade; and trustee of Princeton University. He is an Editor of the New Jersey Law Journal and of Irish Law Reports; and former Chairman of the Princeton University Council on New Jersey Affairs and United States Marshals Foundation. He is a former member of the Board of Directors of Mack Cali Realty and Chelsea GCA.

Mr. Byrne was a member of the Board of Directors of Prudential Insurance Company of America, New Jersey Bell Telephone Company, Elizabethtown Water Company, Jamesway Corporation, Ingersoll-Rand and served as a Commissioner of the New Jersey Sports and Exposition Authority. He was litigation counsel to Carvel Corp. and Witco Corporation.

## JAMES E. CECCHI
JCecchi@CarellaByrne.com

**JAMES E. CECCHI** is a member of the firm's executive committee and specializes in complex civil and chancery litigation in federal and state court as well as the prosecutor of complex federal class actions involving claims arising under federal securities laws, consumer protection laws and antitrust laws. Mr. Cecchi personally handled on behalf of the firm the Exxon class action litigation, Merck Securities litigation, KPMG class action litigation and is currently prosecuting securities class actions, antitrust class actions and numerous consumer fraud class actions on behalf of the firm. Mr. Cecchi joined the firm in 1994 after serving in the United States Department of Justice as an Assistant United States Attorney for the District of New Jersey. In that capacity, Mr. Cecchi participated in numerous significant criminal prosecutions involving money laundering, narcotics smuggling and violations of federal firearms laws.

Mr. Cecchi graduated from Colgate University in 1989 with honors, majoring in History and Political Science. Mr. Cecchi was Executive Editor of the Colgate News. In 1989 he graduated from Fordham University School of Law and was a member of the International Law Journal. Mr. Cecchi served as Law Clerk to the Honorable Nicholas H. Politan in the United States District Court, District of New Jersey from 1989-1991. He is a member of the Federal, New Jersey State, Essex County and Bergen County Bar Associations.

## JOHN G. GILFILLAN III
JGilfillan@CarellaByrne.com

**JOHN G. GILFILLAN III**, a member of the Executive Committee, has been a member of the firm since its inception. He graduated from Villanova University in 1956 with a B.S. degree in mechanical engineering. In 1966 he graduated with a J.D. from Georgetown University Law Center where he served as Associate Editor of the Georgetown Law Journal. He has broad experience in complex technical litigation with particular emphasis on patent, trademark, trade secret, unfair competition and construction matters. In addition, he has handled litigations involving anti-trust, securities fraud and low income housing.

Mr. Gilfillan is a Past Chairman of the Patent, Trademark and Copyright Section of the New Jersey State Bar Association as well as a former member and Chairman of the District 10 Ethics Committee of the New Jersey Supreme Court. He is a member of the American, Federal, New Jersey State and Morris County Bar Associations as well as the American Intellectual Property Association. He was Vice-President, General Counsel and former Chairman of the Executive Committee of the

# Carella, Byrne

American Cancer Society, New Jersey Division, Inc., and has served as a National Delegate to the Board of Trustees of the American Cancer Society. Additionally, he has been a member of the Board of Trustees of Villanova University.

## PETER G. STEWART
PStewart@CarellaByrne.com

**PETER G. STEWART**, a member of the Executive Committee, has been a member of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein since 1979. He has broad experience in many areas of corporate practice, with emphasis on Health Care, Real Estate Development and Public Utility matters. His practice also includes representing clients before various Local, County and State Agencies and the New Jersey Legislature as registered lobbyist.

Mr. Stewart served as the Mayor of his home town, as an elected member of the Essex County Board of Chosen Freeholders, as an Assemblyman in the New Jersey Legislature, and Chief Counsel to the County of Essex. He served as the General Counsel to the New Jersey State Democratic Committee.

He is an emeritus member of the Board of Lay Trustees of Delbarton School, Morristown, New Jersey, and also a member of the Board of Trustees of Saint Peter's College, Jersey City, New Jersey. He is a member of the Board of Directors of Horizon Blue Cross/Blue Shield of New Jersey. He is a former chairman of the Board of Directors of West Jersey Community Bank and West Jersey Bancshares. Inc., a publicly traded State Charter Commercial Bank.

## ELLIOT M. OLSTEIN
EOlstein@CarellaByrne.com

**ELLIOT M. OLSTEIN**, a member of the Executive Committee, has broad experience in intellectual property law including securing patent protection; licensing of technical information and patents; infringement and validity opinions; evaluating intellectual property rights for investors; and intellectual property litigation. His particular areas of expertise include chemical and biochemical inventions with particular emphasis on their medical applications.

He also has experience in corporate law and business financing, including venture capital financing, with specific emphasis on technically-oriented business.

Mr. Olstein graduated from Columbia College and Columbia School of Engineering, receiving an A.B. Degree in 1960 and a B.S.Ch.E. in 1961. He received a J.D. Degree from Georgetown University Law Center in 1965 and an LL.M. in taxation from New York University.

Mr. Olstein served for three years as Chairman of the Patents, Trademarks, Copyrights and Unfair Competition Section of the New Jersey Bar Association and is admitted to practice in the States of New Jersey, New York, and Virginia.

Carella, Byrne

---

### ARTHUR T. VANDERBILT II
AVanderbilt@CarellaByrne.com

**ARTHUR T. VANDERBILT II** joined Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein in 1982. Since 1978, Mr. Vanderbilt has specialized in public finance law. He has been listed in the "Red Book" of approved municipal bond attorneys in the United States for over twenty-five years. He has had broad experience in general obligation bond and revenue bond financings as Bond Counsel, underwriter's counsel, and trustee's counsel, and has been involved with billions of dollars of financings. In addition, Mr. Vanderbilt has represented many clients before the New Jersey Board of Public Utilities, and is a registered Governmental Affairs Agent.

Mr. Vanderbilt graduated with an A.B. degree from Wesleyan University (magna cum laude) in 1972 and with a J.D. degree from the University of Virginia School of Law in 1975.

After a judicial clerkship with the Hon. Herman D. Michels, Presiding Judge of the New Jersey Superior Court, Appellate Division, Mr. Vanderbilt served as Deputy Attorney General of New Jersey, and Counsel to the New Jersey Board of Public Utilities. Before joining Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart, & Olstein, he served as Assistant Counsel to the Governor of New Jersey.

Mr. Vanderbilt is listed in Who's Who in America, and, as the author of many books and articles about the law, in Contemporary Authors. He won the American Bar Association's Scribes Award in 1976 for the best book about the law published that year, and was inducted into the New Jersey Literary Hall of Fame in 2001. Mr. Vanderbilt served as a member and chairman of a Supreme Court District Ethics Committee, and was a member of the Supreme Court's Advisory Committee on Professional Ethics and a member of the New Jersey State Bar Association's Task Force on Attorney Disciplinary System. He has served as a member and president of the Board of Trustees of the Elizabeth, New Jersey Presbytery; the Summit, New Jersey Free Public Library; The Manley-Winser Foundation and Greenwood Gardens. He is a member of the American Bar Association, the New Jersey Bar Association, and the National Association of Bond Lawyers. He was named a fellow of the American Bar Foundation in 2000.

### JAN ALAN BRODY
JBrody@CarellaByrne.com

**JAN ALAN BRODY** a member of the Executive Committee, became associated with the firm of Cecchi & Politan in 1976. He became a partner in 1982 and, in 1987, the firm name was changed to Cecchi, Brody & Agnello when partner Nicholas H. Politan became a United States District Court Judge.

Mr. Brody graduated from Boston University cum laude in 1973 with an A.B. degree in political science. In 1976, he graduated Boston University Law School with a Juris Doctor degree. He has had extensive experience in complex civil and chancery litigation and has a substantial family law practice.

**Carella, Byrne**

He is a member of the American, New Jersey State, and Bergen County Bar Associations. He has also served as counsel for the Fort Lee Planning Board and as a Standing Master appointed by the United States District Court for the District of New Jersey.

### JOHN M. AGNELLO
JAgnello@CarellaByrne.com

**JOHN M. AGNELLO** joined the firm of Cecchi and Politan in 1979. In 1983, he became a partner in the firm. In 1987, he became a name partner as the firm's name was changed to Cecchi, Brody & Agnello after Nicholas H. Politan became a U.S. District Court Judge. Cecchi, Brody and Agnello merged with Carella, Byrne in 1990 at which time Mr. Agnello became a partner in Carella, Byrne.

Mr. Agnello graduated from Stevens Institute of Technology in 1975 receiving a B.E. with Honor in mechanical engineering. In 1979, he graduated from Seton Hall University School of Law receiving a J.D., Cum Laude. He has extensive experience in complex commercial litigation with particular emphasis on environmental, insurance coverage, ERISA and construction cases. Additionally, he has a substantial labor practice representing management (both public and private) in collective bargaining negotiations, labor mediation and arbitration proceedings, as well as actions before the National Labor Relations Board and the New Jersey Public Employment Relations Commission. Mr. Agnello also represents ERISA Pension and Welfare Funds.

He is a member of the American, Federal, New Jersey State, and Bergen County Bar Associations.

### CHARLES M. CARELLA
CMCarella@CarellaByrne.com

**CHARLES M. CARELLA** is experienced in general counsel law, municipal law, bankruptcy matters including corporate insolvency and creditors' rights and general litigation. He received his B.S. in mechanical engineering from Lehigh University in 1979 and his M.B.A. from Iona College's Hagan School of Business in 1985. He received his J.D. degree from Fordham University School of Law in 1989. He is admitted to the Bars of the State of New Jersey; The United States District Court for the District of New Jersey; the State of New York; and the United States District Courts for the Southern and Eastern Districts of New York. He is a member of the New Jersey State and New York Bar Associations. He is currently outside General Counsel for the Archdiocese of Newark and is a member of the Professionals Group Advisory Council for Valley National Bank. He was formerly Township Attorney for the Township of Nutley, New Jersey, 1996. He formerly served as a member of the Board of Trustees of Caldwell College and a member of the Board of Governors of the CYO Youth Ministries of the Archdiocese of Newark, New Jersey.

**LINDSEY H. TAYLOR**, born Spartanburg, South Carolina, July 8, 1961; admitted to bar, 1986, New Jersey; 1987, New York; 1989, District of Columbia. Education: University of North Carolina at Chapel Hill (B.A., with honors, 1983; J.D., 1986). Member: American Bar Association. Reported cases: *Thoroughbred Software International, Inc. v. Dice Corp.*, 488 F.3d 352 (6th Cir. 2007) *aff'g in part and rev'g in part* 439 F.Supp.2d 758 (E.D.Mich. 2006); *Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 186 F.3d 311 (3d Cir. 1999); *Circle Industries USA, Inc. v. Parke*

16

# Carella, Byrne

*Construction Group, Inc.*, 183 F.3d 105 (2d Cir.) *cert. denied* 120 S.Ct. 616 (1999); *Brown v. Grabowski,* 922 F.2d 1097 (3d Cir. 1990), *cert. denied* 111 S.Ct. 2827 (1991); *Thoroughbred Software International, Inc. v. Dice Corp.,* 439 F.Supp.2d 758 (E.D.Mich. 2006); *Euro-Pro Corporation v. TriStar Products*, 172 F.Supp.2d 567 (D.N.J. 2001); *Biovail Corporation International v. Hoechst AG*, 49 F.Supp.2d 750 (D.N.J. 1999); *Broadcast Music, Inc. v. 84-88 Broadway, Inc.*, 942 F.Supp. 225 (D.N.J. 1996); *Broadcast Music, Inc. v. DeGallo, Inc.*, 872 F. Supp. 167 (D.N.J. 1995); *Lifschultz Fast Freight v. Rainbow Shops*, 784 F.Supp. 89 (S.D.N.Y. 1992); *McGill v. Mountainside Police Dept.*, 720 F.Supp. 418 (D.N.J. 1989); *In Re Sound Radio, Inc.*, 145 B.R. 193 (Bankr., D.N.J. 1992); *In Re Prestegaard*, 139 B.R. 117 (Bankr., S.D.N.Y. 1992); *In Re Pineview Care Center, Inc.*, 142 B.R. 677 (Bankr., D.N.J. 1992), *aff'd* 152 B.R. 703 (D.N.J. 1993); *Downs v. Yuen*, 298 A.D.2d 177, 748 N.Y.S.2d 131 (1st Dept. 2002); *Velazquez v. Jiminez*, 336 N.J.Super. 10 (App.Div. 2000); *Conestoga Title Insurance Co. v. Premier Title Agency*, 328 N.J.Super. 460 (App.Div. 2000); *Citibank v. Errico*, 251 N.J.Super. 236 (App. Div. 1991); *Brew v. Stern*, 254 N.J.Super. 237 (Law Div. 1991). Publications: "Responding to the Complaint" in *New Jersey Federal Civil Procedure*, New Jersey Law Journal Books,1999 and annual supplements; "Applying the CISG to International Software Transactions", *Metropolitan Corporate Counsel*, October 1999, "The Digital Millennium Copyright Act: New Protections for the Computer Age", Intellectual Property Supplement, *New Jersey Law Journal*, July 26, 1999; "Copyright Basics for Occupational Therapy Practitioners", *OT Practice*, May 1999, "Facing the New Millennium-Without Bugs", *OT Practice*, December 1998; "The Year 2000 Malpractice Bug: Waiting to Trap the Unwary Attorney", for National Legal Malpractice Conference, sponsored by ABA Standing Committee on Lawyers' Professional Liability, September 1998l "Self-Help in 2000: How a business can do its own Y2K compliance without violating copyright laws", Intellectual Property Supplement, *New Jersey Law Journal*, July 20, 1998; "State and Local Taxation of Software: A Trap for the Unwary CIO" Chief Information Officer Journal, Fall 1989. Lectures: "Intellectual Property Basics for Health Care Attorneys", 2004 Health & Hospital Law Symposium, New Jersey Institute for Continuing Legal Education, October, 15, 2004; "Hot Topics in Copyright Law", 2003 Intellectual Property Summit, New Jersey Institute For Continuing Legal Education, May 2, 2003; "The Inside Track on Copyright Law", WYNY 103.5 First Annual "Country Holiday Expo" songwriters' seminar, November 18, 1995. Practice areas:   Commercial Litigation; Intellectual Property Litigation; Bankruptcy.

## JAMES T. BYERS
JByers@CarellaByrne.com

**JAMES T. BYERS** has been a member of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein since 1981 and during that time has been engaged in general corporate, real estate and banking law and tax exempt bond financing. He has broad expertise in many areas of corporate practice, including real estate and asset based lending, mergers and acquisitions, purchase and sale of real estate and corporate counseling; and as Bond Counsel in connection with the issuance of tax exempt bonds. Mr. Byers graduated from Rutgers College with an A.B. degree in 1974 and received a J.D. degree from George Washington University in 1979. He has lectured and participated in panel discussions on financing and banking law subjects. He is a member of the American and New Jersey State Bar Associations and a member of the National Association of Bond Lawyers.

## DONALD F. MICELI
DMiceli@CarellaByrne.com

# Carella, Byrne

---

**DONALD F. MICELI** specializes in financial matters including federal income taxation, state and real property taxation, taxation litigation and rate making matters before the New Jersey Board of Public Utilities. His practice also includes the representation of developers before local planning boards. He received a B.A. degree from Seton Hall University, an LL.B. degree from Rutgers University, and an LL.M. degree from New York University. He is admitted to the bar of the State of New Jersey and the United States Tax Court. Mr. Miceli has served as Assistant Corporation Counsel, City of Newark, and as Tax Consultant to the Essex County Board of Taxation.

## A. RICHARD ROSS
RRoss@CarellaByrne.com

**A. RICHARD ROSS** is a member of the Litigation and Corporate Departments of the Firm. He has broad experience in complex litigation, corporate, securities, tort and banking matters. Mr. Ross is particularly experienced in international matters including asset recovery and transnational commercial ventures. He also has extensive experience in equity practice and equitable receiverships, and has engaged in a wide range of real estate, trust and estates and commercial loan transactions. Mr. Ross graduated with a B.A. degree from Reed College in 1972, and received a J.D. degree from New York Law School in 1977. He served as a Staff Attorney in the Office of the President, New Jersey Civil Service Commission in 1977, and in the Office of Legal Counsel, New Jersey Supreme Court from 1978-1982, where he also served as an ex-officio member of the Supreme Court Committee on Civil Practice. He is a member of the New Jersey Supreme Court and District Ethics Committee, New Jersey State Bar Association and the American Bar Association (member of the International, Litigation, Business Law, Tort and Insurance and Real Estate, Property and Probate Sections). Mr. Ross has numerous reported decisions including SEC v. Antar, 831 F. Supp. 380 (D.N.J. 1993), judgment aff'd 54 F. 3d 770 (3d Cir. 1995); In re. National Smelting Inc. of New Jersey Bondholders' Litigation, 722 F. Supp. 152 (D.N.J. 1989); and Reinfeld Inc. v. Schieffelin & Co., 94 N.J.(1984). Mr. Ross was a merit selection to the 2005 New Jersey "Super Lawyers".

## KENNETH L. WINTERS
KWinters@CarellaByrne.com

**KENNETH L. WINTERS** is primarily engaged in the areas of construction law, anti-trust, trademarks, copyrights, constitutional challenges to commercial regulatory statutes, computer and software law and general disputes. He also has extensive appellate experience. Mr. Winters graduated from the University of South Carolina in 1977 with a Bachelor of Arts Degree (magna cum laude), and became a member of Phi Beta Kappa that year. He received his J.D. degree from Duke University in 1980. He served a one year clerkship with a judge of the Superior Court of New Jersey and thereafter has been in private practice. Mr. Winters is admitted to the state and federal bars of New Jersey, and to the bars of the United States Courts of Appeal for the Third Circuit, the Federal Circuit, and the Eleventh Circuit. He is a member of the American, New Jersey State, and Essex County Bar Associations.

## JEFFREY A. COOPER
JCooper@CarellaByrne.com

**JEFFREY A. COOPER** specializes in bankruptcy matters involving corporate insolvency and creditors' rights litigation. He received his B.A. degree in History from Yale University in 1977 and his J.D. degree from Cornell University, 1980, where he was a Member Phi Alpha Phi. Jeffrey

# Carella, Byrne

---

was an Assistant Prosecutor, Essex County, New Jersey from 1981 – 1983, a Member of the Fee Arbitration Committee District VC, Essex County, 1991 – 1995 and a Master, Bankruptcy Inn of Court, 1993 – 1994. He is admitted to the Bars of the State of New Jersey; the United States District Court for the District of New Jersey; the State of New York, the United States District Courts for the Southern and Eastern Districts of New York; and the United States Courts of Appeal for the Second and Third Circuits. He is a Member, New Jersey State Bar Association and the American Bankruptcy Institute. Jeffrey has been a Member of the Merit Selection Panel (which recommends bankruptcy judge appointments to the Third Circuit Court of Appeals) in 1998, 2000 and 2001. He also has been selected as a "Super Lawyer' in 2005 and 2006. Jeffrey is a Member of the Board of Directors and also the Chair of the Bankruptcy Section of the State Capital Global Law Firm Group, an association of law firms around the world.

## CARL R. WOODWARD III
CWoodward@CarellaByrne.com

**CARL R. WOODWARD III** is experienced in environmental law, municipal law, zoning and planning, real estate, insurance, personal injury and general civil litigation. He received a B.A. degree, Rutgers University, 1965, and a J.D. degree, Rutgers University of Law, Newark, New Jersey, 1968. He served as Captain, United States Army, 1969-1971. Mr. Woodward was Law Secretary to the Honorable Baruch S. Seidman, Superior Court of New Jersey, Chancery Division. He served as Assistant United States Attorney, District of New Jersey, Chief, Environmental Protection Division, 1971-1978. He is Township Attorney, Township of Chatham, 1992-present, Attorney, Borough of New Providence 1995-present, and Township Attorney, Township of Cranford 2007. He was formerly Attorney, Chatham Township Board of Adjustment, 1979-1992 and Attorney, Borough of New Providence Planning Board 1986-1994. He was Adjunct Professor of Law, Seton Hall University School of Law in 1985; President of the Rutgers Alumni Association from 1984-1985; and Trustee of Rutgers University from 1985-1991. He currently serves as a Trustee of the New Jersey Institute of Local Government Attorneys. He is a member of the American Bar Association, New Jersey State Bar Association, and Morris County Bar Association.

## MELISSA E. FLAX
MFlax@CarellaByrne.com

**MELISSA E. FLAX** is a member of the Litigation Department of the firm. She received an A.B. Degree from the University of Michigan; American University, London, England and a J.D. Degree from Loyola University where she was a member of Loyola University Law Review. Ms. Flax served as a Law Clerk from 1992-1993 to Hon. Julio M. Fuentes, Superior Court of New Jersey, Essex County. She is a member of New Jersey State and New York State Bar Associations.

## DENNIS F. GLEASON
DGleason@CarellaByrne.com

**DENNIS F. GLEASON** is a graduate of the City University of New York having received a Bachelor of Arts in 1975. In 1980 he received a Master of Arts from New York University. Mr. Gleason received his. *Juris Doctor* from Seton Hall University School of Law in 1986 and was admitted to practice to the New Jersey Bar and United States District Court for the District of New

## Carella, Byrne

Jersey in 1987. He is also admitted to practice before the United States Supreme Court; the United States Courts of Appeals for the Federal, Third, Sixth, and Seventh Circuits. He has also been admitted to numerous United States District Courts throughout the country. His practice focuses on commercial and complex litigation with particular emphasis in area the of intellectual property matters including patents, trademarks, copyrights, unfair competition and trade secrets. Mr. Gleason has also litigated matters on behalf of policyholders regarding insurance coverage and defended employment discrimination claims. Mr. Gleason also lectures and publishes in the areas of litigation procedure and intellectual property litigation. Mr. Gleason is member of the American Bar Association (Litigation and Intellectual Property Sections); New Jersey Bar Association (Vice President Federal Practice and Procedure Section); and Association of the Federal Bar of the State of New Jersey.

### DAVID G. GILFILLAN
DGilfillan@CarellaByrne.com

**DAVID G. GILFILLAN**, born Washington, D.C., April 23, 1966; admitted to bar, 1993, New Jersey and U.S. District Court, District of New Jersey. Education: Boston College (B.A., 1988); Seton Hall University (J.D., 1993). Member, Worrall F. Mountain Inn of Court. Reported Cases: Handy & Harmon, et al v. Borough of Park Ridge, 302 NJ Super. 558 (App. Div. 1997).

### G. GLENNON TROUBLEFIELD
GTroublefield@CarellaByrne.com

**G. GLENNON TROUBLEFIELD**, born Belleville, New Jersey, October 3, 1966; admitted to bar, 1991, New Jersey and U.S. District Court, District of New Jersey; 1992, Pennsylvania and U.S. District Court, Eastern District of Pennsylvania; registered to practice before U.S. Patent and Trademark Office. Education: University of Pittsburgh (B.S.M.E., 1988); Seton Hall University (J.D., 1991). Law Clerk to Honorable Virginia A. Long, Judge, New Jersey Superior Court, Appellate Division, 1991-1992. Member, 1989-1990, Articles Editor, 1990-1991, Seton Hall Legislative Law Journal. Member: New Jersey State, Garden State and American Bar Associations. Practice Areas: Patents; Trademarks; Copyrights; Unfair Competition; Intellectual Property Litigation.

# Carella, Byrne

---

### BRIAN H. FENLON
BFenlon@CarellaByrne.com

**BRIAN H. FENLON**, born New York, N.Y., October 30, 1962; admitted to bar, 1987, New Jersey and U.S. District Court, District of New Jersey. Education: Muhlenberg College (A.B., 1984); Seton Hall University (J.D., 1987). Phi Alpha Theta. Member: Morris County and Essex County Bar Associations; Worral F. Mountain Inns of Court.

### KHOREN BANDAZIAN
KBandazian@CarellaByrne.com

**KHOREN BANDAZIAN,** born Richmond, VA, February 7, 1969; admitted to bar, 1995, New Jersey, 1996, New York; Education: Northeastern University (B.S., 1991), Pace University (J.D. 1995). Mr. Bandazian represents individuals, contractors/builders, and developers in all areas of real estate acquisition, financing, leasing, development and sales. He also serves as counsel to lenders in connection with commercial lending. He is counsel to many small business and advises them on the many day-to-day legal issues which face the business community. He is active in the practice of community association law and represents developers in connection with many condominium conversion projects. He is a member of the New Jersey Community Association Institute and serves as a Board of Director for the Community Builder's Association. He is active in his community and also serves on the boards of other charitable organizations. He is president of the Board for the Co-Op where he resides in Fort Lee, New Jersey with his wife and two children.

## OF COUNSEL

**RICHARD K. MATANLE** has broad experience in real estate, banking, general contract and business matters as well as commercial litigation. Within these fields of concentration, he has extensive experience in commercial lending and real estate transactions, including commercial real property leasing. His commercial loan transaction experience includes creditors' rights, litigation and loan workouts. He received a B.A. degree from the State University of New York at Buffalo and a J.D. degree from Hofstra University School of Law. Mr. Matanle was previously Associate Counsel with the Chase Manhattan Bank, N.A. and a partner in the law firm of Blackburn, Rice and Matanle. He also served as counsel with the Federal Deposit Insurance Corporation. He is admitted to the Bars of the State of New Jersey and New York and to the Bars of the United States District Courts in both States.

**DONALD S. BROOKS** received a B.A. degree from Columbia College and an LLB degree from Columbia University Law School. He served as a Trial Attorney with the National Labor Relations Board and immediately prior to joining Carella, Byrne, he was Senior Counsel for Merck & Co., Inc. During his twenty-seven-year career with Merck, Mr. Brooks coordinated a wide variety of general corporate work for the company, including negotiations and preparation of contracts, regulatory compliance and worldwide labor relations activities. Most recently he supervised the legal aspects of the company's worldwide technology transfer activities, including planning, negotiations and drafting licensing agreements, strategic alliances and joint as well as marketing, distribution, supply and research related agreements. Mr. Brooks has also served as a U.S. delegate to the International Labor Organization in Geneva, Switzerland. He is a member of the

# Carella, Byrne

New Jersey and Pennsylvania Bar Association and has served as Chairman of the Corporate Law Section of the New Jersey Bar Association. Mr. Brooks is also a member of the New York Bar and has published articles on labor relations, joint ventures and training and development in corporate law departments.

**FRANCIS C. HAND**, born New York, N.Y.; admitted to bar, 1964, District of Columbia; 1965, New York; 1971, New Jersey; registered to practice before U.S. Patent and Trademark Office. Education: Manhattan College (B.C.E.); Georgetown University (J.D.). Arbitrator, American Arbitration Association. Member: New York State, New Jersey State and American Bar Associations; The District of Columbia Bar. Mr. Hand was previously a partner in the patent law firm of Kenyon & Kenyon for twenty years and presently represents domestic and foreign corporations in the prosecution of patents and trademarks and the litigation of patents in the federal courts. Practice Areas: Patents; Trademarks; Licensing; Litigation.

**AVRAM S. EULE**, born Newark, New Jersey, April 9, 1948; admitted to bar, 1971, New Jersey and U.S. District Court, District of New Jersey; 1986, U.S. Supreme Court. Education: Rutgers University (A.B., 1968); University of Oklahoma (J.D., 1971). Phi Alpha Delta. Member, Board of Governors, Rutgers Alumni Federation, 1974-1978. Board of Trustees, Temple Beth Am, 1989-1994; Task Forces, United Jewish Federation of MetroWest, 1992-1998. Member: American Bar Association. Reported Cases: Dienco, Inc. v. Security National Bank of New Jersey, 221 N.J., Super. 438 (App. Div. 1987). Practice Areas: Transactional Law; Real Estate Law; Commercial Litigation; Corporate Law; Loan Workouts.

**RAYMOND W. FISHER**, born Newark, New Jersey, June 8, 1949; admitted to bar, 1975, New Jersey and U.S. District Court, District Court of New Jersey; 1981, U.S. Supreme Court; 1982, U.S, Court of Appeals, Third Circuit. Education: Georgetown University (B.A., cum laude, 1971); Fordham University (J.D., 1975). Phi Beta Kappa. Member, Fordham Law Review, 1974-1975. Clerk to Honorable Thomas F. Murphy, United Stated District Court Judge, Southern District of New York, 1975-1976. Member New Jersey State and American Bar Association. Practice Areas: Litigation and Appeals in state and federal courts; General Practice; Employment Law; Commercial Law; Computer Law.

**DAVID J. REICH** specializes in complex commercial litigation, health care litigation and intellectual property litigation. He graduated from Yale University cum laude with distinction in American History in 1975 and received his J.D. degree from the University of Pennsylvania in 1978. Mr. Reich served as a Law Secretary to Hon. Alan B. Handler, Associate Justice of the New Jersey Supreme Court from 1978-1979. He is admitted to the bars of the State of New Jersey, the United States District Court of the State of New Jersey, the State of New York, the United States District Court of the Southern and Eastern Districts of New York and the United States Courts of Appeals for the Third and Seventh Circuits.

**DECANDA M. FAULK,** joins the firm as Of Counsel and will head its health law department where she will continue to counsel clients in business development and transactions, including physician contracting and other multi-faceted provider contracting relationships, joint ventures, mergers and acquisitions, not-for-profit/tax-exempt and bond financing matters; State and

# Carella, Byrne

---

Federal regulatory monitoring, including compliance initiatives, EMTALA, HIPAA; accreditation and third-party payer issues; and State and Federal investigations.

Ms. Faulk is a graduate of Rutgers School of Law-Newark where she currently serves as an adjunct professor and teaches Health Law courses. She received her undergraduate degree from Rutgers University College of Nursing and worked for several years as a critical care nurse and in the area of quality assurance and utilization review prior to becoming an attorney. Ms. Faulk comes to the firm with several years of experience in health law, having recently managed her own health law firm, Faulk & Associates, LLC, where she represented health care clients, including hospitals, health systems, home care agencies, individual physicians/group practices and a host of other health-related clients. She has previously worked in law firms, academia, government and the pharmaceutical industry. Ms. Faulk has also served as a County Hearing Officer. She is licensed to pra ctice law in the states of New Jersey and New York.

Ms. Faulk is certified in health care compliance and is a published author and a frequent lecturer in the field of health and pharmaceutical law. She is on the American Health Lawyers Alternative Dispute Resolution Services list in which health care clients may select mediators to resolve their disputes and is the Past Chair and board member of the New Jersey State Bar Association's Health and Hospital Law Section. She has also held board and officer positions with various organizations of which she has very active memberships. She recently completed a two-year term on the New Jersey State Bar Association's Legislative Committee and served on New Jersey Governor Corzine's 2006 Health Care and Senior Policy Issues' Transition Team, Newark Mayor Cory Booker's 2006 Health Care Services Transition Team, and The Sharing Network's New Jersey Organ Donation Task Force (2003), which is part of her ongoing commitment to effect health care policy changes vital to health care in New Jersey. She also frequently hosts community awareness and public advocacy forums on health and pharmaceutical legal issues. Additionally, she is a mentor to law, high school, and grammar school students.

Ms. Faulk has been selected by Manchester Who's Who Among Executives and Professionals and as a New Jersey Superlawyers 2006 Rising Star. She is also the recipient of Sigma Gamma Rho Sorority, Inc. Theta Ph Sigma Alumnae Chapter 2006 Woman of Distinction Award and the YMCA of New Jersey 2003 New Jersey Minority Achiever Award.

**Areas of Expertise:**  Health and Pharmaceutical Law, including Compliance, Fraud and Abuse, Privacy, Food and Drug Administration, including Clinical Studies Phases I-IV, Marketing and Advertising, Best Price, Rebates/Discounts; and Intellectual Property Law, including Licensing.

**Additional Areas of Practice**:  Commercial and General Corporate; E-Business/Internet and Information Technology; Education, including Special Education; General Litigation, including Municipal and Superior Court matters, Administrative Law Hearings, Professional Review Boards, Guardianships; Medicaid Estate Planning, Trusts, Estate and Tax law.

# Carella, Byrne

---

## ASSOCIATES

**RAYMOND J. LILLIE** has experience in patent and trademark cases, including patent application prosecution, interferences, and validity and infringement studies. Mr. Lillie received his B.S. degree (magna cum laude) from the University of Scranton in 1981. He received a J.D. degree from the Marshall-Wythe School of Law, College of William and Mary in 1984. He is registered to practice before the United States Patent and Trademark Office.

He is a member of the American and New Jersey State Bar Associations, and a Fourth Degree member of the Knights of Columbus.

**WILLIAM SQUIRE** graduated from Newark College of Engineering (NJIT) in 1959 with a BS degree in Mechanical Engineering. In 1968, he received his juris doctor degree from Seton Hall University, Newark, N.J. He is admitted to the bar of the State of New Jersey. He is admitted to the United States District Court for the District of New Jersey, the United States Supreme Court and the Court of Appeals for the Federal Circuit. He is a registered patent attorney in the United States Patent and Trademark Office, having been registered in 1970.

He is a member of the New Jersey State Bar Association, The American Intellectual Property Law Association and The New Jersey Intellectual Property Law Association.

**ALAN J. GRANT,** born Brooklyn, New York, March 8, 1950; admitted to bar, 1985, New York; 1989, U.S. District Court, Southern and Eastern Districts of New York; 1993, U.S. Court of Appeals, Federal Circuit; registered to practice before U.S. Patent and Trademark Office. (Not admitted in New Jersey). Education: St. Francis College (B.S., 1972); State University of New York, Downstate Medical Center (Ph.D., 1979); Brooklyn Law School (J.D., 1985). Member: New York State Bar Association. Practice Areas: Patent Law; Trademark; Copyright.

**LAURA S. MUNZER,** born Paterson, New Jersey, December 22, 1957; admitted to bar, 1983, New Jersey. Education: Princeton University (A.B., 1979); Boston University (J.D., 1982). She is counsel to the Passaic City Democratic Club. Practice Areas: Real Estate Law; Wills and Estates.

**MARC D. MICELI**, born Belleville, New Jersey, October 25, 1970; admitted to bar, 1999, New Jersey, Massachusetts and U.S. District Court, District of New Jersey; 2006, U.S. District Court, Southern and Eastern Districts of New York; 2001, U.S. Tax Court. Education: University of Illinois (B.A., 1994; B.M., 1994; M.M., 1995); Case Western Reserve University (J.D., 1998); Boston University (LL.M., Taxation, 2001). Member: New Jersey State, Massachusetts, American Bar Association and American Bankruptcy Institute. Practice Areas: Financial Restructuring and Bankruptcy; Federal and State Taxation; Commercial Litigation.

**Carella, Byrne**

---

**RAYMOND E. STAUFFER**, born Queens, New York, February 24, 1966; admitted to bar, 2000, New York and U.S. District Court, Southern and Eastern Districts of New York; 2006, U.S. Court of Appeals for the Federal Circuit; registered to practice before U.S. Patent and Trademark Office. (Not admitted in New Jersey). Education: State University of New York at Old Westbury (B.S., Chemistry, 1993); Brooklyn Law School (J.D., 1997). Moot Court Honor Society. Member: Association of the Bar of the City of New York; American Chemical Society (Member, Section on: Chemistry and the Law); American Intellectual Property Law Association (Voting Member, Committees on: Chemical Practice; Interference; and Licensing and Management of IP Assets). Practice Areas: Patent Prosecution, Litigation, Opinion Drafting, Counseling, and Licensing, as relates to Pharmaceuticals, Chemicals, and Biotechnologies.
RStauffer@CarellaByrne.com

**JACOB A. KUBERT**, born Dover, New Jersey, December 12, 1976, admitted to bar, 2001, New Jersey and New York; Education: Roger Williams University (B.S., Administration of Justice, 1998); New York Law School (J.D., 2001); Member: American Bar Association; Practice Areas: Personal Injury, Commercial, General, Trademark Infringement, Labor

**STANLEY J. YELLIN**, born New York, New York, March 30, 1948; admitted to bar, 1973, Connecticut and New York; 1976, U.S. Tax Court; 1978, New Jersey and U.S. District Court, District of New Jersey. Education: Queens College (B.A., 1969); University of Connecticut School of Law (J.D. 1972); New York University School of Law (LL.M. in Taxation, 1976). Adjunct Professor, Fairleigh Dickinson University, M.S. in taxation program 1983-1990; Author: Business Acquisitions: Tax & Legal Guide, Panel Publishers, 1987; Bank Tax Report, Warren Gorham & Lamont, 1976-1992. Practice Areas: Estate Planning and Administration, Tax Planning; Business Formations, Sales and Acquisitions; Real Estate.

**STEPHEN R. DANEK,** born Newark, New Jersey, May 3, 1964; admitted to bar 1989, New Jersey and U.S. District Court, District of New Jersey, 1989. Education: Muhlenberg College (B.A., Political Science, 1986); Seton Hall School of Law (J.D. 1989). Practice Areas: Personal Injury Litigation; Environmental Law.

**DANIEL J. MULLIGAN**, born Heidelberg, Germany, May 7, 1970; admitted to bar, 1997, New Jersey; 2000, Pennsylvania. Education: Dartmouth College (B.A., 1992); University of Iowa (J.D., with high distinction, 1996). Order of the Coif. Member: New Jersey State and American Bar Associations; Dartmouth Lawyers' Association. Practice Areas: Commercial Litigation.

**Carella, Byrne**

**MEMBERS OF THE FIRM**

CHARLES C. CARELLA
BRENDAN T. BYRNE
JOHN N. BAIN
JOHN G. GILFILLAN III
PETER G. STEWART
ELLIOT M. OLSTEIN
ARTHUR T. VANDERBILT II
JAN ALAN BRODY
JOHN M. AGNELLO
CHARLES M. CARELLA
JAMES E. CECCHI
JAMES T. BYERS
DONALD F. MICELI
A. RICHARD ROSS
KENNETH L. WINTERS
JEFFREY A. COOPER
CARL R. WOODWARD III
MELISSA E. FLAX
DENNIS F. GLEASON
DAVID G. GILFILLAN
G. GLENNON TROUBLEFIELD
BRIAN H. FENLON
KHOREN BANDAZIAN
RAYMOND J. LILLIE
WILLIAM SQUIRE
ALAN J. GRANT
LAURA S. MUNZER
MARC D. MICELI
RAYMOND E. STAUFFER
JACOB A. KUBERT
STANLEY J. YELLIN
STEPHEN R. DANEK
DANIEL J. MULLIGAN

RICHARD K. MATANLE, II
DONALD S. BROOKS
FRANCIS C. HAND
AVRAM S. EULE
LINDSEY H. TAYLOR
RAYMOND W. FISHER
DAVID J. REICH
DECANDA M. FAULK
(OF COUNSEL)

# EXHIBIT K

## GOLD BENNETT CERA & SIDENER LLP
(February 2008)


Gold Bennett Cera & Sidener LLP is based in San Francisco, California. The Firm is devoted to the aggressive pursuit of its clients' legal objectives. The Firm's practice consists primarily of complex business litigation with an emphasis on securities and antitrust matters. The Firm has had experience representing its clients in courts located across the nation. The particular areas of the Firm's expertise include the following practice areas:

- Securities Litigation

- Antitrust and Trade Regulation

- Consumer Actions

- Bankruptcy Litigation

- Corporate Litigation

The Firm's clientele is diverse. In the course of its practice, the Firm has served as counsel to a variety of individuals and business organizations including entrepreneurs, individual and corporate investors and small to large businesses. The Firm represents its clients on either a contingent fee or a negotiated fee basis depending on the specific circumstances and needs of the client.

During the course of the Firm's work, its members have gained considerable knowledge of a number of varied industries. They include the following: airlines; banking; retailing; insurance; commercial real estate; toys; communications; video games; medical imaging; savings and loan; finance leasing; capital equipment leasing; microcomputers; mainframe computers; independent power production; industrial chemicals; oil and gas; retail and institutional brokerage; municipal bonds; tax-advantaged investments; hedged fund investing and derivatives; food and beverage; food additives; animal feed; health care and e-commerce.

In addition, members of the Firm have acquired expertise in a number of different business disciplines including: corporate reorganizations; mergers and acquisitions; investment banking; economic modeling; accounting; auditing and damage analyses.

Resume of Gold Bennett Cera & Sidener LLP
Page Two of Four

For over thirty (30) years, the Firm has played a leading role in some of the most significant cases in the country. These cases resulted in substantial recoveries, well in excess of $1 billion, for the Firm's clients and have established some of the basic principles for handling complex litigation.

## **Securities Litigation**

The Firm has significant experience in successfully litigating securities litigation cases. Some of these cases in which the Firm has played a lead role include:

*Pacific Lumber Sec. Litig.*
($140 million) (New York)

*Legato Systems Sec. Litig.*
($85 million) (San Jose)

*Peregrine Systems, Inc. Sec. Litig.*
($56 million) (partial) (San Diego)

*Nucorp Energy Sec. Litig.*
($54 million) (San Diego)

*Hedged Investment Assoc. Sec. Litig.*
($50 million) (Denver)

*First Capital Holdings Sec. Litig.*
($47.5 million) (Los Angeles)

*Itel Corporation Sec. Litig.*
($40 million) (San Francisco)

*Hallwood Realty Partners, L.P. Sec. Litig.*
($35.5 million) (San Francisco)

*American Energy Resources Sec. Litig.*
($33 million) (San Francisco)

*CBT Group PLC Sec. Litig.*
($32 million) (San Jose)

*Wickes Cos. Securities Litigation*
($32 million) (San Diego)

*Rent-Way Sec. Litig.*
($30 million) (Erie)

*Sun Microsystems Sec. Litig.*
($30 million) (San Jose)

*Consolidated Capital Sec. Litig.*
($29.5 million) (San Francisco)

*HPL Technologies, Inc. Sec. Litig.*
($25.5 million) (San Francisco)

*Diasonics Sec. Litig.*
($25 million) (San Jose)

Resume of Gold Bennett Cera & Sidener LLP
Page Three of Four

## Antitrust Litigation

The Firm also has significant antitrust litigation experience. The Court in the *Rubber Chemicals Antitrust Litigation* found that it was undisputed that the Firm has "extensive experience and expertise in antitrust and other class actions, as well as other complex litigation, and have successfully prosecuted such cases in courts across the country." *In re Rubber Chemicals Antitrust Litigation*, 232 F.R.D. 346 (N.D. Cal. 2005). The Firm has played or is playing a lead role in the following recent antitrust actions:

| | |
|---|---|
| *Methionine Antitrust Litig.* ($107 million) (San Francisco) | *Rubber Chemicals Antitrust Litig.* ($320 million) (San Francisco) |
| *EPDM Antitrust Litig.* ($81 million) (partial) (Connecticut) | *CR Antitrust Litig.* ($62 million) (Connecticut) |
| *High Pressure Laminates Antitrust Litig.* ($40.5 million) (New York) | *Organic Peroxide Antitrust Litig.* ($37 million) (Washington, D.C.) |
| *Polyester Staple Antitrust Litig.* ($30.5 million) (partial) (Charlotte) | *MCAA Antitrust Litig.* ($15.6 million) (Washington, D.C.) |
| *NBR Antitrust Litig.* ($35 million) (Pittsburgh) | *Plastic Additives Antitrust Litig.* ($30.4 million) (partial) (Philadelphia) |

The Firm is currently acting as a lead counsel for plaintiffs in a number of other pending antitrust actions. In the past, the Firm has also represented plaintiffs in the following large antitrust actions: Vitamin Antitrust Litigation (San Francisco), MSG Antitrust Litigation (Minneapolis), Sorbate Antitrust Litigation (San Francisco), Folding Carton Antitrust Litigation (Chicago), Corrugated Carton Antitrust Litigation (Houston), Sugar Antitrust Litigation (San Francisco), Beer Antitrust Litigation (Honolulu) and the Infant Baby Formula Antitrust Litigation (Los Angeles).

## Other Complex Business Litigation

Sizeable recoveries have been made in other cases as well. For example, the Firm recovered approximately three million dollars ($3,000,000) on behalf of two individuals in a business fraud case. In a major case involving breaches of trust and fiduciary duty, the Firm's effort caused a capital restructuring of a sizeable financial institution, thereby creating a substantial benefit to the Firm's clients and the financial institution (by the elimination of "management" stock), as well as a cash recovery of over one million dollars ($1,000,000).

Resume of Gold Bennett Cera & Sidener LLP
Page Four of Four


The Firm also represented management shareholders of a then private biotechnology company where it was successful in recovering $2 million in stock, reconstituting the board, and imposing voting restrictions on certain significant shares which were held by investors hostile to management. The litigation was an important milestone in the Company's history and permitted the Company to complete a $76 million Initial Public Offering.

The Firm has also handled the defense of major litigation. In one situation, the Firm orchestrated the successful defense of a multi-million dollar claim asserted against numerous sophisticated individuals and a related Chapter 11 bankruptcy proceeding. In another defense matter, we represented a publicly traded company and were successful in settling the case whereby plaintiffs agreed to pay our client (the defendant) over $2 million. In a bankruptcy case, the Firm represented a major equityholder in connection with a Plan of Reorganization.

Proud of its prior achievements, the Firm continues to excel and is in the process of expanding its practice by representing diverse clients in specialized litigation situations. The Firm is willing to take on such representation, where appropriate, on a contingent fee arrangement. As demonstrated by the results previously achieved, the Firm possesses the experience, qualifications and resources necessary to provide superior representation to all of its clients. We have enclosed profiles of the attorneys of the Firm.

## ATTORNEYS OF THE FIRM

### PAUL F. BENNETT

Mr. Bennett has been with the Firm since 1974 and is its managing partner. During that time, he has played a key role in most of the Firm's cases. He has had the primary litigating responsibilities in a number of cases involving, inter alia, the following industries: capital equipment leasing, independent power production, industrial chemicals, computer hardware and software, banking, savings and loan, commercial real estate, retailing, medical imaging, microcomputers, specialized computer applications for the office, food additives, animal feed and health care. Mr. Bennett has also gained considerable expertise and background in the fields of financial analysis, accounting, auditing, investment banking, corporate reorganizations, mergers and acquisitions, and damage analysis.

Mr. Bennett is currently a member of the Bar of the Supreme Court of the United States, the State Bar of California, the Antitrust Law Section, the Corporation, Business and Banking Section, and the Litigation Section of the American Bar Association. Mr. Bennett is also a member of the Class Actions and Derivative Suits and Securities Litigation subsections of the Litigation Section of the American Bar Association. Mr. Bennett was a featured speaker at the Stanford Law School session on Securities Fraud Litigation held in June 1995 and at the Practising Law institute on Sweeping Reform in March 1996. Mr. Bennett authored an article entitled "Pleading Proof for Actions under the Securities Exchange Act of 1934 and New Securities Exchange Act Section 21 D(b)," which appeared in Practising Law Institute Law and Practice Handbook, Securities Litigation, Series No. B-923 (1996 supp.); he also authored a commentary in the Securities Reform Act Litigation Reporter, Symposium on Silicon Graphics (Vol. 1, Nos. 5 & 6, Aug/Sept 1996 at 681-87). Mr. Bennett also served as a Judge in the National Appellate Advocacy Competition in 1996.

Mr. Bennett is a graduate (with distinction) of the University of California at Berkeley and received his J.D. from Hastings College of the Law. Mr. Bennett has been given an "AV" rating by Martindale-Hubbell.

## SOLOMON B. CERA

Mr. Cera joined the Firm in 1983. While at the Firm, Mr. Cera has obtained experience in a variety of fields, including the oil and gas industry, executive compensation, insurance and tax-advantaged investments. In addition, Mr. Cera has obtained significant experience in the fields of mergers and acquisitions, accounting and auditing.

Among the more significant cases in which Mr. Cera has played a leading role on behalf of the Firm are the following. In Roberts v. Heim, No. 84-8069 THE (N.D. Cal.), Mr. Cera represented a class of approximately 3,000 investors who lost money in an oil and gas limited partnership investment. The Firm recovered $33 million in cash for the investors and obtained injunctions which barred collection from the limited partners on $500 million worth of promissory notes. In this same case, Mr. Cera obtained more than 10 judgments on behalf of his clients against various defendants for in excess of $100 million each. In commenting on the Firm's representation of its clients in the case, the Chief Judge of the United States District Court for the Northern District of California stated as follows:

> [T]his action has been extraordinarily complex, resulting in over 300 orders by this court, several of which have been published, and many of which addressed difficult issues of first impression, and were eventually published . . . [T]hroughout this action, class counsel has demonstrated superior legal abilities, and has submitted to the court briefs, memoranda and oral argument of the highest quality . . . [C]ounsel's efforts have conferred substantial benefits on the class.

Roberts v. Heim, [1991 Tr. Binder] Fed. Sec. L.Rep. (CCH) ¶96,221 at 91,155-56 (N.D. Cal. August 28, 1991).

In Higley v. Donahue, et al., No. 93-CV-4288 (Denver District Court), Mr. Cera acted on behalf of the firm as co-lead counsel in an action in Colorado state court against several large, nationally known brokerage firms, based on their involvement in a hedged options trading scheme. A settlement with a value of $50 million was reached for the benefit of a class of approximately 800 investors in the space of 15 months.

In Joseph v. Wiles, 223 F.3d 1155 (10th Cir. 2000), Mr. Cera obtained reinstatement of a case against officers and directors, underwriters and accountants in a class action securities fraud case involving a disk drive manufacturer. The decision is important insofar as it approves the filing of securities law claims by purchasers in the aftermarket of an initial offering of securities, and further analyzes the statute of limitations in a way which benefits investors.

Mr. Cera graduated from Pomona College, Claremont, California, and received his J.D. from the University of San Francisco School of Law where he was the recipient of the American Jurisprudence Award in Corporations. He is admitted to practice before the Supreme Court of the United States, and is a member of the State Bar of California.

Mr. Cera also is a member of the American Bar Association, including its Litigation Section, as well as the Association of Trial Lawyers of America.

Mr. Cera has published an article entitled "Control Person Liability of the Outside Director" which appeared in the ABA Section of Litigation, Committee on Securities Litigation Journal Securities News, Vol. II, No. 2 Winter 1993. Mr. Cera has been given an "AV" rating by Martindale-Hubbell.

## STEVEN O. SIDENER

Steven O. Sidener was with the Firm between 1985 and 1994. He rejoined the Firm in 1998. For over a dozen years, he has represented investors and claimants in complex securities and fraud cases, including In re Technical Equities Securities Litigation, In re Wyse Technology Securities Litigation, Wade v. Industrial Funding Corp., In re Media Vision Securities Litigation, and In re MiniScribe Securities Litigation. He also served as co counsel for a court-appointed receiver in In re TMI Limited Partnership Litigation, a real estate fraud/breach of fiduciary duty case filed on behalf of 40,000 current and former California school teachers. He has also been involved in intellectual property litigation, and recently helped to prosecute a copyright infringement action to a successful conclusion. Mr. Sidener specializes in conducting accounting and financial fraud investigations and prosecuting antitrust actions.

Mr. Sidener was actively involved in, among others, the following published decisions: In re American Continental/Lincoln Savings and Loan Sec. Litig., 130 F.R.D. 475 (J.P.M.L. 1990); Wade v. Industrial Funding Corp. [1992 Tr. Binding] Fed. Sec. L. Rep. (CCH) 96,908 (N.D. Cal. May 28, 1992); Wade v. Industrial Funding Corp., [1993-94 Tr. Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,144 (N.D. Cal. Aug. 30, 1993). Currently, Mr. Sidener is actively litigating numerous antitrust class actions in which the Firm has been appointed as Co-Lead Counsel.

Mr. Sidener received a B.A. degree (economics) from the University of California, Berkeley (with distinction), where he was a member of Phi Beta Kappa. He received his J.D. degree from the University of California, Hastings College of the Law. Mr. Sidener has been given an "AV" rating by Martindale-Hubbell.

## JOSEPH M. BARTON

Mr. Barton joined the Firm in 1993 as a paralegal. He became an associate at the Firm upon his admission to the California Bar in 1997. During his tenure, Mr. Barton has been actively involved in litigating many of the Firm's cases, with a concentration on securities fraud, consumer fraud and antitrust class actions.

Mr. Barton, a native of San Francisco, has a B.A. (Political Science) from the California Polytechnic State University in San Luis Obispo. During college, he studied international politics for one year in Florence, Italy. Mr. Barton earned his J.D. from Golden Gate University School of Law in San Francisco where he was selected for the National Appellate Moot Court Competition team.

Mr. Barton is a member of the American Bar Association, the State Bar of California, and the Bar Association of San Francisco.

## CHARLES A. DIRKSEN

Mr. Dirksen joined the Firm in 2000. For three years prior to attending law school, he worked in Washington, D.C. as a paralegal on civil antitrust individual and complex multidistrict class action cases, and on federal Department of Justice and state attorneys general antitrust grand jury investigations. Throughout law school, he interned in the Special Prosecution Unit of the San Francisco District Attorney's Office. After taking the California bar exam, he gained significant experience in securities, antitrust, product liability, patent and maritime litigation.

Mr. Dirksen received a B.A. (magna cum laude) from Boston College, and a J.D. from the University of San Francisco School of Law. He spent a year as an Article Editor of USF's Maritime Law Journal.

Mr. Dirksen is a member of the American Bar Association, the State Bar of California, and the Bar Association of San Francisco.

## GWENDOLYN R. GIBLIN

Ms. Giblin joined Gold Bennett Cera & Sidener LLP in 2001. She has spent her entire legal career litigating complex business cases, including securities, antitrust, and consumer actions.

Ms. Giblin earned her law degree at Golden Gate University School of Law in 1995, where she was a member of the Law Review (1995) and Assistant Editor of the school's newspaper, The Caveat (1993-1995). She was on the Dean's List (1994-1995) and received the American Jurisprudence Award for Real Property (1994). Ms. Giblin was also honored with several merit scholarships, including the San Francisco Legal Auxiliary Scholarship (1994-1995) and the Natalie Podell Memorial Scholarship (1994-1995). Ms. Giblin was a semi-finalist in Golden Gate University's annual moot court competition (1994) and subsequently was invited to serve of the University's Moot Court Board (1994-1995). She also competed in the state-wide Traynor Moot Court Competition (1995). During the Summer of 1994, Ms. Giblin studied at the University of Moscow School of Law. She was also twice named in Who's Who Among American Law Students (1994 and 1995).

Ms. Giblin graduated from the University of California at Berkeley in 1992 with a degree in Rhetoric. While at Cal, she was honored with the California Alumni Scholarship (1990-1991), which was renewed the following academic year. She also received the Marguerite Higgins Hall Memorial Scholarship (1991-1992). Ms. Giblin was an active member of the Society of Professional Journalists (1990-1992), and served as Vice-President of the organization (1991-1992).

Ms. Giblin is admitted to practice in the State of California, the Ninth Circuit, the Eleventh Circuit, and all federal district courts in California. She is a member of the San Francisco Bar Association (1994-present), where she served as Vice President of the Barristers' Club Antitrust and Securities Litigation Section (1996-1997). Ms. Giblin has also been a member of the San Mateo County Bar Association (1998-2001), the California Women Lawyers Association (1998-2001), and the Association of Business Trial Lawyers (1998-2001).

## THOMAS C. BRIGHT

Mr. Bright joined the Firm in 2002. He has substantial experience in the litigation of complex business matters, intellectual property disputes and antitrust cases. For three years prior to joining the Firm, Mr. Bright worked for an antitrust, intellectual property and business litigation firm located in San Francisco whose clients were small to medium-sized businesses including listed, public companies.

Prior to his relocation to San Francisco, Mr. Bright engaged in complex business and insurance litigation for four years in the Southern California office of a national firm based in New York. In addition to litigating primarily commercial liability coverage disputes, tort,

employment and business matters, Mr. Bright was an entertainment lawyer and assumed various roles in attorney fee matters, ranging from performing internal audits to serving as counsel in litigated matters.

After law school, Mr. Bright worked in the motor sports division of International Management Group, the country's largest sports agency.

Mr. Bright graduated from Vanderbilt University in Nashville Tennessee with a Bachelor of Arts degrees in History. He received his Juris Doctor from the Pepperdine University School of Law in Malibu, California. During his final year of law school, Mr. Bright was an extern under Justice Mildred Lillie for the California Court of Appeals, Second Appellate District, Division Seven.

Mr. Bright is a member of both the State Bar of California, and the District of Columbia Bar. Mr. Bright is also admitted to practice in the Southern District of California, Central District of California, Eastern District of California and Northern District of California.

## PAMELA A. MARKERT

Ms. Markert joined the Firm in 2006. For more than five years prior to joining the firm, Ms. Markert gained significant litigation experience in business, consumer and general liability matters representing clients ranging from individuals, partnerships and closely-held corporations to multinational companies.

Prior to her career in law, Ms. Markert worked at SunGard Financial Systems, Inc. providing technical direction to clients for a comprehensive investment accounting and portfolio management system for client portfolios totaling more than $27 billion. While at SunGard, Ms. Markert spent a year in Washington D.C. providing on-site client support for the capital markets division of the Resolution Trust Corporation.

Ms. Markert received a B.S. in Business Administration, Finance, (cum laude) from California State University, Northridge, and a J.D. from Santa Clara University School of Law. She was an Articles Editor of the Santa Clara Law Review and her comment was published. Ms. Markert was honored as an Emery Academic Scholarship recipient at Santa Clara.

Ms. Markert is admitted to practice in the State of California, United States District Court for the Northern District of California and the Ninth Circuit Court of Appeals. She is a member of Queen's Bench Bar Association of the San Francisco Bay Area.

## KENNETH A. FROST, III

Mr. Frost joined the Firm in 2004 as an associate specializing in antitrust, securities and other complex litigation. Prior to joining the Firm, Mr. Frost worked extensively on a large class action antitrust case affecting California consumers of a well-known brand of computer software. He is also experienced in antitrust cases involving alleged price-fixing in the real estate industry. Mr. Frost previously served as a judicial extern for the Civil Division of the Marin County Superior Court.

Mr. Frost holds a B.A. degree in history from Brown University. He received his Juris Doctor degree from the University of San Francisco School of Law. During law school, Mr. Frost served as Vice President of the USF Intellectual Property Law Association and worked on the USF Maritime Law Journal as a Survey Writer.

Mr. Frost is a member of the Marin County Bar Association, the Bar Association of San Francisco, the State Bar of California and the American Bar Association.

**Selected Published Decisions**
**In Which The Firm**
**Has Played A Significant Role**

1.   In re Activision Securities Litigation,
     (CCH) Fed.Sec.L.Rep. ¶92,397 (N.D.Cal. 1985)

2.   In re Activision Securities Litigation,
     621 F.Supp. 415 N.D.Cal. 1985)

3.   In re Activision Securities Litigation
     723 F.Supp. 1373 (N.D.Cal. 1989)

4.   Adobe Systems, Inc. Securities Litigation,
     Fed.Sec.L.Rep. (CCH) ¶95,873 (N.D.Cal. 1991)

5.   Adobe Systems, Inc. Securities Litigation,
     Fed.Sec.L.Rep. (CCH) ¶96,051 (N.D.Cal. 1991)

6.   In re ASK Securities Litigation,
     Fed.Sec.L.Rep. (CCH) ¶96,991 (N.D.Cal. 1992)

7.   Businessland Securities Litigation,
     Fed.Sec.L.Rep. (CCH) ¶96,059 (N.D.Cal. 1991)

8.   In re Carbon Black Antitrust Litigation,
     2005 W.L. 102966 (D. Mass. 2005)

9.   Colaprico v. Sun Microsystems. Inc.,
     Fed.Sec.L.Rep. (CCH) ¶95,874 (N.D.Cal. 1991)

10.  Colaprico v. Sun Microsystems, Inc.,
     Fed.Sec.L.Rep. (CCH) ¶96,198 (N.D.Cal. 1991)

11.  In re Consolidated Air West Securities Litigation,
     73 F.R.D. 12 (N.D.Cal. 1977)

12.  In re Consolidated Capital Securities Litigation,
     (CCH) Fed.Sec.Rptr. ¶95,238 (N.D.Cal. 1990)

13.  In re Daisy Systems Securities Litigation
     Fed.Sec.L.Rep. (CCH) ¶96,190 (N.D.Cal. 1991)

14. Desmond v. BankAmerica Corp.,
    Fed.Sec.L.Rep. (CCH) ¶90,995 (N.D.Cal. 2000)

15. In re Diasonics Securities Litigation,
    599 F.Supp. 447 (N.D.Cal. 1984)

16. Digital Microwave Corp. Securities Litigation,
    Fed.Sec.L.Rep. (CCH) ¶97,044 (N.D. Cal. 1992)

17. Duval v. Gleason,
    Fed.Sec.L.Rep. (CCH) ¶96,153 (N.D.Cal. 1991)

18. Eza Charitable Trust v. Rent-Way, Inc.,
    136 F.Supp.2d 435 (W.D. Pa. 2001)

19. In re Fortune Systems Securities Litigation,
    604 F.Supp. 150 (N.D.Cal. 1984)

20. Gaillard v. Natomas Co.,
    173 Cal.App.3d 410, 219 Cal.Rptr. 74 (1985)

21. Gaillard v. Natomas,
    208 Cal.App.3d 1250 (1989)

22. In re Gap Stores Securities Litigation,
    79 F.R.D. 283 (N.D.Cal. 1978)

23. In re Granite Partners, L.P.,
    194 BR 318 (Bankr. S.D.N.Y. 1996)

24. Green v. Occidental,
    541 F.2d 1335 (9th Cir. 1976)

25. Hudson v. Capital Management, Inc.,
    565 F.Supp. 615 (N.D.Cal. 1983)

26. Hudson v. Capital Management Int'l., Inc.,
    Fed.Sec.L.Rep. (CCH) ¶99,221 (N.D.Cal. 1982)

27. Hudson v. Capital Management Int'l., Inc.,
    Fed.Sec.L.Rep. (CCH) ¶99,222 (N.D.Cal. 1982)

28. In re Itel Securities Litigation,
    596 F.Supp. 226 (N.D.Cal. 1984)

29.    In re Itel Securities Litigation,
       89 F.R.D. 104 (N.D.Cal. 1981)

30.    Joseph v. Wiles,
       223 F.3d 1155 (10th Cir. 2000)

31.    Lilley v. Charren,
       936 F.Supp. 708 (N.D.Cal. 1996)

32.    Marshall v. Holiday Magic,
       550 F.2d 1173 (9th Cir. 1977)

33.    Masstor Systems Corporation Securities Litigation,
       Fed.Sec.L.Rep. (CCH) ¶92,719 (N.D.Cal. 1986)

34.    McFarland v. Memorex Corp.,
       581 F.Supp. 878 (N.D.Cal. 1984)

35.    In re Memorex Securities Case,
       61 F.R.D. 88 (N.D.Cal. 1973)

36.    In re Nucorp Energy Securities Litigation,
       Fed.Sec.L.Rep. (CCH) ¶99,158 (S.D.Cal. 1983)

37.    In re Nucorp Energy Securities Litigation,
       Fed.Sec.L.Rep. (CCH) ¶93,224 (S.D.Cal. 1987)

38.    In re Plastic Additives Antitrust Litigation,
       2004 WL 2743591 (E.D. Pa. 2004)

39.    In re Pizza Time Theatre Securities Litigation,
       Fed.Sec.L.Rep. (CCH) ¶92,53 7 (N.D.Cal. 1986)

40.    Primavera Familienstiftung v. Askin,
       173 F.R.D. 115 (S.D.N.Y. 1997)

41.    In re Rent-Way Sec. Litig.,
       209 F.Supp.2d 493 (W.D. Pa. 2002)

42.    Roberts v. Heim,
       Fed.Sec.L.Rep. (CCH) ¶94,393 (N.D.Cal. 1989)

43.    Roberts v. Heim,
       Fed.Sec.L.Rep. (CCH) ¶94,394 (N.D.Cal. 1989)

44.  Roberts v. Heim,
     Fed.Sec.L.Rep. (CCH) ¶95,430 (N.D.Cal. 1990)

45.  Roberts v. Heim,
     Fed.Sec.L.Rep. (CCH) ¶95,431 (N.D.Cal. 1990)

46.  Roberts v. Heim,
     Fed.Sec.L.Rep. (CCH) ¶96,094 (N.D. Cal. 1991)

47.  Roberts v. Heim,
     Fed.Sec.L.Rep. (CCH) ¶96,095 (N.D.Cal. 1991)

48.  Roberts v. Heim,
     Fed.Sec.L.Rep. (CCH) ¶96,221 (N.D.Cal. 1991)

49.  Roberts v. Heim,
     Fed.Sec.L.Rep. (CCH) ¶96,970 (N.D.Cal. 1992)

50.  Roberts v. Peat Marwick Mitchell & Co.,
     857 F.2d 646 (9th Cir. 1988)

51.  Rogers v. NationsCredit Financial Services Corp.,
     Bankr. L. Rep. (CCH) ¶77,918 (N.D.Cal. 1999)

52.  In re Rubber Chemicals Antitrust Litigation,
     232 F.R.D. 346 (N.D. Cal. 2005)

53.  In re Seagate Technology II Securities Litigation,
     Fed.Sec.L.Rep. (CCH) ¶97,028 (N.D. Cal. 1992)

54.  In re Technical Equities Federal Securities Litigation,
     Fed.Sec.L.Rep. (CCH) ¶94,093 (N.D.Cal. 1988)

55.  In re Victor Technologies Securities Litigation,
     102 F.R.D. 53 (N.D.Cal. 1984)

56.  In re Victor Technologies Securities Litigation,
     Fed.Sec.L.Rep. (CCH) ¶93,158 (N.D.Cal. 1987)

57.  In re Worlds of Wonder Securities Litigation,
     35 F.3d 1407 (9th Cir. 1994)

58.  In re Worlds of Wonder Securities Litigation,
     721 F.Supp. 1140 (N.D.Cal. 1989)

59.   In re Worlds of Wonder Securities Litigation,
      Fed.Sec.L.Rep. (CCH) ¶95,004 (N.D.Cal. 1990)

60.   In re Worlds of Wonder Securities Litigation,
      694 F.Supp. 1427 (N.D.Cal. 1988)

61.   In re Worlds of Wonder Securities Litigation,
      Fed.Sec.L.Rep. (CCH) ¶97,041 (N.D. Cal. 1992)

62.   In re Worlds of Wonder Securities Litigation,
      Fed.Sec.L.Rep. (CCH) ¶97,018 (N.D.Cal. 1992)

63.   Zatkin v. Primuth,
      551 F.Supp. 39 (S.D.Cal. 1982)

64.   Zell v. Intercapital Income Securities, Inc.,
      675 F.2d 1041 (9th Cir. 1982)