## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

IN RE RAIL FUEL SURCHARGE                )
ANTITRUST LITIGATION                      )
                                          )          MDL Docket No. 1869
                                          )          Misc. No. 07-489 (PLF)
This document relates to: ALL CASES       )
                                          )

---

### REPLY TO RESPONSE OF COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C. AND QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP TO THE MOTION OF WHATLEY, DRAKE & KALLAS LLC

Whatley Drake & Kallas, LLC, respectfully submits this reply to the response of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Quinn Emanuel Urquhart Oliver & Hedges, LLP to the Motion to appoint Whatley Drake & Kallas as Interim Lead Class Counsel.  Whatley, Drake & Kallas, LLC submits herewith the affidavit of Joe R. Whatley, Jr. and the affidavit of Richard P. Rouco attached hereto as Exhibits A and B respectively, with respect to the factual matters asserted herein.

### INTRODUCTION

On January 31, 2008, this Court Ordered that plaintiffs' counsel seeking appointment as Interim Class Counsel on behalf of the proposed class of direct purchaser plaintiffs should file affidavits and memorandum of law in support of their appointments by February 15, 2008.  On February 15, 2008, pursuant to the Court's January 31, 2008 Order, Whatley, Drake & Kallas LLC (hereinafter "WDK") moved the Court to appoint a leadership structure wherein WDK would serve as one of the Interim Lead Counsel and wherein Roger M. Adelman would serve as Liaison Counsel.[1]  (Docket No. 41).  On

---

[1] This motion was also supported by the law firms of Schlichter, Bogard, & Denton and Ashcraft & Gerel which represent Plaintiff RB Rubber Products, Inc., in this litigation.

February 19, 2008, Cohen Milstein, Quinn Emanuel, and other plaintiffs' counsel (hereinafter collectively referred to as "the Cohen Group") filed a motion for the appointment of Cohen Milstein and Quinn Emanuel as Co-Lead Interim Class Counsel.[2] (Docket No. 49).

WDK did not file a response to the Cohen Group's Motion to Appoint Cohen Milstein and Quinn Emanuel as Interim Co-Lead Counsel because WDK believes that its qualifications speak for themselves. Further, WDK did not desire to engage in comparisons that could be held against any of the plaintiff groups in this or other matters because WDK was comfortable that the Court could choose the leadership structure that would best serve the interests of the proposed class without any responses. *See* Whatley Aff. at ¶ 2. However, a number of statements made by the Cohen Group in its Response in Opposition to the Motion of Whatley Drake & Kallas, LLC for Appointment as Interim Lead Class Counsel and Roger M. Adelman as Liaison Class Counsel, (Docket No. 64) (hereinafter referred to as the "Cohen Group Response"), require clarification. Therefore, WDK respectfully submits this reply in further support of the motion to appoint WDK as Interim Lead Class Counsel to this litigation.

## A. THE LEADERSHIP STRUCTURE SHOULD BE INCLUSIVE OF ALL PLAINTIFFS' COUNSEL

In the response to the motion to appoint WDK as Interim Class Counsel, the Cohen Group states that a leadership structure consisting of three Co-Lead Interim Class Counsel would be a "burden" to the leadership structure. *See*, Cohen Group Response, (Docket No. 64) at 3 ("Whatley Drake does not present any reason why the interests of

---

[2] The Court granted Cohen Milstein and Quinn Emanuel's motion to extend the period of time for filing a motion for Lead Class Counsel to February 19, 2008.

the class would be better served by burdening the proposed structure with a third co-lead firm …").   Although WDK suggested that a leadership structure consisting of three Interim Co-Lead Counsel might be appropriate, the motion did not limit the number firms to be appointed as Co-Lead Counsel in this Litigation.   In contrast, the Cohen Group's proposal limits the Co-Lead Counsel leadership to only two firms and the Cohen Group suggests that this leadership structure would best serve the interests of the proposed class. However, in several of the antitrust fuel surcharge cases that WDK has been involved in, the parties have agreed and/or the Court has approved leadership structures consisting of three or four Co-Leads.  *See* Rouco Aff. at ¶ 7.   In the Air Cargo Shipping Services Antitrust Litigation, Cohen Milstein actually advocated for a leadership structure with six co-leads.  *Id.*

Shortly after the Judicial Panel on Multidistrict Litigation transferred this case to the District of Columbia, plaintiffs' counsel met at Cohen Milstein's offices in an effort to reach a private ordering of leadership.  *See* Rouco Aff. at ¶ 8; Whatley Aff. at ¶ 4.  At this meeting, plaintiffs' counsel expressed a desire for a four co-lead structure without an executive committee, and Stephen Neuwirth of Quinn Emanuel agreed that four co-lead counsel could effectively and efficiently prosecute this action.  *See* Rouco Aff. at ¶ 8; Whatley Aff. at ¶ 4. Plaintiffs' counsel believed that a four co-lead structure with committees responsible for designated areas was appropriate, but this later changed when one of the four proposed co-leads could no longer realistically serve in that capacity.  *See* Rouco Aff. at ¶ 8; Whatley Aff. at ¶ 4.   This fact, however, does not change the appropriateness of a co-lead structure that includes more than two co-leads.  If, as plaintiff counsel previously agreed, four co-lead counsel can effectively and efficiently

prosecute this action, then three co-lead counsel can certainly effectively and efficiently prosecute this action in a manner that will best serve the interest of the proposed class.

The Cohen Group also suggests that adding Roger M. Adelman as Liaison Class Counsel would be "unnecessary." *See* Cohen Group Response (Docket No. 64) at 13-14. However, the Cohen Group also ignores that appointing Liaison Class Counsel is necessary because it will allow for a more efficient progression of the litigation. *See* Manual for Complex Litigation (Fourth) § 10.221 (stating that the appointment of Liaison Class Counsel may be necessary to achieve "efficiency and economy without jeopardizing the fairness to the parties."). Mr. Adelman has extensive experience trying cases in this district and he has likely tried more cases in this district than any other counsel proposed for leadership in this case. *See* Whatley Aff. at ¶ 3. Therefore, he certainly has the experience necessary to carry out administrative matters such as communicating between the Court and other counsel, convening meetings of counsel, and advising the parties of developments. Further, the Manual for Complex Litigation states that "Liaison counsel will usually have offices in the same locality as the Court." Manual for Complex Litigation (Fourth) § 10.221. In light of Mr. Adelman's experience and expertise trying cases in this district and his proximity to the courthouse, Mr. Adelman is uniquely suited to serve as Liaison Counsel in this litigation.

WDK also proposed that the leadership structure below the co-leads should be inclusive of all plaintiffs' counsel, meaning that *all counsel* in the litigation should be considered for appointments to any plaintiffs' committees. In contrast, the Cohen Group asks the Court to approve of its suggestion of a limited group of firms to serve on a Plaintiffs Executive Committee. Specifically the Cohen Group requests that the Plaintiffs

Executive Committee consist of the following five firms: Freed Kanner London & Millen LLC; Kaplan Fox & Kilsheimer, LLP; Heins Mills & Olson, P.L.C.; Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein; and Gold Bennett Cera & Sidener LLP. Notably, none of these firms have offices within this district.

The submission by Plaintiff Complete Transportation Systems, Inc., (hereinafter "CTS") regarding the competing motions for the appointment of Interim Lead Class Counsel (Docket No. 65) demonstrates why the Court should not approve the Cohen Group's request for a limited group of firms to serve on the Plaintiffs Executive Committee. Namely, the "private ordering" of the Plaintiffs Executive Committee is only appropriate when *all* counsel agree on who should serve as lead counsel. *See* Manual for Complex Litigation (Fourth), § 21.272 (private ordering is appropriate when "the lawyers agree who should be lead class counsel," but when the lawyers "are unable to agree on lead counsel … [the court should choose the lawyers] best able to represent the class's interests"). It is unsurprising that each member of the Cohen Group's proposed Plaintiffs Executive Committee is supporting the appointment of Cohen Milstein and Quinn Emanuel as Interim Co-Lead Class Counsel, and it appears that the makeup of the Cohen Group's proposed Plaintiffs Executive Committee may have been the result of an explicit or implicit *quid pro quo* agreement as suggested by counsel for CTS. Therefore, the Cohen Group has engaged in conduct that calls into question their ability to lead a broad structure of plaintiffs. In contrast, WDK proposes an alternative for the leadership structure below the Co-Lead Counsel that allows for a broad representation of the plaintiffs to this litigation as a whole.

**B.  WDK  HAS  BEEN  ACTIVELY  INVOLVED  IN  THIS  AND  SIMILAR LITIGATION FROM THE START**

The Cohen group suggests in their response that WDK has not taken any action in identifying or investigating the Class claims involved in this case.  *See* Cohen Group Response (Docket No. 63) at 8.  4-5.  However, WDK has been involved in this and similar litigation from the start.  In late 2006, Richard R. Rouco, an attorney with WDK, was investigating fuel surcharge practices in the airline industry and he became aware of a dispute involving fuel surcharges in the railroad industry.  *See* Rouco Aff. at ¶ 2.  Mr. Rouco thereafter monitored the actions taken by the Surface Transportation Board with respect to fuel surcharges in regulated transactions. *Id*.  Mr. Rouco investigated and continued to monitor the developments related to fuel surcharges in the Railroad industry especially with regard to whether the practices related to rail fuel surcharges investigated by the STB occurred with respect to unregulated traffic.  *Id*.  Further, Mr. Rouco has represented plaintiff in several antitrust cases challenging fuel surcharge practices including the International Air Transportation Surcharge Antitrust Litigation, the Air Cargo Services Antitrust Litigation, the Less than Truckload Shipping Services Antitrust Litigation, and the Household Goods Movers Antitrust Litigation.  *Id.* at ¶¶ 3-6.  In fact, Mr. Rouco serves on the Executive Committee in the Less than Truckload Shipping Services Antitrust Litigation, and the Household Goods Movers Antitrust Litigation.  *Id.* at ¶¶ 5-6.  WDK has been investigating and pursuing the claims alleged in this litigation from its early stages.  It is undeniable that counsel represented in the Cohen Group have also been extensively involved in investigating the claims in this litigation but none of the parties has engaged in any significant formal discovery and these cases have only recently been sent to this Court via an order of the Judicial Panel on Multidistrict

Litigation. As such, the Cohen Group's argument that Cohen Milstein and Quinn Emanuel are significantly more advanced in identifying facts to support the plaintiffs' claims is without merit.

### C. WDK HAS EXTENSIVE LITIGATION EXPERIINCE IN CASES LIKE THIS

Lastly, the Cohen group argues in its response that WDK has not demonstrated any significant expertise regarding the legal issues relevant to this case. *See* Cohen Group Response (Docket No. 63) at 8. As set forth in WDK's moving papers, and in the Affidavit of Joe R. Whatley, Jr. attached to this reply, WDK has the expertise necessary to serve as co-lead counsel in this litigation. Joe R. Whatley, Jr. of WDK is one of the few attorneys that has actually tried an antitrust class action and a RICO class action to a jury verdict. *See* Whatley Aff. at ¶ 3. Mr. Whatley has also tried numerous other cases and argued numerous appellate cases including before the United States Supreme Court. *Id.*

Mr. Whatley has also been personally involved in major class action cases involving conspiracy claims against numerous members of various industries. *Id.* Mr. Whatley brought claims on behalf of physicians against the many of the managed care companies in the country, alleging a conspiracy among the managed care companies. *Id.* Mr. Neuwirth's former firm brought claims on behalf of subscribers against the same managed care companies. *Id.* These cases were consolidated into the same MDL proceeding. *Id.* Mr. Whatley successfully argued, along with one other co-counsel, for class certification, and the 11th Circuit affirmed certification of the RICO claims. *Id.* In contrast, Mr. Neuwirth's former firm was unsuccessful in its motion for class certification. *Id.* As a result of the work of Mr. Whatley and WDK in the managed care

litigation, WDK has achieved settlements valued at approximately five billion dollars against the majority of the defendants. *Id.* The work of WDK in the managed care case demonstrates that the firm has the ability to develop and prove a nation-wide conspiracy among members of an industry, and the lessons learned in that litigation are readily transferable to this case.

WDK has also been active in other cases involving similar conspiracy claims. Specifically, WDK has a lead role in the underground storage tank case against the major oil companies, who WDK alleged to have conspired through the American Petroleum Institute. *See* Whatley Aff. at ¶ 4. WDK is also co-lead counsel in the Insurance Brokerage Antitrust Litigation, where we allege a conspiracy among insurance brokers and insurance companies. *Id.*

In addition, WDK has handled numerous cases involving the railroad industry. Mr. Whatley has practiced for many years in Birmingham, Alabama, which is a railroad center where many of the defendant railroads do business, and he has personally handled many FELA cases against railroads. *See* Whatley Aff. at ¶ 5. Mr. Whatley was lead counsel in Dunn v. Conrail, where the jury returned what was then the largest wrongful death verdict in the history of Louisiana, and even after the verdict was reduced, the defendants paid the largest reported amount in any wrongful death case in Louisiana at that time. *Id.*

## **CONCLUSION**

For the forgoing reasons and for the reasons set forth in WDK's moving papers, the undersigned counsel respectfully request that this Court grant its Motion for

Appointment of Whatley Drake & Kallas, LLC as Interim Lead Class Counsel and Roger

M. Adelman as Liaison Class Counsel.

Dated: March 4, 2008

Respectfully Submitted,

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr.
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, NY 10036
Tel: 212.447.7070
Fax: 212.447.7077

Richard P. Rouco
G. Douglas Jones
Othni J. Lathram
WHATLEY DRAKE & KALLAS, LLC
2001 Park Place North, Suite 1000
P.O. Box 10647
Birmingham, AL 35203
Tel: 205.328.9576
Fax: 205.328.9669

Roger M. Adelman
THE LAW OFFICE OF ROGER M. ADELMAN
1100 Connecticut Avenue, N.W.
Suite 730
Washington, D.C. 20036
Tel: 202.822.0600
Fax: 202.822.6722
Local Counsel

*Counsel for Plaintiff West Alabama Sand & Gravel, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document, filed through the ECF system, will be served electronically through the ECF System on the email-registered participants as identified on the Notice of Electronic Filing ("NEF") on March 4, 2008.


/s/ Joe R. Whatley, Jr.
OF COUNSEL

# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE RAIL FUEL SURCHARGE | ) | |
| ANTITRUST LITIGATION | ) | |
| | ) | MDL Docket No. 1869 |
| | ) | Misc. No. 07-489 (PLF) |
| This document relates to: ALL CASES | ) | |
| | ) | |

**AFFIDAVIT OF JOE R. WHATLEY, JR. IN SUPPORT
OF REPLY OF WHATLEY DRAKE & KALLAS, LLC**

1.     My name is Joe R. Whatley, Jr.  I am a partner in the law firm of Whatley Drake & Kallas, LLC.  I am submitting this affidavit in reply to statements made in the submission by Mr. Neuwirth and Mr. Hausfeld in response to our motion for appointment in this matter on personal knowledge.

2.     After reviewing the submissions to the Court, we concluded that our qualifications speak for themselves, and we were comfortable with allowing the Court to decide the appropriate leadership structure for the representation of the plaintiffs in this case without any responses.  One of the reasons for that conclusion is that we had no desire to make any critical statements of other plaintiffs counsel, and we were, and are, prepared to work within the leadership structure established by the Court to represent the plaintiffs in the most effective manner possible.  Unfortunately, the Response submitted by Mr. Neuwirth and Mr. Hausfeld requires that we make this submission so that there will not be any inaccuracies or incompleteness about our qualifications.  I should emphasize, however, that nothing in this submission is intended to be critical of Mr. Neuwirth, Mr. Hausfeld, or either of their firms.  We would welcome the opportunity to work with them to advance the interests of the plaintiffs in this matter.

3.      With respect to our proposed liaison counsel, Mr. Adelman, I believe that it is no exaggeration to say that the Court can take judicial notice that he has tried more cases in this District than any other counsel proposed for the leadership of this case.  He would provide an important additional resource for the plaintiffs as liaison counsel.

4.      With respect to my qualifications, in addition to being one of the few lawyers who has tried an antitrust class action to a jury verdict (of more than a billion dollars)[1] and a RICO class action to a jury verdict (on the defense side as co-counsel with Gary Kohlman an experienced trial lawyer in Washington, DC), I have also tried numerous other cases and argued numerous appellate cases including before the United States Supreme Court.

5.      As Mr. Neuwirth is personally aware, I personally have been involved in major class action cases involving conspiracy claims against numerous members of various industries.  His former firm brought claims on behalf of subscribers against many of the managed care companies in the country.  We brought claims on behalf of physicians against the same defendants, alleging a conspiracy among the managed care companies.  The cases were all consolidated into the same MDL proceeding.   Mr. Neuwirth's then senior partner, Mr. Boies, and Mr. Neuwirth's co-counsel, Mr. Scruggs, argued for class certification of his cases.  I personally argued, along with one other co-counsel, for class certification of our cases.  We prevailed; they did not.  The 11th Circuit affirmed certification of our RICO claims.  We have achieved settlements valued at approximately five billion dollars against the majority of the defendants.  The lessons

---

[1] Like every plaintiffs' lawyer with an active trial practice, I have unfortunately not always succeeded in convincing courts to uphold every verdict, including this one, but few lawyers have the experience of trying a class action to successful verdict.

from that case including how to develop and prove a nation-wide conspiracy among members of an industry are readily transferable to this case.

6.    By coincidence, the one meeting that our firm was invited to attend about the organization of plaintiffs' counsel was held in November, at the same time as the fairness hearing in Love v. Blue Cross & Blue Shield Association in the Southern District of Florida.  Since our firm is one of the three co-lead counsel in that case where a vast majority of the Blue Cross and Blue Shield companies in the country agreed to settle with physicians, I had to be present before Chief Judge Moreno, and instead two of my partners, Mr. Rouco and Mr. Lathram, attended the meeting in this case.  It is my understanding that at that time, Mr. Neuwirth was advocating that his co counsel, Mr. Scruggs, serve as a co-lead counsel and that there be four co-lead counsel in this case. Unfortunately, other intervening matters have diverted Mr. Scruggs' attention and he is not able to serve as co-lead counsel.  I can state based on personal knowledge and experience that three co-lead counsel in the Love case served to prosecute that case efficiently and effectively.  Certainly, if Mr. Neuwirth was correct that four co-lead counsel could effectively and efficiently prosecute this action, then three can ably do so.

7.    In addition, I personally have been active in other cases involving similar conspiracy claims.  Our firm and I personally, had a lead role in the underground storage tank case against the major oil companies, who we alleged to have conspired through the American Petroleum Institute.  Our firm is co-lead counsel in the Insurance Brokerage Antitrust Litigation, where we allege a conspiracy among insurance brokers and insurance companies, and I have played a significant role in that litigation.

8.      I have handled numerous cases involving the railroad industry.  I practice for many years in Birmingham, Alabama, which is a railroad center where far more of the defendant railroads do business than where Mr. Neuwirth or Mr. Hausfeld's firm is located.  I personally handled many FELA cases against railroads.  I was lead counsel in Dunn v. Conrail, where the jury returned what was then the largest wrongful death verdict in the history of Louisiana, and even after the verdict was reduced; the defendants paid the largest reported amount in any wrongful death case in Louisiana at that time.

9.      Finally, Mr. Neuwirth and Mr. Hausfeld are wrong when they state that our firm has not been involved in developing the facts related to this case.  Two of our partners, Mr. Rouco and Mr. Lathram, have been involved in researching and developing the facts related to the surcharges imposed by various transportation carriers.  Our firm is on the proposed executive committee in the LTL (trucking) Surcharge Litigation which has been consolidated by the MDL Panel in the Northern District of Georgia and in the Moving and Storage Surcharge Litigation which has been consolidated by the MDL Panel in the District of South Carolina.  The practices in those cases are very similar to the ones in this case.  Mr. Rouco is submitting a more detailed description of the experience we have had in investigating and developing the facts related to surcharges in the transportation industry.

10.      I certify under penalty of perjury that the foregoing is true and correct. Executed on this the 4th day of March, 2008.


                                              /s/  Joe R. Whatley, Jr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document, filed through the ECF system, will be served electronically through the ECF System on the email-registered participants as identified on the Notice of Electronic Filing ("NEF") on March 4, 2008.

/s/ Joe R. Whatley, Jr.
OF COUNSEL

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

IN RE RAIL FUEL SURCHARGE    )
ANTITRUST LITIGATION    )
_____)    MDL Docket No. 1869
    )    Misc No. 07-489 (PLF)
This document relates to:  ALL CASES    )
_____)

**AFFIDAVIT OF RICHARD P. ROUCO IN SUPPORT**
**OF REPLY OF WHATLEY DRAKE & KALLAS, LLC**

1.    My name is Richard P. Rouco.  I am a partner in the law firm of Whatley Drake & Kallas, LLC.  I make this affidavit in reply to statements made by Mr. Neuwirth and Mr. Hausfeld in response to our motion for appointment as interim lead counsel on personal knowledge.

2.    In late 2006, I became aware of a dispute involving fuel surcharges in the Railroad industry while investigating fuel surcharge practices in the airline industry. Many rail shippers complained to the Surface Transportation Board that Class I railroads were using an unreasonable method for calculating fuel surcharges that did not reflect the actual increase in fuel costs.  In August 3, 2006, the Surface Transportation Board issued a decision seeking comment on certain proposals regarding fuel surcharges.  (STB Ex Parte No. 661, August 3, 2006).  After receiving comments, the STB issued a second decision dated January 25, 2007 setting forth it's findings for a proposed rule regarding fuel surcharges.   (STB Ex Parte No. 661, January 25, 2007).  On the same day, the STB also issued a notice of proposed rulemaking.   Though the class actions presently before the Court seek to represent a class of plaintiffs with respect to unregulated transactions, the STB findings shed light on fuel surcharge practices.  I continued to monitor the

developments related fuel surcharges in the Railroad industry after the STB's decisions and investigate whether such practices also occurred with respect to unregulated traffic.

3.     I have represented plaintiffs in several antitrust cases challenging fuel surcharge practices.  I represent plaintiffs in the International Air Transportation Surcharge Antitrust litigation that Cohen Milstein was appointed to lead.  That litigation was triggered by revelations in 2006 that the United Kingdom's Office of Fair Trade (OFT) had raided British Airways offices and accused BA with conspiring to fix fuel surcharge prices.  It was also revealed that the United States Department of Justice has served subpoenas on other domestic airlines during its investigation of BA's conduct.

4.     I represent plaintiffs in the Air Cargo Services Antitrust Litigation.  Cohen Milstein was appointed one of four co-leads to head that litigation.  Our firm supported Barbara Hart of Labaton Sucharow for lead counsel rather than seek appointment as lead counsel.  The Air Cargo Services Antitrust Litigation also involves a challenge to fuel surcharge practices.  In February 2006, the European Union and the Department of Justice announced a coordinated raid of the offices of several defendant airlines seeking evidence of unlawful cartel activity with respect to the coordinated setting, among other things, of fuel surcharges.

5.     I represent a plaintiff in the Less Than Truckload (LTL) Shipping Services Antitrust Litigation and have agreed to take a position on an executive committee rather than seek appointment as lead counsel.  The LTL antitrust litigation also involves claims that certain defendants conspired to coordinate their fuel surcharges and thus unlawfully restrained pricing competition.  In the LTL antitrust litigation the plaintiffs have agreed to

2

a private ordering of leadership.   It is my understanding that the leadership will include three co-leads and an executive committee.

6.      Finally, I represent a plaintiff in the Household Goods Movers Antitrust Litigation.  This case alleges that defendants have conspired to set fuel surcharges.  The defendants contend, among other things, that conduct at issue is regulated by the Surface Transportation Board and that there is a specific anti-trust exemption governing the defendants.  Plaintiffs argue, *inter alia*, that the STB does not insulate the conduct at issue in the case and that the antitrust exemption does not apply.  Our firm agreed to an executive committee position.  The plaintiffs agreed to a leadership structure with three co-leads and an executive committee.

7.      Mr. Neuwirth and Mr. Hausfeld argue against the appointment of a leadership structure that includes three co-leads.  As noted above, in several of the antitrust fuel surcharge cases the parties have agreed and/or the Court has appointed a leadership structure with three or four coleads.  In the Air Cargo Shipping Services Antitrust Litigation, Cohen Milstein advocated a leadership structure with six co-leads. Ultimately, the Court appointed a leadership structure of four co-leads.

8.      Indeed, shortly after the Judicial Panel on Multidistrict Litigation transferred this case to the District of Columbia, plaintiffs' counsel met at Cohen Milstein's offices in an effort to reach a private ordering of leadership.  At this meeting, plaintiffs' counsel expressed a desire for a four co-lead structure without an executive committee.  Instead, plaintiffs' counsel believed that a four co-lead structure with committees responsible for designated areas was appropriate.  No one at the meeting voiced opposition to a four co-lead structure.  Apparently, this changed when one of the

four proposed co-leads could no longer realistically serve in that capacity.    This fact, however, does not change the appropriateness of a co-lead structure that includes more than two co-leads.

9.    Finally, Mr. Neuwirth and Mr. Hausfeld note that their firms have actively played a role in communicating with defense counsel.  However, this was done with the consent of Whatley Drake.   Rather than have defendants inundated with calls from various co-counsel, we agreed to let Neuwirth and Hausfeld's firms conduct preliminary discussions with defense counsel.  Both Neuwirth and Hausfeld's firms indicated that our consent to them playing such a role would not be used to support their request for appointment as interim lead counsel.

10.    I certify under penalty of perjury that the foregoing is true and correct. Executed this the 4th day of March, 2008.

/s/ Richard P. Rouco

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document, filed through the ECF system, will be served electronically through the ECF System on the email-registered participants as identified on the Notice of Electronic Filing ("NEF") on March 4, 2008.


<u>/s/ Richard P. Rouco</u>
OF COUNSEL