**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE RAIL FUEL SURCHARGE ANTITRUST LITIGATION ) ) ) ) This document relates to: ALL CASES ) ) ) | MDL Docket No. 1869<br>Misc. No. 07–489 (PLF) |

**PLAINTIFF COMPLETE TRANSPORTATION SYSTEMS, INC.'S RESPONSE IN OPPOSITION TO THE COHEN GROUP'S PROPOSED EXECUTIVE COMMITTEE AND REQUEST FOR APPOINTMENT TO THE EXECUTIVE COMMITTEE**

I.  **INTRODUCTION**

Notwithstanding this Court's strong suggestion for an expansive and more inclusive Executive Committee at the March 7, 2008 hearing and in its subsequent Order, the Cohen Group has (somewhat surprisingly) decided to ignore the Court's guidelines. Indeed, the Cohen Group has unfortunately chosen to reject any effort at creating a consensus leadership structure and proposed an Executive Committee composed of the exact same five (5) firms included in their original petition, without any deviation. What is not surprising is the fact that the composition of the Cohen Group's proposed Executive Committee is the result of questionable "*quid pro quo*" arrangements between supporters of the Cohen Group and the Lead Counsel.

Despite the Cohen Group's claim otherwise, the fact remains that their proposed "Executive Committee" is not the result of an open, fair or democratic selection process. Nor was the process designed to further the interests of the Class.

Moreover, the Cohen Group's proposed Executive Committee is anything but representative of all the filed cases in this MDL, as not all firms with pending cases at that time

attended the "meeting," and a number of cases were filed after the November "coronation" meeting led by the Cohen Group. Indeed, the submissions of the Cohen Group along with the "Report" reveal that support for the proposed lead structure (and the Executive Committee) was improperly based on undisclosed arrangements reached early on in this case amongst the Cohen Group's inner circle.

Most importantly, even assuring the Cohen Group's selection process was valid, fair and open, the fact remains that the Court's function is not simply to "rubber stamp" the suggestions for leadership offered by any one group. As the *Manual* notes, the appointment of lead counsel, liaison counsel and the executive committee is one left to the "sound discretion" of the federal court. *Manual of Complex Litigation* (4th) (2004) at § 10.221. The undersigned, joined by other plaintiffs counsel also excluded from the process, submits that the only real solution to this one-sided Executive Committee is for this Court to appoint a Committee that truly represents the full breadth of cases before this Court, not just the same set of firms that believe they "own" this case because of a private, early meeting held in November 2007.

Accordingly, the undersigned and its attorney respectfully request that this Court appoint Audet & Partners, LLP, to the Executive Committee, and to also consider appointing the Whatley firm to the Executive Committee.[1]

## II.   ARGUMENT

An Executive Committee plays an extremely important and pivotal role in MDL litigation. In light of this important role, an Executive Committee is appointed by the *Court*, not the attorneys before the Court. Remarkably, the Cohen Group essentially argues that, because

---

1 In addition to this *Memorandum*, the undersigned respectfully submits to the Court the following: (i) *Declaration of William M. Audet in Opposition to the Cohen Group's Proposed Executive Committee and in Further Support of Complete Transportation Systems, Inc.'s Request for Appointment on the Executive Committee* (hereinafter, "*Audet Declaration*"), and (ii) *Declaration of Professor William B. Rubenstein* (hereinafter, "*Rubenstein Declaration*").

members of that limited group made "promises" of various sorts to each other over six (6) months ago, this Court may not appoint any other firms to the Executive Committee. Yet, in fact, it is these undisclosed "backroom" arrangements that require Court scrutiny *and* serious consideration of other, qualified representatives outside of the Cohen Group for appointment to the Executive Committee. Indeed, many Courts have, of late, directly sought out applications from all attorneys with filed cases to potentially serve on the Executive Committee — independent of the Court's decision on lead counsel appointments. *See, e.g.,* Exhibits C, D, & E to *Audet Declaration.*

To the extent that Lead Counsel suggests a "head count" is the almost exclusive factor for appointment by the Court, such a suggestion is misplaced. The selection and appointment of an Executive Committee should not simply be a matter of which competing group represents more plaintiffs (or consists of more attorneys). Such a numbers game results in Plaintiff firms improperly encouraging other firms to file duplicative cases in order to stuff the ballot box in favor of their proposed leadership structure. *In re Razorfish, Inc. Secs. Litig.,* 143 F.Supp.2d 304, 308 (S.D.N.Y. 2001).

Under the aptly named "Private Ordering" approach, *all* lawyers with filed cases must agree amongst themselves who should be lead class counsel and members of the Executive Committee. Even with all counsel in agreement, however, such suggested leadership is *always* subject to court review to confirm that the proposed counsel will represent the best interests of the Class. *In re Goodyear Tire and Rubber Company ERISA Litigation,* 2004 U.S. Dist. LEXIS 26706 (N.D.Ohio 2004) (*quoting Manual* (4th), noted that Court should conduct an "independent review" of any proposed leadership structure); *Manual* (4th), § 21.272. Here, *no* agreement among all plaintiffs' counsel has been reached concerning the selection of the Executive Committee. Where, as here, private ordering does not apply, the Court should reject efforts of

any one group (even one purported to be a purported 'majority' of firms) to exclude participation on the Executive Committee by other any well qualified plaintiff's counsel with filed cases. Under such circumstances, the Court must appoint members of the Executive Committee after a review of *all* the relevant criteria for such appointments, not just because a purported "majority" of lawyers claims the right to such appointments.

### A. The Cohen Group's Report and "Supporting" Documents

The Cohen Group's so-called "Report" is remarkable in a number of respects and, on closer scrutiny, actually supports the real need for this Court to rework the proposed Executive Committee.[2]

First, the report mentions a "meeting" held in November 2007, purportedly at which the issue of leadership was "discussed" and, apparently in their view, "resolved." Yet, this early meeting of counsel failed to include a number of attorneys now before this Court. Indeed, the meeting was held before all related cases were sent to this Court. Obviously, an early meeting, with limited attendance, by certain firms, with a limited number of cases, is hardly a democratic process.[3]

Second, the supporting materials, including declarations of a number of attorneys, discuss, in summary fashion, 'deals' reached between proposed lead counsel and other firms, with promises of work and undefined committee positions. Clearly, these vague "deals" are not in the best interest of the class and may in fact place unnecessary obligations on lead counsel and committee members to 'dole out' work to firms that are not suited for that work or should not be

---

2 After the Court issued its Order appointing Co-Lead Counsel and inviting the Co-Lead Counsel propose to the Court a reworked committee, Mr. Audet sent a letter "applying" for a position on the proposed Executive Committee. Ex. A. to *Audet Declaration*. As noted below, this 'application' was apparently not taken seriously.

3 In addition, this November 2007 meeting was rescheduled a number of times by the proposed co-lead without notice to all Plaintiffs' counsel, and, more importantly, appeared to be more of a "coronation" of previously worked-out arrangements. In a letter dated November 9, 2007, Mr. Audet raised these concerns — with no response from any of the members of the Cohen Group. Ex. B. to *Audet Declaration*.

assigned the work due to geographic location limitations. See *Rubenstein Declaration,* ¶¶ 17–18. Any leadership structure appointed by the Court should be free and clear of any "obligations" to create work for certain firms. *Accord* Rule 23(g) (notes that court "may order potential class counsel to provide information on any subject pertinent to the appointment...," which would include any side arrangements relevant to appointment of class counsel).

Third, in a very odd argument, the Cohen Group claims that, if the Court does not *carte blanche* adopt their proposed group's slate, some attorneys will be "punished." Yet, these 'backroom' deals should not be made in the first place: firms that believe they are suited for a leadership role should apply for such a position if they desire to serve an important role in the case. From a policy standpoint, a process that is open and allows the "best of the best" to apply to the Court for leadership positions is clearly in the Class members' interest, as opposed to a process in which the appointment of a leadership structure is beholden to non-committee firms for work and patronage assignments. See *Rubenstein Declaration,* ¶¶ 20-22.

**B.     *The Manual for Complex Litigation* (4th) Frowns Upon "Quid Pro Quo" Leadership Structures**

As noted in the *Manual,* a proposed leadership structure that is the result of "quid pro quos" is *not* a structure that should be summarily approved by a Court. *See Manual* (4th) at § 10.224. Indeed, as the *Manual* and relevant case law point out, a leadership structure that is the result of "arrangements" is tainted and may *not* be in the best interests of the Class.[4] *See In re Scrap Metal Antitrust Litigation,* 2002 WL 31988203 (N.D.Ohio, Aug. 5, 2002).

---

[4] The *Advisory Committee Notes to the Amendments to Rule 23* is in accord and requires full disclosure of "arrangements" between counsel. In fact, the Advisory Committee Notes to Rule 23(g) reference the need for the court to consider 'competing' applications in order to have the ability to select the best suited of all the applicants: "The purpose of facilitating competing applications in such a case is to afford the best possible representation for the class."

As this Court noted at the March 7th hearing, absent an independent process for appointing Executive Committee members, what is the *quid pro quo* for selection by the Cohen Group for such an appointment? In this case, membership in the Cohen Group's proposed Executive Committee required the proposed Executive Committee's members support the Cohen Group's two-way leadership structure. The Cohen Group's submission and supporting papers also reference side "arrangements," "commitments," and "promises" of work to various firms with filed cases in exchange for not seeking a "position" with the Court, as if the private agreements with Lead Counsel were a *"fait accompli."* These "undisclosed" commitments between certain firms create the type of problem that the *Manual* (4th) outlines as a "key" issue for a Court to consider in the creation of a leadership structure. *See Manual* (4th) at § 10.224 (the Court needs to review any 'side agreements' and understandings among supporting counsel and consider whether the proposed committee represents all the interests of the plaintiffs before the Court). *See also Rubenstein Declaration*, ¶¶ 20-22.

Such arrangements, especially in class action cases, are rarely, if ever, in the best interests of the Class, Courts and generally against public policy. These arrangements — especially if interlocked with other deals between firms on other cases — are directly counter to Congressionally passed reforms in the securities bar in 1995. (*See, generally, Private Securities Litigation Reform Act,* 1995, 15 U.S.C § 77z-1). In this case, the admitted deal making and promises of work in exchange for support of a certain leadership structure require this Court to scrutinize *any* proposed Executive Committee that is tied to the initial support of the Cohen Group's two-way leadership structure. *See, In re Fine Paper Antitrust Litig.,* 98 F.R.D. 48, 71 (E.D.Pa 1993) (noted that committee structure should not be based on "patronage").

In this case, it is clear the Cohen Group's proposed Executive Committee is comprised only of those who support the Cohen Group's two-way lead structure and that other possible

'side deals' have apparently been reached with respect to discovery, work, chair opportunities and the like — all which may not serve the bests interest of the litigation as a whole, or the Class's best interest. *See, generally, Rubenstein Declaration.* Similarly, a number of "well-qualified" firms apparently entered into vague (but not fully disclosed) "arrangements" to support the Cohen Group's Executive Committee in exchange for promised work or other undefined roles in the case. *See, e.g. Declaration of Mary Jane Fait* (Ex. 1 to the Cohen Group's Submission.) ("We also agreed to step back from requesting an Executive Committee position with the assurance of proposed Lead Counsel that we would still be able to make a significant contribution to the case." (¶ 3.)) As the *Manual* notes, such "downstream" promises do not serve the interests of the Class and in fact may impede the efficient prosecution of the case. *Accord, Rubenstein Declaration.*

### C. MDL Courts Routinely Establish and Appoint Independent Executive Committees

The *Manual for Complex Litigation* specifically cautions against the Court "[d]eferring to proposals by counsel without independent examination, even those that seem to have the concurrence of the majority of those affected...." *Manual for Complex Litigation* (Fourth) at § 10.224 (2004); *In re Scrap Metal Antitrust Litig.*, No. 1:02-CV-0844, 2002 WL 31988203 (N.D.Ohio, Aug. 5, 2002) (rejecting "negotiated deal among counsel," noting that "the *Manual* warns the Court against accepting deals of counsel at face value without making an independent evaluation."). *See also In re Delphi ERISA Litigation*, 230 F.R.D. 496 (E.D.Mich. 2005) ("In determining lead counsel, a Court should conduct an independent review...."); *In re Williams Companies ERISA Litigation*, 2002 U.S. Dist LEXIS 27691 (N.D.Okl. 2002) (appointment of lead, liaison and Executive Committee is "an issue that is directed to the sound discretion of the trial court...."). Similarly, the purpose of the 2003 amendments to Rule 23 was to provide (by

the enactment of Rule 23(g)) a mechanism for choosing class counsel who would best represent the interests of the class *without regard* to *negotiated deals* or *political arrangements* among plaintiffs' proposed class counsel.

According to the Cohen Group, once a 'consensus' is reached by a limited number of firms representing a limited number of plaintiffs early on in a case, the self-selected (and self-elected) proposed lead counsel then have the complete and sole discretion to 'select' who is a member of the Executive Committee. From their standpoint, the Cohen Group's proposed Executive Committee selection is essentially a *fait accompli*, requiring little, if any judicial review.

Putting aside the irony of the fact, in this case, that the Cohen's Group proposed Executive Committee contains only law firms that supported the Cohen Group's two-way leadership structure, the Cohen Group argues that this Court 'must' approve their one-sided 'consensus' slate, without any 'deviance' or additional appointments. Where, as here, a number of plaintiffs and a significant number of law firms were *excluded* in the purported 'selection' process, the need for Court scrutiny of the so-called 'majority' proposed leadership structure increases significantly. (Indeed, it is not inappropriate for a Court to vacate prior Court *orders* appointing a law firm as lead counsel. *See In re Delphi Corporation Securities Litigation*, 458 F.Supp. 2d 455 (E.D.Mich. 2006) (Court vacated prior order of another district approving a lead plaintiff's "selection" of lead counsel).) Yet, here, the Cohen Group essentially claims that once it selects an Executive Committee slate (regardless of the flaws in the selection process), this Court has no authority to "oversee" the recommendation of a self-selected group of firms.

As the *Manual for Complex Litigation* (4th) makes clear, the ultimate composition of the Executive Committee is not simply the result of one proposed group's recommendations to a MDL Court. *Manual* (4th) at § 10.224 ("Deferring to proposals by counsel without independent

examination, even those that have the concurrence of a majority of those affected, invites problems down the road...."). The *Manual* (4th) discusses at length the need for Court scrutiny of any court appointed positions, and notes the importance of a balanced and representative Executive Committee. *Id.* at §§ 10.22 and 10.221. *See, generally, Rubenstein Declaration.*

Consistent with the *Manual,* courts have in fact independently sought out applications for membership in the Executive Committee. In the *Bextra* MDL (MDL No. 1699), Judge Breyer requested, *sua sponte,* that firms interested in serving on the Plaintiffs Steering Committee apply for the position. (Exhibit C to *Audet Declaration*). The PSC was authorized to essentially conduct the litigation. *Id.* at 2-3. See *Guidant* MDL (MDL No. 1708) (Court appointed lead counsel and then requested separate applications for the Plaintiffs Steering Committee). (Exhibit D to *Audet Declaration.*); *Medtronic* MDL (MDL No. 1726) (Court solicited independent applications for the Plaintiffs Steering Committee.) (Exhibit E to *Audet Declaration*). *See also In re Air Cargo Shipping Services Antitrust Litigation,* 240 F.R.D. 56 (E.D.N.Y. 2006) (Court appointed representatives from both groups, even though one group had "more experience").

Most often, even if <u>all</u> the plaintiffs before the Court have reached a consensus (not the case here), Courts independently verify the <u>entire</u> leadership structure, regardless of any 'deals' between plaintiffs firms regarding a proposed leadership structure. This is particularly true in class action cases. *Manual* (4th) at § 10.224 ("The Court's responsibilities are heightened in class action litigation") and *Manual* (4th) at § 21.273. In a number of cases, it appears that 'consensus' and 'majority' recommendations played virtually no role in the composition of the Executive Committee ultimately appointed by the Court.

Private ordering is generally limited to circumstances of essentially complete unanimity. The relevant authorities recognize that, in the absence of complete unanimity, acceptance of the "private ordering" mechanism propounded to this Court by the Cohen Group would lead to an

easily manipulated system, because it tends to transform the Court's role from that of a qualitative evaluator to a "vote-counter," looking only at which group has managed to file the most cases an recruit the largest number of supporting firms. *Accord, In re Goodyear Tire and Rubber Company ERISA Litigation,* 2004 U.S. Dist. LEXIS 26706 (N.D.Ohio 2004) (Court rejected efforts to claim leadership role based on "first filed" case). Under such a regime, a firm could all too easily "stuff the ballot box" by filing numerous redundant lawsuits and soliciting the efforts of friendly firms in order to create the appearance of spontaneous, "democratic" support.

### D. The Cohen Group's Proposed Executive Committee Structure Is Without the Support of a Number of Cases and Firms Before This Court

The Cohen Group spends a significant amount of time in their papers arguing that the selection of the lead counsel and the Executive Committee was the result of "cooperation" and an open voting structure. Nothing could be further from the truth. In fact, it is clear that the selection and election process was flawed, with backroom deals and undisclosed "arrangements" and *quid pro quos.*

In reality, the Cohen Group's selection process was tainted from the commencement of the first filed case, without any real open selection process. To make matters worse, after the Court's hearing of March 7, 2008, with the exception of one phone call to Mr. Whatley to try to "buy" him off with "promises" of work, no effort was made by the Cohen Group to reconsider their initial proposed Executive Committee, or to even consider Mr. Audet's application to the Executive Committee.[5] *See* Ex. A to *Audet Declaration* (Audet's letter "Application" for

---

5 After the Court's ruling on March 7, 2007, the undersigned counsel "reapplied" for a position on the Executive Committee, outlining his firm's experience in the antitrust bar and noting his client's significant stakeholder interest in the litigation. See Ex. B to *Audet Declaration*. This application was met with silence and not even the courtesy of a telephone call by any Cohen Group member. At minimum, the Cohen Group should have at least considered Mr. Audet's application and provided a platform for consideration of any legitimate application to the "revised" Executive Committee.

Executive Committee position to the Co-Lead Counsel).

Even though the MDL Panel had only just ruled on the pending motion for consolidation and transfer, the Cohen Group convened a so-called meeting of "all counsel." According to the Cohen Group, from this early, limited, invite only meeting, the leadership structure was "agreed upon" by "all firms." In fact, this meeting was in reality simply a coronation of early filers and excluded a number of cases filed before the date of the meeting, and obviously excluded a number of firms with cases filed *after* November 2007.

To the extent a Court defers to a private ordering approach, the process should include *all* firms with filed cases. More importantly, the selection process should not be tainted by promises of work and/or other commitments, nor should the selection process should not simply reward "first to file" firms, as was clearly done in this case, to the exclusion of other, well-qualified firms. *See Rubenstein Declaration,* ¶¶ 20-22. The timing of the meeting and the process itself, including the failure to later consider any other candidates after the March 7th hearing, alone raises serious red flags as to the validity of the Cohen Group's process of selection.[6]

Where, as here, more than one client and more than one set of attorneys are raising legitimate issues with a purported majorities' proposed leadership structure, the Court must carefully oversee the entire appointment process, not just the qualifications of the proposed lead counsel. In this case, the Executive Committee in this case must include other attorneys and firms that did not initially support the Cohen Group's two way co lead structure. At a minimum, the Court needs to protect the interests of the plaintiffs and the firms before this Court who did not 'support' the Cohen Group's leadership structure, including but not limited to appointing the

---

6 The only "justification" for excluding Mr. Audet from the Executive Committee was that such appointment would "upset" existing "arrangements" in the Cohen Group. As Professor Rubenstein notes, this "justification" is without any legal support. *See, generally, Rubenstein Declaration,* ¶¶ 14, 19–23. Indeed, as Professor Rubenstein notes, the "justification" for the same firms offered by the Cohen Group was actually a "non-response," as the Court was already aware of the private ordering. *See Rubenstein Declaration,* ¶ 14.

undersigned counsel to the Executive Committee. See *Rubenstein Declaration,* ¶¶ 17-20.

Lastly, contrary to the Cohen Group's position, the Executive Committee is an important part of the overall leadership and case management team, which must be in place to ensure that the litigation is effective and efficiently litigated. See *Rubenstein Declaration,* ¶¶ 3, 15. fortunately, the Cohen Group acts as if the Executive Committee is no more than a committee to 'reward' supporters and implement undisclosed work agreements between attorneys. In fact, an Executive Committee works hand in glove with the Court appointed lead counsel and provides the plaintiffs bar with the resources, infrastructure and diversity of talent needed to prosecute a complex case of this nature and magnitude. Membership on the Executive Committee is an honor and privilege – and requires significant commitment of resources, hence the need for Court scrutiny of all attorneys selected by the Court to serve on this important committee. *See Manual* (4th) at §§ 21.273 & 10.224. *See, generally, Rubenstein Declaration.*

E. **Audet & Partners, LLP Is As Experienced (In Fact More So) Than A Number of Other Firms and Represents a Significant Plaintiff**

With limited exception, no firm in the proposed Executive Committee has more experience in the antitrust bar or more resources to devote to this case than Mr. Audet's firm. As noted in his previously submitted CV and his firm's resume, Mr. Audet and his firm have been appointed to leadership positions in many complex MDL cases over the past years, including a number of antitrust cases. Mr. Audet also represents a significant direct purchaser of the fuel surcharges, a factor deemed important in complex MDL cases, including antitrust cases. *See, e.g., In re Scrap Metal Antitrust Litig.,* 2002 WL 31988203 (N.D. Ohio Aug 5, 2002)(court considered, among other factors, the proposed class representatives respective "comparative stakes" in the action).

In the *Air Cargo* MDL (MDL No. 1775), the Court considered two competing "private

ordering" applications from two sets of Plaintiffs' counsel (some of whom are also before this Court). The Court declined to pick one group to the exclusion of the other group, and instead appointed representatives from both groups. In doing so, the Court also noted that (as one firm pointed out) the selection of the lead counsel is not a 'popularity contest' and that simply choosing one set of firms over the other is 'problematic'. *In re Air Cargo Shipping Services Antitrust Litigation,* 240 F.R.D. 56, 2006 U.S. Dist. LEXIS 83283 (E.D.N.Y. 2006). In the present case, like *Air* Cargo, the Court in fact can select representative *and* qualified firms from the various competing groups.

In addition, Mr. Audet has had the good fortune to have worked cooperatively in past MDL cases with almost all members of the proposed Executive Committee. Without question, Mr. Audet and his firm will be able to work cooperatively, if his firm is selected by this Court, with the two Co-Lead counsel and the members of the Executive Committee. *See, In re Air Cargo,* 240 F.R.D. 56. Beyond that, if appointed, Mr. Audet will provide a much needed "independent" voice to the Cohen Group's slate.

F.  **Other Issues Requiring Scrutiny of the Cohen Group's Proposed Executive Committee**

Another important but yet undisclosed problem relates to the qualifications of certain named plaintiffs to serve as Class representatives. Unfortunately, in past antitrust MDL cases, when the leadership structure was appointed by a Court, a number of the named plaintiffs, which served as the "support" for a set of firms' position in the case, had a tendency to "disappear" as the case proceeded. This has happened, unfortunately, in a number of MDL cases. In this case, a number of named plaintiffs appear to have little, if any relationship to the railroad transportation industry and also appear to be indirect "plaintiffs." *See, e.g., Quality Refrigerators Installation, Inc.* (very little information on the Internet); *Bar Ale, Inc.* (a small

animal feed company); *GVL Pipe & Demolition, Inc.* (essentially no information on the Internet). In this case, Mr. Audet's client (Complete Transportation Systems, Inc.) is a significant stakeholder in the case, whose primary business is shipping, including rail freight. *See In re Scrap Metal Antitrust Litig.*, 2002 WL 31988203 (N.D. Ohio Aug. 5, 2002)

Another issue relates to "double-dipping" by firms with one shared client, resulting in overrepresentation in the leadership structure, unfortunately at the expense of other named plaintiffs and their firms. For example, in the *Dust Pro* case, Quinn Emanuel and Hein Mills & Olson are listed as counsel, yet the two firms seek, with the one client, two leadership positions (Lead and Executive Committee). Similarly, both Quinn Emanuel and Carella Byrne serve as counsel on the Dust Pro/U.S. Magnesium case, but again, both request inclusion in the leadership structure, to the exclusion of other well-qualified firms. *See Rubenstein Declaration,* ¶ 21.

These issues alone raise enough red flags to warrant a reworked Executive Committee and to include others on the Committee, including Mr. Audet's firm.

### III. CONCLUSION

The Cohen Group asserts that they, and only they, are the sole "heirs" to the leadership in this case because they purport to have the "votes," and earned automatic entitlement for these important positions based on purported contributions by certain members of the Cohen Group to this litigation. These claims are without foundation. As the record makes clear, once stripped of the duplicative filings of identical class actions (and only allowing one vote per case filed to date), the Cohen Group has a very small "plurality" with which to make an "ownership" claim to this case. Moreover, in reality, only a limited number of attorneys from the Cohen Group have in fact contributed to the prosecution of the case so far. Accordingly, the Court must seriously consider a more equitable approach to the leadership appointment than that propounded by the

Cohen Group.

The application of the law to the record precludes this Court's *carte blanche* adoption of the Executive Committee proposed by the Cohen Group. The issue of the composition of the Executive Committee is a critical one for this Court and this case. At the end of the day, the interests of this Class and the litigation as a whole require a reworking of the Executive Committee. The structure must be free and clear of any undisclosed promises of work, committee assignments and the like. As demonstrated above, the Cohen Group's proposed Executive Committee is the result of improper arrangements and does not in fact represent the cases as a whole.

Accordingly, consistent with the *Manual* and other authorities, and to insure the Class is well represented, the Court should appoint Audet & Partners, LLP, to the Executive Committee.

Dated: March 25, 2008

Respectfully submitted,

AUDET & PARTNERS, LLP

William M. Audet
221 Main Street, Suite 1460
San Francisco CA 94105
Telephone: 415.568.2555
Facsimile: 415.568.2556

*Attorneys for Complete Transportation Systems, Inc and the Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 25, 2008, a copy of the foregoing Plaintiff Complete Transportation Systems, Inc's Response in Opposition to the Cohen Group's Proposed Executive Committee and Request for Appointment to the Executive Committee , Declaration of William M. Audet in Opposition to the Cohen Group's Proposed Executive Committee and in Support of Complete Transportation Systems, Inc.'s Request for Appointment to the Executive Committee, Declaration of William Rubenstein, and [Proposed] Order Appointing the Executive Committee of Counsel were served on the attorneys of record for all parties via the Case Management/Electronic Case Filing system, in accordance with the Court's Initial Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C § 1407.

William M. Audet