UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |

### DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN

I, William B. Rubenstein, declare:

1. I am a professor at Harvard Law School. My areas of specialty are civil procedure, complex litigation, and class action law. My qualifications are set forth below in Part I.

2. I have been retained by William M. Audet, counsel for Complete Transportation Systems Inc., to perform two functions: first, to study the proceedings concerning the appointment of an Executive Committee in this matter; and second, to respectfully provide to the Court my expert opinion about the nature of judicial oversight in the creation of a leadership structure in complex class action cases.[1]  My review of the proceedings is set forth below in Part II. That review demonstrates that Lead Counsel has offered but one reason for not including Mr. Audet on the

---

[1] This Declaration does not address the Court's prior appointment of Lead Counsel: Cohen Milstein and Quinn Emanuel are both very experienced and highly respected firms and their appointment is not at issue. This Declaration solely addresses the process questions raised by appointment of the Executive Committee herein.

1

Executive Committee: namely, that many other lawyers in the case have "privately ordered" the leadership positions in this matter and to now include Mr. Audet would upset that private ordering.

3. In assessing whether Lead Counsel's reasoning is sufficient, the Court must balance two competing principles: deference to duly-appointed Lead Counsel in their handling of the lawsuit, on the one hand, versus oversight of Lead Counsel so as to ensure the class's best interest – which is, of course, the Court's ultimate charge – on the other. As set forth more fully in Part III below, my opinion is that most decisions that Lead Counsel makes deserve significant deference from the Court and should only be closely scrutinized or overturned in extraordinary circumstances (something akin to an "abuse of discretion" standard). By contrast, there are other *types of decisions* that Lead Counsel makes that run a greater risk of conflicting with the class members' interests and that therefore call for greater judicial scrutiny from the supervising judge (something akin to a "de novo" review standard). Selection of an Executive Committee falls into this latter category. It is a decision that requires Court approval and, according to the *Manual for Complex Litigation*, it is a decision that should trigger careful judicial scrutiny.[2] Accordingly, this Court should carefully scrutinize the reasons given by Lead Counsel for not including Mr. Audet on the Executive Committee so as to ensure that judicial ratification of the exclusion of Mr. Audet from that Committee would comport with the standards set forth in the *Manual* and would truly be in the class's best interests.

---

[2]*See* FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION, FOURTH, §10.224 (2004) (hereafter *"Manual"*) (advising judge to "take an active part" because "[d]eferring to proposals by counsel without independent examination, even those that seem to have the concurrence of a majority of those affected, invites problems down the road . . ."). Indeed, appointment of an Executive Committee is a task that some courts simply do themselves following applications by interested counsel. *See* note 14, *infra*.

# I
# BACKGROUND AND QUALIFICATIONS

3.  I am a Professor of Law at Harvard Law School. I graduated *magna cum laude* from Yale College in 1982 and *magna cum laude* from Harvard Law School in 1986. I clerked for the Hon. Stanley Sporkin in this Court, the United States District Court for the District of Columbia, following my graduation from law school. Before joining the Harvard faculty, I was a Professor of Law at UCLA School of Law and an adjunct faculty member at Stanford and Yale Law Schools, following nearly a decade as a litigator.

4.  My principal area of scholarship is complex civil litigation, with a special emphasis on class action law. I am the author, co-author, or editor of four books and more than a dozen scholarly articles, as well as many shorter publications. Much of this work concerns various aspects of class action law.[3] I also publish a monthly column entitled, *Expert's Corner,* in the publication, CLASS ACTION ATTORNEY FEE DIGEST.[4] My work has been excerpted in a leading casebook on

---

[3] My recent scholarship on class action law includes: *The Availability of Data on Class Action Claiming Rates, in* CAN INCREASED TRANSPARENCY IMPROVE THE CIVIL JUSTICE SYSTEM? (tentative title) (forthcoming 2008) (with Nicholas M. Pace, RAND Corporation); *The Public Role in Private Law Enforcement: Visions from CAFA*, ___ U. PA. L. REV. ___ (forthcoming 2008); *Finality in Class Action Litigation: Lessons from Habeas*, 82 N.Y.U. L. REV. 791(2007); *The Fairness Hearing: Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. REV. 1435 (2006); *Why Enable Litigation? A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. REV. 709 (2006); *On What a "Private Attorney General" Is – And Why It Matters*, 57 VAND. L. REV. 2129 (2004); *The Concept of Equality in Civil Procedure*, 23 CARDOZO L. REV. 1865 (2002); *A Transactional Model of Adjudication*, 89 GEO. L. J. 371 (2001); *The Myth of Superiority*, 16 CONSTITUTIONAL COMMENTARY 599 (1999); *Divided We Litigate: Addressing Disputes Among Clients and Lawyers in Civil Rights Campaigns*, 106 YALE L. J. 1623 (1997).

[4] My recent *Expert's Corner* columns have included: *Reasonable Rates: Time To Reload The (Laffey) Matrix* (February 2008); *The "Lodestar Percentage:" A New Concept For Fee Decisions?* (January 2008); *The American Law Institute's New Approach to Class Action Objectors' Attorneys Fees* (November 2007); *The American Law Institute's New Approach to Class Action Attorneys Fees* (October 2007); *"The Lawyers Got More Than The Class Did!": Is It Necessarily Problematic*

complex litigation, COMPLEX LITIGATION AND THE ADVERSARY SYSTEM 120-123 (Jay Tidmarsh and Roger Trangsrud eds., 1998).

5. My expertise on procedural matters is recognized by scholars and lawyers in private practice throughout the country for whom I regularly provide consulting advice and educational training programs. The American Law Institute selected me to be one of nine law professors in the United States to serve as an Adviser on a current Restatement-like project developing the *Principles of the Law of Aggregate Litigation*. In 2007, I was the co-chair of the Class Action Subcommittee of the Mass Torts Committee of the ABA's Litigation Section. I am on the Advisory Board of the publication, *Class Action Law Monitor*. I present continuing legal education programs on class action law at law firms and conferences. For example, I am a regular participant at the ABA's annual *National Class Action Institute* and, at the 2006 International Law Association meeting, I was asked to present a talk about the international aspects of class action law.

6. My teaching focuses on procedure and complex litigation. I regularly teach the basic Civil Procedure course to first year law students and a variety of advanced courses on complex litigation, remedies, and federal litigation. I have received honors for my teaching activities, including the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law during the 2001-2002 school year, and the John Bingham Hurlbut Award for Excellence in Teaching, as the best teacher at Stanford Law School during the 1996-1997 school year.

7. In the past few years, I have been retained as an expert witness in more than a dozen

---

*When Attorneys Fees Exceed Class Compensation?* (August 2007); *Supreme Court Round-Up* (July 2007); *On The Difference Between Winning and Getting Fees* (June 2007); *Divvying Up The Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?* (May 2007); *On Plaintiff Incentive Payments* (April 2007); *Percentage of What?* (March 2007); *Lodestar v. Percentage: The Partial Success Wrinkle* (February 2007)(with Hirsh).

4

class action cases and as an expert consultant in another dozen cases. These cases have been in state and federal courts throughout the United States. I have been retained to testify as an expert witness on issues ranging from the propriety of class certification, to the reasonableness of settlement and fees.

8.  I have been retained in this case to provide an opinion on the questions outlined above. I am being compensated for my work at an hourly rate.

9.  In analyzing these issues, I have discussed the case with counsel for Complete Transportation Systems, Inc. (Mr. William Audet), I have looked over the entire Docket for the case on the PACER system, and I have reviewed a file of the case documents. Specifically, I have reviewed the following documents:

   a. Memorandum of Law In Support of Motion for The Appointment of Cohen Milstein and Quinn Emanuel as Co-Lead Interim Class Counsel (filed Feb. 19, 2008);
   b. Submission By *Plaintiff Complete Transportation Systems, Inc.,* And His Counsel Regarding The Two Competing "Motions" (filed March 2, 2008) (hereafter "Complete Transportation Systems Submission");
   c. Order Appointing Interim Co-Lead Class Counsel For Direct Purchaser Plaintiffs (filed March 11, 2008) (hereafter "March 11 Order");
   d. Memorandum Opinion and Order (filed March 11, 2008);
   e. Letter from William M. Audet to Michael D. Hausfeld (dated March 12, 2008);
   f. Report Concerning Plaintiffs' Proposed Executive Committee (filed March 18, 2008) and Exhibits 1-6 attached thereto (hereafter "Report").

I have also researched applicable case law and scholarship on the topics of this Declaration.

10.  I offer this Declaration to assist the Court in analyzing *what approach to employ* in overseeing the appointment of an Executive Committee, but I do not purport to make that ultimate decision for the Court.

## II.
## THE CURRENT PROCEDURAL POSTURE

11. By order filed on March 11, 2008, this Court took different approaches to the appointment of Lead Counsel and of the Executive Committee. As to Lead Counsel, two competing applications were filed. The Court approved the motion of two highly-qualified firms, finding that the firms met the relevant legal criteria, were the consensus choice of all counsel but for the competing application, would adequately represent those interests, and were "best able to represent the interests of the class." March 11 Order at 1. For these reasons, the Court declined to appoint a third firm, writing that such an additional appointment "might well disturb the equilibrium achieved by the virtual consensus reached among plaintiffs' counsel." *Id.* at 1-2.

12. By contrast, the Court stated that "the issue of which firms should serve on the Executive Committee . . . *is a different matter.*" *Id.* at 2 (emphasis added). The third Lead Counsel applicant sought a place on the Executive Committee, as did Mr. William M. Audet. According to the Court's order, Lead Counsel "represented to the Court that [they] would like the opportunity to consider these requests, consult with others, and report their views to the Court . . ." *Id.* For these reasons, the Court "excis[ed] the portion of [the proposed] order relating to the appointment of an Executive Committee," *id.* at 3, and directed Lead Counsel to "advise the Court in writing on or before March 18, 2008 of their views as to which firms should serve on the Executive Committee." *Id.* at 3-4.

13. I have reviewed the submission of Lead Counsel, and its six accompanying exhibits, as well as a draft of the papers to be submitted by Mr. Audet. I have also spoken with Mr. Audet about the situation. I review these facts to bring to the Court's attention two salient features:

    a. First, and rather critically, nothing in Lead Counsel's submission suggests either (i)

6

that Mr. Audet in any way lacks the qualifications for an Executive Committee position or (ii) that his client is not a large enough or important enough stake-holder or otherwise should not be represented on the Committee.

b.  Second, the only real reason[5] given for rejecting Mr. Audet's participation on the Executive Committee is that putting him on the Committee would upset the private arrangement reached by many co-counsel in this case, penalize those who are part of that ordering, and, concomitantly, that permitting Mr. Audet to gain access to the Executive Committee outside the private ordering would create incentives in the future for co-counsel to not partake in private ordering.

14. This response by Lead Counsel is something of a non-response. The Court was already aware of what private ordering had created. It nonetheless supported further review by Lead Counsel. For Lead Counsel to now respond solely on the ground that the Executive Committee is properly staffed because that is what private ordering created merely re-states the situation which Lead Counsel pledged to reconsider. It does not demonstrate much re-consideration. For that reason, the Court's task remains one of deciding whether to yield to the private arrangement that has been created solely on the grounds that it is a private arrangement or to pursue the matter further and determine whether there is any reason not to add a well-qualified applicant to that leadership team who happens to be outside the private ordering that has occurred.

---

[5] Lead Counsel alludes to the fact that Mr. Audet's geographic location in San Francisco overlaps with the large presence of Lead Counsel Quinn Emanuel in California. Report at 7. This does not appear to be a strong argument, however, as the other members of the Executive Committee do not each bring geographic diversity to the task – two of the firms are from the midwest (Freed Kanner in Chicago; Heins Mills & Olson in Minneapolis), while the other three appear, from their websites, to be concentrated in the New York metropolitan area (Kaplan Fox in New York; Carella Byrne in New Jersey; and Gold Bennett in New York and San Francisco) – and Lead Counsel seems to mention this geographic fact only in passing.

7

## III.
## OVERSIGHT OF LEAD COUNSEL –
## NO DEFERENCE IN APPOINTMENT OF EXECUTIVE COMMITTEE

15. In complex multi-district litigation of this type, the many plaintiffs' counsel that have filed the underlying cases must be organized into what is essentially an ad hoc law firm for purposes of running this case. Lead Counsel will be the head of that ad hoc law firm.[6] Lead Counsel runs the lawsuit for the plaintiffs' side of the case, without general day-to-day oversight by the Court.[7] In so doing, Lead Counsel makes myriad day-to-day decisions on behalf of the class. Lead Counsel has special expertise in undertaking these chores – that is why they have been selected and approved. Moreover, Lead Counsel embodies the role of advocate in a way the judge does not. For these reasons, courts should, and do, defer to nearly all decisions make by Lead Counsel. Because the court has judicial oversight of Lead Counsel, in theory co-counsel or a class member could bring to the court's attention any decision made by Lead Counsel and ask the court to overrule Lead Counsel. For example, a court could be asked to instruct Lead Counsel to take deposition A before deposition B, or to utilize Expert C rather than Expert D. A court would be understandably reluctant

---

[6]The *Manual* describes Lead Counsel's role in these terms:

> Typically, they act for the group – either personally or by coordinating the efforts of others – in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for supports services, and seeing that schedules are met.

*Manual* at §10.221.

[7]For example, in this Court's order of March 11, 2008 appointing Lead Counsel, it incorporated by reference Lead Counsel's proposed order enumerating 14 distinct tasks, ranging from conducting discovery, to negotiating with defense counsel, to employing experts, to allocating fees. *See also Manual* §40.22 (sample order identifying responsibilities of lead counsel).

8

to involve itself in these day-to-day decisions of Lead Counsel and would rightly reject a request to do so out of hand.

16. Although the Court generally defers to Lead Counsel's running of the plaintiffs' lawsuit, certain decisions Lead Counsel makes trigger closer judicial scrutiny. Among these are:

* appointment of other committee members;
* settlement of the class's claims;
* petition for attorney's fees; and
* allocation of fees among co-counsel.

These decisions trigger closer judicial scrutiny for the simple reason that these decisions are those in which Lead Counsel is most likely to have conflicting obligations and hence the court must be particularly careful that such conflicts do not interfere with Lead Counsel's duties to the class. That Lead Counsel's settlement proposal and fee petition should be carefully scrutinized for this reason is obvious – the settlement risks selling out the class's interest in return for a fee and the fee petition itself is self-serving, even in the most straightforward circumstances. The fee allocation decision among class counsel has a similar problem at its core: once a fee petition has been approved, there is a lump sum of money available for class counsel and any monies distributed to those counsel by Lead Counsel diminish Lead Counsel's own reward.[8] It may be least immediately apparent that the appointment of Executive Committee members raises these conflict concerns. But of course, appointment to the Executive Committee places an attorney at the center of the case's decision-making. As such, that attorney is likely to get more work allocated to his or her firm, and hence more fees on the back-end of the case.

---

[8] *See In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3rd Cir. 2005) (Ambro, J., concurring) (stating that "counsel have inherent conflicts. They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?").

17. The conflicts that arise as a result of a private ordering arrangement for the creation of the Executive Committee could harm the class's interests. Two examples illuminate the point. First, an attorney may have agreed to not seek a leadership position in return for the promise of certain work being channeled in her direction. Thus, that attorney may, for example, be given the responsibility of taking a deposition. However, it is possible that a different lawyer, who did not support appointment of this particular leadership team, is geographically closer to the deponent and thus would be a less costly lawyer to dispatch for that job and/or is a better deposer and thus would be a more effective advocate to dispatch for that job. Second, the class may be composed of differently-situated clients, perhaps with interests that do not always align but are not so conflicted as to require sub-classing. All things being equal, it would be preferable to have a cross-section of such interests represented on the Executive Committee, making that committee representative of the class for which it litigates. But again, a lawyer who did not support appointment of this particular leadership team might not be asked to join the Executive Committee although her presence there would be in the class's interests because it would bring important diversity of representation to that Committee. For these types of reasons, a task force created by the U.S. Court of Appeals for the Third Circuit cautioned that:

> voluntary agreements among lawyers may create cartel-like groupings that favor some lawyers and disfavor others on the basis of factors that have little to do with ability or fees, and such agreements may also result in overstaffing and padding hours. In order to reach a "deal," lead counsel may have to "cut in" so many lawyers that the representation of the class becomes inefficient and the ultimate fee request becomes inflated.

THIRD CIRCUIT TASK FORCE REPORT ON SELECTION OF CLASS COUNSEL, 74 TEMP. L. REV. 689, 697 (2001).

18. Because appointment of an Executive Committee raises the potential of harming the class's interests, various legal authorities support the conclusion that the court must undertake this task with particular care. *First*, the *Manual* states that:

> the judge is advised to take an active part in the decision on the appointment of counsel. Deferring to proposals by counsel without independent examination, even those that seem to have the concurrence of a majority of those affected, invites problems down the road if designated counsel turn out to be unwilling or unable to discharge their responsibilities satisfactorily or if they incur excessive costs.

*Manual* at §10.224. While the *Manual* instructs the court to "encourage[]" the lawyers to make these arrangements among themselves, it nonetheless notes that often "the court will need to *institute procedures* under which one or more attorneys are selected and authorized to act . . ." *id.* at §10.22 (emphasis added), suggesting that the court "invite submissions and suggestions from all counsel and *conduct and independent review (usually a hearing is advisable)* to ensure that counsel appointed to leading roles are qualified and responsible, that they will fairly and adequately represent all the parties on their side, and that their charges will be reasonable." *Id.* (emphasis added). The *Manual* takes this position on the basis that "few decisions by the court in complex litigation are as difficult and sensitive as the appointment of designated counsel," noting that fees turn on these designations, that agreements may affect them, and that each counsel has his/her own clients' interests to safeguard. *Id.* at §10.224. *Second*, precisely because fee awards turn on committee assignments, judicial scrutiny is particularly appropriate. At the back end of the case, when fee awards are themselves the issue, it is axiomatic that courts will not simply defer to Lead Counsel's decision-making. Lead Counsel's fee petition on behalf of all counsel is, of course, closely scrutinized. Fed. R. Civ. P. 23(e); (h). But Lead Counsel's internal decision of allocation *among* class counsel is also subjected to careful judicial oversight. Thus, if class counsel complains

11

about Lead Counsel's allocation decision to a court, the court is instructed to not defer to Lead Counsel but to look closely at the division of fees Lead Counsel has proposed.[9]

19.  To state that the Court should not defer to Lead Counsel's selection of an Executive Committee does not, in and of itself, state what process the Court should use to scrutinize that decision. To date, the Court has entertained Lead Counsel's recommendations, heard arguments from counsel not selected to be on the Executive Committee, and encouraged Lead Counsel to further consider the rejected members' applications. Lead Counsel have now reported to the Court that they have decided to stick with their initial Executive Committee structure. It is my opinion that the Court should not affirm the rejection of Mr. Audet's application solely on the grounds of private ordering, but rather should continue to probe whether such grounds truly support exclusion of an otherwise-qualified candidate. My opinion is based on two sets of arguments, one legal, one factual.

20.  The legal argument evolves out of the *Manual*'s suggestions that the Court not simply defer to counsel, even when significant agreement is reached among many of them, in establishing leadership structures. As noted, the *Manual* encourages the Court to "take an active part" and cautions against "deferring to proposals by counsel without independent examination, even those that have the concurrence of a majority of those affected." *Manual* at §10.224.[10] The Manual

---

[9] *See In re High Sulfur Content Gasoline Prod. Liability Litig.*, 2008 WL 287347 at *4 (5th Cir. 2008) (stating that "the appointment of a committee does not relieve a district court of its responsibility *to closely scrutinize* the attorney's fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards") (emphasis added).

[10] Beyond eschewing deference, the *Manual* also sets forth a suggested process, stating that:

Although the court should move expeditiously and avoid unnecessary delay, an evidentiary hearing may be needed to bring all relevant facts to light or to allow counsel to state their case for appointment and answer questions from the court about their qualifications . . . Such a hearing is particularly appropriate when the court is unfamiliar with the attorneys seeking

specifically directs a Court to assess at least seven (7) distinct factors, including "whether there has been full disclosure of all and understandings among counsel;" and "whether designated counsel fairly represent the various interests in the litigation." *Id.*

21. I emphasize the last two factors because Mr. Audet's papers have raised concerns about the facts underlying the Executive Committee structure that warrant a close look, concerns that are not put to rest by Lead Counsel's submission. Mr. Audet argues that "the proposed Executive Committee appears to be an effort to 'reward' supporters to the exclusion of other, worthy candidates," and that "the Cohen Group's proposal fails to include the entire 'mosaic' of clients and their respective counsel from the entire process."[11] The "reward supporters" contention finds support in the various declarations submitted by co-counsel supporting Mr. Audet's exclusion.[12] The "non-representation" allegation in Mr. Audet's papers finds support in the fact that several *clients* are double-represented in leadership positions, as several attorneys appearing on one complaint each have positions there.[13] Without such "double-dipping," Mr. Audet points out, the leadership team

---

appointment.

*Id.* (emphasis added).

[11] *See* Complete Transportation Systems Submission at 2.

[12] For example, Mary Jane Fait states that, "We also agreed to step back from requesting an Executive Committee position *with the assurance of proposed Lead Counsel* that we would still be able to make a significant contribution to this case," Report, Ex. 1 at ¶3 (emphasis added), while Gerald J. Rodos declares that, "Co-lead counsel and the proposed Executive Committee members have assured us that our participation in the litigation is welcomed and sought *as is the participation of many other firms who have backed-off from seeking representation on the Executive Committee.*" Report, Ex. 2 at ¶6 (emphasis added). (This last clause makes it sound as though Lead Counsel welcomes the participation of firms who have "backed-off," implying that it does not welcome the participation of firms that have refused to go along.).

[13] *See* Complete Transportation Systems Submission at 6 (alleging that one of the underlying cases lists four plaintiffs firms on the papers, two of which seek leadership appointments; while

13

would necessarily embody a broader cross-section of clients.

22. The *Manual*'s standards and the facts developed to this point combine in a way that support close judicial oversight of the Executive Committee structure. Lead Counsel warns against upsetting its proposal by suggesting a doomsday scenario: namely, that if the Court does not defer to private ordering, firms will lose their incentive to work with one another as they will be "penalized" for agreeing to deals by courts that later place non-dealmakers in leadership positions. Three points undermine the force of this argument. First, some courts undertake appointment of an executive committee from scratch, without emphasizing deference to prior arrangements, a process that the *Manual* itself references in its model form.[14] Second, if private ordering is not fully deferred to in a situation such as this it might well lead to *more*, not less, private ordering in the future: perhaps firms *will work harder to ensure unanimity*, for with absolutely no dissent, a court can easily defer to private ordering. *Third*, even if private ordering is threatened by Mr. Audet's motion, the *Manual* is clear that the Court nonetheless has an obligation to ensure that "there has been full disclosure of all agreements and understandings among counsel." *Manual* at §10.224. The *Manual*'s insistence on transparency does not necessitate the conclusion that private ordering is bad, but simply that agreements and understandings must be aired so that the Court can ensure that they

---

another case lists three plaintiffs firms on the complaint, two of which seek leadership appointments; and concluding that "with just a limited number of clients, a limited number of firms will purport to represent the entire breadth of cases filed").

[14]*See Manual* §40.1 (Order Setting Initial Conference) at ¶6 (stating "The court intends to appoint plaintiffs' lead counsel and/or a plaintiffs' steering committee. . ."; ordering that "Applications for these positions must be filed with the clerk's office . . ."; and identifying selection criteria). For application of a procedure of this sort, see, e.g., *In re: Bextra and Celebrex Marketing Sales Practices and Products Liab. Litig.*, MDL No. 1699, Pretrial Order #1 at ¶16 (N.D. Cal., Nov. 8, 2005) (Charles R. Breyer, J.) (stating that "The court intends to appoint a Plaintiffs' Steering Committee" and ordering that applications for such positions be filed with the court).

are in the class's best interest. Because the class's interest is the ultimate touchstone, other courts have refused to give credence to the argument that court appointments outside of the private ordering arrangement would "penalize" those lawyers who had agreed to the original private ordering.[15]

\* \* \*

23.     In sum, the Court owes no special deference to Lead Counsel in selection of an Executive Committee; the *Manual* clearly places the authority for this decision with the Court itself. Mr. Audet is fully qualified to serve on the Executive Committee – no one argues otherwise – nor is there any contention that Mr. Audet's client's interests are already represented on the Executive Committee. The sole argument offered for his exclusion is private ordering. It is my opinion that

---

[15]For example, in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2006 WL 2038650 (E.D.N.Y., Feb. 24, 2006), the court was faced with two applications for lead counsel, one that emerged from private ordering among 34 of the 40 pending actions and another outside of that arrangement. In selecting the former, the court carefully stated that:

> my decision to chose one of the two competing proposals rather than to meld them together does not rely in any way on . . . the assertion that a number of law firms that are themselves qualified to lead the litigation for the plaintiffs have voluntarily given up a claim to participation in the lead counsel group in order to present a unified – and therefore more likely successful – leadership proposal. The conclusion I am asked to draw from that premise is that it would be unfair to make such altruistic law firms take a back seat to another firm that proposed itself as sole lead counsel rather than work cooperatively with others as they did. The fairness argument has some appeal, although I hasten to add that in saying so I do not mean to suggest that [the losing applicant] has acted inappropriately by striking out on its own. Appealing or not, however, *the fairness argument carries no weight in my analysis because my task in deciding these motions is to protect the interests of the plaintiffs, not their lawyers. A result that best serves the plaintiffs must trump any alternative that may in some sense be deemed fairer to some of the lawyers who would represent them.*

*Id.* at \*4 (emphasis added).

the Court should, as the *Manual* instructs, not blindly defer to private ordering, but thoroughly review it to ensure that the class's full interests are truly served by the continued exclusion of Mr. Audet from the Executive Committee.

    The foregoing is true and correct to the best of my knowledge, information, and belief.

_____
William B. Rubenstein

March 25, 2008
Cambridge, Massachusetts