# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION

This Document Relates to:

ALL CASES

Civil Docket No.1:07-mc-00489 PLF

MDL 1869

**INDIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED
AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Agway Liquidating Trust, Fayus Enterprises, and Maroon Incorporated, individually and on behalf of a class of all those similarly situated, bring this action for damages and injunctive relief under federal antitrust law and state antitrust and consumer protection law and alleges as follows:

## NATURE OF THE ACTION

1.      This is an antitrust class action charging four United States-based Class I railroads, Union Pacific Railroad Company, BNSF Railway Company, CSX Transportation, Inc., and Norfolk Southern Railway Company (collectively, "Defendants") with price fixing in violation of Section 1 of the Sherman Act as well as in violation of state antitrust laws and state consumer protection laws. Plaintiffs bring this action on behalf of themselves and an alleged class of indirect purchasers who purchased unregulated rail freight transportation services from Defendants from July 1, 2003 to the present (the "Class Period," which will also include the period from the date of this filing to the date of class notice) and who were assessed a rail fuel surcharge ("Rail Fuel Surcharge") for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2.      Defendants conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States through use of Rail Fuel Surcharges added to customers' bills.  A Rail Fuel Surcharge is a separately identified fee that is charged by Defendants, purportedly to compensate for increases in the cost of fuel, for the agreed-upon transportation.

3.      Defendants collectively control over 90 percent of the rail freight traffic in the United States.  According to an economic analysis on Railroad Fuel Surcharge practices

commissioned by the American Chemistry Council released in September 2007, Defendants overcharged rail shippers by more than $6.5 Billion between 2005 and the first quarter of 2007.

4.     In the early 2000s, the Defendants sought to increase their revenues by raising prices.  However, unlike in the past era of full regulation of the railroad industry, when the railroads could have applied to the Interstate Commerce Commission (the "ICC") for across-the-board rate increases, the railroads now no longer could do so as a result of deregulation that began with the Staggers Rail Act of 1980 in the early 1980s.  Given deregulation, the only practicable way the railroads now could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many purchasers of rail freight transportation services as possible.

5.     Defendants BNSF Railway Company, Union Pacific Railroad Company, CSX Transportation, Inc., and Norfolk Southern Railway Company – which together control about 90% of rail freight traffic in the United States – conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits.  But this plan faced a significant hurdle: as of 2003, the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the "AII" or "All Inclusive Index," published by the railroad trade organization known as the Association of American Railroads (the "AAR").  The AII (and a related index called the Rail Cost Adjustment Factor (the "RCAF") that was based on the AII) already permitted full recovery by the railroads of actual fuel cost increases, no matter how large.  By weighting different cost factors, the AII and related RCAF accounted accurately for the impact of particular cost increases (e.g., for fuel).  James R.

Young, the President of UP, acknowledged during an October 2004 earning call that the RCAF "looks at actual costs through the industry."

6.     To overcome this obstacle, Defendants devised and embarked on a scheme to remove fuel from the AII, so that a separate "fuel surcharge" could then be applied as a percentage against the total cost of the freight transportation.  This permitted these major railroads to achieve their desired, and mutually agreed, result:  an effective percentage rate increase that could be broadly applied to rail freight customers.

7.     Defendants executed their conspiracy through a number of collective actions as described below.

8.     In July 2003, the two major western railroads, Defendants BNSF Railway Company and the Union Pacific Railroad Company, both started charging the exact same fuel surcharge.  Up until this time, Rail Fuel Surcharges were only intermittently applied, and the Defendants had different Rail Fuel Surcharge rates, reflecting, among other things, that each Defendant had different fuel costs.  In July 2003, however, BNSF Railway Company and Union Pacific Railroad Company began to move in lockstep, each now basing their fuel surcharge on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index").  At this time, the HDF Index was at a higher rate than the West Texas Intermediate Crude Oil Index (the "WTI Index"), which Union Pacific previously had been utilizing.  Defendants BNSF Railway Company and Union Pacific Railroad Company have remained in lockstep, using the HDF Index, through the present.

9.     These actions by defendants BNSF Railway Company and Union Pacific Railroad Company, however, were not sufficient to permit widespread use of Rail Fuel Surcharges as a revenue-raising mechanism because most private contracts still had cost escalation provisions

that included fuel costs as a factor, meaning that a separate Rail Fuel Surcharge could not also readily be used.

10.     In late 2003, Defendants solved this problem through collective action. Defendants caused the AAR, a trade organization that is controlled and dominated by Defendants, to develop and publish a new index with fuel removed as an element of cost escalation.

11.     In contrast, the then-existing standard cost escalation indices – the AAR's All-Inclusive Index (the "AII"), and RCAF based on the AII – each accounted for a variety of cost factors, including fuel.  Furthermore, the RCAF and AII weighted these different factors so that each index would account accurately for the impact of particular cost increases (e.g., for fuel). Thus, prior to late 2003, any actual increase or decrease in fuel costs, no matter how large, could be captured in the RCAF and AII.  In other words, *there was no need to remove fuel from the existing indices in order to recover any fuel cost increases*.

12.     Pursuant to Defendants' agreement and collective action, the AAR announced in December 2003 announced that a new index, the All Inclusive Index Less Fuel ("AII-LF"), was being established.  This new index was unlike the RCAF and AII in that the new index excluded fuel.  Also unlike the RCAF, the new AII-LF was not subject to review by the Surface Transportation Board ("STB").  The AAR's official publication, entitled *AAR Railroad Cost Indexes* announced: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel.  This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, *with the exception of the exclusion of the fuel component*." (emphasis supplied).  This announcement, and the underlying removal of fuel from the AII and RCAF, were the *collective action* of the Defendants, which

dominate and control the AAR.  Moreover, the AAR could not have taken these steps without

collective action by the Defendants.  As an illustration, senior officer of Defendant BNSF

admitted in 2004 that BNSF Chairman, President and CEO Matthew K. Rose "led the charge on"

the AAR's adoption of the new index without a fuel cost component.

13.     Importantly, the AAR had never before established a cost escalation index

without a fuel cost component.  In a July 2007 interview, Defendant UP's James R. Young

("Young") acknowledged the new Rail Fuel Surcharges, as applied to rail freight transportation

services, were "really unique to the railroad industry.  Three, four years ago they were really

non-existent."

14.     Through Defendants' collective action, the AAR's implementation of this new

index in December 2003 provided Defendants the ability to apply, and Defendants, in fact, did

apply, Rail Fuel Surcharges more broadly than before, since fuel would no longer automatically

be covered by standard rate escalation clauses.

15.     Defendant UP's Young admitted, during an October 2004 earnings call, that UP

was now "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in

areas that historically would have used RCAF."  According to Young, by July 2007,

approximately "80 to 90 percent" of UP's business had "some kind of fuel surcharge mechanism

that gets passed on to the customer."

16.     Almost immediately after the AAR announcement, the two major eastern

railroads – Defendants CSX Transportation, Inc. and Norfolk Southern Railway, Inc., each of

which had different fuel costs – in early 2004 made the identical decision that they would now

use the same fuel surcharge rates and that these surcharges would be based on the WTI Index

(which, in early 2004, was at a higher rate than the HDF Index that the Western Railroads

simultaneously started to use in July 2003). As with the Western Railroads, the Eastern

Railroads previously had different fuel surcharges (reflecting, among other things, their different

fuel costs). This identical decision by the Eastern Railroads, coming on the heels of the

Defendants' collective action in late 2003 to remove fuel from the AII and RCAF, eliminates any

reasonable possibility that the Eastern Railroads decided independently to use the WTI Index in

early 2004.

17.     Like the Western Railroads, the Eastern Railroads remained in complete lockstep,

applying the exact same fuel surcharges, through at least June 2007.

18.     With the AII-LF in place, the Defendants were able to use the Rail Fuel

Surcharges as a revenue-generating, rather than cost-recovery, mechanism because the

Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total*

base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF

had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors,

when fuel was removed from the new AII-LF index, the Defendants applied the percentage

increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport.

Thus, if the percentage increase triggered by the applicable fuel index was, for example, 15%,

then by applying the fuel surcharge the Defendants would raise the entire cost of the freight

transport by 15% – even though fuel accounted for only a portion of the total rail transport cost

(which is what the AII and RCAF had been designed to reflect).

19.     This collective approach resulted in billions of dollars of additional profits for

Defendants.

20.     Defendants were able to maintain their conspiracy by uniformly computing the

surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common

trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel

Surcharges on their websites to facilitate coordination and the detection of any deviation from

collusive pricing.

21.     Defendants also took other collective action to enforce the conspiracy and make it

effective.  For example, they largely stopped entering into long-term contracts and entered

instead into contracts for periods of approximately 30 days, or with 30-day cancellation

provisions, thereby making it easier to implement the fuel surcharges, which were adjusted

monthly.  Defendants also limited the previously prevailing practice, in circumstances where

more than one railroad was involved in long-distance freight transport, of sending a customer a

single bill for the entire transport.  Instead, Defendants increasingly switched to having each

railroad on a multi-railroad trip send a separate bill (and thus could separately impose its own

fuel surcharge).  This facilitated each Defendant recouping its share of the supra-competitive

profits.  Such a switch to separate invoicing on multi-railroad trips could be accomplished only

through collective action of the Defendants.  Defendants also began refusing to negotiate

discounts on rail freight rates – even in circumstances where individual railroads had previously

been willing to do so.

22.     The collective actions of Defendants, including effectively removing fuel from

the AII and RCAF by creating the new AII-LF, and moving into lockstep on fuel surcharges,

cannot be explained as the result of routine market conduct to collect increasing fuel costs or

even to do so more efficiently.  The fuel cost component in the AII and RCAF was fully

effective for recovering *actual* fuel costs. Indeed, the AII had been designed to ensure that fuel

and other cost increases could be recovered, regardless of the size of the fuel cost increase.

Rather, by creating a new cost index without fuel (the AII-LF), and through their other collective

actions, Defendants devised and implemented a means to impose an across-the-board rate increase for rail freight transportation services.  Instead of competing on fuel prices given their differing fuel costs, Defendants collectively created the type of across-the-board rate increase that they had been able to ask the now-disbanded ICC to impose during the pre-1980 period of complete rate regulation and then lawful collective railroad pricing activities.

23.     In a January 2007, the STB, which has authority over rate-regulated traffic that is not within the class alleged here, found that the rail fuel surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel.  In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6; s*ee also id.* at 7 ("the term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled.").

24.     The STB further stated that "*[u]nder 49 U.S.C. § 10709, we have no authority to regulate rail rates and services that are governed by a contract.*"  *Id.* (emphasis supplied).

25.     Each of the Defendants has disclosed that it has received a state grand jury subpoena and/or state grand jury inquiry concerning the Rail Fuel Surcharges.  In an SEC Form

10-K dated February 22, 2008, Defendant CSX stated that "[i]n July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate investigations into similar matters." (CSX Corp., 10-K, February 22, 2008 at 99). In an SEC Form 10-K dated February 15, 2008, Defendant BNSF stated that "[t]he Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." (BNSF Railway Company, 10-K, February 15, 2008 at 10). In an SEC Form 10-K dated February 15, 2008, Defendant Norfolk Southern stated that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." (Norfolk Southern, 10-K, February 15, 2008 at K16). And in an SEC Form 10-K dated February 28, 2008, Defendant UP disclosed that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter." (Union Pacific Corp., 10-K, February 28, 2008 at 15).

26.     As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs and each Class member in their business and property. Plaintiffs and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

27.    Plaintiffs seek damages on behalf of themselves and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiffs do not seek, on behalf of themselves or the Class, damages or relief arising from Rail Fuel Surcharges imposed on rate-regulated freight transportation.

## PARTIES

### Plaintiffs

28.    Plaintiff Agway Liquidating Trust ("Agway") was established by order of the United States Bankruptcy Court for the Northern District of New York, dated April 28, 2004 confirming the Debtor's Second Amended Joint Plan of Liquidation, and is authorized to prosecute the claims set forth herein.  D. Clark Ogle was appointed the Trustee of the Liquidating Trust by order dated April 28, 2004, and has directed the Liquidating Trust to prosecute these claims through its counsel.  Agway was an agricultural cooperative formed in 1964 that is headquartered in DeWitt, New York.  On October 12, 2002, Agway and several of its wholly-owned subsidiaries filed for bankruptcy protection pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 1101 et seq.  On April 28, 2004, Agway's Plan was confirmed, and liquidation of the estate currently continues under the Trustee.  Agway has been in the business of shipping farm products to various customs clearance yards in Chicago, Illinois and Detroit, Michigan, transferring those products to storage facilities, and re-shipping product from these storage facilities to customers of Agway.  Agway purchased unregulated rail freight transport services indirectly from one or more of the Defendants during the Class Period, and paid Rail Fuel Surcharges indirectly to Defendants.

29.     Plaintiff Fayus Enterprises ("Fayus") is a corporation organized under the laws of the State of California, with its principal place of business at 1720 N. Market Boulevard, Suite 11, Sacramento, CA 95834.  During the Class Period, Fayus was a California-based wholesale and retail outlet for African and Caribbean food products servicing a diverse clientele ranging from small independent restaurants, institutional foodservice establishments as well as supermarkets and grocery stores.  Fayus purchased unregulated rail freight transport services indirectly from one or more of the Defendants during the Class Period, and paid Rail Fuel Surcharges indirectly to Defendants.

30.     Plaintiff Maroon Incorporated ("Maroon") is an Ohio corporation with its principal office at 1390 Jaycox Road, Avon, Ohio 44011, and a secondary office at 7750 Industrial Drive, Forest Park, Illinois 60130.  At all relevant times during the Class Period, Maroon has been in the business of shipping chemical products to various customs clearance yards in Chicago, Illinois and Detroit, Michigan, transferring those products to storage facilities, and re-shipping said products from said storage facilities to customers of Maroon.  Maroon also has distribution facilities located in Minneapolis, Minnesota; Cincinnati, Ohio; Grand Rapids, Michigan; Chicago, Illinois; Cleveland, Ohio; Detroit, Michigan; Louisville, Kentucky; Milwaukee, Wisconsin; and Newark, Delaware.  Maroon purchased unregulated rail freight transport services indirectly from one or more of the Defendants during the Class Period, and paid Rail Fuel Surcharges indirectly to Defendants.  By reason of the conspiracy alleged herein, and the imposition by Defendants of Rail Fuel Surcharges, Maroon paid prices for rail freight transportation services which were greater than the prices which would have been available in a competitive market without the conspiracy.  Maroon has therefore been injured in its business and property by reason of Defendants' violations of the federal and state antitrust laws, state

consumer protection and unfair competition laws, and state common law, as more fully set forth herein.

31.    Plaintiffs Agway, Fayus and Maroon (collectively, "Plaintiffs") purchased unregulated rail freight transportation indirectly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Plaintiffs in connection with that unregulated rail freight transportation.  The prices Plaintiffs paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Plaintiffs would have paid absent the conspiracy alleged herein.  Plaintiffs have therefore been injured in its business and property by reason of Defendants' antitrust and consumer protection violations. Plaintiffs assert its claims on behalf of themselves and all indirect purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

**Defendants**

32.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX has railway lines throughout the eastern United States.

33.    Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

34.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporations, the holding company formed by the September 22, *1995* merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

35.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including District of Columbia).

## JURISDICTION AND VENUE

36.     This Court's jurisdiction is founded on 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331 and 1337.

37.     This Court also has diversity jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1332(d)(2) and (6) because one or more members of the putative class defined herein are citizens of a State different from one or more defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.  This is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs.

38.     Venue is proper in this district pursuant to Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and 26) and 28 U.S.C. § 1391.  Defendants maintain offices, transact business, have agents and are found within this District; thousands of Class members are located

in this District; a substantial part of the events giving rise to the claims occurred in this District;

and Defendants regularly conduct business in interstate commerce that is carried out in part in

this District.

39.    Venue is also proper because this action has been transferred to this District by

the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28

U.S.C. § 1407(a).  Thus no other forum would be more convenient for the parties and witnesses

to litigate this case.

40.    This Court has jurisdiction of the person of each Defendant.  Each Defendant (a)

transacted business within this District; (b) directly or indirectly sold or delivered rail

transportation services in this District; (c) has substantial contacts with this District; and (d)

engaged in an illegal price-fixing conspiracy that had the intended effect of causing injury to

persons and entities found in or doing business in this District.

## EFFECTS ON INTERSTATE COMMERCE

41.    The AAR Policy and Economics Department reported that railroad total operating

revenue in the United States was over $52 billion in 2006.

42.    Defendants' activities within the Class Period were within the flow of interstate

and international commerce, as they engaged in rail freight shipments to customers and shippers

throughout the United States.  Each Defendant, as well as their co-conspirators, used

instrumentalities of interstate and/or foreign commerce to sell rail freight transportation services.

43.    Defendants accounted for more than 90 percent of all rail freight shipments within

the United States during the Class Period.   The activities of Defendants and their co-conspirators

have had a direct, substantial and foreseeable effect on interstate and international commerce.

44.    Defendants' conspiracy further affected commerce in each of the states identified herein because they, directly or through their agents, engaged in activities affecting each state. Defendants have purposely availed themselves of the laws of each of the states identified herein in connection with their activities relating to the provision of rail freight transportation services. Defendants provided rail freight transportation services in each of the states identified herein, thereby purposefully profiting from access to indirect purchasers in each state. Defendants also contracted to supply rail freight transportation services in each such state. As a result of the activities described herein, Defendants:

(a)    Caused tortious damage to the residents of the states identified herein;

(b)    Caused tortious damage in each of the states identified herein by acts or omissions committed outside each such state by regularly doing or soliciting business in each such state;

(c)    Engaged in persistent courses of conduct within each such state and/or derived substantial revenue from the provision of rail freight transportation services in each such state; and

(d)    Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state and/or deriving substantial revenue from the marketing and provision of rail freight transportation services (and related services) in each such state.

45.    The conspiracy described herein affected adversely every person, including consumers, in each of states identified in this Complaint who indirectly bought Defendants' rail

freight transportation services.  Defendants' conspiracy has lasted over four years and resulted in a collective adverse monetary effect on indirect purchasers in each state identified herein.

46.    Indirect prices of rail freight transportation services in each state can be manipulated by conspirators within that state, outside of it, or both.  Without enforcing the antitrust and/or consumer protection laws of each of the states identified herein, firms that break the law will go unpunished.  Defendants knew that commerce in each of the states identified herein would have to be adversely affected in order to implement their conspiracy.

### CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated, under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  The "Class" is defined as:

> All indirect purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, from July 1, 2003 to the present (the "Class Period").  Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant herein and all federal governmental entities.[1]

48.    The Class is so numerous, and its members so geographically dispersed, that joinder of all class members would be impracticable.   Plaintiffs currently lack precise information as to the size of the Class, but believe that the Class is comprised of thousands of members whose identities can readily be ascertained from the books and records of Defendants.

49.    Plaintiffs' claims are typical of those of the Class, all of whose members have been damaged because they paid supra-competitive prices for unregulated rail freight

---

[1]        Plaintiffs reserve the right to amend the class definition to add additional subclasses and additional plaintiffs at the time of the motion for class certification.

transportation services during the Class Period by reason of Defendants' anticompetitive activities in violation of federal and state law as set forth herein.

50.    Plaintiffs will fairly and adequately protect the interest of Class members. Plaintiffs have retained competent counsel with experience in class action and antitrust litigation.

51.    Common questions of law and fact exist as to all members of the Class, and these questions predominate over any questions affecting solely individual Class members.   Among the common questions are:

• whether Defendants conspired, agreed and/or combined with themselves or others for the purpose of and with the effect of raising, fixing or maintaining the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

• whether Defendants' activities violated the federal and/or state antitrust laws as set forth herein;

• whether Defendants' activities violated state unfair competition and/or consumer protection laws as set forth herein;

• whether Defendants' activities violated state common law as set forth herein;

• whether Defendants' activities caused injury to the business and property of Plaintiffs and the Class; and

• what is the proper measure of any damages to be awarded to Plaintiffs and the Class.

52.    A class action is superior to other available methods for the fair and efficient adjudication of this matter.  Prosecution of separate actions by individual Class members would unduly burden the courts and risk inconsistent adjudications of common questions of law and

fact. A class action would achieve economies of time and expense, uniform results, and procedural fairness to all parties.

53.    The amounts at stake for Class members are not great enough to merit individual actions against Defendants, although the aggregate amount is substantial. No Class member thus has a pragmatic interest in individually controlling the prosecution of this case. Plaintiffs foresee no difficulty in the management of this action as a class action.

## DEREGULATION OF THE RAILROAD INDUSTRY

54.    Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

55.    Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the ICC. During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

56.    Today, by contrast, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, the rates in which are not regulated. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the old ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

57.    Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian

entities). [2] The railroad industry is now highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for approximately $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

58.    Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

### THE DEFENDANTS INTRODUCE FUEL SURCHARGES

59.    By the early 2000s, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

60.    In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term is through the

---

[2]   A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) KCS; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

mechanism of a uniform surcharge to as many customers as possible.  Under the guise of rising

fuel prices, Defendants colluded to create and implement the Rail Fuel Surcharges as a means to

implement what effectively operate as across-the-board rate increases.

61.    Since passage of the Staggers Act in 1980, railroads had increasingly entered into

private transportation contracts with cost escalation provisions often tied to the AII and the

RCAF (which is based on the AII).  Both the RCAF and the AII were published by the AAR, and

both Indexes included fuel costs as a factor.  The AII and RCAF weighted a number of cost

factors – labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other

expenses –  so that the actual impact of particular cost increases (e.g., for fuel) would be

reflected in the index.  Any actual increase in fuel costs, no matter how large, would be captured

in the AII and RCAF.  The Indexes, and the weighted factors within them, were designed for this

purpose.

62.    Defendants, in 2003, seized upon fuel as the means to create the type of across the

board rate increase for which these railroads, in the era of deregulation, could no longer apply to

a regulatory body.  As alleged above, the Defendants embarked upon and implemented an agreed

plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit

separate "fuel surcharges" to be widely applied.  With fuel no longer weighted against other cost

factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a

given percentage – and that is precisely what these four railroads proceeded to do.

63.    By way of background, prior to 2003,  at least some of the Defendants imposed

so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges

were applied only in isolated instances, and (b) each of the Defendants had different fuel

surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad.   At that time, such

surcharges were the exception, with the AII and RCAF indexes widely used to capture fuel costs and other costs. All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system that would allow the widespread use of Rail Fuel Surcharges as a revenue enhancement mechanism.

64.     From at least the Spring of 2003 and continuing through the present, the top executives of each of the Defendants met regularly to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. Defendants' top executives also met and discussed their industry when they came to Washington, DC for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort, in Litchfield Park, Arizona.

65.     Within just months of the Spring 2003 NFTA meeting, and as early as July 2003, the two Western Railroads, BNSF and UP, suddenly began to coordinate their Rail Fuel Surcharges. Prior to this time, the UP fuel surcharge had been adjusted monthly based on the WTI Index. The BNSF fuel surcharge had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

66.     BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon,

BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

67.    The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

68.    The Western Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

69.    UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and

began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

70.     Even having coordinated their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

71.     In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

72.     Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AII-LF) – that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in

December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AII-LF specified the fourth quarter of 2002 as its base period.

73.    Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AII-LF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step itself was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

74.    Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges into contracts with coal shippers, John Lanigan ("Lanigan"), BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR (that is, the new AII-LF). Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an

index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future."
(emphasis added).

75.    Almost immediately after the announcement in December 2003 of the new AII-
LF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern
Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on
the WTI Index.  This move into lockstep was part and parcel of, and flowed from, the
aforementioned agreements implemented and executed by BNSF, UP, CSX and NS in late 2003.

76.    Specifically, the Eastern Railroads agreed to apply a fuel surcharge whenever the
monthly average WTI price exceeded $23 per barrel.  When that happened, the Eastern
Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23
per barrel.  So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge
percentage would be 2 percent.  The Rail Fuel Surcharge would be adjusted upward at 2 percent
for every $5 increase in the WTI average price.

77.    The Eastern Railroads also coordinated when they would change their fuel
surcharge – two calendar months after the WTI Index had adjusted, thereby adopting the same
fuel surcharge price timing used by the Western Railroads.  For example, if the WTI average
price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel
surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants
could apply exactly the same fuel surcharge percentage month after month.  The Eastern
Railroads published their monthly fuel surcharge percentages on their websites, making any
deviation from cartel pricing easily detectable.

78.    The Eastern Railroads' coordination is reflected in their simultaneous selection
and adoption of the same novel, arbitrary and complex combination of features for their Rail

Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

79.    Thus, following the conspiratorial publication of the AII-LF, Defendants BNSF, UP, CSX and NS seized the opportunity and began to apply Rail Fuel Surcharges as a separate item on shippers' bills. The Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues in an across the board manner.

80.    There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AII-LF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of getting fuel removed from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AII-LF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

81.    The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was

to begin assessing a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

82.    The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to institute independently its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

83.    As a result of the concerted action among BNSF, UP, CSX and NS, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels during the Class Period.

**IMPLEMENTATION OF THE SCHEME:  THE FUEL SURCHARGES IMPOSED BY THE DEFENDANTS**

84.    As detailed above, Defendants BNSF, UP, CSX and NS agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved.

This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

85.     With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

86.     The chart below shows that the Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Class Period began, but were identical starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|------|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |

| MONTH | BNSF | UP |
|--------|-------|-------|
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.5% | 15.5% |
| Aug-07 | 16.0% | 16.0% |
| Sep-07 | 16.5% | 16.5% |
| Oct-07 | 16.5% | 16.5% |

| MONTH | BNSF | UP |
|--------|-------|-------|
| Nov-07 | 17.5% | 17.5% |
| Dec-07 | 18.5% | 18.5% |
| Jan-08 | 21.5% | 21.5% |
| Feb-08 | 21.0% | 21.0% |
| Mar-08 | 21.0% | 21.0% |
| Apr-08 | 21.5% | 21.5% |
| May-08 | 26.5% | 26.5% |

87. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Class Period.

88. The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in March 2004:

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS |
|--------|-------|-------|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |

| MONTH | CSX | NS |
|-------|-----|-----|
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

89.     In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance

announcements of each Defendant's Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

90.    Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants.  For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives."  The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition."  ("Following the Competition," *Traffic World*, July 14, 2003).

91.    Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs.  According to an economic analysis on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council released in September 2007, Defendants overcharged rail shippers by more than $6.5 Billion between 2005 and the first quarter of 2007.

92.    BNSF's average cost for diesel fuel in Third Quarter ("3Q") 2003 was $0.846 per gallon and its average cost of diesel fuel for 3Q 2004 was $0.988 per gallon.  Thus, BNSF's cost of fuel increased 14.4% from 3Q 2003 to 2004.  In contrast, the surcharge charged by BNSF based on the HDF 3Q 2003 price was $1.46 per gallon and $1.83 per gallon in 3Q 2004, amounting to a 25.3% increase.  As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3Q 2003 to 2004.  Shippers of unregulated freight from the other Railroad Defendants similarly over-paid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.  Another reason why

Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

93.     There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than a three-year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action – first, to decouple fuel prices from the historical railroad cost indices and, second, to agree upon new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

94.     In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

## OTHER ELEMENTS OF THE CONSPIRACY

95.     At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants also took other steps in furtherance of the conspiracy.  They largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly.  Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

96.     This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

97.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.  Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts.  The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand.  This coordinated behavior was hardly routine market conduct.

98.     In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been

customary for the Defendants at least to entertain such negotiations.  Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."  By way of example, during the relevant period the Archer-Daniels-Midland Company ("ADM") approached individual Defendants to discuss hedging opportunities to allow ADM and the railroads certainty and a method for cost-containment.  The railroads, acting against their own best individual interests, refused to enter into hedging contracts with ADM.

99.     In addition, several national shipper organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier.  That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices.  The other Defendants refused to address the concerns of their customers.

100.     In furtherance of the conspiracy, Defendants also decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped).  Instead, where a shipment requires movement on more than one railroad, the Defendants moved increasingly to having  rates billed separately for each railroad, rather than as one quote for the entire shipment.  Defendants made this change, which could only result from their collective action, as part of their conspiracy for

36

two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

101.    Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates.  In fact, as can be seen from the table that follows, Defendants' market shares became more stable following the 2003 agreements than they had historically been.

| Railroad Market Share: Originated Tons and Carloads 1998 - 2006 [1] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** |
| **BNSF** | | | | | | | | | |
| Carloads Originated | 6,739,202 | 6,876,523 | 6,909,907 | 6,928,188 | 6,999,061 | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 31.9% | 28.4% | 26.5% | 27.0% | 26.9% | 28.4% | 29.2% | 30.2% | 31.2% |
| | | | | | | | | | |
| Tons Originated | 429,408,242 | 440,180,814 | 434,255,161 | 442,932,381 | 438,123,355 | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 31.1% | 28.5% | 26.8% | 27.2% | 26.9% | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | | | | | | |
| **CSXT** [2] | | | | | | | | | |
| Carloads Originated | 4,184,418 | 5,842,422 | 6,542,784 | 6,321,945 | 6,335,611 | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 19.8% | 24.1% | 25.1% | 24.6% | 24.4% | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | | | | | | |
| Tons Originated | 306,034,673 | 378,007,852 | 406,314,179 | 399,970,764 | 392,903,118 | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 22.1% | 24.5% | 25.1% | 24.5% | 24.1% | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | | | | | | |
| **NS** [2] | | | | | | | | | |
| Carloads Originated | 3,621,159 | 4,351,478 | 5,214,436 | 5,025,864 | 5,098,926 | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 17.1% | 18.0% | 20.0% | 19.6% | 19.6% | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | | | | | | |
| Tons Originated | 233,133,810 | 270,383,729 | 320,700,204 | 310,449,934 | 307,770,415 | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 16.9% | 17.5% | 19.8% | 19.0% | 18.9% | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | | | | | | |
| **UP** | | | | | | | | | |
| Carloads Originated | 6,570,086 | 7,137,090 | 7,384,503 | 7,393,306 | 7,580,376 | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 31.1% | 29.5% | 28.3% | 28.8% | 29.1% | 28.6% | 27.7% | 27.2% | 27.2% |
| | | | | | | | | | |
| Tons Originated | 413,615,706 | 453,417,016 | 459,428,341 | 476,759,328 | 489,305,241 | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 29.9% | 29.4% | 28.3% | 29.2% | 30.1% | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | | | | | | |
| **Total** | | | | | | | | | |
| Carloads Originated | 21,114,865 | 24,207,513 | 26,051,630 | 25,669,303 | 26,013,974 | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,382,192,431 | 1,541,989,411 | 1,620,697,885 | 1,630,112,407 | 1,628,102,129 | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | | | | | | |
| 1 AAR Railroad Facts and Analysis of Class I Railroads | | | | | | | | | |
| 2 Data for 1998 and 1999 does not include all of the acquisition Conrail traffic | | | | | | | | | |

## ADDITIONAL EVIDENCE OF ANTICOMPETITIVE CONDUCT

102.    Apart from this direct evidence of price fixing, there is further support that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing conspiracy feasible:

a.     Defendants had a strong collective motive to enter into a price fixing conspiracy because conditions existed in the railroad industry that were conducive to collusion.

b.     The railroad industry is highly concentrated.  Defendants are the only five remaining domestic Class I railroads following decades of mergers and consolidation.  Defendants account for well over 90 percent of the nation's rail traffic, and there is no fringe or niche market of smaller carriers. There are also high fixed costs in the industry.  Such high concentration and fixed costs facilitate a price fixing cartel.

c.     There are significant barriers to entry into the railroad industry.  To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities.  These take decades to develop, and require onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers.  Entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

d.     Rail Fuel Surcharges, when computed as a percentage of revenue, are highly

standardized and fungible. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could monitor the conspiracy without the necessity of frequent communications. It is well recognized that markets having uniform and homogeneous products or services, such as rail freight transportation services, are susceptible to price fixing.

e.    The railroad industry has a long record of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." The Rail Fuel Surcharge program engaged in by the Defendants is strikingly similar to those collective rate-making practices of the past.

f.    The CEOs of Defendants are all board members of the AAR, which facilitated exchange of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies). The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

### THE STB DECISION

103.    On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing

Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "*misleading and ultimately unreasonable practice*," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied.  *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007) (emphasis supplied).

104.    The STB further stated that "the term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied.  If it is used instead as a broader revenue enhancement measure, it is *mislabeled*."  *Id.* (emphasis supplied).

105.    The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint).  The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

106.    Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## DEFENDANTS' SUPRACOMPETITIVE PROFITS

107.    According to an economic analysis on railroad fuel surcharge practices commissioned by the American Chemistry Council released in September 2007, Defendants overcharged rail shippers by more than $6.5 Billion between 2005 and the first quarter of 2007.  The study's findings were based upon regulatory findings and other estimates from Defendants.

108.    According to the article "Rail Fuel Surcharges – Fact Versus Fiction" in the trade press report *Rail Business* by Argus Media Inc. (Volume 14, 15) dated April 14, 2008, "[*t*]*he change in railroads overall operating expenses (including fuel) do not justify the large fuel surcharges railroads are applying to their movements.*"  The article names several factors that

have led to the circumstances in which railroads' fuel surcharges are greater than the change in total operating expense.

(a)     Companies have established escalation methods, including fuel surcharges, to assure that they do not under-recover their costs of fuel as the price of oil has increased substantially. "[A] company will therefore frequently establish a margin of error in an escalation method that will ensure it is fully protected from cost increases. However, what is a small dollar margin of error…becomes a very large dollar margin of error as oil prices increase…"

(b)     "[A]s railroads implemented practices to better manage their cost of fuel internally, they did not reflect these fuel cost improvements in their external fuel surcharge programs."  In fact, "[N]one of the four major US railroads revised their surcharge programs to account for the actions management took to control the cost of fuel. CN was the only railroad that continued to revise its fuel surcharge program and each time the program changed CN lowered its fuel surcharge to more closely reflect the change in its cost of fuel."

(c)     "[T]he STB did not hold a hearing on fuel surcharges until May 2006. This was more than four years after the railroads initiated their fuel surcharge programs." However, "[T]he time to make sure a program like fuel surcharges is working properly is before the dollars generated by the program had a big impact on the railroads' financial statements."

(d)     Finally, "[W]hen the STB issued the results of its findings from the fuel surcharge hearing it did not require railroads to provide any retroactive reporting on fuel expenses and fuel surcharge revenue."

109.    Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

110.    Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to the present), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

111.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

(a)    The Rail Fuel Surcharges charged to Plaintiffs and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

(b)    Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

(c)    competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

**ANTITRUST INJURY TO INDIRECT PURCHASER PLAINTIFFS AND CLASS**

112.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

(a)    The Rail Fuel Surcharges charged to Plaintiffs and the Class for unregulated rail freight transportation have been fixed, raised, maintained and/or stabilized at artificially high and supra-competitive levels;

(b)    Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation;

(c)    Plaintiffs and the Class have been required to pay more for Rail Fuel Surcharges than they would have had to pay in a competitive marketplace absent Defendants' price-fixing conspiracy; and

(d)    Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

113.    During the Class Period, Defendants' Rail Fuel Surcharge conspiracy as described herein directly and proximately caused Plaintiffs and the Class to pay supra-competitive prices

for Rail Fuel Surcharges that they would not have paid absent such violations. As a result, Plaintiffs and the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

114.    The entire supra-competitive overcharge for Rail Fuel Surcharges at issue was passed on to Plaintiffs and the Class.

115.    Two antitrust scholars – Professor Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

## COUNT I

### (Injunctive Relief for Violation of § 1 of the Sherman Act)

116.    Plaintiffs repeat and re-allege the allegations set forth above as though fully set forth herein.

117.    Defendants entered into and effectuated a contract, combination or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act.

118.    Defendants' contract, combination or conspiracy resulted in an agreement and/or concerted action between and among Defendants and their co-conspirators pursuant to which Defendants fixed, maintained and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts as well as through other means exempt from regulation.

119.    The contract, combination or conspiracy has had the following effects;

- the Rail Fuel Surcharges assessed to Plaintiffs and the Class for unregulated rail freight transportation have been fixed at supra-competitive levels;

- Plaintiffs and the Class have been deprived of the benefits of free competition in the market for unregulated rail freight transportation services; and

- competition in the establishing the prices paid for unregulated rail freight transportation in the United States have been unlawfully restrained, suppressed and eliminated.

120.    Plaintiffs and the Class have suffered injury, and will continue to suffer injury in their business or property, proximately caused by Defendants' unlawful conduct, in that they have paid supra-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

121.    Plaintiffs and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### (Violation of State Antitrust Laws)

122.    Plaintiffs repeat and re-allege the allegations set forth above as though fully set forth herein.

123.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401 *et seq.*

124.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§ 16700 *et seq.* and California Bus. & Prof. Code §§ 17200 *et seq.*

125.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501 *et seq.*

126.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 *et seq.*

127.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*

128.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1 101 *et seq.*

129.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.773 *et seq.*

130.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.52 *et seq.*

131.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

132.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

133.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

134.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

135.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq.*

136. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08. 1-01 *et seq*.

137. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. Ch. 37-1 (including SDCL § 37-1-33).

138. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq*.

139. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Statutes, Title 9 §§ 2453, *et seq*.

140. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1 *et seq*.

141. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01 *et seq*.

142. Class members in each of the states listed above paid supra-competitive, artificially inflated prices for rail freight services.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class in each of the identified states have been injured in their business and property in that they paid more for rail freight services than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## COUNT III

### (Violation of State Consumer Protection and Unfair Competition Laws)

143. Plaintiffs repeat and re-allege the allegations set forth above as though fully set forth herein.

144.    Defendants' conduct described herein constitutes unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

145.    Defendants have engaged in unconscionable, unfair or deceptive acts of practices in violation of Arkansas Code § 4-88-101 *et seq.*

146.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Bus. & Prof. Code § 17200 *et seq.*

147.    Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of District of Columbia Code § 28-390 1 *et seq.*

148.    Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*

149.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*

150.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kansas Stat. § 50-623 *et seq.*

151.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices with respect to rail freight services that were indirectly purchased primarily for personal, family, or household purposes in violation of 5 Maine Rev. Stat. § 207 *et seq.*

152.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Rev. Stat. § 59-1601 *et seq.*

153.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Rev. Stat. § 358-A:1, *et seq.*

154.    Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq*.

155.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen. Bus. Law § 349 *et seq*; and New York common law against restraints of trade.

156.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1, *et seq*.

157.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Rev. Stat. § 646.605 *et seq*.

158.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices with respect to rail freight services that were indirectly purchased primarily for personal, family, or household purposes in violation of Rhode Island Gen. Laws § 6-13.1-1 *et seq*.

159.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451 *et seq*.

160.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101 *et seq*.

161.    Class members in each of the states listed above paid supra-competitive, artificially inflated prices for rail freight transportation services.  Defendants' mislabeled the Rail Fuel Surcharge and misled Plaintiffs and the Class as the Rail Fuel Surcharge is a revenue enhancement measure instead of a mechanism to recover fuel costs.  As a direct and proximate result of Defendants' unlawful, unfair, unconscionable, deceptive and misleading conduct, Plaintiffs and the Class members in the identified states have been injured in their business and

property in that they paid more for rail freight services than they otherwise would have paid in the absence of Defendants' flagrant, willful, unlawful, unfair, unconscionable, deceptive and misleading conduct.

## COUNT IV

### (Unjust Enrichment and Disgorgement of Profits)

162.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

163.     Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits enjoyed by Defendants as a direct result of such overpayments in violation of the federal common law as well as common and statutory laws of the following States:  Arizona, Arkansas, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin.  Plaintiffs' detriment and Defendants' enrichment were related to and flowed from the conduct challenged in this Complaint.

164.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

165.     Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     That the Court determine that this action may be maintained as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

(B)     That the unlawful contract, combination and conspiracy alleged herein  be
        adjudged and decreed to be:

       (1)  An unreasonable restraint of trade in violation of Section 1 of the Sherman
        Act as alleged in Count One herein;

       (2)  An unlawful combination, trust, agreement, understanding, and/or concert of
        action in violation of the state antitrust laws identified in Count Two herein;

       (3)  Violations of the state consumer protection and unfair competition laws
        identified in Count Three herein; and

       (4)  Acts of unjust enrichment as set forth in Count Four herein.

(C)     That Plaintiffs and the Class recover compensatory damages, as provided by law,
        determined to have been sustained by each of them, and that judgment be entered
        against Defendants on behalf of Plaintiffs and each and every member of the
        Class;

(D)     That Defendants, and each of Defendants' respective officers, directors, agents
        and employees, and all other persons acting on behalf of or in concert with them,
        be permanently enjoined and restrained from, directly or indirectly, continuing or
        maintaining the combination, conspiracy or agreement alleged herein;

(E)     That Plaintiffs and members of the Class be awarded restitution, including
        disgorgement of profits obtained by Defendants as a result of their acts of unfair
        competition, deceptive practices and unjust enrichment;

(F)     That Plaintiffs and the Class recover treble damages, as provided by law;

(G)     That Plaintiffs and the Class recover their costs of the suit, including attorneys'
        fees, as provided by law; and

(H)     For such other and further relief as the Court may deem just and proper.

Dated: April 15, 2008

**LOVELL STEWART HALEBIAN LLP**

Christopher Lovell
Gary Jacobson
Imtiaz A. Siddiqui
500 Fifth Avenue
New York, NY 10110
T: (212) 609-1900
F: (212) 719-4775

**THE MASON LAW FIRM, LLP**
Gary E. Mason
Donna F. Solen
1225 19th Street NW, Suite 500
Washington, DC 20036
T: (202) 429-2290
F: (202) 429-2294

**STAMELL & SCHAGER, LLP**
Jared Stamell
John C. Crow
One Liberty Plaza, 35th Floor
New York, NY 10006
T: (212) 566-4047
F: (212) 566-4061

*Interim Co-Lead Indirect*
*Purchaser Plaintiffs Class Counsel*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION

Civil Docket No.1:07-mc-00489 PLF

This Document Relates to:

MDL 1869

ALL INDIRECT PURCHASER ACTIONS

## CERTIFICATE OF SERVICE

I, Travis Carter, pursuant to 28 U.S.C. 1746, declare,

I am over the age of eighteen (18) years, not a party to this action and reside in Stamford, CT.

On April 15, 2008, I served the Indirect Purchaser Plaintiff's Consolidated Amended Complaint to the following counsel of record:

**Gary A. Winters**
MAYER BROWN LLP
1909 K Street, NW
Suite 1200
Washington, DC 20006

**Kent Alan Gardiner**
CROWELL & MORING, L.L.P.
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

**John Murray Nannes**
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, NW
Washington, DC 20005-2111

**Tara L. Reinhart**
MORGAN, LEWIS & BOCKIUS, L.L.P.
1111 Pennsylvania Avenue, NW

Washington, DC 20004-2541

**Alan Mitchell Wiseman**
HOWREY, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004 -2420

**Tyrone R. Childress**
HOWREY LLP
550 South Hope Street
Suite 1100
Los Angeles, CA 90071

via first class mail, by inserting a copy in a properly addressed, postage paid envelope and placing in a depository under the care and control of the United States Post Office. I declare under penalty of perjury that the foregoing is true and correct.

Executed April 15, 2008, New York, New York.

2