## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

This document relates to:

ALL CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER

Plaintiffs respectfully submit this memorandum opposing the motion of defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railroad Company ("UP") for a protective order staying discovery during the pendency of defendants' forthcoming motion to dismiss.   For the reasons set forth below, defendants' motion should be denied.

## I.      INTRODUCTION

Plaintiffs have served defendants with two modest, narrowly-tailored document requests, seeking production of documents that the defendants have already compiled and produced to the New Jersey Office of the Attorney General and the Surface Transportation Board ("STB"). Plaintiffs seek this limited set of documents at this time to begin the process of organizing, reviewing, and analyzing relevant evidence in order to identify key witnesses and sources of information.  Defendants' moving papers suggest that the requested documents could fit on a single CD – confirming that producing the requested documents would impose no substantial burden.  *See* Defendants' Motion for Protective Order and Memorandum of Law in Support (Docket No. 102) (hereafter, "Defs.' Mem.") at 3.  Defendants nevertheless take the position that

they should be categorically relieved of any and all discovery obligations simply because they intend to file a motion to dismiss.

District courts have wide discretion over pretrial discovery matters, including over when discovery will commence. *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1382 (D.C. Cir. 1984); *Childers v. Slater*, 197 F.R.D. 185, 187 (D.D.C. 2000). In exercising discretion to determine the appropriateness of a proposed stay pending resolution of a motion to dismiss, courts weigh (1) the strength of the dispositive motion forming the basis for the stay request, (2) the burden of responding to the contemplated discovery, and (3) the prejudice a stay would cause to the party seeking to commence discovery. *OMG Fidelity, Inc. v. Sirius Technologies, Inc*., 239 F.R.D. 300, 304 (N.D.N.Y. 2006).

Defendants largely disregard the balancing of these factors and mistakenly contend that *Twombly v. Bell Atlantic Corp*, 127 S. Ct. 1955 (2007), a case addressing the sufficiency of antitrust pleadings, supports their position. However, nowhere in *Twombly* did the Supreme Court state that discovery should be stayed pending a motion to dismiss in antitrust cases, nor have lower courts read *Twombly* as requiring any such blanket stay of discovery. *See, e.g., In re Static Random Access (SRAM) Antitrust Litig*., No. 07-CV-01819, 2008 WL 426522, at *2 (N.D. Cal. Feb. 14, 2008) (ordering defendants to produce documents produced to Department of Justice in grand jury investigation notwithstanding pendency of motion to dismiss); *In re Flash Memory Antitrust Litig*., No. 07-0086, 2008 WL 62278, at *3 (N.D. Cal. Jan. 4, 2008); *In re NetFlix Antitrust Litig*., 506 F. Supp.2d 308, 321 (N.D. Cal. 2007) (permitting "narrowly-

tailored" discovery to go forward, notwithstanding *grant* of motion to dismiss under *Twombly* with leave to amend).[1]

Defendants' motion should be denied because: (1) defendants have not, and cannot, demonstrate that they are likely to succeed on their prospective motion to dismiss; (2) plaintiffs' discovery requests are narrowly tailored and would not impose any substantial burden on defendants; and (3) plaintiffs would be prejudiced by continuing delay in the commencement of any discovery. Plaintiffs thus respectfully submit that defendants' motion for a protective order should be denied.

## II. BACKGROUND

In the past era of full regulation of the railroad industry, the railroads were able to apply to the Interstate Commerce Commission (the "ICC") for across-the-board rate increases. Consolidated Amended Class Action Complaint, Docket No. 91-2 ("Complaint" or "Compl.") ¶¶ 3, 49. However, in landmark legislation ending decades of control over virtually every aspect of the railroads' economic operations, Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980, and in so doing ended the railroads' ability to effect across-the-board rate increases in this manner. *Id.* ¶¶ 3, 48, 49. Today 80 percent or more of all rail shipments are exempt from rate regulation, including those moving under private transportation contracts. *Id.* ¶¶ 49, 50. For this rate-unregulated traffic, the railroads cannot turn to an agency – like the ICC, or its successor, the STB – to obtain across-the-board increases in freight rates. *Id.*

---

[1]    In their briefing, Defendants continue to press the argument they made at the March 7, 2008 status conference that there is a "standard governing" a Court's discretion, which prevents *any* discovery while a motion to dismiss is anticipated or pending in an antitrust case. *See* Defs. Mem. at 15; March 7, 2008, Transcript ("Tr."), attached hereto as Exhibit 1, at 48:8-19. The Court questioned the existence of such a "standard" at the status conference. *See* Tr. at 48:20-49:7). As the aforementioned cases illustrate, there is no such governing "standard" preventing discovery before resolution of a motion to dismiss antitrust claims.

¶ 50, 54.  In this environment, Defendants concocted a scheme to implement coordinated price hikes themselves by utilizing a new uniform fuel surcharge.  *Id*. ¶¶ 14, 54.

Prior to July 2003, defendants had applied fuel surcharges only intermittently, and, to the extent railroads imposed them at all, they had differing fuel surcharge rates.  *Id*. ¶ 7.  In July 2003, however, the two major western railroads – defendants BNSF and UP – agreed to charge the same rates to their customers for fuel surcharges that would be added to customers' freight transport invoices.  *Id*. ¶¶ 7, 58-63.  Although BNSF and UP established an identical program, their ability to apply the stand-alone fuel surcharges was severely constrained by the fact that the majority of rail freight shipping contracts at the time included rate escalation provisions that already covered fuel cost increases.  *Id*. ¶¶ 8, 64.  Specifically, these rate escalation provisions provided for rate increases in accordance with a particular index, the "AII" or "All Inclusive Index," published by the Association of American Railroads (the "AAR"), or in accordance with a related index, based on the AII, called the "RCAF."  *Id*. ¶¶ 4, 8.  The AII and related RCAF permitted full recovery by the railroads of actual fuel cost increases, no matter how large.  *Id*. ¶ 4.  By weighting a number of different cost factors, including fuel, the AII and related RCAF would account for the actual cost impact of each cost factor.  *Id*.

In other words, because most rail freight shipment agreements had cost escalation provisions that already covered changes in fuel costs, there was no practical way the defendants could broadly apply a separate fuel surcharge.  To overcome this obstacle, defendants conspired to use the AAR to publish a new cost-escalation index with fuel removed, so that a separate "fuel surcharge" could be broadly applied to their customers' rates.  *Id.* ¶ 5.  Defendants, whose CEOs are all board members of the AAR, control the AAR.  *Id*. ¶ 8.  Through meetings and discussions within the AAR board of directors during fall of 2003 (including on October 2-3 and

December 11-12), defendants conspired to have the AAR develop and publish a new cost escalation index with fuel removed – so that fuel surcharges could then be separately applied, and broadly applied, by all of the defendants.  *Id.* ¶¶ 9, 65.  In December 2003, the AAR announced the establishment of the new cost escalation index, the All Inclusive Index Less Fuel ("AIILF").  *Id.* ¶¶ 9, 66.  Defendants' collective action leading to the announcement of the new index in December 2003 allowed them to apply rail fuel surcharges broadly to their customers, because fuel would no longer be covered by standard rate escalation clauses that weighted multiple factors including fuel.  *Id.* ¶ 11.  Given that the existing cost-escalation indexes already permitted full recovery of any fuel cost increases, the defendants' motive for this conspiracy was to use fuel surcharges as a means to boost revenues.

Almost immediately following the agreement to establish the new AIILF, the eastern railroad defendants – CSX and NS – which  previously had different fuel surcharges, announced that they would impose identical fuel surcharges.  *Id.* ¶ 12.  Thereafter, CSX and NS charged the exact same fuel surcharges, using the same index and same methodology, through at least mid-2007.  *Id.* ¶¶ 12, 69-73.  As planned in the conspiracy, the defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport.  *Id.* ¶ 13.  For example, if the percentage increase triggered by the applicable fuel index was 15%, then by applying the fuel surcharge the defendants would raise the entire cost of the freight transport by 15% – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect).  *Id.*

There was no legitimate business justification or natural explanation for the collective action of the defendants to cause the AAR to adopt and publish the AIILF.  *Id.* ¶ 74.  The only purpose in taking these collective actions was to assess an across-the-board, stand-alone fuel

surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment).  *Id*. ¶ 75.

Defendants acted in concert to set fuel surcharge prices, demand them from shippers and

customers, and ensure collective enforcement of the program.  *Id*.[2]

Defendants' fuel surcharge conspiracy yielded staggering profits, even as fuel costs

soared.  According to an independent study, the difference between defendants' rail fuel

surcharge revenue (as publicly reported or estimated) and defendants' publicly reported actual

fuel costs during the period from 2003 through the first quarter of 2007 amounted to over $6

billion.  *Id*. ¶¶ 17, 85.

In a ruling in early 2007, the STB found that the defendants' fuel surcharges, as applied

to rate-regulated freight traffic, were "unreasonable," because the fuel surcharges acted to

increase revenue and had no relation to actual fuel costs.  *See Surface Transportation Board*

*Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, Jan. 26, 2007).  In making this

determination, the STB addressed only rate-regulated freight, expressly stating that the STB's

jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from

rate regulation.  *Id*. at 5; Compl. ¶¶ 16, 97.  Defendants, however, applied the same unreasonable

fuel surcharge practices addressed by the STB to the private rail freight transportation contracts,

and other unregulated freight transport, that are the subject of this litigation.

Plaintiffs filed suit against defendants on May 14, 2007, asserting that, with respect to rail

freight moving under rates set by private contract or through other means exempt from rate

---

[2]    Defendants caricature plaintiffs' Complaint by claiming that it merely alleges "parallel
conduct supplemented with generic allegations of 'agreement.'"  Defs. Mem. at 5.  As the above
summary of the Complaint's detailed and specific allegations of conspiracy indicates, this is
demonstrably false.  Defendants also suggest there is something inconsistent about the allegation
that the defendants conspired to create the new index without fuel "*after* the railroads already
had announced purportedly parallel fuel surcharges."  Defs. Mem. at 6 n.4.  However, as
explained in the Complaint and above, the defendants conspired to create and publish this new
index in order to ensure the fulfillment of their conspiratorial objectives.

regulation under federal law, *i.e.*, rate-unregulated freight, defendants had conspired to fix prices through the use of rail fuel surcharges in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* Compl. ¶ 1. On November 6, 2007, the Judicial Panel on Multidistrict Litigation entered an order consolidating the pending fuel surcharge cases for pretrial purposes and transferring them to this Court.

Defendants are also the subject of at least one government investigation of their fuel surcharge practices. Every defendant has received a state grand jury subpoena or state grand jury inquiry concerning rail fuel surcharges.[3] Compl. ¶ 18. Defendant CSX, for example, has disclosed that it received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to fuel surcharges in July 2007, noting that it is "possible that additional federal or state agencies could initiate investigations into similar matters." CSX Corp., 10-K, Feb. 22, 2008 at 99; Compl. ¶ 18 (quoting same). The other defendants' disclosures are similar. *See id.* At a minimum, according to their SEC disclosures, NS is "cooperating" in the investigation, and UP has met with investigators. *See id.*

Shortly after the Court held an initial status conference on March 7, 2008, plaintiffs served the defendants with modest, narrowly-tailored document requests seeking just two sets of documents: documents that defendants produced to (1) the New Jersey Attorney General in connection with the grand jury investigation of rail fuel surcharges, or to any other state or federal law enforcement agency in connection with an investigation or inquiry related to fuel

---

[3]     Defendants state that it is "ironic" for plaintiffs to seek documents relating to a grand jury investigation that plaintiffs may have "instigated." *See* Defs. Mem. at 4, n.2. There is, however, nothing ironic, much less improper, about plaintiffs seeking a copy of relevant documents defendants have already collected, assembled, and produced to government authorities. While plaintiffs appreciate the suggestion that the complaints here may have triggered the New Jersey grand jury investigation, defendants offer no substantiation whatsoever for their suggestion that the New Jersey Attorney General's office did not act independently in launching its investigation.

surcharges, and (2) the STB between May 1, 2003 and May 1, 2006 concerning rail fuel surcharges.  *See* Direct Purchaser Plaintiffs' First Request for Production to Defendant BNSF Railway Company, Ex. 1 to Defs.' Motion.  Plaintiffs chose to request these two sets of documents because they are clearly relevant to the case and have been already collected by the defendants.

As plaintiffs made clear at the March 7 status conference, those document requests were designed to advance the litigation, initiated in May 2007, by commencing focused discovery. *See* Ex. 1 at 36:20-37:19.  As plaintiffs also made clear at the conference, the purpose of the request was unrelated to obtaining information for purposes of an amended complaint (*id*. at 37:16-19; 34:3-10).  Plaintiffs filed their Consolidated Amended Class Action Complaint on April 15, 2007.  On April 30, 2008, defendants filed their motion for a protective order seeking a blanket stay of discovery.

## III.   ARGUMENT

### A.   Stays of Discovery Pending a Motion to Dismiss are Discretionary and Should Only be Granted Upon a Showing of Good Cause.

Consistent with Rule 1 of the Federal Rules of Civil Procedure, which mandates the "just, speedy, and inexpensive determination of every action," the party moving for a stay of discovery bears the burden of showing both "good cause" for the stay under Federal Rule of Civil Procedure 26(c) and of "establishing its need." Fed. R. Civ. P. 26(c); *see Beecham v. Socialist People's Libyan Arab Jamahiriya*, 245 F.R.D. 1, 3 (D.D.C. 2007) (quoting *Clinton v. Jones*, 520 U.S. 681, 708 (1997)); *see also* 8 Wright & Miller, *Federal Practice & Procedure* § 2035 (2d ed. 1994) ("The courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements, in order to establish good cause."). Motions to stay "are not favored because when discovery is delayed or prolonged it can create

case management problems which impede the court's responsibility to expedite discovery and cause unnecessary litigation expenses and problems." *Coca-Cola Bottling Co. v. Grol*, 1993 U.S. Dist. LEXIS 3734, at *6 (E.D. Pa. Mar. 3, 1993).

"[I]t is well settled that the mere filing of a dispositive motion does not constitute 'good cause' for the issuance of a discovery stay." *Gerald Chamales Corp. v. Oki Data Americas, Inc.*, 247 F.R.D. 453, 454 (D.N.J. 2007); *see also Turner Broadcasting System, Inc. v. Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev. 1997) ("[A] pending Motion to Dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery.") (citation omitted). As one court has explained:

> Had the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) would stay discovery, the Rules would contain a provision to that effect. In fact, such a notion is directly at odds with the need for expeditious resolution of litigation…. [A] stay of the type requested by defendants, where a party asserts that dismissal is likely, would require the court to make a preliminary finding of the likelihood of success on the motion to dismiss. This would circumvent the procedures for resolution of such a motion. Although it is conceivable that a stay might be appropriate where the complaint was utterly frivolous, or filed merely in order to conduct a "fishing expedition" or for settlement value, this is not such a case.

*Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990) (internal citation omitted); *see also In re Currency Conversion Fee Antitrust Litig.*, 2002 U.S. Dist. LEXIS 974, at *4-5 (S.D.N.Y. Jan. 22, 2002) (explaining that the "imposition of a stay is not appropriate simply on the basis that a motion to dismiss has been filed, as the Federal Rules make no such provision" and requiring defendants to respond to document requests and interrogatories while motion to dismiss was pending).[4]

---

[4]       The outcome in *Chavous v. District of Columbia Financial Responsibility & Management Assistance Auth.*, 201 F.R.D. 1 (D.D.C. 2001), which defendants cite repeatedly, is

District courts have wide discretion over pretrial discovery matters, including over when discovery will commence. *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1382 (D.C. Cir. 1984); *Childers v. Slater*, 197 F.R.D. 185, 187 (D.D.C. 2000). In exercising their discretion, courts weigh the following factors: (1) the strength of the dispositive motion that underlies the stay request, (2) the burden of responding to the contemplated discovery, and (3) the prejudice a stay would cause to the party requesting discovery. *OMG Fidelity, Inc. v. Sirius Technologies, Inc.*, 239 F.R.D. 300, 304 (N.D.N.Y. 2006); *accord Lithgow v. Edelmann*, 247 F.R.D. 61, 62 (D. Conn. 2007). Courts balance these factors in antitrust cases. As explained in *Currency Conversion Fee Antitrust*, "factors courts consider in weighing whether to grant a stay of discovery" pending a motion to dismiss "include the breadth of discovery and the burden of responding to it" and "the unfair prejudice to the party opposing the stay." 2002 U.S. Dist. LEXIS 974 at *5. These well-established factors continue to guide district courts, even after the

---

not inconsistent. There, the court concluded that a stay of discovery was warranted because the parties agreed that, if granted, *either* plaintiff's summary judgment motion or defendant's pending motion to dismiss would dispose of the entire case. *Id*. at 3. Further, although defendants contend that *Anderson v. U.S. Attorney's Office*, Civ. A. No. 91-2262, 1992 WL 159186 (D.D.C. June 19, 1992), stands for the proposition that a motion to dismiss renders discovery "generally" inappropriate, that proposition is not supported by *Brennan v. International Brotherhood of Teamsters*, 494 F.2d 1092, 1100 (D.C. Cir. 1974), upon which *Anderson* relies. *Brennan* addressed a motion for stay pending summary judgment, holding that district courts have "broad powers to regulate or prevent discovery and such powers have always been freely exercised," without in any way indicating that a stay is presumptively appropriate pending a dispositive motion. *Brennan*, 494 F.2d at 1100.

In addition, *Maljack Prod. v. Motion Picture Ass'n of Am.*, Civ. A. No. 90-1121, 1990 WL 157900 (D.D.C. Oct. 3, 1990), is inapposite, as the motion to dismiss there was jurisdictional in nature and the court "[f]ound it significant that [plaintiff] has not even alleged that it will be prejudiced by deferring discovery until a determination is made with respect to the pending motion to dismiss." *Id*. at *1. Here, plaintiffs will be prejudiced, as described in Section D, *infra*. Finally, defendants rely on *In re Sulfuric Acid Antitrust Litig*., 231 F.R.D. 331 (N.D. Ill. 2005), but that case actually supports plaintiffs here, since the defendant in that case did produce certain documents to the plaintiffs, including documents the defendant had produced to a grand jury. *Id*. at 333.

Supreme Court's *Twombly* decision. *See, e.g., In re Static Random Access (SRAM) Antitrust Litig.,* No. 07-CV-01819, 2008 WL 426522, at *2 (N.D. Cal. Feb. 14, 2008) (requiring production of documents produced to the Department of Justice in a grand jury investigation, while motion to dismiss was pending); *In re Flash Memory Antitrust Litig.*, No. 07-0086, 2008 WL 62278 (N.D. Cal. Jan. 4, 2008) (concluding that *Twombly* does not foreclose discovery until a complaint survives a motion to dismiss); *In re NetFlix Antitrust Litig.*, 506 F. Supp. 2d at 321 (permitting discovery after motion to dismiss granted with leave to replead).

Defendants ignore these post-*Twombly* decisions that affirm the balancing approach and instead argue that *Twombly* effectively mandates an automatic stay of discovery pending a motion to dismiss. *See* Defs.' Mem. at 9-14. *Twombly* does not so hold, and cannot reasonably be interpreted to support defendants' blanket approach.

*Twombly* addressed pleading standards for certain Section 1 antitrust claims, holding that a "bare assertion" of conspiracy and a mere "allegation of parallel conduct" were insufficient to state a claim for relief under Section 1 of the Sherman Act. 127 S.Ct. at 1966-67. In reaching this holding, the *Twombly* Court noted the potential expense of discovery in cases "with no reasonably founded hope that the [discovery] process will reveal relevant evidence." *Id.* at 1967 (citation omitted). Nowhere in *Twombly*, however, did the Court announce, or claim to be setting forth, any new standard for when to permit discovery – let alone mandating automatic stays pending motions to dismiss.[5]

---

[5]    When it has seen fit, Congress has legislated automatic stays pending motions to dismiss certain claims. *See* Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B) ("In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.") Congress has not chosen to so amend the Sherman Antitrust Act. *See Glenbrook Capital Ltd. Partnership v. Kuo*, No. C07-02377 MJJ, 2008 WL

In a case on which defendants rely, *In re Graphics Processing Units Antitrust Litig.*, No. 06-07417, 2007 WL 2127577 (N.D. Cal. July 24, 2007), the court made clear that *Twombly* does not require an "automatic, blanket stay of all antitrust discovery pending identification of a viable claim":

> Defendants' statement that "*Twombly* stands for the proposition that antitrust plaintiffs cannot subject defendants to any discovery until the Court determines that the plaintiffs have articulated a 'plausible entitlement to relief' on the face of the complaint" is incorrect…. This order does not read *Twombly* to erect an automatic, blanket prohibition on any and all discovery before an antitrust plaintiff's complaint survives a motion to dismiss. Defendants' argument upends the Supreme Court's holding; the decision used concerns about the breadth and expense of antitrust discovery to identify pleading standards for complaints, it did not use pleading standards to find a reason to foreclose all discovery.

*Id*. at *4.

Furthermore, in *Flash Memory Antitrust*, the court emphasized that the decision in *Graphics Processing* was not to be interpreted as reading *Twombly* to compel a blanket stay of all discovery in antitrust cases pending resolution of motions to dismiss. 2008 WL 62278, at *3. The district court in *Flash Memory* noted that "the [Supreme] Court did not hold, implicitly or otherwise, that discovery in antitrust actions is stayed or abated until after a complaint survives a Rule 12(b)(6) challenge. Such a reading of that opinion is overbroad and unpersuasive." *Id*.; *see also SRAM Antitrust*, 2008 WL 426522, at *2 (rejecting defendants' reliance upon *Twombly* in seeking a stay and ordering them to produce documents produced to Department of Justice in grand jury investigation); *In re NetFlix Antitrust Litig.*, 506 F. Supp. 2d at 321 (analyzing *Twombly* and permitting narrowly-tailored discovery to proceed, notwithstanding grant of motion to dismiss with leave to amend).

---

973577 (N.D. Cal. Apr. 3, 2008). Nor has *Twombly* led to any revisions to the Federal Rules of Civil Procedure.

**B.      Defendants' Motion to Dismiss Is Unlikely to Succeed.**

Defendants have not, and cannot, demonstrate that the Complaint in this case is so deficient on its face that dismissal is likely.[6]  The complaint here is a distant cry from the barebones complaint dismissed in *Twombly* – a complaint that "proceed[ed] exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized." *Twombly*, 127 S.Ct. at 1971 n.11.

Here, by contrast, the Complaint details (among other things): who participated in the conspiracy; exactly what the participants agreed to do and why; and how the conspiracy was implemented.  As summarized above, the Complaint describes in detail how the defendants in the fall of 2003 conspired together to remove fuel from the existing cost escalation indexes (which weighted fuel against other cost factors, and permitted full recovery any of fuel cost increases, but not more).  Complaint at ¶¶ 5, 9, 56, 65-66.  Defendants did this collectively through the AAR, an organization that the defendants dominate and control.  *Id*. ¶¶ 9, 68.  Indeed, the Complaint notes that John Lanigan, defendant BNSF's chief marketing officer, acknowledged during a conference call with financial analysts in 2004 that Matthew K. Rose, BNSF's Chairman, President and CEO "led the charge on" the AAR's 2003 adoption of the new index without fuel.  *Id*. ¶ 9; *see also id.* ¶ 68 ("What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future.")

---

[6/]      Plaintiffs respectfully submit that the Court should not countenance defendants' request that their motion for protective order be argued at the same time their forthcoming motion to dismiss, for which the parties have proposed dates in September.  *See* Defs.' Mem. at 4 n.3.  Of course, such a result would suit defendants' ultimate purpose – discovery delay – without a ruling from the Court on the merits of the motion for a protective order.

The Complaint also describes how the defendants, at board meetings of the AAR and otherwise during this fall 2003 period, removed fuel from the existing cost escalation index so that a separate fuel surcharge could be broadly applied to the vast majority of rail freight customers, and thereby operate as an effective across-the-board rate increase. *Id.* ¶¶ 5, 9, 56, 65-66. The fuel surcharge conspiracy was the means by which the defendants imposed repeated, across-the-board rate increases over a period of almost four years or more. *Id.* ¶¶ 3, 78.

As detailed in the Complaint, the defendants caused the AAR in December 2003 to announce the new cost escalation index without fuel (the All Inclusive Index Less Fuel). *Id.* ¶¶ 9, 11, 66. Defendants then proceeded to impose their agreed-upon fuel surcharges through at least mid-2007. *Id.* ¶¶ 59, 69, 79. The four railroads adhered to the same program: to charge a separate fuel surcharge as a percentage of the overall cost of the freight transport to which the surcharge was applied. *Id.* ¶ 5, 13, 56. As alleged, the defendants refused to negotiate the fuel surcharges, and also took other coordinated steps to facilitate imposition of the fuel surcharges – such as moving away from the practice of sending a single invoice for a multi-railroad freight transport, and instead having each railroad involved in the trip send a separate bill. *Id.* ¶ 15, 94. Defendants also published their rail fuel surcharges on their websites to facilitate coordination of price-setting and the detection of any cheating on the collusively-set prices. *Id.* ¶ 14. In addition, the defendants agreed that they would not undercut each other or "steal" market share by discounting underlying rates. *Id.* ¶¶ 14, 95. Defendants' market shares have remained stable during the conspiracy. *Id.*

*Twombly* explained that something beyond "mere possibility" of collusion must be alleged, and that the allegations in a price-fixing complaint "must be enough to raise a right to relief above the speculative level" and "state a claim for relief that is plausible on its face." 127

S.Ct at 1965, 1974.  With respect to the complaint before it, the Supreme Court stated that the plaintiffs had "not nudged their claims across the line from conceivable to plausible."  *Id.* at 1974.

Plaintiffs have alleged the existence of a conspiracy in detail, complete with the identification of specific dates and meetings, and the specific means and methods by which defendants have acted on their conspiracy.  Based upon the detailed, specific allegations of conspiracy in plaintiffs' Complaint, the defendants here are unable to demonstrate that plaintiffs are unlikely to reach this plausibility threshold.

**C.    Plaintiffs Would be Unfairly Prejudiced From Further Delay in Obtaining Discovery.**

Defendants argue that "when there is no need for discovery [to respond to the motion to dismiss], and there is no concern about the ultimate availability of relevant documents, there is no likelihood of prejudice from an interim stay."  Defs.' Mem. at 9.  To the contrary, however, delay of the prosecution of plaintiffs' case is itself highly prejudicial.

Defendants suggest that plaintiffs would suffer only a "modest discovery delay."  *Id.* at 15.  A delay until at least September 2008 (and likely later) is not modest, particularly in view of the fact that this case already has been pending since May 2007.  In *City of Aurora v. PS Systems, Inc*., No. 07-cv-02371, 2008 WL 149998 (D. Colo. Jan. 14, 2008), the defendants in a patent case moved to stay discovery pending a motion to dismiss.  The *Aurora* court determined that a seven and one-half month stay would be too prejudicial to the plaintiff and was, therefore, not appropriate:

> The average time from the filing of a dispositive motion to its determination in this district in 2006 was 7.5 months. Consequently, staying the case while defendants' motion to dismiss is pending could substantially delay the ultimate resolution of the matter, with injurious consequences….    In the litigation

context, delay is not only of practical concern, as it results in a decrease in evidentiary quality and witness availability, but also of social concern, as it is cost prohibitive and threatens the credibility of the justice system.

*Id*. at *1-2 (internal quotation marks and citation omitted).

Given the nature of this case, delay in commencing discovery is a significant concern, even though defendants have committed to preserving relevant documents. "Unnecessary delay inherently increases the risk that witnesses' memories will fade and evidence will become stale." *Pagtalunan v. Galaza,* 291 F.3d 639, 643 (9th Cir. Cal. 2002); *see also United States v. Marion*, 404 U.S. 307, 326 (1971) (noting "the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost."); *Bridgestone/Firestone Research v. Automobile Club*, 245 F.3d 1359, 1362 (Fed Cir. 2001) (prejudice flows from unreasonable delay "due to loss of evidence or memory of witnesses"). Such prejudice is particularly acute where plaintiffs must prove an antitrust conspiracy dating back five years, as conspiratorial conduct "is generally covert and must be gleaned from records, conduct, and business relationships." *Callahan v. A.E.V., Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996). While plaintiffs here seek only limited discovery at this time, the issues of witness availability and fading memories remain highly relevant to defendants' application for a stay. The sooner plaintiffs can review, organize and analyze the requested documents, the sooner plaintiffs will be able to identify key witnesses and sources of documents, so that discovery can proceed expeditiously in the event the Court denies the motion to dismiss. Otherwise, plaintiffs' would be left to start from scratch, in terms of discovery, whenever the motion to dismiss would be denied.

Defendants are thus incorrect when they state that plaintiffs "cannot identify any substantive or procedural interest served by obtaining documents" at this time. Defs.' Mem. at 3. This factor – prejudice to the non-moving party – weighs heavily against a protective order here.

### D.    The Production of Documents Already Produced to Public Antitrust Investigators Would Not Impose Any Significant Burden on Defendants.

Defendants must further demonstrate to the Court that responding to plaintiffs' discovery requests would be unduly burdensome. *City of Aurora,* 2008 WL 149998, at *2 (rejecting defendants' request for discovery stay based on non-specific claim of burden); *see also State Farm Mut. Ins. Co. v. Accurate Med., P.C.*, No. 2007-0051, 2007 WL 2908205, at *4 (E.D.N.Y. Oct. 04, 2007) ( "[D]efendants have not shown how they will be unduly burdened" by having to respond to plaintiff's discovery requests).

Plaintiffs' narrowly-tailored requests would not impose *any* significant burden on defendants. In fact, defendants did not even attempt to argue that responding to the discovery requests would constitute a burden. *See Beecham*, 245 F.R.D. at 3 (burden is on movant to show good cause why a stay of discovery is warranted).

Plaintiffs request the production of documents related to fuel surcharges that defendants have already produced to the New Jersey Attorney General, or any other law enforcement agency investigating railroad fuel surcharges, and the STB (during the time period specified in the request, which is the period *before* any documents provided to the STB would have been posted on the STB's website). To the extent defendants have produced such documents to these government authorities, those documents are already assembled and presumably stored (on CD-ROMs or otherwise).

Plaintiffs in civil litigation routinely request documents produced by the defendants in relevant government investigations, and defendants commonly must produce such documents.

*See, e.g., In re Static Random Access (SRAM) Antitrust Litig.*, No. 07-CV-01819, 2008 WL
426522, at \*2 (N.D. Cal. Feb. 14, 2008) (post –*Twombly*, ordering defendants to produce
documents produced to Department of Justice in grand jury investigation notwithstanding motion
to dismiss); *In re Plastics Additives Antitrust Litig.*, No. Civ. A. 03-2038, 2004 WL 2743591
(E.D. Pa. Nov. 29, 2004) (citing *In re Acrylonitrile Butadiene Rubber (NBR) Antitrust Litig.*, 03-
cv-1898 (W.D. Pa. June 14, 2004); *In re Rubber Chemicals Antitrust Litigation*, 03-CV-1496
(N.D. Cal. Jan. 26, 2004); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
03-MD-1542 (PCD) (D. Conn. Oct. 31, 2003); *In re Wirebound Boxes Antitrust Litig.*, 126
F.R.D. 554, 556 (D. Minn. 1989); *Golden Quality Ice Cream Co. v. Deerfield Specialty*, 87
F.R.D. 53, 56 (E.D. Pa. 1980)).  In this litigation, now pending for over a year without
production of a single document, defendants should similarly be required to produce these
documents without further delay.

## IV.    CONCLUSION

For the reasons set forth in this memorandum, plaintiffs' request that defendants' motion
for protective order be denied.

Dated: May 14, 2008                              Respectfully Submitted,


 /s/ Stephen R. Neuwirth                          /s/ Michael D. Hausfeld
Stephen R. Neuwirth                              Michael D. Hausfeld (D.C. Bar #153742)
Daniel Brockett                                  Benjamin D. Brown (D.C. Bar #495836)
Sami H. Rashid                                   COHEN, MILSTEIN, HAUSFELD
QUINN EMANUEL URQUHART                             & TOLL, P.L.L.C.
  OLIVER & HEDGES, LLP                           1100 New York Avenue NW
51 Madison Avenue, 22nd Floor                    Suite 500, West Tower
New York, New York 10010                         Washington, DC 20005
Telephone: (212) 849-7000                        Telephone: (202) 408-4600
Facsimile:  (212) 849-7100                       Facsimile:  (202) 408-4699
Email:  stephenneuwirth@quinnemanuel.com         Email: mhausfeld@cmht.com


                    *Direct Purchaser Plaintiffs' Interim Co-Lead Class Counsel*

## **CERTIFICATE OF SERVICE**

I, Benjamin D. Brown, an attorney, certify that on May 14, 2008, I caused true and correct copies of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Protective Order to filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to co-lead counsel for all plaintiffs.


 /s/ Benjamin D. Brown

# EXHIBIT 1

08-03-07 - Transcript.txt

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
      IN RE: RAIL FREIGHT FUEL       . Docket No. Misc. 07-489
 3    SURCHARGE ANTITRUST            .
      LITIGATION - MDS 1869          .
 4                                   .
                                     . Washington, D.C.
 5                                   . March 7, 2008
                                     . 10:00 a.m.
 6    . . . . . . . . . . . . . . . .
 7              TRANSCRIPT OF STATUS CONFERENCE
           BEFORE THE HONORABLE PAUL L. FRIEDMAN
 8              UNITED STATES DISTRICT JUDGE
      APPEARANCES:
 9    For the Plaintiffs:      Roger M. Adelman, Esquire
                               Michael D. Hausfeld, Esquire
10                             Paul M. Donovan, Esquire
                               Joe R. Whatley, Jr., Esquire
11                             Richard P. Rouco, Esquire
                               William M. Audet, Esquire
12                             Gary E. Mason, Esquire
                               Matthew H. Armstrong, Esquire
13                             Stephen R. Neuwirth, Esquire
                               Christopher Lovell, Esquire
14                             John Crow, Esquire
                               Reginald Terrell, Esquire
15                             Daniel Brocket, Esquire

16    For the Defendants:      Gary A. Winters, Esquire
                               Richard J. Favretto, Esquire
17                             Alan M. Wiseman, Esquire
                               Tyrone R. Childress, Esquire
18                             David Gelfand, Esquire
                               John M. Nannes, Esquire
19                             Kent A. Gardiner, Esquire
                               Michael S. Gugig, Esquire
20
      Also Present:            Thomas V. Bender, Esquire
21                             David M. Peterson, Esquire

22    Court Reporter:          Linda L. Russo, RPR
                               Official Court Reporter
23                             Room 6403, U.S. Courthouse
                               Washington, D.C. 20001
24                             202.354.3244

25    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription
```

08-03-07 - Transcript.txt

11    discovery disputes.  Somebody else is going to do that.  Yes,

12    Mr. Neuwirth?

13         MR. NEUWIRTH:  If it makes sense for the plaintiffs

14    to go first, I believe that the parties had generally agreed

15    that it would make sense for the plaintiffs to file a

16    consolidated amended complaint within 45 days of the

17    appointment of co-lead interim counsel.  And that's a schedule

18    that we remain comfortable with, and we previously talked to

19    the defendants about that, and I guess we'll hear today if they

20    have a different view about that.  But that was the schedule

21    that we had thought made sense.

22         And the fact is, Your Honor, I think that we may be

23    able to do it even sooner than that because we believe that the

24    complaints that we have -- we anticipate that the motion that

25    the defendants will plan to file is going to be a 12(b)(6)

Linda L. Russo, RPR
Official Court Reporter

PAGE 34

1    motion invoking, among other things, the Supreme Court's recent

2    decision in the co-called Twombly case.

3         We believe that the complaints that have been

4    developed to date already include sufficient allegations to be

5    able to overcome the Twombly motion.  We know that the

6    defendants will have a different view about that, but this is

7    not a situation that has come up in some cases where the

08-03-07 - Transcript.txt

8  plaintiffs are saying to the Court, give us discovery so that

9  we can file a better amended complaint to survive that

10  anticipated motion.

11         We believe that the complaints that we filed talk

12  about very specific meetings in December of 2003, and that

13  period that the defendants had at the Association of American

14  Railroads where they made a very express decision that we talk

15  about in great detail to remove fuel from an index that had

16  been used for price increases.  And we believe that the facts

17  of that and other facts in the complaint will make it very

18  possible for Your Honor to deny a Twombly motion.

19         There's at least one case where a Federal court in

20  California said that it doesn't make sense to have discovery

21  for the purpose of creating a complaint, but that's not what

22  we're asking.  To the extent that Your Honor is interested in

23  hearing about discovery now, I can address it.

24         THE COURT:  If what they are planning is a 12(b)(6)

25  motion, then it rises or falls on the four corners of the

Linda L. Russo, RPR
Official Court Reporter

35

1  complaint.  And so the argument is, neither side needs

2  discovery to do that, but you're anxious to get started and

3  they're anxious to not spend time and money if they're going to

4  win their motion.

5         MR. NEUWIRTH:  Correct.  And I think that it's

(Page 35 continued)

08-03-07 - Transcript.txt

6    important to note that there are courts, to the extent courts

7    have looked at this since the Twombly case, there's been a

8    consensus among courts that have ruled there should be

9    discovery or that there shouldn't, that Twombly did nothing to

10   change the principles in the Federal Rules that discovery is

11   not automatically stayed merely because there is a motion to

12   dismiss.  At least one of those cases is the Flash Memory

13   Antitrust Litigation.

14           THE COURT:  Say it again?

15           MR. NEUWIRTH:  I'm sorry, it's called In Re: Flash

16   Memory Antitrust Litigation, from the Northern District of

17   California in 2008, which held at -- it's a slip opinion, where

18   the defendants argued that because they were making a Twombly

19   motion there should be no discovery.  The Court said to the

20   extent that the defendants are relying on the Supreme Court's

21   opinion in Twombly to support such a position, it must be

22   rejected, this Court concurs with the statement in Graphics

23   Processing, another antitrust case, that Twombly does not

24   "erect an automatic blanket prohibition on any and all

25   discovery before an antitrust plaintiff's complaint survives a

Linda L. Russo, RPR
Official Court Reporter

1    motion to dismiss."

2            That was one of the cases which held you can't have

08-03-07 - Transcript.txt

3    discovery to amend your complaint, but there are other cases

4    that have permitted limited discovery post-Twombly.  And

5    Justice Souter in Twombly said one of the problems with

6    discovery can be, it can impose a huge burden on defendants in

7    a case which doesn't have merit to proceed.  And we believe

8    this is a case that you will determine has merit to proceed,

9    but even putting that aside, this is also a situation where the

10   defendants have disclosed in their S.E.C. filings that they

11   have been subject of at least one State Attorney General grand

12   jury investigation related to the fuel surcharges that are at

13   issue in this case.  We believe that that was a New Jersey

14   investigation that commenced in July of 2007.

15          And the most recent disclosures by one defendant,

16   Kansas City Southern, references that investigation and says

17   "Kansas City Southern Railroad is cooperating with the New

18   Jersey Attorney General's request for information."   The other

19   defendants have all disclosed this.

20          And so we believe that one step the Court can take in

21   discovery that would not impose a burden on defendants but that

22   would allow at least something to move forward given that these

23   cases have now been pending for almost a year, would be to

24   order that the defendants produce to the plaintiffs anything

25   that they have assembled and produced to the New Jersey State

Linda L. Russo, RPR
Official Court Reporter

PAGE  37

08-03-07 - Transcript.txt

1    Attorney General or any other government authority that is

2    investigating the very subject matter of the lawsuits that are

3    now consolidated before Your Honor.

4         That avoids any new burden on the defendants, because

5    presumably they're already assembling that information.  It's a

6    way to keep the case moving forward, because the reality is

7    that it would probably be as much as six months before your

8    Court would have an opportunity to resolve any motion to

9    dismiss.  It might be less.

10        THE COURT:  It's going to be 45 days before you file

11   the consolidated compliant.

12        MR. NEUWIRTH:  Right, and it may be even longer than

13   that with briefing and what's likely to be an extended briefing

14   schedule on the many issues that we would anticipate the

15   railroads will be raising in defense.

16        So just to be clear, this is not for the purpose of

17   getting information to put into the complaint.  This is for the

18   purpose of ensuring that this case isn't allowed to get stale

19   while motions are pending.  And we believe that the meetings of

20   the AAR in December of 2003 are just among the many facts that

21   we have.

22        In Twombly, the Court said the problem was that the

23   plaintiffs there had simply alleged parallel conduct without

24   alleging any evidence of when the defendants supposedly agreed

25   that they were going to work together.

Linda L. Russo, RPR
Official Court Reporter

08-03-07 - Transcript.txt

7      And what has been asked for, as in the decision, in

8    the Netflix Antitrust litigation, 506 F.Supp 308, in the

9    Northern District of California, is a discrete production of

10    materials easily assembled and produced.

11         THE COURT:  When you say what has been asked for,

12    have you asked for it in writing from them, or is this what

13    you're proposing?

14         MR. HAUSFELD:  That's what we're proposing.

15         THE COURT:  Okay.

16         MR. HAUSFELD:  What we seek to at least enable us to

17    have at this point is the production of those materials that

18    have been made available.  Now, we're not saying that there is

19    no expense even in that duplication, but that is a minimal

20    expense.  And clearly, if we use burden or prejudice, there is

21    no burden or prejudice to the defendants in producing those

22    materials which they have already made available so that in the

23    interim while the motion is decided, plaintiffs can continue to

24    evaluate that information and be prepared when the motion is

25    decided, if it's denied, to move the case most expeditiously.

Linda L. Russo, RPR
Official Court Reporter

PAGE  48

1         MR. FAVRETTO:  Very briefly.  Your Honor, I think

2    Mr. Hausfeld's argument illustrates my point.  He basically is

3    prematurely arguing a Twombly motion and what they think they

4    will be able to say in response to our dismissal motion.  And

08-03-07 - Transcript.txt

 5  saying, well, this complaint is really good, Your Honor, so you

 6  ought to allow us to have some discovery.  Okay, let's have

 7  that debate, and let's do it as soon as the Court would desire.

 8           There are lots of cases that have stayed discovery,

 9  that have denied requests for grand jury material post-Twombly.

10  If Your Honor has any doubt on the wisdom or wants further

11  material on the issue, we would request an opportunity to brief

12  the issue.  We don't even have an amend consolidated complaint

13  yet.  All of this is a cart before the horse.  There's no need

14  to decide this issue, at a minimum there's no need to decide

15  this issue now.  But in any event, if the Court so desires, we

16  would be prepared to respond and provide briefing on the issue.

17           But it's not complicated.  As I tried to say, in this

18  District even pre-Twombly, it was the standard.  If it was a

19  12(b)(6) motion and it was coming on, it was the standard.

20           THE COURT:  I don't know that it was the standard,

21  because I know that there are cases in which I permitted some

22  discovery to go forward even with 12(b)(6) motions.

23           The real question is, when you say it's the standard,

24  the question is does that mean it's an inflexible rule, or do I

25  have discretion?  And if I have discretion, how do I exercise


                         Linda L. Russo, RPR
                        Official Court Reporter


                                                          PAGE 49


 1  the discretion.  And is there something, because Twombly was a

08-03-07 - Transcript.txt

2    antitrust case, we're all using Twombly now for the

3    plausibility standard, but in the context of an antitrust case,

4    it means more than just in general the plausibility standard.

5    Is it sort of automatic that they don't get discovery?  Is it

6    in my discretion?  How do I exercise my discretion?  Is what

7    they want nonburdensome, and all these sorts of things.

8          But let's talk for a minute about a schedule, because

9    it seems to me that the schedule comes out something like this,

10   except for the fact that people tend to take summer vacations.

11   But under the schedule that I'm looking at, I don't have to do

12   anything until after Labor Day.

13         April 30th would be the latest for the filing of the

14   consolidated complaint, because that's 45 days, or roughly 45

15   days from now.  And then under the order that I issued and you

16   said that the schedule generally works, 45 days after that is

17   roughly June 15th, and then 45 days after that, I'm just

18   rounding these dates to get to the end or the middle of the

19   month, 45 days after that is July 31st.  And 30 days after that

20   is August 30th.

21         So if that works, except for the fact that people

22   sometimes like to go away in the summer, June 15th for the

23   motions, July 31st for the oppositions, and August 30th for the

24   reply, and we can do an argument in September.  If that makes

25   sense we can pick an argument date, if you want to do that

Linda L. Russo, RPR
Official Court Reporter