**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE<br>ANTITRUST LITIGATION |
| This document relates to:<br><br>ALL CASES |

MDL Docket No. 1869
Misc. No. 07-489 (PLF)

**DEFENDANTS' JOINT MOTION TO DISMISS
DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

Pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, Defendants BNSF

Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union

Pacific Railroad Company (collectively, "Defendants") hereby move this Court to dismiss the

Direct Purchaser Plaintiffs' Consolidated Amended Complaint for failure to state a claim upon

which relief may be granted, and for such other and further relief as may be just and proper.  In

support of the Motion, Defendants are submitting the Memorandum of Points and Authorities in

Support of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated

Amended Complaint and the Declaration of Tara L. Reinhart and exhibits thereto.

Dated: May 30, 2008                    Respectfully submitted,

                                       ____/s/ John M. Nannes_____
                                       John M. Nannes (D.C. Bar #195966)
                                       Tara L. Reinhart
                                       SKADDEN, ARPS, SLATE,
                                         MEAGHER & FLOM LLP
                                       1440 New York Avenue, N.W.
                                       Washington, D.C. 20005
                                       (202) 371-7000

*Attorneys for Defendant Norfolk Southern Railway Company*

Richard J. Favretto
Gary A. Winters
Mark W. Ryan
MAYER BROWN LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

*Attorneys for Defendant BNSF Railway Company*

Richard McMillan, Jr.
Kent A. Gardiner
Kathryn D. Kirmayer
CROWELL & MORING LLP
1101 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 628-5116

*Attorneys for Defendant CSX Transportation, Inc.*

Alan M. Wiseman
Joseph A. Ostoyich
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 783-0800

Tyrone R. Childress
David G. Meyer
HOWREY LLP
550 South Hope Street, Suite 110
Los Angeles, CA 90071
(213) 892-1800

*Attorneys for Defendant Union Pacific Railroad Company*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 |
| This document relates to: | Misc. No. 07-489 (PLF) |
| ALL CASES | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
## DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

STATEMENT OF ALLEGED FACTS ....................................................................... 4

      A.    The Railroad Industry ............................................................... 4

      B.    Allegations of Conspiracy ........................................................ 7

      C.    Rail Fuel Surcharges ................................................................ 9

SUMMARY OF ARGUMENT .................................................................................. 12

ARGUMENT ............................................................................................................. 15

I.     THE COMPLAINT DOES NOT MEET the STANDARD NECESSARY TO STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT. ......... 15

      A.    *Twombly* Clarified the Standard in Rule 12(b)(6) Motions Applicable in Section 1 Cases. ............................................... 15

      B.    Federal Courts Have Applied *Twombly* to Dismiss Complaints Similar to the Present One. .......................................... 18

      C.    Treatment of the Allegations in the Complaint ........................................ 22

II.    PLAINTIFFS HAVE NOT PLEADED FACTS PLAUSIBLY SUGGESTING THAT THE RAILROADS AGREED ON FUEL SURCHARGES. ......................................................................................... 22

      A.    The Complaint Fails To Allege Facts Suggesting A Conspiracy Among The Four Defendants. ............................... 24

      B.    The Alleged Conduct By The Eastern Railroads and By The Western Railroads Is Equally Consistent With Lawful, Independent Conduct ............................................................. 25

III.   CREATION OF THE AIILF INDEX WAS NOT A RESTRAINT OF TRADE AND DOES NOT PLAUSIBLY SUPPORT AN INFERENCE OF AN UNDERLYING FUEL SURCHARGE CONSPIRACY. ...................... 33

      A.    Creation and Publication of the AIILF Is Not A Restraint of Trade ......... 34

      B.    The AIILF Is Not Probative of a Fuel Surcharge Conspiracy. ................. 37

IV.   PLAINTIFFS' ADDITIONAL ALLEGATIONS ARE INSUFFICIENT TO CREATE A PLAUSIBLE INFERENCE OF CONSPIRACY. ..................... 40

      A.    Industry Communications ....................................................... 41

      B.    Short-Term Contracts .............................................................. 42

      C.    Through Rates .......................................................................... 43

      D.    Publication of Fuel Surcharges ............................................... 44

      E.    Failure to Compete on Fuel Surcharges ................................. 45

i

F.    Government Investigation ....................................................................... 46

V.   CONCLUSION ...................................................................................... 46

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adamson v. Ortho-McNeil Pharmaceutical, Inc.*, 463 F. Supp. 2d 496
(D.N.J. 2006) ..................................................................................................... 28

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, --- F.3d ---,
No. 07-7105, 2008 WL 1932768 (D.C. Cir. Apr. 29, 2008)..................................... 18

*In re Baby Food Antitrust Litigation*, 166 F.3d 112 (3d Cir. 1999).................................. 31

*\*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007)........................................ *passim*

*Cement Manufacturers' Protective Ass'n v. United States*,
268 U.S. 588 (1925) .......................................................................................... 35

*Credit Suisse Securities (USA) LLC v. Billing*, 127 S. Ct 2383 (2007)........................... 42

*In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999) ............................................. 30

*City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2008 WL 1735856
(D.D.C. Apr. 16, 2008) ........................................................................................ 21

*Clamp-All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478 (1st Cir. 1988) ............. 30

*Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173
(S.D.N.Y. 2006) ................................................................................................... 28

*\*In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007) .............................. 18, 19

*In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011
(N.D. Cal. 2007).............................................................................................. 21, 46

*In re Insurance Brokerage Antitrust Litigation*, No. 05-1079,
2007 WL 2533989 (D.N.J. Sept. 28, 2007) ............................................................ 21

*InterVest, Inc., v. Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003).................................... 15

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ............................................. 10, 22, 28

*\*Kendall v. Visa, U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ........................................ 19

*Kokinda v. Peterson*, No. 06-0828, 2006 WL 3507074
(W.D. Okla., Dec. 5, 2006) .................................................................................. 29

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)........................29

*\*In re Late Fee and Over-limit Fee Litigation*, 528 F. Supp. 2d 953
 (N.D. Cal. 2007)................................................................19, 20, 24, 25, 41

*Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182 (D.D.C. 2001)..............................28

*\*Maple Flooring Manufacturers' Ass'n v. United States*, 268 U.S. 563 (1925)...............34

*Moore v. Boating Industry Ass'ns*, 819 F.2d 693 (7th Cir. 1987)......................................34

*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984)...................35

*National Society of Professional Engineers  v. United States*,
 435 U.S. 679 (1978) ................................................................34

*Pollstar v. Gigmania*, 170 F. Supp. 2d 974 (E.D. Cal. 2000)...........................................28

*\*Reserve Supply Corp. v. Owens Corning Fiberglas Corp.*, 971 F.2d 37
 (7th Cir. 1992) ................................................................ 30, 33 45

*\*Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397
 (7th Cir. 1989)................................................................ 3, 34, 35

*Schafer v. State Farm Fire and Casualty Co.*, 507 F. Supp. 2d 587
 (E.D. La. 2007)................................................................21

*Southeast Missouri Hospital v. C.R. Bard, Inc.*, No. 1:07cv0031, 2008 WL
 199567 (E.D. Mo. Jan. 22, 2008) ................................................................21

*Stewart v. National Education Ass'n*, 471 F.3d 169 (D.C. Cir. 2006) ............................22

*The America Channel, LLC v. Time Warner Cable, Inc.*, No. 06-2175,
 2007 WL 1892227 (D. Minn. June 28, 2007)................................................................21

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*,
 346 U.S. 537 (1954) ................................................................15

*\*In re Travel Agent Commission Antitrust Litigation*, No. 1:03 CV 30000,
 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007)…......................................... 20, 21, 31

*United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004) ....................10

*Verizon Communications, Inc. v. Trinko, LLP,* 540 U.S. 398 (2004)..............................42

*Wallace v. Bank of Bartlett*, 55 F.3d 1166 (6th Cir. 1995) ................................. 45

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
    516 F. Supp. 2d 270 (S.D.N.Y. 2007) ....................................................... 21

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ................... 26

## STATUTES & LAWS

15 U.S.C. § 1 ....................................................................................... 1, 15

49 U.S.C. §§ 10101 *et seq* ....................................................................... 6

49 U.S.C. § 10502 .................................................................................. 7

49 U.S.C. § 10702 .................................................................................. 6

49 U.S.C. § 10703 .................................................................................. 5

49 U.S.C. § 10706(a)(3)(B)(ii) ......................................................... 6, 41, 42

49 U.S.C. § 10708 ................................................................................ 10

49 U.S.C. § 10709 ................................................................................. 6

49 U.S.C. §11101(b), (c) ....................................................................... 45

Staggers Rail Act, Pub. L. No. 96-448, 94 Stat. 1895 (1980) ........................... 6

## RULES

Fed. R. Civ. P. 8(a) ....................................................................... 1, 16, 22

Fed. R. Civ. P. 8(a)(2) ............................................................................ 16

Fed. R. Civ. P. 12(b)(6) ................................................................ 1, 15, 22, 28

## OTHER AUTHORITIES

*Rail Fuel Surcharges*, Ex Parte No. 661 (Jan. 25, 2007) .......................... *passim*

44 Fed. Reg. 33,230 (I.C.C. June 8, 1979) ................................................. 10

38 Fed. Reg. 34,771 (I.C.C. Dec. 18, 1973) ................................................ 10

*Expedited Procedures for the Recovery of Fuel Costs*, 350 ICC 563,
1975 ICC LEXIS 27 (1975) ................................................................................. 10

*Quarterly Rail Cost Adjustment Factor*, 69 Fed. Reg. 13,954
(S.T.B. Mar. 24, 2004) ........................................................................................ 10

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company (collectively, "Defendants") respectfully submit this Memorandum in Support of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint for failure to state a claim upon which relief can be granted.

## INTRODUCTION

Plaintiffs, direct purchasers of rail freight transportation services, allege that the four railroad Defendants conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to fix fuel surcharges for rail traffic that was not regulated, beginning in July 2003. The Consolidated Amended Class Action Complaint ("Complaint" or "CAC") consists of conclusory allegations of conspiracy, CAC ¶¶ 4, 7, 12, supported by allegations of parallel conduct and publication of a voluntary rail cost adjustment index by a trade association, the Association of American Railroads ("AAR"). These allegations fail to state a claim for relief under the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), and other applicable decisions.

The Court held in *Twombly* that, to satisfy the requirements of Fed. R. Civ. P. 8(a) for pleading a Section 1 claim, a plaintiff must do more than allege that the defendants acted in a parallel fashion and then attribute the defendants' conduct to an unlawful agreement. *Twombly*, 127 S. Ct. at 1965. Actions such as parallel pricing and participation in trade association activities – the types of conduct alleged by Plaintiffs here – will not support an inference of conspiracy because such behavior is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.*

1

at 1964.  To survive a motion to dismiss, allegations such as these "must be placed in a context that raises a suggestion of a preceding agreement," *id*. at 1966; otherwise, the complaint "stays in neutral territory" and must be dismissed.  *Id*.

Although Plaintiffs try to avoid the consequences of *Twombly,* they are doomed by the allegations in their own Complaint.  While Plaintiffs allege that Defendants' fuel surcharges "moved in uniform lockstep," CAC ¶ 83, the Complaint itself specifically refutes that contention. Plaintiffs have not alleged that all four Defendants applied the same surcharge mechanism at any time.  According to the Complaint itself, Defendants' fuel surcharges were based on mechanisms that differed by type of fuel index utilized, the escalation methodology, and other factors. Although Plaintiffs allege that the two "Western Railroads" agreed to use one fuel surcharge mechanism and the two "Eastern Railroads" agreed to use another, the allegations in the Complaint and the materials relied upon by Plaintiffs indicate that the Defendants adopted these different fuel surcharge mechanisms at widely different times separated by months and sometimes years.  The Complaint thus at best alleges that one or more Defendants at times adopted a fuel surcharge mechanism that was already being used by another Defendant. *Twombly* itself makes clear that such price-following behavior is common in concentrated industries and is not a basis for inferring a conspiracy.  These alleged pricing decisions are consistent with independent conduct, provide no basis for inferring an unlawful agreement, and fail to meet the pleading standard that must be applied under *Twombly*.

Apparently aware of this defect in the Complaint, Plaintiffs focus on the approval by the AAR of a new cost escalation mechanism called the All Inclusive Index Less Fuel ("AIILF"). According to the Complaint, after the Defendants commenced their conspiracy in July 2003, they faced a "significant hurdle" in applying stand-alone, rate-based fuel surcharges because most rail

2

freight transportation contracts included other cost adjustment mechanisms that already

accounted for increases in fuel costs.  CAC ¶ 4.  According to Plaintiffs, by creating the AIILF –

a cost escalation mechanism that excluded fuel – in December 2003, Defendants were able to

assess separate fuel surcharges calculated as a percentage of the base transportation rate.  *Id.* ¶ 5.

All that Plaintiffs allege is that the Defendants created and published the AIILF; they do not even

allege that the Defendants agreed to use it.

Like the allegations of parallel pricing, these allegations are insufficient.  The creation of

a voluntary cost index by members of a trade association is insufficient as a matter of law to state

a claim under Section 1 of the Sherman Act.  The reason for this is straightforward:  there is no

"restraint of trade" without a "restraint."  *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870

F.2d 397, 397 (7th Cir. 1989).  It has been established law for more than 75 years that a trade

association may lawfully create a cost index and make it available to members of the industry to

use as they see fit.  Moreover, Plaintiffs' contention that Defendants could not apply stand-alone,

rate-based fuel surcharges without the AIILF is belied by the documented history referenced

directly in the Complaint.  Rate-based fuel surcharges date back more than 30 years, as

acknowledged by a decision of the Surface Transportation Board ("STB") repeatedly cited in the

Complaint.  Thus, the creation of the AIILF in December 2003 could not have been necessary for

the establishment of separately applied, rate-based fuel surcharges (which had long existed) or

provide a basis for inferring an agreement to fix fuel surcharges (which is alleged to have started

before the AIILF was created).

In sum, Plaintiffs have not pleaded facts that "raise their right to relief above a

speculative level."  *Twombly*, 127 S. Ct. at 1965.  The allegations in their Complaint do not

provide any context that raises a plausible inference of a preceding agreement to fix fuel surcharges. The Complaint fails to state a claim and must be dismissed.

## STATEMENT OF ALLEGED FACTS

Plaintiffs bring an action on behalf of themselves and a proposed class of direct purchasers of unregulated rail freight transportation services who were assessed a rail fuel surcharge during the period between July 1, 2003, to at least June 30, 2007. Plaintiffs seek treble damages and injunctive relief for the alleged violation of Section 1 of the Sherman Act by Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSXT"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railroad Company ("UP"). The following facts are alleged in the Complaint, are contained in materials incorporated by reference in the Complaint, and/or can be determined on judicial notice by review of governing statutes, regulations, and regulatory decisions:

### A.    The Railroad Industry

1.     The railroad industry transports freight over tracks owned and operated by private railroads. Unlike motor carriers that can use the nation's publicly funded highway system, railroads must construct and maintain their own infrastructure. As a result, there are "significant barriers to entry" including the "need to invest in a vast network of tracks, stations, yards, and switching facilities," which create "high fixed costs" and take "decades to develop." CAC ¶ 51.

2.     Each Defendant operates in a particular geographic region, and none operates a national system. *Id.* ¶¶ 29-32. Even within those geographic regions, each railroad maintains separate tracks and serves different locations. That is because, unlike

4

air carriers that can change the markets they serve by simply redeploying their aircraft, railroads are limited in the markets they serve by the physical location of their tracks and yards. As a result, the two Western Railroads (BNSF and UP) generally do not compete with the two Eastern Railroads (CSXT and NS). Even within geographic regions, competition for the business of individual shippers may be limited by the physical location of each railroad's tracks.

3.     Shippers have their freight transported from a point of origin to a point of destination. Unless both points are served by a single railroad, the movement will involve the participation of more than one railroad, and railroads must therefore interchange freight every day to move these goods. A rail movement involving more than one railroad is known as "interline" or "through" service. While much interline cargo moves between regions (*e.g.*, between East and West), railroads also frequently interchange freight within a single region, since no one carrier can serve all of the potential points of origin and destination even within the region in which it operates.

4.     Interline carriers are required by federal law to offer a "through rate." *See* 49 U.S.C. § 10703 ("Rail carriers . . . shall establish through routes . . . with each other . . .[and] shall establish rates and classifications applicable to those routes. . . ."). Railroads must communicate and negotiate with each other to establish the terms of interline service. These communications involve all aspects of rates and services, including, for example, fuel surcharges. The railroads participating in an interline movement agree on how to split the revenue (including any applicable fuel surcharges) resulting from the through rate. CAC ¶ 94.

5.      In the late 19th century, when rail became the dominant mode of freight transportation, Congress instituted comprehensive regulation of the industry.  For almost 100 years, the Interstate Commerce Commission ("ICC") exercised control over rail carrier rates and practices.  With the construction of the interstate highway system after World War II, motor carriers became the dominant mode of freight transportation.  Recognizing this greater level of competition, Congress passed the Staggers Act of 1980.  Pub. L. No. 96-448, 94 Stat. 1895 (1980) ("Staggers Act").  The Staggers Act substantially deregulated the rail industry, giving railroads greater latitude to compete while keeping in place a variety of safeguards designed to ensure appropriate regulatory oversight.  The Staggers Act also permitted carriers to enter into private contracts with shippers that were not generally subject to review by the agency.  49 U.S.C. § 10709.

6.      In the Staggers Act, Congress reaffirmed the need for rail carriers to communicate freely about their provision of interline services.  Interline service was deemed so essential to the efficient operation of a national rail transportation system that Congress provided railroads with certain protections from the antitrust laws for interline communications.  *See* 49 U.S.C. § 10706(a)(3)(B)(ii).

7.      The Staggers Act was followed in 1995 by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), which created the STB as a successor to the ICC to provide oversight of the railroads while continuing the process of deregulation.  *See* 49 U.S.C. §§ 10101 *et seq.*

8.      One of the results of deregulation was the creation of three categories of rates for rail traffic:  regulated, exempt and contract.  Regulated rates are directly overseen by the STB.  *See* 49 U.S.C. § 10702.  Exempt rates are rates for specific

categories of traffic (*e.g.*, gravel, furniture, wool) that have been exempted from regulation by the STB after a determination that there is a sufficiently competitive market for that category of traffic that direct regulatory protections are not needed (although the agency can revoke an exemption). *Id.* § 10502.

9.      By the early 2000s, "railroads were experiencing surging freight demand" from shippers, as well as "tight capacity." CAC ¶ 53. Simultaneously, railroads faced "a common problem of increasing fuel costs." *Id.* ¶ 75.

### B.      Allegations of Conspiracy

1.      Plaintiffs generally allege that the Defendant railroads "conspired" beginning in July 2003 to set uniform fuel surcharges as a means to fix and raise the price of rail freight transportation services across the board. CAC ¶¶ 2, 4. These surcharges, which are a separately identifiable fee, are assessed as a percentage of the total base rail freight rate. *Id.* ¶¶ 2, 5. The surcharge percentage is determined by fluctuations in an index of fuel prices.

2.      Plaintiffs allege that the conspiracy began in July 2003 when "Defendants BNSF and UP (together, the 'Western Railroads') – agreed [upon] the exact same fuel surcharges." *Id.* ¶ 7. Plaintiffs allege that the Western Railroads agreed that "a surcharge of 0.5 percent" would be added to the transportation rate for "every five cent increase" by which the monthly average U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF") increased above $1.35 per gallon. *Id.* ¶ 60. Plaintiffs, however, concede that BNSF adopted a fuel surcharge mechanism based on the HDF Index more than a year before and that UP had a fuel surcharge mechanism based on the WTI Index but then switched to a mechanism based on the HDF Index. *Id.* ¶¶ 59, 63, 80.

7

3.    Plaintiffs further allege that the "Eastern Railroads" (CSXT and NS) "suddenly moved into lockstep with fuel surcharges" based on the WTI Index in early 2004 such that their rates would be "increased 0.4 percent for every $1 that the [monthly average] price of WTI oil exceeded $23 per barrel." *Id.* ¶¶ 69-70.  The WTI Index is the West Texas Intermediated Crude Oil Index and is a different index from that employed by the Western Railroads.  *Id.*  The WTI Index is published daily in the *Wall Street Journal*.

4.    Using a table offering a side-by-side comparison, Plaintiffs allege that pursuant to the conspiracy the surcharges of the Western Railroads "moved in lockstep" from July 2003 through June 2007.  *Id*. ¶¶ 79-80.  Similarly, Plaintiffs provide a table to support their allegation that the surcharges of the Eastern Railroads "were identical" starting in March 2004 and continuing through June 2007.  *Id*. ¶¶ 81-82.  "The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges."  *Id*. ¶ 83.  This surcharge information was published on each Defendant's website allegedly to "facilitate coordination and the detection of any deviation from collusive pricing."  *Id*. ¶¶ 14, 61, 71.  "Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here)."  *Id*. ¶ 78.

5.    According to Plaintiffs, after BNSF and UP agreed to implement identical fuel surcharge mechanisms in mid-2003, they faced a "significant barrier to widespread use of fuel surcharges," namely, the fact that private rail "contracts had cost escalation provisions that already accounted for fuel."  *Id*. ¶ 64.  Plaintiffs allege that the four

Defendants "agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program." *Id.*

6.      This purported agreement to remove fuel from certain cost indices allegedly took place in the Fall of 2003, when all four Defendants "caused" the trade association to which they belong, the AAR, to create and publish a new cost index called AIILF. *Id.* ¶¶ 9, 66. This new cost index removed the fuel component from another AAR published cost index, the Rail Cost Adjustment Factor ("RCAF"). *Id.* ¶ 9. Defendants allegedly took this action "so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation." *Id.* ¶ 67.

7.      Plaintiffs also allege that, in furtherance of the conspiracy, Defendants switched from offering long-term contracts to offering contracts as short as 30 days, *id.* ¶¶ 89-91; decreased the use of through rates offered to shippers, *id.* ¶ 94; agreed not to undercut the fuel surcharges to steal market share from each other, *id.* ¶ 95; and announced their fuel surcharges in advance to the public, *id.* ¶ 83.

8.      The conspiracy is alleged to have continued at least through mid-2007. *Id.* ¶¶ 7, 12.

## C.    Rail Fuel Surcharges

1.      There is a "long history [of] fuel surcharges in the rail industry," dating back to the "mid-1970s." *Rail Fuel Surcharges*, STB Ex Parte No. 661, at 10 (Jan. 25, 2007) (hereinafter "*Rail Fuel Surcharges*") (Declaration of Tara L. Reinhart (hereinafter

"Reinhart Decl."), Ex. A) (cited in CAC ¶ 16).[1]  Back then, the ICC authorized the use of fuel surcharges and declined to find that rate-based fuel surcharges were unreasonable. *See Expedited Procedures for the Recovery of Fuel Costs*, 350 ICC 563, 1975 ICC LEXIS 27, at *16-17 (1975); *see also* 44 Fed. Reg. 33,230 (I.C.C. June 8, 1979); 38 Fed. Reg. 34,771 (I.C.C. Dec. 18, 1973).

2.     The AAR has long published a number of cost indices, including the RCAF and the All Inclusive Index ("AII") on which RCAF is based.  *Railroad Facts: 2006 Edition* at 59-60 (Nov. 2006) (Reinhart Decl., Ex. B).  The RCAF measures railroad cost inflation, *id.*, much like the Consumer Price Index measures inflation in the national economy.  The rail transportation statute mandates that the STB publish RCAF quarterly. 49 U.S.C. § 10708.  Pursuant to this statutory mandate, the AAR calculates RCAF and submits it to the STB for approval on a quarterly basis.  *See, e.g.*, *Quarterly Rail Cost Adjustment Factor*, 69 Fed. Reg. 13,954 (S.T.B. March 24, 2004).

3.     In December 2003, the AAR promulgated an additional cost index, the AIILF, which was identical to RCAF without a fuel component.  CAC ¶¶ 9, 65, 66.

---

[1]    It is proper to consider the STB decision because it is incorporated by reference into the Complaint and is a matter of public record.  CAC ¶ 16.  *See Twombly*, 127 S. Ct. at 1988 n.13 ("The District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn."); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (citations omitted) (finding that documents issued by the U.S. Patent and Trademark Office were "public records subject to judicial notice on a motion to dismiss"); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004) (Friedman, J.) (quoting *Baker v. Henderson,* 150 F. Supp. 2d 17, 19 n.1 (D.D.C. 2001)) (finding that courts may "take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment").

4.      One use for these indices is in long-term contracts, where costs can be expected to escalate over time and the parties therefore desire to include a mechanism to provide for rate adjustments over the term of the contract.  When a shipper and a railroad enter into a contract for rail service, therefore, one of the common terms, often referred to as an "escalation clause," concerns whether and to what extent the rate for that service will increase during the duration of the contract.  Cost indices like RCAF or AIILF, which measure a number of railroad costs (*e.g.*, labor, taxes, materials, etc.), can be used by the contracting parties to develop such a provision.  *Id.* ¶ 55.  Contracting parties are not restricted to these indices, however, and can elect any mechanism they wish.  *Rail Fuel Surcharges* at 9 n.34 (Reinhart Decl., Ex. A).

5.      In 2006, the STB considered whether calculating a fuel surcharge as a percentage of the base freight rate constituted an "unreasonable practice" with respect to regulated traffic.  CAC ¶ 96.  While the STB determined that rate-based fuel surcharges should be discontinued in favor of mileage-based or other surcharge methodologies, it acknowledged that "railroads may have reasonably relied on [prior agency decisions permitting rate-based fuel surcharges] in formulating their fuel surcharge programs." *Rail Fuel Surcharges* at 10 (Reinhart Decl., Ex. A).  Thus, "in view of the long history of rate-based fuel surcharges in the rail industry, we do not believe that railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible." *Id.*

6.      The STB decision did not suggest, let alone find, any collusion.  The STB did not award damages or restitution for past surcharges, but rather, explicitly provided a "rule of general applicability for future conduct." *Id.* at 8 (emphasis added).

11

## SUMMARY OF ARGUMENT

The Complaint does not meet the standard necessary to state a claim under Section 1 of the Sherman Act.

Part I:  *Twombly* clarified the standard applicable to motions to dismiss claims under Section 1.  The critical question under Section 1 is whether the alleged conduct arises from an agreement.  Hence, the allegations must raise the inference of a "preceding agreement" in restraint of trade, not merely parallel conduct that could be the product of independent action. The Complaint must plead facts suggestive enough to render a conspiracy claim plausible.

Federal courts have applied *Twombly* to dismiss claims similar to those alleged in the Complaint now before the Court.  The Second Circuit and the Ninth Circuit have held that allegations of similar pricing and other practices are insufficient under *Twombly* because such conduct is equally consistent with lawful conduct in which a competitor follows the price of another.  District courts have similarly dismissed Section 1 complaints, rejecting plaintiffs' efforts to infer conspiracy from similar pricing where that conduct could just as easily be explained as a common reaction of firms in a concentrated market.

Part II:  Plaintiffs have not pleaded facts plausibly suggesting that the Defendants agreed on fuel surcharges.  The Complaint never alleges that all four Defendants had the same fuel surcharge mechanisms, and specific allegations in the Complaint reveal that they never did. Plaintiffs do claim that the two Western Railroads had the same fuel surcharge mechanisms beginning in July 2003 and that the Eastern Railroads had the same fuel surcharge mechanisms (although different from the Western Railroads) beginning in March 2004, from which they seek to infer a conspiracy.  But other facts alleged in the Complaint and from sources on which the

Court may rely refute this contention. In the West, BNSF had a fuel surcharge mechanism based on the HDF Index going back to at least 2002, and UP switched its fuel surcharge mechanism from WTI to HDF in July 2003. In the East, CSXT changed certain elements of its fuel surcharge mechanism effective June 1, 2003, and NS modified its fuel surcharge mechanism in a similar fashion in March 2004. *Twombly* and a legion of other cases hold that price matching and follow-the-leader pricing are logical and rational economic behavior, especially in concentrated industries, and are insufficient to sustain a claim under Section 1.

Part III: The creation by the AAR of the AIILF neither violates the antitrust laws nor provides a basis for inferring the alleged underlying conspiracy to fix fuel surcharges.

A.    Section 1 prohibits restraints of trade, but the Supreme Court and other federal courts have held that the publication of voluntary cost or price indices by trade associations is not such a restraint. An unlawful agreement necessarily involves an exchange of assurances or some kind of enforcement mechanism that results in concerted behavior. Here, while Plaintiffs allege that the AIILF "allowed" Defendants to apply stand-alone fuel surcharges, the Complaint does not allege that the AIILF restricted the freedom of any Defendant to use whatever kind of fuel surcharge mechanism it might choose or even that the Defendants agreed to use the AIILF. As such, the AIILF did not restrain trade as a matter of law.

B.    Nor is the AIILF probative of the broader fuel surcharge conspiracy alleged in the Complaint. In the first place, the AIILF, which was not created until December 2003, cannot illuminate whether the Defendants entered into an agreement that Plaintiffs allege began at least as early as July 2003. Furthermore, the AIILF could not have been the catalyst for the adoption of rate-based fuel surcharges in July 2003, as Plaintiffs allege, because railroads have had such

13

surcharges going back to the 1970s, as indicated by the STB decision on which Plaintiffs expressly rely.  Finally, just as in *Twombly*, Plaintiffs allege that there was no business justification or natural explanation for Defendants' conduct.  But, here again, various allegations in the Complaint, the regulatory history, and applicable administrative decisions provide rational explanations for the AIILF; in these circumstances, the AIILF cannot be used as a plausible basis from which to infer a conspiracy.

Part IV:  Plaintiffs' purported "other elements" of the conspiracy are insufficient to create a plausible inference of conspiracy.  Numerous courts have held that generalized allegations that members of an industry met and talked from time to time provide no basis for inferring a wrongful agreement.  The alleged transition in the industry from longer to shorter contracts is neither anticompetitive on its face nor inconsistent with rational independent conduct in an industry characterized by high demand and tight supply, as Plaintiffs allege is the case in the railroad industry.  While Plaintiffs allege that for interline traffic Defendants started to quote separate rates for each segment, rather than quote a single rate for the overall movement, they cannot connect such an alleged transition to any anticompetitive harm.  Plaintiffs' remaining miscellaneous allegations, that there is something nefarious about Defendants publishing their fuel surcharges on their websites and that the Court should infer something from the pendency of an investigation in New Jersey, have been repeatedly rejected by courts.

At the end of the day, the Complaint fails to state a claim and must be dismissed.

14

**ARGUMENT**

I.    **THE COMPLAINT DOES NOT MEET THE STANDARD NECESSARY TO STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.**

The Complaint alleges that Defendants violated Section 1 of the Sherman Act, 15 U.S.C.

§ 1, which prohibits contracts, combinations, and conspiracies in restraint of trade.  An unlawful

agreement is the necessary predicate for any claim under Section 1.  *Theatre Enter., Inc. v.*

*Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-41 (1954).  Unilateral conduct by a defendant,

no matter what the motivation, cannot give rise to a Section 1 violation.  *InterVest, Inc., v.*

*Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).  Defendants move for dismissal of the

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) because the allegations are

insufficient as a matter of law to state a claim.

A.    *Twombly* **Clarified the Standard in Rule 12(b)(6) Motions Applicable in Section 1 Cases.**

Last year, in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court

considered "what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act."

*Id.* at 1965.  The Court started from the fundamental proposition that, because Section 1 prohibits

only restraints of trade "effected by a contract, combination or conspiracy," the critical question

is whether the alleged conduct arises from independent action or an agreement.  *Id.*  "Labels and

conclusions, and a formulaic recitation of the elements" of a claim are not sufficient, *id.* at 1959,

nor are allegations of "parallel conduct [with] a bare assertion of conspiracy,"  *id.* at 1966.  That

is because antitrust law recognizes that parallel behavior is ambiguous -- "consistent with

conspiracy, but just as much in line with a wide swath of rational and competitive business

strategy unilaterally prompted by common perceptions of the market."  *Id.* at 1964.

Because a Section 1 claim cannot survive a summary judgment motion if the evidence does not "tend to rule out the possibility that the defendants were acting independently," *id.* at 1964 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)), the Supreme Court indicated in *Twombly* that allegations in a complaint must raise the inference "of a *preceding agreement*, not merely parallel conduct that could just as well be independent action," *id.* at 1966 (emphasis added).[2]  The Court held in *Twombly* that, to satisfy the notice pleading requirements of Fed. R. Civ. P. 8(a), a complaint must provide "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 1965.  In other words, a complaint must plead "facts that are suggestive enough to render a § 1 conspiracy plausible."  *Id.*  The Court explained further:  "The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"  *Id.* at 1966.  In sum, a Section 1 complaint making conclusory allegations of conspiracy supported only by allegations of parallel conduct is insufficient.  It must also contain sufficient facts to raise a plausible inference of conspiracy.

In *Twombly*, the Court found that the allegations before it were insufficient to suggest the existence of a preceding conspiratorial agreement.  The plaintiffs, a putative class of subscribers of local telephone and/or high-speed internet services, alleged that a number of previously regulated incumbent local exchange carriers ("ILECs") unlawfully inflated charges to customers.

---

[2]   Requiring plaintiffs to plead sufficient facts to make conspiracy allegations plausible from the outset serves the important end of vesting the courts with gate-keeping obligations to prevent "discovery abuse."  *Id.* at 1967.  This gate-keeper function is particularly important in antitrust cases, which are especially prone to protracted litigation and enormously expensive discovery.

The plaintiffs alleged (1) conspiracy in conclusory terms; (2) "parallel conduct" that impeded the growth of smaller competitors, and (3) the absence of competition against each other as evidenced by their failure to enter one another's geographic markets despite "profitable" opportunities to do so. *Id.* at 1970-71. The Court agreed with the district court judge that "allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that 'ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior.'" *Id.* at 1963. The Court held that the complaint failed to state a claim because the plaintiffs based their claims on descriptions of parallel conduct and "not on any independent allegation of actual agreement." *Id.* at 1970.

Instead of suggesting an unlawful agreement, the facts -- placed in the context of the deregulated telecommunications market -- presented "natural explanation[s]" for the parallel behavior. *Id.* at 1972. The Court noted that the Telecommunications Act of 1996 subjected the ILECs to new competition from smaller firms and that the ILECs had economic incentives to resist the new competitors. Under these circumstances, the Court reasoned, nothing in the complaint suggested that the ILECs needed to collude to "do what was only natural anyway." *Id.* at 1971. With respect to the allegations that the ILECs refused to compete with one another, the Court concluded that "a natural explanation for the noncompetition alleged [was] that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 1972. These natural explanations for defendants' behavior meant the allegations were consistent with independent action and not plausibly suggestive of an agreement.

17

**B.     Federal Courts Have Applied *Twombly* to Dismiss Complaints Similar to the Present One.**

In the aftermath of the Supreme Court's decision, lower courts have applied the *Twombly* paradigm to dismiss antitrust conspiracy complaints founded on conclusory allegations regarding parallel and other ambiguous conduct.[3]  A number of cases have been dismissed because the plaintiff alleged ambiguous conduct that was just as consistent with independent conduct as with conspiracy.

In *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007), for example, the Second Circuit recognized that plaintiffs' allegations that elevator sellers "[p]articipated in meetings" to discuss pricing decisions and "[a]greed" to fix the price of elevators were merely "conclusory allegations of agreement at some unidentified point that do not supply facts adequate to show illegality."  502 F.3d at 50-51 (quoting *Twombly*, 127 S. Ct. at 1966) (internal marks omitted).  There, the plaintiffs alleged that the defendants agreed to fix the price of elevators, rig bids, and allocate markets and customers.  *Id.* at 49, 51.  The plaintiffs supplemented those allegations with averments that the defendants had similar contract language, pricing, and equipment design.  *Id.* at 51.  The court held that these alleged similarities did not provide "plausible grounds to infer an agreement," because, while consistent with conspiracy, they were "just as much in line with" competition and follow-the-leader copying.  *Id.* at 51 (quoting *Twombly*, 127 S. Ct. at 1964).  Plaintiffs also made specific allegations of misconduct in

---

[3]     The D.C. Circuit has not had occasion to apply *Twombly* to a complaint claiming violations of Section 1.  The court recently discussed the scope of *Twombly* in the context of a trademark case.  *See Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.,* -- F.3d –, 2008 WL 1932768 (Apr. 29, 2008).  There, the court declined to dismiss a misrepresentation claim under *Twombly*, noting that "*Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim."  *Id.* at *6.

Europe, including that European enforcers had raided the defendants' offices to investigate possible antitrust violations. *Id.* The court found those allegations insufficient to permit an inference of conspiracy, because the plaintiffs failed to provide sufficient factual allegations to link the defendants' alleged European conduct and their conduct in the United States. *Id.* at 52.

Similarly, in *Kendall v. Visa, U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), the Ninth Circuit held that merchants failed to state a Section 1 claim regarding credit card fees. 518 F.3d at 1048. The merchants alleged that Visa and MasterCard consortiums conspired to set the interchange fee charged to member banks and that the member banks of those consortiums, in turn, conspired with each other and with the consortiums to pass on the interchange fee to the plaintiffs through a "merchant discount" fee charged for credit card transactions. *Id.* at 1048-50. The court concluded that the plaintiffs failed to state a claim because the allegation of agreement was a conclusion and the complaint did not allege facts to support that conclusion. *Id.* at 1048. The court affirmed dismissal because the complaint did not answer "the basic questions: who, did what, to whom (or with whom), where, and when." *Id.* Like *Twombly*, *Kendall* recognized that complaints must allege facts supporting an inference of concerted action rather than general averments that defendants met, agreed, and conspired.

Also, in *In re Late Fee and Over-limit Fee Litigation*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), the court held that credit cardholders failed to state a Section 1 claim when they alleged that the issuing banks conspired to fix late fees. The plaintiffs attempted to plead a claim by alleging that the defendants assessed parallel late fees, operated in a concentrated market, and had repeated opportunities to conspire through their participation in industry associations. *Id.* at 961. The court held that these allegations were insufficient. First, the court noted that the plaintiffs' "centerpiece" chart of each defendant's late fees, which the plaintiffs maintained

showed lockstep pricing, actually demonstrated that several alleged co-conspirators had different

late fees. *Id.* at 962. Relying on *Twombly*, the court explained that parallel behavior in a

concentrated market is insufficient to suggest a conspiracy, because it is a "common reaction of

firms in a concentrated market" to "recognize their shared economic interests" and to reach

similar "price and output decisions" independently. *Id.* at 964 (quoting *Twombly*, 127 S. Ct. at

1964). Likewise, the court recognized that courts have "consistently refused to infer the

existence of a conspiracy" on the basis of participation in trade associations and, accordingly,

found that the averments regarding the defendants' trade association contacts did not plausibly

suggest a conspiracy. *Id.* at 963-64 (citing cases). Finally, the court noted that the plaintiffs'

own allegations regarding the competitive environment in the industry revealed that the

defendants' alleged parallel late fee increases could have been the product of each defendant's

independent business strategy. *Id.* at 962-63. In particular, the plaintiffs' averments that the

defendants faced declining interest rates, elimination of an alternative revenue source, and higher

costs meant that it was entirely rational for each bank "*independently* to decide to increase late

fees as a way to raise revenues, 'expecting [its] neighbors to do the same thing.'" *Id.* (quoting

*Twombly*, 127 S. Ct. at 1972).

Finally, in *In re Travel Agent Commission Litigation*, No. 1:03 CV 30000, 2007 WL

3171675 (N.D. Ohio Oct. 29, 2007), the court dismissed the complaint of travel agents alleging

that airlines conspired to reduce their commissions. The plaintiffs attempted to state a claim by

alleging that the airlines acted in parallel to reduce the commissions and were meeting frequently

at industry and social events during the periods of parallel conduct. *Id.* at *7-8. The plaintiffs

also claimed the commission reductions were "common knowledge" in the industry and against

each airline's independent self-interest. *Id.* The court held that these allegations did not

plausibly suggest a conspiracy.  The plaintiffs' allegations of frequent airline meetings did not

state a claim, even when coupled with the alleged parallel conduct, because the averment of "an

opportunity to conspire [through the frequent contacts], without more, does not suggest that there

was an agreement to reduce commissions."  *Id.* at *9.  The court also concluded that the plaintiffs

failed to allege facts to support their conclusory allegation that airlines would not have reduced

commissions absent an agreement.  *Id.* at *10.  According to the court, to support an inference of

conspiracy, evidence that an action is against self-interest must suggest something more than

"mere interdependence" and "must be so unusual that in the absence of advance agreement, no

reasonable firm would have engaged in it."  *Id.* at *11 (quoting *In re Baby Food Antitrust Litig.*,

166 F.3d 112, 135 (3d Cir. 1999)).  The court recognized that the plaintiffs' allegations did not

move beyond mere interdependence.  *Id.*  Likewise, the court concluded that the allegation that

each airline's commission rates were available for others to see did not suggest a conspiracy,

because availability of information is not invariably anticompetitive, but can increase economic

efficiency and competition.  *Id.* *11.[4]

---

[4]    Numerous other district courts also have dismissed Section 1 claims that relied primarily on
allegations of parallel conduct.  *See, e.g., In re Insurance Brokerage Antitrust Litig.*, No. 05-
1079, 2007 WL 2533989, at *19 (D.N.J. Sept. 28, 2007); *Schafer v. State Farm Fire and Cas.
Co.,* 507 F. Supp. 2d 587, 597 (E.D. La. 2007); *In re Graphics Processing Units Antitrust
Litig.*, 527 F. Supp. 2d 1011, 1023-25 (N.D. Cal. 2007); *Am. Channel, LLC v. Time Warner
Cable, Inc.*, No. 06-2175, 2007 WL 1892227, at *5 (D. Minn. June 28, 2007); *Wellnx Life
Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 290-91 (S.D.N.Y.
2007); *Se. Missouri Hosp. v. C.R. Bard, Inc*., No. 1:07cv0031, 2008 WL 199567, at *6 (E.D.
Mo. Jan. 22, 2008).  Defendants note that there is one post-*Twombly* antitrust decision in this
District in which the court denied defendants' efforts to dismiss.  The court, faced with
allegations that are not analogous to those in the present Complaint, denied a motion for
reconsideration of its pre-*Twombly* ruling that had been issued more than a year earlier
denying a motion to dismiss.  *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2008
WL 1735856, at *5 (D.D.C. Apr. 16, 2008).  In affirming its earlier ruling, the court
acknowledged "the claim may rest ultimately on a thin factual reed" and the "facts alleged
here may be barely over [the] line."  *Id.* at n.5.

These cases apply the principles of *Twombly* in a consistent manner, holding that at the pleading stage under Rule 8(a), complaints alleging a violation of Section 1 of the Sherman Act must be scrutinized to determine whether they provide *factual* material that, in context, plausibly suggests an agreement. Allegations of conduct that is ambiguous because it is just as easily explained by rational, independent behavior and is adorned with an arbitrarily attached label of conspiracy do not suffice and warrant dismissal.

### C.    Treatment of the Allegations in the Complaint

For purposes of a motion to dismiss under Rule 12(b)(6), well-pleaded allegations of fact are taken as true, but a court need not accept conclusory allegations. *Stewart v. Nat'l Educ. Ass'n.*, 471 F.3d 169, 173 (D.C. Cir. 2006). The Court may consider public records that are subject to judicial notice. *See, e.g., Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). The Court may also consider information and documents that are incorporated by reference and relied upon by Plaintiffs in the Complaint. *Id.* (documents that are "referred to in the complaint and are integral" to plaintiffs' claim are properly considered on a motion to dismiss).

## II.    PLAINTIFFS HAVE NOT PLEADED FACTS PLAUSIBLY SUGGESTING THAT THE RAILROADS AGREED ON FUEL SURCHARGES.

Plaintiffs contend that the conspiracy consisted of an overarching agreement among all four Defendants, beginning in July 2003, to set fuel surcharges as a means to raise rates across the board. CAC ¶¶ 4, 17. To implement that conspiracy, Plaintiffs allege, Defendants began by having BNSF and UP, the "Western Railroads," coordinate their surcharges starting in July 2003. *Id.* ¶ 7. Eight months later, in March 2004, CSXT and NS, the "Eastern Railroads," allegedly coordinated their surcharges — which admittedly differed from the Western Railroads'

surcharges — as a further step in implementing the conspiracy. *Id.* ¶ 12. These allegations of agreement are conclusory.

The Complaint then alleges that, through implementation of two different formulas, one in the West and one in the East, rail fuel surcharges moved in "uniform lockstep for a period of nearly 38 months," thus indicating that Defendants were "coordinating their behavior and conspiring to fix prices for Rail Fuel Surcharges." *Id.* ¶ 83. These allegations, lacking in specifics regarding the who, what and when of agreement, plainly seek to rely upon "allegations of parallel conduct . . . in order to make a § 1 claim." *Twombly*, 127 S. Ct. at 1966. Allegations of parallel conduct, however, have never by themselves been deemed sufficient to plead a Section 1 claim. *Id.* To survive dismissal, Plaintiffs must at a minimum place those facts "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.*

Plaintiffs do not allege that all four Defendants agreed to the same surcharge formula. To the contrary, the Complaint plainly demonstrates that the Eastern Railroads and the Western Railroads adopted and applied different fuel surcharge mechanisms through the alleged conspiracy period. While the Complaint alleges that the two Western Railroads charged the same fuel surcharges beginning July 2003 and the two Eastern Railroads charged the same fuel surcharges beginning March 2004, this is no more than an allegation of parallel behavior in which a railroad decided to adopt a fuel surcharge mechanism already being used by one of its rivals. CAC ¶¶ 7, 12. Because such conduct is equally consistent with perfectly lawful, independent pricing decisions, the allegations fail to state a claim under *Twombly*.

**A.    The Complaint Fails To Allege Facts Suggesting A Conspiracy Among The Four Defendants.**

The basic nature of the alleged conspiracy is an agreement by BNSF, UP, NS and CSXT to charge artificially high surcharges.  CAC ¶ 4.  Unlike a typical conspiracy, however, in which all defendants are alleged to have agreed to charge uniform prices, the conspiracy alleged here involves the use of two completely different surcharge formulas adopted at widely different times by the Eastern and Western Railroads.  During the period of the alleged conspiracy, the Western Railroads are alleged to have used Highway Diesel Fuel prices ("HDF") as the index for their respective fuel surcharge mechanisms *Id.* ¶ 79, while the Eastern Railroads are alleged to have used West Texas Intermediate crude oil prices ("WTI") as the index for their respective fuel surcharge mechanisms.  *Id.* ¶ 81.

In fact, the fuel surcharge mechanisms used by the two Western Railroads differed from the fuel surcharge mechanisms used by the Eastern Railroads in almost every possible respect.  According to the Complaint, the Western Railroads applied a *0.5 percent* surcharge for every *five cent* increase in the price of *diesel fuel*, as measured by the *HDF Index*, above *$1.35 per gallon*.  *Id.* ¶ 60.  The Eastern Railroads are not alleged to have done any of that.  Instead, they allegedly applied a fuel surcharge equal to *0.4 percent* for every *dollar* that the price of *oil*, as measured by the *WTI Index*, exceeded *$23*.  *Id.* ¶ 70.  Not surprisingly, therefore, as Plaintiffs' own tables reveal, the Western Railroads had different monthly surcharge percentages from the Eastern Railroads both before and during the alleged conspiracy period.  *Compare* CAC ¶ 80 *with* CAC ¶ 82.  These facts undermine any plausible inference of an integrated overall conspiracy.  *See Late Fee*, 528 F. Supp. 2d at 962 (allegations that defendant banks had parallel late payment fees were held "not even roughly in parallel" because the time when banks implemented their fees differed and some defendants had different fees; complaint was dismissed).

24

Moreover, the timing of events alleged in the Complaint is impossible to square with any suggestion of conspiracy. The four Defendants are alleged to have conspired in July 2003, with the Western Railroads implementing an agreed-upon fuel surcharge mechanism beginning in July 2003 and with the Eastern Railroads applying different fuel surcharges for the next eight months, CAC ¶ 82, and, even then, applying fuel surcharges that differed from their alleged co-conspirators in the West. *Id.* ¶ 80. One might fairly ask what kind of four-way conspiracy that was. *See Late Fee*, 528 F. Supp. 2d at 962 (banks' implementation of late fees at different times undermined an inference of conspiracy). Nowhere in the Complaint is the hint of an answer; and without some facts suggesting how the separate use of HDF and WTI indices and the differential timing of adoption by the Western and Eastern Railroads were part of a unified conspiracy, Plaintiffs cannot get out of the starting gate.

### B. The Alleged Conduct By The Eastern Railroads and By The Western Railroads Is Equally Consistent With Lawful, Independent Conduct.

Even to the extent that the Complaint alleges the conspiracy resulted in lockstep pricing by either the two Eastern Railroads or the two Western Railroads, Plaintiffs cannot overcome *Twombly's* admonition that parallel conduct in concentrated industries can be entirely legitimate and thus provides no basis for inferring conspiracy. Plaintiffs seek to overcome this deficiency by suggesting that the "simultaneous selection" by the two Western Railroads of the same fuel surcharge mechanism in July 2003, and the "simultaneous selection" by the two Eastern Railroads of the same fuel surcharge mechanism in March 2004, shows that these actions could not have been "independent responses" to increased fuel costs, CAC ¶¶ 62, 72, but closer analysis of the Complaint reveals that the conduct was not simultaneous, and, instead, was months and sometimes years apart.

With respect to the Western Railroads, Plaintiffs claim that the first "collective action" in furtherance of the conspiracy was an agreement by UP and BNSF in July 2003 "to implement the same fuel surcharge program, resulting in the exact same fuel surcharges." *Id.* ¶ 7. No facts are alleged concerning how this agreement was supposedly reached. There are no names, places, or events that Plaintiffs are able to tie to this "conspiracy." Likewise, the Complaint alleges that, after the AAR's announcement of the AIILF in December 2003, the two Eastern Railroads "now announced that each would apply identical fuel surcharges based on the West Texas Intermediate Index," but again no specifics are provided concerning the manner or participants in such an agreement. *Id.* ¶¶ 12, 69, 82. Plaintiffs thus do not present an "independent allegation of actual agreement" between the Western Railroads or between the Eastern Railroads that suggests a meeting of the minds among any of them. *Cf. Twombly*, 127 S. Ct. at 1970.[5]

In an effort to connect these alleged changes in fuel surcharge mechanisms to an agreement, Plaintiffs allege that the "*simultaneous* selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs" by each set of carriers produced "similarities [that] are both too precise and too comprehensive" to have been independent responses to indisputably substantial increases in the fuel costs. CAC ¶¶ 62, 72 (emphasis added). Presumably, Plaintiffs have calibrated their allegations in an effort to come within following passage in *Twombly*:

> The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors,

---

[5]    The Complaint's allegation, CAC ¶ 58, that representatives of the defendants met at industry conferences, *id.* ¶ 58, is not suggestive of conspiracy. *See Twombly,* 127 S. Ct. at 1971 & n.12; *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) (a mere *opportunity* to conspire, without more, does not permit an inference of conspiracy).

and made for no other discernible reason" would support a plausible inference of conspiracy.

127 S. Ct. at 1966 n.4 (citation omitted).

Plaintiffs come nowhere near pleading facts of this nature here. To begin with, as the Complaint alleges, at least some of the Defendants imposed fuel surcharges prior to 2003. CAC ¶ 57. Indeed, the STB decision relied upon by Plaintiffs, *id.* ¶¶ 16, 96, noted that there was "a long history of rate-based fuel surcharges in the rail industry" dating back to the mid-1970s. *Rail Fuel Surcharges* at 10 (Reinhart Decl., Ex. A). Thus, Plaintiffs' suggestion that there was something "historically unprecedented," *Twombly*, 127 S. Ct. at 1966 n.4, about rate-based fuel surcharges is belied by their own authority.

Moreover, the Complaint makes it plain that UP and BNSF did *not* adopt their surcharge formulas "simultaneously." According to paragraph 59, prior to the spring of 2003, "the BNSF fuel surcharge had been based on the HDF Index." Then, "[i]n or about July 2003, [ ]UP *switched* to the HDF Index." CAC ¶ 59 (emphasis added). In other words, BNSF was *already using* the HDF Index-based formula when UP announced that it was switching from using the WTI Index to the HDF Index. In paragraph 63, Plaintiffs again reveal that there was no simultaneous action, describing UP's "*move* to the same fuel price index *used* by BNSF" (emphasis added). The Complaint's use of the word "simultaneous" in paragraph 62 seems calculated to create the impression that BNSF and UP suddenly and inexplicably announced at the same time that they were "select[ing] and adopt[ing]" the HDF Index as the basis for fuel surcharges and that the attributes of both programs would be the same. But, by Plaintiffs' own lights, that is not what happened. The Complaint states clearly that, as of the time UP announced its decision to adopt the HDF Index, BNSF already was using it. This is confirmed by their

27

websites,[6] which show that BNSF's fuel surcharge mechanism had been a matter of public record long before UP decided to adopt an HDF-based fuel surcharge mechanism.[7]

The same is true of NS and CSXT. The Complaint alleges that some time around the beginning of 2004, CSXT and NS "announced" that they would apply identical fuel surcharges, CAC ¶ 12, although Plaintiffs do not quote from or cite to this purported "announcement" the way they cite to other public statements of Defendants elsewhere in the Complaint (*e.g.*, *id.* ¶¶ 4, 9-11).[8] Plaintiffs allege that CSXT and NS "agreed" to have identical fuel surcharges, which commenced in March 2004. *Id.* ¶¶ 70, 82.

---

[6]   Plaintiffs allege that all Defendants published their fuel surcharges on their websites in an effort to detect cheating on the conspiracy. CAC ¶¶ 14, 61, 71. Where, as here, plaintiffs have relied upon and incorporated website information into a complaint by reference, the Court may properly consider that information in connection with a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Kaempe*, 367 F.3d at 965 (considering documents that were referred to in the complaint and integral to plaintiff's claim); *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 500-01 (D.N.J. 2006) (considering website material relied upon and incorporated by the complaint); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (court may consider information available on a website on motion to dismiss so long as the website's authenticity is not in dispute and it is capable of "accurate and ready determination"); *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001) (taking notice of plaintiff's phone bill and MCI's FCC-filed tariff because they were referenced in the complaint); *Pollstar v. Gigmania*, 170 F. Supp. 2d 974, 978 (E.D. Cal. 2000) (considering contents of website alleged in the complaint).

[7]   The websites provide more information about the history of BNSF and UP's use of the various indices. At least as early as April 2002, BNSF had in place a fuel surcharge mechanism based on the HDF Index. Reinhart Decl., Ex. C. UP had implemented a fuel surcharge mechanism based on the WTI Index on December 1, 2002. Reinhart Decl., Ex. D. The Complaint does not allege that either of these actions was improper. Then, in June 2003, UP switched to a mechanism based on the HDF Index. *Id.*

[8]   Plaintiffs have long been aware that CSXT announced changes to its fuel surcharge mechanism in early 2003, not early 2004. One of the early complaints filed against Defendants specifically alleged that "CSX announced its new 'fuel cost recovery program' on March 20, 2003." *See Dakota Granite Co. v. Association of American Railroads*, Amended Class Action Complaint ¶ 72 (Sept. 25, 2007).

The NS and CSXT websites, cited by Plaintiffs in the Complaint, clearly show that the railroads did not act simultaneously. They show that NS had implemented a fuel surcharge based on the WTI Index almost four years earlier, in June 2000, and CSXT had implemented a similar fuel surcharge mechanism based on the WTI Index in October 2000. Reinhart Decl., Ex. E & F. None of that is alleged to have been the result of a conspiracy. Effective June 1, 2003, before the alleged inception of the conspiracy, CSXT modified the trigger price and method of calculating the date for adjusting fuel surcharges.[9] This is confirmed by simply applying Plaintiffs' own allegations to the published WTI Index.[10] All that happened in March 2004 was

---

[9]    Although the Complaint alleges that Defendants had the "exact same fuel surcharges . . . through at least mid-2007," CAC ¶¶ 7, 12, 80, 82, the website data shows that, effective July 1, 2006, NS modified its WTI Index-based fuel surcharge by significantly increasing the trigger point (i.e., the WTI Index fuel price at which a fuel surcharge would "kick in") and reduced the increments by which the fuel surcharge is increased. Reinhart Decl., Ex. E.

[10]    The WTI Index is available on the U.S. Department of Energy website. *See* http://tonto.eia.doe.gov/dnav/pet/hist/rwtcM.htm. Courts properly and routinely take judicial notice of material on government agency websites. *See, e.g., Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 705 n.5 (3d Cir. 2004) (holding that court may take judicial notice of records posted on website of Patent and Trademark Office); *Kokinda v. Peterson, No. 06-0828,* 2006 WL 3507074, at *4 (W.D. Okla., Dec. 5, 2006) (taking judicial notice of publicly-available records posted on state agency's website in habeas corpus action). Relying on the Index and the Complaint's allegations alone, it is easily shown that CSXT's surcharge was in place before the start of the alleged conspiracy in July 2003. Plaintiffs allege that CSXT applied a fuel surcharge equal to 0.4 percent for every dollar that the price of oil, as measured by the WTI Index, exceeded $23, with the adjustment in the fuel surcharge being made "two calendar months after the WTI Index had adjusted." CAC ¶¶ 70-71. But this is precisely what CSXT had been doing since prior to the alleged commencement of conspiracy (in July 2003). Plaintiffs' chart showing CSXT's fuel surcharges, *id.* ¶ 82, can be used to confirm this arithmetically, proving that the CSXT surcharges reflected in that chart for the months prior to March 2004 are no more than the application of the formula. Referring for example to the WTI Index for April 2003 – two calendar months before the first fuel surcharge shown in Plaintiffs' chart, and applying the formula alleged, results in a fuel surcharge of 2.4%--precisely what Plaintiffs allege. (Thus, in April 2003, the WTI was $28.17; because $28.17 exceeds $23 by $6 in whole dollars, according to the formula, 6 would be multiplied by 0.4% to arrive at 2.4%). Similar calculations in following months show consistent application of this same formula throughout the months leading up to NS's decision to adopt that formula. (For example, the Index increased from $32.13 to $34.31 in

*(cont'd)*

that NS made the same modifications -- *nine months* after CSXT announced its changes.  This obviously was not "simultaneous" conduct, much less the adoption of a "novel, arbitrary and complex combination of features" for fuel surcharges as Plaintiffs allege.  CAC ¶ 72.  NS's conduct is simply parallel pricing in a concentrated industry, a course of action that does not support an inference of conspiracy.

As to both the Western Railroads and the Eastern Railroads, then, Plaintiffs have done no more than allege conscious parallelism.  The Complaint alleges that Defendants' fuel surcharge mechanisms were a matter of public record, *id.* ¶ 14, 61, 71, and that the railroad industry is highly concentrated.  *Id.* ¶ 51.  It is neither uncommon nor suspicious for competitors to follow each other in charging the same prices, especially in concentrated industries:  "[C]onscious parallelism [is] a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions. . . ." *Twombly*, 127 S. Ct. at 1964 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)) (internal quotation marks and alterations omitted).  Because such behavior is equally consistent with the exercise of independent self-interest, it does not, as a matter of law, support an inference of conspiracy.  *See Reserve Supply Corp. v. Owens Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992) ("One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.") (citation omitted); *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) ("A Section 1 violation cannot . . . be inferred from . . . an industry's follow-the-leader pricing strategy."); *Clamp-All Corp. v. Cast*

_____
*(cont'd from previous page)*
    January 2004, requiring an additional 0.8% increase in the surcharge (2 x 0.4) two months
    later, raising the surcharge from 4.0% to 4.8% in March when NS began applying the same
    formula.)

*Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (finding that identical pricing "shows no more than . . . that each firm, acting individually, copied the price list of the industry leader" and "[o]ne does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry"); *Travel Agent Comm'n Antitrust Litig.*, No. 1:03 cv 30000, 2007 WL 317675, at *4 (dismissing conspiracy claims where defendant airlines "either failed to implement the [travel agent commission] caps entirely or implemented the caps after the larger airlines").[11] And here, the lengthy interval between actions by BNSF and CSXT, and the corresponding later actions by UP and NS, refute any inference of conspiracy. *See Baby Food Antitrust Litig.*, 166 F.3d at 131-32 (holding that time lags of three to six months between defendants' pricing actions "refute rather than support" an inference of conspiracy).

UP and NS's adoption of fuel surcharge mechanisms previously used for many months before by their respective rivals is, in short, perfectly normal behavior "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 127 S. Ct. at 1964. So, while Plaintiffs make dramatic assertions that Defendants' use of the same or similar fuel surcharge mechanisms was so surprising that it could never have been accomplished by firms acting independently, what their own Complaint actually shows is much more prosaic: one railroad observing the mechanism of another and then, some months later, adopting or switching to it. Regardless of how complex the surcharge mechanisms

---

[11]  For the same reason, Plaintiffs' allegation that UP switched to an HDF Index-based fuel surcharge mechanism only two months after having announced a modification to its WTI Index-based fuel surcharge mechanism hardly provides "striking" evidence of a conspiracy. CAC ¶63.  UP elected to switch its fuel surcharge mechanism in June 2003, long after BNSF's fuel surcharge mechanism had become a matter of public record.  Whether UP had made an antecedent change to its mechanism two months or two years before provides no basis for inferring that its change in June 2003 was pursuant to an agreement.

were, it surely did not require a conspiracy for BNSF and UP, or for CSXT and NS, to adopt the same mechanisms. One railroad's mechanism could have been based on Einstein's theory of relativity, but if all the elements of the formula were a matter of public record, the fact that another railroad later adopted the same or a similar formula cannot plausibly raise a suspicion that there was coordination between the two. Simply put, parallel pricing in a concentrated market is as consistent with unilateral conduct as with coordinated action.

Finally, in the absence of any factual context plausibly suggesting something improper about UP and NS's adoption of a fuel surcharge formula that their rivals already were using, Plaintiffs' contention that Defendants engaged in "lockstep pricing" for nearly 38 months thereafter adds nothing. The fact (reflected in tables in paragraphs 80 and 82 of the Complaint) that fuel surcharges may have moved in lockstep in the West and in the East for periods of time is not suggestive of conspiracy because the monthly changes in fuel surcharge percentages do not reflect separate monthly pricing decisions by Defendants, but, instead, an automated application of the fuel surcharge mechanisms previously put into place. Once a formula is adopted, the numerical percentage of each monthly surcharge simply results from a mathematical application of the formula, not a separate pricing decision. The monthly calculation is affected only by whether fuel prices supplied by the HDF or WTI indices rise or fall. Thus, while Plaintiffs cite identical monthly surcharges over a period of time as dramatic evidence of a conspiracy at work, the critical facts are those concerning the timing of the railroads' implementation of the relevant changes to their various fuel surcharge mechanisms. This Complaint alleges conduct too disparate to raise an inference of conspiracy; Defendants' implementation of fuel surcharge

mechanisms at widely different times is just as consistent with independent conduct, which dooms the Complaint.[12]

## III.    CREATION OF THE AIILF INDEX WAS NOT A RESTRAINT OF TRADE AND DOES NOT PLAUSIBLY SUPPORT AN INFERENCE OF AN UNDERLYING FUEL SURCHARGE CONSPIRACY.

Perhaps recognizing that their conclusory allegations are deficient under *Twombly*, the Complaint places substantial weight on the AAR's creation and publication of the AIILF cost index in December 2003.  Specifically, Plaintiffs allege that cost indices available for use prior to that time were a "barrier" or "obstacle" to the use of stand-alone fuel surcharges.  CAC ¶¶ 8, 64. Plaintiffs allege that Defendants, as voting members of the AAR, "conspired" to cause AAR to create and publish a cost index with the fuel component removed so as to "permit separate 'fuel surcharges' to be widely applied."  *Id*. ¶ 56.  Plaintiffs conclude that "creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy."  *Id*. ¶ 67.  It is not clear and does not matter whether Plaintiffs intend to allege that this conduct was itself an illegal agreement or merely an implementing device that somehow bolstered the alleged conspiracy to fix fuel surcharges.  Either way, the allegations are legally and factually deficient to state a claim.

---

[12]   Plaintiffs allege that "advance announcements" of the fuel surcharge percentage that would be applicable in an upcoming month was an important element of the alleged conspiracy. CAC ¶ 83.  Plaintiffs do not explain why this is so, and probably for good reason.  Mere advance announcement of price changes does not bespeak agreement because customers benefit from notice of upcoming changes in price.  *See Reserve Supply*, 971 F.2d at 53-54. Here, the announcement of the particular fuel surcharge percentage is even less relevant to inferences of a conspiracy because, as explained above, the percentage applicable in any particular month is calculated on the basis of changes in fuel costs that are then simply run through the fuel surcharge formula.

### A.    Creation and Publication of the AIILF Is Not A Restraint of Trade.

Section 1 of the Sherman Act prohibits only restraints of trade, and the publication of

voluntary indices by a trade association is not such a restraint.  It has long been settled that the

creation and publication of such indices, if they are non-binding and do not purport to restrict the

trade association's members from acting independently, cannot form the basis for antitrust

liability.  As the Supreme Court explained almost a century ago, trade association activity

involving the collection and dissemination of cost information that does not restrict its members

from acting independently does not violate Section 1.  *Maple Flooring Mfrs.' Ass'n v. United

States*, 268 U.S. 563, 586 (1925).  There, the Court held that "in the absence of proof of such

agreement or concerted action [with respect to prices] having been actually reached or actually

attempted . . . we can find no basis in the gathering and dissemination of [cost] information . . .

for the inference that such concerted action"  in violation of the antitrust laws has occurred.  *Id.*

In the trade association context, it is "enforcement mechanisms [that] are the 'restraints'

of trade," and "[w]ithout them there is only uncoordinated individual action, the essence of

competition."  *Schachar*, 870 F.2d at 399 (holding that a trade association's provision of

information about a procedure, without restricting its members' ability to perform the procedure,

did not violate Section 1).[13]  In other words, there must be some separate allegations indicating

that association members were bound to use the index or otherwise were restricted by it; a trade

---

[13]    *Schachar* highlighted earlier decisions in which an "enforcement device" was a critical factor
in the court's Section 1 analysis in the trade association context.  870 F.2d at 399.  *Compare
Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 684 n.5 (1978) (noting that the
district court found "that NSPE and its members [had] actively pursue[d] a course of policing
adherence" to the challenged trade association policy) *with Moore v. Boating Indus. Ass'n,*
819 F.2d 693, 702, 713 (7th Cir. 1987) (ordering directed verdict in favor of the defendants
where there was no evidence "of any agreement by [trade association] members" to use
safety certification to restrict members' purchases).

association agreement to create and publish a cost index alone will not suffice. An unlawful

agreement under the antitrust laws necessarily involves an exchange of assurances among

competitors to take or not to take some action that affects a competitive variable like price or

output. *See NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984). Here,

although Plaintiffs repeatedly allege that Defendants agreed to establish and publish the AIILF

index, nowhere do they allege that Defendants "had any agreement or understanding . . . that

[they] would . . . make use of" the AIILF. *See Cement Mfrs. Protective Ass'n. v. United States*,

268 U.S. 588, 602-03 (1925) (holding that there is no Section 1 violation in the absence of

allegations or evidence of agreement to follow trade association policy). In short, "[t]here can be

no restraint of trade without a restraint," *Schachar*, 870 F.2d at 397, and, in this Complaint, the

essential requirement of "restraint" is entirely lacking.

Instead, Plaintiffs assert only that the new index "allowed" the Defendants to apply stand-

alone fuel surcharges. CAC ¶ 11. *See also id.* ¶¶ 56, 78 (AIILF "permit[ted]" stand-alone fuel

surcharges); 64 (AIILF "pav[ed] the way" for separate fuel surcharges); 67 ("creation of this new

index" was part of the conspiracy); 74 (alleging "collective action" to "adopt and publish the

AIILF"). As a matter of law, there is nothing improper in the creation of an index that allows

such "uncoordinated individual action." *Schachar*, 870 F.2d at 399. Defendants' alleged

conduct in relation to AIILF did not restrict the freedom of any railroad to compete to sell its

transportation services to shippers or determine whether and in what circumstances fuel

surcharges would be applied. As such, the AIILF did not restrain trade in any way.

Plaintiffs' AIILF allegations are particularly weak given the nature and purpose of the

AIILF. As the Complaint alleges, the AAR publishes various indices, *none* of which is claimed

to have any mandatory applicability to any of the rail movements about which Plaintiffs

35

complain. CAC ¶ 4. Quite the contrary, as explained by the STB, "shippers are free to enter contractual arrangements with carriers that incorporate in those contracts any escalation provision for fuel cost recovery that the parties wish." *Rail Fuel Surcharges* at 9 n.34 (Reinhart Decl., Ex. A). There is no allegation that the Defendants sought to curtail publication or prevent the use of the RCAF or any other index containing a fuel component.[14] Rather, the AIILF is simply an additional index that can be used in conjunction with an escalation provision. The AII Index, on which it is based, was already public, and the AAR simply subtracted out the fuel cost element to create the AIILF, a calculation accomplished by simple arithmetic. Nor can anything improper can be inferred when an openly published index is made available for use by any party and is subject to whatever contractual negotiations may thereafter ensue. Indeed, precisely because it lacks a fuel component, the AIILF leaves the negotiation of any fuel surcharge to individual shippers and the railroads, *i.e.*, to the marketplace. As recognized by a long line of case authority, this type of trade association activity, providing tools for optional use by members, does not violate the antitrust laws. Thus, to the extent that Plaintiffs are contending that the creation of the AIILF constituted an illegal agreement, the Complaint must be dismissed.

---

[14]    The Complaint and the sources incorporated by it demonstrate that the use of AIILF, or any cost index for that matter, was and is optional and that all indices remain available for use by shippers and carriers. Plaintiffs acknowledge in the Complaint the availability of multiple indices. CAC ¶ 4 (discussing AII and RCAF). The December 2003 AAR Railroad Cost Indexes publication cited by Plaintiffs lists four available cost indices: AII, RCAF (of which there are multiple versions), AIILF and RCR. *AAR Railroad Cost Indexes* (Reinhart Decl., Ex. G). The 2006 edition of *Railroad Facts*, an AAR publication cited by Plaintiffs, shows the continued availability of all non-AIILF indices throughout the alleged conspiracy period. *Railroad Facts* at 59-60 (Reinhart Decl., Ex. B).

**B.    The AIILF Is Not Probative of a Fuel Surcharge Conspiracy.**

Plaintiffs fare no better insofar as they contend that creation of the AIILF in late 2003 somehow facilitated the underlying fuel surcharge conspiracy.  While the allegations in the Complaint relating to the AIILF are stated in various ways, Plaintiffs seem to be making two basic arguments.  First, it was not possible for Defendants to assess stand-alone fuel surcharges (*i.e.*, to charge a separate fuel surcharge that would be added to the base rate for the transportation service) that would be calculated as a percentage of the base rate, unless and until Defendants had created a cost escalation index that excluded fuel.  CAC ¶¶ 5, 13, 65, 67, 78.  Second, there was "no business justification or natural explanation" for creation of the AIILF because Defendants could have recovered their increased fuel costs by using other existing indices such as the AII and RCAF.  Again, as with their other allegations, these provide an insufficient basis for inferring an agreement to fix fuel surcharges.

Plaintiffs' allegation that an index without the fuel component was necessary to assess *stand-alone* fuel surcharges, such that the alleged conspiracy "could only have been accomplished" once a fuel-less index was in place, *id.* ¶ 74, is flatly inconsistent with other allegations in the Complaint.  The Complaint alleges that separate fuel surcharges were imposed by the Defendants prior to the creation of the AIILF in December 2003.  Plaintiffs posit, for example, that "BNSF and UP began to charge the exact same fuel surcharges," *id.* ¶ 7, pursuant to conspiracy in July 2003, *id.* ¶¶ 4, 7 -- a full six months *before* creation of the AIILF.  Moreover, Plaintiffs' own surcharge tables show that Defendants assessed stand-alone surcharges more than 18 months before the AIILF was available as an additional index, which confirm that all four Defendants imposed separate fuel surcharges long before creation of the

AIILF. *Id.* ¶¶ 80, 82. The Complaint even alleges that "at least some of the Defendants" had fuel surcharges prior to 2003.

Furthermore, insofar as the Complaint suggests that the AIILF was the catalyst for Defendants to begin assessing fuel surcharges calculated as *percentage* of the base rate, *id.* ¶ 13 ("With the AIILF that had put in place . . . Defendants . . .now each applied the fuel surcharge the same way: as a percentage of the multiplier of the total base rate for the rail freight transportation"), Plaintiffs' contentions are belied by the very STB decision quoted in the Complaint. In that decision, the STB stated that there was a "long history" of rate-based surcharges in the industry dating back to the 1970s when the ICC "specifically declined to require carriers to tie their fuel surcharges to mileage." *Rail Fuel Surcharges* at 10 (Reinhart Decl., Ex. A). In light of this history, it is hardly surprising that in 2007 the STB found it perfectly understandable that the railroads were using rate-based surcharge mechanisms: "[R]ailroads may have reasonably relied on that precedent in formulating their fuel surcharge programs." *Id.* Accordingly, the STB stated: "[W]e do not believe railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible." *Id.* The specific regulatory acknowledgement of a long history of rate-based fuel surcharges not only refutes Plaintiffs' allegations that the AIILF somehow facilitated the introduction of rate-based fuel surcharges but also provides a natural explanation about why Defendants could have decided – unilaterally – to continue using rate-based fuel surcharge mechanisms.

Plaintiffs' second apparent argument is that "[t]here was no legitimate business justification or natural explanation for the collective actions of [Defendants] to cause the AAR to adopt and publish the AIILF" because "the fuel component of the AII and RCAF would have permitted Defendants to recover all of their increased fuel costs." CAC ¶ 74. Plaintiffs' theory

38

apparently is that there was no need for railroads to impose stand-alone fuel surcharges because Defendants could recover their fuel costs by using the AII or RCAF.  From this, Plaintiffs want the Court to infer that the purpose of the AIILF was anticompetitive.  But, the AII and RCAF indices suffer from one material drawback.  They represent averages of historic data and are computed only at quarterly intervals.  *AAR Railroad Cost Indexes* at 1 (Reinhart Decl., Ex. G).  In its fuel surcharge proceeding, the STB noted that carriers have had a "time lag concern (which arises from the fact that the RCAF is adjusted only quarterly)."  *Rail Fuel Surcharges* at 4 (Reinhart Decl., Ex A).  Thus, the quarterly RCAF is not as responsive to sudden spikes or drops in fuel price as is a fuel surcharge that is adjusted up or down on a monthly basis.  This provides a "legitimate business justification" and a "natural explanation" for why Defendants could have concluded that the fuel component of RCAF would not have permitted them to recover all of their increased fuel costs.

Furthermore, the STB itself has noted the usefulness of an index that excludes fuel.  In the STB decision upon which Plaintiffs rely, the STB discussed the concept of "double-dipping, *i.e.*, double recovery for the same fuel cost increase."  *Rail Fuel Surcharges* at 10 (Reinhart Decl., Ex. A).  The STB noted that this "can occur when a carrier both escalates a base rate using an index (such as the RCAF) that includes changes in the cost of fuel and applies a fuel surcharge to the same movement covering the same time period."  *Id.*  The STB indicated that it would be a solution to "double dipping" to use a stand-alone fuel surcharge in conjunction with a "rate escalator" from which the "fuel component has been subtracted out of the index."  *Id.* at 10-11.  Of course, the AIILF is an index that excludes fuel, and the STB decision explains why having such an index can be useful and appropriate.

Thus, Plaintiffs' reliance on allegations concerning the AIILF does nothing to advance their claim that the AIILF was itself a restraint of trade or supports their broader claim of a conspiracy to fix fuel surcharges.  At bottom, Plaintiffs seem to assume that the Defendants' alleged joint support for promulgation of the AIILF necessarily provides evidence that the Defendants also agreed to act jointly in fixing prices.  But Plaintiffs cannot leap from the lawful creation by the AAR of a cost index without a fuel component to an unlawful agreement to impose particular kinds of surcharges.  Nothing in the Complaint indicates that the AIILF was anything more than a voluntary standard, which cannot constitute an illegal agreement in its own right.  Since the Complaint itself indicates that Defendants implemented their fuel surcharge mechanisms long before the AIILF was established, the creation of the AIILF cannot raise an inference of an antecedent conspiracy.  *See Twombly*, 127 S. Ct. at 1966.  And the public record refutes Plaintiffs' conclusory allegation that there was no possible explanation, other than an anticompetitive one, for creation of the AIILF.  As with Plaintiffs' allegations regarding the adoption of the fuel surcharges, the conduct associated with the AIILF is as consistent with independent, unilateral conduct as with conspiracy.  In these circumstances, the Complaint should be dismissed.

## IV. PLAINTIFFS' ADDITIONAL ALLEGATIONS ARE INSUFFICIENT TO CREATE A PLAUSIBLE INFERENCE OF CONSPIRACY.

To bolster their insufficient pleading, Plaintiffs offer a random assortment of additional allegations to support their conspiracy theory.  Particularly when viewed, as they must be, in the context of the rail industry, these additional allegations add nothing:  they are consistent with unilateral conduct, inconsistent with other allegations made by Plaintiffs, or simply make the existence of conspiracy implausible.

40

### A.    Industry Communications

Plaintiffs allege that the conspiracy began some time in 2003 but identify no specifics as to how this alleged agreement was reached.  The Complaint does not identify the people who reached the agreement, nor how, when, or where it was reached.  Bereft of any specific allegations, Plaintiffs resort to general allegations that Defendants communicated "regularly" with one another at industry conferences, railroad trade association meetings or at "restaurants, and recreational and conference facilities to discuss their industry."  CAC ¶ 58.

Though Plaintiffs seek to characterize such interactions as opportunities to collude, courts have consistently refused to infer the existence of a conspiracy from the mere fact of such communications.  *Late Fee*, 528 F. Supp. 2d at 963-64 (collecting cases).  The fact that executives attend industry conferences and trade associations is unremarkable as a general proposition.  *Twombly*, 127 S. Ct. at 1971 n.12.  Furthermore, sustaining a complaint from the fact that Defendants engaged in communications with each other would be particularly dangerous in the rail freight industry, where Congress has enacted laws to encourage and protect such interactions.  As discussed above, railroads are obligated, in both practical and legal respects, to cooperate and communicate with each other to provide interline service, to negotiate terms and conditions of such movements, and to meet their obligations under federal law to promote a national rail network.  That Congress not only contemplated but even encouraged interline communications is seen in the special provision for railroads that prohibits courts from drawing certain adverse inferences from interline communications or conduct and excluding such evidence in antitrust conspiracy cases.  *See* 49 U.S.C. § 10706(a)(3)(B)(ii).[15]  The existence

---

[15]    The statute provides in pertinent part:

*(cont'd)*

of Section 10706 serves to reinforce the core principle in *Twombly* that complaints must contain

factual allegations plausibly suggesting an unlawful agreement when viewed in the context of the

particular industry.  127 S. Ct. at 1971-73 (reviewing allegations against telephone companies in

the context of the Telecommunications Act of 1996).[16]

### B.    Short-Term Contracts

One of the additional allegations made by Plaintiffs is that Defendants shifted from

longer-term contracts between railroads and shippers toward shorter-term contracts.  CAC ¶¶ 15,

89-91.  This is a puzzling allegation.  The Complaint itself alleges facts that indicate such a shift

would be consistent with rational independent conduct and therefore cannot be suggestive of

conspiracy.  Plaintiffs allege that the conspiracy period was a period of high demand and tight

---

*(cont'd from previous page)*

In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic.  In any proceeding in which such a violation is alleged, evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement—

(I) was in substantial accordance with an agreement approved under paragraph (2) of this subsection; or

(II) concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.

[16]    The U.S. Supreme Court has made clear that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.  Part of that attention to economic context is an awareness of the significance of regulation."  *See Verizon Commc'ns, Inc. v. Trinko, LLP,* 540 U.S. 398, 411 (2004); *Credit Suisse Secs. (USA) LLC v. Billing*, 127 S. Ct 2383, 2395-98 (2007).

capacity. *Id.* ¶ 53. Moving to shorter-term contracts during periods of high demand is economically rational behavior that would allow railroads to take advantage of the pricing opportunities presented by such market conditions. It is no different from a consumer buying a 6-month certificate of deposit rather than a 12-month certificate of deposit, because she expects interest rates to rise.

This allegation is also curious given the emphasis placed on the alleged role of the AIILF in facilitating the conspiracy. Cost escalation provisions, such as those allegedly keyed to the AIILF, are associated with long-term contracts, as parties seek to protect themselves from changes in costs over the duration of such contracts. Railroads and shippers would have little use for cost escalation mechanisms, including the AIILF, if contracts were being renegotiated every 30 or 60 days. If the AIILF were so central to the alleged conspiracy, it is difficult to imagine why the conspirators would simultaneously move away from the type of contract that allegedly could make use of the new index. In sum, this allegation does not plausibly support an inference of conspiracy.

### C.    Through Rates

Plaintiffs also offer some implausible assertions regarding trends in quoting of rail "through rates." Plaintiffs describe a "through rate" as a single rate for an interline movement that is charged on a single bill coming from either the originating or terminating carrier on a long-distance trip involving more than one railroad. *Id.* ¶ 94. The participating railroads in that interline movement charge the shipper a single rate and then apportion the revenue from the single rate amongst themselves. *Id.* Plaintiffs contend that Defendants moved away from that system for through rates toward a system where each participating railroad separately bills the shipper for its portion of the interline shipment. *Id.* Plaintiffs allege that this occurred "to

43

provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge." *Id.*

This allegation completely misunderstands the interline operations in the railroad industry. In interline service, railroads necessarily communicate with one another. By contrast, the very essence of separate pricing, as Plaintiffs themselves explain, is that each railroad separately – and privately – negotiates the terms and conditions of its portion of the interline shipment with the shipper. When the shipper establishes separate communication channels with two railroads, this necessarily decreases the level of communication and transparency between railroads with respect to that movement. Thus, Plaintiffs' suggestion that such a rate practice was undertaken "to provide transparency as to what each railroad was charging on multiple line shipments," *id.* ¶ 94, is entirely specious. Precisely the opposite occurs.

Plaintiffs' other suggestion, that the trend facilitated the conspiracy by permitting each railroad to separately bill its fuel surcharge, is equally incapable of providing a plausible basis for a conspiracy. Plaintiffs do not allege any greater use of surcharges in a separate pricing context than in a single rate context; surcharges may be assessed in both contexts.

### D.    Publication of Fuel Surcharges

Plaintiffs' allegation that Defendants published fuel surcharge information on their websites "to facilitate coordination and the detection of any deviation from collusive pricing," *id.* ¶ 14, does not advance their cause. In the first place, the Complaint does not even allege that the Defendants agreed to do so. Beyond that, it is commonplace for companies to publicize their prices. Furthermore, in light of Defendants' common carrier obligations, there are obvious benign explanations for publishing fuel surcharges on railroad websites. Rail carriers "shall . . .

44

provide to any person, on request, the carrier's rates and other service terms" for regulated traffic

and may do so "in electronic form."  49 U.S.C. § 11101(b).  If a carrier plans to increase a rate,

"written or electronic notice" must be provided at least 20 days in advance of the rate change.  *Id.*

§ 11101(c).  With literally thousands of customers, it is hardly remarkable that 21st Century

railroads would make their fuel surcharge information available on websites for the benefit of

both carriers and shippers.  Such customer service does not support an inference of a price-fixing

conspiracy.  *See Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995) (banks' practice

of publicizing certain fees did not support an inference of conspiracy to fix those fees because

each bank had a legitimate interest in providing customers with relevant information about the

fees); *Reserve Supply*, 971 F.2d at 53-54 (practice of announcing price increases prior to

effective dates did not support an inference of conspiracy because customers needed advanced

notice of price changes for their own business planning).

### E.     Failure to Compete on Fuel Surcharges

Plaintiffs allege that Defendants did not deviate from or negotiate their fuel surcharges

and contend that this must have been pursuant to agreement because otherwise it would have

been in their self interest to do so.  CAC ¶¶ 88, 92, 95.  Accepting that allegation as true for

purposes of this motion, the Complaint again is at odds with itself.  Elsewhere, Plaintiffs allege

that the railroad industry was going through a period of high demand and tight capacity.  *Id.* ¶¶

51, 53.  In such circumstances, the structure of the market provides "a natural explanation for the

noncompetition alleged." *Twombly*, 127 S. Ct. at 1972.  This is no basis for inferring a

conspiracy.

## F.     Government Investigation

Plaintiffs' citation to a pending investigation by the State of New Jersey does not add any weight to their claims.  As the dates of the subpoenas demonstrate, the investigation was commenced *after* the first complaints in this litigation were filed in May 2007.  CAC ¶ 18 (quoting Defendants' securities filings disclosing receipts of subpoenas in July 2007).  The simple answer is that no negative inference should be drawn from the mere existence of an investigation.  *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (finding that an allegation of a pending grand jury investigation is a "non-factor" that "carriers no weight in pleading an antitrust conspiracy claim").

## V.     CONCLUSION

It is apparent from a review of the allegations in the Complaint and the materials incorporated therein that Plaintiffs are seeking to draw inferences of an unlawful agreement from conduct that is consistent with independent business decisions.  The Supreme Court has held, however, that such allegations are an insufficient basis for inferring a conspiracy and that a Complaint based on such allegations must be dismissed.  *Twombly*, 127 S. Ct. at 1965-66.

The Complaint alleges that the Defendants conspired to adopt fuel surcharges, but the allegations themselves, taken as true, show only that there were times when one Defendant switched to a fuel surcharge mechanism that had been used publicly by another Defendant for a substantial time prior thereto.  There is nothing unique about rate-based fuel surcharge mechanisms; the STB has noted that such mechanisms have been used for more than 30 years.  The alleged decisions of Defendants to follow the fuel surcharge mechanisms already implemented by other railroads are at most consciously parallel behavior that is insufficient to support a claim.  The Court in *Twombly* specifically recognized that it is perfectly normal for one

competitor to match another competitor's pricing programs in a concentrated industry. *Id.* at 1964.

Allegations that Defendants created and published the AIILF cannot save the Complaint. A voluntary standard – one without any enforcement mechanism or agreement to use – cannot be a restraint of trade. And, despite Plaintiffs' efforts to portray the AIILF as the key to application by Defendants of stand-alone, rate-based fuel surcharges, determinations by the STB that (1) rate-based fuel surcharges have been used for decades preceding the AIILF; (2) the RCAF has certain inherent features that limit its utility during periods of fuel cost volatility; and (3) indices excluding fuel can reasonably be used in conjunction with fuel surcharges, provide natural explanations for Defendants' alleged conduct that do not make it plausible to infer a conspiracy.

In sum, Plaintiffs are left with allegations of (1) parallel conduct reflecting at most what is common behavior in a concentrated market, where participants regularly and lawfully follow pricing activity of their competitors; (2) legitimate activities by a trade association to create a cost index that was voluntary and post-dated the start of the alleged conspiracy; and (3) conclusory allegations of miscellaneous conduct that is all consistent with independent, unilateral conduct. *Twombly* and the many cases since that decision establish that Plaintiffs' allegations have not "nudged their claims across the line from conceivable to plausible." *Id.* at 1974.

Defendants respectfully submit that the Complaint should be dismissed.

Dated: May 30, 2008                    Respectfully submitted,


                                       ___/s/ John M. Nannes_____
                                       John M. Nannes (D.C. Bar #195966)
                                       Tara L. Reinhart (D.C. Bar #462106)
                                       Sean M. Tepe
                                       SKADDEN ARPS SLATE MEAGHER & FLOM
                                       LLP
                                       1440 New York Avenue, N.W.
                                       Washington, D.C.  20005

                                       *Attorneys for Defendant Norfolk Southern Railway
                                       Company*


                                       Richard J. Favretto
                                       Mark W. Ryan
                                       Gary A. Winters
                                       MAYER, BROWN, ROWE & MAW LLP
                                       1901 K Street, N.W.
                                       Washington, D.C.  20006

                                       *Attorneys for Defendant BNSF Railway Company*


                                       Richard McMillan, Jr.
                                       Kent A. Gardiner
                                       Kathryn D. Kirmayer
                                       CROWELL & MORING LLP
                                       1001 Pennsylvania Avenue, N.W.
                                       Washington, D.C.  20004

                                       *Attorneys for Defendant CSX Transportation, Inc.*


                                       Alan M. Wiseman
                                       Joseph A. Ostoyich
                                       HOWREY LLP
                                       1299 Pennsylvania Avenue, N.W.
                                       Washington, D.C.  20004

Tyrone R. Childress
David G. Meyer
HOWREY LLP
550 South Hope Street, Suite 110
Los Angeles, CA  90071

*Attorneys for Defendant Union Pacific Railroad Company*

**CERTIFICATE OF SERVICE**

I, Tara L. Reinhart, an attorney, certify that on May 30, 2008, I caused true and correct copies of the Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint; Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint; Declaration of Tara L. Reinhart and exhibits thereto; and [Proposed] Order Dismissing Direct Purchaser Plaintiffs' Consolidated Amended Complaint to be filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to co-lead counsel for all plaintiffs.


/s/ Tara L. Reinhart_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 Misc. No. 07-489 (PLF) |
| This document relates to: ALL CASES | |

**DECLARATION OF TARA L. REINHART
IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS DIRECT
PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

I, Tara Reinhart, declare pursuant to 28 U.S.C. § 1746 as follows:

      1.      I am Counsel with the law firm Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for Defendant Norfolk Southern Railway Company in the above-captioned matter. I submit this declaration on behalf of all Defendants in the above-captioned matter. I have personal knowledge of the matters set forth herein.

      2.      Attached hereto as Exhibit A is a true and correct copy of the final decision by the Surface Transportation Board in *Rail Fuel Surcharges*, Ex Parte No. 661, dated January 25, 2007.

      3.      Attached hereto as Exhibit B is a true and correct copy of selected pages from the 2006 edition of *Railroad Facts*, an annual publication of industry statistics that is published by the Association of American Railroads ("AAR").

      4.      Attached hereto as Exhibit C is a true and correct copy of webpages from the section of the BNSF Railway Company website devoted to its fuel surcharge.

5.     Attached hereto as Exhibit D is a true and correct copy of webpages from the section of the Union Pacific Railroad Company website devoted to its fuel surcharge.

6.     Attached hereto as Exhibit E is a true and correct copy of webpages from the section of the Norfolk Southern Railway Company website devoted to its fuel surcharge.

7.     Attached hereto as Exhibit F is a true and correct copy of webpages from the section of the CSX Transportation, Inc. website devoted to its fuel surcharge.

8.     Attached hereto as Exhibit G is a true and correct copy of the December 2003 edition of *AAR Railroad Cost Indexes*, which publicized the various railroad cost indices calculated by AAR at that time.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 30, 2008.


       /s/ Tara L. Reinhart
Tara L. Reinhart (D.C. Bar #462106)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

# EXHIBIT A

37341
EB

SERVICE DATE – JANUARY 26, 2007

SURFACE TRANSPORTATION BOARD

DECISION

STB Ex Parte No. 661

RAIL FUEL SURCHARGES

Decided: January 25, 2007

The Board instituted this proceeding to inquire into rail carrier practices related to fuel surcharges. A fuel surcharge is a separately identified component of the total rate that is charged for the transportation involved, purportedly to recoup increases in the carrier's fuel costs. The Board first held a hearing in May 2006, and in August 2006 it sought comments on several proposed measures to address the Board's concerns about these practices. After considering all of the comments received, we conclude that computing rail fuel surcharges as a percentage of a base rate is an unreasonable practice, and we direct carriers to change this practice. We also conclude that the practice of "double dipping," i.e., applying to the same traffic both a fuel surcharge and a rate increase that is based on a cost index that includes a fuel cost component, such as the Railroad Cost Adjustment Factor (RCAF), is an unreasonable practice, and we direct carriers to change this practice as well. We will proceed with a proposal to impose mandatory reporting requirements for all Class I railroads regarding their fuel surcharges, in STB Ex Parte No. 661 (Sub-No. 1). We will not, however, prescribe the index to be used for measuring increases in fuel costs, nor will we partially revoke existing class exemptions to apply the measures set forth here to currently exempted traffic.

BACKGROUND

At the Board hearing conducted May 11, 2006, the shipper community expressed deep dissatisfaction with the railroad industry's methods of assessing fuel surcharges. Shippers acknowledged that railroads are entitled to recover the increased costs they incur from the rising price of fuel. But because rail rates are not cost based – railroads price their services differentially (e.g., based on the differing elasticities of demand for rail transportation of different shippers) – shippers argued that calculating a fuel surcharge as a percent of the base rate results in collecting from captive shippers more than the increased fuel costs associated with their particular traffic. Many shippers also alleged that railroads are double dipping. Shippers argued nearly unanimously that transparency is needed for rail fuel surcharges and asked us to require the railroads to regularly report their fuel costs and revenue from fuel surcharges.

The railroads largely concede that their fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. However, they claim that, because they cannot apply fuel surcharges to every customer, especially those

whose rates are fixed by contract, they do not recover their full increased cost of fuel.[1]  The railroads defended their methods of calculating fuel surcharges as fair, equitable, and easy to administer.

In a decision served August 3, 2006, the Board proposed to adopt several measures to address rail fuel surcharge practices.  First, carriers would be required to develop a means of computing the surcharge that is more closely linked to the portion of its fuel costs attributable to the movement involved.  Second, "double dipping" would be prohibited.  Third, railroads would be required to use a single, uniform index for measuring increases in their fuel costs – the "U.S. No. 2 Diesel Retail Sales by All Sellers (Cents per Gallon)" published by the Energy Information Agency, an independent arm of the Department of Energy (EIA Index).  Fourth, class exemptions would be partially revoked to apply these measures to exempted traffic as well. Finally, each Class I railroad would be required to submit a monthly report to the Board showing its actual total fuel costs, total fuel consumption and total fuel surcharge revenues, as well as how much of its total fuel surcharge revenues are shared with its shortline connections.

We received 73 comments on these proposals.  Some fully support these proposals without any additional suggestions.[2]  Others either object to one or more of the proposed measures or suggest additional or alternative measures, as summarized below.

Linkage.

Shippers generally support a requirement that fuel surcharges be linked to attributes of a movement that directly affect the amount of fuel consumed, such as mileage or weight.  Some further suggest that fuel surcharges be limited to the changes in fuel prices from a defined starting point (such as when a new rate is negotiated), and that shippers be able to separately challenge surcharges that exceed the change in fuel costs for their particular movement.[3]  Many shippers also suggest that the base fuel price to which a surcharge may be applied should be limited (to the fuel price component incorporated into the last increase in the base rate or the fuel

---

[1]  At least one railroad, Union Pacific Railroad Company (UP), concedes that some customers may pay more than the actual incremental cost of fuel used to handle their particular movement, due to long-term transportation contracts with other shippers.  UP Comments filed April 27, 2006 at 15-16.

[2]  U.S. Clay Producers Traffic Association, Inc.; UPS; North Dakota Department of Agriculture; The Canadian Wheat Board; Degussa Corporation; National Corn Growers Association; E.I. du Pont de Nemours and Company (DuPont); and Agricultural Retailers Association (ARA).

[3]  Corn Products International, Inc.; Huntsman LLC; Afton Chemical Corporation; Reagent Chemical & Research, Inc.; Compass Minerals; San Joaquin Refining Co., Inc.; Stora Enso North America Corp.; Goodyear Tire & Rubber Company; CRI/Criterion; Barilla America, Inc.; Illinois Brick Company; and Highroad Consulting, Ltd.

price not more than 1 year prior),[4] and that refunds or credits be required to be issued if fuel prices drop below that base level.[5] Additionally, certain shippers ask us to require railroads to separately identify the fuel cost component in their base rates, or adopt a presumption that the prevailing cost of fuel is fully reflected in any newly-established base rates.[6]

A few shippers argue that fuel surcharges should be based on mileage alone, and not the weight of a movement, so as not to unduly complicate the calculation.[7] And several shippers further suggest that a mileage-based surcharge should be based on the shortest possible mileage, because the actual miles can be circuitous.[8]

While a few railroads offered some positive comments about requiring fuel surcharges to be more closely linked to fuel costs,[9] most oppose such a requirement, which they claim would be unduly costly and difficult to implement. Some argue that a mileage-based fuel surcharge would not be more precise than the present surcharge calculation.[10] The Association of American Railroads (AAR) asserts that a mileage-based approach would not be workable. Several railroads suggest that, if we require a mileage-based calculation, we compile a master rail mileage database containing mileage data for all origin and destination pairs in North America, to facilitate compliance with such a rule.[11]

---

[4] Cargill Incorporated (Cargill); American Chemistry Council (ACC); Electric Power Supply Association; the Dow Chemical Company (Dow Chemical); The Fertilizer Institute (TFI); Potlatch Forest Products Corporation (Potlatch); Occidental Chemical Corporation (OCC); Shell Chemical LP (Shell Chemical); Idaho Power Company (Idaho Power); Sierra Pacific Power Company (Sierra Power); Nevada Power Company (Nevada Power); CEMEX, Inc. (CEMEX); Concerned Captive Coal Shippers (Concerned Coal Shippers); AES Corporation (AES); Kennecott Utah Copper Corporation (Kennecott); and Western Coal Traffic League (WCTL).

[5] Cargill; ACC; Bayer MaterialScience LLC (Bayer); Dow Chemical; TFI; ASHTA Chemicals Inc. (ASHTA); National Grain and Feed Association (NGFA); Potlatch; Ag Processing Inc. (Ag Processing); Ameren Energy Fuels & Services (Ameren); Entergy Corporation (Entergy); Idaho Power; Sierra Power; Nevada Power; CEMEX; AES; Concerned Coal Shippers; OCC; National Industrial Transportation League (NITL); and WCTL.

[6] Entergy; Ameren; Idaho Power; Sierra Power; Nevada Power; CEMEX; South Carolina Electric; NGFA; and AES.

[7] ACC; Bayer; NDGDA; NITL; OCC; TFI; and AAM.

[8] Cargill; NITL; AECC; and TFI.

[9] CSX Transportation, Inc. (CSXT); Kansas City Southern Railway Company (KCSR); and BNSF Railway Company (BNSF).

[10] UP; Canadian National Railway (CN); and Canadian Pacific Railway Company (CP).

[11] CSXT; KCSR; UP; and CP.

The U.S. Department of Transportation (DOT) notes that many factors other than mileage influence fuel consumption. DOT argues that carriers should be free to take other factors into account, as long as their overall approach is reasonable.

The American Short Line and Regional Railroad Association (ASLRRA) asserts that a mileage-based system would adversely affect Class II and Class III railroads, whose proportion of the route miles on a movement is not as large as their proportion of the revenues for the move.

Double Dipping.

Shippers generally support the prohibition against double dipping.[12] Some argue that only the RCAF should be used to adjust for changes in costs, including fuel, and that the RCAF should be modified as needed to address the carriers' time lag concern (which arises from the fact that the RCAF is adjusted only quarterly).[13] DOT fully supports the proposal to prohibit double dipping. No railroad expressed opposition to a prohibition against double dipping. However, Norfolk Southern Railway Company (NS) suggests that having escalation clauses in a tariff that also includes a fuel surcharge should not be considered double dipping.

Uniform Fuel Cost Index.

Shippers have argued that use of a uniform fuel index would ensure accuracy, transparency and accountability.[14] While most parties agree that the EIA index accurately reflects changes in fuel costs in the railroad industry, some parties propose alternate indices,[15] and some parties object to the imposition of a uniform index.[16] For example, DOT argues that an individual carrier should be allowed to use any index that closely correlates with its own fuel costs.

---

[12] AES; Edison Electric Institute (Edison Electric); Ameren; Entergy; CEMEX; South Carolina Electric and Gas Co. (South Carolina Electric); WCTL; Concerned Coal Shippers; NITL; Arkansas Electric Cooperative Corporation (AECC); NGFA; Potlatch; Idaho Power; Sierra Power; and Nevada Power.

[13] WCTL; Entergy; Ameren; Nevada Power; and AES.

[14] ARA; TFI; DuPont; ACC; Cargill; NGFA; Kennecott; NITL; Steel Manufacturers Association; and ASHTA.

[15] Cargill; NDGDA; NITL; AECC; Argus Media Inc. (Argus); Ag Processing; Kennecott; and NGFA.

[16] BNSF; KCSR; Small Railroad Business Owners of America/Minnesota Commercial Railway Company (SRBOA); and DOT.

Revocation of Exemptions.

Railroads vigorously object to the proposal in the August decision that the Board partially revoke the existing class exemptions at 49 CFR part 1039 so as to extend any measures adopted here to the various categories of rail traffic for which the agency has previously found regulation to be unnecessary. They argue that there is no record here for taking such action,[17] and that partially revoking the exemption for intermodal traffic in particular would upset the competitive balance between railroads and trucks in that marketplace.[18] DOT also opposes partial revocation of existing exemptions.

Reporting.

Shippers generally support the proposal for monthly fuel surcharge reports, as does DOT. Many shippers would have us expand the monthly report to include industry- or commodity-specific information or to reflect costs for individual movements,[19] and they would have us require reports from Class II and Class III carriers as well.[20] Some shippers also suggest that we change the reporting requirement for the Waybill Sample to add data fields to monitor fuel surcharge revenues.[21]

Railroads generally oppose additional reporting requirements and anticipate difficulties in complying with them. Most state that their information systems are not presently capable of capturing all of the information necessary and that they would need to develop new information technology systems to produce the proposed report.[22] Additionally, some suggest that any new report should be quarterly, rather than monthly.[23]

In response to the Board's request for immediate voluntary reporting of fuel surcharges, only NS, CP, and KCSR submitted an initial report. CP and KCSR submitted data regarding fuel costs and consumption, but not revenues. BNSF, CSXT, CN, and UP did not submit any data.

---

[17] BNSF; NS; CSXT; UP; CP; and AAR.

[18] NS; CSXT; UP; and CP. J.B. Hunt Transport, Inc. and Hub Group, Inc. also submitted comments opposing revocation of the intermodal exemption.

[19] North Dakota Grain Dealers Association (NDGDA); NGFA; Westlake Chemical Corporation (Westlake); Potlatch; NITL; and Entergy.

[20] NITL; Westlake; and Ag Processing.

[21] NITL; Freight Resources Network, LLC; Wheat & Barley Commissions; Potlatch; and CEMEX.

[22] KCSR; CSXT; CP; and UP.

[23] BNSF; CSXT; UP; and CP.

Implementation.

Railroads ask that they be provided ample time to implement new surcharge systems to comply with any requirements that we adopt.[24] They also ask us to confirm that the requirements would apply only prospectively and only to common carrier traffic, not to contract traffic.

Shippers ask that we set a clear deadline for when railroads would be required to implement new fuel surcharge systems.[25] Some ask that we apply our unreasonable practice findings retroactively and provide for an across-the-board remedy for past overcharges.[26] Finally, some shippers suggest that we establish a compliance process that would encourage dispute resolution between railroads and shippers.[27]

## DISCUSSION AND CONCLUSIONS

Linkage.

After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

Alone among the railroads, CSXT maintains that its fuel surcharge program does not constitute mislabeling. CSXT contends that its fuel surcharge program "is designed to recoup CSXT's increased overall fuel expenses to ensure adequate revenues. Moreover, CSXT's program is fully explained on its website and its tariffs, and has been clearly understood in the market."[28]

---

[24] NS; KCSR; CSXT; UP; CN; and CP.

[25] Shell Chemical; Ag Processing Inc.; and Concerned Coal Shippers.

[26] Dow Chemical and Total Petrochemicals, USA, Inc.

[27] Dow Chemical and Shell Chemical.

[28] CSXT Comment at 18.

However, the term "fuel surcharge" most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled. This sort of mislabeling appears designed to avoid the type of response a carrier would likely receive if it were to honestly inform a shipper that a higher rate was being imposed to recover not only the increased fuel cost of serving that shipper, but also the increased cost of fuel for another shipper's traffic – which is what would often occur under rate-based fuel surcharges. But the fact that a railroad may not be able to recover its increased fuel costs from some of its traffic (for example, traffic covered by a contract lacking a provision to pass through such costs) does not provide a reasonable basis for shifting those costs onto other traffic in this manner. We believe that imposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice.

Several railroads challenge our authority to regulate fuel surcharge programs as an unreasonable practice. They argue that, because a fuel surcharge is a component of the total rate, it cannot be subjected to Board regulation except where we first find that the carrier has market dominance over the particular movement involved. We disagree. As explained in the August decision, we are not limiting the total amount that a rail carrier can charge for providing rail transportation through some combination of base rates and surcharges. Rather, we are only addressing the manner in which railroads apply what they label a fuel surcharge.

BNSF argues that Congress could not have intended for us to regulate an individual component of a rate based solely upon the label given to it by the railroad as a fuel surcharge.[29] But Congress, in the rail transportation policy at 49 U.S.C. 10101(9), explicitly stated that it is the policy of the United States Government "to encourage honest and efficient management of railroads." Moreover, Congress exempted the rail carriers from the consumer protection requirements of the Federal Trade Commission Act,[30] presumably not because Congress intended to permit carriers to mislead their customers, but because our authority to proscribe unreasonable practices embraces misrepresentations or misleading conduct by the carriers. And the record in this proceeding provides extensive testimony by shippers who have expressed concern about carriers raising their rates on the pretext of recovering increased fuel costs. If the railroads wish to raise their rates they may do so, subject to the rate reasonableness requirement of the statute, but they may not impose those increases on their customers on the basis of a misrepresentation.

BNSF also argues that the Board cannot declare an action an unreasonable practice unless it is acting on a specific complaint.[31] This argument overstates our action here. We are not

---

[29]  BNSF Comment at 11.

[30]  See 15 U.S.C. 45(a)(2); FTC v. Miller, 549 F.2d 452 (7th Cir. 1977).

[31]  BNSF Comment at 8-10.

addressing any individual railroad's fuel surcharge program, and we are not awarding any remedies for rate-based fuel surcharges that may have been used in the past. We are instead making a finding that promulgating rate-based fuel surcharges is an unreasonable practice. This finding could be used to support future complaints challenging individual rate-based surcharges, but we are not adjudicating a specific complaint here.

We recognize that our authority to determine whether any particular fuel surcharge applied by a specific railroad is an unreasonable practice, and to award damages on that basis, is limited to proceedings begun on complaint.[32] 49 U.S.C. 10704(b), 11701(a). But as the Board stated in the August decision, we may adopt rules of general applicability for future conduct to address an unreasonable practice, even though our authority to award shipper-specific remedies is limited to a formal complaint proceeding. Cf. Mr. Sprout, Inc. v. United States, 8 F.3d 118, 128-29 (3d Cir. 1993) (citing with approval ICC rules governing carrier processing of claims for loss or damage to cargo, even though such claims could only be resolved in another forum).

The railroads question the practicality of alternatives to rate-based fuel surcharge programs. Many assert that a fuel surcharge based on mileage would be difficult, time consuming, and expensive to implement and administer. But these assertions are largely unsupported. The record shows that BNSF was able to successfully implement a mileage-based fuel surcharge (for coal and agricultural movements) in a matter of months. Moreover, several railroads have expressed some willingness to develop a fuel surcharge program linked to mileage, which further indicates that such a task is feasible.[33] There will, of course, be costs incurred in changing from one method to another (for example, costs associated with reprogramming information systems, retraining personnel, and coordinating with other carriers on interline movements). But we do not believe that converting to a new fuel surcharge methodology would impose an unreasonable burden on carriers. Moreover, the railroads have not asserted, much less demonstrated, that – once having made the change – it would cost more to maintain fuel surcharge programs that are tailored to fuel costs for the movement involved.

Some carriers question the benefits to be gained by moving away from rate-based fuel surcharges. CP and CN argue that a mileage-based (or a weight-and-mileage-based) fuel surcharge would not be any more precise or fair in allocating fuel costs among shippers than a rate-based fuel surcharge. They point out that there are many other factors in addition to mileage and weight that can affect fuel costs, including speed, intensity of local switching, empty return ratio, track conditions, geography, grade, curvature, drag and resistance, weather conditions, and overall operating conditions.

---

[32] We note that the Board received numerous informal complaints from shippers about the freight rail industry's fuel surcharge practices and heard many shippers complain at the Board's May 2006 hearing.

[33] CSXT, KCSR, and BNSF.

8

We are not persuaded by these arguments. First, even a mileage-based fuel surcharge, although not perfect, more closely tracks changes in fuel costs for an individual shipment than does a rate-based fuel surcharge. Mileage is one of the primary factors that affects fuel consumption. In contrast, the base rate often does not closely correlate with fuel consumption, as it routinely reflects demand (and to the extent it reflects costs, fuel costs are less than 20% of a railroad's operating costs). Second, we are not precluding railroads from incorporating as many factors that affect fuel consumption as they wish in calculating fuel surcharges. Nor are we requiring them to incorporate every conceivable such factor, as we agree that would be impracticable. But if a carrier chooses to use a fuel surcharge program, it must be based upon attributes of a movement that directly affect the amount of fuel consumed. In other words, there must be a reasonable nexus to fuel consumption.

A fuel surcharge program keyed to the base rate has one primary benefit – ease of application.[34] Although clearly easy to implement, a fuel surcharge program keyed to the base rate almost guarantees that some shippers will be forced to pay the increased fuel costs of other shippers. For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate – when practical alternatives are available – would permit them to continue to mislead their customers and would be unfair.

ASLRRA argues that a mileage-based fuel surcharge system would adversely affect Class II and Class III railroads, which often receive a portion of the connecting Class I carrier's fuel surcharges. However, the revenue decisions are based on negotiated agreements between the carriers involved,[35] and indeed such agreements often provide for a fixed per-car handling fee.[36] Carriers may continue to agree to divide revenues on through movements in any reasonable manner.

Of course, when a shortline railroad itself establishes a fuel surcharge (rather than merely sharing in the revenues of a fuel surcharge established by a Class I railroad), it must comport with the findings and requirements of this decision. If mileage is not the best indicator of the fuel consumption associated with the movements a shortline handles, it may choose to base its fuel surcharges on other factors that are better correlated to the amount of fuel consumed. But

---

[34] Several carriers introduced evidence that many of their customers favor the continued use of a fuel surcharge program that is tied to the base rate. Given that such a program shifts greater responsibility for fuel recovery to shippers with higher rates, it is not surprising that a subset of customers (presumably those with lower base rates) favor retaining a percentage-of-the-base-rate approach. We note that such shippers are free to enter into contractual arrangements with carriers that incorporate into those contracts any escalation provision for fuel cost recovery that the parties wish.

[35] ASLRRA Comment at 4, 6.

[36] Id. at 6, 8.

even for shortlines, we doubt that the level of the base rates would be an appropriate indicator of the fuel costs associated with individual movements.

Numerous shippers have asked us to make our findings here retroactive, so as to allow them to obtain a remedy for what they perceive to be past overcharges. In contrast, railroads have asked us to clarify that our findings here apply prospectively only. In view of the long history of rate-based fuel surcharges in the rail industry, we do not believe that railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible. Indeed, in the mid-1970s, the ICC specifically declined to require carriers to tie their fuel surcharges to mileage.[37] Although conditions have changed since the mid-1970s, railroads may have reasonably relied on that precedent in formulating their fuel surcharge programs. (That history underscores the need for, and propriety of, this proceeding to address, on an industry-wide basis, whether this well-established practice continues to be a reasonable practice going into the future.)

Railroads will have a 90-day transition period to adjust their fuel surcharge programs. Should an individual railroad need additional time to change its fuel surcharge system, it should request an extension from the Board and be prepared to demonstrate why it is necessary.

We do not believe that it is necessary or appropriate at this time to adopt any of the other linkage suggestions made by the commenters, as summarized above, such as requiring railroads to separately identify the fuel cost component in their base rates. We seek to minimize the degree of Federal regulatory control here, see 49 U.S.C. 10101(2), and to afford individual carriers the flexibility to devise fuel surcharge practices that work best for them, within the limits described herein. Once carriers have had an opportunity to adjust their fuel surcharge programs, should any shipper have concerns that any particular revised fuel surcharge program is being administered in a manner that constitutes an unreasonable practice, it may file a complaint with the Board. Additional rules of general applicability do not appear needed at this time.

Double Dipping.

Nearly every commenter supports a prohibition against "double dipping," i.e., double recovery for the same fuel cost increase. This can occur when a carrier both escalates a base rate using an index (such as the RCAF) that includes changes in the cost of fuel and applies a fuel surcharge to the same movement covering the same time period.

NS suggests that use of a widely accepted index as a rate escalator should not constitute "double dipping" if included in a common carrier tariff that also includes a fuel surcharge. However, the only circumstance in which the use of both a fuel surcharge along with a rate escalator would not constitute "double dipping" is when the fuel component has been subtracted

---

[37] See Expedited Procedures for the Recovery of Fuel Costs, 350 I.C.C. 563, 570-71 (1975).

10

out of the index. Absent such an adjustment, we find that application of both an index that includes a fuel component and a fuel surcharge for the same movement to cover the same time period is an unreasonable practice.

Fuel Index.

Strong support has been expressed in the record for the proposal that railroads apply a single, uniform index to measure changes in fuel prices. Shippers argue that it would better ensure accuracy, transparency and accountability, and thereby enhance the credibility of fuel surcharges in the eyes of those who pay them. Moreover, there is general agreement — even among those carriers that object to Board imposition of a uniform index — that the EIA Index accurately reflects changes in fuel costs in the rail industry. Indeed, the EIA Index closely correlates with other fuel cost indices, including the indices currently used by most carriers. Moreover, the AAR has developed an index for carriers that is virtually identical to the EIA Index.

Because the EIA Index has been the subject of notice and comment and has withstood scrutiny on this record as discussed above, we conclude that it is a reasonable index to apply to measure changes in fuel costs for purposes of a fuel surcharge program. Thus, it provides a "safe harbor" upon which carriers can rely for an index. Use of an alternative index may be subject to challenge.

While we encourage carriers to use the EIA Index, we will not mandate its use. We are concerned that we not hinder the Board's ability to respond nimbly should a superior index be identified. Indeed, some parties have advanced arguments here for the selection of a different index in place of the EIA Index proposed by the Board.[38] And DOT has argued that the fact that carriers buy fuel at different times and places supports the use of different indices. On the record that is before us here, we cannot strike down these alternative indices as unreasonable, nor can we find that is it an unreasonable practice for carriers to use different indices to measure changes in fuel costs. However, any alternative index used may be challenged as unreasonable on a case-by-case basis, and should meet or exceed the standards of accuracy, transparency, availability, and neutrality of the EIA Index, should closely correlate with other indices, and should reflect fuel price changes quickly.

---

[38] NITL and Kennecott suggest use of the EIA's U.S. Diesel Fuel Industrial Price by All Sellers (Cents Per Gallon). NITL Comment at 9, Kennecott Comment at 5. NGFA and AECC recommend use of the wholesale, rather than retail, price of diesel. NGFA Comment at 7, AECC Comment at 11. Argus recommends its own bulk spot market price for Off-Road diesel, and Cargill suggests use of a third party index such as Argus' index. Argus Comment at 2, Cargill Comment at 4-5.

Reporting.

We continue to believe that obtaining a monthly report from each Class I railroad regarding its fuel expenditures and consumption will enable the Board to better monitor the industry's fuel surcharge practices. However, to minimize the regulatory burden, we will narrow the information to be included in the report. In August, the Board proposed including ton-mile revenue information, but because we will not mandate that railroads use a fuel surcharge mechanism based on ton-miles, we conclude that we do not need to collect that information. Likewise, the Board proposed in August to require revenue sharing information based on concerns about the amount of fuel surcharge revenues shared with Class II and Class III railroads. But because the comments make clear that railroads are free to divide fuel surcharge revenues according to negotiated agreements, we conclude that it is not necessary to collect this information either.

Before adopting the proposed reporting requirement (as narrowed here), we need to first obtain additional comments on the costs and burdens of the proposed report to comport with the Paperwork Reduction Act. We will do that in a separate proceeding, STB Ex Parte No. 661 (Sub-No. 1), Rail Fuel Surcharges, which we are instituting by a separate decision also served today.

Exempted Traffic.

Under 49 U.S.C. 10502(a), the Board (like the ICC before it) has been directed to exempt entire categories of traffic from the regulatory provisions of the Interstate Commerce Act, to the maximum extent consistent with the Act. That authority has been used to exempt various broad categories of traffic from such regulation. See 49 CFR part 1039. The Board can revoke an exemption to the extent it finds necessary to achieve the regulatory objectives of the statute. 49 U.S.C. 10502(d). In considering whether to revoke an exemption:

> [T]he first thing we look at . . . is whether the carrier possesses substantial market power. If it does not, then there is generally no basis for revoking an exemption. If it does, then we focus on whether regulation is necessary to protect against carrier abuse of shippers as a result of such market power. Finally, in assessing whether regulation is necessary or appropriate, we address whether regulation or exemption would, on balance, better advance the objectives of the []RTP and the interest of the shipping public overall.

Rail Exemption Misc. Agricultural Commodities, 8 I.C.C.2d 674, 682 (1992).

Here, while several shippers have expressed support for partially revoking the class exemption to apply the measures adopted here, that proposal is uniformly opposed by the railroad community. J.B. Hunt Transport, Inc., Hub Group, Inc., and SRBOA also submitted

12

separate comments opposing the revocation of the exemption for intermodal traffic in particular. And DOT "strongly opposes" the partial revocation of previously granted exemptions from regulation.[39]

We are persuaded by the comments that we should not implement this aspect of the August proposal. The exemptions are based on prior findings that there is a sufficiently competitive market for the transportation involved that regulatory protections are not needed. The exemptions permit the traffic involved (including intermodal traffic) to benefit from a competitive marketplace free of regulatory interference. Under the exemption, trucks and railroads compete on an equal footing for intermodal traffic, for example, with each competitor capable of adapting readily to changes in the marketplace. If we revoke the exemption, even partially, the railroads would be restricted in how they can respond to changes, while trucking companies would not. This kind of imbalance could have unintended consequences and upset the competitive balance between railroads and trucks.

Although in August we noted that certain of the regulatory objectives of the statute supported the extension of our decision to exempted traffic, we are reminded that another regulatory objective is "to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. 10101(2). The record developed in this proceeding offers no evidence that the marketplace has materially changed for any of the exempted categories of traffic since the findings were made to exempt that traffic from regulation. Without such evidence, we have no basis to reimpose regulation over traffic that has been exempted from regulation for almost two decades. Accordingly, we will not move forward with the proposal to apply these measures to exempted traffic. Although we decline to revoke the class exemptions across-the-board here, shippers are not precluded from filing individual petitions to revoke an exemption where there is no longer adequate competition.

Contract Traffic.

Many shippers argue that these rules should apply to traffic handled under transportation contracts. Under 49 U.S.C. 10709, we have no authority to regulate rail rates and services that are governed by a contract. Therefore, our findings and actions here apply only to regulated common carrier traffic. We do note, however, that if a railroad enters into a contract that ignores the potential for significant increases in fuel costs, it cannot remedy that situation by engaging in an unreasonable practice as to other traffic over which we do have regulatory authority. Railroads would be well-advised to focus on improving their contracts to clearly allocate the costs of contingencies such as fluctuating fuel costs, rather than attempting to pass on the costs of ineffective contract drafting to non-contract customers.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

---

[39] DOT Comment at 4.

13

STB Ex Parte No. 661

It is ordered:

1. Railroads are directed to conform their practices to the findings contained in this decision.

2. This decision is effective on its service date.

By the Board, Chairman Nottingham, Vice Chairman Buttrey, and Commissioner Mulvey.  Commissioner Buttrey concurred in part and dissented in part with a separate expression.

Vernon A. Williams
Secretary

---

VICE CHAIRMAN BUTTREY, concurring in part and dissenting in part:

I respectfully dissent from the portion of this decision pertaining to fuel indices, while concurring with the other aspects of the decision.

In the notice served August 3, 2006, in this proceeding, the Board proposed to require all Class I railroads to use a single index to measure increases in fuel costs, and suggested a particular EIA highway diesel price index as best-suited for that purpose.  However, the majority's decision here, while encouraging railroads to adopt the EIA index, stops short of mandating its use.

I believe that mandating a single, well-recognized index that carriers must use in calculation of their fuel surcharges would make rail fuel surcharges more transparent to the shipping community, to the public, and to this Board; and is essential to insure comparability between the surcharges of different carriers.  Indeed, it seems to me that to impose reporting requirements without mandating a specific index, as the majority's decision does here, seriously undercuts the effectiveness of that reporting. I believe that the record compiled in this proceeding demonstrates widespread support for a specific index, and convinces me that use of different indices will detract from the credibility of fuel surcharge programs in the eyes of the shipping public.  The record also demonstrates the legitimacy of the EIA index, which correlates closely to other fuel indices including those currently in use by some carriers. I believe that the Board has the statutory power to mandate use of a specific fuel index, both as part of its broad unreasonable practice jurisdiction, and as part of its power to require meaningful reporting by

14

STB Ex Parte No. 661

carriers as needed to carry out its regulatory responsibilities.  Therefore, I dissent from the fuel index outcome, while fully supporting the other aspects of this decision.

# EXHIBIT B



RAILROAD FACTS
2006 EDITION

# PREFACE

**Railroad Facts** was born in 1924 when its predecessor, **Railroad Facts, For the Farmer, For the Railroad Man, For the Business Man**, was published by the Western Railways' Committee on Public Relations. In 1927, the title was changed to **Railroad Facts, A Yearbook of Railroad Information**. In 1929 and 1930, the same publication was printed by both the Western Railways' Committee on Public Relations and the Committee on Public Relations of the Eastern Railroads, until the latter took sole possession of the cover's byline in 1931. In 1953, the byline was changed to the Eastern Railroad Presidents' Conference. It stayed that way until 1965, when the Association of American Railroads (AAR) assumed responsibility for the publication and changed the title to **Yearbook of Railroad Facts**. Finally, in 1983 the AAR changed the title to its current form, **Railroad Facts**.

In spite of the changes in title and publisher, the type of information presented in **Railroad Facts** has remained virtually unchanged. The publication is a timely, pocket-sized, and relatively quick-and-easy-to-use reference of major indicators of railroad performance. While comprehensive in scope, it does not provide the detail found in some other AAR publications and data bases such as:

1. **Analysis of Class I Railroads**: Annual publication of detailed financial and operating statistics, by railroad and summarized by district and the United States.

2. **Railroad Ten-Year Trends**: Annual publication containing more than 200 tables and graphs describing Class I, Regional and Local railroad economics over the past 10 years.

3. **Freight Commodity Statistics**: Annual publication identifying gross freight revenues, tonnage and carloads up to 5-digit STCC level for Class I railroads.

4. **Profiles of U.S. Railroads**: Comprehensive database and personal computer program, based on an annual survey of all U.S. freight railroads.

5. **Weekly Railroad Traffic**: North American railroad carload data for 19 commodity groupings plus intermodal traffic.

These publications, and others, are available individually or as part of an annual "Database Subscription" offered by the Policy and Economics Department of the AAR. To order publications, visit the AAR web site (www.aar.org).

2

# RAILROAD COST RECOVERY INDEX

The Railroad Cost Recovery Index (RCR) measures railroad inflation in much the same manner as the Producer and Consumer Price Indexes measure inflation in the national economy - that is, it measures the changes in the price levels of inputs to railroad operations: wages and supplements; fuel; materials and supplies; and other expenses (equipment rents, depreciation, purchased services, taxes other than income and payroll, interest, and all other operating expenses).

(1981 = 100)

| Year | Labor (wages & supple-ments) | Fuel | Materials & Supplies | Labor, Fuel & M/S Com-bined | Other Costs | Railroad Cost Recovery Index |
|------|------|------|------|------|------|------|
| 1944 | 6.5 | 5.1 | 12.7 | 6.7 | – | – |
| 1947 | 8.4 | 7.1 | 16.4 | 8.7 | – | – |
| 1955 | 14.2 | 8.7 | 25.1 | 14.1 | – | – |
| 1960 | 19.7 | 9.0 | 29.8 | 18.7 | – | – |
| 1965 | 23.6 | 8.7 | 30.1 | 21.7 | – | – |
| 1970 | 33.4 | 10.1 | 34.7 | 29.7 | – | – |
| 1975 | 55.1 | 29.5 | 60.3 | 51.3 | – | – |
| 1980 | 88.7 | 83.2 | 92.4 | 88.3 | 90.1 | 88.8 |
| 1985 | 131.7 | 76.6 | 99.6 | 116.6 | 115.6 | 116.6 |
| 1990 | 162.6 | 69.2 | 105.2 | 138.5 | 142.8 | 139.9 |
| 1995 | 191.7 | 60.0 | 132.5 | 158.3 | 163.9 | 160.4 |
| 1996 | 197.0 | 70.7 | 133.3 | 165.2 | 169.7 | 166.8 |
| 1997 | 201.4 | 68.6 | 135.6 | 167.6 | 172.6 | 169.4 |
| 1998 | 206.4 | 54.9 | 137.1 | 166.5 | 179.6 | 171.8 |
| 1999 | 204.1 | 55.8 | 136.8 | 165.3 | 180.2 | 171.4 |
| 2000 | 216.4 | 89.9 | 136.4 | 188.3 | 187.2 | 187.1 |
| 2001 | 227.8 | 88.0 | 140.4 | 195.0 | 190.8 | 192.4 |
| 2002 | 238.1 | 75.8 | 139.5 | 196.2 | 192.6 | 193.8 |
| 2003 | 245.6 | 91.8 | 139.5 | 207.5 | 194.6 | 200.8 |
| 2004 | 243.4 | 122.1 | 149.0 | 219.9 | 204.3 | 211.9 |
| **2005** | **255.4** | **178.2** | **161.9** | **261.2** | **216.7** | **238.9** |

59

## RAIL COST ADJUSTMENT FACTOR

The Rail Cost Adjustment Factor (RCAF) is a quarterly forecast of railroad inflation determined by the STB based on the AAR's All-Inclusive Index (AII). Like the Railroad Cost Recovery Index, the AII measures changes in the price levels of inputs to railroad operations. Since the AII submitted to the STB is a forecast, an adjustment for "forecast error" (the difference between the forecast and the later-determined actual index for the same quarter) is made in the second succeeding quarter to derive the RCAF (Unadjusted). An adjustment for productivity gains, added to the calculation in 1989, is applied to derive the RCAF (Adjusted).

In the chart below, all values are on a fourth quarter 2002 base. Calculation of rate change factors and maximum RCAF rate levels using the figures below might lead to inexact results due to rounding in the rebasing of figures prior to the fourth quarter of 2002.

| Quarter | All-Inclusive Index | Forecast Error Adjustment | RCAF Unadjusted | Productivity Adjustment Factor | RCAF Adjusted |
|---|---|---|---|---|---|
| 1992Q4 | 81.3 | 0.004 | 0.817 | 1.1595 | 0.705 |
| 1997Q4 | 90.2 | 0.000 | 0.902 | 1.4965 | 0.603 |
| 2002Q4 | 98.9 | 0.011 | 1.000 | 1.9268 | 0.519 |
| 2003Q1 | 99.2 | 0.004 | 0.996 | 1.9466 | 0.512 |
| 2003Q2 | 101.1 | 0.009 | 1.020 | 1.9557 | 0.522 |
| 2003Q3 | 100.6 | 0.014 | 1.020 | 1.9649 | 0.519 |
| 2003Q4 | 102.0 | (0.003) | 1.017 | 1.9741 | 0.515 |
| 2004Q1 | 101.8 | 0.007 | 1.025 | 1.9834 | 0.517 |
| 2004Q2 | 102.6 | 0.007 | 1.033 | 1.9943 | 0.518 |
| 2004Q3 | 105.5 | 0.016 | 1.071 | 2.0053 | 0.534 |
| 2004Q4 | 107.5 | 0.022 | 1.097 | 2.0163 | 0.544 |
| 2005Q1 | 109.7 | 0.010 | 1.107 | 2.0274 | 0.546 |
| 2005Q2 | 111.9 | 0.030 | 1.149 | 2.0420 | 0.563 |
| 2005Q3 | 113.0 | 0.006 | 1.136 | 2.0567 | 0.552 |
| 2005Q4 | 117.3 | 0.012 | 1.185 | 2.0715 | 0.572 |
| 2006Q1 | 116.6 | 0.011 | 1.177 | 2.0864 | 0.564 |
| 2006Q2 | 116.5 | 0.013 | 1.178 | 2.0962 | 0.562 |
| 2006Q3 | 119.7 | (0.005) | 1.192 | 2.1061 | 0.566 |
| **2006Q4** | **122.4** | **0.026** | **1.250** | **2.1160** | **0.591** |

60



Policy and Economics Department
**Association of American Railroads**
50 F Street, N.W.
Washington, D.C. 20001
Telephone: (202) 639-2102
www.aar.org

L.C. CARD No. A66-7305

November 2006

# EXHIBIT C

BNSF Customer Tools - Prices - BNSF Rules Book 6100 - Carload Fuel Surcharge





## BNSF Rules Book 6100 - Carload Fuel Surcharge

A fuel surcharge may be applied to price authorities subject to BNSF Rules Book 6100. The surcharge for the following month will be determined on the first of the prior month based on the U.S. average price of Retail On-Highway Diesel Fuel for the second prior month. The Fuel Surcharge Rate (FSR) is determined from the table found in Item 3375 of BNSF Rules Book 6100 Series. The BNSF Rules Book 6100 can be found online at: Miscellaneous Pricing Publications.

## Carload Fuel Surcharge Rate Based on Retail On-Highway Diesel Fuel (HDF).

HDF = Prior Period's monthly average of the US average price of Retail On-Highway Diesel Fuel as reported on the U. S. Department of Energy's web pages at:
Click here for EIA Retail On-Highway Diesel Prices

To receive updates to the Carload Fuel Surcharge as well as other Carload Pricing updates by email, log in to your BNSF secured account, select Customer Subscription Service, and subscribe to Pricing Updates.

## Carload Fuel Surcharge Rate

| For the Month of: | Prior HDF Average: |
|---|---|
| Feb 2008 21.5% | Dec 2007 (NA until 12/27/07) |
| Jan 2008 21.5% | Nov 2007 $3.396 |
| Dec 2007 18.5% | Oct 2007 $3.075 |
| Nov 2007 17.5% | Sept 2007 $2.953 |
| Oct 2007 16.5% | Aug 2007 $2.869 |
| Sep 2007 16.5% | July 2007 $2.868 |
| Aug 2007 16.0% | June 2007 $2.808 |
| July 2007 15.5% | May 2007 $2.796 |
| June 2007 16.0% | Apr 2007 $2.834 |

**CUSTOMER TOOLS**
Contact Us
Customer Updates
Equipment Information
Routing Guides
Network Maps
Prices
Rail Mileage Inquiry
Schedules
**Development**
Economic Development
Real Estate
**Reference**
BNSF PIN
Customer Reference Guides
Dimensional Shipments
EDI Reference
Glossary
LOGS
Private Equipment Movements
Station List
Switching Information
**Resource Protection**
Claims Solutions
Load and Ride Solutions
Police Solutions
Protection Solutions
Training Solutions

Load and Ride Solutions
Railway Industrial Clearance Association
Weight Restriction Maps
Commodity/STCC Lookup

BNSF Customer Tools - Prices - BNSF Rules Book 6100 - Carload Fuel Surcharge

| Month | Surcharge | Month | Price |
|---|---|---|---|
| May 2007 | 14.5% | Mar 2007 | $2.667 |
| Apr 2007 | 12.5% | Feb 2007 | $2.488 |
| Mar 2007 | 12.5% | Jan 2007 | $2.485 |
| Feb 2007 | 14.0% | Dec 2006 | $2.610 |
| Jan 2007 | 13.0% | Nov 2006 | $2.545 |
| Dec 2006 | 13.0% | Oct 2006 | $2.519 |
| Nov 2006 | 15.5% | Sep 2006 | $2.783 |
| Oct 2006 | 18.0% | Aug 2006 | $3.045 |
| Sep 2006 | 17.0% | July 2006 | $2.934 |
| Aug 2006 | 16.5% | June 2006 | $2.898 |
| July 2006 | 16.5% | May 2006 | $2.897 |
| June 2006 | 15.0% | Apr 2006 | $2.728 |
| May 2006 | 13.5% | Mar 2006 | $2.559 |
| Apr 2006 | 12.5% | Feb 2006 | $2.475 |
| Mar 2006 | 12.5% | Jan 2006 | $2.467 |
| Feb 2006 | 12.0% | Dec 2005 | $2.443 |
| Jan 2006 | 13.5% | Nov 2005 | $2.573 |
| Dec 2005 | 18.5% | Oct 2005 | $3.095 |
| Nov 2005 | 16.0% | Sep 2005 | $2.819 |
| Oct 2005 | 13.0% | Aug 2005 | $2.500 |
| Sept 2005 | 11.5% | July 2005 | $2.373 |
| Aug 2005 | 10.5% | June 2005 | $2.290 |
| July 2005 | 9.5% | May 2005 | $2.199 |
| June 2005 | 10.5% | Apr 2005 | $2.292 |
| May 2005 | 10.0% | Mar 2005 | $2.214 |
| Apr 2005 | 8.0% | Feb 2005 | $2.027 |
| Mar 2005 | 7.5% | Jan 2005 | $1.959 |
| Feb 2005 | 8.0% | Dec 2004 | $2.009 |
| Jan 2005 | 9.0% | Nov 2004 | $2.147 |
| Dec 2004 | 9.0% | Oct 2004 | $2.134 |
| Nov 2004 | 7.0% | Sept 2004 | $1.917 |
| Oct 2004 | 6.0% | Aug 2004 | $1.833 |
| Sept 2004 | 5.0% | July 2004 | $1.739 |
| Aug 2004 | 5.0% | June 2004 | $1.711 |
| July 2004 | 5.0% | May 2004 | $1.746 |
| June 2004 | 4.5% | Apr 2004 | $1.692 |
| May 2004 | 4.0% | Mar 2004 | $1.629 |

BNSF Customer Tools - Prices - BNSF Rules Book 6100 - Carload Fuel Surcharge

| | |
|---|---|
| Apr 2004 3.5% | Feb 2004 $1.582 |
| Mar 2004 3.5% | Jan 2004 $1.551 |
| Feb 2004 2.5% | Dec 2003 $1.490 |
| Jan 2004 2.5% | Nov 2003 $1.482 |
| Dec 2003 2.5% | Oct 2003 $1.481 |
| Nov 2003 2.5% | Sept 2003 $1.467 |
| Oct 2003 2.5% | Aug 2003 $1.487 |
| Sept 2003 2.0% | July 2003 $1.435 |
| Aug 2003 2.0% | June 2003 $1.424 |
| July 2003 2.5% | May 2003 $1.451 |
| June 2003 3.0% | Apr 2003 $1.533 |
| May 2003 2.0% * | Mar 2003 $1.708 |
| APR 2003 4.5% | Feb 2003 $1.654 |
| Mar 2003 2.5% | Jan 2003 $1.488 |
| Feb 2003 2.0% | Dec 2002 $1.429 |
| Jan 2003 2.0% | Nov 2002 $1.420 |
| DEC 2002 2.5% | Oct 2002 $1.462 |
| Nov 2002 2.0% | Sep 2002 $1.411 |
| Oct 2002 1.0% | Aug 2002 $1.328 |
| Sep 2002 0.0% | July 2002 $1.299 |
| Aug 2002 0.0% | June 2002 $1.286 |
| July 2002 1.0% | May 2002 $1.305 |
| June 2002 1.0% | APR 2002 $1.309 |
| May 2002 0.0% | Mar 2002 $1.230 |
| APR 2002 0.0% | Feb 2002 $1.152 |

## Carload Fuel Surcharge Table

| Prior Period's Avg. Price of HDF between: | Applicable Fuel Surcharge: |
|---|---|
| $1.25 to $1.299 | 0.5% |
| $1.30 to $1.349 | 1.0% |
| $1.35 to $1.399 | 1.5% |
| $1.40 to $1.449 | 2.0% |
| $1.45 to $1.499 | 2.5% |
| $1.50 to $1.549 | 3.0% |
| $1.55 to $1.599 | 3.5% |

BNSF Customer Tools - Prices - BNSF Rules Book 6100 - Carload Fuel Surcharge

| | |
|---|---|
| $1.60 to $1.649 | 4.0% |
| $1.65 to $1.699 | 4.5% |
| $1.70 to $1.749 | 5.0% |
| $1.75 to $1.799 | 5.5% |
| $1.80 to $1.849 | 6.0% |
| $1.85 to $1.899 | 6.5% |
| $1.90 to $1.949 | 7.0% |
| $1.95 to $1.999 | 7.5% |
| $2.00 to $2.049 | 8.0% |
| $2.05 to $2.099 | 8.50% |
| $2.10 to $2.149 | 9.00% |
| $2.15 to $2.199 | 9.50% |
| $2.20 to $2.249 | 10.00% |
| $2.25 to $2.299 | 10.50% |
| $2.30 to $2.349 | 11.00% |
| $2.35 to $2.399 | 11.50% |
| $2.40 to $2.449 | 12.00% |
| $2.45 to $2.499 | 12.50% |
| $2.50 to $2.549 | 13.00% |
| $2.55 to $2.599 | 13.50% |
| $2.60 to $2.649 | 14.00% |
| $2.65 to $2.699 | 14.50% |
| $2.70 to $2.749 | 15.00% |
| $2.75 to $2.799 | 15.50% |
| $2.80 to $2.849 | 16.00% |
| $2.85 to $2.899 | 16.50% |
| $2.90 to $2.949 | 17.00% |
| $2.95 to $2.999 | 17.50% |
| $3.00 to $3.049 | 18.00% |

Each $0.05 per gallon increase there after apply an additional .5%

* **BNSF elected to amend item 3375 of BNSF Rules book BNSF-6100-A, effective May 1, 2003 to reduce the carload Fuel Surcharge to 2% for the month of May 2003.**

For surcharge comments or questions, email auxpricing@bnsf.com

BNSF Customer Tools - Prices - BNSF Rules Book 6100 - Carload Fuel Surcharge

Report railroad emergencies: **BNSF Resource Protection Team (800.832.5452)**

Terms of Use / Privacy Policy / Contact Us / Site Map / Feedback
© 2006 BNSF Railway Company. All Rights Reserved.

# EXHIBIT D

UNION PACIFIC BUILDING AMERICA®

**Customers**

**Surcharge**

# 2002 West Texas Intermediate Crude Oil (WTI) Prices

Return To
- Fuel Surcharge Programs
- Customers
- UP Homepage

**Customers**
- myUPRR
- New Customer Welcome Center
- Find a Price
- Service Area Map
- Announcements

**Employees**

**Suppliers**

**Investors**

**General Public**

**Media**

Report Emergencies
Contact UP Police:
1-888-877-7267

POWER YOUR CAREER.
JOIN OUR TEAM.
LEARN MORE >>

| Close Date | Price per 42-gallon Barrel | Published Consecutive Days Toward Higher Threshold | Within Threshold Percent Applied | Published Consecutive Days Toward Lower Threshold |
|---|---|---|---|---|
| 12/31/02 | $ 31.23 | 13 | 0% | |
| 12/30/02 | $ 31.35 | 12 | 0% | |
| 12/27/02 | $ 32.73 | 11 | 0% | |
| 12/26/02 | $ 32.48 | 10 | 0% | |
| 12/24/02 | $ 32.18 | 9 | 0% | |
| 12/23/02 | $ 31.98 | 8 | 0% | |
| 12/20/02 | $ 30.43 | 7 | 0% | |
| 12/19/02 | $ 30.53 | 6 | 0% | |
| 12/18/02 | $ 30.43 | 5 | 0% | |
| 12/17/02 | $ 30.08 | 4 | 0% | |
| 12/16/02 | $ 30.13 | 3 | 0% | |
| 12/13/02 | $ 28.50 | 2 | 0% | |
| 12/12/02 | $ 28.03 | 1 | 0% | |
| 12/11/02 | $ 27.43 | | 0% | |
| 12/10/02 | $ 27.73 | | 0% | |
| 12/09/02 | $ 27.20 | | 0% | |
| 12/06/02 | $ 26.93 | | 0% | |
| 12/05/02 | $ 27.28 | | 0% | |
| 12/04/02 | $ 26.73 | | 0% | |
| 12/03/02 | $ 27.28 | | 0% | |
| 12/02/02 | $ 27.23 | | 0% | |
| 11/27/02 | $ 26.68 | | 0% | |
| 11/26/02 | $ 26.40 | | 0% | |
| 11/25/02 | $ 27.08 | | 0% | |
| 11/22/02 | $ 26.68 | | 0% | |
| 11/21/02 | $ 26.93 | | 0% | |
| 11/20/02 | $ 26.98 | | 0% | |
| 11/19/02 | $ 26.43 | | 0% | |
| 11/18/02 | $ 26.73 | | 0% | |
| 11/15/02 | $ 25.53 | | 0% | |
| 11/14/02 | $ 25.28 | | 0% | |
| 11/13/02 | $ 25.15 | | 0% | |
| 11/12/02 | $ 25.88 | | 0% | |
| 11/11/02 | $ 25.93 | | 0% | |
| 11/08/02 | $ 25.78 | | 0% | |
| 11/07/02 | $ 25.38 | | 0% | |
| 11/06/02 | $ 25.78 | | 0% | |
| 11/05/02 | $ 26.13 | | 0% | |
| 11/04/02 | $ 26.98 | | 0% | |
| 11/01/02 | $ 27.13 | UP Fuel Surcharge program implemented. | | |
| 10/31/02 | $ 27.23 | | | |
| 10/30/02 | $ 26.83 | | | |
| 10/29/02 | $ 26.88 | | | |
| 10/28/02 | $ 27.28 | | | |
| 10/25/02 | $ 26.98 | | | |

| | | | | |
|---|---|---|---|---|
| 10/24/02 | $ 28.03 | | | |
| 10/23/02 | $ 28.08 | | | |
| 10/22/02 | $ 27.93 | | | |
| 10/21/02 | $ 28.38 | | | |
| 10/18/02 | $ 29.63 | | | |
| 10/17/02 | $ 29.63 | | | |
| 10/16/02 | $ 29.48 | | | |
| 10/15/02 | $ 29.73 | | | |
| 10/14/02 | $ 30.03 | | | |
| 10/11/02 | $ 29.38 | | | |
| 10/10/02 | $ 28.98 | | | |
| 10/09/02 | $ 29.33 | | | |
| 10/08/02 | $ 29.48 | | | |
| 10/07/02 | $ 29.63 | | | |
| 10/04/02 | $ 29.63 | | | |
| 10/03/02 | $ 29.78 | | | |
| 10/02/02 | $ 30.48 | | | |
| 10/01/02 | $ 30.83 | | | |
| 09/30/02 | $ 30.45 | | | |
| 09/27/02 | $ 30.53 | | | |
| 09/26/02 | $ 30.43 | | | |
| 09/25/02 | $ 30.43 | | | |
| 09/24/02 | $ 30.83 | | | |
| 09/23/02 | $ 30.68 | | | |
| 09/20/02 | $ 29.63 | | | |
| 09/19/02 | $ 29.50 | | | |
| 09/18/02 | $ 29.48 | | | |
| 09/17/02 | $ 29.08 | | | |
| 09/16/02 | $ 29.68 | | | |
| 09/13/02 | $ 29.83 | | | |
| 09/12/02 | $ 28.85 | | | |
| 09/11/02 | $ 29.78 | | | |
| 09/10/02 | $ 29.73 | | | |
| 09/09/02 | $ 29.73 | | | |
| 09/06/02 | $ 29.63 | | | |
| 09/05/02 | $ 28.98 | | | |
| 09/04/02 | $ 28.28 | | | |

- **See 2007 WTI**
- **See 2006 WTI**
- **See 2005 WTI**
- **See 2004 WTI**
- **See 2003 WTI**

^ Top|Home|What's New|Search|Site Info|Copyright|Privacy|Contact UP|Feedback



**Customers**

**Surcharge**

Return To
- Fuel Surcharge Programs
- Customers
- UP Homepage

**Customers**
- myUPRR
- New Customer Welcome Center
- Find a Price
- Service Area Map
- Announcements

**Employees**
**Suppliers**
**Investors**
**General Public**
**Media**

Report Emergencies
Contact UP Police:
1-888-877-7267

POWER YOUR CAREER.
JOIN OUR TEAM.
LEARN MORE >>

# Carload Rate Based Standard HDF Fuel Surcharge

## ☞ Fuel Surcharge Rate

Union Pacific's carload rate based standard HDF fuel surcharge program is based on the Department of Energy (DOE) On-Highway Diesel Fuel Price (US Average). Information about **actual fuel surcharges applied** and details about the program are included below.

This fuel surcharge program will apply as follows:

- Fuel surcharge will be adjusted on a monthly basis.
- The basis for the surcharge will be determined by the U.S. Average price of DOE On-Highway Diesel Fuel for a calendar month, as reported weekly on the **U.S. Department of Energy** Web site (www.eia.doe.gov).
- In the event the average monthly price of Retail On-Highway Diesel Fuel, equals or exceeds $1.35 per gallon, a surcharge beginning at 1.5% will apply.
- For every five cent increase above $1.35 per gallon, the surcharge applied will increase by 0.5%. See **threshold schedule** for more details.
- When the average DOE price drops below $1.35 per gallon, no fuel surcharge will apply.
- The surcharge will be billed to applicable shipments beginning the second month following the month on which the DOE average price calculation was based. (Example: the average reported DOE price for the month of February 2007 would determine the fuel surcharge applied throughout the month of April 2007.)

This surcharge became effective with shipments billed on or after June 1, 2003. The fuel surcharge will be applied to the line haul freight charge(s) that make reference to this fuel cost recovery program.

This program does not affect UP's existing Intermodal surcharge program.

The DOE price is reported weekly on the U.S. Department of Energy Web site.

**^Top**

## Fuel Surcharge Rate

| Month Applied | Surcharge Applied | Basis month | HDF Avg. monthly price |
|---|---|---|---|
| January 2008 | 21.5% | November 2007 | $3.396 |
| December 2007 | 18.5% | October 2007 | $3.075 |
| November 2007 | 17.5% | September 2007 | $2.953 |
| October 2007 | 16.5% | August 2007 | $2.869 |
| Sept 2007 | 16.5% | July 2007 | $2.868 |
| Aug 2007 | 16.0% | June 2007 | $2.808 |
| July 2007 | 15.5% | May 2007 | $2.796 |
| June 2007 | 16.0% | April 2007 | $2.834 |
| May 2007 | 14.5% | March 2007 | $2.667 |
| April 2007 | 12.5% | February 2007 | $2.488 |
| March 2007 | 12.5% | January 2007 | $2.485 |
| February 2007 | 14.0% | December 2006 | $2.610 |
| January 2007 | 13.0% | November 2006 | $2.545 |
| December 2006 | 13.0% | October 2006 | $2.519 |
| November 2006 | 15.5% | September 2006 | $2.783 |
| October 2006 | 18.0% | August 2006 | $3.045 |
| Sept 2006 | 17.0% | July 2006 | $2.934 |

| Aug 2006 | 16.5% | June 2006 | $2.898 |
|---|---|---|---|
| July 2006 | 16.5% | May 2006 | $2.897 |
| June 2006 | 15.0% | April 2006 | $2.728 |
| May 2006 | 13.5% | March 2006 | $2.559 |
| April 2006 | 12.5% | February 2006 | $2.475 |
| March 2006 | 12.5% | January 2006 | $2.467 |
| February 2006 | 12.0% | December 2005 | $2.443 |
| January 2006 | 13.5% | November 2005 | $2.573 |
| December 2005 | 18.5% | October 2005 | $3.095 |
| November 2005 | 16.0% | September 2005 | $2.819 |
| October 2005 | 13.0% | August 2005 | $2.500 |
| September 2005 | 11.5% | July 2005 | $2.373 |
| August 2005 | 10.5% | June 2005 | $2.290 |
| July 2005 | 9.5% | May 2005 | $2.199 |
| June 2005 | 10.5% | April 2005 | $2.292 |
| May 2005 | 10% | March 2005 | $2.214 |
| April 2005 | 8% | February 2005 | $2.027 |
| March 2005 | 7.5% | January 2005 | $1.959 |
| February 2005 | 8.0% | December 2004 | $2.009 |
| January 2005 | 9.0% | November 2004 | $2.147 |
| December 2004 | 9.0% | October 2004 | $2.134 |
| November 2004 | 7.0% | September 2004 | $1.917 |
| October 2004 | 6.0% | August 2004 | $1.833 |
| September 2004 | 5.0% | July 2004 | $1.739 |
| August 2004 | 5.0% | June 2004 | $1.711 |
| July 2004 | 5.0% | May 2004 | $1.746 |
| June 2004 | 4.5% | Apr. 2004 | $1.692 |
| May 2004 | 4.0% | Mar. 2004 | $1.629 |
| April 2004 | 3.5% | Feb. 2004 | $1.582 |
| March 2004 | 3.5% | Jan. 2004 | $1.551 |
| February 2004 | 2.5% | Dec. 2003 | $1.490 |
| January 2004 | 2.5% | Nov. 2003 | $1.482 |
| December 2003 | 2.5% | Oct. 2003 | $1.495 |
| November 2003 | 2.5% | Sept. 2003 | $1.467 |
| October 2003 | 2.5% | Aug. 2003 | $1.487 |
| September 2003 | 2.0% | July 2003 | $1.435 |
| August 2003 | 2.0% | June 2003 | $1.424 |
| July 2003 | 2.5% | May 2003 | $1.451 |
| June 2003 | 2.0%* | April 2003 | $1.533 |

*UP elected to reduce the Fuel Surcharge to 2% for the month of June 2003.

^ Top|Home|What's New|Search|Site Info|Copyright|Privacy|Contact UP|Feedback

# EXHIBIT E

Home  >>  Customers  >>  Fuel Price News  >>  Fuel Surcharge History



## FUEL PRICE NEWS

## Fuel Surcharge History

The table below lists the fuel surcharge amounts in effect since June, 2000. Current fuel surcharge information can be viewed on the fuel surcharge status page.

| Fuel Surcharge Effective Date | Surcharge Amount | Avg. Monthly WTI Price | Basis Month |
|---|---|---|---|
| 6/30/2000 | 2.0% | n/a | n/a |
| 10/31/2001 | 0.0% | n/a | n/a |
| 10/17/2002 | 2.0% | n/a | n/a |
| 12/11/2002 | 0.0% | n/a | n/a |
| 1/29/2003 | 2.0% | n/a | n/a |
| 3/1/2004 | 4.8% | 34.27 | Jan-04 |
| 4/1/2004 | 4.8% | 34.74 | Feb-04 |
| 5/1/2004 | 5.6% | 36.76 | Mar-04 |
| 6/1/2004 | 5.6% | 36.70 | Apr-04 |
| 7/1/2004 | 7.2% | 40.29 | May-04 |
| 8/1/2004 | 6.4% | 38.04 | Jun-04 |
| 9/1/2004 | 7.2% | 40.80 | July-04 |
| 10/1/2004 | 8.8% | 44.94 | Aug-04 |
| 11/11/2004 | 9.2% | 45.95 | Sept-04 |
| 12/1/2004 | 12.4% | 53.13 | Oct-04 |
| 1/1/2005 | 10.4% | 48.46 | Nov-04 |
| 2/1/2005 | 8.4% | 43.35 | Dec-04 |

Related Links

Current FSC Status
Current FSC Terms
Current FSC History
Previous FSC Status
Previous FSC Terms
Previous FSC History
Original FSC Status
Original FSC Terms
Fuel Surcharge History
Historical Fuel Price News
WTI Daily Reported Prices
Sign Up for Fuel Surcharge Notification

Sign-up for Email Notifications
Learn About accessNS

Norfolk Southern

| Date | | |
|---|---|---|
| 3/1/2005 | 9.6% | 46.84 | Jan-05 |
| 4/1/2005 | 10.0% | 47.97 | Feb-05 |
| 5/1/2005 | 12.8% | 54.22 | Mar-05 |
| 6/1/2005 | 12.4% | 53.04 | Apr-05 |
| 7/1/2005 | 10.8% | 49.83 | May-05 |
| 8/1/2005 | 13.6% | 56.31 | June-05 |
| 9/1/2005 | 14.4% | 58.70 | July-05 |
| 10/1/2005 | 16.8% | 64.97 | August-05 |
| 11/1/2005 | 17.2% | 65.57 | September-05 |
| 12/1/2005 | 16.0% | 62.37 | October-05 |
| 1/1/2006 | 14.4% | 58.30 | November-05 |
| 2/1/2006 | 14.8% | 59.43 | December-05 |
| 3/1/2006 | 17.2% | 65.51 | January-06 |
| 4/1/2006 | 15.6% | 61.63 | February-06 |
| 5/1/2006 | 16.0% | 62.90 | March-06 |
| 6/1/2006 | 18.8% | 69.69 | April-06 |
| 7/1/2006 | 19.2% | 70.94 | May-06 |

Terms and Conditions | Privacy Policy | Contact Us | © Norfolk Southern Corp.

Version 1.0.6

Norfolk Southern

Home >> Customers >> Fuel Price News >> Previous FSC History



FUEL PRICE NEWS

## Previous Surcharge History

The table below lists the fuel surcharge amounts in effect since March 2004. Current fuel surcharge information can be viewed on the fuel surcharge status page.

**NEW**
(Effective 7/01/2006)
Status
Terms
History

**Previous FSC**
(Effective 3/01/2004)
Status
Terms
History

**Original FSC**
(Effective 6/30/2000)
Status
Terms

**Monthly Surcharge Notifications**
Notification Letter

[x] Sign Up

| Fuel Surcharge Effective Date | Surcharge Amount | Avg. Monthly WTI Price | Basis Month |
|---|---|---|---|
| 10/1/2007 | 20.0% | $72.39 | August-07 |
| 9/1/2007 | 20.8% | $74.15 | July-07 |
| 8/1/2007 | 18.0% | $67.48 | June-07 |
| 7/1/2007 | 16.4% | $63.46 | May-07 |
| 6/1/2007 | 16.4% | $63.96 | April-07 |
| 5/1/2007 | 15.2% | $60.56 | March-07 |
| 4/1/2007 | 14.8% | $59.26 | February-07 |
| 3/1/2007 | 12.8% | $54.24 | January-07 |
| 2/1/2007 | 16.0% | $62.03 | December-06 |
| 1/1/2007 | 14.8% | $59.37 | November-06 |
| 12/1/2006 | 14.4% | $58.88 | October-06 |
| 11/1/2006 | 16.4% | $63.87 | September-06 |

**Related Links**
Current FSC Status
Current FSC Terms
Current FSC History

Previous FSC Status
Previous FSC Terms
Previous FSC History

Original FSC Status
Original FSC Terms

Fuel Surcharge History

Historical Fuel Price News

WTI Daily Reported Prices

Sign Up for Fuel Surcharge Notification

Sign-up for Email Notifications

Learn About accessNS

Norfolk Southern

| Date | Percent | Price | Month |
|---|---|---|---|
| 10/1/2006 | 20.4% | $73.05 | August-06 |
| 9/1/2006 | 20.8% | $74.41 | July-06 |
| 8/1/2006 | 19.2% | $70.96 | June-06 |
| 7/1/2006 | 19.2% | $70.94 | May-06 |
| 6/1/2006 | 18.8% | $69.69 | April-06 |
| 5/1/2006 | 16.0% | $62.90 | March-06 |
| 4/1/2006 | 15.6% | $61.63 | February-06 |
| 3/1/2006 | 17.2% | $65.51 | January-06 |
| 2/1/2006 | 14.8% | $59.43 | December-05 |
| 1/1/2006 | 14.4% | $58.30 | November-05 |
| 12/1/2005 | 16.0% | $62.37 | October-05 |
| 11/1/2005 | 17.2% | $65.57 | September-05 |
| 10/1/2005 | 16.8% | $64.97 | August-05 |
| 9/1/2005 | 14.4% | $58.70 | July-05 |
| 8/1/2005 | 13.6% | $56.31 | June-05 |
| 7/1/2005 | 10.8% | $49.83 | May-05 |
| 6/1/2005 | 12.4% | $53.04 | April-05 |
| 5/1/2005 | 12.8% | $54.22 | March-05 |
| 4/1/2005 | 10.0% | $47.97 | February-2005 |
| 3/1/2005 | 9.6% | $46.84 | January-05 |
| 2/1/2005 | 8.4% | $43.35 | December-04 |
| 1/1/2005 | 10.4% | $48.46 | November-04 |
| 12/1/2004 | 12.4% | $53.13 | October-04 |
| 11/1/2004 | 9.2% | $45.95 | September- |

Norfolk Southern

| | | | 04 |
|---|---|---|---|
| 10/1/2004 | 8.8% | $44.94 | August-04 |
| 9/1/2004 | 7.2% | $40.80 | July-04 |
| 8/1/2004 | 6.4% | $38.04 | June-04 |
| 7/1/2004 | 7.2% | $40.29 | May-04 |
| 6/1/2004 | 5.6% | $36.70 | April-04 |
| 5/1/2004 | 5.6% | $36.76 | March-04 |
| 4/1/2004 | 4.8% | $34.74 | February-04 |
| 3/1/2004 | 4.8% | $34.27 | January-04 |

*For a record of current WTI daily prices, click here >>*

Terms and Conditions | Privacy Policy | Contact Us | © Norfolk Southern Corp.

Version 1.0.6

Home  >>  Customers  >>  Fuel Price News  >>  Current FSC Terms

# FUEL PRICE NEWS

## Current Fuel Surcharge Terms

Effective 7/01/2006, NS will implement a revised fuel surcharge program. The revised surcharge program will apply to all local and joint line traffic moving on NS issued private price authorities with notes that reference the-nbsp;Tariff NS 8003.

The formula for determining the fuel surcharge is based on the monthly average price of West Texas Intermediate Crude Oil (WTI Average Price), an industry standard for tracking oil prices. The WTI Average Price for a given calendar month is determined by adding the daily WTI prices published in the Wall Street Journal during a calendar month and dividing the result by the number of days so published. The result is rounded to the nearest cent.

The fuel surcharge will be 0.3% of the linehaul freight charge for every $1 per barrel, or portion thereof, by which the WTI Average Price exceeds $64. The following schedule provides the new fuel surcharge within the noted WTI Average Price ranges:

### Fuel Surcharge Rates

| WTI Average | Surcharge | WTI Average | Surcharge |
|---|---|---|---|
| $64.00 & Below | None | $87.01 - 88.00 | 7.2% |
| $64.01 - 65.00 | 0.3% | $88.01 - 89.00 | 7.5% |
| $65.01 - 66.00 | 0.6% | $89.01 - 90.00 | 7.8% |
| $66.01 - 67.00 | 0.9% | $90.01 - 91.00 | 8.1% |
| $67.01 - 68.00 | 1.2% | $91.01 - 92.00 | 8.4% |
| $68.01 - 69.00 | 1.5% | $92.01 - 93.00 | 8.7% |
| $69.01 - 70.00 | 1.8% | $93.01 - 94.00 | 9.0% |
| $70.01 - 71.00 | 2.1% | $94.01 - 95.00 | 9.3% |
| $71.01 - 72.00 | 2.4% | $95.01 - 96.00 | 9.6% |
| $72.01 - 73.00 | 2.7% | $96.01 - 97.00 | 9.9% |

**Related Links**

Current FSC Status

Current FSC Terms

Current FSC History

Previous FSC Status

Previous FSC Terms

Previous FSC History

Original FSC Status

Original FSC Terms

Fuel Surcharge History

Historical Fuel Price News

WTI Daily Reported Prices

Sign Up for Fuel Surcharge Notification

Sign-up for Email Notifications

Learn About accessNS

Norfolk Southern

| | |
|---|---|
| $73.01 - 74.00 | 3.0% |
| $74.01 - 75.00 | 3.3% |
| $75.01 - 76.00 | 3.6% |
| $76.01 - 77.00 | 3.9% |
| $77.01 - 78.00 | 4.2% |
| $78.01 - 79.00 | 4.5% |
| $79.01 - 80.00 | 4.8% |
| $80.01 - 81.00 | 5.1% |
| $81.01 - 82.00 | 5.4% |
| $82.01 - 83.00 | 5.7% |
| $83.01 - 84.00 | 6.0% |
| $84.01 - 85.00 | 6.3% |
| $85.01 - 86.00 | 6.6% |
| $86.01 - 87.00 | 6.9% |
| $97.01 - 98.00 | 10.2% |
| $98.01 - 99.00 | 10.5% |
| $99.01 - 100.00 | 10.8% |
| $100.01 - 101.00 | 11.1% |
| $101.01 - 102.00 | 11.4% |
| $102.01 - 103.00 | 11.7% |
| $103.01 - 104.00 | 12.0% |
| $104.01 - 105.00 | 12.3% |
| $105.01 - 106.00 | 12.6% |
| $106.01 - 107.00 | 12.9% |
| $107.01 - 108.00 | 13.2% |
| $108.01 - 109.00 | 13.5% |
| $109.01 - 110.00 | 13.8% |
| $110.01 & Above | * |

* The fuel surcharge will be 13.8%, plus an additional 0.3% of the line-haul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price Per Barrel exceeds $110.00.

The fuel surcharge shall be applied to each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price calculation. The fuel surcharge will change monthly per the table below:

**Calendar Month of Fuel Surcharge**

| WTI Average Price | Applied |
|---|---|
| January | March 1 |
| February | April 1 |
| March | May 1 |
| April | June 1 |
| May | July 1 |
| June | August 1 |

Norfolk Southern

| | |
|---|---|
| July | September 1 |
| August | October 1 |
| September | November 1 |
| October | December 1 |
| November | January 1 |
| December | February 1 |

Notice of current fuel surcharge in effect as well as any changes to the fuel surcharge will be provided on the NS Web site. In addition, while the fuel surcharge remains in effect, NS will provide daily updates on the prior, current and projected surcharges. From the tool bar on the main NS Homepage, simply select "Fuel Price News" from the dropdown menu.

Terms and Conditions | Privacy Policy | Contact Us | © Norfolk Southern Corp.

Version 1.0.6

http://www.norfolksouthern.com/nscorp/Customers/Public%20Prices/NS8003_terms.html?leaf=Current FSC Terms          12/3/2007

EXHIBIT F

ℹ️ For help using ShipCSX, call 1-877-ShipCSX.    CSX Home ⧉  ShipCSX Home    Quick Links    [ 60 ]

# ShipCSX

ShipCSX Log In    [    ]    [ 60 ]

Sign up for eBusiness    Forgot your password?

You are here: ShipCSX > Fuel Surcharge Tariffs & Publications    December 3, 2007  3:19 PM EST  ❓ Help

HDF CSXT Fuel Surcharge Publication 8661-A

WTI Tariff CSXT 8100 & 8200

## HDF CSXT Fuel Surcharge Publication 8661-A

APPLICATION: This publication applies to: (1) all regulated common carrier linehaul freight rates existing or established by CSXT on or after April 23, 2007; and (2) all linehaul freight rates and charges with respect to exempt traffic, and linehaul freight rates and charges in contracts, private price quotations or other pricing documents, that both reference this publication and are entered into or issued and effective on or after April 23, 2007.

In the event that the monthly average price per gallon of highway diesel fuel (as determined below, the "HDF Average Price") equals or exceeds 200.0 cents, CSXT will apply a mileage-based fuel surcharge to the linehaul rates and charges described above. The fuel surcharge will be applied to each qualifying shipment having a bill of lading or other shipping instruction dated on or after the first day of the second calendar month following the calendar month of a given HDF Average Price determination.

The "HDF Average Price" for a month will be the average price for that month of U.S. No. 2 Diesel Retail Sales by All Sellers, as determined and published by the U. S. Department of Energy, Energy Information Administration ("DOE-EIA")[1]. That average price will, in calculating the HDF Average Price, be rounded to the nearest 1/10th of a cent applying conventional rounding principles. The fuel surcharge will be 1¢ per mile per railcar for every 4¢ per gallon, or portion thereof, by which the HDF Average Price for the calendar month two months prior to the calendar month of shipment exceeds 199.9 cents.

If DOE-EIA ceases publication of the above information, CSXT will employ a suitable substitute source of price or measure.

The Mileage to be applied in calculating the fuel surcharge will be based on rail miles between origin, interchange(s) and destination, and can be found at www.csx.com.[2]

The following table reflects a sampling of the fuel surcharge within the included HDF Average Price ranges.

| HDF Average Price Cents Per Gallon | Cents Per Mile |
|---|---|
| 0 - 199.9 | 0 |
| 200.0 - 203.9 | 1 |
| 204.0 - 207.9 | 2 |
| 208.0 - 211.9 | 3 |
| 212.0 - 215.9 | 4 |
| 216.0 - 219.9 | 5 |
| 220.0 - 223.9 | 6 |
| 224.0 - 227.9 | 7 |
| 228.0 - 231.9 | 8 |
| 232.0 - 235.9 | 9 |
| 236.0 - 239.9 | 10 |
| 240.0 - 243.9 | 11 |
| 244.0 - 247.9 | 12 |
| 248.0 - 251.9 | 13 |
| 252.0 - 255.9 | 14 |
| 256.0 - 259.9 | 15 |
| 260.0 - 263.9 | 16 |
| 264.0 - 267.9 | 17 |
| 268.0 - 271.9 | 18 |



**Fuel Surcharge**
- 📧 Status Report
- 📧 Fuel Prices
- 📧 Tariffs & Publications
- 📧 Archive
- 📧 Mileage

**Fuel Surcharge News**
CSXT Fuel Surcharge will change January 1, 2008



**Fuel Surcharge E-mails**
Sign Up to receive an e-mail notification any time a fuel surcharge change occurs.

Enter your e-mail address:
[                    ]

◉ Subscribe
○ Unsubscribe

[ Submit ]

| | |
|---|---|
| 272.0 - 275.9 | 19 |
| 276.0 - 279.9 | 20 |
| 280.0 - 283.9 | 21 |
| 284.0 - 287.9 | 22 |
| 288.0 - 291.9 | 23 |
| 292.0 - 295.9 | 24 |
| 296.0 - 299.9 | 25 |
| Above 299.9 | See Below |

The fuel surcharge will be 25¢ per mile plus 1¢ per mile for every 4¢ per gallon, or portion thereof, by which the HDF Average Price exceeds 299.9 cents.

When CSXT is the billing railroad with respect to a joint rate as to which another railroad's fuel surcharge is to be applied, the mileage (if any) used in calculating the fuel surcharge will be derived from CSXT's mileage lookup system and facility which can be found at www.csx.com.[2]

[1] The referenced DOE-EIA publication can currently be found at www.eia.doe.gov. On the home page select "Petroleum;" under "Prices" select "Weekly Retail Gasoline and Diesel Prices;" for the "Area" select "U.S.;" for the "Period" select "Monthly;" then refer to the data on the line entitled "Diesel (On-Highway)." Monthly data is normally published Wednesday after the last Monday of a given month.

[2] The referenced rail miles can be found at www.csx.com. On the home page select "Customers;" select "Prices, Tariffs, Fuel Surcharge;" select "Fuel Surcharge;" then select "Mileage" and follow the instructions provided. First time users will need to register to use ShipCSX.

Top of page

# WTI Tariffs CSXT 8100/8200

**ITEM 12000-A EFFECTIVE JUNE 1, 2003 (SUPERSEDES ITEM 12000 THAT EXPIRES MAY 31, 2003)**
**MERCHANDISE FUEL SURCHARGE (CSXT 8100)**
**COAL FUEL SURCHARGE (CSXT 8200)**

APPLICATION: This item applies to all: (1) regulated common carrier linehaul freight rates and charges until April 23, 2007, and (2) linehaul freight rates and charges with respect to exempt traffic, and linehaul freight rates and charges in contracts, private price quotations or other pricing documents, which do not reference CSXT Fuel Surcharge Publication 8661-A.

In the event that the average price of West Texas Intermediate Crude Oil (as set forth below, the "WTI Average Price"), calculated monthly based on prices published in the Wall Street Journal, exceeds $23.00 per barrel, CSXT will have the right to apply a fuel surcharge to linehaul freight charges referencing or subject to this Item or Tariff CSXT 8100. If this right is exercised, the fuel surcharge shall be applied to the linehaul freight charge for each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price calculation.

The fuel surcharge will be 0.4% of the linehaul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price exceeds $23.00. The WTI Average Price for a given calendar month will be determined by adding the daily West Texas Intermediate Crude Oil prices published in the Wall Street Journal during a calendar month, and dividing the result by the number of days so published. The result will be rounded to the nearest cent. If the Wall Street Journal ceases publication of the price of West Texas Intermediate Crude Oil, CSXT will employ a suitable substitute source of price or measure. The following schedule reflects the applicable fuel surcharges within the WTI Average Price ranges noted below:

| WTI Average Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $23.00 and Below | No Surcharge |
| $23.01 - $24.00 | 0.4% |
| $24.01 - $25.00 | 0.8% |
| $25.01 - $26.00 | 1.2% |
| $26.01 - $27.00 | 1.6% |
| $27.01 - $28.00 | 2.0% |
| $28.01 - $29.00 | 2.4% |
| $29.01 - $30.00 | 2.8% |
| $30.01 - $31.00 | 3.2% |
| $31.01 - $32.00 | 3.6% |
| $32.01 - $33.00 | 4.0% |

| | |
|---|---|
| $33.01 - $34.00 | 4.4% |
| $34.01 - $35.00 | 4.8% |
| $35.01 - $36.00 | 5.2% |
| $36.01 - $37.00 | 5.6% |
| $37.01 - $38.00 | 6.0% |
| $38.01 - $39.00 | 6.4% |
| $39.01 - $40.00 | 6.8% |
| $40.01 - $41.00 | 7.2% |
| $41.01 - $42.00 | 7.6% |
| $42.01 - $43.00 | 8.0% |
| $43.01 - $44.00 | 8.4% |
| $44.01 - $45.00 | 8.8% |
| $45.01 - $46.00 | 9.2% |
| $46.01 - $47.00 | 9.6% |
| $47.01 - $48.00 | 10.0% |
| $48.01 - $49.00 | 10.4% |
| $49.01 - $50.00 | 10.8% |
| $50.01 - $51.00 | 11.2% |
| $51.01 - $52.00 | 11.6% |
| $52.01 - $53.00 | 12.0% |
| $53.01 - $54.00 | 12.4% |
| $54.01 - $55.00 | 12.8% |
| $55.01 - $56.00 | 13.2% |
| $56.01 - $57.00 | 13.6% |
| $57.01 - $58.00 | 14.0% |
| $58.01 - $59.00 | 14.4% |
| $59.01 - $60.00 | 14.8% |
| $60.01 and Above | * |

*The fuel surcharge will be 14.8%, plus an additional 0.4% of the linehaul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price exceeds $60.00.

No less than 20 days prior notice will be provided of the application of, or of any changes in, the fuel surcharge. Notice will be published on CSXT's web page at www.csx.com. Upon written request, the foregoing notice will be provided by other appropriate electronic or facsimile means. All such requests should be directed to Clyde_McIntyre@csx.com. In no case will a linehaul freight charge be reduced as a result of the application of this Item, nor will the application of the fuel surcharge be retroactive.

Top of page

ShipCSX Privacy    Terms of Use    Corporate Structure    © 2007 CSX Technology, Inc.

For help using ShipCSX, call 1-877-ShipCSX.    CSX Home   ShipCSX Home   | Quick Links | GO

## ShipCSX

**ShipCSX Log In**

Sign up for eBusiness    Forgot your password?    GO

You are here: **ShipCSX** > Fuel Surcharge Archive     December 3, 2007  3:01 PM EST    Help

## HDF Fuel Surcharge Archive

The table below lists expired fuel surcharges that were based on CSXT Fuel Surcharge Publication 8661-A.  Current HDF fuel surcharge information can be viewed in the fuel surcharge status report.

| Fuel Surcharge Effective Date | Surcharge Cents Per Mile | HDF Avg. Price Cents Per Gallon* | Basis Month |
|---|---|---|---|
| 04/23/07 | 13 | 248.8 | February 2007 |
| 05/01/07 | 17 | 266.7 | March 2007 |
| 06/01/07 | 21 | 283.4 | April 2007 |
| 07/01/07 | 20 | 279.6 | May 2007 |
| 08/01/07 | 21 | 280.8 | June 2007 |
| 09/01/07 | 22 | 286.8 | July 2007 |
| 10/01/07 | 22 | 286.9 | August 2007 |
| 11/01/07 | 24 | 295.3 | September 2007 |

**Fuel Surcharge**
- Status Report
- Fuel Prices
- Tariffs & Publications
- Archive
- Mileage

**Fuel Surcharge News**
CSXT Fuel Surcharge will change January 1, 2008



**Fuel Surcharge E-mails**
Sign Up to receive an e-mail notification any time a fuel surcharge change occurs.

Enter your e-mail address:

◉ Subscribe
○ Unsubscribe

Submit

\* The referenced DOE-EIA publication can currently be found at www.eia.doe.gov. On the home page select "Petroleum;" under "Prices" select "Weekly Retail Gasoline and Diesel Prices;" for the "Area" select "U.S.;" for the "Period" select "Monthly;" then refer to the data on the line entitled "Diesel (On-Highway)." Monthly data is normally published Wednesday after the last Monday of a given month.

## WTI Fuel Surcharge Archive

The table below lists expired fuel surcharges that were based on Tariffs 8100 and 8200, Item 12000-Series. Current WTI fuel surcharge information can be viewed in the fuel surcharge status report.

| Fuel Surcharge Effective Date | Surcharge Amount | Avg. Monthly WTI Price* | Basis Month |
|---|---|---|---|
| 10/25/00 | 2.0% | N/A | N/A |
| 10/31/01 | 0.0% | N/A | N/A |
| 10/17/02 | 2.0% | N/A | N/A |
| 12/11/02 | 0.0% | N/A | N/A |
| 01/29/03 | 2.0% | N/A | N/A |
| 06/01/03 | 2.4% | $28.25 | April 2003 |
| 07/01/03 | 2.4% | $28.14 | May 2003 |
| 08/01/03 | 3.2% | $30.72 | June 2003 |
| 09/01/03 | 3.2% | $30.76 | July 2003 |
| 10/01/03 | 3.6% | $31.59 | August 2003 |
| 11/01/03 | 2.4% | $28.29 | September 2003 |
| 12/01/03 | 3.2% | $30.33 | October 2003 |
| 01/01/04 | 3.6% | $31.1 | November 2003 |
| 02/01/04 | 4.0% | $32.15 | December 2003 |
| 03/01/04 | 4.8% | $34.27 | January 2004 |
| 04/01/04 | 4.8% | $34.74 | February 2004 |
| 05/01/04 | 5.6% | $36.76 | March 2004 |
| 06/01/04 | 5.6% | $36.7 | April 2004 |
| 07/01/04 | 7.2% | $40.29 | May 2004 |
| 08/01/04 | 6.4% | $38.04 | June 2004 |
| 09/01/04 | 7.2% | $40.81 | July 2004 |
| 10/01/04 | 8.8% | $44.94 | August 2004 |

| | | | |
|---|---|---|---|
| 11/01/04 | 9.2% | $45.95 | September 2004 |
| 12/01/04 | 12.4% | $53.13 | October 2004 |
| 01/01/05 | 10.4% | $48.46 | November 2004 |
| 02/01/05 | 8.4% | $43.33 | December 2004 |
| 03/01/05 | 9.6% | $46.84 | January 2005 |
| 04/01/05 | 10.0% | $47.97 | February 2005 |
| 05/01/05 | 12.8% | $54.22 | March 2005 |
| 06/01/05 | 12.4% | $53.04 | April 2005 |
| 07/01/05 | 10.8% | $49.83 | May 2005 |
| 08/01/05 | 13.6% | $56.31 | June 2005 |
| 09/01/05 | 14.4% | $58.7 | July 2005 |
| 10/01/05 | 16.8% | $64.97 | August 2005 |
| 11/01/05 | 17.2% | $65.57 | September 2005 |
| 12/01/05 | 16.0% | $62.37 | October 2005 |
| 01/01/06 | 14.4% | $58.3 | November 2005 |
| 02/01/06 | 14.8% | $59.43 | December 2005 |
| 03/01/06 | 17.2% | $65.51 | January 2006 |
| 04/01/06 | 15.6% | $61.63 | February 2006 |
| 05/01/06 | 16.0% | $62.9 | March 2006 |
| 06/01/06 | 18.8% | $69.69 | April 2006 |
| 07/01/06 | 19.2% | $70.94 | May 2006 |
| 08/01/06 | 19.2% | $70.96 | June 2006 |
| 09/01/06 | 20.8% | $74.41 | July 2006 |
| 10/01/06 | 20.4% | $73.05 | August 2006 |
| 11/01/06 | 16.4% | $63.87 | September 2006 |
| 12/01/06 | 14.4% | $58.88 | October 2006 |
| 01/01/07 | 14.8% | $59.37 | November 2006 |
| 02/01/07 | 16.0% | $62.03 | December 2006 |
| 03/01/07 | 12.8% | $54.24 | January 2007 |
| 04/01/07 | 14.8% | $59.26 | February 2007 |
| 05/01/07 | 15.2% | $60.56 | March 2007 |
| 06/01/07 | 16.4% | $63.96 | April 2007 |
| 07/01/07 | 16.4% | $63.46 | May 2007 |
| 08/01/07 | 18.0% | $67.48 | June 2007 |
| 09/01/07 | 20.8% | $74.15 | July 2007 |
| 10/01/07 | 20.0% | $72.39 | August 2007 |
| 11/01/07 | 22.8% | $79.93 | September 2007 |

* Based on prices as published in The Wall Street Journal.

ShipCSX Privacy    Terms of Use    Corporate Structure    © 2007 CSX Technology, Inc.

EXHIBIT G

December 2003



**ASSOCIATION
OF AMERICAN
RAILROADS**

# AAR
# RAILROAD
# COST INDEXES

## Announcing a New Index

This issue of AAR Railroad Cost Indexes inaugurates a new index:  the All-Inclusive Index Less Fuel.  This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component.

Table AA - All-Inclusive Index Less Fuel
Table AB - Forecast vs. Actual All Inclusive Index Less Fuel
Table AC - All-Inclusive Index Less Fuel On Various Bases
Table AD - All-Inclusive Index Less Fuel With Forecast Error Adjustment

Including Series RCR,
The All-Inclusive Index,
and The Rail Cost Adjustment Factor

Copyright © 2003 by the Association of American Railroads.  All rights reserved.  No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by an information storage or retrieval system, without permission in writing from the Association of American Railroads.

# SCOPE OF AAR INDEXES

## Structure of Indexes

AAR price indexes measure changes in railroad inflation, i.e., changes in the price level of inputs to railroad operations. Accordingly, labor is measured on an hourly basis; fuel in terms of price per gallon; materials and supplies by prices for a market basket of items; and other components of operating expense, where practicable, on the basis of units of use. The indexes are intended to be limited to inflation-caused changes and do not generally reflect changes in total expenses, the actual disbursement of monies, and/or extraordinary charges not caused by price level changes.

## Railroad Cost Recovery (RCR) Indexes

The RCR index series is based on two different types of prices: (1) chargeout prices and wage rates, which represent the prices of expensed items at the time they are actually consumed and charged to the expense accounts, and (2) spot prices for materials and supplies and fuel, which represent the price of the supplies at the time they are purchased. The chargeout price index series includes ten component indexes, each representing an element of railroad freight service expense, and 13 composite indexes, comprised of various combinations of the component indexes. Each index is published on both a quarterly and annual basis for the U.S. and two districts (East and West). The spot price index series is comprised of ten indexes – a diesel fuel index, three composition-based and four function-based materials and supplies indexes, and two total materials and supplies indexes, one with and one without fuel. The spot price indexes are published on a quarterly basis for the U.S. and two districts (East and West). (The Eastern District includes the former Southern District, which was published separately prior to the third quarter 1986.)

The RCR index data are compiled into three tables, which are included in this publication:

Table A – Annual Indexes of Chargeout Prices and Wage Rates

Table B – Spot Price Indexes of Fuel and Materials & Supplies

Table C – Quarterly Indexes of Chargeout Prices and Wage Rates

It is the policy of the AAR to revise the RCR indexes where material errors are discovered. The revisions will be made in the edition of this publication immediately following the recognition of the error.

## RCAF and the All-Inclusive Index

The All-Inclusive Index (AII), the first step in creating the RCAF, is comprised of seven component indexes and one composite index (which is expressed on several different base periods). The indexes are published on a quarterly basis for the U.S. only; annual average indexes are not computed for the AII. Each quarter, the AAR is required to file the AII with the Surface Transportation Board (STB), formerly the Interstate Commerce Commission. Filings are available on the AAR's Web site at: www.aar.org/AboutTheIndustry/RailCostIndexes.asp. Each quarter's filing contains detailed explanations of the forecast for that quarter, as well as the actual data from the second quarter prior. Certain index data from the filing are included in this publication in the following tables:

Table D – Current Quarter All-Inclusive Index

Table E – Forecast vs. Actual All-Inclusive Index (2 Quarters Prior)

Table F – All-Inclusive Index on Various Bases

## All-Inclusive Index Less Fuel

In this publication, the AAR also calculates a version of the All-Inclusive Index that does not include fuel. This All-Inclusive Index Less Fuel (AII-LF) is calculated exactly the same, with matching component indexes, as the All-Inclusive Index used with the RCAF – with the exception of the exclusion of the fuel component. Index data for the AII-LF are included in this publication in the following tables:

> Table AA – Current Quarter All-Inclusive Index Less Fuel
> Table AB – Forecast vs. Actual All-Inclusive Index Less Fuel (2 Quarters Prior)
> Table AC – All-Inclusive Index Less Fuel on Various Bases
> Table AD – All-Inclusive Index Less Fuel With Forecast Error Adjustment

## Rail Cost Adjustment Factor (RCAF)

Generally, the STB serves a decision issuing the RCAF prior to the publication deadline of the *AAR Railroad Cost Indexes*. Whenever possible, a synopsis of the decision and the new RCAF are included in this publication. The following tables have been provided to detail the calculation of the RCAF:

> Table G – Rail Cost Adjustment Factor (4Q/1987=100)
> Table H – Rail Cost Adjustment Factor (10/1/1982=100)
> Table I – Rail Cost Adjustment Factor (4Q/1992=100)
> Table J – Rail Cost Adjustment Factor (4Q/1997=100)
> Table K – Rail Cost Adjustment Factor (4Q/2002=100)

The Surface Transportation Board in its October 3, 1996 Ex Parte No. 290 (Sub-No. 7) decision created an additional productivity-adjusted RCAF (RCAF-5) which reflects RCAF values that would have been produced if the agency had always used a 5-year rolling average from the second quarter 1989 inception of the productivity-adjusted RCAF. The results of these calculations are shown in Tables G, I, J and K. Although the AAR believes this new index series is neither required nor permitted by the applicable statute, and has filed a protest before the STB asserting same, the RCAF-5 series is provided herein as information.

## COST COMPONENTS

### Labor

The labor indexes reflect changes in the average unit price of wages and wage supplements (fringe benefits). The RCR labor indexes are published annually using annual wage statistics and fringe benefit data from annual reports. The RCR and RCAF have quarterly labor indexes that use annual data updated in accordance with labor union contracts and benefit cost changes. Preliminary annual indexes, which are simple averages of the four quarters, are published before the actual data become available.

The unit price of wages consists of two components: (1) an hourly rate for straight time (ST) compensation, which is ST compensation divided by ST hours paid for, and (2) an hourly rate for pay for time not worked (PFTNW), such as vacation and holidays, which is PFTNW compensation divided by ST hours paid for. The Wages index is the sum of the two rates for the current period divided by the sum of the two rates in the base period.

The Wage Supplements component is comprised of contributions for health and welfare benefits, payroll taxes for Railroad Retirement and Medicare, unemployment insurance, and other wage supplements. The index includes the employer portion of these payments on a per ST-hour-paid basis.

## Fuel

The fuel index represents the change in the average price per gallon of No. 2 diesel fuel. Beginning in February 1991, the price includes Federal excise taxes, transportation, and handling charges. There are three series of indexes calculated for railroad fuel – spot, quarterly chargeout, and annual chargeout. The first is based on current prices, measured in the second month of the quarter. The second reflects the original purchase price of fuel charged to railroad operating expenses during the middle month of the quarter. The purchase price is measured in the first month of the quarter, thereby reflecting an average one-month inventory lag before the fuel is charged to expense. Annual versions of the indexes, part of the RCR, are simple averages of the four quarterly chargeout indexes.

## Materials and Supplies

Changes in materials and supplies prices are measured by three indexes. The first measures spot prices as of the reporting date for each quarter. The quarterly Indexes of Spot Prices of Railroad Fuel, Materials and Supplies include a breakdown of materials and supplies into three composition categories (Forest Products, Metal Products, and Miscellaneous Products), and four functional categories (Maintenance of Way Items, Freight Car Items, Locomotive Items, and All Other Items). The second series is comprised of quarterly chargeout price indexes, reflecting the original purchase price of materials charged to railroad operating expense accounts during the quarter; a three-month lag is assumed for the average time in inventory before an item is charged to an expense account. Thus, the previous quarter's spot price is the current quarter's chargeout price. The third series presents annual chargeout price indexes, representing the average price of materials and supplies charged to expense accounts during the calendar year. The annual Materials and Supplies indexes are calculated using a simple average of the four quarterly chargeout indexes.

## Other Operating Expenses

There are six separate indexes published in the RCR and four individual indexes calculated for the AII as components of other operating expenses. The six RCR indexes are: Equipment Rents, Purchased Services, Depreciation, Interest, Taxes (other than income and payroll), and All Other operating expenses. The four AII indexes are Equipment Rents, Depreciation, Interest, and All Other operating expenses. Purchased services and taxes are included in all other operating expenses in the AII.

Equipment Rents has two components – Car Hire and Lease Rentals. The Car Hire index is a weighted average of car hire rates for various car types obtained from the CHARM (Car Hire Accounting Rate Master) file. The Lease Rentals component is indexed by the change in a Producer Price Index (PPI) – in the RCR by the PPI-Rail Equipment (PPI-RE) and in the AII by the PPI-Industrial Commodities less Fuel and Related Products and Power (PPI-LF).

Purchased Services in the RCR are indexed by the change in one of the composite indexes – Material Prices, Wage Rates and Supplements Combined, excluding Fuel.

The indexes for depreciation, interest, and taxes in the RCR reflect expenses per physical unit, such as locomotive depreciation per horsepower. The data on expenses and physical capacity are collected quarterly from the Class I railroads. In the AII, the Depreciation index is based on the change in the PPI-RE, while interest is determined annually from railroad data on the embedded cost of debt.

All other operating expenses are indexed by changes in a Producer Price Index – in the RCR by the PPI-All Commodities, and in the AII by the PPI-LF.

# INDEX WEIGHTS

The weights used to calculate the indexes are based on freight operating expenses plus fixed charges for all Class I railroads.  RCR weights are changed at five year intervals (unless there is a major shift in weights prior to that time which would necessitate an earlier change), while the STB requires that the AII weights be updated annually.  Beginning in the fourth quarter 2003, the AII used 2002 weights.  The 1998 weights were employed in the RCR for the first time in the first quarter 2000.  The RCR utilized 1993 weights from 1995 through 1999. Whenever weights are updated, a linking procedure is used so that the weight changes, by themselves, do not cause the index levels to change. The tables below detail the external weighting scheme for the two indexes:

### TABLE 1 - RCR
### External Weighting Factors (1998)

|                      | U.S.     | East     | West     |
|----------------------|----------|----------|----------|
| Wages                | 29.9 %   | 31.8 %   | 28.6 %   |
| Wage Supplements     | 9.9      | 10.4     | 9.6      |
| Fuel                 | 7.0      | 4.9      | 8.5      |
| Materials & Supplies | 5.5      | 5.8      | 5.3      |
| Equipment Rents      | 10.8     | 8.6      | 12.3     |
| Purchased Service    | 10.6     | 12.7     | 9.1      |
| Depreciation         | 10.6     | 10.5     | 10.7     |
| Interest             | 4.8      | 3.7      | 5.5      |
| Taxes                | 2.1      | 2.2      | 2.0      |
| All Other Expenses   | 8.8      | 9.4      | 8.4      |

### TABLE 2 - (RCAF/AII)
### All-Inclusive Index
### Weighting Factors (2002)

| Labor                | 38.0 %   |
|----------------------|----------|
| Fuel                 | 9.0      |
| Materials & Supplies | 4.6      |
| Equipment Rents      | 10.3     |
| Depreciation         | 10.9     |
| Interest             | 3.7      |
| All Other Expenses   | 23.5     |

### TABLE 3 (AII-LF)
### All-Inclusive Index Less Fuel
### Weighting Factors (2002)

| Labor                | 41.8 %   |
|----------------------|----------|
| Materials & Supplies | 5.0      |
| Equipment Rents      | 11.3     |
| Depreciation         | 12.0     |
| Interest             | 4.1      |
| All Other Expenses   | 25.8     |

## ANALYSIS OF SERIES RCR TRENDS

**Third Quarter 2003 RCR (U.S.) -** The Railroad Cost Recovery Index (RCR) increased one percent in the third quarter 2003. All of the ten components, with the exception of Fuel, increased from the prior quarter. The 0.9 percent increase in wage rates was caused by rebenchmarking and wage increases. Six national unions had wage increases effective July 1. In addition, other national unions had increases in their cost of living allowance, plus some independent unions had wage increases. The Depreciation, Interest, and Taxes components had increases of over 1 percent. Fuel decreased by 2.6 percent, but was still higher than any of the quarters from 2002.

*Rebenchmarking -* Third quarter wages and wage supplements were calculated using new benchmarks based on final annual report data and wage statistics for 2002. Health & Welfare was affected slightly by rebenchmarking to final annual report data. Other areas were impacted minimally because the final 2002 wage statistics had few changes from the preliminary 2002 data used for the first and second quarter calculations.

**New National Agreements -** the Brotherhood of Railroad Signalmen signed a new agreement on September 24, 2003. The agreement, which was similar to the Transportation Communications International Union (TCU) from earlier in the year, includes wage increases and employee Health & Welfare cost sharing. Retroactive employee contributions to Health & Welfare were offset against retroactive wage increases.

The United Transportation Union (UTU) signed an agreement in 2002 that contained wage increases, and agreed to continue negotiating Health & Welfare issues. In November 2003, an agreement was ratified that includes employee Health & Welfare cost sharing. This agreement also affects the UTU's Yardmasters Department.

In October 2003, the Brotherhood of Locomotive Engineers reached a tentative agreement that covers work rules, wages, and Health & Welfare. If this agreement is ratified, it will be added to the next quarter's indexes.

**Fourth Quarter 2003 QMPW (U.S.) -** The fourth quarter Index of Materials Prices, Wage Rates and Supplements Combined, Including Fuel (QMPW) increased 0.6 percent from the previous quarter. Fuel rebounded (up by 2.9 percent) to slightly higher than the second quarter level. Higher rail prices, and regional purchases of ballast, caused the Materials & Supplies Index to increase 1.4 percent. Wages increased slightly because of the addition of the new Brotherhood of Railroad Signalmen (BRS) contract. Supplements decreased because of employee Health & Welfare cost sharing featured in the BRS contract and a new employee Health & Welfare cost sharing program added to the United Transportation Union contract.

## Table A
## ANNUAL INDEXES OF CHARGEOUT PRICES AND WAGE RATES (1977=100)
### UNITED STATES

| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wage rates | 244.4 | 244.6 | 249.2 | 261.1 | 272.2 | 274.6 | 289.1 | 283.7 | 300.0 | 309.8 | 314.1 | 322.7 p |
| Wage supplements | 356.8 | 357.0 | 356.1 | 371.7 | 367.4 | 389.7 | 370.5 | 374.5 | 400.1 | 444.2 | 502.0 | 508.3 p |
| Fuel | 178.1 | 178.3 | 168.9 | 168.2 | 198.0 | 192.3 | 153.9 | 156.3 | 252.0 | 246.7 | 212.5 | 257.2 |
| Materials and supplies | 179.8 | 185.5 | 191.3 | 192.4 | 193.5 | 196.9 | 199.1 | 198.7 | 198.1 | 203.8 | 202.5 | 202.6 |
| Equipment rents | 217.8 | 221.8 | 224.5 | 234.3 | 238.1 | 235.7 | 239.0 | 239.1 | 239.4 | 242.6 | 242.5 | |
| Purchased services | 253.2 | 254.6 | 258.6 | 269.7 | 276.3 | 282.3 | 288.8 | 286.0 | 300.7 | 315.7 | 328.1 | |
| Depreciation | 240.3 | 252.1 | 260.3 | 291.5 | 307.4 | 324.9 | 353.2 | 366.3 | 384.8 | 405.8 | 421.7 | |
| Interest | 222.9 | 205.4 | 208.8 | 233.7 | 260.3 | 273.1 | 301.7 | 296.6 | 324.3 | 289.8 | 282.3 | |
| Taxes (other than income and payroll) | 179.7 | 185.4 | 219.4 | 238.1 | 236.9 | 223.4 | 247.5 | 231.3 | 258.3 | 271.1 | 258.3 | |
| All other operating expenses | 180.4 | 183.1 | 185.5 | 192.0 | 196.5 | 196.6 | 191.6 | 193.3 | 204.3 | 206.6 | 202.1 | |
| Wage rates and supplements | 269.1 | 269.3 | 272.8 | 286.4 | 294.3 | 300.9 | 308.4 | 304.9 | 323.3 | 340.3 | 355.7 | 363.9 p |
| All materials (incl. fuel) | 171.7 | 174.7 | 173.5 | 173.1 | 188.9 | 187.5 | 168.8 | 169.8 | 227.3 | 226.1 | 204.8 | 232.2 |
| Matl. prices & wage rates combined (excl. fuel) | 230.3 | 231.9 | 236.9 | 246.1 | 254.9 | 257.5 | 269.2 | 265.0 | 277.3 | 286.2 | 289.3 | 296.1 p |
| Matl. prices & wage rates combined (incl. fuel) | 222.7 | 224.1 | 226.5 | 233.2 | 246.7 | 247.5 | 248.6 | 245.7 | 283.4 | 288.9 | 282.1 | 299.4 p |
| Materials prices, wage rates and supplements combined (excl. fuel) | 253.2 | 254.6 | 258.6 | 269.7 | 276.3 | 282.3 | 288.8 | 286.0 | 300.7 | 315.7 | 328.1 | 334.9 p |
| Materials prices, wage rates and supplements combined (incl. fuel) - QMPW | 245.1 | 246.3 | 248.3 | 256.8 | 267.9 | 271.8 | 270.0 | 268.1 | 305.4 | 316.3 | 318.3 | 334.5 p |
| Taxes, purchased serv, and other expenses | 207.2 | 209.8 | 216.1 | 222.6 | 227.1 | 227.9 | 230.9 | 228.7 | 239.2 | 247.2 | 248.6 | |
| Equip. rents, deprec., and interest | 228.2 | 231.0 | 236.0 | 256.5 | 268.7 | 276.2 | 293.1 | 297.1 | 307.2 | 309.8 | 313.7 | |
| Equip. rents, taxes, deprec., purch. serv., interest & other expenses | 219.2 | 221.9 | 227.7 | 241.3 | 249.8 | 254.1 | 264.3 | 265.3 | 275.5 | 280.9 | 283.5 | |
| Total excl. fuel | 239.9 | 241.9 | 246.8 | 259.4 | 267.2 | 272.4 | 280.9 | 280.0 | 292.7 | 302.7 | 310.1 | |
| Total excl. interest | 237.2 | 239.9 | 243.5 | 254.0 | 263.3 | 267.1 | 269.8 | 269.4 | 294.0 | 304.4 | 307.2 | |
| Total excl. interest and depreciation | 235.2 | 237.0 | 240.2 | 248.7 | 257.3 | 259.6 | 259.7 | 257.9 | 283.2 | 292.4 | 294.0 | |
| Railroad Cost Recovery Index | 236.3 | 238.1 | 241.7 | 252.9 | 263.0 | 267.1 | 270.9 | 270.3 | 295.0 | 303.4 | 305.7 | |

Note: The final annual wage rates and wage supplements are derived from the Annual Wage Statistics and the Annual Report Form R-1, consequently the final annual values may not equal the average of the four quarterly figures. The preliminary annual indexes, which appear in the December publication each year (indicated by a "p"), are averages of the four quarters.

## Table A

## ANNUAL INDEXES OF CHARGEOUT PRICES AND WAGE RATES (1977=100)

### EAST

| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wage rates | 236.5 | 237.4 | 248.0 | 257.2 | 271.5 | 276.3 | 301.4 | 287.1 | 294.8 | 305.2 | 312.0 | 318.9 | p |
| Wage supplements | 333.9 | 345.5 | 346.4 | 373.4 | 373.5 | 386.9 | 379.7 | 382.4 | 417.9 | 455.3 | 525.7 | 532.0 | p |
| Fuel | 170.3 | 168.4 | 161.4 | 157.1 | 187.3 | 181.4 | 143.5 | 143.2 | 238.4 | 234.9 | 202.5 | 247.4 | |
| Materials and supplies | 161.1 | 166.1 | 170.8 | 173.3 | 175.6 | 175.8 | 178.8 | 179.6 | 179.8 | 182.9 | 182.9 | 182.0 | |
| Equipment rents | 216.7 | 221.0 | 223.3 | 233.2 | 237.0 | 234.9 | 238.5 | 238.3 | 238.5 | 242.4 | 242.0 | | |
| Purchased services | 240.6 | 244.1 | 252.0 | 263.6 | 273.2 | 278.5 | 293.9 | 285.5 | 295.7 | 309.4 | 325.5 | | |
| Depreciation | 241.6 | 254.8 | 263.3 | 284.4 | 301.6 | 313.3 | 325.2 | 340.9 | 357.5 | 377.3 | 385.0 | | |
| Interest | 161.6 | 155.3 | 152.9 | 181.2 | 196.1 | 198.0 | 193.4 | 191.0 | 251.1 | 196.9 | 213.8 | | |
| Taxes (other than income and payroll) | 190.1 | 195.3 | 213.2 | 232.9 | 222.9 | 225.7 | 253.4 | 268.3 | 293.5 | 292.2 | 239.5 | | |
| All other operating expenses | 180.4 | 183.1 | 185.5 | 192.0 | 196.5 | 196.6 | 191.6 | 193.3 | 204.3 | 206.6 | 202.1 | | |
| Wage rates and supplements | 257.8 | 260.9 | 269.6 | 283.2 | 294.7 | 301.3 | 319.7 | 309.0 | 322.1 | 338.2 | 358.2 | 365.0 | p |
| All materials (incl. fuel) | 157.9 | 159.8 | 159.5 | 158.0 | 174.0 | 171.2 | 153.7 | 153.9 | 214.3 | 213.4 | 198.3 | 218.0 | |
| Matl. prices & wage rates combined (excl. fuel) | 220.1 | 221.9 | 231.2 | 238.6 | 250.0 | 253.6 | 273.4 | 262.9 | 268.4 | 277.2 | 282.3 | 287.4 | p |
| Matl. prices & wage rates combined (incl. fuel) | 214.3 | 215.6 | 222.3 | 226.1 | 241.9 | 243.6 | 251.1 | 242.6 | 279.2 | 285.0 | 281.5 | 295.2 | p |
| Materials prices, wage rates and supplements combined (excl. fuel) | 240.6 | 244.1 | 252.0 | 263.6 | 273.2 | 278.5 | 293.9 | 285.5 | 295.7 | 309.4 | 325.5 | 330.8 | p |
| Materials prices, wage rates and supplements combined (incl. fuel) - QMPW | 234.4 | 237.2 | 243.2 | 251.0 | 264.8 | 268.1 | 273.8 | 266.7 | 303.7 | 313.9 | 321.1 | 333.9 | p |
| Taxes, purchased serv, and other expenses | 200.3 | 203.5 | 209.3 | 215.6 | 220.3 | 222.8 | 229.5 | 228.6 | 236.4 | 242.5 | 240.0 | | |
| Equip. rents, deprec. and interest | 206.0 | 211.2 | 214.8 | 231.9 | 242.3 | 245.7 | 250.2 | 254.9 | 272.6 | 267.6 | 273.9 | | |
| Equip. rents, taxes, deprec., purch. serv., interest & other expenses | 207.6 | 211.9 | 216.7 | 228.6 | 236.5 | 239.4 | 245.1 | 247.2 | 261.1 | 261.3 | 263.3 | | |
| Total excl. fuel | 228.7 | 232.6 | 239.2 | 251.1 | 260.0 | 264.2 | 274.9 | 271.7 | 284.9 | 291.3 | 300.8 | | |
| Total excl. interest | 228.9 | 232.9 | 238.8 | 247.5 | 258.6 | 261.9 | 268.1 | 265.2 | 288.7 | 298.2 | 303.2 | | |
| Total excl. interest and depreciation | 226.1 | 229.2 | 234.8 | 242.4 | 252.8 | 255.3 | 261.0 | 256.3 | 280.4 | 288.7 | 293.4 | | |
| Railroad Cost Recovery Index | 226.0 | 229.6 | 235.1 | 244.9 | 256.2 | 259.5 | 265.2 | 262.3 | 288.6 | 293.9 | 299.9 | | |

Note: The final annual wage rates and wage supplements are derived from the Annual Wage Statistics and the Annual Report Form R-1, consequently the final annual values may not equal the average of the four quarterly figures. The preliminary annual indexes, which appear in the December publication each year (indicated by a "p"), are averages of the four quarters.

## Table A
## ANNUAL INDEXES OF CHARGEOUT PRICES AND WAGE RATES (1977=100)

### WEST

| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wage rates | 251.3 | 250.9 | 251.0 | 264.8 | 273.6 | 274.2 | 281.6 | 282.3 | 304.6 | 314.1 | 316.7 | 324.1 p |
| Wage supplements | 377.7 | 369.1 | 366.4 | 373.8 | 366.2 | 395.3 | 367.6 | 372.4 | 391.2 | 441.0 | 490.0 | 493.5 p |
| Fuel | 184.4 | 185.6 | 175.0 | 175.8 | 205.8 | 200.1 | 161.0 | 164.7 | 261.9 | 255.5 | 220.1 | 265.3 |
| Materials and supplies | 208.9 | 217.1 | 223.9 | 224.1 | 225.0 | 231.5 | 232.3 | 230.8 | 228.3 | 234.0 | 228.1 | 229.0 |
| Equipment rents | 218.9 | 222.8 | 225.7 | 235.4 | 239.4 | 236.6 | 240.0 | 239.9 | 240.3 | 243.4 | 242.8 | |
| Purchased services | 266.8 | 267.0 | 268.2 | 278.8 | 283.4 | 289.9 | 240.9 | 290.9 | 309.1 | 325.0 | 334.4 | |
| Depreciation | 229.3 | 240.4 | 248.3 | 286.4 | 300.9 | 321.8 | 363.9 | 369.8 | 386.9 | 408.8 | 427.5 | |
| Interest | 291.3 | 260.6 | 270.7 | 291.0 | 330.4 | 353.7 | 420.6 | 414.7 | 422.0 | 396.1 | 367.6 | |
| Taxes (other than income and payroll) | 170.7 | 176.6 | 221.7 | 239.6 | 244.0 | 218.3 | 240.9 | 202.7 | 230.0 | 251.7 | 265.8 | |
| All other operating expenses | 180.4 | 183.1 | 185.5 | 192.0 | 196.5 | 196.6 | 191.6 | 193.3 | 204.3 | 206.6 | 202.1 | |
| Wage rates and supplements | 279.3 | 277.2 | 276.7 | 290.2 | 295.6 | 302.1 | 302.0 | 303.6 | 325.8 | 343.7 | 355.9 | 362.6 p |
| All materials (incl. fuel) | 189.1 | 193.8 | 192.2 | 191.9 | 208.7 | 208.4 | 185.8 | 187.4 | 255.3 | 252.4 | 225.5 | 257.8 |
| Matl. prices & wage rates combined (excl. fuel) | 242.1 | 244.1 | 246.0 | 256.3 | 263.5 | 265.2 | 271.2 | 271.4 | 288.8 | 297.5 | 298.6 | 304.8 p |
| Matl. prices & wage rates combined (incl. fuel) | 232.3 | 234.1 | 233.5 | 241.5 | 253.7 | 253.8 | 248.5 | 249.6 | 295.2 | 299.6 | 289.3 | 307.9 p |
| Materials prices, wage rates and supplements combined (excl. fuel) | 266.8 | 267.0 | 268.2 | 278.8 | 283.4 | 289.9 | 289.9 | 290.9 | 309.1 | 325.0 | 334.4 | 340.2 p |
| Materials prices, wage rates and supplements combined (incl. fuel) - QMPW | 256.6 | 257.1 | 256.1 | 264.9 | 274.4 | 278.7 | 270.1 | 271.7 | 315.4 | 326.1 | 323.7 | 340.7 p |
| Taxes, purchased serv., and other expenses | 210.5 | 212.6 | 219.3 | 226.7 | 231.1 | 230.1 | 230.4 | 227.1 | 240.4 | 249.4 | 251.9 | |
| Equip. rents, deprec., and interest | 239.3 | 240.0 | 246.2 | 269.0 | 282.3 | 290.8 | 317.7 | 319.1 | 327.1 | 332.2 | 333.9 | |
| Equip. rents, taxes, deprec., purch. serv., interest & other expenses | 227.2 | 228.7 | 235.3 | 250.7 | 259.7 | 263.9 | 278.1 | 277.2 | 287.8 | 295.0 | 297.1 | |
| Total excl. fuel | 250.2 | 251.0 | 254.7 | 268.1 | 275.0 | 280.6 | 288.1 | 288.2 | 302.6 | 314.0 | 319.6 | |
| Total excl. interest | 244.3 | 246.4 | 248.3 | 260.2 | 268.6 | 272.3 | 272.0 | 272.7 | 301.5 | 312.0 | 312.8 | |
| Total excl. interest and depreciation | 243.8 | 245.0 | 246.3 | 255.3 | 262.9 | 264.9 | 260.2 | 260.4 | 289.8 | 299.1 | 298.3 | |
| Railroad Cost Recovery Index | 246.1 | 246.9 | 249.1 | 261.4 | 270.8 | 275.1 | 277.2 | 277.7 | 306.4 | 315.5 | 315.2 | |

Note: The final annual wage rates and wage supplements are derived from the Annual Wage Statistics and the Annual Report Form R-1, consequently the final annual values may not equal the average of the four quarterly figures. The preliminary annual indexes, which appear in the December publication each year (indicated by a "p"), are averages of the four quarters.

## Table B
## SPOT PRICE INDEXES OF FUEL AND MATERIALS AND SUPPLIES (1977=100)
### UNITED STATES

| | DIESEL FUEL | MATERIALS & SUPPLIES BY FUNCTION | | | | MATERIALS & SUPPLIES BY COMPOSITION | | | TOTAL MATERIALS & SUPPLIES | |
| | | MAINT OF WAY ITEMS | FRT CAR ITEMS | LOCO ITEMS | ALL OTHER ITEMS | FOREST PROD | METAL PROD | MISC PROD | EXCLUD FUEL | INCLUD FUEL |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/15/98 | 164.0 | 240.4 | 165.4 | 160.7 | 150.8 | 298.2 | 166.4 | 225.2 | 198.4 | 185.1 |
| 05/15/98 | 161.1 | 246.4 | 166.6 | 160.5 | 151.3 | 317.7 | 166.9 | 222.4 | 199.7 | 184.8 |
| 08/15/98 | 144.0 | 243.4 | 167.1 | 159.2 | 150.1 | 310.4 | 166.0 | 222.4 | 198.5 | 177.7 |
| 11/15/98 | 145.1 | 241.0 | 168.3 | 159.2 | 150.4 | 302.3 | 166.8 | 221.9 | 198.1 | 177.8 |
| 02/15/99 | 116.8 | 240.8 | 167.5 | 159.9 | 147.0 | 299.8 | 167.4 | 221.1 | 197.9 | 167.1 |
| 05/15/99 | 152.9 | 241.8 | 167.4 | 160.8 | 144.4 | 289.8 | 171.4 | 223.5 | 199.8 | 181.8 |
| 08/15/99 | 183.2 | 236.1 | 169.6 | 160.2 | 147.9 | 273.2 | 171.2 | 227.8 | 198.9 | 192.6 |
| 11/15/99 | 209.8 | 230.3 | 167.9 | 162.7 | 151.6 | 264.7 | 169.4 | 226.5 | 196.5 | 201.0 |
| 02/15/00 | 249.5 | 227.8 | 176.3 | 162.5 | 151.5 | 263.4 | 169.3 | 227.2 | 196.5 | 217.3 |
| 05/15/00 | 243.6 | 230.3 | 174.1 | 163.6 | 152.2 | 263.2 | 170.7 | 229.8 | 198.0 | 215.8 |
| 08/15/00 | 265.0 | 231.1 | 171.8 | 167.5 | 148.7 | 256.6 | 169.4 | 244.2 | 201.3 | 226.5 |
| 11/15/00 | 310.3 | 232.0 | 167.8 | 171.7 | 149.1 | 274.1 | 167.4 | 235.8 | 199.5 | 244.0 |
| 02/15/01 | 266.8 | 231.1 | 167.8 | 170.4 | 149.5 | 265.3 | 166.8 | 242.9 | 200.5 | 226.7 |
| 05/15/01 | 268.3 | 236.9 | 167.1 | 170.8 | 149.5 | 263.1 | 166.9 | 262.1 | 208.9 | 232.3 |
| 08/15/01 | 247.5 | 234.9 | 168.8 | 169.9 | 149.6 | 262.7 | 167.3 | 255.8 | 206.2 | 222.2 |
| 11/15/01 | 205.6 | 237.1 | 167.9 | 169.6 | 148.5 | 263.4 | 167.0 | 261.2 | 208.6 | 206.4 |
| 02/15/02 | 179.2 | 233.9 | 168.9 | 169.5 | 141.4 | 269.2 | 167.3 | 243.3 | 201.1 | 191.2 |
| 05/15/02 | 217.7 | 235.6 | 168.4 | 167.6 | 144.1 | 271.5 | 167.8 | 242.1 | 201.1 | 207.0 |
| 08/15/02 | 227.6 | 235.6 | 167.3 | 167.3 | 141.4 | 278.5 | 165.7 | 238.7 | 199.3 | 210.0 |
| 11/15/02 | 243.4 | 233.2 | 167.5 | 160.1 | 135.8 | 278.1 | 164.7 | 226.6 | 193.4 | 213.1 |
| 02/15/03 | 310.9 | 241.5 | 168.2 | 161.0 | 136.0 | 280.4 | 163.4 | 252.4 | 204.6 | 247.4 |
| 05/15/03 | 247.0 | 241.8 | 169.0 | 159.6 | 135.9 | 283.2 | 161.7 | 254.4 | 204.7 | 221.2 |
| 08/15/03 | 270.2 | 249.3 | 169.0 | 160.9 | 134.6 | 300.2 | 161.6 | 256.8 | 207.6 | 232.4 |
| 11/15/03 | 266.1 | 259.5 | 169.9 | 163.9 | 133.5 | 307.3 | 166.3 | 268.8 | 215.0 | 235.1 |

Source:  Periodic confidential price quotations from Class I carriers on diesel fuel and 38 operating and maintenance items.  The same items are contained in both the functional and composition groupings.

Table B
## SPOT PRICE INDEXES OF FUEL AND MATERIALS AND SUPPLIES (1977=100)
### EAST

| | | MATERIALS & SUPPLIES BY FUNCTION | | | | MATERIALS & SUPPLIES BY COMPOSITION | | | TOTAL MATERIALS & SUPPLIES | |
|---|---|---|---|---|---|---|---|---|---|---|
| | DIESEL FUEL | MAINT OF WAY ITEMS | FRT CAR ITEMS | LOCO ITEMS | ALL OTHER ITEMS | FOREST PROD | METAL PROD | MISC PROD | EXCLUD FUEL | INCLUD FUEL |
| 02/15/98 | 156.2 | 210.3 | 153.9 | 160.5 | 153.7 | 291.5 | 170.4 | 144.2 | 179.4 | 172.4 |
| 05/15/98 | 149.0 | 210.0 | 152.3 | 161.4 | 152.7 | 291.5 | 169.8 | 144.5 | 179.1 | 170.0 |
| 08/15/98 | 133.0 | 208.4 | 153.3 | 161.2 | 149.1 | 286.5 | 169.9 | 144.3 | 178.4 | 164.4 |
| 11/15/98 | 135.9 | 213.6 | 153.0 | 160.4 | 150.2 | 300.9 | 170.0 | 143.7 | 180.2 | 166.6 |
| 02/15/99 | 108.1 | 213.0 | 153.7 | 161.6 | 139.6 | 299.7 | 169.8 | 143.1 | 179.7 | 157.4 |
| 05/15/99 | 140.6 | 213.0 | 153.2 | 160.0 | 137.7 | 281.8 | 176.4 | 140.8 | 180.7 | 168.4 |
| 08/15/99 | 168.5 | 205.5 | 153.7 | 160.7 | 145.6 | 262.6 | 174.5 | 146.9 | 177.9 | 175.3 |
| 11/15/99 | 199.5 | 203.6 | 153.9 | 168.8 | 155.1 | 257.4 | 177.3 | 149.6 | 179.4 | 186.1 |
| 02/15/00 | 248.6 | 202.1 | 154.5 | 169.2 | 162.7 | 260.6 | 174.3 | 153.0 | 178.7 | 201.2 |
| 05/15/00 | 233.4 | 202.1 | 154.4 | 169.8 | 163.1 | 260.6 | 174.1 | 153.9 | 178.8 | 196.5 |
| 08/15/00 | 255.0 | 205.4 | 154.5 | 168.9 | 164.9 | 249.8 | 174.9 | 171.4 | 182.3 | 205.7 |
| 11/15/00 | 300.1 | 211.0 | 152.5 | 172.1 | 166.8 | 275.2 | 174.2 | 159.7 | 182.8 | 220.3 |
| 02/15/01 | 261.0 | 204.3 | 152.9 | 171.7 | 167.0 | 265.0 | 175.0 | 153.7 | 180.0 | 206.0 |
| 05/15/01 | 252.9 | 212.3 | 152.7 | 170.2 | 167.2 | 260.4 | 175.6 | 173.3 | 185.1 | 206.9 |
| 08/15/01 | 237.2 | 209.9 | 152.8 | 169.9 | 165.9 | 259.2 | 176.6 | 166.2 | 183.5 | 200.9 |
| 11/15/01 | 205.7 | 212.3 | 153.2 | 169.5 | 166.5 | 258.8 | 176.3 | 172.4 | 185.0 | 192.0 |
| 02/15/02 | 181.7 | 201.7 | 152.7 | 171.2 | 162.7 | 259.1 | 173.7 | 154.6 | 178.6 | 180.0 |
| 05/15/02 | 204.5 | 208.0 | 151.4 | 169.4 | 162.3 | 259.0 | 176.4 | 162.3 | 182.2 | 189.7 |
| 08/15/02 | 214.6 | 214.9 | 150.7 | 169.5 | 162.5 | 267.8 | 175.8 | 171.0 | 185.7 | 195.3 |
| 11/15/02 | 226.6 | 213.9 | 150.2 | 156.5 | 168.1 | 265.0 | 171.9 | 164.8 | 181.5 | 196.2 |
| 02/15/03 | 301.6 | 215.4 | 152.3 | 156.7 | 169.4 | 281.1 | 168.3 | 159.5 | 180.9 | 219.6 |
| 05/15/03 | 234.6 | 216.4 | 153.0 | 154.3 | 169.9 | 277.0 | 165.8 | 170.2 | 181.8 | 199.0 |
| 08/15/03 | 251.4 | 220.5 | 153.5 | 154.8 | 165.1 | 285.6 | 165.7 | 171.9 | 183.7 | 205.7 |
| 11/15/03 | 252.8 | 236.0 | 153.3 | 158.7 | 164.0 | 297.7 | 173.4 | 184.0 | 193.2 | 212.6 |

Source: Periodic confidential price quotations from Class I carriers on diesel fuel and 38 operating and maintenance items. The same items are contained in both the functional and composition groupings.

AAR Railroad Cost Indexes

Table B
## SPOT PRICE INDEXES OF FUEL AND MATERIALS AND SUPPLIES (1977=100)
### WEST

| | DIESEL FUEL | MATERIALS & SUPPLIES BY FUNCTION | | | | MATERIALS & SUPPLIES BY COMPOSITION | | | TOTAL MATERIALS & SUPPLIES | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | MAINT OF WAY ITEMS | FRT CAR ITEMS | LOCO ITEMS | ALL OTHER ITEMS | FOREST PROD | METAL PROD | MISC PROD | EXCLUD FUEL | INCLUD FUEL |
| 02/15/98 | 169.9 | 274.2 | 172.7 | 169.7 | 154.5 | 309.6 | 168.8 | 292.1 | 231.3 | 204.8 |
| 05/15/98 | 169.5 | 284.6 | 176.8 | 168.0 | 155.4 | 348.6 | 169.7 | 285.7 | 232.7 | 205.4 |
| 08/15/98 | 151.3 | 280.7 | 177.2 | 166.0 | 155.4 | 339.0 | 168.3 | 285.4 | 231.0 | 197.0 |
| 11/15/98 | 151.4 | 272.7 | 180.0 | 166.5 | 155.4 | 308.0 | 169.6 | 285.6 | 229.3 | 196.1 |
| 02/15/99 | 122.2 | 273.7 | 177.8 | 167.1 | 155.8 | 304.1 | 170.8 | 284.2 | 229.1 | 184.0 |
| 05/15/99 | 160.5 | 278.4 | 177.8 | 169.6 | 154.0 | 301.7 | 173.9 | 291.1 | 233.1 | 202.0 |
| 08/15/99 | 192.3 | 274.3 | 181.4 | 168.0 | 157.4 | 288.3 | 174.6 | 289.4 | 231.5 | 214.1 |
| 11/15/99 | 217.6 | 265.3 | 178.2 | 168.3 | 160.5 | 277.0 | 170.8 | 287.5 | 227.5 | 222.1 |
| 02/15/00 | 252.8 | 260.6 | 191.2 | 167.4 | 157.5 | 271.2 | 172.0 | 284.2 | 226.4 | 238.0 |
| 05/15/00 | 251.6 | 265.7 | 188.2 | 169.1 | 158.5 | 270.8 | 174.2 | 289.0 | 229.4 | 239.0 |
| 08/15/00 | 273.2 | 261.1 | 184.8 | 176.3 | 153.5 | 267.9 | 172.5 | 293.6 | 230.0 | 249.4 |
| 11/15/00 | 319.1 | 259.7 | 180.5 | 181.0 | 153.6 | 277.4 | 170.3 | 294.5 | 229.9 | 270.8 |
| 02/15/01 | 273.1 | 261.3 | 180.3 | 179.6 | 153.9 | 270.3 | 169.2 | 311.2 | 234.9 | 251.9 |
| 05/15/01 | 279.1 | 261.0 | 179.3 | 181.5 | 153.9 | 270.3 | 169.0 | 312.6 | 235.5 | 255.1 |
| 08/15/01 | 255.5 | 260.8 | 181.9 | 180.2 | 154.4 | 270.7 | 169.4 | 312.5 | 235.6 | 244.1 |
| 11/15/01 | 208.4 | 261.4 | 180.6 | 180.0 | 152.5 | 272.3 | 169.0 | 310.6 | 234.6 | 221.6 |
| 02/15/02 | 181.0 | 268.1 | 182.1 | 177.9 | 143.5 | 281.3 | 170.5 | 306.4 | 233.5 | 208.2 |
| 05/15/02 | 226.8 | 265.5 | 181.7 | 175.7 | 147.3 | 286.8 | 170.1 | 292.0 | 226.3 | 225.8 |
| 08/15/02 | 236.4 | 258.6 | 181.1 | 174.9 | 143.6 | 290.7 | 167.2 | 277.4 | 218.0 | 225.9 |
| 11/15/02 | 254.9 | 259.1 | 180.7 | 173.7 | 134.3 | 291.3 | 167.4 | 267.5 | 213.1 | 232.0 |
| 02/15/03 | 319.4 | 266.0 | 181.3 | 175.9 | 134.3 | 277.6 | 167.1 | 312.8 | 235.4 | 274.0 |
| 05/15/03 | 256.1 | 264.4 | 182.2 | 177.4 | 133.9 | 286.9 | 165.7 | 303.6 | 232.0 | 242.6 |
| 08/15/03 | 282.6 | 273.8 | 182.2 | 179.8 | 133.8 | 311.0 | 165.7 | 307.1 | 235.6 | 256.9 |
| 11/15/03 | 275.7 | 278.8 | 183.5 | 180.5 | 133.1 | 312.9 | 168.9 | 307.7 | 237.7 | 254.8 |

Source: Periodic confidential price quotations from Class I carriers on diesel fuel and 38 operating and maintenance items. The same items are contained in both the functional and composition groupings.

## Table C
### QUARTERLY INDEXES OF CHARGEOUT PRICES AND WAGE RATES (1977=100)
#### UNITED STATES

| | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | 2Q02 | 3Q02 | 4Q02 | 1Q03 | 2Q03 | 3Q03 | 4Q03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wage rates | 304.8 | 305.8 | 307.4 | 307.3 | 312.5 | 312.0 | 316.4 | 316.4 | 319.6 | 321.5 | 324.4 | 325.2 |
| Wage supplements | 432.2 | 432.9 | 434.0 | 433.9 | 461.2 | 461.8 | 478.4 | 478.4 | 510.6 | 509.1 | 509.3 | 504.2 |
| Fuel | 275.3 | 250.0 | 234.9 | 226.4 | 175.8 | 212.3 | 212.1 | 249.8 | 263.7 | 257.2 | 250.4 | 257.6 |
| Materials and supplies | 199.5 | 200.5 | 208.9 | 206.2 | 208.6 | 201.1 | 201.1 | 199.3 | 193.4 | 204.6 | 204.7 | 207.6 |
| Equipment rents | 239.7 | 242.8 | 243.3 | 244.7 | 244.3 | 242.8 | 242.1 | 240.7 | 240.7 | 240.2 | 240.4 | |
| Purchased services | 309.6 | 310.5 | 313.3 | 312.7 | 321.2 | 319.7 | 325.3 | 325.1 | 331.7 | 334.6 | 336.6 | |
| Depreciation | 400.3 | 401.8 | 403.8 | 417.1 | 416.5 | 416.5 | 427.9 | 425.8 | 429.5 | 418.9 | 430.9 | |
| Interest | 286.1 | 295.0 | 278.0 | 300.1 | 292.3 | 285.2 | 282.3 | 269.5 | 242.3 | 248.4 | 278.9 | |
| Taxes (other than income and payroll) | 245.2 | 293.1 | 286.5 | 259.4 | 264.0 | 280.5 | 261.1 | 227.7 | 271.2 | 257.3 | 277.7 | |
| All other operating expenses | 211.7 | 209.8 | 205.4 | 199.5 | 198.7 | 201.8 | 202.7 | 205.0 | 212.9 | 211.3 | 212.7 | |
| Wage rates and supplements | 333.8 | 334.7 | 336.3 | 336.2 | 345.9 | 345.7 | 352.6 | 352.7 | 361.9 | 363.1 | 365.5 | 365.1 |
| All materials (incl. fuel) | 242.1 | 226.9 | 220.8 | 214.7 | 184.6 | 204.1 | 204.0 | 226.4 | 232.8 | 232.9 | 228.8 | 234.3 |
| Mat. prices & wage rates combined (excl. fuel) | 281.4 | 282.4 | 285.4 | 284.8 | 289.3 | 287.4 | 290.8 | 290.5 | 291.8 | 295.6 | 297.9 | 299.1 |
| Mat. prices & wage rates combined (incl. fuel) | 292.9 | 286.8 | 285.1 | 282.3 | 272.2 | 280.5 | 283.1 | 293.0 | 297.8 | 299.0 | 299.0 | 301.9 |
| Materials, prices, wage rates and supplements combined (excl. fuel) | 309.6 | 310.5 | 313.3 | 312.7 | 321.2 | 319.7 | 325.3 | 325.1 | 331.7 | 334.6 | 336.6 | 336.7 |
| Materials, prices, wage rates and supplements combined (incl. fuel) - QMPW | 318.2 | 312.9 | 311.5 | 309.1 | 303.9 | 311.4 | 315.9 | 324.7 | 333.4 | 334.2 | 334.2 | 336.1 |
| Taxes, purchased serv. and other expenses | 245.1 | 248.8 | 247.1 | 241.5 | 244.8 | 247.2 | 248.1 | 246.1 | 256.5 | 255.6 | 258.8 | |
| Equip. rents, deprec. and interest | 305.8 | 309.5 | 307.4 | 316.5 | 314.7 | 312.7 | 315.6 | 311.9 | 308.3 | 305.6 | 315.2 | |
| Equip. rents, taxes, deprec., purch. serv., interest & other expenses | 277.8 | 281.5 | 279.6 | 281.2 | 282.0 | 282.3 | 284.2 | 281.3 | 284.9 | 283.1 | 289.5 | |
| Total excl. fuel | 298.2 | 300.6 | 300.9 | 301.5 | 306.0 | 305.4 | 309.2 | 307.5 | 312.5 | 312.9 | 317.4 | |
| Total excl. interest | 303.9 | 302.6 | 301.6 | 300.1 | 298.1 | 302.6 | 306.2 | 310.1 | 317.9 | 317.2 | 319.1 | |
| Total excl. interest and depreciation | 292.5 | 290.9 | 289.7 | 286.8 | 284.7 | 289.6 | 292.4 | 296.8 | 304.9 | 305.1 | 306.1 | |
| Railroad Cost Recovery Index | 302.8 | 301.9 | 300.3 | 299.8 | 297.5 | 301.5 | 304.9 | 308.0 | 314.3 | 313.8 | 317.0 | |

AAR Railroad Cost Indexes

## Table C
### QUARTERLY INDEXES OF CHARGEOUT PRICES AND WAGE RATES (1977=100)

### EAST

| | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | 2Q02 | 3Q02 | 4Q02 | 1Q03 | 2Q03 | 3Q03 | 4Q03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wage rates | 300.4 | 301.7 | 303.5 | 303.3 | 308.8 | 307.6 | 311.8 | 311.8 | 314.0 | 316.5 | 322.1 | 322.8 |
| Wage supplements | 448.6 | 449.4 | 454.6 | 454.5 | 476.6 | 477.0 | 509.2 | 509.2 | 532.6 | 530.9 | 535.2 | 529.1 |
| Fuel | 269.3 | 232.5 | 221.7 | 216.2 | 179.2 | 198.5 | 201.6 | 230.8 | 259.8 | 248.3 | 236.6 | 245.0 |
| Materials and supplies | 182.8 | 180.0 | 185.1 | 183.5 | 185.0 | 178.6 | 182.2 | 185.7 | 181.5 | 180.9 | 181.8 | 183.7 |
| Equipment rents | 239.0 | 242.5 | 243.0 | 244.9 | 244.2 | 242.3 | 241.6 | 239.9 | 239.9 | 239.2 | 239.4 | |
| Purchased services | 305.0 | 305.6 | 308.6 | 308.2 | 315.7 | 313.9 | 322.5 | 323.2 | 327.7 | 328.9 | 333.4 | |
| Depreciation | 372.7 | 374.7 | 379.0 | 382.9 | 380.7 | 378.5 | 388.1 | 392.6 | 386.9 | 394.7 | 392.5 | |
| Interest | 181.2 | 214.2 | 159.9 | 232.3 | 222.2 | 218.9 | 209.3 | 204.7 | 148.4 | 166.7 | 241.1 | |
| Taxes (other than income and payroll) | 284.6 | 296.8 | 300.9 | 286.3 | 273.2 | 294.8 | 216.3 | 173.7 | 252.2 | 181.8 | 223.8 | |
| All other operating expenses | 211.7 | 209.8 | 205.4 | 199.5 | 198.7 | 201.8 | 202.7 | 205.0 | 212.9 | 211.3 | 212.7 | |
| Wage rates and supplements | 332.8 | 334.2 | 336.7 | 336.6 | 345.5 | 344.9 | 354.7 | 354.7 | 361.2 | 362.9 | 368.2 | 367.5 |
| All materials (incl. fuel) | 220.8 | 210.8 | 206.1 | 202.5 | 184.0 | 197.3 | 200.7 | 211.2 | 224.2 | 217.9 | 212.3 | 217.6 |
| Matl. prices & wage rates combined (excl. fuel) | 273.5 | 273.8 | 276.4 | 275.9 | 280.4 | 278.0 | 282.0 | 282.9 | 283.5 | 285.3 | 289.8 | 290.8 |
| Matl. prices & wage rates combined (incl. fuel) | 281.1 | 281.6 | 280.5 | 278.9 | 274.9 | 281.7 | 281.0 | 287.9 | 294.6 | 293.6 | 294.9 | 297.6 |
| Materials prices, wage rates and supplements combined (excl. fuel) | 305.0 | 305.6 | 308.6 | 308.2 | 315.7 | 313.9 | 322.5 | 323.2 | 327.7 | 328.9 | 333.4 | 333.2 |
| Materials prices, wage rates and supplements combined (incl. fuel) - QMPW | 309.6 | 310.2 | 309.8 | 308.4 | 308.2 | 313.9 | 318.3 | 324.3 | 333.4 | 332.4 | 334.2 | 335.6 |
| Taxes, purchased serv. and other expenses | 242.0 | 243.0 | 242.6 | 238.4 | 239.9 | 242.7 | 239.8 | 237.6 | 249.5 | 243.4 | 249.3 | |
| Equip. rents, deprec. and interest | 263.3 | 271.0 | 261.3 | 278.6 | 275.4 | 271.8 | 271.8 | 274.2 | 260.4 | 266.7 | 281.7 | |
| Equip. rents, taxes, deprec., purch. serv., interest & other expenses | 258.6 | 263.4 | 258.4 | 264.5 | 263.8 | 264.3 | 263.2 | 262.0 | 261.8 | 261.5 | 272.0 | |
| Total excl. fuel | 287.7 | 290.7 | 289.4 | 292.6 | 295.7 | 295.2 | 298.5 | 298.2 | 300.2 | 300.6 | 308.6 | |
| Total excl. interest | 295.1 | 296.1 | 296.7 | 295.3 | 295.4 | 298.7 | 301.1 | 303.9 | 311.8 | 310.1 | 312.6 | |
| Total excl. interest and depreciation | 286.1 | 286.7 | 287.0 | 285.1 | 285.3 | 289.0 | 290.8 | 293.4 | 302.7 | 300.0 | 303.0 | |
| Railroad Cost Recovery Index | 290.5 | 293.1 | 290.9 | 293.3 | 292.9 | 295.9 | 297.7 | 300.0 | 304.7 | 304.0 | 310.2 | |

Table C

## QUARTERLY INDEXES OF CHARGEOUT PRICES AND WAGE RATES (1977=100)

### WEST

| | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | 2Q02 | 3Q02 | 4Q02 | 1Q03 | 2Q03 | 3Q03 | 4Q03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wage rates | 308.9 | 309.9 | 311.4 | 311.4 | 316.3 | 316.1 | 320.6 | 320.7 | 319.8 | 321.2 | 327.2 | 328.0 |
| Wage supplements | 415.9 | 416.4 | 423.8 | 423.9 | 459.7 | 460.5 | 462.0 | 462.1 | 494.2 | 492.8 | 495.7 | 491.3 |
| Fuel | 281.8 | 261.6 | 244.2 | 234.3 | 177.0 | 221.5 | 219.9 | 262.0 | 269.1 | 264.9 | 260.1 | 266.9 |
| Materials and supplies | 229.9 | 234.9 | 235.5 | 235.6 | 234.6 | 233.5 | 226.3 | 218.0 | 213.1 | 235.4 | 232.0 | 235.6 |
| Equipment rents | 240.7 | 243.6 | 243.8 | 245.3 | 244.5 | 243.3 | 242.6 | 240.9 | 241.2 | 240.9 | 241.2 | |
| Purchased services | 316.6 | 318.1 | 320.5 | 320.5 | 329.9 | 329.8 | 331.9 | 330.8 | 335.0 | 339.1 | 343.2 | |
| Depreciation | 403.4 | 404.7 | 404.8 | 422.2 | 422.3 | 423.7 | 436.9 | 427.1 | 438.4 | 417.1 | 437.0 | |
| Interest | 401.7 | 394.8 | 401.7 | 386.3 | 379.7 | 368.5 | 372.2 | 350.1 | 346.0 | 342.2 | 336.4 | |
| Taxes (other than income and payroll) | 214.5 | 284.6 | 271.2 | 236.5 | 252.6 | 265.4 | 286.2 | 258.9 | 278.4 | 302.5 | 308.1 | |
| All other operating expenses | 211.7 | 209.8 | 205.4 | 199.5 | 198.7 | 201.8 | 202.7 | 205.0 | 212.9 | 211.3 | 212.7 | |
| Wage rates and supplements | 334.4 | 335.3 | 338.0 | 338.0 | 349.4 | 349.3 | 353.2 | 353.4 | 359.3 | 360.1 | 365.6 | 365.3 |
| All materials (incl. fuel) | 269.8 | 257.0 | 244.9 | 237.9 | 197.0 | 228.2 | 224.8 | 252.1 | 255.6 | 259.5 | 255.0 | 261.0 |
| Matl. prices & wage rates combined (excl. fuel) | 292.6 | 294.3 | 295.6 | 295.7 | 299.5 | 299.1 | 301.4 | 300.0 | 298.4 | 303.6 | 307.9 | 309.2 |
| Matl. prices & wage rates combined (incl. fuel) | 304.1 | 299.1 | 294.7 | 291.6 | 276.6 | 290.2 | 291.4 | 303.4 | 304.4 | 307.0 | 308.6 | 311.8 |
| Materials prices, wage rates and supplements combined (excl. fuel) | 316.6 | 318.1 | 320.5 | 320.5 | 329.9 | 329.8 | 331.9 | 330.8 | 335.0 | 339.1 | 343.2 | 343.5 |
| Materials prices, wage rates and supplements combined (incl. fuel) - QMPW | 326.7 | 322.3 | 319.4 | 316.7 | 308.3 | 320.4 | 321.7 | 332.4 | 337.7 | 339.8 | 341.6 | 343.8 |
| Taxes, purchased serv. and other expenses | 245.4 | 251.7 | 249.0 | 242.7 | 247.3 | 250.0 | 253.3 | 251.4 | 258.9 | 261.9 | 264.7 | |
| Equip. rents, deprec. and interest | 329.8 | 330.8 | 332.0 | 336.3 | 334.9 | 336.6 | 330.1 | 330.1 | 333.3 | 325.6 | 331.5 | |
| Equip. rents, taxes, deprec., purch. serv., interest & other expenses | 291.7 | 295.4 | 294.7 | 293.7 | 295.3 | 295.7 | 299.6 | 294.9 | 300.2 | 297.7 | 302.1 | |
| Total excl. fuel | 308.2 | 310.9 | 311.7 | 311.2 | 316.5 | 316.6 | 319.8 | 316.7 | 321.6 | 322.2 | 326.5 | |
| Total excl. interest | 310.4 | 310.1 | 307.9 | 306.5 | 302.9 | 310.2 | 312.8 | 317.1 | 317.7 | 322.9 | 326.4 | |
| Total excl. interest and depreciation | 298.0 | 297.4 | 295.1 | 292.0 | 288.1 | 295.9 | 297.4 | 303.0 | 308.1 | 310.1 | 312.0 | |
| Railroad Cost Recovery Index | 314.3 | 313.7 | 311.8 | 309.9 | 306.2 | 312.8 | 315.4 | 318.8 | 324.2 | 324.1 | 327.2 | |

AAR Railroad Cost Indexes

# FIRST QUARTER 2004 ALL-INCLUSIVE INDEX

*The Staggers Act of 1980 requires a rebasing of the Rail Cost Adjustment Factor (RCAF) every five years. Beginning with the first quarter 2003 RCAF filing, the All-Inclusive Index and the RCAF have been rebased to 2002Q4 = 100.*

The first quarter 2004 All-Inclusive Index forecast of 101.8 is 0.2 percent lower than the fourth quarter 2004 figure of 102.0. The Labor, Fuel, and Depreciation portions of the Index all decreased from the prior quarter.

**Labor** – A 0.7 percent increase in the Wage Index combined with a 2.3 percent decrease in the Supplements Index caused the first quarter 2004 Labor Index to decrease 0.5 percent. Each first quarter features new Railroad Retirement and Unemployment tax rates, plus new Health & Welfare insurance premiums. Lower Tier II and Unemployment tax rates for 2004 had the most significant impact on Labor.

*National BRS Contract:* On September 24, 2003, the Brotherhood of Railroad Signalmen (BRS) signed a new agreement with the National Carriers' Conference Committee. The agreement is similar to the Transportation Communications International Union (TCU) agreement from earlier in the year, and affects a group of railroads that includes 5 Class I railroads. Highlights of the decision are as follows: 27 cents of the cost-of-living allowance (COLA) is rolled into basic rates of pay effective October 1, 2001; COLAs terminate effective June 30, 2002; a 2.5 percent (retroactive) general wage increase effective June 30, 2002; a 3.5 percent (retroactive) general wage increase effective July 1, 2002; and a 3.0 percent (retroactive) general wage increase effective July 1, 2003. A 3.25 percent wage increase is effective July 1, 2004. COLAs could resume in 2005. In addition, BRS employees will participate in health & welfare cost sharing by making a pre-tax contribution toward health & welfare premiums. The monthly per employee health & welfare contribution will be $33.39, $81.18, and $79.74 – effective July 1, 2001, 2002, and 2003, respectively. Effective July 1, 2004, the cost sharing rate changes to $100 per month per employee. Retroactive employee health & welfare cost sharing will be offset against retroactive wage payments.

*National UTU H&W Contract:* On August 20, 2002, the United Transportation Union (UTU) signed a new national agreement that contained wage increases and agreed to continue negotiating health & welfare issues. In November 2003, an agreement was reached that called for employee health & welfare cost sharing of $119.61 per employee per month effective November 1, 2003 through June 30, 2004. Effective July 1, 2004, the cost sharing rate will change to $100. The wage increase scheduled for July 1, 2004, will be moved to December 1, 2004. This health & welfare agreement, and the wage increase delay, also affects the UTU's Yardmasters Department.

*Tentative National BLE Contract:* According to the Web site for the Brotherhood of Locomotive Engineers, that union has reached a tentative agreement with the National Carriers' Conference Committee that covers work rules, wages, and health & welfare. If this agreement is ratified and signed, it will be incorporated in the second quarter All-Inclusive Index.

*Wage Increases:* Effective January 1, 2004, national unions still participating in the 1996 national agreements will receive a 3 cent COLA increase. This does not affect the newer national contracts.

Non-union employees were assigned the same 2.5 percent wage increase that the UTU, UTU-Yardmasters, and IBBM received in July 2003, effective January 1, 2004. Independent increases were also added where applicable, and independent non-union employee groups were assigned the non-union increase.

*Lump Sums:* The lump sum adjustment decreased by 0.3 cents as two lump sum amounts were completely amortized and removed. No new lump sum amounts were added.

*Back Pay:* The back pay adjustment decreased 0.8 cents. Back pay amounts were added, with offsets for Health & Welfare cost sharing, for the new BRS contract. Negative back pay amounts were added for the new UTU and UTU-Yardmaster health & welfare cost sharing that began November 1. Additional negative back pay amounts were added for independent unions that mimic the national health & welfare agreements but have already had their wage increases.

*Other:* This component contains the amortization of a profit sharing payment that the BNSF made to its Brotherhood of Locomotive Engineers employees from the former Atchison, Topeka and Santa Fe Railway in early 2003 for performance in 2002. This figure increased from the prior quarter by one tenth of one cent.

*Supplements:* The Supplements Index is forecast to decrease by 2.3 percent from the fourth quarter filing. Health & Welfare increased just 3.5 percent as higher premiums were offset by new employee Health & Welfare cost sharing for the BRS, UTU, and UTU-Yardmasters. Lower costs for Railroad Retirement were caused by 2004's decrease in the Tier II tax rate. Unemployment Insurance costs decreased in part because of a lower surcharge included in the tax rate.

**Fuel** – First quarter (January 2004) fuel prices are expected to decrease 2.2 percent from the fourth quarter (October) forecast – a 0.4 percent increase from the actual level. Railroad fuel prices were down in September, up in October, and expectations for the future were full of uncertainty.

**Materials & Supplies** – The Materials and Supplies Index for the first quarter is 3.6 percent higher than the previous period. Regional purchases of ballast and higher prices for rail caused the increase.

**Equipment Rents** – The first quarter 2004 Equipment Rents Index is forecast to increase 0.6 percent from the fourth quarter 2003 forecast. The increase in the Car Hire portion was caused by higher rates for privately-owned cars and railroad-owned autoracks.

**Depreciation** – The Depreciation Index, which is measured by the changes in the Producer Price Index for Rail Equipment, decreased 1.1 percent from the prior quarter forecast.

**Interest** – The interest rate underlying the interest component of the index is updated every fourth quarter and held constant until the next rebenchmarking. Thus, the Interest Index is unchanged.

**Other** – Regulations require that the Producer Price Index for Industrial Commodities less Fuel and Related Products (PPI-LF) be used to index other expenses (purchased services, casualties and insurance, loss and damage, taxes other than income and payroll, and general and administrative expenses). The first quarter 2004 forecast of 163.9 is 0.8 percent above the fourth quarter 2003 forecast.

## Table D

## FIRST QUARTER 2004 ALL-INCLUSIVE INDEX

The components and values of the All-Inclusive Index in the first quarter 2004 are shown below. The projected first quarter index of 101.8 is 0.2 percent below the fourth quarter 2003 forecast.

|  | 2002 Weights | 2003Q4 Forecast | 2004Q1 Forecast | Percent Change |
|---|---|---|---|---|
| Labor | 38.0 % | 278.3 | 276.8 | -0.5 % |
| Fuel | 9.0 | 113.3 | 110.8 | -2.2 |
| Materials & Supplies | 4.6 | 154.8 | 160.3 | 3.6 |
| Equipment Rents | 10.3 | 175.7 | 176.7 | 0.6 |
| Depreciation | 10.9 | 152.4 | 150.7 | -1.1 |
| Interest | 3.7 | 98.0 | 98.0 | 0.0 |
| Other | 23.5 | 162.6 | 163.9 | 0.8 |
| | | | | |
| Weighted Average | | | | |
| a. 1980 = 100 | | 199.6 | 199.3 | |
| b. 1980 = 100 (linked) | | 195.9 | 195.6 [1] | |
| c. 4Q02 = 100 | | 102.0 | 101.8 [2] | -0.2 |

[1]  2004Q1 linked index of 195.6 = relative change (2004Q1 index of 199.3/ 2003Q4 index of 199.6) times 2003Q4 linked index of 195.9. Linking is necessitated by periodic changes in external weighting.

[2]  4Q02 based index = 2004Q1 index (195.6) / 4Q02 linking factor (192.1) times 100 = 101.8. 4Q97 based index is 112.9 and the 4Q92 based index is 124.7.

## Table E

## FORECAST VS. ACTUAL THIRD QUARTER
## 2003 ALL-INCLUSIVE INDEX

As shown below, the actual index of 101.3 in the third quarter 2003 is 0.7 index points above the forecast value of 100.6.  Thus, the forecast error adjustment in the first quarter 2004 is an increase of 0.7 index points.

|  | 2001 Weights | Third Quarter 2003 | |
|---|---|---|---|
|  |  | Forecast | Actual |
| Labor | 37.8 % | 273.5 | 273.5 |
| Fuel | 10.5 | 106.3 | 108.0 |
| Materials & Supplies | 4.6 | 152.7 | 152.7 |
| Equipment Rents [1] | 10.5 | 175.8 | 175.9 |
| Depreciation | 10.6 | 149.9 | 151.7 |
| Interest | 3.8 | 98.6 | 98.6 |
| Other | 22.2 | 163.2 | 162.6 |
| Weighted Average |  |  |  |
| a.  1980 = 100 |  | 195.9 | 196.1 |
| b.  1980 = 100 (linked) |  | 193.3 | 194.6 [2] |
| c.  4Q02 = 100[3] |  | 100.6 | 101.3 |

Note 1:

| Equipment Rents Calculation: | 2001 Weights | Third Quarter 2003 | |
|---|---|---|---|
|  |  | Forecast | Actual |
| Car Hire | 51.5  % | 177.4 | 177.4 |
| Lease Rentals | 48.5 | 163.2 | 162.6 |
| Weighted Average |  | 170.5 | 170.2 |
| Weighted Average (linked) |  | 175.8 | 175.9 |

Note 2:

2003Q3 linked actual index of 194.6 = relative change (2003Q3 actual index of 196.1 / 2003Q2 actual index of 195.1) times 2003Q2 linked actual index of 193.6.

Note 3:

Beginning with the December 5, 2002 filing, the RCAF is on a 2002Q4=100 basis.

**AAR Railroad Cost Indexes**

## Table F

## ALL-INCLUSIVE INDEX ON VARIOUS BASES

| | Base * | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1980 | 10/01/80 | 10/1/82 | 4Q87 | 4Q92 | 4Q97 | 4Q02 |
| 1996Q1 | 168.0 | 163.6 | 139.0 | 127.1 | 107.1 | | |
| 1996Q2 | 167.4 | 163.0 | 138.5 | 126.6 | 106.7 | | |
| 1996Q3 | 169.0 | 164.6 | 139.8 | 127.8 | 107.7 | | |
| 1996Q4 | 170.4 | 165.9 | 140.9 | 128.9 | 108.6 | | |
| 1997Q1 | 174.7 | 170.1 | 144.5 | 132.1 | 111.3 | | |
| 1997Q2 | 173.7 | 169.1 | 143.7 | 131.4 | 110.7 | | |
| 1997Q3 | 174.6 | 170.0 | 144.4 | 132.1 | 111.3 | | |
| 1997Q4 | 173.2 | 168.6 | 143.3 | 131.0 | 110.4 | 100.0 | |
| 1998Q1 | 172.7 | 168.2 | 142.8 | 130.6 | 110.1 | 99.7 | |
| 1998Q2 | 171.5 | 167.0 | 141.9 | 129.7 | 109.3 | 99.0 | |
| 1998Q3 | 173.4 | 168.8 | 143.4 | 131.2 | 110.5 | 100.1 | |
| 1998Q4 | 173.3 | 168.7 | 143.3 | 131.1 | 110.5 | 100.1 | |
| 1999Q1 | 173.0 | 168.5 | 143.1 | 130.9 | 110.3 | 99.9 | |
| 1999Q2 | 172.1 | 167.6 | 142.3 | 130.2 | 109.7 | 99.4 | |
| 1999Q3 | 174.2 | 169.6 | 144.1 | 131.8 | 111.0 | 100.6 | |
| 1999Q4 | 174.1 | 169.5 | 144.0 | 131.7 | 111.0 | 100.5 | |
| 2000Q1 | 179.4 | 174.7 | 148.4 | 135.7 | 114.3 | 103.6 | |
| 2000Q2 | 180.3 | 175.6 | 149.1 | 136.4 | 114.9 | 104.1 | |
| 2000Q3 | 181.6 | 176.8 | 150.2 | 137.4 | 115.7 | 104.8 | |
| 2000Q4 | 183.5 | 178.7 | 151.8 | 138.8 | 117.0 | 105.9 | |
| 2001Q1 | 186.9 | 182.0 | 154.6 | 141.4 | 119.1 | 107.9 | |
| 2001Q2 | 185.6 | 180.7 | 153.5 | 140.4 | 118.3 | 107.2 | |
| 2001Q3 | 186.9 | 182.0 | 154.6 | 141.4 | 119.1 | 107.9 | |
| 2001Q4 | 186.1 | 181.2 | 153.9 | 140.8 | 118.6 | 107.4 | |
| 2002Q1 | 186.4 | 181.5 | 154.2 | 141.0 | 118.8 | 107.6 | |
| 2002Q2 | 184.2 | 179.4 | 152.4 | 139.3 | 117.4 | 106.4 | |
| 2002Q3 | 185.6 | 180.7 | 153.5 | 140.4 | 118.3 | 107.2 | |
| 2002Q4 | 189.9 | 184.9 | 157.1 | 143.6 | 121.0 | 109.6 | 98.9 |
| 2003Q1 | 190.6 | 185.6 | 157.7 | 144.2 | 121.5 | 110.0 | 99.2 |
| 2003Q2 | 194.3 | 189.2 | 160.7 | 147.0 | 123.8 | 112.2 | 101.1 |
| 2003Q3 | 193.3 | 188.2 | 159.9 | 146.2 | 123.2 | 111.6 | 100.6 |
| 2003Q4 | 195.9 | 190.7 | 162.0 | 148.2 | 124.9 | 113.1 | 102.0 |
| 2004Q1 | 195.6 | 190.5 | 161.8 | 148.0 | 124.7 | 112.9 | 101.8 |
| 2004Q2 | | | | | | | |
| 2004Q3 | | | | | | | |
| 2004Q4 | | | | | | | |

* The 1980 linked All-Inclusive Index for each quarter is divided by the following linking factors to determine the values shown on Table F: 10/1/80 = 102.7; 10/1/82 = 120.9; 4Q87 = 132.2; 4Q92 = 156.9; 4Q97 = 173.2; and 4Q02 = 192.1.

# RAIL COST ADJUSTMENT FACTOR

In a decision served December 19, 2003, the Surface Transportation Board (STB) approved a first quarter 2004 Adjusted RCAF of 0.517, which is 0.4 percent above the fourth quarter 2003 Adjusted RCAF. The first quarter 2004 Unadjusted RCAF of 1.025 is 0.8 percent higher than the previous quarter. The difference between the Adjusted and Unadjusted RCAF is a productivity adjustment mandated by the STB. This adjustment has been applied since the second quarter 1989, in accordance with its March 22, 1989 decision in Ex Parte No. 290 (Sub-No. 4), Railroad Cost Recovery Procedures - Productivity Adjustment.

The STB in its October 3, 1996 Ex Parte No. 290 (Sub-No. 7) decision created an additional productivity-adjusted RCAF (RCAF-5) which reflects RCAF values that would have been produced if the agency had always used a 5-year rolling average from the second quarter 1989 inception of a productivity-adjusted RCAF. The results of these calculations are shown in Tables G, I, J, and K.

As shown in Table D, the forecasted AII for the first quarter 2004 is 101.8; this is the linked index of 195.6 (1980 = 100) divided by the fourth quarter 2002[1] base index of 192.1 times 100. The Adjusted RCAF, shown below, is derived in three steps: (1) the AII is divided by the base period AII of 100 to obtain the "Preliminary RCAF" of 1.018; (2) the forecast error of 0.007 is added to the preliminary RCAF to produce the Unadjusted RCAF[2] of 1.025; and (3) the Unadjusted RCAF is divided by the productivity adjustment factor[3] (PAF) of 1.9834 to yield the Adjusted RCAF of 0.517. The PAF-5, unpublished until the first quarter 1997, is the productivity adjustment factor that would have been produced had the STB used a 5-year rolling average methodology from the inception of the productivity adjustment process in the second quarter 1989. The RCAF-5 index of 0.492 in the first quarter 2004 is derived by dividing the RCAF (Unadjusted) index of 1.025 by the PAF-5 value of 2.0852.

|  | 2003Q4 | 2004Q1 | % Change |
|---|---|---|---|
| All-Inclusive Index | 102.0 | 101.8 | -0.2 % |
| Preliminary RCAF | 1.020 | 1.018 | -0.2 |
|    Forecast Error Adjustment | -0.003 | 0.007 | |
| RCAF (Unadjusted) | 1.017 | 1.025 | 0.8 |
|    Productivity Adjustment Factor | 1.9741 | 1.9834 | |
| RCAF (Adjusted) | 0.515 | 0.517 | 0.4 |
| PAF-5 | 2.0754 | 2.0852 | |
| RCAF-5 | 0.490 | 0.492 | 0.4 |

---

[1] The RCAF was changed from a 1997Q4 basis to a 2002Q4 basis, as required by law every five years, beginning with the 2003Q1 forecast. An attachment in that filing contains converted historical data.

[2] The "forecast error" is the 0.7 index point difference between the forecast and actual third quarter 2003 AII, and is shown in Table E. (Because of data availability, there is always a two-quarter lag.)

[3] Starting in the second quarter 2003, the 1997-2001 based PAF of 1.9 percent was applied. Each quarter's PAF is calculated by multiplying the previous quarter's PAF by the fourth root of the current multi-year average. Thus, the first quarter 2004 PAF of 1.9834 equals 1.9741 (previous quarter's PAF) times 1.0047 – the fourth root of the 1997-2001 average annual productivity growth ratio of 1.019.

## Table G
## RAIL COST ADJUSTMENT FACTOR (4Q/87=100)

| Quarter | Prelim-[1] inary RCAF | Forecast[2] Error Adjustment | RCAF[3] (Unad- justed) | Productivity Adjustment Factor | RCAF[3] (Adjusted) | PAF-5[4] | RCAF-5[4] |
|---|---|---|---|---|---|---|---|
| 4Q/87 | 0.994 | 0.006 | 1.000 | - | 1.000 | - | - |
| 1Q/88 | 1.022 | 0.005 | 1.027 | - | 1.027 | - | - |
| 2Q/88 | 1.036 | 0.007 | 1.043 | - | 1.043 | - | - |
| 3Q/88 | 1.034 | 0.001 | 1.035 | - | 1.035 | - | - |
| 4Q/88 | 1.033 | 0.007 | 1.040 | - | 1.040 | - | - |
| 1Q/89 | 1.048 | -0.002 | 1.046 | - | 1.046 | - | - |
| 2Q/89 | 1.055 | -0.003 | 1.052 | 1.0042 | 1.048 | 1.0040 | 1.048 |
| 3Q/89 | 1.061 | 0.006 | 1.067 | 1.0084 | 1.058 | 1.0080 | 1.059 |
| 4Q/89 | 1.071 | 0.009 | 1.080 | 1.0193 | 1.060 | 1.0120 | 1.067 |
| 1Q/90 | 1.092 | -0.004 | 1.088 | 1.0303 | 1.056 | 1.0264 | 1.060 |
| 2Q/90 | 1.093 | 0.005 | 1.098 | 1.0414 | 1.054 | 1.0410 | 1.055 |
| 3Q/90 | 1.092 | 0.006 | 1.098 | 1.0526 | 1.043 | 1.0558 | 1.040 |
| 4Q/90 | 1.126 | 0.000 | 1.126 | 1.0640 | 1.058 | 1.0707 | 1.052 |
| 1Q/91 | 1.144 | 0.001 | 1.145 | 1.0755 | 1.065 | 1.0834 | 1.057 |
| 2Q/91 | 1.128 | 0.015 | 1.143 | 1.0871 | 1.051 | 1.0962 | 1.043 |
| 3Q/91 | 1.157 | -0.009 | 1.148 | 1.0988 | 1.045 | 1.1091 | 1.035 |
| 4Q/91 | 1.176 | -0.002 | 1.174 | 1.1107 | 1.057 | 1.1222 | 1.046 |
| 1Q/92 | 1.169 | -0.001 | 1.168 | 1.1227 | 1.040 | 1.1351 | 1.029 |
| 2Q/92 | 1.157 | 0.005 | 1.162 | 1.1348 | 1.024 | 1.1481 | 1.012 |
| 3Q/92 | 1.161 | -0.003 | 1.158 | 1.1471 | 1.010 | 1.1613 | 0.997 |
| 4Q/92 | 1.181 | 0.006 | 1.187 | 1.1595 | 1.024 | 1.1747 | 1.010 |

(Beginning with 1Q93, the ICC used 4Q92 as the RCAF base period.  See Table I.)

[1] "Preliminary RCAF" is the All-Inclusive Index (Table D), divided by 100.

[2] The "Forecast Error Adjustment" is the difference between the forecast and actual index levels from two quarters prior (Table E), divided by 100.

[3] Prior to 1989Q2, the terms "RCAF (Unadjusted)" and "RCAF (Adjusted)" were not used.  The factor derived by adjusting the Preliminary RCAF for forecast error was simply called the "RCAF".  Beginning 1989Q, the RCAF (Unadjusted) is the Preliminary RCAF adjusted for forecast error, and the RCAF (Adjusted) is the RCAF (Unadjusted) adjusted by the Productivity Adjustment Factor.

[4] The Surface Transportation Board in its Ex Parte No. 290 (Sub-No. 7) decision served October 3, 1996 created an additional RCAF series (RCAF-5) which reflects productivity-adjusted values as if the agency had used a 5-year rolling average productivity adjustment factor since the second quarter 1989 inception of a productivity-adjusted RCAF.  The productivity adjustment factor used in this calculation is called the PAF-5.

## Table H

## RAIL COST ADJUSTMENT FACTOR (10/1/82=100)

| Quarter | Preliminary RCAF | Forecast Error Adjustment | RCAF | Maximum RCAF Rate Level |
|---------|------------------|---------------------------|------|-------------------------|
| 10/1/82 | | | 1.000 | 1.000 |
| 1Q/83 | | | 1.010 | 1.010 |
| 2Q/83 | | | 0.979 | 1.010 |
| 3Q/83 | | | 0.999 | 1.010 |
| 4Q/83 | | | 1.012 | 1.012 |
| 1Q/84 | | | 1.053 [1] | 1.053 |
| 2Q/84 | | | 1.053 | 1.053 |
| 3Q/84 | | | 1.058 | 1.057 [1] |
| 4Q/84 | | | 1.053 | 1.057 |
| 1Q/85 | | | 1.048 | 1.057 |
| 2Q/85 | | | 1.042 | 1.057 |
| 3Q/85 | | | 1.040 | 1.057 |
| 4Q/85 | | | 1.012 | 1.057 |
| 1Q/86 | | | 1.069 | 1.069 |
| 2Q/86 | | | 1.023 | 1.069 |
| 3Q/86 | | | 1.040 | 1.069 |
| 4Q/86 | | | 1.044 | 1.069 [2] |
| 1Q/87 | 1.071 | -0.009 | 1.062 | 1.057 |
| 2Q/87 | 1.069 | -0.001 | 1.068 | 1.057 |
| 3Q/87 | 1.079 | 0.008 | 1.087 | 1.057 |
| 4Q/87 | 1.087 | 0.006 | 1.093 | 1.057 |
| 1Q/88 | 1.117 | 0.005 | 1.122 | 1.101 |
| 2Q/88 | 1.133 | 0.007 | 1.140 | 1.140 |

(Beginning in 3Q88, the ICC used the 4Q87 base for the RCAF. See Table G.)

[1] The ICC in 2Q84 determined that 1Q84 should have been 105.2, but no retroactive rate actions were ordered. The maximum RCAF rate level was held down by 0.1% in 3Q84 to adjust for the overstatement.

[2] The 4Q86 maximum RCAF rate level was 1.069 to November 16, and 1.057 thereafter.

## Table I
## RAIL COST ADJUSTMENT FACTOR (4Q/92=100)

| Quarter | Prelim-[1] inary RCAF | Forecast[2] Error Adjustment | RCAF[3] (Unad- justed) | Productivity Adjustment Factor | RCAF[4] (Adjusted) | PAF-5[5] | RCAF-5[5] |
|---------|------|------|------|------|------|------|------|
| 4Q/92 | 0.995 | 0.005 | 1.000 | 1.1595 | 0.862 | 1.1747 | 0.851 |
| 1Q/93 | 1.008 | 0.004 | 1.012 | 1.1720 | 0.863 | 1.1926 | 0.849 |
| 2Q/93 | 1.003 | 0.002 | 1.005 | 1.1847 | 0.848 | 1.2107 | 0.830 |
| 3Q/93 | 1.011 | 0.002 | 1.013 | 1.1975 | 0.846 | 1.2291 | 0.824 |
| 4Q/93 | 1.024 | 0.001 | 1.025 | 1.2104 | 0.847 | 1.2478 | 0.822 |
| 1Q/94 | 1.033 | -0.004 | 1.029 | 1.2253 | 0.840 | 1.2621 | 0.815 |
| 2Q/94 | 1.022 | 0.002 | 1.024 | 1.2404 | 0.826 | 1.2766 | 0.802 |
| 3Q/94 | 1.046 | 0.000 | 1.046 | 1.2557 | 0.833 | 1.2913 | 0.810 |
| 4Q/94 | 1.043 | 0.002 | 1.045 | 1.2711 | 0.822 | 1.3062 | 0.800 |
| 1Q/95 | 1.055 | 0.003 | 1.058 | 1.2867 | 0.822 | 1.3222 | 0.800 |
| 2Q/95 | 1.065 | 0.005 | 1.070 | 1.3052 | 0.820 | 1.3385 | 0.799 |
| 3Q/95 | 1.076 | 0.004 | 1.080 | 1.3240 | 0.816 | 1.3550 | 0.797 |
| 4Q/95 | 1.076 | 0.003 | 1.079 | 1.3431 | 0.803 | 1.3716 | 0.787 |
| 1Q/96 | 1.071 | -0.005 | 1.066 | 1.3624 | 0.782 | 1.3914 | 0.766 |
| 2Q/96 | 1.067 | -0.004 | 1.063 | 1.3820 | 0.769 | 1.4114 | 0.753 |
| 3Q/96 | 1.077 | -0.003 | 1.074 | 1.4019 | 0.766 | 1.4317 | 0.750 |
| 4Q/96 | 1.086 | 0.006 | 1.092 | 1.4221 | 0.768 | 1.4524 | 0.752 |
| 1Q/97 | 1.113 | 0.003 | 1.116 | 1.4426 | 0.774 | 1.4733 | 0.757 |
| 2Q/97 | 1.107 | 0.008 | 1.115 | 1.4603 | 0.764 | 1.4945 | 0.746 |
| 3Q/97 | 1.113 | -0.001 | 1.112 | 1.4783 | 0.752 | 1.5160 | 0.734 |
| 4Q/97 | 1.104 | 0.000 | 1.104 | 1.4965 | 0.738 | 1.5378 | 0.718 |

(Beginning with 1Q98, the STB used 4Q97 as the RCAF base period.  See Table J.)

[1] "Preliminary RCAF" is the All-Inclusive Index (Table D), divided by 100.

[2] The "Forecast Error Adjustment" is the difference between the forecast and actual index levels from two quarters prior (Table E), divided by 100.

[3] The Unadjusted RCAF is the sum of the Preliminary RCAF plus the Forecast Error Adjustment.

[4] The Adjusted RCAF is the Unadjusted RCAF adjusted by the Productivity Adjustment Factor.

[5] The Surface Transportation Board in its Ex Parte No. 290 (Sub-No. 7) decision served October 3, 1996 created an additional RCAF series (RCAF-5) which reflects productivity-adjusted values as if the agency had used a 5-year rolling average productivity adjustment factor since the second quarter 1989 inception of a productivity-adjusted RCAF.  The productivity adjustment factor used in this calculation is called the PAF-5.

## Table J

## RAIL COST ADJUSTMENT FACTOR (4Q/97=100)

| Quarter | Prelim-[1] inary RCAF | Forecast[2] Error Adjustment | RCAF[3] (Unad- justed) | Productivity Adjustment Factor | RCAF[4] (Adjusted) | PAF-5[5] | RCAF-5[5] |
|---|---|---|---|---|---|---|---|
| 4Q 1997 | 1.000 | 0.000 | 1.000 | 1.4965 | 0.668 | 1.5378 | 0.650 |
| 1Q 1998 | 0.997 | -0.001 | 0.996 | 1.5149 | 0.657 | 1.5567 | 0.640 |
| 2Q 1998 | 0.990 | 0.006 | 0.996 | 1.5503 | 0.642 | 1.5758 | 0.632 |
| 3Q 1998 | 1.001 | -0.003 | 0.998 | 1.5866 | 0.629 | 1.5952 | 0.626 |
| 4Q 1998 | 1.001 | 0.002 | 1.003 | 1.6237 | 0.618 | 1.6148 | 0.621 |
| 1Q 1999 | 0.999 | -0.003 | 0.996 | 1.6617 | 0.599 | 1.6526 | 0.603 |
| 2Q 1999 | 0.994 | -0.001 | 0.993 | 1.6850 | 0.589 | 1.6913 | 0.587 |
| 3Q 1999 | 1.006 | -0.004 | 1.002 | 1.7086 | 0.586 | 1.7309 | 0.579 |
| 4Q 1999 | 1.005 | 0.006 | 1.011 | 1.7325 | 0.584 | 1.7714 | 0.571 |
| 1Q 2000 | 1.036 | 0.007 | 1.043 | 1.7568 | 0.594 | 1.7962 | 0.581 |
| 2Q 2000 | 1.041 | 0.009 | 1.050 | 1.7719 | 0.593 | 1.8213 | 0.577 |
| 3Q 2000 | 1.048 | 0.002 | 1.050 | 1.7871 | 0.588 | 1.8468 | 0.569 |
| 4Q 2000 | 1.059 | 0.003 | 1.062 | 1.8025 | 0.589 | 1.8727 | 0.567 |
| 1Q 2001 | 1.079 | 0.006 | 1.085 | 1.8180 | 0.597 | 1.8888 | 0.574 |
| 2Q 2001 | 1.072 | 0.004 | 1.076 | 1.8305 | 0.588 | 1.9050 | 0.565 |
| 3Q 2001 | 1.079 | 0.000 | 1.079 | 1.8431 | 0.585 | 1.9214 | 0.562 |
| 4Q 2001 | 1.074 | 0.004 | 1.078 | 1.8558 | 0.581 | 1.9379 | 0.556 |
| 1Q 2002 | 1.076 | 0.000 | 1.076 | 1.8686 | 0.576 | 1.9513 | 0.551 |
| 2Q 2002 | 1.064 | -0.002 | 1.062 | 1.8878 | 0.563 | 1.9648 | 0.541 |
| 3Q 2002 | 1.072 | -0.010 | 1.062 | 1.9072 | 0.557 | 1.9784 | 0.537 |
| 4Q 2002 | 1.096 | 0.012 | 1.108 | 1.9268 | 0.575 | 1.9921 | 0.556 |

(Beginning with Q103, the STB used 4Q02 as the RCAF base period.  See Table K.)

[1] "Preliminary RCAF" is the All-Inclusive Index (Table D), divided by 100.

[2] The "Forecast Error Adjustment" is the difference between the forecast and actual index levels from two quarters prior (Table E), divided by 100.

[3] The Unadjusted RCAF is the sum of the Preliminary RCAF plus the Forecast Error Adjustment.

[4] The Adjusted RCAF is the Unadjusted RCAF adjusted by the Productivity Adjustment Factor.

[5] The Surface Transportation Board in its Ex Parte No. 290 (Sub-No. 7) decision served October 3, 1996 created an additional RCAF series (RCAF-5) which reflects productivity-adjusted values as if the agency had used a 5-year rolling average productivity adjustment factor since the second quarter 1989 inception of a productivity-adjusted RCAF.  The productivity adjustment factor used in this calculation is called the PAF-5.

## Table K

## RAIL COST ADJUSTMENT FACTOR (4Q/2002=100)

| Quarter | Prelim-[1] inary RCAF | Forecast[2] Error Adjustment | RCAF[3] (Unad- justed) | Productivity Adjustment Factor | RCAF[4] (Adjusted) | PAF-5[5] | RCAF-5[5] |
|---------|------------|------------|------------|------------|------------|------------|------------|
| 4Q 2002 | 0.989 | 0.011 | 1.000 | 1.9268 | 0.519 | 1.9921 | 0.502 |
| 1Q 2003 | 0.992 | 0.004 | 0.996 | 1.9466 | 0.512 | 2.0126 | 0.495 |
| 2Q 2003 | 1.011 | 0.009 | 1.020 | 1.9557 | 0.522 | 2.0333 | 0.502 |
| 3Q 2003 | 1.006 | 0.014 | 1.020 | 1.9649 | 0.519 | 2.0542 | 0.497 |
| 4Q 2003 | 1.020 | -0.003 | 1.017 | 1.9741 | 0.515 | 2.0754 | 0.490 |
| 1Q 2004 | 1.018 | 0.007 | 1.025 | 1.9834 | 0.517 | 2.0852 | 0.492 |
| 2Q 2004 | | | | | | | |
| 3Q 2004 | | | | | | | |
| 4Q 2004 | | | | | | | |
| 1Q 2005 | | | | | | | |
| 2Q 2005 | | | | | | | |
| 3Q 2005 | | | | | | | |
| 4Q 2005 | | | | | | | |
| 1Q 2006 | | | | | | | |
| 2Q 2006 | | | | | | | |
| 3Q 2006 | | | | | | | |
| 4Q 2006 | | | | | | | |
| 1Q 2007 | | | | | | | |
| 2Q 2007 | | | | | | | |
| 3Q 2007 | | | | | | | |
| 4Q 2007 | | | | | | | |

[1] "Preliminary RCAF" is the All-Inclusive Index (Table D), divided by 100.

[2] The "Forecast Error Adjustment" is the difference between the forecast and actual index levels from two quarters prior (Table E), divided by 100.

[3] The Unadjusted RCAF is the sum of the Preliminary RCAF plus the Forecast Error Adjustment.

[4] The Adjusted RCAF is the Unadjusted RCAF adjusted by the Productivity Adjustment Factor.

[5] The Surface Transportation Board in its Ex Parte No. 290 (Sub-No. 7) decision served October 3, 1996 created an additional RCAF series (RCAF-5) which reflects productivity-adjusted values as if the agency had used a 5-year rolling average productivity adjustment factor since the second quarter 1989 inception of a productivity-adjusted RCAF. The productivity adjustment factor used in this calculation is called the PAF-5.

## Table L

## RAIL COST ADJUSTMENT FACTOR (4Q/2007=100)

| Quarter | Prelim-[1]inary RCAF | Forecast[2] Error Adjustment | RCAF[3] (Unad-justed) | Productivity Adjustment Factor | RCAF[4] (Adjusted) | PAF-5[5] | RCAF-5[5] |
|---------|------|------|------|------|------|------|------|
| 4Q 2007 | | | | | | | |
| 1Q 2008 | | | | | | | |
| 2Q 2008 | | | | | | | |
| 3Q 2008 | | | | | | | |
| 4Q 2008 | | | | | | | |
| 1Q 2009 | | | | | | | |
| 2Q 2009 | | | | | | | |
| 3Q 2009 | | | | | | | |
| 4Q 2009 | | | | | | | |
| 1Q 2010 | | | | | | | |
| 2Q 2010 | | | | | | | |
| 3Q 2010 | | | | | | | |
| 4Q 2010 | | | | | | | |
| 1Q 2011 | | | | | | | |
| 2Q 2011 | | | | | | | |
| 3Q 2011 | | | | | | | |
| 4Q 2011 | | | | | | | |
| 1Q 2012 | | | | | | | |
| 2Q 2012 | | | | | | | |
| 3Q 2012 | | | | | | | |
| 4Q 2012 | | | | | | | |

Tables L through Z are reserved for future Rail Cost Adjustment Factors.

[1] "Preliminary RCAF" is the All-Inclusive Index (Table D), divided by 100.

[2] The "Forecast Error Adjustment" is the difference between the forecast and actual index levels from two quarters prior (Table E), divided by 100.

[3] The Unadjusted RCAF is the sum of the Preliminary RCAF plus the Forecast Error Adjustment.

[4] The Adjusted RCAF is the Unadjusted RCAF adjusted by the Productivity Adjustment Factor.

[5] The Surface Transportation Board in its Ex Parte No. 290 (Sub-No. 7) decision served October 3, 1996 created an additional RCAF series (RCAF-5) which reflects productivity-adjusted values as if the agency had used a 5-year rolling average productivity adjustment factor since the second quarter 1989 inception of a productivity-adjusted RCAF. The productivity adjustment factor used in this calculation is called the PAF-5.

## Table M
## RAIL COST ADJUSTMENT FACTOR (4Q/2012=100)

| Quarter | Prelim-[1]inary RCAF | Forecast[2] Error Adjustment | RCAF[3] (Unad-justed) | Productivity Adjustment Factor | RCAF[4] (Adjusted) | PAF-5[5] | RCAF-5[5] |
|---------|------|------|------|------|------|------|------|
| 4Q 20012 | | | | | | | |
| 1Q 2013 | | | | | | | |
| 2Q 2013 | | | | | | | |
| 3Q 2013 | | | | | | | |
| 4Q 2013 | | | | | | | |
| 1Q 2014 | | | | | | | |
| 2Q 2014 | | | | | | | |
| 3Q 2014 | | | | | | | |
| 4Q 2014 | | | | | | | |
| 1Q 2015 | | | | | | | |
| 2Q 2015 | | | | | | | |
| 3Q 2015 | | | | | | | |
| 4Q 2015 | | | | | | | |
| 1Q 2016 | | | | | | | |
| 2Q 2016 | | | | | | | |
| 3Q 2016 | | | | | | | |
| 4Q 2016 | | | | | | | |
| 1Q 2017 | | | | | | | |
| 2Q 2017 | | | | | | | |
| 3Q 2017 | | | | | | | |
| 4Q 2017 | | | | | | | |

Tables L through Z are reserved for future Rail Cost Adjustment Factors.

[1] "Preliminary RCAF" is the All-Inclusive Index (Table D), divided by 100.

[2] The "Forecast Error Adjustment" is the difference between the forecast and actual index levels from two quarters prior (Table E), divided by 100.

[3] The Unadjusted RCAF is the sum of the Preliminary RCAF plus the Forecast Error Adjustment.

[4] The Adjusted RCAF is the Unadjusted RCAF adjusted by the Productivity Adjustment Factor.

[5] The Surface Transportation Board in its Ex Parte No. 290 (Sub-No. 7) decision served October 3, 1996 created an additional RCAF series (RCAF-5) which reflects productivity-adjusted values as if the agency had used a 5-year rolling average productivity adjustment factor since the second quarter 1989 inception of a productivity-adjusted RCAF. The productivity adjustment factor used in this calculation is called the PAF-5.

# Table AA

# FIRST QUARTER 2004 ALL-INCLUSIVE INDEX LESS FUEL

The components and values of the All-Inclusive Index Less Fuel in the first quarter 2004 are shown below. The projected first quarter index of 102.7 is 0.1 percent lower than the fourth quarter 2003 forecast.

|  | 2002 Weights | 2003Q4 Forecast | 2004Q1 Forecast | Percent Change |
|---|---|---|---|---|
| Labor | 41.8 % | 278.3 | 276.8 | -0.5 % |
| Materials & Supplies | 5.0 | 154.8 | 160.3 | 3.6 |
| Equipment Rents | 11.3 | 175.7 | 176.7 | 0.6 |
| Depreciation | 12.0 | 152.4 | 150.7 | -1.1 |
| Interest | 4.1 | 98.0 | 98.0 | 0.0 |
| Other | 25.8 | 162.6 | 163.9 | 0.8 |
|  |  |  |  |  |
| Weighted Average |  |  |  |  |
| a. 1980 = 100 |  | 208.2 | 208.1 |  |
| b. 1980 = 100 (linked) |  | 207.0 | 206.9 [1] |  |
| c. 4Q02 = 100 |  | 102.8 | 102.7 [2] | -0.1 |

[1] 2004Q1 linked index of 206.9 = relative change (2004Q1 index of 208.1/ 2003Q4 index of 208.2) times 2003Q4 linked index of 207.0. Linking is necessitated by periodic changes in external weighting.

[2] 4Q02 based index = 2004Q1 index (206.9) / 4Q02 linking factor (201.4) times 100 = 102.7.

**AAR Railroad Cost Indexes**

## Table AB

## FORECAST VS. ACTUAL THIRD QUARTER
## 2003 ALL-INCLUSIVE INDEX LESS FUEL

As shown below, the actual index of 101.6 in the third quarter 2003 is 0.1 index points below the forecast value of 101.7. Thus, the forecast error adjustment in the first quarter 2004 is a decrease of 0.1 index points.

|  | 2001 Weights | Third Quarter 2003 | |
|---|---|---|---|
|  |  | Forecast | Actual |
| Labor | 42.2 % | 273.5 | 273.5 |
| Materials & Supplies | 5.1 | 152.7 | 152.7 |
| Equipment Rents | 11.7 | 175.8 | 175.9 |
| Depreciation | 11.9 | 149.9 | 151.7 |
| Interest | 4.3 | 98.6 | 98.6 |
| Other | 24.8 | 163.2 | 162.6 |
| Weighted Average |  |  |  |
| a. 1980 = 100 |  | 206.3 | 206.4 |
| b. 1980 = 100 (linked) |  | 204.8 | 204.6 [1] |
| c. 4Q02 = 100 [2] |  | 101.7 | 101.6 |
| Forecast Error | -0.1 |  |  |

Note 1: 2003Q3 linked actual index of 204.6 = relative change (2003Q3 actual index of 206.4 / 2003Q2 actual index of 204.9) times 2003Q2 linked actual index of 203.1.

Note 2: Linked index divided by 2002Q4 linking factor of 2.014

## Table AC

# ALL-INCLUSIVE INDEX LESS FUEL ON VARIOUS BASES

| | Base * | |
|---|---|---|
| | 1980 | 2002Q4 |
| 1994Q1 | 171.3 | 85.1 |
| 1994Q2 | 170.1 | 84.5 |
| 1994Q3 | 174.0 | 86.4 |
| 1994Q4 | 173.3 | 86.0 |
| 1995Q1 | 175.4 | 87.1 |
| 1995Q2 | 177.2 | 88.0 |
| 1995Q3 | 179.0 | 88.9 |
| 1995Q4 | 179.0 | 88.9 |
| 1996Q1 | 178.1 | 88.4 |
| 1996Q2 | 177.4 | 88.1 |
| 1996Q3 | 179.3 | 89.0 |
| 1996Q4 | 180.1 | 89.4 |
| 1997Q1 | 183.9 | 91.3 |
| 1997Q2 | 184.2 | 91.5 |
| 1997Q3 | 184.9 | 91.8 |
| 1997Q4 | 183.7 | 91.2 |
| 1998Q1 | 183.0 | 90.9 |
| 1998Q2 | 182.8 | 90.8 |
| 1998Q3 | 184.8 | 91.8 |
| 1998Q4 | 185.0 | 91.9 |
| 1999Q1 | 185.1 | 91.9 |
| 1999Q2 | 184.9 | 91.8 |
| 1999Q3 | 186.3 | 92.5 |
| 1999Q4 | 185.5 | 92.1 |
| 2000Q1 | 190.3 | 94.5 |
| 2000Q2 | 190.3 | 94.5 |
| 2000Q3 | 192.0 | 95.3 |
| 2000Q4 | 191.6 | 95.1 |
| 2001Q1 | 195.5 | 97.1 |
| 2001Q2 | 196.2 | 97.4 |
| 2001Q3 | 197.2 | 97.9 |
| 2001Q4 | 196.3 | 97.5 |
| 2002Q1 | 199.1 | 98.9 |
| 2002Q2 | 197.3 | 98.0 |
| 2002Q3 | 197.5 | 98.1 |
| 2002Q4 | 201.4 | 100.0 |
| 2003Q1 | 202.4 | 100.5 |
| 2003Q2 | 203.2 | 100.9 |
| 2003Q3 | 204.8 | 101.7 |
| 2003Q4 | 207.0 | 102.8 |
| 2004Q1 | 206.9 | 102.7 |
| 2004Q2 | | |
| 2004Q3 | | |
| 2004Q4 | | |

* The 1980 linked All-Inclusive Index for each quarter is divided by the following linking factors to determine the values shown on Table AC:  4Q/02 = 2.014

## Table AD

## ALL-INCLUSIVE INDEX LESS FUEL
## WITH FORECAST ERROR ADJUSTMENT
### 4Q/2002 = 100.0

| | All-LF | Forecast Error Adjustment | All-LF With Forecast Error Adjustment |
|---|---|---|---|
| 1994Q1 | 85.1 | -0.3 | 84.8 |
| 1994Q2 | 84.5 | -0.2 | 84.3 |
| 1994Q3 | 86.4 | 0.2 | 86.6 |
| 1994Q4 | 86.0 | 0.0 | 86.0 |
| 1995Q1 | 87.1 | 0.0 | 87.1 |
| 1995Q2 | 88.0 | 0.3 | 88.3 |
| 1995Q3 | 88.9 | 0.3 | 89.2 |
| 1995Q4 | 88.9 | 0.1 | 89.0 |
| 1996Q1 | 88.4 | -0.4 | 88.0 |
| 1996Q2 | 88.1 | -0.5 | 87.6 |
| 1996Q3 | 89.0 | -0.4 | 88.6 |
| 1996Q4 | 89.4 | -0.1 | 89.3 |
| 1997Q1 | 91.3 | -0.1 | 91.2 |
| 1997Q2 | 91.5 | 0.0 | 91.5 |
| 1997Q3 | 91.8 | -0.1 | 91.7 |
| 1997Q4 | 91.2 | -0.4 | 90.8 |
| 1998Q1 | 90.9 | 0.0 | 90.9 |
| 1998Q2 | 90.8 | 0.2 | 91.0 |
| 1998Q3 | 91.8 | -0.2 | 91.6 |
| 1998Q4 | 91.9 | 0.0 | 91.9 |
| 1999Q1 | 91.9 | -0.2 | 91.7 |
| 1999Q2 | 91.8 | -0.2 | 91.6 |
| 1999Q3 | 92.5 | -0.1 | 92.4 |
| 1999Q4 | 92.1 | 0.0 | 92.1 |
| 2000Q1 | 94.5 | 0.2 | 94.7 |
| 2000Q2 | 94.5 | 0.2 | 94.7 |
| 2000Q3 | 95.3 | -0.3 | 95.0 |
| 2000Q4 | 95.1 | -0.1 | 95.0 |
| 2001Q1 | 97.1 | -0.2 | 96.9 |
| 2001Q2 | 97.4 | -0.1 | 97.3 |
| 2001Q3 | 97.9 | -0.1 | 97.8 |
| 2001Q4 | 97.5 | -0.2 | 97.3 |
| 2002Q1 | 98.9 | -0.2 | 98.7 |
| 2002Q2 | 98.0 | -0.2 | 97.8 |
| 2002Q3 | 98.1 | -0.9 | 97.2 |
| 2002Q4 | 100.0 | 0.0 | 100.0 |
| 2003Q1 | 100.5 | -0.1 | 100.4 |
| 2003Q2 | 100.9 | 0.0 | 100.9 |
| 2003Q3 | 101.7 | 0.0 | 101.7 |
| 2003Q4 | 102.8 | -0.1 | 102.7 |
| 2004Q1 | 102.7 | -0.1 | 102.6 |
| 2004Q2 | | | |
| 2004Q3 | | | |
| 2004Q4 | | | |

# INDEX TERMINOLOGY

ALL-INCLUSIVE INDEX – An index which measures changes in prices for various categories of railroad expenses associated with carrying freight. A forecast of this index is used by the Surface Transportation Board (STB) to determine the Railroad Cost Adjustment Factor. It replaced the Interim Mid-Quarter Index in 1985.

ALL-INCLUSIVE INDEX LESS FUEL (AII-LF) – The All-Inclusive Index calculated without the Fuel component. All other components match the All-Inclusive Index used to determine the Rail Cost Adjustment Factor.

BASE PERIOD – The year to which all price levels are compared. Indexes are generally rebased to 100 periodically. An index can be rebased by dividing each index number by the index value for the period which will be established as the new base.

BENCHMARKING – Updating the hourly rates that underlie the quarterly estimates of the various components of the wage index and the supplements index. Benchmark data on hours and compensation are from the annual Wage Statistics, and data on fringe benefits and payroll taxes are from the R-1 Annual Report. The Class I railroads file the R-1 Annual Report and an abbreviated version of the wage statistics with the STB.

CHARGEOUT PRICES – The value of an item at the time it is charged to an operating expense account. The chargeout price is generally the original purchase price, sometimes a "system average price." The AAR publishes both an annual and a quarterly series of chargeout price indexes.

COMPOSITION CATEGORIES – Subcomponents of the materials and supplies index. Each of the market basket items can be assigned to one of three categories: forest products, metal products, and miscellaneous products. Separate spot price indexes are published for these categories. The overall materials and supplies spot price and chargeout price indexes are based on this grouping.

EX PARTE NO. 290 – The STB proceeding which meets the requirements of the Staggers Rail Act to calculate a Rail Cost Adjustment Factor using an index of railroad costs.

FORECAST ERROR – The difference between the forecasted and the actual All-Inclusive Indexes for a given quarter. The forecast error from the second prior quarter is added to (if the forecast was understated) or subtracted from (if the forecast was overstated) the Preliminary RCAF to derive the RCAF (the RCAF (Unadjusted) beginning in 2Q,89).

FUNCTION CATEGORIES – Subcomponents of the materials and supplies index. Each of the market basket items can be assigned to one of four categories: maintenance of way items, freight car items, locomotive items, and all other items. Separate spot price indexes are published for these categories on a quarterly basis.

INTERIM MID-QUARTER INDEX – An index which measures changes in prices for various categories of railroad expenses associated with carrying freight. The ICC used this index for determining the RCAF until 1985, when it completed its analysis of the AII.

LINKING – The statistical process used to adjust indexes for changes other than price changes, the inclusion of which would otherwise distort the index value. Examples are the introduction of new weights, the substitution of a different product in the market basket or the inclusion of a new index component. Since the purpose of a price index is to reflect changes due only to actual changes in price levels, it is often necessary to "link out" the impact of other changes.

PPI-All Commodities – U.S. Department of Labor's Producer Price Index for All Commodities (series ID wpu00000000).

PPI-LF – U.S. Department of Labor's Producer Price Index for Industrial Commodities, Less Fuel and Related Products and Power (series ID wpu03t15m05).

PPI-RE – U.S. Department of Labor's Producer Price Index for Railroad Equipment (series ID wpu144).

PRELIMINARY RCAF – The STB's term for the forecasted All-Inclusive Index, divided by 100. It is the basis for both the RCAF (Unadjusted) and the RCAF (Adjusted), and is prior to forecast error adjustment.

# INDEX TERMINOLOGY (Cont.)

PRODUCTIVITY ADJUSTMENT – The adjustment made to the RCAF each quarter which is designed to convert a price index to a cost index. A productivity adjustment was incorporated in the RCAF for the first time in 2Q.89.

PRODUCTIVITY ADJUSTMENT FACTOR (PAF) – The STB-determined factor which is divided into the RCAF (Unadjusted) to derive the RCAF (Adjusted). Each quarter's PAF is calculated by multiplying the previous quarter's PAF by the fourth root of the current multi-year average. The years included and the productivity change underlying the PAF used for various RCAF calculations are: 2Q and 3Q 89=1982-86 (1.7%); 4Q89-2Q90=1982-87 (4.4%); 3Q90-4Q91=1982-88 (4.4%); 1Q92-4Q93=1982-89 (4.4%); 1Q94-1Q95=1988-92 (5.0%); 2Q95-2Q96=1989-93 (5.9%); 3Q96-1Q97=1990-94 (5.9%); 2Q97-1Q98=1991-95 (5.0%); 2Q98-1Q99=1992-96 (9.7%); 2Q99-1Q00=1993-97 (5.7%); 2Q00-1Q01=1994-98 (3.5%); 2Q01-1Q02=1995-99 (2.8%); 2Q02-1Q03=1996-2000 (4.2%); 2Q03-present=1997-2001 (1.9%).

PRODUCTIVITY ADJUSTMENT FACTOR-5 (PAF-5) – Same concept as PAF above to determine RCAF-5. The five-year rolling average included and the productivity change underlying the PAF-5 used for various RCAF-5 calculations are: 2Q-4Q 89=1982-86 (1.6%); 1990=1983-87 (5.8%); 1991=1984-88 (4.8%); 1992=1985-89 (4.7%); 1993=1986-90 (6.2%); 1994=1987-91 (4.7%); 1995=1988-92 (5.0%); 1996=1989-93 (5.9%); 1997=1990-94 (5.9%); 1998=1991-95 (5.0%); 1999=1992-96 (9.7%); 2000=1993-97 (5.7%); 2001=1994-98 (3.5%); 2002=1995-1999 (2.8%); 2003=1996-2000 (4.2%).

QMPW – Indexes of Railroad Material Prices and Wage Rates. An index series which contains individual indexes for several of the most important components of railroad operating expenses (labor, fuel, and materials and supplies). These indexes have been published continuously since 1933, and are now included in the RCR series.

RCAF – The Rail Cost Adjustment Factor. A factor based on the changes in the forecasted All-Inclusive Index, by which railroads may, as permitted by contracts, virtually automatically adjust their rates for inflationary/deflationary cost changes. The procedures for determining the RCAF are set forth in Ex Parte No. 290 (Sub-No. 2) proceeding.

RCAF (Adjusted) – The RCAF adjusted for productivity. Beginning in 2Q89, regulations required that the RCAF (Unadjusted) be divided by the Productivity Adjustment Factor to derive the RCAF (Adjusted), which is the basis for the maximum RCAF rate level.

RCAF (Unadjusted) – The RCAF prior to adjustment for productivity, but after forecast error adjustment.

RCAF-5 – The Surface Transportation Board in its Ex Parte No. 290 (Sub-No. 7) decision served October 3, 1996 created an additional RCAF series (RCAF-5) which reflects productivity-adjusted values as if the agency had used a 5-year rolling average productivity adjustment factor since the second quarter 1989 inception of a productivity-adjusted RCAF.

RCR – The Railroad Cost Recovery Indexes. An index series containing individual indexes for each component of railroad operating expenses, together with various composite indexes. The series continues all of the series established in the QMPW series and adds inflationary measures for the various categories of Other Operating Expenses. This series is published on both an annual and quarterly basis.

SPOT PRICES – The value of an item at the time it is purchased rather than at the time it is consumed or expensed to operating accounts. Spot price indexes are published for diesel fuel and materials and supplies.

WEIGHTS – The importance of an item with respect to the other items in the category. The AAR indexes use two basic types of weights: internal and external weights. The internal weights are the values used to combine the various subcomponents of an index to arrive at the index (e.g., the three composition groupings within materials and supplies). The external weights are the values used to combine the individual indexes to calculate the composite indexes and the "bottom-line" indexes. The weights are generally based on annual expense data and are updated periodically -- the AII/RCAF, AII-LF, and the internal weights of the RCR annually, and the RCR external weights every five years, or sooner, if the distribution of costs among components changes substantially.

# COMMON ABBREVIATIONS

### Freight Railroads

| | |
|---|---|
| BNSF | The Burlington Northern and Santa Fe Railway |
| CC | Chicago, Central & Pacific (part of CN's Grand Trunk Corporation, also noted as CC&P) |
| CN | Canadian National Railway (Canada, a.k.a. CN) |
| CNGT | AAR's designation of Grand Trunk Corporation (most of CN's U.S. operations) |
| CP | Canadian Pacific Railway (Canada)  Also noted as CPR. |
| CSX | CSX Transportation |
| DWP | Duluth, Winnipeg & Pacific Railway Company (part of CN's Grand Trunk Corporation) |
| FXE | Ferrocarril Mexicano (Ferromex), a subsidiary of Grupo Ferroviario Mexicano (Mexico) |
| GTW | Grand Trunk Western Railroad (part of CN's Grand Trunk Corporation) |
| IC | Illinois Central Railroad (part of CN's Grand Trunk Corporation) |
| KCS | Kansas City Southern Railway |
| NS | Norfolk Southern Combined Railroad Subsidiaries (a.k.a. Norfolk Southern Railway or NS Rail) |
| SOO | Soo Line Railroad (Western U.S. part of Canadian Pacific Railway) |
| SSAM | Sault Saint Marie Bridge Company (part of CN's Grand Trunk Corporation) |
| TFM | TFM, a subsidiary of Grupo Transportación Ferroviaria Mexicana (Mexico) |
| UP | Union Pacific Railroad |
| WC | Wisconsin Central and subsidiaries (part of CN's Grand Trunk Corporation) |

*Note: Index calculations in this publication are based on data provided by the U.S. Class I railroads.*

### Railroad Organizations and Regulators

| | |
|---|---|
| AAR | Association of American Railroads |
| ICC | Interstate Commerce Commission (replaced by the Surface Transportation Board on January 1, 1996) |
| NRLC | National Railway Labor Conference |
| RRB | Railroad Retirement Board |
| STB | Surface Transportation Board |

### Major Railroad Unions

| | |
|---|---|
| ATDA or ATDD | American Train Dispatchers Department of the Brotherhood of Locomotive Engineers |
| BLE | Brotherhood of Locomotive Engineers (predecessor to BLET) |
| BLET | Brotherhood of Locomotive Engineers and Trainmen, a division of the International Brotherhood of Teamsters Rail Conference (labeled in AAR data bases as BLE) |
| BMWE | Brotherhood of Maintenance of Way Employees |
| BRC | (see TCU-Carmen) |
| BRS | Brotherhood of Railroad Signalmen |
| IAM | International Association of Machinists and Aerospace Workers |
| IBBM | International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers |
| IBEW | International Brotherhood of Electrical Workers |
| IBFO | International Brotherhood of Firemen and Oilers (predecessor to NCFO) |
| NCFO | National Conference of Firemen and Oilers (sometimes labeled in AAR data bases as IBFO) |
| SMW or SMWIA | Sheet Metal Workers' International Association |
| TCU | Transportation Communication International Union |
| TCU-Carmen | Brotherhood of Railway Carmen Division of the TCU |
| UTU | United Transportation Union |
| UTU-Yard | United Transportation Union Yardmaster Department (also called the UTU-YMD) |

Policy and Economics Department
Association of American Railroads
50 F Street, N.W.
Washington, D.C. 20001

For information regarding this publication call:

(202) 639 - 2309

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 Misc. No. 07-489 (PLF) |
| This document relates to: ALL CASES | |

**[PROPOSED] ORDER DISMISSING DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED COMPLAINT**

Upon consideration of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint, Plaintiffs' Opposition thereto, and the entire record herein, it is ORDERED that Defendants' Motion to Dismiss be and is hereby GRANTED.

The Court finds that the Consolidated Amended Complaint fails to state a claim upon which relief can be granted, and that Plaintiffs are unable to cure these defects by amendment. It is further ORDERED that the Consolidated Amended Complaint be and is DISMISSED with PREJUDICE as to all Defendants.

So ORDERED.

DATED: _____     _____

PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE