**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869 |
| | Misc. No. 07-489 (PLF) |
| This document relates to: | Hon. Paul L. Friedman |
| ALL CASES | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
JOINT MOTION TO DISMISS INDIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

PLAINTIFFS' ALLEGATIONS ............................................................................... 2

ARGUMENT ........................................................................................................... 3

I.      PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED UNDER *TWOMBLY* ........... 3

II.     PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED ......................................... 3

        A.      Preemption Of State Law Has Long Been An Element Of Federal
                Regulation Of The Rail Industry ........................................................ 5

        B.      The ICCTA Expressly Preempts Plaintiffs' Claims In This Case ........................ 9

III.    PLAINTIFFS HAVE NO CONSTITUTIONAL STANDING TO RAISE MOST
        OF THEIR STATE LAW CLAIMS ................................................................. 16

IV.     PLAINTIFFS HAVE FAILED TO PLEAD FACTS SHOWING THAT THEY
        HAVE STANDING TO BRING PRICE FIXING CLAIMS UNDER FEDERAL
        AND STATE ANTITRUST AND CONSUMER PROTECTION LAWS .................... 18

        A.      Plaintiffs Have Not Pled Facts To Support Antitrust Standing ........................ 18

                1.      Under the law of the states involved here, a plaintiff lacks standing
                        if he or she is too remote from the antitrust violation ............................ 20

                2.      The named plaintiffs have not pled facts sufficient to establish that
                        they have standing ........................................................................ 25

        B.      Plaintiffs Have Not Pled Facts To Support Standing Under State
                Consumer-Protection Statutes ........................................................... 28

V.      PLAINTIFFS' STATE LAW CLAIMS ARE DEFECTIVE FOR MULTIPLE
        OTHER REASONS ................................................................................... 29

        A.      Plaintiffs' New York Common Law Restraint Of Trade Claim Must Be
                Dismissed ....................................................................................... 29

        B.      Plaintiffs' Consumer Protection And Unfair Competition Claims Should
                Be Dismissed ................................................................................... 30

                1.      Plaintiffs fail to plead their claims with the requisite particularity ........... 30

2.      Plaintiffs rely on statutes that apply only to purchases of household goods or services .................................................................................. 33

3.      Many consumer protection laws Plaintiffs seek to enforce apply only to commerce that is predominantly intrastate ................................. 35

4.      A number of Plaintiffs' consumer protection claims should be dismissed on other grounds as well ........................................................ 36

    a.      Plaintiffs have no class action claim for damages under the California Unfair Competition Law ............................................. 36

    b.      As none of Defendants' alleged conduct was directed toward them, Plaintiffs have no New York consumer protection claim.......................................................................... 36

    c.      Plaintiffs have no consumer protection claim based upon alleged antitrust violations under the laws of Illinois, Oregon or Rhode Island................................................................ 37

C.    Plaintiffs' Unjust Enrichment Claims Should Be Dismissed ............................. 37

1.      Plaintiffs cannot evade the requirements of state and federal law by resort to the equitable doctrine of unjust enrichment .............................. 37

2.      Plaintiffs have not alleged that they sought to rescind their indirect purchases and thus do not state a valid unjust enrichment claim ............. 39

3.      Plaintiffs otherwise state no valid unjust enrichment claims ................... 40

CONCLUSION ............................................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Segura,*
907 S.W.2d 503 (Tex. 1995) ............................................................................. 34

*Air Transp. Ass'n of Am., Inc. v. Cuomo,*
520 F.3d 218 (2d Cir. 2008) .............................................................................. 17

*American Ad Mgmt. Inc. v. Gen. Tel. Co. of California,*
190 F.3d 1051 (9th Cir. 1999) ........................................................................... 27

*Antoine v. U.S. Bank Nat'l Ass'n,*
No. 07-1518, 2008 U.S. Dist. LEXIS 32584 (D.D.C. Apr. 22, 2008) ................... 38

*Asher v. Abbott Labs.,*
290 A.D.2d 208 (N.Y. App. Div. 2002) .............................................................. 35

*Associated Gen. Contractors of California v. California State Council of Carpenters,**
459 U.S. 519 (1983) ..................................................................................... passim

*Avery v. State Farm Mut. Auto. Ins. Co.,*
835 N.E.2d 801 (Ill. 2005) ................................................................................. 43

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.,*
235 Cal. Rptr. 228 (Cal. Ct. App. 1987) ............................................................ 31

*Bank of the West v. Superior Court,*
2 Cal. 4th 1254, 10 Cal. Rptr. 2d 538 (Cal. 1992) .............................................. 44

*Barns v. Dairymen's League Co-op. Ass'n,*
220 A.D. 624 (N.Y. App. Div. 1927) .................................................................. 35

*Bates v. Northwestern Human Servs.,*
466 F. Supp. 2d 69 (D.D.C. 2006) ..................................................................... 38

*Beckler v. Visa U.S.A., Inc.,*
No. 08-04-C000030, 2004 WL 2115144 (N.D. Dist. Ct. Aug. 23, 2004) .............. 25

*Bell Atl. Corp. v. Twombly,**
127 S. Ct. 1955 (2007) ................................................................................. passim

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982) .......................................................................................... 23

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) .................................................................................. 21

*Cacique, Inc. v. Robert Reiser & Co., Inc.,*
  169 F.3d 619 (9th Cir. 1999) .................................................................... 44

*California v. ARC Am. Corp.,**
  490 U.S. 93 (1989) .................................................................................... 22

*Chatton v. Nat'l Union Fire Ins. Co.,*
  13 Cal. Rptr. 2d 318 (1992) ...................................................................... 44

*Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,**
  450 U.S. 311 (1981) .................................................................................... 7

*Cit Group/Sales Fin. Inc. v. E-Z Pay Used Cars,*
  29 Kan. App. 2d 676 (Kan. Ct. App. 2001) .............................................. 41

*Cities of Auburn and Kent,*
  2 S.T.B. 330, 1997 WL 362017 (1997) ...................................................... 16

*City of Auburn v. United States,**
  154 F.3d 1025 (9th Cir. 1998) ..........................................................4, 5, 6, 9

*Conboy v. AT&T Corp.,*
  241 F.3d 242 (2d Cir. 2001) ...................................................................... 39

*Cornelison v. Visa U.S.A., Inc.,*
  No. CIV 03-1350 (S.D. Cir. Ct. Sept. 29, 2004) ...................................... 25

*Cox v. Microsoft Corp.,*
  290 A.D.2d 206 (N.Y. App. Div. 2002) .................................................... 35

*Credit Suisse Secs. (USA) LLC v. Billing,*
  127 S.Ct. 2383 (2007) ................................................................................ 12

*Crouch v. Crompton Corp.,**
  Nos. 02CV54375, 03CVS2514, 2004 WL 2414027
  (N.C. Sup. Ct. Oct. 28, 2004) ......................................................25, 29, 31, 32

*CSX Transp., Inc. v. City of Plymouth,*
  92 F. Supp. 2d 643 (E.D. Mich. 2000) ........................................................ 6

*CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n,*
  944 F. Supp. 1573 (N.D. Ga. 1996) ............................................................ 5

*CSX Transp., Inc. v. Williams,*
  406 U.S. 667 (D.C. Cir. 2005) .................................................................... 6

*ERI Max Entm't v. Streisand*,
  690 A.2d 1351 (R.I. 1997) ........................................................................... 42, 45

*Erie R.R. Co. v. Tompkins*,
  304 U.S. 64 (1938) ..................................................................................... 36, 50

*Flynn v. Burlington Northern S.F. Corp.*,
  98 F. Supp.2d 1186 (E.D. Wash. 2000) ........................................................ 16

*Friberg v. Kan. City S. Ry.*,
  267 F.3d 439 (5th Cir. 2001) ......................................................................... 10

*FTC v. Mylan Labs., Inc.*,
  62 F. Supp. 2d 25 (D.D.C. 1999) ................................................................... 49

*Fucile v. Visa U.S.A., Inc.*,
  No. 51560-03, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ................ 25

*G. & T. Terminal Packaging Co. v. Consolidated Rail Corp.*,*
  830 F.2d 1230 (3d Cir. 1987) ...................................................................... 8, 14

*Gaebler v. New Mexico Potash Corp.*,
  676 N.E.2d 228 (Ill. App. 1996) .................................................................. 34, 45

*Ghirado v. Antonioli*,
  14 Cal. 4th 39 (1996) ..................................................................................... 50

*Gonzales v. Assocs. Fin. Serv. Co.*,
  967 P.2d 312 (Kan. 1998) .............................................................................. 39

*Goshen v. Mut. Life Ins.*,
  774 N.E.2d 1190 (N.Y. 2002) ........................................................................ 43

*Griffin v. Dugger*,
  823 F.2d 1476 (11th Cir. 1987) ................................................................. 19, 21

*Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*,
  408 F. Supp. 1251 (S.D.N.Y. 1976) ............................................................... 35

*Harrah's Vicksburg Corp. v. Pennebaker*,
  812 So. 2d 163 (Miss. 2001) .......................................................................... 27

*Hyde v. Abbott Labs.*,
  473 S.E.2d 680 (N.C. App. 1996) .................................................................. 31

*ICC v. Texas*,
  479 U.S. 450 (1987) ......................................................................................... 8

*Illinois Brick Co. v. Illinois*,*
  431 U.S. 720 (1977) ...................................................................................... 11, 22, 25, 47

*In re Credit/Debit Card Tying Cases*,
  No. J.C.C.P. No. 4335, 2004 WL 2475287 (Cal. Super. Ct. Oct. 14, 2004) ......................... 26

*In re Ditropan XL Antitrust Litigation*,
  No. 06-01761, 2007 WL 1411617 (N.D. Cal. May 11, 2007) ................................................ 20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,*
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) .................................................................... passim

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,*
  536 F. Supp. 2d 1129 (N.D. Cal. 2008) (*"DRAM II"*) ......................................................... 27

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................................................... 3, 50

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  496 F. Supp. 2d 404 (D. Del. 2007) ............................................................................ 48, 49

*In re Microsoft Corp. Antitrust Litig.*,
  127 F. Supp. 2d 702 (D. Md. 2001) .................................................................................. 36

*In re Microsoft Corp. Antitrust Litig.*,
  241 F. Supp. 2d 563 (D. Md. 2003) .................................................................................. 47

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,*
  350 F. Supp. 2d 160 (D. Me. 2004) ............................................................................ passim

*In re Relefen Antitrust Litig.*,
  225 F.R.D. 14 (D. Mass. 2004) ....................................................................................... 49

*In re Rezulin Prods. Liab. Litig.*,
  392 F. Supp. 2d 597 (S.D.N.Y. 2005) .............................................................................. 45

*In re Static Random Access Memory Antitrust Litig.*,
  No. M:07-CV-01819, MDL No. 1819, 2008 WL 426522 (Feb. 14, 2008) ...................... 31, 45

*In re Terazosin Hydrochloride Antitrust Litig.*,*
  160 F. Supp. 2d 1365 (S.D. Fla. 2001) ............................................................................ 21

*In re Tobacco/Governmental Health Care Costs Litig.*,
  83 F. Supp. 2d 125 (D.D.C. 1999),
  *aff'd*, 249 F.3d 1068 (D.C. Cir. 2001) ............................................................................... 25

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
  300 F. Supp. 2d 1107 (D. Kan. 2003) ............................................................................... 38

*In re Vitamins Antitrust Litig.*,
    MDL No. 99-197, 2001 WL 849928 (D.D.C. April 11, 2001)................................................ 46

*In re Vitamins Antitrust Litig.*,*
    MDL No. 1285, 2001 U.S. Dist. LEXIS 25072 (D.D.C. Mar. 13, 2001)................................ 46

*Independent Communc'ns v. MCI Telecomms.*,
    657 F. Supp. 785 (D.D.C. 1987) ........................................................................................... 40

*International Brotherhood of Teamsters v. ICC*,
    921 F.2d 904 (9th Cir. 1990)................................................................................................. 14

*Intex Rec. Corp. v. Team Worldwide Corp.*,
    390 F. Supp. 2d 21 (D.D.C. 2005) ....................................................................................... 38

*Johnson v. Gahagan*,
    No. CV-00-576, 2001 Me. Super. LEXIS 53 (Me. Super. Ct. 2001)..................................... 41

*Julian-Ocampo v. Air Ambulance Network, Inc.*,
    No. 00-1262, 2001 U.S. Dist. LEXIS 10986 (D. Or. July 27, 2001) .................................... 44

*Kanne v. Visa U.S.A., Inc.*,
    723 N.W.2d 293 (Neb. 2006)..................................................................................25, 33, 47

*Kluin v. Am. Suzuki Motor Corp.*,
    56 P.3d 829 (Kan. 2002) ...................................................................................................... 43

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000)................................................................................................. 26

*Knowles v. Visa U.S.A., Inc.*,
    No. Civ. A CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004)......................... 24

*Konecranes, Inc. v. Sinclair*,
    340 F. Supp. 2d 1126 (D. Or. 2004)..................................................................................... 42

*Little Rock Elec. Contrs. v. Entergy Corp.*,
    79 Ark. App. 337 (Ark. Ct. App. 2002)................................................................................ 39

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007)............................................................................................. 26

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................................. 19

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004).................................................................................................. 38

*Mazanderan v. Indep. Taxi Owners' Ass'n*,
    700 F. Supp. 588 (D.D.C. 1988) ................................................................ 40, 41

*Medtronic, Inc. v. Lohr*,\*
    518 U.S. 470 (1996) ................................................................................... 5

*Melchior v. New Line Prods., Inc.*,
    106 Cal. App. 4th 779 (2003) .................................................................... 50

*Merck & Co. v. Lyon*,
    941 F. Supp. 1443 (M.D.N.C. 1996) .......................................................... 44

*Meridian Project Sys. v. Hardin Constr. Co.*,
    404 F. Supp. 2d 1214 (E.D. Cal. 2005) ...................................................... 43

*Minebea Co. v. Papst*,
    444 F. Supp. 2d 68 (D.D.C. 2006) ............................................................. 49

*Mueller Co. v. United States Pipe & Foundry Co.*,
    No. CIV 03-170, 2003 WL 22272135 (D.N.H. Oct. 2, 2003) ....................... 43

*New York v. Daicel Chem. Indus., Ltd.*,
    840 N.Y.S.2d 8 (N.Y. App. Div. 2007) ...................................................... 33

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) .................................................................... 30

*Orr v. Beamon*,
    77 F. Supp. 2d 1208 (D. Kan. 1999) ......................................................... 24

*Orr v. BHR, Inc.*,
    4 F. App'x 647 (10th Cir. 2001) ................................................................ 24

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    647 N.E.2d 741 (N.Y. 1995) ...................................................................... 39

*Owens Corning v. R.J. Reynolds Tobacco Co.*,
    868 So. 2d 331 (Miss. 2004) ..................................................................... 26

*Pacamor Bearings, Inc. v. Minebea Co.*,
    918 F. Supp. 491 (D.N.H. 1996) ............................................................... 43

*Paltre v. General Motors Corp.*,
    810 N.Y.S.2d 496 (N.Y. App. Div., 2d Dep't 2006) .................................... 45

*Patel v. Holiday Hospitality Franchising. Inc.*,
    172 F. Supp. 2d 821 (N.D. Tex. 2001) ...................................................... 38

*PCI Transp., Inc. v. Fort Worth & W. Ry. Co.,*
    418 F.3d 535 (5th Cir. 2005).................................................................. 14, 15

*Pejebscot Indus. Park v. Maine Central R.R.,*
    297 F. Supp. 2d 326 (D. Me. 2003)................................................................ 10

*Petri v. Gatlin,*
    997 F. Supp. 956 (N.D. Ill. 1997)................................................................... 38

*Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives Ass'n,*\*
    491 U.S. 490 (1989) ........................................................................................ 6

*Port City Prop. v. Union Pac. R.R. Co.,*
    518 F.3d 1186 (10th Cir. 2008)................................................................ 15, 16

*Robinson v. EMI Music Dist.,*
    Civ. A. No. L-10462, 1996 WL 495551 (Tenn. Cir. Ct. July 8, 1996) ................... 31

*Rowe v. New Hampshire Motor Transp. Ass'n,*
    128 S. Ct. 989 (1993)....................................................................................... 16

*Schneidewind v. ANR Pipeline Co.,*
    485 U.S. 293 (1988) ........................................................................................ 16

*Sheth v. N.Y. Life Ins. Co.,*
    273 A.D.2d 72 (N.Y. App. Div. 1st Dep't 2000)................................................ 42

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) ........................................................................................ 50

*Southard v. Visa U.S.A., Inc.,*
    734 N.W.2d 192 (Iowa 2007) ................................................................... passim

*Southern Pac. Co. v. Arizona,*
    325 U.S. 761 (1945) ........................................................................................ 19

*St. Patrick's Home for the Aged & Infirm v. Laticrete Int'l,*
    696 N.Y.S.2d 117 (N.Y. App. Div., 1st Dept. 1999) ......................................... 45

*Stark v. Visa U.S.A., Inc.,*
    No. 03-055030, 2004 WL 1879003 (Mich. Cir. Ct . July 23, 2004)..................... 25

*Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.,*
    No. W1999-01061-COA-R9-CV, 2000 WL 1390171 (Tenn. Ct. App. Sept. 26, 2000).......... 26

*Strang v. Visa U.S.A., Inc.*,
   No. 3CV011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005) ......................................... 25

*Teague v. Bayer AG*,
   No. 05-CV590, 2007 WL 2569668 (N.C. Super. Ct. May 7, 2007) ....................................... 34

*Temple v. Circuit City Stores, Inc.*,*
   No. 06-CV-5303, 2007 U.S. Dist. LEXIS 70747 (E.D.N.Y. Sept. 25, 2007) ........................ 20

*Texas & Pac. Ky. Co. v. Abilene Cotton Oil Co.*,
   204 U.S. 426 (1907) .............................................................................................................. 7

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981) ............................................................................................................. 50

*Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd.*,
   474 U.S. 409 (1986) ............................................................................................................. 17

*Tungate v. MacLean-Stecens Studios, Inc.*,
   714 A.2d 792 (Me. 1998) ...................................................................................................... 39

*Tyrell v. Norfolk S. Ry. Co.*,
   248 F.3d 517 (6th Cir. 2001) ................................................................................................ 12

*Ulico Cas. Co. v. Prof'l Indem. Agency, Inc.*,
   No. 98-1018, 1999 U.S. Dist. LEXIS 8591 (D.D.C. May 5, 1999) ................................. 40, 41

*United States ex rel. Totten v. Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002) ............................................................................................. 38

*United States v. Dentsply Int'l, Inc.*,
   Nos. CIV. A. 99-005, CIV. A. 99-255, CIV. A. 99-854, 2001 WL 624807 (D. Del. Mar.
   30, 2001) ............................................................................................................................. 36

*United States v. Locke*,*
   529 U.S. 89 (2000) ................................................................................................................ 6

*Verizon Commc'ns, Inc. v. Trinko, LLP*,*
   540 U.S. 398 (2004) ............................................................................................................. 12

*Vinci v. Waste Mgmt., Inc.*,
   43 Cal. Rptr. 2d 337 (Cal. Ct. App. 1995) ........................................................................... 26

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................................................. 21

*Witherspoon v. Philip Morris, Inc.*,
   964 F. Supp. 455 (D.D.C. 1997) .......................................................................................... 37

x

*Wrobel v. Avery Dennison Corp.*,
  No. 05-CV-1296 (Kan. Dist. Ct. Feb. 1, 2006) ....................................................... 24

**Other Proceedings**

*Borough of Riverdale—Pet. for Dec. Order—New York S. & W. Ry. Corp.*,
  4 S.T.B. 380, 1999 WL 715272 (Sept. 9, 1999)........................................................ 14

*Consolidated Rail Corp.—Pet. for Dec. Order—Suspension of Service*,
  Ex Parte No. 346 (Sub-No. 14B), 1989 ICC LEXIS 143 (June 13, 1989) ............................ 12

*CSX Transp., Inc.—Pet. for Declaratory Order*,
  STB Fin. Dkt. No. 34662, 2005 WL 584026 (March 14, 2005)................................................ 9

*Effect of Modifying Proclamation No. 3279 and
  Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject
  to the Interstate Commerce Act*,
  Ex Parte No. 311, 350 I.C.C. 563,
  1975 ICC LEXIS 27 (August 14, 1975) .................................................................. 14

*Rail Fuel Surcharges*,
  STB Ex Parte No. 661 (Jan. 25, 2007) ................................................................. 32

**Legislative Materials**

H.R. REP. NO. 104-311 (1995)................................................................................ 9

H.R. REP. NO. 96-1430 (1980).............................................................................. 8

S. REP. NO. 104-176 (1995) ................................................................................. 9

**Federal Statutes**

49 U.S.C. § 10102(9)........................................................................................... 8

49 U.S.C. § 10501(b).......................................................................................... 4

49 U.S.C. § 10502 ............................................................................................ 11

49 U.S.C. § 10706(a)(3)(B)(ii)........................................................................... 15

49 U.S.C. § 10709 ........................................................................................... 11

49 U.S.C. § 10709(b)......................................................................................... 13

49 U.S.C. § 10709(c)........................................................................................ 13

49 U.S.C. §§ 10101-11908 ................................................................................. 3

**State Statutes**

5 ME. REV. STAT. ANN. §§ 205-A ............................................................ 42

ARIZ. REV. STAT. § 44-1412 ................................................................... 27

ARIZ. REV. STAT. §§ 44-1401 ................................................................. 20

ARK. CODE § 4-88-101 .......................................................................... 39

CAL. BUS. & PROF. CODE §§ 17200 ...................................................... 44

D.C. CODE § 28-3905(k)(1) ................................................................... 41

D.C. CODE §§ 28-3901 ......................................................................... 41

KAN. STAT. ANN. §§ 50-623 .............................................................. 39, 41

ME. REV. STAT. § 207 ........................................................................... 39

N.M. STAT. ANN. § 57-1-15 ................................................................. 27

N.Y. GEN.BUS.LAW § 349 ............................................................ 39, 42, 45

NEV. REV. STAT. § 598A.050 ............................................................... 27

OR. REV. STAT. §§ 646.605 ............................................................. 42, 46

R.I. GEN. LAWS §§ 6-13.1 ............................................................... 42, 46

W. VA. CODE § 47-18-16 ..................................................................... 27

W. VA. CODE §§ 46A-6-101 ................................................................. 42

**Rules**

Fed. R. Civ. Proc. 12(b)(1) ............................................................... 1, 41

Fed. R. Civ. Proc. 12(b)(6) ............................................................... 1, 41

Fed. R. Civ. Proc. 8(a)(2) .................................................................... 3

Fed. R. Civ. Proc. 9(b) ...................................................................... 31

**Treatises**

Moore's Federal Practice § 101.31 ..................................................... 16

Restatement (First) of Restitution ...................................................... 40

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company (collectively, "Defendants") hereby respectfully submit this Memorandum in Support of their Joint Motion to Dismiss the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

The Indirect Purchaser Plaintiffs' Consolidated Amended Complaint ("CAC") is largely a carbon copy of the allegations in the direct purchasers' consolidated amended complaint, with the addition of 61 boilerplate state law claims grouped into (1) state antitrust claims, (2) claims arising under state consumer protection or unfair competition statutes, and (3) unjust enrichment and disgorgement claims under federal and state common law. The CAC is burdened by the same fundamental flaws as the direct purchasers' complaint, and it also suffers from a variety of additional legal shortcomings.

*First*, for all the reasons discussed in Defendants' motion to dismiss the direct purchasers' claims, this CAC fails to adequately allege federal or state antitrust claims under the Supreme Court's decision in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007). *Second*, Plaintiffs' purported state law antitrust, consumer protection, and unjust enrichment claims are all preempted by federal law. *Third*, Plaintiffs lack standing under Article III of the United States Constitution to claim violations of the laws of states in which they do not reside or do business (which negates nearly all of their claims). *Fourth*, Plaintiffs have failed to allege facts demonstrating that they have "antitrust standing," that is, that they are the proper plaintiffs to bring antitrust claims under state antitrust and consumer protection laws. *Fifth*, Plaintiffs' unjust

enrichment and consumer protection claims fail on a number of additional grounds: (a) Plaintiffs cannot plead around the fatal defects in their legal claims by asserting an equitable theory of "unjust enrichment;" (b) Plaintiffs have failed to meet the federal pleading standard for claims involving alleged deception; and (c) they have failed to allege facts sufficient to meet the requirements of a number of the consumer protection statutes they invoke.

<strong>PLAINTIFFS' ALLEGATIONS</strong>

Plaintiffs' factual allegations are identical to those of the direct plaintiffs, and are summarized in Defendants' motion to dismiss the direct purchaser plaintiffs' complaint. *See* Memorandum in Support of Defendants' Motion to Dismiss Direct Purchaser Consolidated Amended Complaint, at Statement of Facts. The CAC names three plaintiffs that allegedly are indirect purchasers, and provides only limited information about each. Plaintiff Agway Liquidating Trust ("Agway") is a bankrupt agricultural cooperative headquartered in New York. It allegedly has been in the business of shipping farm products to storage facilities and "reshipping product from these storage facilities" to customers of Agway. CAC, ¶ 28. Plaintiff Fayus Enterprises ("Fayus") is a California corporation that allegedly "serves as a California-based wholesale and retail outlet for African and Caribbean food products." *Id.*, ¶ 29. Plaintiff Maroon Incorporated ("Maroon") is an Ohio corporation with offices in Ohio and Illinois that allegedly is in the business of shipping chemical products through customs clearance yards and storage facilities to its customers. *Id.*, ¶ 30.

With respect to each of these three named plaintiffs, the CAC contains only the general allegation that it "purchased unregulated rail freight transportation services indirectly from one or more of the Defendants during the Class Period, and paid Rail Fuel Surcharges indirectly to Defendants." *Id.*, ¶¶ 28-30. The CAC says nothing about the nature of the "freight

2

transportation services" that Plaintiffs allegedly purchased, from whom they were purchased, the amount and form of Plaintiffs' alleged payments, where the "transportation services" allegedly were provided, or which Defendants allegedly provided those services. These omissions alone constitute a failure to plead facts sufficient to establish antitrust standing, but that is only one of several such fundamental flaws in the CAC.

## ARGUMENT

### I.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED UNDER *TWOMBLY*

The CAC does not satisfy the pleading requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure. In their motion to dismiss the direct purchasers' claims, Defendants discuss at length why the allegations fail to satisfy the Rule 8 pleading standards articulated by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007), and incorporate those arguments here. *Twombly* applies not only to the indirect purchasers' federal claims under Sherman Act Section 1, but also to Plaintiffs' state law claims. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1025 (N.D. Cal. 2007) ("*GPU*") (applying *Twombly* to dismiss federal and state claims because "[f]ederal pleading standards govern in federal court, even as to state claims"). The CAC is deficient for the same reasons that the direct purchasers' complaint fails: it contains the same conclusory allegations of a conspiracy, and alleges no additional specific facts suggesting a "preceding agreement" to fix fuel surcharges. It therefore should be dismissed.

### II.    PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED

Plaintiffs' claims under state antitrust laws, state consumer protection laws, and the common law of "unjust enrichment" are all expressly preempted by federal law. In the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (1995), Congress gave

the Surface Transportation Board ("STB" or "Board") "exclusive" jurisdiction over rail

transportation, including particularly remedies for railroads' "rates, classifications, rules . . .

[and] practices."  49 U.S.C. § 10501(b).  Specifically, Section 10501(b) provides:

> The jurisdiction of the Board over —
>
> > (1) transportation by rail carriers, and the remedies provided in this
> > part with respect to rates, classifications, rules (including car
> > service, interchange, and other operating rules), practices, routes,
> > services and facilities of such carriers; and
> >
> > (2) the construction, acquisition, operation, abandonment, or
> > discontinuance of spur, industrial, team, switching, or side tracks,
> > or facilities, even if the tracks are located, or intended to be
> > located, entirely in one State,
>
> is exclusive.  Except as otherwise provided in this part, the remedies
> provided under this part with respect to regulation of rail transportation are
> exclusive and preempt the remedies provided under Federal or State law.

As courts have repeatedly observed, "'[i]t is difficult to imagine a broader statement of

Congress's intent to preempt state regulatory authority over railroad operations'" than this

statutory provision.  *City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998)

(quoting *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga.

1996)).

   Plaintiffs' state antitrust, consumer protection, and unjust enrichment claims indisputably

seek relief—damages for "excessive" railroad rates—that cuts to the heart of the economics of

the railroads' operations.  It is difficult to conceive of a more obvious conflict with the STB's

exclusive jurisdiction over such matters.  Moreover, the statute specifically provides that the

"remedies provided [in Title 49, Part A—Rail] with respect to rates, classifications, rules . . .

[and] practices" are "exclusive."  Plaintiffs' state antitrust, consumer protection, and unjust

enrichment claims seek remedies related to Defendants' fuel surcharges—*i.e.*, Defendants'

"rates" and "practices"—outside of Title 49.  Accordingly, those claims are expressly preempted

by the ICCTA.

Plaintiffs cannot avoid ICCTA preemption by invoking any presumption against federal preemption of state law. The touchstone of preemption analysis is Congressional intent. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Congress' intent to preempt state law primarily is discerned from the language of the statute, but the structure and purpose of the statute as a whole are also relevant. *Id.* at 486.[1] While there is generally a presumption against preemption, *id.* at 485, "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). Given the lengthy and pervasive history of federal regulation of the railroad system, there is no presumption against preemption in this case. *See*, *e.g.*, *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005) (citing *Locke*, 529 U.S. at 107); *CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 648 (E.D. Mich. 2000) ("There can be no doubt that just as Congress has regulated ships and vessels since the beginning of the Republic, it has similarly done so with respect to our Nation's rail system.").

### A. Preemption Of State Law Has Long Been An Element Of Federal Regulation Of The Rail Industry

Congress has extensively regulated the nation's railroad system for well over a century. *See Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives Ass'n*, 491 U.S. 490, 510 (1989). In fact, "'[t]he [Interstate Commerce Act of 1887 ("ICA"), Pub. L. No. 49-104, 24 Stat. 379

---

[1] State law may be preempted by federal law where Congress' preemptive intent is expressly stated in a statute, where the state law conflicts with federal law, or where federal law so occupies a legislative field that the court can infer that Congress left no room for the state to supplement it. Because ICCTA preemption is so express and clear-cut in the statute, courts generally do not reach the other grounds for preemption. *See, e.g.*, *City of Auburn*, 154 F.3d at 1031 n.7 (unnecessary to apply conflict preemption or field preemption analysis because Congress explicitly preempted state and local laws at issue). In this case, the history of the federal regulatory scheme governing interstate rail transportation provides as much support for a finding of field preemption determination as for a finding of express preemption.

(1887)], . . . which, as amended, still governs federal regulation of railroads, has been recognized as 'among the most pervasive and comprehensive of federal regulatory schemes.'" *City of Auburn*, 154 F.3d at 1029 (quoting *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981)).

It has long been understood that the application of state law to the rail system would, in many instances, undermine the federal regulatory scheme. *See Texas & P. Ky. Co. v. Abilene Cotton Oil Co*., 204 U.S. 426, 428 (1907) (exclusive authority of ICC to regulate rates preempted state and federal common law actions challenging the reasonableness of rail rates). Because state statutes often "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in regulating the railroad system, courts "have frequently invalidated attempts by the States to impose on common carriers obligations that are plainly inconsistent with the plenary authority of the [federal regulators] or with congressional policy as reflected in the [ICA]." *Kalo Brick*, 450 U.S. at 318 (internal quotation marks and citations omitted).

By the late 1970s, Congress realized that the extensive federal regulatory system was crushing the effectiveness and competitiveness of the rail industry. In response, it took initial steps to deregulate the rail industry in the Railroad Revitalization and Regulatory Reform Act of 1976. Pub. L. No. 94-210, 90 Stat. 31 (1976). Then, in the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 194 (1980), Congress significantly deregulated the industry. But, in doing so, Congress made clear that it had no intention for federal deregulation to provide an avenue for state law to be used to regulate railroads. The Staggers Act explicitly provided that federal jurisdiction over "transportation by rail carriers, and the remedies provided in [Title 49] with respect to the rates, classifications, rules, and practice of such carriers, is exclusive." *G. & T.*

*Terminal Packaging Co. v. Consolidated Rail Corp.*, 830 F.2d 1230, 1234 (3d Cir. 1987).

Although states continued to have some authority over *intrastate* rail transportation, state

regulatory commissions could continue to regulate on an intrastate basis only if they applied

federal standards. *See ICC v. Texas*, 479 U.S. 450, 452-54 (1987). States had no independent

authority over rail rates and practices, including fuel surcharges: "States are precluded from

authority over general rate increases, inflation-based increases and fuel adjustment surcharges."

H.R. REP. NO. 96-1430, at 83 (1980). This was true whether the state regulation came from a

state regulatory agency or resulted from a suit at common law. *Id.* at 106 (no common law

remedies available); *G. & T.*, 830 F.2d at 1235 (common law remedies preempted for exempt

traffic).

      Congress culminated this process of deregulation in the ICCTA. The ICC was terminated

and replaced by the STB. The regulatory authority of state and local governments over rail

operations was terminated. As the House Report explained,

> The bill is intended to standardize all economic regulation (and
> deregulation) of rail transportation under Federal law . . . . [Revised
> Section 10501] reflect[s] the direct and complete pre-emption of State
> economic regulation of railroads. . . . Although States retain the police
> powers reserved by the Constitution, the Federal scheme of economic
> regulation and deregulation is intended to address and encompass all such
> regulation and to be completely exclusive. Any other construction would
> undermine the uniformity of the Federal standards and risk the
> balkanization and subversion of the Federal scheme of minimal regulation
> for this intrinsically interstate form of transportation.

H.R. REP. NO. 104-311, at 95-96 (1995)).

      Likewise, the Senate Report explained,

> The railroad system in the United States is a nationwide network. The
> hundreds of rail carriers that comprise the railroad industry rely on a
> nationally uniform system of economic regulation. Subjecting rail carriers
> to regulatory requirements that vary among the States would greatly
> undermine the industry's ability to provide the "seamless" service that is

essential to its shippers and would waken [sic] the industry's efficient and competitive viability.

S. REP. NO. 104-176, at 6 (1995).

Thus, former Section 10501(c), which had expressly reserved the power in the states to regulate intrastate transportation, was eliminated. Also eliminated was former Section 10103, which had stated that the federal remedies provided in the ICA were "in addition to remedies existing under another law or at common law." Finally, the express preemption provision of the Act, Section 10501(b), was strengthened. As amended by the ICCTA, it now provides that the STB's jurisdiction over rail "transportation" is exclusive. "Transportation" for purposes of Section 10501(b) is broadly defined to include any services related to the movement of property by rail. 49 U.S.C. § 10102(9). Section 10501(b) also provides that the remedies provided in the Act "with respect to rates, classifications, rules . . ., practices, routes, services, and facilities of [rail] carriers" are "exclusive." Further, those remedies "preempt the remedies provided under Federal or State law."

The ICCTA preempts not only traditional state economic regulation, but also all state laws, including both common law and statutory law, whose application would impinge on a railroad's economics or operations. *See*, *e.g.*, *City of Auburn*, 154 F.3d at 1031 (preempting application of state environmental laws to railroad construction project); *Friberg v. Kan. City S. Ry.*, 267 F.3d 439, 442 (5th Cir. 2001) (preempting application of common law nuisance claims and statutory anti-blocking statute to railroad crossing operations); *San Luis Cent. R.R. Co. v. Springfield Terminal Ry. Co.*, 369 F. Supp. 2d 172, 177 (D. Mass. 2005) (preempting state law tort and statutory claims regarding car service and car hire fees because an award of damages can "improperly serve to regulate rail transportation"); *Pejebscot Indus. Park v. Maine Central R.R.*, 297 F. Supp. 2d 326, 334 (D. Me. 2003) (preempting common law tort claims); *CSX Transp.*,

*Inc.—Pet. for Declaratory Order*, STB Fin. Dkt. No. 34662, 2005 WL 584026 at *6-7 (March 14, 2005) (preempting application of municipal law that would restrict railroad routing choices).

In sum, Congress has expressly and completely occupied the field of economic regulation of railroad rates and services. It has long sought uniform, national rules for rail carriers and has been clear during the process of deregulating railroads that it still intends to have a national regime. Permitting Plaintiffs' state law claims would undermine this Congressional intent because courts could become the arbiter of what types of "rates" and "practices" are acceptable under diverse and likely inconsistent state laws. As we discuss next, the ICCTA preempts the very kinds of claims asserted by Plaintiffs in this case.

### B.    The ICCTA Expressly Preempts Plaintiffs' Claims In This Case

In this case, Plaintiffs allege violations of 19 state antitrust laws and 16 consumer protection laws (inclusive of the District of Columbia) that may allow for recovery for antitrust violations, as well as "unjust enrichment" under state and federal common law. CAC, ¶¶ 122-65. Those claims indisputably concern railroad rates or practices—*i.e.*, Defendants' fuel surcharges. Plaintiffs claim an injury flowing from allegedly inflated surcharges (a component of a rate) and seek damages under state law that would require the court to decide what a "proper" rate or practice would have been in the absence of the alleged conspiracy.[2] However, Section 10501(b) could not be clearer. The Board's jurisdiction over "transportation by rail carriers, and the remedies provided in [Part A-Rail of Title 49] with respect to *rates* . . . [and] *practices*" is "exclusive" (emphasis added). Further, "the remedies provided under [Part A-Rail of Title 49]

---

[2] Plaintiffs' unjust enrichment claims are remedial claims that depend on Plaintiffs' first making a substantive demonstration that Defendants' rates or rate practices are "unjust" and should be remedied. Thus, for preemption purposes the analysis of these claims is identical to the analysis of Plaintiffs' state antitrust and consumer protection claims.

are exclusive and preempt the remedies provided under Federal or State law." Thus, insofar as Plaintiffs seek a remedy for Defendants' fuel surcharge rates or practices, they cannot invoke state law. They are limited to the remedies provided under Title 49.[3]

While Plaintiffs may claim that the remedies available to them to address rate and practice issues under Title 49 are inadequate and would prefer state antitrust and consumer protection remedies, the whole point of ICCTA preemption is to prevent the application of different state and local law to different railroads in different locations from undermining the uniformity of the federal regulatory scheme. H.R. REP. NO. 104-311, at 95-96 (1995). The fact that a complainant may disagree with the regulatory scheme that Congress created is irrelevant.

Central to the efficient operation of the national railroad network is the cooperation of each railroad in providing services to shippers beyond its own network. The United States Supreme Court has made clear that "antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation." *Verizon Commc'ns, Inc. v. Trinko, LLP*, 540 U.S. 398, 411 (2004). The Supreme Court also has noted that it was concerned that "antitrust

---

[3] Indirect purchaser plaintiffs do not have a remedy under federal antitrust law for damages, because of the operation of the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Given Congress' stated concern that state law not be permitted to balkanize the uniform, national rail system, allowing a state antitrust remedy where federal law allows none would be contrary to Congress' purpose in the ICCTA.

Other plaintiffs, however, may invoke federal antitrust law to obtain a remedy for alleged price fixing of fuel surcharges. Although a literal reading of Section 10501(b) could arguably support preemption of federal as well as state law, the courts and the STB have concluded that Congress did not intend to preempt other federal statutory law so long as that law could be harmonized with the ICCTA. *See, e.g., Tyrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001) (construing the ICCTA in harmony with the Federal Rail Safety Act); *CSX Transp., Inc.—Pet. for Dec. Order*, STB Fin. Dkt. No 34662, 2005 WL 1024490, *5 (May 3, 2005) (the ICCTA preempted city law that sought to govern rail movements of hazardous materials, even though other federal laws also applied, because "overlapping federal statutes . . . are to be harmonized, with each statute given effect to the extent possible").

plaintiffs may bring lawsuits throughout the Nation in dozens of different courts with different nonexpert judges and juries" resulting in inconsistent decisions that undermine an industry and the regulatory system. *Credit Suisse Secs. (USA) LLC v. Billing*, 127 S.Ct. 2383, 2395-98 (2007). These problems highlighted by the Supreme Court are particularly true here. For juries to use a patchwork of state antitrust laws to make findings about what the "but for" world should have looked like undermines the very network nature of this industry, the statutory framework, and the federal oversight by the STB. In the face of *Twombly*, this court should be ever more cautious in assuring that plaintiffs have more than conclusory allegations of conspiracy to survive a motion to dismiss.

By excluding from their complaint any state law claims for surcharges as applied to "rate-regulated" traffic, Plaintiffs acknowledge the preemptive effect of the STB's exclusive jurisdiction. They appear to believe, however, that they can nonetheless avoid the application of ICCTA preemption to what they characterize as "unregulated" traffic that has been exempted from regulation or that is subject to a private contract. CAC, ¶ 27. They are mistaken.

Plaintiffs cannot escape ICCTA preemption by limiting their claims for relief to what they characterize as "unregulated" traffic—that is, traffic that has been "exempted" from regulation by the STB (*see* 49 U.S.C. § 10502) or that is subject to a private transportation contract (*see* 49 U.S.C. § 10709). The courts and the STB have held that traffic that has been "exempted" from regulation by the STB is still subject to the STB's exclusive regulatory jurisdiction, even if no regulatory relief is available from the STB unless and until the STB revokes the exemption. *See, e.g., G. & T.*, 830 F.2d at 1234 (common law rate remedies preempted for exempt traffic). By the same token, where a railroad and its customer have chosen to bind themselves contractually for a period of time to particular rate and service terms, the

customer cannot invoke state law to obtain extra-contractual relief.  The STB retains its

exclusive jurisdiction over any non-contractual claims both during and after the pendency of the

contract.  *See PCI Transp., Inc. v. Fort Worth & W. Ry. Co.*, 418 F.3d 535, 545 (5th Cir. 2005)

(the ICCTA provides the exclusive remedy for "non-contractual relief" regarding railroad rates

and practices).

Even before passage of the ICCTA, the ICC and the Third Circuit in the *G. & T.* case

addressed the question whether the fact that the traffic in question had been exempted from

regulation meant that a disgruntled rail customer could bring a state common law rate case

against a railroad.  The ICC and the Third Circuit held that the customer could not bring such a

case.  830 F.2d at 1234-35.  Because the ICC continued to have exclusive jurisdiction, the

customer's only recourse  for its complaints about the railroad's rates was to file a petition with

the ICC to revoke the exemption and seek a remedy under Title 49.  *Id.*  That the customer might

have no remedy at all during the period of the exemption did not matter.  State law could not be

invoked to provide an alternative remedy for the railroad's rates and practices.  *Id.* at 1235-36.

*See also International Brotherhood of Teamsters v. ICC*, 921 F.2d 904, 910 (9th Cir. 1990)

(exempt traffic is still "subject to" ICC regulation); *Consolidated Rail Corp.—Pet. for Dec.*

*Order—Suspension of Service*, Ex Parte No. 346 (Sub-No. 14B), 1989 ICC LEXIS 143 (June 13,

1989) ("[A]n exemption under [then] 49 U.S.C. 10505 does not terminate ICC jurisdiction and

create a vacuum which State regulation may fill.")

State antitrust and consumer protection claims related to fuel surcharges on Section

10709 contract traffic are just as preempted as claims relating to exempt traffic.  It does not

matter that the STB has no regulatory authority over traffic moving pursuant to private contracts

for rail transportation and will not resolve disputes about transportation provided under such

contracts. *See* 49 U.S.C. § 10709(c). The unavailability of a regulatory remedy at the STB during the pendency of the contract provides no grounds for a customer to invoke non-contractual state law remedies. *See PCI Transp.*, 418 F.3d at 544-45 (the ICCTA provides the exclusive remedy for "non-contractual relief" regarding railroad rates and practices); *Port City Prop. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1188 (10th Cir. 2008) (dismissing tort claims and citing *PCI Transp.*, 418 F.3d at 545, for proposition that "ICCTA completely preempts non-contractual claims"). The terms of the contract delimit the railroad's duties. *PCI Transp.*, 418 F.3d at 541 (citing § 10709(b)). Any state law claim that would result in modification of the contract through an award of damages for an excessive rate is inconsistent with the federal scheme and therefore preempted. Non-contractual state law claims involving a railroad's "rates" and "practices" are just as preempted during the pendency of a Section 10709 contract as they are when that contract terminates and the traffic is once again subject to regulation.

It bears emphasizing that the ICCTA and the case law interpreting it draw a clear distinction between the STB's regulatory *authority* and its exclusive *jurisdiction*. Even if the STB lacks authority to provide a remedy in a particular area of railroad operations, it still has exclusive jurisdiction over those activities, resulting in preemption of inconsistent state or local law. *See Port City Properties*, 518 F.3d at 1189 (STB had exclusive jurisdiction "over the construction, operation and abandonment of spur or industrial lines, thereby precluding state regulation," even though Congress "specifically withdrew regulation of such lines from the STB"); *Flynn v. Burlington Northern S.F. Corp.*, 98 F. Supp. 2d 1186, 1189-90 (E.D. Wash. 2000); *Cities of Auburn and Kent*, 2 S.T.B. 330, 1997 WL 362017, at *7 (1997). ICCTA preemption applies regardless of whether there is a perceived gap in the STB's regulatory

authority. *See, e.g., Borough of Riverdale—Pet. for Dec. Order—New York S. & W. Ry. Corp.*, 4 S.T.B. 380, 1999 WL 715272, at *4 (Sept. 9, 1999) (discussing cases).

There is nothing novel about the idea that when Congress expressly decides to completely or partially deregulate an industry, it means it—and it does not intend state or local authorities or private parties to attempt to fill the "void" with state law. *See, e.g., Rowe v. New Hampshire  Motor Transp. Ass'n*, 128 S. Ct. 989 (1993) (federal statute that prohibits states from enacting laws "relating to" a motor carrier "price, route or service" preempted a state law imposing requirements for the delivery of tobacco products); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988) (preempting application of state securities laws to natural gas companies); *Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409, 425 (1986) (preempting state regulation of natural gas prices); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 225 (2d Cir. 2008) (Airline Deregulation Act of 1978 preempted New York airline passenger "Bill of Rights").

Most specifically, the history of fuel surcharge regulation underscores the point that Congress did not intend state law to be used to regulate fuel surcharges.  Prior to passage of the Staggers Act, the ICC had significantly greater control over railroads' fuel surcharge practices. *See, e.g., Effect of Modifying Proclamation No. 3279 and Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject to the Interstate Commerce Act*, Ex Parte No. 311, 350 I.C.C. 563, 1975 ICC LEXIS 27 (August 14, 1975) (detailing conditions under which railroads and other common carriers could deviate from published rate tariffs to impose fuel surcharges).  In reducing the ICC's regulatory authority, Congress made clear even then that "[s]tates are precluded from authority over . . . fuel adjustment surcharges."  H.R. REP. NO. 96-1430, at 83.  If there was a question after passage of the Staggers Act about whether the

preemptive effect of Section 10501 was limited to traditional state economic regulation, there was none after passage of the ICCTA. The language of the ICCTA swept all "remedies" for "rates" and "practices" into the STB's exclusive jurisdiction and eliminated the catch-all savings clause for "remedies existing under another law or at common law." The limited regulatory authority that the STB continues to have over fuel surcharge rates or practices is all that can be invoked by a disgruntled state, local, or private party.[4]

In sum, the indirect purchaser plaintiffs cannot invoke state antitrust and consumer protection laws, or the common law of "unjust enrichment," as remedies for alleged price fixing of Defendants' fuel surcharges. The plain language of the ICCTA preempts the use of state law where such use would interfere with the exclusive federal control over railroad rates and practices. Resolution of Plaintiffs' claims would require the application of differing state antitrust and consumer protection laws to decide what Defendants' prices should have been "but for" the alleged conspiracy. That is the essence of economic regulation. Furthermore, given the dozens of state antitrust, consumer protection, and unjust enrichment laws, there is a significant risk that fuel surcharges and rate-making practices could be deemed acceptable in one state but illegal in another. That is exactly the kind of balkanization that Congress has long sought to

---

[4] Plaintiffs may point to 49 U.S.C. § 10706(a)(3)(B)(ii) as an indication that Congress did not intend to preempt state antitrust claims against railroads. That section provides that evidence related to communications on interline matters may not be used to infer a violation of the law "in a proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of [federal antitrust laws] or of any similar State law." Whether Congress actually intended to save all state antitrust laws from preemption under any circumstances does not, however, undermine Defendants' argument in this case. Defendants simply contend that state antitrust law is preempted as it is invoked in the present case by the indirect purchasers to obtain a damages remedy for the payment of allegedly unlawful rates.

avoid and expressly prohibited in the ICCTA.[5]  Accordingly, all of plaintiffs' claims should be dismissed as a matter of law.

### III.    PLAINTIFFS HAVE NO CONSTITUTIONAL STANDING TO RAISE MOST OF THEIR STATE LAW CLAIMS

Plaintiffs lack standing under Article III of the United States Constitution to pursue any antitrust, consumer protection, and unjust enrichment claims arising under the laws of any state other than the three states in which Plaintiffs allegedly reside: California, Illinois, and New York. This is because Plaintiffs cannot claim to have suffered injury in states in which they do not reside or have not purchased rail freight services indirectly.

Every plaintiff bears the burden of demonstrating standing to sue, which includes establishing that the plaintiff personally suffered injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Without an injury-in-fact to the plaintiff that is fairly attributable to the defendant's allegedly unlawful conduct, there is no justiciable case or controversy under Article III.  *Id.*  A plaintiff must demonstrate standing with respect to each legal claim brought in a complaint.  *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987); *see also* MOORE'S FEDERAL PRACTICE § 101.31.

Here, Plaintiffs lack standing to bring nearly all of their state law claims.  To illustrate, Plaintiffs assert a claim under the Arizona antitrust statute, ARIZ. REV. STAT. §§ 44-1401, *et seq.*, at CAC, ¶ 123, but nowhere do Plaintiffs allege that they (1) personally suffered injury in

---

[5] Settled Commerce Clause jurisprudence provides further support for Defendants' position. Under the Commerce Clause, the courts have long recognized that "the states have not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need for national uniformity, demand that their regulation, if any, be prescribed by a single authority.  Whether or not this long-recognized distribution of power between the national and state governments is predicated upon the implications of the commerce clause itself, or upon the presumed intention of Congress, where Congress has not spoken, the result is the same."  *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 767-78 (1945) (citations omitted).

Arizona, (2) reside in Arizona or (3) purchased rail freight services indirectly in Arizona.  The same is true with respect to all of the other states except California, Illinois and New York.

Lacking any allegations of residence or purchases in any state other than California, Illinois and New York, Plaintiffs do not have standing to bring claims under any other state's laws.  Therefore, those claims must be dismissed.  *See GPU*, 527 F. Supp. 2d at 1026-27 (dismissing state law claims where no named plaintiff resided in those states); *Temple v. Circuit City Stores, Inc.*, No. 06-CV-5303, 2007 U.S. Dist. LEXIS 70747, at *27-29 (E.D.N.Y. Sept. 25, 2007) (dismissing non-Tennessee state law antitrust claims because the Tennessee plaintiffs did not reside or purchase in those other states); *In re Ditropan XL Antitrust Litigation*, No. 06-01761, 2007 WL 1411617, at *6-7 (N.D. Cal. May 11, 2007) (dismissing state law antitrust claims where none of the named plaintiffs resided or purchased drug in those states); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1371-72 (S.D. Fla. 2001) (same).

Use of the class action device does not change this result.  Class actions are a creature of procedure and do not serve to enlarge Plaintiffs' rights.  To demonstrate standing, named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *See Warth v. Seldin*, 422 U.S. 490, 502 (1975); *see also Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982); *Griffin*, 823 F.2d at 1483 ("[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.").  This rule is confirmed in the cases cited above in which numerous courts in multi-state class actions have dismissed

claims where, as here, named plaintiffs have purported to assert claims under the laws of states in which they did not reside or make purchases.

Plaintiffs appear to recognize the need to include named plaintiffs who actually have standing for all of the claims. *See* CAC, ¶ 47 and n.1 (plaintiffs "reserve the right . . . to add additional plaintiffs at the time of the motion for class certification"). However, promising to add plaintiffs in the future does not satisfy their burden to establish standing at the pleading stage. *Warth*, 422 U.S. at 518 (affirming dismissal of complaint that failed to allege facts demonstrating the "threshold requirement" of standing).

Plaintiffs' allegations fail to establish standing under any state laws other than those of California, Illinois, and New York. Therefore, all claims under the laws of Arizona, Arkansas, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin should be dismissed for lack of subject matter jurisdiction.

## IV.    PLAINTIFFS HAVE FAILED TO PLEAD FACTS SHOWING THAT THEY HAVE STANDING TO BRING PRICE FIXING CLAIMS UNDER FEDERAL AND STATE ANTITRUST AND CONSUMER PROTECTION LAWS

### A.    Plaintiffs Have Not Pled Facts To Support Antitrust Standing

As indirect purchasers of rail freight transportation services, Plaintiffs lack standing to assert price fixing claims for damages under federal antitrust law. *See Illinois Brick*, 431 U.S. at 746 (only direct purchasers have standing). However, states may confer standing on indirect purchasers under their own antitrust laws. *California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989). Plaintiffs are proceeding under the antitrust laws of 19 jurisdictions (18 states and the District of Columbia), presumably on the ground that those jurisdictions allow indirect purchaser

actions.

However, the fact that a state has permitted indirect purchaser suits does not mean that any plaintiff who claims to be an indirect purchaser automatically has standing to bring an antitrust claim. Rather, a state's "repeal" of *Illinois Brick* merely means that status as an indirect purchaser does not, by itself, disqualify a plaintiff as it would under federal law. Such plaintiffs must still establish antitrust standing. One important dimension of antitrust standing incorporates the concept of proximate cause and precludes suits by persons whose injuries are too remote from the violation or for whom proof of injury is likely to be speculative. *See generally Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"); *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1089-93 (N.D. Cal. 2007) ("*DRAM I*"). Thus, even in a state that has rejected the rule of *Illinois Brick*, an indirect purchaser may lack standing to sue an alleged antitrust violator further up the chain of production or distribution because its alleged injury is too remote. *See DRAM I*, 516 F. Supp. 2d at 1087 (the question whether a state law allows indirect purchasers to sue and the question whether a plaintiff has antitrust standing "for a particular claim" are analytically distinct, and an affirmative answer to the former does not necessarily compel an affirmative answer to the latter); *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982) (recognizing that the blanket prohibition of *Illinois Brick* is a standing issue that is distinct from the question of "which persons have sustained injuries too remote [from an antitrust violation] to give them standing to sue for damages"); *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 195-96 (Iowa 2007) (state's rejection of *Illinois Brick* did not mean that prudential limits on antitrust standing no longer apply). Here, Plaintiffs have failed to allege facts sufficient to show

that they have antitrust standing under the federal Sherman Act or state antitrust and consumer

protection laws, and for that reason their complaint should be dismissed.

> **1.      Under the law of the states involved here, a plaintiff lacks standing if he or she is too remote from the antitrust violation**

The most widely accepted test of standing derives from the Supreme Court's decision in

*AGC. AGC* requires courts to consider several factors in determining whether a plaintiff has

standing to sue: (1) the nature of the plaintiff's injury; (2) the directness of the injury; (3) the risk

of duplicative recovery; and (4) the complexity of apportionment of damages.  459 U.S. at 538-

44.

The *AGC* standing requirements apply to Plaintiffs' Count I for injunctive relief under the

Sherman Act.  In ten of the states involved here, as well as the District of Columbia, courts have

also explicitly adopted the analysis of *AGC* in the context of claims brought by indirect

purchasers.[6]  Courts in California have looked to *AGC* as an appropriate test of antitrust standing

even if they have not explicitly held that *AGC* is the test.[7]

---

[6] *See Southard v. Visa U.S.A. Inc.*, 734 N.W. 2d at 198 ("We think the *AGC* test is more reflective of the legal context within which the Iowa legislature enacted Iowa's competition law. Therefore, we apply the *AGC* factors to determine whether the plaintiffs may recover under Iowa law."); *Wrobel v. Avery Dennison Corp.*, No. 05-CV-1296 (Kan. Dist. Ct. Feb. 1, 2006) ("the Court finds that this *AGC* standing test may be applied to this action even though the [state antitrust statute] specifically contemplated indirect purchaser suits") (cited in *DRAM I*, 516 F. Supp. 2d at 22); *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211 (D. Kan. 1999) ("standing under the Kansas antitrust statutes requires an antitrust injury similar to that required under the Sherman and Clayton Acts"), *aff'd, Orr v. BHR, Inc.*, 4 F. App'x 647, 651 (10th Cir. 2001) ("Because we conclude that plaintiff does not have antitrust standing under federal law, we similarly conclude that he does not have standing under Kansas law."); *Knowles v. Visa U.S.A., Inc.*, No. Civ. A CV-03-707, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004) ("It is probable that the Maine Law Court, if presented with this issue, would look to the [*AGC*] factors in determining standing under Maine's antitrust laws and would apply those factors except to the extent that those factors cannot be reconciled with the legislature's adoption of the *Illinois Brick* repealer."); *Stark v. Visa U.S.A., Inc.*, No. 03-055030, 2004 WL 1879003, at *2-3 (Mich. Cir. Ct . July 23, 2004) (applying *AGC* factors to determine standing under Michigan antitrust statute); *Kanne v. Visa U.S.A., Inc.,*\* 723 N.W.2d 293, 300 (Neb. 2006) ("the amendment to the remedial provision

While there is no judicial decision adopting or using *AGC* in the remaining states,

courts in those states no doubt would apply some prudential limitation on standing to ensure

that plaintiffs whose alleged injuries are too remote cannot bring an antitrust claim.  For

example, a decision in Tennessee approvingly cited federal and state cases dismissing antitrust

claims on the ground that the plaintiffs' injuries were too remote,[8] a decision in Mississippi

---

of the [state antitrust statute] does not reject all standing requirements . . . . To the contrary, [it] mirrors the equally broad working of the federal antitrust remedial statute . . ., pursuant to which courts uniformly impose standing requirements on antitrust damages actions") (citing *AGC*); *Crouch v. Crompton Corp.*, Nos. 02CV54375, 03CVS2514, 2004 WL 2414027, at 18 (N.C. Sup. Ct. Oct. 28, 2004) ("North Carolina courts would apply a multifactor test to determine standing in indirect purchaser cases.  The requirements would recognize indirect purchaser standing, but engraft upon the statute the requirements of standing enunciated in *AGC*, modified to recognize the right to recover for injury created by statute for indirect purchasers."); *Beckler v. Visa U.S.A., Inc.*, No. 08-04-C000030, 2004 WL 2115144, at *2-*3 (N.D. Dist. Ct. Aug. 23, 2004)  (citing *AGC* in support of finding that plaintiffs were not indirect purchasers for purposes of North Dakota law); *Cornelison v. Visa U.S.A., Inc.*, No. CIV 03-1350 (S.D. Cir. Ct. Sept. 29, 2004) (hearing transcript noting state trial court's bench ruling applying *AGC* and dismissing case for lack of standing) (cited in *DRAM I*, 516 F. Supp. 2d at 22); *Fucile v. Visa U.S.A., Inc.*, No. 51560-03, 2004 WL 3030037, at *3 (Vt. Super. Ct. Dec. 27, 2004) ("Although the Vermont Consumer Fraud Act has broader remedial purposes than federal statutes, the court nevertheless believes that the Vermont Supreme Court would also draw upon the standing factors in [*AGC*] for guidance, at least to the extent that these factors are consistent with allowing 'indirect purchaser' standing."); *Strang v. Visa U.S.A., Inc.*, No. 3CV011323, 2005 WL 1403769, at *3 (Wis. Cir. Ct. Feb. 8, 2005) (positing that Wisconsin appellate courts "would look to these [*AGC*] factors for guidance in assessing an indirect or remote purchaser's standing," and applying the factors); *In re Tobacco/Governmental Health Care Costs Litig.*, 83 F. Supp. 2d 125, 132 (D.D.C. 1999) (citing *AGC* in finding the plaintiff's alleged injuries too indirect to sustain the suit), *aff'd*, 249 F.3d 1068 (D.C. Cir. 2001).

[7] *In re Credit/Debit Card Tying Cases*, No. J.C.C.P. No. 4335, 2004 WL 2475287, at *3 (Cal. Super. Ct. Oct. 14, 2004); *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338 (Cal. Ct. App. 1995).  The *Credit Card* decision is unpublished, and therefore not citable as precedent.  A federal court in California, relying on *Vinci* and the Ninth Circuit's analysis of the California Cartwright Act in *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (2000), has concluded that California would apply the *AGC* test.  *DRAM I*, 516 F. Supp. 2d at 1088.

[8] *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*, No. W1999-01061-COA-R9-CV, 2000 WL 1390171, at *5 (Tenn. Ct. App. Sept. 26, 2000).

imposed its own prudential standing requirements,[9] and the Minnesota Supreme Court has required prudential limits informed by a number of factors, including remoteness.[10]

Further, the antitrust statutes of Arizona, Nevada, New Mexico, and West Virginia include harmonization provisions requiring that the statutes be interpreted in accordance with federal antitrust law,[11] and Mississippi has reached the same result by judicial decision.[12]  As the court in *DRAM I* held, "the antitrust statutes of these five states are to be applied with federal antitrust principles in mind," which means that "application of the *AGC* multi-factor test is appropriate in determining plaintiffs' antitrust standing."  516 F. Supp. 2d at 1095.

The first factor of the *AGC* test incorporates the important threshold requirement of antitrust injury.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136 (N.D. Cal. 2008) ("*DRAM II*").  In order to show antitrust injury and establish antitrust standing, a plaintiff must be a participant in the relevant market where the alleged antitrust injury took place.  *AGC*, 459 U.S. at 538-39.  Thus, "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *American Ad Mgmt. Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999).

Establishing standing generally, and antitrust injury specifically, is not a simple matter in many indirect purchaser cases.  In the *DRAM* litigation, for example, the plaintiffs, computer purchasers, alleged that the defendant manufacturers of dynamic random access memory

---

[9] *See Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 343-44 (Miss. 2004) (affirming, on remoteness grounds, summary judgment in favor of defendants on indirect state antitrust claim).

[10] *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 630-31 (Minn. 2007).

[11] *See* ARIZ. REV. STAT. § 44-1412; NEV. REV. STAT. § 598A.050; N.M. STAT. ANN. § 57-1-15; W. VA. CODE § 47-18-16.

[12] *Harrah's Vicksburg Corp. v. Pennebaker*, 812 So. 2d 163 (Miss. 2001).

(DRAM), had engaged in a horizontal price fixing conspiracy that resulted in higher prices for the computers in which DRAM was installed as a component. *DRAM I*, 516 F. Supp. 2d at 1081-82. In finding that the first *AGC* factor—the nature of the injury—weighed against plaintiffs' standing, the court pointed out that

> the market that plaintiffs allege as the source for the purportedly illegal price-fixing conspiracy was the general market for DRAM, a market that is distinct from the market for electronic products that include DRAM. As such, plaintiffs who are purchasing products in which DRAM is a component, rather than DRAM itself, are participating in a secondary market *that is incidental to the primary price-fixed market* (i.e., the market for DRAM modules themselves).

*Id.* at 1091 (emphasis added). The plaintiffs subsequently amended their complaint to allege explicitly that the markets for DRAM and for computers were "inextricably" linked in an effort to satisfy the requirement that plaintiffs be a participant in the same market in which the challenged conduct occurred. *DRAM II*, 536 F. Supp. 2d at 1140. However, the court again found that plaintiffs lacked standing:

> This conclusion is most consistent, in the court's view, with the existing legal precedent, which time and again has reiterated the "same market" language in discussing the market participation requirement . . . . Moreover, the court finds that a contrary conclusion runs the risk of opening the floodgates to potential litigation. In today's current business climate, and with increasingly globalized markets, nearly all markets that service one another can be said to be "related" to such a degree that the impact of one upon another could allegedly be "proven" with the use of econometrics. If such is the standard for market participation, it is difficult to imagine a scenario in which any two markets would not serve as the platform for a lawsuit similar to the instant one in the event of anticompetitive conduct, regardless whether the ultimately injured plaintiffs themselves have tenuous ties with the alleged malefactors and even the allegedly restrained market itself.

*Id.* at 1141.

Employing a similar analysis, the court in *Crouch*, 2004 WL 2414027, at *28, held that purchasers of tires lacked standing to bring price fixing claims against the manufacturers of

rubber chemicals used to make the tires. The court focused on the plaintiffs' remoteness from the markets in which the antitrust violations allegedly occurred:

> The antitrust laws are designed to see that customers *in the relevant market* get the benefit of price competition. This is a mixed case, as there are two relevant markets: the first is the market for chemicals, and the second is the market for rubber products indirectly affected by the artificial influence in the chemical market. As a purchaser at retail of a rubber product, Crouch is in a market secondarily affected by the restraint in the original chemical market. That is a complicating factor for standing.

*Id.* at *24 (emphasis added); *see also id.* at *26 (plaintiffs "did not make a purchase in [the relevant] market").

State courts similarly have found standing to be lacking in numerous cases brought by putative indirect purchasers against Visa and MasterCard. In these cases, customers of retail stores sued Visa and MasterCard alleging that the companies unlawfully required the stores to accept payment by debit card as a condition of accepting payment by credit card, leading the merchants to charge higher fees for debit card transactions which were passed along to their customers in the form of inflated prices for goods. Every court to have considered the issue has held that such purchasers are too remote under the *AGC* analysis. For example, in *Southard*, the court observed that the plaintiffs "did not purchase, directly or indirectly, the product that is the subject of anticompetitive activity by Visa and MasterCard." 734 N.W.2d at 196-97. Using the *AGC* framework, the court concluded that while the plaintiffs had alleged a "causal connection between the defendants' illegal conduct and the plaintiffs' alleged injuries," *id*. at 199, they were too remote from the conduct and had been injured too tangentially to qualify for antitrust standing. They were not consumers of the defendants' debit card services; their injuries were derivative of the injuries caused by the defendants' conduct; direct purchasers had already sued Visa and MasterCard; and determining damages would be speculative at best. *Id.*

**2.    The named plaintiffs have not pled facts sufficient to establish that they have standing**

In this case, Plaintiffs do not even approach providing sufficient allegations to demonstrate they are in the same market in which the alleged conspiracy occurred.  The complaint is vague—fatally so—on the question of how the three named plaintiffs purchased rail freight transportation services "indirectly" from defendants.  Plaintiffs, of course, have the burden of pleading facts that establish that they have antitrust standing.  *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) ("[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be.").  Plaintiffs cannot make vague allegations of standing and survive a motion to dismiss.  As the Supreme Court emphasized in *Twombly*, the obligation under Rule 8 to set forth facts showing an entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . .  *Factual allegations* must be enough to raise a right to relief above the speculative level . . . ."  127 S. Ct. at 1965 (emphasis added) (internal citation omitted).

Because freight transportation is a service rather than a physical product, this case differs markedly from the typical indirect purchaser action where the plaintiff buys at wholesale or retail either the same product that was the subject of the alleged price fixing conduct,[13] or, as is in several recent cases, a distinct finished product that incorporates an allegedly price-fixed

---

[13] *E.g.*, *Hyde v. Abbott Labs.*, 473 S.E.2d 680, 681 (N.C. App. 1996) (indirect purchasers alleged price fixing of infant formula); *Robinson v. EMI Music Dist.*, Civ. A. No. L-10462, 1996 WL 495551, at *1 (Tenn. Cir. Ct. July 8, 1996) (indirect purchasers alleged price fixing of compact discs); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 235 Cal. Rptr. 228, 230 (Cal. Ct. App. 1987) (indirect purchasers alleged price fixing of glass containers).

ingredient.[14]  In some cases, the link between the alleged conduct and the indirect purchasers'

alleged injury is easy to discern:  the plaintiff bought the same product that had been the subject

of a price fixing or other antitrust violation, albeit at a different level of the distribution chain,

and the overcharge was alleged to have been passed through from the original violator all the

way to the plaintiff as the product was sold and resold through the chain of distribution.

Here, it is not so clear.  Agway and Maroon allege that they are in the business of

shipping farm and chemical products, respectively, to various customs clearance yards and

transferring those products to storage facilities.  CAC, ¶¶ 28, 30.  They then assert, without

additional detail, that they purchased unregulated rail freight transport services "indirectly from

one or more of the Defendants" and paid fuel surcharges to these defendants that exceeded a

competitive level.  CAC, ¶¶ 28, 30, 112(a).  There is no telling from these allegations what

services were purchased, from whom, or when and how those purchases allegedly caused them

harm (*i.e.*, how they were injured from rail fuel surcharges).

Agway and Maroon's conclusory allegations that they are shippers who purchased rail

freight transportation services "indirectly" from Defendants are precisely the kind of "label[] and

conclusion[]," unsupported by factual allegations, that cannot carry the day to demonstrate

antitrust standing.  *Twombly*, 127 S. Ct. at 1965.  An indirect purchaser must identify facts that

affirmatively show it has standing to seek relief, and Agway and Maroon have not.

They do not allege any facts that suggest they participate in the relevant market for rail

transportation.  *See AGC*, 459 U.S. at 536.  Similarly, there are no facts that enable one to

---

[14] *E.g.*, *DRAM I*, 516 F. Supp. 2d at 1082 (plaintiffs purchased computers containing DRAM); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. M:07-CV-01819, MDL No. 1819, 2008 WL 426522, at *1 (Feb. 14, 2008) (plaintiffs purchased phones, routers, and other products containing SRAM); *Crouch*, 2004 WL2414027, at *1 (plaintiffs purchased tires containing rubber chemicals).

evaluate "the directness or indirectness of the asserted injury." *Id*. at 540. When "the chain of causation between the [plaintiffs'] injury and the alleged restraint in the market" contains "several somewhat vaguely defined links," standing is lacking. *Id*. Agway and Maroon do not even describe what that chain is, much less describe a chain that is sufficient to confer standing under *AGC*. *Cf. Crouch*, 2004 WL 2414027, at *24 ("The smaller the component, the less likely there will be impact on the final price. . . . There is also an additional question of the length of the distribution chain.").

Allegations of Fayus' indirect purchases are even more vague, and raise even more serious standing questions. Unlike Agway and Maroon, Fayus is not alleged to be a shipper, but instead a wholesale and retail outlet for African and Caribbean foods that serves restaurants and other foodservice establishments. CAC, ¶ 29. If Fayus claims that its injury arose from the purchase of products shipped by rail where the defendants charged a fuel surcharge, Fayus plainly lacks standing. If such remote purchasers had standing to assert a claim, Plaintiffs' purported class could potentially include every consumer in the country, as practically all consumers purchase some product that has been shipped at least in part by rail. Just as purchasers of products subject to Visa and MasterCard's tying policies were too remote from the antitrust violation, a purchaser of goods shipped by rail is too remote from any alleged antitrust violation by the railroads in conspiring on fuel surcharges. Such a purchaser can hardly be said to be a participant in the restrained market; tracing the pass-through of fuel surcharge overcharges through the chain of distribution to end consumers would be an impossible task; and enforcement of the antitrust laws will not suffer by the exclusion of Fayus because direct purchasers have already brought suit. There is no construction of the CAC under which Fayus has standing.

27

In sum, an antitrust complaint should not be permitted to proceed to discovery when the allegations do not "raise a claim of entitlement to relief." *Twombly*, 127 S. Ct. at 1966. Clearly, there is no entitlement to relief if there is no standing. Because none of the three plaintiffs has pled facts showing that it has antitrust standing under state law, the claims must be dismissed.

**B.      Plaintiffs Have Not Pled Facts To Support Standing Under State Consumer-Protection Statutes**

Plaintiffs also bring claims under the consumer protection and unfair competition statutes of 15 states and the District of Columbia. Courts in several states have applied the *AGC* factors to claims that in substance are antitrust claims, but that are brought under consumer protection or unfair competition laws. *See Kanne*, 723 N.W.2d at 301 ("[t]he standing requirements for an antitrust claim under the Consumer Protection Act should be the same as for an antitrust claim under the Junkin Act"); *New York v. Daicel Chem. Indus., Ltd.*, 840 N.Y.S.2d 8, 12 (N.Y. App. Div. 2007) (plaintiffs lacked standing under consumer protection law due to remoteness); *Teague v. Bayer AG*, No. 05-CV590, 2007 WL 2569668, at *5-11 (N.C. Super. Ct. May 7, 2007) (plaintiff who was too remote to bring claim under antitrust law was also too remote to bring the same claim under consumer protection law). This makes eminent sense: a plaintiff should not be excused from the antitrust standing requirement simply because they have labeled a traditional antitrust claim (such as price fixing) as a claim under a different state law. *Cf. Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. 1996) (plaintiffs could not circumvent limitations on antitrust claims by indirect purchasers by bringing the same claims under consumer protection statutes); *Abbott Labs. v. Segura*, 907 S.W.2d 503, 507 (Tex. 1995) (same). For the same reason that Plaintiffs have failed to plead standing under antitrust laws, they have failed to plead it under the consumer protection and unfair competition laws of these 16 jurisdictions.

**V.      PLAINTIFFS' STATE LAW CLAIMS ARE DEFECTIVE FOR MULTIPLE OTHER REASONS**

Defendants do not believe the Court will need to look beyond the *Twombly*, preemption, or antitrust standing analyses and into the particulars of any of the state law claims.[15]   However, Plaintiffs' state law antitrust claims (Count II), their state law consumer protection and unfair competition claims (Count III), and their unjust enrichment claims (Count IV) also fail to state viable legal theories for a host of additional reasons.   In the interests of thoroughness, Defendants address those alternative bases for dismissal below.

**A.      Plaintiffs' New York Common Law Restraint Of Trade Claim Must Be Dismissed**

Plaintiffs' allegation that Defendants have violated New York's "common law against restraints of trade," CAC, ¶ 155, should be dismissed because Plaintiffs cannot bring a class action claim under New York's *statute* prohibiting restraints of trade and there is no difference between the New York common law against restraints of trade and the New York antitrust statute, the Donnelly Act.  *E.g.*, *Harlem River Consumers Coop.*, *Inc. v. Associated Grocers of Harlem*, *Inc.*, 408 F. Supp. 1251, 1283 (S.D.N.Y. 1976); *Barns v. Dairymen's League Co-op. Ass'n*, 220 A.D. 624, 639 (N.Y. App. Div. 1927).  Because Plaintiffs cannot bring a class action under the Donnelly Act, *Asher v. Abbott Labs.*, 290 A.D.2d 208, 208 (N.Y. App. Div. 2002); *Cox v. Microsoft Corp.*, 290 A.D.2d 206, 206 (N.Y. App. Div. 2002) ("Private persons are *precluded* from bringing a class action under the Donnelly Act") (emphasis added), they have no claim under the purported common law of restraint of trade.   And, under the *Erie* doctrine, a federal court must follow this substantive limitation on New York's antitrust laws.  *United States v.*

---

[15] And, even if the Court were to reject those arguments, the only states' laws that would properly be at issue are California, New York, and Illinois.  As explained above in Part III, Plaintiffs lack constitutional standing to pursue claims under any other state's laws.  Nonetheless, in the interest of completeness, Defendants address all of the pled claims.

*Dentsply Int'l, Inc.*, Nos. CIV. A. 99-005, CIV. A. 99-255, CIV. A. 99-854, 2001 WL 624807, at

*16 (D. Del. Mar. 30, 2001); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 727 (D.

Md. 2001). Accordingly, Plaintiffs' New York "common law restraint of trade" claim must fail.

      **B.**    **Plaintiffs' Consumer Protection And Unfair Competition Claims Should Be Dismissed**

      In Count III, Plaintiffs purport to allege claims arising under a laundry list of 16 state

consumer protection and unfair competition statutes. In addition to the defects addressed above,

these claims also fail because: (1) Plaintiffs have failed to allege with specificity any deceptive

or fraudulent statements made by any Defendant, and therefore do not meet the pleading

requirements of Rule 9(b) to the extent they base their consumer protection claims on alleged

deception; (2) Plaintiffs are business entities, but seven of the consumer protection statutes they

cite expressly apply only to purchases for personal or home use; (3) Plaintiffs claim harm from

an alleged nationwide conspiracy affecting interstate commerce, but eight of the state consumer

protection statutes Plaintiffs assert only apply to conduct that is predominantly intrastate; and, (4)

Plaintiffs' claims fail to meet the specific standing and other requirements included in a number

of state statutory schemes.

      **1.**    **Plaintiffs fail to plead their claims with the requisite particularity**

      In Count III, Plaintiffs allege in summary fashion that Defendants' conduct "described

herein" constituted "unfair, unconscionable, deceptive or fraudulent acts or practices" in

violation of the consumer protection and unfair competition statutes of various states. CAC,

¶ 144. Other than this general reference, the only conduct allegation in Plaintiffs' consumer

protection claim is the general assertion that "[d]efendants mislabeled the Rail Fuel Surcharge

and misled Plaintiffs and the Class as the Rail Fuel Surcharge is a revenue enhancement measure

instead of a mechanism to recover fuel costs." CAC, ¶ 161.

The CAC is based upon an alleged price fixing conspiracy.  Yet, to the extent that Plaintiffs rest their consumer protection claims on an allegation of deceptive conduct, Plaintiffs' conclusory allegations fail to meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  This pleading requirement applies equally to consumer protection claims based upon alleged deception brought in federal court.  *See Witherspoon v. Philip Morris*, *Inc.*, 964 F. Supp. 455, 463-64 (D.D.C. 1997) (cited in *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 183 (D. Me. 2004)).[16]

"The particularity requirement of Rule 9(b) demands that the pleader specify what statements were made and in what context, when they were made, who made them, and the manner in which the statements were misleading."  *Intex Rec. Corp. v. Team Worldwide Corp.*, 390 F. Supp. 2d 21, 24 (D.D.C. 2005); *Antoine v. U.S. Bank Nat'l Ass'n*, No. 07-1518, 2008 U.S. Dist. LEXIS 32584, at *9 (D.D.C. Apr. 22, 2008).

Plaintiffs do none of that.  They do not even allege any particular deceptive statement, let alone the "who, what, when, where, and how" of any alleged unfair, deceptive, or fraudulent conduct.  Plaintiffs therefore fail to meet the requirements of Rule 9(b).

---

[16] *See also, e.g.*, *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1150 (D. Kan. 2003) (Kansas Consumer Protection Act); *Petri v. Gatlin*, 997 F. Supp. 956, 973 (N.D. Ill. 1997) (Illinois Consumer Fraud and Deceptive Business Practices Act); *Patel v. Holiday Hospitality Franchising. Inc.*, 172 F. Supp. 2d 821, 825 (N.D. Tex. 2001); *cf. Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004) (antitrust and RICO claims predicated on fraud subject to requirements of Rule 9(b)) (cited in *Bates v. Northwestern Human Servs.*, 466 F. Supp. 2d 69, 88 (D.D.C. 2006)); *accord United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (refusing to draw a "hairsplitting distinction" between "fraudulent" claims and "false" claims for purposes of Rule 9(b)).

Deception is a required element under the consumer protection laws of Arkansas,[17]

Kansas,[18] Maine,[19] and New York.[20] These claims should therefore be dismissed, as should the

claims under the consumer protection laws of California, District of Columbia, Florida, Illinois,

Nebraska, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, Vermont and

West Virginia, to the extent that Plaintiffs rely on deception to support them.[21]

---

[17] ARK. CODE § 4-88-101, *et seq.*; *see, e.g., Little Rock Elec. Contrs. v. Entergy Corp.*, 79 Ark. App. 337, 342 (Ark. Ct. App. 2002) (holding that liability under the ADTPA requires commission of "a deceptive *and* unconscionable trade practice") (emphasis added).

[18] KAN. STAT. §§ 50-623, *et seq.*; *see, e.g., Gonzales v. Assocs. Fin. Serv. Co.*, 967 P.2d 312, 328 (Kan. 1998) (holding that absent "deceptive or oppressive practices[,] overreaching, intentional misstatements, or concealment of facts, there is no claim under the KCPA").

[19] ME. REV. STAT. § 207, *et seq.*; *see, e.g., Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998) (explaining that even an unfairness claim related to price requires that the "price has had the effect of deceiving the consumer, or inducing her to purchase some that she would not otherwise purchase").

[20] N.Y. G.B.L. § 349, *et seq.*; *see, e.g., Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (failure to identify false or deceptive statement bars New York claims); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995) (explaining that to state a claim, plaintiff must allege "that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof").

[21] Plaintiffs do cite the January 25, 2007 decision of the Surface Transportation Board ("STB") finding that the railroads' practice of computing fuel surcharges "as a percentage of base rates" for regulated traffic was "unreasonable." *See Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007) (quoted in CAC ¶¶ 23-24, 103-06, 161.) That does not suffice for adequate pleading, for several reasons. Indeed, the STB itself explained that its decision should not be interpreted as "addressing any individual railroad's fuel surcharge program." *Id.* at 7-8 (emphasis added). Rather, the STB's decision applied on a *going forward* basis to a particular methodology of calculating fuel surcharges. The STB specially rejected shippers' requests to make its ruling retroactive "so as to allow them to obtain a remedy for what they perceive to be past overcharges." *Id.* at 10. Instead, the STB concluded that, "in view of the long history of rate-based fuel surcharges in the rail industry, we do not believe that railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible." *Id.* at 10 (emphasis added). A finding that the railroads "can[not] be faulted" for their fuel surcharge practices hardly substitutes for an allegation that such practices were fraudulent.

### 2. Plaintiffs rely on statutes that apply only to purchases of household goods or services

Even putting aside the lack of factual specificity, seven of the consumer protection statutes protect only individuals or consumers—not businesses. Plaintiffs are business entities that allegedly indirectly purchased rail freight transportation services, CAC, ¶¶ 1, 28-30, 159, and therefore can state no claim under those laws.

Courts in this district have rejected efforts by businesses to hijack such consumer protection laws, holding fast to both statutory text and legislative intent. *See*, *e.g.*, *Ulico Cas. Co. v. Prof'l Indem. Agency*, *Inc.*, No. 98-1018, 1999 U.S. Dist. LEXIS 8591, at *17 (D.D.C. May 5, 1999); *Mazanderan v. Indep. Taxi Owners' Ass'n*, 700 F. Supp. 588, 591 (D.D.C. 1988); *Independent Communc'ns v. MCI Telecomms.*, 657 F. Supp. 785, 787-88 (D.D.C. 1987).

In *Ulico Casualty*, for instance, the court held that an insurance company could not sue another insurance company over alleged unfair and deceptive business practices under the District of Columbia Consumer Protection Procedures Act, D.C. CODE §§ 28-3901, *et seq.* (which is one of the consumer protection acts that Plaintiffs seek to enforce (CAC, ¶ 147)). As the Court explained:

> The CCPA only provides a private cause of action for "consumers" who are injured as the result of an unfair trade practice. *See* D.C. CODE § 28-3905(k)(1) . . . . Furthermore, the CCPA limits "goods and services" to those items which are "primarily used for personal, household, or family use." *Id.* Ulico cannot characterize PIA's services as "goods or services" because underwriting is not the type of service "primarily used for personal, household, or family use."

*Ulico Casualty*, 1999 U.S. Dist. LEXIS 8591, at *17-18; *see also Mazanderan*, 700 F. Supp. at 591 ("It is difficult to understand how plaintiff, as a taxicab operator, fits under this conventional definition of consumer.").

Six other states' consumer protection acts contain similar restrictions:

- **Kansas.** The Kansas Consumer Protection Act, KAN. STAT. ANN. §§ 50-623, *et seq.*, applies only to "**an individual**, **husband and wife**, **sole proprietor**, **or family partnership who seeks or acquires property or services for personal**, **family**, **household**, **business or agricultural purposes**." *Id.*, § 50-624(b) (emphasis added); *see, e.g., Cit Group/Sales Fin. Inc. v. E-Z Pay Used Cars*, 29 Kan. App. 2d 676, 685 (Kan. Ct. App. 2001) (declining to apply the statute because protection "is not extended to individuals who promise performance of a corporation contracting with a supplier").

- **Maine.** The Maine Unfair Trade Practices Act, 5 ME. REV. STAT. ANN. §§ 205-A, *et seq.*, applies only to "any person who purchase or leases goods, services or property, real or personal, **primarily for personal**, **family**, **or household purposes**." *Id.*, § 213 (emphasis added); *see, e.g., Johnson v. Gahagan*, No. CV-00-576, 2001 Me. Super. LEXIS 53, at *13 (Me. Super. Ct. 2001) ("failure to allege that anything was purchased or leased from the Defendants for personal, family or household purposes is fatal to the UTPA claim").

- **New York.** The New York Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349, *et seq.*, is "intended to protect consumers, that is, those who purchase goods and services for personal, family or household use." *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 73 (N.Y. App. Div. 1st Dep't 2000) (declining to apply the statute where the alleged actions were directed only at prospective insurance agents, and not individual consumers). Thus, the New York consumer protection law applies only to conduct that is "consumer-oriented." *DRAM I*, 516 F. Supp. 2d at 1114.

- **Oregon.** The Oregon Unfair Trade Practices Act, OR. REV. STAT. §§ 646.605, *et seq.*, "applies only to goods or services which are or may be obtained **primarily for personal**, **family or household purposes**." *Id.*, § 646.605(6) (emphasis added); *see, e.g., Konecranes, Inc. v. Sinclair*, 340 F. Supp. 2d 1126, 1133 (D. Or. 2004) (declining to apply the statute because "**[f]ew families keep a construction crane in their backyard**") (emphasis added).

- **Rhode Island.** The Rhode Island Unfair Trade Practices & Consumer Protection Act, R.I. GEN. LAWS §§ 6-13.1, *et seq.*, applies only to "[a]ny person who purchases or leases goods or services **primarily for personal**, **family**, **or household purposes**." *Id.*, § 6-13.1-5.2 (emphasis added); *see, e.g., ERI Max Entm't v. Streisand*, 690 A.2d 1351, 1354 (R.I. 1997) (holding that a video store "plainly does not have standing" under the statute).

- **West Virginia.** The West Virginia Consumer Credit & Protection Act, W. VA. CODE §§ 46A-6-101, *et seq.*, applies only to a "natural person to whom a sale or lease is made . . . to a **natural person or persons for a**

**personal**, **family**, **household or agricultural purpose**." *Id.*, § 46A-6-102
(emphasis added); *see, e.g.*, *DRAM I*, 516 F. Supp. 2d at 1119 (declining
to apply the West Virginia statute to plaintiffs who purchased
semiconductor chips for manufacturing purposes).

As businesses, Plaintiffs cannot state a claim under these laws. Their vague and factually

unsupported allegations that some other unidentified persons suffered some unidentified

"consumer harm" do not change the result. Plaintiffs' claims brought under the consumer

protection laws of the District of Columbia, Kansas, Maine, New York, Oregon, Rhode Island,

and West Virginia must therefore be dismissed.

>    **3.    Many consumer protection laws Plaintiffs seek to
>           enforce apply only to commerce that is predominantly
>           intrastate**

Many of Plaintiffs' consumer protection claims fail for a separate reason—the statutes

address only conduct that is predominantly intrastate, rather than national in scope. Plaintiffs

allege that Defendants' conduct had, and continues to have, a substantial effect on interstate

commerce. CAC, ¶ 42. They do not, however, allege any *intrastate* effects resulting from

Defendants' conduct upon the commerce of any of the states under whose laws they plead. For

this reason, Plaintiffs fail to state consumer protection claims under the laws of California,[22]

Illinois,[23] Kansas,[24] New Hampshire,[25] New York,[26] North Carolina,[27] and Oregon.[28] Those

claims must be dismissed. *See DRAM I*, 516 F. Supp. 2d at 1099.

---

[22] *Meridian Project Sys. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005).

[23] *See, e.g.*, *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005).

[24] *See, e.g.*, *Kluin v. Am. Suzuki Motor Corp.*, 56 P.3d 829, 839 (Kan. 2002).

[25] *See, e.g.*, *Mueller Co. v. United States Pipe & Foundry Co.*, No. CIV 03-170, 2003 WL
22272135 (D.N.H. Oct. 2, 2003); *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 504
(D.N.H. 1996).

[26] *See, e.g.*, *Goshen v. Mut. Life Ins.*, 774 N.E.2d 1190, 1195 (N.Y. 2002).

[27] *See, e.g.*, *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996).

4.    **A number of Plaintiffs' consumer protection claims should be dismissed on other grounds as well**

a.    **Plaintiffs have no class action claim for damages under the California Unfair Competition Law**

Plaintiffs assert a claim under California's Unfair Competition Law seeking damages. CAC, ¶ 146 & Prayer for Relief, ¶ C. However, "California law is clear that §§ 17200, *et seq.*, does not authorize a suit by a private party for damages." *Cacique, Inc. v. Robert Reiser & Co., Inc.*, 169 F.3d 619, 624 (9th Cir. 1999); *see also Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 10 Cal. Rptr. 2d 538, 550 (Cal. 1992); *Chatton v. Nat'l Union Fire Ins. Co.*, 13 Cal. Rptr. 2d 318, 330 (1992). Plaintiffs' damage claim under the California Unfair Competition Law must therefore be dismissed.

b.    **As none of Defendants' alleged conduct was directed toward them, Plaintiffs have no New York consumer protection claim**

Plaintiffs have no claim under New York G.B.L. § 349 because New York requires that consumer protection claims challenge only that conduct that is directed toward the plaintiffs. *See SRAM*, 2008 WL 426522, at *10-11.[29] The CAC contains no allegations of any dealings or statements directed toward Plaintiffs. Rather, as alleged, all conduct was directed toward

---

[28] *Julian-Ocampo v. Air Ambulance Network, Inc.*, No. 00-1262, 2001 U.S. Dist. LEXIS 10986, *17-18 (D. Or. July 27, 2001).

[29] *See also In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 614 (S.D.N.Y. 2005) (misrepresentations between two large companies "were not intended for diabetes patients, the ultimate consumers"); *Paltre v. General Motors Corp.*, 810 N.Y.S.2d 496, 498 (N.Y. App. Div., 2d Dep't 2006) (failure to inform New York consumers of a price fixing conspiracy was not actionable under Section 349 because "the alleged misrepresentations *were either not directed at consumers* or were not materially deceptive") (emphasis added); *St. Patrick's Home for the Aged & Infirm v. Laticrete Int'l*, 696 N.Y.S.2d 117, 622 (N.Y. App. Div., 1st Dept. 1999) (where there is no allegation of deceptive action taken towards the ultimate consumer, the claims must be dismissed).

Defendants' customers, the direct purchasers, and not toward any of the indirect purchasers. Plaintiffs' New York consumer protection claims must therefore be dismissed.

> **c.  Plaintiffs have no consumer protection claim based upon alleged antitrust violations under the laws of Illinois, Oregon or Rhode Island**

In three states, Plaintiffs cannot bring consumer protection claims based upon alleged antitrust violations because they have no antitrust claim under state law. Courts in Illinois,[30] Oregon,[31] and Rhode Island[32] have held that plaintiffs may not bring antitrust claims masquerading as consumer protection claims. Plaintiffs have not asserted antitrust claims under the laws of these three states (because they have none), and they are precluded from asserting their antitrust theory in the guise of a consumer protection claim.

> **C.  Plaintiffs' Unjust Enrichment Claims Should Be Dismissed**
>
> **1.  Plaintiffs cannot evade the requirements of state and federal law by resort to the equitable doctrine of unjust enrichment**

In an apparent attempt to seek some insurance against the dismissal of their federal and state statutory claims, Plaintiffs assert vague claims for equitable relief under the heading of "unjust enrichment" purportedly based on federal common law and the laws of 26 states. This tactic must fail. Because Plaintiffs cannot state a statutory claim for relief, they also cannot state an unjust enrichment claim.

First, as to those states where indirect purchasers are barred from bringing claims under either the antitrust or consumer protection statute, such purchasers cannot make an "end run"

---

[30] *Gaebler*, 676 N.E.2d at 230 (plaintiffs could not circumvent limitations on antitrust claims by indirect purchasers by bringing the same claims under consumer protection statutes).

[31] OR. REV. STAT. § 646.605, *et seq.*; *see, e.g.*, *DRAM I*, 516 F. Supp. 2d at 1115 (noting that the Oregon consumer protection statute does not provide a cause of action for antitrust violations).

[32] R.I. GEN. LAWS § 6-13.1, *et seq.*; *see, e.g.*, *ERI*, 690 A.2d at 1354 (noting that the Rhode Island consumer protection statute does not provide a cause of action for antitrust violations).

around those prohibitions by invoking the common law of unjust enrichment.  As the Court in

*New Motor Vehicles* explained, permitting a claim for unjust enrichment where the defendants'

conduct could not be the subject of a claim under state antitrust or consumer protection law

"could result in restitution undermining another body of substantive law, to the extent that the

scope of antitrust laws and consumer protection statutes is designed to permit unfettered

economic activity in matters that are not within their proscription."  350 F. Supp. 2d at 209.  This

Court and other courts have held in accord.  *See In re Vitamins Antitrust Litig.*, MDL No. 1285,

2001 U.S. Dist. LEXIS 25072, at *33-35 (D.D.C. Mar. 13, 2001) (dismissing unjust enrichment

claim where plaintiffs lacked a remedy under Alabama's consumer protection statute); *see also*

*In re Microsoft Corp. Antitrust Litig.*, 241 F. Supp. 2d 563, 565 (D. Md. 2003) (dismissing unjust

enrichment claims under state antitrust and consumer protection statutes); *Terazosin*

*Hydrochloride*, 160 F. Supp. 2d at 1379-80 (unjust enrichment may not be used as an "end run"

around state statutes that preclude claims by indirect purchasers).

Second, even as to those states where indirect purchasers are permitted to bring antitrust

claims under state antitrust or consumer protection law, Plaintiffs here may not invoke an unjust

enrichment theory for all the same reasons their antitrust and consumer protection claims fail,

namely, they have failed to plead an agreement under the standards of *Twombly*, they have failed

to allege facts showing that they have antitrust standing, and they have failed to allege that they

are proper parties to sue under particular consumer protection statutes.  *See Kanne*, 723 N.W.2d

at 302-03 (dismissing indirect purchasers' unjust enrichment claim in *Illinois Brick* repealer state

where plaintiffs failed to state antitrust or consumer protection claims under *AGC*); *Southard*,

734 N.W.2d at 199 (same).  Like the indirect purchaser plaintiffs in *New Motor Vehicles*,

Plaintiffs merely allege that Defendants were "unjustly enriched through overpayments by

Plaintiffs and Class members" as a result of "conduct challenged in this Complaint" and request disgorgement into a constructive trust, from which putative class members may obtain restitution. Count IV, CAC, ¶¶ 162-65. In effect, then, Plaintiffs have brought antitrust claims in the guise of unjust enrichment claims. If pleading deficiencies bar those claims when brought under state antitrust and consumer protection statutes, they cannot obtain relief for the exact same claims merely by affixing a different label. As the court in *New Motor Vehicles* observed, "it would subvert the statutory scheme to allow these same indirect purchasers to secure, for the statutory violation, restitutionary relief." 350 F. Supp. 2d at 211.

> **2.    Plaintiffs have not alleged that they sought to rescind their indirect purchases and thus do not state a valid unjust enrichment claim**

Plaintiffs fail to state a valid unjust enrichment claim for another fundamental reason: they have not alleged that they ever sought to rescind any of their indirect purchases—a prerequisite for obtaining restitution. Unjust enrichment "does not furnish a basis for liability" where parties "voluntarily have negotiated, entered into and fully performed their bargain" with each other. *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 421 (D. Del. 2007) (quoting *New Motor Vehicles*, 350 F. Supp. 2d at 210). In *New Motor Vehicles*, the indirect purchaser plaintiffs claimed that car manufacturers and dealers conspired to keep lower priced Canadian-built automobiles out of the United States, thereby raising the prices of domestically built cars (that plaintiffs bought). 350 F. Supp. 2d at 210. The *Intel* plaintiffs alleged antitrust violations, claiming that defendant's conduct in the market for computer microprocessors was both anticompetitive and misleading. *Intel*, 496 F. Supp. 2d at 418. In dismissing their respective unjust enrichment claims, both the *New Motor Vehicles* and *Intel* courts drew guidance from the Restatement, which provides:

A person of full capacity who, pursuant to a contract with another, has

performed services or transferred property to the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, **unless the transaction is rescinded** for fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain.

RESTATEMENT (FIRST) OF RESTITUTION § 107(1) (emphasis added).  As with the car buyers who "paid their purchase prices and obtained their vehicles," and the computer buyers who "paid the purchase price for their computers and received their computers," Plaintiffs in this case have alleged that they paid for their (unspecified) products or services, but have not alleged that they ever sought to rescind any of those purchases.  *Compare Intel*, 496 F. Supp. 2d at 421; *New Motor Vehicles*, 350 F. Supp. 2d at 210.  Plaintiffs thus cannot invoke the doctrine of unjust enrichment, and their claim should be dismissed.

### 3.    Plaintiffs otherwise state no valid unjust enrichment claims

Plaintiffs' claims for unjust enrichment should be dismissed on additional grounds.  First, unjust enrichment claims require that the plaintiff bestow a "direct benefit" on the defendant.  *Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 186 (D.D.C. 2006).  However, by their nature, "indirect" purchasers do not enrich defendants "directly."  *In re Vitamins Antitrust Litig.*, MDL No. 99-197, 2001 WL 849928, at *9 (D.D.C. April 11, 2001); *see also In re Relefen Antitrust Litig.*, 225 F.R.D. 14, 24 (D. Mass. 2004) (citing *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 43-54 (D.D.C. 1999).

Second, Plaintiffs' claims purportedly brought under the federal common law should be dismissed.  "There is no federal general common law."  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  To the extent that there is any federal common law at all, such law exists only in a "'few and restricted' areas in which 'a federal rule of decision is necessary to protect uniquely federal interests, and those in which Congress has given the courts the power to develop

substantive law,'" such as in the field of admiralty, as it is for Congress and not the federal courts to create substantive federal law.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 741 (2004) (Scalia, J., concurring) (quoting *Texas Industries*, *Inc. v. Radcliff Materials*, *Inc.*, 451 U.S. 630, 640 (1981) (refusing to create a right to contribution under the federal antitrust laws)).  Unjust enrichment is a creature of state law, and Congress has created no federal cause of action for unjust enrichment.  Simply put, there is no basis for Plaintiffs to bring an unjust enrichment claim under the "federal common law."  *Accord New Motor Vehicles*, 350 F. Supp. 2d at 211, n.90 (refusing to recognize a cause of action for unjust enrichment under federal common law).

Finally, any doubt about the availability of equitable relief in this case should be resolved against Plaintiffs.  There is a presumption against granting equitable relief in cases like this, as "restitution and/or disgorgement on behalf of indirect purchasers will be denied absent express authority for such relief under state law."  *Mylan*, 62 F. Supp. 2d at 43.[33]  Thus, in the absence of specific state law authority for the equitable relief that plaintiffs seek, their "unjust enrichment" claim must be dismissed.

---

[33] Moreover, it is unlikely that there is even a cause of action for unjust enrichment under California law.  While there may be a split of authority in California courts as to this issue, *see*, *e.g.*, *GPU*, 527 F. Supp. 2d at 1029 (comparing *Melchior v. New Line Prods.*, *Inc.*, 106 Cal. App. 4th 779, 793 (2003), with *Ghirado v. Antonioli*, 14 Cal. 4th 39, 50 (1996)), given the presumption under *Mylan* and the absence of a clear California rule, Plaintiffs' unjust enrichment claims brought under color of California law should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that their Joint Rule 12(b)(1) and 12(b)(6) Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint should be granted.

Dated: May 30, 2008                    Respectfully submitted,


                                       /s/ Alan M. Wiseman
                                       Alan M. Wiseman (D.C. Bar # 187971)
                                       Joseph A. Ostoyich
                                       Peter A. Barile III
                                       HOWREY LLP
                                       1299 Pennsylvania Avenue, N.W.
                                       Washington, D.C. 20004

                                       Tyrone R. Childress
                                       David G. Meyer
                                       HOWREY LLP
                                       550 South Hope Street, Suite 110
                                       Los Angeles, CA 90071

                                       *Attorneys for Defendant Union Pacific Railroad Company*


                                       Richard J. Favretto
                                       Mark W. Ryan
                                       Gary A. Winters
                                       MAYER, BROWN LLP
                                       1901 K Street, N.W.
                                       Washington, D.C. 20006

                                       *Attorneys for Defendant BNSF Railway Company*


                                       Richard McMillan, Jr.
                                       Kent A. Gardiner
                                       Kathryn D. Kirmayer
                                       CROWELL & MORING LLP
                                       1001 Pennsylvania Avenue, N.W.
                                       Washington, D.C. 20004

                                       *Attorneys for Defendant CSX Transportation, Inc.*

John M. Nannes
Tara Reinhart
SKADDEN ARPS SLATE MEAGHER & FLOM
LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005

*Attorneys for Defendant Norfolk Southern Railway
Company*

**<u>CERTIFICATE OF SERVICE</u>**

I, David G. Meyer, an attorney, certify that on May 30, 3008, I caused true and correct copies of the foregoing Memorandum of Points and Authorities in Support of Defendants' Joint Rule 12(b)(1) and 12(b)(6) Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint to be filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to co-lead counsel for all plaintiffs.


                                          /s/ David G. Meyer