**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | |
| ——————————————— | MDL Docket No. 1869 |
| This document relates to: | Misc. No. 07-489 (PLF) |
| ALL CASES | |

**DIRECT PURCHASER PLAINTIFFS' OPPOSITION IN RESPONSE TO
DEFENDANTS' JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

THE COMPLAINT'S ALLEGATIONS ................................................................... 7

    A.    The Railroad Industry ................................................................... 7

    B.    Origins Of The Conspiracy ........................................................... 8

    C.    Publication of the AIILF and Fixing Surcharge Rates .................. 9

    D.    The Conspiracy Operates Successfully ....................................... 12

    E.    The STB Ruling .......................................................................... 14

ARGUMENT ......................................................................................................... 16

I.      NO HEIGHTENED PLEADING STANDARDS APPLY ............................. 16

II.     THE COMPLAINT ADEQUATELY ALLEGES AN UNLAWFUL PRICE-FIXING CONSPIRACY ............................................................................ 21

III.    THE COMPLAINT'S CONSPIRACY ALLEGATIONS ARE COHERENT AND PLAUSIBLE ............................................................................................ 29

    A.    The Creation and Adoption of the AIILF is Probative of the Conspiracy .......... 29

          1.    Defendants' Creation and Adoption of the AIILF was Key to their Price-fixing Conspiracy ....................................................... 29

          2.    Defendants' Agreement to Publish and Use the AIILF is Actionable Under the Sherman Act. ..................................... 31

          3.    Defendants' *Post Hoc*, Piecemeal Justifications for the AIILF are Unpersuasive ............................................................... 37

    B.    The Lockstep Fuel Surcharges of the Western and Eastern Railroads are Probative of the Conspiracy ................................... 41

          1.    The Complaint Explains How the Mechanisms and Timing of the Defendants' Lockstep Pricing Fit Within the Allegations of Conspiracy ........................................................................ 42

          2.    Defendants' Years of Lockstep Pricing Cannot Be Explained Away As Unilateral Conduct ............................................ 45

i

C.   Defendants' Numerous Breaks from Industry Practice Over a Short Period of Time Are Probative of Conspiracy ............................................... 51

D.   The Complaint's Allegations of Defendants' Other Conspiratorial Conduct Further Support the Plausbility of the Alleged Conspiracy ................................ 55

     1.   Industry Communications ........................................................ 56

     2.   Short-Term Contracts ............................................................. 58

     3.   Through Rates ....................................................................... 59

     4.   Advance Publication of Fuel Surcharges ............................... 60

     5.   Failure to Negotiate Fuel Surcharges ..................................... 61

     6.   Government Investigation ........................................................ 62

     7.   Market Share Stabilization ...................................................... 63

CONCLUSION ................................................................................................ 64

## TABLE OF AUTHORITIES

**Page**

### Cases

*\*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc,*
   525 F.3d 8 (D.C. Cir. 2008) ..................................................... 4, 17, 21, 27, 34, 50

*Am. Column & Lumber Co. v. U.S.,*
   257 U.S. 377 (1921) ................................................................................... 35

*Am. Tobacco Co. v. U.S.,*
   328 U.S. 781 (1946) ................................................................................... 36

*In re Automotive Refinishing Paint Antitrust Litig.,*
   229 F.R.D. 482 (E.D. Pa. 2005) ................................................................ 57

*In re Baby Food Antitrust Litig.,*
   166 F.3d 112 (3d. Cir. 1999) ................................................................49, 50

*Babyage.com, Inc. v. Toys "R" Us, Inc.,*
   Civ. Action No. 05-6792, 2008 WL. 2120493 (E.D. Pa. May 20, 2008) ........................28, 55

*Beach v. Atlas Van Lines,*
   Civ. Action No. 2:07-764-CWH, Order, (D.S.C. Mar. 31, 2008) ...................28, 48

*Behrend v. Comcast Corp.,*
   532 F. Supp. 2d 735 (E.D. Pa. 2007) .......................................20, 23, 28

*\*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007) ...............................................................................passim

*Brown v. Pro Football, Inc.,*
   518 U.S. 231 (1996) ................................................................................... 48

*Callahan v. A.E.V., Inc.,*
   947 F. Supp. 175 (W.D. Pa. 1996) ........................................................... 43

*In re Carbon Black Antitrust Litig.,*
   MDL No. 1543, 2005 WL. 102966 (D. Mass. Jan. 18, 2005) ............................ 57

*Cement Mfrs' Protective Ass'n v. U.S.,*
   268 U.S.588 (1925) ................................................................................... 35

*In re Citric Acid Litig.,*
   191 F.3d 1090 (9th Cir. 1999) ................................................................49, 50

*\*City of Moundridge v. Exxon Mobil Corp.,*
   No. 04-940, 2008 WL. 1735856 (D.D.C. April 16, 2008)................19, 20, 23, 25, 28, 38, 47

*Clamp-All Corp. v. Cast Iron Soil Pipe Institute,*
   851 F.2d 478 (1st Cir. 1988) ................................................................49, 50

*Conley v. Gibson*,
   355 U.S. 41 (1957) ............................................................................ 16

*\*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)............................................... 5, 17, 36, 38, 56

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990)........................................................ 61

*In re Copper Antitrust Litig.*,
   98 F. Supp. 2d 1039 (W.D. Wis. 2000) ..................................... 44

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
   504 U.S. 451 (1992)..................................................................... 38

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)........................................................... 26

*\*Erickson v. Pardus*,
   127 S. Ct. 2197 (2007) ..................................................4, 7, 16, 27

*Esco Corp. v. U.S.*,
   340 F.2d 1000 (9th Cir. 1965)..................................................... 48

*\*Fair Isaac Corp. v. Equifax Inc.*,
   2008 WL. 623120 (D. Minn. March 4, 2008) .....................19, 28, 52

*Fed. Trade Comm'n v. Pac. States Paper Trade Ass'n*,
   273 U.S. 52 (1927) ...................................................................... 35

*In re Fine Paper Antitrust Litig.*,
   685 F.2d at 822 ...............................................................5, 17, 38

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d. Cir. 2004) ....................................................... 57

*\*In re Graphics Processing Units Antitrust Litigation*,
   540 F. Supp. 2d 1085 (N.D. Cal. 2007) .....................28, 43, 47, 52

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002)....................................................... 63

*Hyland v. Homeservices of America, Inc.*,
   No. 05-612, 2007 WL. 2407233 (W.D. Ky. Aug. 17, 2007) .........20, 28

*In re Hypodermic Prods. Antitrust Litig.*,
   MDL No. 1730, 2007 WL. 1959224 (D.N.J. June 29, 2007) ...............18, 23, 28

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
   253 F. Supp. 2d 262 (D. Conn. 2003)........................................ 44

*\*Jung v. Ass'n of Am. Med. Colls.*,
   300 F. Supp. 2d 119 (D.D.C. 2004)...........................5, 17, 38, 53

*Jung v. Ass'n of Am. Med. Colls.,
    339 F. Supp. 2d 26 (D.D.C. 2004)..............................................................5, 36, 37

Kendall v. U.S.A., Inc.,
    518 F.3d 1042 (9th Cir. 2008)........................................................................26, 27

In re Late Fee and Over-limit Fee Litig.,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ............................................................... 27

In re Linerboard Antitrust Litig.,
    504 F. Supp. 2d 38 (E.D. Pa. 2007)...............................................................38, 48

Maple Flooring Mfrs.' Ass'n v. U.S.,
    268 U.S. 563 (1925)............................................................................................ 35

In re Mercedes Benz Antitrust Litig.,
    157 F. Supp. 2d 355 (D.N.J. 2001)................................................................26, 44

Moore v. Boating Indus. Ass'ns,
    819 F.2d 693 (7th Cir. 1987) .............................................................................. 35

In re Motor Fuel Temperature Sales Practices Litig.,
    534 F. Supp. 2d 1214 (D. Kan. 2008) ................................................................ 23

NCAA v. Board of Regents of Univ. of Oklahoma,
    468 U.S. 85 (1984) .............................................................................................. 35

National Soc'y of Prof'l Eng'rs v. U.S.,
    435 U.S. 679 (1978)............................................................................................ 35

In re Newbridge Networks Sec. Lit.,
    767 F. Supp. 275 (D.D.C. 1991) ........................................................................ 30

*In re OSB Antitrust Litig.,
    No. 06-826, 2007 WL. 2253419 (E.D. Pa. Aug. 3, 2007) ..............5, 18, 25, 28, 44, 47, 57, 61

Poller v. Columbia Broadcasting,
    368 U.S. 464 (1962)............................................................................................ 26

Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,
    971 F.2d 37 (7th Cir. 1992)................................................................................. 49

Schachar v. Am. Acad. of Ophthalmology, Inc.,
    870 F.2d 397 (7th Cir. 1989) .............................................................................. 35

*In re Southeastern Milk Antitrust Litig.,
    MDL No. 1899, 2008 WL. 2117159 (E.D. Tenn. May 20, 2008) ........5, 17, 20, 23, 28, 38, 53

In re Static Random Access Memory (SRAM) Antitrust Litig.,
    MDL No. 1819, 2008 WL. 426522 (N.D. Cal. Feb. 14, 2008)............................ 57

In re Tableware Antitrust Litig.,
    363 F. Supp. 2d 1203 (N.D. Cal. 2005) ............................................................. 62

*In re Travel Agent Comm'n Litig.*,
   MDL No. 1561, 2007 WL. 3171675 (N.D. Ohio Oct. 29, 2007)....................................27, 49

*U.S. v. Container Corp. of America*
   393 U.S. 333 (1969) ........................................................................................ 61

*U.S. v. Nat'l Ass'n of Broadcasters*,
   536 F. Supp. 149 (D.D.C. 1982)................................................................... 5, 34

*U.S. v. Patten*,
   226 U.S. 525 (1913)........................................................................................ 17

*U.S. v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)...................................................................................48, 51

*United States v. Yonkers Contracting Co., Inc.*,
   706 F. Supp. 296 (S.D.N.Y. 1989) ............................................................... 44

*In re Vitamins Antitrust Litig.*,
   No. 99-197 (TFH), 2000 WL. 1475705 (D.D.C. May 9, 2000)........................... 44

*In re Western States Wholesale Natural Gas Antitrust Litig.*,
   MDL No. 1566, Order, (D. Nev. Feb. 19, 2008).....................................28, 52, 53

## Statutes

15 U.S.C. § 1 ........................................................................................................ 16

49 U.S.C. § 10704 .................................................................................................. 8

49 U.S.C. § 10708 ................................................................................................ 40

49 U.S.C. § 10709 .................................................................................................. 8

Interstate Commerce Act, Ch. 104, 24 Stat. 379 (1887) ........................................ 15

ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (1995)............................. 15

Staggers Rail Act, Pub. L. No. 96-448, 94 Stat. 1895 (1980)................................. 7, 8

## Rules

*Fed. R. Civ. P. 8 .................................................................................4, 16, 17, 21, 23, 27, 38

## Other Authorities

*Rail Fuel Surcharges, STB Ex Parte No. 661 (January 25, 2007) ..........14, 15, 16, 39, 46, 47, 53

Direct Purchaser Plaintiffs respectfully submit this memorandum in opposition to the Joint Motion to Dismiss filed on May 30, 2008 by Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together, "Defendants"). For the reasons set forth below, Defendants' motion should be denied.

## PRELIMINARY STATEMENT

Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint" or "Compl.") sets forth in detail the price-fixing conspiracy orchestrated by the Defendant railroads, who together account for over 90 percent of the nation's rail freight shipments. The Complaint describes how Defendants agreed, and successfully implemented their joint plan, to make unprecedented and widespread use of stand-alone "rail fuel surcharges," which in fact were not correlated to actual fuel costs, as a means to broadly impose supracompetitive price increases for a period of almost four years or more.

The Complaint here is nothing like the complaint dismissed in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) – a complaint the Supreme Court said included no specific allegations of an actual agreement and "proceed[ed] *exclusively* via allegations of parallel conduct," *Twombly*, 127 S. Ct. at 1971 n.11 (emphasis added); *see also id.* at 1970 ("the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs").

Instead, the Complaint here details the specific agreements made by Defendants, when they were made, and why. The Complaint explains that, unlike in the past era of regulation, when railroads could apply to the former Interstate Commerce Commission for across-the-board rate increases, by 2003 the vast majority of rail freight was shipped pursuant to private contracts with individual customers. These private contracts typically included rate-escalation provisions

based on weighted cost-adjustment indexes that already accounted for any actual fuel cost increases. Those indexes were the All Inclusive Index of Railroad Input Costs ("AII"), published by the Association of American Railroads ("AAR") and the related Rail Cost Adjustment Factor ("RCAF"), based on the AII. As noted in the Complaint, Defendant UP's president admitted in 2004 that the RCAF cost-adjustment index "looks at actual costs through the industry."

While at least some of the Defendants had used stand-alone fuel surcharges prior to 2003, these were only used in isolated instances, and the railroads all used different methods of calculating the surcharges. As the Complaint points out, Defendant UP's president admitted that, prior to 2003, stand-alone fuel surcharges "were really non-existent."

The Complaint then sets forth that in mid-2003 the two major Western railroads (BNSF and UP) determined that they could increase profits by moving away from the then-prevailing AII and RCAF indexes (which only adjusted rates based on actual cost increases) and toward widespread use of separate fuel surcharges calculated as a percentage of the total base rate of the freight shipment (and thus not reflecting actual fuel costs). To facilitate this joint plan, BNSF and UP in mid-2003 brought their fuel surcharge programs into lockstep.

As the Complaint explains, however, BNSF and UP still faced a critical barrier to widespread imposition of the stand-alone fuel surcharges that were now in lockstep: the prevailing use in private contracts of the AII and RCAF indexes that already provided for the full recoupment of any actual fuel cost increases. As detailed in the Complaint, the four Defendants conspired together to solve this problem by causing the AAR – which the four Defendants control and dominate – to publish an entirely new cost-adjustment index excluding fuel as one of the weighted factors. During the Fall of 2003, including at AAR board meetings specifically identified by date in the Complaint, Defendants BNSF and UP, along with the two major Eastern

railroads, Defendants CSX and NS, agreed together to make possible the broad imposition of stand-alone fuel surcharges by creating a new All Inclusive Index *Less Fuel* ("AIILF"). The four Defendants used their control and domination of the AAR to cause the AAR to publish the new index in December 2003. The Complaint points out, among other things, BNSF's public admission in early 2004 that its chairman, president, and chief executive officer "led the charge" at the AAR on adoption of the new index.

Defendants further agreed to impose both the new AIILF and stand-alone fuel surcharges on their customers. Thus, by January 2004, one month after publication of the AIILF through the AAR, all Defendants had publicly announced their intent to begin to impose widely stand-alone fuel surcharges. Freight shipment customers could not refuse, because they had no choice. Defendants simultaneously eliminated any remaining competition in their fuel surcharge rates.

On the heels of the announcement of the new index without fuel, the two Eastern railroads, like the Western railroads before them, moved their stand-alone fuel surcharge rates into lockstep. Both the Eastern and Western railroads used the same complex methods to apply fuel to the overall cost of the freight transport and the same timetable for advance announcement of the fuel surcharges. For instance, Defendants all charged fuel surcharges that were a percentage of the total freight transport cost (and thus independent of actual fuel transportation costs); all established the same two-month time period following an increase to the fuel index to implement rate adjustments; all reported their fuel surcharges on their websites; and all adopted similar mechanisms for determining when and how their fuel surcharges would be calculated. Following adoption of the AIILF, the Eastern and Western railroad freight fuel surcharges remained in lockstep, respectively, through at least mid-2007.

The Complaint also details the Defendants' other collective action to facilitate and enforce implementation of the conspiracy. These include offering more shorter-term contracts than in the past, decreasing the use of so-called "through rates," and refusing to negotiate discounts or make other efforts to compete for market share.

The Complaint thus more than satisfies the applicable notice pleading requirements of Rule 8 – requirements that, as the Supreme Court and D.C. Circuit have both explained, remain unchanged by *Twombly*. *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (under Rule 8(a)(2), the complaint "need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests'") (quoting *Twombly*, 127 S. Ct. at 1964); *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.* ("*Aktieselskabet*"), 525 F.3d 8, 15 (D.C. Cir. 2008) ("We conclude that *Twombly* leaves the long-standing fundamentals of notice pleading intact.").

Defendants do not dispute that the Complaint provides adequate notice. Rather, Defendants employ two improper approaches. The first is overtly to mischaracterize the Complaint, asserting without any basis, for example, that the allegations are purely conclusory. The second is to try to defend particular alleged acts by improperly disaggregating what the Complaint alleges and offering piecemeal, *post-hoc* justifications. For example, Defendants now try to explain away their years of lockstep pricing as a function of "price matching and follow-the-leader pricing," (Defendants' Brief at 13),[1] simply disregarding the clear alleged connection between their lockstep pricing and their joint adoption of the new cost-adjustment index, excluding fuel, at the AAR. Similarly, Defendants' suggestion that they are being charged merely with "participation in trade association activities," (Defendants' Brief at 1), takes their

---

[1] As used herein, "Defendants' Brief" refers to the Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Docket No. 106).

conduct at the AAR out of the context of all of the related activity on fuel surcharges and enforcement of the agreed program.[2]

As this Court has observed, "allegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.'" *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 155 (D.D.C. 2004) (Friedman, J.) (quoting *In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 822 (3d Cir.1982)). *See also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.")[3] And with respect to trade organizations like the AAR, this Court has also noted that if a trade association takes action that is used "as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful." *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d 26, 37 (D.D.C. 2004). Furthermore, Defendants' additional argument, that the AIILF could not be part of a conspiracy because it was not "mandatory" or coercive, has no legal or factual foundation.[4]

---

[2]    Defendants also add to the mix a series of self-serving "factual" arguments that effectively ask this Court not to accept the Complaint's allegations as true – wholly inappropriate at the motion to dismiss stage, and all the more so here where Defendants have successfully argued that discovery should be stayed until this Court has ruled on the motion to dismiss.

[3]    As discussed below, post-*Twombly* rulings are to the same effect. *See, e.g., In re Southeastern Milk Antitrust Litig.*, MDL No. 1899, 2008 WL 2117159 at *7 (E.D. Tenn. May 20, 2008) (rejecting defendants' "attempt to parse and dismember the complaints"); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("an antitrust complaint should be viewed as a whole").

[4]    *See, e.g., U.S. v. Nat'l Ass'n of Broadcasters*, 536 F. Supp. 149, 163 (D.D.C. 1982) ("it is well established that the parties to an agreement which per se violates the antitrust laws may not defend on the basis that they have applied no coercion to bring about adherence to the combination or to compel obedience to its terms."); *id.* at 164 ("It is, indeed, difficult to see why legal unenforceability or lack of formal sanctions should be considered a valid defense.").

As discussed below, Defendants' motion to dismiss should thus be denied for the following reasons.

*First*, Plaintiffs allege the existence of an unlawful price-fixing conspiracy in considerable detail, providing Defendants ample notice of precisely what they are charged to have done, and satisfying – indeed, far exceeding – all applicable pleading standards.  Contrary to Defendants' claims, Plaintiffs' allegations are in no way "conclusory" or incoherent.  *See* Points I & II, *infra*.

*Second*, the Complaint's allegations of Defendants' use of the AAR to provide cover for entering into the conspiracy and fulfilling its objectives are fully sufficient to establish liability under the Sherman Act.  Defendants are not charged with merely participating in trade association activities, or innocently publishing a purely voluntary index.  Rather, Defendants are charged with working collectively through the AAR to implement a price-fixing agreement and agreeing to impose the AIILF and stand-alone fuel surcharges on their customers in a coordinated fashion.  *See* Point III.A, *infra*.

*Third*, the Complaint's allegations surrounding Defendants' years of lockstep pricing – which Defendants' own submissions confirm – firmly support the existence and plausibility of the alleged conspiracy.  Defendants improperly try to disaggregate their lockstep pricing from other allegations of their conspiratorial conduct.  Moreover, their current *post hoc* explanation that they engaged in purposeful "price matching" only underscores the plausibility of the conspiracy, particularly given their simultaneous advance communications of the fuel surcharges and pretextual justifications for their behavior.  *See* Point III.B, *infra*.

*Finally*, the Complaint contains numerous additional allegations further supporting the existence and plausibility of the alleged conspiracy that Defendants do not and cannot dispute –

including numerous breaks with industry practice by Defendants over a short period of time made to facilitate and enforce the conspiracy and actions that were against each railroad's independent self-interest, absent a conspiracy. Defendants' *post hoc* attempts to justify their actions disregard the totality of facts alleged in the Complaint and, for that reason and others, are unpersuasive. *See* Points III.C & D, *infra*.

## THE COMPLAINT'S ALLEGATIONS

Plaintiffs bring this action on behalf of themselves and a proposed nationwide class of entities (the "Class") who purchased rate-unregulated freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the "Class Period") and who were assessed a rail fuel surcharge. Plaintiffs seek treble damages arising from Defendants' agreement to fix prices of rail freight transportation services sold during the Class Period.

The Complaint alleges the following facts in detail to support its claim that Defendants engaged in unlawful concerted conduct under Section 1 of the Sherman Act.[5]

### A.    The Railroad Industry

For about 100 years, the Interstate Commerce Commission ("ICC") exercised almost total control over carrier rates and practices. (Compl. ¶ 49.) During this era, railroads generally charged only published tariff rates filed with the ICC. When railroads wanted a rate increase, they could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis. (*Id.* ¶¶ 48-49.)

In 1980, Congress passed the Staggers Rail Act ("Staggers Act"). Pub. L. No. 96-448, 94 Stat. 1895 (1980). The Staggers Act substantially deregulated the rail industry, giving railroads greater freedom to price their services and encouraging greater reliance on competition to set

---

[5]    "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 127 S. Ct. at 2200.

rates. Rail regulation today is overseen by the successor to the ICC, the Surface Transportation Board (the "STB"). *See* 49 U.S.C. § 10704. The Staggers Act, however, also for the first time permitted the railroads and their freight shipping customers to enter into private contracts that are not subject to rate review by the STB. 49 U.S.C. § 10709. Today, 80 percent or more of all rail shipments move under the private contracts that are not rate-regulated, or are otherwise exempt from rate regulation. (Compl. ¶ 50.)

Following the Staggers Act, the number of Class I railroads declined from 35 to just seven today (two of which are owned by Canadian entities). (*Id.* ¶ 51.) Four of these railroads – Defendants BNSF, UP, CSX, and NS – operate more than 90 percent of all railroad track in the U.S. (*Id.*) Given the high fixed costs in the railroad industry and the significant barriers to entry, there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible. (*Id.*)

### B.    Origins Of The Conspiracy

By the early 2000's, the railroads could no longer turn to some agency – like the previously-existing ICC or the STB – to obtain a percentage increase across their freight rates. (*Id.* ¶ 54.) Instead, to raise prices across-the-board, they would have to negotiate new rates individually with all of their customers. Recognizing the time and costs involved in such a process, as well as the possibility of losing customers, the railroads opted for a different course. They decided to seize on a percentage-based "rail fuel surcharge" as the means to achieve an across-the-board rate increase on all unregulated traffic. (*Id.*) Defendants recognized, however, that it would be difficult to accomplish imposing the rail fuel surcharges widely if they competed with each other.

C.    **Publication of the AIILF and Fixing Surcharge Rates**

In July 2003, the two major Western railroads – Defendants BNSF and UP – agreed to impose the exact same fuel surcharges. (*Id.* ¶¶ 7, 58-63.) Indeed, not only did the Western railroads agree to use the same fuel index (the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF")); they agreed to administer that index in precisely the same way. They agreed to add a surcharge of 0.5 percent to the transportation rate for every five cent increase in the HDF index above $1.35 per gallon. (*Id.* ¶¶ 59-60.) The Western railroads also coordinated when they would adjust their fuel surcharge rates: the surcharge would be applied to shipments beginning the second month after the month in which there was a change in the average price calculation. (*Id.* ¶ 61.) That the Western railroads got into lockstep at this time was a notable development, because only shortly before Defendant UP had adopted a different method of calculating fuel surcharges. (*Id.* ¶ 63.)

Notwithstanding this agreement, the railroads still faced a significant barrier to widespread use of fuel surcharges. (*Id.* ¶ 64.) The great majority of rail freight at this time was transported pursuant to private contracts with rate-escalation provisions that already accounted for increases in fuel costs. (*Id.*) These rate-escalation provisions were based on two indexes: (1) the All Inclusive Index ("AII") published by the Association of American Railroads (the "AAR"), a railroad trade organization; and (2) the Related Rail Cost Adjustment Factor ("RCAF"), which was based on the AII. (*Id.* ¶¶ 4, 55.) Both indexes included fuel as a factor and both accounted accurately for increases in the railroads' fuel costs. The president of Defendant UP acknowledged in 2004 that the RCAF "looks at actual costs through the industry." (*Id.* ¶ 4.) As long as these published and widely utilized indexes included fuel as a cost-adjustment component, the Defendants could not, as a practical matter, impose widely a percentage-based, stand-alone fuel surcharge on their freight customers. (*Id.* ¶¶ 8, 64.)

The Complaint alleges that Defendants agreed to solve this problem by using the AAR, which Defendants dominate and control, to create and disseminate to the market a new index that did not include fuel costs. (*Id.* ¶¶ 9, 66.) This would then allow the railroads to impose their new, percentage-based, stand-alone fuel surcharge program in a coordinated fashion across their customer base. (*Id.* ¶ 64.) The Complaint alleges that the agreement to remove fuel from the AII and RCAF took place in the Fall of 2003, and that the AAR, at the Defendants' behest, published the new index, the All Inclusive Index Less Fuel (the "AIILF") in December 2003.

The Complaint alleges in detail how the new AIILF came about, when it was introduced, why the railroads did it, who was involved, and the crucial role the new index played in the implementation of Defendants' price fixing conspiracy. (*Id.* ¶¶ 56 – 77.) BNSF has admitted that it had a leading role in these efforts. (*Id.* ¶ 68.) When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, pointed to the changes made to the RCAF through the AAR. (*Id.*). Referring to Matthew K. Rose – BNSF's chairman, president, and CEO – Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … *So we'll do RCAF less fuel plus a direct fuel surcharge in the future*." (*Id.*) (emphasis added).

The Complaint alleges specific meetings at which Defendants agreed to create and implement coordinated fuel surcharge programs, employing the AIILF. For example, the Complaint alleges that Defendants discussed this strategy at AAR board meetings on October 2-3 and December 11-12 of 2003. (*Id.* ¶¶ 9, 65.) During these meetings and on other occasions, Defendants agreed to cause the AAR to adopt a new index without fuel. (*Id.* ¶¶ 9, 66.)

10

Defendants further agreed that they would impose their new, stand-alone fuel surcharge on shippers, using the new index, in a coordinated fashion to enhance profits.  (*Id*. ¶¶ 64-67.)

As the Complaint describes, the broad use of a stand-alone, rate-based fuel surcharge was a sharp break from past industry practice.   Prior to 2003, while some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, these fuel surcharges were applied only in isolated instances, reflecting the widespread use at that time of the AII and RCAF fuel-inclusive indexes.  (*Id*. ¶ 57.)  The Complaint specifically alleges that these fuel surcharges were the isolated exception, not the rule, and differed for each company, reflecting each railroad's differing efficiencies and fuel costs.  (*Id*. ¶¶ 7, 57.)  The AAR had never previously published a cost index without fuel, and the railroads had never before applied their fuel surcharges on a coordinated, stand-alone basis as a revenue enhancement mechanism.  (*Id*. ¶¶ 10, 67.)  As UP's James R. Young acknowledged in a July 2007 interview, the new stand-alone rail fuel surcharges were "really unique to the railroad industry.  Three, four years ago they were really non-existent."  (*Id*. ¶10.)

By removing fuel from the then-prevailing cost escalation indexes, Defendants could begin assessing stand-alone fuel surcharges on a widespread basis and in a coordinated manner.  (*Id*. ¶¶ 11-13, 67, 69, 75.)  Defendants could then implement their plan of applying broadly across their various private contracts a fuel surcharge percentage to the entire cost of the freight shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment).  (*Id*.)  Through their collective action, Defendants planned to use the stand-alone fuel surcharge as a way to increase revenue, not simply capture increases in fuel costs (which the AII and RCAF were fully able to capture already), thereby increasing prices far more than any cost increase actually attributable to fuel.  (*Id*. ¶¶ 67, 75.)

Almost immediately after the Defendants' joint effort to cause the AAR to publish the AIILF, the Eastern railroad Defendants (CSX and NS), pursuant to their agreement with BNSF and UP, began to charge the exact same surcharges based on the use of a common index – the West Texas Intermediate Crude Oil Index ("WTI").  (*Id.* ¶¶ 12, 69-73.)  CSX, which already had a surcharge methodology in place, immediately began to apply the surcharge utilizing the new index.  NS announced in January 2004, *the first calendar month after the publication of the AIILF*, that it would be changing its surcharge formulas and unveiled a surcharge formula identical to the CSX surcharge.  (*Id.* ¶¶ 71, 82) (explaining that, notwithstanding a two-month lag, both Eastern railroads were assessing identical surcharges within three months of the first publication of the AIILF.)

The Eastern railroads chose the WTI index because in early 2004, following the publication of the AIILF, it was at a higher rate than the HDF Index.  (*Id.* ¶12.)  As with the Western railroads, the Eastern railroads agreed not only to use the same index but the same trigger points and timing:  the surcharges, applied to the entire base rate for the freight transport, would increase 0.4 percent for every $1 that the monthly average price of WTI oil exceeded $23 per barrel and the surcharge would be imposed two calendar months after the WTI Index had adjusted.  (*Id.* ¶¶ 71-72.)

### D.    The Conspiracy Operates Successfully

With Defendants' price-fixing conspiracy firmly in place, the surcharges of the Western railroads moved in lockstep – *i.e.*, their customers were charged the exact same surcharges – from July 2003 through at least June 2007.  (*Id.* ¶¶ 79-80.)  Similarly, the Eastern railroads' surcharges were identical starting in March 2004 and continuing through at least June 2007.  (*Id.* ¶¶ 81-82.)  Defendants published their surcharge rates on their websites so that the conspirators could monitor adherence to the price-fixing scheme.  (*Id.* ¶¶ 14, 61, 71.)  Railroad industry

analysts contemporaneously noted and were puzzled by the curious "convergence" in rail fuel surcharge methodologies adopted by the Defendants. (*Id.* ¶ 84.) As one analyst noted, "the way to gain significant market share is to lead the competition rather than following the competition." (*Id.*) The Defendants used the new AIILF to apply stand-alone fuel surcharges in contracts extending over periods of time.

Defendants also agreed not to negotiate discounts on their fuel surcharges and overall contract rates, even though prior to mid-2003 the custom had been for the railroads to do so. (*Id.* ¶¶ 88, 92, 95.) Indeed, when shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, they were told by the railroads that the fuel surcharges were "not negotiable." (*Id.* ¶ 92.) Industry analysts publicly questioned the railroads' refusals to negotiate the fuel surcharges despite the opportunities to gain market share. (*Id.* ¶ 84.)

Defendants also began moving from offering long-term contracts to more prevalent use of contracts that contained 30-day cancellation provisions or that were re-priced as often as monthly, another way to facilitate imposition of the stand-alone fuel surcharges. (*Id.* ¶ 15.) Previously, Defendants had typically preferred long-term contracts ranging up to five years, with rate increases usually governed by the AII or RCAF, that locked in market share. (*Id.* ¶ 89.) Defendants made this switch to more prevalent use of shorter term contracts even though most shippers preferred the former system, which for the freight shipment customer could minimize risk and make costs more predictable. (*Id.* ¶ 91.) Defendants were not deterred from this strategy by the risk of increased competition, because they had been guaranteed by their agreement that their "competitors" would be pursuing identical policies. (*Id.* ¶¶ 88, 95.)

At about the same time, Defendants collectively decreased the use of "through rates," a longstanding practice in which a customer receives a single bill from either the originating or terminating railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). (*Id.* ¶ 94.) Instead, Defendants moved increasingly to having rates billed separately for each railroad involved in a multi-railroad shipment. This provided transparency as to what each railroad was charging on multiple line shipments, and allowed each Defendant to bill separately for its applicable fuel surcharge. (*Id.*)

Defendants also agreed not to undercut each other's pricing or to take market share from each other. (*Id.* ¶¶ 14, 75, 95.) As a consequence, Defendants' market shares remained stable throughout the period of the conspiracy. (*Id.* ¶ 95.) Indeed, despite widespread imposition of unprecedented surcharges and inflexibility in negotiating shipping contracts, Defendants' market shares remained essentially unchanged during the time the conspiracy was in effect. (*Id.* ¶¶ 88, 95.)

As a result of their supracompetitive fuel surcharges, Defendants' profits soared. (*Id.* ¶ 99).

### E.     The STB Ruling

After receiving complaints, the STB conducted a regulatory investigation into Defendants' rail fuel surcharge program. This investigation culminated in a decision issued in January 2007 concluding that Defendants' fuel surcharges were an "unreasonable practice." (*Id.* ¶ 16.) (quoting *Rail Fuel Surcharges*, STB Ex Parte No. 661, January 25, 2007 at 6) (Reinhart Decl., Ex. A ("STB Ruling")). The STB explained that "a fuel surcharge program that increases all rates by a set percentage *stands virtually no prospect of reflecting the actual increase in fuel costs* for handling the particular traffic to which the surcharge is applied." (Compl. ¶ 16.) The STB added that the railroads' fuel surcharge program was "a *misleading* and ultimately

unreasonable practice," finding that "there is no real correlation between the rate increase and the increase in fuel costs for that to which the surcharge is applied." STB Ruling at 7 (emphasis added). *See also id.* at 9 ("For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate – when practical alternatives are available – would permit them to continue to *mislead* their customers and would be unfair.") (emphasis added). (*See generally* Compl. ¶¶ 16, 96-98). Although the STB decision applied to rate-regulated rail freight traffic only, Defendants also applied the same misleading and unreasonable fuel surcharge practices to the private rail freight transportation contracts and other unregulated freight transport that are at issue in this case. (*Id.* ¶¶ 97-98.)[6]

In their statement of alleged facts, Defendants state that this "STB decision did not suggest, let alone find, any collusion. The STB did not award past damages or restitution for past surcharges, but, rather, explicitly provided a 'rule of general applicability for future conduct.'" (Defendants' Brief at 11.) However, no issues of collusion were before the STB, which does not have jurisdiction to enforce the antitrust laws.[7] As the STB explained in its ruling, it was relying on its authority to "adopt rules of general applicability for future conduct to address an unreasonable practice" rather than addressing a single shipper complaint (which could lead to an award of remedies for past practices). STB Ruling at 8.

Far from condoning or excusing the Defendants' fuel surcharge program, the STB throughout its decision admonished the Defendants for misleading their freight shipment

---

[6]    As noted in the Complaint, the STB's decision addressed rate regulated freight traffic only, which is not at issue in the Complaint here. The STB expressly stated that its jurisdiction does not reach the rail freight traffic under private contract, or otherwise exempted from rate regulation, that is the subject matter of this litigation. (Compl. ¶¶ 16, 97.)

[7]    The STB is limited by its enabling legislation which is the ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (1995), and the ICC was limited by the Interstate Commerce Act, Ch. 104, 24 Stat. 379 (1887).

customers through unreasonable practices.  *See, e.g.*, STB Ruling at 7 ("We believe that

imposing rate increases in this manner, when there is no real correlation between the rate

increase and the increase in fuel costs for that particular movement to which the surcharge is

applied, *is a misleading and ultimately unreasonable practice*.") (emphasis added).[8]

## ARGUMENT

### I.   NO HEIGHTENED PLEADING STANDARDS APPLY

Plaintiffs bring a single claim for price fixing under Section 1 of the Sherman Act.  15

U.S.C. § 1.  The Supreme Court, with express reference to its *Twombly* decision, has reiterated

the governing notice-pleading standard under Rule 8 of the Federal Rules of Civil Procedure:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and
> plain statement of the claim showing that the pleader is entitled to
> relief."  Specific facts are not necessary; the statement need only
> "give the defendant fair notice of what the … claim is and the
> grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*,
> []127 S. Ct. 1955, [1959] (2007) (quoting *Conley v. Gibson*, 355
> U.S. 41, 47 … (1957)).

*Erickson v. Pardus*, 127 S. Ct. at 2200.  The Court has also directed, again with specific

reference to *Twombly*, that "when ruling on a defendant's motion to dismiss, a judge must accept

as true all of the factual allegations contained in the complaint."  *Id.* (*citing Twombly*, 127 S. Ct.

at 1965).

---

[8]   *See also id.* at 6 ("Because railroads rely on differential pricing, under which rates are
dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather
than to fuel consumption for the movement to which the surcharge is applied, *cannot fairly be
described as merely a cost recovery mechanism*.") (emphasis added); at 7 ("*This sort of
mislabeling* appears designed to avoid the type of response a carrier would likely receive *if it
were to honestly inform* a shipper that a higher rate was being imposed to recover not only the
increased fuel cost of serving that shipper, but also the increased cost of fuel for another
shipper's traffic – which is what would often occur under rate-based fuel surcharges.") (emphasis
added); at 9 ("*For carriers to continue to apply fuel surcharge programs* that are calculated as a
percentage of the base rate – when practical alternatives are available – *would permit them to
continue to mislead their customers and would be unfair*.") (emphasis added).  (*See also* Compl.
¶¶ 16, 96-98.)

The D.C. Circuit similarly observed in a recent ruling applying *Twombly* that in evaluating the legal sufficiency of a complaint's allegations, a court "constru[es] the complaint liberally in the plaintiff's favor," *Aktieselskabet*, 525 F.3d at 15 (quoting *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008)), and gives the complaint "the benefit of all reasonable inferences derived from the facts alleged," *id.* (quoting *Stewart v. NEA*, 471 F.3d 169, 173 (D.C. Cir. 2006)).

Allegations in a price-fixing case are to be considered as a whole, and not on a piecemeal basis. *See Jung*, 300 F. Supp. 2d at 155 ("[A]llegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.'") (quoting *In re Fine Paper Antitrust Litig.*, 685 F.2d at 822). *See also Cont'l Ore Co.*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (quoting *U.S. v. Patten*, 226 U.S. 525, 544 (1913)).

Contrary to the implications in Defendants' moving papers, *Twombly* created no new heightened pleading standard for price fixing cases.[9]  The D.C. Circuit in *Aktieselskabet* expressly observed that "*Twombly* leaves the long-standing fundamentals of notice pleading intact." *Aktieselskabet*, 525 F.3d at 15.[10]

---

[9]    Nor could the *Twombly* Court have created such a heightened pleading standard.  Any change to the applicable standards of Rule 8 would have required amendments to the Federal Rules.  *See Aktieselskabet*, 525 F.3d at 16 (rejecting notion that *Twombly* introduced a heightened pleading standard, because any such standard "would have to arise from an amendment of the Federal Rules of Civil Procedure").

[10]    Most cartel activity is secretive.  If plaintiffs could not proceed to discovery without detailed knowledge of all facets of a price-fixing cartel's conduct, private enforcement of the antitrust laws would be greatly diminished  *See, e.g., In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159 at *11 n.7 ("Defendants cannot be faulted for attacking plaintiffs' complaints on the basis of *Twombly*.  The level of factual pleading they seek, however, could rarely, if ever, (continued)

Defendants train their sights narrowly on *Twombly*, in which the Supreme Court considered a question particular to the complaint then before it: "whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition absent some factual context suggesting agreement . . ." *Twombly*, 127 S. Ct. at 1961. Plaintiffs in *Twombly* were two customers of their local telephone company. Their complaint alleged that the major incumbent local exchange carriers had conspired for seven years not to compete with each other for customers outside their respective market areas. The Telecommunications Act of 1996 required the defendants to open their local telephone service monopolies to competition. As factual support for their claim, plaintiffs pointed to the Telecommunications Act's expectation of competition among defendants and the fact that the defendants had not actually engaged in the expected competition.

The Supreme Court made clear that it considered the complaint in *Twombly* to "proceed *exclusively* via allegations of parallel conduct," *id.* at 1971 n.11 (emphasis added), and "not on any independent allegation of actual agreement among the [defendants]," *id.* at 1970. The Complaint alleged parallel practices by the defendants and contained "a few stray statements" of an agreement by defendants to stay out of each other's markets. *Id.* But it made no mention of the "specific time, place, or person involved in the alleged conspiracies." *Id.* at 1970 n.10.

---

be met by a plaintiff in an antitrust case before discovery."); *In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959224, at * 14 (D.N.J. June 29, 2007) ("adequate notice of the particular grounds upon which Plaintiffs' claims rest" is all that is required "particularly given the fact that Plaintiffs have not yet had the benefit of discovery.") (*citing Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746-747 (1976) (explaining that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly")); *In re OSB Antitrust Litigation*, 2007 WL 2253419, at *5 ("*Twombly* does not . . . require plaintiffs to prove their allegations before taking discovery.").

Despite occasional reference in the complaint to an unlawful agreement, "[t]he nub of the complaint . . . is [defendants'] parallel behavior." *Id.* at 1960, 1970-1971.[11]

On these allegations, the Supreme Court in *Twombly* held that the plaintiffs failed to state a claim for relief under Section 1. The Court explained that "*an allegation of parallel conduct and a bare assertion of a conspiracy* will not suffice . . . and a *conclusory allegation of an agreement at some unidentified point* does not supply facts to show illegality." *Id.* at 1966 (emphasis added). A complaint alleging parallel conduct must provide "some setting suggesting the agreement to make out a § 1 claim." According to the Court, "without some further factual enhancement," the complaint in *Twombly* "stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

The Court in *Twombly* emphasized that there was "an obvious alternative explanation" for defendants' alleged agreement not to compete – that the former monopolies were merely doing the same thing they had done before the Telecommunications Act: keeping to their long-held geographical territories and "sitting tight, expecting their neighbors to do the same thing." *Id.* at 1972.[12]

---

[11]    Courts have consistently recognized that the allegations in *Twombly* constituted mere parallelism and nothing more. *See, e.g.*, *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2008 WL 1735856, at *3 (D.D.C. April 16, 2008) ("Unlike in *Twombly*, the plaintiffs here do not rely on only bare allegations of parallel behavior, or assume that there is a conspiracy because there is an 'absence of any meaningful competition.'") (citing *Twombly*, 127 S. Ct. at 1970); *Fair Isaac Corp. v. Equifax Inc.*, 2008 WL 623120, at *5 (D. Minn. March 4, 2008) ("The *Twombly* plaintiffs' allegations of an illegal § 1 agreement rested exclusively on the parallel conduct of the defendant regional telecommunications providers.").

[12]    This "sitting tight" in furtherance of the phone companies' long-established practice of not invading each other's territories is in marked contrast to the many dramatic changes in the Defendants' conduct in connection with the conspiracy alleged here, including (among other things) the alleged ways in which the railroads ceased competing with each other.

*Twombly* is thus readily distinguishable from the case here, where the plaintiffs make direct and specific allegations of an unlawful agreement independent of parallel behavior.  At the same time, nothing in *Twombly* precludes circumstantial allegations from also being considered in an antitrust complaint.  Rather, *Twombly* held that a complaint must contain merely "enough factual matter (taken as true) *to suggest* that an agreement was made."  *Id.* at 1965 (emphasis added).  *Twombly* confirms that a § 1 claim can be made on the basis of circumstantial allegations alone, including allegations of parallel conduct alone under certain circumstances.[13]  Indeed, the Court noted that "[a]n allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint:  *it gets the complaint close to stating a claim.*"  *Id.* at 1966 (emphasis added).  The allegations of parallel conduct must be placed in a factual context that "nudge[s]" the conspiracy claim "across the line from conceivable to plausible."  *Id.* at 1974.

---

[13]    Many post-*Twombly* courts have held that circumstantial evidence, including parallel conduct, is still relevant in assessing the viability of antitrust claims.  *See, e.g., Hyland v. Homeservices of America, Inc.*, No. 05-612, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) ("Plaintiffs . . . have properly put the Defendants on notice of its alleged antitrust claims by setting out facts of an alleged a conspiracy [*sic*] to price-fix between the Defendants, supported by actions of parallel conduct.  Accordingly, the Court finds that the Plaintiffs have 'nudged' their claims across the line from conceivable to plausible."); *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159 at *6 ("These complaints, while not answering all specific questions about 'who, what, when, and where,' do put defendants on notice concerning the basic nature of their complaints . . . and the grounds on which their claims exist."); *Behrend v. Comcast Corp.*, 532 F. Supp.2d 735, 741 (E.D. Pa. 2007) ("'[A] complaint warrant[s] dismissal only where it fail[s] 'in toto to render plaintiffs' entitlement to relief plausible' . . . [A]n antitrust complaint would certainly meet the *Twombly* criteria if the complaint constitutes notice to the defendant of the legal claims asserted and includes a statement of the elements of those claims, along with allegations of the defendant's underlying conduct that, if proven, would plausibly demonstrate such elements.") (citations omitted); *City of Moundridge*, 2008 WL 1735856 at *4, *6 ("All inferences are construed in favor of the plaintiffs and, while the claim may rest ultimately on a thin factual reed, the plaintiffs have alleged supporting circumstantial facts and placed their claims 'in a context that raises a suggestion of a preceding agreement,' 'nudg[ing] their claims across the line from conceivable to plausible[.] . . . Because the complaint alleged some circumstantial facts that support an inference of an agreement, the plaintiffs' claim is plausible.") (citations omitted).

*See also Aktieselskabet*, 525 F.3d at 17 ("*Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim").

In short, *Twombly* reaffirmed that a Section 1 Sherman Act case can be properly pleaded by either (a) sufficient allegations of an actual agreement, or (b) allegations of parallel action placed in a context plausibly suggesting such an agreement. As developed below (*see* pp. 21 – 28, *infra*), the Complaint here does both. The Complaint alleges with detail the existence of an unlawful agreement, including the who, what, when, why, and where of the conspiracy. The Complaint also contains multiple additional facts that more than "nudge" the claim across the plausibility line. The Complaint thus satisfies the governing standard of Rule 8(a)(2) and far exceeds the pleading requirements of *Twombly*.

## II.    THE COMPLAINT ADEQUATELY ALLEGES AN UNLAWFUL PRICE-FIXING CONSPIRACY

The Complaint directly alleges Defendants' unlawful concerted conduct, providing Defendants ample notice of the particular unlawful acts with which they are charged. At the same time, the Complaint provides abundant details of the conspiracy and its factual context that firmly support the conspiracy's plausibility. Defendants' repeated assertion that the Complaint's conspiracy allegations are merely "conclusory" or somehow incoherent are wide of the mark.

The Complaint sets forth numerous concrete and specific facts as to the why, who, what, where, when, and how of the conspiracy. The Complaint alleges: (1) why the conspiracy took place, (2) who engaged in what concerted conduct (including the specific companies' concerted actions at particular times and the name of a specific executive who led the charge on crucial conspiratorial conduct), (3) what illegal steps Defendants took in furtherance of the conspiracy, (4) where conspiratorial meetings occurred (*e.g.,* at AAR board meetings), (5) when (including specific dates), and (6) how, in detail, the unlawful concerted conduct was carried out. Thus,

Plaintiffs have alleged – specifically and concretely – the elements of a price-fixing agreement and not merely parallel behavior.

The Complaint alleges unlawful collusive conduct and identifies the specific steps taken by Defendants to implement their price-fixing conspiracy. The Complaint alleges that BNSF and UP agreed in July 2003 to bring their fuel surcharge programs into lockstep. (Compl. ¶¶ 7, 59-62.) It also explains that, at this time, the Defendants still faced a significant barrier to widespread use of stand-alone fuel surcharges – namely, the then-prevailing cost adjustment indexes that already included fuel as a factor. (*Id.* ¶¶ 55-56.) To overcome this hurdle, the Defendants in the Fall of 2003, at meetings and discussions within the AAR board (including on dates specified in the Complaint), agreed to take, and took, collective action to create a new cost-adjustment index without fuel and then to use that index and other collective action to impose broadly stand-alone fuel surcharges that were in virtual lockstep in the Eastern and Western regions, respectively, through at least mid-2007. (*Id.* ¶¶ 65, 68, 73, 76-78, 89-95.) *See also* pp. 2 – 4, *supra.*

The Complaint specifies that an officer of BNSF admitted in early 2004 that it was Matthew K. Rose, BNSF's chairman, president and CEO, who "led the charge" behind the AAR's creation of the new fuel cost index. (*Id.* ¶¶ 9, 68.) And it alleges that, following on the heels of the Defendants' collective action through the AAR to create the new index without fuel, Defendants CSX and NS, the two major Eastern railroads, agreed to coordinate their rail fuel surcharge program so that it would run in lockstep, using the fuel index that would yield the highest rail fuel surcharges at the time. (*Id.* ¶¶ 69-72.) The Complaint explains in detail that while the Eastern and Western railroads moved in lockstep with different indexes, the key aspects of the fuel surcharges in both regions – including applying the surcharge as a percentage

of the total cost of the freight transport – were identical. (*Id.* ¶¶ 59-63; 69-72.) The Complaint also explains why Defendants engaged in this unlawful concerted conduct, and the role their newly-created cost-adjustment index played in facilitating the conspiracy's objective. (*Id.* ¶¶ 67-72.)

Both pre- and post-*Twombly*, these allegations are more than sufficient to plead a price-fixing claim. *See City of Moundridge*, 2008 WL 1735856, at *3 ("Unlike in *Twombly*, the plaintiffs here do not rely on only bare allegations of parallel behavior … [The complaint] identifies the years and locations where the agreement was reached and the defendants who participated."); *Behrend*, 532 F. Supp. 2d at 741 (distinguishing *Twombly* because "we have clear allegations of actual agreements between Comcast and its competitors"); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959224, at *14 (finding the complaint's allegations "to be in sharp contrast with the allegations found insufficient in" *Twombly*, since "the instant [c]omplaint sets forth allegations of specific anti-competitive agreements").[14]

---

[14] *See also In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159, at *6 ("[Plaintiffs] argue, and it appears rightfully so to this Court, that rather than simply alleging facts from which an inference of an agreement can be drawn, they allege … that actual agreements exist."); *see also id.* ("These complaints, while not answering all specific questions about 'who, what, when and where,' do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist."); *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566, slip op. at 6 (D. Nev. Feb. 19, 2008) (attached as Exhibit A hereto) ("Plaintiffs' allegations go beyond allegations of parallel conduct paired with a bare allegation of conspiracy. … Plaintiffs allege Defendants engaged in wash trades, which, by their nature, involve collusive agreement between two parties."); *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1237 (D. Kan. 2008) ("Unlike *Twombly*, plaintiffs here do not allege parallel behavior with no actual agreement among defendants."). *Compare Twombly*, 127 S. Ct. at 1970 n.10 ("doubt[ing]" that the bare reference to an agreement in the complaint provided the notice "required by Rule 8" since "the pleadings mentioned no specific time, place, *or* person involved in the alleged conspiracies," giving the defendants "no clue" as to which of the defendants "supposedly agreed or when and where the illicit agreement took place") (emphasis added).

Defendants do not – and could not – credibly claim that they lack *notice* of the unlawful concerted conduct with which they are charged. Instead, they caricature the Complaint as consisting only of "conclusory allegations of conspiracy."[15] (Defendants' Brief at 1.) The Complaint's allegations of conspiracy, however, are supported by a detailed account of Defendants' motivation for conspiring, why they conspired in the manner that they did, what steps they took in furtherance of the conspiracy, and when they took them. In *Twombly*, the conspiracy allegations were considered "conclusory" because they merely parroted the language of the Sherman Act. By contrast, the Complaint here alleges specific facts concerning the unlawful concerted conduct in which Defendants engaged. Indeed, here, one key element of the conspiracy is Defendants' *concerted* conduct at the AAR – the collective agreement to publish the AIILF and then use that new index to impose percentage-based, stand-alone fuel surcharges on customers as widely as possible – all of which is alleged in detail and with specificity. Defendants also make the baffling claim that Plaintiffs do not allege a conspiracy at all. For example, they assert: "Plaintiffs … do not present an 'independent allegation of actual agreement' between the Western Railroads or between the Eastern Railroads that suggests a meeting of the minds among any of them." (Defendants' Brief at 26.) Of course, Plaintiffs allege this (in detail) many times over, as explained above. Paragraphs 65 and 67 of the Complaint, for example, very clearly allege such an agreement:

> 65.   In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants

---

[15]   Defendants call the Complaint's allegations of conspiracy "conclusory." However, "conclusory" means "consisting of or relating to a conclusion or assertion for which no supporting evidence is offered." (Merriam Webster's Dictionary of Law.) As Plaintiffs demonstrate herein, any suggestion that the Complaint has not alleged any facts supporting the allegation of an unlawful conspiracy is patently false.

to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

67.    Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy.

(Compl. ¶¶ 65, 67; *see also* Compl. at ¶¶ 56-77 (describing the details of the agreement).)

Defendants also claim that the Complaint's allegations are "lacking in specifics regarding the who, what and when of agreement." (Defendants' Brief at 23.) However, as detailed herein, the Complaint not only identifies the unlawful acts that each company did; it names a specific executive who admittedly played a lead role in crucial conspiratorial conduct on behalf of BNSF. It identifies the time periods in which all the allegedly unlawful conduct took place, and the *specific dates* of meetings at which crucial steps of the conspiracy occurred. This level of detail is rare and more than sufficient to state a price-fixing claim. *See, e.g., City of Moundridge*, 2008 WL 1735856, at *3 (applying *Twombly* and finding that identification of "years and locations where the agreement was reached and the defendants who participated" was sufficient to support conspiracy allegations); *In re OSB Antitrust Litigation*, 2007 WL 2253419, at *1 (applying *Twombly* and considering it sufficient that complaint identified "the approximate time and manner of their agreement.").

Defendants' argument reduces to the assertion that a complaint cannot proceed to discovery unless the complaint pinpoints *every* executive involved and specifies the dates of

*every* unlawful meeting.  But there is no basis in law or common sense for such a requirement.[16]
Conspiratorial activity is nearly always secret.[17]  The Complaint here reflects more knowledge of the details of this conspiracy than most.[18]

Defendants cite four cases in which courts dismissed complaints that Defendants claim are "similar" to the Complaint in this case.  (Defendants' Brief at 18-21.)  These cases are distinguishable for multiple reasons – but Defendants' assertion that the complaints in those cases are "similar" to the detailed and comprehensive Complaint in this case is spurious.  In *In re Elevator Antitrust Litig.*, the allegations of conspiracy were entirely conclusory.  As the Second Circuit noted, quoting the district court:  "[T]he complaint enumerates 'basically every type of conspiratorial activity that one could imagine. . . .  The list is in *entirely general terms* without *any* specification of *any* particular activities by *any* particular defendant[; it] is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (emphasis added).  The allegations here are not remotely similar.

---

[16]    As noted above, *Twombly* did not institute any heightened pleading standard that would require, for example, that a plaintiff identify the specific date and attendee of every allegedly collusive meeting *before* discovery begins.  Nor could *Twombly* have instituted any such pleading standard, as this would have required amending the Federal Rules.

[17]    *See, e.g., In re Mercedes Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 372-73 (D.N.J. 2001) ("[r]egardless of whether concealment is an essential element of price-fixing, secrecy is its natural lair").   For precisely this reason, dismissal prior to discovery in antitrust cases should occur sparingly.  *See, e.g., Hosp. Bldg. Co.*, 425 U.S. at 746 ("[I]n antitrust cases where 'the proof is largely in the hands of the alleged conspirators,' ... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (*quoting Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962)).

[18]    Moreover, requiring Plaintiffs to identify every executive at the AAR board meetings identified would be a pointless exercise – Defendants *themselves* certainly know who attended the meetings identified.

Likewise, in *Kendall v. U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), even *after* discovery, plaintiffs "simply allege[d]" that the defendants were "coconspirators, without providing *any facts* to support such an allegation, despite having deposed executives from both MasterCard and Visa." *Id.* at 1050 (emphasis in original).[19]  And in *In re Late Fee and Over-limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), the plaintiffs' "principal claim in the case" was that "the defendants' late and over-limit fees are excessive 'punitive damages' subject to limitation under the Due Process Clause." *Id.* at 957, 58.  The plaintiffs' alternate price-fixing claim was pled in a conclusory manner, providing "*no details* as to when, where, or by whom th[e] alleged agreement was reached." *Id.* at 962 (emphasis added).  The plaintiffs did "not identify any actual agreement among the defendants," *id.* at 961, and could not even point to parallel behavior.  The "heart of the plaintiffs' antitrust allegations" was a chart demonstrating that the defendants' behavior was "not even roughly in parallel." *Id.* at 962.  Similarly, in *In re Travel Agent Comm'n Litig.*, MDL No. 1561, 2007 WL 3171675, at *4 (N.D. Ohio Oct. 29, 2007), the court found that, on a number of occasions, some defendants "entirely" failed to follow other defendants' pricing moves – which is hardly reflective of the lockstep pricing alleged in the Complaint.

These decisions show only that <u>some</u> courts have dismissed <u>some</u> price-fixing complaints after *Twombly* – a point Plaintiffs do not dispute.  But these cases have not included the types of allegations here.  And many courts have recognized that *Twombly* is no bar to a properly pled

---

[19]  The *Kendall* court also premised its decision on the belief that the *Twombly* Court had "specifically abrogated the usual 'notice pleading' rule, found in Federal Rule of Civil Procedure 8(a)(2)…." *Id.* at 1047 n.5.  The D.C. Circuit has expressly rejected this reading of *Twombly*, holding that "*Twombly* leaves the long-standing fundamentals of notice pleading intact." *Aktieselskabet*, 525 F.3d 8 at 15.  *See also id.* at 16 ("If, despite this clear language, *Twombly* itself left any doubt, the [Supreme] Court subsequently emphasized the continuation of the prior Rule 8(a) standard: '[S]pecific facts are not necessary,' and a complaint need only give the defendant fair notice of the claims." (*quoting Erickson*, 127 S.Ct. at 2200).

and supported antitrust complaint.[20]  As one court has observed – in a case where plaintiffs

alleged a conspiracy in less detail than the Complaint at issue here:

> Plaintiffs have made specific factual allegations of Defendants'
> wrongdoing – including actions in furtherance of the conspiracy,
> Defendants' purported motive, the approximate time and manner
> of their agreement, and the mechanism by which Defendants fixed
> prices.  ***Twombly* requires no more**.

*In re OSB Antitrust Litig.*, 2007 WL 2253419, at *1 (emphasis added).

Similarly, the Complaint in this case contains at least as much detail, if not more detail,

than the complaint recently found to satisfy *Twombly* in this District in *City of Moundridge*, 2008

WL 1735856.  Defendants virtually ignore *City of Moundridge*,[21] *OSB,* and the other cases that

are far more similar to this case than the cases on which Defendants rely.[22]

---

[20]   Indeed, courts have recognized that defendants seek to stretch *Twombly* far beyond its
limits.  In *In re Southeastern Milk Antitrust Litig.*, for example, the court noted:

> Defendants cannot be faulted for attacking plaintiffs' complaints on the basis of
> *Twombly*.  The level of factual pleading they seek, however, could rarely, if ever, be met
> by a plaintiff in an antitrust case before discovery.  While *Twombly* certainly requires of
> plaintiffs a degree of pleading that may not be required in other cases, it was not intended
> as a shield to be used by antitrust defendants to defeat even a meritorious claim.  Arguing
> that plaintiffs have not pleaded sufficient facts appears to have become the mantra of
> defendants in antitrust cases.

2008 WL 2117159, at *12, n.7.

[21]   Defendants state only that the complaint in *City of Moundridge* made allegations "that are
not analogous to those in the present Complaint," but do not identify anything specifically about
the *City of Moundridge* complaint that is not present in the instant Complaint.  (Defendants'
Brief at 21.)

[22]   *See, e.g., Babyage.com, Inc. v. Toys "R" Us, Inc.*, Civ. Action No. 05-6792, 2008 WL
2120493 (E.D. Pa. May 20, 2008); *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159;
*Fair Isaac Corp.*, 2008 WL 623120; *Beach v. Atlas Van Lines,* Civ. Action No. 2:07-764-CWH
(D.S.C. Mar. 31, 2008) (order denying motion to dismiss) (attached as Exhibit B); *In re Western
States*, MDL No. 1566, slip op., (D. Nev. Feb. 19, 2008) (attached as Exhibit A); *In re Graphics
Processing Units Antitrust Litigation*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007); *Hyland*, 2007 WL
2407233; *Behrend*, 532 F. Supp. 2d 735; *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL
1959224.

## III. THE COMPLAINT'S CONSPIRACY ALLEGATIONS ARE COHERENT AND PLAUSIBLE

Plaintiffs' allegations provide a coherent and plausible account of why Defendants desired to begin imposing rail fuel surcharges widely on their customers and how they developed and implemented a plan to do so through unlawful concerted conduct. Defendants attempt to make this account appear incoherent and "implausible," but in each such instance Defendants misapprehend or mischaracterize the Complaint's factual allegations.

### A. The Creation and Adoption of the AIILF is Probative of the Conspiracy

#### 1. Defendants' Creation and Adoption of the AIILF was Key to their Price-fixing Conspiracy

The Complaint alleges that central to Defendants' efforts broadly to impose rail fuel surcharges, set as a percentage of a freight shipment's base rate, was the Defendants' *agreement* to publish, adopt, and use a rate-escalation index with their customers that had the fuel cost component taken out.

Defendants mischaracterize the Complaint by suggesting that their collective creation and publication of the AIILF is not probative of a conspiracy, because the publication of an index without a fuel component was not actually necessary to impose stand-alone fuel surcharges. (Defendants' Brief at 37.) To begin with, Defendants do not explain why, if this were so, BNSF admitted in a call with analysts that its president and CEO "led the charge" on the AAR's publication of the AIILF in order to facilitate BNSF's move toward imposing stand-alone rail fuel surcharges on its customers. (Compl. ¶ 68.)

Defendants assert that the Complaint purportedly shows the AIILF was not necessary, because it alleges that certain Defendants imposed fuel surcharges prior to December of 2003, when the AIILF was created. (Defendants' Brief at 37.) Defendants also assert that their surcharge tables on their websites show that rail fuel surcharges existed before the creation of the

AIILF.  (*Id.*)[23]  Defendants further assert that the STB has noted that rate-based surcharges dated

back to the 1970s.  (*Id.* at 38.)

The Complaint explains, however, why none of this is contradictory.  Simply put,

although some Defendants intermittently imposed rate-based fuel surcharges in isolated instances

before 2003, they were not in significant use in Defendants' unregulated private contracts by

2003, because those contracts overwhelmingly used rate-escalation indexes (the AII/RCAF) that

already had a component that tracked actual fuel cost increases.  (Compl. ¶ 57.)  Nothing in the

STB's decision contradicts this allegation.  The STB referred to the use of fuel surcharges in the

mid-1970s; it did not suggest that the fuel surcharges were in active use in Defendants'

unregulated contracts by 2003.

Indeed, it is surprising Defendants would even attempt to suggest that the fuel surcharge

program was not a new development in late 2003 or early 2004, given that UP executive James

---

[23]    Defendants attach and cite to various printouts from their websites listing historical fuel surcharges that predate the alleged conspiracy.  (*See* Defendants' Brief at 28-29, & ns.6, 7, 9 (citing, *inter alia*, Ex. C & D).)  Defendants argue that those websites have been incorporated by reference and that all documents and data contained in them, including fuel surcharge data that predate the putative class period, must be accepted as true for purposes of their motion to dismiss because the Complaint accuses Defendants of publishing their surcharges on their websites during the relevant period.  (*Id.* at n.6.)  As a preliminary matter, the existence of fuel surcharges that predate the conspiracy does not contradict the allegations in the complaint.  As discussed above, the Complaint explicitly pleads the existence of those earlier surcharges and explains how the conspiracy allowed Defendants to impose fuel surcharges more broadly and to coordinate their imposition to avoid competition.  However, Plaintiffs further reject the argument that they have broadly incorporated Defendants' websites and all information presently available thereon.  As the Court is aware, Defendants have steadfastly refused to produce any discovery to date and Plaintiffs therefore cannot independently verify any data on those extensive websites.  Under these circumstances, a limited reference to websites in a complaint does not incorporate those websites by reference.  *See generally In re Newbridge Networks Sec. Lit.*, 767 F. Supp. 275, 279 n.4 (D.D.C. 1991) ("Extraneous material may be considered but only if it is attached to the complaint or incorporated by reference, and limited quotation does not constitute incorporation by reference.").  None of Defendants' cited cases support such a broad application of the doctrine of incorporation by reference.

Young acknowledged in a 2007 interview that the new rail freight surcharges were "really unique to the railroad industry.  Three, four years ago they were really non-existent."  (Compl. ¶ 10.)

In order to begin imposing fuel surcharges widely, therefore, Defendants needed to replace the prevailing indexes with a new index that did not have a fuel component.  In order to ensure their goal of across-the-board rate increases, Defendants *agreed* to disseminate this new index (the AIILF) collectively and impose it on their customers widely, along with the rail fuel surcharges.  This concerted conduct is not only probative of a conspiracy – it is the central means by which the price-fixing conspiracy was effectuated.

### 2.    Defendants' Agreement to Publish and Use the AIILF is Actionable Under the Sherman Act.

As detailed in the Complaint and discussed above, at the time the conspiracy began, most of Defendants' customers' contracts included rate-escalation provisions tied to long-standing cost-adjustment indexes (the AII and RCAF) that adjusted rates over the term of the contract based on actual increases in the railroads' costs.  These indexes tracked multiple industry cost components, including fuel.  In order to impose stand-alone fuel surcharges widely, Defendants needed to begin using a cost escalation index that did not include fuel costs.  They used the cover of the AAR to create and publish such an index (the AIILF) collectively, and agreed to impose it, along with stand-alone fuel surcharges, on their customers.  The Complaint alleges that immediately following the publication of the AIILF under the auspices of the AAR, *all* Defendants began immediately imposing that index on their customers along with the inflated

fuel surcharges, which moved in lockstep.[24]  These allegations are directly probative of a price-fixing conspiracy.

Defendants claim that their concerted action at the AAR amounted only to the publication of a voluntary index by a trade association, intended to "provid[e] tools for optional use by members."  (Defendants' Brief at 36.)  According to Defendants, without some "separate allegations indicating that association members were bound to use the index or otherwise were restricted by it; a trade association agreement to create and publish a cost index will not suffice" to confer antitrust liability.  (Defendants' Brief at 34-35.)  But this assertion is based on a fundamental mischaracterization of the Complaint.  In fact, Plaintiffs do allege – repeatedly – that Defendants agreed both to publish the AIILF *and to use it collectively to impose coordinated fuel surcharge programs* on their customers.

This is in certain respects the core of the alleged price-fixing conspiracy:  that Defendants agreed to publish *and use* the AIILF so they could apply stand-alone fuel surcharges on their customers.  Defendants' assertion that Plaintiffs have alleged "*only*" that the new index "allowed" Defendants to apply stand-alone fuel surcharges (Defendants' Brief at 35) (emphasis added) is thus particularly brazen.  The Complaint alleges that the publication of the AIILF "allowed" Defendants to apply stand-alone fuel surcharges, *and* that Defendants *agreed* that they would apply those fuel surcharges, and that they actually did so in a coordinated fashion.  Numerous paragraphs, including 5, 13, 65, 67, and 75 – which Defendants' essentially ignore – clearly allege that Defendants agreed to implement coordinated fuel surcharge programs involving stand-alone rail fuel surcharges *using* the AIILF and to impose these programs on their customers in a coordinated manner:

---

[24]  *See, e.g.,* Compl. ¶¶ 5, 13, 65, 67, 75.

5.    To overcome this obstacle [*i.e.*, the widespread use of the AII/RCAF], **Defendants BNSF, UP, CSX and NS devised and embarked on a scheme to remove fuel from the AII, so that a separate "fuel surcharge" could then be applied as a percentage against the total cost of freight transportation**. This permitted these major railroads to achieve their desired, and **mutually agreed**, result: **an effective percentage rate increase that could be broadly applied to rail freight customers**.

13.    **With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants BNSF, UP, CSX and NS now each applied the fuel surcharge in the same way**: as a percentage multiplier of the *total* base rate for the rail freight transportation. … This **agreed approach** yielded the Defendants billions of dollars of additional profits.

65.    In the fall of 2003, **BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program** that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.  Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, **Defendants BNSF, UP, CSX and NS agreed to create *and implement* coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.**

67.    **Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges**, applied against the total cost of rail freight transportation, ***and coordinate that practice*.  The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy** – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs.  This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

75.    The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs.  Rather, the only purpose in taking these **collective actions** was to begin assessing a stand-alone fuel surcharge applied to revenue (*i.e.*, the entire base rate for the freight shipment), not costs; **to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program**.  That is, **pursuant to the conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of freight* shipment** (notwithstanding that fuel only accounts for a portion of the costs of the shipment).  **Through this collective action**, Defendants BNSF, UP, CSX and NS planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

(Emphases added.)  (*See also* Compl. ¶¶ 6, 8, 11, 12, 69, 74, 76, 77.)

As the foregoing exemplary paragraphs reflect, the Complaint alleges that the conspiracy was not limited to the publication of the AIILF, but extended to agreement by the Defendants to act in concert in imposing stand-alone rail fuel surcharges on their customers by *using* the AIILF.[25]

Such agreement is clearly illegal.  Defendants do not appear to contest – nor could they – that their agreement to impose coordinated fuel surcharge programs by using the AIILF would violate the Sherman Act, regardless of whether there was any independent restraint requiring them to use the index.  As this Court has previously recognized, "it is well established that the parties to an agreement which per se violates the antitrust laws may not defend on the basis that they have applied no coercion to bring about adherence to the combination or to compel obedience to its terms."  *National Ass'n of Broadcasters*, 536 F. Supp. at 163; *see also Fed.*

---

[25]    Plaintiffs are, of course, entitled to reasonable inferences concerning their allegations.  *See Aktieselskabet*, 525 F.3d at 21 n.8 ("We continue to construe complaints liberally by interpreting ambiguous text in the complaint in the light most favorable to the plaintiff.").

*Trade Comm'n v. Pac. States Paper Trade Ass'n*, 273 U.S. 52, 62 (1927) ("An understanding, express or tacit, that the agreed prices will be followed is enough to constitute a transgression of the law.  No provision to compel adherence is necessary."); *Am. Column & Lumber Co. v. U.S.*, 257 U.S. 377, 391, 399 (1921) (noting that the associational plan found to violate Section 1 of the Sherman Act "was optional" for association's members and that the "sanctions" were merely "financial interest, intimate personal contact, and business honor, all operating under the restraint of exposure of what would be deemed bad faith and of trade punishment by powerful rivals").[26]

---

[26]    Notably, in all of the cases Defendants cite in support of their assertion that non-mandatory associational conduct is somehow immune from antitrust scrutiny, courts were assessing associational conduct following either discovery or trial – that is, weighing the evidence and finding it insufficient to support liability.  None found that non-mandatory associational conduct "cannot form the basis for antitrust liability," Defendants' Brief at 34, but rather that there was no evidence (after trial or discovery) that the conduct in question did so.  *See, e.g.*, *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir. 1989) (noting that "[a]fter a month of trial, the jury disagreed" with plaintiff on liability); *Maple Flooring Mfrs.' Ass'n v. U.S.*, 268 U.S. 563, 566, 585 (1925) (noting that "[t]he oral testimony and documentary evidence have covered a wide range and have reached a great volume which it will be impossible, within the limits of an opinion, to review in detail," and that the court must look to the "peculiar circumstances of each case"); *Cement Mfrs.' Protective Ass'n v. U.S.*, 268 U.S.588, 606 (1925) ("[H]ere the government does not rely upon agreement or understanding, and *this record wholly fails to establish, either directly or by inference*, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement to which we have referred; and it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action.") (emphasis added); *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712-13 (7th Cir. 1987) ("Since there was *no evidence which would on any theory support a verdict for plaintiffs* on the antitrust claim, had proper instructions been given to the jury, there is no necessity nor reason to remand for a new trial . . . [The plaintiff] *presented no evidence of any agreement*, combination, or conspiracy to boycott and refuse to deal.") (emphasis added).  The remaining cases cited by Defendants likewise center on highly specific factual and antitrust issues with no bearing on this case at all.  *See Schachar*, 870 F.2d at 399 (analyzing disaggregated "market with thousands of providers"); *NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98-120 (1984) (assessing whether a college athletic association's plan for televising games was a *per se* violation of Section 1 of the Sherman Act); *National Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 684-99 (1978) (analyzing professional associations' code of ethics).

In addition, although the point is largely academic in light of the Complaint's allegations that the Defendants agreed to impose stand-alone fuel surcharges in a coordinated fashion using the AIILF, it merits mention that this Court has recognized that antitrust liability can arise even from non-mandatory associational practices. As this Court has explained, if a trade association lawfully publishes pricing information that is used "as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful." *Jung*, 339 F. Supp. 2d at 37 (*quoting Cont'l Ore Co.*, 370 U.S. at 707 ("acts which are in and of themselves legal lose that character when they become constituent elements of an unlawful scheme.")); *see also Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 809 (1946) ("It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").

In *Jung*, this Court assessed motions to dismiss an antitrust suit in which one "prong" of the conspiracy was the publication of a survey by the American Association of Medical Colleges ("AAMC") aggregating its members' compensation levels, which allegedly "facilitat[ed] . . . the anticompetitive agreement" by providing "a mechanism by which compensation levels remain stabilized and depressed." 300 F. Supp. 2d at 126, 166. There was no allegation that members were bound to provide information that formed the basis of the survey. This Court noted that "[a]lthough institutional defendants provide their individual information to the AAMC and the results of the Survey are distributed by the AAMC to its members, *the institutional defendants are not required to provide information in order to receive the Survey*. In fact, the Survey is available to the public at large." *Id.* at 140 (emphasis added).

Notwithstanding the non-mandatory nature of the request for information from the AAMC members, this Court viewed the allegations "through the lens of" the "larger price-fixing charge" and concluded that:

> while plaintiffs have not alleged expressly that the AAMC agreed to join the conspiracy, it is reasonable to infer from the facts and circumstances detailed in the complaint that the AAMC, an organization whose membership includes the institutional defendants, annually collects and disseminates compensation information to its *members in order to facilitate the alleged compensation-fixing agreement* and to allow for internal policing of member co-conspirators.

*Id.* at 166-167 (emphasis added).[27]

Likewise, when the detailed allegations here concerning the AIILF are "viewed through the lens of" the "larger price-fixing charge," *id.* at 166, the role of the AIILF in the fulfillment of Defendants' conspiratorial objectives becomes clear. Far from being innocent, the Defendants' use of the AAR, which Defendants dominate and control, provided the means by which and through Defendants could collectively act to implement their conspiracy.

### 3. Defendants' *Post Hoc*, Piecemeal Justifications for the AIILF are Unpersuasive

Defendants advance several arguments in an effort to defend creation and publication of the AIILF. In so doing, Defendants not only mischaracterize what the Complaint alleges, but also improperly seek to disaggregate their conduct in the AAR in the Fall of 2003 from all of the other conduct alleged in the Complaint. Defendants also face a formidable burden in attempting to give *post hoc* justifications for their conduct.

It is well established that "allegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy

---

[27]  This Court later had to enter judgment for the defendants in *Jung* due to the subsequent passage of federal legislation amending the antitrust laws to prevent the consideration of the very evidence related to medical residency programs on which plaintiffs' allegations depended. *Jung*, 339 F. Supp. 2d at 26. The passage of that legislation, however, in no way impacts this Court's cited reasoning.

claim itself.'" *Jung*, 300 F. Supp. 2d at 156 (quoting *Fine Paper*, 685 F.2d at 822); *see also Cont'l Ore Co.*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").  This principle is reflected in post-*Twombly* rulings, where price-fixing defendants failed in trying similar strategies.  *See, e.g., In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159, at *7 (rejecting defendants' "attempt to parse and dismember the complaints").

Defendants must do more than give a plausible account of why their alleged conduct was not part of a conspiracy; they must give such a compelling explanation that it renders Plaintiffs' conspiracy allegations implausible.  *See, e.g., In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 59 (E.D. Pa. 2007) (noting that defendants' giving of "one plausible explanation" of their parallel conduct was insufficient to obtain summary judgment); *City of Moundridge*, 2008 WL 1735856, at *4 (holding that "a complaint need not be dismissed where it does not 'exclude the possibility of independent business action,'" as the defendants had argued, because such a requirement "would be counter to Rule 8's requirement of a short, plain statement with 'enough heft to show that the pleader is entitled to relief.'" (*quoting Twombly*, 127 S. Ct. at 1966)); *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159, at * 7 (admonishing defendants for impermissibly parsing the complaint and concluding that defendants' piecemeal justifications were insufficient because "the fact that multiple instances of parallel conduct are alleged makes it far less likely that a business justification exists for all of the acts taken in total").[28]

---

[28]    S*ee also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468 (1992) ("The Court did not hold [in *Matsushita*] that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment.").

Defendants here argue that publication of the AIILF "could have" been motivated by a "time lag concern" arising from use of the AII/RCAF. (Defendants' Brief at 39.) However, this justification is counter to the allegations in the Complaint (which must be fully credited at this stage of the proceedings). The Complaint alleges that the AII and RCAF could capture all actual fuel cost increases, and quotes the president of Defendant UP, who contemporaneously acknowledged that the RCAF "looks at actual costs through the industry." (Compl. ¶ 4.)

Furthermore, notwithstanding Defendants' suggestion to the contrary, the STB in fact made no finding that there was any valid "time lag concern." All the STB noted with respect to the purported "time lag concern" was that some carriers (*i.e.*, the Defendants) had raised this issue as part of their arguments before the STB. *See* STB Ruling at 4. The STB certainly did not credit such arguments in concluding that the Defendants' fuel surcharges were misleading precisely because they did not reflect actual fuel costs. *Id.* at 7.

More basically, even if (contrary to the Complaint's allegations) there was anything to a "time lag concern," this would not explain why Defendants had to address it collectively. If any individual Defendant had such a concern, it could have calculated its own AIILF and tried to impose it along with stand-alone fuel surcharges unilaterally. There was no legitimate reason why Defendants had to address this supposed concern in a concerted fashion.[29]

Defendants do not give a persuasive explanation for why *the AAR* would need to be involved in offering the AIILF "tool" to its members at all. The Complaint alleges that there was

---

[29]    Defendants' claim that their adoption of the AIILF was justified by the STB's concern with double-dipping is even more far-fetched. (Defendants' Brief at 39.) The STB found that Defendants' (coordinated) fuel surcharge programs were the cause of double-dipping. STB Ruling at 10. The most obvious way for Defendants to avoid "double dipping," of course, would have been to continue using the AII/RCAF indexes, which "already permitted full recovery by the railroads of actual fuel cost increases," without stand-alone fuel surcharges. (Compl. ¶ 4.)

no legitimate reason for the AAR to be involved in publishing the AIILF, even if any individual Defendant had thought such an index was desirable. (*Id.* ¶¶ 74-76.) Indeed, Defendants themselves stress that the AIILF is calculated by using "simple arithmetic" based on an index (the AII) which is "already public." (Defendants' Brief at 36.) If that is the case – and it undoubtedly is – then it is difficult to see why the AAR (*i.e.*, the Defendants) would need to be involved in providing that "tool" at all.[30] If BNSF, for example, wanted such a tool, and was operating in a legitimately competitive fashion, then it could have easily made the arithmetical adjustment to the AII itself, giving *itself* a tool that it could use unilaterally. BSNF did not do this, however – because, as the Complaint alleges, it realized that it would be more successful in *implementing* the revenue-based surcharges widely, and not sporadically as they had been used in the past, if *all Defendants* agreed to use the same approach. (*Id.* ¶¶ 56, 64.)

Defendants also cannot reconcile their *post hoc* explanation for the AIILF with the contemporaneous statement by BNSF that its CEO "led the charge on" the AAR's publication of the AIILF. (Compl. ¶ 68.) This statement is more consistent with the alleged fact that the AIILF was published through the AAR as a means of cover for an unlawful agreement than it is with Defendants' *post hoc* explanation that the AAR innocently decided to create a new "tool" for voluntary use by its members.

Nor can Defendants explain why their concerted actions regarding the AIILF occurred at the same time Defendants took steps to begin the broad imposition of stand-alone fuel surcharges *and* to bring their respective Eastern and Western fuel surcharge prices into lockstep. The timing

---

[30]    The RCAF was established in response to the Staggers Act requirement that a cost-adjustment factor be created and published by the STB. *See* 49 U.S.C. § 10708. The AAR publishes and submits the RCAF, and the AII which underlies it, to the STB for approval. There is no statutory or regulatory reason why the AAR would need also to publish the AIILF. (Compl. ¶ 76.)

of these interrelated events alone supports the plausibility of the alleged conspiracy. Defendants'
*post hoc* justifications, based on disaggregating the various contemporaneous actions alleged in
the Complaint, cannot explain away the curious convergence of these events – and certainly do
not render the alleged conspiracy implausible.

**B.    The Lockstep Fuel Surcharges of the Western and Eastern Railroads are Probative of the Conspiracy**

The Complaint alleges that, in implementing the alleged price-fixing conspiracy, each
Defendant agreed to impose upon its customers the same rail fuel surcharges used by its
principal regional competitor. Thus, Plaintiffs allege that during the conspiracy the Western
railroads charged their customers the exact same rail fuel surcharges, and the Eastern railroads
charged their customers the exact same fuel surcharges. The Western railroads began to charge
the same fuel surcharges in July of 2003, shortly before BNSF "led the charge" to the AAR,[31]
and the Eastern railroads began to charge the same fuel surcharges right after the AIILF was
announced.[32] Defendants' websites bear these allegations out – BNSF and UP charged the exact
same fuel surcharges, and NS and CSX charged the exact same fuel surcharges, through at least
mid-2007. (*See* Compl. ¶¶ 80-82.)

Defendants argue that they compete with each other only regionally, and not across the
entire nation. (*See* Defendants' Brief at 4-5.) But this only further explains why the conspiracy
could be effectively implemented with the Eastern and Western railroads, respectively, in
lockstep on fuel surcharges. As discussed herein, the fuel surcharge programs of the four

---

[31]    The Western railroads began to charge identical fuel surcharges shortly after the Spring
2003 meeting of the National Freight Transportation Association, attended by Defendants'
executives. (Compl. ¶ 58.)

[32]    The Eastern railroads promptly began to implement the AIILF after they jointly
effectuated its publication in December 2003. (Compl. ¶¶ 69, 73.)

Defendants were identical in critical respects.  The Eastern Defendants and Western Defendants each implemented the agreed conspiracy in their respective regions.

>    1.    **The Complaint Explains How the Mechanisms and Timing of the Defendants' Lockstep Pricing Fit Within the Allegations of Conspiracy**

Defendants claim that the alleged conspiracy is not "typical" because it "involves the use of two completely different surcharge formulas adopted at widely different times by the Eastern and Western Railroads."  (Defendants' Brief at 24.)  They also assert that this "undermine[s] any plausible inference of an integrated overall conspiracy."  (*Id*.)  These claims are untrue.  The alleged (and uncontrovertible) facts of Defendants' lockstep pricing fits neatly within the Complaint's detailed account of Defendants' price-fixing conspiracy.

First, the fact that the Western railroads and the Eastern railroads used different fuel indexes for setting their fuel surcharge prices was essentially a historical quirk:  when the two Eastern railroads moved into lockstep following publication of the AIILF, they chose to use the fuel index that, at that particular time, would generate higher rail fuel surcharges.  (Compl. ¶ 12.)

Defendants claim that the surcharges between the Western and Eastern railroads differed in "almost every possible respect," (Defendants' Brief at 24), but this is significantly overstated.  The Western and Eastern railroads took the same approach to setting rate-based fuel surcharges, moving in lockstep and keyed to a fuel index.  Indeed, the fuel surcharge programs of the Western and Eastern railroads were largely identical in virtually all of their complex and unprecedented features.  (Compl. at ¶¶ 59-62; 69-72.)  These features included:

- Setting fuel surcharges as "a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job." (*Id.* ¶ 65.)
- Establishing the *exact same* two-month time period between an increase in the applicable index and the implementation of the adjustment to the surcharge. (*Id.* ¶¶ 61, 71.)

- Adopting other similar mechanisms for calculating when and how surcharges would be administered, including the selection of a trigger point above which a fuel surcharge would be assessed, and the amount of the surcharge (as a percentage) to be applied for each incremental increase in the cost of fuel above the trigger point. (*Id.* ¶¶ 59-62; 69-72.)

- Publicly reporting both historical and future monthly surcharges on Defendants' websites (to monitor adherence to agreed-upon rates). (*Id.* ¶¶ 61, 71.)

Given Defendants' success in imposing supracompetitive rail fuel surcharges widely on their customers – allowing them to price significantly above cost and reap enormous profits (*id.* ¶ 99) – the minor differences in the surcharge rates between the Western and Eastern railroads was of no practical consequence to the conspiracy's operation and success.[33]  As the tables of Defendants' fuel surcharges show, the Western railroads' surcharges were similar to the Eastern railroads' surcharges during the entire Class Period.  (*Id.* ¶¶ 80, 82.)

Second, Defendants' suggestion that "the timing of the events" in Defendants' adoption of lockstep surcharge mechanisms "is impossible to square with any suggestion of conspiracy" is, again, simply untrue.  (Defendants' Brief at 25.)  It is true that the Western railroads brought their surcharges into lockstep before the Eastern railroads did.  But all this indicates – and what the Complaint alleges – is that the Western railroads may well have been the initiators of the conspiracy.[34]  (*Id.* ¶ 65.)  A conspiracy is not implausible merely because all of its members do not join at the exact same time.  Despite what Defendants may think the "typical" conspiracy

---

[33]    *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1095 ("absolute lockstep behavior in all situations" is not necessary to show conspiracy).

[34]    It is possible, of course, that evidence obtained through discovery will shed further light on the timing of the early conspiratorial meetings and may even reveal that one or both of the Eastern railroads were involved in conspiratorial meetings from the outset.  Because a cartel operates in secret, plaintiffs are not required to identify when every conspiratorial meeting took place or whether agreement was arranged at the outset through multilateral or bilateral meetings. *See, e.g., Callahan v. A.E.V., Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) (observing that in an antitrust action, conspiratorial conduct "is generally covert and must be gleaned from records, conduct, and business relationships").

looks like (Defendants' Brief at 24), conspiracies are rarely cast in stone from the outset, with all participants involved equally and all effects felt simultaneously from the first days of the enterprise. *See, e.g., In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1056 (W.D. Wis. 2000) ("[T]here is, of course, no requirement that each coconspirator participate in every phase of an evolving conspiracy, as long as each was aware that the conspiracy did not begin and end with his own activities." (quoting *United States v. Yonkers Contracting Co., Inc.*, 706 F. Supp. 296 (S.D.N.Y. 1989)).[35]

The timing of the adoption of Defendants' lockstep pricing mechanisms supports the plausibility of the alleged conspiracy. The Western railroads moved their surcharge programs into lockstep but saw that imposing stand-alone rail fuel surcharges widely would be impracticable in light of the prevailing use of the AII/RCAF. They decided to use the cover of the AAR to create a new index and bring all Defendants on board with adopting it and using it with their customers. The Eastern railroads agreed to do so.

---

[35] Plaintiffs' allegations about the timing of Defendants' actions in furtherance of the conspiracy exceed applicable pleading requirements. Plaintiffs are not required to specify which Defendants led or participated in the various overt actions in furtherance of the conspiracy as long as they have sufficiently pled each Defendant's involvement. *See, e.g.,In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 ("Antitrust conspiracy allegations need not be detailed defendant by defendant.") (citing cases); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 278 (D. Conn. 2003) (plaintiffs not required to "specify individual acts of each defendant" where the complaint identified the co-conspirators and described nature and effect of conspiracy); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d at 375 ("The short answer is that plaintiffs have alleged that all of the named defendants were participants in the conspiracy" and whether "a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator"); *In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2000 WL 1475705, at * 11 (D.D.C. May 9, 2000) ("An overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits.") (quoting *In re Nasdaq Mkt. Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995)).

Following publication of the AIILF, all Defendants began using the new index with their customers, and the Eastern railroads immediately brought their surcharges into lockstep. Thus, the Complaint lays out the time period of the conspiracy and alleges in detail the precise timing of each railroad's imposition of surcharges in relation to the publication of the AIILF. The interrelated timing of these events firmly supports the plausibility of the price-fixing conspiracy alleged.

### 2. Defendants' Years of Lockstep Pricing Cannot Be Explained Away As Unilateral Conduct

Defendants also assert that their years of lockstep pricing in the Eastern and Western regions merely showed that Defendants were engaged in "price matching and follow-the-leader pricing." (Defendants' Brief at 13; *see also id.* at 30 (suggesting that Defendants purposefully "follow[ed] each other in charging the same prices").) Defendants' apparent acknowledgement that they were purposefully following each other's prices, though, actually underscores the plausibility of Plaintiffs' conspiracy allegations.[36]

First, lockstep pricing should not be considered in isolation. It should be considered in light of all of the Complaint's allegations – such as the identification of Defendants' conspiratorial meetings, the publication and collective use of the AIILF, the stabilization of market shares, and the reaping of windfall profits. While "parallelism, *taken alone*, [does not] raise the necessary implication of conspiracy" *Twombly*, 127 S. Ct. at 1968 n.7 (emphasis added), "[a]n allegation of parallel conduct . . . gets the complaint close to stating a claim," and with just "some further factual enhancement," such an allegation will suffice to render the claim

---

[36]    Moreover, Defendants' argument contradicts what is alleged in the Complaint. The Complaint alleges that Defendants met and agreed to fix prices, not that they engaged in unilateral business decisions that led them to follow each other's pricing practices. Indeed, the Complaint alleges that Defendants would not have rationally charged the same prices absent agreement. (*See* Compl. ¶¶ 84, 87, 88.)

plausible. *Id.* at 1966. Such "further factual enhancement" is clearly present here, as discussed at length above. When viewed in the context of Defendants' other conduct alleged in the Complaint, such as the Defendants differing fuel efficiencies and operating costs, (Compl. ¶¶ 83, 86), as well as all of the contemporaneous conduct within the AAR, the Defendants' lockstep pricing clearly supports the plausibility of the conspiracy.[37]

Defendants' suggestion that they engaged in purposeful "price matching and follow-the-leader pricing" contradicts the reasons Defendants gave for their fuel surcharge prices during the Class Period. As the Complaint alleges, and as must be taken as true, Defendants falsely and deceitfully presented their fuel surcharges during the Class Period as a means to "compensate for increases in the cost of fuel." (*See, e.g., id.* ¶¶ 2, 16, 96-98.) As noted above, the STB itself found this "misleading." Thus, Defendants' new explanation shows that the explanation they all gave to their customers for their fuel surcharges was pretextual.

Plaintiffs reiterate that on a motion to dismiss, where the Defendants have moved to stay discovery, it is inappropriate for Defendants to invoke evidence outside the scope of the Complaint. To the extent, however, that Defendants seek to rely on what occurred at the STB (*e.g.*, Defendants' Brief at 9-10 & n.1), it is noteworthy that Defendants explicitly defended their fuel surcharges as a means of cost recovery, not as a matter of follow-the-leader price matching. *See, e.g., Comments of BNSF Railway Co.*, STB Ex Parte No. 661, Filing No. 217709, at 5 (Oct. 2, 2006) ("BNSF is committed to recovering its increased costs of fuel through fuel surcharges

---

[37] As the Complaint notes, an industry analyst at the time expressed puzzlement at the fact that the Defendants had ceased competing to gain market share in favor of charging the same prices. (Compl. ¶ 84.) It is a reasonable inference that this analyst – fairly expected to be knowledgeable about the industry – was puzzled by the railroads' conduct because it was not in any individual railroad's independent self interest, absent a conspiracy. (*See id.* at ¶¶ 87, 88.) *See also* Section III.D.7, *infra.*

and not to over-collect."); *Comments of Union Pacific Railroad Co.*, STB Ex Parte No. 661, Filing No. 217707, at 4 (Oct. 2, 2006) ("UP's [fuel surcharge] is NOT a profit center. It never has been a profit center. It was never intended to be a profit center. It was and is intended to be an efficient way of recouping rapidly changing fuel costs."); *Summary of BNSF Railway Company's May 11, 2006 Presentation*, STB Ex Parte No. 661, Filing No. 216402, at 1 (Apr. 27, 2006) (bullet point summary of STB hearing presentation, stating "Fuel Surcharge is a cost recovery mechanism"); *Written Statement of CSX Transportation, Inc.*, STB Ex Parte No. 661, Filing No. 216397, at 6-7 (Apr. 27, 2006) (discussing increase in fuel expenses paid by CSX and stating that CSX's "fuel surcharge program is designed to recover this astounding increase in its costs for fuel") (*All available at* http://www.stb.dot.gov/filings/all.nsf/ByDocketNumber).

Post-*Twombly* courts have considered pretextual justifications for coordinated behavior to be highly probative of conspiracy. In *City of Moundridge*, for example, the defendant producers of natural gas had given justifications during the alleged conspiracy period that were alleged to be pretextual. The Court found that these pretextual reasons for their pricing behavior supported the plaintiffs' conspiracy allegations. *See* 2008 WL 1735856, at *3 ("Hurricanes Katrina and Rita should not have affected the market in as the defendants claimed and they were only a pretextual reason to justify withholding market supply to create an artificial shortage.").[38]

---

[38]    The *City of Moundridge* court also considered "the allegations that the defendants had reported high profits." *Id. See also In re OSB Antitrust Litig.*, 2007 WL 2253419, at *3 (considering relevant the allegation that conspirators achieved "'staggering' profit increases") (internal reference omitted); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1095 (noting allegation that conspirators' "profit margins grew considerably . . . lend[s] more support to plaintiffs' complaint."). Similarly, here, the Complaint alleges that by collectively adopting the AIILF, and by coordinating their fuel surcharge practices "under the guise of rising fuel prices," Defendants were able to reap substantial additional profits, far in excess of any increases in their fuel costs. (Compl. ¶¶ 2, 54.)

Similarly, in *In re Linerboard Antitrust Litigation*, the defendants gave one reason for their parallel conduct during the period of the alleged conspiracy, but attempted to defend their conduct on summary judgment as conscious parallelism.  The court held that this evidence of pretext strongly supported the conspiracy claim:

> The Court notes that the simultaneous downtime announcements in this case constitute particularly strong circumstantial evidence because Inland's official position has been that its downtime decision was based on internal inventory levels *rather than conscious parallelism*.

504 F. Supp. 2d at 60 (emphasis added); *see also Beach v. Atlas Van Lines, Inc.*, Civil Action No. 2:07-764-CWH, Order, at 3, 6 n.4 (Docket No. 128) (attached as Exhibit B hereto) (denying motion to dismiss where plaintiffs alleged, *inter alia*, that "defendants computed a fuel surcharge as a percentage of the entire linehaul charge, which has no relationship to the actual increased cost of fuel associated with the movement of goods," and thus that their fuel surcharge practice "was simply a secret revenue enhancer."); *compare* Compl. ¶ 74 (Defendants' "'revenue-based' fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs," and "was not a cost recovery mechanism, but a revenue enhancement measure.").

In addition, although "follow the leader" pricing is not illegal on its own, it is also not competitive and it walks right up to the line of illegality.  If consciously parallel pricing is accompanied by improper discussions among competitors or other improper signaling or signs of assent, then it is illegal.  *See, e.g., Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) ("Antitrust law … sometimes permits judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable, or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision.")  (citing cases) (internal citations omitted); *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 179 (1940) (liability for conspiracy may result from "informal gentlemen's agreement or understanding"); *Esco Corp. v. U.S.*, 340 F.2d

1000, 1006 (9th Cir. 1965) (a price-fixing agreement is not usually accomplished through a "formal signed-and-sealed contract or written resolution"); *id.* at 1007 ("A knowing wink can mean more than words.").

The Complaint alleges that Defendants met and discussed railroad fuel surcharges in the industry at approximately the same time that they were announcing the details of their new fuel surcharge programs. Defendants now indicate that, during this period, they were not pricing independently, but instead purposefully following each other's pricing practices. In light of this, it is (at a minimum) *plausible* that Defendants' discussions at the AAR and otherwise were accompanied by improper communications, signaling, or signs of assent regarding their intentions about rail fuel surcharges. Thus, Defendants' own suggestion that their lockstep pricing was the result of "follow the leader" pricing practices only underscores the plausibility of the price-fixing conspiracy alleged in the Complaint.

The cases Defendants cite do not support dismissal. All but one involved appeals from grants of summary judgment, and thus reflected assessments of evidence and expert opinions. *See, e.g., Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 55 (7th Cir. 1992) (concluding that the plaintiffs "evidence" could not overcome defendants' evidence tending to exclude the possibility they were acting independently).[39] At the pleading stage,

---

[39] *See also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134 (3d. Cir. 1999) (considering testimony and expert evidence in evaluation of 'plus factors'); *In re Citric Acid Litig.*, 191 F.3d 1090, 1106 (9th Cir. 1999) ("All in all, there is no more than a scintilla of evidence that [defendant] was a participant in the citric acid conspiracy" which is insufficient to overcome summary judgment); *Clamp-All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 489 (1st Cir. 1988) ("We can find no concrete evidence in the record that [defendant] acted improperly."). The Defendants reliance on *In re Travel Agent Commission Litigation*, the only non-summary judgment case on which they rely, is also puzzling. As noted above, there the court found that, on a number of occasions, some defendants "entirely" failed to follow other defendants' pricing moves – which is not follow-the-leader pricing by definition. 2007 WL 3171675, at *4.

however, "a court constru[es] the complaint liberally in the plaintiff's favor, accept[ing] as true all of the factual allegations contained in the complaint, with the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet*, 525 F.3d at 15 (citations omitted).

Moreover, the courts in *Citric Acid*, *Clamp-All*, and *Baby Food* (*see* footnote 39, *supra*), cited by Defendants, found merely that the adoption of similar list prices, alone, could not be a basis for sustaining a Section 1 claim. One factor underpinning these decisions was the fact that the defendants competed over the actual prices charged. *See, e.g.*, *Citric Acid*, 191 F.3d at 1102 ("[a]lthough there appears to have been little competition in citric acid *list prices*, [defendant] did price aggressively in actual contracts") (emphasis in original).[40] Defendants here did not compete over how rail fuel surcharges were set *or* charged, and agreed not to negotiate discounts on their fuel surcharges and overall contract rates. (*See* Compl. ¶¶ 84, 88, 92, 95.) As Defendants' own websites show (and showed to each other), the Western and Eastern railroads charged the exact same rail fuel surcharges during the conspiracy. The absence of *any* deviation is, indeed, striking.

Finally, Defendants contend that it is unremarkable that they engaged in lockstep pricing "for nearly 38 months" because, after their fuel surcharge formulas were set, monthly surcharge prices did "not reflect separate monthly pricing decisions by Defendants, but, instead, an automated application of the fuel surcharge mechanisms previously put in place." (Defendants' Brief at 32.) Again, it is difficult to see how this undercuts Plaintiffs' conspiracy allegations. Agreeing to use a common formula is an obvious means to implement a price-fixing scheme, and

---

[40]    *See also Clamp-All Corp.*, 851 F.2d at 484 (Defendants "often set prices that deviated from their price lists."); *In re Baby Food Antitrust Litig.*, 166 F.3d at 130 ("the evidence shows that the defendants' actual transaction prices moved in different directions more often than not.").

it is illegal.  *See, e.g., Socony-Vacuum Oil*, 310 U.S. at 222 ("price-fixing includes more than the

mere establishment of uniform prices . . . *prices are fixed* . . . if the range within which purchases

or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or

on ascending or descending scales, if they are to be uniform, *if by various formulae they are*

*related to the market prices.  They are fixed because they are agreed upon.*") (emphasis added).

Absent a price-fixing agreement, there is no reason why Defendants were locked into

using any particular fuel surcharge mechanism for 38 months or for any other period.  Absent a

price-fixing agreement, each Defendant was free to adjust its surcharges any time it pleased.

Defendants' apparent admission that they *ceased* making "monthly pricing decisions" during the

Class Period thus comports with Plaintiffs' conspiracy allegations; it does not undermine them.

(Defendants' Brief at 32.)

### C.   Defendants' Numerous Breaks from Industry Practice Over a Short Period of Time Are Probative of Conspiracy

The plausibility of the alleged conspiracy can also be seen through the numerous breaks

with past industry practice that occurred over a short period of time, and which align with

Plaintiffs' account of Defendants' conspiratorial conduct.  During the alleged conspiracy period,

Defendants took numerous affirmative steps that represented a break with past practice.  In

particular:

- Defendants created and began using a brand-new rate-escalation index in their contracts (the AIILF), notwithstanding that the indexes in use (the AII/RCAF) were long-standing, widely accepted in the industry, and captured all actual increases in fuel costs;

- The Western and Eastern railroads coordinated their fuel surcharge programs, including not only the index used, but the trigger points, timing of adjustments, and other minute details;

- The Western and Eastern railroads' fuel surcharges moved into lockstep for the first time, and stayed there throughout the Class Period;

- Defendants stopped negotiating rail fuel surcharge rates with any of their customers;

- Defendants collectively moved away from using long-term contracts with their customers;

- Defendants collectively moved away from using "through rates" in interline shipments, facilitating their ability to police compliance with the conspiracy;

- Defendants stabilized their market shares.

As the Supreme Court observed in *Twombly*, "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy." *Twombly*, 127 S. Ct. at 1966 n.4 (internal quotations omitted).

A "marked change in [D]efendants' behavior around the time the conspiracy allegedly started" renders Plaintiffs' conspiracy allegations plausible. *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1096 ("Taken as true, plaintiffs' allegations show that there was a marked change in defendants' behavior in the market around the time the conspiracy allegedly started. … Accordingly, direct-purchaser plaintiffs have pleaded allegations that if true would make an antitrust conspiracy plausible."); *Fair Isaac Corp.*, 2008 WL 623120, at *6 ("In the instant case, the Second Amended Complaint alleges a close temporal proximity between the Credit Bureaus' agreement to jointly create, own, and control VantageScore, and the beginning of the alleged parallel price manipulation and denial of access to the Credit Bureau's data."); *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566 (2:03-cv-01431-PMP-PAL), Order (Docket No. 843) at p. 6 (D. Nev. Feb. 19, 2008) ("Plaintiffs allege a historically unprecedented change in natural gas prices as the result of widespread false reporting of trade information made by multiple competitors during the same time period in the natural gas industry for no discernible reason other than conspiracy.  This factual pattern is precisely the type of context *Twombly* recognized as supporting a plausible suggestion of agreement.").

The Complaint alleges that none of these measures were necessary to achieve

Defendants' proffered justification of managing rising fuel costs. Because cost-adjustment

indexes (the AII and RCAF) that accounted fully for rising fuel costs were already in use, the

adoption of the AIILF and the use of separately-assessed fuel surcharges were not needed. (*Id.*

¶¶ 4, 74.) As the STB determined, it was "misleading" for Defendants to suggest that the fuel

surcharges they imposed reflected actual fuel costs. To the contrary, as the STB held,

Defendants' fuel surcharge programs which "increase[] all rates by a set percentage stand[]

*virtually no prospect* of reflecting the actual increase in fuel costs for handling the particular

traffic to which the surcharge is applied." (*Id.* ¶ 16) (*quoting* STB Ruling at 6) (emphasis

added).[41]

Defendants do not even attempt to explain why the fact that all of this affirmative

conduct occurred over a short period of time is not itself suggestive of a conspiracy. They

disaggregate certain actions and try to explain them as innocent. This attempt to explain each

element in isolation is itself improper.  *See Jung*, 300 F. Supp. 2d at 156; *see also In re*

*Southeastern Milk Antitrust Litig.*, 2008 WL 2117159 at *7.

Defendants note that the railroads moved into lockstep in the West when UP adopted the

fuel surcharge mechanism that BNSF was using, and that the railroads moved into lockstep in the

East when NS adopted the fuel surcharge mechanism that CSX was using. (*See* Defendants'

Brief at 26-29.) This is true, as the Complaint makes clear. But it is difficult to see why

Defendants think this should remove their conduct from suspicion. These changes occurred over

---

[41]    Defendants argue that publication of the AIILF "could have" been motivated by
Defendants' concern that use of the AII/RCAF indexes only permitted fuel cost recovery after a
significant "lag." (Defendants' Brief at 39.) As discussed above, this justification is counter to
the allegations in the Complaint (which must be fully credited at this stage of the proceedings)
and counter to the findings of the STB. *See, supra,* at p.39.

a short period of time, grouped around the concerted action by Defendants to publish and adopt a brand-new index, which allowed them to impose that new index and the stand-alone surcharges on all their customers at the same time. These changes also occurred along with Defendants' refusal to negotiate fuel surcharge rates, their move from long-term contracts and through rates, and their stabilization of market shares. Defendants never explain why *all* this conduct was occurring around the same time.

The nearest Defendants come to addressing the close temporal proximity of their numerous breaks with past practice at the outset of and during the conspiracy period is to argue at length that the move into lockstep pricing by the Western and Eastern railroads was not "simultaneous." (Defendants' Brief at 25-30.) Notwithstanding pages of argument on the point, however, it is simply a "red herring." As alleged, when the Western railroads began actively to impose their largely-dormant fuel surcharge programs in July of 2003, they simultaneously brought their fuel surcharge rates into lockstep and kept them there through at least mid-2007, despite changing market conditions, individual factors affecting fuel prices, and customer objections. Similarly, when the Eastern railroads began to impose the AIILF and stand-alone fuel surcharges on their customers, right after Defendants' collectively published the AIILF, they too simultaneously brought their fuel surcharge programs into lockstep and kept them there through at least mid-2007.

Finally, some of Defendants' attempts to suggest that their surcharge programs changed at different times only make their pricing behavior more suspect. Defendants argue, for example, that, "Although the Complaint alleges that Defendants had the 'exact same fuel surcharges … through at least mid-2007,' the website data shows that, effective July 1, 2006, NS modified its WTI Index-based fuel surcharge by significantly increasing the trigger point … and

reduced the increments by which the fuel surcharge is increased." (Defendants' Brief at 29, n.9 (internal complaint citations omitted) (citing Exhibit E to Reinhart Declaration (Doc. No. 106)).) Defendants' historical fuel surcharges, as reported on the websites *they submitted* with their motion, however, show that NS and CSX continued to charge the exact same fuel surcharges *from July 1, 2006 on*. *Compare* Exhibit E to Reinhart Declaration (NS surcharges in, for example, August and September of 2006 were 19.2% and 20.8%) with Exhibit F to Reinhart Declaration (CSX surcharges in August and September of 2006 were 19.2% and 20.8%).

Evidently, this purported change by NS *made absolutely no difference* to its prices at all: they remained in complete lockstep with CSX right up until the last dates reported on the websites. *Compare* Exhibit E (NS surcharge in October of 2007 was 20.0%) with Exhibit F (CSX surcharge in October of 2007 was 20.0%). How is this supposed to undercut the conspiracy's plausibility?

### D.    The Complaint's Allegations of Defendants' Other Conspiratorial Conduct Further Support the Plausbility of the Alleged Conspiracy

The Complaint details various additional steps taken by Defendants to perpetuate, and ensure the effectiveness of, their conspiracy. (*See* Compl. ¶¶ 89-95.) As many of these steps would not have been in any Defendant's independent self-interest in the absence of a conspiracy, they further support the plausibility of the alleged conspiracy. *See, e.g., Babyage.com, Inc.*, 2008 WL 2120493, at *4 ("Plaintiffs have alleged that implementing RMP agreements was against each manufacturer's independent self interest. This tends to suggest … the absence of unilateral action.").

Defendants try to divorce Plaintiffs' allegations about these matters from their context, in order to present them as a merely "random assortment" of allegedly unpersuasive allegations. (Defendants' Brief at 40.) But when such allegations are evaluated "by looking at [the

conspiracy] as a whole," *Cont'l Ore Co.*, 370 U.S. at 699, each adds to the plausibility of the inference of conspiracy.

### 1.    Industry Communications

As discussed above, the Complaint alleges that Defendants, and their top executives, engaged in numerous meetings throughout the Class Period, including meetings that are alleged to have directly involved conspiratorial conduct.  Defendants' assertions that the Complaint is "[b]ereft of any specific allegations" and "does not identify the people who reached the agreement, nor how, when, or where it was reached" (Defendants' Brief at 41) are utterly baseless.    Defendants ignore, for example, paragraph 65:

> 65.    In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of weighted RCAF and AII (which had already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.  Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their programs through a variety of means discussed herein.

(*See also id.* ¶ 9.)

Elsewhere, Plaintiffs identify Matthew Rose, chairman, president, and CEO of Defendant BNSF, as an executive directly involved in this unlawful concerted conduct.  (*Id.* ¶ 68.)  To the extent the Defendants want more names of executives, this is not because of any genuine need for notice.  Defendants themselves undoubtedly know the names of their executives who attended the AAR board meetings in October and December of 2003 identified in paragraph 65. Plaintiffs also allege the existence of other locations where Defendants' top executives met

during the Class Period, including the Spring 2003 NFTA meeting, which occurred shortly

before the Western railroads began to coordinate their fuel surcharges.  (*Id.* ¶¶ 58-59.)

While the identification of such opportunities to discuss, reach, and maintain the unlawful

agreement may not be sufficient standing alone to plead a claim, these allegations do not stand

alone.  They are tiles in a larger evidentiary mosaic, and they further bolster the plausibility of

the alleged unlawful conduct.  Before *Twombly* and after, numerous courts have recognized that

allegations concerning interfirm communications, including those occurring at trade associations,

may be considered in assessing whether a conspiracy can be plausibly inferred.  *See, e.g.*, *In re*

*OSB Antitrust Litig.*, 2007 WL 2253419, at *5 (considering allegations of "price-fixing

discussions during industry events" in denying motion to dismiss); *In re Static Random Access*

*Memory (SRAM) Antitrust Litig.*, MDL No. 1819, 2008 WL 426522 at *6 (N.D. Cal. Feb. 14,

2008) (rejecting defendants' arguments for dismissal under *Twombly* where plaintiffs' complaint

included, *inter alia*, allegations of trade association meetings that provided opportunities to

conspire and instances of intercompetitor exchanges of price information).[42]

Finally, Defendants' argument that nothing can be inferred from their *interline*

communications is misplaced.  (Defendants' Brief at 41.)  While the Complaint alleges that

Defendants took collective action to end "through rates" on interline freight transportations as a

---

[42]    *See also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d. Cir. 2004) (proof of
conspiracy can consist of the fact that "defendants got together and exchanged assurances of
common action or otherwise adopted a common plan even though no meetings, conversations or
exchanged documents are shown") (citation omitted); *In re Automotive Refinishing Paint
Antitrust Litig.*, 229 F.R.D. 482, 492 (E.D. Pa. 2005) ("Evidence of communication and
cooperation among Defendants through the aegis of a trade association may also be relevant to
establish the existence of a conspiracy or combination, which is a required element of a Section 1
Sherman Act claim."); *In re Carbon Black Antitrust Litig.*, MDL No. 1543, 2005 WL 102966, *8
(D. Mass. Jan. 18, 2005) (considering allegations that "price increases were coordinated through
unlawful communication via a third-party conduit and at trade association meetings" and
denying motion to dismiss).

means to help effectuate the fuel surcharge conspiracy (*see* Section III.D.3, *infra*), the Complaint does not allege that such interline communications were used in any way with respect to adoption of the AIILF, the establishment of the fuel surcharge programs, or the steps to bring fuel surcharges rates into lockstep in each of the eastern and western regions.  (*See, e.g.*, Compl. ¶¶ 8, 9, 58.)

###    2.    Short-Term Contracts

The Complaint also alleges that, as one aspect of the conspiracy, Defendants decided collectively to move away from long-term contracts and toward more prevalent use of shorter-term contracts or contracts with 30-day cancellation provisions.  (Compl. ¶¶ 15, 89.)  This is yet another break with industry practice during the Class Period, and it would not have been in any Defendant's independent self-interest absent a conspiracy.  Long-term contracts allow railroads to lock in business, and it is unlikely that all Defendants would have moved away from this practice simultaneously if they had concerns that their competitors would try to take their business.

Defendants rationalize this conduct by asserting that, in a period of high demand and tight capacity, moving to shorter-term contracts is "economically rational behavior." (Defendants' Brief at 43.)  The fact that Defendants may have had some economic incentive to move to short-term contracts, however, does not explain why all Defendants did this in tandem at the same time as they took the other alleged steps in the Complaint.  A plausible explanation is that the move toward short-term contracts was one means by which Defendants could collectively maximize their profits from the conspiracy, by allowing their rate-based fuel surcharges to be broadly imposed in an era of rising base rates.

Defendants also suggest that the move to shorter-term contracts is at odds with the Complaint's allegations concerning the centrality of the AIILF to the conspiracy.  (*Id.*)  In fact,

Defendants' use of the AIILF for longer term contracts, and a move to increasing use of shorter-term contracts, were complementary elements of the conspiracy, which was focused on maximizing application of the stand-alone fuel surcharges as a revenue enhancement mechanism. At the time the AIILF was adopted, most freight was transported pursuant to private contracts that included cost-adjustment provisions based on the AII or RCAF indexes that already accounted for actual fuel cost increases. The AIILF was the necessary means to address cost escalation in long-term contracts, which many customers continue to have to this day. The AIILF was thus integral to the conspiracy, while at the same time Defendants increasingly sought to have shorter term contracts.

Thus, in the context of the Complaint's allegations, this collective move toward short-term contracts by Defendants during the Class Period supports the plausibility of the conspiracy.

### 3.    Through Rates

The Complaint also alleges that, during the Class Period, Defendants made another break from past industry practice, and one that required joint conduct: moving away from using a single "through rate" for interline shipments, and instead having each railroad bill the customer separately. (Comp. ¶ 94.) The Complaint explains that this change was made to increase pricing transparency in order to monitor compliance with the conspiracy and so that each Defendant could bill separately for its surcharge. This change would not have been consistent with any individual Defendant's independent self interest, absent a conspiracy. In response, Defendants neither deny that the practice marked a new departure from historic rate billing practices, nor offer any reason as to why the new practice was adopted by all Defendants at the same time. Instead, Defendants claim that the move away from through rates would not lead to greater transparency. (Defendants' Brief at 43-44.)

Contrary to Defendants' assertion, their collective movement away from through rates does serve to "provide transparency as to what each railroad was charging on multiple line shipments." (Compl. ¶ 94.)[43]

The elimination of single-factor through rates allowed each Defendant in multi-railroad shipments to transmit its own invoice and collect its own fuel surcharge (typically a separate line item on the invoice), and thus allowed each Defendant to demonstrate to its competitor that it was assessing and collecting the agreed upon surcharge. Policing the fuel surcharge agreement thus became far easier. This shift away from through rates could not have been accomplished without the collective action of the Defendants, and it supports the plausibility of the alleged conspiracy.

### 4.    Advance Publication of Fuel Surcharges

The advance announcement of Defendants' fuel surcharges, and publication of those surcharges on their respective websites, provided each Defendant with a means to detect deviations from the price fixing scheme. (Compl. ¶¶ 14, 61, 71.) Defendants attempt to justify this practice as "customer service" and suggest that they publicly announced their surcharges in order to fulfill their obligation to "provide to any person, *on request*, the carrier's rates and other service terms." (Defendants' Brief at 45 (emphasis added).) These reasons are unpersuasive.

Essentially every business is willing to provide to any customer its rates on request, but not every business publicly announces its rates – to its customers and competitors – and explains

---

[43]    When one railroad enters into a single-factor through rate with another railroad, the division of revenues for each railroad and the fuel surcharge actually being assessed and collected by each railroad cannot be discerned by those railroads' nearest regional competitors. So, for example, if BNSF is shipping freight from the West to East coast, and enters into interchange service with CSX, the through-rate customer's bill will not delineate the division of revenues between BNSF and CSX. If the customer shows that bill to BNSF's and CSX's competitors (NS or UP) during the context of contract negotiations, NS or UP cannot determine if a fuel surcharge is even being charged, let alone the amount of the surcharge.

exactly how they will be computed in the future. Defendants have given no persuasive

justification for why they needed to do this, in light of the serious anticompetitive concerns with

disclosing one's prices and pricing intentions to one's competitors.[44]

Defendants' justifications aside, publication of prices can be a relevant factor supporting

an inference of conspiracy. For example, the *OSB* court, in a post-*Twombly* ruling, found

probative of conspiracy an allegation that the defendants published their prices in an "industry

periodical," thereby allowing defendants to "monitor their competitors and ensure that no

member of the conspiracy 'cheated' by offering significantly different prices." *In re OSB*

*Antitrust Litig.*, 2007 WL 2253419, at *3; *see also In re Coordinated Pretrial Proceedings in*

*Petroleum Products Antitrust Litig.*, 906 F.2d 432, 449 (9th Cir. 1990) (concluding that the

defendants' public posting of prices and discounts "supports a reasonable and permissible

inference of an agreement or understanding concerning prices").

### 5. Failure to Negotiate Fuel Surcharges

During the Class Period, Defendants refused to negotiate the rail fuel surcharges they

implemented, or even to reconsider their rail fuel surcharge practices, although it had been

customary for them to do so previously, when stand-alone fuel surcharges had been used

sporadically and only in isolated instances. (Compl. ¶¶ 92-93.) "Shippers from many different

---

[44]    As the Supreme Court observed in *U.S. v. Container Corp. of America*:

> Here all that was present was a request by each defendant of its
> competitor for information as to the most recent price charged or
> quoted, whenever it needed such information and whenever it was not
> available from another source. Each defendant on receiving that request
> usually furnished the data with the expectation that it would be
> furnished reciprocal information when it wanted it. That concerted
> action is of course sufficient to establish the combination or conspiracy,
> the initial ingredient of a violation of § 1 of the Sherman Act.

393 U.S. 333, 335 (1969) (footnote omitted).

industries, some with significant economic power, tried to negotiate the fuel surcharge

percentages, but were told by the Defendants (who had previously been willing to negotiate

discounts on rail freight rates) that the Rail Fuel Surcharges were 'not negotiable.'" (*Id.* ¶ 92.)

Defendants' new practice of refusing to negotiate surcharges, which must be accepted as true at

this stage, goes to the heart of the conspiracy alleged.  This change would clearly not have been

consistent with any individual Defendant's independent self-interest, absent a conspiracy.  It

supports an inference that a conspiracy was plausible.

    In response, Defendants assert that because the railroad industry was going through a

period of high demand and tight capacity, it is natural that they would all cease negotiating

surcharges.  (Defendants' Brief at 45.)  But this is far from a necessary inference.  Even under

such conditions, companies can still use negotiation or discounting to increase market share and,

therefore, profits.  Particularly combined with Plaintiffs' allegations that Defendants' had

different fuel efficiencies and operating costs (Compl.¶¶ 83, 86), and that Defendants' market

shares remained stable during the Class Period, this allegation further supports the plausibility of

the conspiracy.

### 6.    Government Investigation

    As set forth in the Complaint, Defendants have publicly disclosed that they are the

subject of at least one government investigation of their fuel surcharge practices.  Every

Defendant has received at least one state grand jury subpoena or state grand jury inquiry

concerning rail fuel surcharges.  (Compl. ¶ 18.)  Contrary to Defendants' suggestion, this

ongoing governmental investigation also supports the plausibility of the alleged conspiracy.  *See,*

*e.g., In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff

may surely rely on governmental investigations, but must also, under FRCP 11, undertake his

own reasonable inquiry and frame his complaint with allegations of his own design.")  The fact

that an Attorney General's office with limited resources to protect the public welfare exercised its discretion to convene a grand jury to investigate these surcharges supports the plausibility of the Complaint's allegations.

### 7. Market Share Stabilization

Plaintiffs also allege that, during the course of their conspiracy, Defendants agreed not to compete for market share and that Defendants' market shares remained stable following the 2003 agreements. (Compl. ¶ 95.) Defendants do not directly address this allegation, which obviously supports the plausibility of a conspiracy. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002) ("that market shares did not fluctuate significantly during the period of the alleged [ ] conspiracy may indicate that the sellers had agreed tacitly or otherwise to share the sales opportunities created by the growth in demand").

As noted above, an industry analyst at the time expressed puzzlement at the fact that the Defendants had ceased competing to gain market share in favor of charging the same prices. (Compl. ¶ 84.) It is a reasonable inference that this analyst was puzzled by the railroads' conduct because it was not in any individual railroad's independent self interest, absent a conspiracy. (*See id.* at ¶¶ 87, 88.)

\* \* \*

Thus, in sum, Plaintiffs have not only directly alleged unlawful concerted conduct by the Defendants in detail, and placed this conduct in a factual setting firmly suggesting the likelihood of conspiracy, but have also alleged additional features of the conspiracy that further bolster its plausibility. The Complaint here does far more than "nudge" this case into the realm of plausible conspiracy. Defendants' characterization of the Complaint's allegations as "conclusory" is baseless and their *post hoc*, piecemeal justifications fall far short of overcoming Plaintiffs' allegations.

## CONCLUSION

For all of the foregoing reasons, Defendants' joint motion to dismiss the direct

purchasers' Complaint should be denied.

Dated: July 8, 2008

Respectfully submitted:

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Daniel Brockett
Sami H. Rashid
QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

/s/ Michael D. Hausfeld
Michael D. Hausfeld (D.C. Bar #153742)
Benjamin D. Brown (D.C. Bar #495836)
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: mhausfeld@cmht.com

Steig D. Olson
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

*Direct Purchaser Plaintiffs' Interim Co-Lead Class Counsel*

Exhibit A

1

2

3

4                          UNITED STATES DISTRICT COURT

5                                  DISTRICT OF NEVADA

6                                         * * *

7   IN RE: WESTERN STATES                )    MDL 1566
    WHOLESALE NATURAL GAS                )    2:03-CV-01431-PMP-PAL
    ANTITRUST LITIGATION                 )    BASE FILE
8   _____     )

9   ARANDELL CORP., et al.,             )
                                         )
10                  Plaintiffs,          )         2:07-CV-01019-PMP-PAL
                                         )
11  v.                                   )
                                         )
12  XCEL ENERGY, INC., et al.,          )         O R D E R
                                         )
13                  Defendants.          )
    _____     )

14

15          Presently before this Court is the Reliant Defendants' Motion to Dismiss for

16  Failure to State a Claim (Doc. #667;[1] Doc. #106 in 2:07-CV-01019-PMP-PAL), filed on

17  September 7, 2007.  Defendant Coral Energy Resources, L.P. filed a Joinder (Doc. #675;

18  Doc. #110 in 2:07-CV-01019-PMP-PAL) on September 7, 2007.  Plaintiffs filed an

19  Opposition (Doc. #720; Doc. #135 in 2:07-CV-01019-PMP-PAL) on October 12, 2007.

20  Defendant Coral Energy Resources, L.P. filed a Reply (Doc. #741; Doc. #155 in 2:07-CV-

21  01019-PMP-PAL) on November 11, 2007.  The Reliant Defendants filed a Reply (Doc.

22  #739) on November 6, 2007.  Pursuant to the parties' stipulations (Doc. #748 & #750),

23  Plaintiffs filed Surreplies (Doc. #755 & #756; Doc. #160 & #161 in 2:07-CV-01019-PMP-

24  PAL) on November 27, 2007.

25  ///

26  _____

         [1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

I.    **BACKGROUND**

This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001.  Plaintiffs originally filed this action in the Circuit Court, Dane County, Wisconsin.  (Notice of Removal [Doc. #2], Compl.)  Defendants removed the case to the United States District Court for the District of Wisconsin.  (Id.)  The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.

Plaintiffs Arandell Corporation, Merrick's, Inc., Safety-Kleen Systems, Inc., and Sargento Foods, Inc. are Wisconsin corporations.  (Am. Compl. [Doc. #542] at 5-6.)  According to the Amended Complaint, Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Wisconsin.  (Id. at 6-55.)  In this litigation, Plaintiffs allege Defendants conspired to engage in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers.  (Id.)  Specifically, Plaintiffs allege Defendants, directly and through their affiliates, conspired to manipulate the natural gas market by knowingly delivering false reports concerning trade information to trade indices and engaging in wash trades, which conduct violated Wisconsin Statutes ch. 133.  (Id.)  The Amended Complaint asserts two causes of action.  Count one arises under Wisconsin Statutes § 133.14, which voids contracts to which an antitrust conspirator is a party and allows recovery of payments made pursuant to such a contract.  (Id.)  Count two seeks trebled actual damages under Wisconsin Statutes § 133.18 for Defendants' alleged antitrust violations.  (Id.)

The Reliant Defendants move to dismiss the Amended Complaint, arguing it does not adequately allege Defendants entered into an antitrust agreement.  The Reliant Defendants contend that under Bell Atlantic Corp. v. Twombly, --- U.S. ----, 127 S. Ct.

1  1955 (2007), Plaintiffs must plead facts making it plausible that Defendants had an

2  agreement, but the Amended Complaint alleges only parallel but independent conduct,

3  rather than anticompetitive conduct that is the result of an agreement. Defendant Coral

4  Energy Resources, L.P. joins in the motion. Plaintiffs respond that the Amended Complaint

5  alleges Defendants agreed to engage in anticompetitive behavior and the Amended

6  Complaint makes factual allegations regarding agreement. For example, Plaintiffs argue the

7  allegations that Defendants engaged in wash trades show agreement to participate in the

8  conspiracy because wash trades necessarily involve more than one party. Additionally,

9  Plaintiffs note they allege Defendants entered settlements for millions of dollars regarding

10 their illegal price reporting, and several of Defendants' employees were indicted, convicted,

11 or pled guilty to illegal price reporting.

12 **II.    MOTION TO DISMISS**

13        In considering a motion to dismiss, "[a]ll allegations and reasonable inferences

14 are taken as true, and the allegations are construed in the light most favorable to the non-

15 moving party, but conclusory allegations of law and unwarranted inferences are insufficient

16 to defeat a motion to dismiss." Adams v. Johnson, 355 F.3d 1179, 1183 (9th Cir. 2004)

17 (internal citation omitted). There is a strong presumption against dismissing an action for

18 failure to state a claim. See Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir.

19 1997) (citation omitted). The issue is not whether the plaintiff ultimately will prevail, but

20 whether he may offer evidence in support of his claims. Id. (quoting Scheuer v. Rhodes,

21 416 U.S. 232, 236 (1974)).

22        The liberal rules of notice pleading set forth in the Federal Rules of Civil

23 Procedure do not require a plaintiff to set out in detail the facts supporting his claim. See

24 Yamaguchi v. U.S. Dep't of the Air Force, 109 F.3d 1475, 1481 (9th Cir. 1997). All the

25 Rules require is a "short and plain statement" that adequately gives the defendant "fair

26 notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (citations

3

1    and internal quotations omitted).  A claim is sufficient if it shows that the plaintiff is

2    entitled to any relief which the court can grant, even if the complaint asserts the wrong legal

3    theory or asks for improper relief.  See United States v. Howell, 318 F.2d 162, 166 (9th Cir.

4    1963).  However, the alleged facts "must be enough to raise a right to relief above the

5    speculative level." Bell Atl. Corp. v. Twombly, --- U.S. ----, 127 S. Ct. 1955, 1965 (2007).

6    Facts must be sufficient to "nudge[ the plaintiff's] claims across the line from conceivable

7    to plausible." Id. at 1974.  The plaintiff must allege "more than labels and conclusions, and

8    a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65.

9         Specifically in the context of antitrust claims, a complaint must set forth "enough

10   factual matter (taken as true) to suggest that an agreement was made." Id. at 1965.   This is

11   not a heightened pleading requirement; rather "it simply calls for enough fact to raise a

12   reasonable expectation that discovery will reveal evidence of illegal agreement." Id.  An

13   allegation the defendants engaged in parallel conduct combined with a bare assertion of

14   conspiracy is insufficient. Id. at 1966.  Consequently, "allegations of parallel conduct must

15   be placed in a context that raises a suggestion of a preceding agreement, not merely parallel

16   conduct that could just as well be independent action." Id.  Examples of contextual settings

17   in which parallel conduct would state an antitrust claim include parallel behavior that

18   probably would not result from chance or independent conduct, or "complex and

19   historically unprecedented changes in pricing structure made at the very same time by

20   multiple competitors, and made for no other discernible reason." Id. at 1965 n.4 (quotation

21   omitted).

22        Plaintiffs allege Defendants engaged in wash sales and reported false pricing and

23   trading information to trade indices.  (Am. Compl. at ¶¶ 16, 20, 26, 32, 38, 44, 49, 55, 62.)

24   As defined in the Amended Complaint, a wash trade is "an agreement by which Company

25   A would agree with Company B that Company A would agree to sell a certain amount of

26   natural gas at a certain price to Company B, and that in return Company B would sell

4

1   roughly the same amount of natural gas at roughly the same price to Company A." (Id. at

2   ¶ 79a.)  According to the Amended Complaint, wash trades and the false reporting of

3   market information constitute criminal conduct.  (Id. at ¶ 79c.)

4          Additionally, Plaintiffs allege Defendants and co-conspirators not named as

5   defendants in this action have paid millions of dollars to the United States Commodity

6   Futures Trading Commission ("CFTC") to settle claims of false reporting of natural gas

7   prices during 2000 and 2002.  (Id. at ¶¶ 17, 21-22, 28, 33, 41, 45, 50, 57, 65, 75.)  The

8   Amended Complaint also sets forth examples of Defendants' employees who have been

9   indicted, pled guilty, and/or convicted of criminal charges involving the false reporting of

10  trade information.  (Id. at ¶¶ 21-22, 35, 39-40, 45-46.)  According to the Amended

11  Complaint, in September 2002, five Defendants admitted they provided false trade

12  information to price index publishers.  (Id. at ¶ 68.)  Plaintiffs also allege not all companies

13  in the industry engaged in false reporting during the relevant time period, naming BP

14  Energy Company as an example.  (Id. at ¶ 73.)  Plaintiffs thus contend the Defendants'

15  behavior was "neither inevitable, nor natural, but was instead the result of a conscious

16  decision by the defendants to collusively manipulate the markets to their advantage." (Id. at

17  ¶ 73.)

18         With respect to the Reliant Defendants specifically, Plaintiffs allege Reliant

19  Energy Services, Inc. reported false price information and engaged in wash sales, paid an

20  $18 million civil penalty to the CFTC to settle charges of false reporting, and a Reliant

21  Energy Services, Inc. employee, Jerry A. Futch, pled guilty to one criminal count of

22  knowingly delivering false reports that affected natural gas prices.  (Id. at ¶¶ 55, 57.)  With

23  respect to Defendant Coral Energy Resources, L.P. ("Coral") specifically, Plaintiffs allege

24  Coral engaged in approximately 150 wash sales during the relevant time period and paid

25  $30 million in civil penalties to the CFTC to settle charges of false reporting of natural gas

26  prices during the relevant time period.  (Id. at ¶ 60.)

1           According to the Amended Complaint, natural gas prices increased two to three

2    times from January 2000 to January 2001, "a historically unprecedented change in prices,

3    which cannot be explained by a shortage of natural gas or an increase in demand for natural

4    gas." (Id. at ¶ 5.) Moreover, Plaintiffs allege that by Defendants' "marketplace behavior

5    and agreement as to pricing, defendants and the unnamed co-conspirators began and

6    worked together to fraudulently increase the retail price of natural gas paid by commercial

7    entities in Wisconsin." (Id. at ¶ 67.) According to the Amended Complaint, Defendants

8    exchanged price information daily and knew information being posted on price indices was

9    inaccurate, but Defendants did not disregard or report the inaccuracies. (Id.) Rather, the

10    Amended Complaint alleges Defendants passed along the inaccurate trade information and

11    reported inaccurate trade information themselves. (Id.)

12           Plaintiffs' allegations go beyond allegations of parallel conduct paired with a

13    bare allegation of conspiracy. Plaintiffs allege a historically unprecedented change in

14    natural gas prices as the result of widespread false reporting of trade information made by

15    multiple competitors during the same time period in the natural gas industry for no

16    discernible reason other than conspiracy. This factual pattern is precisely the type of

17    context Twombly recognized as supporting a plausible suggestion of agreement. Further,

18    Plaintiffs allege Defendants engaged in wash trades, which, by their nature, involve

19    collusive agreement between two parties. Additionally, the Amended Complaint alleges

20    Defendants engaged in illegal behavior, which is inconsistent with the type of unilateral

21    behavior which Twombly sought to distinguish from conduct that is the product of an

22    anticompetitive agreement. Criminal conduct does not fall within "a wide swath of rational

23    and competitive business strategy unilaterally prompted by common perceptions of the

24    market." Twombly, 127 S. Ct. at 1964. Plaintiffs also make detailed factual allegations

25    regarding Defendants' payments of civil penalties on charges of false reporting; criminal

26    proceedings, including convictions and guilty pleas from Defendants' employees, regarding

1  their illegal conduct; and admissions from several Defendants that they engaged in false

2  trade reporting.  Moreover, Plaintiffs allege such behavior was not inevitable or natural, as

3  demonstrated by at least one company within the industry which did not participate in the

4  alleged market manipulations.  Additionally, Plaintiffs contend Defendants knew of other

5  companies' false price reporting but instead of ignoring or reporting the behavior,

6  Defendants likewise reported false trade information.  The Amended Complaint therefore

7  sets forth sufficient facts to raise a reasonable expectation that discovery will reveal

8  evidence of an illegal agreement.  The Court will deny the Reliant Defendants' motion to

9  dismiss and Coral's joinder thereto.

10  **III.    CONCLUSION**

11        IT IS THEREFORE ORDERED that Reliant Defendants' Motion to Dismiss for

12  Failure to State a Claim (Doc. #667; Doc. #106 in 2:07-CV-01019-PMP-PAL) is hereby

13  DENIED.

14        IT IS FURTHER ORDERED that Defendant Coral Energy Resources, L.P.'s

15  Joinder (Doc. #675; Doc. #110 in 2:07-CV-01019-PMP-PAL) is hereby DENIED.

16

17  DATED: February 19, 2008

18

19                                              _____
                                                PHILIP M. PRO
20                                              United States District Judge

21

22

23

24

25

26

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
DOC. CLERK, CHARLESTON, SC

2008 MAR 31 P 3:27

|  |  |  |
|---|---|---|
| Donald J. Beach, Scott Hansen, Jeffery L. Stoloff, Burnetta Nimons, Thomas Scholtens, Natalie Trueworthy, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 2:07-764-CWH |
| vs. | ) ) ) | |
| Atlas Van Lines, Inc., Allied Van Lines, Inc., North American Van Lines, Inc., Mayflower Transit, LLC, United Van Lines, LLC, Wheaton Van Lines, Inc., American Moving and Storage, Inc., John Does I-X, | ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) ) | |
| Gary Moad, Laurel Moad, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 2:07-2861-CWH |
| vs. | ) ) ) | |
| Atlas Van Lines, Inc., Allied Van Lines, Inc., North American Van Lines, Inc., Mayflower Transit, LLC, United Van Lines, LLC, Wheaton Van Lines, Inc., American Moving and Storage Association, Inc., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court on the defendants' motion to dismiss.

1. Plaintiff's Allegations

The plaintiffs Donald J. Beach, Scott Hansen, Jeffery L. Stoloff, Burnetta Nimons,

Page 1 of 15



Thomas Scholtens, and Natalie Trueworthy (the "Beach Plaintiffs") are citizens of South

Carolina who have used the defendants' services to move household goods. The plaintiffs Gary

Moad and Laurel Moad ( the "Moad Plaintiffs") are citizens of Illinois who also used the

defendants' services to move household goods. The defendants are a household goods motor

carrier industry trade association, American Moving and Storage Association, Inc. ("AMSA"),

and seven household goods motor carriers: Atlas Van Lines, Inc., Allied Van Lines, Inc., North

American Van Lines, Inc., Mayflower Transit, LLC, United Van Lines, Inc., and Wheaton Van

Lines, Inc. The defendants comprise 85% of the national household movers market.

    The plaintiffs allege that the defendants violated Section 1 of the Sherman Act when they

conspired to impose illegal fuel surcharges on customers in the United States who purchased

Household Goods Moving Services for interstate moves. Congress regulates the household

goods transportation industry. *See* 49 U.S.C. § 13701, *et seq.* Rates must be reasonable, and

carriers must publish their rates in a tariff. 49 U.S.C. §§ 13701(a), 13702(a), (c)(1). A rate is

published if it is made available to shippers and the Surface Transportation Board (the "STB").

Antitrust immunity is given to agreements between carriers establishing rates. 49 U.S.C. §

13703. Carriers may submit such an agreement to the STB, which is the successor to the

Interstate Commerce Commission ("ICC"), for approval. The STB may approve such an

agreement if it is in the public interest and does not result in a nationwide collective ratemaking

authority and does not preclude a party to the agreement from establishing independent rates.

Pursuant to an agreement, carriers may make rate adjustments provided that the adjustments are

"limited to industry average carrier costs." 49 U.S.C. § 13703(a)(1)(G).

    The plaintiffs claim that the defendants entered into an agreement to fix prices for their



services. The defendants published a tariff, known as Tariff 400-N, which computes the total

costs of a move as a function of the shipper, weight, mileage, place of origin, destination, and the

total "transportation charge," which is also known as a "linehaul charge." The transportation

charge includes a charge for fuel.

Tariff 400-N also computes a fuel surcharge to cover fluctuations in gas prices. The fuel

surcharge has given rise to this controversy. The plaintiffs claim that the defendants' fuel

surcharge exceeds the average industry carrier costs. The plaintiffs also claim that the defendants

charged a fuel surcharge that is different from the fuel surcharge in Tariff 400-N disclosed to the

public and the STB.[1]

---

[1] The defendants disseminated to the public and to the STB the following information
concerning the fuel surcharge included in Tariff 400-N:
   PROFESSIONAL MOVERS COMMERCIAL RELOCATION TARIFF STB HGB 400-N
   SECTION 1 – RULES AND REGULATIONS – 3RD REVISED PAGE 21 R ITEM 16
   (Concluded)
   FUEL COST PRICE ADJUSTMENT (SURCHARGE)
               . . .
2. If the first Monday of the calendar month is a Federal holiday, the price will be
determined based on the stated DOE price available on the next subsequent
business day (Tuesday)
3. The DOE fuel price obtained will then be indexed based on the fuel
price/adjustment factor matrix set forth in this item to determine the Fuel Cost
Price Adjustment that will become applicable on the fifteenth (15th) day of the
same month. The adjustment determined will apply for shipments loaded on the
15th day of the month and remain in effect through the 14th day of the following
month starting from the effective date of this item.
For example, if the reported price of self-service diesel fuel determined on
Monday, June 5th is $1.599 per gallon, a 2.0 percent Fuel Cost Price Adjustment
will apply for shipments loaded as of June 15th through July 14th. Then, if the
reported price of diesel fuel on Monday, July 3rd increases to $1.749 per gallon, a
three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded
as of July 15th through August 14th.
4. Notwithstanding any other provision of the tariff, the Fuel cost adjustment
WILL APPLY to the transportation charges applicable on SIT shipments when
such shipments are delivered to or removed from the storage-in-transit location



The plaintiffs claim that the defendants distributed software and instructions among themselves for calculating the fuel surcharge. The defendants' fuel surcharge allegedly violates the ICCA in three ways. First, the software calculates the fuel surcharge, but the software is not published.[2]  49 U.S.C. §13702(c)(2). Second, the defendants collect an unpublished fuel

_____

during the period that a Fuel Surcharge is in effect.

[2]  The software and instructions provide:

### Item 16, Fuel Cost Price Adjustment - Surcharge

The following percentage Fuel-Related Cost Price Adjustment (Surcharge) will apply on linehaul transportation charges and transportation charges on shipments picked up and delivered into storage-in-transit, as described below:

1. On the first Monday of each calendar month, the "national U.S. average" price of diesel fuel will be determined based on the price stated by the US Department of Energy (DOE), Energy Information Administration's (EIA) survey of "Retail On-Highway Diesel Prices." This price will be obtained by calling the DOE Fuel Hot Line at 202-586-6966 or via the DOE Internet web site at www.eia.doe.gov.

2. If the first Monday of the calendar month is a Federal holiday, the price will be determined based on the stated DOE price available on the next subsequent business day (Tuesday).

3. The DOE fuel price obtained will then be indexed based on the fuel price/adjustment factor matrix set forth in this item to determine the Fuel Cost Price Adjustment that will become applicable on the fifteenth (15th) day of the same month. The adjustment determined will apply for shipments loaded beginning on the 15th day of the month and remain in effect through the 14th day of the subsequent following month starting from the effective date of this item.

For example, if the reported price of self-service diesel fuel determined on Monday, June 5, 2000 is $1.259 per gallon, a two (2.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of June 15, 2000 through July 14, 2000. Then, if the reported price of diesel fuel on Monday, July 3, 2000 increases to $1.379 per gallon, a three (3.0%) percent Fuel Cost Price Adjustment will apply for shipments loaded as of July 15, 2000 through August 14, 2000.

4. To determine the Fuel Cost Adjustment amount to apply, multiply the applicable linehaul



transportation charges as determined in accordance with Sections 3, 5, 6, and 7, and the applicable pickup and delivery transportation charges on Storage-In-Transit shipments as determined in accordance with Items 210 and 410 of this tariff, by the percentage Fuel Cost Adjustment Factor. The resulting charge is in addition to all other applicable transportation charges.

For example, if the applicable linehaul transportation charge is $5,300, a two (2.0%) percent Fuel Cost Adjustment Factor would be $106.00.

| When the DOE Fuel Price Per Gallon reported on the first Monday of the month is: | The Fuel Cost Adjustment Factor that becomes effective on the 15th day of the same month is: |
|---|---|
| Less than $1.137 | 0% |
| From $1.137 to $1.235 | 1.0% |
| From $1.236 to $1.334 | 2.0% |
| From $1.335 to $1.434 | 3.0% |
| From $1.435 to $1.533 | 4.0% |
| From $1.534 to $1.632 | 5.0% |
| From $1.633 to $1.732 | 6.0% |
| From $1.733 to $1.831 | 7.0% |
| From $1.832 to $1.930 | 8.0% |
| From $1.931 to $2.029 | 9.0% |
| From $2.030 to $2.130 | 10.0% |
| From $2.131 to $2.230 | 11.0% |
| From $2.231 to $2.330 | 12.0% |
| From $2.331 to $2.430 | 13.0% |
| From $2.431 to $2.530 | 14.0% |
| From $2.531 to $2.630 | 15.0% |
| Over $2.630 | (See Note 1) |

Note 1: If the DOE fuel price per gallon exceeds $2.630, the 15% fuel surcharge, subject to



surcharge calculated by software rather than the fuel surcharge published in Tariff 400N. Third,

the fuel surcharge is a rate adjustment,[3] which grossly exceeds industry average carrier costs,[4] in

violation of 49 U.S.C. § 13703(a)(1)(G).

## II. Defendants' Allegations

According to the defendants, their published tariff, Tariff 400-N, has two parts: the

printed rules portion and the software portion. The defendants allege that these two portions

calculate the rate in the same way. The defendants claim that they made the charges as calculated

by the software available to each shipper. The defendants admit that they determine the fuel

surcharge as a percentage of the linehaul charge. However, the defendants allege that the fuel

surcharge is reasonable and lawful.

---

paragraphs 1 through 4 herein, will be increased by an additional 1% for every 10 ($0.10) cents, or fraction thereof, per gallon increase in the price above $2.630 per gallon.

Note 2: Notwithstanding any other provisions of the tariff, the Fuel Cost Adjustment Factor WILL APPLY to transportation charges applicable on storage-in-transit shipments when such shipments are delivered to or removed from the storage-in-transit location during the period that the Fuel Cost Adjustment Factor is in effect.

Note 3: The Fuel Cost Adjustment Factor WILL BE SHOWN SEPARATELY from the linehaul revenue on carrier transportation documents for the purpose of identifying the amount as special fuel-related revenue.

Note 4: Fractions obtained in the calculation of the Fuel Cost Adjustment Factor will be disposed of as provided in Item 21 of this tariff.

[3] 49 U.S.C. § 13703(a)(1)(G) allows carriers to enter into agreements for "rate adjustments of general applications based on industry average carrier costs (as long as there is no discussion of individual markets or particular single-line rates)."

[4] The plaintiffs claim that the defendants' software and instructions determined the fuel surcharge by multiplying the applicable linehaul charge by a percentage fuel adjustment factor. Therefore, the defendants computed a fuel surcharge as a percentage of the entire linehaul charge, which has no relationship to the actual increased cost of fuel associated with the movement of goods. According to the plaintiffs, the fuel surcharge was simply a secret revenue enhancer.



III. Procedural History

On March 19, 2007, the Beach Plaintiffs filed a complaint in South Carolina asserting claims for antitrust violations pursuant to 15 U.S.C. § 1 and for exceeding the lawful tariff. On August 17, 2007, the Moad Plaintiffs filed a complaint in the Eastern Division of Illinois asserting claims for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), antitrust violations, exceeding the lawful tariff, breach of the covenant of good faith and fair dealing, consumer fraud, and unjust enrichment. On August 17, 2007, the United States Judicial Panel on Multidistrict Litigation transferred the Moad action to this district for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

The Beach and Moad plaintiffs have voluntarily dismissed all claims except for their claim for antitrust violation pursuant to 15 U.S.C. § 1. The plaintiffs seek to recover treble damages, the costs of this suit, and reasonable attorneys fees for the damages sustained by the class members by reason of the defendants' alleged violations of the Sherman Act, 15 U.S.C. § 1. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, the plaintiffs must show: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade. Hall v. Am. Airlines, Inc., 118 Fed. Appx. 680, *2 (4th Cir. 2004).

On June 8, 2007, the defendants filed a joint motion to dismiss or, in the alternative, to stay these proceedings pending the STB's resolution of the issues of fact. In support of their motion to dismiss, the defendants argue that: 1) the Filed Rate Doctrine precludes the plaintiff's



claim for an antitrust conspiracy; 2) the defendants are immune from antitrust liability for the alleged conduct; 3) the plaintiffs fail to allege an antitrust conspiracy; and 4) this action is not timely.

## IV.  Standard for Deciding a 12(b)(6) Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). It is well settled that a pleading is sufficient if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint is not required to set forth heightened fact pleading of specifics, "but only enough facts to state a claim for relief that is plausible on its face. [Where] the plaintiffs [fail to nudge] their claims across the line from conceivable to plausible, [the] complaint must be dismissed." Bell Atlantic v. Twombly, 127 S.Ct. 1955, 1974 (2007).

## V.  Filed Rate Doctrine

The defendants allege that they published the fuel surcharge in issue and that pursuant to the filed rate doctrine they cannot charge any other price under the filed rate doctrine.  49 U.S.C. § 13702(c)(3).  According to the defendants, the filed rate doctrine protects the rates attacked by the plaintiffs.

### A.  Definition of the Filed Rate Doctrine

The filed rate doctrine provides that tariffs filed with the ICC are lawful for all purposes and binding with the force of law unless the ICC declares the tariff to be unlawful or



Page 8 of  15

unreasonable. Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 163 (1922); *see also* Amer.

Telegraph & Telephone Co. v. Central Office Tel., Inc., 524 U.S. 214, 222 (1998) (applying the

filed rate doctrine to the telecommunications industry) ("The rate of the carrier duly filed is the

only lawful charge. Deviation from it is not permitted upon any pretext."). The filed rate

doctrine bars collateral attack on tariffs subject to ICC regulation. Keogh v. Chicago & N.W. Ry.

Co., 260 U.S. at 161-62 (1922) (holding that the regulations on railway carriers provided

remedies for persons aggrieved by regulated carrier rate making, thus barring antitrust liability.)

"No court may substitute its own judgment for the judgment of the" ICC. Ark. La. Gas Co. v.

Hall, 453 U.S. 571, 577 (1987). The filed rate doctrine applies even if the market participants are

not required to file their rates with the agency and even when set rates are based on fraudulent

information. Tex. Comm. Energy v. TXU Energy, Inc., 413 F.3d 503, 509 (5th Cir. 2005);

Lifeshcultz Fast Freight v. Consol. Freightways, 805 F.Supp. 1277, 1295 (D.S.C. 1992). The

dual purpose of the doctrine is to prevent discrimination among consumers and to preserve the

rate making authority of federal agencies.

B. Applicability of the Filed Rate Doctrine after the ICCTA

    The parties dispute whether the Filed Rate Doctrine is applicable after the passage of the

ICCTA. Prior to the ICCTA, carriers were required to file rates, also called tariffs, with the ICC

thirty days before the tariffs became effective. Once the ICC approved the tariff, the filed rate

doctrine applied; the tariff was lawful for all purposes, and the carrier could not charge a

different rate.

    Today, household goods carriers are not required to file their tariffs or to secure approval

of their tariffs before their tariffs are effective. Instead, the ICCTA requires carriers to maintain



rates and related rules and practices in a published tariff and prohibits carriers from charging any

rate other than that contained in the published tariff. 49 U.S.C. §§ 13702(a), (c)(1), 13704(a)(2).

The tariff must be available for inspection by shippers upon request and for inspection by the

STB. Id. The law does not require the STB to approve a tariff before it becomes effective;

however, the STB may invalidate a published tariff that violates 49 U.S.C. § 13702. 49 U.S.C. §

13702(d). The STB has authority to determine whether rates are reasonable. 49 U.S.C. §

13710(a)(2)

The United States Court of Appeals for the District of Columbia Circuit noted that the

ICCTA "enacted a new statutory scheme under which a carrier need file tariffs only for the

transportation of household goods, as to which preferential treatment is still prohibited."

Munitions Carriers Conference, Inc. v. United States, 147 F.3d 1027, 1029 (D.C. Cir. 1998)

(citing 49 U.S.C. § 13704(a)(2) ("Any rate established under this section must be available on a

nonpreferential basis to shippers and must not result in charges to shippers which are

predatory.")).

The Court need not decide whether the ICCTA has changed or nullified the filed rate

doctrine because the filed rate doctrine, if operative, does not preclude this action. The plaintiffs

claim that the defendants have not published their rates in a tariff in accordance with 49 U.S.C. §

13702(c)(1). Instead, the defendants used unpublished software to hide their indefinite rates.

Because the rates were not fixed, the defendants were not bound by their tariffs in accordance

with 49 U.S.C. § 13702(c)(3). In addition, the plaintiffs claim that the fuel surcharge is a rate

adjustment that exceeds the industry average carrier costs. 49 U.S.C. §§ 13702(a),

13703(a)(1)(G). The filed rate doctrine does not preclude the plaintiffs' claims.



VI. Antitrust Immunity

A. Statutory Immunity

The plaintiffs allege that the defendants engaged in a conspiracy to fix prices for the transportation of household goods for four years prior to the filing of the complaint. The ICCTA provides that carriers may enter into agreements to establish "rates for the transportation of household goods." 49 U.S.C. § 13703(a)(1). The defendants argue that their agreement is immune from antitrust liability pursuant to 49 U.S.C. §13703(a)(6), which provides:

> (6) Effect of approval– If the Board approves the agreement or renews approval of the agreement, it may be made and carried out under its terms and under the conditions required by the Board, and the antitrust laws . . . do not apply to parties and other persons with respect to making or carrying out the agreement.

The defendants filed an agreement called the Household Goods Carriers Bureau Committee Collective Ratemaking Agreement ("Agreement") with the ICC. The ICC approved the Agreement, and the STB renewed its approval.[5]

The plaintiffs claim that the STB lacked statutory authority to approve the agreement because the defendants' agreement exceeded the bounds of antitrust immunity. According to the plaintiffs, the agreement includes a fuel surcharge rate adjustment which grossly exceeded industry average carrier costs in violation of 49 U.S.C. § 13703(a)(1)(G) because the fuel surcharge is computed as a percentage of the linehaul charge– the total cost of the move. It does not appear from the facts alleged in the complaint that the defendants are immune from antitrust

---

[5] The parties agree that in May of 2007, the STB made a prospective decision to "terminate our approval of the agreements of all remaining motor carriers" and that this decision included the defendants' Agreement. The complaint states that the defendants engaged in an ongoing conspiracy to fix prices for four years prior to the filing of the complaint. The plaintiffs filed their complaint on March 19, 2007– two months prior to the STB's ruling.



liability.

B. Immunity for a Fuel Surcharge Calculated as a Percentage

The defendants claim that they enjoy antitrust immunity because the ICC has approved its fuel surcharge method in the late 1970s. In 1979, in response to rapidly escalating fuel costs, which led to the disruption of the trucking industry, the ICC implemented expedited procedures, known as Ex Parte 311, for the recovery of increased fuel costs. <u>Fisher v. Fleming-Babcock, Inc.,</u> 745 F.2d 513, (8th Cir. 1984). The ICC authorized a percentage surcharge for fuel-based increases in freight charges. <u>Id.</u>; 44 Fed. Ref. 33232 (1979). The surcharge was based on price data derived from an ICC fuel index[6] and from a national average of the percentage of fuel expenses of total operating revenues from transportation performed by owner operators. 44 Fed. Reg. 37427 (1979). The ICC approved "an increase in freight charges for linehaul transportation . . . by means of a percentage surcharge" in the amount of 6%. <u>Id.</u>

The relevance of the validity of a 6% fuel surcharge in the trucking industry in 1979 would be more appropriately addressed at the summary judgment phase. At this stage of the litigation, it is premature to decide that the ICC's decision immunizes the defendants from antitrust liability for an alleged unpublished fuel surcharge reaching 15% or more.

The plaintiffs allege that the defendants' agreement did not comply with the ICCTA and that the fuel surcharge is a rate adjustment not based on industry average carrier costs. The plaintiffs have set forth sufficient facts to allege a plausible antitrust claim. Therefore, the defendants are not entitled to dismissal on the basis of antitrust immunity.

---

[6] The fuel index was derived from a weekly national average of fuel prices at selected truck stops.



Page 12 of 15

VII. The Sufficiency of the Plaintiffs' Allegations of an Antitrust Conspiracy

The defendants claim that the plaintiffs have not alleged enough facts to suggest that an agreement was made and that this Court should dismiss the complaint pursuant to <u>Bell Atlantic v. Twombly</u>, 127 S.Ct. 1955, 1974 (2007). Liability under the Sherman Act requires a contract, combination, or conspiracy in restraint of trade or commerce. 15 U.S.C. § 1. In <u>Bell Atlantic</u>, the complaint alleged that the defendants conspired to restrain trade by engaging in certain parallel conduct such as inflating prices and by refraining from competing with one another. The Supreme Court held that the plaintiffs failed to include enough factual allegations to raise a right to relief above a speculative level. The Fourth Circuit Court of Appeals has held that in order to adequately allege an antitrust conspiracy, "the pleader must provide, whenever possible, some details of the time, place, and alleged conspiracy; it is not enough merely to state that a conspiracy has taken place." <u>Estate Constr. Co. v. Miller & Smith Holding Co.</u>, 14 F.3d 213, 221 (4th Cir. 1994).

In this case, the plaintiffs allege that the defendants developed unpublished software, which they used to collect a fuel surcharge that was not published or disclosed in Tariff 400-N and to collect a rate adjustment that exceeded industry average carrier costs. The plaintiffs provide some details of the time of the conspiracy and of the conspiracy itself. The plaintiffs have alleged enough factual matter to suggest that an agreement was made. The plaintiffs have set forth sufficient facts to plausibly allege an antitrust conspiracy.

IX. Timeliness of this Action

The defendants claim that the plaintiffs can only recover for those acts that occurred in the eighteenth months prior to the action's commencement. According to the defendants, a



person must bring a civil action to recover overcharges within 18 months after the claim accrues, and a claim accrues on delivery or tender of delivery by the carrier. 49 U.S.C. § 14705 (a), (g). The plaintiffs allege that the defendants' conspiracy began in 2003 and lasted until 2007. The plaintiffs do not allege when the defendants delivered the plaintiffs' household goods. Therefore, it is not clear when the plaintiff's action accrued. However, because the alleged conspiracy began in 2003 and lasted until 2007, it appears that at least some of the plaintiff's claims are not time barred.

X. Transfer to the STB

The doctrine of primary jurisdiction concerns the proper relationship between the courts and administrative agencies charged with their regulatory duties. United States v. W. Pac. R. Co., 352 U.S. 59, 63-66 (1956). Primary jurisdiction exists whenever enforcement of a claim originally cognizable in the courts requires the resolution of issues which have been placed within the competency of an administrative body. In such a case, the court should suspend its proceedings until the appropriate agency resolves the issues raised in an administrative claim filed by the shipper.

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons are: (1) the desirable uniformity which is obtained only if the proper agency passes on the pending administrative questions and (2) the specialized knowledge of the agency involved.

Where the construction of the tariff is at issue and the issue is solely one of law, primary jurisdiction does not apply. However, when the words in the tariff are used in a peculiar or



technical sense so that the issue of construction is one of fact and one of discretion in technical matters, the issue of the tariff application must first go to the STB. Only the STB can determine whether a fee is reasonable. 49 U.S.C. § 13710(a)(2); <u>United States v. W. Pac. R. Co.</u>, 352 U.S. at 65 (holding that courts must refrain from making and construing tariffs).

If such issues arise in the course of this litigation, the Court will refer this matter to the STB. In the meantime, whether the defendants violated certain statutes is in issue. Therefore, it appears prudent to proceed with discovery. The Court may revisit the issue of primary jurisdiction later in the course of these proceedings.

The defendants' motion to dismiss is denied.

**AND IT IS SO ORDERED.**

C. WESTON HOUCK
UNITED STATES DISTRICT JUDGE

March **3/**, 2008
Charleston, South Carolina

Page 15 of 15



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

This document relates to:

ALL CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF)

## <u>[PROPOSED] ORDER DENYING DEFENDANTS' MOTION TO DISMISS</u>

Upon consideration of the Joint Motion to Dismiss filed on May 30, 2008 by Defendants

BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX

Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together,

"Defendants"), and the briefs and exhibits submitted in support thereof and in opposition thereto,

it is HEREBY ORDERED that Defendants' Motion to Dismiss is DENIED.


So ORDERED.


Dated: _____          _____
                                 Paul L. Friedman
                                 United States District Judge