**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

In re RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION
_____

This document relates to:

ALL CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF)

**INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**

LOVELL STEWART HALEBIAN LLP
500 Fifth Avenue
New York, NY 10110
T: (212) 609-1900
F: (212) 719-4775

THE MASON LAW FIRM, LLP
1225 19th Street NW, Suite 500
Washington, DC 20036
T: (202) 429-2290
F: (202) 429-2294

STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, NY 10006
T: (212) 566-4047
F: (212) 566-4061

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................. 1

BACKGROUND ................................................................................. 2

    A.    The Railroad Industry ........................................................ 3

    B.    Origins Of The Conspiracy ................................................. 4

    C.    Publication of the AII-LF and Fixing Surcharge Rates ........... 4

    D.    The Conspiracy Operates Successfully ................................. 8

    E.    The STB Ruling ............................................................... 10

ARGUMENT ................................................................................... 12

I.    PLAINTIFFS' CLAIMS SURVIVE *TWOMBLY*. ............................. 12

II.    PLAINTIFFS' CLAIMS ARE NOT EXPRESSLY OR IMPLIEDLY PREEMPTED BY THE INTERSTATE COMMERCE COMMISSION TERMINATION ACT. ................ 12

    A.    The ICCTA Does Not Expressly Preempt Plaintiffs' State Law Claims ............. 14

        1.    The STB Does Not Have Jurisdiction over Plaintiffs' Claims Rooted Solely in Unregulated Contract Traffic .................................... 15

        2.    The Preemption Provision Expressly Limits the STB's Authority Over State Claims. ................................................ 18

            a    The ICCTA Preemption Provision Expressly Preempts Only The "Regulation of Rail Transportation." ................................ 19

            b.    The Preemption Provision Preempts Only "Remedies Provided" Under the Railroad Provisions of the ICCTA. ............... 26

            c.    The ICCTA Preemption Provision Does Not Expressly Preempt *All* State Law. ............................................... 27

    B.    The ICCTA Does Not Impliedly Preempt Plaintiffs' State Law Claims ............. 28

        1.    The State Laws Invoked By Plaintiffs Do Not Impede the Achievement of the ICCTA's Objectives. ........................... 28

   2.  Congress Did Not Intend To Displace State Claims Based on
     Contract and Unrelated to the Regulation of Rail Transportation. ........... 30

 C. Plaintiffs' State Antitrust, Consumer Protection, And Unjust Enrichment
   Claims Fall Outside of the Jurisdiction of the STB. ............................................. 33

   1.  State Antitrust Law is Not Preempted As Conspiracies And Conspiratorial
     Overcharges Involving Exempt Contract Traffic Are Not Within The .......
     STB's Jurisdiction.................................................................................. 33

   2.  Plaintiffs' Claims Premised On Generally Applicable State Consumer
     Protection Laws Do Not Interfere with Interstate Rail Operations Thus
     Are Not Preempted. .................................................................................. 40

   3.  Plaintiffs' Unjust Enrichment Claims Neither Amount to Economic
     Regulation of Rail Transportation Nor Interfere With Interstate Rail
     Operations And Are Thus Not Preempted. ................................................ 44

   4.  The Cases Upon Which Defendants Rely Are Inapposite. ...................... 44

III. PLAINTIFFS STATUTORY STATE LAW CLAIMS SHOULD NOT BE DISMISSED
  ON STANDING GROUNDS. ......................................................................................... 48

IV. PLAINTIFFS' STATE LAW ANTITRUST (AND CONSUMER PROTECTION)
  CLAIMS SHOULD NOT BE DISMISSED UNDER *AGC*. ........................................... 52

 A. Plaintiffs Have Alleged "Antitrust Injury" Under State Law. .............................. 53

 B. Defendants' Attempted Application of *AGC* Is Contrary To The Intent
   Of The Applicable States' Legislatures. ............................................................... 53

 C. The Cases Cited By Defendants Are Distinguishable. ......................................... 55

   1.  The Reasoning Set Forth In The *DRAM* Decisions Has No Application
     Here ..................................................................................................... 55

   2.  The *Visa* Cases Are Inapplicable. .......................................................... 55

   3.  *Crompton (Rubber Chemical)* Is Inapposite............................................. 56

 D. Plaintiffs Have Pled Facts To Support Standing Under State Consumer
   Protection Statutes ................................................................................................. 56

V. NAMED PLAINTIFFS HAVE STANDING TO RAISE THEIR STATE
  LAW CLAIMS. ............................................................................................................... 57

A.    California Plaintiff Fayus Has Standing. ................................................................ 57

B.    Plaintiffs Agway and Maroon Have Standing. ..................................................... 58

VI.    PLAINTIFFS PLEAD VALID STATE LAW CLAIMS ................................................. 59

A.    The New York Common Law Restraint of Trade Claim Should Not Be
Dismissed    ........................................................................................................... 59

B.    Consumer Protection and Unfair Competition Claims Should
Not Be Dismissed. ............................................................................................... 59

1.    Plaintiffs Have Pled Their Claims With the Requisite Particularity......... 60

2.    Plaintiffs' Consumer Protection Law Claims in Five States May be
Dismissed................................................................................................... 63

3.    Plaintiffs Properly Claim Damages for Intrastate Effects of Defendants'
Conduct. ................................................................................................... 63

4.    Plaintiffs Properly State A Claim Under the California
Unfair Competition Law. ........................................................................... 66

5.    Plaintiffs Properly Plead a Cause of Action underNew York Gen.
Bus. L. § 349 ............................................................................................. 66

a.    The New York Consumer Protection Law is not limited to
Purchases of Household  Goods .................................................... 66

b.    New York Law Requires only "Consumer Oriented Acts," Not
"Conduct Directed Towards Consumers.".................................... 68

6.    Plaintiffs Have Stated A Claim Under Illinois Law ................................. 70

C.    Plaintiffs' Properly Claim Restitution Of Defendants' Unjust Enrichment ......... 70

1.    Restitution Provides An Independent Source Of Liability For Unjust
Enrichment. ................................................................................................ 71

2.    Recission Is Not Required Where Plaintiff Is Not A Contracting Party... 72

3.    Restitution Does Not Require That Plaintiffs Bestow A Direct

Benefit On Defendants ................................................................................. 74

CONCLUSION ............................................................................................................... 75

# TABLE OF AUTHORITIES

## Federal Cases

*Air Courier Conference of America/International Committee v. U.S. Postal Service*,
　959 F.2d 1213 (3d Cir. 1992) ........................................................................16

*Air Transport Association of America, Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008)....................46

*Alliance Shippers, Inc. v. Southern Pacific Transportation Co.*,
　858 F.2d 567 (9th Cir. 1988) ...................................................................34, 39

*Alpharma, Inc. v. PennField Oil Co.*, 2008 WL 2331019 (D. Neb. June 4, 2008) ......................61

*Amchem Windsor Prods, Inc. v. Windsor*, 521 U.S. 591 (1997) ....................................................49

*American Consumer Pub. Ass'n, Inc. v. Margosian*, 349 F.3d 1122 (9th Cir. 2003) ...................41

*American Petroleum Institute v. E.P.A.*, 52 F.3d 1113 (D.C. Cir. 1995)........................................17

*Antoine v. U.S. Bank Nat. Ass'n*, 547 F. Supp. 2d 30 (D.D.C. 2008) ............................................62

*Associated Gen. Contractors of California v. California State Council of Carpenters*,
　459 U.S. 519 (1983)..........................................................................................52

*Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431 (2005) ...............................................................18

*Bates v. Northwestern Human Servs.*, 466 F. Supp. 2d 69 (D.D.C. 2006) ....................................62

*Bell Atlantic v. Twombley*, 127 S.Ct. 1955 (2007).........................................................................12

*Blum v. Yaretsky*, 457 U.S. 991 (1982).........................................................................................51

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988)................................................17

*Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901 (6th Cir. 2007).........................................13

*Burlington Northern Santa Fe Corp. v. Anderson*, 959 F.Supp. 1288 (D. Mont. 1997) ..............30

*In re Busiprone Patent Litig.*, 185 F.Supp.2d 363 (S.D.N.Y. 2002) .............................................49

*California v. ARC America Corp.*, 490 U.S. 93 (1989).....................................................35, 39, 41

*In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 618 (E.D.Mi. 2000)......................72, 74

*Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213 (1966) .......................................38

*Chicago and N.W. Transp. Co. v. Kalo Brick & Title*, 450 U.S. 311 (1981)..........................28, 29

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) .....................................................13, 30, 31

*City of Auburn v. U.S.*, 154 F.3d 1025 (9th Cir. 1998)................................................................26

*Clark v. McDonald's Corp.*, 213 F.R.D. 198 (D.N.J. 2003) ........................................................50

*Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004).........................41

*Commodity Futures Trading Commission v. Schor*, 478 U.S. 833 (1986) ...................................15

*Community Television of Southern California v. Gottfried*, 459 U.S. 498 (1983) .......................34

*Cozzi Iron and Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570 (7th Cir. 2001) ...........70

*Credit Suisse Securities (USA) v. Billing*, --- U.S. ---, 127 S. Ct. 2383 (June 18, 2007)...............34

*CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993) ...................................................20

*CSX Transportation, Inc. v. Georgia Public Service Commission*,
   944 F. Supp. 1573 (N.D. Ga. 1996)........................................................................................47

*CSX Transportation, Inc. v. Transportation-Communications International Union*,
   413 F. Supp.2d 553 (D. Md. 2006.)........................................................................................36

*CTS Corp. v. Dynamics Corp.*, 481 U.S. 69 (1987)...............................................................31, 32

*D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F.Supp.2d 485 (E.D.Pa. 2006)...............52, 54

*Demby v. Schweiker*, 671 F.2d 507 (D.C. Cir. 1981) ..................................................................21

*District of Columbia v. 109,205.5 Square Feet of Land*,
   2005 WL 975745 (D.D.C. April 21, 2005)..............................................................................23

*Duncan v. Walker*, 533 U.S. 167 (2001)....................................................................................18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   536 F. Supp. 2d 1129 (N.D.Cal. 2008) ...................................................................................55

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D.Cal. 2007) ...................................................................................54

*Emerson v. Kansas City Southern Railway Co.*, 503 F.3d 1126 (10th Cir. 2007)................ *passim*

*Eon Labs Mfrg. v. Watson Pharmaceuticals*, 164 F.Supp.2d 350 (S.D.N.Y. 2001) .....................68

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007) .............................................................51

*First Gibraltar Bank, FSB v. Morales*, 42 F.3d 895 (5th Cir. 1995) ...........................16

*Fleischmann v. Director, Office of Workers' Compensation Programs*,
  137 F.3d 131 (2d Cir. 1998) .................................................................................16

*Florida East Coast Ry. Co. v. City of West Palm Beach*,
  266 F.3d 1324 (11th Cir. 2004) ..................................................................... *passim*

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) ..................28, 41

*Food Lion v. Capital Cities/ABC*, 951 F.Supp. 1224 (M.D.N.C. 1996).......................65

*Friberg v. Kansas City S. Ry.*, 267 F.3d 439 (5th Cir. 2001)......................................25

*Gilmore v. Southwestern Bell Mobile Systems*, 156 F.Supp.2d 916 (N.D.Ill. 2001) ....64

*Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 1233 (D. Kan. 2007) ....................................63

*In re Grand Theft Auto Video Game Consumer Litig.*,
  2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006)........................................................49

*Grant v. General Electric Credit Corp.*, 764 F.2d 1404 (11th Cir. 1985).....................13

*In re Graphics Processing Units (GPU) Antitrust Litig.*,
  527 F. Supp. 2d. 1011 (N.D. Cal. Sept. 27, 2007)....................................................52

*Great-West Life & Annuity Insurance Company v. Information Systems & Networks Corp.*,
  523 F.3d 266 (4th Cir. 2008) .................................................................................13

*Green Mountain Railroad Corp. v. Vermont*, 404 F.3d 638 (2d Cir. 2005)............22, 24

*Griffin v. Bank of America*, 971 F.Supp. 492 (D. Kan. 1997) .....................................65

*Griffin v. Dugger*, 823 F.2d 1476 (11th Cir. 1987) ...................................................51

*G & T Terminal Packaging Co., Inc. v. Consolidated Rail Corp.*,
  830 F.2d 1230 (3d Cir. 1987) ...............................................................................44

*Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp.*,
  450 F. Supp. 2d 467 (D.N.J. 2006) ...................................................................20, 23

*Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*,
  408 F. Supp. 1251 (S.D.N.Y. 1976) .......................................................................60

*Harris v. Union Pacific Railroad*, 141 F.3d 740 (7th Cir. 1998) ................................................47

*Hattem v. Schwarzenegger*, 449 F.3d 423 (2d Cir. 2006).............................................................31

*Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707 (1985) ........31

*Hines v. Davidson*, 312 U.S. 52 (1941) .......................................................................................28

*Holland v. Delray Connecting Railroad Co.*, 311 F. Supp.2d 744 (S.D. Ind. 2004)....................47

*Ibrahim v. Titan Corporation*, 391 F. Supp.2d 10 (D.D.C. 2005)................................................13

*Ibrahim v. Titan Corporation*, 2007 WL 327484 (D.D.C. Nov. 6, 2007) .............................13, 17

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ......................................................................54

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990) .............................................................27

*In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404 (D. Del. 2007) ..............52

*International Brotherhood of Teamsters v. ICC*, 921 F.2d 904 (9th Cir. 1990)...........................45

*Iowa Chicago & E.R.R. v. Washington County, IA*, 384 F.3d 557 (8th Cir. 2004) ......................24

*J.P. Rail, Inc. v. New Jersey Pinelands Commission*, 404 F.Supp. 2d 636 (D.N.J. 2005) ...........24

*Jefferson v. Chase Home Financial*, 2008 WL 1883484 (N.D. Cal. April 29, 2008) ..................42

*In re K-Dur Antitrust Litigation*, 338 F. Supp. 2d 517 (D.N.J. 2004) ..............................71, 72, 75

*King v. Collagen Corp.*, 983 F.2d 1120 (1st Cir. 1993) ...............................................................31

*Lloyd's of London v. Church Loans and Investments Trust*,
    432 F.Supp.2d 330 (S.D.N.Y.2006) ......................................................................................61

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)............................................................18, 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................................50

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)................................................................62

*McLean Trucking Co. v. U.S.*, 321 U.S. 67 (1944).......................................................................33

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996) .............................................................................30

*In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001) ..................................53

*Merck & Co. v. Lyon*, 991 F.Supp. 1443 (M.D.N.C. 1996)..........................................................65

*Meridian Project Systems v. Hardin Const. Co.*, 404 F. Supp.2d 1214 (E.D. Cal. 2005).............64

*Mississippi Power & Light Co. v. Moore*, 487 U.S. 354 (1988).....................................................15

*Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374 (1992) .................................................13, 20

*Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687 (9th Cir. 1977)..............................34, 39

*Mueller v. United States Pipe & Foundry*, 2003 WL 22272135 (D.N.H. 2003).........................65

*Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661 (1st Cir., 1972).........................................................53

*Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290 (1976) ................................................................29

*New York Shipping Ass'n v. Federal Maritime Comm'n*, 854 F.2d 1338 (D.C. Cir. 1998)...........34

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*,
    514 U.S. 645 (1995)..................................................................................................................31

*New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973) .........................................30

*New York Susquehanna and Western Railway Corp.*, 500 F.3d 238 (3d Cir. 2007) ...............22, 32

*New York v. Feldman*, 210 F.Supp.2d 294 (S.D.N.Y. 2002)....................................................68, 70

*NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822 (1984)..........................................................15

*North Dakota v. Simple.net, Inc.*, 2008 WL 619198 (D.N.D. Mar. 3, 2008)................................41

*Novell Inc. v. Microsoft Corp.*, 505 F. 3d 302 (4th Cir. 2007) ....................................................52

*Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424 (1963)................................31

*In re Ocwen Federal Bank FSB Mortgage Servicing*,
    2006 WL 794739 (N.D. Ill. Mar. 22, 2006)..............................................................................41

*Ortiz v. Fibreboard*, 527 U.S. 815 (1999) ..................................................................................49

*Pacamo Bearings v. Minebea Co.*, 918 F.Supp. 491 (D.N.H. 1996)............................................65

*Pace Electronics, Inc. v. Cannon Computer Systems, Inc.*, 213 F.3d 118 (3d Cir. 2000) .............53

*Patel v. Holiday Hospitality Franchising, Inc.*, 172 F.Supp. 2d 821 (N.D. Tex. 2001)................62

*PCI Transportation, Inc. v. Forth Worth & Western R.R. Co.*, 418 F.3d 535 (5th Cir. 2005) 44, 45

*PCS Phosphate Co., Inc. v. Norfolk Southern Corp.*, 520 F.Supp. 2d 705 (E.D.N.C. 2007) ........44

*Pejepscot Industrial Park, Inc. v. Maine Central R.R. Co.*, 215 F.3d 195 (1st Cir. 2000)............47

*Pejepscot Industrial Park, Inc. v. Maine Central R.R. Co.*,
     297 F. Supp.2d 326 (D.Me. 2003) ...................................................................................16, 44

*Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50 (1st Cir. 1998).....................................................53

*Pharmaceutical Research and Mtfs. Of America v. District of Columbia*,
     406 F.Supp. 2d 56 (D.D.C. 2005)................................................................................................41

*In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F.Supp.2d 172 (D.Mass. 2003) ..........49

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) ......................................................................20

*Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F.2d 1445 (6th Cir. 1988).............35

*Port City Properties v. Union Pacific R.R. Co.*, 518 F.3d 1186 (10th Cir. 2008) ........................45

*R.R. Ventures Inc. v. Surface Transp. Bd.*, 299 F.3d 523 (6th Cir. 2002) ....................................22

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ............................................................................18

*In re Relafen Antirust Litig.*, 221 F.R.D. 260 (D.Mass. 2004) .....................................................50

*Retail Clerks International Ass'n, Local 1625, AFL-CIO v. Schermerhorn*,
     375 U.S. 96 (1963)....................................................................................................................13

*In re Rezulin Prods. Liab. Lit.*, 392 F.Supp.2d 597 (S.D.N.Y. 2005)............................................69

*Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 (1947).................................................................30

*Rowe v. New Hampshire Motor Transport Association*, 129 S. Ct. 989 (2008)...........................46

*Rushing v. Kansas City Southern Railway Co.*, 194 F.Supp. 2d 493 (S.D. Miss. 2001) ..............21

*San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmonk*,
     359 U.S. 236 (1957)...................................................................................................................32

*San Luis Central R. Co. v. Springfield Terminal Ry. Co.*, 329 F. Supp. 172 (D. Mass. 2005)......43

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988) .............................................................46

*Schwartz v. Texas,* 344 U.S. 199 (1952) .................................................................31

*Sompro Japan Ins. Co. v. Norfolk Southern Ry. Co.*, 540 F. Supp.2d 486 (S.D.N.Y. 2008) ........46

*SPGGC, L.L.C. v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) ........................................41

*Stark v. Wickard*, 321 U.S. 288 (1944) .................................................................17

*In re Static Random Access Memory Antitrust Litig.*,
    2008 WL 426522 (N.D.Cal. Feb. 14, 2008) .........................................................69

*Syndicated Publications, Inc. v. Montgomery County, Md.*, 921 F.Supp. 1442 (D. Md. 1996)....42

*Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314 (9th Cir. 1980).........................53

*In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2004) ...............52

*Texas & P. Ky. Co. v. Abilene Cotton Co.*, 204 U.S. 426 (1907) ............................28, 29

*Transcon. Gas Pipe Line Corp. v. State Oil and Gas Bd. of Mississippi*, 474 U.S. 409 (1986)....46

*Transkentucky Transp. R.R. v. Louisville and Nashville R.R. Co.*,
    581 F. Supp. 759 (E.D. Ky. 1983) ................................................................34, 39

*U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542 (D.C. Cir. 2002)......................62

*U.S. v. Borden Co.*, 308 U.S. 188 (1939)...............................................................38

*U.S. v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993) ...................................................31

*U.S. v. Nordic Village, Inc.,* 503 U.S. 330 (1979) ...................................................18

*Van Slyke v. Capital One Bank*, 503 F.Supp.2d 1353 (N.D.Cal. 2007)........................64

*Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097 (9th Cir. 2003) ........................................61

*Village of Bergen v. F.E.R.C.*, 33 F.3d 1385, 1389 (D.C. Cir. 1994)...........................16

*Walters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559 (2007) ........................................41

*Warth v. Seldin*, 422 U.S. 490 (1975) ...............................................................50, 51

*Williams Rail Service LLC v. Stewart*, 2007 WL 2471198 (D.S.C. August 27, 2007)..................24

**State Cases**

*Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801 (Ill. 2005) ............................................64

*Barns v. Dairymen's League Co-op., Ass'n*, 220 A.D. 624 (N.Y. App. Div. 1927) .....................60

*Beckler v. Visa U.S.A.*, Inc., 2004 WL 2115144 (N.D. Dist. Aug. 23, 2004)................................56

*Chance v. U.S. Smokeless Tobacco*, 931 A.2d 571 (N.H. 2007) ....................................................65

*Chatton v. National Union Fire Ins. Co.*, 13 Cal. Rptr. 2d 318 (Cal. App. 1992)........................66

*Comes v. Microsoft Corp.*, 646 N.W.2d 440 (Iowa 2002)...............................................................54

*Consiglio-Tseffos v. Visa U.S.A., Inc.*, 2004 WL 3030043 (Ariz. Super. Ct. Dec. 8, 2004) .........56

*Cox v. Microsoft Corp.*, 290 A.D.2d 206 (N.Y. App. Div. 2002) ...................................................59

*Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C. Super. Oct. 28, 2004)...............................56

*Currier v. Concord Railroad Corporation*, 48 N.H. 321 (N.H. 1869) ..........................................39

*Downers Grove Volkswagon v. Wigglesworth Imports*,
    546 N.E.2d 33 (Ill. App. Ct. 2d Dist 1989)................................................................................70

*Farrell v. General Motors Corp.*, 815 P.2d 538 (Kan. 1991)........................................................65

*Feitler v. Animation Celection*, 13 P.2d 1044 (Or. App. 2000)....................................................65

*Goda v. Abbott Labs., Inc.*, 1997 WL 156541 (D.C. Super. Feb. 3, 1997)...................................54

*Goshen v. Mutual Life Ins. Co. of New York*, 774 N.E.2d 1190 (N.Y. 2002)...............................65

*Gutzwiller v. Visa, U.S.A., Inc.*, 2004 WL 2114991 (Minn. Dist. Ct. Sept. 15, 2004) .................55

*Holder v. Archer Daniels Midland Co.*, 1998 WL 1469620 (D.C.Super. Nov. 4, 1998)........53, 54

*Home of Economy v. Burlington Northern*, 694 N.W. 2d 840 (N.D. 2005) ............................24, 47

*Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490 (Minn. 1997)..................................................54

*Hyde v. Abbott Labs.*, 473 S.E.2d 680 (N.C.App. 1996) ...............................................................54

*Jones v. Union Pac. R.R.*, 79 Cal. App. 4th 1053, 94 Cal. Rptr. 2d 661 (Cal. App. 2000) .....23, 48

*Knowles v. Visa U.S.A., Inc.*, 2004 WL 2475284 (Me. Super. Oct. 20, 2004) .............................56

*Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629-30 (Minn. 2007) .................................52, 53, 56

*Meachum v. Outdoor World*, 652 N.Y.S.2d 749 (N.Y.A.D. 2 Dept. 1997) ..................................65

*Native Village of Ehlutna v. Alabama Railroad Corp.*, 87 P.3d 41 (Alaska 2004) .....................23

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland*, 647 N.E.2d 741 (N.Y. 1995)...67

*Pacific Great Lakes Corp. v. Bessemer & Lake Erie R.R.*,
    720 N.E.2d 551 (8th Dist. Cuyahoga County 1998)..................................................................39

*Paltre v. General Motors, Corp.*, 810 N.Y.S.2d 496 (N.Y.App.Div. 2006)................................69

*Peekskill Theatre v. Advance Theatrical Co. of New York*,
    206 App. Div. 138, 200 N.Y.S. 726, (N.Y. App. Div. 1923) ..................................................60

*Ridgely v. Keene*, 134 App. Div. 647, 119 N.Y.S. 451 (2d Dept. 1909) ......................................39

*Sampson v. Shaw*, 101 Mass. 145 (1809)......................................................................................39

*St. Patrick's Home for the Aged and Infirm v. Laticrete Int'l*,
    696 N.Y.S.2d 117 (N.Y.App.Div. 1999) ................................................................................69

*State ex rel. Firestone v. Parke Circuit Court*, 621 N.E.2d 1113 (Ind. 1993)..............................43

*State v. Burlington N. Ry. Co.*, 24 P.3d 368 (Okl. Civ. App. 2000) .......................................25, 48

*State v. Duluth Board of Trade*, 121 N.W. 395 (Minn. 1909)......................................................39

*Thedford v. Missouri Pacific Railroad Company*, 929 S.W. 2d 39 (Tex. App. 1996) .................43

*Union Carbide Corp. v. Superior Court*, 36 Cal. 3d 1520 (1984).................................................54

*Union Pacific R.R. Co. v. State of Oklahoma ex rel Corporation Comm'n*,
    990 P.2d 328 (Okla. Civ. App. 1999) .....................................................................................47

*In re Vermont Ry.*, 769 A.2d 648 (Vt. 2000) ..........................................................................23, 48

*Village of Ridgefield Park v. New York*, 163 N.J. 446 (N.J. 2000).............................................24

*Wheeling & Lake Erie Ry. Co. v. Pennsylvania Pub. Util. Comm'n*,
    778 A.2d 785 (Pa. Commw. Ct. 2001) ...................................................................................25

## Other Proceedings

*Borough of Riverdale, Petition for Declaratory Order*,
 1999 WL 715272 (S.T.B. September 9, 1999) .........................................................................23

*Cities of Auburn & Kent, Washington*, 1997 WL 362017 (S.T.B. July 1, 1997) .........................22

*CSX Transp. Inc., Petition for Declaratory Order*,
 2005 WL 1024490 (S.T.B. May 3, 2005).......................................................................22, 42

*H.B. Fuller Co. v. Southern Pacific Transp. Co.*, 2000 WL 1771044 (S.T.B. Dec. 1, 2000) .......16

*King County, WA-Pet. For Declaratory Order-Burlington Northern R.R. Co.-Stampede Pass
 Line*, 1996 WL 545598 (S.T.B. September 25, 1996) .................................................................23

*Maumee & Western R.R. Corp. And RMW Ventures, LLC--Pet. For Declaratory Order*,
 2004 WL 395835 (S.T.B. March 2, 2004).................................................................................22

*Minnesota Power, Inc. v. Duluth, Missabe and Iron Range Railway Co.*,
 1999 WL 485895 (S.T.B. July 7, 1999).....................................................................................16

*In re Parrish & Heimbecker, Inc.*, 2000 WL 688049 (S.T.B. May 22, 2000)..............................16

*In re Rail Fuel Surcharges*, 2007 WL 201205 (S.T.B. Jan. 25, 2007) ....................................15, 34

*Town of Woodbridge v. Consolidated Rail Corp.*,
 2000 WL 1771044 (S.T.B. Dec. 1, 2000).............................................................................16, 17

## Federal Statutes

109 Stat. 803 ..................................................................................................................................12

Pub. L. No. 104-88..........................................................................................................................12

15 U.S.C. 1......................................................................................................................................37

15 U.S.C. 8......................................................................................................................................37

15 U.S.C. § 13..................................................................................................................................37

42 U.S.C. § 7543(a) .........................................................................................................................27

49 U.S.C. § 1 ...................................................................................................................................11

49 U.S.C. § 10101 *et. seq*.................................................................................... *passim*

49 U.S.C. § 10103 ........................................................................................................26

49 U.S.C. § 10501 *et. seq*.................................................................................... *passim*

49 U.S.C. § 10502 ........................................................................................................46

49 U.S.C. § 10701-10747 ...........................................................................................26

49 U.S.C. § 10704 .......................................................................................... *passim*

49 U.S.C. § 10706 .................................................................................................14, 37

49 U.S.C. § 10709 ...................................................................................................3, 15

49 U.S.C. § 11321 ........................................................................................................38

49 U.S.C. § 11701- 11707 ..........................................................................................26

49 U.S.C. § 41713(b)(1) .............................................................................................27

## Federal Rules

Fed. R. Civ. P. 8 ..........................................................................................................60

Fed. R. Civ. P. 9 ..........................................................................................................60

## State Statutes

Calif. Bus. & Prof. Code. § 17200............................................................................64

N.Y. General Business Law §349................................................................................66

N.H.Rev. Stat. § 358-A:1 ...........................................................................................65

## Other Authorities

Black's Law Dictionary 1286 (6th ed. 1990) ............................................................20

Carter H. Strickland, Jr., *Revitalizing the Presumption Against Preemption To Prevent
   Regulatory Gaps: Railroad Deregulation and Waste Transfer Stations*,
   34 Ecology L.Q. 1147,  (2007) ...................................................................19, 26, 46

H.R. Conf. Rep. No- 96-1430 ........................................................................................19

H.R. Conf. Rep. No. 104-422 ...........................................................................20, 44, 48

H.R. Rep. 104-311 ......................................................................................................30

Laycock, *The Scope and Significance of Restitution*, 67 Tex.L.Rev. 1277 (1989) ......................71

Wade, *Restitution of Benefits Acquired Through Illegal Transactions*,
    95 U. Penn. L. Rev. 261 (1947) ...............................................................................74

S. Rep. No. 104-176, 104th Cong. 1st Sess., (1995)(Additional Views of Senator Ashcroft),
    1995 WL 710522 ....................................................................................................21

2A Sutherland Statutory Construction § 48.8 (2008) ...................................................21

Indirect Purchaser Plaintiffs Agway Liquidating Trust ("Agway"), Fayus Enterprises ("Fayus"), and Maroon Incorporated ("Maroon") (collectively, "Plaintiffs") respectfully submit this memorandum in opposition to the Joint Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint filed on May 30, 2008 by Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (collectively, "Defendants").  For the reasons set forth below, Defendants' motion should be denied.

## SUMMARY OF ARGUMENT

Defendants raise federal preemption as preliminary grounds for dismissal of Plaintiffs' state antitrust, consumer protection, and unjust enrichment claims.  To circumvent the Surface Transportation Board's ("STB") express disclaimer of authority over rates governed by private contracts, such as those that are the subject of Plaintiffs' claims, and immunize themselves against liability under state antitrust, consumer protection, and unjust enrichment laws, Defendants seek to expand the Interstate Commerce Commission Termination Act's ("ICCTA" or the "Act) preemptive scope to bar enforcement of state laws remedying conspiracies and unfair trade practices.  As shown below, Defendants' preemption plea falls short on all fronts. Indeed, the text and architecture of the Act ensures that virtually nothing is precluded—the polar opposite of Defendants' everything is precluded thesis.  The Act's preemptive reach is cabined by limiting language, which makes clear that only "regulation of rail transportation" and "remedies provided" under the railroad provisions are to be preempted.  Plaintiffs' state law claims, on the contrary, do not amount to regulation of rail transportation.  Nor do they or seek remedies otherwise attainable under the ICCTA.  Instead, Plaintiffs' claims arise of valid exercises of state police powers and generally applicable laws that do not interfere with or

collide with the regulation of rail transportation.  These claims thus cannot possibly fall within the Act's narrowly targeted preemptive scope.

Plaintiffs also have sufficient standing to proceed with their claims.  In the first place, issues relating to Plaintiffs' standing to bring claims under all of the state laws alleged in the Complaint should be decided after class certification since class certification is the source of the potential problem.  Second, Plaintiffs have sufficiently alleged antitrust injury.

Finally, Defendants' attacks on Plaintiffs' state law claims are not well taken and, with certain exceptions, should not be dismissed.

For all of these reasons, set forth in full below, Defendants' Motion to Dismiss shall be denied.

## **BACKGROUND**

Indirect Purchaser Plaintiffs Agway Liquidating Trust ("Agway"), Fayus Enterprises ("Fayus"), and Maroon Incorporated ("Maroon") (collectively, "Plaintiffs") filed a consolidated complaint ("Complaint") in the instant litigation on April 15, 2008 on behalf of themselves and a putative Class of similarly situated Indirect Purchasers against defendant railroads Union Pacific Railroad Company, BNSF Railway Company, CSX Transportation, Inc., and Norfolk Southern Railway Company (collectively, "Defendants").   Through their complaint, Plaintiffs seek damages and injunctive relief under federal antitrust law, state antitrust and consumer protection laws, as well as remedy under common law for unjust enrichment.

Plaintiffs are indirect purchasers who purchased **_unregulated_** rail freight transportation services from defendants during the class period.  The term "**_unregulated_**" refers to "**_rail freight transportation services where the rates are set by private contracts or through other means_**

**exempt** *from rate regulation under federal law*."[1]  (Complaint, ¶¶ 1-3.).  Plaintiffs seek damages

on behalf of themselves and the Class for Surcharges imposed on rail freight shipments made

under private transportation contracts.  Plaintiffs expressly **disclaim** entitlement to relief arising

from Surcharges "**imposed on rate-regulated freight transportation**." (Complaint, ¶ 24.).

The Complaint alleges the following facts in detail to support Plaintiffs' claim that

Defendants engaged in unlawful concerted conduct under federal and state law.

### A.    The Railroad Industry

For about 100 years, the Interstate Commerce Commission ("ICC") exercised almost

total control over carrier rates and practices.  (Complaint, ¶ 55.)  During this era, railroads

generally charged only published tariff rates filed with the ICC.  When railroads wanted a rate

increase, they could apply to the ICC for across-the-board rate increases, which could lawfully

be implemented on a collective basis.  (*Id.*, ¶¶ 54-55.)

In 1980, Congress passed the Staggers Rail Act of 1980 ("Staggers Act").  49 U.S.C.

§10709.  The Staggers Act substantially deregulated the rail industry, giving railroads greater

freedom to price their services and encouraging greater reliance on competition to set rates.  Rail

regulation today is overseen by the successor to the ICC, the Surface Transportation Board (the

"STB").  *See* 49 U.S.C. § 10704.  The Staggers Act, however, also for the first time permitted the

railroads and their freight shipping customers to enter into private contracts that are not subject

to rate review by the STB.  Today, 80 percent or more of all rail shipments move under the

aforementioned private transportation contracts that are not rate-regulated, or are otherwise

exempt from rate regulation.  (Complaint, ¶ 56.)

---

[1]  Specifically, "[a]ll indirect purchasers of rail freight transportation services from Defendants, **through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law**," as to which defendants assessed a Surcharge during the Class Period. (Complaint ¶ 47.)

Following the Staggers Act, the number of Class I railroads declined from 35 to just seven today (two of which are owned by Canadian entities).  (*Id.*, ¶ 57.)   Four of these railroads – Defendants BNSF, UP, CSX, and NS – operate more than 90 percent of all railroad track in the U.S.  (*Id.*).  Given the high fixed costs in the railroad industry and the significant barriers to entry, there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.  (*Id.*)

**B.    Origins Of The Conspiracy**

By the early 2000s, the railroads could no longer turn to some agency – like the previously-existing ICC or the STB – to obtain a percentage increase across their freight rates. (*Id.*, ¶ 60.)  Instead, to raise prices across-the-board, they would have to negotiate new rates individually with all of their customers.  Recognizing the time and costs involved in such a process, as well as the possibility of losing customers, the railroads opted for a different course. They decided to seize on a percentage-based "rail fuel surcharge" as the means to achieve an across-the-board rate increase on all unregulated traffic.  (*Id.*)  Defendants recognized, however, that it would be difficult to accomplish imposing the rail fuel surcharges widely if they competed with each other.

**C.    Publication of the AII-LF and Fixing Surcharge Rates**

In July 2003, the two major Western railroads – Defendants BNSF and UP – agreed to impose the exact same fuel surcharges.  (*Id.* ¶¶ 8, 64-69.)  Indeed, not only did the Western railroads agree to use the same fuel index (the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF")); they agreed to administer that index in precisely the same way. They agreed to add a surcharge of 0.5 percent to the transportation rate for every five cent increase in the HDF index above $1.35 per gallon.  (*Id.* ¶¶ 65-66.)  The Western railroads also coordinated when they would adjust their fuel surcharge rates:  the surcharge would be applied to

shipments beginning the second month after the month in which there was a change in the average price calculation. (*Id.* ¶ 67.) That the Western railroads got into lockstep at this time was a notable development, because only shortly before defendant UP had adopted a different method of calculating fuel surcharges. (*Id.* ¶ 69.)

Notwithstanding this agreement, the railroads still faced a significant barrier to widespread use of fuel surcharges. (*Id.* ¶ 70.) The great majority of rail freight at this time was transported pursuant to private contracts with rate-escalation provisions that already accounted for increases in fuel costs. (*Id.*) These rate-escalation provisions were based on two indexes: (1) the All Inclusive Index ("AII") published by the Association of American Railroads (the "AAR"), a railroad trade organization; and (2) the related Rail Cost Adjustment Factor ("RCAF"), which was based on the AII. (*Id.* ¶¶ 3, 61.) Both indexes included fuel as a factor and both accounted accurately for increases in the railroads' fuel costs; the President of Defendant UP acknowledged in 2004 that the RCAF "looks at actual costs through the industry." (*Id.* ¶¶ 3, 61.) As long as these published and widely utilized indexes included fuel as a cost-adjustment component, the Defendants could not, as a practical matter, impose widely a percentage-based, stand-alone fuel surcharge on their freight customers. (*Id.* ¶¶ 9-10, 70.)

The Complaint alleges that Defendants agreed to solve this problem by using the AAR, which Defendants dominate and control, to create and disseminate to the market a new index that did not include fuel costs. (*Id.* ¶¶ 10, 12, 72.) This would then allow the railroads to impose their new, percentage-based, stand-alone fuel surcharge program in a coordinated fashion across their customer base. (*Id.* ¶ 70.) The Complaint alleges that the agreement to remove fuel from the AII and RCAF took place in the fall of 2003, and that the AAR, at the Defendants' behest, published the new index, the All Inclusive Index Less Fuel (the "AII-LF") in December 2003.

The Complaint alleges in detail how the new index less fuel, the AII-LF, came about, when it was introduced, why the railroads did it, who was involved, and the crucial role the new index played in the implementation of Defendants' price fixing conspiracy. (*Id.* ¶¶ 62 – 83.) BNSF has admitted that it had a leading role in these efforts. (*Id.* ¶ 74.) When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, pointed to the changes made to the RCAF through the AAR. (*Id.*). Referring to Matthew K. Rose – BNSF's chairman, president, and CEO – Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … *So we'll do RCAF less fuel plus a direct fuel surcharge in the future*." (*Id.*) (emphasis added).

The Complaint alleges specific meetings at which Defendants' agreed to create and implement coordinated fuel surcharge programs, employing the AII-LF. For example, the Complaint alleges that Defendants discussed this strategy at AAR board meetings on October 2-3 and December 11-12 of 2003. (*Id.* ¶¶ 13, 71.) During these meetings and on other occasions, Defendants agreed to cause the AAR to adopt a new index without fuel. (*Id.* ¶¶ 13, 72.) Defendants further agreed that they would impose their new, stand-alone fuel surcharge on shippers, using the new index, in a coordinated fashion to enhance profits. (*Id.* ¶¶ 70-73.) As the Complaint describes, the broad use of a stand-alone, rate-based fuel surcharge was a sharp break from past industry practice. Prior to 2003, while some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, these fuel surcharges were applied only in isolated instances, reflecting the widespread use at that time of the AII and RCAF fuel-inclusive indexes and the differing fuel costs of each railroad. (*Id.* ¶¶ 8, 63.) The Complaint specifically alleges that these fuel surcharges were the isolated exception, not the rule, and

differed for each company, reflecting each railroad's differing efficiencies and fuel costs. (*Id.* ¶¶ 8, 63.) The AAR had never previously published a cost index without fuel, and the railroads had never before applied their fuel surcharges on a coordinated, stand-alone basis as a revenue enhancement mechanism. (*Id.* ¶¶ 13, 73.) As UP's James R. Young acknowledged in a July 2007 interview, the new stand-alone rail fuel surcharges were "really unique to the railroad industry. Three, four years ago they were really non-existent." (*Id.* ¶13.)

By removing fuel from the then-prevailing cost escalation indexes, Defendants could begin assessing stand-alone fuel surcharges on a widespread basis and in a coordinated manner. (*Id.* ¶¶ 14, 16, 18, 73, 75, 81.) Defendants could then implement their plan of applying broadly across their various private contracts a fuel surcharge percentage to the entire cost of the freight shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). (*Id.*) Through their collective action, Defendants planned to use the stand-alone fuel surcharge as a way to increase revenue, not simply capture increases in fuel costs (which the AII and RCAF were fully able to capture already), which would increase prices far more than any cost increase actually attributable to fuel. (*Id.* ¶¶ 73, 81.)

Almost immediately after the Defendants joint effort to cause the AAR to publish the AII-LF, the Eastern railroad defendants (CSX and NS), pursuant to their agreement with BNSF and UP, began to charge the exact same surcharges based on the use of a common index – the West Texas Intermediated Crude Oil Index ("WTI"). (*Id*. ¶¶ 16, 75-79.) CSX, which already had a surcharge methodology in place, immediately began to apply the surcharge utilizing the new index. NS announced in January 2004, *the first calendar month after the publication of the AII-LF*, that it would be changing its surcharge formulas and unveiled a surcharge formula identical to the CSX surcharge. (*See* Complaint, ¶¶ 77, 88) (explaining that, notwithstanding a

7

two-month lag, both Eastern Railroads were assessing identical surcharges within three months of the first publication of the AII-LF).

The Eastern railroads chose the WTI index because in early 2004, following the publication of the AII-LF, it was at a higher rate than the HDF Index.  (*Id*. ¶16.)  As with the Western railroads, the Eastern railroads agreed not only to use the same index but the same trigger points and timing:  the surcharges, applied to the entire base rate for the freight transport, would increase 0.4 percent for every $1 that the monthly average price of WTI oil exceeded $23 per barrel and the surcharge would be imposed two calendar months after the WTI Index had adjusted.  (*Id.* ¶¶ 77-78.)

### D.    The Conspiracy Operates Successfully

With Defendants' price-fixing conspiracy firmly in place, the surcharges of the Western railroads moved in lockstep – *i.e.*, their customers were charged the exact same surcharges – from July 2003 through at least June 2007.  (*Id.* ¶¶ 85-86.)  Similarly, the Eastern railroads' surcharges were identical starting in March 2004 and continuing through at least June 2007.  (*Id.* ¶¶ 87-88.)  Defendants published their surcharge rates on their websites so that the conspirators could monitor adherence to the price-fixing scheme.  (*Id.* ¶¶ 20, 67, 77.)  Railroad industry analysts contemporaneously noted and questioned the curious "convergence" in rail fuel surcharge methodologies adopted by the Defendants.  (*Id.* ¶ 90.)  As one analyst noted, "the way to gain significant market share is to lead the competition rather than following the competition." (*Id.*)  The Defendants used the new AII-LF to apply stand-alone fuel surcharges in contracts extending over periods of time.

Defendants also began moving from offering long-term contracts to more prevalent use of contracts that contained 30-day cancellation provisions or that were re-priced as often as monthly, (*Id*. ¶ 21), another way to facilitate imposition of the stand-alone fuel surcharges.

Previously, Defendants had typically preferred long-term contracts ranging up to five years, with rate increases usually governed by the AII or RCAF, that locked in market share. (*Id.* ¶ 95.) Defendants made this switch to more prevalent use of shorter term contracts even though most shippers preferred the former system, which for the freight shipment customer could minimize risk and make costs more predictable. (*Id.* ¶ 97.) Defendants were not deterred from this strategy by the risk of increased competition, because they had been guaranteed by their agreement that their "competitors" would be pursuing identical policies. (*Id.* ¶¶ 94, 101.)

At about the same time, Defendants collectively decreased the use of "through rates," a longstanding practice in which a customer receives a single bill from either the originating or terminating railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). (*Id.* ¶ 100.) Instead, Defendants moved increasingly to having rates billed separately for each railroad involved in a multi-railroad shipment. This provided transparency as to what each railroad was charging on multiple line shipments, and allowed each Defendant to bill separately for its applicable fuel surcharge. (*Id.* ¶ 100.)

Defendants also agreed not to negotiate discounts on their fuel surcharges and overall contract rates, even though prior to mid-2003 the custom had been for the railroads to do so. (*Id.* ¶¶ 94, 98, 101.) Indeed, when shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, they were told by the railroads that the fuel surcharges were "not negotiable." (*Id.* ¶ 98.) Industry analysts publicly questioned the railroads' refusals to negotiate the fuel surcharges despite the opportunities to gain market share. (*Id.* ¶ 90.)

Defendants also agreed not to undercut each other's pricing or to take market share from each other. (*Id.* ¶¶ 20, 81, 101.) As a consequence, Defendants' market shares remained stable throughout the period of the conspiracy. (*Id.* ¶ 101.) Indeed, despite widespread imposition of unprecedented surcharges and inflexibility in negotiating shipping contracts, Defendants' market shares remained essentially unchanged during the time the conspiracy was in effect. (*Id.* ¶¶ 94, 101.)

### E.    The STB Ruling

After receiving complaints, the STB conducted a regulatory investigation into Defendants' rail fuel surcharge program. This investigation culminated in a decision issued in January 2007 concluding that Defendants' fuel surcharges were an "unreasonable practice." (Complaint, ¶ 23) (quoting STB Decision, Rail Fuel Surcharges (STB Ex Parte No. 661, January 26, 2007) at 6) ("STB Ruling") (Ex. A to Declaration of Tara L. Reinhart In Support of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Document 106-2). The STB explained that "a fuel surcharge program that increases all rates by a set percentage *stands virtually no prospect of reflecting the actual increase in fuel costs* for handling the particular traffic to which the surcharge is applied." (Complaint, ¶ 23.) The STB added that the railroads' fuel surcharge program was "a *misleading* and ultimately unreasonable practice," finding that "there is no real correlation between the rate increase and the increase in fuel costs for that to which the surcharge is applied," STB Ruling at 7 (emphasis added). *See also id.* at 9 ("For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate – when practical alternatives are available – would permit them to continue to *mislead* their customers and would be unfair."). (*See generally* Complaint, ¶¶ 23, 103-106) (emphasis added). Although the STB Ruling applied to rate-regulated rail freight traffic only, Defendants also applied the same misleading and unreasonable

fuel surcharge practices to the private rail freight transportation contracts and other unregulated freight transport that are at issue in this case.  (*Id.* ¶¶ 105-106.)

In their statement of alleged facts, Defendants state: "The STB decision did not suggest, let alone find, any collusion.  The STB did not award damages or restitution for past surcharges, but rather, explicitly provided a 'rule of general applicability for future conduct.'"  (Defendants' Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Document No. 106) at 11.)  However, no issues of collusion were before the STB, which does not have jurisdiction to enforce the antitrust laws.[2]  As the STB explained in its ruling, it was relying on its authority to "adopt rules of general applicability for future conduct to address an unreasonable practice" rather than addressing a single shipper complaint (which could lead to an award of remedies for past practices).  STB Ruling at 8.

Nonetheless, the STB did find that the Defendants' rail fuel surcharges were an "unreasonable practice . . . [that] could be used to support future complaints challenging [past] individual rate-based surcharges."  *Id.*  And far from condoning or excusing the Defendants' fuel surcharge program, the STB throughout its decision admonished the Defendants for misleading their freight shipment customers through unreasonably practices.  *See e.g.*, STB Ruling at 7 ("We believe that imposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied, *is a misleading and ultimately unreasonable practice*.") (emphasis added).[3]

---

[2]     The STB is limited by its enabling legislation which is the ICC Termination Act, 49 U.S.C. 10101, *et seq.*, and the ICC was limited by the Interstate Commerce Act, 49 U.S.C. 1, *et seq.*

[3]     *See also id.* at 6 ("Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS SURVIVE *TWOMBLY*.

The Complaint satisfies the pleading requirements of Rule 8(a)(2) of the Federal Rules of

Civil Procedure. Plaintiffs adopt the arguments set forth in Direct Purchaser Plaintiffs'

Memorandum in Opposition to Defendants' Joint Motion to Dismiss the Direct Purchaser

Plaintiffs' Complaint as to why the allegations of the Complaint satisfy the Rule 8 pleading

standards articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955

(2007).[4]  For the reasons set forth therein, Defendants' motion to dismiss should be denied.

### II.    PLAINTIFFS' CLAIMS ARE NOT EXPRESSLY OR IMPLIEDLY PREEMPTED BY THE INTERSTATE COMMERCE COMMISSION TERMINATION ACT.

The state law claims of the Indirect Purchaser Plaintiffs are not preempted by the

ICCTA,[5] and Defendants cannot meet their heavy burden to show otherwise.

In determining whether the ICCTA supersedes Plaintiffs' state antitrust, consumer

protection, and unjust enrichment claims, several basic preemption principles are to be realized.

---

than to fuel consumption for the movement to which the surcharge is applied, *cannot fairly be described as merely a cost recovery mechanism*.") (emphasis added); at 7 ("*This sort of mislabeling* appears designed to avoid the type of response a carrier would likely receive *if it were to honestly inform* a shipper that a higher rate was being imposed to recover not only the increased fuel cost of serving that shipper, but also the increased cost of fuel for another shipper's traffic – which is what would often occur under rate-based fuel surcharges.") (emphasis added); at 9 ("*For carriers to continue to apply fuel surcharge programs* that are calculated as a percentage of the base rate – when practical alternatives are available – *would permit them to continue to mislead their customers and would be unfair*.") (emphasis added).  *See also* Complaint, ¶¶ 16, 96-98.

[4] To the extent that *Twombly* applies to Plaintiffs' state law claims, Plaintiffs adopt the arguments set forth in Direct Purchaser Plaintiffs' brief as to those claims also.  Plaintiffs note that since the consumer protection claims do not rest upon any allegations of conspiratorial agreements or parallel pricing, they remain viable even if the court finds that the *Twombly* pleading standards are not met with respect to the antitrust claims.

[5] Pub. L. No. 104-88, 109 Stat. 803, codified 49 U.S.C.§§10101-16106 (December 29, 1995).

First, there are three distinct varieties of preemption that may be considered in a preemption analysis: express, field, and conflict.  Express preemption, which occurs when Congress explicitly ousts state law, *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374 (1992), is the primary consideration where, as here, the federal statute contains a preemption provision. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 532 (1992) (the Court is to resort to an implied preemption analysis only when Congress has been silent on the preemption issue).

Second, "[t]he purpose of Congress is the ultimate touchstone" in defining the scope of any preemption clause.  *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963).  As such, the scope of the ICCTA's preemptive reach must be determined by "a fair understanding of congressional purpose."  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 529 n.27 (1992) (plurality opinion).

Third, preemption is an affirmative defense, with the burden of proof resting with the defendants.  *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 17-18 (D.D.C. 2005) ("preemption…is an affirmative defense, with the burden of proof on the defendants"); *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007) (same); *Great-West Life & Annuity Ins. Co. v. Information Sys. & Networks Corp.*, 523 F.3d 266, 270 (4th Cir. 2008) (same); *Emerson v. Kansas City Southern Ry Co.,* 503 F.3d 1126, 1133-34 (10th Cir. 2007) (same).

Fourth, determining whether defendants have met their requirements for preemption is ultimately a fact question for the jury.  *Ibrahim v. Titan Corp.*, No. 04-1248, 2007 WL 327484, at *3 (D.D.C. Nov. 6, 2007); *Brown*, 481 F.3d at 913 (preemption defense presented a genuine issue of material fact.); *Grant v. Gen. Elec. Credit Corp.*, 764 F.2d 1404, 1408 (11th Cir. 1985)

(whether the parties intended to enter a federal preemption contract may present a question of fact.).

As set forth below, Defendants fail to demonstrate that any form of federal preemption serves to displace Plaintiffs' claims, each of which is grounded in unregulated private contracts and does not serve to regulate or interfere with the economics of interstate rail transportation.

### A.  The ICCTA Does Not Expressly Preempt Plaintiffs' State Law Claims.

In 1995, Congress enacted the ICCTA, which abolished the Interstate Commerce Commission and established the STB, with the purpose of deregulating the economic activity of interstate surface transportation industries.  With respect to rail transportation in particular, Congress sought, through the ICCTA, to centralize the direct economic regulation of railroads in the federal government.  *See* H.R. Rep. 104-311, at 96 (1995) ("…the Federal scheme of economic regulation and deregulation is intended to address and encompass all [economic regulation of the interstate rail transportation system]").  In doing so, Congress did not, as the legislative history and relevant case law confirm, intend to preempt general state law claims grounded in private contracts like those belonging to Plaintiffs.

It is important to note at the outset that, through 49 U.S.C. §§ 10706 (rate agreements) and 11321 (consolidation or merger of rail carriers), Congress demonstrated that it knew how to exempt rail carriers from the reach of the antitrust laws, yet chose not to do so in § 10501(b). Neither did Congress act to exempt rail carriers from those laws with regard to their fuel surcharges.

### 1. The STB Does Not Have Jurisdiction over Plaintiffs' Claims Rooted Solely in Unregulated Contract Traffic.

In its January 25, 2007 Order concerning the fuel surcharges at issue in this litigation, the STB unambiguously disclaimed authority over claims that arise in private contracts such as those asserted by Plaintiffs here. Specifically, the STB stated that:

> Many shippers argue that there rules should apply to traffic handled under transportation contracts. Under 49 U.S.C. 10709, **we have no authority to regulate rail rates and services that are governed by a contract. Therefore, our findings and actions here apply only to regulated common carrier traffic.** We do note, however, that if a railroad enters into a contract that ignores the potential for significant increases in fuel costs, it cannot remedy that situation by engaging in an unreasonable practice as to other traffic over which we do have regulatory authority. Railroads would be well-advised to focus on improving their contracts to clearly allocate the costs of contingencies such as fluctuating fuel costs, rather than attempting to pass on the costs of ineffective contract drafting to non-contract customers.

*Rail Fuel Surcharges*, STB Ex Parte No. 661 (Sub-No.1), 2007 WL 201205, at *10 (S.T.B. Jan. 25, 2007) (emphasis added).[6]  The STB's interpretation of the scope of its statutory authority is entitled to deference.  *Mississippi Power & Light Co. v. Moore*, 487 U.S. 354, 381 (1988) ("In particular, it is settled law that the rule of deference applies even to an agency's interpretation of its own statutory authority or jurisdiction.") (Scalia, J., concurring) (*citing, among other authorities, Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844-45 (1986) (CFTC's determination regarding its jurisdiction is entitled to "considerable weight."); *NLRB v.*

---

[6] Through this Decision, the STB concluded its inquiry into railroad fuel surcharge practices by issuing a final rule declaring it an unreasonable practice for railroads to compute fuel surcharges in a manner that does not correlate with actual fuel costs for specific shipments. In this Decision, the STB prohibits the assessment of fuel surcharges based on a percentage calculation of the base rate charged to freight railroad customers. Defendants deny the relevance or significance of the Decision, pointing out that the STB, among other observations, noted that the railroads could not be "faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible."(Def. Mem. at 32 n. 21.); *see also infra* at n. 48 (responding to Defendants' argument). However, defendants do not distinguish or dispute the disclaimer regarding contract traffic.

*City Disposal Sys., Inc.*, 465 U.S. 822, 830 (1984) ("…on an issue that implicates its

expertise…a reasonable construction by the Board is entitled to considerable deference.")); *see*

*also Village of Bergen v. FERC*, 33 F.3d 1385, 1389 (D.C. Cir. 1994) (court must defer to

agency's interpretation of its statutory authority or jurisdiction "as long as it is reasonable");

*Fleischmann v. Director, Office of Workers' Compensation Programs*, 137 F.3d 131, 136 (2d

Cir. 1998) (general rule of deference on jurisdictional question is preferable); *Air Courier*

*Conference of America/Int'l Comm. v. U.S. Postal Service*, 959 F.2d 1213, 1223-25 (3d Cir.

1992) (deference invoked to Postal Service's interpretation of its own jurisdiction.); *First*

*Gibraltar Bank, FSB v. Morales*, 42 F.3d 895, 901 (5th Cir. 1995) (court accords deference to

agency's determination of its authority).

   Pursuant to section 10709 of the ICCTA, a multitude of cases have held that claims

arising out of private contracts relating to rail transportation, or "contract traffic," of the type at

issue here are not within the STB's statutory authority.  Hence, those claims may be resolved

only in **courts** of competent jurisdiction. *See, e.g.*, *Pejepscot Indus. Park, Inc. v. Maine Cent.*

*R.R. Co.*, 297 F. Supp. 2d 326, 332-33 (D. Me. 2003) ( "a rail carrier that voluntarily enters into

an otherwise valid and enforceable agreement cannot use the preemptive effect of section

10501(b) to shield it from its own commitments..."); *Town of Woodbridge v. Consolidated Rail*

*Corp.*, STB Docket No. 42053, 2000 WL 1771044, at *3 (S.T.B. served Dec. 1, 2000) (holding

that when rail carrier voluntarily contracts with another party, preemption does not apply); *H.B.*

*Fuller Co. v. Southern Pacific Transp. Co.*, STB Docket No. 41510, 1997 WL 476350, at **2-3

(S.T.B. served Aug. 22, 1997) ("we find no jurisdiction" over "transportation [that] was

performed under [carrier-shipper] contract, even though the terms of the contract refer to the

carrier's tariff."); *Minnesota Power, Inc. v. Duluth, Missabe and Iron Range Railway Co.*, STB

Docket No. 485894, 1999 WL 485895, at *3 (S.T.B. served July 7, 1999) (movement governed by a rail transportation contract is "beyond our regulatory purview under 47 U.S.C. § 10709(c)."); *see also Parrish & Heimbecker, Inc*., STB Docket No. 42031, 2000 WL 688049, at *4 (S.T.B. served May 22, 2000) (explaining that Congress removed contracts and underlying contract service from the regulatory service of the ICC and placed exclusive authority for the interpretation and enforcement of contracts in the courts.).

It is axiomatic that the STB has only such authority as Congress confers. "When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted." *Stark v. Wickard*, 321 U.S. 288, 309 (1944); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *American Petroleum Inst. v. E.P.A.*, 52 F.3d 1113, 1119-20 (D.C. Cir. 1995) (same). Here, the STB unambiguously and correctly determined that it has no authority to regulate contract traffic.

It is Defendants' burden to show that enforcement of the private unregulated contracts at issue here "would unreasonably interfere with [their] operations," *Town of Woodbridge*, 2000 WL 1771044, at *3, an inherently fact-bound inquiry requiring discovery to sort through the extent and nature of any operational "interference." *See, e.g., Ibrahim,* 2007 WL 327484, at *3 ("…the burden is on defendants to show that they meet the requirements for preemption. Whether they have done so is ultimately a question of fact for the jury."). Defendants have failed to meet this burden.

## 2.  The Preemption Provision Expressly Limits the STB's Authority over State Claims.

Defendants' argument in favor of preemption is further flawed as it is premised on an improper reading of §10501(b)'s express terms.  By neglecting to give value to each term of the preemption clause, Defendants misconstrue the reach of §10501(b) and disregard fundamental principles of statutory interpretation, which require that each element of the preemption clause be given meaning.  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 542 (2001) ("We must give meaning to each element of the pre-emption provision); *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute"); *United States v. Nordic Village, Inc*., 503 U.S. 30, 36-37 (1992) ("…statute must, if possible, be construed in such fashion that every word has some operative effect."); *Reiter v. Sonotone Corp*., 442 U.S. 330, 339 (1979) ("In construing a statute we are obligated to give effect, if possible, to every word Congress used."); *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443-48 (2005) (scrutinizing language of federal preemption provision).  As demonstrated below, a proper reading of the preemption provision evinces that in enacting the ICCTA, Congress did not, as Defendants suggest, intend to preempt all state law that may touch on a railroad's property or actions.  *Emerson v. Kansas City Southern Ry. Co*., 503 F.3d 1126, 1131 (10th Cir. 2007).

The ICCTA's preemption provision, codified at 49 U.S.C. 10501, serves dual purposes to establish both the STB's jurisdiction as well as the preemptive effect of its decisions and remedies:

(b) The jurisdiction of the Board over - -

(1)    transportation by rail carriers and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

> (2)      the construction, acquisition, operation, abandonment, or discontinuance
> of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks
> are located, or intended to be located, entirely in one State.

> is exclusive. Except as otherwise provided in this part, the remedies provided under this
> part with respect to regulation of rail transportation are exclusive and preempt the
> remedies provided under Federal or State law.[7]

This provision contains various limitations on the STB's authority, which directly refute

Defendants' broad assertion that all of Plaintiffs' state law claims are expressly preempted.

> a. The ICCTA Preemption Provision Expressly Preempts Only the
> "Regulation of Rail Transportation."

First, Defendants fail to acknowledge that the provision expressly preempts only those

state claims amounting to "***regulation of*** rail transportation," (emphasis added) not state law

generally.  Defendants' broad reading of §10501(b) in a manner that effectively preempts *all*

---

[7] "We are aided in our interpretation [of a preemption clause] by considering the predecessor
pre-emption provision and the circumstances in which the current language was adopted."
*Lorillard Tobacco Co.*, 533 U.S. at 542 (2001).  The predecessor to the Act's preemption
provision, 49 U.S.C. § 10501(d) (1982), provided:

> The jurisdiction of the Commission…over transportation by rail carriers, and the
> remedies provided in this title with respect to the rates, classifications, rules, and
> practice of such carriers, is exclusive.

 The Conference Substitute for the predecessor provision, which is contained in H.R. Conf. Rep.
No- 96-1430, 96th Cong., 2d Sess. 106, *reprinted in* 1980 U.S. Code Cong. & Admin. News
3978, 4110, 4138, states:

> The remedies available against rail carriers with respect to rail rates,
> classifications, rules and practices are exclusively those provided by the Interstate
> Commerce Act, as amended, and any other federal statutes which are not
> inconsistent with the Interstate Commerce Act. ***No state law or federal or state
> common law remedies are available.***

(emphasis added).  The Conference Substitute for the current preemption provision, H.R.
Conf. Rep. No. 104-422, by contrast, does not mention any exclusion for "state law or
federal or state common law remedies."

remedies "*with respect to* rail transportation" is an improper interpretation that runs askew of Congress' intent and wholly negates the limiting term "regulation."[8]

Though specifically adopting language limiting the preemption provision's reach to "regulation of rail transportation," Congress did not define the term "regulation" within the Act. Hence, it follows that "Congress narrowly tailored the ICCTA pre-emption provision to displace only…those state laws that may reasonably have the effect of 'managing' or 'governing' rail transportation…while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Florida East Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324 (11th Cir. 2004) (*quoting* Black's Law Dictionary 1286 (6th ed. 1990)); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987) (explaining that when interpreting a preemption provision's language, it is understood that a "common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate [a matter], a law…must be specifically directed toward [it]."); *Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp.*, 450 F. Supp. 2d 467, 478 (D.N.J. 2006) ("exclusive STB jurisdiction is limited to remedies with respect to rail regulation—not State and Federal law generally.") (internal citations omitted). This narrow reading of the preemption provision is consistent with Congress's intention to limit its scope:

> The conference provision [of 49 U.S.C. 10501(b)] retains this general rule [of increased exclusivity for Federal remedies], while clarifying that the

---

[8] When considering clauses preempting state laws that "relate to" a federal area of regulation, the courts have adopted a broad interpretation. However, when considering preemption clauses that require some level of overlap between state and federal law, the courts have adopted a narrow interpretation. *See* Carter H. Strickland, Jr., *Revitalizing the Presumption Against Preemption To Prevent Regulatory Gaps: Railroad Deregulation and Waste Transfer Stations*, 34 Ecology L.Q. 1147, 1163 n.65 (2007) (*comparing Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) ("State enforcement actions having a connection with or reference to" federal law are preempted.), *with CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662 (1993) (competing state standard not preempted unless "not compatible with federal laws or regulations.")).

> *exclusivity is limited to remedies with respect to rail regulation- not State and Federal law generally*. For example, criminal statutes governing antitrust matters not pre-empted by this Act, and laws defining such criminal offenses as bribery and extortion, *remain fully applicable unless specifically displaced because they do not generally collide with the economic scheme of regulation (and deregulation) of rail transportation*.

H.R. Conf. Rep. No. 104-422, at 167 (1995), reprinted in U.S.C.C.A.N. 850, 852 (emphasis added).[9]

Plaintiffs' state antitrust, consumer protection, and unjust enrichment claims do not amount to the type of economic regulation that Congress sought to preempt. None of these claims are representative of an effort to "manage" or "govern" the fuel surcharges. Though Defendants attempt to characterize Plaintiffs' state claims as a direct attack on the "economics" of their "operations," (Def. Mem. at 4), Plaintiffs do not challenge the reasonableness of Defendants' rates. Plaintiffs instead seek recovery for conspiratorial and unfair overcharges imposed by a group of conspiring competitors through private contracts, remedial relief which does not even remotely fall within the STB's jurisdiction or competence. *See, e.g., Emerson*, 503 F.3d at 1131 (finding that general state law regulating maintenance of vegetation does not collide with Federal scheme of economic regulation); *Rushing v. Kansas City Southern Ry.Co.*, 194 F.Supp. 2d 493 (S.D. Miss. 2001) (finding that an order directing the railroad "to compensate and correct drainage problems resulting from the construction of the berm would not

---

[9] "Since the conference report represents the final statement of terms agreed to by both houses of Congress, next to the statute itself, it is the most persuasive evidence of congressional intent." 2A Sutherland Statutory Construction § 48.8 (2008); *see also Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981) (same). It also is noteworthy that the conference report was adopted in the face of warnings from former Attorney General (then Senator) Ashcroft that Congress should preempt remedies against rail carriers based on statutory or common law. *See* S. Rep. No. 104-176, 104th Cong. 1st Sess., (1995)(Additional Views of Senator Ashcroft), 1995 WL 710522, at *57 (Legis. Hist.).

implicate the type of economic regulation Congress was attempting to prescribe when it enacted the ICCTA").

In clarifying the scope of the preemption provision and its authority under it, the STB has explained that section 10501(b) "does not completely remove any ability of state or local authorities to take action that affects railroad property. To the contrary, state and local regulation is permissible where it does not interfere with interstate rail operations, and localities retain certain police powers to protect health and safety." [10] *Maumee & W. R.R. Corp. and RMW Ventures, LLC. Petition for Declaratory Order*, 2004 WL 395835 (S.T.B. Mar. 2, 2004).[11]

An overwhelming number of courts also have recognized that the ICCTA's preemption provision is not to be construed, as Defendants suggest, in a manner that is so broad and limitless as to displace all state claims. Defendants ignore entirely those cases in which it has uniformly been held that state regulation of rail transportation is permissible so long as it does not unreasonably burden or discriminate against the railroads, a uniquely fact-intensive inquiry. *New York Susquehanna and Western Ry. Corp. v. Jackson*, 500 F.3d 238, 252, 254 (3d Cir. 2007) ("[C]ourts and the Board have rightly held that [the ICCTA] does not preempt *all* state regulation affecting transportation by rail carrier;" "state law that affects rail carriage survives preemption if

---

[10] "As the agency authorized by Congress to administer the [ICCTA], the Transportation Board is uniquely qualified to determine whether state law should be preempted by the [ICCTA]." *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005). Thus, "this Court must give considerable weight and due deference to the STB's interpretation of the statutes it administers unless its statutory construction is plainly unreasonable." *R.R. Ventures Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 548 (6th Cir. 2002).

[11] *See also CSX Transportation, Inc.* 2005 WL 1024490, at *3 (S.T.B. May 3, 2005) (the "preemption analysis requires a factual assessment of whether that [state or local] law would have the effect of preventing or unreasonably interfering with railroad transportation"); *Cities of Auburn & Kent, Washington*, 1997 WL 362017, at *6 (S.T.B. July 1, 1997) (The Act's preemption provision is inapplicable unless enforcement of the state law "would constitute an unreasonable burden on, or interfere with, interstate commerce.").

it does not discriminate against rail carriage and does not unreasonably burden rail carriage."); *see also District of Columbia v. 109,205.5 Square Feet of Land*, 2005 WL 975745, at *3 (D.D.C. Apr. 21, 2005) (upholding District's acquisition of an easement by eminent domain over railroad's land upon a finding that such conduct would not unreasonably interfere with railroad operations); *Emerson*, 503 F.3d at 1133 (tort remedies preempted only if they have the effect of preventing or unreasonably interfering with railroad transportation); *Hackensack Riverkeeper, Inc.*, 450 F.Supp. 2d at 478 (finding that environmental regulation of transloading of construction and demolition waste for shipment by railroad is not preempted by ICCTA); *Native Village of Ehlutna v. Alabama R.R. Corp.*, 87 P.3d 41, 57 (Alaska 2004) (Congress's focus on economic regulation makes clear that it had no intention of preempting all state or local regulation that touches railroads in any way.); *In re Vermont Ry.*, 769 A.2d 648, 652-55 (Vt. 2000) (ICCTA does not preempt city's zoning ordinance for permit for salt shed on railroad property); *Jones v. Union Pac. R.R.*, 79 Cal. App. 4th 1053, 94 Cal. Rptr. 2d 661, 666-67 (Cal. App. 2000) (state and local regulation of Defendant's trains permissible if it does not interfere with railroad's interstate rail operations).

Pursuant to this analysis and Congress' intention to preserve laws of general applicability, the STB and courts have also consistently held that state claims arising from the non-burdensome exercise of state police powers are not preempted by the ICCTA.[12]  *See* H.R. Conf. Rep. No. 104- 422, 104th Cong. 1st Sess., at 852 (1995) (noting that under the ICCTA, "States retain the police powers reserved by the Constitution"); *Borough of Riverdale*, *Petition for Declaratory Order*, 1999 WL 715272, at *9 (S.T.B. Sept. 9, 1999) (ICCTA does not preempt

---

[12] The legislative history illustrates that Congress believed the preemption language of § 10501(b) to be so clear and precise that a savings clause protecting state police powers was unnecessary.  H.R. Rep. No. 104-311, at 95.

"non-discriminatory" public health and safety regulations that do not foreclose or restrict a

railroad's ability to conduct its operations); *King County, WA,  Petition for Declaratory Order*,

1996 WL 545598, at *3-4 (S.T.B. Sept. 25, 1996) (the ICCTA does not usurp the right of state

and local entities to impose appropriate public health and safety regulation on interstate

roads….[a] key element in the preemption doctrine is the notion that only 'unreasonable'

burdens are stricken down'"); *Florida East Coast*, 266 F.3d at 1337, 1329 ("The statutory

changes brought about by the ICCTA reflect the focus of legislative attention on removing *direct*

economic regulation by the *States*, as opposed to the incidental effects that inhere in the exercise

of traditionally local police powers…"; zoning, health, and safety regulations rooted in state's

police power are not "regulation of rail transportation"); *Iowa Chicago & E.R.R. v. Washington

County, IOWA*, 384 F.3d 557, 561-62 (8th Cir. 2004) (state's inherent authority over the safety of

roads and bridges at rail/highway crossings not preempted by ICCTA so long as no unreasonable

burden is imposed on a railroad); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d

Cir. 2005) (ICCTA does not preempt all state and local regulation, particularly police power

regulations);  *Williams Rail Service LLC v. Stewart*, No. 7:07-1528, 2007 WL 2471198, at *4

(D.S.C. Aug. 27, 2007) ("South Carolina's gambling laws and the enforcement of these laws are

a clear exercise of its police powers…and that the text, legislative history, and purpose of the

ICCTA support the finding that [they are] not preempted in this case by the STB"); *Home of

Economy v. Burlington Northern*, 694 N.W.2d 840 (N.D. 2005) (ICCTA does not explicitly or

impliedly preempt states' traditional police power regarding grade crossings); *J.P. Rail, Inc. v.

New Jersey Pinelands Comm'n*, 404 F. Supp. 2d 636, 652 n.31 (N.J. 2005) (ICCTA does not

preempt state's ability to exercise its traditional police powers); *Village of Ridgefield Park v.

New York Susquehanna and Western Railway Corp.*, 750 A.2d 57, 63 (N.J. 2000) (under ICCTA

states "retain a certain residuum of historic police powers"); *Wheeling & Lake Erie Ry. Co. v. Pennsylvania Pub. Util. Comm'n*, 778 A.2d 785, 790-92 (Pa. Commw. Ct. 2001) (ICCTA does not preempt state police power over safety of rail-highway crossings); *State v. Burlington N. Ry. Co.*, 24 P.3d 368 (Okl. Civ. App. 2000) ("We do not believe that Congress intended when it enacted the ICCTA to pre-empt a state agency's police power to require an operating railroad to maintain a fence along its right of way, in the absence of evidence that such a requirement has a significant economic impact on the railroad's operation.").

Defendants cite several cases in support of extending §10501(b)'s preemptive reach beyond the express terms of the ICCTA in order to encompass Plaintiffs' claims. These cases, however, are not inconsistent with Plaintiffs' position of non-preemption. Although illustrative of the fact that some courts have preempted state common law and statutory claims, these cases nonetheless confirm Plaintiffs' arguments that preemption of state law is proper only in limited contexts involving clear intrusions upon the STB's exclusive authority to regulate the economics of rail transportation. For instance, in *Friberg v. Kansas City S. Ry.*, the Fifth Circuit preempted plaintiffs' tort and Anti-Blocking statutory claims, which sought to regulate the time defendant's trains could occupy a rail crossing. 267 F.3d 439 (5th Cir. 2001). The Court explained that plaintiffs' claims directly interfered with the railroad's operations and construction—activities specifically listed as within the STB's exclusive jurisdiction. *Id*. at 443. It also explained that plaintiffs' efforts would amount to the type of economic regulation precluded by the ICCTA as they would undoubtedly impact the railroad's decisions concerning matters such as scheduling, train length and train speed. *Id*. at 444. Similarly, in *City of Auburn v. United States*, the Ninth Circuit deemed appropriate the preemption of state environmental permitting requirements as applied to defendant's railroad project on the grounds the ICCTA dealt specifically with that type

of activity.  154 F.3d 1025, 1030 (9th Cir. 1998).  The Court also explained that the

environmental regulation could amount to economic regulation if its application prevented the

railroad from constructing or operating a rail line.  *Id*. at 1031.[13]  Defendants' cases are plainly

inapposite as Plaintiffs' state claims are not expressly preempted by the language of the

preemption provision and do not have the effect of stripping exclusive jurisdiction from the STB.

      b.  The Preemption Provision Preempts Only "Remedies Provided"
           Under the Railroad Provisions of the ICCTA.

      Next, Defendants' reading of the preemption provision is further deficient because

section 10501(b) expressly limits preemption to "***remedies provided under this part*** with respect

to regulation of rail transportation" (emphasis added).  As one commentator has observed, "[t]his

qualifying language significantly narrows the scope of preemption from the initial House Bill,

which had stated, in its entirety: 'Except as otherwise provided in this part, the remedies

provided under this part are exclusive and preempt the remedies provided under Federal or State

law.' H. Rep. 104-311, at 3 (*discussing* 49 U.S.C. 10103)."[14]  This is important in the instant

preemption analysis because the STB remedies provided for in the ICCTA do not overlap with

those available under state antitrust or consumer protection laws.  Rather, "the [STB's]

substantive powers relate to economic regulations or core operational decisions about opening

---

[13] Needless to say, none of Defendants' cases involve price-fixing conspiracies, and the facts of each fall within the sphere of such core operations as railroad construction, railroad crossing operations, car service, failure to provide rail service, and transport of hazardous materials, and each contains generalized statements about preemption of no relevance here. Each of these cases also arguably involved what can be construed as an attempt to regulate rail transportation, and thus is distinguishable on that ground as well.

[14] Carter H. Strickland, Jr., *Revitalizing the Presumption Against Preemption To Prevent Regulatory Gaps: Railroad Deregulation and Waste Transfer Stations*, 34 Ecology L.Q. 1147, 1165-66 (2007).

and shutting lines and circumscribe the enforcement sections in Part A of the Act."[15]   Under

these express terms, remedies available pursuant to Plaintiffs' state antitrust, consumer

protection, and unjust enrichment claims are not preempted.

            c.   The ICCTA Preemption Provision Does Not Expressly Preempt *All* State Law.

Finally, had Congress intended to preempt all claims related to rail transportation, as

Defendants suggest, it certainly would have stated so expressly, or would have, at the least,

defined the "State law" which is to be preempted.   "When Congress has sought to 'underscore its

intent that [the preemption provision] be expansively applied, [it has] used…broad language in

defining the 'State law' that would be pre-empted,' for example, by stating that such law

included all 'State law having the effect of law.'"   *Florida East Coast*, 266 F.3d at 1330 (*quoting*

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138-39 (1990) (discussing ERISA §514(c)(1)

(29 U.S.C. 1144(c)(1): "…the provisions of this subchapter…shall supersede any and all State

laws…")).[16]

---

[15] Carter H. Strickland, Jr., *Revitalizing the Presumption Against Preemption To Prevent Regulatory Gaps: Railroad Deregulation and Waste Transfer Stations*, 34 Ecology L.Q. 1147, 1162 (2007) (*citing* 49 U.S.C. 11701- 11707; 11901- 11908 and explaining that "the remedies available to the STB under Part A cover such matters as rate levels and economic discrimination, 49 U.S.C. § 10701-10747; the licensing, abandonment, and sale of railroad property, *Id.* §§ 10901-10907; operations, open track rights, and common accounting standards, *id.* §§ 11101-11164; financial matters, including mergers and acquisitions, *id.* §§ 11301-11328, and taxes, *Id.* §§ 11501-11502.  The Board also enforces the uniform, strict liability scheme for liability for goods in transit, which preempts state common law rules to the contrary. *Id.* § 14706").

[16] *Compare* the language of 10501(b) with other statutory provisions in which Congress explicitly preempted state and local laws.  *See e.g.,* Airline Deregulation Act, 49 U.S.C. 41713(b)(1): "Except as provided in this subsection, a State, a political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."; Clean Air Act, 42 U.S.C. 7543(a): "No state or any political subdivision thereof shall adopt or attempt to enforce any standard relating to control of emissions from new motor vehicles or new motor vehicle engines subject to this part."

**B.  The ICCTA Does Not Impliedly Preempt Plaintiffs' State Law Claims.**

In the absence of express preemption, Defendants suggest the possibility that Plaintiffs' claims are impliedly preempted.  (Def. Mem. at 5, 6, fn. 1).  However, as explained above, it is clear that when enacting the ICCTA, Congress did not intend to preempt state laws of general applicability that do not "collide with the scheme of economic regulation of rail transportation" such as those upon which Plaintiffs' claims are grounded. As such, Defendants' assertions of implied preemption must necessarily fail.

### 1.  The State Laws Invoked By Plaintiffs Do Not Impede the Achievement of the ICCTA's Objectives.

Defendants mention the possibility of conflict preemption, but fail to explain even on the most basic level, how the enforcement of Plaintiffs' state antitrust, consumer protection, or unjust enrichment claims would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in regulating the railroad system.  (Def. Mem. at 6).[17]  Instead, they cite two inapplicable Supreme Court holdings, *Texas & P. Ry. Co. v. Abilene Cotton Co.*, 204 U.S. 426 (1907), and *Chicago and N.W. Transp. Co. v. Kalo Brick & Title*, 450 U.S. 311 (1981), neither of which suggest that Plaintiffs' claims may be preempted here.

The issue in *Abiline Cotton* was whether a court could rule as to the reasonableness of a rate that had already been deemed reasonable by the ICC.  Recognizing that allowing a court to do so would directly conflict with the ICC's authority and would effectively make it impossible for the shipper to adhere to both orders if the court were to rule that the rates were unreasonable, the Court held that the shipper's efforts were barred.  It noted specifically, that a shipper seeking

---

[17] Conflict preemption occurs if "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidson*, 312 U.S. 52, 67 (1941).

damages under the Interstate Commerce Act based upon the alleged unreasonableness of rates charged by a common carrier must do so through the ICC, not the courts, because it alone "is vested with power originally to entertain proceedings for the alteration of an established schedule...." *Id*. at 448. Given the sharply contrasting scenario at issue here, the *Abiline* decision has no relevance.  As explained later by the Supreme Court in *Nader v. Allegheny Airlines, Inc.*, "the conflict between the court's common law authority and the agency's ratemaking power" in *Abiline* was "direct and unambiguous."  426 U.S. 290, 299-300 (1976).  Conversely, here as in *Nader*, "the court…is not called upon to substitute its judgment for the agency's on the reasonableness of a rate-or, indeed, on the reasonableness of any carrier practice." *Id*.  Instead, the court is asked only to enforce the STB's finding of unreasonableness such that Plaintiffs may obtain adequate redress.

Further, *Kalo Brick*, as Defendants acknowledge through their citation, states only that regulations that are "plainly inconsistent" with the authority of the STB or congressional policy may be invalidated.  450 U.S. at 318.  There, the Court there held that the Interstate Commerce Act preempts a state court action for damages for abandonment of a railway line when that abandonment was regulated by the ICC.  Plaintiffs' claims here, however, are not in any way inconsistent with the STB's authority or congressional policy.  First, as stated earlier, the STB has made clear that it does not have authority over Plaintiffs' claims as they arise from transportation regulated by private contract.  Second, Plaintiffs' claims do not conflict with STB's authority over the reasonableness of rates because they are in fact aimed at enforcing, not challenging, the STB's finding of unreasonableness as to the fuel surcharges.  Finally, Congress did not intend for the ICCTA to preempt Plaintiffs' claims, which, as set forth below, arise from generally applicable state laws and do not unreasonably interfere with rail transportation.

### 2. Congress Did Not Intend To Displace State Claims Based on Contract and Unrelated to the Regulation of Rail Transportation.

Defendants also refer the Court to the possibility of field preemption to suggest that Plaintiffs' claims are impliedly preempted by the federal government's long and comprehensive history of regulation of rail transportation.  (Def. Mem. at 5; fn. 1).  This argument too is ill-supported.

Field preemption may be found where Congress has occupied a particular field of regulation with the intent to supplant state law.  *Cipollone*, 505 U.S. at 532.  And, to support a claim of implied preemption, defendants must identify a specific provision of law from which to imply intent to preempt.

It is clear that the ICCTA occupies "the field of economic regulation of railroad transportation."  *Burlington Northern Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1296 (D. Mont. 1997); *see also* H.R. Rep. 104- 311, at 96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 808 ("Conforming changes are made to reflect the direct and complete preemption of ***State economic regulation of railroads*...**") (emphasis added).  Plaintiffs' state antitrust, consumer protection, and unjust enrichment claims, however, do not in any manner intrude upon this field as Defendants suggest.  Instead, they arise independently, out of areas of regulation that have traditionally been occupied by the states.  As such, not only are Plaintiffs' claims not impliedly preempted, they are in fact subject to a presumption against preemption.

It is well-established that where the State acts in a field which the States have traditionally occupied the court will retain "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)); *see also New York State Dep't of Soc. Servs. v.*

*Dublino*, 413 U.S. 405, 413 (1973) ("If Congress is authorized to act in a field, it should manifest its intention clearly.  It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so.  The exercise of federal supremacy is not lightly to be presumed.") (quoting *Schwartz v. Texas*, 344 U.S. 199, 202-03 (1952)); *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 86 (1987).[18]

In light of the legislative history and case law realizing the ICCTA's preservation of state police powers, Defendants have not, and in fact cannot, satisfy their heavy burden to show that it was the "clear and manifest purpose of Congress" to preempt Plaintiffs' claims here.[19]  *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995); *Hattem v. Schwarzenegger*, 449 F.3d 423, 431 (2d Cir. 2006); *King v. Collagen Corp.*, 983 F.2d 1120, 1137-38 (1st Cir. 1993); *see also United States v. Ferrara*, 847 F. Supp. 964, 969 (D.D.C. 1993), *aff'd* 54 F.3d 825 (D.C. Cir. 1995) (amended July 1995) ("plaintiff bears a heavy burden of demonstrating that state regulation has been superseded by federal law"). Furthermore, where, as in this case, Congress provides an express preemption clause, the presumption against preemption requires courts to read the clause "fairly," but "narrowly."

---

[18] More recently, the Court used the presumption to support its conclusion that the federal pesticide statute does not preempt tort claims brought by peanut farmers against a pesticide manufacturer.  *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 448-49 (2005).

[19] In contending that the presumption against preemption is inapplicable here because of the "lengthy and pervasive history of federal regulation of the railroad system," Defendants again mistake Plaintiffs' claims as attempts to regulate rail transportation.  As explained throughout this brief, Plaintiffs' claims are not directed in any manner toward economic regulation of rail transportation.  Moreover, the Supreme Court has noted several times that a preemption inquiry "cannot be judged by reference to broad statements about the 'comprehensive' nature of federal regulation" such as those offered by Defendants.  *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 429-30 (1963); *see also Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718 (1985) ("To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive.  Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.").

*Cippollone*, 505 U.S. at 523 (plurality opinion).[20] Where, as here, Defendants point to no substantive provision of the Act from which to imply intent, implied preemption is unavailable.

Finally, it is worth noting that legislative history showing that Congress intended the STB to be a smaller institution with far fewer resources further cripples Defendants' argument that the STB has exclusive jurisdiction over Plaintiffs' state law claims. When Congress terminated the ICC, it had five commissioners and roughly 400 employees. H.R. Rep. No. 104-311, at 82. The STB, on the other hand, has three commissioners and approximately 145 employees. *See Id*. at 90. This substantial decrease in size and resources is inconsistent with Defendants' preposterous "exclusive" STB jurisdiction thesis. The STB simply lacks the resources to police the thicket of the antitrust laws of 19 states, the consumer protection laws of 26 states, and the common and statutory laws of the 26 states in play here. If Congress intended otherwise it would have equipped and funded the STB accordingly.

In sum, the fact that Plaintiffs' claims are rooted in private contract underscores the defects in Defendants' conflict and field preemption claims. Congress, by expressly excluding in 49 U.S.C, § 10709 private contract traffic from STB jurisdiction, could not possibly have intended to preempt claims arising under such contracts.

---

[20] "[The Court] must fairly but - - in light of the strong presumption against pre-emption - - narrowly construe the precise language [of the statute] and . . . look to each of petitioner's common-law claims to determine whether it is in fact pre-empted"). *Cippolone*, 505 U.S. at 523. The *Cipollone* Court held 7-2 that the Federal Cigarette Labeling and Advertising Act, before being amended by the Public Health Cigarette Smoking Act of 1969, did not preempt all state common law damage actions. Specifically, the Court found post-1969 claims of fraudulent misrepresentation, conspiracy, express warranty, and failure to warn claims (not based on advertisements) were not preempted, and that all claims brought as a result of injuries suffered between 1966 and 1969 likewise were not preempted.

### C.  Plaintiffs' State Antitrust, Consumer Protection, and Unjust Enrichment Claims Fall Outside of the Jurisdiction of the STB.

"Federal law does not preempt state laws 'where the activity regulated [by the state is] merely a peripheral concern of the federal law." *New York Susquehanna and Western Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (*quoting San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmonk*, 359 U.S. 236 (1957).  Indeed, as explained by the Eleventh Circuit in *Florida East Coast Ry*., "[a]llowing localities to enforce their ordinances with the possible incidental effects such laws may have on railroads would not result in the feared 'balkanization' of the railroad industry as companies sought to comply with those laws." 266 F.3d at 1339. [21]

Because Plaintiffs' generally applicable state antitrust, consumer protection, and unjust enrichment claims do not serve to regulate rail transportation, and further do not unreasonably interfere with rail transportation, they cannot be preempted by the ICCTA.

### 1.  State Antitrust Law is Not Preempted As Conspiracies And Conspiratorial Overcharges Involving Exempt Contract Traffic Are Not Within The STB's Jurisdiction.

Defendants have failed to show that Plaintiffs' state antitrust claims are preempted by the ICCTA.

---

[21] In this respect, the fact that enforcement of Plaintiffs' generally applicable laws may in fact have some economic effect on the railroads is of no consequence.  The Eleventh Circuit discussed this point as well in *Florida East Coast*, stating that:

> No statement of purpose for the ICCTA, whether in the statute or in the major legislative history, suggests that any action which prevents an individual [railroad] firm from maximizing its profits is to be preempted.  Naturally, at some level, all regulation places constraints on firms' profit-maximizing behavior; to allow [defendants'] argument to prevail would subsume all local [and state] regulation to the profit-maximizing priorities of individual railroad companies.

266 F.3d at 1338 n. 11 (*citing Hayfield N. R.R. Co. v. Chicago & North Western Transport. Co.*, 467 U.S. at 635-36 (1984) (holding that state condemnation authority is "not preempted [by the ICA] merely because it may frustrate the economically optimal use of rail assets.").

To begin with, Defendants fail to acknowledge that the STB (and its predecessor, the ICC), **has no jurisdiction or authority to enforce the antitrust laws or even to determine if they have been violated**.  Hence, such state and federal claims do not fall within the jurisdiction, exclusive or otherwise, of the STB, and so are remitted to the state and federal antitrust laws for enforcement.  *See, e.g., McLean Trucking Co. v. United States*, 321 U.S. 67, 79 (1944) ("the Commission has no power to enforce the Sherman Act as such.  It cannot decide definitely whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize which is forbidden by the Act.  The Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems."); *see also Comty. Television of S. California v. Gottfried*, 459 U.S. 498, 514 (1983) (quoting with approval the above language from *McLean*); *New York Shipping Ass'n v. Federal Maritime Comm'n*, 854 F.2d 1338, 1371 (D.C. Cir. 1998) (same); *Transkentucky Transp.R.R. v. Louisville and Nashville R.R. Co.*, 581 F. Supp. 759, 763 (E.D. Ky. 1983) ("The Supreme Court has never held that a regulatory act has completely displaced the antitrust laws in the sweeping manner suggested by defendants.").[22]  That landscape is unchanged by the deregulatory focus of the Act. *Alliance Shippers, Inc. v. Southern Pacific Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988)

---

[22] The decision in *Credit Suisse Securities (USA) v. Billing*, --- U.S. ---, 127 S. Ct. 2383 (June 18, 2007), is not to the contrary.  There, the issue was whether the antitrust laws could be applied to allegedly anticompetitive practices in underwriting initial public offerings. The Court held that they could not. *Id.* at 2396. There, unlike here, there was a perceived danger that conduct that the securities laws permits or encourages might be deemed a violation of the antitrust laws. In this case, by contrast, (1) the law is clear that  the STB has no jurisdiction or authority to enforce the antitrust laws or even to determine if they have been violated, *McLean, supra*, and (2) the STB itself has decreed that it has "no authority to regulate rail rates and services that are governed by a contract." *See, post.*, STB Ex Parte No. 661 (Sub-No-1), 2007 WL 201205, at *10 (S.T.B. Jan. 25, 2005).

("Antitrust remedies unquestionably survived deregulation" imposed by the Staggers Rail Act of 1980).[23]

Even more important, Defendants admit that the Act does not preempt use of the "federal antitrust law to obtain a remedy for alleged price fixing of fuel surcharges." (Def. Mem. at 10 n. 3.) Plainly, if the Act does not preempt federal antitrust law, state antitrust laws likewise are not preempted. *See, e.g., California v. ARC America Corp.*, 490 U.S. 93, 102 (1989) ("State [antitrust] laws are consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct."). Several cases clinch this fundamental point: *J.P. Morgan Trust Co., Nat'l Ass'n v. The Williams Cos., Inc.(In re Western States Wholesale Natural Gas Antitrust Litig.*), No. 05-1331, 2008 U.S. Dist. LEXIS 39686, at * 53-55 (D. Nev. May 14, 2008) (holding that the Natural Gas Act does not preempt plaintiffs' claims under Kansas' antitrust laws alleging that defendants conspired to manipulate the natural gas market by knowingly delivering false reports concerning trade information to trade indices and engaging in wash trades); *Pinney Dock and Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1481-82 (6th Cir. 1988) (Clayton Act's four-year statute of limitations for federal antitrust claims against railroads does not preempt provision in Ohio antitrust law providing for no statute of limitations; hence plaintiffs' pendent state claims may be tried notwithstanding that the federal claims are time-barred.); *ETSI Pipeline Project v.*

---

[23] *Cf. Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 692-93 (9th Cir. 1977) *vacated on other grounds,* 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978), (Interstate Commerce Act does not foreclose Sherman Act claims by bus company against competitor); *Transkentucky Transp. R.R.,* 581 F. Supp. at 771-72 (provision of Staggers Act conferring exclusive jurisdiction on ICC and on state authorities over remedies provided under Interstate Commerce Act did not bar Sherman Act claims brought by coal transportation companies against two railroads because the complaint did not request any remedy provided under the Interstate Commerce Act; "In passing [the ICA], Congress intended that railroads and other carriers would continue to be subject to the antitrust laws.").

*Burlington Northern, Inc.*, No. 84-979, 1989 U.S. Dist. LEXIS 18796, at *36 (E.D. Tex. June 5, 1989) (finding the evidence "overwhelming" that several railroads conspired to prevent or delay the entry of a coal slurry pipeline into the interstate coal transportation business and accordingly granted a directed verdict for $345 million against railroads). The point of presiding importance is that neither the federal nor state antitrust laws are concerned with the *reasonableness* of rates, and so fall outside the Act's limited preemption clause.

Defendants do not and cannot point to a single case or other binding authority holding that conspiracies and conspiratorial overcharges have any affect whatsoever on the "regulation of rail transportation."

All that the state laws at issue here require is that persons refrain from conspiring or (in the instance of consumer protection laws) from conspiring and failing to disclose the conspiracy. Those state laws prohibit a group of conspiring competitors from assessing conspiratorial and unlawful overcharges involving private Contract Traffic, in no way interfere with Defendants' operations, do not impede the STB's "regulation of rail transportation," and do not undermine the policy that underlay the Act.

Various provisions in the Act, furthermore, specifically address the antitrust laws, and exempt the railroads from them only those limited respects. The very fact that Congress felt it necessary to exempt the railroads from the antitrust laws in certain specific situations (not related to the circumstances at issue in this litigation) demonstrates affirmatively that Congress intended the antitrust laws to apply to the railroads generally, other than in the narrow circumstances to which the specific exemptions apply. For example, 49 U.S.C. § 10706(a)(3)(B)(ii)[24] specifies:

---

[24] 49 U.S.C. § 10706 is titled: "**Rate Agreements: exemption from antitrust laws**." In general, this provision provides rail carriers with express immunity from antitrust liability for implementing agreements for joint rate setting approved by the ICC. As noted above, the Act

(ii) ***In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law***, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic. In any proceeding in which such a violation is alleged, evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement - -

  (I) was in accordance with an agreement approved under paragraph (2) of this subsection; or

  (II) concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.

In any proceeding before a jury, the court shall determine whether the requirements of subclause (I) or (II) are satisfied before allowing the introduction of any such evidence. (Emphasis added.)

49 U.S.C. § 10706(a)(2)(A) states:

(2)(A) A rail carrier providing transportation subject to the jurisdiction of the Board under this part that is a party to an agreement of at least 2 rail carriers that relates to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them, procedures for joint consideration, initiation, publication, or establishment of them, shall apply to the Board for approval of that agreement under this subsection. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy of section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of its approval. If the Board approves the agreement, it may be made and carried out under its terms and under the conditions required by the Board, and the Sherman Act (15 U.S.C. 1, et seq), the Clayton Act (15 U.S.C. 12 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq, sections 73 and 74 of the Wilson Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) do not apply to parties and other persons with respect to making or carrying out the

---

abolished the ICC and created the STB. The STB then adopted the precedents and regulations of the ICC. *CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union*, 413 F. Supp. 2d 553, 556 n. 2 (D. Md. 2006.)

agreement. However, the Board may not approve or continue approval of an agreement when the conditions required by it are not met of if it does not receive a verified statement under subparagraph (B) of this paragraph.[25]

49 U.S.C. § 10706 (a)(2)(B) specifies:

(B) The Board may approve an agreement under subparagraph (A) of this paragraph only when the rail carriers applying for approval file a verified statement with the Board. Each statement must specify for each rail carrier that is a party to the agreement - -

(i) the name of the carrier;

(ii) the mailing address and telephone number of its headquarter's office; and

(iii) the names of each of its affiliates and the names, addresses, and affiliates of each of its officers and directors and of each person, together with an affiliate, owning or controlling any debt, equity, or security interest in it having a value of at least $1,000,000.

Section 10706(a)(3)(b)(ii) clearly demonstrates that Congress did **not** intend to immunize railroads against liability for "agreements, conspiracies, or combinations" unlawful under state antitrust laws or otherwise, and Defendants so acknowledge. (Def. Mem. at 15 n. 4.).

Another provision of the Interstate Commerce Act that specifically exempts the railroads from the antitrust laws in a specific circumstance (again, not related to the matters at issue in this litigation) is 49 U.S.C. 11321, which gives the STB authority to approve pooling arrangements or combinations involving rail carriers.

Those limited carve-outs from the antitrust laws further demonstrate that Congress intended that the antitrust laws do apply to the railroads, notwithstanding Section 10501(b), except in the narrow circumstances in which Congress chose to exempt the railroads from their application. In short, these provisions (and others) constitute an explicit acknowledgement in the

---

[25] Given the STB's express disclaimer of authority to regulate rail rates and services governed by contracts, Defendants, as they must, admit by omission that the STB did not approve their conspiratorial agreement to impose surcharges related to unregulated private contracts.

statute that litigants can file antitrust claims against the railroads in courts of competent

jurisdiction, but that only certain claims are barred by section 10501.  As a matter of law,

furthermore, the Act's inclusion of narrow and express antitrust exemptions implies a

congressional intention that conduct not within the exemptions remains subject to the antitrust

laws.  *See Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 216-17 (1966) ("The

creation of an antitrust exemption for rate-making activities which are lawful under the Shipping

Act implies that unlawful rate-making activities are not exempt. . . . 'If Congress had desired to

grant any further immunity, Congress doubtless would have said so.'") (*quoting United States v.

Borden Co.*, 308 U.S. 188, 201 (1939)).

Furthermore, state antitrust claims, of course, comprise a field of traditional state

regulation under the historic police powers of the states.  *See California v. ARC America Corp.*,

490 U.S. 93, 101 (1989) ("[g]iven the long history of State common-law and statutory remedies

against monopolies and unfair business practices, it is plain that this is an area traditionally

regulated by the States.").  Indeed, citizen plaintiffs have sued railroads for violations of state

antitrust laws since at least 1869. [26]  *See Currier v. Concord R.R. Corp.*, 48 N.H. 321 (N.H.

1869); *Pacific Great Lakes Corp. v. Bessemer & Lake Erie R.R.*, 720 N.E.2d 551, 555 (8th Dist.

Cuyahoga County 1998) (preemption defense not raised); *Alliance Shippers, Inc. v. Southern

Pac. Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988 ) (state and federal "[a]ntitrust remedies

unquestionably survived deregulation").[27]

---

[26] Regulation of anticompetitive conduct is a traditional use of state police power, which pre-dates the enactment of federal antitrust laws. *E.g.*, *State v. Duluth Bd. of Trade*, 121 N.W. 395, 407) (1909) (discussing state antitrust laws in force at the end of the 19th century).

[27] *Cf. Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 692-93 (9th Cir. 1977) (Interstate Commerce Act does not foreclose Sherman Act claims by bus company against competitor); *Transkentucky Transp. R.R.,* 581 F. Supp. at 771-72 (provision of Staggers Act conferring exclusive jurisdiction on Interstate Commerce Commission and on state authorities over

Restraint of trade claims likewise have been enforced under state common law for centuries. *See, e.g., Sampson v. Shaw*, 101 Mass. 145, 148-49 (Mass. 1809) (agreement to make a "corner" in stock is illegal and void as against public policy); *Fisher v. Bush*, 42 N.Y. Sup. Ct. (35 Hun.) 641, (1885) (condemning certain types of collective restraints of stock sales); *Ridgely v. Keene*, 134 App. Div. 647, 648-49, 119 N.Y.S. 451 (2d Dept. 1909) (court refused to enforce contract in restraint of trade).

### 2.  Plaintiffs' Claims Premised On Generally Applicable State Consumer Protection Laws Do Not Interfere with Interstate Rail Operations And Thus Are Not Preempted.

In their cursory argument against Plaintiffs' consumer protection claims, Defendants contend that enforcement of state consumer protection laws would equate to regulation of railroad rates —a practice within the exclusive jurisdiction of the STB.  Plaintiffs, however, are not invoking state consumer protection laws to regulate Defendants in a manner which would interfere or conflict with the STB's authority over rates, i.e., to challenge the reasonableness of the fuel surcharges.  There is, in fact, no sensible reason to do so in the first place as the STB has already determined that the fuel surcharges at issue here are "unreasonable," "misleading" and "unfair" as contemplated by the consumer protection laws.  By raising consumer protection claims, Plaintiffs merely seek to enforce the STB's ruling so that they may obtain appropriate redress in the absence of any remedy available through the Board for claims arising in private contract.[28]

remedies provided under Interstate Commerce Act did not bar Sherman Act claims brought by coal transportation companies against two railroads because the complaint did not request any remedy provided under the Interstate Commerce Act).

[28] As explained later, Defendants' reliance on *G&T Terminal Packaging Co., Inc. v. Consolidated Rail Corp.* is unpersuasive in arguing that the courts lack authority to hear Plaintiffs' consumer protection claims.  830 F.2d 1230 (3d Cir. 1987).  *G&T* dealt with a completely different issue: whether conduct exempted by the *STB* pursuant to §10505 (now,

As previously explained, numerous courts interpreting the express language of the

ICCTA and its legislative history have found that §10501(b) unquestionably preserves the ability

of states to exercise their police powers so long as they do not interfere with rail transportation.

This preservation of police power necessarily includes the right of states to protect their citizens

from unfair and deceptive business practices.  Indeed, the courts have overwhelmingly

recognized that "[c]onsumer protection is quintessentially a 'field which the States have

traditionally occupied,'" *Walters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1580 (2007) (quoting

*Rice*, 331 U.S. at 230)); *see also California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (noting

that the area of unfair business practices is traditionally regulated by the states); *Florida Lime &*

*Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963) (regulations designed to prevent

deception of consumers within historic police powers).[29]  Again, Plaintiffs' consumer protection

_____

§10502) could be regulated by the courts. There, the Court explained that the "[r]ecognition of a
common law remedy with respect to rates would have the effect of substituting a court's
regulation for the Commission's decision in favor of deregulation." This reasoning has no place
here, where Plaintiffs' claims arise not from the STB's decision to deregulate a particular type of
transportation.  There has been no decision, regulatory or otherwise, that private contracts cannot
be regulated in any manner by the courts because "Congress and the [Board] have determined
that the market is adequate protection."  Neither *G&T* nor any other case referenced by
Defendants suggests that the STB retains exclusive jurisdiction over contract traffic.

[29] *See also SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) ("And because consumer
protection is a field traditionally subject to state regulation, 'we should be particularly hesitant to
interfere with the State's efforts under the guise of the Commerce Clause.'" (citation omitted));
*Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir. 2004); *American Consumer
Pub. Ass'n, Inc. v. Margosian*, 349 F.3d 1122 (9th Cir. 2003) ("Consumer protection is a 'matter
firmly committed to the states' under their police powers"); *North Dakota v. Simple.net, Inc.*,
2008 WL 619198 (D. N.D. 2008) ("The historic police powers of the states extend to consumer
protection"); *In re Ocwen Federal Bank FSB Mortgage Servicing*, 2006 WL 794739 (N.D. Ill.
2006) ("...one historic police power is consumer protection, which is an area traditionally
regulated by the states."); *Pharm. Research and Mtfs. Of Am. v. District of Columbia*, 406
F.Supp. 2d 56 (D.D.C. 2005) (discussion of local statute noting that "[t]he traditional police
powers of the District of Columbia include protecting and promoting health, safety, and welfare
of its residents, regulating monopoly pricing of goods and services, and regulating to assume
consumer protection and to prevent and sanction unfair deceptive trade practices..."); *Syndicated
Publ'ns, Inc. v. Montgomery County, Md.*, 921 F.Supp. 1442 (D. Md. 1996) ("The Supreme

claims, which challenge only the unfair and/ or misleading nature of Defendants' fuel

surcharges, are not to be confused with efforts to govern their reasonableness. They are, instead,

valid exercises of the states' police powers. As such, Plaintiffs' consumer protection claims not

only enjoy the general presumption against preemption, but also fall squarely outside the reach

of the ICCTA.

Because Plaintiffs' consumer protection claims do not fall within the express jurisdiction

of the STB and do not conflict with its authority, the appropriate inquiry, as set forth above, is

whether the claims would have the effect of preventing or unreasonably interfering with rail

transportation. *CSX Transp. Inc.*, *Petition for Declaratory Order*, No. 06-6510, 2005 WL

1024490, at *3 (S.T.B. May 3, 2005). Defendants have been unable to establish any such effect

as compliance with state consumer protection laws cannot be said to impair railroad

transportation. State consumer protection laws are generally applicable to all businesses in order

to protect against unfair practices. They are not directed specifically towards regulating the rail

industry and any impact their application may have on railroad transportation is only incidental,

and thus not sufficient to trigger preemption. H.R. Rep. No. 104-422, at 167 (1995) (generally

applicable laws do not collide with rail transportation and are not preempted by §10501(b)); *see*

*also Jefferson v. Chase Home Financial*, 2008 WL 1883484, at *10 (N.D. Cal. April 29, 2008)

(upholding the application of California CLRA and UCL in the face of federal preemption

challenges finding that "such laws of general application, which merely require all

businesses…to refrain from misrepresentations and abide by contracts and representations to

customers do not impair a bank's ability to exercise its lending powers. They only 'incidentally

---

Court has consistently recognized the inherent authority of states and local jurisdictions to
protect their consumers from deceptive trade practices and to regulate commercial
transactions.").

affect' the exercise of a Bank's powers…and are therefore not preempted"); *Thedford v. Missouri Pacific R.R. Co.*, 929 S.W. 2d 39, 46 (Tex. App. 1996) (permitting suit against rail carrier under Texas Deceptive Trade Practices Act); *State ex rel. Firestone v. Parke Circuit Court*, 621 N.E.2d 1113, 1114 (Ind. 1993) (statewide settlement class certified; complaint alleged claims of fraud, conversion, RICO, and other statutory violations).

Furthermore, the fact that the STB has already found Defendants' surcharges to be unreasonable is critical in distinguishing Plaintiffs' claims from those found preempted by other courts because, here, the STB has already exercised the extent of its jurisdiction over the matter. Thus, the enforcement of Plaintiffs' claims will not interfere with the STB's authority in any way. If anything, Plaintiffs' claims are purely consistent with, and even complementary to, the STB's position. The STB's finding of that the fuel surcharges are unreasonable, misleading, and unfair also dismisses Defendants' assertion that resolution of Plaintiffs' claims would require the application of differing state laws to determine what the charges should have been and whether the surcharges were acceptable (Def. Mem. at 15).

As Plaintiffs' consumer protection claims constitute valid exercises of state police power and do not improperly interfere with rail transportation, Defendants' motion to dismiss should be denied.[30]

---

[30] Defendants may cite *PCS Phosphate Co., Inc. v. Norfolk Southern Corp*., 520 F.Supp. 2d 705 (E.D.N.C. 2007) and *San Luis Cent. R.R. Co. v. Springfield Terminal Ry. Co*., 329 F. Supp. 172 (D. Mass. 2005) to support the preemption of state consumer protection claims. These cases ruled that consumer protection claims seeking punitive and treble damages may improperly serve to regulate rail transportation within the meaning of §10501(b). To the extent that this Court concurs with such an analysis, Plaintiffs maintain that they may nonetheless recover actual damages.

### 3.    Plaintiffs' Unjust Enrichment Claims Neither Amount to Economic Regulation of Rail Transportation Nor Interfere With Interstate Rail Operations And Are Thus Not Preempted.

Defendants further fail to explain how Plaintiffs' unjust enrichment claims are preempted. As stated, §10501(b) cannot be read so expansively as to expressly preempt claims for unjust enrichment on the grounds that they constitute an effort to regulate rail transportation.

Furthermore, Defendants make no attempt to explain if and how Plaintiffs' unjust enrichment claims would interfere with their rail operations. This deficiency in their argument is likely attributable to the fact that it has been held, even in those cases Defendants cite in support of their arguments, that an "unjust enrichment claim does not have the effect of preventing or unreasonably interfering with railroad operations" and that they therefore are not preempted by the ICCTA. *See PCS Phosphate Co., Inc*., 520 F.Supp. at 717; *Pejepscot*, 297 F.Supp.2d at 333.

### 4.    The Cases Upon Which Defendants Rely Are Inapposite.

The cases cited by Defendants in support of their argument that common law remedies are preempted are inapposite. (Def. Mem. at 6-7; 11-14.). In *G & T Terminal Packaging Co., Inc.*, the panel held that the ICC's exemption from regulation of traffic in fresh fruits and vegetables does not entitle shippers to assert common law claims for unreasonable or discriminatory rates. 830 F.2d at 1234-35. *G & T*, however, involved discriminatory conduct and not a conspiratorial overcharge imposed by conspiring competitions. *G & T* is also clearly distinguishable because the claims asserted there arose under the Staggers Rail Act of 1980. Thus, the panel relied on Staggers Act legislative history stating that '[n]o state law or federal or state common law remedies are available." Congress, however, **omitted** that phrase from the Act's Conference Substitute, providing instead that "exclusivity is limited to remedies with respect to rail regulation - - not State and Federal law generally." H.R. Conf. Rep. No. 104-422,

*supra*.[31]  Furthermore, *G & T* has nothing whatsoever to do with private contract traffic, but instead deals solely with <u>exempt</u> conduct, as to which it held that the STB, not the courts, may regulate.

*PCI Transp., Inc. v. Forth Worth & Western R.R. Co.*, 418 F.3d 535 (5th Cir. 2005), involved an injunction that was sought concerning rates charged by the railroad and the delivery of cars on a first in/first out basis. The court ruled that the injunction directly affected the operation of the rail yard, thereby bringing the facts within the STB's exclusive jurisdiction. *Id.* at 544-45.

At issue in *Int'l Bhd of Teamsters v. ICC*, 921 F.2d 904 (9th Cir. 1990), was an ICC order declaring that the described transportation of paper products within California for James River Corporation of Virginia was part of a continuous interstate movement, even though it was preceded by an exempt movement, and the Ninth Circuit affirmed. That case, too, involved the character of <u>exempt</u> conduct falling within the ICC's jurisdiction. *Consolidated Rail Corp. - - Petition for Declaratory Order - - Suspension of Service*, Ex Parte No. 346 (Sub-No. 14B), 1989 LEXIS 143, at *5 (June 13, 1989), was based on the ICC's view that only it may "determine the lawfulness of [Conrail's] proposed service suspension," another example of the regulator's exercise of jurisdiction over a rail carrier's "practices" pertaining to "core operations." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1188, 1190-91 (10th Cir. 2008) (holding that the district court had exclusive jurisdiction over breach of contract claim.).[32]

---

[31]  Defendants' extensive reliance on dictum in pre-Act cases characterizing the "federal regulation of railroads" as "pervasive and comprehensive" (Def. Mem. at 4-6) is belied by the language in the Conference Substitute emphasizing that "State and Federal law generally" remains in force "unless specifically displaced." *See id.*

[32]  Defendants also rely on *Rowe v. New Hampshire Motor Transport Ass'n*, 129 S. Ct. 989 (2008); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988); *Transcon. Gas Pipe Line Corp. v. State Oil and Gas Bd.of Mississippi*, 474 U.S. 409 (1986); and *Air Transport Ass'n of*

The fatal flaw in Defendants' analysis is their implication that the contract traffic as to which the STB held in Ex Parte No. 661 (Sub-No.1), *supra*, that it had no authority to regulate must be treated the same as traffic that has been exempted by the STB under 49 U.S.C. § 10502. (Def. Mem. at 11). This implication is false. Whereas the STB can revoke a § 10502 exemption, and so in that limited sense retains regulatory control over exempt traffic, the STB is powerless to create jurisdiction over private contract traffic. *Sompro Japan Ins. Co. v. Norfolk Southern Ry. Co.*, 540 F. Supp.2d 486, 493-94 (S.D.N.Y. 2008) (recognizing the material distinctions between § 10502 exempt traffic and § 10709 contract traffic.). Hence, contract traffic never can be subject to STB jurisdiction.

Moreover, throughout their express preemption argument, Defendants mistakenly conflate the STB's broad jurisdiction with the intentionally narrow preemptive effect of its remedies.[33] Ignoring the distinct functions and scope of exclusive jurisdiction and preemption,[34]

---

*America, Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) (per curiam), to assert that when Congress decides to deregulate, completely or partially, an industry it does not intend private parties to fill the "void" with state law. (Def. Mem. at 14.) But those cases concerned expansive preemption provisions with extraordinarily broad language, and not, as here, narrowly tailored language limiting preemption only to those state and local laws "with respect to regulation of rail transportation." That distinction is crucial. In sum, to classify the Act's limited preemptive scope within the categories of cases Defendants invoke is completely antithetical to fundamental preemption principles.

[33] *See* Carter H. Strickland, Jr., *Revitalizing the Presumption Against Preemption To Prevent Regulatory Gaps: Railroad Deregulation and Waste Transfer Stations*, 34 Ecology L.Q. 1147, 1165-66 (2007) discussing this very problem of confusing the "exclusive jurisdiction" and preemption language of the ICCTA.

[34] *Id.* at 1166, fn. 79 explaining that "[e]xclusive jurisdiction generally is considered to be a form of primary jurisdiction that provides merely for the initial evaluation of an issue by an agency; it does not automatically trigger preemption, or foreclose states from legislating in the field." (*citing Harris v. Union Pacific R.R.*, 141 F.3d 740, 744 (7th Cir. 1998) (holding that the [ICC's] "exclusive jurisdiction" over rail mergers is a matter of primary jurisdiction that does not divest courts of the power to apply generally applicable laws.); *Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*, 215 F.3d 195, 204-05 (1st Cir. 2000) (holding that § 10501(b) does not divest the district courts of jurisdiction in favor of STB jurisdiction, and ruling that plaintiffs' breach of contract claims were not preempted.); *Holland v. Delray Connecting R.R. Co.*, 311 F. Supp.2d

Defendants argue in substance and effect that the Act's preemptive scope is coextensive with the broadest possible reading of the exclusive jurisdiction clause. They inflate the "exclusive jurisdiction" language of 10501(b) and sweep away the narrowly targeted scope of the preemption language. Specifically, Defendants seize (Def. Mem. at 4) on dictum in *CSX Transp., Inc. v. Georgia Pub. Serv.Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996), stating that "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations" than the exclusive jurisdiction language in § 10501(b). As noted above, however, numerous courts have refused to follow this decision.[35] The *CSX* court invested heavy reliance in the "exclusive jurisdiction" language of § 10501(b) and ignored any analysis of the preemption language. The Ninth and Fifth Circuits have made the same mistake in *City of Auburn,* 154 F.3d at 1030, and *Friberg*, 267 F.3d at 443, respectively, using the exclusive jurisdiction prong of § 10501(b) as the basis, without separate analysis of congressional intent, to preempt state claims. The non-preemptive reasoning of that decision, too, has been rejected by several courts. *See Emerson,* 503 F.3d at 1131 ("Congress did not intend to pre-empt all state and federal law that may touch on a railroad's property or actions."); *Home of Economy, supra,* 694 N.W.2d, at 844; *Holland, supra,* 311 F. Supp. 2d at 753; *Florida East Coast Ry., supra,* 266 F.3d, at 1288; *State of Oklahoma ex rel Oklahoma Commerce Comm'n, supra,* 24 P.3d at 371; *In re Vermont Ry.*, 769 A.2d 648, 653 (Vt. 2000); *Jones v. Union Pacific Ry. Co.*, 79 Cal. App. 4th 1053, 1059 (4th Dist. 2000).

---

744, 747 (S.D. Ind. 2004) (holding that § 10501(b) raises primary jurisdiction issues only and did not preempt state law)).

[35] *See generally Home of Economy, supra*, 694 W.W.2d, at 844; *Holland, supra,* 311 F. Supp.2d, at 747 n. 4; *State of Oklahoma ex rel Oklahoma Corp. Comm'n v. Burlington Northern and Santa Fe Ry. Co.*, 24 P.3d 368, 372 (Okla. Civ. App. 2000); *Union Pacific R.R. Co. v. State of Oklahoma ex rel Corp. Comm'n*, 990 P.2d 328, 330 (Okla. Civ. App. 1999)

Defendants also invoke H.R. Conf. Rep. No. 96-1430, *supra*, to support their claim that the states specifically are precluded from exercising authority over "fuel adjustment surcharges." (Def. Mem. at 14). That reference is misleading for two reasons. First, this obsolete Staggers Act language refers solely to "state authority over intrastate transportation." Second, as noted above, Congress in the Staggers Act Conference substitute, provided that "no state law or federal or state common law remedies are available," whereas the Conference Substitute for § 10501 does not mention any exclusion for "state law or federal or state common law remedies." Quite the other way, Congress specifically declared in the Conference Substitute for § 10501 that its "exclusivity is limited to remedies with respect to rail regulation - - not State and Federal law generally." H.R. Conf. Rep. No. 104-422, *supra*, at 853.

Defendants urge a flagrant misapplication of settled preemption precedent and of the Act's narrowly targeted preemptive scope. Defendants make no effort to discharge their affirmative burden to show that enforcement of the state law claims here would have any affect whatsoever on the operation of their railroads, and not one of the cases they proffer even remotely considers that controlling question.

As demonstrated by the relevant legislative history and statutory evidence, Plaintiffs' state law claims are not preempted, and Defendants have failed in their burden to show that enforcement of the state laws at issue "would unreasonably interfere with [their] operations." Defendants' preemption affirmative defense accordingly should be denied, or, in the alternative, stayed, pending discovery on the operational "interference" issue.

## III.    PLAINTIFFS STATUTORY STATE LAW CLAIMS SHOULD NOT BE DISMISSED ON STANDING GROUNDS.

Plaintiffs' state law claims should not be dismissed on standing grounds. Defendants contend that the claims under the laws of certain states should be dismissed for lack of subject

matter jurisdiction.  Def. Mem. at 16-18.  However, Defendants ignore applicable case law where courts have followed Supreme Court precedent and held that class certification issues are "logically antecedent" to issues relating to standing.

As a result of suffering injury-in-fact due to Defendants' anticompetitive conduct, each of the named Plaintiffs has Article III standing to bring the claims set forth in the Complaint.  *See, e.g.*, Complaint, ¶ 31.   Under a settled body of caselaw, courts have held that issues relating to standing of the named plaintiffs to bring claims under all of the state laws alleged in the complaint should be resolved *after* class certification issues have been decided.  *Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999) ("class certification issues [ ] are 'logically antecedent to Article III concerns"); *Amchem Windsor Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("'[t]he class certification issues are dispositive,' … because their resolution here is logically antecedent' to the existence of any Article III issues, it is appropriate to reach them first" (citations omitted)); *In re Busiprone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002) ("it is appropriate to decide class certification before resolving alleged Article III challenges of the present kind"); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. 2006) ("The Court finds that the better interpretation is to treat class certification as logically antecedent to standing where class certification is the source of the potential standing problems.")[36]; *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F.Supp.2d 172, 193-94 (D.Mass. 2003) (deferring until after class certification the "invitation to

---

[36] In *Grand Theft Auto*, the Court stated that
> the alleged standing problems in this case arise only because the Named Plaintiffs are attempting to bring claims on behalf of a nationwide class. As a result, class certification is logically antecedent to standing and the Court will defer consideration of standing until after the class certification issue has been resolved.

Similarly, here, consideration of standing to bring all of the state law claims alleged in the complaint should be deferred until after class certification is resolved.

determine whether a plaintiff who purchased one drug from a given company has standing to

represent a class of others who purchased a different drug or drugs from the same company");

*see also Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204-05 (D.N.J. 2003); *In re Relafen*

*Antirust Litig.*, 221 F.R.D. 260, 267-69 (D.Mass. 2004); *In re OSB Antitrust Litig.*, No. 060826

(PSD) (E.D.Pa. Sept. 25, 2006) (attached hereto as Exhibit A to Declaration of Imtiaz Siddiqui in

Support of Indirect Purchaser Plaintiffs' Opposition to Defendants' Motion to Dismiss

("Siddiqui Decl.")).[37]

     Defendants confuse the issue in citing to *Lujan*,[38] *Griffin*,[39] *Warth*,[40] and *Blum*.[41]  All of

the cases cited by Defendants discuss whether the named plaintiff has alleged an injury due to

---

[37] In *In re OSB*, the court denied defendants' motion to dismiss indirect purchaser antitrust
claims brought under the laws of several "unprecedented" states, stating
> Plaintiffs have satisfied the elements of standing; they have alleged a concrete
> economic injury, traceable to Defendants' alleged conspiracy, that may be
> remedied by a judgment in Plaintiffs' favor.  The remaining issue is whether
> named Plaintiffs who do not reside in the challenged starts, but who nonetheless
> were injured by Defendants' alleged conduct, may bring claims on behalf of
> residents of those states.  This is a question of whether named Plaintiffs may
> properly represent the purported class, not whether they have standing to bring
> their claims in the first instance. *Id.* at 3.

[38] *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) merely states what is required for Article
III standing.  The Court there stated that:
> [O]ur cases have established that irreducible constitutional minimum of standing
> contains three elements.  First, the plaintiff must have suffered an "injury in fact"-
> an invasion of a legally protected interest which is (a) concrete and particularized,
> and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"[citations
> omitted].  Second, there must be a causal connection between the injury and the
> conduct complained of-the injury has to be "fairly ... trace[able] to the challenged
> action of the defendant, and not ... th[e] result [of] the independent action of some
> third party not before the court." [citations omitted].  Third, it must be "likely," as
> opposed to merely "speculative," that the injury will be "redressed by a favorable
> decision." [citations omitted].

[39] *Griffin v. Dugger*, 823 F.2d 1476 (11th Cir. 1987) is clearly distinguishable.  First, *Griffin* was
a decision on a motion to decertify a class.  Therefore, unlike here, the decision was not at the
motion to dismiss stage of the action.   Second, the issue in *Griffin* was whether a class should
be decertified because the named plaintiff did not set forth the class definition that he wished to

the wrongful conduct of the Defendants.  Here, the named Plaintiffs clearly have Article III

standing to bring their claims in this action since each of them was injured as a result of

Defendants' anticompetitive conduct.[42]  Complaint, ¶31.  To the extent that additional plaintiffs

are necessary for the state law claims alleged in the complaint, Plaintiffs respectfully request that

this be deferred until the class certification stage of this action.[43]

_____

represent and, although the named plaintiff had standing to sue as a result of an injury as to one type of conduct, she did not have standing to sue as to a *different* type of injury.  Here, the named plaintiffs fit the class definition herein. (The class definition is as follows: all indirect purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, from July 1, 2003 to the present.  Complaint ¶47.). Furthermore, as a result of Defendants' price fixing conspiracy alleged in the complaint in this action, Plaintiffs and putative Class members were injured.

[40] In *Warth v. Seldin*, 422 U.S. 490 (1975), the Supreme Court stated that plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Here, the named plaintiffs were personally injured as a result of Defendants' price-fixing conspiracy, have stated the requisite case or controversy between themselves and Defendants demonstrating that they are "the proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."  *See Warth*, 422 U.S. at 518.

[41] *Blum v. Yaretsky*, 457 U.S. 991 (1982) is also distinguishable.  In *Blum*, the Supreme Court stated:

> It is axiomatic that the judicial power conferred by Art. III may not be exercised unless the plaintiff shows "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." (citation omitted).  It is not enough that the conduct of which the plaintiff complains will injure *someone.* The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.  (citation omitted).

Here, Plaintiffs are clearly within class of persons who are affected.  In their complaint, Plaintiffs allege one type of injury as a result of Defendants' price-fixing conspiracy.  *See also* n. 39 *supra*.
[42] "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007)).
[43] If the Court should find that these standing issues should not be deferred until the class certification stage of this case, in addition to Illinois (which Defendants concede), plaintiff Maroon has standing as named class representative to assert class claims in the following other states: Michigan, Minnesota and Wisconsin.  *See In re Terazosin Hydrochloride Antitrust Litig.*,

## IV.    PLAINTIFFS' STATE LAW ANTITRUST (AND CONSUMER PROTECTION) CLAIMS SHOULD NOT BE DISMISSED UNDER *AGC*.

The Supreme Court addressed what constitutes antitrust standing under federal antitrust law in *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  To the extent that an *AGC* analysis is appropriate as to the antitrust and consumer protection claims by indirect purchasers here under state law, the cases cited by Defendants are inapposite and distinguishable, and Defendants ignore recent decisions that have rejected *AGC*'s application to state law claims.[44]  Thus, Defendants attempt to put forth a bright-line rule for antitrust standing when several federal and state courts have rejected such an application of *AGC*.

Defendants argue that this Court should dismiss Plaintiffs' complaint because Plaintiffs have failed to allege facts sufficient to show that they have antitrust standing under the federal Sherman Act or state antitrust and consumer protection laws.  Def. Mem. at 19-20.  This argument should be rejected.  Defendants claim that ten of the states involved here, as well as District of Columbia, have explicitly adopted the analysis of *AGC* in the context of claims brought by indirect purchasers.  However, in eight of the ten states, this issue has not reached the highest court in the state.  In fact, the Minnesota Supreme Court has given this issue thorough

---

220 F.R.D. 672, 681 (S.D. Fla. 2004) (finding on a *motion for class certification* that a Wisconsin plaintiff had standing to assert the claims of the class members in California, Florida, Illinois, Kansas, Minnesota, Mississippi, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin (emphasis added)); Complaint, ¶ 30.

[44] *See, e.g., Novell Inc. v. Microsoft Corp.*, 505 F. 3d 302 (4th Cir. 2007) ("*Novell*"); *Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007) ("*Lorix*"); *D.R. Ward Construction Co. v. Rohn & Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006) ("*D.R. Ward*"); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404 (D. Del. July 12, 2007); *In re Graphics Processing Units (GPU) Antitrust Litig.*, 527 F. Supp. 2d. 1011 (N.D. Cal. Sept. 27, 2007) ("*GPU*").

consideration and has rejected *AGC* as applicable to indirect purchaser standing. *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629-30 (Minn. 2007).[45]

### A.  Plaintiffs Have Alleged "Antitrust Injury" Under State Law.

"In applying the antitrust injury requirement, the Supreme Court has inquired whether the injury alleged by the plaintiff 'resembles any of the potential dangers' which led the Court to label the defendants' alleged conduct violative of the antitrust laws in the first instance." *Pace Elecs., Inc. v. Cannon Computer Sys., Inc.*, 213 F.3d 118, 120 (3d Cir. 2000) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).  Here, Plaintiffs have alleged a *per se* antitrust violation (horizontal price-fixing) which caused them to pay higher prices for Defendants' rail freight services.  "It is difficult to imagine a more formidable demonstration of antitrust injury." *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 364 (D.N.J. 2001). Accordingly, Plaintiffs' Complaint clearly states a claim under the state antitrust laws alleged therein.

### B.  Defendants' Attempted Application of *AGC* Is Contrary To The Intent Of The Applicable States' Legislatures.

Defendants erroneously attempt to apply the *AGC* requirements – created by federal courts construing the scope of the Clayton Act's treble-damage provision – in the same manner

---

[45] In the absence of contrary authority by the highest courts of other states, this Court should presume that these other states would follow the Minnesota Supreme Court's rejection of *AGC* as applicable to indirect-purchaser standing.  *See, e.g., Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50, 55 (1st Cir. 1998) (holding federal courts sitting in diversity look to "analogous state court decisions, persuasive adjudications by courts of [the] states, learned treatises, and public policy considerations identified in state decisional law") (internal quotations omitted); *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980) (looking to decisions from other states construing a similar provision in workmen's compensation statute, holding "[i]n the absence of controlling forum state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case.  In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions.") (internal citations omitted); *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 663 (1st Cir., 1972) (where the state's highest court has not delineated the full reach of the state's long-arm statute, looking to "opinions of courts in other states interpreting similar statutes").

to Plaintiffs' claims under state antitrust and consumer protection statutes. However, antitrust injury under state law is dependent on the intent of the state legislature. *See D.R. Ward Const.*, 470 F.Supp.2d. at 495-96 (intent of state law controls standing issue); *Holder v. Archer Daniels Midland Co.*, 1998 WL 1469620, at *2 (D.C.Super. Nov. 4, 1998) ("core of the standing issue" controlled by intent behind state law).

The intent of the state legislatures that repealed *Illinois Brick*, 431 U.S. 720 (1977) was to protect the kind of indirect-purchasers who are Plaintiffs in this action. *See Union Carbide Corp. v. Superior Court*, 36 Cal. 3d 15, 20 (1984) ("California's 1978 amendment to section 16750 in effect incorporates into the Cartwright Act the view of the dissenting opinion in *Illinois Brick* (431 U.S. at 748) that indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution."); *State by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 497 (Minn. 1997) (holding "the legislative history of this amendment [a 1984 amendment to antitrust statute allowing indirect purchaser suits in Minnesota] indicated that it was a direct response to the *Illinois Brick* decision"); *Holder*, 1998 WL 1469620, at *3 ("Justice Brennan's dissent provides a useful backdrop for analyzing the Council's intent in passing [D.C.Code] Section 4509(a)"); *Goda v. Abbott Labs., Inc.*, 1997 WL 156541, at *2 (D.C. Super. Feb. 3, 1997) (Justice Brennan's dissent influenced legislative enactment); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 443 n.2, 450 (Iowa 2002) (discussing Justice Brennan's dissent, holding that Iowa's law allows indirect purchaser suits); *Hyde v. Abbott Labs.*, 473 S.E.2d 680 (N.C. Ct. App. 1996) (same).

### C.  **The Cases Cited By Defendants Are Distinguishable.**

#### 1.  **The Reasoning Set Forth In The *DRAM* Decisions Has No Application Here**

Defendants also rely on two decisions from an action involving a physical discrete component sold as part of a computer purchase, which are distinguishable from the facts here.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1089-93 (N.D.Cal. 2007) ("*DRAM I*") and *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136 (N.D.Cal. 2008) ("*DRAM II*").  Def. Mem. at 19, 22-23.

However, the *DRAM* decisions cannot be reconciled with a number of recent decisions (s*ee Novell, D.R. Ward, Lorix, Intel* decisions cited in n. 44 *supra*) and should not be followed here.

Furthermore, the facts in *DRAM* vastly differ from the instant facts.  In *DRAM I*, the court held that plaintiffs who purchased DRAM as a component of another product, rather than DRAM itself, lacked standing since they were participants in a market separate from the price-fixed market.  Here, Plaintiffs allege that Defendants fixed the prices of rail freight transportation services through use of a separately identified rail fuel surcharge.  Complaint, ¶ 2.  Therefore, the same component concerns that the *DRAM* Court had are simply not present here.

#### 2.  **The *Visa* Cases Are Inapplicable.**

The *Visa* credit card cases cited by Defendants are inapplicable to the facts alleged in this action.  *See* Def. Mem. at 20-21, 24 & n. 6, 7.  These cases all turn on findings by the courts that two very different, unrelated markets were involved.  One market was one in which merchants allegedly were compelled to overpay defendant Visa for use of credit/debit card services.  The other was the market for goods and services sold by those merchants to their customers.  It was alleged that excessive fees paid in the former market were recouped through new and different

overcharges to consumers in the latter market, even consumers who paid by cash or a non-Visa card. *See, e.g., Lorix*, 736 N.W.2d at 632; *Knowles v. Visa U.S.A., Inc.*, 2004 WL 2475284 at *2 (Me. Super. Oct. 20, 2004); *Beckler v. Visa U.S.A., Inc.*, 2004 WL 2115144 at *2 (N.D. Dist. Ct. Aug. 23, 2004). Unlike here, in the *Visa* cases, there was "no industry, business or market nexus or link" between the monopoly overcharge on debit services and the claimed inflated prices for consumer goods. *Gutzwiller v. Visa, U.S.A., Inc.*, 2004 WL 2114991 at *7-*8 (Minn. Dist. Ct. Sept. 15, 2004) (*abrogated by Lorix*). Nor, unlike the rail freight services here, was there any alleged price-fixed service or product that passed through the chain of distribution from one market to the next. *Consiglio-Tseffos v. Visa U.S.A., Inc.*, 2004 WL 3030043 at *1 (Ariz. Super. Ct. Dec. 8, 2004); *see also Lorix*, 736 N.W.2d at 632 (calling *Visa* cases, which involved tying restraints, a "far cry" from price-fixing case). Here, there is only one market involved, the market for rail freight transportation services. Accordingly, the *Visa* decisions are inapposite.

### 3. *Crompton (Rubber Chemical)* Is Inapposite.

Defendants erroneously cite to *Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C.Super. Oct. 28, 2004) as instructive. Def. Mem. at 23-24 & n. 6. However, *Crouch* is clearly distinguishable. In *Crouch*, plaintiffs, purchasers of tires, brought suit against manufacturers for price fixing of rubber chemicals used in the manufacture of such tires. The *Crouch* Court observed that rubber chemicals contributed only 1% to the retail value of a tire. *Id.* at *20. The court thus found the tire purchaser plaintiffs lacked standing due to remoteness of injury. The same is not true of rail freight transportation services.

### D. Plaintiffs Have Pled Facts To Support Standing Under State Consumer Protection Statutes

For the same reasons that Plaintiffs have adequately pled standing under the antitrust laws, they have adequately pled standing under the consumer protection and unfair competition laws alleged in the Complaint.

## V.    NAMED PLAINTIFFS HAVE STANDING TO RAISE THEIR STATE LAW CLAIMS.

### A.    California Plaintiff Fayus Has Standing.

Defendants' attack on California Plaintiff Fayus (Defendants' Mem. at 27) lacks merit. While Defendants brand Fayus Enterprises as a "remote" purchaser and argue that the class could "potentially include every consumer in the country," the Complaint alleges (Complaint, ¶ 29) that Fayus paid Rail Fuel Surcharges indirectly to Defendants.  That is an adequate allegation.  Moreover, the fact is that Fayus Enterprises was specifically charged hundreds of dollars on several invoices from shipper J. B. Hunt for the unlawful fuel surcharges.  *See* Exhibit B attached to Siddiqui Decl. (showing "fuel surcharges" of $359.07, $304.99, $243.47, $448.83 $717.79, $572.22, $698.80, $649.03, $717.79 $533.02, $729.74 $596.62, $504.12 $579.55). There is nothing "remote" about the harm suffered by someone who cumulatively pays thousands of dollars of charges resulting from unlawful conduct.

Defendants hyperbolically argue that "tracing the pass-through of fuel surcharge overcharges through the chain of distribution to end consumers would be an impossible task." (Def. Mem. at 27.)   To the contrary, the invoices received by Fayus Enterprises from J. B. Hunt specifically break down the unlawful fuel surcharges, and adding up the charges to a customer like Fayus would not only be "possible," it would be easy for any sixth-grader with a calculator. California Plaintiff Fayus Enterprises has standing, and his should not be dismissed.

The existing Complaint (¶ 29) adequately alleges Fayus' standing; Fayus' injuries are neither "remote" nor "speculative," as Defendants claim (Def. Mem. at 19), they are quite

tangible.    The motion should be denied; alternatively, Plaintiffs should be granted leave to amend to specify the fuel surcharges paid by California Plaintiff Fayus Enterprises.

### B.  **Plaintiffs Agway and Maroon Have Standing.**

Defendants' argument that plaintiffs Agway and Maroon lack antitrust standing is likewise baseless.  Def. Mem. at 26-27.  The Complaint in this action adequately alleges facts to demonstrate the antitrust injury of Plaintiffs Agway and Maroon.  For example, the Complaint states "Agway has been in the business of shipping farm products to various customs clearance yards in Chicago, Illinois and Detroit, Michigan, transferring those products to storage facilities, and re-shipping product from these storage facilities to customers of Agway.  Agway purchased unregulated rail freight transport services indirectly from one or more of the Defendants during the Class Period, and paid Rail Fuel Surcharges indirectly to Defendants."  Complaint, ¶ 28.  As for Plaintiff Maroon, the Complaint states "[a]t all relevant times during the Class Period, Maroon has been in the business of shipping chemical products to various customs clearance yards in Chicago, Illinois and Detroit, Michigan, transferring those products to storage facilities, and re-shipping said products from said storage facilities to customers of Maroon."  Complaint, ¶ 30.  The Complaint further states "Maroon purchased unregulated rail freight transport services indirectly from one or more of the Defendants during the Class Period, and paid Rail Fuel Surcharges indirectly to Defendants.  By reason of the conspiracy alleged herein, and the imposition by Defendants of fuel surcharges, Maroon paid prices for rail freight transportation services which were greater than the prices which would have been available in a competitive market without the conspiracy."  *Id.*   The Complaint further states that "[t]he prices Plaintiffs [indirectly] paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Plaintiffs would have paid absent the

conspiracy alleged herein." Complaint, ¶ 31. Plaintiffs thus adequately alleged how they were injured as a result of Defendants' alleged anticompetitive conduct. No more is required.[46]

As the Complaint adequately alleges the antitrust injuries of Plaintiffs, Defendants' motion to dismiss should be denied.

## VI. PLAINTIFFS PLEAD VALID STATE LAW CLAIMS

### A. The New York Common Law Restraint of Trade Claim Should Not Be Dismissed.

Defendants wrongly argue that "Plaintiffs' allegations that Defendants have violated New York's 'common law restraint of trade,' should be dismissed because Plaintiffs cannot bring a class action claim under New York's *statute* prohibiting restraints of trade and there is no difference between the New York common law against restraints of trade and the New York antitrust statute, the Donnelly Act." Def. Mem. at 29-30 (original emphasis). This is not true.

First, the enactment by the legislature of a statutory treble damage claim did not change the fact that actions for restraint of trade exist "[b]oth by the common law and by our statute…." *Peekskill Theater v. Advance Theatrical Co. of New York*, 200 N.Y.S. 726, 727 (N.Y. App. Div. 1923) (construing N.Y. Gen. Bus. L. 340, the Donnelly Act). Second, Defendants ignore the reason why a class action is prohibited under the Donnelly Act. "Private persons are precluded from bringing a class action under the Donnelly Act (General Business Law § 340) because the treble damages remedy provided for in subdivision (5) constitutes a 'penalty' within the meaning of CPLR 901(b)."[47] *Cox v. Microsoft Corp.*, 290 A.D.2d 206, 206 (N.Y. App. Div. 2002).

---

[46] Defendants, in conclusory fashion and with no supporting case law, state that "[a]n indirect purchaser must identify facts that affirmatively show it has standing to seek relief…." Def. Mem. at 26.

[47] CPLR § 901(b) provides that "[u]nless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to

Importantly, a New York common law restraint of trade claim does not entitle plaintiff to treble damages. *See, e.g.*, *Peekskill Theatre*, 200 N.Y.S. at 729 (common law provides for reparation in damages). Therefore, CPLR 901(b) has no application to such a claim and, therefore, does not bar a class action under New York common law restraint of trade.

Furthermore, none of the cases cited by Defendants discusses whether or not a class action is maintainable under a common law restraint of trade claim.[48] In fact, Defendants do not cite to a case that prohibits class actions under New York common law restraint of trade.

Therefore, Plaintiffs' New York common law restraint of trade claim should not be dismissed.

### B. Consumer Protection and Unfair Competition Claims Should Not Be Dismissed.

#### 1. Plaintiffs Have Pled Their Claims With the Requisite Particularity

Defendants contend that Plaintiffs' consumer protection claims are not alleged with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. (Def. Mem. at 31). In so arguing, Defendants inappropriately characterize Plaintiffs' claims as alleging fraud, though it is clear that they instead allege unfair and/or misleading conduct pursuant to state consumer protection laws. This distinction is critical as numerous courts have explicitly held

recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action."

[48] The two cases on which Defendants rely for the proposition that there is no difference between the Donnelly Act and the New York common law against restraint of trade can be distinguished. *Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F. Supp. 1251 (S.D.N.Y. 1976) was decided in the context of a motion for directed verdict after plaintiff rested its case. *Harlem River*, 498 F. Supp. at 1259. Moreover, no other court has cited to *Harlem River* for the proposition to which Defendants cite. In *Barns v. Dairymen's League Co-op., Ass'n*, 220 A.D. 624 (N.Y. App. Div. 1927), plaintiff brought claims under the Sherman Act, the Donnelly Act and common law. The Court there underwent independent analyses as to whether the Donnelly Act claim and the common law restraint of trade claim should be sustained. *Barns*, 220 A.D. at 639-643. Therefore, if anything, *Barns* demonstrates that there *is* a difference between a Donnelly Act claim and a claim for common law restraint of trade.

that claims under certain state consumer protection statutes are not equivalent to claims for

common law fraud, and therefore do not trigger Rule 9(b)'s particularity standard. *See, e.g.,*

*Alpharma, Inc. v. PennField Oil Co.*, 2008 WL 2331019, at *2 (D. Neb. June 4, 2008) ("The

heightened pleading requirements of Rule 9(b) do not apply to allegations of unfair and

deceptive trade practices."); *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1103 (9th Cir. 2003)

(because the CLRA and UCL are not fraud statutes, Rule 9(b) is not applicable); *Interested*

*Underwriters at Lloyd's of London v. Church Loans*, 432 F. Supp. 2d 332, 332 (S.D.N.Y. 2006)

(N.Y. General Business Law §349 deceptive trade practices claim "need only meet the liberal

pleading requirements of FRCP 8(a)" and is "not subject to the pleading-with-particularity

requirements of FRCP 9(b).").

   Plaintiffs' claims for unfair and/or misleading conduct are rooted in Defendants' fuel

surcharge practices, which, as delineated in the Complaint, have been characterized as not only

unreasonable, but also misleading and unfair by the STB:

> We believe that imposing rate increases in this manner, when there is no real
> correlation between the rate increase and the increase in fuel costs for that
> particular movement to which the surcharge is applied, is a ***misleading and
> ultimately unreasonable practice.***

*See* STB Ruling at *5 (emphasis added); Complaint, ¶ 103.

> [A] fuel surcharge program that increases all rates by a set percentage
> stands virtually ***no prospect of reflecting the actual increase in fuel costs***
> for handling the particular traffic to which the surcharge is applied.

STB Ruling at *6 (emphasis added); Complaint, ¶ 23.

> For carriers to continue to apply fuel surcharge programs that are
> calculated as a percentage of the base rate—when practical alternatives are
> available- would permit them to continue to ***mislead their customers and
> would be unfair***.

STB Ruling at *6 (emphasis added); *generally* Complaint, ¶ 103-106.  Given Plaintiffs'

unambiguous references to the misleading and unfair nature of Defendants' fuel surcharges,

Defendants' baseless assertion that Plaintiffs have not pled deception (Def. Mem. at 32) is

certainly unfounded.[49]

      Nevertheless, to the extent that it is applicable here, Plaintiffs have satisfied Rule 9(b)'s

particularity standard.[50]  Rule 9(b) requires plaintiffs to plead the "who, what, when, where, and

how" with respect to the circumstances surrounding the alleged fraud.  *Antoine v. U.S. Bank Nat.*

*Ass'n*, 547 F. Supp. 2d 30, 36 (D.D.C. 2008).  Plaintiffs have met this burden with respect to the

unfair and/or misleading conduct at issue here.  Specifically, Plaintiffs' Complaint plainly alleges

that the named Defendants, UP, BNSF, CSX, and NS, ("who") applied misleading and unfair

fuel surcharges ("what") to rail freight transportation services sold throughout the United States

("where") from July 1, 2003 to the present ("when").  It also explains that Defendants' fuel

---

[49] Defendants challenge, buried in footnote 21 of their brief (Def. Mem. at 31), to Plaintiffs'
reliance upon the STB's January 25, 2007 Fuel Surcharges decision is similarly without merit.
Despite what Defendants seem to suggest, the STB in no way excused Defendants' fuel
surcharge practices.  To the contrary, the STB considered the fuel surcharge practices at issue
unreasonable, unfair, and misleading.  Whether such practices are punishable under state
consumer protection laws was not the basis of the decision, nor was such a determination within
the STB's jurisdiction.  As such, Defendants' suggestion that the STB's holding does not
sufficiently support Plaintiffs' pleadings of unfair and misleading conduct must be dismissed as
unfounded.

[50] Many of the cases Defendants cite to support their assertion that Rule 9(b) applies to consumer
protection claims brought in federal court are of no consequence as they do not consider any of
the consumer protection acts invoked here. (Def. Mem. at 31 at fn. 16).  Indeed, several do not
involve consumer protection statutes at all.  Specifically, *Patel v. Holiday Hospitality*
*Franchising, Inc.*, 172 F.Supp. 2d 821, 825 (N.D. Tex. 2001) considered claims brought under
the Texas Deceptive Trade Practices Act, a statute that Plaintiffs have not invoked here.  Further,
*Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), as Defendants acknowledge in their
citation, considered antitrust and RICO claims, not claims under a state consumer protection act
involved here.  *See also Bates v. Northwestern Human Servs.*, 466 F. Supp. 2d 69, 88 (D.D.C.
2006) (alleging RICO claims, which undoubtedly implicate Rule 9(b); no consumer protection
allegations);  *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir.
2002) (False Claims Act is "self-evidently an anti-fraud statute"; no consumer protection
allegations).

surcharges are unfair and/or misleading because they are not, as their customers believed, representative of the fuel consumption associated with the individual movements to which they are applied, and are instead a general revenue enhancement measure ("how").  Complaint, ¶¶ 103-104.  Plaintiffs further make clear that the unfair and deceptive fuel surcharges have caused them injury in their business and property in that they paid more for rail freight services than they otherwise would have.  Complaint, ¶ 161.  The Complaint therefore satisfies Rule 9(b).  *See, e.g., Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 1233, 1247-48 (D. Kan. 2007) (finding Rule 9(b) met where plaintiffs alleged that the named defendants released their product into the national stream of commerce despite knowing, since 1990, that it contained benzene, thereby causing plaintiffs to suffer economic loss).

### 2.  Plaintiffs' Consumer Protection Law Claims in Five States May be Dismissed

Plaintiffs do not oppose dismissal of the State Consumer Protection claims for the District of Columbia (Complaint, ¶ 147) and the following five states: Kansas, Maine, Oregon, Rhode Island and West Virginia (Complaint, ¶¶ 150, 151, 157, 158 & 160, respectively).  Def. Mem. at 33-34.

Defendants' analysis of New York law is incorrect.  For the reasons set forth in section VI(B)(5)(a) below, Plaintiffs' claims under section 349 of the New York General Business Law should not be dismissed.

### 3.  Plaintiffs Properly Claim Damages for Intrastate Effects of Defendants' Conduct.

Defendants argue that the Complaint fails to "allege *intrastate* effects" resulting from Defendants' conduct, and therefore that claims in seven states should be dismissed.  Defendants misread both the pleaded facts and the cases they cite.

The Complaint properly claims damages on behalf of "indirect purchasers who purchased unregulated rail freight transportation services . . ., who were assessed a rail fuel surcharge for the agreed upon transportation," and who were "injured . . . in their business and property." Complaint, ¶¶ 1, 26. Plaintiffs' jurisdictional allegations of effects on interstate commerce do not negate the fundamental allegation that Plaintiffs were injured where they reside. *See* Complaint, ¶ 45 (defendants' conspiracy "resulted in a collective adverse monetary effect on indirect purchasers in each state identified herein").

The cases cited by Defendants say no more than the Deceptive Trade Practices laws in these states do not apply where the acts and injuries occurred outside the state. In none of these states, however, has a court concluded that persons injured in the state may not, under their state's statute, sue out-of-state defendants for the damages they have suffered. In fact, in each state cited by Defendants the state statutes provide remedies for deceptive practices perpetuated by foreign companies from outside the state.

- California's anti-deception statute, Calif. Bus. & Prof. Code. § 17200 *et seq.*, provides such remedies for California residents. *Van Slyke v. Capital One Bank*, 503 F.Supp.2d 1353, 1361-62 (N.D.Cal. 2007). *Meridian Project Systems v. Hardin Const. Co.*, 404 F. Supp.2d 1214, 1225 (E.D. Cal. 2005), cited by defendants, holds only that the statute does not apply to California defendants' conduct outside of California where injury took place outside California.

- Illinois's Consumer Fraud & Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, provides such remedies for Illinois residents. *Gilmore v. Southwestern Bell Mobile Systems*, 156 F.Supp.2d 916, 918-19, 924-25 (N.D.Ill. 2001). *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801 (Ill. 2005), cited by defendants, in fact held that the Illinois Deceptive Practices Act *can* be applied for benefit of non-resident purchasers where "the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois" (at 853-54); the statute was not applied for non-residents here because all circumstances relating to automobile repairs and use of non-OEM parts occurred in the non-resident's home state (at 854).

- Kansas's Consumer Protection Act, Kan. Stat. Anno. § 50-623 *et seq.*, provides such remedies against foreign corporation for deceptive practices in Kansas.

*Farrell v. General Motors*, 815 P.2d 538, 547-48 (Kan. 1991): *Griffin v. Bank of America*, 971 F.Supp. 492 (D. Kan. 1997).  However, Plaintiffs do not oppose dismissal of the Kansas Consumer Protection Act claim.  See VI(B)(2) above.

- New Hampshire's Deceptive Trade Practices Act, N.H.Rev. Stat. § 358-A:1, provides such remedies for New Hampshire residents. *Chance v. U.S. Smokeless Tobacco*, 931 A.2d 571, 573 (N.H. 2007) (rejecting defendants claim that plaintiffs were pursuing an "end run" around the indirect purchaser rules, court held that purchasers of smokeless tobacco products from N.H. retailers could maintain class action under Deceptive Trade Practices Act against tobacco product manufacturers arising out of N.H. conduct). *Mueller v. United States Pipe & Foundry*, 2003 WL 22272135 at * 6 (D.N.H. 2003), and *Pacamo Bearings v. Minebea Co.*, 918 F.Supp. 491 (D.N.H. 1996), cited by defendants, addressed commercial conduct occurring outside of New Hampshire.

- New York's Deceptive Trade Practices Act, N.Y. Gen. Bus. L. § 349 *et seq.*, provides such remedies for New York residents suffering injury for deception perpetuated in New York from outside the state. *Meachum v. Outdoor World*, 652 N.Y.S.2d 749, 750 (App. Div. 1997) (facts that contract was executed in Pennsylvania and most of activities took place there did not prevent application of N.Y. Gen. Bus. L. § 349 on behalf of New York residents who received deceptive promotional materials in New York). *Goshen v. Mutual Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195-96 (N.Y. 2002), cited by defendants, held only that injury from the deceptive act or practice must occur in New York.

- North Carolina's Trade Practices Act, N. Carol. Gen. Stat. §§ 75-1.1 *et seq.*, provides such remedies for business practices of foreign defendants causing injury in the state. *Food Lion v. Capital Cities/ABC*, 951 F.Supp. 1224, 1231-32 (M.D.N.C. 1996) (action against non-resident network and two employees for investigative reporting of a North Carolina company; *held* that network's investigation practices constituted a business and broadcast of a report on national television had "an effect on commerce" giving rise to a claim under section 75-1.1).  The facts addressed in *Merck & Co. v. Lyon*, 991 F.Supp. 1443 (M.D.N.C. 1996), cited by defendants, describe a far more attenuated relationship with North Carolina.  There, a North Carolina company hired a Canadian citizen and resident employed by Canadian subsidiary of plaintiff, a New Jersey company. Employee's responsibilities were to be executed outside the U.S. and related to non-U.S. marketing activities.  941 F.Supp. at 1446-48.  Since the employee's responsibilities dealt with sales outside the U.S. and no "in-state injury" or "a substantial effect on any in-state business operations" was alleged, plaintiff's claim was found to outside the reach of the N.C. Trade Practices Act.  941 F.Supp. at 1463.

- Oregon's Deceptive Practices Act, Or. Rev. Stat. § 646-605, provides such remedies for Oregon purchases from non-resident companies. *Feitler v. Animation Celection*, 13 P.2d 1044, 1045-46, (Or. App. 2000) (vendor of

animation art w/ California gallery sold items of animation artwork to Oregon purchaser; on appeal case was remanded for retrial on issues of reliance and damages, but no dispute as to plaintiff's standing and non-resident defendant's liability under or. Rev. Stat. § 646.605 *et seq.*).  *Julian-Ocampo v. Air Ambulance,* 2001 U.S. Dist. Lexis 10986 at *14 - *18 (unreported district court decision), did not involve deception or injury in Oregon.  A Mexican resident had retained a Florida-based air ambulance service for carriage to Oregon; fact that flight terminated in Oregon did not justify application of Oregaon Deceptive Practices Act, where neither plaintiff nor defendant had any presence and where none of the unlawful trade practices occurred.  However, Plaintiffs do not oppose dismissal of the Oregon Deceptive Practices Act claim.  See VI(B)(2) above.

### 4. Plaintiffs Properly State A Claim Under the California Unfair Competition Law.

Defendants also seek dismissal of Plaintiffs' California Unfair Competition Law ("UCL") claim on the grounds that the UCL does not allow an award of damages.  (Def. Mem. at 36.)  The Complaint, however, does not seek damages under the California UCL.  Paragraph 146 of the Complaint sufficiently alleges a violation of the UCL.  The Prayer for Relief seeks not just damages but injunctive relief (Prayer paragraph D) and restitution (Prayer paragraph E).  The latter two remedies are available under the California UCL.  *Chatton v. National Union Fire Ins. Co.*, 13 Cal. Rptr. 2d 318, 330 (Cal. App. 1992).  Defendants' challenge to the UCL claim lacks merit and its motion to dismiss on that ground should be denied.

### 5. Plaintiffs Properly Plead a Cause of Action under New York Gen. Bus. L. § 349

#### a. The New York Consumer Protection Law is not limited to Purchases of Household Goods

Section 349 of the New York General Business Law declares unlawful any "deceptive acts or practices in the conduct of any business, trade or commerce or the furnishing of any service in this state . . . ."  The statute gives a right of enforcement to "any person who has been injured by reason of any violation of this section . . . ."  N.Y. Gen. Bus. L. §.349.  The New York Court of Appeals has held that conduct challenged under the statute must be "consumer

oriented." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland*, 647 N.E.2d 741

(N.Y. 1995).    The Court has also established

> three factors relevant in the consumer-orientation analysis:  (1) the amount of money
> involved in the agreement; (2) the relative bargaining power and sophistication of the
> parties; and (3) the nature of the agreement.

*Interested Underwriters*, 432 F.Supp.2d at 332 (*citing New York Univ. v. Continental Ins. Co.*,

662 N.E.2d 763, 770, 639 N.Y.S.2d 283, 290 (N.Y. 1995)).  In applying these factors, the court

in *Interested Underwriters* found (1) that the payment of an insurance premium of $11,000 for

the purchase of $750,000 of insurance coverage could not be characterized as not being

consumer oriented, (2) that "commercial entities are not per se excluded from bringing an action

under § 349," especially where, as here, "the relative bargaining power" provides little leverage

to such entities;  and (3) that "standard-issue" contracts with boilerplate having the potential to

be repeated to deceive similarly situated buyers were an indicia of consumer orientation.  *New

York Univ.*,  662 F. Supp. 2d at 333-34.

Applying these criteria to the present case, Plaintiffs' claim under section 349 of the New

York General Business Law cannot be dismissed on the pleadings.  The typical fuel surcharges

added to each invoice will be no greater than the $11,000 premium paid in *Interested*

*Underwriters*.  *See* Exhibit B to Siddiqui Decl. (showing fuel surcharges of $300-$600 per

invoice).  Indirect purchasers had little or no bargaining ability with the Defendants, and given

the disparity they cannot be *per se* excluded from bringing a section 349 claim.  Finally, the fuel

surcharges were added in a standardized way, and were not "tailored to meet the purchaser's

wishes" in such a way to make them "not consumer-oriented for section 349 purposes."

*Interested Underwriters*, 432 F.Supp.2d at 333-34.

As in *Interested Underwriters*, the pleaded facts and documentary evidence submitted

with this motion indicate "that the alleged deceptive practices may affect numerous other

67

consumers."  Accordingly, a claim is stated under section 349 and dismissal on the pleadings

"cannot be made at this stage . . . ."  432 F. Supp.2d at 334.

>    b.  New York Law Requires only "Consumer Oriented Acts," Not
>        "Conduct Directed Towards Consumers."

Defendants argue that Plaintiffs' section 349 claim should be dismissed because the law

only makes actionable "conduct that is directed towards the plaintiffs."  Def. Mem. at 36-37.

However, what § 349 requires is that "defendants engaged in a consumer-oriented act."  *Eon*

*Labs Mfrg. v. Watson Pharmaceuticals*, 164 F.Supp.2d 350, 364 (S.D.N.Y. 2001).

> This requirement . . . has been construed liberally.  A defendant engages in "consumer-
> oriented" activities if his actions cause any consumer injury or harm to the public interest.
> . . . The critical question, then, is whether the matter effects the public interest in New
> York . . . . Based on this standard, courts have found sufficient allegations of injury to the
> public interest where plaintiffs plead repeated acts of deception directed at a broad group
> of individuals.

*New York v. Feldman*, 210 F.Supp.2d 294, 301 (S.D.N.Y. 2002) (internal quotation marks and

citations omitted).

What is at issue in this case is Defendants' conspiracy "to fix, raise, maintain and/or

stabilize prices of rail freight transportation services sold in the United States through the use of

Rail Fuel Surcharges added to customers' bills."  Complaint, ¶ 2.  The deception on the public

was the use of the "rail fuel surcharge," misrepresented as compensation for increases in the cost

of fuel, when in fact it was effectively a "percentage rate increase that could be broadly applied

to rail freight customers."  Complaint, ¶¶ 2, 6.  The effect of this was that "members of the class .

. . paid a higher price for unregulated transportation than they would have been paid absent the

concerted unlawful activity alleged herein."  Complaint, ¶ 26.  These allegations clearly support

the conclusion that Defendants engaged in "repeated acts of deception directed at a broad group

of individuals."  *New York v. Feldman*, 210 F.Supp.2d at 301.

In *In re Static Random Access Memory Antitrust Litigation*, 2008 WL 426522 (N.D.Cal. 2008), cited by Defendants, the California district court made a finding that a claim under § 349 of the New York General Business Law should be dismissed because "false justifications regarding price increases" were directed at direct purchaser plaintiffs not indirect purchaser plaintiffs. The court properly recognized, however, that New York law requires "consumer-oriented acts," not specific representations made in the context of contractual privity. The court simply found that plaintiffs had failed to "allege specific deceptive conduct by Defendants." *Id*. at *10. Plaintiffs' claims were dismissed with leave to replead. *Id*. at *11.

The other cases relied on by Defendants are equally inapplicable. *In re Rezulin Prods. Liab. Litig.*, 392 F.Supp.2d 597, 613 (S.D.N.Y. 2005), involved misrepresentations in the nature of "efforts to persuade Medco, a large and sophisticated business, to include Rezulin in its formularies." The court found § 349 inapplicable because the representation was a "marketing effort-communication from one sophisticated business to another" and not directed at patients. Similarly, in *Paltre v. General Motors, Inc.*, 810 N.Y.S.2d 496, 498 (N.Y.App.Div. 2006), the New York Appellate Division found that "the alleged misrepresentations [not identified in the opinion] were either not directed at consumers or were not materially deceptive." Finally, in *St. Patrick's Home for the Aged and Infirm v. Laticrete Int'l*, 696 N.Y.S.2d 117, 122 (N.Y.App.Div. 1999), at issue were representations by a defendant to a second company, both of which were "in the building construction and supply industry" without any risk "that a customer in an inferior bargaining position would be deceived."

None of these cases provide guidance for the facts of this case, in which Defendants are alleged to have engaged in a price-fixing conspiracy that was a "consumer-oriented activity" causing "consumer injury or harm to the public interest." *Feldman*, 210 F.Supp.2d at 301. As in

*Feldman*, there are "sufficient allegations of injury to the public interest" to warrant denial of

defendants' motion to dismiss the New York Consumer Protection Law claims.

### 6.  Plaintiffs Have Stated A Claim Under Illinois Law

Defendants argue that Plaintiffs do not have a statutory claim in Illinois, Oregon and

Rhode Island because of the absence of a state antitrust statute (Def. Mem. at 37).  Plaintiffs are

withdrawing the statutory claim in Oregon and Rhode Island for other reasons.  *See* VI(B)(2)

*supra*.  Plaintiffs do have a claim under the Illinois Consumer Fraud and Deceptive Business

Practices Act, 815 ILCS 505, *et seq*.

Section 2 of that statute prohibits "[u]nfair methods of competition and unfair or

deceptive acts or practices . . . in the conduct of any trade or commerce. . . ."  Businesses have

standing to sue under this statute for unfair and deceptive practices addressed to a market

generally or that otherwise implicate consumer protection concerns.  *Downers Grove*

*Volkswagen v. Wigglesworth Imports,* 546 N.E.2d 33, 39-41 (Ill. App. Ct. 2d Dist 1989); *see also*

*Cozzi Iron and Metal, Inc. v. U.S. Office Equipment, Inc.,* 250 F.3d 570, 575-76 (7th Cir. 2001)

(plaintiff's allegations that it was deceived about the prices charged under a photocopy lease

stated a violation of § 505).  Here, Defendants imposed the fuel surcharge on rail transportation

services generally (Complaint, ¶6).  The charge was designed to evade contractual rate escalation

restrictions and, therefore, was unfair and deceptive (Complaint, ¶5).  This conduct violates §505

without regard to any other law or statute.

### C.  Plaintiffs' Properly Claim Restitution Of Defendants' Unjust Enrichment

Defendants attack Plaintiffs' claims for restitution primarily on three grounds: (1) that a

restitution claim in equity is an attempt to "evade" the requirements of federal and state law; (2)

that a restitution claim requires a tender of rescission; and (3) that Plaintiffs cannot claim

restitution because they did not deal directly with Defendants.  Defendants fail to recognize that

restitution provides an independent source of liability that is properly pleaded in the alternative,[51]

the dismissal of which "would be premature at this stage of the proceedings . . . ."[52]

### 1. Restitution Provides An Independent Source Of Liability For Unjust Enrichment.

Over 70 years ago the first Restatement of Restitution recognized restitution as a remedy

for unjust enrichment.

UNJUST ENRICHMENT.

A person who has been unjustly enriched at the expense of another is required to make restitution to the other.

The concept remains essentially the same in the current Tentative Draft of the Restatement 3d of

Restitution:

RESTITUTION AND UNJUST ENRICHMENT:

A person who is unjustly enriched at the expense of another is liable in restitution to the other.

In order to state a claim for restitution of unjust enrichment contemplated by the Restatement,

a plaintiff must allege (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it.

*In re K-Dur Antitrust Litigation*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (citing Restatement

(First) of Restitution § 1).  The court specifically rejected the argument made by antitrust

defendants in that case "that equitable remedies such as unjust enrichment would not be granted

where an adequate remedy at law exists."  *Id.*  The court found that plaintiffs "are clearly

---

[51] Laycock, *The Scope and Significance of Restitution*, 67 Tex.L.Rev. 1277, 1283-84, 1287 (1989).
[52] *In re K-Dur Antitrust Litigation*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004).

permitted to plead alternative theories of recovery," and the dismissal of claims by indirect

purchasers "would be premature at this stage" (*i.e.*, on the pleadings). *Id.*

In re Cardizem CD Antitrust Litigation, 105 F. Supp. 2d 618 (E.D.Mi. 2000), also

addressed an argument by antitrust defendants that restitution claims were dependent on "the

success of the statutory claims." The court found that the argument confuses Plaintiffs' right to

recover an equitable remedy under a common law claim based upon principles of unjust

enrichment with [their] right to recover a remedy at law for an alleged violation of a state's

antitrust laws. *In re Cardizem*, 105 F.Supp.2d at 669. Defendants had argued that plaintiffs

success on their restitution/unjust enrichment claims "necessarily depends on the success of their

statutory claims." The court rejected the argument.

> To the contrary, the courts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based on contract or other state law violations prove unsuccessful.

*Id*. In language that echoes the Restatement, the court held that plaintiffs are only required to

show that "the defendant has unjustly retained a benefit to the plaintiff's detriment and that the

defendant's retention of the benefit violates the fundamental principles of justice, equity, and

good conscience." *Id*. (internal quotations and citations omitted).

## 2. Recission Is Not Required Where Plaintiff Is Not A Contracting Party.

Defendants rely on a provision of the Restatement (First) of Restitution addressing

attempts by one contracting party to assert restitution against a second contracting party as a

remedy for breach of contract. The provision is plainly inapplicable to claims by a non-party to

the contract. The Restatement language on which Defendants rely reads:

> A person of full capacity who, *pursuant to a contract with another*, has performed services or transferred property to the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, unless the transaction is rescinded for fraud, mistake, duress, undue

influence or illegality, or unless the other side has failed to perform his side of the bargain.

Restatement (First) of Restitution § 107 (emphasis added).

Defendants' reliance on this provision is wrong for two reasons. First, the provision contemplates one contracting party suing a second for breach of contract, and limits the use of restitution to challenge the agreed upon consideration as inadequate. Indirect purchaser Plaintiffs are not in contractual privity with defendants and are not suing them for breach of contract. Further, the obligation to rescind is imposed only on the contracting party seeking restitution of benefits of an illegal contract (or a contract otherwise tainted as described). An indirect purchaser not a party to the illegal contract cannot be required to rescind it.

Finally, nothing in the quoted language or the comments thereto indicates any intent for the provision to apply in the context of unjust enrichment arising out of violations of statutes such as the antitrust laws. The Restatement (Third) of Restitution, currently circulated as Tentative Draft No. 3, clarifies the "unless clause" of § 107(1). Section 32 of the Third Restatement reads:

> A person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from a recipient in accordance with the following rules:
>
> (1)    Restitution will be allowed, whether or not necessary to prevent unjust enrichment, if restitution is required by the policy of the underlying prohibition.
>
> (2)    Restitution will also be allowed, as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition. There is no unjust enrichment if the claimant receives the counter-performance specified by the parties' unenforceable agreement.

Restatement (Third) of Restitution and Unjust Enrichment § 32, Tent. Dr. No. 3. This new draft, like § 107(1) of the First Restatement, addresses bilateral contractual relationships. While (like § 107) on its face it does not apply to benefits conferred by a third party on one of two contracting

parties, a third party confers as a result of a violation of antitrust laws by two parties to an agreement, to the extent § 32 is found applicable clause (1) allows for restitution as required by the policy of the underlying antitrust laws without requiring rescission.

In sum, in either the First or the Third Restatement of Restitution, rescission is required to affect restitution only where one contract party is suing a second contracting party for breach of an illegal or otherwise tainted contract. Where, as here, the claimant is not a party to the illegal contract and not a participant in the violation of statute, restitutionary relief is still appropriate. Though the relief may not be given to the immediate parties to an illegal contract, the court may still grant relief to an innocent party if it can find one. Wade, Restitution of Benefits Acquired Through Illegal Transactions, 95 U. Penn. L. Rev. 261, 299 (1947).[53]

### 3. Restitution Does Not Require That Plaintiffs Bestow A Direct Benefit On Defendants.

As indirect purchasers, Plaintiffs are not in privity with Defendants. Def. Mem. at 40. This does not vitiate the right to restitution. All plaintiffs are required to show is that they "bestowed some sort of benefit upon the defendant that the defendant ought not to keep in equity and good conscience." *Cardizem*, 105 F.Supp.2d at 671. There is no requirement that the benefit be bestowed directly by plaintiff on defendant.

> Whether or not the benefit is directly conferred upon the defendant is not the critical inquiry; rather, the plaintiff must show that his detriment and the defendant's benefit are related and flow from the challenged conduct.

*Cardizem*, 105 F.Supp.2d at 671. The district court in *K-Dur* reached the same conclusion, based on the reasoning in *Cardizem*:

---

[53] Professor Wade provided two illustrations of this principle. The first is that beneficiaries may qualify for restitution if their trustee engages in illegal or fraudulent behavior with a third party. The second is rescission in favor of a party to an illegal contract, on the condition that "he holds the money as constructive trustee for another person who is not a party to this suit but who was really entitled to it." *Id.*

Defendants also claim that Plaintiffs' claims are deficient because unjust enrichment claims require that Plaintiffs confer a benefit on Defendants. . . . Defendants' argument fails because a benefit conferred need not mirror the actual loss of the Plaintiff. . . . The critical inquiry is whether the plaintiff's detriment and the defendant's benefit are related to, and flow from, the challenged conduct.

*In re K-Dur*, 338 F.Supp.2d at 544 (*citing Cardizem*).

## **CONCLUSION**

For all of the foregoing reasons, Defendants' Joint Motion to Dismiss the Indirect Purchasers' Consolidated Amended Complaint should be denied.


Dated: July 8, 2008

LOVELL STEWART HALEBIAN LLP

/s/Christopher Lovell
Christopher Lovell
Imtiaz A. Siddiqui
500 Fifth Avenue
New York, NY 10110
T: (212) 608-1900
F: (212) 719-4775

THE MASON LAW FIRM, LLP
Gary E. Mason
Donna F. Solen
1225 19th Street NW, Suite 500
Washington, DC 20036
T: (202) 429-2290
F: (202) 429-2294

STAMELL & SCHAGER, LLP
Jared B. Stamell
Richard J. Schager, Jr.
John C. Crow
One Liberty Plaza, 35th Floor
New York, NY 10006
T: (212) 566-4047
F: (212) 566-4061

*Interim Co-Lead Indirect*
*Purchaser Plaintiff Class Counsel*