**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION _____ This document relates to: ALL CASES | MDL Docket No. 1869 Misc. No. 07-489 (PLF) |
|---|---|

**INDIRECT PURCHASER PLAINTIFFS' SUPPLEMENT TO THEIR OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**

In their Memorandum in Opposition to Defendants' Motion to Dismiss, Plaintiffs argue against Defendants' assertions that state antitrust claims are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"). *See specifically Indirect Purchaser Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss* at 33-40. In further support of this argument, Plaintiffs submit as follows:

The crux of the Defendants' defense is that Plaintiffs' state antitrust and consumer protection claims are not triable in the courts. Quite the other way, however, the AAR, as part of its campaign to defeat passage of the Railroad Antitrust Enforcement Act of 2007, made several public statements acknowledging that freight railroads are subject to enforcement of most antitrust laws in courts of competent jurisdiction, including those that prohibit agreements among railroads to set rates, allocate markets, or otherwise unreasonably restrain trade. *See* AAR "Antitrust and Remedies" (July 2007), attached hereto as Exhibit A, p.1; Statement of G. Paul Moates on Behalf of the Association of American Railroads Before the U.S. Senate Committee on the Judiciary, Subcommittee on Antitrust, Competition Policy and Consumer Rights (October 3, 2007), attached hereto as Exhibit B, pp. 1-2; Statement of G. Paul Moates on Behalf of the Association of American Railroads Before the U.S. House of Representatives Committee on the

Judiciary, Taskforce on Antitrust and Competition Policy (February 25, 2008), attached hereto as Exhibit C, p. 1-2. The AAR conceded that railroads are subject to the antitrust laws in the courts, as well as regulation by the STB over rail service, market entry, and such rail-related conduct as the level and structure of rates where there is no effective competition. *See* Ex. B, p.5; Ex. C, pp. 4-5. The AAR represented to Congress that such dual oversight does not foreclose private litigation of claims arising outside the STB's delimited bounded regulatory areas. The AAR likewise represented to Congress that the few, very limited, antitrust exemptions available to railroads under 49 U.S.C. §§ 11321(a) and 10706, 49 U.S.C. § 333, and 15 U.S.C. § 26, are very limited and narrowly applied, and cover only aspects of railroad conduct that are subject to STB oversight. *See* Ex. A, pp. 1-2. The AAR explained that, when Congress deregulated railroad activities, it removed the corresponding antitrust exemptions. So to be clear, the AAR, declared to Congress that only those aspects of railroad conduct that are exempt from the antitrust laws are the narrowly defined categories of conduct remitted to the STB's regulatory jurisdiction, (none of which encompass plaintiffs' claims here). *See* Ex. B pp. 5; 17; Ex. C pp. 5; 17.) These straightforward public pronouncements discredit entirely Defendants' defense that Plaintiffs' state antitrust and consumer protection claims are not triable in the courts. (Def. Mem. at 3-16). Simply put, the AAR represented to Congress and the public that all antitrust aspects of railroad conduct not subject to the STB's regulatory jurisdiction are triable in the courts, and Defendants proffer no evidence impeaching those solemn representations.

For the foregoing reasons, and as previously explained in Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, Defendants' Motion to Dismiss should be denied.

July 17, 2008                            Respectfully submitted,

/s/ Gary E. Mason_____
THE MASON LAW FIRM, LLP
Gary E. Mason
DC Bar # 418073
1225 19th Street NW, Suite 500
Washington, DC 20036
T: (202) 429-2290
F: (202) 429-2294

LOVELL STEWART HALEBIAN LLP
Christopher Lovell
Imtiaz A. Siddiqui
500 Fifth Avenue
New York, NY 10110
T: (212) 608-1900
F: (212) 719-4775

STAMELL & SCHAGER, LLP
Jared B. Stamell
Richard J. Schager, Jr.
John C. Crow
One Liberty Plaza, 35th Floor
New York, NY 10006
T: (212) 566-4047
F: (212) 566-4061
*Interim Co-Lead Indirect*
*Purchaser Plaintiff Class Counsel*

# Antitrust and Railroads

ASSOCIATION OF AMERICAN RAILROADS                                    JULY 2007

| WHAT SHOULD BE DONE? | Reject legislation — such as S. 772/H.R. 1650 (the "Railroad Antitrust Enforcement Act of 2007") in the 110th Congress — that eliminates the limited antitrust immunity that currently exists for U.S. freight railroads. |
|---|---|
| WHY? | The basic premise of S. 772/H.R. 1650 — that freight railroads enjoy wide-ranging immunity from our antitrust laws, giving them freedom from government oversight — is wrong.  Freight railroads <u>are</u> subject to most antitrust laws, including those that prohibit agreements among railroads to set rates, allocate markets, or unreasonably restrain trade.  The few, very limited antitrust exemptions applicable to railroads pertain only to conduct for which the Surface Transportation Board (STB) has regulatory authority over railroads.  The exemptions prevent dual and potentially conflicting oversight of railroads by the STB and the courts, while promoting safer, more efficient rail service. |

## ISSUE OVERVIEW

Critics of U.S. freight railroads complain that railroads are "broadly exempt from the nation's antitrust laws."[1]  The implication is that railroads can engage in anti-competitive conduct free of government oversight.  This is not true.

In fact, freight railroads <u>are</u> subject to antitrust laws that prohibit agreements among railroads to set rates, allocate markets, or otherwise unreasonably restrain trade.  In addition, railroads are subject to extensive economic regulation by the Surface Transportation Board, an independent agency within the U.S. Department of Transportation.  Among other things, the STB has jurisdiction over rail mergers and a range of rail service- and rate-related issues, including the level of rail rates in cases where railroads face no effective competition.

A few limited antitrust exemptions (explained below) are available to railroads, but the exemptions are narrowly applied and only cover aspects of railroad conduct that are subject to oversight by the STB.  The exemptions exist to avoid dual (and potentially conflicting)

---

[1] Statement of Glenn English, Chairman - Consumers United for Rail Equity, at the hearing of the Antitrust Task Force of the House Judiciary Committee, May 8, 2007.  Similar incorrect statements have been made by others.

oversight by the STB and the courts. The exemptions also allow railroads to work together in a limited way to increase efficiency and enhance safety.

- Mergers, consolidations, and pooling agreements. Under 49 U.S.C. § 11321(a), railroad mergers, consolidations, and pooling agreements[2] approved by the STB are exempted from the antitrust laws. However, the STB thoroughly examines the effects of the agreements on competition and the public interest, and only approves agreements that it deems are consistent with the public interest. As part of this examination, any interested party, including the Department of Justice, other government entities, shippers, and other railroads, can have their views considered by the STB.

- Rate agreements. Under 49 U.S.C. § 10706, certain rate agreements that have been reviewed and approved by the STB are exempted from the antitrust laws.

  When initially enacted in 1948, this exemption granted antitrust immunity for railroads to get together in "rate bureaus" to collectively set rates. Today, though, railroad rate bureaus no longer exist. Consequently, as a practical matter, railroads' pricing for their transportation services is not covered by this exemption. This exemption does not apply to collective discussions of, or agreements concerning, rates for shipments that move on just one railroad. Nor does it apply to discussions between railroads covering rates for shipments that move on more than one railroad, unless the railroads involved in the discussions can participate in the movement underlying the rate.

  In other words, this exemption does not give railroads a free hand to collude in ratemaking. Today, the main purpose of this exemption is to provide a framework for railroads to establish rules and regulations pertaining to the fees they pay each other when they use other railroads' equipment. This coordination enhances efficiency and is not controversial.

- Conferences. Under 49 U.S.C. § 333, the U.S. Secretary of Transportation may, upon request by a railroad, hold conferences on proposed unification or coordination projects. The invitees to these conferences may include railroads, rail labor, shippers, consumer representatives, state agencies, the STB, the Department of Justice, and the Federal Trade Commission. Any discussions or agreements entered into with the Secretary's approval in connection with these conferences are exempted from the antitrust laws. The limited use of conferences under this provision has been supported by shippers as well as railroads. It remains a useful potential means of improving rail transportation with the opportunity for participation by all relevant parties.

- Injunctive relief. Under 15 U.S.C. § 26, only the federal government can, in response to an alleged antitrust violation by a railroad that is subject to STB jurisdiction, obtain injunctive relief (that is, have a court order a railroad to take some action) against that railroad.

  As the U.S. Supreme Court noted in a case affirming this exemption[3], the purpose of this exemption is to prevent private parties from interfering with the regulatory agency that

---

[2] In this context, a pooling agreement is an agreement by owners of certain types of railcars (e.g., boxcars or flat cars) to assign control of the cars to a central organization, which is then responsible for dispatching the cars to users. Pooling agreements allow freight cars to be used much more efficiently than would otherwise be the case — for example, by reducing the amount of time a car is in transit while empty.

[3] Central Transfer Co. v. Terminal Railroad Association of St. Louis, 288 U.S. 469, 1933.

oversees railroads (the STB). The STB has broad injunctive authority of its own over railroads, including the authority to enforce certain provisions of the antitrust laws. Moreover, this exemption does not prevent the federal government from seeking injunctive relief for alleged antitrust violations involving railroads.

## JUSTIFICATION FOR DESIRED POLICY

- Proposals like S. 772/H.R. 1650, which seek to eliminate railroads' limited antitrust exemptions, are premised on the assumption that railroads are sometimes free to operate as they wish, subject to neither antitrust scrutiny nor any other government oversight.

  This assumption is wrong. All aspects of railroad conduct that are exempt from antitrust laws are subject to the STB's regulatory jurisdiction. Therefore, ending railroad antitrust exemptions would not fill any void in the law. Instead, it would only provide a dual remedy to shippers, reduce the efficiency of rail operations, and interfere with the STB's implementation of national rail transportation policies set by Congress.

- Proponents of S. 772/H.R. 1650 support the legislation because they don't like some of the decisions the STB has made. But in making its decisions, the STB thoroughly addresses the issues raised, including competitive and market considerations.

- Limited antitrust exemptions for railroads exist because railroads are subject instead to economic regulation. If the goal is to treat railroads like unregulated businesses with respect to the antitrust laws, then consideration should also be given to the entire existing system of railroad economic regulation. In other words, if one is to assess whether railroads' antitrust exemptions should be eliminated, one should also assess whether other forms of railroad economic regulation should be eliminated as well.

# STATEMENT OF G. PAUL MOATES

## ON BEHALF OF

## THE ASSOCIATION OF AMERICAN RAILROADS



### BEFORE THE U.S. SENATE
### COMMITTEE ON THE JUDICIARY

### SUBCOMMITTEE ON ANTITRUST, COMPETITION POLICY
### AND CONSUMER RIGHTS

### HEARING ON AN EXAMINATION OF S. 772,
### THE RAILROAD ANTITRUST ENFORCEMENT ACT

### OCTOBER 3, 2007

**Association of American Railroads**
**50 F Street NW**
**Washington, DC  20001**
**202-639-2100**

The Association of American Railroads submits this testimony to express its opposition to S. 772, the "Railroad Antitrust Enforcement Act of 2007."

In short, this legislation is a solution looking for a problem. It is premised on the incorrect assumption that a gap exists between the scope of economic regulation and the antitrust laws where rail competition and market conduct are subject to neither antitrust scrutiny nor government oversight. In fact, there is no such gap. All aspects of railroad conduct that are exempt from the antitrust laws are subject to the regulatory jurisdiction of the Surface Transportation Board (STB). Rather than filling any void in the law, this legislation would only provide a dual remedy to shippers and interfere with STB's implementation of national transportation policy.

S.772 would effect a number of changes to current law. It would remove the prohibition against private injunctions against railroad common carriers subject to the STB's jurisdiction, while retaining the prohibition with respect to other common carriers (amending 15 U.S.C. §26). It subjects certain STB-approved railroad transactions to section 7 of the Clayton Act relating to corporate acquisitions, while leaving intact an exemption from the reach of section 7 for several other industries (amending 15 U.S.C. §18). In certain types of antitrust actions against railroads, it curtails the judicial doctrine of primary jurisdiction, under which courts typically defer to the expertise of the regulatory agency, in this case the STB, questions within the agency's expertise. While retaining STB's jurisdiction over rail mergers, consolidations, acquisitions and rate agreements, it eliminates the STB's existing authority to enforce certain provisions of the antitrust laws with respect to STB-approved agreements in those areas, conferring that authority on the Federal Trade Commission (FTC) (or DOJ) (amending 15 U.S.C. §21(a)). It confers the FTC with authority over railroads, but not other

types of common carriers (amending 15 U.S.C. §45(a)(2)).  It eliminates the filed rate
doctrine with respect to railroads only.  It eliminates the current exemption from the antitrust
laws that applies to certain STB-approved agreements under 49 U.S.C. §10706 and STB-
approved transactions under 49 U.S.C. §11321.  Finally, by virtue of its effective date
provision, the bill would subject to antitrust scrutiny railroad agreements approved by the
STB (or its predecessor, the Interstate Commerce Commission (ICC)) before the bill was
enacted that remain in effect more than 180 days afterwards.

In sum, while leaving intact the STB's regulatory regime, S. 772 eliminates antitrust
exemptions and carve-outs that apply to railroads, but retains those same exemptions to the
extent they apply to other parties.

Long-standing statutory schemes should be altered only if there is an identified
problem calling for remedial legislation, and only if the proposed legislation would be
effective in remedying the perceived problem.  Neither condition exists with respect to S.772.
To the contrary, the legislation is built on several faulty premises.  Railroads generally are
subject to the antitrust laws and do not enjoy broad antitrust immunities; the existing
immunities are limited and apply to conduct over which there remains close regulatory
oversight.  Moreover, while the bill's proponents argue otherwise, S.772 is unlikely to provide
avenues of relief to shippers that are foreclosed today.  Finally, S.772 does not simply "level
the playing field" — it is built on top of, not as a replacement to, regulation by the STB.  In
short, the case for S.772 does not hold up under examination.

## 1.    Background

Certainly, the antitrust immunities that apply to railroads were not created in a
vacuum.  In the years since passage of the Sherman Act, Congress has enacted a host of
antitrust exemptions applying to a wide array of industries and conduct, typically in order to

promote a public policy that might not be realized under full exposure to the antitrust laws. The exemptions that apply to railroads came about as a complement to the comprehensive regulatory regime that governs the railroad industry.  And, as that regime has evolved over time, so too has the role of the antitrust laws in the railroad industry.

In 1887, before the first antitrust laws were enacted, Congress undertook comprehensively to regulate the economic, operational, and safety aspects of the railroad industry.  This policy first was effected with enactment of the Interstate Commerce Act of 1887, c.104, 24 Stat. 379 (1887), under which the ICC, an independent federal agency, was given broad authority to regulate practically every aspect of railroad operations.  The railroads were the first U.S. industry subject to such a comprehensive scheme of regulation.  This regulatory scheme developed against the backdrop of a common law common carrier obligation, which required a common carrier to carry for all persons who applied, at reasonable charges.  *See I.C.C. v. Baltimore & Ohio R.R.*, 145 U.S. 263 (1892).  Today, that common carrier obligation is carried forward in the statutory requirement in the Interstate Commerce Act, as it has been amended, that railroads provide transportation or service on reasonable request. 49 U.S.C. §11101(a).

With the passage of the Interstate Commerce Act, the railroads became the first U.S. industry subject to regulatory oversight by an administrative agency.  Over time, rigid and arcane regulation came to control nearly every aspect of railroad operations.  By the 1970s, the cumulative effect of decades of stifling government control, combined with strong competition from other modes and changing shipping patterns, crippled the rail industry. Freight rates and accident levels were rising, rail infrastructure was deteriorating, much of the

nation's rail mileage was in bankruptcy, and the industry's rate of return on investment averaged only 2.0 percent.

Because the status quo was untenable, Congress passed the Staggers Rail Act of 1980. Pub. L. 96-448, 94 Stat. 1895.  In the Staggers Act, Congress recognized that railroads faced intense competition for most freight traffic, but prevailing regulation prevented railroads from earning adequate revenues and competing effectively.  Accordingly, the Staggers Act allowed the railroads to establish their own routes, tailor rates and services to market conditions, and differentiate rates on the basis of demand.  And, of course, rate regulation remains where effective competition is found to be absent.

The Staggers Act has been a tremendous success.  Average inflation-adjusted rail rates have declined 55 percent since 1980.  Rail safety has been improved as a direct result of more than $400 billion being invested in infrastructure and equipment since 1980.  And rail industry financial performance has also been improved, although it continues to lag behind Fortune 500 average return on equity.

The Staggers Act did not completely deregulate railroads.  In addition to retaining authority over a variety of non-rate areas, the ICC (now the STB) retained the authority to set maximum rates or take other actions if a railroad was found to have market dominance or to have engaged in anti-competitive behavior.[1]  The Staggers Act established a safety net, which still exists, to address the needs of rail customers for whose traffic there is no effective competition.  In situations in which railroads have market dominance — *i.e.*, situations in which there is an absence of effective competition from other rail carriers or modes of transportation for the traffic at issue — railroads must establish rates that are reasonable.  The

---

[1] The ICC Termination Act of 1995 eliminated certain regulatory provisions, abolished the ICC, and created, in its stead, the STB to maintain continued regulatory oversight of railroad rates and operations.

STB will award reparations and prescribe appropriate rates if a railroad's rates are determined to be unreasonably high.

The end result is that today, railroads are subject to the antitrust laws as well as extensive economic regulation by the STB. The STB has jurisdiction over rail service, market entry, and a wide range of rate-related conduct, including the level and structure of rates where there is no effective competition.

**2.    Railroads Are Subject to Both the Antitrust Laws and Regulatory Oversight: The Antitrust Exemptions That Still Apply Are Limited in Scope**

There is a perception that railroads enjoy broad exemptions from the antitrust laws and that those exemptions result in an anticompetitive market that harms consumers. In fact, railroads <u>are</u> subject to federal antitrust laws. The antitrust laws prohibit anticompetitive agreements to set rates, allocate markets, or otherwise unreasonably restrain trade in the railroad industry. None of the extant antitrust exemptions that apply to railroads would immunize such conduct if it were to take place. *E.g.*, *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3d Cir. 1993).

A few statutory antitrust exemptions apply to railroads, but they are very limited and narrowly applied. Moreover, railroad activities that are exempt from the antitrust laws are subject to regulation by the STB. When Congress has deregulated railroad activities, it has removed the corresponding antitrust exemptions. Railroads continue to be subject to the STB's regulatory jurisdiction with respect to certain rates and services, entry and exit, and mergers and other restructurings. The statutory antitrust exemptions that remain exist to avoid dual and potentially conflicting regulation by the courts and the STB. Moreover, they allow railroads to work together in a limited way to efficiently address some of the issues raised by the industry's network characteristics.

Section 10706 of Title 49, a target of S.772, provides that certain rate agreements that have been reviewed and approved by the STB are exempted from the antitrust laws. However, the scope of the exemption is severely limited (*e.g.*, the exemption does not apply to collective discussions of or agreements upon single-line rates, nor does it apply to any joint-line rate discussions between railroads unless they can practicably participate in the movement underlying the rate). More importantly, railroads' pricing for their transportation services is not covered by this exemption as a practical matter because the so-called rate bureaus that once addressed such rates no longer exist. The exemption remains important, however, to foster coordination on matters that enhance network efficiency (and are not controversial), such as rules governing administration of compensation for rail car use.

A history of this provision can be illustrative to show that changes to the antitrust laws should be considered only in the context of the regulatory environment. As noted above, this provision exempts railroads from the antitrust laws with respect to making and carrying out certain agreements which have been approved by the STB. Agreements which are to be submitted for STB approval under this provision include agreements between at least two rail carriers which relate to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them .

In its original form, 49 U.S.C. §10706 goes back to 1948, a period of far more active and comprehensive regulation of the railroad industry than exists today.[2]  Initially, when enacted, this provision granted antitrust immunity for the railroads to meet together in rate bureaus and collectively set rates with antitrust immunity. However, when Congress passed

---

[2] This provision was originally enacted as section 5b of the Interstate Commerce Act by the Reed-Bulwinkle Act of 1948, 62 Stat. 472.

the Staggers Act and provided a level of regulatory relief for the railroads, it also severely limited the scope of the statutory exemption under this provision.  As noted above, the exemption does not apply to collective discussions or agreements upon single-line rates.  Nor does it apply to any joint-line rate discussions between railroads unless they can "practicably participate" in the movement underlying the rate. 49 U.S.C. §10706(a)(3)(A)(i) &(ii).

There is currently in effect an industry agreement approved under §10706 that permits joint consideration and establishment of rates of compensation for both railroad and shipper furnished freight cars and other transportation equipment, and rules and regulations pertaining thereto.  This agreement, which is administered by the AAR, was first approved by the ICC in 1950 (Section 5a Application, *Association of American Railroads, per Diem, Mileage, Demurrage and Storage — Agreement*, 277 I.C.C. 413 (1950).[3]  Any common carrier by railroad subject to the jurisdiction of the Interstate Commerce Act may become a party to the agreement.

Today, this Agreement provides a framework for the rail industry only to establish rules and regulations that pertain to the charges, known as car hire, that railroads pay each other when using the equipment of other railroads.[4]  These rules, known as the AAR Code of Car Hire, establish procedures for the administration and accounting of car hire payments. Virtually all railroads, including many non-AAR members, subscribe to the Code.  The Agreement sets forth the procedures to be utilized for consideration and establishment of the rules that make up the Code.

---

[3] The Agreement initially covered demurrage and storage charges, rates paid by shippers for the detention of freight cars or for use of other transportation equipment or facilities. However, that authority was subsequently withdrawn by the ICC.

[4] This Agreement also is occasionally used to take up matters related to allowances provided when non-railroad cars are used.

Again, it is important to note that under the Code, the railroads do not collectively establish the rates that users of freight cars pay to the car owners.  These rates are established through bilateral negotiations between the owners and users of the equipment, or through binding arbitration if agreement cannot be reached, pursuant to the ICC's deprescription orders. Ex Parte No. 334 (Sub-No. 8) *Joint Petition for Rulemaking on Railroad Car Hire Compensation*, 9 I.C.C.2d 80 (1992); 9 I.C.C.2d 582 (1993); 9 I.C.C.2d 1090 (1993).  The car hire rules are promulgated, amended, and enforced through the actions of committees, designated by the approved Agreement, which are composed of representatives of AAR member railroads and small railroads (which generally are not AAR members).  Committee meetings where substantive discussions occur are open to all interested parties, typically are attended by representatives of several non-railroad car owners and lessors, and serve as a forum for all parties to express their views and concerns on matters related to the rules.

This process works effectively to assure that there is a uniform set of rules — not rates — pertaining to the payment of car hire.  Given the large number of railroads and car owners, the rules, and the process under which they are promulgated, administered, and enforced, provide an orderly and accepted system for (1) apportioning financial responsibility for making payment in various situations; (2) governing collection; (3) adjustment of accounts; and (4) handling of claims.  While not all parties always favor all proposed rule changes, the process is well-accepted, not controversial, and is seen as beneficial by all participants.

AAR believes the conduct undertaken today pursuant to the industry §10706 agreement would pass muster under a rule of reason analysis.  Nonetheless, the statutory immunity is beneficial because it enables railroads collectively to address matters that arguably relate to rates without fear that they will be subject to antitrust lawsuits aimed at

disrupting that conduct.  STB oversight pursuant to the statute, 49 U.S.C. §10706(a)(3)(C), as well as the fact that all meetings are sound recorded or transcribed and are available to the STB, assures that the conduct under §10706 remains within the confines of the Agreement and is consistent with transportation policy.  Eliminating the exemption that immunizes the making and implementing of car hire rules from antitrust challenge would discourage the railroads' efficiency-enhancing coordination activities without providing any conceivable relief with respect to any alleged deficiencies in the rail transportation market.[5]

**3.     The Purported Benefits of the System of Dual Regulation That S.772 Would Bring About Are Dubious and Illusory**

A.     Railroad Consolidations

In amending both section 7 of the Clayton Act and The Federal Trade Commission Act, S.772 does not so much eliminate an antitrust exemption as establish a system of dual regulation.  Though the STB's authority over rail mergers is not eliminated by S.772, the bill would also make applicable the Clayton Act standards and permit antitrust enforcement agencies to challenge rail mergers — even, it appears, those that were approved by the STB (or ICC) long ago.  There is little reason to believe that this change in the law will provide the relief some shippers insist they need.  In fact, we fail to understand how subjecting a major rail merger to the less stringent DOJ standard to only preserve competition gives shippers more protection than the STB standard of enhancing competition.

Under existing law, the STB closely regulates railroad consolidations and cannot approve them without considering any potential adverse effect on competition and ensuring that they are consistent with the public interest.  Since Staggers, the STB and its predecessor,

---

[5]  As originally drafted, S.772 also would have eliminated the limited antitrust immunity for STB-approved pooling agreement under 49 U.S.C. §11322.  That immunity, which now appears to remain intact under S.772, permits the industry to operate highly efficient pools of multilevel railcars and boxcars and is another example of the procompetitive outcomes of the coupling of STB oversight with limited antitrust immunity.

the ICC, have consistently used their statutory authority to impose conditions on railroad consolidations to ensure that no customer has lost two-railroad service due to a consolidation. The STB regulatory process for assessing mergers, consolidations, and pooling agreements provides for the development of a detailed record, with affected parties (including DOJ) having the opportunity to participate. Where rail customers are served by only one railroad today, it is not the result of consolidations permitted since 1980, it is because the market cannot support the presence of more than one carrier.

When the STB considers a proposed merger of two or more Class I railroads, it must consider, among other things, (1) the effect of the proposed transaction on the adequacy of transportation to the public; (2) the effect on the public interest, and (3) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region or in the national rail system. In that regard, the STB is guided by traditional Clayton Act Section 7 analysis. *See Santa Fe Southern Pac. - Control – Southern Pac. Transp. Co.,* 2 I.C.C. 2d 709, 727 (1986). In fact, since 1980, the ICC/STB has approved only one rail merger that the Justice Department opposed. In an order approving a transaction, the STB may impose conditions on the applicants, including divestiture of tracks, the granting of trackage rights,[6] or access to other facilities.

The STB having exclusive jurisdiction over approval of consolidations is an outgrowth of Congress' decision to have rail consolidations considered in the context of the national transportation policy which, while most certainly including the interest of promoting competition, also includes other important considerations. The railroad consolidation provisions originated in the Transportation Act of 1920, 41 Stat. 456. Under that law, Congress sought to balance the policies embodied in the antitrust laws with those embodied in

---

[6] Trackage rights are the rights of one carrier to use the track of another carrier.

the national transportation policy. Given the context in which railroad consolidations are to be considered, Congress determined that the regulatory agency with substantive expertise and responsibility for implementing national transportation policy is in the best position to evaluate proposed consolidations in the railroad industry.

In recent years, with the competitive environment in which the railroads operate, the focus of the national transportation policy has reflected a greater reliance on competition and market forces. See 49 U.S.C. §10101(1) & (2). As a result, STB oversight of the railroad industry permits railroads far greater flexibility with respect to their rates and services than was the case in the past. This change has also been recognized by the STB with respect to its consolidation policy.

In 2001, the STB revised its regulations pertaining to railroad mergers to elevate the importance of preserving competition as a condition for approval of a transaction. *See generally* 49 C.F.R. Part 1180. The STB's stated policy is to ensure "balanced and sustainable competition in the railroad industry." 49 C.F.R. §1180.1(a). The regulations further state that the STB does not favor consolidations that reduce the transportation alternatives available to shippers unless there are substantial and demonstrable public benefits to the transaction that cannot otherwise be achieved. *Id.* The STB requires that major merger applications include provisions for enhanced competition. §1180.1(c). Moreover, the STB is prepared to use its authority to "preserve and/or enhance competition." *Id.* Applicants seeking approval of a transaction are required to explain how they would, at a minimum, preserve competition and market options and to propose remedies to mitigate and offset competitive harms. §1180.1(c)(2)(I). Thus, while the STB retains exclusive jurisdiction to approve rail

mergers, the agency continues to take into account — indeed, now emphasizes — policies embodied in the antitrust laws along with other public interest factors.

The STB has authority, which it has frequently exercised in the past and maintains today, to impose conditions on merging railroads and to exercise significant oversight when it approved rail consolidations.  See 49 U.S.C. §11324(c). The Board may impose conditions governing the transaction, including the divestiture of parallel tracks or requiring the granting of trackage rights and access to other facilities.  At least since 1980, the Board has consistently imposed merger conditions to preserve two-railroad service where it existed. *E.g., Union Pac. Corp., Union Pac. R.R. Co., and Missouri Pac. R.R. Co. Control and Merger Southern Pac. Rail Corp., Southern Pac. Transp. Co., St. Louis Southwestern Ry. Co., SPCSL Corp., and Denver and Rio Grande Western R.R. Co.* [General Oversight], STB Finance Docket No. 32760 (Sub-No. 21), Decision 13 (1998).

In addition, the Board has exercised its authority by maintaining oversight of transactions for a period of time after approval.  For example, a five-year oversight period was made a condition of approval of the acquisition of Conrail by CSX and Norfolk Southern.  *See CSX Corp. And CSX Transp., Inc., Norfolk Southern Corp. and Norfolk Southern Ry. Co. Control and Operating Leases/Agreements  Conrail, Inc., and Consolidated Rail Corp.*, Decision No. 89, Finance Docket No. 33388 (3 S.T.B. 196) (1998). *aff'd., Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.*, 247 F.3d 437 (2nd Cir. 2001).

Because of STB's imposition of conditions on mergers and its emphasis on preserving competition, there is probably more effective price competition today than there was in the "idyllic" days of long ago.  The greater number of Class I railroads that existed then were subject to heavy-handed ICC rate regulation which made it difficult for railroads to respond to

changed market conditions and tended to leave rates at a level designed to protect the most inefficient carriers.  In addition, as described above, rates were often made by immunized rate bureaus, legalized price-fixing cartels that no longer exist today.  The assigning of jurisdiction over railroad consolidations to the STB is an outgrowth of the longstanding regime of economic regulation.  As a result, the agency that is charged with carrying out the national transportation policy, and which, along with its predecessor, possesses well over 100 years of accumulated expertise, continues to have the final say over rail consolidations.  It is not clear what benefits introducing dual merger authority would bring, or that such dual authority, in the few industries where it now applies, has resulted in a more competitive market than would otherwise exist.

B.        Primary Jurisdiction and Injunctive Relief

Also of questionable benefit is the provision in S.772 that reverses judicial precedent under which federal courts have referred matters to the STB involving its "primary jurisdiction" in four types of antitrust challenges.  Not technically an antitrust exemption, the doctrine of primary jurisdiction is concerned with promoting proper relationships between courts and administrative agencies charged with particular regulatory duties.  Under long-standing precedent, courts may defer to the regulatory agency on otherwise antitrust-related contentions.  Primary jurisdiction, which by no means is limited to application in the railroad industry, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of a claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.  *See U.S. v. Western Pac. R.R.*, 352 U.S. 59, 64 (1956).  The purpose of this court-developed doctrine is to avoid potential conflicts between that oversight and the outcome of private litigation.  *Id*.

Similarly, in order to avoid inconsistent results as between courts and the STB, private parties are prohibited from seeking to enjoin alleged antitrust violations by common carriers related to matters that are within the STB's jurisdiction. 15 U.S.C. §26; *See e.g., Central Transfer Co. v. Terminal R.R. Ass'n,* 288 U.S. 469, 475 (1933). S.772 would open the door to private injunctions against railroads, but not other common carriers. This immunity which is being eliminated does not prevent a private party from seeking antitrust damages against a railroad; nor does it prohibit the federal government from seeking injunctive relief. It simply prevents a civil court, which does not posses the expertise to consider how a decision involving a discrete dispute between a single railroad and single plaintiff might affect other railroads and shippers on other parts of the rail network. The STB, on the other hand, is charged with the responsibility for looking at the railroad network as a whole, taking into account the national, regional, and local aspects of the system. Thus, the STB is in a much better position to ensure that remedies to resolve individual disputes comport with national rail policy objectives.

Permitting private injunctions introduces dual regulation which will often be at cross purposes. So long as there remains a single regulatory body that is charged with oversight of the rail industry, it is imperative that the antitrust laws and national transportation policy be implemented in a harmonious fashion. In permitting courts to fashion equitable remedies in individual civil actions (Section 2), and by discouraging courts from deferring to the STB's expertise (Section 4), S.772 threatens to disrupt that harmony. While individual plaintiffs might find satisfaction in pursuing injunctions, or in having courts ignore (to the plaintiff's benefit) STB resolution of relevant issues, such outcomes could well have ripple effects to the detriment of other shippers and the rail network as a whole.

It is fair to say that part of the motivation behind S.772 (and in particular elimination of the primary jurisdiction doctrine and allowance of private injunctions) is dissatisfaction on the part of some rail shippers with decisions of the STB on certain market practices. One example is concern over the STB's refusal to require railroads to quote "bottleneck" rates, a term that refers to rates that would apply to segments of a railroad's network used to reach individual shippers or receivers that are served by only one railroad. Even in the absence of any antitrust exemptions, it is dubious whether this, and other unilateral railroad conduct, would be subject to antitrust relief. *See Verizon Comm. v. Trinko*, 540 U.S. 398 (2004).[7]

Similarly, repeal of the filed rate, or *Keogh,* doctrine,[8] which S.772 would accomplish, is unlikely to offer any real benefits to rail shippers. The continued viability of that doctrine as it related to railroads is dubious, as most rail rates are no longer subject to filing requirements. AAR is unaware of the filed rate doctrine being used in recent times to absolve railroads of conduct that otherwise would have constituted an antitrust violation. Interestingly, S.772 would eliminate this "immunity" only with respect to railroads. It apparently would remain intact for other regulated industries, which, in recent times, have utilized it to defend antitrust actions. *E.g., Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 273 F.Supp.2d 573 (E.D. Pa. 2003)(rates filed with the Federal Energy Regulatory Commission) AAR would recommend that rather than repealing the Keogh doctrine in a piecemeal fashion, the Committee consider a comprehensive review of Keogh for all affected industries.

---

7  In *Verizon*, despite the antitrust savings clause in the Telecommunications Act, the Court explained that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation." The Court further explained that "[o]ne factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm."

8  *See Keogh v. Chicago & NW Ry.*, 260 U.S. 152 (1922).

**4.    The Premise That S.772 Only Levels the Playing Field and Treats Railroads Like All Other Industries is False**

The notion that S.772 merely seeks to level the playing field and treat railroads like all other industries is belied by the very language of the bill.  In several instances, S.772 addresses specific antitrust exemptions that currently apply beyond just railroads, but eliminates them only with respect to railroads.

For example, STB-regulated common carriers other than railroads remain immune to private injunctions, 15 U.S.C. §26; and, only STB-approved railroad transactions, but not transactions consummated pursuant to the authority of other named federal regulatory agencies, are made subject to section 7 of the Clayton Act. 15 U.S.C. §18.  Motor carrier agreements that are approved by the STB retain antitrust immunity. 49 U.S.C. §13703.

Beyond the obvious question of why these antitrust exemptions remain sound policy for other industries, is the continued reality of STB economic regulation to which railroads remain subject.  S.772 would not replace the STB's regulatory regime with application of the antitrust laws in the areas where limited immunities currently exist.  Rather, S.772 would superimpose antitrust remedied on top of STB regulation.  As described above, the STB has full authority to review proposed railroad mergers and similar transactions and gives full consideration to competitive issues.  Moreover, the STB retains jurisdiction over rail service, market entry, and a wide range of rate-related conduct, including the level and structure of rates where there is no effective competition.  As a result, rail customers continue to enjoy protection against unreasonably-high rates.  In the limited circumstances in which a railroad's service is not subject to competition from other railroads or other modes of transportation, rail customers are protected by regulatory constraints on their rates.  Moreover, the elimination of the antitrust immunities that are proposed will not provide rail customers with any protection

from high rates, because high prices alone do not constitute an antitrust violation.  So long as the regime of economic regulation remains in effect, S.772 cannot be justified as simply treating railroads like all other industries.

In sum, S. 772 is flawed on several counts.  It fails to recognize the public benefits from the limited antitrust exemptions that allow the railroad industry to undertake certain activities subject to expert oversight using a public-interest standard rather than solely the antitrust laws.  It also fails to recognize that railroads are subject to antitrust scrutiny where there is no regulatory oversight. Consequently, eliminating the limited antitrust exemptions that apply to the railroad industry would not fill any void in the law.  More likely, it would discourage activities that are in the public interest and subject railroads to dual, and potentially inconsistent, standards in areas that are being addressed as effectively, if not more effectively, through regulatory oversight.  The AAR urges Congress not to embrace such an ill-advised result.

## G. PAUL MOATES

35 Oxford Street
Chevy Chase, MD 20815

202.736.8175 (office)
301.664.9672 (home)
202.736.8711 (fax)
pmoates@sidley.com

*University of Chicago* (J.D., 1975)
*Amherst College* (B.A., 1969, cum laude)

**G. PAUL MOATES** is a Partner in the Washington, D.C. office of Sidley Austin LLP. He is the head of the firm's transportation practice, a member of its Executive Committee, and world-wide co-chair of the firm's Accounting and Finance Committee. Mr. Moates' practice includes regular representation of several of the largest railroads and railroad holding companies in the United States, as well as of the railroad industry's national trade association. He has tried contract and antitrust cases in the federal courts, argued appeals of decisions of federal regulatory agencies in several of the United States Court of Appeals, represented various railroad clients in rate cases and commercial disputes, and has served as lead litigation counsel in a number of the largest railroad merger and intermodal consolidation cases to come before the Interstate Commerce Commission (now the Surface Transportation Board of the Department of Transportation) over the course of the past 25 years.

Mr. Moates played a prominent role in connection with the Surface Transportation Board's decision in early 2000 to declare a moratorium on major railroad consolidations, as well as in the subsequent development of new rules for adjudicating future major rail merger applications. In recent years he served as special counsel to Norfolk Southern and to CSX in connection with a variety of issues related to those railroads' joint acquisition of Conrail, including ongoing efforts to rationalize and restructure the rail system in the Northeast and Midwest. Mr. Moates also advises clients, including the Association of American Railroads, on legislative matters affecting the rail industry. Mr. Moates is also the freight railroad industry's representative on the National Arbitration Panel which hears disputes between freight railroads and Amtrak.

Clients represented by Mr. Moates have included Norfolk Southern Corporation (and its subsidiary, Norfolk Southern Railway Company), CSX Corporation (and its subsidiary, CSX Transportation, Inc.), Burlington Northern Santa Fe Corporation (and its subsidiary, Burlington Northern Santa Fe Railway Company), CP Rail (and

its subsidiaries Soo Line Railroad Company and Delaware & Hudson Railway Company), The New York, Susquehanna and Western Railway, and the Association of American Railroads.

From 1971 to 1973 he served in the United States Army and was assigned to the White House Communications Agency in Washington, D.C. Mr. Moates, a member of the Association for Transportation Law, Logistics and Policy and of the Public Utility Section of the American Bar Association, has written transportation-related articles in journals of several professional organizations and has been a speaker at a number of conferences and symposia relating to developments in the transportation industry.

Mr. Moates is married to Constance A. Sadler and resides in Chevy Chase, Maryland.

STATEMENT OF G. PAUL MOATES

ON BEHALF OF

THE ASSOCIATION OF AMERICAN RAILROADS



BEFORE THE U.S. HOUSE OF REPRESENTATIVES

COMMITTEE ON THE JUDICIARY

TASK FORCE ON ANTITRUST AND COMPETITION POLICY

HEARING ON H.R. 1650,
THE RAILROAD ANTITRUST ENFORCEMENT ACT OF 2007

FEBRUARY 25, 2008

Association of American Railroads
50 F Street NW
Washington, DC 20001
202-639-2100

The Association of American Railroads submits this testimony to express its opposition to H.R. 1650, the "Railroad Antitrust Enforcement Act of 2007."

In short, this legislation is a solution looking for a problem. It is premised on the incorrect assumption that a gap exists between the scope of economic regulation and the antitrust laws where rail competition and market conduct are subject to neither antitrust scrutiny nor government oversight. In fact, there is no such gap. All aspects of railroad conduct that are exempt from the antitrust laws are subject to the regulatory jurisdiction of the Surface Transportation Board (STB). Rather than filling any void in the law, this legislation would only provide a dual remedy to shippers and interfere with STB's implementation of national transportation policy.

H.R. 1650 would effect a number of changes to current law:

- It would remove the prohibition against private injunctions against railroad common carriers subject to the STB's jurisdiction, while retaining the prohibition with respect to other common carriers (amending 15 U.S.C. §26).

- It subjects certain STB-approved railroad transactions to section 7 of the Clayton Act relating to corporate acquisitions, while leaving intact an exemption from the reach of section 7 for several other industries (amending 15 U.S.C. §18).

- In certain types of antitrust actions against railroads, it curtails the judicial doctrine of primary jurisdiction, under which courts typically defer to the expertise of the regulatory agency, in this case the STB, questions within the agency's expertise.

- While retaining STB's jurisdiction over rail mergers, consolidations, acquisitions and rate agreements, it eliminates the STB's existing authority to enforce certain provisions of the antitrust laws with respect to STB-approved agreements in those areas, conferring that authority on the Federal Trade Commission (FTC) (or DOJ) (amending 15 U.S.C. §21(a)).

- It confers the FTC with authority over railroads, but not other types of common carriers (amending 15 U.S.C. §45(a)(2)).

- It eliminates the filed rate doctrine with respect to railroads only.

- It eliminates the current exemption from the antitrust laws that applies to certain STB-approved agreements under 49 U.S.C. §10706 and §11322, as well as STB-approved transactions under 49 U.S.C. §11321.

- Finally, by virtue of its effective date provision, the bill would subject to antitrust scrutiny railroad agreements approved by the STB (or its predecessor, the Interstate Commerce Commission (ICC)) before the bill was enacted that remain in effect more than 180 days afterwards.

In sum, while leaving intact the STB's regulatory regime, H.R. 1650 eliminates antitrust exemptions and carve-outs that apply to railroads, but retains those same exemptions to the extent they apply to other parties.

Long-standing statutory schemes should be altered only if there is an identified problem calling for remedial legislation, and only if the proposed legislation would be effective in remedying the perceived problem. Neither condition exists with respect to H.R. 1650. To the contrary, the legislation is built on several faulty premises. Railroads generally <u>are</u> subject to the antitrust laws and <u>do not</u> enjoy broad antitrust immunities; the existing immunities are limited and apply to conduct over which there remains close regulatory oversight. Moreover, while the bill's proponents argue otherwise, H.R. 1650 is unlikely to provide avenues of relief to shippers that are foreclosed today. Finally, H.R. 1650 does not simply "level the playing field" — it is built on top of, not as a replacement to, regulation by the STB. In short, the case for H.R. 1650 does not hold up under examination.

## 1.    Background

Certainly, the antitrust immunities that apply to railroads were not created in a vacuum. In the years since passage of the Sherman Act, Congress has enacted a host of antitrust exemptions applying to a wide array of industries and conduct, typically in order to promote a public policy that might not be realized under full exposure to the antitrust laws. The exemptions that apply to railroads came about as a complement to the comprehensive regulatory regime that governs the railroad industry. And, as that regime has evolved over time, so too has the role of the antitrust laws in the railroad industry.

In 1887, before the first antitrust laws were enacted, Congress undertook comprehensively to regulate the economic, operational, and safety aspects of the railroad industry. This policy first was effected with enactment of the Interstate Commerce Act of 1887, c.104, 24 Stat. 379 (1887), under which the ICC, an independent federal agency, was given broad authority to regulate practically every aspect of railroad operations. The railroads were the first U.S. industry subject to such a comprehensive scheme of regulation. This regulatory scheme developed against the backdrop of a common law common carrier obligation, which required a common carrier to carry for all persons who applied, at reasonable charges. *See I.C.C. v. Baltimore & Ohio R.R.*, 145 U.S. 263 (1892). Today, that common carrier obligation is carried forward in the statutory requirement in the Interstate Commerce Act, as it has been amended, that railroads provide transportation or service on reasonable request. 49 U.S.C. §11101(a).

With the passage of the Interstate Commerce Act, the railroads became the first U.S. industry subject to regulatory oversight by an administrative agency. Over time, rigid and arcane regulation came to control nearly every aspect of railroad operations. By the 1970s, the cumulative effect of decades of stifling government control, combined with strong competition from other modes and changing shipping patterns, crippled the rail industry. Freight rates and accident levels were rising, rail infrastructure was deteriorating, much of the nation's rail mileage was in bankruptcy, and the industry's rate of return on investment averaged only 2.0 percent.

Because the status quo was untenable, Congress passed the Staggers Rail Act of 1980. Pub. L. 96-448, 94 Stat. 1895. In the Staggers Act, Congress recognized that railroads faced intense competition for most freight traffic, but prevailing regulation prevented railroads from

earning adequate revenues and competing effectively. Accordingly, the Staggers Act allowed the railroads to establish their own routes, tailor rates and services to market conditions, and differentiate rates on the basis of demand. And, of course, rate regulation remains where effective competition is found to be absent.

The Staggers Act has been a tremendous success. Average inflation-adjusted rail rates have declined 55 percent since 1980. Rail safety has been improved as a direct result of approximately $420 billion being invested in infrastructure and equipment since 1980. And rail industry financial performance has also been improved, although it continues to lag behind Fortune 500 average return on equity.

The Staggers Act did not completely deregulate railroads. In addition to retaining authority over a variety of non-rate areas, the ICC (now the STB) retained the authority to set maximum rates or take other actions if a railroad was found to have market dominance or to have engaged in anti-competitive behavior.[1] The Staggers Act established a safety net, which still exists, to address the needs of rail customers for whose traffic there is no effective competition. In situations in which railroads have market dominance — *i.e.*, situations in which there is an absence of effective competition from other rail carriers or modes of transportation for the traffic at issue — railroads must establish rates that are reasonable. The STB will award reparations and prescribe appropriate rates if a railroad's rates are determined to be unreasonably high.

The end result is that today, railroads are subject to the antitrust laws as well as extensive economic regulation by the STB. The STB has jurisdiction over rail service, market

---

[1] The ICC Termination Act of 1995 eliminated certain regulatory provisions, abolished the ICC, and created, in its stead, the STB to maintain continued regulatory oversight of railroad rates and operations.

entry, and a wide range of rate-related conduct, including the level and structure of rates where there is no effective competition.

**2. Railroads Are Subject to Both the Antitrust Laws and Regulatory Oversight: The Antitrust Exemptions That Still Apply Are Limited in Scope**

There is a perception that railroads enjoy broad exemptions from the antitrust laws and that those exemptions result in an anticompetitive market that harms consumers. In fact, railroads <u>are</u> subject to federal antitrust laws. The antitrust laws prohibit anticompetitive agreements to set rates, allocate markets, or otherwise unreasonably restrain trade in the railroad industry. None of the extant antitrust exemptions that apply to railroads would immunize such conduct if it were to take place. *E.g., In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3d Cir. 1993).

A few statutory antitrust exemptions apply to railroads, but they are very limited and narrowly applied. Moreover, railroad activities that are exempt from the antitrust laws are subject to regulation by the STB. When Congress has deregulated railroad activities, it has removed the corresponding antitrust exemptions. Railroads continue to be subject to the STB's regulatory jurisdiction with respect to certain rates and services, entry and exit, and mergers and other restructurings. The statutory antitrust exemptions that remain exist to avoid dual and potentially conflicting regulation by the courts and the STB. Moreover, they allow railroads to work together in a limited way to efficiently address some of the issues raised by the industry's network characteristics.

Section 10706 of Title 49, a target of H.R. 1650, provides that certain rate agreements that have been reviewed and approved by the STB are exempted from the antitrust laws. However, the scope of the exemption is severely limited (*e.g.*, the exemption does not apply to collective discussions of or agreements upon single-line rates, nor does it apply to any

joint-line rate discussions between railroads unless they can practicably participate in the movement underlying the rate). More importantly, railroads' pricing for their transportation services is not covered by this exemption as a practical matter because the so-called rate bureaus that once addressed such rates no longer exist. The exemption remains important, however, to foster coordination on matters that enhance network efficiency (and are not controversial), such as rules governing administration of compensation for rail car use.

A history of this provision can be illustrative to show that changes to the antitrust laws should be considered only in the context of the regulatory environment. As noted above, this provision exempts railroads from the antitrust laws with respect to making and carrying out certain agreements which have been approved by the STB. Agreements which are to be submitted for STB approval under this provision include agreements between at least two rail carriers which relate to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them .

In its original form, 49 U.S.C. §10706 goes back to 1948, a period of far more active and comprehensive regulation of the railroad industry than exists today.[2] Initially, when enacted, this provision granted antitrust immunity for the railroads to meet together in rate bureaus and collectively set rates with antitrust immunity. However, when Congress passed the Staggers Act and provided a level of regulatory relief for the railroads, it also severely limited the scope of the statutory exemption under this provision. As noted above, the exemption does not apply to collective discussions or agreements upon single-line rates. Nor

---

[2] This provision was originally enacted as section 5b of the Interstate Commerce Act by the Reed-Bulwinkle Act of 1948, 62 Stat. 472.

does it apply to any joint-line rate discussions between railroads unless they can "practicably participate" in the movement underlying the rate. 49 U.S.C. §10706(a)(3)(A)(i) &(ii).

There is currently in effect an industry agreement approved under §10706 that permits joint consideration and establishment of rates of compensation for both railroad and shipper furnished freight cars and other transportation equipment, and rules and regulations pertaining thereto. This agreement, which is administered by the AAR, was first approved by the ICC in 1950 (Section 5a Application, *Association of American Railroads, per Diem, Mileage, Demurrage and Storage — Agreement*, 277 I.C.C. 413 (1950).[3] Any common carrier by railroad subject to the jurisdiction of the Interstate Commerce Act may become a party to the agreement.

Today, this Agreement provides a framework for the rail industry only to establish rules and regulations that pertain to the charges, known as car hire, that railroads pay each other when using the equipment of other railroads.[4] These rules, known as the AAR Code of Car Hire, establish procedures for the administration and accounting of car hire payments. Virtually all railroads, including many non-AAR members, subscribe to the Code. The Agreement sets forth the procedures to be utilized for consideration and establishment of the rules that make up the Code.

Again, it is important to note that under the Code, the railroads do not collectively establish the rates that users of freight cars pay to the car owners. These rates are established through bilateral negotiations between the owners and users of the equipment, or through binding arbitration if agreement cannot be reached, pursuant to the ICC's deprescription

---

[3] The Agreement initially covered demurrage and storage charges, rates paid by shippers for the detention of freight cars or for use of other transportation equipment or facilities. However, that authority was subsequently withdrawn by the ICC.

[4] This Agreement also is occasionally used to take up matters related to allowances provided when non-railroad cars are used.

orders. Ex Parte No. 334 (Sub-No. 8) *Joint Petition for Rulemaking on Railroad Car Hire Compensation*, 9 I.C.C.2d 80 (1992); 9 I.C.C.2d 582 (1993); 9 I.C.C.2d 1090 (1993). The car hire rules are promulgated, amended, and enforced through the actions of committees, designated by the approved Agreement, which are composed of representatives of AAR member railroads and small railroads (which generally are not AAR members). Committee meetings where substantive discussions occur are open to all interested parties, typically are attended by representatives of several non-railroad car owners and lessors, and serve as a forum for all parties to express their views and concerns on matters related to the rules.

This process works effectively to assure that there is a uniform set of rules — not rates — pertaining to the payment of car hire. Given the large number of railroads and car owners, the rules, and the process under which they are promulgated, administered, and enforced, provide an orderly and accepted system for (1) apportioning financial responsibility for making payment in various situations; (2) governing collection; (3) adjustment of accounts; and (4) handling of claims. While not all parties always favor all proposed rule changes, the process is well-accepted, not controversial, and is seen as beneficial by all participants.

AAR believes the conduct undertaken today pursuant to the industry §10706 agreement would pass muster under a rule of reason analysis. Nonetheless, the statutory immunity is beneficial because it enables railroads collectively to address matters that arguably relate to rates without fear that they will be subject to antitrust lawsuits aimed at disrupting that conduct. STB oversight pursuant to the statute, 49 U.S.C. §10706(a)(3)(C), as well as the fact that all meetings are sound recorded or transcribed and are available to the STB, assures that the conduct under §10706 remains within the confines of the Agreement and is consistent with transportation policy. Eliminating the exemption that immunizes the

making and implementing of car hire rules from antitrust challenge would discourage the railroads' efficiency-enhancing coordination activities without providing any conceivable relief with respect to any alleged deficiencies in the rail transportation market.

Similarly, the elimination of antitrust immunity for STB-approved pooling agreements would also discourage efficiency-enhancing coordination. The antitrust exemption provided by 49 U.S.C. §11321 permits railroads to pool equipment when undertaken in strict compliance with agreements approved by the STB (or, formerly, by the ICC) pursuant to prescribed statutory standards. 49 U.S.C. §11322. Examples include national pools of flat cars and multilevels (autoracks). These pooling arrangements are used to share assets in a manner that enhances the utilization of those assets, leading to greater efficiencies that could not be achieved in the absence of the pools. Such pools benefit both the railroads and the customers whose products are shipped in the pooled railcars, and the limited antitrust immunity permits railroads to undertake this efficiency-enhancing conduct without being subject to the threat of antitrust claims. Moreover, the STB maintains jurisdiction over the pooling agreements and is free to modify or revoke its approval if a pool is used for anticompetitive purposes. Eliminating the antitrust immunity would serve no beneficial purpose.

3.    **The Purported Benefits of the System of Dual Regulation That H.R. 1650 Would Bring About Are Dubious and Illusory**

A.    Railroad Consolidations

In amending both section 7 of the Clayton Act and The Federal Trade Commission Act, H.R. 1650 does not so much eliminate an antitrust exemption as establish a system of dual regulation. Though the STB's authority over rail mergers is not eliminated by H.R. 1650, the bill would also make applicable the Clayton Act standards and permit antitrust

enforcement agencies to challenge rail mergers — even, it appears, those that were approved by the STB (or ICC) long ago. There is little reason to believe that this change in the law will provide the relief some shippers insist they need. In fact, we fail to understand how subjecting a major rail merger to the less stringent DOJ standard to only preserve competition gives shippers more protection than the STB standard of enhancing competition.

Under existing law, the STB closely regulates railroad consolidations and cannot approve them without considering any potential adverse effect on competition and ensuring that they are consistent with the public interest. Since Staggers, the STB and its predecessor, the ICC, have consistently used their statutory authority to impose conditions on railroad consolidations to ensure that no customer has lost two-railroad service due to a consolidation. The STB regulatory process for assessing mergers, consolidations, and pooling agreements provides for the development of a detailed record, with affected parties (including DOJ) having the opportunity to participate. Where rail customers are served by only one railroad today, it is not the result of consolidations permitted since 1980, it is because the market cannot support the presence of more than one carrier.

When the STB considers a proposed merger of two or more Class I railroads, it must consider, among other things, (1) the effect of the proposed transaction on the adequacy of transportation to the public; (2) the effect on the public interest, and (3) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region or in the national rail system. In that regard, the STB is guided by traditional Clayton Act Section 7 analysis. *See Santa Fe Southern Pac. - Control – Southern Pac. Transp. Co.,* 2 I.C.C. 2d 709, 727 (1986). In fact, since 1980, the ICC/STB has approved only one rail merger that the Justice Department opposed. In an order approving a transaction, the STB

may impose conditions on the applicants, including divestiture of tracks, the granting of trackage rights,[5] or access to other facilities.

The STB having exclusive jurisdiction over approval of consolidations is an outgrowth of Congress' decision to have rail consolidations considered in the context of the national transportation policy which, while most certainly including the interest of promoting competition, also includes other important considerations. The railroad consolidation provisions originated in the Transportation Act of 1920, 41 Stat. 456. Under that law, Congress sought to balance the policies embodied in the antitrust laws with those embodied in the national transportation policy. Given the context in which railroad consolidations are to be considered, Congress determined that the regulatory agency with substantive expertise and responsibility for implementing national transportation policy is in the best position to evaluate proposed consolidations in the railroad industry.

In recent years, with the competitive environment in which the railroads operate, the focus of the national transportation policy has reflected a greater reliance on competition and market forces. See 49 U.S.C. §10101(1) & (2). As a result, STB oversight of the railroad industry permits railroads far greater flexibility with respect to their rates and services than was the case in the past. This change has also been recognized by the STB with respect to its consolidation policy.

In 2001, the STB revised its regulations pertaining to railroad mergers to elevate the importance of preserving competition as a condition for approval of a transaction. *See generally* 49 C.F.R. Part 1180. The STB's stated policy is to ensure "balanced and sustainable competition in the railroad industry." 49 C.F.R. §1180.1(a). The regulations further state that the STB does not favor consolidations that reduce the transportation

---

[5] Trackage rights are the rights of one carrier to use the track of another carrier.

alternatives available to shippers unless there are substantial and demonstrable public benefits to the transaction that cannot otherwise be achieved. *Id.* The STB requires that major merger applications include provisions for enhanced competition. §1180.1(c). Moreover, the STB is prepared to use its authority to "preserve and/or enhance competition." *Id.* Applicants seeking approval of a transaction are required to explain how they would, at a minimum, preserve competition and market options and to propose remedies to mitigate and offset competitive harms. §1180.1(c)(2)(I). Thus, while the STB retains exclusive jurisdiction to approve rail mergers, the agency continues to take into account — indeed, now emphasizes — policies embodied in the antitrust laws along with other public interest factors.

The STB has authority, which it has frequently exercised in the past and maintains today, to impose conditions on merging railroads and to exercise significant oversight when it approved rail consolidations. See 49 U.S.C. §11324(c). The Board may impose conditions governing the transaction, including the divestiture of parallel tracks or requiring the granting of trackage rights and access to other facilities. At least since 1980, the Board has consistently imposed merger conditions to preserve two-railroad service where it existed. *E.g., Union Pac. Corp., Union Pac. R.R. Co., and Missouri Pac. R.R. Co. Control and Merger Southern Pac. Rail Corp., Southern Pac. Transp. Co., St. Louis Southwestern Ry. Co., SPCSL Corp., and Denver and Rio Grande Western R.R. Co.* [General Oversight], STB Finance Docket No. 32760 (Sub-No. 21), Decision 13 (1998).

In addition, the Board has exercised its authority by maintaining oversight of transactions for a period of time after approval. For example, a five-year oversight period was made a condition of approval of the acquisition of Conrail by CSX and Norfolk Southern. *See CSX Corp. And CSX Transp., Inc., Norfolk Southern Corp. and Norfolk Southern Ry. Co.*

*Control and Operating Leases/Agreements Conrail, Inc., and Consolidated Rail Corp.*,
Decision No. 89, Finance Docket No. 33388 (3 S.T.B. 196) (1998). *aff'd., Erie-Niagara Rail
Steering Comm. v. Surface Transp. Bd.*, 247 F.3d 437 (2nd Cir. 2001).

Because of STB's imposition of conditions on mergers and its emphasis on preserving
competition, there is probably more effective price competition today than there was in the
"idyllic" days of long ago. The greater number of Class I railroads that existed then were
subject to heavy-handed ICC rate regulation which made it difficult for railroads to respond to
changed market conditions and tended to leave rates at a level designed to protect the most
inefficient carriers. In addition, as described above, rates were often made by immunized rate
bureaus, legalized price-fixing cartels that no longer exist today. The assigning of jurisdiction
over railroad consolidations to the STB is an outgrowth of the longstanding regime of
economic regulation. As a result, the agency that is charged with carrying out the national
transportation policy, and which, along with its predecessor, possesses well over 100 years of
accumulated expertise, continues to have the final say over rail consolidations. It is not clear
what benefits introducing dual merger authority would bring, or that such dual authority, in
the few industries where it now applies, has resulted in a more competitive market than would
otherwise exist.

B.    Primary Jurisdiction and Injunctive Relief

Also of questionable benefit is the provision in H.R. 1650 that reverses judicial
precedent under which federal courts have referred matters to the STB involving its "primary
jurisdiction" in four types of antitrust challenges. Not technically an antitrust exemption, the
doctrine of primary jurisdiction is concerned with promoting proper relationships between
courts and administrative agencies charged with particular regulatory duties. Under long-

standing precedent, courts may defer to the regulatory agency on otherwise antitrust-related contentions. Primary jurisdiction, which by no means is limited to application in the railroad industry, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of a claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. *See U.S. v. Western Pac. R.R.*, 352 U.S. 59, 64 (1956). The purpose of this court-developed doctrine is to avoid potential conflicts between that oversight and the outcome of private litigation. *Id.*

Similarly, in order to avoid inconsistent results as between courts and the STB, private parties are prohibited from seeking to enjoin alleged antitrust violations by common carriers related to matters that are within the STB's jurisdiction. 15 U.S.C. §26; *See e.g., Central Transfer Co. v. Terminal R.R. Ass'n,* 288 U.S. 469, 475 (1933). H.R. 1650 would open the door to private injunctions against railroads, but not other common carriers. This immunity which is being eliminated does not prevent a private party from seeking antitrust damages against a railroad; nor does it prohibit the federal government from seeking injunctive relief. It simply prevents a civil court, which does not posses the expertise to consider how a decision involving a discrete dispute between a single railroad and single plaintiff might affect other railroads and shippers on other parts of the rail network. The STB, on the other hand, is charged with the responsibility for looking at the railroad network as a whole, taking into account the national, regional, and local aspects of the system. Thus, the STB is in a much better position to ensure that remedies to resolve individual disputes comport with national rail policy objectives.

Permitting private injunctions introduces dual regulation which will often be at cross purposes. So long as there remains a single regulatory body that is charged with oversight of

the rail industry, it is imperative that the antitrust laws and national transportation policy be

implemented in a harmonious fashion. In permitting courts to fashion equitable remedies in

individual civil actions (Section 2), and by discouraging courts from deferring to the STB's

expertise (Section 4), H.R. 1650 threatens to disrupt that harmony. While individual plaintiffs

might find satisfaction in pursuing injunctions, or in having courts ignore (to the plaintiff's

benefit) STB resolution of relevant issues, such outcomes could well have ripple effects to the

detriment of other shippers and the rail network as a whole.

It is fair to say that part of the motivation behind H.R. 1650 (and in particular

elimination of the primary jurisdiction doctrine and allowance of private injunctions) is

dissatisfaction on the part of some rail shippers with decisions of the STB on certain market

practices. One example is concern over the STB's refusal to require railroads to quote

"bottleneck" rates, a term that refers to rates that would apply to segments of a railroad's

network used to reach individual shippers or receivers that are served by only one railroad.

Even in the absence of any antitrust exemptions, it is dubious whether this, and other

unilateral railroad conduct, would be subject to antitrust relief. *See Verizon Comm. v. Trinko,*

540 U.S. 398 (2004).[6]

Similarly, repeal of the filed rate, or *Keogh,* doctrine,[7] which H.R. 1650 would

accomplish, is unlikely to offer any real benefits to rail shippers. The continued viability of

that doctrine as it related to railroads is dubious, as most rail rates are no longer subject to

filing requirements. AAR is unaware of the filed rate doctrine being used in recent times to

---

6 In *Verizon*, despite the antitrust savings clause in the Telecommunications Act, the Court explained that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation." The Court further explained that "[o]ne factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm."

7 *See Keogh v. Chicago & NW Ry.,* 260 U.S. 152 (1922).

absolve railroads of conduct that otherwise would have constituted an antitrust violation. Interestingly, H.R. 1650 would eliminate this "immunity" only with respect to railroads. It apparently would remain intact for other regulated industries, which, in recent times, have utilized it to defend antitrust actions. *E.g., Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 273 F.Supp.2d 573 (E.D. Pa. 2003)(rates filed with the Federal Energy Regulatory Commission) AAR would recommend that rather than repealing the Keogh doctrine in a piecemeal fashion, the Committee consider a comprehensive review of Keogh for all affected industries.

4.      **The Premise That H.R. 1650 Only Levels the Playing Field and Treats Railroads Like All Other Industries is False**

The notion that H.R. 1650 merely seeks to level the playing field and treat railroads like all other industries is belied by the very language of the bill. In several instances, H.R. 1650 addresses specific antitrust exemptions that currently apply beyond just railroads, but eliminates them only with respect to railroads.

For example, STB-regulated common carriers other than railroads remain immune to private injunctions, 15 U.S.C. §26; and, only STB-approved railroad transactions, but not transactions consummated pursuant to the authority of other named federal regulatory agencies, are made subject to section 7 of the Clayton Act. 15 U.S.C. §18. Motor carrier agreements that are approved by the STB retain antitrust immunity. 49 U.S.C. §13703.

Beyond the obvious question of why these antitrust exemptions remain sound policy for other industries, is the continued reality of STB economic regulation to which railroads remain subject. H.R. 1650 would not replace the STB's regulatory regime with application of the antitrust laws in the areas where limited immunities currently exist. Rather, H.R. 1650 would superimpose antitrust remedied on top of STB regulation. As described above, the STB has full authority to review proposed railroad mergers and similar transactions and gives

full consideration to competitive issues. Moreover, the STB retains jurisdiction over rail service, market entry, and a wide range of rate-related conduct, including the level and structure of rates where there is no effective competition. As a result, rail customers continue to enjoy protection against unreasonably-high rates. In the limited circumstances in which a railroad's service is not subject to competition from other railroads or other modes of transportation, rail customers are protected by regulatory constraints on their rates. Moreover, the elimination of the antitrust immunities that are proposed will not provide rail customers with any protection from high rates, because high prices alone do not constitute an antitrust violation. So long as the regime of economic regulation remains in effect, H.R. 1650 cannot be justified as simply treating railroads like all other industries.

In sum, H.R. 1650 is flawed on several counts. It fails to recognize the public benefits from the limited antitrust exemptions that allow the railroad industry to undertake certain activities subject to expert oversight using a public-interest standard rather than solely the antitrust laws. It also fails to recognize that railroads are subject to antitrust scrutiny where there is no regulatory oversight. Consequently, eliminating the limited antitrust exemptions that apply to the railroad industry would not fill any void in the law. More likely, it would discourage activities that are in the public interest and subject railroads to dual, and potentially inconsistent, standards in areas that are being addressed as effectively, if not more effectively, through regulatory oversight. The AAR urges Congress not to embrace such an ill-advised result.

**G. PAUL MOATES**
35 Oxford Street
Chevy Chase, MD 20815

202.736.8175 (office)
301.664.9672 (home)
202.736.8711 (fax)
pmoates@sidley.com

*University of Chicago* (J.D., 1975)
*Amherst College* (B.A., 1969, cum laude)

**G. PAUL MOATES** is a Partner in the Washington, D.C. office of Sidley Austin LLP. He is the head of the firm's transportation practice, a member of its Executive Committee, and world-wide co-chair of the firm's Accounting and Finance Committee. Mr. Moates' practice includes regular representation of several of the largest railroads and railroad holding companies in the United States, as well as of the railroad industry's national trade association. He has tried contract and antitrust cases in the federal courts, argued appeals of decisions of federal regulatory agencies in several of the United States Court of Appeals, represented various railroad clients in rate cases and commercial disputes, and has served as lead litigation counsel in a number of the largest railroad merger and intermodal consolidation cases to come before the Interstate Commerce Commission (now the Surface Transportation Board of the Department of Transportation) over the course of the past 25 years.

Mr. Moates played a prominent role in connection with the Surface Transportation Board's decision in early 2000 to declare a moratorium on major railroad consolidations, as well as in the subsequent development of new rules for adjudicating future major rail merger applications. In recent years he served as special counsel to Norfolk Southern and to CSX in connection with a variety of issues related to those railroads' joint acquisition of Conrail, including ongoing efforts to rationalize and restructure the rail system in the Northeast and Midwest. Mr. Moates also advises clients, including the Association of American Railroads, on legislative matters affecting the rail industry. Mr. Moates is also the freight railroad industry's representative on the National Arbitration Panel which hears disputes between freight railroads and Amtrak.

Clients represented by Mr. Moates have included Norfolk Southern Corporation (and its subsidiary, Norfolk Southern Railway Company), CSX Corporation (and its subsidiary, CSX Transportation, Inc.), Burlington Northern Santa Fe Corporation (and its subsidiary, Burlington Northern Santa Fe Railway Company), CP Rail (and its subsidiaries Soo Line Railroad Company and Delaware & Hudson Railway Company), The New York, Susquehanna and Western Railway, and the Association of American Railroads.

From 1971 to 1973 he served in the United States Army and was assigned to the White House Communications Agency in Washington, D.C. Mr. Moates, a member of the Association for Transportation Law, Logistics and Policy and of the Public Utility Section of the American Bar Association, has written transportation-related articles in journals of several professional organizations and has been a speaker at a number of conferences and symposia relating to developments in the transportation industry.

Mr. Moates is married to Constance A. Sadler and resides in Chevy Chase, Maryland.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION _____ This document relates to: ALL CASES | MDL Docket No. 1869 Misc. No. 07-489 (PLF) |

**(PROPOSED) ORDER GRANTING INDIRECT PURCHASER PLAINTIFFS'**
**UNOPPOSED MOTION FOR LEAVE TO FILE A SUPPLEMENT TO THEIR**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Upon the motion of Indirect Purchaser Plaintiffs Agway Liquidating Trust, Fayus

Enterprises, and Maroon Incorporated for leave to file a supplement to their Opposition to

Defendants' Motion to Dismiss, and for good cause shown, it is hereby ORDERED that the

motion is GRANTED in all respects.


Dated: _____                    _____
                                                 Hon. Paul L. Friedman
                                                 United States District Court Judge