# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869 |
| | Misc. No. 07-489 (PLF) |
| This document relates to: | Hon. Paul L. Friedman |
| ALL CASES | |

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ....................................................................................................... 5

I.    PLAINTIFFS' COMPLAINT IS DEFICIENT FOR THE SAME REASONS THE
DIRECT PURCHASERS' COMPLAINT IS DEFICIENT ..................................... 5

II.    PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED ........................................ 6

    A.    ICCTA Preemption Is A Question of Law Properly Decided On A Motion
To Dismiss ............................................................................................. 6

    B.    Extra-Contractual Claims Regarding Contract Traffic Are Preempted By
The ICCTA ............................................................................................ 7

        1.    The ICCTA preempts extra-contractual claims concerning both
exempt traffic and Section 10709 contract traffic ..................................... 7

        2.    Plaintiffs confuse STB regulatory authority with ICCTA
preemption ............................................................................................. 10

    C.    Plaintiffs' Argument That Their State Law Claims Do Not Constitute
"Regulation" Is Without Merit ................................................................. 13

        1.    Plaintiffs' state law claims seek to regulate railroad fuel surcharge
rates and practices .................................................................................. 13

        2.    Plaintiffs' purported "enforcement" of the STB's January 25, 2007
decision shows at once that Plaintiffs' claims are regulatory in
nature and in conflict with federal policy ................................................. 19

    D.    Plaintiffs' Legislative Intent Arguments Are Unpersuasive ............................. 21

        1.    The applicability of federal antitrust law has no bearing on the
ICCTA's preemption of state antitrust laws ............................................. 21

        2.    The evidentiary provision of Section 10706 has no effect on
preemption analysis ................................................................................ 22

        3.    Plaintiffs' appeal to legislative history is groundless .............................. 24

III.    PLAINTIFFS LACK ARTICLE III STANDING TO ASSERT THEIR CLAIMS ........ 26

IV.    PLAINTIFFS FAIL TO PLEAD FACTS THAT SHOW ANTITRUST
STANDING .......................................................................................................... 29

     A.     State Courts Apply Prudential Standing Limitations To Indirect Purchaser Claims .................................................................................................. 29

     B.     Plaintiffs Have Not Alleged Facts Sufficient To Show Standing ........................ 32

V.     PLAINTIFFS CONCEDE THAT A NUMBER OF THEIR CONSUMER PROTECTION AND UNJUST ENRICHMENT CLAIMS SHOULD BE DISMISSED ............................................................................................ 34

     A.     Plaintiffs Expressly Concede That Six Of Their Sixteen Consumer Protection Claims Should Be Dismissed ............................................ 34

     B.     By Having Failed To Respond In Their Opposition, Plaintiffs Also Concede That Their Unjust Enrichment Claims Under "Federal Common Law" And California Law Should Be Dismissed ............................... 35

VI.     PLAINTIFFS' ARGUMENTS IN DEFENSE OF THE CONSUMER PROTECTION CLAIMS THAT THEY HAVE NOT ALREADY WITHDRAWN ARE WITHOUT MERIT .................................................... 35

     A.     Plaintiffs Have Not Adequately Alleged Deceptive And Misleading Conduct Under Rule 9(b) .................................................................. 35

     B.     Five Of Plaintiffs' Remaining State Consumer Protection Claims Must Be Dismissed In The Absence Of Alleged Deceptive Conduct Within Those States .......................................................................................... 39

     C.     The New York Consumer Protection Claim Should Be Dismissed Because Plaintiffs Do Not Allege Consumer-Oriented Misrepresentations Directed Toward Them .................................................................................... 40

     D.     Plaintiffs Have Failed To State A Claim Under The Illinois Consumer Protection Law ............................................................................. 42

VII.     PLAINTIFFS' ARGUMENTS IN DEFENSE OF THEIR UNJUST ENRICHMENT CLAIMS ARE MERITLESS ............................................. 43

     A.     Plaintiffs' Unjust Enrichment Claims Should Be Dismissed Because They Are Predicated On Defective Antitrust And Consumer Protection Claims .......... 43

     B.     Plaintiffs' Unjust Enrichment Claims Should Be Dismissed Because Plaintiffs Never Sought to Rescind Their Indirect Purchases ............................. 44

CONCLUSION .................................................................................. 46

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am., Inc. v. Cuomo*,
  520 F.3d 218 (2d Cir. 2008)................................................................. 12

*Aktieselskabet AF 21 v. Fame Jeans, Inc.*,
  525 F.3d 8 (D.C. Cir. 2008) ................................................................. 5

*Allee v. Medrano*,
  416 U.S. 802 (1974) .......................................................................... 28

*Alliance Shippers, Inc. v. Southern Pacific Transportation Co.*,
  858 F.2d 567 (9th Cir. 1988)............................................................... 22

*Alpharma, Inc. v. Pennfield Oil Co.*,
  No. 8:03CV401, 2008 WL 2331019 (D. Neb. June 4, 2008) ................................ 36

*American Airlines, Inc. v. Wolens*,
  513 U.S. 219 (1995) .......................................................................... 13

*Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,*
  549 U.S. 519 (1983) ....................................................................29, 30, 31, 32

*Avery v. State Farm Mut. Auto. Ins. Co.*,
  835 N.E.2d 801 (Ill. 2005),
  *cert. denied*, 547 U.S. 1003 (2006) ...................................................... 39

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005) .......................................................................... 13

*Beaty v. Republic of Iraq*,
  480 F. Supp. 2d 60 (D.D.C. 2007)
  *appeal certified*, 2007 WL 1169333 (D.D.C. Apr. 19, 2007)................................ 31

*Bell Atlantic Corp. v. Twombly*,*
  127 S. Ct. 1955 (2007)................................................................... passim

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) .......................................................................... 28

*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996) .......................................................................... 13

*Boston & Maine Corp. v. Town of Ayer*,
330 F.3d 12 (1st Cir. 2003) ............................................................................. 22

*Burlington N. Santa Fe Corp. v. Anderson*,
959 F.Supp. 1288 (D. Mont. 1997) .................................................................. 11

*Bush v. Clark Constr. & Concrete Corp.*,
267 F. Supp. 2d 43 (D.D.C. 2003) ..................................................................... 6

*Carlon v. Thaman (In re NationsMart Corp. Sec. Litig.)*,
130 F.3d 309 (8th Cir. 1997)............................................................................ 36

*Churchill Village L.L.C. v. GE*,
169 F. Supp. 2d 1119 (N.D. Cal. 2000).......................................................... 40

*Cipollone v. Liggett Group, Inc.*,
505 U.S. 504 (1992) .................................................................................. 16, 19

*City of Auburn v. United States*,*
154 F.3d 1025 (9th Cir. 1998)......................................................................... 11

*City of Seattle v. Burlington N. R.R. Co.*,
41 P.3d 1169 (2002) ........................................................................................ 11

*Credit Suisse Securities (USA) LLC  v. Billing*,*
127 S. Ct. 2383 (2007)............................................................................... 20, 21

*Crouch v. Compton Corp.*,*
Nos. 02CV5437503, 03CV52514,
2004 WL 2414027 (N.C. Sup. Ct. Oct. 28, 2004)........................................ 32, 33

*CSX Transp., Inc. v. City of Plymouth*,
92 F. Supp. 2d 643 (E.D. Mich. 2000) ........................................................... 26

*CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*,*
944 F. Supp. 1573 (N.D. Ga. 1996).......................................................... passim

*CSX Transp., Inc. v. Williams*,
406 F.3d 667 (D.C. Cir. 2005) ........................................................................ 26

*D.R. Ward Constr. Co. v. Rohm and Haas Co.*,
470 F. Supp. 2d 485 (E.D. Pa. 2006)............................................................... 30

*Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*,*
239 F.R.D. 9 (D.D.C. 2006)............................................................................ 27

*District of Columbia v. 109,205.5 Square Feet of Land*,
   No. Civ. A 05-202,
   2005 WL 975745 (D.D.C. April 21, 2005)........................................................ 15

*Doe v. Blum*,
   729 F.2d 186 (2d Cir. 1984)........................................................................ 28

*Emerson v. Kansas City S. Ry. Co.*,
   503 F.3d 1126 (10th Cir. 2007).................................................................. 15

*FDA v. Brown & Williamson Tobacco Corp.*,*
   529 U.S. 120 (2000) ................................................................................... 23

*Florida East Coast Ry. Co. v. City of West Palm Beach*,
   266 F.3d 1324 (11th Cir. 2001).................................................................. 14

*Flynn v. Burlington N. & Santa Fe Corp.*,
   98 F. Supp. 2d 1186 (E.D. Wa. 2000) ................................................... 22, 25

*Franks Inv. Co. LLC v. Union Pac. R.R. Co.*,
   ___ F.3d ___, No. 08-30236,
   2008 WL 2612060 (5th Cir. July 3, 2008)................................................ 11

*Friberg v. Kan. City S. Ry.*,*
   267 F.3d 439 (5th Cir. 2001)........................................................................ 6

*FTC v. Mylan Labs., Inc.*,*
   62 F. Supp. 2d 25 (D.D.C. 1999) .............................................................. 44

*G. & T. Terminal Packaging Co. v. Consol. Rail Corp.*,*
   830 F.2d 1230 (3d Cir. 1987)................................................................... 7, 8

*Gaebler v. New Mexico Potash Corp.*,*
   676 N.E.2d 228 (Ill. App. Ct. 1st Dist. 1996) ......................................... 42

*Geier v. Am. Honda Motor Co.*,*
   529 U.S. 861 (2000) ................................................................................... 13

*Goshen v. Mut. Life Ins. Co.*,
   774 N.E.2d 1190 (N.Y. 2002) .................................................................... 39

*Green Mountain R.R. Corp. v. Vermont*,*
   404 F.3d 638 (2d Cir. 2005)................................................................. 11, 17

*Guckenberg v. Wisconsin Cent. Ltd.*,*
   178 F. Supp. 2d 954 (E.D. Wis. 2001) ................................................. 11, 16

*Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp.*,
   450 F. Supp. 2d 467 (D.N.J. 2006),
   *amended on reconsideration*,
   2007 WL 1147048 (D.N.J. April 17, 2007) .......................................................................... 15

*Hayes v. Chao*,
   541 F. Supp. 2d 387 (D.D.C. 2008).................................................................................... 35

*Illinois Brick Co. v. Illinois*,*
   431 U.S. 720 (1977) ........................................................................................29, 30, 32

*In re Appeal of Vermont Ry.*,
   769 A.2d 648 (Vt. 2000)...................................................................................................... 15

*In re Buspirone Patent Litig.*,
   185 F. Supp. 2d 363 (S.D.N.Y. 2002) ............................................................................... 27

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) ............................................................................ 44

*In re Ditropan XL Antitrust Litig.*,
   No. 06-01761, 2007 WL 1411617 (N.D. Cal. 2007)......................................................... 29

*In re Dynamic Random Access Memory Antitrust Litig. (DRAM)*,*
   516 F. Supp. 2d 1072 (N.D. Cal. 2007)........................................................................ 31, 32

*In re Grand Theft Auto Video Game Consumer Litig. (No. II)*,
   No. 06 MD 1739, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006)....................................... 27

*In re Graphics Processing Units Antitrust Litig.*,*
   527 F. Supp. 2d 1011 (N.D. Cal. 2007)....................................................................... 28, 30

*In re Intel Corp. Microprocessor Antitrust Litig.*,*
   496 F. Supp. 2d 404 (D. Del. 2007) ............................................................................ 30, 45

*In re K-Dur Antitrust Litig.*,
   338 F. Supp. 2d 517 (D.N.J. 2004).............................................................................. 43, 44

*In re K-Dur Antitrust Litig.*,
   MDL No. 1419, 2008 WL 2660780 (D.N.J. Feb. 28, 2008);
   2008 WL 2660778 (D.N.J. Feb. 25, 2008); 2008 WL 2660776 (Feb. 21, 2008).................... 44

*In re Korean Air Lines Co., Ltd., Antitrust Litig.*,*
   MDL No. 1891, 2008 WL 2894666 (C.D. Cal. July 23, 2008) ............................................ 18

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,*
   350 F. Supp. 2d 160 (D. Me. 2004)................................................................................... 45

*In re Relafen Antitrust Litig.*,
  225 F.R.D. 14 (D. Mass. 2004) ........................................................... 44

*In re Rezulin Products Liability Litig.*,
  392 F. Supp. 2d 597 (S.D.N.Y. 2005) ................................................. 42

*In re Static Random Memory (SRAM) Antitrust Litig.*,*
  MDL-1819, 2008 WL 2610549 (N.D. Cal. 2008) ................................. 41

*In re Static Random Memory (SRAM) Antitrust Litig.*,*
  No. M.07-CV-01819, MDL-1819,
  2008 WL 426522 (N.D. Cal. Feb. 14, 2008) ................................. 40, 41

*In re Terazosin Hydrochloride Antitrust Litig.*,*
  160 F. Supp. 2d 1365 (S.D. Fla. 2001) ............................................... 29

*In re Vitamins Antitrust Litig.*,*
  MDL No. 99-197, 2001 WL 849928 (D.D.C. April 11, 2001) ............... 44

*Int'l Bhd. of Teamsters v. ICC*,
  921 F.2d 904 (9th Cir. 1990) ............................................................... 7

*Interested Underwriters at Lloyd's of London v. Church Loans & Invs. Trust*,
  432 F. Supp. 2d 330 (S.D.N.Y. 2006) ................................................. 36

*Jones v. Union Pac. R.R.*,
  94 Cal. Rptr. 2d 661 (Cal. App. 2000) ............................................... 15

*Laughlin v. Evanston Hosp.*,
  550 N.E.2d 986 (Ill. 1990) ................................................................. 42

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) .......................................................................... 34

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) ............................................................. 36

*Lorix v. Crompton Corp.*,
  736 N.W.2d 619 (Minn. 2007) ........................................................... 31

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .......................................................................... 27

*Manganaro Corp. v. Hitt Contracting, Inc.*,
  193 F. Supp. 2d 88 (D.D.C. 2002) ..................................................... 31

*Meridian Project Sys. v. Hardin Constr. Co.*,
  404 F. Supp. 2d 1214 (E.D. Cal. 2005) .............................................. 40

*Minebea Co. v. Papst*,
   444 F. Supp. 2d 68 (D.D.C. 2006) ............................................................ 44

*Moms Against Mercury v. FDA*,
   483 F.3d 824 (D.C. Cir. 2007) ................................................................ 26

*Morales v. Trans World Airlines, Inc.*,*
   504 U.S. 374 (1992) .......................................................... 11, 13, 17, 18

*Native Village of Ehlutna v. Alaska R.R. Corp.*,
   87 P.3d 41 (Alaska 2004) ........................................................................ 15

*New York Susquehanna & W. Ry. Corp. v. Jackson*,
   500 F.3d 238 (3d Cir. 2007) .................................................................... 15

*Novell, Inc. v. Microsoft Corp.*,
   505 F.3d 302 (4th Cir. 2007),
   *cert. denied*, 128 S. Ct. 1659 (2008) .................................................... 30

*O'Shea v. Littleton*,*
   414 U.S. 488 (1974) .......................................................................... 28, 34

*OSB Antitrust Litig.*,
   No. 060826 (E.D. Pa. Sept. 25, 2006) .................................................... 28

*Pacific Great Lakes Corp. v. Bessemer & Lake Erie R.R.*,
   720 N.E.2d 551 (8th Dist. Cuyahoga County 1998) ............................... 22

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*,*
   418 F.3d 535 (5th Cir. 2005) ..................................................................... 9

*PCS Phosphate Co. v. Norfolk S. Corp.*,*
   520 F. Supp. 2d 705 (E.D. N.C. 2007) .............................................. 15, 16

*Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*,*
   297 F. Supp. 2d 326 (D. Me. 2003) ........................................... 9, 11, 15

*Port City Props. v. Union Pac. R.R. Co.*,*
   518 F.3d 1186 (10th Cir. 2008) ................................................................. 9

*Railroad Ventures, Inc. v. STB*,
   299 F.3d 523 (6th Cir. 2002) ............................................................ 11, 26

*Riegel v. Medtronic, Inc.*,*
   128 S. Ct. 999 (2008) ...................................................................... 13, 14, 19

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .................................................................... 36

*Rowe v. New Hampshire Motor Transp. Ass'n*,*
   128 S. Ct. 989 (2008)................................................................ 12, 13

*Rushing v. Kansas City S. Ry. Co.*,
   194 F. Supp. 2d 493 (S.D. Miss. 2001) ..................................11, 15, 17

*San Luis Central R.R. Co. v. Springfield Terminal R.R.*,*
   369 F. Supp. 2d 172 (D. Mass. 2005)...................................6, 14, 15

*Schneidewind v. ANR Pipeline Co.*,
   485 U.S. 293 (1988) ............................................................... 12

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983) ................................................................. 17

*Soo Line R.R. Co. v. City of Minneapolis*,
   38 F. Supp. 2d 1096 (D. Minn. 1998)...................................... 11

*South Dakota v. Burlington N. & Santa Fe Ry. Co.*,*
   280 F. Supp. 2d 919 (S.D. 2003)............................................ 16

*Southard v. Visa U.S.A., Inc.*,
   734 N.W.2d 192 (Iowa 2007) ................................................. 32, 33

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
   476 U.S. 409 (1986) ............................................................... 23

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ................................................................. 27

*Temple v. Circuit City Stores, Inc.*,*
   No. 06-CV-5303, 2007 U.S. Dist. LEXIS 70747 (E.D.N.Y. Sept. 25, 2007) ........................ 29

*Texas & P. Ry. Co. v. Abilene Cotton Oil Co.*,
   204 U.S. 426 (1907) ............................................................... 18

*Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd.*,
   474 U.S. 409 (1986) ............................................................... 12

*Tyrell v. Norfolk Southern Ry.*,
   248 F.3d 517 (6th Cir. 2001)................................................... 22

*United States v. All Assets Held at Bank Julius Baer & Co.*,
   No. 04-0798, 2008 WL 2700304 (D.D.C. July 9, 2008) ........................ 5

*United States v. Estate of Romani*,
   523 U.S. 517 (1998) ............................................................... 24

*United States v. Fausto*,
   484 U.S. 439 (1988) ........................................................................ 23

*United States v. Locke*,*
   529 U.S. 89 (2000) ................................................................... 13, 26

*Vess v. Ciba-Geigy Corp. USA*,*
   317 F.3d 1097 (9th Cir. 2003) ................................................ 36, 37, 38

*Watters v. Wachovia Bank, N.A.*,
   127 S. Ct. 1559 (2007) ........................................................................ 6

*Winder v. District of Columbia*,
   No. 03-2623, 2008 U.S. Dist. LEXIS 41093 (D.D.C. May 20, 2008) ................... 41

*Wisconsin Central Ltd. v. City of Marshfield*,
   160 F. Supp. 2d 1009 (W.D. Wis. 2000) ........................................... 11

*Witherspoon v. Philip Morris, Inc.*,
   964 F. Supp. 455 (D.D.C. 1997) ..................................................... 37

**Other Proceedings**

*Boston and Maine Corp. and Town of Ayer, MA—Joint Pet. For Dec. Order*,
   STB Fin. Dkt. No. 33971,
   2001 WL 458685 (April 30, 2001) ................................................... 17

*Cities of Auburn and Kent, WA—Pet. for Dec. Order—Burlington N. R.R. Co.—Stampede Pass Line*,
   STB Fin. Dkt. No. 33200, 1997 WL 362017 (July 1, 1997) ........................ 11

*Consolidated Rail Corp.—Pet. for Dec. Order—Suspension of Service*,
   Ex Parte No. 346 (Sub-No. 14B),
   1989 WL 238765 (June 13, 1989) ...................................................... 7

*CSX Transp., Inc.—Pet. for Dec. Order*,
   STB Fin. Dkt. No. 34662,
   2005 WL 1024490 (May 3, 2005) .................................................... 22

*Friends of the Aquifer—Pet. for Dec. Order*,
   STB Fin. Dkt. No. 33966,
   2001 WL 928949 (Aug. 10, 2001) ................................................... 11

*Maumee & W. R.R. Corp. and RMW Ventures, LLC—Pet. for Dec. Order*,
   STB Dkt. No. 34354,
   2004 WL 395835 (March 2, 2004) .................................................. 15

*North San Diego County Transit Dev. Corp.—Pet. for Dec. Order*,
   STB Fin. Dkt. No. 34111, 2002 WL 1924265 (Aug. 19, 2002) ............................................. 11

*Rail Fuel Surcharge*,
   STB Ex Parte No. 661,
   2007 WL 201205 (Jan. 25, 2007).............................................................................2, 20, 21

**Legislative Materials**

H.R. Conf. Rep. No. 104-422 (1995)..................................................................................... 24, 25

H.R. Conf. Rep. No. 96-1430 (1980)............................................................................................ 25

H.R. Rep. No. 104-311 (1995) .............................................................................................. 20, 25

S.Rep. No. 104-176 (1995) .......................................................................................................... 20

**Federal Statutes**

49 U.S.C. § 10501 ............................................................................................................... passim

49 U.S.C. § 10702 .......................................................................................................................... 8

49 U.S.C. § 10704 .......................................................................................................................... 8

49 U.S.C. § 10706 .................................................................................................................... 22, 23

49 U.S.C. § 10709 ................................................................................................................... 1, 8, 9

Reed Bulwinkle Act,
   Pub. L. No. 8-662, 62 Stat. 472 ............................................................................................. 23

**State Statutes**

Cal. Bus. & Prof. Code § 17200............................................................................................... 40

N.Y. Gen.Bus.Law § 349 ....................................................................................................... 36, 42

**Rules**

Fed. R. Civ. P. 12 ...................................................................................................................... 6, 46

Fed. R. Civ. P. 8 ............................................................................................................................. 34

Fed. R. Civ. P. 9 .................................................................................................................... passim

**Treatises**

1 HERBERT B. NEWBERG & ALBA CONTE,
  NEWBERG ON CLASS ACTIONS § 1:2 (4th ed. 2002)................................................................ 28

ANTITRUST SECTION OF THE AMERICAN BAR ASS'N,
  INDIRECT PURCHASER LITIGATION HANDBOOK 56-57 (2007)........................................... 43, 44

Carter H. Strickland, Jr., *Revitalizing the Presumption*
  *Against Preemption To Prevent Regulatory Gaps:*
  *Railroad Deregulation and Waste Transfer Stations*,
  34 ECOLOGY L.Q. 1147 (2007) .......................................................................................... 26

RESTATEMENT (FIRST) OF RESTITUTION.................................................................................... 45

Defendants BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern

Railway Company, and Union Pacific Railroad Company (collectively, "Defendants") hereby

respectfully submit this Reply Memorandum in Support of their Joint Motion to Dismiss the

Indirect Purchaser Plaintiffs' Consolidated Amended Complaint ("Complaint" or "CAC") for

lack of subject matter jurisdiction and for failure to state a claim upon which relief can be

granted.

## INTRODUCTION

Plaintiffs' Opposition side-steps the point and the governing statute.  Congress has

declared that the jurisdiction of the STB over remedies with respect to rail transportation rates

and practices is "exclusive," and whatever remedies are provided under Title 49 with respect to

rail regulation "are exclusive and preempt" state law remedies.  49 U.S.C. § 10501(b).  A clearer

statement of preemption would be hard to craft.

Plaintiffs instead argue that preemption is somehow undone with respect to private

contract traffic because Congress also has stated that private contracts are not subject to the

regulatory requirements for public rates set forth in Title 49.  But simply because the STB does

not regulate rates in a private contract it does not follow that shippers can seek extra-contractual

state law remedies in an area that Congress has designated as exclusively the province of federal

law.  Congress determined that, in choosing to negotiate private contracts, shippers foreswore

certain remedies that would otherwise have been available to them under Title 49.  But that has

nothing to do with the preemption of state law.  Neither an exemption established pursuant to

STB action, nor a contract entered into pursuant to Section 10709 of the Act, opens the door to

state regulation.  That is the central tenet of Section 10501(b) of the ICCTA.

Plaintiffs' back-up argument—that their antitrust, consumer protection, and unjust enrichment claims are not a form of preempted rate "regulation"—is absurd, especially in light of the allegations that they make. Plaintiffs assert that Defendants' fuel surcharges were higher than they would have been in the absence of the conduct that Plaintiffs challenge, and they seek damages for what they allegedly overpaid. Such relief necessarily involves a determination of a "lawful" surcharge—the essence of regulation. Plaintiffs also candidly admit that they are asking this Court to "enforce" the STB's findings in its January 25, 2007 ruling on fuel surcharges through the mechanism of a multiplicity of state consumer protection laws. Plaintiffs seek to use state law to extend the STB's January 25, 2007 ruling to contract transportation services expressly *excluded* from the scope of the STB's ruling. That is regulation, and it conflicts directly with the STB's regulation.

Plaintiffs also now assert that the key aspect of the conspiracy they allege was the Association of American Railroads' adoption and publication of a railroad cost index that did not include a fuel component (the All-Inclusive Index Less Fuel, or "AII-LF"). In claiming that the decision to publish this index was unlawful, Plaintiffs ignore that the STB actually *encouraged* the use of such an index in its January 25, 2007 ruling. In that decision, the STB disapproved "double dipping," *i.e.*, combining a separate fuel surcharge with a rate escalation provision using a cost index that also includes a fuel component. The STB concluded that the "only circumstance" in which the use of a fuel surcharge along with a rate escalator is acceptable "is when the fuel component has been subtracted out of the index." *Rail Fuel Surcharge*, STB Ex Parte No. 661, 2007 WL 201205 at *7 (Jan. 25, 2007). That is precisely what the AII-LF does, using data that ultimately is incorporated into the quarterly "Rail Cost Adjustment Factor" that

the STB approves.  This, too, shows how Plaintiffs' claims are in direct conflict with the federal regulatory scheme.

The threat that Plaintiffs' state law claims pose to the uniformity of federal regulation is inherent in the reason Plaintiffs assert them.  Plaintiffs filed this action precisely to avoid federal restrictions on the claims they allege.  Plaintiffs are indirect purchasers, whose antitrust claims are barred under federal antitrust law.  Therefore, they allege violations of numerous state laws, each with their own requirements and policy goals.  Applying the disparate elements of many different state laws to a complaint by plaintiffs whose claims are precluded under federal antitrust law threatens the uniform federal oversight of interstate railroads that Congress intended.

Plaintiffs' claims fail on a number of other grounds as well.  For all the reasons discussed in Defendants' Reply in support of their motion to dismiss the direct purchasers' complaint, Plaintiffs' conclusory conspiracy allegations do not allege an unlawful agreement consistent with the pleading standard the Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  Plaintiffs also fail to show that they have standing to pursue the claims they allege.  They do not challenge the fundamental Constitutional principle that standing is a threshold requirement to assert a legal claim, which precludes them from asserting claims under the laws of states in which they do not reside and have not suffered injury.  In addition, Plaintiffs fail to explain the nature of their claimed injuries or present any reason to conclude that they have antitrust standing to assert their claims.  While Plaintiffs claim that the Defendants' use of the AII-LF was the core of their alleged conspiracy, Plaintiffs do not even allege that they paid for any rail transportation services that included a rate affected by the AII-LF.  All the CAC alleges is that Defendants charged a fuel surcharge to some customers, allegedly causing Plaintiffs

3

eventually to pay a higher price for some undefined service or commodity. Such vague allegations fall short of meeting the requirements to show that Plaintiffs are the proper parties to assert the claims they allege under the standing requirements of Article III, *Associated General Contractors* and applicable state laws.

Finally, many of Plaintiffs' claims fail under the state laws that Plaintiffs assert. After reviewing Defendants' motion to dismiss, Plaintiffs now agree that their consumer protection claims under the laws of Kansas, Maine, Oregon, Rhode Island, West Virginia, and the District of Columbia should be dismissed. Plaintiffs implicitly agree with the dismissal of other claims––for example, their purported unjust enrichment claims under California law and federal common law—by not even addressing the arguments Defendants made concerning those claims in their moving papers. Where Plaintiffs have chosen to respond to the Defendants' arguments, their responses are ineffective. For example, Plaintiffs claim in their Opposition that their state consumer protection claims are based on Defendants' alleged deception in mischaracterizing their fuel surcharges as a cost recovery mechanism rather than a "revenue enhancement" measure, and assert that defendants misled them into paying "more for freight services than they otherwise would have." But such allegations of deception and reliance are included within the scope of FED. R. CIV. P. 9(b), which requires particularity when "alleging fraud or mistake." The CAC falls far short of providing the detail required under this standard, omitting allegations about the time, place, and circumstances of the deception that Plaintiffs purport to allege.

The indirect purchasers' Complaint fails at numerous levels. Each and every claim in the CAC should therefore be dismissed.[1]

---

[1]    For the Court's convenience, attached hereto as Exhibits A-D are graphic depictions of the various reasons for dismissing the multiple state law claims that Plaintiffs have asserted.

## ARGUMENT

**I.    PLAINTIFFS' COMPLAINT IS DEFICIENT FOR THE SAME REASONS THE DIRECT PURCHASERS' COMPLAINT IS DEFICIENT**

By filing a complaint that copies the underlying allegations made by the direct purchasers and attaches different Counts, the indirect purchasers fail to state a claim for all of the reasons that the direct purchasers fail to state a claim under *Twombly*, and more.  Defendants incorporate the arguments made in their Reply to the Direct Purchasers' Opposition with respect not only to Plaintiffs' federal antitrust claim asserted in Count I of the CAC, but to all of their claims asserted in Counts II-IV, as well.  Contrary to Plaintiffs' contention, *Twombly* is not limited to antitrust cases; rather, the case interprets Rule 8 and, therefore, the Court's "newly-clarified standard" applies to all elements of all claims made in federal court subject to that rule.  *See, e.g.*, *United States v. All Assets Held at Bank Julius Baer & Co.*, No. 04-0798, 2008 WL 2700304, at *12 (D.D.C. July 9, 2008) (citing *Aktieselskabet AF 21 v. Fame Jeans, Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008)).

Plaintiffs' litigation tactics demonstrate why this is good policy.  As explained more fully below, in an apparent attempt to amend their Complaint through their Opposition Brief, Plaintiffs have narrowed their putative class to eliminate end consumers.  This appears to be their purpose in withdrawing claims brought under state laws that apply only to consumer fraud.  However, the CAC still contains allegations arguably suggesting that such consumers are a part of the class. The vagueness of the CAC forces Defendants to aim at a moving target.  This is precisely the type of guesswork and speculation that *Twombly* sought to avoid.

## II.    PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED

### A.    ICCTA Preemption Is A Question of Law Properly Decided On A Motion To Dismiss

As an initial matter, ICCTA preemption is not "ultimately a fact question for the jury" as Plaintiffs assert.  Opp. at 13.[2]  Quite the opposite is true: ICCTA preemption here presents a question of law.  *See, e.g.*, *Friberg v. Kan. City S. Ry.*, 267 F.3d 439, 442 (5th Cir. 2001); *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1580 (N.D. Ga. 1996).  As "preemption is a legal question for determination by courts," *Watters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1572 (2007), whether a state law cause of action is preempted by federal law is properly decided on a FED. R. CIV. P. 12(b)(6) motion to dismiss for failure to state a claim.  *E.g.*, *San Luis Central R.R. Co. v. Springfield Terminal R.R.*, 369 F. Supp. 2d 172, 173-74 (D. Mass. 2005);  *Bush v. Clark Constr. & Concrete Corp.*, 267 F. Supp. 2d 43, 46 (D.D.C. 2003).

Section 10501(b) of the ICCTA states that "the remedies provided [in the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."  Lest there be any doubt about the STB's exclusive jurisdiction, Section 10501(b) further makes clear that the exclusive remedies it is talking about are "the remedies provided [in the ICCTA] with respect to *rates*, classifications, rules . . ., *practices*, routes, services, and facilities of [rail] carriers" (emphasis added).  There is no factual issue in this case regarding whether the fuel surcharges are railroad "rates" or "practices."  There are only legal issues about whether ICCTA preemption applies to state antitrust, consumer protection, and unjust enrichment claims challenging the fuel surcharges for contract traffic.  The Court should decide those issues now, without subjecting Defendants to needless further proceedings.

---

[2]   None of the cases that Plaintiffs cite for that proposition involved ICCTA preemption.  *Id.* at 13-14.  All turned on the specific defenses and statutes involved in those cases.

**B.     Extra-Contractual Claims Regarding Contract Traffic Are Preempted By The ICCTA**

**1.     The ICCTA preempts extra-contractual claims concerning both exempt traffic and Section 10709 contract traffic**

Plaintiffs stress in their Opposition that their Complaint challenges what they call "***unregulated*** freight transportation services." Opp. at 2 (emphasis in original). They note that the Complaint defines "unregulated" services as "***services where the rates are set by private contracts or through other means "exempt" from rate regulation under federal law***." Opp. at 2-3 (emphasis in original). They disclaim any entitlement to relief from fuel surcharges imposed on traffic directly regulated by the STB. Opp. at 3.

In their Opposition, Plaintiffs have dropped their claims with respect to "exempt" traffic. Opp. at 14-17, 21, 32, 40-41 n.28, 45-46. They could hardly have done otherwise. The courts and the STB have made clear that traffic exempted from regulation under Section 10502 is still subject to the STB's exclusive jurisdiction under Section 10501(b).[3]

Plaintiffs argue, however, that there is a difference for ICCTA preemption purposes between traffic "exempted by the *STB*" from regulation under Section 10502, Opp. at 40 n. 28 (emphasis in original), and contract traffic exempted by Congress from regulation under Section 10709. Although they acknowledge that the court in the *G. & T.* case held that "'[r]ecognition of a common law remedy with respect to rates would have the effect of substituting a court's regulation for the Commission's decision in favor of deregulation'" they assert that "[t]his

_____

[3]   *See Int'l Bhd. of Teamsters v. ICC*, 921 F.2d 904, 910 (9th Cir. 1990) (exempt traffic is still "subject to" ICC regulation); *G. & T. Terminal Packaging Co. v. Consol. Rail Corp.*, 830 F.2d 1230, 1234-36 (3d Cir. 1987) (state law cannot be invoked to provide an alternative rate reasonableness or rate discrimination remedy during period of exemption); *Consolidated Rail Corp.—Pet. for Dec. Order—Suspension of Service*, Ex Parte No. 346 (Sub-No. 14B), 1989 WL 238765, at *3 (June 13, 1989) ("[A]n exemption under [then] 49 U.S.C. 10505 does not terminate ICC jurisdiction and create a vacuum which State regulation may fill.").

reasoning has no place here, where Plaintiffs' claims [do not] arise . . . from the STB's decision to deregulate a particular type of transportation" and that "[n]either *G&T* nor any other case referenced by Defendants suggests that the STB retains exclusive jurisdiction over contract traffic." *Id*. at 41 n.28 (citing 830 F.2d at 1235).

Plaintiffs could not be more wrong. As a logical matter, Congress' exemption of contract traffic from regulation under 49 U.S.C. § 10709—during the term of the contract—is parallel to the STB's exemption of traffic from regulation under Section 10502—during the term of the exemption. Shippers are always free *not* to enter into such contracts. Rail transportation contracts under Section 10709 are voluntary. They cover only what the parties want them to cover, and they extend for only so long as the parties mutually agree. By entering into a Section 10709 contract, a shipper voluntarily forgoes any regulatory challenge at the STB to the terms to which the shipper agreed. 49 U.S.C. § 10709(c)(1). At the same time, the shipper receives the benefit of assured contractual terms and the ability to enforce those terms in court. 49 U.S.C. § 10709(c)(2). However, a shipper does *not* receive the ability to bring extra-contractual state law regulatory claims against a railroad simply because it has a contract with the railroad.

If the STB's lack of regulatory authority over contract traffic meant that state statutory and common law claims were not preempted for such traffic, then states would be able to re-regulate all aspects of contract traffic. What would prevent a state from enacting and enforcing its own "reasonable rate" statute, echoing Section 10702, or its own rate prescription statute, echoing 10704, but applying them to private contract traffic? Permitting the enforcement of state antitrust, consumer protection, and unjust enrichment laws to private contract traffic is no different, and is most assuredly not what Congress intended.

In fact, Congress' intent was both express and specific.  As the United States Court of Appeals for the Fifth Circuit stated in *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 544 (5th Cir. 2005), ". . . the plain language of section 10501 supports our conclusion that Congress intended actions regarding 'rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services and facilities of such carriers' to be governed exclusively by the ICCTA."  Moreover, as the Fifth Circuit observed in its quotation of the House Report on the proposed ICCTA itself, "[c]onforming changes are made to reflect the direct and complete pre-emption of State economic regulation of railroads . . . Although States retain the police powers reserved by the Constitution, the Federal Scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive."  *Id.* at 544-45.  *See also Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1188 (10th Cir. 2008) (dismissing tort claims and citing *PCI Transp.*, 418 F.3d at 545, for proposition that "ICCTA completely preempts non-contractual claims").

The terms of the contract delimit the railroad's duties.  *PCI Transp.*, 418 F.3d at 541 (citing § 10709(b)).  Any non-contractual state law claim that would result in an award of damages for an excessive rate is inconsistent with the federal scheme and therefore preempted.[4]  Non-contractual state law claims involving a railroad's "rates" and "practices" are just as

---

[4]  Plaintiffs try to distinguish *PCI Transp.* on the ground that the relief sought there would have interfered with the railroad's operations.  Opp. at 45.  But the court in *PCI Transp.* made clear that its holding encompassed any extra-contractual relief regarding a railroad's "'*rates*, classifications, rules . . . *practices*, routes, services, and facilities.'"  418 F.3d at 544 (quoting Section 10501(b)(1)) (emphasis added).  The court rejected the contention that state law claims "related to" a private contract could escape the STB's exclusive jurisdiction, particularly since "[Section] 10709 specifies that a party entering into such a contract has only 'those duties specified by the terms of the contract.'"  *Id.* at 541.  This is completely consistent with other cases holding that extra-contractual relief is preempted by the ICCTA.  *See, e.g., Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*, 297 F. Supp. 2d 326, 332-33 (D. Me. 2003) (holding state law claims for tortious interference preempted by the ICCTA, but permitting claim for breach of contract to proceed).

preempted during the pendency of a Section 10709 contract as they are when the contract terminates and the traffic is once again subject to the STB's regulatory authority.

### 2. Plaintiffs confuse STB regulatory authority with ICCTA preemption

Plaintiffs' argument regarding contract traffic confuses the concepts of the STB's exclusive federal *jurisdiction* and the STB's *authority* to regulate a railroad's rates and practices during the time a shipper's traffic is moving under contract. Plaintiffs' view that the STB must have direct regulatory *authority* to act in order for exclusive federal *jurisdiction* to preempt stems from their mistaken position that Section 10501(b) preemption is limited to the regulatory "remedies provided under this part." Opp. at 26. Since "the STB remedies provided for in the ICCTA do not overlap with those available under state antitrust or consumer protection laws," Plaintiffs contend that ICCTA preemption does not apply to their state law claims. *Id.* In other words, Plaintiffs' view is that federal preemption only applies to state remedies that mimic Title 49 of the United States Code. *Id.*

The courts have consistently held to the contrary. Soon after the passage of the ICCTA, the court in *Ga. Pub. Serv. Comm'n* was presented with the argument that the ICCTA did not preempt a state's laws regulating the closure of railroad business offices ("agencies"), because there was no remedy in the ICCTA for such closures. *Ga. Pub. Serv. Comm'n*, 944 F. Supp. at 1581. Since the STB had no regulatory *authority* to provide the remedy the state was seeking, the state argued that it should be free to act. Reviewing the plain language of the Act and its deregulatory purpose, the court found that "Defendants' argument reflects a misunderstanding not only of the plain language of section 10501(b)(2), but also of the ICC Termination Act generally." *Id.* The court held that when Congress mandated in Section 10501(b) that the "remedies" provided in the ICCTA were "exclusive," it meant that those remedies were

10

exclusive of any state law remedies that might be used to regulate rail transportation, regardless of whether a federal remedy was available to a particular plaintiff with a particular claim. *Id.* at 1581.

The court's broad reading of ICCTA preemption in *Ga. Pub. Serv. Comm'n* has been adopted by most courts across the country, as well as the STB.[5] Plaintiffs may not like the fact that the remedies for railroads' "rates" and "practices" that are set forth in the ICCTA are the only ones available. They may prefer to be able to bring state law challenges to fill what they perceive as deficiencies in the deregulatory scheme. But there is nothing new about the idea that when Congress completely or partially deregulates an industry it does not intend for state or local law to be used to fill any perceived "void."

For example, in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), the issue was whether the Airline Deregulation Act of 1978 ("ADA") preempted states from "prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes." *Id.* at 378. "To ensure that the States would not undo federal deregulation with regulation of their own," the ADA included a preemption provision prohibiting states from

---

[5]  *See*, *e.g.*, *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, ___ F.3d ___, No. 08-30236, 2008 WL 2612060, at *7 (5th Cir. July 3, 2008); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 645 (2d Cir. 2005); *Railroad Ventures, Inc. v. STB*, 299 F.3d 523, 562-63 (6th Cir. 2002); *City of Auburn v. United States*, 154 F.3d 1025, 1027-30 (9th Cir. 1998); *City of Seattle v. Burlington N. R.R. Co.*, 41 P.3d 1169, 1171-72 (2002); *Pejepscot Indus. Park, Inc.*, 297 F. Supp. 2d at 332-33; *Rushing v. Kansas City S. Ry. Co.*, 194 F. Supp. 2d 493, 499 (S.D. Miss. 2001); *Guckenberg v. Wisconsin Cent. Ltd.*, 178 F. Supp. 2d 954, 958-59 (E.D. Wis. 2001); *Wisconsin Central Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wis. 2000); *Soo Line R.R. Co. v. City of Minneapolis*, 38 F. Supp. 2d 1096, 1099 (D. Minn. 1998); *Burlington N. Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1295 (D. Mont. 1997); *North San Diego County Transit Dev. Corp.—Pet. for Dec. Order*, STB Fin. Dkt. No. 34111, 2002 WL 1924265, at *4-5 (Aug. 19, 2002); *Friends of the Aquifer—Pet. for Dec. Order*, STB Fin. Dkt. No. 33966, 2001 WL 928949, at *3-4 (Aug. 10, 2001); *Cities of Auburn and Kent, WA—Pet. for Dec. Order—Burlington N. R.R. Co. Stampede Pass Line*, STB Fin. Dkt. No. 33200, 1997 WL 362017, at *7 (July 1, 1997).

11

enforcing any law "relating to rates, routes, or services" of any air carriers.  *Id.* at 378-79.  The

Court held that since airline fare advertisement related to airline "rates," the application of state

consumer protection laws to the airlines' advertising practices was preempted.  *Id.* at 388.  Other

Supreme Court cases involving industries undergoing deregulation have reached the same result

as *Morales*.[6]

Plaintiffs assert that the decisions involving airlines and other industries do not support

the notion that ICCTA preempts their claims because they involved statutes with "extraordinarily

broad" preemption language.  Opp. at 20 n.8 and 45 n.32.  As discussed above, however, the

courts have repeatedly found that "[i]t is difficult to imagine a broader statement of Congress's

intent to preempt state regulatory authority over railroad operations" than Section 10501(b) of

the ICCTA.  *City of Auburn*, 154 F.3d at 1030 (citing *Ga. Pub. Serv. Comm'n*, 944 F. Supp. at

1581).  In fact, when the Second Circuit specifically compared the language in Section 10501(b)

with the language in the trucking and airline deregulation statutes involved in *Morales*, *Rowe*,

and *Cuomo*, it found that ICCTA preemption was even broader.  *Green Mountain*, 404 F.3d at

645.  Thus, the law is clear that ICCTA preemption applies to any effort by a state or private

party to supplement the federal remedies provided in the ICCTA for railroad "rates" or

"practices" with state law remedies.

---

[6]  *See, e.g.*, *Rowe v. New Hampshire Motor Transp. Ass'n*, 128 S. Ct. 989, 293 (2008) (statute prohibiting states from enacting laws relating to motor carrier "price, route, or service" preempted state law imposing requirements on delivery of tobacco products); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 294 (1988) (preempting application of state securities laws to natural gas companies); *Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409, 425 (1986) (preempting state regulation of natural gas prices); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 219 (2d Cir. 2008) (ADA preempted New York airline passenger "Bill of Rights").

C.    **Plaintiffs' Argument That Their State Law Claims Do Not Constitute "Regulation" Is Without Merit**

1.    **Plaintiffs' state law claims seek to regulate railroad fuel surcharge rates and practices**

Plaintiffs' assertion that their state antitrust, consumer protection, and unjust enrichment claims do not constitute "regulation" within the meaning of 49 U.S.C. § 10501(b) should be rejected out of hand. Opp. At 21. As "[s]tate power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute," *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573 n.17 (1996), a private state law claim cannot survive federal preemption where it frustrates the purposes and objectives of federal law. *See, e.g.*, *Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1020 (2008); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 452 (2005); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000); *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 227-28 (1995). This is especially so where, as here, the asserted claim would encroach upon "an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000).

Likewise, state claims are preempted when a federal regulatory regime seeks to establish national uniformity and consistency and state claims would give rise to a "state regulatory patchwork." *See Morales v. TWA*, 504 U.S. at 390 (quoted in *Rowe*, 128 S. Ct. at 995-96). Plaintiffs' sixty-some state law claims allege that Defendants imposed fuel surcharges that are higher than they would have been in the absence of Defendants' alleged wrongful conduct. For Plaintiffs to recover for such alleged overpayments, Plaintiffs must prove what rate their (as yet unidentified) suppliers would have paid but for Defendants' alleged conduct and directly challenge Defendants' rates and practices. Such claims undoubtedly seek to regulate Defendants' fuel surcharge rates and practices.

13

Numerous cases recognize that state law claims can regulate as effectively as statutes, and, accordingly, have held that the ICCTA preempts state statutory and common law claims seeking recovery in actions that challenge a railroad's operations and services. *See Guckenberg*, 178 F. Supp. 2d at 958 (common law nuisance claim preempted); *Friberg*, 267 F.3d at 444 (holding that the ICCTA preempted application of common law nuisance claims, because the preemption clause does not permit the ICCTA "to be circumvented by allowing liability to accrue under state common law, where that liability arises from a railroad's economic decisions"); *San Luis Cent. R.R. Co.*, 369 F. Supp. 2d at 177 (holding that the ICCTA preempted state law tort and statutory claims regarding car service and car hire fees because an award of damages can "improperly serve to regulate rail transportation"); *Pejepscot Indus. Park v. Maine Central R.R.*, 297 F. Supp. 2d 326, 334 (D. Me. 2003) (holding that the ICCTA preempted a common law tort claim because an "award of damages pursuant to state tort claims may qualify as state 'regulation' when applied to restrict or burden a rail carrier's operations"). The Supreme Court has also recognized the principle. *See Riegel*, 128 S. Ct. at 1008 (a damage award under state tort law "disrupts the federal scheme no less than state regulatory law to the same effect").

Plaintiffs cite a number of cases for the unexceptional proposition that the ICCTA does not preempt *all* state law, however remotely related to rail transportation. Opp. at 21-25. These cases, however, only serve to underscore why Plaintiffs' damages claims regarding Defendants' rates *are* preempted. In a number of those cases, the courts determined that the activities in question were so remotely related to railroad operations that they did not constitute "transportation" within the meaning of the ICCTA at all.[7] In others, the courts determined that

---

[7]    *See Florida East Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324, 1336-37 (11th Cir. 2001) (non-railroad aggregate distribution business leasing space in rail yard not "rail transportation" within the meaning of the ICCTA); *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d

the impact on rail operations was so peripheral or remote that it could not be deemed to interfere

with those operations.[8]  By Plaintiffs' own admission, these cases involved "non-burdensome"

exercises of police power.  Opp. at 23.  *None* of these cases involved a challenge to a railroad's

*rates* or rate *practices*, which is a "core concern" of the ICCTA, clearly involving the

"economics and finances of the rail carriage industry."  *Jackson*, 500 F.3d at 252.

Plaintiffs do not dispute that in cases involving "clear intrusions upon the STB's

exclusive authority to regulate the economics of rail transportation," courts have not hesitated to

find private state law damage actions preempted by the ICCTA.  Opp. at 25.  This includes cases

seeking damages under state consumer protection statutes and common law claims.[9]  Plaintiffs

---

1126, 1129-30 (10th Cir. 2007) (actions of railroad employees in discarding old railroad ties into
a wastewater drainage ditch are not "transportation" within the meaning of the ICCTA);
*Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp.*, 450 F. Supp. 2d 467, 478 (D.N.J.
2006) (transloading activities are not "transportation by rail carriers" subject to the ICCTA),
*amended  on reconsideration*, 2007 WL 1147048 (D.N.J. April 17, 2007); *Jones v. Union Pac.
R.R.*, 94 Cal. Rptr. 2d 661, 666-67 (Cal. App. 2000) (alleged action of railroad employees in
blowing horns and idling locomotives solely for purposes of harassment, if proven, would not
serve a transportation purpose within the meaning of the ICCTA).

[8]  *See Rushing*, 194 F. Supp. 2d at 501 (nuisance claims regarding operations in rail yard
preempted by the ICCTA, but not claims regarding design and construction of berm not directly
related to operation of rail yard); *District of Columbia v. 109,205.5 Square Feet of Land*, No.
Civ. A 05-202, 2005 WL 975745, at *3-4 (D.D.C. April 21, 2005) (easement for bike path that
did not affect railroad operations or safety not preempted); *New York Susquehanna & W. Ry.
Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (ICCTA does not preempt application of
state laws to "peripheral" concern of the federal law, as opposed to its core concerns with "the
economics and finances of the rail carriage industry"); *In re Appeal of Vermont Ry.*, 769 A.2d
648, 655-56 (Vt. 2000) (regulations that could affect railway operations preempted by the
ICCTA, but not regulations concerning motor carrier operations); *Native Village of Ehlutna v.
Alaska R.R. Corp.*, 87 P.3d 41, 57-58 (Alaska 2004) (zoning regulation of stone quarry railroad
planned to use to obtain ballast not preempted by the ICCTA).  *See also Maumee & W. R.R.
Corp. and RMW Ventures, LLC—Pet. for Dec. Order*, STB Dkt. No. 34354, 2004 WL 395835, at
*1 (March 2, 2004) (routine, non-conflicting city easements not preempted by the ICCTA where
they would not impede rail operations).

[9]  *See, e.g., PCS Phosphate Co. v. Norfolk S. Corp.*, 520 F. Supp. 2d 705, 716-17 (E.D. N.C.
2007); *San Luis Cent. R.R. Co.*, 369 F. Supp. 2d at 177; *Pejepscot Indus. Park, Inc.*, 297 F. Supp.

seek to distinguish such cases by arguing that they involved claims for "punitive and treble

damages." Opp. at 43 n.30. Of course, Plaintiffs' state antitrust and consumer protection claims

also involve claims for exemplary damages. Plaintiffs assert, however, that even if the recovery

of exemplary damages is preempted by the ICCTA, they still may recover actual damages. *Id.*

Plaintiffs' position completely misses the point of the cases holding that state law tort

actions seeking damages against railroads are preempted. Those cases held that state tort claims

were preempted, not because of the threat of punitive damages, but because they recognized that

"'state regulation can be as effectively exerted through an award of damages as through some

form of preventive relief.'" *Guckenberg*, 178 F. Supp. 2d at 958 (citing *Cipollone v. Liggett

Group, Inc.*, 505 U.S. 504, 521 (1992)). The focus on punitive damages in cases such as

*Pejepscot* and *PCS Phospate* arose from the fact that those cases also involved a claim for breach

of contract, which the courts found were not preempted by the ICCTA.[10] The plaintiffs in those

cases had added tortious interference and consumer protection claims in an effort to recover non-

contractual punitive damages from the railroads as well. Those claims were held preempted.

Nowhere did those courts suggest that non-contractual common law or statutory claims for actual

damages could have survived.[11]

---

2d at 333; *South Dakota v. Burlington N. & Santa Fe Ry. Co.*, 280 F. Supp. 2d 919, 934-35 (S.D. 2003).

[10]    Similarly, in *Wolens*, the Supreme Court held that the ADA did not preempt "routine breach-of-contract claims" for damages, but did preempt damages actions under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*, 513 U.S. at 229-32. Plaintiffs sought only actual damages in that case, and the Supreme Court held that their non-contractual damages claims were preempted by the ADA. 513 U.S. at 225 n.3.

[11]    Plaintiffs cite *PCS Phosphate* for the proposition that an "unjust enrichment" claim is not subject to ICCTA preemption. Opp. at 44. The court in *PCS Phosphate*, however, held that the particular unjust enrichment claim there was in the nature of a "quasi contract or contract implied in law" arising from the defendant's refusal to adhere to the terms of its contract. 520 F. Supp.

Certainly, as the Supreme Court recognized in *Morales* with respect to ADA preemption (and courts and the STB have recognized with respect to ICCTA preemption), there may be cases that present a "borderline" question. 504 U.S. at 390. Those are the cases that require a determination of when state law claims affect an airline's or railroad's rates in "'too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Id.* As the STB has put it, those are the cases that require a "fact-bound" determination.[12] This is not such a case. As in *Morales*, "'[t]he present litigation plainly does not present a borderline question.'" 504 U.S. at 390 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)). *See also Green Mountain*, 404 F.3d at 643 ("We need not draw a line that divides local regulations between those that are preempted and those that are not, because in this case preemption is clear").

Indeed, *Morales* recognized that consumer protection statutes can impose significant restrictions and severe burdens on how parties conduct business. *See* 504 U.S. at 388-89 (finding that state guidelines on airline advertising, promulgated under state consumer protection laws, had a "significant effect" on fares and "severely burden[ed]" the airlines' ability to communicate their fares). Likewise, state antitrust claims can affect rates by forcing the court to determine

---

2d at 717. In this case, in contrast, Plaintiffs' unjust enrichment claim is derivative of its claims that Defendants have wronged Plaintiffs under state antitrust and consumer protection laws. If the application of those laws to Defendants' rates is preempted, then so is any claim for recovery under a theory of "unjust enrichment."

[12] *See, e.g.*, *Boston and Maine Corp. and Town of Ayer, MA—Joint Pet. For Dec. Order*, STB Fin. Dkt. No. 33971, 2001 WL 458685, *6-7 (April 30, 2001) (holding application of local "noisome trade ordinance, planning board permitting process, and environmental permitting process" to construction of intermodal facility preempted, but suggesting that requirements that railroad share their plans and environmental testing information and use best management practices would not be preempted). *See also, e.g.*, *Rushing*, 194 F. Supp. 2d at 500-01 (holding application of state negligence and nuisance laws to the way the railroad conducted its switching operations preempted by the ICCTA, because of the clear "economic impact" on the railroad, but permitting state law action to proceed with respect to the pooling of rainwater on the plaintiffs' property cause by a peripheral earthen berm).

what the defendants' rates should have been.  *See In re Korean Air Lines Co., Ltd., Antitrust Litig.*, MDL No. 1891, 2008 WL 2894666, at *6 (C.D. Cal. July 23, 2008) (holding that the ADA preempted state antitrust and consumer protection claims alleging a price-fixing conspiracy and noting that the claims sought to "regulate the manner by which Defendants set fares, or components of fares, for air transportation services").  In other words, contrary to Plaintiffs' suggestion, there is nothing "non-burdensome" or "incidental" about Plaintiffs' claims.  Opp. at 23-24.  They cut to the heart of the railroads' operations.[13]  Under the express terms of Section 10501(b), the "remedies" for "rates" and "practices" in the ICCTA are "exclusive" and the STB's regulatory jurisdiction is "exclusive."[14]

---

[13]  Plaintiffs attempt to distinguish between a challenge to the "reasonableness" of Defendants' rates, which they concede would be preempted, and a challenge to Defendants' "conspiratorial and unfair overcharges," which they argue does not fall within the STB's "jurisdiction" or "competence."  Opp. At 21.  Just how tenuous this distinction is can be seen eight pages later, when Plaintiffs claim to be "enforcing, not challenging, the STB's finding of unreasonableness as to fuel surcharges."  *Id.* at 29.  In any event, Plaintiffs confuse *implied* preemption of state law rate reasonableness claims against interstate rail rates, which has been clear for over a century (*see Texas & P. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907)), with *express* preemption in Section 10501(b) of any state law remedy for a railroad's "rates" and "practices."  As the courts have held repeatedly, "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations" than Section 10501(b) of the ICCTA.  *Ga. Pub. Serv. Comm'n*, 944 F. Supp. at 1581.  As discussed in Part I.B. above, it does not matter whether the ICCTA provides the particular remedy a party would like or whether the STB has specific authority to grant that remedy.  If the activity at issue is integral to the railroads' operations—and rates for rail service unquestionably and explicitly are integral to railroads' operations—the STB's jurisdiction is "exclusive" and alternative state law remedies are preempted.

[14]  Plaintiffs cannot succeed with a claim that only state laws specifically addressed to the railroad industry are preempted.  Opp. at 42.  Even leaving aside the fact that all of cases finding state law tort actions against railroads preempted by the ICCTA involved "generally applicable" nuisance, negligence, tortious interference, and consumer protection laws, "there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute."  *Morales*, 504 U.S. at 386.  Nor would it matter even if Plaintiffs' effort to "enforce" the STB's decision in Ex Parte No. 661 were consistent with the decision (which it is not).  As with the ADA preemption provision, nothing in

2.    **Plaintiffs' purported "enforcement" of the STB's January 25, 2007 decision shows at once that Plaintiffs' claims are regulatory in nature and in conflict with federal policy**

Plaintiffs assert that they are seeking to "enforce" the STB's own rail fuel surcharges decision in Ex Parte No. 661. Opp. at 40. It is impossible to credit Plaintiffs' argument that they are *not* seeking to obtain additional "remedies . . . with respect to regulation of rail transportation" when they are openly seeking to "enforce" the STB's quintessentially regulatory decision about Defendants' rates. Even if Plaintiffs were correct (which they are not) that the measure of a "regulatory" remedy is whether it seeks to "manage" or "govern" a railroad's transportation activities, Opp. at 20, in this case that is precisely what Plaintiffs are seeking to do. There is nothing more core to a railroad's operations than the rates it charges for its services, and the damages that Plaintiffs seek are a direct effort to manage Defendants' rates. *See Riegel*, 128 S. Ct. at 1008 ("[W]hile the common law remedy is limited to damages, a liability award 'can be, indeed is designed to be, *a potent method of governing conduct and controlling policy*.'" (citing *Cipollone*, 505 U.S. at 521) (emphasis added).

This case presents a particularly strong demonstration of the reason why non-contractual state law actions for damages are preempted by the ICCTA. Plaintiffs claim to be seeking to enforce the STB's ruling "so that they may obtain appropriate redress in the absence of any remedy available through the Board for claims arising in private contract." Opp. at 40; *see also* Opp. at 29. But this only underscores the conflict between their claims and the STB's exclusive jurisdiction over rail transportation under the ICCTA. Giving due regard to the regulatory history of fuel surcharges, the STB in Ex Parte No. 661 rendered a nuanced order that recognized that the railroads could not be "faulted for assuming that fuel surcharges calculated as a

the language of Section 10501(b) suggests that "preemption is limited to *inconsistent* state regulation." 504 U.S. at 387 (emphasis in original).

percentage of the base rate were permissible" and crafted guidance for future conduct. *Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205 at *7. With respect to exempt traffic, after initially proposing to revoke the exemptions and give a prospective remedy for that traffic, the STB determined to leave that traffic free of regulation, because regulation could "upset the competitive balance between railroads and trucks." *Id.* at *9. With respect to contract traffic subject to Section 10709, the STB also determined not to take any action—because it had no "regulatory authority" over that traffic during the term of those voluntary contracts. *Id.* at *10.

Plaintiffs now seek to obtain through state law damage actions "remedies" for Defendants' fuel surcharges that the STB expressly found were not available under the ICCTA. Although claiming to be "enforcing" the STB's decision, Plaintiffs go out of their way to highlight exactly the opposite—that they are asking this Court instead to supplement the federal regulatory regime with "the antitrust laws of 19 states, the consumer protection laws of 26 states, and the common and statutory laws of 26 states." Opp. at 32. Congress, however, made clear in passing Section 10501(c) of the ICCTA that it intended to prevent railroads from being subjected to "balkanized" regulatory requirements that "vary among the States." H.R. REP. NO. 104-311, at 95-96 (1995); S.REP. NO. 104-176, at 6 (1995).[15]

Moreover, the Supreme Court stressed in *Credit Suisse Securities (USA) LLC v. Billing*, 127 S. Ct. 2383 (2007), that permitting juries to apply different interpretations of the law to a regulated industry can yield inconsistent results and undermine the regulatory system. As the Court discussed in *Credit Suisse* and the STB demonstrated in Ex Parte No. 661, there is often a "fine line," informed by the agency's expertise and experience, between permissible and

---

[15]   The networked nature of the railroad industry requires consistent federal regulation, not balkanized state enforcement. The multi-state networks of the various defendant railroads are illustrated by the maps included in Exhibit "E" hereto (previously submitted with Defendants' MDL filings).

impermissible behavior, and between appropriate and inappropriate remedies.  127 S. Ct. at

2394-97.  Even where the regulatory agency has "*disapproved . . .* the conduct that the antitrust

complaints attack," the antitrust laws may be preempted.  *Id.* at 2394.  Here, the potential for

inconsistent decisions is highlighted by the fact that the STB encouraged the use of an index that

did not include fuel costs, which is precisely the purpose of the AII-LF.[16]

### D.    Plaintiffs' Legislative Intent Arguments Are Unpersuasive

#### 1.    The applicability of federal antitrust law has no bearing on the ICCTA's preemption of state antitrust laws

Plaintiffs make much of the fact that Defendants have consistently taken the position that

*federal* antitrust laws are not preempted by the ICCTA.  Opp. at 35-36.[17]  They suggest that

"[p]lainly, if the [ICCTA] does not preempt federal antitrust law, state antitrust laws likewise are

not preempted." *Id.* at 35.  There is nothing "plain" about it.  As a general matter, one federal

law does not preempt another; to the extent possible, the courts must attempt to "harmonize"

---

[16]  Plaintiffs' response to *Credit Suisse* only reinforces its relevance here.  Opp. at 34 n.22.  They argue that in *Credit Suisse* "there was a perceived danger that conduct that the securities laws permits or encourages might be deemed a violation of the antitrust laws."  *Id.*  That same danger exists here.  The STB determined that in light of regulatory history and industry practice the railroads could not be faulted for using rate-based fuel surcharges in the past.  *Rail Fuel Surcharges,* STB Ex Parte No. 661, 2007 WL 201205, at *7.  Plaintiffs now seek damages under state law for those same surcharges.  (Even if the STB had *disapproved* the past use of rate-based fuel surcharges, as the Supreme Court stressed in *Credit Suisse*, the danger of inconsistent remedies being applied under federal law and a patchwork of state laws would remain.)  Plaintiffs also note that the STB has "no jurisdiction or authority to enforce the antitrust laws," but neither does the SEC.  Opp. at 34 n.22.  And they note that the STB has no "'authority to regulate rail rates and services that are governed by a contract.'"  *Id.* (citing 2007 WL 201205, at *10).  As we discussed above in Subpart II.B., however, this does not give Plaintiffs the authority to apply extra-contractual state laws to regulate rail rates and services.  ICCTA continues to preempt such claims.

[17]  Plaintiffs belatedly submitted a "supplement" to their Opposition, in which they highlight testimony in Congress by a representative of the AAR and an AAR fact sheet in which the AAR sets forth the respects in which the railroads are subject to the federal antitrust laws and statutorily exempt from those laws.  Nothing in those materials even mentions state antitrust laws, let alone suggests that the AAR believes they are applicable to the railroads.

federal laws that overlap.[18]  No such deference is owed state and local laws.  That is why, for

example, the STB and the courts have consistently held that the ICCTA preempts the application

of state and local environmental laws to railroad operations, while at the same time making clear

that federal environmental laws are not preempted.[19]

    None of the cases that Plaintiffs cite for the proposition that state antitrust laws are not

preempted by the ICCTA apply here.  Most pre-date the ICCTA and do not discuss preemption

of state antitrust laws at all.  Opp. at 34-36, 39.  Plaintiffs cite one pre-ICCTA case, *Alliance

Shippers, Inc. v. Southern Pacific Transportation Co.*, 858 F.2d 567, 570 (9th Cir. 1988), for the

proposition that "[a]ntitrust remedies unquestionably survived deregulation."  Opp. at 34.  In that

case, the court did not need to address whether a state antitrust claim survived the Staggers Act

preemption clause, because the parties agreed that the federal and state antitrust standards were

the same and the court could readily dismiss on substantive antitrust grounds.  The only post-

ICCTA decision cited by Plaintiffs, *Pacific Great Lakes Corp. v. Bessemer & Lake Erie R.R.*,

720 N.E.2d 551 (8th Dist. Cuyahoga County 1998), was initiated long before the ICCTA was

passed, and no preemption defense was raised. Opp. at 39.

### 2.    The evidentiary provision of Section 10706 has no effect on preemption analysis

    As evidence that Congress did not intend to preempt state antitrust laws, Plaintiffs refer

to 49 U.S.C. § 10706(a)(3)(B)(ii), which provides that evidence related to communications on

---

[18]   "[W]hile a literal reading of section 10501(b) would suggest that it preempts all other federal law, neither the [STB] nor the courts have interpreted the statute in that manner.  Rather, where there are overlapping federal statutes, they are to be harmonized, with each statute given effect to the extent possible."  *CSX Transp., Inc.—Pet. for Dec. Order*, STB Fin. Dkt. No. 34662, 2005 WL 1024490, at *5 (May 3, 2005) (citing *Tyrell v. Norfolk Southern Ry.*, 248 F.3d 517, 523 (6th Cir. 2001)).

[19]   *See, e.g.*, *Boston & Maine Corp. v. Town of Ayer*, 330 F.3d 12, 16 (1st Cir. 2003) ; *Flynn v. Burlington N. & Santa Fe Corp.*, 98 F. Supp. 2d 1186, 1189 (E.D. Wa. 2000); *Cities of Auburn and Kent, WA*, 1997 WL 362017, at *7.

interline railroad matters may not be used to infer a violation of law "in a proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of [enumerated federal antitrust laws] or of any similar State law." Opp. at 36-38. This thin reed cannot support the weight Plaintiffs place on it. Through § 10706, Congress provided railroads with certain immunities from federal antitrust laws and special evidentiary protections. These special protections cannot be turned on their head and interpreted as a grant of authority for the enforcement of state antitrust laws that are preempted by ICCTA's express preemption clause.

Section 10706(a)(3)(B)(ii) is not a preemption provision. ICCTA's broad preemption of all state laws that regulate railroad rates and practices is contained in a wholly different section, and it would have been both easy and logical for Congress to amend that section had it wished to limit preemption. Indeed, given Congress's concern with preserving a uniform national rail system, it would be anomalous for Congress's express grant of immunity from federal antitrust laws to be read as authorizing claims under a patchwork of state antitrust statutes.[20]

In arguing that Section 10706 limits the scope of preemption, Plaintiffs also ignore well-settled principles of statutory construction. The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988). In particular, "a specific policy embodied in a later federal statute should

---

[20]   Section 10706 was added to the Interstate Commerce Act in 1948 by the Reed Bulwinkle Act, Pub. L. No. 8-662, 62 Stat. 472, to make clear that railroads were protected for certain collective activities against antitrust suits for *injunctive* relief as well as damages. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 418-19 (1986). If Congress had intended to preserve any state law antitrust claims for damages, it is highly unlikely that it would have done so by inserting a passing reference in an evidentiary statute designed to *extend* protection against suits for injunctive relief.

23

control our construction of the [earlier] statute, even though it has not been expressly amended."
*Id*. (quoting *United States v. Estate of Romani*, 523 U.S. 517, 530-31 (1998) (alteration in original)).  While Section 10501 was enacted as part of the ICCTA in 1995, Section 10706 was originally passed in 1948 as part of the Reed Bulwinkle Act (and last amended by the Staggers Act in 1980).  Thus, to the extent that there is any conflict between the two provisions, the federal policy of preemption set forth in Section 10501 should control.

### 3.    Plaintiffs' appeal to legislative history is groundless

Plaintiffs devote considerable time and effort throughout their Opposition to arguments that the legislative history of the ICCTA shows that Congress intended ICCTA preemption to be narrowly restricted to traditional state economic regulation that would replicate and conflict directly with the STB's regulatory authority.  Opp. at 19-21, 23, 26, 30, 32, 42, 44-48.  This argument is unavailing for several reasons. First, as discussed above, most courts that have reviewed the legislative history and purpose of the ICCTA have found that Congress intended a broad reading of ICCTA preemption.  *See* cases cited in footnote 5, *supra.*  Cases that have read the legislative history of the ICCTA to support non-preemption have generally involved activities that were remote or peripheral to rail transportation.  *See* cases cited at footnotes 7 and 8, *supra*.

Second, the only reference to non-preemption of state antitrust laws in the legislative history is a specific discussion of "criminal statutes" including laws "defining such criminal offenses as bribery and extortion."  H.R. CONF. REP. NO. 104-422, at 167 (1995).  There is no suggestion there or elsewhere in the legislative history that non-contractual civil state law claims for damages allegedly arising from "overcharges" could avoid ICCTA preemption—whether couched as antitrust, consumer protection or unjust enrichment claims.  *See Ga. Pub. Serv. Comm'n*, 944 F. Supp. at 1584 (observing that the Conference Report language explained that

"only state regulation of nonrail matters, for example in state criminal statutes, is not preempted by [ICCTA]"). In fact, Plaintiffs' effort to suggest that this language means that their "state antitrust, consumer protection, and unjust enrichment claims do not amount to the type of economic regulation that Congress sought to preempt" only underscores the weakness of their position. Opp. at 21. The Supreme Court in *Morales* had little difficulty under the ADA distinguishing for preemption purposes between "state laws against gambling and prostitution as applied to airlines" and state consumer protection laws restricting airlines' advertisement of their fares. 504 U.S. at 390.

Third, Plaintiffs' convoluted reading of the legislative history of the ICCTA and the Staggers Act leads them to the conclusion that ICCTA preemption is *less* broad than its predecessor, Staggers Act preemption. Opp. at 19 n.7, 48. No court has so held. In fact, courts have repeatedly noted that the ICCTA significantly broadened the preemptive reach of the statute. *See, e.g., Flynn*, 98 F. Supp. 2d at 1188 ("The purpose of the Act was to . . . significantly reduce regulation of surface transportation industries."); *Ga. Pub. Serv. Comm'n*, 98 F. Supp. 2d at 1584 (The ICCTA "evinces an intent by Congress to assume complete jurisdiction, to the exclusion of the states, over the regulation of railroad operations.").[21] In the end, the only

---

[21] Contrary to Plaintiffs' suggestion (Opp. at 19 n. 7 and 48), Congress did not have to provide in the legislative history of the ICCTA, as it did in the legislative history of the Staggers Act, that "[n]o state law or federal or state common law remedies are available" with respect to "rail rates, classifications, rules, and practices." H.R. Conf. Rep. No. 96-1430, at 106. The House version of the ICCTA proposed language that provided: "Except as otherwise provided in [the ICCTA], the remedies provided in [the ICCTA] are exclusive and preempt the remedies provided under Federal or State law." The Committee Report explained that "'State or Federal law' is intended to encompass all statutory, common law, and administrative remedies addressing the rail-related subject matter jurisdiction of [the STB]." H.R. Rep. 104-311, at 95. The Conference Committee adopted this House language, moving it to Section 10501(b). H.R. Conf. Rep. 104-422, at 167. Thus, contrary to Plaintiffs' argument (Opp. at 21 n.9), Senator Ashcroft's concern that the *Senate* bill would not adequately address the question of preemption of remedies based on

authority that Plaintiffs are able to cite for their exceedingly narrow view of ICCTA preemption (Opp. at 26-27) is a law review article that openly states that its purpose is to "develop[] a new theoretical foundation from which to revitalize the presumption against preemption." Carter H. Strickland, Jr., *Revitalizing the Presumption Against Preemption To Prevent Regulatory Gaps: Railroad Deregulation and Waste Transfer Stations*, 34 ECOLOGY L.Q. 1147, 1154 (2007). This Court, of course, cannot indulge in such tendentious efforts to alter existing law.[22]

The plain language of Section 10501(b), the legislative history of the ICCTA, and the great weight of the case law interpreting the statute all support preemption of Plaintiffs' state law damages claims.

## III.    PLAINTIFFS LACK ARTICLE III STANDING TO ASSERT THEIR CLAIMS

Plaintiffs' request that the Court defer ruling on Defendants' motion to dismiss for lack of subject matter jurisdiction until the issue of class certification is decided should be rejected, for "[i]n every case, the jurisdictional requirements of Article III must be present before a court may proceed to the merits." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007)

---

statutory or common law was fully addressed by the Conference Committee. *See South Dakota*, 280 F. Supp. 2d at 932-33 (discussing legislative history).

[22]   It bears emphasizing as well that whatever theoretical efforts Mr. Strickland believes should be made to countermand the courts' general application of the presumption against preemption, those efforts would be particularly ill-suited to regulation of the rail industry. The Supreme Court has made clear that "an 'assumption' of non pre-emption is *not* triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. at 108 (emphasis added). Courts have regularly applied this *Locke* doctrine to preemption adjudication involving rail operations. *See, e.g., CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005); *Railroad Ventures, Inc.*, 299 F.3d at 562; *CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643, 648 (E.D. Mich. 2000). Plaintiffs spend considerable time in their brief arguing that the presumption against preemption should apply, but most of the cases they cite do not involve railroad regulation, and none post-dates *Locke*. Opp. at 30-32. In any event, regardless of whether they have applied the presumption against preemption, no court has read ICCTA preemption as narrowly as Mr. Strickland and the Plaintiffs argue it should be read.

(citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)).  In particular, contrary to Plaintiffs' suggestion that a ruling on standing can wait, the Supreme Court has made clear that "standing is to be determined as of the commencement of suit." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992).

Plaintiffs' argument that the Supreme Court opinions in *Ortiz* and *Anchem* require deferral is contradicted by decisions in this District and elsewhere.  For example, one judge has explained that, in describing the issue of class certification as "logically antecedent" to standing in those cases, the Supreme Court merely was "articulating a 'limited exception' to the general principle that standing should be assessed before certification." *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 15-16 (D.D.C. 2006).  That exception is "applicable only where the standing issue would not exist if the complaint were filed as an individual action." *Id.*  Therefore, "the *Ortiz* exception treating class certification as the antecedent consideration does not apply if the standing issue would exist regardless of whether the name plaintiff filed his claim alone or as part of a class." *Id.* at 16.

In this case, the "standing issue" would exist regardless of whether or not Plaintiffs filed their claims as a class action.  To illustrate, whether a class is certified has no bearing on whether Plaintiff Agway from New York has standing to sue for violations of the Arizona consumer protection act; whether Maroon of Ohio has standing to sue for a violation of the state antitrust laws of New Mexico; or whether Fayus of California has standing to pursue a claim for unjust enrichment under the laws of Maine.  The Court should address Defendants' Article III standing arguments prior to addressing class certification.[23]

---

[23]  Plaintiffs' reliance on *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002), and *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06 MD 1739, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006), is misplaced.  Nowhere in these opinions did the courts

Plaintiffs cannot cure their lack of standing by relying upon the nature or location of injuries that absent class members might have suffered. It is well settled that a named plaintiff cannot base his or her individual standing on the injury of putative class members. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1:2 (4th ed. 2002). "Standing cannot be acquired through the back door of a class action." *Allee v. Medrano*, 416 U.S. 802, 829 (1974). There is no indication in the CAC that Plaintiffs Agway, Fayus, and Maroon, have suffered any injury that could be redressed by any of the state laws they seek to enforce, save the laws of New York, California, and Illinois, respectively. Because Plaintiffs' "class action allegation adds nothing to the standing inquiry," *Doe v. Blum*, 729 F.2d 186, 190 n.4 (2d Cir. 1984), the Plaintiffs' standing should be determined now, and should be decided without any consideration of the possible standing of unidentified putative class members, as have many other courts done under these circumstances. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007); *Temple v. Circuit City Stores, Inc.*, No. 06-CV-5303, 2007 U.S. Dist. LEXIS 70747, at *27-29

---

discuss—much less distinguish—the controlling Supreme Court precedent cited by Defendants. Instead, the *Buspirone* court explained that it did not need to analyze the named plaintiffs' standing because "[i]f certification is granted, the proposed class would contain plaintiffs who have personal standing to raise claims under the laws governing purchases in all of the fifty states." 185 F. Supp. 2d at 377; *see also Grand Theft*, 2006 WL 3039993, at *2-3. But that reasoning conflicts directly with the Supreme Court's holding that plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982) (internal quotation marks omitted). And neither case (both decided before *Twombly*) addresses the Supreme Court's concern in *Twombly*: resolving potentially dispositive issues before undertaking the "potentially enormous expense of discovery." 127 S. Ct. at 1967. Moreover, the cases Plaintiffs cite are inapposite because they characterize the issue as "whether named Plaintiffs may properly represent [a] purported class." *See, e.g.*, *OSB Antitrust Litig.*, No. 060826, at *3 (E.D. Pa. Sept. 25, 2006) (Siddiqui Decl., Ex. A). Defendants do not, at this stage, challenge Plaintiffs' ability to represent a class. Rather, Defendants challenge the ability of Plaintiffs Agway, Fayus, and Maroon to prosecute claims under the laws of states in which they suffered no harm.

(E.D.N.Y. Sept. 25, 2007); *In re Ditropan XL Antitrust Litig.*, No. 06-01761, 2007 WL 1411617,

at *6-7 (N.D. Cal. 2007)*; In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365,

1370-72 (S.D. Fla. 2001).

## IV.    PLAINTIFFS FAIL TO PLEAD FACTS THAT SHOW ANTITRUST STANDING

Plaintiffs insist that, to plead standing under state antitrust and consumer protection laws

that permit suits by indirect purchasers, it is enough merely to allege a purchase made

"indirectly" from a defendant.  In effect, they treat a state's repeal of *Illinois Brick Co. v. Illinois*,

431 U.S. 720 (1977), as tantamount to the abandonment of all limitations on prudential standing.

As state courts in many *Illinois Brick* repealer states (and federal courts faithfully interpreting

state law) have held, however, that position is untenable.  These courts have almost uniformly

opted to preserve traditional standing requirements that permit suit only by indirect-purchaser

plaintiffs whose injuries are not too remote from the alleged wrong.  As demonstrated in

Defendants' Moving Brief, it is this "remoteness" inquiry that determines whether an indirect-

purchaser Plaintiff has established antitrust standing.  In the end, it is apparent that Plaintiffs rest

only on "labels and conclusions" in their Complaint—an approach that, the Supreme Court has

made clear, "will not do."  *Twombly*, 127 S. Ct. at 1964-65.

### A.    State Courts Apply Prudential Standing Limitations To Indirect Purchaser Claims

Plaintiffs appear to argue that the intent of state legislatures and courts that have rejected

*Illinois Brick* was to confer standing on anyone calling itself an "indirect purchaser."  Opp. at 54.

But that position cannot be squared with the fact that, as Plaintiffs acknowledge, courts in eleven

of the nineteen jurisdictions at issue here have found the standing test in *Associated General*

*Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 549 U.S. 519 (1983) ("*AGC*"),

appropriate in cases involving indirect purchasers.  Simply stated, Plaintiffs cannot credibly

maintain the position that standing for plaintiffs claiming to be indirect purchasers is automatic in *Illinois Brick* repealer jurisdictions.

Plaintiffs alternatively urge this Court to disregard the pronouncements of the relevant state courts and instead to substitute its own judgment on the question of state antitrust standing requirements.  They first attempt to justify such a usurpation of authority by arguing that several federal courts have declined to apply *AGC* to state-law antitrust claims.  Opp. at 52 & n.44.  In fact, only one of those cases, *D.R. Ward Constr. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006), reached that conclusion, and it simply predicted that the highest courts of the three states at issue there—Arizona, Tennessee and Vermont—would not apply *AGC*.  *D.R. Ward* is not binding on this Court, which is equally well equipped to predict whether state courts would apply prudential standing principles.[24]

Plaintiffs next point out that, of the eleven jurisdictions that have invoked *AGC*, the issue has not reached the highest court in eight.  Opp. at 52-53 & n.45.  That fact, however, adds nothing to Plaintiffs' standing argument; rather, it merely points up the nature of this Court's

---

[24]    The other cases cited in Plaintiffs' note 44 either do not support, or flatly contradict, Plaintiffs' argument.  *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 314-19 (4th Cir. 2007), *cert. denied*, 128 S. Ct. 1659 (2008) involved a claim under federal, not state, antitrust law, and the Fourth Circuit actually *applied* the *AGC* factors.  *Id*. at 314-19.  In *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1013, the court simply declined to evaluate state standing requirements at that juncture of the proceedings.  And in *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 409 (D. Del. 2007), the district court—citing, *inter alia*, the Minnesota Supreme Court's decision in *Lorix*—found the *AGC* factors *applicable* "at least as a guide" to the plaintiffs' *state* antitrust claims.  *Id*. at 409.  Notably, the *Intel* court also rejected the approach taken by the Eastern District of Pennsylvania in *D.R. Ward*:

> Class plaintiffs contend that the *AGC* factors are inapplicable to state law claims, even where the applicable state law has a 'permissive' harmonization statute that allows federal courts to use federal law as a guide in interpreting them.  However, the Court finds *D.R. Ward* to be inconsistent with the prevailing approach to this question by courts applying the laws of states that have rejected the *Illinois Brick* prohibition on indirect purchaser suits.

*Id.*

task, which is to "*predict* how the highest state court would rule" on an issue that such a court

has yet to address.  *See, e.g.*, *Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60, 94 (D.D.C. 2007)

("This Court is bound by the highest state court's construction of state law.  Where the state

courts have not addressed a question crucial to the resolution of a case before it, however, a

federal court must answer that question as it believes the highest court of the state would."),

*appeal certified*, 2007 WL 1169333 (D.D.C. Apr. 19, 2007); *Manganaro Corp. v. Hitt*

*Contracting, Inc.*, 193 F. Supp. 2d 88, 96 n.7 (D.D.C. 2002) (same).

      In making its predictions, a federal court must give proper regard to relevant rulings of

the state's lower courts.  *See, e.g.*, *Manganaro*, 193 F. Supp. 2d at 96 n.7 ("in order to determine

state law, the federal court must follow the decisions of the state's highest court, or, where the

law is unclear, predict how that court would rule, based on . . . the state's trial court decisions,

among other things") (internal quotation marks omitted); *In re Dynamic Random Access Memory*

*Antitrust Litig. (DRAM)*, 516 F. Supp. 2d 1072, 1087-89 (N.D. Cal. 2007) (looking to state trial

and intermediate appellate court decisions to predict the law of those states).  Plaintiffs ignore

this black-letter principle in favor of an inexplicable argument that "[i]n the absence of contrary

authority by the highest courts of other states, this Court should presume that these other states

would follow the Minnesota Supreme Court's rejection of *AGC*" in *Lorix v. Crompton Corp.*,

736 N.W.2d 619 (Minn. 2007).  Opp. at 53 n.45.  Notably, Plaintiffs cite to no precedent in

support of this dubious proposition—and, indeed, the Minnesota Supreme Court in *Lorix* itself

recognized that the opinions of lower courts in other states represent valid predictions of how

those states' highest courts would rule on the issue of standing.  *See id.* at 629 ("We recognize that some state courts have applied the *AGC* factors to state antitrust claims.").[25]

Plaintiffs do not engage with these points, nor can they.  The law is clear: Plaintiffs cannot establish standing under even the most generous state law merely by asserting, as they do here, that they are "indirect purchasers."

### B.    Plaintiffs Have Not Alleged Facts Sufficient To Show Standing

As shown in Defendants' Moving Brief, cases such as *DRAM*, *Crouch v. Compton Corp.*, Nos. 02CV5437503, 03CV52514, 2004 WL 2414027 (N.C. Sup. Ct. Oct. 28, 2004), and *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192 (Iowa 2007) illustrate that antitrust standing may be lacking for remote purchasers.  Defendants also showed that Plaintiffs Fayus, Agway, and Maroon had not alleged facts sufficient to show that they fall within the class of indirect purchasers who possess standing under the relevant state statutes, as opposed to remote purchasers who lack standing.

In response, Agway and Maroon do nothing more than repeat the allegations of their complaint that describe themselves as purchasing rail freight services "indirectly" from defendants.  That plainly does not suffice.  To establish antitrust standing, a plaintiff must do more than simply allege some conceivable nexus between the alleged antitrust violation and the plaintiff's own injury.  One can always show that conduct in one market had some ripple effect in a distinct market.  *See AGC*, 459 U.S. at 534.  Rather, in this setting, a plaintiff must plead facts that show a sufficiently proximate relationship between the conduct and the injury.

---

[25]   If there were *no* decision on standing in a particular state, and no statutory materials pointing the way toward a decisional rule, it might be appropriate for a federal court to look to well-reasoned decisions of other state supreme courts as persuasive authority.  Here that is unnecessary, because, as pointed out in Defendants' Moving Brief, each of the 19 jurisdictions at issue has a judicial decision or a statute that suggests that prudential standing limitations survive the repeal of *Illinois Brick*.

Fayus, for its part, submitted invoices from J.B. Hunt, a trucking company, showing line items for "fuel surcharges." Fayus contends that this demonstrates that rail fuel surcharges were passed through and ultimately charged to an indirect purchaser. But these invoices are unhelpful for several reasons. First, they do not identify any railroad that sold transportation services to J.B. Hunt in the first instance. Thus, it is possible that the shipments indicated in the invoices did not even move by rail in their journey. Second, assuming the shipments utilized rail services at some point, they do not show that the fuel surcharges were imposed by railroads for those shipments. Indeed, the fuel surcharges on the invoices do not even match the fuel surcharges described in the Complaint. *See* CAC ¶¶ 86, 88. From all that appears, the fuel surcharges could have been assessed directly by J.B. Hunt for its trucking service. The invoices reinforce Defendants' argument that entities such as Fayus do not simply purchase rail transportation services that are resold by an intermediate distributor, wholesaler or retailer; rather, they purchase a package of transportation services (likely intermodal shipping, involving ship, truck, and rail movements) from an intermodal company, a logistics company, a transportation broker, or the like. Identifying the "pass through" of a rail fuel surcharge in this setting is undoubtedly highly complex, and, more importantly for present purposes, pleading facts that establish standing to assert claims against railroads is not a simple matter of intoning the words "indirect purchaser." If anything, the invoices only underscore the standing problem and illustrate how the indirect purchasers here are at least as remote as the indirect purchasers in cases such as *DRAM*, *Crouch*, and *Southard*.

Lastly, Plaintiffs' Opposition—focusing as it does on finding a theory of conspiracy that squares with both the facts and *Twombly*'s requirements regarding conspiracy allegations—steps right into another standing problem. Plaintiffs now assert that the "core" of the alleged fuel

surcharge conspiracy was an agreement by the railroads to "use" AII-LF in rail contracts. But Plaintiffs do not allege that they actually purchased rail freight services from direct customers who had AII-LF provisions in their rail contracts. Thus, they do not allege that they were injured by the conduct of which they complain. *See O'Shea*, 414 U.S. at 493 ("Plaintiffs in the federal courts 'must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction'") (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)). Plaintiffs' failure to allege that they were injured by the key component of the alleged conspiracy means that they are not the proper parties to assert the antitrust claims that they set forth in their Complaint.

## V.    PLAINTIFFS CONCEDE THAT A NUMBER OF THEIR CONSUMER PROTECTION AND UNJUST ENRICHMENT CLAIMS SHOULD BE DISMISSED

### A.    Plaintiffs Expressly Concede That Six Of Their Sixteen Consumer Protection Claims Should Be Dismissed

Recognizing that they have failed to state a claim, Plaintiffs have now withdrawn their consumer protection claims under the laws of Kansas, Maine, Oregon, Rhode Island, West Virginia, and the District of Columbia. Opp. at 63. This move underscores the inadequacy of Plaintiffs' Complaint. Plaintiffs wasted the time of the Court and of Defendants by alleging claims that did not specify an element as basic as the identity of the plaintiffs. Plaintiffs' concession now confirms what Defendants expected—Plaintiffs are not consumers, and never should have asserted consumer protection claims under the laws of the six states that Plaintiffs have now admitted are not applicable. Plaintiffs' decision to assert such groundless claims based upon vague allegations about the nature of their business and their alleged injury is precisely what FED. R. CIV. P. 8, as interpreted by *Twombly*, is intended to avoid.

34

**B.     By Having Failed To Respond In Their Opposition, Plaintiffs Also Concede That Their Unjust Enrichment Claims Under "Federal Common Law" And California Law Should Be Dismissed**

In addition to Plaintiffs' express abandonment of six of their consumer protection claims, Plaintiffs implicitly concede that two of their unjust enrichment claims also should be dismissed. "It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hayes v. Chao*, 541 F. Supp. 2d 387, 391 (D.D.C. 2008). In their moving papers, Defendants argued that Plaintiffs' unjust enrichment claims purportedly based upon "federal common law" and California law should be dismissed, because no such claims exist. *See* Moving Br. at 40-41 & n.33; *see also* Defendants' Proposed Order, Mot. Ex. A, at ¶¶ 18-19. Plaintiffs do not address, much less dispute, these arguments. Their silence requires dismissal.

**VI.     PLAINTIFFS' ARGUMENTS IN DEFENSE OF THE CONSUMER PROTECTION CLAIMS THAT THEY HAVE NOT ALREADY WITHDRAWN ARE WITHOUT MERIT**

**A.     Plaintiffs Have Not Adequately Alleged Deceptive And Misleading Conduct Under Rule 9(b)**

Plaintiffs argue that the facts supporting their state consumer protection claims need not be alleged "with particularity" under FED. R. CIV. P. 9(b) and that, even if this heightened pleading requirement applies, they have met it. Plaintiffs are wrong on both counts. In claiming that they need not allege their claims with particularity, Plaintiffs argue that, because "certain" state consumer protection statutes do not require fraud, they do not "trigger Rule 9(b)'s particularity standard." Opp. at 61. This argument misses the point. Whether or not a particular state consumer protection statute *requires* fraud, if a plaintiff bases its consumer protection claim on allegations of fraud, those allegations must meet Rule 9(b)'s particularity standard.

The authority that Plaintiffs cite confirms this rule. Plaintiffs cite *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003), for their assertion that, "because the CLRA and UCL [California consumer protection statutes] are not fraud statutes, Rule 9(b) is not applicable." Opp. at 61. In fact, that case held that Rule 9(b)'s particularity requirement applies no matter what the elements of the underlying claim, whenever a plaintiff rests its theory on allegations of fraud. The court explained:

> In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

*Id.* at 1103-04. The court further explained that, even if a complaint alleges some fraudulent and some non-fraudulent conduct, the fraud allegations are still subject to Rule 9(b)'s heightened pleading requirement. *Id.* This rule is consistent with the one of the purposes of Rule 9(b), which is to protect a defendant from reputational harm: "[f]raud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, and they are therefore properly subject to Rule 9(b) in every case." *Id.* at 1104.[26] Plaintiffs do not even

---

[26]   A number of other circuits have also adopted this rule. *See Vess*, 317 F.3d at 1104-05 (citing *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) and *Carlon v. Thaman (In re NationsMart Corp. Sec. Litig.)*, 130 F.3d 309, 315 (8th Cir. 1997). *See also Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (the particularity requirement of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action"). The district court cases that Plaintiffs cite do not contradict this principle. *Alpharma, Inc. v. Pennfield Oil Co.*, No. 8:03CV401, 2008 WL 2331019 (D. Neb. June 4, 2008), concerned a motion to amend a complaint and simply stated in dicta that the heightened pleading requirements of Rule 9(b) "do not apply to allegations of unfair and deceptive trade practices." *Id.* at *2. The court did not address whether Rule 9(b) applies when a plaintiff relies upon a fraud theory to support a consumer protection claim. The district court in *Interested Underwriters at Lloyd's of London v. Church Loans & Invs. Trust*, 432 F. Supp. 2d 330, 332 (S.D.N.Y. 2006), also noted that New York General Business Law § 349 is not "subject to the pleading-with-particularity

address the cases Defendants cited in their moving papers (including a district court case in this circuit) holding that consumer protection claims "akin to … fraud" must be alleged with particularity, even if the consumer protection statutes at issue do not require all the elements of fraud. *See Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 463-64 (D.D.C. 1997) (holding that Rule 9(b) applied to claims under the District of Columbia deceptive trade practices statute).

Plaintiffs allege a price-fixing conspiracy. However, Plaintiffs attempt to bring this theory within the ambit of state consumer protection statutes by characterizing it as a conspiracy to deceive. Opp. at 63. Plaintiffs argue that the CAC alleges the Defendants "applied misleading and unfair fuel surcharges" to rail freight transportation services. Plaintiffs claim those surcharges were designed to be a "general revenue enhancement measure" rather than "representative of the fuel consumption associated with the individual movements to which they are applied," as "their customers believed." *Id.* They further argue that, as a result of this alleged deception, Plaintiffs "paid more for rail freight services than they otherwise would have." *Id.* The elements of a fraud claim are "a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages." *Vess*, 317 F.3d at 1105. Plaintiffs claim to have alleged an intentional plan to deceive consumers, reliance, and damages in the form of overpayments. Thus, Plaintiffs themselves characterize their consumer protection claims as grounded in fraud.

The CAC also leaves no doubt that the Plaintiffs have asserted a "unified course" of conduct. *Id.* at 1104. Plaintiffs' consumer protection Count itself contains only conclusory language that defendants' "mislabeled" their fuel surcharges and "misled Plaintiffs and the

---

requirements" of Rule 9(b), but did not discuss whether Rule 9(b) nevertheless applies when a plaintiff asserts a fraud theory. The court did not need to consider the issue in that case, as the plaintiff's theory was not fraud, but an alleged policy of "dilatory practices" by the defendant insurance company.

Class." CAC, ¶ 161. The core of the Complaint consists of its allegations of a unified plan—a conspiracy—to fix fuel surcharges. Plaintiffs do not allege negligence, but a single, deliberate scheme to "enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs." CAC, ¶ 73. Plaintiffs' consumer protection claims thus rise or fall on the theory that Defendants engaged in a unified plan to defraud consumers.

As *Vess* makes clear, where, as here, a plaintiff alleges a unified course of conduct, its consumer protection claim "as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.* at 1103-04. Plaintiffs' allegations fall far short of this requirement. As discussed in detail in Defendants' motion to dismiss the direct purchasers' complaint, Plaintiffs' conspiracy allegations are conclusory and do not sufficiently allege the particulars of an unlawful agreement to fix fuel surcharges, much less a conspiracy to defraud consumers by mislabeling the surcharges as a cost recovery mechanism. Plaintiffs do not allege the time, place, or circumstances of any such agreement. *See Vess*, 317 F.3d at 1106 ("Vess alleges a fraudulent conspiracy between the APA and the other defendants, but he does not provide the particulars of when, where or how the alleged conspiracy occurred"). Plaintiffs also do not explain how they could have been deceived into paying "more for rail freight services than they otherwise would have," CAC, ¶ 161, when, by their own admission, Defendants fully explained the mechanism for their calculation of fuel surcharges on their web sites. CAC, ¶¶ 67, 77, 102(d). Finally, as explained in Defendants' Moving Brief, Plaintiffs' reliance upon the January 25, 2007 STB ruling for allegations of an intentional course of deceptive conduct is misplaced, as the STB expressly stated "we do not believe that railroads can be faulted for assuming that fuel

surcharges calculated as a percentage of the base rate were permissible." *Id.* at 10; Moving Brief at 32, n.21.

> **B.      Five Of Plaintiffs' Remaining State Consumer Protection Claims Must Be Dismissed In The Absence Of Alleged Deceptive Conduct Within Those States**

Because Plaintiffs fail to allege any illegal conduct or effects in California, Illinois, New Hampshire, New York, or North Carolina, Plaintiffs' claims brought under the consumer protection laws of those states therefore must be dismissed. Plaintiffs' argument that the laws of these states can apply to in-state plaintiffs injured by out-of-state defendants cannot save their claims. The Complaint only identifies Plaintiffs from California, New York, and Illinois. (CAC, ¶¶ 28-30.) Therefore, as an initial matter, Plaintiffs' claims under New Hampshire and North Carolina law must fail. As for Plaintiffs' other state law claims, even if one assumes that the New York, Illinois, and California Plaintiffs were harmed in those states, that would not be enough to state a claim. New York and Illinois require that the alleged *deception*, not just injury, occur within the state. *See, e.g., Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190, 1195 (N.Y. 2002) ("to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York"); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005), *cert. denied*, 547 U.S. 1003 (2006) ("the General Assembly did not intend the Consumer Fraud Act to apply to fraudulent transactions which take place outside Illinois"). Plaintiffs do not allege any deceptive conduct in New York or Illinois; indeed, the Complaint is fatally vague with respect to where and how the indirect purchaser Plaintiffs allegedly were "deceived" into paying for a railroad fuel surcharge, and where their payment allegedly occurred.

With respect to California, there is a presumption against the extraterritorial application of the state's consumer protection statute, and the mere allegation of a portion of national sales within the state does not create a sufficient nexus with California to permit claims against out-of-

state defendants based upon an alleged nationwide scheme. *See, e.g., Churchill Village L.L.C. v. GE*, 169 F. Supp. 2d 1119, 1127 (N.D. Cal. 2000) (defendants' sales of ten percent of its total sales in California was an insufficient nexus with California to establish jurisdiction to apply the California unfair competition statute to out-of-state defendant); *Meridian Project Sys. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005) (citing *Churchill Village* in dismissing unfair competition claims against out-of-state defendant where no alleged wrongful conduct occurred in California).[27]  Plaintiffs do not allege that any wrongful conduct occurred in California, New York or Illinois, and their claims under the consumer protection laws of those states (as well as New Hampshire and North Carolina) should be dismissed.

> ### C.    The New York Consumer Protection Claim Should Be Dismissed Because Plaintiffs Do Not Allege Consumer-Oriented Misrepresentations Directed Toward Them

Plaintiffs argue that they need not allege any consumer-oriented deception directed toward them under New York law, and that in any event they have alleged such conduct. Neither argument is correct.

Plaintiffs cite *In re Static Random Memory (SRAM) Antitrust Litig.*, No. M.07-CV-01819, MDL-1819, 2008 WL 426522 (N.D. Cal. Feb. 14, 2008) ("*SRAM I*"), in support of their argument that they need not allege consumer-oriented deception directed toward them. However, that case actually refutes rather than supports their position.  Contrary to Paintiffs' assertion, the court in *SRAM I* did not "simply f[ind] that plaintiffs had failed to allege specific deceptive conduct by Defendants.'" Opp. at 69 (quoting *SRAM I*, 2008 WL 426522, at *11). Instead, the court dismissed the complaint due to the lack of a nexus between the statements and

---

[27]   Plaintiffs also acknowledge, as they must, that they have no claim for damages under the California unfair competition law (CAL. BUS. & PROF. CODE § 17200).  Therefore, even if they had sufficiently alleged a claim under that statute, their remedy would be limited to injunctive and equitable relief only.

the indirect purchasers.  The court explained that the *SRAM* complaint contained "nothing to suggest that Defendants must have provided false justifications for price increases to the *IP* [indirect purchaser] *Plaintiffs*.  Rather, any such justifications would have been directed at the DP [direct purchaser] Plaintiffs." *SRAM I*, 2008 WL 426522, at *10 (emphasis added).  The court gave the plaintiffs leave to amend to assert "misrepresentations directed at Indirect Purchasers" if they were able to do so,  *Id.* at *11, plainly indicating that such direct allegations were necessary to support the claim.  Indeed, the *SRAM* plaintiffs actually did amend their complaint to include such allegations, claiming that "Defendants made [misleading] public statements about the price of SRAM and products containing SRAM that Defendants knew would be seen by New York consumers."  *See In re Static Random Memory (SRAM) Antitrust Litig.*, MDL-1819, 2008 WL 2610549, at *2 (N.D. Cal. 2008) ("*SRAM II*").

The Complaint in this case makes no such allegations and therefore warrants dismissal. Plaintiffs argue that the "public" was deceived by fuel surcharges that Defendants allegedly "misrepresented as compensation for increases in the cost of fuel when in fact it was effectively a 'percentage rate increase that could be broadly applied to rail freight customers.'" Opp. at 68 (quoting in part CAC ¶¶ 2 & 26.)  But the Complaint contains no allegations about any public statements concerning Defendants' fuel surcharges, and does not explain how the surcharges themselves could have misled the public as a whole or deceived indirect purchasers such as Plaintiffs.  It is axiomatic that where an amended complaint "does not make a claim . . . plaintiff cannot further amend his complaint through an opposition brief." *Winder v. District of Columbia*, No. 03-2623, 2008 U.S. Dist. LEXIS 41093, at *12 (D.D.C. May 20, 2008).  Plaintiffs' futile attempt to save their case by crafting new allegations in their Opposition must therefore be disregarded.

Even if Plaintiffs could amend to allege public statements, they could not save their consumer protection claim under § 349.  Unlike the plaintiffs in *SRAM*, Plaintiffs here are not "end-users" of a product and do not make allegations that bring them within the definition of a "consumer" under § 349.  Plaintiffs argue that consumers under that section can include commercial entities, but they do not allege any facts to show that they fit within the criteria that they argue are controlling.  *See* Opp. at 67 (citing "the amount of money involved" in the agreement in question, the "relative bargaining power and sophistication of the parties," and the "nature of the agreement.").  *See In re Rezulin Products Liability Litig.*, 392 F. Supp. 2d 597, 614 (S.D.N.Y. 2005) (Section 349 did not apply to a contract between a pharmaceutical company and a health care provider, which "did not have any broad impact" on consumers).

> **D.** **Plaintiffs Have Failed To State A Claim Under The Illinois Consumer Protection Law**

Plaintiffs do not dispute that, because they have no statutory antitrust claim in Illinois, they are precluded from asserting "classic antitrust allegations dressed in Consumer Fraud Act clothing." *Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1st Dist. 1996). *See also Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990).  Rather, Plaintiffs argue that their consumer protection claim is directed at defendants' alleged "deceptive practices."  Opp. at 70.  Citing paragraph 5 of the CAC, Plaintiffs argue that Defendants' fuel surcharges were "designed to evade contractual rate escalation restrictions…." *Id.*  But neither paragraph 5 nor any other part of the CAC supports this argument, which is nonsensical on its face.  Contractual cost adjustments—such as those based upon the Rail Cost Adjustment Factor or the All-Inclusive Index Less Fuel—are, by definition, contractual provisions that are only imposed when purchasers agree to them.  Free-standing fuel surcharges, no matter how they are calculated, cannot be a means to "evade" such contractual provisions, as they apply only if they

are part of the contract. Plaintiffs do not even attempt to explain how fuel surcharges could be a "deceptive practice" permitting avoidance of bargained-for contractual terms. Their purported basis for a claim of deceptive practices under the Illinois consumer fraud statute therefore fails, and their Illinois claim should be dismissed.

## VII.    PLAINTIFFS' ARGUMENTS IN DEFENSE OF THEIR UNJUST ENRICHMENT CLAIMS ARE MERITLESS

Plaintiffs do not dispute that this Court applies a presumption against granting equitable relief in the absence of statutory authority to do so. Plaintiffs also do not confront the leading authorities that Defendants cite showing the lack of any unjust enrichment claim here, relying instead on inapposite cases that follow a minority view rejected by this Court. Count IV should be dismissed in its entirety.

### A.    Plaintiffs' Unjust Enrichment Claims Should Be Dismissed Because They Are Predicated On Defective Antitrust And Consumer Protection Claims

Like almost every other court to address the issue, this Court has recognized that where, as here, an unjust enrichment claim is based upon a defective antitrust or consumer protection claim, the unjust enrichment claim must be dismissed along with the underlying claim. *See* Moving Br. at 37-39; *see also* ANTITRUST SECTION OF THE AMERICAN BAR ASS'N, INDIRECT PURCHASER LITIGATION HANDBOOK 56-57 (2007) (citing cases). Plaintiffs do not confront the prevailing authority adhering to this principle. Indeed, Plaintiffs do not cite a single case in which a court has dismissed an underlying antitrust or consumer protection claim while upholding an unjust enrichment claim.

Plaintiffs incorrectly claim that *K-Dur* and *Cardizem* support their unjust enrichment claim. In both *K-Dur* and *Cardizem*, the trial court denied the defendants' motions to dismiss the plaintiffs' antitrust and consumer protection claims. *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551-52 (D.N.J. 2004); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618,

681 (E.D. Mich. 2000). By contrast, here Plaintiffs have failed to state viable antitrust and consumer protection claims. *K-Dur* and *Cardizem* therefore stand only for the unremarkable proposition that a plaintiff is "'permitted to plead alternative theories of recovery.'" Opp. at 71-72 (quoting *K-Dur*, 338 F. Supp. 2d at 544). Moreover, in subsequent rulings in the *K-Dur* litigation, the plaintiffs' unjust enrichment claims based upon alleged antitrust and consumer protection violations were dismissed on the ground that plaintiffs were precluded from asserting indirect purchaser claims under state law. *See, e.g.*, *In re K-Dur Antitrust Litig.*, MDL No. 1419, 2008 WL 2660780, at *4-6 (D.N.J. Feb. 28, 2008); 2008 WL 2660778, at *3-4 (D.N.J. Feb. 25, 2008); 2008 WL 2660776, at *14-15 (Feb. 21, 2008).

To be sure, the court in *Cardizem* did suggest that an unjust enrichment claim might survive dismissal of an underlying legal claim, but its suggestion was pure *dicta*, as the court upheld the underlying antitrust and consumer protection claims before it. Thus, the "[o]ne federal court," ABA INDIRECT PURCHASER LITIGATION, *supra*, at 57, to issue an opinion with language favorable to the Plaintiffs did so in dicta and in direct contrast to cases decided by this Court. Count IV should be dismissed in its entirety.[28]

### B. Plaintiffs' Unjust Enrichment Claims Should Be Dismissed Because Plaintiffs Never Sought to Rescind Their Indirect Purchases

As they have not alleged that they ever sought to rescind their indirect purchases, Plaintiffs do not state a valid unjust enrichment claim. Although they dispute this proposition, Plaintiffs do not confront the prevailing authority recognizing that unjust enrichment "does not

---

[28] Plaintiffs also rely upon *Cardizem* and *K-Dur* for the argument that unjust enrichment does not require allegations that plaintiffs conferred a direct benefit on defendants. In doing so, Plaintiffs simply ignore the contrary cases decided by this Court and others that defendants cited in their moving papers. *See* Moving Br. at 40 (citing *Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 186 (D.D.C. 2006); *In re Vitamins Antitrust Litig.*, MDL No. 99-197, 2001 WL 849928, at *9 (D.D.C. April 11, 2001); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 43-54 (D.D.C. 1999); *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 24 (D. Mass. 2004)).

furnish a basis for liability" where parties "voluntarily have negotiated, entered into and fully performed their bargain" with each other. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d at 421; *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 210 (D. Me. 2004) (cited in Moving Br. at 39).

Plaintiffs provide their own self-serving interpretation of the RESTATEMENT (FIRST) OF RESTITUTION to argue that, as indirect purchasers, they need not seek to rescind their purchases because they had no contract with Defendants. However, other than a brief reference to a 61-year-old law review article, Plaintiffs offer no authority to support this gloss on the Restatement. In contrast to this unsupported interpretation of the elements of an unjust enrichment claim, *Intel* and *New Motor Vehicles* specifically applied Section 107 of the Restatement to indirect purchaser unjust enrichment claims premised on antitrust and consumer protection violations. Those cases both held that an indirect purchaser's contract with the party with whom it transacted (*e.g.*, a direct purchaser) is the contract that matters; it is a plaintiffs' purchase under *that contract* that it must seek to rescind as a prerequisite to making a claim for unjust enrichment. Plaintiffs have not alleged that they sought any relief from their direct sellers, and Count IV should therefore be dismissed in its entirety.

## CONCLUSION

For the foregoing reasons and the reasons stated in their Moving Brief, Defendants

respectfully submit that their Joint Rule 12(b)(1) and 12(b)(6) Motion to Dismiss Indirect

Purchaser Plaintiffs' Consolidated Amended Complaint should be granted.

Dated:  August 7, 2008                    Respectfully submitted,


                                          /s/ Alan M. Wiseman
                                          Alan M. Wiseman (D.C. Bar # 187971)
                                          Joseph A. Ostoyich
                                          Peter A. Barile III
                                          HOWREY LLP
                                          1299 Pennsylvania Avenue, N.W.
                                          Washington, D.C.  20004

                                          Tyrone R. Childress
                                          David G. Meyer
                                          HOWREY LLP
                                          550 South Hope Street, Suite 110
                                          Los Angeles, CA  90071

                                          *Attorneys for Defendant Union Pacific Railroad
                                          Company*

                                          Richard J. Favretto
                                          Mark W. Ryan
                                          Gary A. Winters
                                          MAYER BROWN LLP
                                          1901 K Street, N.W.
                                          Washington, D.C.  20006

                                          *Attorneys for Defendant BNSF Railway Company*

Richard McMillan, Jr.
Kent A. Gardiner
Kathryn D. Kirmayer
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004

*Attorneys for Defendant CSX Transportation, Inc.*


John M. Nannes
Tara Reinhart
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005

*Attorneys for Defendant Norfolk Southern Railway Company*

**CERTIFICATE OF SERVICE**

I, Peter A. Barile III, an attorney, certify that on August 7, 2008, I caused true and correct copies of the foregoing Memorandum of Points and Authorities in Support of Defendants' Joint Rule 12(b)(1) and 12(b)(6) Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint to be filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to co-lead counsel for all Plaintiffs.


/s/ Peter A. Barile III

# APPENDIX

**EXHIBIT A**

**CLAIMS WITHDRAWN BY INDIRECT PURCHASER PLAINTIFFS**

| CLAIM WITHDRAWN | ALLEGATION |
|---|---|
| District of Columbia Consumer Protection Act | COUNT III CAC ¶ 147 |
| Kansas Consumer Protection Act | COUNT III CAC ¶ 150 |
| Maine Consumer Protection Act | COUNT III CAC ¶ 151 |
| Rhode Island Consumer Protection Act | COUNT III CAC ¶ 158 |
| West Virginia Consumer Protection Act | COUNT III CAC ¶ 160 |
| Unjust Enrichment under California law | COUNT IV CAC ¶ 164 |
| Unjust Enrichment under "federal common law" | COUNT IV CAC ¶ 164 |

**EXHIBIT B**

**REASONS TO DISMISS COUNTS I-IV IN THEIR ENTIRETY**

| Count | Failure to Adequately Plead Unlawful Agreement | Preempted | Lack of Article III Standing[1] | Lack of Antitrust Standing | Rule 9(b)[2] | End Run Around Legal Claims | No Direct Benefit | Failure to Rescind |
|---|---|---|---|---|---|---|---|---|
| COUNT I Federal Antitrust | X | | | X | | | | |
| COUNT II State Antitrust | X | X | X | X | | | | |
| COUNT III Consumer Protection | X | X | X | X | X | | | |
| COUNT IV Unjust Enrichment | X | X | X | X | | X | X | X |

---

[1]     All of Plaintiffs' state law claims should be dismissed on Article III standing grounds, except that Agway, Fayus, and Maroon arguably have standing to bring their New York, California, and Illinois claims, respectively.

[2]     All of Plaintiffs' consumer protection claims in Count III should be dismissed to the extent that Plaintiffs base their claim on any theory of deception. Plaintiffs' consumer protection claims in Count III brought under the laws of Arkansas, Kansas, Maine, and New York, should be dismissed under Rule 9(b), regardless of the theory.

**EXHIBIT C**

**OTHER REASONS TO DISMISS CONSUMER PROTECTION CLAIMS
BROUGHT UNDER THE LAWS OF CALIFORNIA, ILLINOIS, AND NEW YORK**

| State Law Claim | Law Applies Only to Consumer Oriented Conduct | Law Applies Only to Intrastate Commerce | Claims Cannot Circumvent *Illinois Brick* | No Class Actions | No Class Actions for Damages | Conduct Not Directed Toward Plaintiffs |
|---|---|---|---|---|---|---|
| California COUNT III CAC ¶ 146 | | X | | | X | |
| Illinois COUNT III CAC ¶ 149 | | | X | | | |
| New York COUNT III CAC ¶ 155 | X | X | | X | | X |

# EXHIBIT D

## SUMMARY OF REASONS FOR DISMISSAL OF ALL CLAIMS

| Count | CAC ¶¶ | Claim | Plaintiffs Withdraw | Failure to Adequately Plead Unlawful Agreement | Preempted | No Article III Standing | No Antitrust Standing | Rule 9(b) | End Run Legal Claim | No Direct Benefit | Failure to Rescind | Not Consumer Oriented | Intra-state | End Run Illinois Brick | No Class Actions | No Damages Class Actions | Not Directed Toward Plaintiffs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I Federal Antitrust | 117 | Sherman Act § 1 | | x | | | | x | | | | | | | | | |
| II State Antitrust | 123 | Arizona | | x | | x | x | x | | | | | | | | | |
| II | 124 | California | | x | | x | | x | | | | | | | | | |
| II | 125 | District of Columbia | | x | | x | x | x | | | | | | | | | |
| II | 126 | Iowa | | x | | x | x | x | | | | | | | | | |
| II | 127 | Kansas | | x | | x | x | x | | | | | | | | | |
| II | 128 | Maine | | x | | x | x | x | | | | | | | | | |
| II | 129 | Michigan | | x | | x | x | x | | | | | | | | | |
| II | 130 | Minnesota | | x | | x | x | x | | | | | | | | | |
| II | 131 | Mississippi | | x | | x | x | x | | | | | | | | | |
| II | 132 | Nebraska | | x | | x | x | x | | | | | | | | | |
| II | 133 | Nevada | | x | | x | x | x | | | | | | | | | |
| II | 134 | New Mexico | | x | | x | x | x | | | | | | | | | |
| II | 135 | North Carolina | | x | | x | x | x | | | | | | | | | |
| II | 136 | North Dakota | | x | | x | x | x | | | | | | | | | |
| II | 137 | South Dakota | | x | | x | x | x | | | | | | | | | |
| II | 138 | Tennessee | | x | | x | x | x | | | | | | | | | |
| II | 139 | Vermont | | x | | x | x | x | | | | | | | | | |
| II | 140 | West Virginia | | x | | x | x | x | | | | | | | | | |
| II | 141 | Wisconsin | | x | | x | x | x | | | | | | | | | |
| III Consumer Protection | 145 | Arkansas | | x | | x | x | x | | | | | | | | | |
| III | 146 | California | | x | | x | x | x | x | | | | x | | | x | |
| III | 147 | District of Columbia | x | x | | x | x | x | x | | | | | | | | |
| III | 148 | Florida | | x | | x | x | x | x | | | | | | | | |
| III | 149 | Illinois | | x | | x | x | x | x | | | | x | x | | | |
| III | 150 | Kansas | x | x | | x | x | x | x | | | | x | | | | |
| III | 151 | Maine | x | x | | x | x | x | x | | | | | | | | |
| III | 152 | Nebraska | | x | | x | x | x | x | | | | x | | | | |
| III | 153 | New Hampshire | | x | | x | x | x | x | | | | | | | | |
| III | 154 | New Mexico | | x | | x | x | x | x | | | | | | | | |
| III | 155 | New York GBL § 349 | | x | x | | | x | x | | | | x | | | | x |

| Count | CAC ¶¶ | Claim | Plaintiffs Withdraw | Failure to Adequately Plead Unlawful Agreement | Preempted | No Article III Standing | No Antitrust Standing | Rule 9(b) | End Run Legal Claim | No Direct Benefit | Failure to Rescind | Not Consumer Oriented | Intra-state | End Run *Illinois Brick* | No Class Actions | No Damages Class Actions | Not Directed Toward Plaintiffs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| III | 155 | New York Common Law | | x | x | | x | | | | | | | | x | | |
| III | 156 | North Carolina | | x | x | x | x | x | | | | | x | | | | |
| III | 157 | Oregon | | x | x | x | x | x | | | | | x | | | | |
| III | 158 | Rhode Island | x | x | x | x | x | x | | | | | | | | | |
| III | 159 | Vermont | | x | x | x | x | x | | | | | | | | | |
| III | 160 | West Virginia | x | x | x | x | x | x | | | | | | | | | |
| IV Unjust Enrichment | 163 | Federal Common Law | x | x | x | | | | | | | | | | | | |
| IV | 163 | Arizona | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Arkansas | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | California | x | x | x | | | | x | x | x | | | | | | |
| IV | 163 | District of Columbia | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Florida | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Illinois | | x | x | | | | x | x | x | | | | | | |
| IV | 163 | Iowa | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Kansas | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Maine | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Michigan | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Minnesota | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Mississippi | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Nebraska | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Nevada | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | New Hampshire | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | New Mexico | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | New York | | x | x | | | | x | x | x | | | | | | |
| IV | 163 | North Carolina | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | North Dakota | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Oregon | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Rhode Island | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | South Dakota | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Tennessee | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Vermont | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | West Virginia | | x | x | x | | | x | x | x | | | | | | |
| IV | 163 | Wisconsin | | x | x | x | | | x | x | x | | | | | | |

## EXHIBIT E

## <u>INTERSTATE NETWORK OF DEFENDANT RAILROADS</u>

