## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 Misc. No. 07-489 (PLF) |
| This document relates to: ALL CASES | |

## DEFENDANTS' JOINT REPLY TO
## DIRECT PURCHASER PLAINTIFFS' OPPOSITION
## IN RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS

## TABLE OF CONTENTS

I.     IN ARGUING THAT THE COMPLAINT IS INSUFFICIENT TO STATE A CLAIM, DEFENDANTS MERELY SEEK APPLICATION OF *TWOMBLY*. ................. 4

II.    THE ALLEGATIONS ARE INSUFFICIENT TO PLEAD AN AGREEMENT TO ESTABLISH UNIFORM FUEL SURCHARGES. .................................................. 7

    A.    The Undisputed History of Surcharge Adoptions Does Not Support An Inference of Conspiracy. .............................................................................. 7

    B.    The Alleged AIILF Conduct Does Not Support An Inference of Conspiracy. .................................................................................................. 14

        1.    Creation and Publication Of The AIILF By AAR Is Not A Restraint Of Trade. ................................................................... 15

        2.    The Complaint Does Not Adequately Allege An Agreement To Use In Restraint of Trade. ...................................................... 17

        3.    There Are "Obvious Alternative Explanations" for Defendants' Conduct ....................................................................... 20

        4.    Plaintiffs Have Failed to Sufficiently Allege An Agreement to Fix Fuel Surcharges That Was Facilitated by the AIILF ............................. 24

    C.    Plaintiffs' Additional Allegations Provide No Further Support for Conspiracy. .................................................................................................. 26

        1.    Shorter Term Contracts .......................................................... 27

        2.    Publication of Fuel Surcharge Rates ....................................... 28

        3.    Through Rates ......................................................................... 28

        4.    Failure to Negotiate and Market Share Stabilization .............. 29

        5.    Government Investigation ....................................................... 30

III.    CONCLUSION ............................................................................................. 31

# TABLE OF AUTHORITIES

## CASES

*America Column & Lumber Co. v. United States*,
257 U.S. 377 (1921) ..................................................................... 24

*Arista Records LLC v. Lime Group LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007) ...................................... 26

*\*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007)........................................ passim

*Behrend v. Comcast Corp.,* 532 F. Supp. 2d 735 (E.D. Pa. 2007).....................................7

*City of Moundridge v. Exxon Mobil Corp.,* 250 F.R.D. 1 (D.D.C. 2008) ........................ 25

*Clamp-All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478 (1st Cir. 1988) ........ 11, 29

*Conley v. Gibson*,  355 U.S. 41 (1957)..............................................................................4

*Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962) ............. 30

*In re Copper Antitrust Litigation*,  98 F. Supp. 2d 1039 (W.D. Wisc. 2000).....................8

*In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007) ...................................... 11

*Fair Isaac Corp. v. Equifax Inc.,*
No. 06-44112, 2008 WL 623120 (D. Minn. Mar. 4, 2008) ....................................... 10

*FTC v. Pac. States Paper Trade Association*, 273 U.S. 52 (1927) ................................. 24

*Henthorn v. Department of Navy*, 29 F.3d 682 (D.C. Cir. 1994) .................................... 18

*In re High Fructose Corn Syrup Antitrust Litigation*,
295 F.3d 651 (7th Cir. 2002)..................................................................................... 30

*Jays Foods, Inc. v. National Classification Committee*,
646 F. Supp. 604 (E.D. Va. 1985),
*aff'd per curiam*, 801 F.2d 394 (4th Cir. 1986)........................................................ 17

*Jung v. Association of American Medical Colleges*,
300 F. Supp. 2d 119 (D.D.C. 2004)..................................................................... 23, 24

*Kramer v. Time Warner*, 937 F.2d 767 (2d Cir. 1991).......................................................8

*In re Late Fee and Over-Limit Fee Litigation,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ................................................................ 11, 26

In re Livent, Inc. Noteholders Securities Litigation,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................................ 12

*Maple Flooring Manufacturers' Association v. United States,
    268 U.S. 563 (1925) .......................................................................................... passim

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) .............. 5

Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984) ..................................... 5

O'Shea v. Littleton, 414 U.S. 488 (1974) ......................................................................... 19

*Schachar v. America Academy of Opthomology, 870 F.2d 397 (7th Cir. 1989) ...... 15, 16

In re Southeastern Milk Antitrust Litigation,
    555 F. Supp. 2d 934 (D. Tenn. 2008) .......................................................................... 7

*In re Travel Agent Commission Antitrust Litigation,
    No. 03:CV30000, 2007 WL. 3171675 (N.D. Ohio Oct. 29, 2007) ..................... 11, 28

United States v. International Harvester Co., 274 U.S. 693 (1927) ................................ 10

United States v. National Association of Broadcasters,
    536 F. Supp. 149 (D.D.C. 1982) ............................................................................... 24

Williamson Oil Co., Inc. v. Philip Morris USA,
    346 F.3d 1287 (11th Cir. 2003) ................................................................................. 29

## STATUTES

49 U.S.C. §11904 ............................................................................................................ 28

H.R. 4441, 106th Cong. .................................................................................................. 21

## OTHER AUTHORITIES

2-12 Moore's Federal Practice - Civil § 12.34 (2008) ..................................................... 18

*Rail Fuel Surcharges, STB Ex Parte No. 661 (Jan. 25. 2007) .............................. passim

Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSXT"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railroad Company ("UP") (collectively, "Defendants") hereby submit this Defendants' Joint Reply to Direct Purchaser Plaintiffs' Opposition in Response to Defendants' Joint Motion to Dismiss. For the reasons set forth herein, Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint ("Def. Br.") should be granted.

## INTRODUCTION

The Consolidated Amended Class Action Complaint ("CAC" or "Complaint") alleges that Defendants agreed to fix, maintain, and standardize "prices for rail fuel surcharges." CAC ¶ 104. In their Opposition to Defendants' Motion to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint ("Opposition" or "Opp. Br."), Plaintiffs no longer argue that the Eastern and Western Railroads adopted their fuel surcharge mechanisms simultaneously, as had been alleged in the Complaint. Instead, they argue that all of Defendants' fuel surcharge mechanisms were sufficiently similar, and the various decisions to adopt them sufficiently close in time, to be suggestive of an agreement. But that is just a restatement of parallelism. Nothing in their Opposition explains how UP's decision to switch to the HDF fuel surcharge mechanism already in use by BNSF for almost two years is more suggestive of conspiracy than of parallel, but independent, behavior. This is critical, because the beginning of the "lockstep" surcharge pricing that Plaintiffs treat as a hallmark of the alleged conspiracy occurred before creation and publication of the All Inclusive Index Less Fuel ("AIILF"). And, because Plaintiffs' theory is that the railroads recognized a need for the AIILF only *after* the Western Railroads already had brought their fuel surcharges into tandem, the

1

creation and publication of the AIILF cannot be the "factual enhancement" that makes it more plausible that the earlier "lockstep" pricing resulted from agreement.

Plaintiffs, at least tacitly, seem to acknowledge this deficiency and therefore focus in their Opposition on the decision of the Association of American Railroads ("AAR") to create and publish the AIILF, a cost escalation index that excludes the cost of fuel. In Plaintiffs' own words, this is now the "core" of their allegations, and Plaintiffs repeatedly contend that this concerted action provides the "agreement" necessary to state a claim under Section 1 of the Sherman Act. Courts have long recognized, however, that actions of trade associations in collecting and disseminating cost information do not constitute a restraint of trade within the meaning of Section 1; thus, the creation and publication of the AIILF cannot support liability.

Plaintiffs try to overcome this problem by arguing that they have alleged more than an agreement to create and publish the AIILF; they contend that the Complaint also alleges an "agreement to use" it. That is certainly debatable. Regardless, *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), stands for the proposition that a conspiracy cannot simply be declared in conclusory fashion, without allegations regarding the "factual context" of the unlawful agreement being alleged. Plaintiffs have alleged no facts that describe the nature of any agreement in restraint of trade or from which any such agreement could plausibly be inferred. All they have done is stated in conclusory fashion that an "agreement to use" the AIILF was made.

Plaintiffs' theory is that there was "widespread use" of the AII and RCAF cost escalation indices in contracts; that Defendants could not impose stand-alone, rate-based fuel surcharges "as long as [the AII and RCAF] included a fuel-adjustment component"; and that only by removing the fuel component were Defendants able to assess such fuel surcharges on a

2

"widespread basis." Yet, nowhere in the Complaint is there anything close to an allegation of an agreement that would amount to an agreement in restraint of trade consistent with this theory. For example, there are no allegations that Defendants agreed to substitute the AIILF broadly for the AII and RCAF in contracts, made it impossible to use cost escalation indices other than AIILF, or created an enforcement mechanism to monitor substitutions in favor of AIILF. Tellingly, the Complaint does not contain allegations about actual use or even allege that Plaintiffs had contracts with Defendants in which the AIILF was used. The fatal flaw under *Twombly* is Plaintiffs' failure to allege a single fact that supports the conclusory assertion that an agreement in restraint of trade was made.

Plaintiffs then contend that creating the AIILF must be a collusive action in furtherance of an underlying fuel surcharge conspiracy, because the railroads already had a perfectly acceptable method of recovering fuel costs in the AII and RCAF cost escalation indices. These allegations fail for the same reason the Complaint in *Twombly* failed: there are natural, alternative explanations for why the railroads, acting in pursuit of their own independent self-interests, would cause the AAR to create the AIILF and then use it. Simply stated, and as Plaintiffs do not contest, fuel costs were rising rapidly in 2003. It is not surprising that railroads would desire to make more timely adjustments to their fuel surcharges than permitted by the AII and RCAF. Moreover, as the Surface Transportation Board ("STB") recognized in 2007, a fuel-less cost index provides an effective means of avoiding "double-dipping" (double recovery of fuel costs that can occur when RCAF and a fuel surcharge are used together).

Plaintiffs do not rebut these explanations and instead fall back to the argument that lawful conduct of a trade association can be unlawful if it is part of a conspiracy. But the cases upon which Plaintiffs rely do not relieve them of adequately alleging a conspiracy to fix

fuel surcharges in the first instance. Plaintiffs cannot overcome that hurdle. Their allegations of parallelism are plainly insufficient to infer a conspiracy, and the addition of conclusory allegations about the AIILF – the very nature of which allows for independent decision-making by railroads with respect to fuel surcharges – cannot supply the missing link to plausibly suggest a conspiracy to fix rail fuel surcharges.

Plaintiffs' remaining allegations of various ancillary conduct are the kinds of allegations that were found unavailing in *Twombly* because they were "ambiguous" and thus do not support an inference of an agreement. Plaintiffs are left only with the argument that Defendants improperly disaggregated their allegations and did not consider the Complaint as a whole. Defendants have, to be sure, separately addressed each of Plaintiffs' allegations to be responsive, but there should be no doubt about Defendants' position: Plaintiffs' allegations, whether considered individually or collectively, are insufficient to sustain this Complaint.

The Complaint should be dismissed.

## I.     IN ARGUING THAT THE COMPLAINT IS INSUFFICIENT TO STATE A CLAIM, DEFENDANTS MERELY SEEK APPLICATION OF *TWOMBLY*.

Defendants did not and do not argue that *Twombly* created a "heightened" pleading standard. Rather, Defendants argue that *Twombly* clarified that in the context of a claim under Section 1 of the Sherman Act, the allegations of conspiracy in restraint of trade must go beyond boilerplate assertions to provide factual allegations "plausibly suggesting (not merely consistent with) agreement" to satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure. *Twombly*, 127 S. Ct. at 1966; Def. Br. at 16. As the Supreme Court stated, this "reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Id. Twombly* expressly "retire[d]" the formulation articulated in *Conley v. Gibson*, 355 U.S. 41 (1957), that for 50 years had provided that a

4

complaint was sufficient unless "it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts" in support of a claim. 127 S. Ct. at 1968-69. *Conley*'s formulation was considered inadequate because it resulted in sustaining complaints simply because they "left open the possibility" that a plaintiff could later prove some set of facts establishing conspiracy. *Id.* at 1968.

Noting that the Court's more recent decisions in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), "[had] made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy," the Court decided "it [was] time for a fresh look at adequacy of pleading when a claim rests on parallel action." *Twombly*, 127 S. Ct. at 1968 n.7. The Court in *Twombly* then clarified that, at the pleading stage, allegations of parallel conduct, without "further factual enhancement," stop "short of the line between possibility and plausibility" of entitlement to relief. *Id.* at 1966. *Twombly* offered instruction about what types of allegations do and do not sufficiently plead an illegal agreement. In particular, allegations of parallel conduct are in "neutral territory" and do not permit an inference of conspiracy unless they are placed in a factual context that suggests a preceding agreement. *Id.* Moreover, as Plaintiffs themselves recognize, Opp. Br. at 19, allegations are insufficient when there is an "obvious alternative [non-conspiratorial] explanation" for defendants' alleged conduct, 127 S. Ct. at 1972, or when defendants' alleged conduct is consistent with each defendant's "natural" unilateral interest. *See id.* at 1971 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway.").

Plaintiffs ask this Court to misapply the *Twombly* standard when they use the term "plausibly" to mean "possibly," as they do frequently in their Opposition. For example, Plaintiffs argue that, with regard to Defendants' alleged parallel pricing, "it is (at a minimum) *plausible* that Defendants' discussions at the AAR and otherwise were accompanied by improper communications, signaling, or signs of assent regarding their intentions about rail fuel surcharges." Opp. Br. at 49 (emphasis in original). In other words, they argue that Defendants *could have* hatched the alleged conspiracy at trade association meetings. Here, and in other places in their Opposition, *see, e.g.*, Opp. Br. at 41, 43, 58, they attempt to resuscitate the *Conley* "no set of facts" standard. As a result, they ask this Court to apply a standard at odds with *Twombly*: that they have stated a Section 1 claim simply because it is possible the observed conduct was the result of a conspiracy. This approach effectively would require Defendants to prove a negative at the pleading stage, and the *Twombly* Court plainly was going in the opposite direction.

Despite Plaintiffs' efforts to distinguish the allegations in their Complaint from those in *Twombly*, the allegations are quite similar. The *Twombly* plaintiffs alleged parallel conduct, which they surmised would be "anomalous" without a conspiracy. Consolidated Amended Class Action Complaint at ¶ 40, *Twombly v. Bell Atlantic Corp.*, No. 02-10220 (S.D.N.Y. Apr. 14, 2003) (Declaration of Tara L. Reinhart in Support of Joint Reply (hereinafter "Reinhart Reply Decl."), Ex. A). They supplemented their allegations of parallel conduct (*id.* ¶ 47) with allegations that the conduct grew out of deregulation (*id.* ¶¶ 25-38), that defendants routinely communicated through industry events (*id.* ¶ 46), that defendants could easily detect cheating on the alleged agreement (*id.* ¶ 49), that defendants refused to compete or negotiate in

good faith (*id.* ¶¶ 38-41, 47), that the market structure made collusion feasible (*id.* ¶ 48), and that the CEO of a defendant made an incriminating statement (*id.* ¶ 42-44).

Plaintiffs here make similar allegations. The Complaint offers conclusory allegations of an agreement to fix rail fuel surcharges and allegations that the Eastern and Western Railroads had parallel surcharges.[1] The Complaint offers additional allegations, but they are no more probative of conspiracy than the miscellaneous allegations in *Twombly*. Plaintiffs, like the plaintiffs in *Twombly*, are left with alleged observed conduct that is as consistent with independent behavior as with conspiracy and thus cannot withstand a motion to dismiss.

## II. THE ALLEGATIONS ARE INSUFFICIENT TO PLEAD AN AGREEMENT TO ESTABLISH UNIFORM FUEL SURCHARGES.

### A. The Undisputed History of Surcharge Adoptions Does Not Support An Inference of Conspiracy.

Defendants demonstrated that the Complaint and incorporated materials establish that UP switched to the HDF index that BNSF had been using for almost two years, and that many months later NS switched to the CSXT fuel surcharge mechanism (which differed from the

---

[1] Plaintiffs note that there are cases that have survived a *Twombly* challenge in large part because of allegations of an "actual" agreement. Opp. Br. at 23. But those cases are readily distinguishable because the allegations centered on an "actual" illegal agreement in the form of a contract, not a conspiratorial meeting of the minds inferred from conduct. For example, the "actual" anticompetitive agreements in one case were vertical supply contracts between defendants that foreclosed competition. *See In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (D. Tenn. 2008). Likewise, another court found "clear allegations of actual agreements" in a case that centered on a firm's alleged monopolization through anticompetitive swap transactions with its competitors. *See Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735, 738-39, 741 (E.D. Pa. 2007). In other words, these cases found sufficient allegations of "actual" agreement when the complaint alleged that written contracts or financial transactions were anticompetitive. Here, Plaintiffs' Complaint turns on allegations of parallel conduct and other actions by Defendants from which Plaintiffs seek to infer an agreement to fix fuel surcharges.

UP and BNSF mechanisms).  Def. Br. at 22-33.  Consequently, Plaintiffs now concede that in fact Defendants did not adopt their fuel surcharge mechanisms simultaneously.  Opp. Br. at 43, 53.  This is a rather abrupt turnaround from the allegations in the Complaint that the Western Railroads and the Eastern Railroads, respectively, simultaneously adopted fuel surcharge mechanisms containing such "novel, arbitrary, and complex combination of features" that no two railroads could have arrived at them independently.  CAC ¶¶ 12, 62, 72.[2]

Although Plaintiffs concede these facts, they insist that an inference of conspiracy is permissible because conspiratorial conduct need not occur simultaneously. [3]  Opp. Br. at 43.  It

---

[2]    In response to Defendants' submission of portions of their websites on fuel surcharges, Plaintiffs object that their Complaint does not "broadly incorporate[ ] Defendants' websites and all information presently available thereon."  Opp. Br. at 30 n.23.  Plaintiffs confuse the issue.  Defendants are permitted to cite to sources relied upon and incorporated into a complaint, *a proposition not disputed* by Plaintiffs.  *See* Def. Br. at 28 n.6 (citing cases).  Not only do Plaintiffs rely on Defendants' websites for the allegation that publishing surcharge information on websites facilitated collusion, CAC ¶¶ 14, 61, 71, they also use the fuel surcharge history information on the websites to construct their fuel surcharge tables, from which they allege that Defendants engaged in "lockstep" pricing that supports an inference of conspiracy.  CAC ¶ 83.  In fact, Plaintiffs cannot deny that their own tables of fuel surcharge history are recreated from Defendants' websites.  *See* Opp. Br. at 41 ("Defendants' *websites* bear these allegations out – BNSF and UP charged the exact same fuel surcharges, and NS and CSX charged the exact same fuel surcharges, through at least mid-2007.  (*See Compl.* ¶¶ *80, 82.*)").  Plaintiffs' protestation that they cannot "independently verify" the website data is irrelevant given Plaintiffs' own reliance on that data.  Lastly, Plaintiffs cite only one case in opposition, but that case relied on Second Circuit case law that has since been questioned and not followed by the Second Circuit.  *See Kramer v. Time Warner*, 937 F.2d 767, 773-74 (2d Cir. 1991).

[3]    Plaintiffs also offer up a slew of general principles of conspiracy.  Opp. Br. at 43-44.  The case Plaintiffs cite to support their argument involved a complex and lengthy conspiracy in which there were many co-conspirators with varying roles and degrees of participation in the illegal conduct.  *See, e.g., In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1056 (W.D. Wisc. 2000) (noting that, even though different defendants were involved at different times and used differing methods of accomplishing the conspiracy objectives, defendants pursued the same conspiratorial goal over the entire relevant period).  The cases cited in the Opposition at 44 n.35 are likewise beside the point.  The problem is not that Plaintiffs fail to detail all of the acts of all of the alleged conspirators, it is that they fail to plead facts plausibly suggesting the existence of *any* agreement in restraint of trade.

may be conceivable that a conspiracy could exist when competitors do not all take action at the exact same time; but Plaintiffs do not allege that Defendants changed their fuel surcharge mechanisms to match one another's within a matter of days, or even weeks of one another, where the close proximity of time could reasonably permit an inference of agreement.  Here, if Plaintiffs propose to proceed under a theory that UP and BNSF started the conspiracy in July 2003 when UP switched to the HDF index that BNSF had been using for almost two years, and that the two Western Railroads later lured the Eastern Railroads into the conspiracy, Plaintiffs must plead facts suggestive of an agreement between UP and BNSF in the first instance.  Arguing that the Western Railroads "may well have" entered the conspiracy first, Opp. Br. at 43, does not satisfy Plaintiffs' antecedent burden of pleading facts that plausibly suggest an agreement between these railroads.

Plaintiffs thus are left with conclusory allegations that UP "agreed" with BNSF when it switched to the HDF index that BNSF had been using for almost two years and that, "in furtherance of the conspiracy," NS switched to the same WTI index fuel surcharge mechanism as CSXT nine months after CSXT adopted its fuel surcharge mechanism.[4]  CAC ¶¶ 7, 12.  These are precisely the sorts of "labels and conclusions" forbidden by *Twombly*, 127 S. Ct. at 1964-65, as Plaintiffs have simply slapped the word "agreement" or "conspiracy" on situations in which one railroad merely adopted a mechanism that another railroad already had used for many months.

---

[4]    Conclusory allegations include, for example: "Defendants BNSF, UP, CSX and NS . . . conspired in 2003" (CAC ¶ 4); "In July 2003, . . . Defendants BNSF and UP . . . agreed to implement the same fuel surcharge program" (CAC ¶ 7); "in furtherance of the conspiracy, Defendants CSX and NS . . . now announced that each would apply identical fuel surcharges" (CAC ¶ 12); "[t]his announcement . . . was the result of their conspiracy with the Western Railroads" (CAC ¶ 12).

9

In an effort to overcome these obvious deficiencies, Plaintiffs make several arguments in their Opposition to support their theory that the "lockstep pricing" resulted from an unlawful agreement. First, they insist that the price parallelism must be viewed in the context of the other allegations in the Complaint, such as the creation of the AIILF. Opp. Br. at 45-46. But of course, the Complaint alleges that "lockstep pricing" existed before the AIILF, CAC ¶ 80, which negates any notion that AIILF was a preceding agreement responsible for subsequent lockstep pricing.[5] The Complaint also fails to explain how the after-the-fact creation of the AIILF renders plausible the allegation of a pre-existing agreement by UP and BNSF to impose the same surcharges.

Second, Plaintiffs contend that Defendants' explanation of "follow-the-leader" pricing" is pretextual because the railroads told their customers and the STB that the purpose of fuel surcharges was to recover their costs. Opp. Br. at 46-47. But there is nothing inconsistent in saying that the *purpose* of charging a surcharge is to address rapidly rising fuel costs and then taking into account a competitor's approach when choosing the surcharge mechanism. This is nothing more than consciously parallel behavior; but under Plaintiffs' approach, consciously parallel conduct always would be deemed pretextual (and thus supportive of an allegation of collective action) unless conscious parallelism was the reason given for the action at the time it was taken.

The Court should recognize this pretext argument for what it is – an effort to avoid the settled principle that if a competitor sets its own price, whether or not it elects to match

---

[5]    The facts of this case are unlike those in *Fair Isaac Corp. v. Equifax Inc*., a case relied on by Plaintiffs. There, defendants' alleged parallel price manipulation and denial of access to data was in "close temporal proximity" *after* the agreement by the credit bureaus to create a competing credit score to the one developed by Fair Isaac and previously relied upon by the credit bureaus. No. 06-4112, 2008 WL 623120, at *6 (D. Minn. Mar. 4, 2008).

or follow the price of its competitors, that is lawful, independent behavior.  *See, e.g.*, *United States v. Int'l Harvester Co.*, 274 U.S. 693, 708-09 (1927) ("And the fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination.").  Indeed, courts have found that in concentrated industries, as here, it is perfectly rational – and lawful – economic behavior for a competitor to match prices charged by its competitors.  *See, e.g., Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) ("A firm in a concentrated industry typically has reason to decide (individually) to copy" a competitor.).  The Supreme Court has long held that parallel conduct is just as consistent with independent behavior as with conspiracy and "[w]ithout more, parallel conduct does not suggest conspiracy." *Twombly*, 127 S. Ct. at 1964, 1966 (and cases cited therein).  And "purposefully following each other's prices," Opp. Br. at 45, which Plaintiffs find so suspicious, is just another way of describing parallel conduct.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (rejecting conspiracy inference because "similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy"); *In re Travel Agent Comm'n Antitrust Litig.*, No. 03:CV30000, 2007 WL 3171675, at *4 (N.D. Ohio Oct. 29, 2007) (rejecting conspiracy inference based on allegations that airlines adopted commission caps after other airlines).

Third, Plaintiffs contend that consciously parallel pricing is so close to the line of illegality that, when the surcharge pricing decisions are considered in conjunction with allegations of contemporaneous AAR and other industry meetings, an inference of conspiracy is plausible.  Opp. Br. at 48-49; CAC ¶¶ 58-59.  Significantly, Plaintiffs have not alleged any actual "improper discussions" about surcharges at these meetings, Opp. Br. at 48; they simply allege

11

the existence of the meetings themselves.  These allegations are conclusory and thoroughly

unhelpful, however, in light of the venerable antitrust principle (with which Plaintiffs take no

issue) that opportunities to conspire provide no basis for distinguishing conspiracy from

independent action.  *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963-64 (N.D.

Cal. 2007) (citing cases); *see also Twombly*, 127 S. Ct. at 1971 n.12.  In arguing that "it is (at a

minimum) *plausible* that Defendants' discussions at the AAR" and elsewhere must have

included agreements on fuel surcharges, Opp. Br. at 49 (emphasis in original), Plaintiffs are

implicitly invoking *Conley*'s discredited "possibility" standard for pleading agreement.

> Finally, Plaintiffs cling to the argument that Defendants' behavior was a "break
with [the] past," Opp. Br. at 51, and therefore probative of conspiracy.  But, as they do

throughout the Complaint and Opposition, they attempt to extrapolate an inference of a "break"

from sources that either contradict or do not support the inferences they seek to draw.[6]  The

Complaint and incorporated materials make clear that stand-alone, rate-based fuel surcharges had

been around for years.  Def. Br. at 27-30.  The 2007 STB decision establishes that rate-based fuel

surcharges actually date back to the 1970s.  *See Rail Fuel Surcharges*, STB Ex Parte No. 661, at

10 (Jan. 25, 2007) (Declaration of Tara L. Reinhart, dated May 30, 2008 (hereinafter "May 30

Reinhart Decl."), Ex. A).  In fact, the STB's predecessor agency, the Interstate Commerce

---

[6]    This is one of many examples of allegations in the Complaint that are contradicted by
Plaintiffs' stated source or are inconsistent with other allegations in the Complaint.  For
purposes of a motion to dismiss, a court need only credit well-pleaded allegations.  Where
allegations are inconsistent, a court need not accept them as true.  *In re Livent, Inc.
Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (citing cases).  "[T]he
standard to govern the sufficiency of the complaint presumes 'well-pleaded' allegations, and
it is only those pleadings the courts are charged to deem true.  Thus, a court need not feel
constrained to accept as truth conflicting pleadings that make no sense, or that would render a
claim incoherent, or that are contradicted either by statements in the complaint itself or by
documents upon which its pleadings rely, or by facts of which the court may take judicial
notice."  *Id.*

Commission ("ICC"), had permitted the use of such fuel surcharges since as early as 1975. Def. Br. at 10. All that changed in 2003 was that fuel costs began to rise rapidly, making it perfectly rational for Defendants to adjust their surcharge mechanisms to better address fluctuations in fuel.

    Another of Plaintiffs' sources in the Opposition and Complaint makes this clear. Plaintiffs cite an industry analyst to support the argument that the fuel surcharges in 2003 and 2004 were a "convergence" of methodologies that would not have occurred absent a conspiracy.[7] Opp. Br. at 46 n.37; CAC ¶ 84. The article quoting the analyst was published on July 14, 2003 – the same month that the Western Railroads purportedly agreed to charge uniform surcharges and many months before creation of the AIILF. The article discusses rail fuel surcharges that existed *prior* to the alleged conspiracy period and establishes that stand-alone, rate-based surcharges were being charged *before* the creation of AIILF, which purportedly made possible the widespread application of stand-alone, rate-based fuel surcharges. *See* John Gallagher, "Following the Competition," *Traffic World* (July 14, 2003) (Reinhart Reply Decl., Ex. B). The article establishes, as do Plaintiffs' other sources, that stand-alone, rate-based fuel surcharge

---

[7] Plaintiffs for some inexplicable reason do not concede that NS changed its fuel surcharge mechanism in July 2006. Opp. Br. at 54-55. Defendants' moving papers made the point that the railroad websites relied upon by Plaintiffs contradict the allegation in the Complaint that the CSXT and NS fuel surcharge mechanisms remained unchanged and in lockstep through 2007. Def. Br. at 29 n.9. Defendants supplied the page labeled "Current Fuel Surcharge Terms" which shows that "[e]ffective 7/01/2006" NS implemented a revised fuel surcharge mechanism. May 30 Reinhart Decl., Ex. E. Plaintiffs' Opposition relies on another page in Exhibit E clearly labeled "Previous Surcharge History" (which lists the monthly surcharge percentages of the mechanism implemented on March 1, 2004) to argue that, even with the change, "NS and CSX continued to charge the exact same fuel surcharges." Opp. Br. at 55. However, the "surcharge history" webpage for the July 1, 2006 change that accompanies the "surcharge terms" webpage which Defendants previously submitted establishes that the new NS fuel surcharge resulted in surcharges that are different from those charged by CSXT. *See* Norfolk Southern, *Fuel Surcharge History*, http://www.norfolksouthern.com/nscportal/nscorp/Customers/Public%20Prices/NS8003_hist ory.html?leaf=7/1/2006%20FSC%20Program%20History (last visited Aug. 7, 2008).

mechanisms were in place years before the alleged conspiracy or the creation of the AIILF and have existed since the 1970s with the permission of the STB's predecessor agency, the Interstate Commerce Commission ("ICC").  Def. Br. at 10, 27-30; *see also Rail Fuel Surcharges* at 10 (May 30 Reinhart Decl., Ex. A).[8]

**B.     The Alleged AIILF Conduct Does Not Support An Inference of Conspiracy.**

The Complaint alleges that Defendants agreed to fix, maintain, and standardize "prices for rail fuel surcharges."  CAC ¶ 104.  Recognizing that the repeated intonation of "lockstep pricing" is not enough, Plaintiffs now emphasize that the AIILF is the "core of the alleged price-fixing conspiracy."  Opp. Br. at 32.  Thus, Plaintiffs argue that the Complaint alleges that the Western Railroads agreed in July 2003 to fix fuel surcharges but realized later that they could not implement the agreement without an index that excluded fuel.  *Id.* at 2-3.  Therefore, they agreed with the Eastern Railroads to create and publish the AIILF.  *Id.*  The AIILF was "the central means by which the price-fixing conspiracy was effectuated" and constituted "the core of the alleged price-fixing conspiracy," *id.* at 31, 32, because only "[b]y removing fuel from the then-prevailing cost escalation indexes Defendants could begin assessing stand-alone fuel surcharges on a widespread basis and in a coordinated manner."  *Id.* at 11.  The

---

[8]    Plaintiffs do not dispute that there was a long history of rate-based fuel surcharges, but they instead argue that the STB admonished Defendants for such surcharges.  Opp. Br. at 15.  The purpose of the STB proceeding was to consider "whether this well-established practice [of rate-based fuel surcharges] continues to be a reasonable practice going into the future."  *Rail Fuel Surcharges* at 10 (May 30 Reinhart Decl., Ex. A).  The STB's concern was that rate-based fuel surcharges were not sufficiently correlated to the fuel costs associated with each particular movement of freight.  The STB decided that, in the future, railroads should calibrate fuel costs more closely to particular movements, using, for example, a mileage-based calculation.  *Id.* at 9.  There was no determination by the STB that the railroads recovered more than their fuel costs on a system-wide basis.  And, as relevant for present purposes, there was no suggestion of any collusion between the railroads with respect to fuel surcharges.

Complaint alleges that the coordinated fuel surcharges "*could only have been accomplished* by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes." CAC ¶ 74 (emphasis added). These AIILF allegations, however, do not salvage the Complaint.

        1.      Creation and Publication Of The AIILF By AAR Is Not A Restraint Of Trade.

At the outset, it is clear that the collective action in the AAR to create and publish the AIILF is not an "agreement in restraint of trade" that can support liability under Section 1. Trade association activity is always collective, and often of great benefit, and so courts in this context have been particularly rigorous in insisting that "[t]here can be no restraint of trade without a restraint." *Schachar v. Am. Acad. Of Opthomology*, 870 F.2d 397, 397-98 (7th Cir. 1989).

The need to prove (or in this case, to allege) facts constituting an agreement that restrains Defendants' conduct when complaining about collective action by a trade association is illustrated in the same cases cited in Defendants' opening brief and emanates from a long line of cases, starting with the Supreme Court in *Maple Flooring Manufacturers' Association v. United States*, 268 U.S. 563 (1925). In many of these cases, it is acknowledged that the dissemination of information or guidelines by a trade association might predictably result in "use" of that information by members, which could in turn have an "effect" on prices or conduct in the market. But this "effect" is not what is meant by a "restraint."

In *Maple Flooring*, the defendant flooring manufacturers had published, *via* their trade association, information regarding their production costs, freight rates, quantities and kinds of flooring sold, prices received, and inventory on hand. *Id*. at 566-67. The Court noted that distribution of such information was likely to be used by the members in a way that would have

an effect on prices in the market. *Id*. at 582. But the Court concluded that the agreement to publish such information, and the subsequent usage by members, was not itself a restraint, and further that the Court *could not infer* from such an agreement any "understanding on their part to do acts tending to effect an actual restraint of commerce." *Id*. at 577, 586. The fact that the tool is viewed as useful by the members, or discussed as useful, or is in fact subsequently used, does not constitute an agreement in restraint of trade. As the Supreme Court stated:

> We do not conceive that the members of trade associations become such conspirators merely because they gather and disseminate information, such as is here complained of, bearing on the business in which they are engaged and *make use of it in the management and control of their individual businesses.*

*Id*. at 584 (emphasis added).

In *Schachar*, an association of medical professionals published a statement advising the public to consider a certain procedure "experimental." 870 F.2d at 397. The plaintiffs – doctors performing that procedure – claimed such a joint public statement represented the "upshot of a conspiracy" among trade association members allegedly made for the purpose of reducing the use of this procedure. *Id*. at 398. Noting that the case should never have gone to trial, Judge Easterbrook ruled for the court that there was no evidence of any actual restraint on members' freedom of action: no requirement that members cease performing the operation, no penalty for members who performed it, and no inducement to others who might have the ability to govern whether the surgery was performed. *Id*. As the court noted, no plaintiff was prevented from or restricted in doing what he wished to do:

> Antitrust law is about consumers' welfare and the efficient organization of production. It condemns reductions in output that drive up prices as consumers bid for the remaining supply. . . . Other trade association cases [citations omitted] involved enforcement devices. Perhaps members boycotted those who fell out of step (as in *Professional Engineers*) or perhaps the producers agreed "not to manufacture, distribute, or purchase certain types of

16

products," as in *Allied Tube*. These enforcement mechanisms are the "restraints" of trade. *Without them there is only uncoordinated individual action, the essence of competition.*

*Id.* at 399 (internal citations omitted, emphasis added).

Similarly, in *Jays Foods, Inc. v. National Classification Committee*, 646 F. Supp. 604 (E.D. Va. 1985), *aff'd per curiam*, 801 F.2d 394 (4th Cir. 1986), a motor carrier trade association promulgated classification categories for commodities based on transportation characteristics that served as a useful reference tool in the setting of freight rates. "[N]either the function nor the effect of the Classification has precluded carriers from offering various price options, or from establishing or negotiating competitive rates." *Id.* at 606. The court recognized that the classification is "useful . . . in setting shipping rates and may affect such rates," but indicated this was not an antitrust problem because "so do road maps." *Id.* at 607.

It is through the lens of these cases, and what they teach about the kind of "agreement in restraint of trade" that must arise from trade association collective action, that Plaintiffs' AIILF allegations must now be viewed against *Twombly*'s requirements.

2.  The Complaint Does Not Adequately Allege An Agreement To Use In Restraint of Trade.

Plaintiffs argue that they have alleged more than an agreement to create and publish AIILF. They argue that they also have alleged an "agreement to use." That is news to Defendants.[9] But even if the Complaint were to include the phrase "agreed to use," that

---

[9]    The portions of the Complaint to which Plaintiffs refer when they insist that they have alleged an "agreement to use," *see* Opp. Br. at 33-34, actually allege only that Defendants agreed to create and publish the AIILF "so that" Defendants "could" use it in conjunction with stand-alone fuel surcharges in contracts with shippers. In fact, when Defendants described their Complaint to this Court previously, they characterized the AIILF allegations as an agreement to create and publish the AIILF, not as an agreement to use it. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Protective Order (May 14, 2008), at 4 ("[D]efendants conspired to use the AAR to publish a new cost-escalation index

*(cont'd)*

17

allegation would be just a conclusory label, akin to an allegation of "agreement to fix prices." To meet the pleading standard, Plaintiffs still must allege enough factual material, taken as true, to plausibly suggest that an agreement to restrain trade actually existed. Plaintiffs must allege "facts that are suggestive enough to render a § 1 conspiracy plausible." *Twombly*, 127 S. Ct. at 1965.

If *Twombly* stands for anything, it stands for the proposition that a conspiracy cannot simply be declared, in conclusory fashion, with no supporting facts defining the "factual context" of the unlawful agreement being alleged. The crucial failing of the Opposition is that Plaintiffs point to no allegations of fact – as distinguished from the boilerplate "agreement to use" label – which describe the factual *context* of any agreement in restraint of trade, or from which any such restraining agreement could plausibly be inferred.

Plaintiffs' theory apparently is that the Defendants recognized they could not broadly assess stand-alone, rate-based surcharges so long as there was "overwhelming[]" use of AII and RCAF in contracts. *Id.* at 30.[10]  Only by removing the fuel component from those indices would they be able to negotiate the fuel surcharges alleged to be the result of conspiracy.

---

*(cont'd from previous page)*
with fuel removed so that a separate 'fuel surcharge' could be broadly applied to their customers' rates."); at 6 n.2 ("[T]he defendants conspired to create and publish this new index in order to ensure the fulfillment of their conspiratorial objectives."); at 14 ("[T]he defendants caused the AAR in December 2003 to announce the new cost escalation index without fuel.").  Plaintiffs plainly are trying to bolster the Complaint in their Opposition, but in deciding a motion to dismiss, a court may not consider additional allegations made in the opposition brief that are not made in the complaint.  *See Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994) (finding that allegations in briefs or memoranda may not be considered when deciding a 12(b)(6) motion); *see also* 2-12 *Moore's Federal Practice - Civil* § 12.34 (2008).

[10]   Plaintiffs argue that, prior to creation of the AIILF, contracts "typically included" escalation clauses incorporating AII or RCAF.  Opp. Br. at 1.  There was "prevailing" use of AII and RCAF in contracts.  *Id.* at 2.

*Id.*  If, as Plaintiffs argue, the AII and RCAF were such obstacles, one would expect the Complaint to allege that Defendants agreed to substitute the AIILF broadly for the AII and RCAF in contracts, because that would be the only way to remove the "critical barrier to widespread imposition of the stand-alone fuel surcharges."  *Id*. at 2.  Yet, the Complaint does not allege, for example, that Defendants agreed that they would all start refusing to use RCAF in their contracts, and would instead insist on replacing it with AIILF coupled with a pre-agreed fuel surcharge provision.  The Complaint does not allege that Defendants agreed that they would comprehensively and broadly substitute the AIILF for the RCAF in new contracts or contracts that came up for renewal.  Nor does it allege that Defendants agreed to cease publishing the RCAF, or to take any action to make it difficult for shippers to resist the use of AIILF.  Nor is there any allegation that Defendants agreed to create an enforcement mechanism to monitor whether they actually were replacing RCAF provisions in contracts that came up for renewal with provisions tied to AIILF.  It is not that failure to allege *all* of these facts is fatal.  But failure to allege *any* of them – or any other facts about the relevant factual context of the conclusory "agreement to use" – surely is.

Tellingly, there are no allegations regarding *actual* use, other than a quote from one rail executive stating that his company planned to use AIILF.  CAC ¶ 68.  That quote is fully consistent with independent conduct; it does not suggest conspiracy.  And, remarkably, given that AIILF is now the supposed "core" of Plaintiffs' conspiracy theory, there are no allegations in the Complaint that Plaintiffs had contracts with Defendants in which the AIILF was used, or otherwise had terms of service subject to the AIILF.[11]

---

[11]  Plaintiffs' failure to allege that they were subject to AIILF in any form raises questions of Plaintiffs' standing to assert these claims.  Plaintiffs do not allege that they actually paid for any rail freight services where the AIILF was used and, thus, they do not allege that they were

*(cont'd)*

Any notion of an "agreement to use" the AIILF in restraint of trade is undercut by other allegations in the Complaint and materials incorporated within. As Defendants pointed out, other cost escalation indices are available. Def. Br. at 36 & n.14. Indeed, as late as 2007 the STB reported that railroads and shippers were "free to . . . incorporate into [their] contracts any escalation provision for fuel cost recovery that the parties wish." *Rail Fuel Surcharges* at 9 n.34 (May 30 Reinhart Decl., Ex. A). It is further undercut by the allegation that longer term contracts – to which the AIILF would have been most applicable – were receding in the industry and increasingly being replaced by shorter term contracts, CAC ¶ 89, which would contain no cost escalator, whether it be the AIILF, AII, RCAF or something else.

3.      There Are "Obvious Alternative Explanations" for Defendants' Conduct.

Plaintiffs contend there was no reason why the railroads would need to create the AIILF unless they were conspiring to remove a "barrier" to the negotiation of stand-alone, rate-based fuel surcharges. CAC ¶ 64; Opp. Br. at 1-2, 31-32, 53. Defendants already had a method of recovering fuel costs through the existing indices, the argument goes, and thus the creation of a fuel-less index and use of separate surcharges necessarily shows that they were taking collective action with respect to surcharges. This argument, however, founders on the reasoning of *Twombly*, because there are "obvious alternative explanations" both for the railroads' creation of AIILF and their use of stand-alone fuel surcharges that equally support an inference of unilateral conduct. Defendants provided these explanations, and Plaintiffs failed to address them.

_____

(cont'd from previous page)

injured by the conduct of which they complain. *See O'Shea v. Littleton*, 414 U.S. 488, 493 (1974) ("Plaintiffs in the federal courts must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction.") (internal citation and quotation marks omitted).

Defendants explained, using Plaintiffs' own sources, that RCAF is a quarterly mechanism for calculating changes in costs and thus is not as responsive to volatility in fuel prices as a monthly fuel surcharge. Def. Br. at 39. In a time of dramatically fluctuating fuel costs, it is surely not surprising that railroads (or any similar business) would find it desirable to make more timely adjustments. Indeed, in their submissions to the STB, the shippers (Plaintiffs in this case) argued that "RCAF should be modified as needed to address the carriers' time lag concern (which arises from the fact that the RCAF is adjusted only quarterly)." *Rail Fuel Surcharges* at 4 (May 30 Reinhart Decl., Ex. A).[12] Put simply, it is at least equally plausible, if not more so, that after the AAR made available a fuel-less index that could be used with a fuel surcharge, Defendants independently determined that it was in their interests to use AIILF in conjunction with fuel surcharges that would be more responsive to the volatility of fuel costs. Plaintiffs' rebuttal to this obvious alternative explanation is to bury their heads in the sand and simply assert that the allegations in the Complaint "must be fully credited at this stage of the proceedings." Opp. Br. at 39. But the alternative explanation holds up even if (contrary to what Plaintiffs must know is true) one accepts the allegation that RCAF and AII were perfect fuel cost recovery vehicles and were included in most contracts. No inference of conspiracy to fix rail

---

[12]  If there is any question that the use of stand-alone, rate-based fuel surcharges was not a novel idea that the railroads cooked up in 2003 or shortly before, one need only look to the fact that the House of Representatives in 2000 passed a bill mandating that motor carriers assess a fuel surcharge on their customers when fuel rises above a benchmark price based on the HDF Index. *See* H.R. 4441, 106th Cong. (2d Sess. Oct. 10, 2000). The surcharge could be based on the actual cost of fuel (*i.e.*, mileage-based) or calculated as a percentage of the freight rate. Although this legislation was not enacted into law, it is a further illustration that there is nothing novel about stand-alone, rate-based fuel surcharges.

fuel surcharges can be drawn from Defendants' decisions to pursue a *different* method of fuel cost recovery.[13]

Defendants also noted that removing fuel from RCAF would allay concerns about "double-dipping." The STB found in its 2007 decision that there had been continued usage of both a fuel surcharge and "a cost index that includes a fuel cost component, such as the Railroad Cost Adjustment Factor (RCAF)." *Rail Fuel Surcharges* at 1 (May 30 Reinhart Decl., Ex. A). The STB directed the railroads to "change this practice," *id.*, and endorsed the reasonableness of using a fuel surcharge in conjunction with an index that did not include fuel: "[T]he only circumstance in which the use of both a fuel surcharge along with a rate escalator would not constitute 'double dipping' is when the fuel component has been subtracted out of the index." *Id.* at 10-11. Given this finding by the STB, it is not surprising that Plaintiffs do not deny that the AIILF addresses this sort of "double-dipping" concern. If the STB believes that a railroad's usage of a fuel-less index coupled with a fuel surcharge is a "reasonable" business practice and one that eliminates potential "double-dipping," it is obvious that such a practice is likewise rational and something a railroad might well decide to pursue on its own to remedy this customer concern. It is hardly the kind of change in business practice that is more likely explained by collusion.

---

[13]  Unable to dispute that this is indeed a legitimate alternative explanation consistent with unilateral behavior, Plaintiffs ask why Defendants "had to address it collectively" through the AAR. Opp. Br. at 39. This is an absurd question. The AAR had for years been charged by the STB, and before that by the ICC, with responsibility for collecting cost data and calculating a variety of cost indices required by statute. Use of a clearinghouse to collect each railroad's individual cost data and perform the calculations necessary to produce a single index ensures that railroad-specific cost information is not exchanged between the railroads, and that the index is calculated consistently. As the AAR was already collecting all the information and calculating the RCAF, and calculation of the AIILF simply involved subtracting out the fuel component, the only practical approach was for AAR to calculate AIILF.

Plaintiffs further argue that Defendants cannot "reconcile" their explanations for the creation of the AIILF with the contemporaneous statement by BNSF that its CEO "led the charge on" the AAR's publication of the AIILF. Opp. Br. 40. In fact, no such reconciliation is necessary. If BNSF believed that such an index would allow for more timely fuel cost recovery than the RCAF or eliminate the risk of "double-dipping," then its endorsement of AIILF is perfectly consistent with unilateral behavior. Even accepting as true Plaintiffs' allegations that the AIILF may have made it easier for a railroad to assess a stand-alone, rate-based fuel surcharge, such convenience also would be a legitimate reason for BNSF executives, or any other railroad's executives, to ask the AAR to develop such an index without a fuel component. Indeed, such comments are far more benign than the comments by the ILEC executive in *Twombly* that the Supreme Court found were insufficient to suggest a conspiracy.[14] The fact that a railroad – or all of them – concluded that an index without fuel would be a useful tool is perfectly consistent with independent, unilateral conduct and does not plausibly suggest conspiracy. *Cf. Maple Flooring*, 268 U.S. at 585-86 (noting that industry cost statistics are "legitimate subjects of inquiry and knowledge in any industry" and refusing to find a conspiracy to fix prices from trade association members' desire to collect this information). Viewed in the full context of the Defendants' course of conduct and taking account of "common economic

---

[14]   The complaint in *Twombly* alleged that the CEO of an ILEC was quoted in a newspaper article saying it would be wrong to compete in another defendant's territory and that "it might be a good way to turn a quick dollar but that doesn't make it right." Consolidated Amended Class Action Complaint at ¶ 42, *Twombly v. Bell Atlantic Corp.*, No. 02-10220 (S.D.N.Y. Apr. 14, 2003) (Reinhart Reply Decl., Ex. A). Despite the provocative nature of the statement, the Supreme Court concluded that the complaint and the materials incorporated by reference therein provided a non-conspiratorial explanation for the executive's comment. *Twombly*, 127 S. Ct. at 1973 n.13.

experience," *Twombly*, 127 S. Ct. at 1971, the creation and publication of the AIILF do not plausibly suggest an unlawful agreement rather than independent parallel conduct.

> 4.    Plaintiffs Have Failed to Sufficiently Allege An Agreement to Fix Fuel Surcharges That Was Facilitated by the AIILF.

Plaintiffs try to shoehorn their AIILF allegations into a violation by arguing that lawful trade association conduct can lose its legal character when the conduct is part of an unlawful conspiracy, relying on *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119 (D.D.C. 2004), and asserting that Defendants "used the cover of the AAR to create and publish" the AIILF. Opp. Br. at 31-36. But *Jung* is no help to Plaintiffs, because there the court held that, even though lawful acts can facilitate a conspiracy and thereby become unlawful acts themselves, this does not "relieve[] plaintiffs of the burden of adequately alleging that a conspiracy to restrain trade existed in the first instance." 300 F. Supp. 2d at 161.[15] Likewise, in *Maple Flooring*, because there was nothing illegal about the dissemination of cost information,

---

[15]    Plaintiffs also note that *Jung* involved the publication of a survey of resident physicians' compensation levels as a device to facilitate the alleged compensation fixing conspiracy. The survey was one prong of a three-prong conspiracy allegation. Although the original motion to dismiss was denied, as this Court likely recalls, a subsequent motion to dismiss was successful after Congress immunized one of the prongs – the Match program. The Court held that the allegations of the compensation survey and the remaining prong (accreditation standards) could not together support an inference that a conspiracy existed. The Match was the "core" allegation supporting the threshold question of whether plaintiffs had alleged the existence of an antitrust conspiracy. 339 F. Supp. 2d 26, 37-38 (D.D.C. 2004). Plaintiffs in their Opposition analogize the AIILF to the compensation survey, Opp. Br. 37, but that is not a favorable comparison for them because this Court did not infer the existence of an antitrust conspiracy from the survey. Likewise, and even factoring in the Complaint's other allegations, the AIILF conduct is insufficient to infer the existence of an antitrust conspiracy in this case.

the Court ruled there must be other evidence of the existence of an illegal agreement to support a Section 1 claim. 268 U.S. at 586.[16]

This is exactly what the Plaintiffs have failed to do here. The AIILF is merely an index that includes the same cost components as RCAF and AII (minus the fuel component) that are developed for and submitted to the STB as part of its approval of the quarterly RCAF. The AIILF – which is the only collective action Plaintiffs have identified – offered the railroads the option to use it in conjunction with a surcharge, but compelled them to do nothing. By definition, it leaves the applicable fuel surcharge, if any, to be determined by the railroads in negotiation with their shippers. The AIILF neither specifies a fuel surcharge mechanism that must be used nor provides a recommended fuel surcharge. Its very structure allows for independent decision-making by railroads with regard to their fuel surcharges. These AIILF allegations, together with the allegations of parallel conduct and the conclusory allegations of agreement to fix fuel surcharges, simply do not add up to sufficient allegations of a conspiracy to fix fuel surcharges.

---

[16]   Plaintiffs also argue that they need not allege instances of restraints with respect to the AIILF. Opp. Br. at 34-35. The argument is not well-founded. The cases cited in support establish only that one type of restraint, coercion, need not be shown if there already is evidence of an existing agreement in restraint of trade. The cases stand for the proposition that parties to an illegal agreement have no defense in that they "applied no coercion to bring about adherence" to the illegal agreement's terms. *FTC v. Pac. States Paper Trade Ass'n*, 273 U.S. 52, 59-60 (1927) (enforcement mechanism not necessary when there was evidence that associations and members had already agreed to fix prices and used enforcement mechanisms in neighboring states); *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 385 (1921) (coercion not necessary when evidence showed 91% of association membership participated in a "plan" for the dissemination of sales, pricing, production, and inventory data and for meetings at which curtailment of production and increase of price was accomplished); *United States v. Nat'l Ass'n of Broadcasters*, 536 F. Supp. 149, 163 (D.D.C. 1982) (coercion not necessary after a finding that NAB Code was an agreement among competitors restricting the availability of commercial television time and was "the classical horizontal agreement which the Sherman Act was designed to reach"). Since evidence of an agreement in violation of Section 1 was already established, the lack of an enforcement mechanism or coercion in those cases was therefore inconsequential. In contrast here, the existence of an agreement in violation of Section 1 has not been sufficiently alleged.

**C.    Plaintiffs' Additional Allegations Provide No Further Support for Conspiracy.**

In further defense of their allegations, Plaintiffs accuse Defendants of engaging in an "improper approach[]" – specifically, offering *post hoc* justifications for the conduct alleged in the Complaint.  Opp. Br. at 4, 37-41.  They further assert that Defendants "face a formidable burden in attempting to give *post hoc* justifications."  *Id.* at 37.  At one point, Plaintiffs even contend Defendants "must give such a compelling explanation that it renders Plaintiffs' conspiracy allegations implausible."[17]  *Id.* at 38.  Through these arguments, Plaintiffs have twisted the pleading standard and invented burdens where none exist.

The burden rests with Plaintiffs to state a claim that satisfies the requirement of Rule 8 as articulated by the Supreme Court in *Twombly*.  As explained above, it is permissible for defendants to offer and courts to consider arguments and explanations that the allegations are "merely consistent with" agreement and therefore insufficient to survive dismissal.  *See* Part I, *supra*.  The Court in *Twombly* refused to credit allegations that had "an obvious alternative explanation."  *Twombly*, 127 S. Ct. at 1972.  The Court was receptive to "natural explanation[s]" for the alleged conduct that were grounded in the context of the market.  *Id.*  Lower courts since *Twombly* similarly have found alleged conspiratorial actions to be subject to alternative explanations suggesting the actions were consistent with independent behavior.  *See Late Fee*, 528 F. Supp. 2d at 963 (court reasoned it was "rational for each defendant *independently* to decide to increase late fees" in response to common industry problems) (emphasis in original);

---

[17]    Plaintiffs misstate the law in an attempt to shift their burden to Defendants.  They cite a few summary judgment cases which clearly are not on point, as well as *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1 (D.D.C. 2008).  The court in *Moundridge* ruled that a complaint need not tend to "exclude the possibility" of independent action (the summary judgment standard), but in no way held that Defendants must give a compelling explanation rendering Plaintiffs' conspiracy allegations implausible as Plaintiffs argue in their Opposition.  *Id.* at 5.

*Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 578-79 (S.D.N.Y. 2007) (parallel insistence by record companies for plaintiff to obtain a license of technology was consistent with unilateral desires to avoid legal risk).

Just as Defendants provided alternative, non-conspiratorial explanations for the creation of the AIILF, Defendants also offered similar explanations for Plaintiffs' ancillary allegations, as well as pointed out where these allegations contradict Plaintiffs' conspiracy theory or their other allegations. Despite Plaintiffs' attempts to rehabilitate their ancillary allegations, they simply demonstrate the insufficiency of Plaintiffs' price-fixing conspiracy claim.

1.    Shorter Term Contracts

Plaintiffs allege that the Defendants "largely switched" from offering longer term contracts to contracts with terms as short as one month. CAC ¶ 89. Plaintiffs now concede that it is economically rational, and thus not against self-interest, to move to shorter term contracts during a period of tight capacity and high demand as Plaintiffs allege in the Complaint. Opp. Br. 58; CAC ¶ 53. Nonetheless, Plaintiffs continue to maintain the alleged movement to shorter term contracts supports their conspiracy claim. Defendants previously explained how the alleged movement to shorter term contracts is actually inconsistent with Plaintiffs' allegations regarding AIILF, which is used in longer term contracts. Def. Br. at 42-43. Plaintiffs now insist that the two allegations are complementary, but that argument holds no water. The AIILF, which Plaintiffs admit would have no value in a short, 30- or 60-day contract, is the "core" of their conspiracy theory, yet the Complaint explicitly alleges *at roughly the same time* Defendants created the AIILF they "switched" from offering longer term contracts to shorter term contracts. CAC ¶ 89. If, as alleged, the AIILF was being added to contracts when Defendants had "switched" to shorter term contracts, logic dictates that few contracts would contain AIILF.

27

Plaintiffs' short-term contract allegation simply does not support an inference of conspiracy, and in fact directly contradicts Plaintiffs' conspiracy theory.

      2.      Publication of Fuel Surcharge Rates

      Defendants previously explained how publishing the terms of their fuel surcharges on the Internet is consistent with their regulatory and common carrier obligations (particularly the requirement of 20-day notice to shippers of rate increases), as well as a common business practice in industries without such obligations.  Def. Br. at 44-45.  Plaintiffs fail to take into account facts that are peculiar to transportation industries.  Publication gives the thousands of shippers notice about the fuel surcharge applicable to their traffic, thereby facilitating planning and audit.  In the context of the railroad industry, the alleged conduct is consistent with independent, legitimate behavior.  In any event, in cases featuring publication of actual prices, courts have found that such information exchange does not support an inference of conspiracy. *See, e.g., Travel Agent*, 2007 WL 3171675, at *11 (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978)).

      3.      Through Rates

      Plaintiffs also allege that Defendants began to decrease the use of through rates (which produce a single rate and bill for an interline movement) to provide transparency to other railroads as to its fuel surcharges on each movement and to allow each Defendant in an interline movement to separately bill its own surcharge.  CAC ¶ 94.  Now, in response to Defendants educating Plaintiffs that transparency actually would be decreased in such a scenario and that a surcharge may be assessed in either context (through rate or single rate), Def. Br. at 43-44, Plaintiffs imply that when shippers were billed separately the billing carrier would voluntarily disclose its separate rate/bill to its direct competitor to serve some conspiratorial policing function.  First, Plaintiffs neither allege this theory in their Complaint nor explain in their

28

Opposition when or how this disclosure would occur. Second, railroads are prohibited by federal law from disclosing information that may be used to the detriment of the shipper. *See* 49 U.S.C. § 11904. Plaintiffs are grasping at straws with this allegation, which is based on their confusion or lack of knowledge regarding the nature of interline operations; it does not advance the Complaint's overall conspiracy theory.

               4.       Failure to Negotiate and Market Share Stabilization

Plaintiffs allege that Defendants failed to negotiate or compete on fuel surcharges. CAC ¶¶ 92, 95. This, Plaintiffs argue, was not consistent with Defendants' self-interest. According to Plaintiffs, these failures to negotiate and to compete lead to, and are illustrated by, market share stabilization. Opp. Br. at 61-62, 63.

The alleged failure to negotiate or compete is, as Defendants pointed out previously, consistent with unilateral behavior in an industry going through a period of high demand, tight capacity, and skyrocketing fuel costs. CAC ¶¶ 53, 75. Plaintiffs do not dispute this other than to state it is not a "necessary inference." Opp. Br. at 62. But, this provides an obvious alternative explanation that is consistent with independent conduct. The Complaint indicates a willingness by Defendants to negotiate contract terms prior to 2003 and concludes that, by contrast, an unwillingness to negotiate after that permits an inference of conspiracy. CAC ¶ 92; Opp. Br. at 61. Yet, an alternative explanation for that alleged willingness can be found in the fact that, before 2003, fuel prices and freight demand had not experienced the sharp increases seen during the alleged conspiracy period.[18]

---

[18]   The U.S. Department of Energy website shows the start of fuel price's climb is contemporaneous with the start of the class period. *See* Energy Information Administration, *Cushing, OK WTI Spot Price FOB*, http://tonto.eia.doe.gov/dnav/pet/hist/rwtcM.htm (last visited Aug. 7, 2008).

In addition, courts have frequently rejected the argument that failing to negotiate prices with customers is against the self-interest of companies in a concentrated market, as here. CAC ¶ 51. In a highly concentrated market, an attempt by one company to increase its market share by cutting prices runs the risk that competitors will match the lower price and the company will wind up with lower prices but no gain in market share. *See Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003); *Clamp-All*, 851 F.2d at 484. Therefore, the alleged avoidance of attempts to compete and steal market share is not necessarily against self-interest.

Finally, Plaintiffs seek to infer a conspiracy from their allegation that market shares of the Defendants were stable during the conspiracy period. Once again, their arguments are refuted by other allegations in their own Complaint. Plaintiffs allege that the railroad industry is highly concentrated and during the conspiracy period experienced "tight capacity." CAC ¶¶ 51, 53. In such an economic context, there is no logic to expect a significant variation in market share. Competing on price in a concentrated industry does not assure that a company will increase market share, particularly when there already is tight capacity, which means that output cannot readily be expanded. Indeed, the only case cited by Plaintiffs on this point stated, at the summary judgment stage, that such market share data "probably does not deserve as much weight as the plaintiffs give it" and called any potential inference "conjecture" because market share stability could result from a variety of explanations. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659-60 (7th Cir. 2002).

5.    Government Investigation

In the Complaint, Plaintiffs cite to an investigation by the State of New Jersey. CAC ¶ 18. Defendants responded that "no negative inference should be drawn from the mere existence" of such an investigation. Def. Br. at 46. That remains Defendants' position, but, in

the interest of completeness, Defendants advise the Court that they each have been notified by New Jersey that it is not proceeding with the investigation at this time.

## III.    CONCLUSION

Relying on *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), Plaintiffs contend that Defendants "improperly disaggregated what the Complaint alleges" to avoid evaluating all of the allegations as a whole.  Opp. Br. 4, 37-41.  This could not be further from the truth.  Defendants address Plaintiffs' broad allegations of a conspiracy to fix uniform fuel surcharges, Plaintiffs' allegations that the AIILF effectuated the conspiracy, and Plaintiffs' potpourri of ancillary allegations.  Whether viewed separately or collectively, those allegations are insufficient under *Twombly* to "nudge[] their claims across the line."  *Twombly*, 127 S. Ct. at 1974.

For the foregoing reasons, Defendants respectfully request that Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint be dismissed.

Dated: August 7, 2008                         Respectfully submitted,


/s/ John M. Nannes____ _____
John M. Nannes (D.C. Bar #195966)
Tara L. Reinhart (D.C. Bar #462106)
Sean M. Tepe
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005

*Attorneys for Defendant Norfolk Southern Railway Company*

31

Richard J. Favretto
Mark W. Ryan
Gary A. Winters
MAYER, BROWN, ROWE & MAW LLP
1901 K Street, N.W.
Washington, D.C.  20006

*Attorneys for Defendant BNSF Railway Company*


Richard McMillan, Jr.
Kent A. Gardiner
Kathryn D. Kirmayer
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004

*Attorneys for Defendant CSX Transportation, Inc.*


Alan M. Wiseman
Joseph A. Ostoyich
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004


Tyrone R. Childress
David G. Meyer
HOWREY LLP
550 South Hope Street, Suite 110
Los Angeles, CA  90071

Attorneys for Defendant Union Pacific Railroad
Company

32

**CERTIFICATE OF SERVICE**

I, Tara L. Reinhart, an attorney, certify that on August 7, 2008, I caused a true and correct copy of Defendants' Joint Reply to Direct Purchaser Plaintiffs' Opposition in Response to Defendants' Joint Motion to Dismiss and Declaration of Tara L. Reinhart in Support of Defendants' Joint Reply to Direct Purchaser Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss and exhibits thereto to be filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to co-lead counsel for all plaintiffs.

/s/ Tara L. Reinhart

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |
| This document relates to:<br><br>ALL CASES | |

**DECLARATION OF TARA L. REINHART
IN SUPPORT OF DEFENDANTS' JOINT REPLY TO DIRECT PURCHASER
PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**

I, Tara L. Reinhart, declare pursuant to 28 U.S.C. § 1746 as follows:

      1.    I am Counsel with the law firm Skadden, Arps, Slate, Meagher & Flom

LLP, attorneys for Defendant Norfolk Southern Railway Company in the above-captioned matter.

I submit this declaration on behalf of all Defendants in the above-captioned matter.  I have

personal knowledge of the matters set forth herein.

      2.    Attached hereto as Exhibit A is a true and correct copy of the

Consolidated Amended Class Action Complaint from *Twombly v. Bell Atlantic Corp.*, No. 02-

10220 (S.D.N.Y. Apr. 14, 2003).

      3.    Attached hereto as Exhibit B is a true and correct copy of the article

"Following the Competition" from *Traffic World*, dated July 14, 2003 and cited in paragraph 84

of the Consolidated Amended Class Action Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2008.

       /s/ Tara L. Reinhart

Tara L. Reinhart (D.C. Bar #462106)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

# EXHIBIT A

# ORIGINAL



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____  X

WILLIAM TWOMBLY and LAWRENCE
MARCUS, individually and on behalf of all others
similarly situated,

                        Plaintiffs,

           - against -

BELL ATLANTIC CORPORATION,
BELLSOUTH CORPORATION, QWEST
COMMUNICATIONS INTERNATIONAL, INC.,
SBC COMMUNICATIONS, INC., and VERIZON
COMMUNICATIONS, INC.,

                    Defendants.

_____  X

: Civil Action No. 02 CIV. 10220 (GEL)
:
:
: **CONSOLIDATED AMENDED**
: **CLASS ACTION COMPLAINT**
:
:
: **JURY TRIAL DEMANDED**
:
:



Plaintiffs, by and through their undersigned attorneys, for their Amended Class Action Complaint allege the claims set forth herein. Plaintiffs' claims as to themselves and their own actions, as set forth in ¶ ¶ 9 and 10 are based upon their own knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel.

## I.

## NATURE OF THE ACTION

1.    This lawsuit is brought as a class action on behalf of all individuals and entities who purchased local telephone and/or high speed internet services in the continental United States (excluding Alaska and Hawaii) from at least as early as February 8, 1996 and continuing to present (the "Class Period").

2.      The Telecommunications Act of 1996, 47 U.S.C. §§ 151 to 614 (the "Act") was designed to promote competition for local telephone services by opening the markets to effective competition. The purpose, intent and requirements of the Act are to create competition without delay in the local telephone services markets so that the public's local telephone bills and charges will be reduced as soon as possible by virtue of such competition.

3.      Local telephone services include traditional dial tone primarily used to make or receive voice, fax, or analog modem calls from a residence or business and exchange access services which allow long distance carriers to use their local exchange facilities to originate and terminate long distance calls to end users. Local telephone services also include, but is not limited to, custom calling services such as Caller ID, Call Waiting, Voice Mail and other advanced services. High speed internet services include circuits that connect customers to the internet at speeds in excess of 56K such as, but not limited to, T1 lines, asynchronous transfer mode circuits, frame relay circuits, ISDN, and digital subscriber lines ("DSL"). The rates concerning certain features or services are either not subject to tariff filing requirements and/or are not subject to any meaningful review.

4.      Plaintiffs allege that Defendants entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another.

5.      As a direct and proximate result of Defendants' unlawful contract, combination or conspiracy, Plaintiffs and members of the Class allege that Defendants have hindered the development of the local telephone and/or high speed internet services markets. Plaintiffs and members of the Class further allege that they have been and continue to be denied the benefits of free

- 2 -

and unrestrained competition for local telephone and/or high speed internet services. Plaintiffs and members of the Class have, therefore, been forced to pay supracompetitive prices for such services causing them to sustain injury to their business or property.

## II.

### JURISDICTION AND VENUE

6.    Plaintiffs bring this class action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, to recover treble damages and injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries arising from violations by Defendants of the federal antitrust laws, including Section 1 of the Sherman Act. 15 U.S.C. § 1.

7.    The Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has supplemental jurisdiction over the state antitrust law claims pursuant to 28 U.S.C. § 1367.

8.    Venue in this district is proper pursuant to 28 U.S.C. §1391(b)(2) because a part of the events or omissions giving rise to the claims occurred in this district, and pursuant to 28 U.S.C. §1391(b)(3) and 15 U.S.C. §§15 and 22 because Defendants Bell Atlantic and Verizon have maintained or maintain a principal place of business within this district.

## III.

### PARTIES

9.    Plaintiff William Twombly is a resident of Bethel, Connecticut. At times relevant herein, William Twombly was a resident of New York, New York and purchased local telephone

- 3 -

and/or high speed internet services from Defendants Bell Atlantic Corporation or Verizon Communications, Inc.

10.    Plaintiff Lawrence Marcus is a resident of Maple Glen, Pennsylvania. At times relevant herein, Lawrence Marcus purchased local telephone and/or high speed internet services from Defendants Bell Atlantic Corporation or Verizon Communications, Inc.

11.    Defendant Bell Atlantic Corporation is a Delaware corporation with its principal place of business at 1095 Avenue of Americas, New York, New York. Bell Atlantic Corporation is a telecommunications company with principal operating subsidiaries (together with the parent company "Bell Atlantic") that provide local telephone and/or high speed internet services to subscribers in Connecticut, Delaware, Maryland, Massachusetts, Maine, New Hampshire, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, Virginia, West Virginia and the District of Columbia.

12.    Defendant BellSouth Corporation is a Delaware corporation with its principal place of business at 1155 Peachtree Street, N.E., Atlanta, Georgia. BellSouth Corporation, is a telecommunications company that, through its wholly owned subsidiaries including but not limited to Bell South Telecommunications, Inc. (together with the parent company "BellSouth"), provides local telephone and/or high speed internet services to millions of subscribers in Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina and Tennessee ("BellSouth").

13.    Defendant Qwest Communications International, Inc., is a Delaware corporation with its principal place of business at 1801 California Street, Denver, Colorado. Qwest Communications International, Inc., is a telecommunications company that, through its wholly-owned subsidiaries

- 4 -

including but not limited to Qwest Corporation, Inc (together with the parent company "Qwest"), provides local telephone and/or high speed internet services in fourteen states, including Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming ("Qwest").

14.    Defendant SBC Communications, Inc., is a Delaware corporation with its principal place of business at 175 East Houston, San Antonio, Texas.  SBC Communications, Inc., is a telecommunications company that, through its operating subsidiaries including but not limited to SBC Ameritech, SBC Nevada Bell, SBC Pacific Bell, SBC SNET and SBC Southwestern Bell (together with the parent company "SBC"), provides local telephone and/or high speed internet services to subscribers in Arkansas, California, Connecticut, Florida, Illinois, Indiana, Kansas, Michigan, Missouri, Nevada, Ohio, Oklahoma, Texas and Wisconsin.

15.    Defendant Verizon Communications, Inc. ("Verizon") is a Delaware corporation with its principal place of business at 1095 Avenue of Americas, New York, New York.  GTE Corporation ("GTE") merged with and became a wholly-owned subsidiary of Bell Atlantic.  Bell Atlantic now does business as Verizon Communications, Inc.

## IV.

### CO-CONSPIRATORS

16.    Various other persons, firms, corporations and associations, not named in this Complaint, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.

**V.**

**BACKGROUND**

A.    **The Bell Operating System and Divestiture**

17.    During the early part of its approximately 120-year history, the telephone industry experienced varying periods of competition, monopolization and regulation. By 1934, the Bell System, consisting of Bell Operating Companies, along with American Telephone and Telegraph Company ("AT&T"), owned 80 percent of all the local telephone lines and services in the United States and owned a monopoly long-distance network. The Bell Operating Companies were wholly-owned subsidiaries of AT&T.

18.    In 1934, the Communications Act of 1934 was adopted. That act severed regulation of the telephone industry from the Interstate Commerce Commission and provided for the creation of the Federal Communications Commission ("FCC") to regulate interstate telephone, telegraph and radio companies. Interstate and international telephone services fell under the aegis of the FCC, and intrastate telephone services became regulated under the auspices of respective state commissions. Once a telephone communications service crossed a state line, it fell under the jurisdiction of the FCC.

19.    In 1974, the United States filed a lawsuit against AT&T alleging that it had monopolized and conspired to restrain trade in the manufacture, distribution, sale and installation of telephones, telephone apparatus equipment and materials and supplies in violation of §§ 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2, and 3. The basic theory of the government's case, as explained by the District Court, was that AT&T had unlawfully used its control of local exchange facilities to suppress competition in related markets, such as the markets for long distance services,

- 6 -

which are dependent upon access to the local exchange to originate and terminate calls. *United States v. AT&T*, 524 F. Supp. 1336, 1352 (D.D.C. 1981).

20.    In 1982, the United States and AT&T agreed to settle the case through the entry of a consent decree. In 1982, United States District Court Judge Harold H. Greene signed the Modified Final Judgment, settling the antitrust suit against AT&T. The Modified Final Judgment was based on divestiture; AT&T was required to divest itself of its twenty-two Bell Operating Companies ("BOCs"). The BOCs provided the means by which local telephone service was furnished. Bell customers gained access to the network for both local and long distance telecommunications services through the BOCs. The Modified Final Judgment, however, imposed certain business restrictions on the newly divested BOCs. Specifically, the BOCs were prohibited from providing interLATA services (which are long distance services involving calls that terminated outside the "local access and transport area" in which they originate, as defined in the Modified Final Judgment), or any non-telecommunications services, and from manufacturing telecommunications equipment. In addition, the Modified Final Judgment required the BOCs to provide all interexchange carriers (*i.e.*, long distance providers) with exchange access that was equal in type, quality and price to the access provided to AT&T. *United States v. AT&T*, 552 F. Supp. 131, 227 (D.D.C. 1982), *aff'd sub nom., Maryland v. United States*, 460 U.S. 1001, 103 S. Ct. 1240, 75 L.Ed.2d 472 (1983).

21.    On January 1, 1984, divestiture of the Bell System by AT&T took effect. AT&T divested the seven Regional Bell Operating Companies ("RBOCs") and exited the local telephone business. The RBOCs were barred from providing long distance services. The seven RBOCs became known as the Baby Bells and included: Ameritech; SBC Communications; Pacific Telesis; Bell South; US West; Bell Atlantic; and NYNEX. SBC became the parent corporation of

- 7 -

Southwestern Bell, and Pacific Telesis became the parent corporation of Pacific Bell and Nevada Bell. SBC and Pacific Telesis merged in early 1997. NYNEX and Bell Atlantic merged in mid-1997 and became known as Bell Atlantic Corporation. Bell Atlantic later merged with GTE Corporation and is now doing business as Verizon Communications, Inc.

22.    Local telephone companies such as the Bell Operating Companies are commonly referred to as local exchange carriers ("LECs") and provide business and residential customers with local telephone and/or high speed internet services.

23.    In addition to the Bell Operating Companies, there are hundreds of other local exchange carriers operating in the United States. These local exchange carriers generally offer the same services as the Bell Operating Companies. Although GTE was not one of the original Bell Operating Companies, prior to merging with Bell Atlantic it acquired local telephone systems in 28 states and was one of the largest local phone companies in the nation in terms of telephone lines. Local exchange carriers historically operated in their local franchise areas free of competition, pursuant to exclusive franchises granted by state regulatory authorities.

24.    A consent decree also was entered against GTE in 1984. *United States v. GTE Corp.*, 1985-1 Trade Cas. (CCH) § 66.355 (D.D.C. 1984) ("GTE Consent Decree"). The GTE Consent Decree was prompted by GTE's acquisition of one of the largest long-distance companies in the United States, and was based upon the same concerns underlying the AT&T consent decree with the United States. Under the GTE Consent Decree, operating companies (*i.e.*, the local exchange providers) were prohibited from providing long distance services, but GTE Corporation itself was permitted to provide long distance services through other subsidiaries. GTE was required to maintain total separation between its long distance operations and the GTE operating companies, so

- 8 -

that those companies could not use their position as exclusive local telephone service providers within their franchised areas to lessen competition in long distance services.

### B.    The Telecommunications Act of 1996

25.    On February 8, 1996, the Telecommunications Act of 1996 became law when it was signed by President Clinton. Pub. L. No. 104, 110 Stat. 56. The Act amends the Communications Act of 1934. (See 47 U.S.C. § 609, Historical and Statutory Notes.) The Act changed the landscape of federal and state telecommunications regulatory policies and the telecommunications industry.

26.    The Act adopts a pro-competitive framework for the telecommunications industry in the United States. It opens the markets for both local telephone and long-distance services to effective competition.

27.    Because of their prior unique existence as government granted monopolies and the benefits that they enjoyed as government granted monopolies, the Act requires that the LECs, including Defendants, must provide potential competitors access and connections to their lines and equipment on just, reasonable and non-discriminatory terms.

28.    The Act also requires the incumbent local exchange companies ("ILEC") to provide competitors with the same quality of service that the incumbent local exchange carriers provide to themselves or their own customers. The Act specifically defines an ILEC as follows: "With respect to an area, the local exchange carrier that on February 8, 1996, provided telephone exchange service in such area." 47 U.S.C. § 251. The seven original RBOCs, GTE and Defendants herein are ILECs.

-9-

29.    With respect to long-distance service, the Act establishes a detailed mechanism for the RBOCs to compete for the first time in the long distance business. Unlike the RBOCs, GTE was allowed to expand into long-distance telephone service as soon as the Act became law on February 8, 1996.

30.    Pursuant to the Act, before the respective RBOCs can offer long-distance telephone service, they must, *inter alia*, satisfy a 14-point checklist of requirements and demonstrate that there is competition in their respective local markets. It is up to the FCC in coordination with the Department of Justice and various state public utilities commissions to decide, upon request by an RBOC, when the RBOC has met the requirements.

31.    Section 251 of the Act (47 U.S.C. § 251) imposes certain obligations on ILECs designed to permit new entrants to use some or all of the ILECs' networks to offer local-exchange services.

32.    Section 251 of the Act requires an ILEC to: (1) allow a competitor to interconnect with its network so that the competitor can provide calls to and from that network; (2) sell to competitors access to components of its network, called network elements, on an unbundled or individual basis; and (3) sell its retail telephone services to competitors at wholesale prices. All of these requirements of an ILEC are to be provided by the ILEC "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." *Id.* Section 251 imposes specific obligations on telecommunications carriers designed to promote competition in local exchange markets across the country. Federal Register/Vol. 61. No. 169, August 29, 1996, at 45476.

33.     The Act directed the FCC to establish regulations to implement § 251's requirements within six months of its enactment. On August 8, 1996, the FCC released its Report and Order ("Report and Order").

34.     The Report and Order promulgated "national rules and regulations implementing the statutory requirements of the Act intended to encourage the development of competition in local exchange and exchange access markets." Federal Register/Vol. 61. No. 169, August 29, 1996 at 45476.

35.     GTE and the RBOCs appealed the Report and Order to the 8th Circuit, and on October 15, 1996, the 8th Circuit stayed the Report and Order, including its pricing rules and regulations, pending a decision on the merits. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996). The group defending the Report and Order included, among others, the FCC and the U.S. Department of Justice.

36.     On July 18, 1997, the U.S. Court of Appeals for the Eighth Circuit filed its Opinion in the *Iowa Utilities Board v. FCC* case. *Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997). The Court vacated certain provisions of the FCC's Report and Order and upheld the remainder. Specifically, the Court stated: "We decline the petitioners' request to vacate the FCC's entire First Report and Order and limit our rejection of FCC rules only to those that we have specifically overturned in this opinion." *Id.* at 819. In a footnote, the Court stated: "In total we vacate the following provisions: 47 C.F.R. §§51.303 51.305(a)(4) 51.311(c)-f 51.317 (vacated only to the extent this rule establishes a presumption that a network element must be unbundled if it is technically feasible to do so) 51.405 51.501-51.515 (inclusive except for 51.515 (b) 51.601-51.611 (inclusive) 51.701-51.717 (inclusive except for 51.701 51.703 51.709 (b) 51.7119a0910 51.7159d0

- 11 -

and 51.717 but only as they apply to CMRS providers) 51.809 First Report and Order ¶¶ 101-103

121-128 180. We also vacate the proxy range for line ports used in the delivery of basic residential

and business exchange services established in the FCC's Order on Reconsideration dated September

27 1996." *Id.*

### C.    The RBOCs' Market Allocation and Refusal to Compete

37.    The 1996 Telecommunications Act authorized RBOCs to offer local telephone and/or

high speed internet services in each other's territories, yet they have stayed almost completely out

of one another's markets. Indeed, "[t]he major telephone companies have not sought to provide local

telephone service outside of their home territories." Consumer Federation of America, *Lessons From*

*1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer*

*Disaster*, February 2001, p. 2. "Major incumbent service providers have failed to attack markets

within their industry . . . [m]ajor incumbent service providers have failed to use their facilities to

attack cross markets." *Id.* at 20.

38.    "It was hoped that the large incumbent local monopoly companies (RBOCs) might

attack their neighbors' service areas, as they are the best situated to do so. But such competition has

not happened. The incumbent local exchange carriers (RBOCs) have simply not tried to enter each

other's service territories in any significant way." Consumer Federation of America, *Lessons From*

*1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer*

*Disaster*, February 2001, p. 13.

39.    Although the RBOCs contend that CLECs are hurting them by leasing network

components at below-cost rates, the RBOCs have refrained from engaging in meaningful head-to-

head competition in each other's markets. For example, "[i]n New York, SBC served a grand total

- 12 -

of six residential lines at the end of 2001." Joan Campion, *Competition Is Vital For Phone Customers*, Chicago Tribune, Nov. 11, 2002, Commentary pg. 20.

40.     The failure of the RBOCs to compete with one another would be anomalous in the absence of an agreement among the RBOCs not to compete with one another in view of the fact that in significant respects, the territories that they service are non-contiguous. As reflected in Exhibit A hereto, SBC serves most of the State of Connecticut even though Verizon rather than SBC serves the surrounding states. SBC serves California and Nevada, even though Qwest serves the other surrounding states. Similarly, there are many relatively small areas within the States of California, Texas, Illinois, Michigan, Ohio, Wisconsin, Indiana and other states that are served by Verizon, even though SBC serves all surrounding territories, as illustrated in Exhibit B hereto.[1] The failure of the RBOCs that serve the surrounding territories to make significant attempts to compete in the surrounded territories is strongly suggestive of conspiracy, since the service of such surrounded territories presents the RBOC serving surrounding territories with an especially attractive business opportunity that such RBOCs have not meaningfully pursued.

41.     In competing for business in Connecticut, Verizon's predominance in the surrounding states would have provided it with substantial competitive advantages. In competing for business in California and Nevada, Qwest's predominance in surrounding states would have given it substantial competitive advantages. In competing for the business in the many smaller territories

---

[1] On information and belief, all or substantially all of the small areas served by Verizon that are surrounded by territories served by other RBOCs, as illustrated in Exhibit B hereto, were acquired by Verizon not as the result of competition by it with other RBOCs since the time of enactment of the Telecommunications Act, but rather through acquisition of territories served by Verizon's corporate predecessors-in-interest who served those areas prior to that time.

- 13 -

that Verizon serves that are surrounded by territories served by other RBOCs, the dominance of

those other RBOCs in surrounding areas would have given them substantial competitive advantages.

Nevertheless, Verizon has not sought to compete in a meaningful manner with SBC in Connecticut,

Qwest has not sought to compete meaningfully with SBC in California and Nevada, and the RBOCs

that serve the areas surrounding the smaller areas served by Verizon, as illustrated on Exhibit B

hereto, have not sought to compete meaningfully with Verizon in those smaller areas. In the absence

of an agreement not to compete, it is especially unlikely that there would have been no efforts by

surrounding and dominant RBOCs to compete in such surrounded territories.

42.    On October 31, 2002, Richard Notebaert the former Chief Executive Officer of

Ameritech, who sold the company to Defendant SBC in 1999 and who currently serves as the Chief

Executive Officer of Defendant Qwest, was quoted in a *Chicago Tribune* article as saying it would

be fundamentally wrong to compete in the SBC/Ameritech territory, adding "it might be a good way

to turn a quick dollar but that doesn't make it right." Jon Van, *Ameritech Customers Off Limits:*

*Notebaert*, Chicago Tribune, Oct. 31, 2002 Business, pg. 1.

43.    The pronouncement that Qwest would forgo lucrative opportunities in its sister

monopoly markets and in its principal line of business came as Qwest announced a Third Quarter

loss of $214 million and 13% fall in revenue.

44.    On November 8, 2002, in response to Notebaert's remarks, the Illinois Coalition For

Competitive Telecom called Notebaert's statement "evidence of potential collusion among regional

Bell phone monopolies to not compete against one another and kill off potential competitors in local

phone service." *Illinois CLECS Assail Notebaert*, State Telephone Regulation Report, Comment,

Vol. 20, No. 22. According to the article, "[t]he CLEC group said Notebaert indicated that the Bells'

strategy was to divide the country into local phone 'fiefdoms,' not to compete against each other, and to devote their collective efforts to 'eliminating would-be competitors in local service.'" *Id.*

   45.  On December 18, 2002, United States Representatives John Conyers, Jr. of Michigan and Zoe Lofgren of California sent a letter to United States Attorney General John Ashcroft requesting that the U.S. Department of Justice, Antitrust Division investigate whether the RBOCs are violating the antitrust laws by carving up their market territories and deliberately refraining from competing with one another. Jon Van, *Lawmakers Seek Probe of Bells; Do Firms Agree Not To Compete,* Chicago Tribune, Dec. 19, 2002, Business, pg. 2; James S. Granelli, *Federal Probe of Baby Bells Urged; Comments By Chairman Of Qwest Raise Questions About The Competitive Zeal Of The Regional Phone Companies,* Los Angeles Times, Dec. 19, 2002, Business, Part 3, Pg. 3.; *Conyers Asks Justice Dept. To Investigate Bells On Anticompetitive Practices,* Communications Daily, Dec. 20, 2002, Today's News. Representatives Conyers and Lofgren questioned the extent to which the RBOCs' "very apparent non-competition policy in each others' markets is coordinated." Letter to The Honorable John D. Ashcroft dated December 18, 2002, p. 2.

   46.  The RBOCs do indeed communicate amongst themselves through a myriad of organizations, including but not limited to the United States Telecom Association, the TeleMessaging Industry Association, the Alliance for Telecommunications Industry Solutions, Telecordia, Alliance for Public Technology, the Telecommunications Industry Association and the Progress and Freedom Foundation.

   47.  Defendants have engaged in parallel conduct in order to prevent competition in their respective local telephone and/or high speed internet services markets. "They have refused to open their markets by dragging their feet in allowing competitors to interconnect, refusing to negotiate

- 15 -

in good faith, litigating every nook and cranny of the law, and avoiding head-to-head competition like the plague." Consumer Federation of America, *Lessons From 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster*, February 2001, p. 1. Defendants also have engaged and continue to engage in unanimity of action by committing one or more of the following wrongful acts in furtherance of a common anticompetitive objective to prevent competition from Competitive Local Exchange Carriers ("CLECS") in the their respective local telephone and/or high speed internet services markets:

(a)      Defendants have failed to provide the same quality of service to competitors that Defendants provided to their own retail customers;

(b)      Defendants have failed to provide access to their operational support systems ("OSS"), including on-line customer service records ("CSRs"), on a nondiscriminatory basis that places competitors at parity. Moreover, competitors do not have access to unbundled elements on the same basis on which Defendants accessed the same elements;

(c)     . Defendants' competitors have experienced undue delays in the provisioning of unbundled elements. Such delays are discriminatory and preclude competitors from offering service as attractive to customers as Defendants' services and on a basis that places competitors at parity with a respective Defendant;

(d)      Defendants have billed customers of competitors who are converted from Defendants' retail service. As a result of Defendants' practices, customers of competitors are double-billed. Defendants' practices have severely impacted competitors' relationships with customers;

- 16 -

(e)    Defendants have failed to provide interconnection between the network and those of competitors that is equal in quality to the interconnection that each provided itself;

(f)    Defendants have refused to sell to competitors, on just, reasonable, and non-discriminatory terms, access to components of the network on an unbundled or individual basis;

(g)    Defendants have refused to sell to competitors local telephone and/or high speed internet services at wholesale prices that are just, reasonable and nondiscriminatory, thereby preventing Defendants' competitors from being able to competitively resell the services to Plaintiffs and members of the Class;

(h)    Defendants have refused to allow competitors to connect to essential facilities, consisting of, but not limited to, local telephone lines, equipment, transmission and central switching stations (central office) and "local loop" on just, reasonable and non-discriminatory terms;

(i)    Defendants have used discriminatory and error filled methods to bill local telephone service competitors in order to discourage competition by making it virtually impossible for competitors to audit the bills they received from Defendants;

(j)    Defendants have imposed slow and inaccurate manual order processing causing competitors to devote significant time, effort and expense to identify and rectify problems to ensure that orders were ultimately processed correctly;

(k)    Defendants have used monopoly power in their respective wholesale local telephone and/or high speed internet services market in order to gain or maintain a competitive advantage in the retail market for the provision of local telephone and/or high speed internet services; and

- 17 -

(I)     Defendants have used their respective monopoly power and exclusive control over essential facilities consisting of, but not limited to, local telephone lines, equipment, transmission and central switching stations (central office) and "local loop" to negotiate agreements on unfair terms with competitors who were seeking access to their respective local telephone networks. Each Defendant, possessing the exclusive and sole source of entry into its own local telephone and/or high speed internet services market, was in a superior bargaining position to competitors and potential competitors and used that superior bargaining position to dictate unfair terms upon competitors.

48.     The structure of the market for local telephone services is such as to make a market allocation agreement feasible, in that the four defendants, taken together, account for as much as ninety percent or more of the markets for local telephone services within the 48 contiguous states. Elaborate communications thus would not have been necessary in order to enable Defendants to agree to allocate territories and to refrain from competing with one another. A successful conspiracy among the Defendants to allocate territories would not require such frequent communications as to make prompt detection likely.

49.     If one of the Defendants had broken ranks and commenced competition in another's territory the others would quickly have discovered that fact. The likely immediacy of such discovery makes a territorial allocation agreement among the Defendants more feasible, more readily enforceable, and more probable. In this respect as well, the structure of the market was conducive to an agreement among the Defendants to allocate territories to one another.

50.     Had any one of the Defendants not sought to prevent CLECs (other than the other Defendants) from competing effectively within that Defendant's allocated territory in the ways

- 18 -

described above, the resulting greater competitive inroads into that Defendant's territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct. In addition, the greater success of any CLEC that made substantial competitive inroads into one Defendant's territory would have enhanced the likelihood that such a CLEC might present a competitive threat in other Defendants' territories as well. In these respects as well as others, Defendants had compelling common motivations to include in their unlawful horizontal agreement an agreement that each of them would engage in a course of concerted conduct calculated to prevent effective competition from CLECs in each of the allocated territories.

51.    In the absence of any meaningful competition between the RBOCs in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information and belief that Defendants have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another.

## VI.

## INTERSTATE TRADE AND COMMERCE

52.    At times relevant herein, Defendants and/or their subsidiaries provided local and regional telephone and/or high speed internet services across state lines, and regularly and frequently solicited customers and sent bills and received payments via the mail throughout the United States.

- 19 -

The marketing, sale and provision of local telephone and/or high speed internet services regularly occurs in and substantially affects interstate trade and commerce.

## VII.

## CLASS ACTION ALLEGATIONS

53.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:

> All persons or entities who reside or resided in the continental United States (excluding Alaska and Hawaii) and are or were subscribers of local telephone and/or high speed internet services (the "Class") from February 8, 1996 to present (the "Class Period"). Excluded from the Class are the Defendants and any parent, subsidiary, corporate affiliate, officer, director or employee of a Defendant and any judge or magistrate judge assigned to entertain any portion of this case.

54.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. The exact number and identity of Class members is unknown to Plaintiffs but can readily be ascertained from books and records maintained by Defendants or their agents. Upon information and belief, there are millions of local telephone and/or high speed internet services subscribers in the United States who are within the defined Class.

55.    There are questions of law or fact common to the Class members concerning:

(a)    whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and otherwise allocating customers and markets to one another;

(b)    the duration and extent of the contract, combination or conspiracy alleged herein;

- 20 -

(c)    whether the Defendants were participants in the contract, combination or conspiracy alleged herein;

(d)    whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(e)    whether the alleged contract, combination or conspiracy caused injury and damage to Plaintiffs and members of the Class and the appropriate measure of damages;

(f)    whether a Defendant's conduct violated state antitrust laws;

(g)    whether Plaintiffs and members of the Class are entitled to injunctive and other equitable relief; and

(h)    whether Defendants and their co-conspirators fraudulently concealed the conspiracy alleged herein.

56.    The claims of Plaintiffs are typical of the claims of each of the members of the Class. Plaintiffs and members of the Class purchased local telephone and/or high speed internet services from a Defendant or a competitor of a Defendant in the continental United States.

57.    Plaintiffs will fairly and adequately protect the interests of the Class. There is no conflict of interest between Plaintiffs and other members of the Class and Plaintiffs are represented by experienced class action counsel.

58.    Defendants have acted in an unlawful manner on grounds generally applicable to all members of the Class.

59.    The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual class members, so that the certification of this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

- 21 -

60.    For these reasons, the proposed Class may be certified under Fed. R. Civ. P. 23.

## VIII.

## FRAUDULENT CONCEALMENT

61.    Plaintiffs and members of the Class had no knowledge of the contract, combination or conspiracy or any facts alleged herein which might have led to the discovery thereof until shortly before the filing of this Complaint. Plaintiffs and members of the Class could not have discovered the contract, combination or conspiracy at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendants. Through these acts of secrecy and deception, which included affirmative acts to hide their wrongdoing, Defendants actively misled Plaintiffs and the Class about the existence and terms of their contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another.

## COUNT I

## Violation of Sherman Act § 1 - 15 U.S.C. § 1

62.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 61 as if fully set forth herein.

63.    Defendants and their co-conspirators have engaged in a horizontal contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1.

- 22 -

64.    Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1.

65.    The contract, combination or conspiracy has had and will continue to have the following effects:

(a)    competition in the local telephone and/or high speed internet services market has been unlawfully restrained, suppressed or eliminated;

(b).    Plaintiffs and members of the Class have been denied the benefits of free, open and unrestricted competition in the local telephone and/or high speed internet services markets; and

(c)    the price of local telephone and/or high speed internet services in the United States have been fixed, raised, maintained or stabilized at artificially high and non-competitive levels.

66.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property and have paid supracompetitive prices for local telephone and/or high speed internet services.

67.    If not permanently enjoined, the unlawful contract, combination or conspiracy will continue and cause irreparable harm to Plaintiffs and members of the Class who have no adequate remedy at law.

- 23 -

## COUNT II

### Violation of State Antitrust Laws

68.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

69.     As described above, Defendants have engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of the following state antitrust laws.

70.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et seq.*

71.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Cal. Bus. & Prof. Code §§ 17200.

72.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of violation of D.C. Code Ann. §§ 28-45031, *et seq.*

73.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Fla.  Stat. §§ 501. Part II, *et seq.*

74.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Iowa Code §§ 553.4 *et seq.*

75.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*

76.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of La. Rev. Stat. §§ 51:137, *et seq.*

77.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.*

78.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.*

79.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Mich.Comp.Laws Ann. §§ 445.771, *et seq.*

80.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.*

81.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

82.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A., *et seq.*

83.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq.*

- 25 -

84.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1 *et seq.*

85.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of New York General Business Law §§ 340, *et seq.* And § 349 *et. seq.*

86.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*

87.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.*

88.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.*

89.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

90.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.*

91.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.*

92.     Defendants have unlawfully entered into a contract, combination or conspiracy in unreasonable restraint of trade in violation of Wis. Stat. § 133.01, *et seq.*

93.     Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury consists of paying higher prices for local telephone and/or high speed internet services than they would have paid in

- 26 -

the absence of the violations alleged herein. This injury is of the type the antitrust laws of the above States and the District of Columbia were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## COUNT III

### Unjust Enrichment

94.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 93 as if fully set forth herein.

95.    Defendants have benefitted from their unlawful acts through the overpayments from Plaintiffs and other Class members and the increased profits resulting from such overpayments. It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and the other class members and retained by Defendants.

96.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiffs and the other Class members may make claims on a pro-rata basis for restitution.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and members of the Class pray that the Court enter judgment in their favor as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiffs as the representative of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants violated and are in violation of the Sherman Act § 1 and the various state antitrust statutes alleged herein;

- 27 -

C.     Awarding threefold the damages sustained by Plaintiffs and members of the Class as a result Defendants' violations;

D.     Ordering injunctive relief preventing and restraining Defendants and all persons acting on their behalf from engaging in the unlawful acts alleged herein;

F.     Awarding Plaintiffs and members of the Class the costs, expenses, and reasonable attorneys' fees and experts' fees for bringing and prosecuting this action; and

G.     Awarding Plaintiffs and members of the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(h) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

jury trial on all issues so triable.

Dated:    April 11, 2003
          New York, New York

                              **MILBERG WEISS BERSHAD HYNES
                              & LERACH LLP**


                              By: _Michael M. Buchman_
                                  J. Douglas Richards (JDR-6038)
                                  Michael M. Buchman (MB-1172)
                                  Michael R. Reese (MR-3183)
                              One Pennsylvania Plaza
                              New York, New York 10119-0165
                              Telephone:   (212) 594-5300
                              Facsimile:   (212) 868-1229

                              **SCHIFFRIN & BARROWAY, LLP**
                              Richard S. Schiffrin
                              Joseph H. Meltzer
                              Edward W. Ciolko
                              Three Bala Plaza East
                              Suite 400
                              Bala Cynwyd, Pennsylvania 19004
                              Telephone:   (610) 667-7706
                              Facsimile:   (610) 667-7056


                              **Attorneys for Plaintiffs,
                              William Twombly and Lawrence Marcus**

- 29 -

EXHIBIT B



# RAIL & INTERMODAL

# Following the Competition

BY JOHN GALLAGHER

Study: railroad fuel surcharges are 'money grab';
rails should use own pricing, not trucking initiatives

Railroads are charging their customers more in fuel surcharges than rising fuel prices are costing the railroads, according to a study by an industry consulting company. The study also asserts that railroads should be using their inherent cost advantages to better compete with trucks rather than to recover costs from current customers.

"It has been my experience that the way to gain significant market share is to lead the competition rather than following the competition," said Sandra J. Dearden, president of Chicago-based Highroad Consulting Ltd., which conducted the study. "So I was puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives."

Highroad's "Rail Fuel Impact Study" looks at pricing policies of seven Class 1 railroads through a sampling of 20 traffic lanes in the United States. It compares the railroads' respective operating costs over a three-year period, between December 1999 and December 2002. The costs are based on the railroads' own financial data reported in "R-1" reports to the Surface Transportation Board. The revenue figures used in the study were developed by Highroad's benchmarking and regression analysis and based on the STB's Public Use Waybill File; they are not based on the rates of any client of Highroad.

"It's a money grab," Dearden said. "Supposedly the railroads are doing market-based pricing. If they are, then they should be charging rates as high as possible. But then they add on fuel surcharges — typically 4 to 6 percent of the rate — and then car storage charges and hazardous materials charges. When you get done adding them all up, you can do a lot of trucking."

Railroad fuel surcharges, the study con-

cluded, are not supported by changes in the costs reported by the railroads to the STB. If the cost increases over the sample routes for the three-year period were applied to the rates charged in those lanes over the same period, the fuel surcharge would be only 0.2 to 2.0 percent of the rates, the report said. Those increases are more than offset by the railroads' rate



"If there's really a spike in the cost of fuel, the railroads need to deal with it. But for goodness sake, make them easy to deal with."

WEYERHAEUSER INC.'S FICKER

increases over the three-year period, the study says.

Dearden contends that fuel surcharges were not intended to be applicable to contracts subject to the Rail Cost Adjustment Factor, a rate increase based on volume of business that already takes into account fuel price increases. "But railroads are still charging some customers" the fuel sur-

charge, Dearden said. "Some (customers) are smart enough to figure out this is wrong. But some of them are paying the increases on the RCAF and on top of that paying fuel surcharges."

In addition, while most railroads have used West Texas Intermediate Crude Oil, Burlington Northern Santa Fe Railway began using a surcharge rate based on highway diesel fuel — a more expensive index on which to base surcharges, Dearden said. BNSF spokesman Pat Hiatte re-

sponded that the railroad "uses the highway diesel fuel index because they correlate more closely to the changes we see in our fuel expenses."

The application of fuel surcharges is bad enough if not justified, shippers say. "But it's not just the charge, it's how it's applied," said John Ficker, logistics development manager for paper and forest products shipper Weyerhaeuser Inc. "I don't have a problem with fuel surcharges conceptually. If there's really a spike in the cost of fuel, the railroads need to deal with it. But for goodness sake, make them easy to deal with. Each railroad has their own way of implementing them. There's a whole variety of the way these things are applied, depending on the railroad."

Photo by Larry Smith/Trans Pixs

Dearden noted that Canadian National Railway is in an especially good position to use fuel cost as a means of gaining market share not just from trucks but from competing railroads. "Their costs have come down and their operating ratio is the lowest in the industry. They definitely have an advantage over other railroads," she said.

Dearden said she's "trying to put a positive twist" on the conclusions of the study, "because I don't like bashing the railroads." It shows that the railroads have a real opportunity to take business off the highways and they should do it instead of following the lead of the truckers and put fuel surcharges out there, which end up looking like they nickel-and-dime the shippers to death."

For more information about the study, contact High Road Consulting at 312-201-0836. ●

# Sharing Space

BY JOHN GALLAGHER

## CN, CSX partnership in Memphis is win for city and rails, if not for proposed 'Super Terminal'

Canadian National Railway, CSX Intermodal and the city of Memphis, Tenn., believe that their planned Super Terminal will be a boon to efficient intermodal distribution in the mid-South region. But it also may serve to highlight the limits of cooperation attainable by competing railroads.

The two railroads and the city announced July 3 their final agreement to jointly build the 155-acre facility to be located in the Frank C. Pidgeon Industrial Park in southwest Memphis, with plans to break ground in September. It will have an initial capacity of 200,000 lifts per year and will allow both CN and CSXI to expand their growing intermodal operations in the area.

But the terminal — so far, at least — is a far cry from what was originally envisioned. Eight years ago local government planners had in mind a huge intermodal terminal hub that was to include Union Pacific Railroad, Burlington Northern Santa Fe Railway and Norfolk Southern, as well as CSX and Illinois Central (which merged with CN in 1998). However, in 1997 UP decided to move its intermodal operations across the Mississippi River to Marion, Ark. Over the next few years BNSF made it known that it was considering several sites other than the Super Terminal and then earlier this year said it wasn't interested in the Super Terminal at all. And, NS "has no plans to participate in the project at this time," said spokeswoman Susan Terpay.

The problem came down to competition and track ownership, according to an intermodal industry consultant familiar with the history of the terminal. Because CN owns the rail lines adjacent to the site of the new terminal, the other railroads would have had to negotiate with CN for terminal access. "Most of the railroads didn't want to have to do that," this consultant said. "CN would have benefited from the others being



"CN and CSXI jointly designed the Memphis Super Terminal to be the premier intermodal terminal in the Memphis market."

CSX CORP.'S
WARD

there, since everyone would have had to run over their rail lines to get to it."

Despite the scaled-down version, the terminal is an example of yet another successful public-private investment in the rail industry. CN and CSX will provide $25 million for the project, with the Port of Memphis and Shelby County investing another $28 million. It will feature five tracks with parking spots for 1,800 trailers or container chassis. CN and CSXI jointly will select an operator for the terminal. The terminal will replace CN's Johnston intermodal yard, which is adjacent to the new site and from which CSXI rents space.

"CN and CSXI jointly designed the Memphis Super Terminal to be the premier intermodal terminal in the Memphis market," said CSX Corp. Chairman and Chief Executive Officer Michael Ward. "Intermodal business in this market is growing and the new Memphis Super Terminal will provide our customers with an excellent location, superior service and capacity for business growth."

CN President and CEO E. Hunter Harrison noted: "The Memphis Super Terminal will be a modern facility that will enhance our ability to provide shippers the predictable and reliable movement of goods demanded by today's just-in-time logistics. The shippers using the Super Terminal also will benefit from the added efficiency of railroads sharing assets in a single facility."

CN also pointed out that the construction startup is just the first phase of growth for the terminal, that there's room for expansion and that CSXI may not be the only other participant. "The door is still open," said CN spokesman Jack Burke.

Others aren't as optimistic. "It comes down to the railroads hanging on to that age-old attitude," said the intermodal source. "My territory is mine and it's never going to be yours." ●