UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
In re RAIL FREIGHT FUEL SURCHARGE          )
ANTITRUST LITIGATION                              )
_____)          MDL Docket No. 1869
                                                          )          Misc. No. 07-489 (PLF)
This document relates to:                          )
                                                          )
DIRECT PURCHASER PLAINTIFFS              )
_____)

OPINION

        This matter is before the Court on defendants' motion to dismiss for failure to

state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil

Procedure.[1]  The Court has carefully considered the arguments made by the parties in their papers

and the oral arguments presented by counsel in court on October 10, 2008.  The Court has

concluded that plaintiffs have stated a claim under the test announced by the Supreme Court in

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007).  Accordingly, defendants' motion to

dismiss must be denied.

---

        [1]        The papers submitted in connection with this motion include Direct Purchaser
Plaintiffs' Consolidated Amended Class Action Complaint ("Compl."); Defendants' Joint
Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint; Direct
Purchaser Plaintiffs' Opposition in Response to Defendants' Joint Motion to Dismiss; and
Defendants' Joint Reply to Direct Purchaser Plaintiffs' Opposition in Response to Defendants'
Joint Motion to Dismiss.

1

## I. BACKGROUND

The Multidistrict Litigation Panel consolidated eighteen separate class actions, pending in six districts, involving common antitrust allegations against the four major United States railroads and transferred them to this Court on November 6, 2007.  The plaintiffs were divided into two putative classes -- those who allegedly purchased rail freight transportation services directly from defendants from July 1, 2003 until at least June 30, 2007 and who were assessed a rail fuel surcharge for the transportation services, and those who allegedly purchased rail freight transportation services indirectly from the defendants.  Plaintiffs in both putative classes allege that the defendant railroads violated Section 1 of the Sherman Act and Section 4 of the Clayton Act by conspiring to fix prices through their use of fuel surcharges.

Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railway Company ("UP") have moved to dismiss the claims of both putative classes.  The direct purchaser plaintiffs' complaint, and defendants' challenge to it, are discussed in this Opinion.[2]  The motion to dismiss the indirect purchaser plaintiffs' complaint will be discussed in a subsequent opinion. Resolution of the instant motion to dismiss turns solely on the question of whether plaintiffs' complaint states a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[2]     The direct purchaser plaintiffs are represented by Dust Pro, Inc.; Carter Distributing Company; Strates Shows, Inc.; US Magnesium LLC; Zinifex Taylor Chemicals, Inc.; Donnelly Commodities, Inc.; Dakota Granite Company; and Cedar Creek Wholesale, Inc.

## II. PLAINTIFFS' ALLEGATIONS

Plaintiffs allege that in 2003, defendants, who control approximately ninety percent of all rail freight traffic in the United States, sought to increase their revenues through the use of fuel surcharges.  Compl. ¶ 4.  Before Congress passed the Staggers Rail Act in 1980, defendants would have had to apply to the Interstate Commerce Commission for approval of an across-the-board rate increase.  Compl. ¶ 3.  Following deregulation of the railroad industry, however, at least eighty percent of all rail shipments move under private transportation contracts, which are not rate regulated, or are otherwise exempt from rate regulation.  Compl. ¶ 50. Plaintiffs allege that defendants determined that the most efficient means to increase their profits was through the imposition of an across-the-board artificially high and uniform fuel surcharge, rather than attempt to renegotiate all of these separate contracts.  Compl. ¶ 54.

The barrier to this plan, according to plaintiffs, was that the great majority of rail freight transportation contracts already included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index (the "AII"). Compl. ¶¶ 4, 55.  The railroad trade organization known as the Association of American Railroads ("AAR"), which is dominated by the four defendants, publishes this index.  Compl. ¶¶ 4, 7.  Plaintiffs allege that the AII (as well as a related cost index called the Rail Cost Adjustment Factor ("RCAF")) already accounted accurately for the impact of fuel cost increases. Compl. ¶¶ 4, 55.  Any actual increase in fuel costs, no matter how large, would be contained in the AII and the RCAF.  Compl. ¶ 55.  Plaintiffs allege that the defendants conspired to remove fuel from the AII so that they could apply a separate "fuel surcharge" as a percentage of the total cost of freight transportation.  Compl. ¶ 5.  Doing so permitted plaintiffs to raise total freight

3

prices widely by a given percentage.  Compl. ¶ 56.

      According to plaintiffs, top executives from each of the defendants met regularly at restaurants and various recreational and conference facilities in the spring of 2003 and thereafter to discuss their industry.  Compl. ¶ 58.  Shortly after one such industry meeting, in July 2003 the western railroads (BNSF and UP) began charging identical fuel surcharges based on the U.S. Department of Energy On-Highway Diesel Fuel Price Index.  Compl. ¶¶ 7, 59.  Plaintiffs allege that this parallel and complex pricing decision was based on an agreement among the defendants.  Compl. ¶¶ 7, 60.

      The next step in the alleged conspiracy, according to plaintiffs, was the defendants' agreement and collective action to cause the AAR to create a new cost escalation index, the All Inclusive Index Less Fuel ("AIILF"), which removed fuel costs from the prior cost escalation index (the AII).  Compl. ¶¶ 9, 66.  According to plaintiffs, defendants reached this agreement during the October and December 2003 meetings of the AAR.  Compl. ¶¶ 9, 65.  The index was published in December 2003.  Compl. ¶¶ 9, 66.  Subsequently, and in furtherance of the conspiracy, according to plaintiffs, the eastern railroads (CSX and NS) announced that they would apply identical fuel surcharges based on the West Texas Intermediate Index.  Compl. ¶¶ 12, 69.

      Plaintiffs allege that at that point, and as a result of these collective actions, defendants each applied their fuel surcharges in the same way -- as a percentage multiplier of the total base rate for rail freight transportation.  Compl. ¶¶ 13, 75.  They were able to do so because, under the AIILF, fuel was no longer included in the general cost escalation index.  Plaintiffs allege that this approach yielded defendants billions of dollars of additional profits because the

surcharge raised rates far beyond the real increased cost of fuel.  Compl. ¶¶ 13, 75.  Plaintiffs

allege that defendants, in the east and west, uniformly computed the surcharges and agreed upon

common trigger points for adjusting the percentages monthly.  Compl. ¶ 14. As a result of this

alleged collusion, the eastern and western railroads, respectively, imposed identical fuel

surcharges for more than three years.  Compl. ¶ 83.

In sum, relying on the uniformity of fuel surcharges, the creation and use of the

AIILF, and various other allegations, plaintiffs contend that defendants conspired to fix prices in

violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

## III. ANALYSIS

### A. The Twombly Standard

Defendants' sole basis for urging dismissal of the complaint is that plaintiffs have

not stated a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of

Civil Procedure.  Defendants argue that the complaint does not plead facts plausibly suggesting

that they reached any agreement on fuel surcharges, and that it shows instead only price matching

and follow-the-leader pricing -- neither of which violates antitrust laws.  Defendants further

maintain that creation of the AIILF is not a restraint of trade, nor is it probative of a broader fuel

surcharge conspiracy.  Finally, defendants argue that plaintiffs' various other allegations are

insufficient to create a plausible inference of conspiracy.  The question presented by defendants'

arguments is whether plaintiffs' complaint meets the test articulated just last year by the Supreme

Court in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007).

In <u>Twombly</u>, the Supreme Court clarified the standard of pleading that a plaintiff

must meet in order to survive a motion to dismiss under Rule 12(b)(6).  The Court noted that

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests[.]'"  <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.

Ct. at 1965 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)); <u>see also</u> <u>Erickson v. Pardus</u>, 127

S. Ct. 2197, 2200 (2007); <u>Aktieselskabet AF 21 v. Fame Jeans Inc.</u>, 525 F.3d 8, 15 (D.C. Cir.

2008).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6)

motion, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of

the elements of a cause of action" to provide the "grounds" of "entitle[ment] to relief."  <u>Bell</u>

<u>Atlantic Corp. v. Twombly</u>, 127 S.Ct. at 1964-65; <u>see also</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286

(1986).  While there is no "probability requirement at the pleading stage," <u>Bell Atlantic Corp. v.</u>

<u>Twombly</u>, 127 S. Ct. at 1965, "something beyond . . . mere possibility . . . must be alleged[.]"  <u>Id.</u>

at 1966.  The facts alleged in the complaint "must be enough to raise a right to relief above the

speculative level," <u>id.</u> at 1965, or must be sufficient "to state a claim for relief that is plausible on

its face."  <u>Id.</u> at 1974.  The Court referred to this newly clarified standard as "the plausibility

standard."  <u>Id.</u> at 1968 (abandoning the "no set of facts" language from <u>Conley v. Gibson</u>).

On a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all of

the factual allegations contained in the complaint."  <u>Erickson v. Pardus</u>, 127 S. Ct. at 2200; <u>see</u>

<u>also</u> <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. at 1965; <u>Summit Health, Ltd. v. Pinhas</u>, 500

U.S. 322, 325 (1991); <u>Aktieselskabet AF 21 v. Fame Jeans Inc.</u>, 525 F.3d at 15.  It must construe

the complaint "liberally in the plaintiffs' favor, and grant plaintiffs the benefit of all inferences

6

that can be derived from the facts alleged." Kowal v. MCI Communications Corp., 16 F.3d at

1276; see also Aktieselskabet AF 21 v. Fame Jeans Inc., 525 F.3d at 15.  The Court, however,

need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts

alleged in the complaint; nor must it accept plaintiffs' legal conclusions.  See Kowal v. MCI

Communications Corp., 16 F.3d at 1276; Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir.

2002).

       Twombly, like this case, involved a claim under Section 1 of the Sherman Act.

The Supreme Court explained that "[b]ecause § 1 of the Sherman Act does not prohibit [all]

unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or

conspiracy, [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from

independent decision or from an agreement, tacit or express." Bell Atlantic Corp. v. Twombly,

127 S. Ct. at 1964 (citations omitted).  "[A]n allegation of parallel conduct and a bare assertion

of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy. . . .

[Allegations of parallel conduct] must be placed in a context that raises a suggestion of a

preceding agreement, not merely parallel conduct that could just as well have been independent

action." Id. at 1966.

       The Supreme Court in Twombly concluded that the allegations of the plaintiffs'

complaint -- that regional telephone service providers conspired to restrain trade through parallel

conduct within their respective services areas and an agreement not to compete -- did not meet

this test. Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1972-73.  The complaint was properly

dismissed, said the Court, because it alleged violations of Section 1 based on "descriptions of

parallel conduct and not on any independent allegation of actual agreement among the

[defendants].  Although in form a few stray statements [in the complaint] speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations." Id. at 1970.

The plaintiffs here have alleged substantially more.  They allege that the defendants entered into an agreement, that this agreement had the illicit purpose of fixing prices, and that the defendants actually used the agreed upon mechanism to restrain trade.  More than mere parallelism is described in the complaint, and plaintiffs have supported their theory of conspiracy with sufficient factual details to bring their allegations beyond the realm of bare legal conclusions.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1970.  Accepting as true the factual allegations in the complaint, this Court concludes that the plaintiffs have moved their claims "across the line from conceivable to plausible."  Id. at 1974.[3]

### B.  The Complaint Alleges an Agreement

The centerpiece of defendants' argument for dismissal is the perceived absence of sufficient allegations in the complaint to support the inference of an agreement.  But taking the allegations in the complaint as a whole and accepting them as true, as the Court must for the purposes of this motion, this Court finds ample support for a plausible inference of an agreement made illegal by Section 1 of the Sherman Act.  See In re Southeastern Milk Antitrust Litig, 555

---

[3]        The Court notes the concern expressed in Twombly that district courts not "forget that proceeding to antitrust discovery can be expensive."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1966.  Yet as sensitive as courts must be to the cost to litigants of discovery, where plaintiffs have made out a plausible antitrust claim, as they have here, they are entitled to discovery in order to determine to what relief, if any, they are entitled.  See id. at 1965 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").

F. Supp. 2d 934, 943 (E.D. Tenn. 2008) ("While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the defendants, i.e., that there is a legitimate business justification for each of the acts, a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act.").[4]

In their complaint, plaintiffs first identify the "problem" that coordinated use of the AIILF allegedly solved for defendants:

> [T]he widely used private contracts had cost escalation provisions that already accounted for fuel.  BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

Compl. ¶ 64.  Plaintiffs go on to identify specific occasions, in particular during the fall 2003 AAR meetings -- on October 2-3 and December 11-12, 2003 -- where defendants met and allegedly agreed to solve this problem by promulgating the fuel surcharge program that would become the AIILF.  Compl. ¶ 65.

Defendants argue that the allegations of the complaint as to the existence of an agreement are inadequate.  In particular, they contend that plaintiffs do not allege that price

---

[4]      When considering an antitrust complaint, the allegations "cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.'"  Jung v. Ass'n of Am. Med. Colleges, 300 F. Supp. 2d 119, 155 (D.D.C. 2004) (quoting In re Fine Paper Antitrust Litig., 685 F.2d 810, 822 (3d Cir. 1982)).  Twombly did not change this principle: "[T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts."  In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d at 943-44 (quoting Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 699 (1962)).

fixing actually occurred at the AAR meetings.  In fact, however, plaintiffs expressly allege:

> In the fall of 2003, BNSF and UP initiated an effort in the AAR to
> get all Defendants to agree on a fuel surcharge program that would
> enable the Defendants to take fuel costs out of the weighted RCAF
> and AII (which already permitted the Defendants to recover all of
> their fuel costs), and instead apply artificially high Rail Fuel
> Surcharges as a revenue enhancement mechanism. . . .  Through
> meetings and discussions within the AAR board on October 2-3,
> December 11-12 and otherwise in 2003, Defendants BNSF, UP,
> CSX and NS agreed to create and implement coordinated fuel
> surcharge programs, and to enforce their programs through a
> variety of means discussed herein.

*  *  *

> Defendants BNSF, UP, CSX and NS conspired to cause the AAR
> to inaugurate the AIILF so that they could begin assessing separate,
> stand-alone Rail Fuel Surcharges, applied against the total cost of
> rail freight transportation, and coordinate that practice.

Compl. ¶¶ 65, 67.  Plaintiffs further allege that the fall 2003 AAR meetings actually produced the

alleged restraint of trade, the AIILF, and that defendants attended and dominated these meetings.

Compl. ¶¶ 8, 65, 66.  Short of being in the boardroom at the meeting, it is hard for the Court to

imagine how plaintiffs could more fulsomely allege that defendants entered into an agreement at

the AAR meetings.  See In re Graphics Processing Units Antitrust Litig., 540 F. Supp. 2d 1085,

1096 (N.D. Cal. 2007) ("[D]irect allegations of conspiracy are not always possible given the

secret nature of conspiracies.  Nor are direct allegations necessary."); see also City of

Moundridge v. Exxon Mobil Corp., 250 F.R.D. 1, 9 (D.D.C. 2008) (concluding that antitrust

plaintiffs survived a motion to dismiss under Twombly because the complaint "alleges facts

providing circumstantial evidence of an agreement [and] also identifies the years and locations

where the agreement was reached and the defendants who participated").

Plaintiffs' allegations are not mere "labels and conclusions," "allegation[s] of parallel conduct and . . . bare assertion[s] of conspiracy." Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965-66. The direct purchaser plaintiffs have provided robust factual details in their complaint supporting their "independent allegation of actual agreement" from which the Court can infer that it is plausible that an actual agreement existed. Id. at 1970. They state, for example, who initiated the discussions (BNSF and UP), what they proposed, the object of the alleged conspiracy, the fact that an agreement was reached among all four defendants, and where and when the agreement was reached. See Compl. ¶¶ 65, 67. Given the details of plaintiffs' allegations, the complaint is a far cry from the pleadings in Twombly, which "mentioned no specific time, place, or person involved in the alleged conspiracies," giving the defendants in that case "no clue" as to which of the defendants "supposedly agreed or when and where the illicit agreement took place." Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1970 n.10.

Moreover, the western railroads' alleged coordination of their fuel surcharge before the AAR meetings and the eastern railroads' alleged coordination of their fuel surcharges shortly after those meetings make the inference that an agreement among defendants occurred at the AAR meetings, and possibly at other times, even more plausible. The complaint alleges that although the railroads' surcharges had varied in the past, from July 2003 onward the western railroads imposed identical surcharges. See Compl. ¶ 80. And from March 2004, three months after the December announcement of the AIILF, the eastern railroads imposed identical fuel surcharges. See Compl. ¶ 82. Plaintiffs further assert that it is unlikely that the eastern and western defendants would independently impose identical fuel surcharges, because fuel cost as a percentage of operating cost and fuel efficiency differed widely among the defendant railroads.

See Compl. ¶ 83.  Considering all of plaintiffs' allegations, together, "[i]t seems . . . only logical

that the more individual instances of parallel conduct alleged by the plaintiffs, the stronger the

inference that can be drawn from those acts of parallel conduct to support an illegal conspiracy

and the less likely it is that these parallel acts occurred unilaterally without any conspiracy or

agreement."  In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d at 943-44.

Finally, the method of surcharge achieved by use of the AIILF and stand alone

fuel surcharges was, allegedly, complex and completely new (see Compl. ¶¶ 10, 66) -- two

factors suggested by the Supreme Court in Twombly as making an inference of a conspiratorial

agreement from parallel behavior more plausible:

> Commentators have offered several examples of parallel conduct
> allegations that would state a § 1 claim under this standard. . . .
> [For example,] parallel behavior that would probably not result
> from chance, coincidence, independent responses to common
> stimuli, or mere interdependence unaided by an advance
> understanding among the parties. . . .  Complex and historically
> unprecedented changes in pricing structure made at the very same
> time by multiple competitors, and made for no other discernible
> reason would support a plausible inference of conspiracy.

Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1966 n.4 (citations omitted).  Plaintiffs have

alleged that the use of the AIILF and stand alone fuel surcharges was a break from past practice

by the defendants.  The AIILF was the first cost escalation index without a fuel component

promulgated by the AAR.  Compl. ¶ 67.  And while the defendants traditionally may have used

stand-alone, rate-based fuel surcharges, as they argue in their brief, the use of a surcharge as the

multiplier of the base rate of the cost of transport was an entirely new practice.  See In re

Graphics Processing Units Antitrust Litig., 540 F. Supp. 2d at 1096 (plaintiffs' allegations that

"there was a marked change in defendants' behavior in the market around the time the conspiracy

allegedly started . . . .  if true would make an antitrust conspiracy plausible").

Taken together, these allegations make plaintiffs' allegations that defendants entered into an agreement plausible.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1970.  See also City of Moundridge v. Exxon Mobil Corp., 250 F.R.D. at 7 ("Because the complaint alleged some circumstantial facts that support an inference of an agreement, the plaintiffs' claim is plausible.")

### C.  The Complaint Alleges a Restraint of Trade

Defendants contend that the creation and publication of the AIILF was not a restraint of trade.  The allegations in the complaint, however, make plausible plaintiff's assertion that defendants agreed to promulgate the AIILF in order to impose coordinated fuel surcharge programs, and that defendants actually used the AIILF to restrain trade.

Defendants first rely on the settled principle of antitrust law that "members of trade associations [do not] become [antitrust] conspirators merely because they gather and disseminate information."  Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 584 (1925).  Defendants are correct, of course, that meeting together at the AAR and publication of a cost escalation index like the AIILF may not, by themselves, show that defendants conspired to restrain trade.  But such otherwise lawful behavior in conjunction with the other allegations of the complaint is probative of a conspiracy.  As this Court previously has noted, "if lawful acts are used as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful. . . . 'Acts done to give effect to the conspiracy may be in themselves wholly innocent acts.  Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the

statute forbids, they come within its prohibition.'"  Jung v. Ass'n of Am. Med. Colleges, 339 F.

Supp. 2d 26, 37 (D.D.C. 2004) (quoting American Tobacco Co. v. United States, 328 U.S. 781,

809 (1946)).

Unlike the facts alleged in the cases cited by defendants, plaintiffs allege that the

AIILF constituted more than a simple promulgation of information.  See, e.g., Schachar v.

American Academy of Ophthalmology, Inc., 870 F.2d 397, 400 (7th Cir. 1989) (publication by a

group of medical professionals describing a procedure as "experimental" was not a restraint of

trade); Jays Foods, Inc. v. National Classification Committee, 646 F. Supp. 604, 607-08 (E.D. Va.

1985), aff'd per curiam, 801 F.2d 394 (4th Cir. 1986) (publication of classification of shipping

categories of potatoes, without more, was insufficient to infer a conspiracy).  Plaintiffs allege, for

example, that the purpose of the AIILF was improper -- to raise railroad rates without undergoing

the difficulty of extensive contract renegotiation.  According to the Surface Transportation Board

(which considered only rate-regulated freight traffic, not at issue in this case), "a fuel surcharge

program that increases all rates by a set percentage stands virtually no prospect of reflecting the

actual increase in fuel costs. . . .  [The railroads' fuel surcharge program was] a misleading and

ultimately unreasonable practice," because "there is no real correlation between the rate increase

and the increase in fuel costs for that to which the surcharge is applied."  Rail Fuel Surcharges,

STB Ex Parte No. 661 (January 25,  2007) at 6-7.[5]

---

[5]      While the Court is not, of course, bound by the STB opinion, the STB's findings,
and the logic underlying them, reinforces the Court's view that plaintiffs' claims are plausible.

Plaintiffs also allege that defendants actually and collectively used the AIILF as part of their rate setting mechanism to restrain trade.[6]  For example, the complaint states that "[t]he collective action by BNSF, UP, CSX and NS in December 2003 allowed the defendants to apply new, separate and artificially high Rail Fuel Surcharges *broadly* to their customers." Compl. ¶ 11 (emphasis added).  Furthermore, with the AIILF in place, defendants "now each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation . . . [which] yielded the Defendants billions of dollars of additional profits."  Compl. ¶ 13.  Plaintiffs further allege that even though the use of the AIILF in this manner recouped profits far in excess of increased costs caused by rising fuel prices, defendants did not compete with one another to lower costs.  Compl. ¶ 88.

Defendants have attempted to justify use of the AIILF and the fuel surcharges in various ways, including by positing the argument that in a time of dramatically fluctuating fuel costs, use of the AIILF and monthly fuel surcharges allowed them to adapt their rates to better reflect the changed cost.  This explanation does not account for all aspects of the alleged conspiracy, however.  It ignores the alleged agreements between the eastern and western railroads, respectively, to use the same fuel surcharge indexes, and it ignores the unique method with which the surcharge was applied -- as a multiplier of the total base rate.  Plaintiffs have alleged enough in their complaint to make plausible their theory that defendants' behavior was collusive and

---

[6]      Plaintiffs do not allege that defendants coerced one another to assure adherence to the AIILF.  It is enough, however, that they have alleged an agreement and coordinated use of the mechanism to restrain trade.  See United States v. National Ass'n of Broadcasters, 536 F. Supp. 149, 163 (D.D.C. 1982) ("[I]t is well established that the parties to an agreement which *per se* violates the antitrust laws may not defend on the basis that they have applied no coercion to bring about adherence to the combination or to compel obedience to its terms.")

anticompetitive.  While an innocent explanation for defendants' behavior may exist, a complaint "need not be dismissed where it does not exclude the possibility of independent business action. . . .  Such a requirement at this stage in the litigation would be counter to Rule 8's requirement of a short, plain statement with enough heft to "'sho[w] that the pleader is entitled to relief.'"  City of Moundridge v. Exxon Mobil Corp., 250 F.R.D. at 5 (quoting Bell Atlantic v. Twombly, 127 S.Ct. at 1966).

For these reasons, the Court will deny defendant's motion to dismiss.  A separate Order consistent with this Opinion shall issue this same day.

SO ORDERED.

_/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: November 7, 2008