UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

# FILED

## DEC 3 1 2008

**NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT**

|  |  |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) ) ) ) |
|  | ) |
| This document relates to: | ) ) |
| INDIRECT DIRECT PURCHASER PLAINTIFFS | ) ) |

MDL Docket No. 1869
Misc. No. 07-489 (PLF)

OPINION

This matter is before the Court on defendants' motion to dismiss for failure to

state a claim upon which relief can be granted and for lack of subject matter jurisdiction under

Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.[1]  The Court has carefully

considered the arguments made by the parties in their papers and the oral arguments presented by

counsel in open court on October 10, 2008.  The Court has concluded that the indirect purchaser

plaintiffs' state law claims are preempted by federal law and must be dismissed.  The Court has

also concluded that the indirect purchaser plaintiffs have stated a federal antitrust claim for

injunctive relief and that this claim may proceed.

_____

[1]      The papers submitted in connection with this motion include: Indirect Purchaser
Plaintiffs' Consolidated Amended Class Action Complaint ("Compl."); Defendants' Joint
Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint; Indirect
Purchaser Plaintiffs' Opposition in Response to Defendants' Joint Motion to Dismiss;
Defendants' Joint Reply to Indirect Purchaser Plaintiffs' Opposition in Response to Defendants'
Joint Motion to Dismiss; Indirect Purchaser Plaintiffs' Supplement to their Opposition to
Defendants' Joint Motion to Dismiss; Defendants' Supplemental Memorandum of Points and
Authorities in Support of Defendants' Joint Motion to Dismiss Indirect Purchaser Plaintiffs'
Consolidated Amended Complaint; and Indirect Purchaser Plaintiffs' Supplemental
Memorandum Regarding Federal Injunctive Relief Standing.

I. BACKGROUND

The Multidistrict Litigation Panel consolidated eighteen separate class actions, pending in six districts, involving common antitrust allegations against the four major United States railroads and transferred them to this Court on November 6, 2007. The plaintiffs were divided into two putative classes — those who allegedly purchased rail freight transportation services directly from defendants from July 1, 2003 until at least June 30, 2007 and who were assessed a rail fuel surcharge for the transportation services, and those who allegedly purchased rail freight transportation services indirectly from the defendants and were subject to a similar surcharge. Plaintiffs in both putative classes allege that the defendant railroads violated Section 1 of the Sherman Act by conspiring to fix prices through their use of fuel surcharges. The indirect purchaser plaintiffs also allege various claims arising from state antitrust, consumer protection and unjust enrichment law for the same alleged behavior by defendants.

Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railway Company ("UP") moved to dismiss the claims of both putative classes. The Court denied defendants' motion to dismiss the direct purchasers' complaint on November 7, 2008. See In re Rail Freight Fuel Surcharge Antitrust Litig., Misc. No. 07-489, 2008 U.S. Dist. LEXIS 95456 (D.D.C. Nov. 7, 2008). The indirect purchaser plaintiffs' (hereafter "plaintiffs") complaint, and defendants' challenge to it, are discussed in this Opinion.[2]

---

[2]     The putative indirect purchaser plaintiff class is represented by Agway Liquidating Trust; Fayus Enterprises; and Maroon Incorporated.

2

## II. STANDARD OF REVIEW

Defendants move to dismiss all of plaintiffs' claims for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They also move to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that plaintiffs lack standing.

### A. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of a complaint if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007); Aktieselskabet AF 21 v. Fame Jeans Inc., 525 F.3d 8, 15 (D.C. Cir. 2008). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to provide the "grounds" of "entitle[ment] to relief." Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). While there is no "probability requirement at the pleading stage," Bell Atlantic Corp. v. Twombly, 127 S. Ct. at

3

1965, "something beyond . . . mere possibility . . . must be alleged[.]" Id. at 1966. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," id. at 1965, or must be sufficient "to state a claim for relief that is plausible on its face." Id. at 1974. The Court referred to this newly clarified standard as "the plausibility standard." Id. at 1968 (abandoning the "no set of facts" language from Conley v. Gibson).

On a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S. Ct. at 2200; see also Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965; Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325 (1991); Aktieselskabet AF 21 v. Fame Jeans Inc., 525 F.3d at 15. It must construe the complaint "liberally in the plaintiffs' favor, and grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Aktieselskabet AF 21 v. Fame Jeans Inc., 525 F.3d at 15. The Court, however, need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must it accept plaintiffs' legal conclusions. See Kowal v. MCI Communications Corp., 16 F.3d at 1276; Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

### B. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. They therefore may hear only cases entrusted to them by a grant of power contained in either the Constitution or in an act of Congress. See, e.g., Beethoven.com L.L.C. v. Librarian of Congress, 394 F.3d 939, 945 (D.C. Cir. 2005); Best v. United States, 522 F. Supp. 2d 252, 254 (D.D.C. 2007); Srour v. Barnes, 670

F. Supp. 18, 20 (D.D.C.1987) (citing City of Kenosha v. Bruno, 412 U.S. 507, 511 (1973)).

Under Rule 12(b)(1), the plaintiffs bear the burden of establishing subject matter jurisdiction.

See Kokkonen v. Guardian Life Insurance Co., 511 U.S. 375, 377 (1994); Moms Against

Mercury v. FDA, 483 F.3d 824, 828 (D.C. Cir. 2007) (citing Georgiades v. Martin-Trigona,729

F.2d 831, 833 n.4 (D.C. Cir. 1984)). In determining whether to grant a motion to dismiss for lack

of subject matter jurisdiction, the Court must accept all of the factual allegations in the complaint

as true.  The Court, however, need not accept factual inferences drawn by plaintiffs if those

inferences are not supported by facts alleged in the complaint, nor must it accept plaintiffs' legal

conclusions.  See Best v. United States, 522 F. Supp. 2d at 255; Primax Recoveries, Inc. v. Lee,

260 F. Supp. 2d 43, 47 (D.D.C. 2003).

## III.  PLAINTIFFS' ALLEGATIONS

Plaintiffs allege that in 2003, the four defendants, who control approximately

ninety percent of all rail freight traffic in the United States, sought to increase their revenues

through the use of fuel surcharges.  Compl. ¶¶ 2-3, 43.  Before Congress passed the Staggers Rail

Act in 1980, defendants would have had to apply to the Interstate Commerce Commission for

approval of an across-the-board rate increase.  Compl. ¶¶ 4, 55.  Following deregulation of the

railroad industry, however, at least eighty percent of all rail shipments move under private

transportation contracts, which are not rate regulated, or are otherwise exempt from rate

regulation.  Compl. ¶ 56.  Plaintiffs allege that defendants determined that the most efficient

means to increase their profits was through the imposition of an across-the-board artificially high

and uniform fuel surcharge.  Compl. ¶ 60.

The barrier to this plan, according to plaintiffs, was that many rail freight transportation contracts already included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index (the "AII"). Compl. ¶¶ 11, 61. The railroad trade organization known as the Association of American Railroads ("AAR"), which is dominated by the four defendants, publishes this index. Compl. ¶¶ 12, 61. Plaintiffs allege that the AII (as well as a related cost index called the Rail Cost Adjustment Factor ("RCAF")) already accounted accurately for the impact of fuel cost increases. Compl. ¶¶ 5, 61. Any actual increase in fuel costs, no matter how large, would be reflected in the AII and the RCAF. Compl. ¶ 61. Plaintiffs allege that the defendants conspired to remove fuel from the AII so that they could apply a separate "fuel surcharge" as a percentage of the total cost of freight transportation. Compl. ¶ 62. Doing so permitted plaintiffs to raise total freight prices widely by a given percentage. Id.

According to plaintiffs, top executives from each of the defendants met regularly at various industry conferences and events in the spring of 2003 and thereafter to discuss their industry. Compl. ¶ 64. Shortly after one such industry meeting, in July 2003, the western railroads (BNSF and UP) began charging identical fuel surcharges based on the U.S. Department of Energy On-Highway Diesel Fuel Price Index. Compl. ¶¶ 16, 65. Plaintiffs allege that this parallel and complex pricing decision was based on an agreement among the defendants. Compl. ¶¶ 66-69.

The next step in the alleged conspiracy, according to plaintiffs, was the defendants' agreement and collective action to cause the AAR to create a new cost escalation index, the All Inclusive Index Less Fuel ("AIILF"), which removed fuel costs from the prior cost

6

escalation index (the AII).  Compl. ¶ 72.  According to plaintiffs, defendants reached this

agreement during the October and December 2003 meetings of the AAR.  Compl. ¶ 71.  The

index was published in December 2003.  Compl. ¶ 72.  Subsequently, and in furtherance of the

conspiracy, according to plaintiffs, the eastern railroads (CSX and NS) announced that they

would apply identical fuel surcharges based on the West Texas Intermediate Index.  Compl.

¶¶ 75-77.

      Plaintiffs allege that at that point, and as a result of these collective actions,

defendants each applied their fuel surcharges in the same way — as a percentage multiplier of the

total base rate for rail freight transportation.  Compl. ¶ 84.  They were able to do so because,

under the AIILF, fuel was no longer included in the general cost escalation index.  Plaintiffs

allege that this approach yielded defendants billions of dollars of additional profits because the

surcharge raised rates far beyond the real increased cost of fuel.  Compl. ¶¶ 81-83, 91.  Plaintiffs

allege that defendants, in the east and west, coordinated their computation of the surcharges.

Compl. ¶ 89.  As a result of this alleged collusion, the eastern and western railroads, respectively,

imposed identical fuel surcharges for more than three years.  Compl. ¶ 89.

      In sum, relying on the uniformity of fuel surcharges, the creation and use of the

AIILF, and various other allegations, plaintiffs contend that defendants conspired to fix prices in

violation of Section 1 of the Sherman Act as well as the antitrust, consumer protection and unjust

enrichment laws of various states.  Plaintiffs further allege that as a result, the members of the

plaintiff class have all paid higher prices for unregulated rail freight transportation than they

would have absent this asserted unlawful activity.  Compl. ¶¶ 26, 112. Defendants have moved to

dismiss on the grounds that plaintiffs have not met the Twombly pleading standard; that

plaintiffs' state law claims are all preempted by the Interstate Commerce Commission

Termination Act of 1995 ("ICCTA"); that plaintiffs lack standing under Article III to claim

violations of the laws of states in which they do not reside or do business; that plaintiffs have

failed to demonstrate that they have "antitrust standing;" and that plaintiffs' unjust enrichment

and consumer protection claims fail on a number of grounds.

## IV. ANALYSIS

The complaint alleges both federal and state antitrust claims as well as state

consumer protection and unjust enrichment claims.  Plaintiffs must pursue the state claims in

order to recover damages, because following Illinois Brick v. Illinois, 431 U.S. 720, 746-47

(1977), only direct purchasers may obtain damage awards under federal antitrust law.  As

explained in further detail below, the Court finds that the plaintiffs' state law claims are

preempted by ICCTA and must be dismissed.  Plaintiffs' federal antitrust claim survives,

however, because they have met the pleading standard enunciated by the Supreme Court in

Twombly and have standing to pursue their claim for injunctive relief.

### A. The Twombly Standard

Defendants argue that the complaint does not meet the pleading standard for

federal or state antitrust claims as articulated by the Supreme Court in Bell Atlantic Corp. v.

Twombly, 127 S. Ct. 1955 (2007).  The Court previously found that the direct purchaser

plaintiffs' allegations, which are substantially similar to the indirect purchasers' allegations, met

the Twombly standard.  It therefore denied defendants' motion to dismiss the direct purchasers'

claims on November 7, 2008.  See In re Rail Freight Fuel Surcharge Antitrust Litig., Misc. No.

07-489, 2008 U.S. Dist. LEXIS 95456 at *18-19, 23-26 (D.D.C. Nov. 7, 2008).  The defendants

do not raise any additional or different arguments as to why the indirect purchaser plaintiffs'

complaint should not be allowed to proceed under Twombly.  For the same reasons explained in

the Court's earlier Opinion, the Court finds that the indirect purchasers' complaint states claims

under Twombly, and it therefore will not dismiss their complaint on those grounds.  Id.

### B. Federal Preemption of State Law Claims

Defendants argue that plaintiffs' state antitrust, consumer protection and unjust

enrichment claims are preempted by the Interstate Commerce Commission Termination Act of

1995 ("ICCTA"), 49 U.S.C. § 10101 et seq.  The preemption clause in ICCTA provides:

> The jurisdiction of the [Surface Transportation] Board over —
> (1) transportation by rail carriers, and the remedies provided in this
> part [49 USC §§ 10101 et seq.] *with respect to rates,*
> *classifications, rules (including car service, interchange, and other*
> *operating rules), practices, routes, services, and facilities of such*
> *carriers*; and (2) the construction, acquisition, operation,
> abandonment, or discontinuance of spur, industrial, team,
> switching, or side tracks, or facilities, even if the tracks are located,
> or intended to be located, entirely in one State, is exclusive. Except
> as otherwise provided in this part [49 USC §§ 10101 et seq.], the
> remedies provided under this part [49 USC §§ 10101 et seq.] *with*
> *respect to regulation of rail transportation are exclusive and*
> *preempt the remedies provided under Federal or State law.*

49 U.S.C. § 10501(b) (emphasis added).

Preemption doctrine is rooted in the Supremacy Clause of the United States

Constitution.  U.S. CONST. art. VI, cl. 2.  A federal statute preempts state law when (1) the

preemptive intent is "'explicitly stated in the statute's language or implicitly contained in its

structure and purpose'"; or (2) the state law "actually conflicts with federal law"; or (3) "federal

law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (internal quotations and citations omitted). "'[T]he purpose of Congress is the ultimate touchstone' of pre-emption analysis." Id. at 516 (quoting Malone v. White Motor Corp., 435 U.S. 497, 504 (1978)); see also Altria Group, Inc. v. Good, No. 9127, 2008 U.S. LEXIS 9127 at *10 (U.S. Dec. 15, 2008).

The preemption language in ICCTA is plain and explicit: The remedies provided "with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). "The language of the statute could not be more precise." Friberg v. Kansas City S. Ry., 267 F.3d 439, 443 (5th Cir. 2001). See also Emerson v. Kansas City S. Ry., 503 F.3d 1126, 1128-29 (10th Cir. 2007); Green Mt. R.R. Corp. v. Vermont, 404 F.3d 638, 641 (2d Cir. 2005); City of Auburn v. United States, 154 F.3d 1025, 1030 (9th Cir. 1998). "The most natural reading of section 10501(b)(2) is that the federal remedies provided by the ICC Termination Act are the only remedies available as to the regulation of rail transportation, and that the federal remedies are exclusive of state remedies except where the ICC Act has expressly provided otherwise." CSX Transp. v. Georgia PSC, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996). Indeed, "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." Id.

While the enactment of ICCTA was the culmination of a movement toward deregulation of the railroads that began in the late 1970's, Congress did not intend that the states

fill the regulatory void.[3] The regulation of railroad operations had always been "a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce, and it appears manifest that Congress intended the ICCTA to further that exclusively federal effort, at least in the economic realm." Friberg v. Kan. City S. Ry., 267 F.3d at 443; see also City of Auburn v. United States, 154 F.3d at 1029.[4]  Thus, as numerous courts have held, ICCTA preempts the economic regulation of railroads by the states, as well as state laws whose application would unreasonably interfere with a railroad's operations.  See PCS Phosphate Co. v. Norfolk Southern Corp., 520 F. Supp. 2d 705, 715 (E.D.N.C. 2007) (collecting cases).  As the Third Circuit put it, "the Termination Act does not preempt only explicit economic regulation. Rather, it preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'" New York Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 252 (3d Cir. 2007) (quoting Fla. E. Coast Ry. Co. v. City of W. Palm

---

[3]     Congress began deregulating the industry in the late 1970's, first with the enactment of the Railroad Revitalization and Regulatory Reform Act of 1980, followed shortly thereafter by the Staggers Rail Act of 1980.  See City of Auburn v. United States, 154 F.3d at 1029 & n.6.  Congress enacted ICCTA in order to complete the railroad deregulation that the earlier statutes had begun.  See S. Rep. No. 104-176, at 5 (1995) ("the bill continues the deregulation theme of the past 15 years by providing further regulatory reductions in the surface transportation industries.").

[4]     Plaintiffs argue that there is always a presumption against finding preemption. Certainly this is true when Congress has legislated in a field the states have traditionally occupied.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996).  Conversely, the federal government's historic regulation of the railroad system counsels against such a presumption in this case.  See CSX Transp. v. Williams, 406 F.3d 667, 673 (D.C. Cir. 2005) ("the case for preemption is particularly strong where, as here [rail transportation], 'the State regulates in an area where there has been a history of significant federal presence'") (quoting United States v. Locke, 529 U.S. 89, 108 (2000)); see also Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d at 1327-28.

Beach, 266 F.3d 1324, 1331 (11th Cir. 2001)).  The question is always whether the action "would have the effect of preventing or unreasonably interfering with railroad transportation." PCS Phosphate Co. v. Norfolk Southern Corp., 520 F. Supp. 2d at 715.

   The states retain their traditional police powers to protect health and safety, which is reserved to them by the Constitution, but only so long as the application of these powers is not unreasonably burdensome on railroad operations.  See, e.g., Green Mt. R.R. Corp. v. Vermont, 404 F.3d at 642 ("Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption."); Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d at 1339 (application of local zoning laws to a company leasing railroad property was not preempted by ICCTA because "the zoning ordinances with which [the lessee] must comply, do not burden [the railroad] with the patchwork of regulation that motivated the passage of the ICCTA."); Maumee & W. R.R. Corp. and RMW Ventures, LLC Petition for Declaratory Order, S.T.B. Dkt. No. 34354, 2004 WL 395835, at *1 (S.T.B. Mar. 2, 2004) (localities retain certain police powers to protect health and safety so long as they do not interfere with interstate rail operations).

   To permit plaintiffs to pursue their state antitrust, consumer protection, and unjust enrichment claims against defendant railroads in this case, however, is not the least bit similar to the exercise by states of these non-burdensome police powers through state laws whose application are remote from railroad operations.  Rather, for this Court to resolve plaintiffs' claims would require the application of different state antitrust and consumer protection laws to decide what defendants' fuel surcharges should have been — creating just the patchwork of

railroad regulation that ICCTA sought to preempt.  As the Senate noted when it enacted ICCTA

in 1995:

> The hundreds of rail carriers that comprise the railroad industry
> rely on a nationally uniform system of economic regulation.
> Subjecting rail carriers to regulatory requirements that vary among
> the States would greatly undermine the industry's ability to provide
> the 'seamless' service that is essential to its shippers and would
> weaken the industry's efficiency and competitive viability.

See S. REP. NO. 104-176, at 6 (1995).

Plaintiffs also argue that because Section 10501(b) establishes both the STB's

jurisdiction as well as the preemptive effect of its decisions and remedies, any claims arising out

of private railroad contracts (such as the claims at issue here) are not within the STB's statutory

authority and therefore could not be preempted.  This argument confuses the STB's jurisdiction

with the scope of federal preemption and assumes that Congress would not have allowed ICCTA

to leave a regulatory void.  The argument is not supported by either the statute's language or its

legislative history.  The Senate Report expressly stated that "nothing in this bill should be

construed to authorize States to regulate railroads in areas where Federal regulation has been

repealed by this bill."  S. REP. NO. 104-176, at 6 (1995).  Similarly, the Conference Committee

noted that "integrated into the statement of general jurisdiction is the delineation of the

exclusivity of federal remedies with respect to the regulation of rail transportation."  H.R. CONF.

REP. NO. 104-422, at 168 (1995).  And the courts that have considered the matter have

recognized that through its deregulation of the railroads, Congress purposely left potential

plaintiffs without a federal remedy.   As one of the first courts to consider ICCTA explained:

> Defendants, however, read the ICC Termination Act's preemption
> clause to preempt state remedies only when federal remedies are

> provided under the Act. . . . Defendants' argument reflects a
> misunderstanding not only of the plain language of section
> 10501(b)(2), but also of the ICC Termination Act generally. The
> most natural reading of section 10501(b)(2) is that the federal
> remedies provided by the ICC Termination Act are the only
> remedies available as to the regulation of rail transportation, and
> that the federal remedies are exclusive of state remedies except
> where the ICC Act has expressly provided otherwise.

CSX Transp. v. Georgia PSC, 944 F. Supp. at 1581.

Congress has created similarly broad preemption in other industries. Airlines are

a prime example — like railroads, the operation of airlines is necessarily between states, indeed,

nationwide. Congress recognized in the Airline Deregulation Act ("ADA") that any regulation of

the airlines by individual states would create significant problems, and so it prohibited the

enactment or enforcement of state laws or regulations "related to a price, route, or service of an

air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1)

(previously 49 U.S.C. § 1305(a)(1)), which the Supreme Court concluded preempted even state

laws of general applicability because they "relate to" the airline industry:

> [P]etitioner advances the notion that only state laws specifically
> addressed to the airline industry are pre-empted, whereas the ADA
> imposes no constraints on laws of general applicability. Besides
> creating an utterly irrational loophole (there is little reason why
> state impairment of the federal scheme should be deemed
> acceptable so long as it is effected by the particularized application
> of a general statute), this notion similarly ignores the sweep of the
> "relating to" language.

Morales v. Transworld Airlines, 504 U.S. 374, 386 (1992). See also Altria Group, Inc. v. Good,

2008 U.S. LEXIS 9127 at *26 ("the phrase 'relating to' indicates Congress' intent to pre-empt a

large area of state law to further its purpose of deregulating the airline industry"). One court

expressly held that the ADA preempted the application of state antitrust and consumer protection

14

laws to airlines setting of fares because they "relate to . . . a price of an air carrier." In re Korean Air Lines Co., LTD, Antitrust Litig., 567 F. Supp. 2d 1213, 1220 (C.D. Cal. 2008). With similarly broad language, ICCTA preempts state laws with "respect to regulation of rail transportation." 49 U.S.C. § 10501(b). Plaintiffs' challenges to defendants' rates and rate practices under state antitrust, consumer protection and unjust enrichment laws implicate a core concern of the ICCTA — the regulation of "economics and finances of the rail carriage industry," and, just as with the airline industry, such regulation by the states is preempted. New York Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d at 252.

   Plaintiffs nevertheless argue that ICCTA does not preempt state regulation of contract traffic exempted by Congress from STB regulation under another section of the statute, 49 U.S.C. § 10709. Section 10709(c)(1) states that "[a] contract that is authorized by this section, and transportation under such contract, shall not be subject to this part [49 USC §§ 10101 et seq.], and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part [49 USC §§ 10101 et seq.]." 49 U.S.C. § 10709(c)(1). Plaintiffs rely on the "shall not be subject to this part" language for their argument that ICCTA's preemption clause does not apply to any contract traffic, and thus does not apply to any of plaintiffs' claims, all of which involve contract traffic. But plaintiffs have not cited, nor has the Court discovered, any case that interprets the interplay between Sections 10501 and 10709 in the manner plaintiffs suggest, and the Court is not persuaded by plaintiffs' arguments. Read in its entirety, the sentence makes clear that Congress intended it to mean only that the STB has no regulatory authority over contract claims, not to create an opportunity for state regulation.

To read the "shall not be subject to this part" language as eliminating ICCTA preemption for all contract traffic would be inconsistent with congressional intent. Contract traffic, or otherwise unregulated traffic, accounts for eighty percent of all rail freight traffic. Compl. ¶ 56. Through its enactment of ICCTA, Congress intended that "the Federal scheme of economic regulation and deregulation [of the railroads] . . . address and encompass all such regulation and to be completely exclusive. Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation." H.R. REP. No. 104-311, at 95-96 (1995). Interpreting Section 10709(c) as exempting eighty percent of rail traffic from federal preemption opens that traffic up to the risk of pervasive state regulation of "rates" and "practices," and would make it impossible for uniform federal standards to govern railroad operations.

Nor does Section 10709(c)(2)'s references to lawsuits in court, and not before the STB, as the exclusive remedy for alleged breaches of contract by railroads mean that all claims against railroads arising from shipments governed by contract may be brought in federal courts. Under Section 10709(c)(2), courts may rule on breach of contract claims against railroads, a grant of jurisdiction that is necessary for any industry to function. Ensured enforcement of contracts is a basic premise of our economic system. But plaintiffs are not seeking contractual remedies here. Plaintiffs' desired remedies, through their state antitrust, consumer protection and unjust enrichment claims, are extra-contractual. To allow shippers access to extra-contractual state law remedies against a railroad, simply because they have a contract with the railroad, would gut the purposes of ICCTA.

Plaintiffs' argument concerning ICCTA's evidentiary savings clause, 49 U.S.C. § 10706(a)(3)(B)(ii), is similarly unavailing.  The savings clause includes the phrase, "[i]n any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from [certain kinds of evidence]."  49 U.S.C. § 10706(a)(3)(B)(ii).  By this section, Congress provided railroads with certain evidentiary protections, but these protections cannot be transformed into a grant of authority for the enforcement of state antitrust laws that are preempted by ICCTA's express preemption clause.  Had Congress intended that the entire body of state antitrust law not be preempted by Section 10501(b), it would not have created the exception so tangentially.  The Court will not rely on plaintiffs' interpretation of this one clause as adequate counterweight to the plain language in Section 10501(b), as well as the run of legislative history and of judicial decisions on ICCTA preemption.

For these reasons, the Court concludes that all of plaintiffs' state law claims are preempted by ICCTA and must be dismissed.  Because the Court finds the state claims are preempted as a matter of law, it need not reach the issue of whether the named plaintiffs would have standing to bring state laws claims for states in which they do not reside.[5]

---

[5]     Nor need the Court decide whether a dismissal on preemption grounds is a dismissal for want of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure or for failure to state a claim under Rule 12(b)(6).

*C. Standing*

The indirect purchaser plaintiffs' remaining claim is a federal antitrust claim for injunctive relief.  The Supreme Court's decision in <u>Illinois Brick</u> prohibits claims for damages, but not those for injunctive relief, by indirect purchasers under federal antitrust law.  <u>See</u> <u>Illinois Brick v. Illinois</u>, 431 U.S. 720, 746-47 (1977).  <u>See also</u> <u>Mid-West Paper Products Co. v. Continental Group, Inc.</u>, 596 F.2d 573, 592-94 (3d Cir. 1979).  Defendants contend that although <u>Illinois Brick</u> does not bar plaintiffs' claim for injunctive relief, the claim is barred on other standing grounds and must be dismissed for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Defendants specifically allege that (1) the indirect purchaser plaintiffs fail to allege injury resulting from the conspiracy described in the complaint, and (2) any resulting injunction would be duplicative of the results that may be achieved by the direct purchaser plaintiffs.

The essential standing question for antitrust claims for injunctive relief is whether the plaintiffs have alleged an antitrust injury — namely a "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'"  <u>Cargill, Inc. v. Monfort of Colorado, Inc.</u>, 479 U.S. 104, 113 (1986) (quoting <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 486 (1977)).  Defendants argue that <u>Associated General Contractors v. Cal. State Council of Carpenters</u> ("<u>AGC</u>"), which established a multi-factor test to determine whether federal antitrust plaintiffs met prudential standing requirements, governs plaintiffs' standing.  <u>See</u> <u>Associated General Contractors v. Cal. State</u>

Council of Carpenters, 459 U.S. 519, 542 (1983).[6]  The indirect purchaser plaintiffs are correct,

however, that the "efficient enforcement factors" identified in AGC do not apply to claims for

injunctive relief.  As the Supreme Court stated in Cargill:

> [I]n Associated General Contractors we considered other factors in
> addition to antitrust injury to determine whether the petitioner was
> a proper plaintiff under § 4 [of the Clayton Act for damages]. . . .
> [H]owever, many of these other factors are not relevant to the
> standing inquiry under § 16 [of the Clayton Act for an
> injunction]."). . . .  [The relevant inquiry under Section 16 is
> whether plaintiffs have alleged an antitrust injury because] the only
> remedy available is equitable in nature . . . . [S]tanding under § 16
> raises no threat of multiple lawsuits or duplicative recoveries [once
> an injunction is imposed].

Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104 at 110-11 & nn. 5-6.

The complaint alleges that "[p]laintiffs and the Class have suffered injury, and

will continue to suffer injury in their business or property, proximately caused by Defendants'

unlawful conduct, in that they have paid supra-competitive prices for Rail Fuel Surcharges

applied to unregulated rail freight transportation services during the Class Period."  Compl.

¶ 120.  Unlike in the cases cited by defendants, where the alleged injuries harmed a single

competitor, through their allegations identifying defendants' supra-competitive prices, plaintiffs

here have alleged an injury to competition itself.  See, e.g., Dial A Car v. Transportation, Inc.,

884 F. Supp. 584, 588 (D.D.C. 1995), aff'd in part, rev'd in part 82 F.3d 484 (D.C. Cir. 1996).

This is precisely the sort of injury that the antitrust laws are intended to protect against.  See

Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. at 115 ("The antitrust laws . . . were enacted

---

[6]      The AGC factors include: (1) the nature of the plaintiff's alleged injury; (2) the
directness of the injury; (3) the risk of duplicative recovery; and (4) the complexity of the
apportionment of damages.  Associated General Contractors v. Cal. State Council of Carpenters
("AGC"), 459 U.S. at 542-44.

for 'the protection of *competition*, not *competitors*'") (citations omitted) (emphasis in original);

In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 364 (D.N.J. 2001) ("Where . . . it is

alleged that consumers paid a price higher than the price that would have been offered had the

dealers been competing, the purpose of the antitrust laws is obviously thwarted.").

    Once plaintiffs have alleged an antitrust injury, they must also allege a causal

connection between the prohibited behavior and their injury, a requirement common to standing

for all plaintiffs.  See Arden Wood, Inc. v. United States Citizenship & Immigration Servs., 480

F. Supp. 2d 141, 147 (D.D.C. 2007) ("[s]tanding is an Article III requirement under which the

plaintiffs must show, at an 'irreducible constitutional minimum': (1) that they have suffered an

injury in fact — the invasion of a legally protected interest; (2) that the injury is fairly traceable

to the defendant's conduct (a causal connection); and (3) that a favorable decision on the merits

likely will redress the injury.") (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61

(1992)).  See also Weaver's Cove Energy, LLC v. State of Rhode Island Dep't of Envtl. Mgmt.,

524 F.3d 1330, 1332-33 (D.C. Cir. 2008).

    Defendants argue that the indirect purchasers fail to allege the necessary causal

connection between the charged conspiracy and their injury.  In fact, however, the indirect

purchasers allege:

> Agway has been in the business of shipping farm products
> to various customs clearance yards in Chicago, Illinois and Detroit,
> Michigan, transferring those products to storage facilities, and re-
> shipping product from these storage facilities to customers of
> Agway.  Agway purchased unregulated freight transport services
> indirectly from one or more of the Defendants during the Class
> Period, and paid Rail Fuel surcharges indirectly to Defendants.

*   *   *

20

. . . During the Class Period, Fayus was a California-based
wholesale and retail outlet for African and Caribbean food
products servicing a diverse clientele ranging from small
independent restaurants, institutional foodservice establishments as
well as supermarkets and grocery stores.

\*    \*    \*

. . . At all relevant times during the Class Period, Maroon has been
in the business of shipping chemical products to various customs
clearance yards . . . transferring those products to storage facilities,
and re-shipping said products from said storage facilities to
customers of Maroon. . . . Maroon purchased unregulated rail
freight transport services indirectly from one or more of the
Defendants during the Class Period, and paid Rail Fuel Surcharges
indirectly to Defendants.

\*    \*    \*

. . . [Plaintiffs] purchased unregulated rail freight transportation
indirectly from one or more of the Defendants during the Class
Period, and during the Class Period one or more of the Defendants
assessed Rail Fuel Surcharges on Plaintiffs in connection with that
unregulated rail freight transportation. The prices Plaintiffs paid to
Defendants for unregulated rail freight transportation services on
which Rail Fuel Surcharges were imposed were greater than the
prices Plaintiffs would have paid absent the conspiracy alleged
herein.

Compl. ¶¶ 28-31. Defendants' challenges to these allegations are essentially that plaintiffs

purchased the rail freight services *indirectly*, a fact which, as discussed above, does not, on its

own, invalidate their claims for injunctive relief.[7]  Plaintiffs have alleged an antitrust injury

caused by these asserted antitrust violations  which their desired injunction may ameliorate; and

---

[7]     Defendants' reliance on <u>O.K. Sand & Gravel v. Martin Marietta Technologies</u> for
the required amount of factual detail that must be pled for antitrust standing is misplaced.  The
court there considered whether the plaintiff had produced enough evidence *at trial* to support the
verdict, not what a plaintiff must plead to make the initial showing of standing.  See <u>O.K. Sand &
Gravel v. Martin Marietta Technologies</u>, 36 F.3d 565, 573 (7th Cir. 1994).

they have alleged adequate factual detail to trace the injury to defendants' allegedly collusive activities.  The Court finds that they have adequately alleged both antitrust injury and standing.

Defendants further argue that regardless of whether plaintiffs would otherwise have standing, the Court should dismiss their federal claims on equitable grounds.   Doing so, according to defendants, would eliminate the possibility that the indirect purchaser plaintiffs' desired injunction would be duplicative of the injunction that the direct purchaser plaintiffs seek, would protect defendants against the payment of attorneys' fees to two sets of lawyers and would promote judicial economy.  The Court recognizes the possibility that allowing both the direct and indirect purchasers to proceed with their cases may result in some inefficiency.  Because the outcome of the direct purchasers' case is not yet determined, however, it is not yet known whether allowing the indirect purchasers to proceed will actually be inefficient.  There is no assurance at this point that the direct purchasers will obtain an injunction against defendants.  And none of the cases cited by defendants supports dismissing plaintiffs' claims before the potentially duplicative injunction is in place.  Furthermore, it is possible that a settlement agreement could be reached between defendants and the putative direct purchaser class, a realistic possibility given that the direct purchasers' claims for money damages are viable.  Even if they do not settle before trial, the two putative classes have different attorneys and may pursue different strategies during discovery or at trial, all of which may result in different outcomes.  In short, the Court finds that it would be premature to dismiss the indirect purchasers' federal claim on equitable grounds at this point.

## V.  CONCLUSION

For these reasons, the Court will grant defendant's motion to dismiss in part and will deny it in part.  Plaintiffs' state law claims will be dismissed.  Their federal antitrust claim for injunctive relief will not be dismissed.  A separate Order consistent with this Opinion shall issue this same day.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  12|31|08