UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869 |
| | Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To: ALL DIRECT PURCHASER CASES | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR RELIEF
<u>PURSUANT TO  THE COURT'S JULY 28, 2009 ORDER (DOCKET NO. 296)</u>**

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ..................................................................1

II.     SUMMARY OF DISCOVERY PROCESS......................................................3

      A.      Meet And Confer Process For Transactional Data ..................................3

      B.      Meet And Confer Process Regarding Documents And Non-Data ESI...................4

ARGUMENT ................................................................................................5

III.    LEGAL STANDARD:  DEFENDANTS BEAR THE BURDEN WHEN
       REFUSING TO PRODUCE REQUESTED DATA AND DOCUMENTS ......................5

IV.     DEFENDANTS SHOULD BE REQUIRED TO PRODUCE DOCUMENTS
       AND DATA APPLYING TO RATE-REGULATED SHIPMENTS................................6

      A.      Difference Between "Rate-Regulated" And "Rate-Unregulated"
          Shipments........................................................................6

      B.      Documents Concerning Rate-Regulated Shipments Are Relevant.........................6

      C.      Rate-Regulated Transactional Data Is Relevant. .....................................7

      D.      Any Additional Burden In Producing Rate-Regulated Documents And
          Data Is Minimal. .................................................................8

V.      DOCUMENT AND ESI (NON-DATA) PRODUCTION ISSUES. ...................................9

      A.      UP and CSX Should Produce Communications Among Defendants
          Regarding Profitability, Costs, Pricing, And Market Share.............................9

      B.      UP And CSX Should Produce Documents Concerning Meetings At the
          NFTA Concerning "The Need To Increase Rates For Or Profitability Of
          Freight Shipments" And Fuel Costs. ....................................................12

      C.      Defendants Should Produce Documents Showing Meetings Between
          Custodians With The Power Or Capacity To Influence, Recommend, Or
          Adopt A Fuel Surcharge. .....................................................................13

VI.     CSX-SPECIFIC DOCUMENT ISSUES. .......................................................14

      A.      CSX Should Be Ordered To Produce Requested Information Regarding
          Profits And Profitability.......................................................................15

B.    CSX Should Be Ordered To Produce Requested Information About Fuel
      Costs............................................................................................................................18

VII.  DEFENDANTS UP AND NS SHOULD BE REQUIRED TO TREAT
      ATTORNEYS DESIGNATED AS FIRST WAVE CUSTODIANS AS NORMAL
      CUSTODIANS. ...........................................................................................................20

CONCLUSION......................................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advanced Microtherm Inc. v. Norman Wright Mechanical Equip. Corp.*,
No. C 04-2266, 2009 WL 302003 (N.D. Cal. Feb. 6, 2009) ...................................................15

*Alexander v. FBI*,
194 F.R.D. 299 (D.D.C. 2000).........................................................................................6

*\*American Tobacco Co. v. United States*,
328 U.S. 781 (1946).............................................................................................15, 18

*\*B-S Steel of Kan., Inc. v. Tex Indus. Inc.*,
No. 01-CV-2410, 2003 WL 21939019 (D. Kan. July 22, 2003) .......................................5, 11

*Boca Investerings P'ship v. United States*,
31 F. Supp. 2d 9 (D.D.C. 1998)......................................................................................23

*In re Bulk Popcorn Antitrust Litig.*,
783 F. Supp. 1194 (D.Minn. 1991) ................................................................................11

*In re Carbon Black Antitrust Litig., No. A.03-10191*,
2005 WL 102966 (D. Mass. Jan. 18, 2005) ......................................................................8

*\*City of Moundridge v. Exxon Mobil Corp.*,
429 F. Supp. 2d 117 (D.D.C. 2006)...........................................................................10, 13

*Doe v. District of Columbia, No. Civ.A.03-1789*,
2005 WL 1787683 (D.D.C. July 5, 2005).......................................................................5, 6

*F.T.C. v. Lukens Steel Co.*,
444 F. Supp. 803 (D.D.C. 1977)....................................................................................15

*LeBaron v. Rohm and Haas Co.*,
441 F.2d 575 (9th Cir. 1971) .......................................................................................15

*In re Linerboard Antitrust Litig.*,
497 F. Supp. 2d 666 (E.D. Pa. 2007) ...............................................................................8

*Minebea Co., Ltd. v. Papst*,
228  F.R.D. 13 (D.D.C. 2005).......................................................................................23

*Neuder v. Battelle Pacific Northwest Nat. Lab.*,
194 F.R.D. 289 (D.D.C. 2000).......................................................................................23

*New Park Entm't, LLC v. Elec. Factory Concerts, Inc.*,
No. 98-775, 2000 WL 62315 (E.D. Pa. Jan 13, 2000)..........................................................11

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
998 F.2d 1224 (3d Cir.)...............................................................................................13

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   No. 3:03-MDL-1556,  2007 WL 4150666 (M.D. Pa. Nov. 19, 2007)......................................8

*\*In re Rail Fuel Surcharge Antitrust Litig.*,
   587 F. Supp. 2d 27 (D.D.C. Nov. 7, 2008) ..................................................... passim

*In re Sealed Case*,
   737 F.2d 94 (D.C. Cir.1984).......................................................................................23

*In re Shopping Carts Antitrust Litig.*,
   95 F.R.D. 299 (S.D.N.Y. 1982) ..................................................................................15

*United States v. Int'l Bus. Mach. Corp.*,
   66 F.R.D. 186 (S.D.N.Y. 1974) ..................................................................................11

## Statutes

Fed. R. Civ. P. 26(b)(1).............................................................................................................5

Fed. R. Civ. P. 37(a)(1).............................................................................................................1

Plaintiffs respectfully submit this memorandum in support of their motion to compel production of certain data, pursuant to the Court's July 28, 2009 Order (Docket No. 296) directing Plaintiffs to seek relief from Judge Facciola. This motion also requests the Court to compel production of certain categories of documents, as explained below.[1]

## I.  PRELIMINARY STATEMENT

After months of conferences, Plaintiffs have resolved most issues with Defendants concerning the transactional data, documents, and non-data ESI that they will produce. A small number of data and document issues remain unresolved, however, and are ripe for adjudication by the Court. Because no Defendant has yet produced a single piece of paper or byte of data in response to Plaintiffs' Second Document Requests (served in December 2008), and because Defendants are supposed to be front-loading a production of data and documents (starting 13 days ago) so as to complete the initial wave of discovery by October 31, 2009, Plaintiffs need prompt relief.[2] These disputes seem to hinder Defendants from producing any documents or data.

*First*, all Defendants are reserving the right to withhold transactional data (as well as documents and non-data ESI) that they assert relate solely to freight traffic shipped under rates regulated by the Surface Transportation Board ("STB") (hereafter, "rate-regulated traffic"). This information, however, is directly relevant to this case. That the conspiracy here was intended to

---

[1]  Pursuant to the Court's Order concerning the procedures for handling confidential material, dated April 20, 2009 (Docket No. 275), redacted versions of this memorandum and certain exhibits cited herein are being filed via the electronic filing system, because Defendants have designated the information referenced as confidential. Non-redacted versions of the memorandum and those exhibits shall also be filed under seal with the Court pursuant to the April 20, 2009 Order.

[2]  Pursuant to Fed. R. Civ. P. 37(a)(1) and Civ. L.R. 7(m), Plaintiffs certify that they have conferred with Defendants on the issues presented herein in good faith in an effort to obtain the discovery without court action, and Defendants oppose the motion as it applies to them.

apply across the board, regardless of whether freight was rate-regulated, is well-pleaded in the Complaint and recognized in this Court's order denying Defendants' motion to dismiss.  While the claims in this case are only on behalf of shippers whose freight was not rate-regulated, this does not render irrelevant data or documents about the fuel surcharges that arose in the context of rate-regulated shipments.  Among other things, and as more fully explained below, such data may provide valuable comparative information about Defendants' fuel surcharge practices.  *See* Section IV *infra*.

*Second,* Plaintiffs also seek to compel the production of certain categories of documents and non-data ESI.  Defendants CSX and UP assert that they will not produce documents concerning or evidencing communications among the four Defendants regarding profitability, costs, pricing, and market share.  *See* Section V.A *infra*.  CSX and UP also assert that they will not produce documents concerning certain categories of communications among Defendants at National Freight Traffic Association meetings.  *See* Section V.B *infra*.   And all Defendants assert that they need not produce documents evidencing meetings among high-level custodians unless the documents facially discuss certain topics.  *See* Section V.C *infra*.

*Third,* Plaintiffs move to compel production of more than 9 categories of documents that CSX – which has elected to take a less cooperative approach than any other Defendant – alone refuses to produce.  The documents at issue are relevant, and their production will entail minimal additional burden.  *See* Section VI *infra*.

*Finally,* Plaintiffs seek an order that two custodians whose files the parties agreed would be searched and collected – **REDACTED** – should be treated like any other custodian for the purposes of search and collection.  Defendants UP and NS argue that because **REDACTED**

████████████████████ REDACTED ████████████████████

████████████████████████████████████████████████████

████████     Plaintiffs should be entitled to discover all responsive and non-privileged documents and ESI from these two custodians.   Significantly, Plaintiffs have greatly compromised in agreeing to measures to ease the burden of any privilege review.[3]

## II.   SUMMARY OF DISCOVERY PROCESS

Plaintiffs served their Second Document Requests on December 30, 2008.[4]   Defendants served written objections and responses on February 2, 2009,[5] and the parties began to meet and confer about the requests and other issues relating to the production of ESI.

### A.   Meet And Confer Process For Transactional Data

From the outset of the parties' discussions, Plaintiffs made clear their priority on obtaining sales transactional data, which was requested in Plaintiffs' Second Document Request No. 6, as well as a Third Request for the Production of Documents, which contained a single request seeking some additional categories of transactional data.[6]   After numerous meet-and-

---

[3]   To accommodate Defendants' concerns about the scope of a privilege review, Plaintiffs have agreed to the use of a "privilege filter" designed to minimize Defendants' burden of reviewing and logging privileged documents (although the terms of the privilege filter application are still being negotiated), and Plaintiffs have agreed that the end date of document and non-ESI discovery corresponds to the commencement of this litigation.

[4]   *See* Plaintiffs' Second Request for Production to BNSF (Ex. 1 hereto).  The requests served on the other Defendants are substantially similar.

[5]   *See* BNSF's Responses and Objections to Plaintiffs' Second Request for Production (Ex. 2 hereto); CSX's Responses and Objections to Plaintiffs' Second Request for Production (Ex. 3 hereto); NS' Responses and Objections to Plaintiffs' Second Request for Production (Ex. 4 hereto); UP's Responses and Objections to Plaintiffs' Second Request for Production (Ex. 5 hereto).

[6]   *See* Plaintiffs' Third Request for Production to BNSF (Ex. 6 hereto), dated June 29, 2009.  The requests served on the other Defendants are substantially similar.  Plaintiffs later agreed that Defendants did not need to serve formal written responses to the Third Request, in exchange for Defendants agreeing to explain, by letter, (a) which requested data fields Defendants maintained and agreed to produce, (b) which fields Defendants maintained but were

confers, the production of data samples, and numerous correspondence, Defendants have by-and-large agreed to produce the types of transactional data requested by Plaintiffs (that are accessible) regarding freight shipments that were *not* rate-regulated by the STB.

Plaintiffs are, however, still waiting to hear back from CSX on whether it maintains data fields responsive to Plaintiffs' requests.  For example, CSX has recently committed to producing "the requested categories from the Third Requests that [it] maintain[s] and that are reasonably accessible," but is still in the process of identifying which categories of data it maintains.[7]  CSX is in essentially the same position with respect to data responsive to Plaintiffs' Second Document Request No. 6.  If any issues arise when CSX does disclose what data fields it maintains and will produce, Plaintiffs will immediately raise those issues with the Court.

### B.    Meet And Confer Process Regarding Documents And Non-Data ESI

At the same time the parties were discussing data issues, they also met and conferred regarding Defendants' objections to the requests for documents and non-data ESI in Plaintiffs' Second Document Requests.  Defendants made numerous "burden" objections.  Eventually, it became apparent to Plaintiffs that if the parties could agree to a set of search terms used to search automatically through Defendants' ESI, as well as a set of custodians whose ESI and hard-copy files would be searched, many of these objections would likely be resolved.

After the parties reached agreement on custodian lists and substantial agreement on a set of search terms in the last few weeks, Plaintiffs reinitiated efforts to discuss Defendants'

---

not yet prepared to produce absent further discussion, and (c) which fields Defendants did not maintain.

[7] *See* Letter from John Cuddihy, dated August 10, 2009 (Ex. 7 hereto).  *See* Letter from John Cuddihy, dated August 13, 2009 (Ex. 8 hereto).

objections.   As expected, the use of the "custodian/search-term protocol"[8] has effectively rendered moot many of the objections on burden and relevance originally advanced by BNSF, NS, and UP.   A few discrete areas of dispute remain, where certain Defendants object to producing documents and ESI even if they are generated by the custodian/search-term protocol.

In contrast, CSX has maintained its original objections to over nine different requests.

## ARGUMENT

## III.   LEGAL STANDARD:  DEFENDANTS BEAR THE BURDEN WHEN REFUSING TO PRODUCE REQUESTED DATA AND DOCUMENTS

Plaintiffs are entitled to discover information if the information sought is "reasonably calculated to lead to the discovery of admissible evidence."   Fed. R. Civ. P. 26(b)(1). "Relevance for discovery purposes is broadly and liberally construed."   *Doe v. District of Columbia*, No. Civ.A.03-1789, 2005 WL 1787683, at *2 (D.D.C. July 5, 2005) (Facciola, M.J.) (citing cases).   The principles of broad and liberal discovery are particularly important in price-fixing cases like this one.   *See B-S Steel of Kan., Inc. v. Tex Indus. Inc.*, No. 01-CV-2410, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003) ("This general policy of allowing liberal discovery in antitrust cases has been permitted by courts when there are allegations of conspiracy and where 'broad discovery may be needed to uncover evidence of invidious design, pattern, or intent.'") (internal quotations omitted).

---

[8] On the eve of filing this brief, Plaintiffs learned for the first time that some Defendants were contemplating applying the agreed-to search terms not just to ESI but also to their hard-copy documents.  Plaintiffs do not agree to this approach, because it would involve the very problematic use of OCR for hard copy documents, which is not only ineffective for capturing all terms in a document, but also would not capture any handwritten notes.  Two defendants, BNSF and Norfolk Southern, have already advised Plaintiffs that they will not use this protocol and will conduct a review by hand of hard-copy documents from the files of the designated custodians. Plaintiffs are continuing to negotiate this issue with Defendants UP and CSX, and  Plaintiffs intend to seek resolution from the Court if the parties cannot resolve this issue.

Defendants, as the objecting parties, bear the burden of showing why discovery should not be allowed. *See District of Columbia*, 2005 WL 1787683, at *2 ("When objecting to document requests, the objecting party must establish his or her basis for refusing to respond to the other's requests, and it bears the burden of showing why discovery should not be allowed.") (citing *Alexander v. FBI*, 194 F.R.D. 299, 302 (D.D.C. 2000)). For the reasons discussed below, Defendants cannot meet this burden with respect to any of the issues addressed herein.

## IV. DEFENDANTS SHOULD BE REQUIRED TO PRODUCE DOCUMENTS AND DATA APPLYING TO RATE-REGULATED SHIPMENTS

All Defendants have asserted that they should not be required to produce either transactional data or documents that, in Defendants' view, relate solely to rail freight shipments that were not rate-regulated by the STB. Plaintiffs submit that since data and documents regarding rate-regulated shipments are relevant to this case, Defendants do not have the right to withhold such documents and data.

### A. Difference Between "Rate-Regulated" And "Rate-Unregulated" Shipments.

Freight shipments can be classified into two categories: (i) rate-regulated – those with rates regulated by the STB; and (ii) rate-unregulated – those with rates not regulated by the STB because they are shipped pursuant to private contracts or the shipment is otherwise exempt from rate regulation. A large majority of freight shipments are rate-unregulated. *See In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. 27, 30 (D.D.C. Nov. 7, 2008).

### B. Documents Concerning Rate-Regulated Shipments Are Relevant.

As set forth in the Consolidated Amended Class Action Complaint (the "Complaint") (*see* ¶¶16, 96-98), and in this Court's decision denying Defendants' motion to dismiss, *In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. at 30, Plaintiffs have alleged that Defendants conspired to establish the fuel surcharge program at issue as a means to effectuate an across-the-

board price increase – meaning that it was designed to and did in fact apply *both* to rate-unregulated *and* rate-regulated traffic. The STB addressed these surcharges in its January 2007 ruling, finding that these surcharges were an "unreasonable" practice unrelated to the actual cost of fuel for particular shipments. *Id.* at 36. The STB held, however, that its jurisdiction was limited only to rate-regulated traffic, and so its ruling (and directive that Defendants end the rate-based fuel surcharges) applied only to rate-regulated traffic. *See* Complaint ¶ 97.

Thus, while Plaintiffs' claims are brought only on behalf of shippers whose freight shipments were rate-unregulated, evidence of how the fuel surcharges were discussed or applied in the context of rate-regulated traffic is relevant to the conspiracy claims in this case. By way of example, if a UP executive in 2005 wrote an email about a rate-regulated shipment, observing that the fuel surcharges have been an effective tool for increasing profits from that shipper, that email would be relevant to Plaintiffs' claim that the fuel surcharges were imposed as a means to raise prices and not simply to recover fuel costs. Thus, any document discussing or revealing the adoption and application of the fuel surcharge program, and/or the motivation for imposing fuel surcharges (which Plaintiffs assert  were a pretext for price increases) is relevant, even if that document facially pertains only to rate-unregulated traffic.

### C.      Rate-Regulated Transactional Data Is Relevant.

Transactional data applying to regulated traffic has an additional significance: it can be valuable in an economic analysis to compare the effects of STB-ordered changes to Defendants' fuel surcharge programs.  After the STB found in January 2007 that Defendants' rail fuel surcharges were "'a misleading and ultimately unreasonable practice,'" *In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. at 36 (quoting *Rail Fuel Surcharges*, STB Ex Parte No. 661 (January 25, 2007) at 6-7), Defendants were required to make changes to their rate-regulated surcharge programs.

Accordingly, analysis of fuel surcharges on rate-regulated transactions may show, for example, a difference in the amount of the fuel surcharge as compared either to the fuel surcharge imposed on rate-regulated freight before the STB decision or compared to the fuel surcharge contemporaneously imposed on rate-regulated freight. Either comparison could potentially be useful to an expert's economic analysis of the degree to which the surcharges at issue were supracompetitive. Thus, differences in how fuel charges were handled for rate-regulated traffic following the STB decision in 2007 could be highly probative of the effects of the conspiracy.

One well-recognized method for assessing damages is a benchmark analysis that compares, among other things, conduct before, during, and (if feasible) after the alleged conspiracy. *See, e.g., In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *20 (M.D. Pa. Nov. 19, 2007).[9] Transactional data for rate-regulated shipments could be highly valuable for performing such an analysis, because it will include data for what happened to fuel surcharges before and after the STB's ruling that the surcharge program could not continue as it was for rate-regulated traffic.

**D.      Any Additional Burden In Producing Rate-Regulated Documents And Data Is Minimal.**

Because the parties have already substantially agreed to the terms that will be used to search Defendants' ESI, Defendants' production of documents relating to rate-regulated shipments will not significantly expand the scope of their search for responsive materials. The same electronic files will be generated by the search terms and reviewed; the only difference will

---

[9] *See also In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 670 (E.D. Pa. 2007); *In re Carbon Black Antitrust Litig.*, No. A.03-10191, 2005 WL 102966, at *20 (D. Mass. Jan. 18, 2005)

be into what pile (figuratively speaking) reviewers put them: the "produce" or the "withhold" pile.

With respect to data, although Plaintiffs appreciate that Defendants will be producing a significant volume of data in this case (reflecting the scope of commerce affected by the alleged conspiracy), data pertaining to rate-regulated traffic makes up a small portion of total freight shipments. Furthermore, to withhold data concerning rate-regulated shipments, Defendants presumably would have to take the extra step of analyzing data fields to determine whether they concern rate-regulated traffic or not, which would likely *increase* the burden and introduce a risk of human error.

Accordingly, Defendants should (1) not be permitted to withhold otherwise responsive documents solely because they involve rate-regulated shipments, and (2) be required to produce the same transactional data for rate-regulated as for rate-unregulated traffic.

## V.   DOCUMENT AND ESI (NON-DATA) PRODUCTION ISSUES

### A.   UP and CSX Should Produce Communications Among Defendants Regarding Profitability, Costs, Pricing, And Market Share.

Plaintiffs' Requests Nos. 5 and 18 originally sought production of communications among two or more Defendants on a variety of topics. Each Defendant objected to these requests on various grounds. At the initial meet and confers with each Defendant in March 2009, Plaintiffs offered to combine these requests into a single request seeking communications *among Defendants* on a discrete set of topics that are highly relevant to this price-fixing case: profitability, costs, pricing, and market share.[10] Plaintiffs further offered that Defendants need only produce responsive communications found in the files of agreed-upon custodians, and could employ agreed-upon search terms to search those custodians' electronic files. At the time, each

---

[10] Request No. 61, to which both UP and CSX have objected to, also overlaps with these topics.

Defendant agreed to take this narrowed proposal under advisement, pending negotiation of search terms.

Notwithstanding Plaintiffs' compromises and the fact that the parties have substantially agreed on the search terms to be used, UP and CSX have taken the position that even if their reviewers see communications during the review responsive to these Requests as narrowed, after application of the agreed-upon search terms, the communications will not be produced. There is no reasonable basis for withholding such documents.

First, the requested communications are highly relevant. In this price-fixing case, the existence of communications among custodians (many of whom are senior management) at *different* railroads about profits or profitability, costs, prices, or market share could be highly and directly relevant to the alleged conspiracy. In general, any evidence of communications among alleged conspirators may be probative of a conspiratorial intent. *See* July 13, 2009 Order (Docket No. 292) at 8 (citing *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 131 (D.D.C. 2006)).

And the topics of discussion identified by Plaintiffs are directly relevant to the alleged price-fixing conspiracy. As this Court has recognized, Plaintiffs expressly allege unlawful coordinated conduct relating to profits and market share. *See In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. at 30 ("Plaintiffs allege that defendants determined that the most efficient means to increase their profits was through the imposition of an across-the-board artificially high and uniform fuel surcharge . . . Plaintiffs allege that this approach yielded defendants billions of dollars of additional profits because the surcharge raised rates far beyond the real increased cost of fuel."); *id.* at 36 ("Plaintiffs further allege that even though the use of the AIILF in this manner recouped profits far in excess of increased costs caused by rising fuel prices, defendants

did not compete with one another to lower costs."); Complaint ¶ 95 ("Defendants also agreed that none of the conspirators would be undercutting agreed pricing or 'stealing' market share by using their increasing revenues to subsidize discounting of underlying rates.").   And inter-defendant communications about prices or costs are widely recognized as relevant in price-fixing cases.  *See, e.g., In re Bulk Popcorn Antitrust Litig.*, 783 F.Supp. 1194, 1197 (D.Minn. 1991) (relying on evidence that competitors discussed "sales volume and prices" as well as other competitive conditions in denying defendants' motion for summary judgment).

Second, no legitimate burden or breadth objection can be made to the production of responsive documents, since Plaintiffs have already compromised and agreed that these Requests, as applied to ESI, can be handled through the custodian/search-term protocol. Defendants need not search the files of any additional custodians or run any additional searches on ESI.  The only question is whether responsive non-privileged documents generated by the custodian/search term protocol will be produced or withheld.  Given the liberal standard for discovery, the presumption must be for disclosure.  *See B-S Steel of Kan., Inc.*, 2003 WL 21939019, at *3 ("This general policy of allowing liberal discovery in antitrust cases has been permitted by courts when there are allegations of conspiracy and where 'broad discovery may be needed to uncover evidence of invidious design, pattern, or intent.'").[11]

Simply put, in this price-fixing case, if two of the Defendants' CEOs, for example, shared views or reached agreements or understandings about profits or profitability, costs, prices, or

---

[11] *See also New Park Entm't, LLC v. Elec. Factory Concerts, Inc.*, No. 98-775, 2000 WL 62315, at *3 (E.D. Pa. Jan 13, 2000) ("discovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is a less weighty consideration than in other cases") (quoting *United States v. Int'l Bus. Mach. Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974) (quotation omitted).

11

market share, Plaintiffs are entitled to discover that fact. Accordingly, Defendants UP and CSX should be ordered to produce responsive communications.

B.     **UP And CSX Should Produce Documents Concerning Meetings At the NFTA Concerning "The Need To Increase Rates For Or Profitability Of Freight Shipments" And Fuel Costs.**

Plaintiffs' Complaint specifically identifies the National Freight Transportation Association ("NFTA") as a potential locus of conspiratorial meetings. *See* Complaint at ¶¶ 58-59. Request No. 45 to Plaintiffs' Second Request for Production therefore seeks "documents concerning meetings *among Defendants at the NFTA* and concerning Rail Fuel Surcharges, fuel costs, the AII, the AIILF, the RCAF or the need to increase rates for or profitability of freight shipments."

CSX and UP object to producing documents concerning *meetings at the NFTA among Defendants* regarding "the need to increase rates for or profitability of freight shipments." In a price-fixing case concerning rail freight shipments, CSX's and UP's position that they will not produce records of communications *among the alleged price fixers* about "the need to increase rates for or profitability of freight shipments" is baseless.

UP (but not CSX) also objects to producing documents relating to *meetings at the NFTA among Defendants* concerning fuel costs. As more fully set forth below, *infra* at Section VI.B, fuel costs are relevant to Plaintiffs' claims, as the alleged conspiracy centers on the adoption of pretextual fuel surcharges designed to increase profits (and not just recoup fuel costs, as Defendants claimed publicly). *See In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. at 30 (fuel surcharges "yielded defendants billions of dollars of additional profits because the surcharge raised rates far beyond the real increased cost of fuel"). Discussions among Defendants about fuel costs clearly could "lead to the discovery of admissible evidence." Fed. R. Civ. 26(b)(1).

In addition, providing this information will impose no significant burden on UP and CSX, because Plaintiffs have already compromised and agreed that the Request, as applied to ESI, can be handled through the custodian/search term protocol.

### C. Defendants Should Produce Documents Showing Meetings Between Custodians With The Power Or Capacity To Influence, Recommend, Or Adopt A Fuel Surcharge.

One additional review and production issue applies to all Defendants.  The parties have discussed how some documents (such as emails) may reveal the existence of meetings or other communications between different Defendants' custodians.  Such documents may or may not reflect the topics of the meetings or communications.  For example, UP's CEO may write an internal email that says: "I will be meeting with BNSF's CEO tonight to discuss a variety of issues."

Plaintiffs' position is that Defendants should produce all non-privileged documents referencing or noting any past, potential, or future meeting or communication among two or more Defendants, regardless of whether the document specifically references fuel surcharges, so long as the attendees had the power or capacity to influence, recommend, or adopt a fuel surcharge.  Production of such materials is consistent with Defendants' obligations under Rule 26 and, more specifically, with this Court's July 13, 2009 Order, where the Court stated:

> Evidence of meetings among alleged conspirators may be probable of a conspiratorial intent. See City of Moundridge v. Exxon Mobile Corp., 429 F. Supp. 2d 117, 131 (D.D.C. 2006) (noting that range of circumstantial evidence, including proof of opportunity to conspire in the form of attendance at meetings or discussions, may help plaintiffs carry their burden of proving a conspiracy) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1242 (3d Cir.), cert. denied, 510 U.S. 994 (1993)). While defendants protest that they may have perfectly legitimate meetings, *the existence of a date and time for a meeting, whether legitimate or not, may lead to relevant evidence of a discussion at that meeting that is probative of plaintiffs' case.* By the same token, evidence of such meetings would be relevant

> only if the attendees had the power and capacity to influence,
> recommend, or adopt a fuel surcharge.

July 13, 2009 Order at 8-9 (emphasis added).

Thus, this Court has already recognized that the existence of dates and times for meetings among Defendants' high-level custodians is relevant to this antitrust conspiracy case.  And production of this material will impose no significant burden, since Plaintiffs are only seeking ESI and hard-copy documents from those custodians whose files Defendants have *already agreed to review*.

Several of Plaintiffs' document requests call for documents relating to communications among the railroads on a variety of topics.[12]  Defendants should be ordered to produce all non-privileged documents referencing or noting any past, potential, or future meeting or communication among two or more Defendants, even if the document does not specifically reference fuel surcharges, so long as the attendees had the power or capacity to influence, recommend, or adopt a fuel surcharge.

## VI.   CSX-SPECIFIC DOCUMENT ISSUES.

CSX alone has refused to produce documents and ESI in response to numerous Requests, notwithstanding Plaintiffs' agreement that CSX can use the custodian/search-term protocol for many of them.[13]

---

[12] *See, e.g.*, Ex. 1, Second Document Request Nos. 5, 10, 11, 17, 18, 19, 22, 38, 45, 61.

[13] Plaintiffs note that NS has not yet been able to provide Plaintiffs with its final position on a few of Plaintiffs' Second Set of Document Requests.  Once NS provides its final position to Plaintiffs, there may be areas of disagreement of which Plaintiffs are currently unaware and that may require resolution by the Court.

**A.    CSX Should Be Ordered To Produce Requested Information Regarding Profits And Profitability.**

CSX alone has objected to producing documents in response to several Requests that reference profits or profitability, even though Plaintiffs have compromised and agreed that CSX can use the custodian/search term protocol for most of these Requests.

In general, the Requests at issue seek internal analyses and external communications regarding the relationship between CSX's rail fuel surcharges and profits. Such Requests fit well within the reach of the broad and liberal discovery permitted in antitrust actions. *See, e.g., F.T.C. v. Lukens Steel Co.*, 444 F. Supp. 803, 805 (D.D.C. 1977) ("discovery rules should normally be liberally construed to permit discovery in antitrust cases"). In addition, courts have specifically recognized that information regarding profits and profit margins can be relevant to proving the existence of a price-fixing conspiracy. In *LeBaron v. Rohm and Haas Co.*, 441 F.2d 575 (9th Cir. 1971), for example, the Ninth Circuit held that it was reversible error to deny plaintiffs discovery of profit margins related to the product alleged to be the subject of price-fixing, finding that "the information sought certainly is relevant to the issue of conspiracy to fix prices." *Id.* at 578.[14]

These principles have compelling application here, where CSX and the other Defendants disclosed throughout the alleged class period, in SEC filings and otherwise, that the rail fuel surcharges at issue were a principle source of their profits (further evidence that the surcharges

---

[14] *See also American Tobacco Co. v. United States*, 328 U.S. 781, 804-06 (1946) (recognizing that extraordinary profits could, under the circumstances, constitute "circumstantial evidence of the existence of a conspiracy"); *Advanced Microtherm Inc. v. Norman Wright Mechanical Equip. Corp.*, No. C 04-2266, 2009 WL 302003, at *1 (N.D. Cal. Feb. 6, 2009) (ordering production of profit information and noting that defendant's profits "can be circumstantial evidence of a conspiracy to fix-or otherwise artificially inflate-prices"); *In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299, 309 (S.D.N.Y. 1982) (ordering discovery of profit information and noting that changes in profits "might tend to indicate that a conspiracy did exist").

were not designed as a cost-recovery mechanism).  *See e.g.*, CSX Corp., 10-K, February 9, 2007 at 25 (Ex. 9 hereto) ("Operating Revenue increased $948 million in 2006 to $9.6 billion, compared to $8.6 billion for the prior year.  The primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets.").

Plaintiffs specifically allege that Defendants conspired to use the fuel surcharges as a means to increase prices and profits.  *In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. at 30 ("Plaintiffs allege that defendants determined that the most efficient means to increase their profits was through the imposition of an across-the-board artificially high and uniform fuel surcharge . . . Plaintiffs allege that this approach yielded defendants billions of dollars of additional profits because the surcharge raised rates far beyond the real increased cost of fuel.")  During the period of the alleged conspiracy, however, Defendants represented that their surcharges were not profit vehicles, but pure cost-recovery vehicles.  *See, e.g.,* Complaint at ¶ 11 (UP executive referring to surcharges as "fuel recovery mechanism"); *In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. at 36 ("'[The railroads' fuel surcharge program was] a *misleading* and ultimately unreasonable practice," because "there is no real correlation between the rate increase and the increase in fuel costs for that to which the surcharge is applied.'") (quoting *Rail Fuel Surcharges*, STB Ex Parte No. 661 (January 25, 2007) at 6-7).

Other factors make CSX's refusal to provide information relating to profits and profitability all the more unreasonable.  First, the other Defendants have generally agreed to produce the documents responsive to these Requests (which are specifically identified below).  Second, CSX has agreed to produce certain categories of information on revenues and fuel costs.  So CSX's refusal to produce communications or analyses regarding profits seems to stem more

from a stubborn resistance to the word "profits" than from any substantive objection to production of financial information.

The requested information is therefore directly relevant to probe the motivation for the alleged conspiracy and to test the veracity of CSX's contemporaneous representations about its rail fuel surcharge practices.

The specific Requests at issue are:

**REQUEST NO. 23:**
All documents concerning any analyses of the potential or actual impact of Rail Fuel Surcharges on your profitability, including (but not limited to): (a) analyses of the amount of revenues generated by Rail Fuel Surcharges in comparison to your actual fuel costs; (b) analyses as to whether a rate-based Rail Fuel Surcharge produces more revenues than the AII or the RCAF or any other mileage-based or cost-based fuel surcharge (or any other type of such surcharge); and (c) all documents concerning business plans, planning analysis, budgets, forecasts, sales and profit projections relating to Rail Fuel Surcharges.

With respect to this Request, CSX says it will only produce "analyses of the potential or actual impact of Rail Fuel Surcharges on CSXT's *revenues*."[15]  But as described above, there is no legitimate reason not to produce internal analyses at CSX about the potential or actual impact of Rail Fuel Surcharges on *profits* as well as revenues.  In addition, Plaintiffs have agreed that this Request can be handled through the custodian/search-term protocol; therefore CSX need not incur any additional burden in searching for responsive ESI.

**REQUEST NO. 24:**
All documents concerning the amount of revenues and profits generated by Rail Fuel Surcharges, including (but not limited to) annual or monthly gross and net profits attributable to Rail Fuel Surcharges.

Plaintiffs have offered to limit this Request to documents "sufficient to show" the information requested.  Nonetheless, CSX still objects to producing responsive information beyond revenues, and again there is no basis for this objection.  CSX should be ordered to

---

[15] *See* Ex. 3, CSX's Responses and Objections to Plaintiffs' Second Request for Production.

provide the requested information.

**REQUEST NO. 28:**
All documents concerning any analyses of the potential or actual impact of Rail Fuel Surcharges on the profitability of the rail freight industry, or any of the Defendants, or any other third party.

CSX objects to providing any documents responsive to this Request, even though Plaintiffs have agreed it can be handled through the custodian/search term protocol. Any analysis by CSX about whether changes in rail fuel surcharges would increase the profitability of CSX *or any of the other Defendants* would be relevant to determining the motivation for the conspiracy, and may well lead to admissible evidence probative of the conspiracy's existence.

**REQUEST NO. 64:**
Documents sufficient to identify (on an annual basis) your actual profits and gross and net profit margins.

CSX refuses to produce the requested information, and instead states that it will only provide information about its revenues. As discussed above, the requested information goes to CSX's motivation for the conspiracy and, in addition, changes in profits may provide circumstantial evidence of the conspiracy. *See American Tobacco Co. v. United States*, 328 U.S. at 804-06. Moreover, any burden in providing this information, which is surely kept by CSX in the regular course of business, is minimal.

Thus, CSX should be ordered to produce the documents and ESI requested in Requests 23, 24, 28, and 64.

**B.     CSX Should Be Ordered To Produce Requested Information About Fuel Costs.**

Several Requests seek information about Defendants' fuel costs and measures that Defendants employed (such as fuel hedging and improvements to fuel efficiency) to manage fuel costs. Such information is directly relevant to Plaintiffs' case, both because Plaintiffs' damages and impact analysis compare a Defendant's actual fuel costs to the revenue generated by a

Defendant's rail fuel surcharges, and because Plaintiffs could use this information to examine the veracity of Defendants' statements that their rail fuel surcharges were directed at fuel-cost recovery, not increasing profits. As the Court has recognized, contrary to these statements, it is alleged that Defendants' fuel surcharges were pretextual and "yielded defendants billions of dollars of additional profits because the surcharge raised rates far beyond the real increased cost of fuel." *In re Rail Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d. at 30.

CSX alone has flatly refused to produce documents responsive to the following Requests concerning its fuel-cost management practices, even though Plaintiffs have agreed that the Requests can be handled by the custodian/search-term protocol:

**REQUEST NO. 31:**
All documents concerning any analyses of the use of fuel hedging strategies as a means of addressing fuel costs.

**REQUEST NO. 32:**
All documents concerning whether or not to use hedging strategies as a means of addressing fuel costs.

**REQUEST NO. 33:**
All documents concerning your decision whether or not to enter into hedging contracts with the Archer-Daniels-Midland Company or any other shipper.

**REQUEST NO. 34:**
All documents concerning any other methods you claim to use or have used to offset, recoup or mitigate your fuel costs (apart from Rail Fuel Surcharges and hedging strategies).

**REQUEST NO. 35:**
All documents concerning any analyses of improvements to your fuel efficiency.

These Requests all seek information relevant to determining how Defendants actually managed their fuel costs. In addition, the Complaint alleges that Defendants took actions against their independent self-interest relating to these topics, as part of their price-fixing conspiracy, pointing expressly to Defendants' refusal to enter into hedging contracts with Archer-Daniels-Midland Company ("ADM"). *See* Complaint at ¶ 92. The requested information can also be

used to establish that Defendants' fuel costs, fuel management practices, and fuel efficiencies varied widely, which is directly relevant to Plaintiffs' claim "that it is unlikely that the eastern and western defendants would independently impose identical fuel surcharges, because *fuel cost as a percentage of operating cost and fuel efficiency differed widely among the defendant railroads.*" *Rail Fuel Surcharge*, 587 F. Supp. 2d. at 34 (emphasis added).

For all these reasons, the requested information is relevant. Moreover, CSX cannot maintain a burden objection since Plaintiffs agree that the custodian/search-term protocol can be used for these Requests. CSX should be ordered to produce documents responsive to Requests 31 through 35.

## VII. DEFENDANTS UP AND NS SHOULD BE REQUIRED TO TREAT ATTORNEYS DESIGNATED AS FIRST WAVE CUSTODIANS AS NORMAL CUSTODIANS.

As the Court is aware, Defendants have agreed to prioritize the production of documents from an initial "subset of custodians" prior to the October 31, 2009 deadline for the completion of the first wave of discovery. *See* August 5, 2009 Order (Docket No. 299) at 1. Included on these agreed-to lists of "first wave" custodians are REDACTED



REDACTED

---

[16] Plaintiffs agreed to confer with NS and UP about whether a limited search of these custodians' files was necessary.  However, after discussing this matter with NS and UP, and for the reasons discussed herein, Plaintiffs do not believe such a limitation – much less the exceedingly narrow limitation UP and NS insist upon – is necessary or warranted.

First, after months of negotiations, Plaintiffs have agreed as an accommodation that Defendants can utilize a "privilege filter" to address Defendants' concerns about conducting a privilege review.   While the parties are still finalizing the final elements of a discovery stipulation that will detail the mechanism for the privilege filter, the filter is intended to allow Defendants to run various search terms directed at capturing privileged documents to isolate and automatically log electronic documents without manually reviewing each document captured by the filter.   **REDACTED**

Plaintiffs have also agreed, with respect to documents and non-data ESI, that the end date of discovery is May 14, 2007, which is the date when this lawsuit was commenced.   Again, Plaintiffs agreed to this in part to accommodate concerns about a burdensome privilege review.

Second, NS's and UP's proposal to limit discovery of **REDACTED**



REDACTED

*See e.g.*, Memorandum Opinion, dated July 2, 2009 (Docket No. 291) at 12 ("To limit plaintiffs to what defendants will give them is to, in effect, begin and end discovery with defendants' voluntary disclosures.")

REDACTED

The attorney-client privilege "applies only to communications made to an attorney in his capacity as legal advisor . . . when the legal advice is merely incidental to business advice, the privilege does not apply." *Neuder v. Battelle Pacific Northwest Nat. Lab.*, 194 F.R.D. 289, 292 (D.D.C. 2000). "Because an in-house lawyer often has other functions in addition to providing legal advice, the lawyer's role on a particular occasion will not be self-evident as it usually is in the case of outside counsel." *Minebea Co., Ltd. v. Papst*, 228 F.R.D. 13, 21 (D.D.C. 2005) (Friedman, J.) (quoting *Boca Investerings P'ship v. United States*, 31 F. Supp. 2d 9, 11-12 (D.D.C. 1998).[17]

REDACTED

---

[17] *See also Neuder*, 194 F.R.D. at 293 ("[T]he mere fact that in-house counsel is present at a meeting does not shield otherwise unprivileged communications from disclosure.")

REDACTED

Thus, for the foregoing reasons, NS and UP should be ordered to treat **REDACTED**

█████████████ as normal document custodians (without any special limitations).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit that the Court should grant

Plaintiffs' motion to compel production of certain data and documents.  Plaintiffs have submitted

a proposed order for the Court's consideration, specifying the relief requested by this motion.


Dated: August 13, 2009

                                        Respectfully submitted:


/s/ Michael D. Hausfeld                 /s/ Stephen R. Neuwirth
Michael D. Hausfeld                     Stephen R. Neuwirth
William P. Butterfield                  Daniel Brockett
HAUSFELD LLP                            Marc L. Greenwald
1700 K Street NW, Suite 650             Sami H. Rashid
Washington, DC 20006                    Joseph D. Hammond
Telephone: (202) 540-7200               QUINN EMANUEL URQUHART
Facsimile:  (202) 540-7201                 OLIVER & HEDGES, LLP
Email:  mhausfeld@hausfeldllp.com       51 Madison Avenue, 22nd Floor
                                        New York, New York 10010
Steig D. Olson                          Telephone: (212) 849-7000
HAUSFELD LLP                            Facsimile:  (212) 849-7100
11 Broadway, Suite 615                  Email:  stephenneuwirth@quinnemanuel.com
New York, NY 10004
Telephone: (212) 830-9850
Facsimile:  (212) 480-8560
Email:  solson@hausfeldllp.com

## CERTIFICATE OF SERVICE

I, Sami H. Rashid, an attorney, certify that on August 13, 2009, I caused a true and correct copy of the foregoing memorandum to be filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to Defendants' counsel.

/s/ Sami H. Rashid
Sami H. Rashid