**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION |
| This document relates to: ALL DIRECT PURCHASER CASES |

**MDL Docket No. 1869**
**Misc. No. 07-489 (PLF/JMF/AK)**

**MEMORANDUM OPINION**

Now pending before the court is <u>Plaintiffs' Motion for Relief Pursuant to the Court's July 28, 2009 Order (Docket No. 296)</u> ("Pls. Mot.") [#304].  Plaintiffs seek relief pursuant to <u>Scheduling Order</u> [#296] and Federal Rule of Civil Procedure 37(a).  Plaintiffs seek to compel production of the following documents and/or data:

1)      from all defendants, CSX Transportation ("CSX"), Union Pacific Railroad Company ("UP"), Norfolk Southern Railroad Company ("NS"), and BNSF Railroad Company ("BNSF"), plaintiffs seek to compel the production of transactional data and documents regarding "rate-regulated" traffic;

2)      also from all defendants, plaintiffs seek to compel the production of all non-privileged documents referencing or noting any past, potential, or future meetings or communications among two or more defendants, even if the document does not specifically reference fuel surcharges, so long as the attendee has the power or capacity to influence, recommend or adopt a fuel surcharge;

3)      from defendants CSX and UP, plaintiffs seek to compel production of communications concerning profitability, costs, pricing and market share and

documents concerning meetings among defendants concerning surcharges, fuel

costs or the need to increase rates for or profitability of freight shipments; and,

4)        from defendant CSX, plaintiffs seek to compel production of five other categories

of documents related to fuel costs and measures undertaken by CSX to manage

fuel costs.

In addition, plaintiffs seek related relief from the court regarding the correct designation

of a UP and an NS custodian.  Both custodians are attorneys and, in light of this, NS and UP will

only do a narrow review of their files.  Plaintiffs seek to treat these two attorneys as regular

custodians for the purposes of document collection.

## I. Background

The facts of the case are set out in In re Rail Freight Fuel Surcharge Antitrust

Litigation, 587 F. Supp. 2d 27, 29-31 (D.D.C. 2008) and In re Rail Freight Fuel Surcharge

Antitrust Litigation, 258 F.R.D. 168, 168-69 (D.D.C. 2009).  Briefly, plaintiffs allege that

defendants, the four largest Class I railroads based in the United States, violated federal antitrust

laws by conspiring to price-fix the cost of rail freight transportation services via the application

of rail fuel surcharges. In re Rail Freight Fuel Surcharge Antitrust Litig., 258 F.R.D. at 168.  The

instant case is brought on behalf of shippers whose freight was not rate-regulated. Compl. ¶ 1.

Rate-regulated freight refers to that freight which the Surface Transportation Board ("STB") has

the authority to regulate. Plaintiffs' Memorandum in Support of Their Motion for Relief

Pursuant to the Court's July 28, 2009 Order (Docket No. 296) ("Pls. Memo.") [#304, Attach. 1]

at 6.  Freight shipments governed by private contracts or otherwise exempt from regulation are

rate-unregulated freight. Id.

In the court's July 28, 2009 order, the court ordered the parties to continue discovery on a rolling basis, beginning August 1, 2009. Scheduling Order ¶ 1.  The parties agreed to attempt to "front-load" this production. Id.  The parties have spent months negotiating search terms, filters and protocols for the search, review and production of the immense discovery in this case. Defendants' Joint Opposition to Direct Purchaser Plaintiffs' Motion for Relief Pursuant to the Court's July 28, 2009 Order ("Defs. Joint Opp.") [#307] at 1-2.  Despite extensive discussions between the parties regarding discovery, the parties have reached an impasse on the several issues now before the court.

## II. Transactional data and documents regarding "rate-regulated" traffic

### a. Background

The court's July 28, 2009 Order indicated that the parties were in the process of negotiating an agreement regarding the production of certain transactional data. Scheduling Order ¶ 2.  The court directed the parties to seek relief should they be unable to reach an agreement. Id.  The parties did confer and agreement was reached on all transactional documents in question, save those documents solely related to rate-regulated freight. Defs. Joint Opp. at 2. Plaintiffs seek to compel disclosure of transactional data and documents regarding "rate-regulated" traffic. Pls. Mot. at 1-3.

### b. Summary of Arguments

Plaintiffs' complaint alleges a conspiracy where fuel surcharges were implemented as an "across-the-board increase" designed to apply to both rate-regulated and rate-unregulated traffic. Pls. Memo. at 7 (citing Compl. ¶¶ 16, 96-98); In re Rail Freight Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d at 30.  Plaintiffs argue that evidence as to how fuel surcharges were discussed or

3

applied is relevant to the conspiracy claims in the case, regardless of whether it pertains to rate-regulated or -unregulated freight. Pls. Memo. at 6.  Thus, even if a document relates exclusively to rate-regulated freight, without any reference to rate-unregulated freight, the document may present relevant evidence of collusion.

Plaintiffs argue that transactional data related solely to rate-regulated freight have additional significance due to the changes implemented in defendants' fuel surcharge programs pertaining to rate-regulated freight after the STB ruling.[1] Pls. Memo. at 7.  Plaintiffs argue that prior to the STB decision rate-regulated and rate-unregulated freight were governed by the same fuel surcharge regime. Plaintiffs' Reply Memorandum in Support of Their Motion for Relief Pursuant to the Court's July 28, 2009 Order (Docket No. 296) ("Pls. Reply) [# 309] at 11. Accordingly, rate-regulated transactional data would provide a valuable comparison, both to data before and after the STB directive and to rate-unregulated transactional data. Pls. Memo. at 6-7. The differences between how rate-regulated and rate-unregulated freight were handled after the STB ruling could have probative value in determining the effects of the conspiracy. Id.  Plaintiffs assert that the transactional data on rate-regulated freight present a unique opportunity to assess the degree to which the surcharges at issue were supracompetitive. Pls. Reply at 3.  Plaintiffs conclude that any additional burden on defendants to produce documents and transactional data on rate-regulated freight is minimal at worst and potentially may *reduce* the burden of searching

---

[1] STB has sole jurisdiction over issues related to rate-regulated freight and has the authority to direct railroads to implement changes, according to its rulings. Rail Fuel Surcharges, STB Ex Parte No. 661 (January 25, 2007) at 10.  In 2007, STB ruled that the fuel surcharge program, as it related to rate-regulated freight, was "misleading and ultimately unreasonable." Id. at 4.  The STB directed the railroads to change their practice of applying fuel surcharges to rate-regulated freight. Id. at 6-7.  STB does not have jurisdiction over rate-unregulated freight. Id. at 10.

responsive documents and data and weeding out those related only to rate-regulated freight. Pls. Memo. at 7.

Defendants argue that plaintiffs are not entitled to documents or transactional data related to rate-regulated traffic and that plaintiffs overreach in seeking documents and data relating exclusively to a category of traffic expressly outside the scope of this lawsuit. Defs. Joint Opp. at 8.  In regards to plaintiffs' request for transactional data related exclusively to rate-regulated freight, defendants argue that plaintiffs' assertion that transactional data would be useful for comparative analysis is flawed. Id. at 5.  Defendants argue that plaintiffs' reference to a specific methodology for analysis, called benchmark analysis, is inappropriate in this instance. Id. According to defendants, the STB did not order any change in surcharges that are relevant to a benchmark analysis. Id.  They argue that, since the STB opinion does not suggest there was a conspiracy, changes to fuel surcharges on regulated freight traffic after the STB opinion would not constitute an appropriate "non-conspiracy period" for benchmark analysis. Id.  Defendants also argue that, in light of plaintiffs' exclusion of rate-regulated freight from the case, data regarding surcharges on rate-regulated freight cannot be used for comparison purposes in the case. Id.  Accordingly, if plaintiffs cannot use the transactional data for rate-regulated freight for analysis or comparative purposes, the data are simply not relevant to the instant case and plaintiffs have no basis for seeking that discovery. Id. at 6.

c. Analysis

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense." Fed. R. Civ. P. 26(b)(1).  In Food Lion, Inc. v. United Food and Commercial Workers International

5

Union, 103 F.3d 1007, 1012 (D.C. Cir. 1997), the court of appeals indicated that relevance for the purposes of discovery is to be construed broadly.  The court then stated that, while the boundaries defining relevance to the subject matter involved in the litigation are vague, defying efforts to state a general rule, "it is also true that 'no one would suggest that discovery should be allowed of information that has no conceivable bearing on the case.'" Id. (quoting 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2008 at 107-108 (1994)).  The court then reversed the lower court's ruling when it could not see "any reasonable likelihood that allowing discovery" of certain documents would lead to "discovery of evidence relevant to the underlying action." Id. at 1003.  Notably, the next section of the treatise cited by the court states that "it is not too strong to say that a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action.  If protection is needed, it can better be provided by the discretionary powers of the court under Rule 26(c) than by a constricting concept of relevance." Wright et al, supra, § 2008 at 109.  Accordingly, the court's obligation, when confronted with a discovery demand to which an objection has been made, is first to ascertain whether there is a reasonable likelihood or possibility that the information sought may be relevant to a claim or defense or likely to lead to such evidence. Fed. R. Civ. P. 26(b)(1).[2]  If there is, the court must still weigh the burden and expense of the proposed discovery against its likely benefit, using the factors identified in Rule 26(b)(C)(iii).  See Fed. R. Civ. P. 26(b)(1) ("All discovery is subject to

---

[2] Note that upon a showing of good cause the court may expand the scope of discovery to any matter "relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1).

the limitations imposed by Rule 26(b)(2)(c).").[3]

While plaintiffs' claims are brought on behalf of shippers whose freight was unregulated, plaintiffs have clearly alleged that defendants participated in a conspiracy to implement an "across-the-board" price increase via fuel surcharges that would apply to both rate-regulated and rate-unregulated traffic.  Documents related solely to rate-regulated freight may be probative of the alleged conspiracy, an essential element of the antitrust conspiracy claim; however, the question remains whether documents and data related to rate-regulated traffic would be relevant in the entire period subject to discovery.  I will analyze documents and data separately.

While I have not had access to the data themselves, it would appear that the date of the STB order in 2007 is a logical breaking point.  All documents before 2007 pertaining to fuel surcharges related to both rate-regulated and rate-unregulated freight because, until that point, the defendants imposed fuel surcharges on both types of freight.  It would follow that, if the document was otherwise relevant or likely to lead to relevant evidence of an element of the claims or defenses, it would not become irrelevant because it dealt with regulated freight rather than unregulated freight.  For this purpose, regulation (or lack of it) is immaterial to whether or not the document is relevant or likely to lead to relevant evidence.  Hence, it cannot be said that the relevance and consequential discoverability of documents from this period is a function of whether they deal with regulated or unregulated freight.  I therefore cannot find that their

---

[3] As Wright et al. point out, this sentence was added by the 2000 amendments to remind lawyers and judges of the limitations imposed by Rule 26(b)(C)(iii).  "The [Advisory] Committee [on the Federal Rules of Civil Procedure] Note accompanying the changes notes the reports that courts have not implemented the limitations and explains that the 'otherwise redundant cross-reference' was added to 'emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.'" Wright et al. § 2008.1 at 60 (Supp. 2009).

pertaining to unregulated freight is a basis to declare them not discoverable.  The analysis would be the same as to transactional data related to rate-regulated freight before the STB decision in 2007.  The same alleged conspiratorial regime applied to both rate-regulated and rate-unregulated freight during this time period; therefore, there would be no distinction between the data for the two in regards to relevancy.

The post-STB ruling documents and data fall into a different category.  This is also where the analysis between documents and transactional data differs most.  I will address the issue of the documents first.

Defendants have a legitimate complaint that, once the STB issued its ruling, documents pertaining to rate-regulated freight cannot prove a conspiratorial intent since plaintiffs have not alleged that a conspiracy continued in regards to the imposition of fuel surcharges on rate-regulated freight after this ruling.  I will therefore deny plaintiffs' motion to compel documents solely related to rate-regulated freight after January 26, 2007, the date the STB released its decision.

The more difficult issue is that of post-STB ruling transactional data related exclusively to rate-regulated freight.  This data may be relevant to the comparison of a market victimized by an alleged conspiracy to one that was not.  Plaintiffs so contend, but defendants insist that, since the STB did not rule on whether a conspiracy existed, the comparison of data is a comparison between an apple and an orange and not two apples.  It is true, however, that, regardless of whether the pre-STB ruling market was the product of a conspiracy, the post-STB ruling market divided into two.  Data from the rate-regulated market might make the claim of damages from defendants' behavior more or less likely or might be relevant to show the effects of the anti-

competitive conspiracy in restraining trade or commerce.  On the basis of what I have learned to date in this case, I cannot dismiss plaintiffs' attempt to compare those two markets as so unsound that there is no reasonable likelihood or possibility that the comparison may be relevant to either the issues of liability or damages.

I could condition discovery upon plaintiffs' producing an expert report that confirms such a comparison is legitimate and would meet the standards of Rule 702 of the Federal Rules of Evidence.  I question the legitimacy of ordering the plaintiffs to prove their case to compel discovery in order to prove their case.  I also fear that, by requiring this of plaintiffs, I would be starting a small, but expensive, expert mini-war that would cost more than producing the data will.

On the other hand, I appreciate defendants' concern that plaintiffs should not be permitted to expand their claims beyond those they have pled.  Nevertheless, the record does not permit me to say that the production of this transactional data for rate-regulated freight in the post-STB ruling period is in itself so costly that it overwhelms the potential utility to plaintiffs of comparing markets of all freight before and after the STB decision, particularly in light of the stipulation that I have recently approved regarding discovery protocols.  I will therefore grant plaintiffs' motion to compel as it relates to transactional data on rate-regulated freight.

### III. All non-privileged documents referencing or noting any past, potential, or future meetings or communications among two or more defendants

Plaintiffs propounded Request for Production of Documents Number 67 that demanded the production of "calendars and expense reports of 'officers, directors, and other executives with responsibility for [each defendants'] Rail Freight Transportation Services business.'"  See e.g., Direct Purchaser Plaintiffs' Second Request for Production to Defendant BNSF Railway

Company ("Pls. Req. for Docs.") [#304, Attach. 3] at 15.  Plaintiffs agreed, however, that
defendants needed to provide calendars only for those employees who were production
custodians in this case and subject to redaction of purely personal information.

   Defendants agreed only to produce calendars and expense reports of vice presidents who
head business groups and their superiors and only as to contacts among the defendants
representing trade association meetings and internal meetings concerning fuel surcharges.  I
resolved the dispute by requiring the defendants to produce calendars and expense reports of
only those persons who had the power to influence, recommend or adopt a fuel surcharge and by
permitting the defendants to redact "entries in calendars that would appear to a reasonable person
to be purely personal and unrelated to any business or professional obligation whatsoever."
Memorandum Order re Response to Order of the Court ("July 13 Order") [#292] at 9.

On August 6, 2009, plaintiffs' counsel sent an e-mail to defendants' counsel expressing
that, in his opinion, my July 13 Order required the production of "all non-privileged documents"
that referenced or noted any meeting or communication between two or more of the people
defined by my order (i.e., persons who had the power to influence, recommend or adopt a fuel
surcharge) regardless of whether the document "specifically references fuel surcharges, so long
as the attendee had the power or capacity to influence, recommend or adopt a fuel surcharge."
Defs. Joint Opp. Ex. B.  Defendants assert that they do not have to produce such documents
unless they facially discuss certain topics. Defs. Joint Opp. at 16.

As is first evident, plaintiffs are expanding my ruling concerning calendars and expense
reports and redefining the very nature of the discovery that they seek.  The July 13 Order did not
speak to any category of information other than calendars and expense reports and cannot be

distorted to reach an issue that was not presented.  Moreover, the demand in the e-mail that defendants produce documents pertaining to communications that have nothing to do with fuel surcharges because the persons communicating had the power that I described in my order is archetypical of overbreadth.  According to plaintiffs, the subject matter is relevant so long as the persons communicating occupied a particular position irrespective of the nature or purpose of the communication; this will produce documents that have nothing to do with fuel surcharges and cannot possibly be relevant to this lawsuit.  I will not permit that.

Furthermore, plaintiffs' original formal request as propounded sought only two categories of documents, calendars and expense reports.  I cannot permit plaintiffs to amend it on the fly and to demand by an e-mail what they did not demand in their initial request.  Thus, the only question presented is whether defendants can be required to produce all calendars and expense reports generated by persons defined in my order merely because such persons had the power or capacity to influence, recommend or adopt a fuel surcharge.

The court has already noted that meetings between defendants could be probative of a conspiracy.  See In re Rail Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d at 35.  Plaintiffs have taken advantage of this and seek the broadest discovery to uncover any meeting that might lead to evidence of the conspiracy.  While it may be true that broad discovery is necessary in antitrust cases where plaintiffs have alleged conspiracy and where "broad discovery may be needed to uncover evidence of insidious design, pattern, or intent," there must surely be limits to this breadth.  See B-S Steel of Kan., Inc. v. Tex. Indus., Inc., No. 01-CV-2410, 2003 WL 21939019 (D. Kan. July 22, 2003).

A meeting between defendants could be probative of a conspiracy, but I am concerned

that plaintiffs cast their nets much too wide and that there is a high probability that many of the documents plaintiffs seek will be irrelevant to their claims.  To ensure a greater probability of relevance, I will not require defendants to produce calendar entries and expense reports related to meetings of unspecified purposes for a date prior to February 15, 2003.  In choosing this date, I sought a date by which mere possibility shifted to a viable probability that a meeting between top officials of defendants, the purpose of the meeting being unspecified, might be relevant to plaintiffs' claims.  In their complaint, plaintiffs allege that, from at least Spring 2003, top executives of each defendants held meetings to discuss their industry. Compl. ¶ 58.  According to plaintiffs' allegations, the conspiracy related to fuel surcharges began in 2003 after the spring meetings. Id. at ¶¶ 59-60.  Therefore, it is reasonable to assume that meetings prior to this date whose purposes are unspecified have only a mere possibility of relevance, while there is a greater  probability that meetings after this date with unspecified purposes might be relevant to plaintiffs' claims.

I have already ordered that the calendar entries and expense reports related to meetings about fuel surcharges must be produced.  I also will order the production to include those calendar entries and expense reports related to meetings where the purpose is unclear or unspecified, provided the calendar or expense report is dated after February 15, 2003 but before the end date that the parties have agreed upon for discovery.  Defendants will have to search for calendars and expense reports for a limited number of people over about a four-year period.  I appreciate all that the defendants have done and will do to comply with discovery.  Nevertheless, this additional burden is not so great as to trump the potential utility of the discovery, given that courts have traditionally found that meetings among competitors may be crucial circumstantial

evidence of conspiratorial intent.  I find this to be true, even if I allow for defendants' legitimate

assertion that in a regulated industry, such as this one, meetings are necessary to effectuate

Congressional requirements.  I will order defendants to produce those calendar entries and

expense reports for the time period identified where the purpose of the meeting is unclear or

unknown, so long as the attendee had the power or capacity to influence, recommend or adopt a

fuel surcharge.

### IV. Communications concerning profitability, costs, pricing and market share and documents concerning meetings among defendants concerning surcharges, fuel costs or the need to increase rates for or profitability of freight shipments

Plaintiffs propounded discovery requests Nos. 5 and 18 seeking documents concerning

meetings and communications between or among two or more of the Defendants relating to Fuel

Surcharges, investments in new track, or bids or proposals to serve individual shippers and

documents relating to certain topics if they concern meetings or communications between

defendants and the AAR. Pls. Memo. Ex. 1 at 8-9.  According to plaintiffs, in individual meet-

and-confers with defendants, they offered a compromise request in place of Nos. 5 and 18,

seeking only communications among defendants related to profitability, costs, pricing and

market share.  Plaintiffs further agreed that only documents from agreed-upon custodians needed

to be searched and that agreed-upon search terms could be used.  According to plaintiffs, each

defendant took this compromise under advisement, pending the negotiation of the search terms.

CSX and UP now, however, have taken the position that even if the search terms produce

documents from custodians related to profitability, costs, pricing and market share, reviewers

will not produce those documents that are unrelated to fuel surcharges.  Defendants' brief does

not reference the compromise offered at any meet-and-confer with plaintiffs and instead alleges

13

that plaintiffs have unilaterally expanded the documents sought under these two requests.

Thus, the dispute turns not on what these defendants will produce but what they will exclude from what is yielded by the use of the search terms.  Plaintiffs protest that it may be cheaper to produce everything that the search terms yield rather than to exclude from what is produced documents that defendants claim are not relevant.  It is more likely than not that the search terms may produce documents that will lack any relevance to plaintiffs' claims since no one can pretend that the search terms are such finely honed instruments that they will only produce what is relevant.  It appears to me that defendants therefore have a legitimate claim that the use of search terms should not expand the scope of discovery; however, in my view, excluding everything produced by the search that does not specifically relate to fuel surcharges is unfair.  Plaintiffs' claims relate to more than just fuel surcharges.  Plaintiffs allege a conspiracy to change the cost adjustment indexing for the entire industry to allow for the implementation of a conspiratorial fuel surcharge regime unrelated to the actual cost of fuel. Instead of a cost recovery mechanism, defendants allegedly applied fuel surcharges in a manner that dramatically increased profits.  Plaintiffs further claim that rather than use these profits to negotiate discounts with consumers to increase competition and individual defendant's market shares, defendants, via their conspiratorial agreement, maintained roughly the same market shares throughout the course of the alleged conspiracy.  Thus, some communications between defendants relating to profitability, costs, pricing and market share are more likely than not to be relevant to plaintiffs' claims, even if they did not specifically relate to fuel surcharges.  I do, however, agree, that given the nature of the industry not every communication between defendants related to profitability, costs, pricing and market share will be relevant.

14

Reviewing the search terms in the stipulation I have approved, it appears that only documents produced by search term queries 20-21 will be in issue.  Plaintiffs seek communications between defendants, and these queries relate to communications among defendants but are not further limited by additional terms, such as "AII" or "RCAF."[4]  From the documents produced by search term queries 20-21, I will order defendants CSX and UP to produce those documents that relate to profitability, costs, pricing or market share, regardless of whether they specifically relate to fuel surcharges, if the documents relate to fuel costs.  I therefore will require CSX and UP to produce documents that speak to the cost of fuel, projections of cost of fuel, and all manners and means of either reducing those costs, passing them onto customers or the impact of such costs on profitability, pricing and market share.

In a related issue, CSX and UP have also refused to produce documents concerning meetings at the National Freight Transportation Association ("NFTA") and "the need to increase rates for or profitability of freight shipments."  Defendants CSX and UP have already agreed to produce documents concerning meetings at the NFTA that pertain to rail fuel surcharges, the AII, the AIILF[5] and the RCAF.  CSX has also agreed to produce NFTA meeting documents related to fuel costs; UP has refused in regards to fuel costs.  I will not order CSX and UP to produce those NFTA meeting documents related to "the need to increase rates for or profitability of freight shipments," as the relevance of such documents is too attenuated to plaintiffs' claims, if they do not also relate to one of the topics defendants have agreed to produce.  I will, however,

---

[4] "AII" refers to the All Inclusive Index, published by the Association of American Railroads.  "RCAF" refers to means the Rail Cost Adjustment Fact published by the Surface Transportation Board.

[5] "AIILF" refers to the All Inclusive Index Less Fuel, published by the AAR.

order UP to produce those NFTA meeting documents that relate to fuel costs as I have just

defined that term.

### V. Other categories of documents related to fuel costs and measures to manage fuel costs

Defendant CSX has refused to produce five other categories of documents that relate to

fuel costs and measures undertaken to manage fuel costs.  Plaintiffs argue that documents related

to fuel costs and measures taken to reduce fuel costs (including fuel hedging) are relevant in

addressing defendants' assertions that fuel surcharges were implemented as a cost recovery

measure, rather than to increase profits. Pls. Memo. at 15-20.  In addition, production of

information related to fuel charges is important to show that defendants all had varying fuel

costs, but all implemented the same fuel surcharge program. Id.  Defendants argue that the

request is irrelevant and crosses a line of reasonableness. Defs. Joint Opp. at 20-22.  Defendants

are particularly concerned about the request for documents related to fuel hedging that do not

also concern fuel surcharges. Id. at 21.   Defendants take care to explain the concept of fuel

hedging as an investment strategy for companies (or a "bet"). Id.  According to CSX, whether or

not companies make a good bet in fuel hedging, the loss or gain should not be passed on to

customers (i.e. reflected in fuel surcharges); therefore, communications related only to fuel

hedging are not relevant to the questions at hand. Id. at 23.  Plaintiffs rebut CSX's arguments

that fuel hedging was an investment strategy, the losses and profits of which should not affect

the cost to customers, by claiming that this contradicts public statements made by defendants in

SEC filings. Pls. Memo. at 13.  In the SEC filings, CSX expressly states that fuel hedging was

established to manage exposure to fuel price fluctuations and that the fuel surcharge program

gradually replaced hedging as protection against these fluctuations. Pls. Reply Ex. 4.  Plaintiffs

also argue that fuel costs are relevant to the case, because while defendants may have had differing fuel costs, they implemented identical fuel surcharge programs; therefore, this information may be probative of the existence of a conspiracy. Pls. Reply at 14-16.

Plaintiffs do correctly characterize CSX's SEC filing.  CSX does not characterize fuel hedging as an investment opportunity, as it attempts to do in its Opposition Memorandum. Instead, CSX compares fuel hedging to fuel surcharges as manners by which to protect the company from fluctuations in fuel costs.  Further, the SEC filing indicates that CSX is phasing out fuel hedging in favor of fuel surcharges.  In the SEC document, CSX maintains that it will continue to assess the global fuel market and determine if and when to resume the program. Plaintiffs have alleged a conspiracy relating to fuel surcharges.  As I have just explained, information related to fuel costs and measures to manage fuel costs, including fuel hedging, may provide information probative of a conspiracy.  Thus, plaintiffs' request is reasonably calculated to lead to admissible evidence.  CSX must produce these documents.

### VI.  Designation of UP and NS custodian-lawyers

Defendants have agree to prioritize production of documents from an initial subset of custodians prior to the deadline for the completion of the first wave of discovery. Pls. Memo. at 20 (citing August 5, 2009 Order [# 299]).  Defendants UP and NS identified two custodians who serve as their in-house counsel. Pls. Memo. at 20.  Defendants refuse to treat these two custodians as "normal custodians" or to search their files using the same procedures as those for all other custodians because of their status as attorneys. Id.  Instead, UP and NS insist on only a narrow search focused on a single meeting where fuel surcharges were discussed. Id. at n.16.

According to plaintiffs, documents already produced by defendants show that the two

custodians in question were charged with examining how all the railroads could implement the same fuel surcharge. Id. at 21. Plaintiffs have already agreed to a search procedure that includes a privilege filter. Id. at 22. Further, it is far from certain that all communication by these custodians will be privileged, as their roles may include non-legal duties. Id. Notably, the UP custodian served in an executive business function and may have relevant, non-privileged documents based on his business capacity. Id. at 23. Plaintiffs argue that the relevance of the discovery from these custodians is very clear because even in the limited documents already produced by defendants, these custodians' names emerged. Pls. Reply at 22. The evidence presented in this limited disclosure implicates both custodians in potentially critical price-fixing discussions. Id. at 22-23.

Defendants argue that the reference made to the custodians in question in meeting minutes regarding fuel surcharges is misleading. Defs. Joint Opp. at 24-25. Defendants assert that these custodians serve a mostly legal function in UP and NS and that the "potential relevance of the lawyers is limited." Id. at 26. They also argue that the executive function of the NS custodian alluded to by plaintiffs does not reflect the custodian's function but is merely a typographical error in the custodian's title. Id. Defendants assert that reviewing these custodians' documents and logging all the privileged documents is overly burdensome, in light of the minimal relevance of these custodians' documents. Id. at 27. Defendants then provide a proposal for a limited scope of discovery for these custodians related to the time period around the meeting in question (referred to by plaintiffs as the "cusp of the conspiracy"). Id. at 28.

Limited document production reveals that the two custodians in question either participated in a meeting on fuel surcharges or in follow-up to the meeting. Their status as

attorneys does not shield these custodians unconditionally from fulfilling the discovery

obligations of defendants.  Again, most commendably, the parties have agreed to apply a

privilege filter to the search of these custodians' documents.  Defendants explain:

> The parties negotiated a privilege filter as part of a global
> discovery protocol whereby a short list of search terms, such as
> "work product" and "privilege" will be applied to ESI[6] in which
> the names of in-house counsel appear.  All ESI triggered by the
> filter will be logged automatically and will not be reviewed further
> unless the receiving party in good faith requests further
> information to substantiate the ESI's inclusion in the privilege log.

Defs. Joint Opp. at 27 n.14.

Plaintiffs argue that what burden does exist will be mitigated by the filter, which will

capture the ESI that contains the search terms and the names of in-house counsel.  Since these

documents will be captured and not reviewed further, the use of the filter should dispense largely

with the need for manual review of files for privilege.  Thus, these custodians should be treated

as all other custodians for the purpose of discovery.

Defendants counter that (1) certain ESI generated by counsel that escape the filter

because in-house counsel may not have affixed words like "privileged communication" or other

explicit labels of privilege to the ESI and that (2) hard copy documents will have to be reviewed

manually.  They insist that, despite the filter of the ESI, the burden of manually reviewing the

hard copies cannot be justified because the potential relevance of the documents generated by in-

house counsel is minimal. Id. at 27-28.

Unfortunately, the dispute turns on the unknown: how many hard copy documents are

there by these lawyers that will not be captured when the ESI is produced and subjected to the

---

[6] "ESI" refers to electronically stored information.

privilege filter?  The parties do not provide me with an estimate but my common sense tells me there would be few.  It has been a long time since I have used a typewriter and I would have to suppose that sophisticated counsel, working for large corporations, are producing their written work product on a computer.  Even if it is printed and put in a file, the original ESI will be in the computer's hard drive or network server or both and will be captured by the electronic search, whether or not a hard copy exists.  If I am right in that supposition, the number of hard copy documents to be reviewed may not be great.

Nevertheless, I appreciate the time and money that can be spent in logging documents for a privilege log.  I also appreciate that I may be wrong and there may be a number of hard copy documents to be reviewed that will not also be produced as ESI.  I postulate that these documents will fall into one of three categories: 1) documents that were created as ESI, then printed and placed in the attorney's file and the ESI file deleted; 2) hand-written documents in the attorney's files; and 3) hard copy documents created by third parties that have been filed in the attorney's paper files.  I am reluctant to see money spent unnecessarily on logging these documents, and I am anxious to keep the initial production on schedule.  I therefore will limit the initial search of these custodians' documents to the ESI in the initial production.  Once that is done, I will ask the defendants to provide me with a status report with a reasonable estimate of the number of hard copy documents in the lawyers' possession that are responsive and a reasonable estimate of the percentage of these documents defendants will claim as privileged.  At that point, I am hopeful that, working together, we will be able to devise a method of reviewing the hard copies for privilege without the necessity of a log.  For example, I may be able to review representative samples or, if the number of documents is not great, all of them to see if

20

they are privileged.  This will eliminate the cost of producing a privilege log; I am afraid that all too often I have found the traditional privilege log useless.  See Marshall v. D.C. Water & Sewage Auth., 214 F.R.D. 23, 25 n.4 (D.D.C. 2003).

## VII. Conclusion

For the reasons herein discussed, the court will grant plaintiffs' motion in part.  An order accompanies this memorandum opinion.


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE