**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>―――――――――――――――――――――――――<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF)<br><br>**SECOND CONSOLIDATED AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

**NATURE OF THE ACTION**

1.      This is an antitrust class action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act.  Plaintiffs bring this action on behalf of themselves and a proposed class of direct purchasers who purchased unregulated rail freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the "Class Period") and who were assessed a rail fuel surcharge for the agreed-upon transportation.  As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2.      Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together, "Defendants") conspired to use rail fuel surcharges, which were added to

2

customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States.  A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel.  Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits during the four year period of the conspiracy.

3.      In the early 2000s, the Defendants sought to increase their revenues by raising prices.  However, unlike in the past era of full regulation of the railroad industry, when the railroads could have applied to the Interstate Commerce Commission (the "ICC") for across-the-board rate increases, the railroads now no longer could do so as a result of deregulation that began in the early 1980s with the Staggers Act.  Given deregulation, the only practicable way the railroads now could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible.

4.      Defendants BNSF, UP, CSX and NS – which together control about 90% of rail freight traffic in the United States – conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits.  But this plan faced a significant hurdle: as of 2003, the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII") which was published by the railroad trade organization known as the Association of American Railroads (the "AAR").  The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF") which is based on the AII) already permitted full recovery by the railroads of actual fuel cost

increases, no matter how large.  By weighting different cost factors, the AII and related RCAF accounted accurately for the impact of particular cost increases (e.g., for fuel).  James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

5.     To overcome this obstacle, Defendants BNSF, UP, CSX and NS devised and embarked on a scheme to remove fuel from the AII, so that a separate "fuel surcharge" could then be applied as a percentage against the total cost of the freight transportation.  This permitted these major railroads to achieve their desired, and mutually agreed, result:  an effective percentage rate increase that could be broadly applied to rail freight customers.

6.     The Defendants implemented their conspiracy through a number of collective actions.

7.     In July 2003, the two major western railroads – Defendants BNSF and UP (together, the "Western Railroads") – agreed to implement the same fuel surcharge program, resulting in the exact same fuel surcharges.  Up until this time, fuel surcharges had been applied only intermittently, and to the extent surcharges were used at all, the railroads had different fuel surcharge rates, reflecting (among other things) that each railroad had different fuel costs.  In July 2003, however, BNSF and UP for the first time agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index").  BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement, using the HDF Index, and continued to do so through at least mid-2007.

8.     Even after BNSF and UP took this collective action, however, a major barrier to widespread use of the fuel surcharges – the existing cost escalation indexes (the RCAF and the AII on which it was based) – remained, as noted above.  Defendants BNSF, UP, CSX and NS

then conspired to take collective action at the AAR to remove this obstacle. These four

defendant railroads control and dominate the AAR, and the CEOs of these railroads are all board

members of the AAR, which describes itself as "the central coordinating and research agency of

the North American rail industry." The AAR Board meets regularly and board members (and

their staff) regularly communicate between meetings.

      9.     In the Fall of 2003 at meetings of the AAR, Defendants BNSF, UP, CSX and NS

conspired to cause the AAR to develop and publish a new cost escalation index with fuel

removed. Pursuant to the agreement and collective action of BNSF, UP, CSX and NS, the AAR

in December 2003 announced the establishment of the new cost escalation index, called the All

Inclusive Index Less Fuel ("AIILF"). The AAR's official publication, entitled "AAR Railroad

Cost Indexes," stated that the new index "is calculated using the same components and methods

as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the

exclusion of the fuel component." This announcement, and the underlying removal of fuel from

the AII and RCAF, was the collective action of BNSF, UP, CSX and NS. A senior officer of

defendant BNSF, for example, admitted in 2004 that Matthew K. Rose, BNSF's Chairman,

President and CEO "led the charge on" the AAR's 2003 adoption of the new index without fuel.

      10.    Never before in its history had the AAR created a cost escalation index without a

fuel cost component. As UP's James R. Young acknowledged in a July 2007 interview, the new

Rail Fuel Surcharges as applied to rail freight were "really unique to the railroad industry.

Three, four years ago they were really non-existent."

      11.    The collective action by BNSF, UP, CSX and NS in December 2003 allowed the

Defendants to apply the new, separate and artificially high Rail Fuel Surcharges broadly to their

customers, since fuel would no longer automatically be covered by standard rate escalation

clauses.  UP's Young admitted, during an October 2004 earnings call, that UP was now "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in areas that historically would have used RCAF."  According to Young, by July 2007 approximately "eighty to ninety percent" of UP's business had "some kind of fuel surcharge mechanism that gets passed on to the customer."

12.     Almost immediately following the collective action that led to the establishment of the "AIILF" price escalation index without fuel, and in furtherance of the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), which previously had different fuel surcharges, now announced that each would apply identical fuel surcharges based on the West Texas Intermediate (or "WTI") Index (which in early 2004 was at a higher rate than the HDF Index that the Western Railroads simultaneously started to use in July 2003).  This announcement by the Eastern Railroads, coming on the heels of the collective action in late 2003 to remove fuel from the AII and RCAF, was the result of their conspiracy with the Western Railroads to impose artificially high Rail Fuel Surcharges in a coordinated fashion.  The Eastern Railroads charged the exact same fuel surcharges, through at least mid-2007.

13.     With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants BNSF, UP, CSX and NS now each applied the fuel surcharge the same way:  as a percentage multiplier of the *total* base rate for the rail freight transportation.  That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport.  Thus, for example, if the percentage increase triggered by the applicable fuel index was 15 %, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by

15 % – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect).  This agreed approach yielded the Defendants billions of dollars of additional profits.

14.     BNSF, UP, CSX and NS maintained their conspiracy during the Class Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly.  The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.  The Defendants also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

15.     BNSF, UP, CSX and NS also took other collective actions to enforce the conspiracy and make it effective.  For example, pursuant to the conspiracy, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions – making it easier to implement the fuel surcharges, which were adjusted monthly.  The Defendants also limited the previously prevailing practice, in circumstances where more than one railroad (usually an eastern and a western railroad) was involved in long-distance freight transport, of sending a customer a single bill for the entire transport.  Instead, the Defendants, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate bill (and thus each could separately impose its own fuel surcharge).  This facilitated each Defendant recouping its share of the supracompetitive profits from the Fuel Surcharge program imposed by the conspiracy.  Such a switch to separate invoicing on multi-railroad trips could be accomplished only through collective action of the Defendants.  The Defendants also began refusing to negotiate discounts

on rail freight rates – even in circumstances where individual railroads had previously been willing to do so.

16.     In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic that is not within the class alleged here, found that the Defendants' rail fuel surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel.  The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint.  In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates.  Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism.  Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.  Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

17.     An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

18.     Each of the Defendants has disclosed that it has received a state grand jury subpoena and/or state grand jury inquiry concerning the Rail Fuel Surcharges.  In an SEC Form

10-K dated February 22, 2008, Defendant CSX stated that "[i]n July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions.  It is possible that additional federal or state agencies could initiate investigations into similar matters." (CSX Corp., 10-K, February 22, 2008 at 99).  In an SEC Form 10-K dated February 15, 2008, Defendant BNSF stated that "[t]he Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." (BNSF Railway Company, 10-K, February 15, 2008 at 10).  In an SEC Form 10-K dated February 15, 2008, Defendant Norfolk Southern stated that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." (Norfolk Southern, 10-K, February 15, 2008 at K16).  And in an SEC Form 10-K dated February 28, 2008, Defendant UP disclosed that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program.  We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter." (Union Pacific Corp., 10-K, February 28, 2008 at 15).

19.     As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs and each Class member in their business and property.  Plaintiffs and the members of the Class have each paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

20.     Plaintiffs seek damages on behalf of themselves and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.  Plaintiffs do not seek, on behalf of themselves or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

21.     Plaintiff Dust Pro, Inc. ("Dust Pro") is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona 85051.  During the Class Period, Dust Pro manufactured and distributed soil stabilizers used to inhibit dust on dirt surfaces.  Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Dust Pro in connection with that unregulated rail freight transportation.  The prices Dust Pro paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Dust Pro would have paid absent the conspiracy alleged herein.  Dust Pro has therefore been injured in its business and property by reason of Defendants' antitrust violations.

22.     Plaintiff Carter Distributing Company ("Carter Distributing") is a corporation organized under the laws of the State of Tennessee with its principal place of business at 1305 Broad Street, Chattanooga, Tennessee 37041.  During the Class Period, Carter Distributing distributed beer.  Carter Distributing purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Carter Distributing in connection with that unregulated rail freight transportation.  The prices Carter Distributing paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed

were greater than the prices Carter Distributing would have paid absent the conspiracy alleged herein.  Carter Distributing has therefore been injured in its business and property by reason of Defendants' antitrust violations.

23.    Plaintiff Strates Shows, Inc. ("Strates Shows") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 10600 Orange Avenue, Orlando, Florida 32824.  During the Class Period  Strates Shows operated a traveling carnival that provided amusement rides, games, food and merchandise concessions to fairs and festivals throughout the United States**.**  Strates Shows purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Strates Shows in connection with that unregulated rail freight transportation.  The prices Strates Shows paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Strates Shows would have paid absent the conspiracy alleged herein.  Strates Shows has therefore been injured in its business and property by reason of Defendants' antitrust violations.

24.    Plaintiff US Magnesium LLC ("US Magnesium") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 238 North 2200 West, Salt Lake City, Utah 84116-2921.  During the Class Period, US Magnesium manufactured magnesium, chlorine, ferric chloride and other products.  US Magnesium has annual sales in excess of $100 million, and pays in excess of $2.5 million per year in rail freight charges.  US Magnesium purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on US Magnesium in connection with that unregulated

rail freight transportation.  The prices US Magnesium paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices US Magnesium would have paid absent the conspiracy alleged herein.  US Magnesium has therefore been injured in its business and property by reason of Defendants' antitrust violations.

25.     Plaintiff Zinifex Taylor Chemicals, Inc. ("Zinifex") is a corporation organized under the laws of the State of Tennessee, with its principal place of business at 1800 Zinc Plant Road, Clarksville, Tennessee 37040.  Zinifex is a subsidiary of Nyrstar NV, the world's largest zinc producer.  During the Class Period, Zinifex manufactured sulfuric acid and other chemical products.  Zinifex purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Zinifex in connection with that unregulated rail freight transportation.  The prices Zinifex paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Zinifex would have paid absent the conspiracy alleged herein.  Zinifex has therefore been injured in its business and property by reason of Defendants' antitrust violations.

26.     Plaintiff Donnelly Commodities Inc. ("Donnelly Commodities") is a corporation organized under the laws of the State of New York with its principal place of business at 12 Manor Road, Smithtown, NY 11787.  During the Class Period, Donnelly Commodities was a freight consolidator.  Donnelly Commodities purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Donnelly Commodities in connection with that unregulated rail freight transportation.  The prices Donnelly Commodities

paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Donnelly Commodities would have paid absent the conspiracy alleged herein.  Donnelly Commodities has therefore been injured in its business and property by reason of Defendants' antitrust violations.

27.     Plaintiff Dakota Granite Company ("Dakota Granite") is a South Dakota corporation with its principal place of business at 14964 484th Street, Milbank, South Dakota 57252.  Dakota Granite quarries, manufactures, and sells granite slabs, tile, monuments, mausoleums, columbariums, civic memorials, and blocks, and fabricates custom granite countertops, feature pieces, and building components.  Dakota Granite's products are used extensively throughout the world in various building and interior design applications.  Dakota Granite purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Dakota Granite in connection with that unregulated rail freight transportation.  The prices Dakota Granite paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Dakota Granite would have paid absent the conspiracy alleged herein.  Dakota Granite has therefore been injured in its business and property by reason of Defendants' antitrust violations.

28.     Plaintiff Olin Corporation ("Olin") is a corporation organized under the laws of the State of Virginia, with its principal place of business at 190 Carondelet Plaza, Suite 1530, Clayton, MO 63105.  During the Class Period, Olin, through its Olin Chlor Alkali Products Division, manufactured and distributed various chemicals and chemical products including chlorine, caustic soda, sodium hypochlorite, potassium hydroxide, hydrochloric acid, hydrogen and other chemicals and chemical products.  Olin purchased unregulated rail freight

transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Olin in connection with that unregulated rail freight transportation.  The prices Olin paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Olin would have paid absent the conspiracy alleged herein.  Olin has therefore been injured in its business and property by reason of Defendants' antitrust violations.

29.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

30.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.  NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

31.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe

Corporation.  BNSF is the second largest railroad network in North America and operates 32,000

route miles of railroad.  BNSF has offices and rail lines throughout the western United States,

extending into the Southeastern states and maintains a government affairs office at 500 New

Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

32.     Defendant Union Pacific Railroad Company ("UP") has its principal place of

 business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in

the United States.  UP serves primarily the western two-thirds of the United States and maintains

coordinated schedules with other rail carriers to handle freight to and from other parts of the

country (including Washington, D.C.).  UP maintains an office at 600 13th Street, N.W., #340,

Washington, D.C. 20005.

**JURISDICTION AND VENUE**

33.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to

recover treble damages and reasonable attorneys fees and costs from Defendants for the injuries

sustained by Plaintiffs and members of the Class by reasons of Defendants' violations of Section

1 of the Sherman Act, 15 U.S.C. § 1.

34.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and

1337.

35.     Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and

28 U.S.C. § 1391, because during the Class Period one or more of the Defendants resided,

transacted business, were found, or had agents in this District, and a substantial part of the events

giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade

and commerce described below, has been carried out, in this District.

36.     Venue is also proper because this action has been transferred to this

District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

37.     This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated.  The proposed "Class" is defined as:

> All direct purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from July 1, 2003 until at least June 30, 2007 (the "Class Period").  Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all federal governmental entities.

39.     The Class is numerous and geographically dispersed, and, given the magnitude of the commerce involved, joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are many thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

40.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all members of the Class directly purchased unregulated rail freight transportation

from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein.  Plaintiffs and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

41.      Plaintiffs will fairly and adequately protect the interests of the members of the Class and are represented by counsel competent and experienced in class action and antitrust litigation.

42.      Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.      Whether Defendants conspired, contracted or combined with others, for the purpose and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

      b.      Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

      c.      Whether Defendants' conduct violated the federal antitrust laws; and

      d.      Whether Defendants' conduct caused injury to the business and property of Plaintiffs and the Class and, if so, the proper measure of damages.

43.      A class action is superior to any other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications

of the questions of law and fact common to the Class.  A class action, on the other hand, would

achieve substantial economies of time, effort and expense and would assure uniformity of

decision as to persons similarly situated without sacrificing procedural fairness or bringing about

other undesirable results.

44.     The interests of members of the Class in individually controlling the prosecution

of separate actions is theoretical rather than practical.  The Class has a strong and pervasive

community of interest, and prosecution of the action through representatives would be

unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are

not great enough individually to enable them to maintain separate suits against Defendants.  No

difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

45.     During the Class Period, Defendants accounted for over 90 percent of all rail

shipments within the United States.  The AAR Policy and Economics Department reported that

railroad total operating revenue in the United States in 2006 exceeded $52 billion.

46.     The activities of Defendants and their co-conspirators were within the flow of,

and substantially affected interstate commerce.  During the Class Period, Defendants sold and

carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to

shippers and customers throughout the United States.  Each Defendant and their co-conspirators

used instrumentalities of interstate commerce to sell and market rail freight transportation

services.

47.     The unlawful activities of Defendants have had a direct, substantial, and

reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

48.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act").  This landmark legislation marked a dramatic change in the evolution of U.S. railroads.  After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

49.     Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the ICC.  During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

50.     Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation.  For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

51.     Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). [1]  The railroad industry is now highly concentrated:  four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue.  Given the high fixed

---

[1]     A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars).  There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation.  The Soo Line Railroad is owned by Canadian Pacific Railway.  The Grand Trunk Corporation is owned by the Canadian National Railway.

costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

52.     Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

### THE DEFENDANTS INTRODUCE FUEL SURCHARGES

53.     By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible.  In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

54.     In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase.  As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases.  Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible.  Under the guise of rising fuel prices, Defendants colluded to create and implement the Rail Fuel Surcharges as a means to implement what effectively operate as across-the-board rate increases.

55.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions often tied to the AII and the RCAF (which is based on the AII).  Both the RCAF and the AII were published by the AAR, and both indexes included fuel costs as a factor.  The AII and RCAF weighted a

number of cost factors – labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other expenses – so that the actual impact of particular cost increases (e.g., for fuel) would be reflected in the index.  Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF.  The indexes, and the weighted factors within them, were designed for this purpose.

56.     In 2003, Defendants BNSF, UP, CSX and NS seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body.  As alleged above, the Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage – and that is precisely what these four railroads proceeded to do.

57.     Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges were applied only in isolated instances, and (b) each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad.   At that time, such surcharges were the exception, with the AII and RCAF indexes widely used to capture fuel costs and other costs.  All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system that would allow the widespread use of Rail Fuel Surcharges as a revenue enhancement mechanism.

58.     From at least the Spring of 2003 and continuing through the present, the top executives of each of the Defendants met regularly at restaurants, and recreational and

conference facilities to discuss their industry.  For example, at biannual meetings of the National

Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and

discuss developments in the railroad industry.  Defendants' top executives also met and

discussed their industry when they came to Washington, D.C. for AAR board meetings.  The

Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort,

in Litchfield Park, Arizona.

59.     Within just months of the Spring 2003 NFTA meeting, and as early as July 2003,

the two Western Railroads, BNSF and UP, suddenly began to coordinate their Rail Fuel

Surcharges.  Prior to this time, the UP fuel surcharge had been adjusted monthly based on the

WTI Index.  The BNSF fuel surcharge had been based on the HDF Index.  In or about July 2003,

however, UP switched to the HDF Index pursuant to an agreement with the BNSF.  From that

point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel

Surcharge percentage for each month of the Class Period.

60.     BNSF and UP agreed to administer the HDF Index in precisely the same way.

Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was

lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35

per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent

increase above $1.35 per gallon.  So, for example, if the HDF Index rose to $1.55 per gallon,

BNSF and UP would apply a surcharge of 2 percent.  The surcharge would increase 2 percent for

every 20 cents increase in the HDF Index.

61.     The Western Railroads also coordinated when they would change their fuel

surcharge.  They agreed that the Rail Fuel Surcharge would be applied to shipments beginning

the second month after the month in which there was a change in the HDF Index average price

calculation.  So, for example, if the HDF Index average price changed in January, the Western

Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on

the first day of the month), and then apply the surcharge to shipments in March.  The Western

Railroads published their monthly fuel surcharge percentages on their websites, making any

deviation from cartel pricing easily detectable.

62.     The Western Railroads' agreed-upon coordination is reflected in their

simultaneous selection and adoption of the same novel, arbitrary and complex combination of

features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel

surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge

in the second calendar month after the HDF Index average price had changed.   The similarities

are both too precise and too comprehensive to have been independent responses to any common

market phenomenon that the Defendants were facing.

63.     UP's move to the same fuel price index used by BNSF in July of 2003 is striking

evidence of concerted conduct in light of the fact that just two months before, UP had announced

a different modification to its existing fuel surcharge program.  In April of 2003, UP made

modifications to the trigger points it used for adjusting surcharges in its program, but did not

change the index it employed.  The fact that, just two months later, UP switched indices and

began charging exactly the same surcharges as BNSF is further evidence that this switch was the

result of concerted conduct.

64.     Even after having agreed to coordinated their fuel surcharges, however, BNSF

and UP still faced the significant barrier to widespread use of  fuel surcharges:  specifically, the

widely used private contracts had cost escalation provisions that already accounted for fuel.

BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the

widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive  profits.

65.     In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.   Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

66.     Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF) – that is, a cost escalation index without fuel as a component.  This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component.  The AAR announcement in December 2003 stated:  "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel.  This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."  This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy.  The new AIILF specified the fourth quarter of 2002 as its base period.

67.     Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice.  The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs.  This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

68.     Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003.  When asked how BNSF would be able to apply the new revenue-based fuel surcharges into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR.  Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated:  "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

69.     Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index.  This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

70.     Specifically, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil.  When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel.  So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent.  The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

71.     The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same fuel surcharge percentage month after month.  The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

72.     The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs:  including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed.  The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

73.     Thus, following the conspiratorial publication of the AIILF, Defendants BNSF, UP, CSX and NS began to apply Rail Fuel Surcharges as a separate item on shippers' bills.  The

Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues in an across the board manner.

74.     There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs.  The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes.  The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases.  As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period.  Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

75.     The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs.  Rather, the only purpose in taking these collective actions was to begin assessing a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program.  That is, pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment).  Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone fuel surcharge as an easy

way to dramatically increase profits without having to wait for new rail capacity to come on line

to meet growing demand – so long as these railroads participated by not competing on fuel

surcharge prices to undercut one another.

76.     The creation and publication of a cost escalation index without a fuel component

was not required by any regulatory body, nor was it necessary for any Defendant to institute

independently its own individual fuel surcharge program.  Instead, the creation of the Rail Fuel

Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve

their collective goal of generating additional profits through implementing revenue-based fuel

surcharges.

77.     As a result of the concerted action among BNSF, UP, CSX and NS, prices of Rail

Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or

maintained at supra-competitive levels during the Class Period.

## IMPLEMENTATION OF THE SCHEME:  THE FUEL SURCHARGES IMPOSED BY THE DEFENDANTS

78.     As detailed above, Defendants BNSF, UP, CSX and NS agreed in 2003 to remove

fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges

as a multiplier percentage of the base rate charged for the rail freight transportation involved.

This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-

board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could

have continued to be recovered through the AII and RCAF).  Defendants applied these

surcharges not only to published tariff rates, but to the private contracts, and other traffic, not

subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

79.     With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

80.     The chart below shows that the Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Class Period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |

| MONTH | BNSF | UP |
|--------|-------|-------|
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

81.     As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Class Period.

82.     The chart below shows that the Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |

| MONTH | CSX | NS |
|--------|-------|-------|
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

83.     In stark contrast to this uniformity in Fuel Surcharge percentages, fuel cost as a

percentage of operating cost and fuel efficiency differs widely among the Defendant railroads.

Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

independently price their Rail Fuel Surcharges to arrive at the identical percentage month after

month, year after year, for a period of more than three years.  The fact that Defendants moved in

uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating

their behavior and conspired to fix prices for Rail Fuel Surcharges.  In addition, the advance

announcements of each Defendant's Fuel Surcharges was an important implementation and

enforcement mechanism for the conspiracy.

84.     Railroad industry analysts took note of the curious "convergence" in Rail Fuel

Surcharge methodologies adopted by the Defendants.  For example, after concluding in 2003 that

the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases,

one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel

surcharges rather than developing their own pricing initiatives."  The analyst noted further that

"the way to gain significant market share is to lead the competition rather than following the

competition."  ("Following the Competition" *Traffic World*, July 14, 2003).

85.     Defendants' use of retail price indices in furtherance of the conspiracy also

allowed them to over-recover their actual fuel costs.  An independent study commissioned by the

American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the

difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

86.     BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon.  Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004.  In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase.  As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004.  Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate. Another reason why Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency.  As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving."  BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years.  In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.  By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

87.     There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than a three-year period could not have happened by chance or coincidence.  Nor was it an expected response to a common business problem.  Any actual increased fuel costs experienced by the Defendants would have been

covered by the AII and RCAF.  The uniform pricing could only have been achieved by an express agreement followed by collective action – i.e., decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages.  The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

88.     In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest.  In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge and thereby increase market share at the expense of competing railroads.  Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

## OTHER ELEMENTS OF THE CONSPIRACY

89.     At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants also took other steps in furtherance of the conspiracy.  They largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly.  Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

90.     This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

91.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.  Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts.  The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand.  This coordinated behavior was hardly routine market conduct.

92.     In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations.  Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."  By way of example, during the relevant period the Archer-Daniels-Midland Company ("ADM") approached individual Defendants to discuss hedging opportunities to allow ADM and the railroads certainty and a method for cost-containment.  The railroads, acting against their own individual interests, refused to enter into hedging contracts with ADM.

93.     In addition, several national shipper organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges.  Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program,

and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier.  That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices.  The other Defendants refused to address the concerns of their customers.

94.      In furtherance of the conspiracy, Defendants also decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped).  Instead, where a shipment requires movement on more than one railroad, the Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment.  Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

95.      Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates.  As demonstrated in the table that follows, Defendants' market shares remained stable following the 2003 agreements.

| Railroad Market Share: Originated Tons and Carloads 2003 - 2006 [1] | | | | |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |
| | | | | |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | |
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | |
| [1] AAR Railroad Facts and Analysis of Class I Railroads | | | | |

### THE STB DECISION

96.     On January 25, 2007, the STB, which regulates certain aspects of the railroad

industry, issued an administrative decision concluding that the railroads' practice of computing

Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an

"unreasonable practice," because the fuel surcharges are not tied to the fuel consumption

associated with the individual movements to which they are applied.  *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

97.     The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint).  The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

98.     Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## DEFENDANTS' SUPRACOMPETITIVE PROFITS

99.     Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy.  Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.  During the period of the conspiracy (July 2003 to at least June 30, 2007), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent.  The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006.  These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy.  As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

100.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a.      The Rail Fuel Surcharges charged to Plaintiffs and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

b.      Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c.      competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

101.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the members of the Class have sustained injury to their business or property.  The injuries sustained by the Plaintiffs and the Class are the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation Of Section 1 Of The Sherman
### Act And Section 4 Of The Clayton Act)

102.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

103.     Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

104.     The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

105.     Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

106.     The contract, combination or conspiracy has had the following effects:

a.     Prices charged to Plaintiffs and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra competitive levels;

b.    Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c.    competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

107.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be denominated as class representative, and that Plaintiffs' counsel be appointed as counsel for the Class;

(2)    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)    That Plaintiffs and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and each and every member of the Class;

(4)    That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5)    That Plaintiff and the Class recover treble damages, as provided by law;

(6)    That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

(7)    For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

Dated:  December 31, 2009

| | |
|---|---|
| /s/ Stephen R. Neuwirth<br>Stephen R. Neuwirth<br>Daniel L. Brockett<br>Marc L. Greenwald<br>Sami H. Rashid<br>Joseph D. Hammond<br>QUINN EMANUEL URQUHART OLIVER<br>    & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Facsimile:  (212) 849-7100<br>Email:  stephenneuwirth@quinnemanuel.com | /s/ Michael D. Hausfeld<br>Michael D. Hausfeld<br>William P. Butterfield<br>HAUSFELD LLP<br>1700 K Street NW, Suite 650<br>Washington, DC 20006<br>Telephone: (202) 540-7200<br>Facsimile:  (202) 540-7201<br>Email:  mhausfeld@hausfeldllp.com<br><br>Steig D. Olson<br>HAUSFELD LLP<br>11 Broadway, Suite 615<br>New York, NY 10004<br>Telephone: (212) 830-9850<br>Facsimile:  (212) 480-8560<br>Email:  solson@hausfeldllp.com |
| *Interim Co-Lead Class Counsel*<br>*for the Proposed Direct Purchaser Class* ||