## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 |
| This document relates to:<br><br>DIRECT PURCHASER CASES | Misc. No. 07-489 (PLF)<br><br>**PUBLICLY FILED VERSION** |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................. 1

STATEMENT OF FACTS ................................................................................................... 7

    A.    The Unique and Diverse Aspects of Railroads ............................................... 9

        1.    The Railroad Industry ................................................................... 10

        2.    There Are Many Origins, Destinations and Customers for Which Defendants Cannot Compete With Each Other ............................... 11

        3.    Motor Carriers Set the Prices in Many Markets .......................... 13

    B.    The Effect of Increasing Demand and Tightening Capacity on Rail Pricing ............................................................................................. 15

    C.    Negotiated Prices ......................................................................... 16

    D.    Fuel Surcharges Predated and Were Used Increasingly as Fuel Costs Rose Before the Alleged Conspiracy ............................................ 17

    E.    Defendants' Fuel Surcharges Vary Widely ....................................... 20

ARGUMENT ................................................................................................................ 23

I.    Plaintiffs Cannot Meet Their Rule 23 Burden In This Case ................................. i

    A.    The Standards for Class Certification ............................................ 23

    B.    Rule 23(b)(3)'s Predominance Requirement .................................... 25

    C.    Plaintiffs Must Establish Injury on a Class-Wide Basis ..................... 26

II.    Individualized Analysis Is Required to Determine Whether Each Class Member Would Have Paid a Fuel Surcharge But For the Conspiracy ............................. 28

    A.    Defendants Had Considerable Ability and Incentive to Adopt Fuel Surcharges Entirely Independent of Any Conspiracy ............................ 30

        1.    Given the Trend Toward Increased Use of Fuel Surcharges Before the Alleged Conspiracy, It Is Implausible That Defendants Would Have Stopped Using Surcharges Absent the Alleged Conspiracy ............ 30

2.   It Is Implausible That All Shippers That Agreed to a Fuel Surcharge Prior to July 2003 Would Not Have Agreed After July 2003, Absent a Conspiracy ........................................................ 35

B.   Determining Whether Class Members Would Have Had a Fuel Surcharge in a But-For World Requires Individualized Analysis ......................... 36

C.   There Is No Viable Class-Wide Method for Determining Whether a Class Member's Fuel Surcharge Would Have Been Lower But for the Conspiracy ...................................................................................... 39

III.   The Fact That The Alleged Conspiracy Concerned Only A Portion Of The Price Precludes Class-wide Proof That Inflated Fuel Surcharges, If Any, Always Led To Higher Overall Rates .................................................................. 41

A.   Plaintiffs Have Not Shown That This Alleged Conspiracy to Fix a Component of an Overall Price Had a Common Impact ......................... 42

B.   Many of Defendants' Customers Traded Fuel Surcharges for Rate Reductions or Other Financial Benefits ............................................. 45

C.   Dr. Rausser's Analysis Does Nothing to Negate the Existence or Effect of These Trade-Offs ......................................................................... 48

IV.   Plaintiffs' Methodology For Establishing Antitrust Injury Is Not Viable, As It Relies On False Assumptions About Rail Markets ..................................... 50

A.   There Is No Viable Method for Showing Common Impact for Markets in Which Defendants Do Not Compete ................................................. 50

B.   There Is No Viable Method of Showing Common Impact for Markets Where Truck Pricing Is the Determining Factor for Rail Pricing ........... 54

C.   There Is No "Uniform" or "Standard" Class-Wide Fuel Surcharge That Could Demonstrate Common Impact .................................................. 56

V.   Plaintiffs' Cases Are Inapposite .............................................................. 58

VI.   Dr. Rausser's Methodological Failures Render His Report Unreliable ............ 62

A.   Dr. Rausser Inappropriately Relies on Averages ................................. 62

B.   Dr. Rausser's Regression Models Cannot Show Class-Wide Injury or Damages ...................................................................................... 63

1.   Dr. Rausser's "Common Factors" Model ................................. 63

2.   Dr. Rausser's Damages Model .............................................. 65

C.    Dr. Rausser Fails To Specify a But-For World................................................. 67

D.    Dr. Rausser Offers No Method to Determine What Part of a "Rebased"
      Rate Was Caused by the Conspiracy Rather Than Changes in the Market .......... 69

E.    Dr. Rausser Mischaracterizes the Market ........................................................... 70

VII.   Class Certification Should Be Denied Because Individual Issues As to Damages
       To Each Class Member Predominate Over Any Common Issues ................................... 72

VIII.  Class Certification Should Be Denied Because the Proposed Class Action Is Not
       the Superior Method of Resolving These Claims ............................................................ 74

IX.    Class Certification Should Be Denied Because the Class Definition Renders Class
       Membership Difficult, If Not Impossible, to Determine ................................................. 75

A.    There Is no Easy Way to Determine Whether Traffic Is "Rate-
      Unregulated"................................................................................................... 75

B.    Plaintiffs Have Proposed No Method to Identify Shippers with "Rebased"
      Rates.............................................................................................................. 76

X.     Plaintiffs' Trial Plan Is Unworkable ............................................................................. 77

XI.    Shippers Subject To Arbitration Provisions Cannot Be Part Of The Class ..................... 78

XII.   All of the Putative Class Representatives Face Disqualifying Problems ......................... 79

A.    None of the Putative Class Representatives Is Adequate or Typical.................... 79

B.    Nyrstar Should Be Disqualified Because It Engaged in Spoliation of
      Evidence.......................................................................................................... 80

C.    Donnelly Should Be Disqualified Because It Filed for Bankruptcy..................... 81

CONCLUSION............................................................................................................................... 82

## CHARTS AND GRAPHICS

Figure 1 - Cost of Fuel - 1987-2009 ................................................................. 18

Figure 2 - Published Carload Fuel Surcharge Timeline................................................ 20

Figure 3 - Distribution of Revenues by FSC Percentage Norfolk Southern, Week of
    March 5, 2006 ................................................................................... 22

Figure 4 - UP Pricing Documents With Fuel Surcharges Before the Alleged Conspiracy .......... 33

Figure 5 - Percent Of Non-Regulated Customers With Rate-Based Fuel Surcharges................. 34

Figure 6 - Summaries of Dr. Rausser's Mischaracterizations Of the Market............................. 71

Figure 7 - Disqualifying Characteristics of Each Named Plaintiff.............................................. 79

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Ala. v. Blue Bird Body Co.,
573 F.2d 309 (5th Cir. 1978) ................................................................26, 27, 41, 59

Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.,
247 F.R.D. 156 (C.D. Cal. 2007) ................................................................................67

Amchem Prods., Inc. v. Windsor,
521 U.S. 591 (1997) ................................................................................................25

American Seed Co. v. Monsanto Co.,
238 F.R.D. 394 (D. Del. 2006), aff'd, 2008 U.S. App. LEXIS 6963 (3d Cir. April 1,
2008) ................................................................................................................44

Atl. Richfield Co. v. USA Petroleum Co.,
495 U.S. 328 (1990) ..........................................................................................26, 28

Aulson v. Blanchard,
83 F.3d 1 (1st Cir. 1996) ..............................................................................................76

Bell Atl. Corp. v. AT&T,
339 F.3d 294 (5th Cir. 2003) ................................................................................27, 48, 73

Blades v. Monsanto Co.,
400 F.3d 562 (8th Cir. 2005) ................................................................................. passim

Burkhalter Travel Agency v. Macfarms Int'l Inc.,
141 F.R.D. 144 (N.D. Cal. 1991) ................................................................................47, 59

Burlington Indus., Inc. v. Milliken & Co.,
690 F.2d 380 (4th Cir. 1982) ................................................................................43

Butt v. Allegheny Pepsi-Cola Bottling, Co.,
116 F.R.D. 486 (E.D. Va. 1987) ................................................................................59

Castano v. Am. Tobacco Co.,
84 F.3d 734 (5th Cir. 1996) ................................................................................74

Chestnut Fleet Rentals, Inc. v. Hertz Corp.,
72 F.R.D. 541 (E.D. Pa. 1976) ................................................................................59

Cimino v. Raymark Indus., Inc.,
151 F.3d 297 (5th Cir. 1998) ................................................................................73

*City of Pittsburgh v. West Penn Power Co.,*
  147 F.3d 256 (3d Cir. 1998).................................................................51

*CSX Transp., Inc. - Temp. Trackage Rights Exemption - Ala. Great S. Rail Co.,*
  STB Finance Docket No. 34762 (S.T.B. Sept. 23, 2005)........................16

*CSX Transp., Inc., v. STB,*
  568 F.3d 236 (D.C. Cir. 2009)..............................................................52

*Dechert v. Cadle Co.,*
  333 F.3d 801 (7th Cir. 2003)................................................................82

*Does I through III v. D.C.,*
  No. 01-02398, 2006 WL 2864483 (D.D.C. Oct. 5, 2006)..................73, 74

*Dry Cleaning & Laundry Inst. v. Flom's Corp.,*
  No. 91-CV-76072-DT, 1993 WL 527928 (E.D. Mich. 1993)..................48

*Dukes v. Wal-Mart,*
  603 F.3d 571 (9th Cir. April 26, 2010)...................................................24

*DuPont v. CSX,*
  STB Dkt. Nos. 42099, 42100, 42101, 2007 WL 4466694 (Dec. 17, 2007)...........76

*Exemption From Regulation – Boxcar Traffic,*
  Ex Parte No. 346 (Sub-No. 8), 367 I.C.C. 425 (S.T.B. 1983)...........14, 54

*Exhaust Unlimited, Inc. v. Cintas Corp.,*
  223 F.R.D. 506 (S.D. Ill. 2004) ..........................................44, 58, 59, 67

*Falcon v. Philips Elec. N. Am. Corp.,*
  304 F. App'x 896 (2d Cir. 2008) ..........................................................80

*Fed. Prescription Serv., Inc. v. American Pharm. Assoc.,*
  663 F.2d 253 (D.C. Cir. 1981).............................................................28

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l,*
  No. H-05-3394, 2008 WL 7356272 (S.D. Tex. Nov. 24, 2008)................59

*Garcia v. Johanns,*
  444 F.3d 625 (D.C. Cir. 2006) .............................................................37

*Gariety v. Grant Thornton, LLP,*
  368 F.3d 356 (4th Cir. 2004) ...............................................................25

*Gen. Tel. Co. of the Sw. v. Falcon,*
  457 U.S. 147 (1982)....................................................................... passim

*Griffith v. Jabitch, Block & Rathbone, LLP,*
    358 B.R. 338 (S.D. Ohio 2007) .................................................................82

*Heerwagen v. Clear Channel Commc'ns,*
    435 F.3d 219 (2d Cir. 2006)...................................................................25

*Improvement of TOFC/COFC Regulation,*
    Ex Parte No. 230 (Sub-No. 5), 364 I.C.C. 731 (1981)......................14

*Improvement of TOFC/COFC Regulations (Railroad-Affiliated Motor Carriers and*
    *Other Motor Carriers),* Ex Parte No. 230 (Sub-No. 6), 3 I.C.C. 2d 869 (S.T.B.
    July 23, 1987)......................................................................14, 54

*In re Agric. Chem. Antitrust Litig.,*
    No. 94-40216-MMP, 1995 WL 787538 (N.D. Fla. Oct. 23, 1995) .................55

*In re Beef Indus. Antitrust Litig.,*
    No. M.D.L. Docket No. 248, 1986 U.S. Dist. LEXIS 24731 (S.D. Tex. June 3, 1986)..........59

*In re Cotton Yarn Antitrust Litig.,*
    505 F.3d 274 (4th Cir. 2007) ...................................................................78

*In re Flash Memory Antitrust Litig.,*
    No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ......................62

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D.Cal. 2008)..................................................47, 58, 63, 67

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008)................................................24, 25, 27

*In re Initial Pub. Offerings Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006)...................................................................25

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    202 F.R.D. 12 (D.D.C. 2001)..................................................27, 58, 62

*In re LTL Shipping Servs. Antitrust Litig.,*
    No. 1:08-MD-01895-WSD, 2009 U.S. Dist LEXIS 14276
    (N.D. Ga. Jan. 28, 2009) .................................................17, 18, 68

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
    209 F.R.D. 323 (S.D.N.Y. 2002) ...............................................................77

*In re NCAA I-A Walk-On Football Players Litig.,*
    No. C 04-1254C, 2006 U.S. Dist. LEXIS 28824 (W.D. Wash. 2006) ....................67

*In re New Motor Vehicles Can. Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ........................................................................24

*In re Nifedipine Antitrust Litig.*,
  246 F.R.D. 365 (D.D.C. 2007) ...............................................25, 27, 58, 61, 62

*In re Paxil Litig.*,
  212 F.R.D. 539 (C.D. Cal. 2003) ..............................................................77

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  587 F. Supp. 2d 27 (D.D.C. 2008) ...................................................1, 8, 41

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) .....................................................................80

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
  219 F.R.D. 661 (D. Kan. 2004) ...............................................................45

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008) ..........................................................25, 45

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) ......................................................... passim

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ................................................................................26

*Kansas City Power & Light Co. v. Union Pac. R.R. Co.*,
  STB Docket No. 42095, 2006 WL 2088353 (S.T.B. July 27, 2006) ......................76

*Kenett Corp. v. Mass. Furniture & Piano Movers Ass'n Inc.*,
  101 F.R.D. 313 (D. Mass. 1984) ........................................................59, 60, 61

*Long v. District of Columbia*,
  469 F.2d 927 (D.C. Cir. 1972) ..................................................................80

*McCarthy v. Kleindienst*,
  741 F.2d 1406 (D.C. Cir. 1984) ..................................................23, 24, 25, 74

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) .....................................................................29

*Meijer, Inc. v. Biovail Corp.*,
  533 F.3d 857 (D.C. Cir. 2008) ..................................................................37

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
  246 F.R.D. 293 (D.D.C. 2007) ........................................................... passim

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
 473 U.S. 614 (1985) ............................................................................... 78

*Nat'l Ass'n of Reg. Med. Programs v. Mathews*,
 551 F.2d 340 (D.C. Cir. 1976) ............................................................... 80

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 259 F.3d 154 (3d Cir. 2001) ................................................................... 74

*Nichols v. Mobile Bd. of Realtors, Inc.*,
 675 F.2d 671 (5th Cir. 1982) .......................................................... 58, 60

*N. Am. Freight Car Ass'n v. BNSF Railway Co.*,
 STB Docket No. 42060 (S.T.B. Jan. 26, 2007) ....................................... 16

*Pejebscot Indus. Park, Inc., d/b/a Grimmel Indus. – Petition for Declaratory Order*,
 STB Fin. Docket 339894 (2003) ............................................................. 14

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
 685 F. Supp. 2d 456 (S.D.N.Y. Jan. 15, 2010) ...................................... 81

*Perez v. Metabolife Int'l, Inc.*,
 218 F.R.D. 262 (S.D. Fla. 2003) ............................................................. 75

*Pigford v. Glickman*,
 182 F.R.D. 341 (D.D.C 1998) ................................................................ 75

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
 100 F. App'x. 296 (5th Cir. 2004) .................................................... 63, 73

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
 215 F.R.D. 523 (E.D. Tex. 2003) ..................................................... 73, 74

*Rail Fuel Surcharges*,
 Ex Parte No. 661, 2007 WL 201205 (S.T.B. Jan. 25, 2007) .............. 16, 17

*Rail General Exemption Authority – Nonferrous Recyclables*,
 3 S.T.B. 62 (1998) .................................................................................. 14

*Rail General Exemption Authority – Exemption of Ferrous Recyclables*,
 *Ex Parte No. 34610*, 1 S.T.B. 173 (1995) ............................................. 14

*Petition to Exempt from Regulation the Rail Transportation of Scrap Paper*,
 *Ex Parte No. 394 (Sub-No. 12)*, 9 I.C.C. 2d 957 (1993) ........................ 14

*Rail General Exemption Authority: Used Motor Vehicles*,
 *Ex Parte No. 346 (Sub No-No. 27a)*, 9 I.C.C. 2d 884 (1993) .................. 14

*Rail General Exemption Authority: Export Cord and Export Soybeans,*
    *Ex Parte No. 346 (Sub-No. 28),* 1992 ICC Lexis 145 (July 1, 1992) ....................14

*Rail General Exemption Authority - Lumber or Wood Products,*
    *Ex Parte No. 346 (Sub-No. 25),* 7 I.C.C. 2d 673 (1991)..........................14

*Reed v. Advocate Health Care,*
    No. 06 C 3337, 2009 WL 3146999 (N.D. Ill. Sept. 28, 2009)........................ passim

*Richards v. Delta Air Lines, Inc.,*
    453 F.3d 525 (D.C. Cir. 2006)................................................................23

*Robinson v. Texas Auto. Dealers Ass'n,*
    387 F.3d 416 (5th Cir. 2004) ................................................4, 44, 50, 64

*Rodney v. Nw. Airlines, Inc.,*
    146 Fed. Appx. 783 (6th Cir. 2005) .....................................................79

*Rutledge v. Elec. Hose & Rubber Co.,*
    511 F.2d 668 (9th Cir. 1975) ..............................................................74

*Ryan v. Eli Lilly & Co.,*
    84 F.R.D. 230 (D.S.C. 1979) ..............................................................74

*Sample v. Monsanto,*
    218 F.R.D. 644 (E.D. ........................................................................67

*Schoenbaum v. E.I. DuPont de Nemours & Co.,*
    No. 4:05cv01108, 2009 U.S. Dist. LEXIS 114080 (E.D. Mo. Dec. 8, 2009)..........44

*Six Mex. Workers v. Ariz. Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990) ............................................................73

*Smith v. Café Asia,*
    246 F.R.D. 19 (D.D.C. 2007).............................................................82

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.,*
    __ U.S. __, 130 S. Ct. 1758 (2010) ....................................................79

*Szabo v. Bridgeport Machs., Inc.,*
    249 F.3d 672 (7th Cir. 2001) .............................................................25

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006).............................................................................51

*Tex. Mun. Power Agency v. The Burlington N. & Santa Fe Ry. Co.,*
    STB Docket No. 42056 (March 24, 2003)...............................................52

*Timber Rock R.R. Inc. - Lease Exemption - The Burlington N. & Santa Fe Ry. Co.*,
    STB Finance Docket No. 34503 (S.T.B. Oct. 8, 2004) ........................................16

*Tongue River R.R. Co., Inc. - Constr. and Operation - W. Alignment*,
    STB Finance Docket No. 30186 (S.T.B. Oct. 9, 2007) ........................................16

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ........................................................................68

*Walsh v. Ford Motor Co.*,
    130 F.R.D. 260 (D.D.C. 1990) ...........................................................23, 25, 74

*Walsh v. Ford Motor Co.*,
    807 F.2d 1000 (D.C. Cir. 1986) ................................................................24, 28

*Weisfeld v. Sun Chem. Corp.*,
    210 F.R.D. 136 (D.N.J. 2002) ...................................................................26, 58

*Weisfeld v. Sun Chem. Corp.*,
    84 F. App'x. 257 (3d Cir. 2004) ................................................................26, 58

*W. Tex. Utils. Co. v. Burlington N. R.R. Co.*,
    1 S.T.B. 638 (1996) ............................................................................................52

*Wheeler v. Pilgrim's Pride Corp.*,
    246 F.R.D. 532 (E.D. Tex. 2007) ......................................................................59

*Williams v. Glickman*,
    No. Civ. A 95-1149 (TAF), 1997 WL 33772612 (D.D.C. Feb. 14, 1997) .....74, 76

*Wilson v. Mobil Oil Corp.*,
    840 F. Supp. 944 (E.D. La. 1996) .....................................................................51

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) .................................................................59, 72, 73

## RULES

Fed. R. Civ. P. 23 ................................................................................... passim

Fed. R. Civ. P. 23(a) ......................................................................................23, 80

Fed. R. Civ. P. 23(b)(3) .......................................................................... passim

## STATUTES

9 U.S.C. § 2 ..................................................................................................73, 78

15 U.S.C. § 15 ..............................................................................................26, 28

28 U.S.C. § 2072(b) ...................................................................................................27

49 U.S.C. § 10502 ......................................................................................................54

49 U.S.C. § 10701 ......................................................................................................10

49 U.S.C. § 10702 (2009) ...........................................................................................14

49 U.S.C. § 10703 ........................................................................................................7

49 U.S.C. § 10706 ........................................................................................................8

49 U.S.C. § 10709 .............................................................................................17, 75, 76

Staggers Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 (1980) ..........................10, 17

**TREATISES**

2A AREEDA & HOVENKAMP, ANTITRUST LAW (3d Ed. 2007) .......................................27

Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSXT"),

Norfolk Southern Railway Company ("NS"), and Union Pacific Railroad Company ("UP")

(together "Defendants") respectfully submit this memorandum in opposition to Plaintiffs' motion

for class certification and ask the Court to deny the motion for the reasons set forth below.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs allege that the Defendants conspired to broadly impose a "uniform fuel

surcharge" as a means of raising the rate paid for freight transportation. Second Consolidated

Amended Class Action Complaint ("Complaint" or "CAC") ¶¶ 4, 5, 19, 54, 88, 106a; Plaintiffs'

Memorandum in Support of Motion for Class Certification ("Pl. Br.") 1, 3, 5; *In re Rail Freight*

*Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 29-30 (D.D.C. 2008). To establish liability,

Plaintiffs must ultimately prove that each member of the class suffered "impact," or injury as a

result of the alleged conspiracy. In the context of the claim here, that means that they must prove

that each class member paid a fuel surcharge that it would not have paid absent the alleged

conspiracy (*i.e.*, in the "but-for world") and that, as a result, it paid more for freight

transportation than it otherwise would have.

To obtain class certification, Plaintiffs must demonstrate that they can prove those central

elements of their claim with the same evidence for all class members; if it is necessary to

examine the circumstances of individual class members to determine whether each suffered

impact from the alleged conspiracy, certification is inappropriate. Plaintiffs' claims require such

individual examinations. This is not a case about a commodity with list prices; nor is there a

single market that determines competitive prices. Rather, the freight transportation market in

which Defendants operate is characterized by highly individualized pricing that reflects varied

competitive circumstances, different cost and value propositions, individual shipper preferences

and a host of other circumstances unique to each shipper, commodity and route combination. It

is also characterized by privately negotiated contracts in which shippers and carriers trade off various elements of price and value. It simply is not possible under these circumstances to construct a "one size fits all" but-for world. There is no single benchmark that can be used to determine whether any given shipper actually paid more than it would have absent the alleged conspiracy.

While Plaintiffs portray this as a typical horizontal price-fixing case in which certification of a class should be routine, it is not. Several factors distinguish this case from those on which Plaintiffs rely, and dispositively so.

> **There is no common method to distinguish between shippers that paid a fuel surcharge because of the alleged conspiracy and those that would have paid one in the but-for world.**

Establishing that a shipper paid a fuel surcharge as a result of the conspiracy will require a shipper-specific analysis. Plaintiffs concede that in the years preceding July 2003 (the start of the alleged conspiracy period), each Defendant unilaterally and lawfully adopted and applied rate-based fuel surcharges, the same kind of fuel surcharge mechanisms that Plaintiffs challenge here.

REDACTED

This comes as no surprise, given that many industries, from trucking companies (Defendants' principal competition) to florists, lawn services and pizza delivery, embraced fuel surcharges in the same time frame in response to rapid and unprecedented increases in fuel costs.

---

[1]

REDACTED

Given the undisputed increasing use of fuel surcharges in the pre-conspiracy period and the acknowledged unilateral economic incentives to continue to expand their application, there can be no assumption that every shipper that paid a fuel surcharge after July 2003 did so only because of the alleged conspiracy. But how can one determine which shippers would have continued to pay (or started to pay) fuel surcharges after July 2003 regardless of the alleged conspiracy? And how could that determination be made with evidence that is common to all members of the class? Neither Plaintiffs nor their expert – Dr. Gordon Rausser – has offered any answers. In fact, the only way to figure out which shippers paid for legitimate reasons and which paid only because of the alleged conspiracy is to examine each shipper's negotiating position, with all its vagaries. *See* Section II below.

> **There is no common method for determining whether payment of a fuel surcharge led to a higher total price than the shipper would have paid in the but-for world.**

Unlike nearly all of the cases Plaintiffs cite, in which the alleged conspiracy affected the full price of a product, the allegation here is that Defendants agreed on only a single *component* of the total cost for freight transportation. That distinction is critical to resolving whether it is possible to show impact from the alleged conspiracy using proof common to all class members; it is the total, "all-in" price, which includes base rate, fuel surcharge and other charges and elements of value, against which impact must be judged. And determining what the all-in price for any shipper would have been and whether and how it was affected by the alleged conspiracy mandates an inquiry into each shipper's specific situation. Through the course of the complicated negotiations that are the hallmark of the rail freight industry, there is often a give-and-take in which elements are adjusted until both parties are satisfied with the value of the overall deal. In some cases, this took the form of lowering the base rate or applying a more modest rate increase than otherwise would have occurred when a fuel surcharge was applied. In

other cases, service or volume commitments were adjusted. In still other cases, custom fuel

surcharges were negotiated. Thus, the all-in price could be the same as it would have been

absent the conspiracy even if a collusive fuel surcharge were paid. In a leading case involving

similar allegations of a conspiracy as to a component of an overall price (there, an automobile

tax), the Fifth Circuit concluded that individualized questions overwhelmed any common

questions in the litigation, and declined to allow the case to proceed as a class action. *Robinson*

*v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004). Plaintiffs' effort to deal with this

key hurdle to certification falls flat because it rests entirely on their expert's demonstrably

incorrect assertion that base rates in fact were not traded for fuel surcharges, which even he

admits is not categorically true. *See* Section III below.

> **There is no common method to determine how other characteristics of the surface freight transportation markets affected whether any shipper was injured by the alleged conspiracy.**

Other characteristics of the surface freight transportation market require individual

analysis to determine whether a shipper would have paid a fuel surcharge, and paid more for

shipping as a result, in a properly defined but-for world. For example, notwithstanding

Dr. Rausser's assumption to the contrary, the Defendants do not compete with each other for

many shippers' business because they cannot. Many shippers are served by only one railroad.

Where there is no railroad competition for a shipper's business, an alleged conspiracy among

railroads cannot restrain competition, and it is unlikely that such a shipper would suffer impact.

At a minimum, a close look at the shipper's circumstances would be required to determine

whether the shipper would benefit from rail competition but for the alleged conspiracy.

Similarly, where the shipper's options include trucks, pipelines or barges as well as one or more

railroads, the price-constraining factor may be one of those alternative forms of transportation,

not another railroad. Determining whether a railroad conspiracy affected such a shipper would require a close look at the transportation choices it had. *See* Section IV below.

These facts all demonstrate one thing: to determine whether any shipper was injured by reason of the alleged conspiracy requires an examination of its particular market circumstances and negotiating stance with the railroads. Attempting to reconstruct what would have transpired in the individual negotiations between any particular shipper and any particular Defendant is the very essence of individualized inquiry – and precludes class certification. *See, e.g., Blades v. Monsanto Co.,* 400 F.3d 562, 574 (8th Cir. 2005) (refusing to certify a class where establishing injury required individual examination into "varying factors affecting list prices" so that impact could not be shown with common proof). *See* Section III.B-C below.

> **Plaintiffs' expert, Dr. Rausser, fails to account for the unique qualities of freight transportation markets and relies on a flawed methodology.**

None of the problems discussed above can be fixed with the simple expedient of a regression equation. Dr. Rausser's models just assume away the individual issues of causation and injury that arise from Plaintiffs' claims. With no ability to account for competitive circumstances (whether a move has direct rail competition, the extent of motor carrier competition, *etc.*) or the value of trade-offs made during the contract negotiating process, Dr. Rausser's regression analysis is so insubstantial as to constitute no method at all. The defects inherent in Dr. Rausser's damages model are illustrated by the fact that under his model

REDACTED

5

REDACTED                                    Plaintiffs have offered no viable

methodology – indeed no methodology at all – by which impact and damages can be assessed on

a class-wide basis.

Dr. Rausser's reliance on averaging, unrepresentative data, and incorrect market facts is

the same type of approach that another court rejected last year. *Cf. Reed v. Advocate Health

Care*, No. 06 C 3337, 2009 WL 3146999, at *17-19 (N.D. Ill. Sept. 28, 2009) (rejecting

Dr. Rausser's proffered regression equations). His methods are no more appropriate here and

should be equally rejected. *See* Section VII below.

The accompanying expert report of Dr. Robert D. Willig, attached hereto as Exhibit A,

further demonstrates the flaws in Dr. Rausser's methodology and shows that common evidence

cannot establish class-wide impact and cannot measure damages for all the individual shippers in

the putative class.[2]

\*                        \*                        \*

None of these failings is overcome by Plaintiffs' suggestion that their ability to offer

common proof of the conspiracy, alone is enough to satisfy the predominance prong of Rule

23(b)(3). Even the cases Plaintiffs cite reject that notion. Rather, as Plaintiffs seem to

acknowledge by proffering Dr. Rausser's regression, their burden is to demonstrate that they can

---

[2]     Dr. Willig has been a Professor of Economics and Public Affairs at Princeton University
for 30 years. He has written some 75 articles on economics and a book on competition and the
theory of industrial market structure. His focus is microeconomics, with particular specialization
in industrial organization, which deals with competition among firms, the area of economics that
deals most directly with antitrust issues. He teaches courses on microeconomics, regulation,
antitrust, and competition policy. Dr. Willig served as the Chief Economist in the Antitrust
Division of the United States Department of Justice from 1989 to 1991. He has also done
extensive research and economic analysis of the railroad industry, including testifying before the
Surface Transportation Board ("STB"), and its predecessor, the Interstate Commerce
Commission ("ICC") about issues affecting the rail industry on multiple occasions. *See* Expert
Report of Dr. Robert D. Willig, June 29, 2010 ("Willig Rep.") ¶¶ 1-5.

prove impact with common evidence. They have not and cannot. Consequently, their motion to certify the class should be denied.

## STATEMENT OF FACTS

Most of Plaintiffs' Statement of Facts consists of their effort to paint a picture of conspiracy. Yet as Plaintiffs acknowledge, it is a "fundamental rule that Plaintiffs need not establish the elements of their substantive claim to obtain certification." Pl. Br. 6; 51 ("in determining whether claim is susceptible to class treatment, its merit must be assumed"). Instead, the only question on this motion is whether Plaintiffs' claims "are suitable for resolution on a class-wide basis." Pl. Br. 51 (quoting *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* 246 F.R.D. 293, 299 (D.D.C. 2007)). Thus, Plaintiffs' lengthy detour into the merits seems calculated more to "poison the well" than to provide any useful context for the Rule 23 issues before the Court. At the appropriate juncture, Defendants will demonstrate the lack of evidence supporting Plaintiffs' claim.

Before turning to the facts that *are* relevant to the resolution of this motion, it is appropriate to pause briefly on the "evidence" that underlies Plaintiffs' merits submission because it illustrates – even at this early stage – the fallacy of Plaintiffs' case. Virtually all of the inter-railroad communications Plaintiffs cite as evidence of conspiracy were discussions between railroads that are not competing but rather are working as partners in the joint provision of interline service. By statute, railroads must offer through routes (*i.e.*, routes requiring service on more than one railroad) and must establish rates for such routes. 49 U.S.C. § 10703. To comply with this obligation, carriers must jointly set a rate and determine how to divide the revenues, as well as address other matters such as infrastructure investments to expedite transit time, tracking and billing systems, joint marketing strategies, service issues and delays, car supply, and interchange operations. Discussions between carriers about the rates they will charge for a

service that they can provide only by cooperating with one another in a joint movement are perfectly lawful under the antitrust laws. Furthermore, federal law affords railroads broad protection against the misuse in antitrust cases of communications occurring in the interline context, both by prohibiting certain inferences of collusion and excluding evidence of certain communications altogether. 49 U.S.C. § 10706. It is a sign of a fundamental weakness in Plaintiffs' theory that they rely so heavily on communications between Eastern and Western railroads that do not compete with one another.[3]

Plaintiffs' focus on communications that took place in the interline context underscores the weakness of their claim in another way. At the motion to dismiss stage, Plaintiffs emphasized that the critical element of the alleged agreement was Defendants' creation of a cost-adjustment index without fuel, known as the AIILF, and their agreement to use AIILF in conjunction with a separate fuel surcharge. *Rail Freight Fuel Surcharge*, 587 F. Supp. 2d at 30; *see also* Direct Purchaser Pl. Opp. Br. at 3, 9-12, 29-37 (Dkt 118).[4] Having now taken discovery about AIILF, Plaintiffs treat it as an afterthought, presumably because they have learned that Defendants used AIILF only infrequently, which eliminates any argument of class-

---

[3]      Plaintiffs find it "stunning[]" that Defendants' senior executives documented their discussions about fuel surcharges. Pl. 15. But the discussions Plaintiffs find so nefarious took place between Eastern and Western railroads at meetings concerning the provision of interline service attended by numerous individuals. The participants would have every reason to keep a record of such discussions and no reason to hide them. Plaintiffs' contention (Pl. Br. at 17-18 & n.42) that fuel surcharge-related discussions took place outside the interline context cannot withstand a review of the cited documents.

[4]      In their zeal to show that the routine promulgation of a cost index by a trade association was a conspiracy, Plaintiffs claim that BNSF's CEO "initiated discussions with the other Defendants" about the index. Pl. Br. 29. There is no evidence that BNSF's CEO had discussions with representatives of other railroads, and Plaintiffs provide no citation that supports their assertion.

wide impact based on AIILF usage.[5]  Plaintiffs thus shift their focus elsewhere.  Even at this stage of the litigation, Plaintiffs are still in search of a viable theory.

Other facts about the rail freight transportation industry do bear directly on the issues that are before the Court.  We briefly highlight those below.

## A.  The Unique and Diverse Aspects of Railroads

Plaintiffs and Dr. Rausser fail to take account of the many unique aspects of railroad freight markets that distinguish this case from others in which class certification has been granted and that undermine a showing of common impact from a conspiracy to coordinate fuel surcharges.  Railroads are but one group of competitors in markets for surface freight transportation.  For many freight movements between origin and destination pairs (or "O-D pairs"), railroads compete against trucks, barges, and pipelines, which collectively carry many of the goods shipped on railroads.  Even for movements where rail is the most economical form of transportation, there often is no competition between two railroads because an origin or destination may be served by only one railroad.  As a result, the price-constraining factor or factors vary greatly among railroad customers, as well as among the markets and submarkets in which railroads compete.  In some cases the price-constraining factor is another railroad, but in

---

[5]    Contrary to Plaintiffs' assertion, it is not true that the index was used "aggressively" to "facilitate the[] imposition of Fuel Surcharges."  Pl. Br. 30.  The railroads used the AIILF unevenly, and in some cases hardly at all.

REDACTED

many others, the price-constraining factor is a non-railroad competitor or the potential impact of Surface Transportation Board ("STB") rate regulation.

Plaintiffs have largely ignored these differences and have instead tried to shoe-horn the Defendants' business into a made-for-litigation model designed to show common evidence of impact and damages where there is none.

### 1.    The Railroad Industry

Unlike trucks, which can compete against one another anywhere there is a public road, railroads own their own tracks and can only go where their own tracks are located (or where they otherwise have permission to operate over another carrier's tracks). In fact, the entry of trucks into the surface transportation marketplace and the existence of an outdated and excessively restrictive regulatory regime pushed many of the nation's railroads near or into bankruptcy in the 1970s.[6] As a result, Congress passed the Staggers Rail Act of 1980 to loosen the regulatory reins on railroads where they compete with each other or other modes, and to keep regulation in place for rail movements where shippers have no practicable transportation alternatives.[7] Staggers Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 (1980) ("Staggers Act"). After the passage of the Staggers Act, railroads became more productive, handled more freight, and right-sized their

---

[6]    *See,* PD Ex. 2, U.S. Dep't of Transp., *A Prospectus for Change in the Freight Rail Industry* 45-53 (Oct. 1978).

[7]    Pub. L. No. 96-448; Under the federal scheme of economic regulation for freight railroads, rail carriers are free in the first instance to set any rates they choose for transportation, and where competition from other rail carriers or other transportation modes (trucks and barges) is sufficient to discipline those rates, the STB has no authority to assess their reasonableness or to adjust them. 49 U.S.C. § 10701(c). However, where a rail carrier has "market dominance over the transportation to which a rate applies," the rate established for that movement "must be reasonable" and the federal agency has jurisdiction to adjudicate rate reasonableness. *Id.* at § 10701(d). *See also,* PD Ex. 3, Gov't Accountability Office ("GAO"), *Preliminary Observations on Rates, Competition, and Capacity Issues,* ("GAO Preliminary Observations") 6 (June 21, 2006).

networks.[8]

REDACTED

Despite the progress railroads made after 1980, rail prices steadily declined until around 2004, when they finally began to rise.[9] There were many reasons for that change, including: (i) substantial increases in input costs, including fuel; (ii) a substantial increase in rail traffic and increasing capacity constraints on the railroads; and (iii) a leveling-off of rail productivity gains. Willig Rep. ¶¶ 191-98.[10]

> ### 2. There Are Many Origins, Destinations and Customers for Which Defendants Cannot Compete With Each Other

Unlike many industries, where a conspiracy might be expected to have a common effect on all customers of the formerly-competing suppliers, railroads are unable to compete with each other for freight moving between many O-D pairs. As a result, shipments between those O-D pairs would not experience the competition-reducing effect of a conspiracy, and separate inquiries would be required in the case of many shippers to determine whether the conspiracy caused injury.

The inability of each railroad to compete with other railroads for all shipper business stems from physical limitations inherent in the rail network. Each Defendant operates in a particular geographic region, and none operates a national system. The two Western Railroads

---

[8]    PD Ex. 3, GAO Preliminary Observations, at 7-8.

[9]    PD Ex. 4, Laurits R. Christensen Assoc., Inc., *A Study of Competition in the U.S. Freight R.R. Indus. and Analysis of Proposals that Might Enhance Competition,* Executive Summary of Revised Final Report, Prepared for the S.T.B., ES-17, ES-18 (Nov. 2009) ("Christensen Study").

[10]    *See also* below pp. 15-16, n.20-24; Christensen Study, at ES-15.

(BNSF and UP) generally do not compete with the two Eastern Railroads (CSXT and NS).[11]
Even within geographic regions, a railroad's ability to compete for freight traffic is limited by the
location of its tracks.

REDACTED

Moreover, even where two railroads serve the same origin, for rail competition to be
effective it "must be present at both the origin and the destination of a rail movement."[13]

---

[11]    *See, e.g.,* Lawson Decl. ¶ 3.

[12]

REDACTED

[13]    PD Ex. 13, *Hearing on Econ., Service, and Capacity in the Freight R.R. Industry: Before
the Comm. on Commerce, Sci., and Transp. Subcomm. on Surface Transp. and Merchant
Marine*, 109th Cong. 3 (2006) (testimony of John B. Ficker, Pres. of the Nat'l Indus.
Transportation League) ("Ficker Testimony"); *see also* PD Ex. 14 *Outlook for Growth of Coal-
Fired Electric Generation and Coal Supply: Hearing Before the Comm. on Energy and Natural
Resources*, 109th Cong. 5 (Mar. 25, 2006) (testimony of the Hon. Robert K. Sahr Chairman,
South Dakota Public Utilities Commission on behalf of the National Association of Regulatory
Utility Comm'rs) ("Sahr Testimony") ("[A]t best, only two railroad companies are available to
ship coal out of [the PRB, Illinois Basin, and Appalachian Region] and many customers are
captive to a single carrier at destination."); PD Ex. 15 APPA, *Railroad Competition* 1 (Feb.
2008) ("Many coal-burning electric utilities have no choice but to receive coal shipments from
only one rail carrier . . ."); PD Ex. 16 *Dairyland Power Coop. Statement,* Wis. State Agency
Hearing 3 (Sept. 28, 2006) (statement of Dairyland Power Coop. Pres. and CEO William L.
Berg) (noting access to only one railroad for its largest plant); PD Ex. 17 *Hearing on Rail
Competition and Service: Hearing before the House Transportation and Infrastructure Comm.*,
110th Cong. 2 (2007) (testimony of Ron Harper CEO and Gen. Mgr. Basin Electric Power
Coop.) (Laramie Rivers Station is solely served by BNSF).

12

REDACTED

### 3.    <u>Motor Carriers Set the Prices in Many Markets</u>

Although railroads often cannot compete against other railroads, they routinely *do* compete against other modes of transportation, primarily trucks. The impact of a conspiracy among railroads, therefore, would differ by shipper depending on whether the price of any given freight movement could be constrained by market participants outside the alleged conspiracy.

The construction of the interstate highway system in the post-World War II era radically changed the surface freight transportation market, leading motor carriers to displace the once-dominant railroads as the primary carriers of freight. For example, trucks handled 74.3% of the total value of U.S. shipments in 2002 and 67.2% of the total tons shipped.[16] There are few

---

[14]    PD Ex. 18 *Hearing on H.R. 1650, the "Railroad Antitrust Enforcement Act of 2007: Hearing before the House Judiciary Comm. Antitrust Task Force on Antitrust and Competition Policy*," 110th Cong. 30 (2008) (testimony of Terry Huval, LUS Dir.).

[15]    The American Chemistry Council, of which plaintiff Olin is a member, acknowledges that "nearly two-thirds of rail-served chemical facilities are served by only one railroad." PD Ex. 19 American Chem. Council, *Issue Brief - Freight Rail Policy* (July 2009), *available at* http://www.americanchemistry.com/s_acc/sec_article_acc.asp?CID= 634&DID= 10022 (last visited Mar. 31, 2010); *see also* above n.12.

[16]    PD Ex. 20 U.S. Dep't of Transp. and U.S. Dep't of Commerce, *2002 Economic Census: Transportation, 2002 Commodity Flow Survey* 1 (Dec. 2004); *see also* PD Ex. 21 Cambridge Systematics, Inc., *Bottom Line Technical Report: Highway and Public Transp. Nat'l and State Inv. Needs* 22 (Mar. 2009) (discussing growth of long-haul trucking in surface transportation at

barriers to entry in the trucking industry. Because trucks are more flexible and often can offer more convenient service, they tend to set the market price in markets where they are competitive.


REDACTED


The ICC recognized the strength and pervasiveness of motor carrier competition when it exempted substantial amounts of rail traffic from regulation.[17] A large amount of Defendants' traffic is "exempt."[18]                    REDACTED

---

the expense of rail and water movements); PD Ex. 22 ICF Consulting, *Evaluation of U.S. Motor Carrier Indus. Challenges and Opportunities*, § 2 (Mar. 31, 2003).

[17]      *See, e.g.,* 3 S.T.B. 62 (1998) (nonferrous recyclables); *Ex Parte No. 34610*, 1 S.T.B. 173 (1995) (ferrous recyclables); *Ex Parte No. 394 (Sub-No. 12)*, 9 I.C.C. 2d 957 (1993) (scrap paper); *Ex Parte No. 346 (Sub No-No. 27a)*, 9 I.C.C. 2d 884 (1993) (used motor vehicles); *Ex Parte No. 346 (Sub-No. 28)*, 1992 ICC Lexis 145 (July 1, 1992) (export cord and export soybeans); *Ex Parte No. 346 (Sub-No. 25)*, 7 I.C.C. 2d 673 (1991) (lumber or wood products); *Ex Parte No. 230 (Sub-No. 6)*, 3 I.C.C. 2d 869 (1987) (TOFC/COFC regulations); *Ex Parte No. 346 (Sub-No. 8)*, 367 I.C.C. 425 (1983) (boxcar); *Ex Parte No. 230 (Sub-No. 5)*, 364 I.C.C. 731 (1981) (Improvement of TOFC/COFC Regulation); *see also Pejebscot Indus. Park, Inc., d/b/a Grimmel Indus. – Petition for Declaratory Order*, STB Fin. Dkt. 33989, 2003 WL 21108198, at n.12 (S.T.B. May 15, 2003) ("The ICC's exemption for ferrous recyclables (such as scrap metal) and our exemption for nonferrous recyclables . . . were based on the low rail rates typically charged for transporting these commodities and the widespread competition generally available from trucks and barges to haul them. In both instances, the facts reflected that railroads were, in general, losing market share to competing modes of transportation, indicating that railroads lacked market power to abuse shippers.")

[18]      Rail traffic can be either "regulated" or "exempt." "Regulated" traffic is subject to all of the rules and regulations of the STB. *See* 49 U.S.C. § 10702 (2009). "Exempt" traffic is exempted from regulation if the regulatory agency determines that there is sufficient competition from other modes of transportation to prevent abuse of rail market power with respect to that traffic. *Id.* § 10502. Regulated traffic governed by a rail transportation contract is also outside the scope of the STB's jurisdiction and is included in the proposed class. *See id.* § 10709.

[19]      Rail traffic is either "carload" or "intermodal." "Intermodal" traffic refers to goods shipped in containers or trailers on rail flat cars as part of a continuous movement with another mode of transport such as truck or steamship. All other rail traffic is known as "carload" traffic.

While truck competition is widespread in surface transportation markets, the extent and effect of that competition on pricing to any given customer is not always clear. As Dr. Rausser acknowledges, there is business for which trucks are the best choice, business for which rail is the best choice, and a vast gray area in between. Corrected Expert Report of Gordon Rausser, Ph.D., Ex. A to Pl. Br. ("Rausser Rep.") 30. And, as he concedes, there is no "bright line" indicating where trucks and trains compete and to what extent. *Id.* And with no such bright lines, the common proof necessary for class certification can never be present.

## B.   The Effect of Increasing Demand and Tightening Capacity on Rail Pricing

For much of the Class Period, railroads faced increasing demand and concerns about "shortages of rail capacity."[20] *See* CAC ¶ 53 ("By the early 2000's . . . railroads were experiencing surging freight demand and tight capacity"). This tight capacity also affected trucks as highway congestion grew, companies could not find drivers, and new emissions laws took effect.[21] As early as 2003, an independent committee reported "a pattern of unprecedented

---

All intermodal traffic is exempt. Carload traffic is exempt if (i) the commodity being moved has been exempted (*e.g.*, lumber, soybeans, recyclables, fresh fruits and vegetables and automobiles) or (ii) it moves in a boxcar.

[20]   PD Ex. 23 Francis P. Mulvey, *The STB and the Railroads in Capacity Constrained Environment*, 14-15, 18-19 (June 13, 2005) (discussing "developing rail capacity crisis"); PD Ex. 24 JP Morgan, Railroad Shipper Survey 7 (July 14, 2005) ("The responses to our questions about rail capacity indicate that despite increased capital spending and sporadic operational improvements by the various railroads, rail capacity remains constrained."); *see also* Willig Rep. ¶ 160.

[21]   *See, e.g.*, PD Ex. 25, Citigroup, *Airfreight and Service Transportation* 3 (Dec. 9, 2004) ("a growing percentage of shippers have become increasingly concerned with [truckload] capacity . . . a larger number of shippers are paying higher rates to secure capacity."); PD Ex. 26, Deutsche Bank, *DB Transportation Survey: Peak Acceleration Expected, But Capacity Looser* 5 (Sept. 27, 2006) ("Tighter-than-normal capacity persists for trucking (38%) and rails (42%)."). PD Ex. 27 ICF Consulting, *2010 and Beyond: A Vision of America's Transportation Future 28* (May 2004) *available at* http://freight.transportation.org/intermodal_reports.html (last visited June 29, 2010) (noting increasing congestion for all freight markets).

tight capacity in certain parts of the freight transportation system . . ."[22]   As capacity continued to tighten in 2006, the National Industrial Transportation League (of which Plaintiff Olin is a member) and the GAO and stated that demand for rail transportation exceeded industry capacity.[23]   The STB acknowledged these constraints on several occasions during the Class Period.[24]

### C.      Negotiated Prices

Unlike most industries in which price-fixing conspiracies are alleged, there is no "list price" that applies to rail freight transportation services across the board.  Nor is there even a single market that defines what competitive prices are.  Rather, the factors affecting railroad pricing are many and varied.  They include the competitive circumstances specific to the shipment at issue, which often depend on location, commodity and customer preferences, as well as different cost conditions, volume commitments and various service issues.  *Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205, at *4 (S.T.B. Jan. 25, 2007) (hereinafter "*Rail Fuel Surcharges*") (acknowledging that "railroads rely on differential pricing" accounting for various factors).

---

[22]      PD Ex. 28, Congressional Budget Office, *Rail Freight Transportation: Long-Term Issues* 3 (Jan. 2006).

[23]      PD Ex. 3, GAO Preliminary Observations, at 2; PD Ex. 13, Ficker Testimony at 3; PD Ex. 29, Presentation of Christensen Study 22 (Nov. 2008), available at http://www.lrca.com/railroadstudy/Final_Report_Presentation_Nov_2008.pdf (last visited June 29, 2010) (noting tight capacity in many areas).

[24]      *See, e.g., N. Am. Freight Car Ass'n v. BNSF Ry. Co.*, STB Dkt. No. 42060 (S.T.B. Jan. 26, 2007) ("Traffic is up and capacity is tight"); *Tongue River R.R. Co., Inc. - Constr. and Operation - W. Alignment*, STB Fin. Dkt. No. 30186 (Sub-No. 3) n.66 (S.T.B. Oct. 9, 2007) ("TRRC's revenue projections appear conservative given the current capacity constraints in the rail industry"); *CSX Transp., Inc. - Temp. Trackage Rights Exemption - Alabama Great S. Rail Co.*, STB Fin. Dkt. No. 34762 (S.T.B. Sept. 23, 2005) (". . . there has been increasing congestion on available east-west lines due to capacity constraints . . ."); *Timber Rock Railroad Inc. - Lease Exemption - The Burlington N. and Santa Fe Ry. Co.*, STB Fin. Dkt. No. 34503 (S.T.B. Oct. 8, 2004) (referring to "surrounding capacity constrained areas such as Houston.")

Indeed, one of the important innovations of the Staggers Act is that it permitted railroads and shippers to enter into contracts for the first time. 49 U.S.C. § 10709. This led to highly individualized negotiations with many thousands of different customers over different routes involving different commodities, with an array of concessions on both sides. As a result, there are literally several million different prices, reflecting the endless combinations of factors that influence prices. Contracts correspondingly reflect myriad variations, the fuel surcharge being but one element of the overall deal, and an element that is sometimes itself subject to negotiation and modification.

### D. Fuel Surcharges Predated and Were Used Increasingly as Fuel Costs Rose Before the Alleged Conspiracy

Plaintiffs acknowledge that the Defendants assessed fuel surcharges prior to the beginning of the alleged conspiracy period in July 2003. *See* Pl. Br. 9 (describing adoption of "uncoordinated fuel surcharges").[25] In fact, as the STB recognized, there is a "long history [of] fuel surcharges in the rail industry," dating back to the "mid-1970s." *Rail Fuel Surcharges* at *7. At that time, the ICC authorized fuel surcharges and specifically endorsed surcharges calculated

---

[25]    Plaintiffs darkly refer to fuel surcharges as an attempt to "increase rail freight prices and revenues," Pl. Br. 9, as if there is something nefarious about a business independently seeking to increase its prices and revenues. This is one of many examples in their brief where Plaintiffs attach sinister-sounding labels to normal business communications and conduct. Courts recognize that there is nothing inherently wrong with a fuel surcharge: " . . . Defendants' use of fuel surcharges as a profit generator also does not show anticompetitive behavior. The Defendants are entitled to generate profits on fuel surcharges by charging more than their incremental increase in fuel costs, so long as the Defendants do not illegally conspire to do so." *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 U.S. Dist LEXIS 14276, at *69 (granting motion to dismiss).

as a percentage of the base rate. *See Expedited Procedures for the Recovery of Fuel Costs*, Ex Parte 311, 350 ICC 563, 1975 ICC LEXIS 27, at *16-17 (1975).[26]

As shown in Figure 1 below, from 1987 until 2000, the oil markets were generally stable and predictable, with prices fluctuating around $20 per barrel.

### Figure 1



Source: http://tonto.eia.doe.gov/dnav/pet/hist/rwtcM.htm.

In 2000, fuel prices jumped. As shown in Figure 2, in response to this trend, Defendants introduced published fuel surcharges[27] at different times using different triggers.

REDACTED

---

[26]    In fact, in the *Rail Fuel Surcharges* decision, the STB declined to order retroactive relief for the railroads' past use of rate-based surcharges because the practice had been so widely accepted. 2007 WL 201205, at *7.

[27]    Each Defendant used different nomenclature to refer to the fuel surcharges published on their respective websites. For example, NS referred to them as "public carload fuel surcharges", BN called them "standard carload surcharges" and CSXT called them its "8100 tariff surcharges." UP used various terms, including "standard fuel surcharges." Here, the fuel surcharges will be referred to as Defendants' "published fuel surcharges." These published fuel surcharges applied to public regulated traffic and were sometimes incorporated into negotiated confidential contracts and private quotes.

[28] Many other rail carriers and a wide variety of industries in which fuel was a significant cost input adopted fuel surcharge programs as well.[29]

From 2000 to mid-2003, a period in which the Plaintiffs concede that Defendants were acting independently,

REDACTED

In early 2003, however, fuel prices began a long and sustained increase, triggering fuel surcharge provisions already in place and increasing the incentive for transportation providers to apply a fuel surcharge to traffic that did not already have one.

---

[28]     Adams Decl. ¶ 4; Jenkins Decl. ¶ 8; Lawson Decl. ¶¶ 5-6.

[29]     *See, e.g.* PD Ex. 30 Rick Brooks, *More Business Slap On Fuel Surcharges*, WALL ST. J., May 4, 2006, at D1 ("A wide array of business are using . . . fuel surcharges to shift some of their rising energy costs to consumers. . ."); *see also LTL Shipping*, 2009 U.S. Dist LEXIS 14276, at *65 ("It is quite plausible . . . that the Defendants [trucking companies] imposed fuel surcharges as a direct, and immediate, reaction to relatively high fuel costs and relatively high fluctuations in fuel cost" during the same time at issue here).

REDACTED

The chart below shows Defendants' published fuel surcharges and the dates they were adopted, as well as other significant events in the chronology of Defendants' fuel surcharges.

**Figure 2**



### E. Defendants' Fuel Surcharges Vary Widely

In contending that Defendants coordinated their fuel surcharges, Plaintiffs point to surcharges that are published on Defendants' websites so that public carload customers can see them. However, a majority of the non-regulated traffic moves under confidential, negotiated contracts, which could apply the full published fuel surcharge or a portion of it, another fuel surcharge formula altogether, or no fuel surcharge at all.

REDACTED

REDACTED                                     Moreover, while Plaintiffs

rely on Defendants' published carload fuel surcharge tables for their allegations of surcharge

"uniformity" in the Complaint, Defendants had different fuel surcharges for intermodal traffic,[31]

which accounts for a large proportion of non-regulated traffic.  Willig Rep. ¶ 276.  As a result, no

Defendant had a uniform fuel surcharge applied to all non-regulated traffic, and there was no

uniform fuel surcharge across all four railroads.  For example,

REDACTED

Jacobowski Decl., Attach. A.  Dr. Rausser never reports any of these variations

and presents the data as if each Defendant had a single fuel surcharge mechanism for all of its

unregulated traffic.

REDACTED

---

[31]    Bolander Decl. ¶¶ 3, 8; Duggan Decl. ¶ 10.

[32]

REDACTED

[33]    The fact of diverse fuel surcharges was well-known.  A leading shipper organization
noted in 2006 that, "[T]he eastern and western carriers' use of different indexes to calculate their
fuel surcharge percents produce apparent anomalies. . . .  [T]he BNSF and UP use the DOE retail
on-highway diesel fuel price for calculating their carload fuel surcharge percent, while the NS
and CSXT use the WTI crude oil price. . . . But these calculations produce substantially different

**Figure 3**

REDACTED

---

numbers for carload traffic.  PD Ex. 40, Nat'l Indus. Transp. League, *Written Testimony before the STB: Rail Fuel Surcharges*, Ex Parte No. 661 at 21 (Apr. 27, 2006).

[34]

REDACTED

[35]

As further explained below in Section VI., this

## ARGUMENT

**I.    PLAINTIFFS CANNOT MEET THEIR RULE 23 BURDEN IN THIS CASE**

### A.    The Standards for Class Certification

To obtain class certification, Plaintiffs bear the burden of demonstrating that they satisfy

the four requirements of Rule 23(a) (numerosity, commonality, typicality, and adequate

representation) and the two requirements of Rule 23(b)(3) (predominance and superiority). *Gen.*

*Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157, 160 (1982) (requiring "actual, not presumed,

conformance with Rule 23(a)"); *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529-32 (D.C.

Cir. 2006).

In evaluating whether Plaintiffs have met their burden, the Court must "scrutinize

plaintiffs' legal causes of action to determine whether they are suitable for resolution on a

classwide basis" and may "consider matters beyond the pleadings." *In re Vitamins Antitrust*

*Litig.*, 209 F.R.D. 251, 257 (D.D.C. 2002) (citing *McCarthy v. Kleindienst*, 741 F.2d 1406, n. 8,

1419 (D.C. Cir. 1984) for the proposition that a trial court may consider evidence which tends to

support or refute the existence of a class). This scrutiny is not *pro forma*: "the class

determination generally involves considerations that are 'enmeshed in the factual and legal issues

comprising the plaintiffs' cause of action,' and the Court is required to conduct a 'rigorous

analysis' of the Rule 23 requirements." *Meijer*, 246 F.R.D. at 299 (quoting *Falcon*, 457 U.S.

at 161); *see also Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 265 (D.D.C. 1990) ("[T]he depth of

the Court's inquiry will be a reflection of the complexity of issues presented.").

Contrary to Plaintiffs' assertion that courts "cannot . . . make a preliminary inquiry into

the merits of plaintiffs' claim in determining whether to certify the class," Pl. Br. 51 (quoting

---

demonstrates that Dr. Rausser's damages model bears no relationship to Plaintiffs' theory of
liability that is limited to fuel surcharges.

*Meijer*, 246 F.R.D. at 299), the court must simply avoid "any inquiry into the merits of Plaintiffs'

claims *that is not required to resolve the instant motion.*" *Meijer*, 246 F.R.D. at 299 n.4

(emphasis added) (noting that resolution in that case did "not involve significant factual

disputes" in any event).[36] When there *are* factual disputes relevant to the Rule 23 requirements,

the Court must resolve them. *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C. Cir. 1986)

(vacating a grant of class certification and remanding "the 'class-wide proof' issue for closer

inspection" in light of the factual issues "swept into the certifications.").

Nor is there any support for Plaintiffs' suggestion that the standard articulated in *In re

Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) is inapplicable in this Circuit.

Pl. Br. 54-55. In this Circuit, as in the Third Circuit and others, an expert's analysis offered to

establish the "predominance" element of Rule 23 in an antitrust case must be carefully

scrutinized to ensure that it is sufficient to satisfy Plaintiffs' burden.[37] The fact that Plaintiffs'

---

[36]     Plaintiffs cite *Meijer* for the proposition that a court may not conduct such a preliminary
inquiry. Pl. Br. 5, 51-52, n.210. However, as *Meijer* makes clear, reliance on *Eisen v. Carlisle
& Jacqueline*, 417 U.S. 156 (1974) as establishing a blanket ban on resolving *any* factual
disputes on class certification is misplaced. 246 F.R.D. at 299. This Circuit has found that
"[n]othing in Eisen precludes a court from scrutinizing plaintiffs' legal cause of action to
determine whether they are suitable for resolution on a classwide basis. To the contrary, such
scrutiny is ordinarily an essential ingredient of the determination whether to allow a case to
proceed as a class action." *McCarthy*, 741 F.2d at 1413 n.6. Indeed, every Circuit addressing
the issue has held that *Eisen* merely precludes unnecessary merits determinations and that Rule
23 requires inquiry into the merits where necessary to decide the class certification question.
*Dukes v. Wal-Mart*, 603 F.3d 571, 582-56 (9th Cir. 2010) (surveying the Circuits).

[37]     Many Circuits have articulated the same need to resolve factual disputes as part of the
"rigorous analysis" of whether the requirements of Rule 23 have been met, including disputes
involving expert testimony and those overlapping with the merits. *See, e.g., In re New Motor
Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) ("It would be contrary to
the rigorous analysis of the prerequisites established by Rule 23 before certifying a class to put
blinders on as to an issue simply because it implicates the merits of the case") (internal citations
omitted); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) (holding that
a court may resolve factual disputes relevant to the Rule 23 requirement even if the factual
disputes overlap with a merits issue); *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219,
231-32 (2d Cir. 2006) (affirming denial of class certification where district court weighed

expert here has conducted a regression analysis, whereas in *Hydrogen Peroxide* the expert had not yet done that work, is immaterial. The "rigorous analysis" standard announced almost three decades ago in *Falcon*, 457 U.S. at 161, and applied by *Walsh*, 130 F.R.D. at 265, requires the Court to carefully examine Dr. Rausser's opinion in light of competing evidence, including the empirical work of an opposing expert.[38]

### B.      Rule 23(b)(3)'s Predominance Requirement

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is a "demanding" requirement that "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 624 (1997). When claims "turn upon highly individualized proof," rather than common proof, denial of the motion is required. *McCarthy*, 741 F.2d at 1413; *see also Hydrogen Peroxide*, 552 F.3d at 311.

There is "no bright line test for determining whether common questions of law or fact predominate." *See In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 369 (D.D.C. 2007). Rather, consistent with the rigorous analysis required under Rule 23, "the Court must consider the substantive elements of the plaintiff's claims and the type of proof plaintiff intends to proffer to establish them." *Id.* Here, the substantive elements of Plaintiffs' claim under Section 1 of the

---

competing expert reports); *Blades v. Monsanto Co.*, 400 F.3d 562, 569-70 (8th Cir. 2005) (same); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004) (holding the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (same); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 637 (D. Kan. 2008) (noting that "[t]he recent trend of authority is to permit the district court to compare the relative weight of expert opinions in ruling on a motion for class certification").

[38]      As demonstrated in Section VI below, Dr. Rausser's analysis is riddled with errors and falls far short of the standard.

Sherman Act are (1) a violation of the antitrust laws by defendants, (2) direct injury (or impact) from the violation, and (3) quantification of damages. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-41 (1990); *Meijer*, 246 F.R.D. at 307.

Plaintiffs' burden under Rule 23(b)(3) is not satisfied merely by asserting that evidence going to Defendants' alleged violation of the antitrust laws is common to all class members. Rather, Plaintiffs "must show that the evidence they propose to employ with respect to *each* of th[e] elements [of an antitrust claim] is common to the class as a whole." *Meijer*, 246 F.R.D. at 307 (citing *Vitamins*, 209 F.R.D. at 263) (emphasis added). *Accord, e.g., Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 141 (D.N.J. 2002), *aff'd*, 84 Fed. App'x. 257 (3d Cir. 2004). This includes the critical element of injury.

### C.   <u>Plaintiffs Must Establish Injury on a Class-Wide Basis</u>

An essential element of an antitrust damages claim is "actual injury" (also referred to as "fact of injury" or "impact"). *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981); *see* 15 U.S.C. § 15 (only a claimant who was "injured in his business or property by reason of" a violation may recover damages under the antitrust laws). Courts place "great importance on the 'impact' element of an antitrust cause of action" in deciding whether to grant class certification. *Ala. v. Blue Bird Body Co.*, 573 F.2d 309, 327 (5th Cir. 1978). Proving impact is not the same as proving damages. Impact concerns whether the alleged violation actually caused harm to an antitrust claimant. Only if that requirement is satisfied does a court address the amount of damages incurred by the claimant.

To prove that it has suffered injury from an alleged price-fixing conspiracy, a Plaintiff must demonstrate that it paid more than it would have in the absence of the conspiracy. *Vitamins*, 209 F.R.D. at 263; *see also Blue Bird Body*, 573 F.2d at 327. To obtain class certification, therefore, Plaintiffs must proffer a "valid method" for proving such injury to all or

virtually all class members on a "simultaneous, class-wide basis," that is, a method that does not require examining the individual class members' circumstances. *See Nifedipine*, 246 F.R.D. at 369; *Meijer*, 246 F.R.D. at 308; *Vitamins*, 209 F.R.D. at 267.

Because procedural rules cannot change substantive legal requirements, *see* 28 U.S.C. § 2072(b), courts generally recognize that all class members must have suffered an injury in order to certify a class. *See, e.g., Hydrogen Peroxide*, 552 F.3d at 311-312 (requiring injury to "every class member" to prevail on the merits); *Bell Atl. Corp. v. AT&T*, 339 F.3d 294, 302 (5th Cir. 2003) ("where fact of damage cannot be established for *every* class member through proof common to the class . . . Rule 23(b)(3) predominance [is defeated].") (emphasis added); 2A AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 331d (3d Ed. 2007) ("the fact that some class members may not have been damaged at all generally defeats class certification").[39]  Thus, Plaintiffs here must demonstrate that common proof can be used to show that class members paid "conspiracy-imposed" fuel surcharges and that the effect of those fuel surcharges was that they paid higher all-in rates than they would have paid in the absence of a conspiracy.[40]

---

[39]    Some cases have suggested a more relaxed requirement in which "inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class." *Meijer*, 246 F.R.D. at 310. While Defendants respectfully submit that that standard has not been adopted by the D.C. Circuit and is in any event not the correct standard, the issue need not be decided here, because Plaintiffs cannot meet the more relaxed standard either. Each argument raised by Defendants and each flaw in Plaintiffs' approach applies to large portions of the class, and certainly far more than just a "few" class members.

[40]    Plaintiffs invoke an alleged "presumption" of common injury in antitrust cases, but then claim that they do not need to rely on such a presumption. Pl. Br. 69-70. This is a red herring: Although some recent D.C. cases discuss earlier cases that have referred to a purported presumption, none actually applies one. *Meijer*, 246 F.R.D. at 308 n.16; *Vitamins*, 209 F.R.D. at 263, 266; *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29-30 (D.D.C. 2001). Nor could they, given the Supreme Court's ruling that antitrust injury *cannot* be presumed. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341 (1990). Rather, the courts in those cases looked at the proffered evidence of common impact in a ruling on the respective class certification motions. In any case, (1) presuming injury would be inconsistent with the "rigorous analysis" requirement of *Falcon* and (2) any such presumption has been rebutted.

This requirement is no less stringent in an antitrust case than in any other type of case.[41]

*See Walsh*, 807 F.2d at 1007 n.40 (D.C. Cir. 1986) (citing with approval 4th Circuit opinion rejecting a "rebuttable presumption" of class certification in antitrust cases). Indeed, courts (including the court in *Vitamins*) routinely examine whether evidence specific to each class member would overwhelm common proof with respect to the *other* elements of the claim, namely, injury and damages. Plaintiffs' attempt to substitute presumptions for their burden fails.

## II.    INDIVIDUALIZED ANALYSIS IS REQUIRED TO DETERMINE WHETHER EACH CLASS MEMBER WOULD HAVE PAID A FUEL SURCHARGE BUT FOR THE CONSPIRACY

Plaintiffs' core allegation at this point seems to be that Defendants conspired to expand the use of uniform fuel surcharges. Pl. Br. 13-4, 27, 31; CAC ¶ 3 ("the only practicable way the railroads now could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible."). Antitrust law, as a species of torts, follows the principle that a Plaintiff only has a claim if the challenged conduct was a material cause of its injury. *Atl. Richfield*, 495 U.S. at 344. If the same alleged injury would have been caused by independent, non-conspiratorial forces, the Plaintiff has no antitrust claim. *Fed. Prescription Serv., Inc. v. American Pharm. Assoc.*, 663 F.2d 253, 268 (D.C. Cir. 1981) ("plaintiff must prove not only an antitrust violation but the causal link between the violation and an injury to his business or property," citing 15 U.S.C. § 15). Plaintiffs must therefore first prove that each class member would not have paid the fuel surcharge "but-for" the alleged conspiracy. *See* pp. 26-27, above. Plaintiffs have failed to offer a methodology by which that can be done on a class-wide basis.

---

[41]    The existence of a "rule" that an allegation of conspiracy is enough to obtain class certification (*see* Pl. Br. 65, citing *Vitamins*, 209 F.R.D. at 264 (quoting 4 Newberg & Conte, *Newberg on Class Actions* § 18.28, at 18-98 (3d ed. 1992)) is highly dubious, as courts do not end their analyses merely because a conspiracy has been alleged. Certainly the *Vitamins* court did not do so.

That is no surprise. The facts that (i) the use of fuel surcharges long predates the alleged conspiracy, CAC ¶ 57; Rausser Rep. 42-43, and (ii)

REDACTED                                          , Willig Rep. ¶¶ 78-79,[42] indicate that fuel surcharges would have continued absent the alleged conspiracy. There simply is no basis to conclude that, but-for the alleged conspiracy, all fuel surcharges would have disappeared. *See* Rausser Dep. 91:17-91:21; Willig Rep. ¶¶ 62-81.

Critically, whether a class member would have paid a fuel surcharge but-for the alleged conspiracy depends on many individualized factors. Given the many and varied reasons that shippers might accept fuel surcharges, it is necessary to examine each shipper's situation to determine whether it would have accepted the fuel surcharge regardless of the alleged conspiracy. That renders certification inappropriate. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 226 (2d Cir. 2008) (fact that smokers had a variety of reasons for purchasing light cigarettes precluded class-wide proof that defendants' misrepresentations caused class members to smoke more).

Consider a hypothetical in which each year 10 million new car purchases had air conditioning and a conspiracy among car manufacturers to limit the availability of cars without air conditioning eventually raised the figure to 11 million. A class action would face the enormous hurdle of separating the 1 million true victims of the conspiracy from the 10 million not injured by the alleged conspiracy because they would have bought cars with air conditioning anyway. Plaintiffs here face a much greater hurdle because, as shown below

REDACTED                              Even if there are some class members that

---

[42]     *See also* Adams Decl. ¶¶ 3-4; Bolander Decl. ¶ 14; Duggan Decl. ¶¶ 9, 16, 18; Gehl Decl. ¶¶ 3-4; Krehbiel Decl. ¶ 5A; Listwak ¶ 10; McNulty Decl. ¶ 9.

only paid a fuel surcharge because of the alleged conspiracy, there is no class-wide way to identify them and exclude those that would have paid a fuel surcharge anyway.

Plaintiffs and Dr. Rausser                    REDACTED

, simply assume that every class member paid a fuel surcharge after July 1, 2003 only because of the alleged conspiracy. Assumptions are no substitute for Plaintiffs' burden under Rule 23 to demonstrate that they can establish causation – an essential element of showing impact – with evidence common to the class. Any class members that would have paid a fuel surcharge absent a conspiracy have no injury.

## A.    Defendants Had Considerable Ability and Incentive to Adopt Fuel Surcharges Entirely Independent of Any Conspiracy

REDACTED                                                    , Plaintiffs' theory of class-wide injury requires finding that (1) Defendants' ability to add fuel surcharges was completely exhausted by July 2003 such that, absent a conspiracy, few or no additional shippers would have had fuel surcharges assessed, and (2) Defendants could not continue assessing fuel surcharges on shippers that paid a fuel surcharge prior to July 2003 once their pre-July 2003 contract expired. Neither is remotely plausible or supported by any evidence.

### 1.    REDACTED
                                                    It Is Implausible That Defendants Would Have Stopped Using Surcharges Absent the Alleged Conspiracy

Dr. Rausser concedes that the use of fuel surcharges prior to July 1, 2003 was not collusive. *See* Rausser Rep. 42 ("Between 2000 and 2002, the Defendants independently implemented fuel surcharge programs"); *id.* (fuel surcharges before July 2003 were adopted "without coordination or agreement"); *see also* CAC ¶ 57.

REDACTED                                    Three important

30

aspects of the unilateral use of fuel surcharges preclude any class-wide proof that fuel surcharges applied for the first time after July 2003 were a result of the alleged conspiracy.

*First*, fuel surcharges were widely used before the start of the conspiracy.

REDACTED

Dr. Rausser does not deny these facts. Instead, he says that fuel surcharges were applied "inconsistently" before the alleged conspiracy, Rausser Rep. 42, which is neither a rigorous statistical concept nor a contradiction of the fact that such surcharges were widely used. Once a Defendant decided to pursue a fuel surcharge program, it had to await the expiration of preexisting contracts without fuel surcharge provisions before it could apply a fuel surcharge through negotiations over a new contract.[46]

REDACTED

---

[43]    PD Ex. 41, CSXFSC000000308.

[44]    PD Ex. 42, NS010073260.

[45]    *See also* p. 19 n.30 above.

[46]    *See* Jenkins Decl. ¶ 8; Lawson Decl. ¶ 11.

REDACTED

REDACTED

---

[47]     PD Ex. 43, NS010060426.

**Figure 4**

**UP Pricing Documents With Fuel Surcharges Before the Alleged Conspiracy**

REDACTED

REDACTED

But the fact that fuel surcharges were not always used hardly refutes the strong trend in the overall data.

REDACTED

---

[48]     PD Ex. 44, UPFSC0042871.

REDACTED

**Figure 5**

REDACTED

---

49        PD Ex. 49, Excerpt of Back-up Data for Table 28 of Dr. Rausser's Report.

the admittedly non-conspiratorial period, and the supposed conspiracy did not accelerate the instances of fuel surcharges as Plaintiffs contend.

REDACTED

There is, simply, nothing in Plaintiffs' presentation from which the Court could conclude that all or most of the members of the purported class would not have paid fuel surcharges absent the alleged conspiracy.

### 2.   It Is Implausible That All Shippers That Agreed to a Fuel Surcharge Prior to July 2003 Would Not Have Agreed After July 2003, Absent a Conspiracy

Plaintiffs face an even higher hurdle in claiming that shippers already paying a fuel surcharge before July 2003 were injured because they would not have had a surcharge in whatever new contract they might negotiate thereafter.  This is a large group of shippers:

REDACTED

[51] Plaintiffs recognize that at least some shippers in this group cannot be part of the class.  Thus, they exclude those shippers that paid a fuel surcharge during the conspiracy period "solely pursuant to a railroad-shipper contract that was (i) entered before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract." Pl. Br. 1, n.1.

REDACTED

---

[50]     Willig Rep. ¶ 77, Supp. Figure 1.

[51]     *See* p. 19 n.30 above; *see also* Willig Rep. ¶ 73.

REDACTED

Consider a shipper that entered into a contract running from January 2002 through December 2003 that contained a fuel surcharge. If such a shipper entered into a new contract in January 2004 that also contained a fuel surcharge, it would fall within Plaintiffs' class definition because the fuel surcharge was not "solely" in the pre-conspiracy contract. But, proof of causation for such a shipper is problematic at best. The fact that the shipper had a fuel surcharge when Defendants were concededly acting independently makes it extremely likely that a fuel surcharge would have been included in its January 2004 contract, regardless of any alleged conspiracy to expand fuel surcharge coverage. Certainly one cannot presume that all such shippers would have avoided fuel surcharges thereafter. Other categories of shippers with pre-conspiracy fuel surcharges present similar problems, including:

- Shippers that paid a fuel surcharge prior to the Class Period pursuant to a rate in a regulated tariff and then paid a similar fuel surcharge during the Class Period pursuant to an unregulated price authority, such as a contract.

- Shippers that paid a fuel surcharge prior to the Class Period on one commodity and then paid a fuel surcharge during the Class Period on another commodity.

- Shippers that paid a pre-Class Period fuel surcharge to one railroad (including a non-conspiring railroad) and then paid the same or a similar fuel surcharge to a Defendant railroad during the Class Period.

One would have to examine such shippers' specific circumstances to determine whether they would have continued to pay a fuel surcharge post-July 2003 regardless of a conspiracy.

## B. Determining Whether Class Members Would Have Had a Fuel Surcharge in a But-For World Requires Individualized Analysis

Given the legitimate factors weighing in favor of the continued use and expansion of fuel surcharges, it is not surprising that Plaintiffs and Dr. Rausser do not propose any method of

identifying those shippers that would have had a fuel surcharge regardless of the alleged

conspiracy. Any attempt to distinguish class members that had a fuel surcharge only because of

the alleged conspiracy from those that would have had one anyway would necessarily require

individualized analysis. Many factors influence whether a customer would pay a fuel surcharge

without a conspiracy and the level of that surcharge. *See Garcia v. Johanns*, 444 F.3d 625, 636

(D.C. Cir. 2006) (affirming denial of class certification of farmers alleging discrimination

because "[t]he USDA denied loans for a variety of reasons . . ."); *cf. Meijer, Inc. v. Biovail

Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008) (affirming summary judgment against a class of

wholesale purchasers of brand name drugs because Plaintiffs failed to show that, but for the

alleged patent misuse, the generic drug would have been approved by the FDA and marketed

soon thereafter).

There are numerous reasons why Plaintiffs cannot make the requisite showing in this

case.

1.    Customers served by only one railroad: There are many shippers that are served

by only one railroad. These shippers might have more difficulty avoiding a fuel surcharge, even

absent a conspiracy. If, as Dr. Rausser says, Defendants' concerns over losing business to their

competitors during the pre-conspiracy period limited each Defendant's ability to unilaterally

impose fuel surcharges, Rausser Rep. 43-44, then the absence of such competition would

eliminate that concern and make a fuel surcharge more likely for such customers regardless of a

conspiracy. By definition, such customers would be hard-pressed to use the threat of

competition from another railroad to avoid their sole-serving railroad's fuel surcharge program.[52]

---

[52]    On the other hand, customers with strong rail or non-rail alternatives might have more
success in negotiating out of a fuel surcharge, depending on other elements of the deal and what
the competition was doing with respect to fuel surcharges.

2.    <u>Customer history of purchasing rail freight</u>:  Shippers that first purchased rail freight after July 2003 have no pre-conspiracy history on which to assess their likelihood of paying fuel surcharges absent collusion.  REDACTED Willig Rep. ¶ 82 n. 35.  Other shippers have a long-standing history of rail freight purchases from Defendants, which could inform what the negotiation would have looked like, and whether it would have resulted in assessment of a fuel surcharge, absent the conspiracy.  Or, such customers may have avoided a fuel surcharge before July 2003 simply because their prior contract was negotiated before Defendants began seeking fuel surcharges. Given Plaintiffs' allegation that the use of long-term contracts (up to five years) was common prior to the conspiracy, CAC  ¶ 89, there are many class members in this category.

3.    <u>Existence of capacity constraints</u>:  Capacity constraints were common during the Class Period.  *See* pp. 15-16 above.  Customers whose freight traveled on lanes that were near or at capacity would be more likely to pay a fuel surcharge in the but-for world even with rail-to-rail competition.  Where they were competing with other shippers for limited rail capacity, customers might have had insufficient bargaining power to avoid a fuel surcharge.  On the other hand, customers shipping freight over lanes with excess capacity might have been able to negotiate a discounted fuel surcharge or no fuel surcharge at all.

4.    <u>Customers whose primary freight alternative was truck</u>:  Such customers would be likely to accept a rail fuel surcharge because trucking companies charged a fuel surcharge.  Customers already paying fuel surcharges to competing transportation alternatives would be unlikely to reject the idea of fuel surcharges by railroads.  Moreover, the fact that the customer's alternative choice included a fuel surcharge would allow a railroad to charge a fuel surcharge and still remain competitive with trucks.  *See* Willig. Rep. ¶ 69.

5.    <u>Customer receptivity to fuel surcharges</u>:  Some shippers were more amenable to fuel surcharges, and thus would have been more likely to agree to a fuel surcharge even with competition among railroads.


REDACTED


Nothing in Dr. Rausser's regressions address the issue of what role, if any, the alleged conspiracy played in causing any shipper to pay a fuel surcharge and whether it would not otherwise have done so.  Even ignoring their considerable methodological errors, *see* Section VI below, his regressions only purport to show what happens, on average, to shippers that pay fuel surcharges.  That says nothing about what caused shippers to pay a fuel surcharge, much less whether they would have paid a fuel surcharge absent the alleged conspiracy, and much less still about how this could be shown by common proof.  Willig Rep. ¶¶ 84, 252.[53]

**C.    There Is No Viable Class-Wide Method for Determining Whether a Class Member's Fuel Surcharge Would Have Been Lower But for the Conspiracy**

The existence of class members that would have paid a fuel surcharge absent the alleged conspiracy makes it impossible to demonstrate injury with proof common to the class.  Plaintiffs

---

[53]    By analogy, Dr. Rausser's regression approach could be used to show that people who took up gambling after a certain date lost money relative to the period before they started gambling.  The regression might show that on average gamblers do poorly, but cannot determine what caused them to take up gambling in the first place.

do not try to remedy this defect by arguing that such class members were nonetheless injured because the conspiratorial fuel surcharges were always higher than they otherwise would have been under competition; nor would such an argument succeed because it would require individual inquiry into the level of but-for fuel surcharges versus the level of conspiratorial fuel surcharges.

Of course, the fuel surcharges paid after July 2003 were higher in dollar terms than those paid before July 2003 because the price of fuel was higher than before. But all four Defendants applied fuel surcharges well before the start of the alleged conspiracy that were similar to those applied during the alleged conspiracy. Willig Rep. ¶¶ 87-88.

REDACTED

REDACTED

### III.     THE FACT THAT THE ALLEGED CONSPIRACY CONCERNED ONLY A PORTION OF THE PRICE PRECLUDES CLASS-WIDE PROOF THAT INFLATED FUEL SURCHARGES, IF ANY, ALWAYS LED TO HIGHER OVERALL RATES

A fuel surcharge is an add-on to a base rate for freight transportation. Payment of a

collusively-imposed fuel surcharge therefore can injure a shipper only if it caused the overall rate

to be inflated above the competitive level. *See Vitamins*, 209 F.R.D. at 266; *Blue Bird Body*, 573

F.2d at 327. Recognizing this, Plaintiffs allege that the purpose of the conspiracy was to raise

the total rate paid for shipping. CAC ¶ 4, 54; *Rail Freight Fuel Surcharge*, 587 F. Supp. 2d at

31-32. Dr. Rausser suggests that the alleged conspiracy was limited in this fashion because

conspiring on a component of price such as a fuel surcharge "is much easier than raising prices

across the board by adjusting base rates," which would be "effectively unmanageable." Rausser

Rep. 51 & 52 n.118.

Given that the alleged conspiracy was directed only at a portion of the total price, any

class member that obtained anything of value in exchange for accepting a fuel surcharge may not

have suffered impact from the alleged conspiracy. The only way to determine whether such a

shipper suffered antitrust injury is to make an individual inquiry as to the value received and the

value given by the shipper. In view of evidence that some (but not all) shippers made trade-offs

for fuel surcharges, the task of determining which class members were injured (because their fuel

surcharge was added to the rate with no corresponding reduction in price or other railroad concession) and which were not injured (because they were able to negotiate a price reduction or other service component that the shipper valued), requires an individualized analysis of hundreds or even thousands of railroad-shipper contract negotiations.

Plaintiffs seek to skirt this problem by citing cases involving conspiracies to fix the entire price of a product. Pl. Br. 69. But these cases are not analogous to the component-price conspiracy Plaintiffs allege here, and in fact substantial case law rejects class certification in an alleged conspiracy to raise just one component of the price.

### A. Plaintiffs Have Not Shown That This Alleged Conspiracy to Fix a Component of an Overall Price Had a Common Impact

A conspiracy to fix a component of a price, rather than the price itself, leaves the participants free to compete against each other based on the total price value package. Here, the alleged conspiracy to fix fuel surcharges still left Defendants free to compete against each other on the basis of overall rates and services because,

REDACTED

They could lower (or not raise) a base rate or provide other value and thereby compete for a customer's business while still adhering to the alleged conspiracy to coordinate and impose fuel surcharges. In contrast, Plaintiffs' cited cases involve an alleged agreement to raise or stabilize *overall* prices at some level, where a participant's failure to maintain its prices at the agreed level would constitute cheating on the conspiracy.

The courts recognize the economic significance of an agreement that affects only a component of an overall price. In reviewing a conspiracy to fix patent royalties, the Fourth Circuit explained that such royalties are mere "components of a comprehensive sales price."

*Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 386 (4th Cir. 1982). Inherent in a non-conspiratorial world "is the possibility that the lump sum [payment] might have been increased to make up for a loss of royalties." *Id*. With lower royalties, the patent holder "would have had a strong economic incentive to increase its portion of the lump-sum [payment]. Whether and to what extent it would have done so are difficult factual issues . . ." *Id*.

The same is true here: had a fuel surcharge been lower or non-existent, each Defendant would have had considerable incentive to raise other portions of the base rate. Conversely, if, as must be assumed for purposes of this motion, there was a conspiracy to fix fuel surcharges (but where any claim that base rates were fixed has been disavowed by Plaintiffs), Defendants sometimes may have lowered base rates to compensate for higher surcharges – thus preserving some measure of competition and, more importantly for present purposes, resulting in the same overall price as if there had been no conspiracy. For this reason, cases alleging conspiracies involving only a component of the overall price face a serious problem on class certification. It is nearly impossible to determine, using common class-wide proof, whether the alleged conspirators never reduced (or failed to raise) other elements of the price and thereby competed on an overall price basis. Indeed, Dr. Willig explains why it is implausible to assume, as Plaintiffs do, that such competition does not occur. Willig Rep. ¶ 122.[54]

---

[54]    Plaintiffs' recent inclusion of shipments subject to "rebasing" is an acknowledgement that what matters is the total price-value proposition. Plaintiffs characterize "rebasing" as the process of renegotiating rates with customers "where some or all of the fuel surcharge was included in the base rate." Pl. Br. 1. Such rebasing proves that customers made trade-offs between base prices, fuel surcharge formulas, and other contract terms.

REDACTED

Courts often have denied class certification because of the need for an individualized inquiry regarding the conspiracy's effect on total prices. In *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004), the court reversed certification of a class of automobile purchasers who challenged an agreement among auto dealers on how they would list an automobile tax. The court rejected the Plaintiffs' theory that the tax was simply added to the purchase price "for every consumer in the class." *Id.* at 423. It concluded:

> Such an assumption defies the realities of the haggling that ensues in the American market when one buys a vehicle. Although some purchasers certainly negotiate a price that excludes taxes, titles, and fees, others negotiate with an eye to the 'bottom line.' Bottom-line purchasers base their negotiations on the *final* purchase price, including every tax, fee, and surcharge.

*Id.* In determining whether a customer purchased based on an overall price, "a court would have to hear evidence regarding each purported class member and his transaction ... [which would] destroy any alleged predominance." *Id.* at 424. If anything, the present case is even more complicated than *Robinson*, as the state-mandated automobile tax there never varied. Here, the actual fuel surcharge assessed can and does vary from shipper to shipper – adding another variable to the negotiation over total price.

Other courts addressing class certification motions in cases alleging a conspiracy to fix a component of an overall price have reached the same conclusion. *See Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) (denying certification of a class challenging textile cleaners' inflated environmental surcharges because "[p]rices and other contract terms may be individually negotiated and cover both the total invoice price and each component of that price" and because some customers "received compensating discounts or offsets"); *Schoenbaum v. E.I. DuPont de Nemours & Co.*, No. 4:05cv01108, 2009 U.S. Dist. LEXIS 114080, at *35 (E.D. Mo. Dec. 8, 2009) (denying certification of class challenging technology fee because of the need to consider "the total cost of a bag of GM seed"); *American Seed Co. v. Monsanto Co.*, 238

F.R.D. 394, 401 (D. Del. 2006) (denying certification of a class challenging restraints on a component of the cost of seed), *aff'd*, 2008 U.S. App. LEXIS 6963 (3d Cir. April 1, 2008).[55]

### B.    Many of Defendants' Customers Traded Fuel Surcharges for Rate Reductions or Other Financial Benefits

There is overwhelming evidence that many of the sophisticated shippers constituting a substantial portion of Defendants' customer base focus on the total value of the overall price/service package and frequently negotiate trade-offs between base rates, fuel surcharge and many other terms of service. Terms and conditions vary significantly from contract to contract and reflect not only different markets, including whether a customer has other rail or non-rail alternatives,[56] but the different preferences of rail freight customers. Defendants' declarants have provided numerous examples of major customers that negotiated items of value to them as part of their contracts that also included their agreement to pay fuel surcharges, including:

REDACTED

---

[55]    The few cases involving allegations to fix the price of a component in which a class has been certified are inapposite. *See In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004). In *Urethane*, the system products were made up overwhelmingly of the alleged price-fixed product, unlike rail freight services of which fuel surcharges are only a small component. 251 F.R.D. at 638. In *Universal*, the defendants' *products* were also fungible, unlike rail freight *services* which are often customized for each customer and vary substantially depending on the commodity being shipped. 251 F.R.D. at 637; 219 F.R.D. at 676. Finally, in *Universal*, the court acknowledged the possibility that individually negotiated contracts could affect its analysis, but defendants failed to provide any evidence that customers negotiated lower surcharges. 219 F.R.D. at 675. In contrast, Defendants here have provided numerous examples of non-uniform surcharges and trade-offs. *See above* section II.B.

[56]    *See* above Sections IV.A-B.

REDACTED

These examples are not trivial exceptions to a rule.[57]  They represent large revenues by

themselves and, more importantly, reflect the diversity of outcomes among negotiated contracts.

REDACTED

---

[57]     *See* Section IV.B-C and the declarations cited therein for additional examples of customers that negotiated fuel surcharges that were lower than the "standard" published fuel surcharges published on Defendants' websites, reflecting their ability to negotiate away the effects of the alleged conspiracy.

REDACTED

Such trade-offs and a focus on the overall rate are not limited to large shippers. Even small shippers,               REDACTED               negotiate rates based on the overall, bottom-line price, not on the level of a component of the total price such as the fuel surcharge.[59] Thus, even if we were to assume that there would have been no fuel surcharges assessed, or that the amount would have been lower, absent the conspiracy, it will be necessary to examine the result of the individual negotiations on a shipper-by-shipper basis to determine whether a particular shipper actually paid a higher total price than it would have. Did the shipper receive a corresponding discount in the base rate in return for the fuel surcharge being assessed? Was the shipper able to negotiate out of volume commitments? If the shipper would have negotiated out of a fuel surcharge altogether in a non-conspiratorial but-for world, would its base rate have nonetheless been higher to meet the market price set by trucks, such that the total price would have been the same? These are the kinds of questions that must be answered before impact can be determined. They are the kinds of questions that render certification inappropriate. [60]

REDACTED

[60]    Class certification is often denied in price fixing cases involving a variety of types and sizes of purchasers with differing levels of bargaining power, based on a lack of predominance. *In re Graphics Processing Units Antitrust Litig.*, ("*GPU*"), 253 F.R.D. 478, 496 (N.D.Cal. 2008); *Burkhalter Travel Agency v. Macfarms Int'l Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991); *Dry*

C.    **Dr. Rausser's Analysis Does Nothing to Negate the Existence**
        **or Effect of These Trade-Offs**

Plaintiffs and Dr. Rausser attempt to address the issue of trade-offs in rate negotiations by asserting that Defendants did not reduce base rates to offset fuel surcharges. Pl. Br. 71. This assertion is flawed for several reasons. First, Dr. Rausser did not find an absence of any base rate discounting; rather, he found "no evidence of *widespread* discounting of base rates." Rausser Rep. 95 (emphasis added). But discounting that results in no injury to those class members that benefited from the discount need not be "widespread" to defeat class certification. It need only be enough to preclude a finding of predominance.[61]


REDACTED


Second, Dr. Rausser's assertion that discounting is not widespread relies on an optical trick. [1]


REDACTED


---

*Cleaning & Laundry Inst. of Detroit v. Flom's Corp.*, No. 91-CV-76072-DT, 1993 WL 527928, *5 (E.D. Mich. 1993) (rejecting expert's proposal to multiply each class member's purchases by percentage of claimed overcharge given varying market conditions, pricing, and discounts). As in these cases, class certification is inappropriate here because the putative class includes a wide variety of types and sizes of shippers that ship under varying competitive circumstances and have widely differing levels of bargaining power. Pl. Br. 1; Allen Decl. ¶¶ 4-5; Cerwonka Decl. ¶ 3; Garin Decl. ¶¶ 3 and 5; Krehbiel Decl. ¶ 4; McNulty Decl. ¶ 4; Piacente Decl. ¶ 3; Willig Rep. ¶¶ 131-151.

[61]    *See* above Section I.B-C.; *Bell Atl. Corp.* 339 F.3d at 302 ("where fact of damage cannot be established for every class member through common proof . . . predominance [is defeated]").

Third, not only are Dr. Rausser's data on base rates presented in a misleading manner, but they suffer the inherent limitations of aggregate data – they cannot show whether there are important variations among class members. If one customer received a reduced base rate in exchange for agreeing to a fuel surcharge while another customer shipping the same commodity received a base rate increase (not surprising with a surging economy and tight capacity), Dr. Rausser's aggregate data would mask the first customer's experience. As noted above, Dr. Willig studied individual transactions,

REDACTED

Fourth, the phenomenon of trade-offs between fuel surcharges and other contract terms creates particular problems for Plaintiffs because, as the evidence shows, negotiations often involve both price and non-price elements. An agreement to improve service or infrastructure or guarantee capacity as part of a package that includes a fuel surcharge[62] will not appear in the transactional data on which Dr. Rausser relies for his "common factors" model. Rather, such agreements can be identified only by examining the individual negotiations and then must be analyzed by identifying and placing a dollar value on non-price elements of rail transportation contracts. Assigning value to non-price terms is often difficult for the parties to the negotiation. Determining whether the all-in price/value of a commercial agreement is higher or lower than it would have been absent the alleged conspiracy is impossible to do on a class-wide basis.

---

[62]    *See* Allen Decl. ¶ 3, 11; Cerwonka Decl. ¶ 7-8; Garin Decl. ¶ 7-10; Gehl Decl. ¶ 7; Jenkins Decl. ¶ 11; Krehbiel Decl. ¶ 2-4; Listwak Decl. ¶ 20; McNulty Decl. ¶ 8-9, 16; Pagan Decl. ¶ 5, 8; Piacente Decl. ¶ 9; Strok Decl. ¶ 10-11.

In short, the realities of the railroad business make it clear that determining the impact of an alleged conspiracy to fix a component of railroad rates, as Plaintiffs allege here, would require many separate inquiries into the railroad-shipper negotiations that resulted in the overall value of a commercial negotiation. In *Robinson*, the court found that car buyers had enough savvy and incentive to sometimes negotiate away any effects of a conspiracy on a component of the sales price. Here, the customers include many of the nation's largest corporations – including named Plaintiff Olin – with enormous sums at issue in their rail freight contracts. They have teams of dedicated transportation/logistics specialists responsible for negotiating deals sometimes involving hundreds of millions of dollars. Sophisticated corporations such as REDACTED do not overlook the opportunity to negotiate some improvement in their overall rates in the face of higher fuel surcharges. As in *Robinson*, the ability of Defendants to compete on overall rates means that railroad-shipper negotiations will have to be considered individually to determine whether shippers were injured. Such individual inquiries will predominate over any common proof of injury, requiring denial of class certification.

## IV. PLAINTIFFS' METHODOLOGY FOR ESTABLISHING ANTITRUST INJURY IS NOT VIABLE, AS IT RELIES ON FALSE ASSUMPTIONS ABOUT RAIL MARKETS

Plaintiffs proffer only Dr. Rausser's report to show that they can establish antitrust injury on a class-wide basis. But Dr. Rausser relies on a false set of assumptions about the rail industry, making his analysis fatally flawed.

### A. There Is No Viable Method for Showing Common Impact for Markets in Which Defendants Do Not Compete

As discussed in Section A.1 of the Statement of Facts above, according to independent estimates, government sources, shippers, Dr. Rausser's maps,          REDACTED   many

freight movements do not have rail-to-rail competition.[63] Any theory of class-wide injury from an alleged loss of competition must show that all class members would have benefited from competition among Defendants in the absence of the conspiracy, *i.e.*, in the but-for world. Because that is not possible in the railroad industry, Dr. Rausser's mere assumption of pervasive rail-to-rail competition renders his analysis inapposite.

The law recognizes that where there is no competition, an alleged "conspiracy" cannot be found to reduce it. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5-6 (2006) ("These cases do not present such an agreement, however, because Texaco and Shell Oil did not compete with one another in the relevant market"); *Wilson v. Mobil Oil Corp.*, 940 F. Supp. 944, 954 (E.D. La. 1996) ("SpeeDee's alleged agreement with Mobil does not eliminate price competition between them because there was no competition between them to eliminate."); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998) (dismissing antitrust claim where Plaintiff could not prove that, but for the alleged conduct, there would have been a competitive alternative electricity supplier). Thus, customers served by only one railroad would not be injured by the imposition of an alleged conspiratorial fuel surcharge because the sole-serving railroad is not being constrained by another railroad in the but-for world. The sole-serving railroad may be constrained by motor carriers or other modes of freight transportation, but the presence or absence of a conspiracy solely among railroads cannot be the cause of injury. *See* above Statement of Facts, Section A.2. The only reasonable assumption for such markets is that the alleged conspiracy had no widespread effect on prices. *Id.*

---

[63] *See* above n.12.

REDACTED

There is also no easy way to identify all customers who can only be served effectively by one Defendant. The identification problem is twofold. First, there is no database that contains a list of facilities served by a single railroad and thus no way to sort through the thousands of rail customers and millions of rail moves to determine which ones involved a solely-served facility. Second, the mere existence of two railroads serving one facility does not mean that the shipper has access to effective rail-to-rail competition.

REDACTED [64]

The only way to determine the existence of such competition is by individual inquiry.

Dr. Rausser argues that various strategies may mitigate the absence of rail-to-rail competition. Rausser Rep. 14-15. He cites no support for any of those propositions. For example, his assertion that the "threat" of potential entry by a new railroad restrains pricing by a railroad that has no physical rail competition is contrary to a wealth of literature (including frequent shipper statements and testimony before Congress and the STB), STB and court decisions, and government reports concluding that build-out threats are often unrealistic.[65] In a

---

[64]    PD Ex. 5, Kaplan Dep. 32:3-34:7.

[65]    *See CSX Transp., Inc., v. STB*, 568 F.3d 236, 238 (D.C. Cir. 2009) rev'd on other grounds, 584 F.3d 1076 (D.C. Cir. 2009); *Tex. Mun. Power Agency v. The Burlington N. & Santa Fe Ry. Co.*, STB Dkt. No. 42056, 2003 WL 1523335, at n.10 (S.T.B. March 21, 2003) ("The feasibility study noted a number of contingencies and environmental obstacles that could either increase that cost or preclude construction. These included: additional track or other facilities to prevent obstruction of the entry road to the station; purchase of additional right-of-way in order to maintain existing roadways; proximity of large, privately owned ranch to the planned route; Texas Department of Transportation design plans for highway crossings; prospective need for highway modifications; need for facilities to connect the spur to the UP main line; contingencies concerning wetlands and navigable waterways permits, including Clean Water Act permits incidental to construction of a crossing over the Navasota River; and need to investigate and deal with cultural, archaeological and endangered species habitat sites identified but not yet studied."); *Id.* at *3 (recognizing that while "specific build-outs have provided effective competitive options for utilities in certain instances, [the STB] cannot conclude from this record that the potential for a buildout poses an effective competitive constraint for the issue traffic here,"); *W. Tex. Utils. Co. v. Burlington N. R.R. Co.*, 1 S.T.B. 638, 651 (1996) (determining

study commissioned by the STB, Christensen Associates noted that "[s]ome shippers are truly

captive because of factors such as geographic location and/or low shipper density."[66]   In reality,

building a rail line is expensive,[67] and there may be physical and environmental issues – such as

the presence of urban areas, mountains, rivers, and wetlands – that must be examined on a case-

by-case basis to determine whether a build-in or build-out is actually feasible.  The STB's

decisions in rail rate cases further refute Dr. Rausser's assumption that build-ins and build-outs

are a universal threat.[68]   Moreover, circumstances may dictate that no railroad will make the

expansion because the customer's facility does not ship enough to justify the investment.[69]

Thus, even when building a new rail line is possible, whether the construction could be

done sufficiently quickly and economically to prevent an incumbent railroad from exercising

market power depends on many individualized factors.

REDACTED

Dr. Rausser's blanket assertion that the threat of such expansion

always precludes the exercise of market power is unsupportable.

REDACTED

---

build-out threat was unrealistic because of its high cost and limited benefit); *see also* PD Ex. 45
*Freight Railroads: Industry Health Has Improved, but Concerns about Competition and
Capacity Should be Addressed*, GOA at 22 (Oct. 2006) ("Because even a short segment build-out
can be quite costly, shippers are unlikely to pursue build-out options without a substantial traffic
base"); PD Ex. 46 Salvatore Massa, *Surface Freight Transportation: Accounting for Subsidies in
a "Free Market,"* 4 N.Y.U. J. Legis. & Pub. Pol'y 285 (2001).

[66]      PD Ex. 4, Christensen Study, at ES-41.

[67]      Rausser Rep. 26 (it costs $2.5 million per mile just for the tracks).

[68]      *See* above n.65.

[69]      PD Ex. 47,  *Rail Capacity and Infrastructure Requirements,* (Testimony of Jeffrey Shane,
Deputy Sec'y of Transp.) S.T.B. Ex Parte 671, 5 (Apr. 11, 2007); Rausser Dep. 237:13-238:10.

REDACTED

Because many shippers are sole-served (do not benefit from direct rail-to-rail competition) and individual inquiry is necessary to determine who they are, there is no viable method for proving injury with common evidence.

**B.     There Is No Viable Method of Showing Common Impact for Markets Where Truck Pricing Is the Determining Factor for Rail Pricing**

Any attempt to prove impact or damages on a class-wide basis also fails in light of the multitude of lanes where the Defendants could not raise prices because of truck competition. The STB has exempted certain traffic from regulation based on a determination that market competition – primarily from motor carriers – is so strong that regulation is unnecessary.[71] 49 U.S.C. § 10502.  Dr. Rausser's conclusion (and premise of his regression analysis) that railroads could conspire to raise rates on exempt traffic without fear of losing the traffic to motor carriers, Rausser Rep. 26, is directly at odds with the findings of the agency responsible for the economic regulation of the rail industry, with the testimony of railroad marketing personnel (*see, e.g.*, Cerwonka Decl. ¶¶ 5-6, McGregor Decl. ¶ 16), and with the daily actions of traffic

---

[70]     *See* above n.12.

[71]     *See Improvement of TOFC/COFC Regulations (Railroad-Affiliated Motor Carriers and Other Motor Carriers)*, Ex Parte No. 230 (Sub-No. 6), 3 I.C.C. 2d 869, 881 (1987) ("rates are strictly controlled by truck [and presumably also rail-truck] competition."); *Exemption From Regulation – Boxcar Traffic*, Ex Parte No. 346 (Sub-No. 8), 367 I.C.C. 425 (1983)  (Because of truck competition, "the market itself places an effective ceiling on rail rates for boxcar transportation, and regulation is unnecessary to assure that boxcar rates do not rise to unreasonably high levels.").  *See also* additional ICC/STB exemption decisions at above n.17.

managers throughout the United States who routinely play trucks against railroads to get the best deal for their companies.  This exemption covers all intermodal traffic and much carload traffic.

REDACTED                          Lawson Decl. ¶ 23.

Independent analyses[72] and shipper surveys[73]  confirm the STB's determination that truck pricing constrains many rail rates.  These studies contrast starkly with Dr. Rausser's made-for-litigation conclusion that competition from trucks and water freight cannot stop railroads from collusively raising prices.  Rausser Rep. 131-34.

REDACTED

As Dr. Willig explains, no common evidence can show that no (or only few) class members enjoy sufficient non-rail competition to defeat any attempt by the railroads to raise prices through collusion.  Willig Rep. ¶¶ 144-51.  Dr. Rausser's evidence is at a much too aggregated level to address such individualized issues.  The presence of such alternative forms of competition preclude class-wide proof of injury.  *See In re Agric. Chem. Antitrust Litig.*, No. 94-40216-MMP, 1995 WL 787538, at *11 (N.D. Fla. Oct. 23, 1995) ("[I]t is 'factually unrealistic' to presume that all purchasers paid inflated prices when local competitors not involved in the conspiracy were available as alternative sources of supply.").  Dr. Rausser's failure to account for competition from other modes that are not alleged to have conspired renders his methodology nonviable.

---

[72]    *See* PD Ex. 4, Christensen Report at 15-1 ("Railroad shipments of containers and truck trailers may compete with highway and/or water transportation alternatives."); *Id.* at 15-9 ("[G]iven the evidence of water competition constraints and the cost advantages enjoyed by all-truck movements for shorter lengths of haul, it is likely that the railroad industry's pricing power is limited by competition from other modes.")

[73]    *See, e.g.*, PD Ex. 48, JP Morgan, *Railroad Shipper Survey* 17 (June 9, 2006) ("Almost 70% of shippers in our survey could move a minority of their business to truck (41% could shift up to one quarter and 29% could shift one quarter to one half)").

**C.    There Is No "Uniform" or "Standard" Class-Wide Fuel
Surcharge That Could Demonstrate Common Impact**

Plaintiffs contend that Defendants conspired to apply a "uniform" fuel surcharge.

REDACTED

It is an undisputable fact that the Defendants used dozens of fuel surcharges during the

Class Period.

REDACTED

Many of Defendants' customers negotiated fuel surcharges that were lower than the

"standard" published fuel surcharge shown in the Complaint.  For example:

REDACTED

---

[74]    PD Ex. 49, Excerpt of back up data to Rausser's Report.

REDACTED

Even fuel surcharges paid by individual customers or similar types of customers varied

widely.

REDACTED

This diversity of fuel surcharges precludes common proof of injury because any analysis

of impact must look to the specific provisions of a customer's actual fuel surcharge, consider the

---

[75]    These are large customers, accounting for hundreds of millions in annual revenue to NS.
*See* Listwak Decl. ¶¶ 7, 17.  For additional examples, *see* Defendants' declarations.

trade-offs made by the customer in the course of negotiating its fuel surcharge and compare the resulting all-in price to the result that would have occurred in the but-for world.

## V.    PLAINTIFFS' CASES ARE INAPPOSITE

Plaintiffs rely on several cases from this District, nearly all of which involve vitamins and generic pharmaceuticals. Those cases did not involve the type of industry, with its individualized complexities, present here.

First, in each of the cases on which Plaintiffs rely, a determining factor in the class certification analysis was that the antitrust claims involved fungible commodities. *Nifedipine, Meijer,* and *Lorazepam* each involved generic and branded versions of a particular drug, which by law are bioequivalent, and thus are perfect substitutes for each other. *Nifedipine,* 246 F.R.D. at 368; *Meijer,* 246 F.R.D. at 295; *Lorazepam,* 202 F.R.D. at 15-16. In *Vitamins,* one proposed class consisted of a single fungible commodity; a second proposed class included approximately one dozen bulk vitamins, each of which was "an undifferentiated, commodity-like product." 209 F.R.D. at 264, 267 n.17.

The contrast with the facts of this case is striking. Defendants here do not provide a product, much less a fungible commodity. Rather, Defendants provide the majority of their services pursuant to contracts that reflect the diversity of rail customers and are highly differentiated, varying by customer, lane, equipment, product being shipped, and numerous other factors.

Courts routinely deny class certification in price-fixing actions where there are a variety of markets, customers and pricing factors, because common issues do not predominate. *Blades,* 400 F.3d at 573-74; *Reed,* 2009 WL 3146999, at *18-19; *Exhaust,* 223 F.R.D. at 513; *GPU,* 253 F.R.D. at 496; *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 679 (5th Cir. 1982); *Weisfeld,* 210 F.R.D. at 145 (D.N.J. 2002); *Kenett Corp. v. Mass. Furniture & Piano Movers*

*Ass'n Inc.*, 101 F.R.D. 313, 316 (D. Mass. 1984); *Burkhalter Travel Agency v. MacFarms Int'l Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991).[76]  In such circumstances, individualized evidence is necessary to construct hypothetical competitive prices that would have existed but for the alleged conspiracy. *Blades*, 400 F.3d at 574; *Exhaust*, 223 F.R.D. at 513.

The *Blades* court, for example, denied class certification because of differences among class members with respect to multiple competitive factors:

> "[T]o show injury from price inflation, each plaintiff would need to present evidence that the list prices of the seeds he purchased, not just some or even most of the hundreds of list prices on [defendants'] price list, were inflated. . . . [B]ecause of the variety of hybrids and the varying factors affecting list prices, the construction of hypothetical competitive prices would require evidence that varied among hybrids and perhaps across geographical pricing regions."

400 F.3d at 573-74.  In *Exhaust*, the court held that "[c]ommon proof of actual injury to each class member requires that all class members operate in the same relevant market, otherwise, they could not be affected in a common manner." 223 F.R.D. at 513.  The court found that common issues did not predominate because members of the putative class bought a variety of products and services at different times in many different local markets.  The court further found a lack of common issues because "the but-for-price – what a customer would pay in an unrestrained market – would . . . vary over time, reflecting changes in competitive dynamics,

---

[76]  *See also Alabama v. Blue Bird Body*, 573 F.2d 309, 328 (5th Cir. 1978) (variety of local school markets); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 67 (4th Cir. 1977) (variety of local leaf tobacco auction markets); *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, No. H-05-3394, 2008 WL 7356272 at *16 (S.D. Tex. Nov. 24, 2008) (variety of local funeral markets); *Wheeler v. Pilgrim's Pride Corp.*, 246 F.R.D. 532, 541 (E.D. Tex. 2007) (variety of local chicken processing markets); *Butt v. Allegheny Pepsi-Cola Bottling, Co.*, 116 F.R.D. 486, 491-92 (E.D. Va. 1987) (variety of customers, transactions and products); *In re Beef Industry Antitrust Litig.*, No. M.D.L. Dkt. No. 248, 1986 U.S. Dist. LEXIS 24731 at *5 (S.D. Tex. June 3, 1986) (variety of factors have an impact on beef prices actually paid); *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 548 (E.D. Pa. 1976) (variety of local car rental markets).

customer need, supplier costs, and other factors affecting market price, and would depend on the mix of products and services being considered." *Id.*

In *Reed*, plaintiffs alleged that defendant hospitals operating in the Chicago area conspired to suppress the wages of their registered nurse ("RN") employees.[77] The court held that common questions of impact did not predominate in light of the "substantial variation in the compensation of the individual RNs." 2009 WL 3146999, at *18. For example, with respect to average annual base wage increases, some class members received no pay increase, some received increases of over 15%, and still others had percentage increases which varied greatly among the defendant hospitals. *Id.* Moreover, the factors affecting base wages for registry nurses, who made up approximately 20% of the putative class, were different from those affecting other class members' wages, yet plaintiffs in *Reed* – and their expert Dr. Rausser – offered no method for determining injury for this category of proposed class member that differed from that offered for all others. *Id.* at *19.

In *Nichols*, the Fifth Circuit affirmed the district court's decision decertifying a class of home builders who paid a commission or fee to real estate brokers in Mobile County, Alabama, agreeing with the district court's finding that the product market of "real estate brokerage services" involved a "diversity of factors determining the brokerage commissions" such that "questions common to the class [did] not predominate over questions affecting only individual class members." 675 F.2d at 676-77.

The *Kenett* case is similar to this case in that it involved alleged price-fixing in a transportation service industry, in that case, the moving of household goods and office

---

[77]     Dr. Rausser was the plaintiffs' expert in *Reed*, and the court rejected his methodology as failing to meet the demanding standards of Rule 23. *See* further discussion of *Reed* in Section VI, below.

equipment. The court in *Kenett* rejected plaintiffs' argument that "the product at issue be viewed

homogeneously as simply moving services, rather than as a unique bundle of diverse services."

101 F.R.D. at 316-17. Instead, the court found that "because the exact mix of services purchased

by each customer is unique, proof of impact can only be made on an individual basis." *Id.*

at 316. The contracts submitted here reveal that rail service contracts, like the moving services

contracts in *Kenett*, are anything but homogenous. *See, e.g.,* Bolander Decl. ¶ 20, Ex. 4; Kiley

Decl. ¶ 11, Ex. 3; Listwak Decl. ¶¶ 17-23, Ex. 3.

Second, the question of causation addressed in Section II above is not present in

Plaintiffs' cases. For example, *Nifedipine* and *Meijer* involved claims that defendants conspired

to keep generic drugs out of the market. The pricing structure of pharmaceutical markets and the

effects of generic competition have been the subject of many studies, which demonstrate that the

entry of generic competition drives down prices for both branded and other generic competitors.

*Meijer*, 246 F.R.D. at 308-09; *Nifedipine,* 246 F.R.D. at 370 & n.6. The courts in those cases

concluded that such evidence of higher prices caused by the lack of generic competition

constituted a viable method of showing impact on a class-wide basis, without the need to weigh

dueling expert reports. *Meijer*, 246 F.R.D. at 309; *Nifedipine,* 246 F.R.D. at 370. Here, unlike

FDA rules under which a drug either is marketable or it is not, there is no clear line of

demarcation –

                                    REDACTED

                                                    There can be no class-wide proof of

causation.

Third, the issues addressed in Section III above, regarding the fact that the conspiracy

involved only the fuel surcharges, which were generally a relatively small portion of the total

price, are also absent in the drug cases. *Vitamins* involved a conspiracy on the entire price of the

product. Generic exclusion cases such as *Meijer* and *Nifedipine* involved efforts to keep the entire generic drug out of the market, and *Lorazepam* involved an effort to monopolize the supply of generic drugs, which affect the total sale price of the product.

## VI.    DR. RAUSSER'S METHODOLOGICAL FAILURES RENDER HIS REPORT UNRELIABLE

### A.    Dr. Rausser Inappropriately Relies on Averages

Dr. Rausser relies exclusively on averages and aggregated data, a practice that has already been rejected by another court. The fundamental question for class certification is whether what is true for the named Plaintiffs is also true for all (or nearly all) of the absent class members. Reporting average statistics cannot answer that question. Yet, that is all that Dr. Rausser does. Literally every statistic, figure, table and chart in his report aggregates many class members. He never reports data for individual shippers, such as the class representatives. If one-quarter of the proposed class suffered no injury at all and the remaining three-quarters paid a 10% overcharge, Dr. Rausser would report an average overcharge of 7.5%. He would then assert that the 7.5% figure applies to the class as a whole. Clearly it would not.[78]

The law rejects the use of averages for this purpose. *See Reed*, 2009 WL 3146999 at *18 ("Dr. Rausser's [] use of averages . . . unacceptably masks the significant variation among putative class members"); *see also In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) (denying class certification and criticizing expert's use of averages because it "obscures individual variations over time among the prices that different customers pay for the same or different products that appear in the data."). It is

---

[78]    The inherent flaw in relying on averages to show effects on individual components of the average is fairly obvious: If, for example, the average sale price of housing in a metropolitan area went up by 10%, the price of some houses may have gone up by 30% and others may have actually gone down. The average price therefore provides no information about what happened to the price of any particular house. *See also* Willig Rep. ¶¶ 215-17.

insufficient for an expert to simply assume that what is true on average is necessarily true for each class member.  Instead, Plaintiffs must actually test that hypothesis by looking at the specific factual details to see whether they reveal commonality or differences across class members.

Dr. Willig has done exactly that.  While Dr. Rausser assumes that the averages are representative of the experience of individual shippers, Dr. Willig actually tests that assumption and disproves it.

REDACTED

**B.      Dr. Rausser's Regression Models Cannot Show Class-Wide Injury or Damages**

Dr. Rausser has two regression models, neither of which meets Plaintiffs' burden of showing that injury or damages can be proved with common evidence.[79]

**1.      Dr. Rausser's "Common Factors" Model**

Dr. Rausser's common factors model attempts to show that several factors explain much of the variation in price among rail shipments.  Rausser Rep. 92-94.  That model has several flaws.

REDACTED

---

[79]      A regression is only as good as its assumptions and application to the specific facts. *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. Appx. 296, 299-300 (5th Cir. 2004) (stating that "[m]ultiple regression analysis is not a magic formula," and affirming denial of class certification motion where plaintiffs' model did not control for individual pricing factors); *Reed*, 2009 WL 3146999 at *19 (rejecting regression analysis by Dr. Rausser as flawed); *GPU*, 253 F.R.D. at 493-96 (rejecting regression that omitted relevant variables and relied on averages rather than individual customer data).

REDACTED

Second, the model attempts to explain variations in overall rail rates. *Id.* at 92.

Dr. Rausser does not even attempt to explain how a model focused on overall rates could be used

to assess the impact of a component of the overall rate, such as the fuel surcharges that are the

alleged source of injury here.

REDACTED

That is probably true of the products or services involved in virtually every antitrust case

where class certification was denied. For example, plaintiffs in *Robinson* could have shown that

a car's overall price is significantly affected by whether it is a BMW or a Kia. That would not

change the fact, found by the Fifth Circuit, that variations in customers' negotiating strategies

preclude class-wide proof that a conspiracy on a portion of the price caused all customers to pay

higher overall prices. Here, the fact that                             REDACTED

                              , says nothing about whether the conspiracy caused all class

members to pay a fuel surcharge they otherwise would not have paid or how that fuel surcharge

compared to whatever cost recovery mechanism would have been used instead.

Third, Dr. Rausser offers no accepted benchmark for judging his results.

REDACTED

REDACTED

*See Reed*, 2009 WL 3146999, at \*19 (Dr. Rausser's regression explaining 51-97% of wage variation "falls far short of satisfying plaintiffs' legal burden . . . Dr. Rausser's regression is plainly too imprecise.").

Finally, Dr. Rausser's common impact model looks only at a snapshot in time – 2006 – and thus cannot examine changes in rates over time. Willig Rep. ¶ 213. Consequently, the common factors model tells the court nothing about what factors would have an effect on rates over time. Dr. Rausser compounds this error by predicating his damages model, which purports to cover changes over time, on the common factors model, which is static. That renders both models useless.

### 2.      **Dr. Rausser's Damages Model**

Dr. Rausser estimates aggregate damages through a regression that compares overall rail rates before and after July 2003. This is not a model of injury causation, nor does Dr. Rausser claim otherwise. Rausser Dep. 142:3-143:20. Like his common factors model, the damages regression cannot show whether a shipper paid a fuel surcharge *because* of the conspiracy or would have paid one anyway. The model simply assumes causation and then attempts to quantify the damages.

First, the model cannot be used on a class-wide basis.

REDACTED

Willig Rep. ¶ 273; *see also Reed*, 2009 WL 3146999, at \*21 (Dr. Rausser's "'percentage wage suppression' formula unacceptably relies on averages. It fails to account for the host of factors that affects RN wages. Dr. Willig's criticisms . . . are well-taken").

REDACTED


Willig Rep. ¶ 241; *see also Reed*, 2009 WL

3146999 at *19 (rejecting Dr. Rausser's analysis due to its "high error rate").

Second, Dr. Rausser's damages model yields nonsensical results.




REDACTED

### C.    Dr. Rausser Fails To Specify a But-For World

To establish class-wide injury, Plaintiffs must identify a plausible "but for" alternative world and compare prices in that world to the actual prices paid by putative class members. *Blades*, 400 F.3d at 574; *In re GPU*, 253 F.R.D. at 499; *Meijer*, 246 F.R.D. at 310 ("Plaintiffs must show there is a viable method by which to establish the 'but-for' price as to the [products] in the alleged conspiracy").[80]  Absent a clearly identified but-for world, there is no basis to say whether prices would have been lower across-the-board.

Defining a but-for world is particularly important given the nature of this case. In the typical price-fixing situation, defendants are accused of raising the price of a product by some agreed-upon amount or percentage. The difference between the actual price and the but-for price is calculated with reference to readily quantifiable price levels, and there may be a basis for presuming that there would have been no price increase absent the agreement to raise prices.

Here, Plaintiffs allege something quite different. They accuse Defendants of using rate-based fuel surcharges that resulted in higher overall prices. Given the unprecedented increase in fuel costs, which even Dr. Rausser concedes would have led to increased prices, the logical question is what price strategy supposedly would have been used in lieu of the rate-based fuel surcharges. In contrast to a simple reduction in price in the typical price-fixing case, alternative fuel pricing strategies affect class members in very different ways and the Court cannot simply assume – as Plaintiffs would like it to – that a mechanism that might have been chosen but for the conspiracy would always yield a lower fuel surcharge. Rather, Plaintiffs must posit an

---

[80]    *See also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007); *In re NCAA I-A Walk-On Football Players Litig.*, No. C 04-1254C, 2006 U.S. Dist. LEXIS 28824, *37-38 (W.D. Wash. 2006); *Exhaust*, 223 F.R.D. at 513; *Sample v. Monsanto*, 218 F.R.D. 644, 651 (E.D. Mo. 2003).

alternative and demonstrate that it would yield a lower charge for all (or nearly all) members of the class. That is the rigorous analysis required by *Falcon*.

REDACTED

. There is some suggestion in the Complaint that at one point Plaintiffs may have thought that Defendants should have used a mileage-based fuel surcharge, but Plaintiffs have not pursued that. The reason becomes clear when data are reviewed.

REDACTED

Such a result precludes common proof of injury to all class members and shows the fundamental conflict among class members. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) ("To our knowledge, no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class.").

REDACTED

But, as a matter of basic economics, companies are not in business to break even; they are in business to make a profit. As the court stated in *LTL Shipping*, 2009 U.S. Dist. LEXIS 14276, at *69, "Defendants are entitled to generate profits on fuel surcharges by charging more than their incremental increases in fuel

81

REDACTED

68

costs, so long as Defendants do not illegally conspire to do so."

REDACTED

Thus, whether Defendants recovered more than their incremental fuel costs says nothing about whether they conspired to do so.

     In any event, Dr. Rausser has not supported his argument with any demonstration that Defendants over-recovered on a class-wide basis or offered any methodology to determine over-recovery with common proof.

REDACTED

Willig Rep. ¶¶ 282-83, Figures 50-52.

**D.**    **Dr. Rausser Offers No Method to Determine What Part of a "Rebased" Rate Was Caused by the Conspiracy Rather Than Changes in the Market**

     Plaintiffs' effort to amend the class to include not only "separately identified" fuel surcharges alleged in the Complaint but also "rebasing" is a concession that railroads could raise prices without using a fuel surcharge. It also makes class-wide proof of injury impossible

---

82

REDACTED

because there is no way to determine what portion of a change in price from a rebased rate is a product of the alleged conspiracy and what portion is a product of changed market conditions.[83] An element of a new base rate for transportation intended to cover increased fuel costs is not a fuel surcharge at all and it is not encompassed within the allegations of the Complaint here, which purports to allege a conspiracy to impose stand-alone uniform fuel surcharges.

Moreover, taking account of fuel costs in the negotiation of a base rate requires each party to consider in advance the risk it is taking by "locking in" a base rate that will not respond to changes in fuel prices as a separate fuel surcharge would. Dr. Rausser offers no methodology whatsoever, much less one based on class-wide evidence, to determine which customers were rebased or how much of the change in the base rate was formerly a fuel surcharge and how much was an adjustment of price to reflect underlying changes in markets.

### E.    Dr. Rausser Mischaracterizes the Market

In addition to his mischaracterizations of the market discussed in the preceding sections, Dr. Rausser also incorrectly asserts that this market is susceptible to effective collusion because

REDACTED

---

[83]    Plaintiffs define "rebasing" as the process of renegotiating rates with customers "where some or all of the fuel surcharge was included in the base rate." Pl. Br. 1.

REDACTED

Figure 6 summarizes Dr. Rausser's mischaracterizations of the market:

**Figure 6**

REDACTED

REDACTED

These errors infect not only Dr. Rausser's approach to the issues in Sections II-IV above, but invalidate his report altogether.

**VII.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE INDIVIDUAL ISSUES AS TO DAMAGES TO EACH CLASS MEMBER PREDOMINATE OVER ANY COMMON ISSUES**

Even if it were somehow possible for Plaintiffs to show some injury to all class members through common evidence, the complications of the individualized proof of damages here preclude class certification.  Individual issues of damages cannot be avoided by an aggregate award of damages.  "Such a method of computing damages in a class action has been appropriately branded as 'illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper.'"  *Windham*, 565 F.2d at 72 (internal citations omitted). *Accord, e.g., Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305-06 (9th Cir. 1990) (Rule 23 does not permit "dispensing with individual proof of damages"); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 317-19 (5th Cir. 1998).

Rather, Plaintiffs must provide a just and reasonable estimate of damages based on relevant data that accounts for "the vast differences" in class members. *Bell Atl.*, 339 F.3d at 306. "[W]here the issue of damages 'does not lend itself to . . . mechanical calculation, but requires separate mini-trial[s] of an overwhelmingly large number of individual claims,' the need to calculate individual damages will defeat predominance" and render class certification inappropriate. *Id.* at 307 (quoting *Windham*, 565 F.2d at 68 (internal quotations omitted); *Does I through III v. District of Columbia*, No. 01-02398, 2006 WL 2864483, at *3 (D.D.C. Oct. 5, 2006). Damages may not be determined by speculation. *Bell Atl.,* 339 F.3d at 303; *Piggly Wiggly*, 215 F.R.D. 523, 530 (E.D. Tex. 2003), *aff'd*, 100 Fed. App'x. 296, 299-300 (5th Cir. 2004).

In most price-fixing cases, plaintiffs propose to calculate a standard overcharge percentage, which is then applied to all class member purchases. Thus, the only individualized task is to tally up a class member's purchases, which are then multiplied by the common overcharge percentage. Here, determining individual damages requires, among other things: (1) the class member's actual fuel surcharge payments, (2) the but-for fuel cost recovery that would have applied to that class member in light of its specific competitive situation, including both the timing of when that fuel surcharge would have been added and its terms, and (3) other adjustments to the base rate or non-rate elements of the contract that were made as part of the negotiations to add the fuel surcharge. These are all individualized determinations that are necessary to a reasonable estimate of damages. These involve judgment calls for a jury, not simple ministerial calculations.

Dr. Rausser's damages model does not account for any of these elements and therefore cannot be used to estimate an individual class member's damages. Certification should be

denied on that independent basis. *See Piggly Wiggly*, 215 F.R.D. at 530-31 (denying class

certification because some class members negotiated prices in a bidding process, leading to

individualized pricing factors, for which Plaintiffs' proposed regression model did not control).

## VIII. CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE PROPOSED CLASS ACTION IS NOT THE SUPERIOR METHOD OF RESOLVING THESE CLAIMS

A class action must be superior to all other methods of adjudicating the case. Fed. R.

Civ. P. 23(b)(3). It is not enough for a class action to be "as good as" other litigation means.

*Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975); *see Newton v. Merrill

Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001) (class action must be the

"best" method). As with other requirements of Rule 23, the burden is on Plaintiffs to

demonstrate that a class action is superior, not upon Defendants to devise a more suitable

litigation approach. *Does I through III*, 2006 WL 2864483, at *5; *Ryan v. Eli Lilly & Co.*, 84

F.R.D. 230, 234 (D.S.C. 1979). Class action is inferior where individual issues predominate.

*See, e.g., McCarthy*, 741 F.2d at 1415 (affirming finding that class action was not superior where

issue of liability turned upon highly individualized facts); *Walsh*, 130 F.R.D. at 277 (class action

was not superior where individual factual and legal issues predominated, making the "difficulties

in managing [the] case . . . inevitable and insurmountable."). "The greater number of individual

issues, the less likely superiority can be established." *Williams v. Glickman*, No. Civ. A 95-1149

(TAF), 1997 WL 33772612, at *11 (D.D.C. Feb. 14, 1997) (citing *Castano v. Am. Tobacco Co.*,

84 F.3d 734, 745 n.19 (5th Cir. 1996)). Here, as in *McCarthy*, *Walsh*, and *Williams*, a class

proceeding would be inferior because individual issues of law and fact predominate with respect

to injury and damages as set forth above.[85]  That is especially true given the large size of many class members, who have no need for a class action.

## IX.  CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE CLASS DEFINITION RENDERS CLASS MEMBERSHIP DIFFICULT, IF NOT IMPOSSIBLE, TO DETERMINE

Plaintiffs' class definition renders determining which shippers would actually be in the proposed class extremely difficult, if not impossible.  A class "must be sufficiently definite 'that it is administratively feasible for the court to determine whether a particular individual is a member.'"  *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C 1998) (quoting 7A Wright & Miller, Federal Practice & Procedure § 1760 at 121).  Thus, "[a] court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too administratively difficult."  *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003).  Here, determining class membership is difficult for at least two reasons, either of which renders class certification inappropriate.

### A.  There Is no Easy Way to Determine Whether Traffic Is "Rate-Unregulated"

The proposed class is limited to "rate-unregulated" traffic.  But it can be difficult to discern whether traffic moves under an unregulated contract or a regulated common carrier price authority.  Rather, "[t]he issue of whether a rate is a contract rate or common carriage rate has been examined on a case-by-case basis *in light of the parties' intent*."  *Rail Transp. Contracts Under 49 U.S.C. 10709*, STB Ex Parte No. 669 (Dec. 30, 2008) (citation omitted) (emphasis added).  Despite proposals to establish objective criteria, the STB "continue[s] [its] current

---

[85]    Plaintiffs' trial plan solves none of the problems of individualized issues which predominate. Rather, the trial plan assumes that issues of injury and damages can be proven with common evidence.  As shown in Section X, below, because that assumption is wrong, the trial plan is irrelevant.

practice of deciding whether a disputed rail rate is [regulated] . . . on a case-by-case basis." *Rail Transp. Contracts Under 49 U.S.C. 10709*, STB Ex Parte 676 at 2 (Jan. 21, 2010). The ambiguity in determining whether a rate arrangement is within the STB's jurisdiction has precipitated several disputes. *See, e.g., DuPont v. CSX*, STB Dkt. Nos. 42099, 42100, 42101, 2007 WL 4466694 (Dec. 17, 2007); *Kansas City Power & Light Co. v. Union Pac. R.R. Co.*, STB Docket No. 42095, 2006 WL 2088353 (S.T.B. July 27, 2006). In each case, the STB has undertaken an individual examination to determine whether it had jurisdiction over the dispute. In some cases, price authorities labeled as contracts were determined to be regulated common carrier rates. *See, e.g., DuPont*, 2007 WL 4466694. Thus, while Defendants' transactional data may label movements as regulated or unregulated, those labels are not determinative.

The "rate-unregulated" aspect of Plaintiffs' class definition is therefore far from self-executing. *See Aulson v. Blanchard*, 83 F.3d 1, 5-6 (1st Cir. 1996) (denying class certification because "a reasonable person can[not] readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not"). Determining class membership would require individualized inquiries, making class certification inappropriate. *See, e.g., Williams*, 1997 WL 33772612, at *4 (denying class certification "because the Court must answer numerous fact-intensive questions before determining if an individual may join the class.").

**B.    Plaintiffs Have Proposed No Method to Identify Shippers with "Rebased" Rates**

As discussed above in section VI.D., Plaintiffs would include in the class shippers that paid "rebased" rates during the Class Period in lieu of a separately identified fuel surcharge. However, Plaintiffs do not identify such shippers or propose any methodology for doing so. In the absence of a viable methodology, it is impossible to determine what shippers are in the class due to "rebasing."

## X.    PLAINTIFFS' TRIAL PLAN IS UNWORKABLE

Plaintiffs' preliminary trial plan, Pl. Br. Ex. B, does nothing to address the individual

analyses that are inherent in and demanded by Plaintiffs' theory.  Plaintiffs' failure to account for

the individual issues that will be litigated in Defendants' case renders their trial plan entirely

irrelevant.  *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 352-53

(S.D.N.Y. 2002) (denying certification where "countless individual trials . . . would follow the

class-wide trial" and trial plan failed to "materially advance this litigation").  A federal district

found a similarly vague trial plan faulty because it "sketche[d] the proposed plan of action in

only the broadest strokes" and its "description d[id] not even begin to lay out the specific

elements required to prove certain causes of action."  *In re Paxil Litig.*, 212 F.R.D. 539, 539

(C.D. Cal. 2003).  As a result, "the Court [saw] the individual issues in this case as an

overarching barrier to class action treatment."  *Id.* at 548.

Defendants expect to call one or more economics and industry experts and numerous fact

witnesses concerning many of the issues set forth above, including the extent to which class

members are served by only one railroad (and thus could not experience a decrease in

competition because of the alleged conspiracy), the extent to which prices are set by truck and

not rail competition, and the give and take of hundreds, if not thousands, of negotiations that

resulted in non-uniform fuel surcharges and in trade-offs among fuel surcharge, base rate and

other terms, and the relative value to the parties of those trade-offs at the time of the

negotiations.  As a matter of due process, Defendants are entitled to demonstrate at trial that

Plaintiffs' theoretical industry does not exist and that their model of alleged class-wide injury –

an element of the claim – does not work.  That could require a significant number of witnesses

from competing modes of surface freight transportation, class members and other possible non-

parties.[86]  Once the witnesses necessary to adequately present the causation and individual

damage defenses in this multibillion dollar case are added to the witnesses Plaintiffs intend to

call, a trial is likely to last anywhere from three to six months.

## XI.    SHIPPERS SUBJECT TO ARBITRATION PROVISIONS CANNOT BE PART OF THE CLASS

A significant number of putative class members' contracts include broad arbitration

clauses.[87]

REDACTED

.  Plaintiffs' allegations

that they paid collusively inflated prices in the form of fuel surcharges assuredly "touch matters"

covered by their contracts, which provide for those fuel surcharges.  *Mitsubishi Motors Corp. v.*

*Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985).  Consistent with the strong federal

policy favoring arbitration, the Federal Arbitration Act and a long line of Supreme Court

precedent dictate that these arbitration clauses are fully enforceable.  9 U.S.C. § 2; *see, e.g.,*

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, __ U.S. __, 130 S. Ct. 1758, 1773 (2010) ("[W]e

have said on numerous occasions that the central or 'primary' purpose of the FAA is to ensure

that 'private agreements to arbitrate are enforced according to their terms.'") (citations omitted);

*Mitsubishi*, 473 U.S. at 625-26 (recognizing that Congress's main purpose in passing the FAA

was to enforce private agreements to arbitrate).  Neither the fact that Plaintiffs' claims arise

under the Sherman Act, nor that they proceed as a putative class action, changes that result.  *See,*

*e.g., In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 282 (4th Cir. 2007) (enforcing arbitration

provisions in putative class action alleging price-fixing).  Defendants intend, as they have a right

---

[86]

REDACTED

[87]     PD ¶ 52; *see also* Bolander Decl. Ex. 4; Kiley Decl. Ex. 6.

to do, to rely on their agreements to arbitrate. Shippers whose contracts include arbitration provisions, therefore, cannot pursue their claims in court. As a result, they cannot be part of the class Plaintiffs seek to certify here. "[A]ffirmative defenses should be considered in making class certification decisions." *Rodney v. Northwest Airlines, Inc.*, 146 Fed. Appx. 783, 786 (6th Cir. 2005) (citation and quotation omitted).

## XII.    ALL OF THE PUTATIVE CLASS REPRESENTATIVES FACE DISQUALIFYING PROBLEMS

As shown above, shippers that paid fuel surcharges before July 1, 2003 are not properly members of the class, and shippers that are served by only one Defendant can have no claim because there was no competition among Defendants for their business that could have been affected by the alleged conspiracy.                                    REDACTED

### A.    None of the Putative Class Representatives Is Adequate or Typical

Figure 7 summarizes the disqualifying problems of each putative class representative:

**Figure 7**

REDACTED

---

88    *See* Section XII.C. below.

89

REDACTED

90    *See* Section XII.B. below.

REDACTED

The class representatives' claims also face many other obstacles, such as their negotiating on an overall-rate basis and the existence of truck competition. These defects not only disqualify these class representatives but, more importantly, they illustrate the prevalence of these problems for the class as a whole. Not only do Plaintiffs hold out these class representatives as "typical" but Plaintiffs selected these eight class representatives out of the 27 plaintiffs that originally filed suit. After vetting their options and putting forth their best slate, Plaintiffs' inability to escape these disqualifying problems is telling. A class cannot be certified in these circumstances. A class cannot be certified where the proposed representatives would not be members of the class. Fed. R. Civ. P. 23(a) ("One or more *members* of a class may sue or be sued as representative parties . . .") (emphasis added); *Falcon*, 457 U.S. at 156 ("a class representative must be part of the class . . ."); *Long v. District of Columbia*, 469 F.2d 927, 930 (D.C. Cir. 1972) ("A person simply cannot represent a class of which he is not a member").

### B. Nyrstar Should Be Disqualified Because It Engaged in Spoliation of Evidence

Nyrstar Taylor Chemicals, Inc. ("Nyrstar") cannot be a class representative because it is subject to a unique defense: spoliation of evidence. The presence of a unique defense destroys the typicality and adequacy of the class representative. *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) (typicality); *Nat'l. Ass'n of Reg. Med. Programs v. Mathews*, 551 F.2d 340, 344-46 (D.C. Cir. 1976) (adequacy). That is true of spoliation. *See Falcon v. Philips Elec. N. Am. Corp.*, 304 F. App'x 896, 897 (2d Cir. 2008) (concluding that spoliation rendered plaintiff an inadequate class representative).

Nyrstar failed to preserve potentially relevant documents, including:

.

REDACTED

Nyrstar's admitted destruction of relevant evidence includes:

REDACTED

## C.    <u>**Donnelly Should Be Disqualified Because It Filed for Bankruptcy**</u>

Donnelly Commodities ("Donnelly") filed for Chapter 7 bankruptcy on December 2,

2009 and is currently under the control of an appointed Trustee.  PD Ex. 12 Donnelly Dep. 36:3-

37:15.  When a class representative has filed for bankruptcy under Chapter 7 and has had a

trustee appointed, an "inherent" conflict of interest exists. *Dechert v. Cadle Company*, 333 F.3d 801, 803 (7th Cir. 2003); *Griffith v. Jabitch, Block & Rathbone, LLP*, 358 B.R. 338, 342 (S.D. Ohio 2007). This is because of the trustee's "dual role as class representative and creditors' representative." 333 F.3d at 803. The trustee "has a duty to seek to maximize the value of his claim, and this duty may collide with his fiduciary duty as a class representative . . . to represent all members of the class equally." *Id.* Moreover, this conflict of interest is "especially likely . . . because class-action litigation tends to be protracted yet the Bankruptcy Code requires the trustee to complete his work expeditiously." *Id.* (citations omitted).

Also, Norfolk Southern is a creditor of Donnelly,[91] which puts the creditor "on both sides of the controversy," and creates a second conflict of interest. *Id.* at 804.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

Dated:  Washington, D.C.
July 1, 2010

John M. Nannes
Tara L. Reinhart
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
(202) 371-7000

Sean M. Tepe
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Saul P. Morgenstern
Jennifer B. Patterson
Margaret A. Prystowsky
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

Claudia R. Higgins
Jeffrey Saltman
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
(202) 682-3500

*Attorneys for Defendant Norfolk Southern Railway Company*

---

[91]  PD Ex. 51, Proof of Claim of the amount of $105,431.52 (Mar. 9, 2010).

Tyrone R. Childress
David G. Meyer
HOWREY LLP
550 South Hope Street, Suite 110
Los Angeles, CA  90071
(213) 892-1800

Alan M. Wiseman
Thomas A. Isaacson
Peter A. Barile III
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 783-0800

*Attorneys for Defendant Union Pacific Railroad Company*

Richard J. Favretto
Gary A. Winters
Michael E. Lackey, Jr.
MAYER BROWN LLP
1999 K Street, NW
Washington, DC  20006
(202) 263-3000

Samuel M. Sipe, Jr.
Linda S. Stein
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

*Attorneys for Defendant BNSF Railway Company*

Kent A. Gardiner
Kathryn D. Kirmayer
Shari Ross Lahlou
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C.  20004
(202) 624-2500

*Attorneys for Defendant CSX Transportation, Inc.*

83