# Exhibit 2

(Prystowsky Declaration)

A Preliminary Report by the Secretary of Transportation

# A Prospectus for Change in the Freight Railroad Industry

October 1978





# A PROSPECTUS FOR CHANGE IN THE FREIGHT RAILROAD INDUSTRY

## A Preliminary Report by the Secretary of Transportation



Submitted in accordance with sections 504 and 901 of the Railroad
Revitalization and Regulatory Reform Act of 1976 (P.L. 94-210)

U.S. Department of Transportation

October 1978



THE SECRETARY OF TRANSPORTATION

WASHINGTON, D.C.  20590

October 10, 1978

Honorable Walter Mondale
President of the Senate
Washington, D.C. 20510

Honorable Thomas P. O'Neill
Speaker of the House of Representatives
Washington, D.C. 20515

Dear Mr. President:

Dear Mr. Speaker:

I am transmitting to Congress the preliminary report on the railroad industry as directed by sections 504 and 901 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4R Act). The report entitled, "A Prospectus for Change in the Freight Railroad Industry," paints a rather gloomy picture of the present state of the railroad industry. This situation has developed because traditional rail markets have shifted, and the railroads have not fully held their own against the new competitive technologies of air, highway, and inland waterway transport. Also, the Government's policies on regulation and financial assistance have not been equal for all modes of transportation. Many Government policies were developed when the railroads were the dominant mode—a circumstance that is no longer the case.

This report deals with changes that will be necessary if the railroads are to regain vitality and to continue to play a major role in the Nation's transportation system. I believe the future holds much promise for the railroads. This traditional transportation technology has been given renewed importance because of the long-term problem of energy availability and the economy's need for efficient transportation to dampen inflationary pressures; these are the essential strengths of the industry on which constructive policies can be built.

The Department of Transportation is not in the business of simply preserving railroads and terminals as historic relics or national transportation landmarks. Our role is to identify America's transportation needs and the best ways these needs can be served. Viewing these requirements, I do not think we should be permanently discouraged by the difficult economic situation that this report portrays.

The diagnosis in this report says parts of the system are sick, but the system as a whole is far from dead. The report includes several specific remedies regarding Federal regulation and financial assistance policies that can help move the railroad industry toward financial health, so it can play its proper role in the efficient transportation system demanded by our Nation's economy.

I have often referred to the Nation's transportation system as the "invisible service." Its overall performance has been so good that we only pay attention to it when it doesn't work or when it is stopped by a strike, a natural disaster, or a financial crisis. This is especially true of railroads. The steady decline of the railroads began just after World War I but went virtually unnoticed by the public and untended by the Federal Government as the other modes increased their capacity, and the rail system slowly cannibalized itself until the collapse of the Penn Central forced public attention to the problem.

We must now take the time and seize the opportunity to take the necessary public actions to ensure that our railroad system remains in the private sector and provides good public service. It is a tribute to the basic strength of our economic system that the United States is the only country in the world whose freight railroad system is still mainly in private hands. Elsewhere in the world, it is heavily subsidized as a necessary public service.

I wish to underscore the significance of this report and the public policy debate that will ensue. There have been numerous studies of the problems posed by declining rail service, the financial condition of the railroads, and the effects of regulation on the industry. Some of these studies have been conducted by private groups, some by Government agencies; most, however, have been limited to specific problems or geographic areas. This report takes a broader view. It is a comprehensive nationwide study of railroad problems, finances, and policies and is designed to provide the framework for making judgments about this system as part of the Nation's total transportation policy.

During the decade of the Department of Transportation's existence, the rail industry and its competitors have undergone many changes. The Government now has a much different relationship to the railroad industry than it did 10 years ago. The Department of Transportation has far greater responsibilities and is confronted with substantially different economic circumstances with regard to all means of transportation. The public's attitudes on environmental protection, energy policy, user charges and taxation, regulatory flexibility, and intermodal transportation planning have changed.

Now the railroad industry faces a time of reckoning with those changes. There is no escaping transition, for the underlying social and economic forces cannot be denied. The question is not whether, but how changes will take place.

This report represents the administration's commitment to help in seeking solutions. It cannot offer a Federal guarantee of prosperity or survival for all railroads. The report recommends the continuation of a program of Federal financial assistance, but it also makes clear that financial assistance alone will not cure all the problems of the railroad industry. Changes in Federal financial policy toward the other modes and in the system of economic regulation, as well as other changes in labor and management attitudes will be necessary, and the appropriate role for any Federal financial aid is to facilitate these changes.

Ultimately, the future of the railroad industry rests with the men and women who manage and operate it. Their day-to-day decisions and actions will decide the future of the railroad industry in the private sector. Those who work in railroading must take pride in an industry that helped to build this country and which, through their sustained effort, will continue to make vital contributions to our economic welfare.

Pursuant to an agreement with the Chairmen of the House and Senate commerce committees, we have combined the reports required by sections 504 and 901 and now submit them jointly to the Congress and the public. Following a suitable period to allow interested parties time to reflect upon this preliminary report, we will hold nationwide hearings in which the public may provide comments on the analyses and alternatives presented in the report. We hope to have the advice of railroad management and labor, other elements of the transport industry, the shipping and financial communities, Government officials at the Federal, State, and local levels, and informed members of the general public. These views will assist us in the development of a final report and recommendations to the Congress, to be provided in February 1979.

We welcome the comments and suggestions of the Congress and of those many citizens who share our concern for the future of one of America's most basic and most essential industries, railroading.

Sincerely,

Brock Adams

Enclosure

iv

The displacement of rail passenger travel by automobile travel also indirectly facilitated the rise of rail's primary competitor—the trucking industry. The fast-growing use of automobiles provided both the impetus for highway-building programs and a broader base against which the cost of the programs could be spread.

Associated with the decline in rail passenger traffic is the loss in mail traffic and express traffic since these were carried mostly on passenger trains. As recently as 1960, mail and express revenues amounted to 4.6 percent of Class I railroad-operating revenue. By 1975, however, mail and express traffic had dropped to such a low level that they were no longer listed separately in the Association of American Railroads (AAR) industry income statements.

## INCREASING COMPETITION FOR FREIGHT TRAFFIC

Over the last half century, the railroad industry has been faced with increasing competition from other modes—the rise of the trucking industry, the resurgence of inland water carriers, and the growth of oil pipelines. Figure 2-3 depicts the dramatic shift in modal market shares of freight during the period 1929 to 1976. In 1929, railroads were the dominant freight transportation mode by a wide margin and claimed a 72.9-percent freight market share, as measured in ton-miles. The closest competitor was Great Lakes shipping with 16 percent. By 1976, rail's market share was cut to less than one-half its former size, while market share for trucking grew sevenfold; inland waterway operations, eightfold; and oil pipelines, fivefold. Only Great Lakes shipping suffered a similar drop in market share, falling to one-third its former level. In absolute terms, while railroad ton-miles have less than doubled from 1929 to 1976, truck ton-miles have multiplied by a factor of 26, and inland waterway ton-miles, by a factor of 28.

The rapid growth of trucking and inland waterway carriage has been facilitated by public construction and maintenance of rights-of-way. Publicly provided highways and inland waterways require no direct capital investment by truckers and water carriers, thus lowering the fixed expenses and corporate investment base of these modes. Publicly provided rights-of-way have the additional advantages of exemption from property taxation. In 1975, ad valorem taxes on rights-of-way amounted to $167.4 million for Class I railroads.

## THE TRUCKING INDUSTRY

As shown in figure 2-4, total U.S. highway mileage has steadily increased since 1904, and surfaced highway mileage has grown even faster. A major innovation in highway design, the limited access highway, has led to important improvements in the operating efficiency of the trucking industry. The Pennsylvania Turnpike, the first limited access highway that could be used by trucks, was opened in 1940. The Federal Government took steps as early as 1944 toward construction of a national system of limited access highways, and in 1956, funding was authorized and construction began on the National System of Interstate and Defense Highways (the interstate highway system), the largest public works project in history. By mid-1977, 90.7 percent of the planned 42,500-mile interstate highway system was opened to traffic (fig. 2-5). The Federal Highway Administration (FHWA) estimates that by 1990 the total construction cost of the interstate system will reach $104.3 billion in 1976 dollars.

Limited access highway improvements enable higher truck speeds. According to the FHWA, the average truck speed increased from 43 mph in 1950 to 56.6 mph in 1973, thereby increasing the effective daily operating range of trucks by a proportional amount and boosting overall motor carrier operating efficiency. Since 1973, average truck speed has decreased slightly, in response to the 55-mph speed limit.

The highway system was designed and constructed more recently than the rail network and serves present day markets more directly. Furthermore, highway vehicles can operate over higher gradients than rail vehicles. Consequently, circuity of the rail network is 18 percent greater than the highway network.[1]

Through a combination of license fees, excise taxes, and fuel taxes, the trucking industry contributes to building and maintaining the highways. But, it is highly debatable whether long-distance, multiple-axle heavy vehicles (those trucks most competitive with rail service) pay their fair share towards total highway construction and maintenance expenses. This is discussed in more detail in chapter 5.

From the time trucks were introduced in significant numbers, in the early 1900's, continuing technological improvements greatly increased the trucking industry's ability to compete with the railroads. Trucks have become larger, more powerful, faster, and more reliable. In addition, a wide range of sizes and specialized truck designs were developed to fit the varying requirements of shippers. Such rapid innovation is fostered by the large number of competing truck and trailer manufacturers. As truck innovations are introduced, they are rapidly assimilated into the nationwide truck fleet because the average life of a truck is only 5 years, due to the high rate of utilization.

The rapid growth of the trucking industry is also encouraged by the following factors.



SOURCE: *Motor Vehicle Manufacturers Association, Motor Vehicle Facts and Figures '77.*

FIGURE 2-4.   U.S. SURFACED AND NONSURFACED HIGHWAY MILEAGE, 1904-1975.



SOURCE: Federal Highway Administration.

FIGURE 2-5.   U.S. INTERSTATE HIGHWAY SYSTEM.

● Relaxation of Size and Weight Restrictions. The trucking industry can take advantage of improvements in equipment and highways. The industry has worked hard for State laws allowing operation of twin trailers and triples. In January 1975, Congress passed legislation permitting higher axle and gross weight limits on the interstate system. The legislation allowed States to raise the gross vehicle weight limit on interstate highways from 73,280 to 80,000 pounds. By August 1977, 40 States had enacted laws raising weight limits up to, or near, the Federal maximum limit. Size and weight limits may be waived by special permit, and some States have been criticized because they are too liberal in granting these.

● Enforcement. Not all truckers adhere to truck size, weight, and speed limits. An FHWA Truck Weight Study in 1972, covering all 50 States, determined that 20 percent of tractor-semi-trailers were overloaded,

and 29 percent of five-axle, tractor-semi-trailers (those most directly rail competitive) were overloaded. Despite the recent imposition of a nationwide 55-mph speed limit, a recent survey (1977) of tractor-trailer drivers on the interstate highway system revealed that over half the drivers interviewed averaged 60 mph or more, and 7 percent said they averaged over 70 mph.

● Nonunion Labor. It is estimated that only 25 to 30 percent of rail competitive, intercity truckdrivers belong to a union. By contrast, the railroad industry is almost completely unionized. Nonunion labor generally is paid less and receives fewer fringe benefits.

● Owner-Operator Trucking. Due to economic incentives, some owner-operators log more than 200,000 miles per year. The high productivity of these individuals results in relatively low costs, which, in

turn, often results in lower charges. Because of the competitiveness of this business, owner-operators frequently underprice their services. Consequently, owner turnover is high, despite the potential profit available to an entrepreneur.

● Private Trucking. As the size of a corporation increases and full-service truck leasing expands, many corporations find cost and service advantages in private trucking.

● Skilled Management. Large portions of the trucking industry have developed excellent managerial skills. In this highly competitive environment, trucking companies are compelled either to manage effectively or to go bankrupt. Management combines detailed and accurate profitability analyses of traffic with selling and operating tactics, so that profit decisions can be made quickly and effectively at the terminal level.

## INLAND WATERWAY CARRIERS

Inland waterway carriers, unlike truckers, do not pay any user charges for operating on the inland waterways. In the 95th Congress, both the House and the Senate have passed bills that, if enacted, would impose at least some level of user charges. The total U.S. inland waterway system consists of approximately 25,000 miles of navigable channels, canals, reservoirs, and lakes. Virtually all the natural watercourses making up the inland waterway system have needed improvements in the form of widening, deepening, minimizing bends, and/or construction of locks and dams operated and maintained by the U.S. Army Corps of Engineers. From 1791 through fiscal 1975, the Federal Government has spent $14.7 billion (not including waterway land grants) on the construction, improvement, and operation of domestic waterways. The greater share of these expenditures, $10.7 billion, has been made since World War II.[2] The Federal Government has helped the inland waterway carriers by expanding the size of the inland waterway system, by permitting year-round operation on more river segments, by eliminating bottlenecks, and by allowing larger barge tows and tug equipment to be used, thereby improving operating efficiency.

Towboats have converted to diesel from steam power, thus increasing efficiency. Average towboat horsepower on the Mississippi and Gulf intracoastal waterways has grown by approximately 50 percent since 1967. As a result of improvements to the inland waterways plus technological improvements in equipment (such as the Kort nozzle), a typical tow today carries 300 percent more cargo than the typical tow of 20 years ago, with a 40- to 60-percent smaller crew. Over the last 40 years, the productivity of a tow, measured in ton-miles per day, has increased

from 150,000 to 3 million ton-miles. The net result is a fortyfold increase in productivity per employee.

## PIPELINES

Pipelines are also a source of increased modal competition, but their effect on railroads has been confined primarily to crude oil and petroleum products. By 1938, railroads handled only 2.2 percent of total crude petroleum tonnage carried in domestic transportation, while pipelines handled 71 percent. The use of pipelines for transporting refined petroleum products is a more recent occurrence. Pipelines carried only 6.4 percent of refined petroleum products tonnage in 1938, but, by 1974, this figure had increased to 33.5 percent.

The single most important factor favoring the use of pipelines over rail is lower unit costs for high-volume applications. Unit costs are lower for the following reasons.

● Pipelines are ideally suited to unidirectional movement of commodities. Pipelines only move the commodity, while railroads must move equipment as well. Once the commodity is unloaded, the rail equipment usually has to be returned empty, imposing a heavy economic penalty.

● Pipeline technology readily lends itself to automation. In 1976, pipelines accounted for two-thirds as many ton-miles as rail, with one-thirtieth the number of employees. Total pipeline employment in 1976 was only 17,000.

● Once a pipeline is constructed, costs are largely fixed, since annual interest and depreciation expenses account for a significant proportion of total expenses. Pipeline costs are, therefore, highly resistant to inflation, making pipelines an attractive long-term investment even though they may not be economical in the short term.

In recent years, the development of slurry pipelines has posed a new competitive threat for the railroad industry. Using a fluid-conveying medium to move solid material, slurry pipelines greatly expand the range of commodities open to pipeline carriage. In the past, slurry pipelines have been proposed or built to transport coal, iron ore, limestone, phosphate, and other bulk commodities. The railroad industry is chiefly concerned about slurry pipelines that could divert coal traffic. Thus far, two coal slurry pipelines have been built in the United States. The first line, built in 1957 by the Consolidated Coal Co., went from Cadiz, Ohio, to a point on Lake Erie. The pipeline, 108 miles long, with a capacity of 1.25 million tons per year, was

deactivated in 1963 due to the introduction of unit
coal trains and sharply reduced rail rates. The other
slurry pipeline, the Black Mesa Line (opened in
1970), is 273 miles long and currently transports
approximately 5 million tons per year, or less than 1
percent of total domestic coal production. At least
five new coal slurry pipelines, which could transport
more than 75 million tons of coal per year, are
currently proposed.

The future for slurry pipelines is uncertain.
Railroads have blocked construction by refusing to
allow pipelines to cross rail rights-of-way. Slurry
pipeline builders are attempting to obtain the right of
eminent domain, and several States have already
granted eminent domain for slurry pipelines. The
95th Congress, however, voted down legislation to
allow eminent domain on a national level. Another
concern that may limit the use of slurry pipelines is
water availability. Today, every ton of coal trans-
ported in a slurry pipeline requires about 1 ton of
water.

## GOVERNMENT REGULATION
## OF THE RAILROADS

Although Government regulation has benefited
the industry in certain respects, the adverse effects of
economic regulation have contributed to the decline
of the railroad industry. As common carriers,
railroads are required to provide transportation
service upon demand to the general public and are
subject to very broad Federal and State regulation.
The present regulatory environment has evolved over
many decades and is extraordinarily complex, but, in
general, railroads are subject to the following basic
types of regulation.

● Rate Regulation. Railroads are not allowed to set
rates unilaterally. Rate increases or decreases are
subject to review and possible suspension by the
Interstate Commerce Commission (ICC) and State
regulatory agencies.
● Entry and Exit Regulation. The overall contrac-
tion of the industry has made entry regulation largely
meaningless while increasing the importance of exit
regulation. The latter covers railroad line abandon-
ments, service discontinuances, mergers, and bank-
ruptcies.
● Car Service Regulation. Certain operating practic-
es of the railroads can be directed by regulatory
agencies to insure that the common carrier obligation
is satisfied. This affects freight car availability and
return of empty cars.
● Labor Regulation. Labor regulation covers negoti-
ations, strikes, retirement, and unemployment.
● Safety Regulation. The Federal Railroad Adminis-

tration (FRA) and the Occupational Safety and
Health Administration prescribe various safety regu-
lations to which railroads must comply. The FRA
sets track and car standards and locomotive and car
inspection requirements.
● Environmental Regulation. The Environmental
Protection Agency (EPA) regulates railroads with
respect to water, air, and noise pollution.
● Other Regulation. When involved in federally
assisted projects, railroads are subject to laws
pertaining to equal opportunity and affirmative
action in employment, including contracting with
minority businesses.

The railroad industry has long been fully
regulated, while competitors are either partially or
largely unregulated. When the railroad industry was
first regulated in 1887, it had a virtual monopoly on
intercity freight and passenger transportation. This
monopoly disintegrated as other transportation
modes evolved and pressure to regulate the other
modes developed. This took years to accomplish,
however, and resulted in only partial regulation.
Federal regulation of trucking did not occur until
1935, and inland water carrier regulation did not
occur until 1940. When regulation has been applied
to other modes, it generally has been less comprehen-
sive. The Transportation Association of America's
estimate of Federal regulation of intercity freight in
1975 (based on a percent of total ton-miles per mode)
is shown in table 2-1.

The recent trend is towards lessening those
regulatory restrictions that apply to competing
modes. In 1973, the Barge-Mixing Rule was eliminat-
ed, thereby making all bulk inland waterway carriers
exempt from regulation. Previously, tows mixing
more than three bulk commodities were regulated.

Generally, economic regulation is believed to
have affected the rail industry adversely in that it
has: inhibited the industry's ability to adjust rapidly
to changes in market forces; downgraded managerial

### TABLE 2-1. FEDERAL REGULATION
### BY MODE, 1975

| Mode | Federal regulation[a] (%) |
|---|---|
| Rail | 100.0 |
| Oil pipeline | 84.4 |
| Truck | 44.0 |
| Inland waterways | 15.5 |
| Great Lakes shipping | 0.3 |

[a]The basis of Federal regulation is total ton-miles per mode.
SOURCE: Transportation Association of America.

49

effectiveness by insulating the assets and operations of railroads from market forces; required large expenditures for clerical and legal staff; and served to inhibit innovation. Management has had to devote an inordinate amount of time and resources to coping with the numerous regulatory requirements. In the long run, regulation favors legal skills over marketing and entrepreneurial skills.

## RATE REGULATION

Probably the most significant restriction on railroads is rate regulation. The ICC rarely sets rates, but it rules on the lawfulness of rate changes proposed by railroads and establishes minimum and maximum rate levels. The number of proposed rate changes rejected is very small, usually about 1 to 2 percent of initial applications.[3] Few applications are rejected, however, because a railroad will not propose a rate unless there is a reasonable chance of gaining ICC approval. Rate regulation is treated extensively in chapter 6, but the major effects of rate regulation on the railroads are summarized below.

### Cost of Timelag

The regulatory process moves very slowly, and delays in implementing general rate increases mean lost revenues. The AAR estimates that between 1967 and 1975 regulatory timelag cost the industry $2.2 billion in lost revenues, an amount equal to nearly 25 percent of the actual increases granted during this period.[4]

### Cross-Subdidization to Achieve Public Goals

In approving rates, the ICC, under sections 2, 3, and 4 of the Interstate Commerce Act and the Hoch-Smith Resolution of 1925, must take into consideration various public goals such as port equalization, assistance to agriculture, and aid to depressed industries. Freight rates are either held down or reduced to achieve these purposes, with rate increases on other commodities supposedly making up the loss. Unregulated and private carriers do not have to absorb the cost of realizing these goals; thus, to the extent that cross-subsidy does exist, private carriers are more cost competitive than regulated carriers.

The subsidization of depressed industries poses a particular problem for railroads during recessions, when traffic levels are low. The following examples of ICC-imposed rate holddowns (Ex Parte No. 310 General Rate Increase) during the 1975 recession illustrate the problem.

● Asphalt building and roofing materials, Fiberglas insulating materials, plastic and asbestos, and cement

pipe—"In view of the depressed conditions of the housing industry ..."
● Lumber and other forest products—"Industries ... have been seriously hurt as a result of the depressed housing market."
● Recyclables—"Prices for wastepaper have dropped as much as 80 to 90 percent in the last few months ... no increase is warranted."

## Umbrella Ratemaking

For decades, the ICC rendered rail rate decisions that protected the trucking and water carrier industries. This originated from two key phrases in the Declaration of National Transportation Policy included in the Transportation Act of 1940, to the effect that the Act should be administered to: "preserve the inherent advantages of each" mode, and that "destructive competitive practices" were to be prevented. In enforcing these provisions, the ICC deemed many railroad rate proposals too low since traffic would be drawn away from water or motor carriers. Thus, when other modes made competitive inroads into high-value rail traffic, railroads were not allowed to adjust their rates below fully distributed costs. The Transportation Act of 1958 attempted to correct the inequity by specifying: "Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation."

The mandate to eliminate umbrella ratemaking was not really enjoined, however, until the 1963 Supreme Court decision, ICC v. New York, New Haven and Hartford Railroad Co. This case ruled that "something more than even hard competition must be shown before a particular rate can be deemed unfair or destructive." In 1965, however, the ICC, in the Ingot Molds case, restrictively interpreted the 1963 Supreme Court decision. The Railroad Revitalization and Regulatory Reform (4R) Act, with its emphasis on "going concern value," however, has added a new dimension to costing for railroad ratemaking purposes. The effect of this provision in intermodal rate level disputes is still unclear.

## Stifling of Innovation

The foremost example of the adverse effects of rate regulation on innovation in rail transport is the "Big John" grain rate case of the Southern Railway.[5] From 1962 to 1965, the ICC impeded the installation of 100-ton grain hopper cars that the Southern intended to use for hauling grain at substantially lower rates. A Supreme Court order was required before the Southern could introduce full use of the Big John hopper car.

Another example of rate regulation impeding innovation is the delayed introduction of the unit train. The economic benefits of unit trains were

acknowledged in the industry in the 1920's, but not until the 1960's were unit trains put into service.[6] The railroads feared that if trainload rates were offered in one area to meet competition, the ICC would require them to make similar rate reductions in other areas. Conceivably, the result would have been a net revenue loss. Therefore, railroad companies had no incentive to introduce unit trains. Only in the early 1960's, when demand appeared to change, did the railroads find that they could increase their profits by adopting unit train operations, regardless of restrictive regulations.

Rate regulation is only one factor stifling innovation. Although railroads may own other transportation modes, they are restricted in this ownership, while water carriers, pipelines, and motor carriers are not (except that none may acquire airlines). Approval by the ICC of truckline ownership by railroads is necessary. Many observers believe this policy slowed the development of piggyback service in the United States as compared to the earlier large-scale introduction of piggyback service in Canada, where no such restrictions existed.

### Complexity of Rail Tariffs

As a result of rate regulation, the determination of the rail rate of any given commodity moving between any two specified points is very complex. Rates are not maintained on a current basis; instead, old rates must be adjusted in accordance with various regulatory rate rulings that have occurred since the earlier rates were established. The calculation of freight rates is costly, not only in terms of clerical time but also in terms of clerical mistakes that can and do occur. Complex rail tariffs also deter shippers who would like a rate quotation on short notice. In contrast to railroads, truckers and inland waterway operators can quote rates almost immediately.

### ENTRY AND EXIT REGULATION

Since the Transportation Act of 1920, railroads have been required to petition the ICC before constructing or abandoning a section of line. The Act was passed only 4 years after railroad line mileage peaked, and mileage has since steadily declined.

### Abandonment

Railroad line and facility abandonment is one of the industry's most common methods of adjusting its plant to its changing transportation role, but ICC actions have slowed abandonments and, in some instances, prevented them. As with rate regulation,

regulatory timelag for line abandonments is costly, since the railroad must continue to provide service at a loss until abandonment approval is granted by the ICC. Prior to passage of the 4R Act, it was not unusual for abandonment proceedings to last 2 or 3 years, with a few lingering 4 years or longer. Today, under the expedited provisions of the 4R Act, the ICC will issue a decision on most cases within 15 months, and all uncontested abandonment applications are granted within 2 months. Chapter 6 contains a detailed discussion of the provisions of the 4R Act dealing with abandonments.

Another factor inhibiting railroads from filing abandonment applications, even if approval is likely, is the substantial legal and administrative cost involved, which can exceed $50,000 per application. An analysis of all line abandonment applications filed between 1960 and 1969 revealed that only 2.2 percent were actually denied.[7] Nonetheless, there is evidence that some railroads choose to continue operating small branchlines at a loss, rather than pursue the costly and time-consuming abandonment process.

### Delay in Merger Approval

The merger of the Chicago, Rock Island and Pacific with the Union Pacific was pending before the ICC from 1964 until final approval in 1974. During this time, the condition of the Rock Island deteriorated, and the Union Pacific lost interest in consummating the merger. Less than 6 months after ICC merger approval, the Rock Island filed for bankruptcy. In 14 cases involving a merger, acquisition, or control of two or more Class I railroads between 1955 and 1970, the ICC took an average of 2-1/2 years from the date of application to final approval.

In general, the larger the combined size of the merging properties, the longer the time period required to gain ICC approval. For example, the comparatively small merger of the Minneapolis and St. Louis into the Chicago and North Western was approved by the ICC after only 5 months. By contrast, the merger creating the Burlington Northern required 6 years 9 months to gain ICC approval.[2] Important mergers often are held up in litigation for 1 year or more after ICC approval.[7] Amendments enacted in title IV of the 4R Act—and described in chapter 6—have established a requirement that the ICC must decide merger cases within 31 months of the filing date of the application.

### Bankruptcy Statutes

Section 77 of the Bankruptcy Act has the effect of preserving inefficient railroads rather than allowing the rationalization of the railroad industry

through liquidation of the assets of failed companies and permitting the viable parts of their systems to be acquired and operated by profitable companies. Such a prospect was generally viewed by both Federal and State Governments as potentially too catastrophic to the economy to be allowed when the Act was passed during the Great Depression, although in a few cases, liquidation has occurred. The use of section 77 reorganizations to prolong the life of an individual railroad on the justification of helping the economy in the regions served, nevertheless, has hurt the railroad industry's efforts to improve profitability.

## CAR SERVICE REGULATION

Car service regulations by the ICC focus on the adequacy of car supply and car distribution during times of shortage. As common carriers, the railroads are called upon to meet various levels of demand for transportation, almost as if an unlimited reserve car capacity existed. Historically, the highly seasonal movements of grain and grain products create the worst problems of car supply. While the ICC expects railroads to have an adequate reserve to meet peak harvest flows, their competitors—trucks and barges—are not under this requirement and can lower rates during the off-peak to maximize equipment utilization while charging what the market will bear at harvest.

## SAFETY REGULATION

Significant disagreement exists as to whether, on the whole, static railroad safety laws and regulations have hindered improvements in efficiency and the introduction of new technology. Among the more burdensome requirements imposed on the industry by laws passed as safety measures were the "full crew" laws enacted by many States, which decreased labor productivity while producing few direct safety benefits.

In general, Federal safety laws and regulations merely require minimum maintenance and inspection practices that are essential to assure adequate levels of service and safety. Many of the individual requirements were derived from recommended industry maintenance standards, which may or may not have applicability as safety standards. Federal regulations are highly detailed, however, addressing such issues as component dimensions and frequency of tests and inspections. The FRA is currently engaged in an effort to review and modernize its regulations. Where feasible from the point of view of enforcing safety compliance, the substitution of

performance standards for maintenance and inspection requirements may relieve the industry of strictures that have the effect of raising operating costs or impeding innovation.

## ENVIRONMENTAL REGULATION

Federal, State, and local agencies regulate a variety of environmental problems, including noise, air, and water pollution. Environmental regulation controls the following aspects of railroad operations: permissible diesel smoke; noise from locomotives and rolling stock; disposal of human and other waste (such as oils); treatment of wastewater; cleanup of spills; methods of disposal of cross ties; and selection of herbicides for maintenance of rights-of-way. The Federal agencies involved in air, water, noise, pesticide, and waste treatment include the EPA, the FRA, the Food and Drug Administration, and the Department of Agriculture.

In general, the railroad industry prefers Federal environmental laws, which preempt State and local statutes and regulations, to the difficulties of complying with a variety of State and local laws. A preliminary estimate by the AAR indicates that the annual costs to railroads of environmental controls may now be in the range of $100 million.

## OTHER REGULATION

Railroads, when acting as contractors of the Federal Government or when involved in a federally assisted construction contract, are subject to Executive Order 11246, administered by the Department of Labor, which requires equal opportunity and affirmative action in employment. Railroads that receive Federal financial assistance are also subject to: the FRA's regulations regarding equal opportunity and affirmative action with respect to employment and to participation of minority businesses when assistance is provided under the 4R Act; and, except in the case of loan guarantees, title VI of the Civil Rights Act of 1964, Department of Justice regulations, and implementing regulations of the various Federal agencies that prohibit discrimination on the basis of race, color, or national origin with respect to any program or activity receiving such Federal assistance.

## TAX POLICY

The ICC's method of calculating the depreciation of rail equipment to determine rate bases is used

by the Internal Revenue Service (IRS) in establishing taxing policies for rail companies. Historically, this has meant a low annual depreciation allowance, discouraging railroads from making longer term investments.

Until 1962, the IRS determined the depreciable life of rail equipment by calculating the average life of freight cars retired during the taxable year and the preceding 2 to 4 years. This led to an extremely long depreciation life of 25 to 50 years and a very low annual depreciation allowance, particularly since the scrap value of the car had to be subtracted from the purchase price in determining the depreciable amount. As a result, railroads found it preferable to completely rehabilitate a freight car in cycles of 12 to 15 years rather than scrapping the freight car after it had worn out and replacing it with a new one. Rehabilitation could be treated as an expense item in the year it occurred, whereas the investment in a new car had to be depreciated over many years.

In 1962, the IRS adopted guideline class lives for depreciable assets that reduced the depreciable life of a freight car to 14 years. This was further reduced to 11 years by the Revenue Act of 1971. These reductions as well as the investment tax credit have helped to encourage new equipment investment. Marginally profitable or unprofitable railroads, however, are unable to take advantage of the investment tax credit or accelerated depreciation other than indirectly through leasing. The overall inadequacy of depreciation allowances on railroad property in general, resulting from depreciation lives of 30 years or more, remains an issue, since even the 11-year accelerated depreciation of equipment has been criticized as inadequate. This problem is exacerbated by the high rate of inflation in recent years, which makes it increasingly difficult to renew rail assets.

## INDUSTRY STRUCTURE

Railroads have not been able to adapt their physical facilities swiftly to changes in the demand for transportation. This problem stems from the nature of railroad technology, regulatory constraints, political opposition, labor protection requirements, inadequate cost information for managers, and traffic (or profit) forecasting errors by railroad management. The subject of rail restructuring is treated at length in chapter 4, but several factors are significant to consideration of industry problem.

## EXCESS PLANT AND CIRCUITOUS ROUTING

The problem of excess capacity affects both rail lines and rail yard and terminal facilities. Multiple

rail routes serving the same markets decrease traffic line density and increase operating expenses. Although the number of parallel rail routes has decreased because of mergers, acquisitions, line abandonments, and joint trackage agreements, many parallel mainlines still exist. For example, there presently are five mainline routes between Chicago and Minneapolis, eight between Chicago and Kansas City, and five between Dallas-Ft. Worth and Houston. Multiple rail terminal facilities in major cities lead to inefficient terminal operations. Chicago, the most extreme case, is served by 22 railroads and 105 rail yards.

Circuitous routing of rail traffic over routes that are much longer than the principal direct routes between the origin and destination of shipments serves to increase expenses and decrease profitability. The shipper has the right to specify the particular route for a shipment, even though the route may be extremely circuitous. Originating railroads also encourage circuitous routings to increase their rate divisions, to the detriment of other railroads. Since the freight rate is based on the shortest distance rail route, no additional compensation is received by the railroad industry even though the expense may be greater. The average circuity of traffic routings over shortest distance routings for all rail traffic is estimated to be 9.3 percent,[8] exclusive of the 18-percent circuity factor of the rail network as compared with the highway network, mentioned earlier.

## FOCUS ON INTRA-INDUSTRY COMPETITION

Both the regulatory environment and the structure of the industry tend to promote competition among railroad companies, rather than intermodal competition. Collective ratemaking practices are heavily influenced by the desire of railroad companies to preserve their existing market share. This means that the railroad companies tend to focus their efforts on pricing to protect what they have, and their sales efforts are directed accordingly. The recent general rate increases do not represent any change in this attitude.

## MULTIPLE CARRIER SHIPMENTS

Aside from its effects on competition, the fractured structure of the railroad industry presents other problems. Each railroad serves a restricted geographical area, but since railroads are interconnected to provide service throughout the continental United States, more than 30 percent of rail carloads,