# Exhibit 13

(Prystowsky Declaration)

TESTIMONY OF

MR. JOHN B. FICKER

PRESIDENT

THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE

HEARING ON

ECONOMICS, SERVICE, AND CAPACITY IN THE FREIGHT RAILROAD INDUSTRY

BEFORE THE

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

SUBCOMMITTEE ON SURFACE TRANSPORTATION AND MERCHANT MARINE

JUNE 21, 2006

TESTIMONY OF

MR. JOHN B. FICKER

PRESIDENT, THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE

The National Industrial Transportation League is pleased to have been invited to present testimony on economic, service, and capacity issues in the freight railroad industry. The League is the nation's oldest and largest association of companies interested in transportation. Its 600-plus members range from some of the largest companies in the nation to much smaller enterprises. Many members of the League ship via rail, and are vitally interested in the capacity, service, and competitiveness of the nation's rail industry. But League members also substantially ship via other modes, both domestically and internationally, and the problems of capacity must also be looked at in this broader context, as many modes are facing capacity constraints.

The League actively participated in the General Accountability Office (GAO) study which is in part the subject of this hearing. League staff and the incoming League Chairman met for several hours with GAO staff to discuss rail issues, and provided information developed by the League to assist GAO in its study. Much of the League's discussion with GAO centered on the problem of the rail industry's capacity constraints. Also, the League referred GAO staff to League members for additional information. Finally, in March 2006, the League and several of its members appeared before a panel organized by the GAO to consider the current state of the rail industry and to advise GAO on its study.

As requested by the Committee, the League has reviewed the draft testimony of the GAO, which describes that Office's ongoing work on the performance of the rail industry since the Staggers Act. The League compliments the GAO on its work to date, and concurs with a number of the tentative conclusions set forth in GAO's testimony. The GAO testimony discusses two areas that are particularly integral to further improvement for rail industry policymakers, both of which deserve comment.

First, GAO notes that, while the STB has broad legislative authority to investigate industry practices, there has been little assessment of competition nationally, including areas of inadequate competition. GAO notes that such an assessment of competition would allow decision makers to identify areas where competition is lacking and to assess the need for and merits of approaches to address it. The League agrees that a study of competition and areas of inadequate competition would be useful to policymakers, and urges the Committee to consider such a study. In that connection, the League notes that, in its experience, rail competition, in order to be effective, must be present at both the origin <u>and</u> the destination of a rail movement. For example, if an agricultural shipper at origin is served by a single rail carrier, the fact that the export grain elevator at destination might be served by more than one railroad does not create rail-to-rail competition under current law, since the shipper at origin cannot require its sole-served origin carrier to interchange with a competing rail carrier for the movement to destination.

Second, GAO indicates that the current rate relief process is expensive, time-consuming, complex, and largely inaccessible to most shippers. The League <u>strongly</u> agrees. The League has presented to the STB, along with 26 other industry organizations, numerous suggestions for improving the agency's small shipment rate complaint process. To date, however, the STB has not acted on these suggestions. In addition, the League concurs with GAO that alternative

approaches should be investigated, including (and especially) the use of expedited, mandatory arbitration for rail rate and service disputes. The League believes that such an arbitration process has great potential for effectively resolving disputes between shippers and carriers, both through expediting the dispute process and in encouraging settlements.

The rail industry is laboring under significant capacity constraints for the first time in over 50 years. Since 1980, demand for rail transportation has steadily increased while rail capacity has declined. We have reached a point where demand has exceeded the industry's capacity to haul all of this traffic. This has caused congestion over significant parts of the national rail system, resulting in a substantial deterioration in service levels. The AAR's own figures show that average train speed declined between 1993 and 2003, from about 23 miles per hour to a little over 20 miles per hour.[1] Monthly service statistics published by the AAR show that average train speed for the total U.S. shows a decline from 23 miles per hour in 2000 to less than 22 miles per hour in the twelve-month period ending in September 2005. Meaningful service provisions in contracts are virtually impossible to obtain. Some service-sensitive shippers such as UPS, who so stated in the recent GAO panel discussion, have shifted their traffic to truck, further exacerbating the congestion and wear on the nation's highways.

These capacity constrains have also substantially enhanced the pricing leverage of the rail industry, which is evident in substantial rate increases across all commodities and the de-marketing of less profitable traffic. As stated by GAO in its testimony, four large Class I carriers control almost 90% of the industry's revenue. Many shippers are facing double digit rate increases along with reduced or deteriorating service. Rate negotiations have become a "take it, or leave it" proposition for many shippers. We believe that the effects of these capacity

---

[1]   AAR, "Railroad Ten-Year Trends 1993-2002," p. 132; and "Railroad Ten Year Trends, 1994-2003," p. 132.

3

constraints in the rail industry on prices is felt across modes. Just two days ago, the Council of Supply Chain Management Professionals released the 17th annual "State of Logistics Report." That report stated that, between 2004 and 2005, transportation costs jumped 14.1 percent – a staggering figure, and a "record high," according to the Council.[2]

The inability of the rail industry to meet current demand causes even greater concern for the future. Any projection of future economic growth indicates that the need for transportation will grow dramatically in the next 15 years. For example:

- The American Association of State Highway and Transportation Officials ["AASHTO Report"] projects that, with moderate economic growth, U.S domestic and international freight tonnage will grow by 67% between 2000 and 2020.[3]

- According to the AASHTO Report, rail tonnage is expected to grow by 44%, which is significantly less than the overall growth in freight tonnage.

- The Port of Los Angeles/Long Beach estimates that containerized imports through that port will grow by 44% from 2005 to 2010, by another 34% in 2015; and by another 34% in 2020 – in total more than doubling the traffic through this key facility in just 15 years.[4]

In order to meet current and future demand, the rail industry must expand existing capacity. This will require both the industry and the policymakers to shift radically from a mind-set of cost control and downsizing, to one of growth and expansion.

Rail users are vitally dependent upon a financially healthy rail system, as there is no way for many of them to efficiently transport their goods to market except via rail. Fortunately, the railroad industry is thriving financially for the first time since the Staggers Act, and well before.

---

[2] "17th Annual State of Logistics Report," sponsored by the Council of Supply Chain Management Professionals, June 19, 2006, p. 4.
[3] AASHTO Report, p. 50.
[4] See, http://www.polb.com and http://www.portoflosangeles.org

4

The financial markets have been "bullish" on the rail industry for several years. In a recent Morgan Stanley report,[5] respected analyst James Valentine expressed:

> even greater conviction that the industry will consistently earn its cost of capital over the next few years (a feat not achieved in decades), led by secular upward pricing initiatives that should continue into 2006 and beyond.

This is strong evidence that the financial strength exhibited by railroads is not a temporary phenomenon, but a paradigm shift in rail transportation markets brought about in large part by capacity constraints.

Such statements also suggest that the STB's measure of revenue adequacy significantly overstates the financial returns needed for "real-world" revenue adequacy. For example, despite the financial success of the rail industry over the past several years and reflected in the previously quoted Wall Street assessment of the industry, the STB determined that only one Class I railroad (Norfolk Southern) was revenue adequate in 2004, and that is expected to be the case for 2005 as well. The balance intended in the Staggers Act between allowing competition to establish reasonable rates "to the maximum extent possible" and the policy of fostering a financially healthy rail industry, has been upset by the agency's over-reliance on a questionable methodology of calculating revenue adequacy.

Competition is at the heart of our nation's economic system. It creates a sense of urgency that enables companies to thrive. It spurs efficiency. It allocates resources in the most efficient manner. Competition, therefore, is essential to encourage the most efficient use of today's capacity constrained rail infrastructure and to spur investment in additional infrastructure. Competition encourages the most efficient use of limited capacity by ensuring that goods are moved over the most efficient route available. Competition also ensures that the capital for

---

[5] James Valentine and Michael Manelli, Morgan Stanley Equity Research, "All Aboard! Reiterating Bulling Vies Towards Freight Railroads," Sept. 20, 2005, p. 1 ("Valentine Report").

5

capacity expansion flows to the most economically beneficial projects for the rail transportation system. Indeed, increasing capacity would likely lead to increased competition, as rail carriers sought to attract valuable traffic to their system.

With the financial health of the rail industry no longer an immediate issue, and with the enhanced leverage of railroads in a capacity-constrained market at a time of deteriorating service levels, it is time for a more balanced approach. Direct government regulation seldom has been as effective as the marketplace at increasing efficiency. Emphasis must shift towards the creation of <u>value</u> to the shipping public. The creation of value will occur if railroads and shippers, spurred by the incentives of the market place, work together to identify sources of productivity gains and cost reductions in order to provide a consistent level of service that fully utilizes existing capacity to the maximum extent possible and encourages the addition of more capacity.

The League believes that solutions to these problems must come from the private sector, and the League has over the past year has initiated several efforts at private-sector solutions to various problems.

One set of discussions concerned rail fuel surcharges. This issue has become extremely important to our members, who believe that many of the carriers' fuel surcharge programs have significantly over-recovered the increased cost of fuel as applied to individual movements. Over the past nine months, the League met, along with the National Grain and Feed Association (NGFA), with representatives of each of the major Class I carriers, to present the results of a Fuel Surcharge Study which the League, NGFA and other groups sponsored, and to discuss areas where individual carriers might consider improving their fuel surcharge programs. Some carriers, specifically the BNSF, the Canadian National, and the Canadian Pacific, responded

positively to these discussions with changes in their individual fuel surcharge programs. Other carriers, especially the Eastern carriers, declined to respond.

Additionally, in 2005, the League chose to remain neutral on S.919, and instead entered into discussions with the AAR to identify ways that shippers and carriers can work together to find value through productivity gains and cost reductions that could address the issues and concerns between them. The League and the AAR have formed a number of task forces to examine and address issues connected with local rail service, capacity and infrastructure, and office administration. For about a year now, these task forces have met several times to identify issues and plan improvements. The League continues to pursue these discussions diligently, and remains hopeful that they will yield positive results. However, the League remains mindful that the status quo -- a trifecta of deteriorating service, double-digit rate increases, and serious questions as to whether there are sufficient means and incentives to meet future demand -- is unacceptable.

These are matters of significant importance to rail users and it is essential that solutions are found and that resolutions are reached between rail users and carriers. We believe that League membership will need to see some concrete results flowing from the League's discussions with the AAR within a reasonable time frame. If that does not occur, it is likely that the League's membership would insist that the League review its current position. We urge the Committee to insure that rail carriers and users are moving forward in a serious, focused and positive effort in the development of effective mutual solutions. We would urge the Committee to provide oversight to this process. We would be very pleased to report back to the Committee on the progress of the League's discussions with the AAR and its carriers.