# Exhibit 17

(Prystowsky Declaration)

# RAIL COMPETITION AND SERVICE

**(110–70)**

# HEARING

BEFORE THE

## COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

SEPTEMBER 25, 2007

Printed for the use of the
Committee on Transportation and Infrastructure



RAIL COMPETITION AND SERVICE

RAIL COMPETITION AND SERVICE

RAIL COMPETITION AND SERVICE

RAIL COMPETITION AND SERVICE

RAIL COMPETITION AND SERVICE

RAIL COMPETITION AND SERVICE

RAIL COMPETITION AND SERVICE

# RAIL COMPETITION AND SERVICE

(110–70)

# HEARING

BEFORE THE

## COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

## HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

SEPTEMBER 25, 2007

Printed for the use of the
Committee on Transportation and Infrastructure



U.S. GOVERNMENT PRINTING OFFICE

38–170 PDF               WASHINGTON : 2007

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

JAMES L. OBERSTAR, Minnesota, *Chairman*

NICK J. RAHALL, II, West Virginia, *Vice Chair*
PETER A. DeFAZIO, Oregon
JERRY F. COSTELLO, Illinois
ELEANOR HOLMES NORTON, District of Columbia
JERROLD NADLER, New York
CORRINE BROWN, Florida
BOB FILNER, California
EDDIE BERNICE JOHNSON, Texas
GENE TAYLOR, Mississippi
ELIJAH E. CUMMINGS, Maryland
ELLEN O. TAUSCHER, California
LEONARD L. BOSWELL, Iowa
TIM HOLDEN, Pennsylvania
BRIAN BAIRD, Washington
RICK LARSEN, Washington
MICHAEL E. CAPUANO, Massachusetts
JULIA CARSON, Indiana
TIMOTHY H. BISHOP, New York
MICHAEL H. MICHAUD, Maine
BRIAN HIGGINS, New York
RUSS CARNAHAN, Missouri
JOHN T. SALAZAR, Colorado
GRACE F. NAPOLITANO, California
DANIEL LIPINSKI, Illinois
DORIS O. MATSUI, California
NICK LAMPSON, Texas
ZACHARY T. SPACE, Ohio
MAZIE K. HIRONO, Hawaii
BRUCE L. BRALEY, Iowa
JASON ALTMIRE, Pennsylvania
TIMOTHY J. WALZ, Minnesota
HEATH SHULER, North Carolina
MICHAEL A. ACURI, New York
HARRY E. MITCHELL, Arizona
CHRISTOPHER P. CARNEY, Pennsylvania
JOHN J. HALL, New York
STEVE KAGEN, Wisconsin
STEVE COHEN, Tennessee
JERRY McNERNEY, California
LAURA A. RICHARDSON, California

JOHN L. MICA, Florida
DON YOUNG, Alaska
THOMAS E. PETRI, Wisconsin
HOWARD COBLE, North Carolina
JOHN J. DUNCAN, Jr., Tennessee
WAYNE T. GILCHREST, Maryland
VERNON J. EHLERS, Michigan
STEVEN C. LaTOURETTE, Ohio
RICHARD H. BAKER, Louisiana
FRANK A. LoBIONDO, New Jersey
JERRY MORAN, Kansas
GARY G. MILLER, California
ROBIN HAYES, North Carolina
HENRY E. BROWN, Jr., South Carolina
TIMOTHY V. JOHNSON, Illinois
TODD RUSSELL PLATTS, Pennsylvania
SAM GRAVES, Missouri
BILL SHUSTER, Pennsylvania
JOHN BOOZMAN, Arkansas
SHELLEY MOORE CAPITO, West Virginia
JIM GERLACH, Pennsylvania
MARIO DIAZ-BALART, Florida
CHARLES W. DENT, Pennsylvania
TED POE, Texas
DAVID G. REICHERT, Washington
CONNIE MACK, Florida
JOHN R. 'RANDY' KUHL, Jr., New York
LYNN A WESTMORELAND, Georgia
CHARLES W. BOUSTANY, Jr., Louisiana
JEAN SCHMIDT, Ohio
CANDICE S. MILLER, Michigan
THELMA D. DRAKE, Virginia
MARY FALLIN, Oklahoma
VERN BUCHANAN, Florida

(II)

450

**Testimony of Ron Harper**
**Chief Executive Officer and General Manager**
**Basin Electric Power Cooperative**

**Before the**
**House Transportation and Infrastructure Committee**

**Hearing on Rail Competition and Service**

**September 20, 2007**

Mr. Chairman and Members of the Committee, my name is Ron Harper. I am Chief Executive Officer and General Manager of Basin Electric Power Cooperative. I appreciate the Committee taking the time to hold this important hearing and for the opportunity to be here today. The railroad customer issue is vitally important to Basin Electric and the rural electric consumer-owners we serve.

Let me begin by emphasizing the seriousness of the current rail situation we are facing. Today, no protection from monopoly rail abuses exists for rail customers. Others here can speak to the need for legislative fixes. I would like to focus my testimony on the current regulatory system, which is broken and in urgent need of repair. I know this based on our direct experience.

Congress has statutorily mandated that rail rates on market dominant traffic "must be reasonable." My cooperative is engaged in a grueling, massive, and expensive ratemaking proceeding in an attempt to obtain our statutory right to reasonable rail rates. Moreover, the Surface Transportation STB (STB) imposed additional rule changes in the middle of hearing our case. In a decision released on September 10, 2007, three years after we filed our complaint, the STB upheld the challenged rates and denied us any relief.

We played by all of the rules. We submitted volumes of evidence supported by dozens of expert witnesses -- the most comprehensive rate case ever presented to the STB. We responded promptly and completely to the STB's every request and filed multiple rounds of supplemental information. We had a strong case and met all of the evidentiary requirements for establishing the unreasonableness of the involved rates.

In the end, it appears we were victims of "bait and switch" tactics by the STB. After mountains of evidence were filed, and the evidentiary record closed, the STB implemented new rules it claimed would improve the rate review process. They promised it would not prejudice our case. They were wrong. In its final decision, the STB admitted the new rule changes were prejudicial to us and may have destroyed any prospects for us to obtain rate relief.

The clear message from the STB to customers through our decision is quite simple: we are here to protect the economic interests of the railroads no matter the costs to the public. The STB has abdicated its statutory responsibility, and has made it impossible for Basin Electric to do business in a reasonable way with our railroad service providers. In regions of the country where there is often only one railroad service provider, there is nothing to stop the railroads from being the sole determiner of the economic livelihood of rural populations. This is outrageous.

1

451

### Overview of Basin Electric Power Cooperative

Basin Electric is headquartered in Bismarck, North Dakota. Since its beginning in 1961, Basin Electric has evolved into a network of electric generating facilities with 3,500 megawatts of capacity and owns 1,800 miles of transmission. We provide low-cost, wholesale power to 124 member systems and other customers in nine states that, in turn, distribute electricity to 2.5 million primarily rural American consumers. More than 90 percent of this generation is coal based. Of that coal generation, we operate generating stations located at the mines and also operate facilities that depend on rail transportation for their coal.

One facility that is entirely dependent on rail is the Laramie River Station (LRS) near Wheatland, Wyoming. We own 42 percent LRS and operate the facility on behalf of five other not-for-profit partners. LRS consists of three 550-megawatt turbines. And, being this large, we need a lot of coal. The facility uses 24,000 tons of coal a day on average.

### BNSF's Imposed Transportation Rates

The last generating unit at LRS was built in 1982. Rail service to the plant is provided exclusively by BNSF Railway Company (BNSF), which is the only railroad that serves LRS. There are no other transportation options. Beginning in the early 1980s, we had a contract with BNSF to haul coal the 175 miles from the Powder River Basin coal mines to LRS. The contract served both parties well, and BNSF made considerable money on it – more than $300 million in profits during the 20-year contract term.

When our contract expired in 2004, BNSF dramatically raised its rates. In fact, BNSF more than doubled the already highly profitable freight rates from the previous LRS contract, amounting to $1 billion in rate increases over the next 20 years. We had little choice but to bring a rate case at the STB to protect our consumers from this massive rate increase.

Our rate case pointed out that no coal shipper has ever faced a rate increase of this magnitude. BNSF did not dispute this. It was clear that BNSF was attempting to set an example of us with their pricing actions. BNSF stated one reason we were targeted for a rate increase was because our history as a low-cost provider of electric power to consumers. BNSF made the preposterous claim that the farmers, ranchers, and other consumers served LRS can afford to pay much more and should pay much more for their electricity.

BNSF's message is clear: if you are a low-cost provider, "watch out." We want to extract your customers' savings and transfer them to us and our shareholders. Captive electric cooperatives and rural consumers appear to be particularly vulnerable to similar railroad rate abuses.

We had a very solid case and proved the BNSF has gone too far. Unfortunately, the STB disagreed. In fact, the STB expressed no concern about monopoly railroads exploiting their customers economically. To the contrary, in its decision denying us relief, the STB ignored our undisputed evidence on the unprecedented magnitude of BNSF's rates. The STB stated our rates still appeared low compared to rail customers more than 1,000 miles further away from the same mines from which LRS obtains its coal.

2

452

The railroads are fond of saying that they are only seeking to impose "market-based" rates on captive shippers such as Basin Electric. But that is just jargon for "monopoly rates." The reality is that BNSF's unprecedented rate actions involving Laramie River produced initial rates that approached or exceeded BNSF's service costs by 500 percent -- far above BNSF's system average of 142 percent. The revenue/variable cost ratios are well in excess of 600 percent today. The STB did not even acknowledge any of this undisputed evidence. In fact, you cannot find any revenue/variable cost information anywhere in the STB's 139-page decision – likely because the STB does not want the public to know the real magnitude of rate increases it is sanctioning.

How much is enough? Where there is a lack of market competition, what is a reasonable rate for a railroad to charge a coal customer? In the case of LRS, the answer from the STB is that rates at or above 500 percent of costs are not excessive, and that $1 billion in rate increases over time are reasonable. I respectfully submit that the STB and the BNSF are completely wrong; these monopoly abuses should not be tolerated, and there is a clear need for Congress to step in and address the situation.

**Withstanding the STB's Rate Case Processes**

In order for the Committee to fully understand the arcane rigors of the rate case regulatory process, I must explain the process we endured over the past three years.

The LRS case was filed with the STB on October 19, 2004. The STB actively administered a procedural schedule calling for the parties to submit their evidentiary filings between April and September of 2005. We proceeded to expend $6 million to present a Stand-Alone Cost (SAC) analysis that was supported by 26 expert witnesses and more than 1,200 pages of narrative testimony and argument; 116 exhibits consisting of more than 1,050 pages; 7,223 pages of hard-copy workpapers; and numerous CDs containing tens of gigabytes of supporting electronic workpapers. Following the completion of these evidentiary filings, the parties, at the STB's express direction, submitted final briefs on December 6, 2005.

As matters stood at the end of 2005, a final decision in the case was due under the governing statute by September 6, 2006. In 1995 Congress enacted a policy "to require fair and expeditious [railroad] regulatory decisions." Because of past agency problems, Congress further imposed specific statutory deadlines requiring large rate reasonableness cases be decided within 9 months after the close of the record. These deadlines were not met in the LRS case.

After all filings were submitted, and the record was closed, on February 27, 2006, the STB issued an order that effectively suspended, and reopened a portion of, our case. The STB further implemented a new rulemaking in Ex Parte No. 657 (Sub No. 1), ostensibly to improve the rate case standards and make them easier and fairer to apply. In doing so, STB changed its long-standing practice of deciding SAC issues in individual cases, and not in rulemaking proceedings. No rail customers asked for the rulemaking, and, in fact, customers uniformly opposed the rulemaking. All of the major railroads supported the rulemaking. That clearly tells you something about the STB's intentions. By the way, this all occurred shortly after former STB Chairman Roger Nober became employed as an upper-level officer of the BNSF.

In response to the rulemaking, we submitted three rounds of comments, with final rules issued by the STB on October 30, 2006. In its final decision, the STB rejected our pleas that portions of

3

453

the rulemaking were extremely prejudicial, and that it was arbitrary and capricious to apply parts of the new rules retroactively in our case. In addition to our comments on the rulemaking, we were asked to file supplemental rounds of evidence in our case. Altogether, since "final briefs" were filed in December 2005, we were asked to file seven evidentiary submissions, which we did, with the last filing made in April 2007.

The STB's final decision in our case was served on September 10, 2007 – more than one year after the statutory deadline for deciding our case. The STB's decision gratuitously asserts that while the STB did not find our rates to be unreasonable, its mid-course change in the governing rules "clearly could have prejudiced" our case. The STB therefore is providing us with an opportunity to again modify our evidence in light of the new governing rules that they implemented during the pendency of our case. After spending more than three years on our case, the STB has given us just 30 days to decide whether to file even more supplemental evidence in an attempt to save our case. Mr. Chairman, enough is enough.

The STB made us expend the time, resources, and money to file our complete case. Then they told us that the standards would be reworked, requiring a whole new set of evidentiary filings and supplemental evidence at considerable expense. To date, Basin Electric has spent $6 million on this case. Clearly, the above actions constitute an administrative abomination. By its actions, the STB delayed our case, increased our litigation costs, and sabotaged our evidence. These actions also played into the hands of railroad lawyers who have a blank check from their employers to run-up legal costs in rate cases in order to discourage shippers from challenging railroad rates. We take little solace in the STB granting us the opportunity to file additional evidence in our case given the agency's track record.

## What Can Be Done?

I respectfully submit that the Laramie River Station rates are not the type of market-based actions that Congress envisioned when enacting the Staggers Rail Act. Notwithstanding the STB's recent decision in our case, these are the very type of monopoly rate and service abuses that regulation is designed to prevent. It is not fair for consumers to bear the brunt of these monopoly rate abuses.

We played by all of the rules and presented overwhelming evidence that the challenged LRS rates were unreasonable and met the STB's test for unreasonableness. But we were still denied relief. The bottom line is that there is no longer any reason for us to believe that the STB's coal rate case standards can ever provide effective relief against monopoly railroad rate abuses. To be clear, we had serious reservations over the STB's ratemaking process and the one-sided manner in which the STB had decided its recent rate cases. In the end, our concern for our consumers outweighed our regulatory concerns. We did everything we could, and everything asked of us, to comply with the rules. Obviously, that wasn't good enough.

Mr. Chairman, something must be done to prevent railroad pricing abuses and service shortages that are causing considerable economic harm to the public. Time and time again, the STB has come to Congress and represented that it is an effective regulator that protects the rights of rail customers. However, the STB's actions don't match its words. Railroads win. Customers lose. If you do not have dedicated public servants who are willing to adhere to their statutory responsibility and protect the public interest, the process or standards in place do not matter.

4

454

Congress must take action. Something needs to be done immediately to restore balance and fairness in decision-making, and to ensure that the STB's coal rate case standards provide effective relief against monopoly railroad rate abuses. I respectfully request that this Committee demand the regulators do their job to block unwarranted and unreasonable rate demands of monopoly railroads. If the regulators are unwilling to do their jobs, which by all appearances is the case today, Congress needs to take measures to ensure the regulators are not controlled by the industry they are supposed to regulate.

I greatly appreciate this opportunity to share my views with the Committee on this important subject.