# Exhibit 40

(Prystowsky Declaration)

# THOMPSON HINE

ATLANTA    CINCINNATI    COLUMBUS    NEW YORK
BRUSSELS    CLEVELAND    DAYTON    WASHINGTON, D.C.

216411

April 27, 2006

*Via Hand Delivery*

The Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K St. N.W.
Washington, D.C. 20423

ENTERED
Office of Proceedings
APR 27 2006
Part of
Public Record

RE: STB Ex Parte No. 661; Rail Fuel Surcharges

Dear Secretary Williams:

Please find enclosed the original and ten (10) copies of The National Industrial Transportation League's Written Testimony regarding Rail Fuel Surcharges along with a diskette containing a PDF and Word version for filing in the above referenced proceeding.

An extra copy of the Testimony is enclosed for stamping and returning to our offices.

Should you have any questions regarding the foregoing, please do not hesitate to contact the undersigned.

Sincerely,

Nicholas J. DiMichael

Case 1:07-mc-00489-PLF-JMF Document ... Filed ... Page ...

BEFORE THE

SURFACE TRANSPORTATION BOARD



Ex Parte No. 661

RAIL FUEL SURCHARGES

# Written Testimony

submitted by

# THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE

THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE
1700 North Moore St.
Suite 1900
Arlington, VA 22209

ENTERED
Office of Proceedings
APR 27 2006
Part of
Public Record

By Its Attorneys

Nicholas J. DiMichael
Laurence W. Prange
Thompson Hine LLP
1920 N St. N.W.
Suite 800
Washington, D.C. 20036
(202) 263-4103

Dated: April 27, 2006

BEFORE THE

SURFACE TRANSPORTATION BOARD

---

Ex Parte No. 661

RAIL FUEL SURCHARGES

---

**Written Testimony**

submitted by

**THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE**

---

In a Notice of Public Hearing issued by the Board on March 14, 2006 ("Hearing Notice"), the Board announced that it would hold a hearing to provide interested persons an opportunity to express their views on the subject of fuel surcharges collected by railroads. The Board noted that the cost of fuel is a significant component of the operating costs of providing rail service, and railroads can be reasonably expected to devise methods to collect increases in those costs from shippers. The Board also indicated that the rail shipper community has voiced concerns that recent fuel surcharges collected by railroads are designed to recover amounts over and above increased fuel costs. The Board stated that the proceeding will focus on "whether railroad fuel surcharges are being set in such a manner as to insure that they are used only to recover the increased costs of fuel for the particular movements to which the surcharge is applied." Hearing Notice, p. 2. In addition, the Board asked parties to comment on whether and how the Board's reporting requirements should be adjusted to provide rail customers with better information on a carrier's fuel costs and the revenues collected through fuel surcharges.

This Written Testimony is submitted by The National Industrial Transportation League ("League") in response to the Board's Hearing Notice. The League is an association of companies interested in transportation, and many of its members ship goods via rail. Beyond this general interest, however, the League, along with the National Grain and Feed Association ("NGFA") and other organizations, has analyzed rail fuel surcharge programs and has engaged in discussions with individual rail carriers regarding their fuel surcharge programs. Rail fuel surcharges significantly affect the cost that users of the rail system must pay for rail transportation, and the League has been vitally interested in this topic since fuel surcharges began to be collected by the carriers in 2002, and even well before.

The League strongly commends the Surface Transportation Board for conducting this proceeding, and the League believes that the Board can play a constructive role in improving rail fuel surcharge programs to make them more transparent and more equitable. The League appreciates the opportunity to comment current rail fuel surcharge programs, and on how the Board can be helpful to railroads and their customers in this important area.

I. THE LEAGUE'S POSITIONS

A. The League believes that railroad fuel surcharge programs, if properly structured, are an appropriate method for recovering extraordinary changes in a railroads' fuel costs. Such programs are particularly useful for the recovery of unexpected increases or decreases in fuel expenses; when the magnitude of changes in the cost of fuel is substantial; or when the changes are particularly frequent. However, in addition to rail fuel surcharges, railroads and their customers also frequently use other structured methods of recovering changes in fuel costs, such as the Rail Cost Adjustment Factor ("RCAF") established by the Board's predecessor agency the Interstate Commerce Commission, which contains a fuel component. In still other situations, a



**Norfolk Sourthern Railroad**
**Change in Fuel Expense Per Car vs. Fuel Surcharge Revenue Per Car**
**4th Quarter 2001 to 4th Quarter 2005**



**CSX Transportation**
**Change in Fuel Expense Per Car vs. Fuel Surcharge Revenue Per Car**
**4th Quarter 2001 to 4th Quarter 2005**

18



BNSF Railroad
Change in Fuel Expense Per Car vs. Fuel Surcharge Revenue Per Car
4th Quarter 2001 to 4th Quarter 2005



Union Pacific Railroad
Change in Fuel Expense Per Car vs. Fuel Surcharge Revenue Per Car
4th Quarter 2001 to 4th Quarter 2005

The above graphs comparing each carrier's increased fuel expense per car for each quarter from 4Q01 to 4Q05 to each carrier's carload fuel surcharge revenue per car shows that, especially for the Eastern carriers, there has been an increasing spread between per car expense and surcharge revenue as their fuel surcharge programs have moved to higher and higher levels. In particular, the Eastern carriers' "spread" between fuel expense per car and fuel surcharge revenue per car began to increase dramatically after 1Q03, when the Eastern carriers reduced the WTI "trigger point" for fuel surcharge increases from $28 per barrel to $23 per barrel.

This analysis cannot close without discussing the effects of percentage-based fuel surcharge programs applied to the rate, which have been adopted by all carriers except BNSF for some of its traffic. There are substantial differences in the rates on different commodities moving under similar circumstances (e.g., two hopper cars containing two commodities weighing approximately the same and transported on the same train) transported from the same origin to the same destination. The differences in rates are a result of differential pricing. With respect to the carrier's fuel expense for transporting these commodities, the expense is precisely the same. Yet, a fuel surcharge imposed as a percentage of the rate produces a "cost recovery" that is significantly different. This is illustrated below for an eastern and a western carrier:

**Various Commodities Shipped from Eugene to Chicago Assuming 150,000 lbs. Lading Weight Via BNSF**

| BNSF Rate Source | Product | 50' Boxcar Rate | 4/06 FSC % | FSC $ |
|---|---|---|---|---|
| BNSFQ 80021 | Grass Seed | $3,751 | 12.5 | $469 |
| BNSFQ 110966 | Particleboard | $3,879 | 12.5 | $485 |
| BNSFQ 110965 | Plywood | $3,960 | 12.5 | $495 |
| BNQ 105355 | Lumber | $4,051 | 12.5 | $506 |
| BNSFQ 112150 | Pulp | $5,225 | 12.5 | $653 |
| BNSFQ 111262 | Paper | $7,035 | 12.5 | $879 |

### Tank Car Movements of Caustic Soda and Chlorine Shipped from Niagara Falls, NY to Charlotte, NC Via CSX

| Rate Document | Commodity | Rate Per Car | Weight | 4/06FS % | FSC $ |
|---|---|---|---|---|---|
| CSXT28122 | Caustic Soda | $3,765 | 198,000 | 15.6 | $587.34 |
| CSXT28128 | Chlorine | $5,866 | 180,000 | 15.6 | $915.20 |

The same result occurs with the same commodity transported in private cars versus railroad-owned cars.

### Lumber shipment from Eugene, OR to Chicago, IL via UP 73' Center-beam Flat car – railroad owned car vs. non-railroad owned car

| Rate Document | Product | 73' High Cap CB Rate | April FSC % | FSC $ |
|---|---|---|---|---|
| UP Circular 24 System Car | Lumber | $5,049 | 12.5 | $631 |
| UP Circular 24 Non-System Car | Lumber | $5,453 | 12.5 | $682 |

Plainly, however, the fuel cost for transporting a private car containing "commodity x" between two points is exactly the same as the fuel cost for transporting the same commodity in a railroad-owned car.

Finally, the eastern and western carriers' use of different indexes to calculate their fuel surcharge percents produce apparent anomalies and inequities. As noted in Section II above, the BNSF and UP use the DOE retail on-highway diesel fuel price for calculating their carload fuel surcharge percent, while the NS and CSX use the WTI crude oil price for calculating their fuel surcharge percent for carload traffic. But these calculations produce substantially different numbers for carload traffic. For example, in April 2006, the BNSF and UP carload fuel surcharge is 12.5 percent, while the CSX and NS fuel surcharge for carload traffic is 15.6 percent, or 25% higher. While it can be expected that different carriers will, because of their market purchases, cost structure, terrain and operating conditions, and other factors, have

21

different fuel costs for the same type of traffic, it seems unlikely that the eastern and western rail carriers' fuel costs for carload traffic differ by twenty-five percent. At the very least, differences of this magnitude should be supported and justified.

VI.  THE BOARD CAN REGULATE RAILROAD FUEL SURCHARGE PROGRAMS UNDER ITS UNREASONABLE PRACTICE JURISDICTION

Dramatic increases in fuel prices are not new occurrences. The oil embargoes of the 1970's resulted in fuel shortages and dramatic price increases. To recover the increased cost of fuel, the ICC permitted the railroads to implement fuel surcharge programs. *See, Special Permission No. 74-1825*, ICC. The railroads collectively issued fuel surcharge increases through the Association of American Railroads ("AAR").

Frequent and minor modifications were made to the fuel surcharge rate during 1974. When the AAR proposed the sixth rate increase that year, from 3.3% to 3.5%, shippers objected. *See also, Fuel Related Increases, X-305-A*, 349 ICC 173, (Feb. 26, 1975). The League joined with others to challenge the lawfulness of the practice of frequent and minor increases. *Id.* The League asserted that the piecemeal and repetitive nature of the fuel surcharges was "impractical in comparison with the burden upon both carriers and shippers in areas such as billing, rate retrieval, and computer programming." 349 I.C.C. at 176.

The Commission rejected the proposed increase as not being "just and reasonable." 349 ICC at 177. Specifically, the ICC held that the repetitive filings of new charges for minor cost or percentage increases " ... are not in the best interest of the shipping public and, in fact, approach the status of an unreasonable practice." *Id.*

22

The Commission also addressed fuel surcharge procedures in the Ex Parte 311 proceedings. Through these proceedings, the ICC adopted a means of "permitting the expedited recovery of fuel cost increases brought about by an import tax or alternative measures having the effect of precipitously increasing the price of fuel." *Effect of Modifying Proclamation No. 3279 and Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject to the Interstate Commerce Act,* Ex Parte No. 311, 350 ICC 563, 564 (ICC August 14, 1975). In its initial proceeding under this matter, the ICC decided that a procedure for the adoption of a special permit was necessary when a carrier sought a fuel surcharge.

The ICC again revisited fuel surcharge programs in the *Modification of the Motor Carrier Fuel Surcharge Program,* Ex Parte No. 311 (Sub-No. 4), 365 ICC 311 (Oct. 5, 1981). The Commission initiated the proceeding "to consider improving" the revenue-based fuel surcharge program it had adopted in 1979. The Commission indicated that the revenue-based fuel surcharge program then in place did not "accurately reflect the fuel-related cost component of a rate" and had resulted in "several serious distortions in the rate structure." The Commission thus terminated the revenue-based fuel surcharge program and adopted a mileage-based program.

The Commission held that the national transportation policy required the promotion of efficient transportation and fair working conditions for owner-operators. The Commission further stated that its authority to require a mileage-based fuel-surcharge was derived from its authority to affect the compensation of owner-operators. The Commission noted that through the mileage-based fuel surcharge program, it was not actually regulating compensation, but was instead "merely prescribing a *procedure* relating to an individual component of compensation."