# Exhibit 45

(Prystowsky Declaration)

United States Government Accountability Office

**GAO** Report to Congressional Requesters

October 2006

# FREIGHT RAILROADS

## Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed



GAO
Accountability * Integrity * Reliability

GAO-07-94



**Highlights**

Highlights of GAO-07-94, a report to congressional requesters

October 2006

# FREIGHT RAILROADS

## Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed

### Why GAO Did This Study

The Staggers Rail Act deregulated the freight rail industry, relying on competition to set rates, and allowed for differential pricing (charging higher rates to those more dependent on rail). The act gave the Surface Transportation Board (STB) authority to develop remedies for shippers "captive" to one railroad and set a threshold for shippers to apply for rate relief. GAO was asked to review (1) changes in the railroad industry since the Staggers Rail Act, including rates and competition; (2) STB actions to address competition and captivity concerns and alternatives that could be considered; and (3) freight demand and capacity projections and potential federal policy responses. GAO examined STB data, conducted interviews, and held an expert panel.

### What GAO Recommends

GAO recommends that STB analyze the state of competition and consider appropriate actions. GAO also recommends that DOT consider strategies to level the playing field for all freight modes to maximize public benefits from federal investment. STB disagreed with our recommendation because it would take resources from efforts it believes will address GAO concerns, among other reasons. We recognize STB's efforts, but believe further analysis is needed. STB should seek more resources from Congress if needed. DOT took no position on our recommendation.

www.gao.gov/cgi-bin/getrpt?GAO-07-94.

To view the full product, including the scope and methodology, click on the link above. For more information, contact JayEtta Z. Hecker at (202) 512-2834 or heckerj@gao.gov.

### What GAO Found

Changes in the railroad industry since the Staggers Rail Act are widely viewed as positive, as the industry's financial health has improved and most rates have declined; however, concerns over competition and captivity remain. Rail rates generally declined between 1985 and 2000, then increased slightly from 2001 through 2004. Concerns about competition and captivity remain as traffic is concentrated in fewer railroads. It is difficult to determine the number of "captive" shippers as proxy measures can overstate or understate captivity. Nevertheless, GAO's analysis of limited available measures indicates that the extent of captivity appears to be dropping, but the percentage of traffic traveling at rates substantially over the threshold for rate relief has increased. Also, some areas with access to only one major railroad have higher percentages of traffic traveling at rates above the threshold. These findings may reflect reasonable economic practices by the railroads or a possible abuse of market power. GAO's analysis is limited by available data and proxy measures but suggests that shippers in selected markets may be paying excessive rates, meriting further inquiry and analysis.

While STB has taken action, further efforts to improve its rate relief processes and assess competition could help address competition and captivity concerns and inform the merits of proposed alternative approaches. STB's rate relief processes are largely inaccessible and rarely used. STB recognizes this and is taking steps to improve its processes. STB has broad statutory authority to inquire into and report on railroad industry practices and, given a reasonable possibility that some shippers may be paying excessive rates, an assessment of competition could determine whether there is sufficient evidence that market power is being abused in specific markets. While competition between railroads may not always be feasible, alternative approaches have costs and benefits that should be carefully considered to ensure the balance envisioned in the Staggers Rail Act—including the railroads' need for adequate revenues.

Significant increases in freight traffic are forecast, and the industry's ability to meet them is largely uncertain. Investments in rail projects can produce public benefits, such as reducing highway congestion. As a result, federal and state governments have increasingly participated in freight rail projects. In 2005, for example, Congress provided $100 million for rail improvements in the Chicago area. Congress faces additional decisions about potential federal policy responses in years ahead. Responses should recognize that the freight transportation system includes many modes that are treated differently by the federal government and functions in a competitive marketplace and a constrained federal funding environment. In developing a National Freight Policy, the Department of Transportation (DOT) has made a good start by providing context for those decisions and DOT can help sustain the role of the competitive marketplace through strategies that promote a level playing field for freight transportation decision making and acknowledge the constrained federal fiscal environment by focusing federal involvement where demonstrable, wide-ranging public benefits exist.

**United States Government Accountability Office**

# Contents

| | | |
|---|---|---|
| **Letter** | | 1 |
| | Results in Brief | 3 |
| | Background | 6 |
| | Railroad Industry Increasingly Healthy and Rates Generally Down Since Enactment of the Staggers Rail Act, but Concerns about Competition and Captivity Remain | 9 |
| | Despite STB's Actions, Analysis of Competitive Markets Is Needed to Address Lack of Effective Relief for Captive Shippers | 38 |
| | Uncertainty about Future Freight Rail Demand and Capacity Points to Opportunities for a More Strategic Federal Approach to Rail Infrastructure | 53 |
| | Conclusions | 64 |
| | Recommendations for Executive Action | 66 |
| | Agency Comments and Our Evaluation | 67 |
| **Appendix I** | **Participants in GAO's Expert Panel** | 72 |
| **Appendix II** | **Objectives, Scope, and Methodology** | 74 |
| **Appendix III** | **Comments from the Surface Transportation Board** | 77 |
| | GAO Comments | 83 |
| **Appendix IV** | **GAO Contact and Staff Acknowledgments** | 87 |
| **Related GAO Products** | | 88 |

**Tables**

| | |
|---|---|
| Table 1: Changes in Percentage of Industry Revenue and Tonnage on Origin and Destination Routes with Access to One Class I Railroad | 28 |
| Table 2: Possible Changes in R/VC Ratios | 30 |
| Table 3: Potential Public Benefits of Rail Transportation Investments | 58 |

**Figures**

| | |
|---|---|
| Figure 1: Railroads' Tax-Adjusted Return on Investment, 1980-2004 | 10 |
| Figure 2: Trends in Industry Rail Rates, 1985-2004 | 12 |
| Figure 3: Commodity Rate Changes, 1985-1989, 1990-1999, and 2000-2004 | 13 |
| Figure 4: Rate Changes for Coal, Grain, Miscellaneous Mixed Shipments, and Motor Vehicles, 1985-2004 | 14 |
| Figure 5: Rail Rate Increases and Decreases across 604 Routes, and for Long-, Medium-, and Short-distance Routes, 2000 through 2004 | 15 |
| Figure 6: Tonnage Carried by Railcar Ownership, 1987-2004 | 17 |
| Figure 7: Miscellaneous Revenue Tracked in Carload Waybill Sample, 2000-2004 | 18 |
| Figure 8: Percentage of Railroad Market Represented by Four Largest Class I Railroads, 1985-2004 | 20 |
| Figure 9: Comparison of Rates Charged on Long-distance Grain Routes, 1997-2004 | 22 |
| Figure 10: Rate Changes after the Introduction of a Second Carrier | 23 |
| Figure 11: Comparison of Rate Changes from Champaign, Illinois, Economic Area to New Orleans, Louisiana, Economic Area and Champaign, Illinois, Economic Area to Atlanta, Georgia, Economic Area, 1990-2004 | 24 |
| Figure 12: Number of Class I Railroads Serving Economic Areas, 2004 | 26 |
| Figure 13: Percentage of All Industry Tonnage Originating in Economic with Access to One Class I Railroad, 2004 | 27 |
| Figure 14: Changes in Percentage of All Industry Traffic Tonnage with Access to One Class I Railroad Originating in Economic Areas, 1994 through 2004 | 29 |
| Figure 15: Percentage of Industry Tonnage and Revenue Generated from Traffic Traveling at Rates Equal to or Greater Than 180 Percent R/VC, 1985-2004 | 31 |
| Figure 16: Tonnage Traveling at Rates over 300 Percent R/VC, 1985-2004 | 32 |
| Figure 17: Percentage of Tonnage by R/VC, 1985 and 2004 | 33 |
| Figure 18: Changes in Percentage of Tonnage Traveling at Rates over 300 Percent R/VC, by Originating Economic Area, 1985 through 2004 | 34 |
| Figure 19: Long-distance Grain Route Changes in Percentage of Tonnage Traveling at Rates over 300 Percent R/VC, 1985-2004 | 35 |

| | | |
|---|---|---|
| Figure 20: | Overlap between Percentage of Tonnage over Threshold for Rate Relief and Access to Only One Class I Railroad | 37 |
| Figure 21: | Reciprocal Switching | 45 |
| Figure 22: | Terminal Agreements | 47 |
| Figure 23: | Trackage Rights | 48 |
| Figure 24: | Bottleneck Rates | 50 |
| Figure 25: | Paper Barriers | 51 |

**Abbreviations**

| | |
|---|---|
| AASHTO | American Association of State Highway and Transportation Officials |
| ATA | American Trucking Association |
| BEA | Bureau of Economic Analysis |
| CBO | Congressional Budget Office |
| CDOT | Colorado Department of Transportation |
| CREATE | Chicago Region Environmental and Transportation Efficiency program |
| DOT | Department of Transportation |
| FAF | Freight Analysis Framework |
| FHWA | Federal Highway Administration |
| FOA | Final Offer Arbitration |
| GDP | gross domestic product |
| ICC | Interstate Commerce Commission |
| RRIF | Railroad Rehabilitation and Improvement Financing |
| R/VC | revenue to variable cost |
| RRIF | Railroad Rehabilitation and Improvement Financing program |
| SAFETEA-LU | Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users |
| STB | Surface Transportation Board |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



United States Government Accountability Office
Washington, DC 20548

October 6, 2006

Congressional Requesters:

Over 25 years ago, Congress transformed federal regulation of the railroad industry. After almost 100 years of economic regulation, the railroad industry was in serious economic trouble in the 1970s, with rising costs, losses, and bankruptcies. In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980. Together, these pieces of legislation substantially deregulated the railroad industry. In particular, the 1980 act encouraged greater reliance on competition to set rates and gave railroads increased freedom to price their services according to market conditions, including the freedom to use differential pricing—that is, to recover a greater proportion of their costs from rates charged to shippers with a greater dependency on rail transportation. At the same time, the 1980 act anticipated that some shippers might not have competitive alternatives—commonly referred to as "captive shippers"—and gave the Interstate Commerce Commission (ICC), and later the Surface Transportation Board (STB), the authority to establish a process so that shippers could obtain relief from unreasonably high rates. However, only a rate that produces revenue equal to at least 180 percent of the variable cost of transporting the shipment can be challenged. Since the passage of the Staggers Rail Act in 1980, we have issued several reports on the freight railroad industry.[1] These reports described the significant changes that have taken place in the railroad industry and reported that rates have generally decreased, but shippers and others have found the rate relief process long, complex, and expensive.

Policymakers continue to believe that the federal government should provide a viable process to protect shippers against unreasonably high rates, as well as address competition issues, while still balancing the interests of both railroads and shippers. Over the past 10 years, significant consolidation has taken place in the freight railroad industry, while railroads—particularly Class I railroads[2]— have seen their productivity and financial health improve. Railroad officials worry that any attempt to

---

[1] See the list of related GAO products at the end of this report.

[2] As of 2004, a Class I railroad is any railroad with operating revenue above $277.7 million.

increase economic regulation will reduce carriers' ability to earn sufficient revenues and limit future infrastructure investment. At the same time, a number of academic and government studies are predicting a significant increase in the demand for freight rail over the next 10 to 15 years. In light of these concerns, we reviewed

- the changes that have occurred in the freight railroad industry since the enactment of the Staggers Rail Act, including changes in rail rates and competition in the industry;

- the actions STB has taken to address concerns about competition and captivity and any alternative approaches that could be considered to address remaining concerns; and

- the projections for freight traffic demand over the next 15 to 25 years, the freight railroad industry's projected ability to meet that demand, and potential federal policy responses.

To fulfill our objectives, we examined STB's *Carload Waybill Sample* from 1985 through 2004 (the latest data available at the time of our review).[3] This database includes information on rail rates, tonnage, federal regulation, and other statistics but disguises some revenues to avoid disclosing confidential business information to the public. We obtained a version of the *Carload Waybill Sample* that did not disguise revenues. We held an expert panel consisting of 11 individuals with expertise in the freight railroad industry and the economics of transportation deregulation. Those individuals are listed in appendix I. We also interviewed, and reviewed information from, representatives of each Class I railroad in North America, shipper groups, economists, and experts in the rail industry. In addition, we reviewed pending legislation, transportation planning literature, and forecasts of future freight rail demand and capacity, including syntheses of such forecasts; and interviewed federal and state transportation officials, financial market analysts, national association representatives, and transportation experts. We determined that the data used in this report were sufficiently reliable for the purpose of our review. We conducted our review from June 2005 to August 2006 in accordance with generally accepted government auditing standards. Details of our objectives, scope, and methodology appear in appendix II.

---

[3]The *Carload Waybill Sample* is a sample of railroad waybills (in general, documents prepared from bills of lading that authorize railroads to move shipments and collect freight charges); the sample contains information on rail rates.

## Results in Brief

The changes that have occurred in the railroad industry since the enactment of the Staggers Rail Act are widely viewed as positive, since the financial health of the industry has improved and most rates have declined since 1985. However, concerns about competition and captivity in the industry remain. The freight railroad industry's financial health improved substantially as railroads cut costs through productivity improvements; streamlined and right-sized their rail networks; implemented new technologies; and expanded business into new markets, such as the intermodal market.[4] Between 1985 and 2000, rail rates generally declined, but then increased slightly from 2001 through 2004.[5] Although rates have declined since 1985, they have not done so uniformly, and rates for some commodities are significantly higher than rates for others. Several factors could have contributed to recent rate increases, including broad changes in the domestic and world economy, the emergence of a capacity-constrained environment in which demand exceeds supply, and consolidation in the 1990s in the industry leading to changes in competition. Other costs, such as fuel surcharges, have also shifted to shippers, and STB has not clearly tracked the revenues the railroads have raised from some of these charges. Some concerns about competition and captivity in the industry remain because traffic is concentrated in fewer railroads. It is difficult to determine precisely how many shippers are captive because available proxy measures can overstate or understate captivity. In addition, STB does not accurately collect railroad revenue data. Nevertheless, our analysis of available measures indicates that the extent of captivity appears to be dropping, but the percentage of industry traffic traveling at rates substantially over the statutory threshold for rate relief has increased. For example, the amount of traffic traveling at rates over 300 percent of the railroad's variable cost increased from 4 percent in 1985 to 6 percent in 2004. Furthermore, some areas with access to one Class I railroad have higher percentages of traffic traveling at rates that exceed the statutory threshold for rate relief. These findings may reflect reasonable economic practices by the railroads in an environment of excess demand, or they may indicate a possible abuse of market power. We are recommending that STB conduct a rigorous analysis of the state of competition nationwide and, where appropriate, consider the range of

---

[4]The intermodal market consists of containers and trailers that can be carried on ships, trucks, or rail.

[5]While rate data are not available for 2005 and 2006, shippers, railroads, and financial analysts with whom we spoke told us that rates have generally increased during those years.



**Figure 8: Percentage of Railroad Market Represented by Four Largest Class I Railroads, 1985-2004**

Source: GAO analysis of STB data.

There is significant disagreement on the state of competition in the rail industry and on whether or not federal regulation—resulting from legislation such as the Staggers Rail Act—has ensured effective competition among railroads. This disagreement was represented on our panel of 11 experts, 6 of whom indicated that rail-to-rail competition has been achieved (either "greatly" or "somewhat") and 4 of whom maintained that effective competition had not been achieved.[17] One member of our panel viewed less competition among rail carriers as a negative development because it can result in less efficient railroad companies and fewer options for shipping companies. Another member of our panel said that industry consolidation was essential to achieving an efficient and complete rail network under fewer, but ultimately stronger, railroad companies. Other experts also pointed to the hundreds of short-line

---

[17] One participant did not respond to this question.

railroads[18] that have come into being since the enactment of the Staggers Rail Act, as well as increases in other competitive options for shippers from other modes such as trucks and barges.

A reduction in competitive options can have a significant impact on the rates railroads charge shippers. There are a variety of contexts that affect how railroads compete with each other and with other modes, such as when route origins and destinations can both be reached by more than one railroad, or by multiple modes of transportation.[19] Comparing two routes for shipping the same commodity, but using a different number of rail carriers, can illustrate this effect. Figure 9 shows two long-distance grain routes that both terminate in the Portland, Oregon, economic area from different origin points. Both routes carry comparable tonnage, but the route originating in the economic area in and around Sioux Falls, South Dakota, is served by two Class I railroads, whereas the route from the Minot, North Dakota, economic area is served by one Class I railroad. The rates for the Minot route are roughly double the rates for the Sioux Falls route.

---

[18] A short-line railroad is an independent railroad company that operates over a short distance.

[19] Winston, pp. 54-57.

**Figure 9: Comparison of Rates Charged on Long-distance Grain Routes, 1997-2004**

Cents per ton mile

[Line chart showing rates from 1997 to 2004. Sioux Falls economic area to Portland economic area line stays around 3.0-3.5 cents per ton mile. Minot economic area to Portland economic area line decreases from approximately 1.9 to 1.5 cents per ton mile.]

——— Sioux Falls economic area to Portland economic area
×××××× Minot economic area to Portland economic area

Source: GAO analysis of STB data.

Note: For some years, data have been removed due to insufficient sample size.

The ability to build out to another railroad can also create competition and improve railroad rates for some shippers. For example, following a build-out,[20] a shipper gained access to a second railroad at an origin point that had previously been served by one Class I railroad.[21] Figure 10 shows that within a few years after the introduction of service by the second railroad, the rates had dropped significantly. Because even a short segment build-out can be quite costly, shippers are unlikely to pursue build-out options without a substantial traffic base. Some experts with whom we spoke said that situations like the one depicted in figure 9 reflect the reality of differential pricing in the freight railroad industry, or they suggest that other factors such as differences in the length of two different routes may be the cause of rate discrepancies. Others believe that a significant rate

---

[20] A build-out is a shipper's option to build (or have some other party build) a track connection to a competing railroad.

[21] We do not provide information identifying the location or the shipper involved because doing so could reveal proprietary information.

decrease after the introduction of competition is evidence that railroads are extracting monopoly rates from captive shippers.



Figure 10: Rate Changes after the Introduction of a Second Carrier

Cents per ton mile—masked

Earlier to later

——— Railroad 1—rates
∙∙∙∙∙∙ Railroad 2—rates

Source: GAO analysis of STB data.

While competition between rail carriers is particularly important in some cases, in other cases, competition between rail and other transportation modes, such as trucks and barges, may be more important. Particularly for bulk commodities (i.e., grain), when shipper locations can be served by barge transportation, rail rates will be lower relative to rail costs than on routes that are not conducive to barge competition. Figure 11 depicts costs and revenues for two routes, one (from the Champaign, Illinois economic area to the New Orleans, Louisiana economic area) with rail and barge options, and the other (from the Champaign, Illinois economic area to the Atlanta, Georgia economic area) with just a rail option. Although both routes have the same origin, for shipping the same commodity over a comparable distance, the route with the barge option has consistently lower rates than the route with just rail service.



**Figure 11: Comparison of Rate Changes from Champaign, Illinois, Economic Area to New Orleans, Louisiana, Economic Area and Champaign, Illinois, Economic Area to Atlanta, Georgia, Economic Area, 1990-2004**

Source: GAO analysis of STB data.

Besides the number of rail carriers serving a location, the use of contracts for rail service can affect the competitive landscape. The Staggers Rail Act allowed railroad and shipping companies to enter into confidential contracts for rail service and also placed all traffic running under contract outside the remaining rate regulations. According to railroad and shipper groups, the duration of contracts has declined, in part because of the railroads' desire to quickly react to shifting market demand, which can result in charging higher rates. Other shippers were concerned that moving away from confidential contracts to public pricing could represent price signaling and further reduce competition between railroads. In 2004, 70 percent of tonnage and 71 percent of industry revenue moved under contract.

## Captive Shippers Are Difficult to Identify, but Available Measures Indicate Captivity Dropping in the Railroad Industry

It is difficult to determine precisely how many shippers are "captive" to one railroad because the proxy measures that provide the best indication can overstate or understate captivity.[22] One way of determining potential captivity is to identify which Bureau of Economic Analysis (BEA) economic areas were served by only one Class I railroad.[23] In 2004, 27 of the 177 BEA economic areas were served by only one Class I railroad.[24] As shown in figure 12, these areas include parts of Montana, North Dakota, New Mexico, Maine, and smaller areas in several states.

---

[22]Jerry Ellig, "Railroad Deregulation and Consumer Welfare," *Journal of Regulatory Economics* (The Netherlands: Klower Academic Publishers: 2002), p. 156.

[23]Economic areas are those areas defined by BEA, which defines the relevant regional economic markets in the United States.

[24]The number of carriers serving a given location is not indicated in the *Carload Waybill Sample*. We obtained this additional information from DOT.