# Exhibit 46

(Prystowsky Declaration)



3 of 8 DOCUMENTS

Copyright (c) 2000 New York University School of Law
New York University Journal of Legislation and Public Policy

2000 / 2001

4 N.Y.U. J. Legis. & Pub. Pol'y 285

LENGTH: 24129 words

ARTICLE: SURFACE FREIGHT TRANSPORTATION: ACCOUNTING FOR SUBSIDIES IN A "FREE MARKET"

NAME: Salvatore Massa*

BIO: * Trial Attorney, United States Department of Justice, Antitrust Division, Transportation, Energy and Agriculture Section. B.A. 1992, Marquette University; J.D. 1997, University of Wisconsin. The author's views expressed in this article do not necessarily reflect those of the United States Department of Justice. The author would like to thank Darren Bush, Diana Cook, Roger Fones, Mark Meitzen, John Nannes, Russell Pittman, Robert Rosenberg, and Neal Stevens for their comments and suggestions.

SUMMARY:
 ... Over the past twenty years, the national paradigm of transportation regulation has undergone "a great transformation. ... Regardless of which explanation for ICC regulation is correct, the railroad industry benefited from federal regulation until the growth of the trucking industry. ... Finally, the ICC provided freight shippers with an "open routing" system whereby regulators required railroad firms to maintain interchanges with other railroads "on practically all possible combinations of railroad tracks between two points" so that a shipper could determine exactly where the freight moved. ... Thus, rate regulation in the railroad industry - even when rates are calculated properly - may be an undesirable option compared to alternatives that enhance competition. ... C. Possible Impact of the Highway Subsidy on Rail-Truck Competition ... Assuming the railroad industry is receiving no countervailing subsidies, one obvious effect of the road subsidy is that trucks may have a competitive advantage over railroads. ... This Article has discussed two examples of transportation subsidies that may distort the marketplace: 1) the historical land grant subsidies railroads received that are not considered in the regulation of railroad rates to captive shippers; and 2) federal and state road subsidies that may benefit the trucking industry. ...

TEXT:
[*285]

Introduction

Over the past twenty years, the national paradigm of transportation regulation has undergone "a great transformation." n1 In the area of surface freight transportation, the original paradigm emphasized extensive oversight of each mode of transportation to preserve shipper choice in the routing pattern of freight and to provide shippers with non-discriminatory rates. n2 The paradigm shifted as the health of the railroad industry declined and policymakers began endorsing a pro-market regime that relied on competition. n3 That policy prevails today. Under the new

paradigm, the nation collectively benefits from the competitive rivalry between firms in the same and different transportation [*286] modes. n4 Where regulatory oversight is deemed necessary because markets cannot effectively compete, policymakers use market principles to guide regulation. n5 This regulation becomes a proxy for what market forces would yield if they resulted in competition.

The nation will not fully realize the benefits of this paradigm, however, until policymakers recognize that historic or continuing subsidies embedded in the transportation industry may distort shipper choices in a manner that impedes market forces. Transportation subsidies may allow one mode of transportation, or a segment of firms within that mode, to provide services at a level in excess of what market forces would otherwise warrant absent the subsidy. Such firms may then gain a competitive advantage over their non-subsidized rivals.

Furthermore, when regulators conclude that market forces cannot yield the benefits of competition on their own and implement rate regulation to achieve a proxy to competitive market pricing, failure to consider the effects of subsidization in the regulated firm may lead the regulator to incorrectly estimate the competitive price such a firm would be willing to charge in light of the subsidy. Because the regulator will invariably estimate the costs the firm would pay in an efficient market as well as the firm's need to sustain a competitive return on its investment, failing to consider a subsidy will result in overestimating the firm's actual costs and competitive returns. Thus, the assumption that no subsidies exist results in pricing regulations inconsistent with competitive market behavior once the impact of subsidies is considered.

This Article examines two illustrations of the effects of historic and continuing subsidies and demonstrates how they may distort not only competition, but also regulations designed to reach market-oriented results. n6 The first illustration, discussed in Part I, concerns the [*287] rate regulation of railroads. Regulators have purported to adopt rate regulations that ensure that railroad pricing is consistent with an efficient market in areas where competition is absent and new firms cannot enter the market. However, the existence of historic subsidies may distort the current regulatory standards governing pricing to favor incumbent railroads. Part II discusses the second illustration of the effects of subsidies: the impact of federal highway subsidies on rail-truck competition. This Part also compares the types of subsidies that railroad and trucking firms have received and studies their overall impact on firm and market structure.

I

Railroad Rate Regulation

Government involvement with the railroad industry began shortly after the advent of the steam-powered locomotive and continues today. The first part of this section surveys the government's role in the railroad industry, including the provision of historical subsidies for many railroads. The second part provides a justification for one very important aspect of government oversight: the regulation of railroad freight rates. After exploring the need for such oversight, the section discusses the current regulatory constraints on railroad rates - in particular, the "stand-alone cost" method of determining whether rates are excessive. The stand-alone cost method acts as a surrogate for competitive pricing where market forces are unable to provide this discipline. The final part of this section argues that the stand-alone cost method of rate regulation inaccurately reflects railroad costs to the detriment of shippers because it ignores historical subsidies.

A. Railroads: A History of Subsidization

While current public policy promotes less regulatory intervention with railroads in the belief that market forces generally should determine industry behavior, federal, state, and local governments played a critical role in early railroad development. Only one decade after the invention of steam engines designed to operate on iron tracks did their use begin to rival that of the era's predominant mode of freight transportation: water-borne transit. n7 Railroads offer significant advantages [*288] over canals. Canals require proximity to natural waterways that many regions of the United States do not have. Thus, geography constrains the scope of a canal system, particularly in the western United

States. n8 Furthermore, railroads move goods and people much more quickly than water-borne transit. n9

Government policy promoted the development of a transportation network in order to encourage people to settle the territories of the western and southern United States. n10 While this policy initially favored canals and roadways, public demand for railroad subsidies grew predominant by 1850. n11 Settlers in the western territories lobbied for railroad development in order to spur economic growth in their regions. n12 Government policy opted against direct intervention, however, preferring to adopt various forms of indirect assistance to railroads. Beginning with rather modest forms of aid, this assistance escalated throughout the Nineteenth Century. For example, the government provided route surveys for the construction of railroad lines and contracts for mail delivery. n13 Railroad development in Wisconsin provides an illustration of how railroad promoters sought capital to [*289] build their lines both from local and state governments and, eventually, from the federal government:

Wisconsin, like all frontier communities, was short of capital, and capital in unprecedented amounts was what it needed. The promoters resorted to two expedients. The Wisconsin constitution prohibited the state from contracting debts to finance internal improvements, but it did not forbid the legislature to authorize cities and counties to buy railroad stock. This was the first device the promoters used. A second was to sell stock to individuals, mainly farmers, who usually made payment with notes secured by mortgages on their farms. The company converted the notes and mortgages into cash immediately by discounting them in the Eastern money market. Even these expedients, however, failed to produce enough capital, and the promoters began to eye covetously the only real source of capital Wisconsin had - the public lands within its borders. n14

Initially, government grants of land were fairly limited. In 1835, Congress first granted land to a railroad for the construction of a right-of-way that included thirty feet on either side of the line, rights to timber for construction and repair up to one hundred feet on either side of the line, and ten acres for railroad terminals. n15 For the next seventeen years, Congress entertained requests for individual grants of land for railroad rights-of-way on a case-by-case basis. n16 However, this process of individualized review grew too onerous, and, in 1852, Congress passed a law that provided for a general land grant for all rail companies in existence or chartered within ten years of the passage of the law. n17 This law allowed the railroad firm to claim a one [*290] hundred foot right-of-way; to use earth, stone, and timber from adjacent lands; and to use additional land for depots and water tanks. n18

When grants began to be awarded to individual railroads, they became considerably more generous than the previous general grants. In 1850, Congress permitted the Illinois Central, Mobile and Chicago, and Mobile and Ohio Railroads ("Illinois Central Land Grant") to select every "alternate-even section" of land within a six-mile strip of the location of the right-of-way as well as the right-of-way itself. n19 The railroad could use or sell each section, a one-mile square of land along the right-of-way, for any purpose. The land could even be sold to other developers to fund additional construction. By permitting the railroads to have alternate-even sections of land, the government created a checkerboard pattern of development in which the railroad and government shared in any appreciation of land values as a result of the railroad's construction. n20

The Illinois Central Land Grant's checkerboard scheme for additional land near the right-of-way served as a template for more ambitious land grants that established railroads west of the Mississippi River. As one author notes: "In 1856, the doctrine could be advanced that where a railroad was to be built through the public lands it was [as] a matter of course entitled to an extensive portion of those lands to aid in its construction." n21 From 1862 to 1871, Congress enacted a number of statutes, collectively known as the Pacific Railroad Laws, chartering western railroads and providing direct federal land [*291] grants. These new laws permitted even greater access to federal lands and provided other forms of subsidy. n22

As Thomas Root observes, the Pacific Railroad Laws followed a consistent drafting pattern. n23 Each statute included: 1) a provision that created the railroad as a means to encourage settlement; n24 2) a provision for a right-of-way for the railroad which could be used for national defense; n25 3) a provision for financing the railroad through bonds and land grants; n26 4) a provision that allowed the railroad to take construction materials from public lands; n27 and 5) a provision that stated the government's preference for using the new rail system. n28 In all respects, the provisions relating to land grants were very generous.

For example, Congress allotted the Union Pacific Railroad a 400-foot area surrounding the right-of-way. n29 Congress also granted Union Pacific ten alternating sections of land within twenty miles of either side of the right-of-way for each mile of track laid in the same checkerboard fashion that Congress used in the Illinois Central Land Grant. n30 In federal territories, Union Pacific could claim double the number of sections of land. Ultimately, Union Pacific asserted land grant claims on 11.4 million acres of land. n31

[*292] Additionally, while the Union Pacific land grant excluded "mineral lands" from the grant, n32 this statutory language was later amended to permit land grants for parcels that contained coal and iron ore - two essential inputs for railroads that relied on coal burning steam locomotives operating over steel rails. n33 The scope of such land grants is significant, and in a coal-rich state like Colorado in 1885, railroad companies owned and operated most of the principal coal mines. n34

Railroads enjoyed the benefits of these vast land transfers well into the Twentieth Century. For example, the Southern Pacific Railroad, which Union Pacific acquired in 1996, relied on land sales to generate revenues to upgrade its track network and equipment. n35 From 1988 through 1993, Southern Pacific generated two billion dollars through line sales and real estate sales. n36 Other railroads maintained real estate departments to manage the sale of unneeded parcels often acquired from land grants. n37

While railroads received significant subsidies, railroads also incurred special duties that tempered the ultimate value of such subsidies. During the growth of the industry from the 1830s to the 1880s, certain common law duties and obligations governed railroads. The courts treated railroads as common carriers n38 and correspondingly identified four basic obligations: 1) the carrier cannot refuse to serve freight or passenger customers; 2) the carrier is required to provide [*293] service at a reasonable price; 3) the carrier is required to serve all customers equally; and 4) the carrier is liable to the shipper for the safe transportation of the goods or passengers committed to its care. n39 As the industry grew, this body of common law could no longer adequately regulate the perceived abuses of the industry. For example, courts were unable to resolve what constituted a "reasonable" rate. n40

The pressure for federal regulation of railroad rates intensified as pricing discrimination became more pronounced after the Civil War. Price wars on competitive routes broke out and rates fell to levels generally believed to be unprofitable. n41 On other routes, where a particular railroad enjoyed a monopoly, railroads commanded fairly high premiums, angering shippers. n42 The rate wars inspired railroad firms to form cartels to control pricing, but those cartels were unsuccessful in stopping some firms from breaking the price agreements. n43 Ultimately, courts deemed these cartels illegal. n44 Thus, the railroad industry had an interest in the development of federal pricing regulation. n45 Indeed, after the inception of the Interstate Commerce Commission (ICC) in 1887, "empirical evidence reveals that financial markets expected the profitability of the railroads to improve with regulation." n46

[*294] Two rationales have been put forward for increased federal regulation of railroads during this period:

It would appear that the formation of the ICC was a response to the inability of the railroad industry to maintain stable prices at profitable levels. One explanation for such price instability is that the railroads were attempting to keep rail rates artificially high so as to reap above-normal profits. If that is true, then price wars were not indicative of "destructive competition" but rather of collusive pricing... Under this view, the ICC's role is as a cartel rate-setter, which

is clearly not in society's best interests. Another explanation is a natural monopoly argument that can be made for railroad regulation. An examination of the production technology suggests that average cost might have been declining in output. There are several components of cost that do not rise proportionately with traffic volume, including right-of-way, the cost of track, and certain equipment like locomotive power and train stations. If marginal cost lies significantly below average cost and competition leads to marginal cost pricing, then firms will earn below-normal profits when they are unable to coordinate their pricing decisions. In that case, there is an economic rationale for regulation. n47

Regardless of which explanation for ICC regulation is correct, the railroad industry benefited from federal regulation until the growth of the trucking industry. n48 Indeed, some economists suggest that during this period, the ICC was an agency "captured" by railroad interests. They cite the railroad industry's successful effort to regulate the trucking industry in 1935 when trucking began to pose a serious competitive threat. n49 Only well into the Twentieth Century, long after railroad networks [*295] were constructed, did federal regulation grow burdensome from the perspective of the railroad industry. n50

Beyond regulation and common law, many of the railroads that enjoyed land grants also incurred special obligations under the land grant statutes. For example, the Illinois Central Land Grant provided the government with preferential rights to use the railroads that received federal lands "free from toll or other charge upon the transportation of any property or troops of the United States." n51 The Pacific Railroad Laws similarly had provisions that required preferential treatment for government traffic. The Union Pacific law allowed the government to use the railroad to "transport mails, troops, and munitions of war, supplies, and public stores." n52 Moreover, the original Interstate Commerce Act of 1887 permitted discounts and discriminatory pricing in favor of government traffic. n53 Rate discounts for government traffic were fairly insignificant until the late 1930s but rapidly increased with the advent of the Second World War. n54 In 1944 alone, it is estimated that the War Department saved approximately two billion dollars on its freight bill. n55

Therefore, the large government discounts occurred long after railroad firms had constructed their networks and after the industry had become relatively mature. Furthermore, the government provided railroads with relief if they elected to settle any existing land claims that were not yet established: The Transportation Act of 1940 allowed railroads to receive full compensation for transportation services if they filed a release waiving pending land claims or other forms of reimbursement related to land claims. n56 Ultimately, railroads ceded claims to approximately eight million acres of land. n57

While the obligations for government discounts ended, railroad firms continued to face significant regulations that hampered their ability to compete. From the late 1940s onward, railroads began losing [*296] more and more of their business to the trucking industry. n58 The regulations that the railroad industry initially advocated to keep the trucking industry at bay became detrimental to its cause. The ICC hindered the railroad industry's ability to compete with the trucking industry by closely regulating rates, preventing rates from declining at some times and from increasing to reflect inflationary pressures at others. n59 The ICC monitored abandonments, often thwarting railroad efforts to shutter service on unprofitable rail lines. n60 The ICC pursued a policy of "rate equalization" that effectively set rates equally between an origin and destination regardless of the relative efficiency of the routing. n61 Finally, the ICC provided freight shippers with an "open routing" system whereby regulators required railroad firms to maintain interchanges with other railroads "on practically all possible combinations of railroad tracks between two points" so that a shipper could determine exactly where the freight moved. n62

The weight of such regulations began to weaken the industry substantially in the 1970s as many railroads became bankrupt. n63 As a result, railroad firms received some additional modest subsidies in order to reduce the impact of regulation. n64 However, Congress emphasized initiatives that encouraged deregulation n65 and, particularly after [*297] 1980, initiatives that encouraged rate-making freedom. n66 With these reforms, the railroad industry's financial

health improved significantly. n67 In addition, the industry grew more concentrated through several mergers. n68

### B. The Continuing Need for Regulatory Oversight of Railroad Rates

While the movement toward deregulation encouraged greater reliance on market forces than on direct regulation, a role for the regulation of the railroad industry still exists. Because regulators have embraced the market paradigm, the issue of when to regulate turns on the question of whether there is an inability to achieve effective market competition as a result of anticompetitive behavior. The greater industry concentration and pricing freedom that railroad firms enjoy may raise the risk of anticompetitive behavior that would in some instances undermine market-oriented reforms.

When railroad service is what economists have termed a "contestable market," such anticompetitive concerns are minimal. In contestable markets, even a monopolist - a firm that is the sole provider of a service or good - will be constrained from using market power to raise rates because entry into the market "is absolutely free, and exit absolutely costless." n69 In short, if potential competitors are waiting on the sidelines to enter the marketplace as soon as a monopolist begins charging supracompetitive prices, then the monopolist will behave as [*298] if those potential entrants are in the market, charging consumers a competitive price. n70

Potential competitors need not offer railroad service per se to have this effect as long as they can provide an alternative technology that serves a shipper's needs. The use of trucks, barges, or even air carriers as alternatives to rails provides a method for shippers to bypass rail service. n71 Other less obvious methods of bypass may also exist for some shippers who might otherwise appear dependent on the rail service of one firm. For example, electric utilities may switch their power source from coal to gas or elect to have the power generated elsewhere entirely, simply moving the electricity over transmission wires. n72 Also, some shippers dependent on the rail service of one firm may be able to build out a connecting rail line to a monopolist's. n73 The threat of a build-out constrains the monopolist railroad firm's ability to charge supracompetitive prices. These alternatives to railroad service may make the market for railroad service contestable in many instances even though entry or exit is not costless. At a minimum, these potential substitutes create a limit price that moves railroad pricing somewhat closer to a competitive price.

However, the ICC has recognized that the railroad industry does not generally reflect a contestable market for shippers who are dependent on rail service. n74 Indeed, the railroad industry has significant barriers to entry and high costs of exit. n75 As one economist puts it:

[*299]

Common sense ... indicates that the railroad industry is not contestable: entry entails a long and tedious process of buying up parcels of land, generally requiring powers of eminent domain (which, in turn, requires some government intervention). Engineering and building a railroad line also require considerable time and expense. So entry into the industry is anything but easy.

... Even without regulation, exit from the industry would be difficult by the standards of many other industries: heavy sunk costs, often financed with debt, are incurred to serve a specific market, without the opportunity to transfer them to other markets easily. While bridges, ballast, rails, and ties can be moved from one route to another, they can be moved only at great expense.

Overall, then, rail markets seem unlikely candidates for contestability. As firms are driven out of rail markets by rate wars, losing firms are likely, because of sunk costs, to go bankrupt rather than exit easily. And the entry of new firms into a given market should not be expected to be fast or easy. n76

After measures encouraging market reform were implemented, very limited forms of entry have occurred, n77 and