**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

---

This document relates to:

ALL CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF/JMF/AK)

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

ARGUMENT ........................................................................................................6

I.  DEFENDANTS IGNORE FACTUAL REALITY AND APPLICABLE LAW...............6

    A.  Defendants' Arguments and Dr. Willig's Analysis Cannot Be Reconciled With the Actual Evidence of What Happened in the Real World .........................6

        1.  Defendants Incorrectly Lump FSCs Before the Conspiracy With the Agreed FSC Program During the Conspiracy. ....................................7

        2.  Defendants' Assertion That The Same FSCs Would Have Been Imposed Absent the Conspiracy Cannot Be Reconciled With the Actual Facts......................................................................................10

        3.  The Evidentiary Record Powerfully Refutes Defendants' and Dr. Willig's Assertion That "Individualized" Factors Predominate ..............12

    B.  The Declarations Do Not Support Defendants' and Dr. Willig's Arguments. ...................................................................................................17

    C.  Defendants Ignore the STB Proceedings ..........................................................22

    D.  Defendants Misconstrue the Legal Standard For "Impact"...................................25

II.  DEFENDANTS' ARGUMENTS ARE PREMISED ON FAULTY ECONOMIC ANALYSIS THAT FAILS TO SHOW AN ABSENCE OF COMMON PREDOMINATING ISSUES AS TO IMPACT..............................................................29

    A.  Defendants and Dr. Willig Largely Ignore the Structural Factors That Made the Rail Freight Industry Conducive to the Alleged Conspiracy..................29

    B.  Defendants and Dr. Willig Offer Only Flawed Challenges to Dr. Rausser's Analysis Establishing the Common Impact of the Alleged Conspiracy. ..............30

III.  DAMAGES CAN BE CALCULATED BY A COMMON, WORKABLE METHOD.......................................................................................................36

IV.  DEFENDANTS' OTHER ARGUMENTS DO NOT PRECLUDE CERTIFICATION .......................................................................................39

## TABLE OF AUTHORITIES

**Page**

### Cases

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) ........................................................................23

*American Seed Co. v. Monsanto Co.*,
  238 F.R.D. 394 (D. Del. 2006), *aff'd*, 271 Fed. Appx. 138 (3d Cir. Apr. 1, 2008)................28

*Barnes v. District of Columbia*,
  242 F.R.D. 113 (D.D.C. 2007)...................................................................39

*Behrend v. Comcast*,
  264 F.R.D. 150 (E.D. Pa. 2010).................................................. 13, 26, 27, 29

*Bensel v. Allied Pilots Ass'n*,
  263 F.R.D. 150 (D.N.J. 2009)....................................................................41

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
  974 F.2d 1358 (3d Cir. 1992)....................................................................23

*Bynum v. District of Columbia*,
  214 F.R.D. 27 (D.D.C. 2003)....................................................................39

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001)..........................................................6, 34

*Columbus Drywall & Insulation Inc. v. Masco Corp.*,
  1:04-CV-3066, 2009 WL 856306 (N.D. Ga. Feb. 9, 2009)................................13

*In re Cotton Yarn Antitrust Litig.*,
  505 F.3d 274 (4th Cir. 2007) ...................................................................40

*In re Currency Conversion Fee Antitrust Litig.*,
  224 F.R.D. 555 (S.D.N.Y. 2004) ..............................................................28

*In re Currency Conversion Fee Antitrust Litig.*,
  264 F.R.D. 100 (S.D.N.Y. 2010) ......................................................6, 31, 36

*Dechert v. Cadle Co.*,
  333 F.3d 801 (7th Cir. 2003) ...................................................................41

*Dimidowich v. Bell & Howell*,
  803 F.2d 1473 (9th Cir. 1986) ..................................................................23

*Ernst & Ernst v. U.S. Dist. Court for S. Dist. of Tex.*,
  457 F.2d 1399 (5th Cir. 1972) ..................................................................41

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,
   256 F.R.D. 82 (D. Conn. 2009)................................................................passim

Exhaust Unltd., Inc. v. Cintas Corp.,
   223 F.R.D. 506 (S.D. Ill. 2004)...................................................................28

Feder v. Electronic Data Sys. Corp.,
   429 F.3d 125 (5th Cir. 2005)................................................................28, 40

In re Flash Memory Antitrust Litig.
   07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010)...........................34

Gordon v. Microsoft Corp.,
   No., MC 00-5994, 2003 WL 23105550 (Minn. Dist. Ct. Dec. 15, 2003) ...........34

Griffith v. Jabitch Block & Rathbone, LLP,
   358 B.R. 342 (S.D. Ohio 2007)..................................................................41

In re High Fructose Corn Syrup Antitrust Litig.,
   295 F.3d 651 (7th Cir. 2002) .....................................................................2

Hill v. Shell Oil Co.,
   No. 98-C-5766, 2002 WL 663583 (N.D. Ill. Mar. 28, 2002) ..........................40

*In re Hydrogen Peroxide Antitrust Litig.,
   552 F.3d 305 (3rd Cir. 2008) ...............................................................25, 26

In re Ins. Brokerage Antitrust Litig.,
   579 F.3d 241 (3d Cir. 2009) ....................................................................25

In re Intel Corp. Microprocessor Antitrust Litig.,
   MDL No. 05-1717 (JJF) 39-40 (D. Del. July 28, 2010).................................7

Johnson v. District of Columbia,
   248 F.R.D. 46 (D.D.C. 2008).....................................................................39

J. Truett Payne Co. v. Chrysler Motors Corp.,
   451 U.S. 557 (1981) ...............................................................................37

Kohen v. Pac. Inv. Mgmt. Co.,
   571 F.3d 672 (7th Cir. 2009) ...................................................................25

Lerner v. Haimsohn,
   126 F.R.D. 64 (D. Colo. 1989) ..................................................................40

*In re Lorazepam & Clorazepate Antitrust Litig.,
   202 F.R.D. 12 (D.D.C. 2001).....................................................................36

*McDonough v. Toys R Us, Inc.,
   638 F. Supp. 2d 461 (E.D. Pa. 2009).....................................................passim

*Meijer, Inc. v. Warner Chilcott Holdings, Co.,
   246 F.R.D. 293 (D.D.C. 2007)...............................................................passim

*In re NASDAQ Market-Makers Antitrust Litig.,
   169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................ 13, 26, 34

In re Nat'l Student Mktg. Litig.,
   M.D.L. Docket No. 105, 1973 WL 431 (D.D.C. Oct. 2, 1973) ........................... 41

*In re Nifedipine Antitrust Litig.,
   246 F.R.D. 365 (D.D.C. 2007)..................................................... 26, 27, 34

Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,
   665 F. Supp. 869 (E.D. Cal. 1986)....................................................... 29

Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,
   685 F. Supp. 2d 456 (S.D.N.Y. 2010) ................................................... 40

Pigford v. Glickman,
   182 F.R.D. 341 (D.D.C. 1998)........................................................... 39

In re Pressure Sensitive Labelstock Antitrust Litig.,
   No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. 2007) ........................... 26, 34

In re Ready-Mixed Concrete Antitrust Litig.,
   261 F.R.D. 154 (S.D. Ind. 2009)...................................................... 27, 29

Reed v. Advocate Health Care,
   2009 WL 3146999, No. 06 C 3337 (N.D. Ill. Sept. 28, 2009).......................... 5, 33

Rimkus Consulting Group, Inc. v. Cammarata,
   688 F. Supp. 2d 598 (S.D. 2010) ........................................................ 41

Robinson v. Texas Auto. Dealers Ass'n,
   387 F.3d 416 (5th Cir. 2004) ......................................................... 27, 28

Schnorbach v. Fuqua,
   70 F.R.D. 424 (S.D. Ga. 1975) ......................................................... 41

Schoenbaum v. E.I. DuPont de Nemours & Co.,
   No. 4:05CV01108 ERW, 2009 WL 4782082 (E.D. Mo. Dec. 8, 2009) ................... 28

In re Scrap Metal Antitrust Litig.,
   No. 1: 02 CV 0844, 2006 WL 2850453 (N.D. Ohio, Sept. 30, 2006)...................... 34

Shankroff v. Advest, Inc.,
   112 F.R.D. 190 (S.D.N.Y. 1986) ........................................................ 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.,
   267 F.R.D. 583 (N.D. Cal. 2010)................................................... passim

In re Universal Service Fund Telephone Billing Practices Litig.,
   219 F.R.D. 661 (D. Kan. 2004).......................................................... 28

In re Urethane Antitrust Litig.,
   251 F.R.D. 629 (D. Kan. 2008)......................................................... 25

*In re Vitamins Antitrust Litig.,*
    209 F.R.D. 251 (D.D.C. 2002) ................................................................................ passim

*Wagner v. Nutrasweet Co.,*
    95 F.3d 527 (7th Cir. 1996) ............................................................................................ 41

## **Rules**

Fed. R. Civ. P. 23 .................................................................................................. 2, 25, 26

## PRELIMINARY STATEMENT

Plaintiffs claim, and the evidence confirms, that Defendants ███████████████ ████████████████████████████████████████████ Defendants worked collusively to apply the new standard, as uniformly as possible, to as many freight shipments as possible, with the express goal of 100% coverage.  *See* Plaintiffs' Memorandum in Support of Motion for Class Certification (Dkt. # 337) ("Pl. Mem.") at 27-40 and Point I, *infra*.  Defendants' implementation of and adherence to the agreed FSC standard artificially elevated rail freight shipment prices above competitive levels.  *See* Pl. Mem. 45-47; Corrected Report of Gordon Rausser (May 27, 2010) ("Rausser Rpt.") (Dkt. 368) at 8, 113-23.  This impacted all Class Members.

Plaintiffs' economist, Dr. Gordon Rausser, analyzed structural factors that made the rail freight industry conducive to collusion and the FSC conspiracy a highly effective means of raising Class Members' freight rates above competitive levels.  Dr. Rausser used econometric analysis to show that workable formulas, common to the Class, are available both to prove the conspiracy's impact on the Class – ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████, *see* Rausser Rpt. 120, 122-23 – and to calculate damages both Class-wide and to each Class Member.  Dr. Rausser's analysis is compellingly supported by Defendants' own documents, testimony, and data.

Predictably, the core contention of Defendants and their expert, Dr. Robert Willig, is that no Class-wide inquiry could be made to determine whether Class Members were impacted by the

---

[1] ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

conspiracy.[2]  But Defendants' "impact" arguments, and Dr. Willig's analysis, depend on

speculative and theoretical assertions that cannot be reconciled with the documentary,

testimonial, and data evidence of what actually happened in the real world.

Central to Defendants' claim that the alleged conspiracy had no Class-wide impact is

their argument that equivalent FSCs would have been imposed even without the conspiracy – an

argument that Defendants took the steps they did for no rational reason, even though human

nature dictates that companies conspire only because they perceive a benefit from doing so.  *See*

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (Posner, J.)

("sellers would not bother to fix list prices if they thought there would be no effect on transaction

prices").  The evidence shows that the conspiracy here was ███████████████████

████████████████████████████████████████████████████████████

██████████████  Defendants had been unsuccessful in their pre-conspiracy efforts to achieve

widespread application of FSCs and saw a *need* to conspire to raise rates and improve

profitability.  ████████████████████████████████████████████████

████████████████████████████████████████████████

---

2   Defendants do not meaningfully challenge Plaintiffs' showing on the requirements of
Rule 23(a):  numerosity, typicality, commonality, and adequacy.  To the extent Defendants do
address adequacy and typicality, the arguments are unavailing.  *See* Point IV, *infra.*

3 ███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████ Through their

conspiracy, Defendants transformed FSCs into revenue-enhancement vehicles that could be

applied across the industry and ushered in a period of record profitability.  Pl. Mem. 40-44.

Defendants and Dr. Willig make the related assertion that even before the start of the

alleged Class Period, there was already a trend toward increased use of FSCs that would

naturally have continued absent the conspiracy.  They improperly conflate the start of the Class

Period and the start of the conspiracy;[5] but increased application of FSCs during the first half of

2003 occurred when Defendants *already* were conspiring.[6]  Defendants and Dr. Willig do not

show that all or even most of these pre-Class Period surcharges were comparable to agreed FSCs

imposed during the Class Period.  They were not. ████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ *See* Point I, *infra*.  And Dr.

Willig's model purporting to extrapolate has been exposed as utterly flawed.[8]  *See* Point II, *infra*.



_____

[4] ████████████████████████████████████████████████████
███████████████

[5]  The Class Period constitutes the temporal element of the Class definition.  Plaintiffs do not allege that the Class Period defines the specific dates when the conspiracy was in effect.

[6] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

[7] ████████████████████████████████████████████████████
████████████████████████████████████

[8]  Among other flaws, Dr. Willig's model uses wholly inadequate data inputs (for example, just two for CSX).  Dr. Willig also employs a fabricated metric for "FSC incidence," not used in the real world by any Defendant, based on the mere application of a single FSC to Class Member on a single shipment, regardless of the number of shipments that Class Member made, the volume of and revenue from those shipments, or the rate of the FSC applied.  In other words, if the effect of the conspiracy was to cause a Class Member paying a 2% surcharge on a

Relying principally on declarations submitted with Defendants' opposition papers,

Defendants and Dr. Willig also argue that there was widespread deviation from the agreed FSC

program and that this reflected predominantly "individualized" factors determining whether and

how FSCs were applied to Class Members.  *See, e.g.*, Defendants' Mem. of Law in Opp. to

Plaintiffs' Mot. for Class Certification (Dkt. # 381) ("D. Br.") at 20-21, 45-47; Revised Expert

Report of Robert D. Willig (Dkt. # 389) ("Willig Rpt.") ¶¶ 17, 103, 156-57. ████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

Not surprisingly, the declarations on which Defendants and Dr. Willig so heavily rely

thus turn out to be unreliable and unsubstantiated.  Declarants' depositions showed that the

---

single route before the Class Period to pay the conspiratorial FSC (at, say, up to 20%) on 50
routes during the Class Period, Dr. Willig's "trend" model would not recognize this change,
since his FSC incidence input would treat both circumstances as the same.  *See* Point II, *infra*.

[9] 

underlying facts are consistent with Dr. Rausser's finding, based on the transaction data, that ██

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ██████

– a situation common in price-fixing conspiracies where classes were certified.  *See* Point I, *infra.*

Dr. Willig's challenges to Dr. Rausser's analysis are predicated on these declarations and

other counterfactual and flawed assertions.  Dr. Rausser's analysis, in contrast, is based on the

actual evidentiary record and Defendants' transaction data, and his initial conclusions have now

been reinforced by application of his regression models to the full set of transaction data.  Dr.

Willig has not identified any variable that Dr. Rausser failed to include in his multiple regression

models, let alone that adding any such variable would alter Dr. Rausser's results.  In those few

instances where Dr. Willig does proffer alternative models, his methodology is overtly flawed

and provides no sustainable answer to Dr. Rausser's conclusions that common evidence can be

used to prove the impact of the conspiracy, and that a workable formula common to all Class

Members can be used to calculate each Class Member's damages.  *See* Points II and III, *infra.*

For example, when Dr. Willig constructs a regression model on the relationship between freight

rates and marginal cost (a model that, if it had any probative value, would itself constitute Class-

wide proof), he uses only highly aggregated and averaged data from third-party sources –

precisely the type of input "averages" he has criticized in other cases.[11]

---

10 ████████████████████████████████████████████████████████████████████████

[11]  *See Reed v. Advocate Health Care*, 2009 WL 3146999, No. 06 C 3337, at *16-18
(N.D. Ill. Sept. 28, 2009) ("*Nurses*") (class certification denied, citing Dr. Willig's opinions that
regression models based on averaged inputs were inadequate to assess the impact of a
conspiracy).  Notably, a principal source of Dr. Willig's averaged, aggregate data is a 2009
report by Christensen & Associates.  That report found an unexplained and anomalous increase –

In the end, Defendants' arguments at best present a competing, predominantly common, explanation (albeit a counterfactual one) of what would have happened in the so-called "but for" world absent the alleged conspiracy.  But Courts have consistently held that competing views of the "but for" world raise a predominantly common question for trial.[12]

## ARGUMENT

I.   **DEFENDANTS IGNORE FACTUAL REALITY AND APPLICABLE LAW**

A.   **Defendants' Arguments and Dr. Willig's Analysis Cannot Be Reconciled With the Actual Evidence of What Happened in the Real World**

Defendants and Dr. Willig virtually ignore Plaintiffs' detailed discussion of the evidentiary record.  *See* Pl. Mem. 7-50.[13]  They thus disregard the specific details and consequences of the alleged conspiracy and artificially avoid its inherently Class-wide purpose and effect.[14]  Such a disregard of the real world should not be credited.[15]

---

unrelated to fuel costs – in railroads' variable and marginal costs around 2003, corresponding to the start of the alleged conspiracy period. The authors could only speculate about the causes for this increase.  *See* Laurits R. Christensen Associates, Inc., Analysis of Competition, Capacity, and Service Quality, v. 2, Revised Final Report Prepared For The Surface Transportation Board, November 2009 ("Christensen Rpt."), at 9-16 to 9-18 (excerpts at HD Ex. 12); *see also* Expert Reply Report of Gordon Rausser ("Rausser Reply") (attached hereto as Exhibit A) at 39-43.

[12]   *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 115 (S.D.N.Y. 2010) (expert dispute over which of two "but for" worlds would have existed absent conspiracy presents common question and does not preclude certification); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100-02 (D. Conn. 2009) (experts' competing views relating to market structure and characteristics of "but for" world present merits questions and do not preclude certification); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 320-21 (E.D. Mich. 2001) (arguments concerning how some class members might have behaved absent alleged conspiracy present "merit-based questions that are not considered at the class certification stage").

[13]   Remarkably, Defendants seek to disparage Plaintiffs' discussion of actual facts as nothing more than an effort to "poison the well."  D. Br. 7.

[14]   ████████████████████████████████████████████████████████████

1.    **Defendants Incorrectly Lump FSCs Before the Conspiracy
With the Agreed FSC Program During the Conspiracy.**

Most of  Defendants' arguments and Dr. Willig's analysis are built on a faulty

assumption:  that the FSCs used by Defendants before and during the conspiracy were the same.

*See, e.g.,* D. Br. 2-3; *see also* Willig Rpt. 7-9.  But this is not true.  The new "standard" FSCs that

Defendants put in place in the Spring of 2003 were different both in design and application from

those that came before.  For example, these new FSCs (i) got Defendants in lockstep in

calculating the percentage based on fuel indexes; (ii) used a trigger equal to about $23 per barrel,

rather than the higher $28 per barrel (or higher) that several Defendants had previously used; and

(iii) adjusted the FSC based on the 30-day average fuel price, rather than, as in several

Defendants' earlier programs, only when the trigger was exceeded for 30 (or more) consecutive

days. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

———————————————————————————————

██████████████████████████████████████████

███████████████████████████████████

[15]   *See, e.g., In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717 (JJF),
Special Master's Report and Recommendation at 39-40 (D. Del. July 28, 2010) ("The record
clearly and flatly contradicts Dr. Leffler's economic theory.") (attached at HD Ex. 13); *Meijer,
Inc. v. Warner Chilcott Holdings, Co.*, 246 F.R.D. 293, 309 (D.D.C. 2007) (defendants' expert's
assertions about "but for world" were belied by real world facts); *In re TFT-LCD (Flat Panel)
Antitrust Litig.*, 267 F.R.D. 583, 594 (N.D. Cal. 2010); *McDonough v. Toys R Us, Inc.*,  638 F.
Supp. 2d 461, 476 (E.D. Pa. 2009).

[16]
████████████████████████████████████████████







**2.     Defendants' Assertion That The Same FSCs Would Have Been Imposed Absent the Conspiracy Cannot Be Reconciled With the Actual Facts.**

The evidence shows Defendants saw a *need* to conspire to surmount perceived obstacles to widespread application of uncoordinated fuel surcharges.  *See* Pl. Mem. 7-12.  During the pre-conspiracy period, Defendants were frustrated by

Summarizing the pre-conspiracy environment, 





### 3.     The Evidentiary Record Powerfully Refutes Defendants' and Dr. Willig's Assertion That "Individualized" Factors Predominate

Dr. Rausser's regression analysis shows that specifically identified common factors predominantly explain the variation in Defendants' freight rates. *See* Rausser Reply at 66-67. He concludes that these common, predominating factors in rail freight pricing can be controlled for in "a common analysis of impact and damages" caused by the alleged conspiracy. *Id.* 67.

Defendants claim that "it will be necessary to examine the result of the individual negotiations on a shipper-by-shipper basis to determine whether a particular shipper actually paid a higher total price." D. Br. 47; Willig Rpt. 72-73. Among other things, Defendants assert that

---

27



base rates were discounted to offset the FSCs.  *See, e.g.*, D. Br. 47.  While discounting rates off a

standard is no bar to class certification,[28] Defendants' arguments here are factually unsupported.



---

[28]   *See, e.g., Meijer, Inc. v. Warner Chilcott Holdings Co.*, 246 F.R.D. 293, 309 (D.D.C. 2007) (rejecting argument that individual issues predominated due to variations in "pricing among putative class members"); *EPDM*, 256 F.R.D. at 88 (evidence of common impact in "lock-step increases in national price lists in an oligopolistic market"); *Columbus Drywall & Insulation Inc. v. Masco Corp.*, 1:04-CV-3066, 2009 WL 856306, at *9 (N.D. Ga. Feb. 9, 2009) ("[P]laintiffs can easily prove class-wide impact in spite of the fact that prices are subject to individualized negotiations."); *Behrend v. Comcast*, 264 F.R.D. 150, 187-89 (E.D. Pa. 2010) (comparing list prices to "but for" or "benchmark" prices); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 485-86 (E.D. Pa. 2009) (finding impact based on defendants' maintenance of "uniform list prices nationwide" despite evidence of discounts resulting from sales and coupons); *In re NASDAQ Market-Makers Antitrust Litig. ("NASDAQ")*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) (common impact where "defendants conspired to maintain an inflated 'base' from which all pricing negotiations began.") (quotation omitted).

[29]



[30]   *See, supra*, p. 9, n.21.

[31]

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Dr. Willig asserts that significant base rate discounting must have occurred because (a) Dr. Rausser's data purportedly reflect "significant variations in increases and decreases in base rates across commodities and among shippers during the class period," and (b) Defendants' declarations detail "many circumstances in which the negotiations over FSC changes resulted in changes in other contract terms of benefit to the shippers."  Willig Rpt. ¶ 46; Willig Dep. 121. But as explained in Dr. Rausser's reply report, Dr. Willig's analysis of FSC variations is deeply flawed, because it fails to isolate the portion of rate increases attributable to FSCs.  Once this error is corrected, the data confirm that similar FSCs were imposed on the shippers, regardless of the base rate for the shipment.  Rausser Reply 50-53.   In addition, as discussed *infra*, the declarations do not support Dr. Willig's assertions on base rate discounting.

Second, the evidence contradicts Defendants' and Dr. Willig's assertions that so-called "captive" shippers could not have been affected by the alleged conspiracy.[32]  Defendants

---

[32]   These assertions were contradicted by UP CEO James Young and NS CEO Wick Moorman, who testified in 2007 about why even "captive" shipper routes face competitive pressures:  "Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads.  The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities.  That is one source of leverage. Another source is product competition.  For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers.  When the receiver can use another product in lieu of the one produced at our solely served facility, we will lost the business.…  Another major source of competition is geographic competition….  *In short, even where there is only one railroad serving a facility, there are market factors at play.  These competitive constraints are*

imposed the agreed FSCs on all shippers alike, without regard for whether the shipper was

captive or non-captive,[33] or whether the shipper had access to alternative modes of

transportation.[34] 

RD Ex. 72.[35]

Ignoring this and other evidence,[36] Dr. Willig, repeatedly asserts that impact can be

shown only by "undertaking analysis that is specific to individual plaintiffs."  Willig Rpt.¶ 25.

---



*real.*  *See* HD Ex. 36, at 14 (Oral Testimony of James R. Young before the U.S. House
Committee on Transportation and Infrastructure, Hearing on Rail Competition and Service (Sept.
25, 2007) (attaching Mr. Moorman's written testimony ) (emphasis added);

[33]

[34]

[35]   Defendants' arguments on adequacy and typicality of captive shippers likewise fail.

[36]

But he never explains what shipper-specific analysis he advocates, and instead admits that such an analysis is not even feasible.[37]  His report makes clear that he does not believe even detailed individualized analysis of particular shippers would necessarily prove impact.  Willig Rpt. ¶ 82; Willig Dep. 284-95.  For this reason, if an individual shipper were to sue separately, its case would not focus on a hypothetical analysis of how it and the Defendants might have behaved in individualized negotiations in the absence of a conspiracy.  Rather, a shipper would attempt to prove impact and damages using predominantly the same evidence that Plaintiffs and Dr. Rausser have developed for the Class:  evidence of a conspiracy to impose standard FSCs; evidence that the market is conducive to conspiracy; and evidence that the conspiracy raised rail freight shipment rates above competitive levels.[38]

---

[37]   For example, in ¶ 156 of his report, Dr. Willig asserts that individual issues purportedly affecting supply and demand are "the ability to motivate higher volume from the shipper with discounts" and "the willingness of the shipper to accept risks of price changes instead of a contractually steady price."  Yet at his deposition, Dr. Willig conceded that the former was "a beauty," because "it's essentially impossible to construct a variable of that kind," and for the latter, he "can't imagine how one would find such a variable at the level of the individual shipper."  Willig Dep. 294-95.  Dr. Willig's "general conclusion" was "it's somewhere between extremely hard to imagine and essentially impossible to contemplate a reliable way to construct such a regression at the individualistic level without years of individualistic inquiries[ ] just to construct the variables."  Willig Dep. 292.  In other words, Dr. Willig sets a standard for showing impact that is impossible to meet.

[38]   Would Defendants have sought to maintain and enforce aggressive FSC programs in the Class Period absent a conspiracy?  Would (and could) Defendants have imposed FSCs only on certain shippers or only in markets satisfying certain competitive criteria if they were unable, through a conspiracy, to ensure broad-based application of the standard FSCs that they agreed to adopt and enforce?  And would particular shippers have paid FSCs during the Class Period if it was clear that the FSCs were not being applied essentially across-the-board to all shippers but were instead targeting only competitively vulnerable shippers who lacked sufficient leverage to avoid the surcharges?  These questions are all subject to common proof.  Defendants and Dr. Willig identify no type of individualized evidence that would allow the Court to determine, one way or another, whether a particular shipper would have paid an FSC absent the conspiracy.

**B.      The Declarations Do Not Support Defendants' and Dr. Willig's Arguments.**

Defendants and Dr. Willig rely heavily – and for certain key points almost exclusively –
on 21 declarations submitted by railroad executives, who purport to show that deviations from
the standard FSC programs were widespread during the Class Period.[39]  However, depositions
have now exposed that these declarations are both unreliable[40] and inconsistent with the
propositions for which Defendants and Dr. Willig invoke them.  For example:



_____

[39]   Dr. Willig relied heavily on the declarations and interviews with other unidentified
business people.  Willig Dep. 254-83; *see also* Willig Rpt. 45 ("Declarations of railroad
personnel identify a wide variety of non-standard FSC provisions for significant shippers.").





[42]   Tr. of Dep. of Marc Allen ("Allen Dep.") 23-24 (attached at HD Ex. 85); Jacobowski Dep. 23 (BNSF); Lawson Dep. 37-38; Osborne Dep. 38-41, 48-49;  HD Ex. 40; Listwak Dep. 29-31 (NS); Tr. of Dep. Donna ("Cerwonka Dep.") 7-8 (CSX) (attached at HD Ex. 86); Tr. of Dep. of Dean Piacente ("Piacente Dep.") 7-10 (CSX) (attached at HD Ex. 87).





47

 Various omissions and inconsistencies further undermine the declarations.[49]



Defendants also argue that the fact that trucks compete for some business means a common showing of impact is impossible.  But as Dr. Rausser explains, Rausser Rpt. IV.E, Rausser Reply 28-29, truck competition was constrained during this period, ██████████ ████████████████████  Dr. Rausser's regression model – which accounts for factors like commodity and route – shows that intermodal shipments were impacted by the conspiracy. Rausser Reply 13, 22-23, 28-29, 54-57, 98 n.225.  Defendants' assertion that some shippers could "defeat any attempt by the railroads to raise prices through collusion" (D. Br. 55) is

---

██████████████████████████████████████████████████

[49]   For example, compare: Duggan Decl. ¶ 10 and Duggan Dep. 9-11, HD Ex. 106; Garin Decl. ¶¶ 5, 12 and Garin Dep. 110, 194, 196-99, HD Exs. 118-19; Garin Decl. ¶ 14 and Garin Dep. 134, 137-40, HD Exs. 107, 113-14; Garin Decl. ¶ 15 and Garin Dep. 33, 149-51, 155-56, HD Ex. 107; Garin Decl. ¶ 17 and Garin Dep. 220; Jacobowski Decl. ¶ 6 and Jacobowski Dep. 53-57, HD Exs. 123-26; Jacobowski Decl. ¶ 7 and Jacobowski Dep. 46-47; McNulty Decl. ¶¶ 12, 14, 16 and McNulty Dep. 15, 121-24, 164-66, HD Ex. 128; Piacente Decl. ¶ 7 and Piacente Dep. 44, 45, 61, 74-75, 78, 80, HD Exs. 129-30, 140; D. Br. 49, n. 62 and Piacente Dep. 108-09; Lawson Decl. ¶¶ 13-14 and Lawson Dep. 47; Listwak Decl. ¶ 35 and Listwak Dep. 122, 133-34, 153, 178; Listwak Decl. ¶ 28 and Listwak Dep. 155, 160, HD Ex. 139; Listwak Decl. ¶ 24 and Listwak Dep. 100-01, 123-26, 130, HD Ex. 137; Listwak Decl. ¶ 31 and Listwak Dep. 177, 182-85; Listwak Decl. ¶ 12 and Listwak Dep. 80-84; Listwak Decl. ¶ 5(a) and Listwak Dep. 69, 74-76, HD Ex. 135; Listwak Decl. ¶ 5(b) and Listwak Dep. 84-85, 97, 101-02, 103, HD Exs. 136-37; Listwak Decl. ¶ 7 and Listwak Dep. 58-59, 63-64, HD Ex. 134; Osborne Decl. ¶ 10 and Osborne Dep. 100-10, HD Ex. 143; Adams Decl. ¶ 3 and Young Dep. 148, (Adams was deposed before his declaration was submitted, *see* Young Dep. 13-17, 146-62); D. Br. 29 (citing Adams Decl. Attachment 2) and Young Dep. 159; D. Br. 9, n. 5 (citing Adams Decl. ¶ 6) and Adams Dep. 87, 114-15; Gehl Decl. ¶¶ 3-4 and Gehl Dep. 25; Gehl Decl. ¶ 7, 9 and Gehl Dep. 44, 47, 49-50, 55; D. Br. 29 (citing Gehl Decl.¶¶ 3-4, Krehbiel Decl. ¶ 5(A)) and Gehl Dep. 87, Krehbiel Dep. 123-24; Pagan Decl. ¶ 2 and Pagan Dep. 25-29; *see also* Lawson Dep. 105, 112-13, 116, 121-26, 127-33 (regarding Schaaf and McGregor declarations).

[50] ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

supported by neither economic analysis nor anecdotal evidence.  It does not appear that a single

shipper "defeated" Defendants' coordinated efforts to raise prices through the FSCs.

## C.    Defendants Ignore the STB Proceedings

Defendants assertions about the variability and negotiability of FSCs during the Class

Period (and Dr. Willig's reliance on them) also ignore the record of the STB's FSC proceedings.

At the May 2006 hearing, and in written submissions, shippers industry-wide advanced a

common complaint:  Defendants' FSCs had become "non-negotiable," "enacted by unilateral

decree," and "mandated," on a "take it or leave it basis."  For example:

- *AES Corporation*:  "[T]he incorporation by reference of a carrier's 'public' fuel surcharges into a new contract is typically made with no modifications, over the strong objection of the shipper, and such inclusion is mandated on a 'take it or leave it basis.'"  HD Ex. 94, at 14 (Comments, April 27, 2006).  "[T]he fuel surcharges have been imposed in addition to significant base rate increases as AES' rail transportation contracts have come up for renewal in the past few years."  HD Ex. 99 (Transcript, May 11, 2006 STB Hearing) ("STB Tr") 104.

- *Alliance of Automobile Manufacturers*:  "Surcharges have become 'non-negotiable,' enacted by unilateral decree."  HD Ex. 95, at 3 (Comments, April 27, 2006).  "[T]he requests for supporting documentation basically are rebuffed and the surcharges have become non-negotiable."  STB Tr. 121.[51]

- *Edison Electric Institute*:  "There is a widespread perception that large companies such as utilities or other rail shippers are fully capable of protecting their interests with the railroads because the firms are all large and have the resources to do so.  That is completely flawed logic. * * * The very fact that railroads could systematically, and substantially, over-recover for their fuel costs is vivid proof of their market power, and the abuses of it the railroads have committed."  HD Ex. 96, at 3 (Comments, April 2, 2007).

- *Griffin Industries Inc.*:  "[A]ll railroads have nearly identical methods of determining and levying fuel surcharges. * * * The 'take it or leave it' attitude we have seen has made this situation even more unacceptable."  HD Ex. 97, at 1, 3 (Comments, May 11, 2006).

- *Mittal Steel USA*:  "[T]hese surcharges are presented as a 'take it or leave it' proposition." HD Ex. 98, at 5 (Comments, April 27, 2006)

- *National Industrial Transportation League*:  "[T]here's no negotiation on fuel surcharges today.  It's a take it or leave it thing."  STB Tr. 242.

---

[51]    This Alliance comprises leading automobile shippers that Defendants now claim were freely able to negotiate "fuel surcharges that ranged from *no* fuel surcharge, to a voluntary fuel surcharge, to a surcharge with a higher trigger."  D. Br. 57.

- *Western Coal Traffic League*:  "UP reports that its 'fuel surcharge will be included on all repriced business' and that all of its newly negotiated 'long term contracts' will include UP's 'standard fuel surcharge.'"  HD Ex. 100, at 22 (Comments, April 27, 2006)

Before the STB, Defendants defended their FSCs on the basis that "standard" programs were preferable and that "tailoring" programs to individual shippers was "not practical"[52] – positions clearly inconsistent with their arguments here.

Shippers' vigorous complaints before the STB about how FSC's had become a profit center for the Defendants also corroborate the concerns that Defendants internally expressed about expected shipper resistance to unilaterally imposed FSCs.[53]  The STB decision also corroborates the Class-wide impact reflected in Defendants' documents, testimony and transaction data.  The STB found, without distinguishing among categories of shippers or routes, that Defendants' FSCs were "a misleading and ultimately unreasonable practice," and that continuing the programs "would permit them to continue to mislead their customers and would be unfair."[54]  While Defendants asserted that their FSCs only recouped actual fuel cost

---

[52]   HD Ex. 1, at 15-17 (UP:  "Some customers may pay more than the actual incremental cost of fuel we use to handle their particular shipments.  Some pay less.  While this may appear inequitable to some, we believe standard surcharges are the most appropriate and reasonable way to manage a fair, equitable and easily administered fuel surcharge program. … It is simply not practical to have a unique fuel surcharge program for individual customers….");  HD Ex. 9 (BNSF:  "Our surcharge program is the same for all customers").

[53]   *See, e.g.*, *Alliance of Automobile Manufacturers*:  "[W]e believe the ability to mandate fuel surcharges has become a new profit center for the railroads."  HD Ex. 95, at 2 (Comments, April 27, 2006).  *Chevron Oronite*:  "[F]uel surcharges assessed by the railroads are unreasonable and they do not relate to increased fuel costs.  Instead, they are simply a rate increase."  HD Ex. 101 at 2 (Comments, April 27, 2006).  *Dow Chemical Co.*:  "[T]he fuel surcharges are allowing the railroads to over-recover their incremental fuel cost and have become a method of revenue enhancement."  HD Ex. 102, at 1 (Comments, April 27, 2006).

[54]   RD Ex. 147, at 7, 9 (STB Decision, Jan. 26, 2007).  The type of pretext here can be powerful evidence of a conspiracy.  *E.g.*, *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1012-13 (3d Cir. 1994); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362, 1374-80 (3d Cir. 1992); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1479-80 (9th Cir. 1986).

increases,[55]  the STB found that the Defendants' FSCs "cannot fairly be described as merely a

cost recovery mechanism."  RD Ex. 147, at 6.   An FSC program "that increases all rates by a set

percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling

the particular traffic to which the surcharge is applied."  *Id*. at 6.[56]  The STB proceedings

highlighted the common application of Defendants' FSCs.  STB's then-Chairman told Congress:

> In January of this year we issued a decision declaring it an industry-wide unlawful
> practice for carriers to use a fuel surcharge to recover more than the increased fuel
> costs attributable to . . . particular movement[s] [of traffic]. . . . This action ended
> an industry practice of charging fuel surcharges as a percentage of a shipper's
> base rate regardless of the actual fuel costs associated with the transportation of
> the shippers' goods.[57]

---

[55]  *See, e.g.*, HD Ex. 46 (CSXT April 27, 2006 Statement to STB at 9-10 (CSXT's fuel surcharge program under-recovered fuel costs and this "belies any suggestion that CSXT has profited" from the program)); STB Tr. 258, 261, 274 ( "fuel surcharge is clearly not a profit center at BNSF"); *id*. 301 (CSXT spokesman saying its fuel surcharge program "has not been a profit center for us"); *id*. 314 (NS spokesman saying there had been no over-recovery through its FSC program during the last six years); *id*. 325-26 (UP spokesman: "[t]he bottom line, Union Pacific is not in the business of making money from its fuel surcharge program").

[56]  Other studies confirm the over-recovery resulting from the imposition of the new standard FSCs.  *See, e.g.*, HD Ex. 52 (U.S. Dept. of Agriculture & U.S. Dept. of Transportation, "Study of Rural Transportation Issues," Apr. 2010, at ix ("There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits.  From 2001 to 2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel.")); *id*. 260 (chart showing the increasing spread between fuel costs and FSCs for grain, which expanded substantially beginning in 2003-04 and continuing thereafter); *id*. 272 ("Rail rates have increased rapidly since 2004 resulting in a surge of railroad profitability.  The increase reflects not only increased rail costs, but aggressive pricing and over-recovery of fuel costs.  Fuel surcharges seemingly should reimburse railroads for the increase in fuel costs, not be sources of additional revenue."); HD Ex. 53 (Snavely King Majoros O'Connor & Lee, Inc. Report of July 25, 2007 to the American Chemistry Council at p. 2 (calculating over-recovery during 2003-07 of $6 billion).

[57]  HD Ex. 155  (Oral Statement of Charles D. Nottingham Before the House Committee on Transportation and Infrastructure at pp. 8-9 (Sept. 25, 2007)).

## D.      Defendants Misconstrue the Legal Standard For "Impact"

Plaintiffs moving papers set forth the legal standards governing this motion.  *See* Pl. Mem.

50-56.  Defendants do not dispute that the issue of liability is subject to common proof.[58]

Defendants do argue that Plaintiffs at class certification purportedly must show how

Defendants' conspiracy raised prices for *each* transaction with *each* shipper, D. Br. 3, and that

"Defendants' ability to add fuel surcharges was completely exhausted by July 2003," *id.* 30.

Such arguments, however, "misconstrue[s] the plaintiffs' burden," since "plaintiffs need not

demonstrate to an absolute certainty that all  . . .  purchasers ultimately suffered damages as a

result of inflated list prices."  *EDPM*, 256 F.R.D. 82, 89 (D. Conn. 2009); *see also Toys "R" Us,*

*Inc.,* 638 F. Supp. 2d at 483-85 (applying *Hydrogen Peroxide*; "[i]t is enough that the illegality is

shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative

sources of injury in fulfilling his burden of proving compensable injury . . . .") (quotation and

citation omitted).[59]

---

[58]   *Vitamins*, 209 F.R.D. at 264 ("the allegations of price fixing relate to the *defendants'*
*conduct*, therefore proof will not vary among the class members"); *McDonough v. Toys "R" Us,*
*Inc.,* 638 F. Supp. 2d at 479-80 (following *Hydrogen Peroxide* and finding that the "question [of
antitrust violation] calls for evidence related solely to the defendants' conduct"); *In re Ins.*
*Brokerage Antitrust Litig.*, 579 F.3d 241, 267-68 (3d Cir. 2009) ("'examin[ing] the elements of
plaintiffs' claim through the prism of Rule 23,'" and easily "find[ing] that common questions
abound with respect to whether the defendants engaged in illegal, concerted action," as these
questions "focus[ed] on the conduct of the defendants" (quoting *In re Hydrogen Peroxide*
*Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)).

[59]   *See also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.)
(decision to certify class should be revisited only if it is ultimately shown that a "high
percentage" of the class members were not injured); *In re Urethane Antitrust Litig.*, 251 F.R.D.
629, 638 n.6 (D. Kan. 2008); *Meijer*, 246 F.R.D. at 308.  Defendants' arguments relate to
damages, not impact, and are properly viewed as merits arguments for trial.  *EPDM*, 256 F.R.D.
at 90; *id.* at 94 ("Although those issues may be relevant for calculating *damages* – those rebates,
discounts, and non-price factors may mean that a particular plaintiff suffered no damages – they
do not mean that plaintiffs were not *impacted* in some way.") (emphasis in original).

Rule 23 calls for an examination of whether Plaintiffs have "offered a colorable method by which they intend to prove impact on a class wide basis." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002); *see also Hydrogen Peroxide*, 552 F.3d at 311-12 (court must determine if plaintiffs can "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members").[60]  If so, predominance inquiry is satisfied.

Proof of common impact does not require proof that every class member was actually injured.  *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 369 (D.D.C. 2007).  Generally accepted methods for establishing class-wide impact include, among other things, economic calculations that cover both impact and damages and show predominance by providing a common method for proving that the class paid higher actual prices than in the but-for world.  Other methods of common proof include "lock-step increases in national price lists in an oligopolistic market," *EPDM*, 256 F.R.D. at 88;[61] proof that "defendants conspired to maintain an inflated 'base' from which all pricing negotiations began," *NASDAQ*, 169 F.R.D. at 523

---

[60]  *See In re TFT-LCD (Flat Panel) Antitrust Litig.("TFT-LCD")*, 267 F.R.D. 583, 606 (N.D. Cal. 2010) (assessing whether "plaintiffs have presented plausible methodologies for demonstrating class-wide impact"); *see also Meijer*, 246 F.R.D. at 308-09 (predominance found where plaintiffs' expert "propose[d]" to prove the alleged antitrust impact through a number of types of common proof); *Vitamins*, 209 F.R.D. at 265-68 (where plaintiffs' expert had merely "detailed the approach that plaintiffs intend to take with respect to establishing common impact," it was "enough that plaintiffs ha[d] made a threshold showing of how they intend to prove impact using generalized evidence on a class wide basis"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *16 (M.D. Pa. 2007) (certifying class where there was "a factual basis" for expert's analysis); *Hydrogen Peroxide*, 552 F.3d at 325 (only when it is "genuinely disputed" that impact is "susceptible to proof at trial through available evidence common to the class" must the "district court resolve" disputes between the experts).

[61]  *Behrend*, 264 F.R.D. at 187-89 (comparing list prices to "but for" or "benchmark" prices); *Toys "R" Us*, 638 F. Supp. 2d at 485-86 (finding impact based on defendants' maintenance of "uniform list prices nationwide" despite evidence of discounts resulting from sales and coupons); *Ready-Mixed Concrete*, 261 F.R.D. at 172 ("[C]ommon proof of impact is possible because of the direct evidence of price-fixing contained in Defendants' price lists.").

(citations and quotations omitted); *see also In re Ready-Mixed Concrete Antitrust Litig.*, 261

F.R.D. 154, 171-72 (S.D. Ind. 2009); evidence of structural factors that make defendants'

industry susceptible to successful collusion, *EPDM*, 256 F.R.D. at 91-92; *Behrend*, 264 F.R.D. at

160-61; *Ready-Mixed Concrete*, 261 F.R.D. at 170;[62] studies of the relationship between

competition and prices, *Nifedipine*, 246 F.R.D. at 370; *Meijer*, 246 F.R.D. at 308-09; evidence

concerning defendants' perceptions of the impact of competition (or lack thereof) on prices, *id.*;

*Meijer*, 246 F.R.D. at 308-09; analysis of the effect of defendants' conduct on average price,

*Nifedipine*, 246 F.R.D. at 369-70; and evidence of price hikes that were "not in line with input

prices and were the result of communications between the defendants to sustain supracompetitive

prices." *EPDM*, 256 F.R.D. at 85.

      Plaintiffs have submitted not just one type, but many mutually-enforcing types of

evidence that are widely accepted as sufficient for proving impact on a common basis. Plaintiffs'

common evidence of impact goes well beyond what is required under any applicable standard.

      Defendants repeatedly invoke *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th

Cir. 2004), to argue that since the alleged conspiracy here relates only to a single component of

price, a finding of predominance necessarily cannot follow. *See* D. Br. 3-4, 41-44, 47, 50, 64.

But these cases have nothing in common. Plaintiffs in *Robinson* relied on nothing more than that

class members paid a state tax (called a "VIT") that was imposed as a line item (rather than

treated as an overhead expense). The Fifth Circuit framed the issue as "whether the mere

payment of a VIT – *unaccompanied by any other evidence* – provides enough information such

---

[62]   *EPDM*, 256 F.R.D. at 91 ("[T]hose structural characteristics made it more likely that
the impact of those price increases would be felt class-wide."); *TFT-LCD*, 267 F.R.D. at 601
(certifying class where plaintiffs' expert provided evidence that industry was susceptible to
price-fixing, including evidence of  high barriers to entry, and that there were "regular meetings
and interactions that allowed defendants to exchange information, come to agreements").

that a party may sustain a price-fixing suit on behalf of the entire class." *Id.* at 423 (emphasis

added).  The Fifth Circuit held plaintiffs could not "assume that the VIT represents an additional

charge that artificially increases the final purchase price for every purchaser in the class" or that

"all members of the class suffered an antitrust injury just by paying a VIT." *Id.* at 423, 424.

Plaintiffs here, by contrast, are alleging that the purpose of the conspiracy was to

effectuate an increase to "all-in" prices by means of their agreed FSCs.   Plaintiffs do not ask this

Court to *assume* that payment of FSCs, without more, caused antitrust injury.  Plaintiffs have

provided persuasive evidence – in the form of documents from Defendants themselves and

regression analyses performed by Dr. Rausser – that the FSCs were intended to, and did in fact,

raise overall prices.[63] And Defendants ignore the cases in cases involving price or product

components where classes were certified.[64]

---

[63]    *Robinson* is also inapposite because it involved millions of people raising claims
against over a thousand defendants, who could not be certified as a defendant class.  *Id.* at 420 &
nn. 6, 9.  *See  Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 139-40 (5th Cir. 2005)
(distinguishing *Robinson* on that basis).  *Exhaust Unltd., Inc. v. Cintas Corp.*, 223 F.R.D. 506
(S.D. Ill. 2004), cited by Defendants, is also inapposite.  *Exhaust* involved "*several hundred*
various ancillary charges imposed by the Defendants" relating to different fees ("delivery, fuel,
waste water, service, inventory and maintenance fees"), which varied "in amount and in the
method of calculation," were "subject of individual negotiations, have varying cost justifications,
and were not consistently charged by Defendants in particular markets or at particular times."
*Id.* at 511 (emphasis added).  In *Exhaust*, the expert's "report" consisted of a 15-page, double-
spaced affidavit, with no regression analysis, and a proposed "methodology" that would rely on
examining defendants' invoices and calculating impact and damages based  "simply [on] the
environmental charge plus any tax levied on the charge."  *See* Affidavit in Support of Class
Certification (Oct. 17, 2003), 2003 WL 24334425, at ¶ 23.  Other cases cited by Defendants, D.
Br. 44-5, are not consistent with the approach courts in this Circuit use in analyzing
predominance and are distinguishable based on what the expert for the proposed class did.  *See*
*American Seed Co. v. Monsanto Co.,* 238 F.R.D. 394, 400-01 (D. Del. 2006), *aff'd*, 271 Fed.
Appx. 138 (3d Cir. Apr. 1, 2008) (plaintiffs' expert did not even conduct a preliminary market
analysis; his report was not supported by charts, studies, or articles); *Schoenbaum v. E.I. DuPont
de Nemours & Co.*, No. 4:05CV01108 ERW, 2009 WL 4782082, at *10 (E.D. Mo. Dec. 8, 2009)
(plaintiffs' theory of impact was too "vague and undeveloped" for the court to understand).

[64]    *See e.g., In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555 (S.D.N.Y.
2004) (percentage-based currency conversion charge on credit cards); *In re Universal Service*

## II.   DEFENDANTS' ARGUMENTS ARE PREMISED ON FAULTY ECONOMIC ANALYSIS THAT FAILS TO SHOW AN ABSENCE OF COMMON PREDOMINATING ISSUES AS TO IMPACT.

### A.   Defendants and Dr. Willig Largely Ignore the Structural Factors That Made the Rail Freight Industry Conducive to the Alleged Conspiracy.

Defendants and Dr. Willig do not seriously challenge – and largely disregard – Dr. Rausser's analysis showing the structural factors that made the rail freight industry conducive to collusion and meant that a pricing agreement among Defendants would likely have a Class-wide impact.  *See* Rausser Rpt. 9-40, 49-52.[65]  Dr. Willig's principal response is that the presence of so-called "captive" shippers meant that factors such as industry consolidation could not be expected to facilitate collusion, because "captive" shippers would already be subject to monopoly pricing.  *See* Willig Rpt. ¶ 209.  Not only are such arguments counterfactual, *see* Point I, *supra*, but Defendants' own transaction data shows that during the Class Period, so-called "captive shippers" were subject to the same FSCs as non-captive shippers, precisely as the

---

*Fund Telephone Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004) (universal service fund telephone service surcharges).  *Accord Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F. Supp. 869, 872 (E.D. Cal. 1986) ("[f]inally, defendants have not established beyond doubt by economic evidence that any overcharge on cooling and palletizing charges was offset by an identical decline in other price components, and defendants' argument in this regard is contrary to the holding of the United States Supreme Court in *Catalano*….").

[65]   The structure of the rail freight industry meant an agreement by Defendants to fix prices would likely have a Class-wide impact.  These factors  include (a) the industry is "highly concentrated"; (b) extremely high barriers to entry"; (c) rail freight service is "interchangeable across Defendants" with customers making price-based decisions that create "strong incentives for the railroads to fix those prices"; (d) "demand for the Defendants' rail freight service is in general inelastic"; and (e) "implementation and operation" of a cartel is eased by a "history of regulated pricing and communications between Defendants."  Rausser Rpt. 5-6.  These factors "lay the groundwork for plaintiffs' argument that, if collusive behavior did occur, it would have been effective in raising prices across the class, thus demonstrating class-wide injury-in-fact." *EPDM*, 256 F.R.D. at 92; *see also Behrend*, 264 F.R.D. at 160-61; *Ready-Mixed Concrete*, 261 F.R.D. at 170; *TFT-LCD*, 267 F.R.D. at 601 (certification where expert provided evidence that industry was susceptible to price-fixing, including high entry barriers and "regular meetings and interactions that allowed defendants to exchange information, come to agreements, and police cheating").

pretext of the FSC program demanded.  Rausser Reply 13, 23-27.  Dr. Willig himself admitted

that competitive forces can affect captive shipper rates.  Willig Dep. 159-63.[66]

Even Dr. Willig acknowledges that the FSCs at issue were, in fact, an efficient

mechanism to raise freight rates.  *See, e.g.,* Willig Rpt.  ¶ 26 ("fuel surcharges can enhance

economic efficiency in the rail industry" by "reducing transaction costs due to the need to

renegotiate prices when fuel costs change").  While Dr. Willig uses this efficiency to support his

argument (which is plainly a Class-wide argument) that FSC use would have been prevalent

absent a conspiracy, his efficiency argument is also consistent with Dr. Rausser's conclusion that

the FSCs here were an effective mechanism by which to achieve a conspiratorial price increase.[67]

**B.      Defendants and Dr. Willig Offer Only Flawed Challenges to Dr. Rausser's
         Analysis Establishing the Common Impact of the Alleged Conspiracy.**

Dr. Rausser's regression analysis shows that the conspiracy impacted the Class by,

among other things, causing a structural break in the relationship between fuel prices and freight

rates.  Rausser Rpt. 120, Rausser Reply 83, 92-97.  Notably, Dr. Willig himself observed a

change in the relationship between rail freight rates and fuel costs during the Class Period.[68]

Similarly, the Christensen & Associates report on which Dr. Willig relies concluded that rising

fuel prices between 2002 and 2006 could explain only a 3% average annual increase in rates,

Christensen Rpt. 9-30, further supporting Dr. Rausser's conclusions.  The Christensen report

---

[66]   Dr. Willig's assertion that any conspiracy should have had no effect on "captive"
shippers is also undermined by his admission that it would not be a simple matter for
Defendants to determine which Class Members were truly "captive."  Willig Dep. 145, 149, 168.

[67]   Dr. Rausser explained that FSCs calculated as a percentage of base rates are "an
especially effective mechanism for achieving and sustaining a conspiratorial rate increase in this
industry."  Rausser Rpt. 6.  FSCs provided "a highly cost efficient mechanism for collusion,"
because they were a "mechanism for coordinated behavior that provides the ability to monitor,
detect, and deter violations from agreed-upon collusive strategies."  *Id.* at 9; *see also id.* 49-52.

[68]   *See* Willig Rpt. ¶ 265 (noting an increase in "the sensitivity of rail rates to fuel prices
during the conspiracy").

found that *around 2003* there was an unexplained and anomalous increase in railroads' variable and marginal costs – unrelated to fuel costs – about which the authors could only speculate. Christensen Rpt., 9-16 to 9-18.  While Dr. Willig may attempt to offer an alternative, non-conspiratorial explanation for the break, that is a matter of Class-wide proof to be addressed at trial.[69]

In any event, Dr. Willig's purported criticisms of Dr. Rausser's analysis are methodologically flawed (in addition to being factually flawed as shown in Point I, *supra*).

**Industry Trends:**  Dr. Willig seeks to demonstrate that the FSCs at issue reflected an industry trend that would have continued during the Class Period even absent collusion.  But Dr. Willig utilizes an overtly unreliable model to establish this trend.  The analysis uses an insufficient set of data points to establish purported "trends" – just two data points for CSX, and just two clusters of data points for each of the other Defendants.  *See* Rausser Reply 7, 32-34.

Dr. Willig also uses a metric for "FSC incidence" that is not weighted to reflect the number of shipments subject to FSCs or the revenue earned on routes where FSCs applied:  his analysis treated a shipper who paid FSCs on 1% of its shipments as equal to a shipper that paid FSCs on 100% of its shipments (regardless of the number of routes on which that Class Member

---

[69]  In *In re Currency Conversion Fee Antitrust Litig.*, Plaintiffs alleged that defendants conspired to impose a 2% currency conversion fee, and both sides' experts agreed that the impact of the conspiracy could be determined by comparing that 2% fee to the fee that would have been charged in a "but for" world in which defendants had not engaged in unlawful activity.  264 F.R.D. at 115.  The experts disagreed, however, on what fee would have been charged in the "but for" world.  Plaintiffs' expert said that the fee would have been zero, so that damages and impact equaled the amount of the fee.  Defendants' expert argued that defendants would have imposed the same 2% without collusion, so that class-wide damages were zero and the conspiracy had no impact.  *Id*.  Faced with these competing views of the "but for" world, the court concluded that both experts were relying on evidence common to the class, and that the court "should not resolve which 'but for' price is correct" at the certification stage.  *Id*.

shipped, the volume of shipments, or the rate of the FSC ).  *See* Willig Dep. 47, 52-53.[70]  This

artificially constructed metric was not used by any Defendant.  Defendants' witnesses testified



– metrics that changed dramatically as a result of the

conspiracy.

In addition, Dr. Willig made no effort to assess whether, in cases where FSCs were

applied before the start of the Class Period, those FSCs were the same as the conspiratorial FSCs,

and admitted that his trend analysis led to no such conclusion.[73]  Dr. Rausser showed that Dr.

Willig's failure to weight the data for revenue masked both how much more extensive FSC

---

[70]  Dr. Willig's analysis thus would not account for a conspiracy which dramatically
increased the absolute number of routes on which FSCs were applied.



[73]  "Q:  Have you reached a conclusion that [in] the absence of the alleged conspiracy, the
Defendants, through individual conduct, would have imposed fuel surcharges substantially
similar to those that were imposed during the class period?   A:  I think it's fair to say that, first,
that's not part of the conclusions offered in my report. * * *  I am not going to that as a statement
of my conclusion."  Willig Dep. 235-236.

coverage became during the Class Period and that the sharp increase in coverage began in mid-2003 – wholly consistent with the factual record.  Rausser Reply 34-37.

**Alternative Regression Model:**  Dr. Willig presents an alternative regression model that purports to show the absence of the conspiracy's impact by comparing rail freight rates to marginal costs.  *See* Willig Rpt. ¶¶ 195-199.[74]  But rather than use Defendants' actual transaction data, Dr. Willig bases his model on highly aggregated marginal cost data from the Christensen report  – *i.e.*, *average* inputs from *annual* railroad reports to the STB including from *non-Defendant* railroads.[75]  On the price side, Dr. Willig uses *annual* industry freight rates, including sales data from *non-Defendant* railroads.  Rausser Reply 8 n.14, 39-43.

Dr. Willig thus has used the very type of aggregated, average price and cost inputs that he criticized in *Nurses*.[76]  Dr. Willig also admitted at his deposition that his analysis does not control for demand, commodity, route, car type, seasonality, or interline traffic, *see* Willig Dep. 211-13 – all of which are accounted for in Dr. Rausser's regression analysis.  Thus, Dr. Willig's analysis does not account for critical shifts in the commodity mix, route mix, or the many other

---

[74]   The first version of Dr. Willig's report also included an analysis of costs that compared the STB's freight rate index with the RCAF-A cost index, in an attempt to show that industry-wide freight rates increased during the Class Period in proportion to actual cost increases.  *See* Expert Report of Robert D. Willig (Dkt. # 381) (June 30, 2010), ¶ 39, Figure C-5.  However, Dr. Willig removed this analysis from his corrected report.  *See* Willig Rpt. Ex. 4 (Errata) 1.  He admitted at his deposition that the STB freight rate index was adjusted for general inflation, but the RCAF-A was not.  *See* Willig Dep. 177-181.  Accordingly, no direct comparison could be or should have been made.  A simple solution would have been to adjust the RCAF-A index for inflation (something Dr. Willig chose not to do).  *See* Willig Dep. 176-79.  Dr. Rausser made that adjustment, and the result contradicts Defendants' and Dr. Willig's position: the revised comparison shows that  the gap between industry-wide freight rates and RCAF-A fuel costs *widened significantly* during the Class Period, corroborating Dr. Rausser's analysis of a structural break and thus impact to Class members.  *See* Rausser Reply 8, 37-38.

[75]   Willig Dep. 202-03.

[76]   *See Nurses*, 2009 WL 3146999, at *11 (criticizing use of "average wages" to "form the basis for" a regression analysis).

33

factors that would cause average costs and average freight rates to change in ways that makes a

comparison of the two meaningless.  Rausser Reply 8, 40-42.  As Dr. Willig admitted, "doing an

average price regression is just not going to help anybody, Professor Rausser or myself,

successfully and validly deal with the issues before us in class certification."  Willig Dep. 279.

Dr. Rausser's common-factors regression model, on the other hand, uses as inputs

Defendants' transaction-specific data.  Rausser Reply 66.[77]  This model identifies the factors that

predominantly explain rail freight shipment prices.  *Id.*; Rausser Reply 8, 37-38.[78]

**Univariate Analysis:**  Dr. Willig purports to study individual variables that affect rail

freight shipment prices.  But such univariate analysis is inherently flawed where multiple factors

---

[77]   Defendants' reliance on *In re Flash Memory Antitrust Litig.* is misplaced, given that
the regression there was based on data from only 3 of the 6 defendants.  *See Flash*, 07-0086
SBA, 2010 WL 2332081, at *10 n. 9 (N.D. Cal. June 9, 2010).  In addition, "[m]any sales
contracts did not specify a future price, pricing formula or reference-pricing method, but instead
called for renegotiation of prices on a frequent basis."  *Id.* at *8.

[78]   To the extent that Dr. Rausser made some very limited use of aggregation in
estimating damages, this was primarily to lessen computational time.  Rausser Reply 92.  Courts
have repeatedly found that quantification of damages can involve a reasonable use of average
overcharge calculations.  *See, e.g.*, *Nifedipine*, 246 F.R.D. at 371 ("the Court can find no fault in
[plaintiffs' expert's] consideration of *aggregate* changes in price") (emphasis in original);
*NASDAQ*, 169 F.R.D. at 523 (proper to show that price range was affected "generally" by
defendants' prices); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 2007 WL 4150666, at
*20 ("[Defendants argue that [plaintiffs' expert's] proposed multiple regression analysis is
flawed because it yields an average overcharge . . . .  This will not defeat Plaintiffs' class
certification motion because Plaintiffs do not have to present a precise damages formula at this
stage."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 345 (rejecting defendants' charge that
plaintiffs' expert "makes improper use of averages"); *TFT-LCD*, 267 F.R.D. at 605 (noting that
averaged data are used by courts in granting class certification); *In re Scrap Metal Antitrust
Litig.*, No. 1: 02 CV 0844, 2006 WL 2850453 at *14, 16 (N.D. Ohio, Sept. 30,  2006), *aff'd*, 527
F.3d 517 (6th Cir. 2008) (in situation where plaintiffs' expert used average price spreads to
compute average undercharges, court upheld jury verdict for plaintiffs; "[r]ecognizing that
antitrust cases present damages questions that often are not amenable to concrete mathematical
calculations, courts have regularly recognized averaging of overcharges as a valid method");
*Gordon v. Microsoft Corp.*, No., MC 00-5994, 2003 WL 23105550, at *3 (Minn. Dist. Ct. Dec.
15, 2003) (use of average overcharge analysis was permissible in determining what class-wide
damages would have been in the absence of defendants' conduct).  Regression analysis, which
necessarily involves some aggregation, is a mainstream and widely accepted tool for
demonstrating antitrust impact.  *See Vitamins* 209 F.R.D. at 267-68; Pl. Mem. 73-74.

are known to influence prices.  Rausser Reply 11-12, 69-76.  Multiple regression models, like Dr.

Rausser's common factors model here, are used in antitrust cases to account for the numerous

supply and demand factors that determine prices, and therefore to measure the impact, if any, of

alleged conspiratorial prices.  *See, e.g.,* Reference Manual on Scientific Evidence, Federal

Judicial Center (2d ed. 2000) 182 (excerpts attached at HD Ex. 62).  In his univariate analysis,

Dr. Willig is looking only at the effect of one price-influencing factor at a time.  Not surprisingly,

each individual variable evaluated in isolation can suggest significant pricing variations over

different routes.  But equally unsurprising, as Dr. Rausser shows, the addition of other

explanatory factors reduces the extent of that variation.  Rausser Reply. 73-76.[79]

**False Positives:**  Dr. Willig utilizes a "false positives" analysis that is both misleading

and incomplete.  Dr. Willig cites no authority for utilizing such an analysis in the context of

econometric regression modeling, and the results are flawed and unreliable.  Rausser Reply 13-

14, 83-90.

**Variations in Impact by Defendant:**  Dr. Willig claims his analysis shows that utilizing

Dr. Rausser's methodology, the impact of the conspiracy varies substantially when transaction

data is analyzed on a Defendant-by-Defendant basis.  This is not surprising, given that each

Defendant came to the conspiracy with different circumstances.  The extent of the variations is

overstated by Dr. Willig.  And even with variations, the impact for each Defendant here was

positive.  *See* Rausser Reply 98 n.225.

**Explanatory Power of Dr. Rausser's Regression Model:**  Dr. Willig attacks Dr.

Rausser's common factors regression model as purportedly failing to explain a sufficient amount

---

[79]  Dr. Willing compounds the flaw by presenting variations in freight rates as bar charts
or scatter plots, thus emphasizing extreme variation.  Dr. Rausser's multivariate analysis shows
that variation in freight rates across routes is not greater than in industries with perfectly
homogeneous goods.  Rausser Reply. 73-76.

of the variation in rail freight rates during the Class Period as compared to the pre-Class period.[80]
Willig Rpt. 238-240.  Specifically, Dr. Rausser's model had a so-called "R-squared" of 75%,
meaning that the model explained over 75% of the variation in rates.  Dr. Willig argues that this
R-squared in not sufficiently high.  But this ignores all of the academic literature explaining that
an R-squared of 75% is not only reliable, but also higher than the R-squared measures most peer-
reviewed journals are willing to report.  Rausser Reply 66-68.[81]  And the reliability of Dr.
Rausser's model is further evidenced by professionally accepted statistical tests to determine
whether a multiple regression model has practical value for predicting the dependent variable.[82]

## III.    DAMAGES CAN BE CALCULATED BY A COMMON, WORKABLE METHOD.

By any applicable standard, Dr. Rausser's damage analysis far surpasses the required
showing at the class certification stage.  *See, e.g., Meijer*, 246 F.R.D. at 311 (plaintiff must
present a methodology that is "not so insubstantial as to amount to no method at all"); *In re
Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 30 (D.D.C. 2001); *EPDM*, 256 F.R.D.
at 100-01 ("The real question before this court is whether the plaintiffs have established a

---

[80]    The type of regression modeling used by Dr. Rausser has been generally accepted by
courts as a method for assessing the impact of a conspiracy.  *TFT-LCD*, 267 F.R.D. at 606
("courts have accepted multiple regression analyses as means of proving antitrust injury and
damages on a class-wide basis"); *Currency Conversion*, 264 F.R.D. at 115 (affirming the
experts' "methodology of determining class-wide impact: comparing actual prices to those that
would exist in a 'but for' environment – that is, without the allegedly unlawful activity");
*Vitamins*, 209 F.R.D. at 268 (finding plaintiffs' expert had "viable methodologies by which it is
possible to calculate damages on a class-wide basis," including a "multiple regression analysis").

[81]    *See also TFT-LCD*, 267 F.R.D. at 601 (accepting regression model explaining 77% of
price variation based on five variables).

[82]    Dr. Willig also makes the somewhat contradictory argument that "even a regression
model with a 'high' $R^2$ can fail to predict accurately the price paid for an individual shipment."
Willig Rpt. ¶ 239.  But Dr. Willig's fabricated example to support this argument – involving a
made-up data set consisting of height for 26 individuals, 13 of whom are NBA players and 13 of
whom are jockeys – proves nothing, since the model has a high R-squared resulting from the
ability to predict height based on the profession of the individual (either NBA player or jockey).
Rausser Reply 68.

workable multiple regression equation, not whether plaintiffs' model actually works, because the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of damages through generalized proof.").[83]

Dr. Rausser has developed a regression model that can be used to calculate the damages to the Class and to each Class Member, and he has shown that the model works – first with respect to a large sample of the transaction data, and now with respect to *all* of the data.  In his original report, Dr. Rausser implemented his methodology on a dataset that includes about 25% of each Defendant's total unregulated traffic over the period 2000 to 2008.  Defendants argued (Willig Rpt. ¶ 274) that Dr. Rausser's original sample was unrepresentative (a flawed argument in a context where Plaintiffs are required to do no more than show a workable Class-wide methodology for estimating damages[84]).  But Dr. Rausser has now run his regression model on the complete set of transaction data.  Confirming the robustness of his model, the results of Dr. Rausser's expanded analyses are consistent with those he originally reported, and show both a structural break in the relationship between fuel prices and freight rates, coincident with the start of the conspiracy, and a statistically significant conspiratorial overcharge of approximately 13.4%.  Rausser Reply 83.

---

[83]  *See also Toys "R" Us*, 638 F. Supp. 2d at 490 ("Once injury has been shown, 'the jury is permitted to calculate the actual damages suffered using a reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.'   Therefore, predominance requires only a viable method whereby damages can be reasonably estimated based on common evidence.") (citations omitted).

[84]  *Compare J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (Rehnquist, J.) ("Our willingness to accept a degree of uncertainty in these [antitrust] cases rests in part on the difficulty of ascertaining business damages . . . .  The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.  But our willingness also rests on the principle articulated in cases such a[s] *Bigelow*, that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (quotations omitted).

Defendants mount several attacks on Dr. Rausser's analysis of Class-wide proof of damages. *First*, they argue that reporting an average overcharge is legally impermissible. D. Br. 62-63. However, Dr. Rausser's model does not stand alone, but builds upon his common impact regression. As noted above, in appropriate circumstances, use of averages or aggregated data to show an overcharge has been permitted in many antitrust cases, including a decision from this Circuit.[85] Moreover, as Dr. Rausser explains, his damage model does not assume a single overcharge and can be used to calculate individual damages. Rausser Reply 90-92.

*Second*, Defendants contend that Dr. Rausser's damages model cannot be used on a Class-wide basis because damages vary on particular shipments. D. Br. at 63-64. This argument is fallacious: "many courts have held that individual issues with respect to the amount of damages incurred by class members will not defeat certification where common issues predominate with respect to the alleged antitrust conspiracy and impact." *Meijer*, 246 F.R.D. at 312 (quoting *Vitamins*, 209 F.R.D. at 251). And as Dr. Rausser points out, the reported variation is to be expected and does not affect the conclusion to be drawn. Rausser Reply. At 98 n.225.

*Third*, Defendants contend that Dr. Rausser's damages analysis yields "nonsensical results" in the form of damages that exceed actual FSCs. D. Br. 5, 66. But Dr. Rausser explains that this assessment is incorrect: the overcharges to "all in" price found by his model, applied to 100 % of the transaction data, are generally below the applicable FSCs; and to the extent there are instances where the calculated overcharges do exceed the prevailing FSCs, this reflects various factors, including, for example, that in some instances fuel costs were already reflected in base rates (so that adding the FSC was a form of "double dipping" as found by the STB), and that Defendant NS "rebased" its fuel surcharges mid-conspiracy (thereby putting at least part of

---

[85]   *See* p. 34, n.78, *supra.*

the surcharge into the base rate).  Rausser Reply 96-99.  Defendants other assertions – e.g.,

"negative damages" – are just a rehash of other arguments or otherwise baseless.  *Id.* 83-84.

## IV.    DEFENDANTS' OTHER ARGUMENTS DO NOT PRECLUDE CERTIFICATION

Plaintiffs' class definition certainly is "tailored properly so that 'an individual would be

able to determine, simply by reading the definition, whether he or she is a member of the

proposed class.'"  *Johnson v. District of Columbia*, 248 F.R.D. 46, 52 (D.D.C. 2008) (quoting

*Bynum v. District of Columbia*, 214 F.R.D. 27, 31-32 (D.D.C. 2003)).  This is not "a particularly

stringent test," and requires only that "the general outlines of the membership of the class are

determinable at the outset of the litigation."  *Bynum*, 214 F.R.D. at 31 (quoting *Pigford v.*

*Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998) (Friedman, J.)); *accord Barnes v. District of*

*Columbia*, 242 F.R.D. 113, 120 (D.D.C. 2007).

Defendants assert, quite implausibly, that there is "no easy way" to determine whether

traffic is "rate-unregulated." D. Br. at 75.  But the STB ruling in 2007 applied only to rate-

regulated traffic, and neither the STB nor Defendants argued then that it was too difficult to

figure which traffic the ruling covered.  Earlier in this litigation, Defendants had no problem

refusing (until ordered) to produce transaction data for rate-regulated traffic.  *See* Dkt. # 308.

They did not claim then that it was too difficult to determine which transaction data related to

rate regulated traffic.  Defendants' expert has not claimed difficulty with such distinctions.

Defendants assert (D. Br. 76) that the Class definition is unworkable because it includes

shippers who paid a "rebased" FSC.   While Defendants suggest such shippers are not readily

identifiable, *id.* at 69-70, ███████████████████████████████████

██████████████████████████  Dr. Rausser accounts for this.[87]  Rausser Rpt. 117

n.250.

Defendants claim a "significant number" of contracts have arbitration clauses.  D. Br. 77-

79 & n.87.  But "the possible arbitration of some class member claims will not, by itself, defeat

class certification."  *Lerner v. Haimsohn*, 126 F.R.D. 64, 66 (D. Colo. 1989); *see also Shankroff*

*v. Advest, Inc.*, 112 F.R.D. 190, 194 (S.D.N.Y. 1986).  Defendants do not assert that any *named*

plaintiffs have contracts containing such arbitration clauses,[88] nor that they have initiated

arbitration over the issues in this case.   Defendants' assertions as to their "intent" are far too

speculative to defeat class certification.  *Lerner*, 126 F.R.D. at 66.

Defendants also claim (D. Br. 80-81) that they have a "unique defense" of "spoliation"

against Nyrstar.  But Nyrstar took steps to address any concern that relevant evidence was lost.

*See* Declaration of Mary Jane Fait at ¶¶ 5-12.  Courts reject adequacy and typicality challenges

based on purported spoliation defenses.  *See, e.g., Hill v. Shell Oil Co.*, No. 98-C-5766, 2002 WL

663583, *5 (N.D. Ill. Mar. 28, 2002) (citing *Wagner v. Nutrasweet Co.*, 95 F.3d 527, 534 (7th

Cir. 1996)).  Here, any such defenses are both hypothetical and speculative.[89]

---

[86] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[87]   Defendants claim that Plaintiffs' Proposed Trial Plan is "unworkable," but a trial plan is not even necessary to find superiority.  *See Feder v. Elec. Data Sys.* Corp., 429 F.3d 125, 139-40 (5th Cir. 2005).

[88]   *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274 (4th Cir. 2007), involved three named plaintiffs whose contracts contained enforceable arbitration provisions, which the defendants had sought to enforce.

[89]   Citing *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010), Defendants argue that absence of a written

Finally, Defendants claim plaintiff Donnelly Commodities ("Donnelly") cannot be a class representative because it has recently filed for bankruptcy. But *Dechert v. Cadle Co.*, 333 F.3d 801 (7th Cir. 2003), rejected any "flat rule that a trustee in a bankruptcy . . . can never be a class representative," especially where, as here, there is a "substantial" "expected recovery." *Id.* at 803. Moreover, both *Dechert* and *Griffith v. Jabitch Block & Rathbone, LLP*, 358 B.R. 342 (S.D. Ohio 2007) involved a *single* bankrupt plaintiff seeking to be the *sole* class representative. Other courts have allowed such representation where (as here) "an additional representative [is designated] to appear as plaintiff along with the Trustee." *Ernst & Ernst v. U.S. Dist. Court for S. Dist. of Tex.*, 457 F.2d 1399, 1400 (5th Cir. 1972). The fact that NS is Donnelly's creditor is irrelevant. *See Schnorbach v. Fuqua*, 70 F.R.D. 424, 429 (S.D. Ga. 1975) (noting that "the action [in *Ernst & Ernst*] was allowed for the corporation and the shareholders, *despite possible liability of the former to the latter*." (emphasis added)); *see also In re Nat'l Student Mktg. Litig.*, M.D.L. Docket No. 105, 1973 WL 431, at *6 & n.9 (D.D.C. Oct. 2, 1973).[90]

---

litigation hold constitutes gross negligence. Putting aside that Nyrstar's counsel did follow oral instructions with a written hold notice, *Pension Committee* is not the mainstream view. *See, e.g., Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp.2d 598, 614-15 & n.13 (S.D. 2010) (distinguishing *Pension Committee*, questioning its compliance with Supreme Court authority, and citing *Bensel v. Allied Pilots Ass'n*, 263 F.R.D. 150 (D.N.J. 2009) (declining to apply spoliation inference or other sanction for loss of information resulting from party's failure to impose timely litigation hold where no bad faith was shown)).

[90] Defendants can cite no authority for their claim, D. Br. 79, that Dust Pro's "non-payment" disqualifies it as a Class representative.

Dated:  August 27, 2010

Respectfully submitted:

Michael D. Hausfeld, D.C. Bar #153742
Michael P. Lehmann
William P. Butterfield, D.C. Bar #420354
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201
Email:  mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile:  (212) 480-8560
Email:  solson@hausfeldllp.com

Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel L. Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile:  (212) 849-7100
Email:
stephenneuwirth@quinnemanuel.com

**Interim Co-Lead Counsel for Direct Purchaser Plaintiffs**

42

## <u>CERTIFICATE OF SERVICE</u>

I, Sami H. Rashid, an attorney, certify that on August 27, 2010, I caused a true and correct copy of the foregoing memorandum to be served on counsel for Defendants.


_/s/ Sami H. Rashid_____
Sami H. Rashid