# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | |
| | MDL Docket No. 1869 |
| | Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To: | |
| ALL DIRECT PURCHASER CASES | |

## MEMORANDUM OPINION

## <u>Table of Contents</u>

**INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**I.    Procedural History.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**II.   Defendants' Arguments.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

    **A.    Defendants' Specific Interrogatories and Plaintiffs' Responses.** . . . . . . . . . . . **1**

        **1.    <u>CSXT Interrogatory 5</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

        **2.    <u>NS Interrogatories 1, 2(e) and 2(f)</u>.** . . . . . . . . . . . . . . . . . . . . . . . . **5**

        **3.    <u>NS Interrogatory 2(a)</u>.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

        **4.    <u>CSXT Interrogatory 4</u>.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

        **5.    <u>NS Interrogatory 2(h), CSXT Interrogatory 6 and BNSF</u>**
               **<u>Interrogatory 5</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

    **B.    Defendants' Requests for Admissions.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        **1.    <u>Requests For Admission 153, 154 and 155</u>.**. . . . . . . . . . . . . . . . . . . **19**

        **2.    <u>Requests For Admission 82 and 98-102</u>.**. . . . . . . . . . . . . . . . . . . . . **19**

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

## INTRODUCTION

Now pending before the Court is Defendants' Motion to Compel Answers to Defendants' Interrogatories and Requests for Admissions and Memoranda in Support Thereof [#506]. Defendants have moved to compel plaintiffs to rectify claimed deficiencies in the responses to seven interrogatories and nine requests for admissions.  For the following reasons, the motion will be granted in part and denied in part.

## I.    Procedural History

The parties were engaged in discovery for nearly two years and exchanged millions of pages of documents and deposed dozens of individuals.   Near the end of discovery, on October 20, 2010, defendants served upon plaintiffs interrogatories and requests for admissions. [#506] at 3.  Plaintiffs initially responded on November 30, 2010, referencing an "84-page Narrative Factual Statement" ("narrative") for a number of their responses. Id.  Defendants objected to this form of response and, after consultations between the parties, plaintiffs supplemented their responses on February 8, and May 11, 2011. Id.  Defendants still take issue with the form and substance of the responses and have filed this motion to compel to rectify these perceived deficiencies. Id. at 4.

## II.    Defendants' Arguments

### A.    Defendants' Specific Interrogatories and Plaintiffs' Responses

Defendants have moved the Court to compel plaintiffs to respond to nine of the interrogatories, arguing that the substance and form of the responses are either insufficient or do not conform to Rule 33 of the Federal Rules of Civil Procedure.  Federal Rule of Civil Procedure 33 provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3).  The answer must be "true,

explicit, responsive, complete, and candid." Equal Rights Ctr. v. Post Props., Inc., 246 F.R.D. 29, 32 (D.D.C. 2007) (quoting Hansel v. Shell Oil Corp., 169 F.R.D. 303, 305 (E. D. Pa. 1996)).  As this Court has previously held, "interrogatories are not only an information gathering tool, but also an opportunity to require one's opponent to state its position on an issue in controversy in writing and under oath." Covad Comnc'ns Co. v. Revonet, Inc., 258 F.R.D. 7, 20 (D.D.C. 2009).

1.     CSXT Interrogatory 5

In CSXT Interrogatory 5, defendants asked that plaintiffs identify "each communication among or between any two or more entities or persons that plaintiffs contend, 'standing alone, itself constitutes an unlawful agreement.'" [#506] at 6.  Plaintiffs refused to answer this interrogatory "on the ground[s] that it calls for legal analysis by [p]laintiffs' counsel" and "impermissibly calls for attorney work product." [#506-8] at 99-100.  In the motion to compel, defendants argue that under Rule 33 of the Federal Rules of Civil Procedure, such "contention interrogatories" are permitted. [#506] at 6.  Plaintiffs insist, however, that during meet and confers held to resolve their differences it has become clear that defendants are demanding that plaintiffs sort their evidence into direct and circumstantial evidence and that the distinction between those two types of evidence is considered by courts to be meaningless.  They rely on United States v. MD & Va. Milk Prod. Assoc., 22 F.R.D. 300, 301 (D.D.C. 1958) and Kendrick v. Sullivan 125 F.R.D. 1, 2 (D.D.C. 1989), rev'd on other grounds, 487 U.S. 589 (1988), which they insist hold that, while interrogatories may legitimately require a party to specify its contentions, they may not seek disclosure of their legal theories. Plaintiffs' Opposition to Defendants' Motion to Compel Answers to Interrogatories and Requests for Admission [#510] at 11.  They further point to Kendrick's permitting a party to ask whether it contended certain

portions of governmental guidelines were unlawful and why, but not permitting a party to ask

whether, if any portion of the guidelines were unconstitutional, the remaining portions of the

regulatory scheme were severable. [#510] at 11-12.

Rule 33 permits interrogatories that "[ask] for an opinion or contention that relates to fact

or the application of law to fact." Fed. R. Civ. P. 33(a)(2).  "Contention interrogatories" that ask

a party what it contends or to state all the facts upon which it bases a contention are perfectly

legitimate. Barnes v. District of Columbia, 270 F.R.D. 21, 24 (D.D.C. 2010) (quoting Everett v.

USAir Group, Inc., 165 F.R.D. 1, 3 (D.D.C. 1995)) (Facciola, J.).  Indeed, the advisory

committee note to Rule 33 indicates that contention interrogatories "can be most useful in

narrowing and sharpening the issues, which is a major purpose of discovery." Barnes, 270 F.R.D.

at 24 (quoting Fed. R. Civ. P 33 advisory committee's note (1970)).

In Barnes, I quoted the decision in King v. E.F. Hutton & Co., 117 F.R.D. 2, 5 n.3

(D.D.C. 1987), which also rejected the argument, made again here, that answering a contention

interrogatory invades the work product privilege because it requires a party to confirm a

contention or explain how certain facts support a contention.  In King, Judge Burnett stated:

> [I]n answering contention interrogatories the party is only giving
> the factual specifics which the party contends supports a claim, and
> this in no way impinges on the attorney's impressions or analysis as
> to how the attorney will endeavor to apply the law to the facts. If
> this elementary principle were not applicable, contention
> interrogatories would not exist.

King, 117 F.R.D. at 5 n.3.  See Oklahoma v. Tyson Foods, Inc., 262 F.R.D. 617, 630 (N.D. Okla.

2009) ("Rule 33 expressly permits contention interrogatories that delve into opinion work

product.").  Thus, any broad claim that an interrogatory is impermissible because it probes a

party's contentions as to how the law applies to the facts is wrong.  Such probing is perfectly permissible and does not invade the work product privilege merely because the party's counsel must disclose the reasoning applying the law to the facts.  Thus, and whatever may have happened during the meetings among counsel,  I read defendants' interrogatory to be demanding to know whether these plaintiffs are going to contend that they have evidence that there occurred a moment or moments in time when certain specified persons agreed to fuel surcharges in a manner that in itself was a conspiracy that violated the antitrust laws.  If plaintiffs so contend, they must say who those persons were and when those agreements occurred.  On the other had, if plaintiffs do not so contend and intend instead to rely on evidence from which such an agreement can be inferred, they must say so in response and that will be the end of the matter.

As to the authorities upon which plaintiffs rely, I do not believe that the decision of the Court in 1958, United States v. Md & Va. Milk Prod. Ass'n, which held that asking a party on what grounds it relies to establish that a certain entity was not "a cooperative association of persons engaged in the production of milk"[1] was impermissible, survived the amendment of the Rule 33 that permits such an obviously legitimate contention inquiry.

As to Kendrick, I note that Judge Richey left open the possibility that the interrogatories he found impermissible might be legitimate once more discovery had taken place. Kendrick, 125 F.R.D. at 4.  Moreover, with all due respect to the judge, I am afraid that I do not understand his conclusion that asking a party whether it contends that a certain provision is unconstitutional is legitimate while asking it whether it contends that the offending provision is severable is not. In my view, they are nearly identical and equally legitimate contention inquiries.  While my view of

_____

[1] United States v. Md & Va. Milk Prod. Ass'n, 22 F.R.D. at 301.

4

the legitimacy of contention interrogatories may be aggressive, I can find nothing in the wording of the rule or its interpretation that could possibly bar asking a party what it contends and why.

        2.      <u>NS Interrogatories 1, 2(e) and 2(f)</u>

Defendants take issue with the form that plaintiffs used to respond to their interrogatories, namely the narrative. [#506] at 1. Defendants argue that plaintiffs have failed to "separately and fully" answer the interrogatories as required by Rule 33 of the Federal Rules of Civil Procedure. <u>Id.</u> Defendants assert that plaintiffs' responses to the interrogatories, which incorporate the narrative by reference in answering each interrogatory, "direct defendants to sweeping portions (at times, more than 100 paragraphs) of it without regard to the specific question asked in the interrogatory." <u>Id.</u> at 4. Defendants argue that "[p]laintiffs' [n]arrative defeats the very purpose of contention interrogatories by making it impossible to identify plaintiffs' specific contentions and the evidence underlying each." <u>Id.</u> Defendants further argue that the method by which plaintiffs have responded to their interrogatories has "rendered [interrogatories] useless for the their purpose of 'narrowing and sharpening issues' and 'requir[ing] one's opponent to state its position on an issue in controversy.'" [#506] at 5 (quoting <u>Banks v. Senate Sergeant at Arms</u>, 222 F.R.D. 7, 13 (D.D.C. 2004)).

Specifically, NS Interrogatory 1 asks plaintiffs to identify "the 'precise Rail Fuel Surcharge Mechanisms that are the object' of the alleged unlawful conduct, including 'trigger price, surcharge percentage and increment, fuel price index, [and] whether the mechanism was rate-based or mileage-based and whether you contend that the mechanism was a "standard" Rail Fuel Surcharge." [#506] at 8. NS Interrogatory 2(e) asks plaintiffs to identify "'every alleged object or result of the unlawful agreement'", and NS Interrogatory 2(f) asks that plaintiffs

identify "the 'precise terms of the alleged unlawful agreement' into which plaintiffs allege that defendants entered." [#506] at 9.

In response to these three interrogatories[2], plaintiffs objected to it on the ground that it was vague, overbroad and unduly burdensome to the extent it seeks "(i) each surcharge percentage actually yielded by the fuel surcharge mechanism in question during the Class Period and (ii) each fuel surcharge imposed during the Class Period that resulted from, and was affected by, [d]efendant's conspiratorial conduct." [#506-8] at 104.  They also objected to the word "standard" as being undefined. Id. Without waiving those objections and their General Objections, plaintiffs responded that the object of defendants' conspiracy was "to apply coordinated fuel surcharges as uniformly as possible, to as many freight shipments as possible with the express goal of 100% coverage." Id.

Plaintiffs indicate that the fuel surcharges that resulted from the conspiracy are "those recorded in [d]efendants' transactional databases that meet the criteria for inclusion in the Class specified in [p]laintiffs' class certification papers" and that the burden of identifying each of those fuel surcharges from those databases is "at best equivalent for [d]efendants as it is for [p]laintiffs, and is likely less burdensome for [d]efendants." Id.

 Plaintiffs then directed defendants to paragraphs 16-109 and 113 of the narrative[3] because it explains how "[d]efendants' conspiracy involved coordination and broad application of [d]efendants' fuel surcharges applied to carload, intermodal and energy shipments." [#506-8]

---

[2] The responses to each interrogatory are substantially the same and the court will refer to just the response to NS Interrogatory 1.

[3] The narrative contains 127 total numbered paragraphs.

at 104, 106.  They then direct defendants to paragraphs 25, 30, 32, 41-43, 57-58 , 95 and 101-105.  Id. at 105.

Defendants argue in their motion to compel that the portions of the narrative they were directed to rarely address the specific details of the alleged unlawful agreement. [#506] at 9.  For example, defendants note that while plaintiffs contend that the unlawful agreement began in March of 2003, the vast majority of the paragraphs cited to in the response concern conduct well after that time period. Id.  While defendants concede that plaintiffs may rely on the conduct described in the narrative as evidence of acts done in furtherance of the alleged conspiracy, those acts are distinct from the conspiratorial agreement itself and they are entitled to know what defendants agreed to as opposed to only what plaintiffs contend the defendants did to carry out the alleged agreement once reached. Id.

They also contend that plaintiffs once excluded mileage based surcharges from the class definition and have so advised the presiding judge.  Nevertheless, according to the defendants, plaintiffs now deny requests that they admit that mileage based surcharges were not part of the conspiracy. [#506] at 10-11.  According to defendants, they are entitled to know what defendants are claimed to have agreed to at the inception of the conspiracy.

Finally, defendants argue that plaintiffs' pointing them to the transactional data each defendant produced is insufficient; according to defendants, "there are many fuel surcharges contained within the transactional data, and defendants would have to guess which ones meet plaintiffs' vague and (ever-evolving) class definition." [#506] at 13 n.9.

Plaintiffs, insisting that the use of a narrative statement is a legitimate manner of answering specific interrogatories, insist that the portions of the narrative to which they point

7

establish the nature of the defendants' agreement in 2003, to coordinate their fuel surcharge

programs and "apply them as widely a[s] possible and, as uniformly as possible, to as many

freight shipments as possible with the express goal of 100 % coverage." [#510] at 5 (quoting

[#506-8] at ¶16).  They insist that they have also identified every fuel surcharge that was the

result of the conspiracy as NS Interrogatory 1 demanded because the narrative indicates that:

"while [d]efendants on rare occasion imposed fuel-surcharge formulas from their standard

mechanisms, these variations nonetheless 'resulted from the conspiracy because they were

negotiated off the dominant, standard formulas and were applied more broadly and at more

onerous levels due to the widespread application of [d]efendants' coordinated mechanisms."

[#510] (quoting [#506-8] at 104).  Thus, plaintiffs insist that they contend that "every fuel

surcharge satisfying inclusion in the Class result[ed] from the conspiracy." Id.

      Plaintiffs, relying on a declaration by Marc L. Greenwald, also claim that they would

have to go through 260 gigabytes of data and 70 million qualifying shipments and that to

"identify every fuel-surcharge variation, their terms, and the surcharges they generated

throughout the Class Period, would be overly burdensome." [#510] at 8.  They point out that such

an effort "would be particularly unjustified since [p]laintiffs' expert at Class certification already

analyzed [d]efendants' transaction data and the shipments in the Class to calculate overcharges

suffered by Class members." Id. at 9.

      Finally, they protest that the defendants have indicated that they are aware of the nature of

the fuel surcharges at issue because they opposed class certification on the grounds that the Class

definition embraced a variety of fuel surcharge formulas.  Plaintiffs also indicate that they have

made it clear that mileage based surcharges are not and never have been included in the Class

definition.

Defendants counter that plaintiffs' narrative evades the simple questions proposed: (1) what specific rule index, or indices, (if any) did defendants allegedly agree to?; (2) what specific trigger, price, slope and other particular characteristics did defendants agree to?; or do plaintiffs contend that defendants did not agree on any such details and instead each defendant determined the specific details for its respective fuel surcharges on its own?; (3) what do plaintiffs consider a "standard fuel-surcharge mechanism"?; (4) is it a fuel surcharge published on a defendant's website or something else, and what are its terms?; (5) what else do plaintiffs contend defendants specifically agreed to? [#506] at 12-13.

To begin, since plaintiffs answered the interrogatories, their objections to them are moot. In any event, I do not find these interrogatories vague. They clearly and specifically demand the information sought and plaintiffs' objection to the vagueness of the word "standard" is overcome by assigning to the word its dictionary meaning of "used or accepted as normal or average." Oxford Online English Dictionary. english.oxforddictionaries.com/ (last visited on Nov. 1, 2011).

Second, the question presented is not whether, as a matter of legal theory, a narrative statement is or is not in compliance with the obligation to answer an interrogatory separately and fully with an answer that is explicit, responsive, complete and candid. See Fed. R. Civ. P. 33(b)(3) and Equal Rights Ctr., 246 F.R.D. at 32. As the cases which the parties throw at each other like darts indicate, a narrative statement may or may not comply with this obligation depending on the question presented. If the question is how fast were you going when you hit the other car, a narrative answer that speaks of the accident but does not mention how fast the person

answering was driving would not comply that person's obligation to answer the question.

Finally, given the cost of discovery and the obligation imposed by Rule 1 of the Federal Rules of Civil Procedure to construe and administer the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action," having the opposing party and then the judge read many paragraphs of narrative when most of them are not even directed to the specific question presented is wasteful and not to be encouraged particularly when the answering party can isolate the portions of the narrative that truly speak to the question presented and provide the answer.

Judged by these criteria, plaintiffs' responses to the interrogatories fail. First, and to be blunt, while I cannot pretend the familiarity with the voluminous records that counsel have, I have read the sections of the narrative to which plaintiffs point and I cannot find the answers to defendants' interrogatories.  Plaintiffs, in the narrative, certainly fulsomely describe how the defendants allegedly took concerted action against their customers, disguised their doing so and then attempted "to apply coordinated fuel surcharges as uniformly as possible, to as many freight shipments as possible with the express goal of 100% coverage." [#506-8]  at 104. But, as defendants correctly point out in their reply submission, neither they nor I understand from the narrative whether plaintiffs claim that at the inception of the conspiracy defendants specifically agreed as to the precise mechanisms they would use to accomplish what plaintiffs complain they intended to do.  Did they agree that some occurrence or event would trigger their universal adoption of a means of imposing on their customers the fuel surcharge?  Did they instead simply agree that they would impose a fuel surcharge on all their customers but left open whether they would implement their agreement by each defendant being free to do so in its own manner?

10

While plaintiffs do specify that defendants on rare occasions imposed fuel-surcharge formulas that differed from their standard mechanisms, they insist that even these variations resulted from the conspiracy because "they were negotiated off the dominant, standard formulas and were applied more broadly and at more onerous levels due to the widespread application of [d]efendants' coordinated mechanisms." [#510] at 12. It therefore follows that every surcharge "satisfying the criteria for inclusion in the Class 'result[ed] from the conspiracy.'" Id. at 8.

While that indicates that plaintiffs are contending that all surcharges resulted from the conspiracy, it avoids the question of what was the agreement *ab initio* and whether the defendants agreed, again *ab initio*, to the mechanisms that would be used to bring about the results about which plaintiffs complain.

I also believe that plaintiffs' complaint that they are required to examine gigabytes of data to answer the interrogatories misinterprets the question.  The question does not demand that each surcharge be identified but that plaintiffs state once and for all what the original agreement was with specific answers to the questions posed.

> 3.    NS Interrogatory 2(a)

In NS Interrogatory 2(a), defendants asked that plaintiffs identify "the people that, according to plaintiffs, knowingly participated in the alleged unlawful agreement." [#506] at 13-14.  In response to this interrogatory, plaintiffs directed defendants to paragraphs 16-109 of the narrative. [#506-8] at 106.  Defendants argue that the citation to nearly 100 paragraphs from the narrative fails to identify which of "the more than 50 employees of defendants mentioned throughout these paragraphs knowingly participated in the alleged agreement, as opposed to unknowingly carried out certain aspects of the alleged agreement." [#506] at 14.

11

The same analysis used in the previous section is also applicable here.  I therefore conclude that plaintiffs' answers are insufficient.

      4.     <u>CSXT Interrogatory 4</u>

In CSXT Interrogatory 4, defendants asked whether plaintiffs contend "that defendants agreed not to negotiate discounts on rail surcharges and not to offer any rail surcharge other than the specific fuel charge defendants allegedly agreed to." [#506] at 18.  As just explained, plaintiffs answered this interrogatory by stating that they "contend that [d]efendants agreed to apply their coordinated fuel surcharge programs as uniformly as possible, and to as many freight shipments as possible, with the express goal of 100% coverage." [#506-8] at 99.  Plaintiffs further stated that "[i]n furtherance of this conspiracy, [d]efendants adopted and enforced policies against negotiating discounts on fuel surcharges or otherwise deviating from the coordinated fuel surcharges." <u>Id</u>.  In support of this contention, plaintiffs referred defendants to paragraphs 16-52, 62, 79-94 and 100-103 of the narrative. <u>Id</u>.  In their motion, defendants argue that by using the phrase "in furtherance of a conspiracy," plaintiffs avoid answering the interrogatory.  Defendants cite to <u>Diamond Chemical Co. v. Atofina Chemicals, Inc.</u>, 268 F. Supp. 2d 1, 17 (D.D.C 2003), for the proposition that an act "in furtherance of a conspiracy is not necessarily the same as an act agreed to as part of the unlawful agreement underlying the conspiracy." [#506] at 19.

The point is well taken insofar as plaintiffs have not specifically stated whether they contend that their adopting of policies against negotiating discounts on fuel surcharges or otherwise deviating from the coordinated fuel surcharges was pursuant to an agreement among them.  Their answers are, as just explained, insufficient.  They shall supplement their answer by indicating whether they contend that defendants' adoption of such policies was pursuant to an

agreement among them.

     5.     <u>NS Interrogatory 2(h), CSXT Interrogatory 6 and BNSF Interrogatory 5</u>

In NS Interrogatory 2(h), CSXT Interrogatory 6 and BNSF Interrogatory 5, defendants asked that plaintiffs identify "when they contend the alleged conspiracy ended." [#506] at 15. Plaintiffs responded to these interrogatories by stating that they were "not presently aware of any evidence that any [d]efendant affirmatively withdrew from the conspiracy." [#506-8] at 100-01. Defendants argue that whether plaintiffs "contend the alleged agreement ended is relevant to both the scope and nature of the alleged agreement and to the reasonableness of any theory of injury and damages it allegedly caused." [#506] at 16.

Plaintiffs' responses to NS Interrogatory 2(h), CSXT Interrogatory 6 and BNSF Interrogatory 5 indicate that they are not aware of any information relating to the end of the alleged conspiracy. That, however, evades the question of whether or not they contend that they know when the agreement ended. Plaintiffs have indicated that they currently are not in possession of such information and they cannot be compelled to turn over something that they do not currently possess. Be that as it may, plaintiffs are obliged to supplement their answer if they should become aware of information that would permit a reasonable person to conclude that the conspiracy charged had ended. <u>See</u> Fed. R. Civ. P. 26(a)(1). In the meanwhile, they will be held to have answered the interrogatories by stating they do not know when the conspiracy ended and are not contending that it ended on a particular date. The consequence of their not knowing that fact for the theory of their case and the ascertainment of damages will have to be resolved on that basis.

     6.     <u>CSXT Interrogatory 7</u>

13

In CSXT Interrogatory 7, plaintiffs asked defendants whether they contend, that "the Rail Fuel Surcharge formulas that [d]efendants used before the start of the alleged unlawful agreement would not have resulted in [d]efendants receiving more revenue than the incremental fuel costs [d]efendants incurred during the Proposed class Period, given the actual prices [d]efendants paid for fuel during the period." [#506], Appx. A.  Plaintiffs responded to this interrogatory by objecting on the grounds that it is "vague and ambiguous" and "reserve the right to make all appropriate arguments on this point . . . should [d]efendants at any stage of this proceeding put this at issue." [#506-8] at 102.  Defendants argue in their motion to compel that because plaintiffs have made "repeated claims that each defendant recovered fuel charges 'over and above the actual increase in [fuel] costs,'" they should have some answers to this interrogatory "readily available." [#506] at 18.

In their opposition to the motion to compel, plaintiffs object to this interrogatory on the grounds that it is a hypothetical question and is therefore not permitted under Rule 33. [#510] at 16.  Plaintiffs cite to Kendrick, 125 F.R.D. at 3, for the proposition that interrogatories "seeking a party's position 'on what are, in essence, hypotheticals' are not permitted by the Federal Rules." Id.  They insist that they cannot be obliged to answer a question that is not based on the facts of the case "but rather with respect to a counterfactual scenario–specifically, what would have happened with [d]efendants' various pre-conspiracy fuel surcharges absent the conspiracy." Id. They insist that "Rule 33 does not permit such interrogatories." Id.  They do not cite the Rule itself in support of this contention, for it contains no such prohibition.  Instead they rely on the following statement in Kendrick:

> Given this, it appears to the Court that HHS' "factual scenario"

14

interrogatories effectively ask the plaintiffs to express their legal
positions on what are, in essence, hypotheticals.

Rule 33(b) does not permit such discovery.  Instead, as noted
above, Rule 33(b)'s language requires that the contentions or legal
opinions of an interogatee must relate to, or be applied to, a fact.
At this stage, it appears to the Court that the dearth of facts in the
record (as emphasized by the fact-free nature of the interrogatories
themselves) causes most of HHS' interrogatories to fall outside the
scope of Rule 33(b).

The decision in <u>O'Brien v. Internat'l Broth. of Elec. Workers</u>, 443
F. Supp. 1182, 1187-88 (N.D. Ga. 1977) is instructive.  In O'Brien,
the court dealt with two "contention" interrogatories. According to
the plaintiff, the author of the interrogatories, Rule 33(b)
authorized each.  The court compelled a response to the first, but
refused to do so as to the second.

The first interrogatory asked the defendant (a union) to describe
why certain of the plaintiff's acts, detailed elsewhere in the
interrogatories, were illegal.  The Court found this inquiry
permissible under Rule 33(b), because it sought an "application of
the law to the central facts of the case." <u>Id.</u> at 1187.  The second
interrogatory, on the other hand, asked the defendant to describe
why certain provisions of the union constitution upon which the
defendant relied were not "deprived of force and effect"  by the
federal labor laws.  The court refused to require a response to this
latter inquiry because, in its view, the interrogatory sought "pure
legal conclusions" which were not rooted in the facts of the case.
The court found the interrogatory beyond the scope of Rule 33(b).
<u>Id.</u> at 1187-88.

<u>Kendrick</u>, 125 F.R.D. at 3.

First, I do not understand from where in the rule could come an absolute prohibition on

any hypothetical questions whatsoever.  For example, asking a plaintiff whether she contends

that she would have become a prima ballerina had she not been injured in the car crash, is a

legitimate inquiry for it goes directly to the damages which she is seeking.  It also has nothing

whatsoever to do with the application of a law to a fact.  Thus, an absolute prohibition on any

hypothetical questions cannot possibly be justified.

Moreover, whatever the legitimacy of the distinction the O'Brien court drew between the application of law to a fact and to pure legal theories, this interrogatory involves neither. Answering this interrogatory does not involve applying any law whatsoever.  It asks instead whether plaintiffs are contending that a particular result would have obtained had there been no conspiracy.  There can be no legitimate objection to the question merely because plaintiffs claim there was a conspiracy and from their point of view, the question is hypothetical.

**B.      Defendants' Requests for Admissions**

Defendants also object to plaintiffs' responses to nine of their requests for admissions ("RFAs").

Defendants propounded the following requests for admission:

- RFA 82 "Admit that, during the Class Period, absent the alleged conspiracy, it was in each [d]efendant's unilateral, economic self-interest to charge each customer the highest total, all-in one price each customer would pay for the Rail Freight Transportation Services each [d]efendant provided." [#506], Appx. A.

- RFA 98 "Admit that, absent the alleged conspiracy, at least some Class members that paid a Rail Fuel Surcharge for the first time before the start of the alleged conspiracy would have paid a Rail Fuel Surcharge after the start of the alleged conspiracy." Id.

- RFA 99 "Admit that, absent the alleged conspiracy, at least some Class members that paid a Rate-based Rail Fuel Surcharge for the first time before the start of the

16

alleged conspiracy would have paid a Rate-based Rail Fuel Surcharge after the start of the alleged conspiracy." Id.

- RFA 100 "Admit that, during the Class Period, absent the alleged conspiracy, it would have been in each [d]efendant's unilateral, economic self interest to charge Rail Fuel Surcharges for Rail Freight Transportation Services." Id.

- RFA 101 "Admit that, during the Class Period, absent the alleged conspiracy, it would have been in each [d]efendant's unilateral, economic self-interest to charge Rate-based Rail Fuel Surcharges for Rail Freight Transportation Services." Id.

- RFA 102 "Admit that, during the Class Period, absent the alleged conspiracy, it would have been in each [d]efendant's unilateral self-interest to increase Rail Base Rates for Rail Freight Transportation Services as a means of generating revenues to recover incremental costs, including fuel costs." Id.

- RFA 153: "Admit that the alleged fact that a [d]efendant adopted the same Rail Fuel Surcharge as another [d]efendant does not by itself establish that the Rail Fuel Surcharge was the product of a conspiracy between or among [d]efendants." Id.

- RFA 154: "Admit that the alleged fact that [d]efendant generated more revenues than its actual fuel costs, either for an individual movement or all movements in aggregate during a particular time period, through the application of a Rail Fuel Surcharge does not by itself establish that the Rail Fuel Surcharge was the product of a conspiracy between or among [d]efendants." Id.

- RFA 155: "Admit that the alleged fact that a [d]efendant generated more revenues

17

than its actual fuel costs, either for an individual movement or all movements in

aggregate during a particular time period, through the prices it charged for Rail

Freight Transportation Services does not by itself establish that the Rail Fuel

Surcharge was the product of a conspiracy between or among [d]efendants." Id.

Rule 36 of the Federal Rules of Civil Procedure provides that a "party may serve upon

any other party a written request for the admission . . . of the truth of any matters within the scope

of Rule 26(b)(1) set forth in the request that relate to statements or opinions of fact or of the

application of law to fact." Fed. R. Civ. P. 36(a).  "Rule 36 allows litigants to request admissions

as to a broad range of facts, including ultimate facts, as well as applications of law to fact."

Carney v. IRS, 258 F.3d 415, 419 (5th Cir. 2001) (upholding that party could be compelled to

admit that proof of claim conclusively established the validity of that claim). Tillamook County

Smoker, Inc. v. Tillamook County Creamery Ass'n, 333 F. Supp. 2d 975, 983-84 (D. Ore 2004)

(enforcing admission by party that its actions violated other party's rights in a trademark). See

Turk v. CitiMortgage, No. 05-70386, 2005 WL 2090888, at *3-4 (E.D. Mich. Aug. 29, 2005)

(Rule 36(a) may seek admission of ultimate facts even if dispositive of the entire case; plaintiff

could be required to admit that she defaulted, bank was entitled to foreclosure, she got proper

notice, and that bank was not a "debt collector" as that word is defined in the Fair Debt

Collection Act, 15 U.S.C. § 1681).

Courts draw the line, however, when a request for admission demands that a party admit

what a law or regulation means. See Disability Rights Council of Greater Washington v.

WMATA, 234 F.R.D. 1, 3 (D.D.C. 2006).

Plaintiffs objected to RFAs 153, 154 and 155 on the grounds that they call for "pure legal

18

conclusions" and refused to answer RFAs 82 and 98-102 as "incomplete hypothetical counterfactuals". [#506] at 19-20.

1.     Requests For Admission 153, 154 and 155

 Defendants argue in their motion to compel that RFAs 153, 154 and 155 do not ask for "pure legal conclusions" but in fact ask for "an application of law to the specific facts of this case" and are therefore permissible. [#506] at 20.

As to RFAs 153, 154 and 155, the line between demanding the application of a law to a fact and demanding a party admit the validity of a proposition of law can admittedly waiver.  But, these RFAs do not even come close to that line; they do not ask plaintiffs to, for example, interpret a statute but instead ask them to admit that if certain fact did not exist, a certain legal conclusion would follow.  This Court has already ruled that under Rule 36, requests relating to the application of law to fact are permissible. Michilin Prosperity Co., Ltd. v. Fellowes Mfg. Co., No. 04-1025, 2006 WL 1441575, at *1 (D.D.C. 2006).  RFAs 153, 154 and 155 are such requests and therefore must be answered by plaintiffs.

2.     Requests For Admission 82 and 98-102

With regards to the "incomplete counterfactual hypotheticals" objection for RFAs 82 and 98-102, defendants argue that plaintiffs have failed to offer any case law supporting their objection. [#506] at 20.  Additionally, in their reply memorandum, defendants argue that the RFAs at issue are in fact asking for the application of established antitrust case law to the facts of this case, and are not dealing in hypotheticals. Reply Memorandum in Further Support of Defendants' Motion to Compel Answers to Defendants' Interrogatories and Requests for Admission [#515] at 20.

19

With regards to RFAs 82 and 98-102, there is nothing in the pertinent Rule that precludes a request because it is asks a party to make an assumption as the premise of the request. The only restriction on a request that appears in the Rule is that it be within the scope of the discovery permitted by Rule 26(b)(1) and that it relate to "facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a). That a party is asked to make an assumption as a condition of its answer cannot possibly run afoul of the only requirements in the Rule. Indeed, as explained, a party can be requested to admit the ultimate issue in a manner that has a dispositive effect on the case. Surely, it swallows the camel and strains at the gnat to say that a party can be asked that it, for example, breached the contract without justification but cannot be asked to admit that a certain consequence would have followed had a certain event not occurred.

In any event, these RFAs do not present hypothetical situations as plaintiffs contend. Under Rule 36 of the Federal Rules of Civil Procedure, defendants are permitted to serve upon plaintiffs requests for admission "relating to: facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a)(1). The RFAs at issue here fall within the category of opinions about facts and the application of law to fact. These RFAs ask plaintiffs to "admit that if a certain factual situation is found to exist, a certain . . . outcome results, [which] is precisely the kind of request contemplated by Rule 36(a)." Wagner v. St. Paul Fire & Marine Ins. Co., 238 F.R.D. 418, 423-24 (N.D.W.Va. 2006).

20

**CONCLUSION**

For the reasons set forth above, <u>Defendants' Motion to Compel Answers to Defendants'</u>

<u>Interrogatories and Requests for Admissions and Memorandum in Support Thereof</u> [#506] is

**GRANTED** in part and **DENIED** in part.

An order accompanies this memorandum opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

21