UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) ) ) ) |
| This document relates to: | ) ) ) |
| ALL DIRECT PURCHASER CASES | ) ) ) |

MDL Docket No. 1869
Misc. No. 07-489 (PLF)

~~UNDER SEAL~~

OPINION

TABLE OF CONTENTS

SECTION                                                                                    PAGE

I.      INTRODUCTION                                                                   1

II.     BACKGROUND                                                                    4

        A.     The Alleged Conspiracy                                             7

        B.     Surface Transportation Board Proceedings and              13
               18 Class Action Lawsuits

        C.     Class Certification Papers and Supplemental Briefing        16
               Before and After the Motions Hearing

        D.     "Interline-Related" Communications                            20

III.    LEGAL STANDARD FOR CLASS CERTIFICATION UNDER                 23
        RULE 23(b)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE

        A.     Requirements of Rule 23(a) and (b)(3)                        23

        B.     Resolution of Factual Disputes and Standard of Proof       26

               1.     Factual Disputes and Dueling Experts                 28

               2.     Standard of Proof                                     33

                      a.     Facts Bearing on Rule 23                      33

                      b.     Expert Opinions and Regression Analyses       35

IV.     RULE 23(a) FINDINGS AND CONCLUSIONS                             42

        A.     Two Implied Requirements                                     42

               1.     Class Definition                                      42

               2.     Named Representatives Within the Putative Class      46

        B.     Four Express Requirements                                    47

               1.     Numerosity                                           47

               2.     Commonality                                          48

               3.     Typicality                                           49

               4.     Adequacy of Representation                          54

i

V.      RULE 23(b)(3) FINDINGS AND CONCLUSIONS                              56

      A.      Predominance                                                      57

            1.      Violation of Antitrust Law                            58

            2.      Impact                                                59

                  a.      Uninjured Class Members                   67

                  b.      "Presumption" of Common Impact           68

                  c.      Antitrust Injury                         70

                  d.      Injury-In-Fact                           75

                       i.      Payment of an allegedly conspiratorial fuel        79
                            surcharge

                      ii.      Component of the total price of shipping          101

                      iii.     Expert opinions on injury-in-fact                116

            3.      Damages                                              137

      B.      Superiority                                                     142

VI.     CONCLUSION                                                          144

## I. INTRODUCTION

This matter is before the Court on the motion of the direct purchaser plaintiffs for class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure. Also before the Court is the motion of the defendants to exclude what they refer to as "interline-related communications" from consideration for class certification or for any other purpose under 49 U.S.C. § 10706. The Court heard oral argument on both motions on October 6 and 7, 2010, and took them under advisement. The Court delayed decision on the motions until after the Supreme Court decided Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), and then invited the parties to file supplemental briefs discussing the impact of the Wal-Mart decision on the class certification question in this case. Those briefs have been filed, and the motions now are ripe.

Upon consideration of the parties' papers, the oral arguments presented by counsel, the relevant legal authorities, and the entire extensive record in this case, the Court finds by a preponderance of the evidence that the direct purchaser plaintiffs have satisfied all of the requirements of Rule 23. The Court therefore will grant the direct purchaser plaintiffs' motion for class certification; will certify this case as a class action under Rule 23(b)(3) for purposes of litigation and trial; will define the class as proposed by the direct purchaser plaintiffs in their motion for class certification; will certify for class treatment the direct purchaser plaintiffs' claim for price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; will designate the eight named plaintiffs as the class representatives; and will appoint Quinn Emanuel Urquhart

& Sullivan, LLP and Hausfled LLP as co-lead class counsel.  The Court concludes that it need

not rule at this time on the defendants' motion to exclude interline-related communications.[1]

---

[1]        The papers reviewed in connection with the pending motions include the following:

     *Class Certification.*  The second consolidated amended class action complaint ("2d Am. Compl.") [Dkt. No. 324]; the direct purchaser plaintiffs' motion for class certification ("Class Mot.") [Dkt. No. 337]; the direct purchaser plaintiffs' memorandum in support of motion for class certification ("Class Mem.") [Dkt. No. 337-9]; the corrected expert report of Gordon Rausser ("1st Rausser Report"); exhibits A through D submitted in support of the direct purchaser plaintiffs' motion for class certification; exhibits 1 through 224 submitted in support of the direct purchaser plaintiffs' motion for class certification (individually, "RD Ex."); the defendants' memorandum of law in opposition to plaintiffs' motion for class certification ("Class Opp.") [Dkt. No. 381]; the revised expert report of Robert D. Willig ("Willig Report"); the 21 declarations and their accompanying exhibits submitted in support of defendants' memorandum of law in opposition to plaintiffs' motion for class certification; exhibits 1 through 51 submitted in support of defendants' memorandum of law in opposition to plaintiffs' motion for class certification (individually, "PD Ex."); the plaintiffs' reply memorandum in support of their motion for class certification ("Class Reply") [Dkt. No. 406]; the corrected expert reply report of Gordon Rausser ("2d Rausser Report"); exhibits 1 through 150 submitted in support of plaintiffs' reply memorandum in support of their motion for class certification (individually, "HD Ex."); the plaintiffs' supplemental memorandum pursuant to the Court's September 17, 2010 Order ("Pls. Supp. Brief") [Dkt. No. 434]; the defendants' supplemental memorandum of law regarding class certification standards ("Defs. Supp. Brief") [Dkt. No. 439]; plaintiffs' and defendants' joint submission regarding class definition ("Joint Class Definition Submission") [Dkt. No. 456]; the plaintiffs' memorandum addressing Wal-Mart Stores, Inc. v. Dukes ("Pls. Wal-Mart Brief") [Dkt. No. 523]; the defendants' supplemental memorandum concerning Wal-Mart Stores, Inc. v. Dukes submitted pursuant to the Court's July 20, 2011 Order ("Defs. Wal-Mart Brief") [Dkt. No. 524]; the defendants' reply memorandum concerning Wal-Mart Stores, Inc. v. Dukes submitted pursuant to the Court's July 20, 2011 Order ("Defs. Wal-Mart Reply Brief") [Dkt. No. 526]; and the plaintiffs' reply memorandum addressing Wal-Mart Stores, Inc. v. Dukes ("Pls. Wal-Mart Reply Brief") [Dkt. No. 528].  Included as exhibits to the class certification papers are many deposition transcripts; the Court has reviewed all relevant parts of those transcripts, but lists here only those cited in this Opinion, grouped and alphabetized for ease of reference:

        ■    *Experts* — Deposition of Gordon Rausser ("1st Rausser Dep."), June 3, 2010; Deposition of Gordon Rausser ("2d Rausser Dep."), Sept. 24, 2010; Deposition of Robert D. Willig ("Willig Dep."), Aug. 4, 2010.

- *Defendant BNSF Railway Company* — Deposition of Marc Allen ("HD Ex. 85, Allen Dep."), Aug. 12, 2010; Deposition of George Duggan ("HD Ex. 81, Duggan Dep."), Aug. 13, 2010; Deposition of David Garin ("HD Ex. 79, Garin Dep."), Aug. 16, 2010; Deposition of Thomas Jacobowski ("HD Ex. 76, Jacobowski Dep."), Aug. 12, 2010; Deposition of John Lanigan ("HD Ex. 68, Lanigan Dep."), June 22, 2010; Deposition of Matthew K. Rose ("HD Ex. 72, Rose Dep."), July 16, 2010.

- *Defendant CSX Transportation, Inc.* — Deposition of Donna Cerwonka ("HD Ex. 86, Cerwonka Dep."), Aug. 13, 2010; Deposition of Clarence Gooden ("HD Ex. 69, Gooden Dep."), July 16, 2010; Deposition of Tim McNulty ("HD Ex. 71, McNulty Dep."), Aug. 10, 2010; Deposition of Dean Piacente ("HD Ex. 87, Piacente Dep."), Aug. 13, 2010.

- *Defendant Norfolk Southern Railway Company* — Deposition of Patrick Glennon ("HD Ex. 65, Glennon Dep."), July 20, 2010; Deposition of John Kraemer ("HD Ex. 82, Kraemer Dep."), Aug. 11, 2010; Deposition of David Lawson ("HD Ex. 83, Lawson Dep."), Aug. 5, 2010; Deposition of Ronald Listwak ("HD Ex. 77, Listwak Dep."), Aug. 6, 2010; Deposition of Joseph Osborne ("HD Ex. 78, Osborne Dep."), Aug. 11, 2010; Deposition of Donald W. Seale ("RD Ex. 173, Seale Dep."), Feb. 26, 2010.

- *Defendant Union Pacific Railroad Company* — Deposition of Mark Draper ("HD Ex. 153, Draper Dep."), Mar. 3, 2010; Deposition of Thomas Gehl ("HD Ex. 88, Gehl Dep."), Aug. 10, 2010; Deposition of Robert Knight, Jr. ("HD Ex. 70, Knight Dep."), July 9, 2010; Deposition of Richard Pagan ("HD Ex. 89, Pagan Dep."), Aug. 9, 2010; Deposition of James Young ("HD Ex. 66, Young Dep.").

*Interline-Related Communications*. The defendants' motion to exclude interline-related communications from consideration for class certification or any other purpose prohibited by 49 U.S.C. § 10706 ("Interline Mot.") [Dkt. No. 417]; the defendants' memorandum in support of motion to exclude interline-related communications from consideration for class

3

## II. BACKGROUND

The Court previously has described the background of this case. See In re Rail

Freight Fuel Surcharge Antitrust Litig. ("Rail Freight I"), 587 F. Supp. 2d 27, 29-31 (D.D.C.

2008); In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight II"), 593 F. Supp. 2d 29,

32, 34-35 (D.D.C. 2008), aff'd, Fayus Enters. v. BNSF Ry. Co., 602 F.3d 444, 445-46, 454 (D.C.

Cir. 2010). It therefore will limit its discussion accordingly.

This case involves the claim that defendants — BNSF Railway Company

("BNSF"); CSX Transportation, Inc. ("CSX"); Norfolk Southern Railway Company ("NS"); and

---

certification or any other purpose prohibited by 49 U.S.C. § 10706 ("Interline Mem.") [Dkt.
No. 420]; the plaintiffs' memorandum and exhibits 1 through 18 in opposition to defendants'
motion to exclude interline-related communications from consideration for class certification or
any other purpose prohibited by 49 U.S.C. § 10706 ("Interline Opp.") [Dkt. No. 438]; the
defendants' reply memorandum and exhibits 1 through 8 in support of their motion to exclude
interline-related communications from consideration for class certification or any other purpose
prohibited by 49 U.S.C. § 10706 ("Interline Reply") [Dkt. No. 444]; the defendants' objections
under 49 U.S.C. § 10706 to plaintiffs' exhibits in support of plaintiffs' motion for class
certification, and exhibits 1 through 11 and A through C to defendants' objections ("Defs.
Interline Objections") [Dkt. No. 454]; the plaintiffs' response to defendants' objections under
49 U.S.C. § 10706 to plaintiffs' exhibits in support of plaintiffs' motion for class certification,
and exhibits 1 through 15 to plaintiffs' response ("Pls. Interline Response") [Dkt. No. 457-19];
the plaintiffs' notice of additional evidence and exhibits relevant to the parties' briefing on
49 U.S.C. § 10706, and exhibits 1 through 21 to plaintiffs' notice ("Pls. Interline Notice") [Dkt.
No. 530-1]; the defendants' response to plaintiffs' notice of additional evidence relevant to the
parties' briefing on 49 U.S.C. § 10706, and exhibits A through E to defendants' response ("Defs.
Response to Pls. Interline Notice") [Dkt. No. 532].

*Motions Hearing and Related Submissions*. The Court also reviewed the
transcripts of the motions hearing of October 6 and 7, 2010 (respectively, "Oct. 6 Tr.";
"Oct. 7 Tr."), and the binders of materials, consisting of demonstratives, exhibits, and deposition
excerpts, submitted by the parties at the hearing: the plaintiffs' binder regarding section 10706
("Pls. Section 10706 Binder"); the plaintiffs' hearing binder ("Pls. Hr'g Binder"); the defendants'
hearing binder ("Defs. Hr'g Binder"); the defendants' proffer at hearing on class certification
binder ("Defs. Proffer Binder"); and the plaintiffs' closing arguments binder ("Pls. Closing
Binder").

Union Pacific Railroad Company ("UP") — engaged in a price fixing conspiracy to coordinate their fuel surcharge programs as a means to impose supra-competitive total price increases on their shipping customers. See 2d Am. Compl. ¶¶ 1-2; Class Mem. at 1. As plaintiffs describe it, a rail fuel surcharge "is a separately-identified fee that is charged by the railroads for . . . agreed-upon transportation [services], purportedly to compensate for increases in the cost of fuel." 2d Am. Compl. ¶ 2. Plaintiffs allege, however, that the four defendants, through their collective action, "conspired to impose Rail Fuel Surcharges that far exceeded any of the Defendants' fuel costs, and thereby collected billions of dollars of additional profits during the . . . conspiracy." Id.

Plaintiffs have been divided into two putative classes: (1) the direct purchasers — those who allegedly purchased rail freight transportation from defendants from July 1, 2003 until December 31, 2008 and who were assessed a rail fuel surcharge for the transportation; and (2) the indirect purchasers — those who allegedly purchased rail freight transportation services indirectly from defendants. See Rail Freight I, 587 F. Supp. 2d at 29. Plaintiffs in both putative classes allege that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix prices through use of their fuel surcharges, and seek recovery under Section 4 of the Clayton Act, 15 U.S.C. § 15. See Rail Freight I, 587 F. Supp. 2d at 29; 2d Am. Compl. ¶ 33.

In 2008, defendants moved to dismiss the claims of both putative classes. On November 7, 2008, the Court denied defendants' motion regarding the direct purchaser plaintiffs, concluding that the direct purchasers had sufficiently alleged an agreement in restraint of trade. See Rail Freight I, 587 F. Supp. 2d at 32. Shortly thereafter, on December 28, 2008, the Court denied in part and granted in part defendants' motion regarding the indirect purchaser plaintiffs,

concluding that the indirect purchasers' state law claims were preempted and must be dismissed, but that the indirect purchasers' federal antitrust claim for injunctive relief could proceed. See Rail Freight II, 593 F. Supp. 2d at 32, 43. The United States Court of Appeals for the District of Columbia Circuit affirmed this Court's dismissal of the indirect purchasers' state law claims. See Fayus Enters. v. BNSF Ry. Co., 602 F.3d at 454.[2]

The direct purchaser plaintiffs (hereinafter, "plaintiffs" unless otherwise specified) now move for class certification. Specifically, plaintiffs move this Court under Rule 23(b)(3) of the Federal Rules of Civil Procedure for certification of a class of

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").
>
> Excluded from this Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the

---

[2]    On January 13, 2009, in view of the huge volume of documents to be produced in discovery and other discovery issues, many of which involved challenging e-discovery matters, the Court referred this case for the management of all pretrial matters, discovery, and scheduling jointly to Magistrate Judge John M. Facciola and Magistrate Judge Alan Kay. See Referral Order at 2, Jan. 13, 2009 [Dkt. No. 179]. Magistrate Judge Facciola and Magistrate Judge Kay have provided the Court and the parties with invaluable assistance, presiding over a lengthy discovery process, lasting over two years, in which the parties have raised complex legal issues and have exchanged millions of pages of documents. See In re Rail Freight Fuel Surcharge Antitrust Litig., MDL No. 1869, --- F.R.D. ----, 2011 WL 5603995, at *1 (D.D.C. Nov. 17, 2011) (Facciola, Mag. J.). Magistrate Judge Facciola's expertise in e-discovery matters and his weekly conference calls with counsel during the early stages of discovery made possible an efficient and largely non-contentious discovery process despite the complexity of the case and the challenging nature of some of the discovery issues.

> Complaint, and all federal governmental entities, and (b) all
> entities or persons that paid a Fuel Surcharge directly to any of the
> Defendants solely pursuant to a railroad-shipper contract that was
> (i) entered into before July 1, 2003, and (ii) provided for a
> stand-alone Fuel Surcharge to be paid under a predetermined
> formula specifically set forth in the contract.

Class Mot. at 1.

Plaintiffs request that this case be certified as a class action for litigation and trial

of plaintiffs' claim for price fixing under Section 1 of the Sherman Act, 15 U.S.C. § 1, and that

the eight named plaintiffs — Dust Pro, Inc.; Carter Distributing Company; Dakota Granite

Company; Donnelly Commodities, Inc.; U.S. Magnesium LLC; Nyrstar Taylor Chemicals, Inc.;

Olin Corporation; and Strates Shows, Inc. — be designated as class representatives.  Class Mot.

at 1.  Plaintiffs further request that Quinn Emanuel Urquhart & Sullivan, LLP and Hausfeld LLP

be designated as co-lead class counsel under Rule 23(g) of the Federal Rules of Civil Procedure.

Defendants oppose plaintiffs' motion for class certification, arguing that plaintiffs have failed to

satisfy the requirements of Rule 23.

### A. The Alleged Conspiracy

Plaintiffs allege that in early 2003 defendants, the four largest Class I railroads in

the continental United States, see 2d Am. Compl. ¶ 1, conspired to increase their total revenues

through the use of standardized, uniform, and supra-competitive fuel surcharges.  Rail Freight I,

587 F. Supp. 2d at 29.  A Class I railroad is a large freight railway company that has "annual

carrier operating revenues of at least $250 million."  1st Rausser Report at 20.  Together,

defendants comprise just one percent of all the freight railroads, see id., but control about

90 percent of rail freight traffic in the United States.  2d Am. Compl. ¶ 4; see Class Mem. at 7.

BNSF and UP operate in the western United States; CSX and NS operate in the east.  See 1st

Rausser Report at 30-31; Willig Report ¶ 166.[3]

Before Congress passed the Staggers Rail Act in 1980, defendants would have had

to apply to the Interstate Commerce Commission ("ICC") for approval of an across-the-board

rate increase.  Rail Freight I, 587 F. Supp. 2d at 29-30.  Following the deregulation of the railroad

industry, at least 80 percent of all rail shipments now move under private transportation

contracts, which are not rate regulated, or are otherwise exempt from rate regulation.  Id.

Plaintiffs allege that defendants ultimately determined that the most efficient way to increase

their profits was through the imposition of an across-the-board, artificially high, and uniform fuel

surcharge, see id. at 30, instead of attempting to renegotiate all of their individual contracts, id.,

or attempting to fix each base rate separately, which plaintiffs say "would have been extremely

complex, highly costly and effectively unmanageable."  1st Rausser Report at 52 n.118.

The total freight price for a shipping customer, that is, the all-in rate, consists of a

base rate (also referred to as a line-haul rate) and any percentage fuel surcharge applied to the

base rate.  See Willig Report ¶ 18; Class Opp. at 3 (all-in price includes the base rate, fuel

surcharge, and other charges and elements of value).  The base rate

---

[3]      To preview, see infra at 61 n.11 & 64 n.12, Gordon Rausser is plaintiffs' retained
expert, and Robert D. Willig is defendants' retained expert.  Dr. Rausser is the Robert Gordon
Sproul Distinguished Professor at the University of California at Berkeley.  He has held positions
teaching economics and statistics at numerous universities and has published widely in these
fields.  See 1st Rausser Report at 1.  Dr. Willig is a Professor of Economics and Public Affairs at
Princeton University, where he holds a joint appointment in the Economics Department and at
the Woodrow Wilson School of Public and International Affairs.  His focus is microeconomics,
specializing in industrial organization.  He has published widely in these fields.  See Willig
Report at 1.

includes fixed cost (or overhead) elements, such as the cost of
organizing a particular shipment[,] . . . . the large fixed costs of
building and maintaining track, bridges, and other structures to
achieve long-run sustainability[,] . . . . [and] the railroad's markup
of price over costs, i.e., the profitability element of pricing.

1st Rausser Report at 62. Plaintiffs allege that defendants imposed "an across-the-board

artificially high and uniform fuel surcharge" as a percentage multiplier of the base rate, thereby

permitting defendants "to raise total freight prices widely by a given percentage." Rail Freight I,

587 F. Supp. 2d at 30; see also 1st Rausser Report at 50 ("[A]dding a percentage fuel surcharge

on top of line-haul rates or base rates is by its very nature a general price increase."). In effect,

according to plaintiffs, the allegedly conspiratorial fuel surcharges operated like a tax, increasing

the total price of shipping by a set percentage. 1st Rausser Report at 80. Plaintiffs contend that

this "approach yielded defendants billions of dollars of additional profits because the surcharge

raised rates far beyond the real increased cost of fuel." Rail Freight I, 587 F. Supp. 2d at 30.

According to plaintiffs, it took defendants some trial and error to reach the point

of conspiracy. Before the class period, plaintiffs say that defendants "operated as a

price-discriminating, interdependent, but non-collusive oligopoly." Class Mem. at 8. And for

many years before the class period, defendants "confronted a long-term, structural decline in rail

freight rates." Id. "Between 2000 and early 2003, the three-year period preceding the Class

Period," plaintiffs contend that defendants "unilaterally took various actions designed to increase

rail freight prices and revenues." Id. at 9. As plaintiffs describe it, "[t]hese uncoordinated

actions included, among other things, unilateral attempts to apply stand-alone fuel surcharges,

which were designed 'to take advantage of future rising fuel prices' and intended as 'revenue

enhancement steps.'" Id. (quoting RD Ex. 9, E-mail from C. Adams, at UPFSC 0147060,

9

Dec. 5, 2002; RD Ex. 163, NS 2000 Annual Report, at 3). But plaintiffs contend that defendants "acting on their own had limited success when trying to boost revenues through fuel surcharges." Id. Plaintiffs contend that these pre-class period "fuel surcharges were applied only sporadically to a limited number of shippers," because defendants were concerned about competition — "losing business to other [railroads] that did not apply fuel surcharges[.]" Id. at 9-10.

Another barrier to broad application of fuel surcharges during the pre-class period, according to plaintiffs, was wide use of "the so-called Rail Cost Adjustment Factor, or 'RCAF.'" Class Mem. at 11. The RCAF "is a weighted index that accounts for all significant input costs, including fuel." Id.; see also Willig Rep. ¶ 63 ("RCAF measures changes in the prices of major components of the railroad industry's operating expenses, including labor, fuel, materials, equipment rents, depreciation, interest and other expenses."). According to plaintiffs, wide use of the RCAF impeded broad application of fuel surcharges because defendants "recognized that imposing a stand-alone fuel surcharge where fuel price increases were already covered by the RCAF would be perceived by shippers as double dipping." Class Mem. at 11 (quotations omitted).

> Thus, plaintiffs contend that before the class period
>
> the number of shippers covered by stand-alone, rate-based fuel surcharges was relatively low . . . , and fuel surcharges did not contribute significantly to Defendants' revenues or bottom lines. Defendants were unable to meet their respective revenue enhancement goals through the use of uncoordinated fuel surcharges.

Class Mem. at 12.

But all of this allegedly changed in 2003. Plaintiffs contend that beginning in the spring of 2003 "[t]he four Defendants agreed to create and apply a common Fuel Surcharge" — linked to the price of oil on one of two oil indexes, the On-Highway Diesel Fuel ("HDF") index or the West Texas Intermediate ("WTI") index — "based on a percentage of base rates on an across-the-board basis to all members of" plaintiffs' putative class. Class Mem. at 19. Under CSX's new, allegedly conspiratorial fuel surcharge program, the railroad would assess a 0.4 percent surcharge when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4 percent for every dollar above $23. Id. at 19. Plaintiffs say that "[u]nlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month." Id. at 19-20. And plaintiffs allege that BNSF, UP, and NS adopted "essentially uniform" programs, and all four defendants "remained in synch through the class period." Id. at 24.

As plaintiffs describe it,

> "[t]he only differences in the Defendants' programs concerned the indices used and the thresholds chosen. The two indices chosen were closely related. The western railroads (BNSF and the UP) linked their fuel surcharge to the on-highway diesel fuel (HDF) index, whereas the eastern railroads (CSX and NS) linked their fuel surcharge to the [WTI] index."

Class Mem. at 24 n.76 (quoting 1st Rausser Report at 54-55). Although UP and BNSF used slightly different thresholds in their fuel surcharge programs, plaintiffs allege that this difference "had no practical effect":

> "The UP applied a fuel surcharge when the HDF was above the threshold of $1.35 per gallon and the BNSF applied a Fuel

11

> Surcharge when the HDF index was above $1.25 per gallon. CSX
> and NS both applied fuel surcharges when the WTI index was
> above $23 per barrel. The different thresholds used by UP and
> BNSF were not relevant to fuel surcharge amounts during the class
> period, because the indices were all above the threshold values for
> the entire Class Period. Consequently, the UP and BNSF Fuel
> Surcharge programs provided for identical fuel surcharge
> percentages once the $1.35 threshold was reached."

Id. (quoting 1st Rausser Report at 55).

The next step in the alleged conspiracy, according to plaintiffs, was defendants'

agreement and collective action to cause the American Association of Railroads ("AAR") to

create a new cost escalation index, the All Inclusive Index Less Fuel ("AIILF"), that removed

fuel costs from the prior cost escalation index, the All Inclusive Index ("AII"), on which the

RCAF was based. See Rail Freight I, 587 F. Supp. 2d at 30; see Class Mem. at 27. Plaintiffs say

that defendants reached this agreement during the October and December 2003 meetings of the

AAR; the AIILF index was published in December 2003. Rail Freight I, 587 F. Supp. 2d at 30;

see Class Mem. at 29. As plaintiffs describe it, "[t]he magnitude of this accomplishment from

Defendants' perspective cannot be understated." Class Mem. at 29. Plaintiffs point to a letter

written by BNSF's chief economist, Sam Kyei, in which he stated:

> "In December 2003 [Matt Rose, BNSF's chief executive officer],
> single-handedly got the A.A.R. to establish a non-fuel RCAF
> index, now called the All-Inclusive Index Less Fuel . . . . In my
> 18-year railroad career, no one had ever succeeded in steering the
> A.A.R. to do this. . . . [T]he combination of sound price escalation
> using this index and a fuel surcharge should tremendously help our
> bottom-line for years to come. In fact, . . . the entire rail industry
> should benefit from the escalation options the index provides."

Class Mem. at 29-30 (quoting RD Ex. 122, Letter from S. Kyei, at BNSF-0070502, Mar. 15,

2005).

12

At this point, plaintiffs allege that defendants, having coordinated their fuel surcharges and created and published the AIILF, "worked tirelessly to achieve 100% Fuel Surcharge coverage across their customers." Class Mem. at 31. Plaintiffs say that following defendants' agreement to coordinate their fuel surcharges, defendants' fuel surcharge revenue "skyrocketed": as an example, plaintiffs state that NS saw fuel surcharge revenue for certain businesses grow exponentially from about $11.6 million in 2002 to about $61.7 million, $208 million, $650 million, and $974 million in 2003, 2004, 2005, and 2006, respectively. Id. at 42-43. Plaintiffs say that because of the conspiracy, defendants "were able to reverse the long-term downward trend in rail freight rates and move rates sharply upward[,]" id. at 43, at the expense of putative class members. Id. at 45.

### B. Surface Transportation Board Proceedings and 18 Class Action Lawsuits

Eventually, shippers of both rate-regulated and rate-unregulated freight traffic complained about defendants' use of fuel surcharges, arguing that the surcharges recovered far more than the incremental cost of fuel, and that the surcharges had become non-negotiable. Shippers of rate-regulated traffic expressed their complaints to the Surface Transportation Board ("STB"), see 2d Am. Compl. ¶ 96; Class Mem. at 47, an agency that regulates certain aspects of the railroad industry. See Manufacturers Ry. Co. v. Surface Transp. Bd., 676 F.3d 1094, 1095 (D.C. Cir. 2012). In response, the STB "instituted [a] proceeding to inquire into rail carrier practices related to fuel surcharges." Rail Fuel Surcharges, Ex Parte No. 661, 2007 WL 201205, at *1 (S.T.B. Jan. 26, 2007).

13

As the STB made clear, its proceedings on fuel surcharges and its ultimate decision on the matter related only to rate-*regulated* freight traffic. See Rail Fuel Surcharges, 2007 WL 201205, at *10 ("Under 49 U.S.C. 10709, we have no authority to regulate rail rates and services that are governed by a contract. Therefore, our findings and actions here apply only to regulated common carrier traffic."); see also Fayus Enters. v. BNSF Ry. Co., 602 F.3d at 445 (noting that under 49 U.S.C. § 10709 traffic that moves under railroad-shipper contracts generally is not subject to challenge before the STB). And plaintiffs' putative class in the instant case includes only those shippers who purchased rate-*unregulated* transportation services. See Class Mot. at 1. But plaintiffs say that the fuel surcharges applied to rate-regulated freight traffic are the same fuel surcharges applied during the class period to putative class members, see Class Mem. at 49; 2d Am. Compl. ¶ 98, and both sides reference the STB decision and rely on it for various propositions in their class certification briefing. See Class Mem. at 49; Class Opp. at 16-17; Class Reply at 22-25. The Court therefore will describe below the STB proceedings and the STB's 2007 decision.

The STB held hearings on the use of fuel surcharges on rate-regulated traffic in May and August 2006. Rail Fuel Surcharges, 2007 WL 201205, at *1. On January 26, 2007, the STB issued its decision on the matter, concluding:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to

14

> which the surcharge is applied.  Two shippers may have traffic
> with identical fuel costs, but if one starts out with a higher base
> rate (because, for example, it has fewer transportation alternatives),
> it will pay dramatically more in fuel surcharges.

Id. at *4.  Thus, the STB directed defendants to change their practice of "computing rail fuel

surcharges as a percentage of a base rate" on regulated traffic.  Id. at *1.

      The STB emphasized, however, that its ruling did not ban all fuel surcharges for

regulated traffic.  See Rail Fuel Surcharges, 2007 WL 201205, at *6 ("[W]e are not precluding

railroads from incorporating as many factors that affect fuel consumption as they wish in

calculating fuel surcharges.  Nor are we requiring them to incorporate every conceivable such

factor, as we agree that would be impracticable.").  Under the STB's decision, a railroad could

still choose to implement a fuel surcharge for rate-regulated traffic, but that surcharge "must be

based upon attributes of a movement that directly affect the amount of fuel consumed."  Id.

Essentially, the STB imposed the requirement that any fuel surcharge applied by a railroad must

have "a reasonable nexus to fuel consumption."  Id.  The STB concluded that a fuel surcharge

applied as a percentage of a base rate fails that test because it "increases all rates by a set

percentage" and therefore "stands virtually no prospect of reflecting the actual increase in fuel

costs for handling the particular traffic to which the surcharge is applied."  Id. at *4.

      As discussed, the STB decision did not apply to rate-unregulated freight traffic.

Nor did the STB decision in any way preclude railroads from using fuel surcharges tied to base

rates in private contracts.  As the STB  noted in its decision:

> Several carriers introduced evidence that many of their customers
> favor the continued use of a fuel surcharge program that is tied to
> the base rate.  Given that such a program shifts greater
> responsibility for fuel recovery to shippers with higher rates, it is

> not surprising that a subset of customers (presumably those with
> lower base rates) favor retaining a percentage-of-the-base-rate
> approach.  We note that such shippers are free to enter into
> contractual arrangements with carriers that incorporate into those
> contracts any escalation provision for fuel cost recovery that the
> parties wish.

Rail Fuel Surcharges, 2007 WL 201205, at *6 n.34.

      Although some customers of rate-unregulated freight traffic may have favored the

use of fuel surcharges tied to base rates, many others did not, and that latter group of shippers had

similar complaints to those expressed before the STB.  See Class Mem. at 45-47.  Those

complaints eventually gave rise to 18 separate class action lawsuits, pending in six districts,

involving common antitrust allegations relating to the use of fuel surcharges on rate-unregulated

freight traffic.  See Rail Freight I, 587 F. Supp. 2d at 29; In re Rail Freight Fuel Surcharge

Antitrust Litig., 528 F. Supp. 2d 1358, 1358-59 (J.P.M.L. 2007).  On November 26, 2007, the

Multidistrict Litigation Panel consolidated those 18 separate class actions and transferred them to

this Court, see In re Rail Freight Fuel Surcharge Antitrust Litig., 528 F. Supp. 2d at 1358-59, and

now eight named plaintiffs request that this Court certify this case as a class action under

Rule 23(b)(3).  See Class Mot. at 1-2.

*C.  Class Certification Papers and Supplemental Briefing Before and After the Motions Hearing*

      As will be discussed in detail below, to obtain class certification plaintiffs must

satisfy the four threshold requirements of Rule 23(a) — commonly referred to as numerosity,

commonality, typicality, and adequacy — and the two additional requirements of Rule 23(b)(3)

— predominance and superiority.[4]  Although there is some dispute over whether plaintiffs have

satisfied some of the requirements of Rule 23(a), see Class Opp. at 75-82, the parties agree that

the central question before the Court relates to predominance, that is, whether plaintiffs have met

their burden to show that "questions of law or fact common to class members predominate over

any questions affecting only individual members[.]" FED. R. CIV. P. 23(b)(3); see Defs.

Wal-Mart Reply Brief at 1; Oct. 6 Tr. at 88; Oct. 7 Tr. at 167.  That question, in turn, focuses on

whether plaintiffs have shown that the harm — that is, the impact — from the alleged conspiracy

is capable of proof at trial through evidence that is common to the class rather than individual to

its members.  See, e.g., Defs. Wal-Mart Reply Brief at 1.

> Plaintiffs maintain that they will be able to demonstrate the alleged conspiracy's

impact at trial with common evidence.  See Class Mem. at 67-75.  And in support of their motion

for class certification, plaintiffs have submitted for consideration by the Court the expert report

of Dr. Gordon Rausser, the Robert Gordon Sproul Distinguished Professor at the University of

California at Berkeley.  See 1st Rausser Report at 1.  Plaintiffs asked Dr. Rausser to determine,

among other things, whether "[t]here was a common impact of Defendants' alleged conspiracy

on the Plaintiffs and the Class which can be demonstrated through evidence and economic

analysis common to the Class[.]"  Id. at 4.  Dr. Rausser analyzed the rail freight industry and

defendants' transaction data and concluded that there was such a common impact.  See id. at 5-8.

---

[4]       In addition to the four express requirements of Rule 23(a), there are two implied
requirements: (1) the class must be "sufficiently defined so as to be identifiable as a class"; and
(2) the named representatives must "fall within the class." Vigus v. Southern Ill.
Riverboat/Casino Cruises, Inc., 274 F.R.D. 229, 235 (S.D. Ill. 2011) (citing Oshana v. Coca-Cola
Co., 472 F.3d 506, 513 (7th Cir. 2006); Alliance to End Repression v. Rochford, 565 F.2d 975,
977 (7th Cir. 1977)).

As Dr. Rausser explains, he developed economic regressions that he applied to defendants' transaction data; in view of the results of his regressions, he concludes, among other things, that common evidence and economic analysis can be used to determine the impact of defendants' alleged conspiracy on a class-wide basis. See id. at 7-8, 80-81.

Defendants oppose plaintiffs' motion for class certification, arguing primarily that individual issues predominate in determining the impact of the alleged conspiracy. See Class Opp. at 28-72. In support of their position that class certification is inappropriate, defendants have submitted for consideration by the Court the expert report of Dr. Robert Willig, a Professor of Economics and Public Affairs at Princeton University. See Willig Report ¶ 1. Among other things, defendants asked Dr. Willig to determine "whether it is feasible for plaintiffs to demonstrate through common proof that members of the proposed class suffered economic injury[.]" Id. ¶ 11. Dr. Willig concludes that it is not feasible; as he sees it, individual issues predominate over common issues for purposes of determining the impact from the alleged conspiracy. Id. ¶ 25. According to Dr. Willig, "[e]valuation of plaintiffs' claims in this matter would require undertaking analysis that is specific to individual plaintiffs." Id. Furthermore, Dr. Willig contends that Dr. Rausser's regressions are flawed, and he disagrees with Dr. Rausser's conclusion that common evidence and analysis can be used to determine the impact of the alleged conspiracy. Id.

The parties and their experts therefore have presented this Court with what other courts have referred to as a "battle of the experts" on predominance and, in turn, impact. Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011); In re Puerto Rican Cabotage Antitrust Litig., 269 F.R.D. 125, 132 (D.P.R. 2010). Compare 1st Rausser Report at 7, with

18

Willig Report ¶ 25.  As plaintiffs see it, they should win this battle: whereas Dr. Rausser used

economic analysis to show persuasively that workable formulas, common to the class, are

available to prove impact, Class Reply at 1, Dr. Willig's analysis should not be credited because

his methodology is "overtly flawed."  Id. at 5.  Defendants say the opposite, arguing that the

Court should not credit Dr. Rausser's analysis because it is "fatally flawed."  Class Opp. at 50.

   In preparation for the hearing on plaintiffs' motion for class certification and in

view of the disputes between Dr. Rausser and Dr. Willig on the central issue of predominance,

the Court concluded that supplemental briefing was necessary.  The Court therefore ordered

supplemental briefing on two issues, to be completed before the class certification motions

hearing: (1) What standard of proof should the Court apply when examining the requirements of

Rule 23 of the Federal Rules of Civil Procedure?; and (2) Can the Court resolve factual disputes

relevant to Rule 23 requirements — with particular emphasis on conflicting expert reports — if

those factual disputes overlap with the merits of this case?  See Order at 1-2, Sept. 17, 2010 [Dkt.

No. 423].  The Court then heard oral argument on plaintiffs' motion for class certification,

including argument on these two supplemental issues, on October 6 and 7, 2010.  See generally

Oct. 6 Tr.; Oct. 7 Tr.; see also Order at 1-2, Oct. 5, 2010 [Dkt. No. 445] (listing topics and

schedule of argument).

   After the class certification motions hearing, the Court, on its own review of the

Supreme Court's oral argument transcript in Wal-Mart Stores, Inc. v. Dukes, provided the parties

with the opportunity for further supplemental briefing.  As the Court explained, although

plaintiffs' class certification motion involves Rule 23(b)(3), and the certification question in

Wal-Mart Stores, Inc. v. Dukes involved Rule 23(b)(2), "a review of the oral argument transcript

in Wal-Mart . . . suggest[ed] that the Supreme Court's decision in that case may have a bearing

on this case." Order at 1, Apr. 7, 2011 [Dkt. No. 504].  Thus, the Court ordered the parties to

meet and confer and file a joint report with the Court 30 days after the Supreme Court issued its

decision in Wal-Mart, stating whether either side believed that supplemental briefing was

necessary and, if so, listing the proposed topics and proposing a briefing schedule.  Id. at 1-2.

On June 20, 2011, the Supreme Court issued its decision in Wal-Mart Stores, Inc.

v. Dukes, and one month later the parties agreed that supplemental briefing was necessary and

submitted a joint report listing three proposed topics.  See Joint Report Pursuant to April 7, 2011

Order at 1-2, July 20, 2011 [Dkt. No. 519].  The Court approved the parties' joint proposal and

ordered supplemental briefing on the following three questions:

> (1) Whether Wal-Mart provides guidance with respect to the
> standards to be applied in determining whether to certify a class
> here.
>
> (2) Whether Wal-Mart has any implications for the plaintiffs'
> ability to satisfy the requirements of Rule 23(b)(3), in light of the
> facts of this case, plaintiffs' claims and defendants' asserted
> defenses.
>
> (3) Whether Wal-Mart has any implication for this Court's
> evaluation of the parties' expert evidence submitted in connection
> with the pending class certification motion.

Order at 1, July 20, 2011 [Dkt. No. 520].  That supplemental briefing now is complete.

### D.  "Interline-Related" Communications

One final matter requires preliminary discussion.  In the course of briefing on

plaintiffs' motion for class certification, defendants filed a motion to exclude what they refer to

as "interline-related" communications from consideration for class certification or for any other

purpose under 49 U.S.C. § 10706.  Interline Mot. at 1.  According to defendants, plaintiffs devote

substantial class certification briefing "to the merits of this case" and "repeatedly cite to evidence

of communications between Defendants related to interline traffic," defined by defendants as

"traffic that originates on the line of one rail carrier but must be handed off to one or more other

rail carriers to reach a destination point."  Interline Mem. at 1.  Defendants argue that "Congress,

by statute, has banned such evidence in antitrust cases because it regards such communications as

necessary and perfectly lawful, and wanted to protect rail carriers from false allegations of

antitrust violations."  Id.

      The relevant statute is 49 U.S.C. § 10706, and defendants say that Congress

enacted it specifically

> to prevent plaintiffs from inferring an unlawful agreement "from
> evidence that two or more rail carriers acted together with respect
> to an interline rate or related matter and that a party to such action
> took similar action with respect to a rate or related matter on
> another route or traffic," and
>
> to provide that "evidence of a discussion or agreement between or
> among such rail carrier and one or more other rail carriers, or of
> any rate or other action resulting from such discussion or
> agreement, shall not be admissible if the discussion or agreement
> . . . concerned an interline movement of the rail carrier, and the
> discussion or agreement would not, considered by itself, violate
> the [antitrust] laws."

Interline Mem. at 1 (quoting 49 U.S.C. § 10706(a)(3)(B)(ii)) (alteration in original).

      Plaintiffs oppose defendants' motion on procedural and substantive grounds.  See

Interline Opp. at 1-2.  As for the latter, plaintiffs argue that

> to the extent it applies at all, the limited scope of
> § 10706(a)(3)(B)(ii)'s evidentiary protection is clear.  That
> subsection does not — as Defendants assert — immunize any

> discussion or agreement relating in any way to anything having to
> do with interline traffic.  Rather, it narrowly protects only a
> discussion or agreement that concerned a specific "interline
> movement of the rail carrier."

Id. at 4 (quoting 49 U.S.C. § 10706(a)(3)(B)(ii)(II)).  Plaintiffs therefore contend that 49 U.S.C.

§ 10706 does not preclude the admissibility of the evidence that defendants purport to challenge.

See id. at 10.

      The parties agree that the question whether there was a conspiracy can be

established by common proof, so it is not an issue in dispute for purposes of class certification.

See infra at 58-59.  Thus, defendants note that they "expect that at this stage of the case the Court

will not find it necessary to consider any of the [interline-related communications] evidence that

Plaintiffs have cited to support their claim that Defendants engaged in an unlawful conspiracy."

Interline Mem. at 27; see id. (describing as "legally immaterial" plaintiffs' argument in their

certification briefs referencing purported interline communications); see also Oct. 6 Tr. at 44.

Consequently, the parties also agree that the Court need only rule on defendants' motion before

relying on any such disputed evidence.  See Oct. 6 Tr. at 44.

      At the Court's direction, after the class certification hearing defendants provided

the Court with the list of specific objections to documents and deposition testimony that

plaintiffs submitted in support of their motion for class certification, as well as annotated copies

of relevant excerpts from Dr. Rausser's two reports that purportedly rely on interline-related

communications.  See Defs. Interline Objections at 1; see also id., Exs. 1-11, A-C.  Because the

Court has not relied on any of the disputed evidence in reaching its decision on plaintiffs' motion

for class certification, the Court concludes that it need not rule at this time on defendants' motion

to exclude interline-related communications.

### III. LEGAL STANDARD FOR CLASS CERTIFICATION UNDER RULE 23(b)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE

#### A. Requirements of Rule 23(a) and (b)(3)

A party that moves for class certification bears the burden of showing that its proposed suit meets all of the requirements for certification. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316 n.14 (3d Cir. 2008); Lindsay v. Government Emps. Ins. Co., 251 F.R.D. 51, 54 (D.D.C. 2008). Those requirements fall into two categories.

First, the moving party must show that its proposed suit satisfies the two implied and the four express requirements of Rule 23(a). See Vigus v. Southern Ill. Riverboat/Casino Cruises, Inc., 274 F.R.D. at 235; Lindsay v. Government Emps. Ins. Co., 251 F.R.D. at 54. As for the implied requirements, plaintiffs must show (1) that their proposed class is "sufficiently defined so as to be identifiable as a class"; and (2) that the named representatives "fall within the class." Vigus v. Southern Ill. Riverboat/Casino Cruises, Inc., 274 F.R.D. at 235. As for the express requirements, the moving party must show that

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). Those four express requirements commonly are referred to as numerosity, commonality, typicality, and adequacy. Failure to adequately demonstrate any of the Rule 23(a) requirements is fatal to class certification. See Garcia v. Johanns, 444 F.3d 625, 631 (D.C. Cir. 2006).

Second, the moving party must show that its proposed suit falls within at least one of the three categories of cases set forth in Rule 23(b). Lindsay v. Government Emps. Ins. Co., 251 F.R.D. at 54. In this case, plaintiffs move for class certification under Rule 23(b)(3). That part of Rule 23 is intended to encompass cases in which "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Id. at 56 (quoting FED. R. CIV. P. 23(b) ADVISORY COMMITTEE NOTE TO 1966 AMENDMENTS). In order to certify a class under Rule 23(b)(3), a court must find "[1] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). These two requirements commonly are referred to as predominance and superiority. As Rule 23(b)(3) states, in deciding whether a moving party has satisfied the predominance and superiority requirements, pertinent considerations for a court include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the ligation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Id.

The Supreme Court has emphasized that a class certification decision invites a "close look at the case," Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 615 (1997) (quotations omitted), and a class may be certified only "if the trial court is satisfied, after rigorous analysis," that the applicable Rule 23 requirements have been met. General Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982). In examining the predominance requirement under Rule 23(b)(3), a court's rigorous analysis "'begins . . . with the elements of the underlying cause of action.'" Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 815 (7th Cir. 2012) (quoting Erica P. John Fund, Inc. v. Haliburton, Co., 131 S. Ct. 2179, 2184 (2011)); see In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311; see also Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 299 (D.D.C. 2007). A court must "examine the elements of plaintiffs' claim through the prism of Rule 23 to determine whether" the Rule 23 requirements have been met. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311 (quotations omitted).

Under Rule 23(b)(3), "[i]ndividual questions need not be absent." Messner v. Northshore Univ. HealthSystem, 669 F.3d at 815. Indeed, "[t]he text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." Id. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311 (quotations omitted).

In this case, plaintiffs allege that defendants engaged in price fixing, in violation of Section 1 of the Sherman Act. To prevail on the merits of their claim at trial, plaintiffs will have to prove three elements: (1) a violation of the antitrust laws — here, Section 1 of the

25

Sherman Act; (2) individual impact or injury resulting from that violation; and (3) measurable damages. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311; Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 307.  In antitrust cases, injury includes both injury-in-fact and so-called antitrust injury. See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 106 (2d Cir. 2007); see also In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311.

At the class certification stage, however, plaintiffs need not prove their case.  See Behrend v. Comcast Corp., 655 F.3d 182, 199 (3d Cir. 2011), petition for cert. filed (U.S. Jan. 11, 2012) (No. 11-864); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311; see also Walsh v. Ford Motor Co., 807 F.2d 1000, 1017-18 (D.C. Cir. 1986) ("Class action proponents may not be called upon to prove their case in order to obtain certification.").  Instead, plaintiffs' burden at the class certification stage is to demonstrate that the elements of their claim are "*capable of proof*" at trial through evidence that is common to the class rather than individual to its members." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311-12 (emphasis added); see Messner v. Northshore Univ. HealthSystem, 669 F.3d at 818; Behrend v. Comcast Corp., 655 F.3d at 192-93.  Thus, the Court's focus at the class certification stage is on *how* plaintiffs will attempt to prove the elements of their claim at trial.  See Behrend v. Comcast Corp., 655 F.3d at 199; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311.

### B.  Resolution of Factual Disputes and Standard of Proof

It has long been established that the moving party cannot be called upon to prove its case at the class certification stage. See, e.g., Walsh v. Ford Motor Co., 807 F.2d at 1017-18.

Until recently, however, it was unclear whether and, if so, how, a court should assess factual disputes, especially those related to the merits of plaintiffs' cause of action, in ruling on a motion for class certification.  Compare In re Vitamins Antitrust Litig., 209 F.R.D. 252, 257 n.9 (D.D.C. 2002), with In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 316-20.  Moreover, there was "little guidance . . . available on the subject of the proper standard of 'proof' for class certification."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 316; see 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 3:12 (8th ed. 2011) ("Until recently . . . there had been surprisingly little case law addressing the evidentiary standard the proponent of certification must meet in demonstrating that Rule 23's requirements are satisfied."); Teamsters Local 445 Freight Div. Pension v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008) ("readily acknowledg[ing]" that prior case law had "been less than clear," and directly "address[ing] a question that weaves through the[] various requirements of Rule 23: the standard of proof applicable to evidence proffered to meet them"); see also Shariff v. Goord, 235 F.R.D. 563, 568 n.3 (W.D.N.Y. 2006) ("Neither Rule 23, nor the vast majority of cases interpreting it identifies a particular burden of proof on the plaintiff.").

Although the D.C. Circuit has not yet had occasion to provide much guidance on these questions, see Kottaras v. Whole Foods Mkt., Inc., Civil Action No. 08-1832, --- F.R.D. ----, 2012 WL 259862, at *5 (D.D.C. Jan. 30, 2012), the Supreme Court's recent decision in Wal-Mart as well as persuasive decisions from the Third Circuit and others have clarified the standards that a district court must apply in determining whether to certify a class.  Upon review of those decisions, the Court concludes (1) that it can and must resolve any factual disputes relevant to the requirements for class certification — even if that requires considerations

27

enmeshed in the factual and legal issues comprising plaintiffs' claim on the merits, see Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2551-52; see also In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 320; and (2) that it should apply a preponderance of the evidence standard of proof in doing so. See, e.g., In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 320.

### 1. Factual Disputes and Dueling Experts

As the Supreme Court stated in Wal-Mart Stores, Inc. v. Dukes: "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2551 (emphasis in original). A district court must be satisfied, after "rigorous analysis," that the requirements of Rule 23 have been met, and

> [f]requently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. [T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. . . . Nor is there anything unusual about that consequence[.]

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2551-52 (quotations and citations omitted).

The Supreme Court in Wal-Mart definitively resolved the question whether its decision in Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974), precludes inquiry into the merits at the class certification stage. Before the Supreme Court issued its decision in Wal-Mart, much of the law on that question arose from an "oft-quoted statement" in Eisen, see In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 33 (2d Cir. 2006), that "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits

of a suit in order to determine whether it may be maintained as a class action." Eisen v. Carlisle

& Jacquelin, 417 U.S. at 177.  In the past, that statement in Eisen

> has led some courts to think that in determining whether any Rule
> 23 requirement is met, a judge may not consider any aspect of the
> merits, and has led other courts to think that a judge may not do so
> at least with respect to a prerequisite of Rule 23 that overlaps with
> an aspect of the merits of the case.

In re Initial Pub. Offerings Sec. Litig., 471 F.3d at 33.

The Supreme Court in Wal-Mart made clear that that reading of its decision in

Eisen is wrong.  As the Supreme Court stated:

> [I]n [Eisen], the judge had conducted a preliminary inquiry into the
> merits of a suit, *not in order to determine the propriety of
> certification under Rules 23(a) and (b) (he had already done that
> . . .)*, but in order to shift the cost of notice required by Rule
> 23(c)(2) from the plaintiff to the defendants.

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2552 n.6 (emphasis added) (citation omitted).  To

the extent that language in Eisen suggests the impermissibility of a merits inquiry *related to the

Rule 23(a) and (b) analysis*, the Supreme Court made clear that such language "is the purest

dictum and is contradicted by . . . other [Supreme Court] cases."  Wal-Mart Stores, Inc. v. Dukes,

131 S. Ct. at 2552 n.6.  Thus, "it is appropriate — and indeed necessary — in some

circumstances to 'consider[] a merits question at the Rule 23 stage.'"  Kottaras v. Whole Foods

Mkt., Inc., 2012 WL 259862, at *6 (quoting Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2552

n.6); see In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 316-20; Regents of the Univ. of

Cal. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 381 (5th Cir. 2007); In re Initial

Public Offerings Sec. Litig., 471 F.3d at 41; Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366

(4th Cir. 2004); Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 677 (7th Cir. 2001); see also

1 MCLAUGHLIN ON CLASS ACTIONS § 3:12 ("The Supreme Court recently cemented consensus that recently emerged among the United States Courts of Appeal. Virtually every circuit had expressly adopted standards that require a district court considering class certification to consider evidence" and "resolve factual disputes that are relevant to Rule 23's criteria[.]").

The required rigorous factual review that a court must perform in examining whether the requirements of Rule 23(a) and (b) have been met similarly applies to disputes among experts relevant to class certification. As the Third Circuit stated in In re Hydrogen Peroxide Antitrust Litig.: "Expert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls for rigorous analysis." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 323. Nothing in Rule 23 distinguishes expert evidence from other types of evidence.

> Under Rule 23 the district court must be "satisfied," . . . or
> "persuaded," . . . that each requirement is met before certifying a
> class. Like any evidence, admissible expert opinion may persuade
> its audience, or it may not. This point is especially important to
> bear in mind when a party opposing certification offers expert
> opinion. The district court may be persuaded by the testimony of
> either (or neither) party's expert with respect to whether a
> certification requirement is met. Weighing conflicting expert
> testimony at the certification stage is not only permissible; it may
> be integral to the rigorous analysis Rule 23 demands.

In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 323 (quoting General Tel. Co. of the Sw. v. Falcon, 457 U.S. at 161; In re Initial Pub. Offerings Sec. Litig., 417 F.3d at 41); see also id. at 315 n.13 (stating that the "ultimate question" at the class certification stage is "whether the district court is satisfied, by all the evidence and arguments including all relevant expert opinion, that the requirements of Rule 23 have been met").

30

"Resolving expert disputes in order to determine whether a class certification requirement has been met is always a task for the court — no matter whether a dispute might appear to implicate the 'credibility' of one or more experts[.]" In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 324; see In re Initial Pub. Offerings Sec. Litig., 471 F.2d at 40 (concluding that courts must "resolve[] factual disputes relevant to each Rule 23 requirement," including weighing conflicting opinion evidence); Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 107; In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 256 F.R.D. 82, 96-97 (D. Conn. 2009). Such disputes among experts in an antitrust case may include, among other things, different views on the appropriate characterization of the relevant market, different views on how defendants structured their prices, and any other considerations relevant to whether plaintiffs have satisfied the requirements of Rule 23. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 325; In re EPDM Antitrust Litig., 256 F.R.D. at 96-97; Hnot v. Willis Grp. Holdings Ltd., 241 F.R.D. 204, 209-10 (S.D.N.Y. 2007). Failure to weigh conflicting expert opinions "'amounts to a delegation of judicial power to the plaintiffs, who can obtain class certification just by hiring a competent expert.'" Kottaras v. Whole Foods Mkt., Inc., 2012 WL 259862, at *11 (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 323).

There are, of course, limits to a court's inquiry into disputes among experts, just as there are limits to a court's inquiry into factual disputes generally: they should be resolved at the class certification stage only to the extent necessary to "satisf[y]" or "persuade[]" a court that each requirement of Rule 23 has or has not been met. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 323 (quotations and citations omitted); see also In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 611 (8th Cir. 2011). Thus, for example, a court should only engage itself in

31

"'statistical dueling'" of experts if "such dueling presents 'a valid basis for [granting or] denying class certification.'" Hnot v. Willis Grp. Holdings Ltd., 241 F.R.D. at 210 (quoting In re Initial Pub. Offerings Sec. Litig.,417 F.3d at 35). Similarly, for example, a court should resolve "which expert is correct," Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 107, when experts disagree on "*whether* a single formula can be created, or *whether* there really [are] too many factors at work for a multiple regression model to be methodologically sound." In re EPDM Antitrust Litig., 256 F.R.D. at 96-97 (citing Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 107) (emphasis added).

In contrast, if the defendants' expert is "merely disputing the *results* of the plaintiffs' experts' analysis rather than the feasibility of using a single formula methodology, that would be a merits issue, not a class certification issue." In re EPDM Antitrust Litig., 256 F.R.D. at 96 (emphasis added); see id. at 100-01 (concluding that defendants' challenge to plaintiffs' expert at the class certification stage was a matter to be resolved at trial because, although each sides' expert "arrived at a polar opposing finding concerning common impact[,] . . . significantly both employ single formulas"). When both experts agree on a methodology for determining class-wide impact, but ultimately reach different conclusions whether putative class members were injured by an alleged conspiracy, a court need not resolve which expert is correct at the class certification stage; that dispute presents a merits question to be resolved by the finder of fact at trial. In re Currency Conversion Fee Antitrust Litig., 264 F.R.D. 100, 115 (S.D.N.Y. 2010); see In re EPDM Antitrust Litig., 256 F.R.D. at 90; Hnot v. Willis Grp. Holdings Ltd., 241 F.R.D. at 209-10.

2.  Standard of Proof

a.  Facts Bearing on Rule 23

The Court concludes that plaintiffs must establish the requirements of Rule 23 by

a preponderance of the evidence, and that this standard applies to any factual disputes, including

those among experts, that bear on the decision whether to certify a class.  As both sides

acknowledge, in the past some judges in this district at the class certification stage have required

plaintiffs to make only a "threshold showing" or to set forth a "colorable method" by which they

intend to satisfy the requirements of Rule 23.  In re Vitamins Antitrust Litig., 209 F.R.D. at 264;

see Pls. Supp. Brief at 1-2; Defs. Supp. Brief at 14-15.  Recent decisions by the Second, Third,

and Fifth Circuits, however, all expressly hold that Rule 23 requirements must be established by

a higher standard: a preponderance of the evidence.  See Brown v. Kelly, 609 F.3d 467, 476 (2d

Cir. 2010) ("The Rule 23 requirements must be established by at least a preponderance of the

evidence.") (citing Teamsters Local 445 Freight Div. Pension v. Bombardier Inc., 546 F.3d

at 202 ("Today, we dispel any remaining confusion and hold that the preponderance of the

evidence standard applies to evidence proffered to establish Rule 23's requirements.")); In re Ins.

Brokerage Antitrust Litig., 579 F.3d 241, 257-58 (3d Cir. 2009) ("The '[f]actual determinations

necessary to make Rule 23 findings must be made by a preponderance of the evidence.'")

(quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 320); In re Hydrogen Peroxide

Antitrust Litig., 552 F.3d at 307 (expressly rejecting a "threshold showing" standard and

requiring proof by a preponderance of the evidence); Alaska Elec. Pension Fund v. Flowserv

Corp., 572 F.3d 221, 228 (5th Cir. 2009) ("'[T]he preponderance of the evidence standard

applies to evidence proffered to establish Rule 23's requirements.'") (quoting <u>Teamsters Local</u>

<u>445 Freight Div. Pension v. Bombardier Inc.</u>, 546 F.3d at 202) (alteration in original).[5]

As the Third Circuit stated in <u>In re Hydrogen Peroxide</u>:

> [I]nvoking the phrase "threshold showing" risks misapplying
> Rule 23. A "threshold showing" could signify, incorrectly, that the
> burden on the party seeking certification is a lenient one (such as a
> prima facie showing or a burden of production) or that the party
> seeking certification receives deference or a presumption in its
> favor. So defined, "threshold showing" is an inadequate and
> improper standard. [T]he requirements of Rule 23 must be met,
> not just supported by some evidence.

<u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d at 321 (quotations omitted).

"Class certification requires a finding that each of the requirements of Rule 23 has

been met" by a preponderance of the evidence. <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552

F.3d at 320; <u>see</u> FED. R. CIV. P. 23(b)(3) (the court must "find[] that the questions of law or fact

common to class members predominate"). A court can only do so upon weighing all relevant

evidence for and against class certification and then concluding by a preponderance of the

evidence that the Rule 23 requirements in fact have been met. <u>See id</u>. at 320-22; <u>see also</u> <u>Wal-</u>

<u>Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. at 2551 (party seeking certification "must be prepared to

prove that there are <em>in fact</em> sufficiently numerous parties, common questions of law or fact, etc.")

(emphasis in original). Applying a lesser standard would permit class certification even if a court

thought it less than likely that each Rule 23 requirement had been met, violating the Supreme

Court's instruction that "actual, not presumed conformance" with Rule 23 is "indispensable."

---

[5]     In their supplemental briefing, plaintiffs state that they do not object to the Court
applying the preponderance of the evidence standard because they believe they can readily satisfy
it; nevertheless, plaintiffs note that they "are not agreeing that a preponderance standard should
apply." Pls. Supp. Brief at 3 n.5.

General Tel. Co. of the Sw. v. Falcon, 457 U.S. at 160; see also Wal-Mart Stores, Inc. v. Dukes,

131 S. Ct. at 2551.

### b. Expert Opinions and Regression Analyses

An expert opinion presenting economic regression analysis commonly is used as a

basis for certifying a class. See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D.

291, 313 (N.D. Cal. 2010) (citing cases accepting multiple regression analysis as a means of

proving antitrust injury and damages on a class-wide basis); In re EPDM Antitrust Litig.,

256 F.R.D. at 95; see also DANIEL L. RUBINFELD, REFERENCE GUIDE ON MULTIPLE REGRESSION

305-08 (FED. JUDICIAL CENTER, 3d ed. 2011).  In this case, plaintiffs' expert, Dr. Gordon

Rausser, has developed two multiple regression models, a common factor model and a damage

model, that, in his opinion, together reveal that impact can be established at trial with evidence

common to the class.  See 2d Rausser Report at 91-92, 99-100; see also Oct. 6 Tr. at 137.

Defendants' expert, Dr. Robert Willig, disagrees with Dr. Rausser's analysis and concludes that

Dr. Rausser's regressions suffer from fatal flaws.  See generally Willig Report.

Where, as here, experts disagree on the ultimate question whether an economic

regression model shows that impact is capable of proof at trial through evidence common to the

class, that disagreement must be resolved by a court at the class certification stage: a court must

determine "which expert is correct" about whether "the injury-in-fact question is common to the

class." Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 107; see In re

Hydrogen Peroxide Antitrust Litig., 552 F.3d at 324.  To answer that question, the Third Circuit

instructed in In re Hydrogen Peroxide Antitrust Litig. that a court must apply a two prong test,

examining (1) whether the plaintiffs have established that their expert's theory of common

impact is "plausible"; and, if so, (2) whether the plaintiffs have established by a preponderance of

the evidence that the expert's plausible theory is "susceptible to proof at trial through available

evidence common to the class." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 325; see

Behrend v. Comcast Corp., 655 F.3d at 192-93.

   The Third Circuit recognized in In re Hydrogen Peroxide Antitrust Litig., and then

reaffirmed in Behrend v. Comcast Corp., that an expert's theory that impact is capable of

common proof at trial — by means of regression analysis or other common evidence — is not a

question of fact necessarily capable of resolution by a preponderance of the evidence.  The

plausibility standard falls below a requirement of perfection, see Behrend v. Comcast Corp., 655

F.3d at 204 n.13 (a court need not determine that a regression model "is perfect at the

certification stage"), and above a "threshold," In re Hydrogen Peroxide Antitrust Litig., 522 F.3d

at 321 (quotations omitted), or a "not fatally flawed" standard.  In re Initial Pub. Offerings Sec.

Litig., 471 F.3d at 42. Plausibility depends on the "ability to establish — whether through

mathematical models or further data or other means — the key logical steps behind [the] theory."

In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 25-26 (1st Cir. 2008).

   By way of illustration, Dr. Willig criticizes Dr. Rausser's common factor

regression model for looking at only a snapshot in time and therefore purportedly failing to

examine changes in freight rates over time.  See Willig Report ¶ 213.  Whether this purported

error discredits Dr. Rausser's common factor model is not a question that readily lends itself to

resolution by a preponderance of the evidence; indeed, such a standard has not been adopted by

any court and lacks intuitive force. See Oct. 6 Tr. at 20 (plaintiffs' counsel noting that "there has

been no direction by any circuit, let alone this district or the Supreme Court that applies an

evidentiary type standard to the assessment by the court as a whole of an expert report directed at

proof of impact or fact of damage and amount of damage"). Instead, applying the first prong of

the test set forth in In re Hydrogen Peroxide Antitrust Litig., the Court will evaluate whether this

purported error precludes a determination that Dr. Rausser's theory of proof is "plausible,"

Behrend v. Comcast Corp., 655 F.3d at 204 n.13; In re Hydrogen Peroxide Antitrust Litig.,

552 F.3d at 325, or "viable," In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d

at 25 (1st Cir. 2008); and that his regression analysis is "feasible," In re EPDM Antitrust Litig.,

256 F.R.D. at 96, or "workable." In re Amaranth Natural Gas Commodities Litig., 269 F.R.D.

366, 383 & n.118 (S.D.N.Y. 2010); see In re Ready-Mixed Concrete Antitrust Litig., 261 F.R.D.

154, 171 (S.D. Ind. 2009).[6]

If a court determines that the plaintiffs have established that their expert's theory

of proof is plausible and that their expert's regression analysis, if any, is workable, then the next

question for the court to resolve is whether the plaintiffs have established by a preponderance of

the evidence that the plausible theory and workable regression are "susceptible to proof at trial

through available evidence common to the class." In re Hydrogen Peroxide Antitrust Litig., 552

F.3d at 325; see Behrend v. Comcast Corp., 655 F.3d at 192-93. In assessing that question in this

---

[6]      Defendants use the terms "feasible" and "viable" in evaluating the issue of common impact. See Willig Report ¶ 11 (stating that defendants asked Dr. Willig to determine "whether it is *feasible* for plaintiffs to demonstrate through common proof that members of the proposed class suffered economic injury") (emphasis added); Defs. Wal-Mart Reply Brief at 1 (stating that the central question before the Court is whether plaintiffs have proffered "a *viable* classwide method for proving injury at trial") (emphasis added).

case, the Court will resolve all factual disputes bearing on Dr. Rausser's and Dr. Willig's

analyses — including what the parties refer to as subsidiary factual disputes underlying the

experts' opinions — by a preponderance of the evidence. See In re Hydrogen Peroxide Antitrust

Litig., 522 F.3d at 320-25; see Oct. 6 Tr. at 30-31. And ultimately, the Court will determine

which expert is correct, Dr. Rausser or Dr. Willig, on the question whether a workable regression

model can be used to establish by a preponderance of the evidence that impact can be proven at

trial with common evidence. See, e.g., Behrend v. Comcast Corp., 655 F.3d at 192-93; In re

Hydrogen Peroxide Antitrust Litig., 522 F.3d at 325; Cordes & Co. Fin. Servs., Inc. v. A.G.

Edwards & Sons, Inc., 502 F.3d at 107.

*     *     *     *

To summarize, the Court will resolve factual disputes relevant to Rule 23

requirements, and the Court will apply a preponderance of the evidence standard in examining

whether plaintiffs have satisfied each of the requirements of Rule 23. Accordingly, in order to

certify plaintiffs' putative class, the Court "must find that the evidence more likely than not

establishes each fact necessary to meet the requirements of Rule 23." In re Hydrogen Peroxide

Antitrust Litig., 552 F.3d at 320; see also Behrend v. Comcast Corp., 655 F.3d at 185 (plaintiffs

must establish by a preponderance of the evidence that they would be able to prove through

common evidence impact and a common methodology to quantify damages). As for the

predominance requirement of Rule 23(b)(3), in examining Dr. Rausser's conclusion that impact

can be established at trial with common evidence, the Court will determine whether Dr.

Rausser's theory of proof is plausible and whether his regression models are workable; and, if so,

38

whether plaintiffs have established by preponderance of the evidence that his theory and models are "susceptible to proof at trial through available evidence common to the class." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 325; see Behrend v. Comcast Corp., 655 F.3d at 192-93.

Defendants contend that there are numerous factual disputes between the parties and their experts that are relevant to whether plaintiffs have satisfied the predominance requirement of Rule 23(b)(3), and defendants further contend that Dr. Rausser's analysis is fatally flawed.  Defendants identify four principal factual disputes and assert that each one bears on whether impact can be proven at trial with common evidence: (1) whether rate-based fuel surcharges frequently were used before the class period, see Defs. Wal-Mart Brief at 5; (2) whether "legacy shippers" — that is, shippers who paid a rate-based fuel surcharge during the class period under a contract that was entered into before July 1, 2003 — would have continued paying fuel surcharges, even absent the alleged conspiracy, see id.; see also Defs. Supp. Brief at 17; (3) whether captive shippers — that is, those shippers served by only one railroad or those shippers with no viable transport alternatives to the railroad that serves it — would have paid fuel surcharges, even absent the alleged conspiracy, see Defs. Wal-Mart Brief at 6; Defs. Supp. Brief at 18 & n.10; and (4) whether some class members received concessions from a defendant on certain aspects of their rail transportation agreement in exchange for acceptance of the defendant's fuel surcharge.  See Defs. Wal-Mart Brief at 6; Defs. Supp. Brief at 19.  As defendants describe it, the Court's resolution of each of these factual disputes in plaintiffs' favor is a necessary condition for class certification; defendants contend that these disputes "must be resolved" in examining whether to certify plaintiffs' putative class. Defs. Wal-Mart Brief at 6; see Defs. Supp. Brief at 19-20.

The Court agrees with defendants that these factual disputes are relevant to Rule 23(b)(3)'s predominance requirement — primarily, whether plaintiffs can show that impact is capable of proof at trial through evidence that is common to the class. Regarding, for example, the issue of concessions, if shippers received concessions in the form of base rate discounts in exchange for the application of a fuel surcharge, then, as plaintiffs' expert himself acknowledges, the impact for those shippers "wouldn't have been common to others" who did not receive such discounts. 1st Rausser Dep. at 272; see also id. at 270 (Dr. Rausser, acknowledging that "any coordinated program that focuses just on a part of the pricing can be unwound or made far less effective if there is a change in the base pricing"). Going further, if the fuel surcharge applied to a shipper "was exactly offset by the base rate," then, as plaintiffs' expert states, "there would be no injury." 2d Rausser Dep. at 208.[7]

Defendants and their expert contend that some shippers included within plaintiffs' class were not harmed by the alleged conspiracy because they received contract concessions in the form of base rate discounts. And defendants say that determining which shippers received such discounts requires individualized evidence and analysis that precludes a finding that impact can be proven on a class-wide basis with common evidence. Plaintiffs and their expert disagree,

---

[7]     To be clear on terms, as discussed below, such an exact offset between a fuel surcharge and a base rate would mean that an individual plaintiff has no claim for damages, but not necessarily that that plaintiff was not injured by the defendants' alleged conspiracy. See, e.g., In re EPDM Antitrust Litig., 256 F.R.D. at 88 ("[I]t is possible for a plaintiff to suffer antitrust injury-in-fact and yet have no damages because it has taken steps to mitigate the actual price paid through rebates, discounts, and other non-price factors . . . . By expending resources to negotiate down from the supracompetitive prices established by the cartel, plaintiffs who have suffered no damages may still have suffered an injury-in-fact from the antitrust conspiracy. The fact that a plaintiff may have successfully employed bargaining power to fend off the *effect* of the conspiratorial practices does not mean that it has not been put in a worse position but-for the conspiracy.") (emphasis in original); see infra at 115-16.

arguing that there is no evidence of widespread discounting and any examples of discounting are anomalies that do not preclude a finding that impact can be proven on a class-wide basis with common evidence. Because this dispute is relevant to whether common evidence can be used to establish impact at trial, the Court must resolve it by a preponderance of the evidence — even though it plainly is an issue enmeshed in the factual and legal issues comprising the merits of plaintiffs' claim.

Although the Court agrees with defendants that it must resolve this (and other) factual disputes, the Court disagrees with defendants that the facts fall in their favor at this stage. As discussed below, the Court finds by a preponderance of the evidence that the fuel surcharge programs applied by defendants before the class period were nothing like the widespread application of defendants' more aggressive, standardized fuel surcharge programs during the class period; that these standardized fuel surcharges were applied uniformly, to all or virtually all class members; and that there is no evidence of widespread discounting of base rates in exchange for application of fuel surcharges, and that any such discounting in the record is an anomaly that does not preclude a finding of predominance. Furthermore, the Court credits Dr. Rausser's conclusion that impact and damages are capable of proof at trial with common evidence. The Court finds that Dr. Rausser's economic regression analysis is workable, and that he presents a theory of proof that is plausible and susceptible to proof at trial through available evidence common to the class.[8]

---

[8]     The findings set forth in this Opinion are made "only for purposes of class certification and [are] not binding on the trier of facts" on the merits at trial. In re Initial Pub. Offerings Sec. Litig., 471 F.3d at 41; see In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 318 (a court's findings "for the purpose of class certification are conclusive on that topic," but "do not bind the fact-finder on the merits"); see also Behrend v. Comcast Corp., 665 F.3d at 190. These findings therefore "'may be revised (or wholly rejected) by the ultimate factfinder[.]'" In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 318 n.19 (quoting Unger v. Amedisys Inc., 401 F.3d 316, 323 (5th Cir. 2005)).

## IV.  RULE 23(a) FINDINGS AND CONCLUSIONS

### A.  Two Implied Requirements

#### 1.  Class Definition

The first implied requirement of Rule 23(a) is that the class must be "sufficiently defined so as to be identifiable as a class." Vigus v. Southern Ill. Riverboat/Casino Cruises, Inc., 274 F.R.D. at 235; see also Johnson v. District of Columbia, 248 F.R.D. 46, 52 (D.D.C. 2008); Pigford v. Glickman, 182 F.R.D. 341, 346 (D.D.C. 1998). "The requirement that a class be clearly defined is designed primarily to help the trial court manage the class." Pigford v. Glickman, 182 F.R.D. at 346. This requirement "is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that 'the general outlines of the members of the class are determinable at the outset of the litigation.'" Id. (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1790, at 118). "In other words, the class must be sufficiently definite 'that it is administratively feasible for the court to determine whether a particular individual is a member.'" Id. (quoting 7A FEDERAL PRACTICE & PROCEDURE, supra, § 1760, at 121). A court therefore should deny class certification "where the class definitions are overly broad, amorphous, and vague, or whether the number of individualized determinations required to determine class membership becomes too administratively difficult." Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 269 (S.D. Fla. 2003); see also Johnson v. District of Columbia, 248 F.R.D. at 52.

In this case, plaintiffs seek certification of the following class:

All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from

one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").

Excluded from this Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities, and (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.

Class Mot. at 1.[9]

Defendants contend that plaintiffs' class definition "renders determining which shippers would actually be in the proposed class extremely difficult, if not impossible." Class Opp. at 75. According to defendants, there are two problems with plaintiffs' proposed class:

---

[9]    During the class certification motions hearing, the Court noted that the class definition proposed by plaintiffs in their motion papers is different from the class definition proposed by plaintiffs in their second consolidated amended complaint. See Oct. 7 Tr. at 331. Compare Class Mot. at 1, with 2d Am. Compl. ¶ 38. In view of some case law suggesting that a district court may be bound by the class definition set forth in a complaint, see Berlowitz v. Nob Hill Masonic Mgmt., Inc., Civil Action No. 96-1241, 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996); see also Brewer v. Salyer, Civil Action No. 06-1324, 2009 WL 2019923, at *3 (E.D. Cal. July 8, 2009), the Court directed two questions to the parties at the motions hearing: (1) How do the plaintiffs want the class defined?; and (2) Is there some obligation on the plaintiffs to move to amend their amended complaint to match the definition set forth in the class certification motion? See Oct. 7 Tr. at 331.

In response to the Court's two questions, the parties filed a joint submission regarding the class definition in which they agreed that a formal amendment to plaintiffs' complaint was "not necessary" and that the Court "may decide plaintiffs' motion for class certification based on the proposed class definition in the motion, and on the record before it." Joint Class Definition Submission at 1. In accordance with the parties' joint submission, the Court has decided plaintiffs' motion for class certification based on the proposed class definition in their motion, not the definition in their second consolidated amended complaint.

43

(1) there is no "[e]asy [w]ay" to determine whether freight traffic qualifies as rate-unregulated, id.; and (2) plaintiffs propose no method to identify shippers with "rebased" rates. Id. at 76.

As discussed, plaintiffs' proposed class is specifically limited to "rate-unregulated" traffic. Class Mot. at 1. Plaintiffs have defined the term "unregulated" as referring to "rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law." 2d Am. Compl. ¶ 1. Defendants contend that it is difficult to discern whether freight traffic moves under a regulated common carrier authority or, instead, under an unregulated contract. Class Opp. at 75. According to defendants, determining whether freight traffic is rate-regulated or rate-unregulated requires individualized inquiries viewed in light of the parties' intent. Id. Consequently, defendants contend that "[d]etermining class membership would require individualized inquiries, making class certification inappropriate." Id. at 76.

The Court disagrees with defendants. As plaintiffs point out, the STB ruling in 2007 distinguished between rate-regulated and rate-unregulated traffic, expressly stating that its ruling applied only to the former. See Class Reply at 39. Neither the STB nor defendants asserted that it was too difficult to determine which traffic the ruling covered. Id. Furthermore, in this case defendants have produced during discovery transaction data for rate-unregulated traffic without arguing that it was too difficult to determine which transaction data related to that type of traffic. Id. And finally, defendants' expert, Dr. Willig, has not claimed any difficulty in distinguishing between rate-regulated and rate-unregulated traffic. To the contrary, Dr. Willig was able to quantify both the amount of rate-unregulated traffic during the class period and the revenue it produced for defendants. See Willig Report ¶ 24 ("[S]hippers of unregulated traffic

44

with revenue-based FSCs[, that is, fuel surcharges, ]generated roughly 72 million carloads of rail

traffic during the class period and $110 billion in revenue for defendants. This reflects roughly

56 percent of defendants' total non-regulated traffic over this period. For the class period as a

whole, there were nearly 30,000 shippers of unregulated traffic with revenue-based FSCs[.]");

see also 1st Rausser Report at 89 (noting that "the data supplied by BNSF . . . records whether

the shipment was regulated or not"). Dr. Willig's report therefore belies defendants' claim that it

is too difficult to determine whether rail traffic qualifies as rate-unregulated.

Defendants' second argument focuses on plaintiffs' proposed inclusion of

shippers who paid "rebased" rates. As plaintiffs describe it, at some point during the alleged

conspiracy NS "engaged in something that has come to be known in this case as rebasing;

namely folding at least part of the fuel surcharge into the base rate." Oct. 6 Tr. at 133.

Defendants contend that plaintiffs "do not identify . . . shippers" who paid a rebased rate "or

propose any methodology for doing so." Class Opp. at 76. And in the absence of any viable

methodology, defendants contend that it is impossible to determine what shippers are in the class

due to rebasing. Id.

The Court disagrees with defendants. Plaintiffs assert that shippers who paid a

rebased rate simply paid a new base rate with a portion of the previous supra-competitive fuel

surcharge "bake[d]" in. Class Reply at 40 (citing HD Ex. 83, Lawson Dep. at 72); see Class Mot.

at 48. As Dr. Rausser explains it, NS' rebasing strategy "effectively made permanent a surcharge

based on a WTI of $64 by folding that amount into base rates, and supplemented that with a new

stand-alone fuel surcharge anytime the WTI exceeded $64." 1st Rausser Report at 117 n.250.

And Dr. Rausser has accounted for NS' alleged rebasing in his analysis. See id. ("As my analysis

considers the gross price it will not be affected by NS' change to their fuel surcharge program"

by means of rebased rates.); see also id. at 47 n.105 ("[M]ost shipments still received a fuel

surcharge on top of that new base rate[.]").

The Court therefore finds by a preponderance of the evidence that plaintiffs'

proposed class is defined so as "to establish that 'the general outlines of the membership of the

class are determinable at the outset of the litigation.'" Pigford v. Glickman, 182 F.R.D. at 346

(quoting 7A FEDERAL PRACTICE & PROCEDURE, supra, § 1790, at 118). Plaintiffs have satisfied

their burden of showing that "'it is administratively feasible for the court to determine whether a

particular individual is a member.'" Id. (quoting 7A FEDERAL PRACTICE & PROCEDURE, supra,

§ 1760, at 121).

## 2.  Named Representatives Within the Putative Class

The second implied requirement of Rule 23(a) is that the named representative

plaintiffs must "fall within the class." Vigus v. Southern Ill. Riverboat/Casino Cruises, Inc.,

274 F.R.D. at 235. Defendants appear to argue that some (or perhaps all) of the proposed

representatives are not part of the putative class. See Class Opp. at 80 (stating that "[a] class

cannot be certified where the proposed representatives would not be members of the class.").

The basis for that argument, however, is unclear, and the Court is not persuaded. Plaintiffs

assert, and defendants do not dispute, that during the class period each of the eight named

representatives directly purchased from one or more of the defendants rail freight services as to

which a fuel surcharge was applied. See Class Mem. at 1; id. at 58-60. Consequently, the Court

finds by a preponderance of the evidence that the second implied requirement of Rule 23(a) is

met: each of the named representative plaintiffs falls within the putative class.

46

## B. Four Express Requirements

### 1. Numerosity

The first express requirement of Rule 23(a) is numerosity: the putative class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "Typically, a class in excess of 40 members is sufficiently numerous to satisfy this requirement." Lindsay v. Government Emps. Ins. Co., 251 F.R.D. at 55. "Mere conjecture, without more, is insufficient to establish numerosity, but plaintiffs do not have to provide an exact number of putative class members in order to satisfy the numerosity requirement." Pigford v. Glickman, 182 F.R.D. at 347.

Plaintiffs assert that defendants' transaction data show that "tens of thousands of shippers" are included in the putative class. Class Mem. at 56. Defendants do not contest the numerosity requirement and themselves acknowledge that plaintiffs' putative class includes approximately 30,000 shippers. See, e.g., Oct. 7 Tr. at 258; see also Willig Report ¶ 24 ("For the class period as a whole, there were nearly 30,000 shippers of unregulated traffic with revenue-based FSCs[.]"). "When the class is large" — here, in the tens of thousands — "numbers alone are dispositive[.]" Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 306. The Court therefore finds that plaintiffs have satisfied their burden of showing by a preponderance of the evidence that the putative class "is so numerous that joinder of all members is impracticable[.]" FED. R. CIV. P. 23(a)(1).

2. Commonality

The second express requirement of Rule 23(a) is commonality: there must be "questions of law or fact common to the class[.]" FED. R. CIV. P. 23(a)(2). "Not every issue of law or fact [need] be the same for each member." Lindsay v. Government Emps. Ins. Co., 251 F.R.D. at 55 (quotations omitted) (alteration in original). "Rather, the commonality test is met when there is at least one issue . . . the resolution of which will affect all or a significant number of the putative class members." Id. (quotations omitted) (alteration in original).

Because the commonality requirement is satisfied "by a single common issue," courts have noted that it often is easily met. Taylor v. District of Columbia Water & Sewer Auth., 241 F.R.D. 33, 37 (D.D.C. 2007). But as the Supreme Court recently made clear, what matters for purposes of commonality "is not the raising of common questions — even in droves — but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2251 (quotations omitted).

In antitrust class actions, "numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement[.]" Meijer Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 300 (quotations omitted). As plaintiffs assert, and as defendants do not dispute, the question whether defendants engaged in a conspiracy — the first element of plaintiffs' claim — is an issue that is common to all class members because the answer to that question will focus exclusively on defendants' conduct. See Class Mem. at 57; see also Oct. 7 Tr. at 161 (defendants' counsel, acknowledging that "whether there was or was not a conspiracy

48

is in fact capable of common proof"). The Court therefore finds by a preponderance of the evidence that "there are questions of law or fact common to the class[.]" FED. R. CIV. P. 23(a)(2).

### 3. Typicality

The third express requirement of Rule 23(a) is typicality: "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class[.]" FED. R. CIV. P. 23(a)(3). Typicality is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented." Pigford v. Glickman, 182 F.R.D. at 349 (quotations omitted). "[I]f the class representative's claims arise from the same events, practice, or conduct, and are based on the same legal theory as those of other class members, the typicality requirement is satisfied." Lindsay v. Government Emps. Ins. Co., 251 F.R.D. at 55 (quotations omitted); see Pigford v. Glickman, 182 F.R.D. at 349.

"The facts and claims of each class member do not have to be identical to support a finding of typicality . . . , rather, the requirement goes to whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 301 (citation and quotations omitted)); see also Johnson v. District of Columbia, 248 F.R.D. at 53. "The requirement has been liberally construed by courts . . . [and] in the antitrust context, typicality will be established by plaintiffs and all class members alleging the

same antitrust violations by defendants." Meijer, Inc. v. Warner Chilcott Holdings Co. III,

246 F.R.D. at 301 (alternations in original) (quotations omitted).

Plaintiffs contend that the typicality requirement easily is satisfied in this case

because "all named Plaintiffs and all Class members seek overcharge damages pursuant to an

identical price-fixing claim under Section 1 of the Sherman Act." Class Mem. at 58. As

plaintiffs describe it, "[t]he claims of the named Plaintiffs and the absent Class members alike

arose out of the same course of events: Defendants' conspiracy to impose stand-alone, rate-based

Fuel Surcharges in order to raise shipping prices across the board." Id.

Defendants disagree. They argue that none of the eight proposed class

representatives is typical. See Class Opp. at 79. First, defendants argue that shippers that paid a

fuel surcharge before July 1, 2003 are not properly members of the class, and shippers that are

served by only one defendant can have no claim because there was no competition among

defendants for their business that could have been affected by the alleged conspiracy. See id.

According to defendants, this disqualifies all of the eight proposed class representatives. Id.

The Court finds defendants' arguments inapposite because the typicality

requirement focuses on the "*claims* of the representative, not the individual characteristics of the

[named] plaintiff[s]." Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 301

(quotations omitted) (emphasis added). The claims of the eight named plaintiffs and those of the

absentee class members arose from the same course of events: defendants' alleged conspiracy to

impose supra-competitive fuel surcharges across-the-board on all shippers. And the eight named

plaintiffs and the absentee class members seek the same relief: overcharge damages under

Section 1 of the Sherman Act.

Next, defendants target two of the named representatives, Dust Pro and Nystar, arguing that each one faces a disqualifying problem. As for Dust Pro, defendants argue that the shipper "generally did not pay for its shipments — it liquidated the business while owing a substantial debt to UP — and has no evidence that the dollar total of fuel surcharges it actually paid even approached the amount of its unpaid debt[.]" Class Opp. at 79 n.89. Defendants, however, cite no authority for their claim that Dust Pro's alleged "non-payment" should disqualify it as a class representative. Nor can the Court surmise any reason why Dust Pro should be disqualified.

Regarding Nystar, defendants argue that this named plaintiff should be disqualified because, according to defendants, it spoliated evidence. Class Opp. at 80-81. "The requirement that the proposed representatives not be subject to *unique defenses*" — which includes spoliation — "can be seen as an offshoot of the requirement that the representative have circumstances that are sufficiently similar to those of the class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 598 (3d Cir. 2009) (emphasis in original). Because Rule 23 requires that both the claims and the defenses be typical, a proposed class representative will not satisfy Rule 23(a)(3) "if the representative is subject to a unique defense that is likely to become a major focus of the litigation." Id. (quotations omitted); see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) ("[T]here is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.").

Spoliation of evidence constitutes a unique defense, and courts have concluded that in some circumstances defending against a charge of spoliation of evidence can render a

51

plaintiff an inadequate class representative. See, e.g., Falcon v. Philips Elecs. N. Am. Corp., 304

Fed. App'x 896, 897 (2d Cir. 2008) (district court did not abuse its discretion in concluding that

defending against a charge of spoliation rendered a plaintiff an inadequate class representative).

The presence of a unique defense, however, "will not . . . destroy typicality [unless it] will skew

the focus of the litigation and create a danger that absent class members will suffer if their

representative is preoccupied with defenses unique to it." Meijer, Inc. v. Warner Chilcott

Holdings Co. III, 246 F.R.D. at 302 (quotations omitted) (alteration in original). In this case, the

Court agrees with plaintiffs that at this stage the spoliation issue is hypothetical and speculative,

see Class Reply at 39, and the Court is satisfied that this alleged unique defense presents a

question of law and fact "that can readily be resolved by the Court without skewing the focus of

the litigation or creating a significant danger of distracting [plaintiffs'] ability to pursue the

interests of the absent class members." Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246

F.R.D. at 302 (quotations omitted).

   Finally, defendants argue that a "significant number" of putative class members'

contracts include broad arbitration clauses. See Class Opp. at 78. Defendants state that they

"intend, as they have a right to do, to rely on [those putative class members'] agreements to

arbitrate," which would include, according to defendants, the Sherman Act claim alleged in this

case. Id. at 78-79. Thus, defendants argue that shippers whose contracts include arbitration

provisions cannot pursue their claims in this Court and, as a result, cannot be part of the class

that plaintiffs seek to certify here. Id. at 79. And defendants assert that the Court should

consider these agreements to arbitrate — constituting, as defendants see it, affirmative defenses

— in making its class certification decision. Id. (citing Rodney v. Northwest Airlines, Inc.,

146 Fed. App'x 783, 786 (6th Cir. 2005). Defendants do not assert, however, that any of the

eight named plaintiffs have contracts containing arbitration clauses; nor do defendants assert that

they have initiated any arbitrations. See Class Reply at 40.

   While defendants do not suggest under what part of Rule 23 the Court should

consider their argument regarding arbitration, courts generally have considered the question of

defenses in the context of examining the typicality and commonality requirements of Rule 23(a),

as well as the predominance requirement of Rule 23(b)(3). See, e.g., In re Schering Plough Corp.

ERISA Litig., 589 F.3d at 598 (question of unique defenses is an offshoot of typicality

requirement); Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 327 (5th Cir. 2008) ("[T]he

predominance of individual issues necessary to decide an affirmative defense may preclude class

certification.") (quotations omitted); Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 438 (4th

Cir. 2003) ("[A]ffirmative defenses must be factored into the calculus of whether common issues

predominate."). Regardless of which part of Rule 23 applies, however, the Court concludes that

"the *possible* arbitration of some class members" does not, "by itself, defeat class certification."

Lerner v. Haimsohn, 126 F.R.D. 64, 66 (D. Colo. 1989) (emphasis added). Neither plaintiffs nor

defendants have initiated arbitration, and the Court concludes that defendants' assertion

regarding their "inten[t]" to initiate arbitration, Class Opp. at 78, is too speculative to defeat

predominance, much less commonality or typicality.

   The Court finds that the claims of the eight named class representatives arise from

the "same events, practice, or conduct, and are based on the same legal theory as those of other

class members." Lindsay v. Government Emps. Ins. Co., 251 F.R.D. at 55 (quotations omitted).

Consequently, plaintiffs have satisfied their burden of showing by a preponderance of the

evidence that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" FED. R. CIV. P. 23(a)(3).

### 4. Adequacy of Representation

The fourth and final express requirement of Rule 23(a) is adequacy. It requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Thus, this requirement "necessitates an inquiry into the adequacy of representation, including the quality of class counsel, any disparity of interest between class representatives and members of the class, communication between class counsel and the class and the overall context of the litigation." Pigford v. Glickman, 182 F.R.D. at 350. "A proposed representative is 'adequate' if (1) his interests do not conflict with those of other class members, and (2) he will vigorously prosecute the interests of the class through qualified counsel." Lindsay v. Government Emps. Ins. Co., 251 F.R.D. at 55.

Plaintiffs assert that the eight named representative plaintiffs have shown a willingness to step forward, incur substantial discovery burdens, and prosecute this case in the best interests of the members of the putative class. Class Mem. at 61. Furthermore, plaintiffs assert that there are no conflicts with the unnamed members of the class that would warrant denial of class certification. Id. Finally, plaintiffs contend that they have protected the interests of absent class members through the selection of qualified class counsel. As plaintiffs describe it, interim co-lead class counsel Quinn Emanuel and Hausfeld

> — firms that have extensive experience in both antitrust litigation in particular and class action litigation generally — have vigorously prosecuted this action, expending substantial time and resources in investigating the claims, overseeing the production

> and review of documents, taking and defending of depositions,
> working with experts, and briefing and arguing motions.

Id. at 62. Defendants present mostly the same arguments regarding adequacy as they did for

typicality. See Class Opp. at 79-80. For the reasons just discussed, see supra at 49-54, the Court

rejects them.

In addition, defendants argue that Donnelly Commodities, Inc. should be

disqualified because it filed for bankruptcy and is currently under the control of an appointed

trustee. Class Opp. at 81-82. According to defendants, when a class representative has filed for

bankruptcy under Chapter 7 and has had a trustee appointed, an "'inherent' conflict of interest

exists." Id. at 82 (quoting Dechert v. Cadle Co., 333 F.3d 801, 803 (7th Cir. 2003)). As

defendants see it, this is because of the trustee's "'dual role as class representative and creditors'

representative.'" Id. (quoting Dechert v. Cadle Co., 333 F.3d at 803). But the authority upon

which defendants rely for that proposition, Dechert v. Cadle Co., rejected a "flat rule that a

trustee in a bankruptcy . . . can never be a class representative." Dechert v. Cadle Co., 333 F.3d

at 803. And other courts have allowed such representation where, as here, "an additional

representative [is designated] to appear as plaintiff along with the Trustee[.]" Ernst & Ernst v.

U.S. Dist. Court for the S. Dist. of Tex., 457 F.2d 1399, 1400 (5th Cir. 1972). In this case, of

course, there are eight representative plaintiffs only one of which, Donnelly Commodities, Inc., is

under the control of a trustee in bankruptcy. The Court therefore sees no basis at this stage to

disqualify Donnelly Commodities, Inc. as a named representative.

Finally, as for the quality of class counsel, the Court agrees with plaintiffs'

undisputed assertion that they have protected the interests of absent class members through the

55

selection of class counsel. See Class Mem. at 62-63. As the Court previously has stated, the

firms Quinn Emanuel and Hausfeld both have sufficient resources and expertise to prosecute this

matter in the putative class' best interests. See Memorandum Op. & Order at 3, Mar. 13, 2009

[Dkt. No. 232]. As plaintiffs state:

> Quinn Emanuel and Hausfeld LLP have already demonstrated their
> ability to work well together, coordinate the efforts of the various
> other firms also representing plaintiffs in this multidistrict
> litigation, and generate work product at the highest professional
> levels. Together, these firms are extraordinarily well situated to
> assess how Plaintiffs' case will be presented at trial, and will be
> prepared to try this case should that be necessary.

Class Mem. at 63. Defendants do not disagree, and neither does this Court.[10]

The Court finds that plaintiffs have met their burden of showing by a

preponderance of the evidence that "the representative parties will fairly and adequately protect

the interests of the class," FED. R. CIV. P. 23(a)(4), because the interests of the eight named

representatives do not conflict with those of other class members, and because they will

vigorously prosecute the interests of the class through qualified counsel. Lindsay v. Government

Emps. Ins. Co., 251 F.R.D. at 55.


## V. RULE 23(b)(3) FINDINGS AND CONCLUSIONS

Because plaintiffs have satisfied all of the threshold Rule 23(a) requirements by a

preponderance of the evidence, the Court now must conduct a "rigorous analysis" of the

requirements of Rule 23(b)(3). See In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d at 611;

---

[10]     Under Rule 23(c)(1)(B) and (g), plaintiffs seek formal designation of Quinn
Emanuel and Hausfeld as co-lead class counsel. See Class Mot. at 2; Class Mem. at 62 n.219.
Upon consideration of the matters set forth in Rule 23(g), the Court will grant plaintiffs' request
and will designate these two firms as co-lead class counsel.

Madison v. Chalmette Refining, L.L.C., 637 F.3d 551, 554 (5th Cir. 2011); see also Wal-Mart

Stores, Inc. v. Dukes, 131 S. Ct. at 2551.  In examining whether plaintiffs have satisfied their

burden under Rule 23(b)(3), the Court has resolved the factual disputes between the parties and

their experts that are relevant to the requirements for class certification — even when such

resolution requires considerations enmeshed in the factual and legal issues comprising the

plaintiffs' claim on the merits — and the Court has applied a preponderance of the evidence

standard of proof in doing so.

### A. Predominance

Rule 23(b)(3) requires that the Court "find[] that the questions of law or fact

common to class members predominate over any questions affecting only individual members[.]"

FED. R. CIV. P. 23(b)(3).  As discussed, see supra at 25, in examining the predominance

requirement under Rule 23(b)(3), a court's rigorous analysis "'begins . . . with the elements of the

underlying cause of action.'" Messner v. Northshore Univ. HealthSystem, 669 F.3d at 815

(quoting Erica P. John Fund, Inc. v. Haliburton, Co., 131 S. Ct. at 2184).  The Court must

"scrutinz[e] plaintiffs' legal causes of action to determine whether they are suitable for resolution

on a classwide basis." McCarthy v. Kleindienst, 741 F.2d 1406, 1412 n.6 (D.C. Cir. 1984).  The

Court therefore examines "the elements of plaintiffs' claim through the prism of Rule 23 to

determine" whether plaintiffs have satisfied the predominance requirement.  In re Hydrogen

Peroxide Antitrust Litig., 552 F.3d at 311 (quotations omitted).  If proof of the essential elements

of the claim requires individual treatment, then common questions do not predominate and class

certification is "unsuitable." Id. (quotations omitted).

In this case, plaintiffs allege that defendants engaged in price fixing, in violation of Section 1 of the Sherman Act.  Thus, to prevail on the merits of their claim at trial, plaintiffs will have to prove three elements: (1) a violation of the antitrust laws — here, Section 1 of the Sherman Act; (2) individual impact resulting from that violation; and (3) measurable damages. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311.  At the class certification stage, plaintiffs' burden is different: plaintiffs must show by a preponderance of the evidence that the elements of their claim are "*capable of proof* at trial through evidence that is common to the class rather than individual to its members." Id. at 311-12 (emphasis added).

### 1.  Violation of Antitrust Law

Plaintiffs have alleged that defendants engaged in a horizontal price fixing conspiracy to coordinate their fuel surcharge programs in order to effect an overall supra-competitive total price increase on their customers, in violation of Section 1 of the Sherman Act.  See Am. Compl. ¶¶ 1-2.  A horizontal price fixing conspiracy, as alleged here, is a *per se* violation of the Sherman Act.  See, e.g., Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006); NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133-34 (1998); Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1334 (11th Cir. 2010).  And the parties agree that this element of plaintiffs' claim is capable of proof at trial through evidence that is common to the class.  See Class Mem. at 65-66; see Oct. 7 Tr. at 161 (defendants' counsel, acknowledging that "whether there was or was not a conspiracy is in fact capable of common proof, so that's really not at issue in the predominance analysis").  That is because plaintiffs' allegations of price fixing indisputably "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among

58

class members." In re Vitamins Antitrust Litig., 209 F.R.D. at 264; see Meijer, Inc. v. Warner

Chilcott Holdings Co. III, 246 F.R.D. at 308 (because alleged violation of the antitrust laws

"relates solely to Defendants' conduct . . . proof for [this] issue will not vary among class

members") (quotations omitted) (alteration in original). The Court therefore finds by a

preponderance of the evidence that the first element of plaintiffs' claim is capable of proof at trial

through evidence that is common to the class rather than individual to its members.

### 2.  Impact

In this case, as in many antitrust cases, the second element of plaintiffs' claim —

individual impact resulting from the alleged conspiratorial conduct (also referred to by the parties

as "injury") — is the central issue. See Oct. 6 Tr. at 9; Defs. Wal-Mart Reply Brief at 1 ("The

parties . . . agree that the central question here is whether Plaintiffs have met their burden . . . to

show that common questions predominate over individual ones, which in turn requires that they

proffer a viable classwide method for proving injury at trial."); see also In re Hydrogen Peroxide

Antitrust Litig., 552 F.3d at 311.

In examining whether impact is capable of common proof, it is important to note

at the outset that this element involves two distinct components: injury-in-fact; and antitrust

injury. See Bassett v. National Collegiate Athletic Ass'n, 528 F.3d 426, 434 (6th Cir. 2008)

("[A] private antitrust plaintiff, in addition to having to show injury-in-fact and proximate cause,

must allege, and eventually prove, antitrust injury.") (quotations omitted); Cordes & Co. Fin.

Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 106; see also In re Currency Conversion

Fee Antitrust Litig., 264 F.R.D. at 114; Mazanderan v. Independent Taxi Owners' Ass'n, Inc.,

700 F. Supp. 588, 590 (D.D.C. 1988) (discussing the "two-fold requirement of individual

economic injury to [a] plaintiff that is grounded in the antitrust laws"). These two components

pose "two distinct questions": injury-in-fact presents the "familiar factual question whether the

plaintiff has indeed suffered harm," whereas antitrust injury presents "the legal question whether

any such injury is the 'injury of the type the antitrust laws were intended to prevent and that

flows from that which makes defendants' acts unlawful.'" Cordes & Co. Fin. Servs., Inc. v. A.G.

Edwards & Sons, Inc., 502 F.3d at 106 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,

429 U.S. 477, 489 (1977)). Antitrust injury is injury to competition, not just injury to an

individual. Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 812 (D.C. Cir. 2001). And

the reason an antitrust plaintiff is required to prove antitrust injury is to ensure that a plaintiff can

recover "only if the loss stems from a competition-*reducing* aspect or effect of the defendant's

behavior." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (emphasis in

original).

     *1. Injury-in-fact.* The primary dispute in this case relates to the injury-in-fact

component of the impact element. The parties vigorously dispute whether injury-in-fact can be

established at trial with common evidence, and they have submitted expert reports by

distinguished economists that reach diametrically opposed conclusions. Plaintiffs contend that

they will prove injury-in-fact on a class-wide basis at trial "by showing that Defendants'

conspiracy caused the Class members to pay supra-competitive prices during the Class Period."

Class Mem. at 67. According to plaintiffs, the effect of defendants' alleged conspiracy was to

impose "on all Class members coordinated Fuel Surcharges that rose in lockstep and resulted in

across-the-board prices increases." Id. at 68.

Plaintiffs assert that they will show injury-in-fact "with public information, Defendants' documents, and witness testimony" — all of which, they contend, will be evidence that is common to the class.  Class Mem. at 70.  Specifically, plaintiffs assert that common evidence will show at trial that

■       Defendants intended to use their coordinated Fuel
        Surcharge programs not as a means solely to recover fuel
        costs, but as a means to raise revenues and profits.

■       Defendants[] intended their coordinated fuel surcharge
        programs to be applied across-the-board.

■       Defendants each, and in coordination with each other,
        undertook during the Class Period to monitor success in
        achieving broad application o[f] the Fuel Surcharges.

■       Defendants during the Class Period adopted policies
        precluding discounting to offset the Fuel Surcharges.

■       Defendants recognized in internal documents that during
        the Class Period, the Fuel Surcharges generated revenues
        by raising prices paid by the Class far beyond Defendants'
        actual fuel costs.

■       During the Class Period, the Fuel Surcharges were
        responsible in large part for very large increases in
        Defendants' revenues and profits.

Id. (citations omitted).

Plaintiffs further contend that the analysis of their expert, Dr. Gordon Rausser, confirms that injury-in-fact can be established at trial with common evidence and economic analysis.  See Class Mem. at 71.[11]  Dr. Rausser explains that he has examined the rail freight

----

[11]      Dr. Rausser provides a detailed discussion of his qualifications and background in his expert report.  See 1st Rausser Report at 1-2.  In summary, Dr. Rausser is the Robert Gordon Sproul Distinguished Professor at the University of California at Berkeley and the former Dean of that University's College of Natural Resources.  Class Mem. at 4 n.3.  Dr. Rausser's work

61

industry and concludes that certain structural factors make it so that "had a conspiracy occurred it would have succeeded in subjecting the Class to a common" injury-in-fact. 2d Rausser Report at 80; see 1st Rausser Report at 7-8. Furthermore, Dr. Rausser has developed two economic regression models and has analyzed 100 percent of defendants' transaction data during the alleged conspiracy. 2d Rausser Report at 91-92, 96. Dr. Rausser's regression analyses purportedly substantiate his theory of common proof, showing that

> ■ [Defendants] did implement a common rate increase across the Class through their use of the fuel surcharge applied as a percentage of base rates.

> ■ Common factors such as shipment weight, distance, route and commodity type, among others, predominate over individual factors in the determination of freight rates. These common factors can be measured using the Defendants' transaction data and used in a common analysis to identify and quantity the harm experienced by the Class.

> ■ Defendants' transaction data reveals that there was no material discounting of base rates to offset the fuel surcharges that were applied to shipments made by the Class. As a result, Class members commonly experienced price increases from the Defendants' actions irrespective of the commodity they were shipping. . . .

> ■ Class members paid significantly higher prices to Defendants for rail freight transportation during the Class Period than before and that these higher prices are not explainable by price determinants other than the conspiracy.

---

focuses on the subjects of economics, applied economics, econometrics, and statistics. See id. He has published more than 250 articles, books, and book chapters, and has written more than 100 commissioned papers, governmental reports, and work papers. Id. Dr. Rausser served as the Chief Economist to the Agency for International Development in Washington, D.C. from 1988 to 1990, and as a Senior Economist at the President's Council of Economic Advisors from 1986 to 1987. Id.

1st Rausser Report at 7-8.  Thus, according to Dr. Rausser, "[t]here was a common impact of

Defendants' alleged conspiracy on the Plaintiffs and the Class which can be demonstrated

through evidence and economic analysis common to the Class[.]"  1st Rausser Report at 4.

Defendants disagree that injury-in-fact can be proven at trial with common

evidence.  As defendants frame the issues, in order to demonstrate that plaintiffs' claims are

suited for class treatment

> Plaintiffs must prove . . . that they have a method of providing a
> common answer to each of the core questions each class member
> would have to answer had it brought its own claim: (i) *Did I pay a*
> *fuel surcharge (or higher fuel surcharge) because of the alleged*
> *conspiracy?* and (ii) *Did payment of a fuel surcharge cause me to*
> *pay more for shipping than it would have otherwise paid?*

Defs. Wal-Mart Brief at 2 (emphasis in original).  Defendants contend that the facts in this case

make clear that rate-based fuel surcharges were widely used before the start of the alleged

conspiracy; that the use of fuel surcharges was growing; and that even Dr. Rausser concedes that

some class members would have paid rate-based fuel surcharges absent the alleged conspiracy.

See id.  Given these proffered facts, among others, defendants conclude that neither plaintiffs nor

their expert "has offered any way to use common evidence to show that, absent the alleged

conspiracy, every shipper would have paid a lower fuel surcharge or none at all."  Id.  According

to defendants, plaintiffs therefore have failed to show that they have a common answer to the

first question quoted above.  Id.

As for the second question quoted above, defendants contend that it, too, cannot

be answered with common evidence.  According to defendants, the facts show that "many

shippers received contract concessions, including lower base rates than the railroads initially

offered, in exchange for accepting a fuel surcharge[.]" Defs. Wal-Mart Brief at 6. Because the

alleged conspiracy was only directed at a portion of the total price of shipping, defendants say

that any class member who obtained anything of value in exchange for accepting a fuel surcharge

may not have suffered injury-in-fact. See Class Opp. at 41. And in view of the purported

evidence that "some (but not all) shippers made trade-offs for fuel surcharges," id., defendants

contend that individualized issues predominate because "it is necessary to examine the

circumstances and negotiating history of each shipper to prove that it did not negotiate offsetting

savings and therefore pay a higher all-in price for shipping as a result of its having agreed to a

fuel surcharge." Defs. Wal-Mart Brief at 2.

   In support of their position that class certification is inappropriate in this case,

defendants have submitted the expert report of Dr. Robert Willig.[12] As Dr. Willig explains, he

was asked by defendants to address from an economic perspective "whether it is feasible for

plaintiffs to demonstrate through common proof that members of the proposed class suffered

economic injury"; "whether it is feasible to estimate each class member's damages on a

class-wide basis"; and "to evaluate the damage methodology proposed by Professor Rausser as

well as the analyses that support his conclusions." Willig Report ¶ 11.

---

  [12] Dr. Willig provides a detailed description of his qualifications and background in
his expert report. See Willig Report ¶¶ 1-6. In summary, Dr. Willig has been a Professor of
Economics and Public Affairs at Princeton University for over 30 years. Class Opp. at 6 n.2. He
has written 75 articles on economics and a book on competition and the theory of industrial
market structure. Id. His focus is on microeconomics, with particular specialization in industrial
organization, and he teaches courses on microeconomics, regulation, antitrust, and competition
policy. Id. Dr. Willig served as the Chief Economist in the Antitrust Division of the United
States Department of Justice from 1989 to 1991. Id. He also has done research and economic
analysis of the railroad industry, including testifying before the STB, and its predecessor, the
ICC, about issues affecting the industry. Id.

As for the issue of injury-in-fact, Dr. Willig's overall conclusion is that assessing injury-in-fact "requires an in-depth individualized inquiry into the circumstances of the particular shipper." Willig Report ¶ 15. In arriving at this conclusion, Dr. Willig makes six principal points:

- First, "[t]he fact that shippers paid FSCs [fuel surcharges] is not common evidence of class-wide impact or damages assessment." Willig Report at 13.

- Second, "[t]he levels of the FSCs paid by shippers provide no common evidence of class-wide impact or damages assessment." Id. at 14.

- Third, "[t]he processes by which FSCs were applied to shipper rates preclude common evidence of class-wide impact or damages assessment." Id. at 16.

- Fourth, "[a]ll-in rates varied widely and contradict the possibility of common evidence showing class-wide impact." Id. at 18.

- Fifth, "Professor Rausser's attempts to show that common evidence can establish class-wide impact and assessment of damages fail to support his conclusion." Id. at 22.

- Sixth, "[m]embers of the proposed class have conflicting economic interests." Id. at 28.

2. *Antitrust injury.* Although it was not initially apparent from defendants' papers that they also dispute whether antitrust injury can be established at trial with common evidence, see Class Opp. at 50-56 (seemingly equating antitrust injury with injury-in-fact arguments); see also Oct. 7 Tr. at 172, defendants' counsel stated at oral argument that defendants do argue that some class members — specifically, captive shippers — cannot suffer antitrust injury. See Oct. 7 Tr. at 171-73. As discussed, antitrust injury is "'injury of the type the

antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 106 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. at 489). As defendants see it, certain shippers in plaintiffs' putative class are "captive shippers," also referred to synonymously as "sole served" shippers. Oct. 6 Tr. at 30. Because of various factors, including geographic location, these shippers have "no option but to use a single railroad when it ships out of its place[.]" Oct. 7 Tr. at 172. Defendants contend that these captive shippers cannot as a matter of law suffer antitrust injury because they have "no reduction in competition" — having had no competition in the first place — "as a result of the alleged wrong." Id. And defendants argue that identifying such captive shippers requires individualized inquiry.

Plaintiffs disagree. Plaintiffs contend that defendants themselves, as well as defendants' expert, Dr. Willig, admit that captives shippers are subject to competitive pressures, see Oct. 7 Tr. at 304, and that Dr. Rausser's analysis confirms what defendants themselves have admitted. Id. at 304-05.

The Court first addressees two preliminary legal issues regarding the impact element: the number of uninjured class members sufficient to preclude a finding of predominance, and the "presumption" of common impact. The Court then examines the parties' and the experts' arguments regarding whether antitrust injury and injury-in-fact are capable of proof at trial through evidence that is common to the class.

66

### a.  Uninjured Class Members

The first preliminary legal issue regarding impact involves a dispute between the parties over the number of uninjured class members sufficient to preclude a finding of predominance.  Defendants contend that plaintiffs "must proffer a valid method for proving . . . injury to all or virtually all class members on a simultaneous, class-wide basis[.]"  Class Opp. at 26-27 (quotations omitted).  Defendants acknowledge that "[s]ome cases have suggested a more relaxed requirement in which inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class."  Id. at 27 n.39 (quotations omitted); see Oct. 7 Tr. at 258 (defendants' counsel, acknowledging that "the case law . . . is mixed on the issue of whether every single class member must be injured or whether there's some negligible number"); see also Kottaras v. Whole Foods Mkt., Inc., 2012 WL 259862, at *7-8 (discussing cases addressing number of uninjured class members sufficient to preclude a finding of predominance).  Defendants assert, however, that this "relaxed requirement" has not been adopted by the D.C. Circuit, and argue that, in any event, plaintiffs have failed to meet either standard in this case.  See Class Opp. at 27; Oct. 7 Tr. at 258

The Court concludes that defendants are incorrect about the legal standard for impact.  "Class certification is not precluded simply because a class may include persons who have not been injured by the defendants' conduct."  Mims v. Stewart Title Guar. Co., 590 F.3d 298, 308 (5th Cir. 2009) (citing Kohen v. Pacific Inv. Mgmt. Co., 571 F.3d 672, 677 (7th Cir. 2009).  As the Seventh Circuit stated in Kohen v. Pacific Investment Management Co.:

> [A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be

>  unknown, or if they are known still the facts bearing on their
>  claims may be unknown.  Such a possibility or indeed inevitability
>  does not preclude class certification[.]

Kohen v. Pacific Inv. Mgmt. Co., 571 F.3d at 677; see Messner v. Northshore Univ.

HealthSystem, 669 F.3d at 823 (citing and quoting Kohen v. Pacific Inv. Mgmt. Co., 571 F.3d

at 677).  Thus, the "inability to show injury as to a few does not defeat class certification where

the plaintiffs can show widespread injury to the class." Meijer, Inc. v. Warner Chilcott Holdings

Co. III, 246 F.R.D. at 310 (quotations omitted).  Only when it is apparent that "a great many

persons" have not been impacted should a court deny class certification.  Kohen v. Pacific Inv.

Mgmt. Co., 571 F.3d 677.  "There is no precise measure for 'a great many.'  Such

determinations are a matter of degree, and will turn on the facts as they appear from case to

case." Messner v. Northshore Univ. HealthSystem, 669 F.3d at 825 (quoting Kohen v. Pacific

Inv. Mgmt. Co., 571 F.3d at 677).

### b.  "Presumption" of Common Impact

The second preliminary legal issue involves what the partes refer to as a

"presumption" of common impact.  Class Mem. at 69; Class Opp. at 27 n.40.  "Some courts have

found a presumption of common impact in cases involving allegations of horizontal

price-fixing." In re Vitamins Antitrust Litig., 209 F.R.D. at 266 (citing e.g., In re Master Key

Antitrust Litig., 528 F.2d 5, 12, n.11 (2d Cir. 1975); In re Auction Houses Antitrust Litig.,

193 F.R.D. 162, 166 (S.D.N.Y. 2000)).  As the Third Circuit stated in Newton v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., "[i]n antitrust class actions, injury may be presumed when it is

clear the violation results in harm to the entire class." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 179 n.21 (3d Cir. 2001).

Plaintiffs contend that applying a presumption of common impact in this case would be warranted, because if "Plaintiffs prove that Defendants coordinated their Fuel Surcharge programs in an anticompetitive manner, then it would make basic economic sense to recognize that all Class members, all of whom paid Fuel Surcharges that were either imposed for the first time, or increased by the conspiracy, were impacted by the conspiracy." Class Mem. at 69-70. Plaintiffs, however, make clear that they "do not rest on such a presumption," asserting that they need not do so in view of the evidence in the record in support of their claim of common impact. Id.

Although several judges in this district have mentioned this presumption in passing, none actually has applied it. See, e.g., Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 308 n.16 (concluding that "[n]o . . . presumption is required . . . because [p]laintiffs have established that common proof will predominate over individual issues"). And as the Third Circuit more recently stated in In re Hydrogen Peroxide Antitrust Litig.: "Applying a presumption of impact based solely on an unadorned allegation of price-fixing would appear to conflict with the 2003 amendments to Rule 23, which emphasize the need for a careful, fact-based approach, informed, if necessary, by discovery." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 326. To the extent that any such presumption of common impact remains valid law, see id. at 327 (stating that district court, on remand, could consider whether presumption of common impact "is compatible with the record of th[e] case"), it appears to be

69

some sort of presumption-plus, requiring "some additional amount of empirical evidence." American Seed Co., Inc. v. Monsanto Co., 271 Fed. App'x 138, 141 (3d Cir. 2008).

The Court agrees with the reasoning set forth by the Third Circuit in In re Hydrogen Peroxide Antitrust Litig. and concludes that applying a presumption of impact based on an unadorned allegation of price fixing appears inconsistent with the rigorous analysis that must be performed in examining whether the requirements of Rule 23(b)(3) have been met. And whatever remains of any such presumption or presumption-plus under the law, the Court concludes that no presumption is required in this case, as plaintiffs themselves make clear that they do not rely on it. Nor do they need to.

### c.  Antitrust Injury

In order to establish antitrust injury, the legal component of the impact element, at trial, plaintiffs "must prove that the defendants engaged in an anti-competitive manipulation of the markets." In re EPDM Antitrust Litig., 256 F.R.D. at 87. In examining this legal component at the class certification stage, the Second Circuit held in Cordes & Co. Financial Services, Inc. v. A. G. Edwards & Sons, Inc. that the plaintiffs successfully established that antitrust injury was common to the class and predominated over individual questions because the plaintiffs alleged only one type of injury in the complaint: "overcharges paid to a horizontal price-fixing conspiracy." Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 107. As the Second Circuit stated in Cordes: "Because each class member allegedly suffered the same type of injury, the legal question of whether such an injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' . . . is a

common one." Id. (quoting Brunswick v. Pueblo Bowl-O-Mat, Inc., 429 U.S. at 489). As in

Cordes, the Court concludes that plaintiffs have satisfied the first part of the impact element by

showing that the legal question of antitrust injury is common to the class and predominates over

individual issues.

Plaintiffs have alleged only one type of injury in their second amended

consolidated complaint: that defendants' price fixing conspiracy imposed supra-competitive total

price increases on the putative class, in violation of Section 1 of the Sherman Act. See 2d Am.

Compl. ¶¶ 1-2; Class Mem. at 1. Plaintiffs contend that the type of supra-competitive

overcharges allegedly imposed in this case "clearly constitute antitrust injury." Class Mem.

at 65 n.221. Defendants disagree as to a subset of putative class members, arguing that so-called

captive shippers cannot suffer antitrust injury.

As defendants' counsel described it at oral argument, antitrust injury is the injury

that flows from the harm that the antitrust laws are intended to prevent, and the antitrust laws are

intended to prevent only a reduction in competition. See Oct. 7 Tr. at 172-73. Consequently, if

there is "no competition in the first instance for a customer's business, that customer cannot

suffer antitrust injury." Id. at 173. Defendants and Dr. Willig contend that shippers served by

only one railroad do not benefit from rail-to-rail competition, and, as a result,

> the railroad serving such a shipper would be expected to attempt to
> extract the maximum possible rate given the shipper's non-rail
> alternatives and the value the shipper derives from rail service. A
> conspiracy among railroads does not enable the serving railroad to
> extract more than the maximum rates from such a shipper. For
> shippers served by only one railroad, any attempt by the serving
> railroad to impose an FSC that is not desired by that shipper would
> be expected to require that the railroad make a concession with
> respect to base rate or another dimension of contract.

71

Willig Report ¶ 132. Dr. Willig contends that any claim that captive shippers enjoy competition "is contradicted by the well-recognized fact that 'captive' shippers experience higher prices than shippers that face head-to-head rail competition." Id. ¶ 135.

The antitrust laws were enacted for "'the protection of *competition*[.]'" Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d at 812 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. at 488) (emphasis in original). Defendants therefore are correct that "where there [is] no competition, there [is] no antitrust injury." City of Pittsburgh v. West Penn Power Comp., 147 F.3d 256, 266-67 (3d Cir. 1998). In other words, "[w]ithout demonstrating that there was competition, a plaintiff cannot show that the defendants' actions have had or will have anticompetitive effects." Id. (citing Continental Cablevision of Ohio, Inc. v. American Elec. Power Co., 715 F.2d 1115, 1119-20 (6th Cir. 1983); see also In re Tobacco/Governmental Health Care Costs Litig., 83 F. Supp. 2d 125, 134-35 (D.D.C. 1999) ("The antitrust laws were not intended to prevent losses that result from increased competition but those resulting from activity that may tend to lessen competition. . . . The reason an antitrust plaintiff is required to plead antitrust injury is to assure that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.") (quotations omitted) (alteration and emphasis in original).

The Court, however, disagrees with defendants and Dr. Willig that captive shippers are not subject to competitive forces — a claim that is contradicted by the statements of defendants' own executives. NS' chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a

facility, there are market factors at play." Corrected HD Ex. 36, Written Statement of Charles W.

Moorman, at 16, Sept. 20, 2007. Similarly, UP's chief executive officer, James Young, agreed

that railroads place "competitive constraints" on each other, even in the case of captive shippers.

HD Ex. 66, Young Dep. at 201. And CSX has acknowledged in internal documents that

"[s]tudies have shown that, in aggregate, captive shippers don't pay higher prices than

non-captive shippers," and that "CSX[] sets prices based on all competitive factors." HD Ex. 37,

CSX Talking Points Response to Escalation Resource - Fuel Surcharge Alert,

at CSXFSC000153187.

      That captive shippers enjoy competition is further reflected by the experience of

one of the named plaintiffs in this case before and during the class period. U.S. Magnesium has

an operating facility outside of Salt Lake City, Utah. As plaintiffs' counsel stated at oral

argument, that plant is truly captive — "[t]here is . . . a single rail line coming up to the plant,

which is owned by [UP]." Oct. 6 Tr. at 92-93. In December 2002, before the class period, U.S.

Magnesium *negotiated out* of the application of a fuel surcharge. See RD Ex. 10, at USM005647

(UP proposing to U.S. Magnesium a 4 percent increase on all rates and application of a fuel

surcharge, but ultimately agreeing to a 4 percent across the board increase without a fuel

surcharge). But one year later, during the period when plaintiffs say that defendants were

conspiring to impose fuel surcharges uniformly as to all shippers, the application of a fuel

surcharge was "mandate[d] by UP management[.]" RD Ex. 72, at USM005663.

      Moreover, defendants' executives expressly have denied in their depositions taken

in this case that they would have tried to impose more aggressive programs on captive shippers

than they were able to impose on non-captive shippers. BNSF's chief executive officer, Matthew

K. Rose, stated that BNSF had never considered having a higher or more onerous fuel surcharge

for captive shippers, and that such an approach would "violate [BNSF] principle." HD Ex. 72,

Rose Dep. at 232. UP's chief financial officer, Robert Knight, Jr., acknowledged that he was

unaware of any discussions on the topic of having separate fuel surcharge programs for captive

shippers. HD Ex. 70, Knight Dep. at 64. These statements are consistent with Dr. Rausser's

analysis and conclusion, which the Court finds persuasive, that defendants' transaction data show

that "so-called captive shippers paid the same Fuel Surcharge as others" during the class period.

2d Rausser Report at 23.

       The Court therefore finds by a preponderance of the evidence that railroads are

affected by competitive constraints that apply to both captive and non-captive shippers, and that

plaintiffs have satisfied the first part of the impact element for all putative class members,

including captive shippers, by showing that the legal question of antitrust injury is common to

the class and predominates over individual issues. See Cordes & Co. Fin. Servs., Inc. v. A.G.

Edwards & Sons, Inc., 502 F.3d at 107.[13]

---

[13]    The Seventh Circuit's decision in Messner v. Northshore University
HealthSystem suggests that defendants' argument regarding captive shippers and antitrust injury
is more appropriately categorized as an argument that "the class for which certification is
requested is fatally overbroad because it contains members who could not have been harmed[.]"
Messner v. Northshore Univ. HealthSystem, 669 F.3d at 824. As the court in Messner explained:
"[I]f a proposed class consists largely (or entirely, for that matter) of members *who are ultimately
shown to have suffered no harm*, that may not mean that the class was improperly certified but
only that the class failed to meet its burden of proof on the merits. . . . If, however, a class is
defined so broadly as to include a great number of members *who for some reason could not have
been harmed* by the defendant's allegedly unlawful conduct, the class is defined too broadly to
permit certification." Id. (emphasis added). As the Court has found, however, plaintiffs have
shown by a preponderance of the evidence that railroads are affected by competitive constraints
applying to both captive and non-captive shippers. Thus, the Court concludes that the class is not
defined so broadly as to include a great number of members who "could not have been harmed"
by defendants' allegedly unlawful conduct. Id.

### d.  Injury-In-Fact

The Court now addresses whether injury-in-fact is capable of proof at trial with evidence common to the class rather than individual to its members.  See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311-12.  The Court finds by a preponderance of the evidence that it is.

"It is a basic tenet of antitrust law that a cause of action will not lie if the plaintiff has not been harmed."  Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 92 (3d Cir. 2011).  Thus, in order to prevail at trial on their Sherman Act claim plaintiffs must prove not only an antitrust violation — here, that defendants' conspired on their fuel surcharge programs — but also a "causal link between the violation and an injury to . . . business or property."  Federal Prescription Serv., Inc. v. American Pharm. Ass'n, 663 F.2d 253, 268 (D.C. Cir. 1981); see Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 485 (5th Cir. 2000) ("[T]he fact of damages . . . means that the antitrust violation must cause injury to the antitrust plaintiff.") (quotations omitted); see also Hecht v. Pro-Football, Inc., 570 F.2d 982, 987 (D.C. Cir. 1977) ("[T]he plaintiff must show both an *injury-in-fact* to his business or property and a *causal connection* between that injury and the defendant's allegedly illegal acts.") (emphasis in original) (quotations omitted).  Plaintiffs "need not exhaust all possible alternative sources of injury in fulfilling [their] burden of proving compensable injury under" the antitrust laws, but they must show that the antitrust violation was a "material cause of the injury[.]"  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969).

If plaintiffs would have suffered the same injury absent a conspiracy, then plaintiffs will fail on the merits of their claim.  See Federal Prescription Serv., Inc. v. American

75

Pharm. Ass'n, 663 F.2d at 268.  Put another way, if the same alleged injury would have been caused by independent, non-conspiratorial forces, then no causal link exists between the alleged antitrust violation and the injury.  And if individualized inquiry is necessary to make such a determination on causation, then plaintiffs will have failed to show that common questions predominate as to injury-in-fact.  See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d at 25 ("Plaintiffs cannot make their case without common proof of causation[.]"); see also Kottaras v. Whole Foods Mkt., Inc., 2012 WL 259862, at *7.

This causation question — whether an antitrust violation was a material cause of an injury — commonly is assessed by reference to what the parties and their experts refer to as the but-for world.  See In re EPDM Antitrust Litig., 256 F.R.D. at 88 ("[G]enerally speaking, antitrust injury-in-fact and damages are often determined by comparing the 'but-for' price — the price a customer would have paid in the absence of the conspiracy — and the actual price paid.").  This hypothetical construct is a world that is "free of the restraints and conduct alleged to be anticompetitive."  Blades v. Monsanto Co., 400 F.3d 562, 569 (8th Cir. 2005); see Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d at 107; Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000).  One way of showing that common questions predominate on the issue of injury-in-fact

> is to show that there is a common method for proving that the class plaintiffs paid higher actual prices than in the but-for world, such as using an economic regression model incorporating a variety of factors to demonstrate that a conspiracy variable was at work during the class period, raising prices above the but-for level for all plaintiffs.

In re EPDM Antitrust Litig., 256 F.R.D. at 88.  And this precisely is what plaintiffs have attempted to do through their expert, Dr. Rausser.

Comparing but-for prices with actual transaction prices by regression analysis, however, is "not the *only* way for plaintiffs to succeed in a motion for class certification."  In re EPDM Antitrust Litig., 256 F.R.D. at 88 (emphasis in original).  Other accepted types of evidence for establishing class-wide injury-in-fact include: evidence of lock-step increases of national price lists, see id.; proof that defendants conspired to maintain an inflated base price from which all negotiations began, see id. at 89; and evidence of structural factors that make an industry susceptible to successful collusion.  See id. at 91-93; see also Behrend v. Comcast Corp., 655 F.3d at 199.  Ultimately, the question is whether plaintiffs have shown by a preponderance of the evidence — through regressions, structural industry factors, or any other persuasive means — that "methods of common proof exist to show class-wide impact[.]"  In re EPDM Antitrust Litig., 256 F.R.D. at 88; see In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d at 25-26.

The alleged antitrust violation in this case is a conspiratorial agreement to impose supra-competitive fuel surcharges — a component of the total price of a freight shipment — as a percentage multiplier of the base rate of transportation as a means to impose supra-competitive price increases on the putative class.  See Class Mem. at 1; Am. Compl. ¶¶ 1-2.  Plaintiffs do not allege that defendants conspired to fix each base rate separately, see 1st Rausser Dep. at 98 ("*Q.* . . . There is no agreement to raise the base; right?  *A.* Yes.  *Q.* So all of the injury comes from the fuel surcharge; right?  *A.* Ultimately, yes."), which, Dr. Rausser explains, "would have been extremely complex, highly costly and effectively unmanageable."  1st Rausser Rep. at 52 n.118.

77

Because the alleged antitrust violation involves only a component of the total price, at trial plaintiffs will be required to prove in fact (1) that they paid a fuel surcharge because of the alleged conspiracy and (2) that, as a result, they paid more for shipping than they otherwise would have paid.  And in order to prevail at the class certification stage, plaintiffs now must show by a preponderance of the evidence that common proof can be used to answer the questions (1) whether class members paid a fuel surcharge because of the alleged conspiracy; and, if so, (2) whether payment of that fuel surcharge caused class members to pay more for shipping than they otherwise would have paid.

Plaintiffs contend that they have met their burden.  They assert that they will prove injury-in-fact at trial with public information, defendants' own documents, and witness testimony, all of which will be common to the class.  See Class Mem. at 70-71.  Plaintiffs further assert that Dr. Rausser's expert report confirms through economic regression analysis that injury-in-fact is capable of common proof at trial.  See id. at 71-75.

Defendants and Dr. Willig disagree that common evidence can be used to establish injury-in-fact at trial.  See Class Opp. at 28-56.  As for Dr. Rausser's economic regressions, defendants and Dr. Willig argue that Dr. Rausser's analysis is "fatally flawed."  Id. at 50.  Defendants do not "quibble with the notion . . . that regression analysis can in many cases provide a basis for certifying a class."  Oct. 7 Tr. at 263.  But defendants maintain that Dr. Rausser's regressions and analysis suffer from methodological failures that render his conclusions unreliable, see Class Opp. at 62-72, ultimately invalidating his report altogether.  Id. at 72.

The Court concludes that plaintiffs have satisfied their burden at this stage. It finds by a preponderance of the evidence that injury-in-fact is capable of proof at trial through evidence that is common to the class rather than individual to its members.

i. Payment of an allegedly conspiratorial fuel surcharge

Defendants argue that individualized analysis is required to determine whether class members would have paid a fuel surcharge but for the conspiracy. See Class Opp. at 28. As defendants see it, plaintiffs have failed to offer any methodology by which they can show with common proof that class members would not have paid a fuel surcharge in the but-for world — that is, the non-conspiratorial world. See id.

First, defendants assert that they had considerable ability and incentive to adopt fuel surcharges entirely independent of any conspiracy. See Class Opp. at 30. In support of this claim, defendants point to the purported trend toward increased use of fuel surcharges before the alleged conspiracy, and then contend that it is implausible that this trend would have stopped in the but-for world. See id. at 30-31. Specifically, defendants assert that fuel surcharges were "widely used" before the start of the conspiracy, with nearly 60 percent of shippers paying a rate-based fuel surcharge as of June 2003, id. at 31 (citing Willig Report ¶ 77); that there was "a strong trend toward increasing use of fuel surcharges before the start of the alleged conspiracy," id. at 32, and that it is "implausible to suggest that this trend would have come to a screeching halt in mid-2003," id. at 33; and that the use of fuel surcharges did not accelerate after the start of the alleged conspiracy — "on the contrary . . . , the growth rate actually *slowed* after July 2003 for every defendant." Id. at 34 (emphasis in original).

Dr. Willig points out that there are legitimate economic rationales for the use of fuel surcharges because they can enhance economic efficiency.  See Willig Report ¶¶ 65-68.  As Dr. Willig explains:

> The use of FSCs in many industries expanded in the early 2000s in response to increases in both the levels and the volatility of fuel prices.  Over the alleged conspiracy period, fuel costs became an increasingly large component of rail costs. . . .
>
> FSCs were adopted in the rail industry due in part to dissatisfaction with the RCAF index, which lags behind changes in fuel prices, resulting in delays in cost recovery when fuel prices are rising.

Willig Report ¶¶ 65-66.  Thus, in view of the purported evidence showing a trend toward the increasing use of fuel surcharges and the legitimate rationales for their use, defendants conclude that there is no basis upon which the Court can conclude "that all or most of the members of the purported class would not have paid fuel surcharges absent the alleged conspiracy."  Id. at 35.

Second, defendants argue that plaintiffs face an even higher hurdle for a large group of shippers in plaintiffs' putative class, 55 to 68 percent of the class, that were already paying fuel surcharges before July 2003 — a group referred to by the parties as legacy shippers. See Class Opp. at 35.  As defendants note, plaintiffs have excluded some legacy shippers from the class definition.  See id.  Specifically, plaintiffs have excluded from their putative class those shippers that paid a fuel surcharge during the conspiracy period "solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract."  Class Mot. at 1.  If, however, a legacy shipper entered into a new contract during the class period that included a fuel surcharge, that shipper then is included in plaintiffs' class

because it would not have paid a fuel surcharge "*solely* pursuant to a railroad-shipper contract

that was . . . entered into before July 1, 2003[.]" Class Mot. at 1 (emphasis added); <u>see</u> Class

Opp. at 35-36. And defendants contend that this "narrow legacy exclusion," Class Opp. at 35,

presents a significant causation problem illustrated by the following example:

> Consider a shipper that entered into a contract running from
> January 2002 through December 2003 that contained a fuel
> surcharge. If such a shipper entered into a new contract in January
> 2004 that also contained a fuel surcharge, it would fall within
> Plaintiffs' class definition because the fuel surcharge was not
> "solely" in the pre-conspiracy contract. But, proof of causation for
> such a shipper is problematic at best. The fact that the shipper had
> a fuel surcharge when Defendants were concededly acting
> independently makes it extremely likely that a fuel surcharge
> would have been included in its January 2004 contract, regardless
> of any alleged conspiracy to expand fuel surcharge coverage.
> Certainly one cannot presume that all such shippers would have
> avoided fuel surcharges thereafter.

<u>Id</u>. at 36.

Third, defendants argue that any attempt to distinguish class members that had a

fuel surcharge only because of the alleged conspiracy from those that would have been subject to

one anyway necessarily would require individualized analysis. <u>See</u> Class Opp. at 36-39.

According to defendants, many factors influence not only whether a customer would pay a fuel

surcharge in the but-for world but also the level of that surcharge. <u>Id</u>. at 37. Defendants contend

that these factors include: customers served by only one railroad (captive shippers); customer

history of purchasing rail freight; existence of capacity constraints; customers whose primary

freight alternative was truck; and customer receptivity to fuel surcharges. <u>See id</u>. at 37-39.

Defendants contend that these factors show that individualized analysis is required to determine

injury-in-fact at trial. <u>See id</u>. at 36-37.

Plaintiffs disagree with defendants and make three principal points in response. First, plaintiffs argue that defendants have incorrectly lumped fuel surcharges before the conspiracy with the uniform, standardized, and supra-competitive fuel surcharges imposed during the conspiracy. According to plaintiffs, the fuel surcharges imposed during the conspiracy period were "different both in design and application from those that came before." Class Reply at 7. Second, plaintiffs argue that evidence common to the class contradicts defendants' claim that the same fuel surcharges imposed during the conspiracy would have been imposed in the but-for world. And third, relying on the economic regression analysis conducted by Dr. Rausser, plaintiffs contend that evidence common to the class refutes defendants' claim that any individualized factors predominate. See Class Reply at 6-16.

As for plaintiffs' first point, they contend that "[m]ost of defendants' arguments and Dr. Willig's analysis are built on a faulty assumption: that the FSCs used by Defendants before and during the conspiracy were the same." Class Reply at 7. Plaintiffs assert, however, that the allegedly conspiratorial fuel surcharges put in place in the spring of 2003 were

> different both in design and application from those that came
> before. . . . [T]hese new FSCs (i) got Defendants in lockstep in
> calculating the percentage based on fuel indexes; (ii) used a trigger
> equal to about $23 per barrel, rather than the higher $28 per barrel
> (or higher) that several Defendants had previously used; and
> (iii) adjusted the FSC based on the 30-day average fuel price, rather
> than, as in several Defendants' earlier programs, only when the
> trigger was exceeded for 30 (or more) consecutive days.

Class Reply at 7. For this argument, plaintiffs rely on the testimony of defendants' own employees who repeatedly have admitted in depositions that the new fuel surcharges imposed during the class period were "not the same as, were more aggressive than, and definitely yielded

more revenue" than fuel surcharge programs applied before the alleged conspiracy. Id. at 7 & n.16 (quotations omitted).  Moreover, plaintiffs say that these new, standardized, more aggressive fuel surcharges were uniformly applied, with the express goal of 100 percent coverage. Id. at 1; see id. at 9-10.  In contrast, fuel surcharge programs applied before the conspiracy in some contracts were only "theoretically billable, in that they often were not triggered or applied, and when they were, they were small." Id. at 8 (quotations omitted).

Regarding their second point, plaintiffs dispute defendants' view of the but-for world, arguing that it fails to acknowledge actual facts, established with evidence common to the class, that defendants needed to conspire to surmount obstacles to widespread application of uncoordinated fuel surcharges.  As plaintiffs see it, before the conspiracy, defendants were frustrated by the structural decline in rail freight rates and their inability to raise prices due to "destructive pricing for rail share." Class Reply at 10 (quotations omitted).  According to plaintiffs, defendants were unable to use fuel surcharges as an effective revenue generator because of competition among the defendants, customer resistance, and the frequent use of the RCAF index. Id.  Consequently, plaintiffs argue that defendants' experience with "theoretical and insignificant FSCs before the Class Period cannot be extrapolated to the Class Period because, among other reasons, increased customer resistance would be expected as the FSCs were triggered with rising fuel prices, and as Defendants sought to lower the trigger thresholds and implement more aggressive FSC programs." Class Reply at 11-12 (quotations omitted).

Regarding their third point, plaintiffs contend that Dr. Rausser's regressions — now based on an analysis of 100 percent of defendants' transaction data, see 2d Rausser Report at 12; Class Reply at 38 — refute defendants' and Dr. Willig's assertion that individualized

factors predominate. See Class Reply at 12. According to plaintiffs, Dr. Rausser has used

economic analysis to show that workable formulas, common to the putative class, are available to

"prove the conspiracy's impact on the class — a 'structural break in the relationship between fuel

prices and freight rates,' a surge in rates attributable to the conspiracy, and significant

overcharges in comparison to prices that would have prevailed absent the conspiracy[.]" Id. at 1

(quoting 1st Rausser Report at 120, 122-23).

   As plaintiffs describe it, Dr. Rausser's analysis confirms that overall freight prices

are based on seven factors that are common to all shipments, including, among other factors,

shipment weight, distance, route, and commodity type; and that these seven factors can be

measured using defendants' transaction data and can be used in a common analysis to identify

and quantify the injury experienced by the class. 1st Rausser Report at 7. Dr. Rausser's

regression analysis takes into account the factors that influenced defendants' prices during the

class period compared with benchmark prices during the three preceding years — a time period

in which Dr. Rausser concludes that defendants "acted as an interdependent oligopoly unaffected

by the type of collusion that determined prices during the Class Period." 1st Rausser Report

at 113. Upon an analysis of defendants' transaction data, Dr. Rausser identified a "structural

break in the relationship between freight rates and fuel prices around 2003, which is consistent

with a conspiracy using Fuel Surcharges to raise freight rates." 2d Rausser Report at 92. In other

words, Dr. Rausser's analysis shows that, before the alleged conspiracy, "there was a relationship

between fuel costs and overall prices that was dramatically changed once the [alleged] conspiracy

went into effect." Oct. 6 Tr. at 139; see id. (stating that, before the alleged conspiracy, "if fuel

prices went up by a certain amount, it would have a certain effect . . . on rail freight prices

overall; and after the [alleged] conspiracy, if fuel prices went up, it had a much bigger effect on the overall price"). Plaintiffs therefore contend that Dr. Rausser's analysis shows that members of the class paid artificially higher prices as a result of the conspiracy and were injured-in-fact by the antitrust violation. See Class Mem. at 47.

The Court agrees with plaintiffs and finds that they have shown by a preponderance of the evidence that common evidence can be used at trial to answer the question whether class members paid the allegedly conspiratorial fuel surcharges because of the alleged conspiracy:

*1. Fuel surcharges during the class period — aggressive, standardized, and uniform.* The Court is unpersuaded by defendants' and Dr. Willig's attempt to link fuel surcharges that were in place before the alleged conspiracy to those applied during the alleged conspiracy. Defendants place significant weight on their conclusion that their transaction data show that "almost 60% of Defendants' customers, including all eight of the named Plaintiffs, paid rate-based fuel surcharges *before* the conspiracy began." Class Opp. at 2 (emphasis in original). And, according to defendants, Dr. Rausser's admission during his deposition that he would have expected each defendant to impose fuel surcharges as broadly as possible even absent the conspiracy is particularly damning. See id. (citing 1st Rausser Dep. at 281). But as plaintiffs and their expert make clear, their antitrust claim in this case is not a conspiracy to impose just *any* fuel surcharge; rather, plaintiffs claim that defendants agreed to increase total prices "by widespread application and enforcement of coordinated, and aggressive, fuel surcharges." Pls. Wal-Mart Reply Brief at 7 n.11; see also 1st Rausser Dep. at 94; 2d Rausser Dep. at 119-21.

85

The Court finds by a preponderance of the evidence that the fuel surcharge programs applied before the class period were nothing like the widespread and uniform application of standardized fuel surcharges during the class period. Before the alleged conspiracy, defendants' differentiated fuel surcharges were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically. Furthermore, these pre-class period fuel surcharges were only "theoretically billable." HD Ex. 65, Glennon Dep. at 26 (manager of NS pricing systems (now retired) acknowledging that before the class period "the fuel surcharge was theoretically billable, so I would say that . . . customers might not resist it as much"). That is, these pre-class period fuel surcharges often were not triggered or applied, and when they were they were small. See HD Ex. 66, Young Dep. at 24-25 (UP chief executive officer stating that before the class period "[w]e had fuel surge (sic) programs in many contracts, but because fuel had not run up, they were never implemented"); id. at 28 (agreeing that fuel surcharges triggered "during the 2000 through 2002 time period never reached significant percentage levels"); HD Ex. 70, Knight Dep. at 24 (UP chief financial officer stating that during the 2000 through 2002 time period UP did not have a company-wide policy on fuel surcharges: "[t]here were some isolated situations where there were surcharges, but . . . no policy position"); HD Ex. 68, Lanigan Dep. at 27 (BNSF executive vice president and chief marketing officer stating that BNSF's fuel surcharge participation rates in January 2003 were "low," in the "25 to 30 percent rage"); HD Ex. 69, Gooden Dep. at 101 (CSX executive vice president of sales and marketing agreeing that the "fuel surcharge revenue [CSX] was generating prior to adoption of this new program in March of 2003" was "[l]ow — relatively low to where it

86

needed to be"); HD Ex. 71, McNulty Dep. at 118-19 (CSX director of marketing, agricultural products discussing "fairly minimal" fuel surchargers in 2001 and 2002).

The fuel surcharges that defendants put in place in the spring of 2003 were of a different breed. See Class Reply at 7 (fuel surcharges were different "both in design and application from those that came before"). The evidence shows that defendants employed these fuel surcharges in lockstep, lowered the trigger price for the imposition of the fuel surcharge, and adjusted the fuel surcharge based on the 30-day average fuel price rather than only when the trigger was exceeded for 30 (or more) consecutive days. See 1st Rausser Report at 54-60. Defendants' own executives admitted that the new fuel surcharge programs applied by the defendants during the class period were different — that is, they were more aggressive and yielded more revenue than earlier programs. For example, UP's chief executive officer, James Young, testified that compared to the pre-2003 time period,

> the impact of fuel surcharges on customers . . . was greater in '03, it was greater in '04, it was greater in '05 because, again, the percent of recovery. And in negotiating contracts, [UP was] able to get a fuel surcharge included in those contracts so you were having a — having a greater recovery each year.

HD Ex. 66, Young Dep. at 57. Patrick Glennon, a manager of pricing systems for NS (now retired), testified that the new fuel surcharge program was "not the same" as before, HD Ex. 65, Glennon Dep. at 67, admitting that it "definitely was more aggressive," and "definitely yielded more revenue." Id. at 42; see id. at 67. Indeed, as Mr. Glennon described the new program in an internal NS e-mail: "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase[.]" HD Ex. 30, E-mail from P. Glennon, at NS_010004522, Apr. 29, 2003. Internal CSX e-mails similarly stated that

although the new fuel surcharge program may "seem[] somewhat benevolent, it is actually a large

increase in fuel surcharge billings — maybe as much as 100%." RD Ex. 23, E-mail from

J. Couch, at CSX000326, Mar. 19, 2003.

Not only were defendants' class period fuel surcharges more aggressive than

before, but they also were standardized and uniformly applied across all or virtually all shippers

— regardless of whether such shippers were legacy or captive shippers. BNSF's chief financial

officer testified before the STB in 2006 that "[o]ur surcharge program is the same for all

customers[.]" HD Ex. 9, Testimony of Tom Hunt, at 272, May 11, 2006. UP told a major

customer, ███████████████, in 2005 that it was "uniformly requiring" its "standard

fuel surcharge program . . . of all of [its] customers." HD Ex. 149, Letter from J. Koraleski,

at UPFSC 0342883, Apr. 22, 2005.

Defendants and Dr. Willig, relying heavily on 21 declarations submitted by

railroad executives, contend that the evidence of aggressive, uniform, and standardized fuel

surcharges is not reflective of reality. See Class Opp. at 21-22, 56-58; Willig Report at 54-55.[14]

---

[14]     The 21 declarations submitted by defendants are listed below in alphabetical order: Declaration of Charles M. Adams, UP ("Adams Decl."), June 18, 2010; Declaration of Marc Allen, BNSF ("Allen Decl."), June 24, 2010; Declaration of Jim Bolander, NS ("Bolander Decl."), June 28, 2010; Declaration of Donna Cerwonka, CSX ("Cerwonka Decl."), June 22, 2010; Declaration of George T. Duggan, BNSF ("Duggan Decl."), June 29, 2010; Declaration of David Garin, BNSF ("Garin Decl."), June 24, 2010; Declaration of Thomas R. Gehl, UP ("Gehl Decl."), June 17, 2010; Declaration of Thomas J. Jacobowski, BNSF ("Jacobowski Decl."), June 23, 2010; Declaration of Christopher Jenkins, CSX ("Jenkins Decl."), June 28, 2010; Declaration of Richard Kiley, NS ("Kiley Decl."), June 28, 2010; Declaration of John Kraemer, NS ("Kraemer Decl."), June 23, 2010; Declaration of Julie A. Krehbiel, UP ("Krehbiel Decl."), June 15, 2010; Declaration of David T. Lawson, NS ("Lawson Decl."), June 25, 2010; Declaration of Ronald Listwak, NS ("Listwak Decl."), June 28, 2010; Declaration of Scott D. McGregor, NS ("McGregor Decl."), June 23, 2010; Declaration of Tim McNulty, CSX ("McNulty Decl."), June 28, 2010; Declaration of Joseph Osborne, NS ("Osborne Decl."), June 28, 2010; Declaration of Dean Piacente, CSX ("Piacente Decl."), June 22, 2010; Declaration of Richard A. Pagan, UP ("Pagan Decl."), June 16, 2010; Declaration of James R. Schaaf, NS ("Schaaf Decl."), June 23, 2010; Declaration of Andrew Strok, CSX ("Strok Decl."), June 21, 2010.

According to defendants, their fuel surcharge programs during the class period "varied widely from railroad to railroad as well as by shipper and commodity." Class Opp. at 21, 56-58. Defendants say that

> [i]t is an indisputable fact that the Defendants used dozens of fuel surcharges during the Class Period. NS alone applied fifty distinct fuel surcharge formulas during the Class Period, Lawson Decl. ¶ 14, UP had 90 different fuel surcharges between 2000 and 2008, Adams Decl. ¶ 3, and BNSF had a total of 152 in effect at some point between 2000 and 2007. Jacobowski Decl. ¶ 6.

Class Opp. at 56. Defendants also argue that they had different fuel surcharges for intermodal traffic, id. at 21 — that is, traffic that involves "goods shipped in containers or trailers on rail flat cars as part of a continuous movement with another mode of transport, such as truck or steamship." Class Opp. at 14 n.18.[15] In view of these proffered facts, defendants argue that there is no uniform or standard class-wide fuel surcharge that could be used to demonstrate a common impact. See id. at 56.

The Court finds the railroad executives' declarations unpersuasive. Indeed, the most damning portions of almost every single declaration on which defendants rely are contradicted by the declarant's subsequent deposition testimony. By way of example, relying on the declaration of Thomas J. Jacobowski, the general director of price management in BNSF's industrial products marketing department, defendants say that BNSF "had a total of 152 [fuel surcharge formulas] in effect at some point between 2000 and 2007." Class Opp. at 56 (citing

---

[15]     There are two basic types of rail traffic: intermodal traffic; and carload traffic. See Class Opp. at 14 n.18; Oct. 7 Tr. at 207. As defendants define it, intermodal traffic "proceeds both by rail and by some other mode." Oct. 7 Tr. at 207; see Class Opp. at 14 n.18. "All other rail traffic is known as 'carload' traffic," Class Opp. at 14 n.18, which consists of, for example, "a container that has chemicals in it or that has coal, or it's a designated kind of rail vessel designed to hold the specific kind of traffic." Oct. 7 Tr. at 207-08.

Jacobowski Decl. ¶ 6). But when this assertion was tested during his deposition, Mr. Jacobowski

testified that these non-standard fuel surcharges were associated with only 24 shippers,

HD Ex. 76, Jacobowski Dep. at 28-30, out of approximately 10,000 shippers, id. at 35-36, and

that it is "very possible" that all of those 24 shippers also paid BNSF's standard fuel surcharge on

at least some routes. Id. at 31-32; see also id. at 38.

Relying on the declaration of David T. Lawson, the vice president of industrial

products for NS, defendants say that "NS alone applied fifty distinct fuel surcharge formulas

during the class period[.]" Class Opp. at 56 (citing Lawson Decl. ¶ 14). But at his deposition

Mr. Lawson admitted that during the alleged conspiracy period NS had "a policy to apply the

standard fuel surcharge to as many customers as possible," HD Ex. 83, Lawson Dep. at 38; that

"for any authority that would have either a nonstandard fuel surcharge or no fuel surcharge, it

required group vice-president approval," id.; that he himself had to authorize "any [fuel

surcharge] authority [that] was going to contain any nonstandard fuel surcharge," id.; that the

50 distinct non-standard fuel surcharges could include "duplicates," id. at 16; and that his

declaration provided no information as to the percentage of NS customers that were using the

standard fuel surcharge at any time during the class period. Id. at 36; see id. at 37 (agreeing that

his declaration did not address "whether a majority or a minority of NS customers were paying

the standard fuel surcharge").

Moreover, contrary to what defendants suggest in their opposition papers, the

evidence in the record makes plain, and the railroad executives themselves admitted, that during

the class period defendants uniformly began their negotiations with their standard fuel surcharge

program and their objective was to apply their standard fuel surcharge as widely as possible. See

HD Ex. 85, Allen Dep. at 25-27 ("*Q.* . . . [Y]ou started the negotiation with a given [BNSF]

customer with the $1.25 HDF standard fuel surcharge program as the starting point? *A.* That's

correct."); HD Ex. 76, Jacobowski Dep. at 23 ("*Q.* Now I'm correct . . . that [BNSF's] goal was

to apply the standard fuel surcharges to as much of its traffic as possible? *A.* Correct. *Q.* In

fact, the goal was to apply the standard fuel surcharge to 100 percent of your shippers. Is that

correct, sir? *A.* Correct. *Q.* And any exceptions had to be approved by senior management?

*A.* Correct."); HD Ex. 83, Lawson Dep. at 37-38 ("*Q.* Now, NS had a policy to try to apply the

standard fuel surcharge to as many customers as possible, correct? *A.* Yes. . . . *Q.* And, in fact,

for any authority that would have either a nonstandard fuel surcharge or no fuel surcharge, it

required group vice-president approval correct? *A.* Yes. And I think ultimately my approval as

well."); see also HD Ex. 78, Osborne Dep. at 38-41, 48-49; HD Ex. 77, Listwak Dep. at 29-31;

HD Ex. 86, Cerwonka Dep. at 7-8; HD Ex. 87, Piacente Dep. at 7-10. And any deviations from

defendants' standard fuel surcharge programs were rare. See, e.g., HD Ex. 82, Kraemer Dep.

at 30; HD Ex. 86, Cerwonka Dep. at 19-20; HD Ex. 79, Garin Dep. at 67-68; see supra at 89-90.

Furthermore, each defendant enforced strict policies ensuring across-the-board application of

these standardized fuel surcharge programs on all of their shippers, see supra at 88, including

legacy shippers renewing a contract during the class period. See HD Ex. 50, Union Pacific 2005

Analyst Fact Book, at 11 ("In 2006, approximately 13 percent of the remaining 45 percent of

long-term contracts will be available for repricing. As Union Pacific renegotiates this business to

market rates, it will also include Union Pacific's standard fuel surcharge."); Pls. Hr'g Binder

Tabs 39, 118-19.

Defendants contend that the question "*[w]hy* a shipper paid a particular fuel surcharge is an inherently individualized question, given all the reasons why shippers paid fuel surcharges both before and during the alleged conspiracy." Defs. Wal-Mart Reply Brief at 7 (emphasis in original). But the evidence in the record at this stage reveals that the answer to that question is rather simple and applies class-wide: shippers paid the standard fuel surcharges during the alleged conspiracy because the surcharges were non-negotiable. As of January 2004, BNSF pricing guidelines stated: "*Every contract* should include a fuel surcharge clause. All new and all renewing contract negotiations should have a fuel surcharge as the goal." RD Ex. 223, BNSF Price and Fuel Escalation General Guidelines, at BNSF-0404221, Jan. 2004 (emphasis added). And as BNSF internal e-mails emphasized, contracts requiring the chief executive officer's signature "but excluding full fuel surcharge provisions *will not be signed*." RD Ex. 224, E-mail from S. Kyei, at BNSF-FSC 000488, Mar. 11, 2004 (emphasis added). Similarly, as UP explained it to a customer: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management." RD Ex. 72, E-mail from B. Denkers, at USM005663, Dec. 22, 2003. And internal CSX e-mails said the same thing:

> We have very clear instructions with our team to pursue FSC. . . .
> Here are some specific directions we've given the team that will
> help CSX's overall success:
>
> 1) all renewals include fuel — very very few exceptions as we
> discussed last month.
>
> 2) any multiyear deals must include FSC in the out years[.]
>
> 3) any new prices for customers with master contracts that don't
> renew in the near term should be added to a different price vehicle
> for that customer. The new price vehicle should incorporate our

> FSC program. Even though these master contracts likely have an
> RCAF component.

RD Ex. 141, E-mail from D. Piacente, at CSXFSC000086200, June 5, 2006. As for NS, its vice

president of industrial products agreed that "there was a policy to apply the standard fuel

surcharge to as many customers as possible." HD Ex. 83, Lawson Dep. at 38.

Notwithstanding the documentary evidence and the railroad executives'

admissions during their depositions, Dr. Willig examines defendants' transaction data and

concludes that it tells a different story. Dr. Willig says that there was "widespread use of FSCs

prior to the alleged conspiracy," and asserts that "all eight named plaintiffs paid FSCs prior to

July 2003." Willig Report ¶ 73. As he describes it, the transaction data show that "FSC use was

growing rapidly prior to the start of the alleged conspiracy." Id. ¶ 78. And Dr. Willig ultimately

concludes that "[t]he growth in FSCs before the alleged conspiracy precludes the possibility of

showing that all class members paid an FSC because of the conspiracy." Id. at 36.

Dr. Rausser disagrees. As he sees it, Dr. Willig's analysis is flawed because,

among other reasons, it relies on a "revenue weighting error [that] concealed both how much

more extensive Fuel Surcharge coverage became during the Class Period and that the sharp

increase in coverage began in mid-2003, consistent with the facts of the alleged conspiracy."

2d Rausser Report at 34. Dr. Rausser also contends that Dr. Willig uses an insufficient set of

data points to establish the purported trend toward increasing use of fuel surcharges. See id. at 7,

32-34. Dr. Rausser, analyzing the same data as Dr. Willig and correcting the problems he

identified in Dr. Willig's analysis, concludes that "the pattern in Fuel Surcharge coverage is

consistent with the implementation of the conspiracy as alleged." Id. at 35.

The Court is not persuaded by Dr. Willig.  In his analysis, Dr. Willig treated *any* fuel surcharge applied to a single shipment by a class member as equal to a fuel surcharge applied to *all* of that class member's shipments during the class period.  See Willig Dep. at 47, 52-53; see also Class Reply at 3 n.8.  The Court finds that analysis inadequate: under Dr. Willig's metric, if the effect of the alleged conspiracy was to cause a class member paying a two percent fuel surcharge on a single route before the class period to pay the allegedly conspiratorial fuel surcharge at, for example, up to 20 percent on 50 routes during the class period, then Dr. Willig's trend analysis would not recognize this clearly significant change, since his fuel surcharge incidence inputs would treat both circumstances as the same.  See Class Reply at 3 n.8. Ultimately, Dr. Willig's analysis suffers from the same problem as defendants' primary argument: both defendants and Dr. Willig incorrectly lump fuel surcharges before the alleged conspiracy with fuel surcharges applied during the alleged conspiracy.  As plaintiffs point out, Dr. Willig made no effort to assess whether, in cases where fuel surcharges were applied before the start of the class period, those fuel surcharges were the same as the standardized fuel surcharges applied during the alleged conspiracy.  See Willig Dep. at 253-57.

The Court finds Dr. Rausser's analysis persuasive and credits his conclusion that defendants' transaction data show that each defendant applied a standard fuel surcharge program during the class period, across railroads and shipment types, see 2d Rausser Report at 15-16; and that any deviations from the standard fuel surcharge program were rare and without consequence for purposes of determining injury-in-fact at trial with common evidence.  Id. at 22-23, 53-54. As Dr. Rausser concludes: "[F]or each railroad 83% to 92% of its non-intermodal revenue and 92% to 100% of its intermodal revenue can be accounted for by a handful or programs and a few

94

identifiable exceptional programs." Id. at 54.  The Court also credits Dr. Rausser's conclusion

that standard fuel surcharge coverage became more extensive during the class period and that the

sharp increase in coverage began in mid-2003, consistent with the start of the alleged conspiracy.

See id. at 34-37.[16]

2. *Additional factors identified by defendants*.  The Court concludes that none of

the additional factors identified by defendants — economic efficiency; captive shippers;

customer history of purchasing rail freight; existence of capacity constraints; customers whose

primary freight alternative was truck; and customer receptivity to fuel surcharges, see Class Opp.

at 37-39 — precludes a finding that evidence common to the class can be used to prove that class

members paid a fuel surcharge because of the alleged conspiracy.

*Economic Efficiency*.  As discussed, defendants argue that fuel surcharges can

enhance economic efficiency.  See Willig Report at 31.  As Dr. Willig describes it, fuel

surcharges allocate risk and were adopted by many industries in the early 2000s in response to

increases in both the levels and volatility of fuel prices.  See id. ¶ 64.  He further explains:

> Price adjustment mechanisms have been widely adopted and have
> long been used in the railroad industry.  Historically, many rail
> contracts have included price adjustment clauses tied to the
> . . . RCAF[]. . . . RCAF measures changes in the prices of major
> components of the railroad industry's operating expenses,
> including labor, fuel, materials, equipment rents, depreciation
> interest and other expenses. . . . The widespread use of

_____

[16]     During the class certification hearing, defendants' counsel argued, seemingly for
the first time, that "[t]here was no change in the intermodal standard fuel surcharges of any
consequence during the class period." Oct. 7 Tr. at 208.  After the hearing, defendants argued
this point again in their supplemental briefing.  See Defs. Wal-Mart Brief at 11.  The Court is not
persuaded by that argument.  See 2d Rausser Report at 22-23; Pls. Wal-Mart Reply Brief
at 14-15 & nn.33-34.

> price-adjustment provisions such as RCAF indicates that these
> mechanisms can enhance economic efficiency.  FSCs serve the
> same function but are based on a single input instead of a basket of
> inputs.  Such fuel-only formulas were in use prior to the alleged
> conspiracy both in the rail and other industries. . . . The use of
> FSCs in many industries expanded in the early 2000s in response
> to increases in both the levels and volatility of fuel prices. . . . FSCs
> were adopted in the rail industry due in large part to dissatisfaction
> with the FCAF index, which lags behind changes in fuel prices,
> resulting in delays in cost recovery when fuel prices are rising.

Id. ¶¶ 63-66.  Thus, in view of the legitimate economic rationales identified by Dr. Willig for

adopting fuel surcharges, he argues that growth in fuel surcharge use "would be expected even

absent the alleged conspiracy."  Id. at 31.

      This case, however, is not about fuel surcharges generally, but rather about

aggressive and standardized fuel surcharges tied to base rates.  The Court disagrees with Dr.

Willig's conclusion that fuel surcharges tied to base rates are a more accurate and efficient

method for recovery of fuel costs than other alternatives, such as the RCAF, and thus would have

increased even absent a conspiracy.  As Dr. Rausser persuasively explains:

> Dr. Willig describes the increased use of Fuel Surcharges as a
> "normal business adaptation to the increasing importance of
> volatile costs of fuel" and argues that they were superior to RCAF,
> because "the weights used in the RCAF formula are *only updated
> annually*."  The RCAF used these weights to translate movements
> in underlying costs indexes, one for labor, one for fuel and so on,
> into percentage increases to be applied to freight rates.  The Fuel
> Surcharge program also translated fuel price movements into
> percentage increase in freight rates, but the translation formula (the
> "slope") was *never* updated.  As a result, the Fuel Surcharge
> program was clearly not superior to the RCAF in this respect.
> Furthermore, one variant of the RCAF, the RCAF-A, adjusted for
> productivity improvements over time, thus reflecting changes in
> fuel efficiency rates.  The Fuel Surcharge program incorporated no
> such adjustments and was therefore less likely to properly reflect
> changes over time than was the RCAF.

2d Rausser Report at 30-31 (footnotes omitted) (emphasis in original).[17] Moreover, as the STB

noted during its proceedings addressing rate-unregulated traffic, railroads largely "concede[d]

that their fuel surcharges [were] not tied to the fuel consumption associated with the individual

movements to which they [were] applied." Rail Fuel Surcharges, 2007 WL 201205, at *1.

Dr. Willig also maintains that the standardization and mechanical application of

fuel surcharges to base rates makes them an efficient tool for increasing freight rates across

shippers without having to renegotiate individual contracts. See Willig Report at 35-36. Dr.

Rausser agrees, but persuasively argues that "it is precisely this fact that makes the Fuel

Surcharges an efficient mechanism for price-fixing, raising total freight rates and thus the

Defendants' profits." 2d Rausser Report at 30. Indeed, as the STB noted: "A fuel surcharge

program keyed to the base rate has one primary benefit — ease of application." Rail Fuel

Surcharges, 2007 WL 201205, at *6. But such a program — that is, one "that increases all rates

by a set percentage" — "stands virtually no prospect of reflecting the actual increase in fuel costs

for handling the particular traffic to which the surcharge is applied." Id. at *4; see also 1st

Rausser Report at 50 ("[A]dding a percentage fuel surcharge on top of line-haul rates or base

rates is by its very nature a general price increase.").

*Captive shippers.* Defendants' and Dr. Willig's argument regarding captive

shippers and injury-in-fact is essentially identical to the one made during oral argument regarding

antitrust injury. See supra at 65-66, 71-72. Defendants say that customers served by only one

railroad — referred to by the parties as either "captive" or "sole served" shippers — "might have

---

[17]     As for use of the RCAF-A mechanism of recovery, BNSF price and fuel
escalation guidelines stated: "RCAF-A is absolutely unacceptable." RD Ex. 223, BNSF Price
and Fuel Escalation General Guidelines, at BNSF-0404221, Jan. 2004.

difficulty avoiding a fuel surcharge, even absent a conspiracy." Class Opp. at 37.[18]  Moreover, as

defendants contend, such shippers "do not benefit from rail competition in the first place" and

therefore "cannot be injured by an alleged conspiracy among railroads." Defs. Supp. Brief at

18 n.10. Thus, defendants argue that the alleged conspiracy on fuel surcharges would not be

expected to injure such captive shippers, Class Opp. at 37, and that such shippers — of which

they are "many . . . , although the number cannot be determined with precision," Willig Report

at 75 — can be identified only with individualized inquiry. See Willig Report ¶¶ 139-43.  And

so defendants argue that the existence of such shippers in plaintiffs' putative class precludes a

finding of predominance.

      The Court disagrees with defendants.  As the Court already has concluded,

plaintiffs have shown that captive shippers are subject to competitive forces; that defendants'

executives expressly have denied that they would have tried to impose more aggressive programs

on captive shippers than they were able to impose on non-captive shippers; and that defendants

uniformly imposed their standard fuel surcharges during the class period without regard for

whether the shipper was captive or had access to alternative modes of transportation.  See supra

at 72-74; see, e.g., HD Ex. 79, Garin Dep. at 111-14, 117-18, 120-21, 126-29; HD Ex. 77,

Listwak Dep. at 74-76, 93-101; see also HD Ex. 153, Draper Dep. at 322 (agreeing that UP

"adopted a standard surcharge program that it intended to be common across its customers," and

explaining that "the difficulty of doing it on a customer-by-customer basis is one of the reasons it

_____

[18]    As defendants explain, the term "captive" is used in two different ways: "In some
cases, it is applied to a shipper that is served by only one railroad although that shipper has viable
transportation options available through trucks and/or barges.  Other times, it is applied to a
shipper that claims that it has no viable transport alternatives to the railroad that serves it." Defs.
Supp. Brief at 18 n.10.

was done on a global basis"). Plaintiffs have shown by a preponderance of the evidence that

defendants applied the allegedly conspiratorial fuel surcharges without discrimination. Thus, the

captive-shipper factor does not preclude a finding that injury-in-fact is capable of common proof

at trial.

      *Customer history of purchasing rail freight; existence of capacity constraints;*

*customers whose primary freight alternative was truck.* Defendants argue that roughly one-third

of the shippers in the putative class first purchased rail freight after July 2003, and these shippers

therefore "have no pre-conspiracy history on which to assess their likelihood of paying fuel

surcharges absent collusion." Class Opp. at 38. Other shippers "have a long-standing history of

rail freight purchases from Defendants, which could inform what the negotiation would have

looked like, and whether it would have resulted in an assessment of a fuel surcharge, absent the

conspiracy." Id. Defendants contend that these varying histories require individualized analysis

that preclude a finding of predominance.

      Next, defendants argue that certain shippers faced capacity constraints, and such

shippers would be more likely to pay a fuel surcharge in the but-for world, even with rail-to-rail

competition. See Class Opp. at 38. And defendants then point to customers whose primary

freight alternative was truck. See id. According to defendants, these customers "would be likely

to accept a rail fuel surcharge because trucking companies charged a fuel surcharges." Id. As

defendants see it, "[c]ustomers already paying fuel surcharges to competing transportation

alternatives would be unlikely to reject the idea of fuel surcharges by railroads." Id.

      The Court disagrees with defendants that any of these factors preclude a finding

that injury-in-fact can be established at trial with common evidence. Evidence common to the

class shows that defendants intended to apply the new standard fuel surcharges to all of their

freight shipments — regardless of prior freight purchasing history or any other factor.  To prevail

on the merits of their claim at trial, plaintiffs "need not exhaust all possible alternative sources of

injury in fulfilling [their] burden of proving compensable injury under" the antitrust laws.  <u>Zenith</u>

<u>Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. at 114 n.9.  Rather, they must show only that

the antitrust violation was a "material cause of the injury[.]"  <u>Id</u>.  And at the class certification

stage, plaintiffs must show by a preponderance of the evidence that this is capable of common

proof.  They have satisfied their burden at this stage: plaintiffs have established by a

preponderance of the evidence that each defendant enforced policies ensuring across-the-board,

uniform application of their new fuel surcharge program.

     *Customer receptivity to fuel surcharges.*  Defendants argue that some shippers

were "more amenable to fuel surcharges, and thus would have been more likely to agree to a fuel

surcharge even with competition among railroads."  Class Opp. at 39.  Defendants point out that

several sophisticated clients — ███████████████████████████████████████

— themselves proposed to pay a rate-based fuel surcharge.  <u>See id</u>.  According to defendants,

███████████, for example, "proposed a rate-based fuel surcharge when its UP contract first came

up for renewal after July 2003."  <u>Id</u>.  ██████ "volunteered to pay BNSF and NS a fuel surcharge

even though its contracts with those carriers did not require it."  <u>Id</u>.  ██████ "acknowledged the

need for a fuel surcharge in its contracts with CSX[] because of the volatility of fuel prices."  <u>Id</u>.

████████████████████████, both BNSF customers, "were willing to pay a fuel surcharge

so long as their own formulas were used."  <u>Id</u>.  According to defendants, these examples provide

further support for their claim that individualized analysis is necessary in order to determine what

caused shippers to pay a fuel surcharge and whether they would have paid a fuel surcharge in the but-for world. See id.

The Court disagrees with defendants. That some shippers may have been willing to pay *a* fuel surcharge is not surprising. Indeed, the STB noted in its 2007 decision that several railroads had introduced evidence that "many of their customers favor the continued use of a fuel surcharge program that is tied to the base rate." Rail Fuel Surcharges, 2007 WL 201205, at *6 n.34. As the STB stated: "Given that such a program shifts greater responsibility for fuel recovery to shippers with higher rates, it is not surprising that a subset of customers (presumably those with lower base rates) favor retaining a percentage-of-the-base-rate approach." Id. But the claim in this case is not a conspiracy to impose just *any* fuel surcharge; rather, plaintiffs claim that defendant conspired to increase total prices "by widespread application and enforcement of *coordinated, and aggressive, fuel surcharges*." Pls. Wal-Mart Reply Brief at 7 n.11 (emphasis added); see also 1st Rausser Dep. at 94-95. Thus, defendants' assertion that, for example, ████████████████████████ were "willing to pay *a* fuel surcharge *so long as their own formulas were used*," Class Opp. at 39 (emphasis added), does not discredit plaintiffs' conclusion that injury-in-fact from widespread, aggressive, standardized, and uniform fuel surcharges is capable of common proof at trial.

ii. Component of the total price of shipping

A fuel surcharge is an add-on to the base rate for freight transportation. The total rail freight price for a shipping customer — the all-in rate — consists of the base rate and any

percentage fuel surcharge applied to the base rate.  Willig Report ¶ 18; <u>see</u> Class Opp. at 3;

1st Rausser Report at 62.  The base rate

> includes fixed cost (or overhead) elements, such as the cost of
> organizing a particular shipment[,] . . . . the large fixed costs of
> building and maintaining track, bridges, and other structures to
> achieve long-run sustainability[,] . . . . [and] the railroad's markup
> of price over costs, i.e., the profitability element of pricing.

1st Rausser Report at 62.  As discussed, plaintiffs do not allege that defendants conspired to fix

each base rate separately.  <u>See</u> 1st Rausser Dep. at 98; <u>see also</u> 1st Rausser Report at 52 n.118.

Rather, plaintiffs allege that defendants imposed "an across-the-board artificially high and

uniform fuel surcharge" as a percentage multiplier of the base rate, thereby permitting defendants

"to raise total freight prices widely by a given percentage."  <u>Rail Freight I</u>, 587 F. Supp. 2d at 30;

<u>see also</u> 1st Rausser Report at 50 ("[A]dding a percentage fuel surcharge on top of line-haul rates

or base rates is by its very nature a general price increase."); 2d Am. Compl. ¶ 13.

Defendants argue that since plaintiffs' conspiracy claim is based on a component

of the overall price of shipping, "[p]ayment of a collusively-imposed fuel surcharge . . . can

injure a shipper only if it caused the overall rate to be inflated above the competitive level."

Class Opp. at 41.  And "[g]iven that the alleged conspiracy was directed only at a portion of the

total price," defendants argue that "any class member that obtained anything of value in exchange

for accepting a fuel surcharge may not have suffered impact from the alleged conspiracy."  <u>Id</u>.

As defendants describe it,

> [i]n view of evidence that some (but not all) shippers made
> trade-offs for fuel surcharges, the task of determining which class
> members were injured (because their fuel surcharge was added to
> the rate with no corresponding reduction in price of other railroad
> concession) and which were not injured (because they were able to

> negotiate a price reduction or other service component that the
> shipper valued, requires an individualized analysis of hundreds or
> even thousands of railroad-shipper contract negotiations.

Id. at 41-42.

Defendants maintain that cases in which a conspiracy claim is based only on a

component of the overall price "face a serious problem on class certification" because "[i]t is

nearly impossible to determine, using common class-wide proof, whether the alleged

conspirators never reduced (or failed to raise) other elements of the price and thereby competed

on an overall price basis." Class Opp. at 43 (citing Exhaust Unlimited, Inc. v. Cintas Corp.,

223 F.R.D. 506, 513 (S.D. Ill. 2004); Schoenbaum v. E.I. DuPont de Nemours & Co., Civil

Action No. 05-1108, 2009 U.S. Dist. LEXIS 114080, at *35 (E.D. Mo. Dec. 8, 2009); American

Seed Co. v. Monsanto Co., 238 F.R.D. 394, 401 (D. Del. 2006), aff'd, 2008 U.S. App. LEXIS

6963 (3d Cir. Apr. 1, 2008)).  And defendants contend that this case is similar to Robinson v.

Texas Auto Dealers Ass'n, 387 F.3d 416 (5th Cir. 2004), in which the Fifth Circuit reversed

certification of a class of automobile purchasers who challenged an agreement among auto

dealers on how they would list an automobile tax, referred to as a Vehicle Inventory Tax ("VIT").

See Class Opp. at 44.

The Fifth Circuit in Robinson rejected the plaintiffs' assumption that the tax was

simply added to the purchase price "for every consumer in the class," concluding:

> Such an assumption defies the realities of the haggling that ensues
> in the American market when one buys a vehicle.  Although some
> purchasers certainly negotiate a price that excludes taxes, titles, and
> fees, others negotiate with an eye toward the "bottom line."
> Bottom-line purchasers base their negotiations on the *final*
> purchase price, including every tax, fee, and surcharge.

<u>Robinson v. Texas Auto Dealers Ass'n</u>, 387 F.3d at 423 (emphasis in original).  Thus, the Fifth

Circuit concluded that

> [t]o determine whether a purchaser negotiated in a top-line or
> bottom-line fashion, a court would have to hear evidence regarding
> *each purported class member and his transaction*.  Such an
> individual examination would destroy any alleged predominance
> present in the proposed class.  The offered evidence plainly shows
> that the class members' individual negotiation styles prevent the
> plaintiffs from arguing that all members of the class suffered an
> antitrust injury just by paying a VIT.

<u>Id</u>. at 424 (emphasis in original).  Defendants contend that, if anything, this case is even less

suited for class certification than <u>Robinson</u> because the automobile tax there never varied,

whereas, here "the actual fuel surcharge assessed can and does vary from shipper to shipper —

adding another variable to the negotiation over total prices."  Class Opp. at 44.

Defendants also assert that the evidence in the record, similar to the circumstances

in <u>Robinson</u>, shows that many of defendants' customers negotiate toward the bottom line and

frequently trade fuel surcharges for rate reductions or other benefits.  <u>See</u> Class Opp. at 45.  As

defendants describe it, "[t]here is overwhelming evidence that many of the sophisticated shippers

constituting a substantial portion of Defendants' customer base focus on the overall price/service

package and frequently negotiate trade-offs between base rates, fuel surcharges and many other

terms of service."  <u>Id</u>.  And relying on the declarations of various railroad executives, defendants

say that they have provided "numerous examples of major customers that negotiated items of

value to them as part of their contracts that also included their agreement to pay fuel

surcharges[.]"  <u>Id</u>.  Thus, given the highly individualized nature of rail freight pricing, defendants

contend that plaintiffs cannot establish with common evidence that class members paid more for shipping as a result of paying the allegedly conspiratorial fuel surcharge.

On this point, Dr. Willig has the same view. As he explains, rail contracts are multidimensional, involving a wide variety of complex contractual provisions, and a shipper's evaluation of a contract "depends on the full package of contract terms[.]" Willig Report ¶ 116. Dr. Willig examines defendants' transaction data and relies on defendants' declarations to conclude that the introduction of fuel surcharges into rail contacts during the class period "often" resulted in concessions on other contract terms. Id. ¶ 122; see id. ¶ 123.

Plaintiffs do not appear to disagree with the general proposition that evidence of discounting — for example, reductions in a base rate — is relevant in assessing whether class certification is appropriate. Dr. Rausser himself has acknowledged that if shippers received concessions in the form of base rate discounts in exchange for the application of a fuel surcharge, then the impact for those shippers "wouldn't have been common to those" who did not receive such discounts. 1st Rausser Dep. at 272; see also id at 270. Plaintiffs argue, however, that the depositions of defendants' declarants, on whom defendants primarily rely for their purported evidence of discounting, have exposed that the declarations are both unreliable and inconsistent with later deposition testimony. See Class Reply at 17. According to plaintiffs, although defendants claim that customers traded fuel surcharges for trade reductions, the depositions establish that most reductions were in fact reduced *increases*, and even those such situations were rare. See id. at 20.

As for Dr. Rausser, he acknowledges that defendants' transaction data show that a nominal amount of discounting occurred, see 2d Rausser Dep. at 211 (describing "very little

deviations or anomalies"), but contends that there is no evidence of systematic discounting of base rates to offset increases. See 2d Rausser Report at 91 ("There is no evidence of a systematic pattern of discounting base rates or providing other concessions in order to offset Fuel Surcharges[.]"); Class Reply at 14. As Dr. Rausser sees it, "there is no real-world evidence of widespread discounting of base rates, nor is there any established causal link between the isolated instances of declining base rates and the imposition of Fuel Surcharges." 2d Rausser Report at 66.

The Court agrees with plaintiffs that defendants' executives' declarations are unpersuasive and inconsistent with their later deposition testimony. Furthermore, the Court finds by a preponderance of the evidence that any examples of discounting are, at best, anomalies that do not preclude a finding of predominance. Finally, the Court concludes that the Fifth Circuit's decision in Robinson is inapposite to this case.

1. *Defendants' declarations.* Defendants and Dr. Willig rely heavily on the 21 declarations submitted by defendants' executives purporting to show that many of defendants' customers traded fuel surcharges for rate reductions. Defendants point to eight such examples in their opposition papers, see Class Opp. at 45-46, and then state that they "are not trivial exceptions to a rule," but rather "represent large revenues" and "reflect the diversity of outcomes among negotiated contracts." Id. If defendants' declarations provide examples of anything, it is the paucity of any evidence of discounting.

Relying on the declaration of George T. Duggan, a vice president at BNSF, defendants state: ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Class Opp.

at 45 (citing Duggan Decl. ¶ 16).  But during his deposition, Mr. Duggan testified that ██████

████████████████████████████████ HD Ex. 81, Duggan Dep. at 26-27

(emphasis added).  ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ This, then, is an

example of a reduced increase, not a discounting of the base rate in exchange for application of a

standardized fuel surcharge.

Relying on the declarations of Marc Allen and David Garin, both vice presidents

at BNSF, defendants state:

███████████████████████████████████
███████████████████████████████████
██████████████████In other instances, shippers agreed to pay the
standard BNSF fuel surcharge in exchange for receiving other
economic concessions from BNSF.  Garin Decl. ¶ 12.

Class Opp. at 45-46.  Mr. Allen, however, testified that BNSF's "standard fuel surcharge

provision" was "the starting point in contract negotiations with respect to the fuel surcharge

provision to be included in the contract."  HD Ex. 85, Allen Dep. at 27; see id. at 25 ("[O]ur

initial opening offer is almost always one that includes a standard fuel surcharge program.").  As

for Mr. Garin, he admitted that ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

107

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Id. at 198-99.

Relying on the declaration of Dean Piacente, a CSX vice president, defendants

state: ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Class Opp. at 46 (citing

Piacente Decl. ¶ 6).  But Mr. Piacente subsequently testified that ████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ HD Ex. 87, Piacente Dep. at 102.

Relying on the declaration of Tim McNulty, CSX's director of marketing,

agricultural products, defendants state: ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Class Opp. at 46 (citing McNulty Decl. ¶ 10).  But as Mr. McNulty later testified at his

deposition, ██████████████████████████████████████

HD Ex. 71, McNulty Dep. at 148.

Relying on the declarations of Ronald Listwak and James R. Schaaf, both vice

presidents at NS, defendants state: "In 2006, the South Mississippi Electric Power Association

agreed to pay the fuel surcharge if NS reduced the base rate by $0.35/ton.  NS agreed."  Class

Opp. at 46 (citing Listwak Decl. ¶ 15; Schaaf Decl. ¶ 18).  But as Mr. Listwak subsequently

testified during his deposition, NS "was able to achieve *both the standard fuel surcharge and*

*significant base rate increases*" on its contract with the South Mississippi Electric Power

Association.  HD Ex. 77, Listwak Dep. at 111.  Thus, Mr. Listwak's declaration describes

another example of a reduced increase of the base rate, not a discounting of the original base rate

in exchange for application of the standard fuel surcharge.[19]

       Relying again on the declaration of Mr. Listwak, defendants state:



Class Opp. at 46 (citing Listwak Decl. ¶¶ 19-23).  As Mr. Listwak admitted during his

deposition, however, NS ███████████████████████████████████

███████████████████████████████ HD Ex. 77, Listwak Dep. at 117; NS ████

████████████████████████████████████████████████████

██████████████████ id.; and NS ████████████████████████

████████████████████████████████████████████████████

████████████ Id. at 119 (emphasis added).

<hr>

    [19]    Mr. Schaff, in his declaration, referenced the shipping customer ██████████
████████████████ See Schaff Decl. ¶ 18.  But Mr.
Lawson, another NS vice president, admitted during his deposition that the Schaff declaration
described only three contracts without providing any information on whether ████████████
████████████████████████████████████████
████████ HD Ex. 83, Lawson Dep. at 126.

2. *Mandates not to discount base rates.* Based in large part on the deposition testimony of defendants' own executives, the Court finds that plaintiffs have established by a preponderance of the evidence that any discounting of the base rate by defendants was rare — which is consistent with clear mandates from defendants not to modify their standard fuel surcharge program. As an illustrative example, Donald Seale, at the time NS' senior vice president of marketing services, stated in an internal NS e-mail: "I expect market based price increases to be applied independent of the FSC, and we should *absolutely not* be deferring any rate increases because we are applying the FSC." RD Ex. 84, E-mail from D. Seale, at NS_010034244, Apr. 14, 2004 (emphasis added). Subsequently, Mr. Seale, now the chief marketing officer of NS, testified:

> *A.* . . . . Do not trade off one to gain the other. That was the directive.
>
> *Q.* And don't give up the fuel surcharge for base rate, don't give up base rate for the fuel surcharge, goes to both sides of the equation, correct?
>
> *A.* Well, it would . . . have relationship to both sides of the equation because they are all components of the overall price.
>
> *Q.* And your directive was, If you want to defer rate increases because you are applying a fuel surcharge, you come to me and get my approval, correct?
>
> *A.* That is correct.
>
> *Q.* Okay. And so you would be the sign-off authority for any situation in which, where people were following your directives, at least, someone sought to defer a rate increase because the fuel surcharge was being applied, correct?
>
> *A.* If the fuel surcharge was being modified/customized through negotiation, the directive was that they would secure authority to make that modification.

> *Q.* Okay. I understand that that was the directive. But it was also the directive, was it not, that you are not to defer rate increases because you are applying the fuel surcharge, that was a separate directive?
>
> *A.* That was — that was a part of the directive. The two are inseparable.
>
> *Q.* And you were the person that had final sign-off authority both with respect to any modification of the fuel surcharge and with respect to any deferring of rate increases because of the application of the fuel surcharge, correct?
>
> *A.* That would be correct.
>
> *Q.* And so my question is: Did you keep some record of the situations in which you specifically approved a modification of the fuel surcharge, that is Question Number 1?
>
> *A.* No.
>
> *Q.* Did you keep any record of any situations or of the situations in which you specifically approved the deferring of any rate increase because of the application of the fuel surcharge?
>
> *A.* No. I did not.

RD Ex. 173, Seale Dep. at 299-301. Mr. Seale admitted — despite being the individual with

final sign-off authority for any modifications to NS' clear directives on its fuel surcharge

program — that he had "no direct knowledge" of situations in which rate increases were deferred

because NS was applying its fuel surcharge. Id. at 297; see id. at 299-301.[20]

    *3. Expert opinions on discounting.* As for the parties' experts, Dr. Rausser and

Dr. Willig disagree on the extent of any discounting in exchange for application of the standard

---

[20]    For another example of a company directive not to discount base rates in exchange for application of a fuel surcharge, see RD Ex. 91, BNSF Memorandum from S. Kyei, at BNSF-0325453, Mar. 28, 2008 ("CEO's Mandate for Marketing's Fuel Surcharge Programs": "Every price authority should have a fuel surcharge applied"; "Marketing Team should not discount a fuel surcharge to raise price").

fuel surcharge program. <u>Compare</u> 1st Rausser Report at 94-101, <u>and</u> 2d Rausser Report at 57-66,

<u>with</u> Willig Report at 66-70. The Court finds persuasive Dr. Rausser's analysis, which is

consistent with the evidence in the record. Dr. Willig, relying on the declarations provided by

defendants, states that these declarations show that the application of fuel surcharges "often

resulted in concessions with respect to other contract terms," including discounts on base rates.

Willig Report ¶ 122. Dr. Rausser disagrees. <u>See</u> 2d Rausser Dep. at 205. He explains that he

went through "each and every instance that's specified in the declarations and discussed in

depositions" and concludes that the declarations provide "weak evidence . . . [b]ecause they don't

offset the actual over-recovery of fuel surcharges resulting from" the coordinated fuel surcharge

programs. <u>Id.</u> The Court agrees with Dr. Rausser. As discussed above, the Court finds the

defendants' declarations unpersuasive and often inconsistent with later deposition testimony of

the same people; the declarations primarily reveal reduced increases in base rates with

application of the standard fuel surcharge program.

   Both experts also reviewed defendants' transaction data and reached different

conclusions as to discounting. Dr. Willig concludes that defendants' transaction data reveal "a

variety of examples of pairs of shippers of the same commodity that faced similar changes during

the class period in 'all-in' rates," and that "[t]hese examples demonstrate large differences across

shippers in the extent to which all-in rate increases were attributable to changes in base rates as

opposed to changes in FSCs." Willig Report ¶ 123. In contrast, Dr. Rausser analyzed

defendants' transaction data and concluded that there was no systematic discounting of base rates

to offset the application of the standard fuel surcharge. <u>See</u> 1st Rausser Report at 94-101. As Dr.

Rausser describes it: "An analysis of the transaction data reveals that there is no evidence of

widespread discounting of base rates. Instead, base rates across the main commodities shipped by defendants remained largely constant in real terms from the years before the Class Period to the years during the Class Period." 1st Rausser Report at 95; see also 2d Rausser Report at 66.

In resolving this dispute between the experts, the Court notes, as an initial matter, that Dr. Willig has relied on the defendants' transactional data to reach his conclusions about purported examples of discounting. See Willig Report at 67 ("Defendants' transaction data reveal large differences across comparable shippers in the contribution of base rates and FSCs to all-in rates."). Thus, Dr. Willig is relying on evidence common to the class to dispute the results of Dr. Rausser's analysis regarding discounting and, ultimately, whether class members experienced injury-in-fact. This, then, appears to raise a merits issue, not a class certification issue. The question before the Court is whether plaintiffs, through Dr. Rausser, have "'established a workable multiple regression equation, *not whether plaintiffs' model actually works*[.]'" In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. at 383 (quoting In re EPDM Antitrust Litig., 256 F.R.D. at 100) (emphasis in original); see In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 604 (N.D. Cal. 2010). Defendants should be "focused on disputing the use of the methodology itself, not the results of the methodology." In re EPDM Antitrust Litig., 256 F.R.D. at 96. In any event, the Court finds Dr. Rausser's analysis persuasive, see 2d Rausser Report at 57-66, and credits his determination from his review of the data that there was no evidence of systematic discounting. The Court concludes that any examples of such discounting are outliers, insufficient to defeat a finding of predominance. See Kohen v. Pacific Inv. Mgmt. Co., 571 F.3d at 677.

4. *Starting point for negotiations.* Finally, the Court concludes that the Fifth Circuit's decision in <u>Robinson v. Texas Auto Dealers Ass'n</u>, a case upon which defendants' heavily rely, is inapposite to this case. The Fifth Circuit in <u>Robinson</u> framed the question presented as "whether the mere payment of a VIT — unaccompanied by any other evidence — provides enough information such that a party may sustain a price-fixing suit on behalf of the entire class." <u>Robinson v. Texas Auto Dealers Ass'n</u>, 387 F.3d at 423. In concluding that class certification was inappropriate, the Fifth Circuit criticized the plaintiffs for *assuming* that the automobile tax at issue "represents an additional charge that artificially increases the final purchase price for every consumer in the class." <u>Id</u>. As the Fifth Circuit stated:

> Such an assumption defies the realities of haggling that ensues in the American market when one buys a vehicle. Although some purchasers certainly negotiate a price that excludes taxes, titles, and fees, others negotiate with an eye to the "bottom line." Bottom-line purchasers base their negotiations on the *final* purchase price, including every tax, fee, and surcharge.

<u>Id</u>. (internal footnote omitted) (emphasis in original). Thus, in order to determine whether a customer is a bottom-line or top-line negotiator, the Fifth Circuit concluded that "a court would have to hear evidence regarding *each purported class member and his transaction*," and that was fatal to a finding of predominance. <u>Id</u>. at 424 (emphasis in original).

Here, however, plaintiffs have presented persuasive documentary and expert opinion evidence that is common to the class that shows that the standard fuel surcharges were intended to raise overall prices as a percentage multiplier of the base rate. Because each defendant's standardized fuel surcharge program was applied as a percentage multiplier of a shipper's base rate, application of that surcharge without discounting directly had the effect of

114

"increas[ing] all rates by a set percentage[.]" <u>Rail Fuel Surcharges</u>, 2007 WL 201205, at *4.

And the standardized fuel surcharges applied during the class period were uniform, were not

subject to negotiation, and were not discounted except in the case of anomalies.  Finally even

when, in the rare case, base rates were discounted, railroad executives admitted that the standard

fuel surcharge program "even if not accepted . . . was an effort to at least influence the discussion

on . . . fuel surcharge." HD Ex. 88, Gehl Dep. at 55.  In other words, the allegedly conspiratorial

fuel surcharges were the starting point for negotiations — a situation commonly observed in

price fixing conspiracies where classes have been certified.  <u>See, e.g.</u>, <u>In re Universal Serv. Fund</u>

<u>Tel. Billing Practices Litig.</u>, 219 F.R.D. 661, 675 (D. Kan. 2004) (describing class actions where

"'the negotiated transaction prices would have been lower if the stating point for negotiations had

been list prices set in a competitive market'") (quoting <u>In re Industrial Diamonds Antitrust Litig.</u>,

167 F.R.D. 374, 383 (S.D.N.Y. 1996)).

This case therefore is nothing like <u>Robinson</u>.  <u>Compare</u> <u>Robinson v. Texas Auto</u>

<u>Dealers Ass'n</u>, 387 F.3d at 423 (deciding "whether the mere payment of a VIT —

*unaccompanied by any other evidence* — provides enough information such that a party may

sustain a price-fixing suit on behalf of the entire class") (emphasis added).  Instead, this case falls

within the line of cases holding that class-wide injury-in-fact can be proven at trial by showing

that the allegedly conspiratorial fuel surcharges were the starting point "'from which negotiations

for discounts began.'" <u>In re Universal Serv. Fund Tel. Billing Practices Litig.</u>, 219 F.R.D. at 675

(quoting <u>In re Industrial Diamonds Antitrust Litig.</u>, 167 F.R.D. at 383); <u>see</u> <u>In re Ready-Mixed</u>

<u>Concrete Antitrust Litig.</u>, 261 F.R.D. at 171-72.  The theory behind this line of cases — which

applies with equal force here —

> "is . . . that the negotiated transaction prices would have been
> lower if the starting point for negotiations had been list prices set
> in a competitive market.  Hence, if a plaintiff proves the alleged
> conspiracy resulted in artificially inflated list prices, a jury could
> reasonably conclude that each purchaser who negotiated an
> individual price suffered some injury."

In re Universal Serv. Fund Tel. Billing Practices Litig., 219 F.R.D. at 675 (quoting In re

Industrial Diamonds Antitrust Litig., 167 F.R.D. at 383).  In sum, individualized negotiations and

discounts are not an automatic bar to class action treatment.  See In re EPDM Antitrust Litig.,

256 F.R.D. at 89; In re Urethane Antitrust Litig., 251 F.R.D. 629, 637-38 (D. Kan. 2008); In re

Industrial Diamonds Antitrust Litig., 167 F.R.D. at 383.

Under this line of cases, then, the question is whether common proof can be used

to show that the alleged conspiracy on fuel surcharges, at the very least, affected the starting

point for negotiations.  See In re EPDM Antitrust Litig., 256 F.R.D. at 88-89; In re Urethane

Antitrust Litig., 251 F.R.D. at 637-38.  The answer is yes.  Not only have defendants' own

executives admitted that negotiations started with the standard fuel surcharge program, see

HD Ex. 88, Gehl Dep. at 55; HD Ex. 85, Allen Dep. at 24-27; HD Ex. 83, Lawson Dep. at 38-41;

HD Ex. 77, Listwak Dep. at 23, 129; HD Ex. 89, Pagan Dep. at 55-56; HD Ex. 66, Young Dep.

at 71-75, but plaintiffs have shown — in reliance on defendants' own documents and economic

analysis of defendants' transaction data — that defendants' standardized fuel surcharge programs

overwhelmingly were applied without discounting the base rate.  See supra at 106-13.

### iii.  Expert opinions on injury-in-fact

Plaintiffs do not rely only on the extensive documentary evidence in the record to

show that injury-in-fact is capable of proof at trial with evidence common to the class.  Plaintiffs

116

also submit that they anticipate presenting at trial the testimony of Dr. Rausser, who, as they

describe, confirms with economic principles common to the class and a regression analysis that

injury-in-fact is capable of common proof. See Class Mem. at 71-75; see also Class Mot., Ex. B,

Trial Plan at 8-9.

In his report, Dr. Rausser first discusses the rail freight industry and concludes

that five structural factors strongly suggest that a conspiracy to impose supra-competitive fuel

surcharges on shippers would have succeeded in subjecting the class to a common injury-in-fact.

See 1st Rausser Report at 10-52; 2d Rausser Report at 80-81. Then, Dr. Rausser performs

economic regression analyses on defendants' transaction data that he says reveal that class

members suffered a common injury-in-fact from the alleged conspiracy. See 1st Rausser Report

at 80-101, 120; 2d Rausser Report at 91-92. Dr. Rausser has developed two economic regression

models: a "common factor model and a damage model." Oct. 6 Tr. at 137. According to

plaintiffs and Dr. Rausser, "[t]hese models together show that there are identifiable common

factors that explain pricing in the rail freight industry; and . . . that the conspiracy caused

significant overcharges across the class." Id.; see 2d Rausser Report at 91-92. Thus, plaintiffs

say that Dr. Rausser has established that economic analyses relying on evidence common to the

class — defendants' transaction data and economic principles common to the class — "can be

used to show that Defendants' conspiracy led to artificially high prices during the Class Period

for Class members." 1st Rausser Report at 80-81.[21]

---

[21] As discussed below, see infra at 138-39, Dr. Rausser also concludes that a common damage methodology works in this case.

Dr. Willig disagrees with some of Dr. Rausser's views about the rail freight market. See Willig Report at 64-100. More importantly, Dr. Willig finds flaws in Dr. Rausser's regression analyses, see id. at 107-59, and concludes that individualized inquiry is required to determine whether a particular shipper was injured-in-fact as a result of the alleged conspiracy. See id. ¶ 285.

As the Third Circuit instructed in In re Hydrogen Peroxide Antitrust Litig., the Court has weighed the expert reports of Dr. Rausser and Dr. Willig as a part of the rigorous analysis Rule 23 demands. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 323-24. The Court finds persuasive Dr. Rausser's analysis, which supports plaintiffs' argument that injury-in-fact is capable of proof at trial through evidence common to the class. The Court finds that Dr. Rausser's theory is "plausible," Behrend v. Comcast Corp., 655 F.3d at 204 n.13; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 325, and "susceptible to proof at trial through available evidence common to the class." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 325. Dr. Rausser persuasively has established "the key logical steps behind [his] theory," In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d at 26, that injury-in-fact is capable of proof at trial with workable economic models and analysis — that is, common evidence.

1. Rail freight industry. Dr. Rausser contends that the rail freight industry is conducive to price fixing. See 1st Rausser Report at 5. He first identifies the geographic and product scope relevant to the rail freight industry. See id. at 10. As for the geographic scope, defendants sell rail services throughout the continental United States. Id. Together, defendants possess a 90 percent market share based on track miles and a 94 percent market share based on freight revenue. Id. at 21. Together, they provide rail services throughout the continental United

States "to nearly every industrial, wholesale, retail, and resource-based sector of the economy."

Id. In short, Dr. Rausser concludes that defendants have "an enormous market share in the rail

freight market," and that this "structure . . . created an environment conducive to collusion[.]"

Id. at 20.

      The product at issue is freight service. See 1st Rausser Report at 16. As Dr.

Rausser describes it, freight services are "homogenous and interchangeable across Defendants."

Id. at 27. He further explains:

> The service that the Class I railroads offer shippers is
> interchangeable and therefore, when shippers make a choice
> between railroads, they do so based on price. The service that is
> offered to the market is simply the movement of goods between
> origin and destination. Shippers can even use their own cars and
> often do. Any differences that may exist between shippers
> concerning reliability and speed are very likely to be eliminated
> over time as railroads compete with each other and invest to
> eliminate any service deficiencies they may have.

Id. In view of this characterization of the product, Dr. Rausser concludes that "[b]ecause

customers choose between railroads based on price, there are strong incentives for railroads to

restrict the resulting price competition by collusion." Id.

      Having examined the geographic market and the product at issue, Dr. Rausser

contends that the rail freight industry has five characteristics that make it conducive to price

fixing: (1) the industry is heavily concentrated; (2) there are significant barriers to entry; (3) rail

freight services are interchangeable across defendants, and shippers choose their railroad based

on price; (4) the demand for rail freight services generally is inelastic; and (5) pricing is

transparent. See 2d Rausser Report at 79. And according to Dr. Rausser, these five

characteristics strongly suggest that "had a conspiracy occurred it would have succeeded in

119

subjecting the Class to a common" injury-in-fact. 2d Rausser Report at 80. Dr. Rausser

concludes:

> *Characteristic 1* — as the industry is concentrated in the hands of the Defendants, the alleged cartel would have been able to sustain high prices across the Class and non-Defendant railroads would have lacked the capacity to lure Class members away with lower prices;

> *Characteristic 2* — the Defendants' high prices would not have been undercut by the creation of new railroads (*de novo* entry), or the expansion of existing railroads;

> *Characteristic 3* — because Class members considered the railroads' services as interchangeable and chose their railroad based on price, they would have been harmed by the restriction of that choice and the routinely imposed higher prices;

> *Characteristic 4* — although some shippers may have been able to find viable transport alternatives to rail (all price-fixing cartels lose some customers), the vast majority would have been unable to do so and, thus, Defendants could profitably elevate their prices in a coordinated manner without risk of losing substantial business;

> *Characteristic 5* — costs of implementing and maintaining the conspiracy would have been extremely low due to thoroughly standardized service descriptions, established mechanisms for communicating and tracking prices, and ease of using generally available indexes to increase prices.

2d Rausser Report at 80-81 (footnotes omitted).[22]

---

[22]    Defendants contend that one part of "Characteristic 5" references objectionable interline-related communications. See Defs. Interline Objections, Ex. C, at 80-81. Specifically, defendants say that Dr. Rausser improperly has relied on interline-related communications when he states that costs of implementing and maintaining the conspiracy would have been extremely low due to "*established mechanisms for communicating and tracking prices*[.]" Id. (emphasis added). The Court has not relied on this part of Characteristic 5 in reaching in decision on plaintiffs' motion for class certification.

Not surprisingly, Dr. Willig disagrees with Dr. Rausser: he contends that the industry characteristics discussed by Dr. Rausser "do not suggest, and provide no valid basis for concluding, that the alleged conspiracy would have had a systematic effect on rail rates paid by members of the purported class." Willig Report ¶ 43. As Dr. Willig sees it, the economics of the rail industry imply that there can no common evidence of class-wide injury-in-fact. Willig Report at 64.

Dr. Willig's disagreement with Dr. Rausser appears to focus on two questions about the structure of the rail freight industry: whether freight prices are truly interchangeable; and whether pricing is transparent. As for the first issue, Dr. Willig contends that rail contracts involve a wide variety of complex contractual agreements and are multidimensional in nature. Willig Report ¶ 115. Dr. Willig concludes:

> Testimony from defendants' marketing personnel as well as defendants' transaction data demonstrate that FSCs cannot be viewed in insolation from the other dimensions of agreements between railroads and shippers. Rather, only an individualized inquiry can determine whether shippers benefitted from modification of other parts of the agreement as part of their agreement to pay an FSC. The existence and magnitude of such modifications cannot be measured on a class-wide basis since they depend upon the terms of both rate and non-rate provisions of the agreements.

Willig Report ¶ 115. According to defendants, they "do not provide a product, much less a fungible commodity"; rather, they "provide the majority of their services pursuant to contracts that reflect the diversity of rail customers and are highly differentiated, varying by customer, lane, equipment, product being shipped, and numerous other factors." Class Opp. at 58; see Willig Report ¶ 116.

121

Regarding the second issue, Dr. Willig contends that Dr. Rausser's claim that pricing is transparent is incorrect. Willig Report ¶ 43. According to Dr. Willig, "rates typically paid by members of the proposed class are confidential and are not transparent to other members of the alleged conspiracy." Id. This industry characteristic, Dr. Willig says, "creates practical incentives for members of the alleged cartel to 'cheat' or 'deviate' by offering concessions to shippers on base rates, fuel escalation provisions, or other elements of rail contracts." Id.

The Court finds persuasive Dr. Rausser's characterization of the rail freight industry. There is no question that the rail freight industry is concentrated in the hands of the four defendants — they possess 90 percent market share based on track miles and control 94 percent of the market based on freight revenue — and Dr. Willig does not claim otherwise. Nor does Dr. Willig dispute Dr. Rausser's contention that there are significant barriers to entry.

As for the nature of the product, the Court disagrees with defendants that "there are a lot of individualized factors that drive shippers to choose between different rail freight service providers." Oct. 6 Tr. at 32. Dr. Rausser persuasively has explained that customers routinely switch between railroads for shipments along the same routes, "confirming that they see the railroads' services as interchangeable." 1st Rausser Report at 27; see id. at 27-29. The Court also credits Dr. Rausser's conclusion that demand for freight services generally is inelastic. See 1st Rausser Report at 29-36. As he explains, "an analysis of the industry demonstrates that Defendants' businesses are concentrated in commodities and distances over which rail is the most cost efficient transport option and therefore the demand that they faced was in general inelastic." Id. at 31-32.

Finally, regarding the issue of transparency, Dr. Rausser acknowledges, as he must, the existence of private contracts, but explains that rail freight pricing nevertheless is established, well defined, and easily understood. See 1st Rausser Report at 37.[23] As Dr. Rausser states: "[F]reight railroad companies use common types of *price authority* documents, which provide a detailed account of all the base freight charges, surcharges, accessorial, and fuel surcharges associated with a specified rail movement." Id. at 37 (emphasis in original). Although rail freight is, of course, a service, rather than a good, "that service is well defined and highly standardized using commodity classifications for the material shipped, tonnage as a measure of quantity, and miles representing the distance traveled." 2d Rausser Report at 29. Thus, "[i]ntelligence on price quotes for this service can be exchanged and both parties in the exchange know exactly what they are talking about," which "eases the costs of monitoring for a cartel." Id. Moreover, the allegedly conspiratorial mechanism applied by defendants — standardized fuel surcharges — does not require constant communications once the details of the surcharge have been agreed upon. See 1st Rausser Report at 50. And although Dr. Willig contends that the existence of private price quotes creates practical incentives to "cheat" or "deviate" by offering concessions, see Willig Report ¶ 43, as the Court previously has found by a preponderance of the evidence, see supra at 106, the examples of discounting are, at best, anomalies.

---

[23]     Moreover, as Dr. Rausser points out, the existence of private price agreements in the rail freight industry does not distinguish the industry "from many other industries, including some that have experienced price fixing despite the supposedly confidential nature of customer contracts." 2d Rausser Report at 10 & n.16 (citing peer-reviewed study concluding that "cartels in industries with fuller reporting on prices are not statistically significantly higher than for cartels in other industries").

The Court therefore is not persuaded by Dr. Willig's characterization of the rail freight industry, see Willig Report ¶¶ 43, 115-16, or by defendants' attempts to discredit Dr. Rausser's analysis. See Defs. Hr'g Binder, Part III at 45; Oct. 7 Tr. at 222-35. Rather, the Court finds that the five structural characteristics of the rail freight industry identified by Dr. Rausser, and the evidence he marshals regarding those characteristics, provide strong support for plaintiffs' contention that injury-in-fact is capable of proof at trial with evidence common to the class. See In re Puerto Rican Cabotage Antitrust Litig., 269 F.R.D. at 139 (considering, among other things, highly concentrated industry, high entry barriers, static elasticity, and price competition in finding by a preponderance of the evidence that predominance requirement was satisfied); In re EPDM Antitrust Litig., 256 F.R.D. at 92 (according to expert analysis credited by the court, certain market factors "lay the groundwork for plaintiffs' argument that, if collusive behavior did occur, it would have been effective in raising prices across the class, thus demonstrating class-wide injury-in-fact").

    *2. Background on multiple regression analysis.* The centerpiece of Dr. Rausser's report focuses on two economic models that examine defendants' transaction data through multiple regression analysis. See 2d Rausser Report at 91-92; see also id. at 11. Before addressing the specific analyses done in this case, the Court provides below some background on multiple regressions in general, as set forth in a reference guide published by the Federal Judicial Center:

> Multiple regression analysis is a statistical tool for understanding the relationship between or among two or more variables. Multiple regression involves a variable to be explained — called the dependent variable — and additional explanatory variables that are thought to produce or be associated with changes

in the dependent variable.  For example, a multiple regression analysis might estimate the effect of the number of years of work on salary.  Salary would be the dependent variable to be explained; years of experience would be the explanatory variable.

Multiple regression analysis is sometimes well suited to the analysis of data about competing theories for which there are several possible explanations for the relationships among a number of explanatory variables.  Multiple regression typically uses a single dependent variable and several explanatory variables to assess the statistical data pertinent to these theories. . . . [For example, ]in an antitrust cartel damages case, the plaintiff's expert might utilize multiple regression to evaluate the extent to which the price of a product increased during the period in which the cartel was effective, after accounting for costs and other variables unrelated to the cartel.  The defendant's expert might use multiple regression to suggest that the plaintiff's expert had omitted a number of price-determining variables.

More generally, multiple regression may be useful (1) in determining whether a particular effect is present; (2) in measuring the magnitude of a particular effect; and (3) in forecasting what a particular effect would be, but for an intervening event. . . .

Multiple regression analysis can be a source of valuable scientific testimony in litigation.  However, when inappropriately used, regression analysis can confuse important issues while having little, if any, probative value.

RUBINFELD, supra, at 305-08.

"In an antitrust suit, plaintiffs will generally use multiple regression analysis to demonstrate that a 'conspiracy' variable has influence over the dependent variable (price) — that is, class members paid a higher price than the basic economic principles of supply and demand would otherwise dictate, thus demonstrating collusive behavior was at work."  In re EPDM Antitrust Litig., 256 F.R.D. at 95; see Schumacher v. Tyson Fresh Meats, Inc., Civil Action No. 02-1027, 2006 WL 47504, at *1 n.1 (D.S.D. Jan. 5, 2006) ("A multiple regression analysis is

a statistical tool that attempts to reveal relationships between explanatory variables and a

dependent variable."). A multiple regression model must, of course,

> be correctly set up for the results to be valid. The expert's choices
> are crucial for the success of the analysis and the ultimate
> fact-finder should consider the following when evaluating the
> efficacy of the expert's analysis: has the expert correctly identified
> the dependent variable; has he or she chosen the correct
> explanatory variable that is relevant to the question at issue; are the
> additional variables chosen all correct or are some missing and/or
> irrelevant; is the form of the analysis correct?

In re EPDM Antitrust Litig., 256 F.R.D. at 95; see RUBINFELD, supra, at 310-17.

Ultimately, "[e]ven the best regression equation cannot prove causation."

Schumacher v. Tyson Fresh Meats, Inc., 2006 WL 47504, at *7; see RUBINFELD, supra, at 310.

Rather, "[t]he most it can show is a correlation that can give rise to an inference that causation

exists." Schumacher v. Tyson Fresh Meats, Inc., 2006 WL 47504, at *7; see Morgan v. United

Parcel Serv. of Am., Inc., 380 F.3d 459, 466 (8th Cir. 2004) (a valid regression equation gives

rise to an inference of causation, but does not itself prove causation); see also In re Oil Spill by

the Amoco Cadiz Off the Coast of Fr. on Mar. 16, 1978, 954 F.2d 1279, 1320 (7th Cir. 1992)

("If done right, regression analysis permits an inference of causation, and of the size of the

effect."). Thus, "one must infer that a causal relationship exists on the basis of an underlying

causal theory that explains the relationship between the two variables." RUBINFELD, supra,

at 310.

> *3. Dr. Rausser's regressions are workable and susceptible to proof at trial*

*through common evidence.* As discussed, Dr. Rausser explains that he developed two multiple

regression models, a common factor model and a damage model, that together reveal that

126

injury-in-fact can be established at trial with evidence common to the class. See, e.g., 2d Rausser Report at 91-92, 99-100; see also Oct. 6 Tr. at 137.  As Dr. Rausser describes it, his common factor model performs "an investigation of whether . . . common transaction characteristics predominate over individual factors in determining the variation in freight rates." 2d Rausser Report at 84.  Dr. Rausser analyzed defendants' transaction data and concluded that there are seven common factors that predominately explain rail price variations, and that these factors can be controlled for in a regression.  See 1st Rausser Report at 92.  In other words, according to Dr. Rausser, his common factor model explains pricing in the rail freight industry and shows, relying only on defendants' transaction data, that rail freight pricing is "highly standardized." Id. at 84.

According to Dr. Rausser, the seven factors that predominately explain rail price variations are: (1) weight of the shipment; (2) distance; (3) whether the shipment is interline; (4) the origin and destination; (5) the commodity being transported; (6) the rail car type; and (7) the quarter of departure.  See 1st Rausser Report at 92.  Dr. Rausser concludes that these seven factors are highly predictive of freight rates: he says that these factors explain "over 75% of the variation in actual per car revenues for individual shipments."  2d Rausser Report at 66-67. Because, according to Dr. Rausser, the seven common factors predominate over individual factors in determining rail freight price, the seven common factors can be used in a common analysis of impact.  See 2d Rausser Report at 67; see also 1st Rausser Report at 7 (stating that "common factors can be measured using the Defendants' transaction data and used in a common analysis to identify and quantify the harm experienced by the Class").

Dr. Rausser's damage model builds on the common factor model to show, again relying on defendants' transaction data, that the alleged conspiracy injured class members by

127

inflating freight prices and to quantify the amount of damages. See 2d Rausser Report at 91-92.

Dr. Rausser says that the damage model works by taking into account the factors that influenced

defendants' prices during the class period as compared to "benchmark" prices during the three

preceding years. 1st Rausser Report at 113. Dr. Rausser says that his regression analyses —

applied now to 100 percent of defendants' transaction data, see 2d Rausser Report at 12 — find

"that all-in freight rates were higher during the Class Period than could be explained by

economic forces other than the alleged price-fixing conspiracy" and reveal "a structural break in

the relationship between fuel prices and freight rates starting in 2003, consistent with the advent

of a price-fixing conspiracy using Fuel Surcharges as its facilitating mechanism." Id. at 82-83;

see 1st Rausser Report at 120. Dr. Rausser's damage model calculates a class-wide overcharge

of 13.4 percent. See 2d Rausser Report at 83; 1st Rausser Report at 119-20.

Defendants and Dr. Willig argue that Dr. Rausser's economic regressions suffer

from fatal flaws, and that neither his common factor model nor his damage model satisfies

plaintiffs' burden of showing that injury-in-fact is capable of proof at trial with common

evidence. See Class Opp. at 63. As for the common factor model, defendants contend that it has

four flaws. See id. at 63-65. First, defendants contend that Dr. Rausser "only studied traffic

destined for three geographic areas out of the thousands served by Defendants and only for a

single year — 2006." Id. at 63. The three destinations that he chose, according to defendants,

are not representative samples. Id. Second, defendants argue that although Dr. Rausser's model

shows that certain characteristics "play an important role in overall rail rates," it "says nothing

about whether the conspiracy caused all class members to pay a fuel surcharge they otherwise

would not have paid or how that fuel surcharge compared to whatever cost recovery mechanism

would have been used instead." Id. at 64. Third, defendants argue that Dr. Rausser's model "purports to explain 76–89% of the variation in overall rates," but provides "no scientific basis to dismiss the 11–24% in unexplained price variation as unimportant." Id. Fourth, defendants argue that Dr. Rausser's model "looks only at a snapshot in time — 2006 — and thus cannot examine changes in rates over time." Id. at 65. Thus, as defendants see it, Dr. Rausser's common factor model "tells the [C]ourt nothing about what factors would have an effect on rates over time[.]" Id.

Next, addressing Dr. Rausser's damage model, defendants argue that it is "not a model of injury causation," and that Dr. Rausser purportedly has not claimed otherwise. Class Opp. at 65 (citing 1st Rausser Dep. at 142-43). And even if it were a model of injury causation, defendants argue that it suffers the same underlying flaw as his common factor model. As defendants see it, his damage model "cannot show whether a shipper paid a fuel surcharge *because* of the conspiracy or would have paid one anyway. The model simply assumes causation and then attempts to quantify the damages." Id.

Finally, defendants argue that Dr. Rausser's analysis fails to specify a but-for world. See Class Opp. at 67. According to defendants, absent a clearly identified but-for world, "there is no basis to say whether prices would have been lower across-the-board." Id. Defendants contend:

> Given the unprecedented increase in fuel costs, which even Dr. Rausser concedes would have led to increased prices, the logical question is what price strategy supposedly would have been used in lieu of the rate-based fuel surcharges. In contrast to a simple reduction in price in the typical price-fixing case, alternative fuel pricing strategies affect class members in very different ways and the Court simply cannot assume — as Plaintiffs would like it to —

129

> that a mechanism that might have been chosen but for the
> conspiracy would always yield a lower fuel surcharge.  Rather,
> Plaintiffs must posit an alternative and demonstrate that it would
> yield a lower charge for all (or nearly all) members of the class.

Class Opp. at 67-68.  Defendants say that plaintiffs have not identified a but-for fuel pricing

strategy, and Dr. Rausser's regressions fail to measure any specific but-for fuel cost recovery

mechanism.  Id.

      The Court disagrees with defendants and concludes that Dr. Rausser has presented

a theory of proof that is plausible and economic regression analyses that are workable.  The Court

finds by a preponderance of the evidence that Dr. Rausser's theory and regression analyses are

susceptible to proof at trial through evidence common to the class.  See In re Hydrogen Peroxide

Antitrust Litig., 552 F.3d at 325; see also In re EPDM Antitrust Litig., 256 F.R.D. at 96.  The

Court addresses each of defendants' arguments in turn:

      First, the Court is not persuaded by defendants' argument that Dr. Rausser's

common factor model relies on unrepresentative destinations.  The point of the common factor

regression is to demonstrate that certain factors predominately explain rail price variations.  See

1st Rausser Report at 92; 2d Rausser Report at 85.  As defendants acknowledge, Dr. Rausser's

model "[o]f course" shows that "a shipment's physical characteristics, such as its weight, car type

and commodity, play an important role in overall rail rates."  Class Opp. at 64.  Defendants do

not assert that, had Dr. Rausser chosen other destinations, he would have reached a different

conclusion that seven common factors predominately explain freight rates.  The Court concludes

that defendants have failed to undermine plaintiffs' showing that the seven factors identified and

controlled for in Dr. Rausser's analysis are the determinative factors of rail freight pricing.

Second, defendants criticize Dr. Rausser's common factor model for purportedly failing to say anything about whether the conspiracy caused all class members to pay a fuel surcharge they otherwise would not have paid or how that fuel surcharge compared to whatever cost recovery mechanism would have been used instead. Class Opp. at 64. The Court finds that criticism misplaced. Dr. Rausser's common factor and damage models together set forth persuasive, workable multivariate regressions that give rise to an inference of causation (the most any regression analysis can be expected to do) — that is, that putative class members paid more for rail freight transportation services than they would have absent the conspiracy on fuel surcharges. Dr. Rausser has examined the entire universe of defendants' transaction data from 2000 to 2008. As plaintiffs point out, that data consist of "more than 200 million unregulated shipments nationwide over an eight-year period." Pls. Wal-Mart Brief at 15. Dr. Rausser's regression analyses revealed that seven common factors predominate over individual factors in determining rail freight prices, and that these common factors permit a common analysis of defendants' transaction data that can measure injury-in-fact suffered by the class.

Third, defendants criticize Dr. Rausser's common factor model for failing to "explain all of the variation in rail rates." Oct. 7 Tr. at 265; see also Class Opp. at 64. As defendants' counsel stated at oral argument, "there's quite a bit of variation that's unexplained by [Dr. Rausser's] common factors model." Oct. 7 Tr. at 265. But Dr. Rausser's model explains "over 75% of the variation in actual per car revenues for individual shipments." 2d Rausser Report at 66. His damage model, which builds on the common factor model, explains "84% of the variation in all-in rates." Id. at 67. The Court agrees with plaintiffs that both of Dr. Rausser's regression models provide high levels of explanatory power, and that there is no basis

131

for demanding, as defendants appear to do, 100 percent explanatory power. See Pls. Wal-Mart

Reply Brief at 10; 2d Rausser Report at 67 ("In no industry is it possible to explain 100% of the

variation in prices."); see also In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. at 601

(concluding that plaintiffs put forth feasible regression methodology that, among other things,

found that 77 percent of price variation was determined by five variables); see id. at 604

(plaintiffs "need not demonstrate that their multiple regression analysis captures all the proper

variables and thus reaches the 'right' answer, as the defendants would require").  Furthermore,

Dr. Rausser persuasively explains that the important question for the Court is

> whether the remaining unexplained variation is both systematic and
> related to the conspiracy.  Unless this is true, the residual (random)
> unexplained price component is irrelevant for class certification
> purposes, given that it would have been present even in the but-for
> world.  In evaluating this question, economic logic plays an
> important role, identifying factors that would be likely to influence
> price and therefore should be included in the model.

2d Rausser Report at 68.  The Court agrees that Dr. Rausser's common factor and damage

models together plausibly include the logical determinants of freight rates, and neither defendants

nor Dr. Willig credibly have identified any missing variables.

Fourth, regarding defendants' claim that Dr. Rausser's common factor model is

merely a snapshot in time that does not explain rail rates over time, the Court disagrees that this

is a valid basis on which to discredit Dr. Rausser's model.  Dr. Rausser examined rail rates over a

12-month period, and defendants have not asserted that this time period was not representative of

the years of the alleged conspiracy period, was somehow aberrational or unreliable, or that Dr.

Rausser would have reached any other conclusion had he chosen different years within the period

or examined all years.

Fifth, defendants criticize Dr. Rausser's damage model, arguing that it is not a model of injury causation, as Dr. Rausser purportedly admitted during his deposition. Class Opp. at 65 (citing 1st Rausser Dep. at 142-43). But what Dr. Rausser explained in his deposition was that his common factor model was a "maintained hypothesis," 2d Rausser Dep. at 143, in his damage model — which he then uses to explore what effect, if any, can be attributed to the alleged conspiracy, and what portion of the prices paid by shippers can be attributed to the conspiracy. See id. As Dr. Rausser explains in his reply report, neither his common factor model nor his damage model in isolation attempts to prove common injury-in-fact. Rather, the result of the damage model "must be viewed as the final step in the body of evidence . . . presented" to show that injury-in-fact is capable of common proof. 2d Rausser Report at 92.

Sixth, defendants argue that Dr. Rausser's damage model cannot show whether a shipper paid a fuel surcharge because of the conspiracy — it simply assumes causation. The Court disagrees. As discussed, see supra at 127-28, Dr. Rausser's common factor model and damage model work in conjunction. Together, these two models set forth a persuasive inference of causation: certain common factors predominate in the determination of freight rates; controlling for those common factors, analysis of defendants' transaction data reveals that there was a structural break in the relationship between freight rates and fuel prices around 2003, "which is consistent with a conspiracy using Fuel Surcharges to raise freight rates[.]" 2d Rausser Report at 92.

Finally, defendants argue that Dr. Rausser has not clearly identified a but-for world or a but-for fuel pricing strategy, and he therefore has no basis to say whether prices would have been lower across-the-board. Class Opp. at 68. Defendants contend that there is some

133

suggestion in plaintiffs' complaint that, at one point, plaintiffs may have thought that defendants

should have used a mileage-based fuel surcharge, but that plaintiffs have not pursued that theory.

See id. Defendants contend that the reason for that is simple: "Dr. Willig examined whether

shippers would have been better off with mileage-based fuel surcharges and found that a

substantial percentage of shippers would have paid *more* under a mileage-based surcharge." Id.

(emphasis in original) (citing Willig Report ¶ 282). According to defendants, "[a]bsent a clearly

identified but-for world, there is no basis to say whether prices would have been lower across-

the-board." Class Opp. at 67.

Plaintiffs, however, do not need to prove at the class certification stage that prices

would have been lower across-the-board. Plaintiffs' burden, rather, is to demonstrate that

injury-in-fact is capable of common proof at trial. See In re Hydrogen Peroxide Antitrust Litig.,

552 F.3d at 311-12. And as to Dr. Rausser's regression analyses,

> "[t]he real question . . . is whether the plaintiffs have established a
> workable multiple regression equation, *not whether plaintiffs'*
> *model actually works*, because the issue at class certification is not
> which expert is the most credible, or the most accurate modeler,
> but rather [whether] the plaintiffs [have] demonstrated that there is
> a way to prove a class-wide [injury-in-fact] through generalized
> proof."

In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. at 383 (quoting In re EPDM

Antitrust Litig., 256 F.R.D. at 100) (emphasis in original); see In re TFT-LCD (Flat Panel)

Antitrust Litig., 267 F.R.D. at 604; In re Ready-Mixed Concrete Antitrust Litig., 261 F.R.D.

at 170-71. The Court concludes that Dr. Rausser's regression analyses are workable. Dr.

Rausser has presented a plausible theory of injury-in-fact that is susceptible to proof at trial

through available evidence common to the class. See Behrend v. Comcast Corp., 655 F.3d

at 198; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 325.

As Dr. Rausser describes it:

> [A]bsent the conspiracy, fuel cost recovery would have been but one component of a total price kept lower by price competition between the railroads . . . . The "but-for" world analyzed in my Initial Report is simply characterized by railroads competing with each other over *total price* (base rates plus Fuel Surcharges) as they did in the pre-Class period.  A combination of different fuel recovery programs might be used, or none at all.  This is what the world looked like prior to mid-2003 . . . , and this period serves as a reliable benchmark with which to quantify damages.

2d Rausser Report at 47 (emphasis in original).  As for Dr. Willig's analysis that shippers would

have been better off with mileage-based fuel surcharges, he essentially is submitting a *competing*

view of the but-for world based on an analysis of defendants' transaction data, which is not an

appropriate inquiry for the Court at the class certification stage.  See, e.g., In re Currency

Conversion Fee Antitrust Litig., 264 F.R.D. at 115 ("[W]hen both experts rely on evidence

common to the class, this Court should not resolve which 'but for' price is correct."); In re

EPDM Antitrust Litig., 256 F.R.D. at 90; Hnot v. Willis Group Holdings Ltd., 241 F.R.D.

at 209-10; see also In re TFT-LCD (Flat Panel) Antitrust Litig., MDL No. 1827, 2012 WL

253298, at *4 (N.D. Cal. Jan. 26, 2012) ("Defendants have not challenged the reasonableness of

plaintiffs' methodology for proving classwide impact.  Instead, their arguments concern the

application of that methodology.  Such analysis, however, goes beyond the inquiry at the class

certification stage.") (citing In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 490

(N.D. Cal. 2008)).[24]

---

[24]     Both sides and their experts reference and rely on a 2009 study that was conducted by Laurits R. Christensen Associates, Inc. and commissioned by the STB to analyze competition, capacity, and service quality in the rail freight industry.  See, e.g., Oct. 6 Tr. at 140-41; Oct. 7 Tr. at 272-73; see generally HD Ex. 12, LAURITS R. CHRISTENSEN ASSOCIATES, INC., VOLUME 2, ANALYSIS OF COMPETITION, CAPACITY, AND SERVICE QUALITY (Nov. 2009) (hereinafter,

Ultimately, in evaluating Dr. Rausser's regressions and Dr. Willig's criticisms, the Court must determine whether Dr. Rausser's theory of proof is plausible and whether his regression models are workable. The Court concludes that they are: Dr. Rausser has established "the key logical steps behind [his] theory" that injury-in-fact is capable of proof at trial with common evidence. In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d at 26. Relying on principles common to the class and an analysis of 100 percent of defendants' transaction data, Dr. Rausser has presented a workable regression analysis that is susceptible to proof at trial through available evidence common to the class. See Behrend v. Comcast Corp., 655 F.3d at 198; In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 325.

*     *     *     *

The burden for plaintiffs at the class certification stage is to show by a preponderance of the evidence "that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311-12. Plaintiffs have satisfied that burden. The Court has examined all the relevant evidence and arguments including all relevant expert opinion, see id. at 315 n.13, and finds by a preponderance of the evidence that plaintiffs have shown that impact is capable of proof at trial through common evidence.

---

"Christensen Report"). Plaintiffs say that the Christensen Report supports Dr. Rausser's conclusion that there was a structural break in the relationship between fuel costs and rail freight prices that was consistent with the start of the alleged conspiracy. See Oct. 6 Tr. at 140-41; see also Christensen Report at 9-16–9-17. Defendants say, among other things, that the Christensen Report "does quite the opposite." Oct. 7 Tr. at 272. Defendants do not dispute, however, that the Christensen Report relies on evidence common to the class and itself constitutes such common evidence. Thus, if anything, the Christensen Report supports plaintiffs view that injury-in-fact is *capable* of common proof at trial. The question of which party's characterization of that report is correct is a matter to be resolved by the finder of fact at trial.

136

3. Damages

The third element that plaintiffs will have to prove at trial is "measurable

damages." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311; Meijer, Inc. v. Warner

Chilcott Holdings Co. III, 246 F.R.D. at 307.  The element of damages is distinct from impact:

impact asks "*whether* the plaintiffs were harmed," whereas damages "quantify *by how much*."

In re EMDM Antitrust Litig., 256 F.R.D. at 88 (emphasis in original).  "The inquiry for a district

court at the class certification stage is whether the plaintiffs have demonstrated by a

preponderance of the evidence that they will be able to measure damages on a class-wide basis

using common proof." Behrend v. Comcast Corp., 655 F.3d at 204.

"Some variation of damages among class members does not defeat class

certification." Behrend v. Comcast Corp., 655 F.3d at 204; see 7AA FEDERAL PRACTICE &

PROCEDURE, supra, § 1781 ("[I]t uniformly has been held that differences among the members as

to the amount of damages incurred does not mean that a class action would be inappropriate.").

Moreover, as the Seventh Circuit recently stated: "It is well established that the presence of

individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."

Messner v. Northshore Univ. HealthSystem, 669 F.3d at 815; see Arreola v. Godinez, 546 F.3d

788, 801 (7th Cir. 2008) ("Although the extent of each class member's personal damages might

vary, district judges can devise solutions to address that problem if there are substantial common

issues that outweigh the single variable of damages amounts. . . . [T]he need for individual

damages determinations does not, in and of itself, require denial of [a] motion for certification.")

(internal citations omitted); Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1261 (11th

Cir. 2003) ("[N]umerous courts have recognized that the presence of individualized damages

137

issues does not prevent a finding that common issues in the case predominate."); Hardy v. City

Optical Inc., 39 F.3d 765, 771 (7th Cir. 1994) (recognizing that "[t]here have been many antitrust

class actions in which the relief sought was damages, and the fact that the damages would

generally be different for each member of the class was not deemed an insurperable obstacle");

see also Kottaras v. Whole Foods Mkt., Inc., 2012 WL 259862, at *7.  To be sure, however,

"[c]omplex and individualized questions of damages . . . weigh against finding predominance."

Behrend v. Comcast Corp., 655 F.3d at 204.

Plaintiffs rely on Dr. Rausser to show that analysis common to the class can be

used to calculate and apportion class-wide damages among class members.  See Class Mem.

at 75.  As plaintiffs describe it, Dr. Rausser has observed that "it is entirely feasible to perform

the estimation of the percentage overcharge across the entire class for each regression

specification described in his report, yielding a calculation of overcharge for the entire class."  Id.

According to Dr. Rausser, his analysis reveals that "a professionally accepted

regression based methodology using the Defendants' transaction data . . . does in fact work" in

assessing class-wide damages.  1st Rausser Report at 113.  As Dr. Rausser explains, he

"developed such a regression model" — that is, his damage model — "to test whether the prices

during the Class Period are significantly different than prices generated from an appropriate

'benchmark' period, after adjusting for differences in all relevant economic forces."  Id.

Dr. Rausser has calculated class-wide damages using his damage model

employing the conspiracy and pre-conspiracy transaction data:

> The percentage overcharge due to the alleged conspiracy can be
> calculated using the regression model to compare freight rates in
> the Class Period to those in the pre-Class Period, while using the

> Defendants' transaction data and publicly available data to account
> for the other predominating common economic forces that
> determine prices.  The transaction data can be used to account for
> the effect of shipment specific characteristics, such as weight,
> distance, route, car type, commodity type, and so on. . . . The
> regression model can be used to "back out" the effect of these
> factors to isolate the effect of the alleged conspiracy on freight
> rates.

1st Rausser Report at 114.  He further adds that "to calculate each individual customer's

damages[,] the relationship between price drivers and freight rates calculated by the model run on

the full range of data can be used to estimate the but-for price for each customer transaction." Id.

at 122.  Thus, the "difference between this but-for price and the actual price paid is the

overcharge to that customer for that transaction." Id. at 122-23.

Defendants argue that "the complications of the individualized proof of damages

here preclude class certification." Class Opp. at 72.  As defendants describe it, in most price

fixing cases, plaintiffs will propose to calculate a standard overcharge percentage, which then is

applied to all class member purchases. See id. at 73.  In that situation, defendants contend that an

assessment of damages is not particularly complicated: "the only individualized task is to tally up

a class member's purchases, which are then multiplied by the common overcharge percentage."

Id.

Here, however, defendants argue that determining individualized damages

requires evidence of, among other things:

> (1) the [individual] class member's actual fuel surcharge payments,
> (2) the but-for fuel cost recovery that would have applied to that
> class member in light of its specific competitive situation,
> including both the timing of when that fuel surcharge would have
> been added and its terms, and (3) other adjustments to the base rate
> or non-rate elements of the contract that were made as part of the
> negotiations to add the fuel surcharge.

139

Class Opp. at 73.  According to defendants, "[t]hese are all individualized determinations," and

Dr. Rausser's damage model "does not account for any of these elements and therefore cannot be

used to estimate an individual class member's damages."  Id.  Thus, defendants contend that

class certification must be denied.  See id. at 73-74 (citing Piggly Wiggly Clarksville, Inc. v.

Interstate Brands Corp., 215 F.R.D. 523, 530-31 (E.D. Tex. 2003)); see also Willig Report

at 137-51.

> The Court disagrees with defendants and finds that plaintiffs have satisfied their

burden of showing by a preponderance of the evidence that "they will be able to measure

damages on a class-wide basis using common proof."  Behrend v. Comcast Corp., 655 F.3d

at 204.  Dr. Rausser has developed a workable regression model that uses defendants' transaction

data to calculate damages to the class and to each class member.  In his original report, Dr.

Rausser applied his regression methodology on a dataset that included about 25 percent of each

defendants' total unregulated freight traffic over the period 2000 to 2008.  See Class Reply at 37.

As Dr. Rausser explains in his reply report, he now has run his regression model on the complete

set of defendants' transaction data.  See 2d Rausser Report at 96; see also Class Reply at 37.

And, according to Dr. Rausser, "[t]he results on 100% of the relevant transactions confirm that a

structural break in the relationship between fuel prices and freight rates occurred in 2003, and

that this break increased freight rates above what they would have been absent the conspiracy.

The estimated class-wide overcharge is 13.4%."  2d Rausser Report at 83.  Furthermore, as Dr.

Rausser explains, his damage model "does not assume that all shippers paid the same

overcharge."  2d Rausser Report at 92.  Rather, he explains that his damage model "can be used

to calculate individual damages[.]"  Id.

The Court rejects defendants' argument that Dr. Rausser's damage model cannot be applied on a class-wide basis to calculate damages because such damages vary on particular shipments. See Class Opp. at 65; Willig Report ¶ 273. Even if that were true, it would not preclude a finding of predominance. See Messner v. Northshore Univ. HealthSystem, 699 F.3d at 815; see supra at 137-38. And in any event, the Court agrees with Dr. Rausser that the reported variation among shipments is to be expected and does not prevent a common damage methodology from applying in this case. See 2d Rausser Report at 98 n.225.

The Court also rejects defendants' argument that Dr. Rausser's damage model "yields nonsensical results." Class Opp. at 66. As defendants describe it: "Dr. Rausser says injury to class members results from the payment of fuel surcharges, but the damages he calculates, which are expressed as percentage reductions in all-in-rates, vastly exceed the fuel surcharges actually assessed." Id.; see Willig Report ¶¶ 258-60. The Court agrees with plaintiffs that this criticism is misplaced. As Dr. Rausser persuasively explains:

> My damage methodology pertains to all-in rates, rather than merely the increase in Fuel Surcharge percentages, and estimates how much those all-in rates increased as a result of Defendants' conspiratorial conduct. As documented throughout the discovery record, the Fuel Surcharge is the facilitating mechanism used by Defendants to increase these all-in rates. The computed all-in overcharge which I have arrived at using 100% of the transaction data is 13.4%, a figure well below the *average* percentage Fuel Surcharge imposed during the Class Period.

2d Rausser Report at 96 (emphasis in original). To the extent that there are instances where calculated overcharges do exceed the fuel surcharges assessed, the Court credits Dr. Rausser's explanation that this reflects various factors, including, for example, instances of "double-dipping" — that is, when fuel surcharges were applied on top of base rates that

themselves already have built-in fuel cost recovery mechanisms — and instances of rebasing.
See id. at 96.

As the Third Circuit recently stated: "At the class certification stage we do not
require that Plaintiffs tie each theory of antitrust impact to an exact calculation of damages, but
instead [require] that they assure us that if they can prove impact, the resulting damages are
capable of measurement and will not require labyrinthine individual calculations." Behrend v.
Comcast Corp., 655 F.3d at 206. The Court is persuaded that Dr. Rausser's damage model
satisfies this burden, and the Court finds by a preponderance of the evidence that plaintiffs "will
be able to measure damages on a class-wide basis using common proof." Id. at 204.

### B. Superiority

The second requirement of Rule 23(b)(3) is superiority: a court must find "that a
class action is superior to other available methods for fairly and efficiently adjudicating the
controversy." FED. R. CIV. P. 23(b)(3); see Meijer, Inc. v. Warner Chilcott Holdings Co. III,
246 F.R.D. at 313. This requirement "ensures that resolution by class action will 'achieve
economies of time, effort, and expense, and promote . . . uniformity of decision as to persons
similarly situated, without sacrificing procedural fairness or bringing about other undesirable
consequences." Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 313 (quoting
Amchem Prods Inc. v. Windsor, 521 U.S. at 615) (alteration in original).

"When common questions are found to predominate, then courts also generally
have ruled that the second prerequisite of Rule 23(b)(3) — that the class suit be superior to any
other available means of settling the controversy — is satisfied in the context of an antitrust

142

action." In re Ready-Mixed Concrete Antitrust Litig., 261 F.R.D. at 173 (quotations omitted).  In

contrast, when individual issues predominate, a class action will be deemed inferior.  See

McCarthy v. Kleindienst, 741 F.2d at 1415; see also Williams v. Glickman, Civil Action

No. 95-1149, 1997 WL 33772612, at *11 (D.D.C. Feb. 14, 1997) ("The greater the number of

individual issues, the less likely superiority can be established.").

       Defendants contest the superiority requirement on the same grounds as they

contest predominance: they say that a class action is inferior because individual issues

predominate regarding injury and damages.  See Class Opp. at 74-75.  But as the Court has

concluded, individual issues do not predominate, and so the Court finds that plaintiffs have

satisfied the superiority requirement.

       This case involves approximately 30,000 shippers, and plaintiffs have shown by a

preponderance of the evidence that the elements of plaintiffs' Sherman Act claim are capable of

proof at trial through evidence that is common to the class.  Given the size, complexity, and

expense of this case, the Court finds that class action treatment is superior to any other available

methods for fairly and efficiently adjudicating plaintiffs' claim.  See FED. R. CIV. P. 23(b)(3).

The Court has considered plaintiffs' proposed trial plan, see Class Mot., Ex. B, Trial Plan

at 1-10, as well as any possible difficulties in a trial on plaintiffs' Sherman Act claim.  See Class

Opp. at 77-78.  The Court concludes that the resolution of this case by class action will "'achieve

economies of time, effort, and expense, and promote . . . uniformity of decision as to persons

similarly situated, without sacrificing fairness or bringing about other undesirable consequences."

Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. at 313 (quoting Amchem Prods Inc.

v. Windsor, 521 U.S. at 615).

143

VI. CONCLUSION

For the foregoing reasons, the Court finds by a preponderance of the evidence (1) that plaintiffs have established each fact necessary to meet the requirements of Rule 23 of the Federal Rules of Civil Procedure; and (2) that plaintiffs have established that the elements of their Sherman Act claim are capable of proof at trial through evidence that is common to the class rather than individual to its members.

Therefore, the Court will grant the motion of the direct purchaser plaintiffs' for class certification [Dkt. No. 337]; will certify this case as a class action under Rule 23(b)(3) for purposes of litigation and trial; will define the class as proposed by the direct purchaser plaintiffs' in their motion for class certification; will certify for class treatment the direct purchaser plaintiffs' claim for price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; will designate the eight named plaintiffs as the class representatives; and will appoint Quinn Emanuel Urquhart & Sullivan, LLP and Hausfled LLP as co-lead class counsel for the class. The Court will not rule at this time on the motion of the defendants to exclude interline-related communications from consideration for class certification or for any other purpose [Dkt. No. 417].

This Opinion temporarily has been issued under seal in its entirety in view of the possibility that the Court has referenced "Confidential" or "Highly Confidential – Attorneys' Eyes Only" material, as described in the Protective Order issued in this case. See Protective Order ¶¶ 1.3, 1.4, Jan. 29, 2009 (Facciola, Mag. J.) [Dkt. No. 195]. This Opinion, however, will not remain under seal. The Court will order the parties to meet and confer and file a joint report by July 10, 2012 showing cause why this Opinion should not be published in full without redactions on the public docket of this Court.

If either party believes that some passage(s) of the Court's Opinion should be redacted, they must specify in the joint report which passage(s) and must specifically state the cause for each redaction. In making any such request, the parties are reminded that the courts are not intended to be, nor should they be, secretive places for the resolution of secret disputes. See, e.g., Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.") (footnotes omitted); Johnson v. Greater Se. Cmty. Hosp. Corp., 951 F.2d 1268, 1277 (D.C. Cir. 1991) (noting that there is a "strong presumption in favor of public access to judicial proceedings"); United States v. Hubbard, 650 F.2d 293, 317 n.89 (D.C. Cir. 1980) (holding that the trial court's discretion to restrict access to court records should "clearly be informed by this country's strong tradition of access to judicial proceedings"). Accordingly, any redactions shall be made solely to the extent necessary to preserve the confidentiality of the relevant information in accordance with the terms of the Protective Order issued in this case. See Protective Order ¶¶ 1.3, 1.4.

An Order consistent with this Opinion shall issue this same day.

SO ORDERED.


/s/ _____
PAUL L. FRIEDMAN
United States District Judge

DATE:  June 21, 2012

145