**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

MDL Docket No. 1869
Misc. No. 07-489 (PLF/AK/JMF)

This document relates to:

ALL DIRECT PURCHASER CASES

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE
INTERLINE-RELATED COMMUNICATIONS FROM CONSIDERATION FOR CLASS
CERTIFICATION OR ANY OTHER PURPOSE PROHIBITED BY 49 U.S.C. SECTION
10706**

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................................1

I. COMMUNICATIONS AND AGREEMENTS RELATED TO INTERLINE
TRAFFIC ARE LAWFUL AND PRO-COMPETITIVE. ..............................................4

    A. Interline Partners Must Communicate About and Agree Upon Rates and
Other Matters Related to Interline Traffic. ........................................................4

    B. The Federal Government Repeatedly Has Acknowledged The Lawfulness
of Communications and Agreements Between Interline Partners
Concerning Rates and Other Matters Related to Joint Traffic. ............................8

II. SECTION 10706 PROTECTS INTERLINE CONDUCT AND
COMMUNICATIONS FROM THE MISUSE PLAINTIFFS ATTEMPT IN THIS
LITIGATION. .............................................................................................................11

    A. Congress Enacted Section 10706 To Prevent False Inferences From
Lawful Interline Conduct ...............................................................................11

    B. The Plain Text of Section 10706 Precludes Plaintiffs' Use of Interline
Communications ............................................................................................13

    C. Judicial Decisions Applying Other Evidentiary Protections Support
Application of Section 10706 in This Case. ......................................................17

III. PLAINTIFFS' ATTEMPTED MISUSE OF LAWFUL INTERLINE
COOPERATION WARRANTS EARLY RESOLUTION BY THE COURT .............18

    A. Concurrences on interline traffic ....................................................................21

    B. Discussions of policies and practices related to interline traffic .......................24

    C. Strategic alliance meetings between interline partners .....................................25

IV. THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING INTERLINE
COMMUNICATIONS FROM CONSIDERATION FOR CLASS
CERTIFICATION OR ANY OTHER PURPOSE PROHIBITED BY SECTION
10706 .........................................................................................................................27

V. CONCLUSION ..........................................................................................................28

APPENDIX ....................................................................................................................30

CERTIFICATE OF SERVICE ..........................................................................................1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baltimore Gas & Elec. Co. v. United States*,
  817 F.2d 108 (D.C. Cir. 1987) ........................................................................... 6

*Demby v. Schweiker*,
  671 F.2d 507 (D.C. Cir. 1981) ........................................................................... 12

*In re Penn Central Transportation Co.*,
  486 F.2d 519 (3d Cir. 1973) ............................................................................... 5

*Jung v. Ass'n of Am. Med. Colleges*,
  339 F. Supp. 2d 26 (D.D.C. 2004),
  *aff'd*, 2006 U.S. App. LEXIS 14079 (D.C. Cir. 2006) .............................. 17, 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...................................................................................... 4, 12

*Matter of Lehigh and N.E. Ry. Co.*,
  657 F.2d 570 (3d Cir. 1981) ............................................................................... 5

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
  246 F.R.D. 293 (D.D.C. 2007) ........................................................................... 3

*Moore v. District of Columbia*,
  907 F.2d 165 (D.C. Cir. 1990) ......................................................................... 12

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ......................................................................................... 15

*Society of Plastics Industry v. ICC*,
  955 F.2d 722 (D.C. Cir. 1992) ............................................................... 6, 10, 21

*Society of the Plastics Industry, Inc. v. Cons. Rail Corp.*,
  990 WL 300440 (I.C.C. Oct. 11, 1990) ........................................................... 10

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ....................................................................................... 10, 27

*United States v. Braxtonbrown-Smith*,
  278 F.3d 1348 (D.C. Cir. 2002) ....................................................................... 13

*Winkler v. United States*,
  372 F.2d 74 (5th Cir. 1967) ............................................................................. 16

**Statutes**

15 U.S.C. § 1 ........................................................................................................ 14

15 U.S.C. § 37b(a)(1)(E) ..................................................................................... 18

49 U.S.C. § 10706(a)(3)(B)(ii) ..................................................................... passim

49 U.S.C. §10703 ................................................................................ 2, 5

**Other Authorities**

BLACK'S LAW DICTIONARY 1158 (5th ed. 1979) ...................................... 15

*Canadian Pacific Railway Company – Control – Dakota, Minnesota & Eastern Railroad Corp.*,
STB Finance Docket No. 35081,
Decision No. 11, 2008 STB Lexis 54 ................................................. 26

H.R. Conf. Rep. 96-1430 (Sept. 29, 1980) ....................................... 12, 18

*Major Rail Consolidation Procedures*,
STB Ex Parte No. 582 (Sub-No.1),
2001 STB Lexis 546 ........................................................................ 26

Testimony of David I. Wilson, Asst. Director, Bureau of Competition,
FTC, Hearing Before the Subcommittee on Transportation and
Commerce Committee on Interstate and Foreign Commerce on H.R. 4570,
House of Representatives, 96th Cong. (Oct. 23, 1979) ........................... 9

Testimony of Donald Flexner, acting Deputy Assistant Attorney General,
Antitrust Division, DOJ, Hearing Before the Subcommittee on
Transportation and Commerce Committee on Interstate and
Foreign Commerce on H.R. 4570, House of Representatives,
96th Cong. (Oct. 23, 1979) ........................................... 3, 9, 22

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (Philip Babcock Gove, ed. 1966).... 16

*Western Railroads – Agreement*,
1988 WL 224309 (I.C.C. June 21, 1988) .......................................... 10

# INTRODUCTION

Plaintiffs devote 50 pages of their opening class certification brief and a significant portion of their reply brief to the merits of this case.  They repeatedly cite to evidence of communications between Defendants related to interline traffic—traffic that originates on the line of one rail carrier but must be handed off to one or more other rail carriers to reach the destination point.  But Congress, by statute, has banned such evidence in antitrust cases because it regards such communications as necessary and perfectly lawful, and wanted to protect rail carriers from false allegations of antitrust violations.  That statute is 49 U.S.C. § 10706(a)(3)(B)(ii) ("Section 10706"), and Congress enacted it specifically:

- to prevent plaintiffs from inferring an unlawful agreement "from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic," and
- to provide that "evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement … concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the [antitrust] laws."

*Id.*

Plaintiffs rely heavily on interline-related evidence in support of their assertion that there is "specific evidence common to all Class members, and already in the discovery record, that can be introduced at trial to establish the conspiracy's existence and operation."  *See* Plaintiffs' Memorandum in Support of Motion for Class Certification (hereinafter "Pl. Br.") at 67.  Plaintiffs' class papers leave no doubt that (1) their conspiracy claims are built entirely on

1

inferences; and (2) those inferences flow almost entirely from communications between interline

partners about fuel surcharges on the business they transport in end-to-end rail service.

Plaintiffs' class certification motion therefore forces Defendants and the Court to confront the

issue of whether the interline evidence that Plaintiffs cite is admissible under Section 10706.

   The answer is clearly no.  It is important at the outset to note that Section 10706

recognizes the fact that communications between Defendants concerning interline traffic are

lawful and pro-competitive.  In fact, interline communications are critical to the efficient flow of

commerce across the country.  Interline partners are not competitors with respect to such traffic,

but instead effectively act as "joint venture" partners in moving freight that they could not

otherwise handle if acting alone.  Because no one railroad's tracks cover the entire country,

shippers depend on multiple rail carriers to work together to provide a through service from the

origin point to the destination point.  This is not possible without communications and

agreements between rail carriers about a host of policies and practices affecting operations,

freight interchanges, joint-line rates, and billing.  Fuel surcharges, as part of the carriers' freight

rates, must be agreed upon and divided between interline partners just as base rates and other

charges routinely are, many thousands of times each year—and thus it is necessary for the

carriers to communicate about them with some regularity.  Indeed, in contrast to the

circumstances of many other industries, where communication between industry participants is

rare and therefore may seem suspect, here such cooperation is not only a practical necessity, but

is legally compelled:  Rail carriers are *required* to offer "through routes . . . with each other" and

to "establish rates and classifications applicable to those routes."  49 U.S.C. §10703.

   The antitrust laws do not proscribe collaborations between rail carriers regarding

rates and other terms applicable to interline movements.  The U.S. Justice Department's Antitrust

Division itself has noted the lawfulness of interline coordination, explaining that interline

"carriers *do not compete with each other for the carriage of the interline traffic* and, therefore,

they *have no reason to fear antitrust liability* in this situation."[1]  And, in enacting Section 10706,

Congress took steps to make sure that interline collaborations could not serve as the basis for

antitrust actions.

       Plaintiffs' class certification motion invites the Court to consider interline

evidence and draw inferences of conspiracy from precisely the type of evidence that Congress

prohibited in Section 10706.  The Court should reject that invitation.  As Plaintiffs themselves

have acknowledged, on class certification the Court need not "resolve factual and legal disputes

that go to the merits rather than Rule 23 requirements."  *See* Pl. Br. at 52 (citing *Meijer, Inc. v.*

*Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 299 (D.D.C. 2007)).  This means that, for

purposes of class certification, the Court need not decide whether Plaintiffs can prove their

conspiracy claim.  Defendants therefore expect that the Court will simply ignore the evidence

that Plaintiffs have submitted to support the existence of an alleged conspiracy.  However,

Plaintiffs' heavy reliance on interline-related evidence in their moving papers (including

Plaintiffs' citation to such evidence in their Reply brief as purported evidence of common

"impact") compels Defendants to file this motion in the event the Court is otherwise inclined to

consider any of it.  Section 10706 requires that the Court first determine the admissibility of such

evidence before considering it in connection with class certification or for any other purpose.

---

[1] Testimony of Donald Flexner, acting Deputy Assistant Attorney General, Antitrust
Division, DOJ, Hearing Before the Subcommittee on Transportation and Commerce Committee
on Interstate and Foreign Commerce on H.R. 4570, House of Representatives, 96th Cong. (Oct.
23, 1979), at 429 (emphasis added).

Moreover, this motion is also timely in light of the obvious centrality of interline evidence to Plaintiffs' case.  Depending on the posture of the case after the Court rules on class certification, some or all of the Defendants undoubtedly will move for summary judgment on the ground that Plaintiffs lack sufficient admissible evidence to meet their burden to prove conspiracy under *Matsushita Elec. Indus. Co.  v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). The scope of those motions will depend substantially on the question presented here:  what use, if any, can Plaintiffs make of evidence of interline communications between the Defendants?  It would assist the parties, conserve the Court's resources, and advance the efficient resolution of the case were the Court to answer that question sooner rather than later.

Thus, Defendants ask that, for purposes of deciding the class certification motion, the Court exclude from its consideration Plaintiffs' purported evidence of conspiracy. Defendants further request that, pursuant to Section 10706, the Court order that Plaintiffs are precluded from offering as evidence in this action any communication or agreement among or between the Defendants concerning interline movements of rail freight, so long as such communication or agreement did not, considered by itself, violate antitrust law.

I.     **COMMUNICATIONS AND AGREEMENTS RELATED TO INTERLINE TRAFFIC ARE LAWFUL AND PRO-COMPETITIVE.**

A.     **Interline Partners Must Communicate About and Agree Upon Rates and Other Matters Related to Interline Traffic.**

Defendants' route maps show why interline shipments are necessary and common: no one railroad's tracks cover the entire country or even the entire region in which it operates.  *See* Figures 1-4 in the Appendix to this memorandum.  When multiple railroads work together to move freight between points that they could not otherwise serve – switching cargo at points in between – they engage not as competitors, but as partners.  In such situations, they are

in essence joint venturers, cooperating publicly in the successful origination, interchange, and safe and timely delivery of the customers' goods.  The communications and resulting agreements between connecting railroads related to these interline shipments facilitate the flow of commerce in this country via the interconnected, national rail system.  Interline communications are therefore pro-competitive and present no antitrust concern.

It is due in large part to the collaborative nature of interlining that "the nation's railroads function in many ways as a single system."  *Lehigh & N.E. Ry. Co.*, 657 F.2d 570, 575 (3d Cir. 1981) (quoting *In re Penn Central Transportation Co.*, 486 F.2d 519, 527 (3d Cir. 1973)).  Without cooperation in establishing interline routes, rail transportation would be Balkanized and could not function as a national system.  For cargo to be transported by rail from, say, Seattle to Baltimore or from New York to Los Angeles – or to countless other locations in the United States beyond the reach of any single railroad – rail carriers must communicate and agree with one another regarding various terms and conditions of service.

Congress recognized the need for cooperation on interline routes by *requiring* rail carriers to offer "through routes" and to establish rates for those routes. 49 U.S.C. §10703.[2]  A "through route" is an interline route, *i.e.,* an *"*arrangement under which a shipment is transported to its ultimate destination by two or more railroads in succession," *Baltimore Gas & Elec. Co. v.*

---

[2]     Section 10703 requires that:

> Rail carriers providing transportation subject to the jurisdiction of the Board under this part *shall establish through routes . . . with each other . . ., shall establish rates* and classifications applicable to those routes, and shall establish rules for their operation and provide – 1) reasonable facilities for operating the through route; and 2) reasonable compensation to persons entitled to compensation for services related to the through route (emphasis added).

*United States*, 817 F.2d 108, 110 (D.C. Cir. 1987).  For customer convenience, rail carriers may

establish a single "joint rate" for these through routes.  *Id.* at 110 ("The rate charged [for a

through route] is a joint rate if it is published as a single tariff . . . divided among all

participants. . . .").[3]  Setting a joint rate requires communication between the interline carriers,

as a joint rate is "a unitary rate arrived at by agreement between the carriers participating in a

through route."  *Society of Plastics Industry, Inc.  v. ICC*, 955 F.2d 722, 724 (D.C. Cir. 1992).

As one might expect given the vast size of the country, interline service is at the

core of U.S. rail freight transportation.  Plaintiffs' expert, Dr. Rausser, acknowledges that

between a third and one half of each Defendant's unregulated shipments are interline.  *See*

Corrected Expert Report of Gordon Rausser, Ph.D, ("Rausser Report") at 39.  He explains that,

as "participants in a network industry," rail carriers "have long cooperated" to "link their

systems, coordinate operations, and standardize equipment and procedures in order to achieve

efficiency."  *See id.* at 38-39.  He further acknowledges that rail carriers must collaborate to

"develop joint-line rates and customer-servicing technology" for interline traffic.  *Id.*

In practice, to earn and keep customers' business, in vigorous competition with

trucks and other modes of transportation, connecting railroads developing joint-line business

must ensure that their joint service has the following:

---

[3]      Shippers and rail carriers also have the option, through an Association of American
Railroads accounting mechanism known as "Rule 11," to develop an individual rate for each
portion of a through route, resulting in a separate rate agreement between the shipper and each
rail carrier participating in the route.  To use Rule 11, shippers negotiate independently with
multiple rail carriers and process and pay multiple invoices for a single move.  Where Rule 11 is
used, connecting rail carriers nonetheless must communicate about and agree upon certain
aspects of interline movements because of the need to interchange that traffic across the carriers'
connecting networks.

- pricing that is attractive to the customer and that each railroad is prepared to accept;

- the exact operating logistics – including time of departure, number and type of rail cars, who will supply the rail cars, interchange and delivery plans – agreed to by two, three or even four railroads;

- timely and accurate billing to the customer; and

- accurate division of revenues received among the joint venturing railroads.

And, to establish an efficient and workable framework for the large volume of interline shipments, discussions about these topics often must go beyond discussions of particular rates for *individual* shipments by specific customers. Rather, connecting carriers must reach agreement on (1) general practices governing the establishment of interline rates; (2) interline operating practices, including the handing off of traffic from one carrier to another at interchange points; (3) general practices to assure timely and accurate billing to the customer; and (4) procedures to ensure the appropriate distribution of revenues ("settlement procedures") among railroads participating in the interline movement. Rail transport would grind to a halt if every aspect of each of the many thousands of annual interline shipments had to be the product of separate negotiation and agreement between carriers.

Consequently, by custom and practice in the industry, the carrier originating a particular shipment usually communicates with the customer regarding rates and handles billing. The originating carrier then seeks either "specific" or "general" concurrences to rate actions from other participating carriers. This could include concurrences in periodic rate adjustments to be implemented by the originating carrier. It could also include, as is the case with Defendants here, concurrences by the participating carrier in the originating carrier's fuel surcharge program or other terms of service. Such an arrangement allows a participating carrier — say, Norfolk Southern — to know when the originating carrier — say, Union Pacific — would assess a

particular Union Pacific fuel surcharge on some group of through movements handled jointly

with Norfolk Southern; Norfolk Southern then decides whether to concur to that fuel surcharge

and receives a division of the fuel surcharge revenues from individual shipments.

Thus, every time a rail carrier wanted to change the fuel surcharge applicable to

its traffic moving under joint rates, it was required to communicate with its interline partners to

seek concurrence in the proposed changes.  Other items that were the subject of communications

between interline partners included those topics one would expect to be discussed when joint

venture partners are contemplating changing their pricing to their customers:

- Will our customers accept a new, different, or higher fuel surcharge?

- Which traffic does the changed formula apply to?

- What are all the exact details of the implementation of the changed formula?

- Will our customers – including their computers and accounting systems – be able to process the intended charge?

- How do we make sure we announce, bill and collect our new changes accurately?

Defendants had to discuss and agree upon the answers to these and similar questions in order to

jointly move interline traffic across their connecting networks, and their customers expected

them to do so.

**B.**     **The Federal Government Repeatedly Has Acknowledged The Lawfulness of Communications and Agreements Between Interline Partners Concerning Rates and Other Matters Related to Joint Traffic.**

The simple but critical reality that interline coordination is lawful and pro-

competitive was recognized by the U.S. Department of Justice ("DOJ") in testimony before a

House subcommittee considering what became known as the Staggers Rail Act of 1980 ("SRA").

At the time, Congress was considering de-regulating aspects of rail transportation and curtailing

the use of "rate bureaus" that had operated for decades pursuant to antitrust immunity.  The DOJ,

which supported deregulation, maintained that antitrust immunity was unnecessary because rail

carriers could freely communicate about interline movements without antitrust exposure.

Testimony of Donald Flexner, acting Deputy Assistant Attorney General, Antitrust Division,

DOJ, Hearing Before the Subcommittee on Transportation and Commerce Committee on

Interstate and Foreign Commerce on H.R. 4570, House of Representatives, 96th Cong. (Oct. 23,

1979) (hereinafter "Flexner Testimony").  As Mr. Flexner explained in his testimony:

> [I]t must be emphasized that in the ordinary situation, when two
> carriers interline at a particular junction point and provide a
> through service, *the antitrust laws do not proscribe in any way* the
> negotiation by the two carriers of a through rate for these
> movements.  Simply stated, these two carriers *do not compete with
> each other for the carriage of the interline traffic* and, therefore,
> they *have no reason to fear antitrust liability* in this situation.

*Id.* at 427 (emphasis added).  *See also id.* at 428 ("a joint-line participant must concur in

scheduling, pricing, and service-before a joint-line tariff is possible").

    Similarly, the Federal Trade Commission ("FTC") representative explained in his

testimony to the subcommittee that "[n]o one has seriously suggested that antitrust problems are

created where railroads are simply end-to-end connectors – *i.e.*, when they interconnect with

each other but do not overlap."  Testimony of David I. Wilson, Asst. Director, Bureau of

Competition, FTC, Hearing Before the Subcommittee on Transportation and Commerce

Committee on Interstate and Foreign Commerce on H.R. 4570, House of Representatives, 96th

Cong. (Oct. 23, 1979), at 513.  The FTC recognized that railroads do compete on other, non-

interline routes.  And so it addressed concerns that interline communications might be used as a

basis to attack the legitimacy of railroads' actions on their competing routes:  "[A] lawful

agreement on a joint-line rate is not a sufficient basis on which to infer an unlawful agreement on competing routes." *Id.*

The Interstate Commerce Commission ("ICC"), the predecessor agency to the STB, has echoed the views of the DOJ and the FTC in recognizing the inherent lawfulness of interline-related conduct and communications. *See Society of the Plastics Industry, Inc. v. Cons. Rail Corp.*, 1990 WL 300440 (I.C.C. Oct. 11, 1990), *aff'd Society of Plastics Industry, Inc. v. ICC*, 955 F.2d 722 (D.C. Cir. 1992); *Western Railroads – Agreement*, 1988 WL 224309, at *3 (I.C.C. June 21, 1988) (Gradison, Chairman, commenting) ("Joint line ratemaking between direct connectors . . . appears lawful outside the auspices of a rate bureau.  Where participating carriers are not competitors in a movement, no antitrust concerns would seem to be present.").

This understanding that interline communications and agreements do not pose antitrust problems is consistent with the more general treatment of cooperative joint ventures under antitrust law.  The *per se* prohibition of agreements on price does not apply to such cooperative ventures. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5-6 (2006) (*per se* rule did not apply to price-setting agreement between Texaco and Shell Oil for sale of gasoline to service stations in the western United States where the two companies did not compete, but rather "participated in that market jointly" through a joint venture).   To fulfill the purposes of a joint venture, there necessarily must be joint action, and joint action requires communication and agreement on issues relating to that action.

II.     **SECTION 10706 PROTECTS INTERLINE CONDUCT AND COMMUNICATIONS FROM THE MISUSE PLAINTIFFS ATTEMPT IN THIS LITIGATION.**

      A.     **Congress Enacted Section 10706 To Prevent False Inferences From Lawful Interline Conduct**

Though the representatives of the DOJ and FTC who testified to Congress were confident that plaintiffs could not misuse interline communications to impose antitrust liability, Congress was less sanguine.  While rail carriers act effectively as joint venture partners with respect to interline traffic, they may also compete with respect to certain "local" traffic.  For example, because neither BNSF nor Union Pacific has tracks that cover the entire western United States, they must cooperate in some interline shipments within their geographic areas of service while competing fiercely for other business.  Congress recognized that in such circumstances – where industry participants compete in certain respects but must cooperate in others – the danger of plaintiffs misconstruing or mischaracterizing such interline cooperation was real and the national rail system could not operate without rules protecting interline communications.

It was against this background, and with the recognition that essential interline-related communication could be inhibited by fear of antitrust liability, that Congress enacted the provision that is now codified at 49 U.S.C. § 10706(a)(3)(B)(ii).[4]  In explaining its purpose, the

---

[4]     After Congress passed this provision as part of the Staggers Rail Act, Pub. L. No. 96-448, 94 Stat. 1895 § 219 (Oct. 14, 1980), it was originally codified at 49 U.S.C. § 10706(a)(3)(C)(ii). When Congress again significantly overhauled rail regulation in the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 ("ICCTA"), Section 10706 was recodified, without substantial change, at § 10706(a)(3)(B)(ii).  (The word "rail" was added before "carrier" in three places.)  *Cf. Western Coal Traffic League v. United States*, 677 F.2d 915, 923 n.18 (D.C. Cir. 1982) (citing former provision codified at 49 U.S.C. § 10706(a)(3)(B) prior to the ICCTA).

Conference Committee pointed directly to the requirement that rail carriers concur in changes to joint rates, and the concern that such lawful communications could lead to false conclusions:

> Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed. To prevent such a conclusion the Conference substitute provides procedural protections about lawful discussions and resulting rates. The Conferees intend that these protections be construed to insure that remedies for anti-competitive activities remain under existing laws.

H.R. Conf. Rep. 96-1430, at 114 (Sept. 29, 1980) ("Conference Report").[5]

Congress had compelling reasons for fearing misuse of interline coordination in antitrust cases. As the Supreme Court recognized not long after the enactment of Section 10706, "mistaken inferences" in antitrust cases can have a "chill[ing]" effect on lawful and pro-competitive conduct. *Matsushita Elec. Indus. Co.*, 475 U.S. at 593-594. And the risk of such mistaken inferences is particularly acute in the circumstances here because rail carriers are required to cooperate and to price and move customers' traffic jointly. *See* Conference Report at 114. Congress recognized that, absent the protection provided by Section 10706, carriers could be discouraged from taking steps that would increase efficiency and enhance the joint service that is essential to the nation's transportation system. In fact, permitting the use of interline conduct to support allegations of an antitrust conspiracy, as Plaintiffs are attempting here, would itself *restrain* trade in this country by discouraging the routine interline coordination that is essential to the effective and efficient flow of trade via the interconnected rail system.

---

[5]    The Conference Report "represents the final statement of terms agreed to by both houses," and, therefore, "next to the statute itself it is the most persuasive evidence of congressional intent." *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981). *See also Moore v. District of Columbia*, 907 F.2d 165, 175 (D.C. Cir. 1990).

Plaintiffs have suggested that the statutory prohibition on drawing inferences from interline communications extends only to communications that relate to individual shipments for particular customers, and does not apply to discussions of "generally applicable policies and practices with respect to Fuel Surcharges." Pl. Br. at 17 n.40. *See also* Rausser Report at 69 (asserting ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ But they have provided no support for such a narrow view of the statute, and their position is inconsistent with the expansive statutory language, the authority cited above, and Congress' purpose of ensuring the smooth flow of rail traffic across the entire network.

The fear that interline discussions would be misused has now been realized. As illustrated by their class certification submissions, Plaintiffs attempt to do precisely what Congress sought to prevent: they point pervasively to interline communications and agreements as supposed evidence of antitrust misconduct; they explicitly ask the Court to infer an unlawful conspiracy from such discussions; and they indicate they intend to rely extensively on evidence that Congress directed be excluded entirely. Section 10706 does not permit such misuse of interline communications.

B.    **The Plain Text of Section 10706 Precludes Plaintiffs' Use of Interline Communications.**

"In construing a statute, the court begins with the plain language of the statute." *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002). Here, Congress' intent is clear in the text of § 10706(a)(3)(B)(ii), which provides two significant procedural protections for interline discussions: (1) a prohibition on inferring proof of an antitrust conspiracy from evidence of interline-related action by interline partners and similar, or "parallel," action by those individual partners on other traffic; and (2) a bar on the admission of

13

evidence of discussions, agreements, or resulting action between rail carriers if they concerned

interline movements and did not themselves violate the antitrust laws.

The scope of the litigation to which the provision applies is clear:

> (ii) In any proceeding in which it is alleged that a carrier was a
> party to an agreement, conspiracy, or combination in violation of a
> Federal law cited in subsection (a)(2)(A) of this section or of any
> similar State law. . . .

It applies in *any proceeding* in which a rail carrier – such as all four Defendants here – is alleged

to have been a party to an unlawful conspiracy in violation of the federal antitrust laws.  (Section

10706(a)(2)(A) specifically lists, *inter alia*, "the Sherman Act (15 U.S.C. § 1, et seq.)".)  It is

thus beyond dispute that the provision applies to Plaintiffs' federal civil action alleging the

existence of a price-fixing conspiracy in violation of § 1 of the Sherman Act.

The "no inferences" protection follows:

> *proof of an agreement, conspiracy, or combination may not be
> inferred* from evidence that two or more rail carriers *acted together
> with respect to an interline rate or related matter and* that a party
> to such action *took similar action* with respect to a rate or related
> matter *on another route or traffic.*

49 U.S.C. Section 10706(a)(3)(B)(ii) (emphasis added).  By its terms, this provision operates to

preclude any inference of conspiracy from conduct relating to interline traffic.  What this means

in the context of this case is that Plaintiffs are *barred* from saying:  "Rail carrier A and rail

carrier B discussed fuel surcharges programs that would be applied to their traffic moving under

joint rates; they applied similar fuel surcharge programs to their other traffic, where they

compete; the Court should thus draw an inference that they are colluding on their competing

traffic."

14

This provision precludes drawing inferences from the fact that rail carriers agreed on interline rates or related matters, such as fuel surcharge programs, and applied the same rates or related policies to their local traffic.  Yet this is what Plaintiffs are seeking to do, and in arguing that Section 10706 does not apply because "Defendants applied the same FSC policies to interline and local movements" (Reply Br. at 8 n.18), they are actually articulating precisely the impermissible argument that the statute forecloses.  The rationale behind this protection is obvious:  a railroad may – and indeed often does – decide for perfectly legitimate and unilateral reasons of efficiency to apply the same or similar practices and policies for its local traffic as it applies to its interline traffic.  There is nothing whatsoever nefarious about that, and Plaintiffs are barred from suggesting otherwise to a court or jury.  The statutory prohibition against inferences drawn from interline communications thus applies broadly to any interline conduct involving an interline rate or any "related" matter, including fuel surcharges.[6]

The statute confirms the breadth of this protection by prohibiting the admission of such evidence at trial:

> In any proceeding in which such a violation is alleged, *evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers*, or of any rate or other action resulting from such discussion or agreement, *shall not be admissible* if the discussion or agreement—
>
> * * *

---

[6]      As the Supreme Court has explained, the ordinary meaning of the term "relating to" is "a broad one – 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'"  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (citing BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)).

> (II) concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.[7]

49 U.S.C. Section 10706(a)(3)(B)(ii)(II) (emphasis added).  This "evidentiary bar" excludes from evidence in an antitrust case any "discussion or agreement" among rail carriers that "*concerned*" an interline movement, so long as that discussion or agreement is not unlawful "considered by itself."[8]

Finally, Section 10706 directs that in any jury case, the court must determine whether the above requirements are met "before allowing" introduction of interline-related evidence:

> In any proceeding before a jury, the court shall determine whether the requirements of subclause (I) or (II) are satisfied before allowing the introduction of any such evidence.

49 U.S.C. § 10706(a)(3)(B)(ii).

The breadth of the terms that Congress used reveals an intention to preclude any use of interline communications as a basis for inferring the existence of a conspiracy in some other, non-interline competition among carriers.  Discussions or agreements in the interline

---

[7]     Subclause (I), omitted here, provides the same evidentiary bar protection to rate discussions and agreements conducted in accordance with an STB-approved rate agreement, such as a rate bureau.

[8]     "Concerned" is also a broad term with an ordinary meaning that captures anything "relat[ing] to or refer[ing] to" or "bear[ing] on."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (Philip Babcock Gove, ed. 1966).  *See also Winkler v. United States*, 372 F.2d 74, 75 (5th Cir. 1967) (relying upon dictionary definitions in interpreting the "ordinary and usual" meaning of the term "concerned" in a criminal statute to include each person "involved," "affected" or "having a connecting relation").

context are inadmissible unless such a discussion or agreement, "considered by itself, violate[s] the [antitrust] laws."

## C.   Judicial Decisions Applying Other Evidentiary Protections Support Application of Section 10706 in This Case.

No court has yet considered the scope and application of Section 10706(a)(3)(B)(ii).  This is understandable:  for Section 10706 to apply, a litigant would have to try to use interline-related communications to prove or infer a conspiracy or agreement in violation of federal antitrust law, despite Congress' explicit prohibition against such use.  In almost 30 years since Section 10706 was enacted, it appears that only Plaintiffs here have ever made such an attempt.

Although there has been no judicial construction of Section 10706, this Court considered another antitrust evidentiary provision in *Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26 (D.D.C. 2004), *aff'd*, 2006 U.S. App. LEXIS 14079 (D.C. Cir. 2006).  The statute at issue in that case – which was enacted while the litigation was pending – included both substantive immunity and evidentiary protection for a graduate medical education residency "matching" program.  It provided that: (1) it is not unlawful under the antitrust laws to sponsor, conduct, or participate in the matching program, and (2) evidence of such conduct is not admissible in federal court to "support any claim or action alleging a violation of the antitrust laws."  *See* 339 F. Supp. 2d at 34-35.

Following passage of the statute, the Court dismissed the plaintiffs' complaint, which alleged a "single overarching integrated antitrust conspiracy with the [residency matching program] as its centerpiece."  *Id.* at 38.  The Court recognized that the substantive immunity alone did not necessarily defeat plaintiffs' antitrust claim, because "if lawful acts are used as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful." *Id.* at 37. But

17

the court went on to determine that Congress, through the evidentiary provision, had prevented

federal courts from *considering* any evidence of match-related conduct. *Id.* at 39. Because

plaintiffs' match-related allegations were central to their complaint, the case could not survive

the absence of evidence on those allegations.

The Court also recognized Congress' express intent to protect participants in the

match program from the high cost of defending antitrust challenges, which Congress had found

had "the potential to undermine this highly efficient, pro-competitive, and long-standing

process." *Id.* at 44 (citing 15 U.S.C. § 37b(a)(1)(E)). In rejecting constitutional challenges to the

statute, the Court concluded that "the evidentiary prohibition [was] a rational means" of

accomplishing the protection of resources that Congress intended. *Id.* at 44.

Two aspects of Section 10706 support the conclusion that it should be interpreted

even more liberally than the statute discussed in *Jung*. Unlike the underlying conduct at issue in

*Jung* – which may have involved otherwise unlawful agreements not to compete in hiring

employees and therefore required an immunity provision – the interline conduct addressed by

Section 10706 is inherently lawful and requires no immunity. And Section 10706 does not –

unlike the intervening statute in *Jung* – "snatch away" anything from Plaintiffs here. The

provision has been on the books for almost thirty years. *Cf. Jung*, 339 F. Supp. 2d at 40. Thus,

Plaintiffs cannot claim to be "frustrated" by the provision, which Congress intended "to *prevent*"

misuse of interline conduct and communications long before Plaintiffs filed their lawsuits. *See*

Conference Report at 114 (emphasis added).

## III. PLAINTIFFS' ATTEMPTED MISUSE OF LAWFUL INTERLINE COOPERATION WARRANTS EARLY RESOLUTION BY THE COURT

The pleadings Plaintiffs have submitted in support of their class certification motion are

replete with improper and misleading citations to interline communications. Plaintiffs' Reply

brief highlights the significance that Plaintiffs place on such communications.  In their Reply,

Plaintiffs purport to find evidence of common impact – and a basis to attack the conclusions of

Defendants' expert, Dr. Willig – in an alleged agreement among the Defendants to put in place

"new 'standard'" fuel surcharges in the Spring of 2003. Pl. Reply at 7.  Plaintiffs assert that

"[t]he new standard FSCs were agreed to at a number of high-level inter-Defendant meetings."

*Id.* at 8.  In support of that allegation, Plaintiffs highlight a document that they claim shows that

Union Pacific's Chief Marketing Officer, Jack Koraleski, met with CSXT on March 12, 2003 to

██████████████████████████████  *Id.* at 9 (citing Exhibit 210 to the Declaration of Sami

Rashid in support of Plaintiffs' class certification motion (hereafter cited as "RD Ex. __")).[9]

Despite Plaintiffs' misleading attempt to portray this document as evidence of an

agreement to adopt a "standard" fuel surcharge on local traffic, the document itself shows that it

refers to perfectly lawful discussion between interline partners.  ████████████████████

████████████████████████████████████████████████

██████████████████████  CSXT and Union Pacific were – and are – required to

discuss the price terms of their joint interline business, including fuel surcharge provisions, and

Section 10706 prohibits Plaintiffs from using such a discussion as evidence to support an

inference of conspiracy.

Plaintiffs' improper reliance on interline communications is symptomatic of their

misunderstanding of Section 10706.  In their Reply, Plaintiffs defend their extensive citations to

---

[9]     This document is particularly prominent in Plaintiffs' Reply brief, as they cite it as a purported basis to move the alleged start of the conspiracy to some earlier unidentified date "during the first half of 2003" in a futile attempt to explain away the data showing that fuel surcharge usage was trending up well before the beginning of the alleged conspiracy.   Pl. Reply at 3.

interline evidence with the claim that "any distinction between interline and local movements is academic since Defendants applied the same FSC policies to interline and local movements."  Pl. Reply at 8, n.18.  Plaintiffs thus ignore the express language of Section 10706 in arguing that the Court should draw an adverse inference from evidence that Defendants applied the same surcharges to local and interline traffic.  Defendants were required to communicate about their fuel surcharges for traffic that they interchange, and Section 10706 prohibits any inference of conspiracy from "similar action with respect to a rate or related matter on another route or traffic."

Plaintiffs' expert's conclusions are similarly tainted by improper reliance upon inadmissible interline communications.  For example, in his initial Report, Dr. Rausser claimed that interline communications "were used to signal each other regarding fuel surcharge policies, levels,  and coverage…." (Rausser Report at 107), and in his Reply Report he asserts that interline communications "served as an efficient mechanism for coordinating Fuel Surcharges and monitoring Fuel Surcharge coverage for local as well as interline traffic."  Rausser Expert Reply Report at 11.  He further identifies the existence of regular interline communications as one of the market characteristics of the rail freight industry "that facilitates collusion."  *Id.* at 79-80.  *See also id.* at 27 (identifying "high levels of inter-firm communication" and "exchange of price information" as alleged "plus factors" tending to show the incentive and ability to conspire).  The interline communications that Dr. Rausser claims facilitated a conspiracy are inadmissible for any purpose, and cannot be used to support the inferences he suggests.

The range and extent of Plaintiffs' improper reliance upon interline communications is shown below by discussing several categories of documents that Plaintiffs improperly cite in support of their conspiracy claim or as purported evidence of common impact.

A.      **Concurrences on interline traffic**

As noted above, when a rail carrier makes changes impacting traffic moving under joint rates, it must seek approval – or "concurrence" – for the change from each rail carrier with which it interchanges such traffic.  There were – literally – millions of interline transactions during the alleged class period involving Defendant railroads.[10]  Given the enormous volume and variety of interline traffic, and the technical requirements associated with tracking and allocating the revenues for such interline traffic, communications and agreement on general terms for setting joint rates across whole categories of interline traffic exchanged between railroads are a practical necessity.  Thus, while railroads that ship traffic on through routes can and often do provide specific concurrences relating to a particular shipper and commodity, "general" concurrences that apply to broader categories or shippers and commodities are also common.

The use of general concurrences to agree on generally applicable terms or formulas for joint rates is perfectly proper, *see Society of Plastics Industry,* 955 F.2d at 724 (upholding carrier practice of obtaining general concurrences that applied to future adjustments to rates), and can be more efficient than movement-by-movement agreements.  There is, in fact, no principled basis to distinguish between the lawfulness of communications and agreements between interline partners on generally applicable terms or formulas for their interline shipments, and communications by those same partners regarding terms and rates for particular shipments.  In either situation, the interline carriers are partners rather than competitors with respect to the interline service, and thus the communications and agreements do not restrain competition.  *See*

---

[10]  *See* Rausser Reply Report at 94 ███████████████████████████████████████
██████████████████████████████████   Rausser's acknowledgment that a third to a half of all unregulated shipments are interline means that interline shipments totaled in the millions.

Flexner Testimony at 427-28.  Moreover, discussions about general rules for interline service "concern an interline movement" just as much as discussions about specific interline moves, and are thus protected by the express terms of Section 10706.

The Plaintiffs' misuse of concurrence communications is demonstrated by the following examples from their class certification submissions:

-  Of course, each of the other railroads was Union Pacific's interline partner, and Union Pacific was required to obtain concurrence from each before it could apply its revised fuel surcharge to traffic moving under joint rates with those carriers.  The basis for these interline-related communications is evident: each states that ████████████████████

████████████████████████████████████████

████████████████████████████ *See, e.g.*, RD Ex. 48.  All are evidence of discussions or agreements between interline partners and are inadmissible under the evidentiary protection because none by itself would be unlawful, and any inference of conspiracy plaintiffs seek to draw is equally impermissible.

- Plaintiffs refer to CSXT's announcement of its new fuel surcharge program in March, 2003, citing documents indicating that "CSXT and UP discussed CSXT's plan 'to implement a new fuel surcharge formula' on at least two occasions" in

the week following the announcement.  Pl. Br. at 20 n.52 (citing RD Exs. 30 and

31).  These internal Union Pacific emails discuss ███████████████████████

███████████████████████████████████████████ They are evidence of

customary communications between interline partners about pricing changes

affecting joint business and thus are inadmissible and may not be used to support

an inference of conspiracy.

■   When Norfolk Southern changed its public carload surcharge program in early

2004, it needed to communicate to its interline connection, Union Pacific, the

effective date of its new surcharge, the types of joint pricing documents to which

the surcharge would be applied, and how the surcharge would be identified in the

interline settlement system (the "REN" system).  Plaintiffs cite a communication

between Norfolk Southern and Union Pacific ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Pl. Br. at 23 n.75 (citing RD Ex. 79).  This interline-related discussion is not

unlawful, and Section 10706 thus renders it inadmissible and bars any inference

of conspiracy from the communication.

■   Plaintiffs' misuse of evidence of basic interline concurrence discussions is not

confined to documentary evidence.  *See* Pl. Br. at 22-23 n.68 (citing Seale Dep.

26).  In his deposition, Don Seale of Norfolk Southern testified that ██████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████This is a straightforward

description of appropriate and lawful interline-related discussions between interline partners and a statement of the legal requirement that each railroad obtain concurrence on interline rates.  Seale Dep. 26:6-9.  It is neither direct nor inferential evidence of conspiracy, and is not admissible.

**B.** **Discussions of policies and practices related to interline traffic**

As discussed above, interline partners often need to coordinate on general policies and practices affecting their interline traffic.  Such discussions do not violate the antitrust laws and may not be used to suggest otherwise under Section 10706.  Plaintiffs nonetheless improperly rely on such discussions as evidence of conspiracy.  Several examples illustrate Plaintiffs' improper reliance on such communications:

- Plaintiffs cite a series of documents in which ███████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████  Pl. Br. at 35 & n.140.  The originating carrier on an interline move typically bills the customer for the rate and other charges, such as a surcharge, and the carriers divide the revenue.  Thus, the receiving carrier has an interest in knowing whether the originating carrier's price authorities for interline shipments contained a surcharge, so it will know how much revenue to expect on the move and whether to concur.  It is evident from the cited documents that this was the nature of the discussions between BNSF and NS.  Such discussions do not violate the antitrust laws, and Plaintiffs' purported inference of conspiracy is thus precluded by Section 10706.

24

- Plaintiffs attempt to draw an inference of unlawful behavior from the fact that Union Pacific had no specific policy that "so-called 'concurrence communications,'" like those described above, be in writing.  Pl. Br. at 17 n.38 (citing Adams Dep. 34-35).  As explained above, such communications are entirely lawful, and no conspiratorial inference can permissibly be drawn from the absence of a specific policy that all such communications be written.

- Plaintiffs also attempt to turn the alleged "extraordinary" number of interline communications into a basis to infer conspiracy.  Pl. Br. at 14, 25 ("During this entire period, Defendants discussed Fuel Surcharges with each other regularly.").  *See also* Rausser Reply Report at 31 (citing "extensive discussions regarding Fuel Surcharges in early 2003….")  But the simple reality of today's national rail network, where interline traffic constitutes between a third and a half of each Defendants' total movements, is that Defendants must discuss interline traffic with each other frequently, and agree on changes in joint rates.  Nothing about those discussions violates the antitrust laws—nor can they be used as evidence to support an inference that they do.  Just as individual interline discussions cannot be offered as evidence of conspiracy, neither can the number of those discussions be offered for the same purpose.

C.     **Strategic alliance meetings between interline partners**

The third major category of evidence upon which Plaintiffs seek impermissibly to build their case involves "alliance" and similar strategic partnership meetings between connecting railroads for the purpose of increasing their interline business.  As the documents that Plaintiffs cite show, such alliance meetings between connecting railroads were designed to

enhance the efficiency of the interline service they offered to shippers and to develop joint-line

business opportunities.  In fact, alliances were expressly endorsed by the STB.  Recognizing that

the efficiency of the nationwide rail network is enhanced when rail carriers communicate broadly

about topics that relate to the joint provision of interline service, the STB in 2001 noted that, in

ruling on a proposed rail merger, it would consider whether the benefits claimed by the merger

applicants could be realized by private arrangements other than the proposed consolidation:

"The Board believes that other private-sector initiatives, *such as joint marketing agreements and*

*interline partnerships,* can produce many of the efficiencies of a merger while risking less

potential harm to the public."  *Major Rail Consolidation Procedures*, STB Ex Parte No. 582

(Sub-No.1), 2001 STB Lexis 546 at *30 (June 7, 2001) (emphasis added).  For this reason, the

STB explained that "under our statute alliances and joint ventures that fall short of either

common control or pooling do not require our approval."  *Id.* at *28-29.  The STB's decisions

confirm that broad interline cooperation on service and marketing issues through such alliances

enhances efficiency, is pro-competitive, and, the STB believes, should be encouraged.[11]

---

[11] For example, in *Canadian Pacific Railway Company – Control – Dakota, Minnesota & Eastern Railroad Corp.*, STB Finance Docket No. 35081, Decision No. 11, 2008 STB Lexis 549, the STB approved a merger of the Canadian Pacific Railroad Company ("CPRC") and the Dakota, Minnesota & Eastern Railroad Corp. ("DM&E").  The Kansas City Southern Railroad ("KCS") requested as a condition of the merger that a grain agreement between KCS and DM&E be made permanent to protect its ability to compete against the merged entity, because of the "multi-faceted strategic relationship" between CPRC and the Union Pacific Railroad Company ("UP").  KCS asserted that "CPRC and UP are parties to numerous alliances regarding traffic solicitation, pricing and operations" and that CPRC and UP had a "commercial bond just short of a merger."  *Id.* at *23-24.  In rejecting the KCS's request, the STB noted that the CPRC and UP marketing agreements were designed to compete with BNSF single-line grain movements, and explained that the STB "has encouraged such interline marketing agreements to promote efficiency in the interconnected competitive railroad system."  *Id.* at *25-26.

Moreover, it is clear that the alliances were bilateral in nature and related to the operational efficiency and marketing of interline traffic across connecting rail networks.  *See, e.g.*, RD Ex. 215 (agenda for BNSF-CSXT Alliance meeting on April 1, 2003, listing as topics for discussion ███████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████  The alliances effectively functioned as joint ventures between interline partners directed to strategically developing and growing joint business or adopting specific policies or practices needed for the smooth and efficient flow of interline traffic between the two participating rail carriers.  Such arrangements are plainly lawful.  *See, e.g.*, *Dagher*, 547 U.S. at 5-6 (pricing by joint venture in which firms that competed historically but did not compete in the relevant market pooled their investments amounted to permissible "price setting").

## IV.   THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING INTERLINE COMMUNICATIONS FROM CONSIDERATION FOR CLASS CERTIFICATION OR ANY OTHER PURPOSE PROHIBITED BY SECTION 10706

Plaintiffs themselves acknowledge that they "need not establish the elements of their substantive claim to obtain certification."  Pl. Br. at 6.  Defendants therefore expect that at this stage of the case the Court will not find it necessary to consider any of the evidence that Plaintiffs have cited to support their claim that Defendants engaged in an unlawful conspiracy.  But while legally immaterial now, Plaintiffs' lengthy merits argument in their certification briefs at least has the virtue of dispelling any doubt about the essence of their case: their claim rests almost exclusively on interline-related communications, from which they seek to infer a broad conspiracy between the carriers.  If the use of such evidence is impermissible, as we submit, it would be best for the Court to set out that conclusion clearly, at the earliest possible time —

before the parties invest additional resources in marshalling and debunking this sort of evidence, and before the Court is put to the task of assessing it.

## V.      CONCLUSION

For the foregoing reasons, the Court should decline to consider interline-related communications in ruling on Plaintiffs' motion for class certification.  Defendants further request that, in accordance with 49 U.S.C. § 10706, the Court order that Plaintiffs are precluded from offering as evidence in this action any communication or agreement among or between the Defendants concerning interline movements of rail freight, so long as such communication or agreement did not, considered by itself, violate antitrust law.

Dated:  September 8, 2010             Respectfully submitted,

                                /s/ Alan M. Wiseman

| | |
|---|---|
| Tyrone R. Childress | Alan M. Wiseman (D.C. Bar # 187971 |
| David G. Meyer | Thomas A. Isaacson |
| HOWREY LLP | Peter A. Barile III |
| 550 South Hope Street, Suite 1100 | HOWREY LLP |
| Los Angeles, CA  90071 | 1299 Pennsylvania Avenue, N.W. |
| (213) 892-1800 | Washington, D.C.  20004 |
| | (202) 783-0800 |

*Attorneys for Defendant Union Pacific Railroad Company*

| | |
|---|---|
| John M. Nannes | Saul P. Morgenstern |
| Tara L. Reinhart | Jennifer B. Patterson |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | Margaret A. Prystowsky |
| | KAYE SCHOLER LLP |
| 1440 New York Avenue, N.W. | 425 Park Avenue |
| Washington, D.C. 10005 | New York, NY 10022 |
| (202) 371-7000 | (212) 836-8000 |
| | |
| Sean M. Tepe | Claudia R. Higgins |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM | Jeffrey Saltman |
| | KAYE SCHOLER LLP |
| Four Times Square | 901 Fifteenth Street, NW |
| New York, New York 10036 | Washington, DC 20005 |
| (212) 735-3000 | (202) 682-3500 |

*Attorneys for Defendant Norfolk Southern Railway Company*

| | |
|---|---|
| Richard J. Favretto | Samuel M. Sipe, Jr. |
| Gary A. Winters | Linda S. Stein |
| Michael E. Lackey, Jr. | STEPTOE & JOHNSON LLP |
| MAYER BROWN LLP | 1330 Connecticut Avenue, NW |
| 1901 K Street, N.W. | Washington, D.C. 20036 |
| Washington, D.C. 20006 | (202) 429-3000 |
| (202) 263-3000 | |

*Attorneys for Defendant BNSF Railway Company*

Kent A. Gardiner
Kathryn D. Kirmayer
John L. Cuddihy
David D. Cross
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500
*Attorneys for Defendant CSX Transportation, Inc*

APPENDIX



**Defendants' individual routes**

## CERTIFICATE OF SERVICE

I, David G. Meyer, an attorney certify that on September 8, 2010, I caused a true and correct copy of the foregoing **Defendants' Memorandum In Support Of Motion To Exclude Interline-Related Communications From Consideration For Class Certification Or Any Other Purpose Prohibited By 49 U.S.C. Section 10706 – Filed Under Seal** to be served upon Co-lead Plaintiffs' counsel by first class, postage pre-paid, U.S. Mail at the addresses provided below and by electronic mail:

Steig D. Olson
Hausfeld LLP
11 Broadway, Suite 615
New York, NY 10004
solson@hausfeldllp.com

Stephen R. Neuwirth
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
stephenneuwirth@quinnemanuel.com

 

David G. Meyer

1