## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

This document relates to:

ALL DIRECT PURCHASER CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF/JMF/AK)

**PUBLICLY FILED VERSION**

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL CERTAIN DISCOVERY FROM PLAINTIFFS AND RULE 30(B)(6) <u>DEPOSITION OF PLAINTIFF OLIN AND FOR SANCTIONS</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

I.  Factual Background ......................................................................................3

    A.  Plaintiffs Have Maintained Longstanding Objections to Downstream Discovery. ...................................................................................3

    B.  Defendants Obtained the Olin Testimony To Which They are Entitled.................6

        1.  Plaintiffs Produced a Prepared Olin Witness Who Provided Testimony on all Relevant Topics. .............................................6

        2.  Defendants Have Already Obtained Much of What They Seek From Other Sources. ..............................................................8

        3.  The Objections at the Olin Deposition Followed the Pattern Established by Defendants.............................................................9

    C.  Defendants Filed this Motion in the Midst of a Constructive Meet and Confer After Filing Their Class Certification Opposition. ....................................11

II.  Argument .......................................................................................................12

    A.  The Motion Should Be Denied Because Defendants Did Not Complete The Meet And Confer Process...............................................................12

    B.  Defendants' Motion Also Fails on the Merits.......................................................14

        1.  Downstream Discovery is Highly Disfavored. ............................................14

        2.  Information About Plaintiffs' Sales Is Not Relevant................................15

        3.  Plaintiffs' Individual Actions Are Irrelevant To Whether Defendants Conspired.............................................................18

        4.  Plaintiffs Have Not Opened The Door to Downstream Discovery............19

        5.  The Cases Defendants Cite in Support of Discovery Are Inapposite. .................................................................................21

        6.  Plaintiffs Have Not Waived Their Relevancy Objections. ........................23

    C.  Mr. Gilley Was an Adequate and Appropriate 30(b)(6) Witness. .........................25

    D.  Sanctions Are Entirely Unwarranted. ....................................................................26

i

Conclusion ................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Air Tech Equipment, Ltd. v. Humidity Ventilation Systems, Inc.*,
    2006 WL 3193720 (E.D.N.Y. Nov. 2, 2006)..................................................21, 22

*Alexander v. FBI*,
    186 F.R.D. 137 (D.D.C. 1998)...................................................................25

*Alexander v. F.B.I.*,
    186 F.R.D. 197 (D.D.C. 1999)...................................................................27

*Allahverdi v. Regents of N.M.*,
    228 F.R.D. 696 (D.N.M. 2005)..................................................................23

*In re Aspartame Antitrust Litig.*,
    2008 WL 2275528 (E.D. Pa. April 8, 2008)...........................................14

*In re Automotive Refinishing Paint Antitrust Litig.*,
    2006 WL 1479819 (E.D. Pa. May 26, 2006)....................................14, 18

*Banks v. Office of the Senate Sergeant-At-Arms*,
    241 F.R.D. 370 (D.D.C. 2007)...........................................................26, 27

*Byrd v. Reno*,
    1998 WL 429676 (D.D.C. 1998) ..............................................................24

*Chrysler Corp. v. Gen. Motors*,
    596 F. Supp. 416 (D.D.C. 1984)..............................................................19

*Covad Commc'ns. Co. v. Revonet, Inc.*,
    267 F.R.D. 14 (D.D.C. 2010).....................................................................26

*Equal Rights Center v. Post Props., Inc.*,
    246 F.R.D. 29 (D.D.C. 2007).....................................................................12

*Goff v. Harrah's Operating Co., Inc.*,
    240 F.R.D. 659 (D. Nev. 2007)................................................................24

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968).........................................................................15, 21

*Herdlein Techs. Inc., v. Century Contractors, Inc.*,
    147 F.R.D. 103 (W.D.N.C. 1993)............................................................23

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977).................................................................................15

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc.*,
    Case No. C-1-01-704 (S.D. Ohio June 7, 2004) ...................................23

*Meijer, Inc. v. Abbott Labs.*,
   251 F.R.D. 431 (N.D. Cal. 2008)........................................................................14

*Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*,
   245 F.R.D. 26 (D.D.C. 2007)............................................................................21

*In re Papst Licensing GMBH & Co. KG Litig.*,
   550 F. Supp. 2d 17 (D.D.C. 2008).....................................................................24

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
   392 U.S. 134 (1968)..................................................................................18, 19

*In re Plastics Additives Antitrust Litig.*,
   2004 WL 2743591 (E.D. Pa. Nov. 29, 2004) ....................................................14

*In re Polyester Staple Antitrust Litig.*,
   MDL Docket No. 3:03-CV-1516 (W.D.N.C. Feb. 5, 2004) ...............................14

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   226 F.R.D. 492 (M.D. Pa. 2005)........................................................................14

*Rozier v. Ford Motor Co.*,
   573 F.2d 1332 (5th Cir. 1978) ...........................................................................24

*Skelton & Co. v. Goldsmith*,
   49 F.R.D. 128 (S.D.N.Y. 1969) .........................................................................23

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*,
   235 F.R.D. 521 (D.D.C. 2006)...........................................................................12

*U.S. ex rel. Singh v. Bradford Regional Medical Center*,
   249 F.R.D. 220 (W.D. Pa. 2008) .......................................................................18

*U.S. ex rel. Tennessee Valley Marble Holding Co. v. Grunley Const.*,
   433 F. Supp. 2d 104 (D.D.C. 2006) ...................................................................27

*In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006) ....................................22

*In re Urethane Antitrust Litig.*,
   Case No. 04-MD-1616-JWL (D. Kan. Jan 20, 2010) .........................................22

*In re Vitamins Antitrust Litig.*,
   198 F.R.D. 296 (D.D.C. 2000)...........................................14, 16, 18, 20, 21, 22, 23

## <u>Miscellaneous</u>

Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5039.1 (2d ed. 2005)...........19

Fed. R. Civ. Proc. 37(a)(1)................................................................................................13

Local Civil Rule 7(m)  ...............................................................................................12, 27

Direct Purchaser Plaintiffs ("Plaintiffs") respectfully submit this memorandum in opposition to Defendants' Motion and Memorandum in Support to Compel Certain Discovery From Plaintiffs and Rule 30(b)(6) Deposition of Plaintiff Olin and For Sanctions (Docket No. 401) (filed under seal) ("D. Br.").

## PRELIMINARY STATEMENT

Defendants' motion to compel is both unnecessary and without merit.  Seeking downstream discovery concerning the pricing of Plaintiffs' products, including Plaintiffs' use of fuel surcharges, Defendants have moved to reopen the 30(b)(6) deposition of Plaintiff Olin Corporation ("Olin") on various topics and to compel responses from each Class Plaintiff to a single interrogatory.[1]  *See* Proposed Order (Docket No. 401).  But Defendants abruptly and without reason cut off a productive meet and confer process on the Olin deposition, one which Plaintiffs expected would resolve the bulk of the discovery issues without court intervention.  This Court need not waste its time and should instead direct the Defendants to continue to meet and confer.

Besides being unnecessary, this motion is also meritless.  It is well established that defendants may not defend an allegation of price-fixing on the ground that the plaintiffs passed the overcharge onto their customers.  Accordingly, information concerning a plaintiff's downstream sales is generally considered irrelevant in a price-fixing case, and Plaintiffs here have maintained long-standing objections to any such discovery.  When Defendants recently

---

[1] Although Defendants only seek to compel a response to Interrogatory 11 and additional Olin testimony, Defendants' brief is quite ambiguous about the scope of downstream discovery Defendants think is warranted.  To the extent Defendants want to parlay a narrow ruling from the Court on Interrogatory 11 into issuing broad downstream discovery, such an attempt is unfounded.  Plaintiffs will advance significant burden objections, among others, if asked to conduct another significant search of their electronic and hard-copy files at this date, after having already done so in a comprehensive fashion.

raised the issue of downstream discovery, Plaintiffs asked that Defendants stipulate not to use any such discovery to assert an improper pass-on defense.  Defendants concede that a pass-on defense is improper, but rejected this stipulation and filed this motion without offering any clear explanation as to how downstream discovery could otherwise be relevant.

Indeed, Defendants' motion describes no legitimate basis to obtain this burdensome information.  In the Amended Complaint, Plaintiffs allege that Defendants conspired to impose an across-the-board artificially high and uniform fuel surcharge.  But the discovery Defendants seek in their motion relates to different industries and markets altogether – for example, the pricing of chlorine, granite monuments, tickets for carnival rides, and wholesale beer.[2] Defendants do not, and cannot, explain how the information they seek—such as whether Plaintiff imposed a fuel surcharge on a carnival ticket or a shipment of beer—could possibly be probative or lead to the discovery of admissible evidence relevant to the conspiracy regarding rail freight services alleged in this case.

As for Defendants' other contentions, Olin's 30(b)(6) witness was properly prepared even if he did not memorize every fact related to the 13 broad topics contained in Defendants' notice. While Plaintiffs had informed Defendants weeks ago that they were willing to allow a supplemental 30(b)(6) deposition pending agreement on the logistics and scope, the deposition transcript of the original 30(b)(6) witness, Mr. Gilley, demonstrates that he was properly prepared and provided answers to Defendants' questions covered by the noticed topics.  What's more, the information Defendants claim was not provided by Mr. Gilley was subsequently addressed through testimony by two other Olin employees who were deposed.

---

[2]   Plaintiffs U.S. Magnesium and Olin ship chlorine, among other products, Plaintiff Dakota Granite manufactures and sells granite, Plaintiff Strates Shows operates a travelling carnival, and Plaintiff Carter Distributing distributes beer.  *See* Plaintiffs' Memorandum in Support of Class Certification ("Pl. Cert. Mem."), at 58-60 (Docket No. 337).

Defendants' motion should be denied in all respects.

## I.   FACTUAL BACKGROUND

In this motion, Defendants seek an order that the Olin 30(b)(6) deposition be reopened to address an enumerated set of topics (including concerning Olin's downstream sales), and that each Class Plaintiff respond to Interrogatory No. 11, which asks for a description of any fuel surcharge Plaintiffs have charged their customers.  *See* Proposed Order (Docket No. 401); Declaration of David D. Cross (August 23, 2010) ("Cross Dec.") (Docket No. 401) Exs. 5 and 11.[3]  Defendants also seek sanctions, alleging that – due to unpreparedness or instructions from counsel – Olin's 30(b)(6) designee failed to answer questions regarding Olin's pricing practices and other topics.  D. Br. 32-34.  Putting aside the merits, *see infra* Point II.B., Defendants' arguments for this discovery are misplaced given the timing of this motion, Plaintiffs' longstanding objections to downstream discovery, and the meet and confer process that Defendants chose to end abruptly and without explanation.

### A.   Plaintiffs Have Maintained Longstanding Objections to Downstream Discovery.

Plaintiffs have maintained longstanding objections to downstream discovery based on the well-established principle that downstream evidence may not be used to assert a defense that plaintiffs passed on overcharges to their customers (often called a "pass-on" or "pass-through" defense).  *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, (D.D.C. 2000); *see infra* II.B.  Defendants have not pressed this issue until now (*i.e.* in a motion filed the week before Plaintiffs' class certification reply papers were due).

---

[3] Defendants complain about various other actions, D. Br. 4-7, but do not seek any remedy other than those identified in the Proposed Order.

Discovery began in earnest in this case in Spring 2009.  In May 2009, Defendants served interrogatories and requests for production on all Plaintiffs (except for Olin, which was added as a Plaintiff on December 31, 2009).  On or about July 24, 2009, all Plaintiffs (other than Nyrstar and Olin) served objections and responses to Defendants' interrogatories and requests for production.[4]  Plaintiffs objected to Interrogatory 11, inquiring into Plaintiffs' downstream use of fuel surcharges, on the ground that it sought irrelevant information that was not reasonably calculated to lead to the discovery of admissible evidence.  *See* Hamm. Dec. Ex. 1, at ¶ 14 and response to Interrogatory 11.[5]  In particular, Plaintiffs' General Objection No. 14 states:

> Plaintiff objects to each interrogatory to the extent it impermissibly seeks "downstream" information relating to Plaintiff's marketing or sale of its products to its customers on the grounds that such information is not relevant to any party's claim or defense or to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

*Id*. ¶ 14.  Likewise, Plaintiffs' specific objection to Interrogatory No. 11 incorporated their general objections by reference and stated:

> Plaintiff objects to this interrogatory as impermissibly seeking "downstream" information relating to Plaintiff's marketing or sale of its products to its customers on the grounds that such information is not relevant to any party's claim or defense or to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

*Id*. at response to Interrogatory 11.  As for Defendants' document requests, Plaintiffs objected to "each request to the extent it impermissibly [sought] 'downstream' information relating to Plaintiff's marketing or sales of its products to its customers."  Hamm. Dec. Ex. 2 ¶ 15.

---

[4]  Nyrstar served its objections and responses to Defendants' interrogatories on July 29, 2009.  *See* Second Declaration of Joseph Hammond (September 7, 2010) ("Hamm. Dec.") Ex. 1. Olin served its objections and responses on March 4, 2010.  *See* Cross Dec. Exs. 5 and 6.

[5]  The interrogatory and document request responses of Plaintiff Nyrstar are attached at Hamm. Dec. Exs. 1 and 2.  To avoid burdening the Court, Plaintiffs have not attached the identical responses of the seven remaining named Plaintiffs.

Despite their instant assertion of the necessity of conducting broad downstream discovery into "certain aspects of the sales and pricing of plaintiffs' products to their customers," D. Br. 1, Defendants did not request such discovery until adding this topic into certain deposition notices in March 2010.  Neither Defendants' May 2009 interrogatories nor document requests directly sought broad discovery into Plaintiffs' "sales and pricing" practices.  *See* Hamm. Dec. Exs. 1 and 2.  The closest to this was Interrogatory 11, which, as noted above, calls for downstream information but is limited to identification of whether the Plaintiff used a fuel surcharge and if so, its mechanics.

Similarly, while the deposition notices Defendants served on named Plaintiffs March 3, 2010 included a topic calling for testimony on fuel surcharges charged by Plaintiffs (Topic 9), they did not include any topics directly seeking discovery into Plaintiffs' "sales and pricing" practices.  *See* Cross Dec. Exs. 8-10.  It was only in several of "amended" notices served on March 17, 2010, that Defendants for the first time included a deposition topic that called for broad downstream discovery:

> Factors that influence the pricing of your products that are, have been, or can be shipped by freight transportation service providers, including the sources and nature of competition for said products, the cost of freight transportation, and other costs.

Cross Dec. Exs. 11-15.

Defendants, by this time, were aware that Plaintiffs had consistently advanced general and specific objections to downstream discovery.[6]  Nevertheless, while Plaintiffs objected to any downstream questions both prior to and during depositions of the named Plaintiffs,[7] Plaintiffs'

---

[6]   *See surpa* note 5 and accompanying text.

[7]   *See, e.g.*, Cross Dec. Ex. 16; Hamm. Dec. Exs. 3-5; Tr. of Dep. of Howard Kaplan, at 148 ("object to the line of inquiry to the extent it has to do with what US Magnesium may have charged its customers.") (excerpts attached at Hamm Dec. Ex. 9); Tr. of Dep. of Blair Carter, at

counsel generally allowed some limited inquiry into this territory in an effort to avoid any needless dispute.[8]  Defendants' own papers cite testimony from the Strates Shows 30(b)(6) deposition where Defendants' counsel was permitted to wander into the irrelevant arena of how Strates prices its carnival tickets.  D. Br. 13.  It is ironic that Defendants now claim that Plaintiffs waived any objections to downstream discovery by allowing witnesses to answer such questions despite objections, D. Br. 16-18, when Defendants also claim that instructing the Olin witness not to answer the same question was inappropriate, D. Br. 25-27.

## B.   Defendants Obtained the Olin Testimony To Which They are Entitled.

### 1.   Plaintiffs Produced a Prepared Olin Witness Who Provided Testimony on all Relevant Topics.

Olin produced Mr. Michael Gilley for its May 5, 2010 Rule 30(b)(6) deposition.  The deposition notice had 13 broad topics covering many aspects of Olin's business (including Topics 9 and 10 calling for downstream information).  *See* Cross Dec. Ex. 11.  At his deposition, Mr. Gilley testified to the steps he had taken to prepare.  Mr. Gilley testified that he had reviewed Defendants' Notice of 30(b)(6) topics to Olin "two [or] three months ago," in the context of "[d]iscussions with our attorneys and understanding what actions had been taken and

---

148-49 ("[L]et me object because this is a downstream question and we've already established ground rules for that.") (excerpts attached at Hamm. Dec. Ex. 10); Tr. of Dep. of Efstrateos Jay Strates, at 31, 77 (objecting to Topic 10 and "downstream inquiry") (excerpts attached at Hamm. Dec. Ex. 11); Tr. of Dep. of Michael Donnelly, at 108-09 ("[T]his starts to get into downstream data, and I know you know we've made an objection to that, so I'll let him answer that, but I'm not going to let him answer questions on downstream data.") (excerpts attached at Hamm. Dec. Ex. 12); Tr. of Dep. of Michael Gilley, at 21-22, 242-50 (objecting to questions concerning Topic 9 and Olin's use of fuel surcharges) (excerpts attached at Hamm Dec. Ex. 13); Tr. of Dep. of Betsy Myers and Corneice Hester, at 12-13, 30-31, 131-33 (objecting to topic 9 and questions exceeding scope of noticed topics) (excerpts attached at Hamm Dec. Ex. 14); Tr. of Dep. of William Ruoff, at 88 (objecting to question concerning "pass through" of shipping charges; "As you know, we've objected to those categories of questions") (excerpts attached at Hamm. Dec. Ex. 15).

[8]  *See* supra note 7.

6

claim filed."   Hamm. Dec. Ex. 13, at 11-12.  "Within … four weeks" of his deposition, *id*. at 13,

Mr. Gilley began preparation by "review[ing] documents."  *Id*. at 12.  Approximately five weeks

prior to his deposition – around "the first of April," *id*. at 14 – Mr. Gilley had the first of three

preparation meetings with external counsel, meeting with a team of four attorneys for a "two or

three hour[]" preparation meeting.   *Id*. at 13-15.  In preparing during that meeting, Mr. Gilley

and counsel also met with two employees who had significant responsibility for freight

negotiations over the Class Period.  *Id*. at 14; *see id*. at 19-21 (describing duties of Olin

employees Amanda Davis and Steve Bahn, who met with Mr. Gilley in the course of his

preparation).[9]  "[A]pproximately two weeks" prior to the date of his deposition, *id*. at 15, Mr.

Gilley again met with the same team of four lawyers for a "five hour[]" preparation session.  *Id*.

Finally, the day before his 30(b)(6) deposition, Mr. Gilley had a third, five-hour preparation

meeting with his team of counsel.  *Id*.  Outside of these meetings, Mr. Gilley spent additional

time in "personal study" of the "documents" and "information that had been requested through

the proceedings that ha[d] occurred already [in the litigation]."  *Id*. at 19.  Such preparation

belies Defendants' arguments that Mr. Gilley was not adequately prepared and effectively "failed

to appear" at his deposition.  D. Br. 34.

As discussed *infra*, Mr. Gilley's preparation allowed him to answer many of counsel's

questions, even when they were overbroad, tested Mr. Gilley's memory of details, and strayed

into arguably improper territory.  While there were certain questions that Mr. Gilley was unable

to answer, many of those topics were inquired into with further Olin witnesses, and Plaintiffs had

---

[9]  Mr. Gilley also testified that in another meeting "[a]pproximately three weeks" before his deposition, he had a telephonic meeting with Jack Hugh, "retired transportation manager from Olin Corporation."  *Id*. at 24.  Much like Mr. Bahn and Ms. Davis, Mr. Hugh's "responsibilities were negotiating primarily railroad freight rates and contracts" during his time at Olin.  *Id*. at 26.

offered to allow Defendants to reopen the Olin 30(b)(6) deposition, subject to appropriate time and scope restrictions, before this motion was abruptly filed.

> **2.      Defendants Have Already Obtained Much of What They Seek From Other Sources.**

Defendants have already obtained much of the information they seek.  Plaintiffs did not withhold otherwise responsive documents on the basis that they bore upon downstream discovery, and Defendants have made full use of such documents at deposition.  For example, Defendants questioned both Mr. Gilley and Mr. Bahn (Olin's production manager, and former transportation manager) on documents reflecting Olin's (largely unsuccessful) attempt to recover from its own customers the fuel surcharges imposed by Defendants, and obtained detailed answers.  *See, e.g.*, Hamm. Dec. Ex. 13, at 288-91, 299-304 (reviewing Olin slide presentation, indicating discrepancy between FSCs imposed upon Olin and the percentage amount of these FSCs it was able to recover from its own customers); Tr. of Dep. of Steve Bahn, at 195 ("Olin surcharge calculation is based on the average freight rates and average railroad fuel surcharges, and has been escalated and adjusted every four months recently while the railroad surcharge is based on the actual freight rate for a given lane in the West Texas Intermediate crude prices and is adjusted monthly…. in some months Olin collected more than the railroad charge and some months Olin collected less, but the intent was that they average out over time") (excerpts attached at Hamm. Dec. Ex. 16).  Amanda Davis, manager of logistics at Olin, also testified on other topics that Defendants (wrongly) claim they need further discovery on.  For example, while Defendants claim that they have not had sufficient discovery into makeup of Olin's logistics department, D. Br. 23, Davis provided detailed testimony of the employees within her group and their responsibilities.  *See* Tr. of Dep. of Amanda Davis, at 14-24 (excerpts attached at Hamm. Dec. Ex. 21); *see also* Tr. of Dep. of Steve Bahn, at 13-18.

### 3. The Objections at the Olin Deposition Followed the Pattern Established by Defendants.

Defendants' counsel have themselves made many of the relevancy and privilege objections highlighted in their brief as grounds to impose sanctions on Plaintiffs. Defendants assert, for instance, that it was improper for Plaintiffs' counsel to instruct Mr. Gilley not to answer questions that, in the view of Plaintiffs' counsel, exceeded the scope of properly noticed deposition topics. D. Br. 26-27; *id*. 34 n.21 (citing this instruction as an independent basis to impose sanctions). Defendants neglect to inform the Court, however, that counsel for Defendants issued the same instruction weeks earlier at the deposition of Kenneth Hayden, a 30(b)(6) witness designated by CSX to testify to the import of certain CSX refund data. *See* Hamm. Dec. Ex. 6. The relevant exchange was as follows:

> Q   And other than these account reconciliation documents that you just described, are there other types of documents that CSX maintains that describe its refund policies and practices?
>
> MR. CROSS: Same objection. We're -- we're way beyond the scope of the topics here.
>
> MR. WERDER: I don't think so. I'm just trying to learn --
>
> MR. CROSS: Show me the topics it relates to.
>
> MR. WERDER: It relates to the entirety of the topic.
>
> BY MR. WERDER:  You can answer.
>
> MR. CROSS: ***No, no, no. If you want to get testimony on just general refund policies that's a different topic. That's maybe a different witness. That's not why we're here today***.
>
> BY MR. WERDER: You can answer.
>
> MR. CROSS: ***No, I'm not going to let him answer***.
>
> MR. WERDER: You're instructing him not to answer that question?

MR. CROSS: *If you want to direct me to a topic that it covers, I'm happy to do that, but we're way beyond background at this point.*

Tr. of Dep. of Kenneth Hayden, at 18-19 (emphasis added) (excerpts attached at Hamm. Dec. Ex. 17).

This instruction by defense counsel set the practical precedent for future depositions in the case. The day after Mr. Hayden was deposed, Plaintiffs' counsel instructed Nyrstar's 30(b)(6) designee not to answer questions exceeding the scope of noticed topics, s*ee, e.g.,* Hamm. Dec. Ex. 14, at 30, 35-36, 110, and explained that the instruction was consistent with the approach Defendants had taken with Mr. Hayden. *Id.* at 131-33 (referencing Hamm. Dec. Ex. 7). Instructions at the Olin 30(b)(6) deposition followed suit.

Defendants also complain that, on privilege grounds, Plaintiffs' counsel instructed Mr. Gilley not to answer certain questions relating to his preparation as a 30(b)(6) witness. Again, however, Defendants ignore their own similar conduct. At the deposition of Mr. Hayden, to take one example, Defendants' counsel instructed Mr. Hayden not to answer questions regarding preparatory conversations he had with non-lawyers outside the presence of lawyers. *See* Hamm. Dec. Ex. 17, at 14. Defendants' motion to compel asserts that a virtually identical instruction from Plaintiffs' counsel was improper, *see* D. Br. 29, and ground for sanctions, *see* D. Br. 33.[10]

Likewise, at the August 24, 2010 deposition of Christopher Jenkins – that is, after this motion had been filed – counsel for Defendants instructed Mr. Jenkins not to answer questions regarding the documents that he relied upon to prepare a declaration he submitted in opposition to class certification. *See* Hamm. Dec. Ex. 19, at 9-18, 111-122. Defense counsel asserted that

---

[10]   *See also* Hamm. Dec. Ex. 18, at 43-46 (defense counsel instructing witness not to answer whether he had or had not discussed his testimony with counsel during break in the deposition that defense counsel had suggested be taken).

counsel for Plaintiffs had instructed witnesses similarly, but did not mention the pending motion to compel challenging those very instructions. *See id*. at 18, 118-19.

### C.     Defendants Filed this Motion in the Midst of a Constructive Meet and Confer After Filing Their Class Certification Opposition.

The timing of this motion and the failure to fully meet and confer belies Defendants' arguments for the relief they seek.  Defendants claim that the requested discovery bears upon class certification, however Defendants (i) waited until just before filing their class certification opposition even to raise this issue with Plaintiffs, (ii) waited more than a month to respond to Plaintiffs' offer to meet and confer, and then (iii) abruptly terminated the meet and confer process, imposed an arbitrary deadline, and filed this motion one week before Plaintiffs' class certification reply was due.

The timeline of relevant events bears recounting.  Plaintiffs (other than Olin) objected to Interrogatory No. 11 in July *2009* (and Olin did so on March 4, 2010).  The Olin 30(b)(6) deposition took place on May 5, 2010.  It was not until June 25, 2010 that Defendants wrote "to schedule the resumption of Olin's 30(b)(6) deposition" to address purported deficiencies in Mr. Gilley's testimony.  *See* Cross Dec. Ex. 23, at 4.  On July 9, 2010, Plaintiffs responded that they disagreed with Defendants' characterizations but offered to "discuss the best way to cure any material deficiencies in Mr. Gilley's testimony (if Defendants specify which questions Mr. Gilley was unable to satisfactorily answer on topics material to the litigation.)."  Cross Dec. Ex. 24, at 1.  Defendants did not respond for over one month, and then on August 12 requested that the parties meet and confer on August 17.  *See* Hamm. Dec. Ex. 8.  At the August 17, 2010 meet and confer, Plaintiffs offered to reopen the Olin deposition, provided that Defendants specify focused topics for further inquiry.  *See* Cross Dec. Ex. 35.  (This meet and confer was also the first time Defendants raised the issue of Plaintiffs' objections to Interrogatory No. 11.)  In an

11

effort to avoid the need for court intervention regarding downstream discovery, Plaintiffs also

proposed that Defendants stipulate that such discovery not be used to assert an improper defense.

*See id*.  Defendants agreed to consider this proposal.

However, Defendants then chose to terminate the meet and confer process by sending an

ultimatum.  On Friday morning, August 20, one week before Plaintiffs' class certification reply

was due, Defendants rejected the proposed stipulation and gave Plaintiffs until the close of

business to agree to reopen the Olin deposition on a number of topics including 9 and 10 (*i.e.* the

downstream topics).  Cross Dec. Ex. 35.  Defendants gave no reason for this arbitrary deadline

besides asserting that the discovery is "relevant, in part, to class certification, and we have had

numerous meet and confers on this subject over many months without reaching resolution."  *Id*.

In fact, as the record of the meet and confer process shows, any delay is due to Defendants' own

inaction and any impasse is contrived.

## II.   ARGUMENT

### A.   The Motion Should Be Denied Because Defendants Did Not Complete The Meet And Confer Process.

Pursuant to Fed. R. Civ. Proc. 37(a)(1) and Local Civil Rule 7(m), Defendants were

obliged to confer with Plaintiffs' counsel in an effort to resolve this dispute without court action

and to, at the very least, "narrow the areas of disagreement."  Local Civil Rule 7(m); *U.S. ex rel.

Pogue v. Diabetes Treatment Centers of Am., Inc*., 235 F.R.D. 521, 529 (D.D.C. 2006).  This

obligation is not "satisfied by perfunctory action, but requires a good faith effort to resolve the

non-dispositive disputes that occur in the course of litigation."  *Id*.  Failure to complete a good

faith meet-and-confer is, standing alone, "sufficient basis to deny a motion to compel."  *Id*.;

*Equal Rights Center v. Post Props., Inc.*, 246 F.R.D. 29, 31 (D.D.C. 2007) (collecting cases).

Defendants have not satisfied their obligation to meet and confer in good faith to resolve, or at least narrow, the discovery issues upon which they have moved.  As detailed above, and documented in the parties' correspondence, Defendants moved this Court to compel a continued 30(b)(6) deposition of Plaintiff Olin even though Plaintiffs had *already offered* to continue the deposition.  *See supra* Point I.C.; *see also* Cross Dec. Ex. 35.  While the parties had not settled on a final list of deposition topics at the time Defendants filed their motion, progress was being made in that regard and there was simply no need to involve the Court.  *See* Cross Dec. Ex. 35; *U.S. ex rel. Pogue*, 235 F.R.D. at 529 ("It is a waste of this Court's time and resources to adjudicate a dispute that could have been resolved by the parties themselves.").

Similarly, Defendants filed this motion despite the parties' ongoing efforts to establish parameters within which Defendants could obtain further discovery concerning the pricing of Olin's products.  *See* Cross Dec. Ex. 35.[11]  But Defendants imposed an arbitrary ultimatum without any justification for the urgency.  Defendants profess that this downstream information bears on class certification, *see* D. Br. 8, but made no serious effort to obtain the information prior to the July 1, 2010 filing of their brief in opposition to class certification and did not press the issue until shortly before Plaintiffs' class certification reply papers were due.  In a week's time, however, the parties made substantial progress, even though Defendants never specified exactly what downstream discovery they sought.  Plaintiffs proposed that downstream discovery could potentially be provided if Defendants agreed not to use the discovery to assert a pass-on defense.  *See* Cross Dec. Ex. 35.  Although Defendants have stressed the legal inconsequence of such a stipulation – conceding, as they must, that downstream data cannot be used to support a pass-on defense – Defendants rejected the proposal out of hand on Friday (8/20) and filed a 34

---

[11]   Plaintiffs engaged this effort notwithstanding their view, set forth below, that this information could not be relevant to any (permissible) claim or defense.

page motion the following Monday (8/23). This course of events does not reflect a good faith engagement with or conclusion of the meet and confer process.

In sum, Defendants' motion does not rest on a genuine impasse warranting judicial intervention. Plaintiffs respectfully submit that, at the very least, Defendants' motion be denied for failure to comply with Fed. R. Civ. Proc. 37(a)(1) and 7(m).

## B.     Defendants' Motion Also Fails on the Merits.

### 1.     Downstream Discovery is Highly Disfavored.

Defendants seek discovery of information relating to Plaintiffs' sales, including Plaintiffs' use of fuel surcharges – *i.e.*, Defendants seek classic "downstream discovery."

It is well established, however, that "courts generally proscribe downstream discovery." *In re Pressure Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 497-98 (M.D. Pa. 2005) ("In general, a price fixing conspiracy claim may not be defended on the ground that the purchaser passed on the higher cost of the product to its customers. Consequently, courts generally disallow discovery of downstream sales data in cases such as this one." (citing *In re Polyester Staple Antitrust Litig.*, MDL Docket No. 3:03-CV-1516, slip op. at 5-6 (W.D.N.C. Feb. 5, 2004) and *In re Folding Carton Antitrust Litig.*, MDL No. 250, 1978 U.S. Dist. LEXIS 20409, at *9 (N.D.Ill. May 5, 1978))); *see also In re Automotive Refinishing Paint Antitrust Litig.*, 2006 WL 1479819, at *7 (E.D. Pa. May 26, 2006) (downstream discovery "generally disfavored."); *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 302 (D.D.C. 2000) ("[T]he fact remains that no court has ever allowed production of individualized downstream data.").[12]

---

[12] *See also Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 433, 436 (N.D. Cal. 2008) (denying motion to compel evidence of downstream sales to demonstrate alleged conflict among class members); *In re Aspartame Antitrust Litig.*, 2008 WL 2275528, at *4 (E.D. Pa. April 8, 2008) (denying motion to compel downstream data and observing that "courts have consistently noted this kind of discovery is not favored"); *In re Plastics Additives Antitrust Litig.*, 2004 WL 2743591, at *16 (E.D. Pa. Nov. 29, 2004) (Because "downstream data is irrelevant to determine

14

Even where courts have found downstream information minimally relevant (in circumstances not applicable here), they have generally concluded that the burdens of responding outweighed the benefits, and denied the discovery request.  As explained in *Pressure Sensitive Labelstock*, the "marginal relevance of the information sought [in such discovery requests] is clearly outweighed by the burden and expense that the proposed discovery would impose" – indeed,  "the effectiveness of antitrust actions may be substantially reduced if defendants are allowed to pursue an inquiry into downstream activities and the massive discovery that such an inquiry would entail."  *In re Pressure Sensitive Labelstock*, 226 F.R.D. at 498; *see also In re Vitamins*, 198 F.R.D. at 302 (assuming, *arguendo*, that certain downstream data was "at least marginally relevant," and concluding that any marginal benefit of downstream discovery was outweighed by the burden of production).  There is no reason why the result should be any different in this horizontal price-fixing case.

## 2.    Information About Plaintiffs' Sales Is Not Relevant

Defendants concede, as they must, that a pass-through defense is not available, and thus that downstream discovery is not relevant to show that Plaintiffs passed on the alleged overcharges to their customers.  *See* D. Br. 15; *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

Instead, Defendants claim that information about Plaintiffs' downstream sales or use of fuel surcharges is relevant because it will somehow:  (1) relate to the demand for railroad transportation services (D. Br. 9-12); (2) show that businesses can increase prices in excess of actual incremental increases in cost without colluding with competitors (D. Br. 12-13); and (3) prove that Defendants would have imposed fuel surcharges "but for" the conspiracy (D. Br. at

---

whether defendants are liable for price fixing under the Sherman Act . . . courts have refused to require production of downstream data in antitrust price fixing cases.").

14).  Defendants also assert that Plaintiffs have opened the door to downstream discovery.  None

of these arguments establish that the requested discovery is at all relevant or permissible.

*First*, Defendants' demand-based argument makes no sense.  Defendants claim that they

need this information because "[u]nderstanding defendants' customers underlying pricing

environment is important to understanding the shipper-specific demand for, and valuation of,

defendants' rail services."  D. Br. 9.  Citing Dr. Willig's report, Defendants assert that demand

for shippers' products bears on the impact and damages of the alleged conspiracy because such

demand was "integrally tied to" the prices that Defendants were able to charge for rail freight

services.  *See id.*  But Defendants' expert listed the factors "that affect the demand elasticities

and marginal costs of rail services" and did not include demand for shippers' products, or the

prices charged by shippers for their products, among them.  *See* Cross Dec. Ex. 1, at 85.  Even if

rail rates were directly related to demand for Plaintiffs' products, it would be impossible to draw

a meaningful extrapolation from the downstream data of Olin (or the other Plaintiffs).

Defendants can, of course, draw on their own transaction data for information about shipper

demand.  Finally, Defendants' expert notes that █████████████████████████

████████████████████████████████████████████████████████

████  Cross. Ex. 1 at 84 (citation omitted).  ████████████████████

████████████████████████████████████████████████████████

████████  *Id.*  However, this Court has found that defendants who price discriminate "must

already have in their possession the information necessary to measure individualized demand

elasticities if such information is vital to these alleged price discrimination practices."  *In re*

*Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301 (D.D.C. 2000) (denying motion to compel

downstream information in price-fixing case).

And, even if it did relate to Olin Topics 9 and 10, Defendants' demand-based first argument cannot explain how Interrogatory 11 could possibly be relevant.  Simply put, if a Plaintiff stated that, say, it used a fuel surcharge for three months and set it at 2%, that would reveal nothing at all about the purportedly "shipper-specific demand for, or valuation of, defendants' rail services."  D. Br. 9.

*Second*, Defendants propose that downstream discovery may show that businesses can increase prices in excess of actual incremental increases in cost without colluding with competitors.  D. Br. 12-13.  But this is irrelevant to the issues raised in this case—i.e. whether Defendants conspired to artificially fix prices.  There are countless industries in the United States – some of which employed fuel surcharges (and many of which did not) – and opening the door to discovery into the pricing practices of those other industries has no logical bearing on the *only alleged conspiracy* in this litigation.  Whether the named Plaintiffs over-recovered their fuel costs in, for example, the price of carnival tickets (or assessed rate-based fuel surcharges similar to those imposed by Defendants), would reveal nothing about the truth or falsity of the allegations against Defendants.  Furthermore, the discovery requested would not provide information about whether Plaintiffs maintained, as did Defendants, an identical pretense that their fuel surcharges were not profit centers, but were limited to cost recovery.  And, even if Defendants could somehow show that Plaintiffs maintained a pretense about their fuel surcharge pricing practices, this would say nothing about whether *Defendants* did so.

*Third*, Defendants argue that if they can show that a Plaintiff used a fuel surcharge (say, in shipping beer) this will somehow show that Defendants did not conspire or, put differently, that "it would be unreasonable to insist that defendants' use of fuel surcharges is an indicator of a conspiracy."  D. Br. 14.  Again, this is meritless.  The application of a surcharge on a shipment

of beer (if it happened) says *nothing* about whether Defendants conspired to fix fuel surcharges on rail freight shipments.  Nor will it say anything about what *Defendants* would have done in the "but for" world absent a conspiracy.  An internet search will undoubtedly reveal that some companies somewhere used fuel surcharges at some time during the relevant period, but that is hardly relevant evidence about whether Defendants conspired or not.

>   **3.      Plaintiffs' Individual Actions Are Irrelevant To Whether Defendants Conspired.**

On closer analysis, the second and third arguments reveal that the only asserted "relevance" for the discovery Defendants seek—and particularly Interrogatory 11—is of the "we are innocent because they did it too" variety.  Defendants would like to argue that if Plaintiffs had fuel surcharges that were not tied to the cost of fuel it proves that Defendants did not collude.  But this type of evidence is irrelevant and inadmissible.  Defendants' approach was rejected in *U.S. ex rel. Singh v. Bradford Regional Medical Center*, 249 F.R.D. 220 (W.D. Pa. 2008), a *qui tam* action brought by a group of physicians ("Relators," under the False Claims Act) who alleged that defendants engaged in an unlawful referral arrangement.  *Id*. at 221-22.  Defendants moved to compel discovery of Relators' patterns and practices for referring patients, as well as Relators' non-compete agreements.  *Id*. at 222, 224.  Defendants argued that such discovery was relevant because it could demonstrate that Defendants' referral patterns conformed to prevailing standards.  *Id*. at 222-24.  Defendants further claimed that Relators had "open[ed] the door" to this discovery by inquiring into Defendants' conduct.  *Id*. at 223.  The district court rejected these arguments, holding that Relators' practices were irrelevant.  *Id*. at 224.  The court explained:

>   Perhaps Relators are also guilty of the same conduct, or that Defendants' conduct is as legal as the Relators' conduct, but a fact-finder does not need the Relators' information to determine if Defendants conduct is illegal.  In fact, such

> information would only add confusion by partly shifting the focus of attention to
> Relators' irrelevant conduct.

*Id.*; *accord In re Automotive Refinishing Paint Antitrust Litig.*, 2006 WL 1479819, at *8

("Plaintiffs' activities are almost wholly irrelevant in proving or disproving the underlying

charge. This claim must be substantiated by evidence of Defendants' activities, not Plaintiffs'.");

*In re Vitamins Antitrust Litig.,* 198 F.R.D. 296, 301 (D.D.C. 2000) ("Whether certain buyers

made profits is irrelevant to the question of whether those buyers actually paid higher prices as a

result of the alleged conspiracy to fix prices.").

Here, there is no reason to think *Plaintiffs* did anything wrong in pricing their products.

And, in any event, what Plaintiffs did would not be a defense to Defendants' own illegal

conduct.  *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134 (1968) (overruled on

other grounds).  In *Perma Life Mufflers*, the United States Supreme Court held that the common

law doctrine of *in pari delicto*, meaning "of equal fault," is not a defense to a claim under the

Sherman Act.  *Id.* at 138.  The Supreme Court explained:

> the purposes of the antitrust laws are best served by insuring that the private
> action will be an ever-present threat to deter anyone contemplating business
> behavior in violation of the antitrust laws.  The plaintiff who reaps the reward of
> treble damages may be no less morally reprehensible than the defendant, but the
> law encourages his suit to further the overriding public policy in favor of
> competition.  A more fastidious regard for the relative moral worth of the parties
> would only result in seriously undermining the usefulness of the private action as
> a bulwark of antitrust enforcement.

*Id.* at 139; *accord Chrysler Corp. v. Gen. Motors*, 596 F. Supp. 416, 418-19 (D.D.C.

1984) (unclean hands no defense to antitrust claim).

### 4.        Plaintiffs Have Not Opened The Door to Downstream Discovery.

Defendants assert that Plaintiffs' counsel "opened the door" to discovery of Plaintiffs'

pricing practices by inquiring into the matter in depositions of Defendants' witnesses. D. Br. 10-

12.  This is an outlandish suggestion.  As a threshold matter, the depositions that Defendants cite

were called to test assertions made by Defendants' employees in a set of declarations filed in

opposition to class certification.  By testing those declarations, Plaintiffs did not concede their

relevance or "open the door" to any irrelevant topics they may have raised, including the topic of

Plaintiffs' downstream sales.  *See* 21 Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 5039.1 (2d ed. 2005) (efforts to rebut evidence introduced by opposing party

does not "open the door" to that evidence).

In any event, Defendants have grossly mischaracterized the lines of questioning pursued

by Plaintiffs' counsel.  Defendants assert, for instance, that Plaintiffs' counsel opened the door

by "explicitly" asking CSX's Tim McNulty whether ███████████████████████████

██████████████████████████████████ D. Br. 10 (quoting Cross Dec. Ex. 26,

at 65).  Defendants fail to note that this question referred ████████████████ and omit the

follow-up question, which clarifies the inquiry:  "I didn't mean to try to oversimplify things, but

I'm trying to ask – I am asking ███████████████████████████████████████

███████  *See* Hamm. Dec. Ex. 20, at 71-72.  Plaintiffs' counsel was not asking █████████

████████████████████████████████████████████████████

Defendants also cite to the depositions of David Garin and Donna Cerwonka, but neither

witness was asked about the prices that shippers charge their customers.  Ms. Cerwonka was

asked to describe CSX training materials ██████████████████████████.  *See* Cross

Dec. Ex. 29, at 66; D. Br. 12.  Mr. Garin, for his part, was simply asked to elaborate on

████████████████████████████████████████████████ a term

Mr. Garin used in his declaration.  *See* Cross Dec. Ex. 27, at 71-75.[13]  Such questions did not aim

---

[13] ████████████████████████████████████████████████████████
███████████████████████████████ *See* Cross Dec. Ex. 27, at 71-72.

to elicit testimony on shippers' pricing practices.  And to the extent Ms. Cerwonka or Mr. Garin provided such testimony, it was simply non-responsive.

### 5.    The Cases Defendants Cite in Support of Discovery Are Inapposite.

Defendants selectively quote *In re Vitamins Antitrust Litigation*, 198 F.R.D. 296, 299 (D.D.C. 2000), but that case does not support their motion.  The Court there *denied* defendants' requests for downstream discovery, financial data, and currency exchange rate data.  In doing so, the court rejected the same arguments that Defendants are advancing here, namely that downstream information is probative of demand for Defendants' products, as well as Plaintiffs' damages.  *Id*. at 298.  The Court rejected the defendants' demand-based argument, concluding that "[t]he defense that plaintiffs' economic power could have kept the prices of [defendants' goods] down is irrelevant where, as here, the crucial issue is whether there was a conspiracy to fix prices.  To suggest that a conspiracy was not as successful as it might otherwise have been because of the plaintiffs' countervailing economic power is absurd."  *Id.* 301 (internal quotation marks omitted).  The Court also found "no reason why damages could not be calculated through the industry-wide public data which [plaintiffs' experts] claim[ed] would be sufficient."  *Id.* at 300.  Here, as well, Plaintiffs' expert has opined that ███████████████████████████ ██████████████████████████████████████████████  *See* Corrected Expert Report of Gordon Rausser, Ph.D ("Rausser Rpt.") 80-123.

Defendants also claim that *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 26, 34-35 (D.D.C. 2007) "allow[ed] discovery of downstream information for purpose of evaluating applicability of the 'cost plus' exception to the *Hanover Shoe* rule and as relevant to damages calculation."  D. Br. 15.  This description grossly mischaracterizes the holding in that case.  In fact, the *Meijer* court did not address, let alone credit, defendants' argument that

21

downstream data was relevant to damages.  *Meijer*, 245 F.R.D. at 35.  As for the cost plus

exception (which Defendants do not even contend applies in this case), the *Meijer* court stated:

> the Court is not sure whether [defendant] asserts that it needs actual sales data to
> determine the applicability of the cost-plus exception or alternatively, more
> detailed information about the pricing formulas employed by Plaintiffs.  The
> Court finds that [defendant] is entitled to explore the applicability of a cost plus
> exception and therefore, the Court directs the parties to meet and confer to
> compromise on the limited production of some additional information that will
> aid [defendant] in this inquiry.

*Id*. at 35.  Thus, *Meijer* in no way supports Defendants' request.

*Air Tech Equipment, Ltd. v. Humidity Ventilation Systems, Inc*., 2006 WL 3193720

(E.D.N.Y. Nov. 2, 2006) is also inapposite.  There, plaintiffs and defendants were "direct

competitors."  *Id*. at 1.  In counterclaims, defendants claimed that plaintiffs "hampered

defendants from growing and profiting from their business in the relevant market of alternative

dehumidifiers."  *Id*. at 2.  Stressing that the defendants' claimed injury rested on lost profits, the

court ordered defendants to produce the names of its customers and pricing information.  *Id*.

This holding has no application to the case at hand, where Plaintiffs are seeking damages for

overcharges, not for lost profits.[14]  Nor does *In re Urethane Antitrust Litigation* assist

Defendants. 237 F.R.D. 454 (D. Kan. 2006).  The defendants there sought various downstream

data but "did not seek pricing information." Id. at 462 (distinguishing *In re Vitamins* on this

ground).  Further, the parties in *In re Urethane* were involved in the same market – the sale of

polyol products – and thus information concerning the plaintiffs' sales was probative of "[t]he

characteristics and complications of the relevant market [which] may be material to determining

---

[14] Even assuming, *arguendo*, that there is some minimal relevance to any of the
downstream information, its probative value would be far outweighed by the burdens of
collecting it.  Requiring testimony on the noticed downstream topics would require Olin to
engage in a far-reaching review of its internal sales and pricing practices.

whether a class should be certified." *Id*. at 459.  The same could not be said here.  None of the

Plaintiffs sell rail freight; rather they operate in entirely different markets.

Defendants also rely on another opinion from *In re Urethane Antitrust Litig.*, Case No.

04-MD-1616-JWL (D. Kan. Jan 20, 2010), ordering plaintiffs to produce some "limited, high-

level, downstream documents."  Slip Op. at 19 (Cross Dec. Ex. 31).  Putting aside that

Defendants here seek far more than a limited set of documents, *In re Urethane* chose not to

follow *In re Vitamins* in part because damages in *In re Vitamins* were calculable from available

evidence (which minimized any conceivable benefit of the downstream data).  *See* Slip Op. at

13-14.  Because ████████████████████████████████████████

████████████████████████████████████████[15]  this case falls squarely under *In re*

*Vitamins*.  Similarly, while *J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc*., Case No. C-1-01-704,

slip-op. (S.D. Ohio June 7, 2004) (Cross Dec. Ex. 32) allowed downstream discovery, it did so

only because the defendants there had alleged that plaintiffs' downstream "speculative

purchasing" was the cause (and not the result) of price increases.  In those limited circumstances

– not present in Defendants' arguments here – the court partially granted defendants'

downstream discovery requests.

### 6.   Plaintiffs Have Not Waived Their Relevancy Objections.

Defendants contend that Plaintiffs waived their relevancy objection to Topics 9 and 10

(regarding downstream discovery) by permitting some of their 30(b)(6) witnesses, but not all, to

answer questions relating to those topics.  D. Br. 16-18.  Defendants point to no authority

supporting such a rule.  *See id*.  The lead cases cited by Defendants stand for the inapposite

proposition that a party served with an excessive number of interrogatories must respond to all or

---

[15]   *See* Corrected Expert Report of Gordon Rausser, Ph.D ("Rausser Rpt.") 80-123.

none of them; a party cannot respond to certain interrogatories (likely the unproblematic ones) and argue that the unanswered interrogatories were excessive.  *See Herdlein Techs. Inc., v. Century Contractors, Inc*., 147 F.R.D. 103, 104-05 (W.D.N.C. 1993); *Allahverdi v. Regents of N.M.*, 228 F.R.D. 696, 698 (D.N.M. 2005).  Defendants' reliance on this line of authority is confounding, as Defendants did not serve an excessive number of interrogatories, s*ee* Cross Dec., Ex. 5, and do not contend that Plaintiffs' interrogatory responses somehow resulted in a waiver, s*ee* Br. 17-18; *see also id*. 4 n.2 (noting that Plaintiffs' interrogatory responses were substantially identical).  The remaining cases upon which Defendants rely stand for similarly unremarkable propositions not at issue here.  *Skelton & Co. v. Goldsmith*, 49 F.R.D. 128, 130 n.1 (S.D.N.Y. 1969) (court need not consider burden of supplementing interrogatory response where initial response was provided without objection); *Rozier v. Ford Motor Co*., 573 F.2d 1332, 1346 (5th Cir. 1978) (withholding critical document within scope of discovery order is improper and ground for a new trial).

In any event, the waiver rule Defendants ask the court to apply makes no sense.[16]  It cannot be that Plaintiffs waived their relevance objections to downstream discovery *in toto* because certain 30(b)(6) witnesses answered questions bearing on these topics, whereas others did not.  Furthermore, and more fundamentally, the principle Defendants invoke – that a party may not use evidentiary objections as both a sword and a shield – has no application to the facts of this case.  Plaintiffs' contention, after all, is that the downstream discovery Defendants seek is *not relevant* to any claim or defense – a position Plaintiffs have maintained throughout this

---

[16]   This Court has noted, in related contexts, that precluding relevancy objections can "lead to absurd results." *Byrd v. Reno*, 1998 WL 429676, at *6 (D.D.C. 1998) (Facciola, J.); (rejecting argument that a relevancy objection is invariably waived whenever it is not timely asserted); *In re Papst Licensing GMBH & Co. KG Litigation*, 550 F. Supp. 2d 17, 23 (D.D.C. 2008) (same).

litigation.  Any irrelevant testimony Plaintiffs may have provided on Topics 9 and 10 could not, by definition, distort the truth-finding process.  S*ee Goff v. Harrah's Operating Co., Inc*., 240 F.R.D. 659, 662 (D. Nev. 2007) (if redacted material is not relevant to dispute, contention that party was using redactions as both a sword and a shield necessarily fails).

### C.   Mr. Gilley Was an Adequate and Appropriate 30(b)(6) Witness.

As discussed above, *see supra* at Point I.B., Mr. Gilley was adequately prepared for his deposition.  In addition, Defendants' specific complaints about Mr. Gilley's performance at the deposition fall apart under scrutiny.  Defendants complain, for example, that Mr. Gilley could not: specify "what rail option Olin had for transporting products from one or more Olin facilities"; "identify the truck companies that compete for Olin's business from its Niagara Falls plant"; recall whether Olin "had paid a fuel surcharge prior to 2002"; or identify the time period in which "the former transportation manager for Olin, who had responsibility for negotiating freight rates with rail carriers, was in that role."  D. Br. 21-23.  But Mr. Gilley's inability to answer every hyper-technical question falling under the noticed topics does not render his testimony deficient.  A 30(b)(6) deposition is not a "memory contest"—the witness must be "prepared and knowledgeable."  *See, e.g.*, *Alexander v. FBI*, 186 F.R.D. 137, 143 (D.D.C. 1998) (citation omitted).

Furthermore, Mr. Gilley's purportedly incomplete answers were in many cases elicited amidst garbled lines of questioning that skipped back and forth between questions about products and questions about plants with little coherence, making it all the more difficult for the witness to answer in detail.[17]  In addition, some of Defendants' complaints fall outside the noticed topics. *See* Cross Dec. Ex. 24, at 3 (noting that the noticed topics do not fairly include any request to

---

[17]  *See, e.g.*, Hamm. Dec. Ex. 13, at 50-52, 123-24.

address the specific make-up and employment histories of the logistics department).  Defendants

also ignore the detailed testimony that Mr. Gilley did give on these areas.  *See* Hamm. Dec. Ex.

13, at 77, 79-80, 85 (testimony on the products shipped from each Olin plant and modes of

transportation); *id*. at 46, 95-96, 130-38, 144-52, 154-62, 186-89 (testimony on the fuel

surcharges Olin paid); *id*. at 19-20, 26-28, 32-35 (testimony about the business and corporate

structure of the logistics department).  Finally, Defendants fail to note the access they already

have to much of the information at issue.  *See supra* Point I.B.

In sum, Mr. Gilley gave substantive and informed answers on every permissible noticed

topic.  Olin is a very large company with many different products and inputs to ship.  The level

of preparation upon which Defendants insist is neither required under the Rules nor possible in a

practical sense for an organization of the size and scale of Olin.  And, in any event, Plaintiffs

have already offered to make an Olin 30(b)(6) witness available for supplemental testimony on

focused topics.  *See supra* Point I.C.

### D.    Sanctions Are Entirely Unwarranted.

Defendants request expenses and fees associated with any further 30(b)(6) deposition of

Plaintiff Olin.  Defendants have, however, provided no basis for such a sanction.  To begin with,

Olin's 30(b)(6) witness was, contrary to Defendants' assertions, fully and appropriately prepared

for his deposition.  *See supra* I.B.  While he was not able to answer every question, this is

understandable given the breadth of the topics covered and, in any case, no ground for sanctions.

As this Court has explained, "[i]gnorance in one area, provided it is professed in good faith, may

lead to additional 30(b)(6) witnesses, but it should not lead to sanctions that should be reserved

for the 'bandying' that the courts have found unacceptable."  *Covad Commc'ns. Co. v. Revonet,*

*Inc.*,  267 F.R.D. 14, 25-26 (D.D.C. 2010) (Facciola, J.) (denying motion for sanctions, noting

that while 30(b)(6) witness "lacked knowledge in certain areas, she was well informed in most of

the areas of inquiry"); *see also Banks v. Office of the Senate Sergeant-At-Arms*, 241 F.R.D. 370,

375 (D.D.C. 2007) (Facciola, J.) (denying sanctions where 30(b)(6) witness answered questions

"adequately").

Moreover, to the extent Defendants seek sanctions for instructions issued during the Olin

30(b)(6) deposition, Defendants ignore, first, that they made substantially the same instructions

during depositions of their witnesses and, second, that Plaintiffs have already agreed to reopen

the Olin deposition with appropriate scope.  Indeed, as discussed above, the parties were in the

midst of ironing out the details of that deposition when Defendants filed this motion.  If

anything, sanctions could be imposed on Defendants for cutting short the meet and confer and

burdening the Court with a needless, and meritless, motion.  *See Alexander v. F.B.I.*, 186 F.R.D.

197, 199 (D.D.C. 1999) (sanctions may be appropriate for violations of Local Rule 108(m), the

predecessor to Local Rule 7(m)); *see also U.S. ex rel. Tennessee Valley Marble Holding Co. v.

Grunley Const*., 433 F. Supp. 2d 104, 111-12 (D.D.C. 2006) (motion for sanctions premature

where meet and confer not completed).

Finally, the downstream pricing information that Defendants seek to elicit from Olin's

30(b)(6) witness is not relevant to any claim or defense.  *See supra* Point II.B.  As this Court has

explained, "it is unreasonable to base sanctions on the failure to provide irrelevant information."

*Banks,* 241 F.R.D. at 375.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' motion should
be denied in its entirety.

Dated:  September 7, 2010

Respectfully submitted:

Michael D. Hausfeld, D.C. Bar #153742
William P. Butterfield, D.C. Bar #420354
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201
Email:  mhausfeld@hausfeldllp.com


Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-6850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

Stephen R. Neuwirth
Rick I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART &
     SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email:  stephenneuwirth@quinnemanuel.com


*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

28

**CERTIFICATE OF SERVICE**

I, Joseph D. Hammond, an attorney, certify that on September 7, 2010, I caused a true and correct copy of the foregoing declaration (and accompanying exhibits) to be served on counsel for Defendants.


/s/ Joseph D. Hammond
Joseph D. Hammond