**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869 |
| | Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To: | **PUBLICLY FILED VERSION** |
| ALL DIRECT PURCHASER CASES | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE INTERLINE-RELATED COMMUNICATIONS**
**FROM CONSIDERATION FOR CLASS CERTIFICATION OR**
**ANY OTHER PURPOSE PROHIBITED BY 49 U.S.C. SECTION 10706**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

I.  DEFENDANTS' REQUEST THAT THE COURT RESOLVE THEIR
    EVIDENTIARY CHALLENGES FOR CLASS CERTIFICATION PURPOSES IS
    FLAWED. .......................................................................................................... 5

    A. Defendants' Motion is Procedurally Flawed. ............................................... 5

    B. Defendants' Admissibility Challenges Are Also Misplaced at Class Certification. .... 6

II. SECTION 10706(a)(3)(B)(ii) DOES NOT APPLY TO THE UNREGULATED
    TRAFFIC AND SURCHARGES AT ISSUE HERE. ...................................................... 11

III. DEFENDANTS CANNOT SHOW THAT SECTION 10706(a)(3)(B)(ii) APPLIES TO
     THE CHALLENGED EVIDENCE. ............................................................................ 15

    A. Congress Did Not Protect All Interline-Related Discussions Specifically Because of
       Antitrust Concerns Arising from Such Discussions. .................................................. 16

       1.  The 4R Act............................................................................................... 16

       2.  The Staggers Act....................................................................................... 19

       3.  Alliance Agreements................................................................................. 20

       4.  Rail Carrier Discussions Raise Competition Concerns. ........................................ 21

    B. The Evidentiary Protection of § 10706(a)(3)(B) is Limited to Discussions or
       Agreements of Specific Joint-Line Movements. ...................................................... 24

       1.  The Impetus for § 10706(a)(3)(B) .............................................................. 24

       2.  The Plain Language of § 10706(a)(3)(B)....................................................... 24

       3.  The Legislative History............................................................................. 27

       4.  The Statute Protects Only Evidence Congress Intended to Protect. ..................... 29

    C. Plaintiffs Do Not Rely on Evidence of Discussions and Agreements Concerning "An
       Interline Movement of the Rail Carrier."................................................................ 31

       1.  Purported "Alliance" Meetings ................................................................. 32

       2.  The March 2003 UP/CSX Meeting.............................................................. 38

       3.  Purported "Concurrence" Communications.................................................... 39

        4.     Purported Discussions of "General Policies and Practices".............................. 43

CONCLUSION........................................................................................................................... 44

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Am. Short Line R.R. Ass'n. v. U.S.*,
  751 F.2d 107 (2d Cir. 1984).............................................................................19, 26

*Ammons v. La-Z-Boy, Inc.*,
  No. 1:04-CV-67 TC, 2008 WL 5142186 (D. Utah Dec. 5, 2008) ..........................10

*Atl. Cleaners & Dyers v. U.S.*,
  286 U.S. 427 (1932)................................................................................................26

*Bankamerica Corp. v. United States*,
  462 U.S. 122 (1983)................................................................................................26

*Barnhart v. Walton*,
  535 U.S. 212 (2002)................................................................................................27

*Bell v. Addus Healthcare, Inc.*,
  No. C06-5188RJB, 2007 WL 3012507 (W.D. Wash. Oct.12, 2007) .....................10

*Carrier v. Am. Bankers Life Assur. Co. of Fla.*,
  No. 5-CV-430-JD, 2008 WL 312657 (D.N.H. Feb.1, 2008) .................................10

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)................................................................................................26

*Fla. E. Coast Ry Co. v. U. S.*,
  623 F.2d 391 (5th Cir. 1980) .............................................................................17, 26

*Goldring v. District of Columbia*,
  416 F.3d 70 (D.C. Cir. 2005)..................................................................................26

*Grant v. U.S. Air Force*,
  197 F.3d 539 (D.C. Cir.1999)...................................................................................6

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008).................................................................................2, 9

*In re Lindsey*,
  158 F.3d 1263 (D.C. Cir. 1998)..............................................................................31

*In re Nifedipine Antitrust Litig.*,
  No. 1:03-mc-00223-RJL, slip. op. (D.C. Cir. Feb. 23, 2009)..................................9

iii

*In re Rail Freight Fuel Surcharge Antitrust Litig.,
    587 F. Supp. 2d 27 (D.D.C. 2008) ........................................................3, 6, 7, 28

In re Sealed Case,
    737 F.2d 94 (D.C. Cir. 1984) ........................................................................31

In re Vitamins Antitrust Litig.,
    209 F.R.D. 251 (D.D.C. 2002) .......................................................................6

Jung v. Ass'n of Am. Med. Colls.,
    339 F. Supp. 2d 26 (D.D.C. 2004) ...............................................................30

LaShawn A. v. Barry,
    87 F.3d 1389 (D.C. Cir. 1996) .....................................................................11

McDonough v. Toys "R" Us, Inc.,
    638 F. Supp. 2d 461 (E.D. Pa. 2009) .............................................................6

Meijer, Inc. v. Warner Chilcott Holdings Company III, Ltd.,
    246 F.R.D. 293 (D.D.C. 2007) .......................................................................9

Nat'l Public Radio, Inc. v. FCC,
    254 F.3d 226 (D.C. Cir. 2001) .....................................................................25

Pardo-Kronemann v. Donovan,
    601 F.3d 599 (D.C. Cir. 2010) .......................................................................5

Parkinson v. Hyundai Motor Am.,
    258 F.R.D. 580 (C.D. Cal. 2008) .................................................................10

Rail Fuel Surcharges,
    2006 WL 2180211 (STB Aug. 3, 2006) .......................................................15

Rodriguez v. Union Pac. Corp.,
    No. 8:04CV576, 2006 WL 2239043 (D. Neb. July 31, 2006) .......................5

Ruth v. Superior Consultant Holdings Corp.,
    No. 99-CV-71190-DT, 2000 WL 1769576 (E.D. Mich. Oct. 16, 2000) ........5

Singh v. George Washington Univ.,
    383 F. Supp. 2d 99 (D.D.C. 2005) ...............................................................10

Soc'y of Plastics Indus., Inc. v. I.C.C.,
    955 F.2d 722 (D.C. Cir. 1992) .....................................................................41

Starr v. Sony BMG Music Entertainment,
    592 F.3d 314 (2d Cir. 2010) .........................................................................37

*STB Docket No. 33556,*
    4 S.T.B. 122 (1999)..................................................................20, 21, 27, 30, 32, 41

*STB Docket No. 35081,*
    Decision No. 11, 2008 STB Lexis 549 ...............................................................21

*Tedrow v. Cowles,*
    No. 2:06-CV-637, 2007 WL 2688276 (S.D. Ohio Sept. 12, 2007) .......................10

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006)................................................................................................37

*U.S. v. Meade,*
    175 F.3d 215 (1st Cir. 1999)...............................................................................25

*Western Railroads—Agreement,*
    364 I.C.C. 1 (1980) ......................................................................................17, 18

*Western Railroads—Agreement,*
    364 I.C.C. 635 (1981) .................................................................................. passim

*Western Railroads—Agreement,*
    365 I.C.C. 918 (1982) .....................................................................................20, 40

*Western Railroads—Agreement—Petition To Reopen,*
    364 I.C.C. 787 (I.C.C. Mar. 24, 1981) ................................................................12

## STATUTES

49 U.S.C. § 5b...........................................................................................................17

49 U.S.C. § 10101......................................................................................................19

49 U.S.C. §§ 10101-16106 ..........................................................................................3

49 U.S.C. § 10502(a)..................................................................................................12

49 U.S.C. § 10701(a) ..................................................................................................15

49 U.S.C. § 10706 ................................................................................................ passim

49 U.S.C. § 10709(c)(1).............................................................................................3, 13

49 U.S.C. § 10713 .....................................................................................................12

49 U.S.C. § 10713(a)(1980).......................................................................................12

Pub. L. No. 96-448, 94 Stat. 1895 (Oct. 14, 1980)................................................ passim

v

ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 ............................................3, 13

49 U.S.C. §§ 10701-10709 ..............................................................................................13

**OTHER AUTHORITIES**

49 CFR § 1039 (2010) ......................................................................................................12

FED. R. CIV. P. 23 ...........................................................................................2, 8, 9, 10

Fed. R. Civ. P. 56 ............................................................................................................10

FED. R. EVID. 402 .............................................................................................................31

http://www.csx.com/?fuseaction=about.rr_dictionary ...................................................40

Merriam-Webster's Collegiate Dictionary 257 (11th ed. 2003)....................................25

## PRELIMINARY STATEMENT

Defendants' motion seeks to exclude "interline-related communications" from consideration on Plaintiffs' motion for class certification or for any other purpose.  Their motion is premised on 49 U.S.C. § 10706(a)(3)(B)(ii), about which they state "[n]o court has yet considered [its] scope and application."[1]  Defendants' Memorandum in Support of Motion to Exclude Interline-Related Communications From Consideration for Class Certification or Any Other Purpose Prohibited By 49 U.S.C. Section 10706," at 17 (Sept. 8, 2010) ("D. Br.").  They assert that Plaintiffs "rely heavily" on such evidence in their initial class certification brief (*id*. at 1), although Defendants are only now belatedly raising this issue.

Defendants' motion is procedurally defective.  Though styled as a motion to exclude, it does not specify with particularity the evidence at issue, even though Defendants claim that Plaintiffs' class certification briefing is "replete with improper and misleading citations to interline communications."  *Id*. at 18.  Instead, Defendants rely on "examples," citing fifteen documents, a few snippets of deposition testimony, and some statements from Plaintiffs' brief and expert reports.  *Id*. at 22-27.[2]  This vagueness does a disservice to the Court, which is asked to issue a broad exclusion order—in effect, an advisory opinion—about any evidence cited by Plaintiffs that "referred to, related to, or had a bearing upon … interline traffic."  Defs.' Proposed Order at 1.  Thus, the Court and Plaintiffs are left to guess as to the full scope of Defendants' exclusion request.  *See infra* Section I.A.

---

[1] For the Court's convenience, the full text of 49 U.S.C. § 10706 ("§ 10706") is attached as Appendix A.

[2] Defendants specifically cite Exs. 30, 31, 48, 49, 79, 95, 96, 97, 100, 101, 102, 104, 210, 212, and 215 to the previously submitted declaration of Sami Rashid ("RD Ex.__"), filed in support of Plaintiffs' Memorandum in Support of Motion for Class Certification (Dkt. #337) ("Pl. Class Cert. Mem.") at 27-40.

Defendants' request for admissibility rulings is also improper in the context of class certification. The D.C. Circuit and other Courts, including the Third Circuit in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 317 (3d Cir. 2008), have emphasized that Supreme Court authority precludes resolution of factual issues unnecessary to the class certification inquiry, and resolving Defendants' motion is certainly not necessary to address any of the Rule 23 requirements. At most, Defendants' motion only confirms that common "questions of law or fact common to class members predominate." FED. R. CIV. P. 23(b)(3). Moreover, given the breadth of evidence in support of class certification that is unrelated to interline shipments, Defendants' challenges could not possibly exclude all of Plaintiffs' common evidence that Defendants conspired to coordinate standard fuel surcharge ("FSC") programs to be applied to all rail traffic. *See infra* Section I.B.

These defects to one side, Plaintiffs would ordinarily ask to complete fact discovery before the Court resolves Defendants' admissibility challenges; but Defendants' motion lacks merit even on the present record. Thus, were the Court to address Defendants' motion on the merits (independent of class certification), Plaintiffs' respectfully submit that the motion should be denied—and that Defendants should be precluded from raising another challenge to the same evidence under § 10706 at a later date. Defendants should be given only one bite at the apple.

To the extent the Court resolves the admissibility issue, the Court should affirmatively rule that the challenged evidence falls outside the scope of the statutory protection. This conclusion is justified on several grounds.

***First***, the evidentiary protection of § 10706(a)(3)(B)(ii) does not apply to the *unregulated* freight traffic at issue in this case. Congress specifically provided that traffic moving under contracts—which comprises the unregulated traffic at issue here—"*shall not be subject to*" the

2

other provisions of the regulatory scheme, including the evidentiary protections of § 10706.  49

U.S.C. § 10709

(c)(1) (emphasis added).  *See infra* Section II.

**Second**, contrary to Defendants' claims, Congress, the Interstate Commerce Commission

("ICC"), and its successor, the Surface Transportation Board ("STB")[3] have recognized that

anticompetitive discussions and agreements can occur in the interline context and have therefore

placed constraints on Defendants' behavior that exist alongside and in addition to the antitrust

laws.  This concern extends to formal "Alliance" agreements that some rail carriers have entered

into (though Defendants apparently had no such formal agreements with each other).  Defendants

ignored such constraints in practice, as they ignore them in their brief.  *See infra* Section III.A.

**Third**, the statute's plain language, the logic of the statutory scheme, the relevant

legislative history, and the ICC/STB's interpretations all confirm that, even if it were to apply, §

10706(a)(3)(B)(ii) offers only narrow evidentiary protection to discussions or agreements that

concern particular interline movements in which the rail carriers actually participate—and not

broader discussions.  *See infra* Section III.B.

**Fourth**, none of Plaintiffs' evidence is remotely restricted to particular interline

movements.  Plaintiffs do not allege, or seek to prove, a conspiracy that was confined to specific

rates or movements.  Rather, Plaintiffs allege, and will prove, that Defendants agreed to fix

prices across-the-board by using the common mechanism of an FSC standard, which, by

definition and in practice, was imposed on virtually all movements and all traffic.  *See In re Rail*

---

[3] The ICC regulated all aspects of Defendants' conduct from 1887 to approximately 1976, when deregulation began to occur.  In the ICC Termination Act of 1995, the ICC was replaced by the STB.  *See* ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (codified generally at 49 U.S.C. §§ 10101-16106).

3

*Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 30 (D.D.C. 2008) ("*Rail Freight*")

("Plaintiffs allege that defendants determined that the most efficient means to increase their

profits was through the imposition of an across-the-board artificially high and uniform fuel

surcharge …."). Even the few specific pieces of evidence Defendants highlight demonstrate that

they far overstepped the bounds of protected discussions in an effort to elevate prices by

imposing standard rail FSC programs across-the-board. *See infra* Section III.C.

In sum, to the extent it applies at all, the limited scope of § 10706(a)(3)(B)(ii)'s

evidentiary protection is clear. The subsection does not—as Defendants assert—immunize any

discussion or agreement relating in any way to anything having to do with interline traffic.

Rather, it narrowly protects only a discussion or agreement that concerned a specific "interline

movement of the rail carrier." § 10706(a)(3)(B)(ii)(II). Congress was not so naïve as to turn a

blind eye to all discussions between carriers with interline business.[4] Rather, it was well aware

of the potential for such discussions to have anticompetitive effects. Congress thus enacted

restrictions on interline discussions in § 10706(a)(3)(A)—restrictions which the evidence shows

Defendants regularly disregarded. And it granted a narrow evidentiary protection with the

express understanding that the antitrust laws—including private actions like this one—would

police its boundaries.

---

[4] Defendants concede that they have interline relationships with even their most direct
competitors. *See, e.g.,* D. Br. 11 ("[B]ecause neither BNSF nor Union Pacific has tracks that
cover the entire western United States, they must cooperate in some interline shipments within
their geographic areas of service while competing fiercely for other business."). Defendants'
sweeping interpretation of the statute would effectively render off-limits any discussions
between "fierce" competitors, as long as they designated such discussion "interline related."

I.      **DEFENDANTS' REQUEST THAT THE COURT RESOLVE THEIR
        EVIDENTIARY CHALLENGES FOR CLASS CERTIFICATION PURPOSES IS
        FLAWED.**

   A.           **Defendants' Motion is Procedurally Flawed.**

   Defendants' request that the Court exclude Plaintiffs' evidence for class certification

purposes is procedurally flawed.  First, motions to exclude or strike broad categories of evidence

are disfavored and routinely denied where the requesting party fails to identify with specificity

the challenged evidence[5]—just as Defendants have done here.

   Second, Defendants' motion amounts to an improper sur-reply on class certification,

while disregarding the page limitations that applied to that briefing.  Nothing prevented

Defendants from raising the identical issues they now raise in their opposition papers.  But

despite referencing § 10706 in their opposition to the Class motion, Defendants did *not* argue

that the Court must "exclude" or "ignore" Plaintiffs' evidence.  *See* Defendants' Memorandum

of Law in Opposition to Plaintiffs' Motion for Class Certification (Dkt. #381) at 8 n.3.  If this

argument was to be made, it should have been made in Defendants' responsive class certification

papers.  Thus, even if § 10706 admissibility determinations were proper at class certification,

raising those arguments only now was improper.  *Cf. Pardo-Kronemann v. Donovan,* 601 F.3d

599, 610 (D.C. Cir. 2010) ("district courts, like this court, generally deem arguments made only

---

[5] *See, e.g., Rodriguez v. Union Pac. Corp.*, No. 8:04CV576, 2006 WL 2239043, at *2 (D. Neb.
July 31, 2006) (where defendant had "not challenged specific evidence, such as a witness's
proposed testimony, an exhibit, or a particular document," the court "decline[d] to make a
blanket exclusion," and stated it would rule on admissibility at trial); *Ruth v. Superior Consultant
Holdings Corp.*, No. 99-CV-71190-DT, 2000 WL 1769576, at *6 (E.D. Mich. Oct. 16, 2000)
(defendant's motion to exclude did "not explicitly state which evidence it wishes to exclude,"
and "[w]ithout this information, the Court [could] not make a determination").

in reply briefs to be forfeited"); *Grant v. U.S. Air Force*, 197 F.3d 539, 542 n.6 (D.C. Cir.1999)

("our caselaw makes clear that an argument first made in a reply comes too late").[6]

## B.  Defendants' Admissibility Challenges Are Also Misplaced at Class Certification.

Even if Defendants had properly raised the issue, Defendants' request that the Court

resolve § 10706 admissibility challenges as part of class certification is also substantively

flawed.  In fact, the resolution of Defendants' admissibility challenges is not relevant to the

Court's class certification inquiry.

At most, Defendants' motion raises questions common to class members regarding the

scope of § 10706 and its application to this case.  *See* D. Br. 4 (asserting that "the question

presented here" will "advance the efficient resolution of the case").  But *resolution* of these

common questions will not advance the class certification inquiry for two reasons.  First,

Defendants' evidentiary challenges could not possibly affect the conclusion that, as in virtually

every price-fixing case,[7] Plaintiffs' proof of the conspiracy will be common to the Class.[8]  Much

of Plaintiffs' evidence does not remotely concern interline traffic.  This includes evidence that all

four Defendants reached agreements at the trade association they control for the purpose of

---

[6] Notably, Defendants' evidentiary challenge was filed only after Plaintiffs demonstrated that the factual assertions underlying Defendants' arguments in their class certification opposition papers are unreliable and unsupported where they are not simply counterfactual.  *See* Plaintiffs' Reply Memorandum in Support of Motion for Class Certification (Dkt. #406) ("Pl. Reply"), at 6-24.

[7] *See, e.g., In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) (allegations of price fixing "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members"); *see also McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 479-80 (E.D. Pa. 2009) (question of whether alleged conspirators had a unity of purpose, common design and understanding, or a meeting of the minds "calls for evidence related solely to the defendants' conduct").

[8] Plaintiffs' case concerns an agreement to impose a coordinated FSC standard universally, on all traffic, movements, and routes.  *See Rail Freight*, 587 F. Supp. 2d at 30.  Plaintiffs' evidence is thus by its nature common to Class members.

widely implementing their coordinated standard FSC programs. ████████████



███████████████████████████████████████████████████

██████ ██████ ████████████████████████████████████████████

██████████████████████████

█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████

████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ █ ██████████

███████████████████████████████ █ ███████████████████

██████████████ ████████████████████████████████. [13]

[9] ███████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████

[10] RD Ex. 16, at 6; Adams Dep. 127-138. ██████████████████
███████████████████████████████████████████████
████████████████████████████████

[11] Adams Dep. 155-60.

[12] ███████████████████████████████████████████████████
████████████████████

Indeed, Plaintiffs have ample evidence of the conspiracy and its impact that is not

concerned at all with interline traffic, even broadly construed, including 

.[18]

Second, resolution of Defendants' admissibility challenges is irrelevant to class

certification because Defendants have focused their challenges on the predominance prong of

Rule 23(b)(3).  But the predominance inquiry requires the Court to assess the type of "*questions*"

that exist in the case, not to resolve them.  *See* FED. R. CIV. P. 23(b)(3) (emphasis added).  As

---

[13] This and other evidence of Defendants' joint action to facilitate imposing FSCs on shippers exposes the falsity of their claim that Plaintiffs' "conspiracy claims are built entirely on inferences."  D. Br. 1-2.

[14] *See generally*, See Pl. Class Cert. Mem. 7-12; Pl. Reply 10-11; *see e.g.*, RD Ex. 7, at CSXFSC000199149; HD Ex. 24, at BNSF0574531.

[15] *See, e.g.*, RD Ex. 5, at BNSF-0574617; RD Ex. 182.

[16] *See generally*, Pl. Class Cert. Mem. 11-12, 31, 37-39; *see, e.g.*, RD Ex. 82, at NS_010034040; RD Ex. 86, at CSXFSC000000574; RD Ex. 126, at UPFSC_0066571; RD Ex. 180; RD Ex. 224, at BNSF-FSC000488.  Defendants' analyses concerning the structure or adoption of their FSCs, as well as their competitors' FSCs, also could not fall within Defendants' motion.  *See, e.g.* RD Ex. 23; RD Ex. 42; RD Ex. 211; RD Ex. 213; HD Ex. 17, HD Ex. 18; HD Ex. 154.

[17] *See generally*, Pl. Class Cert. Mem. 31-33; *see e.g.*, RD Ex. 78, at UPFSC-0276428; RD Ex. 108, at BNSF-0029497; HD Ex. 20, at BNSF-0048723; HD Ex. 21, at NS_007000489; Gooden Dep. 191-92.

[18] *See generally*, Pl. Class Cert. Mem. 40-45; *see, e.g.*, RD Ex. 75; RD Ex. 92, at CSXFSC000086525; RD Ex. 94, at NS_010034938; RD Ex. 127.

noted, at most Defendants' motion raises questions of law and fact—relating to Plaintiffs' proof

on the merits—that are common to Class members.  Resolution of these common questions will

not advance the inquiry as to the type of "questions" that predominate.  Accordingly, under any

class certification standard, it is unnecessary and improper to resolve these questions for class

certification purposes.  This Court has held that "the Court avoids any inquiry into the merits of

Plaintiffs' claims that is not required to resolve the instant motion for class certification."

*Meijer, Inc. v. Warner Chilcott Holdings Company III, Ltd.*, 246 F.R.D. 293, 299 (D.D.C.

2007).[19]  In *Hydrogen Peroxide*, the Third Circuit similarly held that, under Supreme Court

precedent, courts may not resolve disputes that are not *necessary* to the class certification

inquiry.  *See In re Hydrogen Peroxide*, 552 F.3d at 317 ("*Eisen* is best understood to preclude …

a merits inquiry that is not necessary to determine a Rule 23 requirement.").

Moreover, Defendants are incorrect that § 10706 determinations are statutorily required

at class certification.  *Cf.* D. Br. 3.  Section 10706 provides that any admissibility determination

should take place before submission of evidence to a jury.  *See* § 10706(a)(3)(B)(ii) ("*In any*

*proceeding before a jury*, the court shall determine whether the requirements of subclause (I) or

(II) are satisfied before allowing the introduction of any such evidence.") (emphasis added).

This language contemplates that the Court will serve as a gatekeeper before specific evidence is

admitted before a jury.  It would not make sense to require this admissibility assessment well in

advance of trial, let alone during class certification and prior to the close of discovery.

---

[19]   *See also In re Nifedipine Antitrust Litig.*, No. 1:03-mc-00223-RJL, slip. op. at 1 (D.C. Cir.
Feb. 23, 2009) ("[T]he propriety of a district court's refusal to scrutinize the probative value of
the evidence proffered to demonstrate that the requirements of Fed. R. Civ. P. 23 are satisfied is
well-settled.") (OD Ex. 18).

Courts generally recognize that class certification is not the time for making admissibility determinations about evidence that may be offered at trial. *See, e.g., Disability Rights Council of Greater Washington*, 239 F.R.D. at 24 ("Evidence need not be admissible at trial in order to be submitted for purposes of a class certification inquiry.") (citing *In re Rand Corp.*, No. 02-8007, 2002 WL 1461810 at *1 (D.C. Cir. July 8, 2002)).[20]  Defendants provide no reason to depart from this sound principle.

*          *          *

For the reasons set forth below, Defendants' motion is also wrong on the merits.  To the extent the Court were to address the merits of Defendants' motion, separate and apart from the class certification inquiry, Plaintiffs respectfully submit that it would only be appropriate for the Court to rule that § 10706(a)(3)(B)(ii) does *not* preclude the admissibility of the evidence Defendants purport to challenge.  Since Defendants have sought to have evidence declared inadmissible for "any … purpose," such a ruling would preclude Defendants from raising any further admissibility challenge under § 10706 to the evidence encompassed by their motion. Defendants are neither entitled to an advisory opinion, nor to repeated bites at the apple.[21]

---

[20] *See also Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 599 (C.D. Cal. 2008) ("Unlike a summary judgment motion under Fed. R. Civ. P. 56, a motion for class certification is not dispositive and need not be supported by admissible evidence.") (citing cases); *Ammons v. La-Z-Boy, Inc.*, No. 1:04-CV-67 TC, 2008 WL 5142186, at *12 (D. Utah Dec. 5, 2008) ("Every decision the court located has ruled that evidentiary rules need not be strictly applied at the class certification stage."); *Carrier v. Am. Bankers Life Assur. Co. of Fla.*, No. 5-CV-430-JD, 2008 WL 312657 at *3 (D.N.H. Feb.1, 2008) ("the rules of evidence do not strictly apply for purposes of determining class certification"); *Bell v. Addus Healthcare, Inc.*, No. C06-5188RJB, 2007 WL 3012507 at *2 (W.D. Wash. Oct.12, 2007) ("Thus, Fed. R. Civ. Pro. 23 does not require admissible evidence in support of a motion for class certification and the Court will not create that standard."); *Tedrow v. Cowles*, No. 2:06-CV-637, 2007 WL 2688276 at *2-3 (S.D. Ohio Sept. 12, 2007) (Federal Rules of Evidence do not apply at class certification).

[21] *See Singh v. George Washington Univ.*, 383 F. Supp.2d 99, 101 (D.D.C. 2005) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without

10

II.     **SECTION 10706(a)(3)(B)(ii) DOES NOT APPLY TO THE UNREGULATED TRAFFIC AND SURCHARGES AT ISSUE HERE.**

Plaintiffs' case is brought on behalf of shippers who paid a stand-alone FSC on *rate unregulated* freight transportation services.[22]  Without citing any authority, Defendants assert that the application of § 10706(a)(3)(B)(ii) to this case is "beyond dispute."  D. Br. 14.  But that is simply not true.

Section 10706—entitled "Rate agreements: exemption from antitrust laws"—grants antitrust immunity to rate agreements when the railroad carriers involved apply to the STB, typically as part of a "rate bureau," and the STB grants approval.[23]  § 10706(a)(2)(A).  The portion of the statute upon which Defendants rely—§ 10706(a)(3)—expressly relates to actions taken by "[a]n organization established or continued under an agreement approved under this subsection"—that is, a rate bureau.  Subsection 3(A) lays out what rail carriers may and may not do in the context of approved rate-bureau discussions.  Subsection 3(B)—including § 10706(a)(3)(B)(ii), specifically relied on by Defendants here—provides certain procedural protections for legal challenges to ratemaking conduct.  Thus, on its face, the section relates only to *regulated* ratemaking activities.

---

good reason permitted, to battle for it again.") (quoting *In re Ski Train Fire in Kaprun, Austria, on November 11, 2004*, 224 F.R.D. 543, 546 (S.D.N.Y. 2004)).  Under law-of-the-case doctrine, "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996).

[22] Pl. Class Cert. Mem. 1.

[23] While rail carriers have not actively used rate bureaus for some time, this procedure provides the only means by which rail rates may receive antitrust immunity.  Defendants do not claim that they have any rate-bureau antitrust immunity for the actions at issue here.

11

When Congress, through the Staggers Act,[24] added this subsection to the Interstate

Commerce Act, essentially all traffic was subject to ICC regulation or oversight.  This included

contracts, which could only be entered into on terms prescribed by the Act, subject to regulatory

oversight.  *See* 49 U.S.C. § 10713(a)(1980) ("Such a rail carrier may not enter into a contract

with purchasers of rail service except as provided in this section.").  Contract terms had to be

filed with the ICC, with the "essential terms of the contract" available to the "general public."

*Id*. § 10713(b).[25]

Congress provided that, once contracts were approved, traffic under such contracts was

exempted from the broader regulatory scheme:

> A contract that is approved by th        e Comm  ission under this section, and
> transportation under such contract,  ***shall not b e subject to this subtitle*** , and m ay
> not be subsequently challenged before the Commission or in any court on the
> grounds that such contract violates a provision of this subtitle.

 *See* Staggers Act § 208 (codified initially at 49 U.S.C. § 10713(i)(1)) (emphasis added).  Section

10706 falls under the same subtitle as 49 U.S.C. § 10713.[26]  Thus, the Staggers Act expressly

divorced transportation under (approved) private contracts from the statutory provision that

Defendants seek to invoke.[27]

---

[24] Pub. L. No. 96-448, 94 Stat. 1895 § 219 (Oct. 14, 1980) ("Staggers Act").

[25] Applying the Staggers Act, ICC has indicated that, under the statute, both contracts and FSCs
are not protected as part of joint-line ratemaking, even in the context of regulated traffic.  In
*Western Railroads—Agreement*, 364 I.C.C. 635, 644 (1981) ("*WRA II*"), the ICC noted that
"[s]urcharges (new section 10705a) and contract rates (new section 10713) will be considered
single-line rates for purposes of this section [§ 10706(a)(3)(A)(i)].  The legislative history
indicates that Federal antitrust laws are available to protect against improper use of these
ratemaking options."  *Accord Western Railroads—Agreement—Petition To Reopen*, 364 I.C.C.
787, 787-88 (I.C.C. Mar. 24, 1981) ("*WRA III*").

[26] *See* Pub. L. No. 96-448, 94 Stat. 1895 (Oct. 14, 1980).

[27] The unregulated traffic at issue in this case also includes traffic specifically "exempted" from
regulation (and the other statutory provisions) by the STB.  *See* 49 U.S.C. § 10502(a).  Section

12

In the ICC Termination Act of 1995, Congress provided that carriers and shippers could enter contracts on whatever terms they chose (without approval being necessary), and expressly maintained the removal of traffic moving under contracts—which comprises the unregulated traffic at issue here— from the regulatory scheme set up elsewhere in the Act:

> A contrac t that is au thorized by this section, and transp ortation under such contract, **shall not be subject to this par t**, and m ay not be subsequently challenged before the Board or in any c ourt on the grounds that such contract violates a provision of this part.

49 U.S.C. § 10709(c)(1) (emphasis added).

The plain language of this provision would seem to reflect Congress's intent that contract traffic may not avail itself of the protections of other "part[s]" of the statutory scheme.[28] Notably, Section 10706 (applying to rate bureaus and relied on by Defendants here) remains in the same "part" of the statute as § 10709 (applying to contracts). *See* Subchapter I of Chapter 107 of Part A of Subtitle IV of Title 49, 49 U.S.C. §§ 10701-10709.

Defendants are left to argue that § 10706(a)(3)(B)(ii) is the only § 10706 provision that applies to the unregulated private contracts specifically exempted from § 10706.[29] Yet Defendants appear to have taken a different position before Congress in May of 2009—through

---

10502 gives the ICC authority to exempt whole categories of traffic, which it did for intermodal, box car, and other traffic. *See* 49 CFR § 1039 (2010). Such traffic is also exempt from all provisions of the Act and, as such, must move under contract since it cannot move under tariff.

[28] Since Defendants' contract traffic is subject to none of the burdens of regulation, it should not receive the benefits. This conclusion also comports with the fact that, while their rate-bureau discussions are required to be transcribed or recorded, § 10706(a)(3)(C), Defendants' discussions about private contracts are not subject to regulatory monitoring or oversight.

[29] Subsections (B)(i) and (ii), of § 10706(a)(3), both apply "[i]n any proceeding in which" parties make certain claims, but this language must be read in conjunction with the express exemption of contract traffic from § 10706 and the other statutory provisions. *See* 49 U.S.C. § 10709(c)(1) (contract traffic "shall not be subject to this part"). Reading the statutory scheme as a whole, "any proceeding" refers to proceedings involving transportation subject to regulation under the statute. *See* § 10706(a)(2)(A) ("A rail carrier providing transportation subject to the jurisdiction of the Board under this part….").

13

the written testimony of J. Michael Hemmer, UP's Senior Vice President – Law and General

Counsel, on behalf of the American Association of Railroads ("AAR").[30]  Mr. Hemmer traced

the history of railroad regulation, noting that, "[w]herever economic regulation was removed,

antitrust law took its place."  *Id.* at 6.  Mr. Hemmer proclaimed that:  "Railroads cannot and do

not get together to set prices for competing services."  *Id.*  And he cited this very case as proof

that the antitrust laws are vigorously enforced.  *Id.* at 6-7.  He claimed that Defendants would not

"assert in that case that we are exempt from the antitrust laws.  Our defense is that we complied

with the antitrust laws."  *Id*. at 7.  And he specifically asserted that UP "did not coordinate its

fuel surcharge programs with any other railroad."  *Id.*[31]

Later, with this case firmly in mind, Mr. Hemmer addressed § 10706, referring to it as a

section pertaining to "rate bureaus" and stating that:

> As difficult as this m ay be to believe, railroad s for decades were
> required by law to agree on prices and charge the sam       e price
> regardless of which route a shi pper choose[s] between two points.
> In that regulatory environm      ent, Congress essentially forced
> railroads to use rate bureaus to develop rates, and it conferred
> antitrust immunity on the proce    ss.  But Congress changed that
> policy in the Staggers Act and        rebalanced the in   terface of
> regulation with antitru st law. The  rate bu  reaus are gon  e, and
> railroads must com   pete on price and service—subject to th       e
> antitrust laws. …
>
>  For all practical purposes,  ***Section 10706 continues to apply in
> only one modest respect***   , which  is to esta   blish the c   omplex
> mechanics for paying rentals for      use of rail cars ("car hire")
> between railroads and by railroads to other car owners. 49 U.S.C. §
> 10706(a)(d)(C).

---

[30] *See* OD Ex. 13.  Hearing Before the Subcommittee on Courts And Competition Policy of the
Committee on the Judiciary—House of Representatives, 111th Cong., 1st Sess., Serial No. 111-
63 (May 19, 2009), at 44-73.

[31] This representation is difficult to reconcile with Defendants' apparent concession that they did
coordinate FSC programs, including by discussing whether shippers would "accept a new,
different, or higher fuel surcharge."  D. Br. 8.

*Id.* at 9-10 (emphasis added).  This testimony is consistent with the conclusion that §

10706(a)(3)(B)(ii) does not apply at all to the unregulated traffic at issue here.[32]

## III.   DEFENDANTS CANNOT SHOW THAT SECTION 10706(a)(3)(B)(ii) APPLIES TO THE CHALLENGED EVIDENCE.

The statute also gives Defendants no protection from the overwhelming evidence that

they coordinated FSC programs to be applied across-the-board.[33]  Contrary to Defendants'

claims that Congress turns a blind eye to whatever discussions happen between interline carriers,

Congress (and the ICC and STB, operating under Congressional mandates) have repeatedly

expressed concern about the potential for anticompetitive conduct in the interline context.

Congress even enacted rules specifically requiring that interline discussions be movement-

specific—which the evidence shows Defendants ignored.

These constraints are reflected in the statutory provision at issue, which, by its plain

language, offers a narrow evidentiary protection *only* to discussions and agreements concerning

*particular interline movements* in which both carriers *actually participate*.  In proving that

Defendants conspired to apply coordinated FSCs across-the-board, on all movements and

contracts, Plaintiffs in no way rely on movement-specific evidence.  Rather, Plaintiffs' evidence

---

[32] The conclusion that § 10706 does not apply to FSCs is also supported by *Rail Fuel Surcharges*, 2006 WL 2180211, at *2 (STB Aug. 3, 2006), where the STB said that it could examine for unreasonableness the manner in which railroads portrayed FSCs to customers, viewing such conduct as a "practice" under 49 U.S.C. § 10701(a).

[33]

shows that Defendants engaged in the very type of price-fixing and related collusive discussions (such as price-signaling) against which Congress and the STB have specifically warned.

> **A.    Congress Did Not Protect All Interline-Related Discussions Specifically Because of Antitrust Concerns Arising from Such Discussions.**

Defendants sweepingly claim that Congress regards "communications between Defendants related to interline traffic … as necessary and perfectly lawful" (D. Br. 1), that "communications between Defendants concerning interline traffic are lawful and pro-competitive" (*id.* at 2), and that "[i]nterline communications … present no antitrust concerns" (*id.* at 5).  These assertions are remarkable given that both Congress and its regulators have repeatedly and publicly expressed concerns about anticompetitive conduct occurring under the guise of interline discussions, and have placed restrictions intended to narrowly cabin pricing discussions related to interline traffic—including in § 10706 itself.  Congress and the ICC/STB have expressly acknowledged that the antitrust laws apply when rail carriers stray.

The history of § 10706 manifests a Congressional concern about the need to keep rail carrier discussions narrow and focused, because of the serious risks that broader discussions—like the ones Defendants claim are permissible here—could have anticompetitive effects.  This history, in turn, informs the proper analysis of the statute as one that provides evidentiary protection only to discussions about particular interline movements in which both rail carriers actually participate.

> **1.    *The 4R Act***

In 1976, Congress passed the Railroad Revitalization and Regulatory Reform Act (the "4R Act"), which reduced rate regulation, granting carriers some rate flexibility.  The 4R Act

16

introduced statutory prohibitions on rate-bureau conduct[34] that were specifically directed at the

scope of permissible agreements, including in the interline (sometimes called "joint-line")

context.  Congress enacted provisions—first codified as 49 U.S.C. § 5b and then at 49 U.S.C. §

10706(a)—that prohibited the ICC "from approving any agreement which permits voting or

agreement on single-line rates or charges, and on interline rates and charges by railroads which

cannot practicably participate in the movement."  *Western Railroads—Agreement*, 364 I.C.C. 1,

3 (1980) ("*WRA I*").  Applying this statute, the ICC determined that it would not approve rate

agreements that permitted rail carriers to address single-line movements and joint-line

movements simultaneously—even if the carrier intended to charge the same rate on both its

single-line and joint-line movements.  *Id*. at 14.  The ICC held that single-line rates must be

processed separately from joint-line rates, noting that this "should encourage price competition

between carriers."  *Id.*

Thus, for over 30 years rail carriers have known that it is not appropriate to address

single-line rates with other railroads, even in the context of interline discussions and even if the

single-line and interline rate proposals are identical.

The ICC also addressed § 10706(a)(3)(A)(i) (1980), explaining that the provision

prohibits rate bureaus from permitting members to vote or agree "on rates related to a particular

interline movement by railroads which cannot 'practicably participate' in that movement."  *WRA

I*, 364 I.C.C. at 15.  The ICC held that "practical participants in an interline movement are only

---

[34] As noted by Mr. Hemmer, *supra*, for many years the ICC regulated all aspects of rail traffic.
The antitrust exemptions in the railroad industry derive from the Interstate Commerce Act of
1887, as amended by the Reed-Bulwinkle Act of 1948, under which the ICC approved rate
bureaus, which conferred antitrust immunity for collective ratemaking.  *See Fla. E. Coast Ry Co.
v. U. S.*, 623 F.2d 391, 392 (5th Cir. 1980).  Any rate bureau member could originally participate
in all of the bureau's rate determinations, even those concerning single-line rates and interline
rates on routes in which the member did not participate.  *See id.*

those carriers who are *direct connectors* to a specific joint-line movement of a specific commodity." *Id.* at 17.[35]  Only direct connectors "are permitted to vote and agree on rates for that specific joint-line movement of that specific commodity." *Id.*

The ICC further held that rail carriers should not be permitted even to *discuss* rates upon which they were not permitted to vote.  *Id.* at 19.[36]  Thus, carriers were not permitted to discuss their single-line rates with other carriers, and carriers were only allowed to discuss joint-line rates when they were *direct connectors* to the specific joint-line movement.  The ICC stressed the need to narrowly limit such discussions to avoid collusion:

> The potential that extensive discus sions of rate proposals w ill result in im plied agreements is simply too great to allow *any discussion* of single-line rates or *any discussion* of joint-line rates except by carr iers which can p racticably participate in the involved movement.

*Id.* at 19 (emphasis added).

Thus, again for over 30 years, rail carriers have known that it is not appropriate to have *any discussion* of joint-line rates except about specific joint-line movements in which a carrier participates, and only with other carriers that also participate in those same specific movements.  And these restrictions arose from the recognition that "broad" discussions between interline carriers can lead to collusion.  *See id.* at 18, *15 ("Extensive price discussions among competitors obviously tends towards prohibited anticompetitive activity.  Thus, the broad scope of discussions proposed by applicants would be inconsistent with this congressional mandate.").

---

[35] "[T]he exception for practical participants must be narrowly construed given the obvious congressional intent to limit collective action manifested in the single-line restriction and our responsibility to protect the fundamental values of the antitrust statutes." *Id.* at 16.

[36] Here, the ICC agreed with the arguments "made by the [United States Department of Justice ("DOJ")] and [Federal Trade Commission ("FTC")] that no discussions should be permitted on restricted proposals by carriers not eligible to vote or agree on these proposals." *Id.* at 19.

18

2.    *The Staggers Act*

In 1980, the Staggers Act further deregulated the industry.  Congress made clear that: "In regulating the railroad industry, it is the policy of the United States Government—(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail."  49 U.S.C. § 10101.[37]

Congress further amended § 10706—in language that is virtually unchanged today—to effectively codify the foregoing ICC rulings.  The Staggers Act thus prevents approval of any ratemaking agreement involving *discussions* of (1) single-line rates (§ 10706(a)(3)(A)(i)) or (2) rates related to a particular interline movement unless both carriers "practicably participate[]" in that specific movement (§ 10706(a)(3)(A)(ii)).  *See also* § 10706(a)(3)(A)(iii).[38]  The Staggers Act provided a four-year grace period during which these restrictions would not apply to "general rate increases to recover inflationary cost increases" and "broad tariff changes," but when this period expired the restrictions were duly implemented by the STB on such general rate increases as well.  *See Short Line*, 751 F.2d at 109-115.

The ICC and STB have consistently interpreted the provisions of § 10706 narrowly to advance the procompetitive purposes of the 4R Act and Staggers Act.  In a 1981 decision interpreting the Staggers Act, the ICC noted that rail "carriers … have no inherent right to

---

[37] The purposes of the Staggers Act were "clearly enunciated, revealing its dominant precompetitive objectives."  *Am. Short Line R.R. Ass'n. v. U.S.*, 751 F.2d 107, 113 (2d Cir. 1984) ("*Short Line*") (citing 49 U.S.C. § 10101a(1)).  "[T]he language of the Act itself highlights the central importance of competition by specifically mandating that competition is to determine rates to the *maximum extent possible* … and that rail carriers are to rely on individual rate increases *to the maximum extent practicable* …."  *Id.*

[38] Congress tasked the ICC with defining "practicably participates in the movement."  § 10706(a)(1)(C).  In 1981, pursuant to this obligation, the ICC determined that: "Practicable participants in an interline movement are only those carriers who are direct connectors to a specific joint-line movement."  *WRA II*, 364 I.C.C. at 651 (emphasis added).  The DOJ and FTC again supported this definition.  *Id.* at 648.

receive advance notice of competitors' rates.  Other industries do not extend this right, which may effectively negate any potential competitive advantage to an independent actor."  *WRA II*, 364 I.C.C. at 656.  And the ICC reaffirmed its determination that single-line and joint-line movements must be discussed separately, as it has repeatedly.  *Id.* at 656-57.

Thus, Defendants and other rail carriers have been repeatedly instructed that it is not proper to discuss intended pricing practices that apply *both* to their individual and joint-line business with other carriers.  Yet, as discussed below, this is precisely what the evidence Defendants now seek to exclude shows they did.  And Defendants have also been on notice that this prevention of broad discussions of unspecified scope is due to collusion concerns.  *Western Railroads—Agreement*, 365 I.C.C. 918, 927 (1982) ("*WRA IV*") ("The setting of rates at a meeting attended by a carrier's competitors is patently anticompetitive.  It is an axiom of antitrust law that violations may occur without an exchange of words by the participants.").

### 3.    *Alliance Agreements*

Concern about the potential for abuse in the interline context has always extended to formal rail carrier "Alliances."  Defendants fail to cite the STB's fullest discussion of such agreements.  In 1999, the STB examined a formal "Alliance" agreement between several smaller railroads that rose out of a settlement agreement related to a proposed merger.  *See STB Finance Docket No. 33556*, Decision No. 37, 4 S.T.B. 122 (1999) ("*STB Docket 33556*").  The STB scrutinized the agreement and concluded it would be procompetitive—that is, would yield *more* price competition.[39]  In so doing, the STB effectively rebutted Defendants' assertions here:

---

[39] *See STB Docket 33556*, 4 S.T.B. 122, at 18 ("The Alliance Agreement is procompetitive" because "[i]t allows several carriers to combine in an efficient through service to compete more vigorously with other carriers, some of whom can provide single-line service.").

> *We emphasize that any collusive efforts that the participants might undertake under the auspices of this agreement* to allocate markets or otherwise d iminish competition where th ey c ompete with each other … *would subject these carriers and their management personnel to severe criminal and civil penalties under the antitrust laws.*[40]  Accordingly, we expect that these carriers will zealously avoid such behavior.
>
> \* \* \*
>
> [R]ailroads, like othe r f irms, are not perm itted to colla borate where they compete.  Such collaboration is not permitted under the antitrust laws, and *we may not immunize it from scrutiny under 49 U.S.C. § 10706.*
>
> \* \* \*
>
> Any attempts at p rice-signaling ac tivities f or c ompetitive traf fic *under the guise of interline ratemaking* will continue to rem ain subject to the antitrust laws.

*Id.* at 14, 16, & n.79 (emphasis added).  The STB noted that the Alliance Agreement limited the participants' ability to share information even "on a joint movement." *Id.* at 16.  *See also id.* at 15 ("There is nothing about the Alliance Agreement that requires these connecting carriers to reveal to each other any confidential information.").  And it expressly stated that, even with all of its protections, the agreement "remains subject to the antitrust laws." *Id.* at 18.

The STB took as its premise that a rail carrier "Alliance" would be embodied in an agreement that would spell out its terms and scope, while remaining subject to antitrust challenge.[41]  As discussed below, however, while Defendants' senior executives regularly met with each other under the cover of "Alliances" from 2003 to 2006, Defendants' purported "Alliances" had *none* of these protections; ████████████████████████████████

████████████████████████████████

---

[40] This rebuts Defendants' assertion that "Alliance" partners are freed from the antitrust laws.

[41] Even the decision cited by Defendants, D. Br. at 26, highlights this assumption. *See STB Docket No. 35081*, Decision No. 11, 2008 STB Lexis 549, at \*25-26 (referring to "interline marketing *agreements*") (emphasis added).

#### 4.   *Rail Carrier Discussions Raise Competition Concerns.*

This history of restrictions in the interline context—which Defendants ignore—occurred

precisely because of the recognition that relationships between rail carriers, including interline

carriers, need to be strictly policed (including by the antitrust laws) to protect competition.

Defendants, as the dominant rail carriers in the United States, must act as competitors,

except in the narrow contexts in which they do not compete (*i.e.*, on *specific* joint-line routes).

Defendants acknowledge this in their brief.  *See* D. Br. 9 ("[R]ailroads do compete on other, non-

interline routes."); *id.* at 11 ("While rail carriers act effectively as joint venture partners with

respect to interline traffic, they may also compete with respect to certain 'local' traffic.").

Defendants' internal documents,[42] and deposition testimony,[43] confirm that they understood this.

Among other things, ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████,[44]

Defendants have explained to Congress how they impose competitive pricing constraints

on each other, even when they do not appear to directly compete for business.  In 2007, James

Young, the Chairman, CEO, and President of UP, testified before a House committee regarding

---

[42] 2002 BNSF Risk Assessment, RD Ex. 5, at BNSF-0574617 ███████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

[43] Adams Dep. 236 ███████████████████████████████████████     Tr. of
Dep. of Robert Knight, Jr. ("Knight Dep.") 103-04 (excerpts at OD Ex. 7)█████████████
███████████████████████████████████████████     Tr. of Dep. of
Charles Eisele ("Eisele Dep.") 82-84 (excerpts at OD Ex. 4).  Michael Giftos testified that
███████████████████████████████████     *See* Giftos Dep. 298-99.

[44] Knight Dep. 207; *see also id.* 221-22, 236; Tr. of Dep. of Mark Draper ("Draper Dep.") 72-73
(excerpts at OD Ex. 3)███████████████████████████████████████████████████████████
███████████████████████████████████████████████████

the nature of railroad competition and submitted the written testimony of Wick Moorman, the

CEO of NS, on behalf of the AAR (*i.e.*, the Defendants).  Mr. Moorman explained how rail

carriers impose "competitive constraints" on pricing that are "real …even where there is only

one railroad serving a facility."  *See* HD Ex. 36, at 14 (Oral Testimony of James R. Young before

the U.S. House Committee on Transportation and Infrastructure, Hearing on Rail Competition

and Service (Sept. 25, 2007) (attaching Mr. Moorman's written testimony).

"Product" competition, for example, refers to the fact that railroad shippers have

customers who can switch to different products (perhaps sold by another railroad shipper) if the

shipper's prices must be raised too high to pay freight costs.  *Id.* at 15.  "Geographic"

competition refers to the fact that many customers, including most large customers, have

multiple plants, served by different railroads, and can adjust their production accordingly.  *Id.*

As Mr. Young acknowledged at his deposition, ███████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ Tr. of Dep. of James Young ("Young Dep.")

190-201 (excerpts attached at OD Ex. 12).[45]

Plaintiffs' expert, Dr. Gordon Rausser, has explained other factors that make Defendants'

pricing interrelated, even where Defendants' tracks do not overlap.[46]  This is why, as Congress

and the STB have long been aware, Defendants' discussions in the interline context must be

---

[45] This explains why Defendants' track maps can be misleading about the full scope of rail
competition.  As noted in Plaintiffs' class certification reply brief, these and other factors also
explain why rail pricing competition can affect even "captive" rail customers.  *See* Pl. Reply at
14 n.32.

[46] *See* Corrected Expert Report of Gordon Rausser, Ph.D., at 13-16 ███████████████
████████████████████████████████████████████████████████████████
Expert Reply Report of Gordon Rausser, Ph.D., at 23-27.

limited to the specific interline routes and movements in which the carriers actually participate. Anything beyond such narrow discussions yields antitrust exposure.

    **B.**    **The Evidentiary Protection of § 10706(a)(3)(B) is Limited to Discussions or Agreements of Specific Joint-Line Movements.**

    **1.**    *The Impetus for § 10706(a)(3)(B)*

The Staggers Act added what is now § 10706(a)(3)(B)[47] to provide procedural protections arising from the requirement that single-line and joint-line rate proposals and discussions must be kept separate, as provided in § 10706(a)(3)(A). Some carriers raised the concern that they could face antitrust liability if they reached an agreement on a joint-line rate for a specific movement, and then also charged that rate for a specific single-line movement. *See WRA II*, 364 I.C.C. at 657-58. As explained in the Conference Report on the Staggers Act:

> Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements *in which they interchange*. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed. To prevent such a conclusion the Conference substitute provides procedural protections about *lawful discussions and resulting rates*. *The Conferees intend that these protections be construed to insure that remedies for anticompetitive activities remain under existing laws.*

H.R. Conf. Rept. No. 96-1430, at 114 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4110, 4146, 1980 WL 13000, at *35 ("Conference Report") (emphasis added).

This language confirms that Congress was intending to protect only the narrow types of interline discussions permitted by the Act: discussions about (and only about) specific joint-line movements and routes in which both carriers participate.

---

[47] At the time, this provision was codified at § 10706(a)(3)(C)(1980).

### 2.     *The Plain Language of § 10706(a)(3)(B)*

The statute's plain language reflects Congress's intent to provide evidentiary protection only to this narrow category of discussions.[48]  Defendants ignore both the express requirement that the communication specifically concern "an interline movement" and that the specific movement must be one "of the rail carrier"—that is, one in which the rail carrier participates (*i.e.*, is a direct connector).  § 10706(a)(3)(B)(ii)(II).

This language must be presumed to mean precisely what it says.  *See Nat'l Public Radio, Inc. v. FCC*, 254 F.3d 226, 230 (D.C. Cir. 2001) ("Because statutory language represents the clearest indication of Congressional intent," a court must "presume that Congress meant precisely what it said.").  Neither of these provisions would make sense if the evidentiary exclusion was meant to apply broadly to discussions related to non-specific traffic.  The first clause ("an interline movement"), which uses a singular definite article,[49] denotes specificity. And the second clause ("of the rail carrier") confirms this specificity, while also clarifying that the interline movement must be one in which the rail carrier actually participates.

Defendants' ignore this language, and rest their sweeping reading of § 10706 entirely on the word "concerned."  *See* D. Br. 16 n.8.  But here, "concerned" was used as a limiting term: *i.e.*, "concerned" means "was about."  *See, e.g.*, Merriam-Webster's Collegiate Dictionary 257 (11th ed. 2003) (including definition to "be about"); *see id.* 4 ("about" can be used to mean "fundamentally concerned with or directed toward") (OD Ex. 17).  Defendants' broad reading of "concerned" is untenable, given that it would give the evidentiary protection nearly boundless

---

[48] To be clear, Plaintiffs are not suggesting that two Defendants could never discuss multiple specific joint-line movements in which they both participate in a single communication; but the evidentiary protection only applies to discussions of specific joint line movements.

[49] *Cf. U.S. v. Meade*, 175 F.3d 215, 218-19 (1st Cir. 1999) (effect must be given to singular use of "element" in federal firearm statute).

and indefinite scope.  This is underscored by Defendants' Proposed Order, which seeks to shield

any discussion or agreement that "referred to, related to, or *had a bearing upon* … interline

traffic."  Defs.' Proposed Order at 1 (emphasis added).  Virtually anything relating to a

Defendant's business—including its confidential single-line pricing decisions—could arguably

have "a bearing upon" its interline traffic.  Thus, this definition could potentially be used to

shield even overtly collusive discussions or agreements.

     If Congress had intended to give Defendants broad protection for any discussion that

"referred to, related to, or had a bearing upon … interline traffic," *id.*, it would have used

similarly broad and expansive terms.  But it did not do so, *see Conn. Nat'l Bank v. Germain*, 503

U.S. 249, 254 (1992) (Congress "says in a statute what it means and means in a statute what it

says"), because such protection would have swept far too broadly.[50]  Congress meant to provide

evidentiary protection arising from the requirement that discussions of interline traffic must be

focused on particular moves in which both carriers participate—*i.e.*, an interline movement of

the rail carriers— and that such discussions occur separate and apart from discussions of single-

line traffic or broad discussions of all traffic.  This supports the conclusion that when Congress

said that, to be protected, the discussion or agreement "*concerned* an interline movement of the

---

[50] To the extent a term is susceptible to more than one meaning, the meaning that "best manifest[s] the legislative purpose" should be favored.  *Atl. Cleaners & Dyers v. U.S.*, 286 U.S. 427, 435 (1932); s*ee also Goldring v. District of Columbia*, 416 F.3d 70, 80 (D.C. Cir. 2005) ("The ultimate purpose of statutory construction is to effectuate congressional intent").  Courts have adopted narrow readings of other § 10706 terms to promote Congress's primary purposes of increasing competition and curtailing rail-carrier antitrust immunity.  *See Short Line*, 751 F.2d at 113 (rejecting interpretation of "feasible" in § 10706 at odds with "procompetitive objectives" of the Staggers Act); *Fla. E. Coast Ry.*, 623 F.2d at 393-94 (rejecting interpretation of "practically participates" in § 10706 as inconsistent with Congress's efforts to "narrow the scope of the railroads' exemption from the operation of the antitrust laws").  *Cf. Bankamerica Corp. v. United States*, 462 U.S. 122, 147-48 (1983) (antitrust exemptions "must be construed narrowly").

rail carrier," § 10706(a)(3)(B)(ii)(II) (emphasis added), it meant that the discussion or agreement must be *about* an interline movement of the rail carrier.

Significantly, the ICC interpreted the relevant language in precisely this manner. As noted, the Staggers Act provided that the ICC would define "practicably participates in the movement," as that phrase is used in what is now § 10706(a)(1)(C). The ICC's definition uses the very term at issue here ("an interline movement") and equates it to a "specific joint-line movement" between "direct connectors." *WRA II*, 364 I.C.C. at 651 ("Practicable participants in *an interline movement* are only those carriers who are direct connectors to *a specific joint-line movement*.") (emphasis added).[51] As noted above, the STB also specifically recognized that antitrust liability would exist for "[a]ny attempts at price-signaling activities for competitive traffic under the guise of interline ratemaking," or collusion occurring "under the auspices" of an alliance agreement. *STB Docket 33556,* 4 S.T.B. 122 at 16 n.79, *14. Thus, it recognized that interline discussions are not all protected and can give rise to antitrust liability.[52]

### 3.    *The Legislative History*

The Conference Report specifically instructs that the § 10706 amendments should be construed to "insure that remedies for anticompetitive activities remain under existing laws." Conference Report at 114, 1980 WL 13000, at *35. This also mandates a narrow reading of the procedural protection.

---

[51] *See Barnhart v. Walton*, 535 U.S. 212, 218-220 (2002) (agency interpretation of governing statute entitled to deference).

[52] Under Defendants' interpretation—where the statute would protect any evidence that "referred to, related to, or had a bearing upon … interline traffic" (Defs.' Proposed Order), proving that price-signaling activities occurred under the guise of interline ratemaking, or under the auspices of an alliance relationship, would be effectively impossible.

Defendants rely on statements made by then-DOJ Assistant Attorney General (Antitrust Division), Donald Flexner, at 1979 committee hearings, but fail to include the full transcript of this testimony in their moving papers.  *See* D. Br. 3, 9, 22.  In fact, Mr. Flexner began his remarks by noting that the Antitrust Division had serious concerns about the precise type of general, across-the-board price increase Defendants allegedly orchestrated here:

> There is one particular rem aining form of rate agreement which is of concern to us, and that is the ability of railroads to agree on general rate increases.  These are rate increas es which h ave a general ac ross-the-board app licability, a nd which raise the general rates for all shippers.
>
> This, it seem s to us, is a particular ly anticompetitive form of conduct and ought to be ended.[53]

Testimony of Donald Flexner, acting Deputy Assistant Attorney General, Antitrust Division, DOJ, Hearing Before the Subcommittee on Transportation and Commerce Committee on Interstate and Foreign Commerce on H.R. 4570, House of Representatives, 96th Cong. (Oct. 23, 1979), OD Ex. 14, at 420.[54]

As Plaintiffs have contended, *see Rail Freight*, 587 F. Supp. 2d at 30, and the evidence corroborates, Defendants used the FSC conspiracy as an unlawful means to achieve just this type of "particularly anticompetitive" form of conduct.  The price-fixing agreement challenged here was neither lawfully permissible nor procedurally protected, even if it was reached at meetings ostensibly devoted to "interline" topics.

---

[53] As noted above, after a four-year phase in period, the Staggers Act effectively ended the former ability of rail carriers to achieve across-the-board price increases on regulated traffic.  *See supra* p.19.  It has never been lawful to achieve such increases on unregulated traffic.

[54] *See also id.*  ("The ability of railroads or any other   competitor to join in agreem ents on particular fares, an activity which is banned in    virtually all other industries in the Am    erican economy is undoubtedly going to have the effect of   increasing the overall level of fares, giving the parties to those agreements market power where none need exist.").

Even the portion of Mr. Flexner's testimony cited by Defendants underscores that, at the time of the subsection's passage, protected interline discussions about pricing were limited to particular interline movements in which both carriers actually participated.

> [I]t must be emphasized that in the ordinary situation, when two carriers interline *at a particular junction point* and provide a through service, the antitrust laws do not proscribe in any way the negotiation by the two carriers of a through rate *for these movements*.

D. Br. 9 (emphasis altered).

Thus, the plain language, the statutory scheme, the STB's interpretation, and the legislative history all compel a conclusion that the subsection protects discussions or agreements concerning specific interline movements in which both rail carriers actually participate—and no more.  Broader discussions are not protected and remain fully subject to the antitrust laws.

### 4.      *The Statute Protects Only Evidence Congress Intended to Protect.*

Defendants may protest that this analysis gives the statute no teeth.  But this is untrue.  Under the statute's plain language, discussions or agreements limited to specific interline movements, between carriers participating in the movements, might be inadmissible.[55]  Defendants suggest that agreements on specific joint-line prices for specific routes, and related issues, are routine and numerous.  The evidentiary protection would presumably prevent a shipper from using such an agreement to assert that, given a similarity between specific interline and single-line rates, the carriers in question had unlawfully agreed on the single-line rates.  But, as shown below, in this case about an agreement to inflate all rates by using a standard FSC

---

[55] They would presumably be inadmissible if § 10706 applies to the traffic at issue and if the discussion or agreement does not independently violate the antitrust laws.  Here, much of Plaintiffs' evidence would independently violate the antitrust laws, particularly where it shows Defendants agreeing to coordinate FSC programs to be applied across-the-board.  Defendants cannot argue that such an agreement is lawful.

program applied across-the-board, Defendants have not demonstrated that Plaintiffs rely on any such agreements.[56]

The evidence Plaintiffs have cited often comes from Defendants' most senior executives (like CEOs and CMOs).  Defendants' own witnesses have acknowledged that interline discussions typically occurred at lower levels.  Michael Giftos testified, for example, ███

███████████████████████████████████████████████████████

███████████████████████████████████████  ████  █████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████  *Id*. at 125-26.

Nor does *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d 26 (D.D.C. 2004) (Friedman, J.) support Defendants' expansive reading of the statute.  In *Jung*, the Court dismissed the action in light of a statute specifically providing that the centerpiece of the plaintiffs' claims was not unlawful.  *Id*. at 36-39.  Here, Congress has *not* similarly provided that anything that happens in a meeting between interline carriers is lawful; rather, Congress has provided only that narrow discussions or agreements concerning particular movements may be inadmissible.  Congress is not blind to the potential for abuse "under the guise of interline ratemaking."  *STB Docket 33556*, 4 S.T.B. 122 at 16 n.79.[58]

---

[56] For the same reason, Plaintiffs' allegations of conspiracy do not rest on the inference prohibited by § 10706.  Plaintiffs do not rely on an inference that the FSCs Defendants assessed on their single-line traffic mirrored any legitimate interline agreements.

[57] *See also id.* ███████████████████████████████████████████

[58] Defendants spend much of their brief defending their need to have broad discussions with each other.  Just as in any other industry, Defendants can try to defend those broad discussions to the jury, but they cannot obtain the limited evidentiary protection afforded by § 10706.

Finally, *Defendants themselves* contemporaneously articulated their constraints in this way.  In March 2005, for example, Bob Toy of UP relayed information about a BNSF announcement of a mileage-based FSC, while admonishing employees that: ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  OD Ex. 15.  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████

### C.    Plaintiffs Do Not Rely on Evidence of Discussions and Agreements Concerning "An Interline Movement of the Rail Carrier."

Defendants essentially ask the Court to assume that all—or some undefined substantial part—of Plaintiffs' evidence meet the statutory criteria for exclusion.  But this is improper.  Defendants, as the party seeking to exclude evidence, must identify which evidence they believe should be excluded,[59] and demonstrate that, with respect to that evidence, "the requirements of subclause (I) or (II) are satisfied."  § 10706(a)(3)(B)(ii).  As in the case of a party claiming that communications are protected by the attorney-client privilege, Defendants "bear[] the burden of proving that the communications are protected," *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998), and "must demonstrate with reasonable certainty" that the evidence at issue is not admissible, *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984).[60]

---

[59] Pursuant to FED. R. EVID. 402, "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court to statutory authority."

[60] *See also* 1 Federal Rules of Evidence Manual, An Introduction to the Rules of Evidence (Matthew Bender 2010), at 5 ("The lawyer who relies upon a rule of evidence has the burden of showing, by a preponderance of the evidence if facts are disputed, entitlement under the rule.").

Defendants' motion specifically mentions only a few pieces of evidence, but Defendants can point to no facts establishing that this evidence is subject to exclusion. Nor do Defendants provide any reason to conclude they could do so for any other unspecified evidence.[61]

### 1.   *Purported "Alliance" Meetings*

Defendants' assertion that their discussions at so-called "Alliance" meetings were perfectly legitimate and protected is particularly spurious. In fact, Defendants' purported "Alliance" meetings are in no way insulated from antitrust liability under § 10706, as the STB has recognized. This would be true even if Defendants did have actual "Alliance" agreements, which they did not. *See STB Docket 33556,* 4 S.T.B. 122 at 18 (noting that formal alliance agreement "remains subject to the antitrust laws"). The evidence is overwhelming that Defendants failed to "zealously avoid" actions that could "diminish competition" under the auspices of Alliance meetings, *id.* at 14, and that they instead used "Alliance" meetings to coordinate their company-wide FSC programs. *See infra* & notes 71-76.

Defendants' own executives—including those charged with overseeing the meetings— testified that ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[61] Plaintiffs cannot be asked to address each piece of its evidence in response to Defendants' vague challenge. Presumably, the "examples" Defendants' identify, discussed *infra*, include the pieces of evidence they believe are most vulnerable. As discussed *supra*, much of Plaintiffs' evidence could not possibly be reached by Defendants' motion. *See* Section III.

[62] Charles Eisele ███████████████████████████████████████████

████████████████████████████████████████████████████████████



[65]

The Chairmen and CEOs would start most meetings with a ██████████████

---

[63] Eisele Tr. 85-87

[64] Eisele Dep. 91

[65] Eisele Dep. 102-03

[66] Eisele Dep. 130-32

[67]Eisele Dep. 182-83



[69]

Eisele Dep. 193.

.[70]

It is at these so-called "Alliance" meetings where,

---

[68] *See, e.g.,* Eisele Dep. 139

Young Dep. 281-82; 288.

[69] OD Ex. 16, at UPFSC0004883.  UP CEO Jim Young could not explain

[70] Young Dep. 251-52



[71]

It is facially clear that these discussions and agreements were not limited to particular interline movements, or even to Defendants' interline business at all. Defendants certainly cannot show that they were so limited, given that their witnesses have consistently claimed not to recall any details concerning them.[76]

---

[71] RD Ex. 208, at BNSF-FSC000643 ("action item"). ███████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ *See* RD Ex. 216.

[72] RD Ex. 215. No information exists to suggest that this discussion was limited to interline issues, much less specific movements between BNSF and CSX.

[73] RD Ex. 204 (emphasis added).

[74] RD Ex. 209, at UPFSC0001088. Nothing suggests this discussion was limited to interline business; indeed, ████████████████████████████████████████████
████████████████████████████████████████████

[75] RD. Ex. 59 (emphasis added). Mr. Lanigan admitted ████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████ There can be no argument that the discussion at NEMC was limited to the Defendants' interline business.

[76] (1) ***March 18, 2003 BNSF-NS Senior Team Meeting:*** Matt Rose, John Lanigan, and Don Seale could not recall what was discussed. *See* Rose Dep. 142 ("I do not remember any specifics from this."); Lanigan Dep. 47-48 ██████████████████████████████████████████
████████████████████████████████████████████████████████████

These high-level meetings and FSC discussions—which were very rare prior to 2003[77]—
took place just as Defendants adopted new standard FSC programs that ultimately led to lockstep
FSCs applied across-the-board.  And these are just the meeting records Plaintiffs were fortunate
to find given the lack of any formal protocol for accurately recording what transpired.[78]

And during all of this, ███████████████████████████

███████ ████████████████████████████. UP's Chairman, President, and CEO,

testified that ███████████████████████████████████

████████████████████████████████████████████



███████████████████ Seale Dep. 257-58 ("I don't recall the specifics of the March
18, 2003, meeting."); (2) ***March 27, 2003*** ████████████████████████████
█████████████████████ *See* Lanigan Dep. 82 ("I don't recall the
substance of discussions I had with Mr. Seale or anyone else at that ████████████████ ");
Seale Dep. 258-59 (not recalling whether he met with Lanigan at April 2003 NFTA meeting); (3) ***April
1, 2003 BNSF-CSX Alliance Meeting***:  Rose, Lanigan, and Mike Giftos could not recall what
was discussed.  *See* Rose Dep. 166-70 ("I don't remember the meeting from 2003."); Lanigan
Dep. 69-70 ("I don't recall any specific discussions with Mr. Giftos.");  Giftos Dep. 241-42 ("I
don't actually remember this meeting . . . ."); (4) ***May 14, 2003 NS/UP Alliance Meeting***:  Jim
Young could not recall what was discussed.  *See* Young Dep. 229 ("I don't recall much."); (5)
***June 3, 2003 CSX-UP Alliance Meeting***:  Giftos, Clarence Gooden, and Charles Eisele could
not recall what was discussed.  *See* Giftos Dep. 253-56; Gooden Dep. 139-43 ("I do not
remember being at this meeting ████████████████ Eisele Dep. 130,
135 (Eisele could not recall attending ████████████
[77] CSX's Mike Giftos testified, for example, that prior to 2003 the only discussion he could recall
with an executive of another railroad about FSCs ████████████████████████
█████████████████████████ Giftos Dep. 194-98.
[78] Eisele Dep. 89
████████████████████████████████████
████████████████████████
[79] Eisele Dep. 88
████████████████████████████████████
████████████████████████████████████
████████████

36

██████████████████████████████████ Young Dep. 214-15.  Little wonder then that these

meetings mysteriously and abruptly ceased being scheduled after the STB began holding

hearings on Defendants' FSCs.[80]  This fact gives the lie to any claim that such high-level

meetings were necessary for Defendants' interline business to function, and it indicates

Defendants were concerned about their conduct being examined.

This is a far cry from the formal alliance agreements with numerous protections

contemplated by the STB or the fully-integrated joint venture, approved by federal and state

regulators, at issue in *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.1280 (2006).  *Cf.* Def. Br. 27.[81]

Defendants cannot identify a single "Alliance"-related document that specifically

"concerned an interline movement of the rail carrier."  § 10706(a)(3)(B)(ii)(II).  The only

document they specifically identify, RD Ex. 215, indicates that ████████████████████

████████████████████████████████████████████████████████████████

---

[80] Mr. Eisele testified that ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████ *See* Lanigan Dep. 279.

[81] To the extent Defendants' joint venture analogy holds at all, it merely confirms that
Defendants' interline discussions *must* be strictly limited to the specific business at issue.  Joint
venture partners are not allowed to use the venture as a pretext to engage in wide-ranging
coordination of non-venture business.  Here, where Defendants' operations were not fully
integrated, or governed by any document subject to oversight, the concern of abuse is greatly
heightened.  *Cf. Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 327 & n.5 (2d Cir.
2010) (noting that prominent commentators believe that *per se* rule may, even after *Dagher*,
apply to some pricing agreements even in a legitimate joint venture).

███████████████████████████ Defendants cannot point to a single fact evidencing that

this discussion was narrow or specific in scope, and the evidence makes that conclusion

untenable.  Indeed, Defendants do not even argue that this was the case.

Defendants effectively seek immunity for anything that happened at a meeting labeled

"Alliance"—████████████████████████████████████████████████

████.[82]  If this was accepted, the ability of the nation's four dominant rail carriers to collude

would be virtually boundless.  Congress never contemplated immunity for such misconduct.

2.     *The March 2003 UP/CSX Meeting*

Defendants seek to exclude evidence of other conspiracy meetings as well—including a

March 2003 meeting that compellingly supports Plaintiffs' claim that Defendants coordinated

their FSC programs, resulting in much higher prices to shippers.[83]  The evidence shows that, on

March 12, 2003, UP's CMO Jack Koraleski traveled to CSX for a meeting at which UP and CSX

████████████████████████████████ *See* RD Ex. 210.  The day before this meeting, CSX

had ████████████████████████████████████████████████████████████

*See* HD Ex. 154. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

*See* HD Ex. 17.  Shortly thereafter, UP announced it was adopting the same FSC program, *see*

HD Ex. 17, and ████████████████████████████████████████████████

─────────────────────

[82] *See supra* n.62.

[83] Defendants claim that Plaintiffs' discussion of this evidence in their reply brief is part of a
"futile" attempt to "move" the start of the conspiracy period.  D. Br. at 9.  In fact, Plaintiffs'
opening brief identified multiple pieces of evidence showing that Defendants were conspiring
during the early part of 2003.  *See* Pl. Class Cert. Mem. at 12-27.

███████████████████████████████████████████████████████

████████████████████████████████████████ (emphasis added).

In light of this, Defendants' assertion that this meeting must have been a "perfectly lawful discussion between interline partners," D. Br. 19, shows the disconnect between Defendants' assertions and the actual evidence.[84]  Defendants' sole support for that assertion is that ███████████████████████████████.  *Id*.  In effect, Defendants argue that by affixing this label to documents they could prevent them from being used in an antitrust case. Such an absurd result—amounting to an antitrust exemption for the railroads of unprecedented scope—is not what Congress contemplated when it used narrow language in the statute and specifically instructed that it must be interpreted to "insure that remedies for anti-competitive activities remain under existing laws."  Conference Report at 114, 1980 WL 13000, at *35.

Defendants thus have not shown, and cannot show, that the March 2003 UP-CSX meeting was limited to discussion of "an interline movement" (or set of movements) in which both carriers participated.

### 3.     *Purported "Concurrence" Communications*

Defendants also argue that any and all purported "concurrence" communications must be excluded.  Def. Br. 21.  While a narrow "concurrence" regarding interline traffic might be protected, that abstract proposition hardly proves that every communication called a "concurrence" by Defendants is necessarily protected.  In fact, the evidence shows that

---

[84] CSX's Gooden and John Couch have both testified that ████████████████████████████████
████████████████████████████████████████████  *See* Gooden Dep. 76-77; Tr. of Dep. of John Couch ("Couch Dep.") 192-98 (excerpts attached at OD Ex. 2).

Defendants used "concurrences" to signal their intentions with respect to FSCs that were to be applied across-the-board.

Defendants' own witnesses have acknowledged that ████████████████████████ ███████████████████████████████████████████████████ ██████▌████████████████████████████████████████████ ██████████████████ Adams Dep. 32.  He then gave testimony that ██████ ██████████████████████████



Adams Dep. 37-38.[87]

This testimony is consistent with § 10706, which limits interline discussions to particular movements and routes in which the carriers participate.  And it is inconsistent with Defendants' position now that they are free to communicate broad or nonspecific pricing intentions with impunity.  As discussed above, rail carriers have known for over 30 years that they are not permitted to have broad discussions about anticipated pricing practices.

---

[85] As senior director of revenue in the marketing and sales department, Mr. Adams's duties included ███████████████████████████████████████████████████ ███████████████████████████████████████."  Adams Dep. 12-13.

[86] A STCC (Standard Transportation Commodity Code) is a seven-digit code used to classify particular commodities.  http://www.csx.com/?fuseaction=about.rr_dictionary&i=S (last visited Sept.13, 2010).  "OD" refers to "origin-destination."

[87] Just after this testimony, the parties took a break and, immediately after returning, Mr. Adams suggested ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ve, *id.* at 45.

If a Defendant uses a purported concurrence communication to alert one or more railroads to what it intends to do with *all* of its prices (including in confidential contracts), this communication is *not* protected.  *See WRA IV*, 365 I.C.C. at 923 ("[I]t is not consistent with the intent of the Staggers Act that a carrier propose a rate for a nonspecified route open to any would-be direct connectors"); *STB Docket 33556*, 4 S.T.B. 122 at 16 n.79 ("Any attempts at price-signaling activities for competitive traffic under the guise of interline ratemaking will continue to remain subject to the antitrust laws.").[88]  Defendants' suggestion that it is logistically necessary for them to make such general and far-encompassing disclosures (D. Br. 21), has already been rejected[89] and is inconsistent with their own witnesses' testimony.[90]  Defendants may try to convince the jury that a broad disclosure of future pricing intentions to another rail carrier, *e.g.*, covering both single-line and interline traffic, is not unlawful.  But they are not entitled to have such communications excluded from evidence.

An examination of the "concurrence"-related evidence cited by Defendants demonstrates that their request to exclude these types of documents is baseless:

---

[88] *Soc'y of Plastics Indus., Inc. v. I.C.C.*, 955 F.2d 722 (D.C. Cir. 1992), does not support Defendants' position.  There, a trade association (the "Society") challenged the ICC's determination (irrelevant here) that the Multiple Independent Factor Through Rate ("MIFTR"), used by carriers to adjust rates, was a joint rate, and thus must be published and filed with the ICC as a tariff.  *Id.* at 724-25.  MIFTR did not allow carriers, in any way, to discuss rates in which they did not participate (or to discuss pricing intentions generally).  Rather, it was simply a mechanism for one carrier to adjust its specific rates for the specific portions of interline movements that occurred over its lines.  *Id.* at 725.  It is, thus, almost the opposite of what Defendants now claim they can do.  Notably, the D.C. Circuit discussed the Society's claim that the participating carrier's discussions should not qualify for protection under § 10706.  Without resolving the issue, the D.C. Circuit clearly showed that it considered the protection only to apply to "discussions between rail carriers 'practicably participat[ing]' in a '*particular interline movement*.'"  *Id.* at 730 (emphasis added).

[89] *WRA II*, 364 I.C.C. at 656-58.

[90] Adams Dep. 239-40

***RD Exs. 48, 49, 212***:  These documents show that on ███████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████  *See* D. Br. 11.  Contrary to

Defendants' brief, the announcement was ███████████████████████████████

███████████████████████████████████████████████ ██████

███████████████████████████████████████████

████████████ █████████████████████████████████████

███████████████████  including the March 2003 meeting between Mr.

Koraleski and CSX.  Defendants have provided no basis for excluding these documents, which

were in no way limited to particular interline movements of connecting carriers.

***RD Exs. 30 and 31***:  On their face, these documents reflect a telephone conversation on

March 21, 2003, between a UP employee (Kurt Schroeder) and CSX's Director of Pricing

Services Clyde McIntyre, about ████████████████████████████████

██████████████████████████████  RD Ex. 30.  It is thus facially

clear that the document is not a formal concurrence request.[93]  Mr. McIntyre acknowledged at his

deposition that █████████████████████████████████████████"

---

[91] *See* Adams Dep. 238-39 ███████████████████████████

██████████████████████████████████████████████

[92] Adams Dep. 239.  Mr. Adams acknowledged ████████████████████████

███████████████████  *Id.* at 239-40.

[93] Mr. McIntyre expressed ████████████████████████████████

█████████████████████████████  RD Ex. 31.

███████████████████████████████████████████████████████████

███████████████████████████████████ [4]

**RD Ex. 79:**  This time it was NS's turn to confirm for other Defendants (here UP), on

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ as both NS and UP knew that NS was adopting the standard FSC

program to which Defendants had agreed.

**Donald Seale Deposition Testimony:**  Defendants also seek to exclude Plaintiffs'

reliance on the admission by Donald Seale, NS's CMO, that ████████████████████████

███████████████████████████████████████████████████████████

████████████  Seale Dep. 26.  Defendants contend that qualification is enough to prevent

admissibility.  But here, too, Mr. Seale provided ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████  Seale Dep. 36.

---

[94]  McIntyre Dep. 77.  Even on redirect examination, Mr. McIntyre did not ████████████

███████████████████████████████████████████████████████████

43

### 4.     *Purported Discussions of "General Policies and Practices"*

Finally, Defendants seek to exclude any communications about "general policies and practices affecting their interline traffic."  D. Br. 24.  They make no effort to justify this in light of the statutory language (which does not embrace policies and practices); nor do they give the Court a way to define the bounds of protected "policies and practices."  Defendants cannot even identify with specificity which pieces of evidence meet their own criteria.

*RD Exs. 95, 96, 97, 100, 101, 102, 104*:  Defendants apparently seek to exclude a series of discussions in which they claim



*See* RD Ex. 98; *see also* RD Ex. 97.[95]

*Mr. Adams's Testimony*:  Mr. Adams testified at his deposition that ██████████ █████████████████████████████████████████████████  Adams Dep. 34-35. This testimony, in combination with other similar evidence, is probative of the fact that Defendants made no meaningful effort to police their behavior.  *See* Pl. Br. at 17 n.38.  Defendants make no effort to explain how this "policy" relates to an interline movement.

Finally, Defendants argue that Plaintiffs are somehow precluded from observing that, beginning in 2003, Defendants had an "extraordinary" number of communications about FSCs.

---

[95] Other evidence shows that BNSF and CSX executives ████████████████████ ██████████████████████████████████████████████████████████████ █████████████████.  *See* Gooden Dep. 234.

Def. Br. 25.  But there is no statutory bar to this accurate statement, particularly when

Defendants cannot point to a single specific communication protected by the statute.

Defendants have thus failed to show that a single piece of Plaintiffs' evidence fulfills the

criteria of § 10706.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude should be denied in full.

Dated: September 22, 2010

Respectfully submitted:

_Michael D. Hausfeld, D.C. Bar #153742_
Michael P. Lehmann
William P. Butterfield, D.C. Bar #420354
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel L. Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Class Counsel for Direct Purchaser Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Sathya S. Gosselin, certify that on September 22, 2010, I caused a true and correct copy of the foregoing memorandum to be served on counsel for Defendants.

_/s/ Sathya S. Gosselin_____
Sathya S. Gosselin

# APPENDIX A





**Effective: October 11, 1996**

United States Code Annotated Currentness
   Title 49. Transportation (Refs & Annos)
      Subtitle IV. Interstate Transportation (Refs & Annos)
         Part A. Rail (Refs & Annos)
            Chapter 107. Rates (Refs & Annos)
               Subchapter I. General Authority
                  **§ 10706. Rate agreements: exemption from antitrust laws**

**(a)(1)** In this subsection--

   **(A)** the term "affiliate" m eans a p erson controlling, controlled b y, or under common control or ownership with another person and "ownership" refers to equity holdings in a business entity of at least 5 percent;

   **(B)** the term "single-line rate" refers to a rate or allowance proposed by a single rail carrier that is applicable only over its lin e and fo r wh ich the tran sportation (exclusive of term inal services by s witching, drayage or other terminal carriers or agencies) can be provided by that carrier; and

   **(C)** the term "practicably participates in the movement" shall have such meaning as the Board shall by regulation prescribe.

**(2)(A)** A rail carrier providing transportation subject to the jurisdiction of the Board under this part that is a party to an agreement of at least 2 rail carriers that relates to rates (including charges between rail carriers and compensation paid or recei ved for the use of facilities a nd e quipment), cl assifications, divisions, or rules relate d to the m, or procedures for j oint con sideration, in itiation, publication, o r estab lishment of th em, sh all app ly to t he Bo ard for approval of that agreement under this subsection. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy of section 10101 of this title and may require co mpliance with cond itions n ecessary to m ake th e ag reement furth er th at policy as a con dition of its approval. If t he Board approves the a greement, it may be m ade an d carried out und er its term s an d under th e conditions requi red b y th e B oard, and t he Sherman Act ( 15 U.S.C. 1, et seq.), th e Clayton Act ( 15 U.S.C. 12, et seq.), the Federal Trade Commission Act (15 U.S.C. 41, et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) do not apply to parties and other persons with respect to making or carrying out the agreement. However, the Board may not approve or continue approval of an agreement when the c onditions requir ed by it are not met or if it does not recei ve a verifie d state ment under subparagraph (B) of this paragraph.

**(B)** T he B oard m ay approve an agreement un der s ubparagraph ( A) of t his paragraph only when t he rai l car riers applying for approval file a verified statement with the Board. Each statement must specify for each rail carrier that is a party to the agreement--

   **(i)** the name of the carrier;

   **(ii)** the mailing address and telephone number of its headquarter's office; and

   **(iii)** the names of each of its affiliates an d the names, addresses, and affiliates of each of its officers and directors and of each person, togethe r with an a ffiliate, owning or controlling any debt, equity, or security interest in it having a value of at least $1,000,000.

**(3)(A)** An organization est ablished or continued under an ag reement approved under t his subsection shall make a final d isposition of a rule o r rate d ocketed with it by the 120th d ay after th e pro posal is docketed. Su ch an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



organization may not--

**(i)** permit a rail carrier to discuss, to participate in agreements related to, or to vote on single-line rates proposed by an other ra il carri er, e xcept t hat f or purposes of general rat e i ncreases an d broad cha nges i n rat es, classifications, rules, and practices only, if the Board finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part;

**(ii)** permit a rail carrier to discuss, to participate in agreements related to, or to vote on rates related to a particular interline movement unless that rail carrier practicably participates in the movement; or

**(iii)** if th ere are in terline movements o ver two or more rou tes between the same end points, permit a carrier t o discuss, to p articipate in agreements related to, or t o vote o n rat es e xcept wi th a car rier w hich forms part of a particular single route. If the Board finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part.

**(B)(i)** In any proceeding in which a party alleges that a rail carrier voted or agreed on a rate or allowance in violation of this subsection, that party has the burden of s howing that the vote or agreement occurred. A showing of parallel behavior does not satisfy that burden by itself.

**(ii)** In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal l aw ci ted i n su bsection (a)(2)(A) o f t his sect ion or of a ny si milar St ate l aw, proof of a n agreement, conspi racy, or com bination may not be infe rred from evidence that two or m ore rail carriers acte d together with respect to an interli ne rate o r related matter and that a p arty to su ch action took similar action with respect to a rate or related matter on another route or traffic. In any proceeding in which such a violation is alleged, evidence of a discussion or agreement between or among such rail ca rrier and one or more other rail ca rriers, or of any rat e or other act ion res ulting fr om such di scussion o r agreement, shal l not be a dmissible i f the di scussion or agreement--

**(I)** was in accordance with an agreement approved under paragraph (2) of this subsection; or

**(II)** concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.

In any p roceeding before a jury, t he c ourt shal l determine whether t he re quirements o f s ubclause (I) or ( II) a re satisfied before allowing the introduction of any such evidence.

**(C)** An o rganization described i n s ubparagraph ( A) of this pa ragraph shal l provide t hat t ranscripts or s ound recordings be made of all meetings, that records of votes be made, and that such transcripts or recordings and voting records be submitted to the Board and made available to other Fe deral agencies in con nection with their statutory responsibilities ov er rate bureaus, except t hat such m aterial sh all b e kept confi dential and sh all no t be su bject to disclosure under section 552 of title 5, United States Code.

**(4)** Notwithstanding any other provision of this subsection, one or more rail carriers m ay enter into an agreem ent, without obtaining prior Board approval, that provides solely for c ompilation, publication, and other distribution of rates in effect or to become effective. The Sherman Act (15 U.S.C. 1 et seq.), the Clayton Act (15 U.S.C. 12 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) shall not apply to parties and other persons with respect t o m aking or car rying out suc h agreem ent. Ho wever, t he B oard m ay, upo n ap plication or o n i ts ow n initiative, investigate whether the parties to such an agreement have exceeded its scope, and upon a finding that they have, the Board may issue such orders as are necessary, including an order dissolving the agreement, to ensure that actions taken pursuant to the agreement are limited as provided in this paragraph.

**(5)(A)** Whenever t wo or m ore sh ippers en ter in to an agree ment to d iscuss am ong th emselves th at relates to th e



amount of compensation such shippers propose to be paid by rail carriers providing transportation subject to the jurisdiction of the Board under this part, for use by such rail carriers of rolling stock owned or leased by such shippers, the shippers shall apply to the Board for approval of that agreement under this paragraph. The Board shall approve the agreement only when it finds that at the making and carrying out of the agreement will further the transportation policy set forth in section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of approval. If the Board approves the agreement, it may be made and carried out under its terms and under the terms required by the Board, and the antitrust laws set forth in paragraph (2) of this subsection do not apply to parties and other persons with respect to making or carrying out the agreement. The Board shall approve or disapprove an agreement under this paragraph within one year after the date application for approval of such agreement is made.

**(B)** If the Board approves an agreement described in subparagraph (A) of this paragraph and the shippers entering into such agreement and the rail carriers proposing to use rolling stock owned or leased by such shippers, under payment by such carriers or under a published allowance, are unable to agree upon the amount of compensation to be paid for the use of such rolling stock, any party directly involved in the negotiations may require that the matter be settled by submitting the issues in dispute to the Board. The Board shall render a binding decision, based upon a standard of reasonableness and after taking into consideration any past precedents on the subject matter of the negotiations, no later than 90 days after the date of the submission of the dispute to the Board.

**(C)** Nothing in this paragraph shall be construed to change the law in effect prior to October 1, 1980, with respect to the obligation of rail carriers to utilize rolling stock owned or leased by shippers.

**(b)** The Board may require an organization established or continued under an agreement approved under this section to maintain records and submit reports. The Board may inspect a record maintained under this section.

**(c)** The Board may review an agreement approved under subsection (a) of this section and shall change the conditions of approval or terminate it when necessary to comply with the public interest and subsection (a). The Board shall postpone the effective date of a change of an agreement under this subsection for whatever period it determines to be reasonably necessary to avoid unreasonable hardship.

**(d)** The Board may begin a proceeding under this section on its own initiative or on application. Action of the Board under this section--

   **(1)** approving an agreement;

   **(2)** denying, ending, or changing approval;

   **(3)** prescribing the conditions on which approval is granted; or

   **(4)** changing those conditions,

has effect only as related to application of the antitrust laws referred to in subsection (a) of this section.

**(e)(1)** The Federal Trade Commission, in consultation with the Antitrust Division of the Department of Justice, shall prepare periodically an assessment of, and shall report to the Board on--

   **(A)** possible anticompetitive features of--

      **(i)** agreements approved or submitted for approval under subsection (a) of this section; and

      **(ii)** an organization operating under those agreements; and

   **(B)** possible ways to alleviate or end an anticompetitive feature, effect, or aspect in a manner that will further the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



goals of this part and of the transportation policy of section 10101 of this title.

**(2)** Reports received by the Board under this subsection shall be published and made available to the public under section 552(a) of title 5.

CREDIT(S)

(Added Pub.L. 104-88, Title I, § 102(a), Dec. 29, 1995, 109 Stat. 812, and amended Pub.L. 104-287, § 5(24), Oct. 11, 1996, 110 Stat. 3390.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1995 Acts. House Report No. 104-311 and House Conference Report No. 104-422, see 1995 U.S. Code Cong. and Adm. News, p. 793.

1996 Acts. House Report No. 104-573, see 1996 U.S. Code Cong. and Adm. News, p. 3831.

References in Text

The Sherman Act, referred to in subsec. (a)(2)(A), (4), is Act July 2, 1890, c. 647, 26 Stat. 209, as amended, which is classified to sections 1 to 7 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1 of Title 15 and Tables.

The Clayton Act, referred to in subsec. (a)(2)(A), (4), is Act Oct. 15, 1914, c. 323, 38 Stat. 730, as amended, which is classified generally to sections 12, 13, 14 to 19, 20, 21, and 22 to 27 of Title 15 and sections 52 and 53 of Title 29, Labor. For further details and complete classification of this Act to the Code, see References in Text note set out under section 12 of Title 15 and Tables.

The Federal Trade Commission Act, referred to in subsec. (a)(2)(A), (4), is Act Sept. 26, 1914, c. 311, 38 Stat. 717, as amended, which is classified generally to subchapter I (section 41 et seq.) of chapter 2 of Title 15. For complete classification of this Act to the Code, see section 58 of Title 15 and Tables.

Sections 73 and 74 of the Wilson Tariff Act, referred to in subsec. (a)(2)(A), (4), are sections 73 and 74 of Act Aug. 27, 1894, c. 349, 28 Stat. 570, which enacted sections 8 and 9, respectively, of Title 15.

Act of June 19, 1936, referred to in subsec. (a)(2)(A), (4), is Act June 19, 1936, c. 592, 49 Stat. 1526, popularly known as the Robinson-Patman Anti-discrimination Act and also as the Robinson-Patman Price Discrimination Act, which enacted sections 13a, 13b, and 21a of Title 15 and amended section 13 of Title 15. For complete classification of this Act to the Code, see Short Title note set out under section 13 of Title 15 and Tables.

Amendments

1996 Amendments. Subsec. (a)(5)(C). Pub.L. 104-287, § 5(24), substituted "October 1, 1980," for "the effective date of the Staggers Rail Act of 1980".

Effective and Applicability Provisions

1995 Acts. Section effective Jan. 1, 1996, except as otherwise provided in Pub.L. 104-88, see section 2 of Pub.L. 104-88, set out as a note under section 701 of this title.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



A prior section 10706, Pub.L. 95-473, Oct. 17, 1978, 92 Stat. 1377; Pub.L. 96-258, § 1(7), June 3, 1980, 94 Stat. 426; Pub.L. 96-296, § 14(a), (c), (d), July 1, 1980, 94 Stat. 803, 808; Pub.L. 96-448, Title II, § 219(a)-(e), 224(b), Oct. 14, 1980, 94 Stat. 1926-1929; Pub.L. 97-261, § 10(a)-(d), Sept. 20, 1982, 96 Stat. 1109, 1110; Pub.L. 98-216, § 2(12), Feb. 14, 1984, 98 Stat. 5; Pub.L. 99-521, § 7(c), Oct. 22, 1986, 100 Stat. 2995, related to exemption from antitrust laws of rate agreements, prior to the general amendment of this subtitle by Pub.L. 104-88, § 102(a). See also section 13703 of this title.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.