# RAILROAD DEREGULATION ACT OF 1979

## HEARINGS

BEFORE THE

## SUBCOMMITTEE ON TRANSPORTATION AND COMMERCE

OF THE

## COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE HOUSE OF REPRESENTATIVES

NINETY-SIXTH CONGRESS

FIRST SESSION

ON

## H.R. 4570

A BILL TO REFORM THE ECONOMIC REGULATION OF RAILROADS, TO IMPROVE THE QUALITY OF RAIL SERVICE IN THE UNITED STATES THROUGH FINANCIAL ASSISTANCE WHICH ENCOURAGES RAILROAD RESTRUCTURING, AND FOR OTHER PURPOSES

APRIL 24, MAY 31, JULY 2, OCTOBER 16, 23, 25, 30, AND NOVEMBER 1, 1979

**Serial 96–145**

Printed for the use of the Committee on Interstate and Foreign Commerce



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1979

52-442 O

H501-101

## COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE

HARLEY O STAGGERS, West Virginia, *Chairman*

JOHN D. DINGELL, Michigan
LIONEL VAN DEERLIN, California
JOHN M. MURPHY, New York
DAVID E. SATTERFIELD III, Virginia
BOB ECKHARDT, Texas
RICHARDSON PREYER, North Carolina
JAMES H. SCHEUER, New York
RICHARD L. OTTINGER, New York
HENRY A WAXMAN, California
TIMOTHY E. WIRTH, Colorado
PHILIP R. SHARP, Indiana
JAMES J. FLORIO, New Jersey
ANTHONY TOBY MOFFETT, Connecticut
JIM SANTINI, Nevada
ANDREW MAGUIRE, New Jersey
MARTY RUSSO, Illinois
EDWARD J. MARKEY Massachusetts
THOMAS A. LUKEN, Ohio
DOUG WALGREN, Pennsylvania
ALBERT GORE, Jr., Tennessee
BARBARA A. MIKULSKI, Maryland
RONALD M. MOTTL, Ohio
PHIL GRAMM, Texas
AL SWIFT, Washington
MICKEY LELAND, Texas
RICHARD C. SHELBY, Alabama

SAMUEL L. DEVINE, Ohio
JAMES T. BROYHILL, North Carolina
TIM LEE CARTER, Kentucky
CLARENCE J. BROWN, Ohio
JAMES M. COLLINS, Texas
NORMAN F LENT, New York
EDWARD R. MADIGAN, Illinois
CARLOS J MOORHEAD, California
MATTHEW J. RINALDO, New Jersey
DAVE STOCKMAN, Michigan
MARC L. MARKS, Pennsylvania
TOM CORCORAN, Illinois
GARY A. LEE, New York
TOM LOEFFLER, Texas
WILLIAM E. DANNEMEYER, California

W E. WILLIAMSON, *Chief Clerk and Staff Director*
KENNETH J. PAINTER, *First Assistant Clerk*
THOMAS M. RYAN, *Professional Staff*
J. PAUL MOLLOY, *Minority Professional Staff*

---

### SUBCOMMITTEE ON TRANSPORTATION AND COMMERCE

JAMES J FLORIO, New Jersey, *Chairman*

JIM SANTINI, Nevada
BARBARA A MIKULSKI, Maryland
JOHN M. MURPHY, New York
MARTY RUSSO, Illinois
HARLEY O. STAGGERS, West Virginia (Ex Officio)

EDWARD R MADIGAN, Illinois
GARY A. LEE, New York
SAMUEL L DEVINE, Ohio (Ex Officio)

CLIFFORD ELKINS, *Staff Director*

# CONTENTS


| | Page |
|---|---|
| Hearings held on— | |
| April 24, 1979 | 1 |
| May 31, 1979 | 183 |
| July 2, 1979 (New York, N.Y.) | 263 |
| October 16, 1979 | 325 |
| October 23, 1979 | 419 |
| October 25, 1979 | 541 |
| October 30, 1979 | 647 |
| November 1, 1979 | 929 |
| Text of H.R. 4570 | 2 |
| Statement of— | |
| Adams, Hon. Brock, Secretary, Department of Transportation | 88 |
| Aron, Mark G., Assistant General Counsel for Legislation, Department of Transportation | 88 |
| Briggs, Richard E., executive vice president, Association of American Railroads | 118, 800 |
| Burns, Joel E., Director, Bureau of Operations, Interstate Commerce Commission | 648 |
| Carey, Ollie, president and chairman, New York Dock Railroad | 308 |
| Cisneros, Lee, director of physical distribution, Firestone Tire & Rubber Co., on behalf of Committee on Railroad Shippers | 541 |
| Cobb, Otis W., executive committee, Western Railroad Traffic Association | 436 |
| Collier, James, general attorney, Association of American Railroads | 800 |
| Compton, James F., vice president and general manager, Remarketing Services Division, North American Car Corp | 684 |
| Cox, Ellis T., on behalf of Edison Electric Institute | 594 |
| Dempsey, William H., president, Association of American Railroads | 118 |
| Dustin, Alan G., president and chief executive officer, the Boston & Maine Corp | 185 |
| Edelman, Fred, member, Association of Independent Corrugated Converters | 609 |
| Erenberg, Michael, Director, Finance Section, Interstate Commerce Commission | 929 |
| Falvey, Patrick, chief counsel, Port Authority of New York and New Jersey | 264 |
| Feeney, Joseph D., general counsel, Western Railroad Traffic Association | 436 |
| Feldman, Roger, counsel, Pepco, on behalf of Edison Electric Institute | 594 |
| Fishwick, John P., president and chief executive officer, Norfolk & Western Railway Co | 185, 207, 986 |
| Flexner, Donald L., Deputy Assistant Attorney General, Antitrust Division, Department of Justice | 420, 959 |
| Fournaris, James, director of traffic, Sweetheart Plastics, Inc | 520 |
| French, Peter, manager, car utilization, Research and Test Department, Association of American Railroads | 800 |
| Gallamore, Robert, Deputy Administrator, Federal Railroad Administration, Department of Transportation | 88, 1014 |
| Gitomer, Louis, Finance Section, Interstate Commerce Commission | 929 |
| Gliedman, Anthony B., commissioner, Department of Ports and Terminals for the City of New York | 279 |
| Hagen, James, Senior Vice President, marketing and sales, Consolidated Rail Corporation | 290 |
| Hall, Ted W., Association of American Railroads | 800 |
| Harbert, Michael, executive director, Institute for Longshore & Maritime Studies | 286 |

Statement of—Continued

Page

Jordan, Edward G., Chairman and Chief Executive Officer, Consolidated Rail Corporation ... 185, 203, 290, 393
Kalish, Steve, commerce counsel, Association of Independent Corrugated Converters (AICC) ... 609
King, Emmett, on behalf of Carmine Gagucci, president, Holland Hook Marine Terminals ... 308, 316
Lyon, Carl, vice president, Government Affairs, Itel, Corp ... 844
Malatt, Richard, Bureau of Competition, Federal Trade Commission ... 495
Miller, Melvin, president, Clayton Container Co., Inc, and also on behalf of the Association of Independent Corrugated Converters (AICC) ... 609
Mladinov, John, assistant commissioner, planning and development, New York State Department of Transportation ... 274
Molm, John, attorney, Pepco, on behalf of Edison Electric Institute ... 594
Morton, Alexander L, Director, Office of Policy and Analysis, Interstate Commerce Commission ... 135, 359, 648
Mulford, George, vice president, marketing, Revere Sugar Co. ... 307, 316
Norton, John H., director of transportation and distribution, E. I. du Pont de Nemours & Co., on behalf of Committee on Railroad Shippers ... 541
O'Hara, Clifford, Port Commerce Department, Port Authority of New York and New Jersey ... 264
O'Neal, A. Daniel, Chairman, Interstate Commerce Commission ... 135, 929
Oberdorfer, John L, Committee on Railroad Shippers ... 541
Opal, Robert T., attorney, Western Railroad Traffic Association ... 436
Ostrow, Joseph M., vice president of market development and pricing, Western Pacific Railroad Co ... 326
Ouellette, Roland A., director of transportation affairs, General Motors Corp., on behalf of Committee on Railroad Shippers ... 541
Peavey, Clay, Planning Department, Port Authority of New York and New Jersey ... 264
Pezold, George C., general counsel, Freight Users Association of Long Island ... 300
Rees, John H., chairman of the board, president and chief executive officer, National Railway Utilization Corp ... 689
Robinson, John, Chief, Rail Policy Branch, Interstate Commerce Commission ... 359
Romanick, Conrad, manager, traffic economics and government relations, Dow Chemical, U.S.A ... 527
Rosenak, Janice M, Deputy Director, Section of Rates, Interstate Commerce Commission ... 135
Rossi, Louis, railroad administrator, New York Department of Transportation ... 274
Sagner, Alan, chairman, Port Authority of New York and New Jersey ... 264
Seiden, Elliott, Chief, Transportation Section, Antitrust Division, Department of Justice ... 420, 959
Staunton, Vincent, vice president, Seal & Service, Inc ... 308, 318
Sullivan, John M., Administrator, Federal Railroad Administration, Department of Transportation ... 88
Tapley, James L., vice president of law, Southern Railway Co ... 367
Taylor, Carl N., president, Rail Division, Itel Corp844 ...
Thomasson, Sam, deputy general counsel, Pepco, on behalf of Edison Electric Institute ... 594
Tidd, J. Thomas, director, deregulation project, Association of American Railroads ... 118
Tumolillo, Allan, director of research and policy, Department of Ports and Terminals for the city of New York ... 279
Tydings, Joseph, Washington counsel, National Railway Utilization Corp.. 689
Van Slyke, William, executive director, Car Service Division, Association of American Railroads ... 800
Watkins, Hays T., chairman and president, Chessie System, Inc ... 185, 198
Webster, R. Kingman, executive vice president, H. K. Webster Co ... 587
Wheeler, Edwin M., president, the Fertilizer Institute ... 623
Wilson, David I., Assistant Director, Bureau of Competition, Federal Trade Commission ... 495
Welsh, Hugh, Law Department, Port Authority of New York and New Jersey ... 264
Young, Ronald S., Assistant Director, Bureau of Accounts, Interstate Commerce Commission ... 135

Statement of—Continued
Zell, Martin, Office of Policy and Analysis, Interstate Commerce Commission ..... Page 929
Additional material submitted for the record by—
Association of Independent Corrugated Converters (AICC), response to subcommittee's questions ..... 613
Boston & Maine Corp., response to questions submitted by Congressman John M. Murphy ..... 194
Committee on Railroad Shippers:
Why return on investment is a better standard of rate reasonableness than revenue/cost ratio ..... 568
Section 10705 proposed amendment, Interstate Commerce Act ..... 585
Consolidated Rail Corporation, final draft, October 4, 1979, joint rate compromise ..... 409
Dow Chemical, U.S.A., attachment to Mr. Romanick's prepared statement, letter dated August 14, 1975, from J. E. Weiss, Southern Railway System to Walter Chapin, Dow Chemical re revised basis for determining rates on shipments in jumbo tank cars ..... 535
Edison Electric Institute, letter dated December 4, 1979, from Ellis T. Cox, to Chairman Florio re responses to inquiries contained in October 18, 1979 letter ..... 598
Fertilizer Institute, attachment to Mr. Wheeler's prepared statement, answers to questions of Transportation and Commerce Subcommittee on shipper concerns ..... 637
Freight Users Association of Long Island, attachment to Mr. Pezold's prepared statement, appendix A—Liability provision of the Southern Pacific Railroad master transportation agreement ..... 307
Interstate Commerce Commission:
Attachment to Chairman O'Neal's April 24, 1979, prepared statement, appendix A—ICC Special Conference, February 27, 1979, Rail Regulatory Issues and Option Papers ..... 155
Attachments to Chairman O'Neal's November 1, 1979, prepared statement:
ICC ex parte No. 282 (Sub No. 2) Railroad Consolidation Procedures ..... 947
Consolidations filed and acted upon since 4RA—Pending consolidations ..... 953
Letter dated November 16, 1979, from Alexander L. Morton, Director, Office Policy Analysis, ICC, to Chairman Florio re responses to questions which arose during recent testimony ..... 678
Itel, Corp., attachments to Mr. Taylor's prepared statement:
Responses to questions posed in Chairman Florio's letter dated October 23, 1979 ..... 862
Report entitled, "An Economic Analysis of Railroad Deregulation Impacts on Railcar Leasing" ..... 875
National Railway Utilization Corp., attachments to Mr. Rees' prepared statement:
Picture of national railway boxcar ..... 716
Modern Rail supplement containing article on National Railway, September 1978 ..... 719
Bad order chart ..... 741
Volume of U.S. intercity freight and passenger traffic ..... 742
Chart showing decrease in number of plain boxcars owned ..... 743
Chart showing decrease in numbers of plain boxcars in serviceable condition ..... 744
Table showing historic and estimated freight car retirements from 1960 through 1985 ..... 745
Tables of statistics showing daily freight car surpluses of class I railroads during 1978 ..... 746
Shipper letter testifying to the need for and value of National Railway's boxcars to individual shipper, June 1979 ..... 748
Tables of statistics showing daily freight car shortages of class I and II railroads during 1978 ..... 751
AAR data showing age of freight cars in 1978 owned by class I railroads ..... 753
AAR data showing age of freight cars in 1978 "privately owned" ..... 759
Sale of distillate fuel oil in the U.S. 1975 ..... 765
Intercity freight traffic graph ..... 766

# RAILROAD DEREGULATION ACT OF 1979

TUESDAY, OCTOBER 23, 1979

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON TRANSPORTATION AND COMMERCE,
COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
*Washington, D.C.*

The subcommittee met at 9:30 a.m., pursuant to notice, in room 2123, Rayburn House Office Building, Hon. James J. Florio, chairman, presiding.

Mr. FLORIO. The subcommittee will come to order.

I would like to welcome all the attendants to this continuing part of our extended hearings on rail deregulation.

The hearing today will focus on collective ratemaking in the railroad industry. If we are to reduce Federal regulation, we must consider whether the need for antitrust immunity to engage in collective ratemaking should continue.

The argument has been made that collective ratemaking, as it is practiced in rate bureaus, is a key barrier to increasing competition in the industry. Greater competition among railroads can lead to improved, more cost-efficient service for shippers.

Shippers want the opportunity to choose among a greater variety of service and pricing packages on alternative rail routes. It would appear railroads would welcome the opportunity to offer shippers innovative pricing and marketing services.

We must seriously consider whether the anticompetitive effects of collective ratemaking harm the consumer. There is concern that it is the consumer who ultimately pays the price of railroad pricing and marketing decisions made collectively in rate bureaus, rather than in the marketplace.

In today's environment rate bureaus provide a valuable function. They provide a forum for shipper input and insure that shippers are aware of numerous daily rate changes.

Deregulation will give railroads the opportunity to perform in the marketplace. But we must ask if it is appropriate in a free market environment to continue antitrust immunity which allows railroads collectively to discuss and set rates.

I look forward to hearing from the very distinguished group of witnesses that we have today. At this point, I will introduce our first witness, Mr. Donald L. Flexner, Deputy Assistant Attorney General, Antitrust Division, Department of Justice.

Mr. Flexner, welcome to the committee.

## STATEMENT OF DONALD L. FLEXNER, DEPUTY ASSISTANT ATTORNEY GENERAL, ANTITRUST DIVISION, DEPARTMENT OF JUSTICE, ACCOMPANIED BY ELLIOTT SEIDEN, CHIEF, TRANSPORTATION SECTION

Mr. FLEXNER. Thank you, Mr. Chairman.

I am pleased to be here this morning to discuss the appropriate role of rate bureaus in the railroad industry. I would like to introduce Elliott Seiden, Chief of the Transportation Section, Antitrust Divison, who is with me today.

Mr. FLORIO. We welcome you to the subcommittee. With all witnesses, their prepared statements will be entered in their entirety into the record, and all the witnesses may proceed as they see fit in a summary fashion.

Mr. FLEXNER. Thank you, Mr. Chairman. I would briefly summarize my prepared statement.

As the chairman recognizes, the issue of collective ratemaking and rate bureau functions is part of the broader question of what kind of regulatory reform ought to be enacted in the railroad industry.

Obviously, the railroad industry, as a whole, has not performed from a profitability standpoint very well over the years. It is, I think, fair to say that the situation is presently quite desperate.

A key element of regulatory reform would obviously be to increase individual railroad's fare flexibility. But the question that arises is whether or not fare flexibility ought to be undertaken in the context of collective ratemaking activities.

Obviously, the Antitrust Division we strongly believe that to the extent there is fare flexibility it ought to be tied to the individual decisions of particular competitors, in this case, railroads.

The ability of railroads or any other competitor to join in agreements on particular fares, an activity which is banned in virtually all other industries in the American economy, is undoubtedly going to have the effect of increasing the overall level of fares, giving the parties to those agreements market power where none need exist.

There is one particular remaining form of rate agreement which is of concern to us, and that is the ability of railroads to agree on general rate increases. These are rate increases which have a general across-the-board applicability, and which raise the general level of rates for all shippers.

This, it seems to us, is a particularly anticompetitive form of conduct and ought to be ended.

As the chairman undoubtedly knows, the 4-R Act has already prohibited agreements on single-line rates, and we think that that statute has had a positive effect.

There are two questions that have been posed in respect of rate bureau activities, and the necessity for antitrust immunity. One has to do with the necessity of railroads to enter into agreements on division of tariffs and respective joint-line rates and the other on joint tariff publication.

It is the opinion of the Division that neither activity creates a necessary problem under the antitrust laws.

We have entered into consent decrees and judgments in litigation involving motor carriers to evidence that position. We have indicat-

ed that joint publication of rates which are independently set is a permissible activity and can continue under the antitrust laws.

Similarly, we think that joint-line rates do not involve the kinds of competitive problems that would raise antitrust issues of liability. Parties to joint-line rates are inherently engaged in agreements with respect to service which is not competitive.

That being the case, their agreements as to how to divide the revenues provided by that service should not be a problem under the antitrust laws.

[Mr. Flexner's prepared statement follows:]



# Department of Justice

STATEMENT

OF

DONALD L. FLEXNER
DEPUTY ASSISTANT ATTORNEY GENERAL
ANTITRUST DIVISION

BEFORE THE

COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE
SUBCOMMITTEE ON TRANSPORTATION AND COMMERCE
UNITED STATES HOUSE OF REPRESENTATIVES

CONCERNING

RAILROAD RATE BUREAUS

ON

OCTOBER 23, 1979

Mr. Chairman and members of this Subcommittee, I appreciate the opportunity to testify today on behalf of the Department of Justice concerning the need to reform railroad rate bureau activity. Railroad rate bureaus serve as forums for making critical decisions regarding rail rates, services, routings and divisions. Because of the antitrust immunity given to ratesetting activities, railroad rate bureaus are able to eliminate intramodal rail competition. Rate bureau procedures calling for notice, discussion, and voting on rate changes also impose a several month delay on implementation of rate changes, discourage individual railroads from pricing their services competitively, and handicap the entire rail industry's ability to respond quickly to the rates of regulated and unregulated motor carriers.

The Department of Justice does not object to many of the activities of the rate bureaus, including the setting of joint-line rates by participating carriers and joint tariff publication. However, the ability of the rate bureaus to institute general rate increases, to discuss single-line rates and to hold their government-sanctioned meetings in secret under the cloak of antitrust immunity is unnecessarily anticompetitive and should be prohibited by legislation.

The United States relies upon competition as the primary regulator of our economy because it produces efficiency and spurs innovation. Rate fixing attacks the central nervous system of a competitive economy and should be tolerated only when a clear

and convincing case has been made that competitive pricing will simply not work in a particular industry. For many years, it was felt that the rail industry was such an industry. The record is now overwhelming that whatever may have been the validity of this judgment in 1887, it no longer holds true. */ Therefore, the time is at hand to restore rail ratesetting to its proper forum, that is, to take it out of the rate-bureau meeting hall and put it in the marketplace.

I would like to discuss four rate bureau reforms that can achieve this goal: prohibiting general rate increases; withdrawing antitrust immunity for discussion of single-line rates; allowing tariff publication without immunity; and requiring open rate bureau meetings.

GENERAL RATE INCREASES

Although many procompetitive reforms were instituted by the 4R Act, **/ including prohibition on collective agreement and voting on single-line rates and limitations on voting on joint-line rates to carriers that can "practicably participate," two forms of price-fixing related activities still occur in rate bureaus: (1) general rate increases and (2) discussion of

---

*/ See Report to the President and the Attorney General of the National Commission for the Review of Antitrust Laws and Procedures, January 1979, at 215; Statement of Donald L. Flexner, Deputy Assistant Attorney General, before the Senate Committee on Commerce, Science and Transportation, Subcommittee on Surface Transportation, concerning the Railroad Deregulation Act of 1979 (June 6, 1979).

**/ Railroad Revitilization and Regulatory Reform Act, Pub. L. 92-210, §208, codified as amended as 49 U.S.C. §10706(a).

single-line rates. General rate increases elevate the rates for transporting all commodities a given percentage for all railroads in a rate bureau. These general increases assure the railroads that all rail carriers will increase their rates an equal amount at the same time and substitute the collective power of the rate bureau for the often ineffective ability of a single railroad to influence rates. Competitive forces normally put a check on inflationary price increases, since competitors can attract traffic simply by remaining at the old prices. However, antitrust immunity given to the rate bureaus makes it possible for rate bureaus to implement general rate increases not justified by cost increases.

This practice is inflationary since costs due to inefficiency can be passed on to shippers and consumers without fear of losing traffic to other rail competitors. Whenever carriers collectively set rates it is likely that those rates will be above competitive levels. The purpose in prohibiting agreement on single-line rates was to prevent such non-competitive rates, and the same rationale applies to general rate increases. Thus, by requiring carriers to set rate increases <u>independantly</u>, it is intended that rates will be set at the minimum necessary to cover increased costs. Moreover, if one carrier increases its rates excessively, it is expected that another will offer a smaller rate increase, forcing the first carrier to match that rate or lose the traffic. On the other hand, if carriers are permitted to set general rate increases collectively, and if they set rates above competitive levels,



62-442 O - 80 - 28

that would contribute to greater inflation in the next period. I should also point out that general rate increases are not restricted to cost increases; they can include increases due to the collective market power of the carriers as well.

In short, Congress should not permit the railroads to use their market power to implement unjustifiable general rate increases. Intramodal rail competition can still be a viable economic force in many transportation markets and we believe it should be encouraged by elimination of the present ability to establish general rate increases.

DISCUSSION OF SINGLE-LINE RATES

A second price-fixing related activity that occurs in rate bureaus is the discussion of single-line rates. As I have already mentioned, the 4R Act prohibited both voting and agreement on single-line rates. The effectiveness of these prohibitions can be severely compromised if competing carriers can nevertheless collectively discuss competing single-line rates. Such discussion is likely to be a facilitating device for price fixing, resulting in tacit understandings on single-line rates. In the ordinary course, such tacit understandings in the rail industry could not successfully be challenged under the antitrust laws because such antitrust challenge would have to rely in large measure on the discussions to establish the existence of the agreement. See United States v. Container Corp. of America, 393 U.S. 333 (1969). However, this proof would be unavailable in the rail context because the discussions have been immunized. In my view, the net

effect of this system is to frustrate, or at least significantly compromise, Congress' intent in prohibiting agreement on single-line rates because rail carriers are still permitted to discuss single-line rates.

The antitrust immunity presently accorded to discussion of single-line rates encourages intramodal rail rate-fixing but produces no public benefit. It simply is not necessary or appropriate to permit ratesetting for interline routes.

I would like to address this issue in some detail because it is critical to an understanding of the application of the antitrust laws to railroad ratesetting activities in both regulated and deregulated environments.

First, it must be emphasized that in the ordinary situation, when two carriers interline at a particular junction point and provide a through service, the antitrust laws do not proscribe in any way the negotiation by the two carriers of a through rate for these movements. Simply stated, these two carriers do not compete with each other for the carriage of the interline traffic and, therefore, they have no reason to fear antitrust liability in this situation. However, the railroad rate bureaus argue that antitrust immunity for all ratesetting is justified because there are some routes in which a carrier's single-line route competes with a joint-line route offered by that same carrier interlining with a second carrier. The rate bureaus assume that these alternate routings compete with each other, and therefore, that the single-line carrier -- which participates in both movements -- could be exposed to antitrust prosecution for

fixing the price of two competitive services.

This argument reveals a basic misunderstanding of competition. Merely because two routes are available to move freight between the same two origin and destination points, it does not necessarily follow that these are competitive routings. In the example I have described, the joint-line route does not provide competition for the through route because the single-line carrier effectively controls both operations. That carrier will manage the joint-line routing in a manner designed to maximize the overall profits over both routings. The carrier can do this because a joint-line participant must concur in scheduling, pricing, and service before a joint-line tariff is possible. */ Therefore, the single-line carrier is able to exercise effective market power over the joint-line route and thereby prevent it from competing effectively against its single-line route. In the absence of effective competition joint ratesetting for these routes does not harm competition, and therefore, no antitrust immunity is necessary.

Turning from the theoretical to the practical, this spring, the Interstate Commerce Commission totally lifted antitrust immunity and rate regulation for transportation of fresh fruits and vegetables

---

*/ See 49 U.S.C. §10762(b)(2).

pursuant to 49 U.S.C. 10505. While the same concerns of antitrust exposure were expressed by the railroads and acknowledged by the Commission in that proceeding, the Commission nevertheless removed antitrust immunity for all movements of fresh fruits and vegetables for single-line as well as joint-line rates. We are not aware of any significant problems faced by the railroads as a result of this total removal of antitrust immunity. To the contrary, as a result of this action, competitive ratesetting has enabled many railroads to recapture this traffic from motor carriers and meet an important and urgent shipper demand during the recent independent trucker shut down. I submit that this single experience demonstrates better than thousands of pages of theoretical argument that independent ratesetting can be innovative and flexible and can flourish in an antitrust environment. We believe the same result could follow if antitrust immunity were removed for all rail movements.

TARIFF PUBLICATION

Since joint tariff publication does not violate the antitrust laws, this rate bureau function could continue to exist without antitrust immunity. A single-agency tariff could be compiled with rates that have been unilaterally adopted by the carriers that are parties to the tariff; it is only necessary that the tariffs be organized and published. Indeed, the validity of a tariff publishing service has been recognized in a recent consent judgment proposed by the Department of Justice and the

Motor Carriers Tariff Bureau and entered in the United States District Court for the District of Columbia. */ The ICC also has rejected as a justification for railroad rate agreements the assertion that collective ratemaking will enable parties to economize in their operations or tariff publications. Thus, rate bureau publication of tariffs does not require continued antitrust immunity.

OPEN RATE BUREAU MEETINGS

To assure that any restrictions on rail carrier discussion, agreement or voting are followed, all rate bureau meetings must be open to the public. Public meetings will also bring rate bureau activities into conformance with the policies underlying the "Government in the Sunshine Act" and encourage competition among rail carriers.

Given the limitations imposed by the 4R Act and the Administration's proposed restriction on single-line discussion, open meetings are a necessity. Neither the ICC nor the Department of Justice has sufficient personnel to monitor rate bureau meetings, nor is there a practical way for any interested or affected parties seeking to enforce the antitrust laws to learn of an illegal agreement outside the scope of a rate bureau agreement in the context of closed rate bureau meetings. Moreover, closed meetings present an anomaly whereby the ICC is required by the "Government

---

*/ United States v. Motor Carriers Tariff Bureau, Civil Action No. 77-1973 (D.D.C. Oct. 24, 1978).

in the Sunshine Act" */ to hold open meetings while the rate bureaus, which have the authority for debating and setting the rates, may act secretly.

Open meetings would encourage greater rail competition and would put downward pressure on rates since shippers attending rate bureau meetings would be able to determine whether or not a carrier voted for or against a proposed rate increase. Moreover, rail carriers would no longer be shielded from the legitimate competitive pressures faced by other industries. Large shippers are presently able to exert some pressure on rail carriers to keep rates low since large shippers can demand independent action and can easily ascertain whether or not a carrier acted accordingly. In addition, open rate bureau meetings would provide smaller shippers the advantage of at least having access to a carrier's votes on rate proposals. In short, open rate bureau meetings should be mandated.

## NEED FOR LEGISLATION

Congressional legislation is necessary to reform existing anticompetitive rate bureau procedures. The ICC still has not rendered a final decision on the resubmitted railroad rate bureau agreements following the 4R Act. Since antitrust immunity is not needed for those rate bureau activities that might benefit the public interest, the Congress should now affirmatively act to remove such immunity for rate bureau activity. This action would

*/ 5 U.S.C. §552(b); P.L. 94-409.

not only provide a clear statement of our nation's primary reliance on competition whenever feasible, but would also have the advantage of eliminating the need for further ICC consideration of this issue and of eliminating the lengthy and costly litigation proceedings that inevitably follow ICC pronouncements.

CONCLUSION

In conclusion, removal of antitrust immunity for rate bureau activities would increase rail intramodal competition yet would allow the rate bureaus to continue necessary joint ratesetting and tariff publication functions. Such immunity is not needed to allow joint ratesetting as a matter of law, and as a matter of practice, has been demonstrated not to be needed in the fresh fruit and vegetable experience. The present railroad rate bureau procedures are a product of privilege and complacency growing out of the monopoly power railroads enjoyed at the beginning of the century. In today's competitive transportation sector, the rate bureau immunity accorded by the Reed-Bulwinkle Act not only is unnecessary, but also stifles the initiative of individual rail carriers and thus discourages marketing innovation. As railroads are given increased freedom to price their services without unnecessary regulatory restriction, application of the antitrust laws is necessary to help insure the effective functioning of the competitive rail system.

Mr. FLORIO. Mr. Flexner, you are undoubtedly aware of the point that has been made that the mere possibility of litigation under the antitrust laws is an inhibiting factor, such that joint rate negotiations would be forestalled or in some way made less effective.

Accepting that for the moment as a legitimate concern, what would your thoughts be with regard to a more limited antitrust immunity specifically exempting discussions with regard to joint rates?

Mr. FLEXNER. Mr. Chairman, I should point out that we are trying to give you our best judgment as to the antitrust problems that might be raised.

As you know, the administration's bill, S. 796, which we support, contains what I regard as a limited antitrust immunity for such discussions and agreements. We obviously support that.

On the question of the underlying merits, I think that we are fairly clear in our own minds that such agreements which may in all candor create some degree of uncertainty in the parties' minds are nevertheless free of antitrust problems in 99 percent of the cases.

I should point out that uncertainty is a fact of life in the American economy. Other industries operate with some degree of uncertainty as to their litigation risks.

The railroad industry, to a greater or lesser extent, has for over 30 years been involved in rate bureau activities, and it is understandable that there is some concern and uncertainty as to what the world will be like without that kind of comfortable setting.

It may not be reassuring, but it is certainly a fact to be recognized that firms in other industries operate efficiently with the same degree of uncertainty as to limited areas of possible antitrust immunity.

Mr. FLORIO. Not to ask you for legal opinions, but one of the things that has been brought to my attention is the concern of the industry, that if the discussion of joint-line rates is banned, and after a joint rate change if the single rate is also changed—the presumption would be that there were discussions—is that the type of thing that the Division would be inclined to initiate investigations into?

Mr. FLEXNER. I would have to know more about the facts, Mr. Chairman.

If the discussions that occurred involved different parties—that is, that the single-line rate applied to a service and a party totally different from the service and the parties to the joint line tariff——

Mr. FLORIO. Assume to the contrary, that one of the participants in the joint rate discussions is the single-line carrier.

Mr. FLEXNER. In that case, our feeling, as I have indicated in my prepared testimony, is that there is an absence of effective competition in that situation. The railroad providing the single-line service would be able to so totally control the agreed-upon rate for the joint-line service that it could not be said that there was the kind of competition that would give rise to an antitrust problem if there were discussions on the particular rates involved.

Finally, Mr. Chairman, there is the question of whether or not there ought to be open rate bureau meetings. We believe that that

is a kind of a prophylactic measure which would be appropriate to a time after the rate-fixing activities of rate bureaus had been ended in the main.

By opening the meetings to shipping public, obviously greater information would be available to shippers. Shippers would be in a position to monitor those meetings and to determine whether or not discussions that had been prohibited were being engaged in.

They would further have more information on which to base their individual negotiations with railroads. I think by and large as long as there is some collective activity that is continued, the more that it can be exposed to the public, the more likely it is that the result will be fair and equitable.

Mr. FLORIO. Are you at all concerned about the point that has been raised about confidential information being publicly disseminated?

Mr. FLEXNER. I would be concerned if there were no collective action that was being authorized. But since the assumption is that there would be some collective activity that would be authorized, in that instance I think it is better that the activity and the information relating to that activity be public rather than secret.

Mr. FLORIO. One of the other points that has been raised, with regard to small carriers, is that rate bureaus are particularly important to the small carriers who must connect with other lines in order to offer through roads to customers.

The point has been raised likewise that absent antitrust immunity the small carriers will be hampered in their ability to compete with innovative rate actions of single-line carriers.

I would like your thoughts on whether in fact they will be impaired absent antitrust immunity.

Mr. FLEXNER. I cannot, Mr. Chairman, see why that would be so. I don't understand the relationship between the ability to engage in collective ratemaking and the ability of smaller firms to be able to negotiate——

Mr. FLORIO. I am talking about smaller carriers.

Mr. FLEXNER [continuing]. Smaller carriers to be able to negotiate through rates. It is not clear to me that there is any relationship.

Mr. FLORIO. Shippers have urged that the discussion of single-line rates continue to be permitted as a rate bureau activity. What is wrong with the continued discussion if there is no agreement on such rates?

Mr. FLEXNER. I think, Mr. Chairman, whenever there is discussion between competitors relating to competitive services, there is a possibility that those discussions will lead to explicit and tacit anticompetitive agreements.

There is obviously law that has developed under the antitrust laws that prohibits discussions in certain kinds of industries where such agreements are particularly likely to occur.

If you believe, as we do, that competition among railroads is a desirable thing where possible, then we would be particularly concerned about any discussions that could possibly lead to anticompetitive agreements among direct rail competitors.

Mr. FLORIO. Isn't that the point that some of the railroads have made? That they are very concerned about the potential antitrust implications and therefore would like to be blanketed in protection.

Mr. FLEXNER. It is an understandable concern and an understandable desire, Mr. Chairman. I think the question is, Is the shipping public, and the consumer better off absent agreements.

The answer to that question, we think is that the shipping public and the consumer is better off absent agreements, and that while railroads would perhaps prefer a greater degree of protection afforded by the antitrust immunity, that that is not the basic issue.

In addition, as you know, railroads, have already been prohibited from entering agreements or voting on single-line rates, and we are essentially advocating that that objective not be undermined by unnecessary rate bureau discussions.

Mr. FLORIO. I have difficulty reconciling your concern that discussions on single-line rates may lead to the assumption that something is going on, that it may be a violation of the antitrust laws.

Yet, you don't seem to feel that discussions about joint rates are going to lead you to the conclusion that you ought to be looking into any antitrust implications there.

Mr. FLEXNER. Well, there is a very significant difference between those situations. In the area of single line rates, we are talking about competitive services. In the area of joint-line rates, we are either talking about a situation where the parties to the discussions are not competitors, and they are actually talking about dividing revenues for a particular service, or in the hypothetical that you provided to me earlier on, there isn't any effective competition because one of the parties to the discusions essentially controls the rate for both services.

Mr. FLORIO. Railroads have raised the point in terms of who can participate in joint rate discussions that the carrier must agree under the proposal provided to us by the administration, to carry traffic at a rate which cannot be known to him because he cannot discuss the rate until he agrees to carry traffic under it.

It is sort of a "Catch 22" situation. To participate you have got to agree in advance that you will carry. That means you have to agree to something you are not even a participant in setting. How would you respond to the concerns of the industry?

Mr. FLEXNER. I cannot answer that question. I would be happy to provide the chairman with a written response after we have had some time to reflect on it.

Mr. FLORIO. The Association of American Railroads has commented to us and stated they see difficulties in opening rate bureau meetings to the public which would make rail price and marketing strategies available to representatives of competing modes.

Further stated, it would increase the leverage of large shippers over the pricing decisions. Are you at all concerned about this, or—and I am anticipating your response—do you regard this as part of the whole new marketplace determination, as to what prices should be?

Mr. FLEXNER. I would be more concerned about secret discussions of any subject than open discussions. I think there is less of a

possibility of improper agreements being entered into if the discussions are open to public view.

I think the law in various areas reflects that philosophy; that is, to the extent that meetings among competitors can be subjected to an effective monitoring system, either by virtue of the maintenance of a transcript or the presence of government monitors or consumer representatives that lessens the likelihood of improper agreements being entered into.

Mr. FLORIO. Since the 4-R Act was enacted into law, the FTC has a greater role in monitoring ICC decisions and actions with regard to rate bureaus. To what extent has the division made any determinations as to whether the FTC's role is a meaningful role in the ICC's evaluation of rate bureaus?

Mr. FLEXNER. I think clearly the FTC's role is meaningful. We are talking about an industry which is broad and varied. There is plenty of room for shared responsibility in terms of addressing the kinds of antitrust problems that might arise.

Mr. FLORIO. I didn't mean potentially meaningful. I mean actually meaningful as a result of actions over the last couple of years since the 4-R Act was passed into law.

Mr. FLEXNER. I have no basis for answering that question, Mr. Chairman.

Mr. FLORIO. Are you aware of how much independent action has actually been taking place by the railroads; that is to say, how many instances railroads have decided not to go along with the proposed rate? Has that been a frequent or infrequent occurrence?

Mr. FLEXNER. I don't know the answer, Mr. Chairman.

Mr. FLORIO. I thank you for your testimony today. We will keep in contact with you as we develop this.

Mr. FLEXNER. Thank you.

Mr. FLORIO. Our next witnesses are Otis Cobb, senior assistant vice president, pricing, Burlington Northern, accompanied by Mr. Joseph Feeney, general counsel of the Western Railroad Association.

## STATEMENT OF OTIS W. COBB, ON BEHALF OF THE EXECUTIVE COMMITTEE, WESTERN RAILROAD TRAFFIC ASSOCIATION, ACCOMPANIED BY JOSEPH D. FEENEY, GENERAL COUNSEL, AND ROBERT T. OPAL, ATTORNEY

Mr. COBB. Good morning, Mr. Chairman.

My name is O. W. Cobb. I am senior assistant vice president of the Burlington Northern at St. Paul, Minn. I am appearing here today on behalf of the executive committee of the Western Railroad Traffic Association, an organization of railroads operating on and west of a line roughly from Chicago to New Orleans.

Also with me, as you have stated, is Mr. Joseph Feeney. He is general counsel to the association; also, Mr. Robert T. Opal, who is attorney with the association.

I have been engaged in railroad pricing activities for almost 30 years. I have held various positions with the Burlington Northern and predecessor companies. For the past 2 years I have been the chief pricing officer for the Burlington Northern.

I want to express our appreciation first for this opportunity to appear before you and to present our views on a matter generally