# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 Misc. No. 07-489 (PLF) |
| This document relates to: ALL CASES |  |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF OXBOW'S MOTION TO DISQUALIFY COUNSEL

TROUTMAN SANDERS LLP
John R. Gerstein, D.C. Bar No. 913228
Merril Hirsh, D.C. Bar No. 366952
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone:  (202) 274-2950

Fletcher Paddison
11682 El Camino Real, Suite 400
San Diego, CA 92130-2092
Telephone:  (858) 509-6007

*Attorneys for Oxbow Carbon & Minerals LLC; Oxbow
Mining, LLC; Oxbow Calcining International LLC; Oxbow Midwest
Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 2

    A.    Latham & Watkins Has Represented Oxbow for Nearly a Decade in a Variety of Matters .................................................................. 2

    B.    Oxbow and UP Are Directly Adverse on the Matters on Which Latham Seeks To Represent UP ...................................................... 4

        1.    Oxbow is a member of a class alleging a conspiracy to fix fuel surcharges that the Court has certified in this MDL Case........................................................................................ 4

        2.    Oxbow is actively litigating the same Section 1 claim against UP in a "Related Case"...................................... 5

        3.    Oxbow also has appeared in the MDL through counsel seeking relief that UP has opposed ............................... 6

    C.    When Oxbow Learned (by ECF Notice) that Latham Had Entered Its Appearance on Behalf of UP in the MDL, Oxbow Identified the Conflict and Requested Latham to Withdraw—But Latham Declined ............................................................................................ 6

LEGAL STANDARD............................................................................................ 11

ARGUMENT........................................................................................................ 13

I.    LATHAM'S CONDUCT VIOLATES THE RULES OF PROFESSIONAL CONDUCT. ......................................................... 13

    A.    Latham's Representation of UP in the MDL Case Is Prohibited by Rule 1.7(b)(1) and that Alone Merits Disqualification ........................... 13

    B.    Latham's Representation of UP in the MDL Case Is Prohibited by Rule 1.7(b)(2)(3). ................................................................. 14

    C.    Latham's Representation is Also Prohibited by Rule 3-310 of the California Rules of Professional Conduct................................. 16

II.    OXBOW DID NOT PROVIDE INFORMED CONSENT TO LATHAM'S REPRESENTATION OF UP IN THE MDL CASE..................... 18

# TABLE OF CONTENTS
## (continued)

**Page**

A.    Oxbow Calcining LLC Did Not Provide a Consent or Waiver at All. ........................................................................................... 18

B.    No Oxbow Company Consented to UP's Representation *in this Matter* ................................................................................... 18

C.    Regardless, No Oxbow Company Provided *Informed* Consent .............. 19

    1.    In *Visa,* a prospective waiver was enforced where the particular adverse client, unlike here, was expressly disclosed and consent to future adverse representation of that client was expressly given .................................................... 20

    2.    In *Concat*, the court found a broad waiver, similar to the Latham Engagement Letter here, was inadequate and a second waiver was required ........................................................ 21

    3.    DC Ethics Op. 309 is consistent with *Visa* and *Concat* ............... 24

III.    LATHAM'S CONDUCT ALSO VIOLATES RULE 1.9 PROHIBITING THE REPRESENTATION OF ANOTHER PERSON IN A SUBSTANTIALLY RELATED MATTER ....................................................... 25

IV.    THE DISQUALIFICATION OF LATHAM IS NOT ONLY REQUIRED UNDER THE RULES, BUT IS FAIR UNDER THE CIRCUMSTANCES....... 27

CONCLUSION .......................................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*,
   CV-08-1816 (LDW) (AKT), 2010 U.S. Dist. LEXIS 53290 (E.D.N.Y. June 1, 2010) ..........14

*Brown v. D.C. Board of Zoning Adjustment*,
   486 A.2d 37 (D.C. 1984) ......................................................................................................25

*Cinema 5 Ltd. v. Cinerama, Inc.*,
   528 F.2d 1384 (2d Cir. 1975)...............................................................................................17

*Concat LP v. Unilever, PLC*,
   350 F. Supp. 2d 796 (N.D. Cal. 2004) .......................................................................... passim

*Ehrich v. Binghamton City School District*,
   210 F.R.D. 17 (N.D.N.Y. 2002)...........................................................................................12

*Faulk v. Union Pacific Railroad Co.*,
   449 F. App'x 357 (5th Cir. 2011) ...........................................................................................9

*Flatt v. Superior Court*,
   9 Cal. 4th 275 (1994) ......................................................................................................12, 17

*Franks Investment Co. LLC v. Union Pacific Railroad Co.*,
   593 F.3d 404 (5th Cir. 2010) ..................................................................................................9

*Hempstead Video, Inc. v. Incorporated Village of Valley Stream*,
   409 F.3d 127 (2d Cir. 2005)..................................................................................................17

*Iacangelo v. Georgetown University*,
   710 F. Supp. 2d 83 (D.D.C. 2010) ........................................................................................19

*Interstate Properties v. Pyramid Co. of Utica*,
   547 F. Supp. 178 (S.D.N.Y. 1982)........................................................................................23

*Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*,
   130 S. Ct. 2433 (2010) ............................................................................................................9

*Lewis v. NFL*,
   146 F.R.D. 5 (D.D.C. 1992)......................................................................................... passim

*Merck Eprova v. ProThera, Inc.*,
   670 F. Supp. 2d 201 (S.D.N.Y. 2009)...................................................................................12

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Palumbo v. Tele-Communications, Inc.*,
    157 F.R.D. 129 (D.D.C. 1994)........................................................................................11

*Paul v. Judicial Watch, Inc.*,
    571 F. Supp. 2d 17 (D.D.C. 2008) ..........................................................................11, 12

*People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.*,
    20 Cal. 4th 1135 (1999) ...........................................................................................17

*Responsible Citizens v. Superior Court*,
    16 Cal. App. 4th 1717 (1993) ...................................................................................17

*Talon Research, LLC v. Toshiba America Electronic Components, Inc.*,
    11-CV-04819-WHA, 2012 U.S. Dist. LEXIS 23109 (N.D. Cal. Feb. 23, 2012) ...................26

*TransPerfect Global, Inc. v. MotionPoint Corp.*,
    No. 10-02590, 2012 U.S. Dist. LEXIS 85649 (N.D. Cal. June 20, 2012)..............................17

*Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers and Trainmen*
    *General Commitee of Adjustment*,
    558 U.S. 67 (2009)......................................................................................................9

*Union Pacific Railroad Co. v. California Public Utilities Commission*,
    109 F. Supp. 2d 1186 (N.D. Cal. 2000) .........................................................................9

*Union Pacific Railroad Co. v. California Public Utilities Commission*,
    346 F.3d 851 (9th Cir. 2003) ......................................................................................9

*Union Pacific Railroad Co. v. Louisiana Public Utilities Commission*,
    662 F.3d 336 (5th Cir. 2011) ......................................................................................9

*United States v. Philip Morris Inc.*,
    312 F. Supp. 2d 27 (D.D.C. 2004) ...............................................................................11

*Visa, U.S.A, Inc. v. First Data Corp.*,
    214 F. Supp. 2d 1100 (N.D. Cal. 2003) ................................................................. passim

### OTHER AUTHORITIES

Ass'n of the Bar of the City of New York Committee on Professional & Judicial Ethics
    Formal Opinion 2001-2................................................................................................17

California Bar Standing Committee on Professional Responsibility & Conduct Formal
    Opinion 1989-115 ....................................................................................................21

California Rules of Professional Conduct R. 3-310(A) ................................................................19

**TABLE OF AUTHORITIES**
(continued)

**Page**

California Rules of Professional Conduct R. 3-310(C)(3)...........................................................17

D.C. Bar Legal Ethics Committee Opinion No. 265 (1996)...................................................13, 15

D.C. Bar Legal Ethics Committee Opinion No. 309 (2001).........................................................24

D.C. Rules of Professional Conduct R. 1.0(e) .............................................................................19

D.C. Rules of Professional Conduct R. 1.7(b).............................................................................13

D.C. Rules of Professional Conduct R. 1.7 cmt. 13................................................................15, 16

D.C. Rules of Professional Conduct R. 1.7 cmt. 27.....................................................................19

D.C. Rules of Professional Conduct R. 1.7 cmt. 28.....................................................................19

D.C. Rules of Professional Conduct R. 1.9..................................................................................25

D.C. Rules of Professional Conduct R. 1.9 cmt. 2.......................................................................25

D.C. Rules of Professional Conduct R. 1.9 cmt. 3..........................................................25, 26, 27

D.C. Rules of Professional Conduct R. 1.10................................................................................12

New York Rules of Professional Conduct R. 1.0(j)......................................................................19

New York Rules of Professional Conduct R. 1.7 .........................................................................18

## **INTRODUCTION**

Oxbow Carbon & Minerals LLC; Oxbow Calcining LLC; Oxbow Mining, LLC; Oxbow Calcining International LLC; Oxbow Midwest Calcining LLC; and Terror Creek LLC (collectively, "Oxbow") unfortunately have been forced to file this motion because Latham & Watkins ("Latham"), a law firm that Oxbow has trusted and relied upon for years to provide it with critical legal representation, insists on representing an adverse party, Union Pacific Railroad ("UP"), in this matter—a matter of substantial importance to both clients. Latham's representation of UP, adverse to its client Oxbow, presents a classic conflict of interest situation necessitating Latham's disqualification.

On October 4, 2012, without advance notice to Oxbow, Latham entered its appearance in the pending MDL as counsel for UP, joining Covington & Burling and Jones Day, which had already been representing UP for almost five years in the matter. At the time that UP had Latham enter its appearance for UP in the MDL: (i) Latham was actively serving as counsel to a number of related Oxbow entities; (ii) Latham's relationship with Oxbow had spanned almost a decade; (iii) Latham had received millions of dollars in fees from Oxbow and its related companies for its legal work; (iv) Latham's representation of Oxbow entities was ongoing; (v) Latham was dealing with the highest levels of Oxbow's management; (vi) and Latham was privy to Oxbow's most sensitive and confidential business information, including confidences related to Oxbow's petroleum coke and coal businesses.

The Oxbow entities that were current Latham clients when it entered its appearance for UP in the MDL included, among others, both Oxbow Carbon & Minerals LLC and Oxbow Calcining LLC. Oxbow Carbon & Minerals LLC and Oxbow Calcining LLC were then, and are now, adverse to UP in three ways: (a) as members of the class this Court certified in the MDL;

(b) as moving parties in the MDL, actively appearing and seeking access to sealed materials in the MDL—a motion UP has opposed; and (c) as plaintiffs suing UP in a case that UP has referred to as alleging, in part, the "identical" Section 1 claims that UP is defending here and the Court's ECF docket has denominated as a "Related Case," and "Associated" with this one.

By entering its appearance for UP in the MDL and representing and counseling UP on the opposite side of this case, Latham became directly adverse to Oxbow and its interests in the matter.  That is not allowed under the law.  And because of the access Latham has received to relevant confidential business information, Latham's representation of UP would be improper even if UP were not directly adverse to Oxbow.

No finding of intentional wrongdoing is required.  Rather, under the District of Columbia Rules of Professional Conduct, the California rules governing Latham's attorney-client relationship with Oxbow, and applicable case law, Latham is simply not permitted to represent or counsel UP in connection with the MDL and the issues litigated therein.  Accordingly, and as discussed in more detail below, Oxbow's Motion to Disqualify should be granted.

## FACTUAL BACKGROUND

### A.     Latham & Watkins Has Represented Oxbow for Nearly a Decade in a Variety of Matters

Since 2004, Latham has represented Oxbow on more than 23 separate matters for which Oxbow has paid over $4.6 million in fees.[1]  Among other things, Latham:

- **acted as counsel in drafting the confidential limited liability company agreement among the members of the parent company, Oxbow Carbon LLC, including its outside equity investors.**  Through this Latham was provided with confidential business information on the amount of the respective equity investments, the overall equity structure, distribution rights, and buyout structure, all of which provided Latham with highly privileged information on the management of the company and its membership rights.[2]

---

[1] Clark Decl. ¶¶ 2-3.

[2] *See* Clark Decl. ¶ 6 (a)

- **acted as outside counsel in connection with Oxbow's multi-billion dollar term debt and revolving credit facility, that was originally entered into in May 2007 and which currently finances the entirety of Oxbow's business, including its coal and petroleum coke businesses**.  The borrowers are Oxbow Carbon LLC and Oxbow Calcining LLC, one of the Oxbow Plaintiffs, with each of the remaining Oxbow Plaintiffs, as guarantors.  Latham's representation of Oxbow Calcining LLC and the remaining Oxbow Plaintiffs with respect to this credit facility, including several amendments to it, was ongoing and continued through October 4, 2012, when Latham first appeared as UP's counsel in the MDL Action.  Through this Latham was provided with extensive confidential and privileged information on the Oxbow Companies as well as the details of the credit facility, including the highly sensitive financial covenants, negative loan covenants, and default provisions.[3]

- **advised Oxbow, from approximately 2009 through October 2012, on certain August, 2003 Note Indentures to which Oxbow became a party when it acquired Great Lakes Carbon LLC and its affiliated companies in May 2007.**  Great Lakes Carbon LLC is the business entity that today is operated as Oxbow Calcining LLC, one of the plaintiffs in the Oxbow Action, and Latham acquired substantial confidential and privileged information relating to Oxbow Calcining LLC.[4]

- **acted as Oxbow Carbon & Minerals, LLC's and related Oxbow companies' outside counsel in connection with numerous debt financings, including a $140,000,000 syndicated debt financing, a $40,000,000 subordinated note financing, a $12,500,000 junior subordinated note financing, as well as an $86,000,000 term and revolver syndicated debt financing for Oxbow Mining LLC.**  Oxbow provided Latham with extensive confidential and privileged information on the relevant Oxbow companies in connection with these services.[5]

- **represented Oxbow Carbon & Minerals LLC in connection with its marine terminals at the Port of Long Beach and Oxbow's exports of coal and petroleum coke from the Port since 2004.  Here again, Latham's representation was ongoing and continued through October 4, 2012.** Latham was provided detailed confidential information relating to Oxbow's valuable West Coast coal and petroleum coke export business, projected coal and coke tonnages and rail shipments including UP rail shipments.[6]

---

[3] *See* Clark Decl. ¶ 6 (b).

[4] *See* Clark Decl. ¶ 6 (c).

[5] *See* Clark Decl. ¶ 6 (d).

[6] *See* Clark Decl. ¶ 6 (f).

- **has worked on highly sensitive and confidential internal investigations for Oxbow Carbon & Minerals LLC and related Oxbow companies**. In the context of that work, Latham obtained extensive attorney-client and confidential information on its coal and petroleum coke business and Oxbow's executive decision making process.[7]

Throughout its relationship with the Oxbow Companies, Latham has communicated with the highest executive levels of Oxbow management, including the Chairman and Chief Executive Officer, the Chief Operating Officer, and the Chief Financial Officer. Oxbow advised Latham of and afforded it access to the confidential business plans for Oxbow Carbon LLC and the other Oxbow Companies, which included (i) internal financial statements and projections, (ii) detailed and voluminous confidential memoranda and related information prepared in connection with strategic acquisitions, (iii) detailed country-by-country and product-by-product breakdowns of sales in the United States and international markets, (iv) the business plan for Oxbow Mining LLC's coal mine, and (v) the confidential business plan for Oxbow's export of petroleum coke and coal, including contracts and projected tonnages that would be shipped on the Union Pacific Railroad.[8]

B.     **Oxbow and UP Are Directly Adverse on the Matters on Which Latham Seeks To Represent UP**

1.     **Oxbow is a member of a class alleging a conspiracy to fix fuel surcharges that the Court has certified in this MDL Case**

On November 6, 2007, the United States Judicial Panel on Multidistrict Litigation consolidated eighteen separate class actions, pending in six districts, involving common antitrust allegations against the four major United States railroads and transferred them to this Court. *See* ECF Nos. 1, 138.[9] The second consolidated class-action complaint alleges that UP conspired

---

[7] *See* Clark Decl. ¶ 6(i).

[8] *See* Clark Decl. ¶ 5.

[9] Unless otherwise noted, the citations to "ECF" refer to this MDL docket.

with the three other Defendants to fix fuel surcharges for rail transportation in violation of Section 1 of the Sherman Act.[10]  On June 21, 2012, this Court certified a class consisting of entities that, during the relevant time period, "purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport."[11]

Oxbow is a direct purchaser of rail freight services subject to these fuel surcharges.[12] Oxbow purchases, sells, and ships coal mined by itself and others and also manufactures, sells, and ships petroleum coke and calcined coke.[13]  Thus, UP concedes that Oxbow is a member of the recently certified direct purchaser class in this action.[14]  Oxbow's interests as a class member in the MDL are directly adverse to UP.

### 2. Oxbow is actively litigating the same Section 1 claim against UP in a "Related Case"

On June 7, 2011, Oxbow filed its own action that the Court's ECF docket denominates as a "Related Case" "Associated" with the MDL:  *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, ECF No. 1, 1:11-cv-01049-PLF (the "Related Case").  In the Related Case, Oxbow, alleged, as one of its counts, the same fuel surcharge conspiracy as pled in the MDL.[15] Oxbow alleges that, during the period of the fuel surcharge conspiracy, Oxbow's various

---

[10] *See* Second Consol. Am. Class Action Compl. ¶¶ 1, ECF No. 324 ("2d CAC").

[11] ECF No. 540.

[12] Compl. ¶¶ 124-26, *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, No. 1:11-cv-01049-PLF ("Related Case"), Related Case ECF No. 1 ("Related Case Compl.").

[13] *Id*. ¶¶ 13-17, 84-85, 87, 93, 96, 105, 107-08, 123.

[14] Related Case ECF No. 27, at 4.

[15] Related Case Complaint ("Compl.")  ¶¶ 1, 6, 8, 127-38.

businesses paid over $30 million in unlawful fuel surcharges.[16]  UP has affirmatively represented

that the MDL Case and the Related Case allege an "identical" conspiracy to fix rail fuel

surcharges in violation of Section 1 of the Sherman Act.[17]  Thus, Oxbow is adverse to UP in

connection with the fuel surcharge price fixing conspiracy matter both as a class member in the

MDL and as a plaintiff in the Related Case making the same claim.[18]

### 3. Oxbow also has appeared in the MDL through counsel seeking relief that UP has opposed

In the MDL, Oxbow has appeared through counsel and moved for access to sealed record

material in the MDL.[19]  UP has opposed that motion.[20]  That dispute is still pending.

### C. When Oxbow Learned (by ECF Notice) that Latham Had Entered Its Appearance on Behalf of UP in the MDL, Oxbow Identified the Conflict and Requested Latham to Withdraw—But Latham Declined

On October 4, 2012, without even consulting Oxbow, much less obtaining its informed

consent or seeking an express conflict waiver, Latham entered an appearance on behalf of UP in

the MDL.[21]  Oxbow learned of Latham's appearance only after receiving the ECF notice.[22]

When Oxbow learned that Latham had filed an appearance to represent UP, Oxbow

contacted outside counsel and informed it of the clear conflict arising from Latham's actions.

Within a few days, in a conversation between Oxbow's CEO William Koch, Oxbow's General

Counsel Michael McAuliffe, and Latham's Global Chair and Managing Partner Robert M. Dell,

---

[16] *Id.* ¶ 124.

[17] Related Case ECF No. 27, at 1; *see also* Related Case ECF No. 33, at 2, 8.

[18] Oxbow also has asserted an additional broad based Section 2 claim in the Related Case.

[19] ECF No. 554.

[20] ECF No. 563.

[21] *See* ECF Nos. 621-24.

[22] Clark Decl. ¶ 13.

Oxbow requested that Latham withdraw from its representation of UP in the MDL Case.[23]
Latham declined to withdraw.[24]  As a result, and because of the conflict of interest and Oxbow's
concerns about the divided loyalties of its counsel, Oxbow terminated Latham's representation in
all but one pending matter in which Oxbow could not immediately terminate Latham without
being significantly prejudiced.[25]

On December 21, 2012,[26] Oxbow sent Mr. Dell a letter reiterating its request that Latham
withdraw from representing UP in the MDL Case by January 11, 2013 and explaining its
reasoning in more detail.  Latham responded by letter of January 10, 2013 declining to
withdraw.[27]

In its January 10th letter, Latham—reflecting an apparent misunderstanding of the extent
of Oxbow's involvement in the fuel surcharge price fixing matter—asserted that UP and Oxbow
were not "directly adverse" in connection with the MDL matter because Oxbow was "simply a
potential class member."[28]  Latham asserted that, regardless, it was entitled to represent UP
adverse to Oxbow because, according to Latham, Oxbow prospectively consented to Latham's
representation of UP adverse to Oxbow in the MDL as part of an October 6, 2011 engagement
letter ("Engagement Letter") between Latham and Oxbow Carbon & Minerals LLC.

Although Oxbow's relationship with Latham began in 2004 and extended over at least 23
separate matters, Oxbow has been unable to locate and Latham has never referenced any signed
agreement or written engagement letter with Latham that predates 2011.  In October 2011, seven

[23] *Id.* ¶ 15.

[24] *Id.*

[25] *Id.*

[26] *See* Clark Decl. Ex. E.

[27] Clark Decl. Ex. F.

[28] *See id.*

years into Latham's representation of Oxbow, four years after the MDL was on file, and four

months after six different Oxbow companies sued UP in the Related Case, Latham obtained an

engagement letter in connection with one of its matters representing Oxbow Carbon &Minerals

LLC.[29]  And in language Latham now references as a basis for representing UP's adverse interest

in this lawsuit, the 2011 Engagement Letter says:

> We thus ask you in connection with this engagement to consent in advance to our
> acceptance of *future matters* (including litigation matters) adverse to Oxbow,
> provided that those matters are not substantially related to the work that we have
> done for you. . . .  [Y]ou agree that we would be able to take a *new lawsuit* or
> transactional matter for one of our current or future clients, adverse to Oxbow, at
> the same time that we are representing Oxbow in this matter, so long as the
> adverse matter is not substantially related to the work we have done for you.[30]

As this language reflects, this October 2011 Engagement Letter did not identify UP as an

existing client of Latham (which it was).  It did not refer to either the fuel surcharge price fixing

matter, the MDL or Oxbow's Related Case.  It did not purport even to apply to currently pending

litigation.  Moreover, the purported waiver in the Engagement Letter does not apply to any

Oxbow entity other than Oxbow Carbon & Minerals LLC, including other Oxbow entities that

Latham had been representing and was representing when it entered its appearance in the MDL.

In a January 21, 2013 letter,[31] Oxbow's counsel explained to Latham why its reliance on

the Engagement Letter was misplaced.  To begin with, as they explained, the Engagement Letter

expressly applies **only** to "Oxbow Carbon & Minerals LLC[32] (identifying, the party as "Oxbow

Carbon & Minerals LLC" and defining it, in Section II as "Oxbow," and expressly excluding

from its scope "current or future parents, subsidiaries, or shareholders…" of Oxbow).[33]

---

[29] *See* Clark Decl. ¶¶ 10-11; *id.* Ex. A at 1 & n.1

[30] Clark Decl. Ex. A at 3 (emphasis added)

[31] *See* Clark Decl. Ex. G.

[32] *See* Engagement Letter, Exhibit A hereto.

[33] *Id.*

Thus, when the Engagement Letter purports to provide for a prospective conflict waiver by "Oxbow," the "Oxbow" referenced was specifically and narrowly defined by Latham to be Oxbow Carbon & Minerals LLC.   Latham never sought or obtained a conflict waiver from any other Oxbow entity.

Latham was representing Oxbow Calcining LLC at the time it entered its appearance for UP in the MDL.[34]  Oxbow Calcining LLC is a class member in the MDL, and it has appeared in the MDL through counsel, moving for access to sealed record materials[35]—a motion that UP has opposed.[36]  Oxbow Calcining LLC is also a plaintiff in the Related Case.  Latham has no consent or waiver from Oxbow Calcining LLC pertaining to its representation of UP in the MDL.

Even as to Oxbow Carbon & Minerals LLC the prospective consent/waiver did not apply to Latham's appearance in the MDL.  The Engagement Letter asked Oxbow Carbon & Minerals LLC to consent to Latham representing other clients "adverse" to Oxbow in "*future matters*" which Latham said would allow it to take a "***new lawsuit***" for a "current or future client."[37]  This was not a "future matter" or "new lawsuit."  It was pending at the time.

Nor did Latham attempt to obtain informed consent about this matter.  At the time it asked that Oxbow Carbon & Minerals LLC sign the Engagement Letter, Latham (i) did not advise it that UP was a longstanding client of Latham (which it was);[38] (ii) did not refer to the

---

[34] Clark Decl. ¶ 14.

[35] ECF No. 554.

[36] ECF No. 563.

[37] Clark Decl. Ex. A (emphasis added).

[38] Unbeknownst to Oxbow at the time of the Engagement Letter, Latham had been representing UP since at least 1997 in various litigation matters presenting a range of legal issues .  *See Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 109 F. Supp. 2d 1186 (N.D. Cal. 2000) (filed Oct. 10, 1997 and listing Latham as counsel of record); *see also Union Pac. R.R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336 (5th Cir. 2011); *Faulk v. Union Pac. R.R. Co.*, 449 F. App'x 357 (5th Cir. 2011); *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433 (2010); *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404 (5th Cir. 2010); *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67 (2009); *Union Pac. R.R. Co. v. Cal. Pub.*

fuel surcharge price fixing matter, the MDL or the Related Case, which were already in litigation between Oxbow and UP at the time; (iii) did not advise Oxbow Carbon & Minerals LLC (or any Oxbow entity) that it wanted to be able to represent UP, adverse to Oxbow's interests, in connection with the fuel surcharge price fixing matter, the MDL, or issues in the Related Case; and (iv) did not suggest that it intended the ostensible prospective, abstract "consent" being sought for "future matters" to apply to then-existing litigation.  Oxbow Carbon & Minerals LLC did not provide any consent (much less informed consent) to Latham representing UP in the MDL.[39]  And, no other Oxbow entity provided (or was even asked to provide) advance consent or waiver of conflicts of any kind.

Nor could any consent—even if informed—apply to this case.  As Mr. Clark's Declaration explains, Latham's work for Oxbow gave it access to confidential information that relates to issues being litigated by Oxbow and UP.[40]  So even if the Engagement Letter had provided a basis for informed consent (which it did not) and even if the consent were sought from all Oxbow entities (which it was not), consent would not apply here.  The confidential information that Latham acquired in its work for Oxbow prevents it from representing UP in the MDL, because the information that Latham acquired in a privileged context working with Oxbow may implicate issues and strategies in the fuel surcharge price fixing matter.  As such, the matters are "substantially related" and the Engagement Letter expressly represents that Latham will not undertake work for another client adverse to Oxbow on a matter that is "substantially related" to the work Latham has done for Oxbow.

---

*Utils. Comm'n*, 346 F.3d 851 (9th Cir. 2003).  The extent of any other work by Latham on behalf of UP remains unknown.

[39] Clark Decl. ¶¶ 11-12.

[40] *Id.* ¶ 5.

Nor, in any event, could Latham have ever seriously thought that Oxbow would view

Latham representing Oxbow's adversary in this major antitrust dispute as anything but the most

serious breach of trust.  As Mr. Clark explains,[41] Latham's representation was not just extensive

and intensive, it was personal and confidential. This case does not involve some small

disagreement of the sort clients waive.  This is an antitrust lawsuit that Oxbow has pursued at

great expense only after the most careful consideration of matters critical to its business.

In its counsel's January 21, 2013 letter to Latham,[42] Oxbow advised Latham that the

prospective waiver relied upon by Latham was inapplicable for all the reasons noted above and

made clear that Latham continued to have a disqualifying conflict.  In addition, Oxbow requested

that Latham provide information pertaining to how Latham came to be in the current conflict

situation.  To date, Latham has provided no response, has provided none of the requested

information, and has not voluntarily withdrawn from representing UP in the MDL.  All of which

has led Oxbow to file the instant Motion to Disqualify.

## **LEGAL STANDARD**

In ruling on a motion to disqualify, courts in this district consider "first, whether a

violation of an applicable Rule of Professional Conduct has occurred or is occurring, and if so,

whether such violation provides sufficient grounds for disqualification." *See Paul v. Judicial

Watch, Inc.*, 571 F. Supp. 2d 17, 20 (D.D.C. 2008) (Lamberth, C.J.).  Any "doubts are to be

resolved in favor of disqualification."  *United States v. Philip Morris Inc.*, 312 F. Supp. 2d 27, 45

(D.D.C. 2004) (internal quotation marks and citation omitted).

Violations of D.C. Rules of Professional Conduct 1.7 and 1.9 provide sufficient grounds

for disqualification.  *See Palumbo v. Tele-Commc'ns, Inc.*, 157 F.R.D. 129, 130, 133 (D.D.C.

---

[41] *Id*. ¶ 16.

[42] Clark Decl. Ex. G.

1994) (Rule 1.7); *Paul*, 571 F. Supp. 2d. at 26 (A "motion to disqualify can be granted on the basis of a violation of Rule 1.9, without any further showing."); *see also* D.C. Rules of Prof'l Conduct R. 1.10 (while "lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9").

For purposes of applying Rules 1.7 and 1.9, representation is treated as concurrent if the firm represented both clients at the time the conflict developed.  Thus, a firm cannot be heard to maintain that its conflict was eliminated because its conduct led to or forced the moving party to discharge the firm and obtain other counsel.  *See, e.g.*, *Ehrich v. Binghamton City School District*, 210 F.R.D. 17, 25 (N.D.N.Y. 2002) (the present-client rule "applies if an attorney simultaneously represents clients with differing interests even though the representation ceases prior to filing the disqualification motion"); *Merck Eprova v. ProThera, Inc.*, 670 F. Supp. 2d 201, 209 (S.D.N.Y. 2009) ("the rule requiring a conflict to be judged by the concurrent representation standard even after representation has ended should not turn on whether representation is terminated by conflicted counsel or by the client.  Otherwise, counsel could simply persist in dual representation until one client or the other capitulates"); *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 288 (1994) (en banc) (discussing "hot potato rule," whereby the "automatic disqualification rule applicable to concurrent representation cannot be avoided by unilaterally converting a present client into a former client prior to hearing on the motion for disqualification").

## ARGUMENT

I.   **LATHAM'S CONDUCT VIOLATES THE RULES OF PROFESSIONAL CONDUCT.**

    **A.   Latham's Representation of UP in the MDL Case Is Prohibited by Rule 1.7(b)(1) and that Alone Merits Disqualification**

D.C. Rule 1.7(b) provides that, absent informed consent by each affected client, "a lawyer shall not represent a client with respect to a matter if:

> (1) That matter involves a specific party or parties and a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter even though that client is unrepresented or represented by a different lawyer;

> (2) Such representation will be or is likely to be adversely affected by representation of another client;

> (3) Representation of another client will be or is likely to be adversely affected by such representation;

Latham's representation of UP in this action violates all three of these provisions.

Rule 1.7(b)(1) "gives expression to the basic notion that a lawyer ought not, without the client's consent, oppose the lawyer's own client, even where that client is represented by another lawyer in that matter."[43]  *See Lewis v. NFL*, 146 F.R.D. 5, 7, 10-11 (D.D.C. 1992) (noting that law firm was barred under Rules 1.7(b)(1), (2) from representing class of NFL players in antitrust case where it simultaneously represented NFLPA in a separate unrelated action adverse to 20 unnamed putative class members).  As the court said in *Lewis*, "Weil, Gotshal would both represent and be adverse to the approximately twenty defendants in the *Golic* case who are also class members here."  *Id.* at 11.  Likewise here, at the time Latham entered its appearance for UP, in the words of *Lewis*, Latham "would both represent [certain Oxbow companies]" elsewhere and "be adverse" [to Oxbow companies] "who are also class members here."

---

[43] *See* D.C. Bar Legal Ethics Comm. Op. No. 265 (1996).

Latham seeks to represent UP in the MDL Case, even though Latham's other client, Oxbow, is a class member in that same litigation and is directly litigating the same matter in a Related Case.  The instant situation captures the letter and intent of D.C. Rule 1.7(b)(1).  Oxbow is not only a class member here, but it has appeared directly through counsel in this action (seeking access to the sealed record, which UP has opposed) and has filed the Related Case, raising what UP itself represented is an "identical" Section 1 claim before this Court.[44]  Given that these actions are pending before the same judge and have directly overlapping issues, the advice, legal work, and information that Latham provides UP in the MDL necessarily aid it in litigating the Related Case, and success by UP in litigating the merits of the class's Section 1 claim would as a practical matter severely limit (if not foreclose) Oxbow's ability to succeed on that claim, whether as a class member or in its individual action against UP.  That presents a classic conflict.

That Oxbow has its own counsel (in the Class Action and in the Related Case) does not allow Latham to represent UP.  Oxbow Carbon & Minerals LLC and Oxbow Calcining LLC were clients of Latham when it entered its appearance in the MDL, and, absent informed consent, Rule 1.7(b)(1) prohibits that adverse representation even though Oxbow's interests are "represented by another lawyer in that matter."[45]

**B.      Latham's Representation of UP in the MDL Case Is Prohibited by Rule 1.7(b)(2)(3).**

Latham's representation of UP similarly violates D.C. Rules 1.7(b)(2) and 1.7(b)(3).

"Rules 1.7(b)(2) and 1.7(b)(3) express two faces of the same concept, which is that where the

---

[44] Related Case ECF No. 27, at 1.

[45] *See Lewis*, 146 F.R.D. at 11; *accord All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, CV-08-1816 (LDW) (AKT), 2010 U.S. Dist. LEXIS 53290, at *11-13 (E.D.N.Y. June 1, 2010) (noting that disqualification is appropriate where an attorney is representing one client in a litigation against another current client).

representation of one client interferes in some substantial way with the representation of another, the lawyer is prevented from representing at least one and perhaps both of the clients unless there is full disclosure and unless both clients consent."[46]  "Factors relevant in determining whether the clients need to be advised of the risk include:  where the matters are pending, the temporal relationship between the matters, the significance of the issue to the immediate and long-term interests of the clients involved, and the clients' reasonable expectations in retaining the lawyer."[47]

The legal issue in the MDL Case—whether UP's pricing policies violate Section 1 of the antitrust laws—is of immense significance to both Oxbow's and UP's long term interests.  Given that transportation costs are central to Oxbow's business, it is reasonable for Oxbow to expect that Latham, which had intimate knowledge of Oxbow's coal and petroleum coke businesses, would not advocate on behalf of another client in antitrust litigation alleging a conspiracy to charge Oxbow and others similarly situated higher prices for shipping its coal and petroleum coke.  *See Lewis,* 146 F.R.D. at 11 (finding conflict for multiple reasons including that "confidential" information" obtained in representing one group of clients potentially could be used "to the detriment" of those clients in other litigation where counsel represented the opposing party).

There also is more than a "significant risk" that Latham's representation of UP will adversely affect its representation of Oxbow.  It *has* adversely affected its relationship with Oxbow by leading Oxbow to terminate its longstanding relationship with Latham on all but one matter and requiring it to find alternative counsel on several matters at its own expense and with

---

[46] D.C. Bar Legal Ethics Comm. Op. No. 265 (emphasis added).

[47] D.C. Rules of Prof'l Conduct R. 1.7 cmt. 13.

all the attendant dislocations.[48]  Oxbow was otherwise satisfied with this representation and

would have preferred not to terminate this relationship, but Latham's representation of UP in the

MDL Case demonstrated that its "loyalty truly lies" with UP, not Oxbow, and so Oxbow was

simply unwilling to continue to share "confidential information" that could be used to its

"detriment."[49]  Given that Oxbow gained nothing by doing so except avoiding the risk of harm

from representation by conflicted counsel, the adverse impact of Latham's action on its

representation of Oxbow by itself mandates disqualification.[50]

### C.     Latham's Representation is Also Prohibited by Rule 3-310 of the California Rules of Professional Conduct

Oxbow hired Latham in California, and that is where its attorney-client relationship was

founded.  The principal Latham lawyers who have appeared for UP in the MDL are California

attorneys.  Even the Engagement Letter relied upon by Latham was issued from its California

office, involved its California attorneys, and concerned a California matter.  Latham's attorney-

client obligations to Oxbow, including with respect to obtaining informed consent and

prospective waivers, are governed by California's rules.[51]

Under California law, as in the District of Columbia, an attorney owes a duty of

undivided loyalty and cannot represent another client in a matter adverse to his client without the

---

[48] Clark Decl. ¶¶ 15-16.

[49] *See Lewis*, 146 F.R.D. at 11; *see also* Clark Decl. ¶¶ 15-16 & Ex. E.

[50] *See* D.C. Rule 1.7 cmt. 13 ("If there is significant risk of material limitation, then, absent informed consent of the affected clients, the lawyer *must* refuse one of the representations or withdraw from one or both matters . . . .") (emphasis added).

[51] Of course, when they appear in this District, Latham lawyers must also comply with applicable District of Columbia Rules of Professional Conduct as well.  Oxbow additionally notes that the Engagement Letter contains a New York choice of law provision.  That is irrelevant here because only one Oxbow entity was a party to the prospective waiver in the Engagement Letter and, regardless, Oxbow does not believe (and thinks Latham does not believe either) that, as a California-based firm, when its California lawyers are retained in California, Latham can avoid California ethics requirements by "outsourcing them" through a choice of law provision.  For reasons of completeness, however, Oxbow will refer hereinafter to New York law in addition to California and D.C. law.  As the Court will see, the law of each jurisdiction requires "informed" consent, which was not obtained here.

informed written consent of the parties.  As the courts have noted "no man can serve two

masters" and, in the context of ethical rules, this prohibits an attorney from representing one

client and then concurrently representing another when the clients' interests are adverse.[52]  In

*SpeeDee Oil Change*, the California Supreme Court held that:

> [I]f an attorney-or more likely a law firm-simultaneously represents clients who
> have conflicting interests, a more stringent per se rule of disqualification applies.
> With few exceptions, disqualification follows automatically, regardless of
> whether the simultaneous representations have anything in common or present
> any risk that confidences obtained in one matter would be used in the other.

*Id.* at 1147.  *See also TransPerfect Global, Inc. v. MotionPoint Corp*., No. 10-02590, 2012 U.S.

Dist. LEXIS 85649, at *19-20 (N.D. Cal. June 20, 2012) ("Rule 3-310 forbids lawyers in

California from simultaneously representing two clients that are adverse to each other, even

where the adversity arises in two unrelated matters, unless the lawyer fully discloses the conflict

and obtains a waiver in writing.")  The *TransPerfect* court noted that the New York rules and the

California rules on the issue are the same.  *See TransPerfect*, at *30.  Indeed, in cases of

concurrent representation, the Second Circuit has ruled that it is "prima facie improper" for an

attorney to simultaneously represent a client and another party with interests directly adverse to

that client.  *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976), *Hempstead

Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005) (affirming the rule but

declining to extend the per se rule to impute conflicts to "of counsel" attorneys in the firms).[53]

---

[52] See *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 284-286 (1994); *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1147 (1999); *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 815 (N.D. Cal. 2004); *Responsible Citizens v. Super. Ct.*, 16 Cal. App. 4th 1717, 1724 (1993); Cal. Rules of Prof'l Conduct R. 3-310(C) (3) ("A member shall not, without the informed written consent of each client[,] represent a client in a matter and at the same time in a separate matter accept . . . a client . . . whose interest in the first matter is adverse to the client in the first matter.")

[53] *See also* Association of the Bar of the City of New York Comm. on Prof'l & Judicial Ethics, Formal Op. 2001-2 ("Our analysis necessarily begins with Disciplinary Rule 5-105 of the New York Code of Professional Responsibility (the "Code"), which was amended effective June 30, 1999.  22 N.Y.C.R.R. §1200.24.  Under this rule, a lawyer may not represent a client in a matter that is adverse to the interests of another client, even if the dual representations are wholly unrelated, unless the lawyer has the informed consent of both clients and 'a disinterested

## II.   OXBOW DID NOT PROVIDE INFORMED CONSENT TO LATHAM'S REPRESENTATION OF UP IN THE MDL CASE.

Latham cannot justify its adverse representation by claiming that each of the Oxbow companies that it was representing at the time it entered its appearance in the MDL had provided informed consent, allowing Latham to comply with Rule 1.7(b)(1).  That is so for multiple reasons.

### A.   Oxbow Calcining LLC Did Not Provide a Consent or Waiver at All.

First, as set forth *supra* at 9, Oxbow Calcining LLC was represented by Latham at the time it entered its appearance in the MDL, and Oxbow Calcining LLC did not ever purport to provide any consent (prospective or otherwise) to Latham's representation of UP in the MDL.  Thus, there is no "consent" protecting Latham from disqualification.

### B.   No Oxbow Company Consented to UP's Representation *in this Matter*.

As explained *supra* at 8-9, although Latham has asserted that Oxbow—really, Oxbow Carbon & Minerals, LLC—consented to its representation in this matter, the boilerplate language to which Latham refers does not purport to provide that consent.  The only "consent" any Oxbow entity purports to provide is for "future" matters and "new litigation"—not to pending litigation.  At the time of the October 6, 2011 Engagement Letter—UP was *already* defending both this case and the Oxbow "Related Case."  They were *pending* cases as to which Latham obtained no consent.

---

lawyer would believe that the lawyer can competently represent the interest of each . . . .' DR 5-105(A) and (C); 22 N.Y.C.R.R. §1200.24." ) (footnote omitted).  DR 5-105 has since been superseded by Rule 1.7 of the New York Rules of Professional Conduct, which also requires that both affected clients give "informed consent in writing" in order for a lawyer to engage in a representation where a "reasonable lawyer" would conclude that the "representation will involve the lawyer in representing differing interests."  *See* N.Y. Rules of Prof'l Conduct R. 1.7.

**C.      Regardless, No Oxbow Company Provided *Informed* Consent**

In any event, as detailed *supra* at 9-10, Oxbow Carbon & Minerals LLC did not provide informed consent to any representation in this matter.  A conflict may only be cured if "**each** potentially affected client provides **informed consent** to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation.'" *Iacangelo v. Georgetown Univ.*, 710 F. Supp. 2d 83, 90 (D.D.C. 2010) (emphasis added, quoting D.C. Rule 1.7(c)).[54]  A client must "be fully advised before the Court can conclude that he has given informed consent" under Rule 1.7(c).  *Iacangelo*, 710 F. Supp. 2d at 94; *see also* D.C. Rule 1.0(e) (lawyer must communicate "adequate information and explanation about the material risks of and reasonably available alternatives" to the proposed representation); D.C. Rule 1.7 cmt. 27 ("Adequate disclosure requires such disclosure of the parties and their interests and positions as to enable each potential client to make a fully informed decision as to whether to proceed with the contemplated representation.").  Under "District of Columbia substantive law, the lawyer bears the burden of proof that informed consent was secured."  D.C. Rule 1.7 cmt. 28.

The boilerplate language Latham has referenced from its October 6, 2011 Engagement Letter cannot constitute informed consent to Latham's representation of UP in the MDL, either by Oxbow Calcining LLC (which provided no consent) or by Oxbow Carbon & Minerals LLC. Latham did not inform Oxbow Carbon & Minerals LLC that UP was a longstanding client of Latham or that any prospective consent/waiver that it was being asked to consent to would apply to pending litigation (as distinct from the "future litigation" and a "new lawsuit" referred to in the Engagement Letter), much less to pending litigation in which UP and Oxbow were already

---

[54] Both California (where Latham was retained) and New York (the choice of law provision in the Engagement Letter) also require informed consent.  *See* Cal. Rule 3-310(A) and N.Y. Rule 1.0(j).

adverse.  An advance waiver of future, and then unknown, conflicts cannot be applied to pending suits without express disclosure and clear wording.

While the D.C. and the California Rules are nearly identical in requiring that there be informed consent to avoid an impermissible conflict, there do not appear to have been any decisions in the District of Columbia addressing the issue of informed consent in these circumstances.  However, there is substantial and instructive law in California, which is where Latham is based, where it was retained, and where the purported consent/waiver was given.

Two federal cases arising in California and dealing with advance waivers make it clear that the Engagement Letter here does not constitute informed consent and that a second waiver would have been required at the time Latham sought to represent UP in the MDL Case: *Visa, U.S.A, Inc. v. First Data Corp*., 241 F. Supp. 2d 1100 (N.D. Cal. 2003) and *Concat LP v. Unilever PLC*, 350 F. Supp. 2d 796 (N.D. Cal. 2004).

**1.      In *Visa,* a prospective waiver was enforced where the particular adverse client, unlike here, was expressly disclosed and consent to future adverse representation of that client was expressly given**

In *Visa*, the district court upheld the waiver issue there and found that the client, First Data, provided its informed written consent to the future, but then unknown, conflict of interest. There, the engagement letter, unlike the situation here, *specifically identified* the potentially adverse current client (Visa), and incorporated First Data's consent to counsel's "ability to represent Visa on matters which may arise in the future including matters adverse to First Data . . ."[55]

There, First Data sought to retain Heller Ehrman ("Heller"); Heller informed First Data that it had a long-standing relationship with Visa, and Heller "could not represent First Data"

---

[55] *Id*. at 1102-1103.

unless First Data agreed to permit Heller to represent Visa in any future disputes "including litigation that might arise between First Data and Visa."[56]  First Data consented.

Subsequent to the engagement letter, litigation arose between Visa and First Data and Visa hired Heller to represent it against First Data.  First Data objected and moved to disqualify Heller.  The court held that informed consent required full disclosure:

> To show full disclosure, Heller must demonstrate that it "communicated information reasonably sufficient to permit the client to appreciate the significance of the matter in question." ABA Formal Op. 93-372 at 29 (citing ABA model rules).[57] An evaluation of whether full disclosure was made . . . "is obviously a fact specific inquiry".[58]

The Court held that this was a fact specific inquiry based upon a review of the following factors:  (a) the breadth of the waiver; (b) whether it was a waiver of a current conflict versus all future conflicts; (c) the "quality" of the conflicts discussion with the client; (d) the specificity of the waiver; (e) the nature of the conflict; (f) the sophistication of the client; and (g) the interests of justice.[59]  The court concluded: "In evaluating all these factors, there is substantial evidence showing that Heller made a full and reasonable disclosure to First Data, and First Data knowingly waived any conflicts concerning Heller's ongoing representation of Visa."[60]

**2.    In *Concat*, the court found a broad waiver, similar to the Latham Engagement Letter here, was inadequate and a second waiver was required**

In *Concat*, the district court examined a prospective waiver nearly identical to the waiver here, and held that there was no "informed" consent.  In *Concat*, the court held that when a law firm is concurrently representing two adverse clients, even on unrelated matters "it is presumed

---

[56] 241 F. Supp. 2d at 1102.

[57] *Id.* at 1106.

[58] *Id.* (quoting Cal. Bar Standing Comm. on Prof'l Responsibility & Conduct, Formal Op. 1989-115, at IIA-315).

[59] *See Visa* at 1106.

[60] *Id.* at 1106-1107.

that the duty of loyalty has been breached and counsel is automatically disqualified."[61]  This

"presumption may be rebutted if full disclosure is made and both clients agree in writing to

waive the conflict."[62]  Applying the factors identified in *Visa* to the waiver here, the court found:

> (1) [T]he terms of the waiver are extremely broad and were evidently intended to cover almost any eventuality; (2) its temporal scope is likewise unlimited; (3) the record contains no evidence of any discussion of the waiver; (4) the waiver lacks specificity as to the conflicts that it covers and effectively awards Morgan, Lewis an almost blank check; (5) however, Morgan, Lewis stated that it would not seek to represent Dr. Winchell and an adverse client in a "substantially related" matter; and (6) Dr. Winchell's education and business experience are strongly indicative of a high degree of sophistication.  Thus, the fifth and sixth factors tend to support a finding of informed consent, but the first four weigh in the opposite direction.  The interests of justice (factor 7) remain to be determined.[63]

Notwithstanding the facts that (i) prospective waivers are common for large firms

practicing in diverse jurisdictions, (ii) a waiver is "not required to indicate every conceivable

possibility of potential conflict," (iii) Morgan, Lewis "had no knowledge of the impending

dispute," and (iv) "no blame attaches to (counsel) for failing to detect a conflict which had not

yet crystallized" (*id.*), the court held that the **advance waiver was not sufficient** and a second

waiver was necessary if there were to be no disqualifying conflict:

> Under the law of this jurisdiction, even if a prospective waiver of conflict has been obtained, the attorney must request a second, more specific waiver, "if the [prospective] waiver letter insufficiently disclosed the nature of the conflict that subsequently arose between the parties." [*Visa*] at 1106.  This Morgan Lewis did not do.  In *Visa*, the court found that a second waiver was not required because the initial waiver signed by plaintiff First Data Corporation included specific disclosure of the law firm's concurrent representation of defendant Visa U.S.A., Inc., together with a clear warning that, because First Data and Visa were business competitors, the two concurrent client relationships might, in [the] future, give rise to conflict. . . .  These facts are in stark contrast to the generalized boilerplate waiver that Morgan, Lewis presented to Dr. Winchell.  By the standard that

---

[61] 350 F. Supp. 2d at 819 (*quoting Visa*, 241 F. Supp. 2d at 1104).

[62] *Id.* at 820 (citing *Visa* at 1105).

[63] *Id* at 820 (footnote omitted).

applies in this jurisdiction, Morgan, Lewis failed to obtain [the client's] informed consent . . . .[64]

Applying the *Concat* factors here it is clear that Latham did not obtain informed consent.

(1) "[T]he terms of the waiver are extremely broad and were evidently intended to cover almost any eventuality"—although here the waiver is misleading, as well, in that it appears not to apply to matters that are already in litigation but only to "future" matters and "new" litigation, (2) "its temporal scope is likewise unlimited"—at least into the future, (3) "the record contains no evidence of any discussion of the waiver," (4) "the waiver lacks specificity as to the conflicts that it covers and effectively awards [Latham] an almost blank check," (5) "however, [Latham] explicitly stated that it would not seek to represent [Oxbow] and an adverse party in a "substantially related" matter—here that is an additional problem, and (6) "[Oxbow has] … a high degree of sophistication."[65]

The factors above that led the court in *Concat* to find that there was no informed consent apply with equal force here.  At the time of its Engagement Letter with Oxbow Carbon & Minerals LLC, Latham had a longstanding attorney-client relationship with UP, but this was not disclosed.  Further, UP and Oxbow were already adverse in connection with the fuel surcharge price fixing matter.  Latham did not, as in *Visa,* identify its client UP or seek a waiver applying to UP.  In the boilerplate waiver it sought, it did not refer to pending litigation at all.  And, it certainly did not ask Oxbow to consent to Latham representing UP adversely to Oxbow in the fuel surcharge price fixing matter generally, or in the MDL specifically. Moreover, it is

---

[64] *Id*. at 821.

[65] *See Concat* at 820; *see also Interstate Props. v. Pyramid Co. of Utica*, 547 F. Supp. 178 (S.D.N.Y. 1982) (prospective waiver upheld where the specific adverse client and nature of the potential conflict was expressly disclosed ).

inconceivable that Latham would have expected that Oxbow would ever have given such a waiver, if it had been asked.

### 3.     DC Ethics Op. 309 is consistent with *Visa* and *Concat*

In the District of Columbia, the Bar has recognized, as in *Visa* and *Concat*, that "[a]dvance conflict waivers have been sustained where the **potential adverse party was known and identified**…" D.C. Bar Legal Ethics Comm. Op. No. 309 (2001) (emphasis added).  Here, the potential adverse party (Latham's existing client UP) was not "identified" to Oxbow, much less was there a discussion of Latham representing UP in connection with **existing** litigation where it was **already adverse** to Oxbow.  To the contrary, Latham did not disclose its existing attorney-client relationship with UP, it did not purport to seek a waiver applicable to already pending litigation generally, much less specifically litigation directly involving UP and Oxbow, and it did not purport to seek a waiver of any kind from its client Oxbow Calcining LLC.

Moreover, Latham had more than sufficient reason to know from its longstanding representation of Oxbow, there was *no possibility that Oxbow would ever have consented had Latham indicated its desire to represent UP in this pending litigation*.[66]  The point of requiring lawyers to obtain "a second, more specific waiver," *Concat,* 350 F. Supp. 2d at 819, when they know of an actual conflict, is to make sure that lawyers do not obtain in the abstract waivers they could not obtain in the particular.  To allow a boilerplate waiver as to "future matters" to apply, as to a pending matter, and obtain a result that Latham could not have obtained directly, would encourage lawyers to use their skills to trick a client into acting contrary to its own interests.  That is the opposite of the end the ethics rules exist to serve.

---

[66] *See* Clark Decl. ¶ 12.

For all these reasons, Latham cannot represent UP in the MDL, pursuant to Rule 1.7(b)(1).

### III.   LATHAM'S CONDUCT ALSO VIOLATES RULE 1.9 PROHIBITING THE REPRESENTATION OF ANOTHER PERSON IN A SUBSTANTIALLY RELATED MATTER

D.C. Rule 1.9 provides:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

California Rule 3-310(C) is to the same effect. Latham not only did not obtain the informed consent required, but expressly committed in the Engagement Letter, on which it otherwise purports to rely, that it would not represent an adverse party in a "substantially related matter."

"Matters are 'substantially related' for purposes of this rule if . . . there . . . is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Id.* cmt. 3; *see also Brown v. D.C. Bd. of Zoning Adjustment*, 486 A.2d 37, 48 (D.C. 1984) (en banc). "[K]nowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation."[67] "When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited."[68]

There is a substantial risk that confidential information obtained in Latham's representation of Oxbow relating to its coal mines would materially advance UP's position in

---

[67] D.C. Rule 1.9 cmt. 3.

[68] *Id.* cmt. 2.

antitrust litigation relating to the shipping rates for coal.  Here there is a substantial amount of

confidential information on Oxbow's equity structures, its debt structure, its business plans for

both coal and petroleum coke and financial details of each aspect of the foregoing that would be

critical and valuable information to UP.  "[I]t is reasonable to assume that confidential

information material to the present action would normally have been imparted to the attorneys in

the course of prior representation."  *Talon Research, LLC v. Toshiba Am. Elec. Components,*

*Inc.*, 11-CV-04819-WHA, 2012 U.S. Dist. LEXIS 23109, at *10-11 (N.D. Cal. Feb. 23, 2012)

(quotation omitted) (noting that "confidential information" is construed broadly to include

information "material to the evaluation, prosecution, settlement or accomplishment" of a matter

and may include "the identity of key decision makers, litigation philosophy, and organizational

structure of the former client").

Latham had access to the highest levels of Oxbow's management and was given all of the

key financial information concerning both the debt and, even more importantly, the equity

structure of the company.[69]  As discussed above, Latham's prior representation gave it

knowledge of Oxbow's confidential business information that is "relevant to the matter in

question" and therefore precludes Latham's representation of UP in this action.[70]  Specifically, a

number of matters on which Latham represented Oxbow gave it access to Oxbow's confidential

information on rail shipping involving UP, the very subject of the MDL Case and the Related

Case.[71]  Moreover, Latham was directly involved in growing Oxbow's business westward to

facilitate shipment of Oxbow's coal to Asia,[72] and now Latham seeks to represent UP, whose

---

[69] Clark Decl. ¶ 5.

[70] D.C. Rule 1.9 cmt. 3.

[71] Clark Decl. ¶¶ 4-6.

[72] Clark Decl. ¶ 6(h).

interest in charging supra-competitive prices is adverse to Oxbow's interests.[73]  Latham's

representation of UP in the MDL violates D.C. Rule 1.9.

## IV.     THE DISQUALIFICATION OF LATHAM IS NOT ONLY REQUIRED UNDER THE RULES, BUT IS FAIR UNDER THE CIRCUMSTANCES

Obviously, there is no unfair prejudice to Latham in ordering Latham to withdraw from

this new representation.  Latham knew of its relationship with Oxbow when it undertook the

subject representation of UP.  And, as outlined above, Latham's representation of Oxbow was

neither trivial nor short-lived.  Latham had handled 23 matters for Oxbow related entities.

Latham had been paid over $4.6 million for its work, and it had obtained access to the highest

levels of Oxbow's management and its confidential business information.  Latham had ongoing

work involving at least two Oxbow companies that were class members/moving parties in the

MDL and which were plaintiffs in the Related Case.

Nor does UP suffer unfair prejudice.  Presumably, UP also knew of Latham's relationship

with Oxbow when it hired Latham as its third set of counsel in the MDL, because Latham surely

disclosed it to UP before UP hired Latham.  Both Latham and UP certainly should have

appreciated that there was a risk of potential disqualification before they joined forces in the fuel

price fixing surcharge matter.

In any event, Oxbow cannot be said to be seeking disqualification to obtain some tactical

advantage.  UP has been well represented by two prominent firms, Covington & Burling and

Jones Day in the MDL for almost five years.  Disqualifying Latham would not leave UP without

counsel—its "most up to speed" counsel would remain in the case.

On the other hand, allowing UP to hire Oxbow's counsel, Latham, as UP's third set of

counsel, years into the MDL case and after Latham had access to high level confidential business

---

[73] *See id.* cmt. 3.

information about Oxbow, would not seem right even apart from all of the ethical prohibitions described above.

So in this case, not only is the relief that Oxbow seeks mandated by the rules, it is also dictated by principles of fairness.

## CONCLUSION

For the foregoing reasons, Oxbow respectfully requests that the Court grant its motion to disqualify Latham from representing UP in this action and award Oxbow its attorney fees and costs incurred in bringing the instant motion.

Dated:  February 12, 2013                    Respectfully submitted

                                             TROUTMAN SANDERS LLP

                                             ___/s/ John R. Gerstein_____
                                             John R. Gerstein, D.C. Bar No. 913228
                                             Merril Hirsh, D.C. Bar No. 366952
                                             901 9th Street, NW, Suite 1000
                                             Washington, DC 20004-2134
                                             Telephone:  (202) 274-2950

                                             Fletcher Paddison
                                             11682 El Camino Real, Suite 400
                                             San Diego, CA 92130-2092
                                             Telephone:  (858) 509-6007

*Attorneys for Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC;*
*Oxbow Calcining International LLC; Oxbow Midwest Calcining LLC;*
*Oxbow Calcining LLC; and Terror Creek LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, John R. Gerstein, an attorney, certify that on February 12, 2013, I caused true and correct copies of the foregoing Notice of Motion, Motion, Memorandum of Points and Authorities in Support of the Motion, and the Declaration of David Clark and exhibits attached thereto, to be filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsels of record.

/s/ John R. Gerstein