**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>_____<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |

**LATHAM & WATKINS LLP's OPPOSITION IN RESPONSE TO
OXBOW'S MOTION TO DISQUALIFY COUNSEL**

LATHAM & WATKINS LLP

Daniel M. Wall (*pro hac vice*)
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Tel:  (415) 395-8240
Fax:  (415) 395-8095
Email: Dan.Wall@lw.com

J. Scott Ballenger (DC Bar #465252)
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel:  (202) 637-2200
Fax:  (202) 637-2201
Email: Scott.Ballenger@lw.com

*Attorneys for Latham & Watkins LLP*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 5

ARGUMENT ....................................................................................................................... 9

 I. LEGAL STANDARD ............................................................................................ 9

 II. LATHAM IS NOT ADVERSE TO OXBOW IN EITHER THE CLASS
  ACTION OR THE RELATED CASE ................................................................. 11

  A. Oxbow's Status As An Unnamed Class Member Does Not Make It
   Adverse To UP In The Class Action ........................................................ 12

  B. Oxbow's Prosecution Of A Separate Antitrust Lawsuit Does Not
   Make It Adverse To UP In The Class Action .......................................... 19

  C. Oxbow's Collateral Motion For Access To The Record In The
   Class Action Is, At Most, A "Thrust Upon" Conflict That Is
   Excused Under D.C. Rule 1.7(d) And Does Not Warrant Latham's
   Disqualification From The Entire Class Action ....................................... 23

 III. LATHAM PERFORMED NO WORK FOR OXBOW THAT WAS
  RELATED TO THE CLASS ACTION, AND OBTAINED NO
  CONFIDENTIAL INFORMATION FROM OXBOW THAT IS
  RELEVANT TO THE CLASS ACTION ............................................................ 25

 IV. LATHAM HAS NO CONFLICT UNDER D.C. RULES
  1.7(B)(2) AND (3) ............................................................................................. 28

 V. EVEN IF THERE WERE A CONFLICT, OXBOW WAIVED IT ..................... 31

 VI. NEITHER THE LAW NOR CONSIDERATIONS OF "FAIRNESS"
  WOULD SUPPORT DISQUALIFYING LATHAM FROM THE CLASS
  ACTION ............................................................................................................. 39

CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Butler v. Fairbanks Capital*,
  Civ. A. No. 04-0367, 2005 U.S. Dist. LEXIS 44537 (D.D.C. 2005) ...................................... 18

*City of San Diego v. Haas*,
  207 Cal. App. 4th 472 (4th Dist. 2012) ...................................................................... 12

*Concat LP v. Unilever*,
  350 F. Supp. 2d 796 (N.D. Cal. 2004) ......................................................................... 38

*Dean v. Kraft Foods N. Am., Inc.*,
  Civ. A. No. 02-8609, 2004 U.S. Dist. LEXIS 5491 (E.D. Pa. Mar. 26, 2004) ........................ 12

*Edwards v. First Am. Corp.*,
  No. CV 07-03796, 2012 U.S. Dist. LEXIS 174957 (C.D. Cal. Nov. 30, 2012)........................ 12

*Fremont Indemnity Co. v. Fremont Gen. Corp.*,
  143 Cal. App. 4th 50 (2d Dist. 2006) ......................................................................... 22

*Griva v. Davison*,
  637 A.2d 830 (D.C. 1994) ....................................................................................... 13

*Iacangelo v. Georgetown Univ.*,
  710 F. Supp. 2d 83 (D.D.C. 2010).............................................................................. 20

*In re Fine Paper Antitrust Litig.*,
  617 F.2d 22 (3d Cir. 1980) ...................................................................................... 12

*In re Glassine and Greaseproof Paper Antitrust Litig.*,
  88 F.R.D. 302 (E.D. Pa. 1980) ................................................................................. 12

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  No. 09 C 7666, MDL No. 2109, 2010 U.S. Dist. LEXIS 34882 (N.D. Ill. Apr. 7, 2010) .. 12, 18

*Koller v. Richardson-Merrill, Inc.*,
  737 F.2d 1038 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424 (1984)....... 10, 25, 39

*Konarski v. Donovan*,
  763 F. Supp. 2d 128 (D.D.C. 2011)............................................................................. 9

*Laker Airways, Ltd. v. Pan American World Airways*,
  103 F.R.D. 22 (D.D.C. 1984) ................................................................................. 9, 10

*Lewis v. NFL*,
  146 F.R.D. 5 (D.D.C. 1992) ............................................................................. 16, 17, 18

*Little Rock School Dist. v. Borden, Inc.*, Nos. LR-76-C-41, LR-C-77-108, LR-C-77-126,
  1979 WL 1626 (E.D. Ark. Mar. 28, 1979) .................................................................. 12

*Paul v. Judicial Watch, Inc.*,
    571 F. Supp. 2d 17 (D.D.C. 2008) ........................................................................ 10

*\*Sharp v. Next Entm't, Inc.*,
    163 Cal. App. 4th 410 (2d Dist. 2008) ........................................................ 12, 13, 14

*Steinbuch v. Cutler*,
    463 F. Supp. 2d 4 (D.D.C. 2006) ........................................................................ 10

*\*Sumitomo Corp. v. JP Morgan Chase Co.*,
    No. 99 Civ. 8780, 99 Civ. 4004, 2000 U.S. Dist. LEXIS 1252
    (S.D.N.Y. Feb. 8, 2000) .......................................................................... 20, 21, 22

*\*Tauriac v. Rosas*,
    No. Civ. 2:10-417, 2011 U.S. Dist. LEXIS 72715 (E.D. Cal. July 6, 2011) ...................... 12, 13

*Truck Ins. Exch.v. Fireman's Fund Ins. Co.*,
    6 Cal. App. 4th 1050 (1st Dist. 1992) .................................................................. 24

*United States v. Philip Morris, Inc.*,
    312 F. Supp. 2d 27 (D.D.C. 2004) ........................................................................ 10

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .......................................................................... 17

## RULES

ABA Model Rules of Prof'l Conduct R. 1.7 cmt. 24 ...................................................... 22

*ABA Model Rules of Prof'l Conduct R. 1.7 cmt. 25 ................................................ 1, 12, 13

Cal. Rules of Prof'l Conduct R. 3-310 ...................................................... 13, 22, 38

D.C. Rules of Prof'l Conduct R. 1.0(e) .................................................................. 36

D.C. Rules of Prof'l Conduct R. 1.6 ...................................................................... 27

D.C. Rules of Prof'l Conduct R. 1.7(a) ............................................................ 13, 20

*D.C. Rules of Prof'l Conduct R. 1.7(b)(1) ...................................................... 11, 19, 20

*D.C. Rules of Prof'l Conduct R. 1.7(b)(2) .............................................................. 28

*D.C. Rules of Prof'l Conduct R. 1.7(b)(3) .............................................................. 28

*D.C. Rules of Prof'l Conduct R. 1.7(d) ............................................................ 23, 24

D.C. Rules of Prof'l Conduct R. 1.7 cmt. 7 ............................................................ 29

D.C. Rules of Prof'l Conduct R. 1.7 cmt. 8 ............................................................ 29

*D.C. Rules of Prof'l Conduct R. 1.7 cmt. 13 .................................................... 22, 28, 30

D.C. Rules of Prof'l Conduct R. 1.7 cmt. 31 ............................................................ 36

D.C. Rules of Prof'l Conduct R. 1.9 cmt. 3 .................................................................. 27

D.C. Rules of Prof'l Conduct R. 8.5(b)(1)..................................................................... 11

Fed. R. Civ. P. 23(a)(4).......................................................................................... 15, 17

## TREATISES

1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 10.9 (3d ed.
    2000 & 2012 Supp.) ............................................................................................. 37

1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 13.5 (3d ed.
    2000)...................................................................................................................... 25

1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 17.9 (3d ed.
    2000 & 2012 Supp.) ............................................................................................. 33

Restatement (Third) of the Law Governing Lawyers §121 cmt. c(iii) (2000)............................ 22

Restatement (Third) of the Law Governing Lawyers §122 cmt. d. (2000) ................................ 37

Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on
    Professional Responsibility §1.7-3(e) (2012-2013 ed.)...............................................25

Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on
    Professional Responsibility §1.7-5 (2012-2013 ed.) ..................................................24

Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on
    Professional Responsibility §1.7-6(o)(4) (2012-2013 ed.).........................................21

## OTHER AUTHORITIES

ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 05-436 (2005) ............................ 37

Cal. State Bar Standing Committee on Prof'l Responsibility and Conduct,
    Formal Op. 1989-108 ....................................................................................... 21, 22

D.C. Bar Legal Ethics Comm., Op. 217 (1991)........................................................... 20

*D.C. Bar Legal Ethics Comm., Op. 265 (1996)...................................... 13, 14, 30, 31

D.C. Bar Legal Ethics Comm., Op. 272 (1997)........................................................... 25

*D.C. Bar Legal Ethics Comm., Op. 309 (2001)........................................... 36, 37, 38

D.C. Bar Legal Ethics Comm., Op. 343 (2008)........................................................... 25

D.C. Bar Legal Ethics Comm., Op. 356 (2010)........................................................... 11

Richard W. Painter, Advance Waiver of Conflicts, 13 Geo. J. Legal Ethics (2000).................... 38

iv

## INTRODUCTION

No law firm wants an unhappy client or former client—much less one that accuses the firm of having a conflict of interest.  But we are confident that any measured view of the facts will confirm that Latham & Watkins LLP ("Latham") acted completely appropriately and consistent with its obligation to all its clients by representing Union Pacific Railroad Company ("UP") in this case.  The motion filed by various Oxbow entities (collectively, "Oxbow") to disqualify Latham from representing UP in the fuel surcharge class action (the "Class Action") is meritless and should be denied.

Latham has for many years represented UP in a variety of matters, and currently represents UP in the Class Action (both in this Court, and in connection with the D.C. Circuit proceedings pursuant to Rule 23(f)).  Insofar as rail fuel surcharges are concerned, Latham represents UP only in the Class Action.  Latham does not represent UP, or any other party, in Oxbow's separate case against UP and BNSF alleging monopolization and conspiracy.  This is not accidental; Latham honored its relationship with Oxbow by declining to represent UP in that individual action, just as Latham—and we presume every law firm defending the Class Action— would in the future decline to defend an opt-out case brought by a firm client, absent a waiver.

That is how the conflict system works in class actions: the parties to a putative class action lawsuit, for conflicts purposes, are *only* the named plaintiffs and the named defendants. *See* American Bar Association Model Rules of Prof'l Conduct R. 1.7 cmt. 25 ("a lawyer seeking to represent an opponent in a class action typically does not need the consent of an unnamed member of the class whom the lawyer represents in an unrelated matter") ("ABA Model Rule 1.7").  To defend a class action, a law firm thus clears conflicts against the named class representatives.  It has to be this way.  Otherwise, it would be practically impossible for large law firms—the kind that typically defend antitrust class actions—to clear conflicts, and thus for

1

defendants to obtain qualified counsel.  This case is a perfect illustration.  *Every* law firm representing the railroads in the Class Action would have to be disqualified, because they surely all have some client among the 30,000 or so unnamed class members, thousands of which are the large corporations that firms like these represent.  Oxbow's motion ignores this settled and commonsense rule.

Oxbow also argues as if it is and will be a class member notwithstanding that it filed its own case against UP and BNSF that it obviously intends to pursue instead (despite a recent setback).  Oxbow's theoretical status as a class member is no more than a temporary illusion and has no legal significance.  On account of *res judicata* principles, Oxbow cannot remain in the Class Action and pursue its separate action.  It must make a choice.  And it has, already opting-out in substance by exercising the right every affected party has to file an individual action on its own timetable, up to or *before* the moment that it is legally required to opt-out.

Furthermore, upon exercising its right to proceed alone, Oxbow did not just copy the four-railroad conspiracy claim focused on public carload fuel surcharges that constitutes the Class Action.  Rather, Oxbow brought a case tailored to its own business and thus focused on "the production, marketing, sale, and shipment of coal and petroleum coke." *Oxbow Carbon & Minerals, LLC v. Union Pac. R.R. Co.*, No. 1:11-cv-01049-PLF ("Related Case"), ECF No. 50, at 2 (opinion granting motions to dismiss).  It sued UP and BNSF only and advanced a monopolization claim against UP.  To be sure, the case is about fuel surcharges and the conspiracy claim is (to a degree) patterned on the Class Action, but it is still just a fiction for Oxbow to pretend that it is just another class member—or that its separate case is somehow the "same matter" as the Class Action.  Oxbow has gone off in its own direction, presumably optimizing its litigation strategy for its unique business interests.

Oxbow's own motion for access to discovery does not make them a party in the Class Action either.  Moreover, neither an absent class member nor any other third party can disqualify a law firm representing a party in a case by virtue of a discovery dispute, let alone one they initiate.  Such disputes are commonplace, and they are routinely dealt with by having the potentially conflicted firm step aside and letting another firm, without a conflict, deal with that discrete dispute.  Here, Latham did not advise UP about that motion or the defendants' response.  It was handled entirely by other law firms, namely Jones Day and Covington & Burling.

Eventually Oxbow gets to the only issue that matters: whether Latham would have learned confidential information from Oxbow in other matters that would confer a material litigation advantage on UP in the Class Action.  But Oxbow's argument on that crucial issue is essentially makeweight.  Oxbow's motion conspicuously and completely fails to allege *anything* that could present an ethics issue under the confidential information standard.

Oxbow's own motion and declarant make clear that Latham's prior work for Oxbow involved advising Oxbow about its internal capital structure, debt and equity financings, an employee benefits plan, an environmental permitting matter, an insurance coverage matter, and a litigation matter involving shipments to Asia—none of which had *anything* to do with rail fuel surcharges, rail pricing, or the relationship between Oxbow and the freight railroads.  Oxbow thus resorts to generalized arguments that Latham had access to its senior management and general business plans, but every lawyer who represents a client in a serious matter obtains that sort of access and information.  Lawyers are not disqualified because they know people who possess confidential information that the lawyers never obtained.

The closest Oxbow comes to identifying confidential information pertinent to the Class Action is that Latham lawyers had access to Oxbow's business projections about future shipping

volumes by rail to the Port of Long Beach, when seeking an emissions permit for Oxbow's

operations at that facility.  That Oxbow has to reach that far speaks volumes.  The Class Action

is about whether shippers overpaid for rail shipping on specific past shipments that actually

happened.  Nothing whatsoever turns on how many of the affected shipments went to the Port of

Long Beach, nor on what Oxbow's rail shipping *projections* were (generally or in Long Beach).

Likewise, the more substantial confidential information Latham possesses concerns how Oxbow

was internally organized or financed, and that too is completely irrelevant and has no value to

UP in the antitrust litigation.

Even if there were a conflicts issue here (there is not), Oxbow waived it.  In an

engagement letter signed nine months before Latham first became involved in the surcharge

class action, Oxbow freely and voluntarily "consent[ed] in advance to [Latham's] acceptance of

future matters (including litigation matters) adverse to Oxbow, provided that those matters are

not substantially related to the work that [Latham] ha[s] done for [Oxbow]."  Oxbow claims that

does not matter because its subsidiary Oxbow Calcining LLC was not a party to the Engagement

Letter, but that is form over substance.  The Letter plainly states that it "*is intended to also cover

the several ongoing matters* . . . for which Oxbow has engaged [Latham], as well as future work

for which we would be retained."  Clark Decl. Ex. A, Engagement Letter at 1 n.1 (emphasis

added) ("Engagement Letter").  Among the identified "ongoing matters" were "debt financing

matters," which is a direct reference to the only work that Oxbow claims Latham ever did for

Oxbow Calcining LLC.  It would make no sense to say, and the parties did not intend to say, "we

agree to a broad waiver, encompassing the entire relationship including the debt financing

matters involving Oxbow Calcining LLC, but Oxbow Calcining LLC is not covered."  Oxbow is

an extremely sophisticated company, and neither *post hoc* efforts to nullify its waiver nor its various suggestions that it did not give "informed" consent to the waiver are tenable.

The D.C. Circuit has made clear that disqualifying a party's chosen counsel is an extreme and disfavored remedy, generally reserved for situations in which the court either seriously doubts the lawyer's ability to zealously represent the client, or believes that the lawyer has received confidential information that would give the client a materially unfair advantage in the case. That standard is not met here. Latham stayed out of Oxbow's case. Latham never had confidential information from Oxbow that would be pertinent here in the Class Action, and Oxbow ended Latham's access to confidential information (on any subject) by terminating its relationship with Latham. This motion is just a parting shot to punish Latham for perceived disloyalty to Oxbow's business interests, in circumstances that do not present a genuine ethics conflict and where Oxbow has waived any conflict that might exist. While UP certainly has able representation from other firms, it has chosen Latham to be lead trial counsel and Latham has been preparing in that capacity for months. This is one of the largest antitrust cases of all time, and trial approaches. It would be very difficult for UP to replace Latham at this juncture, and it would be unfair to ask UP to do so.

## FACTUAL BACKGROUND

The facts pertinent to this motion are straightforward and, we believe, not genuinely disputed in any material respect.

Latham has represented UP since 1997 in at least 32 separate matters, many of which were very public and prominent—such as three cases in the Supreme Court of the United States since 2009. Ballenger Decl. ¶2. Latham first became involved in the Class Action in early July 2012, when UP asked a member of Latham's Supreme Court and Appellate Practice to comment on a draft Rule 23(f) petition seeking interlocutory appellate review of this Court's class

certification decision.  *Id.* ¶3.  Prior to that time Latham was not involved and had no plans or

intention to become involved in the Class Action.  *Id.*  Relying on the rule that only the named

plaintiffs and named defendants are parties to a class action for ethical adversity purposes,

Latham searched for potential conflicts involving the named plaintiffs and named defendants in

the Class Action on July 2, 2012.  *Id.*  There were none.  *Id.*

Over the course of July and August 2012, Latham lawyers advised UP about the class

certification appeal and also began getting up to speed on the broader issues and strategy in the

Class Action.  *Id.* ¶4.  UP then asked Daniel Wall of Latham to be lead trial counsel for the Class

Action.  *Id.* ¶5; Wall Decl. ¶7.  Shortly thereafter, UP asked Wall and Latham to represent it in

the separate case Oxbow had filed against UP and BNSF (the "Related Case").  Wall Decl. ¶8.

Latham declined the engagement, notwithstanding an applicable waiver, because it did not want

to be adverse to a valued client.  *Id.*  UP therefore continued to defend that unique case with its

existing counsel from Jones Day and Covington & Burling.  Ballenger Decl. ¶7; Meyer Decl.

¶¶5-6.  Latham did not participate in the briefing or argument on the motion to dismiss the

Oxbow complaint that the Court recently granted with leave to amend.  And Latham has not

advised UP about Oxbow's separate case.  Wall Decl. ¶8; Ballenger Decl. ¶7; Meyer Decl. ¶¶5-

6.  Similarly, Latham did not advise UP concerning Oxbow's July 31, 2012 motion to unseal

records in the Class Action, or participate in any way in UP's opposition filed on August 8, 2012.

Ballenger Decl. ¶6; Meyer Decl. ¶7.

In its disqualification motion, Oxbow portrays itself as an absent class member.  But

Oxbow has made very clear that it intends to pursue the Related Case vigorously—by, for

example, successfully opposing a motion to "coordinate" that case with the Class Action, *see*

Related Case, ECF No. 29 and ECF No. 43, and by seeking access to discovery exchanged in the

Class Action in order to prepare for discovery in the Related Case, *see* Class Action, ECF No. 554.  Oxbow has not yet had the opportunity to opt out because this Court has stayed the class notice and opt out process in light of the pending D.C. Circuit appeal.  *See* Class Action, ECF Nos. 617, 618.  But Oxbow filed its Related Case several years after the Class Action and with full knowledge of the pending Class Action.  *See* Related Case, ECF No. 1 (Complaint).

Oxbow was also a valued client of Latham until recently, when Oxbow terminated that relationship on all pending matters.  Clark Decl. ¶15; Wyman Decl. ¶3.[1]  As Oxbow's declarant confirms, Latham's work for Oxbow was overwhelmingly transactional in nature, focusing on Oxbow's capital structure.  For example, Latham helped draft the LLC agreement for the parent company, Oxbow Carbon LLC, and helped Oxbow obtain debt financing for its operations. Clark Decl. ¶¶6(a)-(e); *see also* Sheridan Decl. ¶5; Van Driesen Decl. ¶¶5(a)-(e).  Latham also advised on an environmental permitting matter involving coal and petroleum coke exports from the Port of Long Beach, the structuring of an employee benefit plan for Oxbow Carbon LLC, an internal investigation, and a litigation matter related to shipping to Asia.  *Id.* ¶¶6(f)-(i); *see also* Wyman Decl. ¶¶5-6; Della Rocca Decl. ¶¶3, 5; Schindler Decl. ¶3; Barrett Decl. ¶3.

Oxbow contends that this work gave Latham access to "the highest executive levels of Oxbow management" and to "confidential business plans" including business projections.  Clark Decl. ¶5.  But Oxbow identifies *no* work that Latham ever performed for Oxbow—and no confidential information that Latham ever received from Oxbow—that had anything to do with rail fuel surcharges, rail pricing, or Oxbow's relationship with UP or any other freight railroad. Latham performed no such work and received no such information from Oxbow.  Barrett Decl.

---

[1]  Oxbow's declarant suggests that Oxbow terminated Latham in all matters "but one."  Clark Decl. ¶15.  We do not understand the reference, and believe that our attorney-client relationship with Oxbow has been completely terminated.

¶¶5-7; Della Rocca Decl. ¶¶6-8; Schindler Decl. ¶¶6-8; Sheridan Decl. ¶¶7-9; Van Driesen

Decl. ¶¶7-10; Wyman Decl. ¶¶11-12.  The closest that Oxbow comes to alleging that Latham

received information pertinent to the Class Action is its claim that Latham "obtained detailed

confidential information on projected coal and coke tonnages and rail shipments" through the

Port of Long Beach, in connection with an environmental permitting matter.  Clark Decl. ¶6(f).

That information about projected shipping volumes was pertinent to the emissions permit Oxbow

sought, since under environmental regulations the price of an emission permit depends (in part)

on shipment volumes through the port.  The purported confidential information did not include

any information about fuel surcharges, rail pricing, or Oxbow's negotiations with UP.  Wyman

Decl. ¶¶5, 11.

    Like most large law firms, Latham frequently asks clients to waive certain future

conflicts.  The engagement agreement between Oxbow and Latham signed October 5-6, 2011

(the Engagement Letter) provides for a broad advance waiver of any future conflict of interest,

including in litigation matters.  It states that Latham will not represent any other party in a matter

"substantially related" to any matter that Latham handles for Oxbow, but that Oxbow "consent[s]

in advance to [Latham's] acceptance of future matters (including litigation matters) adverse to

Oxbow, provided that those matters are not substantially related to the work that we have done

for you."  Engagement Letter at 3.  The Engagement Letter was signed by Oxbow's declarant

David Clark on behalf of the parent company, Oxbow Carbon LLC.  *Id.* at 7.

    Oxbow now quarrels with which Oxbow entities are covered by the waiver, arguing that

one—Oxbow Calcining LLC—is exempt from it.  Latham and Oxbow may dispute which

Oxbow entities Latham has historically performed work for, and particularly whether Latham

8

ever had a distinct attorney-client relationship with Oxbow Calcining LLC,[2] but any such dispute is not significant here.  The Engagement Letter containing the advance waiver states that it is intended to cover "the several pending matters … for which Oxbow has engaged [Latham]," specifically including "continuing assistance concerning debt financing matters," as well as any additional services requested by Oxbow going forward.  Engagement Letter 1 & n. 1.  If Latham had any connection to Oxbow Calcining LLC, it was—according to Oxbow—on account of one or more of these debt financing matters.  Clark Decl. ¶¶6(b), 14; Van Driesen Decl. ¶5(e); Sheridan Decl. ¶11.  So the waiver plainly extends to that entity.  (Of course, if Latham never worked for Oxbow Calcining LLC, a waiver from that entity is unnecessary.)

## ARGUMENT

### I.   LEGAL STANDARD

Disqualification of counsel is a "drastic measure that is disfavored by the courts." *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135-36 (D.D.C. 2011) (internal quotation marks and citations omitted).  Accordingly, "disqualification motions [are] subject to particularly strict judicial scrutiny."  *Id.* at 136 (internal quotation marks and citations omitted).  Such heightened scrutiny is applied for good reason.  "A litigant has a right to freely chosen, competent counsel." *Laker Airways, Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 27 (D.D.C. 1984).  Courts in this jurisdiction have also recognized that disqualification motions must be viewed with

---

[2]   Oxbow appears to contend that Latham represented all of the Oxbow affiliates by virtue of advising on various debt and equity instruments governing their internal relationships and relationships with outside investors and creditors.  *See generally* Clark Decl. ¶¶4-6.  Latham lawyers believe that although their work touched on issues involving other entities, that work was consistently performed for and directed by the same small group of persons who were employees or officers of the parent company, Oxbow Carbon LLC, or the affiliates Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC.  *See* Barrett Decl. ¶3; Della Rocca Decl. ¶4; Schindler Decl. ¶4; Sheridan Decl. ¶4; Van Driesen Decl. ¶4; Wyman Decl. ¶4.  Oxbow's declarant confirms that those are the only three Oxbow entities that ever received or paid a bill from Latham.  Clark Decl. ¶3.

"cautious scrutiny" given the unfortunate reality "that some motions for disqualification are

motivated not by a fine sense of ethics and a well-developed desire to remove from litigation

practitioners whose ethics are less acute, but, bluntly, by a desire to achieve a tactical

advantage." *Id.* at 28, 41; *see id.* at 28 (observing that disqualification motions "have become

increasingly popular tools of the litigation process" used for "purely strategic purposes" (internal

quotation marks and citation omitted)).

The D.C. Circuit has cautioned that disqualification of counsel "is warranted only rarely

in cases where there is neither a serious question as to counsel's ability to act as a zealous and

effective advocate for the client, nor a substantial possibility of an unfair advantage to the current

client because of counsel's prior representation of the opposing party." *Koller v. Richardson-

Merrill, Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424

(1984). Indeed, as Judge Facciola observed, "any motion to disqualify counsel faces the

extraordinarily high burden articulated by the Court of Appeals in [*Koller*]." *Steinbuch v. Cutler*,

463 F. Supp. 2d 4, 7 (D.D.C. 2006); *see id.* at 7-8 (explaining that in "*Koller*, the court held that

disqualification may be ordered only when the conduct is in violation of the rules of professional

conduct to the point of undermining the court's confidence in the vigor of counsel's

representation of her client or where the attorney is in a position to use confidential information

concerning her client's opponent gained from a prior representation").

When deciding a motion to disqualify, this Court looks to the D.C. Rules of Professional

Conduct. *See Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17, 20 (D.D.C. 2008) ("The District

of Columbia Rules of Professional Conduct govern the practice of law in this District."); *United

States v. Philip Morris, Inc.*, 312 F. Supp. 2d 27, 38 (D.D.C. 2004) ("The District of Columbia

Rules of Professional Conduct have been adopted by this Court and are applicable to all lawyers

who handle litigation in this District."); LCvR 83.15; D.C. Rules of Prof'l Conduct R. 8.5(b)(1)

("For conduct in connection with a matter pending before a tribunal, the [ethical] rules to be

applied shall be the rules of the jurisdiction in which the tribunal sits, unless the rules of the

tribunal provide otherwise.").  The discussion that follows therefore focuses on the D.C. Rules—

although, as noted throughout, California generally follows the same principles.

## II.   LATHAM IS NOT ADVERSE TO OXBOW IN EITHER THE CLASS ACTION OR THE RELATED CASE

Oxbow's principal contention is that Latham's representation of UP in the Class Action

violates D.C. Rule 1.7(b)(1), which provides that, absent consent, "a lawyer shall not represent a

client with respect to a matter if" that "matter involves a specific party or parties and a position

to be taken by that client in that matter is adverse to a position taken or to be taken by another

client in the *same matter* even though that client is unrepresented or represented by a different

lawyer." D.C. Rules of Prof'l Conduct R. 1.7 (b)(1) (emphasis added).  In short, D.C. Rule

1.7(b)(1) prohibits attorneys (absent consent) from representing a client when that representation

would be adverse to a position taken by another client in the "same matter."  *See* D.C. Bar Legal

Ethics Comm., Op. 356 (2010) (noting that this provision "aims to safeguard the duty of loyalty

to one's client").

D.C. Rule 1.7(b)(1) has no application here because Latham is not representing any client

adverse to Oxbow in the same matter.  Latham represents UP in the Class Action, where Oxbow

is not a party.  Oxbow is adverse to UP in the Related Case, but Latham does not represent UP

(or anyone else) in that case.  Ballenger Decl. ¶7; Meyer Decl. ¶¶5-6.  Oxbow tries to create

adversity between Latham and Oxbow in three ways, none of which has any merit.

### A.  Oxbow's Status As An Unnamed Class Member Does Not Make It Adverse To UP In The Class Action

Oxbow first argues that its purported membership in the class makes it adverse to UP in the Class Action.  That argument rests on a fatally mistaken premise.  As is clear from the case law—and confirmed in the attached declaration of Professor Geoffrey Hazard, one of the nation's foremost experts on legal ethics—the only parties in a putative class action for conflicts purposes are the named plaintiffs and named defendants.  *See* Hazard Decl. ¶¶5(b)-(d).

The precedent is nearly unanimous on that point nationwide.  *See, e.g.*, *City of San Diego v. Haas*, 207 Cal. App. 4th 472, 502 (4th Dist. 2012) ("unnamed class members are not considered . . . for purposes of applying the professional rule that restricts representation when there are concurrent conflicts of interest"); *Edwards v. First Am. Corp.*, No. CV 07-03796, 2012 U.S. Dist. LEXIS 174957, at *16-17 (C.D. Cal. Nov. 30, 2012) (same); *Tauriac v. Rosas*, No. Civ. 2:10-417, 2011 U.S. Dist. LEXIS 72715, at *8-9 (E.D. Cal. July 6, 2011) (same); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, MDL No. 2109, 2010 U.S. Dist. LEXIS 34882, at *9-13, *18 (N.D. Ill. Apr. 7, 2010) (relying on "the legal precedent and ethical commentary" that "find[s] that absent class members do not create conflicts"); *Sharp v. Next Entm't, Inc.*, 163 Cal. App. 4th 410, 432-34 (2d Dist. 2008); *Dean v. Kraft Foods N. Am., Inc.*, Civ. A. No. 02-8609, 2004 U.S. Dist. LEXIS 5491 (E.D. Pa. Mar. 26, 2004); *In re Fine Paper Antitrust Litig.*, 617 F.2d 22 (3d Cir. 1980); *In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 305-06 (E.D. Pa. 1980); *Little Rock School Dist. v. Borden, Inc.*, Nos. LR-76-C-41, LR-C-77-108, LR-C-77-126, 1979 WL 1626, at *1 (E.D. Ark. Mar. 28, 1979). In 2002, and consistent with this extensive precedent, the American Bar Association ("ABA") added a comment to its Model Rule 1.7 specifically addressing the precise situation at issue here. Comment 25 provides that "a lawyer seeking to represent an opponent in a class action does not

typically need the consent of an unnamed member of the class whom the lawyer represents in an

unrelated matter."  ABA Model Rule 1.7 cmt. 25.

Although the "format" of D.C. Rule 1.7 differs from that of ABA Model Rule 1.7, *see*

D.C. Bar Legal Ethics Comm., Op. 265 (1996), there is no reason to believe that the D.C. rules

reach a different conclusion on this point.[3]  As the Court of Appeals has explained, the "principal

purpose" of the changes made to the D.C. version of Rule 1.7 "was to state more clearly and

unequivocally than ABA Model Rule 1.7 that there are circumstances in which representation is

absolutely forbidden."  *Griva v. Davison*, 637 A.2d 830, 843 (D.C. 1994).[4]  That concern is

reflected in the D.C. Rule's clear distinction between unwaivable conflicts, governed by D.C.

Rule 1.7(a), and waivable conflicts, governed by D.C. Rule 1.7(b).[5]  It has nothing to do with the

unique concerns and case law underlying the issue now before this Court and addressed by

Comment 25 to the Model Rules, which should be treated as fully persuasive authority.  *See* D.C.

Bar Legal Ethics Comm., Op. 265 ("Despite th[e] facial differences, the drafters of the District of

Columbia's Rule 1.7 were at some pains to point out that, although they took a different drafting

approach than did the ABA, they did not believe that the different form of words they used

would lead to significantly different results in actual cases from the results that would be

---

[3]    California courts have already explicitly followed Comment 25 in a number of cases applying California's ethics rules.  *See, e.g.*, *Sharp*, 163 Cal. App. 4th at 433-34; *Tauriac*, 2011 U.S. Dist. LEXIS 72715, at *8-9.  Thus, contrary to Oxbow's suggestion, Latham's representation of UP in the Class Action does not violate California Rule of Professional Conduct 3-310(C).  Indeed, none of the cases cited by Oxbow involve the issue of absent class members.  *See* Memorandum of Points and Authorities in Support of Oxbow's Motion to Disqualify Counsel ("Oxbow Mem.") 16-17.

[4]    *See also* D.C. Bar Legal Ethics Comm., Op. 265 ("The drafters of the District of Columbia conflicts rule found the . . . ABA Model Rule could be read to mean that all conflicts were potentially waivable.  The design of the District of Columbia version was intended in part to emphasize that some conflicts are intolerable, even if full disclosure is made and even if client consent is obtained.")

[5]    There is no contention that D.C. Rule 1.7(a), which states "[a] lawyer shall not advance two or more adverse positions in the same matter," is relevant to the present motion.

achieved under the ABA's model rule."); *id.* ("Inasmuch as the District of Columbia rule and the ABA model rule are intended to achieve the same results, albeit through different drafting approaches, the ABA's [interpretations of its model rules] is persuasive in helping us" interpret D.C. Rule 1.7.).

Comment 25, and the authority underlying it, simply have to be the law because any other rule would be unmanageably burdensome and unworkable.  It often is impossible to determine at the outset of a class action who all of the potential plaintiffs embraced by the class definition *are*, and the rules permit notice to the class by publication rather than individually. *See, e.g., Sharp*, 163 Cal. App. 4th at 432-34 (obtaining consent from unnamed class members is "impractical").  If all potential class members were parties for conflicts purposes it would be impossible for any lawyer to determine whether he or she could take the case.  Latham could and did search its conflicts system for potential conflicts involving the named parties to the Class Action, but there is no way to check for every client that might have shipped goods by rail under a contract with a fuel surcharge provision first signed after July 1, 2003.

Furthermore, in big class actions like this one it is a virtual certainty that every major law firm in the country will have *some* client that meets the class definition.  That is particularly true of federal class actions under the antitrust laws, which in most circumstances can only be brought by the "direct purchasers" of the relevant product.  More often than not, those tend to be corporate purchasers buying inputs into the products they make and sell.  Thus the putative classes in a case involving the price fixing of semiconductors may include PC makers like Hewlett-Packard, Dell, or Apple.  Wall Decl. ¶5.  The putative class in an automotive parts case may include Ford, GM, Chrysler, etc.  The class here is a perfect example as it contains at least 30,000 shippers, including most companies in America that manufacture or ship anything heavy.

Treating the entire class as parties for conflicts purposes surely would require the disqualification of *every* law firm representing the railroad defendants in this case.  It is inconceivable that firms such as Skadden Arps, Crowell & Moring, Gibson, Dunn & Crutcher, Jones Day, Covington & Burling, or Latham & Watkins will not have at least one client in the class.

The rule Oxbow advocates for would be just as problematic for counsel for a plaintiff class.  Of course class counsel have ethical responsibilities to the class members, and potential conflicts issues are relevant to the adequacy determination under Rule 23(a)(4).  But treating every unnamed class member as a full-fledged client, for conflicts purposes, would make it impossible for class counsel to take on any other work.  Before class counsel could undertake *any other representation* it would have to determine whether any class members would be adverse in the new action.  A lawyer that has represented a class in a consumer class action about airline overpricing could not represent a new client in a traffic accident case without determining, somehow, whether the defendant had bought an airline ticket in the class period.

The reality is that the world does not work this way.  The normal practice in antitrust class actions is to follow the rule as stated in Comment 25 to the Model Rules and clear conflicts against the named class representatives.  Wall Decl. ¶3.  Individual actions, whether filed before or at the opt-out deadline, are treated as separate cases.  Very often, a firm representing a defendant in a class action is unable to represent that client in an opt-out case—just as Latham chose not to represent UP in the separate Oxbow action.  Very often, a firm representing a defendant in a class action is unable to represent that client in a discovery dispute with another firm client, in which case a different firm without the conflict handles the dispute.  But so long as the discrete ethical issues presented by individual actions and disputes with third parties are

honored, the firm can defend the class action notwithstanding that absent class members are clients.

Oxbow does not acknowledge the absurdities inherent in its position or the nearly uniform contrary authority, and relies solely on *Lewis v. NFL*, 146 F.R.D. 5 (D.D.C. 1992).  The *Lewis* case is not a disqualification decision.  The litigation involved antitrust claims made by two NFL players, on behalf of a class of 250 NFL players, against the NFL and its teams.  The named plaintiffs were represented by Weil, Gotshal & Manges ("Weil"), which also represented the NFL Players Association ("NFLPA") in a separate breach of contract suit against approximately 20 players, all of whom were also unnamed plaintiffs in the class action.  The NFL argued that the class in *Lewis* should not be certified because Weil would not properly safeguard the interests of those 20 unnamed plaintiffs and thus was not adequate class counsel. In response, Weil offered "to amend their class certification request to exclude" the 20 unnamed plaintiffs at issue in the separate breach of contract action.  *Id.* at 11.  The court agreed with the NFL, found Weil inadequate, and declined to certify the class.  *Id.* at 11-12.

The court gave three reasons for its decision, though it devoted more attention to the latter two.  First, the court concluded, in a single paragraph devoid of any case citation, that "Weil should not assume the representation for the plaintiff class" because its representation of the NFLPA in the breach of contract action was "directly adverse" to 20 unnamed class members.  *Id.* at 11.  Presumably believing that unnamed plaintiffs should be considered current clients of class counsel under the D.C. Rules of Professional Conduct, the court observed that Weil's service as class counsel would violate D.C. Rule 1.7(b)(1).  *Id.*

Second, the court explained that it was "deeply troubled" by Weil's suggestion that it could avoid any potential ethical dilemma by dropping those 20 unnamed plaintiffs from the

proposed class.  *Id.*  The court lamented that Weil had, "quite simply, offered to betray almost

ten percent of the plaintiff class" and stated that "[s]uch behavior clearly demonstrate[d] that

counsel's loyalty truly lies with the NLFPA, not with [the players]."  *Id.*; *see id.* at 12 ("counsel's

offer to abandon twenty class members is an explicit demonstration of a lack of the necessary

loyalty").

    Third, the court observed that Weil's service as class counsel would make it privy to

"confidential information" about the unnamed class members that could, in turn, "be used to the

players' detriment in the [separate] breach of contract action."  *Id.* at 11.  Noting that such a risk

was unacceptable under the ethical rules, the court found that Weil's representation of the class

in *Lewis* would violate D.C. Rule 1.7(b)(2).  *Id.*

    The *Lewis* case is easily distinguishable from this one, and to the extent it is not the

statement about adversity with absent class members is incorrect and unpersuasive.  The actual

issue in *Lewis* was not whether Weil had to be disqualified under the ethics rules (a question

subject to stringent standards explained *supra*, §I) but whether Weil would "fairly and

adequately protect the interests of the class" as class counsel under Federal Rule of Civil

Procedure 23(a)(4).  *See Lewis*, 146 F.R.D. at 9.  Courts frequently view apparent conflicts

within the class, or between the class and class counsel, as a reason not to certify a class under

Rule 23 in circumstances that may not raise a true violation of the rules of professional ethics.

*See, e.g., Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1190 (11th Cir. 2003).

Those heightened and specialized concerns about counsel's fidelity to all class members are not

pertinent here.

    The court's view of Weil's conduct in *Lewis* also was shaped by two real and substantial

ethical conflicts under Rules 1.7(b)(2) and (3).  Weil essentially confessed that its concurrent

representation of the NFLPA in the breach of contract suit would adversely affect its representation of the purported class, by offering to sever those 20 plaintiffs. And the court also was deeply troubled by the possibility that confidential information learned during the class action could be used against those unnamed plaintiffs in the separate lawsuit.

Against those backdrops, there was no reason for the *Lewis* court to grapple with the rather technical question of whether unnamed class members count as parties for purposes of Rule 1.7(b)(1), and nothing in the opinion indicates that Weil raised the nationwide case law holding otherwise. Nor did the *Lewis* court have the benefit of Comment 25, which was adopted years later in 2002. Unsurprisingly, courts that have addressed *Lewis* have sought to harmonize it with the great body of contrary case law by emphasizing *Lewis*'s concern with the risk of confidential information being used against the absent class members in the breach of contract suit. *See, e.g., In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2010 U.S. Dist. LEXIS 34882, at *11, *18. This Court should take a similar approach. And because there is no risk of such confidential information being used against Oxbow here (*see infra*, §IV), this Court should reject Oxbow's argument that there is a conflict under *Lewis*.

Finally, this Court should not lose sight of the fact that Oxbow has "indicated [its] intent to be excluded from the class action by filing independent litigation addressing the same claims as the class action." *Butler v. Fairbanks Capital*, Civ. A. No. 04-0367, 2005 U.S. Dist. LEXIS 44537, at *18 (D.D.C. 2005). Oxbow vociferously argued that its separate case should not even be *coordinated* with the Class Action. *See* Related Case, ECF No. 29. Oxbow has not opted out formally only because this Court's order staying the notice and opt out process pending the interlocutory appeal has postponed that process. But surely that is irrelevant. Class members opt out to pursue separate actions, which Oxbow has done. They opt out by necessity, because

anyone with notice who does not becomes subject to *res judicata* based on the outcome of the class action.  Oxbow has already protected its rights by filing a separate action with separate counsel, and it is sheer fiction to pretend otherwise.  The fluke of timing that has put off its inevitable formal opt-out does not give Oxbow an opportunity to seek disqualification of UP's chosen counsel in the Class Action—particularly since it would not matter even if Oxbow remained in the class, given the rule that absent class members are not parties for conflict purposes.

### B.     Oxbow's Prosecution Of A Separate Antitrust Lawsuit Does Not Make It Adverse To UP In The Class Action

Oxbow next argues that Latham has a Rule 1.7(b)(1) conflict because its separate lawsuit and the Class Action are the "same matter."  Oxbow's claim rests on a fundamental misunderstanding of the "same matter" requirement of D.C. Rule 1.7(b)(1).  Oxbow's separate lawsuit is not the "same matter" as the Class Action for several obvious reasons.

First, the two lawsuits involve different parties (e.g., Oxbow is not a named party to the Class Action).  Second, Oxbow's separate case includes a Sherman Act Section 2 claim that is not present in the Class Action.  Indeed, as Oxbow emphasized when opposing a motion to coordinate Oxbow's lawsuit with the Class Action, its Section 2 "claim alleges monopolization, attempted monopolization and conspiracy to monopolize" that "*goes well beyond* the fuel surcharge conspiracy claim" and "bring[s] into issue UP's unlawful securing, maintenance and abuse of its monopoly power in defined markets in the western United States as well as its conspiracy with BNSF to maintain its monopoly."  Related Case, ECF No. 29, at 3 (emphasis added).

Third, with respect to Oxbow's Section 1 claim, Oxbow filed its own lawsuit in order to receive individualized treatment, separate and apart from the Class Action.  And so it has: this

Court recently dismissed Oxbow's Section 1 claim without prejudice, concluding that Oxbow's "Complaint lacks adequate facts concerning how any individual plaintiff was harmed by the alleged conspiracy."  Related Case, ECF No. 50, at 7.  (The Court also dismissed Oxbow's Section 2 claim without prejudice.)  When Oxbow files an amended complaint, adjudication of its Section 1 claim—as demonstrated by this Court's dismissal without prejudice—will involve individualized factual allegations, individualized claims of antitrust injury, individualized damages claims, and individualized defenses by UP and BNSF.  Given all this, Oxbow's separate case cannot plausibly be considered the "same matter" as the Class Action.  *See Iacangelo v. Georgetown Univ.*, 710 F. Supp. 2d 83, 89 (D.D.C. 2010) (Friedman, J.) (explaining that D.C. Rule 1.7(a)'s absolute prohibition on lawyers representing adverse interests in the "same matter" applies "only to situations where a lawyer *actually* asserts two incompatible arguments on behalf of two different clients on the same issue in the *same proceeding*" (citing D.C. Bar Legal Ethics Comm., Op. 217 (1991)) (second emphasis added)).  Therefore, because Latham is not representing UP in Oxbow's separate case, Rule 1.7(b)(1) is not implicated here.[6]

---

[6]  To be clear, even if this Court had granted defendants' motion to coordinate Oxbow's separate case with the Class Action, the two matters would still not be the "same matter" under D.C. Rule 1.7(b)(1).  The court's opinion in *Sumitomo Corp. v. JP Morgan Chase Co.*, No. 99 Civ. 8780, 99 Civ. 4004, 2000 U.S. Dist. LEXIS 1252 (S.D.N.Y. Feb. 8, 2000), is instructive.  In that case, Sumitomo Corporation ("Sumitomo") filed two separate lawsuits—one against Chase Manhattan Bank ("Chase") and one against J.P. Morgan & Co. ("J.P. Morgan").  Each lawsuit concerned disputes over the liability for significant losses suffered by Sumitomo in its copper trading business.  The law firm Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") represented Sumitomo in its lawsuit against J.P. Morgan.  A different law firm represented Sumitomo in its action against Chase.  Chase moved to consolidate the two cases, and also moved to disqualify Paul Weiss on the grounds that Paul Weiss represented Chase on unrelated matters.  The court granted the motion to consolidate, but denied the motion to disqualify.  The court explained that Paul Weiss was not adverse to Chase, even upon consolidation, because "consolidation does not merge separate lawsuits into a single action and does not make parties in one suit parties in another.  Thus, consolidation does not create a situation in which Paul Weiss is representing a client who is suing another current client."  *Id.* at *15 (citations omitted).  If consolidation does not "merge separate lawsuits into a single action," then *a fortiori*, neither does mere coordination.

Oxbow nonetheless argues (at 14) that the two cases are "pending before the same judge and have directly overlapping issues" and, therefore, "success by UP in litigating the merits of" the Class Action may "as a practical matter severely limit (if not foreclose) Oxbow's ability to succeed" on a similar claim in its own separate action.  This argument is meritless.  Oxbow is entitled to litigate its separate case and cannot be bound, factually, by anything that happens in the Class Action unless it consents to remain in the class.

If Oxbow's concern is that *legal* issues resolved in the Class Action may establish precedent that Oxbow will find inconvenient in its separate case, the answer is that a lawyer always can—and indeed must—argue the law zealously for his client in a case the lawyer is handling, without regard to whether the precedent established might be harmful to other clients in cases the lawyer is not involved in.  *See, e.g.*, Hazard Decl. ¶8; *Sumitomo Corp. v. JP Morgan Chase Co.*, No. 99 Civ. 8780, 99 Civ. 4004, 2000 U.S. Dist. LEXIS 1252, at *12-13 (S.D.N.Y. Feb. 8, 2000)  ("While one can understand that Chase's in-house counsel might be unhappy that a law firm which represents it in some matters was taking a position in litigation involving another client that, if adopted, would prejudice an argument that Chase was advancing in a separate case, that does not mean that the law firm is violating a confidence of its client or engaging in unethical conduct."); Ronald D. Rotunda & John S. Dzienkowski, <u>Legal Ethics: The Lawyer's Deskbook on Professional Responsibility</u> §1.7-6(o)(4) (2012-2013 ed.) ("[C]ourts are not quick to disqualify simply because a client objects to a legal argument that its law firm makes in a case in which that client is not a party." (citing *Sumitomo*)).  "'[I]ssues conflicts' are common and prolific in our adversarial system of justice," and "[a]lmost daily the litigator or transactional attorney finds himself or herself taking positions on behalf of clients which are

antithetical to another client" in some other matter the lawyer is not handling.  *See* Cal. State Bar

Standing Committee on Prof'l Responsibility and Conduct, Formal Op. 1989-108.[7]

Arguing a legal position for one client that another client does not like is an ethics

problem in only extreme circumstances not presented here.  There may be an issue if the lawyer

is himself representing two clients simultaneously in different cases that require him to argue

inconsistent legal positions.  Even that is generally permissible,[8] but the issue is not remotely

posed here because Latham was never representing Oxbow in any matter where the legal issues

at stake in the Class Action were implicated.  And in an exceptional case a lawyer's relationship

with the other client might be so extensive and important to the lawyer, as a professional and

business matter, that knowledge of that client's views might adversely affect the lawyer's

advocacy in the case he is handling.  *See, e.g., Sumitomo*, 2000 U.S. Dist. LEXIS 1252, at *12-

13.  That is a Rule 1.7(b)(2) and (b)(3) question.  *See infra* §IV (discussing those rules).  But

Oxbow has never contended that UP cares at all about any issues posed in Latham's separate

work for Oxbow.  And Oxbow certainly has not argued, and would not have standing to argue,

---

[7]    *See also Fremont Indemnity Co. v. Fremont Gen. Corp.*, 143 Cal. App. 4th 50, 65 (2d Dist. 2006) (interpreting California Rule of Professional Conduct 3-310(C) and concluding that it "does not prohibit the concurrent representation of clients whose interests are adverse only in a matter in which the attorney does not represent either client").  Because Latham "does not represent either" UP or Oxbow in the Related Case, Oxbow is wrong to suggest (at 16-17) that Latham has violated California Rule of Professional Conduct 3-310(C) based on the mere existence of that entirely separate matter.  Like the D.C. Rules, the California Rules do not prohibit Latham from representing UP in the *Class Action*, where there is no adversity with Oxbow.  *See* Cal. Rules of Prof'l Conduct R. 3-310(C)(3) (absent consent an attorney shall not represent "a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the *first matter* is adverse to the client in the *first matter*") (emphasis added).

[8]    Comment 13 to D.C. Rule 1.7 explains that the "mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not, without more, create a conflict."  Other leading authorities are in accord.  *See* ABA Model Rule 1.7 cmt. 24 (exact same language as Comment 13 to D.C. Rule 1.7); Restatement (Third) of the Law Governing Lawyers § 121 cmt. c(iii) (2000) ("General antagonism between clients does not necessarily mean that a lawyer would be engaged in conflicted representations by representing the clients in separate, unrelated matters.").

that UP should be deprived of its chosen counsel here on the theory that Latham's loyalty to

Oxbow would have impaired Latham's representation *of UP*.  UP has never been concerned

about that, and Latham's response to Oxbow's threat to terminate Latham on all pending matters

if it did not abandon UP in this case demonstrates that Latham would never allow such concerns

to influence its work.

> **C.     Oxbow's Collateral Motion For Access To The Record In The Class Action Is, At Most, A "Thrust Upon" Conflict That Is Excused Under D.C. Rule 1.7(d) And Does Not Warrant Latham's Disqualification From The Entire Class Action**

Oxbow next claims that it is adverse to UP in the Class Action because it has filed a

Motion for Access to the Record in that matter.  *See* Class Action, ECF No. 554.  As already

noted, Oxbow effectively disavowed any membership in the putative class when it filed its

separate antitrust lawsuit.  Unsurprisingly, therefore, Oxbow's motion for access was filed in

support of its own individual lawsuit, and not based on any interest it had in the Class Action.

Oxbow argued that the "record in this Fuel Surcharge Action is directly relevant to Oxbow's

own fuel surcharge claims in a related suit involving [UP and BNSF]."  *Id.* at 1; *see id.* at 2

("Because Oxbow has asserted its own fuel surcharge claims against defendants UP and BNSF,

Oxbow has a direct interest in the similar claims that are the subject of this Fuel Surcharge

Action.").

Filing a motion for access to the record does not make Oxbow a named party in the Class

Action, and certainly should not give Oxbow an opening to argue that UP's chosen lead counsel

should be disqualified from the entire case.  D.C. Rule 1.7(d) provides that "[i]f a conflict not

reasonably foreseeable at the outset of representation arises under paragraph (b)(1) after the

representation commences . . . a lawyer need not withdraw from any representation unless the

conflict also arises under paragraphs (b)(2), (b)(3), or (b)(4)."[9]  Oxbow's motion was filed after Latham began representing UP in the Class Action and was not reasonably foreseeable.  As noted above, Oxbow had previously made clear that it did not intend to participate in the Class Action and successfully opposed any effort to coordinate discovery or other pretrial proceedings in its separate case with the Class Action.  Oxbow's previous requests for access to discovery exchanged in the Class Action had been filed as discovery requests in its own separate case.  *See* Related Case, ECF No. 26, at 1 (Oxbow demanding that UP "produce to Oxbow the documents that UP produced in the pending [MDL] action," in addition "to its answers to interrogatories and requests to admit, depositions of UP witnesses and all other discovery materials in the MDL Action not covered by a protective order").  Oxbow had given no indication that it would suddenly appear seeking access to discovery exchanged in the Class Action.  "Thrust upon" or "springing" conflicts associated with discovery issues are routinely handled by separate counsel who do not have the conflict.

Regardless, the drastic measure of disqualification would be entirely inappropriate here. Latham did not advise or otherwise represent UP with regard to its opposition to Oxbow's motion to access.  That opposition was handled exclusively by UP's other counsel.  Ballenger Decl. ¶6; Meyer Decl. ¶7.  To conclude, as Oxbow requests, that Latham should be disqualified from *the entire Class Action* based on this single, collateral motion—a motion in which Latham did not even participate—would be dramatically inconsistent with the principle that disqualification should only be imposed only when absolutely necessary, generally when there is either "a serious question as to counsel's ability to act as a zealous and effective advocate for the

---

[9]   California courts have recognized a similar exception for so-called "thrust upon" conflicts. *See, e.g.*, *Truck Ins. Exch.v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1059 (1st Dist. 1992).  *See also* Rotunda & Dzienkowski, *supra*, at §1.7-5 (observing that if a "law firm was not the source of the conflict and [if] it could not have foreseen the event creating the conflict, courts excuse the conflict as one that has been 'thrust upon' the firm").

client," or "a substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party." *Koller*, 737 F.2d at 1056.  It would also invite the sort of strategic behavior that courts and the D.C. Bar have cautioned against countenancing.  *Cf.* D.C. Bar Legal Ethics Comm., Op. 272 (1997) (explaining that one of the goals of D.C. Rule 1.7(d) is to "addres[s] the situation in which one client potentially has the power to disable [a] law firm from its ongoing representation of another client in a particular matter already in progress, simply by intervening in the proceeding with separate counsel, which would of course result in substantial prejudice to the client deprived in midstream of its lawyer"). Rather, the most appropriate remedy would be the precise course of action taken here— precluding Latham from participating in the opposition to Oxbow's motion.  *See* Hazard Decl. ¶¶7(a)-(c); *Rotunda & Dzienkowski*, *supra*, at §1.7-3(e) (approving the use of "conflicts counsel"—*i.e.*, a different lawyer from a different law firm—to handle "discrete, severable matters" that otherwise create a conflict; explaining that the use of "conflicts counsel" in such situations, including "in the area of discovery," "protect[s] a client's legitimate expectation of loyalty" without imposing the "unnecessary and expensive" costs of disqualification).

## III.   LATHAM PERFORMED NO WORK FOR OXBOW THAT WAS RELATED TO THE CLASS ACTION, AND OBTAINED NO CONFIDENTIAL INFORMATION FROM OXBOW THAT IS RELEVANT TO THE CLASS ACTION

The ABA's Comment 25 to Rule 1.7 recognizes that a lawyer representing a class action defendant is not adverse, for D.C. Rule 1.7(b)(1) conflicts purposes, to unnamed class members that the lawyer has represented in *unrelated* matters.   Matters are *related* for ethics purposes if confidential information relevant to one would normally and naturally have been exchanged in the course of the lawyer's work in the other.  *See, e.g.,* D.C. Bar Legal Ethics Comm., Op. 343 (2008) (citing 1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 13.5 (3d ed. 2000).  It would therefore be inappropriate for Latham to represent UP in the Class Action if

Oxbow intends to remain as a class member *and* Latham's prior work for Oxbow was of a nature that Latham would be expected to have obtained confidential information from Oxbow that would give UP a materially unfair advantage in the Class Action.  Oxbow's motion fails to allege any facts suggesting that Latham has violated those principles.

First, as noted earlier this Court should not accept Oxbow's pretense that it is or will be an unnamed class member in the Class Action.  Oxbow has constructively opted out already.

Regardless, Latham never represented Oxbow in any matter that was related to the fuel surcharge Class Action, or in any matter that would normally have involved the exchange of confidential information that would materially advance UP's position in the Class Action. Oxbow has never retained Latham for advice concerning rail fuel surcharges, rail pricing, or Oxbow's relationship or negotiations with the freight railroads.  Barrett Decl. ¶¶5-7; Della Rocca Decl. ¶¶6-8; Schindler Decl. ¶¶6-8; Sheridan Decl. ¶¶7-9; Van Driesen Decl. ¶¶7-10; Wyman Decl. ¶¶11-12; *see also supra*, 7-8.  Oxbow's Motion and declaration conspicuously *never* claim that anyone at Oxbow discussed rail fuel surcharges, rail pricing, or Oxbow's relationship with the freight railroads with Latham.  Latham has never represented Oxbow in any matter to which rail fuel surcharges, rail pricing, or Oxbow's relationship with the freight railroads would even have been a relevant topic of discussion.  *Id.*

The great majority of Latham's work for Oxbow involved structuring internal corporate documents and negotiating the terms of debt and equity financing for Oxbow's operations. Oxbow repeatedly and vaguely contends that "Latham had access to the highest levels of Oxbow's management and was given all the key financial information concerning both the debt and, even more importantly, the equity structure of the company." *E.g.,* Oxbow Mem. 26; Clark Decl. ¶5.  But Oxbow never attempts to explain how knowledge of Oxbow's capital structure

could possibly confer a material advantage on UP in the Class Action.  The Class Action is about whether rail shippers overpaid for transportation services because of an alleged industry-wide cartel.  How a particular shipper chooses to organize and finance its internal operations is utterly irrelevant to those allegations.

The general tenor of Oxbow's motion is that Oxbow and UP have adverse business interests in some respects, and that Latham had access to senior Oxbow management and to Oxbow plans that might be competitively valuable to UP *as a business matter*.  *See, e.g.,* Oxbow Mem. 26 (arguing that confidential information about Oxbow's capital structure and business plans "would be critical and valuable information to UP").  But of course that was true before Latham became involved in the Class Action.  Every lawyer who represents business clients in substantial matters has contact with senior management and sees confidential information that might have business value to the client's competitors, customers, suppliers, or contractors.  That is why the ethics rules require lawyers to keep client confidences.  *See* D.C. Rules of Prof'l Conduct R. 1.6.  There is no rule that a lawyer cannot represent two companies that have adverse business interests, even after receiving confidential business information from each.  The ethics rules are implicated only if the lawyer has received confidential information likely to confer an improper advantage *in a particular legal matter that the lawyer is handling*.  *See* D.C. Rules of Prof'l Conduct R. 1.9 cmt. 3.

The closest Oxbow comes to alleging that Latham obtained confidential information from Oxbow that is pertinent to the Class Action is Oxbow's allegation that a Latham lawyer helping Oxbow apply for environmental permits at the Port of Long Beach had access to Oxbow's internal business projections about the quantities of coal and coke that Oxbow anticipated receiving by rail at that facility.  Clark Decl. ¶6(f); Wyman Decl. ¶¶5, 11.  That information is

irrelevant to these proceedings and would not confer any material advantage on UP.  The Class

Action is about whether shippers overpaid for rail shipping on particular past shipments.  That is

assessed against all of the affected shipments, not whatever subset happened to flow through the

Port of Long Beach, and thus affects the price of an emissions permit.  The Port of Long Beach

data would never even come up in the antitrust litigation, let alone projections about future

shipments through that port.  The relevant shipment data—which would unquestionably be

revealed to UP's counsel through discovery anyway—are the aggregate data upon which

Oxbow's damages claims will be based.  Oxbow does not claim that Latham had any access to

that information, and it did not.

Oxbow obviously cares deeply about this Motion.  It presumably looked hard to find

material confidential information to which Latham had access.  If this is the best it has got, this

motion is frivolous.  On this record there is clearly no basis for the Court to find that Latham

performed any prior work for Oxbow that was genuinely related to the Class Action, or received

any confidential information that would genuinely be relevant and material here.

## IV.    LATHAM HAS NO CONFLICT UNDER D.C. RULES 1.7(B)(2) AND (3)

D.C. Rules 1.7(b)(2) and (3) prohibit a lawyer from taking on concurrent representations

when one "is likely to be adversely affected" by the other.  Oxbow alleges no facts that

reasonably suggest any likelihood that Latham's work for Oxbow would have been impaired by

representing UP in the Class Action, or vice-versa.

We can move swiftly past Oxbow's circular declaration that Latham's representation of

UP already "has adversely affected its relationship" with Oxbow—namely, "by leading Oxbow

to terminate its longstanding relationship with Latham."  Oxbow Mem. 15-16 (citing D.C. Rules

of Prof'l Conduct R. 1.7 cmt. 13).  Oxbow's anger at Latham, and self-inflicted injury, do not

"mandat[e] disqualification."  Oxbow Mem. 16.  The comments to the Rule recognize that a

"client may, on occasion, adopt unreasonable positions with respect to having the lawyer who is representing that client also represent other parties," such as "an aversion to the other parties being represented by the lawyer," and provide that the client's own reactions do not affect the application of the ethics rules. D.C. Rules of Prof'l Conduct R. 1.7 cmt. 8. Instead such reactions raise a "client relations" issue that ultimately goes to the client's "broad discretion to terminate their representation by a lawyer"—discretion that Oxbow exercised here. *Id.* If the rule were as Oxbow suggests, any client upset about a lawyer's decision to represent another party could manufacture a Rule 1.7(b)(2)/(3) conflict and force disqualification merely by firing the lawyer. Of course that is not the law.

On the merits, Latham does not have a conflict under Rules 1.7(b)(2) or (3) for reasons already explained. Latham's work for Oxbow and its work for UP in the Class Action were entirely unrelated. The premise of those Rules "is that disclosure and informed consent are required before assuming a representation if there is any reason to doubt the lawyer's ability to provide wholehearted and zealous representation of a client or if a client might reasonably consider the representation of its interests to be adversely affected by the lawyer's assumption of the other representation in question." D.C. Rules of Prof'l Conduct R. 1.7 cmt. 7. But no reasonable objective observer would conclude that Latham's representation of UP in the Class Action would be "likely" to "adversely affect" Latham's ability to zealously represent Oxbow in any of the matters Latham had been handling for Oxbow: negotiating agreements with banks and investors, obtaining environmental permits, insurance coverage matters, or pursuing unrelated litigation involving former employees and shipping to Asia. There simply is no inconsistency. And Oxbow has no grounds or standing to question whether Latham will vigorously represent UP. *Supra*, 22.

Oxbow's reliance on comment 13 to Rule 1.7 and D.C. Ethics Opinion 265 betray its misunderstanding of the Rule.  *See* Oxbow Mem. 15 & n.47.  As noted above, *supra*, 22 & n.8, comment 13 deals with situations where a lawyer is advocating a position in one case that is directly inconsistent with what the *same lawyer* is arguing for a different client in another case. The "factors" that Oxbow quotes at the top of page 15 of its Memorandum are relevant only to a court's consideration of whether there is "a significant risk that a lawyer's action on behalf of one client in a given matter . . . will adversely affect the lawyer's effectiveness in representing another client in the same or different matter," such as "when a decision favoring one client will create a precedent likely to seriously weaken the position being taken on behalf of the other client" *by that lawyer*.  D.C. Rules of Prof'l Conduct R. 1.7 cmt. 13.  D.C. Ethics Opinion 265 similarly makes clear that concerns about creating adverse precedent are limited to situations where the same lawyer is on opposite sides of an issue for two different clients at the same time. *See* D.C. Bar Legal Ethics Comm., Op. 265 ("It is difficult to know how a lawyer could be equally diligent and equally zealous on behalf of two clients when simultaneously taking inconsistent positions before the same court, where the results of the lawyer's representation of one client will directly and adversely impact another client of the same lawyer.").

The real core of Oxbow's argument is that the dispute in the Class Action "is of immense significance to both Oxbow's and UP's long term interests," and "[g]iven that transportation costs are central to Oxbow's business, it is reasonable for Oxbow to expect" that Latham would not take on a matter that could ultimately raise Oxbow's transportation costs.  Oxbow Mem. 15. Oxbow's business concerns are overstated, since Oxbow's interests will be adjudicated in its separate case, not the Class Action.  Regardless, Oxbow's argument once again rests on the premise that Latham had an ethical obligation not to take on any representation that might

ultimately prove injurious to Oxbow's *business* interests.  Oxbow is obviously surprised and

angry that Latham would refuse Oxbow's demand that it withdraw from a case that Oxbow cares

deeply about.  But Oxbow's expectations simply are not grounded in the actual ethics rules.

Indeed, D.C. Ethics Opinion 265 notes that before D.C. Rule 1.7 was adopted, there was a

proposal—styled as Rule 1.7(b)(5)—to "requir[e] a lawyer to make full disclosure and to seek

client consent where 'other interests of a client will be or are likely to be adversely affected by

the lawyer's assumption of such representation,'" and the proposed commentary said that the

protected client interests "could be as broad as business rivalry or personal difference[s] between

two clients."  That proposal was withdrawn as plainly overbroad and was not included in the

final Rule as promulgated by the D.C. Court of Appeals.  D.C. Bar Legal Ethics Comm., Op.

265.  Opinion 265 makes the sound observation that interpreting Rules 1.7(b)(2) and (3) in a

manner consistent with that rejected proposal, as Oxbow urges here, "would be contrary to the

Court's intention."

There is no objectively reasonable basis to believe that Latham's legal work for Oxbow

was likely to be adversely affected by Latham's representation of UP in the Class Action.

Latham's legal work for Oxbow had nothing to do with the Class Action.

## V.     EVEN IF THERE WERE A CONFLICT, OXBOW WAIVED IT

Since there is no conflict for the reasons stated above, the Court's analysis can and should

end here.  However, even if there were a conflict here, Oxbow freely and voluntarily consented

to such adversity when it executed an Engagement Letter with Latham on October 6, 2011.  In

that Engagement Letter, Oxbow "consent[ed] in advance to [Latham's] acceptance of future

matters (including litigation matters) adverse to Oxbow, provided that those matters are not

substantially related to the work that [Latham] ha[s] done for [Oxbow]."  Engagement Letter at

3.  Oxbow specifically "agree[d] that [Latham] would be able to take a new lawsuit or

31

transactional matter for one of [its] current or future clients, . . . so long as the adverse matter is

not substantially related to the work [Latham] ha[d] done for [Oxbow]." *Id.*  Oxbow also

acknowledged that it had "an opportunity to consult with other counsel" about the waiver. *Id.*[10]

Oxbow carefully scrutinized the Engagement Letter, and successfully demanded that one of the

most important proposed terms—an arbitration clause—be deleted before Oxbow would sign.

*See* Sheridan Decl. ¶10; Wyman Decl. ¶8; *see also* Clark Decl. ¶ 11.

      Latham's representation of UP in the Class Action falls squarely within the heart of the

waiver provided by Oxbow.  As already discussed (*supra*, §III), that representation is not

"substantially related" to any work that Latham performed for Oxbow.  And since the

Engagement Letter was executed nine months before UP first contacted Latham for advice about

the Class Action, Latham's agreement to represent UP was "acceptance of [a] future matter[]."

      Oxbow attempts to avoid the straightforward consequences of its bargain in several ways,

none of which is persuasive.

      **1.**  Oxbow first argues that the conflicts waiver is not fully applicable here because

Oxbow Calcining LLC was not a party to the Engagement Letter but was a client of Latham

when Latham commenced its representation of UP in the Class Action.  Oxbow is incorrect.

---

[10]   For the Court's convenience, the pertinent passage of the Engagement Letter is reprinted here:

"It is possible that during the time we are representing you, some of our current or future clients may ask us to represent them in matters in which you are involved as another party. Furthermore, some of our clients may now or in the future operate in the same lines of business as you do.  Both our own prudent business conduct, and the interests of our other clients, call for us to seek to retain the ability to take unrelated matters for all of our clients.  We thus ask you in connection with this engagement to consent in advance to our acceptance of future matters (including litigation matters) adverse to Oxbow, provided that those matters are not substantially related to the work that we have done for you.  By entering into this agreement, you consent to such adverse representations.  Thus, for example, you agree that we would be able to take a new lawsuit or transaction matter for one our current or future clients, adverse to Oxbow, at the same time that we are representing Oxbow in this matter, so long as the adverse matter is not substantially related to the work we have done for you.  This consent also includes being adverse to you in any bankruptcy, regulatory, administrative, legislative or rulemaking proceeding." Engagement Letter at 3.

Oxbow identifies only two matters in which it claims that Latham had an attorney-client relationship with Oxbow Calcining LLC.  According to Oxbow, Latham (a) "provid[ed] ongoing work and representation" related to a Credit Agreement with Bank of America under which Oxbow Carbon LLC and Oxbow Calcining LLC were the borrowers, and (b) "advised Oxbow with regard to certain August, 2003 Note Indentures . . . ."  Clark Decl. ¶¶ 6(b), 6(c), 14(b); Oxbow Mem. 9 & n. 34.  But if that is Oxbow's argument, it has defeated itself.  The Engagement Letter plainly states that it "is intended also to cover the several ongoing matters (including the Solvadis matter; *continuing assistance concerning debt financing matters*; and Project Ochocinco) for which Oxbow has engaged [Latham], as well as future work for which we would be retained."  Engagement Letter at 1 & n.1 (emphasis added).  The "continuing assistance concerning debt financing matters" language is a reference to, and embraces, the finance advice that Latham was providing relating to the Bank of America facility on which Oxbow Calcining LLC was a co-borrower and the August 2003 Note Indentures.  Sheridan Decl. ¶11; Van Driesen Decl. ¶¶5(d), (e).  So if that is the critical connection to Oxbow Calcining LLC, it must be encompassed by the Engagement Letter.

It makes no sense to think otherwise.  Why would Oxbow Calcining LLP be exempted from what is plainly intended as a broad prospective waiver?  The intent of the agreement, and import of its clear text, was to eliminate any ambiguities and establish agreed terms to govern the entire relationship between Latham and the Oxbow companies.  As the Engagement Letter itself memorializes, this point was in fact expressly discussed with Oxbow's declarant David Clark, who signed the agreement on behalf of the parent company Oxbow Carbon LLC.  *Id.* at 1 & n. 1, 7; Sheridan Decl. ¶11; Wyman Decl. ¶10.  *See also* 1 Geoffrey C. Hazard, Jr. and W. William Hodes, The Law of Lawyering § 17.9, at 17-27 (3d ed. 2000 & 2012 Supp.) ("Where there is

common ownership, the lawyer may safely assume that it is appropriate to take direction from

the highest decisionmaking body of the conglomerate entity, as in any entity representation.").

2. Oxbow argues that the waiver in the Engagement Letter applied only to "future

matters" and the Class Action was pending in October 2011, even though Latham was not

involved in any way.  Of course, Oxbow's argument rests on the false assumption that Oxbow is

a party to the Class Action.  In any event, Oxbow's interpretation of the parties' agreement is

implausible.

By executing the Engagement Letter, Oxbow agreed "to consent in advance to

[Latham's] acceptance of future matters (including litigation matters) adverse to Oxbow,

provided that those matters are not substantially related to the work that we have done for you."

Engagement Letter at 3.  The only sensible reading of that language is that Oxbow consented to

Latham's acceptance of matters in the "future" from Latham's perspective, even if the dispute

itself already existed.  The Engagement Letter explains that Latham sought an advance waiver

from Oxbow because "our own prudent business conduct, and the interests of our other clients,

call for us to seek to retain the ability to take unrelated matters for all of our clients."  *Id.*

Oxbow's interpretation would severely impair that objective and make it impossible for either

party to confidently assess whether a particular matter is covered by the waiver.

As is evident from the text and context of the waiver, the reference to "future matters"

merely sought to distinguish "present" or "active" matters, in which Latham was already

engaged, from "future" matters for which Latham had no current involvement.  The waiver in the

Engagement Letter did not address "present" conflicts, or matters in which Latham was already

engaged.  Rather, Oxbow agreed "to consent *in advance* to [Latham's] acceptance of future

matters" adverse to Oxbow.  Engagement Letter at 3.  The most reasonable interpretation of that

language is that Latham was seeking an *advance* waiver for its own *future* engagements, not an advance waiver limited to disputes that originated only after October 6, 2012.

Oxbow argues that if Latham had a present intention to become involved in already-pending litigation against Oxbow when negotiating this waiver, Latham would have had an obligation to disclose that intention to Oxbow. But nothing of the kind happened here. Latham *avoided* adversity with Oxbow—as the law, rather than Oxbow's subjective opinions, define adversity. First, as of October 2011 no one at Latham had any intent to become involved in the fuel surcharge litigation. Ballenger Decl. ¶3; Sheridan Decl. ¶12; Wyman Decl. ¶13. Latham's first involvement came nine months later, after this Court certified the class and UP reached out to Latham for advice about how to appeal the certification order. Ballenger Decl. ¶3. Oxbow's Motion insinuates that Latham planned this course of events from the start, but offers no facts to support that charge. It is false. But more importantly, Latham stayed out of the Oxbow case. Once again, Oxbow's logic is based on the stubborn refusal to acknowledge that long before Latham got involved with any of this, it pursued its own litigation that Latham properly avoided.

Oxbow's related suggestion that Latham somehow misled Oxbow by failing to "disclose" that UP was a Latham client is hard to understand. Latham has represented UP in a large number of public matters over many years. And Latham has more than two thousand lawyers, representing thousands of clients all over the world. Oxbow did not ask for a client list. Sheridan Decl. ¶13; Wyman Decl. ¶14.

**3.** Finally, Oxbow claims that it did not provide *informed* consent to Latham's representation of UP in the Class Action because the advance waiver it signed was general in nature and did not reference this matter specifically. That contention is meritless.

D.C. Rule 1.7 "permits advance waivers within certain limits and subject to certain client protections." D.C. Rules of Prof'l Conduct R. 1.7 cmt. 31. One such protection is that a waiver must be based on the client's "informed consent." The D.C. Rules define "informed consent" as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." D.C. Rules of Prof'l Conduct R. 1.0(e). Comment 31 to D.C. Rule 1.7 makes clear that the requirement of informed consent is ordinarily satisfied in the context of advance waivers so long as one of two things is true: "*either* (1) the consent is specific as to the types of potentially adverse representations and types of adverse clients . . . *or* (2) the waiving client has available in-house or other current counsel independent of the lawyer soliciting the waiver."

Oxbow is a highly sophisticated party and indisputably had "available in-house or other current counsel independent of" Latham to consult regarding the advance waiver in the Engagement Letter. *Id.* By signing the Engagement Letter, Oxbow specifically "acknowledge[d]" that it had "an opportunity to consult with other counsel." Engagement Letter at 3; *see also* Sheridan Decl. ¶10. The substance of Oxbow's present argument is that the "or" in Comment 31 should be changed to an "and"—and that general waivers are never permissible, even when "the waiving client has available in-house or other current counsel independent of the lawyer soliciting the waiver." Such a rule would be inconsistent with the Comment and directly contrary to D.C. Ethics Opinion 309, as well as guidance provided by the ABA, Restatement, and other leading ethical authorities.

In D.C. Ethics Opinion 309, the D.C. Bar explained that that the "modern view—held by the courts, the American Bar Association, local bar associations, and the American Law

36

Institute—is that advance waivers of conflicts of interest are permissible" along the lines

described in Comment 31 of D.C. Rule 1.7.  *See* D.C. Bar Legal Ethics Comm., Op. 309 (2001).

Opinion 309 concludes that the validity of a general advance waiver depends on whether the

client had access to independent counsel.  A "client not independently represented by counsel

(including in-house counsel) generally may waive conflicts of interest only where specific types

of potentially adverse representations or specific types of adverse clients are identified in the

waiver correspondence."  *Id.*  "A client that is independently represented by counsel," by

contrast, "generally may agree to waive such conflicts even where the specificity requirements

set out in the preceding sentence are not satisfied."  *Id.*

      The standards set forth in Comment 31 and D.C. Ethics Opinion 309 are consistent with

the other leading authorities that have addressed this issue.  For example, ABA Formal Ethics

Opinion 05-436 recognizes that ABA Model Rule 1.7 (and its comment 22) supports "the likely

validity of an 'open-ended' informed consent if the client is an experienced user of legal

services, particularly if, for example, the client has had the opportunity to be represented by

independent counsel in relation to such consent and the consent is limited to matters not

substantially related to the subject of the prior representation."  ABA Comm. On Ethics & Prof'l

Responsibility, Formal Op. 05-436 (2005). *See also* Restatement (Third) of The Law Governing

Lawyers §122 cmt. d. (2000) ("A client's open-ended agreement to consent to all conflicts

normally should be ineffective unless the client possesses sophistication in the matter in question

and has had the opportunity to receive independent legal advice about the consent."); 1 Geoffrey

C. Hazard, Jr. and W. William Hodes, The Law of Lawyering § 10.9, at 10-26 to 10-27 (3d ed.

2000 & 2012 Supp.) (explaining that "a waiver by a corporation or other business that has

actually been reviewed . . . by inside counsel should ordinarily be taken as fully effective"

because "inside counsel well know the rules concerning conflicts and can readily appraise the value of giving up future objections to a conflict in exchange for obtaining presently needed counsel" (emphasis omitted)); Richard W. Painter, <u>Advance Waiver of Conflicts</u>, 13 Geo. J. Legal Ethics 289, 312 (2000).[11]

The purpose of informed consent is to ensure that the client will make "a fully informed decision." D.C. Bar Legal Ethics Comm., Op. 309. A sophisticated corporate client with independent counsel need not be treated exactly the same as a first-time consumer of legal services that does not have in-house counsel readily available. This surely is not Oxbow's first time negotiating an engagement letter with outside counsel, and Oxbow's suggestion that it was incapable of understanding an advance waiver is factually implausible and legally unsustainable.[12]

---

[11]  Oxbow's reliance on *Concat LP v. Unilever*, 350 F. Supp. 2d 796 (N.D. Cal. 2004) is misplaced for several reasons. First, Oxbow maintains (at 23) that Latham was required to "identify its client UP or seek a waiver applying to UP" in the Engagement Letter because "UP and Oxbow were already adverse in connection with the fuel surcharge price fixing matter." But even *Concat* acknowledged that a "prospective waiver is not required to indicate every conceivable possibility of a potential conflict." 350 F. Supp. 2d at 820. When Oxbow executed the Engagement Letter, Latham had no intent to represent UP in the Class Action. Second, *Concat* is distinguishable from this case because there is no indication that, unlike Oxbow, the individual client at issue there acknowledged that he had access to independent counsel for purposes of considering the advance waiver. *See id.* at 820-21. Third, and finally, *Concat* applies California Rule of Professional Conduct 3-310. To the extent California's approach to advance waivers differs from that of the D.C. Rules, it is of course the D.C. Rules that govern here. *See supra*, §I. And, under those rules, the advance waiver executed by Oxbow is plainly valid.

[12]  The waiver set forth in Engagement Letter also complies with D.C. Ethics Opinion 309's requirement that "the lawyer make full disclosure of the facts of which she is aware, and hence cannot seek a general waiver where she knows of a specific impending adversity unless that specific instance also is disclosed." When Oxbow executed the Engagement Letter, Latham had no expectation or knowledge that it would be approached by UP nine months later for advice regarding the Class Action. And to the extent Oxbow suggests that Latham was required to identify every possible client that may eventually be adverse to Oxbow, such a condition has absolutely no basis in the ethics rules.

In sum, because Oxbow indisputably had access to independent counsel when considering the conflicts waiver, its execution of the Engagement Letter constituted informed consent under D.C. Rule 1.7.

## VI.   NEITHER THE LAW NOR CONSIDERATIONS OF "FAIRNESS" WOULD SUPPORT DISQUALIFYING LATHAM FROM THE CLASS ACTION

Oxbow does not even attempt to grapple with the D.C. Circuit precedent explaining that disqualification is an extreme and disfavored remedy, "warranted only rarely in cases where there is neither a serious question as to counsel's ability to act as a zealous and effective advocate for the client, nor a substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party." *Koller,* 737 F.2d at 1056.  The concerns articulated by the court of appeals in *Koller* are not remotely implicated here.

By contrast, UP's interest in retaining lead counsel of its choice is very strong.  Oxbow correctly notes that UP has other experienced counsel available.  But many months ago this case shifted from a long stage where the primary issues resolved around discovery and class certification, into a new phase where the parties must prepare for summary judgment and trial on an aggressive schedule set by this Court.  UP determined that it needed to supplement its existing team with more experienced antitrust trial counsel.  That decision is understandable, in what would be one of the largest and most complex Sherman Act §1 cases *ever* to go to trial, and deserves great weight.

On the other side, Oxbow's interests are only remotely implicated here.  Oxbow is not really a member of the class.  It has already declared its intention to opt out of the Class Action, and is already pursuing its own case.  Oxbow has no real interest—certainly not a weighty one— in which law firm represents UP in a class action lawsuit that Oxbow has no intention of participating in and which cannot bind Oxbow's interests.  Oxbow obviously desires to punish

39

Latham for perceived disloyalty.  Latham regrets that a valued client relationship has come to

that.  But Oxbow's remedy is the one it has already exercised—to terminate Latham and hire

other counsel.

## **CONCLUSION**

For the foregoing reasons, Oxbow's Motion to Disqualify Counsel should be denied.

Dated:  March 1, 2013                                  Respectfully submitted,


                                                      /s/ Daniel M. Wall
                                          _____
                                          Daniel M. Wall (*pro hac vice*)
                                          LATHAM & WATKINS LLP
                                          505 Montgomery Street
                                          Suite 2000
                                          San Francisco, CA 94111
                                          Phone: (415) 395-8240
                                          Fax: (415) 395-8095
                                          Email: Dan.Wall@lw.com

                                          J. Scott Ballenger (DC Bar #465252)
                                          555 Eleventh Street, NW
                                          Suite 1000
                                          Washington, D.C. 20004
                                          Tel:  (202) 637-2200
                                          Fax:  (202) 637-2201
                                          Email: Scott.Ballenger@lw.com

                                          *Attorneys for Latham & Watkins LLP*

## <u>CERTIFICATE OF SERVICE</u>

On March 1, 2013, I electronically submitted the foregoing document and its supporting declarations and attachments with the clerk of the court for the U.S. District Court for the District of Columbia, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.


/s/ Daniel M. Wall

Daniel M. Wall (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Phone: (415) 395-8240
Fax: (415) 395-8095
Email: Dan.Wall@lw.com

*Attorney for Latham & Watkins LLP*