# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )

In re RAIL FREIGHT FUEL SURCHARGE     )
ANTITRUST LITIGATION                    )
_____ )     MDL Dkt. No. 1869
                                    )     Misc. No. 07-0489 (PLF)

This document relates to:          )
                                    )

ALL CASES                           )
_____ )

## OPINION

      In this case, thirty-one named plaintiffs have alleged a far-reaching price-fixing conspiracy by the four largest rail freight carriers in the United States: BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company, which together account for nearly 90 percent of rail freight traffic in the country. On June 21, 2012, the Court certified a class consisting of approximately 30,000 shippers – a class that likely includes Oxbow Carbon & Minerals LLC and five of its affiliated companies (together, "Oxbow").[1] In re Rail Freight Fuel Surcharge Antitrust Litig., 287 F.R.D. 1, 10 (D.D.C. 2012). On August 9, 2013, the United States Court of Appeals for the District of Columbia Circuit vacated this Court's class certification decision and remanded the case to permit the Court to reconsider that decision in light of the Supreme Court's recent decision in Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013). In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, --- F.3d ----, 2013 WL 4038561, at *8 (D.C. Cir. 2013).

---

[1]       The five affiliated companies are: Oxbow Mining LLC, Oxbow Calcining International LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek.

This matter is before the Court on Oxbow's motion to disqualify Latham & Watkins LLP ("Latham") as counsel for defendant Union Pacific Railroad Company ("UP") in this case, sometimes referred to herein as "the MDL". Oxbow requests that the Court disqualify Latham as counsel for UP on the ground that Latham's representation of UP in this case is tainted by a conflict of interest. After careful consideration of the parties' arguments presented in their briefs and at oral argument on July 9, 2013, the numerous declarations submitted by the parties, including declarations of eminent experts in legal ethics, and the relevant legal authorities, the Court concludes that Latham's representation of UP in this case does not present a disqualifying conflict of interest and will deny Oxbow's motion to disqualify counsel.[2]

---

[2] The papers reviewed by the Court in reaching its decision include the following: Oxbow's Motion to Disqualify Counsel [Dkt. No. 636] ("Oxbow Mot."); Declaration of David W. Clark, Oxbow Mot. Attach. 2 ("Clark Decl."); Latham & Watkins's Opposition to Oxbow's Motion to Disqualify Counsel [Dkt. No. 637] ("Latham Opp."); Declaration of Geoffrey C. Hazard, Jr., Latham Opp. Attach. 1; Declaration of J. Scott Ballenger, Latham Opp. Attach. 2 ("Ballenger Decl."); Declaration of Daniel M. Wall, Latham Opp. Attach. 3 ("Wall Decl."); Declaration of Robert A. Wyman, Latham Opp. Attach. 4 ("Wyman Decl."); Declaration of Paul F. Sheridan, Latham Opp. Attach. 8 ("Sheridan Decl."); Declaration of Jennifer S. Van Driesen, Latham Opp. Attach. 9 ("Van Driesen Decl."); Declaration of David A. Barrett, Latham Opp. Attach. 10 ("Barrett Decl."); Declaration of David T. Della Rocca, Latham Opp. Attach. 11 ("Della Rocca Decl."); Declaration of David J. Schindler, Schindler Opp. Attach. 12 ("Schindler Decl."); Oxbow's Reply to Latham's Opposition to Oxbow's Motion to Disqualify Counsel [Dkt. No. 642] ("Oxbow Rep."); Declaration of Professor Nancy Moore, Oxbow Rep. Attach. 1 ("Moore Decl."); Latham & Watkins's Sur-Reply in Opposition to Oxbow's Motion to Disqualify Counsel [Dkt. No. 649] ("Latham Sur-Rep."); Supplemental Declaration of Geoffrey C. Hazard, Jr., Latham Sur-Rep. Attach.; Oxbow's Response to Latham's Sur-Reply in Opposition to Oxbow's Motion to Disqualify Counsel [Dkt. No. 651] ("Oxbow Sur-Rep."); Supplemental Declaration of Professor Nancy Moore, Oxbow Sur-Rep. Attach. 1 ("Moore Supp. Decl."); and the Transcript of the Oral Argument [Dkt. No. 665] ("Tr.").

# I.  BACKGROUND

Because the sequence of events is highly relevant to the Court's determination of whether the Rules of Professional Conduct have been breached, the following discussion presents the pertinent events chronologically.

In 1997, Latham began representing UP.  Ballenger Decl. ¶ 2.  Since that time, Latham has represented UP in at least thirty-two separate matters, including litigation and environmental matters.  Id.

In 2004, Latham began representing Oxbow on a variety of corporate transactions. Clark Decl. ¶ 2.  Over the last nine years, Latham has advised Oxbow on more than twenty-three separate matters.  Id. ¶¶ 2-3.  The parties agree that none of these matters involved Oxbow's relationship with UP or Oxbow's domestic rail freight needs, although Oxbow asserts that Latham had access to a wide range of confidential documents, including documents relating to Oxbow's purchases of rail transportation services.  See id. ¶¶ 2, 5; Oxbow Mot. at 2-4; Wyman Decl. ¶ 5; Sheridan Decl. ¶¶ 5-7; Van Driesen Decl. ¶¶ 8-10; Barrett Decl. ¶¶ 5-7; Della Rocca Decl. ¶¶ 6-8; Schindler Decl. ¶¶ 6-8.

In January 2007, the Surface Transportation Board ("STB") concluded an investigation of the leading railroads' practice of imposing rate-based fuel surcharges on top of the base rates charged to customers for rail freight services.  Rail Fuel Surcharges, Ex Parte No. 661, 2007 WL 201205 (S.T.B. Jan. 25, 2007); see also In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, 2013 WL 4038561, at *1-2.  This practice, which was infrequent in the early-2000s, had become ubiquitous by the middle of the decade.  In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, 2013 WL 4038561, at *2.  Troubled by the disconnect between the purported rationale for the surcharge, as a recovery mechanism for

fuel costs, and the manner in which the surcharge was applied regardless of marginal fuel costs, the STB terminated the practice with respect to rail freight traffic within its regulatory authority. See id. at *2; Rail Fuel Surcharges, 2007 WL 201205, at *4. Following the STB's decision, purchasers of rate-unregulated rail freight began to sue the defendant railroads, alleging that those railroads had illegally conspired to impose supra-competitive rates through the uniform application of the rate-based fuel surcharge. In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, 2013 WL 4038561, at *2.

On November 6, 2007, eighteen of those cases, pending in six districts, were consolidated and transferred to this Court by the Panel on Multidistrict Litigation. See In re Rail Freight Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d 27, 29 (D.D.C. 2008). The consolidated cases involve common allegations that UP, along with the three other defendant railroads, engaged in price-fixing by conspiring to fix fuel surcharges on rail transportation in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). See generally Second Consol. Am. Class Action Compl., Dkt. No. 324. Initially, only Jones Day and Covington & Burling LLP ("Covington") represented UP in the MDL.

On June 7, 2011, Oxbow filed a separate lawsuit in this Court against UP and BNSF Railway Company. See Oxbow Carbon & Minerals LLC v. Union Pac. R.R., Civil Action No. 11-1049 (referred to herein as the "Related Case"). Oxbow alleges virtually the same Section 1 fuel surcharge conspiracy as that alleged in the MDL; in addition, Oxbow alleges Section 2 monopoly violations. Oxbow Carbon & Minerals LLC v. Union Pac. R.R., --- F. Supp. 2d ----, 2013 WL 673778, at *1 (D.D.C. 2013). In the Related Case, UP has been represented only by Jones Day and Covington. Wall Decl. ¶ 8.

While, as noted, Latham had represented Oxbow on various matters since 2004, on October 3, 2011, Latham solicited an engagement letter (the "Engagement Letter") from Oxbow Carbon & Minerals LLC for legal work performed in connection with the permitting of new and expanded facilities at the Port of Long Beach in California, and to cover representation on other ongoing and future matters. Engagement Letter, Wyman Decl. Ex. A at 1. The Engagement Letter contained an advance conflicts waiver. Id. at 4. Prior to executing the Engagement Letter, Oxbow's in-house counsel negotiated for the removal of the Engagement Letter's arbitration clause. Clark Decl. ¶ 11; Latham Opp. at 32. After Latham agreed to remove that clause, Oxbow signed the Engagement Letter on October 6, 2011. Clark Decl. ¶ 11.

On June 21, 2012, this Court certified a class of direct purchasers of rate-unregulated rail freight services. In re Rail Freight Fuel Surcharge Antitrust Litig., 287 F.R.D. 1, 10 (D.D.C. 2012). Oxbow and Latham agree that Oxbow falls within the definition of the plaintiff class certified by this Court, although Latham suggests that Oxbow opted out of that class for all practical purposes by filing its own separate lawsuit. See Oxbow Mot. at 5; Latham Opp. at 18-19. Technically, however, Oxbow did not have the opportunity to opt out of the class before the Court's certification was vacated, as the Court stayed class notice pending appeal of the class certification decision. See In re Rail Freight Fuel Surcharge Antitrust Litig., 286 F.R.D. 88, 90 (D.D.C. 2012).

On or about July 2, 2012, UP contacted Latham about assisting UP with respect to its class certification appeal. Latham Opp. at 5-6; Ballenger Decl. ¶ 3. At that time, Latham "requested a conflicts check regarding the named plaintiffs and named defendants in the class action in Latham's conflicts system." Ballenger Decl. ¶ 3. Latham determined that there were no conflicts and began advising UP concerning the class certification appeal. Id.

Later in July 2012, UP requested that Latham become more deeply involved in UP's representation in the MDL. Ballenger Decl. ¶ 4. Before accepting this expanded representation, Latham performed a second conflicts check, on July 30, 2012. Id. Latham determined that there were no conflicts and began advising UP on broad issues of strategy in the MDL. Id. ¶¶ 3-4.

On July 31, 2012, Oxbow appeared directly in the MDL by filing a motion seeking access to sealed records ("Motion for Access"). Oxbow's Motion for Access to the Record, Dkt. No. 554. UP, represented by Jones Day and Covington, opposed the Motion for Access. Defendants' Opposition to Motions for Access, Dkt. No. 562. Latham represents that "it did not advise UP about Oxbow's motion seeking access to discovery, and it had nothing to do with UP's response to that motion." Ballenger Decl. ¶ 6. Oxbow does not allege that Latham advised or assisted UP in opposing Oxbow's Motion for Access.

In September 2012, UP asked Latham's Daniel Wall to become UP's lead trial counsel in the MDL, and he agreed. Wall Decl. ¶¶ 6-7; Ballenger Decl. ¶5. A few weeks later, UP asked Latham to defend UP in Oxbow's Related Case. Wall Decl. ¶ 8. Latham declined that representation, it says, because the firm "did not want to be adverse to a valued client." Latham Opp. at 6.

On October 4, 2012, Latham entered an appearance on UP's behalf in the MDL. Latham Opp. at 6; Latham's Notice of Appearance & Motions for Leave to Appear *Pro Hac Vice*, Dkt. Nos. 621-24. Prior to Latham's entering this appearance, Oxbow was unaware that Latham was working with UP concerning the MDL. Clark Decl. ¶ 13. Oxbow learned of Latham and UP's relationship by ECF notice. Id.

Within days, Oxbow contacted Latham and requested that Latham cease to represent UP in the MDL. Clark Decl. ¶ 15. Oxbow's senior management and General Counsel spoke directly with Latham's Global Chair and Managing Partner, Robert M. Dell, and insisted that Latham withdraw from its representation of UP. Id. When Latham refused to withdraw, Oxbow terminated its relationship with Latham. Id.[3] Then, between December 2012 and January 2013, Oxbow and Latham exchanged a series of letters in which Oxbow continued to insist that Latham withdraw; Latham continued to refuse. See id. Exs. E-G. Finally, being unable to secure Latham's voluntary withdrawal, Oxbow moved, on February 12, 2013, to disqualify Latham from UP's representation in the MDL. See Oxbow Mot.

Oxbow argues that Latham's disqualification is required because Latham's representation of UP in the MDL violates Rule 1.7(b)(1) of the D.C. Rules of Professional Conduct ("D.C. Rules"), which prohibits a firm from representing a client that takes a position in a matter that is adverse to the position taken by another current firm client in the same matter. First, Oxbow contends that Latham's representation of UP in the MDL is directly adverse to Oxbow in the Related Case, as Latham's defense of UP in the MDL will provide UP with defenses and arguments relevant to defending the Related Case. Oxbow Rep. at 4-7. Second, Oxbow contends that under the totality of the circumstances presented here, Latham's representation of UP in the MDL is directly adverse to Oxbow, an unnamed putative class member in the MDL. Oxbow supports its arguments with two expert declarations of Nancy J. Moore, Professor of Law and Nancy Barton Scholar at Boston University School of Law.

---

[3]     Oxbow and Latham disagree as to whether Oxbow terminated Latham on all pending matters or on all but one pending matter. See Oxbow Mot. at 7 (all but one); Latham Opp. at 7 n.1 (all). Because the Court considers Latham's relationship with Oxbow at the time it began representing UP in the MDL for the purposes of determining whether there is a conflict of interest, this disagreement is immaterial to the Court's analysis.

In response, Latham argues that its representation of UP in the MDL does not violate D.C. Rule 1.7(b)(1) because that Rule only restricts a firm from representing a client that takes a position adverse to a current firm client where the clients are each parties in the same case. And, while conceding that Oxbow has not opted out of the putative class, Latham contends that "the only parties in a putative class action for conflicts purposes are the named plaintiffs and named defendants." Latham Rep. at 12, 19-23. Latham supports its arguments with two expert declarations of Geoffrey C. Hazard, Jr., Distinguished Professor Law Emeritus, Hastings College of Law, University of California, and Trustee Professor of Law Emeritus, University of Pennsylvania.

## II. LEGAL STANDARD FOR DISQUALIFICATION

A motion to disqualify counsel is within the Court's discretion. Grouper v. Taff, 717 F.2d 1415, 1418 (D.C. Cir. 1983). "Disqualification, however, is a drastic measure that is disfavored by the courts, and disqualification motions should be subject to particularly strict judicial scrutiny." Konarski v. Donovan, 763 F. Supp. 2d 128, 135-36 (D.D.C. 2011) (internal quotations and citations omitted). "Disqualification of counsel is uncommon, as evidenced by the relative paucity of case law directly on point." Paul v. Judicial Watch, Inc., 571 F. Supp. 2d 17, 20 (D.D.C. 2008). The Court also recognizes, however, that motions to disqualify sometimes are used as "'procedural weapons' to advance purely tactical purposes." Id. at 20 (quoting In re Am. Airlines, Inc., 972 F.2d 605, 611 (5th Cir. 1992)).

When considering a motion to disqualify, the Court "must consider two questions in turn: first, whether a violation of an applicable Rule of Professional Conduct has occurred or is occurring, and if so, whether such violation provides sufficient grounds for disqualification." Paul v. Judicial Watch, Inc., 571 F. Supp. 2d at 20. The District of Columbia Rules of

Professional Conduct are the applicable rules. D.C. Rules R. 8.5(b)(1) (2007); Loc. Civ. R. 83.15(a). If the Court finds that a violation of the D.C. Rules has occurred, disqualification is appropriate if the Court is convinced that the lawyer's "ability to act as a zealous and effective advocate for the client" is compromised, or if the representation poses "a substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party." Koller v. Richardson-Merrell, Inc., 737 F.2d 1038, 1056 (D.C. Cir. 1984), vacated on other grounds, 472 U.S. 424 (1985); see also Steinbuch v. Cutler, 463 F. Supp. 2d 4, 7 (D.D.C. 2006) (noting that "any motion to disqualify counsel faces the extraordinarily high burden" articulated by the court of appeals in Koller).

Finally, when determining if a firm's violation of the D.C. Rules requires that firm's disqualification, the Court should be mindful of the competing interests at stake and make its decision in the interest of justice to all relevant parties. As Judge Harold Greene put it in Laker Airways v. Pan Am. World Airways, 103 F.R.D. 22 (D.D.C. 1984):

> It is true, of course, that where there are conflicts of interest, the particular attorney or attorneys must be ordered disqualified. Conflicts of interest by attorneys give rise to many substantive evils (e.g., unfair advantage in litigation, neglect of duties to the client) and they tend to diminish the bar's image in the mind of the public. But the mere claim of a conflict is not enough; there must be proof. Moreover, the Court must make its decision in the interest of justice to all concerned, and it must balance the need to ensure proper conduct on the part of lawyers appearing before it against the harm to other social interests which may ensue if disqualification is improvidently granted.

Id. at 27 (internal citations omitted); see id. at 27-28 (collecting cases).

## III. DISCUSSION

When considering whether an attorney may represent a client in a way that is adverse to the interests of another client, the District of Columbia Rules of Professional Conduct distinguish between the duties owed to a firm's current clients and those owed to former clients. Compare D.C. RULES R. 1.7 (governing duties to current clients), with D.C. RULES R. 1.9 (governing duties to former clients). The nature of the attorney-client relationship at the time the conflict arose governs the applicable standard, regardless of the status of that relationship at the time of the disqualification motion. Unified Sewerage Agency of Wash. Cnty., Or. v. Jelco, Inc., 646 F.2d 1339, 1345 n.4 (9th Cir. 1981) ("This [current client] standard continues even though the representation ceases prior to filing of the motion to disqualify."); see also Merck Aprova AG v. Prothera, Inc., 670 F. Supp. 2d 201, 209 (S.D.N.Y. 2009) (collecting cases). Because Latham was actively representing Oxbow when it began advising UP on the MDL, D.C. Rule 1.7(b)(1), which prohibits a firm from accepting representation in a matter that is adverse to a current firm client in the same matter, applies here.[4]

Rule 1.7 of the D.C. Rules provides, in relevant part:

(b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:

(1) That matter involves a specific party or parties and a position to be taken by that client in that matter is adverse to a position taken

---

[4] Although Oxbow invokes other D.C. Rules as well, see Oxbow Mot. at 14-16, 25-26, these rules are inapplicable to the facts here. D.C. Rule 1.9 does not apply because Oxbow was Latham's current client when Latham began representing UP in the MDL. See D.C. Bar Legal Ethics Comm., Op. 272 (1997). D.C. Rules 1.7(b)(2)-(3), which prohibit representation of a client if such representation interferes in some substantial way with the representation of another client, do not apply here, as Latham represented Oxbow on transactional matters that are unrelated to this antitrust litigation. See supra at 3; cf. D.C. Bar Legal Ethics Comm., Op. 265 (1996) (noting that a conflict may arise when a lawyer who represents two clients on different matters in the same subject area advocates inconsistent positions in those matters).

or to be taken by another client in the same matter even though that
client is unrepresented or represented by a different lawyer. . . .

D.C. RULES R. 1.7(b)(1). This Rule "deals with a situation in which the lawyer is representing

one client in a matter, such as a litigation or an administrative proceeding, in which another

client, which the lawyer represents only in unrelated matters, takes a position adverse to the first

client." D.C. Bar Legal Ethics Comm., Op. 272.

As discussed below, the Court has carefully considered the parties' arguments and

their expert declarations and finds that Oxbow has not met its burden to show that Latham's

representation of UP in the MDL violates D.C. Rule 1.7(b)(1) for two separate reasons. First,

Latham's representation of UP in the MDL is not adverse to Oxbow in the Related Case because

the MDL and the Related Case are not the "same matter" under D.C. Rule 1.7(b)(1). Second,

Latham's representation of UP in the MDL is not adverse to Oxbow in the MDL because Oxbow

is only an unnamed class member; and nothing about Latham's relationship with UP or Oxbow's

unusually active participation in the MDL gives the Court reason to stray from the general rule

that unnamed class members are not firm clients for conflict purposes.

## A. Conflict Arising from Oxbow's Status in the Related Case

Oxbow argues that the price-fixing claim that it presents in the Related Case is the

"same matter" as the price-fixing claim brought in the MDL. Therefore, according to Oxbow,

Latham's representation of UP in the MDL constitutes a violation of Rule 1.7(b)(1), which

prohibits a firm from representing a client that takes a position adverse to another client in the

"same matter." Oxbow Rep. at 4; Oxbow Sur-Rep. at 2-4. To support its argument, Oxbow

points to D.C. Rule 1.0(h), which defines "matter" to include "any litigation, . . . claim, . . .

charge or accusation." Oxbow Sur-Rep. at 3. Oxbow also relies on two decisions from other

jurisdictions for the proposition that a firm's position for one client in one case may be directly adverse to another firm client in a separate but related case. <u>See</u> Oxbow Rep. at 6-7 (citing <u>GATX/Airlog Co. v. Evergreen Int'l Airlines</u>, 8 F. Supp. 2d 1182 (N.D. Cal. 1998), <u>vacated</u> <u>as moot</u>, 192 F.3d 1304 (9th Cir. 1999)); Tr. at 6-10 (discussing <u>Arrowpac, Inc. v. Sea Star Line, LLC</u>, 3:12-cv-01180-TJC-JBT (M.D. Fla. Apr. 30, 2013)).

Latham responds that its representation of UP in the MDL is not adverse to Oxbow in the Related Case because the MDL and the Related Case are not the "same matter" under D.C. Rule 1.7(b)(1). Latham Opp. at 19-23; Latham Sur-Rep. at 7-15. Latham cautions that overlapping facts and law cannot make separate cases the "same matter" because, by that analysis, an opt-out case would always be the "same matter" as the underlying class action. Latham Sur-Rep. at 8. Thus, Latham argues that "virtually any law firm could be conflicted out of a class action by finding a firm client in the class to file suit and assert a conflict." <u>Id</u>. Latham suggests that "different proceedings are presumptively not the same matter." Tr. at 38. This presumption is overcome only in "extreme circumstances not presented here," Latham Opp. at 22, when "there [is] no way to say that there [is] any daylight between" the separate cases. Tr. at 39.

Considering Oxbow's first argument, the Court is not convinced that D.C. Rule 1.0(h) supports the conclusion that the MDL and the Related Case are the "same matter" simply because they involve the same or similar "claims." Other sources more persuasively suggest that "same matter" operates narrowly in D.C. Rule 1.7(b)(1), which "deals with a situation in which the lawyer is representing one client in a matter, such as *a litigation* . . ., in which another client, which the lawyer represents only in unrelated matters, takes a position adverse to the first client." D.C. Bar Legal Ethics Comm., Op. 272 (emphasis added to identify singular article).

Furthermore, interpreting "same matter" narrowly is consistent with the position on issue conflicts articulated in the comments to Rule 1.7.  The comments provide that "[t]he mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not, without more, create a conflict of interest."  D.C. RULES R. 1.7 cmt. 13.  Oxbow's broad reading of "same matter" in D.C. Rule 1.7(b)(1) would swallow this principle.

Oxbow cites Arrowpac and GATX/Airlog in support of its argument that the MDL and the Related Case overlap to such a degree that they must be considered to be the "same matter."  In Arrowpac, the magistrate judge disqualified the law firm of Baker Hostettler LLP ("Baker") from representing defendant Sea Star, Inc., in three class action opt-out cases, on the ground that Nestlé USA, Inc. ("Nestlé"), another client of Baker's, was suing Sea Star on the same claim in a fourth opt-out case.  Arrowpac, Inc. v. Sea Star Line, LLC, 3:12-cv-01180-TJC-JBT, at *4-6, *22.  The four cases were nearly identical in both substance and procedural posture, and the magistrate judge expressed concern that work product developed by Baker in the first three cases inevitably would be used against Nestlé in the fourth case.  Id. at *9-10, *14-15, *20-21.  In fact, Baker attorneys already had signed a motion to dismiss Nestlé's case, and the magistrate judge anticipated that defendant Sea Star, with the assistance of Baker, would file consolidated motions against all plaintiffs, including Nestlé, in the future.  Id. at *10, *19-20.  "Given the unique facts presented," the magistrate judge found that Baker was acting directly adverse to its client and concluded that disqualification was appropriate.  Id. at *4; see id. at *19.

In GATX/Airlog, the court disqualified Mayer Brown & Platt ("Mayer Brown") from seeking a declaratory judgment on behalf of plaintiff GATX/Airlog ("GATX"), on the basis that a declaratory judgment would have foreclosed the claim of another Mayer Brown client,

Bank of New York, against GATX in a related case. GATX/Airlog Co. v. Evergreen Int'l Airlines, 8 F. Supp. 2d at 1185. Focusing on the unique beneficial owner relationship involved, the court noted that any defenses presented by Mayer Brown on behalf of GATX, if successful, would "probably [be] dispositive of BNY's claims." Id. The Court therefore found that Bank of New York and GATX were adverse to each other in the same action, and it granted the motion to disqualify. Id.[5]

Both of these cases are based on facts distinguishable from those relevant here. In Arrowpac, the law firm ultimately disqualified was directly involved in the lawsuit involving its own client, as evidenced by the firm's signature on a motion to dismiss that client. In GATX/Airlog, the disqualified firm sought a declaratory judgment that would have been binding against its current client due to beneficial ownership. The Court does not find the reasoning of Arrowpac persuasive and finds the facts of both cases distinguishable from those presented here. The Court finds the reasoning in Sumitomo Corp. v. J.P. Morgan & Co., Nos. 99 Civ. 8780(JSM), 99 Civ. 4004(JSM), 2000 WL 145747, at *4 (S.D.N.Y. Feb. 8, 2000), more convincing.[6]

In Sumitomo, Paul, Weiss, Rifkin, Wharton & Garrison ("Paul Weiss") agreed to represent plaintiff Sumitomo Corporation against defendant J.P. Morgan & Co., Inc. ("J.P. Morgan"), but the firm declined to represent Sumitomo in a related case against another firm

---

[5]    With little explanation, the court also disqualified Mayer Brown from related actions that were consolidated with the first action for discovery purposes. GATX/Airlog Co. v. Evergreen Int'l Airlines, 8 F. Supp. 2d 1184-85.

[6]    The district court in Sumitomo effectively distinguished the additional cases cited by Oxbow. See Sumitomo Corp. v. J.P. Morgan & Co., 2000 WL 145747, at *5 & n.4 (distinguishing GATX/Airlog Co. v. Evergreen Int'l Airlines, Inc., 8 F. Supp. 2d 1182 (N.D. Cal. 1998); Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977); and Avacus Partners, L.P. v. Brian, Civ. A. No. 11001, 1990 WL 161909 (Del. Ch. Jan. 23, 1990)). These cases, according to the court in Sumitomo, involved firms "attempting to establish wrongdoing by the current client" or "seeking a declaratory judgment that would have a direct adverse impact on the current client." Id. at *5. Latham's representation of UP does not raise these concerns.

client, Chase Manhattan Bank ("Chase").  <u>Sumitomo Corp. v. J.P. Morgan & Co.</u>, 2000 WL

145747, at *1-2, *4.  Although the two cases involved similar law and facts, the court denied

Chase's motion to disqualify, based on its finding that Paul Weiss's representation of J.P.

Morgan did not "undermine the Court's confidence in the vigor of Paul Weiss' representation of

either Sumitomo in the Morgan action or Chase in any unrelated matters."  <u>Id</u>. at *5.  The court,

like the District of Columbia Rules of Professional Conduct, recognized that a firm may ethically

take positions for one client that, if adopted, would be harmful to another client's position in a

separate case:

> While one can understand that [a client] might be unhappy that a
> law firm which represents it in some matters was taking a position
> in litigation involving another client that, if adopted, would
> prejudice an argument that [the client] was advancing in a separate
> case, that does not mean that the law firm is violating a confidence
> of its client or engaging in unethical conduct.

<u>Id</u>. at *4; <u>see also</u> D.C. RULES R. 1.7 cmt. 13.

While Latham's defense of UP in the MDL may involve the development of

arguments or the taking of positions that ultimately establish negative precedent for Oxbow in

the Related Case, the MDL and the Related Case nevertheless constitute distinct matters for the

purposes of D.C. Rule 1.7(b)(1).

## B.  *Conflict Arising from Oxbow's Status in the MDL*

Oxbow also asserts that, because it is an "active" absent class member in the

MDL, Latham's representation of UP is directly adverse to Oxbow, in violation of D.C. Rule

1.7(b)(1).  As Oxbow acknowledges, its motion presents a question of first impression.  Moore

Supp. Decl. ¶ 3.  Neither party has cited, nor has this Court found, any case addressing a motion

made by an unnamed member of the plaintiff class to disqualify defense counsel in a class action

case.  After careful consideration, the Court concludes that the general rule that unnamed class members are not firm clients for conflicts purposes applies to Latham's representation of UP in the MDL.  And Oxbow's filing of its Motion for Access in no way alters this conclusion.  Nor is the Court persuaded that the "totality of the circumstances" test proposed by Oxbow and its distinguished ethics expert is a workable standard.

## 1.  The General Rule

The rules of professional conduct that have been developed to apply to traditional attorney-client relationships outside the class action context cannot be applied mechanically to conflict of interest problems that arise in class action litigation.  See Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 589-90 (3d Cir. 1999) (conflict rules were not drafted with class action providers in mind and may be at odds with policies underlying class actions); In re "Agent Orange" Prod. Liab. Litig., 800 F.2d 14, 19-20 (2d Cir. 1986) (traditional conflicts rules cannot be "mechanically applied").  Indeed, both Latham and Oxbow agree that, typically, a firm seeking to represent a defendant in a class action is not required to clear potential conflicts with unnamed class member clients, and that a contrary rule would be "virtually impossible to satisfy" and "patently unworkable."  Oxbow Rep. at 2; see Latham Opp. at 14 (describing contrary rule as "unmanageably burdensome and unworkable"); Tr. at 14.[7]

A contrary rule would create a host of problems for large class actions like this one, in which so many major law firms throughout the country are likely to have at least one client that falls within the class.  Thus, many firms sophisticated enough to represent a class

---

[7]        Initially, Oxbow argued that Latham's representation of UP in the MDL was adverse to Oxbow in the MDL solely because "Oxbow is a member of a class alleging a conspiracy to fix fuel surcharges that the Court has certified in this MDL case."  Oxbow Mot. at 4-5.  Oxbow has abandoned this position.

action defendant would be disqualified from such representation because of a conflict with an unnamed class member client, unless the firm obtained the requisite consent. But a firm seeking to represent a class action defendant often will be unaware of the identities of absent class members, making it impossible to clear conflicts with clients that fall within the plaintiff class. Even if locating class members were possible, class actions are "designed to permit class members to sit back through the process, knowing there are safeguards for their protection." In re Katrina Canal Breaches Consol. Litig., Civil Action No. 05-4182, 2008 WL 3845228, at *6 (E.D. La. Aug. 13, 2008) (internal quotation omitted). Requiring a firm's unnamed class member clients to come forward and identify themselves to consent to an adverse representation "would eviscerate [this] class action device." Id.

Recognizing similar difficulties, courts consistently have recognized that unnamed members of the plaintiff class generally are not considered to be clients of class counsel for conflicts purposes. See, e.g., In re Plasma Derivative Protein Therapies Litig., No. 09 C 766, 2010 WL 1433316, at *4 (N.D. Ill. Apr. 7, 2010) ("[A]bsent class members do not create conflicts."); In re Katrina Canal Breaches Consol. Litig., 2008 WL 3845228, at *4-5 (discussing policy reasons not to apply standard conflict rules to unnamed class members); In re Glassine & Greaseproof Paper Antitrust Litig., 88 F.R.D. 302, 305-06 (E.D. Pa. 1980) (discussing problems with recognizing conflicts with unnamed class members). Consistent with this case law, the ABA has clarified that Rule 1.7 of the ABA Model Rules of Professional Conduct ("Model Rules") – the model rule on which D.C. Rule 1.7 is based – permits class counsel to sue or otherwise oppose unnamed class members in unrelated litigation because unnamed members of the class ordinarily are not considered clients of class counsel. MODEL RULES R. 1.7 cmt. 25 (2002). The ABA also has adopted the same position with regard to

defense counsel in class actions: "Similarly, a lawyer seeking to represent an opponent in a class action does not typically need the consent of an unnamed member of the class whom the lawyer represents in an unrelated matter." Id. Because the D.C. Rules are based on the Model Rules, and for the policy reasons discussed above, the Court finds that D.C. Rule 1.7(b)(1) should be read to include the limitation made explicit in Comment 25 to Rule 1.7 of the Model Rules.[8]

Note that Comment 25 says that "typically" the consent of unnamed class members is not required. MODEL RULES R. 1.7 cmt. 25 (noting that defense counsel "does not *typically* need consent" of a client who falls within the class) (emphasis added). This suggests that in "atypical" situations, notice – and, absent consent, possibly disqualification – may be appropriate. As the court noted in Sumitomo, "[o]ne can imagine a factual situation where the relationship between the lawyer and client is so extensive and the prejudice that would result to the client, if the position the lawyer advanced on behalf of the other client was accepted, is so great that there would be an appearance of impropriety." Sumitomo Corp. v. J.P. Morgan & Co., Nos. 99 Civ. 8780(JSM), 99 Civ. 4004(JSM), 2000 WL 145747, at *4 (S.D.N.Y. Feb. 8, 2000). But this is not such a case.[9]

---

[8]    While the D.C. Rules do not have an analogous comment, the D.C. Rules were not intended to "lead to significantly different results in actual cases from the results that would be achieved under the ABA's model rule[s]." D.C. Bar Legal Ethics Comm., Op. 265.

[9]    In support of its argument that this case presents an atypical situation, Oxbow relies heavily on Lewis v. NFL, in which Judge Lamberth refused to certify a plaintiff class of football players, where the firm seeking to represent the plaintiff class was adverse to twenty unnamed members of this class in different proceedings. Lewis v. NFL, 146 F.R.D. 5, 10 (D.D.C. 1992). In his discussion of the potential conflict of interest, Judge Lamberth noted that such simultaneous representation likely would constitute a violation of D.C. Rule 1.7(b)(1). Id. at 11. This case, however, was decided several years before comment 25 to the Model Rules was adopted. Moreover, the facts in the case – which raised concerns about counsel's ability to fairly and adequately represent the class, and which arguably present an example of the "atypical" situation alluded to in comment 25 – are clearly distinguishable from those presented here. See id. at 11-12.

Latham's representation of UP in the MDL presents no reason to doubt Latham's loyalty to either UP or Oxbow in the matters in which Latham represented those clients. And Oxbow does not contend that it has shared confidential information relevant to the MDL (or the Related Case) with Latham that could be used against Oxbow. Finally, as will be discussed, despite Oxbow's assertions, neither its filing of its Motion for Access nor a broader "totality of the circumstances" warrant treating Oxbow as anything other than a typical absent class member.

### 2. Oxbow's Motion for Access in the MDL

As noted earlier, Oxbow filed a motion in the MDL seeking access to sealed filings submitted by class counsel and defendants. UP – along with other defendants and class plaintiffs – opposed the motion, although Latham represents that it did not participate in any legal work related to this motion. Oxbow's filing of the Motion for Access does not affect the Court's determination that Latham's representation of UP in the MDL does not violate D.C. Rule 1.7(b)(1).

Looking only at the text of D.C. Rule 1.7(b)(1), it might appear that Latham's representation of UP violates that Rule because Latham's client, UP, opposed a motion by another current Latham client, Oxbow, in the same proceeding, the MDL. See D.C. RULES R. 1.7(b)(1) (prohibiting representation of a client in a matter where "a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter"). But D.C. Rule 1.7(d) provides: "If a conflict not reasonably foreseeable at the outset of representation arises under paragraph (b)(1) after the representation commences, and is not waived under paragraph (c), a lawyer need not withdraw from any representation unless the conflict also arises under paragraphs (b)(2), (b)(3), or (b)(4)." D.C. Rule 1.7(d) is implicated when "a law firm ha[s] been representing Client A in an ongoing [matter] and Client B,

represented by separate counsel, unexpectedly intervene[s] in the [matter] taking positions adverse to Client A." D.C. Bar Legal Ethics Comm., Op. 272. As noted, such "unforeseeable" or "thrust upon" conflicts only constitute a violation of the rules if the conflict arises under D.C. Rule 1.7(b)(2), (b)(3) or (b)(4) – in addition to meeting the requirements of D.C. Rule 1.7(b)(1). The conflict that Oxbow alleges arises only under D.C. Rule 1.7(b)(1). See supra note 4. Because Oxbow filed its Motion for Access after Latham began representing UP in the MDL, the literal violation of D.C. Rule 1.7(b)(1) therefore is excused by D.C. Rule 1.7(d).

Even if the Court were to consider Latham's October 4, 2012, appearance in the MDL as a new discrete representation, as suggested by Oxbow, but see D.C. Bar Legal Ethics Comm., Op. 272, such that D.C. Rule 1.7(d)'s safe harbor were unavailable, disqualification still would be inappropriate. Oxbow's Motion for Access presented a discrete dispute in a complicated antitrust class action, and Latham's uncontested representation is that it did not assist UP in opposing Oxbow's motion. See Ballenger Decl. ¶ 7. Considering the harm that would result from depriving UP of its chosen counsel by virtue of Oxbow's decision to file its Motion for Access, and the discrete and severable nature of the discovery dispute, Latham's disqualification would be disproportionately prejudicial to UP. Indeed, Oxbow has backed away from its contention that its having filed a motion for access in the MDL is an independent ground for Latham's disqualification, and now suggests that the motion is a "symptom of a larger and more pervasive adversity," Oxbow Rep. at 14 n.25, that demonstrates that Oxbow is something more than "some nameless, faceless, passive class member." Id. at 3.[10]

---

[10]     Initially, Oxbow argued that Latham's representation of UP in the MDL was adverse to Oxbow in the MDL solely because "Oxbow also has appeared in the MDL through counsel seeking relief that UP has opposed." Oxbow Mot. at 4-6. Oxbow no longer presses this argument, and its expert suggests that the argument has been abandoned altogether. See Moore

### 3.  Totality of the Circumstances

Professor Moore's Supplemental Declaration provides the clearest articulation of Oxbow's argument regarding why Latham's representation of UP in the MDL is adverse to Oxbow in the MDL.  <u>See</u> Oxbow Sur-Rep. at 1 (citing Professor Moore's totality of the circumstances test).  Oxbow argues that a firm must decline representation of a class action defendant when that firm "knows, before entering an appearance that: (1) a current client is an unnamed member of the class; (2) the client has a substantial interest in one or more claims asserted in the class action; and (3) the client is actively pursuing those claims, whether in the class action itself or in related litigation."  Moore Supp. Decl. ¶ 5; <u>see also</u> Moore Decl. ¶¶ 7-13.  In this analysis, Oxbow urges that "the adversity results from the totality of these circumstances" and that "[t]here is no need to disaggregate them."  Oxbow Sur-Rep. at 1.  Therefore, Oxbow's Related Case and Motion for Access become relevant insofar as they establish Latham's knowledge that Oxbow was an unnamed class member with a substantial interest in the price-fixing claim and that Oxbow was actively pursuing that claim.  <u>Id</u>. at 1-2; <u>see</u> Oxbow Rep. at 3 ("Oxbow is not some nameless, faceless, passive class member.").

The Court finds that Oxbow's "totality of the circumstances" argument has no foundation in either law or practicality.  While unnamed class members may create a conflict of interest in atypical situations, this is not one of those situations.  Oxbow, an unnamed class member with a substantial interest in one or more claims, is similar to the tens of thousands of other class members in this case, all of whom presumably have substantial interests in the case.  What sets Oxbow apart is that it has been unusually interested in pursuing its claims *outside* of

---

Decl. ¶ 13 ("Oxbow is not arguing, and it is not my opinion, that it is Oxbow's sole act of filing its motion for access that created the directly adverse conflict in the class action.").

this class action.[11]  Such activities cannot serve as the basis for deeming Oxbow equal, for

conflicts purposes, to a named party *within* the class action.  Moreover, Oxbow's proposed rule

would deny firms the pre-decisional guidance that any rules of professional conduct must

provide.  For example, a firm seeking to represent a defendant in a class action would somehow

need to evaluate and quantify the degree to which unnamed class member clients are "actively

pursuing" claims.  Such a standard would only invite post-representation litigation.

The Court recognizes that there may be situations in which a law firm's attorney-

client relationship with an unnamed class member may create a conflict that would prevent that

firm from representing a named defendant.  Such a situation might occur where the law firm's

relationship with the class member is so substantial that it raises questions about the firm's

ability to zealously represent the defendant, or where there is a risk that the class member's

confidential information could be used by the firm in preparing the defendant's legal strategy.

But such circumstances are not present here.[12]

---

[11]        With her Supplemental Declaration, Professor Moore, who assisted in drafting
Comment 25, provides the following legislative history documents: Working Draft of Proposed
Rule 1.7; Reporter's Observations; Meeting Minutes; and an article by ALAS lawyer Brian J.
Redding.  See Moore Supp. Decl. at 5-48.  This material does not help Oxbow's argument that it
is an "atypical" class member or that this case presents an "atypical" situation.

[12]        Latham argues that even if its representation of UP violated Rule 1.7(b)(1),
Oxbow consented to the potential conflict of interest – as permitted under Rule 1.7(c) – when
Oxbow Carbon & Minerals LLC and Latham signed an Engagement Letter containing a broad
advance conflicts waiver provision.  Latham Opp. at 23-25.  The Court finds Latham's argument
unconvincing.  According to the plain language of the Engagement Letter, only Oxbow Carbon
& Minerals LLC was bound by that Letter's terms.  Other Oxbow entities – including entities for
which Latham also had performed legal work – were not mentioned.  Although Latham points to
other evidence that the Engagement Letter was intended to apply to the entire corporate family,
this evidence does not overcome the presumption that the Engagement Letter – and the advance
waiver provision it contained – were limited to the parties clearly specified therein.  See Mesa
Air Grp., Inc. v. Dep't of Transp., 87 F.3d 498, 503 (D.C. Cir. 1996) ("Where the language of a
contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily

For the foregoing reasons, Oxbow's motion to disqualify is denied. An

appropriate Order accompanies this Opinion.


/s/_____
PAUL L. FRIEDMAN
DATE:  September 3, 2013                    United States District Judge

---

ascribed to those words reflects the intentions of the parties.") (internal quotation omitted).
Because the Court finds no violation of Rule 1.7(b)(1), however, no waiver was required.