UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER CASES | **<u>PUBLIC VERSION</u>** |

**PLAINTIFFS' SUBMISSION REGARDING THE SCOPE OF THE REMAND FROM
<u>THE COURT OF APPEALS AND PROPOSED PROCEDURES</u>**

Plaintiffs respectfully submit this memorandum pursuant to the Court's September 11, 2013 Opinion and Order directing the parties to (1) address the scope of the remand from the Court of Appeals and (2) propose a schedule and procedures for remand proceedings.

## PRELIMINARY STATEMENT

The Court of Appeals granted interlocutory review and remanded on a single question: whether the damages model sponsored by Plaintiffs' expert, Dr. Gordon Rausser, yields "false positives" for so-called "legacy contracts" entered before the start of the defined Class Period, and, if so, whether that result reflects a methodological flaw in Dr. Rausser's model such that class certification is precluded under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ("*Behrend*").[1] The Court of Appeals remanded to "afford" this Court the opportunity to consider this narrow question with the "benefit of *Behrend*'s guidance," *In re Rail Freight Fuel Surcharge Antitrust Litig.*, __ F.3d __, 2013 WL 4038561, at *8 (D.C. Cir. 2013), given the Panel's perception that this Court's class certification decision had not "address[ed] the defendants' concern that the damages model yielded false positives with respect to legacy shippers," *id.* at *6.

The Court of Appeals expressly stated that "[o]f the medley of attacks on the plaintiffs' ability to satisfy the predominance requirement, *we focus on one*: according to the defendants,

---

[1] While the Court of Appeals characterized Defendants' argument regarding legacy contract damages as a "critique of the damages model as prone to false positives," *In re Rail Freight Antitrust Litig.*, 2013 WL 4038561 at *6 – a critique that was the centerpiece of Defendants' oral argument on appeal – in fact, Defendants never even used the term "false positives" in their memoranda or oral argument opposing class certification in this Court. While Defendants' class certification expert did assert that Dr. Rausser's model yielded damages on legacy contracts, Willig Rep. at ¶¶ 266-69 (Dkt. No. 391), Defendants' class certification opposition brief did not describe this as a defect undermining the fundamental reliability of Dr. Rausser's damages model. Defendants did not raise that suggestion until the oral argument on class certification, where defense counsel made only a passing allusion to the issue during the two-day hearing. *See* Class Cert. Hr'g Tr., Oct. 7, 2010, at 273-74 (Dkt. No. 447).

Rausser's damages model is defective" because it yields overcharges on "shippers who, during the Class Period, were bound by rates negotiated before any conspiratorial behavior was alleged to have occurred." *Id*. at *5 (emphasis added).  The Court of Appeals also stated expressly that it "need not reach the defendants' alternate grounds for relief." *Id*. at *8.

The narrow scope of the remand, as well as the proceedings necessary to respond, are discernible from the Panel's limited focus on "legacy contracts" as the issue of "concern."  For example, the Panel framed Defendants' argument as follows:

- "Some [shippers] had entered into so-called *legacy contracts* with the defendants before this period, thereby guaranteeing[2] they would be subject to fuel surcharge formulae that predated the later changes." *Id.* at *1 (emphasis added).

- "When applied to shippers who were subject to *legacy contracts* – *i.e.*, those shippers who, during the Class Period, were bound by rates negotiated before any conspiratorial behavior was alleged to have occurred – the damages model yields similar results" to those yielded on non-legacy contracts. *Id*. at *5 (emphasis added).

- "*If* accurate, *this* critique" would preclude certification. *Id*. (emphasis added).

As Plaintiffs demonstrated at class certification, and are prepared to show on remand, the central objective of the alleged conspiracy – rigid enforcement of fuel surcharges across the board – naturally affected all contracts, including "legacy contracts" entered before the start of the Class Period.  Overcharges on legacy contracts are thus not "false" at all, much less suggestive of any defect in Dr. Rausser's model.  Indeed, they are the direct and natural result of the conspiracy.

This Court's decision discussed at length the significance of "legacy contracts," and made many findings supportive of Plaintiffs' position on remand. *See*, *e.g.*, *In re Rail Freight*

---

[2] Contrary to Defendants' argument, there is no evidence in the record that the legacy contracts that were entered into prior to the class period "guarantee[d]" that shipments under the contract were not harmed by the conspiracy.  In fact, the record shows the opposite. *See infra* at 5-7.

2

*Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) (Defendants' fuel surcharge were "uniformly applied across all or virtually all shippers – regardless of whether such shippers were legacy . . . shippers."). The question of overcharges on legacy contracts during the Class Period has also been addressed in merits expert reports submitted while the appeal was pending.

Against this backdrop, Plaintiffs respectfully submit that Defendants' "false positives" argument in respect to legacy contracts can be resolved largely on the basis of findings this Court has already made, with some focused supplementation of the existing record. As detailed below, Plaintiffs propose that over the coming months, the parties provide supplemental class certification briefing, and a single supplemental expert report per side, limited to the single issue that was remanded by the Court of Appeals.

## BACKGROUND

As the Court of Appeals itself noted:

- "Four companies account[ed] for nearly 90% of rail freight traffic." *In re Rail Freight Antitrust Litig.*, 2013 WL 4038561, at *1.

- "Rate-based fuel surcharges were not unheard of at the start of the new millennium, but neither were they the norm." *Id*.

- "That all changed by the mid-2000s, when fuel surcharge provisions became ubiquitous, governing the vast majority of the defendants' shipments." *Id*.

- "At the same time, the defendants sharpened the surcharges' sting, with all four dropping their trigger prices between March 2003 and March 2004." *Id*.

- "The heyday of the rate-based fuel surcharge did not last. Eventually, the Surface Transportation Board (STB) put an end to the practice with respect to common carrier traffic within its regulatory authority." *Id*. at *2.

- "The STB was especially troubled by the disconnect between the purported rationale for the fuel surcharges – fuel cost recovery – and the formula's dependence on base rates[.]" *Id*.

In fact, the STB, after extensive briefing by shippers and carriers and hearings, found that "a fuel surcharge program that increases all rates by a set percentage *stands virtually no prospect* of

3

reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." *Rail Fuel Surcharges*, STB Ex Parte No. 661, 2007 WL 201205, at *4 (Jan. 25, 2007) (emphasis added).

Consistent with the foregoing, this Court found that at the outset of the alleged conspiracy Defendants began to impose uniform fuel surcharges, which became ubiquitous throughout the industry with no discounting. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. at 48-49, 52 (referring to conspiracy-period fuel surcharges as "widespread," "uniform" and "standardized"). As noted above, this Court found among other things that the fuel surcharges were "uniformly applied across all or virtually all shippers – regardless of whether such shippers were legacy . . . shippers." *Id*. at 49.[3] This Court also found that before the conspiracy, fuel surcharges were "applied only sporadically," were "subject to competition and negotiation with shippers" and "were only *theoretically billable*" – meaning they "often were not triggered *or applied*." *Id.* at 48 (emphasis added).[4] The record evidence demonstrates that, facing customer pushback to fuel surcharges before the conspiracy, Defendants were forced to reduce those surcharges (TD Ex. B, at UPFSC0195602), grant offsetting concessions on other price terms (TD Ex. C, at BNSF-0574624_011), and negotiate with customers who simply

---

[3] *See also id.* ("Internal CSX e-mails similarly stated that although the new fuel surcharge program may seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." (internal quotation marks omitted)).

[4] One of Defendants' experts on the merits, John H. Johnson IV, affirmatively acknowledges that fuel surcharges prior to the conspiracy were ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Declaration of Kyle R. Taylor, dated September 25, 2013 ("TD") Ex. A (Johnson Rep.) ¶¶ 91-92. Dr. Johnson notes, for example, that CSX understood its pre-conspiracy period fuel surcharge to be ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬." *Id*. ¶ 89 (internal quotation marks omitted). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

As Dr. Johnson noted, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬." *Id*. ¶ 101 (internal quotation marks omitted).

4

refused to pay (TD Exs. D-F). Once the more aggressive fuel surcharges were enacted in 2003, Defendants adopted coordinated policies mandating rigid enforcement, and thereby uniformly expanded and maintained the agreed-upon fuel surcharges across their customer base. *See* Pls. Class Cert. Br. at 31-39 (Dkt. No. 336). This Court was "unpersuaded" by Defendants' efforts to compare these sporadic practices before the alleged conspiracy to what this Court found was a blanket imposition of more aggressive fuel surcharges during the alleged conspiracy. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. at 48-49.

Legacy contracts, like all contracts containing fuel surcharges, were impacted by the Defendants' joint imposition of, and refusal to discount or waive, the fuel surcharges that characterized the conspiracy. Dr. Rausser explained at class certification that overcharges on legacy contracts are ▮▮▮▮▮▮▮▮. *See* TD Ex. G at 99. Dr. Rausser observed, in particular, that all legacy contracts, including those executed before the conspiracy period, were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*[5] This analysis showed that damages on legacy shipments are to be entirely expected – not unexpected as Defendants assert, without record support, as the fundamental premise of their argument in respect to legacy contracts.

This Court analyzed the parties' competing expert evidence with the rigor *Behrend* would later specify. Each critique of Dr. Rausser's model advanced by Defendants was carefully evaluated, even those "enmeshed in the factual and legal issues comprising plaintiffs' claim on the merits." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. at 22. The Court

---

[5] Dr. Rausser also noted that while ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

directly addressed its obligation to "determine which expert is correct." *Id*. at 27.  In performing that exacting inquiry, the Court determined that Dr. Rausser's analyses of impact and damages was consistent with the evidence and was economically reliable and "persuasive," *see id*. at 42-43, 52-53, 59-60, 62, 64, 67-68, 70, 73, and that Dr. Willig's competing opinion was not, *see id*. at 42, 48-49, 51-52, 53-54, 64, 73.

Following class certification, and while the Defendants' appeal petition was pending, Defendants presented merits experts reports from four new economists who have asserted that "legacy contracts" are an appropriate benchmark for testing whether the alleged conspiracy had an impact, because such legacy contracts purportedly were not affected by the conspiracy.  *See* TD Ex. H (Kalt Rep.) ¶¶ 533-36; *id*. at Ex. I (Carlton Rep.) ¶¶ 148-51; *id*. at Ex. J (Ordover Rep.) ¶¶ 95-97; *id*. at Ex. A (Johnson Rep.) ¶¶ 272-74.  Not one of these economists, however, conducted any analysis to test the assertion that legacy contracts were not impacted.  *See id*. Ex. K (Kalt Dep.) at 235-37; *id*. at Ex. L (Ordover Dep.) at 102-03; *id*. at Ex. M (Johnson Dep.) at 271-75.  Instead, Defendants' economists either assume this to be true or purport to rely on an alleged admission by Dr. Rausser.[6]

In response, Dr. Rausser, in his merits rebuttal report, demonstrated that the conspiracy deprived legacy shippers of competitive leverage during the conspiracy period and allowed Defendants during that time to enforce legacy fuel surcharges without exception or modification. Dr. Rausser explained that because ████████████████████

████████████████████████████████████████████████████

---

[6] Defendants' economists conceded at deposition that ████████████████████ ████████, *see* TD Ex. L (Ordover Dep.) at 102-03; *id*. at Ex. M (Johnson Dep.) at 272-75; *id*. at Ex. K (Kalt Dep.) at 235-37 – a concession that ████████████████████, *see id.* at Ex. N (Rausser Merits Reply Rep.) at 222-23.

6

███████████████████████████████████████████████ TD Ex. N at 220.  He further explained: ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ *Id.*[7]

## ARGUMENT

I. **THE COURT OF APPEALS ISSUED A LIMITED REMAND TO EXAMINE WHETHER DR. RAUSSER'S MODEL GENERATES "FALSE POSITIVES" FOR LEGACY CONTRACTS**

The scope of a remand is defined by the terms of the remand decision, and "[w]here the text of a mandate is clear, the district court is without authority to act contrary to those instructions." *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 865 F. Supp. 2d 1, 5 (D.D.C. 2011).  This principle flows from the so-called "mandate rule," a "more powerful version of the law-of-the case doctrine, which prevents courts from reconsidering issues that have already been decided in the same case." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001) (internal quotations omitted).  Under the mandate rule, when a higher court remands for consideration of a particular issue, the district court's authority is limited to only the issue or issues in the remand.  *See Role Models Am., Inc. v. Geren*, 514 F.3d 1308, 1311 (D.C. Cir. 2008).

The Court of Appeals' remand is unambiguously narrow.  The court limited both its discussion, and the scope of the remand, to the question whether the overcharges Dr. Rausser's damages model generates on legacy contracts render the model unreliable in light of *Behrend*. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2013 WL 4038561, at *5-8.  The court

---

[7] The record also shows that a number of legacy contracts were entered during the first half of 2003 when Defendants *were already conspiring*.  *See* TD Ex. G (Rausser Class Cert. Reply Rep.) at 99.  Those contracts cannot be "false positives" unless one presumes, circularly, that the conspiracy had no effect.  *See id.*

7

was careful to constrain its decision to this single inquiry, observing that "[o]f the medley of attacks on the plaintiffs' ability to satisfy the predominance requirement, *we focus on one*: according to the defendants, Rausser's damages model is defective" because it yields overcharges on "shippers who, during the Class Period, were bound by rates negotiated before any conspiratorial behavior was alleged to have occurred." *See id*. at *5 (emphasis added); *see also id*. at *8 (noting that the court "need not reach the defendants' alternate grounds for relief"). Indeed, the court granted interlocutory review on this issue only, *see id*. at *5-7, and discussed nothing else in addressing the merits, *id*. at *7-8. It would be anomalous – if not impossible – for the Court of Appeals to remand on a set of issues it did not reach or even assume jurisdiction to consider in the first place.

Although Defendants have asserted that "other problems identified by the Court of Appeals . . . bear consideration by this Court," Defs.' Mot. to Amend Schedule, at 2 (Dkt. No. 665), the Court of Appeals opinion contains no such directive. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2013 WL 4038561, at *7 (referencing "structural break" identified by Dr. Rausser in the context of Defendants' argument that Dr. Rausser's model is flawed because it yields overcharges on legacy contracts); *id*. at *6 (noting that *Behrend* is relevant only insofar as it "sharpens the defendants' critique of the damages model as prone to false positives" in respect to legacy contracts). Having addressed only the issue of so-called "false positives" on legacy contracts, the Court of Appeals identified no other perceived shortcoming in this Court's opinion, and did not call for a broader re-litigation of the host of Defendants' arguments already carefully considered and appropriately rejected by this Court.

## II. PROPOSED PROCEDURES AND SCHEDULE FOR REMAND

Given the narrow scope of the remand, and the extensive factual record already before the Court on class certification, Plaintiffs respectfully propose that one round of briefing, with a limit of no more than 30 pages for opening and opposing papers, and no more than 15 pages for the reply, would allow each side sufficient opportunity to present their positions, in light of *Behrend*, on the legacy contract issue before the Court.

In addition to the proposed supplemental briefing, should either party wish to supplement the already-served expert materials, one additional supplemental expert report of no more than 30 pages (exclusive of tables and exhibits) per side should suffice. Each side would be permitted to take a deposition of the opposing supplemental expert.[8]

Consistent with the foregoing, Plaintiffs propose the schedule below, to follow the October 15, 2013 status conference:

- Within 30 days of the Court's determination of the scope of the remand: Plaintiffs file opening brief and any supplemental expert report.

- Within 30 days of Plaintiffs' submission of opening brief: Deposition of Dr. Gordon Rausser must be completed, and Defendants' response brief due along with any supplemental expert report.

- Within 21 days of Defendants' submission of response brief: Deposition of Defendants' supplemental expert, if any, must be completed, and Plaintiffs' reply brief due.

- Within 21 days of Plaintiffs' submission of reply brief: Deposition of Plaintiffs' supplemental reply expert, if any, must be completed.

---

[8] Defendants would also be permitted to conduct their deposition concerning the rebuttal expert report on the merits by Plaintiffs' expert Dr. Rausser, whose deposition, originally scheduled to take place in September, was postponed by agreement of the parties pending determination by this Court of the scope of, and procedures for, the remand. Plaintiffs anticipate using Dr. Rausser as their supplemental expert. His deposition would therefore cover his supplemental report and merits rebuttal report. No additional deposition of Dr. Rausser related to the merits rebuttal report would be necessary.

9

Dated: September 25, 2013

Respectfully submitted,

_____  
Michael D. Hausfeld (DC Bar #153742)  
William P. Butterfield (DC Bar #420354)  
Seth R. Gassman (DC Bar #1011077)  
Sathya S. Gosselin (DC Bar #989710)  
HAUSFELD LLP  
1700 K Street NW, Suite 650  
Washington, DC 20006  
Telephone: (202) 540-7200  
Facsimile: (202) 540-7201  
Email: mhausfeld@hausfeldllp.com

_____  
Stephen R. Neuwirth  
Richard I. Werder, Jr.  
Daniel L. Brockett  
Kyle R. Taylor  
Ben M. Harrington  
QUINN EMANUEL URQUHART  
  & SULLIVAN, LLP  
51 Madison Avenue, 22nd Floor  
New York, NY 10010  
Telephone: (212) 849-7000  
Facsimile: (212) 849-7100  
Email: stephenneuwirth@quinnemanuel.com

*Co-Lead Interim Class Counsel*

## **CERTIFICATE OF SERVICE**

      I, Kyle R. Taylor, an attorney of record, certify that on September 25, 2013, I caused a true and correct copy of the foregoing to be served by email on counsel for Defendants.

                                              /s/ Kyle R. Taylor