UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER CASES | **<u>FILED UNDER SEAL</u>** |

**<u>DECLARATION OF THOMAS D. CROWLEY</u>**

I, Thomas D. Crowley, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the President of the consulting firm L.E. Peabody & Associates, Inc. I was retained by the Plaintiffs to provide expert testimony about the railroad industry. I submitted an expert report in this matter dated June 12, 2013 ("Report"). I have personal knowledge of the matters contained herein.

2. In my Report, I opine that "[a]round mid-2003. . . there was a clear change in approach by the four Defendant railroads when they all began insisting on non-negotiable fuel surcharges that would not be accompanied by offsetting base rate discounts." *See* Rebuttal Expert Report of Thomas D. Crowley, dated June 12, 2013, at 5 (attached hereto as Exhibit A).

3. My opinions regarding the mid-2003 shift in the Defendants' approach to fuel surcharges are, as specified in my Report, based in large part on my experience in the railroad industry, including my experience negotiating with the railroads on behalf of shippers. *See id.* at 1, 3, 5.

4. In formulating these opinions, I consulted documents relating to four specific confidential contract negotiations in which I participated. Those specific negotiations are described in detail at page 10 of my Report.

5. In late June 2013, I was informed that the Defendants had requested the materials I had relied on in preparing my testimony about contract negotiations. As specified in my Report, however, the materials I reviewed with respect to the specific negotiations described in my Report contain sensitive information subject to confidentiality agreements that I had executed with my shipper clients. *See id*. at 5 n.5.

6. Maintaining the confidentiality of my clients' contract negotiations with railroads is of paramount concern to my clients and me. My disclosure of such information could result in competitive harm to my clients and breach the trust my clients have placed in me.

7. In an effort to satisfy Defendants' request, I had several discussions with my clients, including during the week of July 4, to seek their permission to disclose the requested materials. By July 10, I secured permission from my clients to disclose all the materials I consulted for three of the four specific contract negotiations – specifically, those described in the first, third, and fourth paragraphs at page 10 of my Report. On July 30, I secured my client's permission to disclose, subject to Norfolk Southern's approval, all the materials I consulted for the fourth specific contract negotiation referenced in my Report.

8. I understand that, in addition to the four specific negotiations described in my Report, the Defendants have requested specific information relating to every other contract I have negotiated with a Defendant railroad – namely, the shipper's name, the carrier, the timeframe of the negotiation, the contract term, the route, the commodity, the contract number, and the fuel surcharge terms.

9. In formulating the opinions set forth in my Report, however, I did not read, review, or consider any of the additional information the Defendants have requested.

10. While my Report states that I reviewed hundreds of contracts before and after 2003, *id*. at 6-8, it does so to specify my industry experience. Beyond the four negotiations at page 10 of my Report, I did not review any contracts I negotiated, negotiation files, or any other documents in forming my opinions. Nor are my opinions based on any recollection of particular contracts or negotiations other than the four I discussed at page 10.

11. Instead, I relied on the totality of my experience in the railroad industry, which includes over 42 years of evaluating railroad operations and pricing behavior. *See id*. at 1. As specified in my Report, the mid-2003 change in Defendants' approach to fuel surcharges was remarkable in my experience, and memorable, precisely because it was an industry-wide phenomenon. The railroads' take-it-or-leave-it stance on fuel surcharges that emerged in mid-2003 was unprecedented in its abruptness and was manifested in my dealings with the Defendants and my clients. This change was also widely discussed and understood across the railroad industry. *See id*. at 8. The opinions in my Report rest on my consideration of this significant shift in Defendants' behavior as observed against the backdrop of my industry experience, not isolated contracts (other than those I specifically described) to which I was exposed at the time.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 31, 2013, in La Jolla, CA.

Thomas D. Crowley
Thomas D. Crowley

**CERTIFICATE OF SERVICE**

I, Kyle R. Taylor, an attorney of record, certify that on August 1, 2013, I caused a true and correct copy of the foregoing to be served by email on counsel for Defendants.

/s/ Kyle R. Taylor