# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

_____

This document relates to:

ALL CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF/AK/JMF)

**PUBLICLY FILED VERSION**

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

PART I:       THE NEW LEGAL STANDARDS......................................................................11

    A.       Question 1: *Behrend* And The D.C. Circuit Require That Aggregate Proof
Offered To Justify Class Certification Must Provide A Reliable Means Of
Adjudicating The Claims Of All Class Members In One Stroke.........................13

        1.       A Model Is Not A Reliable Method For Establishing Classwide
Injury Unless It Can Withstand Robust Testing .......................................15

        2.       False Positives—Findings Of Injury Where None Ought To
Exist—Are Disqualifying (Question 2) ....................................................16

        3.       Economic Models Must Fully And Reliably Resolve Disputed
Issues For All Class Members .................................................................17

    B.       Question 3: "Widespread" Injury Fails To Support Class Certification...............19

    C.       Question 4: *Behrend* Establishes That In Class Actions There Must Be A
"Requisite Commonality Of Damages" ................................................................23

PART II:      THE RAUSSER MODEL IS PLAGUED BY DISQUALIFYING
FALSE POSITIVES ........................................................................................25

    A.       Relevant Factual Background ..............................................................................25

        1.       Class Period Fuel Surcharge Formulas Did Not Yield More
Revenue Than The Competitive, Pre-Class Formulas..............................25

        2.       The Rausser Model Is Designed To Find "Damages" Whenever
Fuel Costs Rise ........................................................................................32

        3.       The ███████████████ Guarantees "Structural Breaks"....................37

    B.       Dr. Rausser's Model Produces False Positive Findings Of Injury That
Render His Model Unreliable ..............................................................................39

    C.       Dr. Rausser's Purported "Audit" Of Legacy Shipments Does Nothing To
Explain Or Justify The False Positives ................................................................45

        1.       Prior To *Behrend*, Plaintiffs Freely Admitted That Dr. Rausser's
Model Shows That "Legacy" Shippers Were Injured...............................46

i

2.      Dr. Rausser's "Audit" For "Clean" Legacies Cannot Salvage The Damages Model ........................................................................................50

3.      Plaintiffs' Fallback Position—That Legacy Damages Arise From An Inability To Renegotiate Binding Contracts—Fails............................55

PART III:   COMMON PROOF CANNOT BE USED TO ESTABLISH HARM FROM INCREASED FUEL SURCHARGE COVERAGE....................58

A.      The Coverage Data Demonstrates That Coverage And Enforcement Was Widespread Before The "Conspiracy" And Did Not Materially Accelerate During The Class Period .......................................................................60

B.      Plaintiffs Cannot Prove By Common Evidence That *Every* Class Member Paid Fuel Surcharges Because Of The Alleged Conspiracy ..................................63

PART IV:   THE CLASS CONTAINS THOUSANDS OF UNINJURED SHIPPERS, PRECLUDING A FINDING OF COMMON IMPACT ..............................................................................................66

A.      Plaintiffs' Own Damages Model Finds That Thousands Of Class Members Were Uninjured...............................................................................67

B.      Many Shippers Could Not Have Been Injured By The Conspiracy Plaintiffs Theorize..................................................................................70

PART V:   THE RAUSSER MODEL IS INCAPABLE OF REDUCING THE DETERMINATION OF DAMAGES INTO A VIRTUALLY MECHANICAL TASK .......................................................................73

A.      Plaintiffs Have No Method Of Measuring Individualized Damages....................73

B.      Dr. Rausser's Model Is Not Capable Of Reliably Estimating Damages ...............75

CONCLUSION..................................................................................................80

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Express Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304 (2013) ................................................................................... 12, 25

*Am. Honda Motor Co. v. Allen*,
   600 F.3d 813 (7th Cir. 2010) ................................................................................ 14

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................ 12, 22, 69

*Amgen Inc. v. Conn. Retirement Plans and Trust Funds*,
   133 S. Ct. 1184 (2013) ......................................................................................... 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 13

*Babineau v. Fed. Express Corp.*,
   576 F.3d 1183 (11th Cir. 2009) ............................................................................ 18

*Bell Atl. Corp. v. AT&T Corp.*,
   339 F.3d 294 (5th Cir. 2003) ................................................................... 18, 23, 75

*Bigelow v. RKO Radio Pictures, Inc.*,
   327 U.S. 251 (1946) ............................................................................................. 57

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ................................................................................ *passim*

*Daubert v. Merrell Dow Pharmaceuticals*,
   509 U.S. 579 (1993) ....................................................................................... 14, 15

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
   773 F.2d 1506 (9th Cir. 1985) ............................................................................. 57

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982) ............................................................................................... 3

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ...................................................................... 22, 23, 25

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) .................................................................. 18

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .................................................................................... 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ...................................................................... *passim*

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   287 F.R.D. 1 (D.D.C. 2012) ......................................................................... *passim*

*Kohen v. Pac. Inv. Mgmt. Co.*,
   571 F.3d 672 (7th Cir. 2009) .................................................... 11, 20, 22, 71

*McCarthy v. Kleindienst*,
   741 F.2d 1406 (D.C. Cir. 1984) ............................................................... 18

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) ................................................................. 17, 21

*Meister v. Med. Eng'g Corp.*,
   267 F.3d 1123 (D.C. Cir. 2001) ............................................................... 15

*Mims v. Stewart Title Guar. Co.*,
   590 F.3d 298 (5th Cir. 2009) .................................................... 11, 20, 22, 71

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ................................................................. 18

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ....................................................................... 12

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*,
   319 F.3d 205 (5th Cir. 2003) ............................................................... 23

*Sher v. Raytheon Co.*,
   419 F. App'x 887 (11th Cir. 2011) ........................................................ 14

*United Food Mart, Inc. v. Motiva Enters., LLC*,
   404 F. Supp. 2d 1344 (S.D. Fla. 2005) .................................................. 15

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ............................................................. 18

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .................................................................. *passim*

*Windham v. Am. Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) .................................................... 23, 25, 75

**STATUTES**

15 U.S.C. § 15(a) ......................................................................................................... 21

28 U.S.C. § 2072 .......................................................................................................... 12

28 U.S.C. § 2072(b) ...................................................................................................... 12

42 U.S.C. § 2000e *et seq.* ................................................................................... 17, 19, 21

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, *Econometrics:  Legal, Practical, and Technical Issues*
    (ABA Publishing 2005) ............................................................................................ 17

Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (4th ed. 2013) ...................................................... 40

Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed. 2005) ....... 40

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97 (2009) ................................................................. 17, 18, 20, 65

Jeffrey R. Wooldridge, *Introductory Econometrics: A Modern Approach* (5th ed. 2012) ........... 76

**RULES**

Fed. R. Civ. P. 23 ............................................................................................... *passim*

Fed. R. Civ. P. 23(a) ................................................................................................. 20, 21

Fed. R. Civ. P. 23(b)(3) ...................................................................................... *passim*

Fed. R. Civ. P. 30(b)(6) ............................................................................................... 49

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs' approach to class certification is equal parts denial and misdirection. They deny the changes in class certification law that led the D.C. Circuit to vacate this Court's prior order and direct this Court to "reconsider [class certification] in light of *Comcast Corp. v. Behrend*," 133 S. Ct. 1426 (2013), and its own opinion. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 12-7085 (D.C. Cir. Sept. 19, 2013) (per curiam). They then try to limit the remand to an exercise in taxonomy about what constitutes a "legacy" shipment and dispute the *number* of them—as if that exercise somehow meets their burden under Rule 23 and *Behrend*. Plaintiffs do *nothing* to prove that they meet the new and more demanding standards for class certification. They never defend the Rausser model under the D.C. Circuit's "reliability" standard, never explain how they intend to prove causation and injury for *every* class member (now that the D.C. Circuit has held that "widespread" injury is insufficient), never rebut Defendants' expert's showing that under the Rausser model there are thousands of "uninjured" shippers included in the class, and do not produce or defend the long-promised estimates of individual shipper damages—an imperative after *Behrend*.

This approach is a clear default on Plaintiffs' burdens under the law. It is beyond reasonable debate that there must be a fresh analysis of class certification. The D.C. Circuit found that the legal standards and precedents underlying this Court's prior certification decision were "far more accommodating to class certification under Rule 23(b)(3)" than is appropriate after the 2013 *Behrend* decision. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("*D.C. Cir. Op.*"). As Plaintiffs acknowledge, the changes in law are rooted in both *Behrend* and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2546 (2011). Pls.' Supplemental Mem. of Law in Support of Mot. for Class Cert., Dec. 19, 2013 ("Pls.' Mem.") 8-11. Those cases treat class actions—including antitrust class actions—as "an exception to the

usual rule that litigation is conducted by and on behalf of the individual named parties only[,]"
and Rule 23(b)(3) class actions as an "adventuresome innovation" to be used only when it is
clear such an approach will not sacrifice substantive rights. *Behrend*, 133 S. Ct. at 1432
(citations and quotations omitted). The Supreme Court has made it clear that lower courts must
consider not only class plaintiffs' proposed method of litigating a case—which they will always
say constitutes "common proof"—but also any dissimilarities among class members that would
impede classwide adjudication. And it is steadfast in its view that the right of the defense to
raise legitimate individualized issues cannot be ignored: *Wal-Mart* holds that "a class cannot be
certified on the premise that [the defendant] will not be entitled to litigate its . . . defenses to
individual claims." *Wal-Mart*, 131 S. Ct. at 2546.

The D.C. Circuit vacated the prior class certification in light of these changes. It held
that the "plausibility" standard applied to Dr. Rausser's work, and the "widespread" injury
standard applied in assessing the predominance of common questions, were contrary to the new
standards. *D.C. Cir. Op.*, 725 F.3d at 252-55. It further held that if Dr. Rausser's model
generates "false positives," it would "shred" Plaintiffs' case for certification. *Id.* at 252-53.
Plaintiffs argued the mandate was narrow, but this Court did not agree. The Court directed
Plaintiffs and Defendants to address four broad issues, and warned Plaintiffs that if all they
intended to say was that "nothing has changed, then I think we've got a problem." Ex. 1, Scope
of Remand Hr'g Tr. 36:6-7, Oct. 15, 2013.[1]

Yet that is essentially what Plaintiffs are now arguing. The unstated premise of
Plaintiffs' renewed motion is that the Court's prior findings—even though made under a legal
framework that has been disapproved—will support class certification under the proper standards

---

[1] All exhibit references are to the Declaration of Timothy O'Mara, filed concurrently herewith.

as long as Plaintiffs can come up with some reason to believe that legacy shipments "would have been affected by the coordination among the Defendants." Supplemental Expert Report of Gordon Rausser, Ph.D., Dec. 19, 2013 ("Rausser Suppl. Rep.") 7.

This myopic approach is not consistent with the D.C. Circuit's mandate. The Court's duty is to carry out the remand in full, not merely to address Plaintiffs' one cherry-picked issue. The Court has acknowledged this unequivocally, stating at the hearing on the scope of the remand that it wants to consider all that is needed "to get it right." Ex. 1, Scope of Remand Hr'g Tr. 7:1-3, 40:12-13, Oct. 15, 2013. Furthermore, class certification may always be reconsidered in "light of subsequent developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982). The analytical work bearing on class certification in this case has advanced substantially since the class certification proceedings three-and-a-half years ago and is now focused not on *promises* of common proof that Dr. Rausser might develop, but his *actual proposed trial testimony*.[2] Plaintiffs do not get a free pass on the class certification implications of Dr. Rausser's proposed trial testimony, or Defendants' responses to it.

Plaintiffs' efforts to explain away the false positives—and, remarkably, to deny that there could even be a "false" finding of injury in this case—are baseless. They require changing the very nature of the alleged conspiracy, which is directly contrary to *Behrend*.

*Behrend* and the D.C. Circuit decision hold that a plaintiff's injury and damages model "must be consistent with its liability case." *Behrend*, 133 S. Ct. at 1433 (citation and quotations omitted); *D.C. Cir. Op.*, 725 F.3d at 253 ("Predicating class certification on a model divorced from the plaintiffs' theory of liability, the [Supreme] Court held, indicates a failure to conduct

---

[2] At this point, Dr. Rausser has submitted five expert reports, including the most recent report in this remand proceeding. Only Dr. Rausser's first two reports were part of the record when the Court ruled on Plaintiffs' initial motion for class certification.

the rigorous analysis demanded by Rule 23."). Accordingly, "[t]he first step in a damages study

is the translation of the *legal theory of the harmful event* into an analysis of the economic impact

*of that event*." *Behrend*, 133. S. Ct. 1435 (emphasis in original) (citation omitted).

There is no doubt that if one proceeds, as *Behrend* requires, from Plaintiffs' long-stated

liability theory, Dr. Rausser's damages methodology finds positive damages "where none could

exist." *D.C. Cir. Op.*, 725 F.3d at 252. That liability theory—the foundation of this Court's

class certification decision—has always been about the widespread imposition of allegedly

conspiratorial fuel surcharges in July 2003 that were "more aggressive" than previous

surcharges, *i.e.*, the surcharge formulas "yielded more revenue" at a given cost of fuel than prior

surcharges. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 46, 48-49 (D.D.C.

2012) ("*Class Cert. Op.*"). Plaintiffs and the Court likened this to a new and more aggressive

"tax, increasing the total price of shipping by a set percentage." *Id.* at 14. This Court was very

clear in its class certification order that "the claim in this case is not a conspiracy to impose *any*

fuel surcharge; rather, plaintiffs claim that defendant[s] conspired to increase total prices by

widespread application and enforcement of *coordinated, and aggressive, fuel surcharges*." *Id.* at

55 (emphasis in original) (quotations omitted); *see also id.* at 48.[3]

The D.C. Circuit thus reasoned that shipments subject to *pre-conspiracy pricing* should

not generate damages findings. *D.C. Cir. Op.*, 725 F.3d at 252. Such findings are as a matter of

law "false positives" that preclude class certification. *Id.* This is the logic underlying

Dr. Rausser's pre-*Behrend* sworn testimony that "a shipper couldn't have been injured by the

conspiracy if it was merely paying a fuel surcharge by virtue of a price authority that it entered

---

[3] The Court echoed the position articulated by Plaintiffs' counsel at the class certification
hearing: "[T]he claim of the plaintiffs is not as to *all* fuel surcharges; it's only as to that
coordinated *standardized* fuel surcharge *formula* that was collusively imposed by the
defendants." Ex. 2, M. Hausfeld Arg., Hr'g Tr. 308:15-20, Oct. 7, 2010 (emphasis added).

prior to the conspiracy," and for excluding such "legacy" shipments from the class definition. Ex. 3, Rausser Dep. 275:1-16, Sept. 24, 2010.

The problem for Plaintiffs—which the false positives inquiry exposed—is that Dr. Rausser's damages findings have nothing to do with "more aggressive" fuel surcharge formulas. There is nothing in Dr. Rausser's model that can distinguish between competitively adopted fuel surcharges and "*coordinated, and aggressive, fuel surcharges*." *Class Cert. Op.*, 287 F.R.D. at 55 (emphasis in original) (quotations omitted). Indeed, Dr. Rausser now claims that "whether there's more or less earnings power" due to changes in fuel surcharge formulas is "not relevant" to his assessment of injury and damages. Ex. 4, Rausser Dep. 52:23-53:5, 69:3-12, 76:22-77:8, Mar. 4, 2014.[4] An entirely different logic is driving Dr. Rausser's model, and as soon as one understands what that is and how irrelevant fuel surcharges are to it, it becomes clear that the model will "detect[] injury where none could exist" and generate damages findings altogether "divorced from the plaintiffs' theory of liability." *D.C. Cir. Op.*, 725 F.3d at 252-53.

Plaintiffs no longer want to ground their case in "more aggressive" fuel surcharges for good reason: in fact, the allegedly conspiratorial surcharge formulas do not materially "yield more revenue" at the Class Period fuel prices—and certainly not across the board (as Plaintiffs' theory requires). Some of the most significant fuel surcharge formulas in effect during the Class Period *never changed at all*, and some were *lowered*. For example, BNSF's public intermodal formula was unchanged from 2001 to well after the Class Period, and UP actually reduced its public intermodal formula—twice. *Infra* Part II:A.1. Furthermore, at Class Period fuel prices,

---

[4] The same disconnect exists with respect to "coverage": Plaintiffs' liability theory emphasizes an allegedly collusive "goal of 100 percent coverage" during the Class Period, in contrast to the pre-Class Period when, Plaintiffs allege, there was minimal coverage or enforcement of fuel surcharges. But rate-based fuel surcharge coverage had reached approximately ▉ on new contracts *before the conspiracy*. Dr. Rausser has not modeled coverage and cannot predict who accepted surcharges because of the conspiracy. *Infra* Part III:B.

the pre-"conspiracy" and Class Period public carload surcharge formulas (the primary focus of Plaintiffs' arguments) generate *essentially the same revenues*.  The difference in earning power for any Defendant—when there is a difference—is on the order of *one percent*, which Dr. Rausser himself characterized as "approximately the same."  Ex. 4, Rausser Dep. 36:5-10, Mar. 4, 2014.  It is therefore mathematically impossible for Dr. Rausser to devise a methodology that will produce billions of dollars in damages to class members without also showing damages to shippers with admittedly competitive fuel surcharge provisions.  The two groups are too alike.

Dr. Rausser therefore does not measure damages with any regard for the incremental earning power of "more aggressive" fuel surcharges.  Nor do "more aggressive" fuel surcharges have anything to do with the vaunted "structural break."  Instead, Dr. Rausser generates both with a modeling trick that converts legitimate fuel cost recovery into "damages."

Perhaps the most important fact in this case is that the price of diesel fuel during the Class Period was essentially *double* the average price before the Class Period—and at times more than double.  Declaration of Joseph Kalt, Mar. 31, 2014 ("Kalt Decl.") ¶ 47, Fig. 6.[5]  As a result, Defendants' fuel expense grew from an average of 9.7% of overall operating expenses during the pre-Class Period to an average of 17.9% of operating expenses (and peaking at much higher levels) during the Class Period.  *Id.* at ¶ 48, Fig. 7.  Dr. Rausser admits that with or without fuel surcharges Defendants would have recovered those higher costs by passing them through to shippers.  Yet Dr. Rausser's damages estimates are generated by assuming that the "proper" relationship between a railroad's rates and its fuel costs, *i.e.*, how much rates should increase when fuel prices rise, *never changes* even when fuel prices increase two or even three

---

[5] Dr. Joseph Kalt has taught economics at Harvard since 1978, among his many credentials. Dr. Kalt submitted a report on liability and damages on behalf of all Defendants at the merits phase.  His declaration here substantially builds off of that work.

times.  As we demonstrate below, this assumption (which is hard-wired into Dr. Rausser's damages model as a ███████████████ ) mathematically generates "damages" if Defendants simply recover their higher fuel costs.  Recovering higher fuel costs also leads to what Dr. Rausser calls the "structural break," and if one tests the structural break—as the D.C. Circuit suggested, but Dr. Rausser refuses to do—Dr. Rausser's model yields a structural break at nearly any date tested.  The ███████████████ assumption also guarantees that Dr. Rausser's model will find damages *irrespective of what changes occurred with respect to fuel surcharge formulas*.  A model that does not allow ordinary fuel cost recovery is bound to produce false positives, and the Rausser model does exactly that.

Plaintiffs cannot honestly argue otherwise.  Dr. Rausser's damages methodology has always generated "overcharges" and "damages" for shipments *he* excluded from the class because *he* concluded they were subject to pre-"conspiracy" contracts.  *See* Kalt Decl. ¶¶ 35-38. Plaintiffs never argued otherwise prior to *Behrend*.  To the contrary, when, during the prior class certification proceedings, Defendants' expert pointed this out, Dr. Rausser *confirmed it*, quibbling only with the *amount* of the overcharge.  And now, numerous tests confirm it again, in many different ways.  False positives are evident on:

- Shipments subject to fuel surcharge formulas that were *exactly the same* before and during the Class Period.  *Id.* at ¶¶ 37-38, Fig. 2.

- Shipments subject to fuel surcharge formulas that were *reduced* during the Class Period.  *Id.*

- Shipments that *occurred in the three years before* the alleged start of the conspiracy. *Id.* at ¶¶ 41-42, Fig. 5.

In fact, if we replace the rates paid in the Class Period with rates merely equal to the Defendants' variable costs—in other words, if we remove all *profit* and therefore all *overcharge potential* from the rates—the false positives persist.  *Id.* at ¶¶ 61-64, Fig. 11.

Plaintiffs' featured argument—Dr. Rausser's supposedly "painstaking" audit of his own prior work identifying legacy shipments—does nothing to cure this problem, and is really just a misdirection play.  Dr. Rausser now contends that over ██ of the shipments *he* previously classified as legacies are not really legacy shipments, either because they had "self-adjusting or adjustable" fuel surcharge provisions (what Dr. Rausser calls "Category 1") or surcharge provisions adopted during the alleged conspiracy (what Dr. Rausser calls "Category 2").  Rausser Suppl. Rep. 37-38.  That means Dr. Rausser is now contending his previous legacy work contained *more than* ██████ *errors*.  His latest work is riddled with errors as well, but most importantly *it has nothing to do* with any change to the fuel surcharge formulas that might explain the false positives.  Dr. Rausser made no effort to verify that the contracts he now claims were not truly "legacy" (because they were adjusted or adopted during the Class Period) resulted in *higher* fuel surcharges than the shippers agreed to in the pre-Class Period.  He testified that he could think of no reason to do that.  Ex. 4, Rausser Dep. 126:20-128:4, 132:4-25, Mar. 4, 2014.  In fact, he admitted at his deposition that he transferred entire categories of shipments to his non-legacy categories even where fuel surcharge adjustments during the Class Period had *no impact* or even *reduced* pre-Class Period surcharge formulas.  This legacy audit offers no useful information on the issues that concerned the D.C. Circuit.

But it is worse than that.  Plaintiffs and Dr. Rausser are also now denying the possibility of false positives during the Class Period by, for the first time, arguing that "the [alleged] conspiracy raised all-in rates for *all shippers with rate-based FSCs*, including any 'legacy' contracts for which the FSC formulas were set before formation of the conspiracy and did not change during the conspiracy."  Pls.' Mem. 28 (emphasis added).  The need for this argument is clear:  Dr. Rausser could not figure out a way to assign *all* of the shipments he previously

identified as legacy to his new non-legacy categories, and his model continues to find substantial "overcharges" on legacy shipments.  Kalt Decl. ¶ 35, Fig. 1.  Since it is the fact of false positives, not their precise number, that demonstrates the unreliability of the model and "shred[s] the plaintiffs' case for certification," *D.C. Cir. Op.*, 725 F.3d at 252, Dr. Rausser and Plaintiffs needed a second argument to deal with undisputed legacy shipments.

The result, quite simply, is that Plaintiffs have taken the fuel surcharges out of *In re Rail Freight Fuel Surcharge Antitrust Litigation.*  With no other way to explain the false positives, Plaintiffs have abandoned the cornerstones of their prior case—(1) that the "conspiratorial" fuel surcharge formulas were "more aggressive" than preexisting formulas; (2) that class members would not have paid these "more aggressive" surcharges absent the alleged conspiracy; and (3) that a "structural break" proves both the alleged conspiracy and its common impact. Dr. Rausser now contends that whether the Class Period fuel surcharges had greater earning power than the pre-class fuel surcharges is "not relevant" to this case (Ex. 4, Rausser Dep. 52:23-53:5, Mar. 4, 2014); the vaunted structural break is all but gone, mentioned *one time* in Plaintiffs' entire brief (in a footnote); and somehow even shippers whose fuel surcharge formulas did not change, changed in immaterial ways, or were even reduced are harmed.

Plaintiffs cannot fundamentally rewrite their theory of liability to evade the D.C. Circuit's holding.  The rule of *Behrend* is that a plaintiff's injury and damages model "must be consistent with its liability case," *Behrend*, 133 S. Ct. at 1433 (citation and quotations omitted), and the D.C. Circuit has squarely held that false positives *in relation to* Plaintiffs' "more aggressive" fuel surcharges theory "shred" the case for class certification.  *D.C. Cir. Op.*, 725 F.3d at 252.  One cannot reverse the logic and conform the liability theory to whatever the model finds.

Even if reimagining the conspiracy were permissible, the case for class certification without a more aggressive fuel surcharge that acts as a type-marker for an injured shipper is far different than the case Plaintiffs presented in 2010.  This Court's prior analysis depended on a stark contrast between (a) a pre-conspiracy marketplace in which fuel surcharges were moderated by competition, and (b) one in which allegedly virtually every class member became subject to new, more aggressive, supracompetitive fuel surcharges.  We disagree that even under those facts, class certification was appropriate, but if that stark transformation is *not* there, which it is not, Plaintiffs' case collapses entirely.

The focus on false positives required by *Behrend* and the D.C. Circuit opinion has unraveled Plaintiffs' case.  Under the standards adopted by the Supreme Court in *Behrend* and *Wal-Mart*, and by the D.C. Circuit in this very case, class certification must be denied.

\* \* \*

**Part I** of this memorandum addresses the legal standards for class certification after the D.C. Circuit decision, *Wal-Mart*, and *Behrend*.  We debunk Plaintiffs' argument that nothing has really changed, and address the legal questions propounded in the Court's October 16, 2013 Order (ECF No. 691).

**Part II** addresses the false positives question comprehensively.  We show that the false positives are admitted, verified, and "shred" the case for class certification.

**Part III** addresses Plaintiffs' theory of injury via increasing surcharge "coverage."  We show that there was no dramatic change in fuel surcharge coverage levels at the time of the alleged conspiracy; that Plaintiffs have no common proof of coverage; and Dr. Rausser has not developed a model that even purports to address coverage.  As such, there is no longer any

tenable argument that whether particular individual shippers paid a fuel surcharge *because of* the alleged conspiracy can be resolved for all class members in "one stroke."

Part **IV** addresses common impact, in particular the significance of "uninjured" class members.  Defendants show that even under Dr. Rausser's flawed methodology (*i.e.*, accepting his model as is with no adjustments)▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆)—including one of the named Plaintiffs—have no damages on any shipment, and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆)—including three of the named Plaintiffs—have zero or negative net "damages" on their shipments.  Kalt Decl. ¶¶ 73-74, Fig. 13.  These findings are understated (since they are the product of a model rigged to find damages) but nonetheless dispositive under the D.C. Circuit decision.

Finally, **Part V** addresses the damages implications of *Behrend*.  Plaintiffs have declined to produce damage estimates for individual class members, a default on their burden under *Behrend*.  Plaintiffs could not meet that burden anyway, because in the circumstances of this case damages analysis is highly individualized.

**PART I:        THE NEW LEGAL STANDARDS**

This Court asked the parties to address four issues concerning whether *Behrend* and/or the D.C. Circuit's opinion:  (1) "establish a more demanding standard for evaluating expert proof of classwide injury than the standard previously applied by this Court;" (2) make false positives disqualifying; (3) reject the widespread injury rule of *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298 (5th Cir. 2009), and *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009); and (4) establish any new principles concerning "individualized damages determinations" in class certification analysis.  Oct. 16, 2013 Order at 2-3.  The short answer to all four questions is yes; *Behrend* and the D.C. Circuit's opinion reflect an important shift in how courts must conduct a

class certification analysis.  That change is part of a broader trend in class certification law evident not only in those decisions, but also in *Wal-Mart* and other recent cases.

In its recent decisions, the Supreme Court has emphasized that class certification is not meant to be the norm, including in antitrust cases.  *See Behrend*, 133 S. Ct. at 1432 ("The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'") (citation omitted); *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (antitrust case: "Rule [23] imposes stringent requirements for certification that in practice exclude most claims.").  It has narrowed the fundamental concept of a "common question," holding in *Wal-Mart* that a question is "common" only if it is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.  It has emphasized that to justify class treatment, classwide litigation must be able to "resolve" the common issues, and resolve them for *everyone*—all class members and all defendants—without altering anyone's burdens under the governing law and, critically, without prejudicing the defendants' right to advance individualized defenses.  *Id.* at 2561 ("[A] class cannot be certified on the premise that [defendants] will not be entitled to litigate [their] statutory defenses to individual claims.").[6]  If litigation by common proof cannot accomplish that goal, there is no possible basis for saying common questions predominate.  *Id.*

---

[6] This has become a common refrain in Supreme Court class certification cases, and is grounded in the Rules Enabling Act, which "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right[.]'"  *Wal-Mart*, 131 S. Ct. at 2561 (quoting 28 U.S.C. § 2072(b)); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999).  The Court has even reiterated the point in a post-*Behrend* antitrust case, noting that "the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim" and that any presumption that class action procedures must be available in antitrust cases likely "would be an 'abridg[ment]' or 'modif[ication]' of a 'substantive right' forbidden to the Rules[.]"  *Am. Express*, 133 S. Ct. at 2309-10 (quoting 28 U.S.C. § 2072(b)).

The Court has also addressed what is expected of expert proofs offered in support of class certification. Plaintiffs can always use seemingly sophisticated mathematical tools to model the aggregate experience of even the most diverse class, and assert that those aggregate proofs are appropriate. Class certification standards had evolved to tolerate a broad range of quality in such proofs, as well as the imprecision that results when one generalizes about class members rather than studying individual circumstances. The Supreme Court and the D.C. Circuit have now forcefully reasserted a profoundly different perspective—aggregate proofs of liability, injury, and even damages must be subjected to rigorous scrutiny to make sure that aggregation does not ignore critical evidence, that the proposed expert proof fits the liability theory, that it meets accepted professional standards, that its reliability has been tested, and that it obviates the need for individualized evidence at trial.

**A.  Question 1: *Behrend* And The D.C. Circuit Require That Aggregate Proof Offered To Justify Class Certification Must Provide A Reliable Means Of Adjudicating The Claims Of All Class Members In One Stroke**

Prior to *Behrend*, some courts held that to satisfy Rule 23 proposed common proof need only be a "plausible" method of proving a fact. *Class Cert. Op.*, 287 F.R.D. at 26 (relying on Third Circuit *Behrend* decision). Plausibility has always been a controversial rubric. It is essentially a pleading standard[7] and permits class certification even when a model has evident flaws. In application it also focused exclusively on whether *plaintiffs* had a "plausible" way to prove *their* case through common evidence (such as a "workable" regression), with little or no regard to whether the defendants had individualized rebuttals that they were entitled to present.

*Behrend* makes clear that Rule 23 is not a "mere pleading standard" but requires the moving party to demonstrate that the Rule's requirements are "*in fact*" satisfied, and that

---

[7] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face'") (citation omitted).

certification is proper only if "the trial court is satisfied, after a rigorous analysis, that [Rule 23's] prerequisites . . . have been satisfied." 133 S. Ct. at 1432 (emphasis in original; citations omitted). The D.C. Circuit cited this Court's reliance on the Third Circuit's plausibility standard as the primary example of "case law . . . far more accommodating to class certification" than is appropriate after *Behrend*, and held that "Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it." *D.C. Cir. Op.*, 725 F.3d at 255.[8]

The D.C. Circuit decision holds that a class certification model must be evaluated for "soundness" and must be shown to be a "reliable means" of proving what it purports to prove. *Id.* at 252-53, 255. But what is the difference between "plausible" and "reliable" or "sound?" We believe that in addition to basic admissibility standards (*i.e.*, *Daubert*),[9] the new standard— "reliable"—embraces at least three important features.

---

[8] Plaintiffs suggest that *Behrend* holds that a "model must 'plausibly' show a common theory of impact[.]" Pls.' Mem. 10 n.9 (citing *Behrend*, 133 S. Ct. at 1435 n.6). The citation is to a footnote, which Plaintiffs badly misread. The Court was making the point that even if the model offered by Dr. James McClave (one of Plaintiffs' experts in this case) only studied effects from "the deterrence of overbuilding, it still would not have established the requisite commonality of damages unless it plausibly showed that the extent of overbuilding (absent deterrence) would have been the same in all counties, or that the extent is irrelevant to effect upon ability to charge supra-competitive prices." *Behrend*, 133 S. Ct. at 1435 n.6. This is simply an observation that the McClave model assumed, implausibly, that the deterrence of overbuilding hurt all class members alike. It is not an endorsement of a "plausibility" standard, as is made clear by the D.C. Circuit's subsequent opinion interpreting *Behrend*.

[9] *Daubert v. Merrell Dow Pharmaceuticals* and its progeny establish "a standard of evidentiary reliability." 509 U.S. 579, 590 (1993). Although the Supreme Court has not settled the issue, it makes no sense to think that evidence which fails under the considerable body of *Daubert* reliability law can be the "reliable" common proof the D.C. Circuit requires to justify class certification. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010) (requiring *Daubert* analysis); *Sher v. Raytheon Co.*, 419 F. App'x 887 (11th Cir. 2011) (same). At the oral argument in *Behrend*, five Justices (Kagan, Kennedy, Alito, Scalia and Sotomayor) questioned why it made any difference whether a *Daubert* motion was filed if it was agreed that the district court had to find the expert proof reliable. Ex. 5, Tr. of Oral Argument at 25:20-26:8, 28:2-20, 29:6-24, 30:8-31:5, 31:11-16, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426

### 1.    A Model Is Not A Reliable Method For Establishing Classwide Injury Unless It Can Withstand Robust Testing

At a very basic level, the difference between a "plausibility" standard and a "reliability" standard is the difference between *potential* value and *proven* value; between what a plaintiff claims is "workable" and what actually "works."  That means the model's predictive powers must be *validated by testing*.  *Daubert*, 509 U.S. at 593 ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested."); *see also id.* at 593 ("'the scientific status of a theory is its falsifiability, or refutability, or testability'") (citation omitted); *cf. Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir. 2001) (expert testimony "must be supported by appropriate validation"); *United Food Mart, Inc. v. Motiva Enters., LLC*, 404 F. Supp. 2d 1344, 1348-50 (S.D. Fla. 2005) (excluding expert's opinion regarding the relevant geographic market because it was based on an assumption that was not tested).

The D.C. Circuit specifically criticized Dr. Rausser for not testing his work, in particular the previously all-important "structural break."  *D.C. Cir. Op.*, 725 F.3d at 254 (suggesting that Plaintiffs "rerun[] both [Rausser] models from an earlier start date").  Indeed, the false positives issue is an object lesson in what happens to a supposedly "plausible" model when tested.  It is therefore unacceptable that Dr. Rausser refuses to test either the structural break or his model's propensity towards false positives.  Untested, his work is unreliable as a matter of law.

---

(2013) (No. 11-864).  As Justice Sotomayor put it, "The problem everyone's having is – I think – [] why do you need *Daubert* to point out that something is not probative or unreliable?"  *Id.* at 50:24-51:1.  Defendants agree with this reasoning, and therefore do not intend to make a *Daubert* motion at this time.  We reserve all rights to do so should this case proceed to trial.

**2.      False Positives—Findings Of Injury Where None Ought To Exist—Are Disqualifying (Question 2)**

The D.C. Circuit held that if a model "purports to quantify the injury in fact to all class members[,]" but "the same methodology also detects injury where none could exist"—*i.e.*, the model generates false positives—then "there exists no reliable means of proving classwide injury in fact." *D.C. Cir. Op.*, 725 F.3d at 252-53.  Indeed, "[i]f accurate, this critique [of the Rausser model] would shred the plaintiffs' case for certification."  *Id.* at 252.

This clear-cut rule—the answer to the Court's Question 2—was derived from *Behrend*, where the Supreme Court held that "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case,'" and a "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to th[e] theory" of anticompetitive injury.  133 S. Ct. at 1433.  A "methodology that identifies damages that are not the result of the wrong[,]" the Supreme Court held, cannot satisfy Rule 23(b)(3).  *Id.* at 1434.  This is not a question of class definition, such that one can solve a false positives problem by changing the contours of the class.  A model that predicts damages where it should not cannot be trusted as proof of *anything*, and certainly does not suffice as proof of whether cognizable, classwide antitrust injury has occurred.  *See id.* at 1434-35; *D.C. Cir. Op.*, 725 F.3d at 254 ("As things stand, we have no way of knowing the overcharges the damages model calculates for class members is any more accurate than the obviously false estimates it produces for legacy shippers.").

Plaintiffs agree that these holdings are "not controversial."  Pls.' Mem. 2 ("plaintiffs have never disagreed" that "there would be something wrong with a model that shows damages for shippers that could not have been injured").  They contend, however, that the debate over false positives is really a debate over the proper "benchmark" for what prices would have been in the

"but for" world, and as such presents a jury issue. *See id.* at 38-40. The D.C. Circuit decision unquestionably forecloses this argument. The court held that false positives "shred" the case for class certification, and that what a class certification model shows presents an issue of law. *D.C. Cir. Op.*, 725 F.3d at 252-53. And Defendants' experts are not just quibbling with the facts underlying Dr. Rausser's model. They have illustrated that Dr. Rausser's model is fundamentally unreliable because—even on its own terms—it assigns injury in multiple scenarios where no injury could exist.

### 3. Economic Models Must Fully And Reliably Resolve Disputed Issues For All Class Members

A reliable model also must capture the full panoply of facts that bear on the issues it addresses and that could be decisive if the class members' claims were tried individually. As Professor Nagareda notes, "the real concern about aggregate proof in class certification lies in its threat 'to conform the law to the proof.'" Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 104 (2009) (hereinafter "Nagareda"), quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 220 (2d Cir. 2008). This was the Supreme Court's concern in *Behrend*, 133 S. Ct. at 1435 n.6, where the damages model failed to account for the geographic effects of "overbuilding," and in *Wal-Mart*, 131 S. Ct. at 2551, where the disparate-impact study fell short of addressing all relevant Title VII considerations. It was also the basis for the Court's separate holding in *Wal-Mart* rejecting a proposed "Trial by Formula," where the formulas left out so much important detail that basing decisions on them would have prejudiced the defendant's right to assert individualized defenses. 131 S. Ct. at 2561. The Supreme Court is unwilling to allow the plaintiffs' proposed common proof to constrain the range of proof otherwise permissible, viewing that as a violation of the Rules Enabling Act. *Id.*

The concern arises because "[i]t is always possible to perform a regression with the price as the dependent variable and with a variety of independent variables." *ABA Section Of Antitrust Law, Econometrics: Legal, Practical, And Technical Issues* 221 (ABA Publishing 2005). "[T]his does not mean, however, that impact can be shown with common proof, or that damages can be calculated in a formulaic manner." *Id*. The Court must rigorously scrutinize the regression, which "presupposes—at least as a matter of economic or statistical methodology—the aggregate unit whose legitimacy the court is to determine," in order to assess whether it justifies limiting the proofs in the lawsuit to competing aggregate proofs. *Nagareda*, 84 N.Y.U. L. Rev. at 103. That is clearly not justified when a model obscures important differences among class members, such as through the excessive use of averages. *See, e.g.*, *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003). It is clearly not when the model fails to consider important factors bearing on price. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 972 (C.D. Cal. 2012). And it clearly cannot be done "on the premise that [defendants] will not be entitled to litigate . . . defenses to individual claims." *Wal-Mart*, 131 S. Ct. at 2561.[10] A court may limit the dispute to a battle of aggregate proofs only upon a finding that the model so reliably and comprehensively captures the underlying facts relevant to each class member's claim that individualized evidence can be excluded as irrelevant or repetitive under the Rules of Evidence.

There are cases where this is possible because the underlying substantive law makes the key issues "common," such as when the fraud-on-the-market doctrine dictates a classwide

---

[10] Prior decisions have often come to the same conclusion. *See, e.g.*, *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413-15 & n.9 (D.C. Cir. 1984) (holding that certification was properly denied because defendants were entitled to rebut plaintiffs' proposed common proof with individualized evidence); *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191-94 (11th Cir. 2009) (same); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1277 (11th Cir. 2009) (same); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191-92 (3d Cir. 2001) ("actual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member").

presumption of reliance in securities cases.  *See Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 133 S. Ct. 1184 (2013); Nagareda, 84 N.Y.U. L. Rev. at 116-17.  Or it may be clear from the facts, such as in the prototypical antitrust case where every purchaser bought the same fungible product at the same uniform, market-wide price, and the factors bearing on injury and damages are simple and mechanical.  But the crucial point, for present purposes, is that Plaintiffs' ability to construct a "plausible" or "workable" multiple regression analysis *does not* establish that the underlying issues are common in the legally relevant sense.  Only if the model *succeeds* in obviating the need for voluminous, individualized rebuttal (by rendering such proof irrelevant and repetitive) can it be said to facilitate classwide resolution.  *Wal-Mart*, 131 S. Ct. at 2555 (rejecting Title VII regression model that did not obviate defendants' rebuttal that its employment decisions were gender-neutral and performance based).  One cannot say that where, as here, the facts disclose complexity (a) that the model cannot capture, and (b) that Defendants would be entitled to litigate if the cases were tried separately.

This is an issue of law for the court alone.  *Behrend* specifically holds that when an economic model is offered to prove Rule 23 criteria, what the model proves is a question of law.  *Behrend*, 133 S. Ct. at 1433 n.5 ("while the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold").  A "reliability" analysis proceeds with none of the deference to the jury that the "plausible" or "workable" formulations imply.

## B.      Question 3: "Widespread" Injury Fails To Support Class Certification

Throughout its class certification opinion, this Court answered Defendants' evidence that the circumstances of individual class members relevant to causation, injury, and damages varied, often dramatically, by stating that Plaintiffs' evidence plausibly demonstrated "widespread" injury within the class and that exceptions appeared to be "rare," "outliers" or "anomalies."

*Class Cert. Op.*, 287 F.R.D. at 28, 50, 52, 57, 58, 60, 61, 64.  The Court relied on the Fifth and Seventh Circuit opinions in *Mims* and *Kohen* for this approach, specifically the proposition that "inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class." *Id.* at 39-40 (citations and quotations omitted).

 The D.C. Circuit has now specifically disapproved *Mims* and *Kohen*, and ruled unambiguously and repeatedly that it "expect[s] the common evidence to show all class members suffered *some* injury."  *D.C. Cir. Op.*, 725 F.3d at 252-55 (emphasis in original); *see also id.* at 252 ("The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy.").  The answer to the Court's question "[w]hether . . . the D.C. Circuit's remand decision" rejects *Mims* and *Kohen* is thus clear.

 To understand the implications of this ruling (the other part of Question 3), one must return to *Wal-Mart*, which was the principal authority upon which Defendants relied in urging rejection of the *Mims/Kohen* "widespread injury" rule.[11]  *Wal-Mart* reverses a tendency in the law to construe the phrase "common question," which appears in both Rules 23(a) and 23(b)(3), as if the issue is whether class members have enough in common to warrant certification.  The Supreme Court endorsed Professor Nagareda's observations that "'[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation[,]'" and that "'[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers.'"  *Wal-Mart*, 131 S. Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L. Rev. at 132 (emphasis in original)).  The Supreme Court held a question is "common" only if "in one stroke" the judge or jury can "resolve an issue that is central to the

---

[11]  Plaintiffs make too much out of the fact that *Behrend* does not address this issue.  *See* Pls.' Mem. 56-57.  Defendants never claimed otherwise.

validity of each one of the claims[.]" *Id.* The class before it failed under this standard because, notwithstanding an expert's statistical evidence of supposed widespread discriminatory impact, classwide proof could not generate a "common answer to the crucial question *why was I* [any class member] *disfavored*" by Wal-Mart's policies. *Wal-Mart*, 131 S. Ct. at 2552 (emphasis in original). *Wal-Mart* makes clear that where there is a gap between what the common proof can establish (widespread injury) and what a plaintiff must prove (injury to each individual), that proof fails to establish a common question.

In this antitrust case, just as in the Title VII action in *Wal-Mart*, Plaintiffs must prove individual injury to "business or property." 15 U.S.C. § 15(a). This Court appropriately referred to individual injury as "the central issue" in the case. *Class Cert. Op.*, 287 F.R.D. at 36. The antitrust plaintiff cannot survive by proving only that he or she is in a class of persons who collectively experienced fuel surcharges becoming more "widespread," or "uniform," or less negotiable, or even "more aggressive." Each class member must have suffered demonstrable and quantifiable injury-in-fact *or else it has no claim.* Proof of "widespread injury" fails to meet this standard because it leaves open whether any individual was in the allegedly injured majority or the uninjured minority—which one must answer as many times as there are members in the class, even if the uninjured group is small. *See Wal-Mart*, 131 S. Ct. at 2551, 2555. If the issue is ignored—for example, by dismissing some class members as "anomalies"—the court effectively modifies substantive antitrust law, allowing the "anomalous" class members to share in a recovery they could not obtain alone. This is improper. "Rule 23 is not a one-way ratchet, empowering a judge to conform the law to the proof." *McLaughlin*, 522 F.3d at 220.

This analysis applies with even more force to Rule 23(b)(3)'s concept of predominance. *Behrend* teaches that "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more

demanding than Rule 23(a)." 133 S. Ct. at 1432.  It is meant to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The presence of altogether uninjured class members signals that irrespective of whatever issues might be common, the litigation is still going to devolve into individualized inquiries about who was injured, who was not, and what are the damages for those who were.

Plaintiffs nevertheless argue that "[a]fter *Behrend*, the law remains clear—the presence of a few uninjured class members does not preclude certification." Pls.' Mem. 57.  But every case they cite is an out-of-circuit district court case, many of which cite *Mims* or *Kohen*.  The D.C. Circuit decision controls.  Plaintiffs also try to limit the import of the D.C. Circuit's discussion of *Mims* and *Kohen* to the issue of whether "Rule 23 requires 'a hard look' at 'statistical models that purport to show predominance.'" *Id.* at 58.  That is wishful thinking.  Neither *Mims* nor *Kohen* has anything to do with that issue, and in all events the D.C. Circuit *quoted* the proposition that it deemed *incorrect*:  that "'[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct.'" *D.C. Cir. Op.*, 725 F.3d at 255 (quoting *Mims*, 590 F.3d at 308).[12]

Plaintiffs argue that it would be unfair or "distort[] the meaning of predominance" to permit the possibility of a single uninjured shipper to "vitiate the class-action device" for "a Class of roughly 30,000 shippers[.]" Pls.' Mem. 58.  That is nothing but a straw man.  There are *thousands* of uninjured class members in this case—even according to Dr. Rausser's rigged model.  Furthermore, it is Plaintiffs who are distorting the meaning of predominance.  Rule 23(b)(3) does not ask district courts whether class members with viable claims predominate over

---

[12]  Plaintiffs' feigned shock is also hard to credit, because the D.C. Circuit decision was far from the first to articulate these principles. *See, e.g.*, *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008) (requiring that "each member of the class was in fact injured"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).

class members with no viable claim, or whether the perceived policy virtues of certifying a class predominate over accuracy and procedural justice in individual cases.  It asks whether common issues will predominate over individualized issues *in the presentation of evidence* at a trial where the defendants' right to contest all relevant issues is fully preserved.[13]  If proving that certain class members were uninjured cannot be accomplished except by individualized inquiry, then "the class action device" is not appropriate.

### C.      Question 4: *Behrend* Establishes That In Class Actions There Must Be A "Requisite Commonality Of Damages"

Long before *Wal-Mart* and *Behrend*, a substantial number of cases held that where calculating damages "requires separate mini-trial[s] of an overwhelming large number of individual claims, . . . the staggering problems of logistics thus created make the damage aspect of [the] case predominate, and render the case unmanageable as a class action." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (collecting cases) (citations and quotations omitted); *Bell Atl. Corp.*, 339 F.3d at 306-07.  This Court acknowledged this rule.  *Class Cert. Op.*, 287 F.R.D. at 71 ("To be sure, however, '[c]omplex and individualized questions of damages . . . weigh against finding predominance.'") (citation omitted).

*Behrend* embraces this position, requiring that plaintiffs in large antitrust class actions like this one "establish that damages are susceptible of measurement across the entire class[.]" 133 S. Ct. at 1433.  *Behrend* reversed a class certification decision where plaintiffs' economic proof did not meet that test.  *Id.*  The Court clarified that predominance is a "demanding" inquiry

---

[13]  In assessing predominance, the "critical need is to determine how the case will be tried."  Fed. R. Civ. P. 23 advisory committee's note on 2003 Amendments; *see also Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003) (Rule 23(b)(3) requires the court to "consider how a trial on the merits would be conducted") (overruled on unrelated grounds); *Hydrogen Peroxide*, 552 F.3d at 311 ("a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate") (citations and quotations omitted).

and explained that plaintiffs "[could not] show Rule 23(b)(3) predominance" without a "common methodology" because in a case with so many class members and different damage "permutations," "[q]uestions of individual damage calculations" would "*inevitably* overwhelm questions common to the class." *Id.* at 1432-35 (emphasis added); *see also id.* at 1435 n.6 (referring to "requisite commonality of damages").

Plaintiffs say that *Behrend* "made no law" because it was merely "holding plaintiffs" to their concession that damages had to be measurable through common proof, and that "nothing in *Behrend* suggests that individualized damage calculations preclude class certification." Pls.' Mem. 63. They are dodging the issue. This has nothing to do with "precision," but instead whether the normal damages rules apply to class certification decisions, and if so whether complexity in adjudicating damages claims can preclude class certification. The Supreme Court's answers were yes and yes. The entire analysis in *Behrend* is about the sufficiency of the McClave study *as a damages study*, and the Supreme Court's reversal of class certification confirms that the inability to make "individualized damages calculations" *according to the normal rules* precludes certification. One of the Supreme Court's criticisms of the McClave damages study was that it potentially yielded wrong damages estimates for individual class members who lived in different places or were subject to different practices or market forces. *Behrend*, 133 S. Ct. at 1434-35. The Court specifically noted the potential damages "permutations" among "2 million subscribers," and held that this complexity would preclude certification if the damages proof could not properly account for it. *Id.*

We note this Court's concern, stated at the Scope of Remand Hearing, that if damages count in the class action analysis, class certification could become impossible. We do not think that is what *Behrend* portends. First, there are clearly cases where both impact and damages are

capable of formulaic determination and a defendant loses nothing if it is unable to contest

damages plaintiff-by-plaintiff, *i.e.*, where the damages calculation is "virtually a mechanical task,

capable of mathematical or formula calculation[.]" *Windham*, 565 F.2d at 68 (citations and

quotations omitted).  Second, there will be cases where any required individualized damages

inquiries would not "inevitably overwhelm questions common to the class." *Behrend*, 133 S. Ct.

at 1433.  *Behrend* allows for both of those categories of cases to proceed as class actions.  But it

plainly does not permit courts to disregard the need to calculate individual damages, and to do so

under the same standards that would apply in individual trials, when undertaking the

"demanding" predominance inquiry.  Many antitrust actions will be too large and complex to

satisfy the standards announced in *Behrend*, but the Supreme Court has been emphatic that there

is no presumption favoring certification—even in antitrust cases.  *Am. Express*, 133 S. Ct. at

2309-10; *Hydrogen Peroxide*, 552 F.3d at 313.

**PART II:      THE RAUSSER MODEL IS PLAGUED BY DISQUALIFYING FALSE
                       POSITIVES**

Our discussion of false positives proceeds in three steps.  We first set the stage by

reviewing the record evidence about the allegedly "more aggressive" Class Period fuel surcharge

formulas, how the Rausser model actually works, and what really produces the so-called

"structural break" and "damages."  We then present the abundant and incontestable evidence that

the Rausser model generates findings of injury inconsistent with Plaintiffs' liability theory (*i.e.*,

false positives).  Lastly, we address Dr. Rausser's new "audit" of legacy shipments.

**A.      Relevant Factual Background**

**1.      Class Period Fuel Surcharge Formulas Did Not Yield More Revenue
                  Than The Competitive, Pre-Class Formulas**

Plaintiffs' core allegation in this case is that there was "a conspiratorial agreement to

impose supracompetitive fuel surcharges[.]" *Class Cert. Op.*, 287 F.R.D. at 44.  The Court's

prior analysis therefore distinguished preexisting fuel surcharge formulas, which Plaintiffs concede were unilaterally adopted and applied, from the allegedly "new, standardized, [and] more aggressive fuel surcharges" that Plaintiffs claimed were the product of the alleged conspiracy. *Id.* at 47.[14]  A pervasive theme of the Court's decision was that the new "fuel surcharges that defendants put in place in the spring of 2003 were of a different breed[,]" and by design "yielded more revenue" at a given fuel price than prior formulas. *Id.* at 46, 48.[15]

To be direct, Plaintiffs misled the Court with respect to whether the allegedly conspiratorial fuel surcharges were "more aggressive," in particular the notion that they led to "billions of dollars of additional profits during the . . . conspiracy." *Id.* at 12 (quotations omitted).  That is simply not true.  There are two basic reasons for this.  First, some of the allegedly collusive formulas were in fact adopted years before the alleged conspiracy and *did not change at all during the Class Period*.  Second, the changes made to other formulas—which Dr. Rausser claims were the result of the alleged conspiracy—turned out to be almost completely irrelevant because the adjustments did *not* "yield more revenue" at Class Period fuel prices.

*Intermodal Surcharges:*  We start with fuel surcharge formulas for intermodal shipments—the largest commodity group for Defendants as a whole and for which Plaintiffs

---

[14]  *See also id.* at 96 ("This case . . . is not about fuel surcharges generally, but rather about aggressive and standardized fuel surcharges tied to base rates."), 101 ("the claim in this case is not a conspiracy to impose *any* fuel surcharge; rather, plaintiffs claim that defendant[s] conspired to increase total prices 'by widespread application and enforcement of *coordinated, and aggressive, fuel surcharges.*'") (emphasis in original).

[15]  There is a "coverage" dimension to Plaintiffs' case as well, *i.e.*, Plaintiffs allege that Defendants agreed to impose these new, "more aggressive" fuel surcharge formulas on all class members, without exception. *Class Cert. Op.*, 287 F.R.D. at 45.  This aspect of Plaintiffs' theory fails as well. *Infra* Part III.  Further, this Court's prior coverage analysis depended on "uniform" application of fuel surcharge formulas that "yielded more revenue" than competitive, pre-class formulas. *Class Cert. Op.*, 287 F.R.D. at 48.  Thus, even Plaintiffs' coverage theory was fundamentally founded upon "aggressive" changes to the surcharge *formulas* themselves.

seek ███ million in damages.  Kalt Decl. ¶ 98 n.142.  Plaintiffs' allegations about "more aggressive" fuel surcharge formulas that "yielded more revenue" are unfounded with respect to intermodal traffic.

BNSF is illustrative.  BNSF announced its published intermodal FSC formula in March 2000 and modified this formula only once prior to the alleged Class Period—in 2001.  As Dr. Rausser has admitted, BNSF's published intermodal surcharge formula remained the same from 2001 until well after the end of the Class Period.  Ex. 6, Rausser Dep. 394:20-395:7, Mar. 5, 2014.  Consequently, shippers who paid BNSF's published intermodal surcharge during the Class Period indisputably paid fuel surcharge rates derived from a competitively adopted formula.  Dr. Rausser's model would nevertheless award them damages totaling ███ million.  Kalt Decl. ¶ 98 n.142; *see also* Ex. 7, Expert Report of Janusz A. Ordover, Ph.D., Jan. 22, 2013 ("Ordover Merits Rep.") ¶¶ 127-28 & Fig. 35.  And this is not just a BNSF issue.  NS *did not change* its domestic intermodal formula, and *UP actually lowered* its intermodal formula by 3.9%.  Kalt Decl. ¶ 97 & n.140, Appx. C, Fig. C.II.22.  Only CSXI raised its published formula, though not until 19 months after Plaintiffs claim the alleged conspiracy began, and not nearly enough to explain the alleged damages.  *Id.*[16]

*Carload Surcharges:*  The published carload formulas also did not materially "yield more revenue" during the Class Period.  Plaintiffs' theory regarding published carload surcharge formulas focuses on reductions in the "trigger prices"—*i.e.*, the minimum fuel prices at which fuel surcharges are first applied.  These reductions created some *potential* for the formulas to be "more aggressive" *if* fuel prices were between the new (lower) and old (higher) trigger prices

---

[16] CSXT did not provide intermodal service during the Class Period.  This was provided by CSX Intermodal, which was a separate company from CSXT during the Class Period and is not a named Defendant in this case.  By definition, CSX Intermodal customers are not class members.  *Class Cert. Op.*, 287 F.R.D. at 12-13.

during the Class Period.  But that potential was *not* realized.  Fuel prices measured in highway-diesel fuel (HDF) were above the previous HDF trigger prices for the entire Class Period; and fuel prices measured in WTI were above the previous WTI trigger prices for all but six days in 2003 when the WTI index dropped briefly below $28.  *Id.* at ¶ 96; Ex. 12, Expert Report of Joseph P. Kalt, Ph.D. (Corrected), Mar. 1, 2013 ("Kalt Merits Rep.") Fig. IV-5A.

Consider the BNSF published carload formula.  The 2003 BNSF "conspiratorial" published carload fuel surcharge formula had only one difference from the prior, concededly competitive 2001 BNSF published carload formula—it lowered its trigger price from $1.30 to a $1.25 HDF.  Ex. 4, Rausser Dep. 60:8-61:8, 62:12-63:3, Mar. 4, 2014; Ex. 12, Kalt Merits Rep. Fig. IV-1B.  Under the 2003 formula, when fuel prices were at or above the old trigger price of $1.30 HDF, shippers continued to pay *the exact same* fuel surcharge percentages as they had since 2001.  Ex. 4, Rausser Dep. 62:12-63:3.  Fuel prices never dropped below $1.30 HDF during the Class Period.  Consequently, BNSF's 2003 trigger price adjustment had *no impact* on the surcharge percentages shippers paid under that formula during the Class Period.  Kalt Decl. ¶¶ 96-97, Fig. 17.  Dr. Rausser admitted this in his merits report: The "different thresholds used by UP and BNSF were not relevant to fuel surcharge amounts during the Class Period, because the indices were above all threshold values for the entire Class Period."  Ex. 8, Expert Report of Gordon Rausser, Ph.D., Oct. 15, 2012 ("Rausser Merits Rep.") 119.  Similarly, Dr. Rausser admitted in his recent deposition that "above $1.30 [the pre-class trigger price] the mathematical earning power of the BNSF carload public fuel surcharge is *exactly the same* as the immediately preceding pre-conspiracy fuel surcharge[.]"  Ex. 4, Rausser Dep. 62:12-63:3, Mar. 4, 2014 (emphasis added); *see also id.* at 27:14-19 (if the price of fuel is above the old, pre-class trigger price, then the change in the trigger price alone "doesn't cause injury").

The BNSF facts are exceptionally clear because there was *zero* change in the public carload fuel surcharge formula's earning power given Class Period fuel prices.  However, the other Defendants' Class Period public carload fuel surcharge formulas did not materially "yield more revenue" either.  It is a simple and objective process to apply the legacy and class formulas to the 2003-2008 fuel prices, and compare the surcharge rates (and revenue) generated by the two sets of formulas.  As Figure 17 shows, the adoption of the allegedly collusive carload formulas led to *lower* surcharge rates for UP, *no change* for BNSF, and only slightly higher rates, on average, for CSXT and NS (1.4% and 1.5%, respectively).[17]  Kalt. Decl. ¶ 97, Fig. 17. The average increase in earning power for all Defendants between the pre-"conspiracy" and the allegedly collusive public carload formulas is only 0.1%.  *Id.* at ¶ 98, Fig. 18.

\\\\

---

[17]  The slightly higher rates for CSXT and NS were a function of using (i) slightly smaller fuel price increments and (ii) monthly average oil prices.  It was not the result of lowering the trigger price or increasing the "slope" of the surcharges.  For every $5 change in fuel price, the pre-class and class formulas generate the same fuel surcharge (above the pre-class trigger).



Figure 17
Were Conspiracy FSCs More Onerous?
Pre-"Conspiracy" v. "Conspiracy" Published Carload FSCs

Dr. Rausser admitted at deposition that between July 2003 and June 2006, the NS class formula

raised less than ▮▮▮ more revenue than its legacy formula would have—a difference so small that

Dr. Rausser characterized the revenue generated by the two formulas as "approximately the

same." Ex. 4, Rausser Dep. 35:5-37:5, Mar. 4, 2014.[18]

---

[18] The work of Defendants' individual experts confirms these findings. For example, Dr.
Carlton calculated the impact of the class formulas on UP's surcharge revenue relative to the
impact the legacy formulas would have had on the same class shipments if they had remained
in place. Ex. 9, Corrected Expert Report of Dennis W. Carlton, Ph.D., Feb. 6, 2013 ("Carlton
Merits Rep.") ¶¶ 112-18. Carload shippers in the class paid ▮▮▮ *less* in surcharges under the
"conspiracy" formulas than they would have under UP's legacy formula. *Id.* at ¶ 116.
Similarly, intermodal shippers paid ▮▮▮ *less*. *Id.* Only coal shippers paid more ▮▮▮. *Id.*
Despite the fact that UP's class formulas resulted in net *savings* to shippers of over ▮▮

Dr. Kalt also demonstrates that the Class Period fuel surcharge formulas did not have greater earning power by comparing (a) Defendants' actual surcharge rates on local carload traffic, with (b) the surcharge rates that would have applied to this traffic if the competitive, pre-"conspiracy" published carload surcharge provisions had been applied during the Class Period. Kalt Decl. ¶¶ 99-100.  As the chart below shows, the admittedly competitive, pre-class surcharge rates for local carload traffic are actually *higher* than the allegedly collusive surcharge rates.  *Id.*

### Defendants' Actual v. But-For FSCs Rates

| Railroad | Actual Class FSC Rate | Pre-"Conspiracy" FSC Rate |
|---|---|---|
| BNSF | ▆ | ▆ |
| CSXT | ▆ | ▆ |
| NS | ▆ | ▆ |
| UP | ▆ | ▆ |
| **Total** | ▆ | ▆ |

Lacking any empirical evidence to support their claim that supposedly collusive adjustments to the competitively adopted fuel surcharge formulas caused the formulas to "yield more revenue," Plaintiffs will no doubt cite contemporaneous documents in which employees at some of the railroads used the phrase "more aggressive" to describe contemporaneous views about their own or another railroad's new carload surcharge formulas.  Some railroad employees had this view because the prevailing projection at the time—which Dr. Rausser confirmed in his merits report—was that oil prices would *not* rise precipitously, but would rather remain in the $20-28 range.  Ex. 8, Rausser Merits Rep. 61 n.137 (citing both external sources and internal Defendant documents).  Had oil prices remained in that range, the new published surcharge

---

███, Dr. Rausser's merits model says that those same reduced surcharges somehow generate an ████ "overcharge" attributable to the alleged conspiracy.  *Id.* at ¶ 118.

formulas would have generated more revenue because they would have been triggered at times when the old formulas would not have been.  But that is not how history unfolded.  In the real world, oil prices escalated to $40 per barrel by July 2004 and continued an upward trajectory until they peaked at $145 per barrel in June 2008.  The changes to the trigger prices in the Class Period public fuel surcharge formulas were rendered irrelevant.[19]

How can a damages model estimate billions of dollars of overcharge damages for shippers whose surcharge formulas were the same or "approximately the same" as preexisting, competitive surcharge formulas?  The answer is that the Rausser model is rigged.

### 2.    The Rausser Model Is Designed To Find "Damages" Whenever Fuel Costs Rise



Dr. Rausser's regression model is overwhelmingly driven by a single number—his ███ ██████████ —which purportedly captures how much █████████████████████████ ███████████████████████████████████████████████████████████████████████

Critically, Dr. Rausser *estimates* this ███████████████████████████████

---

[19] The Defendants' fuel surcharges were also not "standardized," as Plaintiffs have falsely asserted.  For example, BNSF and UP—but not CSXT or NS—adopted coal fuel surcharge formulas (each substantially different).  Ex. 12, Kalt Merits Rep. Fig. IV-1C.  BNSF announced a mileage-based fuel surcharge formula in 2005.  *Id.* at ¶ 202.  Moreover, each of the railroads privately negotiated distinct fuel surcharges during the Class Period that can no longer be dismissed as inconsequential "anomalies."  Nearly ████ of BNSF's revenue from unregulated traffic, including business with ████████████████████ ████████████, paid distinct, privately negotiated fuel surcharges.  Ex. 7, Ordover Merits Rep. ¶ 83; Ex. 16, Expert Reply Report of Gordon Rausser, Ph.D., Aug. 27, 2010 ("Rausser Class Cert. Reply Rep.") 52-53, Table 12; Ex. 26, BNSF-0337916-918 (████); Ex. 27, BNSF-0581954 ████); Ex. 28, BNSF-0800349-353 ████); Ex. 29, BNSF-0800664-665 ████ ████); Ex. 30, BNSF-FSC 001713-740 at -713, -727 (████).  *See also* Ex. 10, Corrected Expert Report of Dr. John H. Johnson, IV, Feb. 15, 2013 ("Johnson Rep.") ¶¶ 174-93 (discussing numerous examples of privately-negotiated non-standard fuel surcharges paid by CSXT and CSXI customers during the Class Period); Ex. 31, Corrected Expert Report of Barry C. Harris Ph.D., Mar. 22, 2013 ("Harris Rep.") ¶¶ 114-18, Table A-2 (demonstrating that NS created dozens of non-"standard" carload fuel surcharges during the Class Period that were lower or less "onerous" than the competitive pre-conspiracy FSC).

████████████████, and then *applies* this same ████████████████ to the Class Period

with its unprecedented, high fuel prices.  He justifies this approach by contending that the ███

████████████ should be <u>constant</u> across all fuel prices.  This assumption that the ████████

████████████████████████████████████████ is the key feature of Dr. Rausser's

entire analysis.  This is what produces the "structural break" and hard-wires in "damages"

whenever fuel prices rise faster than other costs.  We need to explain this in some detail, as this

is also key to understanding the false positives.

In his merits report, Dr. Rausser purported to measure how ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[20]  Using

this ████████████████████████████, Dr. Rausser calculated a ████████████████ of

████.  According to Dr. Rausser, this means ████████████████████████████████

████████████████ ████ ████████████████████.  Dr. Rausser then used this coefficient to

predict "but for" prices for *the entire Class Period*.  In other words, he purported to calculate

what the "but for" prices during the Class Period would have been by mathematically instructing

his model to assume that there would be a ████████ ████████████████████████████████

████—*no matter how high fuel prices climbed, or how big a portion of Defendants' total costs

fuel became*.  Dr. Rausser claimed that any actual rate higher than the projected "but for" prices

proves injury, damages, and even collusion.

In their merits reports, Defendants' experts demonstrated that Dr. Rausser's ████ ████

████████████████ is an unrealistically low benchmark, largely because it was derived entirely

---

[20] The ████████████████ is supposed to measure the ████████████████████████████████

████████████████████████████████████████

from , when fuel prices were much lower than during the Class Period.[21]
*E.g.*, Ex. 9, Carlton Merits Rep. ¶ 145.  Applying this coefficient, the large increases in fuel
prices during the Class Period would have basically no effect on rail rates and would not have
allowed the railroads to come even close to recovering their actual fuel costs.  *See id.*  In his
reply report, Dr. Rausser was forced to admit that "the non-collusive ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . ."
Ex. 11, Expert Reply Report of Gordon Rausser, Ph.D., June 12, 2013 ("Rausser Merits Reply
Rep.") 245.  In short, the cornerstone of his entire injury and damages model was wrong.

Dr. Rausser therefore constructed a second damages model that uses (actually, misuses)
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dr. Rausser calculates an ▮▮▮▮
▮▮▮▮▮▮▮ ▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮. *Id.* at 247.
Dr. Rausser uses this result to adjust his damages model based on the assumption that, but for the
alleged conspiracy, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The net
effect is simply that Dr. Rausser recalculates his ▮▮▮▮▮▮▮▮, raising it to ▮▮▮—three
times higher than his original coefficient.

Of course, since the *average* sensitivity of rates to fuel costs over a ten-year period is—
by definition—lower than the *peak* sensitivity that coincides with the Class Period (when fuel

[21] From July 2003 through their peak in mid-2008, fuel prices rose by over 200%.  Kalt Decl. ¶
47 n.72.  As a result, the average price per gallon of diesel from 2003 to 2008 was nearly
double the average price per gallon from 1999 to 2003.  *Id.* at ¶ 47, Fig. 6.  The impact on the
WTI index (which is listed in price per barrel, not per gallon) was even more dramatic.  The
price of oil fluctuated around $25 per barrel between 1999-2002, but reached over $135 per
barrel in the summer of 2008.  Ex. 12, Kalt Merits Rep. Fig. IV-5A.  As a result, the average
price of oil per barrel from 2003 to mid-2008 was nearly 2.3 times higher than the average
price per barrel from 1999 to 2002.  Kalt Decl. ¶ 47 n.72

prices were much higher), this is another way of applying an artificially low coefficient to the

Class Period.  And that is what Dr. Rausser does.  In a series of steps, Dr. Rausser plugs his new

███████████████ into his damages model, reducing his estimate of damages somewhat, but

still generating a figure of ██████████.  *Id.* at 251 n.741 & Table 105.[22]

The key feature and methodological flaw of the model remains exactly the same:  it

continues to use a ██████████████████ (now ██████ to represent the predicted amount

of fuel recovery at all times, irrespective of whether diesel fuel costs $1.00 or $3.00 per gallon.

As Dr. Rausser testified, "[t]he ██████ coefficient never changes."  Ex. 6, Rausser Dep. 459:11-

460:3, Mar. 5, 2014.

Here is why it is wrong to use a ████████████████████████████

████████████████████████████████████████████ to predict rail

rates during the Class Period, when fuel prices were much higher.  As a matter of basic

mathematics, whenever fuel costs become a larger percentage of a railroad's total costs than they

have been previously, rail rates must increase by a greater percentage amount in response to

rising fuel prices *simply to allow for dollar-for-dollar recovery of fuel costs*.  A simple example

illustrates why this is true.

Assume that at a time when diesel costs $1.00/gallon the fuel costs for shipping a

commodity over a route are $10, non-fuel costs are $80, and after taking a $10 margin the

railroad charges $100; thus fuel makes up 10.0% of the freight rate ($10 out of $100) and 11.1%

of total costs ($10 out of $90).  If fuel costs rise by 10% to $11 (an increase of $1), one would

expect Dr. Rausser's model to allow railroads to recover this increased cost; indeed, Dr. Rausser

concedes that his but-for world should allow for full cost recovery.  *See* Ex. 13, Rausser Dep.

---

[22] The purported overcharge rate falls from ██████ of the but-for all-in rates using his original
damages model to ██████ using his STB-adjusted model.  Kalt Decl. ¶¶ 3, 30 & n.41.

31:8-22, Dec. 11, 2012.[23]  Dr. Rausser's most recent ████ ███████████████████████

███████████████████  ████  █████████████████  resulting in a new all-in rate of

██████.  That is more than the $1 increased fuel cost, so, however flawed it may be, the ████

███████████ at least allows full cost recovery at this fuel cost level.

Now assume that at a later time fuel prices are $3.00/gallon.  Fuel costs for the same

route are now $30.00.  If the non-fuel costs are still $80.00 and the railroad still adds a $10.00

margin, total costs are $110 and the rate is $120.  Note that in this later period fuel makes up a

much higher percentage of the total costs (27.3%, or $30 out of $110) and of the rate (25%, or

$30 out of $120) than in the earlier period.  If fuel prices then rise again by 10%, to $33 for the

same route, one would again expect an all-in rate to rise at least to $123 just to allow the

railroads to recover this $3 (10% of $30) in increased fuel costs.  *Dr. Rausser's methodology*

*does not produce such a rate*.  It can't, because Dr. Rausser insists on applying a ████████

███████████████ that is largely a product of the lower fuel prices in the earlier period.  When

applied to the starting rate in this example ($120), the model predicts a ██████ rate increase

leading to a new all-in rate of ██████—which allows for recovery of only ██████ out of the $3 in

increased fuel costs.  Dr. Rausser treats any rate higher than ████████ as evidence of injury and

"damages"—even though a $123 rate is needed just to allow the railroad to recover its higher

fuel costs.

Mathematically, Dr. Rausser's ██████████████████ will *always* generate a

predicted all-in rate that is too low to permit fuel cost recovery for any period in which fuel costs

are a higher percentage of a railroad's total variable costs than they were in the period used to

<hr />

[23] *See also* Ex. 2, M. Hausfeld Arg., Hr'g Tr. 309:13-18, Oct. 7, 2010 ("Yeah, fuel costs were
going up.  They were going nuts.  No one here in this litigation or anywhere else has said that
a company cannot recover its legitimate increase in costs.").

estimate the coefficient.  Dr. Kalt calculates that over the entire Class Period, ████ of fuel cost changes become "damages" under Dr. Rausser's model, and at the end of the Class Period, when fuel prices peaked, the Rausser model converts approximately ████ of Defendants' fuel cost increases into "damages."  Kalt Decl. ¶ 53, Fig. 9.

The relevant economic literature confirms that the relationship between ████████████ ████████████████ is dynamic (not fixed).  In fact, in his merits report Dr. Rausser cites and relies on several economists that studied the railroad industry and had to account for this in their work—*not one of those* economists modeled the industry with a ████████████████ ██████████████████████████ *Id.* at ¶ 54, Fig. 10.  Rather, each of these experts has allowed the relationship ████████████████████ to change in response to higher fuel costs.  In fact, Dr. McClave—Plaintiffs' second expert—testified that this dynamic relationship is "just math," and concedes that "you would have more to pass through" to the rate when fuel prices are high than when they are low.  Ex. 14, McClave Dep. 35:1-40:14, Feb. 26, 2014.

**3.**      **The ████████████████ Guarantees "Structural Breaks"**

Dr. Rausser's ████████████████ drives his finding of a "structural break" in the relationship between fuel prices and freight rates.  Dr. Rausser introduces the alleged "structural break" by stating:  "*In the absence of an intervening event*, such as an agreement among the Defendants as alleged by Plaintiffs, the historical relationship between freight rates and fuel prices would generally be expected to continue."  Ex. 8, Rausser Merits Rep. 7 (emphasis added).  What Dr. Rausser fails to acknowledge is that it is normal and completely consistent with pricing in competitive markets for fluctuations in fuel costs to cause the relationship between fuel costs and freight rates to shift.  It must shift simply to allow for dollar-for-dollar recovery of fuel costs.  Fuel cost changes can thus be an "intervening event" that changes "the

historical relationship between freight rates and fuel prices."  The coefficient will be higher in a

high fuel price period than it was in a low fuel price period, and higher in a high fuel price period

than in high and low price periods averaged together.  This is "just math," as Dr. McClave

conceded.  Ex. 14, McClave Dep. 35:1-40:14, Feb. 26, 2014.  Even Dr. Rausser admitted at his

deposition that "the levels of the fuel prices during the class period" altered the relationship

between fuel costs and freight rates.  Ex. 15, Rausser Dep. 431:18-432:19, Dec. 18, 2012.

Accordingly, when one instructs the model to assume arbitrarily that the ███████████

██████████████ (regardless of fuel prices), it will find a "structural break" _whenever fuel_

_prices rise faster than other costs_.[24]  That is readily confirmed by testing the structural break, as

the D.C. Circuit suggested, by replicating Dr. Rausser's analysis with different presumed start

dates for the alleged "conspiracy."  As Kalt Figures 4-5 show, at any date in the January 2001 to

July 2007 period, ██████████████████████.  Kalt Decl. ¶¶ 40-42, Figs. 4-5.  This includes

dates that long precede the alleged conspiracy.  _Id_.  Again, this is because the dramatic increase

in fuel costs that the railroads experienced _dictates_ as a simple matter of arithmetic that the

relationship between freight rates and fuel prices _must change_ as fuel costs change.

Since Dr. Rausser's model is essentially designed to convert fuel cost increases into

damages, it is unsurprising that the model finds "damages" for legacy shipments.  Dr. Rausser is

---

[24] The structural break is also the product of another design feature of Dr. Rausser's model.
Dr. Rausser ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████  Since fuel surcharges by design make
rates more responsive to fuel costs, this data construction guarantees "structural breaks" (as
well as findings of impact and damages) simply by comparing ████████████████████████
████████████████████████████████████████████████████████
Ex. 12, Kalt Merits Rep. ¶¶ 530-32.

simply predicting but-for prices that do not allow for normal cost recovery, necessarily generating "damages" for virtually all shippers.

### B.  Dr. Rausser's Model Produces False Positive Findings Of Injury That Render His Model Unreliable

As a direct result of the methodological flaws discussed above, Dr. Rausser's model generates a host of false positives, *i.e.*, findings of injury or damages where—according to Plaintiffs' liability theory—"none could exist."  *D.C. Cir. Op.*, 725 F.3d at 252.  We show this by first addressing legacy shipments, and then analyzing alternative tests for false positives.

*False Positives on Legacy Shipments*:  We begin with the group of legacy shipments that Dr. Rausser identified before his post-*Behrend* about-face, in particular legacies identified in his merits report.  Dr. Kalt used Dr. Rausser's STB-adjusted model to test that traffic and found a false positive average overcharge of ███  Kalt Decl. ¶ 35, Fig. 1.  That is essentially the same average overcharge as Dr. Rausser calculates for the class.

Does Dr. Rausser's "audit" of the legacies change the result?  Not in any way that matters under the D.C. Circuit's decision.  Even if we accept, for the sake of argument, that there is some shred of merit to Dr. Rausser's effort to de-designate legacies, it is still possible to analyze large segments of traffic that Dr. Rausser previously identified as "legacy" shipments that indisputably qualify as shipments "where [no injury] could exist."  *D.C. Cir. Op.*, 725 F.3d at 252.  Dr. Kalt isolated categories of legacy shipments accounting for approximately ███ in Class Period freight revenues as to which there either was (a) no change or "adjustment" to the fuel surcharge during the Class Period, or (b) if there was a change, it did not result in increased earning power. Kalt Decl. ¶ 38, Fig. 2.  Dr. Rausser's STB-adjusted model generates false positive average overcharges in *eight out of the thirteen* test cases.  *Id.*  For example, using BNSF intermodal shipments subject to the public intermodal surcharge formula—where the surcharge formula *did*

*not change at all*—produces an overcharge of ■■■■. *Id.* Similarly, using BNSF carload shipments subject to the public carload surcharge formula—where the surcharge rates were the same as those under the pre-class public surcharge formula—produces an overcharge of ■■■■. *Id.* Likewise, using UP intermodal shipments—where the surcharge formula actually *declined*—produces an overcharge of ■■■■. *Id.* Under the D.C. Circuit order, each of these findings mandates that class certification be denied. *See D.C. Cir. Op.*, 725 F.3d at 252.

We can also confirm the false positives while avoiding altogether the debate over what is and is not a "true" legacy. Numerous additional tests—completely unrelated to legacy shipments—confirm findings of injury "where none could exist." *Id.* We turn to those now.

*Dr. Rausser's Model Generates Damages On Shipments Occurring Entirely Before Any Collusion Is Alleged.* The first such test focuses on shipments that occurred entirely *before the conspiracy* was allegedly formed, when, Dr. Rausser has admitted, the rates charged "could not be attributed to the alleged conspiracy." Ex. 11, Rausser Merits Reply Rep. 222; *see also* Ex. 4, Rausser Dep. 137:23-138:7, Mar. 4, 2014 (testifying that there is "fundamentally" "no reason to think that the all-in rates that were charged to shippers prior to March 2003 should have any impact from the conspiracy"). It is beyond dispute that if Dr. Rausser's model generates "damages" for shipments that occurred prior to the alleged conspiracy (and any purported "formation" period), the model produces "damages" where none can exist.

Dr. Kalt designed a test for this that hypothesizes 12 different "conspiracy" start dates in the pre-Class Period—when no one claims there was conspiracy—and tests for the "structural breaks" that Dr. Rausser claims prove conspiracy and common impact. *In every instance* the Rausser model finds statistically significant "structural breaks" and overcharges, ranging from

████ to ████ .  Kalt Decl. Fig. 5.[25]  This is a false positive trifecta, finding conspiracy, impact, and overcharges where none could exist.

<u>*Dr. Rausser's Model Generates Damages For Shipments Hypothetically Priced At*</u>

<u>*Variable Cost*</u>.  Another way to test Dr. Rausser's model is to ask what happens when shippers are presumed to have paid rail rates merely equal to the Defendants' variable costs, rather than what they actually paid in the real world.  In antitrust economics, prices equal to variable costs are frequently used as a proxy for competitive pricing.[26]  If the Rausser model generates damages when rail rates just equal variable costs, it is generating false positives.

Dr. Kalt conducted this test.  He used variable cost data calculated by the STB that Dr. Rausser used in his STB-adjusted model—the model that Dr. Rausser testified "contains real signals about the relationship between fuel prices and variable cost," and consequently is "a more reliable way to compute both class-wide and individual damages."  Ex. 6, Rausser Dep. 441:22-442:20, Mar. 5, 2014; *see also* Ex. 11, Rausser Merits Reply Rep. 245-51.  Using these data, Dr. Kalt replaced the actual freight rates the railroads charged with an estimate of the railroads' average variable costs.  He then applied Dr. Rausser's STB-adjusted model and finds

---

[25]  In his merits reply report, Dr. Rausser reports that he finds ████████████████████
████████████████ Ex. 11, Rausser Merits Reply Rep. 229 & Table 92.  This is highly misleading.  To obtain these results, Dr. Rausser fundamentally alters the methodology that he otherwise uses to allegedly show damages by changing what traffic he includes in the control and test periods.  Kalt Decl. ¶ 42 n.65.  By contrast, Dr. Kalt's pre-class overcharges reported above use the exact methodology that Dr. Rausser applies when he purports to calculate class damages.  *Id.*

[26]  *See, e.g.*, P. Areeda and H. Hovenkamp, Antitrust Law:  *An Analysis of Antitrust Principles and Their Application* ¶ 740 (4th ed. 2013); Carlton & Perloff, *Modern Industrial Organization* 63 (4th ed. 2005).  In fact, to remain in business over the long run, firms must also recover their fixed costs and their cost of capital, and therefore must price above their variable costs.  Thus, the variable cost proxy used in this test implies rates lower than true competitive pricing.

positive weekly overcharges for more than ▮▮ of shipments.  Kalt Decl. Fig. 11.  A model that

generates overcharges in these circumstances is unreliable.

*Dr. Rausser's Model Generates Damages For Many Shippers That Exceed The Total*

*Fuel Surcharges That They Paid*.  Plaintiffs claim overcharges were baked into Class Period fuel

surcharges, and Dr. Rausser admits that any conspiracy to elevate base rates would fail.  Ex. 8,

Rausser Merits Rep. at 52 n.94.  Therefore, any damages must come solely from fuel surcharge

revenues.  If Dr. Rausser's model predicts damages that *exceed* the fuel surcharges that

individual class shippers actually paid, it is surely finding damages "divorced from the plaintiffs'

theory of liability."  *D.C. Cir. Op.*, 725 F.3d at 253.

As Dr. Kalt's analysis shows, Dr. Rausser's STB-adjusted model generates "damages"

that are in excess of the total fuel surcharge payments for ▮▮ shippers (*i.e.*, ▮▮ of class

members) and over ▮▮ million shipments in the class (*i.e.*, ▮▮ of all class shipments).  Kalt

Decl. ¶ 80, Appx. C, Figs. C.II.6 - 7.  Not only does this false positive apply to thousands of

class shipments, it also encompasses the majority of the total damages.  Dr. Rausser's STB-

adjusted model attributes ▮▮ of the total class damages to shipments for which the alleged

damages exceed the fuel surcharges that they paid.  *Id.*

*Applying Legacy Formulas to Class Period Shipments Produces False Positives*: It is also

possible to test the Rausser model for false positives using the legacy *formulas*.  Fundamentally,

one gives Class Period shipments the benefit of "fuel surcharge formulae that predated the later

[allegedly conspiratorial] changes."  *D.C. Cir. Op.*, 725 F.3d at 248.  If "repriced" in that

manner, and the shipments still show damages under the Rausser model, then the model is

clearly measuring something other than injury from allegedly "more aggressive" fuel surcharges.

Dr. Kalt has run this test for all Defendants using local carload traffic.  He used the admittedly competitive, public fuel surcharge formulas, applied those formulas to local carload class shipments, and calculated the but-for revenue that these legacy formulas would have generated had they been applied on this class traffic.  In other words, he simply replaced (a) the fuel surcharge payments generated by the allegedly collusive class formulas with (b) fuel surcharge payments calculated using the admittedly competitive pre-class formulas.  He then applied Dr. Rausser's STB-adjusted model to these hypothetical shipments.  Again, the false positives are unequivocal.  Dr. Rausser's model finds over ███ million in damages for these class shipments when the legacy formulas are applied.  Notably, Dr. Rausser's model finds these damages even though, as shown in Figure 3 below, the class shippers' actual surcharge payments were *lower* than they would have been under the competitive, pre-"conspiracy" surcharge formulas.  Kalt Decl. ¶ 39, Fig. 3.

Figure 3
**The STB Model Finds "Damages" When Actual Class Carload FSCs Are Replaced With FSCs Calculated Using Pre-"Conspiracy" Published Formulas**



Kalt Figure 18, below, is a striking illustration of this false positive.  It compares the STB-adjusted model's weekly overcharge for carload traffic (the black line) to the difference in

the legacy and class public carload surcharge rates (the orange line).  It is clear that "more

aggressive" fuel surcharges are *not* driving these damages.

Figure 18
**Prof. Rausser's Model Finds Massive Overcharges Even When "Conspiracy"
FSCs Are Not Materially Different From Pre-"Conspiracy" FSCs**



In fact, the Rausser model is completely indifferent to whether anyone became subject to

more aggressive fuel surcharges on account of some conspiracy.  Plaintiffs' rhetoric about new

surcharges "different [] in design" and "more aggressive" than pre-Class Period formulas, *see,

e.g.*, Pls.' Class Cert. Mot. 9-10, Mar. 18, 2010; Pls.' Class Cert. Reply Br. 7, Aug. 27, 2010, is

not incorporated into the Rausser model in any way, shape or form.  This is why he now claims

that the relative earning power of the competitive, pre-class formulas versus the allegedly

collusive formulas is *irrelevant*.  Ex. 4, Rausser Dep. 52:23-53:5, 69:3-12, 76:22-77:8, Mar. 4,

2014.  It was certainly relevant to the Court in its class certification decision.

And we know why Plaintiffs have done an about face on this issue—because, as we have shown, at Class Period fuel prices the average increase in earning power for all Defendants between the admittedly competitive and the allegedly collusive public carload formulas is only ███, Kalt Decl. ¶ 98, Fig. 18.  Adopting the allegedly collusive public carload formulas actually led to *lower* surcharge rates for UP, *no* change for BNSF, and only slightly higher rates for NS and CSXT.  *Supra* Part II:A.1; Kalt Decl. ¶ 97, Fig. 17.  Dr. Rausser conceded at his deposition that "it's hard to imagine" that "a 1 percent increase in the fuel surcharge . . . is [] going to be able to increase the total collection by 10 percent," Ex. 4, Rausser Dep. 48:23-49:11, Mar. 4, 2014,[27] so it is certainly not going to generate a weekly average "overcharge" of ███, Kalt Decl. ¶ 98.  Dr. Rausser therefore jettisoned the constraint of "more aggressive" fuel surcharges from his model, creating one that by design finds damages where, by the logic of Plaintiffs' liability theory, none should exist.  That is flatly and indisputably prohibited by the D.C. Circuit decision.

### C.   Dr. Rausser's Purported "Audit" Of Legacy Shipments Does Nothing To Explain Or Justify The False Positives

Plaintiffs *admitted* to the false positives before *Behrend* made that admission inconvenient.  *See* Ex. 16, Rausser Class Cert. Reply Rep. 99 n.227.  They excluded legacy shipments from the class definition because "as a matter of logic" such shipments should not have been impacted by the alleged conspiracy.  Ex. 3, Rausser Dep. 275:1-20, Sept. 24, 2010.  But since *Behrend*, Plaintiffs have done an about face and now contend that overcharges are expected on all traffic, including legacy traffic.  Rausser Suppl. Rep. *passim.*  The first attempt—

---

[27] *See also id.* at 46:22-47:3 (conceding that a fuel surcharge that has 1% more earning power cannot lead to a 10% increase in revenues), 48:23-49:2 ("[Q.] Assume that we have a new fuel surcharge with 1% increase in its earning power.  Mathematically can that produce a 10% increase in the all-in prices?  A. It would be very, very difficult . . . .").

their argument that legacy contracts entered between March and June 2003 may have been

impacted by the alleged conspiracy—was shot down by the D.C. Circuit, which pointed out that

it created an untenable contradiction with Plaintiffs' "structural break" theory.  *D.C. Cir. Op.*,

725 F.3d at 254-55.  The D.C. Circuit also specifically held that if Plaintiffs persist in this line of

argument, it is *Plaintiffs' burden*—not Defendants'—to (a) "adduce specific evidence" that the

model does not produce false positives when applied to legacy shipments, and (b) reconcile any

such evidence with their own theory of collusion.  *Id.* at 254.[28]

This apparently explains the two arguments that dominate Plaintiffs' most recent papers:

*first*, that Dr. Rausser's audit of legacy data purportedly shows that many of the contracts that

generate the false positives are not in fact legacy contracts, and *second*, that the alleged

conspiracy harmed all legacy shippers by eliminating their ability to get waivers or otherwise

negotiate price concessions off of binding, pre-class contracts containing fuel surcharge

provisions.  We address these in turn.

### 1.    Prior To *Behrend*, Plaintiffs Freely Admitted That Dr. Rausser's Model Shows That "Legacy" Shippers Were Injured

We begin with some history that puts Plaintiffs' arguments in perspective, in particular

Plaintiffs' suggestion that Defendants misled the D.C. Circuit by identifying an overly inclusive

set of legacy contracts.  Not true.  The false positives issue arose in this case because

*Dr. Rausser* identified a set of legacy shipments in his original class certification report,

purportedly to ensure that "unaffected" shippers were not included in the class.  *See* Ex. 17,

Corrected Expert Report of Gordon Rausser, Ph.D., May 27, 2010 ("Rausser Class Cert. Rep.")

---

[28] *See also id.* ("[Plaintiffs] misapprehend *their burden*.  It is not enough to submit a questionable model whose unsubstantiated claims cannot be refuted through *a priori* analysis.  Otherwise, 'at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.'") (first emphasis added) (citation omitted).

120-21.  Defendants' expert tested those shipments, revealing the false positives.  Ex. 18, Expert

Report of Robert D. Willig, June 30, 2010 ("Willig Class Opp. Rep.") ¶¶ 267-68 & Fig. 45.

Then, *Dr. Rausser's own work confirmed that his model generated damages on those legacy*

*shipments*.  Ex. 16, Rausser Class Cert. Reply Rep. 98-99.  In other words, Dr. Rausser conceded

his model produced overcharges on legacy shipments.  *Id*.  Then *Behrend* came along, making

this a fatal admission.

Identifying legacies became an issue in this case because Plaintiffs' motion for class

certification expressly excluded from the proposed class "all entities . . . that paid a Fuel

Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that

was (i) entered before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid

under a predetermined formula specifically set forth in the contract."  Pls.' Class Cert. Mot. 1

n.1.  This was not some "conservative" choice as Plaintiffs now claim; Plaintiffs' stated

reasoning at the time was that "*legacy contracts [] protected customers for some time from the*

*collusive Fuel Surcharges*."  *Id*. at 74 (emphasis added).  Dr. Rausser likewise testified that

shipments subject to legacy contracts were excluded from the class "as a matter of logic"

because those shippers could not have been injured.  Ex. 3, Rausser Dep. 275:1-20, Sept. 24,

2010.

Consequently, in his opening class certification report, Dr. Rausser acknowledged that he

would have to identify and "remove legacy contracts from a Class-wide damage analysis" in

order to "ensure that th[e] damage methodology provides an accurate estimate of the Class-wide

overcharge[.]"  Ex. 17, Rausser Class Cert. Rep. 120-21.  This turned out to be complicated

because the Defendants' data systems were not designed to track "legacies."  The first time

Dr. Rausser tried to identify legacies, in his opening class certification report, he complained that

he did not have all the data to do so properly, and therefore he would temporarily use "an approximate method" to "account for legacy contracts." *Id.* at 121 (first quotation); Pls.' Class Cert. Mot. 74 (second quotation).  Nevertheless, Dr. Rausser identified what he said were legacy shipments.

In opposition, Defendants' expert (Dr. Willig) tested the "approximate" set of legacies that Dr. Rausser had identified, and found that Dr. Rausser's damage model yielded an overcharge of ███ for the shipments in that set.  Ex. 18, Willig Class Opp. Rep. ¶¶ 267-68 & Fig. 45.  Dr. Rausser responded to this in his class certification reply report, claiming that new information "enabled me to improve *my* method for identifying those shipments associated with [legacy] contracts in order to exclude them from the Class designation in the model."  Ex. 16, Rausser Class Cert. Reply Rep. 93 & n.212 (emphasis added); *see also id.* at 99.  For the most part, the documents and data that Dr. Rausser referred to, and used to identify legacy contracts, were produced in response to Plaintiffs' Interrogatory No. 1.  That interrogatory does not ask Defendants to identify legacy contracts or shipments.  Rather, it calls for the identification of all contracts entered into before July 1, 2003 that provided for any fuel surcharge to be applied during "any portion" of the Class Period.  *See* Ex. 19, Pls.' First Set Interrogs. to UP, Interrog. No. 1, May 11, 2010.  BNSF, UP, and CSX produced data and documents in response to this request; NS referred Plaintiffs to its prior data productions.  This was simply *information* of varying relevance to identifying what we now call legacy shipments.[29]

---

[29] Given the scope of Interrogatory 1, Defendants' responses properly included most of the categories of contracts that Dr. Rausser now claims are not "true" legacies, including (a) contracts with effective dates between March and July 2003, (b) contracts with FSC terms that changed between March and July 2003, and (c) pre-July 2003 contracts that included self-adjusting FSC provisions.  These are not newly-discovered types of contracts.

With this information, Dr. Rausser purportedly improved what he expressly acknowledged was *his* method ("my method") for identifying legacies that needed to be removed from class damage calculations, tested this refined set of legacy shipments himself—*and still found overcharges* (equal to ███). Ex. 16, Rausser Class Cert. Reply Rep. 93 & n.212, 99 n.227. In other words, Dr. Rausser's response to Dr. Willig was not that once one cleaned up the legacies, the findings of damages went away; it was "that, although *the damage model does estimate a positive overcharge for these shipments*, the amount of that overcharge is statistically significantly ███ than the overcharge for shipments in the Class." *Id.* at 98-99 (first emphasis added). Dr. Rausser's own class certification work thus confirmed that his model generated findings of damages where they should not be found.

Dr. Rausser made a further adjustment to his identification of legacies when he presented his proposed trial testimony. Indeed, he fundamentally changed his method for identifying legacy shipments for NS. Ex. 12, Kalt Merits Rep. ¶¶ 510-11.[30] Dr. Rausser said and gave every indication at that time that he had thoroughly scrubbed the legacy data. So Dr. Kalt took Dr. Rausser's "identified [] group of legacy contracts," and used those contracts to test Dr. Rausser's model for false positives using a variety of different analyses. *Id.* at ¶ 255; *see also id.* at ¶¶ 514-18. In every instance, Dr. Rausser's model produced false positives. *Id.*

---

[30] This effort had the effect of drastically reducing the number of legacy shipments and drastically increasing the number of class shipments, even though NS had previously provided discovery, including Rule 30(b)(6) testimony, indicating its data was not suited for the task of reliably identifying legacy shipments. *See id.* Dr. Rausser admitted that he never tested the accuracy of the new method in comparison to his original, Ex. 15, Rausser Dep. 394:8-395:11, Dec. 18, 2012, and has acknowledged that his modified methodology underestimates the volume of NS legacy shipments, Ex. 6, Rausser Dep. 522:21-524:14, Mar. 5, 2014. *See also* Ex. 20, Suppl. Resp. and Objections of NS to Pls.' First Set of Interrogs., Suppl. Response to Interrog. No. 1, Apr. 25, 2013.

It so happened that by the time Dr. Rausser responded to Dr. Kalt's legacy analysis on June 12, 2013, *Behrend* had been decided. This changed everything for Plaintiffs, especially since Defendants were already arguing to the D.C. Circuit that Dr. Rausser's model improperly "predicts substantial damages for shippers who could not have been injured by the alleged conspiracy." Pet'rs Opening Br. 58. Yet even then Dr. Rausser *did not deny* that his model generated ████ of dollars in damages on shipments he had identified as legacies; he never has, and does not now. Rausser Suppl. Rep. 20 ("positive overcharges . . . [on] legacy contracts" are "not surprising"). Rather, Dr. Rausser and Plaintiffs argued that legacy overcharges are not "true" false positives—the story we have been hearing from Plaintiffs ever since.

## 2. Dr. Rausser's "Audit" For "Clean" Legacies Cannot Salvage The Damages Model

Dr. Rausser claims that many contracts being used to test his model are not "clean" legacies because they (a) have "self-adjusting" fuel surcharge provisions (his "Category 1"), (b) contain a fuel surcharge formula that was actually created during the alleged conspiracy (his "Category 2"), or (c) were entered during the Class Period or as the conspiracy allegedly took shape between March and July 2003. Rausser Suppl. Rep. 37-38. Based on these arguments, Dr. Rausser claims that ████ of the shipments *he previously identified as legacies* (and for which he has any fuel surcharge information) are incorrectly categorized. *Id*. at 39, 74. This is over ████ shipments he now says he incorrectly categorized, and there are over ████ more shipments that he says he does not know how to categorize any longer. *Id*. at 37-39.

Dr. Rausser's analysis is superficial and contrived. He does not analyze contracts to reach his conclusions, but rather interrogatory responses and data fields that he does not understand or is misusing. Worse, his argument is exceptionally misleading in that it implies—without even considering, let alone proving—that Class Period changes to legacy contracts

explain the findings of legacy damages.  This turns out to be yet another example of analytical work by Dr. Rausser that *has nothing to do* with more aggressive fuel surcharges.

<u>*Excluded Data Leads to Misleading Claims*</u>:  First, let us be clear about what this "audit" actually means, because Dr. Rausser misrepresents it.  As he presents percentages of shipments allegedly misclassified as legacies, Dr. Rausser obscures the fact that he simply ignores ▮▮▮ ▮▮▮▮ of the roughly ▮▮▮▮▮▮ shipments that he previously identified as legacies.  He decided upon closer examination that he did not have sufficient data to tell whether they were or were not "clean" legacies.  *See* Rausser Suppl. Rep. 37 & n.124; Ex. 4, Rausser Dep. 98:5-23, 100:5-12, 107:3-109:19, Mar. 4, 2014.  Accordingly, his conclusions about which shipments are not "clean" legacies—reported simply as percentages of "legacy shipments" or "legacy shipper-price authorities"—are actually based on just two-thirds of the total legacy shipments that he previously identified.  Ex. 4, Rausser Dep. 112:7-17, Mar. 4, 2014.

This wholesale data dump is typical of his "painstaking" audit.  For example, Dr. Rausser excluded nearly all BNSF intermodal traffic—which accounts for ▮▮▮ of all legacy shipments previously identified for BNSF—from his legacy classification exercise.  *Id*. at 243:19-244:7, 244:24-245:2; Rausser Suppl. Rep. 45 & n.160.  The BNSF intermodal shipments subject to the public intermodal formula are unequivocally "clean" legacies:  Dr. Rausser squarely admits that BNSF's public intermodal formula *remained unchanged* from 2001 through the Class Period.  Ex. 6, Rausser Dep. 394:20-395:24, Mar. 5, 2014 ("It is the same as in the pre-class period.").[31]

---

[31]  Dr. Rausser says he excluded the BNSF intermodal shipments from his legacy analysis because they were not listed on BNSF "Revenue Price Management System" spreadsheets produced in discovery.  But since the BNSF public intermodal formula *remained unchanged from 2001 forward*, there is no question that intermodal shipments subject to that formula fall squarely within the legacy ambit, regardless of what is or is not listed on the spreadsheets.

*Meaningless Adjustments:*  Dr. Rausser is supposedly conducting this exercise to show that overcharges are to be expected on some legacy shipments because during the Class Period the shipper lost the benefit of its pre-class, competitive surcharge formula when a contract was amended or otherwise updated with a new fuel surcharge formula during the Class Period.  The rationale for Dr. Rausser's categorization of legacies is that these contracts and shipments would have been impacted by the alleged conspiracy in one way or another.  Rausser Suppl. Rep. at 39; Ex. 4, Rausser Dep. 127:12-132:25, 158:14-159:4, 160:23-161:9, Mar. 4, 2014; Ex. 6, Rausser Dep. 324:25-325:19, Mar. 5, 2014.  But some of the most significant changes he makes to his identification of legacies are based on so-called "self-adjusting" surcharge formulas that *did not change* or formula changes that *actually lowered the fuel surcharge.*

The changes to UP's intermodal surcharge formula are a perfect example.  UP's "Standard Intermodal Fuel Surcharge" was adopted in 2000.  During the alleged conspiracy, the formula was changed twice to decrease the "fuel weight" component of the formula, first from ███████████ in the Spring of 2005, and then to ██████ in the Fall of 2006.  Ex. 9, Carlton Merits Rep. ¶¶ 108, 114 n.121, Appx. B (documenting evolution of intermodal formulas).  Both of those changes lowered the surcharge percentage the formula produced, and therefore *reduced* the amount of the surcharge relative to the original calculation.  *Id.*[32]  Dr. Rausser previously conceded that the only adjustments to UP's intermodal formula "'had the effect of *reducing the fuel surcharge.*'"  Ex. 11, Rausser Merits Reply Rep. 172 (citation omitted) (emphasis in original); *see also id.* ("UP made changes to its intermodal formula to reduce the FSC rates that it produced.").

---

[32] UP also made occasional ad-hoc adjustments that further lowered the charge produced by the standard formula in order to meet specific competition from BNSF and truckers.  *Id.*

However, in his supplemental report, one of Dr. Rausser's primary methods for excluding UP shipments from the "clean" legacy category is to exclude those same intermodal shipments. Rausser Suppl. Rep. 51-52, n.174, Table 13. He puts these shipments in his "self-adjusting or adjustable" category, presumably because the fuel weight was not hard-coded into the contract (and thus is subject to adjustment). That's true. But obviously, if the Class Period adjustments *reduce* the fuel surcharge, as Dr. Rausser previously admitted, that makes the damages model's findings of overcharges *harder* to explain. The "self-adjusting" surcharge argument only makes sense if the adjustment actually raised the surcharge rate.

At his deposition, Dr. Rausser admitted to numerous cases where he reclassified formulas as "non-legacy" fuel surcharges in the absence of any evidence of increased fuel surcharge rates. In addition to the UP intermodal surcharge, this included:

- <u>BNSF published carload surcharge</u>: 88% of the BNSF reclassifications were because BNSF had a "self-adjusting" carload fuel surcharge in its "rules book"—even though Dr. Rausser admitted that the only formula change, to the trigger price, had no effect in the Class Period. Ex. 4, Rausser Dep. 62:12-63:3, Mar. 4, 2014.

- <u>UP's "FMC/Fuel 60 Published Days" surcharge</u>: Dr. Rausser admitted that he reclassified this as non-legacy even though the changes (a higher strike price and a longer period during which fuel costs must exceed a threshold) were to the shippers' benefit. *Id*. at 240:4-242:2.



Similarly, he assigned *44* NS fuel surcharges to Category 2 without once trying to determine whether the purported Category 2 event led to higher fuel surcharges. *Id*. at 260:22-261:13. As Dr. Rausser's own workpapers demonstrate, several of these formulas were facially less onerous

than the competitive pre-class carload formula.  *See id.* at Ex. 1 (workpapers summarizing FSCs in Categories 1 and 2).

These were not accidents or oversights.  Dr. Rausser admitted repeatedly that in performing his legacy audit, he made no attempt—zero—to determine whether the "self-adjustment" (or other allegedly disqualifying event) had any impact on the fuel surcharge formulas.  *Id.* at 132:4-25, 239:24-25 ("You don't find that in my report anywhere.  I haven't done that analysis.").

The false positives inquiry does not turn on some hyper-technical requirement that the "legacy" formula was set in stone; rather, the relevant question is whether the model "detects injury where none could exist."  *D.C. Cir. Op.*, 725 F.3d at 252.  Dr. Rausser has provided an analysis with no useful information on that question.

*Blurring the Conspiracy Start Date*:  Dr. Rausser also argues in his supplemental report that shipments under contracts entered between March and June 2003, just prior to the start of the Class Period, should not be regarded as "clean" legacies because injury is to be expected in this "formative" stage of the alleged conspiracy.  Here, he is simply walking away from his prior, unequivocal testimony that the "anticompetitive consequences [of the alleged conspiracy] began in July of 2003."  Ex. 13, Rausser Dep. 12:22-13:7, Dec. 11, 2012.  This argument also flies in the face of Dr. Rausser's testimony that the allegedly collusive surcharge formulas were not implemented until June 2003.  *See id.* at 59:5-21 (testifying that "CSX didn't implement their [allegedly collusive fuel surcharge] program . . . until June.  UP didn't actually implement theirs until June.  BNSF . . . didn't implement until June.").

As the D.C. Circuit made abundantly clear, the March-June 2003 "tainted" legacy argument "runs directly counter" to the "crux of the plaintiffs' own evidence of collusion—that

there was a 'structural break' at the start of the Class Period[.]"  *D.C. Cir. Op.*, 725 F.3d at 254-

55.  Furthermore, Dr. Rausser expressly states in his supplemental report that in this "formative"

period Defendants could *not* obtain the fuel surcharges they wanted *due to competition*.  Rausser

Suppl. Rep. 13-14.  It makes no sense that without the supposedly "more aggressive" fuel

surcharges that were the *sine qua non* of this alleged conspiracy, the Defendants were able to—

categorically—raise prices in all contracts entered into during this "formative" period.

     In any case, Dr. Rausser's argument that "clean" legacies would pre-date March 1, 2003

does not cure the legacy shipment false positives.  Dr. Kalt tested Dr. Rausser's model using a

legacy benchmark that was limited to the period before March 1, 2003 (and thus pre-dates the

alleged "formative stages" of the conspiracy), and the conclusion remains exactly the same.  The

legacy false positive is ███—higher than Dr. Rausser's calculated overcharge for class

shipments.  Kalt Decl. Fig. 1.

### 3. Plaintiffs' Fallback Position—That Legacy Damages Arise From An Inability To Renegotiate Binding Contracts—Fails

     Since Dr. Rausser has not moved—and cannot move—all shipments out of the legacy

category, and his audit still leaves ███ of dollars of uncontested legacies, Plaintiffs offer a

sweeping backup argument intended to cover all other legacy shipments.  Plaintiffs and

Dr. Rausser argue that the damages generated by Dr. Rausser's model for these legacy shipments

are correct (not false) because all legacy shippers were actually injured.  Ex. 4, Rausser Dep.

157:17-161:9, Mar. 4, 2014; Ex. 6, Rausser Dep. 324:25-325:19, Mar. 5, 2014.  Getting a

straight answer to how that could have happened has proven impossible, but supposedly it is

because, in the absence of the alleged conspiracy, each and every legacy shipper would have

been able "during the Class Period to negotiate [its] way out of" the fuel surcharges that they had

contractually agreed to pay previously.  Ex. 11, Rausser Merits Reply Rep. 220; *see also id.*

(legacy shippers "lost the ability to mitigate these costs through re-negotiation").[33]   The audacity

of this argument cannot be overstated:  Plaintiffs are trying to define away the concept of false

positives for legacy shipments during the Class Period—and thereby circumvent the D.C.

Circuit's *holding* that positive damages on legacy shipments preclude class certification.  This

would also render the legacy exclusion in the class definition—a concept Plaintiffs defined and

used from the early stages of this case—meaningless.  This theory is wholly implausible and

violates the basic rules of estimating antitrust damages.

First, it makes no sense that shippers would have been systematically able to negotiate

their way out of binding fuel surcharge provisions *as fuel costs skyrocketed*—the precise

circumstances under which one would expect contractual commitments to pay surcharges to be

enforced.  *See* Kalt Decl. ¶ 118.  We will assume for the sake of argument that some might have

pulled this off.  But to explain away the findings of injury across legacy shippers generally,

Plaintiffs must be able to show that this apparent disregard for contractual obligations was

ubiquitous, and everyone would have succeeded in either eliminating or reducing their fuel

surcharge obligations.  Other than Dr. Rausser's *ipse dixit,* Plaintiffs do not offer any proof of

such an extremely unlikely outcome.  Notably, Dr. Rausser's regression model does not, and

cannot, provide any empirical support for this theory.  Dr. Rausser repeatedly testified that his

model provides no insight into which shippers would have renegotiated their contracts, when it

would have happened, or by how much such reductions would have reduced all-in rates.  Ex. 6,

Rausser Dep. 399:25-401:20, Mar. 5, 2014.  Ultimately, determining which shippers would have

---

[33]  To underscore just how dramatically Plaintiffs and Dr. Rausser have altered their theory of
liability, Dr. Rausser testified that as a result of this alleged inability to renegotiate binding
pre-class contracts, he would expect "damages" even in the case of a category of shippers for
whom the applicable surcharge rate declined during the Class Period.  Ex. 4, Rausser Dep.
158:14-159:4, Mar. 4, 2014.

been able to reduce or avoid already existing fuel surcharge obligations, and on which shipments, is an inherently individualized inquiry.

At most, Plaintiffs point out that in the pre-Class Period a very small portion of fuel surcharges that were triggered were "waived" or uncollected. *See, e.g.*, Ex. 11, Rausser Merits Reply Rep. 190. Dr. Rausser examined the data for NS, and, according to *his analysis*, the amount of revenue covered by surcharge waivers or smaller price concessions in the pre-Class Period was only ███ of the total surcharges billed. Ex. 11, Rausser Merits Reply Rep. 190, Table 80. In other words, as Dr. Rausser was forced to admit in his deposition, those "theoretically billable" NS pre-class fuel surcharges were actually billed and collected ███ of the time that they were triggered. Ex. 4, Rausser Dep. 191:7-192:16, Mar. 4, 2014 ("Q. So that means that they collected the other ███ percent; right? A. Yes."). And as Dr. Kalt notes, there was no radical change in NS collections in the Class Period. Kalt Decl. ¶ 112. Furthermore, Dr. Rausser admitted that he has no data to quantify the degree to which "waivers" (or other price concessions) varied across shipper size, commodity, route, etc. in the pre-Class Period. Ex. 4, Rausser Dep. 197:2-200:15, Mar. 4, 2014. Thus, he has no ability to assess the impact of those conditions on a shipper's ability to get a "waiver" of FSC payments in a competitive environment.

In all events, antitrust law does not permit damages claims to be based on better prices, terms, and conditions than were available in the competitive market. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (noting that antitrust damages should be measured by "comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions"); *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) ("In economic terms, the amount of

damages is the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities."). The legacy contracts, including their fuel surcharge provisions, were the product of competition. Even if we presume—without any evidence whatsoever—that some pre-class shippers could have found "a better deal . . . elsewhere" (Pls.' Mem. 28), the deals they made—and which the data show were enforced according to their terms at least ███ of the time—are entirely unaffected by the alleged anticompetitive conduct.  *See, e.g.*, Ex. 4, Rausser Dep. 142:9-143:4, Mar. 4, 2014 (admitting that "there's no reason to doubt" that shippers that "were under contract from a prior nonconspiratorial period" were paying "a competitive price . . . at the beginning of the conspiracy").  Thus, any showing of injury and damages on shipments subject to those contracts is a false positive.

* * *

Neither the facts nor the law related to false positives is the least bit contestable.  The D.C. Circuit held that "[i]f accurate, this critique [of Rausser's model] would shred the plaintiffs' case for certification."  *D.C. Cir. Op.*, 725 F.3d at 252.  The critique is accurate.

**PART III:     COMMON PROOF CANNOT BE USED TO ESTABLISH HARM FROM INCREASED FUEL SURCHARGE COVERAGE**

We now turn to the other element of Plaintiffs' conspiracy theory, purported "universal" fuel surcharge coverage, and the key causation issues in this case, which are whether particular class members would have agreed to a surcharge provision even without a purported conspiracy, what surcharge they would have paid, and when they would have paid it.

Previously, the Court recognized that "[i]f plaintiffs['] . . . alleged injury would have been caused by independent, non-conspiratorial forces, then no causal link exists between the alleged antitrust violation and the injury.  And if individualized inquiry is necessary to make

such a determination on causation, then plaintiffs will have failed to show that common questions predominate as to injury-in-fact." *Class Cert. Op.*, 287 F.R.D. at 43. The Court nonetheless concluded that individualized inquiry would be unnecessary because the new "more aggressive" surcharges were "non-negotiable," "each defendant enforced policies ensuring across-the-board, uniform application of their new fuel surcharge program," and "any deviations from the standard fuel surcharge program were rare and without consequence for purposes of determining injury-in-fact with common evidence." *Id.* at 50-51. The Court's conclusion seemed to be that if the alleged conspiracy changed the market from one in which surcharges were both *low and rarely applied and enforced* into one in which they were *high and almost universally applied and enforced*, a few "rare" "deviations" from universal coverage were not an obstacle to certification. *Id.* at 52.

The record has since evolved, and the picture is just not that black and white. First, basic math proves that public Class Period formulas *were not* more aggressive than the pre-Class Period formulas at the fuel prices that existed during the Class Period. *Supra* Part II:A.1. Second, the new expert work establishes conclusively that (i) rate-based fuel surcharges were already common before early 2003, (ii) pre-Class Period fuel surcharges were almost always paid when they were triggered, (iii) there was no spike in coverage after the onset of the theorized conspiracy, and (iv) Defendants did not achieve "across-the-board" surcharge coverage during the Class Period. Some Defendants did not even come close to 100% coverage during the Class Period, proving that many shippers retained the power to resist surcharges. Moreover, fuel surcharges are commonplace in many industries; they were used by other railroads and trucking companies before and during the Class Period; and they were becoming more common during the alleged conspiracy. Kalt Decl. ¶ 117, Fig. 24; Ex. 12, Kalt Merits Rep. Fig. IV-6A.

Ultimately, the real picture depicted by the data is one in which each Defendant achieved varying degrees of success in negotiating fuel surcharges both before and during the Class Period. And, because there is no one-size-fits-all answer for why some shippers accepted surcharge obligations and others did not, Plaintiffs face an insurmountable hurdle in establishing with common evidence that the adoption of any FSC was *caused* by the alleged conspiracy.

> A.  **The Coverage Data Demonstrates That Coverage And Enforcement Was Widespread Before The "Conspiracy" And Did Not Materially Accelerate During The Class Period**

The current expert record demonstrates that Plaintiffs' theory that the market switched from "sporadic" coverage to near-"universal" coverage is not true.

Looking first at the pre-Class Period, there is no doubt that rate-based fuel surcharges, which Plaintiffs concede were "uncoordinated" and "implemented by the individual Defendants unilaterally[,]" Pls.' Class Cert. Mot. 9, were in widespread use before the alleged conspiracy. The named Plaintiffs, for example, all paid rate-based surcharges before July 2003, and some did so on 100% of their traffic. Ex. 12, Kalt Merits Rep. ¶¶ 153-54 & Fig. IV-8A. This Court was unpersuaded by an analysis of surcharge prevalence prepared by Dr. Willig, because it did not account for whether a shipper paid surcharges on just one shipment or all of them. *Class Cert. Op.*, 287 F.R.D. at 51-52. Dr. Kalt has prepared an analysis that resolves the Court's objection, and it reveals that each Defendant had ███ to nearly ███ or more of its revenue base subject to rate-based surcharges prior to the commencement of the Class Period. Kalt Decl. Fig. 20; *see also* Ex. 12, Kalt Merits Rep. Fig. IV-9A - D. By April 2001, shippers paid rate-based fuel surcharges on approximately ███ of CSXT's revenue. *Id.* That number rose to approximately ███ in February of 2003, before Plaintiffs allege any supposedly conspiratorial acts. *Id.* Similarly, NS's share of revenue on which shippers paid rate-based fuel surcharges was approximately ███ in July 2001, and rose to approximately ███ in February 2003. *Id.* UP's

coverage increased from approximately ███ in November 2002 to more than ███ by the end of February 2003. *Id.* Similarly, by the end of 2002, BNSF had rate-based fuel surcharges in contracts covering almost ███ of its gross revenue. *Id.*

These data also refute Plaintiffs' contention that prior to the Class Period "defendants experienced increasing pushback to their FSC programs" such that collusion was necessary "[t]o overcome shipper resistance[.]" Pls.' Mem. 35-38. Of course there is always going to be some "shipper resistance" to anything that might raise prices, but what the data actually show is that in the period leading up to either March 2003 (when the conspiracy formation period allegedly began) or July 2003 (when the conspiracy allegedly was implemented), Defendants' rate-based fuel surcharges had already achieved substantial coverage and were spreading rapidly. Ex. 12, Kalt Merits Rep. ¶¶ 146-68; Ex. 9, Carlton Merits Rep. ¶¶ 88-102. The use of such surcharges had sky-rocketed from roughly ███ in Spring 2002 to more than ███ a year later. Figure 21, which examines how often fuel surcharge formulas were included in new contracts, further illustrates the point. For Defendants collectively, more than ███ of *new* contracts entered just prior to March 2003 (before the first challenged communication) contained a rate-based surcharge formula. Kalt Decl. ¶ 105, Fig. 21.[34] Across the board, the data refute Plaintiffs'

---

[34] Dr. Rausser obtains a much lower pre-class coverage figure by three techniques. First, he uses November 2002 as his measuring point. This approach is inherently misleading because it discounts the growth in surcharge coverage before the alleged start of the conspiracy. For example, UP adopted its first public carload fuel surcharge—which Dr. Rausser concedes was independently adopted (Ex. 8, Rausser Merits Rep. 55)—in December 2002. The first challenged communication was not until March 2003. One cannot ignore the coverage UP (or others) achieved prior to this time. Second, Dr. Rausser excludes all legacy transactions with rate-based fuel surcharges from his coverage numbers, and thereby significantly overstates the increase in coverage between 2002 and 2007. Ex. 12, Kalt Merits Rep. ¶¶ 243-44 & Figs. IV-19A - 19D. Finally, he calculates the percentage of all existing contracts that contain fuel surcharge provisions. However, because many contracts have long terms, it takes time for new fuel surcharge policies to affect actual transactions. Thus, the better measure, which

contention that in the pre-Class Period competition was creating some "brick wall" of opposition to adding fuel surcharges to new contracts.  Dr. Rausser conceded this fact at his deposition.  Ex. 15, Rausser Dep. 353:21-354:7, Dec. 18, 2012.

Moving to the other side of the equation, Class Period coverage, the data show that while surcharge coverage clearly increased—in this and other transportation industries subject to rising fuel prices—no Defendant came close to achieving universal coverage.  Kalt Decl. ¶¶ 106-07, Figs. 20-21.  A significant portion of Defendants' revenue never became subject to rate-based surcharges (see the "white space" in Kalt Decl. Fig. 20).  Kalt Decl. ¶ 104, Fig. 20.  For example, on a revenue basis, CSXT and CSXI never achieved more than ███ coverage combined, and BNSF never more than ███  *See* Ex. 11, Rausser Merits Reply Rep. Figs. 66-69.  In other words, even when rate-based fuel surcharge usage was at its absolute peak for those railroads, approximately ███ and ███ of their respective revenues did not pay one.  *Id.*; *see also* Kalt Decl. Fig. 20.  Dr. Rausser does not dispute these data.  Ex. 4, Rausser Dep. 293:4-12, Mar. 4, 2014.  The conclusion is the same if one examines new price authorities entered during the Class Period—there is a substantial shortfall between the alleged goal of "universal" coverage and the surcharge adoption rate the Defendants actually achieved.  Kalt Decl. Fig. 20.

The data also prove that there was no significant spike in coverage at the start of the alleged conspiracy, as one would expect if a conspiracy was necessary to overcome shipper resistance to fuel surcharges.  As Kalt Figure 21 shows, the use of surcharges in new contracts did not jump at all in July 2003 (it was basically flat for the next several months), and grew only modestly in the next few years.  Kalt Decl. Fig. 21.  The only spike in coverage occurred *before* March 2003.  Statistically, the data show no material acceleration in coverage subsequent to July

Dr. Kalt uses, looks at the portion of *newly contracted business* which had a rate-based fuel surcharge.

2003.[35]   Ex. 12, Kalt Merits Rep. ¶¶ 146-68; Ex. 9, Carlton Merits Rep. ¶¶ 88-102.

In short, the pre-existing and rapidly expanding use of rate-based fuel surcharges immediately before the Class Period, coupled with (i) the unilateral incentives to use such surcharges, (ii) the lack of any sudden or statistically measurable increase in their usage after the start of the alleged conspiracy, (iii) their widespread use in other industries (and by other, non-defendant railroads), (iv) their pre-class use by the named Plaintiffs, and (v) their continued use today, all point to the conclusion that many class members would have paid rate-based fuel surcharges regardless of any alleged conspiracy.

### B.   Plaintiffs Cannot Prove By Common Evidence That *Every* Class Member Paid Fuel Surcharges Because Of The Alleged Conspiracy

The coverage data tee up a legal issue, which is whether coverage (or the coverage aspect of causation) is a common issue under Rule 23 and *Wal-Mart*.   Clearly it is not.

First, Plaintiffs do not have any genuine "common proof" of coverage.   Dr. Rausser has *no* model to deal with the issue at all.   He has admitted that "certain fuel surcharges would have been charged by the defendants during the class period absent a conspiracy[,]" including "the same kinds of fuel surcharges that were charged prior to the class period[,]" which included "standardized" "rate-based" surcharges.   Ex. 3, Rausser Dep. 119:3-120:2, Sept. 24, 2010.   He concedes that shippers that paid fuel surcharges before the Class Period would have likely

---

[35]   In fact, regression analyses performed by Dr. Carlton—both on total shipments covered and new contracts covered—show that for UP the rate of coverage actually declined during the Class Period relative to the pre-Class Period.   Ex. 9, Carlton Merits Rep. ¶ 97 ("The growth in rate-based fuel surcharge coverage spikes in December 2002; falls back to a level indistinguishable from the pre-December 2002 level after March 2003; *actually falls below the pre-December 2002 trend after July 2003*; and then declines further as rate-based fuel surcharges declined following the shift to mileage-based fuel surcharges after April 2007.") (emphasis in original); *see also* Ex. 12, Kalt Merits Rep. ¶¶ 156-60.

continued to pay them during the Class Period.[36]  And he concedes that some shippers would

have paid them for the first time during the Class Period.[37]  But he concedes that he has "never

developed a model to predict coverage" of surcharges absent a conspiracy.[38]  His model

addresses damages, but apparently just presumes that coverage but-for the alleged conspiracy "is

the same as . . . what actually took place in the actual world, it's just at a different price."  Ex. 6,

Rausser Dep. 410:2-23, 412:14-413:7, Mar. 5, 2014.  Thus, his model is *not* a common method

for predicting increases in coverage, and cannot "translat[e]" Plaintiffs' coverage theory into any

assessment of the supposed impact on class members.  *Behrend*, 133 S. Ct. at 1435.

     Indeed, because Dr. Rausser presumes the same coverage in his but-for world as in the

actual world, he is proceeding as if the alleged conspiracy *did not cause* any shipper to pay a fuel

surcharge.  He further acknowledges that he has no idea why any shipper did or did not pay a

fuel surcharge during the Class Period because he has never analyzed that question—even

though that is the critical question Plaintiffs must answer to prove up their claim that the alleged

conspiracy *caused* shippers to pay fuel surcharges that they would not have paid absent

collusion.  *Supra* n.38.  Thus, Plaintiffs lack any evidence—much less common proof—that the

"alleged injury would [not] have been caused by independent, non-conspiratorial forces," which

---

[36]  Ex. 6, Rausser Dep. 336:1-16, Mar. 5, 2014 (Dr. Rausser would "expect that they will just continue [during the Class Period] with the same terms"); Ex. 21, Rausser Dep. 287:9-288:4, June 3, 2010; Ex. 3, Rausser Dep. 116:19-117:5, 119:9-120:2, Sept. 24, 2010.

[37]  Ex. 21, Rausser Dep. 94:20-95:5, June 3, 2010 (Q: "Are there some class members who paid a fuel surcharge for the first time after July 2003 who would have paid a fuel surcharge anyhow absent the alleged conspiracy?"  A: "[Y]es."); Ex. 3, Rausser Dep. 117:6-119:8, 120:3-121:6, Sept. 24, 2010.

[38]  Ex. 4, Rausser Dep. 263:8-17, Mar. 4, 2014; *see also* Ex. 16, Rausser Class Cert. Reply Rep. 84-85 (conceding his model cannot answer why any shipper paid fuel surcharges); Ex. 3, Rausser Dep. 293:16-295:11, Sept. 24, 2010 (he has "no information on what were the factors that caused some shippers to have fuel surcharges whereas other[s] did not").

means as a matter of law that "no causal link exists between the alleged antitrust violation and the injury." *Class Cert. Op.*, 287 F.R.D. at 43.

We recognize that Plaintiffs claim to have common proof in the form of their narrative that the Defendants *sought* universal coverage. But even if we presume that this narrative constitutes common proof of liability (and we do not agree that it does, because each Defendant had an obvious unilateral incentive to seek to expand coverage), it does nothing to resolve the individualized causation issues facing shippers who want to link their adoption of a surcharge to the alleged conspiracy. Defendants are still entitled to say, "But wait, you had agreed to the same surcharge six months earlier." Or, "Two-thirds of our customers had already agreed to this before any alleged conspiracy; you would have too." Or, "One third of our customers never agreed to it; you did not have to." Thousands of class members accepted surcharge provisions (such as the public carload and intermodal surcharge formulas) during the Class Period that were very similar to the ones they accepted prior to the alleged conspiracy. Some shippers, like ███████████ and ███████████████████, negotiated highly individualized surcharge formulas (*e.g.*, a higher trigger price and a fuel surcharge percentage cap as low as ██). Ex. 10, Johnson Rep. ¶ 188; Ex. 6, Rausser Dep. 532:23-536:7, Mar. 5, 2014; Ex. 4, Rausser Dep. at Ex. 1, Mar. 4, 2014; Ex. 22, NS_003043436-452 at -451. And there are other shippers who don't care about fuel surcharges because they can pass on the costs. It is clear that individualized evidence about causation would not be irrelevant or repetitive, and that Defendants are entitled to present it.

Plaintiffs cannot ask the Court to solve the coverage problem by ruling again (as it did in the original class certification opinion) that "rare" "deviations" from universal coverage would be "without consequence for purposes of determining injury-in-fact with common evidence." *Class Cert. Op.*, 287 F.R.D. at 50-52. The point is now moot anyway because the new expert analysis

shows that shippers without surcharges were not rare or "deviations."  But even if they were, the Court's prior reasoning was an application of the *Mims*/*Kohen* standard that is no longer good law in this Circuit.  After *Wal-Mart* and the D.C. Circuit decision, "deviations" cannot be dismissed as "without consequence" because *they are the object of the analysis*, revealing the "[d]issimilarities within the proposed class [that] have the potential to impede the generation of common answers." *Wal-Mart*, 131 S. Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L. Rev. at 132).

And in all events, dismissing uncovered shipments as mere "deviations" does nothing to prove that those shippers who *were* covered—class members—were covered *because of* the conspiracy.  The reality of this case is that under concededly competitive conditions, some shippers but not others were willing to accept fuel surcharge obligations, and that under allegedly conspiratorial conditions, some shippers but not others were not.  The existence of such profound "dissimilarities" is completely inconsistent with classwide adjudication.

**PART IV:   THE CLASS CONTAINS THOUSANDS OF UNINJURED SHIPPERS, PRECLUDING A FINDING OF COMMON IMPACT**

Something is deeply wrong when Plaintiffs' own "common proof" generates not only thousands of disqualifying false positives, but also thousands of "negative damages"—meaning that the predicted but-for, supposedly competitive price is *higher* than what the shipper actually paid.  But Dr. Rausser's model does just that, which means that even if we were to accept the model as reliable despite the methodological flaws which generate false positives, Plaintiffs fail to meet their burden to show "that all class members were in fact injured by the alleged conspiracy."  *D.C. Cir. Op.*, 725 F.3d at 252.

Additionally, beyond the failures of the model itself, the record now shows that *thousands* of class members never experienced higher fuel surcharge levels, obtained reductions in their base rates, or otherwise escaped the alleged effects of "standardized" fuel surcharges.

On this record, there can be no legitimate finding that "all" (or even "virtually all") shippers paid

higher rates because of the allegedly "more aggressive," "standardized" fuel surcharges.

A.      **Plaintiffs' Own Damages Model Finds That Thousands Of Class Members Were Uninjured**

Dr. Rausser only reports *average weekly* or what he calls "*classwide*" overcharges for the

Defendants.  Even to this date, with his trial proofs supposedly disclosed, he has never revealed

individual class member damages calculations.  He *promised* such calculations repeatedly, but he

never delivered on those promises.

Nonetheless, in testimony after the submission of his merits report in 2012, he described

a method one would use to run his model separately for individual shippers, producing

individualized rather than average damages estimates.  Ex. 15, Rausser Dep. 436:2-437:16, Dec.

18, 2012.  If one implements that approach using Dr. Rausser's STB-adjusted model:

- ██████ shippers, or ██████ of the putative class members (including three of the proposed class representatives), have zero "damages" in the aggregate.  Kalt Decl. ¶ 74, Figs. 13, 16.  In other words, the model indicates that at least ██████ putative class members actually paid the same or less in the aggregate for their class transactions than the model predicts they should have paid in a competitive but-for world.

- ██ million class shipments—██████ *of all class shipments*—were actually priced at or below Dr. Rausser's estimate of competitive but-for rates.  Kalt Decl. Fig. 13.

- ██████ class shippers, comprising ██████ of all class shippers, have negative overcharges on *all* of their shipments.  *Id.*

- ██████, one of the named Plaintiffs, has negative overcharges on *all* of its shipments, and two other named Plaintiffs have net negative damages.  *Id.* at Fig. 16.

If it seems odd that Dr. Rausser's model finds that approximately ██████ of the putative

class (██████ shippers) had a mix of shipments with and without damages (Kalt Decl. ¶ 74,

n.103) and that another ██████ shippers) had only negative damages (*id.*), it should:  there is

no way that should happen under the logic of Plaintiffs' case, in which "more aggressive" fuel surcharge formulas "yielded more revenue" by inflating the all-in rates on *all* class traffic.  The model results reject, rather than validate, that hypothesis.  The inescapable conclusion is that, contrary to Plaintiffs' many assurances, Dr. Rausser's model neither establishes nor is capable of establishing that all class members were injured, let alone that injury and damages are common issues that will stand or fall, "in one stroke" for the entire class.

Attempting to minimize Dr. Kalt's findings on negative damages, Plaintiffs brought in a new expert, Dr. James McClave (whose model the Supreme Court found not viable to meet plaintiffs' burden in *Behrend*).  At the outset, Dr. McClave's analysis concedes that Dr. Rausser's model implies no injury to at least ██ of the class.  Ex. 23, Expert Report of James T. McClave, Ph.D., June 12, 2013 ("McClave Rep.") 15.  However, Dr. McClave argues that Dr. Rausser's model does in fact demonstrate "that all or virtually all customers were impacted by the alleged conspiracy[,]" *id.* at 17—*as long as you exclude ██ of the class*, for which *Dr. McClave admits Dr. Rausser's model cannot reliably assess injury or damages*.

Dr. McClave's argument, in short, is that Dr. Rausser's methodology cannot be trusted with regard to class members that had fewer than ██ transactions each in both the pre-class and Class Periods.  *See id.* at 15-17; *see also* Ex. 6, Rausser Dep. 387:15-389:4, Mar. 5, 2014 (admitting that shippers with fewer than ██ observations are "subject to prediction errors").  So he chooses not to include these class members when "testing" the model's overall reliability for calculating *class member damages*.  But this is hardly a detail.  The excluded class members constitute *approximately ██ of class members* including three of the named Plaintiffs.  Kalt Decl. ¶ 84 n.116.  It is only after discarding ██ of the class that Dr. McClave can conclude "that all or virtually all" of the *remaining* class members (██ he claims) "have net positive

overcharges, and ███████████████████████████.” Ex. 23, McClave Rep. 16.
What he means is that the Rausser model predicts positive damages for ███ *of less than* ███ *of the class*.

Dr. McClave appears to ask the Court to simply *assume* that the discarded ███ were injured—even though the model says that many of them were not.  His argument is that because there is "increased random variability when the number of observations is this small, . . . these 'net negative' customers should not be assumed to be un-impacted by the conspiracy." *Id.* at 15; *see also* Pls.' Mem. 61 n.58 (arguing such "shippers are not appropriately categorized as uninjured").  But no one is entitled to *assume* anything about injury.  The Plaintiffs' burden is to show they can *prove* it—for all class members—with reliable common proof.  What Dr. McClave is saying is that Dr. Rausser's model is not capable of accurately identifying impact or calculating damages for shippers with fewer than ██ transactions in each of the class and pre-Class Periods.  That's dispositive.  There has never been a class certified based on proposed common proof that was admittedly worthless for over ███ of the putative class.  It does not matter that—conveniently enough—Plaintiffs say the model is reliable for larger shippers.  After *Wal-Mart* common proof must be able to "resolve an issue that is central to the validity *of each one of the claims* in one stroke." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis added).  If Dr. Rausser's model is unreliable for small shippers, injury does not qualify as a "common issue" and class certification must be denied.[39]

---

[39] It is more than a little ironic that Plaintiffs dismiss the implications of these results by claiming the problems concern only smaller class members.  They are the ones that class-based litigation was designed to protect. *Amchem*, 521 U.S. at 617 (the core concern of the Federal Rules Advisory Committee was "people who individually would be without effective strength to bring their opponents into court").  The larger shippers—many of which have multi-million dollar damages claims according to Dr. Rausser—do not need a class action to protect their interests.

**B.    Many Shippers Could Not Have Been Injured By The Conspiracy Plaintiffs Theorize**

Independent of the model's plainly unreliable results, the largely undisputed facts establish that even if a conspiracy of the type Plaintiffs originally posited had existed, there are many class members who could not have been injured by it.

The most obvious cases are class members who indisputably were not subject to "more aggressive" fuel surcharges.  For example, this would be true of shippers who before and during the Class Period purchased services pursuant to BNSF's published intermodal formula, which was adopted in 2000 and *never* changed from 2001 through the Class Period.  *See, e.g.*, Ex. 12, Kalt Merits Rep. Fig. IV-14A.  It would also be true of shippers who before and during the Class Period purchased services pursuant to (a) BNSF's published carload formula, which was changed in June 2003 only to lower the trigger price, but generated *exactly the same* surcharge rate as the pre-conspiracy surcharge formula (*id.* at Fig. IV-24A; Ex. 11, Rausser Merits Reply Rep. 153); (b) UP's published carload formula, where the change to the HDF index turned out to be favorable to shippers (Ex. 12, Kalt Merits Rep. Fig. IV-24D; Ex. 9, Carlton Merits Rep. ¶¶ 111-18); (c) UP's published intermodal formula, which as Dr. Rausser admitted was twice lowered during the Class Period (Ex. 11, Rausser Merits Reply Rep. 172); (d)  NS's domestic intermodal formula, which did not change after April 2002 (*id.* at Fig. IV-1D); (e) NS's published carload surcharge formula prior to the first Class Period change in March 2004 (Ex. 12, Kalt Merits Rep. Figs. IV-1B, IV-24C); (f) CSXI's published intermodal formula prior to the only Class Period change in October 2004 (*id.* at Fig. IV-1D; Ex. 10, Johnson Rep. ¶¶ 99-100); and (g) NS's international intermodal formula, which did not change until August 2006 (Ex. 31, Harris Rep. ¶ 127).[40]

---

[40]  Plaintiffs misleadingly argue that there is no need to examine the extent to which there might

The list of the likely uninjured hardly stops there.  Dr. Rausser concedes that in the but-for world Defendants would have used "the same kinds of fuel surcharges that were charged prior to the class period[,]" including "standardized" "rate-based" surcharges.  Ex. 3, Rausser Dep. 119:3-120:2, Sept. 24, 2010.  Because many of those pre-class fuel surcharge formulas resulted in exactly the same or even more revenue than the allegedly collusive ones, a large portion of the class is uninjured.  Kalt Decl. ¶ 98, Fig. 18.  The predicted variance in actual and but-for rates under that assumption is ███ on average (for public carload formulas), and thus class members end up paying the same as they would have anyway.  *Id.*

The data also make it impossible to dismiss the avoidance of injury by bargaining for price concessions.  *Cf. Class Cert. Op.*, 287 F.R.D. at 27-28.  In rejecting Defendants' argument that some shippers escaped "injury" by obtaining "contract concessions in the form of base rate discounts," the Court expressly relied on the supposedly "more aggressive, standardized fuel surcharge programs" which Plaintiffs claimed resulted in a ███ overcharge.  *Id.* at 28, 72.  Then, applying the now-rejected "widespread" injury standard in *Mims* and *Kohen,* the Court found that "there is no evidence of widespread discounting of base rates in exchange for application of fuel surcharges, and that any such discounting in the record is an anomaly that does not preclude a finding of predominance."  *Id.* at 28.

---

be uninjured class members because the Court's earlier finding that Defendants' supposedly "standardized" Class Period fuel surcharges were applied to "all or virtually all class members" already answers that question.  Pls.' Mem. 59 (citing *Class Cert. Op.*, 287 F.R.D. at 28).  Contrary to Plaintiffs' assertion, the Court recognized that the mere fact of paying a rate-based fuel surcharge during the Class Period does not by itself result in injury.  "[T]o prevail at the class certification stage," Plaintiffs must also "show by a preponderance of the evidence that common proof can be used to answer the question[] . . . whether payment of that fuel surcharge caused class members to pay more for shipping than they otherwise would have paid." *Class Cert. Op.*, 287 F.R.D. at 44.

Under the D.C. Circuit's standard, however, the Court's prior conclusion can no longer stand. That is, even "anomalous" discounting is enough to preclude a finding of predominance under the D.C. Circuit's decision requiring that "the common evidence [] show all class members suffered *some* injury." 725 F.3d at 252-55 (emphasis in original). But in addition, if—as we have established—the new surcharges were either the same as the pre-class ones or only trivially "more aggressive," it is impossible to dismiss categorically the ability of shippers to negotiate offsets. Even if we assume that it is difficult for shippers to obtain base rate discounts sufficient to offset new fuel surcharge provisions that lead to a ████ overcharge (such that those who succeed are "anomal[ies]"), the same cannot be said when shippers only need to obtain a 1% concession, or less, to fully negate the effects of the alleged conspiracy. At the very least, Defendants have a right in such circumstances to put on individualized injury defenses establishing that a shipper obtained a modest price concession leading to a competitive all-in rate. And allowing Defendants to exercise that right (as *Wal-Mart* requires) would render a class proceeding or trial unmanageable.

In fact, Dr. Kalt's new and more comprehensive analysis of the transaction data shows that base rates were frequently discounted during the Class Period, making it impossible to prove without individual analysis that such discounts did not fully offset any fuel surcharges paid. Approximately ████ of class shipments experienced a base rate *decrease* between March 2003 and March 2006, *after* controlling for all of the common factors that Dr. Rausser says explain rail prices. Kalt Decl. ¶ 81, Appx. C, Fig. C.III.4. Many of those shipments received base rate decreases of ████ or more, easily large enough to fully offset the Class Period fuel surcharges. *Id*. Nor is it surprising that so many class members would be able to negotiate significant base rate discounts given that the class includes many powerful companies with enormous bargaining

leverage, such as ▮ and ▮, and the supply-and-demand realities that vary widely across geography and commodities.  In fact, Dr. Kalt did an analysis of shippers' all-in rates comparing March 2003 and March 2006 rates for shipments having the same customer, commodity, route, car type, and interline status.  After controlling for changes in economic conditions using Dr. Rausser's own model, Dr. Kalt found that ▮ of the analyzed traffic had all-in rate decreases.  *Id*. at ¶ 81.

In short, the Court's prior determination that uninjured shippers would be "anomalies" and could therefore be disregarded is no longer legally or factually supportable.  There are indisputably substantial numbers of uninjured members of the proposed class—even according to Plaintiffs' biased damages study.  Class certification must therefore be denied.

**PART V:     THE RAUSSER MODEL IS INCAPABLE OF REDUCING THE DETERMINATION OF DAMAGES INTO A VIRTUALLY MECHANICAL TASK**

We turn to *Behrend*'s requirement that the proponent of class certification "establish[] that damages are capable of measurement on a classwide basis."  *Behrend*, 133 S. Ct. at 1433.

**A.     Plaintiffs Have No Method Of Measuring Individualized Damages**

When Defendants raised these issues during the first class certification proceeding, Plaintiffs answered with promises that the Rausser model would in time be capable of proving individualized damages, based not on averages but on each customer's transactions and individual "but-for" prices.  *See, e.g.*, Pls.' Reply Mem. Addressing *Wal-Mart Stores, Inc. v. Dukes*, Sept. 1, 2011 11 (arguing that Dr. Rausser's "models are fully capable of determining individual impact and calculating individual damages"); Ex. 16, Rausser Class Cert. Reply Rep. 92 ("although I report the average percentage overcharge for each week of the Class Period, the damage model does not assume that all shippers paid the same overcharge. On the contrary, the

model can be used to calculate individual damages"); Ex. 17, Rausser Class Cert. Rep. 122-23;

Ex. 3, Rausser Dep. 277:18-279:16, Sept. 24, 2010 (describing method).[41]

In certifying the class, the Court expressly relied on these promises, finding that

Dr. Rausser's model "can be used to calculate individual damages." *Class Cert. Op.*, 287 F.R.D.

at 71-72 (quoting Rausser Class Reply Rep. 92); *see also id.* at 72 ("the relationship between

price drivers and freight rates calculated by the model . . . can be used to estimate the but-for

price for each customer transaction").

But the promises were not kept.  Dr. Rausser submitted his trial proofs *without any*

*calculations of individualized damages.*  Even his most recent submission, in the wake of

*Behrend*, does not provide common proof of individualized damages.  Dr. Rausser has claimed

that he calculated individual damages for the class representatives (8 entities), but he has never

disclosed those calculations.  He declines to say how many total class members he has computed

damages for, acknowledging only that it is fewer than 10% of the proposed class.  Ex. 6, Rausser

Dep. 373:24-374:1, Mar. 5, 2014.  Regardless, the work has not been disclosed, even though the

time for Dr. Rausser to disclose his full trial testimony has long passed.

This is a plain default after *Behrend*.  The Supreme Court has instructed lower courts not

to certify class actions unless and until common proof of damages survives "rigorous" scrutiny.

*Behrend*, 133 S. Ct. at 1433.  This Court is required to find that "damages are susceptible of

measurement across the entire class," *id.*; that the common proof generates "just and reasonable"

damages estimates, *id.* (criticizing the Third Circuit's "finding [that it was] unnecessary to decide

'whether the methodology [was] a just and reasonable inference or speculative'"); and that the

---

[41]  Plaintiffs renewed these promises after class certification.  Dr. Rausser repeatedly testified
that he had a way to determine individualized damages with his model.  Ex. 8, Rausser Merits
Rep. 171; Ex. 15, Rausser Dep. 436:2-438:11, Dec. 18, 2012 (describing method and stating
that "there would be a different but-for price [for each shipper], and that is computable").

common proof is robust enough to avoid "'labyrinthine individual calculations,'" *id.* at 1434. And it is crystal clear that *Behrend* is referring to measuring *individual* damages, not some aggregate classwide number that then gets distributed arbitrarily. The Court's concern about damages "permutations" among "2 million subscribers located in 16 counties" makes no sense otherwise. *Id*. at 1434-35. And *Wal-Mart* forbids such aggregate approaches, which it rejected as a "novel project." *Wal-Mart*, 131 S. Ct. at 2561. The Supreme Court has clearly sided with cases such as *Windham*, 565 F.2d at 68, and *Bell Atlantic Corp.*, 339 F.3d at 306-07, requiring plaintiffs to show that estimating damages is a virtually mechanical exercise.

That is impossible if Plaintiffs *fail to develop or produce individualized damages estimates*. The class cannot possibly be certified under these circumstances; it is, literally, a default on Plaintiffs' burden of proof.

## B.     Dr. Rausser's Model Is Not Capable Of Reliably Estimating Damages

At this point in the discussion we know that the Rausser model simultaneously generates thousands of false positives—damages where there should not be any—and thousands of findings that shippers who are supposed to be injured were not. It produces multi-million dollar damages claims when the shipper's surcharge rate decreased. It routinely produces damages estimates greater than fuel surcharge payments. It shows positive damages on some of a shipper's traffic and negative damages on other traffic. It generates a wildly varying range of damages estimates—which then get averaged together. It is no wonder Plaintiffs have chosen not to follow through on their promises to generate individual damages calculations.

This simply does not work after *Behrend*. The days are over when class plaintiffs could meet their burden by focusing only on the yes/no question of injury and essentially ignore the reasonable estimation of damages. *Behrend* confirmed that a model advanced in support of class certification must satisfactorily account for market forces that cause the effects of the unlawful

conduct to vary across geographic or other lines that fracture the class.  *Behrend*, 133 S. Ct. at 1435 n.6 (noting that even if the damages model was limited to overbuilding, it still would fail unless it showed that the extent of overbuilding "would have been the same in all counties").

Dr. Rausser's model is simply not up to the task.  It purports to be a one-size-fits-all solution for predicting the average overcharge every one of the 16,000 shippers in the class (Dr. Rausser's latest estimate) would have paid ████████ in the Class Period, in the absence of the alleged conspiracy.  That is, using ████████████████, the model purports to be as probative and accurate for predicting ██████████████ of a sole-served coal shipper as it is for ████████, or a beverages shipper with trucking alternatives, or a shipper of hazardous materials, and so forth.  Ostensibly this is accomplished through a regression analysis that appears complex (because it has hundreds of thousands of "dummy" variables) and reliable (because it generates a high R-squared).  But separate and apart from the ████████████ ████████ issue discussed earlier, the model is far too rudimentary to predict every class member's individual damages reliably.

The goal of a regression analysis is to predict the *expected* value of a dependent variable based on the *known* values of various independent variables.  Dr. Rausser specifies regressions with ████████████████████████████████ ████████ in the latter case using predicted variable costs to predict but-for rates.  In all versions the model has over ████████ independent variables, *but virtually all of those are "dummy" variables and just five (including two more dummy variables) move with time*.  Kalt Decl. ¶¶ 130-33, n.190.  Only the variables that move with time can explain how rail rates, absent the alleged conspiracy, would be expected to change over time.  *Id.*  Yet these five variables have very little explanatory power themselves:  an incremental R-squared of only 0.102, meaning that

only 10.2% of the variation in rail rates is explained by these factors. *Id.* Thus, the only variables Dr. Rausser relies on to explain changes in rail rates over time—a critical purpose of his damages model—actually explain only 10.2% of those changes. That is not nearly high enough to predict anything reliably. As Dr. Kalt explains, "[t]his very low incremental R-squared tells us that the model does a very poor job of explaining how actual rail rates change over time (which is the foundation for using a pre-Class Period benchmark), much less reliably predicting but-for rail rates." *Id.* at ¶ 133.

The purported "high" explanatory power of Dr. Rausser's regression (*i.e.*, the model's 0.90 R-squared) is the result of the over ███████ dummy variables, which are known to generate misleadingly high R-squares. *See* J. Wooldridge, *Introductory Econometrics: A Modern Approach* (5th ed. 2012) at 488-489 ("The R-squared from the dummy variable regression is usually rather high. *** We should not get too excited about this…."). Dummy variables simply take the value 0 or 1 to indicate the absence or presence of a qualitative characteristic. They are used as devices to sort data into mutually exclusive categories (such as smoker/non-smoker). Here, for example, a dummy variable for a commodity or a route will be "1" if the shipment is of that commodity or moves on that route and "0" if it is not. Dr. Rausser uses over a million combinations of dummy variables to account for the *average* difference in rail rates across different kinds of traffic (*e.g.*, the average rate for "crushed stone" or "LA-to-Chicago"). But as averages that *ignore* time rather than vary with it, and are always either "1" or "0" (never any other value), they do not help explain how forces that change over time—in particular, changes in fuel prices over time—lead to changes in rail rates. Kalt Decl. ¶¶ 130-33. That is the critical question in estimating damages in this case, and the Rausser model cannot do that with even minimal accuracy.

Moreover, the Rausser model does not account at all for numerous factors that would obviously matter to measuring damages in many if not all individual cases.  For example:

- Fuel Surcharges:  Incredibly, there is nothing in Dr. Rausser's model that considers whether a shipper supposedly entitled to damages paid a fuel surcharge prior to the alleged conspiracy, and if so what it paid.  The model makes no distinction between a shipper who had a fuel surcharge before the Class Period, and a shipper who outside the alleged conspiracy never paid a surcharge.

- Contract Terms:  Confined to common proof, Dr. Rausser does not consider any contract terms that might bear on damages, including but not limited to customized fuel surcharge provisions.

- Non-Rail Competition:  It is indisputable that at least a substantial portion of the traffic carried by railroads can be shipped by truck or other modes as well.  There is nothing in Dr. Rausser's model that accounts for whether a Defendant was constrained in what it could charge because it would have lost business by imposing a higher surcharge.

- Rail Competition:  Dr. Rausser's model does not account for whether the Defendant railroad has one or more competing railroads serving the shipper, or whether it is "sole-served."  Nor does it account for competition from railroads not part of the alleged conspiracy that could have taken business from Defendants.

- Special Requirements:  Dr. Rausser's model does not account for whether the shipment is time-sensitive, has a guaranteed service level, or has special handling requirements (for example, hazardous materials) that affect a shipper's negotiating power and pricing.

- Commodity or Route-Specific Demand Conditions:  Dr. Rausser's model addresses the effect of changes in demand on rail pricing in an especially simplistic way, based on GDP and seasonality variables only.  There is nothing in the model to account for increased demand for a particular commodity group or along a particular route.

Dr. Rausser will claim that these factors (and everything else that might matter) are inherently accounted for in his regressions by the interaction of his variables.  But as Dr. Kalt explains, this could only be true if rates vary in exactly the same way for all commodities, routes and market conditions; otherwise the model "inevitably finds false positive damages and

purported evidence of conspiracy under numerous circumstances when none can exist, and it inevitably finds negative or no damages where Prof. Rausser's theories say it should only find positive damages." *Id*. at ¶¶ 124, 128.  Remarkably, Dr. Rausser did not test or control for this. To the contrary, as presented, his damages model is hard-coded to assume as a matter of arithmetic that all routes, commodities, and shippers were impacted equally by changes in fuel price.  *See id.*  That "resolves" by a completely unreasonable and artificial assumption some of the most basic questions in this case.  One should want to know whether, for example, fuel cost increases have the same effect on coal shippers in Maine as on apple shippers in California; or whether the fact that coal is extremely heavy and can't economically be shipped by trucks for long distances increases the impact of fuel price changes on rates; or whether the fact that apple shippers can use trucks decreases it.  Dr. Rausser's model does not attempt to answer these questions; it *imposes* a one-size-fits-all answer that is nothing more than an *assertion* that common factors are adequate for estimating everyone's damages.

Dr. Kalt performed simple tests of this assumption and found—not surprisingly—that it is wrong.  *Id*. at ¶ 127, Fig. 25.[42]  When the model was no longer instructed to simply assume that the parameters (*e.g.*, supply and demand effects) are the same for all routes and commodities, over half the tested routes had "damages" parameters that were materially different from the parameter that Dr. Rausser indicates should apply to all of the tested routes.  In fact, ■ of the 100 tested routes had negative overcharges, while ■ had positive overcharges (■ had insufficient data).  *Id.*; Ex. 12, Kalt Merits Rep. ¶¶ 423-35 & Figs. VI-3A - 3C.  This categorically proves that Dr. Rausser's assumption that changes in fuel price affect all routes

---

[42] *See also* Ex. 9, Carlton Merits Rep. ¶¶ 135-37 (the effect of fuel costs on rail rates "varies along the following dimensions: across the four Defendants, by type of shipment (carload, coal, or intermodal), by half-year . . . , by route length . . . , [and] by customer size").

equally is false, and that Dr. Rausser's methodology simply disregards dissimilarities among class members by homogenizing unlike experiences.  This is specifically forbidden by *Wal-Mart*, 131 S. Ct. at 2561, and *Behrend*, 133 S. Ct. at 1435 n.6.

The class consists of thousands of shippers in a famously heterogeneous market that is a textbook example of "differential pricing."  There are inevitably going to be individualized damages issues in that setting, and *Wal-Mart* makes it clear that "Trial by Formula" cannot deprive Defendants of the right to defend individual damages claims—dozens of which are for millions of dollars or more—with substantial, substantive individualized defenses.  Imagine, for example, that ███████████ were to bring its own case against UP and claim the ██ million implied by Dr. Rausser's model for UP traffic only.  UP's first response would be that ██ has a customized fuel surcharge formula that does not even look like the alleged conspiratorial formulas.  Dating to ████, it uses the WTI index (not the HDF index UP allegedly adopted through conspiracy), and specifies completely different triggers and slopes ████████████ ████████████████████████████████████████, including a ████████████████████████████████████ Ex. 24, UPFSC0469677-711 at -710; Ex. 25, UPFSC0000079-102 at -085.  UP would also likely mention that this is ██████████, whose bargaining power is hardly at the classwide average, particularly since trucks carry automobiles too.  Plainly these factors (to name only three) have profound damages implications that would be fully considered in an individual trial.  The Rausser model is blind to this—and a thousand variations on these facts in the case of other class members.  It has no idea these kinds of facts even exist.  The damages issues in this case have not been modeled and are too complex to model to the standards established in *Behrend*.

**CONCLUSION**

Plaintiffs' renewed motion for class certification should be denied.

Dated:  March 31, 2014                    Respectfully submitted,

       /s/ Daniel M. Wall

Daniel M. Wall                            Tyrone R. Childress
Timothy L. O'Mara                         David G. Meyer
Christopher Campbell                       JONES DAY
Connie Sardo                              555 South Flower Street, 50th Floor
LATHAM & WATKINS LLP                      Los Angeles, CA  90071-2300
505 Montgomery Street, Suite 2000         Telephone:   (213) 489-3939
San Francisco, CA  94111
Telephone:   (415) 391-0600               Alan M. Wiseman (D.C. Bar No. 187971)
                                          Thomas A. Isaacson (D.C. Bar No. 376959)
J. Scott Ballenger (D.C. Bar No. 465252)  COVINGTON & BURLING LLP
LATHAM & WATKINS LLP                      1201 Pennsylvania Avenue, NW
555 Eleventh Street, NW, Suite 1000       Washington, DC  20004-2401
Washington, D.C. 20004                    Telephone:   (202) 662-6000
Telephone:  (202) 637-2200

*Attorneys for Defendant Union Pacific Railroad Company*

      /s/ John M. Nannes                 Saul P. Morgenstern
John M. Nannes (D.C. Bar No. 195966)      Jennifer B. Patterson
Tara L. Reinhart (D.C. Bar No. 462106)    Amanda C. Croushore
Sean M. Tepe (D.C. Bar No. 1001323)       KAYE SCHOLER LLP
SKADDEN, ARPS, SLATE,                     425 Park Avenue
  MEAGHER & FLOM LLP                      New York, NY 10022
1440 New York Avenue, N.W.                Telephone:   (212) 836-8000
Washington, DC  20005
Telephone:  (202) 371-7000                Claudia R. Higgins (D.C. Bar No. 940288)
                                          KAYE SCHOLER LLP
                                          901 Fifteenth Street, NW
                                          Washington, DC 20005
                                          Telephone:   (202) 682-3500

*Attorneys for Defendant Norfolk Southern Railway Co.*

_____/s/ Randy M. Mastro_____

Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:  (212) 351-4000

Theodore J. Boutros, Jr.
GIBSON, DUNN & CRUTCHER LP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  (213) 229-7000

Joshua H. Soven (D.C. Bar No. 436633)
Andrew S. Tulumello (D.C. Bar No. 468351)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
Telephone:  (202) 955-8500

Veronica S. Lewis
Robert C. Walters
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201
Telephone:  (214) 698-3100

Samuel M. Sipe, Jr. (D.C. Bar No. 256446)
Linda Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone:  (202) 429-3000

*Attorneys for Defendant BNSF Railway Company*

_____/s/ David D. Cross_____

Kent A. Gardiner (D.C. Bar No. 432081)
Kathryn D. Kirmayer (D.C. Bar No. 424699)
Shari Ross Lahlou (D.C. Bar No. 476630)
David D. Cross (D.C. Bar No. 490187)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  (202) 624-2500

*Attorneys for Defendant CSX Transportation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel M. Wall, an attorney of record, certify that on March 31, 2014, I caused a true and correct copy of Defendants' Memorandum Of Law In Opposition To Plaintiffs' Renewed Motion For Class Certification; the Declaration of Timothy O'Mara in Support of Defendants' Memorandum Of Law In Opposition To Plaintiffs' Renewed Motion For Class Certification, and exhibits thereto; and the Declaration of Joseph P. Kalt, Ph.D. to be served by email on counsel for Plaintiffs.

_/s/ Daniel M. Wall_____

DC\3168769