# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) ) ) MDL No. 1869 ) Misc. No. 07-489 (PLF) |
| _____ | ) Hon. Paul L. Friedman ) |
| This document relates to: ALL DIRECT PURCHASER CASES | ) ) PUBLICLY FILED VERSION |
| _____ | ) |

**Declaration of**

**Joseph P. Kalt, Ph.D.**

**On Behalf of Defendants**

**BNSF Railway Company**
**CSX Transportation, Inc.**
**Norfolk Southern Railway Company**
**Union Pacific Railroad Company**

March 31, 2014

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

# Table of Contents

I.   **INTRODUCTION** ............................................................................................. 1

    A.   Background .......................................................................................... 1

    B.   Summary of Findings .......................................................................... 3

II.  **ASSESSING THE RELIABILITY OF PROF. RAUSSER'S MODELS** ....................... 11

    A.   Overview:  Can Prof. Rausser's Modeling Be Tested for Reliability? ......................... 11

    B.   Prof. Rausser's New STB Model ......................................................... 15

    C.   False Positive Legacy Damages under Prof. Rausser's New Modeling ....................... 18

    D.   False Positive Damages for Legacy FSC Formulas under Prof. Rausser's Modeling ... 22

    E.   Testing Prof. Rausser's Model for False Positive Structural Breaks ........................... 23

III. **PROF. RAUSSER'S MODELING FINDS DAMAGES BECAUSE IT DISREGARDS THE FUNDAMENTAL ECONOMICS OF COSTS** ...................................................... 28

    A.   Prof. Rausser's Models Assume███████████████████ ........... 28

    B.   Prof. Rausser's "Constant Relationship" Contradicts Basic Economics ....................... 32

    C.   Prof. Rausser's "Constant Relationship" Contradicts the Professional Literature ........ 36

    D.   Data Errors:  Prof. Rausser's Misuse of STB Data on Variable Costs of Intermodal Service ................................................................................................ 38

    E.   Data Errors:  Prof. Rausser's Benchmark Mixes FSC-Paying and Not-FSC-Paying Rates .................................................................................................. 42

IV.  **PROF. RAUSSER'S MODEL DOES NOT RELIABLY IDENTIFY THE FACT AND MAGNITUDE OF CLAIMED INDIVIDUALIZED DAMAGES** ................................... 44

    A.   Claimed Individualized Damages of the Members of the Proposed Class ................... 44

    B.   Dr. McClave's Conclusion that All Class Shippers Were Harmed Is Baseless ............. 53

    C.   Preliminary Observations on Prof. Rausser's New Method of Calculating Individual Damages ............................................................................................. 54

V.   **ASSESSING PROF. RAUSSER'S CLAIM THAT EVERY SHIPPER, LEGACY AND CLASS, WAS INJURED** ............................................................................... 56

    A.   Overview:  Prof. Rausser's Changing Theory of Harm and Legacy "Damages" .......... 56

    B.   The Foundations of Prof. Rausser's Damages Modeling Have Crumbled ................... 58

    C.   Prof. Rausser's Remaining Theory of Conspiracy-as-Contract-Enforcement ............. 69

    D.   Prof. Rausser's Enforcement Theory of Injury Is Not Susceptible to Common Proof .. 76

    E.   Summary:  Prof. Rausser's Model Cannot Detect or Quantify Injury ........................... 77

i

**VI. PROF. RAUSSER'S MODELS *ASSUME*, RATHER THAN PROVE, A COMMON FACT OF INJURY** ........................................................................................................... **78**

    A.   The Mathematical Structure of Prof. Rausser's Model Cannot Yield Anything Other than "Common" Impact ................................................................................................ 78

    B.   Prof. Rausser's Claims of Reliability ............................................................................ 82

## I. INTRODUCTION

### A. Background

1. My name is Joseph P. Kalt.  I am the Ford Foundation Professor (Emeritus) of International Political Economy at the John F. Kennedy School of Government at Harvard University.  I am also a senior economist with Compass Lexecon, an economics consulting firm.  I have previously filed an expert report[1] and provided deposition testimony[2] on behalf of Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSXT"),[3] Norfolk Southern Railway Company ("NS"), and Union Pacific Railroad Company ("UP"). My qualifications and terms of compensation were set forth in my prior expert report.  The latter have not changed, and I have updated my qualifications in my curriculum vitae (attached hereto as Appendix A).  Materials I have relied upon in preparing this declaration are listed in Appendix B.

2. On August 9, 2013, the D.C. Circuit vacated the class certification decision in this matter, remanding the matter back to the Court for further consideration.[4]  In response to the Court's remand order, on December 19, 2013 Plaintiffs submitted the Supplemental Expert Report of Gordon Rausser, PhD.[5]  I have been asked by counsel for Defendants to provide my opinions on the economic issues related to class certification and to assess and respond to the analyses

---

[1]  Expert Report of Joseph P. Kalt, this matter, January 22, 2013 (as corrected March 1, 2013; hereinafter "Kalt Merits Report").

[2]  Deposition of Joseph P. Kalt, this matter, May 28, 2013 ("Kalt Merits Deposition").

[3]  I understand that during the Class Period intermodal transportation service was provided by CSX Intermodal ("CSXI"), which was a separate corporate entity from Defendant CSX Transportation ("CSXT").  I have included CSXI in my analysis because Prof. Rausser has offered opinions implicating CSXI in the alleged conspiracy and attributing damages to CSXI transactions during the Class Period.  In this report, I use "CSXT" for non-intermodal traffic, "CSXI" for intermodal traffic, and "CSXT/CSXI" when both intermodal and non-intermodal traffic are included.

[4]  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 252, 253 (D.C. Cir. 2013) ("Decision").

[5]  Supplemental Expert Report of Gordon Rausser, PhD, this matter, December 19, 2013 ("Rausser Remand Report").

and opinions now set forth by Prof. Rausser in his new supplemental report, as well as in his previous four reports, as they relate to the economics of class certification.

3.  This is my first opportunity to address Prof. Rausser's fourth report (his Merits Reply Report), which introduced a new injury and damages model and, for the first time, applied his modeling to Surface Transportation Board ("STB") cost data.[6]  He has testified that the results arising from this new "STB model" represent his preferred approach to proving injury and damages on a class-wide basis, since, in his view, they are more reliable than the results produced by his prior modeling (as presented in his class and merits reports – his "Class & Merits model").[7]  The prior modeling produced a class-wide average overcharge of ██████.[8] The STB model reduces Prof. Rausser's class-wide average overcharge to ████████ when applied to the updated data from his recent Supplemental Report).  These models and their results are presented to the Court as the "common proof for determining injury and damages" across Plaintiffs' proposed class.[9]

4.  In my opinion, neither model qualifies as acceptable common economic proof of the alleged injury to purchasers of rail transportation services who were subject to rate-based fuel surcharges during the Class Period, nor of the damages allegedly sustained by Class Members as a result.  I focus my analysis below primarily on the new, preferred STB model.  However, since Prof. Rausser has testified that he may present the results of both his STB model and his Class & Merits model to the jury, I also address issues (many of which are the

---

[6]   Expert Reply Report of Gordon Rausser, PhD, this matter, June 12, 2013 ("Rausser Merits Reply").
[7]   Deposition of Gordon Rausser, March 4-5, 2014 ("Rausser Remand Deposition") at 377.
[8]   Workpapers to Rausser Merits Reply Report.  The overcharge percentage provides a means to summarize the results of the model, but does not itself represent a single percentage used for determining class-wide damages.
[9]   Expert Reply Report of Gordon Rausser, PhD, this matter, August 27, 2010 ("Rausser Class Reply Report") at 83, 94, 96.

same) that arise with his Class & Merits model as appropriate.  All core conclusions set out below regarding the former hold for the latter as well.[10]

**B.  Summary of Findings**

➢ **Prof. Rausser's New Preferred Model Is Rife with False Positives**

5.  I begin my analysis with the issue that was most emphasized in the D.C. Circuit's decision: whether Prof. Rausser's model generates "false positives."  It is a central feature of the scientific method to test a model for results that should not be found – in this case "damages" where there should be none.  Prof. Rausser's work in this case provides an opportunity for testing for false positives, because he divides shipments which paid fuel surcharges ("FSCs") after the start of the Class Period in July 2003 into class and non-class (i.e., legacy) shipments.  As used here, a legacy shipment is one made during the Class Period under a price authority which was adopted during the pre-Class Period.  By separating out shipments which paid FSCs under price authorities adopted during the Class Period for inclusion in his analysis as class shipments, Prof. Rausser's technique leaves the remainder of FSC-paying shipments as his legacy group (i.e., shipments paying FSCs under price authorities adopted prior to the Class Period).

6.  As I report in Section II, Prof. Rausser's new modeling continues to generate large numbers of false positive findings of injury and damages.  Specifically, when applied to the shipments that Prof. Rausser has identified as legacy, his STB model generates an average overcharge on legacy shipments of ███ – effectively indistinguishable from the ███ average overcharge it generates for Class Members' shipments.  The same basic result occurs when

---

[10]  See Appendix C, which includes versions of the relevant analyses using Prof. Rausser's Class & Merits model.

the legacy shipments are limited to shipper-price authorities that began paying FSCs before March 2003 (i.e., before the first allegedly conspiratorial communication).

7.  In his fifth, most recent report, Prof. Rausser questions the validity of millions of his "legacy" shipments; and on that basis, questions whether his model's false positives are really "false."   In Section II, I show that categories of legacy shipments that could not logically be affected by a conspiracy to impose "more aggressive" FSCs, such as shipments with FSC provisions whose earning power decreased or did not change during the alleged conspiracy period relative to the pre-"conspiracy" period, continue to generate very large false positive legacy "damages".   The frequency and scope of false positives tells us the model is not reliable.

8.  Prof. Rausser now maintains that his modeling cannot be tested for false positives by using any information on legacy shipments.   This is because, he says, findings of damages for *any* legacy shipments are not *false*.   Instead, Prof. Rausser now asserts that all shipments, both class shipments and legacy shipments, were injured.[11]   I show in Section IV that this claim is unfounded.   But even if Prof. Rausser's proposition is accepted, his models yield false positive damages under tests which are entirely independent of any legacy shipments.   As I report in Section II, his STB model and his prior Class & Merits model both generate false positive "damages" when applied to rail rates solely in the pre-"conspiracy" period.   That is, the models yield conspiracy "damages" before there was even a putative conspiracy.

9.  I also address in Section II Prof. Rausser's claims that Defendants' data "reveal a structural break in the relationship between freight rates and fuel prices starting at the beginning of the

---

[11]   Rausser Remand Deposition at 89-90, 105-106, 119-120, 132-134, 141-143, 394-397.

Class Period."[12]  He asserts that this "structural break" constitutes "economic evidence" of both the "conspiracy itself" and its impact.[13]  I test the structural break by looking for "breaks" at dates that no one claims coincide with the beginning of a conspiracy.  I find that Prof. Rausser's methods generate "structural breaks" ███████████████████████ ████████████████   the purported implementation of the alleged conspiracy.  In fact, both Prof. Rausser's new STB model and his Class & Merits model find ███████████████ █████████████████████████   Within Prof. Rausser's framework, in which "structural break" is purportedly evidence itself of the onset of conspiracy, these ubiquitous structural breaks are themselves false positives.  They falsely reveal economic "evidence" of the onset of "conspiracy itself" at times completely divorced in time from Plaintiffs' allegations of conspiracy.  This demonstrates that Prof. Rausser's "structural break" tells us nothing about either the existence of a conspiracy or damages from it.

> **Prof. Rausser's Damages Models Build in Fundamental Economic Error**

10. I next address the reasons for the false positives in Prof. Rausser's modeling, and for the implausible findings of ubiquitous structural breaks.  The primary reason for such striking results lies in modeling error.  As I discuss in Section III, "overcharges" arise in both of Prof. Rausser's models, in key part, because these models take fuel cost increases – which were dramatic in the Class Period, and which naturally increase the responsiveness of rail rates to fuel prices – and convert them into "overcharges" and "damages".

11. Specifically, at the core of Prof. Rausser's damages methodology is his explicit assumption that "[i]n the absence of an intervening event, such as an agreement among the Defendants as

---

[12]   Rausser Merits Report at 7.
[13]   Rausser Merits Report at 7, 170; Expert Report of Gordon Rausser, this matter, March 18, 2010 ("Rausser Class Report") at 120.

alleged by Plaintiffs, the historical relationship between freight rates and fuel prices would generally be expected to continue."[14]   By this, he means that he would expect a given percentage change in fuel costs to always result in the same percentage change in rail rates, regardless of fuel prices and the proportion of fuel expense in railroads' overall costs and rates.   Given this assumption, the modeling interprets any statistically significant change in that "relationship"[15] between the pre-Class and Class Periods as a "structural break" reflecting the result of a conspiratorial imposition of fuel surcharges in the Class Period.[16] Indeed, the extent of such a difference becomes his conspiratorial "damages".

12.  As I show in Section III, under wholly non-conspiratorial "but for" conditions, railroad rates naturally become more responsive to fuel price changes as fuel costs rise and become a larger share of overall costs.   Prof. Rausser's models, however, *impose by assumption a* ███████ ████████████████████████████████████.   During the Class Period, the price of diesel fuel was approximately double the price in the pre-Class Period.   Prof. Rausser's models convert the resulting increased responsiveness of rail rates in the Class Period to those higher fuel prices, i.e., anything greater than his model's assumed fixed degree of responsiveness, into "overcharges".

13.  This is economic error.   It is simple mathematics that a 10% increase in the costs of an input such as fuel has a greater impact on a railroad's total costs when that same input is 25% of total costs than when it is just 10% of total costs.[17]   The basic economics of costs thus show that *competitively* set prices which keep pace with overall costs will respond more to fuel

---

[14]   Rausser Merits Report at 7.
[15]   The expected relationship is represented in his Class & Merits model by the coefficient on diesel prices and in his two-stage STB model by the estimate of the relationship between total variable costs and diesel fuel prices imposed in his second regression.
[16]   Rausser Remand Report at 5.
[17]   I.e., an input such as fuel in the rail sector, for which substitutability with other factors is limited (see Kalt Merits Report at ¶135).

cost changes when fuel costs are a larger proportion of overall operating costs. Thus, one cannot infer that competition has broken down, let alone that conspiracy has arisen or shippers have been damaged, when during a period of higher fuel costs rail rates become more responsive to fuel prices. Prof. Rausser's failure to account for this renders his models unambiguously unreliable. Indeed, I show in Section III below that when Defendants' rates are just equal to their variable costs and are thus free of any supra-competitive conspiratorial markup, Prof. Rausser's models nevertheless report high rates of false positive overcharges.

> ➤ **Contrary to Plaintiffs' Theory and Prof. Rausser's Claims, Prof. Rausser's Models Find Thousands of Class Members Were Uninjured**

14. Not only do Prof. Rausser's models find damages where there should be none; they also find no or *negative* damages for thousands of Class Member shipments.[18] This contradicts Prof. Rausser's claims that the putative conspiracy was inescapable and that *all* shipments subject to Defendants' rate-based FSCs were damaged. As I discuss in Section IV, fully ▮ of class shipments have negative damages under his STB model. In fact, ▮, or ▮, of Class Members have negative net damages; and ▮, or almost ▮, of class shippers (including class representative DustPro) have *no* positively damaged shipments at all. After correcting an error in Prof. Rausser's treatment of the STB cost data, almost ▮ shippers, or ▮ of the Class, have negative net damages. Just as false positives tell us the modeling is unreliable, the thousands of class shipments and shippers that Prof. Rausser's models say were *not* injured demonstrate that his models are not able to assess injury and damages from the conspiracy Plaintiffs have hypothesized.

---

[18] As used here, "negative damages" means that a Class Member actually paid lower rates, on a net basis, on its class shipments than the damages model predicts that it would have paid in the but-for world.

> ➤ **Prof. Rausser's Models Are Not Capable of Reliably Identifying and Measuring a Common Fact of Injury to Individual Members of the Proposed Class**

15. Importantly, Prof. Rausser is not modeling the alleged conspiracy he now describes. He acknowledges that he is not modeling damages from economically more aggressive or "onerous" fuel surcharges, meaning surcharges that "yield more revenue" at a given cost of fuel than the FSCs applied before the Class Period.[19]  As I discuss in Section V, Prof. Rausser now effectively acknowledges that FSC earning power is not relevant to his modeling of damages. He has also effectively acknowledged that whether the Class Period fuel surcharge programs were applied "universally"[20] is no longer relevant, because in calculating damages he presumes that the application (or "coverage") of fuel surcharges would have been the same in the but-for world he envisions as in the actual, purportedly conspiratorial world.[21]  In other words, in modeling damages Prof. Rausser now assumes that the alleged conspiracy did not cause any class shipper to be "covered" by an FSC.

16. Instead, Prof. Rausser's new theory is that, even if Class Period FSC formulas did not differ materially from pre-Class Period FSC formulas, the former would have been waived, breached, or otherwise not fully collected as they purportedly got out of step with putatively non-conspiratorial economic conditions. According to Prof. Rausser, "in an environment of competition, Defendants would have yielded to resistance from shippers (including legacy shippers)…either by adjusting those FSC rates, re-pricing base rates or offering other concessions."[22]  This is a response to the reality that the central thesis of the original theory – that the supposedly conspiratorial FSCs were "more aggressive" and "onerous" than pre-

---

[19]   Plaintiffs' Reply Memorandum Addressing Wal-Mart Stores, Inc. v. Dukes, September 1, 2011 at 7.
[20]   Rausser Remand Deposition at 338-339.
[21]   Rausser Remand Deposition at 263-264, 412-413.
[22]   Rausser Remand Report at 5.

"conspiracy" FSCs – has crumbled.  In fact, at Class Period fuel prices, the incremental earning power of the allegedly conspiratorial FSCs was very close to, and often lower than, that of the earlier rate-based FSCs.

17. I also show in Section V that Prof. Rausser's new theory lacks economic coherence.  It does not make sense to claim that all legacy shippers would be expected in the but-for world of no conspiracy to have broken or gotten partially or completely out of their contractual obligations to pay surcharges.[23]  Fuel surcharges are utilized because of the risk of fuel price increases, and Prof. Rausser cannot simply assume that they are generally abrogated when that risk materializes – as it most surely did during the Class Period.

18. For purposes of class certification, there is an enormous difference between a conspiracy to increase the spread of FSC formulas that were nothing like and more aggressive than their pre-"conspiracy" versions and a conspiracy (1) to prevent shipper-favorable renegotiation of FSCs, including those entered into during the admittedly pre-"conspiracy" period, or (2) to refuse to give Class Members more favorable FSC terms than the admittedly non-conspiratorial FSC formulas applied in the pre-Class Period.  The source of the alleged harm – a "changed economic environment" of "no escape" in which a disgruntled shipper's ability to threaten to switch to another Defendant railroad (as well as to somehow threaten to switch to a non-Defendant railroad or to trucks or to barges) was blocked by a conspiracy among the four Defendant railroads[24] – is far too nebulous and circumstantial to capture in common proof for all class members.

19. Prof. Rausser has done nothing to adjust his model for this revised theory of conspiracy as contract enforcement and "no escape."  Prof. Rausser's modeling, *by his own admission*,

---

[23]   Rausser Remand Deposition at 202-203.
[24]   Rausser Remand Deposition at 26, 325.

purports to test only whether there was an abrupt "structural break" in the responsiveness of rail rates to fuel prices that started on July 1, 2003. He does not model the hypothesized failure to discount or waive FSCs which were consistent with originally competitive FSC formulas. The models are completely divorced from the FSC enforcement-with-no-escape theory. They cannot reliably determine damages purportedly emanating from such a theory.

20. Prof. Rausser cannot, and has not, modeled, for example, *when* and to *what extent* each class shipper in the but-for setting would have obtained discounts or waivers of FSC payments. These FSC formulas were competitive when adopted before the Class Period, and waivers of such FSCs were rare (e.g. ███████████, according to data proffered by Prof. Rausser) in the pre-Class Period. Certainly, waivers of FSCs were not a widespread phenomenon before the Class Period. And, evidence from other competitive industries, such as trucking, shows that FSCs were broadly applied and their collection rose along with rising oil prices during the Class Period (as they did with railroads). Prof. Rausser's "no escape" theory inherently depends on a particular shipper's knowledge, options for bargaining and "escape", and other individualized attributes. Such matters are not subject to common proof and Prof. Rausser has not presented any modeling of a common method demonstrating otherwise. His claims to have demonstrated common impact across the members of the proposed class are unsubstantiated.

> **Prof. Rausser's Models Assume, Rather than Prove, Common Injury**

21. In Section VI, I address the key issue of whether Prof. Rausser's proffered aggregate statistical proof can serve as "common proof" of the fact of injury for all members of the proposed class. I show that neither Prof. Rausser's STB model nor his Class & Merits model yields reliable common proof of injury. Prof. Rausser's models assume what they are trying

to prove with respect to common class-wide injury. The models fundamentally *ignore* relevant differences across individual Class Members' facts and circumstances, and *impose* the requirement that the models' supply and demand factors have common impacts on Class Members' rail rates. This is methodologically invalid. Common impact must be tested for, not assumed. When I remove the requirement that the results be common and allow them to vary, they vary dramatically. In addition to thousands of uninjured shippers, the models generate widely varying overcharges, including negative overcharges, for shipments within a given week and for different routes within the same commodity group.

## II. ASSESSING THE RELIABILITY OF PROF. RAUSSER'S MODELS

### A. Overview:  Can Prof. Rausser's Modeling Be Tested for Reliability?

22. A valid model of economic damages requires the abilities to:  (1) reliably detect and isolate the impact of alleged unlawful conduct, and (2) reliably demonstrate injury and calculate damages to individual victims. Prof. Rausser's modeling fails to meet both of these requirements. Below I show that what it reports as "damages" cannot properly be interpreted as the effects on rates of the conspiracy Plaintiffs theorize. In Section IV, I show that the actual results of Prof. Rausser's model directly contradict his claims of a common class-wide fact of injury.

23. A standard and practical means of testing whether a model can reliably isolate the effects (e.g., on prices) of claimed harmful conduct from the effects of other causes is to apply the model to situations where the harmful conduct is known to be absent. This is testing for "false positives". To illustrate, consider the case of a biomedical company that develops a

new test for a disease and wishes to determine whether the test reliably identifies affected patients.  If the test indicates that a patient suffers from the disease when the patient does not (for example, if the patient has never been exposed and is uninfected), the test falsely shows a positive result—a "false positive."[25]  The biomedical company can test a group of patients who are known not to have the disease.  If the test regularly indicates that some numbers of these unexposed and healthy patients have the disease, the test generates false positive results that make it unreliable for diagnosing disease.  Similarly, if a damages model finds "damages" where it should not – e.g., in data where the alleged collusive conduct is known to be absent and/or not coherently asserted to exist, these are false positive results.  Thus, the model's reported "damages" do not represent the isolated effects of the unlawful conduct.

24. In his Remand Report, Prof. Rausser provides no tests of the reliability of either his Class & Merits model or his STB model.  Instead, he attempts to explain away the fact that his modeling finds damages for his legacy shipments.  He does this by placing his previously identified legacy shipments into various categories which he regards as "contaminated."[26]  Prof. Rausser provides no empirical tests for whether these categories have any economic significance or are in any way related to the damages found by his model.  Rather, he portrays his model as beyond testing for false positives because, he claims, all "legacy" transactions were tainted by the alleged conspiracy and therefore cannot serve as a benchmark for testing the reliability of his model.

---

[25]   I understand that the D.C. Circuit uses the term "false positive" to describe the "detect[ion of] injury where none could exist" (Decision at 252-53), and that is how I use the term in my expert report and in this declaration.  See also Areeda, P.E. and H. Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* (3d ed.), (New York:  Aspen Law and Business, 2006) at 132.

[26]   Rausser Remand Report at 76.

25. According to Prof. Rausser's latest opinions, the alleged conspiracy affected not only shipments under price authorities adopted during the Class Period, but also all shipments subject to FSCs implemented during the period of March-June 2003.[27]   This represents a significant change in Prof. Rausser's opinions.  He originally claimed that the period January 2000 through June 2003 was free of the *effects* of collusive conduct and thus served as an appropriate benchmark in his model.[28]   He clearly maintained that, while communications leading to the conspiracy may have begun as early as March 2003,[29] "the actual execution [of the claimed conspiracy] in terms of anticompetitive *consequences* began in July of 2003."[30] According to Prof. Rausser, the "precise date" of the first effects of the alleged conspiracy – in the form of a "structural break" – was July 2003.[31]

26. In defending the use of July 2003 as the starting date of actual damages, Prof. Rausser originally asserted he had "spent a huge amount of time looking at all of the evidence in the discovery record….   And in doing that particular analysis, the overwhelming evidence [shows to him] the emergence of that [conspiratorial] understanding through early 2003 until the actual *anticompetitive consequences* beginning in July of 2003."[32]   Now, confronted with evidence that his model finds "overcharges" in rates struck under legacy contracts entered into prior to July 1, 2003, Prof. Rausser maintains that the anticompetitive consequences of the claimed conspiracy began prior to July 1, 2003.[33]   However, as I show below, even

---

[27]   Rausser Remand Report at 27, footnote 98.  Rausser Remand Deposition at 68.

[28]   Rausser Class Report at 113; Rausser Class Reply Report at 47; Rausser Merits Report at 10, 162-163; Rausser Merits Reply Report at 7; Deposition of Gordon Rausser, PhD, this matter, December 11, 2012 ("Rausser Merits Depositions") at 12-13.

[29]   Rausser Merits Depositions at 12-13; Rausser Remand Deposition at 68.

[30]   Rausser Merits Deposition at 13 (emphasis added).

[31]   Rausser Merits Deposition at 45.

[32]   Rausser Merits Deposition at 47 (emphasis added).

[33]   Rausser Remand Report at 27, footnote 98.

limiting the analysis to shipments that moved before March 2003, and thus before any claimed conspiratorial conduct, the false positive results persist.

27. Prof. Rausser now identifies March 1, 2003 as the beginning of not only the conspiratorial conduct, but of the actual consequences in the marketplace of that conspiracy. And, Prof. Rausser now reveals that he "accepted the representations of the Plaintiffs with regard to July 1 being the date by which to move forward and evaluate common impact, to evaluate liability, to construct my maintained hypothesis, and to proceed with regard to estimating class-wide damages."[34]   In other words, his "maintained hypothesis" was based not on his own independent inquiry, but on representations by Plaintiffs' attorneys. He does not identify any new sources of information or any new work that can explain this shift. He now indicates that he does not know when the alleged conspiracy or its harmful effects started.[35]

28. Prof. Rausser's structural break must be tested for its ability to reliably isolate damage created by unlawful conduct.[36]   If his modeling "finds" structural breaks that are not related to the claimed unlawful conduct, such results are false positives and indicate unreliability. Prof. Rausser conducts no such test. I have done so and present the results below.

---

[34] Rausser Remand Deposition at 345.
[35] Rausser Remand Deposition at 345.
[36] See, for example, Areeda and Hovenkamp, *op. cit.* at 132 (discussing importance of testing an expert's methodology for error rate, stating "[f]or example, one symptom of pneumonia may be a high fever. But if many other illnesses unrelated to pneumonia also produce a high fever, then using high fever as a 'test' for pneumonia would produce too many false positives.")   In other words, if many other illnesses produce "structural breaks" in the form of high fever, taking high fever as "evidence of pneumonia itself" is unreliable inference. The general need to determine the reliability of statistics-based modeling in drawing inferences is summarized, for example, in the textbook by Spanos, Aris, *Probability Theory and Statistical Inference: Econometric Modeling with Observational Data,* (Cambridge, U.K.: Cambridge University Press, 1999) at 560. "This inductive argument [inferring economic relationships from the results of statistical models], however, is embedded in a **deductive argument** which in a nutshell says:   if the premises are valid certain inference results necessarily follow. The premises is (*sic*) nothing more than the postulated statistical model. Hence, the most crucial problem of parametric statistical inference is to ensure that the premises are valid (statistical adequacy) because otherwise the inference conclusions do not necessarily follow. Despite its impertinent nature, the common saying: **garbage in, garbage out,** describes the situation aptly. That is, the inference results depend crucially on the validity of the assumptions making up the model; …" (emphasis in original).

### B.  Prof. Rausser's New STB Model

29. Prof. Rausser's new preferred STB model was not presented to the Court during the class

certification stage.  It uses a new data source and adds a new, ███████████████████

████████████████████████████████████████████  The changes attempt to fix errors

in Prof. Rausser's Class & Merits model by imposing what he represents as "a conservative

adjustment".[37]  Indeed, Prof. Rausser says he created his STB model in response to criticisms

of his Class & Merits model,[38] and he now opines that his original Class & Merits model is

less reliable,[39] overstating damages by ██████ of dollars relative to his STB model.[40]

30. Prof. Rausser reports that the STB model finds average overcharges of ██████,[41] as compared

to the ██████ overcharges yielded by the Class & Merits model.[42]  Class-wide damages drop

from ████████ using the Class & Merits model to ████████ using the new STB

model.[43]  The STB model, however, is still methodologically flawed and still produces wide-

spread false positives.  The STB model also introduces an entirely new error by failing to

account for a known and fundamental change in the methodology the STB used to calculate

costs starting in 2003.  Correcting just this one, new error reduces damages under the STB

model by approximately ████ .

31. A central feature of Prof. Rausser's Class & Merits model was the assumption that, but for

conspiracy, the responsiveness of freight rates to changes in fuel prices during the Class

---

[37]  Rausser Merits Reply Report at 245-251.
[38]  Rausser Merits Reply Report at 245, Rausser Remand Deposition at 437-438.
[39]  Rausser Remand Deposition at 377.
[40]  In his Merits Reply Report (at 251, footnote 741), Prof. Rausser reports "class-wide damages" of ████████
     using his Class & Merits model and ████████ (at 251, Table 105) using his STB model.
[41]  Rausser Merits Reply Report at 249, Table 103.  When the STB model is run on Prof. Rausser's data from his
     Merits Reply Report, updated with changes he introduces in his Remand Report, the average overcharge is
     ████ . See Figure 1.
[42]  See workpapers to Rausser Merits Reply Report; Rausser Remand Deposition at 440-441, 483-484.
[43]  Rausser Merits Reply Report at 251, Table 105 and footnote 741.

Period would be the same as in the pre-Class Period (which serves as his benchmark of non-conspiratorial rate determination).   Prof. Rausser represents that he constructed his STB model to respond to the criticism that his Class & Merits model was unreliable, in part, because the estimated ███████████████████████████████████████████ ██████████████████ was implausibly low.[44]   Prof. Rausser apparently recognizes that (1) his original assumption of ███████████████████████████████████ ██████████████████████████████████████████████████████ ███████████ that did not accurately reflect market conditions during the Class Period (when fuel prices were much higher) meant that his Class & Merits model did not allow freight rates to increase sufficiently in response to rising fuel costs.   Consequently, the difference between the Class & Merits model's predicted but-for prices and actual prices – i.e., the basic measure of damages in Prof. Rausser's framework – was too great and wrongly assumed to be entirely antitrust damages.

32. Like Prof. Rausser's Class & Merits model, his STB model is a statistical regression model which estimates overcharges based on a structural break in Defendants' all-in rail rates in July 2003 that is not otherwise explained by a selected set of non-conspiratorial ███████████ ██████████████████████████████████████████████████████ Prof. Rausser has altered his Class & Merits model, however, to impose a higher ███████████ ██████████████████████████████ Nonetheless, his resulting STB model continues to require that this relationship ██████████████████████████████████████ ██████████████████████████████████████████. (See further in Section III below.)

---

[44]   Rausser Merits Reply Report at 245; Rausser Remand Deposition at 442.

33. Relative to his Class & Merits model, Prof. Rausser's STB model introduces a new data set and a new ██████████████████████████████████ ██████████████████████████████ Specifically, Prof. Rausser uses ████████████ published by the STB to ████████████████████████████████ ████████████████████████████████ ████████ With his new approach, Prof. Rausser estimates the ████████████ ██████████████████████████████████.[45]   He purports to corroborate this ██████ value by citing to academic economic literature, asserting that "████ is high and towards the upper end of those found in the academic literature…making the damages analysis conservative."[46]   This is more than *three times higher* than the rate of the ██████████████████████████ that was estimated by the most recent version of his Class & Merits model ████████.[47]

34. The STB model imposes the ██████ figure as the ████████████████████████ ████████████████████████████████ ██████████████████████████ Thus, the STB model does not alter Prof. Rausser's basic assumption █████████████████████████████ ████████████████ despite the fact that fuel prices overall were much higher in the Class Period than in the January 2000-June 2003 pre-Class Period.   As I explain in Section III below, the STB model systematically converts rising fuel costs into "damages" when, in fact,

[45]   Rausser Remand Deposition at 446.
[46]   Rausser Merits Reply Report at 247-248.
[47]   See workpapers to Rausser Merits Reply Report.

increased ████████████████████████████ is the expected outcome in competitive circumstances.

### C.  False Positive Legacy Damages under Prof. Rausser's New Modeling

35. As described above, the new STB model does not change Prof. Rausser's modeling's production of false positive results.  The STB model continues to generate the same kinds of false positive results as his Class & Merits model.  Figure 1 shows the results of the STB model when applied to (1) all of Prof. Rausser's class shipments, (2) all of his legacy shipments, and (3) all of his legacy shipments under customer-price authorities that began paying FSCs prior to March 1, 2003.[48]  Using all of the legacy shipments created by Prof. Rausser's designation of class shipments, his STB model finds a false positive average overcharge of ████.  On his legacy shipments which first started paying FSCs prior to March 1, 2003, the model finds a false positive average overcharge of ████.[49]

---

[48]  These are identified by ████████████████████████████ in Prof. Rausser's data.  For simplicity, a ██████████████████████ is hereafter referred to as a "legacy contract".

[49]  In identifying legacy shipments for his class and merits reports, Prof. Rausser has sometimes chosen not to control for whether a shipper-price authority appears in his data prior to July 2003 or whether the shipper-price authority had an FSC prior to July 2003.  Much of his Remand Report attempts to quantify the impact of these choices.  In the figure, the "Legacy Traffic" analysis uses all of Prof. Rausser's legacy shipments based on his data choices, including his choice to designate as "legacy" shipments made under shipper-price authorities which do not appear in his data prior to July 2003 or that do not have FSCs in his data prior to July 2003.  The "Legacy Traffic Paying FSC Pre-March 2003" analysis in Figure 1 is limited to shipments for legacy shipper-price authorities in Prof. Rausser's data with FSC payments prior to March 2003.

Figure 1
**Prof. Rausser's Model Finds Overcharges for Legacy Shipments**



36. In each of his first four reports, when identifying class shipments, Prof. Rausser also identified legacy shipments and removed them from his class shipment dataset. He unambiguously opined that it was reasonable to assume legacy shipments were not harmed by the alleged conspiracy.[50]   Now, however, Prof. Rausser questions the legitimacy of the "legacy" designation.   He argues, for example, that some of the shipments moved under contracts that may have referenced FSC provisions outside of the contracts themselves and, thereby, could have been updated during the alleged conspiracy (Prof. Rausser's "Category

---

[50]   Deposition of Gordon Rausser, September 24, 2010 ("Rausser Class Deposition") at 275.

1" shipments) and others were created after March 1, 2003 ("Category 2" shipments).[51] Tellingly, however, Prof. Rausser does not test whether and which FSC provisions actually changed to generate more earning power—the percentage FSC rate for a given fuel price—at the Class Period's fuel prices.[52]

37. While he now asserts that many of his legacy shipments are "contaminated" for testing purposes, Prof. Rausser does not challenge formulas such as UP's WTI1 Fuel Surcharge Standard Carload provision, which was created in December 2002,[53] and BNSF's published intermodal provision, which was created in late 2001 and has not changed.[54] Both of these provisions were implemented long before March 2003, and their earning power at given fuel price levels did not change over the pre-Class and Class Periods. Similarly, FSC rates under the Class Period provisions of formulas such as BNSF's Fuel 6100 Standard Carload and UP's Intermodal Standard Fuel Surcharge had the same, or lower, earnings power relative to their pre-class versions.

38. In Figure 2, I apply Prof. Rausser's preferred STB model separately to legacy shipments made under legacy provisions that were applied to multiple shippers and either were not challenged and did not increase in earning power during the Class Period or, even if challenged by Prof. Rausser, did not increase in earning power.[55] Legacy shipments with these provisions together account for approximately ███████ in Class Period freight

---

[51] Rausser Remand Report at 40-45, 49-52, 56-57.

[52] Rausser Remand Deposition at 19-20.

[53] Kalt Merits Report Figure IV-1B.

[54] Kalt Merits Report Figure IV-1D. The transaction data do not identify this provision by name, but I have used the data to identify shipper – price authorities with this provision. See my workpapers. My method is similar to that used by Prof. Rausser to identify FSC provisions in the transaction data (Rausser Class Reply Report at 52-53, Table 12), but I apply more stringent screens to the data. Appendix C at Figures C.II.1 and C.II.2 include analysis with intermodal shipments for CSXI and NS.

[55] Prof. Rausser's legacy data construction contains errors and inaccuracies in identifying FSC provisions and rates. To limit these, Figure 2 includes price authorities that are indicated as having paid within 0.5% of the applicable FSC formula rate and that accounted for at least ███████ in combined gross freight revenue.

revenues.  If Prof. Rausser's model is truly free of false positives, none of the cases in Figure 2 should generate overcharges.  They would not have been affected by a conspiracy to either increase the spread of FSCs (because the test groups are selected such that all members had FSCs prior to either March 1 or July 1, 2003) and/or to increase the earning power of FSCs (because, again, the test groups of legacy contracts are limited to those with FSC provisions that were in place prior to the indicated dates and whose earning power did not change or in fact declined at Class Period fuel price levels).  Prof. Rausser's STB model, however, produces false positive average overcharges in eight out of the 13 individual tests.[56]  When all of the indicated provisions are combined (in the last line of Figure 2), the STB model generates false positive average overcharges of █████ (pre-July 2003 legacy) and █████ (pre-March 2003 legacy).  In short, as was the case with his prior modeling,[57] neither Prof. Rausser's new preferred STB model nor his extensive efforts to categorize large numbers of legacy contracts as tainted has overcome the reality that false positives plague his modeling.[58]

---

[56]   Note that under Prof. Rausser's theory *all* legacy shipments are asserted to have borne damages (see above) and, thus, no cases of negative damages should arise.

[57]   See Appendix C at Figure C.I.2.

[58]   In Section III below, I report a further test for false positives in Prof. Rausser's modeling that cannot be subject to claims that rates were elevated by conspiracy.  Specifically, after correcting the STB model of a critical error in Prof. Rausser's use of STB cost information, I replace actual rates with rates that are just equal to variable costs.  Such rates cannot contain the overcharges claimed by Prof. Rausser's theory, yet application of the STB model to such cost-based rates yields high frequencies – ████████████ – of false positive weekly overcharges.

Figure 2

**Testing for False Positives:  Prof. Rausser's STB Model Finds Overcharges for Legacy Shipper-Price Authorities with FSC Provisions that Were Unchanged or Had Reduced Earning Power during the Class Period**

| FSC Provision | Class Period Revenue with FSC Payments | Rationale | Average Weekly Overcharge | |
|---|---|---|---|---|
| | | | Legacy FSC Was First Applied Before July 2003 | Legacy FSC Was First Applied Before March 2003 |
| BNSF FUEL 6100 STANDARD | ■■■■ | No change in FSC rate applied during Class Period relative to previous formula | ■■■■■■■■■■■■ | |
| UP INTERMODAL STANDARD FUEL SURCHARGE | ■■■ | FSC formula unchanged until April 2005, and then became less onerous | | |
| UP WTI1 FUEL SURCHARGE STANDARD | ■■■ | Not challenged by Prof. Rausser | | |
| BNSF PUBLISHED INTERMODAL SURCHARGE | ■■■ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL 60 PUBLISHED DAYS | ■■■ | No change in formula | | |
| NS 6766 (2000 CARLOAD FORMULA) | ■■■ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL | ■■■ | Not challenged by Prof. Rausser | | |
| AGGREGATED PROVISIONS | ■■■ | | | |

**Source:**  Rausser Data updated per Rausser Remand Report.
**Note:**  * Provision created March 24, 2003.

### D.  False Positive Damages for Legacy FSC Formulas under Prof. Rausser's Modeling

39. A related false positive arises from the fact that the STB model generates substantial damages when applied to pre-Class Period FSC formulas.  Regardless of whether any given shipper's FSC formula changed or not, I can apply pre-Class Period published formulas to Class Members' local carload traffic in the Class Period and then test whether the STB model

generates damages.[59]  As shown in Figure 3, if class shipments had been made under the pre-"conspiracy" published FSC formulas, those formulas would have generated more than ███ ███ more in FSC payments by Class Members than those Class Members' actual FSC payments.  Moreover, if the pre-"conspiracy" published formulas had applied to class shipments during the Class Period, the STB model would generate more than ████████ in damages on Class Members' local carload traffic.

Figure 3

**The STB Model Finds "Damages" When Actual Class Carload FSCs Are Replaced with FSCs Calculated Using Pre-"Conspiracy" Published Formulas**



Source:  Rausser Data updated per Rausser Remand Report.
Note:  Local carload traffic only.  In light of rebasing, data for NS are not incorporated into the analysis after July 1, 2006.

### E.  Testing Prof. Rausser's Model for False Positive Structural Breaks

40. Prof. Rausser claims his finding of a structural break in rail rates as of July 1, 2003 is "evidence of the conspiracy itself."[60]  To test Prof. Rausser's new STB model to see whether it provides a reliable method of detecting "evidence of the conspiracy itself", I have run his STB model so as to ask whether it detects structural breaks – statistically significant, "damage" generating changes in the effects of the model's indicator of the onset of

---

[59]    Data do not permit comparable analyses for interline and intermodal traffic.  Thus, the damages figure for the local carload traffic depicted here is much lower than the damages figure for the class traffic as a whole.
[60]    Rausser Merits Report at 170.

conspiracy and fuel prices – at each six-month interval between January 2001 and July 2007. All of the outcomes are shown in Figure 4.   The STB model (like the Class & Merits model[61])

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████, even though the alleged conspiracy did not begin until 2.5 years after the test date of January 1, 2001.  This result is highly statistically significant, reflecting an actual result of the model, not random noise in the data.   Under Prof. Rausser's claim that the structural break he finds for July 2003 is "evidence of the conspiracy itself", the results of Figure 4 represent ubiquitous false positives.

---

[61]     Kalt Merits Report at ¶¶518-521, Figure VII-3; Appendix C at Figure C.I.4.

Figure 4

**Prof. Rausser's STB Methodology Produces Ubiquitous
False Positive Structural Breaks**



**Source**:  Rausser Data updated per Rausser Remand Report.
**Note**:  Two asterisks (**) denote significance at the 99% level.

41. In defense of Prof. Rausser's claim that his structural break is "evidence of the conspiracy

itself", Plaintiffs' expert James T. McClave has asserted that a conspiracy with effects on

rates starting in July 2003 (or, presumably, March 2003) could possibly produce results of

the type shown in Figure 4, by elevating rates in the post-break period relative to the pre-

break period.[62]  Yet, Prof. Rausser's STB model (like the Class & Merits model[63]) produces

structural breaks and associated "overcharges" even when we apply it solely to data from the

period prior to March 2003.  This is shown in Figure 5, where I report the results of applying

the STB model to shipments that moved exclusively in the period before March 2003.

---

[62]    Expert Report of James T. McClave, PhD, this matter, June 12, 2013 ("McClave Report") at 12-13.
[63]    Appendix C at Figure C.I.5.

Figure 5

**Testing for False Positives with Pre-March 2003 Data Only:
Prof. Rausser's STB Model Finds Overcharges
Long before the Onset of Alleged Conspiracy**



**Source:** Rausser Data updated per Rausser Remand Report.
**Note:** Two asterisks (**) denote significance at the 99% level.

42. In the tests shown in Figure 5, I cut off the transaction data as of March 1, 2003, so as to remove all possibility that a conspiracy that allegedly started in March 2003 might contaminate the findings. I then divide the period into hypothetical benchmark periods and corresponding hypothetical damages periods.[64] I run repeated tests by choosing the dates separating the hypothetical benchmark and damages periods to fall on the beginning of each quarter. Prof. Rausser's STB model again finds false positives in the form of a statistically

---

[64]    Prof. Rausser claims that analysis of the type shown in Figure 5 is not meaningful because it does not have sufficient data in both the benchmark and test periods. (Rausser Merits Reply Report at 229-230.)  This misrepresents the nature of statistical testing. Measures of statistical significance and confidence adjust for the size of the data sample being used, and the reported levels of confidence generated by regression analysis and indicated by the asterisks in Figure 5 are only made after assessing the adequacy of the sample size. The probability of any of these results occurring by chance, given the sample size, is less than 1%.

significant structural break and damages for all tested dates.[65]   For example, the first row shows that if the period of January 1, 2000-March 31, 2000 is used as the competitive benchmark and the period of April 1, 2000-February 28, 2003 is used as the damages test period, the STB model generates an average "overcharge" of ███ for the test period.  This result is highly statistically significant.  In short, the model cannot identify when the alleged conspiracy began or isolate or measure damages attributable to the Defendants' alleged unlawful conduct.[66]

43. Prof. Rausser objects to testing his contention that his model's structural break is "evidence of the conspiracy itself".  He asserts that testing of the type I show in Figures 4 and 5 constitutes improper "data mining" in violation of his "maintained hypothesis".[67]  The tests I conduct of Prof. Rausser's models are not improper data mining.  Improper data mining occurs when a researcher runs many tests and then selectively reports the results only from the tests which confirm the researcher's pet hypothesis.  The danger of such data mining, of course, is that it is misleading because it treats a stray, random outcome as if it is representative of reality.  If I had tested numerous dates for possible structural breaks, eventually found one, and then reported only that date as producing a structural break, *that* would be improper data mining.  But that is not my methodology.  In testing whether Prof.

---

[65]   The same results hold for his Class & Merits model.  See Appendix C at Figure C.I.5.  In his Merits Reply Report, Prof. Rausser claims to have run a test similar to that summarized in Figure 5, and to have found "small and negative" damages which are "nothing like the structural break found in [his] own damage analysis". (Rausser Merits Reply Report at 229, Table 92.)  In running this test, however, Prof. Rausser alters his model in a fundamental way which he does not mention in his report.  This alteration causes his test to find "small and negative damages."  The altered test in Prof. Rausser's Table 92 includes ████████ ████████████████████████████ (Workpapers to Rausser Merits Reply Report.)  That is not the method used in his damages model, where his test ████████████████████████.  Had Prof. Rausser accurately replicated the methodology he uses in his actual Class & Merits model, he would have found false positives – as in Figure 5.

[66]   The difference in the overcharges reported in Figure 5 from those for similar dates in Figure 4 results from the fact that Figure 4 includes data from the period after March 1, 2003, including a period of very large increases in fuel costs.

[67]   See, e.g., Rausser Remand Deposition at 463-465.

Rausser's model finds false positive structural breaks on alternative dates I did not test many dates and then report only those where such breaks were found. Instead, I tested many dates and *reported the results for each such test.* This is the opposite of "data mining".[68] The fact that any January or July tested in Figure 4 and any first day of a quarter tested in Figure 5 produces a structural break tells us that Prof. Rausser's model is not capable of reliably identifying "evidence of the conspiracy itself" and associated damages.

### III. PROF. RAUSSER'S MODELING FINDS DAMAGES BECAUSE IT DISREGARDS THE FUNDAMENTAL ECONOMICS OF COSTS

**A. Prof. Rausser's Models Assume** ████████████████

44. Both Prof. Rausser's STB model and his Class & Merits model are fatally flawed as a result of their basic structural design. Specifically, they both disregard the fundamental economics that govern the relationship between an industry's costs and the prices of inputs used by the industry. As I discuss below, applied to the case at hand, these economics show that, as fuel becomes a greater proportion of railroads' overall costs, competitive rail rates (reflecting

---

[68] For example, Prof. Rausser cites an article decrying data mining in which testing stock market outcomes repeatedly across the calendar is used to assert statistically significant differences for certain days and months. (Rausser Merits Reply Report at 228, fn. 693.) This is the opposite of what I am doing when, for example, I test whether Prof. Rausser's assertion to the effect that a "structural break" on a specific date is "evidence of conspiracy itself" is associated with (1) the hypothesized conspiracy or (2) whether the evidence shows a "structural break" independent of the claimed onset date of conspiracy effects. Properly criticized data mining entails model specification based on searching the data for, e.g., best fit, and then drawing statistical inferences from that model. What is *proper* use of data, what Prof. Rausser terms my "data mining" here, is diagnostic testing of the statistical assumptions of a model. (See, e.g., Kincaid, Howard, "Naturalism and the Nature of Economic Evidence," in *Philosophy of Economics* (vol. 13, *Handbook of the Philosophy of Science*), ed. Mäki, Uskali (North Holland, 2013).) In this case, the modeling assumption, or "maintained hypothesis" (*sic*, the directive from Plaintiffs' attorneys), I am testing is Prof. Rausser's model's assumption that the effects of conspiracy began in July 2003. Using dates such as July 1, 2004 or January 1, 2005 is certainly a proper test of his assumption.

those costs) will change more in response to any given percentage change in fuel prices.[69] By this we mean that as fuel becomes a larger share of railroads' overall costs, a given percentage change in fuel prices will generate a larger percentage change in competitive rail rates.

45. Prof. Rausser violates these basic economics of costs by using a benchmark which measures the  . Prof. Rausser's modeling thus creates "damages" out of increases in the market prices of diesel fuel. These "damages" are artifacts of faulty model design.

46. Prof. Rausser acknowledges that his models, including his STB model, use a .[70] To support this imposed assumption, he claims that "[i]n the absence of an intervening event, such as an agreement among Defendants as alleged by Plaintiffs, the ".[71] This modeling

---

[69] Nicholson, Walter and Snyder, Christopher, *Microeconomic Theory:  Basic Principles and Extensions, 10th ed.* (Mason, OH: Thomson South-Western, 2008) at 332.  This effect is stronger when, as in this case, the ability to substitute other factors of production for fuel is limited (see Kalt Merits Report at ¶135).

[70] Rausser Remand Deposition at 466-467.

[71] Rausser Merits Report at 7.

assumption is false.  The relationship, as Prof. Rausser defines it, ████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

will increase as fuel prices rise and fuel costs become a greater share of total costs.

47. To put the issue in context, Figure 6 shows that, on average, fuel prices were 92% higher during the Class Period than during the period of January 1999 - June 2003 (where Prof. Rausser starts his estimation of the responsiveness of rail rates to fuel prices).[72]  At times, fuel prices during the Class Period reached levels several multiples higher than prices during January 1999-June 2003.[73]

---

[72]   Fuel prices grew substantially higher and more volatile during the Class Period relative to the pre-Class Period. From the beginning of the Class Period to the time prices peaked in mid-2008, diesel prices increased by over 200%.  Oil prices also rose dramatically.  The price of West Texas Intermediate ("WTI") crude oil averaged about $25 per barrel from 1999 through 2002.  By the summer of 2008, however, the price of WTI was more than $135 per barrel.  The average price of oil was about 2.3 times higher during the Class Period than it was during the period 1999-2002.

[73]   Prof. Rausser ████████████████████████████████████████████████████████████████████████ During the Class Period, fuel prices were approximately 28% higher than the average level for 1999-2008.  (Kalt Merits Report Figure IV-5A.)  Prof. Rausser's STB model is highly sensitive to ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (See my workpapers).  This model sensitivity indicates unreliability.

Figure 6

## Highway Diesel Prices Were 92% Higher during the Class Period than during January 1999-June 2003



**Source:** Kalt Merits Report Figure IV-5A.

48. In the face of large increases in fuel prices of the type seen in Figure 6, fuel costs become a larger share of costs (and of revenue). Thus, as seen in Figure 7, Defendants' fuel expense grew from an average of 9.7% of overall operating expenses in the January 1999-June 2003 time period to an average of 17.9% of operating expenses during the Class Period.[74] This is not in dispute. Prof. Rausser reports similar results with regard to fuel costs as a share of operating expenses.[75]

---

[74] These figures reflect gains in fuel efficiency and do not reflect the costs, such as the purchase of new, more fuel-efficient locomotives, incurred to obtain these efficiencies.

[75] Rausser Merits Reply Report at 120-121, Figures 30-33.

Figure 7

**Defendants' Fuel Expense as a Share of Total Operating Expense**



**Sources:** Defendants' Annual and Quarterly Filings.

### B. Prof. Rausser's ▮▮▮▮▮▮▮▮▮▮ Contradicts Basic Economics

49.  An important background to Prof. Rausser's error is that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   In this

framework, prices which track costs will rise by a greater percentage in response to any given

percentage change in the price of an input as that same input accounts for a larger share of

overall costs.[76]

---

[76]   See note 69 above.   Note also that Prof. Rausser acknowledges that Defendants would have recovered
incremental fuel costs absent purported conspiracy.   Rausser Merits Deposition at 31, 425.

50. To illustrate the concept, consider an input for which there is no substitute such that, when its price rises, the same amount of the input must be used per unit of output.[77] If that input accounts for 10% of costs, a 50% increase in the price of that input requires approximately a 5% increase in the price of the output to cover the cost increase (i.e., 50% of 10% is 5%). But, if an input accounts for 25% of overall costs and its price rises by the same 50%, the price of the output would have to rise approximately 12.5% (i.e., 50% of 25% is 12.5%) to cover the cost increase. To see the principle quite clearly, if a single input accounted for all of costs (i.e., 100%), a 50% increase in the input's price would, of course, require the output price to rise by 50% if prices are to keep pace with costs. These basic economics are summarized in Figure 8.

Figure 8
**Fuel Price Increases Have a Greater Percentage Impact on Freight Rates As Fuel Becomes a Larger Component of Costs**

| Fuel Cost as a Share of Total Cost | Fuel Price Increase | Cost/Rate Increase |
|---|---|---|
| 10% | 50% | ~5.0% |
| 25% | 50% | ~12.5% |
| 50% | 50% | ~25.0% |
| 100% | 50% | 50.0% |

**Note:** This example applies when there is limited ability to substitute away from fuel when fuel prices rise, as is the case with railroads. See note 77.

---

[77] This example follows the design of Prof. Rausser's damages models, ███████████████████ ████████ (Rausser Remand Deposition at 415-416.) If there is no possibility at all for substitution with other factors of production, the "approximately 5% increase" is exactly correct. The limited increase in fuel efficiency in response to large increases in fuel prices demonstrates that there is limited ability for railroads to substitute out of using fuel. (Kalt Merits Report at ¶135.)

51. Prof. Rausser's models' incorrect assumption ████████████████████████████
████████████████████████████████████████████ no matter how high fuel
prices go (and no matter how important fuel expense becomes as a share of costs and
revenue) has dire consequences for his models.  This incorrect assumption leads ██████
████████████████████████████████████████████████████████████.

52. This fundamental error is readily illustrated.  Using the numbers in the example of Figure 8,
assume that fuel costs are 10% of overall rail costs and that the ████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████████ Now, assume that
fuel prices rise so that fuel costs are 25% of total costs.  A further 50% increase in fuel prices
would lead competitive freight rates to rise by 12.5%, just to cover increased fuel costs.  (See
Figure 8.) ███████████████████████████████████████████████████████
██████████████████████████████ █ ██████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████ the model
is defective.[79]

53. Figure 9 shows the share of Defendants' fuel cost increases that Prof. Rausser's STB model
automatically converts into "damages" for each year of the Class Period, whether there are
any true damages or not.  The calculations are based on the ████████████████████████
██████████████████████████████████████████████ and the share of fuel
in rail revenues using Defendants' financial information reported in their regulatory filings.
Over the entire Class Period, fully ████████ of fuel cost increases become "damages" under

---

[78]   Rausser Remand Deposition at 457-458.
[79]   Federal Judicial Center, *Reference Manual on Scientific Evidence*, 2nd Edition, at 307.

Prof. Rausser's faulty modeling, and for 2008 (which accounts for ▮▮ of Prof. Rausser's claimed class-wide damages[80]), nearly ▮▮ of fuel cost increases become "damages".  Under the Class & Merits model, the figures are even higher, with ▮▮▮ of fuel cost increases becoming automatic "damages".[81]

Figure 9

**How Much Fuel Cost Does Prof. Rausser's Model Convert into "Damages"?**
**Share of Fuel Cost Increase Found to Be "Damages" in Prof. Rausser's Model**



---

[80]   Rausser Merits Reply Report at 251, Table 105.   Note that Prof. Rausser's STB model ▮▮▮▮▮▮▮

[81]   Appendix C at Figure C.I.9.

**C.  Prof. Rausser's** ███████████████████ **Contradicts the Professional Literature**

54. Prof. Rausser's assumption ████████████████████████████████████████

███████████████ is also inconsistent with the economics literature on railroad costs.  Figure

10 shows the four studies that Prof. Rausser cites as support for his modeling.[82]  With the

singular exception of Prof. Rausser's reports in this matter, each study ████████████████

████████████████████████████████████████████████████████████████████

██████████████████████.  In fact, the statistical analyses in each of the economic articles

cited *rejects* the hypothesis that ████████████████████████████████████████

██████████████████████████████████████.

Figure 10
**Prof. Rausser's Model Is Inconsistent with
the Economics Literature He Cites on Rail Costs**



| Authors | Year | ████████ |
|---|---|---|
| Angulo | 2013 | Yes |
| Bitzan | 2003 | Yes |
| Bitzan & Keeler | 2003 | Yes |
| Wilson | 1997 | Yes |
| Rausser | 2010-2014 | No |

**Sources:**  Rausser Class Report, Rausser Class Reply Report, Rausser Merits Report, Rausser Merits Reply Report, Rausser Remand Report, Rausser Remand Deposition.

---

[82]   Rausser Merits Reply Report at 247-249.   Angulo, L.P., "Labor Inputs Substitution during Corporate Restructuring:  A Translog Model Approach for US Freight Railroads," *Applied Economics*, Vol. 45 (2013), pp. 2547-2562. Bitzan, J.D., "Railroad Costs and Competition:  The Implications of Introducing Competition to Railroad Networks," *Journal of Transport Economics and Policy*, Vol. 37 (2003), pp. 201-225. Bitzan, J.D. and T.E. Keeler, "Productivity Growth and Some of its Determinants in the Deregulated US Railroad Industry," *Southern Economic Journal*, Vol. 70 (2003), pp. 232-253.  Wilson. W.W., "Cost Savings and Productivity in the Railroad Industry," *Journal of Regulatory Economics*, Vol. 11 (1997), pp. 21-40.

55. The principle at issue is embodied in FSC formulas that are acknowledged to be lawful and the product of competitive market forces.  Formulas that Prof. Rausser acknowledges were competitively adopted provide that a 10% increase in fuel prices produces a larger increase in the surcharge when fuel prices are high than when they are lower.  To illustrate, consider the published carload surcharge adopted by BNSF years before the challenged conduct.  Under this FSC, each 10 cent/gallon increase in fuel prices (above the trigger) yields an additional 1% surcharge.  Under such a formula, a 10% increase in fuel prices produces a 2% additional surcharge when fuel is at $2/gallon (the 10% increase equals 20 cents) whereas a 10% increase in fuel prices produces a 4% additional surcharge when fuel is at $4/gallon (the 10% increase equals 40 cents).  Thus, the inherent arithmetic of the formula means that a 10% increase in fuel prices produces a much larger effect when fuel prices are high.  Under Prof. Rausser's models, ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████ Such a model does not measure antitrust *damages*.

56. Prof. Rausser acknowledges that the consequence of ████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████.[83]  He similarly recognizes that ███████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████," ."[84]

Notably, Prof. Rausser recognizes that there "are a number of explanations" for the change in

---

[83]   Rausser Remand Deposition at 466; Rausser Merits Deposition at 44-45.
[84]   Rausser Remand Deposition at 467; Rausser Merits Deposition at 45.

the relationship, which have nothing to do with the alleged conspiracy.[85]   These admissions

completely undermine Prof. Rausser's damages models, which ███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████

57. In sum, Prof. Rausser's ████████████████████████████████████████

███████████████████████████████ is out of step with both the literature (Figure

10) and the facts (Figure 7).   In fact, as shown in Figure 7, Defendants' fuel costs exceeded

████████ of their collective operating expenses for nearly all of the Class Period.   The result of

Prof. Rausser's assumption is to convert fuel price increases into damages where they should

be converted into normal, competitive market cost and rate changes.

### D.  Data Errors:  Prof. Rausser's Misuse of STB Data on Variable Costs of Intermodal Service

58. As discussed above, in the STB model, Prof. Rausser ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████.   The model, however, does not

account for a known change in the way the STB reported variable costs for intermodal

shipments beginning in 2003.   This change in data calculation – not an actual change in

variable costs – caused a distinct discontinuity in the STB's variable cost measures for

---

[85]    Rausser Remand Deposition at 467.  He also acknowledges that the ████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

Rausser Remand Deposition at 466-467.  This means that his model converts fuel cost increases into damages.

intermodal service.[86]   Variable costs per ton-mile of affected shipments dropped by

approximately ▮ as the data, which are reported as annual figures, went from 2002 to

2003.[87]

59. Prof. Rausser is apparently not aware of the discontinuity in the STB's data series on the

variable costs of intermodal service.[88]  He treats it as if it is a real break in actual costs, rather

than a break in the way costs were reported.  The affected intermodal shipments account for

approximately ▮ of the observations in Prof. Rausser's STB regression dataset, and thus

significantly bias the ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮.   I have corrected Prof. Rausser's data error (by excluding the inconsistent

intermodal data), which results in a ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮.  This is more than twice as large as Prof. Rausser's estimate of ▮

60. This one change to Prof. Rausser's model dramatically changes the model's results.  Without

correction for the STB data error, Prof. Rausser's STB model reports an ▮▮▮▮

▮▮▮[89]  In contrast, when the error is accounted for in ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ falls to approximately ▮.[90]   The intermodal data error more than

▮▮ the model's damages.

---

[86]   The impact of the change in the STB's methods for calculating and reporting variable costs for intermodal shipments is discussed in the economic literature on railroads.  See, e.g., Laurits R. Christensen Associates, Inc., Analysis of Competition, Capacity, and Service Quality, Revised Final Report, Volume 2, November 2009 at 11-25.
[87]   See Appendix C at Figure C.II.3.
[88]   Rausser Remand Deposition at 435-437.
[89]   As noted above, Prof. Rausser reports an overcharge factor of ▮ (Rausser Merits Reply Report at 249, Table 103); when his data are updated to reflect his most recent report (Rausser Remand Report), the model finds an average overcharge of ▮.
[90]   See my workpapers.

39

61. Even when the ███████████████████████ is corrected for its STB data error,
the ████████████████████████████████████████████████████████████████
████████████████████████████████████████.   The role of this in Prof.
Rausser's modeling is illustrated by examining the STB model's results when we apply it to
a set of rates that cannot plausibly reflect conspiratorial elevation.   Specifically, we can set
rail rates equal to Defendants' variable costs in both the pre-Class and Class Periods by using
the STB variable cost data Prof. Rausser has employed in stage one of his STB model.   As
Prof. Rausser acknowledges, the STB data on variable costs could not be affected by the
alleged conspiracy.[91]   If the model finds overcharges even where Defendants' changes in
rates are no greater than the changes in their costs, the model clearly cannot reliably isolate
the fact and magnitude, if any, of damages.[92]   Because we lack a consistent data series from
the STB on the variable costs of intermodal service, we lack a valid means of setting
Defendants' intermodal rates equal to variable costs.   I adopt two approaches to this issue.

62. In the first approach, I exclude the intermodal data due to the data error, but employ Prof.
Rausser's benchmark of ████.   Prof. Rausser presents that estimate as supported by research
and sources (albeit, see Figure 10 above) independent of his calculations.[93]   In fact, he says
that his estimate is "high and towards the upper end of those found in the academic literature
and, as a result, will serve to make the damages analysis conservative".[94]   That means Prof.
Rausser believes the literature would support a lower value than the estimate of ████.
Under this approach, when we set rates equal to costs, the STB model reports an average

---

[91]   Rausser Remand Deposition at 461-462.
[92]   As shown in Appendix C, Figure C.II.4, setting rates equal to variable costs in Prof. Rausser's Class & Merits
        model yields a false positive average weekly overcharge of ████.
[93]   Rausser Merits Reply Report at 247-248.
[94]   Rausser Merits Reply Report at 247.

weekly "overcharge" of ████ and ████ of shipments during the Class Period have false positive overcharges.[95]   The model should not generate any such overcharges because rates that are no higher than variable costs do not contain supra-competitive mark-ups or profits.

63. Alternatively, given that the data error affects the STB model's calculation of the ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████.   The results are a much higher benchmark of ████ (compared to ██████ from Prof. Rausser's version which includes the erroneous data) and the ███████████████████████ shown in Figure 11.   The rise in the ███████████████████ ████████████████████████████████████████████████████ but there are significant periods of time, ██████████████████████, ████████████████████ ██████████████████.   And, the STB model still yields ████████████████████ ██████████████ of shipments when rates just equal costs.   These are, again, false positives – i.e., damages where there can be none.

64. Tellingly, in both approaches to ████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████ This is clear in Figure 11 and is the consequence of the model's ████████████████████████████████████████████████████████████████ ██████.   The untenability of the ████████████████████████████████████████████ ██████████████████████████████████ (Figures 6 and 7, respectively). By the latter years of the Class Period, ████████████████████████████████████████ ██████████████████████████ (as in Figure 11).

---

Figure 11

**Correcting for Prof. Rausser's STB Data Error:  His Model Finds False Positive Overcharges Even When Rail Rates Just Equal Variable Cost**



**E.  Data Errors:  Prof. Rausser's** ███████████████████████████
███

65. It is clear from the foregoing that Prof. Rausser's modeling generates "structural breaks" and damages as artifacts of its failure to properly account for the dramatically different oil prices in the pre-Class versus the Class Period.  Contributing to the modeling's "structural breaks" are further errors of data construction.  Most notably, Prof. Rausser's ██████████████
████████████████████████████████████████████████████
████  ████████████████████████████████████████████

movements under rates that did contain fuel surcharges. ███████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████. [96]

66. This apples-and-oranges v. apples approach means that Prof. Rausser's model is explicitly at odds with his description of the but-for world.  That is, as noted above, Prof. Rausser says that he presumes that the but-for world would have the same FSC coverage as the actual world.  The actual world he is modeling during the Class Period is one in which all class shipments were covered by FSCs, ████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████

67. Prof. Rausser's ███████████████████████████████████████████████████

███████████████████████████████████████████████████.  As a result, Prof. Rausser is bound to find that his Class Period rates – ██████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████.

68. Figure 12 shows the result of correcting Prof. Rausser's STB data error (as above) and employing apples-to-apples pre-Class v. Class Period benchmarking.  I do the latter by basing the measure of structural break on the comparison of pre-Class Period v. Class Period all-in rates for shipments subject to FSCs in both the pre-Class Period and the Class Period. Paralleling Figure 11, I show the results when ██████████████████████████████ is corrected for his STB data error (resulting in the noted value of ████████████████

███████████████████████████.

---

[96]   See Kalt Merits Report at ¶¶529-532.

Figure 12

**Correcting for Prof. Rausser's STB Data Error and** ███████████████
███████: *Negative* **Overcharges Are Frequent in the STB Model**



**Source:** Rausser Data updated per Rausser Remand Report.

69. As we see in Figure 12, the STB model now reports that fully ████ of class shipments had negative "overcharges" despite Prof. Rausser's "no escape" hypothesis saying there should only be positive damages.[97]   In fact, correction of both Prof. Rausser's STB data error and his improper apples-and-oranges pre-Class Period versus Class Period data construction leaves the STB model generating an ██████████████████████████[98]   It is clear that the model's errors are responsible for the damages reported by Prof. Rausser.[99]

## IV. PROF. RAUSSER'S MODEL DOES NOT RELIABLY IDENTIFY THE FACT AND MAGNITUDE OF CLAIMED INDIVIDUALIZED DAMAGES

### A.  Claimed Individualized Damages of the Members of the Proposed Class

70. Prof. Rausser asserts that the alleged conspiracy would be expected to have "increased the prices paid by all shippers by the same percentage amount".[100]   He opines that there is a

---

[97]   These are examples of what are known methodologically as false negatives.  See further discussion in Section IV below.

[98]   When the STB data error is not corrected in ████ of the model, leaving the ██████████████████ ███████, the frequency of shipments reported to have negative overcharges is ████████ and the ██████████████ is ██. See Appendix C at Figure C.II.5.

[99]   Similar results hold for Prof. Rausser's Class & Merits model when it is corrected for Prof. Rausser's apples-and-oranges benchmarking.  See Appendix C at Figure C.II.5.

[100]   Rausser Merits Report at 50.

common fact of injury across all Class Members and, by implication, that all class shipments suffered damages of "the same percentage amount". Prof. Rausser never tests these assertions. I have used his model to do so, and they are demonstrably incorrect.

71. Prof. Rausser calculated average overcharges and aggregate damages for the proposed class in each of his first four reports. In these reports and associated depositions, he described a methodology for calculating individual damages that he planned to use.[101] However, notwithstanding claims that he has applied his methodology to calculate damages for the named Class Representatives and has been calculating individual damages for all proposed Class Members,[102] Prof. Rausser still has not produced *any* calculations of individual Class Member damages.

72. Utilizing the method of damage calculation which he has described so far, Figures 13 through 15B below assess the claim of a common fact of injury across the class (i.e., positive damages for all class shipments). If Prof. Rausser's model is a reliable model for isolating the effects of the unlawful conduct and measuring damages from that conduct, we should not find any undamaged class (or legacy) shipments. On the other hand, if the modeling finds shipments with negative damages and uninjured shippers, then either there is no common injury across the Class Members or, at the least, the model is unreliable for identifying and measuring such injury.

73. In Figure 13, I have compiled results from applying Prof. Rausser's STB model and his previously described method of individual damage computation to his data's individual

---

[101]    Prof. Rausser indicated that he intende ███████████████████████████████████████████
███████████████████████████████████████████████████████████████████. (Rausser Merits Report at 171; Rausser Merits Deposition at 436-437.)
[102]    Rausser Merits Deposition at 436, 438-439.

shipments and its designations of individual shippers.[103]   As we can see, Prof. Rausser's

modeling and damage methodology finds thousands of uninjured shipments and shippers.[104]

Figure 13
**Testing for Negative Damages:
The Frequency of Shipments with Negative "Damages"
in Prof. Rausser's STB Model**



74. Specifically, Prof. Rausser's STB model finds negative damages for approximately ▮ of

the class *shipments* in his dataset, accounting for approximately ▮▮▮▮ of class

revenue.[105]   In other words, the model finds that ▮▮ of the time Class Members actually

paid *less* on class shipments than the model predicts they would have paid absent the putative

conspiracy.   Overall, approximately ▮▮ of shippers have at least some negative damages.

---

[103] Plaintiffs have represented that there are 30,000 shippers in the proposed class (Plaintiffs' Supplemental Memorandum of Law in Support of Motion for Class Certification, this matter, December 19, 2013, at 58), and the model that Prof. Rausser used in his class and merits reports included approximately 30,000 individual shippers.  In his latest, fifth report his data include only about ▮▮▮ class shipper names.  The discrepancy arises because Prof. Rausser ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  In his first four reports, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  As pointed out in my merits report (at ¶509), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   In his fifth report, he has apparently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (See workpapers to Rausser Remand Report.)  Particularly for this reason, the individual shipper identifiers in his dataset are not confirmed to each represent unique shippers.  For the purposes of testing Prof. Rausser's results and claims (e.g., in Figure 13), however, I have accepted his shipper designations.

[104] I note that large numbers of class shipments are not analyzed by Prof. Rausser's STB or Class & Merits models.  The method he has described for calculating individualized damages to class shipments can only be applied to class shipments which are included in his regression models.  Prof. Rausser has described no method of generating an unbiased prediction of but-for rates and thereby damages on the excluded shipments.

[105] See my workpapers.

Approximately ■ of class shippers have no shipments with positive damages and another ■ of class shippers have a mixture of positive and negative damages shipments.

75. When the STB data error discussed in Section III is corrected (thus raising Prof. Rausser's factor for ████████████████████████████████████ from its value of ██ as used in Figure 13 to ███, slightly more than ████ of the class *shipments* in Prof. Rausser's data are reported by the model to have negative damages.  This is seen in Figure 14.  In terms of *shippers* (as designated in Prof. Rausser's data), these negative damages leave more than ██ of class shippers with negative overall damages and more than ██ of class shippers with no shipments with damages.

Figure 14
**The Frequency of Shipments with Negative Damages
in Prof. Rausser's STB Model after Correction for His Data Error**



76. Figures 15A and 15B examine the distribution of individual shipment "damages" produced by Prof. Rausser's STB model.  Figure 15A shows this distribution across the many ████ of class shipments during the entire Class Period, and Figure 15B illustrates the distribution of damages across a representative set of specific weeks (the second week in each

47

November) in the Class Period.[106]   In each figure, the percentages of class shipments falling within +/- 1% of the indicated values of Prof. Rausser's damage ratio (i.e., each individual shipment's damage divided by that shipment's all-in rate) are shown by heights of the blue bars.

Figure 15A
**Testing Prof. Rausser's STB Model for the Frequency of
Shipments with Negative Damages in the Class Period**



---

[106]   See my workpapers for versions of Figure 15B for all weeks in the Class Period.  In assessing the distribution of individualized damages, I apply the principles developed in, for example, Heckman, James J., Jeffery Smith and Nancy Clements, "Making The Most Out Of Programme Evaluations and Social Experiments:  Accounting For Heterogeneity in Programme Impacts," *Review of Economics Studies*, Vol. 64 at 506.

77. The left-most bar in Figure 15A shows that approximately ▮ of class shipments had damage ratios below *negative* ▮ The bar outlined in red shows that Prof. Rausser's model finds an average weekly damage ratio of ▮.[107]   The STB model not only generates thousands of uninjured shippers, but the damages on individual shipments vary dramatically from the average reported by Prof. Rausser.

---

[107] This figure is expressed as a percentage of actual all-in rates, and is consistent with Prof. Rausser's overcharge percentage, which is expressed as a percentage of the but-for all-in rate.   In Figures 15A and 15B, I have employed the method of computing individual damages described by Prof. Rausser (see above) and used by Dr. McClave (workpapers to McClave Report).   This method entails well-recognized error which leads to overstatement of individual damages.   (See Wooldridge, Jeffrey M., Introductory Econometrics: A Modern Approach (Mason, OH: Thomson South-Western, 2013), at 212-214.)   Thus, the analysis of Figures 15A and 15B is conservative, understating the frequency of shipments with negative damages.

Figure 15B
**Testing Prof. Rausser's STB Model for the Frequency of Shipments with
Negative Damages:  Sample Weeks across the Class Period**



78. Figure 15B takes the analysis a step further and examines overcharges for shipments within a

given week in each year of the Class Period.  It shows that Prof. Rausser's modeling reports

(1) negative damages for at least ▮ of shipments (accounting for approximately ▮ of

revenues) in two of the six weeks tested, and (2) negative damages for at least ▮ of shipments and ▮ of revenues in each of the six weeks tested. The STB model's average damage percentage for the week (outlined in red) never applies to even as much as ▮ of shipments across the weeks, with the other ▮ having damages that often diverge dramatically from that average.

79. Figure 16 examines the presence or absence of negative damages among the named Class Representatives. The first column of numbers in Figure 16 shows the net total "damages" Prof. Rausser's model finds for each Class Representative. Three Class Representatives



The third column of data shows the share of each Class Representative's shipments that have negative damages. These shares range from ▮.

**Figure 16**
**Prof. Rausser's STB Model Finds Negative "Damages"**
**for the Named Class Representatives**



80. In addition, the STB model finds that ▮ of class shipments have calculated "damages" greater than the entire FSC payments on the shipments, and approximately ▮ of total

damages come from shipments where damages are greater than actual FSCs.[108]   Further,

███████████████████████████ designated in Prof. Rausser's dataset) have total

damages in excess of their total FSC payments.[109]   This result is directly contrary to

Plaintiffs' theory that the conspiracy operated by imposing more onerous FSCs.   Under such

a theory, the damages should not exceed the total for any shipment or shipper.

81. One source of Prof. Rausser's models' very wide range of *not* common "damage" estimates

(which we see in Figures 15A and 15B above) is that Prof. Rausser's assumption of "largely

constant", relatively "static" base rates[110] is belied by the evidence.   I have previously shown

that different commodities on different routes exhibited large differences in movements in

base rates between 2002 and 2006, after accounting for the "common factors" identified by

Prof. Rausser.[111]   I also showed that movements in base rates were very large relative to his

asserted overcharges:   Base rates fell for more than ████ of class shipments for which the

comparison could be made, and a substantial percentage of shipments had base rates that

increased by more than the overcharges.[112]   Prof. Rausser's new STB model is subject to the

same basic inability to explain the movements in base rates that drive changes in the all-in

rates he models.   In addition, I showed that all-in rates (i.e., the sum of base rates and fuel

surcharges) matched based on their characteristics and adjusted for changes in economic

conditions using Prof. Rausser's model changed by percentage amounts between March 2003

and March 2006 that were vastly different than Prof. Rausser's model predicts.   In fact, ████

of all-in rates for which the comparison could be made decreased between March 2003 and

---

[108]   See Appendix C at Figure C.II.6.  Prof. Rausser's Class & Merits model finds that ████ of Class Members have total damages in excess of their total FSC payments.  Appendix C at C.II.7.
[109]   See Appendix C at Figure C.II.6.  The noted figures do not include NS data after its rebasing of its FSCs as of July 2006.
[110]   Rausser Merits Report at 138-142.
[111]   Kalt Merits Report, Figures V-9A -9C at 245-248.  See also Appendix C at Figure C.III.1-3.
[112]   Kalt Merits Report, Figures V-8A -8E at 238-242.  See also Appendix C at Figure C.III.4-5.

March 2006.[113]   Because "All-in Rates = Base Rates + FSCs", the modeling's failure to explain changes in base rates means that it is unable to reliably tell us that changes in Class Members' all-in rates are caused by the purported change from competitive to conspiratorial FSCs.

82. In summary, whatever Prof. Rausser's model is calculating, it is not reliable for the purposes to which it is put.  Yet, even if we accept his model as reliable for the purposes of calculating individual Class Member damages, the results tell us that there was not a common fact of injury, not the "same percentage amount" of injury, and thousands of shippers and almost ███████ shipments for which there are no damages.

**B.  Dr. McClave's Conclusion that All Class Shippers Were Harmed Is Baseless**

83. Plaintiffs' expert Dr. McClave, in reviewing Prof. Rausser's model, concludes that "all or virtually all" class shippers "were impacted by the conspiracy."[114]   He writes:  "In this model, fully ████ of customers have net positive overcharges…."[115]  Dr. McClave reaches this conclusion only by radically altering Prof. Rausser's model and ignoring ████ of the putative class.

84. Specifically, Dr. McClave first drops from the analysis the ████ of class shippers in his data who have fewer than ██ weekly observations in either the pre-Class or the Class Period.[116] This change, by itself, means that the damages model, as modified by Dr. McClave, is not measuring any common class-wide effect.  A model that only "works" for ████ of the class

---

[113]   Kalt Merits Report at 265, Figure VI-1.  See also Appendix C at Figure C.III.6.
[114]   McClave Report at 17.
[115]   McClave Report at 16.
[116]   Dr. McClave begins with ████ shippers and drops ████████ of them because they do not meet his "████████ observations" screen.  (McClave Report at 16.)  Shippers dropped by Dr. McClave in his analysis include three of the named Class Representatives – ██████████████████████████.

shippers cannot be said to "work" class-wide – except by improperly assuming what one is trying to prove.

85. For the remaining ▮▮▮ of shippers in his data, Dr. McClave ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



. Yet, particularly for purposes of class certification, we are interested in explaining precisely what Dr. McClave "backs out" of his analysis.  Dr. McClave's analysis merely demonstrates that the common factors included in Prof. Rausser's model are inadequate to explain individual shippers' rates.

86. Finally, Dr. McClave's analysis employs the Class & Merits model, rather than the new STB model.  The STB model generates even a larger portion of class shippers with net negative "damages" than under the Class & Merits model analyzed by Dr. McClave.[118]

**C.  Preliminary Observations on Prof. Rausser's New Method of Calculating Individual Damages**

87. At his latest deposition, Prof. Rausser indicated he does not intend to calculate individual damages for a large portion of the class based on the individual shippers' actual all-in rates compared to their but-for rates.[119]   Instead, he indicates he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[117]   McClave Report at 14.

[118]   Approximately ▮▮▮ of shippers have negative damages in the Class & Merits model (Appendix C at Figure C.I.13), compared to approximately ▮▮▮ in the STB model (Figure 13).

[119]   Rausser Remand Deposition at 387-391, 476-483 and 487-490.  Although the methodology for doing this has not been revealed by Prof. Rausser and he apparently has not yet applied it, he can cite to no economics or econometrics literature that would allow me to understand what he intends to do.  (Rausser Remand Deposition at 487-490.)

███████████████████████████████████████████████████████

████████████████████████████ ".[120]  He further indicated that his new method

will incorporate data that are not included in any of the regression models presented in his

reports.[121]  Moreover, Prof. Rausser has not explained how █████████████████████

███████████████████████████████████████████████████████

will not constitute the fatal error of science:  assuming what one is trying to prove.  Here,

Prof. Rausser is ████████████████████████████████████████████

████████.  But, a key premise of class certification is to test whether, rather than simply

assume that, the experience of particular individual class members departs in no important

ways from the experience of other class members.  Prof. Rausser assumes commonality

rather than testing for it.

88.  Prof. Rausser's proposed methodology suffers the same flaw as Dr. McClave's.  It excludes

the majority of class members from an analysis of their own actual prices.  Further critique of

Prof. Rausser's new way of calculating individual damages will have to await his

presentation of its methodology, data and results.  But he, like Dr. McClave, suggests that his

approach may involve taking "those shippers that have ████████, or if you want to be very

complete based on [Dr. McClave's] results, ████████ observations" as constituting Class

Members with insufficient observations.[122]  My preliminary observation is that, in his current

data, Prof. Rausser designates ██████ shippers, including ██████ who do not have at least █

observations in each period, and ██████ who do not have at least █ data points in each

---

[120]  Rausser Remand Deposition at 389-391.

[121]  Among "all the factors that distinguish one group from another," Prof. Rausser mentions specifically "what fuel surcharges did they pay" "with which defendant"—factors not included in any of his regressions.  (Rausser Remand Deposition at 477-478.)

[122]  Rausser Remand Deposition at 478.  In the analysis Prof. Rausser refers to, Dr. McClave drops shippers who do not have at least █ observations (i.e., weekly shipments) in the pre-Class Period and █ observations in the Class Period.  (McClave Report at 16.)

period.   Accordingly, Prof. Rausser apparently intends to exclude up to  of his class shippers from an analysis of individual Class Members based on their actual prices.   Instead, he apparently will This provides no basis for his claim that his model demonstrates a common fact of injury across the class, much less that it provides reliable measurement of such claimed injuries.[123]

## V. ASSESSING PROF. RAUSSER'S CLAIM THAT EVERY SHIPPER, LEGACY AND CLASS, WAS INJURED

### A.  Overview:  Prof. Rausser's Changing Theory of Harm and Legacy "Damages"

89. As I have noted above, Prof. Rausser now maintains that all shipments, class and legacy, which paid revenue-based FSCs during the Class Period were damaged.   The theory underlying this claim of universal class and legacy harm does *not* turn, as it originally did,[124] on the alleged conspiracy universally imposing more uniform and more onerous FSCs that were "nothing like" their pre-Class Period precursors.[125]

90. It is now clear and uncontested that the Defendants' purportedly "conspiratorial" FSC formulas did not generate materially higher earning power than Defendants' competitive, pre-conspiratorial formulas.[126]   In fact, Prof. Rausser now says that the incremental earning power of the fuel surcharge formulas applicable to Class Members' shipments is "not

---

[123]   If and when his new analysis is presented, I anticipate I will comment on it as appropriate.

[124]   Rausser Merits Report at 129.

[125]   I have previously shown that Defendants' Class Period FSCs were not more uniform than in the pre-Class Period (Kalt Merits Report at ¶¶245-251).  See also Appendix C at Figure C.III.15-18.

[126]   See Kalt Merits Report at 36-37; Rausser Remand Deposition at 50-54.

relevant" to his analysis,[127] and that FSCs were not, and did not need to be, applied to every new opportunity that arose in the Class Period.[128]  It is also now clear and uncontested that Prof. Rausser cannot determine if and to what extent the alleged conspiracy resulted in an increase in FSC coverage on Class Members.  In fact, Prof. Rausser has no means to determine which shippers (and shipments) were covered by an FSC as a result of the conspiracy.  He now says that, in his modeling, FSC "coverage is presumed to be the same as it was in the actual world." [129]

91. Prof. Rausser now asserts a theory of a less specific, more generalized reduction in competitiveness in the Class Period.   Under this theory, as noted above, the alleged conspiracy harmed all class and legacy shipments during the Class Period because the claimed "restraint of competition... would be expected to reduce the effectiveness of negotiations and availability of concessions" from Defendants.[130]  Class and legacy shippers purportedly had "no way of escaping"[131] their contractual FSCs.  Legacy shippers thus purportedly found themselves with FSCs that pushed all-in rates above but-for competitive levels as fuel prices rose in the Class Period.   Similarly, class shippers purportedly found they could not negotiate better terms than those resulting from FSC formulas which were not materially different from the originally-competitive FSCs in the pre-Class Period, or could not realize favorable waivers or discounts of their FSCs.  They were purportedly injured, too, because the terms of what once were competitive FSCs eventually produced all-in rates that were above competitive levels as fuel prices rose in the Class Period.

---

[127]   Rausser Remand Deposition at 50-54.
[128]   Rausser Remand Deposition at 296-297, 337-339.
[129]   Rausser Remand Deposition at 412-413.
[130]   Rausser Class Reply Report at 99.  In fact, Prof. Rausser says "it could well be" that non-FSC payers were also harmed.  Rausser Remand Deposition at 325 and 392.
[131]   Rausser Remand Deposition at 61.

92. I show below that the factual predicates of Prof. Rausser's new, or at least substantially modified, theory of the conspiracy and its harm to Class Members are contrary to the data. Moreover, Prof. Rausser's models do not even approximately model this new theory of injury.  The models are not capable of determining if, when, and to what extent any individual Class Member would have obtained modifications of FSCs during the Class Period.

**B.  The Foundations of Prof. Rausser's Damages Modeling Have Crumbled**

93. Each of the key elements of a claim that the FSCs implemented at the purported onset of conspiracy were nothing like the immediately preceding FSCs is demonstrably unsupportable. Prof Rausser essentially acknowledges this.

➢ **FSC Formulas Applicable to Class Shipments Did Not Materially Increase FSC Earning Power and Cannot Account for the "Damages" Reported by Prof. Rausser's Model**

94. Plaintiffs claim that "conspiratorial" FSCs were uniform and more aggressive or more onerous than non-"conspiratorial" FSCs.[132]  Echoing this, Prof. Rausser concluded that the alleged conspiracy "will have increased the prices paid by all shippers by the same percentage amount."[133]  As summarized by the Court:  "In effect, according to plaintiffs, the allegedly conspiratorial fuel surcharges operated like a tax, increasing the total price of shipping by a set percentage."[134]

95. It is now evident that the data reject such propositions.  Indeed, Prof. Rausser has made no study to assess whether the purportedly "conspiratorial" FSC formulas would have resulted in higher FSC percentage rates at the fuel prices in the Class Period than the FSC formulas

---

[132]   Consolidated Amended Class Action Complaint, this matter, April 15, 2008 at ¶¶79-83, 88, 104; Plaintiffs' Narrative at ¶¶16, 53, 63, 64, 80, and 81; Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 4, 9, 10, 13, 15; Plaintiffs' Wal-Mart Reply at 7.
[133]   Rausser Merits Report at 50.
[134]   Opinion, this matter, June 21, 2012 at 9.

used prior to the conspiracy.[135]   He finds the issue to be "irrelevant."[136]   He has made no calculations to determine whether FSCs in the Class Period had more earning power (i.e., the percentage surcharge rates generated by the FSC formulas for the same fuel prices) than in the pre-Class Period.[137]   He says he does not care "whether there's more or less earnings power" in Class Period FSCs.[138]

96.   The data demonstrate that there was no overall, material change in the Class Period "earnings power" between pre-"conspiratorial" and "conspiratorial" FSC formulas.   In fact, in many cases, the formulas did not change at all (e.g., BNSF's published intermodal FSC, discussed in Section II above).   In other cases, the trigger prices used in the formulas changed, but these changes had essentially no effect on surcharge rates in the Class Period because prices remained above either trigger price, with all but *de minimis* exceptions.

97.   Figure 17 shows the published carload fuel surcharge rates for each railroad during the Class Period generated by pre-"conspiratorial" and "conspiratorial" FSC formulas.[139]   As the figure indicates, the adoption of the allegedly collusive carload formulas led to lower surcharge rates for UP, no change for BNSF, and only slightly higher rates for CSXT and NS (1.4% and 1.5%, respectively).   The same basic conclusions hold for Defendants' respective intermodal FSCs.[140]

---

[135]   Rausser Remand Deposition at 66.

[136]   Rausser Remand Deposition at 68-69 and 77-79.

[137]   Rausser Remand Deposition at 68-69.

[138]   Rausser Remand Deposition at 53-54.

[139]   Figure 17 does not reflect changes in NS's published formula established effective July 1, 2006, which raised the trigger price to $64 and reduced the fuel surcharge increment from 0.4% per $1 change in the price per barrel of WTI oil to 0.3%.   The effect of this change is shown in Kalt Merits Report Figures IV-23C and IV-24C.   The figure also does not reflect BNSF's, CSXT's and UP's introduction of mileage-based published carload provisions in 2006 (BNSF) and 2007 (CSXT and UP).   See Kalt Merits Report at 182-185, 188, Figures IV-23A, B, and D.

[140]   See Appendix C at Figure C.II.22 (showing average difference between pre-"conspiracy" and "conspiracy" FSC rates for intermodal shipments).   I show above in Figure 3 that damages generated by Prof. Rausser's model do not depend on any change in the earning power of the FSC formulas purportedly implemented by the alleged

Figure 17

**Were Conspiracy FSCs More Onerous?**
**Pre-"Conspiracy" v. "Conspiracy" Published Carload FSCs**



**Source:** Kalt Merits Report Figure IV-1B.

98. The damages generated by Prof. Rausser's models are not plausibly caused by a switch from non-"conspiratorial" FSC formulas to more aggressive, "conspiratorial" FSC formulas. We saw in Figure 3 above that the earning power of Class Period FSCs on local carload class traffic was *less* than the earning power of the pre-"conspiracy" published FSC formulas applied to the local carload class traffic. The same conclusion as to FSC earning power is

conspiracy. If we limit Prof. Rausser's STB model to local carload class shipments, the model generates an average overcharge of ▮▮▮▮ . For such shipments, we can replace the actual FSC with the FSC determined using non-"conspiratorial", pre-"conspiracy" published FSC formulas. All-in rates using the non-"conspiratorial" FSC formulas in place of the Class Period FSC formulas result in a reported overcharge which is slightly higher ▮▮▮▮▮ in the STB model. See Appendix C at C.II.8. This analysis is the basis for the data shown in Figure 3.

evident from Figure 18, which presents the weekly overcharges obtained by applying Prof. Rausser's STB model to his class carload traffic which moved under the purportedly conspiratorial published carload fuel surcharge formulas.[141]  For this traffic, Prof. Rausser's STB model finds average weekly overcharges of ███ (black line).  By comparison, the difference between the published "conspiratorial" FSC and non-"conspiratorial" pre-Class Period FSC formula rates are small and average ██████ (orange line).  An abrupt shift to more onerous Class Period FSC formulas did not occur, and thus Prof. Rausser's damages are not the result of such a shift.[142]

---

[141]   This analysis is limited to class shippers paying one of the Defendant's published carload "conspiratorial" FSCs.  A similar analysis, in which we compare pre-"conspiracy" published carload FSC formulas to "conspiracy" published carload formulas finds similar results. See my workpapers.

[142]   Similarly, BNSF's intermodal surcharge formula did not change after 2001.  Nevertheless, Prof. Rausser's model finds ██████ in damages for BNSF intermodal traffic, and a total of ██████ in damages for all four Defendants' intermodal class traffic.  See my workpapers.

Figure 18

**Prof. Rausser's Model Finds Massive Overcharges Even when "Conspiracy" FSCs Are Not Materially Different from Pre-"Conspiracy" FSCs**



99. Further demonstration that the FSC formulas of the Class Period did not have greater earning power than pre-Class Period formulas is provided by Figure 19.  This figure parallels Figure 3 above and shows each Defendant's actual average FSC rates on local carload traffic, the average FSC rate that would have applied to such traffic if subject during the Class Period to the pre-"conspiracy" published carload FSC provisions (as identified by Prof. Rausser), as well as the resulting difference in FSC payments that the actual and pre-"conspiracy" provisions imply.[143]   In the last column of Figure 19, I show the "damages" that Prof.

---

[143]   Data do not permit comparable analyses for interline and intermodal traffic.  Thus, the damages figure for the local carload traffic depicted here is ▮▮▮▮▮▮▮▮ the damages figure for the class traffic as a whole.

Rausser's STB model, using the previously described individual shipper damage calculation method, yields for the subject traffic.

Figure 19

**The STB Model Finds "Damages" Even Though Actual Class FSCs Had Lower Earning Power than Pre-"Conspiracy" Published FSC Formulas**



**Source:** Rausser Data updated per Rausser Remand Report.
**Note:** Local carload traffic only. In light of rebasing, data for NS are not incorporated into the analysis after July 1, 2006.

100.    As the figure indicates, each Defendant's actual total FSC revenues from Class Members on their local carload traffic were *less* than what those revenues would have been had the published pre-"conspiracy" carload provisions remained in place and been applied to all of Class Members' local carload shipments traffic during the Class Period. That is, the earning power of the purportedly conspiratorial FSC provisions was less than the earning power of the published pre-"conspiracy" provisions. Nevertheless, Prof. Rausser's STB model calculates ███████████████ in "damages" for each Defendant for such traffic.

➢ **Conspiracy Was Not Needed to Increase the Coverage of Fuel Surcharges**

101.    Another pillar of the Plaintiffs' conspiracy theory has been that a conspiracy among the Defendants was required to achieve "widespread" and "across the board" application of

revenue-based FSCs.[144]   The Defendants, say the Plaintiffs, implemented "this conspiracy, with a particular focus on achieving near universal application of the new Fuel Surcharge programs as promptly as practicable....",[145] imposing FSCs without exception "whenever opportunities arose".[146]   According to the Plaintiffs, prior to the alleged conspiracy, "fuel surcharges were applied only sporadically to a limited numbers [*sic*] of shippers";[147] and but for conspiracy, Defendants' fuel surcharges "would not have existed *at all*".[148]

102.    Echoing this, Prof. Rausser previously claimed that a conspiracy among Defendants was required, in part, to overcome "shipper resistance" to implementing and "setting fuel surcharges prior to the Class period."[149]   Based on his reading of the "documentary evidence pre-dating the program launch in July 2003," Prof. Rausser asserted he concluded that the Defendants "acting in a unilateral fashion and without benefit of coordination, had been unable to force shippers to accept their Fuel Surcharges so long as competitive alternatives remained available.   Fuel Surcharge coverage increased only with the advent of the conspiracy which served to eliminate those competitive alternatives";[150] and, he claimed, "100% FSC coverage was expressly mandated and enforced during the Class Period."[151]

103.    Significantly, for purposes of determining injury and damages purportedly resulting from the conspiracy alleged by the Plaintiffs, Prof. Rausser has "never developed a model to

---

[144]   Plaintiffs' Narrative at 9, 63.

[145]   Plaintiffs' Memorandum in Support of Motion for Class Certification at 3.

[146]   Rausser Merits Report at 62.

[147]   Plaintiffs' Memorandum in Support of Motion for Class Certification at 9.

[148]   Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories Directed to all Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railroad Company, January 4, 2012, ("Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories") at 9 (emphasis in the original).

[149]   Rausser Class Reply Report at 7.

[150]   Rausser Class Reply Report at 36-37 (footnote omitted).

[151]   Rausser Merits Reply Report at 16.

predict coverage" in a competitive but-for world and therefore has never modeled the effect

of the alleged conspiracy on FSC coverage.[152]  Instead, as noted, his model "presumes" that

the actual world had the same coverage of FSCs as in the but-for world of no putative

conspiracy.  The economic data refute the claims that FSC coverage increased only with the

advent of a conspiracy.[153]

104.    The data demonstrate clearly that FSC coverage was substantial and growing

immediately before the start of alleged conspiratorial conduct in March 2003.  Figure 20

shows the share of revenue for each railroad that was assessed an FSC—requiring that a

shipment was covered by an FSC and that fuel prices were above the relevant trigger.  For

UP, and to a lesser extent BNSF and NS,[154] the figure also shows the coverage of FSCs

(including FSCs that were in place but not assessed because, for example, they were not

triggered in periods of relatively low oil prices).  The apparent drop in coverage for BNSF

and NS for several months in 2002 in Figure 20 cannot reliably be interpreted as showing a

drop in coverage because coverage data for these two railroads is incomplete and fuel prices

were frequently below trigger levels.[155]  Only for UP do we have fairly complete coverage

data, and as we can see in Figure 20, there was no dip in the share of UP's revenue covered

by an FSC during 2002.

---

[152]   Rausser Remand Deposition at 263-264.
[153]   See Kalt Merits Report at 12, 97, 105, 112.
[154]   Due to data limitations, FSC coverage information is frequently missing for BNSF and NS, especially in the earlier period.
[155]   Kalt Merits Report Figures IV-9A-9D.

Figure 20
**Percent of Revenue with Revenue-Based Fuel Surcharges**



105.   The data also reject the theory that a conspiracy was needed to overcome mounting

customer resistance to FSCs in the period leading up to March 2003.  Such a theory implies

that we should see a slowing in the spread of FSCs prior to March 2003, and then an

acceleration in coverage immediately upon purported creation of the alleged conspiracy.  If

anything, the data show the opposite.[156]  As reflected in Figure 21, Defendants included FSC

provisions with very high frequency in their new agreements during the non-"conspiratorial"

period leading up to March 2003.  Just prior to that date, more than ███████ of all new

---

[156]   Kalt Merits Report at 160-168.

pricing opportunities included a revenue-based FSC provision, and every Defendant had included a revenue-based FSC in at least ▮ of new pricing opportunities prior to March 2003.[157]   Moreover, no acceleration of the implementation of FSCs in new opportunities occurred upon the purported start of the conspiracy.[158]

Figure 21
**Percentage of New Opportunities with Revenue-Based FSCs**



---

[157]   Prof. Rausser criticizes my method for identifying a "new opportunity" for traffic to be re-priced.  (Rausser Merits Reply Report at 180-181.)  This method, however, is identical to the one he uses for identifying contract start dates for many of his legacy shipments.  (Rausser Remand Report at 47-48.)  Prof. Rausser also points out a coding error in my analysis in my merits report.  He does not point out the error affected only the BNSF data, or that his "correction" (which he claims to have made, but the results of which he does not report) actually made my analysis conservative (i.e., the error *decreased* the number of missed opportunities in the analysis.  (See my workpapers.)  The error is corrected in Figure 21.  He also criticizes my failure to weight the new opportunities analysis by revenue.  Doing so does not change any of the conclusions.  See Appendix C at Figure C.II.30.

[158]   Kalt Merits Report at 160-166.

106.    The white areas of Figure 21 represent missed opportunities to apply revenue-based FSCs.  During the Class Period, more than ██████ new opportunities escaped the allegedly universal imposition of FSCs.[159]   Notwithstanding his prior claims (1) to the effect that "100% FSC coverage was expressly mandated and enforced [by Defendants] during the Class Period"[160] and (2) that shippers had "no way of escaping" the claimed conspiracy,[161] Prof. Rausser now asserts that he does not "find it surprising at all that [Defendants] were not able to achieve what was their common objective with regard to coverage."[162]   In fact, acknowledging the Defendants' otherwise inexplicable failure to apply their putatively conspiratorial fuel surcharges, Prof. Rausser asserts that "if there's still an equitable balance, that wouldn't undermine the efficacy of the conspiracy."[163]   No definition or evidence of such an "equitable balance" is provided by Prof. Rausser.  His assertions are wholly *ad hoc.*

107.    The foregoing data also highlight fundamental failings in the damages models. Specifically, neither Prof. Rausser's reasoning nor his models explain which shippers received a "conspiratorial" FSC that they otherwise would not have received.  The strong trend toward the use of such FSCs before March 2003 and Prof. Rausser's acknowledgement mean it is not possible that all class members would have escaped such FSCs.  Yet, his models provide no way to identify such shippers.

---

[159]    Even after accounting for Prof. Rausser's improper use of NS's 9255 data source (see my merits report at ¶¶510-511), and applying his alternative methodology ████████████████████████████, his method finds more than ████ new pricing opportunities that failed to have revenue-based fuel surcharges applied to them by Defendants, including ██████████ involving movements over multiple months.  See my workpapers.
[160]    Rausser Merits Reply Report at 16.
[161]    Rausser Remand Deposition at 61.
[162]    Rausser Remand Deposition at 297.
[163]    Rausser Remand Deposition at 338.

**C. Prof. Rausser's Remaining Theory of Conspiracy-as-Contract-Enforcement**

108.     The theory of conspiracy and harm now put forth by Prof. Rausser does not involve more onerous FSCs imposed like a tax.  Rather, the new theory involves a conspiracy of contract enforcement:  Absent collusion, Defendants allegedly would have discounted or waived FSCs, including those already under contract, and would have done so on a class-wide basis.  As Prof. Rausser states:  "The alleged conspiracy was not solely about FSC formulas… But the alleged conspiracy was also about increased FSC application and enforcement, and denying competitive alternatives through coordinated FSC application and enforcement."[164]  The remaining "enforcement" theory of harm rests on claims that, absent the putative conspiracy, Defendants would have waived, renegotiated, discounted, or otherwise failed to collect FSCs that were applicable to class (and legacy) shippers and shipments in existing contracts.[165]  There is no common evidence of this.

109.     Under the conspiracy-as-enforcement theory, the particular FSC formula a shipper was obligated to pay is irrelevant.  Rather, in Prof. Rausser's but-for world, all shippers who were subject to an FSC – class and legacy alike – would have successfully breached, renegotiated or otherwise avoided paying some or all of their contractual FSCs.  The claimed conspiracy is asserted to have blocked such "escape" from what shippers eventually came to perceive as excessive fuel surcharges when fuel prices rose during the Class Period.  "Escape" was blocked because, upon seeking a better FSC deal, shippers purportedly found that the putative conspiracy had taken away their competitive leverage.  A shipper purportedly could not realistically leave or threaten to leave its current carrier and switch to another Defendant's service because "when they turn[ed] to another defendant, they [got] the same

---

[164]     Rausser Remand Report at 19.
[165]     Rausser Remand Report at 5, 12-15, 23.

pricing."[166]   In the sections below I demonstrate that each of the factual predicates of this theory is wrong, and certainly not provable on a common basis for all class members.

> **Prof. Rausser and His Models Do Not Provide Evidence of a Common Fact of Injury from the Allegedly Injurious Conduct**

110.   Prof. Rausser's theory of conspiratorial enforcement of FSCs that would otherwise have been waived, forgiven, or uncollected involves highly individualized considerations.   The relevant, highly individualized considerations include:   whether the shipper has feasible access to non-Defendant railroads; the ability to switch to trucks or barges; the importance and bargaining power of a shipper to a Defendant; the knowledge and importance of rail shipping costs in a shipper's overall costs of doing business; and myriad other elements of leverage and bargaining that would have enhanced or diminished a shipper's ability to renegotiate, waive, or breach contract terms so as to escape putatively excessive fuel surcharges.

111.   Significantly, Prof. Rausser offers anecdotes rather than systematic quantitative evidence common to the class to support his speculations that shippers came to perceive that their FSCs were excessive and that there were no "escape" options.[167]   Thus, based on Table 80 of his merits reply report, Prof. Rausser claims that NS "waived a higher percentage of FSCs that were actually billed in the pre-Class Period, than it did in the Class Period".[168]   To investigate the basis for this claim, Figure 22 reproduces Prof. Rausser's Table 80, adding data from the source document omitted by Prof. Rausser ("A/R [Accounts Receivable] Balance") and adding a column to show NS's FSC "Collection Rate."   The FSC "Collection Rate" is calculated as total *paid* FSCs divided by total *billed* FSCs.   Prof. Rausser calculates

---

[166]   Rausser Remand Deposition at 363.  See also Rausser Remand Report at 11-12.
[167]   See Rausser Remand Report at 42-44 (discussing the cases of ███████████ ).
[168]   Rausser Merits Reply Report at 190-191 and Table 80.

his measure of the percent of FSCs that were "waived" as the ratio of reported "Write-Off/Settlement/Waiver" amounts to "Billed" amounts.  In making this calculation and with no basis in the data for doing so, Prof. Rausser effectively ignores NS's collection rate and treats outstanding accounts receivable (i.e., accounts billed but not yet received) as collected, whereas NS identifies them as not collected in the indicated year.

Figure 22
**NS FSC Collections:  Correction of Prof. Rausser's Table 80**



112.    If we straightforwardly use what NS reported as billed and paid, the results are the "Collection Rate" shown in the fourth column of Figure 22 and the "Percent of FSC Uncollected" in the last column of the figure.  These data indicate only minor variation in FSC collection rates; collections remained in the range of ▮▮▮▮▮▮▮▮ of FSCs billed throughout 2002-2006.[169]  This is not evidence for a "sea change" in the enforcement and collection of FSC revenues.

113.    Beyond his Table 80, Prof. Rausser provides selective anecdotes represented as illustrating greater numbers of FSC waivers, non-collection, and/or or forgiveness during the

---

[169]   Rausser Merits Reply Report at 191-192 and Figure 81 (from Figure IV-9D in my merits report).

pre-Class period than in the Class Period.  For example, Prof. Rausser points out that BNSF reduced the published carload FSC percentage rate in May 2003 (which is during the pre-Class Period, but when Prof. Rausser says the conspiracy was being implemented) from that which was called for under the FSC formula.[170]  He fails, however, to point out instances of comparable "waiving" of FSCs during the Class Period.  For example, UP in 2005 and again in 2007, changed a component of its most widely used intermodal FSC formula that unambiguously reduced FSC rates going forward.[171]  Similarly, NS changed the surcharge increment in its public carload formula from 0.4% to 0.3% when it raised the trigger price from $23 to $64 in July 2006, meaning that when oil prices rose above $64/bbl the surcharge rate increased at a 25% slower rate than it would have under the previous formula.[172]  Additionally, for all four Defendants, the FSC rates on new business during the Class Period often were at a "discount" to the purportedly uniform and universal "conspiratorial" rates.[173]

114.    Prof. Rausser must turn to his non-quantitative narrative because the data on FSC non-assessment, waiving, and non-collection which are observable absent purported conspiracy do not support the contention that a but-for world would have seen the massive non-enforcement and softening of FSCs required to generate Prof. Rausser's damages.  Figure 23 shows the magnitude of FSC waivers and non-collections that would be required to move all-

---

[170]   Rausser Remand Report at 13.
[171]   See discussion above.
[172]   Kalt Merits Report Figure IV-1B.
[173]   Kalt Merits Report Figures IV-20A-D; see Appendix C at Figure C.III.15-18.  In another example, Prof. Rausser cites internal UP email communications from fall 2002 to conclude that "in light of the minimal FSCs that UP did actually apply at that time, UP *did not even seek* to collect FSCs on the 'average' freight bill". (Rausser Remand Report at 9 (emphasis in original).)  The subject communication explains: ██████████████ ██████████████████████████████                        (Rausser Remand Report at 9.) Regardless of whether this supports Prof. Rausser's conclusion that UP "*did not even seek*" to collect certain FSCs in the Class Period, the ████████████████ is economically irrelevant for the matter at hand:  Prof. Rausser provides no basis for concluding that UP treated low level payments differently in the Class Period, and less than ██ of Class Members' Class Period FSC assessment fell below a ████████████.   (See my workpapers.)

72

in rates in the but-for world low enough to generate the damages the STB model reports for class shipments (left panel). The right panel of the figure shows the extent of but-for waivers and other non-collections required to explain the "damages" the model reports when applied to legacy shipments.

Figure 23

**What Level of Non-Enforcement of FSCs Would the But-For World Require to Eliminate Overcharges Found by Prof. Rausser's Model?**

| Class | | Legacy | |
|---|---|---|---|
| **Waiver Percent** | **STB Model Overcharge** | **Waiver Percent** | **STB Model Overcharge** |



**Source:** Rausser Data updated per Rausser Remand Report.

115. Taking the ▬ waiver rate identified by Prof. Rausser for the pre-Class Period (see Figure 22 above) and applying it as a but-for world during the Class Period would explain only a *de minimis* amount of the damages calculated by Prof. Rausser's STB model. As Figure 23 shows, in the but-for world Defendants *would have had to have waived or otherwise not collected* ▬ *of FSC revenue* in order for all-in but-for prices to be pushed to the level implied by Prof. Rausser's damage calculations for class shippers. In the case of his model's calculated damages to legacy shippers, this rate would have had to be ▬. There is simply no support for such massive non-collection of FSCs in Prof. Rausser's pre-Class benchmark period or in the anecdotes that he cites.

➢ **Competitive Freight Transportation Markets Support Application and Enforcement of Large FSCs during the Class Period**

116. Prof. Rausser's "enforcement" theory of the conspiracy assumes that during the Class Period railroads would have been unable, absent conspiracy, to broadly assess FSCs. This theory assumes that the alleged conspiracy eventually resulted in all shippers perceiving FSCs as excessive, and that in the but-for world this eventually would have put "stress"[174] on all of Defendants' Class Period FSCs. In the but-for competitive world, so the theory goes, this stress would have been universally irresistible and all shippers' FSCs would have been reduced by one means or another, to the point of causing the massive waivers and discounts we see in the bottom row of Figure 23.

117. Evidence from other freight transportation providers in competitive industries, shows that competitive transportation providers could implement and sustain collection of FSCs at high and rising levels after 2002. Figure 24 shows published FSC percentage rates for a wide array of trucking companies in the United States between 2000 and 2008. Defendants' FSC rates follow the same pattern as those published by the indicated trucking companies, whose rates reach levels that are often in excess of Defendants' FSC rates. The trucking firms' FSC collections follow paths over time similar to the paths of fuel prices and of the trucking companies' FSC rates, which reached levels of 15%-35% of non-FSC operating revenues by 2008.[175]

118. The enforcement theory assumes that, having negotiated for contractual protection against the risk of rising fuel prices, the railroads (absent conspiracy) would then have waived the very protection for which they had negotiated. Such an extreme hypothesis

---

[174] Rausser Remand Report at 11, 12, 16, 20.
[175] See Appendix C at Figure C.II.21.

requires strong evidence, but there is none, much less evidence common to all shippers.  The evidence from a competitive sector like trucking tells us that FSCs survive in the marketplace, even when they yield high surcharge percentages, because they are efficient risk allocation mechanisms.[176]

Figure 24

**Defendant v. Publicly-Reported Revenue-Based
Fuel Surcharge Rates in Trucking, 2000-2008**



**Source:**  Company websites; Kalt Merits Report Figure IV-1.
**Note:**  Asterisk (*) denotes companies for which both truckload and less-than-truckload rates are shown, two asterisks (**) denote truckload only.

---

[176]   See further at Kalt Merits Report at ¶¶127-134.

**D.  Prof. Rausser's Enforcement Theory of Injury Is Not Susceptible to Common Proof**

119.    Each step of the conduct imagined and necessary to generate injury in Prof. Rausser's

enforcement theory requires inherently individualized inquiry.  Whether or not, and when,

any particular shipper actually (1) came to perceive its FSC as excessive, (2) tried to find a

putative "escape" by negotiating or otherwise reducing or breaching its FSC obligations, (3)

threatened or sought to leave its carrier for another option, but (4) found the option of

"escape" blocked by the putative conspiratorial coordination of Defendants depends on

shipper-specific facts and circumstances.  For example, for shippers and/or shipments served

by only one railroad, such as a number of the named Class Representatives,[177] there is no

Defendant railroad that could make a "better offer" for that traffic and, in Prof. Rausser's

world of no "escape", no competitive alternative offer to be lost due to conspiracy.

120.    Assume, for example, that half of the Defendants' actual FSC revenue would have been

waived or gone uncollected absent the conspiracy – a level unsupported by any facts or

anecdotes that have been proffered by Plaintiffs or Prof. Rausser.  Neither Prof. Rausser nor

Plaintiffs has a means, and none exists – by which to determine *when* and *which* Class

Members would have perceived their FSCs as excessive, attempted to negotiate lower FSC

rates, threatened or sought to switch to an alternative transportation provider if they could

find one, and then been successful in getting out of or otherwise obtaining a waiver from the

purportedly conspiratorial-level FSCs in the but-for world.

121.    Prof. Rausser's new theory of conspiracy-as-enforcement also fails to match Plaintiffs'

claims and representations as to the conduct that gave rise to claimed injury and damages.

Unlike the Plaintiffs' "nothing like", FSC-as-tax theory of harm, there is no basis for

---

[177]   See Kalt Merits Report at ¶¶343-356.

assuming that in any given week all shippers would be able to realize the same percentage waiver and non-collection.   Certainly, implementing a statistical damages model on a common basis across the class to test for and measure who was injured, at what times injury arose, and by how much would not be feasible without individualized data discovery.   And Prof. Rausser has implemented no such model.

### E.  Summary:  Prof. Rausser's Model Cannot Detect or Quantify Injury

122.    Prof. Rausser's damages modeling not only lacks any data on the factors that his conspiracy-as-enforcement theorizing identifies as the conduct that purportedly gave rise to injury, but it does not even attempt to model that conduct.   His models establish no benchmark for but-for levels of FSC waivers and non-collections.   They cannot indicate when, if ever, and in what amount, if any, purported waivers, breaches or renegotiations would have occurred in the but-for setting.[178]   The models are not models of when and which Class Members would have come to see their FSCs as excessive, acted on that perception, and then been successful in reducing the FSC payments, or to what degree.   In short, the damages models that Prof. Rausser has produced do not model the claimed unlawful conduct that he now says created injury.

---

[178]    Rausser  Remand  Deposition  at  399-401.   Prof.  Rausser's  transaction  data ████████████████████████████████████████████████████████████████

## VI. PROF. RAUSSER'S MODELS *ASSUME*, RATHER THAN PROVE, A COMMON FACT OF INJURY

### A. The Mathematical Structure of Prof. Rausser's Model Cannot Yield Anything Other than "Common" Impact

123.    The large range of damage estimates generated by Prof. Rausser's model that we see in Figures 15A and 15B above tells us that Prof. Rausser's model is not reliably explaining how freight rates vary across shipments and over time under non-conspiratorial, "but for" conditions – and hence cannot isolate purported effects of conspiracy.   A central reason for this is that Prof. Rausser's model embeds in its very mathematics key applications of "one size fits-all", "assuming what you are trying to prove" reasoning in a real world which is demonstrably *not* "one size fits all".

124.   In particular, ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████   And so on.

125.    This is invalid modeling in the class certification context.   Prof. Rausser incorrectly ████████████████████████████████████████████████ Such errors lie at the heart of the wide distributions of rate impacts that we see in Figures 15A and 15B above. ██████████████████████████████████████



that can entirely undermine the reliability of a damages model.  This problem plagues Prof. Rausser's models.

126.   Economic analysis of the railroad industry ███████████████████████████

███████████████████████████.  Prof. Rausser's own analyses recognize that railroads face different degrees of competition on different shipments depending on whether there is rail-on-rail competition, or whether the shipment can be moved by truck, for example.[179]  The degree of competition on a particular route will affect how freight rates are set and their relationships to fuel prices, costs, and other factors.  Thus, the question of whether the ███████████████████████████████████████████████████████████ must be determined by empirical analysis.  Prof. Rausser has not done such analysis and, instead, his modeling simply ████████████████████████████████████████.[180]  Figure 25 tests whether this assumption accords with the data.

127.   In Figure 25, I have applied Prof. Rausser's STB model to the entirety of his data,[181] and

---

[179]   See, for example, Rausser Merits Report at 25.

[180]   Prof. Rausser's common factor "test" does not test whether the ██████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (Rausser Class Report at 118-119.)  As explained below, this claim was misleading:  The high R-squared that Prof. Rausser reports is driven by th ██████████████████████████████████

[181]   Prof. Rausser has previously criticized a similar analysis presented in my merits report on the grounds that I had not used the data on all of the shipments, intermodal and non-intermodal, contained in my modeling.  (Rausser Merits Reply Report at 230-232.)  Figure 25 employs all of the data on intermodal and non-intermodal shipments.

for the 100 largest intermodal routes (by revenue).  The model produces overcharge estimates for █ of these routes.[182]  As shown in Figure 25, █ of these are found by the STB model to have *negative* overcharges, while █ are reported as having positive overcharges.  Whether positive or negative, the range of estimates is very broad.  Fully ████████ individual routes have overcharge parameters that are statistically different from Prof. Rausser's estimate, which he represents as applying in common to all intermodal routes (indeed, to all routes for all commodities in his data) based upon his STB model.[183]  Prof. Rausser finds a "common" overcharge because he assumes it, not because his model finds or confirms it.

---

[182]   For █ of the routes tested data are insufficient to calculate overcharges.

[183]   I utilize the same tests for statistical significance as used by Prof. Rausser.  Consistent with standard application of statistical methods, these tests necessarily account for differences in the number of observations on a route and do not yield statistical significance unless there is enough data to do so.

Figure 25

**Prof. Rausser's Model Does Not Find a Common Fact of Injury:
Example of the Top 100 Intermodal Routes**



128.     The results shown in Figure 25 (or Figures 13-16 above) do not mean that there are, in

truth, positive damages on some routes and negative damages on other routes.  Rather, Prof.

Rausser's damages model is simply broken.  It is not based on sound economics.  It assumes,

rather than proves, commonality across the class.  And it does a poor job of explaining how

freight rates change over time.   Therefore, it inevitably finds false positive damages and

purported evidence of conspiracy under numerous circumstances when none can exist, and it

inevitably finds negative or no damages where Prof. Rausser's theories say it should only

find  positive  damages.    Prof.  Rausser's  modeling  is  unsuited  to  the  task  of  reliably

determining whether or, if so, by how much Defendants rates were elevated by the claimed conspiracy.

**B.  Prof. Rausser's Claims of Reliability**

129.    One indispensable attribute of a reliable model of overcharges and damages is that the model must do a good job of explaining the factors that affect prices, so that prices "but for" the alleged overcharge can be estimated with reasonable confidence.[184]  In this vein, Prof. Rausser points to what he represents as his Class & Merits model's "highly satisfactory" R-squared (a commonly used measure of explanatory power), and states that he has "satisfied [himself] that the calculation of the effect of the alleged conspiracy is accurate."[185]

130.    Prof. Rausser's claims as to the "highly satisfactory" explanatory power of his models are misleading.  Prof. Rausser's regression models have high R-squared results largely because he has inserted ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████   In effect, this ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████

---

[184]    ABA Section of Antitrust Law, *Proving Antitrust Damages:  Legal and Economic Issues*, 2nd Edition, at 53, 169.

[185]    Rausser Merits Report at 163.  Prof. Rausser makes a similar claim for the R-squared of his STB model. Rausser Merits Reply Report at 246.

131.    Thus, for example, the model can ████████████████████████████



████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████   ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.  This is particularly

flawed modeling in the class certification context:   As noted by the American Bar

Association's handbook on econometrics, "[a] conspiracy may have little or no effect on

some customers for many different reasons."[186]   Prof. Rausser's models ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.

132.    It is standard in economics that a high R-squared is not a sign of a reliable model when

the model includes the kinds of indicator, dummy variables employed by Dr. Rausser.  As

one introductory text puts it:

> The R-squared from the dummy variable regression is usually rather high.  This
> occurs because we are including a dummy variable for each cross-sectional unit
> ████████████████████████   which explains much of the variation in the
> data…. We should not get too excited about this large R-squared.[187]

133.    A more informative measure for assessing how well a model like Prof. Rausser's explains

changes in freight rates over time is the *incremental R-squared*.  Applied to Prof. Rausser's

model, this measures the "incremental contribution" to model explanation of the variables

---

[186]   ABA Section of Antitrust Law, Econometrics:  Legal, Practical, and Technical Issues, 2005, at 204.
[187]   Wooldridge, Jeffrey M., Introductory Econometrics: A Modern Approach (Mason, OH: Thomson South-Western, 2013), at 488-489.

that vary with time.[188]   The incremental R-squared for Prof. Rausser's Class & Merits model,

using his data, is ██████ ██ ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ [190]   This very

low incremental R-squared tells us that the model does a very poor job of explaining how

actual rail rates change over time (which is the foundation for using a pre-Class Period

benchmark), much less reliably predicting but-for rail rates.

---

[188]   Theil, Henri, Principles of Econometrics (New York:  John Wiley & Sons, Inc., 1971) at 163-174.
[189]   See my workpapers. ███████████████████████████████.  Similar results
apply to the STB model.
[190]   ██████████████████████████████████████████████

Rausser Merits Report at 170, Table 53.

I declare under penalty of perjury that the foregoing is true and correct.

March 31, 2014

**Appendix A**



# CURRICULUM VITA

## Joseph Peggs Kalt

Compass Lexecon
4280 N. Campbell Avenue, #200
Tucson, Arizona 85718
(520) 615-5300, jkalt@lexecon.com

## PROFESSIONAL POSITIONS

### JOHN F. KENNEDY SCHOOL OF GOVERNMENT, HARVARD UNIVERSITY CAMBRIDGE, MA

*Ford Foundation Professor of International Political Economy*, 1992-2012; emeritus 2012-present

> Areas of specialization include Industrial Organization, Economics of Antitrust and Regulation, Natural Resource Economics, Public Choice and Political Economy, Economic Development, Microeconomic Theory.

*Co-Director*, The Harvard Project on American Indian Economic Development, 1987-present

*Faculty Chair,* Harvard University Native American Program, 2000-2006

*Chair,* Economics and Quantitative Methods Cluster*,* 1995-2000

*Professor of Political Economy*, 1986-1992

*Faculty Chair and Academic Dean for Research*, 1992-1994

*Chairman,* Environment and Natural Resources Program, Center for Science and International Affairs, 1990-1994

*Chairman of Degree Programs,* 1990-1992

*Chairman of Ph.D. Programs,* 1989-1990

*Assistant Director for Natural Resources*, Energy and Environmental Policy Center, 1985-1990

*Co-Director*, Harvard Study on the Future of Natural Gas Policy (with Frank C. Schuller), Energy and Environmental Policy Center, 1984-1986

### DEPARTMENT OF ECONOMICS, HARVARD UNIVERSITY, CAMBRIDGE, MA

*Associate Professor of Economics*, 1983-1986

*Assistant Professor of Economics*, 1980-1983

*Instructor in Economics*, 1978-1980

### THE UNIVERSITY OF ARIZONA, TUCSON, AZ

*Visiting Professor,* Rogers College of Law, 2008-2013; *Faculty Affiliate*, 2013-present

*Visiting Professor,* Eller College of Management, 2005-2010

*Visiting Professor,* School of Government and Public Policy, 2009-2012

*Faculty Chair for Nation Building Programs*, Native Nations Institute for Leadership, Management, and Policy, Udall Center for Studies in Public Policy, 2005-present

*Visiting Professor, American Indian Studies Department,* 2005-2006; *Faculty Affiliate*, 2013-present

COMPASS LEXECON
*Senior Economist*, 2003-present (and since 1983 with predecessor enterprises)

PRESIDENT'S COUNCIL OF ECONOMIC ADVISERS, WASHINGTON DC
*Junior Staff Economist*, 1974-1975

## EDUCATION

University of California, Los Angeles, Ph.D. in Economics, 1980; M.A. in Economics, 1977
> Doctoral Dissertation:  *Federal Control of Petroleum Prices:  A Case Study of the Theory of Regulation*

Stanford University, Stanford, CA, B.A. in Economics (Honors), 1973

## PUBLICATIONS AND RESEARCH:  BOOKS AND MONOGRAPHS

*Constitutional Design* (with Jessie M. Mosqueda and C. Falan Yinug), The Native Nations Institute for Leadership, Management and Policy, *Guides for Indigenous Governance*, March 2013.

*The State of the Native Nations: Conditions under U.S. Policies of Self-Determination* (a principal author, with The Harvard Project on American Indian Economic Development), Oxford University Press, 2008.

*American Indians on Reservations: A Databook of Socioeconomic Change Between the 1990 and 2000 Censuses* (with Jonathan B. Taylor), The Harvard Project on American Indian Economic Development, January 2005.

*Annotated Bibliography: The Social and Economic Impacts of Indian and Other Gaming* (with Leigh Gardner and Katherine A. Spilde), The Harvard Project on American Indian Economic Development, January 2005.

*The Context and Meaning of Family Strengthening in Indian America: A Report to the Annie E. Casey Foundation by The Harvard Project on American Indian Economic Development* (with Amy Besaw, Andrew Lee, Jasmin Sethi, Julie Boatright Wilson, Marie Zemler), The Annie E. Casey Foundation, Baltimore, Maryland, August 2004.

*New Horizons in Natural Gas Deregulation*, ed. (with Jerry Ellig) and co-author of two chapters, Greenwood Press, 1995.

*What Can Tribes Do? Strategies and Institutions in American Indian Economic Development*, ed. (with Stephen Cornell), University of California, 1992.

*National Parks for the 21st Century: The Vail Agenda*, editor and primary author of the Report of the Steering Committee, National Park Foundation, Chelsea Green Publishing Co., 1992.

*Cases in Microeconomics* (with Jose A. Gomez-Ibanez), Prentice Hall, 1990.

*Drawing the Line on Natural Gas Regulation,* ed. (with F. C. Schuller) and author of two chapters, Greenwood-Praeger Press/Quorum Books, 1987.

*The FACS/Ford Study of Economic and Business Journalism* (with James T. Hamilton), Foundation for American Communications and the Ford Foundation, 1987.

*The Economics and Politics of Oil Price Regulation: Federal Policy in the Post-Embargo Era*, MIT Press, 1981; paperback edition, 1983.

*Petroleum Price Regulation: Should We Decontrol?* (with Kenneth J. Arrow), American Enterprise Institute, 1979.


## PUBLICATIONS AND RESEARCH:  ARTICLES

"Trade Corridor planning merits community input," (with Robin Shamback and Kurt Wadlington), in *Arizona Daily Star*, The Editorial Page, August 30, 2013, p. A17.

"American Indian Self-Determination:  The Political Economy of A Successful Policy" (Co-Author with Stephen Cornell), Paper for American Academy of Sciences International Workshop on Minority Groups: U.S. and China, American Academy of Arts and Sciences, Tufts University, June 25-27, 2010.

"Is There Only One Cultural Path to Development? Sustainable Heterogeneity Among Contemporary American Indian Nations" (with Stephen Cornell and Miriam Jorgensen), Conference in Honor of Samuel Huntington, Cultural Change Institute, The Fletcher School, Tufts University, October 2008.

"The U.S. Energy Outlook:  Will It Go from Bad to Worse?"  in *The Issues Inside the Fishbowl*, FTI Consulting, April 2008.

"Two Approaches to the Development of Native Nations: One Works, the Other Doesn't" (with Stephen Cornell), in M. Jorgensen, ed., *Rebuilding Native Nations: Strategies for Governance and Development,* University of Arizona Press, 2007.

"Development, Governance, Culture: What Are They and What Do They Have to Do with Rebuilding Native Nations?" (with Manley A. Begay, Jr., Stephen Cornell, and Miriam Jorgensen), in M. Jorgensen, ed., *Rebuilding Native Nations: Strategies for Governance and Development,* University of Arizona Press, 2007.

"The Role of Constitutions in Native Nation Building: Laying a Firm Foundation," in M. Jorgensen, ed., *Rebuilding Native Nations: Strategies for Governance and Development,* University of Arizona Press, 2007.

"Seizing the Future: Why Some Native Nations Do and Others Don't" (with Stephen Cornell, Miriam Jorgensen and Katherine Spilde), in M. Jorgensen, ed., *Rebuilding Native Nations: Strategies for Governance and Development,* University of Arizona Press, 2007.

"Competition & Regulation, Part III: Tensions Evolve between Regulation and Competition" (with Charles Augustine and Joseph Cavicchi), in *Electric Light and Power*, www.elp.com, January/February 2006, pp. 24-25.

"Constitutional Rule and the Effective Governance of Native Nations," in Eric D. Lemont, ed., *Contemporary American Indian Constitutionalism and the Rebuilding of Native Nations,* University of Texas Press, 2006.

"Gradualism in Retail Restructuring" (with Charles Augustine and Joseph Cavicchi) in *Electric Light and Power*, www.elp.com, September/October 2005, pp. 26-30.

"Competition & Regulation in the Power Industry: Can the Two Coexist?" (with Charles Augustine and Joseph Cavicchi) in *Electric Light and Power*, www.elp.com, July/August 2005, pp. 28-31.

"Establishing a Tribal Development Corporation," *Forum on Establishing a Tribally Owned Development Corporation*, the United States Senate Committee on Indian Affairs, July 20, 2004.

"Economics, Law, and Politics: What Will Drive Energy's Future," in *Proceedings of the 50th Annual Institute of the Rocky Mountain Mineral Law Foundation*, vol. 50, p. 1-1 (2004), December 2005.

"Myths and Realities of Tribal Sovereignty: The Law and Economics of Indian Self-Rule" (with J. Singer), *Joint Occasional Papers in Native Affairs*, The Harvard Project on American Indian Economic Development, John F. Kennedy School of Government, Harvard University, January 2004.

"Partisan Misperceptions and Conflict Escalation: Survey Evidence from a Tribal/Local Government Conflict" (with Keith Allred and Kessely Hong), in *Third-Party Intervention eJournal*, November 2003.

"Roundtable: Recent Developments in Section 2" (with Aaron Edlin, A. Douglas Melamed, and Gary L. Roberts), *Antitrust Magazine,* vol. 18, No. 1, Fall 2003.

*The First Nations Governance Act: Implications of Research Findings from the United States and Canada* (with Stephen Cornell and Miriam Jorgensen), Report to the British Columbia Assembly of First Nations, July 2002.

"Public Policy Analysis of Indian Gaming in Massachusetts" (with Kenneth Grant and Jonathan B. Taylor), Faculty Research Working Paper Series #RWP02-019, John F. Kennedy School of Government, Harvard University, May 13, 2002.

"Means-Testing Indian Governments: Taxing What Works" (with Jonathan Taylor), in Richard C. Monk, ed., *Taking Sides: Race and Ethnicity*, McGraw-Hill/Dushkin, 2001.

"Where's the Glue? Institutional and Cultural Foundations of American Indian Economic Development" (with Stephen Cornell), *The Journal of Socio-Economics*, vol. 29, 2000.

"Open Access for Railroads? Implications for a Non-Hub, Congestible Network Industry" (with Amy B. Candell), Advanced Workshop in Regulation and Competition, Center for Research in Regulated Industries, May 2000 (unpublished working paper).

"What Tribes Can Do: An Interview with Joseph P. Kalt," *American Indian Report*, March 1999.

"Sovereignty and Nation-Building: The Development Challenge in Indian Country Today" (with Stephen Cornell), *The American Indian Culture and Research Journal*, vol. 22, no. 3, February 1999.

"Making Research Count in Indian Country: The Harvard Project on American Indian Economic Development" (with Manley A. Begay, Jr., and Stephen Cornell), *Journal of Public Service and Outreach*, vol. 3, no. 1, Spring 1998.

"Successful Economic Development and Heterogeneity of Governmental Form on American Indian Reservations" (with Stephen Cornell), in Merilee S. Grindle, ed., *Getting Good Government: Capacity Building in the Public Sector of Developing Countries*, Harvard University Press, 1997.

"Cultural Evolution and Constitutional Public Choice: Institutional Diversity and Economic Performance on American Indian Reservations" (with Stephen Cornell), Faculty Research Working Paper Series, John F. Kennedy School of Government, January 1995; reprinted in John Lott, ed., *Uncertainty and Economic Evolution: Essays in Honor of Armen A. Alchian*, Routledge Press, 1997.

"Regulatory Reform and the Economics of Contract Confidentiality: The Example of Natural Gas Pipelines" (with A. B. Jaffe, S. T. Jones, and F. A. Felder), *Regulation*, 1996, No. 1.

"Precedent and Legal Argument in U.S. Trade Policy: Do They Matter to the Political Economy of the Lumber Dispute?" in *The Political Economy of American Trade Policy*, Anne O. Krueger, ed., University of Chicago Press, 1996.

"Do Precedent and Legal Argument Matter in the Lumber CVD Cases?" in *The Political Economy of Trade Protection*, Anne O. Krueger, ed., University of Chicago Press, 1996.

"Introduction: The New World of Gas Regulation" (with Jerry Ellig), J. Ellig and J. P. Kalt, eds., *New Directions in Natural Gas Deregulation*, Greenwood Press, 1995.

"Incentive Regulation for Natural Gas Pipelines" (with Adam B. Jaffe), in J. Ellig and J. P. Kalt, eds., *New Directions in Natural Gas Deregulation*, Greenwood Press, 1995.

"Where Does Economic Development Really Come From? Constitutional Rule Among the Modern Sioux and Apache" (with Stephen Cornell), *Economic Inquiry*, Western Economic Association International, vol. XXXIII, July 1995, pp. 402-426.

"Insight on Oversight" (with Adam B. Jaffe), *Public Utilities Fortnightly*, April 1995.

"The Redefinition of Property Rights in American Indian Reservations: A Comparative Analysis of Native American Economic Development" (with Stephen Cornell), L. H. Legters and F. J. Lyden, eds., *American Indian Policy: Self-Governance and Economic Development*, Greenwood Press, 1994.

"Reloading the Dice: Improving the Chances for Economic Development on American Indian Reservations" (with Stephen Cornell), in J. P. Kalt and S. Cornell, eds., *What Can Tribes Do? Strategies and Institutions in American Indian Economic Development*, University of California, 1992, pp. 1-59.

"Culture and Institutions as Public Goods: American Indian Economic Development as a Problem of Collective Action" (with Stephen Cornell), in Terry L. Anderson, ed., *Property Rights and Indian Economies*, Rowman and Littlefield, 1992.

"The Regulation of Exhaustible Resource Markets" (with Shanta Devarajan), Environmental and Natural Resources Program, Center for Science and International Affairs, Kennedy School of Government, April 1991.

"Comment on Pierce," *Research in Law and Economics*, vol. 13, 1991, pp. 57-61.

"Pathways from Poverty: Economic Development and Institution-Building on American Indian Reservations" (with Stephen Cornell), *American Indian Culture and Research Journal*, 1990.

"The Apparent Ideological Behavior of Legislators: On-the-Job Consumption or Just a Residual?" (with Mark A. Zupan), *Journal of Law and Economics* 33 (April 1990), pp. 103-32.

"How Natural Is Monopoly? The Case of Bypass in Natural Gas Distribution Markets" (with Harry G. Broadman), *Yale Journal on Regulation*, Summer 1989.

"Culture and Institutions as Collective Goods: Issues in the Modeling of Economic Development on American Indian Reservations" (with Stephen Cornell), *Project Report*, Harvard Project on American Indian Economic Development, June 1989.

"Public Choice, Culture and American Indian Economic Development" (with Stephen E. Cornell), *Project Report*, Harvard Project on American Indian Economic Development, July 1988.

"The Political Economy of Protectionism: Tariffs and Retaliation in the Timber Industry," in R. Baldwin, ed., *Trade Policy Issues and Empirical Analysis*, University of Chicago Press, 1988.

"The Impact of Domestic Environmental Regulatory Policy on U.S. International Competitiveness," *International Competitiveness*, A.M. Spence and H.A. Hazard, eds., Ballinger Publishing Co., 1988.

"Re-Establishing the Regulatory Bargain in the Electric Utility Industry," *Discussion Paper Series*, Energy and Environmental Policy Center, Kennedy School of Government, March 1987, published as Appendix V in *Final Report of the Boston Edison Review Panel*, W. Hogan, B. Cherry and D. Foy, March 1987.

"Natural Gas Policy in Turmoil" (with Frank C. Schuller), in J. P. Kalt and F. C. Schuller, eds., *Drawing the Line on Natural Gas Regulation: The Harvard Study on the Future of Natural Gas Policy*, Greenwood-Praeger Press/Quorum Books, 1987.

"Market Power and Possibilities for Competition," in J. P. Kalt and F. C. Schuller, eds., *Drawing the Line on Natural Gas Regulation: The Harvard Study on the Future of Natural Gas Policy*, Greenwood-Praeger Press/Quorum Books, 1987.

"The Political Economy of Coal Regulation: The Power of the Underground Coal Industry," in R. Rogowsky and B. Yandle, eds., *The Political Economy of Regulation*, Federal Trade Commission, GPO, 1986, and in *Regulation and Competitive Strategy*, University Press of America, 1989.

"Exhaustible Resource Price Policy, International Trade, and Intertemporal Welfare," February 1986 (revised June 1988), *Journal of Environmental Economics and Management*, 1989.

"Regional Effects of Energy Price Decontrol: The Roles of Interregional Trade, Stockholding, and Microeconomic Incidence" (with Robert A. Leone), *Rand Journal of Economics*, Summer 1986.

"A Framework for Diagnosing the Regional Impacts of Energy Price Policies: An Application to Natural Gas Deregulation" (with Susan Bender and Henry Lee), *Resources and Energy Journal*, March 1986.

"Intertemporal Consumer Surplus in Lagged-Adjustment Demand Models" (with Michael G. Baumann), *Energy Economics Journal*, January 1986.

"A Note on Nonrenewable Resource Extraction Under Discontinuous Price Policy" (with Anthony L. Otten), *Journal of Environmental Economics and Management*, December 1985.

"Capture and Ideology in the Economic Theory of Politics" (with Mark A. Zupan), American Economic Review, June 1984; republished in *The Behavioral Study of Political Ideology and Public Policy Formation*, Carl Grafton and Anne Permaloff, eds., University Press of America, Inc., 2005, pp. 63-103; republished in *The Political Economy of Regulation*, Thomas P. Lyons, ed., Edgar Elger Publishing, 2007, chapter 9.

"A Comment on 'The Congressional-Bureaucratic System: A Principal Agent Perspective,'" *Public Choice*, Martinus Nijhoff Publishers, Dordrecht, The Netherlands, vol. 44, 1984, pp. 193-95.

"The Creation, Growth and Entrenchment of Special Interests in Oil Price Policy," in *Political Economy of Deregulation*, Roger G. Noll and Bruce M. Owen, eds., American Enterprise Institute, 1983.

"The Costs and Benefits of Federal Regulation of Coal Strip Mining," *Natural Resources Journal*, October 1983.

"Oil and Ideology US Senate," *The Energy Journal*, April 1982.

"Public Goods and the Theory of Government," *The Cato Journal*, Fall 1981.

"The Role of Governmental Incentives in Energy Production" (with Robert S. Stillman), *Annual Review of Energy*, vol. 5, Annual Reviews Inc., 1980, pp. 1-32.

"Why Oil Prices Should be Decontrolled" (with Kenneth J. Arrow), *Regulation*, September/October 1979, pp. 13-17.

"Technological Change and Factor Substitution US, 1929-67," *International Economic Review*, Spring/Summer 1977.

"The Capital Shortage: Concept and Measurement" (with George M. von Furstenberg), *The Journal of Economics and Business*, Spring/Summer 1977, pp. 198-210.

"Problems of Stabilization in an Inflationary Environment: Discussion of Three Papers," *1975 Proceedings of the Business and Economic Statistics Section: American Statistical Association Annual Meetings*, pp. 20-22.

## RESEARCH REPORTS

*On Improving Tribal-Corporate Relations in the Mining Sector: A White Paper on Strategies for Both Sides of the Table* (with Saleem H. Ali, Miriam Jorgensen, Sarah Krakoff, and Anthony McInnis), The Harvard Project on American Indian Economic Development, 2014.

*The Mining of Crow Nation Coal: Economic Impact on the Crow Reservation, Big Horn County, and Montana,* Report Prepared for the Crow Nation by Prof. Joseph P. Kalt, The Harvard Project on American Indian Economic Development, February 4, 2014.

*Tucson's New Prosperity: Capitalizing on the Sun Corridor, A Sun Corridor Legacy Program Concept Paper Prepared by the Sonoran Institute* (with Dan Hunting and Luther Propst), Draft, The Sonoran Institute, Tucson Arizona, May 25, 2010.

*Economists' Amici Brief to the United States Supreme Court* (In re: Long-Term Contracts for Energy Markets, No.08-674; with Blaydon, Colin C., *et al.*), July 14, 2009.

*Economic and Public Policy Analysis of the Proposed Western Navajo-Hopi Lake Powell Water Pipeline*: *Prepared for the Hopi Nation*, March 19, 2008.

*Economists' Amici Brief to the United States Supreme Court* (In re: Long-Term Electric Power Contracts, Nos. 06-1457, 06-1462; with Baumol, Wm. J, *et al.*), November 28, 2007.

"The Links Between Air Quality Policies, Electric Power and Natural Gas Markets, and Macroeconomic Impacts: *Clear Skies Versus The Clean Air Planning Act*" (with Charles Augustine and Stephen Makowka), A Policy Analysis Study by Lexecon, an FTI Consulting Company, March 2004.

*Alaska Native Self-Government and Service Delivery: What Works?* (with Stephen Cornell), Report to the Alaskan Federation of Natives, The Harvard Project on American Indian Economic Development, John F. Kennedy School of Government, Harvard University, August 2003.

*The Costs, Benefits, and Public Policy Merits of the Proposed Western Navajo-Hopi Lake Powell Pipeline* (with Jonathan B. Taylor and Kenneth W. Grant II), December 22, 1999.

"A Public Policy Evaluation of the Arizona State Land Department's Treatment of the Island Lands Trust Properties at Lake Havasu City" (with Jonathan B. Taylor and Matthew S. Hellman), August 16, 1999.

"Reserve-Based Economic Development: Impacts and Consequences for Caldwell Land Claims" (with Kenneth W. Grant, Eric C. Henson, and Manley A. Begay, Jr.), August 10, 1999.

"Policy Recommendations for the Indonesian Petrochemical Industry" (with Robert Lawrence, Henry Lee, Sri Mulyani and LPEM, and DeWitt & Company), March 1, 1999.

"American Indian Gaming Policy and Its Socio-Economic Effects: A Report to the National Gambling Impact Study Commission" (with Stephen Cornell, Matthew Krepps, and Jonathan Taylor), July 31, 1998.

"Public Interest Assessment of the Proposed BLM/Del Webb Land Exchange in Nevada," report submitted to the U.S. Department of the Interior on behalf of Del Webb Conservation Holding Corporation, June 25, 1996.

"Politics Versus Policy in the Restructuring Debate," The Economics Resource Group, Inc., funded by Northeast Utilities System Companies, June 1995.

"Indexing Natural Gas Pipeline Rates" (with Amy B. Candell, Sheila M. Lyons, Stephen D. Makowka, and Steven R. Peterson), The Economics Resource Group, Inc., April 1995.

"An Economic Analysis of Electricity Industry Restructuring in New England" (with Adam B. Jaffe), The Economics Resource Group, Inc., funded by Northeast Utilities System Companies, April 1995.

"Oversight of Regulated Utilities' Fuel Supply Contracts: Achieving Maximum Benefit from Competitive Natural Gas and Emission Allowance Markets" (with Adam B. Jaffe), The Economics Resource Group, Inc., funded by Enron Gas Services Corporation, April 1993.

"Incentives and Taxes: Improving the Proposed BTU Tax and Fostering Competition in Electric Power Generation," Harvard University and The Economics Resource Group, Inc., March 10, 1993.

"An Assessment of the Impact of the PT Chandra Asri Petrochemical Project on Indonesia's Economy" (with Henry Lee, Dr. Robert Lawrence, Dr. Ronald M. Whitefield, and Bradley Blesie), The Economics Resource Group, Inc., December 1991.

"The Federal Energy Regulatory Commission's Proposed Policy Statement on Gas Inventory Charges (PL 89-1-000)" (with Charles J. Cicchetti and William W. Hogan), *Discussion Paper Series*, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, July 1989.

"The Redesign of Rate Structures and Capacity Auctioning in the Natural Gas Pipeline Industry," *Discussion Paper Series*, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, June 1988.

"A Review of the Adequacy of Electric Power Generating Capacity US , 1985-93 and 1993-Beyond" (with James T. Hamilton and Henry Lee), *Discussion Paper Series*, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, June 1986.

"Energy Issues in Thailand: An Analysis of the Organizational and Analytical Needs of the Thailand Development Research Institute," Harvard Institute for International Development, March 1986.

"Old Gas Decontrol, FERC's Block Billing for Pipelines, and the Winners and Losers in Natural Gas Policy," prepared for the Natural Gas Supply Association (NGSA), December 1985.

"Natural Gas Decontrol, Oil Tariffs, and Price Controls: An Intertemporal Comparison," Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, April 1985.

"Market Structure, Vertical Integration, and Long-Term Contracts in the (Partially) Deregulated Natural Gas Industry," *Discussion Paper Series*, Harvard Institute of Economic Research, Harvard University, April 1985.

"Can a Consuming Region Win under Gas Decontrol?: A Model of Income Accrual, Trade, and Stockholding" (with Robert A. Leone), *Discussion Paper Series*, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, February 1984.

"Natural Gas Decontrol: A Northwest Industrial Perspective" (with Susan Bender and Henry Lee), *Discussion Paper Series*, John F. Kennedy School of Government, Harvard University, November 1983.

"Natural Gas Decontrol: A Northeast Industrial Perspective" (with Henry Lee and Robert A. Leone), *Discussion Paper Series*, John F. Kennedy School of Government, Harvard University, October 1982.

"Television Industry Self-Regulation: Protecting Children from Competition in Broadcasting" (with George J. Holder), Harvard Institute of Economic Research, Discussion Paper No. 896, April 1982.

"The Use of Political Pressure as a Policy Tool During the 1979 Oil Supply Crisis" (with Stephen Erfle and John Pound), *Discussion Paper Series*, John F. Kennedy School of Government, Harvard University, April 1981.

"Problems of Minority Fuel Oil Dealers" (with Henry Lee), *Discussion Paper Series*, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, April 1981.

**OTHER PUBLICATIONS AND LEGISLATIVE TESTIMONY**

"Tucson must not become bottom feeder underneath Phoenix's sprawl machine," *Arizona Daily Star*, Opinion, May 28, 2010.

Statement to U.S. House of Representatives Committee on Appropriations, Subcommittee on Interior, Environment, and Related Agencies, *The State of Indian America*, March 13, 2007.

"Political Windfall", Review & Outlook editorial, *The Wall Street Journal Opinion*, November 2, 2005.

Statement to U.S. Senate Committee on Indian Affairs, *Lessons in Economic Development*, Hearings Regarding International Lessons in Economic Development, September 12, 2002 (hearings cancelled September 11, 2002); published in U.S. Senate Committee on Indian Affairs, F*orum on Establishing a Tribally Owned Development Corporation*, July 20, 2004.

"Institution Building: Organizing for Effective Management" in *Building Native Nations: Environment, Natural Resources, and Governance*, ed. by Stephanie Carroll Rainie, Udall Center for Studies in Public Policy, The University of Arizona, 2003.

Statement to U.S. House of Representatives Committee on Government Reform, Subcommittee for Energy Policy, Natural Resources and Regulatory Affairs, Hearings Regarding Natural Gas Capacity, Infrastructure Constraints, and Promotion of Healthy Natural Gas Markets, Especially in California, October 16, 2001.

Statement to U.S. Senate Committee on Indian Affairs, *Harvard University Native American Program*, Hearings Regarding Native American Program Initiatives at the College and University Level (with Dr. Ken Pepion), June 21, 2001.

Statement to U.S. Senate Committee on Indian Affairs*, Impact of Federal Development Initiatives in Indian Country,* Hearing Regarding S.2052, of September 27, 2000.

Foreword to *Impossible to Fail*, J.Y. Jones, Hillsboro Press, 1999.

Statement to U.S. House of Representatives, Subcommittee on Energy and Mineral Resources, *Federal Oil Royalty Valuation* (HB 3334), Hearing of May 21, 1998.

Statement to the National Gambling Impact Study Commission, *Economic Impact of Gaming by American Indian Tribes*, Hearing of March 16, 1998.

"Measures Against Tribes Are Counterproductive," editorial (with Jonathan B. Taylor), *Indian Country Today*, September 22-29, 1997.

"American Indian Economic Development," *Tribal Pathways Technical Assistant Program Newsletter,* February 1997, p. 3.

"Tourists' Role Downplayed", Plaintiffs say Crow have no authority to compel them to collect a tax from tourists, *by David Crisp Of The Gazette Staff*, copy dated January 30, 1997.

Statement to U.S. Senate Committee on Indian Affairs*, Economic Development in Indian Country*, Hearing of September 17, 1996.

"A Harvard Professor Looks at the Effects of Allowing U.S. Hunters to Import Polar Bear Trophies," *Safari Times*, April 1994.

Statement to U.S. Congress, Joint Economic Committee, Subcommittee on Trade, Productivity and Economic Growth, *The Economic Impact of Lower Oil Price*, Hearing of March 12, 1986.

"Administration Backsliding on Energy Policy" (with Peter Navarro), *Wall Street Journal*, editorial page, February 9, 1982.

Statement to the Energy and Natural Resources Committee, U.S. Senate, *Government Responses to Oil Supply Disruptions*, Hearing of July 28-29, 1981, U.S. Government Printing Office, 1981, pp. 623-630 and 787-801.

"Staff Report on Effects of Restrictions on Advertising and Commercial Practice in the Professions: The Case of Optometry," Ronald S. Bond, *et al.*, Executive Summary, Bureau of Economics, Federal Trade Commission, September 1980.

"Redistribution of Wealth in Federal Oil Policy," *San Diego Business Journal*, August 18, 1980, pp. 22-23.

"The Energy Crisis—Moral Equivalent of Civil War" (with Peter Navarro), *Regulation*, January/February 1980, pp. 41-43.

"Windfall Profits Tax Will Reap Bonanza—But For Whom?" (with Peter Navarro), *The Miami Herald*, December 23, 1979, editorial page.


**SELECTED PRESENTATIONS**

"Indigenous Self-Government:  The Political Economy of the Only Policy That Has Ever Worked," Ministry of Business, Innovation and Employment, Government of New Zealand, Wellington, NZ, April 18, 2013.

"American Indian Self-Government: The Political Economy of a Policy That's Worked," Dean's Distinguished Speakers Series, University of Auckland (NZ) Business School, April 16, 2013.

Keynote Address: "Harvesting Creosote to Build Houses: Is Arizona's Economic Model Sustainable?" 96th Arizona Town Hall, Tucson, AZ, April 26, 2010.

Keynote Address: "Resurgence and Renaissance in Indian America," Native American Business Association Annual Convention, Mississippi Choctaw Nation, April 29, 2008.

"Standard Oil to Today: Antitrust Enforcement in the Oil Industry," American Bar Association, 56th Antitrust Law Spring Meeting, Washington, D.C., March 27, 2008.

Keynote Address: "Nation Building:  Lessons from Indian Country," National Native American Economic Policy Statement, Phoenix, AZ, May 15, 2007.

Keynote Address: "A Conversation on the State of the Native Nations: A Gathering of Leaders," Res 2007, Las Vegas, NV, March 14, 2007.

"Foundations of Nation Building: The Roles of Culture, Institutions, & Leadership Among Contemporary American Indian Nations," a lecture to faculty, staff and students, Marine Corps University, Quantico, VA, March 12, 2007.

Keynote Address: "The Universal Challenge of Nation Building," First Annual Great Lakes Tribal Economic Development Symposium, Traverse City, MI, October 25-26, 2006.

Transcript of Keynote Address, "Setting the Agenda: What Will Drive Energy's Future?" *Congressional Quarterly Forum*, "The Politics of Oil: U.S. Imperatives, Foreign Consequences," Washington, D.C., September 13, 2005.

"The Role of the Tribal Courts and Economic Development," Bureau of Indian Affairs, *Tribal Courts in the 21st Century*, Billings, MT, August 16, 2005.

"Linking Tribal Sovereignty to Economic Self-Determination in Indian Country," *The Tribal Leaders Forum*, "Sovereignty in Crisis," Las Vegas, NV, May 27, 2005.

"Competition and Regulation in the North American Electricity Industry: Can These Two Seemingly Opposed Forces Coexist?" (with Charles Augustine and Joseph Cavicchi), 24th Annual North American Conference, USAEE/IAEE, Energy, Environment, and Economics in a New Era, Washington, DC, July 8-10, 2004.

"The State of U.S. Railroads and the Challenges Ahead," briefing of Capitol Hill staff, Association of American Railroads, April 17, 2003.

"The State of the Railroad Industry and the Challenges Ahead," briefing of Roger Nober, Chairman, US Surface Transportation Board, Association of American Railroads, January 28, 2003.

"The Wealth of American Indian Nations: Culture and Institutions," Federal Reserve Bank of Boston, December 11, 2002.

"The Roots of California's Energy Crisis: Law, Policy, Politics, and Economics," Regulation Seminar, Center for Business and Government, Kennedy School, Harvard University, November 7, 2002.

"Public Policy Foundations of Nation Building in Indian Country," National Symposium on Legal Foundations of American Indian Self-Governance," Mashantucket Pequot Nation, February 9, 2001.

"Twenty-Five Years of Self-Determination: Lessons from the Harvard Project on American Indian Economic Development," Udall Center for Studies in Public Policy, University of Arizona, November 13-14, 1999.

Proceedings of the Fourth Annual DOE-NARUC Natural Gas Conference, Orlando, FL, February 1995.

Keynote Address, "Sovereignty and American Indian Economic Development," Arizona Town Hall, Grand Canyon, AZ, October 1994.

"Is the Movement Toward a Less-Regulated, More Competitive LDC Sector Inexorable?, (Re)Inventing State/Federal Partnerships: Policies for Optimal Gas Use," U.S. Department of Energy and The National Association of Regulatory Utility Commissioners Annual Conference, Nashville, TN, February 1994.

"Cultural Evolution and Constitutional Public Choice: Institutional Diversity and Economic Performance on American Indian Reservations," Festschrift in Honor of Armen A. Alchian, Western Economic Association, Vancouver, BC, July 1994.

"Precedent and Legal Argument in U.S. Trade Policy: Do they Matter to the Political Economy of the Lumber Dispute?" National Bureau of Economic Research, Conference on Political Economy of Trade Protection, February, September 1994.

"The Redesign of Rate Structures and Capacity Auctioning in the Natural Gas Pipeline Industry," Natural Gas Supply Association, Houston, TX, March 1988.

"Property Rights and American Indian Economic Development," Pacific Research Institute Conference, Alexandria, VA, May 1987.

"The Development of Private Property Markets in Wilderness Recreation: An Assessment of the Policy of Self-Determination by American Indians," Political Economy Research Center Conference, Big Sky, MT, December 4-7, 1985.

"Lessons from the U.S, Experience with Energy Price Regulation," International Association of Energy Economists Delegation to the People's Republic of China, Beijing and Shanghai, PRC, June 1985.

"The Impact of Domestic Regulation on the International Competitiveness of American Industry," Harvard/NEC Conference on International Competition, Ft. Lauderdale, FL, March 7-9, 1985.

"The Welfare and Competitive Effects of Natural Gas Pricing," American Economic Association Annual Meetings, December 1984.

"The Ideological Behavior of Legislators," Stanford University Conference on the Political Economy of Public Policy, March 1984.

"Principal-Agent Slack in the Theory of Bureaucratic Behavior," Columbia University Center for Law and Economic Studies, 1984.

"The Political Power of the Underground Coal Industry," FTC Conference on the Strategic Use of Regulation, March 1984.

"Decontrolling Natural Gas Prices: The Intertemporal Implications of Theory," International Association of Energy Economists Annual Meetings, Houston, TX, November 1981.

"The Role of Government and the Marketplace in the Production and Distribution of Energy," Brown University Symposium on Energy and Economics, March 1981.

"A Political Pressure Theory of Oil Pricing," Conference on New Strategies for Managing U.S. Oil Shortages, Yale University, November 1980.

"The Politics of Energy," Eastern Economic Association Annual Meetings, 1977.


## WORKSHOPS PRESENTED

University of Auckland; Ministry of Business, Innovation and Employment, Government of New Zealand; Federal Reserve Bank of Boston; University of Indiana; University of Montana; Oglala Lakota College; University of New Mexico; Columbia University Law School; Department of Economics and John F. Kennedy School of Government, Harvard University; MIT; University of Chicago; Duke University; University of Rochester; Yale University; Virginia Polytechnic Institute; U.S. Federal Trade Commission; University of Texas; University of Arizona; Federal Reserve Bank of Dallas; U.S. Department of Justice; Rice University; Washington University; University of Michigan; University of Saskatchewan; Montana State University; UCLA; University of Maryland; National Bureau of Economic Research; University of Southern California.

## TEACHING

Markets and Market Failure with Cases (Harvard Kennedy School of Government, graduate); Native Americans in the 21st Century: Nation Building I & II (Harvard, University-wide, graduate and undergraduate); Competition, Strategy, and Regulation (Harvard Kennedy School of Government, graduate); Introduction to Nation Building/The Law, Policy, and Economics of Contemporary Tribal Economic Development (University of Arizona, School of Law and College of Management, graduate); Introduction to Environment and Natural Resource Policy (Harvard Kennedy School of Government, graduate); Seminar in Positive Political Economy (Harvard Kennedy School of Government, graduate); Intermediate Microeconomics for Public Policy (Harvard Kennedy School of Government, graduate); Natural Resources and Public Lands Policy (Harvard Kennedy School of Government, graduate); Economics of Regulation and Antitrust (Harvard Department of Economics, graduate); Economics of Regulation (Harvard Department of Economics, undergraduate); Introduction to Energy and Environmental Policy (Harvard Kennedy School of Government, graduate); Graduate Seminar in Industrial Organization and Regulation (Harvard Department of Economics, graduate); Intermediate Microeconomics (Harvard Department of Economics, undergraduate); Principles of Economics (Harvard Department of Economics, undergraduate); Seminar in Energy and Environmental Policy (Harvard Kennedy School of Government, graduate)

## OTHER PROFESSIONAL ACTIVITIES

Working Advisory Board, National Institute for Civil Discourse, 2011-present

Board of Directors, Sonoran Institute, 2008-present

National Advisory Board, Big Sky Institute, Montana State University, 2007-present

Board of Trustees, The Communications Institute, 2003-present

Board of Trustees, Fort Apache Heritage Foundation, 2000-present (Chair, 2010-present)

Mediator (with Keith G. Allred), Nez Perce Tribe and the North Central Idaho Jurisdictional Alliance, MOU signed December 2002

Mediator, *In the Matter of the White Mountain Apache Tribe v. United States Fish and Wildlife Service*, re: endangered species management authority, May-December, 1994

Steering Committee, National Park Service, 75th Anniversary Symposium, 1991-1993

Board of Trustees, Foundation for American Communications, 1989-2003

Editorial Board, *Economic Inquiry*, 1988-2002

Advisory Committee, Oak Ridge National Laboratory, Energy Division, 1987-1989

Commissioner, President's Aviation Safety Commission, 1987-1988

Principal Lecturer in the Program of Economics for Journalists, Foundation for American Communications, teaching economic principles to working journalists in the broadcast and print media, 1979-2000

Lecturer in the Economics Institute for Federal Administrative Law Judges, University of Miami School of Law, 1983-1991

Research Fellow, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, 1981-1987

Editorial Board, MIT Press Series on *Regulation of Economic Activity*, 1984-1992

Research Advisory Committee, American Enterprise Institute, 1979-1985

Editor, *Quarterly Journal of Economics*, 1979-1984

Referee for *American Economic Review, Bell Journal of Economics, Economic Inquiry, Journal of Political Economy, Review of Economics and Statistics, Science Magazine, Journal of Policy Analysis and Management, Social Choice and Welfare, Quarterly Journal of Economics*, MIT Press, North-Holland Press, Harvard University Press, *American Indian Culture and Research Journal*


**SELECTED HONORS AND AWARDS**

Distinguished Visiting Professor, University of Auckland Business School, April 2013.

Public *Sector Leadership Award*, National Congress of American Indians, Washington, DC, March 1, 2010.

*First American Public Policy Award*, First American Leadership Awards 2005, "Realizing the Vision: Healthy Communities, Businesses, and Economies," National Center for American Indian Enterprise Development, Phoenix, AZ, June 9, 2005.

Allyn Young Prize for Excellence in the Teaching of the Principles of Economics, Harvard University, 1978-1979 and 1979-1980.

Chancellor's Intern Fellowship in Economics, September 1973 to July 1978, one of two awarded in 1973, University of California, Los Angeles.

Smith-Richardson Dissertation Fellowship in Political Economy, Foundation for Research in Economics and Education, June 1977 to September 1977, UCLA.

Summer Research Fellowship, UCLA Foundation, June 1976 to September 1976.

Dissertation Fellowship, Hoover Institution, Stanford University, September 1977 to June 1978.

Research funding sources have included: Archibald Bush Foundation; Annie E. Casey Foundation; Nathan Cummings Foundation; Department of Indian Affairs and Northern Development (Canada); National Indian Gaming Association; The National Science Foundation; USAID (IRIS Foundation); Pew Charitable Trust; Christian A. Johnson Family Endeavor Foundation; The Ford Foundation; The Kellogg Foundation; Harvard Program on the Environment; The Northwest Area Foundation; the U.S. Department of Energy; the Research Center for Managerial Economics and Public Policy, UCLA Graduate School of Management; the MIT Energy Laboratory; Harvard's Energy and Environmental Policy Center; the Political Economy Research Center; the Center for Economic Policy Research, Stanford University; the Federal Trade Commission; Resources for the Future; and The Rockefeller Foundation.

Four years of undergraduate academic scholarships, 1969-1973; graduated with University Distinction and Departmental Honors, Stanford University.

Joseph P. Kalt                                                                                    March 2014

## EXPERT TESTIMONY

Burlington Resources Oil & Gas Company
> *In the State of New Mexico, County of Santa Fe, First Judicial District Court, Docket No. D-0101-CV-2003-02309; Phillis Ideal, Jose E. and Clara Gomez Living Trust, and J. Fidel Candelaria v. Burlington Resources Oil & Gas Company, Successor in Interest to Burlington Resource Oil and Gas Company,* Expert Report, March 5, 2014; Oral Deposition March 11, 2014.

TTX Company
> *Before the Surface Transportation Board, In re Finance Docket No. 27590 (Sub-No. 4), Application for Approval of Pooling Of Car Service with Respect to Flatcars,* Verified Statement of Joseph P. Kalt, January 16, 2014.

Apple Inc.
> *In the United States District Court for the Southern District of New York, Docket No. 11-md-02293 (DLC) ECF Case, In Re: Electronic Books Antitrust Litigation v. Apple Inc.,* Declaration, November 15, 2013; Deposition, December 4, 2013; Sur-Reply Declaration, January 21, 2014.

Lao Holdings, N.V.
> *Lao Holdings, N.V., Claimant, v. The Government of the Lao People's Democratic Republic, Respondent, ICSID Case No. ARB/(AF)12/6,* Witness Statement, July 22, 2013; Witness Statement, October 1, 2013.

Tri-State Generation and Transmission Association, Inc.
> *Before the Public Utility Commission of the State of Colorado, Docket No. 13F-0145E, La Plata Electric Association, Inc., et al. v. Tri-State Generation and Transmission Association, Inc.*, Witness Statement, July 5, 2013; Oral Testimony, August 1, 2013.

United Parcel Service Company
> *In the United States District Court for the Central District of California, Western Division, AFMS, LLC v. United Parcel Service Company and FedEx Corporation,* Expert Report, February 8, 2013.

BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company
> *United States District Court for the District of Columbia, In Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL No. 1869, All Direct Purchaser Cases,* Expert Report, January 22, 2013; Oral Deposition, May 28, 2013.

Equilon Enterprises, LLC, Motiva Enterprises LLC, Shell Oil Company, Shell Oil Products Company LLC, and Shell Trading (US) Company
> *In the United States District Court for the Southern District of New York, Case No. 08 Civ. 00312 (SAS), New Jersey Department of Environmental Protection, et al.,*

*Plaintiffs, against Atlantic Richfield Company, et al., Defendants,* Expert Report, November 15, 2012; Deposition, May 14, 2013.

The Hershey Company
> *In the United States District Court for the Middle District of Pennsylvania, In Re: Chocolate Confectionary Antitrust Litigation:  MDL Docket No. 1935 (Civil Action No. 1:08-MDL-1935),* Expert Report, August 3, 2012; Oral Deposition, August 20, 2012; Declaration, November 5, 2012; Expert Report, May 31, 2013; Oral Deposition, June 20, 2013; Supplemental Expert Report, September 16, 2013.

Atlantic Richfield Company
> *In the United District Court for the Western District of Pennsylvania, Classes of Plaintiffs v. Babcock & Wilcox Power Generation Group, Inc., et al., Defendants, Civil Action No. 2:10-cv-00368-RCM, et al.,* Oral Deposition, May 4, 2012; Expert Report of Joseph P. Kalt, February 28, 2013; Videotaped Deposition, June 12, 2013.

Perenco Ecuador Ltd.
> *International Centre for Settlement of Investment Disputes: In The Arbitration Under The Convention on The Settlement of Investment Disputes Between States and Nationals of Other States and The Treaty Between The Republic of France and The Republic of Ecuador Concerning The Encouragement and Reciprocal Protection of Investment; Perenco Ecuador Limited, Claimant v. The Republic of Ecuador, Respondent, ICSID Case No. ARB/08/6,* Statement, April 12, 2012; Supplemental Statement, November 7, 2012; Oral Testimony, November 15, 2012.

Electronic Arts, Inc.
> *In the United States District Court for the Northern District of California, Geoffrey Pecover and Andrew Owens, on behalf of themselves and all others similarly situated, Plaintiffs, v. Electronic Arts Inc., a Delaware Corporation, Defendant: Case No. 08-cv-02820 CW,* Expert Report, March 8, 2012; Reply Report, April 12, 2012.

The PPL Companies, The Calpine Companies, Exelon Generation Company, NAEA Ocean Peaking Power, and The PSEG Companies
> *In the United States District Court for the District of New Jersey. PPL EnergyPlus et al., Plaintiffs, v. Lee A. Solomon et al., Defendants. Case 2:11-cv-00745-PGS-ES,* Declaration, February 6, 2012.

MPS Merchant Services, Inc. (F/K/A Aquila Power Corporation) and Illinova Energy Partners, Inc.
> *Before the Federal Energy Regulatory Commission. Exh. No. MI-1, San Diego Gas & Electric Company, Complainant v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator Corporation and the California Power Exchange, Respondents, Docket No. EL00-95-248,* Prepared Direct Testimony, October 25, 2011; Oral Testimony, July 10, 2012.

Motiva Enterprises LLC, Shell Oil Company, and TMR Company
> *In the State of New Hampshire Superior Court, Case No. 03-C-550, State of New Hampshire, Plaintiff, against Hess Corporation et al., Defendants,* Expert Report, October 17, 2011; Oral Deposition, December 6, 2011.

BP Exploration (America) Inc.
> *In the Superior Court for the State of Alaska at Anchorage, The State of Alaska, Plaintiff, v. BP Exploration (Alaska) Inc., a Delaware Corporation, Defendant, IN Case No. 3AN-09-6181 CI,* Expert Report (with W. David Montgomery), September 30, 2011; Oral Deposition, January 18, 2012; Supplemental Expert Report, March 15, 2012; Oral Testimony, June 13, 2012.

Mobil Oil Corporation
> *In the Twenty-Sixth Judicial District, District Court, Stevens County, Kansas, Willie Jean Farrar, et al. Plaintiffs, vs. Mobil Oil Corporation, Defendant*, Affidavit, September 14, 2011; Expert Report, March 23, 2012; Affidavit, June 1, 2012.

> *In the United States District Court, for the District of Kansas, Jimmie Hershey, on behalf of himself and all others similarly situated, Plaintiffs, v. ExxonMobil Oil Corporation, Defendant*, Affidavit, June 1, 2012.

Intercontinental Terminals Company, LLC
> *In the District Court, Harris County, Texas, 133rd District; Cause No. 2010-66657; Port Terminal Railroad Association, Plaintiff, vs. Intercontinental Terminals Company, LLC, Vopak North American, Inc., and Vopak Terminal Deer Park, Inc., Defendants, vs. Mitsui & Col. USA, Inc., Third-Party Defendant;* Expert Report, September 2, 2011.

Motiva Enterprises, LLC
> *In the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Bay Point Oil Corp., et al, Plaintiffs, vs. Motiva Enterprises, LLC, Defendant, Case No. 03-03572,* and *Hollywood Hills Service Center, Inc., et al, Plaintiffs, vs. Motiva Enterprises, LLC, Defendant, Case No. 04-13857 CA (30),* Declaration, July 15, 2011; Affidavit, May 25, 2012.

Kaiser-Francis Oil Company
> *In the United States District Court for the Western District of Oklahoma, J.C. Hill, et al., Plaintiffs, v. Kaiser-Francis Oil Company, Defendant, Case No. CIV-09-07-R,* Affidavit, June 7, 2011; Expert Report, December 2, 2011; Supplemental Expert Report, August 13, 2012; Affidavit, October 19, 2012; Affidavit, November 7, 2012.

Progress Energy and Duke Energy

> *Before the Public Service Commission of South Carolina, Docket No. 2011-158-E, In the Matter of Application of Duke Energy Corporation and Progress Energy, Inc. to Engage in a Business Combination Transaction,* Direct Testimony, September 14, 2011; Rebuttal Testimony, November 30, 2011; Oral Testimony, December 12, 2011.

> *North Carolina Utilities Commission, Docket Nos. E-2, Sub 998 and E-7 Sub 986, In the Matter of Application of Duke Energy Corporation and Progress Energy, Inc. to Engage in a Business Combination Transaction and Address Regulatory Conditions and Codes of Conduct*, Testimony, May 20, 2011; Rebuttal Testimony, September 15, 2011; Oral Testimony, September 21, 2011.

> *Before the Public Service Commission of South Carolina, In the Matter of Application of Duke Energy Carolinas to Engage in a Business Combination Transaction, Docket No. 2011-158-E.,* Rebuttal Testimony, December 8, 2011.

United States Soccer Federation Inc. and Major League Soccer LLC

> *In the United States District Court, Northern District of Illinois Eastern Division, Champions World LLC, Plaintiff, v. United States Soccer Federation Inc. and Major League Soccer LLC, Defendants, Case No. 06-CV-5724,* Expert Report, May 13, 2011; Oral Deposition, September 22-23, 2011.

The AES Corporation, Tau Power B.V.

> *At the International Centre for Settlement of Investment Disputes, Case No ARB/10/16, The AES Corporation, Tau Power B.V. and The Republic of Kazakhstan,* Expert Report of Joseph P. Kalt and Howard N. Rosen (FTI Consulting Inc.), April 28, 2011; Rebuttal Expert Report of Joseph P. Kalt and Howard N. Rosen (FTI Consulting Inc.), March 30, 2012; Supplemental Expert Report of Joseph P. Kalt, August 6, 2012; Oral Testimony, September 14, 2012; Expert Report of Joseph P. Kalt and Howard N. Rosen (FTI Consulting Inc.), November 2, 2012; Oral Testimony, February 6-7, 2013.

Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC

> *In the US District Court for the District of Vermont, Alice H. Allen and Laurence E. Allen d/b/a/ Al-Lens Farm et al, Plaintiffs, v. Dairy Farmers of America Inc., Dairy Marketing Services, LLC, and Dean Foods Company, Defendants, Docket No. 5:09-cv-00230-cr,* Expert Report, April 5, 2011; Declaration, April 12, 2011; Oral Deposition, May 6, 2011; Reply Report, July 6, 2011; Expert Report, December 16, 2011; Oral Deposition, February 14, 2012; Expert Report, May 11, 2012; Reply Report, July 26, 2013.

Devon Energy Corporation, BP America Production, and Conoco Phillips Co.

> *In the First Judicial District Court, State of New Mexico, County of Santa Fe, Phillis Ideal and Collins Partners, Ltd., a Texas Limited Partnership, Plaintiffs, v. BP America Production Company, Defendant, Case No.: D-0101-CV-2003-02310,* Affidavit, June 27, 2011.

*In the First Judicial District Court, State of New Mexico, County of Santa Fe, F. Ferrell Davis, Plaintiff, v. Devon Energy Corporation, et al., Defendants, No. D-0101-CV-200301590,* Affidavit, March 30, 2011; Affidavit, June 26, 2011; Expert Report, July 6, 2012; Oral Deposition, August 6, 2012; Affidavit, October 22, 2012.

*In the First Judicial District Court, State of New Mexico, County of Santa Fe, Smith Family, LLC, Plaintiff, v. ConocoPhillips Company, Defendant, No. D-0101-CV-200302311,* Affidavit, May 18, 2012; Affidavit, August 24, 2012.

ICM Assurance Ltd. and Nexen Inc.
*In the Matter of the Arbitration Pursuant to the UK Arbitration Act 1996 Between ICM Assurance Ltd. and Nexen Inc., Claimants, v. Oil Insurance Limited, Respondent,* Expert Report, December 17, 2010.

Atlantic Richfield Company
*Superior Court for the State of California, County of Santa Clara, Case No. 1-00-CV-788657, the People of the State of California vs. Atlantic Richfield Company, et al.,* Deposition, September 26, 2011; Deposition, December 19, 2012.

*In the US District Court for the Eastern District of Wisconsin, Glenn Burton, Jr., Plaintiff, Case No. 07-CV-0303, vs. American Cyanamid Co., et al., Defendants; and in the State of Wisconsin Circuit Court: County of Milwaukee, Yasmin Clark, Minor, by her guardian ad litem, Susan M. Gramling, Plaintiff, Case No. 06-CV-012653, vs. American Cyanamid Co., et al., Defendants,* Telephonic Deposition of Joseph P. Kalt, September 28, 2010.

*State of Wisconsin Circuit Court, Milwaukee County, No. 99-CV-6411, Steven Thomas v Atlantic Richfield Co., et al.,* Deposition, April 5-6, 2006; Affidavit, April 27, 2007; Videotaped Deposition, May 3, 2007.

*Superior Court of the State of Rhode Island, No. 99-5226, State of Rhode Island, Attorney General v Lead Industries Association, Inc., et al.,* Deposition, May 11-12, 2005; Deposition, August 18-19, 2005.

New England Power Generators Association
*Before the Federal Energy Regulatory Commission. RE: ISO New England Inc. and New England Power Pool, Docket No. ER10-787-000, EL10-50-000, EL10-57-000, Second Brief of the New England Power Generators Association Inc.,* Written Testimony, September 1, 2010.

PPL Corporation and E.ON U.S. LLC
*Before the Federal Energy Regulatory Commission, In re Docket No. EC10-__-000, Application for Approval Pursuant to Section 203 of the Federal Power Act, Volume 1 of 3*; Affidavit filed with Joseph Cavicchi, June 28, 2010.

BNSF Railway Company
> *Before the Surface Transportation Board, In re STB Finance Docket No. 35305, Petition of Arkansas Electric Cooperative Corporation for a Declaratory Order,* Rebuttal Verified Statement of Joseph P. Kalt and Glenn Mitchell, June 4, 2010.

Cypress Semiconductor Corporation
> *In the US District Court for the Northern District of California Oakland Division, In re SRAM Antitrust Litigation, MDL No. 1819,* Expert Report, May 4, 2010; Oral Deposition, June 8, 2010.

Dean Foods Company, et al.
> *In the US District Court for the Eastern District of Tennessee Greenville Division, Sweetwater Valley Farm, Inc., et al., Plaintiffs, vs. Dean Foods Company, et al., Defendants, MDL No. 1899,* Expert Report, May 3, 2010; Oral Deposition, June 23-24, 2010; Expert Report, August 12, 2011.

> *In the US District Court for the Eastern District of Tennessee Greenville Division, Sweetwater Valley Farm, Inc., et al., No. 2:07-cv-208, Plaintiffs, vs. Dean Foods Company, et al., Defendants, Case No. 2:08-MD-01000,* Declaration, March 30, 2011; Supplemental Declaration, March 15, 2012.

> *In the US District Court for the Eastern District of Tennessee Greenville Division, Food Lion, LLC, et al., Plaintiffs, vs. Dean Foods Company, et al., Defendants, Case No. 2:07-CV-188,* Expert Report, May 3, 2010; Oral Deposition, June 11, 2010.

McKesson Corporation
> *In the US District Court for the District of Massachusetts, San Francisco Health Plan individually and on behalf of the State of California, et al., Plaintiffs v McKesson Corporation, Defendant in C.A. No. 1:08-cv-10843-PBS*; Responsive Expert Report, September 19, 2011.

> *In the US District Court for the District of Massachusetts, the State of Connecticut v. McKesson Corporation in Civil Action No. 08-10900-PBS,* Responsive Expert Report, April 14, 2010.

> *In the US District Court for the District of Massachusetts, New England Carpenters Health Benefits Fund, et al. v First Databank, Inc. and McKesson Corporation, No. 05-11148-PBS,* Report, January 28, 2008; Rebuttal Report, October 1, 2008.

CITGO Petroleum Corporation
> *In the United States District Court, Northern District of Oklahoma, in Re: Stephenson Oil Company, on behalf of itself and all others similarly situated, Plaintiff, vs. CITGO Petroleum Corporation, Defendant, Case No. 08-CV-380-TCK-TLW,* Expert Report, November 20, 2009; Oral Testimony, February 25, 2010.

Confederated Tribes of the Chehalis Reservation

> *In the United States District, Western District of Washington at Tacoma, in Re: Confederated Tribes of the Chehalis Reservation, Plaintiffs, v. Thurston County Board of Equalization, Defendants, Civil Action No. C08 5562,* Expert Report, October 15, 2009; Oral Deposition, December 4, 2009.

Rio Tinto

> *In the Australian Competition Tribunal, Application for the Review of the Deemed Decision by the Commonwealth Treasurer of 23 May 2006 Under Section 44H(9) of the Trade Practices Act in Relation to the Application for Declaration of Services Provided by The Mount Newman Railway Line; Application for Review of the Decision by the Commonwealth Treasurer of October 27, 2008 Under Section 44h(1) of Trade Practices Act in Relation to the Application for Declaration of a Service Provided by the Robe Railway; Application for Review of the Decision by the Commonwealth Treasurer of October 27, 2008 Under Section 44h(1) of Trade Practices Act in Relation to the Application for Declaration of a Service Provided by the Hamersley Rail Network;* and *Application for Review of the Decision by the Commonwealth Treasurer of October 27, 2008 Under Section 44h(1) of Trade Practices Act in Relation to the Application for Declaration of a Service Provided by the Goldsworthy Railway,* Affidavit, July 3, 2009.

North West Shelf Gas Party Ltd.

> *In the Matter of the Commercial Arbitration Act and an Arbitration Between Woodside Energy Ltd. and Others, Sellers, and Alinta Sales Party Ltd., Buyer*, Statement and Expert Report on Behalf of the Sellers, July 3, 2009; Oral Testimony, August 26-27, 2009.

Gunnison Energy Corporation, SG Interests I, Ltd., and SG Interests VII, Ltd.

> *In the United States District Court for the District of Colorado In re: Riviera Drilling & Exploration Company, Plaintiff, v. Gunnison Energy Corporation, SG Interests I, Ltd., and SG Interests VII, Ltd., Defendants, Civil Action No. 08-cv-02486-REB-CBS,* Expert Report, June 24, 2009; Expert Rebuttal Report, August 24, 2009; Deposition, October 20, 2009.

Gannett Company, Inc. *et al.*

> *In the United States District Court for the District of Arizona, State of Arizona ex rel. Terry Goddard, Attorney General, Plaintiff, v. Gannett Company, Inc.; Citizen Publishing Company; Lee Enterprises, Inc.; Star Publishing Company; and TNI Partners, Defendants,* Affidavit, May 18, 2009.

Hyundai Heavy Industries Co., Ltd., *at al.*

> *International Chamber of Commerce, Court of Arbitration Case No. 15521/JEM/CYK, Hyundai Heavy Industries Co., Ltd., et al., Claimants v. International Petroleum Investment Company, et al., Respondents,* Witness Statement, February 20, 2009; Oral Testimony, May 27, 2009.

Shell Oil Company; Shell Oil Products Company; Shell Trading (US) Company, LLC; Shell Enterprises, LLC; Motiva Enterprises, LLC; and TMR Company

> *In the United States District Court for the Southern District of New York, MDL No. 1358, Case No. 04-CV-3417 (SAS), In re: Methyl Tertiary Butyl Ether ("MTBE"), City of New York, Plaintiff v Amerada Hess Corporation, et al., Defendants,* Expert Report, February 13, 2009; Supplemental Expert Report, March 30, 2009.

City of Los Angeles, California, *et al.*

> *US District Court, District of Columbia, Federal Maritime Commission v. City of Los Angeles, California, et al. Civil Action No. 1:08-cv-010895-RJL,* Declaration, November 26, 2008.

PPL Companies

> *Federal Energy Regulatory Commission, Docket No. EL08-67-00 Protest of the PPL Companies to the Complaint of the RPM Buyers,* Affidavit (with A.J. Cavicchi), July 11, 2008; *Answer of the PPL Companies to the Motion for Leave to Answer and Answer of the RPM Buyers,* Suppl. Affidavit (with A.J. Cavicchi), August 12, 2008.

Federal Government of Canada

> *London Court of International Arbitration, In the Matter of Arbitration No. 111790, The United States of America v. Canada,* Expert Witness Report of Joseph P. Kalt, November 9, 2011; Rebuttal Expert Report, Ex. R-151, February 3, 2012; Oral Testimony, March 6, 2012.

> *London Court of International Arbitration, In the Matter of Arbitration No. 81010, The United States of America v. Canada,* Expert Witness Statement of Joseph P. Kalt, February 20, 2009; Rebuttal Expert Witness Report, May 8, 2009; Second Rebuttal Expert Witness Report, July 7, 2009; Oral Testimony, July 22-23, 2009; Expert Report (with Robert H. Topel), June 22, 2010.

> *London Court of International Arbitration, In the Matter of Arbitration No. 91312, The United States of America v. Canada,* Expert Witness Statement of Joseph P. Kalt and David Reishus, May 12, 2009; June 11, 2009.

> *London Court of International Arbitration, In the Matter of Arbitration No. 7941, The United States of America v. Canada,* Statement (with D. Reishus) June 29, 2008; Rebuttal Statement (with David Reishus), August 11, 2008; Oral Testimony, September 22-23, 2008.

ExxonMobil Corporation; *et al.*

> *US District Court, District of Columbia, Cause No. 1:04CV00940, City of Moundridge, Kansas et al. v ExxonMobil Corporation, et al.,* Affidavit, January 11, 2006; Report, June 5, 2008.

City of Las Cruces, New Mexico
> *State of New Mexico, et al. Plaintiffs, v. City of Las Cruces, New Mexico, and Dona Ana Mutual Domestic Water Consumers Association, Defendants, No. CV-06-1289,* Declaration, May 16, 2008.

Association of American Railroads
> *Surface Transportation Board, Petition of the Association of American Railroads to Institute a Rulemaking Proceeding to Adopt a Replacement Cost Methodology to Determine Railroad Revenue Adequacy,* Statement (with J. Klick), May 1, 2008.

Chevron USA, Inc., *et al.*
> *US District Court, Eastern District of Texas, Texarkana Division, United States of America ex rel. Harrold E. (Gene) Wright v Chevron USA, Inc., et al., No. 5:03cv264,* Reports, April 1, 2008 (Unocal, Mobil), April 11, 2008 (Mobil); Depositions, April 14, 20-21, 2008.

Infineon Technologies AG
> *US District Court, Northern District of California, Dynamic Random Access Memory (DRAM) Antitrust Litigation (Dockets No. 06-cv-1665, 07-cv-1200, 07-cv-1207, 07-cv-1212, 07-cv-1381),* Report, March 7, 2008; Deposition, April 26, 2008.

Exxon Mobil Corporation
> *State of Alaska Department of Natural Resources and Alaska Department of Revenue, Call for Public Comments Regarding the TransCanada Alaska Company, LLC...,* Statement, March 6, 2008; *Before the Alaska State 25th Legislature Third Special Session, Regarding the TransCanada Application Pursuant to the Alaska Gasoline Inducement Act,* Statement, July 10, 2008.

Tyco Healthcare Group L.P. and Mallinckrodt Inc.
> *US District Court, Central District of California, Western Division, Allied Orthopedic Appliances, Inc., et al. v Tyco Healthcare Group L.P. and Mallinckrodt Inc.,* No. V-05-6419-MFP (AJWx), Report, February 1, 2008; Deposition, March 4, 2008.

P3 Group
> *Federal Energy Regulatory Commission, Docket No. EL08-34-000, Maryland Public Service Commission v PJM Interconnection, L.L.C.,* Affidavit (with A.J. Cavicchi), February 19, 2008.

Tractebel Energy Marketing, Inc.
> *Tractebel Energy Marketing, Inc. v AEP Power Marketing, Inc., et al.,* Nos. 03 CV 6731, 03 CV 6770, Report, January 21, 2008.

Cabot Corporation

*US District Court, District of Massachusetts, AVX Corporation and AVX Limited v Cabot Corporation, C.A. No. 04 CV 10467 RGS,* Report, January 15, 2008; Deposition, March 12, 2008.

Columbia Gas Transmission Corporation, *et al.*

*US District Court, Southern District of West Virginia, Stand Energy Corp., et al. v Columbia Gas Transmission Corp., et al., No. 2:04-0867,* Report, December 18, 2007; *Civil Action Nos. 2:04-0868 through 0874,* Videotaped Deposition, February 7, 2008; *Civil Action No. 2:04-0867,* Expert Report, September 30, 2008.

Nissan North America, Inc.

*US District Court, District of Maine, MDL Docket No. 03-md-1532, ALL CASES, In Re: New Motor Vehicles Canadian Export Antitrust Litigation,* Report, October 26, 2007; Deposition, December 13, 2007.

Energy Transfer Partners, L.P.

*Federal Energy Regulatory Commission, Docket No. IN06-3-002, Answer of Energy Transfer Partners, L.P,* Affidavit (with John R. Morris), October 9, 2007; Suppl. Affidavit *Docket No. IN06-3-003* (with John R. Morris), March 31, 2008; Prepared Answering Testimony, March 31, 2009; Deposition, April 21-22, 2009.

Equilon Enterprises LLC, *et al.*

*US District Court, Eastern District of Missouri, Eastern Division, Daniels Self, et al. v Equilon Enterprises LLC, et al.,* Cause No. 4 00CV0193 TIA, Report, September 4, 2007; Deposition, September 22, 2007.

Occidental Petroleum Corporation

*Arbitration under the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States and the Treaty Between the United States of America and the Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investment,* ICSID No. ARB/06/11, Report, September 17, 2007; Rebuttal Witness Statement, June 12, 2009; Oral Testimony, November 7, 2009; Joint Expert Report with Daniel Johnston, April 11, 2011; Supplemental Joint Expert Report with Daniel Johnston, June 10, 2011; Second Supplemental Joint Expert Report with Daniel Johnston, June 24, 2011.

The Hanwha Companies, ORIX Corporation, and Macquarie Life Limited

*International Court of Arbitration of the International Chamber of Commerce, Korea Deposit Insurance Corporation v Hanwha Companies, ORIX Corporation, and Macquarie Life Limited,* ICC No. 14501/JB/JEM/EBS (c. 14502/JB/JEM/EBS), Report, July 13, 2007; Reply Report, September 7, 2007.

New Times Media LLC, *et al.*
> *Supreme Court of the State of California, In and For the County of San Francisco, Unlimited Jurisdiction, Bay Guardian Company, Inc. v New Times Media LLC, et al.,* No.: 04-435584, Report, June 27, 2007; Declaration, June 28, 2007; Deposition, December 18, 2007; Oral Testimony, February 14, 2008.

American Electric Power Service Corporation, *et al.*
> *Federal Energy Regulatory Commission, The People of the State of Illinois, ex rel., Illinois Attorney General Lisa Madigan v Exelon Generation Co., LLC, et al.,* Docket No. EL07-47-000, Affidavit (with J. Cavicchi), June 18, 2007.

Western Refining, Inc.
> *US District Court, Federal Trade Commission v Western Refining, Inc., et al., No. 1:07-CV-00352-JB-ACT,* Report, May 2, 2007; Deposition, May 6, 2007; Oral Testimony, May 11, 2007.

Equilon Enterprises LLC dba Shell Oil Products US, *et al.*
> *US District Court, Central District of California, Southern Division, No. SACV-04-10370 JVS (JTLx),* Report, November 20, 2006; Rebuttal Report, December 22, 2006; Declarations, February 12, 2007, February 15, 2007, March 12, 2007, March 26, 2007; Addendum to Rebuttal Report, March 26, 2007; Oral Testimony, June 20, 2007.

Qualcomm, Inc., *et al.*
> *US District Court, Eastern District of Texas, Tyler Division, Golden Bridge Technology Inc., Plaintiffs v. Nokia, Inc. et al., Defendants, Civil Action No. 6:06-cv-163 LED*, Report, November 7, 2006; Deposition, December 8, 2006.

ExxonMobil Corporation
> *ExxonMobil Royalty Settlement Agreement Reopener: Direct Cost Reopener,* Report, July 31, 2006; Rebuttal Report, September 13, 2006.

ExxonMobil Corporation
> *Internal Revenue Service,* Reports, June 29, 2006, December 15, 2006 (with D. Reishus).

Individual Defendants
> *US District Court, Southern District of Texas, Civil Action No. H-05-0332; U.S. Commodity Futures Trading Commission v Denette Johnson,* Report, June 14, 2006; Oral Testimony, August 30, 2006; Affidavit, April 20, 2007; Affidavit, May 23, 2007; Oral Testimony, January 11, 2008.

BP America Production Company, *et al.*
> *State of New Mexico, County of Santa Fe First Judicial District, No. D-0101-CV-200001620, Laura Dichter, et al. v BP America Production Company, et al.,* Affidavit, February 8, 2006; Report, March 23, 2007.

TAPS Carriers (BP Pipelines (Alaska) Inc.; *et al.*)

> *Federal Energy Regulatory Commission, In the Matter of: BP Pipeline (Alaska), Inc., et al.; Docket Nos. OR05-2, OR05-3, OR05-10, IS05-82, IS05-80, IS05-72, IS05-96, IS05-107, IS06-70, IS06-71, IS06-63, IS06-82, IS06-66, IS06-1, OR06-2,* Testimony (All TAPS Carriers), December 7, 2005; Testimony (Designated TAPS Carriers), December 7, 2005; Answering Testimony (All TAPS Carriers), May 26, 2006; Rebuttal Testimony (All TAPS Carriers), August 11, 2006; Oral Rebuttal Testimony (All TAPS Carriers), November 2-3, 2006.

BP America Production Company F/K/A Amoco Production Company, *et al.*

> *District Court of Kleberg County, Texas, Camp Gilliam v BP America Production Company F/K/A Amoco Prod. Co., et al., Cause No. 03-445-D;* Report, November 18, 2005; Oral/Video Deposition, January 10, 2006.

General Motors Corporation, *et al.*

> *US District Court, District of Maine, MDL Docket No. 03-md-1532, ALL CASES, In Re: New Motor Vehicles Canadian Export Antitrust Litigation,* Report, September 30, 2005; Deposition, December 6, 2005; Report, December 1, 2006.

OXY USA, Inc.

> *Eighth Judicial District Court, State of New Mexico, County of Union, No. 04-24 CV, Heimann, et al. v Oxy USA, Inc.,* Report, July 13, 2005.

US Bancorp

> *Superior Court of Los Angeles County, Central District, State of California, No. BC 285 134, Auerbach Acquisition Associates, Inc. v Greg Daily et al.,* Deposition, June 21, 2005.

PPL Corporation

> *Federal Energy Regulatory Commission, PJM Interconnection, L.L.C., Docket Nos. ER05-1410-000 and EL05-148-000, Motion to Intervene and Protest of the PPL Parties;* Affidavit (with A.J. Cavicchi and D. Reishus), October 19, 2005; "A Policy Analysis of PJM's Proposed Four-Year Forward Capacity Market"; submitted in PPL Resource Adequacy Market Proposal, Docket No. PL05-7-000, (with A.J. Cavicchi), June 16, 2005.

SBC Communications, Inc.

> *Federal Communications Commission, Special Access Rates for Price-Cap Local Exchange Carriers, WC Docket No. 05-25, RM-10593,* Statement, June 13, 2005.

General Electric and Bechtel

> *Arbitration Under an Agreement Between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments and Under the Citral Rules, Capital India Power Mauritius I and Energy Enterprises (Mauritius) Company (Claimants) and the Government of*

*the Republic of India (Respondent),* Report (with D. Newbery and T. Lumsden), May 23, 2005.

Hamersley Iron/Rio Tinto

*Before the National Competition Council, Melbourne, Australia, FMG Access Application,* Statement, May 2, 2005; *Pilbara Infrastructure Party, Ltd. Application*, Statement, April 30, 2008.

Duke Energy LNG Services, Inc.

*Arbitration under the uncitral rules. L'Enterprise Nationale pour la Recherche, la Production, le Transport, la Transformation et al Commercialisation des Hydrocarbons, and Sonatrading (Amsterdam) B.V., Claimants; and Duke Energy LNG Services, Inc.,* Report, April 22, 2005**;** Second Report, November 11, 2005; Oral Testimony, February 16, 2006.

*Surface Transportation Board, Ex Parte 657, Rail Rate Challenges Under the Stand-Alone Cost Methodology,* Statement, April 30, 2005; Oral Statement, April 26, 2005; Statement, May 1, 2006; Reply Statement, May 31, 2006; Rebuttal Statement, June 30, 2006.

BNSF Railway Company

*Surface Transportation Board, STB Docket No. 42088, Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc. v BNSF Railway Company,* Statement, April 19, 2005; Reply Statement, July 20, 2005; Rebuttal Statement, September 30, 2005.

Community of Awas Tingni

*Inter-American Court of Human Rights, Mayagna (Sumo) Indigenous Community of Awas Tingni Against the Republic of Nicaragua,* Report (with M. Begay), April 15, 2005.

PPL Corporation

*State of New Jersey Board of Public Utilities, The Joint Petition of Public Service Electric and Gas Company and Exelon Corporation for Approval of a Change in Control of Public Service Electric and Gas Company, and Related Authorizations*, Docket No. EM05020106, OAL Docket No. PUC-1874-05, Testimony, November 14, 2005; Surrebuttal Testimony, December 27, 2005; Oral Testimony, January 12, 2006; Reply Testimony, March 17, 2006; Pennsylvania Public Utility Commission, Surrebuttal Testimony, August 26, 2005.

*Federal Energy Regulatory Commission, Docket No. EC05-43-000,* Testimony, April 11, 2005; Suppl. Testimony, May 27, 2005; Affidavit, August 1, 2005.

Sovereign Risk Insurance Limited

*American Arbitration Association, ZC Specialty Insurance Company v Sovereign Risk Insurance Limited, No. 50 T 153 0055203,* Report, March 10, 2005; Suppl. Report, April 11, 2005.

ExxonMobil Corporation

*State of Alaska v. ExxonMobil; JAMS (Joint Arbitration & Mediation Services) Ref. No. 1220032196; ExxonMobil Royalty Settlement Agreement Reopener: Destination Value,* Report, March 4, 2005; Rebuttal Report, March 24, 2005; Oral Testimony, April 7, 2005.

PPL Montana, LLC

*Federal Energy Regulatory Commission, RE: PPL Montana, LLC, et al., Docket No. ER99-3491-__,* Testimony (with A.J. Cavicchi), November 9, 2004; Affidavit (with A.J. Cavicchi), February 28, 2005; Affidavit (with A.J. Cavicchi), November 14, 2005; First Suppl. Affidavit, (with A.J. Cavicchi), December 23, 2005; Affidavit (with A.J. Cavicchi), February 1, 2006.

T-Mobile

*Superior Court of the State of California, County of Alameda, No. 4332, Cell Phone Termination Fee Cases,* Affidavit, January 17, 2005, Declaration, November 6, 2008.

Shell Oil Company, Texaco Refining and Marketing Inc., Equilon Enterprises LLC

*US District Court, Central District of California, No. SACV- 03-565-JVS (JTLx), Andre Van Der Valk, et al. v Shell Oil Company, et al.,* Report, October 8, 2004; Rebuttal Report, November 8, 2004; Deposition, December 13, 2004; Second Rebuttal Report, April 4, 2005.

Shell Oil Products Company, LLC, Shell Oil Company, and Motiva Enterprises, LLC

*US District Court, District of Massachusetts, Mac's Shell Service, Inc., et al. v Shell Oil Products Company, LLC, et al., No. 01-CV-11300-RWZ,* Report, July 6, 2004; Deposition, July 29, 2004; Oral Testimony, November 30-December 1, 2004; Declaration Re: Expert Testimony of Brian S. Gorin, October 14, 2008; Declaration Re: Expert Testimony of Richard J. Olsen, October 14, 2008.

Equilon Pipeline Company

*US District Court, Western District of Washington at Seattle, No. C01-1310L, Olympic Pipeline Co. v Equilon Pipeline Co., LLC, et al.,* Report, June 18, 2004; Deposition, June 29-30, 2004; Suppl. Report, October 27, 2004.

ExxonMobil Corporation

*District Court of Monroe County, Alabama, Aline Moye, et al. v ExxonMobil Corporation, et al., CV-98-20,* Report, June 15, 2004.

CSX Transportation Inc.
> *US District Court, Northern District of Florida, Tallahassee Division, No. 4:03CV169-RH, CSX Transportation, Inc. v Department of Revenue of the State of Florida, et al.,* Report, May 14, 2004; Deposition, August 5, 2004.

TTX Company
> *Surface Transportation Board, Finance Docket No. 27590 (Sub-No.3), Application for Approval of Pooling Of Car Service with Respect to Flatcars,* Statement, January 5, 2004; Rebuttal Statement, May 12, 2004.

British Columbia Lumber Trade Council and the Province of British Columbia
> *U.S. Dept. of Commerce, International Trade Administration, Certain Softwood Lumber Products from Canada (C-122-839),* Reports, December 12, 2001, January 16, 2002, March 15, 2004 (with D. Reishus), March 16, 2004 (with D. Reishus), April 15, 2004 (with D. Reishus.), September 15, 2004 (With D. Reishus), February 28, 2005 (with D. Reishus), March 15, 2005, December 5, 2005 (with D. Reishus), December 5, 2005 (with D. Reishus).

CSX Transportation, Inc.
> *US District Court, Northern District of Georgia, No. 1:02-CV-2634CAP, CSX Transportation, Inc. v State Board of Equalization of the State of Georgia, et al.,* Report, April 15, 2004; Deposition, September 24, 2004; Oral Testimony, May 16, 2005.

El Paso Natural Gas Company and Burlington Resources Oil & Gas Company
> *District Court of Washita County State of Oklahoma, Nations Bank, N.A., et al. v El Paso Natural Gas Company and Burlington Resources Oil & Gas Company, No. CJ-97-68,* Report, March 30, 2004; Deposition, April 27, 2004; Suppl. Report, August 16, 2005; Oral Testimony, November 2, 2005.

Chevron U.S.A. Inc.
> *District Court, 17th Judicial District, Parish of LaFourche, LA, Chevron U.S.A. Inc. v State of Louisiana, et al.,* Report, November 21, 2003; Suppl. Report, January 9, 2004; Oral Testimony, March 16, 2004.

Arizona Competitive Power Alliance
> *Arizona Corporation Commission, Application of Arizona Public Service Company for a Hearing to Determine the Fair Value of the Utility Property…, E-01345A-03-0437,* Testimony, February 3, 2004.

Shell Oil Company
> *Court of Common Pleas, Cuyahoga County, Ohio, Donald J. Casserlie, et al.* v *Shell Oil Company, et al.*, Report, January 30, 2004.

Shell Oil Company, *et al.*

> *District Court, County of Montezuma, State of Colorado, Celeste C. Grynberg, et al. v Shell Oil Company, et al.,* Affidavit, June 12, 2003; Report, June 20, 2003; Suppl. Report, August 15, 2003; Deposition, December 2, 2003; Affidavits, January 6, 2004; Affidavit, January 22, 2004; Oral Testimony, October 14, 2004.

Motiva Enterprises, LLC, *et al.*

> *Superior Court of Connecticut, Complex Litigation Docket at Waterbury, Wyatt Energy, Inc. v Motiva Enterprises, LLC, et al.,* Report, November 20, 2003; Deposition, December 18-19, 2003; Suppl. Report, August 20, 2008; oral testimony, June 15-16, 2009.

SDDS, Inc.

> *Circuit Court, Sixth Judicial District, SDDS, Inc. v State of South Dakota,* Affidavit, December 23, 2002; Affidavit, January 17, 2003; Report, February 24, 2003; Report, April 25, 2003; Deposition, May 13, 2003; Oral Testimony, July 2, 2003, July 11, 2003; Oral Rebuttal Testimony, July 17, 2003; Affidavit, October 22, 2003.

Shell Western E & P Inc., Shell Gas Trading Company, and Shell Oil Company

> *US District Court, 112th Judicial District, Crockett County, TX, Minnie S. Hobbs Estate, et al. v Shell Western E & P Inc., et al.,* Report, August 28, 2002; Deposition, December 14, 2002; Suppl. Report, August 1, 2003; Affidavit, August 20, 2003; Oral Testimony, October 7, 2003.

The Burlington Northern & Santa Fe Railway Company

> *US District Court, Northern District of California, San Francisco Division, Truck-Rail Handling, Inc. and Quality Transport, Inc. v The Burlington Northern & Santa Fe Railway Company*, Report, August 18, 2003; Suppl. Report, September 22, 2003; Deposition, September 25, 2003.

Dex Holdings, LLC

> *Washington Utilities and Transportation Commission, the Application of Qwest Corporation Regarding the Sale and Transfer of Qwest Dex to Dex Holdings, LLC.* Rebuttal Testimony, April 17, 2003; Oral Testimony, May 23, 2003.

Amerada Hess Corporation

> *First Judicial District, State of New Mexico, County of Santa Fe, Patrick H. Lyons, Commissioner of Public Lands of the State of New Mexico, Trustee v Amerada Hess Corporation,* Report, September 21, 2001; Deposition, November 7, 2001; Suppl. Report, January 31, 2002; Second Suppl. Report, April 7, 2003; Deposition, May 8, 2003.

Oxy USA, Inc.

> *Twenty-Sixth Judicial District, District Court, Stevens County, Kansas, Civil Department, Opal Littell, et al., v Oxy USA, Inc.,* Report, October 7, 2002; Rebuttal Report, October 29, 2002; Oral Testimony, April 7, 2003.

El Paso Merchant Energy, L.P.
> *Federal Energy Regulatory Commission, et al., v Sellers of Long-Term Contracts to the California Department of Water Resources, Sellers of Energy and Capacity Under Long-Term Contracts with the California Department of Water Resources,* Testimony, October 17, 2002; Rebuttal Testimony, November 14, 2002; Deposition, November 24, 2002; Oral Testimony, December 10, 2002; Prepared Reply Testimony, March 20, 2003.

Joint Complainant Sellers of Jet Fuel
> *US Court of Federal Claims, Department of Defense Jet Fuel Contract Litigation*, declarations in various individual cases, December 2002-2007.

El Paso Merchant Energy, L.P.
> *Federal Energy Regulatory Commission, PacifiCorp v Reliant Energy Services, Inc., et al.,* Testimony, October 8, 2002; Rebuttal Testimony, November 26, 2002; Deposition, December 5, 2002; Oral Testimony, December 18, 2002.

Powerex Corp.
> *American Arbitration Assoc., International Commercial Arbitration Between Powerex Corp. and Alcan Inc.,* Report, November 20, 2002; Oral Testimony, December 12, 2002.

Mardi Gras Transportation System Inc.
> *Federal Energy Regulatory Commission, Caesar Oil Pipeline Company, LLC,* Affidavit, December 5, 2002; *Proteus Oil Pipeline Company, LLC,* Affidavit, December 5, 2002.

The Burlington Northern & Santa Fe Railway Company
> *US District Court, Western District of Texas, Austin Division, South Orient Railroad Company, Ltd. v The Burlington Northern & Santa Fe Railway Company and Union Pacific Railway Company,* Report, October 30, 2002; Deposition, November 15, 2002.

Texaco Inc., *et al.*
> *District Court, 19th Judicial District, Parish of East Baton Rouge, LA, State of Louisiana and Secretary of the Department of Revenue and Taxation, et al. v Texaco Inc., et al.,* Report, November 11, 2002.

Ticketmaster Corporation
> *US District Court, Central District of California, Tickets.com, Inc. v Ticketmaster Corporation and Ticketmaster-Online Citysearch, Inc.,* Rebuttal Report, November 8, 2002; Deposition, November 20, 2002.

ExxonMobil Corporation
> *US Department of the Interior, Board of Land Appeals, Request for Value Determination Regarding the Arm's-Length Nature of a Gas Sales Contract,* Affidavit, October 8, 2002.

El Paso Merchant Energy, L.P. and Calpine Energy Services, L.P.
> *Federal Energy Regulatory Commission, Nevada Power Company and Sierra Pacific Power Company v Duke Energy Trading and Marketing, L.L.C., et al.; Southern California Water Company v Mirant Americas Energy Marketing, L.P., et al., v Morgan Stanley Capital Group Inc.,* Testimony, June 28, 2002; Answering Testimony, August 27, 2002; Deposition, September 24, 2002.

Conoco Inc. and Phillips Petroleum Company
> *US District Court, Northern District of Oklahoma, Transeuro Amertrans Worldwide Moving and Relocations Limited v Conoco Inc. and Phillips Petroleum Company,* Affidavit, August 21, 2002; Oral Testimony, September 17, 2002.

Amoco Production Company
> *District Court, La Plata County, Colorado, Richard Parry, et al. v Amoco Production Company,* Report, May 1, 2002; Oral Testimony, August 29, 2002.

Conoco Inc., Amoco Production Company, and Amoco Energy Trading Corp.
> *US District Court, District of New Mexico, Elliott Industries Limited Partnership v Conoco Inc., et al.,* Report, July 1, 2002; Affidavit, July 6, 2002; Deposition, August 13, 2002.

CFM International, Inc.
> *US District Court, Central District of California, Western Division, Aviation Upgrade Technologies, Inc. v The Boeing Company, et al.,* Report, June 28, 2002.

Elkem Metals Company and CC Metals & Alloys, Inc.
> *US International Trade Commission, Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, Remand Proceedings,* Affidavit, May 23, 2002; Oral Testimony, June 6, 2002.

Chevron U.S.A., Conoco, and Murphy Exploration & Production Company
> *US Court of Federal Claims, Chevron U.S.A., Inc.; Conoco Inc.; and Murphy Exploration & Production Company v United States of America,* Report, May 1, 2002.

El Paso Merchant Energy, L.P.
> *Federal Energy Regulatory Commission, Public Utilities Commission of the State of California v El Paso Natural Gas Company, et al.,* Testimony, May 8, 2001; Oral Testimony, May 29-30, 2001; Oral Rebuttal Testimony, June 6-8, 2001; Oral Surrebuttal Testimony, June 19, 2001; Rebuttal Testimony, March 11, 2002; Oral Testimony, March 26-27, 2002.

American Quarter Horse Association

*251ˢᵗ District Court, Potter County, Texas, Kay Floyd, et al. v American Quarter Horse Association*, Affidavit, October 30, 2001; Report, February 1, 2002.

Amoco Production Company, *et al.*

*First Judicial District, State of New Mexico, County of Santa Fe, Ray Powell, Commissioner of Public Lands of the State of New Mexico, Trustee v Amoco Production Company, Amerada Hess Corporation, Shell Western E&P, Inc., and Shell Land & Energy Co,* Report, September 21, 2001; Deposition, November 7, 2001; Suppl. Report, January 31, 2002.

Shell Oil Company

*Montana Sixteenth Judicial District Court, Fallon County, Fidelity Oil Company v Shell Western E & P, Inc., and Shell Oil Company,* Report, September 7, 2001.

*Anne E. Meyer and Mary E. Hauf, et al. v Shell Western E & P, Inc., and Shell Oil Company.* Rebuttal Report, September 7, 2001.

*Fran Fox Trust, et al.* v *Shell Western E & P, Inc., and Shell Oil Company*. Rebuttal Report, September 7, 2001.

*Marvel Lowrance and S-W Company* v *Shell Western E & P, Inc., and Shell Oil Company.* Rebuttal Report, September 7, 2001.

Bass Enterprises Production Company

*Bass Enterprises Production Company, et al. v United States of America, Assessment of Bass Enterprises Production Company's and Enron Oil and Gas Company's Economic Losses Arising from the Temporary Taking of Oil and Gas Lease,* Report, March 19, 1999; Deposition, May 13, 1999; Oral Testimony, October 24-25, 2000; Suppl. Report, June 11, 2001; Deposition, June 30, 2001; Oral Testimony, July 23-24, 2001.

Tosco Corporation

*US District Court, District of Hawaii, Carl L. Anzai, Attorney General, for the State of Hawaii, As Parens Patriae for the Natural Persons Residing in Hawaii, and on Behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies, v Chevron Corporation, et al.,* Report, October 23, 2000; Deposition, January 8-9, 2001; Suppl. Report, April 16, 2001; Deposition, April 24, 2001.

Shell Oil Company, *et al.*

*US District Court, District of Colorado, United States Government and CO2 Claims Coalition, LLC, v Shell Oil Company and Shell Western E&P, Inc., Mobil Producing Texas and New Mexico, Inc., and Cortez Pipeline Company,* Report, November 23, 1998; Deposition, January 11-12, 1999; Affidavit, January 21, 1999; Suppl. Report, April 30, 1999; Second Suppl. Report, March 30, 2001.

American Airlines

*The United States Department of Justice v AMR Corporation*, Report, October 11, 2000; Deposition, October 31-November 1, 2000; Suppl. Report, November 16, 2000; Revised Suppl. and Rebuttal Report, December 4, 2000; Deposition, December 14-15, 2000; Declaration, January 5, 2001; Declaration, March 14, 2001.

Teléfonos de Mexico

*US District Court, Western District of Texas, San Antonio Division, Access Telecom, Inc. v MCI Telecommunications Corp., MCI International, Inc., SBC Communications, Inc., SBC International, Inc., SBC International Latin America, Inc., and Teléfonos de Mexico*, Report, January 22, 2001; Suppl. Report, February 14, 2001; Deposition, February 22, 2001.

Exxon Corporation

*Allapattah Services, Inc., et al. v Exxon Corporation, U.S. District Court, Southern District of Florida,* Affidavit, November 25, 1996; Report, January 22, 1997; Deposition, September 22 and November 11, 1998; Report, April 15, 1999; Deposition, May 3-4, 1999; Affidavit, May 16, 1999; Affidavit, June 6, 1999; Deposition, July 12, 1999; Daubert Testimony, July 15-17, 1999; Oral Testimony, August 24-25, 1999; Oral Testimony, February 6, 7, 8, 12, 2001.

Burlington Northern Santa Fe

*Surface Transportation Board, STB Ex Parte No. 582, Public Views on Major Rail Consolidations.* Statement (with Amy Bertin Candell), February 29, 2000. *STB Ex Parte No. 582 (Sub-No. 1),* Statement (with José A. Gómez-Ibáñez), November 17, 2000; Rebuttal Statement (with José A. Gómez-Ibáñez), January 11, 2001.

Compaq Computer Corporation

*US District Court, Eastern District of Texas, Beaumont Division, Charles Thurmond, Hal LaPray, Tracy D. Wilson, Jr., and Alisha Seale Owens v Compaq Computer Corporation.* Opinion, December 15, 2000; Deposition, January 4, 2001.

Phillips Petroleum Company, *et al.*

*District Court of Fort Bend, Texas, 268th Judicial District, Kathryn Aylor Bowden, et al. v Phillips Petroleum Company, et al.,* Deposition, August 1, 2000; Oral Testimony, September 8, 2000.

Exxon Corporation, Shell Oil Company, and Union Oil Company of California

*US District Court, Eastern District of Texas, Lufkin Division, J. Benjamin Johnson, Jr., and John M. Martineck, Relators, on Behalf of the United States of America, v Shell Oil Company, et al.,* Reports, June 16, 2000; Deposition (Shell Oil Co.), August 8-11, 2000.

Union Oil Company of California and Shell Oil Company

*Review of the Federal Royalties Owed on Crude Oil Produced from Federal Leases in California,* Report, June 30, 1997; Suppl. Report, July 28, 2000.

Government of Canada
> *Arbitration Under Chapter Eleven of the North American Free Trade Agreement: Between Pope & Talbot, Inc., and The Government of Canada*, Affidavit, March 27, 2000; Second Affidavit, April 17, 2000; Oral Testimony, May 2, 2000.

Exxon Company, U.S.A.
> *Hearing Officer of the Taxation and Revenue Department of the State of New Mexico, Protest to Assessment No. EX-001*, Report, April 17, 2000.

Crow Indian Tribe
> *Rose v Adams, Crow Tribal Court, Montana.* Report Concerning the Crow Tribe Resort Tax (with D. Reishus), November 27, 1996; Testimony, January 23, 1997; Surrebuttal Report (with D. Reishus), February 25, 1997; Report (with D. Reishus), March 31, 2000.

BP Amoco, PLC, and Atlantic Richfield Company
> *US District Court, Northern District of California, San Francisco Division, Federal Trade Commission v BP Amoco, PLC and Atlantic Richfield Company*, Report, March 1, 2000; Deposition, March 7, 2000.

Williams Production Company *et al.*
> *First Judicial District, County of Santa Fe, State of New Mexico*, *San Juan 1990-A, L.P., K&W Gas Partners, et al. v Williams Production Company and John Doe*, Affidavits, August 29, 1997, February 7, 2000.

Te Ohu Kai Moana (Treaty of Waitangi Fisheries Commission)
> *High Court of New Zealand, Auckland Registry, between Te Waka Hi Ika O Te Arawa and Anor, et al.,* Affidavit, February 4, 2000.

American Petroleum Institute
> *US Department of the Interior Minerals Management Service, Further Supplementary Proposed Rule for Establishing Oil Value for Royalty Due on Federal Leases,* Declaration (with K. Grant), January 31, 2000.

Amoco Production Company and Amoco Energy Trading Corporation
> *First Judicial District Court, County of Santa Fe, State of New Mexico, The Florance Limited Company, et al. v Amoco Production Co., et al.,* Report, December 15, 1999; Deposition, January 11-12, 2000.

Reliant Technologies, Inc.
> *U.S. District Court, Northern District of California/Oakland Division, Reliant Technologies, Inc. v Laser Industries, Ltd., and Sharplan Lasers, Inc.*, Report, October 15, 1999; Deposition, December 2-3, 1999.

El Paso Natural Gas Company
> *District Court of Dallas County, Texas, Transamerican Natural Gas Corporation v El Paso Natural Gas Company, et al.,* Report, September 24, 1999; Deposition, September 28, 1999; Affidavit, November 19, 1999.

Rockwell International Corporation and Rockwell Collins, Inc.
> *US District Court, District of Arizona, Universal Avionics Systems Corporation v Rockwell International Corporation, et al.,* Report, September 15, 1998; Second Report, November 18, 1998; Supplement to Report, July 30, 1999; Supplement Amended Second Report, July 30, 1999; Deposition, September 22-23, 1999.

Exxon Corporation
> *Superior Court, State of California, Los Angeles, the People of the State of California, City of Long Beach, et al. v Exxon Corporation, et al.* Deposition, May 11-12, 19, 1999; Oral Testimony, July 22-23, 26-29, 1999.

Texaco, Inc.
> *US District Court, Middle District of Louisiana, Long, et al. v Texaco, Inc., et al.,* Report (with K. Grant), August 14, 1998; Deposition, October 2-3, 1998 [6[th] *Judicial District Court, Parish of Iberia, State of Louisiana, John M. Duhe, Jr., et al. v Texaco Inc., et al.,* Oral Testimony, March 2, 1999; *United District Court, Western District of Louisiana, Texaco Inc., et al. v Duhe, et al.,* Report (with K. Grant), June 30, 1999.

AIMCOR, American Alloys, Inc., *et al.*
> *US International Trade Commission, Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela,* Oral Testimony, April 13, 1999.

Elkem Metals Company, L.P.
> *In Re Industrial Silicon Antitrust Litigation and Related Cases, US District Court, Western District of Pennsylvania,* Report, January 9, 1998; Deposition, February 5-6, 1998.

> *US District Court, Western District of Pennsylvania, Bethlehem Steel Corporation v Elkem Metals Company, L.P., and Elkem ASA,* Report, December 9, 1998; Deposition, March 26-27, 1999.

El Paso Energy Corporation and El Paso Tennessee Pipeline Co.
> *EPEC Gas Latin America, Inc. and EPEC Baja California Corporation v Intratec S.A. de C.V., et al. v El Paso Energy Corp., et al.,* Report, March 26, 1999.

Government of Canada
> *Arbitration Panel Convened Pursuant to Article V of the Softwood Lumber Agreement Between The Government of Canada and The Government of the United States of America, Canada-United States Softwood Lumber Agreement: British Columbia's June 1, 1998 Stumpage Reduction,* Report, March 12, 1999.

Rockwell International Corporation and Rockwell Collins, Inc.
> *US District Court, District of Arizona, Universal Avionics Systems Corporation v Rockwell International Corporation, et al.,* Report, September 15, 1998; Second Report, November 18, 1998; Supplement to Report, July 30, 1999; Supplement Amended Second Report, July 30, 1999; Deposition, September 22-23, 1999.

American Alloys, Inc., Globe Metallurgical, Inc. and Minerais U.S. Inc.
> *In re Industrial Silicon Antitrust Litigation: Civil No. 95-2104, US District Court, Western District of Pennsylvania.* Oral Testimony, November 2, 1998.

Burlington Northern Santa Fe
> *Surface Transportation Board Union Pacific Corp., et al. -- Control and Merger -- Southern Pacific Rail Corp., et al.,* Statement, April 27, 1996; Deposition, May 14, 1996, Statement, July 8, 1998; Statement, October 16, 1998.

Group of Oil Company Defendants
> *US District Court, Southern District of Texas, Corpus Christi Division, Lease Oil Antitrust Litigation No. II, MDL No. 1206,* Deposition, September 28, October 15, 1998; Affidavit, October 8, 1998.

American Alloys, Inc., *et al.*
> *US District Court, Western District of Pennsylvania, Industrial Silicon Antitrust Litigation, No. 95-2104,* Testimony, September 14, 1998.

North West Shelf Gas Project
> *Arbitration Between Western Power Corporation and Woodside Petroleum Development Pty. Ltd. (ACN 006 325 631), et al.* First Statement, May 6, 1998; Second Statement, May 15, 1998; Third Statement, July 22, 1998; Oral Testimony, July 22-28, 1998.

TransCanada Gas Services Limited
> *US District Court, District of Montana, Paladin Associates, Inc., et al. v Montana Power Company, et al.,* Report, November 19, 1997; Rebuttal Report, December 22, 1997; Deposition, January, 1998; Affidavit May 19, 1998.

Association of American Railroads
> *Review of Rail Access and Competition Issues, Surface Transportation Board,* Statement (with D. Reishus), March 26, 1998; Oral Testimony, April 3, 1998.
>
> *Market Dominance Determinations—Product and Geographic Competition, Surface Transportation Board*, Statement (with R. Willig), May 29, 1998; Reply Statement (with R. Willig), June 29, 1998.

Northern Natural Gas Company
> *Federal Energy Regulatory Commission, Northern Natural Gas Company,* Testimony, May 1, 1998.

Koch Pipeline Company, L.P.
> *CF Industries, Inc. v Koch Pipeline Company, L.P., Surface Transportation Board.* Statement (with A. Candell), November 10, 1997; Deposition, December 12, 1997; Reply Statement, January 9, 1998; Rebuttal Statement, February 23, 1998.

Exxon Corporation and Affiliated Companies
> *US Tax Court, Exxon Corporation and Affiliated Companies v Commissioner of Internal Revenue*, Rebuttal Report, February 19, 1998.

Exxon Company
> *US Department of the Interior, Minerals Management Service, Review of the Federal Royalties Owed on Crude Oil Produced from Federal Leases in California,* Affidavit, February 17, 1998.

CSX Corporation and CSX Transportation, Inc., Norfolk Southern Corporation, *et al.*
> *Surface Transportation Board,* Testimony, June 12, 1997; Rebuttal Statement, December 15, 1997.

Group of Oil Company Defendants
> *US District Court, District of New Mexico, Doris Feerer, et al. v Amoco Production Company. et al.,* Report, May 5, 1997; Suppl. Report, July 14, 1997; Deposition, December 4-5, 1997.

Phillips Petroleum Company
> *US District Court, Canyon Oil & Gas Co. v Phillips Petroleum Company,* Report (with K. Grant), September 30, 1997.

*Pro Se* Testimony
> *US Department of the Interior, Minerals Management Service, Establishing Oil Value for Royalty Due on Federal Leases...,* Comments, May 27, 1997; Suppl. Comments (with K. Grant), August 4, 1997.

Pennsylvania Power & Light Company
> *Pennsylvania Public Utilities Commission,* Testimony, April 1, 1997; Rebuttal Testimony, August 1997.

Exxon Corporation
> *Department of Revenue, State of Alaska, Exxon Corporation,* Rebuttal Report, April 29, 1996; Deposition, May 21, 1996; Statement, August 26, 1996; Oral Testimony, March 10-11, 1997.

Honeywell, Inc.
> *Litton Systems, Inc. v Honeywell Inc., US District Court, Central District of California, No. CV-90-0093 MR.*, Preliminary Report, March 7, 1997.

Public Service Company of New Hampshire
*New Hampshire Public Utilities Comm., Testimony on Antitrust issues,* January 21, 1997.

Group of Oil Company Defendants
*Fifth Judicial District Court, County of Chaves, State of New Mexico, Carl Engwall, et al. v Amerada Hess Corp., et al.,* Deposition, November 1-2, December 6, 1996; Oral Testimony, January 16-17, 1997.

*District Court of Seminole County, State of Oklahoma, Laura Kershaw, et al. v Amoco Production Co., et al.,* Deposition, November 5, December 6, 1996.

Fond du Lac Band of Chippewa Indians
*US District Court, District of Minnesota, Fourth Division, Fond du Lac Band of Chippewa Indians, et al. v Arne Carlson, et al.,* Report, December 4, 1996; Suppl. Report, December 20, 1996.

Northeast Utilities
*New Hampshire Public Utilities Commission, Electric Industry Restructuring,* Statement (with A. Jaffe), October 18, 1996.

*Pro Se* Testimony
*Federal Energy Regulatory Commission, Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines, Regulation of Negotiated Transportation Services of Natural Gas Pipelines,* Statement (with A. Jaffe). May 30, 1996.

Burlington Northern Railroad Company
*Surface Transportation Board Burlington Railroad Company -- Crossing Compensation -- Omaha Public Power District.* Statement, April 1996.

Pennzoil Company
*Lazy Oil Co., et al. v Witco Corporation, et al.,* Report, January 29, 1996; Deposition, March 1996.

Yavapai-Prescott Indian Tribe
*Yavapai-Prescott Indian Tribe v Harold Scott (Director of Revenue, State of Arizona), et al.* Declaration, June 27, 1995; Second Declaration, August 10, 1995.

Northeast Utilities
*Massachusetts Department of Public Utilities, Electric Industry Restructuring,* Testimony, April and June 1995.

State of Michigan
*Court of Claims, State of Michigan, Carnagel Oil Associates, et al. v State of Michigan, The Department of Natural Resources, et al; Miller Brothers, et al. v State of Michigan, The Department of Natural Resources, et al.,* Deposition, May 30, 1995.

Burlington Northern Railroad Company
>   *Interstate Commerce Commission, Burlington Northern Railroad Company -- Control and Merger -- The Atchison, Topeka and Santa Fe Railway Company*, Statements, October 1994 and April/May 1995.

Northern Natural Gas Pipeline Co.
>   *Federal Energy Regulatory Commission, Northern Natural Gas Pipeline Co.* (rate filing), Testimony, March 1995.

Houston Lighting and Power Company
>   *Public Utility Commission of Texas, Houston Lighting and Power Company*, Testimony, September, December 1994 and February 1995.

Atlantic Richfield Corp., Exxon U.S.A., Inc., and British Petroleum, Inc.
>   *Superior Court, State of Alaska, First Judicial District at Juneau, ANS Royalty Litigation.* Report, June 6, 1994; Deposition, October 1994.

Esso Standard Oil Company (Puerto Rico)
>   *US District Court, Puerto Rico, Esso Standard Oil Company (Puerto Rico), et al. v Department of Consumer Affairs, Commonwealth of Puerto Rico,* Deposition, April, 1994; Testimony, July-August, 1994; Testimony, August 1989, April, May 1990.

Governments of British Columbia and Canada
>   *US Department of Commerce, International Trade Administration, Certain Softwood Products from Canada, Report for the First Administrative Review,* Statement, April 12, 1994.

Southwestern Public Service Company
>   *Federal Energy Regulatory Commission, El Paso Electric Company and Central and South West Services, Inc,* Affidavit, February 25, 1994.

Mojave Pipeline Company
>   *Federal Energy Regulatory Commission, Mojave Pipeline Company, Economic Analysis of Public Policy with Respect to Mojave Pipeline Company's Proposed Expansion,* Testimony, January 1994.

ARCO Pipe Line Company, Four Corners Pipe Line Co. and ARCO Transportation Alaska, Inc.
>   *Federal Energy Regulatory Commission, Market-Based Ratemaking for Oil Pipelines, Comments in Response to Notice of Inquiry,* Statement, January 1994.

Exxon
>   *U.S. Bankruptcy Court, Claims Quantification Proceedings, In Re: Columbia Gas Transmission Corporation,* Testimony, July 1993, October 1993.

El Paso Natural Gas Company
> *El Paso Natural Gas Company v Windward Energy & Marketing, et al.*, Report, August 1993, Affidavit, September 4, 1993.

SAGASCO Holdings Ltd.
> *Federal Court of Australia, Santos Ltd. Acquisition of SAGASCO Holdings Ltd.*, Testimony, August 1993.

PSI Resources, Inc.
> *Indiana Utility Regulatory Commission, the Proposed Merger between PSI Resources, Inc., PSI Energy, Inc., Cincinnati Gas & Electric Co., and CINergy Corp.*, Statement, June 1993.

Gulf Central Pipeline Company
> *Interstate Commerce Commission Farmland Industries, Inc. v Gulf Central Pipeline Company, et al.,* Statement, May 1993.

> *Federal Energy Regulatory Commission, Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992, Comments on the Commission Staff's Proposal*, Testimony, May 1993.

White Mountain Apache Tribe
> *US Fish and Wildlife Service, U.S. Department of the Interior, Proposed Endangered Species Act Designation of Critical Habitat for Salix Arizonica (Arizona Willow) on the Fort Apache Indian Reservation*, Statement, April 1993.

General Chemical Corporation
> *US Department of the Interior, Bureau of Land Management, Proposed Increase in Royalty Rates on Soda Ash,* Statements, February 1993.

Association of American Railroads
> *Interstate Commerce Commission, Ex Parte No. 346 (Sub-No. 28) Rail General Exemption Authority: Export Corn and Export Soybeans*. Statement, December 1992.

Coalition of Petroleum Refiners
> *US Department of Energy, Office of Hearings and Appeals, The Citronelle Exception Relief,* Statement, July 1992; Testimony, October 1992, November 1992, December 1992; Testimony, March and July, 1989.

Exxon
> *State of California, et al. v Standard Oil Co. of California, et al.,* Deposition, October 1992.

Burlington Northern Railroad Company
> *American Arbitration Association, Arbitration between Wisconsin Power & Light Company and Burlington Northern Railroad Company and Soo Line Railroad Company,* Testimony, August, September 1992.

Atlantic Richfield Company
> *Don Van Vranken, et al. v Atlantic Richfield Company*. Deposition, February 1992; Testimony, August 1992.

National Council on Compensation Insurance `
> *Commonwealth of Virginia, Corporation Commission, Revision of Workers' Compensation Insurance Rates,* Testimony, April, July 1992.

Governments of British Columbia and Canada
> *International Trade Administration, U.S. Department of Commerce, Certain Softwood Lumber Products from Canada,* Statement, February, March, April 1992; Testimony, April 1992, May 1992.

British Petroleum and Exxon Corporation
> *Superior Court, State of Alaska, First Judicial District at Juneau, ANS Royalty Litigation, State of Alaska, et al. v Amerada Hess, et al.,* Report, April 1991; Deposition, June, September 1991; Suppl. Report, April 1992.

Transcontinental Gas Pipe Line Corporation
> *United States of America Federal Energy Regulatory Commission*, Testimony, March 1992.

Atlantic Richfield Company
> *Greater Rockford Energy and Technology, et al. v Shell Oil Company, et al.,* Deposition, December 1991.

Better Home Heat Council
> *Commonwealth of Massachusetts, Department of Public Utilities, Petition of Boston Gas Company for Preapproval of Suppl. Residential Demand-Side Management Programs*, Testimony, June 15, 1991.

Burlington Northern Company
> *Interstate Commerce Commission, National Grain and Feed Association v Burlington Northern Railroad Co., et al.*, Testimony, May 14, 1991.

Arco Pipe Line Company
> *Federal Energy Regulatory Commission, ARCO Pipe Line Company, et al.,* Testimony, February 1, 1991.

Joseph P. Kalt                                                                                      March 2014

Liberty Mutual Insurance Company
> *Minnesota Workers' Compensation Insurance Antitrust Litigation,* Deposition, November 1990.

Misle Bus and Equipment Company
> *United States of America v Misle Bus and Equipment Company*, Oral Testimony, September 1990.

Northeast Utilities Service Company
> *Federal Energy Regulatory Commission, Northeast Utilities Service Company (Re: Public Service Company of New Hampshire),* Testimony, March, July 1990.

Amoco Production Company
> *The Kansas Power and Light Company, et al. v Amoco Production Company, et al.,* Deposition, March 1990 through June 1990.

Santa Fe Industries
> *Texas Utilities Company and Chaco Energy Company v Santa Fe Industries, Inc., et al.* Deposition, November 1988, March, July 1989.

Arizona Public Service
> *Utah International v Arizona Public Service, et al.,* an arbitration proceeding, June 1989.

Atlantic Richfield Company
> *Department of Revenue, State of Alaska, Atlantic Richfield Company and Combined Subsidiaries, Oil and Gas Corporate Income Tax for 1978-1981*, Testimony, December 1988.

El Paso Natural Gas
> *Doyle Hartman v Burlington Northern, Inc., El Paso Natural Gas Co., et al.,* Deposition, October 1988.

Honeywell Inc.
> *MidAmerican Long Distance Company v Honeywell, Inc.,* Deposition, August 1988.

Exxon
> *Federal Energy Regulatory Commission, Brokering of Interstate Natural Gas Pipeline Capacity,* Testimony, July 1988.

Natural Gas Pipeline Company of America
> *Federal Energy Regulatory Commission, Natural Gas Pipeline Company of America,* Testimony, November 1987.

Mojave Pipeline Company
> *Federal Energy Regulatory Commission, Mojave Pipeline Company, et al.,* Testimony, June, October 1987.

Exxon
> *Federal Energy Regulatory Commission, Columbia Gas Transmission Company,* Testimony, April 1987.

Villa Banfi
> *L. Knife & Sons v Villa Banfi,* Testimony, February, March 1987.

Cities Service Corp.
> *Office of Hearings and Appeals, U.S. Department of Energy, U.S. Department of Energy v Cities Service Corporation,* Testimony, December 1986, February 1987.

Exxon
> *Federal Energy Regulatory Commission, Texas Eastern Transmission Corp,* Testimony, August 1986.

Mobil Oil Corporation
> *Federal Energy Regulatory Commission, Northwest Central Pipeline Corp,* Testimony, August 1986.

Bethlehem Steel Corporation
> *Federal Energy Regulatory Commission, ANR Pipeline Co., et al.,* Testimony, May 1986.

Natural Gas Supply Association
> *Federal Energy Regulatory Commission, Request for Suppl. Comments Re: FERC Order No. 436 and Related Proposed Rulemakings, Old Gas Decontrol, FERC's Block Billing for Pipelines, and the Winners and Losers in Natural Gas Policy,* Statement, February 25, 1986.

Group of Oil Refiners
> *Office of Hearings and Appeals, MDL-378 Stripper Well Exemption Litigation,* Testimony, July, September 1984.

Dorchester Gas Corp.
> *Office of Hearings and Appeals, U.S. Department of Energy v Dorchester Gas Corporation,* Testimony, January 1984.

**Appendix B**

## <u>Materials Relied Upon</u>

### <u>Legal Documents</u>

Consolidated Amended Class Action Complaint, In Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF), April 15, 2008.

Plaintiffs' Memorandum in Support of Motion for Class Certification, In Re: Rail Freight Fuel Surcharge Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF/JMF/AK), March 18, 2010.

Direct Purchaser Plaintiffs' Second Amended Consolidated Objections and Responses to the First Set of Interrogatories Directed to all Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company ("Defendants"), In Re: Rail Freight Fuel Surcharge Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF/JMF/AK), May 11, 2011.

Plaintiffs' Reply Memorandum Addressing Wal-Mart Stores, Inc. v. Dukes, In Re: Rail Freight Fuel Surcharge Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF/JMF/AK), September 1, 2011.

Opinion, In Re: Rail Freight Fuel Surcharge Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF), June 21, 2012.

In the US Court of Appeals for the District of Columbia Circuit, No. 12-7085, In RE:  Rail Fuel Surcharge Antitrust Litigation.  MDL Docket 1869, BNSF Railway et al, petitioners. Order Vacating Class Certification, August 9, 2013 – 725 F.3d 244.

Plaintiffs' Supplemental Memorandum of Law in Support of Motion for Class Certification, In Re: Rail Freight Fuel Surcharge Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF/JMF/AK), December 19, 2013.

### <u>Depositions and Expert Reports</u>

Videotaped Deposition of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF), September 24, 2010.

Videotaped Deposition of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF), December 11, 2012.

Videotaped Deposition of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF), December 18, 2012.

Videotaped Deposition of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF), March 4 and 5, 2014.

Expert Report of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, USDC, District of Columbia, Case No. 1:07-mc-00489-PLF, March 18, 2010.

Expert Reply Report of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, USDC, District of Columbia, Case No. 1:07-mc-00489-PLF, August 27, 2010.

Expert Report of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, USDC, District of Columbia, Case No. 1:07-mc-00489-PLF, October 15, 2012.

Expert Report of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, USDC, District of Columbia, Case No. 1:07-mc-00489-PLF, June 12, 2013.

Supplemental Expert Report of Gordon Rausser, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, USDC, District of Columbia, Case No. 1:07-mc-00489-PLF, December 16, 2013.

Expert Report of James T. McClave, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, USDC, District of Columbia, Case No. 1:07-mc-00489-PLF, June 12, 2013.

Expert Report of Joseph P. Kalt, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, USDC, District of Columbia, Case No. 1:07-mc-00489-PLF, March 1, 2013 (errata corrected).

Videotaped Deposition of Joseph P. Kalt, Ph.D., In Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL Docket No. 1869, Misc. No. 07-489 (PLF), May 28, 2013.

## Discovery Documents

BSNF-FSC 00012; BNSF-FSC 001702-04; BNSF-0070536-42; BNSF-0814151; CSXFSC000045; NS_036002112; NS_010003409; NS_013002165-71; NS_003044057-71; UPFSC0078792-95; UPFSC0362818; UPFSC0418186; UPFSC0552636; UPFSC0000518-19; UPFSC0000506-07

## Publicly Available Material

ABA Section of Antitrust Law, *Econometrics*, Chicago: American Bar Association (2005).

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues, 2ⁿᵈ ed*. Chicago: American Bar Association (2010).

Angulo LP, "Labour Inputs Substitution During Corporate Restructuring:  A Translog Model Approach for US Freight Railroads," *Applied Economics*, Vol. 45 (2013), pp. 2547-2562.

Areeda PE and H Hovenkamp, *Antitrust Law : an Analysis of Antitrust Principles and Their Application – 3rd ed.*  New York:  Aspen Law and Business (2006).

Bitzan JD, "Railroad Costs and Competition:  The Implications of Introducing Competition to Railroad Networks," *Journal of Transport Economics and Policy*, Vol. 37 (2003), pp. 201-225.

Bitzan JD and TE Keeler, "Productivity Growth and Some of its Determinants in the Deregulated US Railroad Industry," *Southern Economic Journal*, Vol. 70 (2003), pp. 232-253.

Central Freight Lines, Inc. Tariff CENF 100 Supplement 4.  Fuel  Surcharge.  Issued October 18, 2004.

Central Freight Lines, Inc. Tariff CENF 100 Supplement 6.  Fuel  Surcharge.  Issued March 30, 2011.

Covenant Transport, Inc.  Form 10-K for year ended December 31, 2004.

Covenant Transport, Inc.  Form 10-K for year ended December 31, 2007.

Covenant Transport, Inc.  Annual Report for year ended December 31, 2010.

Federal Judicial Center, *Reference Manual on Scientific Evidence*, 2nd ed., 2000.

Heartland  Express, Inc.  Form 10-K for year ended December 31, 2004.

Heartland  Express, Inc.  Annual Report for year ended December 31, 2007.

Heartland  Express, Inc.  Annual Report for year ended December 31, 2009.

Holland and Reddaway Special Services Schedule, Effective June 3, 2013.

J.B. Hunt. Notice of Annual Meeting, Proxy Statement and Annual Report for year ended December 31, 2005.

J.B. Hunt. Notice of Annual Meeting, Proxy Statement and Annual Report for year ended December 31, 2006.

J.B. Hunt. Notice of Annual Meeting, Proxy Statement and Annual Report for year ended December 31, 2009.

Kincaid H, "Naturalism and the Nature of Economic Evidence," in *Handbook of the Philosophy of Science.  Volume 13, Philosophy of Economics.* Oxford, UK:  Elsevier, (2012).

Knight Transportation, Inc. Form 10-K for year ended December 31, 2003.

Knight Transportation, Inc. Form 10-K for year ended December 31, 2006.

Knight Transportation, Inc. Notice of Annual Meeting, Proxy Statement and Annual Report for year ended December 31, 2009.

Laurits R. Christensen Associates, Inc., A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition:  Revised Final Report, prepared for the Surface Transportation Board, November 2009, Volumes 1-3.

Marten Transport, Ltd. Form 10-K for year ended December 31, 2004.

Marten Transport, Ltd. Form 10-K for year ended December 31, 2006.

Marten Transport, Ltd. Form 10-K for year ended December 31, 2009.

Nicholson W, and C Snyder, *Microeconomic Theory:  Basic Principles and Extensions, 10th ed.* Mason, OH:  Thomson South-Western (2008).P.A.M. Transportation Services, Inc. Form 10-K for year ended December 31, 2004.

P.A.M. Transportation Services, Inc. Form 10-K for year ended December 31, 2008.

Spanos A., *Probability Theory and Statistical Inference:  Econometric Modeling with Observational Data*, Cambridge, UK: Cambridge University Press – Virtual Publishing (2003).

Surface Transportation Board, "Agency Information Collection Activities:  Proposed Collections; Comment Request*," 70 Federal Register 28979-28982*, May 19, 2005.

Surface Transportation Board, Decision.  STB Ex Parte No. 661, Rail Fuel Surcharges, decided January 25, 2007.

Swift Transportation Co., Inc. Form 10-K for year ended December 31, 2002.

Swift Transportation Co., Inc. Annual Report for year ended December 31, 2003.

Swift Transportation Co., Inc. Form 10-K for year ended December 31, 2006.

Swift Transportation Co., Inc. Form 10-K for year ended December 31, 2010.

Theil H, *Principles of Econometrics*, New York: John Wiley and Sons, (1971).

Universal Truckload Services, Inc. Form 10-K for year ended December 31, 2004.

Universal Truckload Services, Inc. Form 10-K for year ended December 31, 2007.

Universal Truckload Services, Inc. Form 10-K for year ended December 31, 2009.

USA Truck, Inc. Annual Report for year ended December 31, 2002.

USA Truck, Inc. Annual Report for year ended December 31, 2005.

USA Truck, Inc. Form 10-K for year ended December 31, 2010.

Ward Trucking Corp.  Standard Rules and Accessorial Charge Tariff Ward 110D (2003) and 110I (May 2005).

Werner Enterprises, Inc. Annual Report for year ended December 31, 2003.

Werner Enterprises, Inc. Form 10-K for year ended December 31, 2007.

Werner Enterprises, Inc. Form 10-K for year ended December 31, 2010.

Wilson Trucking Corporation – Tariff No. 100-R.  Issued March 18, 2013.

Wilson WW, "Cost Savings and Productivity in the Railroad Industry," *Journal of Regulatory Economics*, Vol. 11 (1997), pp. 21-40.

Woolridge JM, *Introductory Econometrics: A Modern Approach 5th ed.* Mason, OH: South-Western, Cengage Learning, (2013).

**Internet Sources**

A. Duie Pyle – LTL Fuel Surcharge – http://aduiepyle.com/publicdocs/LTLFuelSurcharge.aspx

AAA Cooper Transportation – Historical Applicable Diesel Fuel Prices –
http://www.aaacoooer.com/FuelSurchargeHistPopUp.aspx

AAA Cooper Transportation – Application of Fuel Surcharge – ITEM 180-10 -
http://www.aaacooper.com/Rates/Rules/Item180-10.pdf

Averitt Fuel Surcharge Effective 9-5-05 - http://www.averittexpress.com/fuelsurcharge.htm

Carlile Transportation Systems – Fuel Surcharge History -
http://www.carlile.biz/customertools/Pages/FuelSurchargeHistory.aspx

Con-way Historical Data 2012 – http://www.con-way.com/en/tools_pricing/freight/fuel_surcharge/historical_surcharge_data/fuel_surcharge_historical_data_2012

Estes Fuel Charge History – http://www.este-express.com/WebApp/FuelSurcharge/MainServlet?action=estes

Paraclete Management Inc., Fuel Percentage History – http://paraclete.us/

Peninsula Truck Lines, Inc. Fuel Surcharge Listing –
http://www.peninsulatruck.com/Rates/FSCHistory.aspx

Rail-Bridge Fuel Surcharge – http://www.railbridge.com/RBC-Fuel/Rail-Bridge-Fuel-Surcharge.shtml

Fuel Surcharge History – Wilson Trucking – http://www.wilsontrucking.com/news/fuelhist.htm

## **Data**

### *Confidential*

Surface Transportation Board. Carload Waybill Sample.

Work papers of Gordon Rausser, for Expert Reports dated March 10, 2010; August 27, 2010; October 15, 2012, and June 12, 2013.

Workpapers of Gordon Rausser, for Supplemental Expert Report dated December 16, 2013.

Workpapers of James T. McClave, for Expert Report dated June 12, 2013.

Workpapers of Joseph P. Kalt, for Expert Report dated March 1, 2013.

### *Public*

Burlington Northern Santa Fe Corp. Form 10-K for years ending 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

Burlington Northern Santa Fe Corp. Form 10-Q, all quarters, for years 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

CSX Corp. Form 10-K for years ending 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

CSX Corp. From 10-Q, all quarters, for years 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

Norfolk Southern Corp. Form 10-K for years ending 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

Norfolk Southern Corp. Form 10-Q, all quarters, for years 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

Union Pacific Corp. Form 10-K for years ending 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

Union Pacific Corp. Form 10-Q, all quarters, for years 1999, 2000, 2001, 2002, 20903, 2004, 2005, 2006, 2007, and 2008.

Surface Transportation Board – URCS Data.

Surface Transportation Board – R-1 Annual Reports.

## **Additional Material**

All other materials cited in this report and in the figures and appendices to this report.

**Appendix C**

**ADDITIONAL ASSESSMENT OF
PROF. RAUSSER'S MODELS AND DATA**

# I.   CLASS & MERITS MODEL VERSIONS OF ANALYSES IN KALT DECLARATION

Figure C.I.1
**Prof. Rausser's Model Finds Overcharges for His Legacy Shipments**
*Kalt Declaration Figure 1, Class & Merits Model*



Prof. Rausser's Legacy

Prof. Rausser's Legacy
(Pre-March 1, 2003 Requirement)

**Source**:  Rausser Data updated per Rausser Remand Report
**Note:**  Prof. Rausser's Legacy includes all shipments designated as legacy in Prof. Rausser's data; Pre-March 1, 2003 Requirement limits

3

Figure C.I.2
**Testing for False Positives:  Prof. Rausser's Model Finds Overcharges for Legacy Shipper Price Authorities with FSC Provisions that Were Unchanged or Had Reduced Earning Power during the Class Period**
*Kalt Declaration Figure 2, Class & Merits Model*

| FSC Provision | Class Period Revenue with FSC Payments | Rationale | Average Weekly Overcharge | |
| --- | --- | --- | --- | --- |
| | | | Legacy FSC Was First Applied Before July 2003 | Legacy FSC Was First Applied Before March 2003 |
| BNSF FUEL 6100 STANDARD | ■■■■■ | No change in FSC rate applied during Class Period relative to previous formula | ■ | ■ |
| UP INTERMODAL STANDARD FUEL SURCHARGE | ■■■■ | FSC formula unchanged until April 2005, and then became less onerous | | |
| UP WTI1 FUEL SURCHARGE STANDARD | ■■■■ | Not challenged by Prof. Rausser | | |
| BNSF PUBLISHED INTERMODAL SURCHARGE | ■■■■ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL 60 PUBLISHED DAYS | ■■■■ | No change in formula | | |
| NS 6766 (2000 CARLOAD FORMULA) | ■■■■ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL | ■■■■ | Not challenged by Prof. Rausser | | |
| AGGREGATED PROVISIONS | ■■■■ | | | |

**Source:**  Rausser Data updated per Rausser Remand Report
**Note:**  * Provision created March 24, 2003.  Date restrictions require that a customer-price authority-FSC provision combination appear prior to each date specified.  Data limited to shipments for customer-price authorities which Prof. Rausser's data indicate paid within 0.5 percentage points of the applicable FSC formula rate.

4

Figure C.I.3
**Prof. Rausser's Model Finds "Damages" When Actual Class Carload FSCs Are Replaced
with FSCs Calculated Using Pre-"Conspiracy" Published Formulas**
*Kalt Declaration Figure 3, Class & Merits Model*



**Source**:  Rausser Data updated per Rausser Remand Report
**Note**:  In light of rebasing, data for NS not included after June 2006.  Local carload traffic only.

Figure C.I.4
**Prof. Rausser's Methodology Produces Ubiquitous**
**False Positive Structural Breaks**
*Kalt Declaration Figure 4, Class & Merits Model*

| Date of Test for Break | "Class" Shipments | |
| --- | --- | --- |
| | Structural Break? | Calculated "Overcharge" |
| January 1, 2001 | Yes** | |
| July 1, 2001 | Yes** | |
| January 1, 2002 | Yes** | |
| July 1, 2002 | Yes** | |
| January 1, 2003 | Yes** | |
| July 1, 2003 | Yes** | |
| January 1, 2004 | Yes** | |
| July 1, 2004 | Yes** | |
| January 1, 2005 | Yes** | |
| July 1, 2005 | Yes** | |
| January 1, 2006 | Yes** | |
| July 1, 2006 | Yes** | |
| January 1, 2007 | Yes** | |
| July 1, 2007 | Yes** | |

**Source:** Rausser Data updated per Rausser Remand Report
**Note:** Two asterisks (**) denotes significance at the 99% level.

Figure C.I.5
**Testing for False Positives with Pre-March 2003 Data Only:**
**Prof. Rausser's Model Finds Overcharges Long before the Onset of Alleged Conspiracy**
*Kalt Declaration Figure 5, Class & Merits Model*

| Date of Test for "Conspiracy" Break | Does Prof. Rausser's Model Find… | |
| --- | --- | --- |
| | Structural Break? | "Overcharges" |
| April 1, 2000 | Yes** | |
| July 1, 2000 | Yes** | |
| October 1, 2000 | Yes** | |
| January 1, 2001 | Yes** | |
| April 1, 2001 | Yes** | |
| July 1, 2001 | Yes** | |
| October 1, 2001 | Yes** | |
| January 1, 2002 | Yes** | |
| April 1, 2002 | Yes** | |
| July 1, 2002 | Yes** | |
| October 1, 2002 | Yes** | |
| January 1, 2003 | Yes* | |

**Source:** Rausser Data updated per Rausser Remand Report
**Note:** Two asterisks (**) denotes significance at the 99% level.  One asterisk denotes significance at the 95% level.

Figure C.I.9
**How Much Fuel Cost Does Prof. Rausser's Model Convert into "Damages"?  Share of Fuel
Cost Increase Found to Be "Damages" in Prof. Rausser's Model**
*Kalt Declaration Figure 9, Class & Merits Model*



Figure C.I.13
**Testing for Negatives Damages:**
**The Frequency of Negative "Damages" in Prof. Rausser's Model**
*Kalt Declaration Figure 13, Class & Merits Model*



Figure C.I.16
**Prof. Rausser's Model Finds Negative "Damages" for the Named Class Representatives**
*Kalt Declaration Figure 16, Class & Merits Model*



Figure C.I.18
**Prof. Rausser's Model Finds Massive "Overcharges" Even When "Conspiracy"
FSCs Are Not Materially Different from Pre-"Conspiracy" FSCs:**
*Kalt Declaration Figure 18, Class & Merits Model*



Figure C.I.19
**Prof. Rausser's Model Finds "Damages" Even Though Actual Class FSCs Had Lower Earning Power than Pre-"Conspiracy" Published FSC Formulas**
*Kalt Declaration Figure 19, Class & Merits Model*



**Source**:  Rausser Data updated per Rausser Remand Report
**Note**:  In light of rebasing, data for NS not included after June 2006.


Figure C.I.23
**What Level of Non-Enforcement of FSCs Would the But-For World Require to Eliminate Overcharges Found by Prof. Rausser's Model?**
*Kalt Declaration Figure 23, Class & Merits Model*

| Class | | Legacy | |
|---|---|---|---|
| | **Class & Merits** | | **Class & Merits** |
| **Waiver Percent** | **Model Overcharge** | **Waiver Percent** | **Model Overcharge** |
| | | | |

**Source:**  Rausser Data updated per Rausser Remand Report

11

Figure C.I.25
**Prof. Rausser's Model Does Not Find a Common Fact of Injury:**
**Top 100 Intermodal Routes**
*Kalt Declaration Figure 25, Class & Merits Model*



# II.  ADDITIONAL ANALYSES

Figure C.II.1

**False Positives:  Prof. Rausser's Model Finds Overcharges for Legacy Shipper Price
Authorities with FSC Provisions that Were Unchanged or Had Reduced Earning Power
during the Class Period and for CSXI and NS Intermodal Shipper Price Authorities which
Prof. Rausser's Data Indicate Paid Revenue-Based FSCs Prior to March or July 2003**
*STB Model*

| FSC Provision | Class Period Revenue with FSC Payments | Rationale | Average Weekly Overcharge Legacy FSC Was First Applied Before July 2003 | Legacy FSC Was First Applied Before March 2003 |
|---|---|---|---|---|
| BNSF FUEL 6100 STANDARD | ■ | No change in FSC rate applied during Class Period relative to previous formula | | |
| UP INTERMODAL STANDARD FUEL SURCHARGE | ■ | FSC formula unchanged until April 2005, and then became less onerous | | |
| CSXI INTERMODAL SURCHARGE (April 2000 Formula) | ■ | No change in formula | | |
| UP WTI1 FUEL SURCHARGE STANDARD | ■ | Not challenged by Prof. Rausser | | |
| BNSF PUBLISHED INTERMODAL SURCHARGE | ■ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL 60 PUBLISHED DAYS | ■ | No change in formula | | |
| NS PUBLISHED DOMESTIC INTERMODAL SURCHARGE | ■ | Not challenged by Prof. Rausser | | |
| NS 6766 (2000 CARLOAD FORMULA) | ■ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL | ■ | Not challenged by Prof. Rausser | | |
| AGGREGATED PROVISIONS | ■ | | | |

**Source:**  Rausser Data updated per Rausser Remand Report
**Note:**  * Provision created March 24, 2003.  Date restrictions require that a customer-price authority-FSC provision combination appear prior to each date specified.  Data limited to shipments for customer-price authorities that Prof. Rausser's data indicate paid within 0.5 percentage points of the applicable FSC formula rate.  Includes NS domestic intermodal shipments designated by Prof. Rausser's alternative NS legacy identification method based on shipper, commodity, and shipment destination paying an FSC prior to July or March 2003.  Includes CSXI customer-price authorities which Prof. Rausser's data indicate paid revenue-based FSCs prior to March 1, 2003.

14

Figure C.II.2

**False Positives:  Prof. Rausser's Model Finds Overcharges for Legacy Shipper Price
Authorities with FSC Provisions that Were Unchanged or Had Reduced Earning Power
during the Class Period and for CSXI and NS Intermodal Shipper Price Authorities which
Prof. Rausser's Data Indicate Paid Revenue-Based FSCs Prior to March or July 2003**
*Class & Merits Model*

| | | | Average Weekly Overcharge | |
| --- | --- | --- | --- | --- |
| FSC Provision | Class Period Revenue with FSC Payments | Rationale | Legacy FSC Was First Applied Before July 2003 | Legacy FSC Was First Applied Before March 2003 |
| BNSF FUEL 6100 STANDARD | ███████ | No change in FSC rate applied during Class Period relative to previous formula | | |
| UP INTERMODAL STANDARD FUEL SURCHARGE | ████████ | FSC formula unchanged until April 2005, and then became less onerous | | |
| CSXI INTERMODAL SURCHARGE (April 2000 Formula) | ███████ | No change in formula | | |
| UP WTI1 FUEL SURCHARGE STANDARD | ██████ | Not challenged by Prof. Rausser | | |
| BNSF PUBLISHED INTERMODAL SURCHARGE | ██████ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL 60 PUBLISHED DAYS | ██████ | No change in formula | | |
| NS PUBLISHED DOMESTIC INTERMODAL SURCHARGE | ███████ | Not challenged by Prof. Rausser | | |
| NS 6766 (2000 CARLOAD FORMULA) | ██████ | Not challenged by Prof. Rausser | | |
| UP FMC/FUEL | ██████ | Not challenged by Prof. Rausser | | |
| AGGREGATED PROVISIONS | ██████ | | | |

**Source:**  Rausser Data updated per Rausser Remand Report
**Note:**  * Provision created March 24, 2003.  Date restrictions require that a customer-price authority-FSC provision combination appear prior to each date specified.  Data limited to shipments for customer-price authorities that Prof. Rausser's data indicate paid within 0.5 percentage points of the applicable FSC formula rate.  Includes NS domestic intermodal shipments designated by Prof. Rausser's alternative NS legacy identification method based on shipper, commodity, and shipment destination paying an FSC prior to July or March 2003.  Includes CSXI customer-price authorities which Prof. Rausser's data indicate paid revenue-based FSCs prior to March 1, 2003.

15

Figure C.II.3
**Monthly Average URCS Variable Cost Per Ton-Mile**
**Car Type 46 (Intermodal)**



Figure C.II.4
**Testing for False Positives:  Prof. Rausser's Model Finds Overcharges
Even When Rail Rates Just Equal Variable Cost**
***Class & Merits Model***



**squared**                                                                      0.96

**Source:**  STB Carload Waybill Sample; workpapers to Rausser Merits Reply Report
**Note:**  Includes Prof. Rausser's unregulated non-intermodal Defendant traffic.

Figure C.II.5
**Correcting for Prof. Rausser's Mixing of FSC and
Non-FSC Traffic:** *Negative* **Overcharges Are Frequent**
*Kalt Declaration Figure 12, Class & Merits Model & STB Model*

| Model | Average Overcharge | Frequency of Negative Overcharges |
|---|---|---|
| STB Model | | |
| Class & Merits Model | | |

**Source**:  Rausser Data updated per Rausser Remand Report

18

Figure C.II.6
**Prof. Rausser's Model Finds Damages in Excess of FSC Payments**
*STB Model*



Figure C.II.7
**Prof. Rausser's Model Finds Damages in Excess of FSC Payments**
*Class & Merits Model*



19

Figure C.II.8
**Prof. Rausser's Model Finds Comparable "Overcharges" When Class FSC Rates Are Replaced with Pre-"Conspiracy" FSC Rates**
*STB Model*

**Actual Carload Rates**  **Pre- "Conspiracy" Carload Rates**



**Source**:  Rausser Data updated per Rausser Remand Report

Figure C.II.9
**Sensitivities of Fuel Price Responsiveness Factor to Prof. Rausser's
Choice of Period of Calculation**



Figure C.II.10
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.11
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.12
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.13
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.14
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.15
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.16
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.17
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.18
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**



Figure C.II.19
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**

Figure C.III.20
**Were Defendants' Rates for Given Traffic the Same?**
**Intermodal Traffic, Seattle to Chicago**

Figure C.II.21
**FSC Revenue as a Share of Non-FSC Operating Revenue
for Publicly-Reporting Trucking Companies, 2000-2008**



**Source:** Company websites

Figure C.II.22
## Were "Conspiracy" FSCs More Onerous?
## Pre-"Conspiracy" v. "Conspiracy" Intermodal Fuel Surcharge Formulas



**Source:** Kalt Merits Report Figure IV-1, UPFSC0078792-95, UPFSC0362818, UPFSC0418186, UPFSC0552636, UPFSC0000518-19, UPFSC0000506-07, BNSF-FSC 00012, BNSF-FSC001702-04, BNSF-0070536-42, BNSF-0814151, NS_036002112, CSXFSC000045
**Note**: Domestic intermodal rates shown for NS.

Figure C.II.23
**Percentage of New Opportunities with Revenue-Based FSCs (Weighted by Revenue)**



Figure C.II.24
**Fuel Expense as a Percentage of Total Operating Revenue**



**Source:** Defendants' Annual and Quarterly Filings

Figure C.II.25
**Impact on NS Class Revenue of Prof. Rausser's Merits Report (9255/ERAS) Method for
Identifying Legacy Shipments**



Figure C.II.26
**Impact on Class Revenue of Prof. Rausser's Merits Report (9255/ERAS) Method for Identifying Legacy Shipments:  Examples of Selected NS Intermodal Shippers**



Figure C.II.27
**Prof. Rausser's CSXI Class Revenue from Customer-Price Authorities that Paid Revenue-Based FSCs Prior to March 1, 2003**

Gross Revenue for Class Shipments for
Customer-Price Authorities that Paid
Revenue-Based FSCs before March 2003

Percent of Total CSXI Gross Class Revenue
from Customer-Price Authorities that Paid
Revenue-Based FSCs before March 2003

**Source**:  Rausser Data updated per Rausser Remand Report

Figure C.II.28
**Sample Data Error in Prof. Rausser's Categorization of His Legacy Shipments:
CSXT Category 2**

Gross Revenue Placed by Prof. Rausser in
Category 2 because of Data Error

Percent of Total Category 2 Gross Revenue
Generated by Data Error

**Source**:  Rausser Data updated per Rausser Remand Report
**Note**:  Gross revenue shown for Prof. Rausser's legacy shipments that he places in Category 2 as paying mileage-based FSCs despite his data indicating payment of revenue-based FSCs.

Figure C.II.29
**Sample Data Error in Prof. Rausser's "Legacy Contract Start Date" Analysis:  CSXT**

Gross Revenue from Prof. Rausser's Legacy
Shipments with "Contract Start Date" Error

Percent of Total Legacy Gross Revenue from
Prof. Rausser's Legacy Shipments with
"Contract Start Date" Error

**Source**:  Rausser Data updated per Rausser Remand Report
**Note**:  Revenue shown for customer-price authorities whose "contract start dates" per Prof. Rausser occur after his data show shipments for these customer-price authorities.

39

# III. ANALYSES FROM KALT MERITS REPORT

Figure C.III.1
**Assessing Prof. Rausser's Claim that Base Rates Were "Static":**
**Absolute Base Rate Changes for Top STCCs, 2002-2006, Prof. Rausser's Figures 39, 41-43**



Figure C.III.2
**Assessing Prof. Rausser's Claim that Base Rates Were "Static": Percentage Change in
Base Rates for Top STCCs, 2002-2006, Prof. Rausser's Figures 39, 41-43**
*Kalt Merits Report Figure V-9B*



Figure C.III.3
**Assessing Prof. Rausser's Claim that Base Rates Were "Static":**
**Percentage Change in Base Rates, 2002-2006, All Defendants**
*Kalt Merits Report Figure V-9C*



Figure C.III.4
**Testing Prof. Rausser's Assertion that Base Rates Were "Static":  Distribution of Actual
Base Rate per Carload Changes, March 2003 v. March 2006, All Defendants**
*Kalt Merits Report Figure V-8A*



Figure C.III.5
**Testing Prof. Rausser's Assertion that Base Rates Were "Static":  Distribution of Actual
Base Rate per Carload Changes, March 2003 v. March 2006 Individual Defendants**
*Kalt Merits Report Figure V-8B-E*

Figure C.III.6
**Does Prof. Rausser's Model Accurately Predict Changes in Shippers' All-In Rates?**
**March 2003 v. March 2006**
*Kalt Merits Report Figure VI-1*



Figure C.III.7
**Public Carload Fuel Surcharge Formulas:**
**Pre- "Conspiracy" v. "Conspiracy" Public Carload:  NS**
***Kalt Merits Report Figure IV-23C***



**Source:** http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices
**Note:**  NS rebased on July 1, 2006.

Figure C.III.8

**NS:  Public Carload Fuel Surcharge Formulas:**
**Pre- "Conspiracy" v. "Conspiracy" Public Carload**
***Kalt Merits Report Figure IV-24C***



**Source:** http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices
**Note:**  NS rebased on July 1, 2006.

48

Figure C.III.9
**Plaintiffs' Prediction:  Defendants Quit Competing and Stabilized Shares of Shippers'**
**Traffic Intermodal Shares by Shipper: LA to Chicago,  April 2003-December 2008**
*Kalt Merits Report Figure VI-15A*



Figure C.III.10
**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper:  LA to Chicago,  April 2003-December 2008**
*Kalt Merits Report Figure VI-15B*



50

Figure C.III.11
**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period
Intermodal Shares by Shipper:  Memphis to Jacksonville,  April 2003-December 2008**
*Kalt Merits Report Figure VI-15C*



Figure C.III.12
**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper:  LA to Dallas,  April 2003-December 2008**
*Kalt Merits Report Figure VI-15D*



Figure C.III.13
**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper:  Seattle to Chicago,  April 2003-December 2008**
*Kalt Merits Report Figure VI-15E*



53

Figure C.III.14
**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS
Ethyl Alcohol Traffic, Chicago, IL to Sewaren, NJ**
*Kalt Merits Report Figure VI-16A*



Figure C.III.15
**Distribution of Carloads by Revenue-Based Surcharge Rate for
New Customer Price Authorities in Class Period:  BNSF, Carload**
*Kalt Merits Report Figure IV-20A*



Figure C.III.16
**Distribution of Carloads by Revenue-Based Surcharge Rate for
New Customer Price Authorities in Class Period:  CSXT, Carload**
*Kalt Merits Report Figure IV-20B*

Figure C.III.17
**Distribution of Carloads by Revenue-Based Surcharge Rate for New Customer Price
Authorities in Class Period:  NS, Carload**
***Kalt Merits Report Figure IV-20C***



Figure C.III.18
**Distribution of Carloads by Revenue-Based Surcharge Rate for New Customer Price
Authorities in Class Period:  UP, Carload**
*Kalt Merits Report Figure IV-20D*



Figure C.III.19
**Percent of Unregulated Traffic with Revenue-Based Fuel Surcharges by Transaction Type:**
**UP, 2000-2008**
*Kalt Merits Report Figure IV-7A*



Figure C.III.20
**Percent of Unregulated Traffic with Payment of Revenue-Based Fuel Surcharges by Transaction Type:  BNSF, 2000-2008**
*Kalt Merits Report Figure IV-7B*



Figure C.III.21
**Class Representatives' First Movements with Revenue-Based Fuel Surcharges**
*Kalt Merits Report Figure IV-8A*



Figure C.III.22
**Percent of Class Representatives' Total Payments to Defendants under Price Authorities
with Revenue-Based Fuel Surcharges, June 2003**
*Kalt Merits Report Figure IV-8B*

