# Exhibit 64

**Expert Report of James T. McClave, Ph.D.**

**In the matter of**

*In Re: Rail Freight Fuel Surcharge Antitrust Litigation*
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential
Pursuant to Protective Order**

**June 12, 2013**

Highly Confidential                                             Pursuant to Protective Order

# Table of Contents

**1.0**  Introduction ..................................................................................................2

**2.0**  Background and Summary of Opinions ...........................................................4

**3.0**  Dr. Kalt's estimation of Dr. Rausser's model using different "structural break" points produces results that are consistent with Plaintiffs' allegations and serves to validate Dr. Rausser's model ...................................................................................................**10**

**4.0**  Contrary to Dr. Kalt's claim that a large number of customers have "negative overcharges," Dr. Rausser's model shows that all or nearly all customers were impacted by the conspiracy .**13**

**5.0**  Dr. Kalt claims that Dr. Rausser's overcharge calculations contain an "unambiguous methodological error."   Although I disagree with Dr. Kalt's claim, adoption of his "corrected" methodology results in every class member incurring overcharges during the class period ......**18**

**6.0**  Dr. Kalt's claim that Dr. Rausser's model suffers from "out of sample" problems is statistically incorrect ...................................................................................**21**

**7.0**  Dr. Carlton's various tests of "structural stability" serve to confirm the robustness of Dr. Rausser's overcharge estimate ...........................................................................**23**

**8.0**  Drs. Ordover and Harris make the same basic statistical error in their interpretation of Dr. Rausser's class period estimate. ...............................................................................**27**

**9.0**  Dr. Carlton's, Dr. Ordover's and Dr. Johnson's use of only their respective client's data to estimate Dr. Rausser's model is statistically unreliable ...........................................**29**

**10.0**  Drs. Kalt, Carlton, Ordover, and Johnson all specify models that use rates for legacy shipments as a benchmark against which they compare non-legacy shipment prices during the class period.  None of them, however, performs any analysis to assure that the legacy shipments were not impacted by the conspiracy, and their analyses are unreliable as a result. .............................................................................................................**32**

**11.0**  Conclusion ...................................................................................**35**

Highly Confidential                                        Pursuant to Protective Order

## 1.0   <u>Introduction</u>

My name is James T. McClave.  My educational background includes a B.S. in physics and a Ph.D. in statistics.  I taught at the university level for 20 years, both in departments of statistics and in business schools.  The primary area of my research and consulting has been econometrics, which is the application of statistical and mathematical methods to economic issues.  During my academic career I have published peer-reviewed research in the fields of econometrics and statistics.  I also authored and co-authored six textbooks in statistics and econometrics, including *Statistics for Business and Economics*, now in its 12th edition, which has been translated into several foreign languages.

In my consulting practice, I have analyzed economic data in the context of more than 100 matters during the past thirty years.  During that time I have performed econometric analyses on a wide range of products and services, both to form opinions about whether market behavior was competitive or collusive (liability issues) and, if collusive, to measure the amount of economic damages, if any (damages issues).  I have been retained by private plaintiffs and defendants, and by governmental entities, such as the attorneys general of a number of states, to investigate and report on the issue of damages arising out of anticompetitive conduct.

I am currently the President and CEO of Info Tech, Inc.  Since its inception, Info Tech has provided consulting and software development services associated with antitrust analysis.  My expertise and that of my associates at Info Tech has included the development of computerized statistical and econometric tools to assist in the discovery of, and the calculation of damages attributable to, anticompetitive behavior.  Info Tech first became involved in this endeavor as a result of a research grant received in 1977 under the sponsorship of the U.S. Department of Justice and administered by the Florida Attorney General's Antitrust Section.

Currently, Info Tech has approximately 230 full-time employees, the great majority of whom are professionals with a broad range of expertise, including statistics,

economics, econometrics, finance, accounting, computer science, and many other technical fields.

I have testified in federal and state courts in a number of different jurisdictions. I have been court-qualified as an expert in statistics and econometrics in both federal and state courts. I have testified in federal courts on the issue of antitrust damages, and before two grand juries regarding allegations of horizontal conspiracies. I have provided deposition testimony in a number of other antitrust cases, and have served as a non-testifying consultant for both plaintiffs and defendants both before and after antitrust claims have been advanced. My CV is provided as Appendix A to this Report. The CV indicates all of my publications and lists all cases in which I have testified as an expert at trial or by deposition during the last four years. I have also included the Info Tech rate sheet, which provides the hourly rates being charged for all work performed under my supervision on this case. My work on the case is being compensated at the rate of $650 per hour, and is not contingent upon the outcome of the case.

I was asked by Plaintiffs' counsel in this case to review and evaluate statistical and econometric issues presented by the reports of five consultants retained by the Defendants: "Corrected Expert Report of Dennis W. Carlton, Ph.D. On Behalf of Defendant Union Pacific Railroad Company," February 6, 2013 ("Carlton Report"); "Corrected Expert Report of Barry C. Harris, Ph.D.," March 22, 2013 ("Harris Report"); "[Corrected] Expert Report of Dr. John H. Johnson, IV," February 15, 2013 ("Johnson Report"); "[Corrected] Expert Report of Joseph P. Kalt, Ph.D.," March 1, 2013 ("Kalt Report"); and "Expert Report of Janusz A. Ordover, Ph.D.," January 22, 2013 ("Ordover Report"). Each of these reports contains criticisms of the merits report filed by Plaintiffs' expert: Expert Report of Gordon Rausser, Ph.D., October 15, 2012 ("Rausser Report"). More specifically, I was asked to evaluate the Defendants' consultants' statistical criticisms of the econometric methodologies Dr. Rausser employed to determine whether common factors predominate in rail freight pricing and to estimate the overcharges caused by the alleged conspiracy.

Highly Confidential                                    Pursuant to Protective Order

The subsequent sections of this report contain my conclusions and opinions reached as a result of my review and evaluation of Dr. Rausser's econometric analyses, and the Defendants' consultants' statistical criticisms of them.

The materials I have relied upon for my work in this case are listed in Appendix B.

## 2.0    Background and Summary of Opinions

Plaintiffs are direct purchasers of rail freight services that allege that the defendant railroad companies conspired to fix the prices of rail freight transportation. Plaintiffs allege that this conspiracy was enabled by agreements among the Defendants to coordinate and broadly apply, without offsetting base rate discounts, rail freight fuel surcharges ("FSCs"), and that the conspiracy was in effect from early to mid-2003 through December 2008.  The Court has certified a class of similarly-situated direct purchasers, including all those that paid revenue-based FSCs either as a stand-alone add-on to the base rate, or as a part of the base rate through a process known as "rebasing."  Shippers that paid stand-alone FSCs pursuant to a predetermined formula specifically set forth in a contract entered into before July 2003 ("legacy contracts") have been excluded from the class definition.  Also excluded are those that paid regulated freight rates, Defendants (including their subsidiaries and affiliates), and federal government entities.

The Rausser Report utilizes the most widely-accepted and commonly-applied methodology for estimating overcharges in price-fixing antitrust cases:  multiple regression analysis.  The Rausser Report presents the results of a regression analysis performed by Dr. Rausser, from which he concluded that "the common, predominating factors in rail freight pricing can be controlled for in an economic analysis of both impact and damages caused by the alleged conspiracy."[1]  And it also presents the results of a

---

[1] Rausser Report, pp. 159-162.

regression-based methodology performed by Dr. Rausser that uses Defendants' transaction data to quantify class-wide damages.[2]

None of the Defendants' consultants claims that the use of multiple regression models is inappropriate; instead, each of them argues that Dr. Rausser's model is flawed in one way or another.  I have evaluated Defendants' consultants' various statistical criticisms of Dr. Rausser's model, focusing particularly on their criticisms of Dr. Rausser's damages model.  I have concluded that none of those criticisms has merit, and that Dr. Rausser's model constitutes a well-accepted, reliable and appropriate methodology for determining the factors affecting rail freight pricing and for calculating whatever overcharges were caused by the alleged conspiracy in this case.

The following sections of this report provide the details of my analyses and opinions.  A summary of my conclusions is as follows:

1.     **In a failed attempt to explain why Dr. Rausser's model is flawed, Dr. Kalt asserts that Dr. Rausser's model results in "structural breaks" at many different points, both before and during the class period.  Rather than refute Dr. Rausser's hypothesis, however, Dr. Kalt's estimation of Dr. Rausser's model using different "structural break" points actually produces results that are consistent with Plaintiffs' allegations and serves to validate Dr. Rausser's model.**  Dr. Kalt estimates Dr. Rausser's model using what he calls different "structural break" points, which are simply different dates chosen arbitrarily by Dr. Kalt to separate the "benchmark" and "conspiracy" periods.[3]  The resulting models estimated by Dr. Kalt ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which is exactly what is expected, since in every case – as Dr. Kalt acknowledged at deposition[4] – all or part of the class period is included in Dr. Kalt's "damage" period.  Also as expected, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  As shown in Section 3 of this report,

---

[2] Rausser Report, pp. 162-172.

[3] Kalt Report, ¶¶ 519-521.

[4] Deposition of Joseph P. Kalt, Ph.D., May 28, 2013, 33:25-34:8.

Dr. Kalt's results in no way undermine Dr. Rausser's conclusions and, in fact, only serve to validate the robustness of Dr. Rausser's model in general, and its overcharge estimates in particular.

2.     **Dr. Kalt claims that a large number of class members have "negative overcharges."  Dr. Kalt is wrong.  Dr. Rausser's proper econometric analysis demonstrates that all or nearly all customers were impacted by the conspiracy.**  In reaching the opposite – and incorrect – conclusion that many class members suffered no damage, Dr. Kalt estimates customer-level overcharges without implementing econometric methods that can be used to account for expected variation at the customer level.[5]  As discussed in Section 4 of this report, by using accepted econometric methodology and simply adding a ████████████████████████████████████████████████, I have shown that all or virtually all customers were impacted by the conspiracy.  The results of this customer-level model fully support the robustness and reliability of Dr. Rausser's model, which remains the most reliable method for estimating both class-wide and individual customer-level overcharges.

3.     **Dr. Kalt claims that Dr. Rausser's overcharge calculations contain an "unambiguous methodological error."   Although I disagree with his claim, adoption of his "corrected" methodology results in** ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████ as Dr. Rausser has done, is a standard methodology for calculating damages caused by anticompetitive behavior.  Nevertheless, Dr. Kalt claims that this approach creates "damages not caused by the conspiracy."[6]  Dr. Kalt suggests that a better approach is to replace ████████████████████████████████████ ██████████████████████████████████, which Dr. Kalt describes as the part of the actual price "explained by the 'conspiracy' & other, normal factors."[7]

---

[5] Kalt Report, ¶¶ 545-548.

[6] Kalt Report, ¶¶ 549-554.

[7] Kalt Report, Figure VII-9, p. 356.

That is, in order to correct what Dr. Kalt (incorrectly) deems a "methodological error," one would ███████████████████████████████████ ███████████████████████████. As discussed in Section 5 of this report, the method used by Dr. Rausser – the time-tested ████████████████ ███████████████ – provides the most reliable estimate of overcharges at the transaction level. However, even if Dr. Kalt's method were used in this case, it would result in ██████████████████████████████████████.

**4.    Dr. Kalt claims that Dr. Rausser's model suffers from "out of sample" problems. Once again, Dr. Kalt's econometric analysis is statistically incorrect.** Dr. Kalt claims that Dr. Rausser's econometric modeling has the "problem of 'of of sample' data."[8] "Out of sample data" problems are a well-known statistical issue that arise when a model is used to forecast or predict values of the dependent variable for a sample of observations that is different than the sample used to estimate the model. No such problem exists in Dr. Rausser's model. Because Dr. Rausser utilizes a ████████████████████████████ ██████████████████████████████, there is no "out of sample" data – ████████████████████████. By way of example, and contrary to Dr. Kalt's incorrect analysis, the fact that fuel prices were higher in the class period than in Dr. Rausser's benchmark period does not represent an "out of sample data" problem – or any problem at all given the design of Dr. Rausser's model and the analyses that he performed. As discussed in Section 6 of this report, Dr. Kalt's reference to the literature on "out of sample data" problems is misleading, and his "out of sample data" claim is statistically incorrect.

**5.    Dr. Carlton's structural stability critique does not call Dr. Rausser's model into question, but rather serves to confirm the robustness of Dr. Rausser's overcharge estimate.** Dr. Carlton estimated a series of regression models by adding explanatory variables that allow the relationship between all-in freight rates and diesel fuel costs to vary by ████████████████████████ ████████████████████████ He claims that because each of his added

---

[8] Kalt Report, ¶ 523.

explanatory variables proves to be statistically significant, Dr. Rausser's model must not be "structurally stable" and therefore must be unreliable.[9]  As shown in Section 7 of this report, Dr. Carlton's analysis is incomplete and his claim is incorrect.  The fact that additional explanatory variables can be added to an existing regression model and shown to be statistically significant does not imply that the regression model is not structurally stable – especially where, as here, the model is applied to a very large data set.  When I evaluate the practical significance of Dr. Carlton's series of models, I show that his series of models serves to support the robustness of Dr. Rausser's model in general, and Dr. Rausser's overcharge estimates in particular.

6.   **Drs. Ordover and Harris both claim that the ████████████ on Dr. Rausser's ██████████████████████████████████ ████████████████.  Both consultants make the same basic statistical error in their interpretation of Dr. Rausser's class period estimate, and, as a result, their interpretation is incorrect.**  Dr. Rausser's model includes a ████████████ ████████████████████████████████████████████████████████ ████.[10]  Drs. Ordover and Harris make the same basic statistical error by attempting to interpret the ████████████████████████████████████ ████████████████████████████.[11]  As discussed in Section 8 of this report, their interpretation is statistically incorrect and misleading:  when correctly analyzed, the model coefficients produced by Dr. Rausser's model are both economically and statistically sensible, and fully support Dr. Rausser's overcharge estimate.

7.   **Drs. Carlton, Ordover, and Johnson each use only their respective client's data to estimate Dr. Rausser's model.  This approach is statistically unreliable.  Nevertheless, the results that all three of these consultants obtained when estimating Dr. Rausser's model using only relatively small**

---

[9] Carlton Report, ¶¶ 135-138.

[10] Rausser Report, p. 167.

[11] Ordover Report, ¶¶ 121-122; Harris Report, ¶ 208.

**subsets of the full data set used by Dr. Rausser confirm the robustness of Dr. Rausser's model.**  Dr. Carlton estimates Dr. Rausser's model using only UP data; Dr. Ordover estimates it using only BNSF data; Dr. Johnson estimates it using only CSX data.[12]  A model specified and estimated for a group of companies based on a national data set cannot be expected to produce precisely the same results for each company or smaller subsets of the data.[13]  Dr. Carlton's, Dr. Ordover's, and Dr. Johnson's use of subsets of the full data set results in less reliable estimates of Dr. Rausser's model, which was developed to measure price relationships across all Defendants' transactions.  As shown in Section 9 of this report, even these less reliable models support the robustness and reliability of Dr. Rausser's overcharge calculations.

8. **Drs. Kalt, Carlton, Ordover, and Johnson all specify models that use rates paid on legacy shipments as a benchmark against which they compare non-legacy shipment prices during the class period.[14]  None of them, however, performs any analysis to assure that the legacy shipments were not impacted by the conspiracy, and as a result their analyses are unreliable.**
Econometric models are commonly used to quantify the damages, if any, caused by conspiratorial behavior.  The objective is to compare prices during the time period of the conspiracy to prices from a competitive "benchmark" that is relatively free of the conspiratorial behavior.  Dr. Rausser used a 42-month pre-class period as an appropriate benchmark against which to compare the class period prices.  As discussed in Section 10 of this report, Drs. Kalt, Carlton, Ordover, and Johnson used legacy prices for shipments as a "benchmark," but failed to perform any analysis to determine whether or not their alternative benchmark was impacted by the contemporaneous conspiracy.  Instead, they simply seem to have assumed that the all-in rates paid by shippers with legacy contracts during the class period

---

[12] Carlton Report, ¶ 138; Ordover Report, ¶ 124; Johnson Report, ¶ 274.

[13] Chatterjee, Samprit and Hadi, Ali S., *Regression Analysis By Example,* 4th Edition, Wiley-Interscience, 2006, p. 281.

[14] Kalt Report, ¶¶ 533-536; Carlton Report, ¶¶ 148-151; Ordover Report, ¶¶ 95-97; Johnson Report, ¶¶ 272-274.

were not affected by the contemporaneous conspiracy.  That assumption does not appear to be consistent with the conspiracy alleged by the Plaintiffs since, among other things, it seems clear that Defendants' incentive to enforce fuel surcharges in legacy contracts could have affected the rates paid during the class period on contracts entered into in the immediately preceding period even though shippers with such contracts are not part of the certified class.  As a result, the analyses performed by Drs. Kalt, Carlton, Ordover, and Johnson are econometrically unreliable.

## 3.0   Dr. Kalt's estimation of Dr. Rausser's model using different "structural break" points produces results that are consistent with Plaintiffs' allegations and serves to validate Dr. Rausser's model.

Dr. Kalt purports to test Dr. Rausser's claim that his results provide "evidence of a structural break in the relationship between fuel prices and freight rates, coincidental with the start of the conspiracy."[15]  Dr. Kalt's test consists of estimating a series of models by re-defining a series of hypothetical and concocted class periods.  These "pseudo class periods" begin every January and July starting with January 2001 and ending with July 2007.[16]  Noting that each of his "pseudo class periods" ███████████████████████  Dr. Kalt concludes that Dr. Rausser's "claims that the one 'structural break' he tested for validates his claims regarding the onset of conspiracy are baseless."[17]  Dr. Kalt's analysis does not support his conclusion.

Dr. Rausser tested a specific hypothesis that was consistent with Plaintiffs' allegations: namely, that the Defendants' conspiracy took shape in early to mid-2003. His econometric model results were fully consistent with that hypothesis, and as a result he expressed the opinion that the "structural break constitutes economic evidence that

---

[15] Rausser Report, p. 170.

[16] Kalt Report, ¶¶ 519-520 and Figure VII-3 p. 339.

[17] Kalt Report, ¶ 521.

is *consistent with* the existence of a conspiracy."[18]  Nothing in Dr. Kalt's analysis serves to refute or to alter the fact that Dr. Rausser's empirical results are fully consistent with the Plaintiffs' allegations regarding the onset of conspiratorial behavior in 2003.

In fact, Dr. Kalt's results actually provide further support for Dr. Rausser's opinion that his model provides economic evidence consistent with a conspiracy beginning in the first half of 2003.  Examination of Figure VII-3 in Dr. Kalt's report reveals that the trend in his ███████████████████████████████████████████████████ is statistically consistent with a structural break occurring in 2003.  The first point to be made is that every one of his "pseudo class periods" contains all or part of the alleged actual class period, July 2003 through December 2008.[19]  As a result, it is no surprise that every one of his models ███████████████████████████████████████████ ███████████████ in fact, that his models do so is supportive of and consistent with Plaintiffs' allegations that conspiratorial behavior elevated prices during the class period.

The sizes of Dr. Kalt's ████████████████████████████████████████" are also instructive.  Figure 1 ███████████████████████ for each of Dr. Kalt's models from January 2002 through January 2007.[20]

---

[18] Rausser Report, p. 170 (emphasis added).

[19] Kalt Deposition 33:25-34:8.

[20] I have omitted the values prior to January 2002 and after January 2007 in order to have at least two years of data in both the "pseudo benchmark" and "pseudo class periods."  Shorter periods are more likely to produce unreliable statistical results.



This is a period during which part of the actual benchmark period is included in the "pseudo class period."  This is consistent with the hypothesis that the

Once Dr. Kalt's

.  Once again, these results are supportive of the Plaintiffs' allegations and Dr. Rausser's econometric model.  During the first part of the class period, Dr. Rausser's overcharge estimates are relatively small.  Thus, Dr.

Kalt's inclusion of the early class period in his alternative "benchmark period" has little



When Dr. Kalt includes as part of his alternative "benchmark period" longer parts of the actual class period, however, the effect is ███ ██████████████████████████████. In other words, when Dr. Kalt's alternative "benchmark period" becomes contaminated by the inclusion of a significant part of the actual class period, the result is, as expected, █████████████████████████████ ██████████████████████████████

Dr. Rausser is correct in concluding that his results are fully consistent with Plaintiffs' allegations of conspiratorial behavior.  Dr. Kalt's results do not contradict, and in fact offer further support for, that conclusion.[21]


## 4.0   Contrary to Dr. Kalt's claim that a large number of customers have "negative overcharges," Dr. Rausser's model shows that all or nearly all customers were impacted by the conspiracy.



Dr. Kalt claims that "more than ██████ Class Members have zero or negative 'damages'" when Dr. Rausser's model is applied at the customer level.[22]  This represents approximately ██████ of the total number of customers, but accounts for only ██████ of the revenue that Dr. Kalt analyzed.  The number of customers with zero or negative damages is reduced to ██████, accounting for ██████ of the revenue, when Dr. Kalt utilizes "Defendants' transaction database processed to identify relevant information not available in Prof. Rausser's original dataset" rather than utilizing the

---

[21] Dr. Kalt supplied another set of "structural break" analyses after the submission of his report.  For these analyses, Dr. Kalt used data from only part of the time period covered by the data, using data from only either the benchmark or the class period.  *See* output files:  Jan2000_Feb2003.xls, Jan2000_Jun2003.xls, Jul2003_Dec2008.xls.  Since these analyses use only subsets of the data, the model results are often inconsistent and less reliable than those using all the data.  Nonetheless, the ███████████████ are generally consistent with the Plaintiffs' allegations, and nothing in these results alters any of the opinions I have expressed regarding Dr. Kalt's "structural analyses" based on all the data.

[22] Kalt Report, ¶ 548.

Highly Confidential                                    Pursuant to Protective Order

data originally provided to Dr. Rausser. [23]  Both customer percentages are actually quite small and decrease further once one accounts for the fact that prices may vary across shippers, for reasons that are not readily observable, but that are wholly unrelated to the conspiracy.  Standard econometric methods can account for this expected variation, as Dr. Rausser's model does.

One such method of accounting for this expected variation █████████████



████████.  This is a well-accepted statistical method for capturing the effects of factors that are not readily observable.[24]  In effect, such █████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████.

Utilizing the most recent transaction dataset created by Dr. Kalt, I have estimated Dr. Rausser's model after ████████████████████.  A customer must have at least ████ transactions in order for this model to calculate an estimate of each customer's characteristics as well as a corresponding estimate of the customer's overcharge.[25] More than ████████ customers meet this criterion, representing more than ██████ of the Defendants' class period revenue.

The results of this model serve to demonstrate the robustness of Dr. Rausser's model.  All the explanatory variables in the model remain statistically significant, and their price-effects remain economically sensible, with signs and sizes of the coefficients

---

[23] Kalt Report, ¶ 504.  Although Dr. Kalt did not disclose this reduced percentage in his Report, he did include the information in his back-up materials.  *See*, Dr. Kalt's production, in file: Kalt_Workpapers\Section VII\Figure_7_8_10_11_15_16\TX_Data\Figure_7_8_10_11_15.xls.

[24] Greene, William H., *Econometrics Analysis*, 7th Edition, Pearson, 2012, p. 194:  "In most applications, we use dummy variables to account for purely qualitative factors such as membership in a group, or to represent a particular time period. There are cases, however, in which the dummy variable(s) represents levels of some underlying factor that might have been measured directly if this were possible."

[25] I am using "transaction" to represent one observation in Dr. Kalt's "Defendants' Transaction" database. Customers with only one transaction cannot be included in the model, since that transaction represents the only available data to characterize the customer, which leaves no information (or, as econometricians would say, no "degrees of freedom") for computing the customer's overcharge.  As a general matter, the estimate of the price-effects of a customer's characteristics is likely to become increasingly reliable as the number of the customer's transactions increases.

Highly Confidential                                    Pursuant to Protective Order

consistent with those in Dr. Rausser's model.  In addition, the customer model indicates that class-wide overcharges are █████,[26] in the same █████ percent range of Dr. Rausser's (and Dr. Kalt's) estimates using Dr. Kalt's "Defendants' Transaction" database.

In addition to validating Dr. Rausser's model, the use of ████████████ ████████████ provides an additional method of calculating customer-specific overcharges.  The customer-level model shows that ████ of customers, representing ████ of the Defendants' class period revenue, have net positive overcharges, and that ████ of customers, representing ████ of Defendants' class period revenue, are impacted by at least one transaction with an overcharge during the conspiracy period. ████████████████████████████████████████████████ ██████████████████████ estimated using Dr. Kalt's "Defendants' Transaction" database.[27]  The small fraction of customers with net negative overcharges is characterized by relatively few transactions in the class period: more than ████ of the ████ of customers with net zero or negative overcharges under the customer model have █████████████████, and more than ████ of the ████ of customers have ████████ ████████  Due to increased random variability when the number of observations is this small, these "net negative" customers should not be assumed to be un-impacted by the conspiracy.[28]

To examine the effects of increasingly reliable customer indicator variables, I estimated a customer model requiring ████ or more observations per customer in both the

---

[26] This is a weighted average overcharge over all customers in the model, computed using the methodology Dr. Kalt described in ¶ 547 of his Report, namely "by summing the product of … individual weekly shipments and the difference in the actual and the but-for price across the Class Period."

[27] In fact, even Dr. Kalt's customer-level analysis using the "Defendants' Transaction" database shows that ██████████████████████████████ I've included in my analysis. *See*, Dr. Kalt's production, in file: Kalt_Workpapers\Section VII\Figure_7_8_10_11_15_16\TX_Data\Figure_7_8_10_11_15.xls.

[28] Collapsing customer names across multiple transaction databases is difficult to accomplish, due to different spellings, subsidiary relationships, etc.  Under-collapsing customer names – failure to combine names of customers that should be combined – can result in over-stating the number of "net negative" customers. ████████████████████████████████████████████████ ████████████████████████████████████

Highly Confidential                                   Pursuant to Protective Order

pre-class and class periods.[29]  More than ███ customers meet that requirement, and their purchases represent ███ of the Defendants' total revenue during the class period. The results of this model are once again very consistent with Dr. Rausser's model:  all model coefficient estimates are statistically significant and right-signed, and the overcharge estimate is ███ .  In this model, in which a larger number of observations are available to estimate the ████████████████████████████████████ ██████████████████████████ of customers have net positive overcharges, and ███ of customers are impacted on at least one transaction. The model continues to support the robustness of Dr. Rausser's model if that number is increased to at least ██ observations per customer in each period – ███ customers representing ███ of the Defendants' revenue meet the requirement, and the overcharge estimate is ███  In this model, fully ███ of customers have net positive overcharges, and ███ have at least one impacted transaction.

    I have summarized the results of these analyses in Figure 2.

---

[29] Pindyck, Robert S., and Rubinfeld, Daniel L., *Econometric Models and Economic Forecasts*, 4th Edition, Irwin-McGraw-Hill, 1998, pp. 31-33.

Highly Confidential                                    Pursuant to Protective Order



As shown in Figure 2, the series of models ██████████████████ serves to support the robustness of Dr. Rausser's model and to demonstrate that all or virtually all customers were impacted by the alleged conspiracy.  Thus, Dr. Kalt's claim that nearly ██████ of customers may have "negative damages" is without merit.  For practical purposes, all or virtually all shippers were impacted by the conspiracy.

It is important to emphasize that the fact that the customer models could be used to estimate overcharges does not suggest any shortcoming in Dr. Rausser's model.  Dr. Rausser's model, because it includes all transactions and all class members (regardless of size), remains the most reliable and well-accepted method for computing class-wide overcharges.

17

**5.0    Dr. Kalt claims that Dr. Rausser's overcharge calculations contain an "unambiguous methodological error."   Although I disagree with Dr. Kalt's claim, adoption of his "corrected" methodology results** ███████████████████ ███████████████████████

Dr. Kalt claims that the methodology Dr. Rausser described for calculating transaction-specific damages – the same method Dr. Kalt described and used for the customer-specific calculations he reported in paragraph 547 of his report – contain an "unambiguous methodological error."[30]  In fact, Dr. Rausser's method is consistent with widely-accepted, standard practice in the calculation of antitrust damages.  However, application of Dr. Kalt's preferred methodology continues to show class-wide impact and ██████████████████████.

The Federal Judicial Center's *Reference Manual on Scientific Evidence* provides the following description of the typical process followed when calculating damages in litigation:

> In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position.  …Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario.  **Economic damages are the difference between that value and the actual value that the plaintiff achieved.[31]**

In antitrust cases, the "actual values" are typically the actual prices paid, and the "but-for values" are often estimated prices using multiple regression models.  ████████████ ████████████████████████████████████████████ ███████████████████████████.  Standard practice is to compute damages as the difference between these two prices.

Although Dr. Kalt initially adopted this methodology when he computed overcharges at the customer level,[32] he later claimed it "contains unambiguous

---

[30] Kalt Report, ¶ 549.

[31] Hall, Robert E. and Lazear, Victoria A.  "Reference Guide on Damages," *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, 2011, p. 432 (emphasis added).

[32] Kalt Report, ¶ 547.

methodological error."[33]  The gist of Dr. Kalt's claim is that he disagrees with the standard and well-accepted use of the actual price when computing the overcharges at the customer level.

Dr. Kalt states that each actual price paid during the class period can be viewed as consisting of two components: (i) the part "explained by 'conspiracy' & other, normal factors," and (ii) the part "not explained by 'conspiracy' & other, normal factors."[34]  In statistical terminology, the explained part is the "predicted value" and the unexplained part the "residual value."  When the actual price is compared to the but-for price, the residual value is included in the calculation because it is part of the actual price.  Dr. Kalt claims that including the unexplained part – the residual – as part of the damage calculation is inappropriate.

To understand Dr. Kalt's claim, we first need a basic understanding of the term "residual" in a multiple regression model context.  In a multiple regression model, every transaction price used to estimate the model is an "actual value."  Once the model is estimated, it is an equation that can be used to estimate the price of each transaction based on the values of the explanatory variables for that transaction.  That estimate is the "predicted value."  The "residual" value for each observation in a price regression model is the difference between the actual price (the observed price) and the predicted price (the price predicted by the regression model).  Dr. Kalt recognizes that in "real world" applications residual values exist, meaning that there will be differences between the actual and predicted prices.[35]  That is, in real-world applications of multiple regression models, positive and negative residuals are inevitable.

The goal of the regression model is to minimize the difference between the actual and predicted prices,[36] and Dr. Rausser's model R-squared of 90% indicates that his

---

[33] Kalt Report, ¶ 549.

[34] Kalt Report, Figure VII-9, p. 356.

[35] Kalt Deposition, 36:13-37:25.  Dr. Kalt notes that in a "determinant system" one might have a perfectly fitting multiple regression model, id. 36:16-22, but he does not claim that the "system" consisting of transactional prices being modeled in this case is "determinant."

[36] Technically, the standard estimation procedure minimizes the sum of the squared differences between the actual and predicted prices.

model meets very high standards in that regard.[37]  The methodology used to compute the regression model assures that the sum of all the residuals is zero.  That is, approximately half the observations will have positive residuals (actual price higher than predicted price) and half the observations will have negative residuals (actual price less than predicted price).[38]

Dr. Kalt argues that a transaction with a positive residual (actual value greater than predicted value) inflates the overcharge estimate by including a portion that is unexplained by the regression model; he also acknowledges that a transaction with a negative residual (actual value less than predicted value) deflates the overcharge estimate.[39]  Dr. Kalt emphasizes that many customers' damages are inflated by the inclusion of more positive than negative residuals.[40]  The numerical facts he reports, however, show that the inclusion of residuals in the damages calculation – that is, the use of the actual prices customers paid – results in a net increase in the overcharge for only █████████████████████████████████████████████████████████ ███████ have a net decrease in their overcharges.[41]  These positive or negative residuals do not signify some sort of defect in Dr. Rausser's model or in the way that Dr. Rausser has applied the model in computing overcharges; instead, the residuals are simply the product of a normally functioning regression model.  Indeed, since Dr. Rausser's model is accounting for 90% of the variability in prices, we know that the unexplained "residual" component is a relatively small portion of the actual prices.

Although the use of actual prices paid in the computation of damages is standard practice, I have analyzed the effect of Dr. Kalt's suggestion that inclusion of the residual values is a "methodological error."  Rather than using the actual prices in the damage computation, I have used the predicted price, which excludes the residual, whether positive or negative.  That is, for each customer I have calculated the difference

[37] The 90% R-squared is based on Dr. Kalt's "Defendants' Transaction" data.

[38] In probabilistic terms, the expected value of the difference is zero.  Actual realizations of the difference will therefore be positive and negative with approximately equal frequency.

[39] Kalt Report, ¶ 552; Kalt Deposition, 40:2-9.

[40] Kalt Report, ¶ 553.

[41] Kalt Report, Figure VII-10, p. 358.

between the predicted prices and the "but-for" prices.  The result is that  when I adopted Dr. Kalt's suggestion that the residual values should not be included in the calculation.

In summary, I showed in the previous section that when actual prices are compared to but-for prices in a model that includes ███████████████████, virtually all customers are shown to be impacted by the conspiracy.  In this section I showed that even Dr. Kalt's novel approach, which uses predicted rather than actual prices, shows class-wide impact.  The bottom line is that Dr. Rausser's model provides strong econometric evidence in support of the Plaintiffs' allegations that all or virtually all class members were impacted by the conspiracy.


## 6.0   Dr. Kalt's claim that Dr. Rausser's model suffers from "out of sample" problems is statistically incorrect.

Dr. Kalt claims that Dr. Rausser's econometric model has a basic statistical problem:

> Specifically, the Class Period experienced levels and changes in fuel prices (the driving force behind "damages" in Prof. Rausser's model) that were outside of the experience picked up by Prof. Rausser's modeling of the pre-Class benchmark period.… This creates an apples v. oranges problem, well-known in statistics as the problem of "out of-sample" data.[42]

Dr. Kalt is correct that fuel prices were generally at different levels in the two periods. However, Dr. Kalt is incorrect that Dr. Rausser's model has an "out of sample" problem as a result.

The statistical context in which an "out of sample" problem might exist is when a model is used to forecast (predict) values of the dependent variable for a sample of observations with values of one or more explanatory variables that are significantly

---

[42] Kalt Report, ¶ 523.

Highly Confidential                                    Pursuant to Protective Order

different from those used to estimate the model. For example, suppose a regression model is specified to estimate the percentage of annual earnings that are saved or invested (dependent variable) as a function of the age (explanatory variable) for those employed by high tech companies. The sample is selected from companies who employ only young people in the age range 20-40. If this model were then to be used to estimate the savings rate for high tech employees in the 50-60 age range, it would represent an "out of range" application of the model, since the estimate is being made for ages that are significantly different than those on which the model was based. The reliability of the estimates depends on the assumption that the relationship is the same in both age ranges, which in examples like this one may be doubtful.[43]

Dr. Kalt's assertion that Dr. Rausser's model suffers from an "out of sample" problem is statistically incorrect, and his cite to the literature is misleading. Both Dr. Rausser's model specification and his use of all the data to estimate his model and its corresponding overcharge estimates ensure that they are not subject to any "out of sample" problem. Dr. Rausser used the standard and widely accepted



which eliminates any potential "out of sample" problem.

Dr. Kalt cites to an article by Jonathan Baker and Daniel Rubinfeld in support of his assertion that Dr. Rausser's model has an "out of sample" problem.[44] This cite does not support Dr. Kalt's claim. In the first part of the article to which he cites is a footnote that states the importance of testing various model specifications "when making out-of-sample predictions using the estimated regression equation, as sometimes occurs in

---

[43] "Usually, considerable caution is needed in using extrapolation, because it is based on the assumption that the model used in fitting remains valid outside the range of observation. The greater the reliance that can be placed on this assumption, the greater is the confidence in the accuracy of the results of extrapolation." *Encyclopedia of Statistical Sciences*, Volume 3, John Wiley & Sons, 2006, p. 2177.

[44] Baker, Jonathan B.and Rubinfeld, Daniel L., "Empirical Methods in Antitrust Litigation: Review and Critique," *American Law and Economics Review*, 1999, 386-435, at p. 397 n. 24 and p. 415.

Highly Confidential                                          Pursuant to Protective Order

simulation studies."[45]  The "out-of-sample predictions" to which this footnote refers are
clearly those outside the sample used to estimate the model, *i.e.*, forecasts.  Dr.
Rausser is not using his model to make "out-of-sample" predictions.  Dr. Kalt's other cite
to the article is to a page on which the authors are discussing the use of econometric
models in evaluating proposed mergers. This page of the article discusses "forecasts"
and "simulations" using econometric models, neither of which applies to Dr. Rausser's
model or his application of the model to estimate overcharges.  In short, Dr. Kalt's cite to
this article is irrelevant and misleading.[46]


## 7.0    Dr. Carlton's various tests of "structural stability" serve to confirm the robustness of Dr. Rausser's overcharge estimate.

Dr. Carlton conducted a series of tests that he claims "reject Professor Rausser's
stability assumption."[47]  However, Dr. Carlton focuses only on the statistical significance
of certain variables he adds to Dr. Rausser's model, rather than their practical
significance in the model and their practical effects on the estimated overcharge, which
he failed to analyze.[48]  As a result, his tests do not undermine the validity of Dr.
Rausser's model and serve to confirm the robustness of Dr. Rausser's results.

Dr. Carlton's tests consist of adding explanatory variables to Dr. Rausser's model
and then testing for their statistical significance.  For example, he adds terms that allow

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

---

[45] *Ibid*, p. 397 (fn. 24).

[46] Dr. Kalt attempted to justify his cites at his deposition, but his attempted justifications did not provide relevant connections to the cites and his incorrect "out of sample" claims.  *See* Kalt Deposition, 69:7-85:4.

[47] Carlton Report, ¶ 137.

[48] "Practical significance should be distinguished from statistical significance, which addresses the precision with which a parameter or parameters are measured.  A parameter can have statistical significance without practical significance, if, for example, it is estimated accurately to be a very small number that is greater than zero, but not practically different from zero."  Baker, Jonathan B. and Rubinfeld, Daniel L., "Empirical Methods in Antitrust Litigation: Review and Critique," American *Law and Economics Review,* 1999, 386-435, at p. 397, n 23.



[49] Dr. Carlton then tests the statistical significance of the interaction variables, and reports them to have passed the test. He repeats this test by ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ with each of these other factors are statistically significant, and concludes that Dr. Rausser's model is therefore not structurally stable. Dr. Carlton's conclusion does not withstand scrutiny.

Dr. Rausser's model is intended to measure the degree to which the alleged conspiracy impacted class members. Therefore, Dr. Carlton's "structural stability" tests should be evaluated on the basis not only of their statistical significance, but also of their practical significance with respect to Dr. Rausser's impact and overcharge results. The importance of considering practical significance in conjunction with statistical significance is well understood by practitioners.[50] The degree of statistical significance increases as the sample size increases, so that differences that are small and practically insignificant can become statistically significant for samples as large as those in this case.[51] Dr. Carlton did not report any analysis of his proposed additional variables' practical significance.

I have examined the practical significance of Dr. Carlton's alterations to Dr. Rausser's model, and found that they do not have practical significance. For example, adding the ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[49] ████████████████████████████████████████████████████████████ ████████████████████████████████████

[50] "Often, results that are practically significant are also statistically significant. However, it is possible with a large dataset to find statistically significant coefficients that are practically insignificant." Rubinfeld, Daniel, L. "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, 2011, pp. 318-319.

[51] "For example, a model estimated with a large number of observations may allow one to reject null hypotheses of zero coefficients for many explanatory variables." Pindyck, Robert S., and Rubinfeld, Daniel L., *Econometric Models and Economic Forecasts*, 4th Edition, Irwin-McGraw-Hill, 1998, p. 67.

Highly Confidential                                    Pursuant to Protective Order

██████████████████████████████████████.[52]  Thus, Dr. Carlton's model would imply that, all else equal, increasing costs are accompanied by declining prices, an economically nonsensical relationship.  These anomalous results may be due to multicollinearity – correlation among the explanatory variables that can lead to apparently nonsensical relationships with the dependent variable – introduced by adding numerous unnecessary dummy variables to the model.[53]

I have considered the effects of these additional variables on the overcharge estimate.  The overcharge estimates for each of the five models are shown in Table 1.

---

[53] Gujarati, Damodar N. and Porter, Dawn C., *Basic Econometrics,* 5th Edition, McGraw-Hill Irwin, 2012, p. 598: "[W]ith many dummy variables in the model, both individual and interactive or multiplicative, there is always the possibility of multicollinearity, which might make precise estimation of one or more parameters difficult."

Highly Confidential                                        Pursuant to Protective Order



Note that every overcharge estimate is positive and generally supportive of Dr. Rausser's overcharge estimates. Some of the variability in the estimates is likely due to random variation attributable to Dr. Carlton's addition of practically insignificant

variables to the model.  Nonetheless, the overcharge estimates produced by Dr. Carlton's models provide strong support for the robustness of Dr. Rausser's model and its overcharge estimates.



The principle of parsimony advises against complicating Dr. Rausser's model with factors that, although statistically significant, have no practical significance.[54]  Dr. Carlton's models are inconsistent with that principle.  Dr. Carlton's models only serve to confirm the robustness of Dr. Rausser's model for the assessment of impact and the estimation of damages.

## 8.0     Drs. Ordover and Harris make the same basic statistical error in their interpretation of Dr. Rausser's class period estimate.

Dr. Rausser's model includes ███████████████████████████████████████ ████████████████████████████████████.  This means that, from a statistical perspective, the two variables have to be considered as a unit in order to understand their price effects, and, in particular, to determine the estimate of overcharges as measured by them.[55]

---

[54] "The Occam's razor …, or the principle of parsimony, states that a model be kept as simple as possible, or, as [economist] Milton Friedman would say, 'A hypothesis [model] is important if it 'explains' much by little.'  What this means is that one should introduce in the model a few key variables that capture the essence of the phenomenon under study and relegate all minor and random influences to the error term." Gujarati, Damodar N., *Basic Econometrics,* 3rd Edition, McGraw-Hill, 1995, p. 454. (citing Milton Friedman's "The Methodology of Positive Economics," *Essays in Positive Economics*, University of Chicago Press, 1953, p. 14.)

[55] Mendenhall, William and Sincich, Terry*, A Second Course in Business Statistics: Regression Analysis,* 4th Edition, Dellen Publishing, 1993, pp.185-187.

Drs. Ordover and Harris make the same basic error by attempting to interpret the ████████████████████████████, without reference to ██████████████████. Dr. Ordover states that "the ████████████████████████████████ which *on its own* indicates that the impact of the conspiracy was to lower the all-in rates, rather than to raise them."[56]  Similarly, Dr. Harris claims that, because ████████ ██████████████████████████, "the entire estimated effect of the supposed collusion is due to the ██████████████████████████████."[57]  Both are attempting to attach meaning to the ████████████████████████, without considering it in conjunction ████████████████████████████.

Dr. Ordover's and Dr. Harris' interpretation of the ██████████████ is not statistically sound, and is misleading and incorrect.  I have re-estimated Dr. Rausser's model after removing ██████████████████████████████████ from his model, while making no other changes to the model.  I have done this solely for the purpose of evaluating the manner in which Drs. Ordover and Harris have interpreted Dr. Rausser's ████████████████, and not because I believe that Dr. Rausser's use of the ████████████ is in any way statistically inappropriate.

After the ████████████████████████████████████████ can be properly interpreted on its own.  The ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ caused by the fuel surcharge conspiracy.  The price effects of the other factors in Dr. Rausser's model remain statistically significant and economically sensible after the interaction is removed.  Therefore, the remaining ████████████████████████████████████████████████, because all other (non-conspiracy related) price effects have been accounted for in the model.

The ████████████ model shows that Drs. Ordover and Harris reached an incorrect conclusion based on the ████████████████████████████ in the with-

---

interaction model.  The data clearly show that prices were elevated by the conspiracy even when the ███████████████████████████ However, Dr. Rausser's model remains the most reliable methodology for estimating the overcharges. His model properly includes the statistically significant ███████████████ ████████████████████████████████████████ ████████████████████████████████ the significantly different relationship between the transactions prices and diesel fuel prices in the benchmark and class periods.  That ███████████████████████████ ████████████████████████████████ ███████████████████████████ when that effect is properly included in Dr. Rausser's model.

## 9.0   Dr. Carlton's, Dr. Ordover's and Dr. Johnson's use of only their respective client's data to estimate Dr. Rausser's model is statistically unreliable.

Drs. Carlton, Ordover, and Johnson each estimate Dr. Rausser's model using subsets of the full database consisting of only their client's data – UP, BNSF, and CSX, respectively.  Dr. Rausser's damage analysis – like all damage analyses in antitrust cases – is predicated on the assumption that the jury will find the Defendants liable for the alleged conspiracy.  The Plaintiffs allege a conspiracy among the four Defendants that affected rail shipment prices throughout the U.S. market.  In order to determine whether the alleged conspiracy impacted prices, Dr. Rausser properly specified a multiple regression model that related price to supply and demand factors at a national level encompassing the transactions of all four Defendants with class member shippers. His model passes all standard statistical tests of reliability, and all the factors' relationships to price are economically sensible.  Most importantly, his model provides statistically reliable, robust estimates of the overcharge attributable to the conspiracy.

Defendants' consultants have variously attempted to estimate Dr. Rausser's model to selected subsets of the data, and have criticized the model for not producing precisely the same results as the model estimated based on all the data.  Their criticisms are meritless.  By definition, models based on a smaller sample (subset) of

the data will be less reliable than the model based on all the data.  In addition, when subsets are selected for a specific attribute, a national model cannot be expected to produce identical results.[58]  For example, Dr. Kalt's models using only data for specific routes are irrelevant for evaluating Dr. Rausser's model.  Dr. Rausser appropriately accounts for ███████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████ .

     Dr. Carlton estimated Dr. Rausser's model using UP data only.  He notes that "sub-groups of the data may yield substantially different results than those found by Professor Rausser, thus further demonstrating that his results are not reliable."[59]  Dr. Carlton's assertion is wrong; any differences he finds simply reflect the fact that selected subsets of data produce less reliable estimates of the national model's price relationships than those based on all the data.  His client's data represent only part of the entire set of transactions implicated in the alleged conspiracy, so the estimated relationships are inherently less reliable than those from Dr. Rausser's model of all of Defendants' transactions nationwide.  Nonetheless, Dr. Carlton's model does serve to add more evidence of the robustness of Dr. Rausser's overcharge estimate.  Dr. Carlton notes that his UP-only model results in an overcharge of █████████████ ."[60]  Considering that his model's supply and demand price relationships are less reliable than Dr. Rausser's, this estimate provides evidence that prices were significantly elevated, even though the quantification of the overcharge is less reliable than that based on Dr. Rausser's statistically superior model.

     Similarly, Dr. Ordover estimated Dr. Rausser's model based on BNSF data only.  Dr. Ordover focuses on what he asserts is an "implausible" change in the relationship between BNSF's fuel prices and its all-in rates resulting from his estimated model.[61]  As

---

[58] "The problems of variable selection and the functional specification of the equation are linked to each other."  Chatterjee, Samprit and Hadi, Ali S., *Regression Analysis By Example,* 4th Edition, Wiley-Interscience, 2006, p. 281.

[59] Carlton Report, ¶ 138.

[60] Carlton Report, ¶ 138.

[61] Ordover Report, ¶ 124 and Figure 33 p. 109.

discussed above, the model relationships are expected to be less reliable when data subsets are used to estimate the national model, so the fact that he found a relationship that is "implausible" is not surprising.  What Dr. Ordover fails to report, however, is the overcharge estimate that results from his BNSF-only model.  His model results in an overcharge estimate of ███ – a percentage that, like Dr. Carlton's finding based on UP data, provides evidence that prices were significantly elevated in the class period even though the quantification of the overcharge is less reliable than that based on Dr. Rausser's statistically superior model.

Dr. Johnson estimates what he describes as "an extension of Dr. Rausser's damage model" using "transactional data for CSXT and CSXI."[62]  He does not report the results of using only CSXT and CSXI data *without* making other changes ("extensions") to Dr. Rausser's model.  In fact, even with this relatively small subset of the full transaction data, the CSX-only model continues to demonstrate the robustness of Dr. Rausser's overcharge estimate.  Using Dr. Kalt's "Defendants' Transaction" database, the CSX-only model results in an overcharge estimate of ███.  Again, this model confirms Dr. Rausser's findings, although it quantifies the overcharge less reliably than Dr. Rausser's statistically superior model.

Dr. Carlton's UP-only model, Dr. Ordover's BNSF-only model, and Dr. Johnson's CSX-only model all support the robustness of Dr. Rausser's overcharge estimate, despite the inherently less reliable estimates of the model's price relationships when subsets of the full transactional database are used to estimate the model.

---

[62] Johnson Report, ¶ 274.

**10.0   Drs. Kalt, Carlton, Ordover, and Johnson all specify models that use rates for legacy shipments as a benchmark against which they compare non-legacy shipment prices during the class period.[63]  None of them, however, performs any analysis to assure that the legacy shipments were not impacted by the conspiracy, and their analyses are unreliable as a result.**

Econometric models are often used, as in this case, to estimate damages caused by conspiratorial behavior.  The objective is to specify a model that compares prices during the alleged conspiracy period to "benchmark" prices that are unaffected by the conspiratorial behavior.  The model first accounts for changes in price attributable to supply and demand factors that are unrelated to the conspiratorial behavior, and then is used to compare the prices between the conspiracy and benchmark.  In this case, Dr. Rausser's model compared prices in the class period, July 2003 through December 2008, to those in the benchmark period, January 2000 through June 2003.  A benchmark consisting of either a time period prior to the conspiracy, after the conspiracy period, or both before and after the conspiracy period is called the "Before and/or After" methodology, and is widely accepted and utilized by antitrust analysts.[64]  The "Before and/or After" methodology can produce a conservatively low estimate of the conspiratorial overcharges if the inception of the conspiracy is earlier than the beginning of the class period, or if the price-effects of the conspiracy linger after the end of the class period.[65]  ██████████████████████████████████ assures that any such transition effects are likely to have affected at most a small portion of the benchmark period, and would only *reduce* the overcharge percentage in any event.

Defendants' consultants Drs. Kalt, Carlton, Ordover, and Johnson all attempt to use prices of so-called "legacy" transactions during the class period as benchmarks for

---

[63] Kalt Report, ¶¶ 533-536; Carlton Report, ¶¶ 148-151; Ordover Report, ¶¶ 95-97; Johnson Report, ¶¶ 272-274.

[64] Connor, John M., "Forensic Economics: An Introduction with Special Emphasis on Price Fixing," *Journal of Competition Law and Economics*, 2007, 31-59 at p. 54.

[65] Nieberding, James F., "Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues," *Journal of Applied Economics*, Vol. IX, No. 2, 2006, 361-380 at p.370.

the prices that would have prevailed absent the alleged conspiracy.  My understanding
is that legacy transactions correspond to those associated with contracts that had been
entered prior to the start of the class period in July 2003.[66]  Based on my review of their
reports, Defendants' consultants seem to have assumed that the all-in rates paid by
shippers with legacy contracts during the class period were not affected by the
contemporaneous conspiracy.  That assumption does not appear to be consistent with
the conspiracy as alleged by the Plaintiffs.  Among other things, for example, it seems
clear that Defendants' incentive to enforce fuel surcharges in legacy contracts could be
different during the alleged conspiracy, and, thus, an agreement like the one alleged by
the Plaintiffs to coordinate on imposing and enforcing fuel surcharges could certainly be
found to have affected the rates paid during the class period on contracts entered into in
the immediately preceding period even though shippers with such contracts are not part
of the certified class.  Sound practice dictates that an assumption of this kind with
respect to a benchmark should not be made without testing and verification.

Defendants' consultants attempt to justify their use of legacy transactions as a
benchmark based on the fact that the Plaintiffs do not include customers with legacy
contracts in the class definition.[67]  But the exclusion of legacy contracts from the class
definition does not necessarily mean that these legacy transactions were not impacted
by the conspiracy.  In fact, the use of prices charged to non-class members by the
conspiring defendants during the conspiracy period as a benchmark raises a very real
concern that those prices might be elevated above competitive levels as a result of the
very same conduct at issue with respect to members of the class.  Based on a review of
their reports and deposition transcripts, Defendants' consultants performed no analysis
to determine whether or not the all-in rates paid by shippers with legacy contracts in fact

---

[66] Rausser Report, p. 166.

[67] Carlton Report, ¶ 142; Johnson Report, ¶ 272; Kalt Report, ¶¶ 515, 533-536.  I understand that
Defendants' consultants also point to statements by Dr. Rausser concerning legacy contracts in support
of their use of legacy contracts as a benchmark.  *E.g.*, Deposition of Janusz A. Ordover, May 24, 2013,
100:5-101:2; Deposition of John H. Johnson, IV, Ph.D., May 31, 2013, 271:20-272:7.  I have not been
asked to evaluate the statements at issue, but any statements that Dr. Rausser may have made
concerning legacy contracts cannot change the fact that Defendants' consultants performed no analysis
to determine whether legacy contracts were in fact impacted by the alleged conspiracy.  Absent such
analysis by Defendants' consultants, it is my opinion that their use of legacy contracts as a benchmark is
inappropriate.

were impacted by the alleged conspiracy, and no analysis that validates their use of Defendants' "during conspiracy period" prices as a benchmark.  In fact, the results they obtained would confirm just the opposite – that some or all of the legacy contract prices were impacted by the conspiratorial behavior.

The same conclusion applies to analyses by Defendants' consultants using freight rates paid by shippers subjected to mileage-based FSCs during the class period as a benchmark for determining whether class members were subject to overcharges.[68] Although shippers that paid mileage-based FSCs are not members of the class, I have seen no evidence that Defendants' consultants performed any analyses to determine whether contracts that included mileage-based FSCs were impacted by the alleged conspiracy.  Absent such analysis by Defendants' consultants, my opinion is that the use of mileage-based FSCs as a benchmark is inappropriate.

Defendants' consultants' attempts to use prices charged by the Defendants during the conspiracy period to shippers that have been excluded from the class definition as benchmarks are unreliable.  Dr. Rausser's use of the widely accepted "Before and/or After" methodology – using prices from a relatively long pre-class period mostly free of conspiratorial effects – is appropriate and provides a reliable benchmark for the calculation of damages in this case.

---

[68] Carlton Report, ¶¶ 149-151

Highly Confidential                                                    Pursuant to Protective Order

**11.0   Conclusion**

After evaluating statistical criticisms of the Defendants' consultants regarding Dr. Rausser's econometric model, I find that none of them has merit.  In fact, many of them serve only to validate the reliability and robustness of Dr. Rausser's model.  Dr. Rausser's model results are fully consistent with the Plaintiffs' allegations that a conspiracy beginning in early- to mid-2003 had the effect of elevating prices above competitive levels through at least December 2008.  Dr. Rausser's model establishes that all or virtually all class members were impacted by the conspiracy.  His model also provides an econometrically reliable methodology for measuring both class-wide and individual class members' damages.


I declare under penalty of perjury that the foregoing is true and correct.  Executed June 12, 2013.




James T. McClave, Ph.D.

35

...............................Appendix A

**JAMES T. McCLAVE, Ph.D.**
**President**
**Info Tech, Inc**.
5700 Southwest 34th Street, Suite 1235
Gainesville, FL  32608-5371
Telephone:  352-381-4400
Fax:  352-381-4444
E-mail: jim.mcclave@infotechfl.com

## Areas of Specialization

Statistics, Econometrics, Statistical and Econometric Modeling, Time Series and Regression Analysis, Forecasting, Biostatistics, Antitrust Liability Analysis and Damage Estimation, Employment Discrimination Analysis (Liability and Damages), Calculation of Business Damages, Collusion Detection Software Development and Training.

## Professional Background

President, Info Tech: Statistical Consulting, Information Systems Software Development, Data Management, Computer Analysis, Litigation Support, Expert Testimony, 1977-present.

Adjunct Professor, Business and Economic Statistics, Graduate School of Business, University of Florida, 1989-present.

Associate Professor, Department of Decision and Information Sciences, University of Florida, 1986-1989.

Associate Professor, College of Business Administration, University of Florida, 1981-1986.

Associate Professor, Department of Statistics, University of Florida, 1977-1981.

Assistant Professor, Department of Statistics, University of Florida, 1973-1977.

Visiting Assistant Professor, Department of Statistics, State University of New York at Buffalo, 1972-1973.

Assistant Professor, Department of Statistics, University of Florida, 1971-1972.

Graduate Teaching Assistant, Department of Statistics, University of Florida, 1966-1971.

## Education

| | | | |
|---|---|---|---|
| 1971 | Ph.D. | Statistics | University of Florida |
| 1966 | B.S. | Physics | Bucknell University |



James T. McClave, Ph.D.

## Partial List of Courses Taught

Statistics and Econometric Modeling (TV Course for approximately 1,000 students per term)
Statistics and Econometrics for MBAs
Introduction to Probability and Statistics
Engineering Statistics
Statistics for Computer Sciences
Mathematical Statistics
Statistical Methods for Social Sciences
Statistical Methods for Business
Statistical Methods for Biological Sciences
Applied Time Series Modeling and Forecasting
Stochastic Processes
Advanced Time Series Analysis

## Publications

### Books

Statistics for Business and Economics, 12th Edition, Pearson, 2014 (with G. Benson and T. Sincich).

A First Course in Business Statistics, 8th Edition, Prentice Hall, 2001 (with G. Benson and T. Sincich).

Statistics, 12th Edition, Pearson, 2013 (with T. Sincich).

A First Course in Statistics, 11th Edition, Pearson, 2013 (with T. Sincich).

Probability and Statistics for Engineers, 4th Edition, Duxbury Press, Wadsworth Publishing Company, 1995 (with R. Scheaffer).

A Second Course in Business Statistics: Regression Analysis, 4th Edition, Dellen Publishing Company, 1993 (with W. Mendenhall and T. Sincich).

### Publications in Refereed Statistics and Economic Journals

Lanzillotti, R. F. and McClave, J.T., "Comment: Meeting the 'Ambiguity' Test Under *Daubert*." Antitrust, 17(2), 44-48, Spring 2003.

Blair, R.D., Kaserman, D.L., and McClave, J.T., "Competition on Trial: Florida Deregulates Trucking." Challenge, 30(4), 60-64, 1987.

Blair, R.D., Kaserman, D.L., and McClave, J.T., "Motor Carrier Deregulation: The Florida Experiment." The Review of Economics and Statistics, 68, 159-164, 1986.

McClave, J.T. and Tipton, J., "Time Series Modeling: A Comparison of the Maximum Chi-square and Box-Jenkins Approaches." Time Series Analysis: Theory and Practice, 4, 155-161, 1983.

Spreen, T.H., Mayer, R.E., Simpson, J.R., and McClave, J.T., "Forecasting Monthly Slaughter Cow Prices with a Subset Autoregressive Model." Southern Journal of Agricultural Economics, 11, 127-131, 1979.

Littell, R.C., McClave, J.T., and Offen, W.W., "Goodness of Fit Tests for the Two Parameter Weibull Distribution." Communications in Statistics, B8(3), 257-269, 1979.



James T. McClave, Ph.D.

McClave, J.T., "Choosing the Order of a Moving Average Process: The Max Chi-square." Communications in Statistics, A7, 259-276, 1978.

Wackerly, D.D., McClave, J.T., and Rao, P.V., "Measuring Nominal Scale Agreement Between a Rate and a Known Standard." Psychometrika., 43, 213-223, 1978.

McClave, J.T., "Choosing the Order of an Autoregressive Process: The Max Chi-square Technique." Journal of the American Statistical Association, 73, 122-128, 1978.

McClave, J.T. and Marks, R.G., "Predicting Hospital Census Using Time Series Regression Methods." Communications in Statistics, A6 (No. 12), 1187-1206, 1977.

McClave, J.T., "Subset Autoregression." Technometrics, 17, 213-220, 1975.

McClave, J.T., "A Comparison of Moving Average Estimation Procedures." Communications in Statistics, 3(9), 865-883, 1974.

McClave, J.T., "On the Bias of Autoregressive Approximations to Moving Averages." Biometrika, 60, 559-605, 1973.


**Other Publications**

Hewitt, C., McClave, J.T., and Sibley, D.S., "Incumbency and Bidding Behavior in the Dallas-Ft. Worth School Milk Market." (Mimeo, University of Texas at Austin) 1993.

Hodgson, T.J., King, R.E., McClave, J.T., Sullivan, J.H., and Zegel, W.C., "Analysis and Modeling of a Proposed Mining and Benefication Process." Industrial and Engineering Chemical Research, 26, 2223-2228, 1987.

Newman, J.R., Novakova, I.E., and McClave, J.T., "The Influence of Industrial Air Emissions on the Nesting Ecology of the House Martin (Delichon Urbica) in Czechoslovakia." Biological Conservation, 31, 229-248, 1985.

Doering, P.L., Brackbill, Y., McManus, K., Woodward, L., and McClave, J.T., "Prenatal Drugs: Patient Information and its Source." Contemporary Pharmacy Practice, 5(2), 112-119, 1982.

McClave, J.T., Sullivan, J.H., and Pearson, J.G., "Statistical Analysis of Fish Chronic Toxicity Test Data." Aquatic Toxicology and Hazard Assessment, Proceedings of the Fourth Annual Symposium on Aquatic Toxicology, ASTM, 1981.

Winchester, B.J., Delotelle, R.S., Newman, J.R., and McClave, J.T., "Ecology and Management of the Colonial Pocket Gopher: A Progress Report." Proceedings of the Rare and Endangered Wildlife Symposium, 1979.

Rothrock, T.P., McClave, J.T., and Ailstock, J.P., "A Computerized Economic and Statistical Investigation of the Florida School Bread Market." Southeast Antitrust Review, 1, 13-54, 1978.

McLean, J.E., Ware, W.B., and McClave, J.T., "How Analysis of Covariance Can Yield Misleading Results in Educational Experiments-a Monte Carlo Study." Proceedings of the American Statistical Association, 548-553, 1975.



3

## Expert Testimony

<u>Standard Iron Works v. Acelormittal, et al</u>.  U.S. District Court, Northern District of Illinois, Eastern Division; Case No. 08-cv-5214.  Testimony in deposition regarding methodology for determining impact and estimating damages on classwide basis.  December 12-13, 2012.  Retained by Plaintiffs.

<u>In the Matter of the Commission Rate Adjustment for Montana Agency Liquor Store, Great Falls No. 140; Cause No. 10-165-LQ and Great Falls No. 141; Cause No. 10-166-LQ</u>.  Before the Department of Revenue, State of Montana.  Testimony at hearing regarding statistical methodology used to establish commission rates. December 7, 2012.  Retained by Department of Revenue.

<u>Lake City Medical Group, d/b/a Southern Medical Group v. Blue Cross Blue Shield of Florida, Inc</u>.  Circuit Court of the 3rd Judicial Circuit and for Columbia County, FL; Case No.: 03-29CA.  Testimony in class certification hearing regarding proposed methodology for computing medical claim underpayments on a classwide basis.  November 15, 2012. Retained by Defendant.

<u>Lake City Medical Group, d/b/a Southern Medical Group v. Blue Cross Blue Shield of Florida, Inc</u>.  Circuit Court of the 3rd Judicial Circuit and for Columbia County, FL; Case No.: 03-29CA.  Testimony in deposition regarding proposed methodology for computing medical claim underpayments on a classwide basis.  October 30, 2012. Retained by Defendant.

<u>CMMF, LLC v. J.P. Morgan Investment, Inc. and Ted C. Ufferfilge</u>.  Supreme Court of the State of New York, County of New York; Index No. 09-601924. Testimony in deposition regarding statistical comparison of financial metrics for managed accounts.  August 31, 2012.  Retained by Plaintiff.

<u>Urethane Antitrust Litigation, Seegott Holdings, Inc., et al. v. Bayer AG, et al. Relates to the Polyether Polyol Cases</u>.  U.S. Disctrict Court, District of Kansas, Case No. 04-MD-1616-JWL. Testimony in deposition regarding classwide damage estimation. July 12, 2012.  Retained by Plaintiffs.

<u>TFT-LCD (Flat Panel) Antitrust Litigation</u>.  U.S. District Court, Northern District o California, MDL 1827; No. M-07-1827 SI; Relating to All Actions  Testimony in deposition regarding pass-through rates and damages for indirect purchasers. June 13, 2012. Retained by Plaintiffs.

<u>IMA Ponte Vedra, Ltd., et al. v. Food Lion, Inc., et al.</u>  Circuit Court, 7th Judicial Circuit, St. Johns County, Florida, Case No.CA09-2495.  Testimony in deposition regarding damage methodology in breach of contract case.  May 15, 2012.  Retained by Defendants.

<u>Air Cargo Shipping Services Antitrust Litigation</u>.  U.S. District Court for the District of New York, MDL No. 1775; Master File 06-MD-1775(JG)(VVP); Relating to All Actions.  Testimony in deposition regarding methodology for determining classwide impact.  April 12, 2012.  Retained by Plaintiffs.

<u>Air Cargo Shipping Services Antitrust Litigation</u>.  U.S. District Court for the District of New York, MDL No. 1775; Master File 06-MD-1775(JG)(VVP); Relating to All Actions.  Testimony in deposition regarding methodology for determining classwide impact.  February 16, 2012.  Retained by Plaintiffs.

<u>Chocolate Confectionary Antitrust Litigation</u>.  U.S. District Court, Middle District of Pennsylvania, MDL Docket No. 1935, Civil Action No. 1:08-MDL-1935.  Testimony regarding impact methodology at class certification hearing.  November 14, 2011.  Retained by Plaintiffs.

<u>Rita B. Head, et al. v. Jeffrey M. Cohen, et al</u>. Circuit Court, Eleventh Judicial Circuit, Miami-Dade County, Florida, Case No. 02-01716 CA 25.  Testimony in deposition regarding damages in a legal malpractice case.  October 21, 2011.  Retained by Plaintiffs.

<u>Medtronic Sofamor Danek, Inc. v. RTI Biologics, Inc</u>.  Case No. AAA 32-122 y-00744 10.  Testimony at an Arbitration Hearing regarding the statistical analysis of litigation rates following product recall.  October 12, 2011.  Retained by Defendant.



James T. McClave, Ph.D.

Medtronic Sofamor Danek, Inc. v. RTI Biologics, Inc.  Case No. AAA 32-122 y-00744 10.  Testimony in deposition regarding the statistical analysis of litigation rates following product recall.  September 29, 2011.  Retained by Defendant.

Scottsdale Memorial Health Systems, et al. v. Maricopa County, et al. Superior Court of Arizona, Maricopa County, Case No: CV1997-021512 (Consolidated). Testimony at hearing involving medical claims sampling methodology.  July 11-12, 2011. Retained by Plaintiffs.

Chocolate Confectionary Antitrust Litigation.  U.S. District Court, Middle District of Pennsylvania, MDL Docket No. 1935, Civil Action No. 1:08-MDL-1935.  Testimony in deposition regarding damages analysis performed in price-fixing case.  July 1, 2011.  Retained by Plaintiffs.

Scottsdale Memorial Health Systems, et al. v. Maricopa County, et al. Superior Court of Arizona, Maricopa County, Case No: CV1997-021512 (Consolidated). Testimony in deposition regarding the evaluation of sampling methodology used to estimate health care reimbursement amounts owed by County to hospitals. May 31, 2011. Retained by Plaintiffs.

Merco Group at Aventura Landings I, Inc., et al. v. Tampa Electric Company.  Circuit Court, Eleventh Judicial Circuit, Miami-Dade County, Florida, Case No: 04-22909(CA09). Testimony in deposition regarding statistical analysis comparing sites for likelihood of contamination responsibility. May 24,2011. Retained by Defendant Continental Holdings, Inc.

State of Ohio, ex rel Mike Dewine, Attorney General v. American International Group, Inc., et al. Court of Common Pleas, Cuyahoga County, Ohio, Case No: CV 07 633857.  Testimony in deposition regarding the evaluation of damage calculations in insurance antitrust case.  April 26, 2011.  Retained by Defendant.

Applied Surgical, LLC and Dave Alexander v. Stryker, Inc., et al.  Circuit Court for Jefferson County, Alabama, Civil Action No: CV-2008-900173.  Testimony in deposition regarding probability analysis testing similarity of surgical devices in patent infringement case. March 21, 2011. Retained by Defendant.

Vincent J. Bifolck, as Executor of the Estate of Jeanette D. Bifolck and Individually v. Philip Morris, Inc. U.S. District Court, District of Connecticut, Case No: 3L06CV1768(PCD). Testimony in deposition regarding relative risk analysis. December 7, 2010.  Retained by Defendant.

Engle Progeny Cases, Tobacco Litigation, Pertains to: Mary Brown as Personal Representative of the Estate of Rayfield Brown. Fourth Judicial Circuit, Duval County, FL, Civil Division, Case No. 2008-CA-15000, Division: Tobacco, (16-2007-CA-011175-BXXX-MA). Testimony in deposition regarding risk analysis under various assumptions regarding quit years and intensity of smoking.  December 1, 2010. Retained by Defendant.

New Mexico State Investment Council, et al. v. Countrywide Financial Corporation, et al. First Judicial Court, Santa Fe, NM, Case No. D-0101-CV-2008-02289.  Testimony in deposition regarding statistical analysis of property appraisals of assets included in mortgage-back securities. September 9, 2010. Retained by Plaintiffs.

State of Florida, Office of the Attorney General, Department of Legal Affairs v. Alltel Communications, Inc. Second Judicial Circuit, Leon County, FL, Case No. 2006CA2520.   Testimony in trial regarding damage analysis for case involving alleged overcharges related to automatic enrollment in roadside assistance plan.  June 4, 2010.  Retained by Defendant.

Boca Airport, Inc. d/b/a Boca Aviation v. Proskauer Rose LLP., Circuit Court, Fifteenth Judicial Circuit, Palm Beach County, Florida, Case No. 50 2006 CA 002732 XXXX MB AF.  Testimony in trial regarding damage analysis for legal malpractice claim, May 25, 2010. Retained by Plaintiff.



James T. McClave, Ph.D.

Lucille Ruth Soffer, Personal Representative of the Estate of Maurice Benson Soffer v. R.J. Reynolds
  Tobacco Company, et al.  Eighth Judicial Circuit, Alachua County, FL, Case No. 07-CA-005192, Div J.
  Testimony in deposition regarding risk analysis under various assumptions regarding quit years and
  intensity of smoking.  April 28, 2010. Retained by Defendant.

Douglas and Denise Campbell, et al. v. First American Title Insurance Company. U.S. District Court,
  District of Maine, Civil Action No. 2:08-cv-311-GZS.  Testimony in deposition regarding damage
  analysis in a class action case involving alleged overcharges for title insurance for refinanced
  mortgages in Maine.  February 8, 2010.  Retained by Plaintiffs.

State of Florida, Office of the Attorney General, Department of Legal Affairs v. Alltel Communications, Inc.
  Second Judicial Circuit, Leon County, FL, Case No. 2006CA2520.  Testimony in deposition regarding
  damage analysis for case involving alleged overcharges related to automatic enrollment in roadside
  assistance plan.  February 2, 2010 and May 12, 2010.  Retained by Defendant.

Treasure Coast Interiors, Inc. v. Ethan Allen Global, Inc., et al.,  Circuit Court, 19th Judicial Circuit, Martin
  County, FL, Case No.07-1237 CA - Metzger.  Testimony in deposition regarding damage analysis in a
  breach of contract and unfair trade practices case, December 22, 2009.  Retained by Plaintiffs.

City of St. Louis, et al. v. American Tobacco Company, Inc., et al.,  Circuit court of the City of St. Louis,
  MO, Case No. 982-09652-01, Division 6.  Testimony in deposition regarding calculation of the size of
  the Missouri cigarette market in relationship to  the U.S. cigarette market, October 21, 2009.  Retained
  by Defendants.

Caroline Behrend, et al. v. Comcast Corporation, et al., U.S. District Court, Eastern Division of
  Pennsylvania, Case No. 03-6604.  Testimony at class certification hearing regarding damage analysis
  involving alleged anti-competitive behavior in the Cable Television Industry, October 13, 14, 15 and
  26, 2009.  Retained by Plaintiffs.

A.D. Alberton, et al. v. Commonwealth Land Title Insurance Company, U.S. District Court, Eastern District
  of Pennsylvania, Case No. 06-3755.  Testimony in deposition regarding damage analysis in a class
  action case involving alleged overcharges for title insurance for refinanced mortgages, September 16,
  2009. Retained by Plaintiffs.

Raymond H. Pierson, et al. v. Orlando Regional Healthcare Systems, Inc., et al., U.S. District Court,
  Middle District of Florida, Orlando Division, Case No. 6:08-cv-466-orl-28GJK.  Testimony in deposition
  regarding damage analysis in alleged wrongful denial of hospital privileges case, September 9, 2009.
  Retained by Plaintiffs.

Alan Schein, et al. v. Ernst & Young, LLP, Circuit Court, 17th Judicial Circuit, Broward County, Florida,
  Case No. 03-000266-CACE-19. Testimony at trial regarding damage analysis involving alleged
  professional negligence and accounting malpractice, July 8, 2009.  Retained by Plaintiffs.

Deborah Ann DeMarta et al. v. HCA, Inc. et al., Circuit Court, 19th Judicial Circuit, St. Lucie County,
  Florida, Case No. 56 2007 CA 001238AXXXHC.  Testimony in deposition regarding damage analysis
  associated with alleged breach of contract for hospital privileges, June 26, 2009.  Retained by
  Plaintiffs.

Caroline Behrend, et al. v. Comcast Corporation, et al., U.S. District Court, Eastern Division of
  Pennsylvania, Case No. 03-6604.  Testimony in deposition regarding damage analysis in a class
  action case involving alleged anti-competitive behavior in the Cable Television Industry, June 3, 2009.
  Retained by Plaintiffs.

The Wackenhut Corporation v. Miami Dade County, Cathy Jackson and George M. Burgess, U.S. District
  Court, Southern District of Florida, Case No. 09-21147-CIV-Jordan/McAliley.  Provide testimony in



James T. McClave, Ph.D.

federal court injunction hearing regarding review of statistical method used by Dade County in audit of security contract, June 2, 2009.  Retained by Plaintiff.

Alan Schein, et al. v. Ernst & Young, LLP,  Circuit Court, 17th Judicial Circuit, Broward County, Florida, Case No. 03-000266-CACE-19. Testimony in deposition regarding damage analysis involving alleged professional negligence and accounting malpractice, February 11, 2009.  Retained by Plaintiffs.

Boca Airport, Inc. d/b/a Boca Aviation v. Proskauer Rose LLP., Circuit Court, 15th Judicial Circuit, Palm Beach County, Florida, Case No. 50 2006 CA 002732 XXXX MB AF.  Testimony in deposition regarding damage analysis for legal malpractice claim, February 3, 2009. Retained by Plaintiff.


### Professional Activities and Awards


**Entrepreneur of the Year, University of Florida, Center for Entrepreneurship and Innovation, 2005.**

**Outstanding Alumni, University of Florida,  Department of Statistics, 2002.**

**University of Florida Committees**

University of Florida Center for Entrepreneurship and Innovation, 2002.
University of Florida President's Council, 2001-present.
Business Leaders Forum, 1994-present.
College of Business Undergraduate Curriculum Committee, 1988-1989.
College of Business Teaching Committee, 1987-1988.
College of Business Associate Dean Search Committee, 1987
College of Business and Liberal Arts and Sciences Task Force, 1986-1989.
College of Business Computing Committee, 1986-1989.
University Senate, 1979-1980.
College of Liberal Arts and Sciences Tenure and Promotion Committee, 1978-1979, 1979-1980.
College of Arts and Sciences Curriculum Committee, member 1976-1980.
College of Arts and Sciences Computer Sciences Committee Member, 1973-1976;
    Chairman 1974-1975.
Instruction and Research Users Committee, NERDC, member 1974-1975.

**Council for Economic Outreach**

**The Executive Committee (TEC)**

**State of Florida Department of Education Committee**

Statewide Common Course Designation and Number Project, Statistics Task Force Member, 1974-1981.

**Professional Associations**

American Statistical Association
American Bar Association – Associate Member – Section of Antitrust Law
International Association of Assessing Officers
NHCAA, National Health Care Anti-Fraud Association



James T. McClave, Ph.D.

**Invited Teaching/Training Sessions**

"Collusion Detection Methods Training," Florida Department of Transportation, September 11-13, 2012.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 27-March 1, 2012.

BAMS/DSS Asphalt/Concrete Analysis Presentation, Minnesota Department of Transportation, October 31, 2011.

BAMS/DSS Asphalt/Concrete Analysis Presentation, Minnesota Department of Transportation, June 26-27, 2011.

BAMS/DSS Market Analysis Presentation, Alabama Department of Transportation, May 16-17, 2011.

"Collusion Detection Methods Training," Montana Department of Transportation, November 8-10, 2010.

"BAMS/DSS Econometric Training," FBI/Office of Inspector General, U.S. Department of Transportation, August 17-18, 2010.

"Collusion Detection Training," Minnesota Department of Transportation, June 9-10, 2010.

"Collusion Detection Training," Kentucky Department of Transportation, March 16-18, 2010.

Ohio BAMS/DSS Econometric Training, Webinar Presentations, May 1, May 15 and June 18, 2008.

"Bid Analysis and Collusion Detection Training," New Mexico Department of Transportation, April 2-3, 2008.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 26-28, 2008.

Competition Analysis, Nebraska Department of Roads, February 12, 2008.

"Dusting for Fingerprints of Collusion," SASHTO presentation, Huntsville, AL, August 5-6, 2007.

"Bid Analysis and Collusion Detection Training," North Carolina Department of Transportation, March 12-15, 2007.

"Bid Analysis and Collusion Detection Training," South Carolina Department of Transportation, March 6-8, 2007.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 27-March 1, 2007.

Asphalt Analysis, Richmond, VA, December 8, 2006.

BAMS/DSS Presentation, Helena, MT, August 16, 2006 and September 17, 2006.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Albany, NY, July 21-25, 2006.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 27-March 3, 2006.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 22-25, 2005.

Guest Lecturer at Penn Law School on "Use of Statistics and Econometrics in Antitrust Litigation," 2004-2005.

"Bid Analysis and Collusion Detection Training," Ohio Department of Transportation, November 16-18, 2004.

"Bid Analysis and Collusion Detection Training," Ohio Department of Transportation, July 11-14, 2004.

"Bid Analysis and Collusion Detection Training," Kentucky Department of Transportation, July 14-16, 2004.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 24-26, 2004.

"Competition Audit," Tennessee Department of Transportation, November 13, 2003.

"Competition Audit," Nebraska Department of Transportation, October 27, 2003.

"Collusion Detection Training," U.S. Department of Agriculture, Kansas City, MO, October 15-16, 2003

"Competition Audit," Ohio Department of Transportation, August 26, 2003.

"Competition Audit," Oregon Department of Transportation, June 4, 2003.

"Collusion Detection Training," Ohio Department of Transportation, April 22-24, 2003.

"Collusion Detection Training," South Carolina Department of Transportation, March 12, 2003.



8

James T. McClave, Ph.D.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 25-27, 2003.

"Statistical Methods for Medicare and Medicaid Investigations," University of Florida, Shands Hospital, one-day training in Jacksonville, FL, August 1, 2002.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 20-22, 2001.

"Collusion Detection Training," Ohio Department of Transportation, April 18-20, 2000.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 22-24, 2000.

Missouri BAMS/DSS Data Analysis Presentation, December 13, 1999.

Nebraska BAMS/DSS Data Analysis Presentation, November 1, 1999.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 23-25, 1999.

"Collusion Detection Training," Colorado Department of Transportation, December 7-8, 1998.

"Collusion Detection Training," Texas Department of Transportation, September 1-2, 1998.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 24-26, 1998.

"Collusion Detection Training," Colorado Department of Transportation, December 18-19, 1997.

"Collusion Detection Training," Vermont Department of Transportation, November 4-5, 1997.

"Collusion Detection Training," New Mexico Department of Transportation, June 26-27, 1997.

"Collusion Detection Training," Missouri Department of Transportation, May 1-2, 1997.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, February 4-6, 1997.

"Collusion Detection Training," Indiana Department of Transportation, September 16-17, 1996.

Collusion Detection Training, "Short Course in Computerized Collusion Detection," Gainesville, FL, April 23-25, 1996.

"Collusion Detection Training," Austin, TX, January 31-February 1, 1996.

"Collusion Detection Training," Nebraska Department of Transportation, November 28-30, 1995.

"Statistical Methods for Medicaid Investigations," Medicaid Program Integrity Unit, Florida Health Care Administration. One-half day training in Tallahassee, FL, June 1995.

"Collusion Detection Training," New Mexico State Highway and Transportation Department, September 1994.

"Collusion Detection Using BAMS," BAMS Users' Group Meeting. One-day training course in Columbus, OH, October 1994.

"Collusion Detection Seminar," Connecticut Department of Transportation. One-day training course, December 1993.

"Collusion Detection Seminar," Colorado Department of Transportation. One-day training course, November 1993.

Florida Attorney General. Provided a one-day training seminar to state procurement officials on the use of analytical tools to detect bid-rigging and price-fixing, October 1993.

"Collusion Detection Seminar," Virginia Department of Transportation, One-day training course, February 1993.

United States General Services Administration, Inspector General's Office. Provide training in bid/price analysis and collusion detection, 1992.

California Department of Transportation. Provide training in bid analysis and collusion detection using BAMS, 1992.

New York City Department of Investigations. Three-day training program conducted on the use of computerized techniques to detect collusive behavior, 1990.

Florida Attorney General. Provided a one-day training seminar to state procurement officials on the use of analytical tools to detect bid-rigging and price-fixing, 1989.

Texas Department of Transportation. Three-day training provided to the bid analysis and collusion detection unit on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1989.

Virginia Department of Transportation. Three-day training provided to the bid analysis and collusion detection unit on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1989.



James T. McClave, Ph.D.

"Training Session: Use of Computerized Techniques in Bid Monitoring and Collusion Detection," FHWA Antitrust and Transportation Legal Affairs Meeting, Lake George, NY, November 1989.

"Market Analysis and Adaptive Estimation Impact on Construction Cost," BAMS User's Group, San Antonio, TX, February 1989.

"BAMS/DSS Collusion Detection Training: An Overview," BAMS Users' Group, San Antonio, TX, February 1989.

Florida Department of Transportation.  Three-day training course provided to the bid analysis and collusion detection unit on the use of BAMS/DSS for collusion detection in bidding on highway contracts, 1988.


## Invited Presentations

University of Pennsylvania Law School (Penn Law), Guest Lecture: Econometrics of Antitrust, December 2009.

University of Pennsylvania Law School (Penn Law), Guest Lecture: Econometrics of Antitrust, April 2009.

University of Pennsylvania Law School (Penn Law), Guest Lecture: Econometrics of Antitrust, December 2006.

University of Pennsylvania Law School (Penn Law), Guest Lecture: Econometrics of Antitrust, November 2004.

American Statistical Association.  Florida Section Keynote Speaker, February 2004.

ABA National Meeting, Panel Member on "Use of Statistical Evidence to Prove Liability in Non-Employment Cases," Phoenix, AZ, May 11, 2001.

Virginia Beach Fraud Conference, "Basics of Fraud and Collusion Detection," and "Computerized Fraud and Collusion Detection," May 5-7, 1999.

"Top Ten Collusion Indicators for Estimators," Transportation Estimators Association, Portland, ME, October 26-28, 1998.

"Bid Collusion Detection," AASHTO TRNS.PORT Users' Group Conference, Portland, OR, October 4-7, 1997.

"Using Expert Witness to Prove Damages in a Business Torts Case," Business Torts Seminar, Asheville, NC, October 10, 1997.

"Entrepreneurism," *Fast Trac II* Course, sponsored by University of Florida and North Florida Technology Innovation Center, April to July 1996.

"Using On-Site Service Units for Collusion Detection Projects," BAMS Users' Group Meeting, Mobile, AL, October 11, 1995.

Ohio Bar Association, "Computerized Analyses in Antitrust Investigations," CLE Course, October 1993.

"Special Address: Expert Systems and Cost Estimation," Cost Estimation Workshop, Columbus, OH, November 1988.

"Statistical Techniques for Item Level Price Estimation," BAMS Users' Group, Gainesville, FL, March 1987

"Detecting Collusion in Highway Contracting: An Evaluation of Statistical Methods," BAMS Users' Group, Gainesville, FL, March 1987.

"Damage Estimation at the Line Item Level for Highway Contracts," BAMS Users' Group, Gainesville, FL, March 1986.

"The Role of the Textbook in Introductory Business Statistics Courses: The Efficient Market Hypothesis," Invited Paper, American Statistical Association Winter Meetings, January 1987.

"Analysis of Toxicity Data," American Society of Testing and Measurement, Chicago, IL, October 1979.

"Testing Goodness of Fit for Linear Time Series Models," American Statistical Association, National Meetings, Washington, DC, August 1979.

"Analysis of a Sealed Bid Market Using a Statistical Model," TAMS-OSSA National Meeting, New Orleans, LA, Presented by T. Rothrock, 1979.

"Analysis of Toxicity Data to Determine No-Effect Levels" presented at the EPA Fisheries Laboratory, Duluth, MN, 1978.



James T. McClave, Ph.D.

"Another Look at Some Famous Time Series – the Max Chi-Square Technique," Poster Session, American Statistical Association, National Meeting, San Diego, CA, 1978.

"Choosing the Order of Autoregressive and Moving Average Models: The Max Chi-Square Technique," National American Statistical Association Meeting, Boston, MA, 1976.

"Subset Autoregression," invited paper presented to the Department of Statistical Science, State University of New York at Buffalo, NY, 1975.

"Regression and Smoothing in Time Series," invited paper, University Statisticians of Southern Experiment Stations Conference, Gainesville, FL, 1974.

"Introductory Statistics: The Normal Approach," Eastern Regional Meeting of the Institute of Mathematical Statistics, Blacksburg, VA, 1972.

"On Estimation Problems for Stochastic Growth Processes," Joint National Meeting of the Institute of Mathematical Statistics and the American Statistical Association, Fort Collins, CO, 1971.

"On Some Problems of Estimation and Prediction for a Class of Growth Process," Joint National Meetings of the Institute of Mathematical Statistics and the American Statistical Association, Laramie, NM, 1970.

"On Some Problems of Estimation and Prediction for Stationary Time Series," Regional Meetings of the American Statistical Association, Tallahassee, FL, 1970.

## Others

Acting Department Chairman, Department of Statistics, University of Florida, Summers of 1974, 1975, and 1976.

Invited discussant in Time Series Session, Regional Meetings of the American Statistical Association and the Biometric Society, Rochester, NY, 1975.

Session Chairman, Joint Regional Meetings of the American Statistical Association and the Institute of Mathematical Statistics and the Biometric Society, Tallahassee, FL, 1974.

*December 2012*



11



**CONSULTING SERVICES RATE SCHEDULE**
**Professional Services**

| TITLE AND DESCRIPTION | HOURLY RATE |
|---|---|
| **Dr. James T. McClave - President/Expert Consultant**<br>Info Tech's President and CEO with widely recognized expertise and accomplishments in statistics and econometrics.  Ph.D. with over 30 years of experience.   Directs key projects, provides expert testimony. | $650 |
| **Project Director/Senior Consultant**<br>Senior personnel with extensive experience in conducting and  managing complex litigation projects. Can provide expert testimony. | $350 |
| **Project Manager/Senior Consultant**<br>Senior personnel with extensive experience in conducting and managing project activities. | $300 |
| **Senior Analyst**<br>Senior personnel capable of designing and performing highly technical analyses. | $250 |
| **Analyst**<br>Personnel experienced in performing project work with minimal supervision. | $200 |
| **Programmer/Analyst**<br>Entry level programming and project analysis.  Performs project work under close supervision. | $150 |
| **Senior Project Assistant**<br>Experienced personnel providing technical assistance and project management support to senior staff. | $125 |
| **Project Assistant**<br>Personnel providing project support activities, data entry and verification. | $75 |

**Other Expenses**
   Travel and other direct expenses invoiced at Info Tech's cost.

**Invoicing**
   Invoices will be submitted monthly.  Amounts not paid within sixty days of the invoice date will accrue interest at 1.5% per month.

5700 SW 34th Street, Suite 1235                     Phone:  352-381-4400
Gainesville, FL  32608-5371                              Fax:  352-381-4444

120201

..............................Appendix B

**Appendix B**
**McClave Materials Relied Upon**


## PLEADINGS

Second Consolidated Amended Class Action Complaint; Document 324 filed 2/3/10


## REPORTS

Corrected Expert Report of Dennis W. Carlton, Ph.D. On Behalf of Defendant Union Pacific Railroad Company, February 6, 2013
Corrected Expert Report of Barry C. Harris, Ph.D., March 22, 2013
Expert Report of Dr. John H. Johnson, IV, Corrected February 15, 2013
Expert Report of Joseph P. Kalt, Ph.D. On Behalf of Defendants BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, Union Pacific Railroad Company, Errata Corrected March 1, 2013
Expert Report of Janusz A. Ordover, Ph.D. On Behalf of Defendant BNSF Railway Company, January 22, 2013
Expert Report of Gordon Rausser, Ph.D., October 15, 2012
Errata to Expert Report of Gordon Rausser, Ph.D., December 10, 2012


## BOOKS/PUBLICATIONS/ARTICLES

Baker, Jonathan B. and Rubinfeld, Daniel L., "Empirical Methods in Antitrust Litigation: Review and Critique," *American Law and Economics Review,* V1 N1/2,  1999 , 386-435
Chatterjee, Samprit and Hadi, Ali S., *Regression Analysis By Example,* 4th Edition, Wiley-Interscience, 2006
Connor, John M., "Forensic Economics: An Introduction with Special Emphasis on Price Fixing," *Journal of Competition Law and Economics*, 2007, 31-59
*Encyclopedia of Statistical Sciences*, Volume 3, John Wiley & Sons, 2006
Greene, William H., *Econometrics Analysis*, 7th Edition, Pearson, 2012
Gujarati, Damodar N. and Porter, Dawn C., *Basic Econometrics,* 5th Edition., McGraw-Hill Irwin, 2012
Gujarati, Damodar N., *Basic Econometrics* , 3rd Edition, McGraw-Hill, Inc., 1995
Hall, Robert E. and Lazear, Victoria  A.  "Reference Guide on Damages," *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, 2011
Mendenhall, William and Sincich, Terry, *A Second Course in Business Statistics: Regression Analysis,* 4th Edition, Dellen Publishing Company, 1993
Nieberding, James F., "Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues," *Journal of Applied Economics* , Vol. IX, No. 2, 2006, 361-380
Pindyck, Robert S., and Rubinfeld, Daniel L., *Econometric Models and Economic Forecasts* , 4th Edition, Irwin-McGraw-Hill, 1998
Rubinfeld, Daniel, L. "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence* , 3rd Edition, Federal Judicial Center, 2011

## DATA

Production of Dennis W. Carlton, Ph.D. re: Report dated February 6, 2013
Production of Barry C. Harris, Ph.D. re: Report dated January 22, 2013
Production of Dr. John H. Johnson, IV. re: Report dated February 15, 2013
Production of Joseph P. Kalt, Ph.D. re Report dated March 1, 2013, Including Workpaper Corrections and Additional Structural Break Production
Production of Janusz A. Ordover, Ph.D. re: Report dated January 22, 2013
Production of Gordon Rausser, Ph.D. re: Report dated October 15, 2012


All other materials cited in this report.