UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER CASES | **FILED UNDER SEAL** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXPERT REPORT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................4

LEGAL STANDARD.................................................................................................14

ARGUMENT ..............................................................................................................15

I.     PLAINTIFFS SHOULD BE GRANTED LEAVE TO SUBMIT A
SUPPLEMENTAL EXPERT REPORT .........................................................15

     A.    Plaintiffs Have Good Cause To Supplement The Record. ...................15

     B.    The Class Would Be Significantly Prejudice If Prevented From
Supplementing The Record....................................................................18

     C.    Defendants Will Not Suffer Undue Prejudice As A Result Of Plaintiffs'
Supplementing The Record....................................................................21

II.    PLAINTIFFS SHOULD NOT BEAR DEFENDANTS' COSTS ....................23

CONCLUSION............................................................................................................24

## TABLE OF AUTHORITIES

**Page**

### Cases

*Barnes v. District of Columbia*,
   289 F.R.D. 1 (D.D.C. 2012)............................................................................15

*Butera v. District of Columbia*,
   235 F.3d 637 (D.C. Cir. 2001).......................................................................20

*In re Cardizem CD Antitrust Litig.*,
   218 F.R.D. 508 (E.D. Mich. 2003) ...................................................................4

*DAG Enterprises, Inc. v. Exxon Mobil Corp.*,
   226 F.R.D. 95 (D.D.C. 2005)..........................................................................21

*Engineered Products Co. v. Donaldson Co., Inc.*,
   313 F. Supp. 2d 951 (N.D. Iowa 2004)...........................................................15

*Fid. Int'l Currency Advisor A Fund, LLC v. U.S.*,
   747 F. Supp. 2d 49 (D. Mass. 2010),
   *aff'd, Fid. Int'l Currency Advisor A Fund, LLC v. U.S.*
   661 F.3d 667 (1st Cir. 2011)............................................................................4

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
   1:04-C 2010 WL 3892860 (N.D. Ind. Sept. 30, 2010) .........................................17

*Medpace, Inc. v. Biothera, Inc.*,
   No. 1:12-CV-179, 2014 WL 1045960 (S.D. Ohio Mar. 17, 2014)............................16, 17, 24

*Morel v. Daimler-Chrysler Corp.*,
   259 F.R.D. 17 (D.P.R. Jun. 15, 2009) ............................................................17, 22

*Nat'l R.R. Passenger Corp. v. Expresstrak, LLC*,
   2006 WL 2711533 (D.D.C. Sept. 21, 2006) ..............................................15, 16, 19, 20, 21, 22

*Purdue Pharma Products L.P. v. Par Pharma., Inc.*,
   642 F. Supp. 2d 329 (D. Del. 2009).................................................................4

*Richardson v. Korson*,
   905 F. Supp. 2d 193 (D.D.C. 2012) ................................................................22

*Scruggs v. Getinge USA, Inc.*,
   258 F.R.D. 177 (D.D.C. 2009)........................................................................23

*In re Southeastern Milk Antitrust Litig.*,
   No. 08-MD-1000, 2012 WL 1981511 (E.D. Tenn. June 1, 2012)...........................4

*TIC—The Indus. Co. v. Factory Mut. Ins. Co.*,
   No. 4:10-CV-3153, 2012 WL 2830867 (D. Neb. Jul. 19, 2012) ................................... passim

*Trinity Homes, LLC v. Ohio Cas. Ins. Co. Grp.*,
    2011 WL 2261297 (S.D. Ind. June 8, 2011)...........................................................................19

*Vincent v. Omniflight Helicopters*,
    No. 08-C-0572, 2009 WL 4262578 (E.D. Wis. Nov. 24, 2009)..................................16, 19, 20

## PRELIMINARY STATEMENT

Plaintiffs recently learned of serious matters concerning Dr. Gordon Rausser's credibility, due to a relationship between Dr. Rausser and the entity Cascade Settlement Services, LLC ("Cascade").[1]  In light of this relationship, plaintiffs now move under Federal Rule of Civil Procedure 16 for leave to supplement the record on class certification with a report by an economic expert who will address the reliability and integrity of Dr. Rausser's opinions, to quell any concerns that defendants raise about Dr. Rausser's credibility.

Plaintiffs have no reason to believe that Dr. Rausser's economic and econometric analysis, or this Court's findings to date related to that analysis, have been compromised in any way by the relationships Dr. Rausser and his company, OnPoint Analytics ("OnPoint"), had with Cascade.  Dr. Rausser is a noted economist at the University of California, Berkeley and a former Dean of Berkeley's College of Natural Resources.  He has taught at the University of Chicago, Harvard University, Hebrew University, University of Illinois, Iowa State University, and the University of California, Davis.  Dr. Rausser has served as a Senior Economist on the President's Council of Economic Advisors and as Chief Economist of the U.S. Agency for International Development.  He has extensive litigation experience, including as an economic expert in numerous antitrust cases, and his work has been cited favorably by several courts.[2]  Moreover, recent discovery shows that Dr. Rausser did not enter any agreement with Cascade until late 2010—after his opening and reply class certification reports had been completed and

---

[1]   According to its website, http://www.cascadesettlement.com/, Cascade "provides comprehensive filing services to maximize settlement proceeds for institutional investors and corporations" and "purchases difficult-to-value settlement assets, providing immediate liquidity to our clients whose settlement payments are highly uncertain both in timing and amount."

[2]   *See infra* note 6.

1

submitted to the Court; after he had been deposed twice about those reports; and after the October 2010 class certification hearing in this Court.

Nevertheless, it is evident that defendants will use the relationships that have now come to light to raise serious questions about whether Dr. Rausser's opinions in this case have been affected in any way by his and his company's relationships with Cascade, regardless of the merit of that position. All parties, and the Court, appear to agree that Dr. Rausser should testify at the class certification hearing to address these issues. But Dr. Rausser should not stand alone. Plaintiffs respectfully submit that the appropriate way to address this issue, and to prevent considerable undue prejudice to the proposed Class, is to permit plaintiffs to supplement the record with the expert opinions of an economist who can independently corroborate the opinions that Dr. Rausser has submitted to this Court, from Dr. Rausser's economic analysis to his regression modeling. It would be manifestly unfair and prejudicial to deny the proposed Class the opportunity to provide the Court with a supplemental expert economist to speak to the integrity of Dr. Rausser's previous work in this litigation, which remains in harmony with the extensive record evidence and plaintiffs' other proffered expert testimony. That supplemental expert will not espouse any new theory of liability, impact, or damage. Rather, that individual will confine his or her opinions to the reliability, integrity, and accuracy of Dr. Rausser's previous work.

Plaintiffs first learned of Dr. Rausser's and OnPoint's business relationships with Cascade in late September 2014, when responding to defendants' subpoenas to Dr. Rausser and OnPoint. Plaintiffs promptly produced the requested documents to defendants, and brought the issue to the Court's attention immediately.

Defendants, meanwhile, have known about Dr. Rausser's relationship with Cascade for at least seven months.  It was only on October 7, 2014 that defendants first produced to plaintiffs an email, dated March 10, 2014, between Mr. Montgomery and defense counsel, in which Mr. Montgomery informed defense counsel of Dr. Rausser's relationship with Cascade, stated that it "could be a serious conflict of interest," and observed that Dr. Rausser "stands to gain directly from any purchases [by Cascade] of claims made in the Rail case" and "has been able to keep [Cascade] apprised of all developments in the case given he has 'insider' information."[3] Defendants did not disclose this letter to the Court during the conference on October 2, 2014, when defense counsel asserted that they were just learning this information.[4]  Had defendants disclosed this information when they first learned of it, the issues that now must be addressed could have been resolved sooner.  Given their silence, defendants cannot now claim to be prejudiced by a delay necessary to fairly address the situation.

Plaintiffs respectfully submit that they should be granted a reasonable amount of time— until April 1, 2015—to file a supplemental expert report that will independently affirm the integrity of the economic analysis and methodologies previously relied upon by the Court in its initial class certification opinion, as well as Dr. Rausser's responses to criticisms leveled by defendants following the remand.[5]  Plaintiffs recognize that defendants should have an opportunity to depose this supplemental expert prior to the class certification hearing.

---

[3]   CD Ex. 1, Email from Tim O'Mara to Plaintiffs' Counsel, Oct. 7, 2014, attaching email from Rod Montgomery to Scott Ballenger, March 10, 2014.  References to "CD" are to the Declaration of Alicia Cobb, dated October 31, 2014, and exhibits attached thereto.

[4]   CD Ex. 2, Oct. 2 Hr'g Tr. at 8-9.

[5]   In the alternative, if the Court is not inclined to grant plaintiffs' request to supplement the record with an additional economic expert, plaintiffs request that the Court permit plaintiffs to substitute a new economic expert for Dr. Rausser.  In that event, the new expert's report would be similarly limited in scope.

Plaintiffs propose the following schedule:

- By no later than November 4, 2014, plaintiffs will identify their supplemental expert.

- Plaintiffs will file a single supplemental expert report from that individual on or before April 1, 2015, without an accompanying legal brief.

- Defendants will have until May 1, 2015, to depose the supplemental expert.

- The Court will convene a class certification hearing sometime thereafter, at a date that is convenient for the Court. Plaintiffs anticipate that, even with the additional proposed testimony, the hearing would require no more than four days.

## STATEMENT OF FACTS

Because this Court is familiar with the underlying facts giving rise to this action, only the key facts relevant to this motion are summarized below. The facts concerning Dr. Rausser's (and OnPoint's) relationship with Cascade are based on the recently and still developing discovery record, as it is currently known to plaintiffs.

Dr. Rausser is a well-known economist at the University of California, Berkeley, and has been cited favorably in numerous class action cases.[6] When plaintiffs first retained Dr. Rausser in this matter in 2009, Dr. Rausser and OnPoint had not yet entered the relationship with Cascade that forms the basis of this motion. Plaintiffs submitted expert reports authored by Dr. Rausser in support of their motion for class certification on March 18, 2010 and August 27, 2010, Dkt. Nos. 337-1, 406-1, and the class certification hearing was held on October 6-7, 2010. The Court granted class certification on June 21, 2012, after which plaintiffs submitted merits expert reports

---

[6] *See, e.g.*, *In re Southeastern Milk Antitrust Litig.*, No. 08-MD-1000, 2012 WL 1981511, at *3 (E.D. Tenn. June 1, 2012); *Fid. Int'l Currency Advisor A Fund, LLC v. U.S.*, 747 F. Supp. 2d 49 (D. Mass. 2010), *aff'd*, *Fid. Int'l Currency Advisor A Fund, LLC v. U.S.* 661 F.3d 667 (1st Cir. 2011); *Purdue Pharma Products L.P. v. Par Pharma., Inc.*, 642 F. Supp. 2d 329, 351-52 (D. Del. 2009); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 522-24 (E.D. Mich. 2003).

by Dr. Rausser on October 15, 2012 and June 12, 2013, Dkt. Nos. 704-98, 704-96, and by Dr. James McClave on June 12, 2013, Dkt. No. 704-69.  The D.C. Circuit issued its remand decision on August 9, 2013, and plaintiffs subsequently submitted expert reports by Dr. Rausser in support of their class certification remand briefing on December 19, 2013 and May 28, 2014, Dkt. Nos. 701-1, 711-1, and by Dr. McClave on May 28, 2014, Dkt. No. 711-2.  With respect to the remand proceedings, Dr. Rausser was deposed by defendants on March 4 and 5, 2014, July 31, 2014, and October 1, 2014.

On March 10, 2014, a then-employee of Cascade, Rodney Montgomery, wrote to Scott Ballenger, Esq., of Latham & Watkins, counsel for defendant Union Pacific.  In that letter, Mr. Montgomery stated that he was concerned that Dr. Rausser's relationship with Cascade constituted a "serious conflict of interest," that Dr. Rausser "has a 10% interest in the company" and "stands to gain directly from any purchases of claims made in the Rail case," was "able to keep the company apprised of all developments in the case given he has 'insider' information," and "might" benefit financially from his model.[7]

Defendants—who received this letter before Dr. Rausser had submitted his reply report on remand in support of class certification, and before Dr. Rausser was deposed by defendants concerning that reply report—did not disclose the existence of this letter to plaintiffs or the Court prior to October 7, 2014.  Indeed, Union Pacific's counsel acknowledged at the recent conference before this Court that defendants withheld this information for strategic reasons, so as not to disclose it before using it in an effort to impeach Dr. Rausser.  Defense counsel also have

---

[7]   CD Ex. 1, Email from Tim O'Mara to Plaintiffs' Counsel, Oct. 7, 2014, attaching email from Rod Montgomery to Scott Ballenger, March 10, 2014.

confirmed that Mr. Montgomery's email was shared with defense counsel for all four defendants relatively contemporaneously to when it was sent to Mr. Ballenger.[8]

On July 31, 2014, during the closing portion of defendants' deposition of Dr. Rausser concerning Dr. Rausser's reply report on remand, defendants' counsel questioned Dr. Rausser about OnPoint's and Dr. Rausser's relationships with Cascade, whether OnPoint had any formal relationship with or a financial interest in Cascade, and whether either OnPoint or Dr. Rausser had a financial interest in any company which had purchased claims in this litigation.  Dr. Rausser testified as follows:

COUNSEL:  [D]o you have any financial interest in the outcome of this case?

DR. RAUSSER:  No. . . .

COUNSEL:  Does OnPoint Analytics have a financial interest in the outcome of this case?

DR. RAUSSER:  No.

COUNSEL:  Are you familiar with a company called Cascade Settlement Services LLC?

DR. RAUSSER:  Yes.

COUNSEL:  How do you know them?

DR. RAUSSER:  I know them because of the principals that exist at Cascade, many years ago they started another firm looking at claims in security cases and class certification cases, and I did some analysis.  My company . . . did some analysis looking at the probability analysis with regard to claims and what was the probability associated with the value of those claims.

COUNSEL:  Is there any formal relationship between OnPoint Analytics and Cascade Settlement Services?

DR. RAUSSER:  No, but . . . OnPoint Analytics has done some work for them in the past.  There was an acquisition of a company, and OnPoint Analytics was asked to do some analysis about what the value was of the other company, and

---

[8]   CD Ex. 4, Email from Rick Werder to David Cross, Oct. 10, 2014.

they looked at all their records and did a financial analysis of what was the value of that company.

COUNSEL:  So OnPoint Analytics doesn't have any ownership or other financial interest in Cascade Settlement Services?

DR. RAUSSER:  No.

COUNSEL:  Do you?

DR. RAUSSER:  No.

COUNSEL:  Do you or OnPoint Analytics have any ownership or financial interest in any company that has purchased claims in this case?

DR. RAUSSER:  No.[9]

Plaintiffs had no reason to inquire further, and indeed defendants' counsel has stated that based on these answers, defendants thought the matters related to Cascade were closed.[10]

A few weeks later, an errata sheet for Dr. Rausser's July 2014 deposition, prepared without the involvement of plaintiffs' counsel,[11] was signed by Dr. Rausser and sent on August 28, 2014, by Dr. Rausser's colleague at OnPoint to plaintiffs' counsel.  Plaintiffs' counsel served the errata sheet on defendants the following day.[12]  In the errata sheet, in response to the question "[d]o you or OnPoint Analytics have any ownership or financial interest in any company that has purchased claims in this case?," Dr. Rausser modified his answer to state:

"No, I don't have an ownership or financial interest in Cascade Settlement Services as a company.  I do, however, have the right to share in distributions

---

[9]   CD Ex. 5, Deposition of Gordon Rausser, July 31, 2014 ("Rausser July 31, 2014 Dep.") at 827-29.

[10]   CD Ex. 2, Hr'g Tr. Oct. 2, 2014, at 10 ("Candidly, Your Honor, at that point we thought there wasn't really anything to this, we were prepared to move on.").

[11]   CD Ex. 6, Deposition of Laura Craft, Oct. 18, 2014 ("Craft Oct. 18, 2014 Dep.") at 141-43; CD Ex. 7, Deposition of Gareth Macartney, Oct. 18, 2014 ("Macartney Oct. 18, 2014 Dep.") at 83-84, 103-110; CD Ex. 8, Deposition of Gordon Rausser, Oct. 20, 2014 ("Rausser Oct. 20, 2014 Dep.") at 90-92.

[12]   CD Ex. 9, Errata to the July 31, 2014 Rausser Dep., Aug. 28, 2014 ("Aug. 28, 2014 Rausser Errata").

from certain claims they manage, but those do not include claims in this case or any other case in which I am a testifying expert or OnPoint has performed any services."[13]

Dr. Rausser did not otherwise modify his deposition testimony on this topic.

Following service of the errata sheet, defendants issued subpoenas to Dr. Rausser, OnPoint, Cascade, and Mr. Montgomery, seeking documents relating to Dr. Rausser's and OnPoint's relationships with Cascade.[14]  Plaintiffs' counsel immediately forwarded these subpoenas to Dr. Rausser and OnPoint.  After initial objections, plaintiffs' counsel responded to the subpoenas and, on October 1, produced the responsive documents that they had received from Dr. Rausser and OnPoint.  Having reviewed the documents in the course of their production, in furtherance of their obligations to the Court and the proposed Class, on October 1, 2014 plaintiffs' counsel contacted the Court to request the conference that this Court held on October 2.  At no point before receiving defendants' subpoenas did OnPoint or Dr. Rausser disclose to plaintiffs' counsel any ongoing business relationship with Cascade, aside from what was stated in his errata.[15]

---

[13]   CD Ex. 9, Aug. 28, 2014 Rausser Errata, at 1-2.

[14]   CD Exs. 10-13.

[15]   CD Ex. 6, Craft Oct. 18, 2014 Dep., at 58-59, 143, 146-49; CD Ex. 7, Macartney Oct. 18, 2014 Dep., at 109; CD Ex. 8, Rausser Oct. 20, 2014 Dep., at 84-86, 89-93; CD Ex. 3, Chilcott Oct. 16, 2014 Dep., at 40-43, 223-24.  Although defense counsel represented during the October 21 court conference that Dr. Rausser testified that he had discussed this issue with plaintiffs' counsel on July 31 after his deposition, CD Ex. 2, Oct. 21, 2014 Hr'g Tr., at 28 ("we learned from Dr. Rausser yesterday that he had a conversation about that, which he thinks was with Plaintiffs' counsel after the depositions in July"), in fact, Dr. Rausser testified as follows:

> Q.  Is it your recollection that there was a brief conversation with [plaintiffs' counsel] concerning the questioning about your relationship with Cascade immediately after the deposition? . . . A.  You know, quite frankly, I don't have a complete recollection.  There may have been a conversation in the elevator on the way out . . . I had a brief conversation.  It may have been just with Gareth [Macartney from OnPoint] in the elevator.  I don't recall specifically.  Q.  So the earliest you have a concrete recollection of a communication with any lawyer

At the October 2 conference, plaintiffs' counsel informed this Court of the information plaintiffs' counsel then possessed regarding Dr. Rausser's relationship with Cascade.  Based upon the discovery completed to date, which is still ongoing, we believe defendants are likely to use the following information in an attempt to attack Dr. Rausser's credibility, regardless of the merits of that approach:

In July 2010, after the completion of Dr. Rausser's first class certification report and deposition that formed the basis for the remainder of his reports and testimony in this case, Dr. Rausser and OnPoint each began negotiations to enter business relationships with Cascade.[16] Negotiations on these agreements were not completed until after the submission of Dr. Rausser's reply class certification report and deposition, and after the class certification hearing on October 6-7, 2010.  OnPoint executed a Modeling Services Agreement with Cascade on October 14, 2010,[17] while Dr. Rausser executed a Consulting Agreement with Cascade on December 16, 2010.[18]

The Cascade Agreement provided that Dr. Rausser was to assist in the identification of cases and claims, modeling and referring cases, and negotiations and closings.[19]  Under the Agreement, Dr. Rausser would receive, among other compensation, a base fee equal to 10% of "the amount of any Distribution received by Cascade from any Fund during that quarter which is

---

representing plaintiffs about your relationship with Cascade is sometime after receiving the defendants' subpoenas?  A.  Yes.  Q.  So that's September of this year?  A.  Yes.

CD Ex. 8, Rausser Oct. 20, 2014 Dep., at 85-86.

[16]   CD Ex. 15, at CSS 000001.

[17]   CD Ex. 16, at CSS 000077.

[18]   CD Ex. 17, at CSS 000188.

[19]   *Id.* at CSS 000189.

attributable to any Contract entered into during the Term."[20]  Dr. Rausser was also permitted to

invest in Cascade's Fund 1, made up of class action claims purchases, which he did between

December 15, 2011 and March 29, 2013 in an amount of approximately $1,150,000.[21]  At the

time when OnPoint and Dr. Rausser entered their agreements with Cascade, Cascade had neither

purchased nor entered any contracts to process any claims in this litigation.[22]

Cascade consulted with Dr. Rausser and OnPoint about various facets of this litigation

between 2011 and 2013, soliciting publicly-available documents, memoranda, and advice on

marketing strategies from Dr. Rausser and OnPoint.  For example:

- In January 2011, Dr. Gareth Macartney, an employee at OnPoint working to support Dr. Rausser in this litigation, provided Cascade with a list of publicly-available documents related to this case.[23]

- Also in January 2011, Dr. Macartney provided Cascade with information about identifying Class members in this case.[24]

- In February 2011, Dr. Macartney sent Dr. Rausser a memorandum in preparation for a meeting with Cascade, including certain information regarding the role that Cascade might play in processing Class members' claims in this litigation.[25]

---

[20]  *Id.* at CSS 000190.  "Fund" is defined as "any corporation, limited partnership or limited liability company *established by Cascade during the Term* to pursue the Business."  *Id.* at CSS 000189.

[21]  *Id.* at CSS 000196 (outlining investment opportunities); CD Ex. 18, at CSS 000675 (Dec. 15, 2011 $300,000 subscription agreement, of which Dr. Rausser explained he invested only the first 50% equaling $150,000); CD. Ex. 8, Rausser Oct. 20, 2014 Dep., at 147-48, 206-08; CD Ex. 19, at CSS 000699 (March 29, 2013 $790,419 promissory note); CD Ex. 20, at CSS 000706 (March 29, 2013 $149,700.60 promissory note); CD Ex. 21, at CSS 000692 (March 29, 2013 $59,880 subscription agreement).

[22]  CD Ex. 3, Chilcott Oct. 16, 2014 Dep., at 52-53, 54-55.

[23]  CD Ex. 22, at CSS 000200.

[24]  CD Ex. 23, at CSS 000206.  Dr. Macartney explained at his deposition that he was pointing Cascade to publicly available document so that they could do their own analysis in identifying Class members.  CD Ex. 7, Macartney Oct. 18, 2014 Dep., at 35-38.

[25]  CD Ex. 24, at OPA_GR_SUB_00226-28; CD Ex. 7, Macartney Oct. 18, 2014 Dep., at 52.  Dr. Macartney testified that Cascade had asked whether there was any possibility of a role

- In July 2011, Dr. Rausser sent Cascade a memo addressed to co-lead class counsel in this litigation regarding the implications of the Supreme Court's Wal-Mart Decision for this case.[26]

- In September 2011, Dr. Rausser told Cascade that "it's very difficult for us to be involved in any decisions about Rails until the class is certified," but nevertheless agreed to rearrange his schedule to meet with Cascade to discuss the case.[27]

- In January 2012, Cascade solicited Dr. Rausser and Dr. Macartney's thoughts on how to rebut JP Morgan's analyses suggesting that "damages in a [*Rail Freight*] settlement could be small."[28]

- In June 2012, Dr. Rausser agreed to meet with Cascade to discuss Cascade's Rail Freight Antitrust Litigation marketing campaign.[29]

- Again in October 2012, Cascade asked Dr. Rausser to discuss recent developments in this case, and review marketing materials.[30]

- In May 2013, Dr. Rausser emailed Cascade, claiming that he had assisted in identifying the Rail Freight Antitrust Litigation for their business.[31]

Cascade's marketing efforts aimed at Class members in this litigation were intended to result in

Class members' claims being purchased by, or processed for filing through, Cascade's Fund 1.[32]

---

Cascade could play in the claims filing process, as compared to cases "where it's a matter of signing a bit of paper . . . that you bought a TV."  CD Ex. 7, Macartney Oct. 18, 2014 Dep., at 56-57.

[26]   CD Ex. 25, at OPA_GR_SUB_000229.  Dr. Rausser explained during his October 20 deposition that the privileged memorandum was sent to Cascade in error by his assistant, in the place of a publicly available brief that Dr. Rausser intended to provide.  CD Ex. 8, Rausser Oct. 21, 2014 Dep., at 137-42; *see also* CD Ex. 6, Craft Oct. 18, 2014 Dep., at 179-83.

[27]   CD Ex. 26, at CSS 000506.

[28]   CD Ex. 27, at CSS 000526.  Dr. Macartney, Dr. Rausser's principal OnPoint staff support on this litigation, explained that OnPoint did not discuss the JP Morgan analysis in any detail.  CD Ex. 7, Macartney Oct. 18, 2014 Dep., at 93-95.

[29]   CD Ex. 28, at CSS 000553.

[30]   CD Ex. 29, at CSS 000568.

[31]   CD Ex. 30, at CSS 000617.

[32]   CD Ex. 31, at CSS 000725.

In June 2012, Cascade purchased a claim in this litigation from Class member Sturgis Iron & Metal Co. and placed this claim into Fund 1.[33]  As a result of his Consulting Agreement and personal investment in Fund 1, Dr. Rausser was entitled to distributions from this claim for a period of time.  After his July 31, 2014 deposition, Dr. Rausser and OnPoint president Laura Craft contacted Cascade to determine whether any claims from this litigation had been placed in Fund 1.[34]  After Cascade informed Dr. Rausser and Ms. Craft that in fact the single claim purchased from Sturgis Iron & Metal Co. had been placed into Fund 1, Cascade agreed to remove that claim from Fund 1 on August 14, 2014.[35]

In response to these issues, we anticipate that Dr. Rausser will raise certain points in his defense:

*First*, both he and Laura Craft testified that they were unaware that the Sturgis Rail Freight surcharge claim had been included in Cascade Fund I until after his July 29 deposition.[36]

*Second*, they both testified that Dr. Rausser had an understanding with Cascade management whereby Cascade would not place Dr. Rausser in an investment position with respect to any claims related to this litigation, and that this understanding was confirmed orally

---

[33]   CD Ex. 32, at CSS 000645.

[34]   CD Ex. 6, Craft Oct. 18, 2014 Dep., at 125-26; CD Ex. 8, Rausser Oct. 20, 2014 Dep., at 29, 33-34.

[35]   CD Ex. 33, at CSS 000638; CD Ex. 3, Chilcott Oct. 16, 2014 Dep., at 174-176.  Also in early August 2014, Dr. Rausser and Ms. Craft learned that Cascade had closed five deals with Class members in this litigation whereby Cascade will administer the filing of those Class members' claims.  CD Ex. 34, at OPA_GR_SUB_00273.  However, those five claims were placed into Cascade Settlement Services, LLC, rather than Fund 1, so Dr. Rausser may not benefit from those claims directly.  CD Ex. 3, Chilcott Oct. 16, 2014 Dep., at 225-26, 228-31; CD Ex. 6, Craft Oct. 18, 2014 Dep., at 95, 128, 190.  However, Dr. Rausser may still realize a benefit from Cascade's processing of those claims to the extent it contributes to the general financial well-being of Cascade.

[36]   CD Ex. 6, Craft Oct. 18, 2014 Dep., at 127-29; CD Ex. 8, Rausser Oct. 20, 2014 Dep., at 186-87, 251.

by Cascade management several times both before and after Dr. Rausser's July 31 deposition.[37] Both Cascade's former CEO and former Chairman have produced declarations to that effect.[38] To that end, Dr. Rausser testified that the structure of Fund I provided a safe harbor such that claim inadvertently placed therein could be backed out of any distributions to Dr. Rausser.[39]

*Third*, OnPoint has terminated its Modeling Agreement with Cascade,[40] and Dr. Rausser has both terminated his Consulting Agreement and disclaimed any fees that may be owing to him under the agreement, which relate to any claims in cases where he serves as an expert.[41]  And in any event, Cascade management testified that Dr. Rausser would have received no more than $2000 from his interest in the Sturgis claim, if any distribution had been paid before its removal from Fund 1, and Dr. Rausser's disclaimer.[42]

*Fourth*, Dr. Rausser, Dr. Macartney, and Ms. Craft all testified that no confidential information was ever intentionally shared with Cascade—testimony corroborated by Cascade management—and that on multiple occasions they refused information Cascade requested.[43]

Plaintiffs, of course, contend that this dispute has no bearing on the validity of Dr. Rausser's economic and econometric models offered in support of class certification.  Now is neither the time nor place to resolve these competing contentions.  Defendants do not seek to

---

[37]   CD Ex. 6, Craft Oct. 18, 2014 Dep., at 60, 102, 129, 131-32; CD. Ex. 8, Rausser Oct. 20, 2014 Dep., at 26-28, 34, 61-64, 95-96.

[38]   CD Exs. 35-36.

[39]   CD Ex. 8, Rausser Oct. 20, 2014 Dep., at 246-48.

[40]   CD Ex. 38.

[41]   CD Ex. 37; Ex. 39.

[42]   CD Ex. 3, Chilcott Oct. 16, 2014 Dep., at 224-26.

[43]   CD Ex. 8, Rausser Oct. 20, 2014 Dep., at 135-42; CD Ex. 6, Craft Oct. 18, 2014 Dep., at 51-52, 69-70, 118-19, 150; CD Ex. 7, Macartney Oct. 18, 2014 Dep., at 18-21, 32; CD Ex. 3, Chilcott Oct. 16, 2014 Dep., at 211-12.

disqualify Dr. Rausser, and any questions raised about his credibility can be dealt with at the

rescheduled class certification hearing.  The only point to be made here is that the questions

defendants have raised about his credibility will prejudice the proposed Class, and necessitate

allowing plaintiffs to retain a supplemental expert to testify in support of Dr. Rausser's analyses

to avoid any such prejudices.

## LEGAL STANDARD

Fed. R. Civ. P. 16(b), which provides that a scheduling order "may be modified only for

good cause and with the judge's consent," governs a request to submit a supplemental expert

report after the deadline for expert discovery has expired.  *See, e.g., Barnes v. District of*

*Columbia*, 289 F.R.D. 1, 14  (D.D.C. 2012) (applying Rule 16 in evaluating defendant's motion

to designate a rebuttal expert after scheduling deadline); *Nat'l R.R. Passenger Corp. v.*

*Expresstrak, LLC*, 2006 WL 2711533, at *2 (D.D.C. Sept. 21, 2006) (applying Rule 16(b) in

considering motion to substitute expert).  The good cause standard requires the party seeking

relief to show that the deadlines cannot "reasonably be met despite the diligence of the party

seeking the extension."  *Nat'l R.R. Passenger*, 2006 WL 2711533, at *2.  In evaluating good

cause, courts also consider "the potential prejudice faced by the movant" and the possible

prejudice to the party opposing modification.  *Id*. at *3-4.  "Deciding whether to extend

discovery is within the sound discretion of the trial court."  *Barnes*, 289 F.R.D. at *7 (collecting

cases).

14

## ARGUMENT

I. **PLAINTIFFS SHOULD BE GRANTED LEAVE TO SUBMIT A SUPPLEMENTAL EXPERT REPORT**

### A. Plaintiffs Have Good Cause To Supplement The Record

Courts permit a party to substitute an expert or supplement the expert discovery record when the reason for the new expert submission arises or is discovered after the relevant deadline has passed, and the movant is diligent in bringing the reason to the court's attention. *See, e.g.*, *Nat'l R.R. Passenger*, 2006 WL 2711533, at \*2; *TIC—The Indus. Co. v. Factory Mut. Ins. Co.*, No. 4:10-CV-3153, 2012 WL 2830867, at \*8 (D. Neb. Jul. 19, 2012); *Engineered Products Co. v. Donaldson Co., Inc.*, 313 F. Supp. 2d 951, 1005 (N.D. Iowa 2004) (holding that defendant was substantially justified in submitting late supplemental expert report as to particular defense, where only after expert disclosure deadline had the court indicated the defendant could pursue the defense).

Courts have found "good cause" to permit supplemental expert disclosures when it is discovered that an expert has provided inaccurate answers at a deposition, such that the expert's credibility is damaged. *Nat'l R.R. Passenger*, 2006 WL 2711533, at \*1; *Vincent v. Omniflight Helicopters*, No. 08-C-0572, 2009 WL 4262578, at \*1, \*4 (E.D. Wis. Nov. 24, 2009) (permitting party to designate new expert after deadline, where expert's credibility was undermined at deposition by false statements set forth in his qualifications profile). Courts also find good cause when a conflict of interest arises or is discovered after the expert discovery deadline. *See, e.g.*, *TIC*, 2012 WL 2830867, at \*8 (permitting party to substitute its expert after summary judgment briefs had been filed, because "once plaintiff's counsel knew of the problem, they promptly brought it to the attention of defense counsel and the court"); *Medpace, Inc. v. Biothera, Inc.*, No. 1:12-CV-179, 2014 WL 1045960, at \*4 (S.D. Ohio Mar. 17, 2014).

*National Railroad Passenger*, a 2006 decision from this district, is instructive.  There, the plaintiff had timely disclosed its expert, but during the expert's deposition, the expert repeatedly gave incorrect answers.  2006 WL 2711533 at *1, 2.  After the deposition, the plaintiff discovered that the expert had also provided inaccurate information regarding his educational and personal background.  *Id.* at *1.  Because there was "no evidence in the record that the plaintiff had reasons to doubt [the expert's] credentials . . . prior to the expiration of the expert witness disclosure deadline," the court found good cause to permit the plaintiff to use a substitute expert going forward.  *Id.* at *3.

Plaintiffs respectfully submit that here, good cause exists under the unusual circumstances now before this Court, to permit plaintiffs to submit a supplemental report from a new expert who will independently address the reliability and integrity of Dr. Rausser's opinions.  That supplemental expert would be limited to "the same subject matter" of Dr. Rausser's opinions and regression modeling, and "substantially similar" opinions.  A supplemental report by a new expert is not "*carte blanche* to generate an entirely new damages theory."  *See Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 1:04-CV-396, 2010 WL 3892860, at *3 (N.D. Ind. Sept. 30, 2010).  The new expert "should be able to proceed with [his] testimony as any other expert would with the caveat that [he] address the same subject matter as [Dr. Rausser] without meaningful changes."  *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 22 (D.P.R. Jun. 15, 2009); *Lincoln Nat'l*, 2010 WL 3892860, at *3 ("[T]he substitute expert's testimony and report are generally restricted to the same subject matter . . . [T]he substitute expert should have the opportunity to express his opinions in his own language after reviewing the evidence and performing whatever tests prior experts on both sides were allowed to perform.") (internal quotes omitted); *Medpace*, 2014 WL 1045960, at *4 (plaintiff "obviously

cannot guarantee that its new expert will adopt all of [the original expert's] opinions, or articulate opinions in the same manner . . . [but] it is reasonable to limit that expert to findings that are 'substantially similar' to those presented in the [original expert's] comprehensive reports."); *TIC*, 2012 WL 2830867, at *9 ("the substitute expert's report and testimony is usually limited to the subject matter and theories already espoused by the former expert.").

Good cause exists because, as detailed above:

- Aside from what is stated on the face of the errata, plaintiffs did not learn until late September 2014 about the relationships that Dr. Rausser, and his company OnPoint, had with Cascade.[44]

- Plaintiffs had no reason before September 2014 to know of Dr. Rausser's or OnPoint's relationship with Cascade, or to question the veracity of Dr. Rausser's July 2014 deposition responses or his August 2014 errata sheet.  Though Dr. Rausser did use the errata to modify a response to a question at the deposition, the modified answer stated that Dr. Rausser had no interest in any Class members' claims.[45]  And while at that time defendants had the benefit of Mr. Montgomery's email that suggested Dr. Rausser's deposition testimony and errata were inconsistent with the facts, plaintiffs did not have that information in reviewing Dr. Rausser's testimony and errata.

- Dr. Rausser and OnPoint negotiated and entered a relationship with Cascade in late 2010, long after they had been retained by plaintiffs for this litigation.  Moreover, at the time that OnPoint and Dr. Rausser entered the relationship with Cascade, Cascade had not closed any deals with Class members in this litigation—indeed, Cascade's attempts to solicit Class members in this litigation did not begin until 2011, and the single claim from this litigation that Cascade purchased was not purchased until mid-2012.  Plaintiffs thus did not ignore "red flags" at the time they hired Dr. Rausser or thereafter.

- While plaintiffs had no reason to know of these relationships before September 2014, defendants received notice as early as March 2014,[46] but elected not to bring the issue to

---

[44]   CD Ex. 6, Craft Oct. 18, 2014 Dep., at 58-59, 143, 146-49; CD Ex. 7, Macartney Oct. 18, 2014 Dep., at 109; CD Ex. 8, Rausser Oct. 20, 2014 Dep., at 84-86, 89-93; CD Ex. 3, Chilcott Oct. 16, 2014 Dep., at 40-43, 223-24.

[45]   CD Ex. 9, Aug. 28, 2014 Rausser Dep. Errata at 1-2 ("I don't have an ownership or financial interest in Cascade Settlement Services as a company.  I do, however, have the right to share in distributions from certain claims they manage, *but those do not include claims in this case or any other case in which I am a testing expert or OnPoint has performed an services*.") (emphasis added).

[46]   CD Ex. 1, Email from Tim O'Mara to Plaintiffs' Counsel, Oct. 7, 2014, attaching email from Rod Montgomery to Scott Ballenger, March 10, 2014.

plaintiffs' attention at that time, before Dr. Rausser submitted his final remand reply report in May 2014, and before Dr. Rausser was deposed on that remand reply report.[47]

- As soon as plaintiffs learned of the relationships that Dr. Rausser and OnPoint had with Cascade, plaintiffs diligently informed the Court.  In addition, plaintiffs have worked with defendants to understand the relationship between Dr. Rausser and OnPoint and Cascade.  Indeed, within hours of defendants' emailing plaintiffs copies of the subpoenas directed to Dr. Rausser and OnPoint, plaintiffs forwarded those subpoenas to Dr. Rausser and OnPoint.  Plaintiffs reviewed the documents that were collected in response to the subpoenas and produced all of the responsive documents to defendants.  And the same day that plaintiffs produced Dr. Rausser's and OnPoint's documents, plaintiffs requested a conference with the Court to disclose the issues that the documents raised.

### B.    The Class Would Be Significantly Prejudice If Prevented From Supplementing The Record

Plaintiffs and the proposed Class would suffer significant harm if the requested relief were denied.  Through no fault of plaintiffs or their counsel, defendants now have the ability to challenge Dr. Rausser's personal credibility and therefore the credibility of his underlying work.  Only through the service of a supplemental expert will plaintiffs' counsel be able to demonstrate that Dr. Rausser's opinions and regression models proffered in this case are credible, reliable and accurate, and untainted by any actions by Dr. Rausser and his company outside of this litigation, and ensure that the proposed Class is not prejudiced under the circumstances.

Courts give careful consideration to the prejudice that the moving party will suffer if not permitted to substitute a new expert.  *Nat'l R.R. Passenger*, 2006 WL 2711533, at *4; *TIC*, 2012 WL 2830867, at *8; *Vincent v. Omniflight Helicopters*, 2009 WL 4262578, at *4 (permitting plaintiff to substitute its expert because otherwise "plaintiff will be unable to offer credible testimony on this issue").  In considering the potential for prejudice to the moving party, courts take into account several factors, including:  (1) whether any damage to the expert's credibility is likely to impair the moving party's ability to prosecute its case; (2) the significance of the

---

[47]   CD Ex. 2, Oct. 2, 2014 Hr'g Tr., at 27.

expert's testimony; and (3) whether denying the motion would effectively resolve the case in the non-moving party's favor. *See, e.g.*, *Nat'l R.R. Passenger*, 2006 WL 2711533, at *4; *TIC*, 2012 WL 2830867, at *8; *cf. Trinity Homes, LLC v. Ohio Cas. Ins. Co. Grp.*, 2011 WL 2261297, at *6 (S.D. Ind. June 8, 2011) ("The court's desire for cases to be decided on their merits and its recognition that striking these expert reports would be a drastic sanction convince the court under the facts presented here that striking the new reports would be a sanction disproportionate to the foul.").

In *National Railroad*, the court noted that because the plaintiff's expert's "credibility has been seriously damaged as a result of the plaintiff's discovery that he provided inaccurate information as to his professional, educational, and personal background, it is likely that the plaintiff's ability to establish the true value of its liquidated damages claim will be significantly impaired if it has to rely on [the expert's] testimony." *Nat'l R.R. Passenger*, 2006 WL 2711533, at *4. The court also noted that "the plaintiff's liquidated damages claim is central to this litigation." *Id.* Accordingly, the court found that "the potential prejudice to the plaintiff is substantial," weighing in favor of permitting substitution. *Id.*[48]

---

[48] *See also TIC*, 2012 WL 2830867 at *8 (moving party would be "substantially prejudiced" if it was denied the opportunity to disclose a new expert, because the original expert who withdrew from the case "was the plaintiff's sole liability expert, and denying the substitution could, in effect, summarily resolve the case in favor of the defendants."); *Omniflight*, 2009 WL 4262578, at *4 ("It appears his testimony is of some importance. . . . it appears . . . that the testimony bears on an important issue in the case that is not covered by the other experts. Accordingly, I find the importance of the testimony to be significant."). Indeed, the D.C. Circuit has noted, in reviewing the exclusion of a substitute expert report, that "[w]here the failure to comply [with the expert discovery schedule] is not due to willful bad faith or fault of the disobedient party . . . the harshest sanction of dismissal of the action, or preclusion of evidence, which is tantamount to dismissal, is inappropriate." *Butera v. District of Columbia*, 235 F.3d 637, 661 (D.C. Cir. 2001) (affirming district court's decision to exclude a substitute expert because of attorney misconduct, and because due to the moving party's devastating admissions at tria,l the additional expert could not have made a difference).

Likewise here, though there is no evidence to suggest that Dr. Rausser's opinions in this case were impacted by his or OnPoint's relationship with Cascade—indeed, Dr. Rausser submitted his first report forming the basis of the damage model months before even entering negotiations with Cascade—defendants will seek to impugn Dr. Rausser's credibility on the basis of the relationships with Cascade, and the fact that Dr. Rausser provided incorrect testimony at his deposition.  This is precisely how defendants described how they intend to use this information.[49]  Moreover, it is indisputable that Dr. Rausser's testimony regarding the economics of the rail freight industry, and his preparation and analysis of the damage model, are central to plaintiffs' case.[50]  Without a doubt, plaintiffs' ability to prosecute this case will be "significantly impaired" if plaintiffs are forced to proceed with Dr. Rausser alone—a result that would negatively impact tens of thousands of Class members.

Were the Court to deny the request for a supplemental expert, the prejudice to plaintiffs would be substantial and potentially irreparable.  Plaintiffs are entitled to have class certification decided on the merits of the motion, not on ancillary disputes about the integrity of their expert that can readily be addressed through a supplemental submission.  There is no justification for imposing upon plaintiffs the "Hobson's choice" of either proceeding solely with Dr. Rausser (despite defendants' plan to raise serious, newly discovered attacks on his credibility), or proceeding with no expert at all.

---

[49]    CD Ex. 14, Oct. 21, 2014 Hr'g Tr., at 12-13 ("And now for what is a credibility issue, it's a serious credibility issue.  It's a credibility issue that we submit Your Honor should fully take into account in considering his testimony."); 14 ("But we want to cross-examine Dr. Rausser about this. . . . [W]hat we know is that despite the façade of being this University of California professor, he is a speculator in class action claims and has been for many years."); *see also id.* at 27, 29, 32, 34-35.

[50]    *Id.* at 33.  Nor do defendants dispute the importance of Dr. Rausser's testimony.  *Id.* at 29 (defense counsel recounting the importance of Dr. Rausser to class certification); *see also id.* at 33.

C.      **Defendants Will Not Suffer Undue Prejudice As A Result Of Plaintiffs'**
        **Supplementing The Record**

Courts may also consider the potential prejudice to the non-moving party.  But as the

*National Railroad* court made clear, "the existence or degree of prejudice to the party opposing

modification as an additional reason for denying a motion to modify a scheduling order, has 'not

ultimately [been considered by courts as] determinative.'"  *Nat'l R.R. Passenger*, 2006 WL

2711533, at *3 (alterations in *Nat'l R.R.*) (quoting *DAG Enterprises, Inc. v. Exxon Mobil Corp.*,

226 F.R.D. 95, 110 (D.D.C. 2005)); *see Richardson v. Korson*, 905 F. Supp. 2d 193, 200 (D.D.C.

2012) ("While it is certainly disruptive to the efficient management of this case to re-open

discovery – especially where Plaintiff and his expert had countless opportunities to remedy

deficiencies in the report during the extended period for discovery – the Court finds that the harm

to Plaintiff of precluding the report outweighs this disruption.").  Here, defendants will suffer no

comparable prejudice from plaintiffs submitting a supplemental expert report that addresses Dr.

Rausser's existing opinions.

In assessing prejudice to the non-moving party, courts will consider (1) whether the

moving party plans to present entirely new theories or subjects, *Nat'l R.R. Passenger*, 2006 WL

2711533, at *3 ("plaintiff is not raising new theories or legal issues"), *Morel*, 259 F.R.D. at 21

("[p]rejudice may arise when a party is surprised with new theories of liability or a new subject

matter"); (2) whether the resolution of the case will be delayed, *see Nat'l R.R. Passenger*, 2006

WL 2711533, at *3; and (3) whether the schedule of the case would prohibit the non-moving

party from having a fair hearing or trial on all relevant issues, *see TIC*, 2012 WL 2830867, at *8.

Courts will also consider whether the non-moving party had notice of the potential for

supplementation.  *Morel*, 259 F.R.D. at 21.

If the Court elects to consider potential prejudice to defendants, it will find that any

prejudice was at least partly self-inflicted, and in any event insufficient to deny plaintiffs'

motion. *First*, defendants knew of Dr. Rausser's relationship with Cascade as early as March

2014—before much of the remand expert discovery was complete.[51]  Indeed, had defendants not

elected to wait seven months to alert plaintiffs to Mr. Montgomery's March 10 email, the parties

may have been able to resolve this issue and hold the class certification hearing in October, as

scheduled.

*Second*, plaintiffs are not submitting a supplemental expert report on the eve of trial.  Far

from it.  Class certification has yet to be resolved, and motions for summary judgment have yet

to be filed.  *See TIC*, 2012 WL 2830867, at *8 (finding no prejudice resulting from substitution

because trial was two months away and could be continued "to permit a full and fair trial of all

the issues"); *Scruggs v. Getinge USA, Inc*., 258 F.R.D. 177, 181 (D.D.C. 2009) ("Defendant

takes issue with the March 30 opinion because it was filed after the deadline for disclosing expert

opinions and after Dr. Davis was deposed.  While troubling, the delay in filing is not sufficient

reason to grant defendant's motion to strike.  Indeed, the Court denied a similar motion to strike

filed by plaintiff.").  Plaintiffs' proposed schedule provides sufficient time for defendants to

consider the new expert's report and take a deposition.  A schedule permitting submission of a

supplemental expert report in April 2014, and permitting a deposition of the new expert and a

---

[51]   In fact, defense counsel acknowledged that they did not wish to disclose the
information because they relished using it for impeachment.  CD Ex. 14, Oct. 21, 2014 Hr'g Tr.,
at 27 ("no, we didn't bring it to their attention.  Can you imagine if you were in our position that
you'd bring this to their attention?  If this has value, it has value as impeachment.  You don't
share your impeachment material with your adversary.").

class certification hearing thereafter, is no great delay under the circumstances and in the broader context of this seven-year litigation.[52]

*Third*, plaintiffs do not seek to put forward new subject matter or theories in a supplemental expert report.  Rather, as discussed above, the supplemental expert will address only the opinions and regression models that were submitted by Dr. Rausser.

*Fourth*, to the extent prejudice from the addition of an expert witness at this stage of the proceedings is a concern, the prejudice to the proposed Class is *far* greater.  Tens of thousands of Class members here will be negatively impacted if plaintiffs are not permitted to supplement the record, potentially losing their ability to obtain a remedy for the harm defendants' conduct caused.

## II.    PLAINTIFFS SHOULD NOT BEAR DEFENDANTS' COSTS

Despite withholding Mr. Montgomery's March 10 email so that defendants could later employ it as a litigation weapon,[53] defendants apparently intend to seek costs if plaintiffs are granted leave to submit a supplemental expert report.[54]  Where there is no evidence of "bad faith, fault, or tactical maneuvering" by the party seeking to supplement the expert discovery record – and "particularly" where the non-moving party had "equal and perhaps greater knowledge of [the expert's] potential conflict" than the moving party had – costs and fees should not be awarded.  *TIC*, 2012 WL 2830867 at *10; *Medpace*, 2014 WL 1045960 at *4.  As the record above makes clear, no credible suggestion of bad faith, fault, or tactical maneuvering on the part of plaintiffs can be made here.

---

[52]    This is all the more true given the function of the supplemental expert's testimony, to assist the Court in determining whether credibility issues in any way affected the integrity of Dr. Rausser's analyses to date.

[53]    CD Ex. 14, Oct. 21, 2014, Hr'g Tr., at 27.

[54]    *Id.* at 15-16.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs respectfully submit that this Court should permit plaintiffs to file a supplemental expert report, or in the alternative a replacement expert report, by April 1, 2015; order that defendants are entitled to depose the supplemental (or replacement) expert by May 1, 2015; and schedule the class certification hearing at a time thereafter convenient for the Court.

The parties can meet and confer following the deposition of the supplemental expert, with the goal of a joint submission concerning the contours of the hearing, as the parties have done in the past.

Dated:  October 31, 2014

Respectfully submitted,

| | |
|---|---|
| _/s/ Michael D. Hausfeld_ | _/s/ Stephen R. Neuwirth_ |
| Michael D. Hausfeld (DC Bar #153742) | Stephen R. Neuwirth |
| Sathya S. Gosselin (DC Bar #989710) | Richard I. Werder, Jr. |
| Seth R. Gassman (DC Bar #1011077) | Daniel L. Brockett |
| HAUSFELD LLP | Kyle R. Taylor |
| 1700 K Street NW, Suite 650 | Alicia Cobb |
| Washington, DC 20006 | QUINN EMANUEL URQUHART |
| Telephone:  (202) 540-7200 | & SULLIVAN, LLP |
| Facsimile:  (202) 540-7201 | 51 Madison Avenue, 22nd Floor |
| Email:  mhausfeld@hausfeldllp.com | New York, NY 10010 |
| | Telephone:  (212) 849-7000 |
| Michael P. Lehmann | Facsimile:  (212) 849-7100 |
| HAUSFELD LLP | Email:  stephenneuwirth@quinnemanuel.com |
| 44 Montgomery Street Suite 3400 | |
| San Francisco, CA 94104 | |
| Telephone:  (415) 633-1908 | |
| Facsimile:  (415) 358-4980 | |
| Email: mlehmann@hausfeldllp.com | |

_Interim Co-Lead Class Counsel_

## <u>CERTIFICATE OF SERVICE</u>

I, Kyle R. Taylor, certify that on October 31, 2014, I caused a true and correct copy of the foregoing to be served by email on counsel for defendants.

/s/ Kyle R. Taylor