# Exhibit 105

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

IN RE RAIL FREIGHT FUEL ) MDL Docket No. 1869
SURCHARGE ANTITRUST ) Misc. No.
LITIGATION. ) 07-489(PLF)
)

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, Ph.D.

Tuesday, December 18, `2012

San Francisco, California

VOLUME II (Pages 277-460)

REPORTED BY:
JANIS JENNINGS, CSR 3942, CLR, CCRR

prices, yeah, it could make a difference, certainly.
And the collection of all of that information, that has come up in my prior depositions, my prior reply report. I specifically -- looking at this page 170, I direct your attention to footnote 406 where I speak specifically about using another source of information with regard to looking at that specific [redacted]
Q. I got it.
A. No. No, no, no, no. No, no.
Q. I withdraw the question.
A. No.
Q. Yes. Yes.
A. And if you look -- if you look at footnote 406, you will see the basis for some outside information which will, in fact, change the [redacted] that appears in Table 53.
Q. Got it. Okay.
In the but-for world, you know, that you projected, would the defendants have fully recovered their fuel costs?
A. In the but-for world?



Q. Yeah.
A. That is the same way of asking me the question that you asked five minutes ago.
Q. All I want to know do you feel they would have fully recovered their fuel costs but for the conspiracy?
A. I have already told you that is not an analysis I have done. It is easily computable.
Q. I am asking the question as a conceptual matter. In the but-for world do you think the defendants would have fully recovered their fuel costs absent the conspiracy?
A. In the but-for world?
Q. Yeah.
A. Using -- coming back to the RCAF, updating the RCAF on a frequent basis, yes, indeed they would have.
Q. The answer is yes. Okay.
If that [redacted] is not an accurate projection of the but-for world, how, if at all, would that affect your damages analysis?
A. May I have the question back. "If it's not an accurate..."
(Record read as follows:



"Q. [redacted] is not an accurate projection of the but-for world, how, if at all, would that affect your damages analysis?")
THE WITNESS: Well, your question is incomplete. It's one thing to say it's inaccurate. In which direction --
MR. SOVEN: I'll withdraw the question and ask a better question. You are right. The direction could matter.
BY MR. SOVEN:
Q. If it's low --
A. If it's too low.
Q. If it's too low, how would that affect your damages analysis?
A. It would certainly affect my damage analysis.
Q. It would drive the number down a lot, wouldn't it?
A. No, it wouldn't drive it down a lot. It would drive it down, but -- well, let's be precise. What do you mean -- what's your measure of "a lot"?
Q. You're right.
Why do you think it would drive it down?



A. Because in terms of no one would argue that the defendants wouldn't in the but-for world be able to recover their fuel costs. If the [redacted]
MR. SOVEN: Will you mark that.
DEPOSITION REPORTER: No. 23.
MR. SOVEN: Yeah.
(Exhibit 23 was marked for identification and attached hereto.)
THE WITNESS: Thank you.
BY MR. SOVEN:
Q. Dr. Rausser, I am handing you what's been marked for identification as document 23. This is one of your work papers.
Do you recognize it?
A. Yes.
Q. Okay. My understanding is that you calculated that, [redacted] is that correct?
A. Based on the data that was used at this point in time when this document was prepared, yes.
Q. Now, that [redacted]

[redacted]
A. Yes.
Q. Okay. Could you turn to the very last page of the document and look at the row "1 July 2008."
A. The row -- I'm sorry. I wasn't paying attention. I apologize.
Q. Sure. The third column is "Weekly Date."
A. Yes.
Q. And if you could look at the row -- I'm sorry -- the row "1-July-2008."
A. January 2008?
Q. July 1, 2008.
A. Oh, July 1. Yes, I'm there.
Q. If I understand this correctly – I'm sure you'll tell me if I don't -- the defendants were, on [redacted]
A. Yes.
Q. That's one year after the STB decision, correct, or more than one year?
A. Yes.
Q. Is it still your opinion that that's an accurate estimate of the overcharge of the



defendants at – of the overcharge of the class members at that time?
A. No.
Q. It's not?
A. No.
Q. How has your opinion changed?
A. There has been additional production with regard to legacy contracts. We have analyzed that data or are in the process of analyzing that data, and that percentage overcharge, based on the new production of data, is too high.
Q. By what order of magnitude?
A. I'll have -- you'll have to wait to see the order of magnitude when I complete my reply report, my next report.
Q. Mr. Cross asked you a week ago whether you had done any empirical analysis of the cost of the defendants adhering to the terms of the alleged conspiracy. Do you recall that?
A. In terms of rational collusion?
Q. Yes.
A. I just want to make sure I get the context right. Yes, I do recall that.
Q. And at that point in time you hadn't done any of that work?



A. I'm sorry. I hadn't done any of that work? I don't think that's correct.
Q. I will ask a different question.
As the overcharge rises, do the incentives of the defendants to defect from the conspiracy go up?
(Clarification requested by Reporter.)
MR. SOVEN: Sure.
BY MR. SOVEN:
Q. As the amount of the overcharge rises, do the incentives of the defendants to defect from the conspiracy go up?
A. Everything else constant, yes.
Q. Have you – have you performed any empirical analysis of the potential benefits of any defendant defecting from the conspiracy in July 1, 2008 with the [redacted] overcharge?
A. Looking at that specific week? No.
Q. Have you performed any empirical analysis of the potential economic benefits of defendant defecting from the conspiracy in 2008?
A. I want to make sure I understand your train of thought. These questions have nothing to do with your earlier statement about rational collusion.



Q. Okay.
A. Nothing to do with it.
Q. Glad to hear it.
A. Okay. So have I done any analysis –
Q. Yeah.
A. – looking at the incentives for defection?
Q. Yes.
A. I've done, certainly, qualitative analysis, and I reported that in my section 5.
Q. I'm asking –
A. I know. Not specifically, no.
Q. Have you – you've mentioned the term "overcharge" a number of times in response to Mr. Wall's questions. What do you mean by "overcharge"? "Over-recovery" of the fuel costs?
A. Yeah. Your question is confusing –
Q. Yeah, you're right.
A. -- because how I've used – I didn't use "overcharge" in my response –
Q. You're right.
A. -- to Mr. Wall.
Q. You used "over-recovery."
A. Yes. Thank you.
Q. What do you mean by that?