# Exhibit 106

1 of 1 DOCUMENT

*Antitrust Law Para. 395*

Antitrust Law - Areeda and Hovenkamp

Copyright © 2013 Aspen Publishers Inc., a Wolters Kluwer Company, All Rights Reserved

Antitrust Law - Areeda and Hovenkamp
CHAPTER 3 The Antitrust System of Remedies (¶300-¶399)
3G The Economics of Impact, Antitrust Injury, and Antitrust Damages (¶390-¶399)

*Antitrust Law Para. 395*

# ¶395. Damages in Overcharge Cases

**Treatise**: Antitrust Law - Areeda and Hovenkamp, ¶395. Damages in Overcharge Cases

Antitrust plaintiffs may complain about overcharges - prices that are higher than they would otherwise be - as a result of illegal monopolization, a price-fixing conspiracy, an illegal merger, or an illegal vertical restraint such as tying, exclusive dealing, or resale price maintenance. 1 An immediate question is what the measure of damages should be in an overcharge case. There are two obvious alternatives: (1) lost profits and (2) the overcharge, which is the difference between the price actually paid and the price that would have been paid "but for" the unlawful conduct multiplied by the quantity purchased. As we will see in the next Subparagraph,these measures of damages are not economically equivalent.

What has come to be known as the overcharge measure of damages received early approval from the Supreme Court. In *Chattanooga Foundry,*2 the manufacturers of cast-iron water pipe had been engaged in a price-fixing conspiracy. The city of Atlanta had purchased some of that pipe for use in its municipal waterworks at the collusive prices. The city suffered no lost profits because by definition not-for-profit entities have no profit to lose. The Court, however, found that the city "...was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe." 3 As a result, the Court found that the city could recover damages for "the difference between the price paid and the market or fair value" of the pipe that it had purchased. This measure of damages was clearly appropriate in *Chattanooga Foundry*, given the not-for-profit nature of the city's undertaking. The direct loss caused by the price fixing cartel was the increased cost of providing the water service above the cost at which it could have been provided had pipe prices been competitively determined. In the case of for-profit businesses, however, it is not as easy to conclude that the overcharge is the appropriate measure of damages. Section 4 of the Clayton Act provides for the recovery of threefold the damages actually *sustained*. This is not necessarily captured by

the overcharge, as we shall see below. The most accurate measure of the damages actually sustained is lost profit, but this will usually lead to smaller recoveries and therefore is not apt to be selected by plaintiffs if they are given a choice.

**395a. Lost profits versus overcharges. 4**

According to §4 of the Clayton Act, an antitrust victim is entitled to recover "threefold the damages by him *sustained*." 5 As we shall see, the most commonly used measure of damages, *viz.*, the overcharge, is an ambiguous proxy for the actual damages suffered. Initially, however, we should note that the overcharge measure of damages typically exceeds the unjust gains to the cartel members. This can be seen quite readily in Figure 1. Prior to the formation of the price-fixing cartel, a typical competitive firm will sell a quantity equal to *Q 1* at the market-determined price of *P 1*. The firm earns no excess profit because price equals average cost at that quantity. The proportional demand curve, which is denoted as *d* = (1/ *n*) *D* in Figure 1, intersects marginal and average cost at the competitive price (P 1) and output ( *Q 1*). Following the formation of a price-fixing cartel, each firm will restrict output to the point where its marginal revenue ( *mr*) equals its marginal cost ( *MC*) - that is, each firm will reduce output from *Q 1* to *Q 2*. The collusive price will rise from *P 1* to the collusive price of *P 2*, and the cartel members will each earn excess profits equal to ( *P 2* - *C 2*) *Q 2*.




Figure 1

In contrast to the excess profit, the collusive overcharge will be equal to the difference between the unlawful price ( *P 2*) and the competitive price ( *P 1*) times the actual quantity sold ( *Q 2*):

$$O/C = (P_2 - P_1)\,Q_2.$$

It is clear that, since $C_2$ exceeds $P_1$, the collusive overcharge exceeds the illicit profits earned by the colluding sellers. 6

For business customers, purchases from the colluders are made in order to conduct their businesses. As a result, the damages sustained are captured most appropriately by their lost profits. Moreover, despite the prevalence of the overcharge as a measure of damages, it is a disconcerting fact of life that the overcharge is not precisely the same as the lost profit. The overcharge may be larger or smaller than the lost profit depending upon the economic circumstances. Several simple examples illustrate this point.

**395a1. *Overcharging a monopolist.***

In the first example, suppose that a monopolist produces output at a constant marginal (and average) cost represented by the horizontal line labeled $MC_1$ in Figure 2. The demand for the product is represented by the negatively sloped line *D*, and the associated marginal revenue curve is *MR*. In order to maximize its profits, the monopolist will expand production until marginal cost equals marginal revenue, which occurs at a quantity of $Q_1$. The price that corresponds to $Q_1$ is $P_1$.




Figure 2

Assume that the firm's formerly competitive suppliers form a cartel and thereby raise the prices of an input needed by the monopolist. As a result of paying higher prices, the monopolist's marginal cost rises from $MC_1$ to $MC_2$. This causes the monopolist to reassess its own price and output decisions. Given a marginal cost of $MC_2$, it is now optimal (i.e., profit-maximizing) for the monopolist to reduce its output to $Q_2$ and increase its price to $P_2$.

At the initial price and output, profit was equal to ( *P 1 - MC 1*) *Q 1*, while at the new price and output, the profit has fallen to ( *P 2 - MC 2*) *Q 2*. The lost profit ( *D[#x3c0]*) is therefore equal to

$$\Delta\pi = (P_1 - MC_1)Q_1 - (P_2 - MC_2)Q_2.$$

The overcharge ( *O/ C*) is captured by the increase in marginal cost multiplied by the quantity of output:

$$O/C = (MC_2 - MC_1)Q_2.$$

In this case, some algebraic rearrangement reveals that the lost profit exceeds the overcharge. 7

***A numerical example*. 8**

We can provide a numerical example that corresponds to the graphical analysis. Suppose that the demand function assumes the following simple form:

$$P = 100 - 0.01Q,$$

where *P* denotes price and *Q* represents quantity. The monopolist's total revenue is the product of price and quantity:

$$TR = PQ = 100Q - 0.01Q^2.$$

Marginal revenue 9 equals 100 - 0.02 *Q*. In the "but for" world, the monopolist's marginal (and average) cost is assumed to be constant at $4. Now, the maximum profits that the monopolist can earn require producing where marginal revenue equals marginal cost:

$$100 - 0.02Q = 4$$

Solving for the optimal quantity yields *Q* = 4800, and substituting that quantity into the demand function yields a profit-maximizing price of *P* = $52. The firm's profit ( *[#x3c0]*) can be found by substituting into the profit function:

$$\pi = 100Q - 0.01Q^2 - 4Q.$$

In this case, the maximum profit is $230,400.

Now suppose that the firm is overcharged due to a price-fixing conspiracy and marginal cost rises from $4 to $8.

Since there is no reason for the demand function to change, the firm's marginal revenue will not change. Once again, the firm will maximize its profit by producing the output where marginal revenue equals marginal cost:

$$100 - 0.02Q = 8$$

Solving this condition for *Q*, it follows that the optimal quantity falls from 4,800 to 4,600 units. Substituting a quantity of 4,600 into the demand curve reveals that the corresponding price will rise to $54. By substitution into the new profit function, *[#x3c0]* = 100 *Q* - 0.01 *Q* - 8 *Q*, we find that profit is now $211,600. The lost profit is the difference between the actual profit following the illegal behavior of $211,600 and the "but for" profit of $230,400 - or $18,800.

The overcharge is the difference between the actual price of $8 paid and the "but for" price of $4 times the units purchased, which is 4,600. Accordingly, the total overcharge is ($4)(4,600) = $18,400, which is less than the lost profit. As a result, the overcharge damages will undercompensate the antitrust victim relative to a lost-profits calculation.

**395a2. *Overcharging competitors*.**

When the cartel overcharges competitive firms, the results are somewhat different. Suppose that each unit of the competitively produced output requires one unit of an input that the cartel supplies. The increase in the price of that input will cause the firms' average and marginal costs to rise by the amount of the overcharge. The effect on the profits of the overcharged firms will depend on what happens to the price, which is governed by supply and demand conditions.

In Figure 3, the competitive firm initially had average and marginal cost curves *AC 1* and *MC 1*, respectively. At a competitive price of *P 1*, the firm maximized its profit by producing where price was equal to marginal cost - that is, at a quantity of *Q 1*. As Figure 3 reveals, the competitive firm sold *Q 1* at the competitive price and earned a competitive return in doing so. 10 The influence of the cartel overcharge is to shift the average and marginal cost curves from *AC 1* and *MC 1* to *AC 2* and *MC 2*, respectively. The effect on profit will depend on what happens to price.




Figure 3

At one extreme, suppose that the price does not rise at all. The competitive firm in Figure 3 will respond to the higher cost by producing that quantity where *MC 2* equals *P 1*, - that is, it will produce *Q 2*. In this case, the firm's lost profit will be equal to the loss that it experiences, which equals ( *C 2* - *P 1*) *Q 2*. The overcharge, however, is equal to the increase in average cost times the quantity purchased: ( *C 2* - *C 1*) *Q 2*. Now, one can see by inspecting Figure 3 that the lost profit exceeds the overcharge. Thus, the overcharge estimate does not adequately compensate the antitrust victim in this case.

At the other extreme, we may assume that the competitive price rises by the full amount of the overcharge. In Figure 4, we show that *P 1* rises to *P 2*. In that case, the competitive firm will continue to produce *Q 1* because the new marginal cost ( *MC 2*) equals the new price ( *P 2*) at a quantity of *Q 1*. In this case, the overcharge equals the difference between *C 1* and *C 2* times the quantity: ( *C 2* - *C 1*) *Q 1*. But there is no lost profit. The firm continues to earn a competitive return on its investment. In this case, the overcharge is grossly at odds with the damages sustained by the competitive firm because there were no damages at all.




Figure 4

We have shown the polar cases. If industry demand is perfectly elastic (i.e., horizontal), the price does not rise, and lost profits clearly exceed the overcharge. If industry demand is perfectly inelastic (i.e., vertical), the price rises by the full amount of the overcharge, but profits are unaffected. In one case, the overcharge measure of damages is inadequate, while it is excessive in the other. Now, demand is not apt to be perfectly elastic or perfectly inelastic, which means that the output price will rise but not by the full amount of the cost increase. In some cases, the price will rise enough for the overcharge to exceed the lost profits. In other cases, the price increase will be small enough for the overcharge to be less than the lost profit. The precise circumstances will dictate the final outcome because output demand elasticity and the shape of the firm's cost curves determine the relationship between the overcharge and lost profits. But the basic fact remains that the overcharge measure is an inexact proxy for the actual damages sustained, which are the lost profits.

**395b. Estimating the overcharge.**

In spite of the (arguably) theoretical superiority of lost profits as a measure of damages in a price enhancement case, nearly all plaintiffs claim damages on the basis of an overcharge calculation. Since the actual prices paid are usually straightforward to establish, 11 the real problem arises in establishing the "but for" price.

**395b1. *Before-and-after estimates*.**

Consider a before-and-after model applied to the price data presented in Table 1 and in Figure 5. The prices - suitably adjusted for inflation - of the proverbial widget were determined by competitive market forces from 1987 until 1998. It is well documented that a conspiracy began in 1998 and persisted through 2000. Just a glance at the data in either Table 1 or Figure 5 suggests that the substantially higher prices during 1998 - 2000 (the conspiracy period) were due to the conspiracy. Prior to the conspiracy, the average price was $51.82, in contrast to the prices of $80, $85, and $75 during the conspiracy period. But the question is not what the prices were in the past. Rather, the problem is estimating the prices for 1998 - 2000 had the conspiracy not occurred. The price data from the "before" period are (or at least may be) useful in estimating the "but for" prices during the "after" period.

**Table 1**

| Year | Price |
|---|---|
| 1987 | $50 |
| 1988 | 45 |
| 1989 | 50 |
| 1990 | 60 |
| 1991 | 55 |
| 1992 | 40 |
| 1993 | 50 |
| 1994 | 45 |
| 1995 | 60 |
| 1996 | 55 |
| 1997 | 60 |
| 1998 | 80 |
| 1999 | 85 |
| 2000 | 75 |




**Figure 5**

As a first approximation, one would look to see whether there was any trend in the price data. This can be done by fitting a regression line to the price observations prior to the conspiracy. The most basic model would be

$$P = \beta_0 + \beta_1 T$$

where *P* denotes price and *T* is time. Using the principles developed in ¶*394* , the data in Table 1 generate the following estimates:

$$\beta_0 = 47.18 \text{ and } \beta_1 = 0.77$$

The upward trend in the prices is captured by the estimate of *[#x3b2] 1*, which is positive and equal to 0.77. In other words, prior to the formation of the conspiracy, the price was drifting upward by $0.77 per year on average. In Figure 5, the regression line has been added to the price information. Based on the simple regression model, one would predict prices (rounded off) of $56 in 1998, $57 in 1999, and $58 in 2000. These "but for" prices would then be compared to the actual prices in order to estimate the overcharge per unit.

This simple model of damages presumes that whatever conditions were present during 1987 - 1997 continued to prevail during the conspiracy period. This is necessary in order to draw inferences regarding the 1998 - 2000 prices from the past prices. If something has changed - in addition to the fact of collusion - this must be taken into account in estimating the "but for" prices during theconspiracy period. For example, there could have been substantial increases in some input costs. If the cost of producing our widget is sensitive to petroleum prices and there was an oil shock in 1998, one would expect widget prices to rise without the help of a price-fixing conspiracy. This increased cost must be taken into account. One way of doing this is to assume that the entire cost increase was passed on in the form of higher prices. In other words, to the estimated "but for" prices, one would simply add the increased cost of the petroleum products used in producing widgets. This adjustment is extremely conservative because cost increases are not usually passed on in their entirety. 12 A less conservative approach would be to examine the relationship between widget prices and petroleum prices in the pre-conspiracy period. This would require a more complicated regression model:

$$P = \beta_0 + \beta_1 T + \beta_2 O$$

where *O* denotes the oil price. Now, the predicted price of the widget will take into account all of the conditions captured by the passage of time plus the influence of oil prices.

There are other changes that could also account for some of the price increase. Similar cost increases have to be considered. For example, there may have been substantial increases in wages due to a new labor contract. Insurance costs may have risen because of a revised risk assessment. Regulatory changes may have imposed added costs. All of these influences should be considered in estimating the "but for" prices.

Widget prices are influenced by demand factors as well as cost considerations. Many of us may recall the dramatic increase in the demand for oat bran when it was first touted for its cholesterol-reducing properties. Grocery store shelves quickly emptied and prices rose. In the short run, changing productive capacity can be difficult. As a result, a sudden increase in demand will lead to price increases even in the absence of a conspiracy. To the extent that an increase in demand coincided with the formation of the widget cartel, the influence of the demand shift should be taken into account when estimating the but-for prices. For example, if there is a large change in population, then one would expect demand to shift and prices to rise. To account for this, one could add population to the regression model:

$$P = \beta_0 + \beta_1 T + \beta_2 O + \beta_3 POP,$$

where *POP* denotes population in the market. Now, the influence of any change in population that coincided with the price increase can be taken into account.

In effect, we have built a so-called reduced-form price equation. The widget price is expressed as a function of supply and demand variables. The selection of the variables should be guided by economic theory and the realities of the market in question. In many cases, the data will be limited, and therefore only the most important explanatory variables can be employed. Once the model is specified, the pre-conspiracy observations are used to estimate the coefficients in the regression equation: *[#x3b2] 0*, *[#x3b2] 1*, *[#x3b2] 2*, *[#x3b2] 3*. Then, the equation that we use for prediction is

$$P = b_0 + b_1 T + b_2 O + b_3 POP,$$

where *b 0*, *b 1*, *b 2*, and *b 3* are the estimated coefficients of the model. In order to estimate the prices during the conspiracy period but for the cartel behavior, one substitutes the actual values of the explanatory variables ( *T*, *O*, *POP*) for the conspiracy period in the estimated price equation. In this way, the plaintiff has controlled for changes in demand and supply determinants of price. The resulting prediction on price during the conspiracy period takes into account influences other than the conspiracy that could serve to increase the widget prices. The differences between the predicted prices and the actual prices charged during the conspiracy period are inferred to be the overcharges due to the conspiracy.

An alternative formulation of the price equation is to add an indicator or dummy variable to the model. The equation would then be

$$P = \beta_0 + \beta_1 T + \beta_2 O + \beta_3 POP + \beta_4 D$$

where *D* is a binary variable that takes on the value 1 if the observation falls within the conspiracy period or 0 if the observation falls in the pre-conspiracy period. The coefficient on the dummy variable - that is, the estimate of *[#x3b2]4*, is an estimate of the collusive overcharge - that is, the increase in price due solely to the anticompetitive behavior.

The data do not always cooperate in these econometric endeavors. As an example, consider the statistical results in the *Chicken Antitrust Litigation.*13 The plaintiffs tried to use a price equation with a conspiracy dummy variable. In their price equation, they included the prices of beef, pork, and turkey, which are substitutes for chicken; seasonal dummy variables to control for time of the year; the consumer price index; consumer disposable income; per capita production of chicken to account for supply variation; and a dummy variable to isolate the effect of the conspiracy on price. Much to their surprise no doubt, the estimated coefficient on the collusion dummy variable was negative. This, of course, indicates that after taking other factors into account, the price of chicken during the conspiracy period was actually lower than it would have been absent the conspiracy. This, of course, is implausible because the point of a price-fixing conspiracy is to raise - not lower - price. 14 Assuming that there was, in fact, price-fixing behavior, the results suggest that a further refinement in the econometrics may be warranted. More sophisticated econometric

methods may reveal the effects of conspiracy.

**395b2. *Some problems in practice.***

The before-and-after approach to estimating overcharge damages may run into some problems in practice. First, the before-and-after approach necessarily relies on time series data. In the widget hypothetical, annual observations on price were available for the 1987 - 1997 period prior to the collusive behavior. Although one may be quite confident that there was no collusion during that period, some other things may well have changed. For example, the product itself is apt to change over time. All else being equal, product improvements may require higher prices because of higher costs. Moreover, product improvements that consumers presumably value will lead to shifts in the demand, which will also influence price. As the supply and demand conditions evolve over time, the plaintiff is forecasting outside the sample range. That is, the regression model estimates the relationship between supply and demand variables during one period while the forecast pertains to supply and demand variables that have not been incorporated in the estimation procedure. As a statistical matter, this tends to increase the standard errors of the estimates. In essence, the estimates are less precise. 15 One may argue that the observed price differential may be due to random error as well as the collusion, thereby casting doubt on the reliability of the damage estimates.

A second problem in practice involves identifying the beginning and ending of the conspiracy period. In some instances, there will be testimony regarding the advent of the conspiracy. In others, there may be a key event - a specific trade association meeting, for example - that provides a starting point. The plaintiff also needs to determine the end of the conspiracy if it wants to use post-conspiracy prices to estimate the "but for" prices during the damage period. It is obvious that a failure to identify precisely when the collusion occurred and when it did not will be critical to satisfactory damages estimation. A companion problem surfaces when the effect of the conspiracy lingers beyond the end of the formal collusion. This also taints the post-conspiracy prices and may give rise to extended damages.

Third, cartel activity may be subject to periodic episodes of cheating. If there is evidence that competition occurred from time to time during the conspiracy period, these prices may provide further evidence of "but for" prices. If there is no such evidence, then these competitive prices serve to confuse matters. In comparing the forecasted price with the actual prices, there will be instances where there is no measurable overcharge. In some cases, the difference may even be negative - that is, the predicted "but for" price will exceed the actual price. These differences should not be netted out against the overcharges. Just because some of the prices were lower than anticipated is no reason to reduce the damages on those transactions where the prices were collusive.

Fourth, it may be true that one or more explanatory variables is influenced by the conspiracy. In an ideal cartel, all variables are specified: price, quantity, production quotas, nonprice variables (such as advertising, service, and warranty terms), credit terms, and so on. In practice, the cartel may not adequately control all of these variables. Suppose, for example, that the cartel members agree on price but do not allocate production quotas. As price is presumably higher than before the conspiracy began, each firm has an incentive to try to expand its output and thereby increase its market share. In effect, the colluders will compete on a nonprice basis. 16 To the extent that this inflates the expenditures on promotion, the "but for" estimate will be higher than it would have been otherwise. This, of course, will bias the damage estimate downward.

**395b3. *Yardstick estimates of overcharges.***

In some instances, the plaintiff may be able to use the yardstick approach to estimate overcharge damages. It is especially useful in cases where the pre-conspiracy prices are unreliable predictors of future prices - that is, in cases where the before-and-after approach is unavailing. As Hovenkamp has observed, "[t]he ideal conspiracy for the yardstick approach is a local cartel where a nearby market can be found which has the same basic cost structure." 17 It is also necessary that the yardstick market be as comparable as possible in all respects: degree of competition, tax structure, regulatory requirements, population density, average income, and so on. The selected yardstick will be vulnerable to attack if there are meaningful differences between the plaintiff's market and the yardstick market. It is

possible to make some adjustments to account for the differences across the two markets. For example, suppose there is a difference in labor costs. One way of coping with this is to determine the labor cost per unit of output and adjust the "but for" price for the labor cost difference. Similar adjustments must be made for any other differences as well. If there is an important difference that is beyond adjustment, this approach will have to be abandoned. Suppose, for example, that there are 3 competitors in the plaintiff's market and 20 in the yardstick market. There is a suspicion (at least) that, all else being equal, prices will be higher in a market with 3 participants relative to one with 20 competitors. There is, however, no a priori way to adjust for that difference. Consequently, one of these markets may not be a suitable yardstick for the other.

In some instances, an econometric approach to building a yardstick may be possible. The most prominent example involves bid-rigging claims. Since the bid riggers agree among themselves who is to win a particular job and no one submits a bid below that of the designated winner, this is a classic overcharge case. The measure of damage would be the difference between the rigged bid and the bid "but for" the collusion. Assuming that one knows which bids were rigged and which bids were competitively determined, it will be possible to apply a statistical yardstick. Using information on winning bids for sewer construction projects, Howard and Kaserman constructed two econometric models. 18 In the first model, the competitive winning bids were used to predict the "but for" bids on the jobs that were rigged. In the second model, they used all of the bids (rigged as well as competitive) but singled out the rigged bids by including a dummy variable.

Using the first approach, the competitive bids were assembled and all relevant characteristics were isolated. These characteristics included the number of bidders and the project size. In other circumstances, one might include other variables that would determine the bids in a competitive market. These bids, along with their associated characteristics, constituted the observations for a regression model of the following form:

$$B = \beta_0 + \beta_1 N + \beta_2 S + \varepsilon$$

where *B* is the bid, *N* is the number of bidders, *S* is the size of the project, and *[#x3b5]* is the random error term. 19 The estimated coefficients, $b_0$, $b_1$, and $b_2$ were determined by the competitive bidding process. Thus, the plaintiff could use the estimated relationship,

$$B = b_0 + b_1 N + b_2 S$$

to predict the "but for" competitive bids that can be compared to the collusive bids.

The first regression equation estimated by Howard and Kaserman was 20

$$B = 225{,}905 - 22{,}142N + 0.74S.$$

Thus, the data indicate that a competitive bid (on average) will be equal to $225,905 plus 74 percent of the engineering estimate of the cost, minus $22,142 times the number of bidders. The signs of the coefficients make sense and the $R^2$ was 0.847, which means that the model explained 84.7 percent of the variation in the competitive winning bids. The actual values for *N* and *S* associated with a specific *rigged* bid would be substituted into the equation to obtain an estimate of a competitive bid. The difference between that estimate and the actual winning bid is an estimate of the overcharge on that job. For example, if the engineering cost estimate were $500,000 and there were three bidders,

then the econometric results would forecast a competitive "but for" bid of

$$B = \$225{,}905 - \$22{,}142\ (3) + 0.74\ (\$500{,}000) = \$529{,}479.$$

If the actual winning rigged bid had been, say, $750,000, a point estimate of the overcharge would be the difference between the actual bid ( $B_A$) and the "but for" bid ( $B_{BF}$):

$$B_A - B_{BF} = \$750{,}000 - 529{,}479 = \$220{,}521.$$

Two caveats are in order. First, this procedure will not work unless the plaintiff can identify which bids are competitive and which are collusive. Second, the statistical results will be weak if the number of competitive bids is small. The precision of the parameter estimates falls as the number of observations falls.

There is another econometric approach to estimating the overcharge on rigged bids: pool all of the bids together and use a dummy variable for the rigged bids. Howard and Kaserman specified their second regression model as

$$B = \beta_0 + \beta_1 N + \beta_2 S + \beta_3 R + \varepsilon$$

where $R$ is a dummy variable that takes on the value of 1 for rigged bids and the value of 0 for competitive bids. Obviously, even with this approach the plaintiff must still be able to identify those bids that were rigged in order to use this variant. In this case, however, the coefficient on $R$ provides an estimate of the average collusive overcharge on the rigged bids. Howard and Kaserman had a sample of 46 winning bids - 39 competitive bids and 7 rigged bids. In their second model, they used all 46 observations. Their results were as follows:

$$B = 65{,}178 - 52{,}550N + 1.02S + 586{,}834R.$$

The regression results were very good in a statistical sense. The regression coefficients were statistically significant and had the predicted signs; the $R^2$ was 0.914, which means that the model explained 91.4 percent of the observed variation in the winning bids. The coefficient on $N$ indicates that the presence of an additional bidder reduced the winning bid by $52,550. The coefficient on size indicates that the winning bid rose by $1.02 for every dollar increase in the engineering estimate of the project size. Finally, the coefficient on $R$ indicates that the winning rigged bid was $586,834 higher than the winning competitive bid. Thus, the coefficient on $R$ is a measure of the average overcharge across all of the rigged bids after controlling for differences in project size and the number of bidders. When there is a single plaintiff, the total damage estimate can be computed by multiplying the average overcharge times the number of rigged bids. In such cases, it does not matter that the plaintiff has not identified the overcharge on a per-project basis. Because this formulation does not separate the overcharges on a per-project basis, however, it does not work when there are multiple plaintiffs. When there are several municipalities filing suit, for example, it would seem necessary to use the first regression model so that project-specific overcharges could be estimated.

**395c. Spurious damage estimates.**

Some damage methodologies will produce spurious damage estimates. Suppose that the plaintiff compares prices in the post-conspiracy period with prices during the conspiracy period. If the price of a major input has increased between the conspiracy and post-conspiracy periods, the plaintiff must control for that cost increase. One way of doing this is to construct a cost-adjusted price of the output equal to the ratio of the output price to input price. The cost-adjusted price is used as the dependent variable in a regression model estimated using observations in the post-conspiracy - presumably competitive - period. These regression results are used to predict "but for" prices during the conspiracy period. Any deviation between the observed cost-adjusted prices during the conspiracy period and the "but for" prices is then interpreted as an illegal overcharge.

If the input price that is used in constructing the cost-adjusted price is increasing over time, this approach will generate a positive damage estimate even if the defendants have charged competitive prices at all times. 21 This built-in bias toward a finding of overcharges when in fact there have not been any is due to the concavity of the long-run cost curve in input prices. 22 This can be seen quite easily. Let $P_1$ and $P_2$ represent the prices of the output in periods 1 and 2, respectively. Let $w_1$ and $w_2$ denote the prices of the input used as a cost proxy in periods 1 and 2, respectively. Finally, let $C_1$ and $C_2$ represent the total cost in periods 1 and 2, respectively. For simplicity, suppose that the firm's output is the same in both periods. If the price is at the competitive level in both periods, then $P_1 = C_1/Q$ and $P_2 = C_2/Q$ - that is, price will equal average cost in each period.

The long-run cost curve is concave in input prices. This means that the cost curve increases at a decreasing rate. This relationship is depicted in Figure 6. It is apparent that the slope of a straight line from the origin to the cost curve gets flatter as the input price ( $w$) increases. But the slope of the straight line is $C_1/w_1$ and $C_2/w_2$, respectively. As a result,

$$\frac{C_1}{w_1} > \frac{C_2}{w_2}.$$

Since quantity was assumed to be constant, it will be true that

$$\frac{C_1/Q}{w_1} > \frac{C_2/Q}{w_2}.$$

Because price is equal to average cost in each period, it follows that

$$\frac{P_1}{w_1} > \frac{P_2}{w_2}.$$




Figure 6

Using the cost-adjusted price in period 2 as a competitive benchmark, the plaintiff will estimate positive damages even though there are no damages at all. This spurious result will be exacerbated if the quantity sold in period 2 increases due to, say, growth in the market.

***A simple numerical example.***

Suppose that the output is produced with inputs in fixed proportions. Each unit of output ( *Q*) requires exactly one unit of each input. 23 For example, a hammer requires one handle and one hammerhead. Suppose that in the alleged conspiracy period, the price of input 1 ( *w11*) is $1.00 and that the price of input 2 ( *w12*) is also $1.00. Because each unit of output requires one unit of each input, the average (and marginal) cost of production will be $2.00. In period 2, suppose that the price of input 1 ( *w21*) increases to $2.00, but that the price of input 2 ( *w22*) does not change. Thus, average cost in period 2 will be equal to $3.00.

In period 2, the post-conspiracy period, output price is at the competitive level, which is equal to average cost - that is, $P^2$ = $3.00. If we look at the so-called cost-adjusted price, we observe

$$\frac{P^2}{w_1^{\ 2}} = \frac{\$3.00}{\$2.00} = 1.5.$$

Suppose that the price in period 1 was at the competitive level - that is, $P^1$ = \$2.00. Then the cost-adjusted price will be

$$\frac{P^1}{w_1^{\ 1}} = \frac{\$2.00}{\$1.00} = 2.0.$$

Note that the firm charged a competitive price in both periods and therefore there is clearly no overcharge. But a comparison of the so-called cost-adjusted prices suggests that there was an overcharge:

$$\frac{P^1}{w_1^1} > \frac{P2}{w_1^2}.$$

This approach obviously generates purely spurious damage estimates. Irrespective of the competitiveness of the output prices, 24 this approach is guaranteed to produce positive damages as long as the input price that is used as a proxy for average cost increases in the post-conspiracy period. If the plaintiff is going to use this method, all of the costs must be used for the adjustment. In our simple example, one should compare $P^1/AC^1$ and $P^2/AC^2$:

$$\frac{P^1}{AC^1} = \frac{\$2.00}{\$2.00} = \frac{P^2}{AC^2} = \frac{\$3.00}{\$3.00}.$$

This avoids the problem of spurious inferences.

In some cases, the plaintiff will have price data before, after, and during the conspiracy. All of the data provide useful information for purposes of damage estimation, and therefore all of the data should be employed in the damage estimation. 25 Consider the price data plotted in Figure 7. There are 10 pre-conspiracy observations, 10 post-conspiracy prices, and 7 prices during the conspiracy period. It is fairly clear that the price data exhibit a general downward drift. Before, during, and after the alleged damage period, there appears to be a negative trend. This trend could be due to a continuing improvement in the production process that leads to declining costs. If the plaintiff estimates a reduced-form price equation over the post-conspiracy period and applies it to the conspiracy period, spurious damages may be estimated. It is difficult to model the gradual improvement in the production technology. As a result, the reduced-form price equation is apt to miss this influence. When the regression equation is applied to the damage period, it will generate positive damage estimates even if there are none because of the higher costs of production. This is an instance where the plaintiff should use all of the prices in the regression model and include a dummy variable for the conspiracy period. In this way, all of the available information will be used, and the effects of the conspiracy - if any - will be

isolated in the coefficient on the dummy variable.




Figure 7

**395d. Overcharges and partial conspiracies. 26**

A complication arises when a price-fixing conspiracy does not involve the entire industry. 27 In an oligopoly, one firm could simply refuse to participate. 28 In an industry with a handful of large firms and a significant number of small firms, the dominant firms may decide to collude but not bother to include the smaller fringe firms. In this setting, the economic analysis is uncontroversial. Consider Figure 8, in which demand is represented by *D* and industry supply is *S 1* + *S 2*. Absent collusion, the competitive price will be *P C* and the corresponding quantity will be *Q C*. Suppose we disaggregate industry supply into two components: *S 1* is the supply of the noncolluders and *S 2* is the supply of the colluders. The colluders will maximize their profits by taking into account the supply response of the noncolluders in their calculations. In effect, the colluders concede part of the market to the noncolluders. In Figure 8, this concession is reflected in the residual demand curve, which is the difference between the market demand ( *D*) and the supply response of the noncolluders ( *S 1*). Thus, the residual demand, labeled *d* = *D* - *S 1*, shows the quantity available for sale by the colluders after taking into account the supply responses of the noncolluders.




Figure 8

In order to maximize collusive profits, the cartel will produce the quantity where the cartel supply ( *S 2*) equals the marginal revenue associated with the residual demand ( *mr*). The optimal quantity for the colluders, which is shown as *Q 2* in Figure 8, yields a cartel price of *P M*. The noncolluders will respond to the higher price in the market by sliding along their supply curve ( *S 1*) to the price in the market. In this example, the noncolluders will produce *Q 1* at a price of *P M*. Together, the cartel output ( *Q 2*) and the noncolluders' output ( *Q 1*) will equal *Q 3*, which is the quantity that clears the market at the collusive price of *P M*.

Consider the economic results of this conspiracy. The price in the market has risen from *P C* to *P M*. That is, the overcharge is clearly equal to the difference between *P M* and *P C*. It is also true that all buyers pay the same price, and therefore all buyers suffer the same overcharge. Every buyer faces the same problem: proving the price that it actually paid, proving the price that it would have paid "but for" the conspiracy, and proving the quantity that was actually purchased. It does not matter whether the buyer purchased from a colluder or a noncolluder - the overcharge is precisely the same. The problem of establishing the "but for" price is no more severe for purchasers from the conspirators. The damages cannot be characterized as speculative because purchases were not made from the actual colluders. If the damage claims are speculative, it is because the "but for" price was not proven with the appropriate degree of precision.

**395d1. *Duplicative recovery.***

The next question is who should compensate the purchasers of the noncolluders. The obvious answer is that the cartel members should bear the full costs of their illegal behavior. This, of course, would include the overcharges imposed on all buyers of the product in question. 29 This may raise concerns about duplicative recovery. Such concerns seem misplaced. First, the recoveries would not be duplicative in the sense that a single overcharge was being recovered by more than one antitrust victim. For example, in Figure 8, let $P_M$ be $10, $P_C$ be $8, and $Q_3$ be 300. The total overcharge will be ($P_M$ - $P_C$) $Q_M$ = ($10 - 8)(300), which is $600. Permitting the customers of the noncolluders to recover from the cartel members would not increase the total overcharge. Suppose that $Q_1$ equals 125 and $Q_2$ equals 175. It is true that the overcharge collected by the cartel members is ($10 - 8)(175) or $350. The customers of the noncolluders have been overcharged ($10 - 8)(125) or $250, but the conspirators did not collect that portion of the total overcharge. This does not make their recovery duplicative. It simply does not duplicate any part of the overcharge recovery accorded to the customers of the conspirators. It is true, of course, that the cartel members will have to repay more than they collected in overcharges, but it cannot be denied that they are responsible for the total overcharges suffered by all buyers.

**395d2. *Product differentiation.***

The logic of the umbrella model is most compelling when the product is homogeneous. Product differentiation introduces some difficulties because the overcharge is not the same across all producers. 30 Product differentiation may lead to equilibrium price differentials across the various brands. A conspiracy among a subset of all producers will upset these differentials, and market forces will lead to price adjustments by the nonconspirators. Again, the overcharge will be the difference between the new price and the "but for" price. If the "but for" price cannot be estimated without speculation, the umbrella plaintiffs will be out of luck.

Consider a coffee cartel. There are many varieties of coffee: Colombian, Kona, Jamaican Blue Mountain, and so on. Even though there is product differentiation, the cartel can (in principle at least) agree on a new price structure. This case may pose some additional difficulties, but they should not be insurmountable. More troublesome, however, are consumers of tea, hot chocolate, milk, fruit juices, and other imperfect substitutes for coffee. As an economic matter, one would expect a collusive increase in the price of coffee to cause changes in the prices of these imperfect substitutes. Proving the extent of the price change in these products that can be attributed to the increased coffee price is apt to be quite difficult in practice. In principle, these antitrust victims should be afforded an opportunity to prove their damages, but they are apt to be denied standing.

**395e. Collusive monopsony and damages.**

When buyers collude, their aim is to reduce the quantity purchased and depress the price below the free market level. This is price-fixing behavior that imposes welfare losses that are analogous to those imposed by traditional cartels. Collusive monopsony is a per se violation of the Sherman Act 31 and invokes §4 of the Clayton Act. The principles of damage estimation can be used to estimate *undercharges* in the collusive monopsony cases.

**395e1. *Collusive monopsony.*32**

The effects of collusive monopsony can be seen with the aid of Figure 9. The collective demand of the buyers is shown as *D* and the supply is shown as *S*. If the buyers compete with one another in the market, they will expand their purchases to the point where supply and demand are equal. As a result, the competitive price will be $P_C$ and the competitively determined quantity will be $Q_C$. Following the formation of a buying cartel, the firms collectively recognize their buying power, which flows from the positive slope of the supply curve. They will understand that the price can be depressed if they agree to buy less. This effect is reflected in the marginal factor cost (*MFC*), which is the increase in total expenditures when the quantity purchased increases by a small amount. 33 Profit maximization by the colluders requires restricting purchases to the point where demand equals marginal factor cost. In Figure 9, we see that

this occurs at a quantity of $QM$. The price on the supply curve that corresponds to $QM$ is $PM$. For the quantity $QM$, the price on the demand curve is $PD$. The buying cartel, therefore, imposes an undercharge of $PD$ - $PM$ per unit in the sense that the marginal value of the good is $PD$, but the price paid is only $PM$. This is a measure of monopsonistic exploitation. 34 The damage, however, is the difference between the actual price paid ( $PM$) and the price "but for" the conspiracy, which would be $PC$, times the quantity actually purchased ( $QM$): 35




Figure 9

$$\Delta = (P_C - P_M) Q_M.$$

The problem, of course, is how to measure this collusive undercharge.

**395e2. *Measuring the damages.***

Precisely the same empirical methods can be used for estimating undercharges as were used for estimating overcharges. All of the same problems arise in using the before-and-after approach: identifying the precise dates of the conspiracy and controlling for changes in supply and demand factors that would affect the "but for" price. Trying to use the yardstick model requires finding another market that is as similar to the plaintiffs' market as possible, which may be exceedingly difficult.

**395f. Overcharges in tying cases.**

A tying contract involves a conditional sale: the seller will sell good *A* on the condition that the buyer also purchases good *B*. 36 In such arrangements, the tying good is *A* and the tied good is *B*. Usually, the customer plaintiff alleges that it was overcharged on the tied good and therefore is entitled to recover the difference between the competitive price of the tied good and the price that it actually paid. 37 This measure of damages, however, is not correct. The plaintiff is entitled to recover only the difference between the good's actual condition and its condition "but for" the tying contract. This means that the plaintiff is not entitled to reformulate only part of the contract. Instead, the plaintiff must determine the net effect of reformulating the entire contract. This will be a daunting task and perhaps not worth the effort.

Consider the tying contract in *Siegel*.38 The franchisor charged neither a franchise fee nor a running royalty (as most franchisors do), but it required that its franchisees purchase a certain number of cookers and fryers as well as packaging supplies and mixes exclusively from Chicken Delight. The prices for these tied products were higher than the prices of comparable products sold by other suppliers of the tied goods. The franchisee's damage, however, is not equal to the "overcharge" on these tied products because it got a license granting it the right to assume Chicken Delight's identity, to adopt its business methods, and to prepare and market chicken under the Chicken Delight trademark without a separate charge. The license must have been worth something or the franchisees would not have agreed to the contract. The court recognized this and required the plaintiff to deduct a reasonable franchise fee from the sum of the overcharges on the tied items in measuring the damages. The result of this requirement is that the franchisee's damage equals the difference between the price paid for the tied package and the sum of the market prices of the tied and tying products. This requirement is articulated quite clearly in *Kypta*:

> ...injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value. The rationale behind this requirement is apparent: a determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the franchisor for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed; suit, then, would be foreclosed. 39

Usually, it will not be possible for a franchisee to prove any injury under this formula.

Suppose that over the life of Siegel's franchise he paid a premium for the cookers and fryers that he bought from Chicken Delight when he became a franchisee. In addition, suppose he paid a premium for the packaging materials and mixes that he needed to operate his fast-food restaurant. For illustrative purposes, suppose that the overcharge on the equipment plus the present value of the overcharges on the packaging supplies and mixes over the life of the franchise amounted to $250,000. The fair market value of the franchise license must have been worth at least $250,000 to Siegel or he would not have become a Chicken Delight franchisee. As a result, Siegel has suffered no injury at all. Of course, he would like to reformulate the contract in part. He would like to be a Chicken Delight franchisee with a zero franchise fee and no running royalty, and be able to buy equipment and supplies at competitive market prices. But if the contract were to be reformulated, Siegel might have to pay a franchise fee of $250,000. Alternatively, he might pay a combination of a franchise fee and a running royalty. The net result is that he will be better off (if at all) by less than the $250,000 that he is no longer "overcharged" on the equipment and supplies.

More generally, any time that there is an overcharge on the tied good, there must be an undercharge on the tying good. At a minimum, this creates a serious problem in estimating damages. In addition to estimating the overcharge on the tied goods, the plaintiff must estimate the discount on the tying good. In many cases, the plaintiff can readily measure the overcharge on the tied good(s) simply by comparing the actual price(s) paid to market price(s) on comparable products. Of course, it will be necessary to establish that the tied products are actually comparable to the products available from rivals. But the real problem is estimating the price of the tying good absent the tying contract. If

the defendant possesses real market power in the tying good, there will be no close substitutes for comparison purposes.

**395g. Overcharges in merger cases.**

Horizontal mergers - that is, mergers between competitors - may cause a change in industry structure that is competitively significant. All horizontal mergers necessarily reduce the number of competitors. If the pre-merger industry structure is sufficiently unconcentrated, a merger may have no competitive significance. Indeed, in such a setting, the merger is apt to be motivated by efficiencies and therefore would tend to be procompetitive and certainly no worse than competitively neutral. In other instances, however, the post-merger market structure may become sufficiently noncompetitive that price will rise following the merger. In those cases, there may be illegal overcharges that require estimation.

Suppose two firms merge and the post-merger price exceeds the pre-merger price. If the merger violates §7 of the Clayton Act, customers may sue for damages. In this case, the overcharge will be equal to the difference between the actual post-merger price and the price that would have prevailed but for the merger. The usual estimation problems surface: conducting a satisfactory before-and-after analysis or finding a suitable yardstick market. All of the remarks that were made above apply with equal force to damages in horizontal merger cases. Moreover, the analysis of partial conspiracies also applies here. If, say, two of the ten market participants merge and industry price rises as a consequence, all buyers experience the overcharge and therefore all have suffered antitrust injury and damages. All buyers should be able to sue, and the newly merged entity would seem to be the culprit. Since no other supplier was involved in an antitrust violation, these firms cannot be held *responsible* for the overcharge even though they collected a part of it. The merging firms, however, are responsible for all of the overcharge because "but for" the merger there would not have been an overcharge.

**395h. Resale price maintenance and antitrust damages.**

Resale price maintenance (RPM) is a vertical price restraint. A seller conditions the sale of its product on an agreement not to resell the product at a price below some specific level. 40 As a contract in restraint of trade, RPM has been illegal per se since *Dr. Miles.*41 Most of the private cases are filed by terminated dealers who refused to acquiesce to the price restraint. 42 In principle, however, customers who cannot buy from discounters may claim that they have suffered overcharges. The measure of damages would be equal to the difference between the price actually paid and the price that would have prevailed absent the illegal RPM agreement. Such a claim poses conceptual problems as well as problems of estimation. 43

**395h1. *Conceptual problems.***

It is not entirely clear that consumers of products subject to RPM have been injured at all. If in fact the RPM was motivated by either a dealer cartel or a manufacturer cartel, then per se illegality follows and consumers are clearly overcharged. In cases involving a dealer cartel, there is no conceptual problem because the overcharges are clearly illegal. Consumers have suffered antitrust injury and antitrust damages. In cases involving a manufacturer cartel, the dealers are the direct purchasers who have been overcharged and presumably will sue for damages. Again, there is no conceptual problem: the overcharge is like any other resulting from a price-fixing cartel.

A substantial literature on RPM has developed, however, that does not involve cartel activity. This literature offers efficiency justification for RPM, which undermines anticompetitive concerns. 44 In essence, the manufacturer wants its distributors to provide product-specific services that lead to a shift in the demand curve for the product. 45 If the demand shift is parallel, this means that the value of the product with the product-specific services is higher than the value of the product without the services. As a simple example, consider Figure 10. Demand curve *D 1* represents the value to consumers of a product without the services. When the distributor provides product-specific services, the value of the product rises and demand shifts to *D 2*. As an example, it is easy to see that a cell phone that has many bells and whistles and includes thorough instructions on how to use the phone is worth more to the consumer with than without

the instructions. On the supply side, the provision of product-specific services is not free.Accordingly, the supply of the product with the services ( *S 2*) lies above the supply without the services. Notice that the provision of product-specific services not only leads to an increase in price from *P 1* to *P 2*, but quantity also increases from *Q 1* to *Q 2*. The reason for this outcome is that the demand curve shifted more than the supply curve. This can be seen at *Q 1*. The value of *Q 1* with the services is *P 3* whereas the cost of *Q 1* with the services is *P 4*.



Figure 10

In these circumstances, RPM is used to prevent free riding. Because the product-specific services can often be consumed without buying the product, there is an incentive for discounters to skimp on services. The consumers will get the benefits of the full-service distributors but will be lured to the discounters by their lower prices. In effect, the discounters free-ride on the efforts of the full-service distributors. Now, the manufacturers are concerned about free riding because it undermines the incentives of the full-service distributors. As formerly full-service distributors begin to reduce their services, the demand curve will shift back to *D 1*. This results in fewer sales and lower profits for the manufacturer. By imposing RPM, the manufacturer can blunt the consumer's incentive to shop around for a lower price. There will be no reward for consuming product-specific services at one location while buying the product at a separate location.

It is true that RPM prevents discounting, and therefore the prices paid by some consumers will be higher than they would be if discounting were permitted. But the consequences of discounting may be the elimination of product-specific services and consequent reduction in the value of the product. Clearly, the marginal consumer at a quantity of *Q 1* is no

worse off paying *P 2* and getting services along with the product than he or she would be paying *P 1* but not getting the service. Consequently, the consumer arguably has not been injured.

**395h2. *Estimation problems.***

In cases where cartel activity of the dealers or of the manufacturers explains the existence of RPM, the overcharges are the same as in any price-fixing case. If the distributors are fixing prices, the consumers are overcharged directly. As a consequence, they would have standing, and damage estimation would proceed as described above. If the manufacturers are engaging in cartel activity, RPM is used as a means of preventing cheating. Consumers in that case are overcharged indirectly. As a result, under *Illinois Brick*, 46 they will not have antitrust standing. The distributors would be the direct purchasers and therefore would have standing. Again, there is nothing special about their damage estimation problem.

Things are far more confused in the case of RPM that is motivated by a desire for product-specific services coupled with free riding. As a conceptual matter, it is not clear that there is an overcharge in the usual sense of the term. One possible measure of the "overcharge" would be the difference between the actual price paid and the price that a discounter would charge. If there are no discounters, it will be very difficult to estimate the "but for" price because there will be no evidence. If there are discounters, the discounted prices provide a benchmark, but the plaintiff would seem to have failed to mitigate if he or she did not buy from the discounter. If the discounted prices were only available for a short period, those prices provide a benchmark, but the manufacturer would seem to be entitled to an offset for the value of the product-specific services that RPM made possible.

**FOOTNOTES**

1 When buyers collude, the claim will involve prices that are too low - that is, undercharges. These cases will also be examined in this Paragraph. On buyer cartels, see Ch. 20B; and Roger D. Blair & Jeffrey L. Harrison, Monopsony: Antitrust Law and Economics 36-54 (1993).
2 *Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390 (1906).*
3 *Id. at 396.*
4 For an argument in favor of lost profits, see Jeffrey L. Harrison, The Lost Profits Measure of Damages in Price Enhancement Cases, 64 Minn. L. Rev. 751 (1980). For an argument in favor of overcharges as opposed to lost profits, see Frank H. Easterbrook, Treble What?, *55 Antitrust L.J. 95 (1986)*. On lost profit damages when the direct purchaser is an intermediary, see Herbert Hovenkamp, The Antitrust Enterprise: Principle and Execution 72-76, 304-305 (2006).
5 *15 U.S.C. §15(a).*
6 All of this analysis assumes that the colluding firms do not cheat, that the cartel members are identical, and that the cartel maximizes industry profits.
7 We need to show that

$$\Delta\pi > O/C, \text{ i.e.}, (P_1 - MC_1)Q_1 - (P_2 - MC_2)Q_2 > (MC_2 - MC_1)Q_2$$

or

$$(P_1 - MC_1)Q_1 - P_2Q_2 + MC_2Q_2 - MC_2Q_2 + MC_1Q_2 > 0$$

or

$$(P_1 - MC_1)Q_1 - (P_2 - MC_1)Q_2 > 0.$$

The first term on the left-hand side is the maximum profit obtainable by operating where marginal cost ( *MC* 1) equals marginal revenue. The second term is the profit associated with producing a quantity below that at which marginal cost ( *MC* 1) equals marginal revenue. Thus, the first term is necessarily larger than the second, and therefore the lost profit exceeds the overcharge.

8 The interested, albeit mathephobic, reader can omit this example without loss of continuity or can simply read around the technical material.

9 Marginal revenue is the first derivative of total revenue:

$$MR = dTR/dQ = 100 - 0.02Q.$$

10 Although price equals average cost at *Q 1* and the competitive firm's profits are zero, the firm still earns a competitive return on its investment because that is part of the cost. In other words, the average cost curve has embedded within it a competitive return.

11 It is not always true that the actual prices paid can be measured easily. The plaintiff cannot rely on list prices because list prices do not reflect the actual payments. The plaintiff must present evidence of actual transaction prices that reflect all discounts, rebates, and allowances, whether on the invoice or not. The relevant figures are the prices actually paid in the most literal sense.

12 See ¶*396* for an examination of passing on overcharges.

13 *560 F. Supp. 963 (N.D. Ga. 1980).*

14 This is only true of colluding *sellers*; colluding buyers will take steps to reduce the prices that they pay. See ¶395e below.

15 See Franklin M. Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702 (1980).

16 In the limit, the expenditures on nonprice competition could completely dissipate the collusive profits; see George J. Stigler, Price and Nonprice Competition, 72 J. Pol. Econ. 149 (1968).

17 See Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §17.5b (3d ed. 2005).

18 See Jay H. Howard & David L. Kaserman, Proof of Damages in Bid-Rigging Cases, 34 Antitrust Bull. 359 (1989).

19 The size of the projects was determined by engineering cost estimates. Id. at 374.

20 Id. at 390.

21 We are indebted to David L. Kaserman for bringing this example to our attention.

22 A good exposition is provided by Eugene Silberberg, The Structure of Economics: A Mathematical Analysis 252-254 (2nd ed. 1990).

23 This production function is written as

$$Q = \min [X1, X2]$$

where *X 1* and *X 2* are the quantities of inputs 1 and 2. For example, if we had 10 handles and14 hammerheads, output would be the minimum of the two input quantities: *Q* = 10.

24 If the price of the input used as a proxy falls in the post-conspiracy period, there could be overcharges in period 1 that will go undetected.

25 As an econometric matter, the added observations will improve the precision of the estimates - that is, the standard errors of the estimates will be smaller with more observations.
26 In this section, we employ the dominant firm model, which has been used to good advantage by Thomas R. Saving, Concentration Ratios and the Degree of Monopoly, 11 International Econ. Rev. 139 (1970); and William M. Landes & Richard A. Posner, Market Power in Antitrust Cases, 94 Harv. L. Rev. 937 (1981).
27 Partial conspiracies are analyzed in Roger D. Blair & David L. Kaserman, Antitrust Economics 146-151 (1985).
28 The following analysis has been used to identify nonparticipants when collusion is alleged; see Roger D. Blair & Richard E. Romano, Distinguishing Participants From Nonparticipants in a Price-Fixing Conspiracy: Liability and Damages, 28 Am. Bus. L.J. 33 (1990).
29 For a more extensive analysis, see Roger D. Blair & Virginia G. Maurer, Umbrella Pricing and Antitrust Standing: An Economic Analysis, 1982 Utah L. Rev. 763 (1982).
30 Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §16.6 (3d ed. 2005), makes this point. See R.D. Blair & R.E. Romano, note 3, for a technical demonstration that the logic carries through in the presence of product differentiation.
31 *Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 835 (1947)*. See ¶*2011* for a discussion. Also, see *Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991)*; and *Roger D. Blair & Jeffrey L. Harrison, Cooperative Buying, Monopsony Power, and Antitrust Policy, 86 NW. U. L. Rev. 331 (1991)*.
32 A more complete exposition of the theory of monopsony and its collusive variant is contained in Roger D. Blair & Jeffrey L. Harrison, Monopsony: Antitrust Law and Economics 36-61 (1993).
33 Total expenditures will be $TE = PQ$. As $Q$ increases by a small amount, the effect on $TE$ is $dTE/dQ = P + QdP/dQ$. This is the marginal factor cost, which lies above the supply curve because $dP/dQ$ is positive.
34 See Joan Robinson, The Economics of Imperfect Competition 281-283 (1933), for a brief discussion of monopsonistic exploitation.
35 In Figure 9, it is clear that collusion leads to a reduction in sales of $Q_C - Q_M$. These unsold units involve losses but will be uncompensated for the same reason that those who are priced out of a market by a cartel of sellers cannot recover for their losses: problems of proof.
36 On tying, see Ch. 17. For a more compact examination, see Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §10.1-10.3 (3d ed. 2005).
37 In addition to the buyers, sellers of the tied good may complain that they have been foreclosed from the market or at least a part of it. These claims will be examined in ¶*397* .
38 *Siegel v. Chicken Delight, 448 F.2d 43 (9th Cir. 1971)*, cert. denied , *405 U.S. 955 (1972)*.
39 *Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir. 1982)*, cert. denied, *459 U.S. 857 (1982)*.
40 For the substantive law, see Ch. 16B-1.
41 *Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911)*.
42 Damages for terminated dealers are examined in ¶*397* .
43 For a detailed examination of the problems that arise, see *Roger D. Blair, Jill B. Herndon & John E. Lopatka, Resale Price Maintenance and the Private Antitrust Plaintiff, 83 Wash. U. L. Q. 657 (2005)*.
44 The result has been substantial controversy. For a review of the conflicting views, see Chapter 11 in H. Hovenkamp, note 36.
45 See Lester Telser, Why Should Manufacturers Want Free Trade? 3 J.L. & Econ. 86 (1960).
46 *Illinois Brick v. Illinois, 431 U.S. 720 (1977)*, denies damage recoveries under federal law to indirect purchasers. See ¶¶*346* , *396* .

**LOAD-DATE:** September 11, 2013