# Exhibit 108

# CORRECTED EXPERT REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**May 27, 2010**

- There were dramatic differences in the behavior of the Defendants between the pre-Class Period and the Class Period concerning the increased use of fuel surcharges and the Defendants' refusal to negotiate with shippers concerning those fuel surcharges.

- In sum, the features of the rail industry are such that the collusion was rational since the benefits outweighed the associated costs, unadjusted for the risk of antitrust liability. Defendants' own actions made price fixing easily implementable and effective, since they selected the fuel surcharge which was an especially effective mechanism for achieving and sustaining a conspiratorial rate increase in this industry.

***Opinion #2—The Defendants' behavior in the Class Period is consistent with collusion***

- Based on a review of the discovery record, I found that the evidence thus far produced is consistent with the allegations in the Complaint.

- The Defendants did indeed instigate a common rate increase in unison implementing a fuel surcharge program with identical or near identical features. Defendants each instigated a fuel surcharge that: was applied as a percentage of the base freight rate; used one of two fuel indexes that are highly correlated to each other; had similar thresholds and remained above those thresholds throughout the Class Period; and had effectively the same conversion rates.

- There was no economic correspondence between the fuel surcharge program and actual fuel cost recovery. The Defendants' program, due to its features, increased revenues by more than that which would be necessary to recover increased fuel costs.

- The Defendants communicated with each other to coordinate the implementation of the fuel surcharge program. They engaged in coordinated activities,

such as the creation of a new non-fuel cost index, to facilitate their fuel surcharge conspiracy.

- Instead of competing, with each other the Defendants ignored their own unilateral self-interest in order to pursue the common goals of the conspiracy.

***Opinion #3—Common evidence and economic analysis can be used to determine the impact of the Defendants' alleged conspiracy on Class Members***

- Defendants' transaction data reveals that they did implement a common rate increase across the Class through their use of the fuel surcharge applied as a percentage of base rates.

- Common factors such as [redacted] predominate over individual factors in the determination of freight rates. These common factors can be [redacted] and used in a common analysis to identify and quantify the harm experienced by the Class.

- Defendants' transaction data reveals that there was no material discounting of base rates to offset the fuel surcharges that were applied to shipments made by the Class. As a result, Class members commonly experienced price increases from the Defendants' actions irrespective of the commodity they were shipping.

- Defendants' document production, the facts of the case and my own industry analysis corroborate the findings of my investigation of the transaction data since:
    - The Defendants instigated a mechanism well-suited for implementing a general price increase across their customers.

  - Defendants intended that the fuel surcharge be applied to all customers and engaged in monitoring activities with the goal of achieving 100% coverage.
  - Defendants planned on and each implemented a fuel surcharge program with the same key features across Defendants.
  - The pretext of the program – to recover fuel costs – necessitated universal coverage and full application.
  - The industry regulator, the Surface Transportation Board, ruled that the revenue based fuel surcharge program was unreasonable.

***Opinion #4—A common damage methodology works in this case***

- [redacted]

- Defendant's transaction data and publicly available data sources are, together, sufficiently rich to account for the common factors that predominate in rail freight pricing and a regression model can be used to quantify Class-wide damages.

- I have specified and estimated such a model using the transaction data as well as publicly available data sources, and the model results in an economically reasonable quantification of Class-wide damages.

- The damage analysis shows that Class members paid significantly higher prices to Defendants for rail freight transportation during the Class Period than before and that these higher prices are not explainable by price determinants other than the conspiracy.

## IV. FACTORS CONDUCIVE TO PRICE FIXING IN THE U.S. RAIL FREIGHT INDUSTRY

The Plaintiffs allege that Defendants conspired to use coordinated and artificially high fuel surcharges as a means of raising railroad freight rates across the board, and thereby increasing their collective profits.[2] Rather than engage in competitive behavior, the Defendants are alleged to have collectively agreed to impose on their customers an industry-wide fuel surcharge program that set such charges at uniform levels and applied them as a percentage of the total base freight rate paid by each customer.[3] In my experience, allegations of this kind are generally subject to proof by generalized evidence and common economic analysis.

Price-fixing is facilitated when the cartel and the industry in question have certain attributes, namely, (a) the cartel members have market power, (b) there is little threat of entry by non-cartel competitors, (c) their product or service is homogenous and interchangeable; (d) the demand for their product or service is relatively inelastic; and (e) the pricing of the product or service is well understood and easily communicated between industry participants. All of these factors are present in the rail freight industry.

Beyond these economic factors that influence the ability to establish and maintain a price-fixing cartel, its success is enhanced by the cartel's selection of a mechanism for coordinated behavior that provides the ability to monitor, detect, and deter defections from agreed-upon collusive strategies. The Defendants in this case chose a highly cost efficient mechanism for collusion.

I have observed a number of characteristics of the U.S. rail freight industry that created a business environment conducive to price fixing. Similarly, I have analyzed the types of evidence

---

[2] Complaint, ¶ 4.
[3] Complaint, ¶ 88.

conspiracy attitude to fuel surcharges, and stands in sharp contrast to their behavior during the Class Period.

### 1. During the pre-Class period, individual actions on fuel surcharges were not consistently implemented by all Defendants

Before 2000, fuel surcharges were virtually unheard of in the rail freight industry. Between 2000 and 2002, the Defendants independently implemented fuel surcharge programs. Effective October 25, 2000 the CSX started a limited fuel surcharge program.[83] NS also implemented its first fuel surcharge program in 2000.[84] The BNSF's original fuel surcharge program began in 2001 and on December 1, 2002, UP implemented its first standard fuel surcharge for carload business.[85] These original fuel surcharge programs were apparently designed and implemented by the individual Defendants without agreement or coordination. Indeed, the Defendants relied on a variety of fuel recovery programs, including fuel surcharge programs, in the period before July 2003.[86]

The Defendants' original fuel surcharges were applied inconsistently, in part because of the lack of coordination among the Defendants, and in part for other reasons, including the fact that the surcharges generally did not apply to contracts that incorporated the AAR's cost escalation index, the Unadjusted Rail Cost Adjustment Factor (RCAF-U) or some other cost-escalation index. As an alternative to fuel surcharges, many contracts included rate escalator provisions based on the RCAF or a similar index that captured the cost of escalating fuel bills, and the application of these indexes varied as well. CSX's Mike Giftos testified that during the

[83] The fuel surcharge was based on the WTI, with a trigger price of $28, and the index had to remain above $28 for 30 business days. CSXFSC000000358-363, at 359.
[84] Seale Deposition, at 51.
[85] The fuel surcharge was based on the WTI, with a trigger price of $28, and the index had to remain above $28 for 30 business days. The surcharge was applied in 2% increments for every $5 per barrel the WTI exceeded $28 per barrel.
[86] Seale Deposition, at 54-55.

pre-Class period, [redacted][87]

NS's Don Seale testified that in the months that NS's first fuel surcharge program was being implemented no discussions were held with other railroads about establishing an industry-wide fuel surcharge.[88] Mike Giftos, who was in charge of the fuel surcharge program at CSX, testified that he did not discuss his proposed fuel surcharge with any other railroads prior to implementation.[89] In seeking to impose their original surcharges, the Defendants encountered significant customer opposition, and in an environment in which there was no agreement among the Defendants with respect to fuel surcharges, the Defendants sought to compete with one another on the basis of their respective non-coordinated approaches to fuel surcharges.

In addition, fuel surcharges during the pre-Class period were not applied consistently to all contracts and were often modified or waived in favor of base rate increases. At BNSF, only a small number of price authorities were subject to the fuel surcharge because the "option" to apply the fuel surcharge was "put in the hands of individual marketing personnel."[90] Marketing personnel at NS were also given the authority to reduce or eliminate the fuel surcharge in contract negotiations.[91] In an email dated October 3, 2002, Bob M. Toy, a director at UP, states that [redacted][92]

[87] Giftos Deposition, 49:16-20.
[88] Seale Deposition, 223.
[89] Giftos Deposition, 69-70.
[90] CSX000000270-271, 270.
[91] NS0010013399-400.
[92] UPFSC0042871-873.

The Defendants also waived fuel surcharge provisions to compete with one another. For example, in a bid for [redacted] from a potential customer, BNSF and UP both offered as part of the incentive package contracts without fuel surcharge clauses.[93] In their attempt to apply their fuel surcharge, BNSF personnel noted that they faced difficulties and lost business because their competitor, "the UP [did] not use a fuel surcharge in the competitive marketplace."[94] Similarly, NS waived its fuel surcharge for certain customers in order to win business from CSX.[95]

### 2. In the Class period, the use of fuel surcharges was coordinated and executed by all Defendants

While the original fuel surcharge programs do not appear to have been preceded by substantive discussions among the Defendants, evidence common to the Class as a whole shows that, in 2003, the Defendants engaged in a series of discussions concerning revised fuel surcharge programs. These discussions apparently covered all aspects of fuel surcharge policy, and the Defendants explicitly discussed the desirability of an industry-standard approach to fuel surcharges – the very approach that they implemented as part of the conspiracy alleged in the Complaint. These discussions allowed the Defendants to implement coordinated fuel surcharges starting in the latter half of 2003, through which they were able to achieve significant increases in their revenue and profitability.

In March 2003, CSX announced a new fuel surcharge program that was based on the WTI. CSX initially faced such strong opposition to its program that Mike Giftos, the architect of the program, considered modifying it in various respects.[96] Shortly thereafter, in June 2003, UP

---

[93] UPFSC0033490-494.
[94] BNSF-0574516-4624.
[95] Giftos Deposition, 66-67.
[96] Giftos Deposition, 172:20-173.

began to use the same fuel surcharge program as the other western railroad (BNSF), with each railroad applying the same fuel surcharge percentages based on the HDF.[97] NS announced that it was adopting the CSX fuel surcharge program in January 2004, after preparing during the latter half of 2003.[98]

[redacted][99] The RCAF had already accounted for fuel costs – although in a manner that the Defendants asserted was ineffective[100] – and thus made imposition of a fuel surcharge appear to be "double dipping." By removing the fuel component from the AII and RCAF, the new AIILF index facilitated Defendants' ability to apply their new fuel surcharge program to contracts (and other shipments) that had previously being linked to the RCAF index. [redacted][101] while freely imposing the new (higher) fuel cost surcharges without subjecting themselves to customer complaints that the applicable price escalation formula already was designed to address rising fuel costs.

---

[97] Email correspondence re: Updated UP FSC effective 6/1/03, dated May 12, 2003 (BNSF_0342448-450, at 448); NS email correspondence re: Fuel Surcharge Update, dated May 16, 2003 (NS001000329-330); UP, "Carload Rate Based Standard HDF Fuel Surcharge." Available at: http://www.uprr.com/customers/surcharge/index_revenue.shtml.

[98] NS email correspondence re: Fuel Surcharge notes, dated July 23 through August 4, 2003 (NS010005138-142); NS email correspondence re: Fuel Surcharge Policy Review, dated November 4-9, 2003 (NS001000119-123); NS Email from Pat Glennon to NS personnel re: NS Fuel Surcharge Change 03/10/04, dated January 8, 2004 (NS013001654-1656).

[99] [redacted]

[100] From the evidence I have reviewed, it appears that Defendants' claim that the RCAF was ineffective to recover actual changes in fuel costs was merely a pretextual reason for adopting the AIILF and using fuel surcharges. Defendants' principal complaint appears to be the lag in adjusting the weighting of the cost inputs in the RCAF, but as UP's Mark Draper explained at his deposition, there were two solutions to this problem if the railroad genuinely wanted to address it: (1) the railroads could have worked with the STB to calculate the RCAF on a more frequent basis, or (2) any railroad could have calculated its own RCAF-like index and updated that as frequently as it wished. Draper Dep. at 119-127.

[101] [redacted]

**Figure 12:** [redacted]

[redacted]

**NS:** [redacted] **e**[105]

[redacted]

[104] Source: Defendants’ transaction data produced in this litigation. [redacted]

Source: Defendants’ transaction data produced in this litigation. [redacted] Despite NS folding its stand alone fuel surcharge program as part of its rebasing program, most shipments still received a fuel surcharge on top of that new base rate, as is clear from the high percent figures in 2008.

**Figure 14:** [redacted]

### 3. During the Class period Defendants adopted policies against negotiating fuel surcharges with shippers, in contrast to the pre-Class period

In the pre-Class period, shippers often negotiated more favorable fuel surcharge provisions. Email correspondence regarding contract negotiations show that Defendants waived fuel surcharge provisions in exchange for rate increases and additional business. For example, an NS email dated from June 2000 states, "With Don Seale's approval we have offered to waive the surcharge language in exchange for an additional 1% increase across the board."[107] A UP email from May 2002 describes a deal in which [redacted]."[108] Some shippers successfully negotiated entirely different fuel cost escalators. For years after the implementation of CSX's original fuel surcharge in the

---

[106] Source: Defendants' transaction data produced in this litigation. [redacted]

NS010013795-798

[108] UPFSC0117070-7072.

fall of 2000, customers were able to negotiate fuel recovery programs based on indexes such as the RCAF instead of the standard fuel surcharge.[109]

By contrast, in the Class Period Defendants adopted strict policies that rendered fuel surcharges non-negotiable. The revised CSX program required either the permission of Mike Giftos or one of his direct reports to waive the fuel surcharge,[110] and Giftos recalls making only one exception in which he made a short-term accommodation to [redacted] to the fuel surcharge policy announced in March 2003.[111] [redacted][112] Numerous emails across the Defendants regarding contract negotiations with shippers state that the application of fuel surcharges was "non-negotiable."[113] [redacted][114]

### H. *Given the railroad industry structure, collusion in connection with fuel surcharges was rational; the benefits outweighed the costs*

These industry facts display that the Defendants had a strong incentive to conspire to fix prices, even given the risk of antitrust liability. In order to do so, there needed to be a mechanism that would effectively generate higher prices. An agreed upon, jointly imposed fuel surcharge program provided a highly successful mechanism. Generalized proof and common

---

[109] Giftos Deposition, at 58.
[110] Giftos Deposition, at 142.
[111] Giftos Deposition, at 164-165.
[112] BNSF0035777-779.
[113] Internal NS email correspondence re: Air Products, dated December 22, 2005 through February 16, 2006 (NS010019516-518, at 516 and 518); Email correspondence between Katie J. Benolken and Jerry A. Finan re: Verasun, dated March 6-8, 2005 (UPFSC0170773); Email from Dan Collins Jr. to Dean Piacente and Bruce Kuzma. re: Degussa Master Contract for CH & AG & Fuel Surcharge, dated September 27, 2005 (CSXFSC00149573-574).
[114] [redacted]

economic analysis both corroborate the existence, nature, and scope of such an agreement and its effect.

Plaintiffs' allege that the Defendants chose a fuel surcharge set as a percentage of the base rate as an agreed-upon mechanism to raise rail freight prices across-the-board. Analysis demonstrates that such a fuel surcharge is a highly successful and ideal mechanism for achieving an across-the-board price increase by agreement of the dominant participants in the highly concentrated rail freight industry. This conclusion is based on the following facts.

*First*, adding a percentage fuel surcharge on top of line-haul rates or base rates is by its very nature a general price increase. Prices for all customers, in all regions, are increased in a uniform and easily observed fashion that enables the Defendants to increase profits across the entire customer base except for legacy contracts.

*Second*, because a percentage fuel surcharge is by definition added to the line-haul or base rates otherwise established for particular rail movements by particular customers, prices after the application of the surcharge still reflect the fact that different shippers may have different amounts of leverage in their pricing negotiations with the railroads. That some shippers can negotiate prices lower than those negotiated by other shippers is unaffected by a fuel surcharge that increases all shippers' prices by the same percentage amount. Those shippers with greater leverage, due to, for example, more choices of transport alternatives, will still enjoy lower prices than those shippers with less leverage. The conspiracy will have increased the prices paid by all shippers by the same percentage amount.

*Third*, an agreed-upon surcharge does not require constant communications once the details of the surcharge have been agreed upon. The Defendants implemented common fuel surcharges that increased all per car freight rates by a percentage derivable by an agreed-upon

[redacted]

Figure 22 shows a similar analysis for Defendant NS, confirming that the shippers of all Defendants affected by the fuel surcharge experienced the same striking departure in freight rates from fuel costs.

[145] UP Form 10-Qs and Quarterly Operating and Financial Statistics filed to the SEC for 2000 through 2008.

[redacted]

Given these facts, the Defendants' fuel surcharge program is designed so that a percentage increase in fuel prices will lead the Defendants to increase base revenues by a percentage similar to the response of incremental costs to that percentage increase in fuel prices. But because the base revenue includes much more than just incremental costs – fixed cost elements plus the profitability element of pricing – the shipper will be charged an amount greater than that required to offset the actual rise in fuel prices.

Strikingly, the railroads conceded as much to the industry's regulator, the Surface Transportation Board (STB), which reported that: "The railroads largely concede that their fuel surcharges [calculated as a percentage of the base rate] are not tied to the fuel consumption associated with the individual movements to which they are applied."[147]

[146] Source: Norfolk Southern Quarterly Financial Reviews for 2000 to 2009. Available at: http://nscorp.com/nscportal/nscorp/Investors/Financial_Reports/Quarterly_Financial_Reviews/
[147] Surface Transportation Board Decision, STB Ex Parte No. 661 – Rail Fuel Surcharges, Decided January 25, 2007 (hereafter "STB Decision"), at 1.

Internal documents from UP confirm that over-recovery of fuel surcharge revenue in excess of fuel costs was occurring. UP analysis showed that, even by November 2004, UP's [redacted] group was recovering over 100% of incremental fuel costs.[148] A fuel surcharge recovery analysis of [redacted] shows that UP recovered over 100% of fuel costs.[149] A 2005 analysis by UP's Matt Draper confirms the same for the [redacted] business groups: "Results show that across the fuel price spectrum the composite recovery percentages [through surcharges] are indeed [redacted]"[150] Mr. Draper noted that UP CFO Robert Knight had repeatedly told him that [redacted]"[151]

### *D. Evidence of pricing communication and coordination*

Defendants regularly interacted with each other for the ostensible purpose of discussing regulated interline shipments. There is, however, considerable evidence in the record to date indicating that these interactions included discussions of fuel surcharges in contexts that were not limited to particular rail freight movements.[152] The evidence also makes clear, and economic analysis confirms, that discussions of fuel surcharges in the context of interline shipments would have obvious implications for non-interline shipments even if the specific discussions had in fact

[148] "Fertilizer: Incremental Fuel Cost Recovery Analysis" spreadsheet attached to email from Trena K. Bryan to Kenny Rocker, dated November 16, 2004 (UPFSC_0045248-249); Email from Kenny Rocker to Ed Sims re: Finance Fuel Surcharge Request, dated November 17, 2004 (UPFSC_0257900-902, at 900).
[149] [redacted] Fuel Surcharge Analysis" spreadsheet for October-December 2004 and January-March 2005, attached to email from Mary E. McArdle to Vern W. Davis re: [redacted] fuel recovery, dated May 25, 2005 (UPFSC_0077006-77007).
[150] Email correspondence between Bob M. Toy and Mark J. Draper re: FSC Recovery at Various Fuel Price Levels, dated November 17, 2005 (UPFSC_0047717-718).
[151] UPFSC_0066571-73
[152] *See* BNSF-FSC000643-645; NS0010000225; NS000100005 – 10; NS001000360-362; UPFSC0001088-90; NS001000416-420.

been limited to interline shipments (which the record suggests was not the case). This is true because, among other reasons, the Defendants' fuel surcharge policies were not limited to interline traffic but instead were policies of general application that were applied to both interline and other shipments. The Defendants generally did not maintain different fuel surcharge policies for interline and other shipments, as confirmed by testimony of Defendants' witnesses.[153] Thus, by having discussions that were ostensibly related to fuel surcharges applicable to relatively small percentages of their business (i.e., regulated interline shipments), the Defendants would be, and were, able to coordinate their activities with respect to fuel surcharges applicable to all or most of their business.[154]

In addition, the Defendants met frequently throughout the Class period to discuss a wide range of business issues, including network performance, sales and marketing initiatives, and business development strategies. [155] Here, again, there is considerable evidence that these interactions included substantive discussions of fuel surcharges in contexts that were not limited to interline shipments and, in particular, were not limited to particular interline rail freight movements.

Other documents show that Defendants' high-level employees met in person as regularly as once a month,[156] and that Defendants' executives saw each other in a variety of social situations conducive to facilitating collusion.[157]

---

[153] *See* Seale Dep. 42:11-20, 56: 5-8.

[154] The proportion of the Defendant's business that is regulated interline is very small. In terms of the percentage of gross revenue in the years 2003-2008 it was [redacted] for Defendants CSX, BNSF, UP and NS respectively.

[155] See, for example, Agenda for CSX/UP Alliance Meeting in Jacksonville, FL, November 20, 2003 (CSXFSC000156185); "Sales & Marketing Update," a presentation from a NS/UP meeting, dated May 21, 2004, attached to an email dated December 28, 2004 (UPFSC_0154591-589); Agenda for NS/UP Alliance Meeting in Norfolk, VA on September 15, 2003 (NS 010033064-010033066); Meeting Action Items list from BNSF-CSX Executive Team Meeting in Jacksonville, FL on April 20, 2004 (CSXFSC000238153-238154..

[156] *See, e.g.*,UPFSC_0135949 (reflecting meetings between CSX and UP employees in Jacksonville, Florida, Omaha, Nebraska, and Orlando, Florida over a three-month period in 2002).

improvement over 2006, avoiding the purchase of more than 38 million gallons of fuel, saving $90 million."[190]

As well as ignoring railroad specific improvements in fuel efficiency, the common fuel surcharge program did not account for the fact that each Defendant's fuel efficiency was different. NS documents show that UP was more fuel efficient than BNSF from January through September 2005, achieving gross ton-miles per gallon of diesel of fuel equal to [redacted] compared to BNSF's [redacted]. Yet BNSF and UP fuel surcharge percentages were identical for every month in the Class Period.[191] The same document reveals that CSX achieved [redacted] gross ton-miles per gallon compared to NS's [redacted] yet both railroads applied the exact same fuel surcharge percentage for every month of the Class Period after March 2004.

The class-wide evidence shows that the common fuel surcharge program was incompatible with competition as it ignored the fuel efficiency gains that are a key component in railroad competition.

## VI. COMMON IMPACT

I have investigated whether rail freight transportation prices were artificially inflated during the Class Period as a result of the Defendants' alleged conspiracy, and whether members of the Class therefore paid artificially inflated prices (*i.e.*, were impacted). By its nature, the Defendants' alleged conspiracy was intended to have a broad impact on shippers in the form of higher prices. The fuel surcharges were after all simply a percentage increase of all prices, similar to a tax. Even while discovery is not yet complete, it is my opinion that an economic analysis relying on such evidence and principles common to the Class as a whole can be used to

---

[190] BNSF 2007 Annual Report, p. 13.
[191] Big Six Class I Commodity Carload Comps for the Quarter and Nine Months ending 9/30/05 (NS 010017374).

show that Defendants' conspiracy led to artificially high prices during the Class Period for Class members. This common evidence and analysis are summarized below.

First, based on an analysis of the Defendants' transactional data it is clear that the Defendants did actually implement their agreed upon fuel surcharge strategy across the board and that the prices paid by Class Members increased as a result. Second, I conducted an analysis to determine whether the Defendants' rail freight prices are based on factors that are common to all shipments, such as [redacted], as opposed to factors specific to particular shippers. These factors are well defined and [redacted] produced to date in this case. Using regression analysis, I am able to conclude that these common factors predominate in Defendants' pricing of rail freight and that, once they are accounted for, a very high proportion of the variation in freight prices can be explained. Accordingly, this analysis confirms that it is possible for a regression model to control for factors that determine freight rates in assessing what portion of the higher prices observed in the Class Period are attributable to the alleged conspiracy.

The transaction data also confirms that the Defendants did not use base rate discounts as a means to offset the newly established fuel surcharges. An economic analysis of the rail freight industry and an analysis of the transaction data show that price discrimination in base rates was employed by each of the Defendants both before and during the Class Period. The transaction data shows that such price discrimination in base rates was generally constant before and during the Class Period, while the effect of fuel cost recovery mechanisms on rail freight prices changed dramatically during the Class Period. Defendants were not lowering base rates to "offset" the higher and more widespread fuel surcharges that the Defendants were imposing on Class

Members. This is of no surprise because it was the Defendants' express policy to avoid discounting the base rate. Evidence of this policy that corroborates my analysis exists in the documents produced in this case, some of which I present below.

The documents so far produced in this case also show that the Defendants adopted, communicated and monitored policies and practices designed to ensure application of the fuel surcharges whenever possible, with the goal of universal application of fuel surcharges to all rail freight shippers. Here, the Class is defined to cover only those shipments during the Class Period that were rate-unregulated and to which a stand-alone, rate based fuel surcharge was applied. Regardless, the Defendants' policy is indicative of their intention to raise prices for all of their customers with the fuel surcharge, irrespective of the commodities those customers were shipping or the regions in which they wished to ship.

### *A. Transaction data reveals common price increases across Defendants*

Defendants' own transaction data reveals that they applied very similar fuel surcharge programs in unison leading to materially higher prices during the Class Period. This result is based on using the produced transaction data to calculate the percentage fuel surcharge rate for each Defendant. The fuel surcharge percentage rate is calculated as the per car (or per waybill, depending on how the Defendants' data is organized) fuel surcharge amount divided by the per car (or per waybill) base revenue amount.

The median of this fuel surcharges percentage is a reliable indicator of the extent to which the shippers paying stand alone fuel surcharge were experiencing a common fuel surcharge percentage. A graph of the median of the calculated fuel surcharge percentage is presented in Figure 24.

**Figure 24:** [redacted]

The Figure is based on all unregulated shipments for each Defendant, where a stand-alone fuel surcharge was applied. These shipments include stand-alone fuel surcharges during the Class Period that were based on legacy contracts from the pre-Class Period. To the extent that the effect of these legacy fuel surcharges is different across Defendants, this leads to slight differences across the Defendants in Figure 24. Nevertheless, the figure demonstrates that the Defendants did implement the common percentage fuel surcharge program as planned, and that the percentage fuel surcharges moved in a similar fashion across Defendants.

[192] The graphs for BNSF, UP, CSX and NS cover all unregulated shipments that incurred a stand-alone fuel surcharge.

produced transaction data. Although the coefficient of variation does move over the years, it does not increase for the thirty commodities that comprise the majority of BNSF's, CSX's, NS's and UP's sales. These results indicate that there was not a widespread change in the pricing pattern across commodities into the class period, consistent with the result that discounting for selected commodities did not take place.

**Table 35:**

| | | [redacted] | | | | | [redacted] | | |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | | | | | |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

### *D. Corroborating evidence*

The analysis in the preceding section demonstrates that common evidence can be used to support the impact of the conspiracy experienced by Class members. The Defendants' fuel surcharge program raised prices without any material discounting to offset those price increases, thus harming those shippers that paid fuel surcharges in the Class Period. That harm can be determined via a common analysis because common factors predominate in rail freight pricing, and these factors can be accounted for in a common methodology to isolate and quantify the

[215] Defendant transaction data produced in this litigation. [redacted]

damage experienced by Class members. That the Class was impacted by the conspirators' behavior is further supported by qualitative evidence from the record to date.

### 1. Execution of a well-designed mechanism for coordinated pricing

Common evidence can be used to ascertain the harm to the Class because the Defendants chose a mechanism that raised prices by a percentage amount each month. Given the characteristics of the industry this was the best system for the conspirators to achieve their objective. The past use of indexes gave the Defendants a useful precedent for a conspiratorial mechanism linked to fuel indexes that essentially involved the publication of percentage rate increases each month. These increases acted like a tax that the Defendants applied effectively in unison to the prices they charged their customers. Certain industry characteristics, such as a history of well defined prices necessary for regulatory reporting and frequent communications between Defendants further facilitated the conspiracy, enabling the Defendants to easily monitor each other to insure compliance with the collusive agreement. An exposition of why this mechanism was ideal for the conspirators was outlined in Section IV.H.

### 2. Intention to achieve universal coverage of revenue-based fuel surcharges

The Defendants intended to apply the fuel surcharge across 100% of their customer base in a common fashion and largely accomplished this objective. The fuel surcharge was generally applied widely to customers, except those covered by "legacy contracts". Defendants each adopted internal policies directing that surcharges would be imposed whenever opportunities arose, including when legacy contracts expired and those contracts were renewed or replaced.

In order for the conspiracy to succeed, each Defendant needed to strive for broad application of the fuel surcharge for at least two reasons. First, the pretext for Defendants'

implementation of the fuel surcharge programs was fuel cost recovery. For that message to be credible to customers, the public, and policymakers, the railroads needed to appear serious about applying the surcharges broadly to as many shipments as possible. Second, a Defendant that did not strive and send signals that it was striving for widespread coverage would be considered a defector. Each Defendant had a strong incentive to deviate from the conspiracy by being slow to apply the agreed fuel surcharge broadly. Indeed, market share could be gained by that Defendant pricing just below the conspiracy price. The possibility of winning traffic from railroads that did impose the fuel surcharge was identified early on by Defendant NS's Pat Glennon, when considering whether or not to adopt CSX's proposed new fuel surcharge program:

> *"The CSXT formula faces continued opposition, particularly in private publications. NS can use this as leverage in negotiating larger rate increases into base rates, or additional traffic."*[216]

Ultimately, NS ignored its own unilateral self-interest, a sign in itself of anti-competitive behavior, and decided to join the conspiracy.

Once the conspiracy was embarked upon, evidence common to the Class as a whole shows that widespread coverage was each Defendant's explicit policy. Each of them signaled this policy to the other railroads and each of them regularly monitored the other railroads' coverage rates.

It was the clear intent of Defendants that the new Fuel Surcharge program would be applied across the board, covering all customers, all commodities, all business groups, and all routes. BNSF's CEO Matthew Rose was clear on this in his instructions to his marketing team, presented in Figure 36:[217]

---

[216] Internal NS Email (NS001000012).
[217] "Fuel Cost Recovery Analysis," a BNSF Presentation dated May 12, 2004 (BNSF0354762-354783, at 763).

**Figure 36:**
**Instructions for BNSF's Marketing Team**

BNSF **Report 1**

Burlington Northern Santa Fe Railway

## CEO's Mandate for Marketing's Fuel Surcharge Programs

- **Marketing Team should strive for 100% fuel coverage by account**
  - **Every price authority should have a fuel surcharge applied**
  - **All contracts should have a fuel surcharge clause**
- ***All contracts requiring CEO's signature will not be signed without provisions for total fuel coverage***
- **Marketing Team should not discount a fuel surcharge to raise price**
- **Marketing Team should not consider the Hedging Program as an offset to their fuel expenses (i.e., programs should be self sufficient)**

In fact, Sam Kyei notes after a meeting with Rose that "Contracts requiring his [Rose's] signature but excluding full fuel surcharge provisions will not be signed," and that Rose "likes to see a list of big shippers not paying fuel surcharges," so that such a list can be reviewed in order to raise fuel surcharge coverage to 100%.[218]

NS also sought to apply the new fuel surcharge to all customers, as revealed by the following debate over policy. On June 10-11, 2004, NS's Director of Planning and Analysis, Tom Bayrer, suggested that NS's rate-based fuel surcharges could be waived if a contract [redacted][219] When Bayrer's email was forwarded to NS's Senior VP for Energy and Properties, Danny Smith, Smith

[218] BNSF-0345050 to BNSF-0345051.
[219] Internal NS email correspondence between Tom Bayrer and Danny D. Smith re: FSC, dated June 11, 2004 (NS_010007412–13). This is an example of the "double-dipping" practice condemned by the STB, whereby the railroads added a fuel surcharge percentage to shipments that already had a fuel cost escalator provision.

responded that "This is not true. I had Tom [Bayrer] send an e-mail saying that all new contracts will have the new FSC, no exceptions. What Don [Seale] said was . . . that he would allow [redacted] but in no instance would there not be the new FSC. I have made this clear . . . and I am perplexed at your e-mail." Bayrer concedes: "Sorry—I got the message backwards as you note. *All deals must have the new FSC.*" (emphasis added)

In fact the only thing that prevented Defendants from immediately achieving their ambition of universal coverage was the existence of "legacy contracts" that either had no fuel surcharge provision or had an old fuel surcharge provision. This necessitated a phased implementation, as described by UP's CFO Robert Knight in 2006:

> *"UP does not have a fuel surcharge on 100% of its customers' shipments – although we would like to be able to recover from all shippers … Commercial agreements from the past preclude Union Pacific from applying fuel surcharge to all of its businesses. These limitations are being reduced over time … Union Pacific is applying a fuel surcharge on every freight bill that it can."* [220]

CSX had the same policy - "Everything is subject to fuel surcharge."[221] CSX implemented a "clear, unambiguous, rigid policy" that required the permission of either the Chief Commercial Officer or his direct reports to waive the fuel surcharge. Mike Giftos, the Chief Commercial Officer, recalls only *one* customer for which he made an exception to the fuel surcharge policy.[222] CSX ensured that all new contracts would include a fuel surcharge, as CSX's Gooden reveals in an analyst interview. "[Gooden:] On new contracts since late 2003, all

---

[220] Comments of Union Pacific Railroad Company, re: STB Ex Parte No. 661 – Rail Fuel Surcharges, presented by Robert M. Knight, Jr., Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad, dated April 27, 2006, p. 4, 13-15. http://www.uprr.com/newsinfo/attachments/2006/stb_surcharge.pdf.
[221] "Commercial Prices – Escalators," a CSX Presentation dated May 2004 (CSXFSC000000574).
[222] Giftos Deposition, at 142, 164-165.

of our new contracts have been recovered either through surcharge or through other mechanisms. [Analyst:] What will it be a year from now? Can it get to 95-100%? [Gooden:] I don't know if it can get to 95 or 100% a year from now. As all of our contracts are renewed they will all have some type of fuel surcharge mechanism." And similarly, "We've renewed no contracts since the fourth quarter of '03 without some sort of fuel recovery mechanism."[223]

Class-wide evidence also shows that the policy of universal coverage was communicated between Defendants. For example, in April 2004, BNSF's James Arnett wrote to Kurt Schroeder of UP: "It is a BNSF marketing policy to include fuel surcharge in all price authorities that BNSF participates in… Our marketing department has been instructed to include fuel surcharge in all price authorities wherever possible."[224]

Each Defendant actively monitored its own coverage, as defined as the percentage of shipments covered that included a fuel surcharge provision. For example, by November 2, 2004 NS's Pat Glennon had authored PowerPoint slides on the status of the FSC program, which included a bullet point stating "The 'no FSC' gap is shrinking as larger customer[] hold outs agree to some form of energy cost recovery program."[225]

BNSF's John Lanigan sent a September 10, 2004 email stating that "Matt [Rose, BNSF's CEO] has asked for an accounting of all contracts signed this year without a fuel surcharge to be discussed at the Exec Team Offsite on Monday. The attachments list the specific accounts. George P. will be walking around to your teams this afternoon to fill in the 'Explanation'

[223] CSX, Analyst Meeting Q&A (CSXFSC000148017-137, at 148030); CSXFSC000203553-595.
[224] Email from James A. Arnett, Price Management at BNSF, to Kurt Schroeder at UP, dated April 13, 2004 (UPFSC0001181). This communication, like many between defendants, was ostensibly about interline movements, but the Arnett's points about BNSF coverage policy are not explicitly restricted to policy regarding interline movements.
[225] NS_010047416–34, at 417. Also, Don Seale wrote: At the end of 2005 we estimated that we had [redacted] of our revenue covered by some version of the FSC. I want to see how much we plan to move this upward in 2006 and 2007." (NS_013001781–82).

column. Good, bad or ugly, we do need this info. Please ask your teams to cooperate. The good news is that about [redacted] of all contracts signed this year have FSC."[226] The UP noted that [redacted] of UP's revenue base in 2005 was subject to some form of fuel surcharge."[227]

In fact, to ensure that no one was deviating from the agreement, the Defendants monitored each other's coverage. Many such communications were ostensibly about interline movements, but were often implicitly much broader than that. While the Defendants were deliberately careful to avoid discussing non-interline shipments because of the antitrust implications of such communications,[228] it is apparent that these regular communications were used to signal each other regarding fuel surcharge policies, levels, and coverage well beyond bilateral interline shipments. Indeed, the Defendants well knew that their fellow conspirators' universal coverage policies covered all movements: local and interline. An internal NS email written by Pat Glennon discusses how NS concurred to both CSXs and UPs new fuel surcharge programs for interline shipments. But Glennon states that CSX's new fuel surcharge program will apply to all rate publications, not just interline.[229]

An email exchange between BNSF and NS reflected BNSF's concern that NS was not achieving broad coverage for interline joint through rates between the two railroads. For a sample of interline movements BNSF's data ***on NS price authorities*** suggested that only [redacted] of those authorities had fuel surcharge provisions. This proved to be inaccurate due to poor data

---

[226]BNSF-0041531-533.
[227]Comments of Union Pacific Railroad Company re: STC Ex Parte No, 661 – Rail Fuel Surcharges, presented by Robert M. Night, Jr., Executive Vice President of Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad Company. Available at: http://www.uprr.com/newsinfo/attachments/2006/stb_surcharge.pdf.
[228] UPFSC0001471-1472; UPFSC0000572-582, at 581; CSXFSC000000643-647.
[229] NS 001000192.

quality. As a result, NS's Pat Glennon responded to BNSF's concerns stating that the correct coverage figure was [redacted].[230]

On September 24, 2004, Mr. Glennon sent an email to BNSF's Jim Arnett with more detail about the NS-BNSF FSC coverage: "Jim - Don Seale asked for an update on the FSC question. . . . NS FSC coverage should be around [redacted] for the data we reviewed. We did uncover [redacted] NS authorities that erroneously had either partial or no FSC coverage. We have reissued these prices and expect to increase NS FSC coverage by a point or two. . . . I've attached a report that tracks overall FSC implementation. Private authorities are being updated with the new FSC as they are reissued."[231] On October 8, 2004, Glennon emailed George Gillen of BNSF to suggest that the two companies exchange "FSC Coverage stats" on a quarterly basis.[232]

Coverage discussions among the Defendants clearly reached beyond interline shipments, to non-interline shipments as well – and not merely by implication or inference, as was typically the case, but explicitly. As stated in an email dated October 6, 2003 written by CSX's John Couch, senior staff members from CSX including Clarence Gooden, met with the BNSF and discussed fuel surcharge coverage.[233] In that meeting, BNSF told CSX that [redacted] of BNSF' carload and intermodal business had either a fuel surcharge or an escalator on the revenue. Subsequent to that meeting Gooden has asked Couch how CSX's coverage compared to that of BNSF. Couch stated that he had a reasonable degree of confidence that on "CSXT originated (local and forwarded [meaning non-interline shipments as well as interline shipments where CSX is the first carrier] …that [redacted] had an escalator…and that [redacted] has fuel surcharge." Couch asked

[230]Email from Pat Glennon, dated September 15, 2004 (BNSF-FSC 000679-682)
[231] *See* NS_010046591–95 (emphasis added).
[232] *See* BNSF_0492869–72.
[233] Email from John Couch dated October 6, 2003 (CSXFSC000000476-477).

his staff to confirm his intuition and he reported the results to Gooden.[234] Clearly, Couch perceived the relevant universe when discussing fuel surcharge coverage with BNSF as both local (non-interline) and interline shipments.

**3. Uniformity of the use of indexes, thresholds and conversion rates**

The commonality of the Defendants fuel surcharge programs has been demonstrated in Section V.B. The Western railroads based their fuel surcharge on the HDF index, with the same conversion rates and effectively the same threshold. The Eastern railroads based their fuel surcharge on the WTI index with the same $23 threshold and the same conversion rates. The HDF and the WTI indexes are both driven by the price of oil and are highly correlated, as I showed in Figure 15. An analysis of these indexes and the formulas used by the Defendants to convert index movements into price increases is by its very nature a common analysis that can be used to ascertain the impact of the conspiracy on the Class.

**4. Coordinated policy of no discounting to offset the fuel surcharge**

The Defendants transaction data reveals that the Defendants did not generally, if at all, discount base rates in order to offset the fuel surcharge (see Section VI.C). In fact the Defendants enacted policies intended to ensure that neither the fuel surcharge itself nor the underlying base rate were discounted. Referring back to BNSF's CEO Matthew Rose's instruction to his marketing team, BNSF expressly forbade discounting the fuel surcharge in order to raise price (the third bullet point in Figure 36).

Email correspondence regarding rate agreements state that the application of fuel surcharges was non-negotiable.[235] [redacted]

---

[234] Email from John Couch to Clarence Gooden dated October 9, 2003 (CSXFSC000000476-477).

[redacted]."[236] [redacted].[237]

An April 2004 BNSF Consumer Products presentation identifies as part of "CEO's Goals for Marketing's Fuel Surcharge Programs", that "Discounted programs unacceptable. CEO will not sign contracts not meeting the above criteria… Minimize price/fuel surcharge tradeoffs."[238] In fact BNSF's CEO Matt Rose was commended for his discipline by his own Chief Economist, Sam Kyei, who stated that: [239]

> *"**Creating discipline with our fuel surcharge programs is another one** [of your achievements]. As I reviewed fuel surcharge guidelines with members of the leadership teams in the various departments including Marketing and Finance, it quickly became clear to me that members were on different sides of many of the proposals. For example, **most wanted to discount the programs for price** or disagreed that every contract should have a fuel surcharge clause. **It was amazing for me to see how your leadership and vision helped steer the course**, align, inspire and focus the entire leadership team on the path of full fuel cost recovery." [emphasis added].*

Defendant CSX was explicit about the policy against discounts in the base rate (also referred to as the line haul rate) in its announcement of the fuel surcharge program.

---

[235] Internal NS email correspondence re: [redacted], dated December 22, 2005 through February 16, 2006 (NS010019516-518, at 516 and 518); Email correspondence between Katie J. Benolken and Jerry A. Finan re: [redacted] dated March 6-8, 2005 (UPFSC010773); Email from Dan Collins Jr. to Dean Piacente and Bruce Kuzma re: [redacted] Master Contract for [redacted] & Fuel Surcharge, dated September 27, 2005 (CSXFSC00149573-574).
[236] [redacted] Email from Dan Collins Jr. to Dean Piacente and Bruce Kuzma re: Degussa Master Contract for CH & AG & Fuel Surcharge, dated September 27, 2005 (CSXFSC00149573-574).
[238] BNSF-0368426-437.
[239] BNSF-0070502; CSXFSC000251026-027.

> *"CSXT 8100 Fuel Surcharge- CSX FSC Announcement- ITEM 12000-A EFFECTIVE JUNE 1, 2003 SUPERSEDES ITEM 12000 THAT EXPIRES MAY 31, …**In no case will a linehaul freight charge be reduced as a result of the application of this Item**, nor will the application of the fuel surcharge be retroactive." [emphasis added].*

### 5. Pretext of increasing fuel prices impact on cost

The Defendants' mechanism for artificially increasing prices was ideal for reasons other than ease of implementation, as previously discussed. It came with its own pretext: that of the recovery of rising fuel costs. Section V.C demonstrates the fuel cost recovery was indeed pre-textual. The effect of the Defendants' fuel surcharge program on freight rates far exceeded that which would have been necessary to recover fuel costs. Excess fuel cost recovery was built into the fuel surcharge program – that was its intent – because of the conversion rates used and the fact that it was applied as a percentage of revenue. Furthermore, in order to maintain the pretext of fuel cost recovery the Defendants had to apply the surcharge to all customers and could never permit discounts in either the fuel surcharge itself or in the underlying base rate. The pretext demanded that the Defendants appeared to be covering rising fuel costs for all transactions. Therefore, again by design, the fuel surcharge program was applied commonly to Class members and an analysis of its impact on Class members can be based on common evidence.

### 6. STB findings

In January 2007, the STB issued a decision finding "that computing rail fuel surcharges as a percentage of a base rate is an unreasonable practice."[240] The STB, which only has jurisdiction over regulated traffic, ruled that fuel surcharges arbitrarily calculated as a percentage

---

[240] STB Decision at 1.

of the base rate were expressly prohibited.[241] The STB acknowledged that revenue based fuel surcharges are inherently unfair "because rail rates are not cost based."[242] As the STB points out, this means that shippers paying high rates will pay more than "the increased fuel costs associated with their particular traffic."[243] The STB also found that in some instances the railroads were guilty of "double-dipping" in that they were applying fuel surcharges to shipments that already had fuel surcharge escalation provision built-in, using the RCAF or some other cost escalation factor.[244]

The STB emphasized that there should be "linkage" between fuel cost recovery mechanisms and the actual characteristics of shipments that affect fuel costs, such as weight and distance. The STB gave the railroads a 90-day transition period to adjust their fuel surcharge programs for rate regulated traffic. Defendants acquiesced. For some traffic, BNSF had already implemented a mileage-based fuel surcharge program, which complies with the STB's decision, for coal and agricultural products customers since early 2006.[245] Effective April 26, 2007 and April 23, 2007, UP and CSX, respectively, implemented a new mileage-based fuel surcharge program for regulated traffic.[246] NS discontinued assessing fuel surcharges on its published public (regulated) rates during the second quarter of 2007.[247] These changes help to underscore the problems with the common revenue-based fuel surcharge program imposed during the Class Period.

---

[241] For example, about 86% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts. Norfolk Southern Corporation 2008 10-K, p. K11. Regulated traffic represents approximately 19% of UP's revenue base. Union Pacific 2007 Annual Report, p. 23.
[242] STB Decision, at 1.
[243] STB Decision, at 1.
[244] STB Decision, at 4.
[245] Burlington Northern Santa Fe Corporation 2006 Annual Report, p. 11.
[246] UP 2007 Annual Report, at p. 23; CSXT Fuel Surcharge Publication 8661-B.
[247] Norfolk Southern Corporation 2007 Annual Report, p. K23.

## VII. QUANTIFICATION OF CLASS-WIDE DAMAGES

It is my opinion that economic analysis and generalized evidence will be available to Plaintiffs to quantify class-wide damages, and a feasible formulaic damage methodology exists. As explained in this section, I demonstrate that a professionally accepted regression based methodology using the Defendants' transaction data produced in this litigation does in fact work.

Specifically I have developed such a regression model, to test whether the prices during the Class Period are significantly different than prices generated from an appropriate "benchmark" period, after adjusting for differences in all relevant economic forces. As I explain below and as shown in Section IV.G, [redacted]. In the period prior to the conspiracy, the Defendants acted as an interdependent oligopoly unaffected by the type of collusion that determined prices during the Class Period. The model is accurate, robust and demonstrates that during the Class Period freight rates significantly increased due to the fuel surcharge conspiracy.

Therefore, even at this time while discovery is not yet complete, a formulaic, manageable model, constructed in accordance with generally accepted economic principles, can be used to quantify the damages Defendants' alleged conspiracy caused Class members to incur. Such a model is presented in this section. This analysis is, of course, subject to being refined and supplemented based on further discovery in the case.

### *A. Design of formulaic methodology*

Class-wide damages can be calculated using a regression model employing the conspiracy and pre-conspiracy transaction data. This model can control for factors that determine freight rates in order to measure the effect the conspiracy had on the prices paid by

customers. A regression model enables an economist to calculate the effect on prices of various economic forces, beyond the control of the Defendants during both the benchmark and Class periods. The regression identifies the magnitude of the effect of each of these economic forces and determines whether the effect is statistically significant, *i.e.* not due to random variation in the data. The regression also reports the "R-Squared" which is described in Section VI.B. The R-Squared in the regression model that I have used here is highly satisfactory by professional standards and I have satisfied myself that the calculation of the effect of the alleged conspiracy is accurate.

[redacted] As demonstrated in Section VI.B these common factors or characteristics of shipments predominate over individual factors as determinants of railcar freight rates and these factors are fully recorded in the Defendants' transaction dataset. The regression model can be used to "back out" the effect of these factors to isolate the effect of the alleged conspiracy on freight rates.

Publicly available data can be used to account for supply and demand economic forces that determine freight rates and that may have changed from before the Class Period to the Class Period. For example, [redacted]

[redacted]. The railroad industry maintains very rich data on these cost factors which should be incorporated into any class-wide damage analysis. In the analysis that I present in this section I have used both the Defendants' transaction data and publicly available data to control for other economic determinants of freight rates.

***B. Benchmark: price discriminating interdependent but non-collusive oligopoly***

Absent the alleged conspiracy, the railroads would have made supply and pricing decisions in competition with each other. Rising fuel costs would have had two effects on railroad freight rates. First, rising fuel costs would naturally increase rates as the railroads costs increase. Second, rising fuel costs would increase the cost of transport substitutes to rail and most likely more so than they would increase the cost of rail itself. All else equal, this would lessen the competitive pressure on rail for commodities that can be shipped by other modes, which would enable the railroads to charge higher rates. Accordingly, for a given commodity travelling along a given route, fuel costs would be expected to be an important and uncontrollable economic force influencing the pricing and competition during the benchmark and Class periods.

[redacted]

I have been supplied with Defendant transaction data for the period from January 2000 to December 2008, [redacted] In this pre-conspiracy period changes in fuel costs will affect freight rates. They did so both through their