# Exhibit 109

# CORRECTED EXPERT REPLY REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**September 20, 2010**

Surcharge programs and actual fuel costs incurred by the railroads.[11] This STB finding corroborates the conclusions set forth in my Initial Report.

Dr. Willig also suggests that Defendants' nearly simultaneous decision in 2003 to increase Fuel Surcharge coverage under the revenue-based programs may have been a response to (or in anticipation of) higher oil prices. However, there is no recorded evidence that Defendants could have (or, in fact, did) foreseen the price increases that materialized in the ensuing years.

Dr. Willig incorrectly concludes that increased Fuel Surcharge coverage during the Class period was merely the continuation of a pre-Class period trend. As described below, this trend analysis is methodologically flawed and relies on too few data points to yield any meaningful results.[12] Further, it ignores clear evidence of shipper resistance when Defendants attempted to act unilaterally in setting fuel surcharges prior to the Class period, and were able to achieve only limited coverage without benefit of coordinated action. It also ignores the difficulties inherent in attempting to extrapolate from pre-Class period experience (with surcharges that were at relatively low levels or, in many cases, not triggered at all) to the Class period in which standardized Fuel Surcharges produced significant revenues. A corrected analysis of the transaction data (corroborated by Defendants' contemporaneous business documents articulating the objective of near-universal application) confirms a sea change in Fuel Surcharge usage during 2003 and 2004.

---

[11] Surface Transportation Board Decision, STB Ex Parte No. 661 – Rail Fuel Surcharges, Decided January 25, 2007 (hereafter "STB Decision"), at 9.

[12] Revised Willig Report, Figure 5, at p. 41. Willig Deposition at 47:5-15, 65:23-67:3, 67:6-14, 72:16-74:17.

**Criticism #3: *Dr. Willig contends I have failed to properly acknowledge the efficiency of Fuel Surcharges in recovering actual fuel cost increases. My analysis shows this justification to be pretext.***

Dr. Willig originally presented two Exhibits designed to show that railroads' revenues increased during the Class Period no more rapidly than did their costs. The implication is that there must not have been any profit-enhancing conspiracy at work. However, both of these Exhibits are deeply flawed.

Dr. Willig withdrew the first of these two Exhibits (Figure C-5) just days before his deposition, explaining that he had inadvertently compared a price index that controls for inflation to a cost index that does not. Correcting the exhibit to control for inflation reverses the result and shows that rail freight prices grew more rapidly during the Class Period than did railroad costs.[13]

Dr. Willig's second Exhibit (Figure 35) is taken directly from a study by Christensen Associates and presents a comparison of *average* industry freight rates and an estimate of *industry-wide* marginal costs. Christensen studied competition in the rail freight industry generally and did not analyze the issues specific to this litigation, much less the parties hereto. This publication is based on aggregate annual data, and thus does not reflect critical shifts in the [redacted] in ways that makes a comparison of the two meaningless.[14] It is

---

[13] Figure C-5 of Dr. Willig's original report was withdrawn in the Willig Revised Report. In his deposition Dr. Willig testified that he also removed the comparison was because the RCAF-A cost index was unreliable. (Willig Deposition 176:19-179:2.) However, this would merely render the original comparison conservative because, to the degree that the RCAF-A understates costs in times of rising fuel prices, this would have increased the apparent difference between revenue and costs. Revised Willig Report, ¶66 at p. 33.

[14] Dr. Willig admitted in his deposition that his analysis of the Christensen data, which included a regression run on the industry average price and industry average marginal cost series, did not control for [redacted] Willig Deposition 210:24-213:22.

professionally unsupportable to draw conclusions about the relationship of Fuel Surcharges to input costs from this study.

Defendants' own reports of their financial performance and the reports of outside analysts controvert Dr. Willig's conclusions about the relationship between profits and costs. There is no question that fuel costs rose during the Class Period: the question is whether this cost increase explains the newly imposed Fuel Surcharges or was merely an opportunistic occasion for Defendants to inflate pricing to their mutual benefit. My Initial Report, using Defendants' own transaction data, demonstrated that the increase in freight rates--including Fuel Surcharges—was not and could not entirely be explained by increasing marginal costs due to higher fuel prices. Dr. Willig argues that my analysis fails to control for changes in *other* costs unrelated to fuel. However, he provides no real-world evidence that any such costs increased. In fact, the other costs borne by Defendant railroads did not increase materially during the Class Period. Instead of recovering costs, the Fuel Surcharge programs acted as a "profit center"[15] for Defendants, a fact confirmed by Defendants' own documents and multiple independent studies, including a combined investigation by the Department of Agriculture and the Department of Transportation. That investigation found that Defendants' Fuel Surcharges during the time corresponding to the Class period exceeded actual fuel costs and generated inflated profits.

---

[15] Air Freight and Surface Transportation Freight Pulse 10: Shipper Survey Has Good News for Railroads but Bad for Trucks, prepared by Morgan Stanley Research North America April 10, 2006 (BNSF-0533031-067, at 046) reports the view of shippers that "Fuel surcharges have become *profit centers* for rails - rails are not simply passing through the fuel costs [emphasis added]." United States Department of Agriculture and United States Department of Transportation, *Study of Rural Transportation Issues*, April 2010 ("USDA/DOT Rural Transport Study") states that "As fuel prices and the attendant fuel surcharges were implemented, shippers felt that carriers were using these surcharges as *profit centers*, whether the fuel costs were going up or down [emphasis added]." (p. 259) And "Fuel surcharges are designed to allow railroad firms to recover the costs caused by abnormally high fuel prices; normal fuel costs have always been included in the rail rate determination. Fuel surcharges, however, have become *profit centers* for railroads [emphasis added]." (p. 520)

**Criticisim #4:** ***Dr. Willig contends that the difficulties of coordination would have been insurmountable and yet ignores the industry characteristics that made rail freight especially susceptible to collusion.***

Dr. Willig overlooks the important characteristics of the rail freight industry that tended to promote the Fuel Surcharge conspiracy and assure its common impact on Class members.

Despite noting theoretical difficulties with coordination, Dr. Willig does not meaningfully challenge the characteristics of rail freight that make it conducive to collusion. He discusses the possible benefits of de-regulation (initiated in 1980) but disregards the overwhelming concentration that ensured, the high barriers to entry, and inelastic demand resulting from the fact that most shipments--even those in intermodal containers-- are too heavy and travel too far to be economically shipped by truck. Under these conditions, the benefits of collusion are large because Defendants can be confident of their ability to sustain high prices. These facts are important for class certification--as well as for any merits analysis-- because they both increase the probability of a conspiracy being instigated, and establish that such a conspiracy could be carried out successfully, with uniform application across the Class.

Dr. Willig asserts that the proprietary nature of price agreements between railroads and shippers may have stood in the way of efficiently implementing a Fuel Surcharge conspiracy. This certainly would not distinguish rail freight from many other industries, including some that have experienced price fixing despite the supposedly confidential nature of customer contracts.[16] In this case, there was no need for individual customer agreements to have been shared directly.

---

[16] Bolotova, Y., Connor, J. and Miller, D., "Factors Influencing the Magnitude of Cartel Overcharges: An Empirical Analysis of the US Market", *Journal of Competition Law & Economics*, 5(2), 361-381, surveys 333 cartel episodes that occurred in industries which include shipping services, food products, construction services and other industries, many of which engage in confidential price negotiations. The authors of this peer-reviewed study, which investigates the industry characteristics that make cartels successful, hypothesize that collusion may result in higher overcharges when prices are fully reported (p. 373). However, their empirical tests find no statistically significant support for this hypothesis. It turns out that overcharges from cartels in industries with fuller reporting on prices are not statistically significantly higher than for cartels in other industries (p. 377).

Dr. Willig's other criticisms of my damage methodology are equally unfounded. For example, he runs my damage model separately for a the category of shippers that he denominates as "captive" and then for intermodal shippers, both of whom he incorrectly assumes would not have been harmed by the alleged conspiracy. Based on that assumption, he argues that my model must be flawed because it finds positive damages for both of these groups—a conclusion that he says conflicts with his theory that neither of these types of shippers could have been harmed by an alleged conspiracy. However, the model finds positive damages for these groups of shippers because, contrary to Dr. Willig's theory, captive shippers and intermodal shippers *were, in fact, harmed by this conspiracy*.

Dr. Willig also reports on an estimated rate of what he calls "false positives"--instances in which he asserts my damage model would find overcharges although none in fact occurred. His approach has no basis in the peer-reviewed literature or professional practice. To arrive at his conclusion, Dr. Willig inappropriately conflates two regression models that have different purposes and that cannot be used together in the manner in which Dr. Willig has used them. Further, because of an embedded conceptual flaw, his methodology will *always* compute instances with no damages even if a conspiracy is perfectly implemented. In other words, the approach is tautological and, because there is no refutable hypothesis (Dr. Willig's "test" always supplies the same answer no matter what the facts) it is scientifically invalid.

Section II of this Report highlights the many instances in which Dr. Willig has ignored real world facts; including Defendants' own transaction data (for which he substitutes industry averages and aggregates), structural characteristics of the rail freight industry that render it especially amenable to collusion, and the empirical relationship between changes in fuel costs and the revenue collected by Defendants using their Fuel Surcharges. Section III addresses issues of common impact and shows that the price variability Dr. Willig describes is in some

cases non-existent and in other cases can be readily explained and controlled for using a multivariate analysis. Section IV responds to Dr. Willig's arguments regarding my damage analysis and sets forth the damage findings generated using 100% of the transaction data, covering all shipments falling within the Class definition.

## II. DR. WILLIG IGNORES REAL WORLD FACTS

Dr. Willig's analysis suffers from two types of errors. He performs analyses that suffer from a variety of methodological flaws that make his results unreliable. Also, he depends on factual assertions which, upon further analysis, prove not to be true. The assertion that there were widespread exceptions to the Fuel Surcharge programs and major differences between Defendants' programs is disproved through analysis of the actual transaction data. That data reports base freight charges, Fuel Surcharges and at least ten shipping characteristics for each individual shipment made during the Class Period. It is clearly the best available data and must be utilized in any professionally acceptable analysis. Dr. Willig similarly assumes that coordination would have been difficult, but ignores the evidence of the actual communications among Defendants and the existence of the interline communication channel, as well as the extreme concentration of the rail freight industry that heightened incentives for collusion and increased the probability of a successful price fixing conspiracy. His assumptions about what *would* have happened in the but-for world (absent any conspiracy) lack support and, indeed, are contrary to the historical record. His assertion that Fuel Surcharges were an efficient mechanism to recover increasing fuel costs (as opposed to merely boosting profits) disregards Defendants' significant *over-recovery* which was assured by the formulas employed, and has been corroborated in third party assessments, all ignored by Dr. Willig.

### A. *Fuel Surcharges were standardized and their application widespread.*

#### 1. The exceptions to Fuel Surcharges materially relied upon by Dr. Willig were, in fact, rare.

Dr. Willig uses the 21 declarations of Defendants' own executives as the sole support for his assertion that Fuel Surcharges frequently deviated from the prescribed programs or were met with offsetting concessions on other contractual terms. The transaction data, contemporaneous business documents and depositions of the same declarants upon whom Dr. Willig relies all confirm (as do various governmental investigations) that such deviations were rare and without consequence for the common impact and damages analyses described in my Initial Report.

In total, the 21 declarations identify [redacted] shipper-defendant relationships that the declarants assert constitute exceptions to the standard Fuel Surcharges. These supposed exceptions represent approximately [redacted] of the more than [redacted] shippers with unregulated shipments during the Class Period, but even that figure overstates their significance. A review of the transaction data for these shippers, summarized in Table 1, reveals that roughly [redacted] identified cases) do not fall within the Class definition at all, either because the shipper did not pay a revenue-based Fuel Surcharge at any time during the Class Period ([redacted] instances) or because the shipper's fuel surcharge was calculated under a legacy arrangement that predated the Class period ([redacted] instances). For another [redacted] of the identified cases, the transaction data reveals that the shipper was, in fact, paying the standard Fuel Surcharge or its equivalent under a minimally different program and that the relationship involves no exception. For the remaining [redacted] shippers, my analysis of the declarations reveals that many paid the standard Fuel Surcharge program on at least *some* portion of their shipments during the Class Period. This leaves just [redacted] shipper-defendant relationships out of a population of more than

**Figure 4. Dr. Willig's Original Graphs with Data Points Highlighted**[79]

[redacted]

In Figure 5 below I have reproduced Dr. Willig's graphs while correcting for his revenue weighting error, again noting in black the few data points that Dr. Willig used to construct the supposed trends.

[79] Source: Defendants' transaction data produced by Dr. Willig.

**Figure 5. Reproduction of Dr. Willig's Trend Analysis[80]**

[redacted]

A comparison of the corrected incidence of FSC's in Figure 5 and Dr. Willig's graphs reproduced in Figure 4 makes clear that the revenue weighting error concealed both how much more extensive Fuel Surcharge coverage became during the Class Period and that the sharp increase in coverage began in mid-2003, consistent with the facts of the alleged conspiracy.

Even the few data points from the pre-Class period that Dr. Willig uses in his trend analysis do not reflect the increased adoption of Fuel Surcharges he assumes. In the short period covered by these data points, there were a variety of different programs in place, with differing

---

[80] Source: Defendants' transaction data produced by Dr. Willig.

thresholds and lag structures.[81] An artifact of these different programs is that, as fuel prices rose, different programs would take hold in different months, giving the false appearance of increased coverage for Fuel Surcharges generally, when in fact program coverage may have been constant. For example, in Dr. Willig's original graph BNSF's Fuel Surcharge coverage appears to increase from [redacted] in just the four months preceding January 2001. (See Figure 4, the first set of black stars in the BNSF chart).[82] This is clearly at odds with the reported facts in this case.[83]

After correcting for these various errors, the pattern in Fuel Surcharge coverage is consistent with the implementation of the conspiracy as alleged. For example, as illustrated in Figure 6, the sudden increase in Fuel Surcharge coverage for NS in the second quarter of 2004 is coincidental with the effective date of changes to its program in March 2004.[84] Figure 6 is based on NS's "9255" rate authority database and shows the percentage of shipments that match to a rate authority with a Fuel Surcharge provision. Because it uses rate authority data, the analysis is not sensitive to the price of fuel. The dip in coverage apparent in 2006 is coincidental with the implementation of NS's rebasing program.[85] The sudden increase in Fuel Surcharge usage going into the Class period is confirmed.

---

[81] In BNSF's case, Dr. Willig's upward sloping trend line relies on a cluster of data points in 2000-2001 where the FSC percentage rises in steps from March 2000 to January 2001. BNSF began both the standard intermodal FSC program and the standard carload FSC program in the early 2000s. Each program had different strike prices and one was adjusted weekly while the other was adjusted on a monthly basis. In addition, the standard intermodal FSC formula adopted in 2000 was changed in January 2001. Shipper specific legacy programs contributed to this upward trend, such as [redacted] which begun on March 15, 2000. (Declaration of George T. Duggan, June 29, 2010, ¶9-10, 16.)

[82] Revised Willig Report, Figure 5 at p. 41.

[83] In his deposition Dr. Willig appeared to concede this point. Willig Deposition 74:2-17. "Q: So is it your opinion that in the period you just described, BNSF [redacted] its fuel surcharge coverage? MS. LAHLOU: Same objection. A. That word coverage is not the right word to summarize what I was just explaining. But let me try again. These data are based on what was actually paid. The squiggly line is the percentage of the customer-STCC records in that given month here for BNSF where there is recorded an FSC payment right in the payment record of the data that were discovered from the Defendants. So the word isn't coverage. The word is paid."

[84] NS implemented the new Fuel Surcharges a little later than the other Defendants due to technical issues. Email from Pat Glennon re: Fuel Surcharge Review – April 25, dated April 29, 2003 (NS001000012-013).

[85] See NS 001001206-13 at NS 001001207.

**Figure 6. NS –** [redacted][86]

[redacted]

Despite these facts, in his "but-for" world Dr. Willig posits a smooth upward trend in the adoption (and coverage) of Fuel Surcharges imposed on shippers by individual railroads, without benefit of any coordinated action. He concludes that more than [redacted] of all shipments would have been covered by Fuel Surcharges, even absent a conspiracy. This is contrary to his position, articulated elsewhere, that Defendants have been forced to modify, waive or provide offsetting concessions for their Fuel Surcharges in the actual world (during which he purportedly assumes existence of a conspiracy). In the "but-for" world, Dr. Willig assumes Fuel Surcharges are easily imposed and meet with no resistance from shippers and no competition from other railroads. In the actual world (while Defendants are assumed to be conspiring), he assumes the opposite. The documentary evidence pre-dating the program launch in July 2003 clearly demonstrates that

[86] NS's 9255 database and revenue waybill data. [redacted]

**Figure 8. Defendants' Profit Margins**[100]




Dr. Willig runs an incomplete and uninformative regression model using the two data series from the Christensen Study. There are no other variables in his model (aside from an indicator variable for each year); as a result, the multivariate capability of regression modeling is not used.[101] Dr. Willig admitted in his deposition that this regression analysis does not control for [redacted].[102] It also fails to account for [redacted]. All of these variables are available in either the transaction data or from public sources. An analysis that considers all of them, such as the damage analysis in my Initial Report, shows that freight rates increased by

---

[100] Profit margin is calculated using the ratio of Net Railway Operating Income over Railway Operating Revenues. Surface Transportation Board, Office of Economics, Environmental Analysis, and Administration, Class I Freight Railroads Quarterly Earnings Reports for 2000 to 2009. Available at http://www.stb.dot.gov/stb/industry/econ_reports.html.

[101] In fact the regression model only checks that the two series are related in a statistically significant way. The fact that there are not other variables in the model (absent the year variables) means that the multivariate functionality of regression analysis is not being exploited.

[102] Willig Deposition 211:18-213:22.

much more during the Class Period than can be explained by the combined effect of these factors together with the actual increase in railroad costs.

**3. Absence of an explanation in other input costs.**

Dr. Willig criticizes my analysis showing freight rates increased more than fuel costs.[103] He suggests that other costs may also have increased, and could explain the difference.[104] However, the evidence shows that other costs did not significantly increase during the Class Period. The All Inclusive Index Less Fuel increased by only by 2% in real terms between 2002 and 2006 and thus cannot explain the rising rail freight charges.[105]

I have never asserted that any type of revenue-based Fuel Surcharges would necessarily over-recover railroad costs.[106] The occurrence and extent of over-recovery obviously depend upon the relationship between fuel prices and the Fuel Surcharge percentages used in the formulas. However, the formulas *in fact* adopted by Defendants assured that Fuel Surcharges would grow faster than any increase in actual fuel costs, thus producing over-recovery to Defendants' and incrementally boosting their profits at the expense of Class members. Because the Fuel Surcharge was applied to the entire base revenue, and not merely the variable (or marginal) cost component thereof, the program would necessarily produce over-recovery based on simple economic logic.[107]

---

[103] Initial Report, Figures 18-22.

[104] Dr. Willig states: "By analogy, it would hardly be remarkable if a baseball team raised ticket prices by more than its increased cost of stadium rental. It has other costs, such as player salaries, that might have increased too." However, the "player salaries" in the rail industry did not go up. Revised Willig Report, ¶99 and footnote 46.

[105] Source: American Association of Railroads, All-Inclusive Index Less Fuel with Forecast Error Adjustment. Although the AIILF was not created until 2003, when it was created it was computed for prior years and serves as a useful index of non-fuel related rail costs.

[106] Revised Willig Report, ¶98 at p. 53, states:"it is incorrect as a matter of economic logic to conclude that the use of revenue-based FSCs necessarily results in over-recovery for all shippers."

[107] Contrary to what Willig asserts, economic logic dictates over-recovery. Dr. Willig himself points out that base revenues in the rail industry are necessarily higher than variable costs to cover the large fixed-cost elements, Revised Willig Report ¶154 at 84.

To buttress his use of the Christensen Study, Dr. Willig presents a hypothetical example of how the Fuel Surcharge program could theoretically *under*-recover for particular shipments with especially high fuel intensities.[108] Instead of using the production of actual freight rates, fuel efficiencies, and fuel costs made available in this case, Dr. Willig instead creates numbers, generating an unrealistic hypothetical without factual basis. His hypothetical "fuel-intensive" shipment, for which he argues the Fuel Surcharge raises revenue *less* than increased fuel costs, uses 4 ½ barrels of oil, and is charged a base rate of $1000. However, CSX reports that it can "move a ton of freight up to 436 miles on a single gallon of fuel."[109] Using this metric, Dr. Willig's hypothetical shipments must have weighed 25 tons and have travelled 3,296 miles.[110] An inspection of the transaction data reveals that [redacted].[111,112] With this larger base revenue, the revenue-based Fuel Surcharge again produces over-recovery for the railroad. In short, the actual transaction data disproves any speculation that Fuel Surcharges merely recovered increases in fuel costs and were designed for this purpose.

#### 4. Statements of the STB, shippers, railroads and numerous independent studies corroborate my findings.

The Christensen Study performs no analysis specific to fuel surcharges. Indeed, the 2008 version of this study contains a section entitled "Rates – Fuel Surcharges" which expressly warns, "[a]lthough the STB has begun to collect data on fuel surcharges, the data are not

---

[108] Revised Willig Expert Report, Figure 10 at 52.

[109] http://www.csx.com/?fuseaction=about.environment_sustainability, accessed on 8/27/2010.

[110] A barrel of oil contains 42 gallons, 4 ½ barrels contains 189 gallons. For 189 gallons CSX can ship 82,404 ton-miles (189 x 436),which is equivalent to 25 tons travelling 3,296 miles.

[111] Defendant BNSF's transaction data contains the most reliable information on mileage of all of the Defendants. [redacted]

[112] In addition, fuel intensity based on Dr. Willig's Figure 1 is around 10% in 2004 when a barrel of oil was around $40. In my example, this implies total [redacted]

sufficient to examine a number of issues related to these surcharges."[113] However, there are numerous other studies and statements by industry participants that are specific to Fuel Surcharges. All of these corroborate my independently derived conclusion that this mechanism has over-recovered fuel costs. None of these is mentioned by Dr. Willig.

For example, a 2010 study on rural transportation costs by the United States Department of Agriculture and United States Department of Transportation finds:

> *"There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001 to 2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."*[114]

> *"Shippers contend that fuel surcharges should reimburse railroads for only the incremental increase in fuel costs and not the base, since the base fuel costs are already in the rate. The average fuel surcharge per grain carload during the 4th quarter of 2007 was $292.68, contrasted to the growth in railroad fuel costs from 2001 till 2007 of $188.54, a difference of 55 percent over the incremental increase in the cost of fuel (see Figure 7-17)".*[115]

Similarly, a 2006 report by the Government Accountability Office describes the rail-freight industry's increasing concentration following the Staggers Act, the increase in freight rates above costs (even for captive shippers), and the possible abuse of market power by railroads that shippers feared was linked to Fuel Surcharges.

> *"Changes in the railroad industry since the Staggers Rail Act are widely viewed as positive, as the industry's financial health has improved and most rates have declined; however, concerns over competition and captivity remain. Rail rates generally declined between 1985 and 2000, then increased slightly from 2001 through 2004. Concerns about competition and captivity remain as traffic is concentrated in fewer railroads. It is difficult to determine the number of "captive" shippers as proxy measures can overstate or understate captivity. Nevertheless, GAO's analysis of limited available measures indicates that the extent of captivity appears to be dropping, but the percentage of traffic traveling at rates substantially over the threshold for rate relief has increased. Also, some areas with access to only*

---

[113] Christensen Associates Report, November 2009, Volume 1, at p. 5-21.
[114] USDA/DOT Rural Transport Study, at ix.
[115] USDA/DOT Rural Transport Study, at 259 and Figures 7-17 and 7-18.

> *one major railroad have higher percentages of traffic traveling at rates above the threshold. These findings may reflect reasonable economic practices by the railroads or a possible abuse of market power. GAO's analysis is limited by available data and proxy measures but suggests that shippers in selected markets may be paying excessive rates, meriting further inquiry and analysis."*[116]

> *"Shippers have expressed deep concerns over how fuel surcharges relate to actual fuel costs."*[117]

Statements by shippers themselves confirm that they were convinced Fuel Surcharges over-recovered increases in fuel costs.

> *"With surcharges are [sic] as high as 20% of their base rates, the same railroads are reporting to investors that their fuel cost represents 10-12% of revenue. Even if there was no fuel cost covered in their base rates, the surcharge revenue would be two times what it would need to be to allow them to recover their expenses!"*

> *"The Alliance [of Automobile Manufacturers] is concerned that the railroads may intend to comply with the STB decision by rolling their current surcharges into their base rates and creating a new surcharge mechanism which may superficially appear less onerous. (In fact, that is the approach the Norfolk Southern announced on April 24th - after most of the papers for the May 11th STB surcharge hearing had been filed.) Taking a surcharge which grossly over-compensates the railroad and rolling it into a rate does not make the surcharge reasonable."*[118]

> *"DuPont would note that in a truly competitive market place, rail carriers would not be able to increase prices for their services above legitimate and unavoidable cost increases. It is only their monopoly or oligopoly positions that permit them to pass along these costs and add profit factors to the increases."*[119]

Finally, in 2007 the STB also concluded that the revenue-based Fuel Surcharges over-recovered costs.

> *"In January of this year we issued a decision declaring it an industry-wide unlawful practice for carriers to use a fuel surcharge to recover more than the increased fuel costs attributable to the particular movement to which the surcharge is applied. This*

---

[116] United States Government Accounting Office, 'Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed,' Report to Congressional Requesters, Oct. 2006 ("GAO Study").

[117] GAO Study at 17.

[118] Letter From: Alliance of Automobile Manufacturers To: Surface Transportation Board Re: STB Ex Parte No. 661 - Rail Fuel Surcharges September 22, 2006

[119] Letter From: DuPont (E.I du Pont de Nemours and Company) To: Surface Transportation Board Re: STB Ex Parte No. 661 - Rail Fuel Surcharges October 2, 2006

> *action ended an industry practice of charging fuel surcharges as a percentage of a shipper's base rate regardless of the actual fuel costs associated with the transportation of the shippers' goods."*[120]

**5. No evidence that Fuel Surcharges would have been higher in the but-for world.**

In disputing that Class members were consistently harmed by Defendants' actions, Dr. Willig argues that alternative fuel cost recovery regimes would have left some shippers worse off in the "but-for" world. He incorrectly asserts that any "creditable methodology for estimating damages would have to posit a structure of the FSCs in the "but-for" world."[121] On the contrary, absent the conspiracy, fuel cost recovery would have been but one component of a total price kept lower by price competition between the railroads; it is far from axiomatic that fuel surcharges of any type would have prevailed.[122] The "but-for" world analyzed in my Initial Report is simply characterized by railroads competing with each other over *total price* (base rates plus Fuel Surcharges) as they did in the pre-Class Period. A combination of different fuel recovery programs might be used, or none at all. This is what the world looked like prior to mid-2003 (and particularly before 2003 when, Plaintiffs allege, Defendants began holding conspiracy meetings), and this prior period serves as a reliable benchmark with which to quantify damages.

Dr. Willig also contends that some Class members may have been worse off under mileage and ton-mileage based programs that might have been operative in the but-for world.[123] However, he fails to consider the competitive negotiations that would have occurred in that

---

[120] House Committee On Transportation and Infrastructure Hearing on Rail Competition and Service, 'STB Chairman Charles D. Nottingham Oral Statement', Sep. 25, 2007

[121] Revised Willig Report, ¶56 at p. 28.

[122] Dr. Willig misrepresents me as stating that a shipper paying a fuel surcharge before the Class Period, who later had that fuel surcharge updated during the Class Period, is not a member of the Class. This is based on a misrepresentation of my deposition testimony in which I answered questions in light of certain data limitations at the time of my Initial Report, limitations which Defendants' recent production of legacy contracts have in large part resolved. Rausser Deposition, 284:15-285:16, 289:10-20.

[123] Revised Willig Report, Section XI at p. 154.

scenario, given that absence of coordinated action would have allowed shippers to price-select one railroad against another. In addition, he uses data from the Class Period to construct his "but-for" world, despite the fact that this data is allegedly contaminated by the conspiracy. He specifically calculates hypothetical Fuel Surcharge rates per mile and per ton-mile using the Class period data on Fuel Surcharge revenues, mileage and weight.[124] As a result, Dr. Willig's estimated "but-for" rates are necessarily too high, resulting in biased estimates of the but-for fuel surcharges.

## III. DR. WILLIG EXAGGERATES THE INDIVIDUAL NATURE OF THE INDUSTRY AND THE CONSPIRACY. COMMON ISSUES PREDOMINATE AND IMPACT CAN BE PROVEN USING COMMON EVIDENCE

Dr. Willig produces an extensive analysis of the Fuel Surcharge rates paid by Class Members and the variation in all-in rates they experienced. His argument is that there is much unexplained variation in these two pricing methods and that variation can only be accounted for in an individual analysis for each shipper. This opinion is factually incorrect and unsupported by sound economic principles.

### *A. Dr. Willig's assertions about individual variations in the implementation of Fuel Surcharges is inconsistent with a full review of the transaction data.*

#### 1. Little variation in Fuel Surcharge rates.

Dr. Willig contends there is considerable variation in the particular Fuel Surcharge percentage rates paid by shippers during the Class Period.[125] However, the graphics and data manipulation techniques he relies upon to support this conclusion exaggerate the variation. Once a few basic corrections are made to the data and its presentation, and the known differences in

---

[124] Revised Willig Report, Figure 49 at p. 156.
[125] Revised Willig Report, ¶104-108 and Figure 12 at p. 57.

**Figure 14. The Slopes of BNSF's Carload, Intermodal and Coal Programs versus the HDF**[139]




These figures reveal that the spread between Fuel Surcharges produced with different formulae *increases* as fuel price increases – i.e., the separation between the lines for each program becomes larger as we move along the horizontal axis to the right.[140] This pattern of diverging Fuel Surcharges (in which some formulas grow more rapidly with rising fuel costs) is consistent with other programs but leads Dr. Willig to reach a false conclusion. He compares the variation in 2007 and 2008 Fuel Surcharges with those used in the pre-Class period and concludes that variation increased in these later years.[141] He implies that this greater variation may be evidence of an increased divergence in the Fuel Surcharge programs used in the Class Period relative to the pre-Class Period, contrary to Plaintiffs' theory of a conspiracy that standardized Fuel Surcharge use. He states that: "the range of variation in FSCs is highest in

---

[139] "Fuel Surcharge – Comparison of Class I Programs," a BNSF presentation dated July 27, 2006 (BNSF-0328151-168, at 164).
[140] Revised Willig Report, ¶113 at p. 62.
[141] Revised Willig Report, ¶112-114 and Figures 16-17 at p. 61-62.

2007 and 2008." These were, however, also the years in which *fuel prices* were highest, and in which the formulaic divergence between Fuel Surcharges would therefore also have been the greatest. Dr. Willig's observation about variation in rates is therefore merely an artifact of the combination of rising fuel prices and the small assortment of slightly different formulas used by each Defendant, which I have confirmed through a statistical test.[142] It is neither evidence of competition nor of increasing variation in the number or type of Fuel Surcharge programs applied, as Dr. Willig seems to suggest.

The different Fuel Surcharge programs just described offer no obstacle to proof of common impact. So long as shippers subjected to the *least* aggressive of these programs (typically carload, as illustrated above) were consistently harmed, Class members subjected to the other formulas will have suffered injury as well, only in a greater degree. The difference in these losses is systematic, predictable and accurately calculable after the fact. As a result, no individual analysis is required and all of the information necessary for accurate damage estimation can be obtained directly from the transaction data.

### 2. No evidence of discounting base rates to offset Fuel Surcharges.

As previously discussed, Dr. Willig's Report asserts that base rates may frequently have been reduced, or other concessions made, as a means of offsetting Fuel Surcharges. However, his only direct evidence of such conduct comes from the problematic declarations of 21 railroad executives prepared for this litigation, which are undermined by both the transaction data and

[142] That is, if one program increases the Fuel Surcharge by 0.5% for every 5 cent increase in Highway Diesel Fuel, and another program increases the Fuel Surcharge by 0.5% for every 4 cent increase in Highway Diesel Fuel, the separation between the two resulting Surcharges becomes greater when the HDF has a higher value. Dr. Willig's Figure 17 shows increasing dispersion between the 10th and 90th percentiles of fuel surcharge percentages over time. This dispersion is statistically significant and positively correlated with higher oil prices for each of the Defendants. Thus, the pattern Dr. Willig observes in this respect is merely an artifact of the handful of common Fuel Surcharges formulas in use combined with the rising price of oil.

their own subsequent testimony.[143] In his deposition he also alluded to undocumented conversations with railroad personnel that he then said he did not rely on in writing his report.[144] The only other support offered by Dr. Willig in his deposition appears in Figure 18 of his Revised Report which describes shippers who experienced the same percent changes in all-in rates between 2002 and 2006, but experienced different shares of those changes that were due to base rates as opposed to Fuel Surcharges.[145] However, Figure 18 was constructed using average data that hides the critical facts related to particular shippers.[146] The figure groups together shippers based upon the change over time in their average all-in rates, while seeking to isolate the portion of that change which is attributable to Fuel Surcharges. The first example, and the one discussed at length in Dr. Willig's deposition, is of [redacted] and [redacted] both of which experienced an increase in average all-in rates of [redacted]. However, for [redacted] only [redacted] of this increase was due to Fuel Surcharges and for [redacted] was due to Fuel Surcharges. This result is hardly surprising given that only [redacted] of [redacted] shipments in 2006 were subject to a Fuel Surcharges ([redacted] of its shipments were outside the Class definition) while [redacted] of [redacted] shipments were within the Class and subjected to Fuel Surcharges. To group these transactions together and attempt to draw inferences from the resulting averages is misleading.

Disaggregating the data to separate shipments with and without Fuel Surcharges as I have done in Table 15 reveals that, on average, these two shippers' Fuel Surcharge rates were very

---

[143] Willig Deposition 110:3-116:15. "Q. The question is: Apart from the specific examples given in these declarations of instances where the introduction of a fuel surcharge is said to have caused a concession on some other contract term with the shipper, are you aware of any other specific instances where you believe that occurred? A. As I sit here, I cannot cite other examples to you." Willig Deposition 121:13-21.
[144] Willig Deposition 110:3-116:15.
[145] Willig Deposition 123:6-124:18.
[146] Dr. Willig acknowledged in his deposition that the analysis used averages. Willig Deposition 126:19-136:25.

similar both in 2002 (highlighted in amber) and in 2006 (highlighted in yellow).[147] In 2002, [redacted] effective Fuel Surcharge rate was [redacted] while [redacted] was [redacted]. Four years later, in 2006, [redacted] effective Fuel Surcharge rate was [redacted] while Schneider's was [redacted]. Dr. Willig has missed this by averaging over shipments that paid Fuel Surcharges and those that did not. In fact, almost every example given in Figure 18 of Dr. Willig's Report suffers from the same problem.[148] Even if this problem were corrected and Dr. Willig made an apples-to-apples comparisons for this analysis, he misses the point that the proportion of changes in all-in rates that are due to movements in base rates can be explained by a multivariate analysis such as the described in my Initial Report.

---

[147] If the mix of months were different between the two carriers, aggregate Fuel Surcharge percentages could still have been very different since Fuel Surcharges change with the price of oil.

[148] This problem is apparent as there are numerous entries in the "FSC" column of Dr. Willig's Figure 18 with a 0.0%, meaning that shipper did not pay Fuel Surcharges on any of its shipments.

**Table 15.** [redacted]

| | | | | | |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | [redacted] | | |
| [redacted] | | [redacted] | | | |
| [redacted] | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | | | |
| [redacted] | | [redacted] | | | |
| [redacted] | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | [redacted] | | |
| [redacted] | | [redacted] | | | |
| [redacted] | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | |
| [redacted] | | [redacted] | | | |
| [redacted] | | [redacted] | | | |

Despite the fact that these two shippers experienced very similar Fuel Surcharge rates, their base rates changed quite differently, increasing between 2002 and 2006 by [redacted] for [redacted] and [redacted] for [redacted] when calculated for their shipments bearing Fuel Surcharges (see Table 15, cells highlighted in light blue). The differences in their base rates, rather than Fuel

Surcharges, then explains why a far smaller portion of [redacted] all-in rate increase is attributable to growing base rates ([redacted]) than is the case for [redacted] (See Table 15, cells highlighted in dark blue.) This observation does not suggest that [redacted] received base rate concessions; instead, the pattern is due to a simple mathematical identity, and the fact that base rates changed differently for [redacted] than for [redacted]

Base rates vary across shippers and average base rates for a given shipper will change as its shipment characteristics change.[149] Despite this fact, Dr. Willig offers Figure 19 of his Revised Report to illustrate the significant share of change to all-in rates that is due to base rates. This is not, as Dr. Willig suggests, evidence either that shippers had different Fuel Surcharge experiences or that some shippers obtained concessions to off-set their Fuel Surcharges. Instead, as the colored cells in Table 15 revealed, these differences are merely attributable to changes in shipments over time that result in different base rates.

There is, however, another more economically appropriate and acceptable way to evaluate the cause of changes in the all-in rates paid by shippers. I have taken the data Dr. Willig presents in his Figure 19 and excluded transactions that did not pay a revenue-based Fuel Surcharge in 2006 (and thus are not in the Class). For each remaining observation, I determined the share of the all-in rate that was comprised of the base rate changes. I then plotted this share against the percentage change in the applicable base rate. The results are presented in Figure 16. The light colored dots show the relationship between the share of changes in all-in rates that are due to base rates, and the percent change in the base rates themselves. Superimposed on this chart is the share of changes in all-in rates due to base rates as presented in Willig's Figure 19 in ascending order (instead of being ordered by the percent change in base rates). This graph

[149] A multivariate analysis such as the one in my damage model would control for such variation.

makes it clear that the share of changes in all-in rates due to base rates is almost entirely determined by the percent change in base rates.[150] Dr. Willig's Report has only demonstrated that there are different changes in base rates (likely due to shifts in transaction characteristics that he has not tried to take into account) for shippers facing relatively similar Fuel Surcharge percentages imposed by the conspiracy.

**Figure 16.** [redacted]

Dr. Willig's Report incorrectly asserts that there were "many significant declines in base rates during the class period."[152] As support for this statement, he revises a graph from my

---

[150] Indeed, as shown by the trend line, this relationship is well approximated by a third order polynomial of the percent change in base rates. In addition, the lack of dispersion in the share of changes in all-in rates due to base rates when ordered by the percent change in base rates (light colored dots) around Willig's ordering of the share of changes in all-in rates due to base rates (dark colored dots) indicates that Fuel Surcharge percentages actually account for very little of the distribution in the share of changes in all-in rates due to base rates.

[151] Source: Dr. Willig's Production.

Initial Report which had shown no economically significant decreases in base rates (controlling for inflation) when compared with the pre-Class period. Most importantly, there were no systematic base rate decreases in sectors likely to have been more sensitive to non-rail competition, such as the intermodal sector.[153] Dr. Willig's Report has taken my analysis of base rates, and expressed it in percentage changes rather than levels.[154] He then claims that the revised graphic shows: "For the 30 [commodities] … median [base] rates fell by more than [redacted] for 10 BNSF commodities, 7 UP commodities, 9 CSX commodities, and 9 NS commodities."[155] However, what is important for evidence of discounting and concessions is not that there is movement in base rates, but whether or not that movement is more prevalent for commodities that may be susceptible to customer opposition to Fuel Surcharges, such as the intermodal category (STCC 461).

Dr. Willig's version of my chart shows that base rates for the intermodal category (STCC 461) [redacted] for two Defendants (BNSF and CSX) while [redacted] for the other two Defendants (UP and NS), thus demonstrating no systematic pattern.[156] Elsewhere in his Report he specifically confirms that there was no pattern to base rate movements, and therefore no evidence of systematic concessions. In his Figure 41 he presents statistics to demonstrate that "the correlations of changes in [commodity-specific] base rates across defendants are low (or negative) and generally are not statistically significant…"[157] He offers this conclusion to show that "these data are inconsistent with the claim that the alleged conspiracy systematically

---

[152] Revised Willig Report, ¶33 at p. 17.
[153] Initial Report Figures 30, 32-34: pp. 32-34 to pp. 96-100.
[154] Revised Willig Report, at pp. 121-129.
[155] Revised Willig Report, ¶224 at pp. 121-122.
[156] All movements for 461 are [redacted] over the four year period.
[157] Revised Willig Report, ¶228 at p. 126.

stabilized base rates."[158] However, the Defendants are not alleged to have *stabilized* base rates, they merely agreed not to discount them in order to offset Fuel Surcharges, as I described in my deposition.[159] As a result, even if base rates decreased for some commodities, routes or shipments, this occurred independently of the imposition of Fuel Surcharges and does nothing to undermine common impact.

Dr. Willig's analysis also misrepresents and misuses a well known statistical tool employed to measure price variation - the *coefficient of variation*.[160,161] He argues that the coefficient of variation (which I used [redacted]) would not detect a change in pricing resulting from offsetting discounts. [162] However, the coefficient of variation is widely accepted in the academic literature to measure increases in price variation and would detect systematic discounts in base rates for certain commodities had they occurred.

It is a fact of the rail freight industry that base rates differ depending upon shipment characteristics. It is also a fact that base rates change over time. It is therefore no surprise that over a four year period the median or average base rates for a specific commodity could have declined by [redacted] or so. What matters for antitrust impact analysis is that any such decrease was

---

[158] Revised Willig Report, ¶228 at p. 126.
[159] Rausser Deposition 96:21-97:10. "Q: Did the conspiracy involve any agreement as to the base rate? A. Not to my knowledge. Q. Okay. Neither an agreement to raise the base rate nor an agreement to lower the base rate; it was simply not a topic of agreement whatsoever? A. No. There is an agreement and there is correspondence and communications not to engage in discounting the base to counter the otherwise increase in final prices resulting from the imposition of a fuel surcharge, so there is an agreement in that -- along those lines."
[160] Revised Willig Report, ¶230 at p. 128.
[161] "The coefficient of variation…[is] a common measure of relative [price] dispersion." Sorensen, A., "Equilibrium Price Dispersion in Retail Markets for Prescription Drugs," *The Journal of Political Economy* 108.4 (2000): 833-850, at 838.
[162] Willig Report, ¶230 at 128. Dr. Willig presents a scenario of prices for 5 commodities in 2 years where the coefficient of variation is the same in years 1 and 2, but the ordinal ranking of prices for the commodities is reversed in these two years (i.e., the least expensive became the most expensive, and so on). This scenario is irrelevant to any search for systematic discounting behavior that might be a response to Fuel Surcharges. Instead, such behavior would involve a decline in pricing for a single commodity or industry while the ordinal ranking of other prices remained basically the same. This scenario would be picked up by changes in the coefficient of variation. It was not, because it did not happen.

not *caused by* (and intended to counteract) the imposition of Fuel Surcharges. My analysis has found no evidence of such a causal link, nor has Dr. Willig identified any. In his Figure 39, Dr. Willig cites examples of individual shippers of specific commodities along specific routes that both incurred Fuel Surcharges and experienced a decline in average base rates between 2002 and 2006. From these anecdotal observations he draws an unsupported causal inference: "The widespread reductions in shipper-specific base rates contradict Professor Rausser's claim that defendants' alleged conspiracy was not accompanied by selective reductions in base rates."[163]

His description of these examples as "widespread" is inaccurate. Further, his analysis does not control for changes in demand at the destinations he considers or other changes in shipment characteristics. To demonstrate why this might be important, consider Dr. Willig's example of the shipper [redacted]. The data he uses for [redacted] is depicted in my Figure 17, highlighting 2002 and 2006, the two periods that Dr. Willig examines. The periods when [redacted] was *not* paying a Fuel Surcharge are indicated with a dashed line, and the periods in which it *was* paying Fuel Surcharges are represented by a solid line. Although it is true that [redacted] paid lower real base rates in 2006 than it did in 2002, this was clearly a continuation of a downward trend that started a full two years before the imposition of the Fuel Surcharge. As a result, the base rate decrease cannot be construed as an offset or concession designed to mitigate the effects of those Fuel Surcharges. All of the remaining examples given by Dr. Willig in his Figure 39 suffer from similar problems, as described in Appendix 4.

---

[163] Revised Willig Report, ¶226 at p. 124.

**Figure 17.** [redacted]

In sum, there is no real-world evidence of widespread discounting of base rates, nor is there any established causal link between the isolated instances of declining base rates and the imposition of Fuel Surcharges. Instead, Dr. Willig has merely described the known variability in base rates resulting from other market forces, as opposed to defections from the coordinated Fuel Surcharge programs.

### *B. Variation in rail freight rates is less than Dr. Willig suggests, and can be controlled for in a common, multivariate analysis.*

#### 1. Despite Dr. Willig's criticism of the R-squared value in my regression model, the predictive power of the model is high and its results are of material importance.

The common factor regression model presented in my Initial Report (which uses only transaction data) explains over 75% of the variation in actual per car revenues for individual

shipments. Moreover, my independent damage model explains 84% of the variation in all-in freight rates. Both of these are considered very high levels of explanatory power by professional standards, measured using the metric known as R-squared.[164,165] The ability to explain and predict individual freight rate differences confirms that common factors reported in the data, such as [redacted] predominate over individual factors in determining price. Thus, these factors can be accounted for in a common analysis of impact and damages.

Dr. Willig argues both that these R-squareds are insufficiently high and that they are misleading measures of the reliability of my regression and damage models. In no industry is it possible to explain 100% of the variation in prices. The total variation is decomposed into explained variation (represented by the R-squared) and unexplained *random* variation which is present for every product.[166] The R-squared is nothing more than the ratio of the explained variation to the total variation.[167] There are many reasons that real world industries exhibit unexplained price dispersion.[168] One of these is that not every market participant has the same information at the same time. At any given moment, not all buyers know each of the prices on

---

[164] This is one of the first regression statistics taught to students of econometrics. Johnson, J. and Dinardo, J. *Econometric Methods*, McGraw-Hill International Editions, at 21. It increases confidence that there is nothing missing from the model that could affect the estimate of damages.

[165] The R-squareds of many multivariate regressions cited in economic and litigation research are well below that of my regression models. For example, R-squareds range from 0.039 to 0.258 in the regressions testing hypotheses on market concentration cited by Carter, John R. , "Collusion, Efficiency and Antitrust," *Journal of Law and Economics*, Vol.21, No.2 , October.,1978, pp.435-444; another litigation research on examining employment discrimination reports a series of regressions with R-squared lower than 0.80, see Whiteside, M M. and A. Narayanan, "Reverse Regression, Collinearity, and Employment Discrimination," *Journal of Business & Economic Statistics*, July 1989, Vol.7, No.3, pp.403-406; also, Rubinfeld (2000) takes a regression with R-squared of 0.56 as an example explaining the utilization of multiple regressions in antitrust analysis, see Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 2nd ed., 2000, pp.179–227.

[166] In describing variation as "random," I mean that it is unrelated to the common factors that distinguish one transaction from another or, in the case of the damage model, is unrelated to the conspiracy.

[167] Added to the ratio of the unexplained variation to the total variation it will sum to one or, equivalently, 100%.

[168] In a seminal paper on the economics of information George Stigler notes that "it is important to emphasize immediately the fact that dispersion is ubiquitous even for homogenous goods." Stigler, G. "The Economics of Information", *The Journal of Political Economy* (1961), Vol. LXIX, No. 3.

for communicating and tracking prices, and ease of using generally available indexes to increase prices.

In sum, the motives to conspire and the probability of successfully doing so were both quite high. The minimal costs of colluding were far outweighed by the massive benefits for Defendants, creating strong incentives to ensure that the conspiracy goals were implemented consistently across the Class.

### *D. Dr. Willig concedes that Fuel Surcharges made it possible to increase all-in freight prices without having to renegotiate base rates. This was an efficient mechanism for implementing the conpiracy, well suited to producing a class-wide impact.*

As discussed in my Initial Report and again at pages 28–35 of this Reply, Fuel Surcharges were no more efficient at recovering fuel costs than the pre-existing methods such as the RCAF. However, they were an especially efficient method of raising all-in freight charges and thus boosting Defendants' profits. Dr. Willig himself describes how Fuel Surcharges could increase the total price paid by shippers without the need to renegotiate base rates.[195] For this and other reasons Fuel Surcharges were an ideal mechanism for implementing the alleged conspiracy. The programmatic adoption of these Fuel Surcharges assured that they would be imposed across the board, resulting in a common impact for all of the Class.

Defendants had only to communicate and agree at the outset of the conspiracy which Fuel Surcharge formulas to use. The extensive documentary evidence establishes that this is precisely what they did in the first half of 2003, as described in my Initial Report.[196] Once agreed upon each Defendant had simply to follow the formulas, which were based on published fuel indexes. Although no other direct communication between them was necessary, Defendants published the resulting Fuel Surcharge percentages on their websites. In order to monitor each other they

[195] Revised Willig Report, ¶26 at p. 13.
[196] Initial Report, Section VI.D at p. 102.

simply had to observe the proportion of total shipments to which these Fuel Surcharges were being applied. This could be achieved directly for interline shipments (a large share of Defendants' business) using the interline concurrence system, and indirectly for local shipments. It was not necessary to monitor, compare or coordinate total price, but only the imposition of the Fuel Surcharges themselves. Because these were mathematically pre-determined using the agreed upon formulas they required no further coordination and assured a consistent application across the Class. The pretext that Fuel Surcharges were a cost recovery mechanism was useful in compelling their adoption—shippers would certainly have resisted had they been told that their base rates were being raised by 15% simply in order to increase Defendants' profits. However, maintaining this pretext required that the program be universal. For example, an exemption in favor of shippers in remote regions, whose cargo was equally subject to the effects of fuel price movement, would be inconsistent with and belie the stated purpose of the programs. For these reasons the Fuel Surcharges were applied to all shippers, including those arguably captive to one railroad, as I have described in Section II.A.3 of this Report. Given these facts, the Fuel Surcharge mechanism itself serves as proof of common impact.

## IV. DAMAGES

In my Initial Report I proposed a regression model specifically designed to estimate class-wide damages. Not all of the transaction data had yet been produced by Defendants, and I performed the regression on a sample of [redacted] of the relevant transactions. The purpose was to prove whether the methodology was workable and to determine whether the model's results were generally consistent with the facts of the alleged conspiracy. As explained in my Initial Report, the model found that all-in freight rates were higher during the Class Period than could be explained by economic forces other than the alleged price-fixing conspiracy. The results also

demonstrated a structural break in the [redacted] starting in 2003, consistent with the advent of a price-fixing conspiracy using Fuel Surcharges as its facilitating mechanism.

Dr. Willig criticizes my proposed methodology from a few perspectives, each of which I address in this section. In response to his assertion that the [redacted] transaction sample used in my Initial Report may have been unrepresentative of the population as a whole, I have now performed the analysis on 100% of the relevant transactions. The results are consistent with those found in my Initial Report, thus increasing confidence that the model works as designed.

The results on 100% of the relevant transactions confirm that a structural break in the [redacted] occurred in 2003, and that this break increased freight rates above what they would have been absent the conspiracy. The estimated class-wide overcharge is [redacted]

### A. *Criticisms of my damages regression.*

#### 1. The "false positive" analysis is conceptually flawed.

Dr. Willig applies the estimated overcharge for 2006 from my damage model to predict prices from my common factor regression model. He then compares these predicted but-for prices to the prices actually paid. In so doing, he claims to find that [redacted] of shipments suffered no damage (i.e., the actual price was lower than the predicted but-for price).[197] He then assumes an error rate in the predicted but-for prices themselves, and asserts that there is a 20% probability of falsely concluding a shipment resulted in damages when it in fact did not (this he refers to as a

[197] Revised Willig Expert Report, ¶49 at 25.

### B. *Use of 100% of transaction data, measuring damages for every shipment meeting the Class definition.*

Dr. Willig criticized my initial damage analysis for using an unrepresentative data sample covering [redacted] of the Class transactions.[210] That criticism is misdirected because my assignment was to show that a methodology could be developed in order to prove impact and damages on a Class-wide basis. I have, however, continued my work since submitting my Initial Report and have now performed the same analysis on data covering 100% of transactions meeting the Class definition. In doing so, I have incorporated data that was produced by Defendants too late to be included in my Initial Report.[211] In addition, three of the Defendants (UP, CSX and BNSF) recently produced legacy contracts that have enabled me to improve my method for indentifying those shipments associated with such contracts in order to exclude them from the Class designation in the model.[212] The results of the damage model using this new data and 100% of the relevant shipments are presented in Table 23.[213] These results are consistent with those found in my Initial Report, thus increasing confidence that the damage model will work reliably to quantify class-wide damages at the time of trial.

[210] Revised Willig Report, ¶274-276 at pp. 151-153.
[211] NS data to resolve duplicates was produced March 15, 2010.
[212] It is my understanding that NS has provided data and documents sufficient to isolate shipments covered by fuel surcharge provisions under legacy contracts. Prior to August 24, 2010 I had not been supplied by NS with an understanding of this data sufficient to use it in my analysis. On that date, just three days before the filing deadline for this reply report the deposition of Matthew Bailey (see Deposition of Mathew Bailey, dated August 24, 2010) provides me with an understanding at this stage to conclude that NS production of data can be used to identify legacy contracts, although such an analysis cannot reasonably be accomplished before the filing of this reply report.
[213] The results here correspond to Category 3 in my Initial Report. That is, legacy shipments have been removed from the Class designation, but retained in the pre-Class benchmark period.

**Table 23.** [redacted]

| [redacted] | |
|---|---|
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

In Table 23, the double asterisks indicate that the result is statistically significant at the 99% level of confidence, which provides strong confirmation of its reliability. The regression has an R-squared of 84%, which is very high by professional standards and confirms the strong explanatory power of the model. As in my Initial Report, I [redacted] For reporting purposes only and simplicity of communication, I also [redacted] The result is an average overcharge of [redacted] over the Class Period as compared with [redacted] found at the time of my Initial Report.

Dr. Willig claims that the damage model predicts overcharges greater than the Fuel Surcharge percentages and therefore the model is unreliable.[216] In fact, Dr. Willig has made a

---

214 [redacted]

216 Willig Report, Figure 44 at p. 143.

material computational mistake in his Figure 44 which is responsible for the discrepancy. He has failed to adjust the percentage overcharge to be directly comparable to the Fuel Surcharge expressed as a percent of the all-in rate.[217] Fully correcting for Dr. Willig's errors, a revised version of this comparison based on 100% of relevant transactions is presented in Figure 24. The estimated overcharge (dashed line) is graphed against the average Fuel Surcharge percentage (solid line). This is strikingly different than the picture presented in Dr. Willig's report, due wholly to the correction of his error.[218]

**Figure 24.** [redacted]

[redacted]

---

[217] As is always the case in this type of functional form, the estimated percentage overcharge, "p", represents the percentage by which actual prices are higher than but-for prices. [redacted] Note that in this Figure [redacted]