# Exhibit 110

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) | MDL No. 1869 |
| | ) | Misc. No. 07-489 (PLF) |
| | ) | Hon. Paul L. Friedman |
| This document relates to: ALL DIRECT PURCHASER CASES | ) | |

**Expert Report of**
**Joseph P. Kalt, Ph.D.**

**On Behalf of Defendants**
**BNSF Railway Company**
**CSX Transportation, Inc.**
**Norfolk Southern Railway Company**
**Union Pacific Railroad Company**

**Errata Corrected March 1, 2013**

### D. Structure of This Report

14. This report consists of seven main sections, including this introduction. Section II presents a summary discussion of the Plaintiffs' claims and the conclusions of Plaintiffs' expert, Prof. Rausser. It also provides a summary of my key findings in this matter. Section III provides an overview of the rail freight transportation sector, including a discussion of the economics, public policy, regulatory structure, and industry practices that are relevant to assessing the merits of Plaintiffs' claims and Plaintiffs' expert's conclusions.

15. In Section IV, I assess whether the challenged conduct of Defendants represents conduct expected of railroads individually pursuing their unilateral business interests or, alternatively, whether it is conduct only coherently explained as railroads participating in an anticompetitive conspiracy as alleged by Plaintiffs. In addition, I subject the claims and descriptions of the purported conspiracy and its attributes to empirical testing to see which, if any, are borne out by the data.

16. In Section V, I investigate the economic underpinnings of Plaintiffs' theories and descriptions of the claimed conspiracy. Specifically, I undertake extensive data analysis to assess whether industry and market conditions are conducive to conspiracy. I also examine the economic logic and consistency of those theories and descriptions in order to determine the plausibility of the alleged conspiracy in light of the interests of Defendants and extant marketplace conditions.

17. Any conspiracy among sellers of a product or service, if it actually exists, should leave evidence of its operation in the outcomes observable in the marketplace. In Section VI, I identify the marketplace outcomes predicted by Plaintiffs' theory of conspiracy. I then use economic analysis to examine whether predicted outcomes, as reflected in prices, traffic shares and the like, are evident in the data.

18. Finally, Section VII assesses Plaintiffs' expert's claims to the effect that he has found and reliably measured damages in the aggregate and to each Class Member. Specifically, I subject Prof. Rausser's modeling and measurement of economic damages to empirical testing and replication in order to determine the reliability of his calculations of the magnitude of injury, if any, purportedly suffered by individual Class Members and the Class as a whole.

## II. PLAINTIFFS' ALLEGATIONS AND OVERVIEW OF MY FINDINGS

### A. Plaintiffs' and Their Expert's Claims and Contentions

19. Plaintiffs in this matter allege that, apparently beginning in mid-March 2003,[4] Defendants met and conspired to use revenue-based fuel surcharges ("FSCs") as a means of fixing prices of rate-unregulated rail freight transportation in the United States.[5] Plaintiffs seek damages for the period from July 1, 2003 through December 31, 2008 for a class including all persons (other than government entities and persons affiliated with Defendants) who, between July 1, 2003 and December 31, 2008, purchased directly from one or more Defendants rail freight service under terms that included a stand-alone rail freight fuel surcharge applied as a percentage of the base rate or where some or all of the fuel surcharge was included in the base rate.[6]

20. Plaintiffs contend that between 2000 and early 2003 Defendants each unilaterally adopted fuel surcharges, but that they were largely unsuccessful in including them in contracts with customers.[7] These fuel surcharges are portrayed by Plaintiffs as being "at low levels" of coverage,[8] varying in type across railroads,[9] commonly waived or "negotiate[d] away",[10] and applied only intermittently[11] to low volumes of traffic.[12]

---

4 Plaintiffs and their expert are not consistent regarding when the conspiracy allegedly began. Prof. Rausser previously testified, without qualification, that his analysis proved it began July 1, 2003 and also proved that the pre-July 2003 conduct was competitive and without anticompetitive coordination. (Rausser Class Report at 3 and 60, Figure 16) He and Plaintiffs now appear to say that the conspiracy had its genesis as early as mid-March 2003, while "the actual execution in terms of anticompetitive consequences began in July of 2003." (Rausser Merits Deposition at 13; Plaintiffs' Reply Memorandum in Support of Motion for Class Certification, August 27, 2010 ("Plaintiffs' Reply Memorandum") at 8-9; Direct Purchaser Plaintiffs' Second Amended Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company ("Defendants"), May 11, 2011 (hereinafter "Narrative") at ¶¶29-39; (Rausser Merits Report at 59-60) I find that Plaintiffs' and Prof. Rausser's claims of conspiracy are not supported by the data and facts whether the purported start date is in March 2003 or July 2003. I present my analyses as much as possible for both March 2003 and July 2003 start dates, and find that the results are essentially the same using either as the presumed start date of the alleged conspiracy.

5 "Unregulated" here refers to rail freight service not subject to Surface Transportation Board-established maximum tariffs.

6 Plaintiffs' Memorandum at 1-2.

7 See, e.g., Narrative at ¶¶5-11.

8 See, e.g., Narrative at ¶5.

9 See, e.g., Second Consolidated Amended Class Action Complaint, December 31, 2009 ("Complaint") at ¶¶7, 12, 57; Narrative at ¶¶5, 6.

10 See, e.g., Complaint at ¶92; Plaintiffs' May 2011 Responses at 111; Narrative at ¶¶82, 84, 113.

11 Complaint at ¶7.

12 Narrative at ¶5.

Plaintiffs attribute Defendants' supposed inability to successfully expand the use of fuel surcharges prior to purportedly conspiring to resistance from customers [13] and competition among the railroads.[14]

21. According to Plaintiffs, but for the alleged conspiracy, the fuel surcharges adopted by Defendants after spring 2003 would have faced a brick wall of customer resistance and "would not have existed *at all*".[15] At most, there might have been quite "modest" fuel surcharges that would have been subject to "collapse", and the fuel surcharges Defendants used prior to the alleged conspiracy would not have spread "widely" absent the conspiracy.[16] Plaintiffs maintain that the conspiracy enabled Defendants to spread FSCs that were "nothing like" the surcharges they had used prior to the alleged conspiracy.[17] The alleged conspiratorial surcharges were purportedly uniform,[18] standardized,[19] and more "onerous"[20] than the FSCs used in the pre-Class Period. Moreover, Plaintiffs allege that Defendants' surcharges purportedly were implemented in "lockstep,"[21] were non-negotiable,[22] and were intended to achieve universal coverage.[23]

22. Echoing Plaintiffs' claims, Prof. Rausser asserts that there was a "trend reversal" in overall railroad rates that corresponded with the alleged onset of the claimed conspiracy, and that "[t]his trend reversal constitutes economic evidence consistent with Plaintiffs' allegation that Defendants conspired to raise freight rates."[24] He goes

---

13 See, e.g., Narrative at ¶¶7, 11.

14 See, e.g., Plaintiffs' Reply Memorandum at 10.

15 Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories Directed to all Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railroad Company, January 4, 2012, ("Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories") at 9 (emphasis in the original).

16 See, e.g., Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories, January 4, 2012, at 9.

17 Plaintiffs' Reply Memorandum Addressing Wal-Mart Stores, Inc. v. Dukes, September 1, 2011, at 7.

18 Complaint at ¶¶79-83, 88, 104; Narrative at ¶¶16, 53, 63, 64, 80, 81.

19 See, e.g., Complaint at ¶104.

20 Narrative at ¶64; and see also ¶11; Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 4, 9, 10, 13, 15.

21 Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 15; see also Complaint at ¶¶7, 12, 14, 57, 59, 61, 62, 64, 65, 71, 72, 83, 91, 99; Narrative at ¶¶42, 44, 60 (footnote 172), 105.

22 Complaint at ¶¶15, 90, 92; Narrative at ¶¶81, 82, 83, 84; Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 2.

23 Plaintiffs' Reply Memorandum at 13.

24 Rausser Merits Report at 89.

on to assert that he has found a "structural break" – starting at the beginning of the Class Period in July 2003 – in the relationship between fuel prices and the overall (or "all-in", base-plus-FSC) rates paid by Class Members.[25] Similar to Plaintiffs, Prof. Rausser opines that although the Defendants' revenue-based FSCs prior to the alleged conspiracy were "designed and implemented by the individual Defendants without agreement or coordination,"[26] they were only "used sporadically" and "were often modified or waived" in the process of negotiating rates because of competition among Defendants.[27]

23. Prof. Rausser opines that, during the Class Period, Defendants' purportedly conspiratorial FSC "program was applied universally";[28] and that Defendants employed a uniform, "industry-standard"[29] approach to fuel surcharges "with identical or near identical features"[30] across Defendants. Moreover, he represents Defendants' FSCs during the Class Period as being non-negotiable,[31] with the purported conspiracy also entailing agreement not to discount base rates so as to prevent the offsetting of FSCs in all-in rates.[32] Prof. Rausser further opines that market conditions were conducive to conspiracy,[33] and that revenue-based FSCs provided a "highly cost-efficient mechanism for collusion."[34] Attempting a conspiracy through base rates, he observes, would be "effectively unmanageable."[35]

24. Prof. Rausser argues that the purported universal coverage and uniformity of Defendants' FSCs, coupled with base rates that he describes as "static",[36] permit him to reliably calculate individual Class Member damages based on "evidence common to the Class" such that "no individual analysis is required".[37] He concludes that the FSCs implemented during the Class Period resulted in a Class-wide common all-in rate increase[38] and a corresponding Class-wide common overcharge of [redacted][39] Prof.

25 Rausser Merits Report at 7.

26 Rausser Class Report at 42.

27 Rausser Merits Report at 55-56.

28 Rausser Merits Report at 149.

29 Rausser Merits Report at 58; see also Rausser Class Report at 82.

30 Rausser Merits Report at 6.

31 Rausser Merits Report at 71.

32 Rausser Merits Report at 7, 9, 72, 113-114.

33 Rausser Merits Report at 11-52.

34 Rausser Merits Report at 12; see also Rausser Class Reply at 80-81.

35 Rausser Class Report at 52, footnote 118.

36 Rausser Merits Report at 141.

37 Rausser Merits Report at 126.

38 Rausser Merits Report at 8.

39 Rausser Merits Report at 11.

Rausser bases these conclusions on a model which he maintains shows the asserted upward "structural break" in Class Members' all-in rates at the start of the Class Period. He claims that his model "validates" Plaintiffs' allegations[40] and is, in fact, "evidence of the conspiracy itself."[41]

### B. Overview of Findings

25. I find that the applicable economics and economic evidence do not support, and Plaintiffs' expert's analyses and assertions do not support, inference of the conspiracy alleged by Plaintiffs. Prof. Rausser asserts he finds that the Defendants operate as, and in the market structure of, an "interdependent oligopoly".[42] Economics has not developed accepted and reliable methods of detecting collusion in markets structured as interdependent oligopolies. The reason is that sellers in such a market structure can readily engage in closely parallel conduct and generate fuel surcharge programs that are very similar without engaging in collusion. Indeed, the economics of interdependent oligopoly generally lead us to expect firms in such market structures to engage in similar, or parallel, conduct.[43] In affirmatively asserting that he has detected and concluded that the conspiracy alleged by Plaintiffs in this case "actually occurred",[44] Prof. Rausser is not applying any professionally accepted economic methodology.

26. The tools and methods of economics can be employed, however, to test hypotheses of conspiracy. Specifically, hypotheses of conspiracy are properly rejected: (i) when the conduct alleged to be conspiratorial is, in fact, consistent with the subject parties' unilateral pursuit of their non-conspiratorial economic interests; (ii) when the hypothesized conspiracy is inconsistent with the alleged conspirators' rational interests and/or implausible in light of competitive marketplace forces; and/or (iii) when data analysis demonstrates that the market outcomes are in conflict with the outcomes predicted by the economics of the alleged conspiracy. I find that application of economic analysis and available data to these tests yields results that do not support inference of the conspiracy alleged in this case. As a consequence, no appeal to "conspiracy" is required – or reasonable, as a matter of economics – as explanation for Defendants' pricing or, in particular, their development and use of the challenged fuel surcharge formulas.

---

[40] Rausser Class Reply at 101.

[41] Rausser Class Report at 120; see also Rausser Merits Report at 7, 170.

[42] Rausser Merits Report at 54; Rausser Merits Deposition at 62.

[43] See, for example, Harrington, Joseph E., Jr., "Detecting Cartels," in *Handbook in Antitrust Economics*, MIT Press, 2008 (hereinafter "Harrington").

[44] Rausser Merits Deposition at 12.

[redacted]

[redacted]

### J. Testing the Characteristics of the Alleged Conspiracy: Universally Applied?

235. The alleged conspiracy is purportedly marked by a number of key characteristics which Plaintiffs and Prof. Rausser claim allow them to distinguish Defendants' Class Period revenue-based fuel surcharges from the pre-Class Period surcharges and that mark the Class Period FSCs as conspiratorial. Specifically, the Class Period fuel surcharges of Defendants purportedly were "applied universally"[326] with "no exceptions",[327] were

326 Rausser Merits Report at 148-149; see also at 9, 64, 67-68, 72, 112, 114, 127, 145, 148-149.

327 Rausser Merits Report at 64-66, 71, 150; or "with any exceptions being insignificant" (Rausser Merits Report at 128).

"uniform"[328] and "non-negotiable,[329] and were more "onerous"[330] than the surcharges that were implemented unilaterally in the period preceding the alleged onset of conspiracy in July 2003. Below, I test the data for these asserted "markers" of the alleged conspiracy. In each case, I find that the data reject the hypothesized characteristic.

236. Under Prof. Rausser's theory of conspiracy, "Defendants each adopted internal policies directing that Fuel Surcharges would be imposed whenever opportunities arose, including when legacy contracts expired and those contracts were renewed or replaced."[331] Thus, according to Prof. Rausser, the conspiratorial fuel surcharge program was "applied universally". Moreover, he concludes that "it is clear that the Defendants did actually implement their agreed upon Fuel Surcharge strategy across the board…."[332]

237. Whether Defendants actually applied fuel surcharges universally "whenever opportunities arose" is a testable proposition. Using the Defendant transactions database, Figures IV-18A through 18D apply the results we saw in Figures IV-10A through 10D to Prof. Rausser's claim. As noted above, under Prof. Rausser's theory of conspiracy, Class Members share the common fact of having paid a putatively conspiratorial fuel surcharge, and no Class Member is more or less susceptible than another to having to pay an FSC once the opportunity arises. Accordingly, under Prof. Rausser's theory of the conspiracy he alleges, there is no phasing in of the conspiracy and the number of new opportunities not paying revenue-based fuel surcharges in Figures IV-18A through 18D should fall to zero in July 2003. Similarly, each subsequent month's new opportunities should be captured by the conspirators, leaving them all paying conspiratorial surcharges and with "any exceptions being insignificant."[333] In terms of Figures IV-18A through 18D, there should be no cross-hatched area of missed opportunities from July 2003 onward.

---

328 Rausser Merits Report at 150; see also at 17, 49, 58, 61, 128.

329 Rausser Merits Report at 71-72; see also at 7, 70-72, 92.

330 Rausser Merits Report at 59.

331 Rausser Merits Report at 62.

332 Rausser Merits Report at 113; see also at 49, 59, 66, 72, 92, 127-28, 150.

333 Rausser Merits Report at 128.

[redacted]

[redacted]

[redacted]

[redacted]

238. Clearly, these predictions of the hypothesized conspiracy are not borne out by the data. Following the implementation of the asserted conspiracy, there remain large numbers of *missed opportunities* (i.e., instances in which Defendants had an opportunity to apply a revenue-based fuel surcharge but did not do so). These missed opportunities are shown by the crosshatched areas at the tops of each graph in Figure IV-18. The graphs also include a line at the level of incidence or coverage in June 2003, just prior to the implementation of the asserted conspiracy. The solid area above the line shows the increased incidence and coverage of revenue-based fuel surcharges relative to the level achieved just before implementation of the asserted conspiracy. The figure shows that for each Defendant, the cross-hatched area – the missed opportunities – in the 18

months following the implementation of the asserted conspiracy far outweigh the increased incidence and coverage of Defendants' surcharges.

239. Each of the "missed opportunities" shown in Figures IV-18A through 18D, which total in the thousands, represents a violation of the predicted universal, non-negotiable application of the alleged conspiracy. In fact, as we noted in connection with Figures IV-10A through 10D above, there is not even a discernible acceleration of new opportunities that are brought under FSCs upon the purported implementation of conspiracy in July 2003. Neither the predicted universal application nor even accelerated application of Defendants' revenue-based fuel surcharges upon implementation of the purported conspiracy is evidenced by the data.

240. Prof. Rausser's conclusion that Defendants "did actually" implement their purported conspiratorial fuel surcharges "across the board" after asserted implementation relies upon flawed analysis. He presents four figures that purport to show the percent of the Defendants' revenue covered by fuel surcharges in November 2002 and November 2007, by state (his Figure 3) and by commodity (his Figures 33 through 36). Based on these figures, he concludes: "In sum, my analysis reveals that, irrespective of the commodity shipped or the geographic region of the shipment, shippers were assessed Fuel Surcharges much more often in the Class Period, than in the pre-Class Period."[334]

241. It is important to note that Prof. Rausser opines here only that his figures show Defendants' challenged fuel surcharges were applied "much more often", not that they were applied universally, across-the-board, or with only insignificant exception following implementation of the alleged conspiracy. His own presentation of his data contradicts his and Plaintiffs' assertions that the conspiracy they allege was designed to achieve, and did actually result in, non-negotiable, universal application of Defendants' Class Period revenue-based fuel surcharges.

242. Even Prof. Rausser's softened interpretation of his data, however, is grossly flawed. By choosing November 2002 as his pre-Class Period benchmark for comparison, he has artificially ignored the very rapid growth in the spread of fuel surcharges that occurred between November 2002 and the purported implementation of the conspiracy in July 2003 (see Figures IV-9A through 9D). By making the pre-Class Period benchmark smaller in this way, the change by November 2007 is artificially made to appear correspondingly larger.

---

334 Rausser Merits Report at 135. See also Rausser Merits Report at 20: "The Defendants' transaction data reveal that Defendants applied Fuel Surcharges commonly across states in the U.S. This is evident from Figure 3, which shows the percentage of gross revenue covered by stand-alone fuel surcharges in November 2002 compared to the same number for November 2007, for each of the top 20 origin states for each Defendant." Rausser Merits Report at 130: "For nearly every commodity presented [in Figures 33 through 36], the percentage of gross revenue with a fuel surcharge was very low in November 2002 and, in contrast, was high in November 2007, and often very close to [redacted]."

243. In addition, Prof. Rausser's data do not test whether and how fast Defendants' fuel surcharges spread across *new opportunities* as they arose. Instead, in both November 2002 and November 2007, Prof. Rausser's data represent a mixture of shipments that are paying and not paying fuel surcharges, but with all so-called "legacy" traffic dropped from the analysis – i.e., traffic that paid a revenue-based fuel surcharge in the pre-Class Period under price authorities which carried that surcharge over into the Class Period. As a result of dropping such traffic, his data tend to understate the actual coverage of FSCs in both November 2002 and November 2007. Figures IV-19A and 19B illustrate the magnitude of the effect for November 2002 and November 2007, respectively, for the case of UP (whose data come with requisite detail that permits isolation of shipments with and without FSCs). The figures show actual levels of FSC coverage (as percents of gross revenue) in blue and Prof. Rausser's truncated measure of coverage in red.

[redacted]

[redacted]

244. For many of his selected states (Figure IV-19A) and commodities, actual levels of FSC coverage in November 2002 are many multiples of the measure employed by Prof. Rausser. Similar gross errors of measurement apply to November 2007. The net effect, however, is that Prof. Rausser's understatement of coverage in November 2002 is larger than in November 2007. Consequently, his figures *overstate* the growth over November 2002-November 2007 in coverage across most states (his Figure 3) and most commodities (his Figures 33-36). This is seen in my Figures IV-19C and 19D. These corrected results, while still biased by the use of the November 2002 benchmark, are directionally consistent with the data on overall coverage seen, for example, in Figures IV-9A through 9D. There we see that the purported implementation of Defendants' fuel surcharges in July 2003 was not met with an acceleration of coverage and

incidence, but at most was met with a continuation of the trends evident in the months leading up to July 2003.

[redacted]

[redacted]

### K. Testing the Characteristics of the Alleged Conspiracy: Uniform and Non-Negotiable?

245. Regarding the purported uniformity of Defendants' Class Period revenue-based fuel surcharges, we saw above that, at the moment of purported onset of the alleged conspiracy and claimed "*de novo* joint implementation of the same basic programs" in July 2003,[335] Defendants' fuel surcharge programs were not the same, effectively the same, or at least more the same (more harmonized) than the purportedly "failed" programs that are asserted to have motivated conspiracy. We also saw above that FSC

335 Rausser Merits Deposition at 216 (emphasis added).

rates paid during the Class Period by members of the Association of Automobile Manufacturers (AAM) were markedly *non*-uniform (Figures IV-17A and IV-17D).

246. Beyond these results, Plaintiffs' and Prof. Rausser's theory of the alleged conspiracy should lead us to find that Defendants charged each new customer the same conspiratorial surcharge during the Class Period. Figures IV-20A through 20D show the distributions of each Defendant's revenue-based surcharge rates paid by shippers for carload traffic immediately before the alleged beginning of conspiratorial conduct in March 2003 and the distributions of such rates on *new* customer-price authorities in the same week in March in subsequent years (until BNSF, CSXT, and UP offered mileage-based FSCs and NS rebased its public carload FSCs).

[redacted]

[redacted]

247. Focusing for discussion purposes on Figure IV-20B for CSXT, the left-most bar in each panel shows the share of traffic (measured by carloads) that did not pay a revenue-based fuel surcharge under a new price authority. Each successive category on the horizontal axis captures a range of fuel surcharge rates spanning two percentage points (i.e., 0-2 percent, 2-4 percent, 4-6 percent, etc.). Each panel in Figure IV-20B also shows the publicly-posted carload fuel-surcharge rate that Prof. Rausser's theories predict would have been levied on each new customer-price authority were the application of carload surcharges universal and uniform. The publicly-posted surcharge rate is indicated by the thin vertical line labeled "Prof. Rausser's Prediction". The height of the line indicates that Prof. Rausser's prediction is that [redacted] percent of traffic should pay the publicly-posted, "standard" surcharge.

248. Figure IV-20B reveals that most new price authorities did not contain the publicly-posted fuel surcharge rate in any sample week shown for CSXT. Moreover, during the

Class Period, a large number of CSXT shippers with new price authorities continued to pay [redacted] revenue-based fuel surcharge at all (the left-most bars). Finally, not only are the FSC rates that new opportunities paid not uniform at any point in time; if anything, they spread out and get less uniform during the Class Period relative to the pre-Class Period. In short, the results contradict Prof. Rausser's assertion that Defendants' fuel surcharges were both universal and uniform following the purported implementation of conspiracy. They were neither.

249. Figures IV-20A, 20C, and 20D show the same information for BNSF, NS, and UP, respectively, during the periods that their carload surcharge formulas were revenue-based.[336] In all cases, there is substantial variation in the rates charged and some shippers with new rate authorities always avoid paying the fuel surcharge that Prof. Rausser asserts Defendants would have charged were negotiation not possible. In no case does Prof. Rausser's prediction that Defendants' fuel surcharges were universally and uniformly applied by all Defendants hold. In each case, if anything, FSC rates spread out and get less uniform during the Class Period relative to the pre-Class Period.

---

[336] Figure IV-20A is limited to the period prior to BNSF's implementation of a mileage-based fuel surcharge program for some carload traffic in 2006. Figure IV-20B is limited to the period prior to CSXT's introduction of mileage-based FSCs in 2007. Figure IV-19C is limited to the period prior to NS's rebasing (July 1, 2006). Figure IV-20D is limited to the period prior to UP's implementation of its mileage-based public carload fuel surcharge program.

[redacted]

[redacted]

250. Finally, UP's transaction data permit identification of the specific surcharge formulas actually applied by UP to individual waybills (shipment). Figure IV-21 shows the rates UP charged under its top ten (out of more than 80) revenue-based carload fuel surcharge programs employed over 2003-2008. Not only does this multiplicity of surcharge formulas belie claims of conspiratorial uniformity, but the resulting FSC rates actually paid did not lead to uniform results.

[redacted]

251. The purported attribute of uniformity in Defendants' purportedly conspiratorial FSC formulas plays a critical role in Prof. Rausser's framework. "Across-the-board" imposition of supposedly uniform percent-of-revenue surcharges on top of conspiratorially non-discountable base rates undergirds his assertion that the alleged conspiracy "will have increased the prices paid by all shippers by the same percentage amount".[337] This conclusion, in turn, is the central foundation of Prof. Rausser's assertions that the conspiracy he alleges had the same, common impact (i.e., overcharge) across the Class. As I set out in Sections V and VI below, this chain of

[337] Rausser Merits Report at 50.

claims is broken at each of its links. Here we have seen that the first link in the chain – "uniformity" of fuel surcharge formulas and rates – is broken.

### L. Testing the Characteristics of the Alleged Conspiracy: More Onerous?

252. Plaintiffs and Prof. Rausser assert that the fuel surcharges Defendants introduced during the Class Period were more onerous and more aggressive than the fuel surcharges introduced prior to the Class Period.[338] This claim can be interpreted two ways. First, the claim could simply mean that shippers' actual revenue-based fuel surcharge payments were higher during the Class Period than they were before. This claim clearly has no economic merit. The formulas underlying Defendants' fuel surcharges would yield increasing surcharges only *if* fuel or oil prices were to rise. Prof. Rausser agrees that rail rates would naturally rise with increasing fuel costs.[339] Therefore, a claim that fuel surcharges were more onerous because fuel prices rose and thereby made surcharges larger is really just a complaint about fuel prices, which Defendants do not control.[340] It is, of course, the results of *fuel prices* and the fuel-surcharge formulas that determine whether surcharges are more onerous.

253. The second interpretation is that the Class Period fuel surcharge formulas led to higher surcharges than would have been the case under the fuel surcharge formulas in place prior to purported implementation of conspiracy. This is the economically relevant question for assessing the onerousness of Defendants' revenue-based fuel surcharges. I address this question here.

254. To compare fuel surcharge formulas introduced under competitive circumstances to surcharge formulas introduced during the Class Period, we can take advantage of the fact that some contracts negotiated prior to the Class Period (so-called "legacy" contracts) contained revenue-based fuel surcharges and remained in effect during the Class Period. Legacy contracts were negotiated under non-conspiracy conditions and they preserve the benefits of competition for shippers.[341]

255. Prof. Rausser has identified a group of legacy contracts. I use the fuel surcharges included in these contracts, as they were applied by Defendants and paid by shippers during the Class Period, as the competitive benchmark for the analysis of the onerousness of purportedly conspiratorial surcharges applied during the Class Period. By comparing the revenue-based fuel surcharges embedded in competitively negotiated contracts with the revenue-based fuel surcharges during the class period, we can

338 Narrative at ¶¶14, 25, 26, 41, 64; Rausser Merits Deposition at 42.

339 Rausser Merits Report at 165.

340 Rausser Merits Deposition at 112-113.

341 Neither Plaintiffs nor Prof. Rausser assert that these contracts are a source of anticompetitive injury to shippers.

determine whether the Class Period surcharges were more onerous than competitive legacy fuel surcharges.

256. Figures IV-22A through 22D make this comparison.[342] Figures IV-22A through 22D show for each Defendant the differences between the average fuel surcharge rates legacy shipments and Class shipments paid. The figures show that, for each individual Defendant, the average surcharge rate generated by surcharge formulas introduced during the Class Period was very close to the average surcharge rate determined by formulas in competitively negotiated legacy contracts. For example, Figure IV-22A shows the difference between the average Class Period surcharge rate and the average legacy surcharge rate (i.e., average Class Period rate less average legacy rate) for BNSF. If average Class Period surcharge rates are higher than average legacy rates, the line in the bottom panel will be above the horizontal axis, and vice versa. As the figure shows, the average difference between Class and legacy FSC rates for BNSF is [redacted].[343]

[342] The analysis in Figure IV-22C applies the legacy treatment for NS that Prof. Rausser used in his reply report in the Class phase of this proceeding. The analysis in Figure IV-22D incorporates UP legacy data that are missing from Prof. Rausser's analysis. See discussion of errors and inconsistencies in Prof. Rausser's data in Section VII.

[343] Note that when comparing legacy revenue-based fuel surcharge rates to Class Period revenue-based fuel surcharge rates, the comparison becomes more volatile as the Class Period progresses. The reason is that the number of legacy contracts falls over time as contracts expire. In addition, Defendants began transitioning to non-challenged mileage-based surcharges during the Class Period. As a result the number of Class rate authorities containing fuel surcharges falls as well.

[redacted]

[redacted]

[redacted]

[redacted]

257. In no case does the evidence support the conclusion that the revenue-based fuel surcharge formulas introduced during the Class Period are uniformly or universally more onerous than those that stuck in the marketplace prior to the asserted conspiracy. For BNSF, the Class Period fuel surcharge rate is, on average [redacted] percent higher than the legacy rate. For UP, the Class Period fuel surcharge rate is [redacted] percent higher, on average, than the legacy rate. This figure is driven by the large uptick in the Class Period rate relative to the legacy rate at the end of the Class Period, which is the result of a few high-priced Class Period contracts that had not been transitioned to mileage-based fuel surcharges. Clearly, the rise in the Class Period surcharge rate relative to the legacy rate at the end of the Class Period could not have been anticipated at the date of implementation of the asserted conspiracy and, therefore, cannot be taken to indicate a conspiracy occurred.

258. For CSXT/CSXI and NS, the difference between the Class Period and the legacy fuel surcharge rates is negative, indicating that Class Period fuel surcharges for these railroads were *less onerous* than legacy surcharges. Of course, if the asserted conspiracy were effective, the predicted outcome would be that all four Defendants would have been able to materially increase the fuel surcharges they collected from class shippers relative to legacy shippers. No such "across-the-board" increase in fuel surcharges occurred.

259. For carload traffic, it is possible to directly compare the formulas and triggers Defendants used to calculate fuel surcharges prior to and during the asserted conspiracy. Figures IV-23A-D shows the revenue-based surcharge levels that result from the formulas used prior to and during the asserted conspiracy for carload traffic. The figure also indicates the dates at which BNSF, CSXT, and UP implemented mileage-based public carload surcharge programs as an alternative or replacement for their revenue-based programs. The figure shows that the formulas from the two periods give very similar results.

Figure IV-23A

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**BNSF**




**Source:** www.bnsf.com/tools/prices/fuelsurcharge/fuel_surcharge_hdf.html

Figure IV-23B

**Public Carload Fuel Surcharge Formulas:**
**Pre-“Conspiracy” v. “Conspiracy” Public Carload**
**CSXT**




**Source:** http://www.csx.com/share/wwwcsx_mura/assets/File/Customers/Price_Lists_Tariffs_Fuel_Surcharge/Fuel_Surcharge/Frequently_Asked_Questions_On_CSXT_Fuel_Surcharge.pdf

**Note:** CSXT implemented a mileage-based public carload formula on April 23, 2007.

Figure IV-23C

**Public Carload Fuel Surcharge Formulas:**
**Pre-“Conspiracy” v. “Conspiracy” Public Carload**
**NS**




**Source:** http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices, http://www.nscorp.com/nscportal/nscorp/ Customers/Public-Prices
**Note:** NS rebased on July 1, 2006.

Figure IV-23D

**Public Carload Fuel Surcharge Formulas:
Pre-"Conspiracy" v. "Conspiracy" Public Carload
UP**




**Source:** http://www.uprr.com/customers/surcharge/index.shtml,
**Note:** UP implemented a mileage-based public carload formula on April 26, 2007.

260. Figures IV-24A-D show the differences, if any, in fuel surcharge rates from the Class Period relative to those in place before the Class Period. As above, the Class Period rates are higher when the lines in Figure IV-24A-D are above the horizontal axis. Note that the lines indicating the difference in Class Period and legacy fuel surcharge rates stop when the railroads shifted to use of mileage-based surcharges.

Figure IV-24A

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**BNSF**




**Source:** www.bnsf.com/tools/prices/fuelsurcharge/fuel_surcharge_hdf.html

Figure IV-24B

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**CSXT**




**Source:** http://www.csx.com/share/wwwcsx_mura/assets/File/Customers/Price_Lists_Tariffs_Fuel_Surcharge/Fuel_Surcharge/Frequently_Asked_Questions_On_CSXT_Fuel_Surcharge.pdf
**Note:** CSXT implemented a mileage-based public carload FSC formula on April 23, 2007.

Figure IV-24C

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**NS**




**Source:** http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices
**Note:** NS rebased on July 1, 2006.

Figure IV-24D

**Public Carload Fuel Surcharge Formulas:
Pre-"Conspiracy" v. "Conspiracy" Public Carload
UP**




**Source:** http://www.uprr.com/customers/surcharge/index.shtml
**Note:** UP implemented a mileage-based public carload formula on April 26, 2007.

261. The results of Figures IV-24A-D do not support the contention that putatively conspiratorial Class Period surcharge rates were systematically and collectively across Defendants more onerous than non-conspiratorial pre-Class Period surcharge rates. While BNSF made changes to its public carload surcharge rate on June 1, 2003, its actual surcharge rate during the Class Period was unaffected by the change. Its carload formula FSC rates were the same in the pre-Class Period and Class Period. CSXT's and NS's public carload surcharge rates are slightly higher during the Class Period relative to what they would have been but for the change in their formulas on June 1, 2003 and March 1, 2004, respectively. UP's rate is slightly lower on average during the Class Period relative to what it would have been but for UP's change in its formula on June 1, 2003. The different results for the different Defendants are not consistent

with coordinated conduct yielding significantly higher fuel surcharge rates relative to rates that Prof. Rausser agrees are competitive – i.e., the rates in place prior to the purported implementation of conspiracy.

262. The analyses in this subsection show that the Class Period fuel surcharge formulas did not lead to systematically higher surcharges for all Defendants relative to the earlier formulas negotiated under admittedly competitive circumstances. In fact, the earlier, competitive surcharge formulas generally led to slightly higher surcharge levels than the Class Period surcharge formulas across all Defendants and all traffic. For carload traffic, the Defendants' revenue-based fuel surcharge formulas do not exhibit a common increase in rates for all Defendants as would be expected if Defendants had worked jointly to make their surcharges more onerous during the Class Period relative to the prior period.

263. These results, taken together with the analysis above showing non-universal application of Defendants' revenue-based surcharges following the purported implementation of conspiracy in July 2003, indicate that Class Period fuel surcharges were neither higher nor more widespread than would be expected based on the fuel surcharges in place prior to the asserted implementation date. The findings indicate that shippers did not pay, in the aggregate, more than competitive fuel surcharges. I address this point and its implications for Prof. Rausser's impact and damages analyses more fully in Sections VI and VII below.

# V. ASSESSING THE ECONOMIC LOGIC AND FEASIBILITY OF THE ALLEGED CONSPIRACY

## A. The Role of Economic Analysis

264. As we have seen, economic analysis can be employed to assess the observed *conduct* of alleged conspirators: Is their conduct in the marketplace consistent with their individual and separate pursuit of their unilateral, non-conspiratorial business interests, or is that conduct only economically explained as conspiratorial? In Section IV, we saw that, in the case at hand, the central elements of Defendants' conduct vis-à-vis their fuel surcharge programs did not contradict the conduct expected of non-conspiring railroads; and, in key respects, that conduct was inconsistent with the conduct expected of railroads participating in the conspiracy alleged by Plaintiffs and Prof. Rausser.

265. Economic analysis can also be used to assess the feasibility, likelihood of success, and rationality of participating in an alleged conspiracy. In particular, the "structural" aspects of an industry and the markets in which the industry operates make it either more or less likely that a conspiratorial agreement could be struck and, if struck, whether such an agreement would succeed in achieving the purported conspirators' objectives.[344] By "structural", we mean such matters as the number and variety of sellers in the market, the price and non-price dimensions over which sellers compete for customers, how the inter-seller transparency or opaqueness of the dimensions of competition of pricing make it easier or harder for individual would-be conspirators to get away with "cheating" that attracts customers from fellow conspirators, and the ease or difficulty with which new competitors can enter affected markets in the event a conspiracy tries to elevate prices so as to generate excess profits.

266. Apart from legal penalties that can befall conspirators, the fundamental internal threat to the feasibility of a successful conspiracy is what economics terms "cheating" or "defection". Any attempt at conspiracy is accompanied by incentives for individual conspirators to cheat or defect on their fellow conspirators. The reason is straightforward: If other conspirators are elevating their prices in the attempt to realize supra-competitive profits, any one conspirator can profit by undercutting such efforts with lower prices and/or more attractive non-price inducements, thereby attracting volumes of profitable business away from those who stick to the conspiratorial agreement. In the process, trust among conspirators depreciates and encourages further cheating, portending the unraveling of the conspiracy.

267. To prevent cheating and to maintain trust, an effective conspiracy must be able to monitor and detect defections, distinguishing shifts of business across conspirators that

---

344 See, for example, Pepall, Lynne, Daniel J. Richards, and George Norman, *Contemporary Industrial Organization: A Quantitative Approach*, Wiley, 2010, at 254-264.

are due to cheating from those that occur for normal or benign reasons. And a feasible conspiracy must be able to punish cheaters by imposing losses on them when they are detected defecting on the collusive agreement. All else equal, would-be conspiracies become less feasible as, for example, the number of conspirators needed in an agreement increases. This is because newly entering or already existing non-conspirators can take business from conspirators who attempt to raise prices to supra-competitive levels, because the dimensions of product and service attributes over which competition can occur become more heterogeneous and difficult to monitor, and because the price and non-price inducements that can be used to attract customers are confidential and hard to monitor, detect and punish.

268. The fundamental external threat to the feasibility of a successful conspiracy is competition from firms outside of the asserted conspiracy. A successful conspiracy, by definition, raises prices above competitive levels, inviting entry and expansion by firms who are not part of the conspiracy. Such entry and expansion steal business from the conspirators, which is costly to them and can readily undermine a conspiracy. In the case of the conspiracy Plaintiffs assert here, a large share of the Class shipments are intermodal shipments that are subject to competition from, especially, truck transport. The trucking industry is highly competitive, can expand rapidly, and can deploy trucks on whatever routes are most profitable. Thus, a successful conspiracy involving intermodal shipments or other shipments that, at the margin, could be shifted from rail to truck, would be undermined by the expansion of truck competition.

269. If conspiracy is infeasible or not likely to be successful, it is economically irrational for sellers to undertake conspiratorial conduct. Doing so by, say, artificially raising one's prices only leaves business on the table for non-conspirators (or other, would-be non-complying conspirators) to pick up, with no positive payoff to one's profitability. Canonically, if two wheat farmers among a multiplicity of wheat farmers in a market conspire to elevate and fix their prices, they harm only themselves. Thus, economic analysis can be employed to assess whether an alleged conspiracy is feasible and likely to succeed, or is infeasible or otherwise irrational for would-be conspirators to pursue.

270. In short, the less feasible the conspiracy, or to the extent an alleged conspiracy would entail economically irrational conduct against the self-interest of purported conspirators, the more difficult it will be to reject the hypothesis that marketplace outcomes are the result of non-conspiratorial conduct. Prof. Rausser, in fact, concurs with this framework for economic analysis, indicating that if the industry conditions were not conducive to conspiracy and "didn't pass that test" of feasibility, he "wouldn't