# Exhibit 112

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re: RAIL FREIGHT FUEL | ) MDL No. 1869 |
| SURCHARGE ANTITRUST LITIGATION | ) MISC No. 07-489 |
| | ) (PLK/AK/JMF) |
| This Document Relates To: | ) |
| DIRECT PURCHASE CASES | ) |
| | ) |

HIGHLY CONFIDENTIAL

Videotaped Deposition of Joseph P. Kalt

Washington, D.C.

Wednesday, May 7, 2014

8:39 a.m.

Job No. 247766

Pages: 1-340

Reported by: Bonnie Russo

Page 2

Deposition of Joseph P. Kalt held at:

Quinn Emanuel Urquhart & Sullivan, LLP
777 6th Street, N.W.
Washington, D.C.

Pursuant to agreement, before Bonnie Russo, Court Reporter and Notary Public in and for the District of Columbia.

Page 3

A P P E A R A N C E S

ON BEHALF OF THE DIRECT PURCHASE PLAINTIFFS:
STEPHEN NEUWIRTH, Esq.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
777 6th Street, N.W.
Washington, D.C. 20001
Telephone: (202) 538-8000
stephenneuwirth@quinnemanuel.com
-and-
KYLE R. TAYLOR, Esq.
RICHARD I. WERDER, JR., Esq.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
kyletaylor@quinnemanuel.com
rickwerder@quinnemanuel.com
-and-
SETH R. GASSMAN, Esq.
HAUSFELD, LLP
1700 K Street, N.W.
Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7226
sgassman@hausfeldllp.com

Page 4

APPEARANCES (CONTINUED):

ON BEHALF OF THE DIRECT PURCHASE PLAINTIFFS:
PAUL M. DONOVAN, Esq.
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
Telephone: (202) 298-8100
paul.donovan@laroelaw.com

ON BEHALF OF THE DEFENDANT BNSF RAILWAY COMPANY:
JOSHUA H. SOVEN, Esq.
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
jsoven@gibsondunn.com
-and-
LINDA S. STEIN, Esq.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8185
lstein@steptoe.com

Page 5

APPEARANCES (CONTINUED):

ON BEHALF OF THE DEFENDANT CSX TRANSPORTATION, INC.:
DAVID D. CROSS, Esq.
LUKE van HOUWELINGEN, Esq.
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2583
dcross@crowell.com
lvanhouwelingen@crowell.com

ON BEHALF OF THE DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY:
SEAN M. TEPE, Esq.
JOHN M. NANNES, Esq.
TARA L. REINHART, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7106
sean.tepe@skadden.com
john.nannes@skadden.com
tara.reinhart@skadden.com

APPEARANCES (CONTINUED):

ON BEHALF OF THE DEFENDANT UNION PACIFIC RAILROAD COMPANY:
THOMAS A. ISAACSON, Esq.
COVINGTON & BURLING, LLP
1201 Pennsylvania Avenue, N.W.
Washington D.C. 20004
Telephone: (202) 662-5082
tisaacson@cov.gov
-and-
TIM O'MARA, Esq.
LATHAM & WATKINS, LLP
505 Montgomery Street
Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
tim.omara@lw.com

Also Present:
Deidre Ciliento, Compass Lexecon, Economist
Don Fletcher, Union Pacific Railroad Company, Corporate Representative
David Cooper, Videographer



CONTENTS

EXAMINATION OF JOSEPH P. KALT PAGE

BY MR. NEUWIRTH 10
328

BY MR. CROSS 321

EXHIBITS

Exhibit 1 E-Mail dated 4-29-03 148
Attachment
UPFSC 012913

(Exhibit included with transcript.)



JOSEPH P. KALT
PROCEEDINGS

THE VIDEOGRAPHER: Here begins Video Disk No. 1 in the video deposition of Joseph P. Kalt in the matter of In Re: Rail Freight Fuel Surcharge Antitrust Litigation in the United States District Court for the District of Columbia. Case No. 07489 PLF/AK/JMF.
Today is Wednesday, May 7th, 2014. The time on the video monitor is 9:39:03 a.m.
We are now on the record. My name is David Cooper. I'm the certified legal video specialist with Merrill Legal Solutions, 25 West 45th Street, Suite 900, New York, New York 10036.
This video deposition is taking place at Quinn Emanuel in the Lincoln Room located at 777 6th Street, Northwest, the 11th floor, Washington, D.C. 20001.
Would counsel and all present please introduce themselves and who they represent.
MR. NEUWIRTH: I would just ask the videographer to correct the statement. You said that the time on the monitor is 9:39 a.m.,



JOSEPH P. KALT
and it is not 9:00 yet today.
THE VIDEOGRAPHER: Thank you. It is actually 8:39:54 a.m. and now we are on the record.
MR. NEUWIRTH: Stephen Neuwirth from Quinn Emanuel for the plaintiffs.
MR. TAYLOR: Kyle Taylor from Quinn Emanuel for the plaintiffs.
MR. WERDER: Rick Werder, Quinn Emanuel for the plaintiffs.
MR. GASSMAN: Seth Gassman, Hausfeld, LLP for the plaintiffs.
MR. DONOVAN: Paul Donovan, LaRoe Donovan for the plaintiffs.
MS. REINHART: Tara Reinhart, Skadden Arps, for Norfolk Southern Railway Company.
MR. NANNES: John Nannes from Skadden for Norfolk Southern Railway Company.
MR. FLETCHER: Dean Fletcher, Union Pacific Railroad.
MS. CILIENTO: Deidre Ciliento, Compass Lexecon.
MS. STEIN: Linda Stein representing

JOSEPH P. KALT

BNSF Railway Company.
MR. HOUWELINGEN: Luke van Houwelingen, Crowell & Moring for CSX Transportation.
MR. O'MARA: Tim O'Mara, Latham & Watkins, for Union Pacific.
MR. TEPE: Sean Tepe, Skadden Arps, for Norfolk Southern Railway.
MR. SOVEN: Josh Soven, Gibson Dunn, for BNSF Railway Company.
MR. ISAACSON: Tom Isaacson, Covington & Burling, for Union Pacific.
MR. CROSS: David Cross of Crowell & Moring for CSXT.
THE VIDEOGRAPHER: The court reporter, Bonnie Russo of Merrill Court Reporting, will now swear in the witness.
JOSEPH P. KALT,
being first duly sworn, to tell the truth, the whole truth and nothing but the truth, testified as follows:
EXAMINATION BY COUNSEL FOR DIRECT PURCHASE PLAINTIFFS
BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. Good morning, Dr. Kalt.**
A. Good morning.
**Q. You have before you a small three-ring binder. Is it correct that in that binder is a copy of the declaration that you prepared in this case dated May 6, 2014?**
A. Yes. It's -- I believe it's the copy that I provided to you all yesterday which corrected various typos and so forth.
**Q. And is there anything else in the binder besides that declaration?**
A. Just the list of errata that you were already -- you were also presented.
**Q. Okay, thank you very much.**
**And let me just hand you a copy of that declaration. I take it that this document which says originally filed March 31st, 2014 errata, corrected May 6th, 2014, and incorporating errata dated April 3rd, 2014 and May 6th, 2014, is the declaration that you have got in your book, correct?**
A. Yes. Yes.
**Q. Thank you very much.**
**Now, as of today, have you formed**



**JOSEPH P. KALT**

**any opinions about this matter as an expert that you intend to put forward in this case but that are not set forth in the revised declaration dated yesterday that is in your book?**
A. No.
MR. CROSS: To be clear, are you -- he has got another report in this case, too. Are you including that report?
MR. NEUWIRTH: I am asking him about this -- I am asking him about --
THE WITNESS: Just this one? I thought you were talking about up to this point.
BY MR. NEUWIRTH:
**Q. Well, let me --**
A. I have two reports.
**Q. Well, let me ask you this: As of today, have you formed any opinions about this matter as an expert that you intend to put forward in this case that are not set forth in either your revised declaration that was submitted to us yesterday, or the merits report that you previously provided to us in this**



**JOSEPH P. KALT**

**case?**
A. No. I think I have provided all my opinions thus far.
**Q. Now, as we just noted, the earlier report that you submitted was framed as an expert report, and what you have submitted in these remand proceedings is a declaration.**
**What is the reason that, for these remand proceedings, you have submitted a declaration rather than an expert report?**
A. I don't know. It has something to do with the legal requirements or legal -- I regard these as my opinions.
**Q. What is your understanding of the legal requirements that called for you to submit a declaration at this stage of the proceedings as opposed to the type of report that you submitted earlier?**
A. I don't know.
**Q. I take it this is something that you were advised by counsel to do?**
A. They told me this one was called a declaration. I would have written the same words whether it was a report or a declaration.

**Q. What circumstances caused you to take emeritus status on the Harvard faculty in 2012?**

A. I have a joint institute between a big project that I have at Harvard called the Harvard Project on American Indian Economic Development and we were instrumental and essentially cofounded with my codirector an institute at the University of Arizona and -- called the Native Nations Institute and I was increasingly spending my time working at the latter -- it's the primary venue through which we deliver executive education -- education to various leaders, decision makers and so forth.

I keep my project at Harvard still, but by going emeritus, I was able to cut back on my teaching east and now I am centered with my teaching in the west.

**Q. Since 2012, has the amount of time you spend each year as an expert doing work through Compass Lexecon increased?**

A. Probably, you know, over an entire year probably.

**Q. It's correct that you're familiar**





**with the term "prediction error" in the context of econometrics?**

A. Yes.

**Q. What do you understand the term "prediction error" to mean in econometrics?**

A. Well, in the context such as we have here, the prediction error would refer to the difference between a predicted value and an actual value being generated through econometric regression analysis.

**Q. And is it correct that prediction error is inherent in regression modeling?**

MR. CROSS: Objection to form.

THE WITNESS: Yes, you could make up models that had no prediction error but they wouldn't be expected to be found in the real world.

BY MR. NEUWIRTH:

**Q. Are you familiar, at least as a general matter, with the statistical and econometric literature related to regression modeling?**

A. Sure.

**Q. Is it correct that in that**





**literature, it is understood that if you run a model on a very small number of observations, you are more likely to have a prediction error than if you run the model on a very large number of observations, just as in general?**

A. It's hard to say that. You have to have models that are correctly specified so, for example, if you have a model that was poorly specified but have a large amount of data, you can get garbage and have very wide prediction errors.

**Q. Well, let's talk about just a single model. Let's say there were a model that you felt was well-specified. I am just speaking hypothetically now.**

**Do you agree as a general matter that in that particular model, if you run the model on a very small number of observations, in general, you are more likely to have prediction error than if you run that model on a very large number of observations?**

A. That can happen but it is a little hard to generalize. In other words, if you take the same model and you pour additional





data into it, that doesn't have characteristics like the data that you have been using for the smaller model, you can get different results, but -- so I think that how you would have to think about that.

**Q. So let's just assume now that you have a model that you feel is properly specified and you have data which is equally good in terms of -- in terms of the characteristics. If you, just as a general matter, run a smaller number -- a smaller number of observations through the model, are you more likely to have prediction error than if you run a larger number of observations with those assumptions?**

MR. CROSS: Objection to form.

THE WITNESS: As a general matter, that can happen. Again, because models are not -- may be well-specified but are not perfectly specified, you can get different results.

BY MR. NEUWIRTH:

**Q. Sticking with the context of econometrics and regression modeling, are you familiar with the concept of data mining?**

**JOSEPH P. KALT**

A. Sure. I talk about it in my report.

**Q. And can you explain what you understand data mining to refer to in the context of econometrics?**

A. Well, as I quote in my report, and I refer you to my report, I don't know if I will use the same words, but data mining refers to, for example, searching and testing a model across various data sets and, for example, then reporting only a subset of results or cherry pick results in order to make a point that is actually contained only on those particular results, not on the overall data analysis when it's done.

**Q. Now in this last answer, you made reference to cherry picking results.**

**Do you understand in the context of econometrics that data mining and cherry picking refer to the same thing?**

MR. CROSS: Objection to form.

THE WITNESS: There is an overlap but the two VIN diagrams are not exactly on top of each other, no.

BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. Okay. So what is included in data mining that is not included in cherry picking?**

MR. CROSS: Objection to form.

THE WITNESS: Well, what I said was you would -- in data mining, for example, you might run your model on a whole bunch of different data sets and then select and report only subsets of results, so that would be a form of cherry picking but not all -- there's different kinds of cherry picking one might imagine happening in the world.

BY MR. NEUWIRTH:

**Q. Your understanding is, you said that you could have a VIN diagram with two circles, one representing data mining and one representing cherry picking.**

**Is there anything that you consider to be data mining in the context of econometrics that is not a form of cherry picking?**

MR. CROSS: Objection to form.

THE WITNESS: There could be instances of that, yes.

BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. Can you tell me what those instances might be?**

A. You might selectively -- instead of selectively reporting results, you might selectively be altering your data set for example, and doing it in a fashion that reflects data selection unguided by the theory of the matter at hand.

**Q. And when you talk about data selection unguided by the theory of the matter at hand, does that have anything to do with whether your starting point in the regression modeling is a maintained hypothesis?**

MR. CROSS: Objection to form.

THE WITNESS: Not necessarily. Not that way that has been used here. I talk about that in my report. That phrase has been misused by Professor Rausser in this case.

BY MR. NEUWIRTH:

**Q. Well, that wasn't my question. My question -- we are just talking now generally about what you understand about econometrics. I am just asking you your opinions.**

**So would you consider evaluating the**



**JOSEPH P. KALT**

**results of a regression model without having a maintained hypothesis to be a form of data mining?**

MR. CROSS: Objection to form.

THE WITNESS: Without having a maintained hypothesis. If you had a maintained hypothesis, you would want to test that maintained hypothesis with various tests. Those would be guided by the fact that you are testing the, quote, "maintained hypothesis."

BY MR. NEUWIRTH:

**Q. So is it your understanding that the correct use of a regression model -- I am now talking just generally, I am not asking you anything about your opinion of whether Dr. Rausser did this in this case, I am just asking just about econometrics.**

**Is it your understanding that a regression model should be testing maintained hypothesis?**

MR. CROSS: Objection to form.

THE WITNESS: You may use regression models to test maintained hypotheses the way I have done here, for example, so that is one way

JOSEPH P. KALT

to test maintained hypotheses, yes.
BY MR. NEUWIRTH:
**Q. Right. And is it correct that in those instances when you use a regression model to test a maintained hypothesis, you need to have the maintained hypothesis before you design and implement the regression model?**
MR. CROSS: Objection to form.
THE WITNESS: Well, typically, there will be a maintained hypothesis, say, put out by an expert, in this case Professor Rausser, and that it would be appropriate to test that maintained hypothesis which is what I have done in my report.
BY MR. NEUWIRTH:
**Q. If you could turn in your report, please, to Paragraph 23. Unless I tell you otherwise, I am always going to be referring to paragraphs in your report as opposed to page numbers.**
A. Sure.
**Q. Okay. And do you see that at the start of Paragraph 23, you say that: "A standard and practical means of testing whether**



**JOSEPH P. KALT**

**a model can reliably isolate the effects, e.g., on prices of claimed harmful conduct from the effects of other causes is to apply the model to situations where the harmful conduct is known to be absent. This is testing for false positives."**
**Do you see that?**
A. Yes.
**Q. So when you refer in this paragraph to a standard and practical means of testing, is it correct to assume that this did not just in recent weeks or months become a standard in practical means of testing?**
A. I don't believe so. I cite for you, for example, I cite for you the work of Phillip Areeda and Hovenkamp about this and Phil wrote that a long time ago.
**Q. Right. So the standard and practical means that you are referring to here, I assume is something that you understand to have been in place for a long time; is that correct?**
A. I don't try to go back and look how long, but it was not a recently -- a recent



JOSEPH P. KALT

innovation of the scientific method.
**Q. And certainly, it was a standard and practical means of testing, according to you, at the time you submitted your merits report in this case, correct?**
A. Yes, I did tests of that nature.
**Q. Now, are you familiar with the fact that in your merits report, the phrase "false positives" only appeared three times?**
A. I have never tried to count. I recall I used it but I never tried to count.
**Q. Okay. Do you recall that to the extent you used that phrase, it was in connection with arguments that you made about structural breaks? And I am now talking about in your merits report.**
A. That may have been the case. Again, I didn't try to count and go back and look up the use of that word in that report.
**Q. Right. Well, did you review your merits report recently in preparation for this deposition?**
A. Yes.
**Q. Are you aware of anyplace other than**



**JOSEPH P. KALT**

**in connection with discussing structural breaks that you used the term "false positives" in your merits report?**
MR. CROSS: Objection to form.
Do you want him to review it?
MR. NEUWIRTH: I am just asking if he knows.
THE WITNESS: I would have to go back and look. I didn't -- when I reviewed my report, I wasn't trying to count the use or particularly focused on that matter.
BY MR. NEUWIRTH:
**Q. Now I take it that you are certainly familiar with the fact that the phrase "false positives" appears frequently in the declaration that you have submitted in these remand proceedings?**
A. Certainly, yes. I cite that many times.
**Q. And you have said, in fact, that Dr. Rausser's model is rife with false positives, correct?**
A. Yes.
**Q. So if false positives is a standard**

JOSEPH P. KALT

**and practical means of testing whether a model can reliably isolate the effects of claimed harmful conduct from the effects of other causes, as you say in your report, how did you miss all of these false positives at the time you prepared your merits report?**

MR. CROSS: Objection to form. Argumentative and misstates the facts.

THE WITNESS: I don't think I understand your question. You are misstating what I did in my prior report.

BY MR. NEUWIRTH:

**Q. Well, your earlier report never said that Dr. Rausser's model was rife with false positives, did it?**

MR. CROSS: Objection to form.

THE WITNESS: I don't know if I used that phrase, but you will recall, for example -- let's assume you are correct, I haven't tried to count, let's assume you are correct, and in my merits report, I used the word false positives in connection with the testing for structural breaks.

You recall I also did tests, for



JOSEPH P. KALT

example, using legacy shipments rather than class shipments, and I don't recall exact phrasing, but you all quoted in your remand brief that I was using the phrase -- same phrasing that I use here at first opening sentence of Paragraph 23, that is, finding damages where there should not be damages so I may not have called it a false positive, but I am sure using the concept, and as I say, you even cite that quote almost from my -- in your remand brief, I can't remember the page, but it is fairly early in your remand brief as I recall, and you cited it from my merits report.

BY MR. NEUWIRTH:

**Q. So you think that you said in your merits report that there was a false positives problem with legacy contracts --**

MR. CROSS: Objection to form.

BY MR. NEUWIRTH:

**Q. -- not in words or substance?**

A. Not in words or substance?

**Q. I said in words or substance.**

A. I think in substance, I said something to the effect of -- some phasing, as



JOSEPH P. KALT

I recall you even quote it, something to the effect of finding damages where there should be none or some phrase like that.

**Q. And you think we quoted that from your report?**

A. I believe so, yeah.

**Q. Okay. Isn't it correct that in your merits report, your argument about legacy contracts was that they should have been an alternative benchmark for testing whether the alleged conspiracy had any effect during the class period?**

A. That was certainly one of the analyses that I did, yes.

**Q. What other analysis did you do of that in your merits report? By that, I mean what other analysis of legacy contracts did you do in your merits report?**

A. I would have to see a copy of my merits report just to be accurate.

**Q. I am now handing you the expert report of Joseph P. Kalt, which says on the cover: "Errata Corrected March 1st, 2013."**

MR. NEUWIRTH: Does anybody else



JOSEPH P. KALT

need a copy of this?

MR. CROSS: Is there a question pending?

BY MR. NEUWIRTH:

**Q. Yes. The question is: What other analysis did you do of that in your merits report? By that I mean what other analysis of legacy contracts did you do in your merits report?**

MR. NEUWIRTH: And Dr. Kalt said I would have to see a copy of my merits report just to be accurate.

MR. CROSS: And I'll object to this as being beyond the scope of the deposition which is supposed to be limited to his declaration.

THE WITNESS: For example, at paragraph -- I'm sorry, at Figure 7-2, Page 338, I do an analysis that is essentially reproduced in terms of its basic approach in Figure 1 of my class of merits report.

It deals with the fact that the model finds damages for nonclass legacy traffic and it shows that result. It is pretty much

JOSEPH P. KALT

like my -- actually, this is based on the class of merits model which I have in Appendix 1 of my current report or declaration.

I will probably say report throughout today, but referring to my most recent report or declaration. The numbers differ slightly because Dr. Rausser's data changed slightly, but I did that analysis.

BY MR. NEUWIRTH:

**Q. In your merits report, wasn't the conclusion that you were drawing from that table set forth in Paragraph 517 saying: "Thus, Professor Rausser's model finds a structural break where it should not"?**

A. That's one of the conclusions, yes. It also says right above it, these overcharges are comparable to the results shown in Figure 7-1 for class traffic.

Do you see that above it? That was also one of the conclusions.

**Q. Now, in your --**

A. I just say that because I kept refiguring to my Figure 1 in this report where I drew this as a line essentially and showed



JOSEPH P. KALT

the lines were practically right on top of each other. That is what that last sentence is basically saying.

**Q. Now, you say in Footnote 25 on Page 12 of your declaration that: "You understand that the D.C. Circuit uses the term false positive to describe the detection of injury where none could exist."**

**Do you see that?**

A. Yes, I see that.

**Q. And you say: "That is how you use the term in my expert report and in this declaration."**

**Do you see that?**

A. Yes.

**Q. Now, in Paragraph 23 in the carryover section on Page 12 about eight lines down, there is a sentence that begins: "Similarly."**

**Do you see that?**

A. Yes.

**Q. And there you say: "Similarly, if a damages model finds damages where it should not, e.g., in data where the alleged collusive**



**JOSEPH P. KALT**

**conduct is known to be absent and/or not coherently asserted to exist, these are false positive results."**

A. Yes.

**Q. Do you see that?**

A. Yes.

**Q. Where did you get the standard not coherently asserted to exist as a basis for determining that there was a false positive?**

A. Particularly in the context of, say, litigation, if you have to deal with the case that is put before you, you all now say that you believe and assert and claim that alleged conspiratorial conduct commenced in -- I think the first document you cite are March 2003 and Professor Rausser uses March 2003 as well.

Because the human voice is capable of doing just about anything, you can come back now and say, in response to one of my figures, no, the conspiratorial conduct began in 2001. Within the context of your claims, that wouldn't be coherent, coherently asserted, and so recognizing you could say that, I am saying I understand that, you can say it, but I have



JOSEPH P. KALT

to deal with the actual case as being pled or dealt with at hand.

**Q. So what does that have to do with false positives?**

A. For example, I do analyses showing, for example, false positive structural breaks in the period before the plaintiffs allege a conspiracy -- conspiratorial conduct began, and before the period in which Professor Rausser used to assert or maybe still does assert the conspiratorial effects began, and so I am saying that in previous periods, if the structural break, for example, is taken as Professor Rausser says as, quote, "evidence of the conspiracy itself," end quote, then those would be false positives.

They are not -- it is not a structural break that would be evidence of the conspiracy itself in a period that is completely outside the claimed period conspiracy.

**Q. Right. Now -- but that would fall into the category of where -- when you talk about the period outside the conspiracy where**

JOSEPH P. KALT

**the alleged collusive conduct is known to be absent, right?**

A. Not asserted is what I am saying. That's what that sentence is saying. Known and not asserted.

**Q. Well, you say: "Not coherently asserted."**

A. Yes.

**Q. If the class period is defined and you are talking about something that takes place outside the class period, and that would be -- that would fit into the category presumably of saying where the alleged collusive conduct is known to be absent, right, because you are saying in that example, you are arguing that if there is a period of time where something happens that is not when the conspiracy was going on, that would be something that is alleged collusive conduct known to be absent, right?**

MR. CROSS: Objection to form.

Are you now representing that the conspiracy period is limited to the class period?



JOSEPH P. KALT

MR. NEUWIRTH: My question had nothing to do with that. That is a ridiculous objection.

MR. CROSS: Sure, it did.

MR. NEUWIRTH: No, I'm asking him about his answer.

BY MR. NEUWIRTH:

**Q. You said -- you said -- what is so funny about this, Dr. Kalt, that you are laughing?**

A. Well, you said something outside the class period couldn't -- you referred specifically to the class period.

**Q. Right, because you said, quote: "If the class period is defined," and you are talking about something that takes place outside the class period, that would fit into the category presumably of saying here the conduct is known to be absent?**

A. What I said to you, if you look back at the answers, I referred both to March and July of 2003 and I said under one version of the plaintiffs' theory, you all announce that the conspiratorial conduct began in March.



JOSEPH P. KALT

Professor Rausser says that now. I tested that by looking at breaks back, say, in 2001. I've also tested in various cases where Professor Rausser said the effects of conspiracy began in July of 2003. I have also tested that.

So there is somewhat of a distinction as you can see between effects and conspiratorial conduct in your theory and I have tested both of those fairly consistency. All my figures test both March and June, and just --

**Q. In either one of those tests, what you are looking at is -- you're saying if the conspiracy started at a certain point of time, I am going to test what happened in the period before that.**

A. That is one of the tests I do, yes.

**Q. Right. And so when you are doing that test, you are testing whether -- you are testing data where you say the alleged collusive conduct is known to be absent, right?**

MR. CROSS: Objection to form.

THE WITNESS: Where it is known to be absent or not coherently asserted.



JOSEPH P. KALT

BY MR. NEUWIRTH:

**Q. Well, you keep saying, "not coherently asserted," but the example you gave where you test -- where you do a test where you say if I assume that the start was March 2003 and I look at what happened in the period before that, you are treating the period before that, right, as a period where the alleged collusive conduct is known to be absent, right?**

A. And/or not coherently asserted.

**Q. Well, how does that have anything to do with the coherence of the assertion? You have got a very clear assertion. I'm testing -- you say there is an assertion that the class period started in March 2003, and now I'm going to look at the period before that. What is incoherent in the assertion about March 2003?**

A. I am not referring to that. I am referring to the potential assertion by the plaintiffs when it sees that the model produces structural breaks, let's say, back in 2001 and 2002. You might come back and say, well, now, we think the conspiracy started earlier.

The reason that is not coherent is

Page 38

JOSEPH P. KALT

you are starting to create an untestable theory. Anytime we find a structural break, you come back and say, well, that is when the conspiracy started. And indeed, you can see that in the evolution of Professor Rausser's treatment of July 1st, 2003.

**Q. And tell me where you see that in his treatment of July 1st, 2003.**

A. Here -- I have a section in my report about this in which he says quite clearly that he did -- I think he uses the phrase many hours of analysis or some phrase like that I quoted, in which he says, he had -- previously, he had determined that the effects of conspiracy began in July 1st -- on July 1st, 2003.

He then subsequently argues now in his remand report, I think you all call it the supplementing declaration, but you will understand what I mean by his remand report?

**Q. Yes, I do.**

A. He now says that effects or consequences began sometime between March and July 2003. So the theory evolved, is what I am

Page 39

JOSEPH P. KALT

saying in other words.

**Q. Now when you wrote this section of the report that you just referred to, the section of your remand declaration that you just referred to, where you say that Dr. Rausser's theory changed.**

A. Yes.

**Q. At the time that you wrote that, did you review in connection with that, the reports that Dr. Rausser had submitted on class certification?**

A. Yes, I had, yes.

**Q. Including his reply report on class certification?**

A. Yes. Yes.

**Q. And that was something you took into account in reaching those conclusions?**

A. Yes. He had said at the time of his merits deposition, for example, regardless of what he had said earlier, he said very strenuously that the effects, the consequences -- I italicized it when I quoted I believe here, began July 1st, 2003 and now he doesn't, and I was aware of his prior reports but that's

Page 40

JOSEPH P. KALT

what his theory was at that moment.

**Q. And it is based on that understanding that you set forth the conclusions in your reply deck -- in this remand declaration, correct?**

A. No. No. That is not accurate. What I have done is I have looked at both. Again and again, I test just about every single time as I recall. Let's take the effects beginning in March. Let's take the effects beginning in July of '03, so I have done both.

In other words, notwithstanding what he said, I have looked at both versions of the theory.

**Q. I think you misunderstood my question or it may have been unclear.**

**What I was saying is your conclusion that Dr. Rausser's theory had changed was based on your understanding that at the time of his merits deposition, he said strenuously that the effects, the consequences began in July 1st, 2003 and now he doesn't. Right? That's what you just testified.**

MR. CROSS: Objection to form.

Page 41

JOSEPH P. KALT

BY MR. NEUWIRTH:

**Q. That's the basis for your view that his position evolved, correct?**

A. I set forth the basis of this view primarily at Paragraphs 25, 26, 27, and what I said there was beginning with -- really, Footnote 28, you see I am referring to Professor's class report at 113, class reply report 47 merits reported at 10162 and 163, merits reply report at 7, deposition of December 11th, 2012, and there I -- and then I quote him in Paragraph 26, I quote him actually several times.

You see the quote on 30 was what I was referring to. His merits deposition says, quote: "The actual execution of the claimed conspiracy in terms of anticompetitive consequences." You see I mentioned --

**Q. Where are you?**

A. Paragraph 25.

**Q. Yep.**

A. I told you I italicized the word "consequences." There, you see it. That is from his merits deposition at 13. In answer at

JOSEPH P. KALT

that merits deposition as well, at 45, he says that the precise date, the last sentence of 25, the precise date of the first effect of alleged conspiracy in the form of structural break was July 2003.

**Q. My question is --**

A. And then -- I'm sorry. There is more in the next two paragraphs as well.

**Q. And in writing this Paragraph 25, 26 and 27, is it correct that you reviewed and considered Dr. Rausser's reply report on class certification?**

A. Yes. You can see me citing it there.

**Q. Now, turning back to Paragraph 23 where you talk about data where the alleged collusive conduct is known to be absent and/or not coherently asserted to exist, does the D.C. Circuit opinion that you reference in Footnote 25 talk about this test of not coherently asserted to exist?**

MR. CROSS: Objection to form.

THE WITNESS: I don't know if they use that phrase, but I understand that the



JOSEPH P. KALT

Court in the discussions that I can see took into account the claim that -- of the plaintiffs that conspiratorial conduct began in March of 2003 and treated that, as I understand it, as saying well, conduct could not -- uses the phrase could not exist prior to that. It doesn't use that phrase, but that's the logical implication. That doesn't --

BY MR. NEUWIRTH:

**Q. You are talking again about the first part of the sentence?**

A. I'm going to finish. Let me finish.

MR. CROSS: Just let him finish.

THE WITNESS: That doesn't -- again, that doesn't preclude you all from now saying, well, or actually think the conspiracy began in 2001, but given your claims as they stand, then the District Court would be right, No. 1, damages could not exist in the preperiod prior to March 2003, and second, you could not coherently assert that they did given your current claims. I think that is consistent with the reasoning of the Court.

BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. So is it correct that your position is that this concept of not coherently asserted to exist can be derived from the D.C. Circuit opinion in this case?**

MR. CROSS: Objection to form.

THE WITNESS: I believe that the logic of your claims means that it can be derived, yes. That is if your claim is the conspiratorial conduct began in March of 2003, then in the context of your claims, it would not be coherent for you to now assert the contrary and damages could not exist coherently in the period, the prior period.

BY MR. NEUWIRTH:

**Q. I didn't ask you anything about our claims. My question was: Is it your position that this concept of not coherently asserted to exist that you set forth in Paragraph 23 can be derived from the D.C. Circuit opinion in this case which you say sets forth the way that you used the term false positives?**

MR. CROSS: Objection to form. Asked and answered. The decision is all about your claims.



JOSEPH P. KALT

THE WITNESS: Yes, for the reasons I stated in my last answer, yes, I believe it can be derived as a simple matter of logic and that's what I apply here.

BY MR. NEUWIRTH:

**Q. When you say, "derived as a simple matter of logic," you mean from the D.C. Circuit opinion?**

A. D.C. Circuit in the context of -- D.C. Circuit opinion in the context of your claims. It's all about, as David said, it's all about the claims, right, what you claim, and so I believe that is accurate.

**Q. Okay. Now, does this concept of coherently asserted to exist appear in the Areeda and Hovenkamp antitrust law treatise that you cite in Footnote 25?**

A. Again, I belive for the same reasons it would. They are talking about a legal context and for the exact same reasons, I believe that it would be derived -- derivable -- I don't know if they use that phrase, but it would be directly derivable as a matter of logic of the flow of claims and then testing of

JOSEPH P. KALT

claims.
**Q. But it is not there. You say it can be derived but certainly, Areeda and Hovenkamp don't make any reference to anything like that in the treatise that you refer to, correct?**
MR. CROSS: Objection to form.
THE WITNESS: I would have to go back and look at that. They do have discussion about -- as I recall, if a plaintiff says X and that is their claim, I don't know the exact words they use, but they have some discussions of that nature as I recall.
BY MR. NEUWIRTH:
**Q. So is it your position that this concept of not coherently asserted to exist can be derived from that Areeda and Hovenkamp treatise?**
A. Yes.
**Q. Now I take it when you -- apart from this derivation that you say can be done from the D.C. Circuit opinion and the Areeda and Hovenkamp antitrust law treatise, is there any other source that you can identify for this not coherently asserted to exist framework that you**



**JOSEPH P. KALT**

**discuss in Paragraph 23 of your remand declaration?**
A. There may be. I haven't tried to memorize anything but there may be.
**Q. Well, the question is: Is there anything that you are aware of now, given that you are here asserting this as a standard?**
A. Again, I haven't tried to memorize anything. I would have to go back and look through various pieces of the literature to give you a specific citation.
**Q. Under this framework you have articulated of not coherently asserted to exist, who decides what is coherent?**
MR. CROSS: Objection to form.
THE WITNESS: I think that the actual decider in some sense, to use the George Bush phrase, but the decider is logic. That is, if the claim is X not X, then you can test for false positives in the not X context. It is a matter of logic. If you mean in a legal sense, the Court decides all of these questions.
BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. So is it the Court or an economic expert who's in a position to know whether something has been coherently asserted to exist?**
MR. CROSS: Objection to form.
THE WITNESS: I don't know if one can generalize about everything. I think in the context such as this, if you assert that the alleged conspiracy began in March of 2003 and Professor Rausser originally asserts the facts began in July 2003, then as I say, I believe I would be confident to conclude that asserted -- I'm sorry, asserting outside of that claim, that well, now, we think they started in April 2001 or something, would not be coherent in the context of the claims.
That is actually just a matter of X not X. And so I think that I would have the ability to detect that in the plaintiffs' claims.
BY MR. NEUWIRTH:
**Q. So is -- anytime there is a change in the claim, does that render the theory of the case not coherent?**



**JOSEPH P. KALT**

MR. CROSS: Objection to form.
THE WITNESS: It would depend upon whether the change in the claim was in response to false positive findings or was, in fact, independently derived and asserted at the time of the doing the testing for false positives.
BY MR. NEUWIRTH:
**Q. How about if it's based on the evidence and the record of the case?**
MR. CROSS: Objection to form.
BY MR. NEUWIRTH:
**Q. Would that be --**
A. That's what I was referring to. I was referring to in the last part of my answer.
**Q. Now, you said in this past discussion that you were talking about how if a conspiracy is alleged to exist starting on a certain date. Let's say just making one up, June 2005.**
A. Okay.
**Q. You said that in looking whether there is false positives, you said that damages could not exist in the preperiod and if they did, that would be a false positive, correct?**

**JOSEPH P. KALT**

A. If in the context of some analysis the claim by one party was the conspiracy began on July 1st, 2005, then by -- the word "began" contains in it the converse of not began, I believe that the claim -- you are telling me the claim -- that it did not began prior to July 1st, 2005, it is not an ambiguous thing according to your hypothesis.

**Q. Now in this case, Dr. Rausser's model has not found damages for legacy contracts prior to the start of the alleged class period, has it?**

MR. CROSS: Objection to form.

THE WITNESS: There are no legacy contracts. If you mean on the tests where you stopped the data?

BY MR. NEUWIRTH:

**Q. I am just saying in general. Dr. Rausser -- there has been no finding in this case by Dr. Rausser, has there been, that legacy -- that his model shows damages for legacy contracts in the preclass period, right?**

A. That is actually not true.

MR. CROSS: Objection to form.



JOSEPH P. KALT

Vague.

THE WITNESS: That is actually not true. He says -- begins to say in his class reply report that when he is presented with evidence that there are damages in the months leading up to July 1st, 2003 in the start of the class period, he actually says that -- and I think he even runs a test and says that the period beginning in March had been also affected, and so what you said I think is not accurate actually.

BY MR. NEUWIRTH:

**Q. Well, Dr. Rausser, in that instance -- you can have whatever position you have about it, but in that instance, Dr. Rausser took the position that there were -- that the conspiracy began earlier than July 2003, correct?**

A. At that position, he said that there were -- the conspiracy had begun earlier than 2003, earlier than the class period, and your question previously asked about whether he ever said there were damages before the class period --



JOSEPH P. KALT

**Q. Right.**

A. And there were.

**Q. Right.**

A. And he said there were.

**Q. I want to ask a more refined question.**

A. Okay.

**Q. Dr. Rausser's model has never been used by Dr. Rausser in this case to show damages to legacy contracts in a period earlier than when Dr. Rausser said the conspiracy was in effect, correct?**

A. So you are basically moving it back to March. I am just trying to keep your dates clear.

And now can I have the question again, I apologize.

**Q. Yes. Well, let me just do it to make it easier.**

**Dr. Rausser has never used his model in this case to find damages for legacy contracts prior to March 2003, correct?**

A. I believe that it is correct that Professor Rausser did not test his model with



JOSEPH P. KALT

earlier break dates as I state for the reason I state in my report, he should have. It is incumbent when he makes the claim that the break is evidence of conspiracy itself to quote him. He should have, but he did not as far as I recall.

**Q. But you also have not --**

A. Wait, I take it back. He does say he has actually done a test of -- that would be the -- comparable to my figure, Figure 5. He does say that he does that. He said he did two tests. I talk about it in my report so he does say he did do that.

**Q. Have you made a finding that there were damages to legacy contracts -- let me rephrase that.**

**Have you made a finding that Dr. Rausser's model shows damages to legacy contracts prior to March 2003?**

A. I made a finding that Professor Rausser's analysis shows that there were false positive damages for the reasons -- for the definition of false positive reasons, that that model finds false positive damages for

JOSEPH P. KALT

structural breaks, essentially creating legacy at a different break than July 1st, 2003 or March 2003, for example, in my Figures 4 and 5.

**Q. But Dr. Rausser's model only shows damages for legacy contracts during the period that the model is looking at as a damages period, whether it's March 2003 or some other date, correct?**

A. He reports those. The model produces false positive damages when tested on other break periods under his methodology.

**Q. I didn't ask you about break periods. I asked you whether you had done anything -- you've done any analysis in this case which shows that if you run Dr. Rausser's model, it generates damages for legacy contracts during a period prior to March 2003?**

MR. CROSS: Objection to form.

THE WITNESS: You can't generate damages because there is no claim -- there is no -- nothing to be damaged by. It generates false positive damages. That's what Figures 4 and 5 go to.

BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. And --**

A. Of my remand report.

**Q. Right. And Figures 4 and 5 have to do with your structural break analysis, correct?**

A. Have to do with -- it's one of the things that is in there, yes, but it is actually using his methodology and testing for a finding of damages in a period in which there could not be damages or could not be asserted to be damages.

**Q. Well, the tests that you are doing there in 4 and 5 is a test of whether you found a structural break, correct?**

A. No. There are actually two columns of results. You see it says structural break, the column says, yes, yes, yes, yes, yes, and then the calculated overcharge. Those are the quantitative measures of the false positive damages average overcharge.

**Q. And how is that --**

A. I'm sorry, false positive overcharge, hence, false positive damages.

**Q. How is that so-called calculated**



**JOSEPH P. KALT**

**overcharge derived for Figure 4 and Figure 5?**

A. I employ basically Professor Rausser's methodology and directly his model. In this case, in both of these cases, his STB model before corrections for the STB data error, for example. I just take his model. I [redacted]. That's what I do.

**Q. And what theory guided that selection that you did?**

A. I took Professor Rausser's model, the data that he was using and the date of construction method by which he separates his prebreak benchmark period from the post-break period. I was guided -- just employed his model. That's what you do when you do a test like this. You say, okay, let's use the gentleman's data and model and test it. That's



JOSEPH P. KALT

what I did.

**Q. But what was the -- what was the theory that you were testing?**

A. Professor Rausser, for example, claims that his structural break on -- he originally claims that his structural break on July 1st, 2003 was, quote: "Evidence itself of conspiracy." In other words, he makes a claim as to a result that X caused Y, that is conspiracy caused the structural break, the proper testing for false positives on that claim and secondly, he claimed that the effects, meaning the damages, began with that structural break.

The proper test of those claims, the proper test for false positives to say, okay, let's go look and see if in context where the alleged conspiracy is not asserted to have been turned on, we still find a structural break in damages, and we do, and so that's what I was doing was testing his claim. It is incumbent upon a scientific method to test such claim.

**Q. Now these results that you report in Figure 4 and Figure 5, are these the same**

JOSEPH P. KALT

**analyses that you presented in your merits report?**

A. I believe in my merits report, we just looked at it, at Figure 7-2, I reported the results that you see in Figure 4, the data set varies slightly because Professor Rausser has now modified the data set for purposes of use in his model. Figure 5 was simply referred to and was contained in a work paper.

**Q. And the only difference between what you did that you reported here in Figure 4 from your earlier report and what you did from Figure 5 in the earlier work paper, was to use the STB data in the model, correct?**

A. Use the STB model, right, you see what I am saying?

**Q. The only difference is that you added the STB data. You didn't change anything else, did you?**

A. No, I used the STB model here.

**Q. What is different in the STB model besides using the STB data?**

A. The STB model at the time of Professor Rausser's merits report and my



JOSEPH P. KALT

response to it, Professor Rausser had not presented the STB data model. STB model. He had used what I referred to in this report as the class of merits model.

**Q. My question is: What is different between those two models besides using the STB model?**

A. That's what I'm telling you. That's what I'm telling you.

MR. CROSS: Let him finish his answers.

THE WITNESS: The STB model -- the [redacted] purporting to find overcharges asserted with the conspiracy that began to have effect in July 1st, 2003. The [redacted] and so the model now uses is compared to class



JOSEPH P. KALT

of merits test, it's the STB model, uses a [redacted]

BY MR. NEUWIRTH:

**Q. When you say to modify the data, what we are talking about is the STB data, correct?**

A. No. What I am talking about is what Professor Rausser [redacted] which says, well, people have criticized me on my class of merits model for inadequate treatment of nonconspiratorial rate changes that would reflect, for example, variable costs, so he [redacted]



JOSEPH P. KALT

**Q. And what is happening [redacted] other than introducing the STB data into the analysis?**

A. What [redacted]

**Q. Has any of the transaction data run in the model changed?**

A. Yes, in running --

MR. CROSS: Objection to form.

THE WITNESS: As I point out in my report, it changed from his merits reply for example to here or his merits report, yes, what I have done here is used the data that he has now provided in connection with his remand report and used that as the transaction data.

BY MR. NEUWIRTH:

**Q. What is different between the**

JOSEPH P. KALT

**transaction data that you say Dr. Rausser used previously as opposed to what he is using in the analysis submitted with his remand report?**

A. I don't recall all the changes but, for example, he added additional UP data. He has -- there was an error I had pointed out originally in the -- in addition to some UP data, he had actually dropped a digit in the coding for the price authorities. I think UP calls them [redacted], and that had just caused garble in his data set before. He seems to have corrected that.

He has applied, as I point out in my report, a new method that he had not previously used before for identifying names of shippers in the data. There may be some other changes as well, but that is what I recall. But bottom line was, in other words, I used the data set that he produced in connection with his remand report to run the model.

**Q. And apart from the things you just mentioned, adding -- what you say was adding additional UP data, dropping a digit in the coding or addressing a dropped digit in the**



JOSEPH P. KALT

**coding and applying a new method for identifying names of shippers, is there anything else that you consider a change in the transaction data that was included in the model that Dr. Rausser submitted with his merits report and what was submitted with his remand report?**

MR. CROSS: Objection to form.

THE WITNESS: He didn't submit a model with his remand report. But he had the new data set. I believe there were other changes, I didn't try to memorize all of them, but I just wanted to take the data that he said he was using for his analysis and remand report.

I previously pointed out in my merits report -- just let me make something clear. I previously pointed out in my merits report that these fundamental tests like my Figures 4 and 5 have are not fundamentally altered. In fact, I say that in this report, when I use his prior class of merits model and the data he was using at the time of his merits report, that's what I did in my merits report,



JOSEPH P. KALT

and I have also tested, as you know in my appendix, I give you the results for the class of merits versions of things like my Figures 4 and 5 in my remand report.

BY MR. NEUWIRTH:

**Q. But is there anything else that you consider to be a change in the transaction data included in the model that you haven't mentioned today?**

MR. CROSS: Objection to form. This is not a memory test.

THE WITNESS: Again, as I said, I believe there are. I would have to go back and check but I wanted to use the data that he was presenting to the Court in his remand report as the basis of these calculations, because I had presented similar calculations previously in my merits report.

BY MR. NEUWIRTH:

**Q. What would you have to do to check? When you say, "I would have to go back and check." What would you have to do?**

A. I would go back and look in the transactions data, look at some of the coding



JOSEPH P. KALT

and whether he had changed various things relative to what he had in his merits report data.

**Q. Now, when Dr. Rausser ran the model using the STB data, did the variables included in the model change?**

A. Yes. The [redacted]

So he is changing the specification of the model, we would say. He has now [redacted]

**Q. I was not asking you about specifications. We'll come back to that.**

JOSEPH P. KALT

**But in terms of the actual variables in the model, do you consider what you just described to be a change in the variables that are in the model?**

MR. CROSS: Objection to form.

THE WITNESS: Yes. In [redacted] so it has to be a change. In other words, there was never a [redacted]

BY MR. NEUWIRTH:

**Q. I asked you about a change in variables. What variables --**

A. Well, in [redacted] for example --

**Q. -- have to do with -- what you called [redacted] what variable does that change in the model?**

A. [redacted].

**Q. Is that --**

A. Just a second. And in [redacted] for example, he [redacted], for example, okay? But the model consisted of [redacted]



JOSEPH P. KALT

model, the variables used in that way are not even present previously. It's just a completely different specification.

**Q. You consider a change in specification to be the same thing as a change in variables?**

MR. CROSS: Objection to form.

THE WITNESS: Well, think of it this way. You can think of it this way as a matter of logic. He previously had [redacted] one could think of that as a model with no variables. He now has variables so he's changed the specification by introducing [redacted]

In [redacted] will use it as a shorthand, [redacted]



JOSEPH P. KALT

he's specified how they work differently.

BY MR. NEUWIRTH:

**Q. And what variable --**

A. In [redacted]

**Q. And what variable is included in what you have referred to as [redacted] that was not previously in the model?**

MR. CROSS: Objection to form.

THE WITNESS: There was no [redacted] in the model.

BY MR. NEUWIRTH:

**Q. But that is not the question.**

MR. CROSS: That actually is the question.

BY MR. NEUWIRTH:

**Q. The question is --**

MR. NEUWIRTH: That's a ridiculous comment, David.

BY MR. NEUWIRTH:

**Q. The question is: You said that the model as Dr. Rausser has now run it, has a [redacted] that was not previously part of the model, correct?**

A. That's correct.



JOSEPH P. KALT

**Q. And you said that in that sense, [redacted] has variables that have to be compared to the absence of a [redacted] previously, correct?**

A. That's correct. Yes.

**Q. My question is: Is there any variable included in what you have described as [redacted] that was not also present in the model when you say it did not have a [redacted]**

A. You mean the data series?

**Q. I am asking a variable.**

**You know what a variable is in a regression model, right? I am asking you if -- do you have any doubt as you sit here today about what a variable is in a regression model?**

A. In the way you are using it, I have some concern you are not understanding what I am saying.

**Q. I didn't ask -- the question is: What do you understand a variable in a regression model to be?**

A. A variable would be in a given regression model, a data series that is used by the model to calculate, for example,

Page 70

JOSEPH P. KALT
coefficients, so it would be the data to which a beta coefficient applies to.
In Professor Rausser's [redacted] model, what he has done is -- the [redacted] model does not include the same data series, so in that sense, not the same variables, he drops [redacted].
**Q. And he uses the STP data instead, correct?**
MR. CROSS: Objection to form.
THE WITNESS: No. No. No, that is not right. No, that is not right.
BY MR. NEUWIRTH:
**Q. So what do you think is right?**
A. The [redacted], [redacted].
**Q. Right.**
A. Yeah.
**Q. And you said that in a given model,**

Page 71

**JOSEPH P. KALT**
**a data series used to calculate coefficients is what you would consider to fall within the definition of a variable, correct?**
A. That's one of the right-hand side explanatory variables.
**Q. Is there any right-hand side explanatory variable that was included in what you called [redacted] that was not previously already included in Dr. Rausser's model?**
MR. CROSS: Objection to form.
THE WITNESS: You mean, does he use the same data -- in [redacted] there is a new model. So you are asking me to compare a [redacted]
BY MR. NEUWIRTH:
**Q. I am asking you, you defined what you consider to be a variable. I am asking you: Is there any variable that you consider to be included in what you have called [redacted] that was not already in Dr. Rausser's model when you say it did not include [redacted]**
MR. CROSS: Objection to form.

Page 72

JOSEPH P. KALT
THE WITNESS: You mean his damages regression, his class of merits damages regression, is that what you are calling already, when you say already?
BY MR. NEUWIRTH:
**Q. All right. Yes.**
A. The data series are the same except he's [redacted] And in his [redacted].
BY MR. NEUWIRTH:
**Q. Now this definition you have given today of what is a variable in regression modeling, is that a definition that you think we could find in textbooks about statistics and econometrics?**
A. I believe so, yes.
**Q. Is there a textbook you would recommend we look at to find that definition?**

Page 73

**JOSEPH P. KALT**
A. Sure, just about any economy -- econometric textbook teaches multiple regression even invariable regression. You would find a discussion of the form that will express the model, for example, as Y, the dependent variable equals the sum of a series of betas times Xs, meaning beta being coefficients estimated by the model, the X as being the variables.
When you impose a prior and don't have the model, estimated coefficients has the effect of not being an explanatory variable, but actually subtracting it off of the dependent variable. So you can look in any econometrics textbooks for that kind of formula, Y equals beta X, sum of the Xs, and you can look for discussions of priors.
**Q. And can you just give me one econometrics textbook that you think would have this?**
A. Sure. Take a look at Edward Leamer Specification Searches, would be a classic one to start.
**Q. Is that book still in publication?**

**JOSEPH P. KALT**

A. I believe so.

**Q. Could you turn to Paragraph 29 of your report.**

A. Paragraph 29?

**Q. Yes. Actually, let me strike that. There is no question, but let me just move on from there.**

MR. NEUWIRTH: I have been told that we have less than five minutes on the video, so why don't we let him change it and I don't need to take a break while they change it, but if anybody else wants to take a break.

Let's go off the record.

THE VIDEOGRAPHER: This concludes Disk No. 1 of the video deposition of Joseph P. Kalt.

The time is 9:55:33 a.m.

We are now off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: This begins Disk No. 2 of the video deposition of Joseph P. Kalt.

The time is approximately 9:59:33 a.m.



JOSEPH P. KALT

We are now on the record.

BY MR. NEUWIRTH:

**Q. So if we could return to Paragraph 23, and again, at the beginning of the paragraph, you focus on the language which said: "As a standard and practical means of testing whether a model can reliably isolate the effect, e.g., on price of the claimed harmful conduct from the effects of other causes is to apply the model to situations where the harmful conduct is known to be absent."**

**Do you see that?**

A. Yes.

**Q. Is it your understanding if a circumstance where the harmful conduct is known to be absent is the functional equivalent of saying that the transaction at issue is immunized from the effects of the conspiracy?**

MR. CROSS: Objection to form. Vague.

THE WITNESS: Perhaps depend on the context. You haven't given me any context but perhaps depend on the context, but it could



JOSEPH P. KALT

have that meaning. If immunized means was not harmed, then it would mean it was not harmed.

BY MR. NEUWIRTH:

**Q. Well, in order to satisfy the condition that the harmful conduct is known to be absent, presumably at least two things would need to be true. One, that either the harmful conduct didn't occur at a time when it could have affected the transaction, or two, that the harmful -- that the transaction was immunized from any harmful effects of the conduct that might have occurred later, right?**

MR. CROSS: Objection to form.

THE WITNESS: Can I have that back one more time. I'm trying to follow you.

BY MR. NEUWIRTH:

**Q. I take it that were harmful conduct to be known to be absent, at least two things have to be true. First -- at least one of two things have to be true.**

A. Fine. Go ahead.

**Q. At least one of two things has to be true, either the harmful conduct did not occur at a time when it could have affected the**



**JOSEPH P. KALT**

**transaction, or the transaction was somehow immunized from any effects of harmful conduct that occurred later.**

A. I don't think that is -- I don't think -- that is exhaustive. I don't think that is right. What you said doesn't seem right. In other words, if you had a situation where the conduct is occurring, so it's -- the conduct is occurring during the period of analysis, the transaction is occurring during the period of alleged conduct and it was immunized and not affected, then it would not be affected, and I think you didn't include that in the way you set your dichotomy up.

**Q. I guess it is also true that if conduct occurred later -- well, let me strike that. Let me strike that.**

**Now, in order for -- if the conduct is occurring at the time of a transaction, isn't it true that the transaction has to be immunized from the effects of that conduct in order for the harmful conduct to be known to be absent?**

MR. CROSS: Objection to form.

Page 78

JOSEPH P. KALT

Misstates facts.

THE WITNESS: If I understand your question, it's a tautology. You are saying for a transaction occurring during the conduct, for it not to be harmed, it must not be harmed, as I understand your question.

BY MR. NEUWIRTH:

**Q. Well, no, that is not the question.**

A. I am missing something.

**Q. You've described the standard that harmful conduct is known to be absent, correct?**

A. Yes, provide a standard but a context.

**Q. But presumably, to have a false positive, harm has to be shown at a time when harm could not have occurred, correct?**

A. Not necessarily. If you had a transaction where conduct could have occurred but for some reason it is known that for this particular set of transactions or transaction, it did not occur, it doesn't have to -- the transaction doesn't have to be before the period of conduct.

**Q. Right, but for it to know that the**

Page 79

**JOSEPH P. KALT**

**transactions were not affected, you would have to know that they were immunized from any effects of the conduct, correct?**

MR. CROSS: Objection to form.

THE WITNESS: You mean that they were not harmed. You have to know that they were not harmed.

BY MR. NEUWIRTH:

**Q. Not just that they weren't harmed, but that they couldn't have been harmed, right? In order to determine that something is a false positive, you have know two things. You have to know -- you have to know that they could not have been harmed, right, because otherwise, you don't necessarily have a false positive?**

A. Well, they can't coherently be asserted, you know, because like I said, as we discussed before, but yes, you would have to say these contracts were not harmed, they couldn't have been harmed, they are not coherently asserted to be harmed. Yes, that would be the basis for saying I could use that as a context for false positive testing.

**Q. If a contract for rail freight**

Page 80

**JOSEPH P. KALT**

**shipments in this case was entered in June of 2002 and remained in effect through a period after July 2003, is it your understanding that by virtue of having been adopted in June of 2002, that contract and transactions under it would be immunized from any affects of the conspiracy alleged in this case?**

MR. CROSS: Objection to form.

THE WITNESS: If I understand your question correctly, that would depend upon what theory of the plaintiffs we are dealing with. If we are dealing with the theory that the plaintiffs -- actually, the Court actually ends up describing it as a theory in which the fuel surcharges at issue were nothing like the fuel surcharges that preceded the purported conspiracy and acted like a tax on the -- like a tax theory, in other words, then in that situation, there are ways to test whether a transaction was immunized. I have done that in my report.

Under Professor Rausser's theory, now, that all payers of FSCs, no matter when their contracts were signed, were harmed, then

Page 81

JOSEPH P. KALT

under that theory, you would apply different tests, but certainly under the first theory, you can apply a false positive test.

BY MR. NEUWIRTH:

**Q. Is it your understanding in this case that the defendants are accused of trying to eliminate interdefendant competition?**

A. Yes.

**Q. And do you agree that at the core of the complaint is an alleged collusive agreement to use fuel surcharges as a means to raise rail freight shipment rates?**

A. I don't know what you mean by "core," but certainly that has been something that you all have stated, I believe.

**Q. Do you have any understanding of what the word "core" means when we talk about at the core of a complaint?**

MR. CROSS: Objection to form.

THE WITNESS: It depends in the context, certainly, you have alleged that FSCs which as I believe your complaint stated, were more aggressive, uniform, nonnegotiable and universally applied, served as a means to raise

JOSEPH P. KALT

rates to customers. I believe that is -- I would think of that as core, core to your theory.

BY MR. NEUWIRTH:

**Q. And to raise all-in rates, correct?**

A. Yes.

**Q. And did you review the complaint again before preparing your remand declaration?**

A. I believe I did it, yes.

**Q. Did you review any other papers setting forth plaintiffs' positions in this case in connection with preparing your remand declaration?**

A. Yes, I believe I did, and I believe I cited some. I believe I cited some as well.

**Q. Okay. Where do you cite them?**

A. If you look at, for example, Footnote 132 of my report, Page 58, I cite there the plaintiffs' narrative, the direct purchaser's supplemental consolidated objections and responses to the first set of interrogatories, plaintiffs' Wal-Mart reply and consolidated amended class action complaint.

**Q. Now I see that you cite --**



JOSEPH P. KALT

A. There may be some others as well.

**Q. Let's just talk about Footnote 132. I see that you cite those things there that you just referred to.**

**Did you read them prior to preparing this declaration -- I should say and in connection with preparing the declaration?**

A. I believe so, yes.

**Q. Did you read them in full or did you just read the particular portions that you cited in Footnote 132?**

A. I read them previously in full. I read more than as cited here, but I don't recall whether I ever read every page again, but I had done it before.

**Q. And these passages that are selected in Footnote 132, are those passages that you selected yourself to review or did -- were you directed to look at those?**

A. I did. I selected them.

**Q. And you selected --**

A. I never take directions from these guys.

**Q. And you selected them by going**



**JOSEPH P. KALT**

**through the entire document to determine that those were the relevant portions?**

A. I had previously gone through the entire documents in preparation of my merits report, so I had some familiarity with them. I went back and remembered things, looked at additional things and decided these were appropriate. They seemed to be what you were saying.

**Q. And you felt like you remembered the documents well enough that if you reviewed these particular paragraphs that you cited, you would get a complete picture of what it was that the plaintiffs had been alleging in the case from the outset?**

MR. CROSS: Objection to form.

THE WITNESS: For the purposes to which I was putting this analysis, obviously, for the purpose for which I was citing it.

BY MR. NEUWIRTH:

**Q. Now you said a few minutes ago that if the theory of the case is as you understand Dr. Rausser to currently be asserting it, with respect to that contract we talked about from**



**JOSEPH P. KALT**

**July 2002 and transactions under it, you would have to do other tests. You said that for the theory that you said was articulated by the Court in its opinion, you would use a false positives test, but you said that for the theory now being asserted by Dr. Rausser, there would be other tests.**

**Can you identify what other tests you are talking about?**

A. Sure. You do false positive tests, for example, like my Figures 4 and 5. That is -- I mean, go look there and see whether even under his new theory whether you're finding false positives.

You can also do tests like my figure -- the tests that are discussed in Paragraphs 61, 62, 64, the Figure 11, the companion figures and the work papers and the appendix that go with -- along with Figure 11. You could do those tests, which I have done. Those are not dependent upon his new theory.

**Q. Okay. What do you mean, "not dependent upon his new theory?"**

A. The fact that he now says that all

payers of FSCs during the class period would have been damaged by the conspiracy, whether they were legacy or class. You all basically now say the same thing in your remand brief. Wouldn't expect you -- under that theory, it is not -- that doesn't change the fact that Figures 11 and its companions for the other related tests, Figures 4 and 5 give you test of that theory. You can do false positive testing on the new theory.

**Q. Is there any other testing that can be done?**

MR. CROSS: Objection to form.

THE WITNESS: Under this everyone was harmed theory, that all payers of FSCs during the class period were injured theory.

BY MR. NEUWIRTH:

**Q. Well, what you are describing that way --**

A. You didn't say --

**Q. What you are describing in that way.**

A. In that way. I'm sorry. Now I am confused.

**Q. You have said -- you have**





**characterized Dr. Rausser's -- what you call Dr. Rausser's new theory as being that all payers of fuel surcharges during the class period were injured. That is how you -- those are your exact words for describing what you call Dr. Rausser's new theory, right?**

A. From memory, I'm quoting, and I do quote it, I believe in here, exactly his words. He says all payers of FSCs during the class period were injured. He says that, so -- and I quote it, so you can say I am doing the characterization, but he actually says it.

**Q. I am just asking you how you characterize it. You can have whatever source for it, it's fine. I am just asking you: You've used those words in this deposition. That's what you said. That's the theory I am talking about. What you said was the theory that all payers of fuel surcharges during the class period were injured, and you said that you can do testing of the type you did in Figure 4 and 5 and the testing that you say is reflected in Figure 11 and the paragraphs that you referenced in the pages proceeding Figure**





**11.**

**I am asking you: Are there -- since you referred to tests that could be performed, I am asking you if there are any other tests that you say could be performed with respect to what you described as that theory of the case?**

MR. CROSS: Objection to form.

THE WITNESS: I don't think I understand your -- you keep -- I interpret the word characterize meaning, I read something or something and then drew my own conclusion. I am actually testing what Professor Rausser now says. That is all I am saying. I am now testing his assertion that his model still works, even though and -- I'm approximately quoting, you can see what he says in his deposition and I believe in his report that all payers of FSCs were injured during the class period as a result of the alleged conspiracy. That is what I am testing.

Now your question is: If I test Professor Rausser's claim, what other tests besides what I pointed to -- is that what you're trying to ask?





BY MR. NEUWIRTH:

**Q. Correct.**

A. Professor Rausser's claim with respect to all shippers being injured is not tested, it is asserted but not tested by Professor Rausser, and is somewhat vague. If by that claim he means that all shippers were injured as a result of paying FSCs that were more onerous in the -- or more -- had higher earning power in the class period then during the preclass period or alleged preconspiracy period, then my tests in Figures 1, 2, 3, 19 and the companion analyses of that would also provide a test of that version of his theory. There may be additional tests, but this is what I recall at this time.

**Q. And do you believe that Dr. Rausser has asserted in this case that the conspiracy alleged is one to use fuel surcharges that have greater earning power?**

A. He --

MR. CROSS: Objection to form.

THE WITNESS: He now says that it is irrelevant to his analysis whether FSCs during

JOSEPH P. KALT

the class period -- instituted during the class period or alleged conspiracy period, were -- had greater earning power, were more aggressively applied, were universally applied and were uniform. He now apparently says that that is irrelevant to his analysis. I quote that.

BY MR. NEUWIRTH:

**Q. Let's break that down. Whether something was more universally applied has nothing to do with what you describe in your report as earning power, does it?**

A. No, we use earning power to mean for a given set of fuel prices but does the -- fuel surcharge generating FSC revenue.

**Q. Now, do you agree with Dr. Rausser's finding that for many of the contracts that were considered to be legacy contracts, the rate to be applied to shipments during the class period was determined during the class period?**

MR. CROSS: Objection to form. Vague.

THE WITNESS: I have not attempted



JOSEPH P. KALT

to reproduce his kind of taxonomy. His designation of legacy contracts -- his designation of legacy contracts may have some instances of that in it, but I have turned my testing to looking at instances that didn't involve that, to continue with the testing. I didn't try to reproduce his results.

BY MR. NEUWIRTH:

**Q. Right. So you did not in the analysis that Dr. Rausser did in what he calls --**

A. When I say his taxonomy, I mean in his remand report.

**Q. Yes. In the remand report, Dr. Rausser had a discussion of what he called deconstruction of the set of legacy contracts, and he identified contracts that he said fell into different categories in terms of the fuel surcharges. I take it that you did not attempt to either replicate or independently perform a similar analysis, correct?**

A. I did not attempt to replicate his analysis or undertake an examination of that character. I look, you know, in my Figure 2



JOSEPH P. KALT

for example, I look at instances that don't fit his criticisms of his prior designation of legacy, and so that is the way I approached it because I didn't find it useful to try to reproduce his taxonomy.

**Q. And why did you not find it useful?**

A. No. 1, notwithstanding his claims that his prior designation as a legacy, he now questions and appears to say many of them should have been in the class in some instances, vice versa. I understand him to be saying that he intends to take his model and his model's results which depend upon the data to the jury as reliable. He has said that the models as it appears in the merits reply report, the STP model, as well as the class merits model using his designations of class and legacy. If his designations of legacy are incorrect, it means his designations of class are correct and -- are incorrect, and if his designations of class are incorrect, then he is not able to provide a demonstration of reliability of the very data and model that he proposes to take to the Court as reliable.



JOSEPH P. KALT

And so my understanding was we were trying to test the reliability of what he says he is going to take to the Court. So for that reason, I did not find it pertinent particularly to redo his taxonomy.

Secondly, with respect to specific claims, I was able to test for false positive results, for example, and test the reliability of his modeling with -- for example, my Figure 2 as well as my Figures 3, 4, 5, 11, the companions to 11, 19 and so forth.

So I just didn't find it necessary or particularly relevant to what I understood to be the real challenge, which was to test the reliability of his model.

**Q. Now you made reference in that last answer to Dr. Rausser's own designations of legacy contracts.**

A. Yes.

**Q. Is it your understanding that Dr. Rausser independently determined which were the legacy contracts or that the defendants in the case, in this case, through their production of data, had a role in identifying which were the**

**legacy contracts?**
A. Had a role --
MR. CROSS: Objection to form. Vague.
THE WITNESS: Had a role, you said?
BY MR. NEUWIRTH:
**Q. Yes.**
A. Well, I think the data came from the defendants but Professor Rausser clearly used his own methodologies and data to define from the very beginning, his definition of class and therefore, legacy or legacy and therefore, class.
So for example, he -- with respect to BNSF, he provided data that provides him with various information, including names of shippers, until his remand report, he ignored the data on names of shippers and now he comes back and uses it to criticize what he had previously done and does ignore the name. UP, he ignores data and information he had on provision names. And used that to create his data set that he proposes as I understand it, to take to the jury as reliable, but now





criticizes that decision to ignore the provision names for UP by now using those provision names as a key basis for criticizing his designations of class and legacy.
With respect to CSX, he has told in answers to interrogatories in 2010 and 2012, that two columns of data are not reliable. Data on dates and provision names are not reliable. He follows that until -- and uses that in his -- all of his reports that he can use it in until this latest report, and now he goes back to using data dated previously, not used to criticize his prior designations.
With respect to NS, there is clearly -- he originally did not use the [redacted] and now does use the [redacted], and uses it to criticize his prior designations of legacy, despite being told that the [redacted] is not reliable for that purpose.
So all I can see in there is he had this information and he used it to make the call as to what was legacy or not legacy. Be that as it may, as I say, it is not particularly relevant in the sense that we are





trying to test the reliability of the model.
The designation of legacy is -- its flip side is the designation of class. If one is inaccurate, the designation of class is inaccurate. If you are not running the model on reliable data for class, then it's not proper to say that you are bringing a reliable model to the Court.
**Q. Is it your position that Dr. Rausser has said that any contracts that were previously designated as legacy contracts are part of the class?**
MR. CROSS: Objection to form.
THE WITNESS: Designated -- I believe that is correct, yes.
BY MR. NEUWIRTH:
**Q. So your understanding is that Dr. Rausser has attempted in his report to --**
A. I'm sorry, as part of the class?
**Q. Yes.**
A. No, in fact, he has not said that. I apologize. He says they fit the criteria for class and if the legacy is wrong, then they shouldn't be legacy. There is only one other





place for them to go and that is class and if you don't run your data, your model on the data for class, you don't have a reliable model of damages to class. It is certainly not a reliable model of common harm to the class.
**Q. So are you changing the class definition?**
A. No. Professor Rausser, when he says certain things should not be legacy, then he is saying they should be class.
**Q. Is there --**
A. Those are the mathematics of the dichotomy choice between class and legacy.
**Q. So you believe Dr. Rausser said in his report or in his deposition testimony or anywhere else --**
A. I'm sorry. I need to go back.
**Q. -- that contracts entered prior to July 2003 is now within the class definition?**
A. I have to go back and correct an answer.
He does, for example, change his definition of class when he shifts from not using the [redacted] for example to using the

JOSEPH P. KALT
[redacted]
**Q. How does that change the class definition?**
MR. CROSS: Objection to form.
THE WITNESS: The transactions that are in the class, not the definition, the word definition, but the transactions in his database for class are different.
BY MR. NEUWIRTH:
**Q. But the class definition hasn't changed, has it? The test for whether something is in the class has not changed, has it?**
MR. CROSS: Objection to form. That is two different questions.
THE WITNESS: Yeah, that is two different questions. That's what I was referring to when you said has he changed his definition of class? He has got different data now is what I am telling you.
BY MR. NEUWIRTH:
**Q. The question wasn't -- what data fits the definition doesn't mean you are changing the definition, does it?**



**JOSEPH P. KALT**
A. No, not necessarily, no.
MR. CROSS: Objection to form.
THE WITNESS: But he is changing the class in the sense of what data represents the class.
BY MR. NEUWIRTH:
**Q. But he is not changing the definition?**
A. Your previous questions didn't always use the word definitions, which is what I am trying to indicate to you. Or if they did, I heard it as -- I didn't hear it. I was talking about --
**Q. Just to be clear, you are not suggesting that Dr. Rausser has attempted to change the class definition in this case, have you?**
A. Well, he certainly is not -- as far as I know, trying to change the legal definition. If we take as the definition of class, the set of transactions that he designates of class, those have changed. If that's the -- in other words, if he takes the definitions, the set of transactions, then



JOSEPH P. KALT
those have changed.
**Q. But the criteria that he is using for what satisfies the class definitions have not changed?**
A. No. That has change dramatically.
**Q. How has that changed?**
A. For example, we can go back though it, but he originally, for example, ignores data from BNSF on the name of the shipper and now he comes back and uses that to designate something legacy or not legacy.
**Q. You think that is an example of changing the criteria for what satisfies the class definition?**
A. Yes, he changed one of the criteria but -- which he said what satisfies the definition of legacy versus class. He changed it. It is actually in his computer code.
**Q. And what do you say is the changed criteria for whether something satisfies the class definition in that example?**
A. Well, he originally adopts procedures. It's in the computer code, that separates the world into legacy and class.



JOSEPH P. KALT
Those are criteria he adopts. He may believe that they are consistent with the legal definitions, so forth, but he adopts criteria to separate data into class and legacy. Those have actually changed now quite dramatically going from his prior reports to the taxonomy that he has now done in his remand report. Those are different.
**Q. You are saying that the methodology is different for determining whether the criteria are satisfied, correct?**
MR. CROSS: Objection to form.
THE WITNESS: I view what he writes in the code as criteria. He says, if the data meet this criteria, okay, then it goes into legacy. If the data meets this criteria, then it goes into class, so maybe you have a different word criteria with the lawyers and the data analysts, but that's the way I think of criteria. Those have clearly changed.
BY MR. NEUWIRTH:
**Q. Now, when you analyzed legacy contracts and shipments in your current report, did you use the [redacted] database or the**

JOSEPH P. KALT

**estimate methods for identifying NS legacy contracts?**

MR. CROSS: Objection to form.

THE WITNESS: In my remand report, I believe in every instance, what I have tried to do is use the data that Professor Rausser sets forth in his remand report as defining the class. That is based on the [redacted] as I point out. So when you see me running a model, let's say I am using, testing Professor Rausser's STB model. I am using the definition of class that is contained in materials, the designation of class that is contained -- by Professor Rausser, that is contained in his most recent report and apply that to his STP model.

BY MR. NEUWIRTH:

**Q. So do you know whether, when you did an analysis of legacy contracts in connection with your remand declaration and the results that were reported there, do you know whether you used the NS database set of legacy contracts or the set of legacy contracts that was derived from the estimate methods for**



JOSEPH P. KALT

**identifying those legacy contracts?**

MR. CROSS: Objection to form.

THE WITNESS: The first one, you say the NS database, you mean the [redacted].

BY MR. NEUWIRTH:

**Q. Yes. The [redacted] database, or did you use the set of legacy contracts for NS that was derived by the estimate methods?**

MR. CROSS: Objection to form.

THE WITNESS: That he had used previously?

BY MR. NEUWIRTH:

**Q. Right.**

A. I believe that he tells us he was using the [redacted]. I used his data for class, so I conclude that I am using his data which were based on the [redacted] In other words, what I was trying to do is -- if he is going to take this data and his STB model and class of merits model to the Court as reliable, that's what I'm going to check for so I used his data.

**Q. You are certain about that.**

A. Yes.

**Q. Now, if you could turn to Paragraph**



JOSEPH P. KALT

**6 of your report, you say in the second sentence of Paragraph 6: "His STB model generates" --**

A. I'm sorry. Let me catch up. Paragraph 6. I turned to Page 6.

**Q. Paragraph 6. You say --**

A. Yes.

**Q. "When applied to the shipments that Professor Rausser has identified as legacy, his STP model generates an average overcharge on legacy shipments of [redacted] percent."**

**Do you see that?**

A. Yes.

**Q. When you talk about the shipments that Professor Rausser has identified as legacy in that sentence, are you talking about the set of contracts that Dr. Rausser had identified as legacy contracts in total, or are you talking about legacy contracts that after his deconstruction process, didn't fit into any of the categories that he identified as having been under his approach affected by the conspiracy?**

A. For purposes of Figure 1, if I



JOSEPH P. KALT

understand your question correctly, I have looked at this category, labels, legacy, the total category, I have not done Figure 1 for any subcategories other than in Figure 2, but Figure 1 which is being discussed in Figure 6 is using the data that he designates as -- I think -- I think of the data as he designates class that splits the whole transaction in the database between class and legacy and I used that database for Figure 1.

**Q. So it's the full set of legacy contracts prior to any of his deconstruction?**

A. The whole set of contracts he's identified as legacy prior to his -- I don't know if he uses the word deconstruction or not, he might, but his taxonomy analysis.

**Q. Now if you could look at Figure C 1.2, which is at the back of your report.**

A. Okay.

**Q. What is your explanation for why shipments under legacy contracts would have greater overcharges than shipments under class contracts?**

A. The model is permeated by various

Page 106

JOSEPH P. KALT

errors and flaws that I point out in my report. In particular, in test after test that I run, it fails to show a common fact of a common overcharge despite the use of Professor Rausser's -- despite his claims and his use for damage calculations of a common overcharge.

And so we know that the model generates different results. In various ways, the model, for example, as I show, for example, in my Figure 25, is sensitive to his [redacted], and when you estimate the model on different data, you are going -- that is telling you is, you are going to find different results.

Secondly, the model has a strong tendency because of the way that the data are constructed and going from class to the -- I'm sorry, [redacted], that along with the ill treatment -- erroneous treatment of the [redacted],

Page 107

JOSEPH P. KALT

generates this strong upward pattern to damages, where they start negative or low and then grow over time, so depending on the pattern of shipments, you can find varying results for an average overcharge just because the model is erroneously [redacted]

And then it goes back to the first thing I said which is, when you test the model for the assumption which Professor Rausser doesn't test of [redacted] and so forth, you find what you'd expect to find actually, which is -- if you can't find that commonality, so you get different results.

**Q. So --**

A. And there may be other reasons as well. The model is -- those various areas also interact with each other in various ways, but that seems to be certainly the core as to why we are finding -- I have this microphone cord wrapped around my foot. Go ahead.

**Q. So who selected the FSC provisions that are listed in Figure C 1.2?**

Page 108

**JOSEPH P. KALT**

A. I did.

**Q. Okay. Now, is it correct that the aggregated revenue for all of these provisions that are listed in Figure C 1.2 is approximately [redacted]?**

A. Yes, it is.

**Q. And is it correct that the first FSC provision that you listed, [redacted] standard, accounts for [redacted] or close to half of that aggregated total?**

MR. CROSS: I think you misspoke, Steve. You said [redacted]?

MR. NEUWIRTH: I said [redacted].

MR. CROSS: I'm sorry.

THE WITNESS: [redacted] actually.

BY MR. NEUWIRTH:

**Q. So we can call it [redacted], that's fine, because that brings it even closer to half.**

MR. CROSS: Let's just be clear what is there.

THE WITNESS: It makes it farther away from that actually. It's more than half by a little bit.

Page 109

JOSEPH P. KALT

BY MR. NEUWIRTH:

**Q. Okay. Good. So it's more than half of his total --**

MR. CROSS: Let's go with what is on the page.

BY MR. NEUWIRTH:

**Q. -- is accounted for by the [redacted] fuel standard, correct?**

A. Yes.

**Q. Now, isn't it correct that the [redacted] was an FSC provision that provided that the fuel surcharge to be applied would be determined at the time of the shipment?**

A. I believe that is accurate, yes.

**Q. And that this is what Dr. Rausser characterized in his report as a self-adjusting fuel surcharge, correct?**

A. He uses those phrases.

MR. CROSS: Objection to form.

BY MR. NEUWIRTH:

**Q. Now, let me ask if you can also look at the [redacted] carload formula, correct?**

A. Yes.

JOSEPH P. KALT

**Q. That shows a negative overcharge, correct?**

A. That's correct.

**Q. And the [redacted] provision shows a very small -- a very small overcharge, correct?**

A. Yes. But both of those are statistically significant though.

**Q. Right, but small.**

A. Well, small relative to -- I mean it's a lot of money tied up with something like that, but small relative to, for example, his asserted average overcharge in the class of the merits model of approximately [redacted].

**Q. That is a fair way to put it. Thanks for that clarification.**

**And the same thing is true, right, under that criterion of the UP with fuel surcharge standard, right? That provision generates overcharges that are also on your chart shown to be smaller during the period you looked at than the average overcharge that Dr. Rausser calculated during the class period, correct?**



**JOSEPH P. KALT**

MR. CROSS: Objection to form. I don't think you read that right, Steve. It's not with.

MR. NEUWIRTH: I'm sorry, the UP WTI 1 fuel surcharge standard, sorry about that.

BY MR. NEUWIRTH:

**Q. The same is true for that, correct?**

A. What?

**Q. The same is true that the overcharges that you show on this chart of [redacted] percent and [redacted] percent are much smaller than the average overcharge that Dr. Rausser calculated during the class period, correct?**

A. For the class and merits model, yes. In the July 2003 version for that one, relative to the STB model, they are not that different, [redacted] or something versus [redacted]

**Q. But you don't dispute that [redacted] is small?**

A. No. No. You said -- you had an adjective in there. I was just making it clear what the value was.

**Q. And certainly, [redacted] is a lot**



**JOSEPH P. KALT**

**smaller?**

A. Yes.

**Q. And [redacted]?**

A. Yes.

**Q. Now, so let me ask if you can turn to Figure 3 in your report. Do you have that in front of you?**

A. Yes, at Page 23, right?

**Q. Right. Now, it's correct, isn't it, that the UP formula that you used for the analysis reflected in Figure 3 was the fuel surcharge that UP created on December 1st, 2002?**

A. I believe that is accurate, yes.

**Q. Now, isn't it true that, in fact, the most commonly used preclass period fuel surcharge formula for UP was the [redacted] program?**

A. At some period of time, yes, I believe that is accurate, yes.

**Q. So why for the analysis in Figure 3 did you not use the formula from the [redacted] program if that was, as you said at least in some periods, the most commonly used formula?**



**JOSEPH P. KALT**

A. Because I was doing a what-if test here effectively implemented, which you all state, for example, at Page 26 of your remand brief where according to Professor Rausser, you say something about a criticizing Willie -- Professor Willie for not examining fuel surcharges that either -- that were implemented preconspiracy and were not changed during the conspiracy period. That's what I am doing here.

So I take essentially the stated published fuel surcharge as the preconspiracy rate, I then apply it to the volumes of local carload traffic and I run Professor Rausser's model on that, that price, as if it was an all-in rate based on that preconspiracy formula which didn't change, and it says that if that had been rate applied, which did not change over the class period or got less onerous, Professor Rausser's model on all-in rates based on that price would still find damages. It is a false positive under that test.

**Q. How did anything that you just said in that answer explain the choice of the**

**formula adopted on December 1st, 2002, by UP rather than the [redacted] program that was, again, in some periods, the most commonly used UP formula?**

MR. CROSS: Objection to form. Argumentative.

Do you want him to repeat it?

THE WITNESS: I wasn't attempting to test anything about the most commonly used. I was trying to test what you all state in your remand brief on 26 and also Page 6, as I recall it. You guys are real clear about it. I am testing, let's say, it was an efficacy formula put in place before the conspiracy, and it did not change over the conspiracy. Let's take that as the hypothesis.

Under that hypothesis in the context of your claims, that shouldn't have generated damages. And so I applied that rate to -- in this case, the P rate to all of that -- to all of the local carload traffic saying, okay, let's supposed that happened. Does this model still produce damages?

It wasn't an attempt to look at





whether the model produced damages for the actual rates. It was an attempt to look at the hypothesized rates that you all discussed in your remand brief and Professor Rausser discussed as well.

BY MR. NEUWIRTH:

**Q. So you think the hypothesized rate was best tested by using the formula that UPA -- that UP adopted -- created on December 1st, 2002 rather than the formula that UP actually used more frequently, the [redacted] formula?**

MR. CROSS: Objection to form.

THE WITNESS: For the purpose which I'm putting here, this is the proper way to do the test. That's what I have done. I was not concerned with what was actually being charged. I was saying, let's deal with the plaintiffs claim. What if they paid these? Would the model still produce damages and that is what I tested here.

I have other tests on rates that were actually paid. That wasn't the question.

BY MR. NEUWIRTH:

**Q. The question is about Figure 3.**





A. Yes.

**Q. Not about other test, right?**

A. I didn't want you to leave the impression that I hadn't looked at actual rates as well, which I do as well.

**Q. I am not testifying so I am not leaving any impressions. I think you are leaving the impression.**

MR. CROSS: Objection. Move to strike.

BY MR. NEUWIRTH:

**Q. Why is that funny, Dr. Kalt?**

A. Because you were asking me about Figure 2 and also I do look at UP.

**Q. We were talking about Figure 3, weren't we?**

A. And you said that I was doing a test and why wasn't I concerned, and I was pointing out in certain other places, I am concerned and I do tests on actual rates paid. Figure 3 is a what-if analysis. You asked me to explain that twice. If you do a what-if analysis, this is the proper way to do the analysis.

**Q. In Figure 19, as well, you used the**





**UP formula created on December 1st, 2002.**

A. Which one?

**Q. Figure 19. The results reported in Figure 19 are also based on analysis that uses the formula that UP created on December 1st, 2002.**

A. That's correct, yes.

**Q. Could you turn to Paragraph 17 of your report.**

**You say -- you say that what you describe is Professor Rausser's new theory, in your words, "lacks economic coherence."**

**Do you see that?**

A. Yes.

**Q. Then you say: "It does not make sense to claim that all legacy shippers would be expected in the but-for world of no conspiracy to have broken or gotten partially or completely out of their contractual obligations to pay surcharges."**

**Do you see that?**

A. Yes.

**Q. Does that statement mean that it might make sense to claim that some portion**

Page 118

JOSEPH P. KALT

**less than all legacy shippers would be expected in the but-for world of no conspiracy to have broken or gotten partially or completely out of their contractual obligations to pay surcharges?**

A. Not necessarily, no.

**Q. So do you think it is economically incoherent to claim that any group of legacy shippers, any proportion of them, would have been expected in the but-for world of no conspiracy to have broken or gotten partially or completely out of their contractual obligations to pay surcharges?**

A. One could claim that, but in the absence of a model that would explain that and in particular this context, a model that would explain that on a common basis across the class, I don't think that would be a coherent statement to be made.

**Q. Well, is the -- the question is: Your assertion here was about whether the theory has economic coherence. You are not talking here about the model. You are saying that it is the new theory of Professor Rausser**

Page 119

JOSEPH P. KALT

**that you say lacks economic coherence, and you say what doesn't make sense is to claim that all legacy shippers would be expected in the but-for world to have broken or gotten partially or completely out of their contractual obligation to pay surcharges.**

**The question is: Is the thing that you say gives us the lack of economic coherence, the fact that you're characterizing Professor Rausser's new theory is relating to all legacy shippers or is it the theory itself that you are saying lacks economic coherence and it has nothing to do with the portion of legacy shippers that might be subject to that theory?**

MR. CROSS: Objection to form.

THE WITNESS: This particular sentence is referring to the claim of all.

BY MR. NEUWIRTH:

**Q. Does it follow from that --**

A. Which is not my characterization. It comes from him saying that in his view now, all payers of FSC, legacy or nonlegacy during the conspiracy period were injured. And if the

Page 120

JOSEPH P. KALT

mechanism was this, the conspiracy purportedly shut off this purported escape capability. I recall him using the word escape, I can't remember the exact quote, but that is what I am referring to.

**Q. So is the problem with the theory from a coherent standpoint that you articulate here, the fact that you understand Dr. Rausser to have said that this applies to all legacy shippers?**

MR. CROSS: Objection to form.

You're asking just this sentence or overall.

MR. NEUWIRTH: I am asking about what he says in these sentences we're talking about.

THE WITNESS: The problem with the theory is that he says that some mechanism of escape for all legacy -- for all legacy shippers was cut off or otherwise prevented by the purported conspiracy, and what I am saying here is that that particular proposition is not economically coherent from both underlying economic reasons and I go on, of course, this

Page 121

JOSEPH P. KALT

is in my introduction.

I go on to explain those reasons and the evidence for them later in my report. That's what I am saying.

BY MR. NEUWIRTH:

**Q. Now, have you done any study in connection with your work in this case of whether legacy shippers would have been able in a but-for world to have broken or gotten partially or completely out of their contractual obligations to pay surcharges?**

A. I have done analysis of that question, yes.

**Q. What analysis have you done to determine whether this would or would not have occurred in the but-for world?**

A. For purposes here, recognizing we were focusing on class certification, in my Section 5, in particular, I have studied the issue and reached the conclusion that such a theory requires -- would require individualized inquiry as to the facts and frequency and timing and magnitude, et cetera, of purported escape in the but-for world from -- otherwise

JOSEPH P. KALT

were portrayed as FSCs that made all-in rates higher than no conspiracy but-for rates. I have also analyzed whether the claims that Professor Rausser sets forth with regard to claimed, noncollection, waiving, discounting, et cetera, would support a claim that would be consistent with the proposition that there was a common fact, since we are doing class cert, there was a common fact that one could determine of such escape for -- across the class in the but-for world and I concluded for reasons I set forth particularly in Section 5, I find that not to be accurate.

I have also analyzed the presence of opportunities for imposition of FSCs under plaintiffs' theory that purportedly we're going to -- FSCs in the conspiracy period that were purportedly going to be applied on the universal basis without negotiation and there I find that, in fact, a substantial numbers of shipments do not have FSCs despite being given such opportunities.

The economics in that context as I explained in my report, tell us that when that



JOSEPH P. KALT

happens under the plaintiffs' theory, when there is purportedly no escape, someone escaped, and that tells you that there are factors not captured in the modeling that relate to individual circumstances that affect whether one has an FSC or not. Those same individual circumstances, the economics will tell us, would affect whether, for example, one escaped the purportedly conspiratorial FCS by getting base rate reduction, and so the data is telling us that.

Also, when you looked in the data, just looked at the data in the preclass period of the preconspiracy period before March, alleged conspiracy period, what you find is a strong vintage affect in the pricing, that is, you do not find that contracts that have been signed at earlier dates have their prices adjusted to contemporary competitive market conditions.

So for all of those reasons, I reached the conclusion that the claim on a common basis for classification purposes is not supported by the economics or the evidence.



JOSEPH P. KALT

MR. CROSS: When you get a moment, can we take a break.

MR. NEUWIRTH: Yes.

BY MR. NEUWIRTH:

**Q. And everything that you just described is a description of what you have set forth in Section 5 of your report, correct?**

A. I believe -- some of it is discussed in Section 2 for example, as well -- I'm sorry, Section 1 in a summary fashion. It comes up in some other places as well besides Section 5. The data on the vintage contracts, I have just looked at the data. You can see it in the data.

Well, let me also say I have laid out and I cite to my merits report where it is relevant to this, where I examined and actually put them in Appendix C, Roman 3, some quite relevant merits report figures, and cited them in my text regarding the presence of negotiations away from a uniform FSC and so forth. So in all of those ways, I presented this evidence.

BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. So -- but you haven't described any analysis on this question of whether legacy shippers could have escaped fuel surcharges in the but-for world. You haven't described anything in these answers that is not in your existing report, correct?**

MR. CROSS: Objection to form.

BY MR. NEUWIRTH:

**Q. Your report, your merits report and your remand declaration include all of the analyses that you just described, correct?**

A. I believe so. The point I made about the vintaging of contracts, I don't think I wrote about that but it's in the data on the transaction prices that are used in the report and I've looked at them, and I just know that information, but other than that --

**Q. What do you mean by "vintaging of contracts?"**

A. Again, you don't find that when we see contracts signed at some earlier date, transactions entered into at some earlier date in the preconspiracy period, they end up being higher than contemporaneously struck price --

JOSEPH P. KALT

end up with prices higher than contemporaneously struck prices. You don't see them negotiated, waived, reduced or otherwise moved to the level of contemporaneous nonconspiratorial all-in rates. And in economics, we say there is a vintage effect in the price.

**Q. So what did you do to test whether -- in the circumstances you described, fuel surcharges were negotiated, waived, reduced or otherwise moved to the level of contemporaneous nonconspiratorial all-in rates? Let me rephrase that question.**

**What evidence do you have -- what testing did you do to determine whether, for these contracts that you say would be subject to a vintaging analysis, whether there were pricing terms that were negotiated, waived, reduced or otherwise changed as compared to contemporaneous nonconspiratorial prices?**

A. What I have seen in the data is comparing all-in rates from transactions that were struck earlier to contemporaneous ones in the pre-no-conspiracy period. All-in rates



JOSEPH P. KALT

from older transactions -- struck in older transactions -- all-in rates today struck in earlier transactions versus all-in rates being struck in contemporaneous transactions reflecting contemporaneous supply and demand and different -- and contemporaneous competitive prices and nonconspiratorial prices, and what I looked at there is -- I don't find that the contemporaneous prices for example -- well, there are systematic differences when the all-in rates of -- from older contracts are in excess of those in newer contracts, you do not see them. You don't see them basically capped by contemporaneous prices. Just see it in the data. And that is what I looked at.

**Q. When you say you can see it in the data, did you look at just a few examples or did you actually systematically test this?**

A. I looked at Professor Rausser's transaction data and looked at transactions under price authority, price authorities that have been in place prior to a contemporaneous month, and compared it to that month's, a



JOSEPH P. KALT

newly-appearing price authorities that -- new opportunities if you will, looked at that data through out the transaction database for the period up through the end of February 20, 2003.

**Q. Well, Dr. Rausser's database has literally millions and millions of transactions. How many of them did you look at?**

MR. CROSS: Objection to form.

THE WITNESS: I looked at all of the unregulated traffic as I recall for the period in the pre-March 2003 period in the transactions database. It is millions of transactions. I don't recall.

BY MR. NEUWIRTH:

**Q. When you say, "looked at it," what does that mean, "looked at it?"**

A. Well, I systematically calculated -- when I was doing my analyses, I looked at -- I calculated each month's average price under the old contracts versus contemporaneously newly-appearing contracts. I looked at that at every month. I examined whether the new price explained old prices and through simple



JOSEPH P. KALT

statistical analysis, that looked at that straightforward statistical analysis, that looked at whether the new price predicted the older price contemporaneously. It did not. So that is what I did.

I also was able to look at data that broke, I believe, by year, where you could see the effect, so I looked at that information as well.

**Q. Everything you just described relates to this vintaging analysis that you were talking about?**

A. In part, yes.

**Q. And did you -- did you report any of that in your merits report or your remand declaration?**

A. Not directly, I didn't discuss it. I was aware of the vintaging effect in the data but I didn't discuss it. Some of my tests reveal some of that effect. It's one of the reasons that you get structural breaks, for example, in the Figure 5.

In the course of doing Figure 5, you can look at the data. That is one of the

JOSEPH P. KALT

reasons you get structural breaks is because you have turnover of contracts going on in the marketplace.

**Q. And did you produce the results of all your work in the backup materials from which this vintaging effect that you described can be derived? Have you produced all of that?**

A. I don't think so. I didn't directly rely on it. It was behind Figure 5 and I was relying on Figure 5.

**Q. Does it exist?**

A. I suspect.

**Q. Does the backup still exist?**

A. I suspect so, sure.

MR. NEUWIRTH: David, you said you wanted to take a break. I still have some questions, but I wanted to be respectful to you.

MR. CROSS: That will be great. Thank you, Steve.

THE VIDEOGRAPHER: This concludes Disk No. 2 of the video deposition of Joseph P. Kalt.

The time is 11:13:439 a.m.



JOSEPH P. KALT

We are now off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: This begins Disk No. 3 of the video deposition of Joseph P. Kalt.

The time is 11:35:34 a.m.

We are now on the record.

BY MR. NEUWIRTH:

**Q. Dr. Kalt, you observe in your report that the earning power of fuel surcharge formulas adopted or implemented during the class period was often lower than the earning power of earlier fuel surcharges.**

**What is your evidence of that?**

A. In Figure 3, you can see in the third column of numbers, I have calculated for local cargo rates, a comparison between actual FSC rates that were paid on local carload versus what would have been paid under the pre -- at least pre-March 2003 preconspiracy published standard or published conspiracy rate.

I also at Figure 17, do a visual -- a graphical representation and numerical



JOSEPH P. KALT

calculation relating the alleged preconspiracy versus, quote, "conspiracy," published carload FSCs and break it out by individual railroads in Figure 17.

At Figure 18, I again compare alleged preconspiracy versus purported conspiracy FSCs in Figure 18 and in Figure 19. Again, the third column of numbers.

And then in the course of the discussion around those figures, I cite additional facts. I believe I point out that I have various calculations either in my appendices, my work papers or in my merits report which examine the same issue.

**Q. So let's start with Figure 3, which was the first example you gave of evidence that fuel surcharge formulas were often lower during the class period than the earlier fuel surcharges.**

**So on Figure 3, you have a column which is the preconspiracy fuel surcharge rate. This is on Page 23 of your report. That is the Figure 3 you were referring to when you said Figure 3, right?**



**JOSEPH P. KALT**

A. Yes. Yes.

**Q. So what you are using as -- for purposes of comparison is the preconspiracy rate is what you list under that column, preconspiracy FSC rate, right?**

A. Yes.

**Q. And the actual class FSC rate is the rate that you say was the rate that applied during the class period, correct?**

A. It was actually the rate that was actually applied during the class period.

**Q. So for example, for UP, that [redacted] percent number is the number that you derive as you explained earlier from that fuel surcharge formula that UP adopted on December 1st, 2002, correct?**

A. Yes, pre-March 2003, and then the first column, you would have what people actually paid, whether it was that or UP FMC, any of those. But that's the rates.

**Q. The specific question, that [redacted] percent is derived from that December 1st, 2002 UP fuel surcharge that you said before was what you used for Figure 3, right?**

A. I'm sorry. You and I are both tied up. Sorry.

**Q. Let me just ask that again to make sure you heard the question.**

A. I didn't hear it at all.

**Q. This [redacted] percent figure that is in the preconspiracy FSC rate column for UP, that is as you said earlier, derived from the fuel surcharge that UP adopted on December 1st, 2002, correct? That's what you said before.**

A. Yes. In the case of UP and the others as well, that is the preconspiracy standard or published FSC rate. That's what I used for all of them.

**Q. What do you mean by standard? This UP rate, the specific one you used, is the one from December 1st, 2002, correct?**

MR. CROSS: Objection to form.

THE WITNESS: That's correct.

BY MR. NEUWIRTH:

**Q. Now, the next table --**

MR. CROSS: Are you withdrawing the question about what he meant by standard?

BY MR. NEUWIRTH:



**Q. Do you believe that contemporaneous observations by business people at the defendants about their ability to apply a fuel surcharge formula are relevant to determining the earning power of the formula?**

A. They may be. I believe it's appropriate however in most instances, to test that with the data which I have tried to do as an expert.

**Q. And when you say that you have attempted to -- is it a correct understanding of the answer that you just gave that you tested the contemporaneous observations of business people about their ability to enforce fuel surcharge formulas?**

A. I didn't, for example, take a particular e-mail and test that. What I said was, I am aware that the plaintiffs -- what I meant was, I am aware that the plaintiffs make various use of speaking documents and so forth. My job is to go look at the data which is what I've done, and the data say what they say.

**Q. So when you say the data say what they say, did you also consider, besides**



**whatever you found in your data analysis, what the contemporaneous documents of the business people said in determining the earning power of a particular fuel surcharge formula?**

A. Yes, I did.

**Q. How did you do that? In what way did you take account of what they said?**

A. I realized that the plaintiffs, as I said before, make various claims and Professor Rausser makes various use and claims of such documents. I was aware that that was being raised as an issue. I took that into account by then going to the data. I was aware of the issue and then I went to the data.

**Q. So your version of taking -- I just want to make sure I understand what you are saying.**

**When you say you take -- you took account of it in your analysis, is it correct that what you are saying is, you are aware of what the documents said and you tested the data and relied on what the data showed you?**

A. I was aware of how you all characterized what the documents say, fair



enough, and that you were raising it at various times, although Professor Rausser now says that he says whether there was additional earning power is irrelevant, I was aware that that was said. I turned to the data and relied on the data for my conclusions, which I think is what you just asked. So I relied on the data for my conclusions.

**Q. Correct. And whatever conclusions you derived from the data, you did not alter or modify based on anything that you observed in documents that business people prepared at the time, correct?**

MR. CROSS: Objection to form. Overbroad.

THE WITNESS: I don't know how I would modify the data. It would be inappropriate to modify the data. The data are what they are.

BY MR. NEUWIRTH:

**Q. No, I mean, but the conclusions that you drew from the data, you did not -- after you ran the data analysis that you referred to, you did not incorporate into your conclusions**

**anything that was stated by defendants' business people contemporaneously, correct?**

MR. CROSS: Objection to form.

THE WITNESS: I took it into account and asked myself whether I would find it necessary to modify the results of the data and did not find it necessary to modify the results of the data.

BY MR. NEUWIRTH:

**Q. Now do you consider it to be data analysis, as you have just been describing it, to take a fuel surcharge formula that was in existence prior to the start of the class period and -- let me just rephrase so that you have the whole question at once.**

**Do you consider it to be data analysis, as you have just been describing it, to take a fuel surcharge formula that was in existence prior to the start of the class period and run it to see what effect that formula would have had on all-in rates during the class period?**

A. Say it one more time.

**Q. Do you consider it to be the type of**





**data analysis that you have said you did, to take a fuel surcharge formula that had been adopted prior to the start of the class period and to test what effect that formula would have on all-in rates, had it been applied during the class period?**

A. If I understand your question correctly, in light of plaintiffs' claims, that was the kind of data analysis. That would fit within what I was describing as data analysis.

**Q. In fact, that is a type of data analysis that you did?**

A. Right. I have done that in a number of these things. Figure 3, in a number of places I have done that, yeah.

**Q. In fact, that is really a factor in the various figures that you referred to when I asked you where was the evidence in your report of -- to support the idea that there were fuel surcharges adopted and implemented during the conspiracy that had less earning power than preconspiracy fuel charges, right?**

A. If I understand your question correctly, I did do analyses in which I asked,





let's examine fuel surcharges, implemented before the alleged start of conspiracy and apply them essentially to ask what the all-in rate would be if they were applied, and then I even took the next step in some of the figures and said would the models still generate damages.

Analytically, I am doing what a damage model does which is come up with a but-for price during a period of alleged conspiracy, substituting that but-for price into the analysis as a form of data analysis in that case to try to see if there are damages. I have done that form of analyses. I have done a number of those forms of analyses.

**Q. Right. So what you just described, the but-for price would be the fuel surcharge formulate -- the application of the fuel surcharge formula that was adopted prior to the start of the class period as applied to the conditions during the class period?**

A. All in the context of plaintiffs' claims, that is, you know, for some reason, it sticks in my mind, in your remand brief at Page





6 and again at 26, you talk about the case of fuel surcharges adopted prior to alleged conspiracy that did not change, and I tested that hypothesis in the way that you see in this report here.

**Q. Now, is it your understanding that the defendants believed that the fuel surcharges that were set forth in writing prior to the class period worked in the real world?**

MR. CROSS: Objection to form. Vague.

THE WITNESS: What do you mean? What do you mean?

BY MR. NEUWIRTH:

**Q. Well, do you have an understanding that the fact that a fuel surcharge formula was in existence prior to the start of the class period meant that the defendants believed they had the ability to implement it?**

MR. CROSS: Objection to form.

THE WITNESS: I'm aware that the plaintiffs cite documents repeatedly about -- people use phrases like, only theoretically billable and so forth. I talk about those

JOSEPH P. KALT

documents at great length in my merits report.

I've certainly analyzed that issue. I'm very well aware of that being something that you all raise in your representation and so forth. So I have examined that. I have actually put various tests to implement them with the data here, so I am very well aware of it. I have taken it into consideration and I think, effectively, I'm testing that part of the dispute between the plaintiffs and the defendants.

BY MR. NEUWIRTH:

**Q. Your analysis of earning power --**

A. I'm sorry. I need to amend that answer if I could real quick.

In addition, I realize I have taken the issue into consideration for purposes of class certification, not just in my merits report. I discussed this earlier and I showed you the figures and you had the page opened for a minute which reminded me.

I am also aware that this issue I mentioned before that you do not find during the class period or during the alleged



JOSEPH P. KALT

conspiracy period universal application or I think you all cite documents, something about in position of FSC, you quote every opportunity. I recall you all cite those documents.

I have tested that and looked in the class period and found that there is not universal application, you didn't see it here. I also did it in my merits report and I explained to you earlier and in my report, one of the implications of that is it's telling you that there must be reasons related to individuals, why someone in a purportedly nonescapable conspiracy escaped.

Professor Rausser now says it doesn't matter so long as there is something he calls equitable sharing, and I use that phrase, so you can find what I am talking about in my report, I quote it, but in fact, it tells us for class certification, that during class period, there were individual factors affecting whether one had an FSC or not or whether it was billed or not and so forth, and I make that point that -- for class certification purposes,



JOSEPH P. KALT

in order to make any claims of common harm, you have to go and do individualized inquiry, so I didn't want to leave that out of my prior answer.

**Q. Is there anything else you want to add?**

A. No. That was the main point.

**Q. By the way, when you keep using this phrase "you all," about where you find information, who are you referring to?**

A. First of all, pardon the figure -- I get it from my father who was from West Virginia. Sometimes in context, I will be talking about the plaintiffs. Other times, I will be talking about dispute between the parties. If I say a dispute between you all, I apologize if it is not good grammar, but it's what it is.

**Q. I am just trying to understand who you are referring to.**

A. In context, it's either related to the plaintiffs when I say you all cited, and look at you, I know the camera can't pick up you all, but I was referring to plaintiff



JOSEPH P. KALT

there.

**Q. Do you have any independent view of what defendants' contemporaneous documents show, or do you only have the ability to describe what the plaintiffs have said about them?**

MR. CROSS: Objection to form.

THE WITNESS: No. I also have the ability as I express in my merits report, to say that fundamentally, the role of an expert in looking at documents of that nature is -- the role of an expert is to turn to the data. The plaintiffs give one interpretation, the defendants give another, and it is not the job of an expert to arbitrate any dispute that might arise on interpretation.

That is why it is appropriate, the kind of issues we are discussion right now, to turn to the data and that's what I have done in my analysis.

BY MR. NEUWIRTH:

**Q. And in turning to the data, you have --**

A. I lay that more fully out in my

merits report if you recall the discussion. There is a section about that.

**Q. About what?**

A. Where I actually talk about various documents and what an expert probably should do and not do. But I am just referring to that in my merits report.

**Q. Right. But in your -- it's in your reply declaration that you introduce your discussion of earning power, correct?**

A. No. I had done -- the phrase that started to be used, earning power, previously was called onerousness, and I think actually some of the graphs are almost identical. We had done this before, you will recall.

**Q. And -- but you certainly don't talk about earning power per se in your merits report?**

MR. CROSS: Objection to form.

THE WITNESS: Oh, I do.

MR. CROSS: Misstates testimony.

THE WITNESS: A great deal, yes. It was called onerousness then.

BY MR. NEUWIRTH:





**Q. Let me just -- all I am saying --**

MR. CROSS: Let him finish.

BY MR. NEUWIRTH:

**Q. You don't use the phrase "earning power" in your merits report.**

MR. CROSS: Finish your answer to the prior question.

THE WITNESS: My prior answer, I will incorporate it. I might have used the phrase, I don't know, but what happened was you all -- somebody used the word onerous, I used it. Did the same analyses for a number of these things, remember those pictures where I showed like the four companies and the various FSC rates and then in Professor Rausser's latest definition, it started to become a term of art, because he started using the phrase earning power and so I used the phrase earning power.

That's the evolution and etymology of that phrase, so that is how it went, but I examined exactly the same issue and drew the same conclusions, by the way.

MR. NEUWIRTH: Let me mark as Kalt





Remand Deposition Exhibit 1, a document bearing the Bates number UP FSC 0129183, that has attached to it, a document that is not Bates numbered, but that was produced as an attachment to the document that is Bates numbered which is an e-mail chain.

(Kalt Remand Deposition Exhibit 1 was marked for identification.)

BY MR. NEUWIRTH:

**Q. Do you see that at the -- please take whatever time you need to look at the document.**

**Let me just ask you first whether you have seen this document before.**

A. It sure looks familiar, but I have seen a lot of documents. This looks somewhat familiar.

**Q. So do you see that at the top of the first page, and again, feel free to look at anything in this document you want to, but my question is: If you look at the top of the first page, the one with the Bates number, do you see that there is an e-mail from Bob M. Toy, I believe it says, T-O-Y, to Greg Barbe,**





**B-A-R-B-E, at UP.**

**Do you see that?**

A. The very top e-mail?

**Q. Yes.**

A. Yes, I see it.

**Q. Do you see that the subject is: "Forward BNSF Reducing Fuel Surcharge 5/1 to 2 percent."**

**Do you see that?**

A. Yes, I do see that, yes.

**Q. And do you see that it says: "Fuel surcharge dollar are melting away at the competition in a downward pressure environment. What is on paper must not work in the real world."**

**Do you see that?**

A. Yes.

**Q. And did your data analysis cause you to reach a conclusion that -- what the type of observation reported here, that what is on paper must not work in the real world was false?**

MR. CROSS: Objection to form.

THE WITNESS: I took this under

JOSEPH P. KALT
consideration and analyzed the issues that it raised, present my results in my report, analyzed and discuss for UP where we can see whether things are triggered or not, we can see this phenomenon arising in this case in which they are not collecting FSC revenues, it's one of my figures, the one with the pink and red kind of figure.
I took into account Professor Rausser cites it Footnote 174 of his remand report, a similar document from -- within the period of conspiracy concluded that the same economics seemed to be at play in these business people's thinking, so I took it all into account and I realized you tried to interpret -- must not work in the real world in the context of your claims about theoretically billable and so forth, I find that the data indicate when FSCs are not collected, the data indicate that that is overwhelming correlated with the nontriggering of FSCs, that would be consistent with a downward pressure environment, so I considered all that but notice, I keep referring you back to the data



JOSEPH P. KALT
to see the phenomenon and that's what I've looked at.
BY MR. NEUWIRTH:
**Q. Who is the "you" that you were just referring to in that answer?**
A. The plaintiff. Well, and Professor Rausser. He also cites those same kind of documents as I mentioned before. I think he cites the melting away document as well.
**Q. And of course, the not collected analysis you are referring to only relates to instances where the fuel surcharge was billed as opposed to where it wasn't billed, right?**
A. No. In part, it is related to claims made by the plaintiffs and Professor Rausser as well, which Professor Rausser looks at data for Union Pacific and compares -- I believe it is October '02 and September '03 or September '02 and October '03, and claims to be able to discern that the noncollection must be due to greater levels of discounting or non -- of waiving, but misanalyzes the prices that apply in that time period when they clearly indicate that one could not distinguish



JOSEPH P. KALT
Professor Rausser's hypothesis from the nontriggering of the surcharge formula. So I have also taken into account that analysis of Professor Rausser.
**Q. You said, quote: "I find the data indicates when FSCs are not collected, the data indicates that it is something correlated with the nontriggering of fuel surcharge that would be consistent with a downward pressure environment, so I considered all that, but keep referring you back to the data to see the phenomenon and that's what I looked at."**
**So we are now talking about the analysis that you did. Okay? That answer was referring to your own analysis?**
A. Your next question prompted me -- your next question prompted me --
**Q. I am asking -- fine, so -- but what I just read to you, you were talking about your own analysis, correct?**
MR. CROSS: Objection to form.
THE WITNESS: Yes.
BY MR. NEUWIRTH:
**Q. Okay. And when you found the data**



**JOSEPH P. KALT**
**indicated whatever you found with respect to fuel surcharges that were not collected, that analysis you did of fuel surcharges that were not collected, only related to circumstances where a fuel surcharge was billed, but not collected, as opposed to where the fuel surcharge wasn't billed, correct?**
A. No, that is not right. I looked at both.
**Q. How did you look at the latter? How did you look at where a fuel surcharge wasn't billed? What method did you use to determine that a fuel surcharge had not been billed?**
A. I am able to see in the data, for example, of Figure 20 and similar figures in my merits report, where I am able to examine data, where we see, as I state here, fuel surcharges that -- first, that was coverage, meaning a fuel charge applied and whether the fuel surcharge was triggered and assessed. And so in addition to the kind of analyses I do in Figure 22 and 23, I was also able to examine what had been claimed to be by Professor Rausser, noncollections and determine that, in

JOSEPH P. KALT
fact, that conclusion was not justified, that what he was looking at was associated with nontriggering rather than noncollection. So I did that analysis.
**Q. Figure 20 is -- it is represented to show the percent of revenue with revenue-based fuel surcharges, right?**
A. It shows -- in the lighter colors, it shows the percent of gross revenue for movements, assessed revenue-based FSCs billed, in other words, I think you were using the term at least here in this figure, I used assessed, and then it shows in the darker additional area, light plus dark showing you total coverage. Okay? So it is showing the difference between coverage and collection.
**Q. Right.**
A. Okay.
**Q. And -- but coverage and collection doesn't tell you anything about whether the fuel surcharge was actually billed, does it?**
A. I've used Professor Rausser's data here and treated it the way he does. Again, in my remand report, his data. He treats that



JOSEPH P. KALT
data for the damage analysis as collected, that is, these are write-offs of the weigh bills. He intends, as I understand it, to use them to say you paid this much and you should have paid a lower price, so I have treated it in the same way he has for this purpose.
**Q. Let me ask you something, Dr. Kalt. Have you, as an expert, determined whether this data shows whether or not a fuel surcharge was billed? Have you independently made a determination of that?**
A. In the sense of -- yes, I guess so, in the sense, obviously, the transactions data and the weigh bills have to come from the defendants, so none of us can independently do it beyond getting data from the defendants, but I worked with this data and in my merits report, I worked with the data as well.
For purposes of my remand report, I've relied on Professor Rausser's data on billing, and the proposition that he says, he will assess damages against this billing.
**Q. Okay. My -- so I take it the answer is no, you don't know looking at this Figure 20**



**JOSEPH P. KALT**
**what portion of the light-shaded area was actually billed?**
MR. CROSS: Objection to form.
THE WITNESS: No, I believe we do know this was assessed. This was billed.
BY MR. NEUWIRTH:
**Q. And you independently determined that?**
A. They come from the weigh bill data and my understanding is that data reflected the billing. Now, I say in the context of this report, I have considered, suppose that data doesn't accurately reflect that. This is Professor Rausser's data, in which it is treated for purposes of damage analysis as billed and collected, not just billed, but billed and collected, because that is what he is going to assess his damage against. If it wasn't collected, you were not damaged.
So I am trying to remember this data. I am trying to assess the reliability of his modeling and his damage calculations.
**Q. And --**
A. That's what I have done in this



JOSEPH P. KALT
figure.
**Q. And the gray bar that is shown on each of these charts, the solid gray bar is for the period -- where does that gray bar start?**
A. It starts on March, and runs through the end of June. It's this period of alleged start of -- formation of conspiracy, I think is the phrase that Professor Rausser is now using.
**Q. And is it correct that in Figure 21, which is your new opportunities chart, that while in this instance you used Rausser data, is it correct that the methodology in Figure 21 for calculating the percentage of new opportunities is the same methodology that you used in your merits report?**
A. I believe that is right. I have used here Professor Rausser's new data in my merits report, I did these kinds of calculations with the data he was using at the time of his merits report.
**Q. But the methodology, you now used a different set of data, but the methodology for determining what was a new opportunity and what is reported here, is the same as in your merits**

**JOSEPH P. KALT**

**report?**
A. I believe so. I would have to go back and check the code exactly. I believe that is accurate. I don't recall any changes as I sit here right now.
The pictures look a little different because his data set changed.
**Q. Now, have you done -- do you understand what would be meant -- let me frame it this way.**
**Are you comfortable if a fuel surcharge -- actually, let me frame this again.**
**Have you done any work to compare how much over-recovery fuel surcharges triggered in the class period compared to the preclass period? By over-recovery, I mean revenue beyond the actual cost of fuel.**
MR. CROSS: Objection to form.
THE WITNESS: I have done that analysis in my merits report at Figures 412 A through 412 D in the surrounding text.
BY MR. NEUWIRTH:
**Q. Can you just tell me what pages you were just looking at?**



**JOSEPH P. KALT**

A. Page 412 A is on 297 -- 296.
**Q. Okay. Now, do you believe that over-recovery of costs through a mechanism that is presented as a cost recovery mechanism, like a fuel surcharge, is something that economists would expect to result in changed behaviors by both sellers and buyers in a competitive market?**
MR. CROSS: Objection to form on many grounds.
THE WITNESS: Can I have that again.
BY MR. NEUWIRTH:
**Q. Yes. If the imposition of a stated cost recovery mechanism, like a fuel surcharge, resulted in over-recovery of the actual costs that the mechanism was meant to recover, in this case fuel, isn't that something that economists would expect to result in changed behavior by both sellers and buyers in a competitive market?**
MR. CROSS: Objection to form.
THE WITNESS: If I am focused in an antitrust context on the prices that result through the interaction of suppliers and



JOSEPH P. KALT

demanders, I mean, there might be some other behavior unrelated to an antitrust case, once I read it, but I don't know, but if I am focused on interactions of suppliers and demanders that the set the prices in a competitive market and that's what I test in my merits report, you would not expect that to cause prices to deviate from competitive marginal cost base price for example, in a competitive market, so you wouldn't expect that change to arise.
**Q. So just to make sure we are talking about the same thing.**
**If hypothetically, you had something called a dinner cost recovery charge in a circumstance where you needed to eat dinner as part of the service provided, and the sellers represented that this dinner cost surcharge was meant to cover the cost of dinner and it turned out that it was actually collecting far more than the cost of dinner, wouldn't an economist expect that in a competitive environment, the fact that this mechanism was over-recovering on the cost it was represented to cover, would cause the purchasers and the sellers to change**



**JOSEPH P. KALT**

**their behavior?**
MR. CROSS: Objection to form.
THE WITNESS: And so you're not in a competitive market anymore?
BY MR. NEUWIRTH:
**Q. I am talking about --**
A. You mean marginal cost?
**Q. I said in a competitive market. I said that there is something called a dinner cost surcharge in a circumstance in a competitive market, where the sellers of the product eat dinner as part of the service, and they say that they are using this dinner cost surcharge to recover the cost of the meal that they eat, and it turns out that, in fact, the dinner cost surcharge is collecting far more than the actual cost of the dinner, wouldn't an economist in that competitive environment expect the result to be that sellers and purchasers would change their conduct in response to the fact that the surcharge was over-recovering the cost it was meant to cover?**
MR. CROSS: Objection to form.
THE WITNESS: I can tell you what I

JOSEPH P. KALT

think the research says, and it says that -- there is a language of commerce that we use in which people often use that kind of language, but that we do not find in a competitive market that kind of oral presentation and discussions or representations between buyers and sellers in a competitive market, causes prices to deviate in competitive markets from marginal costs.

We all recognize that such language occurs in commerce, but the evidence doesn't say that it upsets the marginal cost equilibrium in a competitive marketplace. And somehow, for example, it will allow you to get above your marginal costs in other words, in a competitive equilibrium.

BY MR. NEUWIRTH:

**Q. Now, I want you to accept as true for purposes of this question, the assertion that for the four defendants in this case, the earning power of their fuel surcharges, as you defined it, did not change, both from the preclass period to the class period.**

A. They went into the class period with



JOSEPH P. KALT

identical surcharges. This is important to think about, right?

**Q. Well, I wouldn't -- I want to just say it the way you said it in your report that -- I want you to accept this as true.**

A. Well, you're giving me a hypothetical.

**Q. I am giving you a hypothetical. I want you to accept as true, the notion that there was no change in earning power, as you defined it in your report, between fuel surcharges in the class period and fuel surcharges before the class period. This is a hypothetical question.**

A. Now, and I'll take that to mean that they go from class -- from preclass to class period with just no change in the formulas.

**Q. Well, I don't think -- I don't think -- you don't even say that in your report. You say that the earning power of the formulas stays the same.**

A. I know, but what I am referring to is if you look at the charts where I show those graphs, they may be average .1 percent



JOSEPH P. KALT

difference, but they are going up and down a little bit. So now you are asking me to assume they are the same and I'm telling you --

**Q. I am not asking you to assume they are the same. I'm asking you --**

A. On average over the entire period?

**Q. Is it not a conclusion of your report that the earning power of the fuel surcharges between the preclass period and the class period did not change?**

A. What I have said is, when you look at -- over the whole period, you find them to be very close, in some cases, one -- .1 percent above or below. I am just pointing out to you that I presented in my data, that wasn't the statement that said every moment, there wasn't a blip up or down. I mean, you used the word same. That's why I'm trying to -- I didn't know how strict you wanted me to be with the word same.

**Q. For purposes of this hypothetical, let's assume the correctness of what you just said that over the period we're looking at, the preclass period and class period, the earning**



**JOSEPH P. KALT**

**power of the fuel surcharges stayed roughly the same in the way you defined it with some --**

A. The way my pictures show.

**Q. -- with some variation?**

A. I will assume the picture show what they show.

**Q. Right. I want you to assume for purposes of this hypothetical, not tell me why it is not true, but assume for purposes of this hypothetical, that it is nonetheless found that all-in rates for freight shipments went to super competitive levels as a result of the conduct of defendants that is alleged in this case. I want to be clear.**

MR. CROSS: Objection to form.

BY MR. NEUWIRTH:

**Q. I am not asking you -- you are not -- whatever you say in this answer, you are not agreeing that that happened. I am just asking you a hypothetical question to understand what conclusions to draw from your report. So I promise you, we will never say that the answer you are about to give is an answer where you say all-in rates went to super competitive**

JOSEPH P. KALT

**levels as a result of what the defendants alleged.**

**I am just asking you as a hypothetical matter, if it is determined that what your charts show about earning power is correct and accurate, and it is also demonstrated that as a result of defendants' conduct, all-in rates went to super competitive levels, under that hypothetical scenario, would you conclude that the conspiracy alleged in this case had no impact?**

MR. CROSS: Objection to form. Vague. Internally contradictory.

THE WITNESS: I don't think you can say yes to that, because you would have to say -- yes or no. It is -- if I take the claims to be the alleging of what the Court ends up calling a tax arena, and you all adopted and in your class reply motion, you refer to the phrase nothing like, then you would say that under that theory presented by the plaintiffs, the result is a non sequitur, that is, they were exactly alike but your -- you are asking me to assume it, so exactly alike that they



JOSEPH P. KALT

could not have been the cause, so a tax theory of the conduct of the defendants could not generate your result and your hypothetical would not make sense. Under some other theory, there must be something else going on, and I understand that Professor Rausser now asserts a generalized theory of but-for noncollection, discounting, et cetera, and he can make that assertion as a tautology. He can say that is what generates damages, but for the purposes here, I have drawn no such conclusion.

I am focused on class certification. Even if that were true, you would not be able to show that damage on a common classified basis, without doing individualized inquiry and why one guy got a discount, another one might not have. When they got it. How deep was it, was it discount or noncollection. You would have to do that kind of inquiry, like Section 5 in my report.

BY MR. NEUWIRTH:

**Q. And is the answer that you just gave to the hypothetical I posed, what you consider to be the best answer you can give as an**



JOSEPH P. KALT

**economist?**

MR. CROSS: Objection to form. What does that mean?

THE WITNESS: What does that mean?

BY MR. NEUWIRTH:

**Q. I am asking you: Is that the best answer you think you can give to the hypothetical as an economist?**

MR. CROSS: Objection to form.

THE WITNESS: I would imagine --

MR. CROSS: Nonsensical question.

THE WITNESS: I would imagine if I thought more, I could do better, that is, I prepare lectures all the time and usually I just gave you an answer -- a lecture off the cuff. I would probably do better in making you understand it, if I had more time, I would imagine, but I certainly have given you the correct economics in my answer. I may say it better. Best is a little --

BY MR. NEUWIRTH:

**Q. Let me put it that way. So you are comfortable --**

A. I think I've accurately described



JOSEPH P. KALT

the economics, yes, based on these two theories.

**Q. Right. And you feel -- based on your expertise reflected in your CV, you believe that you have given the correct economic answer to that hypothetical?**

MR. CROSS: Objection to form.

THE WITNESS: If you mean, a trained economist, a teacher and so forth?

BY MR. NEUWIRTH:

**Q. Yes.**

A. And I have analyzed this case.

**Q. Yes.**

A. Which is -- this remand report is not on my CV yet.

**Q. Yes.**

A. Maybe it is. Based on my work in this matter and my training as an economist, I think I've accurately described the economics that are implicit in the tax theory, the nothing-like theory of -- that has been raised by plaintiffs. I understand that Professor Rausser says he doesn't find that relevant anymore and I said, as a tautology, he could

JOSEPH P. KALT

say, I have got another theory of nonescape and associated failure to renegotiate discounts or otherwise noncollect FSCs during the class period.

That could generate your hypothetical answer, result that you hypothesized, but for purposes of class certification, I focused on whether to generate the answer at the level of the individual class members and it cannot. I think that is the accurate economics without doing individualized inquiry that I talked about particular in Section 5 and other places in my report.

**Q. So what do you mean when you say but for purposes of class certification, you are focusing on individual -- you are focusing on whether it could generate the answer at the level of individual class members and it cannot -- you just explained what you meant by that statement.**

A. I interpreted our purpose here as related to class certification. I interpreted, without giving legal opinion, I do understand that you all, both sides of the table, are



JOSEPH P. KALT

concerned with the question of whether Professor Rausser's damage model provides demonstration of a common fact of injury across the class, and that that in some deep sense or profound sense, that is what brings us here today.

I have pointed out in my report the various reasons, ranging from the very nature under the second theory of what causes injury as being -- requiring individualized inquiry into the factors I discuss in Section 5.

Secondly, I point out that Professor Rausser has no model of the coverage of these FSCs legacy or class during the alleged damage period and no model by which to come up with but-for rates and levels of noncollection, discounting and negotiations, et cetera.

And so that's what I am referring to is what I thought was the -- at least probably the central thing I thought at this proceeding, which deals with whether we have a reliable model before us that can demonstrate a common fact of injury across the class. Now this second theory I am telling you, I don't believe



JOSEPH P. KALT

it is accurate. I don't think it can.

**Q. So is it your understanding that Dr. Rausser's damages model is what Dr. Rausser is using to determine whether the conspiracy had a common impact on the class?**

A. My understanding is that Professor Rausser, in fact, does use the model because he refers when shown results, that show injury to legacy shippers. His response is to say that is what my model shows, because legacy shippers, in fact, should be damaged and it is just proof, he has actually an almost verbatim discussion like that. That is what I expect and that is how I find and justify the common impact.

**Q. But legacy shippers are not in the class, are they?**

A. Let me say, I need to add to that last answer.

I pointed out to you in my previous answer that Professor Rausser does not have a model of what is now under the nonenforcement theory of injury. He does not have a model of that process and has not provided any basis by



JOSEPH P. KALT

which to, No. 1, identify a common fact of injury, much less measure its magnitude and impact on a common classified basis.

**Q. Legacy shippers are not part of the class in this case, are they?**

MR. CROSS: Objection to form. Misstates the facts.

THE WITNESS: From a legal perspective, that is right. In Professor Rausser's newest remand report, I just have to say that remains unclear, that is, what he defined as legacy, by his own application of the legal criteria, he is now saying some of his legacy are not legacy, but are class. Although he doesn't appear to put them back into his data set for class.

BY MR. NEUWIRTH:

**Q. Here is Dr. Rausser's report. Can you show me where he says that?**

MR. CROSS: Objection. Says what?

MR. NEUWIRTH: What he defined as legacy by his own application of the legal criteria. He is now saying some of his legacy are not legacy, but are class.

HIGHLY CONFIDENTIAL
Joseph P. Kalt - 5/7/2014

Page 174

JOSEPH P. KALT
THE WITNESS: You mean that phrase?
BY MR. NEUWIRTH:
**Q. You just said that that is what Dr. Rausser says. I am asking you to show me where in his report he says that.**
A. Well, I was not quoting him directly. What I was referring to --
**Q. You were describing what you said his report said. Tell me where in his report --**
MR. CROSS: If you stop interrupting him --
MR. NEUWIRTH: I am not interrupting at all, David. Stop the nonsense.
MR. CROSS: You did interrupt him.
MR. NEUWIRTH: Nobody is being interrupted. We are just trying to get through something and your objections here are just purely disruptive.
THE WITNESS: And you're asking where that quote appears? Is that what --
BY MR. NEUWIRTH:
**Q. I am asking you -- I'm not asking you for the exact words, you said that this was**

Page 175

**JOSEPH P. KALT**
**a description of what you understood to be in Dr. Rausser's report. So I am asking you where that substance appears in Dr. Rausser's report.**
A. Thank you. Thank you.
In his analysis, he presents calculations in which he represents them as being transactions that he now finds occurred following the onset of the class date of July 1st, 2000 and -- following June 30th, 2003.
And he does that analysis, for example, in his table -- for example, in Table 2, where he presents at Line 1, data from his designated legacy class that he says arose from transactions that were commenced on or after July 1st, 2003. And I understood, because I believe he quoted it earlier, that he understood that -- that you couldn't be legacy if the contract was actually struck and in place and enforced in the period prior to that. You had to be class. He does it again in Table 3 and Table 4 and the text related to those.
And, in fact, when he says -- and he says in his quote on Page 39, decomposing rather than deconstructing, he says decomposing

Page 176

JOSEPH P. KALT
legacy shipments. He discusses in there again, various volumes of his legacy contracts that he now says he finds to have been put in place following the onset of the class period, and therefore, disqualified his legacy, and he does that for each of the defendants through the next series of figures.
**Q. So the only thing you are referring to, the fact that Dr. Rausser found that there were certain contracts that had been said to be legacy contracts that, in fact, were entered during the class period?**
MR. CROSS: Objection to form.
THE WITNESS: He had previously designated them as legacy and now he says he finds that they were entered into following the onset of class period. That's -- I've discussed that. In addition, the logic of his reasoning would also apply to his treatment of contracts that have what he called self-adjusting provisions, because from an economic -- in an economic sense, because in an economic sense, what he means is that they are self-adjusting, so they are renewed every time

Page 177

JOSEPH P. KALT
they are adjusted, and so any renewal or adjustment that occurred after the onset of the class period could not be in legacy by his logic.
BY MR. NEUWIRTH:
**Q. Is it your position that Dr. Rausser says in his report, in words or substance, that a legacy contract entered prior to the start of the class period that had a self-adjusting fuel surcharge is part of the class now?**
A. He has not put it in his class data in substance though his logic -- the economic logic of what he is saying says, well, I should treat that as a new contract subject to the conspiracy, because its terms and conditions are changing because of this self-adjustment and the new -- when an FSC gets adjusted, the new FSC that goes in will find self-adjustment, so in the substance, I think that is what it means.
But he's not -- he's not moved anything to the class based on this. That is one of the problems here.
**Q. Do you agree with that, what you**

JOSEPH P. KALT

**just described? Is that analysis that a self-adjusting contract, the economic logic of it, is that the fuel surcharge that self-adjusts is like what happened to the contracts that were entered during the class period?**

MR. CROSS: Objection to form.

THE WITNESS: Is likely.

BY MR. NEUWIRTH:

**Q. Well, you said --**

A. No, that is not what I said at all.

**Q. You said -- you said the logic that you were referring to was a logic that -- a contract that has terms and conditions that are changing because of the self-adjustment is logically like a new contract entered during the class period because the terms have changed.**

**Do you agree with that logic?**

A. My -- I don't have an opinion as to the legal implication of that.

**Q. I didn't ask you. I said: Do you agree with that economic logic?**

A. Let me finish. Let me finish my



JOSEPH P. KALT

answer.

**Q. Well, answer the question, which was: Do you agree with the economic logic?**

MR. CROSS: Let him finish and don't interrupt him again.

THE WITNESS: From an economic perspective, what I have done is I neither agreed or disagreed. I tested its implications, that is what I do in, for example, Figure 2 and Figure 3 and other figures. What I did was I tested the implication. Let's assume it is subjected to the conspiracy and in that sense was like what else is supposed to be in the class according to Professor Rausser, and I tested whether the model would find damages if that, in fact, took picking up on what you and others have said in your remand brief and so forth, and looked in my Figure 2, for example, and said, okay, it has an adjustment provision, but it was never adjusted, or it got less -- it had less onerousness, less earning power, and I tested whether the model would still generate damages. That's the way I've looked at it.



JOSEPH P. KALT

I have not made a decision what he's going to do about this class. He's -- he is the one bringing this data saying, this is my class, this is legacy. I am just testing whether it is reliable or not.

BY MR. NEUWIRTH:

**Q. Right. And this is consistent with your view earlier that Dr. Rausser was solely responsible for the determination of what was a legacy contract, correct?**

MR. CROSS: Objection to form.

THE WITNESS: That is not at all -- come on.

BY MR. NEUWIRTH:

**Q. Is that not your position?**

A. Solely responsible? He, like everybody else, has to get the data and some information where I told you -- from the defendants, from the records. What he did though is make his own judgments. He takes BNSF and he first ignores the name, creates legacy that he uses all the way up through his merits reply report and then comes back now and criticizes himself for doing that, and uses the



JOSEPH P. KALT

name data that BNSF had already given him. That is what I've told you. That seems -- that's what happened. I don't know what else to say.

**Q. You seriously believe that Dr. Rausser criticizes himself in his report?**

A. Well, if he made the choices to not -- for example, not use BNSF name data that he had, not used UP provision data that he had, used CSX data on date and provision that he was told didn't work and he never used it until now, had previously created data sets that he's presenting to us all as reliable, and now he is coming back and saying, what I did before was unreliable.

He says they are contaminated. He didn't tell us that before. He said these -- what I did before are contaminate for these reasons because I've changed choices as to how I'm going to calculate legacy. That is what he has done.

**Q. And I assume that you very carefully reviewed Dr. Rausser's report in connection with the work that you have been doing on**

Page 182

JOSEPH P. KALT
**remand?**
A. Yes. Yes.
**Q. And I assume you read it very thoroughly?**
A. Yes.
**Q. Maybe more than once?**
A. Yes. So have you, I'm sure.
**Q. And this -- and I take it that this characterization you just gave of what is going on in Dr. Rausser's report reflects the work that you have done with it on remand?**
A. Not just the report, but his work papers.
MR. CROSS: Steve, can I ask -- I was just going to ask whether we should break for lunch when you are ready.
MR. NEUWIRTH: We can break whenever you and Dr. Kalt would like to.
THE VIDEOGRAPHER: This concludes Disk 3 of the video deposition of Joseph P. Kalt.
The time is 12:42:50 p.m.
We are now off the record.
(A short recess was taken.)

Page 183

JOSEPH P. KALT
THE VIDEOGRAPHER: This begins Disk No. 4 of the video deposition of Joseph P. Kalt.
The time is 1:36:32 p.m.
We are now on the record.
BY MR. NEUWIRTH:
**Q. Dr. Kalt, could you be good enough to look at the errata sheet that accompanied the report that you -- I'm sorry, the declaration that you -- or that was transmitted to us yesterday.**
A. Yes.
**Q. And can you tell me when this -- well, first let me ask you: Did you prepare this errata sheet?**
A. Yes, I had my staff with me finding the typos and so forth, but this is my responsibility.
**Q. And can you tell me roughly when this errata sheet was completed?**
A. I think it was probably completed either yesterday morning or the evening before.
**Q. And at -- during what period of time were these errors identified?**

Page 184

JOSEPH P. KALT
MR. CROSS: Objection to form.
THE WITNESS: We had issued some errata fairly soon after the report. These particular ones, I guess I became aware of some of them, not all of them, probably -- what is today? Today is Wednesday. Probably last Thursday or Friday, something like that.
BY MR. NEUWIRTH:
**Q. And were these -- were these matters that you correct on the errata sheet, things that were identified in connection with preparation for this deposition?**
A. No. I had some staff looking for typos and so forth, independent of preparation for the deposition.
**Q. So let me ask you if you could turn to Paragraph 3 in your report, and your errata sheet indicates that in the last line of Paragraph 3 on Page 2 of your report, quotation marks were removed from the phrase common proof for determining injury and damages.**
A. Yes.
**Q. Correct? And so it is correct, isn't it, that in the prior version of this**

Page 185

JOSEPH P. KALT
**declaration where those quotation marks were present, you were attributing a quote to Dr. Rausser that you have now determined he actually didn't make?**
MR. CROSS: Objection to form.
THE WITNESS: No, actually, that is not what happened. Actually what happened was is I wrote that, that I was thinking of this phrase that I hear a lot just in the context of class certification, and then one of my staff pointed out, it looks like you are attributing it to Professor Rausser and we don't want to leave that impression.
So it's actually more me saying, common proof of injury or scare quotes as they call them, and then my staff pointed out that so -- that could look like you are attributing that to Rausser.
BY MR. NEUWIRTH:
**Q. Who on your staff pointed that out?**
A. I don't know. Charlie Augustine maybe.
**Q. When was this pointed out to you?**
A. I think last Saturday, maybe.

JOSEPH P. KALT

**Q. So four or five days ago?**
A. Uh-huh.
**Q. And you can't remember for sure who said it to you?**
A. I had my staff assembled when we were sitting around the table. I don't know exactly who said it to me.
**Q. And then if you can look at Page 8 of your report, Paragraph 15, and the second sentence as indicated on your errata sheet indicates previously said, he, meaning Dr. Rausser, acknowledges that he is not modeling damages from economically more aggressive or onerous fuel surcharges, meaning surcharges that yielded more revenue at a given cost of fuel than the FSC applied before the class period, correct?**
A. Yes.
**Q. That's what it used to say?**
A. Yes.
**Q. And that has now been changed to say plaintiffs acknowledge that Professor Rausser is not modeling damages from economically more aggressive or onerous fuel surcharges, et**



**JOSEPH P. KALT**

**cetera, right?**
A. Right.
**Q. So does this mean that your original version of this declaration had attributed to Dr. Rausser an admission that he, in fact, did not make?**
MR. CROSS: Objection to form.
THE WITNESS: No, that is not an accurate view. If you look at Footnote 19, which didn't change. It was always attributed to the plaintiffs. It was a typo in the writing. It was always attributed to plaintiffs, if you look at the citation.
BY MR. NEUWIRTH:
**Q. So you consider changing from he acknowledges that he is not -- to plaintiffs acknowledge that Professor Rausser is not to just be a typo?**
A. It was written incorrectly. We had already cited -- if you look back in the original report, we cited the plaintiffs documents.
**Q. Well, do you consider -- do you consider something being written incorrectly to**



**JOSEPH P. KALT**

**be a typo?**
MR. CROSS: Objection to form.
THE WITNESS: Well, it was written incorrectly. It is not a misspelling, but it was not accurate. It was always citing the right document but it was inaccurate.
BY MR. NEUWIRTH:
**Q. What was that --**
A. So I fixed it.
**Q. And the thing that was inaccurate was saying that this was something that Dr. Rausser acknowledges, correct?**
A. That was inaccurate so I corrected it.
**Q. So I have nothing further on the errata.**
A. I'm sorry. Again, I don't want to leave the false impression. I believe actually Professor Rausser essentially says the same thing. Now he says it is irrelevant to his model, I quote him elsewhere on that, so I didn't want to leave the impression that he didn't acknowledge that, but the citation was to plaintiffs' documents.



JOSEPH P. KALT

**Q. So you are now saying that even though you made this change, you meant what you said the first time around?**
A. I think it was true the first time around. He says and I quote it later, where he says that he finds it irrelevant now whether there was different earning power to FSCs, so I believe in sum and substance, he certainly has acknowledged it, but this citation was incorrect, incorrectly attributed to him. The citation was always to the plaintiffs' documents.
**Q. Right, but didn't -- didn't this plaintiffs' document that you cite here, didn't that predate the original class certification decision?**
A. It may, yeah.
**Q. It may. You have doubt about that? It's from 2011.**
A. I don't recall the exact date.
**Q. That class decision was in 2012.**
A. Okay.
**Q. And so the assertion in this sentence about what plaintiffs now acknowledge**

JOSEPH P. KALT

**is actually from a different part of the case, isn't it?**

A. That's right, yeah.

**Q. So your position is that this is something that plaintiffs acknowledged even before the remand proceedings?**

A. Apparently, yeah.

**Q. So unless you have anything further to add at this point, I have nothing further on the errata sheet.**

**Now, it is correct, isn't it, that you did work on calculating a [redacted] and determined, based on that analysis, a [redacted] is that correct?**

A. No, what I -- that is not quite correct. What I did was corrected the STP, the data error that was present in Professor Rausser's calculation and examined [redacted], what impact the STP model, what impact that had on his calculations in [redacted]

**Q. And through that work, you came up with a [redacted], correct?**

A. His STP model comes up with that. I



JOSEPH P. KALT

did run his model, if that's what you mean.

**Q. When you say his STB model, do you deny that through the steps you just described, you determined through your use of his model, that there was a [redacted]?**

A. I used his model. That's what I just said to you, yes.

**Q. So this was a determination you made using his model, correct?**

MR. CROSS: Objection to form.

THE WITNESS: Quite right. What's going on is, I used his model. The model determines it. I don't calculate it outside of the model. His model determines it when you put in the correct data. I did that. I am not -- no denying that. I did -- I reran his model with the correct data. There is no question about that.

BY MR. NEUWIRTH:

**Q. Do you know what it means to demur at a deposition?**

A. No, that's a legal term. I don't know what you mean.

**Q. Do you think that what you just did**



JOSEPH P. KALT

**is an example of demurring in response to a deposition question?**

MR. CROSS: Argumentative. You don't have to answer that.

BY MR. NEUWIRTH:

**Q. You do have to answer it.**

MR. CROSS: He said he doesn't know what the term is.

MR. NEUWIRTH: Are you instructing him not to answer?

MR. CROSS: I'm not, but he said he doesn't even know what the word means.

MR. NEUWIRTH: But you're not instructing him not to answer?

BY MR. NEUWIRTH:

**Q. Do you think what you just said --**

A. I just told you, I don't know what you mean by it, so I don't know what --

**Q. You've never heard that phrase used, demurring at a deposition?**

A. I don't think I have actually.

**Q. You never read it anywhere?**

A. I don't recall it. I have heard the word demur but not demur at a deposition. I



JOSEPH P. KALT

don't think I have heard it.

**Q. Now, it is accurate, isn't it, that the steps you took to get to the [redacted] included removing intermodal data from the data set that was used, correct?**

A. It was the intermodal data that was wrong, and yes, I took it out. It was wrong data.

**Q. Now when you say that it was wrong data, what was your basis for determining that intermodal data was wrong data?**

A. When you examine the data, and I show you the graph of it in my appendix, you find an abrupt drop in the data at the start of the year. I think it's 2004. We did -- that was not plausibly associated with a change in fuel costs or variable costs of the railroads.

We then investigated the issue further, found several things. One, that ultimately, what we found was that the surface transportation board had changed the data that it collected in reports and used it to calculate variable costs by adding a new line to their R1 reporting forms. I think it's Line

JOSEPH P. KALT
134, and this causes a -- we found out that was -- the change in the form was reported in the Federal Register, the document I cite in my appendix, that uses this data. We investigated with the STB what happened. It had to do with the changing technology of intermodal carriage and in particular, the carloads per car bed. And we also found that it had been pointed out in the literature by Christianson & Associates and their studies for the STB in their 2008, 2009 and 2010 reports.

**Q. Are you aware of any instance where the STB at the time of or following the change that you just said you determined had occurred, removed intermodal data from any analysis that it undertook of variable costs?**

MR. CROSS: Objection to form. Nonsensical.

THE WITNESS: For any reason?

BY MR. NEUWIRTH:

**Q. I am asking you: Are you aware of any STB report on variable costs that excluded intermodal data at or after the time of the change that you just described?**



**JOSEPH P. KALT**

A. Actually, it goes the other way. They had excluded the data prior to its inclusion as Line 134 of the R1, and so it went the other direction. In other words, they added data in and caused a break in their data and their data series.

**Q. Well --**

A. So previously, all their variable costs did not have this Line 134 data in it and subsequently, it does.

**Q. And at the time the STB made this change that you say it made, did the STB say that any of its prior data was no longer reliable because of this change?**

MR. CROSS: Objection to form.

THE WITNESS: I don't recall them saying those words. They had -- they did put a notice in the Federal Register that they were making the change. It is pretty cryptic and we had to do further investigation to even understand exactly what they were doing.

BY MR. NEUWIRTH:

**Q. And was the further investigation that you spoke to a Mr. Boyles at the STB?**



**JOSEPH P. KALT**

A. We looked in the Christianson materials. We spoke to Mr. Boyles and we examined the R-1s themselves.

**Q. Now, when you spoke to Mr. Boyles what did he tell you?**

A. He explained that because of the changing technology over time that the -- the intermodal carriage that the STB had become concerned that its data on intermodal -- that it was using a URCS costing analysis were not accurate or as accurate as they should be, and that that prompted their issuing to the Federal Register and then eventually implementing the new data collection that you find in Line 134 of the R-1.

**Q. And did Mr. Boyles tell you anything else?**

A. I believe he told us also that there -- I think he may have been the one that indicated that there was a notice in the Federal Register. He probably was the one who first told us what line in the R-1 had been changed or added. That is what I recall.

**Q. Did you take notes of your meeting**



**JOSEPH P. KALT**

**with him?**

A. No. I didn't have a meeting. Phone call.

**Q. Did you speak to him on the phone. Did you take notes of the phone call?**

A. My staff did.

**Q. Have those notes been produced?**

A. I don't know if they have.

**Q. Do you know if they still exist?**

A. I don't know if they were ever taken so I'm not sure. I just don't know.

**Q. Well, if you don't know if they were ever taken how were you able to remember exactly what Mr. Boyles said?**

A. Well, as I said, I told you everything I could remember. I don't know I remember every word, but it was certainly clear that this new line had been added to the R-1. I confirmed that, that he had told us about. There was a notice in the Federal Register. We confirmed that. There was a break in the data that you can see in my appendix so I confirmed things that he said. That is what I did.

**Q. Mr. Boyles told you there was a**

**break in the data?**
A. We knew that the change in the data collection would cause a break and sure enough it did.
**Q. Did Mr. Boyles tell you it would cause a break?**
A. I don't recall one way or the other. I could look at it myself so I looked at it myself.
**Q. So you don't know one way or the other whether Mr. Boyles told you that?**
A. I don't recall.
**Q. And is it possible that you don't recall anything else Mr. Boyles told you?**
MR. CROSS: Objection to form. It's impossible to answer.
THE WITNESS: I have given you what I recall. That is all I can say.
BY MR. NEUWIRTH:
**Q. And why is this funny?**
MR. CROSS: Because he can't recall what he can't recall.
THE WITNESS: Can't recall what you can't recall.





MR. NEUWIRTH: You are not testifying today.
MR. CROSS: It's a silly question. That is why it is funny.
BY MR. NEUWIRTH:
**Q. You think it is a silly question, too, Dr. Kalt?**
A. There is some illogic in asking: "What else can you recall about what you can't recall?"
That was the structure.
**Q. No, the question was: Do you think it's possible that there are other things that you don't recall given that you contact recall whether or not he told you that there was a break in the data?**
MR. CROSS: Same objection.
THE WITNESS: I don't think that is what you asked but there may be other things but I have given you what I recall.
BY MR. NEUWIRTH:
**Q. And as you sit here today you can't remember whether you ever looked at notes of a conversation with him?**





A. No, I did not look at notes.
**Q. Who else was on the call with you with Mr. Boyles?**
A. I think one of my research assistants Mark Wiesenberger.
**Q. Is he still working with you at Compass Lexecon?**
A. Yes.
I'm sorry. What was your question again? What was your question?
**Q. Was he still working with you?**
A. No. Before that.
**Q. Who else was on the call with you with Mr. Boyles?**
A. As I said, I wasn't on the call. My staff talked to Mr. Boyles.
**Q. Oh, so you didn't even talk to him yourself?**
A. No. My staff talked to Mr. Boyles. We went about confirming the things he had said in the way that I mentioned.
**Q. So who reported to you what Mr. Boyles said?**
A. Well, I think it was Mark





Wiesenberger but it was actually discussed among myself and the staff, and then, as I say, we went and confirmed the key elements about it as I recall.
**Q. And if there were no -- if you don't know whether there were any notes of the conversation, you don't have any firsthand knowledge of the full extent of what Mr. Boyles did or did not say in that conversation, correct?**
A. I have not reviewed such notes. My purpose is it wouldn't matter. There was a break in the data as a result of the change in the data. We learned about it in part from Mr. Boyles and in part from Christianson and so forth, but there is still a break in the data. It doesn't matter for my purposes the source of that knowledge. There is a break in the data. There is a break in the R-1 report and literally a new line of data being collected.
**Q. Are you now saying that you learned about the break in the data from Mr. Boyles?**
A. No. As I told you, I don't recall if he said there was a break or not. I said we

Page 202

JOSEPH P. KALT
knew that by inserting the line in the R-1 form you would create a break in the data because you are now basing your analysis on additional data. We confirmed that by drawing the graph that you see in my figure whatever -- my Figure C 2.3.
**Q. And Figure C 2.3 is where you indicate that Mike Boyles of the Surface Transportation Board was a source -- one of the sources for the information that you say you were graphing in that figure, correct?**
A. Yes. He provided the information, some of the information that I describe.
**Q. And what information reported in this Figure C 2.3 did he provide?**
A. As best I recall he told us that there had been a Federal Register notice, which you also see in there, and so I believe that was -- in terms of drawing the graph that was one of the sources of information -- I believe that is what he supplied, and then as knowledge -- information about how the R-1 had been changed through the addition of data collection that I mentioned.

Page 203

JOSEPH P. KALT
**Q. But there is actually nothing on this graph that Mr. Boyles at the Surface Transportation Board told you, right? All that this graph does is plot monthly average URCS variable costs per ton mile for intermodal, right?**
MR. CROSS: Objection to form.
BY MR. NEUWIRTH:
**Q. And he didn't tell you what these numbers were for, did he?**
A. No. These data are actually I believe are Professor Rausser -- Professor Rausser's data. You can see the first citation on the source.
**Q. Correct.**
A. I was investigating --
**Q. You know what? I am trying to understand.**
A. I am not done. I am not done. What I am saying is we graphed from Professor Rausser's data. You can see that it was received. What we did is try to investigate why it happened and knowing how cost functions worked we would know that this didn't come

Page 204

JOSEPH P. KALT
about as something other than some kind of data break or data glitch.
We then investigated why did it happen and learned that the STB had changed the way it calculates -- collects and calculates data for use in the URCS costing system.
**Q. Now, you referenced the Christianson study as another source for your understanding in all of this, correct?**
A. You can see that both in the discussion in the text and you can see it again in Figure C 2.3. I cited his 2009. He also discusses and mentions it in -- they. It is actually associates. They also discuss it and mention it in their 2008 and 2010 studies.
**Q. And do you consider that -- let me ask you this: Are you aware of any instance where when using STB cost data Christianson Associates excluded intermodal data?**
A. I did not investigate the reports one way or the other for that.
**Q. And are you aware that the Christianson study uses a fuel coefficient?**
A. It calculates for its cost function

Page 205

JOSEPH P. KALT
analysis, impacts of fuel. It does not use a
[redacted]
They are not doing a damage model or anything like that. They do calculate effects of fuel and what is known as a translog production function.
**Q. And what is the fuel coefficient that they come up with?**
MR. CROSS: Objection to form.
THE WITNESS: What do you mean fuel coefficient?
BY MR. NEUWIRTH:
**Q. Well, when they do the analysis you just described of calculating --**
A. I think because they are using --
**Q. When they do the translog production function what is it that they came up with as the fuel coefficient?**
MR. CROSS: Objection to form.
THE WITNESS: What do you mean "the fuel coefficient?" That is in a translog production function. Fuel is interacted with many different variables. That is like this -- like the central insight of translog production

JOSEPH P. KALT
function measurement. The fuel alone variable I don't recall a numerical value, but there is no single fuel coefficient in that analysis.
BY MR. NEUWIRTH:
**Q. And so are you aware of whether Christianson did any analysis of the elasticity of fuel?**
MR. CROSS: Objection to form.
THE WITNESS: Elasticity of fuel. Well, in a translog production function there is many elasticities of fuel. You get these interacted variables; fuel and labor costs, fuel and materials costs and so forth. I would have to go back and look in detail at the Christianson model, but there are many elasticities. That is part of the problem of fixing a number is the translog production functions don't fix the number or the effects.
BY MR. NEUWIRTH:
**Q. Isn't it a fair reading of the Christianson study that a -- that a -- isn't it a correct understanding that what Christianson indicates is that a hundred percent increase in fuel costs caused an 11 percent increase in**



**JOSEPH P. KALT**
**variable costs?**
A. I think you are referring to what is probably, best I recall, the sole variable of fuel price alone, not the interaction terms. It is kind of taking a derivative with respect to only one of the places in the translog production function modeling where fuel appears, and that is part of this problem that arises in Professor Rausser's model which arises in the way he used other literature he cited.
So I don't think that is accurate with respect to the, if you will, the full derivative of fuel in the cost function.
**Q. So you don't believe that it is indicated anywhere in the Christianson report that a hundred percent increase in fuel costs caused an 11 percent increase in variable costs?**
A. No. As I said, I think you are probably reading the fuel alone variable but not the interaction variables for fuel is there. You take the total derivative with respect to fuel. You have to take into account



JOSEPH P. KALT
the interaction terms to get the full effect of fuel. So you are probably reading the single coefficient. The same way Professor Rausser does when he looks in the literature he cites.
**Q. Do you deny that when the Christianson report looks at fuel it finds that a hundred percent increase in fuel costs caused an 11 percent increase in variable costs? Do you deny that it says that?**
MR. CROSS: Objection to form. Asked and answered.
THE WITNESS: I would have to go back and look at the study and see if the fuel alone variable has that kind of number to it, but I don't recall the full derivative being taken in the Christianson study. And so the fuel effect of what you are asking I don't think is measured.
The single variable may have that value but that is the point. You can't just have one variable for fuel in the translog -- one place where fuel enters in a translog production function.
BY MR. NEUWIRTH:



JOSEPH P. KALT
**Q. Now, you say that in using Dr. Rausser's model you generated this [redacted] correct?**
A. His model generates it when you do --
**Q. Which is to take out -- when you take out the intermodal data you generated a [redacted] portion?**
A. When you take out the variable cost data for intermodal that has been infected by the break in the STB data reporting.
**Q. And the you who did that was you, Dr. Kalt, correct, not me?**
A. Yes, correct, yes.
**Q. And do you agree that when you did that analysis the model still found overcharges of [redacted] percent?**
A. What are you referring to?
**Q. The model when you took the steps you took and had the [redacted] set at [redacted] do you not agree that the model still generated overcharges of [redacted] percent?**
A. That sounds about right that the model reports -- if you only correct that one

Page 210

JOSEPH P. KALT

error, I believe that is what the model reports.

**Q. And so --**

A. As I recall, this effect drops the damages usually by about [redacted] percent no matter what model you are using -- what version of the model you are using.

**Q. So according to Dr. Rausser's model even when you double the but-for world elasticity, you are still getting overcharges according to the model, correct?**

A. The model is reporting as overcharges. For other reasons they are not overcharges. The model is not measuring damages --

**Q. I ask you to --**

A. -- but the model reports -- let me look at this real quick. The model reports that it does find aggregate overcharges of some amount when you fix the STB data error.

**Q. Now, when you ran the STB regression without the intermodal data, did you do anything to check the other coefficients for reliability?**

Page 211

**JOSEPH P. KALT**

MR. CROSS: Objection to form.

THE WITNESS: Yes. I am sure I looked at the T stats and so forth, yes.

BY MR. NEUWIRTH:

**Q. And it's correct, isn't it, that when you removed the intermodal data the [redacted] was around [redacted] correct?**

A. I don't recall now.

**Q. A coefficient of around [redacted] would mean that when [redacted] percent. That is what it would mean if that was the number, correct?**

A. If that is the point estimate that the model produced that is what it would mean, yeah.

**Q. Are you aware of any literature in any field that finds a [redacted]**

MR. CROSS: Objection to form.

BY MR. NEUWIRTH:

**Q. In a cost analysis?**

A. You mean this falsely specified one?

Page 212

JOSEPH P. KALT

There may be some but most of the literature doesn't do what Professor Rausser did. Not only are you correcting STB data but you are [redacted] and so it produces results that are generally not reported in the literature. You don't see this reported in the literature because most -- because the literature Professor Rausser cites is this translog production function literature, which is the dominant way in which people analyze costs in the railroad industry. [redacted] and so you would expect to get results that are inconsistent with the literature because he is inconsistent with the literature. That also applies to the [redacted]. That is not a reasonable result because the model is not implementing what we as economists do when we analyze costs of railroads.

**Q. You have run the model using this [redacted]. What I am trying to find out is since you chose to use that coefficient, which resulted from removing the intermodal**

Page 213

**JOSEPH P. KALT**

**data, are you aware of any circumstance where there was a [redacted] coefficient used to measure [redacted] in any context?**

MR. CROSS: Objection to form.

THE WITNESS: You are misrepresenting what I did. What I actually did was said, okay, let's correct this one error but not the error, for example, of [redacted]. I did report that result. I also reported the result in the same paragraphs basically of not holding -- of not replacing the [redacted]. So I am just examining the effect of that one error. It does produce results that do not make sense. That's the point of the analysis. It produces all kinds of results that don't make sense because the literature does not use this technique that Professor Rausser has used. The literature is fundamentally based, and he cites it, on translog production functions which [redacted].

BY MR. NEUWIRTH:

**Q. What have you done to quantify the impact of the STB reporting change on Dr.**

JOSEPH P. KALT

**Rausser's calculation of a [redacted]?**

A. Just what we have been talking about.

**Q. And so you -- your position is that removing the intermodal data is a way to assess what impact the STB reporting change had on that calculation?**

MR. CROSS: Objection to form.

THE WITNESS: I think it is an appropriate way for several reasons. As I point out in my report, Professor Rausser endorses the [redacted] value as being consistent with the literature outside of his model. He doesn't present the [redacted] as being solely based on his model.

What I have done is I have asked the question both ways you see in my text around this. Suppose he says [redacted] is right notwithstanding the STB data error. Let's look at it that way. But suppose he changes and says I will still use the STB model, you get the [redacted]

In addition -- in addition, Professor Rausser uses this [redacted]



JOSEPH P. KALT

[redacted] Consequently, one would expect, if his hypothesis of [redacted] is accurate, it would be unaffected by throwing out the data that is infected and contaminated by the STB data error, and what the [redacted] demonstrates is that his assumption of a [redacted], is not supported by the data. But his methodology would say I should have gotten [redacted] back because it is true outside of his data and apparently he believes it is true for all kinds of traffic and the presence or absence of intermodal should not affect the calculation by that reasoning on his part.

BY MR. NEUWIRTH:

**Q. But you only got the [redacted] by removing the intermodal, correct? There was no other method by which you derive that number, right?**

A. I had an infected data theory. I didn't run his model on the infected data. I ran it on the -- I ran it without that data.

**Q. But the only infection you are talking about, to use your term, is what you**



JOSEPH P. KALT

**felt was the inappropriate inclusion of intermodal data and the only step you took to get to the [redacted] was to remove the intermodal data from that part of the analysis? That is a factual truth, isn't it?**

MR. CROSS: Objection to form.

THE WITNESS: That is not accurate. I didn't say that having intermodal data in there was wrong. It is the intermodal series. It is not the fact of the intermodal data. It is the series has this discrete break in it that is associated not with anything that happened in the real world but it happened as a result of the STB changing its method of collecting data for URCS.

**Q. And the other way --**

A. By the way, URCS is capital -- all caps -- U-R-C-S.

**Q. And the way that you got from Dr. Rausser's [redacted] to the [redacted] was to remove the intermodal data from the analysis, correct?**

A. That's correct. It was infected. I didn't want to use bad data, but I also did it under the hypothesis that is implicit in his



JOSEPH P. KALT

work that it shouldn't matter and it did matter.

**Q. What hypothesis did Dr. Rausser make that removing the intermodal data shouldn't matter?**

A. He used his [redacted] for all kinds of traffic. In other words, he said this [redacted]. The number appears -- [redacted]

So that is in the statement which says he believes that this is common across all kinds of traffic. It shouldn't matter if the intermodal is not used to calculate it. I should still find what he says is a common factor.

**Q. And the answer that you just gave is what as an economist you believe is the appropriate and correct answer to that question, correct?**

MR. CROSS: Objection to form.

THE WITNESS: That is the only way

JOSEPH P. KALT

I'm answering your questions.

BY MR. NEUWIRTH:

**Q. Okay. Now, you have been discussing the issue of the coefficient that Dr. Rausser used being [redacted]?**

A. Yes.

**Q. Correct?**

A. Yes.

**Q. And in fact, you describe that in your remand declaration as a fundamental economic error, correct?**

A. I believe so, yes.

**Q. And was this a feature of what you referred to as Dr. Rausser's earlier modeling?**

A. As I discuss in my merits report, in his class of merits model, which doesn't use this STB [redacted], but is a different model using only one stage, he does a form of the [redacted] in a different way. In other words, he doesn't do [redacted] but [redacted], and I have a long



JOSEPH P. KALT

discussion in my merits report about the fact that this was a period of rising oil prices and so forth, and so he did it in a different way is what I should say in other words. But the same basic idea.

**Q. Now, you had indicated earlier that in connection with your work on this case you had looked at at least some of the defendants' documents from the time period when these events occurred?**

A. In what time period did you say? I missed the opening of your question. I was distracted. I apologize.

**Q. I take it -- you had testified earlier today that part of the work you have done in this case has involved reviewing the defendants' contemporaneous documents or at least some of them?**

A. I viewed many, many documents, yes.

**Q. Right. So in your review of many, many documents did you come across any document or deposition testimony where any defendant ever said that at the fuel prices that actually prevailed at any point in time, either during**



**JOSEPH P. KALT**

**the class period or before the class period, the historical relationship between fuel prices and rates had changed because fuel prices became higher?**

A. I don't recall specifically that I recall Sam Kaye, I don't know how to say it, from BNSF, I believe -- maybe you can remember -- I believe he understood the issue. I don't recall if I saw it in a document or deposition or perhaps when I interviewed him, but I believe he understood the issue, that's for sure.

**Q. Did you take notes of your interview?**

A. I believe I did. You are asking about in my merits report, at the time of my merits report?

**Q. Right. And were those notes -- have you produced those notes?**

A. I don't recall. That was back at the merits report. I just don't recall.

**Q. And did you talk to Mr. Kaye yourself or was that one of your staff who talked to him and then reported to you?**



**JOSEPH P. KALT**

A. I talked to him. I talked to him.

**Q. How long did you talk to him for?**

A. Gosh it has been a long time, but an hour maybe, hour and two. I don't know. Something like that.

**Q. And that was at the time of your merits report, around the time of your merits report or prior to --**

A. Preceding the merits report. You asked me questions about it before, yeah.

**Q. And other than -- other than Mr. Kaye, who you say may have told you this in an interview, is there any other piece of evidence in the case you can recall where it was suggested by any defendant that at any time that the relationship between fuel prices and rates was changing because fuel prices were getting higher?**

A. I don't recall them expressing it in an economist's language of elasticity, but I think it was actually a fairly common understanding that fuel was becoming a greater proportion of their costs. I actually provided you data on that in my merits report, and in

Page 222

JOSEPH P. KALT

this report as well, and that that was one of the reasons why -- I have a discussion of this in my merits report -- one of the reasons why fuel surcharges were used in the marketplace, not only in this industry but in other industries. But I certainly had that sense that they understood that fuel was becoming -- I think that I quoted in my merits report, now that I think about it -- they were quoting exactly what was happening and that fuel was becoming a more important part of the costs and was one of the bases for the market's use of fuel surcharges.

**Q. So you think I will be able to find in your merits report evidence from the record that there was a time when one or more of the defendants contemporaneously observed that higher full prices were changing the relationship between fuel prices and fuel -- and freight shipment rates?**

MR. CROSS: Objection to form.

THE WITNESS: I think what you will find -- I think the issue is certainly discussed in my report -- that the rising

Page 223

JOSEPH P. KALT

importance of fuel was one of the reasons the companies, not only in this industry but in other industries, were seeking fuel surcharges and what I am telling you is, I don't recall them doing an economist style elasticity analysis, but the nature of that perception and conduct in the marketplace is consistent with what you have described. You would have to ask them whether they thought about it the way an economist does but certainly their conduct was consistent with that.

BY MR. NEUWIRTH:

**Q. Well, what conduct are you talking about as being consistent with that, imposing fuel surcharges?**

A. It was recognized that fuel was becoming more important and more volatile and that one of the reasons then for a fuel surcharge was to make prices more responsive to all -- all-in rates more responsive to changing fuel prices. It seemed pretty clear that they understood that one of the purposes of FSCs was to make all-in rates more responsive.

**Q. And you think that there is --**

Page 224

**JOSEPH P. KALT**

A. I'm sorry. And more responsive to an economist is the concept of elasticity you and I discussed earlier.

**Q. And you think your merits report contains references to evidence from this case that this was something that was stated by the defendants as it was happening?**

MR. CROSS: Objection to form. Asked and answered many times.

THE WITNESS: I would have to go back and check whether -- how much I discussed that specific point, but, gee, that was sure the sense that I was trying to convey when I talked about it. Remember the long sections --

**Q. I know what you have been trying to convey. That is very clear.**

**The question I am asking you is what evidentiary support is there for it, and so far I have heard you say over and over again that it makes sense. I am just trying to find out where the evidence is that actually shows that any of the defendants said this while it was happening. If you don't know where it is, that is fine. I am just asking if you are able to**

Page 225

**JOSEPH P. KALT**

**point to any evidence that any of the defendants ever said that because fuel prices were getting higher the relationship between fuel prices and rates was changing?**

MR. CROSS: Objection to form. The question has been asked and answered many times. He is supposed to be testifying about his class cert.

MR. NEUWIRTH: This is about his class cert and it hasn't been answered.

MR. CROSS: You have asked him 12 different times.

MR. NEUWIRTH: Are you instructing him not to answer?

MR. CROSS: I objected.

MR. NEUWIRTH: Are you instructing him not to answer?

MR. CROSS: I objected.

MR. NEUWIRTH: That is a yes or no question.

MR. CROSS: I am not your witness. You ask him your questions.

MR. NEUWIRTH: Obviously you are not instructing him not to answer so the question

Page 226

JOSEPH P. KALT
is, Dr. Kalt --
MR. CROSS: Can we talk about the report that he is supposed to be talking about?
MR. NEUWIRTH: We are talking about his report.
MR. CROSS: Stop asking him about his merits report.
MR. NEUWIRTH: If you don't stop, it's fine. You -- look, this is so silly I will not even engage and dignify it.
BY MR. NEUWIRTH:
**Q. Dr. Kalt, are you able to tell me any place in the record of this case where any of the defendants contemporaneously observed that because fuel prices were getting higher the relationship between fuel prices and freight shipment rates was changing?**
MR. CROSS: Objection to form. Asked and answered.
THE WITNESS: You mean exactly those words or --
BY MR. NEUWIRTH:
**Q. The substance.**
A. Sum and substance. Sum and

Page 227

JOSEPH P. KALT
substance.
Well, I do believe, and, again, I may have cited it in my merits report, I don't recall specifically, but I do believe that in fact when you see the statements that are made of the people are aware that fuel is getting more expensive and of course more volatile, becoming a greater portion of costs, that is in the data, and I believe they recognize through their conduct, whether they said it or not I would have to go back and check the record, but through their conduct it was clear, indeed that is kind of at the heart of your case, it was clear that fuel surcharges would make all-in rates more responsive to rising fuel prices.
As I understand it, the claim is not that people didn't recognize that, but in the sense I think plaintiffs are saying they went too far and made them too responsive. That is what Professor Rausser's model says. That is what I recall about the record. I would have to go back and look through it to find the places where I have drawn that conclusion, but that certainly seems consistent with what I

Page 228

JOSEPH P. KALT
understand.
**Q. Do you believe, as you sit here today, that the heart of plaintiffs' case is that it was clear that the fuel surcharges would make all-in rates more responsive to rising fuel prices?**
A. That's not what I said.
**Q. Really? I am reading you a quote. Here is your quote: "I believe they recognized through their conduct, whether they said it or not, I would have to go back and check the record, but through their conduct it was clear indeed that is the heart of your case" --**
A. Keep going.
**Q. "Is it was clear that fuel surcharges would make all-in rates more responsive to rising fuel prices."**
A. Keep going.
**Q. "As I understand it, the claim is not that people didn't recognize it, but in a sense I think plaintiffs are saying they went too far and too responsive."**
**So is it your claim that it's alleged in this case by the plaintiffs that the**

Page 229

**JOSEPH P. KALT**
**fuel surcharges were meant to be responsive to changes in fuel prices and that the defendants went too far in that regard?**
A. You didn't read the last sentence, which says -- what I told you was Professor Rausser's model turns, and I say it in my report very bluntly, [redacted]. That is the -- at that part of the case that's what I was referring to.
**Q. But you made a statement that this is what the plaintiffs allege and that it is at the core of the case.**
A. I was taking Professor Rausser as representing you in terms of his damage model. That is all I was saying.
**Q. So you withdraw the assertion that this is what the plaintiffs allege?**
MR. CROSS: Objection to form.
THE WITNESS: No, because I understand you are sponsoring Professor Rausser as your witness, and his model just so clearly says these [redacted] The

JOSEPH P. KALT
[redacted]
BY MR. NEUWIRTH:
**Q. Can you show me -- here is Dr. Rausser's report. Can you show me where he says that --**
A. It won't be in this one. This is his supplemental. He didn't do a new model here. He didn't do a damage calculation. That is his remand report.
**Q. Okay. I think you still have a copy of Dr. Rausser's report in that pile.**
MR. CROSS: Which one?
THE WITNESS: It's the same one. Same one. It's his remand report.
BY MR. NEUWIRTH:
**Q. What I want you to do when you get the report is show me where Dr. Rausser says --**
A. I can show it without even -- I actually have an exhibit.
**Q. -- that the prices are too responsive to fuel.**
A. I can --
**Q. I want to see where he says that,**



**JOSEPH P. KALT**
**not where you derive it.**
A. I didn't derive it actually. It is a result of his results. I --
**Q. You are interpreting his results. I want to see where he said it. Here is the report.**
**Tell me where he said that -- that his model says that these prices are too responsive to fuel.**
MR. CROSS: Objection to form.
MR. ISAACSON: Can we identify for the record which report you handed the witness.
MR. NEUWIRTH: Yes. It's the one that he asked for which is Dr. Rausser's merits report.
MR. CROSS: The opening report. This is the one dated October 15, 2012.
THE WITNESS: Right here. If you look at his Page 187.
BY MR. NEUWIRTH:
**Q. 187?**
A. Yes.
**Q. Okay.**
A. If you look at the last row of this



JOSEPH P. KALT
table he is describing here the specification of his regression analysis. The last row of the table is actually the source of the damage or overcharge calculation. [redacted] which appears above as well. In the bottom row [redacted]
What that is doing is saying, you understand it's statistics, [redacted] he is using in the third row of the table is -- [redacted].
The bottom row is the [redacted]. In addition he has a [redacted] is actually what is happening in the model. That is actually what is happening.
**Q. Right. So your answer to the question is that this Section E, the table in Section E on Page 187, which has the heading "Variables used in Regression Analysis," this is what you say shows that his model says that**



**JOSEPH P. KALT**
**the prices were too responsive to fuel under the conspiracy?**
A. No. When you apply the model to that variable and it finds the coefficients it does, that is what generates the overcharge.
**Q. Okay. The question I said to you was: You testified that Dr. Rausser's model says that the prices during the conspiracy were too responsive to fuel. That is what you said, and I asked you where in his report does it say that and your answer was to point to this table.**
**So all I am asking you is is this what you think says that Dr. Rausser's model says that these prices were too responsive to fuel?**
A. This model when he reports his [redacted], which I don't know if he reported them in this report, [redacted].

JOSEPH P. KALT

[redacted]. He implements that when he reports any overcharge. When he reports any overcharge that is what he is doing.

**Q. So you think the proper interpretation of this table and the modelling that the table reflects is that the model is saying that prices during the conspiracy were too responsive to fuel?**

A. That, and you can actually see results. Turn to Table 53 on Page 170.

**Q. So this Section E on Page 187 and the table on 170, which is I assume Table 53, you understand those to be saying that the model shows that prices during the conspiracy period were too responsive to fuel?**

A. Read the paragraph under the figure that I just took you to and he actually explains it. He says, third sentence, "That [redacted]



JOSEPH P. KALT

[redacted]

And as we all recognize, he uses that, [redacted]. He tells you right there that he is finding this [redacted] over and above his but-for base.

**Q. So --**

A. That's how I interpret your question. That is how I interpret your question.

**Q. So what you are saying is the text you just read you understand to mean that the model is saying that prices during the conspiracy period were too responsive to fuel?**

A. Too in the sense that they reflect the but-for and hence he calls them evidence of the conspiracy itself. That's the meaning of the word T double O in what you and I have been talking about for the last ten minutes.



JOSEPH P. KALT

**Q. So you think this paragraph means --**

A. Yes.

**Q. -- that prices during the conspiracy were too responsive?**

A. Too responsive to explain by -- be explained by nonconspiratorial factors, which is what leads him to say this is evidence of the conspiracy itself.

Of course, what I go on and test is we find that greater responsiveness at every break we test so it can't be evidence of the conspiracy.

**Q. And just to be clear, the variable that we have been discussing in these two tables that we have been looking at is the [redacted], correct?**

A. This is where he reports the [redacted], yes.

**Q. So the two tables you were just talking about are dealing with that variable, correct?**

A. That's right.

**Q. [redacted]**



**JOSEPH P. KALT**

A. Right. And that's the interaction term you see him discussing on Page 170.

**Q. Right. Now, could you turn in your declaration from yesterday, which I know -- let's just call it your remand declaration -- to Figure 9, which appears on Page 35.**

A. Okay.

**Q. Do you have that in front of you?**

A. Yes.

**Q. Now, it's correct, isn't it, that this Figure 9 does not actually use Dr. Rausser's model as the input, right?**

A. No, that is not correct.

**Q. Isn't it correct that Figure 9 --**

A. It uses the [redacted] It uses [redacted]

**Q. Isn't it correct that what happens here is that you take fuel as a percent of operating costs, subtract [redacted] percent, and then divide the result by fuel as a percent of operating costs?**

A. The formula is [redacted] divided by fuel cost share of operating revenues.

**Q. So the only --**

A. So [redacted]

JOSEPH P. KALT

is being divided. You can't see my parentheses. The [redacted] is divided by the fuel cost share of operating revenues.

**Q. So the only aspect of Dr. Rausser's model that serves as an input into your Figure 9 is the [redacted] percent number, correct?**

A. The [redacted], yes.

**Q. Which is the [redacted] percent?**

A. Yeah. I'm sorry. There is one other piece, I realized. The [redacted] also enters. That is that there is a [redacted] is also entering here. That's what I am testing is showing you the implications of the [redacted] and [redacted]

**Q. Now, have you analyzed whether the defendants' fuel surcharges did anything more than recover incremental fuel costs?**

MR. CROSS: Objection to form.

THE WITNESS: I have analyzed that. Again, it would be figures, I think it is, IV-12A through 12D of my merits report where I applied an antitrust analysis and looked at the marginal costs and whether the all-in rates --



JOSEPH P. KALT

rate changes were covering marginal costs so that is what I have done.

BY MR. NEUWIRTH:

**Q. Now, in doing this work on -- that you just described that is reported in those tables --**

A. Those figures.

**Q. Those figures, did you consider anything that the STB said about the defendants' fuel surcharges and their relationship to the cost of fuel?**

MR. CROSS: Objection to form. Beyond the scope of this deposition.

MR. NEUWIRTH: It is not beyond the scope. I am asking if in preparing these tables that are in his declaration he considered anything that the STB said in its decision about fuel surcharges about the relationship between the fuel surcharges and the cost of fuel.

MR. CROSS: The question related to tables in his merits report is how I understood it.

BY MR. NEUWIRTH:



JOSEPH P. KALT

**Q. You can answer.**

A. You are asking me in connection with those figures -- we are talking about in my declaration? The figures in my merits report or here?

BY MR. NEUWIRTH:

**Q. The figures in the merits report that you just referred to in answering the question I asked you about the declaration.**

MR. CROSS: Beyond the scope.

THE WITNESS: Certainly I gave consideration to that. I probably discussed it a little bit in the merits report, I don't recall, but I certainly gave consideration to it.

BY MR. NEUWIRTH:

**Q. What did the STB say in its decision about the relationship between the defendants' fuel surcharges and the cost of fuel?**

MR. CROSS: Beyond the scope.

A. Well, as I recall, and as an economist looks at it, the STB applied not an antitrust standard and antitrust economics, but what we in economics refer to as a public



JOSEPH P. KALT

utility standard of cost recovery. I considered that and concluded that that standard of a public utility -- from a public utility context was not germane to an antitrust analysis, so I went ahead and did my antitrust analysis and my figures IV-12A through 12D.

I also understood that the STB was concerned that on a route-by-route or shipment-by-shipment basis a public utility standard might not be met by revenue-based fuel surcharges. I understand the implications of that for class certification, which would have been that, well, that is -- even if that is right you would have to do individualized inquiry into the nature of shipments, fuel use, et cetera, and so from a class certification perspective it wouldn't have been pertinent or -- at a signal you would have to do individualized inquiry.

I think those are the kinds of considerations that I had at the time and still have as I think about the STB analysis.

**Q. And can you look at Paragraph 12 of your declaration, and you say there that:**

JOSEPH P. KALT
**"Railroad rates naturally become more responsive to fuel price changes as fuel costs rise and become a larger share of overall costs."**
**Do you see that?**
A. Yes. Yes.
**Q. Have you done any empirical analysis of whether that statement is true?**
A. Yes. Yes.
**Q. What empirical analysis have you done of whether railroad rates become more responsive to fuel prices naturally as fuel costs rise and become a larger share of overall costs?**
A. You see analyses of mine in, for example, my -- sort of starting on pages 28 through 34 -- well, actually including Figure 10 actually and the discussion thereof.
In addition, in my merits report I discuss the implications and findings of Christianson's analyses indicating at this point and -- that was an empirical analysis. I have considered implications of Professor Rausser's model, for example, Figure 9, and



JOSEPH P. KALT
looked at the empirics of that. Those would be analyses that I have done. I may have done additional, but those would be the empirical analyses that I have done.
**Q. So the question that we are looking at is whether railroad rates naturally become more responsive to fuel price changes as fuel costs rise and become a larger share of overall costs?**
A. Yes.
**Q. So how is that shown as an empirical matter in Figure 6?**
A. It is part of the empirical analysis.
**Q. But this Figure 6 doesn't show --**
A. Not by itself.
**Q. Figure 6 by itself doesn't tell us anything, right, about responsiveness.**
**Figure 7 doesn't either, does it?**
A. Yes, it does.
**Q. In what way?**
A. It shows the rising importance of fuel and railroads' costs and the sentence you are reading speaks of conspiratorial but-for



JOSEPH P. KALT
conditions and -- I'm sorry -- nonconspiratorial but-for conditions in Paragraph 12 that you were asking me about, and all else equal what that tells you is that a rising share of costs in nonconspiratorial but-for conditions would cause rates to become more responsive to fuel price changes.
**Q. Well, all that Figure 7 shows is that, according to the table, fuel after a point marked by the bar in 2003 became a larger share of the total operating expenses --**
A. Right.
**Q. Right? This table by itself only says that. It doesn't say anything about what happens to rates when the change occurs, correct?**
A. In the but-for analysis?
**Q. I am just asking you whether -- I am not asking you about a but-for analysis.**
**Figure 7 doesn't even talk about rates, does it?**
A. Well, my discussion does.
**Q. I am asking you does Figure 7 show anything about rates?**



**JOSEPH P. KALT**
A. Yes. It shows that under but-for nonconspiratorial conditions railroad rates naturally become more responsive to fuel prices.
**Q. Really? Where does it say that? Figure 7 has two bars; percentage of total operating expense and -- it has percentage of total operating expense?**
A. Right. Right.
**Q. Right? There is nothing here about rates. This is just showing what percentage of operating expense fuel represented at different points in time for two of the railroads?**
A. Then the economics written around it in the paragraph tell you the implication of this in a but-for nonconspiratorial environment where you are holding other factors constant, which is what this analysis is.
**Q. I didn't ask you about the other paragraphs. I am just asking you about the table itself. The table itself without further commentary only talks about fuel expenses becoming a share -- how fuel expenses were as a share of total operating expense, right?**

JOSEPH P. KALT
MR. CROSS: Objection to form.
BY MR. NEUWIRTH:
**Q. That's all the table shows?**
MR. CROSS: Objection to form.
THE WITNESS: It doesn't talk about anything. It just draws a couple lines. Just draws a couple lines.
BY MR. NEUWIRTH:
**Q. About that, right? About the share of operating expenses and fuel costs?**
A. No. It is about the relationship between rates and fuel costs. It's fine drawing the lines.
**Q. There is nothing there about rates in that table, is there?**
MR. CROSS: Objection to form.
BY MR. NEUWIRTH:
**Q. That table by itself --**
A. No. You are asking me what it was about.
**Q. That table -- that table doesn't have any rate data in it, does it?**
A. No, of course not. That is not the function of it.



JOSEPH P. KALT
**Q. Right. So now let's turn to Figure 8. Figure 8 says that -- has the heading "fuel price increases have a greater percentage impact on freight rates as fuel becomes a larger component of costs," correct?**
A. Right.
**Q. Now, this table says that if fuel costs as a share of total costs is ten percent and the fuel price increases 50 percent, that this would lead to a rate increase of approximately five percent?**
A. That's correct.
**Q. See that? And you say you have the same analysis for a 25 percent, 50 percent and hundred percent share that fuel cost represents of total costs, correct?**
A. Right.
**Q. Now, does this table -- is this table based on any empirical data?**
MR. CROSS: Objection to form.
THE WITNESS: Well, yes, in the context it is, yes.
BY MR. NEUWIRTH:
**Q. Well, did you run data to get these**



JOSEPH P. KALT
**numbers?**
A. No.
**Q. Or did you as an economist put these numbers together?**
A. No, as it said on figure -- I understand you want to not let me put my figures together but I am actually using them together. And so notice I open Paragraph 50 by saying "to illustrate the concept," so I am doing an illustration of the concept immediately following my discussions of figure 6 and 7.
So Figure 8 is illustrating the concept. It is not the presentation, for example, of the Christianson results which I referred to you earlier and I discussed at great length in my merits report which show this happening. But I know you don't want to look -- but that is what I am doing here is trying to show the reader how this works.
**Q. So you think that these figures that are in Figure 8 can be derived from the Christianson study?**
MR. CROSS: Objection to form.



JOSEPH P. KALT
THE WITNESS: I'm sorry. You started your question with "and so." Why would you say that?
I said --
BY MR. NEUWIRTH.
**Q. You think that --**
A. I'm sorry. I said the Christianson study supports the concept. I didn't derive the figure from that. I am doing this as a teacher illustrating the concept. That is what it says in the opening line of Paragraph 50.
**Q. Okay. So let's -- as a teacher illustrating the concept, you put in four figures in the left-hand column?**
A. That's correct.
**Q. 10, 25, 50 and 100?**
A. Sure.
**Q. Under this model what happens if fuel is 11 percent of the total cost and there is a fuel price increase of 50 percent?**
A. Then in a nonconspiratorial but-for environment where you are holding other factors constant you will get approximately a 5.5 percent increase in rates.

Page 250

JOSEPH P. KALT
**Q. So your understanding is that for every percentage increment of fuel costs as a share of total costs there will be a corresponding percentage increase of rates?**
A. There will be in a but-for competitive environment an equilibrium. This is what you get. This is how rates will move and a but-for competitive environment allows recovery of those rates, and so all else equal, that's how the rates will move.
**Q. And it will be a straight line where for every percent increase in fuel as a share of total costs --**
A. No, for a 50 percent increase it will be a straight line.
**Q. For every --**
A. Not a straight line.
**Q. No, for every percentage that fuel costs goes up as a share of total costs, if your fuel price increase is constant there will be a straight line where you will have a direct correspondence -- this table assumes a 50 percent fuel price increase?**
A. I don't know if it is a straight

Page 251

JOSEPH P. KALT
line. You will get -- you will just fill out the far right-hand column.
**Q. Right. And for every percent you -- for every percentage increase the amount of movement of the rate will be the same?**
MR. CROSS: Objection to form.
THE WITNESS: The percentage -- the percentage will be -- take the fuel costs, the share of fuel costs, whatever it is, 11 percent, multiply it by 0.5 and it will fill out -- whatever you want -- it will fill out for every number a column that -- I choose these four because I didn't want to just write them all out, but it will fill out the column on the far right-hand side.
BY MR. NEUWIRTH:
**Q. Now, have you done any empirical study to demonstrate that that is actually what happened in the rail freight business when fuel -- where the share of total cost represented by fuel goes up?**
MR. CROSS: Let's go off -- just so you know that -- I don't want him to end up mid answer losing tape. You are down to one

Page 252

JOSEPH P. KALT
minute.
MR. WERDER: Why don't you withdraw that question and change the tape, Steve.
MR. NEUWIRTH: Yeah, but nobody is leaving the room if there is a question pending and you are not going to talk to the witness during the break.
MR. CROSS: No need to get hostile. Go ahead.
MR. WERDER: Change the tape.
THE VIDEOGRAPHER: This concludes Disk No. 4 of the video deposition of Joseph P. Kalt. The time is 2:55:52 p.m.
We are now off the record.
(A short recess was taken.)
THE VIDEOGRAPHER: This begins Disk No. 5 of the video deposition of Joseph P. Kalt. The time is 2:59:42 p.m.
We are now on the record.
BY MR. NEUWIRTH:
**Q. So you explained before we took this break for the tape that --**
MR. CROSS: Can we get the last question read back. You said it was pending so

Page 253

JOSEPH P. KALT
he should answer that.
MR. NEUWIRTH: I'm going to ask the question.
BY MR. NEUWIRTH:
**Q. You testified --**
MR. CROSS: No. You asked him to answer the question that is pending. We all sat here in the room for it.
MR. NEUWIRTH: Okay.
MR. CROSS: I would like the court reporter to read it back.
MR. NEUWIRTH: I was trying to clarify it but if you want to have her read it, that's fine.
(The record was read back as requested.)
THE WITNESS: I have done analysis of that question, yes.
BY MR. NEUWIRTH:
**Q. Have you done empirical analysis using actual data?**
A. What I have done is I have gone to the literature on the cost functions that are referred to in Figure 10 that Professor Rausser

Page 254

JOSEPH P. KALT

cites and noted that each one of those analyses finds the greater responsiveness of variable costs to rising fuel prices, it explicitly does it; each one of the ones that he cites.

And then in order to illustrate -- I'm sorry. In order to implement the concept, if you will, I recognize, number one, that it is effectively part of the definition of a competitive marketplace that the greater responsiveness of variable costs shows up as greater responsiveness in a competitive marketplace of rates.

And then lastly, beyond that, I did not try to correlate the results in Figure 10 with transaction prices because it was not -- the principle that variable costs get recovered in competitive markets was actually not in dispute. [redacted]. So that's the analysis that I did.

**Q. But you testified today that in your Figure 8 there would be a constant increase in rates every time fuel increased as a share of**

Page 255

**JOSEPH P. KALT**

**total cost, even if that increase was one percentage point?**

A. No. That is not what I said. For a given fuel price increase, all else equal, say a 50 percent price increase, you would -- all else equal in a competitive market free of conspiratorial effects, you would get the cost of rate increases on the right. That is a fundamental proposition of what it means to be in a competitive market.

**Q. But you also testified if the increase was 11 percent --**

A. Which increase?

**Q. -- there would be a --**

A. Which increase?

**Q. If the fuel cost as a share of total cost went up by a percent there would be a corresponding rate increase in the right column, and you said --**

A. No, no, no.

**Q. -- if it went from 11 to 12 there would be a corresponding rate increase.**

A. You just got that wrong. I apologize. But, no, what I said is if you had

Page 256

JOSEPH P. KALT

fuel cost share of 11 percent and the fuel costs went up by 50 percent, then you would get the right-hand column.

**Q. Obviously we are talking about your table where the fuel price is 50 percent. Okay?**

A. No. That is a change in --

**Q. The change in fuel price increases 50 percent, right?**

A. Increases 50 percent.

**Q. That center column doesn't change ever. It is always 50 percent. And you testified that if the left column went up just one percent there would be a corresponding change in the right column, correct?**

A. But what is going up is the fuel price. If the left column was higher by one percent and fuel prices went up by 50 percent, then you would get a corresponding change in right-hand column.

**Q. Correct.**

A. What is changing the column, in other words, is fuel price.

**Q. What I am trying to ask you is**

Page 257

**JOSEPH P. KALT**

**whether you put 25 -- you put big increments here from 10 to 25 to 50 to a hundred, and what I asked you was does the same relationship occur for smaller increments and you said yes.**

A. You mean for smaller -- for values between the values --

**Q. Yes.**

A. -- I have shown?

**Q. Correct.**

A. The concept is still present.

**Q. And that for every small increase in the left column you will have a small increase in the right column?**

A. For a given middle column.

**Q. Correct. The middle column is not changing?**

A. Right.

**Q. And that is what I was asking you if you have done any empirical study of that, that -- if the middle column remains constant any change, no matter how small in the left column, is going to cause a change in the cost increase in the right column?**

A. And what I -- that is what I

Page 258

JOSEPH P. KALT
answered you. That is, I have gone and examined the literature, the literature specifically that Professor Rausser cites and I note in Figure 10, have found that yes, they do find that for any given price increase, any value of the middle column in other words, on the fuel price, they do find that variable costs are responsive in the way the concept is illustrated in Figure 8.
And then I told you that in economics where competitive firms are able to recover their costs such changes that are demonstrated empirically in Figure 10, all else equal, will have the corresponding rate increases that recover those costs. And then I told you that in fact beyond that I didn't find it necessary to do further analysis because that principle is actually not in dispute.
Professor Rausser's core proposition for why he does his [redacted] is to capture the recovery and competitive markets of changes in costs.
**Q. What in Figure 10 is empirical?**
A. In Figure 10 when you go to these

Page 259

JOSEPH P. KALT
models they all -- all four of these authors are estimating translog production functions with empirical data, and they all show rather than a [redacted] they show a variable responsiveness to rising prices, and if you will notice that variable response is what I am picking up and illustrating conceptually in Figure 8 is -- is that effect.
**Q. So based on Figure 10 the answer to my question is you have done no empirical analysis of your own on this; you have looked at materials by the authors that you list in Figure 10 and derived your conclusions from that, correct?**
A. I have gone to the literature and relied on the literature to show --
**Q. But you have done --**
MR. CROSS: Hold on. He is not done.
BY MR. NEUWIRTH:
**Q. You have done no empirical testing --**
MR. CROSS: He is not done.

Page 260

JOSEPH P. KALT
BY MR. NEUWIRTH:
**Q. -- yourself of the data on this, correct?**
MR. CROSS: You have to stop cutting him off.
BY MR. NEUWIRTH:
**Q. Correct?**
A. That is actually not true. In my merits report I also looked at this issue -- when I do my learner index analysis I looked at how rates respond to costs there as well. But for this purpose, as I said, I -- at this point in this report I turned to this literature. I did not find it necessary to go rerun translog production function models because in fact ultimately there is not a dispute about this matter.
Professor Rausser's fundamental reason for doing this [redacted] is a recognition that competitive market conditions allow recovery of variable costs. If that is true then the principles illustrated in figure -- the principles, the concepts illustrated in Figure 8 have to be right so there is not a

Page 261

JOSEPH P. KALT
dispute.
**Q. So which of the studies listed in Figure 10 where you said they said yes, in terms of the responsiveness of variable costs to rising fuel costs, indicate that for every -- if you keep the fuel price increase constant that for every increase in fuel cost as a share of total cost no matter how small there will be a rate increase?**
A. If one applies it in the context of our case to a world in which competition -- because all economists recognize or allows for recovery of costs -- then that is a conclusion from those models. They estimated the responsiveness of variable costs to fuel rates.
**Q. Did any of these --**
A. Fuel prices, I'm sorry. Fuel prices.
**Q. Did any of these studies actually reach the conclusion that for -- that if you hold the amount of the fuel price increase constant as you do in Figure 8 that any increase in fuel cost as a share of total cost, no matter how small, will cause rate increases?**

A. The -- now you are adding "no matter how small." Let me say what they did. I don't recall if they use your word, but, in fact, what they do in their translog production function model is actually give you the derivatives of variable costs with respect to fuel, actually print them out for you, that is the change in variable costs, and then it follows from basic economics that but-for rates in a competitive setting would allow recovery of those changes in variable costs. Some of them, I can't remember which one, and they do talk some about rates and recognize that these variable costs changes -- and built into their model again they have this nonconstant fuel price responsiveness -- variable cost changes are affecting prices.

**Q. But --**

A. Now -- just a second.

They did not try to implement my Figure 8. They had never seen it. As far as I know they didn't try to implement my Figure 8. But they do embody what Figure 8 does, which is I illustrate the concept in Figure 8.





**Q. And so you believe that one could read the Angulo study and derive from that study, with nothing else, what you show in Figure 8?**

A. No, I didn't say that. I said you have to know some economics. You have to read it with an understanding of what the word competition means, what the words but-for mean, and what the concept of other things equal means.

**Q. But that is not what Angulo was doing in that study, right?**

A. What?

**Q. Those economics?**

MR. CROSS: Objection to form. Vague.

THE WITNESS: He was doing -- Angulo, as I recall, was doing something different. He didn't try to address that question as I recall. One of the others did, but I don't think Angulo did.

BY MR. NEUWIRTH:

**Q. How about Bitzing?**

A. I don't recall which one.





**Q. Well, which one? You are saying that you relied on these studies.**

A. I'm sorry. Just a second. You have to let me finish.

MR. CROSS: Steve, stop. You have to let him finish.

THE WITNESS: I said I don't recall which one. One of them has a discussion of how -- with changes in costs that they are finding in their model they would expect, and I think I can point out, that the changes in rail rates, freight rail rates are consistent with their model. They were not trying to have the debate you and I are now having and they were not trying to illustrate the concept the way I was in my Figure 8.

But those economics are certainly present and once one understands how to read those studies they will just front and center, and they are embodied in Professor Rausser's [redacted].

MR. NEUWIRTH: Want to take a break?

MR. CROSS: Yes. Thank you, Steve.





THE VIDEOGRAPHER: The time is 3:11:15 p.m.

We are now off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is 3:27:22 p.m.

We are now on the record.

BY MR. NEUWIRTH:

**Q. Dr. Kalt, I would appreciate if you could turn to Paragraph 72 in your report, and this is a section of your report that is looking at damages issues, correct?**

A. The whole report does. I mean, I am not being facetious but we looked at his damage model in other ways. This section of my report looks at the question of the model's reliability for -- Professor Rausser's model's reliability for calculating -- identifying the facts and calculating the magnitude of individual damages.

**Q. Now --**

A. Meaning to the individual class shipment models.

**Q. Now, when you find what you refer to**

Page 266

JOSEPH P. KALT

**in your report as undamaged shipments, are these shipments with zero damages or negative damages?**

A. These would be shipments that with -- they come out negative, maybe one or two that are precisely zero, but I doubt it.

**Q. So is it fair, based on that answer, to say that with just some exceptions the overwhelming majority are negative?**

A. Actually, I think we had a strict cutoff. I think they are all negative.

**Q. They are all negative?**

A. The ones I report are negative, yeah.

**Q. Is there any econometric or statistical literature you are familiar with that says a model is not reliable if it shows any undamaged transactions?**

MR. CROSS: Objection to form.

THE WITNESS: Undamaged or unaffected or -- I mean a lot of the literature doesn't deal with antitrust damages. You mean the specific --

BY MR. NEUWIRTH:

Page 267

JOSEPH P. KALT

**Q. We are talking about your -- we are talking about what you described as the reliability of the model?**

A. Right.

**Q. So the question is you report findings that show what you say is the frequency of shipments with negative damages?**

A. Yes. Yes.

**Q. And you have told me that with possibly a very small number of exceptions, and probably no exceptions, these were all instances where the model yielded a negative damages number?**

A. That's correct.

**Q. So my question is for purposes of looking at the reliability of Dr. Rausser's model, I am just asking if you are familiar with any econometric or statistical literature that says a model isn't reliable if it shows transactions that have zero or negative damages?**

MR. CROSS: Objection to form.

THE WITNESS: The literature that exists and the literature I cite -- I cite to

Page 268

JOSEPH P. KALT

you, for example, in Footnote 106 the work of Nobel Prize winner James Heckman. What that literature does is examine -- they don't apply it to the data of this case. They don't have the data in this case. They look at the model in which you have hypothesized outcomes, in this case as we apply it here, of overcharges or damages and they -- in that literature, then ask questions about the reliability of the model and in particular they look at an examination of cases that are the analytic analog to what we have here. They don't have our data, but they basically say -- think of it this way, okay, in this case that we have we have a purportedly inescapable conspiracy and an asserted common fact of damage and yet we produce large numbers of transactions that if you believe the model, you would have to say somehow escaped or actually benefitted by the conduct at issue. And what the literature says is well, you don't say they escaped and actually benefitted. What you say is the model is actually not reliable when it produces the kinds of error rates and errors that we find in

Page 269

JOSEPH P. KALT

Professor Rausser's model.

The literature I refer you to is the literature predominantly associated with Jim Heckman that I cite in Figure 106, but you can go to any of the literature in case -- the broader citations in that literature. That literature is focused directly on the question of when can one use an average effect from a regression to infer individual impact. And that is the literature that I have employed here.

**Q. Now, in your last answer you just said -- what you say is: "A model is not reliable when it produces to kinds of error rates and errors that we find in Professor Rausser's model."**

A. Yes.

**Q. So I just want to ask, when you made that statement were you suggesting that results that show negative damages for shipments, that those are errors or were you referring to different errors when you made that statement?**

MR. CROSS: Objection to form.

THE WITNESS: Well, the phrase error

JOSEPH P. KALT

rate is related to the model, and, of course, the claims of Dr. Rausser and the plaintiffs, of you all. The model claims a common fact of injury.

Secondly, Professor Rausser's claim now is, and I guess all along, has been inescapable conspiracy, and so under that model the model is predict -- the theory is predicting that you would not find what we call here negative damages, and what I am referring to is the frequency and the magnitude of those negative damages.

BY MR. NEUWIRTH:

**Q. And so what is the number or percentage of findings of negative damages that a model would have to generate for you to conclude that it is unreliable in this way?**

A. Well, there is -- in any general context there is no particular cutoff point. People do look at things like five percent error rates, for example, in various context, but you also examine the magnitude of the errors. So note that what is going on, you can see it in 15A and 15B, is the focus here is not



JOSEPH P. KALT

on prediction error around the overcharge of Professor Rausser's estimates. It is not the prediction error there. What the literature focuses on is the magnitude of error, meaning in this case, if you take a look at 15A, [redacted] percent of shipments and [redacted] percent -- covering [redacted] percent of revenues actually have prediction errors that are greater than the estimated overcharge.

In other words, what you are not explaining is greater than what you are asserting in this case as a common effect, and what the literature says is that said, a measure then of well, for those values you can't reliably say you have explained the cause of purported price changes.

So that is why the focus in the literature is applied as it would be applied to a context like antitrust damages is done in this way.

**Q. So two followups about that answer.**

**First, when you refer to the literature are you referring to anything other than this article in Footnote 106? If I am**



**JOSEPH P. KALT**

**reading it correctly, 106, this Heckman piece, or are you referring to something else besides that?**

A. I say in there -- you will see in the footnote, for example, and what I said to you a moment ago was if you look at the Heckman literature, you look at his Nobel Prize, actually his address, Nobel Prize lecture or address in Helsinki or Oslo, or wherever they give them out. There is a literature associated particularly with Heckman and I said you can go to the citations, for example, in this article here and there is lots of citations -- there is a broader literature like most of our journal articles because we give prior literature, and you would find it, for example, by looking at the citations in the study that I cited. I didn't try to cite their whole bibliographies.

**Q. Right. Now, the second question is -- you said that -- in the answer that you gave you said that -- you said "so note that what is going on, you can see it in 15A and 15B, is the focus here is not on prediction error around**



**JOSEPH P. KALT**

**the overcharge of Professor Rausser's" --**

A. Overcharge estimate.

**Q. Right. "It is not the prediction error there from what the magnitude of error meaning in this case if you take a look at 15A, [redacted] percent of revenues actually have prediction errors that are greater than the estimated overcharge."**

A. It is [redacted] percent.

**Q. So can you just explain what you mean by prediction error in that context?**

A. Yes. What I am doing here is any regression model will have prediction error and people sometimes get confused. The prediction errors that would be applied here as one would be looking, okay, let's look at the prediction error around the estimate that in this case the model creates, and I have put in the red bars in 15A and 15B. You will see those red bars there.

And what the analysis does is it recognizes you get some prediction error, but what we are asking is not whether you get prediction error, not whether you get small

JOSEPH P. KALT

distribution of errors around, let's say, in 15A an estimate of [redacted] percent overcharge, but rather the focus is on the production of those -- the production by the model of those prediction errors that swamp the magnitude of that which would -- that which one is estimating.

That is, in order to be negative you have to have a prediction error if you look at 15A and use that as an example. In order to be negative you have to have average prediction errors that are greater than [redacted] percent below the estimate put forward as a common factor, purported common factor by Professor Rausser.

What that is telling you is that the prediction errors are swamping the effect that you are trying to measure. That is, it is relevant, and this is what this Heckman literature gets into, it is relevant to say, wait a minute, for [redacted] percent of the shipments that supposedly could not escape this conspiracy, we actually -- it is not that they have negative damages, it is that we can't tell given the magnitude of the prediction error



JOSEPH P. KALT

whether we are -- whether we are seeing just normal random prediction error or we are seeing something real because these prediction errors are so large. That is, they are tending to swamp the matter that is being predicted, the [redacted] percent average damage ratio in Figure 15A.

**Q. Can you tell me what question you were just answering?**

MR. CROSS: Your last question.

THE WITNESS: You asked me what we were talking about with prediction errors.

BY MR. NEUWIRTH:

**Q. I was asking you what did prediction error means --**

A. That's what it means.

**Q. -- as you were using it in this context?**

MR. CROSS: Objection to form.

THE WITNESS: That is what it means. What I just said to you.

BY MR. NEUWIRTH:

**Q. You didn't answer what it means. You answered what predictions errors are shown.**

**I am asking you what is -- what do**



**JOSEPH P. KALT**

**you mean by the -- what type of prediction error are we talking about.**

MR. CROSS: You just answered that question. You will get upset when he gives you the same answer again.

MR. NEUWIRTH: I hope not.

THE WITNESS: You asked what they mean.

BY MR. NEUWIRTH:

**Q. I asked you what the term prediction error means in that context. What is it that is being predicted erroneously?**

A. Okay. I thought you were asking what it means in terms of its meaning for this case.

**Q. No. I was asking what -- can you define what prediction error means as you are using it in this discussion?**

A. Professor Rausser's model produces a measure of a but-for price, and I have used his description of his calculation of that but-for price and compared it to actual prices paid. So the prediction error here is actual price minus but-for price is what is being



JOSEPH P. KALT

calculated.

**Q. That is all I wanted to know.**

**Now, in Paragraph 72, which we were looking a couple of minutes ago, the last sentence says: "On the other hand, if the modeling finds shipments with negative damages and uninjured shippers, then either there is no common injury across the class members or, at the least, the model is unreliable for identifying and measuring such injury."**

A. Yes.

**Q. So based on the work you have done, what have you concluded here that the model -- that there is no common injury across class members or that the model is unreliable?**

A. I have concluded that this model is unreliable and its results are unreliable, in deed it contradicts a conclusion that there is common injury across the class. The model is unreliable for asserting otherwise.

**Q. And this paragraph -- so this unreliability here that you are talking about is an unreliability that comes from the findings of negative damages and uninjured**

Page 278

JOSEPH P. KALT

**shippers, correct?**

A. In this paragraph I am discussing negative damages. Of course, I have many other tests that I rely on.

**Q. But you have made a point here that if the modeling finds shipments with negative damages and uninjured shippers, that would make the model unreliable for identifying and measuring such injuries.**

**I am just asking, in this case does your finding about negative damages and uninjured shippers cause you to conclude that on that basis the model is unreliable for identifying and measuring such a common injury across the class?**

A. I believe that is a basis for finding this conclusion, yes. It's not the sole basis I have, but it certainly is a basis. There is no question about that.

**Q. Now, what does a negative damage number mean?**

MR. CROSS: Objection to form.

THE WITNESS: That is the question I asked you before -- answered before because the

Page 279

JOSEPH P. KALT

negative damages measure -- is arising from the prediction errors here.

What it means -- what it means here is first arithmetically or mathematically, hence the -- negative damage arise -- arises when the but-for price is predicted by the model, exceeds the actual price, not by some random distributions around the prediction, but rather by amounts that are quantitatively larger than the asserted effect one is investigating. In this case it is an asserted common overcharge of 15A, [redacted] percent damage -- 15A and 15B are done in damage ratios. I may say overcharge. But you can see in 15A they are damage ratios.

So that is how negative damage arises. It means that your prediction error is swamping. That is, it is exceeding in magnitude. It actually happens in the other direction as well on the positive side where about more than [redacted] percent of all these transactions have error returns, either positive or negative, greater than the asserted overcharge. What it means is it is telling you

Page 280

JOSEPH P. KALT

that given the plaintiffs' theory of an inescapable conspiracy and a common fact of injury, it is saying that for the indicated shipments you actually can't reliably say that you have discovered impact, much less common impact, because their prediction errors are larger than the thing you are trying to estimate it. It is a simple way to put it.

So what it is really saying then is it is not reliable. That is you actually -- the model, meaning the user of the model in this case when I use the word "you," the user of the model cannot accurately say that he has information on the fact much less the magnitude of injury here for the indicated negative damages.

**Q. Does a negative damage number mean that the shipper was better off as a result of a conspiracy?**

A. If you believe the model that would be the interpretation, but, in fact, you have to look at it in the -- if you believe the model is reliable you have to believe that, but, in fact, what you do when you apply this

Page 281

JOSEPH P. KALT

kind of testing in the Heckman-style framework is you are saying just what I said a moment ago. It is not that you are saying these people were not hurt. What you are saying is you don't have any reliable information -- you don't have any reliable basis for asserting that they were hurt. In other words, you have no basis for asserting a common fact of injury applies to these particular shipments.

**Q. And you believe that -- I take it from your testimony today you believe that there are principles articulated in the Heckman article that you cite?**

A. And related literature that is in there.

**Q. That would allow that conclusion you just described to be derived from the circumstances here?**

A. I believe so, yes.

**Q. Now, have you done anything to determine whether there are any common characteristics of those shipments that generate negative damages under the model?**

MR. CROSS: Objection to form.

JOSEPH P. KALT

THE WITNESS: First, I have done the following. The model is asserted to control for common characteristics. This is telling you that the model has failed to do so for large numbers of shipments. That is the -- that is what the regression model is. It is an attempt to control.

Beyond that, when I look at this data I do not find common characteristics of an economic nature that would generate these results that one could put into the model and get rid of them. What it is telling you is there are factors -- facts and circumstances affecting things down at the individualized level that the model cannot explain. That is what I keep telling you.

But the model itself is trying to control for common factors, and this is saying that we are testing Professor Rausser's model for reliability. It is not reliably done so.

**Q. Now, you just testified that: "When I look at this data I do not find common characteristics of an economic nature that would generate these results that one could put**



**JOSEPH P. KALT**

**into the model and get rid of them."**

**So the question is when you say that you look at the data and don't find common characteristics, what did you do to determine that there are not common characteristics among the shipments for which there were negative damages?**

A. Two-stage process. One is to look at the model itself. That is, what the data are telling you the model is the set of common characteristics that are being proposed to explain this data. They are not. So that's the first thing you have to understand that what this is telling you is the model is not able to reliably use common factors and produce a credible or reliable statement of a common fact of injury.

Secondly, I have looked at the negative damages, for example, they are spread out across the time period that they arise in all kinds of types of shipment -- types of shipments. They arise in holding in different commodities. These negative damages span the range of those kinds of factors.



JOSEPH P. KALT

**Q. And what testing did you do to determine that they arise in all kinds of types of shipments?**

A. First the model itself does that because remember [redacted] where it is purporting to do that. That is [redacted] forth, so that's the first thing that I keep pointing out to you. Within the model, the model's common factors are supposed to solve this problem and have not. It is an unreliable model.

Secondly, when you look at the distribution, for example, over time of the class shipments, they appear in all time periods. For example, we know that this data has this tendency to have its damages in those periods when fuel prices were highest, and we find -- and its [redacted]



JOSEPH P. KALT

[redacted], but we find negative damages on shipments across the entire time period. So I have looked to see where those occurred. I looked at, I believe, type of carriage, was it intermodal, for example, or not. That should already have been controlled for by the model. I can't identify any additional variables that Professor Rausser put into the model without doing individualized inquiry into the facts and circumstances that are clearly generating these very large prediction errors to generate negative damages.

**Q. Did you do anything to assess the size of the shippers where -- in terms of volume shipped where negative damages were found?**

A. Well, I looked at Professor Rausser's measure of shipments and I looked at size of shippers, so I looked at that kind of thing.

**Q. Where were those results reported?**

A. I didn't find it necessary to report them. They should already be accounted for in the model if that's the common factor that is

JOSEPH P. KALT

missing. We are testing the reliability of this model, but when I did that I found, as I said, I found large shippers, I found small shippers with negative shipments and so forth.

**Q. And you're confident that that is what one would find if one went and looked at the instances where there were negative damages, that there were large shippers and small shippers and no common characteristic related to the size of the shippers in terms of volume?**

MR. CROSS: Objection to volume. Sorry. Objection to form.

THE WITNESS: No. What I said is that these damages occur for large and small shippers. And there is no way to control for that in a way that doesn't violate the whole principle of doing class certification damage models.

BY MR. NEUWIRTH:

**Q. The question isn't how you control for it. The question is: Did you look at those shipments where you found negative damages or where the model found negative**



**JOSEPH P. KALT**

**damages and determined that for those actual shipments there were large shippers and small shippers in terms of volume shipped?**

A. Yes, I did, yeah.

**Q. And did you find that there was an even disbursal among large shippers and small shippers for these negative damaged shipments?**

A. I don't know if it was even, but it spanned -- the data spanned. I didn't test for evenness. I tested for span.

**Q. Did you find that most were big or most were small or do you have no sense of how it's divided up?**

MR. CROSS: Objection to form.

THE WITNESS: I would have to go back and look at the data. I was interested whether it was kind of spanning that data. The point that I was making a moment ago about why one has to stay within the model is if size of shipper is a variable, that is actually not an explanatory variable, that is just saying something individualized about this shipper.

BY MR. NEUWIRTH:

**Q. Nobody is asking you --**



**JOSEPH P. KALT**

A. But I am asking myself to do this because I am trying to do a class certification, and so when you see, for example, Dr. McClay putting [redacted], it is not an explanation, as I say in my report. It just pulls out what you are trying to explain. It doesn't explain it.

So I looked at this in the context of the model and its results and whether its common factors produce this evidence, this purported evidence of the common fact injury.

**Q. So you have no idea what portion of the shipments for which negative damages are found involved large shippers or small shippers, correct? You just don't know?**

A. Well, I know that not the size -- I know that the negative damages arise more frequently when Professor Rausser reports fewer shipments for a shipper. I know that.

Let me say one more thing about that as I realize what you are asking, I think. But the model doesn't work -- that's why you have to stay within the model. [redacted]



[redacted] in Professor Rausser's data, and so within the model the model is telling you that there are -- its common factors do not explain and do not reliably demonstrate a fact of individual injury.

**Q. If you could look at Figure 13 on Page 46.**

A. Yes.

**Q. Can you tell me what hypothesis is being tested in Figure 13?**

A. I wanted to test whether this model in which there is purportedly an inescapable conspiracy and it is asserted that the model demonstrates common fact of injury across the class. I wanted to test whether the model did that, and so what I am doing there in the first column is telling you the number of times and the number of shipments where the model finds prediction errors which swamp the associated

JOSEPH P. KALT

overcharges in the given week where the shipments occur. And so I am telling you that this model again is finding in this case [redacted] shipments in the STB model using Professor Rausser's designation of the class, which I take it he now thinks is unreliable, but nevertheless using his data, using his model, I find [redacted] shipments where the prediction error, which are not explained, is larger than what is being asserted as a common overcharge.

And that again goes to this point as I say it is telling you you actually don't have information indicating injury there. Even how the model predicts no escape from this alleged conspiracy.

**Q. So your hypothesis is that the model demonstrates a common fact of injury across the class?**

A. Yes, because what Professor Rausser does is [redacted]



JOSEPH P. KALT

[redacted]. The numerical value comes from the model and he says that is how the model should be used for individual damages. And I have said, okay, that is your statement. I will give the common overcharge on every shipment.

Do we have evidence that common asserted overcharge is in fact indicated by the model and you can see the rate at which it is not.

**Q. And what you did in figure -- as reported in Figure 13 was to calculate but-for prices and compare them to actual prices, correct?**

A. I used Professor Rausser's model -- I'm sorry -- methodology, corrected for the error I note in just the treatment of the error, determined a log in the logarithmic model. I used his but-for price and compared it to actual prices. That is what the prediction error is.

**Q. This is what the table results -- this table reports that comparison?**

A. That's correct. The left-hand



JOSEPH P. KALT

column reports the model's results.

**Q. Now, this reports that there are [redacted] class shippers with negative overall damages, correct?**

A. Yes.

**Q. And ten --**

A. In this version of the STB model. I do other versions in my appendix on Table 14, for example.

**Q. I am asking you about Table 13.**

A. Understood. I just want to make it clear that those numbers apply to his STB model with no correction for the STB data error.

**Q. Which figure would you like to use; Figure 13 or 14? It doesn't matter.**

A. It doesn't matter. Whatever you want.

**Q. I talked about Figure 13. You keep talking about Figure 14. Do you want to use Figure 14?**

A. I don't care. That's fine with me.

**Q. Let's use Figure 14.**

A. Okay.

**Q. You say that there are [redacted] class**



**JOSEPH P. KALT**

**shippers with any negative damages and [redacted] class shippers whose negative damages are overall -- whose damages are overall negative?**

A. Yes.

**Q. That group class shippers with negative overall damages means that for those shippers there are some shipments with positive damages and some shipments with negative damages and when you add it all together you come up with an overall negative number; is that correct?**

A. That is not quite correct. That group would include everybody in the far right-hand column, right?

**Q. So --**

A. Because they would have negative --

**Q. It would include the [redacted] with only negative damages plus an additional amount with both positive and negative damages?**

A. About an additional [redacted], yes.

**Q. Now, for the class shippers with only negative damages, see that?**

A. Yes.

**Q. What percentage of the class period**

**revenue is represented by these [redacted] shippers identified in the far right of Figure 14?**
MR. CROSS: Objection to form.
THE WITNESS: Of revenue?
BY MR. NEUWIRTH:
**Q. Yes.**
A. I don't know. I think it is quite small. I don't recall specifically a number.
**Q. All else being equal, would you expect big shippers in terms of volume or small shippers in terms of volume to have been more likely to have been able to escape injury in a price fixing conspiracy?**
MR. CROSS: Objection to form.
THE WITNESS: Well, in this particular price fixing conspiracy the claim is that there was no escape, large or small. As a general matter in other contexts where you do investigations of individual -- of an individual nature, all else equal, you might expect a larger shipper to escape injury. What that means in this context if you apply that reasoning it says that the model is actually -- because there is a tendency, as I mentioned a





moment ago, to find not small shippers, but small numbers of shipments to have more negative damages. What that is telling you is the model is -- if you believe the model it is the small shippers who are somehow escaping, but, again, I stress that the model itself works on shipments and to test the reliability of the model you look at the left-hand column -- you look at the left-hand column, and it is telling you -- if the model only sees shipments, it doesn't see anything about any size of shipment or anything outside of shipment or numbers of other shipments by a shipper, it just looks at shipments, and so its error rate is what is represented in the left-hand side of figures 13, 14 and so forth.
BY MR. NEUWIRTH:
**Q. Could you look at Figure 16, please. This is on Page 51.**
**Now, does this chart use your method for calculating individual damages which include the multiplication by E to the power of the residual?**
A. It does include the adjustment for





the logarithmic effects. The effects in a logarithmic model of the error term that I cite to -- everyone to the Woodridge classic citation for this. This does include that, yes.
**Q. Now, did you calculate results using your original method that didn't include that step?**
A. I'm sorry. I had no original method. Professor --
**Q. You had a method where you did not do that --**
A. In Figure 15 -- I mentioned this earlier, Figure 15 I use what Professor Rausser has said about the method where he doesn't appear to make the proper correction. I have a footnote about that. But that was -- I am using his described method in Figure 15. I am using his described method with the correction in Figure 16.
**Q. Did you run figures -- did you run what is in Figure 16 without what you call the correction?**
A. Yes.





**Q. And what were the results?**
A. As I recall, they didn't look materially different. As I recall, for the STB model I believe we found [redacted] negatives, that is [redacted] with overall net negative damages that percent of shipments with negative damages the distribution looked the same, and they were all yeses in the far right-hand column.
**Q. Now, how about the column on percentage of shipments with negative damages?**
A. That is what I am saying, the distribution was basically the same. In other words, it may have changed a little bit. The numbers may have changed a little bit, but, for example, I recall [redacted] had [redacted] percent negative and so forth, but the distributions were about the same.
**Q. So you are saying that when you don't make that correction DustPro has [redacted] percent of its shipments with negative damages? That's your recollection?**
A. That's my recollection, yes.
**Q. Are those results reported anywhere?**
A. No. I reported the results with the

Page 298

JOSEPH P. KALT
correct calculation.
**Q. Right. Well, you corrected but are -- did you turn over in your work papers or anywhere else the results of running Figure 16 without making the corrections you say you made?**
A. No. I did do the correction here in Figure 16.
**Q. I know but --**
A. Figure 15?
**Q. You said that you ran the results in figure -- you said you ran Figure 16, the analysis in Figure 16, without making the correction, too, and that you looked at the distribution and that it was -- you described it as largely the same, and my question is have you produced those results?**
A. I believe in my work papers what you have is the code. I don't know if we produced a printout but in the code you can see where you set -- you do this correction or not, and that is what I used when I did it. You can run the code in two seconds. Well, actually it takes more than two seconds.

Page 299

JOSEPH P. KALT
**Q. Do you agree that on this Figure 16 that [redacted] have far fewer observations in the data than [redacted]**
MR. CROSS: Objection to form.
THE WITNESS: That may be true. That may be true. I was testing the reliability of the model.
BY MR. NEUWIRTH:
**Q. I just asked -- my question is: When you say it may be true, do you know whether it is true?**
A. I don't recall. I don't recall.
Actually, I would say when I look at Figure 16 I recognize we have [redacted] which has far more shipments. I recognize those are likely to come from far more shipments than say [redacted] but again for testing the reliability of the model, what I am interested in is the presence of negative damages and you see, for example, for [redacted] percent of the shipments have negative damages and are reportedly in an inescapable conspiracy, and I think it actually provides direct confirmation or indication of

Page 300

JOSEPH P. KALT
the unreliability of the model because now you have a reported conspiracy in which the same shipper is getting large rates of positive damages and large rates of negative damages, so I took all of that into consideration.
**Q. So does this statement you just made mean that any model that finds that a portion of shippers -- shipments had negative damages would be unreliable?**
MR. CROSS: Objection to form.
THE WITNESS: Any portion at all? I think that would come in the context -- as I said to you earlier, I think in this context where you see the kinds of rates of negative damages in Figure 15A, 15B and 16, for example, I think the conclusion is there are large portions of the class for which you cannot claim that you have evidence of common overcharge or any overcharge during the class period as a result of using Professor Rausser's models and data.
BY MR. NEUWIRTH:
**Q. So is the answer that any model in this case that would find negative damages for**

Page 301

**JOSEPH P. KALT**
**some shipments would be unreliable?**
A. No. What I have said to you it will ultimately, I guess, be the decision of the Court, whether it finds the fact that the model produces like in Figure 14 with just over half of all of the shipments in the model, the model does not have reliable evidence of common impact or any impact, and I am telling you that by normal professional standards that this was presented, he would say well, that is not a reliable model on which to say that you can reliably identify the fact and magnitude across the entire sample when you have an error rate of this magnitude.
**Q. My question wasn't about this particular model. My question was: Is it your position that any model used in this case that would find negative damages for some portion of the shipments would be unreliable?**
MR. CROSS: Objection to form.
THE WITNESS: Of course, I just told you no, that is not what I am telling you. I just told you in my answer. That is not what I am telling you.

Page 302

JOSEPH P. KALT
BY MR. NEUWIRTH:
**Q. So if not everyone that found negative damages would be unreliable what portion of the shipments could have negative damages before the model becomes unreliable on the basis of having negative damages?**
MR. CROSS: Objection to form.
THE WITNESS: Again, it is partly contextual, and it will ultimately be for the Court, I guess, to decide whether it is willing to accept a model that produces 50 percent of the shipments. The actual observations in the model don't have any evidence of common or any impact. That will be for the Court.
What I am telling you is we do see people use rates like five percent of error rates, for example, in various contexts. I am also telling you that I believe it is fair to say that among professional economists that you would look at this model and saw that kind of error rate in Figure 14, also 15A, 15B, and so forth, you would say that this model is not reliable for the purposes to which it is being put, which is for ultimately the calculation of

Page 303

JOSEPH P. KALT
individual damages to all members of the class when such a large portion of their shipments the model actually doesn't have any reliable evidence of damage.
**Q. Now, this again is premised on your statement earlier that negative damages constitute an error, correct?**
A. They constitute a particular kind of error. Remember that. It is not just prediction error. It is prediction error that swamps. It is larger than the purported overcharge that the model would apply to the individual shipments through Professor Rausser's calculation of actual and but-for prices.
**Q. And any time you had a regression model generating negative damages you would call that an error and the question is how big of an error is it, right?**
MR. CROSS: Objection to form.
THE WITNESS: Well, with respect to the individual, it is reasonable to conclude that with respect to an individual unit of observation in the regression which purportedly

Page 304

JOSEPH P. KALT
cannot escape but you find that its error is larger than the overcharge that is being asserted and it wouldn't be applied upon the payment of damages to the individuals who shipped these -- who made these shipments, for the individual that is the swamping effect, in other words, that I have mentioned. It is quite relevant and you will find the principle being expressed in the literature associated by Heckman and others who have picked up on that literature.
BY MR. NEUWIRTH:
**Q. How about --**
A. With respect -- with respect to overall -- again, same answer. It is contextual and ultimately for the Court to decide, I guess, but I believe that professional economists will say an error rate of 50.5 percent where you have prediction errors which are larger than the asserted impact would be regarded as having no reliable information on 50.5 percent of the shipments.
**Q. Are you embarrassed to keep giving the same speech over and over again no matter**

Page 305

**JOSEPH P. KALT**
**what the question is?**
MR. TEPE: Objection.
MR. CROSS: Objection. Try to be professional, Steve. At least try.
You don't have to answer that. I can't imagine that is a serious question.
BY MR. NEUWIRTH:
**Q. You can answer.**
A. I will be happy to answer. No, I am giving you the correct and accurate answer based on the economics.
**Q. So --**
MR. CROSS: Are you embarrassed you keep asking the question over and over again?
BY MR. NEUWIRTH:
**Q. How about if you --**
A. That is my job here to try to give those answers.
**Q. How about if you have a negative overcharge that is less than the overcharge that is being asserted? Would you consider that an error?**
MR. CROSS: Objection to form.
THE WITNESS: It's an error. It's

JOSEPH P. KALT

an error. But as I explained to you earlier -- and your reliability gets worse as that error gets larger relative to the overcharge, but it is appropriate to look and show the percentage of errors that swamp the predicted effect, that is the negative so-called damages, but sure any errors is a source of unreliability. But what I am telling you is for the purposes of class certification if the legal standard is you are supposed to have reliable evidence that the model can find damage and use that model to eventually compensate injured parties that it's appropriate to focus on the very large errors where your prediction error, which you are not explaining is even larger than what you think you are explaining, that is quite appropriate.

BY MR. NEUWIRTH:

**Q. And so is what you are saying there that if the negative damages are smaller than the alleged overcharge in terms of the percentage that might not mean that the model is unreliable?**

A. No. It is still an indicator of unreliability. No model is perfect. And it is



JOSEPH P. KALT

appropriate then to examine the model and if all you had was prediction errors that were tightly clustered around in say Figure 15A; [redacted] percent damage ratio, and none of them went negative, you would say, well, I got pretty good indication that this model is finding something positive everywhere. But it is not totally reliable. It is not accurately predicting everything. That is just the computing of the model. What this analysis does is go beyond -- oh, this is just all -- people say it is just regression models, they all have errors in them, that is standard. This is going beyond that and saying we are looking and concentrating on errors that are in excess, are greater than -- what is not being explained is greater than what is being asserted as the overcharge.

**Q. How about if the model finds that the negative overcharges are less than what is being asserted as the overcharge?**

A. Model might --

**Q. What condition has to be present for you to determine that that model is unreliable?**



**JOSEPH P. KALT**

A. It may be unreliable for many reasons, including misuse of data, unreliable data, data that has got errors in it. It may be unreliable for many, many reasons even though you get a tight fit on the model, and one could find the model to be unreliable for the purposes of which it is being put in that context.

**Q. But the question is you have been talking about a model being unreliable because of the negative overcharge?**

A. That is one of the reasons, yes.

**Q. So we are just talking about when negative overcharges make a model unreliable. And so the question is if the negative overcharges are less as a percentage then what is being asserted as the overcharge, what does that mean that the negative overcharges make the model unreliable?**

A. Actually, you have a glitch in your question.

The negative overcharges are those overcharges where the prediction error exceeds the estimated overcharge in the negative



JOSEPH P. KALT

direction. And I believe, if I understand you correctly, are you talking about prediction error just to the left of the overcharge or just the negative ones? We have talked about the negative ones.

**Q. Well, let's talk about the negative ones.**

A. Yes.

**Q. What has been the focus of all these questions.**

**The negative overcharge arises under your analysis when the but-for price is higher than the class period price, correct?**

A. No.

**Q. I thought you testified that that is what you are doing --**

A. I am saying this is where you seem to be -- I said this correctly before. I will say it again.

The negative overcharge arises when the but-for price is higher than the actual price by a magnitude which in the negative -- by a magnitude which exceeds the overcharge.

**Q. Right.**

Page 310

JOSEPH P. KALT

A. Okay. So you didn't add that last part.

**Q. I thought that was what we were talking about, but, fine. You have clarified it.**

**So when that occurs you are saying that by definition to get a negative damage number you have to exceed in terms of your negative magnitude the overcharge?**

A. Yeah.

**Q. Given that you have said that when that occurs the model is unreliable, I take it you are saying that any time you get negative overcharges the model is unreliable?**

A. Yes and no. Here is the yes and no.

For those negative overcharges for those shipments -- for those shipments you do not have reliable measures of impact. In other words, you do not have common impact in the sense that for those shipments you cannot say -- that have negative damages, you cannot say you have reliable information on what happened to them as a result of the hypothesized conspiracy. You just don't have information.

Page 311

JOSEPH P. KALT

Your error term is swamping your prediction, your predicted effect or overcharge.

Secondly, overall when you look at a model and you say -- and you see rates of error in the form of negative damages, that is prediction errors that are large, and, in fact, larger than the predicted overcharge, when you see the kinds of rates of error that you see in Professor Rausser's model, then it is telling you the overall model doesn't do a reliable job of isolating other factors apart from the effects of alleged conspiracy from the effects -- asserted effects of conspiracy and you can't say that you have a reliable model that is attributing the damages to the alleged conspiracy.

**Q. Your Figure 15A says damage percentages are plus or minus one percent of the indicated value?**

A. Yes.

**Q. So for example, where it says negative [redacted] percent does that mean that there is a range from negative [redacted] percent to negative [redacted] percent?**

Page 312

JOSEPH P. KALT

A. That is correct. This is a slight understatement of the degree of -- the frequency and magnitude of the negative damages. In other words, that [redacted] is centered there, okay, and so it doesn't go all the way back to zero. There is some negatives in that bar that is labeled [redacted] percent.

Do you see it?

**Q. So why do you say understatement? It says plus or minus. It could be an understatement or an overstatement.**

A. No. There are some negatives in the bar that is labeled [redacted] percent because it goes from [redacted] to minus [redacted]. Okay? And so in counting the negatives in the box up in the left where it says: "Professor Rausser's model finds [redacted] percent of shipments ([redacted] of revenues) those numbers would go up slightly for negative values that are falling in the bar that is labeled and visually looks positive.

**Q. And all your negative numbers could be one percent too high, correct?**

A. No. The frequency of negatives would go up slightly. If there are any

Page 313

JOSEPH P. KALT

negatives at all in that bar that goes from minus [redacted] to plus [redacted] there -- if there is any negatives in that little range between zero and [redacted] your count of negatives would go up.

**Q. But for the -- but the magnitude of the negative damages could go down by a percent in all of your columns with negative numbers, correct, because you say damages percentages are plus or minus one percent of indicated value, correct?**

A. What is going up or down? I apologize. In the negative bars?

**Q. You say that the damage percentage -- that the damages percentage are plus or minus 1. -- plus or minus one percent of the indicated value, right, and the indicated value is what is going across the bottom?**

A. Let me back up. I said something I stand corrected. The little box up above would not change. It is actually done right down to the -- whether something is negative or not. The bars could change sizes slightly, if you started to say it is a strict zero instead of [redacted], you would have a little more in the first

JOSEPH P. KALT
bar of negative transactions visually.
**Q. Or you could have less because it says plus or minus, correct?**
A. But to do that -- but to do that you would have to have more negatives to the left somewhere. In other words, if I move that first bar over a tiny bit -- first of all, be clear, the boxes that are summarized there, the text boxes in the figure, those wouldn't change. If you say -- I guess mathematically it is possible that you could have less because there is more -- even more negative stuff, but one of the more negative bars would then have to go up. They have to go somewhere. The negatives have to go somewhere.
**Q. Do you use for Table 15A and 15B your correction?**
A. No. As I said to you before, and as I say in the text, I believe, I used Professor Rausser's method in Figure 107. I tell you that I did not here make the correction, making this analysis slightly conservative, but did not make the correction for this particular figure.



JOSEPH P. KALT
MR. CROSS: Did you say Figure 107? Footnote 107?
THE WITNESS: I'm sorry. I meant Footnote 107. 107 was in my merits report.
MR. CROSS: Yeah.
BY MR. NEUWIRTH:
**Q. Could you turn to Paragraph 104.**
**Do you see you say there: "The data demonstrate clearly that FSC coverage was substantial and growing immediately before the start of the alleged conspiratorial conduct in March 2003"?**
A. Yes.
**Q. Do you agree that the coverage data, at least for all of the defendants other than UP, shows when fuel surcharges were first triggered as opposed to when they were first inserted into the contract?**
A. I don't believe that is accurate. I believe for CSX we are only able to see things that were assessed because they were triggered, but for BNSF'S -- BNSF, NS and UP we see both coverage through customer price authorities, for example, and we also see billings in Figure



JOSEPH P. KALT
20.
By the way, earlier when we were talking about Figure 20 I think I said that the lighter colors are collections. They are treated as collections by Professor Rausser, but they are actually the billing data because something was triggered.
So you are seeing -- you notice for CSX I don't have a double shading going on? We don't have that for CSX, but for BNSF, NS, UP we do.
**Q. And you personally confirmed that that is what BN'S and NS data permit you to determine?**
A. I certainly examined that data. Here I have used Professor Rausser's definition of class and legacy or his designation of class and legacy and accepted his data here. That is what this source statement says. Accepting that data I have applied, as we talked earlier, the methodology I previously used.
**Q. No, but you said just a couple of minutes ago that the BNSF and NS data allow you to determine when a fuel surcharge was inserted**



**JOSEPH P. KALT**
**into a contract as opposed to when it was first triggered. I am just asking you if you have personally determined that to be the case?**
A. It allows you to see -- what it allows you to see is the appearance of customer price authorities in the data.
**Q. And you understand that to mean -- you understand that to mean that that is when a fuel surcharge was inserted into a contract as opposed to when it was first triggered?**
A. You do see instances where customer price authority is present and not triggered so we have taken as the coverage the measure of being present in the customer price authorities, and then we can see actual collections under those price authorities. The former gives you the top bounds on BNSF, NS, and UP.
The bottom gives you the measure of revenue gross -- percent of gross revenue for movements that are actually assessed because of triggering the FSCs.
**Q. And your -- all I am asking if you confirmed that for BNSF and Norfolk Southern**

**there is a distinction in the data between the authority being present and a charge under that authority being part of the data?**

MR. CROSS: Objection to form.

THE WITNESS: What I have done is used Professor Rausser's data first and used the -- that data to identify using his -- essentially his basis approach of saying that coverage arises when I see a customer price authority. As you can tell by the darker shading there is situations in which there is a customer price authority but a -- no assessment under that customer price authority. That's the difference between the two lines.

MR. CROSS: If we could stop.

BY MR. NEUWIRTH:

**Q. And is that --**

A. Let me finish that answer. And as I said to you earlier, from all we can tell that is very highly correlated with the nontriggering of FSC provisions.

**Q. All I am trying to do is confirm that you believe --**

MR. CROSS: Steve, I think we have



to stop.

MR. NEUWIRTH: We have time, David. We have a minute to go. There is a minute to go.

BY MR. NEUWIRTH:

**Q. All I am trying to do is confirm that you understand that in the BNSF and Norfolk Southern data there actually is a difference between the circumstances where there would be an indication of a fuel price authority and an indication that a fuel surcharge had actually been assessed?**

A. If I understand you correctly, I have been able to see that in the data is what I would say. And for what two companies? I'm sorry.

**Q. I said BNSF and Norfolk Southern.**

A. Okay.

THE VIDEOGRAPHER: This conclude Disk No. 5 of the video deposition of Joseph P. Kalt. The time is 4:35:51 p.m.

We are now off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: This begins Disk



No. 6 of the video deposition of Joseph P. Kalt. The time is 4:51:36 p.m.

We are now on the record.

BY MR. NEUWIRTH:

**Q. Dr. Kalt, before the break you had indicated that in figure -- that in Figure 15A -- so we had talked earlier about whether for figures 15A and B you had used your corrected version of Dr. Rausser's model and I believe you pointed to Footnote 107 as indicating that?**

A. Yes.

**Q. Could you explain what in Footnote 7 indicates that?**

MR. CROSS: 107.

BY MR. NEUWIRTH:

**Q. 107.**

A. What I am telling you there that in 15A and B I have employed the method of computing individual damage described by Professor Rausser and used by Dr. McClay. They didn't make this epsilon to the E to the error term adjustment that you asked me about. That is what I have employed in 15A and B. Okay.

And then I say: "This method



entails a well recognized area which leads to overstatement of individual damages." Okay.

"Thus, the analysis of 15A and 15B is conservative understating frequency of shipments."

In other words, the correction shifts the blue distributions to the left slightly counting for [redacted] percent of damages approximately -- I'm sorry. I can't remember the figure but it shifts the blue to the left.

MR. NEUWIRTH: We have no further questions.

MR. CROSS: I think we have a few questions.

EXAMINATION BY COUNSEL FOR DEFENDANT CSX TRANSPORTATION, INC.

BY MR. CROSS:

**Q. Dr. Kalt, can you turn to Figure 8, Page 33 of your declaration.**

A. Okay.

**Q. You were asked a number of questions about Figure 8 today by Mr. Neuwirth.**

**Let me just ask the threshold question, what is Figure 8?**

Page 322

**JOSEPH P. KALT**

A. Figure 8 is an illustration of an economic principle associated with cost recovery in variable cost coverage in a competitive industry, and it provides illustration of that principle as a teaching tool. The principle that is being illustrated is the principle, as I said several times to Mr. Neuwirth, the principle that is being illustrated is actually the principle behind [redacted] of Professor Rausser's STB model, that is that a certain portion of all-in rates in his case would reasonably affect -- reflect changes in variable costs and I was just trying to illustrate that principle.

**Q. When you say it is an illustration or a teaching tool, what does that mean about the figures that appear in Figure 8; the numbers?**

A. They are obviously a model illustrating essentially the mathematics of competitive markets and the response -- it's response to changes in input price which could result or occur at various levels of that inputs share of overall costs, variable costs.

Page 323

JOSEPH P. KALT

And so it is not a model. It is an illustration of the mathematics associated with the operation of competitive markets, in particular the response of variable costs to changes in -- variable costs in rates to changes in the input price change.

**Q. Changes in the input price? So to be clear the numbers that you have in the three columns here in Figure 8, do those come from the transaction data in this case? Are those intended to be actual transactional data figures?**

A. No. I think I said to Mr. Neuwirth that these data are illustrating the mathematics associated with what happens at different fuel cost shares, the left-hand column, when fuel price increases. I illustrated it with a common amount of 50 percent in each of the rows of illustration and the associated change in variable costs and hence the principle embodied in Professor Rausser's [redacted] of, well, a change in variable costs would in a competitive marketplace a long equilibrium statement would

Page 324

JOSEPH P. KALT

reasonably respond and you could call those price changes or rate changes conspiratorial. That is the principle behind his [redacted] of his analysis and I have illustrated how it actually works when you have variable fuel cost shares.

**Q. You may have answered this already, but are you offering Figure 8 as a model of but-for pricing or the but-for world in this case?**

MR. NEUWIRTH: Objection to the form of the question.

THE WITNESS: No. This is an illustration of how competitive markets in that sense, about four, meaning in the context of your dispute with the plaintiffs, how competitive markets would move rates or prices in response to changes that were given inputs price.

BY MR. CROSS:

**Q. You were asked a number of questions about the left column in Figure 8 and different changes in the figures there.**

**Does the left column reflect changes in fuel prices?**

Page 325

**JOSEPH P. KALT**

A. No. It is saying -- the middle column is talking about changes in fuel prices. The left is talking about the share of fuel as a percent of cost.

**Q. Are you suggesting in Figure 8 that any change in fuel prices will always produce an increase in freight rates because there is some immediate corresponding change in freight rates in the market?**

MR. NEUWIRTH: Object to the form of the question and leading.

THE WITNESS: This is, as I told Mr. Neuwirth, is an illustration of what we economists refer to as competitive market equilibrium. Competitive markets going to allow cost recovery. That is the principle Professor Rausser is invoking when he builds his [redacted]. That doesn't mean that every time a fuel price moves one iota everything changes by these amounts. It is a statement about other things equal what competitive equilibrium will produce.

BY MR. CROSS:

**Q. If you were to create Figure 8 using**

HIGHLY CONFIDENTIAL
Joseph P. Kalt - 5/7/2014

Page 326

JOSEPH P. KALT
**Professor Rausser's approach in his model, what would the numbers in the right-hand column where it says "cost/rate increase," what would those numbers look like?**
MR. NEUWIRTH: Object to the form of the question and objection, lack of foundation.
THE WITNESS: The numbers in Professor Rausser's column -- I'm sorry -- Professor Rausser's model would have a right-hand column which would be a [redacted]. You see how my right-hand column rises? He would have a column which would say that [redacted] percent of that 50 percent price increase in the middle column, that would be a [redacted] times 50 percent, [redacted] times 50 percent, [redacted] times 50 percent, [redacted] times 50 percent, a [redacted] down that column.
What I am saying is that is inconsistent with competitive market equilibrium and the competitive coverage of a cost change.
BY MR. CROSS:
**Q. Sticking with the same context of running Figure 8 according to your**

Page 327

JOSEPH P. KALT
**understanding of what Professor Rausser has done in his model, why is it that the numbers under the cost/rate increase column, why would the [redacted]**
MR. NEUWIRTH: Objection to the form of the question and lack of foundation.
THE WITNESS: [redacted]. That's why I said this is not -- that part of it, the responsiveness of rates, isn't actually a dispute. That is what he does.
I am just illustrating it is [redacted] that is improper and inconsistent with the underlying economics of competitive markets, which I am illustrating in Figure 8, and inconsistent with the economics literature, which I discuss and show in Figure 10.
MR. CROSS: I don't have anything

Page 328

JOSEPH P. KALT
further. Anyone else on our side?
Do you guys have any further questions?
MR. NEUWIRTH: Yes.
MR. CROSS: Okay. Your witness.
FURTHER EXAMINATION BY COUNSEL FOR DIRECT PURCHASE PLAINTIFFS
BY MR. NEUWIRTH:
**Q. In response to questioning by Mr. Cross you testified that under Dr. Rausser's approach the right-hand column in Figure 8, that is the cost/rate increase column would be [redacted], right?**
A. Yes.
**Q. Can you explain how you reach the conclusion that the right-hand column would be [redacted]?**
A. As you have correctly used the term today, Professor Rausser's [redacted]
What an elasticity is is it tells you for a given change in X what is the percentage change in Y. So in this case the

Page 329

JOSEPH P. KALT
middle column for a given change in the middle column, 50 percent, 50 percent, 50 percent, the multiplication of the [redacted] times that 50 percent gives you [redacted] in other words.
**Q. And your Figure 7 shows that in the -- your Table 7 shows that what the data indicates is that fuel expense as a share of total operating expense in the start of the period you look at was in the range of 10 percent or lower, correct?**
MR. CROSS: Objection to form.
THE WITNESS: Figure 7?
BY MR. NEUWIRTH:
**Q. Figure 7 shows that at the start of the period you looked at from 1999 to 2008 --**
A. Hang on one second. Okay. Go ahead.
**Q. Fuel expense is a share of total**

**JOSEPH P. KALT**

**operating expense --**
A. Uh-huh.
**Q. -- started in the range of 10 percent or lower, correct?**
A. Started in 1999 at 10 percent or lower, yes.
**Q. And as of the first quarter of 2002 it was 10 percent or lower, right?**
A. You mean right where it comes back down, that upper leg? Is that what you are pointing to?
**Q. Yes. That point which is -- yes.**
A. It comes back down briefly.
**Q. Well, it's the first quarter of 2002.**
A. It comes back down briefly and in that quarter the western railroads have a value of 10 percent for the second quarter of 2002.
**Q. Correct. Now, you say here that the source for your chart on fuel expense as a share of total operating expense is the defendants' annual and quarterly filings?**
A. Yes.
**Q. And what data from those annual and**



**JOSEPH P. KALT**

**quarterly filings did you use to put together Figure 7?**
A. When you look at those data you will see tables in which you can go in and you can see and there will be a line on total fuel expense and there will be a total line on operating expense. You will see that -- you will see that in those tables. It is just labeled that way.
**Q. And --**
A. So in other words, fuel is broken out separately from total operating expense.
**Q. Right. And I take it that you had this data based on this chart comparably available for all four of the defendants, right?**
MR. CROSS: I'm going to object that at this point it is beyond the scope. There were not any questions about Figure 7.
MR. NEUWIRTH: It is absolutely not beyond the scope. You asked about --
MR. CROSS: I will not argue it. I am stating an objection.
MR. NEUWIRTH: You asked about



JOSEPH P. KALT

Figure 8 and Figure 7.
MR. CROSS: I didn't ask any questions about Figure 7.
MR. NEUWIRTH: That doesn't determine whether it relates to what you asked about.
MR. CROSS: Steve, we don't have to debate. I am just asserting an objection.
BY MR. NEUWIRTH:
**Q. So I take it from what you indicate at the top of Figure 7 that you had comparable data for all four of the defendants?**
A. The data sources were, yes, were comparable. Obviously the data numbers are not exactly the same, that's why you get a difference between east and west.
**Q. But you had the type of data was available?**
MR. CROSS: Beyond the scope.
THE WITNESS: The type of data, yes. The type of data, yes.
BY MR. NEUWIRTH:
**Q. Now, did Dr. Rausser ever purport to present an elasticity for a situation where**



**JOSEPH P. KALT**

**fuel was 100 percent of the operating expense?**
A. Not directly. He invoked the principle but not directly.
**Q. Well, in fact, he did not do it, did he?**
A. Well --
**Q. He doesn't present an elasticity calculation for a circumstance where fuel represents 100 percent of the operating expense, does he?**
A. He invokes the principle but he did not do -- he wasn't doing the teaching I was doing in Figure 8. What he does do is he [redacted]. What I am illustrating in Figure 8 based on Figure 7 is in a world of varying shares, fuel shares in operating expenses and hence revenues, you do not get his [redacted]. I illustrated it with those particular numbers that I am just showing you the arithmetic and you asked me would it apply to other percentages, yes, it did.
**Q. But your Figure 8 is, as you just said to Mr. Cross, a teaching tool that is not**

**based on anything actual, correct?**

MR. CROSS: Objection to form.

THE WITNESS: I don't know what is actual here.

MR. CROSS: That's not his testimony at all.

THE WITNESS: That is not what it says. What is actual here and what Professor Rausser invokes is how competitive markets work with respect to number one, [redacted]. That is actual -- that is what economists study. That is what Professor Rausser is invoking.

The point of the figure, and you didn't earlier want me to talk about 7 and 8 together, but obviously what I am saying is in Figure 7 and 8 the fuel costs share changes. So what I show you in Figure 8 is the implications of changing fuel cost shares. They don't produce a [redacted] right-hand column.





Professor Rausser, [redacted] right-hand column for a given fuel price change. So that is what this analysis shows you and so the analysis is illustrating those economics. Those economics don't change if I did 10 to 25 percent and only showed you two numbers. It's the same principle.

BY MR. NEUWIRTH:

**Q. Now, what Dr. Rausser studied was a circumstance where fuel started out in the range of 10 percent of total operating expense, correct? That's what your Figure 7 shows, doesn't it?**

A. Yeah, but what he studied actually what he did was [redacted]. It is not -- the question is being illustrated by Figure 8 so what the student understands from his teaching is it is not [redacted]; it is not the 10 percent that is being talked about. It is the fact that in Figure 7 we see variable fuel cost shares and that is what Figure 8 is about.

**Q. But you don't deny that when Dr.**





**Rausser derived his elasticity figure he was looking at a situation where at the start of the period being studied as reflected on your Figure 7 fuel was in the range of 10 percent of total operating expense?**

MR. CROSS: Objection to form. That doesn't even characterize Figure 7, right?

THE WITNESS: Yeah. You have to say that again. I think you messed something up.

BY MR. NEUWIRTH:

**Q. The start of the period being studied, right, on Figure 7 as we just went over a few minutes ago, shows that fuel as a percentage of total operating expense was in the range of 10 percent or lower, right? We have already established that?**

A. At the start of the period being studied.

**Q. Yes. Correct.**

A. But he didn't study the start of the period. He studied the whole period shown by Figure 7. In fact, started from 1999 through 2008. He studied the whole period.

MR. NEUWIRTH: Thank you. We have





nothing further.

MR. CROSS: No further questions.

THE VIDEOGRAPHER: This concludes the video deposition of Joseph P. Kalt consisting of six DVD disks. The time is 5:13:14 p.m.

We are now off the record.

(Whereupon, the proceeding was concluded at 5:13 p.m.)

Page 338

JOSEPH P. KALT

(The following Acknowledgement of Deponent Page is included in the event at the conclusion of Mr. Kalt's deposition he elects to read and sign his deposition transcript.)

ACKNOWLEDGEMENT OF DEPONENT

I, JOSEPH P. KALT, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

__________________ _________________________
(DATE) (SIGNATURE)

Page 339

JOSEPH P. KALT

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Bonnie Russo, Court Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this ____ day of May 2014.

My commission expires: May 31, 2015

________________________
NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA

Page 340

JOSEPH P. KALT

E R R A T A S H E E T

IN RE: Rail Freight Fuel Surcharge

RETURN BY: ______________________

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |
| _____ | _____ | ________________________________ |

______________________________________________
(DATE) (SIGNATURE)