# Exhibit 113

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) MDL No. 1869 |
| | ) Misc. No. 07-489 |
| This Document Relates To: | ) (PLF/AK/JMF) |
| DIRECT PURCHASER CASES | ) |

"HIGHLY CONFIDENTIAL"

VIDEOTAPED DEPOSITION OF

CLARENCE GOODEN

Taken on behalf of the Plaintiffs

DATE TAKEN: Friday, July 16, 2010

TIME: 8:34 a.m. - 4:13 p.m.

PLACE: McGuire Woods
50 North Laura Street
Suite 3300
Jacksonville, Florida

REPORTED BY: Cindy D. McClary, RPR, CRR



3cba9299-2b0b-4c3d-8806-11127c42376a

A Yes, I was told on the next day.
Q And were you asked to weigh in?
A No. Mike was pretty emphatic about it. This was Mike's thing.
Q Okay. And did this program have the approval of Mr. Ward, the chief executive officer?
A As far as I know it did, yes.
Q Okay. So, your best memory is, you learned about the change when you were on vacation in Florida?
A That's right.
Q What did you say to Mike when he called you and told you this?
A As far as I know, okay, I understand your reasoning and your logic.
Q Were you concerned that it would get customer pushback?
A Oh, we were going to get customer pushback if we did nothing or if we did anything.
Q Well, let's look at the e-mail. It talks about the terms of the new program. Do you see this, the middle?
A "The changes are"? Is that where you're starting?
Q Yeah. And the first one is that it's based on the prior month's average, not 30 consecutive



business days. Do you see that?
A I see that.
Q And that fixes what you call the flaw or the mistake in the prior program, right?
A Fixes one of them.
Q Were there others?
A Well, obviously, we thought it needed to start at 23 and not at 28.
Q All right. And that's the second change, is that the trigger was reset down to 23 from $28 a barrel, correct?
A That's right.
Q And for every $1 increase above $28 a barrel, the fuel surcharge would be .4 percent, correct?
A That's what it reads.
Q And that would be equal to 2 percent for every $5 increase in the WTI index, correct?
A That's what it reads.
Q Does that refresh your recollection if that was the terms of the program that CSX put in place?
A As far as I know, it does, yes. As I think I told you at the outset, there was an algebraic formula in there, and I said it went up 4 -- in my testimony it went up for every 4 cents, 1 cent, but



that's obviously wrong. It's for every dollar change it goes up .4 percent.
Q Right. And that translates into 2 percent for every $5 increase above $28 a barrel, correct?
A It's above 23, right?
Q 23, correct. Yes. I'm sorry.
And there's no fuel surcharge if the WTI is between $13 a barrel and $23 a barrel, correct?
A That's right. That's what it reads.
Q Now, Mr. Couch also writes: While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billing, maybe as much as 100 percent. Do you see that?
A I see that.
Q Okay. And Mr. Couch was a number crunching guy, was he not?
A He was one of many.
Q Yeah. And were you told before this program went into effect that it would increase fuel surcharge billing by as much as 100 percent?
A I don't recall being told that, but, you know, that's 100 percent at the time of a very small number. We weren't getting full fuel surcharge recovery in there.
Q Right. I understand. At the time, your



coverage levels were pretty low, were they not, sir?
A I don't recall exactly what they were, but they were -- they weren't where they needed to be.
Q But the amount of money that you were collecting on fuel surcharge revenues in March of 2003 was relatively low; is that fair to say?
A It was not covering the cost.
Q Okay. Can you answer my question?
A I thought I did.
Q The fuel surcharge revenue the company was generating prior to adoption of this new program in March of 2003 was relatively low?
A Low -- relatively low to where it needed to be.
Q Do you remember how much money you were collecting in fuel surcharge revenue?
A I don't.
Q And do you have any facts, as you sit here today, to dispute Mr. Couch's assertion that the new program would result in [redacted]
A I do not have any facts to dispute it.
Q Who would be better at making those kind of calculations, you or Mr. Couch?
A Mr. Couch.

Page 102

Q Now, Mr. Gooden, in the prior e-mail, there was a reference to a meeting with UP on the 13th, and there was an agenda, and I believe you said you can't remember whether you attended that meeting or not, right?
A That's right.
Q But you have no doubt, as you sit here today, that that meeting occurred, right?
A Based on that document, I have to assume that it did.
Q Okay. Now, this program --
A But I can't swear to it that it did.
Q Okay. That's fine. Now, this announcement that was going to go out of the new program came about one week after senior executives of your company met with senior executives of UP; is that correct?
A Well, if all those meetings occurred and those dates are right, yes.
Q Well, my question to you is, I know you're not at the meeting, or you can't remember whether you were at the UP meeting, but given that CSX was about to go public with this announcement, is that the kind of thing that you likely would've discussed and told UP about at this meeting?
A I don't think so.

Page 103

Q Why not?
A Because I don't think we would be talking about changes in this unless it involved interline movements with the UP. Now, if it involved interline movements with the UP, end-to-end movements, yes, we would've talked about it --
Q Well, the announcement --
A -- we're changing our fuel surcharge.
Q The announcement the company came out with applied to both interline and local rates, did it not?
A It did.
Q So -- and so, would it likely have been that you would've discussed with the UP that you're going to change your fuel surcharge for interline rates?
A Prior to the announcement, I'm sure we would've.
Q And you would've discussed with them the fuel surcharge methodology for interline rates, right, sir?
A On interline rates you would've, yes.
Q All right. So you think that discussion likely occurred at the meeting?
A I don't know if it occurred at that meeting or not, because I can't recall the meeting.
Q Well, we do know there was an agenda item

Page 104

that said that you and Mr. Koraleski were going to talk about fuel surcharge methodology, right? We do know that.
A No.
MS. KIRMAYER: Objection.
THE WITNESS: No.
MS. KIRMAYER: That mischaracterizes the document.
BY MR. BROCKETT:
Q No?
MS. KIRMAYER: Do you want to pull the document out and have him look at it and get accurate testimony?
BY MR. BROCKETT:
Q You can answer it, sir.
MS. KIRMAYER: What was the question? I believe the question was --
BY MR. BROCKETT:
Q We do know that the agenda said there was to be a discussion of fuel surcharge methodology at this meeting, right?
A Well, that's not my recollection of the document. Let me look at it here.
My -- what I thought this thing read was that the fuel surcharge methodology -- other pricing

Page 105

issues on interline business would be the fuel surcharge methodology, I believe that we had talked on it. And earlier, up above, same guy sends an e-mail that says, hey, I'm not sure these guys have talked about anything, you know, more specific, reference Wednesday.
Q Okay. Let's put aside what he believes you've talked to -- about.
A All right.
Q The e-mail from the UP representative, Giftos Exhibit 35, the e-mail at the bottom says: Here's a suggested agenda item for next week. And one of the agenda items is fuel surcharge methodology. Do you see that?
A I see that.
Q Okay. So, can we agree that at least this agenda for that meeting, someone indicated that there should be a discussion of fuel surcharge methodology?
A Yes, we can agree to that.
Q Let me show you what's marked as Giftos 10. Is this the announcement, the public announcement, the company issued announcing its new fuel surcharge program?
A Let me read it just a second.
Yes, this is the announcement.





3cba9299-2b0b-4c3d-8806-11127c42376a

disclose communications with Mr. Hitchcock.
Maybe you weren't going to, and I'm sorry.
THE WITNESS: No, I was just going to say I had the lawyer --
MS. KIRMAYER: Go ahead.
THE WITNESS: -- in the room.
BY MR. BROCKETT:
Q Okay. So then, am I hearing you correctly that you called him back with your lawyer?
A Actually, he called me with his lawyer.
Q And that was at the time you set up for this call?
A That's right.
Q Okay. So, this call included yourself, right?
A Right.
Q Mr. Lanigan?
A That's correct.
Q And who was the lawyer you had at the meeting -- at the call?
A Paul Hitchcock.
Q Who's he?
A He's a lawyer for CSX.
Q And did Mr. Lanigan have a lawyer on the phone?



A Right.
Q Who was that?
A I don't recall their name.
Q Okay. And what was discussed at this meeting, this call?
A John Lanigan wanted to go to a mileage-based fuel surcharge and we didn't want to do that.
Q What did Mr. Lanigan say to you on this call?
A We'd like to go to a mileage-based fuel surcharge. Are you guys agreeable to that? I responded no. And there was an awkward silence. He said, you know, we can put it in on our westbound -- on our eastbound shipments unilaterally. I said, yes, I know that. He said, then that's what we're going to do and you guys will keep the -- your current fuel surcharge on your westbound origination. I said, that's fine with me. We hung up the phone, and that was the extent of the conversation.
Q How long did it last?
A Not long. Not longer than what I just did.
Q And do you recall him saying anything else?
A No. I mean, it was a polite, professional conversation, but, you know, he had to know what our position was going to be before he called, because



that would've been his position had the shoes been reversed.
Q And you didn't want a mileage-based fuel surcharge because your routes are shorter than the BNSF routes; is that correct?
A That's right.
Q Was that the sum and substance of the conversation?
A That was it.
Q Did the lawyers say anything on the phone?
A No.
Q Did you have any further discussions with Mr. Lanigan about this concept?
A Not ever since that day.
Q And, again, you don't recall the subject even ever coming up at NEMC?
A I don't.
Q Did you have any conversations with Mr. Lanigan about fuel surcharges of any kind outside this -- of this conversation?
A Let me think about that just a second.
I saw a document yesterday in which I was at a meeting in which the question was brought up by the BNSF that -- whatever their percentage of fuel surcharge coverage was. In that document there was no



mention that we said anything. In fact, the reason I recall seeing the document yesterday was, I -- when I got back from the meeting, I sent an e-mail to John Couch that said whatever BNSF said their percentage of coverage was, what is ours. So, this would've been early, early on, 2002, 2003.
Q So, am I hearing you correctly, you had a meeting with BNSF?
A (Nods head.)
Q Where was the meeting?
A I don't recall off the top of my head.
Q Okay. Who was at the meeting?
A It was an alliance meeting.
Q And at this alliance meeting, the BNSF was telling you, the CSX representatives, what their fuel surcharge coverage percentages were?
A Right, because it was involving interline discussions, you know, and what percent of their interline traffic and what percent of their traffic then would be covered by a fuel surcharge.
Q And what did they tell you, what percentage did they tell you?
A I don't recall the number, but it was a high number.
Q Do you remember this meeting being in '04 or





3cba9299-2b0b-4c3d-8806-11127c42376a

Page 226

'05?
A No, I thought it was way before that, but I could be wrong.
Q '03?
A I thought it was before that.
Q All right. And what did CSX state at this meeting about your coverage percentage?
A In the minutes of the meeting, there was no -- you know, the little write-ups like you had, there was no mention that CSX said anything.
Q And is it your understanding they shared with you only coverage statistics on interline routes?
A That's my understanding.
Q Would you have any reason to share with BNSF their coverage statistics for fuel surcharges on their local routes?
A Well, if my memory's right and -- theirs was a high number, and given the fact what I've just seen from the data you gave me that ours was a low number, I probably wouldn't want to tell them what mine was.
Q You were embarrassed?
A I'd be embarrassed.
Q Because in '03, yours were very low, were they not?
A Probably were.

Page 227

Q All right. Now, after Lanigan called you and had a discussion with you about mileage-based fuel surcharges, did you discuss that -- did you discuss the fact that Lanigan had called in making this request on anyone else at CSX?
A Not that I recall. I may have mentioned it to either Fredrik Eliasson or to Ed Jenkins, the fact that I got the call. But because of the sheer nature of the request, I would not have sat down with any of my direct reports or any of the people who normally would get involved in making these kind of decisions and even talk about it, because it just felt like a category of something I wasn't going to do.
Q Well, I mean, had CSX looked at a mileage-based fuel surcharge prior to the time Lanigan called you?
A We had been -- we looked at mileage-based fuel surcharges, but when we do that, we charge by the mile, but we get a percent of the total fuel surcharge that's charged. And that part is not based on mileage.
Q But how is it that you were so certain that a mileage-based fuel surcharge wouldn't benefit CSX at the time Lanigan made this call to you?
A Because I've been doing this for a long,

Page 228

long time, and I just knew that their length of hauls were going to be longer than ours. I didn't need a study or anybody to tell me that.
Q Did you tell Mr. Ward that Lanigan had called?
A I don't think so.
Are you familiar with the term fishing? Lanigan was fishing? Lanigan was fishing. He was just hoping somebody would say yes, you asked for it, say, well, maybe the guy will say yes.
Q Okay. So let's show you what was previously marked as Giftos Exhibit 42.
All right. So, this is an e-mail from Mr. Eliasson, dated July 23, 2003. Do you see this?
A I see this.
Q Okay. And among others, Mr. Giftos is copied, correct?
A I see.
Q And you're not, correct?
A And who?
Q And you're not copied?
A And I'm not copied, that's correct.
Q Now, this talks about a meeting with the BNSF; do you see this?
A I see this.

Page 229

MS. KIRMAYER: Objection.
Q Well, all right, it talks about --
MS. KIRMAYER: Talks about an analyst call.
MR. BROCKETT: Excuse me?
MS. KIRMAYER: I believe it talks about an analyst call.
MR. BROCKETT: Where does it say that, Counsel?
MS. KIRMAYER: Do you want me to answer?
MR. BROCKETT: Yeah, where?
MS. KIRMAYER: It doesn't say that, I said, I believe that's what it talks about.
MR. BROCKETT: Well, then you're not really entitled to make statements like that, are you?
MS. KIRMAYER: Okay. I don't see anything where it says anything about a meeting either, Counsel, and you made a statement about a meeting pretty definitively a minute ago, you suggested to the witness this reflected a meeting, and I don't see that in here either anywhere.
BY MR. BROCKETT:
Q Well, Mr. Gooden, it does talk about BNSF saying things to CSX about their coverage statistics for fuel surcharge, right?
MS. KIRMAYER: Objection. It doesn't say





3cba9299-2b0b-4c3d-8806-11127c42376a