# Exhibit 116

**UNITED STATES OF AMERICA**
**SURFACE TRANSPORTATION BOARD**

STB Ex Parte No. 661

***RAIL FUEL SURCHARGES***

# COMMENTS OF NORFOLK SOUTHERN RAILWAY COMPANY

**James A. Hixon**
**George A. Aspatore**
**John M. Scheib**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, VA 23510**

***Counsel to Norfolk Southern Railway Co.***

**Dated: October 2, 2006**

- NS will continue to monitor the oil market and make further changes to its fuel surcharge program if warranted;
- NS charges market rates—of which the surcharge is a component;
- NS' traffic has and continues to grow despite fuel surcharges; and
- NS must charge market rates to continue to grow our capacity to meet the nation's transportation needs.

NS Written Testimony, Ex Parte No. 661 Rail Fuel Surcharges, (submitted April 27, 2006) ("NS Written Testimony").

We believe that there is no sound economic or regulatory reason for the STB to act regarding fuel surcharges. NS' Written Testimony for the Hearing explained that we charge market-based total transportation rates: base rates plus fuel surcharges and other charges.[2] In particular, we reported that "[w]e use the market as our gauge when negotiating contract arrangements and when determining the appropriate level of our public rate authorities." NS Written Testimony at 14. We also explained that fuel

---

whenever the WTI price was above or below the next trigger point for 30 consecutive days. Trigger points were in $5 increments. NS Written Testimony at 7-8.

On March 1, 2004, Norfolk Southern modified its fuel surcharge program for public rate authorities on non-intermodal traffic, under which the applicable fuel surcharge equaled 0.4% of the line-haul freight rate for every $1.00, or portion thereof, in excess of a monthly average price of $23.00 for WTI. The applicable fuel surcharge changes monthly. NS Written Testimony at 8-10.

On April 24, 2006, Norfolk Southern announced a new fuel surcharge program for public rate authorities for non-intermodal traffic in response to what it perceives as persistently higher oil prices. NS now applies a fuel surcharge of 0.3% of the line haul freight rate for every $1.00, or portion thereof, in excess of a monthly average price of $64.00 for WTI. The applicable fuel surcharge changes monthly. NS Written Testimony at 11-12.

NS' fuel surcharge for November will be 0%.

[2] Viewed through the commercial prism (which is how this proceeding must be viewed), a fuel surcharge is a rate. Accordingly the STB's powers are limited. Union Pacific R.R. v. ICC, 867 F.2d 646 (D.C. Cir. 1989). In a rate case in which the rate reasonableness of a fuel surcharge had not been specifically challenged, the STB did not need to rule on whether a fuel surcharge was a rate or a separate rule. Under the facts of that case, NS argued that the fuel surcharge was a separate rule. Of course, the shipper party argued that the fuel surcharge was a rate. Carolina Power & Light Co. v. Norfolk Southern Ry. Co., STB Docket No. 42072, at 6 (Served Oct. 20, 2004).

prices directly affect the marketplace for transportation services. Id. We further pointed out that NS' traffic continues to grow at its current total transportation rates. Id. We concluded that "a different fuel surcharge does not necessarily mean that customers' transportation bills will decline, which is not unusual when demand is so strong." Id.

**B. Regulation of fuel surcharges would commercially disadvantage railroads versus other modes and would eliminate an effective market tool.**

The STB has made it clear that it is "not proposing to limit the total amount that a carrier can charge," (Decision at 4), but by imposing numerous restrictions on what a railroad fuel surcharge may look like, the STB is placing railroads at a commercial disadvantage without any offsetting public policy gain. As the STB is well aware, fuel surcharges are ubiquitous. Other freight transportation modes have fuel surcharges, and there are no government regulations concerning what those modes can and cannot do with fuel surcharges.

In addition to restricting railroads – large and small – in an area in which other modes have no restrictions, the proposal will eliminate an effective rail marketing tool. The majority of our traffic moves under transportation contracts. The rates and other terms are negotiated in the normal give-and-take of the marketplace. Determining a rate is far from simple and because getting it right is critical to our financial well being, we devote considerable time and resources to this task. Setting a market-based rate that will apply at a future date is even more difficult. We have found that a fuel surcharge structured such that as the price of oil rises the line haul rate increases by a given percentage allows us to enter into contracts more readily because such a mechanism

reflects, at least partially, the market advantage rail has over its primary competitor, the motor carrier, when oil prices rise.

Such a fuel surcharge is important to us because we do our best to establish market-based, not cost-based, prices. Cost-based pricing was long ago abandoned. The STB should not adopt proposals premised even indirectly on cost-based pricing. Reverting to such a discredited regulatory system would undermine the goals of the Staggers Rail Act of 1980.

**C. Regulation of fuel surcharges will adversely affect contracting.**

Although we recognize that the STB's proposal does not apply to terms agreed upon in a transportation contract, the practical effect of any STB rule is that it will make it difficult to have a fuel surcharge that does not conform substantially to the STB's standards. In the marketplace, any action by the STB will be deemed to be generally applicable to both tariff and contract traffic. NS has already been contacted by some shippers who have existing contracts with NS, who erroneously assert that NS must renegotiate contracts as a result merely of the STB issuing proposals related to fuel surcharges in tariffs. Moreover, the Alliance of Automobile Manufacturers is actively participating in this proceeding, perhaps because it expects any STB rules to apply to the contracts under which most of its members' traffic is shipped.[3] The repercussions of any STB action will be further felt in contract negotiations as parties are already asserting rights to any new fuel surcharge arrangement, thus making it more difficult for us to use our current fuel surcharge mechanism to reflect more accurately what the market price should be over the course of the contract.

---

3 Comments of the Alliance of Automobile Manufacturers, Ex Parte 661, (filed Sept. 22, 2006).

**D. The market says rail rates, including fuel surcharges, remain a bargain.**

The fact that we continue to set records for the amount of traffic handled does not suggest to us that we are overcharging or somehow being unfair to our customers. Indeed, the increased traffic levels of the last several years suggest to us that customers view us as a bargain and would like the Board to make us an even bigger bargain. Indeed, despite the STB's narrow intent not to limit the total amount railroads can charge, some shipper parties' express intent is to have the STB restrict the total amount a railroad may charge through this rulemaking.[4]

**E. These unintended consequences will adversely affect investment in rail capacity.**

If railroads are unable to sustain their revenues because of the unintended consequences of regulatory action, our ability to invest in infrastructure to increase capacity will be diminished. In our written testimony for the Hearing, we highlighted that the U.S Department of Transportation estimated that the demand for freight transportation will increase by 55 percent by 2020 and that the American Association of State Highway and Transportation Officials projected that freight tonnage will grow by almost 57 percent between 2000 and 2020. NS Written Testimony at 15. Now is not the time to take actions that will be disincentives to railroads, capital markets, and shareholders to invest further in rail capacity.

---

[4] *See* Comments of the Alliance of Automobile Manufacturers, Ex Parte 661, at 2 (filed Sept. 22, 2006) ("The Alliance is concerned that the railroads may intend to comply with the STB decision by rolling the current surcharges into their base rates . . .); Comments of Steel Manufacturers Association, Ex Parte 661, at 2 (filed Sept. 26, 2006).