# Exhibit 117

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: RAIL FREIGHT FUEL | ) | MDL No. 1869 |
| SURCHARGE | ) | Misc. No. 07-489 |
| ANTITRUST LITIGATION, | ) | (PLF/AK/JMF) |
| This Document Relates To: | ) | |
| ALL DIRECT PURCHASER CASES | ) | |

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF CHARLES WICKLIFF MOORMAN
TAKEN ON BEHALF OF THE PLAINTIFFS
Norfolk, Virginia
January 7, 2011

"HIGHLY CONFIDENTIAL"



7a322d07-5d6a-443b-9f85-f4206415fb0a

Page 46

reflected a cost of diesel fuel that was about 73 cents a gallon or $23 a barrel.
Q. And in the absence of the FSC, your pricing, regardless of how it was set, was intended to recoup that cost, correct?
A. Well, our pricing was intended to, obviously, if we could, recoup the cost but more importantly it was based upon an assumption that we were looking at a transportation marketplace that was driven because all transportation is -- uses energy, that it was driven on -- by an energy market with a certain set of prices.
Q. Right. And am I correct that the FSC was directed to incremental fuel cost above $23 a barrel or above 73 cents a gallon --
A. Well, you --
Q. -- at the time -- at the time when a $23 trigger was used?
A. I think the answer to what you are asking is, yes, because if, in fact, the $23 number was the trigger point, there would have been no fuel surcharge until oil went above $23 a barrel.
Q. And so the -- the intent of the FSC was to address situations in which your fuel cost was above the core assumption of $23 a barrel or 73 cents

Page 47

a gallon, correct?
A. Yes. Yes, and it was also built on the assumption, which, in fact, was the case, that as fuel costs went above this, if you will, long-term norm, the transportation marketplace would reflect that, that market prices in general would reflect that.
Q. Right. And so in a situation with a $23 FSC trigger, it is true, is it not, that the first $23 a barrel of cost of fuel would, under the structure of your pricing, be intended to be covered within the base rate?
MR. NANNES: Objection. That has been asked and answered I think.
THE WITNESS: Yes. I think I have said that in -- in our pricing -- and we price to the -- as first to the market but second to make a profit -- that obviously we have a cost structure and $23 was kind of for the long-term the fuel price in our -- in our budgeting assumptions had been based on $23 oil. I think I am answering your question.
BY MR. WERDER:
Q. We may be --
A. Or we may be going like this.
Q. I may just be using slightly different words but I wanted to -- I did want to make sure that

Page 48

I clearly understood --
A. Yes.
Q. -- that in a -- in a $23 triggering --
A. In the long-term -- go ahead.
MR. NANNES: Let him finish the question.
BY MR. WERDER:
Q. Let me make sure I am asking my question.
A. I am sorry. I apologize.
Q. No. I tend to -- I tend to do the same thing so you don't need to apologize. But in a $23 trigger environment, it is true, is it not, that fuel costs up to $23 is intended to be covered within the base rate not under an FSC?
MR. CROSS: Objection to form.
BY MR. WERDER:
Q. You can answer.
A. I think I am using different words because I would phrase it differently but I will say that I think, in essence, we are saying the same thing.
Q. Okay. Maybe if I make it concrete. Let me ask you to assume $23 trigger FSC and $30 -- $30 a barrel oil.
A. Okay.
Q. It is true, is it not, that the fuel

Page 49

surcharge in that environment is intended to recover the increment between 23 and 30?
A. It is intended to do two things.
Q. Okay.
A. It is intended to account for that increase in our cost structure. But remember, again, we don't price to cost, we price to the market. So it is also intended to reflect the higher value of our product in a marketplace in which prices -- inevitably, all transportation prices will have gone up because of the increase in fuel cost and gone up disproportionately, I will add, on the part of our major competition, the motor carrier.
Q. So it is not a pure cost recovery mechanism?
A. It is certainly not.
(A document was marked as Moorman Exhibit No. 2.)
BY MR. WERDER:
Q. Let me hand you what has been marked as Moorman Exhibit 2. And before you look at the -- at anything in the document, let me just ask you if from time to time in your experience Norfolk Southern executives participate in earnings calls?
A. I will go so far as to say as quarterly.

Page 50

Q. And those calls are recorded, are they not?
A. Yes.
Q. And you are aware that there are public services that transcribe them and that make them available to the public?
A. I am aware of that. Sure.
Q. And you recognize this as a report of a Norfolk Southern earnings call, do you not?
A. That is what it seems to be.
Q. The only thing -- let me ask you to turn to Page 18. And this one, just for the record, is an August 10, 2005, second quarter of 2005, Norfolk Southern Corporation earnings conference call that is made available by FD Wire. And the only thing I want to ask you about is -- is it Mr. Goode or Mr. Goode?
A. It is actually Mr. Goode.
Q. Mr. Goode. I was wrong on both. So I want to ask you about Mr. Goode's comment that is the -- is not his last comment on Page 18, but his second-to-the-last comment on Page 18.
A. Yes.
Q. Just take a moment to review that. And, again, review as much of it as you want to but I am going to ask you about that specific comment.

Page 51

A. Okay. If you don't mind, he -- I do not recall this call at all, and it seems like the analyst in question is referring to something that happened before.
Q. Yes. Take your time. Time your time.
A. Let me go back and see if I can at least see it. I apologize but these things wander from time to time. I think I -- let's try. I can't find everything but let's try.
Q. All right. So have you had an opportunity to review Mr. Goode's comment in response to Ken Hoexter's question?
A. Yes.
Q. All right. And so Mr. Goode says that the way we -- "The way we manage fuel surcharges is through a combination of fuel surcharges and hedging, where appropriate, and where we can do it to try to" recover "as much as we can of the increase in fuel costs over the last couple of years." Do you see that?
A. I do.
Q. Do you agree with that?
A. Mr. Goode said it so I don't know whether -- again, I am trying to think of exactly the context in which he would say it but he did say it.

Page 52

Q. And when he is referring to the increase in fuel costs over the last couple of years --
A. Yes.
Q. -- do you know whether he is referring to the increase above the what you previously referred to as the core assumption of a $23 price?
A. That would be my assumption.
Q. And so what Mr. Goode was communicating here is that through our FSC and hedging we are trying to recover as much as we can of the increase over the $23 core assumption?
MR. NANNES: I just want to object. There may have been a misreading of the language as being referred to there but I have lost track of it in the record. So I just call your attention to the words that Mr. Goode used.
BY MR. WERDER:
Q. Whatever the words are. If I misread them, I certainly didn't intend to. But the witness has the words in front of him.
A. Could you -- I beg your pardon. Could you just restate the question?
MR. WERDER: Can you read the question back?
(The record was read as requested.)

Page 53

MR. NANNES: Objection. Calls for speculation by the witness.
THE WITNESS: Mr. Goode -- I really don't know exactly what was in Mr. Goode's mind when he was saying this.
BY MR. WERDER:
Q. All right. Well, let me ask you without regard to what was in Mr. Goode's mind --
A. Right.
Q. -- is the statement that what Norfolk Southern was trying to do with its FSC and its hedging was to recover as much as it could of the increase in fuel costs over a $23 level consistent with your understanding of what Norfolk Southern was, in fact, trying to do?
A. The question -- as I hear your question, the first component is, Is the increase in general in fuel cost --
Q. Right.
A. -- what does it refer to.
Q. Right.
A. And I would say that whether or not it was $23 a barrel as a specific number, it was certainly a reference to the fact that fuel costs had started to rise and rise, as you will recall, somewhat





7a322d07-5d6a-443b-9f85-f4206415fb0a

Page 122

debt capacity, as well, that it was within our means to return $964 million in our -- to our shareholders while still continuing to invest in the company, invest substantial amounts in the company.
BY MR. WERDER:
Q. Was there any discussion at the board level or otherwise tying their receipt of FSC revenue to the stock buyback program?
A. Not that I can remember.
Q. Was there any recognition that occurred internally at the board level or any other level that the receipt of FSC revenue was permitting NS to conduct these significant buybacks?
A. I certainly don't recall any discussions about any linkage like that.
Q. I am going to hand you what has been previously marked as Seale Exhibit 13.
A. Are you done with this?
Q. Maybe. I think so.
A. Okay. It can go in the stock.
Q. We talked previously about the STB, the Surplus Transportation Board, and some hearings that it conducted in 2006, with respect to rail fuel surcharges. And have you seen this document before, this transcript before?

Page 123

A. Not that I recall.
Q. Were you aware that Mr. Seale testified on behalf of Norfolk Southern in May of 2006, to the Surface Transportation Board?
A. I am sure I was aware at the time.
Q. Okay. And when Mr. Seale or any other representative of Norfolk Southern would go to testify at a hearing of this kind, was there -- is there some internal process that Norfolk Southern uses to determine what testimony it is that that witness will offer?
A. Any -- as far as I am aware, any time we would have a representative at the STB we would have, if nothing else, gone through counsel to make sure that our testimony was appropriate.
Q. And do you recall reviewing Mr. Seale's testimony with him prior to the time that he went to testify to the STB?
A. I do not.
Q. I am going to direct your attention to Page 310.
A. Okay.
Q. And you see where Mr. Seale says he has got six basic points that he is going to go through.
A. I do.

Page 124

Q. And then turn, if you would, over to Page 313.
A. Well, since he has six points, may I just take a moment and --
Q. Yes. Read the whole thing. Sure.
A. Okay. I have skimmed it all.
Q. Have you had an opportunity?
A. Yes.
Q. So directing your attention to Page 313.
A. Right.
Q. Where Mr. Seale talks about a three-legged stool.
A. Right.
Q. And then he says, "First is a partial cost recovery." Do you see that?
A. I do.
Q. Do you know what Mr. Seale intended to communicate to the STB by that?
A. I really don't know exactly what he meant by that phrase.
Q. Well, is partial cost recovery part of a three-legged stool supporting NS -- Norfolk Southern's fuel surcharge?
MR. NANNES: Objection. Calls for speculation on the witness's part.

Page 125

THE WITNESS: Again, I don't know exactly what partial cost recovery means. As I have testified before, certainly acknowledging what is happening with the price of fuel is one component of our fuel surcharge as are -- as is the market-based component we have discussed, which Mr. Seale also certainly talked about at length.
BY MR. WERDER:
Q. Well, you certainly would understand partial cost recovery as being something different than total cost recovery or more than total cost recovery, wouldn't you, sir?
A. Well, I -- you are asking me to kind of speculate on what partial in this context means and I really -- I just don't know exactly why he used that word as compared to another word.
Q. Is that -- is this the only time that you have ever seen the phrase "partial cost recovery" used in connection with Norfolk Southern's FSC policies and practices?
A. I don't recall. We may have used it in other instances and in different contexts. So I just -- I don't recall.
Q. Well, is it a premise of Norfolk Southern's FSC policies and practices that the FSC





7a322d07-5d6a-443b-9f85-f4206415fb0a

Page 126

should achieve partial cost recovery?
A. Well, again, the premise -- I mean, I have stated over and over the premise is there is -- we certainly look at what is happening in fuel and to the extent there are significant costs or costs differentials in fuel, that is fine, but at the end of the day it is about the market. At the end of the day, we don't price to cost, we price to the market. So do we -- do we know what our costs are? Yes. Can we always price to cost? No. We price to the market.
Q. So it is not a premise of Norfolk Southern's FSC policies and practices that the FSC is intended to achieve partial cost recovery?
A. Well, again, I don't know exactly what Don meant in this context by you saying partial cost recovery. I just don't know. I wasn't at the testimony. I don't know what the other people who were testifying said. I just -- I really don't know.
Q. And then Mr. Seale goes on to talk about how, in his sixth point, how we have to be able to price to the market in order to be able to enhance our capacity to meet demand. Do you see that?
A. I am sorry. I skipped a page.
Q. At the bottom of Page 3-.
A. Yeah. That is right. Yeah.

Page 127

Q. And he describes that as -- a little bit farther on 314, as one of the cruxes of your FSC application. Do you see that?
A. "Six components are the crux," is his quote. Yes.
Q. Okay. And are you aware of any analysis that was done within Norfolk Southern during your tenure as president, CEO and chairman that indicated that FSC revenue was needed in order to support necessary reinvestment?
A. Am I aware of a specific study? I am not. All of our studies were just based upon our overall pricing and the margin we would be able to accomplish and the revenues we would be able to generate.
Q. And is there any document that exists within NS, to your knowledge, that indicates that in any given time period for any given year we need to achieve X dollars of FSC revenue in order to permit us to make the investments that we believe as our management group we need prudently to make for our business?
A. I am not aware of any specific document.
Q. Okay. And, in fact, it is true, isn't it, sir, that over the period of time that we are

Page 128

talking about here or a part of the period of time that we are talking about, 2006 through 2008, $3.3 billion of after-tax dollars were concluded by management to be unnecessary for reinvestment in the business and, therefore, available for essentially being dividended to stockholders, right?
MR. NANNES: Asked and answered.
THE WITNESS: Yes. I think we have said before that there was -- when there is cash beyond the requirements of reinvestment in the company and investment which we feel we can make an adequate return around the company then we obviously, like every company, try to look for ways to return that cash to our shareholders.
BY MR. WERDER:
Q. And am I right that the numbers that we looked at in the 2008 annual report reflected over the period 2006 through 2008 a $3.3 billion after-tax cushion in the cash resources available to Norfolk Southern for reinvestment in its business?
A. Well, I don't know that I would categorize it as a cushion. I will just say what I said before. It is certainly an indication that we felt that there was $3.3 billion over that period of time that we could return to our shareholders.

Page 129

Q. And do you know how that $3.3 billion compares to the total amount of fuel surcharge revenue that was received over that period of time?
A. Well, I think we discussed the one year. I don't know how the -- I mean, I -- I am sure you can help me do the math but I don't recall specifically how they compare.
Q. I don't have -- you haven't given to me your total figures for '07 and '08 in the discovery process, to my knowledge. But we did have the billion dollar figure for '06. Do you know whether the fuel surcharge revenues in '07 and '08, were larger or smaller than in '06?
A. I just don't recall.
Q. And you just don't know as you sit here today whether -- whether the total FSC revenues for '06, '07 and '08 exceeded $3.3 billion?
A. I just don't know the numbers right now.
Q. The -- if the billion dollars of FSC revenues that were achieved in 2006, had not been received at all, Norfolk Southern still would have been able to return over $2.3 billion of dividend to its shareholders in stock buyback during the period 2006 through 2008, correct?
MR. NANNES: Objection. Calls for

Page 130

speculation.
THE WITNESS: Wait. What are you telling me? What are you saying?
BY MR. WERDER:
Q. If you had -- if you had received $0 in FSC revenue in 2006 -- withdrawn.
For the period 2006 through 2008, you took $3.3 billion and gave it back to your shareholders, correct?
A. Yes. There were $3.3 billion returned.
Q. And so if you had achieved $0 in fuel surcharge revenue in 2006, you still would have had billions of dollars in money in the period 2006 through 2008 available for return to the shareholders and not needed for reinvestment, correct?
A. No. I am just -- I am not sure I quite follow this. Are you saying that if our -- let me --
MR. NANNES: He can pose the question if you don't understand the one rather than pose it back to him.
THE WITNESS: Well, may I in the interest --
BY MR. WERDER:
Q. Sure. Go ahead.
[redacted]

Page 131

[redacted]
Q. All right. Do you see a little bit farther down on Page 314 -- by the way, did you borrow money to do the stock repurchases?
A. I think our -- there was some slight component of net debt that went up actually. Yes. I don't recall exactly. But I think our net borrowings may have increased slightly over that time period.
THE VIDEOGRAPHER: We are going off the record at 12:01 p.m.
(There was a pause in the proceedings.)

Page 132

THE VIDEOGRAPHER: We are back on record at 12:02 p.m. It was 12:01 when we went off.
BY MR. WERDER:
Q. So, Mr. Moorman, looking at Page 314, Chairman Buttrey asks Mr. Seale whether he can unequivocally state for the record that Norfolk Southern is not over recovering fuel costs. Do you see that?
A. Yes. I do.
Q. And have you had an opportunity to review Mr. Seale's answer to that?
A. I have not. I stopped at the six points. Can I --
Q. Yeah. Why don't you take a moment.
A. -- ramble on through this?
Q. Yes. Go on through.
A. Thank you. Okay.
Q. So Mr. Seale is asked the question whether he can unequivocally state for the record that you are not over recovering on fuel costs. And is the answer --
A. Where -- okay. Yes. Beginning with Chairman Buttrey. Got it.
Q. Yes. You've got that okay?
A. All right.

Page 133

Q. And then he says that, Over the last six years, I can state that we have not over recovered over that period of time. Do you see that?
A. I do.
Q. And would that be a true statement with respect to 2004 on a standalone basis, do you know?
A. I wouldn't know.
Q. Would it be a true statement with respect to 2005 on a standalone basis, do you know?
A. I do not know.
Q. Would it be a true statement, given what we have looked at, for 2006 on a standalone basis, do you know?
MR. NANNES: Objection to the form of the question.
THE WITNESS: Well, recall the conversations that we have already had about -- recalling the conversation about lag, again, I go back to the idea that we were charging to the market.
BY MR. WERDER:
Q. Rather than charging in a way that would ensure that you didn't do more than recover your costs?
A. Again, we were -- as I say, we were charging to the market.





7a322d07-5d6a-443b-9f85-f4206415fb0a

Page 134

Q. And not charging in a way that would ensure --
A. We don't do cost-based pricing.
Q. Okay. And that means, does it not, sir, that you don't do pricing in a way to ensure that the FSC is not recovering more than your -- than your fuel costs?
MR. NANNES: Asked and answered.
THE WITNESS: Yes. I think so. And I will, again, just go back and state that over the past whatever number of years you want to take the railroad industry back when diesel was $12 a gallon or $23 a gallon or whatever it is it is a cost and it is part of our cost structure but we charge to the market if we can.
BY MR. WERDER:
Q. Okay. And then if we look over to 317.
A. All right.
Q. Vice-chairman Mulvey asks -- did you read that far, by the way?
A. I glanced at it so go ahead and ask.
Q. Well, he asks -- the question is, "So, you would argue that you're not over recovering from the fuel surcharge program? Not over recovering from double dipping as they say." And Mr. Seale says, "We

Page 135

do our absolute best to ensure that that does not occur." Do you see that?
A. Wait now.
MR. NANNES: I think you referred to Page 316 but you are reading from 317.
THE WITNESS: Yes. Okay.
BY MR. WERDER:
Q. Did I say 316?
MR. NANNES: Yes. I believe you did.
BY MR. WERDER:
Q. I am sorry. I did intend to --
A. You may not have but that is where I went.
Q. I am sorry.
A. Okay. I see that.
Q. And when Mr. Seale came back from providing this testimony, did he come and chat with you about it?
A. I don't recall.
Q. Did you come to learn at some point in time that the issue of over recovering fuel costs through the FSC program came up in the STB hearing?
A. I am sure I did. I don't recall the specifics.
Q. And did you come to learn that Norfolk

Page 136

Southern had taken the position that Mr. Seale set forth here that we do our absolute best to ensure that we are not over recovering was the position that they had taken?
MR. NANNES: Objection to the -- objection to the characterization of his testimony here.
THE WITNESS: You know, I -- let me say this is obviously the first time I have seen this testimony and I don't -- I just don't know the -- again, anything about the context, the use of the word "double dipping," for example. So was I aware of this -- of this conversation with Vice-Chairman Mulvey? No.
BY MR. WERDER:
Q. Okay. And I take it you didn't attend this STB hearing, right?
A. I did not.
Q. Did you attend any preparation sessions for the STB hearing?
A. Not that I recall.
Q. Did you talk to Mr. Seale about the testimony that he was going to give before he went to give it?
A. I don't recall.

Page 137

Q. Okay. The idea -- to the extent that Mr. Seale was testifying that we do our absolute best to ensure that we don't over recover our fuel costs from our FSC program, that is not your view of the world, is it, sir?
MR. NANNES: I object again to the characterization of the testimony. There is a specific reference here to not double dipping and you are assuming the contents of Mr. Seale's testimony that I don't think is warranted by the actual language.
THE WITNESS: And contextually I will point out that this is immediately after a conversation about RCAF pricing in which the conversation pertains to RCAF, the rail cost adjustment factors, which have historically included some fuel component. And what Mr. Seale is referring to and I think, in fact, Vice-Chairman Mulvey is referring to is that when we are in negotiations about RCAF it is appropriate to, if we are going to have another fuel surcharge in place, we remove the fuel component that has historically been baked into RCAF hence the term "double dipping."
BY MR. WERDER:
Q. And if we go back, sir, to 314 and 315





7a322d07-5d6a-443b-9f85-f4206415fb0a

Page 138

where Mr. Seale was first asked to unequivocally state for the record that you are not over recovering your fuel costs, there wasn't any reference in that question to the -- to the RCAF, was there?

MR. NANNES: Objection again to the characterization.

THE WITNESS: Chairman Buttrey asked a question and Mr. Seale's response was that over a six-year period, he could state that cumulatively we had not over recovered.

BY MR. WERDER:

Q. And then he says at the top of Page 315, "We continue to work on that," doesn't he?

A. He does.

Q. And what work were you doing in the May 2006 time frame, to ensure that your fuel surcharge didn't over recover your fuel costs?

MR. NANNES: Objection.

BY MR. WERDER:

Q. You weren't doing any, were you?

A. I am not -- in reading this, I wouldn't even say that I am sure that that sentence applies to the previous sentence because he immediately starts talking about coverage of fuel surcharge and I think he was, in fact, referring to the fact that we had

Page 139

85 percent coverage and not -- not a higher percentage but this is in the context, which I shouldn't do, of surmising something from a printed document when I wasn't there.

Q. All right. Well, let me just ask you without reference to Mr. Seale's testimony. Was Norfolk Southern doing anything in May 2006, to ensure that its fuel surcharge revenues didn't over recover its fuel costs?

A. Again, I will go back to the same answer I have given you repeatedly. Norfolk Southern was doing everything it possibly could in May 2006, to price to the marketplace.

Q. But my question is a little bit different and it is: Were you taking any action of any kind that was addressed to the issue or intended to achieve the result that your FSC revenues didn't exceed your fuel costs?

A. We weren't taking any specific action because that is -- you know, we -- we don't look at the world in that way. We look at market-based pricing not cost-based pricing.

Q. Okay. And is it -- there is no doubt in your mind about that, is there, that in 2006, you were taking no steps whatsoever to ensure that fuel

Page 140

surcharge revenues did not exceed fuel costs?

MR. NANNES: Asked and answered.

THE WITNESS: I have answered it in the way that I guess affirmatively in the sense that we were doing everything we possibly could to make sure that our pricing, whatever the components of it were, were at market.

BY MR. WERDER:

Q. And you were doing nothing to ensure that the fuel surcharge didn't exceed the fuel costs, right?

MR. NANNES: Asked and answered.

THE WITNESS: I have answered, I think.

BY MR. WERDER:

Q. Does pricing to market mean maximizing profit, by the way?

A. Pricing to market means that we should price as high as we can within the confines of the marketplace and what our transportation customers are willing to pay for our services.

Q. And was the fuel surcharge policy that Norfolk Southern has applied during the -- during your tenure as president, CEO and chairman been a policy that has been designed to maximize Norfolk Southern's profits?

Page 141

MR. NANNES: Objection. Lack of foundation.

THE WITNESS: I am somewhat taken aback by the question. I guess, you know, it is -- as far as I know, the objective of most companies or all companies within a capitalist system to try and maximize their profits within all of the confines and contexts of the marketplace in which they operate.

BY MR. WERDER:

Q. And it is true, is it not, that Norfolk Southern decided internally that in its pursuit of market prices, what you call market prices, it is better able to achieve that objective by raising prices through a fuel surcharge than it would be to achieve that objective by trying to modify line haul or base rates, correct?

A. I think we had this conversation earlier about the context of the marketplace in terms of changes in pricing versus changes in -- or duration of contracts. And so what I would tell you is that the fuel surcharge mechanism is one way of maintaining market pricing was certainly there but in every contract negotiation and, in fact, in our public pricing, if we felt it is appropriate or feel it is appropriate to raise line haul rates, we do that, as





7a322d07-5d6a-443b-9f85-f4206415fb0a