# Exhibit 131

Federal Practice & Procedure
Database updated April 2014

Federal Rules Of Civil Procedure
The Late Charles Alan Wright[a85], Arthur R. Miller[a86], Mary Kay Kane[a87], Richard L. Marcus[a88], Adam N. Steinman[a89]

Chapter
5. Parties
Mary Kay Kane[a457]

Rule
23. Class Actions
C. Class Actions Maintainable

Link to Monthly Supplemental Service

**§ 1784 Class Actions in Which Common Questions Predominate Over Individual Questions—Problems in Administering Judicial Relief**

**Primary Authority**

Fed. R. Civ. P. 23

**Forms**

West's Federal Forms §§ 3051 to 3107

On occasion, the award of relief to a plaintiff class that has brought suit successfully under Rule 23(b)(3) presents some unusual difficulties of administration and distribution that do not arise in actions under the other portions of Rule 23(b). In an action brought under Rule 23(b)(1), the class members by definition have highly similar interests and generally are seeking damages and the enforcement or prohibition of some course of conduct by the opposing party that affects all of them in much the same way. As a result, basically only one recovery is sought and the determination of the overall amount and the sum due each class member is not difficult.[1] Similarly, suits brought under Rule 23(b)(2) seek declaratory or injunctive relief that will benefit all class members automatically; therefore, the number of persons involved or the fact that it is a class action does not materially increase the problem of framing or enforcing the decree.[2]

But in an action under Rule 23(b)(3) the members are loosely bound together by common questions of law or fact and considerations of convenience. Even the damages they seek generally are individual in character and disparate in amount.[3] Furthermore, Rule 23(b)(3)(D) obliges the court to consider the management difficulties when determining whether the class suit is the best means of resolving the controversy.[4] Thus, management problems associated with determining what relief may be awarded may encourage a court to refuse to give a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

case class-action treatment.[5] This has occurred, for example, when courts have considered how to structure the presentation of evidence on damages consistent with jury-trial rights.[6] But even when that hurdle is surmounted, problems relating to the judicial administration of the relief take on a special significance in determining the amount of the damages and distributing the recovery among the members of the class.

Professor Zechariah Chafee, reflecting on class actions before the 1966 amendments, suggested that many difficulties in administering relief in class actions seeking damages stem from the fact that representative suits involving money claims were tried in equity and allowing them to be brought at law is a relatively recent development.[7] The net effect is that the courts must use their discretion, and in many cases their ingenuity, to shape decrees or to develop procedures for ascertaining damages and distributing relief that will be fair to the parties but will not involve them in an unduly burdensome administration of the award.

As discussed in several of the earlier sections, when confronting the issue of the maintainability of the class action and, in particular, whether common questions predominate, differences among class members as to their damages have not typically led the courts to conclude that representative treatment is inappropriate. Thus, cases have held that separate issues concerning damages among the class members do not prevent the common issue of liability from being adjudicated on a class basis.[8] Rule 23 provides the courts with enough flexibility and room for judicial innovation so that the question of damages can be determined through individual trials on that issue pursuant to “equitable procedures” devised by the court.[9]

The formulation of procedures by which the individual issues of class membership and damages are determined for each of the claimants, who may number in the hundreds, thousands, or even millions, may demand considerable foresight and ingenuity. Some early courts thought it advantageous to establish the extent of the claims and claimants early in the trial and have ordered notice to be sent to all class members requiring them to file a statement of their claims within a reasonable period or lose the right to assert them.[10] This procedure provides the court and the litigants with a fairly good idea of the identity of the potential claimants and the size of the class, as well as the amount of their asserted damages at an early stage in the action. More often, however, courts await the adjudication of the liability issue before adopting procedures requiring class members to come forward and assert their claims.[11] This approach has the obvious advantage of avoiding considerable paperwork and expense in cases in which no liability is found. In either event, the courts frequently use a proof-of-claim form that must be filed by members intending to prove damages.[12]

Although individual claims could be resolved by separate trials, the cost of doing so in the case of a large plaintiff class is likely to be prohibitive and the prospect may deter many members from asserting their claims or discourage class members from bringing suit as representatives in the first instance. One possible solution is the appointment of a special master to process the claims, determine questions of membership in the class, and assess damages in accordance with a formula or guideline established by the court.[13] But special masters cannot be used in a way that would subvert any right to a jury determination on basic questions of fact, in particular damages, so they may have only limited utility. Further, the appointment of a master to govern the task of damage distribution may not represent the best approach since it may be so expensive that a large portion of the recovery might be depleted by its use. Thus the question remains as to what techniques may be utilized that will lessen the burden on the court without significantly impairing the potential award.

One possibility is to try the damage issue only once, making a single award for the class, and then develop an expeditious administrative means of dividing the lump sum among the class members.[14] This approach has been employed in judicially approved settlements under Rule 23(e) and the courts could look for guidance to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

some of the procedures that have been developed in that context.[15]

For example, in West Virginia v. Chas. Pfizer & Company,[16] private antitrust class actions were brought against drug companies by several classes seeking treble damages under the federal statute: the class consisted of government entities and institutions, individual purchasers, wholesalers, and retailers. Defendants offered a settlement of $100,000,000 and plaintiffs, upon request, submitted various plans for the distribution of that sum. The plan adopted by the court gave the governmental claims first priority since their damages were easily calculable and directly provable. Then reimbursement payments were computed for the class of individual claimants and, finally, the wholesaler-retailer class was given a nuisance-value allocation plus interest since they actually had not suffered any damages.

The Pfizer opinion raises another important consideration relating to lump-sum recoveries. Despite the detailed schedule formulated for distributing the settlement, the court noted that there would be some individual purchasers who would never present claims. Anticipating this problem, plaintiffs had utilized a notice procedure under which consumers who did not assert individual claims were deemed to assign their rights to the Attorneys General of the various states that were involved in the action. As a result, any portion of the settlement that was not claimed would revert to the state and be held by it subject to the court's order. It was anticipated that the court might consider ways in which to apply the excess funds to achieve socially desirable objectives. For example, it might direct expenditures that would prevent future violations or wrongs of the kind that gave rise to the Pfizer litigation.

Devising a plan to distribute a lump-sum recovery is beneficial because it may eliminate the need for separate trials on damage issues. In a case involving an extremely large plaintiff class whose members only have small individual claims, the savings in time and expense for all will be considerable. Simplifying the process of establishing individual claims may be the only way of making it economically feasible for class members to come forward and assert their rights. Nonetheless, this approach when utilized outside the settlement context challenges some of the procedural safeguards—most notably jury trial[17]—that are considered fundamental when the litigation involves a single plaintiff and a single defendant.

These concerns have caused courts, particularly in mass-tort actions, to refuse certification because the importance of the individual day in court and need for jury trials has been deemed inconsistent with proposed methods of determining damages on a group basis.[18] But in cases brought under Rule 23(b)(3) alleging violations of the antitrust or securities laws more flexibility in damage assessment may be feasible. This is true in part as a matter of policy and, in part because the nature of the damages suffered in many of these cases may be more readily ascertainable without individual testimony. One of the main reasons for allowing the institution of these private civil actions is that their availability acts as a deterrent to conduct proscribed by federal statutes. Thus, to the extent that allowing a single damage recovery makes it feasible for representatives to act as private attorneys general while at the same time affording them some relief, the procedure should be encouraged.[19]

The opinion by the New York district court in Eisen v. Carlisle & Jacquelin[20] exemplifies this approach. That suit involved a class action on behalf of all odd-lot stock investors against major dealers on the New York Stock Exchange for an alleged violation of the antitrust laws. The court first decided that the gross damages could be estimated without requiring each class member to file an individual claim.[21] The district judge also suggested that further management problems in distributing the award might be ameliorated by applying something akin to the cy pres principle in the estates field to any portion of the recovery not distributed to individual claimants.[22] For example, the defendants might be ordered to reduce their prices until they had dis-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

gorged their illegal profits. This approach had been first suggested in a California state-court class suit[23] and typically is called a fluid-class recovery.

On appeal in Eisen, the Second Circuit held that there was no authority for allowing that type of remedy in amended Rule 23 and that a fluid recovery was improper.[24] It distinguished West Virginia v. Chas. Pfizer & Company[25] on the ground that it involved a settlement so that there was no objection to the district court assuming jurisdiction to accept and administer the fund; in Eisen there was no settlement and every issue was contested.

The Second Circuit's decision can be criticized as representing a mechanical and unsympathetic reading of Rule 23 and one that completely ignores the courts' discretion to fashion relief.[26] Unfortunately, when the Supreme Court ruled on this case it failed to address the damage-remedy problem and affirmed the Second Circuit's opinion on other grounds.[27] Nonetheless, most lower federal courts have followed Eisen and have ruled that the fluid recovery is impermissible under Federal Rule 23,[28] unless it is part of a distribution arising out of a settlement.[29] The object to which the unspent funds are directed must be related to the origins of the underlying action, however, to be approved.[30]

Somewhat interestingly, state courts have not found themselves so constrained and have continued to utilize this special recovery method to overcome the management problems presented by distributing enormous damage awards to absent class members.[31] Nonetheless, in the federal courts, although damage assessments sometimes may be made on a lump-sum basis, rather than as a result of individual testimony, distribution mechanisms must be directed toward individual recoveries. The Ninth Circuit has recognized an exception. It upheld the use of a fluid recovery to distribute a large unclaimed damage fund after a trial awarding statutory damages.[32] The court distinguished other federal cases disallowing fluid recoveries on the ground that the statutory damages involved were not dependent on proof of actual injury and were intended to deter future violations.

Insofar as the problem presented is one of damage distribution, rather than damage calculation, the district judge might reduce the burden on the court in actually administering the damage distribution by having the parties submit proposals as to how to distribute the award with a minimal amount of judicial supervision.[33] The court needs to supervise and approve the activities of counsel, however, since the process of distributing the fund would not be truly adversarial. Defendant would have no interest in assuring that all claimants were fairly compensated since the class members would be bound by the judgment regardless of their individual recovery.[34] On the other hand, assuming that the class representation is adequate, or could be reinforced for purposes of distributing the award, there is little reason for concern. Courts nonetheless must be sensitive to the fact that an attorney-managed distribution process might be expensive, thereby reducing the ultimate recovery of the class members. As an alternative to attorney control, use of a master to supervise the distribution may be preferable or, in certain types of litigation, such as that arising out of the antitrust or securities laws and consumer cases, the court might invoke the aid of the governmental agency charged with the responsibility of administering the applicable law to help in distributing the relief.[35]

Courts should not be reluctant to adopt procedures along the lines described in this section or any others that seem to fit a particular case. These steps are not radical deviations but have a strong relationship to the wide range of approaches utilized in the analogous process of framing equity decrees. Keeping in mind that the modern class action sprang from equity,[36] a federal court should feel free to experiment in structuring and distributing relief under Rule 23. It has the tools to shape the remedy to meet the exigencies of each case and difficulties in administration should not be allowed to destroy the usefulness of the class-action procedure.[37] Of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

course, the burdens that are attached to class actions must be weighed against the benefits that might be derived. But as one commentator appropriately noted:

> The practical limitations on establishing damages in a lawsuit are some assurance that there will be substantial uncompensated, but measurable, social costs prior to the commencement of a class action. Large uncompensated costs imply that some action should at least be attempted.[38]

[FNa85] Charles Alan Wright Chair in Federal Courts, The University of Texas.

[FNa86] University Professor, New York University. Formerly Bruce Bromley Professor of Law, Harvard University.

[FNa87] John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law.

[FNa88] Horace O. Coil ('57) Chair in Litigation, University of California, Hastings College of the Law.

[FNa89] Professor of Law and Michael J. Zimmer Fellow Seton Hall Law School.

[FNa457] John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law.

---

[FN1]

**Rule 23(b)(1) actions**

See §§ 1772 to 1774.

[FN2]

**Rule 23(b)(2) actions**

See §§ 1775 to 1776.1.

[FN3]

**Rule 23(b)(3) actions**

See §§ 1777 to 1783.

[FN4]

**Rule 23(b)(3)(D)**

See § 1780.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN5]

**Management problems preclude**

The court has the right to decertify a class following a determination of liability against defendants if the plaintiffs are unable to develop a method of proving damages that would permit the trial to proceed in an efficient manner. In re Sugar Indus. Antitrust Litigation, D.C.Pa.1976, 73 F.R.D. 322.

"The prospect that a substantial portion of the class will not share in the recovery makes the superiority of the class action device doubtful. … The inability of the court and counsel to effectuate recovery by silent class members constituting a substantial portion of the class may thus result in dismissal of the suit." Comment, Damage Distribution in Class Action: The Cy Pres Remedy, 1972, 39 U.Chi.L.Rev. 448, 449.

[FN6]

**Jury trial issues**

See § 1 for a fuller discussion of class actions and the right to a jury trial.

[FN7]

**Professor Chafee**

Chafee, Some Problems of Equity, 1950, p. 285.

[FN8]

**Class action maintainable**

Kohen v. Pacific Inv. Management Co. LLC, 571 F.3d 672, 676 (7th Cir. 2009), **citing Wright, Miller & Kane**.

Recipients of income-tax-refund-anticipation loans brought class actions against a bank and tax preparers, alleging various claims including violations of the Racketeer Influence and Corrupt Organizations Act. The appellate court upheld class certification, noting that the tools available to the district court to address problems created by the presence of individual damages issues included: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to the class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class. Carnegie v. Household Int'l, Inc., C.A.7th, 2004, 376 F.3d 656, certiorari denied 125 S.Ct. 877, ___ U.S. ___, ___ L.Ed.2d ___.

Although there were undoubtedly administrative complications in managing a distribution of damages to a class of migrant farmworkers, who alleged that defendants had violated certain disclosure and posting provisions of the Farm Labor Contractor Registration Act, those problems were not nearly substantial enough to suggest that the district court abused its discretion in finding that the class was manageable. De La Fuente v. Stokely-Van Camp, Inc., C.A.7th, 1983, 713 F.2d 225, 233, **citing Wright &**

**Miller.**

That factual determinations pertaining to individual class members would be necessary did not preclude the court from aiding the class to obtain its just restitution, and when it would be necessary for the court in each case to determine only whether the student was a Pennsylvania resident at the time of paying nonresident tuition and, if so, the amount of restitution due, the class was not unmanageable on the restitution issue and, at least without investigation into the possible use of subclasses, decertification of the class was error. Samuel v. University of Pittsburgh, C.A.3d, 1976, 538 F.2d 991.

Green v. Wolf Corp., C.A.2d, 1968, 406 F.2d 291, certiorari denied 89 S.Ct. 2131, 395 U.S. 977, 23 L.Ed.2d 766.

Eisen v. Carlisle & Jacquelin, C.A.2d, 1968, 391 F.2d 555.

The class-action certification requirement that common issues of law and fact predominate over individual issues was satisfied by the proposed class action involving buyers of the drug levothyroxine claiming they overpaid due to false representations of the manufacturers of the brand-name version inducing them to purchase the manufacturers' product over the generic version, despite the manufacturers' claim that there were individualized fact situations and differences in the damages claims. In re Synthroid Marketing Litigation, D.C.Ill.1999, 188 F.R.D. 287.

Former employees seeking to collect severance benefits, vacation pay, bonuses and damages for failure to provide requested information under ERISA, satisfied the class-action requirement that common questions of law or fact predominate over any individual questions; although defendants contended that commonality existed only as to legal questions, factual distinctions, such as the issue of individual damages, involved mathematical calculations based on the length of service and formulas for calculating dismissal benefits, severance pay, vacation, pay, and bonuses were contained in individual benefit plans. Walsh v. Pittsburgh Press Co., D.C.Pa.1994, 160 F.R.D. 527.

Common questions of fact predominated in consumer's action against the bank under the Illinois Consumer Fraud Act for the purposes of class certification, although the damage determination would entail individual factual questions; the consumer claimed that the bank schemed with various contractors to lure consumers into entering into contracts with relatively favorable credit terms, then switched them to more costly financing with the bank. Heastie v. Community Bank of Greater Peoria, D.C.Ill.1989, 125 F.R.D. 669.

It is not necessary to find that the damage formula would dispose of the damages question in order to conclude that common questions predominate in a class action for illegal price fixing. In re Alcoholic Beverages Litigation, D.C.N.Y.1982, 95 F.R.D. 321.

Alameda Oil Co. v. Ideal Basic Indus., Inc., D.C.Colo.1971, 326 F.Supp. 98.

Epstein v. Weiss, D.C.La.1970, 50 F.R.D. 387.

Illinois v. Harper & Row Publishers, Inc., D.C.Ill.1969, 301 F.Supp. 484.

Berland v. Mack, D.C.N.Y.1969, 48 F.R.D. 121.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Herbst v. Able, D.C.N.Y.1969, 47 F.R.D. 11, amended D.C.N.Y.1970, 49 F.R.D. 286.

Minnesota v. U.S. Steel Corp., D.C.Minn.1968, 44 F.R.D. 559.

Siegel v. Chicken Delight, Inc., D.C.Cal.1967, 271 F.Supp. 722.

Brennan v. Midwestern United Life Ins. Co., D.C.Ind.1966, 259 F.Supp. 673.

The point has often been stated in antitrust class actions, see § 1781 n. 12, and in securities class actions, see § 1781.1 nn. 7–8.

[FN9]

**"Equitable procedures"**

Common issues predominate when individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria, rendering unnecessary an evidentiary hearing on each claim. Smilow v. Southwestern Bell Mobile Sys., Inc., C.A.1st, 2003, 323 F.3d 32.

Six (6) Mexican Workers v. Arizona Citrus Growers, D.C.Ariz.1986, 641 F.Supp. 259, 261, citing Wright & Miller, affirmed C.A.9th, 1990, 904 F.2d 1301.

Dolgow v. Anderson, D.C.N.Y.1968, 43 F.R.D. 472, 491, grant of summary judgment reversed C.A.2d, 1970, 438 F.2d 825.

**See also**

Epstein v. Weiss, D.C.La.1970, 50 F.R.D. 387.

Mattoon v. City of Norman, Oklahoma, Okl.1981, 633 P.2d 735, 738 n. 18, **citing Wright & Miller.**

[FN10]

**Claims filing requirement**

Biechele v. Norfolk & Western Ry. Co., D.C.Ohio 1969, 309 F.Supp. 354.

Philadelphia Elec. Co. v. Anaconda Am. Brass. Co., D.C.Pa.1968, 43 F.R.D. 452.

Harris v. Jones, D.C.Utah 1966, 41 F.R.D. 70.

[FN11]

**After judgment**

Green v. Wolf Corp., C.A.2d, 1968, 406 F.2d 291, certiorari denied 89 S.Ct. 2131, 395 U.S. 977, 23 L.Ed.2d 766.

Foster v. City of Detroit, Michigan, C.A.6th, 1968, 405 F.2d 138.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

See also the discussion of intervention in §§ 1799 to 1800.

[FN12]

**Proof-of-claim form**

See §§ 1787, 1796.

[FN13]

**Special master**

Foster v. City of Detroit, Michigan, C.A.6th, 1968, 405 F.2d 138.

The potential recovery of actual damages by some class members in a suit alleging violations of the Truth in Lending Act did not defeat predominance for purposes of certification to resolve the issue of liability; if plaintiffs were able to establish liability, the court either could appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a res judicata finding of liability. Fabricant v. Sears Roebuck, D.C.Fla.2001, 202 F.R.D. 310.

Complexity of class action involving alleged used-car churning scheme required the appointment of a special master when the class action involved seven different theories of liability from plaintiffs, exculpatory theories from defendant, and a putative class in excess of 2,500, and the multiplying effect of the theories, upon defensive theories, upon the overall class size would be complicated for even the most talented juries. Chisolm v. TranSouth Financial Corp., D.C.Va.2000, 194 F.R.D. 538.

Biechele v. Norfolk & Western Ry. Co., D.C.Ohio 1969, 309 F.Supp. 354.

In Abitanta, Bifurcation of Liability and Damages in Rule 23(b)(3) Class Actions: History, Policy, Problems, and a Solution, 1982, 36 Sw.L.J. 743, the author suggests that a manageable method of dealing with the assessment of damages is by using a special master appointed pursuant to Rule 53.

[FN14]

**Lump-sum remedy**

District court's use of an aggregate damages methodology in a class action brought on behalf of third-party payors against a drug manufacturer for violation of the Massachusetts consumer protection statute in connection with the reimbursement for an injectable prostate-cancer drug did not violate the class-action rule or the manufacturer's due-process rights. In re Pharmaceutical Industry Average Wholesale Price Litigation, 582 F.3d 156 (1st Cir. 2009), cert. dismissed, 131 S. Ct. 60 (2010).

The procedure of having one lump-sum damage award, which then is divided among the class members through the administrative means of a claims resolution facility was approved in In re A.H. Robins Co., C.A.4th, 1989, 880 F.2d 709, 743, **citing Wright, Miller & Kane**, certiorari denied 110 S.Ct. 377, 493 U.S. 959, 107 L.Ed.2d 362.

For purposes of the predominance requirement for class certification in a securities/antitrust action against market-makers for a computerized securities quotation system (NASDAQ), aggregation of dam-

ages of the class as a whole was susceptible to determination in single trial, despite defendants' contention that that approach would lead to a “fluid class recovery,” i.e., distribution of unclaimed or unclaimable funds to persons not found to be injured but who had interests similar to those of class; computerized records of the system, supplemented by claims forms, provided means to distribute damages to injured class members in the amount of their respective damages. In re NASDAQ Market-Makers Antitrust Litigation, D.C.N.Y.1996, 169 F.R.D. 493.

In a class-action prisoner lawsuit alleging unconstitutional conditions and practices at a correctional facility, the district court could award per diem damages to each prisoner for unconstitutional confinement, or award per diem damages for each day during which conditions were of a given degree of unconstitutional severity and then permit both prisoners and correctional officials to seek variation for specific class members based upon a showing of unique individual circumstances, although the methods involve some degree of inexactitude. Langley v. Coughlin, D.C.N.Y.1989, 715 F.Supp. 522, 558.

Eovaldi v. First Nat. Bank of Chicago, D.C.Ill.1976, 71 F.R.D. 334, reversed on other grounds C.A.7th, 1979, 596 F.2d 188.

Dam, Class Actions: Efficiency, Compensation, Deterrence, and Conflict of Interest, 1975, 4 J.Legal Studies 47.

Jacoby & Cherkasky, The Effects of Eisen IV and Proposed Amendments of Federal Rule 23, 1974, 12 San Diego L.Rev. 1.

Patrick & Cherner, Rule 23 and the Class Action for Damages: A Reply to the Report of the American College of Trial Lawyers, 1973, 28 The Business Lawyer 1097, 1102.

**See also**

Wells v. Meyer's Bakery, C.A.8th, 1977, 561 F.2d 1268 (back pay treated as class issue though each employee must show denial of jobs).

**Compare**

In a class action brought by dealers against an oil refiner for breach of contract in which the jury returned a special-verdict form finding a common damage factor to measure individual compensatory damages for the refiner's failure to reduce wholesale prices charged to the dealers as promised in order to offset credit-card fees imposed on the dealers, the dealers were not entitled to the entry of a final judgment for the total amount of the compensatory damages suffered by the class as a whole, plus prejudgment interest for the class as a whole calculated in accordance with the laws of the 35 political jurisdictions in which the dealers purchased motor fuel from the refiner during the class period; it would be inappropriate for the court to go beyond the special-verdict form to enter an aggregate compensatory and prejudgment-interest award to the class, the dealers could not equate a class member's interests in the total damage award sought by the class with a “joint and undivided” interest in a single claim or res, and thereby justify the entry of an aggregate judgment, and the aggregate judgment issue did not arise during the deliberation on the jury instructions. Allapattah Servs., Inc. v. Exxon Corp., D.C.Fla.2001, 157 F.Supp.2d 1291, affirmed C.A.11th, 2003, 333 F.3d 1248, certiorari granted 125 S.Ct. 317, ___ U.S. ___, 160 L.Ed.2d 221.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**But compare**

Problems presented by individual damage claims in an action by present and future pensioners seeking reinstatement of medical insurance and damages did not mandate adoption of aggregate damages approach when the individual damage claims were susceptible to individualized proof in a bifurcated trial. Bower v. The Bunker Hill Co., D.C.Wash.1986, 114 F.R.D. 587.

[FN15]

**Settlement procedures**

See §§ 1797 to 1797.3.

[FN16]

**Chas. Pfizer case**

C.A.2d, 1971, 440 F.2d 1079, certiorari denied 92 S.Ct. 81, 404 U.S. , 30 L.Ed.2d 115.

[FN17]

**Jury trial**

See § 1.

[FN18]

**Mass tort**

See § 1783.

[FN19]

**Acts as deterrent**

Note, The Cost-Internalization Case for Class Actions, 1969, 21 Stan.L.Rev. 383, 419.

**See also**

Comment, Manageability of Notice and Damage Calculation in Consumer Class Actions, 1971, 70 Mich.L.Rev. 338, 360.

**But see**

In Comment, SEC Enforcement of the Rule 10b-5 Duty to Disclose Material Information—Remedies and the Texas Gulf Sulphur Case, 1967, 65 Mich.L.Rev. 944, 957, the author discusses the problem of allowing civil damage suits to be brought to help in enforcing the securities legislation. Noting that the civil liability frequently will be overwhelming, he concludes that private actions may not be a viable means of compelling adherence to the disclosure provisions of the Securities Exchange Act. However, this conclusion is not necessary. If a class action were brought, instead of innumerable individual suits,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and one damage recovery was made binding on all other investors, then a balance would be achieved. The use of class actions to aid in enforcing the securities laws is discussed in §§ 1781.1 and 1806.

[FN20]

**Eisen case**

D.C.N.Y.1971, 52 F.R.D. 253, reversed C.A.2d, 1973, 479 F.2d 1005, noted 1973, 73 Col.L.Rev. 1641, 59 Iowa L.Rev. 252, 27 Rutgers L.Rev. 212, 1973 Utah L.Rev. 489; 1974, 54 B.U.L.Rev. 111, 53 Ore.L.Rev. 225, affirmed on other grounds 1974, 94 S.Ct. 2140, 417 U.S. 156, 40 L.Ed.2d 732.

[FN21]

**Estimate gross damages**

The judge explained how the estimate was to be made as follows: "The sources for such a computation will include at least the following: defendants' own records, the Report of Special Study of Securities Markets of the Securities and Exchange Commission, … records of the NYSE Special Committee on Odd Lots relating to the lowering of the odd-lot differential in 1966 and a cost study of the odd-lot industry conducted for the NYSE by Price Waterhouse & Co. … " 52 F.R.D. at 262 (per Tyler, J.).

**But see**

The district court improperly entered aggregate class-wide judgments, in violation of the Rules Enabling Act, which provides that the federal rules cannot be used to abridge, enlarge or modify any substantive right, by estimating gross damages for each class of the holders of defaulted bonds as a whole in their actions against the Republic of Argentina for losses arising out of the country's default on sovereign debt, since, without using appropriate procedures to ensure the damages awards roughly reflected the aggregate amount owed to class members, the court enlarged the holders' rights by allowing them to encumber property to which they had no colorable claim; the court did not explain how it calculated aggregate class-wide awards but acknowledged that the estimates were likely inflated, and the court incorrectly reasoned that the inflated judgments were justifiable because, given Argentina's general refusal to pay any judgment against it, the holders were unlikely to recover. Seijas v. Republic of Argentina, 606 F.3d 53 (2d Cir. 2010).

In Simon, Class Actions—Useful Tool or Engine of Destruction, 1971, 1 Lincoln L.Rev. 20, 30, the author criticizes the Eisen approach as legislating "a shift in private antitrust policy from compensation to confiscation."

[FN22]

**Cy pres**

In Comment, Damage Distribution in Class Actions: The Cy Pres Remedy, 1972, 39 U.Chi.L.Rev. 448, 453, the author examines the possibility of utilizing three different cy pres approaches in the class-action context: "(1) distribution to those class members who come forward to collect their damages, (2) distribution through the state in its capacity as parens patriae or by escheat, and (3) distribution through the market."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Compare**

See Judge Weinstein's opinion setting forth a distribution plan for the settlement fund in the products-liability class action, In re "Agent Orange" Prod. Liability Litigation, D.C.N.Y.1985, 611 F.Supp. 1396. In Judge Weinstein's opinion, he agreed to the establishment of an independent foundation to distribute research funds drawn from any funds remaining after classwide distribution. The Second Circuit modified that portion of his decision, eliminating the independent foundation and insisting that the district court manage the funds for projects that would benefit the defined class as precisely as possible. In re "Agent Orange" Prod. Liability Litigation, C.A.2d, 1987, 818 F.2d 179.

[FN23]

**California suggested**

Daar v. Yellow Cab Co., 1967, 63 Cal.Rptr. 724, 67 Cal.2d 695, 433 P.2d 732.

[FN24]

**Eisen appeal**

C.A.2d, 1973, 479 F.2d 1005, noted 1973, 73 Col.L.Rev. 1641, 59 Iowa L.Rev. 252, 27 Rutgers L.Rev. 212, 1973 Utah L.Rev. 489, 1974, 54 B.U.L.Rev. 111, 53 Ore.L.Rev. 225, affirmed on other grounds 1974, 94 S.Ct. 2140, 417 U.S. 156, 40 L.Ed.2d 732.

[FN25]

**Pfizer**

C.A.2d, 1971, 440 F.2d 1079, certiorari denied 92 S.Ct. 81, 404 U.S. , 30 L.Ed.2d 115.

[FN26]

**Decision mechanical**

The Eisen decision is analyzed in detail in Note, Managing the Large Class Action: Eisen v. Carlisle & Jacquelin, 1973, 87 Harv.L.Rev. 426.

Note, Eisen v. Carlisle & Jacquelin III: Applying the Axe to the Green Bay Tree, 1973, 35 U.Pitts.L.Rev. 450.

**See also**

Coiner, Class Actions: The Legal Odyssey of Eisen v. Carlisle & Jacquelin, 1974, 5 Memphis State U.L.Rev. 19.

[FN27]

**Supreme Court**

1974, 94 S.Ct. 2140, 417 U.S. 156, 40 L.Ed.2d 732.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN28]

**Not allowed**

A "fluid recovery plan," under which smokers would prove collective damages on a class-wide basis and individual smokers then would claim shares of a fund, would violate the Rules Enabling Act and Due Process Clause if used in a civil Racketeer Influenced and Corrupt Organizations Act action alleging that the manufacturers deceived smokers into believing that "light" cigarettes wre more healthful than "full-flavored" cigarettes, in that the aggregate determination was likely to result in an astronomical damages figure that would not accurately reflect the number of smokers injured and would bear little or no relationship to the amount of economic harm caused by the manufacturers. McLaughlin v. American Tobacco Co., 522 F.3d 215 (2d Cir. 2008).

Class members who filed proper proofs of claim were not entitled to receive on a pro rata basis any portion of the damage award which remained unclaimed. Van Gemert v. Boeing Co., C.A.2d, 1977, 553 F.2d 812.

Cy pres awards are a bad idea and inappropriate, because they inject a third party into the litigation, do not adequately reflect the best interests of the absent class members, create an appearance of impropriety, and are not the best use of the court's time and resources. In re Thornburg Mortg., Inc. Securities Litigation, 885 F. Supp. 2d 1097 (D.N.M. 2012).

In a shareholder's class action alleging a proxy statement issued by a corporation in connection with its merger misrepresented and/or omitted material facts in violation of the Securities Exchange Act, the district court would not apply the cy pres doctrine to turn settlement funds over to a non-for-profit foundation established to benefit the corporation's former shareholders instead of using the funds to pay awards to individual class members, since awarding the funds to the foundation would not directly benefit the class and would be inappropriate. Lane v. Page, 862 F. Supp. 2d 1182 (D.N.M. 2012).

Once liability had been admitted, and general damages of $500 per search had been awarded to the arrestees, in a class action against the county for unconstitutional strip searches, an aggregate class judgment would be entered in the amount fixed by multiplying the number of qualifying strip searches by $500, rather than allowing defendants to pay in perpetuity any valid future claims, and any unclaimed funds would revert back to the county, rather than being distributed pro rata to class members making claims under cy pres principles, since a fluid recovery resulting in a windfall to plaintiffs was against public policy. Augustin v. Jablonsky, 819 F. Supp. 2d 153 (E.D. N.Y. 2011).

In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, D.C.Minn.1975, 410 F.Supp. 706.

Fluid-recovery award in a treble-damage antitrust action erodes due process, so that such a recovery may not be allowed in order to overcome the fact that questions of law and fact applicable to individual members of the proposed class predominate over common questions. Al Barnett & Son, Inc. v. Outboard Marine Corp., D.C.Del.1974, 64 F.R.D. 43.

The use of a fluid-class recovery is criticized in Malina, Fluid Class Recovery as a Consumer Remedy in Antitrust Cases, 1972, 47 N.Y.U.L.Rev. 477.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**But compare**

In Schwab v. Philip Morris USA, Inc., D.C.N.Y.2006, 449 F.Supp.2d 992, 1252–1272, **quoting Wright, Miller & Kane,** Judge Weinstein thoroughly examined the law surrounding the use of fluid recovery, as well as the arguments for and against its use, and ultimately concluded that it may be used in a particular class action if it is needed to vindicate the substantive law at issue. Applying that standard, he then ruled that the potential use of a fluid recovery to distribute damages would not prevent certification of a class action under the Racketeer Influenced and Corrupt Organizations Act alleging that the manufacturers induced smokers to buy "light" cigarettes by falsely representing that they would experience reduced health risks, when plaintiffs planned to prove the manufacturers' liability to the class on an aggregate basis and to distribute total damages among individual class members through a proof-of-claim procedure, damages would be allocated among class members based on the number of "light" cigarettes purchased by each within the relevant geographic area and time, class members' estimated individual damages were low enough to make individual lawsuits cost-prohibitive, individual notice was not practicable because an appreciable number of the class members could not be identified in advance, the class members were likely to share in any eventual judgment, and any residue would be distributed on the basis of cy pres principles.

Although the cy pres approach is most frequently used for the purpose of distributing the residue of a class settlement fund, it may be utilized as a means for distributing the entirety of a class fund when the proceeds cannot be economically distributed to the class members. In re Microsoft Corp. Antitrust Litigation, D.C.Md.2002, 185 F.Supp.2d 519.

In Six (6) Mexican Workers v. Arizona Citrus Growers, D.C.Ariz.1986, 641 F.Supp. 259, affirmed C.A.9th, 1990, 904 F.2d 1301, the court ruled that individually proven damage awards for identified members of a class of farm workers who could not be located would be distributed through the fluid recovery method.

[FN29]

**Allowed in settlement**

Direct distributions to the class are preferred over cy pres distributions; cy pres distributions present a potential conflict of interest between class counsel and their clients because the inclusion of a cy pres distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class; when a court fears counsel is conflicted, it should subject the settlement to increased scrutiny. Thus, when considering a class cy pres settlement, a thorough analysis of the settlement terms requires an inquiry into the degree of direct benefit provided to the class; in making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to the claimants' estimated damages, and the claims process used to determine individual awards and, barring sufficient justification, cy pres awards should generally represent a small percentage of the total settlement funds. In re Baby Products Antitrust Litigation, 708 F.3d 163 (3d Cir. 2013).

The district court did not abuse its discretion, under the evolving law of cy pres distributions in class-action settlement agreements, in either the process utilized or in the decision to make a cy pres award of the remaining $11.4 million in unclaimed consumer-fraud settlement proceeds to promote research into

prostate cancer and other diseases treatable by the drug for which the consumers were overcharged; there was no abuse of discretion in the court's choice to forego a direct notice mailing given that the administrative burden of doing so appeared to outweigh the small potential for increased claims, and the 11,000 claimants had already received an enhanced payment beyond single damages, however, an explicit requirement that the district court receive an annual audit at the expense of the recipient, in addition to the annual and semi-annual accountings to be submitted by the court would be added to ensure that the cy pres fund was distributed in a way that was both financially sound and comported with the interests of the class and that the auditing function would not fall on the district court. In re Lupron Marketing and Sales Practices Litigation, 677 F.3d 21 (1st Cir. 2012), cert. denied, 133 S. Ct. 338 (2012).

The district court did not abuse its discretion in approving the cy pres part of the settlement in an consumers' class action against a manufacturer claiming that the consumers had overpaid Medicare copayments because the manufacturer had inflated the price of drugs, the district court insisted that the settlement pay class members treble damages before any money was distributed to cancer or patient-related charities through the cy pres fund. In re Pharmaceutical Industry Average Wholesale Price Litigation, 588 F.3d 24 (1st Cir. 2009).

In re “Agent Orange” Prod. Liability Litigation, C.A.2d, 1987, 818 F.2d 179.

Reallocation to one plaintiff class of a portion of funds originally allocated to two other plaintiff classes did not constitute an improper “fluid class” recovery, inasmuch as the case involved a settlement agreement and defendant had agreed to some “fluidity” with respect to the individual class members' recovery by agreeing that no portion of the fund would revert to it and, in addition, the allocation plan itself made allowance for “spillover” between classes in the event that the amount allocated to the class exceeded the total of allowed claims. Beecher v. Able, C.A.2d, 1978, 575 F.2d 1010.

Cy pres award to nonprofit organizations focusing on the education of large and small entities was warranted in the settlement of class actions involving federal and state antitrust claims, and alleged Racketeer Influenced and Corrupt Organizations Act and conspiracy violations, by numerous brokerage and insurance companies; given the large number of class members, the distribution of the settlement fund to each member would be inefficient and ineffective, and the estimated administrative expenses associated with distribution of the settlement fund to non-excess casualty claimants would entirely absorb the amount available to each member. In re Ins. Brokerage Antitrust Litigation, 282 F.R.D. 92 (D.N.J. 2012).

Cy pres distributions would be made, of the excess funds arising from the settlement of an antitrust class action alleging price fixing by vendors of stock-car racing souvenirs, to charities providing health care, assistance to children, and legal aid, and also to a lawyers' philanthropic foundation. In re Motorsports Merchandise Antitrust Litigation, D.C.Ga.2001, 160 F.Supp.2d 1392.

Distribution of $18,400.80 residue of securities-fraud class-action fund settlement outside of the class, following the pro-rata distribution to qualified claimants and efforts to locate missing claimants, was proper; the cost of distributing the residue to 17,198 class members would have been prohibitive. Thus, the charitable donation of the unclaimed funds to the Legal Aid Society Civil Division at the request of class counsel was appropriate. Jones v. National Distillers, D.C.N.Y.1999, 56 F.Supp.2d 355.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

In utilizing its cy pres power to distribute the remaining residue of securities-fraud class-action settlement fund to an alternate recipient, the court would order class counsel to give money to law school clearinghouse that distributed information on pending securities class actions via the Internet, which qualified as an organization that would serve the interests of future class members in similar litigation, and not to the local bar association. In re Wells Fargo Secs. Litigation, D.C.Cal.1998, 991 F.Supp. 1193.

Most appropriate and equitable disposition of residual settlement funds in an employment-discrimination case was to distribute funds to a tax-exempt foundation created by the employer for the purpose of establishing a scholarship fund to provide educational opportunities for African-Americans; reversion to the employer or distribution to identified class members was not appropriate, when no provision was made for such disposition, and when both the class members and the employer had received the benefit of the consent decree. Powell v. Georgia-Pacific Corp., D.C.Ark.1994, 843 F.Supp. 491.

In antitrust class litigation brought against the manufacturers of folding cartons, all motions filed by former class members and by settling defendants for distribution to them of the approximately $6,000,000 in the reserve fund, which had been established to pay late claims and to meet various expenses and contingencies associated with distribution of the settlement fund, were denied; instead, the court approved the administration committee's recommendation that any reserve funds remaining after payment of all valid claims and expenses should be utilized for research into possible techniques for maximizing competition and preventing or detecting and stopping antitrust violations, and, to that end, the court directed the committee to establish a foundation. In re Folding Carton Antitrust Litigation, D.C.Ill.1983, 557 F.Supp. 1091. The Seventh Circuit reversed that portion of the settlement proposal, holding that after enlarging the time for filing claims by another year, any excess funds should escheat to the government. C.A.7th, 1984, 744 F.2d 1252, certiorari denied 106 S.Ct. 11, 471 U.S. 1113, 86 L.Ed.2d 269. While certiorari was pending, the parties entered into a second settlement agreement providing that half of the funds remaining would be distributed pro rata to previously paid claimants and that the other half would be paid to two or more Chicago law schools to fund research projects in the area of class actions, and particularly antitrust law. That agreement was subsequently approved by the court, after notifying the United States and being told that the government did not object, and distribution to the claimants as well as to two law schools was accomplished. Subsequently, the United States sought to intervene to reopen the question of the validity of the agreement on the ground that it violated law of the case. The court denied that motion, finding the government's request to be untimely, and further ruled that law-of-the-case doctrine was inapplicable. D.C.Ill.1988, 687 F.Supp. 1223. Although there may be some question whether the district court's view of the law-of-the-case issue is correct, its ruling on the untimeliness of the government's intervention clearly is appropriate.

In the case of In re Three Mile Island Litigation, D.C.Pa.1982, 557 F.Supp. 96, the court approved a settlement that included the establishment of a public health fund to finance studies of the long-term health effects of the accident involved and to further evacuation planning for the future, instead of providing funds for those claiming physical injuries due to the accident.

In Ohio Public Interest Campaign v. Fisher Foods, D.C.Ohio 1982, 546 F.Supp. 1, the distribution plan for the settlement fund included provisions requiring defendant to contribute either food or cash to charitable organizations that gave away food to the needy in an amount equal to the unclaimed portion of the settlement fund.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Hillebrand & Torrence, Claims Procedures in Large Consumer Class Actions and Equitable Distribution of Benefits, 1988, 28 Santa Clara L.Rev. 747.

Note, The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions, 1987, 38 Hast.L.J. 729.

**Compare**

The question of the disposition of unclaimed funds from the settlement of an antitrust class action was substantive, under Erie, and therefore, the district court was not free to disregard the Texas Unclaimed Property Act and the rights secured thereunder in favor of distributing the funds via a cy pres order; although the availability of cy pres did not pose a significant threat of forum-shopping by plaintiffs, permitting federal courts to disregard the Unclaimed Property Act in favor of a cy-pres distribution, while state courts followed the Act, would lead to the inequitable administration of justice. All Plaintiffs v. All Defendants, 645 F.3d 329 (5th Cir. 2011).

The Fifth Circuit has ruled that the use of cy pres to allocate monies remaining in a settlement fund after the time for filing claims against the fund had passed was proper only if the nonclaiming class members retain an equitable interest. When distribution achieved the compensatory purposes of Title VII, then the court was in error to apply cy pres when the existing parties has a substantial equitable claim to the excess. Wilson v. Southwest Airlines, Inc., C.A.5th, 1989, 880 F.2d 807.

[FN30]

**Related to action**

Pre-certification class action settlement's cy pres distributions of food and unclaimed funds bore no relation to the class of consumers or their claims against a breakfast-cereal producer for violation of California's Unfair Competition Law (UCL) and California's Consumer Legal Remedies Act (CLRA) by alleged false advertising regarding the effect of cereal on children's attentiveness, thus precluding approval of the settlement under fairness standards, since the cy pres distributions to unspecified charities involved in feeding the indigent were divorced from concerns embodied in the UCL and CLRA consumer protection laws. Dennis v. Kellogg Co., 697 F.3d 858 (9th Cir. 2012).

The cy pres remedy included in the settlement of the members' class action against an on-line social network and participants in the network program that had updated the members' network personal profiles to reflect their actions on the participants' websites, pursuant to which approximately $6,5000,000 would be used for a charity organization that would fund and sponsor programs to educate users and others regarding online privacy issues, bore a direct and substantial nexus to the interests of the absent class members, and thus provided for the "next best distribution" to the class members alleged violations of state and federal privacy statutes, direct monetary payments to the class members were infeasible, given the de minimis recovery, and the organization's distributions would promote causes of online privacy and security that would benefit the absent class members and serve the purposes of the underlying privacy statutes. Lane v. Facebook, Inc., 696 F.3d 811 (9th Cir. 2012), cert. denied, 134 S. Ct. 8 (2013).

Factors considered in determining whether distributions of unclaimed cy pres funds from a class-action

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

settlement reasonably approximate the interests of the class members include the purposes of the underlying statutes claimed to have been violated, the nature of the injury to the class members, the characteristics and interests of the class members, the geographical scope of the class, the reasons why the settlement funds have gone unclaimed, and the closeness of the fit between the class and the cy pres recipient; the failure to meet the reasonable approximation test can lead to reversal. In re Lupron Marketing and Sales Practices Litigation, 677 F.3d 21 (1st Cir. 2012), cert. denied, 133 S. Ct. 338 (2012).

The district court abused its discretion in making a cy pres distribution of unclaimed funds from the settlement of a travel agents' national class action against the airlines to mostly local recipients because the distribution should have been more closely related to the origin of the underlying actions. In re Airline Ticket Comm'n Antitrust Litigation, C.A.8th, 2001, 268 F.3d 619. After the district court redesigned its cy pres distribution scheme another appeal was taken and the Eighth Circuit again reversed, holding that the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated. Applying that standard, the distribution of unclaimed funds should have been made to travel agencies in Puerto Rico and the Virgin Islands, rather than to an entity that did not claim any relation to the substantive issues in the case. Even though those agencies were not members of the class, equitable considerations underlying the cy pres doctrine meant that the agencies were the best recipients of the funds since cy pres distributions to those agencies would have related directly to the antitrust injury alleged in the lawsuit, suffered by the agencies, and settled by the parties. In re: Airline Ticket Comm'n Antitrust Litigation, C.A.8th, 2002, 307 F.3d 679.

A cy pres award which designated three California academic institutions as recipients in a proposed final settlement of the consumers' class action against an Internet retailer and its marketer alleging violation of the Electronic Funds Transfer Act and California law was appropriate, and therefore would be approved, since there was a nexus between the plaintiff class and the cy pres beneficiaries making it the next best distribution to giving the funds directly to class members; although three of the many attorneys in the suit had attended one of the designated cy pres law schools, that school was not entitled to any greater award than the others, the award was directly tied to the California statutes underlying plaintiffs' claims and would benefit all Internet users in that it would be used to fund education programs and professorship positions regarding Internet privacy and data security, and without the cy pres award, claimant class members would receive a windfall at the expense of silent class members. In re EasySaver Rewards Litigation, 921 F. Supp. 2d 1040 (S.D. Cal. 2013).

A cy pres award of $998,075 paid to third-party organizations as part of a settlement of a class of credit cardholders' breach-of-contract, Fair Credit Reporting Act, and negligence claims against a credit-card processor, was proper; it was not possible to put the funds to their very best use, benefiting the class members directly, because the vast majority of the class members did not file claims, whether from lack of interest or the absence of losses, the agreement was organized so cy pres relief was triggered only after the class members had ample opportunity to file claims, cy pres was the only way to avoid having the unclaimed funds revert to the processor, escheat to the government, or provide a windfall to the few who filed valid claims, and the organizations that class counsel selected to receive the cy pres distribution reasonably approximated the interests pursued by the class by working to create a more secure payment-card technology that would help prevent data breaches, and working to help financial institutions minimize the consequences if breaches occurred. In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation, 851 F. Supp. 2d 1040 (S.D. Tex. 2012).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Settlement proposed from the class members and the bank comported with the law regarding cy pres in a class action by account holders against the bank alleging conversion, unjust enrichment, and the violation of state unfair trade practice statutes as a result of overdraft fees, when the proposal recommended the direction of funds owed to unidentified class members to respected organizations that promoted financial literacy, given that the claims being settled involved allegations of unfair treatment of customers by large financial institutions. In re Checking Account Overdraft Litigation, 830 F. Supp. 2d 1330 (S.D. Fla. 2011).

Objection to the proposed settlement of the consumer's class action against a restaurant for breach of contract, consumer fraud, and false advertising, based on the restaurant's failure to honor a coupon for a free two-piece chicken meal, which claimed that the three cy pres recipients approved by the court to receive any settlement funds remaining were "questionable," would be rejected when the recipients had been chosen independently by the parties, they had no affiliation with individuals in the case, and included the nation's leading domestic hunger-relief charity, a nationwide organization devoted to combating hunger, and an organization which helped to improve low-income consumers' access to the courts. In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation, 280 F.R.D. 364 (N.D. Ill. 2011).

Cy pres distribution appeared to be an appropriate disposition of the remaining settlement fund in a class action alleging antitrust violations, in light of the equitable claim to that fund held by the non-claiming class members and the deterrence and punitive goals of the Sherman Act; however, the class plaintiff failed to establish that its proposed cy pres recipient, a law-school endowment fund, was the appropriate recipient. Diamond Chemical Co., Inc. v. Akzo Nobel Chemicals B.V., 517 F. Supp. 2d 212 (D.D.C. 2007).

In an antitrust class action on behalf of 1.8 million purchasers of a satellite television package of the National Football League (NFL) games, excess funds would be paid in their entirety to NFL Youth Education Town Centers as proposed by settling defendants rather than split as proposed by plaintiffs, even though defendants' proposal was far from a perfect fit under cy pres principles; the distribution of excess funds to a student legal clinic was not needed to promote the policies of the underlying antitrust statutes at issue, the distribution to either the law school's legal clinic or a charter school for gifted underprivileged students did not touch upon the subject matter of the lawsuit, there was no evidence that a further class reminder by way of publication in a newspaper of national circulation would result in filing of any significant number of additional claims, and while the class and geographic scope of the lawsuit was nationwide, the relief proposed by plaintiffs was limited to organizations based in the Philadelphia area, the payment of excess funds to class members was impractical, and escheat to the federal government would serve no public purpose. Schwartz v. Dallas Cowboys Football Club, Ltd., D.C.Pa.2005, 362 F.Supp.2d 574.

In light of the level of need experienced by individual members of the Looted Asset Class, suggestions that a portion of excess and possibly unclaimed residual funds, resulting from the settlement of a class action brought by Holocaust victims, be allocated to research and educational programs regarding the plight of homosexuals in the Nazi era and its aftermath, and to disability-oriented organizations, were not more consistent with the original purpose of the Class than a direct distribution to needy survivors. In re Holocaust Victim Assets Litigation, D.C.N.Y.2004, 311 F.Supp.2d 407.

**Compare**

When funds in a class-action settlement involving exposure to toxic chemicals were allocated among three subclasses, and one subclass, the members of which had suffered no physical injury at the time of the agreement did not use the sums allocated to it for medical monitoring, the district court abused its discretion by ordering a cy pres distribution of the unused funds to charities. It should, instead, have distributed the funds to another subclass, whose members had suffered cancer and other injuries from exposure because the agreement preserved for the class something akin to a reversionary interest in funds unused by a particular subclass. Klier v. Elf Atochem North America, Inc., 658 F.3d 468 (5th Cir. 2011).

[FN31]

**Continue to utilize**

Bruno v. Superior Court, 1981, 179 Cal.Rptr. 342, 127 Cal.App.3d 120. In 1993, California enacted a statute specifically authorizing the fluid-recovery remedy in class actions. See Cal.Civ.Pro.Code § 384.

Specific authorization for a fluid class recovery also is found in some state class-action rules. E.g., N.D. Rule 23(*o*)(3). See also McKinney's N.Y. CPLR 907.5 (lump-sum recovery authorized).

[FN32]

**Ninth Circuit**

Six (6) Mexican Workers v. Arizona Citrus Growers, C.A.9th, 1990, 904 F.2d 1301, 1306.

[FN33]

**Counsel aids**

Stewart v. General Motors Corp., C.A.7th, 1976, 542 F.2d 445, certiorari denied 97 S.Ct. 2995, 433 U.S. 919, 53 L.Ed.2d 1105 (although may use master to help distribute back pay award, counsel encouraged to make their own agreement on method of distribution).

In Ace Heating & Plumbing Co. v. Crane Co., C.A.3d, 1971, 453 F.2d 30, 34, a settlement was reached by the parties and then the amount was placed under the control of a committee composed of counsel from both sides to "conduct the notice program, to review proofs of claim filed by class members and to approve or disapprove those claims." The court noted that the participation of defense counsel on these committees guaranteed fairness since it prevented any unfair practices that could jeopardize the settlement defendants desired.

A class-wide trial on damages was appropriate in a property owners' class action to recover for damage to their property interests caused by releases of plutonium and other hazardous substances from a nearby nuclear-weapons manufacturing plant; if class-wide liability and damages were found by the jury, the court then would, with the assistance of counsel, determine appropriate principles and procedures for distributing the compensatory and any exemplary damages awarded. Cook v. Rockwell Int'l Corp., D.C.Colo.2003, 273 F.Supp.2d 1175.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bromine Antitrust Litigation, D.C.Ind.2001, 203 F.R.D. 403, 415 (preliminary approval of proposed partial settlement made when it contained a provision that stated: "the Settlement Fund shall be used and/or distributed in accordance with the Plan that Class Counsel shall submit at the appropriate time for approval by the Court.").

In Six (6) Mexican Workers v. Arizona Citrus Growers, D.C.Ariz.1986, 641 F.Supp. 259, affirmed C.A.9th, 1990, 904 F.2d 1301, farm workers prevailed in a class action against farm labor contractors. The court then made various rulings regarding how statutory damages would be distributed, including that a plan to verify the identity of class members could be accomplished through the appointment of a committee of farm workers and that proven awards for unlocated class members would be distributed through the fluid recovery method. The court directed the parties to develop the particulars of a plan to effectuate its rulings.

**See also**

Dolgow v. Anderson, D.C.N.Y.1968, 43 F.R.D. 472, 491, grant of summary judgment reversed C.A.2d, 1970, 438 F.2d 825.

Epstein v. Weiss, D.C.La.1970, 50 F.R.D. 387.

[FN34]

**Parties bound**

See § 1789.

[FN35]

**Governmental agency aids**

Under New York City's Consumer Protection Law, the Department of Consumer Affairs may bring an action on behalf of aggrieved consumers, obtain a lump sum recovery, and distribute it to members of the class. The ordinance is analyzed in Note, New York City's Alternative to the Consumer Class Action: The Government as Robin Hood, 1972, 9 Harv.J.Legis. 301.

[FN36]

**Equitable roots**

See § 1751.

[FN37]

**Tools to shape**

Dam, Class Actions: Efficiency, Compensation, Deterrence, and Conflict of Interest, 1975, 4 J.Legal Studies 47.

In Weinstein, Some Reflections on the "Abusiveness" of Class Actions, 1973, 58 F.R.D. 299, 304,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Judge Weinstein explores some of the ways in which a federal judge can deal with the problems posed by class actions and concludes: "In sum, we want to control, we want to prevent abuses. We do not want to really kill this little beastie. We do not want to so entangle it so that it cannot be used effectively. It does give us a more adequate tool for the deterrence of unlawful, socially destructive conduct through civil suits."

[FN38]

**Social costs**

Note, The Cost-Internalization Case for Class Actions, 1969, 21 Stan.L.Rev. 383, 391.

Westlaw. © 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

FPP § 1784

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.