**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

_____

This document relates to:

ALL CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF/AK/JMF)

**PUBLICLY FILED VERSION**

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXPERT REPORT**

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ......................................................................................................1

II.    FACTUAL BACKGROUND .....................................................................................6

     A.     The Discovery of Dr. Rausser's Role in Cascade Settlement Services ..................6

     B.     Dr. Rausser and OnPoint Have Been Involved in Cascade's Class Action
            Arbitrage Work for Years, Including in Activities and Investments Related
            to This Case......................................................................................................8

     C.     Dr. Rausser Provided Advice Contrary to His Opinions in This Case in
            His Consultation with Cascade ...........................................................................11

     D.     Plaintiffs' Counsels' Willful Indifference to These Issues ....................................12

     E.     Plaintiffs Propose to Add Another Plaintiff-Side Class Certification
            Economist to Their Roster, Even Though Dr. McClave is Already Serving
            as a Witness Whose Sole Function is to Validate Dr. Rausser .............................15

III.    ARGUMENT ...........................................................................................................16

     A.     No Cases Support Plaintiffs' Extraordinary Request for a Last Minute,
            "Supplemental" Expert .......................................................................................17

     B.     The Fact that Dr. Rausser's Credibility Issues Have Come to Light Is
            *Important*, Not "Unfairly Prejudicial" to Plaintiffs .................................................20

     C.     Plaintiffs' Request for a Supplemental Expert to Parrot Dr. Rausser Adds
            No Value to the Existing Class Certification Record ............................................24

IV.    CONCLUSION........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adams v. Cooper Indus., Inc.*,
  2007 U.S. Dist. LEXIS 99057 (E.D. Ky. Apr. 5, 2007) .........................................................24

*Aruba Bonaire Curacao Trust Co. v. IRS*,
  777 F.2d 38 (D.C. Cir. 1985) ...............................................................................................17

*United States ex rel. Brown v. Rundle*,
  417 F.2d 282 (3d Cir. 1969) .................................................................................................20

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ..........................................................................................................21

*Doctor's Associates, Inc. v. QIP Holder LLC*,
  2009 WL 5184404 (D. Conn. Dec. 23, 2009) ..................................................................18, 24

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
  2005 U.S. Dist. LEXIS 11676 (S.D. Ohio June 13, 2005) ....................................................15

*Roberts ex rel. Johnson v. Galen of Va., Inc.*,
  325 F.3d 776 (6th Cir. 2003) ................................................................................................24

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
  2010 WL 3892860 (N.D. Ind. Sept. 30, 2010) .................................................................20, 24

*Masimo Corp. v. Tyco Health Care Group, L.P.*,
  2006 U.S. Dist. LEXIS 29977 (C.D. Cal. Mar. 22, 2006) .....................................................15

*In re Med. Waste Servs. Antitrust Litig.*,
  2006 U.S. Dist. LEXIS 19793 (D. Utah Mar. 3, 2006) ........................................................15

*Medpace, Inc. v. Biothera, Inc.*,
  2014 WL 1045960 (S.D. Ohio. Mar. 17, 2014) ................................................................20, 24

*Morel v. Daimler-Chrysler Corp.*,
  259 F.R.D. 17 (D.P.R. 2009) ................................................................................................20

*National Railroad Passenger Corp.*,
  2006 WL 2711533 (D.D.C. Sept 21, 2006) ...........................................................................19

*Nijjar v. General Star Indemnity Co.*,
  2014 WL 271630 (C.D. Cal. Jan. 23, 2014) .....................................................................18, 19

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) .......................................................................17

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) .........................................................................21

*Rink v. Chemninova*,
    400 F.3d 1286 (11th Cir. 2005) .......................................................................17

*Sample v. Monsanto Co.*,
    218 F.R.D. 644 (E.D. Mo. 2003) .....................................................................15

*Schindler Elevator Corp. v. Riverboat Corp. of Miss.*,
    2011 WL 1113471 (S.D. Miss. Mar. 24, 2011) ...............................................16

*Tagatz v. Marquette*,
    861 F.2d 1040 (7th Cir. 1988) .........................................................................16

*TIC-The Industrial Company Wyoming, Inc. v. Factory Mut. Ins. Co*,
    2012 WL 2830867 (D. Neb. July 10, 2012) ....................................................19

*Vincent v. Omniflight Helicopters*,
    2009 WL 4262578 (E.D. Wis. Nov. 24, 2009) .................................................19

*Whiteside v. State Farm Fire and Casualty Co.*,
    2011 WL 5084981 (E.D. Mich. Oct. 26, 2011) ...............................................18

*In re Wholesale Grocery Products Antitrust Litig.*,
    2012 U.S. Dist. LEXIS 103215 (D. Minn. July 25, 2012)................................15

*Zoltek Corp. v. United States*,
    95 Fed. Cl. 681 (2010) ....................................................................................16

## RULES

Fed. R. Civ. P.
    16(b)(4) ............................................................................................................17
    23......................................................................................................................21
    30(b)(6) ...............................................................................................2, 9, 10, 11
    37(c)(1) ............................................................................................................17

## OTHER AUTHORITIES

Jeffrey Leitzinger and Russell L. Lamb, *The Predominance Requirement for
    Antitrust Class Actions—Can Relevant Market Analysis Help?*, ABA Antitrust
    Section Economics Committee Newsletter (Spring 2007) .......................................15

## I.       INTRODUCTION

Plaintiffs ask the Court to permit them to add yet another expert, long after discovery closed and after the time the class certification hearing was set to occur.  The sole basis for this request is that, in Plaintiffs' own words, recently discovered evidence raises "serious matters concerning Dr. Gordon Rausser's credibility."  Pls.' Mot. For Leave To File Suppl. Expert Report, Oct. 31, 2014 ("Pls.' Mot.") at 1.  That is unquestionably true, but there is no basis in the law upon which Plaintiffs may be rewarded for Dr. Rausser's conduct with an extra witness.  The hearing should proceed in January, as discussed during the October 21, 2014 conference, and on the extensive record built by the parties.

We do not doubt the seriousness of the issues that have come to light in the past few weeks.  The evidence shows that Dr. Rausser has for years invested in and advised a group of related companies ("Cascade") that invests in class action claims, including in this very case.  At the time of his July 31, 2014 deposition, Dr. Rausser had a direct financial interest in Cascade by virtue of (a) his personal investment of more than $1,000,000 in a "fund" that was created to invest in this and other cases, and (b) his personal consulting arrangement with Cascade whereby he had the right to receive at least 10% of Cascade's revenues for claims purchased in this and other cases.  Cascade projected that if a class were certified here, Cascade and its investors would ultimately earn *over* ████████ *on this case alone*.  Accordingly, when Dr. Rausser was asked about Cascade at his deposition and specifically whether he had "any ownership or financial interest in any company that has purchased claims in this case," his answer—an unqualified "no"—was false.  Even Plaintiffs' counsel have been forced to admit that it is a "fact" that "Dr. Rausser provided incorrect testimony at his deposition."  Pls.' Mot. at 20.

Dr. Rausser changed his testimony in his August 28, 2014 errata, asserting that while he has "the right to share in distributions from certain claims [Cascade] manage[s], … those do not include claims in this case or any other case in which [he is] a testifying expert or [his consulting

1

firm] OnPoint has performed any services." Ex. 1, Rausser Errata, Aug. 28, 2014, at 829:7.[1]  But

that appears to be false too.  Dr. Rausser asserts that there was an undocumented "agreement" to

restrict his right to Cascade distributions; in essence an oral modification to formal written

contracts that (a) do not restrict his compensation and (b) have integration clauses stating that

they constitute the entire agreement on such issues.  Cascade's Rule 30(b)(6) witness flatly

refuted Dr. Rausser's assertion, testifying that Dr. Rausser's rights to distributions are as stated

in the formal contractual instruments, and that Dr. Rausser did have a financial interest in a

Cascade entity that had purchased claims in this case.  Ex. 2, Chilcott Dep., October 16, 2014, at

178:23-179:15.

In their motion, Plaintiffs imply that Dr. Rausser's credibility problems are limited to his

financial relationship with Cascade.  In fact, Dr. Rausser's credibility issues go much further and

bear directly on the merits of his economic work and core aspects of Plaintiffs' arguments for

class certification.  Dr. Rausser and OnPoint consulted with Cascade about this very case, and in

doing so offered advice and opinions directly at odds with Dr. Rausser's testimony here.  For

example, Dr. Rausser evidently acknowledged in a discussion with Cascade that shippers with

legacy contracts are not damaged ███████████████████  This contradicts Dr.

Rausser's efforts since *Behrend* was decided to dismiss legacy false positives generated by his

damages model by claiming that shippers with legacy contracts *were* damaged.

The facts are so damaging to Dr. Rausser's credibility that, at the October 21, 2014

hearing, Plaintiffs made the extraordinary suggestion that they should be allowed to have

someone *other than Dr. Rausser* present and defend his class certification model.  Ex. 3, October

21, 2014 Hearing Transcript ("Oct. 21 Tr.") at 9:7-11, 9:17-10:6.  Defendants objected, and

while the Court did not formally resolve the issue, the discussion indicated that Dr. Rausser

would have to stand for cross-examination.  *See, e.g.*, *id.* at 18:23-19:2 (THE COURT: "[A]

piece of what the Court of Appeals is going to look at is Rausser.  And they ought to have my

---

[1]   All exhibit references are to the Declaration of Timothy O'Mara, filed concurrently herewith.

views on his credibility.  They ought to have him on the witness stand being examined and cross-examined."); *id*. at 33:17-18 (THE COURT: "We're not at the beginning.  So Rausser is essential.").

Plaintiffs have now changed their position.  They admit—as Defendants have said all along—that Dr. Rausser's relationship with Cascade does not create a disqualifying conflict of interest, but rather poses a credibility issue.  Accordingly, they now accept that Dr. Rausser cannot be replaced and must be cross examined.  Pls.' Mot. at 2.  That should be the end of the matter.  But Plaintiffs, obviously concerned about moving forward with Dr. Rausser in a leading role, now seek to add an entirely new expert for the sole purpose of purportedly vouching for Dr. Rausser's work.  *Id.*  They seek at least a seven-month delay in this case so that another expert—another well-known plaintiff-side class certification economist—can come in and vouch for Dr. Rausser's model.

Plaintiffs' request should be rejected for at least three reasons.

**First, credibility issues do not justify such extraordinary measures.**

As serious as they are, the revelations about Dr. Rausser's involvement with Cascade, his "incorrect testimony," and his contradictory statements regarding class certification issues are issues of *credibility*.  They confirm what Defendants have been saying for years:  that despite the façade provided by his prestigious academic position, Dr. Rausser is an ardent advocate for class certification whose testimony is misleading, result-oriented, and untrustworthy.  In our adversary system, credibility issues are entrusted to the judgment of the fact-finder, in this instance the Court.  The unstated assumption underlying Plaintiffs' proposal is that this Court is *unable* to weigh Dr. Rausser's credibility and render a fair and legally-sound decision on class certification without hearing from a brand new, previously undisclosed witness.  Defendants disagree.  We believe—as Plaintiffs have recently acknowledged—that the very purpose of having the parties'

experts testify is to allow the Court to assess their credibility.[2]  We agree with the Court that in the case of expert testimony, trial courts have a special responsibility to vet expert testimony. That critical process should not be burdened by a new witness whose admitted function is to divert attention from the revelations about Dr. Rausser, the central figure in Plaintiffs' class certification arguments.

Moreover, no one can seriously believe that Plaintiffs' proposed supplemental witness will resolve credibility concerns.  Plaintiffs are proposing a witness whose testimony is literally preordained—at the October 21 Hearing, Plaintiffs unequivocally acknowledged that they seek to bring in a new economist who would merely "*come to the same conclusions*" as Dr. Rausser. Ex. 3, Oct. 21 Tr. at 9:7-11, 9:25-10:6.  In weighing the respective credibility of the parties' experts, the Court should find absolutely no comfort in the testimony of a "supplemental" witness who was only hired after passing the litmus test of being willing to endorse Dr. Rausser's work.  How many of the "dozen and a half" economists that Plaintiffs contacted *failed* that test?  *See id.* at 25:23.

**Second, there is no legal basis for the relief requested.**

Plaintiffs cite no authority that actually supports their requested relief, nor could they. The cases cited by Plaintiffs address substitution, not supplementation.  Substitution is typically justified by genuine unavailability, such as by death or illness, or in the rare case where a key witness is completely unusable.  Here, Dr. Rausser is available and ready to testify; Plaintiffs admit that he *must* testify; and Plaintiffs are already trying to rehabilitate him as much as one can by devoting ten pages of their brief to a telling of the recent revelations that can only be understood as an exercise in damage control.  No case supports giving a party a supplemental expert witness simply to address another witness's credibility problems.

---

[2]  *See* Ex. 4, August 21, 2014 Hearing Transcript 10:24-11:3 (PLS' COUNSEL: "[W]e didn't object when the defendants proposed live testimony [because] it will give [the Court] an opportunity to assess the demeanor of the experts with respect to the work that they did.").

Furthermore, the substitution case law is of no use to these Plaintiffs, as an element of that analysis is the exercise of due diligence by the plaintiff's counsel.  Here, Plaintiffs' counsel ignored this issue until Dr. Rausser's conduct and misrepresentations were undeniable, and now they are actively trying to minimize the issue.  They have no standing to present themselves as some kind of victims.

The substitution case law also requires the Court to consider fairness and prejudice. Plaintiffs' proposal is manifestly unfair.  It rewards Plaintiffs for Dr. Rausser's lack of objectivity and honesty by allowing them to have yet another witness.  Moreover, under Plaintiffs' proposal, their supplemental expert gets five months to evaluate and respond to a well-developed record where the fundamental failures of Plaintiffs' case have been laid out by Defendants in painstaking detail.  By contrast, Defendants get only 30 days to depose this new expert after receiving his report (which is supposed to address the thousands of pages of existing expert reports and deposition testimony in this case) and are *not permitted any written response of their own*.  Defendants must also bear all of the costs of this exercise themselves.  Plaintiffs are asking for something they would *never* get under ordinary circumstances, and justifying it by circumstances that are at least partly Plaintiffs' own fault.

### *Third, Plaintiffs already have the witness they claim to need.*

Even if Plaintiffs' request were appropriate (which it is not), Plaintiffs conspicuously ignore the second expert witness that they already have, Dr. James T. McClave.  Dr. McClave has already put in a report serving the same function as the proposed new expert; the first paragraph of his Summary of Opinions states:  "Dr. Rausser's model constitutes a well-accepted, reliable and appropriate methodology for determining the factors affecting rail freight pricing and for calculating overcharges caused by the alleged conspiracy in this case."  Ex. 5, McClave Suppl. Expert Rep., May 28, 2014, at 3.  Needless to say, Defendants dispute that Dr. McClave's work proves this contention, but the point is that Plaintiffs already have an expert who has done

5

exactly what they say they now need.  There is no justification for the additional expense and delay that will result from obtaining a cumulative *third* expert.

Plaintiffs' motion should be denied, and the class certification hearing should proceed.

## II.   FACTUAL BACKGROUND

### A.   <u>The Discovery of Dr. Rausser's Role in Cascade Settlement Services</u>

In a remarkable attempt to shift the focus from Dr. Rausser's so-called "lapses," and their own failure to take these issues seriously until they were forced to do so, Plaintiffs go to great length to suggest that *Defendants* were somehow lax in addressing this issue.  That obvious effort at misdirection is baseless.

In March of this year, Scott Ballenger of Latham & Watkins LLP, counsel for Union Pacific, received an email that purported to be from an employee of Cascade named Rod Montgomery.  In that email, Mr. Montgomery represented that Dr. Rausser had a financial interest in Cascade, and inquired about whether that interest might pose a conflict of interest:

> Mr. Rausser holds a non-voting percentage ownership in our company, specifically Cascade, LLC.  I believe he has a 10% interest in the company.  As a result, he stands to gain directly from any purchases of claims made in the Rail case.  He has been able to keep the company apprised of all developments in the case given he has "insider" information.  His model … also might have indirect or direct benefit to him financially.
>
> I have made a request of the company ownership and management to verify with the court that our relationship with Mr. Rausser would not represent a conflict of interest. . . .  Since I have not had a reply to my inquiry for over a month, I believe it's my responsibility to pursue an answer.  As I understand it, Mr. Rausser is good friends with the judge.  As a result, I'm directing my inquiry to you.

Ex. 6.

Defendants responded to the email cautiously.  Frankly, it was hard to know what to make of the email, which had obvious indications of unreliability (such as the reference to Dr. Rausser's supposed "friendship" with the Court) and could have been the unfounded accusations of a disgruntled employee.  Between March and July, Defendants tried to confirm or refute Mr.

Montgomery's claim using publicly available information.  Defendants were unable to find any evidence corroborating the allegations contained in Mr. Montgomery's email.

On July 31, 2014, the Defendants deposed Dr. Rausser in accord with the stipulated schedule.  This was the first opportunity for Defendants to question Dr. Rausser about Cascade subsequent to receiving Mr. Montgomery's email.  At the very end of the deposition, counsel for Defendant CSXT asked a handful of questions about Cascade.

Q:  Are you familiar [with] a company called Cascade Settlement Services LLC?

A:  Yes.

Q:  How do you know them?

A:  I know them because of the principals that exist at Cascade, many years ago they started another firm looking at claims in security cases and class certification cases, and I did some analysis.  My company—in fact, at that point, Charles River did some analysis looking at the probability analysis with regard to claims and what was the probability associated with the value of those claims.

Q:  Is there any formal relationship between OnPoint Analytics and Cascade Settlement Services?

A:  No, but we have—OnPoint Analytics has done some work for them in the past.  There was an acquisition of a company, and OnPoint Analytics was asked to do some analysis about what the value was of the other company, and they looked at all their records and did a financial analysis of what was the value of that company.

Q:  So OnPoint Analytics doesn't have any ownership or other financial interest in Cascade Settlement Services?

A:  No.

Q:  Do you?

A:  No.

Q:  Do you or OnPoint Analytics have any ownership or financial interest in any company that has purchased claims in this case?

A:  No.

7

Ex. 7, Rausser Dep., July 31, 2014, at 828:7-829:11.

In light of Dr. Rausser's unequivocal denials, Defendants assumed that was the end of the matter.  However, on August 29, 2014, Plaintiffs produced an errata sheet for Dr. Rausser's deposition.  Among the standard typographical corrections, the errata contained a "clarification" of his answer to the financial interest question.  Ex. 1, Rausser Errata, Aug. 28, 2014, at 829:7. Dr. Rausser modified his prior, unqualified "no" to state that while he does not "have an ownership or financial interest in Cascade Settlement Services as a company," he does "however, have the right to share in distributions from certain claims they manage, but those do not include claims in this case or any other case in which [he is] a testifying expert or OnPoint has performed any services."  *Id.*

Dr. Rausser's clarification was significant in two respects.  First, it provided the first independent *confirmation* of some of the allegations in Mr. Montgomery's email.  Second, it is of course highly unusual—and suspicious—for a witness to change an unqualified "no" to what was obviously a carefully constructed and nuanced "yes."  Defendants promptly issued subpoenas to Cascade, OnPoint, Dr. Rausser, and Mr. Montgomery.  Plaintiffs produced the first set of documents to Defendants on October 1, 2014—the exact same day that Plaintiffs contacted the Court and requested a status conference.

**B.**      **Dr. Rausser and OnPoint Have Been Involved in Cascade's Class Action Arbitrage Work for Years, Including in Activities and Investments Related to This Case**

The documents produced in response to Defendants' subpoenas, and the recent testimony in the depositions noticed and taken by Defendants, leave no doubt that Dr. Rausser misrepresented his relationship with Cascade, including in the August 28, 2014 errata.

Cascade provides claim handling services in class actions (charging clients a percentage of any ultimate recovery) and also engages in litigation arbitrage by valuing and purchasing the claims of class members for its own account.  The claim arbitrage work is generally done by two

underlying limited liability companies known as "funds":  Cascade Settlement Services Fund 1, LLC ("CSS Fund 1"), and Spectrum Portfolio Acquisition, LLC ("SPA").

The documents indicate that Cascade and OnPoint entered into a services agreement in October 2010, pursuant to which OnPoint would be Cascade's "preferred provider for modeling services."  Ex. 8, CSS000077.  Later that year, on December 16, 2010, Dr. Rausser entered into a personal consulting agreement with Cascade to provide strategic, origination, and management services.  Ex. 9, CSS000188.[3]  The contract was heavily negotiated, and both parties were represented by counsel, such that one can fairly assume that all material terms are found in the contract and not in informal "understandings" as Dr. Rausser now claims.  The contract itself contained an integration clause expressly stating:  "The terms of this Agreement are intended by the Parties to be the final expression of their agreement and … shall constitute the complete and exclusive statement of its terms."  *Id*. at CSS000196.  Cascade's Rule 30(b)(6) witness confirmed that there were no oral "understandings" between Cascade and Dr. Rausser, unequivocally testifying that "[o]ur agreements with Dr. Rausser are reflected in the documents."  Ex. 2, Chilcott Dep. at 179:24-25.

The contract contemplated that Dr. Rausser would identify potential class action cases in which Cascade could invest, and would assist in assessing those cases, in exchange for a base fee of 10% of distributions from any funds managed by Cascade.[4]  There is nothing in the contract (or any other contemporaneous document) that states or implies that Dr. Rausser's right to distributions from Cascade is limited to cases in which he is not a testifying expert.  *Id*. at 95:1-5; Ex. 10, Rausser Dep., Oct. 20, 2014 at 60:24-61:5.

---

[3]  Ex. 10, Rausser Dep., Oct. 20, 2014, at 22:4-25.

[4] Ex. 20, OPA_GR_SUB_00880.

Dr. Rausser also made a number of investments in Cascade.  In 2011, Dr. Rausser invested in CSS Fund 1 by purchasing 150,000 preferred units at $1/per unit.  Ex. 11, CSS000509; Ex. 10, Rausser Dep., Oct. 20, 2014 at 206:20-208:1.  This entitled Dr. Rausser to a pro rata return on revenue earned by the fund.  Dr. Rausser also invested in Cascade through a series of promissory notes. ███████████████████████████████████████ Ex. 12, OPA_GR_SUB_00015.  That promissory note held certain conversion rights, which in March 2013 resulted in Dr. Rausser converting his original $1,000,000 investment into a $790,000 note with SPA and a $149,700.60 note with CSS Fund 1.  Ex. 13, CSS00699; Ex. 14, CSS000706.  The balance was used to purchase an additional 59,880 preferred units (at $1/per unit) in CSS Fund 1.  Ex. 15, CSS000686.  The March 2013 promissory notes gave Dr. Rausser the right to receive interest payments (at 14% per annum) and under certain circumstances receive pro rata distributions from the funds' cash flow.  Ex. 13, CSS00699; Ex. 14, CSS000706. Cascade's Rule 30(b)(6) witness confirmed that ████████████████████████████████ ██████████████████████████████████████████████ ██████████████████ Ex. 2, Chilcott Dep. at 149:12-17. ███████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████████████ ████ Ex. 16, OPA_GR_SUB_00318. ██████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████ Ex. 17, CSS000574, ██████████████ ███████████████████████████████████████████████ ███████ Ex. 18, OPA_GR_SUB_00270.

Despite the extensive documentation of Dr. Rausser's financial arrangements with Cascade, and despite the involvement of Dr. Rausser's counsel in drafting the pertinent

agreements, there is no contemporaneous document reflecting any understanding that Dr. Rausser would not receive funds from Cascade relating to cases in which Dr. Rausser is a testifying expert.  Ex. 2, Chilcott Dep. at 95:1-5, 107:15-20, 111:22-112:2, 129:21-130:1, 143:1-5, 144:18-145:1, 179:10-25; Ex. 19, Craft Dep., Oct. 18, 2014, at 190:19-191:12, 195:7-22; Ex. 10, Rausser Dep., Oct. 20, 2014, at 60:24-61:5.  It is not plausible that Dr. Rausser was investing substantial sums of money in a fund that anticipated making the Rail Freight case one of its principal investments and yet Dr. Rausser could not receive any return on his investment. Economists do not make large investments on which they have no hope for a return.

Since the July 31 deposition, Dr. Rausser has tried to cover up his financial interest in Cascade.  In August 2014, immediately after the deposition in which he was asked about Cascade, Dr. Rausser ostensibly terminated his consulting agreement with Cascade.  Ex. 21, Chilcott Dep. Exhibit 38 (CSS000637).  The termination letter is undated and purportedly is "effective as of January 1, 2014," but Cascade's Rule 30(b)(6) deponent confirmed that Cascade received the termination notice on or about August 22, 2014.  Ex. 2, Chilcott Dep. at 191:1-23; Ex. 21, Chilcott Dep. Exhibit 38; *see also* Ex. 22, CSS00643.  On September 30, 2014, OnPoint Analytics purported to terminate its consulting agreement with Cascade effective December 30, 2014.  Ex. 23, CSS000644.  In addition, CSS Fund 1 transferred the claim it had purchased in the Rail Freight case to Cascade Settlement Services on August 29, 2014.  Ex. 24, CSS000638.  This transfer of the Rail Freight claim from the entity in which Dr. Rausser holds a direct interest (by virtue of his 209,880 preferred units) came one day after Dr. Rausser served his deposition errata, and was done at the request of the CEO of OnPoint.  Ex. 19, Craft Dep. at 134:22-25; Ex. 2, Chilcott Dep. at 175:21-176:2.

### C. <u>Dr. Rausser Provided Advice Contrary to His Opinions in This Case in His Consultation with Cascade</u>

The Cascade documents show very clearly that Dr. Rausser and at least one other analyst at OnPoint provided written information to Cascade about the Rail Freight litigation and also met with Cascade employees on several occasions to discuss this case (among others).  These

11

documents also indicate that Dr. Rausser and OnPoint provided Cascade with opinions that are contrary to Dr. Rausser's testimony in this case.  For example:

- Since *Behrend* was decided, Dr. Rausser has tried in this case to explain away the fact that his model generates false positive damages on legacy contracts by claiming that all legacy shipments *were* damaged.  Ex. 25, Rausser Suppl. Rep., Dec. 19, 2013, at 5.  ██████████████████████████████████ ████████████████████████████████████████████████ Ex. 26, CSS000771.

- In this litigation, Dr. Rausser now proposes to use an average overcharge to calculate individual class member damages.  Ex. 27, Rausser Suppl. Reply Rep., May 28, 2014, at 127-28.  But OnPoint conceded to Cascade that the "estimated overcharge will vary by time … and may vary by shipper category (such as Intermodal, Coal etc.), or some other dimension."  Ex. 28, OPA_GR_SUB_00228.  ████████████████████████████████ ██████████████████████ Ex. 26, CSS000771.

- Dr. Rausser testified in this case that ████████████████████████ █████████████████████████████████████ Ex. 29, Corrected Expert Rep. of Gordon Rausser, May 27, 2010, at 9-10, 17-20, 29-32. █████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████ Ex. 30, CSS000773.

### D.    Plaintiffs' Counsels' Willful Indifference to These Issues

In support of their motion, Plaintiffs assert that "Plaintiffs had no reason before September 2014 to know of Dr. Rausser's or OnPoint's relationship with Cascade."  Pls.' Mem at 17.  With all due respect, that is simply not true.

The questions posed to Dr. Rausser during his July 31, 2014 deposition were not a generic inquiry regarding an unidentified financial interest in the case.  Rather, Defendants asked Dr. Rausser very specific questions regarding whether he had (a) a financial interest in one specific company, Cascade, or (b) a financial interest in this case by virtue of an ownership

interest in any company that has purchased claims in this case.  Ex. 7, Rausser Dep., July 31, 2014, at 828:7-829:11.  The specificity of the questions on a potentially serious issue at the very least gave Plaintiffs' counsel reason to ask Dr. Rausser about his relationship with Cascade, in which case they presumably would have learned everything.

Instead, Plaintiffs claim that it did not occur to them, or they did not think it was necessary, to ask Dr. Rausser a single question about Cascade following the deposition. Plaintiffs likewise claim that they saw no need to ask Dr. Rausser a single question when they received his August 28 errata, notwithstanding the magnitude of the change made to his prior deposition testimony regarding his financial interest in this case.  Neither claim even seems possible, given the stakes and the sophistication of counsel.  But if these things are true, it demonstrates a complete lack of diligence.

Moreover, Plaintiffs' initial response to Defendants' formal discovery on this issue was not to bring Dr. Rausser's "lapses" to the Court's attention; it was to object, stall, and do what they could to prevent the discovery from going forward.  Plaintiffs first forced Defendants to effect personal service on Dr. Rausser and OnPoint, which Defendants did on September 12, 2014.  Plaintiffs then proceeded to object to every single document request, and told both Dr. Rausser and Cascade—a third party that they did not represent—that Plaintiffs would move to quash the subpoenas.  Ex. 10, Rausser Dep., Oct. 20, 2014, at 87:17-88:23; Ex. 31.  As a result, Cascade delayed production of its documents until October 6, 2014, and Dr. Rausser and OnPoint did not even begin collecting responsive documents until a few days before the compliance deadline (nearly three weeks after receiving the subpoenas).  Ex. 19, Craft Dep. at 26:6-14; Ex. 31; Ex. 32; Ex. 33.  Plaintiffs have also refused to respond to multiple requests from Defendants for information regarding their knowledge of Dr. Rausser's relationship with Cascade.  Ex. 32; Ex. 34; Ex. 35.

Plaintiffs have also not undertaken the "independent investigation" that they told the Court they conducted.  Ex. 36, October 2, 2014 Hearing Transcript ("Oct. 2 Tr.") at 6:21-25.

13

They did not do so at any time between July and the production of the OnPoint documents on October 1. Ex. 34. And notwithstanding the fact that at the October 2 status conference Plaintiffs asked the Court to postpone the class certification hearing in order to give them additional time to inquire into the relevant facts, Ex. 36, Oct. 2 Tr. at 7:7-8:6, they did nothing after that either. Following the October 2 status conference, Defendants served five deposition notices and multiple follow up document subpoenas on Cascade, Dr. Rausser, OnPoint, and Mr. Montgomery. Plaintiffs served a single subpoena on Mr. Montgomery, and then limited their participation in each of the depositions to a few questions directed at what *Defendants* knew and when. To this day, Plaintiffs have not asked one question in discovery regarding the "serious matters concerning Dr. Gordon Rausser's credibility." Pls.' Mot. at 1.

Finally, Plaintiffs are now trying to minimize and even justify Dr. Rausser's conduct. They have the temerity to start their brief by reciting his academic credentials and the fact that "his work has been cited favorably by several courts"—who like this Court had no idea about his true character. *Id.* They continue the "good man gone bad" theme by claiming that "Dr. Rausser did not enter any agreement with Cascade until late 2010," *id.*, after his original class certification testimony, even though he has been speculating on class action claims since 2002. And they are now sponsoring the blatantly false argument that "Dr. Rausser had an understanding with Cascade management whereby Cascade would not place Dr. Rausser in an investment position with respect to any claims related to this litigation." *Id*. at 12. <u>All</u> of the documentary evidence refutes that, as does the testimony of Cascade's Rule 30(b)(6) witness.

Plaintiffs' willful indifference to this issue—until they had no choice—cannot now be spun into some sort of virtue, a species of innocence. Their willingness to defend the indefensible should not be forgotten. They bear a share of the responsibility for all of this.

**E.     Plaintiffs Propose to Add Another Plaintiff-Side Class Certification Economist to Their Roster, Even Though Dr. McClave is Already Serving as a Witness Whose Sole Function is to Validate Dr. Rausser**

Plaintiffs have been beating the bushes for an economist who would come in and defend Dr. Rausser's work.  Counsel said at the October 21 Hearing that they have spoken to "a dozen and a half" candidates.  Ex. 3, Oct. 21 Tr. at 25:23.  The one who agreed to serve is Dr. Jeffrey Leitzinger, a full-time testifying witness with no academic or government experience since 1980.  Pls.' Notice of Identification of Proposed Suppl. Expert, Nov. 4, 2014, Dkt. No. 743.  Dr. Leitzinger espouses controversial views on class certification, in particular his contention that in price fixing cases one may presume injury to all consumers in the relevant market.[5]  His work has been criticized in numerous reported cases.[6]  The proposition that testimony from Dr. Leitzinger would resolve credibility concerns regarding Dr. Rausser is not credible.

In all events, Plaintiffs already have a second economic expert whose specific role in this case is to support the soundness of Dr. Rausser's model.  That is Dr. McClave, who was hired by Plaintiffs for the specific purpose of ██████████████████████████

---

[5]   *See* Jeffrey Leitzinger and Russell L. Lamb, *The Predominance Requirement for Antitrust Class Actions—Can Relevant Market Analysis Help?*, ABA Antitrust Section Economics Committee Newsletter (Spring 2007), *available at* http://www.econone.com/images/media/Predominance_requirement_for_antitrust_class.pdf.

[6]   *See*, *e.g.*, *In re Wholesale Grocery Products Antitrust Litig.*, 2012 U.S. Dist. LEXIS 103215 at *32, 35, 40 (D. Minn. July 25, 2012) (denying class certification and finding that Dr. Leitzinger's "contrary hypothesis test has no evidentiary value in establishing a prima facie case of injury;" Dr. Leitzinger's variance test "does nothing to inform the factfinder whether prices increased for all class members;" and that the results of Dr. Leitzinger's tests are "immaterial"); *Sample v. Monsanto Co.*, 218 F.R.D. 644, 650 (E.D. Mo. 2003), *aff'd, Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) (because "Dr. Leitzinger *assume[d]* the answer to this critical issue" his "testimony does *not* show that impact can be demonstrated on a class-wide basis"); *In re Med. Waste Servs. Antitrust Litig.*, 2006 U.S. Dist. LEXIS 19793, at *22 (D. Utah Mar. 3, 2006) (Dr. Leitzinger "merely *assumed* what needed to be demonstrated to establish the propriety of class certification"); *Masimo Corp. v. Tyco Health Care Group, L.P.*, 2006 U.S. Dist. LEXIS 29977, at *39 (C.D. Cal. Mar. 22, 2006) (rejecting Dr. Leitzinger's benchmark damages analysis because he "did not account for differences in the competitiveness and complexity of the overall market"); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 2005 U.S. Dist. LEXIS 11676, at *54, *57 (S.D. Ohio June 13, 2005) (finding Dr. Leitzinger's work "fatally flawed").

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████   Ex. 37, McClave Expert Rep., June 12, 2013, at 3.  In June 2013, he

provided a 34-page report with his ████████████████████████████████████████

█████████████████████████████████████████████████   *Id.* at 4.  ████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████   Plaintiffs offer no reason why Dr.

McClave's existing testimony does not serve the "validation" function that Dr. Leitzinger's

proposed testimony would serve.

## III.   ARGUMENT

Courts have consistently held that a financial interest in the outcome of litigation—while

a very suitable subject matter for cross-examination and impeachment—is insufficient to

disqualify an expert from testifying absent facts that are not present here.  Indeed, courts have

recognized that "experts, who generally are highly compensated—and by the party on whose

behalf they are testifying"—are hardly ever "disinterested."  *Tagatz v. Marquette*, 861 F.2d 1040,

1042 (7th Cir. 1988).[7]  For example, court have held that it would be improper to disqualify a

plaintiff's expert who had a significant ownership interest in a corporate plaintiff.  *Zoltek Corp.

v. United States*, 95 Fed. Cl. 681, 687 (2010) ("While financial interests may certainly factor into

the credibility afforded to any witness, the Court does not believe Mr. Rumy's financial interest

in Zoltek renders him ineligible to serve as an expert witness in the company's case.").

Accordingly, Plaintiffs do not claim that the financial interest at issue here gives rise to any sort

of disqualifying conflict of interest.  Instead, they now take the extraordinary position that,

---

[7]   *See also Schindler Elevator Corp. v. Riverboat Corp. of Miss.*, 2011 WL 1113471, at *2 (S.D.
Miss. Mar. 24, 2011) ("most expert witnesses have a financial interest in the testimony that
they give, and thus, a financial interest alone is insufficient to justify striking an expert
witness").

having compromised if not destroyed his own credibility, "Dr. Rausser should not stand alone." Pls.' Mot. at 2.  Rather, Plaintiffs argue that they should be entitled to call Dr. Leitzinger as a new supplemental expert witness to endorse the soundness of Dr. Rausser's economic analysis. This position has no basis in the law.

### A.   No Cases Support Plaintiffs' Extraordinary Request for a Last Minute, "Supplemental" Expert

Plaintiffs characterize the recent discoveries about Dr. Rausser as "serious matters" that, absent relief, will cause "significant harm" and "substantial and potentially irreparable" prejudice. Pls.' Mot. at 1, 20.  But at the same time, Plaintiffs protest that "there is no evidence to suggest that Dr. Rausser's opinions in this case were impacted" by those "serious matters." *Id*. at 20.  According to Plaintiffs, this state of affairs calls for a unique solution:  introduce a brand new, supplemental expert for the class certification hearing who will do nothing more than vouch for Dr. Rausser's model. *Id*. at 2.  The unstated assumption underlying this request is that the Court is incapable of weighing Dr. Rausser's credibility and expert opinions without a new, less-tarnished expert from Plaintiffs' side of the table.  This approach finds no support—literally none—in the case law.

Although the Federal Rules do not expressly address last minute "supplemental" expert witnesses, motions to notice a new expert out of time are analyzed under Rule 16(b)(4) or Rule 37(c)(1).  The former permits a court to modify a scheduling order for "good cause," while the latter provides that a party may not rely upon the testimony of untimely-disclosed witnesses "unless the failure [to disclose the expert witness on time] was substantially justified or is harmless." Fed. R. Civ. P. 16(b)(4), 37(c)(1).  There is no rigid formula for what constitutes good cause or substantial justification under these rules. *See Aruba Bonaire Curacao Trust Co. v. IRS*, 777 F.2d 38, 43 (D.C. Cir. 1985).  But the courts have considered a variety of factors that include any potential prejudice to either party, whether granting the request would be burdensome or inconvenient for the court and the opposing party, the moving party's diligence in vetting the expert and preparing backup alternatives, and whether granting the request would

17

realistically change the outcome.  *See, e.g.*, *Rink v. Chemninova*, 400 F.3d 1286, 1296 (11th Cir. 2005); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*., 326 F.3d 1333, 1351 (11th Cir. 2003).

Plaintiffs repeatedly argue that courts have allowed "*supplemental* expert disclosures" in various circumstances analogous to this case.  They have not, and not one of Plaintiffs' cases supports such a request.  The cases cited by Plaintiffs are *substitution* cases.  Understandably, motions to substitute an expert tend to be granted where "unforeseen events render the original expert witness unavailable to testify at trial," due to medical concerns, incarceration, death, or other unforeseeable external circumstances, and proceeding without any expert would doom the party's case.  *Whiteside v. State Farm Fire and Casualty Co.*, 2011 WL 5084981, at *1 (E.D. Mich. Oct. 26, 2011) (citing *Doctor's Associates, Inc. v. QIP Holder LLC*, 2009 U.S. Dist. LEXIS 119949, at *9 (D. Conn. Dec. 23, 2009) (collecting cases)).  Here, Dr. Rausser is not sick.  He is not imprisoned.  He is not dead.  He is available and perfectly able to testify, he remains an active participant in the litigation, and Plaintiffs fully intend to call him.

Dr. Rausser simply has developed a credibility problem—he has been revealed as a speculator in class action claims and he lied about it in his deposition.  That may indeed be inexcusable, but it is not unique.  Issues of bias, personal financial interests, and basic honesty are standard fare in litigation, and not much different from other issues impacting a witness's credibility—such as how forthright or prepared a witness is when testifying.  Every expert who routinely testifies as a paid witness for plaintiffs or defendants, and therefore has an economic stake in pleasing one constituency or the other, may be cross-examined about those loyalties and incentives.  Every expert may be asked how much he is being compensated for his testimony.  Every expert may be asked about other financial interests in the case (e.g., stock ownership in a party to the case).  Every expert may be asked whether he has ever expressed opinions that are inconsistent with his present testimony.  And courts are left free to evaluate all of these issues against other factors, like the inherent persuasiveness of the expert's views and his general demeanor as a witness.

The very recent case *Nijjar v. General Star Indemnity Co.*, 2014 WL 271630 (C.D. Cal. Jan. 23, 2014), shows that a credibility issue is not a basis for a new witness.  There, the court denied a plaintiff's request to substitute after learning at a deposition that his chosen expert had a conflict of interest (i.e., the expert had testified for the opposing party in another lawsuit on the same contract at issue).  The court held that the plaintiff should have vetted the expert more thoroughly, and that reopening expert discovery would prejudice the defendant both by "allow[ing] the new expert to craft a report with the benefit of seeing the contentions of the opposing expert in advance" and "by delaying final resolution of the dispute."  *Id.* at *2-3.[8]

Plaintiffs rely principally on *National Railroad Passenger Corp.*  2006 WL 2711533 (D.D.C. Sept. 21, 2006).  That case does not address a request like Plaintiffs' to simply add a cumulative expert, while simultaneously proceeding to continue to offer the original expert's testimony, as a shield against the credibility issues that had arisen.  To the contrary, the movant requested the wholesale *substitution* of its existing expert after the expert made various false statements about his professional, educational, and personal background—i.e., issues going to his qualifications as an expert.  *Id.* at *4.  Dr. Rausser will testify, and his financial interests and his dishonesty about those interests do not bear on his *qualifications*, they bear on the *weight* the Court ought to afford his testimony.  Accordingly, *National Railroad* is inapposite and does not support Plaintiffs' motion.

*Vincent v. Omniflight Helicopters,* 2009 WL 4262578 (E.D. Wis. Nov. 24, 2009), is even further afield.  In that case, it was discovered in deposition that an expert lied about his professional background, and the expert subsequently *withdrew on his own accord.*  *Id.* at *1-2. In other words, the original expert witness was no longer available to testify at all, so the

---

[8]   The court also found significant defendant's compromise offer to allow plaintiff's rebuttal or secondary expert, who was already involved in the case, to serve instead as plaintiff's primary expert.  Even though the court found the overlap between the subject matter of their testimony "only partial," it concluded that changing the roles of the existing experts would provide a "workable solution in this circumstance."  2014 WL 271630 at *3.  Just as in the *Nijjar* case, Plaintiffs here already have a backup expert waiting on stage right, in Dr. McClave.

plaintiffs (not surprisingly) sought leave to substitute a new one.  The same was true in *TIC-The Industrial Company Wyoming, Inc. v. Factory Mut. Ins. Co*, 2012 WL 2830867 (D. Neb. July 10, 2012).  There, the plaintiff's sole liability expert became aware of a conflict of interest *and withdrew as an expert*. *Id.* at *7, 8.  In stark contrast, Dr. Rausser and others at his consulting firm have vehemently denied that he has or ever had *any* conflict of interest, and he has made no indication that he will withdraw as an expert.  Ex. 10, Rausser Dep., Oct. 20, 2014, at 93:14-18; Ex. 19, Craft Dep. at 150:1-20, 188:11-19; Ex. 38, Macartney Dep., Oct. 18, 2014, at 121:2-25.  He is as ready and willing to testify now as he ever has been.[9]

Plaintiffs did not cite, and Defendants were unable to find, any case that even considered an analogous request for an additional expert simply because of a credibility issue unrelated to an expert's qualifications.  And that is no wonder.  Expert credibility is always at issue; that is the nature of the adversary system and why litigants are allowed to depose and cross-examine opposing experts.  This is not a case in which something has gone *wrong*, justifying extraordinary relief.  It is a case where the system *worked* to root out important evidence bearing on Dr. Rausser's credibility.  Now it is the Court's responsibility to give that evidence, as it is revealed in the crucible of live cross-examination, all of the weight that it deserves.

**B.** **The Fact that Dr. Rausser's Credibility Issues Have Come to Light Is *Important*, Not "Unfairly Prejudicial" to Plaintiffs**

Plaintiffs cannot legitimately suggest that revelations about Dr. Rausser's role in Cascade or his testimony about it will *unfairly* prejudice them at the class certification hearing before this Court.  There is no dispute that credibility matters.  Nor is there cause to suggest that this Court cannot fairly and objectively consider (a) Dr. Rausser's credibility generally, or (b) the Rule 23

---

[9]   The other cases cited by Plaintiffs are similarly unhelpful to them.  *See Medpace, Inc. v. Biothera, Inc.*, 2014 WL 1045960, at *1-2 (S.D. Ohio. Mar. 17, 2014) (plaintiff was forced to withdraw expert because confidentiality contracts prevented further work); *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2010 WL 3892860, at *1 (N.D. Ind. Sept. 30, 2010) (party forced to seek substitute expert where the original expert was convicted of embezzlement and incarcerated); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 19 (D.P.R. 2009) (party sought to substitute a new expert after the original expert died).

issues specifically without the "assist" from Dr. Leitzinger.  To the contrary, it is universally acknowledged that judges are uniquely capable in evaluating evidence and putting things in proper perspective—especially when the issues are primarily legal.  *See, e.g.*, *United States ex rel. Brown v. Rundle*, 417 F.2d 282, 284 (3d Cir. 1969) (noting that "the trier of fact was not a lay jury but a professional judge, whose training and experience in the analysis and evaluation of evidence must have caused him" to draw the correct inferences and attribute proper weight to the evidence at issue.).  Here, all of this relates to the Rule 23 analysis that in the first instance is grounded in the law, especially in this case given the remand and the holding of *Behrend* and the D.C. Circuit decision that what Dr. Rausser's model proves or does not prove, and whether the requirements of Rule 23 have been satisfied, are all questions *of law*.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *D.C. Cir. Op.*, 725 F.3d at 253-55.

In all events, Plaintiffs' "good cause" and "prejudice" arguments are all based on the notion that it is unfair to conflate Dr. Rausser's "personal" lapses with the credibility of his testimony, as if one has nothing to do with the other.  That is not true.  The distinction Plaintiffs seek to draw between "Dr. Rausser, *qua* Dr. Rausser" and "the economics that Dr. Rausser put forth to the Court," Ex. 3, Oct. 21 Tr. at 35:8-10, is nothing but damage control.  Personal and testimonial credibility are inextricable, for everyone.  Here, Gordon Rausser the testifying economist is not a different person and no more credible than Gordon Rausser the class action speculator.  His testimony in this case raises numerous issues of personal credibility and basic honesty that the Cascade issues put in sharp relief.  For example:

- The main argument that Dr. Rausser makes to finesse his way out of the "false positives" issues addressed by the D.C. Circuit is to claim that "false positives" are a "false premise" because all shipments during the Class Period, including legacy shipments, were subject to overcharges.  This is directly contrary to his prior testimony in this case that "as a logical matter" legacy shipments should not have been impacted by the alleged conspiracy.  This inconsistent testimony itself presents a credibility issue.  But in addition, we now have ██████████████

███████████████████████████████████████

████████      Ex. 26, CSS000771.  He is telling this Court one thing and his business and investing partners at Cascade another.

▪   Dr. Rausser's injury and damages model is designed to find widespread injury by assuming that the relationship between fuel costs and rates should have remained constant throughout the Class Period notwithstanding historical fuel cost increases.  He now purports to justify that by asserting that independent studies by Christensen Associates (referenced in the Court's prior class certification decision) utilize a constant fuel coefficient.  That is unambiguously false, and a prime example of Dr. Rausser trying to use his economic expertise and credentials to pull a fast one on the Court.  A complete understanding of his personal honesty is directly relevant to the Court's evaluation of this issue.

▪   Dr. Rausser constantly falls back on his review of "the body of evidence" in this case whenever pressed for quantitative analysis on a specific issue.  Whether the Court accepts this line, which is just another way of saying "trust me," would naturally depend on its evaluation of how trustworthy Dr. Rausser is personally.

The fact that this is a putative class action does not change the calculus or somehow make Dr. Rausser's credibility issues any more or less "fair" than they would be in an individual action.  As in all cases, Dr. Rausser's credibility is relevant to the reliability of the opinions he has rendered and, in particular, whether his work can satisfy the standards for class certification.  Plaintiffs do not get a free pass to avoid expert credibility disputes in the name of protecting an uncertified class.

In fact, if fairness and prejudice count in this decision—and they do—they cut squarely against Plaintiffs' novel request.  Plaintiffs hired Dr. Rausser and have for many years assured the Court that his work justified certifying a class in this case.  Countless hours and many tens of millions of dollars have been spent addressing the class certification and merits arguments that Dr. Rausser has developed and that he has put forth and defended in seven expert reports totaling 928 pages (exclusive of exhibits) and 8 days of deposition testimony.  Moreover, this Court

22

wrote an opinion that, as it acknowledged at the October 21 Hearing, "is based to a very, very large extent on Rausser because essentially what we had was Rausser saying all of these things and [defendants'] expert criticizing all of these things, and I agreed with him [Rausser] on almost everything." Ex. 3, Oct. 21 Hrg. Tr. at 33:5-9.  The Court said *twice* that had it known of Dr. Rausser's credibility issues, it may not have relied on him.  *Id.* at 20:1-3 ("if I had had all of these facts before me before, I might have had some views on Rausser's credibility"); 21:3-6 ("Mr. Hausfeld:  Your Honor, we don't want the record to go away.  The record is what it is. THE COURT:  Except that I didn't know anything about Mr. Rausser's credibility."); *see also id.* at 19:20 (referring to the existing record as one with "a pristine Rausser").

In that context, what notion of fairness gives Plaintiffs a special right to divert attention from these credibility issues by calling an extra, last-minute witness?  For many years, Defendants have been arguing and striving to prove against his considerable skills at dissembling and obfuscation that Dr. Rausser's work is not credible.  His work is not based on sound econometric techniques.  Dr. Rausser is not applying science; he is an advocate who ignores all evidence contrary to his desired position, and he frequently misrepresents the record.  With this new information to add to the mix, it is not unfair or prejudicial to anyone for Dr. Rausser's testimony to be disbelieved because he is not a credible witness.  To the contrary, it would be extremely unfair and prejudicial to Defendants for Dr. Rausser's credibility issues to be downplayed or diluted by the pretense that the economics are an unimpeachable science that cannot be influenced by the economist.  And it is unfair and prejudicial to halt the class certification proceedings as they are finally concluding, adding a seven-month delay to a case that is already seven years old, simply to have a new witness come in to say that while Dr. Rausser may not be pristine, his economics are—testimony that Dr. Leitzinger undoubtedly has agreed to give as a condition of his hiring.

C.     **Plaintiffs' Request for a Supplemental Expert to Parrot Dr. Rausser Adds No Value to the Existing Class Certification Record**

Finally, Plaintiffs' novel request for a cumulative, supplemental expert adds no value to the record.

*First*, Plaintiffs concede—as they must—that they may not change their class certification theories and models at this point in the process.[10]  The case law addresses this question in the context of substitution, and courts "generally limit the scope of the testimony that may be given by the substitute expert" to "establishing the veracity and integrity of [the original expert] and the conclusions reached in [his] original expert report."  *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2010 WL 3892860, at \*2, 3 (N.D. Ind. Sept. 30, 2010); *Doctor's Associates, Inc. v. QIP Holder LLC*, 2009 WL 5184404, \*5 (D. Conn. Dec. 23, 2009).[11] Indeed, courts are quick to say that substitution is merely "intended to put the plaintiffs in as good a position as they would have held had [the prior expert] performed his job as expected; it [is] not intended to allow the plaintiffs to designate a superior . . . expert after the deadline for expert disclosures."  *Adams v. Cooper Indus., Inc.*, 2007 U.S. Dist. LEXIS 99057, at \*8 (E.D. Ky. Apr. 5, 2007).

---

[10]  *See, e.g.*, Pls.' Mot. 2 ("[S]upplemental expert will not espouse any new theory of liability, impact, or damage.  Rather, that individual will confine his or her opinions to the reliability, integrity, and accuracy of Dr. Rausser's previous work."); *see also* Ex. 3, Oct. 21 Tr. at 9:8-11 (substitute expert would "adopt and verify, corroborate, stay within the bounds of the class certification report as developed by Dr. Rausser").  When the Court specifically asked Plaintiffs' counsel whether the new economist would simply "review what it is Dr. Rausser had already done and decide whether the conclusions are the same," Plaintiffs' counsel answered, "Yes."  Ex. 3, Oct. 21 Tr. at 9:24-10:6.

[11]  *See also Medpace, Inc. v. Biothera, Inc.*, 2014 WL 1045960, at \*4 (S.D. Ohio Mar. 17, 2014) ("Courts granting motions to substitute experts after the close of discovery have routinely required the new expert's testimony to be limited to the subject matter opinions espoused in the first expert's report."); *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 784 (6th Cir. 2003) (finding no error in district court requiring that substitute expert "not deviate from [the prior expert's] conclusions"); *Dunkin' Donuts, Inc. v. N.A.S.T., Inc.*, 2005 U.S. Dist. LEXIS 16703, at \*2, 3, 6-7 (N.D. Ill. Aug. 10, 2005) (rejecting an "entirely new" substitute report with "major differences" that "re-invented the wheel").

Thus, the most that Dr. Leitzinger would be allowed to do is simply vouch for Dr. Rausser's existing work.  Best case, that will be duplicative of Dr. Rausser's own testimony, and duplicative of Dr. McClave's.  And since Dr. Rausser will no doubt present the best possible defense of his own work, it makes no sense to bring in a new expert simply to say he agrees with Dr. Rausser.

*Second*, Plaintiffs' current second class certification expert, Dr. McClave, already purports to perform this *exact* role.  For whatever reason, Plaintiffs decided they wanted a witness to validate Dr. Rausser's econometrics *two years ago*, and hired Dr. McClave. Dr. McClave has thus studied Dr. Rausser's work in depth, filed his own expert reports, and been deposed on them.  There is no justification for bringing in a third expert to do what Dr. McClave already purports to do.

## IV.   CONCLUSION

Giving Plaintiffs an opportunity to solicit a new expert opinion that purports to shore up Dr. Rausser's unfounded class certification conclusions would unfairly and improperly reward Plaintiffs for making a bad tactical litigation decision in hiring and relying on Dr. Rausser as their principal expert.  Whether that decision was unwise, reflected a lack of diligence, or was simply unlucky is beside the point—it was their decision, and like all litigants they are bound by it.

Consequently, Defendants respectfully submit that Plaintiffs' motion should be denied, and the class certification hearing should be scheduled as soon as practical.[12]

---

[12] Defendants reserve the right to address all scheduling issues that will arise if a supplemental expert is permitted, including the manner in which Defendants are permitted to respond to any new expert report.  Further, Defendants reserve the right to seek costs and sanctions associated with the issues raised in Plaintiffs' motion, but believe it is premature to do so until the Court rules on the pending motion.

Dated:  November 10, 2014                    Respectfully submitted,

_____/s/ Daniel M. Wall_____

Daniel M. Wall                              Tyrone R. Childress
Timothy L. O'Mara                           David G. Meyer
Christopher Campbell                         JONES DAY
LATHAM & WATKINS LLP                         555 South Flower Street, 50th Floor
505 Montgomery Street, Suite 2000            Los Angeles, CA  90071-2300
San Francisco, CA  94111                     Telephone:   (213) 489-3939
Telephone:   (415) 391-0600
                                             Alan M. Wiseman (D.C. Bar No. 187971)
J. Scott Ballenger (D.C. Bar No. 465252)     Thomas A. Isaacson (D.C. Bar No. 376959)
LATHAM & WATKINS LLP                         COVINGTON & BURLING LLP
555 Eleventh Street, NW, Suite 1000          1201 Pennsylvania Avenue, NW
Washington, D.C. 20004                       Washington, DC  20004-2401
Telephone:  (202) 637-2200                   Telephone:   (202) 662-6000

*Attorneys for Defendant Union Pacific Railroad Company*

_____/s/ John M. Nannes_____            Saul P. Morgenstern
John M. Nannes (D.C. Bar No. 195966)         Jennifer B. Patterson
Tara L. Reinhart (D.C. Bar No. 462106)       Amanda C. Croushore
Sean M. Tepe (D.C. Bar No. 1001323)          KAYE SCHOLER LLP
SKADDEN, ARPS, SLATE,                        425 Park Avenue
  MEAGHER & FLOM LLP                         New York, NY 10022
1440 New York Avenue, N.W.                   Telephone:   (212) 836-8000
Washington, DC  20005
Telephone:  (202) 371-7000                   Claudia R. Higgins (D.C. Bar No. 940288)
                                             KAYE SCHOLER LLP
                                             901 Fifteenth Street, NW
                                             Washington, DC 20005
                                             Telephone:   (202) 682-3500

*Attorneys for Defendant Norfolk Southern Railway Co.*

_____ /s/ Veronica S. Lewis _____

| | |
|---|---|
| Randy M. Mastro | Theodore J. Boutros, Jr. |
| GIBSON, DUNN & CRUTCHER LLP | GIBSON, DUNN & CRUTCHER LP |
| 200 Park Avenue | 333 South Grand Avenue |
| New York, NY 10166-0193 | Los Angeles, CA 90071 |
| Telephone: (212) 351-4000 | Telephone: (213) 229-7000 |

| | |
|---|---|
| Joshua H. Soven (D.C. Bar No. 436633) | Veronica S. Lewis |
| Andrew S. Tulumello (D.C. Bar No. 468351) | Robert C. Walters |
| GIBSON, DUNN & CRUTCHER LLP | GIBSON, DUNN & CRUTCHER LLP |
| 1050 Connecticut Avenue, NW | 2100 McKinney Avenue, Suite 1100 |
| Washington, DC 20036 | Dallas, TX 75201 |
| Telephone: (202) 955-8500 | Telephone: (214) 698-3100 |

Samuel M. Sipe, Jr. (D.C. Bar No. 256446)
Linda Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000

*Attorneys for Defendant BNSF Railway Company*

_____ /s/ David D. Cross _____

Kent A. Gardiner (D.C. Bar No. 432081)
Kathryn D. Kirmayer (D.C. Bar No. 424699)
Shari Ross Lahlou (D.C. Bar No. 476630)
David D. Cross (D.C. Bar No. 490187)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500

*Attorneys for Defendant CSX Transportation, Inc.*

27

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel M. Wall, hereby certify that, on November 10, 2014, I caused a true and correct copy of the foregoing document to be served by email on counsel for Plaintiffs.

_____ /s/ Daniel M. Wall _____

DC\3624128

28