# EXHIBIT 8

# MODELING SERVICES AGREEMENT

**THIS MODELING SERVICES AGREEMENT** ("***Agreement***") is entered into effective as of October 14, 2010 (the "***Effective Date***") by and between:

a) **CASCADE SETTLEMENT SERVICES LLC** ("***Cascade***"), a Delaware limited liability company doing business as "***Cascade Capital Management***"; and

b) **ONPOINT ANALYTICS, INC.** ("***OnPoint***"), a California corporation.

Cascade has developed a business plan which consists of, among other things, the formation of one or more entities to pursue the Business (as defined below). OnPoint is skilled in the area of, among other things, developing models for Commercial Cases (as defined below). Cascade has determined that the services of OnPoint would be beneficial to Cascade and any such entity formed by Cascade in their business activities.

**NOW THEREFORE, FOR VALUABLE CONSIDERATION,** Cascade and OnPoint (each a "***Party***" and, collectively, the "***Parties***") agree as follows:

1) **Certain Definitions**. As used herein, the following terms shall have the meanings set forth below:

***Business*** means the anticipated Business to be pursued by Fund-I which shall consist primarily of entering into and performing the Contracts.

***Cause*** has the meaning given to it in Section 5(c) of this Agreement.

***Commercial Case*** means a potential, pending, threatened or settled state or federal class action lawsuit or any judgment thereon (other than a lawsuit relating to violations of state or federal securities laws) arising out of actual or alleged violations of state or federal antitrust or other laws.

***Contracts*** means the anticipated contracts or agreements to be entered into by Fund-I with respect to any Commercial Case or claims or rights thereunder.

***Definitive Agreement*** has the meaning given to it in Section 2(b)(v) of this Agreement.

***Fund-I*** means Cascade Fund I [the first corporation, limited partnership or limited liability company to be established by Cascade to pursue the Business.

***OnPoint Proposal*** has the meaning given to it in Section 2(b)(ii) of this Agreement.

***Person*** means (a) any individual, (b) any corporation, limited liability company, partnership, trust or other entity of any kind, type or nature, and (c) any governmental agency or authority.

***Rausser*** means Gordon Rausser.

***Retainer*** has the meaning given to it in Section 3(a) of this Agreement.

***RFP*** has the meaning given to it in Section 2(b) of this Agreement.

***Term*** has the meaning given to it in Section 5(a) of this Agreement.

2) **OnPoint Services**.

a) **Preferred Provider**. It is the intention of Cascade that, during the Term, OnPoint shall be the preferred provider for modeling services required by Fund-I in connection with Commercial Cases as to which (i) Fund-I intends to seek to obtain a Contract, (ii) Fund-I requires modeling services and (iii) Fund-I determines that OnPoint would be a good fit for the provision of the modeling services.

b) **RFPs and OnPoint Proposals**. In order to implement the foregoing, the Parties agree as follows:

i) RFPs. From time to time during the Term, if and when Fund-I determines that (1) it desires to pursue obtaining a Contract for a Commercial Case, (2) it requires modeling services in connection with such Commercial Case and (3) OnPoint would be a good fit for providing such modeling services, then, Fund-I shall provide OnPoint with a written Request for Proposal (each, an "***RFP***") describing (A) the Commercial Case and (B) the modeling services which Fund-I desires in connection with such Commercial Case.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY CSS 000077
SPECIAL CONFIDENTIALITY

ii) **OnPoint Proposals**. Within seven (7) days after receipt of an RFP, OnPoint shall develop and present to Fund-I a written proposal (the "***OnPoint Proposal***") for the provision of the requested modeling services described in the RFP. The OnPoint Proposal shall include all relevant terms relating to the provision of the requested modeling services, including, without limitation, the following:

(a) a non-binding estimate of the aggregate fees and expenses to be charged by OnPoint for the modeling services;

(b) the timing for the payment of the fees and expenses;

(c) a description of the deliverables to be provided by OnPoint and the timing for the delivery of such deliverables; and

(d) the names of the professionals who will be providing the services for OnPoint.

Cascade acknowledges that each OnPoint Proposal shall provide for payment by Fund I of OnPoint's then-current standard hourly billing rates (currently $200/hr. to $450/hr.) and expenses.

iii) **OnPoint Proposal Fees**. Fund-I shall pay OnPoint for the preparation of each OnPoint Proposal at OnPoint's then-current standard hourly billing rates (currently $200/hr. to $450/hr.) and expenses. Payment of the fees and expenses for any OnPoint Proposal shall be due and payable on a monthly basis, within thirty (30) days after receipt of OnPoint's monthly invoices.

iv) **Failure to Provide OnPoint Proposal**. If OnPoint fails to provide an OnPoint Proposal within the seven (7) day period set forth above, Fund I shall be free to seek to obtain the required modeling services from any other Person.

v) **Definitive Agreements**. If (1) Fund-I submits an RFP to OnPoint, (2) OnPoint provides an OnPoint Proposal in response to such RFP within the seven (7) day period set forth above, and (3) Fund-I finds the OnPoint Proposal acceptable, then, during the seven (7) day period following receipt of the OnPoint Proposal, OnPoint and Fund-I shall execute a written agreement (each a "***Definitive Agreement***") for the services covered by the OnPoint Proposal. If OnPoint and Fund-I fail to execute a Definitive Agreement with respect to an RFP within the seven (7) day period set forth above, Cascade may obtain the required modeling services from any other Person.

c) **Work Made for Hire**. OnPoint agrees that all work product produced by OnPoint for Cascade or Fund-I shall be deemed to be a "**WORK MADE FOR HIRE**" for Cascade or Fund-I, as applicable, and shall be the absolute property of Cascade or Fund-I, as applicable. OnPoint shall assist Cascade or Fund-I, as applicable, in any litigation or other controversy relating to said work product both during and after the Term and shall be reimbursed for such services at its regular hourly rates. OnPoint agrees to make assignment to Cascade or Fund-I, as applicable, of all rights to said work product, and to sign any documents which might be necessary to perfect the interest of Cascade or Fund-I, as applicable, in such rights.

d) **Conflicts**. Despite the potential conflict of interest, the Parties anticipate that Rausser will assist Cascade and Fund-I in the preparation of the RFPs, the evaluation of OnPoint Proposals and the negotiation of Definitive Agreements.

e) **Suspension of Services**. Cascade agrees that OnPoint may suspend the performance of any services called for under this Agreement or any Definitive Agreement if Cascade and/or Fund-I is delinquent in the payment of any amounts due OnPoint under this Agreement or any Definitive Agreement. Moreover, if Cascade and/or Fund-I fails to remedy such delinquency within the time period specified in Section 5(c)(ii) of this Agreement this shall constitute Cause for termination pursuant to Section 5(c).

f) **Exclusivity**. During the Term, OnPoint shall not provide modeling or similar services with respect to (a) the filing of claims in any Commercial Case, or (b) the purchase or recovery of settlement awards or judgment awards in any Commercial Case, for any Person other than Cascade and/or Fund-I.

3) **Retainer**.

a) As an advance against OnPoint's fees and expenses under this Agreement and any Definitive Agreements executed by OnPoint and Fund-I, Cascade (or Fund-I) shall pay to OnPoint a retainer (the "***Retainer***") in the amount of Fifty Thousand Dollars ($50,000). The Retainer shall be paid by Cascade (or Fund-I) to OnPoint on

or before the earlier of (1) sixty (60) days after execution of this Agreement, or (2) the date on which Fund-I submits to OnPoint the first RFP under Section 2(b) of this Agreement.

b) OnPoint shall be, and hereby is, authorized to draw against the Retainer from time to time for payment of its fees and expenses due under this Agreement or any Definitive Agreement.

c) From time to time, when and as the balance of the Retainer held by OnPoint is reduced below Thirty Thousand Dollars ($30,000), then, within twenty (20) days following demand from OnPoint, Cascade shall replenish the amount of the Retainer to Fifty Thousand Dollars ($50,000).

d) Within ten (10) days after the latest of the following:

i) the expiration or earlier termination of the Term; and

ii) the completion of all services of OnPoint called for under this Agreement and any Definitive Agreements; and

iii) the payment in full of all amounts due OnPoint from Cascade or Fund-I under this Agreement and any Definitive Agreements,

OnPoint shall refund to Cascade the entire then-remaining balance of the Retainer (if any).

4) **Post-Term Services.**

a) Notwithstanding the expiration or earlier termination of the Term, during the twelve (12) month period following the end of the Term, Cascade (or Fund-I) may continue to request that OnPoint provide services of the type described in this Agreement. To the extent that OnPoint has capacity to provide such services and on terms and conditions mutually acceptable to OnPoint and Cascade (or Fund-I), OnPoint shall provide such services to Cascade (or Fund-I).

b) Accordingly, for a period of twelve (12) months following the end of the Term, OnPoint shall not provide modeling or similar services with respect to (a) the filing of claims in any Commercial Case, or (b) the purchase or recovery of settlement awards or judgment awards in any Commercial Case, for any Person other than Cascade and/or Fund-I.

c) As consideration for the commitments of OnPoint under this Section, on or before the last day of each calendar quarter during the twelve (12) month period following the end of the Term, Cascade shall pay to OnPoint the sum of One Thousand Dollars ($1,000).

5) **Term and Termination.**

a) **In General**. Subject to extension as provided in Section 5(b), and earlier termination as provided in Section 5(c), the term of this Agreement (the "***Term***") shall commence on the Effective Date and shall end on December 31, 2015.

b) **Automatic Annual Extensions**. If neither Party gives the other written notice of non-renewal prior to the end of the then-current Term, then, at the end of such then-current Term, the Term shall be automatically renewed and extended for an additional twelve (12) months.

c) **Early Termination**. The Term shall be subject to early termination upon the occurrence of any of the following events:

i) The Term shall terminate upon ninety (90) days' prior written notice of termination from either Party to the other Party.

ii) The Term may be terminated by either Party for Cause if such Cause is not cured within 30 days after written notice to the other Party.

In the case of termination by Cascade, the term "***Cause***" shall mean any material breach by OnPoint of any term or provision of this Agreement.

In the case of termination by OnPoint, the term "***Cause***" shall mean any material breach by Cascade or Fund-I of any term or provision of this Agreement.

d) **Completion of Pending Projects**. Notwithstanding the expiration or earlier termination of the Term, after the end of the Term, OnPoint shall complete all services called for under Definitive Agreements which are



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SPECIAL CONFIDENTIALITY 

outstanding as of the end of the Term. Notwithstanding anything in the foregoing to the contrary, OnPoint shall not be required to complete any services called for under outstanding Definitive Agreements if this Agreement is terminated by OnPoint for Cause due to a material breach by Cascade or Fund-I.

6) <u>**Confidential Information**</u>. During and after the Term, OnPoint agrees not to directly or indirectly disclose or use (or permit the disclosure or use of) any trade secrets or other confidential or proprietary information of Cascade, Fund-I or any of the affiliates, investors, customers or clients of Cascade or Fund-I, or developed for Cascade or Fund-I as a result of OnPoint's engagement under this Agreement, including but not limited to any documentation, records, listings, notes, data, sketches, drawings, computer disks, computer programs, computer coding, files or records, memoranda, designs, models, accounts, reference materials, samples, equipment, trade-secrets, prices, strategic partners, marketing plans, strategic or other plans, customer names or lists, project opportunities and the like, <u>provided</u>, <u>however</u> that the foregoing restriction shall not include information or data which:

a) is already rightfully in OnPoint's possession at the time of its disclosure by Cascade or Fund-I to OnPoint,

b) is now or becomes a part of the public domain by virtue of publication, free of copyright or other protection, other than by or through the fault of OnPoint (or OnPoint's agents or employees), or

c) is rightfully received by OnPoint from a third party who has a right to disclose such information, without restriction on disclosure and without breach of this Agreement or any other agreement.

7) <u>**Miscellaneous Provisions**</u>.

a) <u>**Successors and Assigns**</u>. OnPoint will not assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any rights or obligations under this Agreement. Any purported assignment, transfer, or delegation by OnPoint shall be null and void. Subject to the foregoing, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Fund-I, when created, shall be a third-party beneficiary of the provisions of this Agreement. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto and Fund-I or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Upon the creation of Fund-I, Cascade shall cause Fund-I to execute and deliver to OnPoint an agreement to be bound by and to comply with the provisions of this Agreement.

b) <u>**Governing Law**</u>. This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

c) <u>**Counterparts**</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

d) <u>**Notices**</u>. Any notice required or permitted under this Agreement shall be given in writing to the appropriate Party, either by personal service or by registered or certified mail, postage prepaid, addressed to such Party at the address set forth below such Party's signature (or to such other address as may be specified in a written notice given under this subsection). For the purpose of determining compliance with any time limit in this Agreement, a notice shall be deemed to have been duly given and received (a) on the date of service, if served personally on the Party to whom notice is to be given, or (b) on the second business day after mailing, if mailed to the Party to whom the notice is to be given in the manner provided in this subsection.

e) <u>**Interpretation**</u>. This Agreement shall be interpreted fairly in light of the intentions of the Parties as set forth in this Agreement. The Parties each hereby waive the benefit of any rule or statute requiring that ambiguities be interpreted against the Party preparing this Agreement or causing the ambiguity.

f) <u>**Mandatory Arbitration**</u>. Except for injunctive relief under <u>Section 7(j)</u>, any controversy or claim arising out of or relating to this Agreement, or breach or alleged breach of this Agreement, shall be settled by mandatory and binding arbitration in the City and County of San Francisco, California, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction. In each arbitration, the arbritrator(s) shall be instructed to determine the prevailing Party in such arbitration (whether or not there is an monetary award made in such arbitration) and award to such prevailing Party an award from the other Party of an amount equal to all of the prevailing Party's costs of the arbitration, including, without limitation, reasonable attorneys' fees and

expenses and all costs of the arbitration for transcripts of the arbitration, administrative fees and the fees of the arbitrator(s).

g) **Attorneys' Fees**. In the case of any arbitration or litigation arising out of or related to the interpretation or enforcement of this Agreement, the prevailing Party in such arbitration or litigation (as determined by the arbitrators or the Court) shall be entitled to recover, in addition to any award or judgment, all costs of such arbitration or litigation, including, without limitation, reasonable attorneys' fees. The provisions of this subsection shall survive entry of any such award or judgment.

h) **Entire Agreement; Integration; Amendments**. The terms of this Agreement are intended by the Parties to be the final expression of their agreement with respect to the subject matter of this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The Parties further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any arbitration or judicial, administrative, or other legal proceeding involving this Agreement. Accordingly, this Agreement contains the entire agreement between the Parties and supersedes all prior oral, written and implied agreements, understandings, commitments, and practices between the Parties. No amendments to this Agreement may be made except by a writing signed by each of the Parties.

i) **Severability**. If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement shall nevertheless remain in full force and effect. If any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

j) **Injunctive Relief**. The Parties state and agree that the obligations imposed by Sections 4 and 6 are necessary for the protection of the business and goodwill of Cascade and Fund-I, are reasonable for that purpose, and that any breach of OnPoint's obligations under such Sections would cause substantial and irreparable injury to Cascade and Fund-I, for which an award of damages alone would be an inadequate remedy. Thus, in addition to any other remedy (including monetary damages) that may be available to Cascade or Fund-I for any breach of such Sections by OnPoint, the Parties agree that Cascade and Fund-I shall have the right to seek specific performance of such Sections, along with other equitable and injunctive relief, without proof of actual damage and without the necessity of posting a bond.

k) **Cumulative Remedies**. All rights and remedies hereunder are cumulative and are in addition to and not exclusive of any other rights and remedies available, at law, in equity, by agreement or otherwise.

l) **Survival**. The provisions of Sections 1, 2(c), 3(d), 4, 6 and 7 shall survive the expiration or termination of the Term.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement effective as of the date first above written.

| | |
|---|---|
| **CASCADE SETTLEMENT SERVICES LLC,**<br>a Delaware limited liability company doing business as "*Cascade Capital Management*"<br><br>By: [signature]<br>Name: John Chilcott<br>Title: Managing Partner<br><br>**Address for Notices**:<br>Cascade Capital Management<br>Attn: John Chilcott, Managing Partner<br>100 Shoreline Highway, Suite A-190<br>Mill Valley, CA 94941 | **ONPOINT ANALYTICS, INC.,**<br>a California corporation<br><br>By: [signature]<br>Name: Laura R. Craft<br>Title: President<br><br>**Address for Notices**:<br>OnPoint Analytics, Inc.<br>Attn: Laura R. Craft<br>Watergate Tower III<br>2000 Powell Street, Suite 860<br>Emeryville, CA 94608 |