# EXHIBIT 13

THIS PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "*ACT*") AND MAY NOT UNDER ANY CIRCUMSTANCES BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OF THE UNITED STATES OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR APPLICABLE STATE SECURITIES LAWS.

SPECTRUM PORTFOLIO ACQUISITION, LLC
SECURED PROMISSORY NOTE

U.S. $790,419

**March 29, 2013**
**Mill Valley, California**

FOR VALUE RECEIVED, the undersigned, Spectrum Portfolio Acquisition, LLC, a Delaware limited liability company, with its principal office at 100 Shoreline Highway, Suite B-125, Mill Valley, CA 94941 (the "*Company*"), unconditionally promises to pay to **Gordon Rausser** ("*Investor*"), or its permitted assigns, transferees and successors (collectively, the "*Holder*"), on March 29, 2020 (the "*Maturity Date*"), if not sooner paid, at such place as may be designated in writing by the Holder, the principal sum of **Seven Hundred Ninety Thousand Four Hundred Nineteen Dollars (U.S. $790,419)** and the sum of Twenty Six Thousand Six Hundred Seventy Nine Dollars and Thirty Five Cents (U.S. $26,679.35) representing interest accrued on the aforesaid principal sum from December 31, 2012 to the date of this Note, together with interest thereon at the rates and in the amounts hereinafter set forth. This Note is delivered pursuant to Section 1 of that certain Secured Promissory Note Purchase Agreement, dated as of March 29, 2013, between the Company, the Holder and the other purchasers party thereto (the "*Purchase Agreement*"). Capitalized terms not defined herein shall have the meanings ascribed thereto in the Purchase Agreement.

ARTICLE 1: PAYMENTS AND OTHER PAYMENT TERMS.

1.1 Principal and Basic Interest. The entire outstanding principal balance of this Note, together with all accrued Basic Interest thereon as defined below (the "*Repayment Amount*"), shall be due and payable on the Maturity Date. Interest on this Note shall commence accruing on the date hereof at the rate of fourteen percent (14.0%) per annum ("*Basic Interest*"), shall be computed on the basis of a 365-day year and actual days elapsed, compounded quarterly (it being understood and agreed that interest at such fixed rate shall accrue on unpaid, accrued Basic Interest, as on principal), and shall be payable from time to time as provided herein. Prior to the Maturity Date, accrued Basic Interest and principal of this Note shall be prepaid by the Company from time to time to the extent of one hundred percent (100%) of Available Cash Flow (as defined herein) of the Company, as the same is available from time to time, but not less frequently than monthly. Consistent with the foregoing prepayment requirement, the Company shall not pay or otherwise distribute any Available Cash Flow to any person or entity other than the Holder (and the other purchasers party to the Purchase Agreement) until the Repayment Amount has been paid in full.

1.2 Minimum Return and Participating Interest. After the Holder has received the Repayment Amount, one hundred percent (100%) of Available Cash Flow shall be distributed by the Company to the existing, sole equity member of the Company, Cascade Settlement Services Fund I LLC (the "***Member***"). After the Member has received cumulative distributions from Available Cash Flow totaling one hundred percent (100%) of its invested equity capital in the Company (but not to exceed $10 million in the aggregate), Holder, together with the other holders of the Notes issued under the Purchase Agreement, shall thereafter be entitled to receive, on a *pari passu* basis, one hundred percent (100%) of all subsequent Available Cash Flow from time to time until such time as the Holder has received payments under this Note on account of principal and Basic Interest (but exclusive of Participating Interest, as defined below) equal to one hundred twenty-five percent (125%) of the original principal amount of this Note (such minimum, aggregate amount being the "***Minimum Return***"). After the Holder has received the Minimum Return, ten percent (10%) of all subsequent Available Cash Flow from time to time shall thereafter be distributed, in perpetuity and on a *pari passu* basis, to the Holder and the other holders of the Notes issued under the Purchase Agreement (such distributions to the Holder being referred to herein as the "***Participating Interest***"), with the remaining 90% being distributed to the Member.

1.3 Voluntary Prepayments. This Note may be prepaid by the Company, in whole or in part, at any time and from time to time prior to the Maturity Date without premium or penalty, subject to the Holder's right to receive the Minimum Return as provided in Section 1.2. Neither the payment in full of this Note at Maturity nor a voluntary prepayment shall alter or diminish the Holder's right to receive Participating Interest payments.

1.4 Application of Payments. All payments made by the Company under this Note shall be applied first to principal, then to accrued and unpaid Basic Interest, and the remainder to Participating Interest.

1.5 Secured Note; Ratable Treatment. This Note and the other Notes issued pursuant to the Purchase Agreement are secured by and entitled to the benefits of the Security Agreements executed by the Company, which contain provisions for the acceleration of repayment of principal and Basic Interest upon the happening of certain events of default stated therein. This Note and each of such other Notes are of equal rank and priority, and shall share in any proceeds of collateral under the Security Agreements on a pro rata basis, in proportion to the relative amounts owing under the Notes from time to time. Notwithstanding anything to the contrary in this Section 1 or elsewhere in this Note or the Security Agreements, all payments and prepayments from time to time on the Notes by or for the account of the Company, whether scheduled, accelerated, voluntary or involuntary, shall be paid to holders of all Notes issued under the Purchase Agreement on a *pari passu* basis.

1.6 Available Cash Flow Defined. For purposes of this Note, "***Available Cash Flow***" of the Company shall mean the excess of cash actually received by the Company from its subsidiary, Claimco, with respect to Agency Contracts owned by Claimco, to the extent (after it has been determined how much) of cash not required to be paid to the counterparties to the Agency Contracts ("***Agency Receipts***"), over the sum of: (a) operational cash disbursements and expenses related to the Spectrum Business (without duplication of operating expenses of Claimco, and excluding operating expenses for which the Company has set aside reserves from Company Capital), and (b) a reasonable allowance for reserves (but not those for which the

Company has set aside reserves from Company Capital), contingencies and anticipated obligations and working capital as reasonably determined from time to time by its manager; provided, however, that Agency Receipts which (i) are excluded from the definition of Available Cash Flow by virtue of clauses (a) or (b), and (ii) do not consist of operating expenses and reserves for which funds were set aside from Company Capital: (x) shall not exceed $0.00 (Zero Dollars) until the outstanding principal balance has been paid in full; and (y) once the outstanding principal balance has been paid in full, shall not exceed the lesser of (1) $500,000 and (2) five percent (5%) of Agency Receipts in any quarter without the written consent of the Majority Holders.

1.7 Exchange for Member Note. This Note has been issued by the Company in consideration for the surrender and exchange of a secured promissory note previously issued by the Member (a "Member Note"), and the Purchaser, by accepting this Note, acknowledges and agrees that the Member Note has been surrendered and cancelled, and that all indebtedness previously evidenced by the Member Note shall be deemed outstanding under and evidenced by this Note, for which the Company is the sole obligor and for which there shall be no recourse to the Member.

**ARTICLE 2: SECURITIES MATTERS.**

2.1 Restricted Securities. By acceptance hereof, the Holder understands and agrees that this Note is a "restricted security" under the federal securities laws inasmuch as it is being acquired from the Company in a transaction not involving a public offering under the Securities Act of 1933, as amended (the "***Securities Act***") and that under such laws and applicable regulations such securities may be resold in the absence of registration under the Securities Act only in certain limited circumstances.

**ARTICLE 3: TRANSFERS, ASSIGNMENTS AND PARTICIPATIONS**

3.1 The Holder may assign or transfer this Note, and may grant participations in this Note, subject to compliance with applicable securities laws, without the consent of the Company. The Holder shall notify the Company of any such assignment or transfer promptly. The Company may not assign its rights or obligations under this Note without the prior written consent of Holder.

**ARTICLE 4: EVENTS OF DEFAULT.**

The occurrence of any of the following events shall constitute an event of default under this Note (an "***Event of Default***"). The Company shall notify the Holder in writing within two (2) business days following the occurrence of any Event of Default.

4.1 If the Company fails to make any payment of principal, Basic Interest or Participating Interest as required hereunder, and such failure continues for three (3) business days after written notice from the Holder or the Agent.

4.2 If the Company breaches its covenant in the final sentence of Section 1.1 of this Note.

4.3 If a default occurs after any cure period under, or acceleration prior to maturity of, any note, mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any indebtedness for money borrowed by the Company or Claimco for in excess of $100,000, or for money borrowed the repayment of which is guaranteed by the Company or Claimco for in excess of $100,000, whether such indebtedness or guarantee now exists or shall be created hereafter.

4.4 If, pursuant to or within the meaning of applicable law relating to insolvency or relief of debtors (a "***Bankruptcy Law***"), the Company (a) commences a voluntary case or proceeding, (b) consents to the entry of an order for relief against it in an involuntary case, (c) consents to the appointment of a trustee, receiver, assignee, liquidator or similar official or (d) makes an assignment for the benefit of its creditors.

4.5 If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (a) is for relief against the Company in an involuntary case, (b) appoints a trustee, receiver, assignee, liquidator or similar official for the Company's properties, or (c) orders the liquidation of the Company, and in each case the order or decree is not dismissed within sixty (60) days.

4.6 If any representation or warranty made by the Company in this Note, the Purchase Agreement or any Security Document proves to be untrue in any material respect when made and remains uncured; or the Company breaches any covenant on its part under this Note, the Purchase Agreement or any Security Document and, as to any breach that is capable of cure, the Company fails to cure such breach within thirty (30) days of the sooner to occur of the Company's receipt of notice of such breach and the actual knowledge of such breach by any key management personnel of the Company.

4.7 If the Security Documents shall for any reason cease to create a valid and enforceable interest with respect to any of the Collateral, free and clear of any Encumbrance, or the interest of the Agent with respect to the Collateral shall cease to be a valid and enforceable first priority perfected security interest, free and clear of any Encumbrance except for Permitted Liens.

4.8 Prior to the payment of the Minimum Return, if: (a) CFI ceases, other than for tax purposes, to be the sole member of the Company, or CFI ceases to be the sole manager of the Company; or (b) the Company ceases, other than for tax purposes, to be the sole member of Claimco, or the Company ceases to be the sole manager of Claimco.

4.9 Prior to the payment of the Minimum Return, if (a) both of John Chilcott and David H. Levy: (i) die; (ii) become disabled; or (iii) cease for any reason to be materially involved in the day-to-day operations of Cascade Settlement Services LLC without there being other senior management in place selected by one or both of them(provided, however, that each member of such other senior management so selected shall have no less than a 5% equity or profits interest in Cascade Settlement Services LLC and in each other entity that hereafter has control over or management responsibilities with respect to the servicing and/or administration of the Agency Contracts), and (b) the second of such individuals dies, becomes disabled or ceases material involvement without other senior management selected by one or both of them being in place, and in the event of either (a) or (b), senior management is not replaced with a

person reasonably satisfactory to the Majority Holders within 120 days after such death, disability or cessation.

4.10 Prior to the payment of the Minimum Return, if clients (a) totaling 25% or more of the aggregate number of clients in any single Case, or (b) totaling 15% or more of the aggregate number of clients in all Cases, terminate their respective Agency Contracts on the basis of a judicial determination of gross negligence or malfeasance on the part of the Company and/or Claimco in the performance of their duties or responsibilities under the Agency Contracts.

4.11 Failure to comply with the covenant set forth in the parenthetical phrase within the proviso to Section 4.8 of the Purchase Agreement to sell, after the Initial Closing, additional Notes and CFI debt and preferred equity in an aggregate amount equal to the Shortfall (if any) on or before the fifteenth calendar day immediately following the date of the Initial Closing.

**ARTICLE 5: REMEDIES IN THE EVENT OF DEFAULT.**

5.1 Upon the occurrence of an Event of Default, the Holder may, at its option, declare the Repayment Amount immediately due and payable in cash by providing written notice to the Company (except that in the case of an Event of Default arising from events described in Sections 4.4 or 4.5, the Repayment Amount shall become automatically due and payable without further action or notice); provided, that such demand will be in addition to all other rights and remedies of the Holder under this Note, the Purchase Agreement, the Security Documents and applicable law; provided further, that this Section 5.1 may be waived in writing by the Majority Holders.

5.2 The Company shall pay all costs and expenses incurred by or on behalf of the Holder in connection with the Holder's exercise of any or all of its rights and remedies under this Note, including, without limitation, reasonable attorneys' fees.

5.3 In the case of any Event of Default under this Note that is continuing and has not been waived in writing by the Holder or by the Majority Holders, this Note will continue to bear Basic Interest but at the rate of 19% per annum from the date of such Event of Default (but in any event not in excess of the maximum rate of interest permitted by applicable law).

**ARTICLE 6: MISCELLANEOUS.**

6.1 Advice of Counsel. Investor and the Company have each consulted, or had the opportunity to consult, counsel of their choice regarding this Note and have participated in the drafting of this Note, and each acknowledges and agrees that this Note shall not be deemed to have been drafted by one of the Investors or the Company and will be construed accordingly.

6.2 Severability. In the event that any provisions of this Note are determined to be invalid or unenforceable by a court of competent jurisdiction, the remainder of this Note shall remain in full force and effect without such provision. Any provision of this Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

6.3 Waivers and Amendments; Preservation of Remedies. No waiver by the Holder of any right or remedy under this Note shall be effective unless in a writing signed by the Holder

or by the Majority Holders. Neither the failure nor any delay in exercising any right, power or privilege under this Note will operate as a waiver of such right, power or privilege and no single or partial exercise of any such right, power or privilege by the Holder will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right of the Holder arising out of this Note may be discharged by the Holder, in whole or in part, by a waiver or renunciation of the claim or right unless in writing, signed by the Holder; (b) no waiver that may be given by the Holder or by the Majority Holders will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on the Company will be deemed to be a waiver of any obligation of the Company or of the right of the Holder to take further action without notice or demand as provided in this Note. The Company hereby waives presentment, demand, protest and notice of dishonor, protest, diligence, filing suit, nonpayment and all other notice. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies which any party may otherwise have at law or in equity.

6.4 Headings. The captions to the several Articles and Sections hereof are not a part of this Note, but are included merely for convenience of reference only and shall not affect its meaning or interpretation.

6.5 Successors and Assigns. This Note shall be binding upon and inure to the benefit of both parties hereto and their respective successors and permitted assigns.

6.6 Governing Law; Exclusive Jurisdiction and Venue; Waiver of Jury Trial. This Note will be governed by the laws of the State of California without regard to conflicts of laws principles. The Company (a) hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois for the purposes of any suit, action or proceeding arising out of or relating to this Note, and (b) hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. The Company consents to process being served in any such suit, action or proceeding by mailing a copy thereof to the Company at its address in effect for notices to it under the Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing in this Section 6.6 shall affect or limit any right to serve process in any other manner permitted by law. THE COMPANY HERETO HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTES, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE COMPANY AGREES THAT HOLDER MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT BY THE COMPANY IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY PROCEEDING WHATSOEVER BETWEEN OR AMONG THE COMPANY AND HOLDER RELATING TO THIS NOTE SHALL INSTEAD BE TRIED IN A COURT BY A JUDGE SITTING WITHOUT A JURY.

6.7 Notices. Any notice required or permitted to be given hereunder shall be given in accordance with the Purchase Agreement.

6.8 Loss, Theft or Destruction of Note. Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft or destruction of this Note and of indemnity or security reasonably satisfactory to it, the Company will make and deliver a new Note which shall carry the same rights to interest (unpaid and to accrue) carried by this Note, stating that such Note is issued in replacement of this Note, making reference to the original date of issuance of this Note (and any successors hereto) and dated as of such cancellation, in lieu of this Note.

6.9 Savings Clause. In no event shall the amount of interest paid hereunder exceed the maximum rate of interest on the unpaid principal balance hereof allowable by applicable law. If any sum is collected in excess of the applicable maximum rate, the excess collected shall be applied to reduce the principal debt. If the interest actually collected hereunder is still in excess of the applicable maximum rate, the interest rate shall be reduced so as not to exceed the maximum allowable under law.

6.10 No Partnership. This Note is not intended to create, and shall not be interpreted as creating, an association, partnership or joint venture of any kind between Holder and the Company.

IN WITNESS WHEREOF, the Company has caused its duly authorized representative to execute this Note on the date first above written.

**SPECTRUM PORTFOLIO ACQUISITION, LLC,**
a Delaware limited liability company

By: Cascade Settlement Services Fund I LLC,
a California limited liability company
Its: Manager

By: Cascade Settlement Services, LLC,
a Delaware limited liability company
Its: Manager

By: [signature]
David H. Levy
Its: Manager



48036301
RDP\428834.1f

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY
SPECIAL CONFIDENTIALITY