# EXHIBIT 14

THIS PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "*ACT*") AND MAY NOT UNDER ANY CIRCUMSTANCES BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OF THE UNITED STATES OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR APPLICABLE STATE SECURITIES LAWS.

CASCADE SETTLEMENT SERVICES FUND 1 LLC
SECURED PROMISSORY NOTE

**U.S. $149,700.60** | **March 29, 2013**
**Mill Valley, California**

FOR VALUE RECEIVED, the undersigned, **Cascade Settlement Services Fund 1 LLC**, a California limited liability company, with its principal office at 100 Shoreline Highway, Suite B-125, Mill Valley, CA 94941 (the ***"Company"***), unconditionally promises to pay to **Gordon Rausser (*"Investor"*)**, or its permitted assigns, transferees and successors (collectively, the ***"Holder"***), on March 29, 2020 (the "***Maturity Date***"), if not sooner paid, at such place as may be designated in writing by the Holder, the principal sum of **One Hundred Forty Nine Thousand Seven Hundred Dollars and Sixty Cents (U.S. $149,700.60)**, together with interest thereon at the rates and in the amounts hereinafter set forth. This Note is delivered pursuant to Section 1 of that certain Secured Promissory Note Purchase Agreement, dated as of March 29, 2013, between the Company, the Holder and the other purchasers party thereto (the "***Purchase Agreement***"). Capitalized terms not defined herein shall have the meanings ascribed thereto in the Purchase Agreement. Capitalized terms not defined herein shall have the meanings ascribed thereto in the Purchase Agreement.

**ARTICLE 1: PAYMENTS AND OTHER PAYMENT TERMS.**

1.1 Principal and Basic Interest. The entire outstanding principal balance of this Note, together with all accrued Basic Interest thereon as defined below (the "***Repayment Amount***"), shall be due and payable on the Maturity Date. Interest on this Note shall commence accruing on the date hereof at the rate of fourteen percent (14.0%) per annum ("***Basic Interest***") shall be computed on the basis of a 365-day year and actual days elapsed, compounded quarterly, and shall be payable from time to time as provided herein. Prior to the Maturity Date, accrued Basic Interest and principal of this Notes shall be prepaid by the Company from time to time to the extent of one hundred percent (100%) of Company Available Cash Flow (as defined herein) of the Company, as the same is available from time to time, but not less frequently than annually. Consistent with the foregoing prepayment requirement, the Company shall not pay or otherwise distribute any Company Available Cash Flow to any person or entity other than the Holders until the Repayment Amount has been paid in full.

1.2 Minimum Return and Participating Interest. Subject to the prior payment of the Repayment Amount, Holder, together with the holders of all the Notes issued under the Purchase Agreement shall be entitled to receive Holder's pro rata share of an amount equal to five percent



48033/0801
APS/428919.5

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY
SPECIAL CONFIDENTIALITY

CSS 000706

(5%) of all SPA Available Cash Flow (as defined herein) from time to time ("***Participating Interest***"), provided that in no event shall the aggregate of all payments to the Holder under this Note on account of principal and Basic Interest (but exclusive of Participating Interest) be less than one hundred twenty-five percent (125%) of the original principal amount of this Note (such minimum, aggregate amount being the "***Minimum Return***").

1.3 Voluntary Prepayments. This Note may be prepaid by the Company, in whole or in part, at any time and from time to time prior to the Maturity Date without premium or penalty, subject to the Holder's right to receive the Minimum Return as provided in Section 1.2. Neither the payment in full of this Note at Maturity nor a voluntary prepayment shall alter or diminish the Holder's right to receive Participating Interest payments.

1.4 Application of Payments. All payments made by the Company under this Note shall be applied first to principal, then to accrued and unpaid Basic Interest, and the remainder to Participating Interest.

1.5 Secured Note: Ratable Treatment. This Note and the other Notes issued pursuant to the Purchase Agreement are secured by and entitled to the benefits of the Security Agreement executed by the Company, which contains provision for the acceleration of repayment of principal and Basic Interest upon the happening of certain events of default stated therein. The security interests granted under the Security Agreement will terminate and be released upon the payment or satisfaction of all principal and Basic Interest under the Notes. The Company's obligation to pay Participating Interest hereunder will thereafter be unsecured. This Note and each of such other Notes are of equal rank and priority, and shall share in any proceeds of collateral under the Security Agreement on a pro rata basis, in proportion to the relative amounts owing under the Notes from time to time. Notwithstanding anything to the contrary in this Section 1 or elsewhere in this Note or the Security Agreement, all payments and prepayments from time to time on the Notes by or for the account of the Company, whether scheduled, accelerated, voluntary or involuntary, shall be paid to holders of the Notes on a *pari passu* basis.

1.6 Certain Definitions.

(a) For purposes of this Note, "***Company Available Cash Flow***" shall mean the excess of cash actually received by the Company from any and all sources (including cash received from operations and distributions of SPA Available Cash Flow, but excluding contributed capital and proceeds of the Notes and any other loans taken by the Company to funds its business operations), over (i) operational cash disbursements and expenses, (ii) tax distributions as provided in the Company's limited liability company operating agreement, and (iii) a reasonable allowance for reserves, contingencies and anticipated obligations and working capital as reasonably determined from time to time by the manager of the Company.

(b) For purposes of this Note, "***SPA Available Cash Flow***" shall mean the excess of cash actually received by SPA from its subsidiary, Claimco, with respect to Agency Contracts owned by Claimco, to the extent (after it has been determined how much) of cash not required to be paid to the counterparties to the Agency Contracts ("***Agency Receipts***"), over the sum of: (a) operational cash disbursements and expenses related to the Spectrum Business (without duplication of operating expenses between SPA and Claimco, and excluding operating



48033/0801
APS/428919.5

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY
SPECIAL CONFIDENTIALITY

CSS 000707

expenses for which SPA has set aside reserves from SPA Capital), and (b) a reasonable allowance for reserves (but not those for which SPA has set aside reserves from SPA Capital), contingencies and anticipated obligations and working capital as reasonably determined from time to time by its manager, provided, however, that Agency Receipts which (i) are excluded from the definition of SPA Available Cash Flow by virtue of clauses (a) or (b), and (ii) do not consist of operating expenses and reserves for which funds were set aside from SPA Capital: (x) shall not exceed $0.00 (Zero Dollars) until the outstanding principal balance has been paid in full; and (y) once the outstanding principal balance has been paid in full, shall not exceed the lesser of (1) $500,000 and (2) five percent (5%) of Agency Receipts in any quarter without the written consent of the Majority Holders of the SPA Notes (as "Majority Holders" is defined in the SPA Notes).

**ARTICLE 2: SECURITIES MATTERS.**

2.1 Restricted Securities. By acceptance hereof, the Holder understands and agrees that this Note is a "restricted security" under the federal securities laws inasmuch as it is being acquired from the Company in a transaction not involving a public offering under the Securities Act of 1933, as amended (the "***Securities Act***") and that under such laws and applicable regulations such securities may be resold in the absence of registration under the Securities Act only in certain limited circumstances.

**ARTICLE 3: TRANSFERS, ASSIGNMENTS AND PARTICIPATIONS**

3.1 The Holder may assign or transfer this Note, and may grant participations in this Note, subject to compliance with applicable securities laws, without the consent of the Company. The Holder shall notify the Company of any such assignment or transfer promptly. The Company may not assign its rights or obligations under this Note without the prior written consent of Holder.

**ARTICLE 4: EVENTS OF DEFAULT.**

The occurrence of any of the following events with respect to the Company shall constitute an event of default under this Note (an "***Event of Default***"). The Company shall notify the Holder in writing within five business days following the occurrence of any Event of Default.

4.1 If the Company fails to make any payment of principal, Basic Interest or Participating Interest as required hereunder, and such failure continues for ten (10) business days after written notice from the Holder or its Agent.

4.2 If the Company breaches its covenant in the final sentence of Section 1.1 of this Note.

4.3 If, pursuant to or within the meaning of applicable law relating to insolvency or relief of debtors (a "***Bankruptcy Law***"), the Company (a) commences a voluntary case or proceeding, (b) consents to the entry of an order for relief against it in an involuntary case, (c) consents to the appointment of a trustee, receiver, assignee, liquidator or similar official or (d) makes an assignment for the benefit of its creditors.

4.4 If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (a) is for relief against the Company in an involuntary case, (b) appoints a trustee, receiver, assignee, liquidator or similar official for the Company's properties, or (c) orders the liquidation of the Company, and in each case the order or decree is not dismissed within sixty (60) days.

4.5 If any representation or warranty made by the Company in the Purchase Agreement or Security Document (as defined therein) proves to be untrue in any material respect when made and remains uncured; or the Company breaches any covenant on its part under the Purchase Agreement or any Security Document and, as to any breach that is capable of cure, the Company fails to cure such breach within thirty (30) days of the sooner to occur of the Company's receipt of notice of such breach and the actual knowledge of such breach by an officer of the Company.

**ARTICLE 5: REMEDIES IN THE EVENT OF DEFAULT.**

5.1 Upon the occurrence of an Event of Default, the Holder may, at its option, declare the Repayment Amount immediately due and payable by providing written notice to the Company; provided, that such demand will be in addition to all other rights and remedies of the Holder under this Note and under applicable law; provided further, that this Section 5.1 may be waived by the Majority Holders.

5.2 The Company shall pay all costs and expenses incurred by or on behalf of the Holder in connection with the Holder's exercise of any or all of its rights and remedies under this Note, including, without limitation, reasonable attorneys' fees.

5.3 In the case of any Event of Default under this Note that is continuing and has not been waived in writing by the Holder or by the Majority Holders, this Note will continue to bear Basic Interest but at the rate of 16% per annum from the date of such Event of Default (but in any event not in excess of the maximum rate of interest permitted by applicable law).

**ARTICLE 6: MISCELLANEOUS.**

6.1 Advice of Counsel. Investor and the Company have each consulted, or have the opportunity to consult, counsel of their choice regarding this Note and have participated in the drafting of this Note, and each acknowledges and agrees that this Note shall not be deemed to have been drafted by one of the Investors or the Company and will be construed accordingly.

6.2 Severability. In the event that any provisions of this Note are determined to be invalid or unenforceable by a court of competent jurisdiction, the remainder of the Note shall remain in full force and effect without such provision. Any provision of this Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

6.3 Waivers and Amendments; Preservation of Remedies. No waiver by the Holder of any right or remedy under this Note shall be effective unless in a writing signed by the Holder or by the Majority Holders (as defined in the Purchase Agreement). Neither the failure nor any delay in exercising any right, power or privilege under this Note will operate as a waiver of such

right, power or privilege and no single or partial exercise of any such right, power or privilege by the Holder will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right of the Holder arising out of this Note may be discharged by the Holder, in whole or in part, by a waiver or renunciation of the claim or right unless in writing, signed by the Holder; (b) no waiver that may be given by the Holder or by the Majority Holders will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on the Company will be deemed to be a waiver of any obligation of the Company or of the right of the Holder to take further action without notice or demand as provided in this Note. The Company hereby waives presentment, demand, protest and notice of dishonor, protest, diligence, filing suit, nonpayment and all other notice. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies which any party may otherwise have at law or in equity.

6.4 Headings. The captions to the several Articles and Sections hereof are not a part of this Note, but are included merely for convenience of reference only and shall not affect its meaning or interpretation.

6.5 Successors and Assigns. This Note shall be binding upon and inure to the benefit of both parties hereto and their respective successors and permitted assigns.

6.6 Governing Law. This Note will be governed by the laws of the State of California without regard to conflicts of laws principles.

6.7 Notices. Any notice required or permitted to be given hereunder shall be given in accordance with the Purchase Agreement.

6.8 Loss, Theft or Destruction of Note. Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft or destruction of this Note and of indemnity or security reasonably satisfactory to it, the Company will make and deliver a new Note which shall carry the same rights to interest (unpaid and to accrue) carried by this Note, stating that such Note is issued in replacement of this Note, making reference to the original date of issuance of this Note (and any successors hereto) and dated as of such cancellation, in lieu of this Note.





HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY
SPECIAL CONFIDENTIALITY

6.9 No Partnership. This Note is not intended to create, and shall not be interpreted as creating, an association, partnership or joint venture of any kind between Holder and the Company.

IN WITNESS WHEREOF, the Company has caused its duly authorized representative to execute this Note on the date first above written.

**CASCADE SETTLEMENT SERVICES FUND 1 LLC,**
a California limited liability company
Its: Manager

By: Cascade Settlement Services, LLC, a Delaware limited liability company
Its: Manager

By: ______________________
David H. Levy
Its: Manager



4803340801
APS:478919 5

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY
SPECIAL CONFIDENTIALITY