# EXHIBIT 28

OnPoint

# Memorandum

**To:** **Gordon Rausser**

**From:** **Gareth Macartney**

Date: February 1, 2011

Re: Cascade – Meeting on February 2, 2011

## *Item #1 Follow-up questions to the Visa/MasterCard Report*

1. The Class Period in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* ("*Visa/MasterCard*") is "any time from and after January 1, 2004." In the report that we delivered last week we assumed the damage period would run to December 31, 2010. Could the damage period be longer?
   a. Yes, the final damage period will run up to the trial date or the settlement date.

2. In our report on *Visa/MasterCard* we stated that if Judge Gleeson grants class certification (which we believe he will), one scenario is that immediate appeal of the decision may be permitted if the case is considered to pass the "death knell" test, where "grant of certification [is likely to] force[] the defendants to settle [because some face ruinous liability]."[1] If immediate appeal is granted[2] this would delay the process to settlement by a year or more, as the appeal proceeds through the Second Circuit Court of Appeals. Cascade want to know if the fact

[1] The Second Circuit applies a "Core-Committee Factors" test (Derived from the Seventh Circuit's comprehensive discussion of its own standards for granting review under Rule 23(f) in *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 834-35 (7th Cir.1999)) and grants review under either of two circumstances: where the certification ruling effectively sounds the "death knell" of the litigation, and where the appeal would involve a "fundamental issue" relating to class actions.

[2] This occurred in the *In re Visa Check/MasterMoney Antitrust Litigation ("Visa Check")* litigation, but in that case it was because the tying nature of the allegations presented a "fundamental issue" relating to class actions.

that the Defendants included some of the biggest banks in the US[3], with large financial reserves, makes the death knell scenario more or less likely.

a. What matters for the death knell argument is the financial strength of the weakest Defendant. Therefore, the fact that some of the Defendants are very strong financially would not make the death knell scenario less likely, as such.

b. However, in order to argue for the death knell consideration, some Defendants are going to have to argue that they face possible bankruptcy. We think that because of consideration for investor sentiment that it is very unlikely that the banks will wish to take such a position. Most likely once the class is certified the decision will not be appealed immediately.

c. Note that because the Defendants are jointly and severally liable, that if one Defendant were to actually go bankrupt now, the remaining Defendants are liable for the entire class-wide damage amount (Cascade asked about this when we spoke).

3. Further, Cascade wanted to know if there was a likelihood of a "domino" settlement, with one Defendant breaking away from the others and settling with the Plaintiffs.

a. It is possible, however very difficult to predict. Often a Defendant will break away and settle for idiosyncratic commercial and, sometimes, accounting reasons. It is very difficult to predict which Defendant may do so, or how likely such a scenario is. An attempt to predict this would be speculation.

4. Further, Cascade wanted to know if the presence of the large banks as Defendants puts upward or downward pressure on the settlement amount relative to the

[3] In the *Visa Check* litigation it was only Visa and MasterCard who were Defendants, whereas in the *Visa/MasterCard* litigation the Defendants include: Visa, MasterCard, Bank of America, Barclays Bank plc, Capital One, Chase Bank USA, Citibank, HSBC, Fifth Third Bankcorp, National City Corp, SunTrust Bank, Texas Independent Bankshares, Wachovia Bank, Washington Mutual Bank, Wells Fargo, Providian National Bank and others.

settlement amount in the prior litigation (*In re Visa Check/MasterMoney Antitrust Litigation ("Visa Check")*)?

a. Downward pressure. The large Defendants have the financial resources to credibly risk a trial and will therefore increase Defendants' bargaining power, enabling them to hold out for a smaller settlement amount.

5. In *Visa Check* the settlement was appealed. Cascade wanted to know which parties appealed the settlement and why.

a. A small group of class members (all very small merchants) challenged a number of issues on appeal, mainly connected with the fact that as part of the settlement these merchants were prevented from pursuing other related litigation.[4] The merchants contested:

i. the validity of the settlement's release of non-parties (specifically, the merchants challenged the release of non-defendant banks from other related litigations that the merchants were pursuing);

ii. the adequacy of class representation and the adequacy of notice (the merchants' related litigation was not considered in the negotiations and the notice to the class of the settlement did not alert merchants to the release of parties and non-parties from the related litigation);

iii. the fairness of the settlement (again, the value to the merchants' of their related litigation was not considered in the negotiations);

iv. the reasonableness of attorneys' fees.

6. Cascade suggested that an approximate method to identify the value of each merchants' claim in *Visa/MasterCard* might be to use the assumption that the

[4] Namely, Wal-Mart, Sears, Safeway, Autolab of Farmington Hills, Bernie's, Army-Navy Store, Burlington Coat Factory, Warehouse Corp, Circuit City, The Coffee Stop, Torreo Coffee & Tea Co, Computer Supplies Unlimited, Denture Specialists, Payless Shoesource, Shoes Etc., Arnold's Shoes, Scrub Shop, Sportstop, Geneva White, UCC Kwik Doc, UCC Express, International Mass Retail Association, National Retail Federation and Food Marketing Institute.

allocation of class-wide damages across the class in *Visa/MasterCard* will follow the same proportions as the allocation of class-wide damages in *Visa Check*.

a. I said that the proportions would likely be different because *Visa Check* involved primarily the Interchange Fees on debit cards, while *Visa/MasterCard* involves Interchange Fees on all card types. Therefore, merchants who accept a large volume of debit card transactions would have received a larger portion of class-wide damages in *Visa Check*, but this would not be true in *Visa/MasterCard*.

b. However, this approximate method may be workable if we take into account the mix of card types that each merchant accepts.

## *Item #2 Whether to focus on Rail Freight or Visa/MasterCard*

7. As you suggested, given the greater certainty regarding class certification for the *Visa/MasterCard* case (due to the prior litigation), Cascade should pursue this case first. It would be better to leave the *Rail Freight* case on the back burner until a decision on class certification has been made.

## *Item #3 Marketing their filing service*

8. The first part of Cascade's business model it is to buy claims from class members. The second part is to manage the claims submission process for class members who wish to retain their claims. Cascade will ensure full and accurate recovery of these claims.

9. In *Visa/MasterCard* damages will be some proportion of the Interchange Fees that the class members were required to pay to the Visa and MasterCard networks and the card issuing banks. Claim filing will be complex because:

a. Interchange Fees rates vary by:

i. Card type- credit or debit;

ii. If credit, whether the card offers rewards or not;

iii. If debit, whether the transaction is PIN or signature;

iv. Merchant category (i.e. grocery store, gas station, restaurant and so on) – there are hundreds of these different categories.

b. Interchange Fees changed over time during the Class Period.

c. Interchange Fees are different for different card types.

d. Plaintiffs' expert may calculate that the overcharge due to the illegal conduct varied across merchant type, time or some other dimension.

e. As Cascade themselves noted, the claims administrator in the *Visa Check* litigation made many mistakes in administering claims. In that case class members gave their company name to the administrator and their transactions were looked up in Visa's and MasterCard's transaction data, which includes many millions of transactions. Without individual attention to each merchant, such a look-up process is prone to error due to:

i. neglect of corporate structures and the fact that some transactions will be recorded against merchants' subsidiaries;

ii. different representations of corporate identifiers ("Mom and Pop Stores, Inc.", rather than "Mom and Pop Stores, Incorporated");

iii. mis-types of company names.

10. In *Rail Freight* claim filing will be complex because:

a. The Class definition excludes legacy contracts and mileages based Fuel Surcharges, but includes NS "re-based" Fuel Surcharges (note, Class Period is July 1, 2003 to December 31, 2008);

b. Fuel Surcharges depended on the price of oil and were therefore different depending on the timing of the shipment;

c. Fuel Surcharges were different in their underlying indexes (HDF or WTI), thresholds and conversion formulas for different Railroads and different shipper categories (such as Intermodal, Carload and Coal);

d. There were (very rare) instances of exceptional Fuel Surcharges, with slightly non-standard formulas;

e. Interline shipments;

f. The estimated overcharge will vary by time (it was greater when the price of oil was high) and may vary by shipper category (such as Intermodal, Coal etc.), or some other dimension.

### *Item #4 Identification of class members in the Rail Freight case*

11. I responded to their questions on this in the email I sent to Cascade yesterday and forwarded to you today.