# EXHIBIT 36

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION - MDL NO. 1869

MC No. 07-489

Washington, DC
October 2, 2014
11:00 a.m.

SEALED

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Class Plaintiffs:

Michael D. Hausfeld, Esquire
Sathya S. Gosselin, Esquire
Seth R. Gassman, Esquire
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, DC 20006
(202) 579-1089
mhausfeld@hausfeldllp.com

Stephen R. Neuwirth, Esquire
QUINN EMANUEL
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000
Fax: (212) 849-7100
stephenneuwirth@quinnemanuel.com

| | |
|---|---|
| For the Defendant Union Pacific: | Daniel M. Wall, Esquire<br>Timothy L. O'Mara, Esquire<br>LATHAM & WATKINS<br>505 Montgomery Street<br>Suite 2000<br>San Francisco, CA 94111-2562<br>(415) 395-8240<br>Fax: (415) 395-8095<br>Dan.Wall@lw.com |
| For Defendant CSX: | David D. Cross, Esquire<br>Kent Alan Gardiner, Esquire<br>CROWELL & MORING, L.L.P.<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004-2595<br>(202) 624-2578<br>Fax: 202-628-5116<br>kgardiner@crowell.com<br>dcross@crowell.com |
| For Defendant Norfolk Southern: | John Murray Nannes, Esquire<br>Tara L. Reinhart, Esquire<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP<br>1440 New York Avenue, NW<br>Washington, DC 20005-2111<br>(202) 371-7500<br>Fax: (202) 661-9191<br>john.nannes@skadden.com |
| For Defendant BNSF: | Veronica S. Lewis, Esquire<br>GIBSON, DUNN & CRUTCHER LLP<br>2100 McKinney Avenue<br>Suite 1100<br>Dallas, TX 75201-6912<br>(214) 698-3320<br>Fax: (214) 571-2900<br>vlewis@gibsondunn.com |

Court Reporter: Lisa M. Foradori, RPR, FCRR
Official Court Reporter
U.S. Courthouse, Room 6706
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3269

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

P R O C E E D I N G S

COURTROOM DEPUTY: Miscellaneous Case 07-489. In Re: Rail Freight Surcharge Antitrust Litigation.

Counsel, please identify yourselves for the record.

MR. HAUSFELD: Good morning, Your Honor, Michael Hausfeld for the cross-plaintiffs.

MR. NEUWITH: Good morning, Your Honor, Stephen Neuwirth, Quinn Emanuel, for the plaintiffs.

MR. GASSMAN: Good morning, Your Honor, Seth Gassman from Hausfeld for the plaintiffs.

MR. GOSSELIN: Good morning, Your Honor, Satya Gosselin from Hausfeld for the plaintiffs.

MR. WALL: Good morning, Your Honor, Dan Wall, along with Tim O'Mara, from Latham & Watkins for Union Pacific.

MS. LEWIS: Good morning, Your Honor, Veronica Lewis from Gibson, Dunn for BNSF Rail.

MR. NANNES: Good morning, Your Honor, John Nannes for Norfolk Southern Railway Company.

MR. GARDINER: Your Honor, Ken Gardiner, Crowell & Moring for CSX.

MR. CROSS: Good morning, Your Honor, David Cross, Crowell & Moring for CSX Transportation.

THE COURT: And everybody else is associated with one or another of the defendants. So, yesterday Mr. Hausfeld

called on behalf of both sides, as I understood it, and asked for a -- that we get together and it be done under seal. He originally asked for a chambers conference, and I said, well, how many people are going to be there? And I quickly concluded it would be too large for chambers.

So, I didn't put anything on the docket, I just asked the courtroom deputy, Ms. Moon, to list it as a sealed civil matter. And we can keep the notes of -- the reporter's notes under seal and she won't make a transcript unless and until I tell her to. But, other than that, I don't know why we're here.

MR. WALL: Your Honor, just to clarify --

THE COURT: You need to speak in the microphone, Mr. Wall.

MR. WALL: Just to clarify, we were advised yesterday that this hearing had been scheduled. It wasn't -- counsel didn't call on behalf of both parties, he called on behalf of plaintiffs. We found out later on that it was going to be sealed. We don't understand the basis for sealing it. We don't agree that it should be sealed. We know what it's about because we've talked to the counsel in the interim. And I can understand why they would want it private, but the standards for what one might want private or sealed are not the same. So, I just want that on the record.

THE COURT: Mr. Hausfeld.

MR. HAUSFELD: Good morning, Your Honor. It has recently come to our attention -- first, Your Honor, let me thank you on behalf of the plaintiffs, as well as, I think, of the defendants, for accommodating us on such short notice. And I think, as you will see, there is no disagreement in -- once the defendants have learned the nature of what is it that we're about to address, that they, too, agree that the matter that we're about to present to the Court should be considered favorably by the Court. And, that is, that it has recently come to our attention that there is a serious issue concerning potential conflict of interest on behalf of our plaintiff, Gordon Rausser, in this matter.

THE COURT: On behalf of what?

MR. HAUSFELD: Our expert, Gordon Rausser, in the course of this matter. It appears -- and the defendants will prepare to raise the issue that Dr. Rausser had an interest, both economically and/or otherwise in equity, in a company that either purchased or represented entities that otherwise would have been opt-out claimants in the Rail Litigation, and that was undisclosed.

When we first learned about it, pursuant to subpoenas issued by the defendants for documents from OnPoint, Dr. Rausser's company, as well as Dr. Rausser. We had an independent investigation or review of the documents that were requested. There are other companies that were

subpoenaed as well. We have produced the documents that have been requested. The other company that has been subpoenaed has not yet produced the documents, as far as we know.

THE COURT: Subpoenaed by whom?

MR. HAUSFELD: Subpoenaed by the defendants.

THE COURT: Okay.

MR. HAUSFELD: We have -- this has just arisen. We have not had an opportunity to fully absorb the complexities of the transactions involved between Dr. Rausser, his company, and this company acquiring opt-out shipper rail claims called Cascade.

We have not had any opportunity to see the documents of this other company that has yet been subpoenaed, and we feel -- we feel and felt that in light of the seriousness of the matter and of the seriousness in which we are taking the matter, that this could become a distraction or unnecessary diversion to the class certification hearing scheduled for Monday. And we were going to request an opportunity to have that hearing adjourned to give us the time in order to fully evaluate the materials produced, interview the individuals who may be associated with this, so that we have a fuller and more meaningful understanding of what occurred and what consequences and implications are raised by this issue.

We have spoken to the defendants about this.

We feel that there should be a target date for a rescheduled hearing, if convenient with the Court's schedule. We're looking at some time in November, if that works. And in the interim, both the plaintiffs and the defendants will use that time to apprize themselves of all of the information that needs to be had with regard to this issue.

THE COURT: Okay. Mr. Neuwirth, do you want to add anything?

MR. NEUWITH: No, I think Mr. Hausfeld has fully covered it. And I would just add that I think that the reason that the proposed adjournment makes sense is so that, given the nature of the issues and the seriousness of them, there is an opportunity to assess what is the appropriate -- what are the appropriate steps, if any, to take in response to what we've learned already.

THE COURT: Okay. Mr. Wall.

MR. WALL: So, needless to say, this is not ordinary, and it is all quite shocking. I think that we want to proceed here in two steps, if it's okay with Your Honor. We have a position, of course, on what we should do as a result of this, albeit, one that's been formed in the last 16-17 hours. But I think that there's a lot more to this than a question of an undisclosed conflict of interest.

So, with Your Honor's permission, I think that I would like to turn over, for a moment, to Mr. Cross

representing CSX, who can give you a summary of just what we found in the document production that we received yesterday.

MR. CROSS: Good morning, Your Honor. I think it's fair to say that we feel like at this point we're still a little bit at the tip of the iceberg. We're just starting to learn these facts. We've started to try to go through the documents, they're a bit dense, complicated, a lot of security notes and things of that sort.

So, I'm just going to give Your Honor a few of the highlights, but I wanted to start with the background just to let Your Honor know how we got to where we are. We had reason to believe, before going into a July deposition of Professor Rausser, that he may have some financial interest, ownership interest or something like that, in a company that was buying claims in this litigation, and that company is called Cascade Settlement Services.

There's another company -- used to be another company called Spectrum, that has, as we understand it, merged with Cascade Settlement Services, they're now one company. And Spectrum, we knew, had been buying or at least soliciting claims in this litigation. In the deposition on July 31st of this year, I asked Professor Rausser some questions about this, and in particular, just to give Your Honor the context, again, of where we are. I asked him whether he was familiar with a company called Cascade Settlement Services. He said

Yes. How do you know them? I know them because of the principals that exist at Cascade, many years ago they started another firm. He goes on to say: My company, in fact, at that point -- his company is OnPoint Analytics.

THE COURT: His company is called what?

MR. CROSS: OnPoint Analytics.

THE COURT: All right.

MR. CROSS: He talks about they have done some work. So, I then asked him: Is there any formal relationship between OnPoint Analytics and Cascade Settlement Services? His answer was: No. He said they had done some work in the past. The questions that really matter are these two, Your Honor. The next question was: So, OnPoint Analytics does not have any ownership or other financial interest in Cascade Settlement Services? He said: No. I said: Do you? He said: No.

I said: Do you or OnPoint Analytics have any ownership or financial interest in any company that has purchased claims in this case? And he said: No. Candidly, Your Honor, at that point we thought there wasn't really anything to this, we were prepared to move on. Fast forward to August 28th, and we receive a deposition errata from the plaintiffs. The bulk of it is pretty typical errata, and then you get to the last part, and to the question that I had just read to Your Honor about whether he has any financial

interest. He keeps the No, but he adds a But. So the answer becomes: No, I don't have ownership interest or -- ownership or financial interest in Cascade Settlement Services as a company. I do, however, have the right to share in distributions from certain claims they manage, but those do not include claims in this case or any other case in which I am a testifying expert or OnPoint has performed any services. That's what they added after the word No, and it's characterized as a clarification.

This, of course, flagged the concern for us that there was something more there. That's when we served subpoenas. We got those subpoenas out within two weeks. And that's how we find ourselves where we are today, Your Honor. Yesterday we received documents from the plaintiffs. I'm just going to give Your Honor a few of the highlights, as I said, they are a bit dense.

We have not yet received documents from Cascade Settlement Services, we did subpoena them. We actually had reached an agreement with them that they were going to produce documents last Friday, once we had an additional protective order entered. Judge Facciola signed that order last Friday. Unfortunately, I was later informed in the evening by their counsel --

THE COURT: I was at a baseball game, so --

MR. CROSS: Well, we appreciate Judge Facciola

turning to it, Your Honor. We learned that evening that the plaintiffs' counsel reached out to them and asked them not to produce any documents because they might challenge the subpoena. So, we don't yet have those yet, we're hoping to get those today.

So, again, Your Honor, just the highlights and some of the stuff we've learned on the documents that have come in. And what we now know from the documents is not only was the original deposition testimony not accurate, but as we now know, the errata also was not accurate, because it seems clear from what we have so far that there is a financial interest that Professor Rausser has in Cascade Settlement Services.

Among the documents we have, Your Honor, December 28th of 2012, Professor Rausser purchased a promissory note. He paid a million dollars to Cascade Settlement Services for this.

THE COURT: December what?

MR. CROSS: I'm sorry.

THE COURT: December what?

MR. CROSS: December 28th of 2012.

THE COURT: And one of the questions that's running through my mind, there are many questions running through my mind, and you probably don't have the answer to this at this point. How early was the relationship? How early was the financial relationship or his interest in any of this?

Because -- does it affect his -- it may affect his credibility if he lied or dissembled in his deposition or even in the errata. But does it affect the credibility or quality of his first reports two or three years ago that were the ones before me when I decided the first class certification decision and the one that the courts of appeals were looking at.

And I think that's a question that probably affects how both sides would approach the state of the record at that point, irrespective of what happened later in terms of his financial interest and irrespective of what it does to his credibility. So that's -- I'm sure that's -- I'm not the first one in the room to have thought of that. And I take it you're probably not in a position to know the answer at this point.

MR. CROSS: Not yet. We do know that the relationship between OnPoint Analytics and Cascade Settlement Services goes back to at least 2010, they began doing some consulting work for them. And, Your Honor, interestingly enough, it was only, I think, September 30th of this year, literally just a couple of days ago, that OnPoint Analytics decided to terminate their relationship with Cascade Settlement Services. So, we do know it goes back to 2010.

As to Professor Rausser's own financial interest, again, we know that he paid a million dollars to Cascade for the purpose of Cascade Settlement Services investing in

Because -- does it affect his -- it may affect his credibility if he lied or dissembled in his deposition or even in the errata. But does it affect the credibility or quality of his first reports two or three years ago that were the ones before me when I decided the first class certification decision and the one that the courts of appeals were looking at.

And I think that's a question that probably affects how both sides would approach the state of the record at that point, irrespective of what happened later in terms of his financial interest and irrespective of what it does to his credibility. So that's -- I'm sure that's -- I'm not the first one in the room to have thought of that. And I take it you're probably not in a position to know the answer at this point.

MR. CROSS: Not yet. We do know that the relationship between OnPoint Analytics and Cascade Settlement Services goes back to at least 2010, they began doing some consulting work for them. And, Your Honor, interestingly enough, it was only, I think, September 30th of this year, literally just a couple of days ago, that OnPoint Analytics decided to terminate their relationship with Cascade Settlement Services. So, we do know it goes back to 2010.

As to Professor Rausser's own financial interest, again, we know that he paid a million dollars to Cascade for the purpose of Cascade Settlement Services investing in

Spectrum. Remember, these two companies eventually merged, and we know that Spectrum was buying claims in the Rail Freight Fuel Surcharge litigation.

In March of 2013, he took that promissory note, and it looks like he converted it into a promissory note directly with Spectrum, and he paid about $750,000 -- I'm sorry, about $790,000 for that note. There's another one in also the same time where he purchases another note with Cascade Settlement Services for about $150,000.

He also, Your Honor, has an ongoing consulting relationship. So, I talked about this a moment ago. Since December of 2010 he's been providing consulting services. The consulting agreement lays out, it's a pretty broad scope, but the bottom line looks to be that they use him and OnPoint Analytics to identify potential claims to invest in, how to value those claims. And he gets compensated in a variety of ways, but essentially he gets a percentage of revenue.

And what concerns us, Your Honor, is his deposition errata says that he segregates the revenue from claims where he's testifying versus claims where he's not.

THE COURT: How does he know?

MR. CROSS: Well, that's our question, Your Honor, we need more discover on that. What we've seen so far is, if you look at his consulting agreement and you look at these promissory notes, what they all say is that the revenue he

receives, either compensation as a consultant or interest on these promissory notes, comes from the cash flow that comes into the company, most of them say across all funds.

So, in his compensation agreement, in particular, he gets upwards of 17-percent of the revenue they bring in the door on anything and everything. There's no indication in the agreement that it's somehow segregated. He also gets a 7-percent distribution on anything he refers to them. So, if he tells them: Here's something I think you should invest in, and they invest in it, he gets 7-percent of anything that comes in the door.

And of concern there, Your Honor, is we have an e-mail from Professor Rausser to Cascade indicating -- and this is May of 2013 -- he indicates that the Rail Freight case, he refers to it as Rails -- it certainly looks to be this case, is a case that he referred to them to invest in.

And just a couple other points, Your Honor. One point that I did want to make is, it also -- there's obviously a credibility concern about the conflict of interest, but another concern we have that we started to see in the documents, Your Honor, is there are statements internal in the dealings between OnPoint Analytics and Cascade that contradict positions that Professor Rausser has taken in this case. And just to give Your Honor a couple of examples. Your Honor will recall that Professor Rausser has long maintained that fuel

surcharges going into the class period were designed not to recover fuel costs but for the purpose of recovering conspiratorial profits.

In an internal memo from OnPoint Analytics, this is January of 2011, Your Honor, from someone named Gareth Macartney, that works at OnPoint Analytics. Mr. Macartney writes: The full surcharge programs were designed to recover fuel costs due to fuel price increases over a specified threshold. And Gareth Macartney, Your Honor, has attended every deposition of Professor Rausser in this case.

THE COURT: Who is he?

MR. CROSS: He works for OnPoint Analytics. So, we're not dealing with a situation where they created a wall and had people not involved in the litigation dealing with OnPoint Analytics. Mr. Macartney was the person who seems to be principally dealing with Cascade on the Rail Freight litigation. And, of course, he's also attending all of Professor Rausser's depositions.

There are indications of a number of meetings or at least multiple, more than one meeting in 2011, and it looks like on into 2013 or 2014, where folks from OnPoint Analytics are meeting with people from Cascade, and they're talking specifically about the Rail Freight litigation. There's an e-mail, this is from 2011, I believe, where Cascade asked a number of questions about the litigation, and OnPoint provides

a number of answers.

What's yet unclear to us, Your Honor, is to what extent they are using the confidential information obtained in this case to provide the services that they provide to Cascade Services -- Cascade Settlement Services. Of course, that's one of the things that we'd like to figure out, Your Honor.

And I'll just close with the last couple of things. Two other contradictions that we found, Your Honor, in the document -- of course, one of the points that we have long maintained in this case, and is at issue in class cert now, is the appropriateness of using average overcharges. And we've pointed out that there are a lot of differences between the railroads and shippers that matter.

In a memo that OnPoint Analytics prepared, and this is in February of 2011, they point out that: In Rail Freight, claimed filing will be complex. And they give a number of examples, Your Honor, I won't go through all of them, but one of them they point out is that contrary to the claims that Professor Rausser has made in his reports, they say: Fuel surcharges were different in their underlying indexes, HDF or WTI, thresholds and conversion formulas for different railroads in different shipper categories, such as intermodal, carload and coal. As Your Honor may recall, that is a central premise of our defense on class cert in many ways.

He also talks about the complexity of dealing with

interline shipments and how that would be a challenge dealing with the claims at the class cert stage. And ultimately he says: The estimated overcharge will vary by time, it was greater when the price of oil was high. And here is the important part, Your Honor. And may vary by shipper category, such as intermodal, coal, et cetera, or some other dimension. And, again, Your Honor, we believe that is inconsistent with the position they have taken on overcharges.

Your Honor, I'll just close with these two things. The last thing we see in the documents, and I'm not going to walk through the specifics because I think we should move on. There are e-mails in July of 2014 and August of 2014 where Professor Rausser is receiving information specifically about Cascade purchasing claims in the Rail Freight case, and there are even evaluations associated with those particular claims.

And most interesting, Your Honor, is although Professor Rausser said that he had no formal relationship or financial interest in Cascade Settlement Services, we received an organizational chart where he is actually listed on the org chart with a dotted line, albeit, but he is listed on the org chart with the title of Director of Analytics.

So, Your Honor, Mr. Wall is going to speak more to this. We do think it's going to be important to get more discovery, and we'll talk about that later. The last point that I did want to make is, we do want to ensure that OnPoint

Analytics, Professor Rausser and the plaintiffs' counsel have taken appropriate measures to preserve documents, because we do think there will be additional discovery. To be clear, I'm not suggesting anyone has not, it is just a concern that we want to make sure that those steps have been taken. Obviously, this has just come to light, we're all dealing with it.

Thank you, Your Honor.

THE COURT: Okay.

MR. NEUWITH: Your Honor, Mr. Wall agreed that I could say one thing before he gets up, just very briefly. Our presentation, obviously, did not include a description of these underlying documents, and these are documents that we've recently become aware of. We produced them all, everything we have received, to the defendants. And these are, obviously, raising very serious issues for us as well.

And I just wanted to make clear that in requesting the conference today, our purpose was to alert the Court to what we have learned, and we're certainly prepared to answer any questions. I can assure you that Mr. Cross has not identified every document that is troubling to us. I'm not sure that we would agree with some of the characterizations he had of some of the substantive points he referred to. But in terms of the issues that raised troubling concerns for us, these documents are there. We just wanted to make clear to

the Court that if the Court has any questions that you want us to answer today, we will do that.

THE COURT: Well, first of all, on the document preservation point, I'm sure that counsel is doing everything they can to preserve the documents.

MR. NEUWITH: Yes.

THE COURT: And the next question is, what about your clients and what about Mr. Rausser and his company? Are they aware of the -- I assume they're aware of the concerns being raised.

MR. NEUWITH: I think they are certainly aware because they have had to produce these -- these subpoenas were not to the plaintiffs, these subpoenas were to Dr. Rausser's company. And it was through the collection of documents that was made in response to those subpoenas that we became aware of these issues.

THE COURT: Is he and/or his company, separately, retained by counsel at this point. I mean, are they just producing documents to both sides pursuant to subpoena or otherwise on their own, or are there --

MR. NEUWITH: As of this initial production, to my -- they have not advised us that they retained separate counsel. The production -- the documents were provided to the lead counsel for the plaintiffs, and we made the production. I couldn't tell you whether -- if Dr. Rausser has retained

separate counsel in connection with this, he hasn't told us about it yet.

THE COURT: Okay.

MR. WALL: I'm not sure where to begin, but I think I might want to begin with just following up and saying it probably wouldn't be a bad idea if he got separate counsel at this point. I've got to add one thing to what Mr. Cross said to just give you sort of a sense of where we are.

One of the things that we were going to talk about at the class certification hearing is the fact that the plaintiffs have now abandoned their pretenses of individualized damages estimates and have just come right out and said they're going to award average damages. There's actually a document in this case that was produced, which is Dr. Rausser's own analysis of the Wal-Mart Supreme Court decision, which contains the line: Since the Hydrogen Peroxide ruling, we know that we have to be careful with the use of average comparisons when making arguments on common impact. Using averages may mask individual differences.

What's going on here is, he is a player in the game of trying to buy class action claims cheap and selling them high, you know, cashing them in. And so he makes evaluations of the strength and the weakness of class certification. There's documents in here in which he advises Cascade not to invest in this case because class certification is going to be

very hard, but to instead invest in the Visa/MasterCard litigation because it's better.

He was asked about this. There's no way his original testimony is true. There's no way. I remember it very distinctly because -- look, I was about to argue to you on Monday that you should not have any faith in this man's credibility, he is a champion dissembler. He is a manipulator of facts and an advocate to the extreme. And taking his deposition is like trying to catch the wind because of that. But when Mr. Cross went to ask those questions, his demeanor changed entirely. And he very calmly -- I hope to show you the video -- he very calmly told us that he had no financial interest in Cascades, and that he knew them because of some stuff they used to do, and it was all false.

And then the errata comes in and, obviously, he thought about it. We now get why he thinks he can get away with it because he's making a distinction between whether he's an owner of the company as opposed to a debt holder and a consulting agreement and having a claim to distributions. Nobody could find him a reliable witness after what we have just found in the last 24 hours. That, however, is not an excuse to not finish the assignments that we were given by the Court of Appeals and to resolve this case.

And, frankly, we are ready to go. There are some of us that the thought of moving this hearing a day

practically makes us ill. But the most important value that we feel about is that we need to finish this and we need to finish it promptly and we need to finish it on this record. We're here, as the plaintiffs have frequently reminded you, on a mandate. And that mandate says that if the Rausser model, not somebody else's model, but the Rausser model, doesn't pass muster under Behrend and under the false positives analysis, the class certification must be denied. And we want to get to that as soon as possible.

So, what we're -- we're willing to move this into November; that's okay. But we want it -- and we understand that the plaintiffs want to keep their options open. And what we've talked about is that within, say, two weeks, they would come back and -- I guess we'd jointly come back, but it's really they're coming back to let you know what they want to do as a result of this. But I'll tell you what we want to do right now, which is, we want to finish this out, we want to have the class certification hearing.

This is fundamentally a question of credibility. Credibility is always an issue, it doesn't go away. And, certainly, there's no way that our -- that all the time and the investment getting to this point, getting to where we're ready to argue class certification can somehow be prejudiced because it turns out that their expert is a guy who invests in class action claims and tried to hide it from us. That just

doesn't work.

So, we're willing to do that. It's certainly conditioned, and I don't think there's any dispute about this, but we want unfettered, ultra fast track discovery of what's going on here. We got 300 pages yesterday, there's a lot in it, but it raises a lot of other questions. We're going to get another production today. And we will move heaven and earth to get this done in time so we can back here to finish this, as we all should finish it, in November. Hopefully that works with Your Honor's schedule.

MR. HAUSFELD: Your Honor, if I may. Clearly, it is with great regret that we even requested this conference. But in light of the seriousness of the issues raised, we felt it imperative. We too would like to finish this out. But let's just listen to what Mr. Cross said and the purpose of this conference.

These matters have just come to light, he said. They're just starting to learn the facts. It's a complex matter with dense materials, and yet, they don't have answers because it is unclear at this point exactly what occurred. Therefore, for those reasons, because we need the time for both sides to evaluate exactly what is the extent and the implication and the consequences, we asked for the adjournment. That's what we're asking for today, not to argue the merits on a half record or to make inferences correctly or

incorrectly on the basis of that.

It's whether or not, at this point, Your Honor feels it makes sense in light of these recent revelations and the seriousness with which the plaintiffs' counsel are taking them to uncover and evaluate and understand what happened, should the class certification hearing be temporarily postponed in order to enable both sides to present a full record.

THE COURT: Okay. So, have you talked about dates?

MR. WALL: What would work for us is, essentially we still need three days.

THE COURT: Well, we originally had three and then two of them got truncated, so we could set -- so, we could get a full three days or -- unless somebody thinks we should set four, just to be safe, but we could set a full three days when we don't have any commitments to be involved in speaking engagements or to go temple or to build a sukkah.

MR. WALL: So, we have two blocks that work for us, November 12th, 13th, 14th, and then the four-day block between the 17th and the 20th, which we could do either the 17th to the 19th or the 18th through the 20th.

MR. NEUWITH: Your Honor, I apologize, I had not had a chance to look at my calender when we initially talked about November earlier today. My schedule during November is very problematic during virtually every week, in part because

we had -- I don't know if the first week of December would be an option. I could do any of those five days.

MR. WALL: I'm sorry, but we just really don't want to wait that long, we want to get this over with.

MR. NEUWITH: Just to be clear, Your Honor, we certainly don't have a problem with tentatively setting a date for a hearing, but we don't know what are necessarily going to be the ramifications of what we ultimately conclude about what went on here, and we may need to approach the Court about relief about what is going to happen going forward in the case. And we certainly wouldn't want to foreclose the opportunity to do that. That has absolutely nothing to do with the scheduling, but we just don't want there to be a -- we would --

THE COURT: All right. I could, from my perspective, the week of November 10th, I'd have to move one or two things, and the week of the 11th is Veterans Day, which is -- court is closed. But that gives us the Monday or the Wednesday, Thursday, Friday. The week of the 17th, except for one sentencing so far, I'm totally open. The week of the 24th and the last part -- the 27th is Thanksgiving, so for people who travel, that's probably not a good week.

So the week of the 10th, the week of the 17th, the week of the 1st of December, the week of the 8th of December. I mean, I'm pretty good in December so far.

MR. NEUWITH: If it's --

MR. HAUSFELD: Your Honor, can we have some time to discuss this with the defendants and see if we can reach an agreement?

THE COURT: Sure.

MR. HAUSFELD: Possibly things can be reshuffled with the schedules.

MR. WALL: Can we put the 17th on the calendar tentatively, and then we'll see what we can do. If we have to come back, we'll come back.

THE COURT: What's your story on the week of the 17th, Mr. Neuwirth?

MR. NEUWITH: I have a major commitment in another case where, to be blunt, I may lose the client if I'm not able to be where I have to be for that week.

THE COURT: Is it the entire week?

MR. NEUWITH: It is the 18th, the 19th and the 20th.

THE COURT: Well --

MR. NEUWITH: It's a deposition of a very senior officer of the company.

THE COURT: So, there's another -- well, I don't know. There's also the -- what's the prior week?

MR. WALL: Your Honor, we have -- our expert is not available that week, so we wouldn't be able the week of the

3rd.

THE COURT: The week of the 10th.

MR. WALL: Oh, the week of the 10th we could do the 12th, 13th and 14th works for us. Sorry.

MR. NEUWITH: If that were the only way to get this done, we could do it, as long as we stopped at 4:00 o'clock on Friday the 14th.

THE COURT: That's fine. And the other possibility is to work with those three days and the following Monday, since Mr. Neuwirth has -- he's getting ready for his hearing later in the week.

MR. NEUWITH: I could do that.

MR. HAUSFELD: I think that makes sense, Your Honor. That works for me.

MR. WALL: I don't have a problem with that. One thing that I just want to follow up with -- one thing I want to follow up with is that if -- if the plaintiffs are giving any thought to seeking relief, whatever that means, we'd like to be able to resolve that issue in time to hold the date that we're setting now. So...

THE COURT: I thought I heard somebody say that maybe we should all come back here in a couple of weeks for an update as to what's going on.

MR. NEUWITH: We think that is --

THE COURT: That's separate and apart from the

hearing dates.

MR. WALL: That would be fine.

THE COURT: All right. So, should we block off the 12th, 13th, 14th and 17th, or just the 12th, 13th and 14th, or --

MR. HAUSFELD: I think, Your Honor, given this other issue, to the extent it plays in, it would be wise to have the flexibility of keeping the 17th open.

THE COURT: All right. I'll put it on my calendar.

MR. HAUSFELD: If we can return two weeks from today, unless that conflicts with anyone's calendar, if necessary.

MR. NEUWITH: I have a holiday that day.

THE COURT: What's today? Today is the 2nd. I'm going to be out of town -- I either have to do it the 10th, the 9th or the 10th, or the -- I've got to be in New York the 15th, 16th and 17th, I'm not sure -- for American Law Institute -- I'm not sure what time on the 14th I'm leaving to get there. But we could maybe think about the morning of the 14th for a status or the following week.

MR. WALL: Your Honor, I can't do the 14th or the 15th. I could do the 16th or 17th.

THE COURT: Those are the days I'm in New York.

MR. WALL: Oh, sorry. The 13th.

THE COURT: That's a holiday.

MR. WALL: The 20th?

THE COURT: The 20th is okay with me.

MR. HAUSFELD: Going once.

MR. NEUWITH: Is there any chance to do it the 21st instead of the 20th?

MR. WALL: I think so.

THE COURT: The 21st at what time?

MR. WALL: Doesn't matter. Whatever is convenient to you. Morning?

THE COURT: I've got two short things, one at 9:30 and one at 10:00. So, we could do it 10:30 or 11:00 on the 21st.

MR. HAUSFELD: Why don't we make it 11:00 so it gives us a change to get in, in case there are delays.

THE COURT: So the plan is -- we will -- I guess we'll place on the docket for today, status conference held, and that the dates -- next weeks' dates are vacated. That there will be a further status conference on October 21 at 11:00 a.m, and that the hearing that was to take place next week will be November 12th, 13th, 14th and, if necessary, 17th. Something like that.

MR. WALL: Your Honor, one last housekeeping point. We very much want this transcribed. We want this to be part of the record in this case. And we also want the opportunity to address the question of whether this should be sealed,

because it just -- this was done ex parte, we didn't have a voice in it, and it is what it is. But there's a pretty serious question as to whether this meets the standards for sealing a courtroom.

THE COURT: Well, we can have that discussion. On the other hand, for some of the reasons that Mr. Cross stated, in terms of not knowing the breadth and depth and scope of all this, and the fact that people's reputations are at stake. And I understand from the defense perspective, it may be a reputation that can never be resurrected, but I don't know that yet. I think for the time being it should be under seal.

MR. WALL: Okay.

THE COURT: But if you want a transcript, we can do a transcript under seal that would be provided -- I don't know whether the existing protective order is sufficient. I don't know how widely --

MR. HAUSFELD: I think, Your Honor, in this situation what courts have done is have a transcript available for counsels' eyes only.

THE COURT: There are a lot of counsel, too.

MR. HAUSFELD: I understand, but I don't think that it's fair to discriminate among counsel, but as long as every counsel who is associated with the litigation, in terms of having entered appearance, understands that they cannot reveal that outside themselves.

MR. WALL: Your Honor, that's fine. I think everybody gets how serious this is.

THE COURT: All right.

MR. WALL: And we'll --

THE COURT: If you can talk with Lisa afterwards and she will prepare a transcript under seal. If you want her to put some magic language on the cover of the transcript -- I mean, do you want her to put on the cover of the transcript: Under seal for counsels' eyes only -- something like that.

MR. NEUWITH: That would make it -- then we could apply the protective order.

THE COURT: Okay. So, she'll hang around and you can just clear it up with her. And that does not foreclose Mr. Wall's concern that at some point, maybe everything that happened here should be taken out from under seal. But I think that in fairness everybody -- and, actually, Mr. Cross makes the point, as did Mr. Hausfeld and Mr. Neuwirth, that there is a lot that is yet unknown, and it may only get worse, not better. But I don't think it's fair to the people -- the person involved, and maybe there's more than one person involved, ultimately, I don't know, to prejudge that until we know more.

MR. HAUSFELD: Thank you, Your Honor.

MR. WALL: Understood, Your Honor. Thank you very much.

THE COURT: Okay. So, I guess I won't see you next week. I will, I understand, be seeing Mr. Hausfeld on Yom Kippur but we won't be discussing the case.

COURT ADJOURNED AT 11:50 A.M.

C E R T I F I C A T E

I, Lisa M. Foradori, RPR, FCRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: 10-3-14 Lisa M Foradori

Lisa M. Foradori, RPR, FCRR