IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        )
                                   )
        Plaintiff,       )  MC No. 07-489
                                   )
                                   )  Washington, D.C.
        vs.             )  November 13, 2014
                                   )  9:30 a.m.
                                   )
IN RE: RAIL FREIGHT FUEL SURCHARGE, )
ANTITRUST LITIGATION - MDL NO. 1879,)
                                 )
        Defendant.       )
_____)

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          MICHAEL D. HAUSFELD, ESQ.
                         SETH R. GASSMAN, ESQ.
                         SATHYA GOSSELIN.
                         HAUSFELD, LLP
                         1700 K Street, Suite 650
                         Washington, D.C. 20006
                         (202)540-7200

                         STEPHEN R. NEUWIRTH
                         KYLE R. TAYLOR
                         ALICIA COBB.
                         QUINN EMANUEL URQUHART
                         & SULLIVAN, LLP
                         51 Madison Avenue, 22nd Floor
                         New York, NY 10010
                         (212)849-7165

APPEARANCES CONTINUED:

For the Defendants:                    RANDY MASTRO, ESQ.
                                       GIBSON DUNN & CRUTCHER, LLP
                                       200 Park Avenue, 48th Floor
                                       New York, NY   10166-0193
                                       (212)351-3825

                                       KENT A. GARDINER
                                       DAVID CROSS.
                                       CROWELL MORING
                                       1001 Pennsylvania Avenue NW
                                       Washington, D.C. 20004-2595
                                       (202)624-2578

                                       DANIEL M. WALL
                                       TIM O'MARA
                                       LATHAM & WATKINS, LLP
                                       505 Montgomery Street
                                       Suite 2000
                                       San Francisco, CA 94111-6538
                                       (415)395-8227

                                       JOHN M. NANNES
                                       SEAN M. TEPE.
                                       SKADDEN ARPS, LLP
                                       1440 New York Avenue NW
                                       Washington, D.C.  20005
                                       (202)371-7500

                                       Saul P. Morgenstern
                                       Kaye Scholer, LLP.
                                       250 West 55th Street
                                       New York, NY 10019-9710
                                       (212)836-6210

APPEARANCES CONTINUED:

Court Reporter:                    William P. Zaremba, RMR, CRR
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

P R O C E E D I N G S

1

2          DEPUTY CLERK:  Come to order.

3          Miscellaneous Case No. 07-489, United States of

4   America v. In Re: Rail Freight Fuel Surcharge Antitrust

5   Litigation, M.D L. No. 1869.

6          Counsel, please come forward and identify

7   yourselves for the record.

8          MR. HAUSFELD:  Good morning, Your Honor.

9   Good morning, Your Honor, Michael Hausfeld for the class

10   plaintiffs.

11          MR. NEUWIRTH:  Good morning, Your Honor.

12   Steven Neuwirth for the class plaintiffs.

13          MR. GOSSELIN:  Good morning, Your Honor,

14   Sathya Gosselin for the class plaintiffs.

15          THE COURT:  Okay.  Mr. Gassman.

16          MR. GASSMAN:  Good morning, Your Honor.

17   Seth Gassman for the class plaintiffs.

18          MS. COBB:  Good morning, Your Honor.  Alicia Cobb,

19   also for the class plaintiffs.

20          MR. TAYLOR:  Good morning, Your Honor.

21   Kyle Taylor from Quinn Emanuel for the plaintiffs.

22          MR. WALL:  Good morning, Your Honor.  Dan Wall

23   from Latham and Watkins for Union Pacific.

24          MR. NANNES:  Good morning, Your Honor.

25   John Nannes for Norfolk Southern Railway Company.

```
1              THE COURT:  Mr. Nannes.

2              MS. LEWIS:  Good morning, Your Honor.

3    Veronica Lewis, BNSF Railway.

4              MR. MASTRO:  Good morning, Your Honor,

5    Randy Mastro, Gibson Dunn, BNSF Railway.

6              MR. CROSS:  Good morning, Your Honor.  David Cross

7    of Crowell Moring for CSX.

8              To save time, I'll also introduce my partner,

9    Ken Gardiner, who's at the end of the table.

10             MR. O'MARA:  Good morning, Your Honor.  Tim O'Mara

11   from Latham Watkins for Union Pacific.

12             THE COURT:  Good morning, everybody else who's

13   here.  I'm sure there's others who have also entered

14   appearances in the case and others who are interested in the

15   case.

16             So basically, just to review briefly, there was a

17   matter that was brought to my attention by Plaintiffs'

18   counsel.  We held a hearing on October the 22nd, 2014, we

19   held another hearing on October the 21st, 2014.  Both of

20   those were closed proceedings until we saw how the case --

21   how the issue would arise, would resolve itself -- or let me

22   be clear because I don't think it's resolved itself.

23   So that the issue could be further explored.  And the issue

24   is what I've used as a shorthand but I'm not sure the

25   parties would agree with this, whether or not
```

1   Dr. Gordon Rausser, the plaintiffs' primary expert in the

2   case, might have a conflict of interest in the case or an

3   appearance of a conflict or at least a serious credibility

4   problem that needed to be explored.

5          The documents were exchanged, protective orders

6   were entered with various third-party companies, documents

7   were sought by subpoena, depositions were taken, and we

8   moved the class certification hearing from the date it was

9   supposed to start on October 6th to November the 12th at

10  that first hearing.

11         And then at the second hearing changed that date

12  again, vacated that date.  And I asked the parties for

13  further briefing.  One was the briefing on Plaintiffs'

14  behalf, a motion for leave to file a supplemental expert

15  report; and on Defendants' behalf, a motion to unseal the

16  transcript of the previous hearings and all of the

17  proceedings related to this matter.  At the end of the day,

18  the plaintiffs did not oppose defendants' motion to unseal.

19         So on Friday, I guess it was Friday, November the

20  7th, I issued an order granting the defendants' motion to

21  unseal, and directing the Clerk of the Court to unseal and

22  file everything that had transpired up until that date,

23  briefs and transcripts on the public record.  Took a little

24  time to get some of that done, but it was done.

25         In the meantime, the defendants filed their

1    response to Plaintiffs' motion to permit a supplemental

2    expert.  They filed their response in exhibits -- initially

3    under seal, because they did have some concerns about the

4    protective order -- orders that are involved in the case,

5    but I understand that now everything is up on the public

6    docket.

7          So then obviously I've read the briefs with

8    respect to Plaintiffs' motion to unseal -- I'm sorry,

9    Plaintiffs' motion -- I haven't had enough coffee this

10   morning -- Plaintiffs' motion for leave to file a

11   supplemental expert report in the opposition, and there's

12   also a supporting declaration on each side from a lawyer,

13   one of the firms on each side, with a lot of exhibits, which

14   I've also looked through.

15         So -- and then yesterday, I issued an order which

16   said -- and I'm summarizing this, it's also on the public

17   record, but there are a lot of people here who probably

18   haven't read everything on the public record at this

19   point -- that said in this order that I was concerned that

20   in light of recently discovered evidence, that issues

21   relating to Dr. Rausser's credibility could predominate the

22   class certification hearing and be a time-consuming

23   distraction from resolving the ultimate issue of whether the

24   class should be certified.

25         And raised the possibility, which was mentioned in

1   passing in Plaintiffs' memorandum, about rather than

2   supplementing with an additional expert, substituting a

3   totally new economic expert.  And noted that if we went down

4   that road, it seems to me that it would require entirely new

5   expert report or reports on Plaintiffs' side, a new economic

6   analysis and reports from Defendants' expert in briefing the

7   class certification issue ab initio, going back to square

8   one, including just ignoring everything that happened in the

9   Court of Appeals and everything that happened before me

10  before.  Just telling the Court of Appeals, we decided to go

11  back to the beginning.

12          And rather than trying to take a little bit of

13  this and a little bit of that and adding it all together and

14  taking the record, which may or may not be tainted from

15  before the appeal and putting Band-Aids on it after the

16  appeal with additional experts or supplemental experts and

17  trying to explain it all to the Court of Appeals, which part

18  of Rausser's initial reports and testimony I had relied on

19  from prior to the appeal and which parts, it just seems to

20  me to be muddying the waters in ways that are not best

21  designed to get to the ultimate issue and as clear and

22  direct and untainted way as possible.

23          And it would certainly avoid the sideshow or trial

24  within a trial that Plaintiffs' own filing, then defendants'

25  filings, too, suggested virtually inevitable in this, if we

1    go down the supplementation route.

2           We're going to spend a lot of time at a hearing

3    with one side trying to bolster Rausser's analysis and his

4    credibility, and the other side trying to tear apart his

5    analysis, based on his lack of credibility.

6           And the cross-examination of any supplemental

7    expert is going to be a lot about what they think about

8    Mr. Rausser's work and would they feel the same way had they

9    known the following facts.  And then there will be a lot of

10   debate about the facts.

11          And that messy record would then go to the

12   Court of Appeals to add to the record they had before, and

13   they would -- I would try to sort it out in this, in my

14   opinion, they would try to sort it out in their opinion.

15          So in yesterday's order, I suggested that one of

16   the things that the parties should be prepared to discuss

17   today is whether we should just start all over again, treat

18   everything that went before as a nullity.  And if we do

19   that, who bears the costs and fees involved in doing that?

20          And secondly, because everything was under seal --

21   and certainly, I don't want to invade any attorney-client

22   communications or joint attorney-client communications on

23   the plaintiffs' side, but -- and I don't know the financial

24   arrangements that Quinn Emanuel and Hausfeld have with all

25   of the other firms in the case and with the experts in the

1  case, but it seems to me that this problem is something that

2  might affect more than these two law firms in a number of

3  ways, some of which may be financial and some not.

4         And I guess I'm just asking the question whether

5  or not, since everything up until today has been under seal,

6  whether interim co-lead class counsel, Mr. Hausfeld and

7  Mr. Neuwirth, have fully apprised members of the executive

8  committee or steering committee and, perhaps, lawyers beyond

9  the steering committee and executive committee about this

10  problem and consulted with them before taking a position on

11  behalf of all plaintiffs and all plaintiffs' counsel as to

12  how to proceed.

13         So that's sort of the background, and I'm happy

14  to hear you in whatever order you want to speak.  I guess

15  plaintiffs should go first, because it's technically a

16  motion filed by plaintiffs for a supplemental expert.

17         MR. NEUWIRTH:  Good morning, Your Honor.

18  Steven Neuwirth for the plaintiffs.

19         Let me just address briefly at the beginning the

20  point you raised just a moment ago about consultation with

21  our executive committee.

22         And I can report to you that Mr. Hausfeld and I

23  have reported to the executive committee on what is

24  happening once we were able to do so following your orders.

25         And they have obviously had access as well to what

1  has now been put on the public record by the Court.

2  And I think it's fair to say that what we are saying to the

3  Court, at least initially today, is something that we have

4  consulted with the executive committee about.

5      We did advise them that there are still issues

6  that you are going to be deciding, perhaps, some decisions

7  may be made during the hearing that we may need to react to,

8  and so we've consulted -- to the extent we knew what was

9  happening, we consulted with them.  And what I'm about to

10  say I think can fairly be characterized as on behalf of

11  Mr. Hausfeld and me, as well as the executive committee.

12      You know, I think it's fair to say that this is

13  really a tragic situation in many ways.  Many people on both

14  sides of this case, and certainly the Court, have invested

15  tremendous resources and time in this litigation.  And the

16  situation that we find ourselves in, I'm sure, is

17  frustrating, vexing, surprising, the full range of emotions

18  that would rationally flow from it.

19      I think that we'll probably hear today from both

20  sides about what it has meant to them to be in this

21  situation, but I do think it's fair to say from the

22  plaintiffs' perspective that it would be hard to view anyone

23  as having been more affected or hurt by this.

24      This was a case where we won class certification

25  before Your Honor.  It was a case where the Court of Appeals

1   vacated -- as Your Honor knows, it did not reverse -- on the

2   eve of a class certification hearing where we felt we were

3   in a strong position to address the issues that have been

4   raised by the Court of Appeals and to demonstrate that one

5   of the principle issues that they had focused on was not

6   consistent -- the issues that had been presented to them on

7   that issue were not consistent with the underlying facts, we

8   found ourselves in a situation where this all had to be put

9   off.  And the impact, I think, on the plaintiffs in the

10  alleged class is straightforward.

11          The -- I think as is clear from the case law that

12  Your Honor had an opportunity to review in the papers that

13  were presented by both sides, in these situations, the cases

14  which have really dealt with facts that are not exactly the

15  same as what we have here.

16          And it may be that what we have here is different

17  from all the precedents just because of where we are in the

18  case:  The fact that there's been an appeal; the fact that

19  there's been a class certification ruling, et cetera.

20  We do believe that those cases provide guiding principles

21  that are relevant here, and those cases, I think, as a

22  general matter, have typically used a replacement expert as

23  the resolution when the Court has allowed a different expert

24  to testify.

25          I can say, frankly, that our proposal for a

1    substitution was very influenced by --

2         THE COURT:  Well, let me ask this question:

3    There's -- It seems to be in the cases and certainly in

4    defendants' briefs that defendants at least make a

5    distinction between substitution and supplementation.

6    You just used the word "substitution."  Is that what you

7    meant to say?

8         MR. NEUWIRTH:  I'm sorry.  I think our proposal to

9    have a supplemental expert was very informed by the

10   discussion at the last conference before Your Honor, where

11   Your Honor had identified certain reasons, or at least we

12   understood your Honor to be identifying certain reasons,

13   why, particularly in light of your initial class

14   certification decision, it would be important for the Court

15   to have an opportunity to hear further from Dr. Rausser and

16   to, perhaps, just try to get an independent view of those

17   findings by having a supplemental expert.

18        And so while we continue to think that that would

19   be an option that could be consistent with the principles in

20   the relevant cases, it is also clearly true that, in the

21   particular cases that both sides have cited, the solution

22   when the Courts have felt some new expert was appropriate

23   has been to have a new expert replace the old expert, and

24   those cases have typically focused on the notion that the

25   new expert would address the same range of opinions that the

1    old expert had put forth.

2           We certainly -- I think that the way that the

3    defendants have described those cases is not accurate.

4    First, the suggestion that the only time these cases have

5    treated an expert as appropriate to replace is when the

6    expert has voluntarily withdrawn.  It's really not what the

7    cases say, and both the *National Railroad* case and the

8    *Medpace* case that we cite and that the defendants refer to

9    in their papers were cases where a substitution was made

10   where the expert had not voluntarily withdrawn.

11          The *National Railroad* case, which is from this

12   district, was one where there was an issue similar to the

13   one we had here in terms of a conflict having been

14   identified.

15          And so we think that if the Court --

16          THE COURT:  Did those cases -- I thought the point

17   that the defendants made was not just voluntarily

18   withdrawing but that there were other kinds of circumstances

19   in which the original expert had become, quote, unavailable.

20   And, you know, obviously if somebody dies or is deathly ill,

21   they're unavailable.  If they're incarcerated, they're

22   unavailable.  But I take it *National Railroad* nor *Medpace*

23   were cases where that was not the case?

24          MR. NEUWIRTH:  Well, I don't think that is

25   accurate for these cases.

1              In the *National Railroad* case, there was a

2     credibility issue.

3              THE COURT:  Right.

4              MR. NEUWIRTH:  It had nothing to do with the

5     expert not being able to show up.

6              In the *Medpace* case, there was a conflict.

7     And specifically, the conflict there was that the expert,

8     it had been discovered that the expert had performed

9     7.4 hours of work for the defendant.  That was the conflict.

10    And the plaintiff maintained that the plaintiff could no

11    longer work with this expert in light of that.

12             THE COURT:  Right.

13             MR. NEUWIRTH:  And so that had nothing to do with

14    physical unavailability, death, illness, having withdrawn.

15             THE COURT:  Right.

16             MR. NEUWIRTH:  I mean, there are some cases where

17    the expert, after something happening at the deposition or

18    in discovery that exposed the conflict or that exposed that

19    the expert, might have misrepresented what he or she had

20    done previously, or academically.  Those were cases -- there

21    were some cases where the expert, after that happened, said,

22    I can't work on this case anymore.

23             THE COURT:  Sure.

24             MR. NEUWIRTH:  But that's a little bit different

25    from someone becoming ill or sick or unavailable in that

1    way.

2              And certainly at least in *National Railroad* and

3    *Medpace* –– and *Medpace* is a Southern District of Ohio case

4    of this year from March of 2014, there was no issue of the

5    physical unavailability of the witness, of the expert or the

6    unwillingness of the expert to come forward.

7              And so we think, you know, that the Court does

8    have different options here.  One thing we would say is that

9    I know Your Honor, in your order yesterday and this morning,

10   made reference to the possibility of putting aside what has

11   happened previously on class certification, including the

12   Court of Appeals decision.  I think our position would be

13   that the Court of Appeals decision is still governing in

14   this case; that what the Court of Appeals has directed about

15   the application of *Comcast*, about the need for any class

16   certification decision to address, among other things, the

17   question of whether what I'll call the legacy contract

18   question that is discussed in that discussion is still

19   guidance that would be applicable going forward under any of

20   these alternatives.

21             THE COURT:  Well, just –– obviously, regardless of

22   whether we started from square one or we did something to

23   take what had gone before and combine it with you guys going

24   forward, clearly I have to apply *Comcast* to every,

25   everything that any expert in the case says.

1          With respect to legacy contracts, I agree with

2    you, but it also seems to me that it doesn't necessarily

3    mean we have to start with the current state of the record

4    and Rausser pre-Court of Appeals.  It may also -- we could

5    also read the Court of Appeals to say that any expert has to

6    focus on legacy contract, among other things --

7              MR. NEUWIRTH:  Right.

8              THE COURT:  -- even if they were totally

9    substituted.

10             MR. NEUWIRTH:  Right.  Or if the defendants raise

11   that, it has to be addressed.

12             THE COURT:  Right.

13             MR. NEUWIRTH:  It can't be not addressed.

14             But, again, I think that it would be -- If the

15   Court were to decide to pursue the type of option that was

16   described in yesterday's order, we think that could be done

17   without including the Court of Appeals' ruling, in the broad

18   sweep of what should be pushed aside along the lines that

19   Your Honor just described.

20             Your Honor raised the issue -- I do think it's

21   important in this context to just recall in thinking about

22   what's the right alternative that this really was a

23   situation -- I don't think there's anything to dispute it in

24   the record -- that the plaintiffs' counsel learned about

25   this very late in the game.

1          THE COURT:  Well, they accuse you of not

2    exercising due diligence; you accuse them of not bringing to

3    your attention as soon as they use it because they wanted to

4    keep it to the side for a tactical advantage at a

5    deposition.

6          MR. NEUWIRTH:  Well, frankly, until Mr. Wall had

7    made a comment about a tactical reason for not disclosing

8    it, we had not, I think, assumed that that was what

9    happened.  But -- and that was at our recent hearing.

10   But I do think that it is a fact that's undisputed that

11   there was information that the defendants had.

12          And I only bring it up in this context, because

13   I think it's very important to note that at the October 2nd

14   hearing, Mr. Cross, CSX's attorney who spoke, made the point

15   that after the initial deposition of Dr. Rausser where a

16   question about this relationship had been raised and

17   Dr. Rausser gave the answers that he gave at that

18   deposition, Mr. Cross told you, he said -- and this is on

19   page 10 of that transcript from that October hearing at

20   lines 19 to 21 -- Mr. Cross said, "Candidly, Your Honor, at

21   that point we thought there wasn't really anything to this;

22   we were prepared to move on."

23          And they reached that conclusion having had the

24   letter from Mr. Montgomery, which we and you learned about

25   later, they'd had it for several months at that point.

1          And so if with that letter based on those answers,

2     they could reach the conclusion that there was nothing to

3     this and they could move on.  I don't think they can

4     legitimately say that we, who had none of that information,

5     were purposefully or not diligently pursuing something,

6     where there didn't seem even to them to be any issue.

7          Turning to the issue of fees -- or costs,

8     I'm sorry -- I think it's clear that we in our papers put in

9     case law that explained why courts have often not ordered

10    costs, and that the circumstances where they've had are

11    distinguishable from those here, and that, in fact, it was

12    either in circumstances where there was some bad faith by

13    the party that wanted to make the substitution or, as in the

14    *Vincent* case, some failure to look into very publicly

15    available information that was on the Internet that could

16    have permitted the issue to have been discovered sooner.

17    I don't think anyone can say that those types of

18    circumstances exist here.

19          And certainly, the plaintiffs, as you noted

20    earlier, are already facing tremendous consequences, both in

21    the case, and there are obvious cost questions that we have

22    to deal with on our side for this type of moving forward.

23    This was certainly none of our choosing.  I don't think we

24    could conceivably have wanted this outcome.

25          And I think in the cases where costs have been

1  awarded, it was because the Court perceived either that the

2  plaintiffs were trying to game the system somehow -- or the

3  parties seeking to substitute was gaming the case now or had

4  information that was obviously available and didn't pursue

5  it.  But for -- but that somehow that party was getting some

6  advantage from all of this.

7          I don't think that can be said here.

8  We are clearly disadvantaged by this.  Not being able to go

9  forward with the class certification hearing on the record

10  that was presented to Your Honor is not good for the class

11  and the plaintiffs in this case.  It is not something that

12  I want, it's not something that Mr. Hausfeld wants, it's not

13  something that the executive committee wants.  Nobody on our

14  side could have conceivably done anything to encourage this

15  outcome.

16          And we don't know what would have happened,

17  you know, if we had been made aware of this earlier, what

18  options there would have been if this had been presented to

19  Your Honor and to us.  We were in a situation we're in under

20  these circumstances, and we would very respectfully submit

21  that none of the cases that have awarded costs have been

22  cases where -- have been cases where the types of

23  circumstances here have been present, and where we're

24  already facing tremendous costs just from the circumstances

25  of what's taken place.

1          And then the last thing I would just say,

2     Your Honor, is that while we -- as I noted earlier, there

3     are options before Your Honor here of how to perceive, we do

4     think that -- we do think that it is past the point where

5     there could be an argument that these issues are not going

6     to seriously impact the case and trigger the type of

7     sideshow that Your Honor referred to.

8          Defendants in the papers that that they just filed

9     in response to our motion said at page 2, "In fact,

10     Dr. Rausser's credibility issues go much further and bear

11     directly on the merits of his economic work and core aspects

12     of Plaintiffs' arguments for class certification."

13          And there are other similar statements in the

14     briefs, and it may be, in fact, that those observations had

15     some impact on Your Honor's -- on Your Honor's thinking

16     about what the viable options might be here.

17          But the bottom line is that we think the

18     principles and the case law, although they don't address the

19     exact circumstance we have here, justify either a supplement

20     or a substitution and that they would not call for costs to

21     be imposed here on the plaintiffs under these very specific

22     circumstances and the history of how this played out, which

23     is all before Your Honor in the papers that have been

24     submitted and that have now been made public.

25          THE COURT:  Okay.

1        Well, before you sit down, a couple of things.

2   Your penultimate point about how this is going to have an

3   impact regardless of what path we take, what procedure we

4   follow going forward.

5        I mean, there are some things on page 10 of the

6   defendants' brief and the bottom of page 11 through 12,

7   that, if true -- first of all, that would be explored if

8   Dr. Rausser testifies.  But if true, it raises the

9   question -- we talk about credibility, but it raises the

10  question how can we be objective at all?

11       And I guess your answer is that a supplemental

12  expert, regardless of what's done to Rausser and his

13  credibility or his attacking his objectivity, if a

14  supplemental expert or a substituted expert -- if a

15  supplemental expert comes to the same conclusion and

16  justifies his opinion, then you would argue to me it's not

17  all about Rausser; we've got Dr. So-and-so or Mr. So-and-so.

18  And what they have done is totally reliable, even though

19  they have re-reviewed Rausser and stayed within the

20  parameters of Rausser, they've also done their own work.

21       MR. NEUWIRTH:  Well, the idea, as we put forth in

22  our papers, if we were going to go down the supplemental

23  expert route, the idea was that that expert would need to

24  come to his or her -- I'm sure now it's a his -- his own

25  independent conclusions, with the idea that that would

1    enable the Court to make a finding about the underlying

2    economics and regression analysis, without the taint of

3    anything that Dr. Rausser may have done.

4            It is clearly the case that substitution creates

5    an easier way for the Court to do it, and, as Your Honor

6    said, eliminates this sideshow that will inevitably flow and

7    that I think these types of statements in the papers, these

8    types of statements in the papers show will necessarily come

9    to the fore in any ongoing proceeding where Dr. Rausser is

10   still the expert.

11           I think I was just trying to make the point that

12   we had previously suggested the supplement, as I noted

13   earlier, based on the discussion that Your Honor had had or

14   at least our interpretation of it, which may have been

15   wrong, but we have interpreted the last conference to be a

16   suggestion by Your Honor that, in light of the fact that you

17   had previously had an opinion on class certification -- and

18   I don't think at the last conference you suggested that that

19   could be pushed aside, as you've now suggested --

20           THE COURT:  Right.

21           MR. NEUWIRTH:  -- that this type of supplemental

22   procedure could work.

23           And my closing remark was just to say that we

24   continue to believe that what we put forward in our papers

25   is accurate, but we certainly don't disagree with the

1   proposition that the cases -- that all the precedents have

2   used substitution as the vehicle for addressing this; and

3   with the caveat that we made about the Court of Appeals'

4   decision, we certainly think that what Your Honor has

5   proposed is also a viable option under those cases.

6          THE COURT:  Okay.  One other question; it has to

7   do with Mr. McClave.  He's already an expert in this case,

8   I guess, for more limited purposes.

9          But regardless of which road we go -- and you've

10   proposed, Mr. Leitzinger, regardless of which road we go

11   down, the question that struck me was whether or not

12   it would be less expensive, perhaps, but certainly less

13   time-consuming if your primary expert became Dr. McClave

14   instead of Mr. Leitzinger, because he already has some

15   familiarity with the case.  There may be some reasons that

16   you don't want to do that.

17          But clearly, Dr. McClave is well-regarded.

18   He's well-regarded, even though he was the expert in

19   *Comcast*, but well-regarded by the trial judge in the

20   Third Circuit in *Comcast*, and not well-regarded by the

21   Supreme Court.  And Judge Lundstrom just had him in the

22   *Urethane* case, which was affirmed by the 10th Circuit, and

23   they talked at length about the reliability of his work in

24   that case.

25          So it's a thought that struck me as I was reading

1    the briefs that we're going to have to -- this process is

2    going to be prolonged regardless -- if I let you do -- if I

3    let you use either a supplemental or a substitute expert.

4    And my question was whether it might not be quite as

5    prolonged if you teed up McClave instead of somebody

6    entirely new to the case.

7                MR. NEUWIRTH:  So we share the view that

8    Dr. McClave is a very excellent and very well-qualified

9    expert, and we feel that many of the opinions he's expressed

10   in this case already confirm that the underlying economics

11   and regression modeling here should ultimately be deemed

12   valid notwithstanding all that has come to transpire about

13   the relationships of Dr. Rausser and OnPoint.

14               We certainly made the proposal we made in the

15   context of understanding that the Court might do a

16   supplemental expert rather than a substitution, and we

17   certainly have no disagreement about Dr. McClave's ability

18   to have a head start.

19               The only issue that we were considering was that

20   there is -- Dr. Rausser had a very broad range of opinions

21   that went beyond the regression modeling and the damages

22   issues; and depending on how Your Honor framed the next

23   phase of the proceeding, we would want to evaluate whether

24   that is a viable option in terms of what the new expert

25   would be covering, and, you know, we'd certainly -- we have

1    no interest in delaying this proceeding.  But we would, at

2    the very least, want to have the opportunity to assess what

3    is the new procedure and get back to Your Honor with a

4    recommendation of what would make the most sense in terms of

5    a new expert for whatever procedure Your Honor ultimately

6    applies.  The recommendation we made for Dr. Leitzinger was

7    in the context of what we thought was going to be a

8    supplemental answer.

9              THE COURT:  I understand.

10             And one last point just for the record.  As we, as

11   I mentioned last time Judge Pratter in Pennsylvania has a

12   case with Dr. Rausser, and Mr. Hausfeld is also in that

13   case.

14             MR. NEUWIRTH:  And I am as well.

15             THE COURT:  Oh, okay.

16             And so I've had a subsequent conversation with her

17   about what's going on and let her know that this was all in

18   the public record as of yesterday.  So she's aware of that.

19             And there's another judge who also has a case and

20   there may be many, but another judge who has a case with

21   Dr. Rausser, an expert who called me yesterday afternoon,

22   Judge Sarah Vance, chief judge in New Orleans.  So I've sort

23   of brought her up to date and told her that all this stuff

24   was now filed publicly so she and her law clerk can take a

25   look at it.

1          MR. NEUWIRTH:  Okay.  Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Neuwirth.

3          Mr. Wall.

4          MR. WALL:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. WALL:  I guess the ending was sort of

7    equivocal.  I guess what I heard is that they're open to

8    either substitution or replacement.

9          I guess I should probably address the Court's

10   order first, and that's the prospect of replacement or

11   substitution.

12         THE COURT:  Replacement and substitution being

13   synonymous?

14         MR. WALL:  Yes.

15         THE COURT:  Versus supplementation?

16         MR. WALL:  Versus supplementation.

17         THE COURT:  Right.

18         MR. WALL:  The do-over option?

19         THE COURT:  Yeah.

20         MR. WALL:  Which is kind of the way that we've

21   been talking about it.

22         And I just have to just start by saying I'm sure

23   this is no shock but that the defendants oppose that, could

24   not oppose it any stronger, any more strongly.

25         It is -- We're at a loss with all due respect,

1   Your Honor, to see how we've gone from a request from

2   supplementation, which, for all its flaws and for all we

3   disagreed with it, at least tried to sort of touch the basis

4   of the case law that it would -- where the -- it would only

5   relate to the existing expert opinion, it wouldn't expand

6   upon it.

7          THE COURT:  Well, don't you think we need entirely

8   new briefs regardless?  Because I do.

9          MR. WALL:  I don't actually think --

10         THE COURT:  See, I don't want to take a piece of

11  this and a piece of that and try to paste it together now.

12  So you're going to tell me in a brief, we're incorporating

13  by reference pages 7 through 28 of the earlier brief, but

14  we're not incorporating pages 32 through 37.

15         MR. WALL:  I don't understand why you would say

16  that, Your Honor.  Just let me go back to the beginning of

17  this here.

18         We didn't call this a sideshow.  The plaintiffs

19  called this --

20         THE COURT:  I understand that, but I don't want to

21  make a mistake.

22         MR. WALL:  I understand.

23         THE COURT:  And I don't want you to go to the

24  Court of Appeals and say, Judge Friedman messed up because

25  he couldn't figure out how to put it all together.

1   But I don't see the issue here.

2          MR. WALL:  This -- It is not the first time in the

3   history of American jurisprudence that credibility had to be

4   determined about a witness.

5          THE COURT:  Well, there's a lot more than

6   credibility of a witness involved here.  You said so

7   yourself at the last hearing or the one before it.

8          MR. WALL:  It's a serious credibility issue.

9   It is grounded in what may be certainly characterized as a

10  conflict of interest, but this is not a question of this man

11  being unavailable or unwilling to testify.  You saw the

12  letter.

13         THE COURT:  And what if he becomes unwilling or

14  the lawyer tells me she's become unwilling halfway through

15  the hearing?

16         MR. WALL:  We're not presented with that.

17  We are presented --

18         THE COURT:  What if we're presented with it

19  halfway through the hearing?

20         MR. WALL:  Then I think we would have to deal with

21  it halfway through the hearing.

22         THE COURT:  What if he invokes some privilege?

23         MR. WALL:  The Fifth Amendment privilege?  What --

24  He hasn't yet.  He was deposed on this.  He's probably

25  waived it because he allowed himself to be deposed on these

1    matters.  His lawyer just sent in a letter saying that he

2    didn't do anything wrong, and it's really all our fault for

3    overblowing this stuff.

4          They put in -- the plaintiffs put in a defense of

5    sorts of him in their brief.

6          This is -- Yes, this is really a serious

7    credibility problem, but that's what it is:  It's a

8    credibility problem.

9          And, Your Honor, what we find so objectionable

10   about this, if you allow me, is that we have, for better or

11   worse, an adversary system.  This is a system -- This isn't

12   France, where we have a civil system and somebody just puts

13   their testimony up and they never stand cross-examination.

14   We believe that the truth comes out through this adversary

15   process, where we get a chance to attack credibility.

16         You could -- It's an overgeneralization for sure,

17   but you could say that that's the main purpose of the

18   discovery rights, we get to depose their expert and to get

19   ready to have a hearing like this, and to have live

20   witnesses.

21         And we feel like this is now -- it's as if we're

22   being pushed, because the credibility material we had is too

23   strong.  And now we're going to lose the ability to do that,

24   and, instead, actually contemplating a do-over on work that

25   has probably cost these railroads $100 million.

1              THE COURT:  Last time you said 50, but that's

2      okay.

3              MR. WALL:  And that's because we've checked, and

4      we've looked at it, and these railroads cumulatively have

5      spent over $125 million on this litigation.

6              And Gordon Rausser is not just the class

7      certification expert.  He is the primary merits expert.

8      And virtually everything that -- since I've gotten this

9      case, virtually everything I've done has been about chasing

10     Gordon Rausser and his testimony and the arguments that he

11     is making.  For those who have been longer, it's a much

12     longer trail that we have been on.  And we have been driving

13     to a conclusion.  And we would have been at that conclusion.

14             And the irony about this whole thing is that we're

15     talking now about a sideshow for something that would have

16     been 15 minutes of cross-examination had we gone forward

17     last month.  That's what it would have been.

18     It wouldn't have been three hearings, all of these briefs.

19     It would have been 15 minutes of cross-examination.

20             THE COURT:  Before the discovery you've had all

21     over the last couple of months?

22             MR. WALL:  Right.

23             THE COURT:  Right.

24             MR. WALL:  And it would have been -- Well, we

25     had -- We would have used the documents that we got on

1    October 1st, which are, frankly, the core of what's in the

2    filings that we and Plaintiffs put in last week, in the last

3    two weeks.  We would have asked a few questions about those.

4            And we have gone on, because, Your Honor, I -- we

5    do not want you to deny class certification because

6    Gordon Rausser is not a trustworthy man.  We want you to

7    deny class certification for arguments that we are prepared

8    to argue tomorrow, some of which are certainly informed by

9    his credibility, but which are much, much more than that.

10           The false-positives issue comes from the output of

11   his model.  It's his -- it isn't -- their credibility issues

12   intertwine with everything, of course, but the false

13   positives issue is because you run his model and legacy

14   contracts, and you get damages.

15           Thirty -- over a third of all the shipments in his

16   database are not -- do not show a positive overcharge.

17   They are uninjured, a third of them, shippers, large

18   shippers, small shippers, it's over a third of them.

19           Under the D.C. Circuit's opinion that requires

20   injury to all, you cannot, as a matter of law, certify a

21   class action on a model where a third of the shipments are

22   uninjured in a conspiracy that's supposed to affect the

23   price of every single shipment.

24           Dr. Rausser never estimated individualized damages

25   and is purporting to award average damages.  His credibility

1    doesn't even come up at all in that argument.

2    It's a straightforward issue of law as to whether consistent

3    with *Comcast* and *Walmart* and the long history of cases about

4    requiring individualized damage estimates rather than

5    average damages, they have any possibility of getting class

6    certification on this record.

7              And we're losing the right to argue this now,

8    potentially, because it turns out that his credibility is

9    worse than we've ever said, and because we have a different

10   kind of proof.

11             We've been telling you forever that you shouldn't

12   believe him, that his economics are tricked up and rigged.

13   Now we've got something that shows more about his character,

14   and we lose all rights somehow to finally get to it, reap

15   the fruits of the adversary process and all the money that's

16   been spent chasing him, not because of anything that's our

17   fault but because of what he's been doing.

18             I don't see the justice of this or the fairness of

19   this at all.  Okay, I get it that it would be better for

20   everyone if none of us had ever heard of Gordon Rausser, but

21   it's not for nothing that the plaintiffs in this case and

22   all those other cases -- you know, you're getting a lot of

23   calls, and it's not for nothing.  He is a favorite of the

24   plaintiffs' class action bar, and it's not for nothing.

25   Do you think it's unrelated to his flexible approach to

1   these cases?  No, it's not.  It's 100 percent related to

2   that.

3           And the fact that we have found this cannot be

4   shunted off to the side as something that should not be

5   taken in consideration in the proper evaluation of the

6   economic testimony of this man.

7           You know, two weeks ago, this seemed so clear.

8   Your Honor was saying we're too far down the line.  You said

9   Rausser is essential.  You talked about the Court of Appeals

10  having a record that included a pristine Rausser.  You said

11  it was too late to go back, and now we're talking about

12  going all the way back to the beginning.

13          The case law that deals with these issues of

14  whether substitution or supplementation, as far as I can

15  tell, has never dealt with anything at this scale where we

16  are combining substitution with a do-over.

17          The plaintiffs are very clear in their own

18  briefing about this, based upon the substitution law, that

19  when you substitute, you basically had somebody -- the right

20  was to have somebody come in and present and defend the

21  prior expert's work.

22          And we can get into some more of the details about

23  these cases, but there isn't a case in which somebody said,

24  well, you can just address the same broad subject matter.

25  What?  The subject matter of whether class certification is

1    appropriate?  That's a pretty broad subject matter.

2              THE COURT:  Well, clearly the case, the plaintiffs

3    had proposed supplementation --

4              MR. WALL:  Right.

5              THE COURT:  -- limited to the parameters of

6    Rausser and going back over what Rausser had said.

7              MR. WALL:  Right.

8              So, you know, how did we end up here?

9              I think we ended up here because, if this isn't

10   presumptuous, because it just seems to me that you've just

11   started to come to grips with how bad these facts are and

12   how difficult it is to rely on Gordon Rausser.  But,

13   Your Honor, I think that's a good thing.  I think that

14   that's what the system is intended to allow you to learn

15   through the adversary process.

16             And I don't get how we get the -- that when his

17   credibility is revealed or his lack of credibility is

18   revealed, that justifies a do-over, that justifies findings.

19   The findings that Your Honor talked about two weeks ago

20   where you said the Court of Appeals is entitled to your

21   findings on his credibility, that's the right answer, not

22   this.

23             And the fact that this is in a remand, how can we

24   ignore that, I mean, the mandate here?  We can't nullify a

25   Court of Appeals decision; we can't treat it as a nullity.

1  But it's also not just some sort of abstract statement about

2  the law.

3           What the mandate is is a direction that if you

4  find that this record -- and it's been supplemented, to be

5  sure -- but if you find that this record doesn't pass muster

6  under *Baron* because of the false positives or -- then we

7  argue about the scope and sure want to have that argument,

8  I'm ready to have that argument about the scope -- but if

9  you find those things, then you're required to deny class

10  certification.

11          It's -- And this is the funneling process of the

12  appellate system and the law of the case and the remand

13  rule, where we have invested these resources here, we got to

14  the Court of Appeals in a very, very unusual Rule 23(f)

15  proceeding.  They spent their time on it.  They said --

16          THE COURT:  They spent their time talking about

17  Rule 23(f), and two paragraphs talking about the merits.

18          MR. WALL:  You know, we've had this conversation.

19  I would like a few more words --

20          THE COURT:  So would I.

21          MR. WALL:  -- in this thing.

22          But the reality is, if everybody agrees that the

23  very least that they said is that if the Rausser model

24  generates false positives, that, in their phrase, shreds the

25  case for class certification.

1          We're ready to go on this.  We want to stand up

2     here and talk about class certification, not about

3     Gordon Rausser's shady dealings.

4          THE COURT:  But you're going to talk about that?

5          MR. WALL:  Probably.

6          Do you think I need to say much more about it,

7     Your Honor?  No.

8          THE COURT:  Well, you'd want to ask him some

9     questions.

10         MR. WALL:  I'll make you a deal.  I won't.

11         THE COURT:  No, you don't have to make any deals.

12         MR. WALL:  Let's be honest about it right now.

13    This process that the plaintiffs started allowed us to build

14    our record and to present the record.  I don't need to ask

15    him more questions about this on the stand.  I'd sure like

16    to have you have the opportunity to ask him more questions

17    about it.

18         But can anybody seriously think that -- what is

19    that going to take, a half hour?  An hour?  That that is a

20    sideshow as compared to starting over?

21         And you want another sideshow?  Let's talk about

22    the sideshow that is about to loom here over fees.  And I'll

23    use the word "fees" that Neuwirth didn't want to use and

24    costs, because he's clearly suggesting that these railroads

25    are going to pay their own costs for the do-over.  And you

1    don't think we're going to have a fight for over that and

2    that isn't going to be a sideshow?  That's going to be a

3    huge sideshow.

4            And I say that knowing perfectly well -- Let's

5    face it.  We all know that sanctions awards are never fully

6    compensatory damages.  They just -- they should be, but they

7    aren't.  And so one way or the other, we're going to be left

8    holding the bag for a lot of these costs, but we are going

9    to fight as hard as we can for what we should be entitled

10   to.  And yes, that's going to be another sideshow.

11           We should get on with this.  We are going to

12   prevail on this class certification because of the record

13   that has been developed, because of the holdings of the

14   Court, the Supreme Court, and the Court of Appeals.

15           And because of the fact that there's at least

16   three points that are substantially undisputed that are

17   essentially of summary judgment quality that don't require

18   anybody to get into anybody's credibility, we want that

19   opportunity.  We want to be able to get to that now and have

20   that argument and end the sideshow.

21           THE COURT:  Let me ask you a question of fact, and

22   maybe Mr. Cross knows the answer.  Not that you won't but --

23   someone on both sides who have reviewed the documents.

24           MR. WALL:  Uh-huh.

25           Are you suggesting that I might not have,

1    Your Honor?

2           THE COURT:  You know, it's one of the benefits of

3    your position.

4           The -- When I first went to White & Case, there

5    was this -- and I'd come out of government, I was eight

6    years out of law school and I went over there.  And there

7    was this guy who has since become a really good friend who

8    went to law school late in life, and he was -- he had gotten

9    a Ph.D. in linguistics before he went to law school.  And he

10   was older, and he was bald.

11          And when we went to court the first time, there

12   were these two huge litigation bags and he picked them both

13   up and I said, "Hayes, what are you doing?"  And he said,

14   "Well, didn't they tell you when you came to a firm like

15   this, the associates would carry your bags?  They didn't

16   tell you you'd be old and bald, but they told you they'd

17   carry your bags."

18          Anyway, somebody on both sides has read this

19   record very carefully.  And so the question that I have is,

20   the record that went to the Court of Appeals, the record

21   that was before me and went to the Court of Appeals,

22   is there any indication that Rausser or his company was

23   involved in these activities with Cascade and the other

24   company involved prior to that time or did --

25          MR. WALL:  The timing actually gets close.

1          A lot of stuff happens in 2010, and the plaintiffs

2    make the point in their brief that he does not sign these

3    agreements until after 2010.

4          It actually -- this is -- people come up with

5    interesting rationalizations for what they do.

6          There's some documents that indicate to me that

7    Dr. Rausser might have reasoned -- I used the word

8    advisedly -- that -- that it was okay for him to be involved

9    in doing some of the things related to the rail case,

10   because his testimony was already in.  And that if the class

11   was certified, it would settle, and he'd never -- because of

12   the crush of the potential liability -- and therefore he'd

13   never have to do anything else in the case, and then that

14   just turned out to be quite mistaken.

15         I think that it's a little bit charitable to

16   himself, but I do think that there's some element of that.

17         THE COURT:  Okay.  Thanks.  Anything else?

18         MR. WALL:  Not at the moment.

19         THE COURT:  Mr. Neuwirth, do you want to respond

20   to anything Mr. Wall's said and answer my question that

21   Mr. Wall just answered?

22         MR. NEUWIRTH:  Yes.

23         If it would please the Court, I was just going to

24   raise a couple of responses to what Mr. Wall said.

25   And if it would, if Your Honor would permit it, Mr. Hausfeld

1    was also going to make a couple of responses to some of the

2    points he had raised.

3           But in terms of the answer to the specific

4    question you just asked, the class certification hearing was

5    on October 6th and 7th, 2010.  Our understanding of the

6    record is that negotiations at least between OnPoint and

7    Cascade started after Dr. Rausser had submitted his opening

8    report in support of class certification; that the

9    negotiations for -- as we understand it for all practical

10   purposes, ended after he had submitted his reply report in

11   support of class certification.

12          I noted a minute ago that the class certification

13   hearing was October 6th and 7th, 2010.  We understand that

14   OnPoint signed its agreement with Cascade -- and OnPoint is

15   Dr. Rausser's company -- on October 14th, 2010, which was

16   just one week later, and that Dr. Rausser himself signed his

17   agreement with OnPoint on December 16th, 2010.

18          THE COURT:  Okay.

19          MR. NEUWIRTH:  Just -- The few points that I

20   wanted to make, Your Honor, are, first, while I understand

21   that lawyers have to adjust to the circumstances that are

22   presented to them, I think that what Mr. Wall was suggesting

23   today about how this hearing will go and how the defendants

24   view the issues just can't be reconciled with what they said

25   in their papers about all of this.  I quoted that statement

1    from page 2, but on page 21, here's what they say:

2    "The distinction" -- now, again, this is their

3    characterization of our arguments.  I don't think this is a

4    fair characterization, but it bears on what you said.

5            "The distinction Plaintiffs seek to draw between

6    Dr. Rausser qua Dr. Rausser and the economics that

7    Dr. Rausser put forth to the Court is nothing but damage

8    control.  Personal and testimonial credibility are

9    inextricable for everyone.  Here, Gordon Rausser, the

10   testifying economist, is not a different person and no more

11   credible than Gordon Rausser, the class-action speculator.

12   His testimony in this case raises numerous issues of

13   personal credibility and basic honesty that the Cascade

14   issues put in sharp relief."

15           We also saw in the pages that Your Honor pointed

16   to earlier the substantive issues about the case.  And while

17   we certainly believe that it's possible to talk about the

18   underlying economics without respect to all of this, and

19   while we think that the record shows that on the issues that

20   Mr. Wall raised today the plaintiffs have the correct and

21   better position in support of class certification, it's the

22   defendants themselves that from day one at every prior

23   conference and in their briefs said that this was all

24   inextricably linked.

25           And you heard it when Mr. Wall stood up here --

1    and I don't know whether he was serious or just less than

2    fully serious -- said he would limit himself to half an

3    hour, might not ask any questions.  One of the other counsel

4    at defense table called out, "Don't make that agreement."

5              THE COURT:  I didn't accept his offer, so there's

6    no offer in acceptance.

7              MR. NEUWIRTH:  Right, I know that.

8              But the point is, Your Honor, that I think that we

9    know the sideshow that is going to be triggered by this, and

10   surely the defendants can't have it both ways.  They can't

11   say that it's possible to put this all aside for the

12   examination of Dr. Rausser, but then say it's all in the

13   record.

14             And if you grant class certification, they can go

15   to the Court of Appeals and say Dr. Rausser should have been

16   disqualified because this was all in the record.

17             THE COURT:  Well, I'm not going to say Dr. Rausser

18   should have been disqualified because nobody's moved to

19   disqualify him, right?

20             MR. NEUWIRTH:  Well, Dr. Rausser's opinions on the

21   merits shouldn't be accepted, is the way I should have put

22   it.

23             THE COURT:  Right.

24             In theory, you could withdraw Dr. Rausser.

25   I don't know whether they'd scream and yell.  And in theory,

1   they could move to disqualify Dr. Rausser.  But neither of

2   those things has happened.

3          MR. NEUWIRTH:  That is correct, because of the

4   circumstance that we're in and the type of concerns that are

5   expressed in the case law that Your Honor has expressed

6   about where we are.

7          And the goal here is to find some practical

8   solution that deals with this tragic situation and whatever

9   is going to be the most reasonable way from a set of

10  difficult options.

11         THE COURT:  So procedurally -- and you said some

12  of this in your papers -- your initial request is to

13  supplement, now we're talking about supplementation or

14  substitution.

15         If I permitted you to do either of those things,

16  you would need an expert report, and they would have the

17  opportunity to file -- to do a report with respect to their

18  expert's view of your new expert, and then they'd both be

19  deposed or maybe there's more than two people involved, but

20  at least two people would be deposed.

21         So what did you propose in terms of a time frame

22  for that to happen?

23         MR. NEUWIRTH:  Our proposal was that for the

24  supplemental route, was that the new report would be

25  submitted in April.  I think we proposed April 1st of 2015.

1            And I think -- I do think it's important to note

2   that what the case law refers to is that this expert would

3   stay within the same subject matter and be required to cover

4   substantially the same opinions, but the expert obviously

5   wouldn't just take the reports and say, I adopt them.

6   The expert would have the opportunity to say things in his

7   own words.

8            And also obviously this isn't pre-judged.

9   The expert will put forward the opinions that there are, and

10  we have the burden of having to have a new expert look at

11  this.

12           THE COURT:  Okay.  So what else?

13           MR. NEUWIRTH:  If it would please the Court,

14  Mr. Hausfeld just had a couple of further responses to

15  Mr. Wall.

16           THE COURT:  Good morning.

17           MR. HAUSFELD:  Thank you, Your Honor.

18           Expressing the sentiments of, I think, both

19  counsel here, this is a deeply regrettable situation that

20  was foisted upon everyone after the revelations concerning

21  challenges to Dr. Rausser's credibility.

22           And the issue is, as you have said, what do you do

23  in order to create the cleanest, un-muddied record so that

24  you can make a determination based on a rigorous analysis of

25  the facts and the economics, unspoiled and untainted by what

1   I would call ancillary allegations concerning whether or not

2   the class has met the requirements of Rule 23.

3          Going back to something that Judge Bazelon had

4   identified many years ago, it's called the irresistible

5   impulse.  I think Mr. Wall illustrated that this morning

6   when it is inseparable in their minds in terms of their

7   challenges to Dr. Rausser's credibility for which we offer

8   no comment on the merits to their challenge of the integrity

9   of the economics.

10         Mr. Wall said it clearly:  "Dr. Rausser's

11   economics are tricked up and rigged."

12         THE COURT:  Everybody else has said he would have

13   made that argument even if none of this had happened.

14         MR. HAUSFELD:  No, because at least before they

15   added this layer, there was the statements of Dr. Rausser

16   based on economics, and then there were the criticisms.

17   For example, they talk about the false positives.

18   False positives are not some talisman that can be incanted

19   and automatically debunk a model.  Dr. Kalt tried that, for

20   example, in the *Apple* case, and the Judge in the *Apple* case

21   said those are not false positives.

22         So the model that they were challenging still

23   stood.  So the fact that they just said, well, there's a

24   false positive, doesn't mean that that model -- that

25   utilizes, you know, a regression, needs to be discounted by

1   a court, nor does it mean the fact that you invoke the word

2   "false positive" means that the expert who developed the

3   model is not credible.

4          How do they account for the fact that the STB

5   found that the rate-based fuel surcharges overrecovered and

6   stood virtually no prospect of accounting for just the

7   increased cost in fuel on the shipments to which they were

8   applied?

9          The Court of Appeals found that there was

10  concentration in this industry, which at least led to the

11  possibility of collusion.

12         The Court of Appeals found that the rate-based

13  fuel surcharges, as you found, were not the norm in the

14  pre-class period, but then became ubiquitous in the class

15  period.  Dr. Rausser's credibility, one way or another, is

16  not going to change those facts.

17         So what do we do, what does Your Honor do, as

18  Mr. Wall said, to get to the truth of the issues relating to

19  class certification without the sideshow?  That's the issue.

20         And as difficult as the decision is, in order to

21  maintain the integrity of the class process and the

22  integrity of the economics, the class deserves the right to

23  put on an economist who is untainted by any challenge on an

24  ancillary issue.

25         The determination of class certification should

1   not become the title of Mr. Wall's movie,

2   Chasing Gordon Rausser.  That's not what this is about.

3          And your suggestion about combining Dr. McClave

4   with a new economist because Dr. McClave is an

5   econometrician, is one that we've considered.

6          And depending upon what Your Honor's ruling is,

7   we'd be prepared to sit down with the defendants to work out

8   a schedule where we would attempt to most efficiently bring

9   the issue of an unclouded class certification procedure back

10  to the Court.

11         THE COURT:  Well, what about Mr. Wall's back to

12  chasing Dr. Rausser?  He says that they've been chasing what

13  they thought was an untainted Dr. Rausser for many, many

14  years, and it's cost them a lot of money to do it.

15  And if we either eliminate Rausser from this entire case or

16  allow Rausser to be supplemented, it's going to cost them a

17  lot of money that they wouldn't otherwise have had to spend

18  but for these revelations.

19         MR. HAUSFELD:  Your Honor asked at the last

20  hearing why we were semi-confident that we'd come up with

21  conclusions by a new expert that would not be that

22  dissimilar from that of Dr. Rausser, and we've stated that

23  we felt -- and still do feel -- that the integrity of

24  Dr. Rausser's economics is sound.

25         We understand what the facts in this case were.

1   We believe that applying, again, the same sound economics,

2   we're going to be in the same place with the same

3   criticisms, leveled at a different economist but at least

4   focused on the integrity of the economics, not tainted by

5   any sideshow.

6          And so --

7          THE COURT:  But it's going to cost both sides

8   money to engage in that process that wouldn't have had to

9   have been spent if you all had decided to hire an expert

10  other than Dr. Rausser in the beginning.

11         MR. HAUSFELD:  Absolutely.

12         And, Your Honor, I candidly said before we even

13  got to this point at the last hearing, had we known then

14  what we know now, we never would have retained Dr. Rausser.

15         It's regrettable.  We're all in an unenviable or

16  inenviable position, one that is really relatively

17  unprecedented in terms of the depths to which even the

18  request for substitution has evolved.

19         But we're here, and now -- I know you're

20  struggling with this, what do we do about this, so that you

21  have a record from which you can make an untainted decision

22  with regard to the merits of the request for certification

23  which can go up to the Court of Appeals.

24         If they want to raise the issues of false

25  positives and any other economic issue on the integrity of

1    the economics, then it's there, as opposed to what we have

2    potentially now.

3           THE COURT:  I'm not sure I understood that.

4    You're talking about substitution versus supplementation in

5    that last statement?

6           MR. HAUSFELD:  Yes.

7           And I think in Your Honor's order of yesterday,

8    it contemplates the fact that in order to get the best

9    record, one that doesn't require picking and choosing, one

10   that no matter what is going to have a muddied history as

11   well as a muddied presentation, the way to do it is to

12   relatively start over.  I say "relatively" because, as you

13   said, there is Dr. McClave, and he is a recognized expert.

14   And the basic facts have now been developed so the record

15   doesn't have to start all over from someone trying to garner

16   all of that information in the first place.

17          But if the objective, as Mr. Wall has said, is to

18   obtain the truth, the truth in the sense of at least by a

19   preponderance of the evidence, which statement of or

20   representation of the facts is more credible, then we should

21   have the ability to have an expert who is not being

22   challenged because, again, his economics is tricked up and

23   rigged, because we don't believe that the economics was or

24   is tricked up and rigged.

25          But in order to remove that potential for

1    diversion, as I think Your Honor has contemplated in his

2    recent order, you need a new -- we need a new expert.

3            MR. NEUWIRTH:  Just one last point, Your Honor.

4            I know that the defendants had said in their

5    papers at least they filed, that they were going to address

6    the issue of cost later, and you asked the parties to come

7    prepared to address it.

8            I just wanted to say that I really do believe the

9    way we characterized the case law earlier is accurate, and

10   that the conditions, in any case where you substitute an

11   expert, there are going to be costs on the parties.

12   It just -- That's just the way it goes.

13           And the only cases that we're aware of where costs

14   have been imposed is where there was either a finding of bad

15   faith or a finding that the information was so available

16   that it's almost some form of gross negligence on the part

17   of the plaintiffs not to have found it or the party that

18   wants to substitute not to have found it.

19           But we would respectfully submit that none of

20   those conditions are present here.  And, again, it's a case

21   where we had some delay in learning about it relative to

22   when other parties did.

23           MR. WALL:  Your Honor, on that, with the cases

24   recent -- is that it's sometimes not necessary to impose

25   costs because the new expert will have to say exactly what

1   the old expert did.  It's just like they're walking into his

2   chair and taking over.  And I think it's a bit of a fiction,

3   but it's still one of our fictions in the law that as a

4   result of that, the prior investments and all the work are

5   completely, 100 percent relevant to the cross-examination of

6   the new expert who's the same guy, different person

7   defending it.

8           We're obviously talking about something very

9   different here.

10          Mr. Neuwirth --

11          THE COURT:  My very simplistic example last time

12   of the medical examiner who dies --

13          MR. WALL:  Right.

14          THE COURT:  -- and the new medical examiner comes

15   in, looks at the autopsy, looks at the file; and based on

16   his or her experience and background, can say, yes, that's

17   right.

18          MR. WALL:  Right.

19          And presumably in that case, the other side's

20   expert looked at the same file already, and it's got maybe a

21   little bit --

22          THE COURT:  Right.

23          MR. WALL:  -- of things to take into account

24   because the --

25          THE COURT:  It's an instinct.

1           MR. WALL:  Yeah.

2           But it's not -- Mr. Neuwirth twice today and in

3     the last hearing has always come back to the phrase,

4     "the same subject matter."  And when we hear that, I grab

5     for my wallet, because it is -- it's clearly a way of trying

6     to suggest that there's a bunch of leeway for the

7     supplemental expert to, you know -- I don't know --

8     he's talking about a new model or whatever, whatever it is,

9     a new approach, a tweak to the model, whatever it is.

10    But he's clearly not just suggesting that Dr. Leitzinger is

11    just going to come in and defend the Rausser model, which

12    is, as you know, and I won't repeat myself, is what we think

13    that has to happen under the terms of the D.C. Circuit

14    mandate.

15          Just a couple of points.  Mr. Hausfeld talking

16    about the wanting the cleanest, un-muddied record.  Well,

17    you know, I can understand that, but I believe in muddy

18    records.  I believe that the truth is messy and muddy and

19    requires -- that a better record with the mud and the filth

20    that we sometimes find in the world is the right record.

21    The sanitized record should scare us all.  And that's what

22    this is.  It's a motion to sanitize the record from what we

23    have learned about Dr. Rausser.

24          And I don't -- you know, this got derailed just

25    before the class certification hearing.  This is our class

1    certification brief.  I don't know whether Your Honor ever

2    had a chance to read it, but I have to tell you, if you

3    didn't pick up that we attacked Gordon Rausser's credibility

4    in this brief, then I'd like to rewrite it because I failed

5    big time.  It is throughout this brief an attack on

6    Gordon Rausser's credibility.  We say it all the time in a

7    lot of different ways.

8            And had it not been for this sideshow that has

9    developed here, I had two hours to cross-examine him.

10   I would have spent, you know, the 15 minutes on this and an

11   hour 45 attacking his credibility is what I would have been

12   doing.  I would have been attacking his credibility on all

13   of the other bases for the facts that the model is tricked

14   up, for the fact that he's got this constant fuel

15   coefficient which guarantees damages broadly.  All of these

16   things that we've argued.

17           When Mr. Hausfeld was speaking and he starts to

18   talk to you and give you a speech about the STB decision,

19   even though he doesn't actually say that and all these other

20   things, I just wanted to say, can we just get at it now?

21   We've got the rest of the day.  Let's argue class

22   certification now.

23           THE COURT:  With no witnesses.

24           MR. WALL:  Yeah.

25           It's just get on with it, because we've been

 1   waiting far, far too long to do this and to have this

 2   argument.

 3           I'll just close with this, Your Honor.

 4   Supplementation, we disagree, but it's at least within the

 5   realm of reason.  I know that it comes from you, and I know

 6   I'm challenging something that you suggested, but it's not

 7   within the realm of reason to start over, and please do not

 8   sentence us to that because we found out what we learned

 9   about Gordon Rausser.  That is just not remotely fair.

10           THE COURT:  I don't have a thick skin -- I don't

11   have a thin skin.

12           The points you made this morning are perfectly

13   fair responses to what I said in yesterday's order.

14           MR. WALL:  Thank you, Your Honor.

15           THE COURT:  Did we, last time, set aside some date

16   in January tentatively, or did we not do that?

17           MR. WALL:  We identified some dates.  I think it

18   was the dates that would work for us on our side would be

19   the dates, I think it was the week of -- it's the last week

20   of January.

21           What were the dates?

22           The week of the 26th were the dates that worked

23   for us with witness availability and lawyer availability.

24           THE COURT:  How many experts -- I mean, I know not

25   for this hearing, but how many experts?

1          And Maher said they've got Mr. Rausser and

2   Mr. McClave on your side.  How many people do you have?

3          MR. WALL:  We have Dr. Kalt.

4          And then what we did is each of the railroads has

5   a merits expert.  And it just -- because of the overlap

6   between some class issues and merit issues, there were some

7   pieces of their merits reports that we submitted.  But, you

8   know, we had not anticipated that they would testify.

9   We had the discussion at a few hearings ago that if they

10  were going to call a second witness, then we might want to

11  call one of those ourselves, but that's the roster.

12         THE COURT:  Okay.  Mr. Hausfeld.

13         MR. HAUSFELD:  Is Mr. Wall and the defendants

14  saying that they're going to call someone other than

15  Dr. Kalt or in addition to Dr. Kalt?

16         THE COURT:  No.  As I understood what Mr. Wall

17  just said is that at an earlier hearing he said that if I

18  was going to permit you to call Rausser and McClave, then

19  they would call Kalt and one other person.  But if I was

20  going to limit you to Rausser, it would just be Kalt.

21  Is that his name?

22         MR. WALL:  Kalt, K-A-L-T.

23         THE COURT:  Kalt.

24         MR. WALL:  And then obviously if you permit

25  Dr. Leitzinger, we're -- we just want to talk about how

1  we would respond to that.  We don't actually have a position

2  whether we need to call anybody else if Dr. Leitzinger

3  calls.  But we'd like to at least have the opportunity to

4  discuss it.

5          THE COURT:  But if Leitzinger or McClave is a

6  supplemental witness and they do a supplemental report, I

7  assume Dr. Kalt would want to respond to that report?

8          MR. WALL:  That's my assumption as well, which is

9  why I'm equivocating on it, which is why I'm not saying that

10  we would definitely want somebody.  We just don't know what

11  it is, so we're just trying to kick the can down the road so

12  we can think about it once we have something tangible to

13  look at.

14          THE COURT:  Right.  Okay.  Well --

15          MR. NEUWIRTH:  Your Honor, may I just say one

16  thing?

17          I know that there's been some discussion about the

18  possibility of -- or you've raised the possibility of

19  Dr. McClave having a supplemental or substitute expert role.

20  And as I said earlier, I would hope that the Court, once the

21  Court determines what procedure it's planning to use, would

22  give us an opportunity to assess and report to the Court

23  whether that is a role that Dr. McClave could play,

24  depending on how Your Honor defines the role.

25          THE COURT:  Well, it seems to me that if I permit

1    a supplemental expert or a substitute expert, that it's not

2    up to me to decide who it's going to be.  The only role that

3    I play in that regard is deciding how much time I'm going to

4    give you to do it, and that may inform your decision of who

5    to use and how extensive any supplemental report would be.

6            But, you know, I don't need a report about whether

7    you're going to use McClave or Leitzinger.  If I were to

8    say, for example, I'll let you supplement, but you've only

9    got X time instead of Y time.

10           MR. WALL:  Your Honor, I can probably --

11           MR. NEUWIRTH:  I was just going to say, the only

12   issue, Your Honor, is that obviously if the role of the

13   supplemental expert is going to be to address the full range

14   of issues that Dr. Rausser has put forth, we would need to

15   determine which expert would do that and within which time

16   period.

17           THE COURT:  Wait a minute.  Your motion, somewhere

18   in your motion you define what you think the supplemental

19   expert would do?

20           MR. NEUWIRTH:  Correct.

21           THE COURT:  I know we've gotten away from that

22   today in talking about it.

23           MR. NEUWIRTH:  But yes.  And for that we

24   proposed -- We told Your Honor that we thought that having

25   till April 1st for the opportunity to present that

1    supplemental report would be appropriate.

2            It's -- This is just -- You've clarified that

3    Your Honor is not planning to order which expert we use.

4            THE COURT:  Right.  I don't think that's my role.

5            MR. HAUSFELD:  Your Honor, we will be guided by

6    your decision with regard to how you rule on the motion, and

7    with regard to your order yesterday as to whether or not

8    substitution as opposed to just supplement makes sense, and

9    then we'll make our decisions in terms of the hearing.

10            THE COURT:  All right.

11            MR. WALL:  Just to demystify this for a minute.

12    The reason that we're having this conversation about this is

13    that Dr. McClave is not an economist.  He's just an

14    econometrician.  There are hundreds of pages of merits

15    reports and class certification arguments that Dr. Rausser's

16    sponsors which are outside of Dr. McClave's expertise.

17    That's why they're hedging on this.

18            MR. NEUWIRTH:  Thank you, Your Honor.

19            THE COURT:  Okay.  Anybody else have anything to

20    say?

21            All right.  I'll be in touch.

22            MR. WALL:  Thank you.

23            THE COURT:  I need to think.

24            (Proceedings concluded at 11:00 a.m.)

25

1

2                    C E R T I F I C A T E

3            I, William P. Zaremba, RMR, CRR, certify that

4   the foregoing is a correct transcript from the record of

5   proceedings in the above-titled matter.

6

7

8

9   Date:_November 13, 2014_____   /S/__William P. Zaremba_____

10                                 William P. Zaremba, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25