# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL  DIRECT PURCHASER CASES | MDL No. 1869<br>Misc. No. 07-489 (PLF)<br>Hon. Paul L . Friedman<br><br>PUBLIC VERSION |

Expert Report of Dennis W. Carlton, Ph.D.

July 15, 2015

I.      QUALIFICATIONS AND ASSIGNMENT...................................................................1

II.     SUMMARY OF OPINIONS ........................................................................................2

III.    THE EMPIRICAL EVIDENCE CONTRADICTS THE ASSUMPTIONS AND
        PREDICTIONS OF PROFESSOR RAUSSER'S DAMAGES MODEL AS
        WELL AS DR. LEITZINGER'S DEFENSE OF THEM .............................................10

        A.      ALTHOUGH DR. LEITZINGER DEFENDS PROFESSOR RAUSSER'S ███
                ████████████████████████ THE ASSUMPTION LEADS TO
                PROFESSOR RAUSSER'S FINDING OF DAMAGES AND IS FUNDAMENTALLY
                FLAWED ........................................................................................................13

        B.      EMPIRICAL STUDIES OF RAIL RATES AND DR. LEITZINGER'S OWN FUEL
                SHARES DEMONSTRATE THAT ████████████████████████
                AND EXCEEDS PROFESSOR RAUSSER'S ESTIMATED FUEL PRICE ELASTICITY...........17

                1.      Contrary to Dr. Leitzinger's claims, Professor Rausser's █
                        ████████████████████ and estimate are not consistent
                        with other empirical studies of fuel price elasticities................................17

                2.      Dr. Leitzinger's analysis demonstrates that fuel price elasticities
                        increase with fuel prices and are higher *in every year* than the
                        ████ estimated by Professor Rausser .......................................................19

        C.      USING DR. LEITZINGER'S REPORT FUEL SHARES IN PROFESSOR RAUSSER'S
                MODEL (RATHER THAN PROFESSOR RAUSSER'S ████████████████
                ████████ RESULTS IN A FINDING OF NO DAMAGES AND DR. LEITZINGER'S
                DEPOSITION FUEL SHARES, THOUGH FLAWED, ALSO DEMONSTRATE THAT
                PROFESSOR RAUSSER'S MODEL IS UNRELIABLE .......................................................25

                1.      Dr. Leitzinger's revised fuel shares provided in his deposition are
                        lower than fuel shares estimated using other data and yet still
                        contradict Professor Rausser's assumption of a ████████████
                        and result in greatly reduced damages ....................................................28

        D.      PROFESSOR RAUSSER'S FLAWED DAMAGES MODEL YIELDS IMPLAUSIBLY
                LOW COST PASS-THROUGH AS WELL AS NONSENSICAL PRICE PREDICTIONS
                WHEN THE MODEL IS APPLIED TO THE PRE-CLASS PERIOD........................................32

                1.      In many years during the Class Period, the implied annual dollar
                        pass-through rate in Professor Rausser's model is far below the
                        ████ calculated by Dr. Leitzinger.............................................................33

                2.      Using Professor Rausser's model to predict prices in the pre-Class
                        Period yields nonsensical results, demonstrating that Professor
                        Rausser's model is fundamentally flawed; Dr. Leitzinger fails to
                        provide any such predictive tests of Professor Rausser's model ..............35

        E.      DR. LEITZINGER'S BOX-COX ANALYSIS FURTHER UNDERMINES PROFESSOR
                RAUSSER'S DAMAGES MODEL ...............................................................................40

      1.      Dr. Leitzinger's Box-Cox analysis rejects Professor Rausser's ██████████████████████.................................................................41

      2.      Dr. Leitzinger's Box-Cox fuel price elasticities are unreliable and his alteration of those elasticities is erroneous...........................................42

  F.     DR. LEITZINGER ERRS IN SUGGESTING THAT PROFESSOR RAUSSER'S FLAWED FUEL PRICE ELASTICITY IS SOMEHOW OFFSET BY THE MODEL'S FAILURE TO ACCOUNT FOR MARGIN COMPRESSION ..................................................45

IV.   DR. LEITZINGER PERFORMED NO TEST FOR FALSE POSITIVES BUT MY ANALYSIS SHOWS THERE ARE FALSE POSITIVES; DR. LEITZINGER'S CRITICISM OF PROFESSOR KALT'S FALSE POSITIVES IS UNJUSTIFIED AND, IN ONE CASE, IS ACTUALLY A CRITICISM OF PROFESSOR RAUSSER'S DAMAGES MODEL..........................................................49

  A.     EVEN IF SHIPPERS HAD PAID RAIL RATES BASED ON RCAF, PROFESSOR RAUSSER'S MODEL STILL WOULD FIND DAMAGES .................................50

  B.     DR. LEITZINGER'S CRITICISM OF PROFESSOR KALT'S ANALYSIS OF FALSE POSITIVES BASED ON LEGACY SHIPMENTS WITH RATE-BASED FSCS IS UNFOUNDED ...............................................................................................54

  C.     DR. LEITZINGER'S CRITICISM OF PROFESSOR KALT'S ANALYSIS OF FALSE POSITIVES DURING THE PRE-CLASS PERIOD IS IN FACT A CRITICISM OF PROFESSOR RAUSSER'S DAMAGES MODEL ................................................57

V.    DR. LEITZINGER HAS NOT TESTED WHETHER PROFESSOR RAUSSER'S MODEL FINDS COMMON IMPACT ACROSS SHIPPERS; IT DOES NOT...............58

APPENDIX A: RELATIONSHIP OF PROFESSOR RAUSSER'S FUEL PRICE ELASTICITY TO RAILROADS' FUEL SHARE............................................................62

APPENDIX B: DR. LEITZINGER'S ALTERATION OF THE BOX-COX ELASTICITIES IS ERRONEOUS AND IS NOT SUPPORTED BY THE ACADEMIC LITERATURE...............................................................................................64

APPENDIX C: SHIPPERS (AMONG TOP 200 SHIPPERS) IDENTIFIED BY PROFESSOR RASUSER'S DAMAGES MODEL AS BENEFITTING FROM THE ALLEGED CONSPIRACY ......................................................................................69

## I.      QUALIFICATIONS AND ASSIGNMENT

1.      I am the David McDaniel Keller Professor of Economics at the Booth School of Business of The University of Chicago.  I received my A.B. in Applied Mathematics and Economics from Harvard University and my M.S. in Operations Research and Ph.D. in Economics from the Massachusetts Institute of Technology.  I have served on the faculties of the Law School and the Department of Economics at The University of Chicago and the Department of Economics at the Massachusetts Institute of Technology.  I specialize in the economics of industrial organization. I am co-author of the book Modern Industrial Organization, a leading text in the field of industrial organization, and I also have published over 100 articles in academic journals and books.  In addition, I serve as Co-Editor of the Journal of Law and Economics, a leading journal that publishes research applying economic analysis to industrial organization and legal matters; serve on the Editorial Board of Competition Policy International, a journal devoted to competition policy; and serve on the Advisory Board of the Journal of Competition Law and Economics.  I have also served as an Associate Editor of the International Journal of Industrial Organization and Regional Science and Urban Studies, and on the Editorial Board of Intellectual Property Fraud Reporter.

2.      In addition to my academic experience, I served as Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice from October 2006 through January 2008.  I also served as a Commissioner of the Antitrust Modernization Commission, created by Congress to evaluate U.S. antitrust laws.  I have served as a consultant to the Department of Justice and Federal Trade Commission on the Horizontal Merger Guidelines, as a general consultant to the Department of Justice and Federal Trade Commission on antitrust matters, and as an advisor to the Bureau of the Census on the collection and interpretation of economic data.

3.      I also am a Senior Managing Director of Compass Lexecon, a consulting firm that specializes in the application of economics to legal and regulatory issues and for which I served as President (of Lexecon) for several years.  I have provided expert testimony before various U.S., state and federal courts, the U.S. Congress, a variety of state and federal regulatory agencies and foreign tribunals.  My curriculum vitae and a list of my testifying experience over the last four years, is attached as Exhibit 1.

4.      I previously filed an expert report on merits issues in this matter for Union Pacific Railroad Company ("UP").[1]  I have now been asked by Counsel for the four Defendant railroads to analyze the economic claims and conclusions contained in the Expert Report submitted by Dr. Jeffrey Leitzinger.[2]  I understand that Dr. Leitzinger was charged by the Court with "address[ing] the reliability and integrity of Dr. [Gordon] Rausser's opinions" in this matter and assessing "the reliability, integrity, and accuracy of Dr. Rausser's previous work."[3]  Thus my analysis of Dr. Leitzinger's opinions necessarily also implicates the conclusions reached by Professor Rausser. Where Dr. Leitzinger either ignores certain of Professor Rausser's opinions or simply asserts agreement with Professor Rausser without analysis or basis, I do not offer a further reply.  In those instances, Dr. Leitzinger has not added anything germane to the record to which I can respond.

5.      Compass Lexecon is being compensated for my work on this matter since January 1, 2015 at the rate of $1,400 per hour.  I have no financial interest in the outcome of this litigation.

## II.      SUMMARY OF OPINIONS

6.      My main conclusion in this matter is that Dr. Leitzinger's defense of Professor Rausser's analyses and opinions, including Professor Rausser's damages model, is flawed and fails to confirm that the model is reliable; moreover, some of Dr. Leitzinger's analyses demonstrate the

---

[1]      Corrected Expert Report of Dennis W. Carlton, Ph.D. On Behalf of Defendant Union Pacific Railroad Company, *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, Misc. No. 07-489 (PLF), February 6, 2013 (hereinafter, *Carlton Merits Report*).

[2]      Expert Report of Jeffrey J. Leitzinger, Ph.D., *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, Misc. No. 07-489 (PLF), April 1, 2015 (hereinafter, *Leitzinger Report*).

[3]      Opinion and Order, *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, Misc. No. 07-489 (PLF), November 26, 2014, at 10.  Professor Rausser submitted several expert reports on class certification issues: Corrected Expert Report of Gordon Rausser, May 27, 2010 (hereinafter, *Rausser Corrected Class Report*); Corrected Expert Reply Report of Gordon Rausser, September 20, 2010  (hereinafter, *Rausser Corrected Class Reply Report*); Supplemental Expert Report of Gordon Rausser, Ph.D., December 19, 2013 (hereinafter, *Rausser Supplemental Class Report*); Supplemental Reply Expert Report of Gordon Rausser, Ph.D., May 28, 2014 (hereinafter, *Rausser Supplemental Class Reply Report*).  Professor Rausser also submitted two reports in the merits phase of this case: Expert Report of Gordon Rausser, October 15, 2012 (hereinafter, *Rausser Merits Report*); Expert Reply Report of Gordon Rausser, June 12, 2013 (hereinafter, *Rausser Merits Reply Report*).

opposite, *i.e.*, that Professor Rausser's model is unreliable.   My opinions are summarized as follows:

- *To be reliable, an econometric model of damages must pass a fundamental test:  it must not attribute price elevation to an alleged conspiracy when the elevation stems from other causes.*  In this case, the alleged conspiracy coincided with a period of high and rapidly increasing fuel prices.  Because fuel costs are variable costs, a non-conspiring railroad will respond to an increase in fuel prices by raising its rail rates[4] to its customers by some amount—a non-conspiratorial "pass-through"[5] of increased costs to rail rates.  Thus, for Professor Rausser's damages model to be reliable, it must be able to distinguish between (a) increases in rail rates that are due to the non-conspiratorial pass-through of increases in fuel costs, and (b) increases in rail rates that are due to the alleged conspiracy.  Dr. Leitzinger offers a blanket endorsement of Professor Rausser's damages model, but he fails to demonstrate that the model passes this threshold test and he ignores his own findings that demonstrate that, in fact, Professor Rausser's model fails this test.

- *Contrary to Dr. Leitzinger's assertions, Professor Rausser's damages model is unreliable* ███████████████████████████████████████████████████████████████ ███████████████████████████████████ █████████ *this incorrect assumption causes the model to find damages in a period of high fuel prices, even in the absence of a conspiracy to fix rail rates.* ███████████████████████████ ███████████████████████████████████████████████████████████████

---

[4]    Unless otherwise stated, I use the term "rail rates" to refer to the all-in price paid by shippers, inclusive of any fuel surcharge.

[5]    Pass-through of fuel costs into rail rates is defined as the increase in the dollar rail rate for shipping one ton-mile when the fuel cost of shipping one ton-mile increases by \$1.  A pass-through rate of 0.80, for example, means that if the fuel cost of shipping one ton-mile increases by \$1, then the rail rate for shipping one ton-mile increases by \$0.80.

[6]    As I discuss later and as Professor Kalt discussed, Professor Rausser's model has numerous other flaws.  *See, e.g.*, n. 62 and § IV.C.

[7]    ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████

3



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████  If
this assumption is false, that is, if the rail rate elasticity rose during the Class Period for
reasons unrelated to the alleged conspiracy, then Professor Rausser's model will find
damages even in the absence of the alleged conspiracy.  (Section III.A.)

- *Contrary to Dr. Leitzinger's claims, the economic literature cited by Professor Rausser does not support* ████████████████████████  The cited
economic literature unequivocally demonstrates the exact opposite.  (Section III.B.1.)

- ████████████████████████████████████████
████████████████████.  By applying an economic concept known
as Shephard's Lemma, Professor Rausser's fuel price elasticity can be shown to be
approximately equal to the share of fuel in a railroad's variable costs (the "fuel share").
For example, if the fuel share is 20 percent, then the fuel price elasticity would be 0.20.
The fuel share can be calculated from available data that is free from any taint of the
alleged conspiracy, and thus the fuel share provides a benchmark against which one can

████████████████████████████████████████████ (Deposition of Dr. Gordon
Rausser, March 5, 2014, at 376:1-379:15.)  Because Dr. Leitzinger also endorses the Class &
Merits model as reliable, I address that model in connection with certain analyses.

8  ████████████████████████████████████████████

9  ████████████████████████████████████████████

assess the ████████████████████████████████████
(Section III.B.2 and Appendix A.)

- *The empirical evidence on fuel shares presented by Dr. Leitzinger in his Expert Report demonstrates that Professor Rausser's* ███████████████████████████

  In his Expert Report, Dr. Leitzinger presents data on annual fuel shares showing that the fuel share increases as fuel price increases during the Class Period.  Because the fuel price elasticity should equal the fuel share, this evidence demonstrates ██████████ ████████████████████████████████████  Dr. Leitzinger fails to note that his data disproves Professor Rausser's key assumption.  Moreover, Dr. Leitzinger's fuel shares are higher in every year ██████████████████████████████████ and the divergence between the two grows during the Class Period.  As the divergence between Professor Rausser's fuel price elasticity and the fuel share grows, the damages found by Professor Rausser's model increase.  Dr. Leitzinger fails to note the implications of his fuel shares, namely, that Professor Rausser's model would find damages in a period of high fuel prices, even in the absence of the alleged conspiracy. (Section III.B.2.)

- ████████████████████████████████ *are key drivers of his finding of damages, and when those assumptions are changed, his damages are severely reduced or disappear.* ████████████████████████████████████████ ██████████████ ████ ██████████████.  When I replace Professor Rausser's ████████████████████████████████████████████████████████ ████ Professor Rausser's "damages" vanish.  Alternative measures of fuel shares, including revised fuel shares presented by Dr. Leitzinger in deposition, also demonstrate that Professor Rausser's damages model is unreliable.  I am not correcting Professor Rausser's model.  Rather, I am showing that his damages model is not robust to changes in his assumptions that are called for by the data in this case, and that his erroneous assumptions determine his finding of "damages."  (Section III.C.)



---

[10]    Professor Rausser models non-fuel costs in his model using AIILF ("All-Inclusive Index Less Fuel").

- *I have tested Professor Rausser's model to determine how much of a $1 increase in fuel costs per ton-mile would be passed through to the rail rate per ton-mile in a non-conspiratorial environment; that test reveals that, contrary to Dr. Leitzinger's conclusion, the non-conspiratorial pass-through rates implied by the model are implausibly low in some years.* Dr. Leitzinger proposes a method of calculating the pass-through rate from Professor Rausser's model but-for the conspiracy. The pass-through rate calculated by Dr. Leitzinger is misleading, however, because it is calculated across a multi-year period, and thus it masks year-to-year variation. This averaging approach leads Dr. Leitzinger to conclude incorrectly that the non-conspiratorial pass-through rate in Professor Rausser's model is reasonable when, in fact (using Dr. Leitzinger's own calculation methodology), the non-conspiratorial, annual pass-through rate implied by Professor Rausser's model is implausibly low in some years, especially in the latter years of the Class Period. For example, in 2007 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Professor Rausser treats any increase in rail rates that would enable railroads to recover more than the "allowed" (non-conspiratorial) increase in fuel cost as damages. (Section III.D.1.)

- *The unreliability of Professor Rausser's model is confirmed by the implausible rail rate predictions that it yields.* A reliable model of rail rates should be able to accurately predict those rates. Dr. Leitzinger, however, does not perform any test of the model's predictive power. I have performed such a test by using the model to predict pre-Class Period rail rates, hypothetically assuming there was a conspiracy during that period of time. In this simple test, the model predicts that the rates that would have prevailed during the pre-Class Period—if the alleged fuel surcharge conspiracy had occurred during that time—would have been lower than the actual, admittedly non-conspiratorial, rail rates that were in fact charged. Of course, the prediction that conspiratorial rates would be lower than non-conspiratorial rates makes no economic sense. This test further demonstrates that Professor Rausser's damages model does not accurately predict rail rates and thus is unreliable. (Section III.D.2.)

- *Dr. Leitzinger's Box-Cox model further disproves the reliability of Professor Rausser's model.* The Box-Cox model implemented by Dr. Leitzinger provides a simple test of whether the data support Professor Rausser's specification for his damages model, ██████████████████████████████████████████ Dr. Leitzinger ignores the result of this test, which appears only in his backup materials. I show that his own test rejects ████████████████████████████████ ██████████ (Section III.E.)

- *Dr. Leitzinger's attempt to explain away the faulty assumption* ████████████ ████████████████████████████ *through "margin compression" is not supported by economic theory or the empirical evidence in this case.* Dr. Leitzinger speculates that any problem with Professor Rausser's model arising from its failure to capture the non-conspiratorial effect of fuel prices on variable cost could be offset by margin compression. Dr. Leitzinger is arguing that if Professor Rausser's damage model fails to correctly model ordinary, non-conspiratorial fuel cost pass-through into variable cost, then those false results might still be somehow reliable because the model also fails to accurately account for the pass-through between variable cost and rail rates and the two deficiencies will offset each other. Dr. Leitzinger provides no empirical evidence in support of his theory, nor does he test his theory to see if it is supported by the annual implied pass-through rates in Professor Rausser's model. I have examined these, and I demonstrate that Dr. Leitzinger's theory is rebutted by the fact that Professor Rausser's model implies that the ordinary fuel cost recovery (as measured by the implied pass-through rates) is already implausibly low in the latter years of the Class Period. (Section III.F.)

- *I have tested Professor Rausser's damages model for "false positives," which result when a damages model finds positive damages where none should exist, and I confirm that Professor Rausser's model generates false positives.* Professor Kalt provides analysis showing that Professor Rausser's damages model generates false positives in several ways. I implement a false positive test based on the RCAF[11] cost-escalation

---

[11]     RCAF ("Rail Cost Adjustment Factor") is an index of rail costs. It was established in response to the requirement in the Staggers Rail Act of 1980 that a quarterly cost-recovery index be created. The RCAF is approved by the STB each quarter. The RCAF index provides a mechanism by

index that Plaintiffs have never claimed was tainted by the alleged conspiracy; to the contrary, they have argued that rate adjustments based on RCAF had been used for decades and would have been used in the but-for world.  I show that if shipments had been priced consistent with the escalation of the RCAF index, Professor Rausser's model still would generate positive damages.  In other words, Professor Rausser's model results in false positives: it finds positive damages where, given Plaintiffs' admission, none could plausibly exist.  (Section IV.A.)

- *Dr. Leitzinger's and Professor Rausser's renegotiation theory cannot explain away Professor Kalt's false positives for legacy contracts.*  Dr. Leitzinger does not test Professor Rausser's damages model for false positives.  Instead, Dr. Leitzinger argues that the false positives found by Professor Kalt are not false.  For example, in response to Professor Kalt's demonstration that legacy shipments produce false positives, Dr. Leitzinger repeats Professor Rausser's contention that these shippers were actually injured by the alleged conspiracy because they lost the ability to renegotiate their binding, pre-Class contracts, with the implication that contract rates can never result in a shipper paying rates above spot rates.  This contention contradicts common sense and academic literature that supports the importance of contracts.  Neither Dr. Leitzinger nor Professor Rausser provides empirical evidence supporting their theory, but I test their renegotiation theory using data in this case by comparing contract rail rates and spot rail rates.  If their renegotiation theory were correct, one would expect to find that contract rates and spot rates are the same because a disadvantaged party would simply renegotiate its contract each time the spot rate moved above or below the contract rate.  The data disprove this idea, showing instead that shippers that are under contracts pay different rates than shippers that are not under contracts—a difference in rates that would not persist if contracts were easily renegotiated as claimed by Professor Rausser and Dr. Leitzinger. (Section IV.B.)

- *Dr. Leitzinger's criticism of Professor Kalt's false positives based on the pre-Class Period is actually a criticism of Professor Rausser's damages model, not of Professor*

---

which rates in a rail freight price authority can be adjusted to reflect changes in rail operating costs.  (Association of American Railroads, "Rail Cost Adjustment Factor (RCAF)," *available at* https://www.aar.org/data-center/rail-cost-indexes, *site visited* July 13, 2015).

*Kalt's false positives.*  Although Dr. Leitzinger criticizes Professor Kalt's findings of damages (false positives) in the pre-Class Period, his criticism concerns Professor Kalt's use of contracts with and without FSCs in his hypothetical base period but using only contracts with FSCs in his hypothetical conspiracy period.  Dr. Leitzinger concludes that it is not surprising that this methodology resulted in a finding of damages.  But given that Professor Kalt was merely following Professor Rausser's methodology, Dr. Leitzinger's criticism is really a criticism of Professor Rausser and exposes another reason why Professor Rausser's damages model is unreliable. (Section IV.C.)

- *Testing Professor Rausser's model demonstrates that it does not establish common impact from the alleged conspiracy.*  Dr. Leitzinger defends Professor Rausser's findings of common impact, but he has not tested whether Professor Rausser's model demonstrates common impact.  I perform such a test using data on the largest shippers during the Class Period and find that when Professor Rausser's model is modified to estimate damages to individual shippers, shippers that comprise a substantial volume of commerce were not damaged—indeed, according to the model, they "benefitted" from the alleged conspiracy because they paid lower rail rates than they would have paid in the absence of the alleged conspiracy.  Specifically, Professor Rausser's model estimates that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████  Moreover, when Professor Rausser's model is partially corrected to allow the fuel price elasticity to vary, I find that ████████████████████████ ████████████████████████████████  Thus, my empirical analysis rebuts Dr. Leitzinger's conclusory assertion of impact common to the class. (Section V.)

7.    I explain below the analyses underlying my opinions.  The materials on which I relied in reaching these opinions are listed in Exhibit 2, and the econometric tests and analyses that I performed are provided in the backup materials to be produced following the submission of this report.

III.    **THE EMPIRICAL EVIDENCE CONTRADICTS THE ASSUMPTIONS AND PREDICTIONS OF PROFESSOR RAUSSER'S DAMAGES MODEL AS WELL AS DR. LEITZINGER'S DEFENSE OF THEM**

8.      Plaintiffs claim that the railroads' alleged conspiracy to raise rail rates was accomplished through the application of fuel surcharges; the period in which Plaintiffs claim damages from the alleged conspiratorial surcharges, however, coincided with a period of high and rapidly increasing fuel prices.  Fuel costs are variable costs, and basic economic theory teaches that, when variable costs increase, a firm will pass through some or all of its increased variable costs to its customers in the form of increased prices, even in the absence of conspiracy.[12]  Thus, to be reliable, it is imperative that Professor Rausser's damages model pass a fundamental test: the model must be able to distinguish between increases in rail rates that are due to non-conspiratorial causes (including pass-through of increases in fuel prices to rail rates) and increases in rail rates that are due to the alleged conspiracy.[13]  A model that fails this test will incorrectly attribute rail rate increases to the alleged conspiracy that are, in fact, attributable to non-conspiratorial pass-through of higher fuel prices.

9.      Dr. Leitzinger defends Professor Rausser's model, including his regression that estimates the fuel price elasticity, as reliable.  As support for his opinion on the reliability of Professor Rausser's model, ███████████████████████████████████████████████ ██████████████████ well as his estimated level of the elasticity are consistent with the evidence.  He also asserts that Professor Rausser's damages model███████████████████ ██████████████████████████████████ because that assumption can be relaxed without eliminating the estimated damages.  And Dr. Leitzinger asserts that Professor Rausser's damages estimate is conservative because his model does not capture the full margin

---

[12]    Section III.D discusses that, depending on the underlying market conditions, a firm could even increase price by more than 100 percent of an increase in its unit variable costs.  (*See*, Jeremy I. Bulow and Paul Pfleiderer (1983), "A Note on the Effect of Cost Changes on Prices," *Journal of Political Economy,* **91**(1), at 182-185.)  The principle that a firm can pass through some, all, or more than 100 percent of a change in its unit variable costs depending on market conditions is consistent with the proposition that Defendants "price to market."  Variable costs play an important role in determining market prices.

[13]    Dr. Leitzinger concurs that this is fundamental to the reliability of a damages model.  (Deposition of Jeffrey J. Leitzinger, Ph.D., June 25-26, 2015 (hereinafter, *Leitzinger Deposition)* at 98:24-99:9.)

compression that might be occurring, causing non-conspiratorial rail rates to be even lower than what Professor Rausser's model predicts in the non-conspiratorial world.

10.     Dr. Leitzinger's defense of Professor Rausser's methodology ignores evidence that demonstrates the model's unreliability.  In fact, Professor Rausser's model, which relies on the key—and false— ███████████████████████████ cannot distinguish between increases in rail rates caused by non-conspiratorial fuel price pass-through and increases in rail rates resulting from an alleged conspiracy to fix rail rates.  The result is that Professor Rausser's model labels ordinary, non-conspiratorial fuel cost recovery as "damages."  Moreover, Dr. Leitzinger's own data and analysis demonstrate the fundamental flaws in Professor Rausser's model.  Dr. Leitzinger thus not only provides no credible defense of Professor Rausser's model, but also provides evidence that discredits it.

11.     I understand that Plaintiffs have argued that my current report "may lack credibility" because my prior ███████████████████████████████████ ███████    Plaintiffs have completely ignored Section V of my prior report where I analyze Professor Rausser's model and discuss several of its flaws, including that "in contrast to the assumption in Professor Rausser's model of a common effect of fuel costs on prices, the actual effect of fuel costs on prices…varies along [several] dimensions."[15]  My merits report for Defendant UP primarily focused on the conspiracy liability issue.  My current report delves more deeply into class certification and the damages models, including Professor Rausser's STB model which was put forth after my merits report.

12.     In any event, in my merits report I made several observations about Professor Rausser's Class & Merits model that identified the problem with the rail price elasticity in that model.  Those observations are consistent with the points that I have more fully developed in this report.  First, I described at length the fact that the model generates damages for legacy shipments and shipments with a mileage-based FSC, which reveal "other economic factors not appropriately captured by the model."[16]  Second, I specifically contrasted the rail rate elasticity of that model

---

[14]     Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion for Leave to File Supplemental Expert Report, *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, Misc. No. 07-489 (PLF/AK/GMH), July 8, 2015, at 3.

[15]     *Carlton Merits Report*, § V and ¶ 137.

[16]     *Carlton Merits Report*, § V.C.1.

(which implies that a ████████████████████████████████████████ ████████ with the fact that, "on average, fuel costs represented 11.0 percent of UP's operating revenues during the 2000-2003 pre-Class Period."[17]  Third, in Figure 11 in my Merits Report, I showed how the low cost pass-through rate in the Class & Merits model would allow only a very small fraction of a $1 increase in the fuel cost of shipping a ton-mile to be passed through to rail rates per ton-mile and showed that this was particularly pronounced in the years with high fuel costs.[18]  I specifically attributed this to the "fact that [Professor Rausser's] baseline relationship between fuel costs and prices is implausibly low."  Fourth, I wrote that:[19]

> One potential explanation for the nonsensical results from Professor Rausser's model is that the differential pricing behavior that Professor Rausser attributes to the conspiracy actually reflects a different relationship between fuel prices and rail prices during the Class Period, perhaps driven by the fact that fuel prices during the Class Period were higher and more volatile than at any point during the pre-Class Period.

13.     My focus on the "different relationship between fuel prices and rail prices during the Class Period" when "fuel prices were higher and more volatile" involves the same basic principles that I am addressing here.  Finally, I showed that the Class & Merits model was structurally unstable over different time periods, which, as I explained, means that the "relationship between fuel costs and [rail] prices varies" across time periods.[20]

14.     In short, my prior merits report identified as flaws in the Class & Merits model the same economic concepts that I have more fully developed here in response to Dr. Leitzinger's report.  The model does not properly account for the effects of the higher fuel prices in the Class Period.  That point remains at the core of my analysis here with ████████████████████ ████████████████████

15.     This section is structured as follows:  In Section III.A, I explain that, although Dr. Leitzinger defends Professor Rausser's use of simplifying assumptions in his model, one key assumption—████████████████████████████████████████

---

[17]     *Carlton Merits Report*, ¶ 145.

[18]     *Carlton Merits Report*, Figure 11 and ¶ 146.

[19]     *Carlton Merits Report*, ¶ 148.

[20]     *Carlton Merits Report*, § V.B.

███████████████████████████████████████████████████████

██[21]  In Section III.B, ████████████████████████████████ is rejected by the economic literature, by the Christensen model, and by Dr. Leitzinger's own data on annual fuel shares.  In Section III.C, I show that Professor Rausser's erroneous fuel price elasticity has a large effect on damages; using Dr. Leitzinger's own fuel share data (as well as alternative measures of fuel shares) yields a finding of no damages or drastically reduced damages, demonstrating that Professor Rausser's damages model is unreliable.[22]  In Section III.D, I show that Professor Rausser's modeling flaws result in nonsensical predictions, indicating that the model is unreliable.  In Section III.E I show that Dr. Leitzinger's Box-Cox model, rather than supporting Professor Rausser's model, further undermines it.  In Section III.F, I discuss the fact that Dr. Leitzinger's new theory—that Professor Rausser's model is conservative because, according to Dr. Leitzinger, it fails to account for margin compression—is unfounded.

### A.   Although Dr. Leitzinger Defends Professor Rausser's  the Assumption leads to Professor Rausser's Finding of Damages and is Fundamentally Flawed

16.  █████████████████████████████████████████████████
████████████████████████████ ██████ ████████████████████
████████████████ ██████████████████████████████████████

---



[21]    Professor Rausser's model has other flaws as well, but I focus here on the fuel price elasticity assumption since it is fundamental in determining his finding of damages and, on its own, it renders his model unreliable.  Dr. Leitzinger appears to appreciate the importance of the fuel price elasticity assumption in Professor Rausser's model since he discusses this aspect of Professor Rausser's model at great length in his report and even performs original work in an attempt to defend the assumption.  (*Leitzinger Report*, ¶¶ 114-141.)

[22]    The corrections discussed in this section should not be construed as an endorsement of Professor Rausser's model.

[23]    Professor Rausser's econometric specification is known as ███████████████████
████████████████████████████

[24]    ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

17.   ███████████████████████████████████████████████████

███████████████████████████████████████████ that it is common practice to adopt

simplifying assumptions in an econometric model and that models should be judged not on the

realism of their assumptions but on their ability "to provide meaningful and economically

sensible answers for the question at hand."[25]   Although I agree that simplifying assumptions are

sometimes appropriate, they are not appropriate if they are false and if adjusting those

assumptions to be more accurate leads to different conclusions.   Thus it is important to test

whether the assumptions underlying a model are contradicted by known facts and whether the

results of the model are sensitive to those assumptions so that small changes in the assumptions

cause the model to yield different results.   ████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████ Such a discrepancy between a model's

assumptions and the real world are problematic in this case because of the important role that the

fuel price elasticity plays in determining damages in Professor Rausser's model.

18.   ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

████████████████████████████████████████ I discuss this assumption further below in Section
III.C.

[25]   *Leitzinger Report*, ¶ 105.



If the but-for fuel price elasticity in the Class Period is higher than Professor Rausser's estimated non-conspiratorial fuel price elasticity of ▮▮▮▮ the model will misattribute some or all of the rail rate increases during the Class Period to the alleged conspiracy rather than to the increase in fuel price.  In other words, if the but-for fuel price elasticity during the Class Period is higher than ▮▮▮▮ hen Professor Rausser's model will incorrectly find damages, even if there were no conspiracy.  Thus, given



26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 Professor Rausser has offered several different estimates of the rail rate elasticity in his various reports.  Professor Rausser's first (corrected) report, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (*Rausser Corrected Class Report* at 119.)  In his next report, he presented his Class & Merits model, which yielded an estimate of ▮▮▮▮ which is still implausibly low.  (*Rausser Merits Report* at 170.)  In the face of opposing experts' critiques, including my own opinions set forth in my Merits Report (*Carlton Merits Report*, ¶¶ 144-146), Professor Rausser changed his model again, this time offering his STB model that yielded ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  As I explain in more detail below, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ an assumption that is inconsistent with the data that Dr. Leitzinger presents.

Professor Rausser's framework, the accuracy of the estimation of the non-conspiratorial fuel price elasticity is one key element in specifying a reliable model of damages.[28]

19.     Dr. Leitzinger agreed that if the non-conspiratorial fuel price elasticity used in Professor Rausser's damages model was lower than the actual elasticity, then the model could "produce overcharges where none existed."[29]  Dr. Leitzinger nevertheless defends Professor's Rausser's modeling approach as "reasonable and reliable."[30]  As I show in the rest of this section, Dr. Leitzinger's defense of the model is invalid; ███████████████████████████████ a time of rising fuel prices is rejected by Dr. Leitzinger's analysis of fuel shares as well as his Box-Cox analysis.[31] ████████████████████████████ incorrectly leads Professor Rausser to find damages.[32]  As a result of this fundamental error, Professor Rausser's model cannot reliably estimate damages from the alleged conspiracy.  Because the model fails to provide an economically sensible framework for estimating damages in this case, Professor Rausser's model is unreliable and must be rejected.

---

[28]     As I explained above, I do not claim that replacing Professor Rausser's ███████████████ with an accurate measure of fuel price elasticity would make Professor Rausser's framework reliable, given the other problems with his model that I discuss in this report and in my Merits Report.

[29]     *Leitzinger Deposition* at 441:18-442:11.

[30]     *Leitzinger Report*, ¶¶ 140-141; *see, also, Leitzinger Report*, ¶¶ 45 and 198.

[31]     

[32]     still would fail to account properly for the increases in rail rates arising from increases in fuel costs.

### B.   EMPIRICAL STUDIES OF RAIL RATES AND DR. LEITZINGER'S OWN FUEL SHARES DEMONSTRATE ██████████████ █████████ ████████████████████████

1.   **Contrary to** ██████████████████████████ **with other empirical studies of fuel price elasticities**

20.   Professor Rausser attempts to show ███████████████████████ and estimate are supported in the literature by pointing to five empirical studies, including a study by Christensen Associates.[33]   None of these studies uses the type of econometric model that Professor Rausser uses here to model costs, specifically ████████████   Instead, all of the cited studies use a more detailed and flexible specification, the translog specification.  ████ ████████████████████████████████████████████████   In the translog specification used in the cited studies, the fuel price elasticity is calculated as a function of several different variables and estimated parameters, and thus the fuel price elasticity can vary over time as those variables change.  Thus, unlike Professor Rausser's model, the translog model in each of the studies he cites ██████████████████████████████████████ ████████████████████████████████   Dr. Leitzinger nonetheless opines that Professor Rausser's reliance on these studies is appropriate.[34]  Dr. Leitzinger is mistaken.

21.   The economic literature ████████████████████████████████ █████████████████████████████████████████████████████████ ███████   As already described by Professor Kalt, the empirical studies of costs cited by

---

[33]   *Rausser Supplemental Class Reply Report*, at 47 (citing to the Christensen Study); *see, also, Leitzinger Report*, n. 362; *Rausser Merits Reply Report* at 247-248 (citing to four empirical studies, ████████████████████   The studies cited are Laura Padilla Angulo (2013), "Labour Inputs Substitution During Corporate Restructuring: A Translog Model Approach for US Freight Railroads," *Applied Economics*, **45**(18):2547-2562; John D. Bitzan and Theodore E. Keeler (2003), "Productivity Growth and Some of Its Determinants in the Deregulated U.S. Railroad Industry," *Southern Economic Journal*, **70**(2):232-253;  John D. Bitzan (2003), "Railroad Costs and Competition: The Implication of Introducing Competition to Railroad Networks," *Journal of Transport Economics and Policy*, **37**(2):201-255; Wesley W. Wilson (1997), "Cost Savings and Productivity in the Railroad Industry," *Journal of Regulatory Economics*, **11**(1):21-40; and Laurits R. Christensen Associates, Inc. (2009), "Analysis of Competition, Capacity, and Service Quality," Revised Final Report Prepared for The Surface Transportation Board, Vol. 2 (hereinafter, *Christensen Study).*

[34]   *Leitzinger Report*, ¶¶ 186-187.

Professor Rausser, including the Christensen Study, imply fuel price elasticities that vary over time because the fuel price elasticity estimates depend on interactions with several other variables and those variables change over time.[35]  Focusing on the Christensen Study, Dr. Leitzinger claims to answer Professor Kalt by showing that the fuel price elasticity calculated at the sample means[36] of all of the variables ███████████████████████████ ██ ██ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████  Professor Rausser's calculation is akin to calculating the average daily temperature at noon in Chicago over the course of a year, and then concluding that the temperature at noon in Chicago on any given day in that year is always equal to that average.  Dr. Leitzinger's claimed defense of Professor Rausser is both tautological and irrelevant.

22.    Importantly, Professor Rausser's calculation █████████████████████████████ ██████████████  obscures the fact that, in the Christensen model, the fuel price elasticity varies over time and through interactions with other variables.[38]  Dr. Leitzinger fails to recognize this variation over time in the fuel price elasticities implied by the Christensen study.  This is a key failing of Dr. Leitzinger's review of Professor Rausser's model because once one allows elasticities to vary, consistent with the fuel share data, Professor Rausser's damages are drastically reduced or disappear.

---

[35]    Sur-Reply Declaration of Joseph P. Kalt, Ph.D., July 21, 2014 (hereinafter, *Kalt Remand Sur-Reply Report*), ¶¶ 15-16.

[36]    A "sample mean" refers to the average value of a variable in a particular sample of data.

[37]    *Leitzinger Report*, ¶ 187.

[38]    Professor Rausser has produced a supplemental workpaper that claims to calculate a fuel price elasticity from the Christensen Study that accounts for the interaction of the fuel variable with time.  (*See* Rausser Workpapers, September 2014, "Christensen Time Trend.xlsx"; *see, also, Kalt Remand Sur-Reply Report*, Figure SR-3.)  This calculation is incorrect.  When log cost is modeled using a translog cost equation, where the fuel price affects variable costs not only directly but also through interactions with other variables, the estimated elasticity depends not just on the parameters on log fuel price and its interaction with time, but also on the levels of all other variables that are interacted with log fuel price.  At any point in time, the level of the variables generally will differ from their mean values.  Dr. Leitzinger agrees with this basic fact.  (*Leitzinger Deposition* at 236:2-7.)

2.   **Dr. Leitzinger's analysis demonstrates that fuel price elasticities increase with fuel prices and are higher *in every year* than ▮▮▮▮ estimated by Professor Rausser**

23.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but it is also possible to calculate the railroads' fuel price elasticity using available data on the railroads' variable costs and their expenditures on fuel.  I show in Appendix A how Professor Rausser's fuel price elasticity is related to the railroads' fuel share of variable cost according to a well-known result in economics known as Shephard's Lemma.[39]  In particular, I show that, given Professor Rausser's model, his fuel price elasticity can be treated as being approximately equal to the fuel share of variable cost.[40]  Importantly, the fuel shares calculated from the railroad's data provide an independent measure of the fuel price elasticity but-for the conspiracy; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[39]   Briefly, I show using Shephard's Lemma that the formula for Professor Rausser's fuel price elasticity equates to the railroads' fuel share, if either the railroads' cost of fuel is the HDF price or changes in the HDF price are passed through completely into the railroad's cost of fuel.

[40]   Professor Leitzinger appears to acknowledge this equality in his Expert Report, and moreover uses his fuel shares to make comparisons against fuel price elasticities.  (*Leitzinger Report*, ¶¶ 126-127.)  Yet he indicates that that the equality between fuel shares and fuel price elasticities would hold only if changes in the HDF price were passed through completely into the price of fuel to the railroads.  (*Leitzinger Report*, ¶ 127; *see, also*, *Leitzinger Deposition* at 157:23-158:15.)  He testified at deposition that he could not agree that the fuel price elasticity and the fuel share were equal because he did not know how much of an increase in HDF price would be passed through to the railroad's fuel cost.  (*Leitzinger Deposition* at 167:9-168:3.)  Dr. Leitzinger has not done any empirical study on this relationship.  I have done such an analysis and I estimated the relationship between HDF price and railroad's fuel cost and find it to be 0.93, which is very close to 1 and supports the treatment of fuel shares and fuel price elasticity as being approximately equal.  If the various measures of fuel shares that I discuss here were adjusted by a factor of 0.93 to allow for the possibility that the pass-through of HDF price changes into railroad fuel costs was less than 1, none of my conclusions about the reliability of Professor Rausser's model based on my use of fuel shares would change.

I also note that it was Professor Rausser's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (For a discussion of errors-in-variables, *see,* James H. Stock and Mark W. Watson (2010), *Introduction to Econometrics*, 3rd Edition, Addison-Wesley, at 319-320.)

████████████████████████████████████████████████████████
████████████████████

24.     In his Expert Report, Dr. Leitzinger presented his calculations of fuel shares.  (I will refer to these as his "Report Fuel Shares" to distinguish them from the revised fuel shares that he presented in his Deposition, which I will refer to as his "Deposition Fuel Shares.")  Despite Dr. Leitzinger's lengthy defense of Professor Rausser's ████████████████████████████ and estimate,[41] his Report Fuel Shares (and even his flawed Deposition Fuel Shares) demonstrate that Professor Rausser's ████████████████████ and estimate are incorrect.

25.     Table 1 compares Dr. Leitzinger's Report Fuel Shares in each year to Professor Rausser's ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████[2]  Instead, rather than being constant, Dr. Leitzinger's fuel shares increase over time as fuel price increases.[43]  Thus Dr. Leitzinger's own data contradict the assumption Professor Rausser imposed on his model, ████████████████ ████████  Moreover, it also is obvious from the data in Table 1 that Professor Rausser's fuel price elasticity estimate is far too low. ████████████████████████████ ████████████████████████████████████████ ████████████████████████████[44]  Dr. Leitzinger's own data thus contradict Professor Rausser's fuel price elasticity assumption and estimate.

---

[41]     *Leitzinger Report*, ¶¶ 114-141.

[42]     *See* n. 40.

[43]     To the extent that a railroad has limited ability to substitute away from fuel as fuel prices rise, one would expect that the fuel cost share will increase as fuel price increases.

[44]     ████████████████████████████████████████████████ ████████████████████████████████



26.    Figure 1 illustrates the relationship between Professor Rausser's fuel price elasticity and Dr. Leitzinger's Report Fuel Shares.  Dr. Leitzinger's Report Fuel Shares (blue line) increase as fuel prices (orange line) increase.



27.     The widening gap between the fuel shares and Professor Rausser's fuel price elasticity illustrates the fundamental methodological flaw in Professor Rausser's model discussed above:



and attributes the rise in responsiveness to the alleged conspiracy.  The observed gap between the

Report Fuel Shares and Professor Rausser's ███████████████ would result in a finding of damages from the alleged conspiracy using Professor Rausser's methodology, and, as the gap between Professor Rausser's fuel price elasticity and the Report Fuel Shares widens, the amount of damages estimated by Professor Rausser increases.  Figure 2 shows this relationship.  The gap between Professor Rausser's ███████████████ and the Report Fuel Share is shown on the horizontal axis, and the total amount of Professor Rausser's damages is shown on the vertical axis.  Each point in the figure (the red dots) represents the combination of damages in one year of the Class Period and the share-elasticity gap in that year.  It is evident from Figure 2 that the larger is the share-elasticity gap, the larger are Professor Rausser's damages.  In the latter years of the alleged conspiracy, ██████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████  The growing gap between the actual fuel shares and the fuel price elasticity used in the model cause the model to estimate growing "damages" in these years.



28.     In summary, economic theory tells us that the elasticity of variable cost with respect to fuel prices should equal the share of fuel in variable cost and thus data on fuel shares can be used to test whether Professor Rausser's fuel price elasticity is reasonable.  Dr. Leitzinger provided in his Expert Report data on fuel shares to use in this validation process.  These Report Fuel Shares directly contradict Professor Rausser's ███████████████████████████████ ██████  Rather than reliably estimating damages from the alleged conspiracy, therefore, Professor Rausser's model will find increasingly large damages over time—even in the absence of conspiracy—as the gap between the fuel shares and Professor Rausser's fuel price elasticity grows.  Professor Rausser's critical mistake in assuming that █████████████████████████ ██████  his damages model to fail, in Dr. Leitzinger's words, "to provide meaningful and economically sensible answers for the question at hand."[45]  Despite providing both the method and tools (data) with which to test Professor Rausser's fuel price elasticity assumption and

---

[45]      *Leitzinger Report*, ¶ 105.

estimate, Dr. Leitzinger fails to do so.  Had he done so, he would have recognized the critical

flaw of Professor Rausser's ████████████████████████████ and estimate.

### C.   USING DR. LEITZINGER'S REPORT FUEL SHARES IN PROFESSOR RAUSSER'S MODEL ████████ ████████████ ██████ ████████ RESULTS IN A FINDING OF NO DAMAGES AND DR. LEITZINGER'S DEPOSITION FUEL SHARES, THOUGH FLAWED, ALSO DEMONSTRATE THAT PROFESSOR RAUSSER'S MODEL IS UNRELIABLE

29.   As explained above and acknowledged by Dr. Leitzinger, the elasticity of variable cost

with respect to fuel price can be estimated using annual data on fuel shares.  Dr. Leitzinger

provided such estimates, with his ██████████████████████████████████████████

██████████████ ████████████████████████████████████

████████████████████████████████ The natural question to ask, then, is

what happens to Professor Rausser's estimate of overcharges when Dr. Leitzinger's annual

Report Fuel Shares are used in place of Professor Rausser's ████████████████████

████

30.   In addition to replacing Professor Rausser's ████████████████████████ with

Dr. Leitzinger's Report Fuel Shares, I make one additional change to Professor Rausser's

treatment of elasticities.  Professor Rausser's model includes ████████████████████████

████████████████████████████[7] Just as Professor Rausser's model

████████████████████████████████████████████████████

██████████████████████████ ██████████████████████████████

████████████████████████████████████████

██████████████████████████████[49] Just as Professor Rausser

---

<div class="footnotes">

[46]   *See* Table 1 above.

[47]   *Rausser Merits Report*, at 169.  *See, also, Rausser Merits Reply Report*, Table 103.

[48]   *Rausser Merits Reply Report*, Table 103.

[49]   If I simply replace Professor Rausser's ████████████████████ with the annual fuel shares calculated by Dr. Leitzinger, without any corresponding change to the non-fuel cost elasticity, I find that the average overcharge under Professor Rausser's model falls to ████████████ (See my backup materials for these results.)  This one change demonstrates the sensitivity of the model to the fuel price elasticity.

Dr. Leitzinger cautioned against making changes to only one elasticity in a model, saying "a full accounting for the effects of changing elasticities over time would also incorporate changes in the

</div>

████████████████████████████████████████████████████████

████████████████   As fuel costs as a share of variable cost grew during the Class Period, all other costs (*i.e.* non-fuel costs) as a share of variable cost declined and, correspondingly, the non-fuel cost elasticity declined during that period.

31.     I allow the non-fuel cost elasticity to vary over time in two alternative ways, both of which yield similar results.  In the first method, I allow the non-fuel cost elasticity to vary over time so that the model estimates a separate AIILF coefficient for each year.[50]  In the second method,[51] I model the elasticity in each year as being equal to one (1) minus the fuel price elasticity in that year.[52]

32.     If Professor Rausser's methodology reasonably captures the effect of fuel price increases on railroads' costs and rail rates, then his damages estimates should not change much if one replaces his fuel price elasticity estimate with Dr. Leitzinger's Report Fuel Shares and allows the non-fuel cost elasticity to vary over time.  In fact, however, my more realistic treatment of elasticities causes the damages estimates produced by Professor Rausser's model to change dramatically.  Indeed, his damages disappear.

33.     My results are shown in Table 2.  The estimated overcharges for both ways of treating the non-fuel cost elasticity just described are negative: damages are ████ percent when the non-fuel-cost elasticity is allowed to vary using a separate coefficient in each year and damages are ████ percent when the non-fuel-cost elasticity varies over time but is modeled to equal one (1) minus

---

relevant elasticities as to the other [input] factors identified by Christensen Associates." (*Leitzinger Report*, ¶ 132.)

[50]     In particular, I include in the model an interaction term between the AIILF variable and a dummy variable for each year. ████████████████████████████████████████

[51]     To the extent that AIILF is a price index of the costs of all other factor inputs to a railroad, then the two cost shares (of fuel and all other factor inputs) should add up to 1.

[52]     This simply means that the sum of the fuel share of variable cost and the non-fuel share of variable cost equals one. █████████████████████████████████████

that is, I subtract the effect of non-fuel costs on rail rates by subtracting the product of the non-fuel cost elasticity and the log of AIILF from the log rail rate for each observation.  (*Rausser Merits Reply Report*, at 248.)

the fuel price elasticity in each year.[53]  Thus, replacing Professor Rausser's faulty elasticity with elasticities that are consistent with the empirical evidence on fuel shares causes Professor Rausser's damages to disappear.



34.     I make no claim to have fixed Professor Rausser's damages model by altering his treatment of elasticities to better reflect the existing data; numerous other flaws still remain.[54] Nevertheless, my analysis yields a straightforward conclusion █████████████████████ ████████████████████████████████████████████████         This assumption both

---

[53]     As expected, when using separate coefficients in each year, the ██████████████████████ █████████████ are positive and statistically significant, and, consistent with expectations that when fuel shares are increasing, they decrease over time.  I note that the coefficient on the █████████████████████████████ is positive and significant in both specifications.

[54]     *See, e.g.*, n. 62 and § IV.C.

impacts substantially his damages estimates and is demonstrably wrong.  When these elasticities are modeled more realistically—and Dr. Leitzinger's own calculations of annual fuel shares are used as the fuel price elasticities—Professor Rausser's model yields a finding of no damages.

1.     **Dr. Leitzinger's revised fuel shares provided in his deposition are lower than fuel shares estimated using other data and yet still contradict Professor Rausser's** ████████████████████ **and result in greatly reduced damages**

35.     In his deposition, Dr. Leitzinger presented a new set of fuel shares ("Deposition Fuel Shares").[55]  The Deposition Fuel Shares, which range from ██████ during the Class Period with an average of ███ differ substantially from the Report Fuel Shares, which range from ████ with an average of ███ during the Class Period.  Dr. Leitzinger testified that he changed his fuel share calculation not because there was an error in his original calculation but rather because he is attempting to match Professor Rausser's methodology.[56]  Dr. Leitzinger's approach in matching Professor Rausser's methodology is problematic because it caused him to exclude a large portion of data;[57] if that data had not been excluded, Dr. Leitzinger's revised fuel shares would not have changed much from his Report Fuel Shares.

36.     In calculating his Deposition Fuel Shares, Dr. Leitzinger used the same sample of data from the STB's Carload Waybill Sample ("CWS") that Professor Rausser used to estimate the variable cost function in his STB model.  Table 3 shows that Dr. Leitzinger estimated his measure of railroads' variable cost using only about 1/6 of all traffic in the CWS data and less than ¼ of the unregulated traffic.[58]  Neither Professor Rausser nor Dr. Leitzinger provides any justification for their use of a small subset of the available data.[59]

---

[55]     *Leitzinger Deposition*, Exhibit 1.

[56]     *Leitzinger Deposition* at 126:5-128:11 and 139:3-140:4.

[57]     For example, Dr. Leitzinger testified that he expected that Professor Rausser's data included contract unregulated shipments.  (*Leitzinger Deposition* at 492:10-17.)  In fact, it did not. (*See* n. 58.)

[58]     

2008 Surface Transportation Board Carload Waybill Sample, August 31, 2009, at 62.) Intermodal freight and freight traveling by boxcar are also exempt from STB rate regulation. (Expert Report of Joseph P. Kalt, Ph.D., January 22, 2013 (hereinafter, *Kalt Merits Report*), ¶301.) ██████████████████████████████████████████

**Table 3: Dr. Leitzinger's Deposition Fuel Shares are Based on Only a Small Fraction of the Available Data for Unregulated Traffic**

|  | Percent of All Ton-Miles used in Dr. Leitzinger's Deposition Fuel Shares | Percent of All Deregulated Ton-Miles used in Dr. Leitzinger's Deposition Fuel Shares |
| --- | --- | --- |
| 1999 | 17.1% | 28.0% |
| 2000 | 17.6% | 27.4% |
| 2001 | 16.4% | 24.6% |
| 2002 | 16.6% | 24.5% |
| 2003 | 17.0% | 23.4% |
| 2004 | 18.1% | 22.6% |
| 2005 | 18.1% | 22.8% |
| 2006 | 17.0% | 21.7% |
| 2007 | 16.2% | 20.7% |
| 2008 | 15.1% | 19.9% |

Source: Carload Waybill Sample.

Lastly, contract traffic is not subject to STB rate regulation (49 U.S.C. § 10709) and is identified in the CWS data by a "Calculated Rate Flag" used to protect confidential contract rate information. (Reference Guide for the 2008 Surface Transportation Board Carload Waybill Sample, August 31, 2009, at 40, 53.)

[59]

I understand that the Class is defined as:

All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").

I also understand that the following categories of shippers are excluded from the Class:

(a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities; and, (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was: i) Entered into before July 1, 2003; and, ii) Provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.

(*Leitzinger Report*, n. 1, citing *Rausser Merits Report* at 3.)

37.     The use of a subset of the data does not by itself imply that Dr. Leitzinger's Deposition Fuel Shares are problematic.  But here, Dr. Leitzinger's Deposition Fuel Shares are problematic because they are very different from fuel shares calculated using either all unregulated traffic or all traffic in the CWS data.[60]  Table 4 and Figure 3 below compare Dr. Leitzinger's Report and Deposition Fuel Shares to fuel shares calculated using all unregulated traffic and all traffic in the CWS data.  Dr. Leitzinger's Deposition Fuel Shares are outliers.  The fuel shares calculated using the other three methods are very similar but the Deposition Fuel Shares are lower. Moreover, the fuel shares based on all unregulated traffic and all traffic incorporate variable cost rather than operating cost, which Dr. Leitzinger says he now prefers.  Thus, it is clear that what drives Dr. Leitzinger's severe reduction in his Deposition Fuel Shares is not the shift from using operating cost in his Report Fuel Shares to using variable cost in his Deposition Fuel Shares[61] but rather the unjustified use of an unrepresentative sample on which to base his calculation.



---

[60]     Using all traffic (regulated plus unregulated) circumvents the problem of common cost allocation in the STB Uniform Railroad Costing System ("URCS") which is the source of the variable costs used by Dr. Leitzinger in his Deposition Fuel Shares.  URCS's methodology for allocating common costs has been recognized as being problematic.  (*See* Surface Transportation Board (2010), "Report to Congress Regarding the Uniform Rail Costing System," at 1 and 11-14.)

[61]     Dr. Leitzinger testified that his Report Fuel Shares and Deposition Fuel Shares differed solely due to the switch from operating costs to variable costs.  (*Leitzinger Deposition* at 128:5-128:11.)



38.     Even if one accepted Dr. Leitzinger's Deposition Fuel Shares, they continue to demonstrate that Professor Rausser's ███████████████████████████████ is incorrect.  Furthermore, as I show in Table 5 below, using Dr. Leitzinger's Deposition Fuel Shares in Professor Rausser's damages model reduces the damages by about two-thirds.[62]  The use of other fuel share estimates discussed above result in no damages.  Taken together, these results indicate that Professor Rausser's damages model is unreliable.

---

[62]     Professor Rausser's average overcharge is ███ percent.  Using Dr. Leitzinger's Deposition Fuel Shares as elasticities, the average overcharges are ███ percent when the coefficient on the AIILF variable equals one (1) minus the fuel elasticity in each year, and ███ percent when that coefficient is estimated with separate coefficients in each year.  Professor Rausser's model also errs by comparing rates that include FSCs in the Class Period to all rates (both with and without FSCs) in the pre-Class Period.  This "apples and oranges" error was criticized by Dr. Leitzinger, as is described in Section IV.C below.  If I correct this error, the average overcharges under these two specifications are ███ percent and ███ percent respectively.



**D.**  **PROFESSOR RAUSSER'S FLAWED DAMAGES MODEL YIELDS IMPLAUSIBLY LOW COST PASS-THROUGH AS WELL AS NONSENSICAL PRICE PREDICTIONS WHEN THE MODEL IS APPLIED TO THE PRE-CLASS PERIOD**

39.    Dr. Leitzinger has opined that Professor Rausser's damages model is reliable for the estimation of damages.  If the model were reliable, then we would expect it to perform well in dimensions other than the estimation of overcharges, and the reliability of a model that failed to give economically sensible results or predictions should be questioned.  In this section, I provide two tests of the model's results or predictions.  First, I show that Professor Rausser's model implies fuel cost pass-through rates that are implausibly low, particularly in the years where the model finds most of the alleged damages.  Dr. Leitzinger's pass-through calculations mask the low pass-through rates leading him to conclude incorrectly that the pass-through rate is reasonable.  Second, I show that Professor Rausser's damages model yields economically unsound results when it is used to predict prices in the pre-Class Period.  Dr. Leitzinger provides no test of the model's ability to predict prices.  These failures of the damages model are clear indications that the model as specified is unreliable and must be rejected.

1.      **In many years during the Class Period, the implied annual dollar pass-through rate in Professor Rausser's model is far below the ███ calculated by Dr. Leitzinger**

40.      Using Professor Rausser's estimate of ███████████████████████ Dr. Leitzinger estimates an implied average dollar pass-through rate of fuel costs into rail rates but-for the conspiracy.[63]  He estimates this pass-through rate to be ████████████████████ ████████████████████████████████████████  Thus, according to Dr. Leitzinger's calculation, ████████████████████████████ ████████████████████████████████████████████████████ ████████████████

41.      Dr. Leitzinger's pass-through calculation is misleading because he calculates the pass-through rate based on changes in fuel costs and rail rates over long time periods: he compares the average rail rate and fuel cost in the pre-Class Period (1999-2003H1) to the average rail rate and fuel cost in the Class Period (2003H2-2008).  To get a more accurate representation of the pass-through rates over time covered by Professor Rausser's model, Dr. Leitzinger should have calculated the pass-through rate implied by the model using shorter time periods, *e.g.*, annual pass-through rates, which would be calculated using the changes in average rail rates and fuel costs from year to year.

42.      Applying Dr. Leitzinger's methodology on a year-by-year basis yields the implied annual pass-through rates shown in Table 6.  In the years when fuel prices were highest ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████  This means that, in 2007, for example, Professor Rausser's damages model allows a railroad to pass-through to shippers in the form of higher rail rates only █████ for every dollar increase in its fuel cost per ton mile.  Professor Rausser classifies as damages any increase in rail rates that recovers more ███████ for every dollar increase in fuel costs per ton-mile.  If fuel cost per ton mile increased by $1 in 2007 and rail rates per ton-mile increased by that same $1, Professor Rausser's model would treat █████ of the rail rate increase as damages.

---

[63]      *Leitzinger Report*, ¶ 191.

43.     Because Dr. Leitzinger defends Professor Rausser's Class & Merits model,[64] I have also computed the implied annual pass-through rates from that model in Table 6.  The pass-through rates implied by the Class & Merits model are even lower than those implied by the STB model, with the pass-through rate in the Class & Merits model averaging about ¼ the pass-through rate from the STB model.  The average implied pass-through during the Class Period under the Class & Merits model is ███ with a low of ████████  Thus, using the Class & Merits model, in 2007, Professor Rausser classifies as damages any increase in rail rates that recovers more than ████████████████████████████████  If fuel cost increased by $1 in 2007 and rail rates increased by that same $1, Professor Rausser's model would treat ████████ of the rail rate increase as damages.



44.     This analysis demonstrates that Professor Rausser's model allows pass-through rates (but-for the conspiracy) that are implausibly low when fuel costs are high.  The low pass-through

---

[64]     *Leitzinger Deposition* at 438:7-440:24.

rates implied by Professor Rausser's model are another consequence of ████████████ ████████████. The low implied pass-through rate in the years with high fuel prices results from the large gap between Professor Rausser's ████████████ and the prevailing elasticities (measured by fuel shares) in those years (see Figure 1, above). This explains why Professor Rausser's model finds large damages in those years: █████ of the total damages estimated by Professor Rausser is generated during the 2006-2008 period,[65] when fuel prices were at their highest levels.

<div align="center">

2.   **Using Professor Rausser's model to predict prices in the pre-Class Period yields nonsensical results, demonstrating that Professor Rausser's model is fundamentally flawed; Dr. Leitzinger fails to provide any such predictive tests of Professor Rausser's model**

</div>

45.   Professor Rausser's fundamental modeling flaw is his use of a ████████████ ██████████████████████████ and this causes him to mis-attribute rail rate increases to the alleged conspiracy rather than to non-conspiratorial pass-through of increases in fuel prices to rail rates. As further evidence to illustrate that Professor Rausser's model is unreliable, I test how well his model predicts rail rates during a time period outside of that used to estimate his model. The accuracy of such "out-of-sample" predictions is one test of a model's reliability.[66] Professor Rausser's model fails to provide reasonable predictions of prices in the pre-Class Period. This is further confirmation of its unreliability.

46.   To implement my test, I use his model, estimated on Class Period data, to predict rail rates in the pre-Class Period. If a model's rail rate predictions are not economically sensible, then one should question whether the model accurately captures the influence of economic variables on rail rates and this provides a test of the reliability of the model. Professor Rausser's model, when estimated in the Class Period and then used to predict rail rates in the pre-Class Period, yields rail rate predictions that make no economic sense. Professor Rausser's model therefore does not accurately capture the influence of non-conspiratorial economic variables on

---

[65]   *Rausser Merits Reply Report* at 251, Table 105.

[66]   For a discussion, *see, e.g.*, Peter Kennedy (2008), *A Guide to Econometrics*, Sixth Edition, Blackwell Publishing, at 339: "Even if time series analysts are more interested in parameter estimation and testing, they should be testing their specifications by evaluating their out-of-sample forecasting performance."

rail rates and therefore is unreliable for the purpose of estimating the impact of the alleged conspiracy.

47.     Professor Rausser estimated his model using data from both the pre-Class and Class Periods.  In my test of his model's reliability, I use data from the Class Period to estimate the model and then predict rail rates for the pre-Class Period.[67]  If Professor Rausser's model is correct that there is a conspiracy that raised rail rates and that his model is correctly specified, then predictions into the non-conspiracy period based on a model estimated in the alleged conspiracy period should yield predictions of (conspiratorial) rail rates that are higher than the actual rail rates in the non-conspiracy period.  I ███████████████████████████████████ █████████, obtaining a fuel price elasticity during the alleged conspiracy period of ████ [68]  I then use that coefficient in Professor Rausser's second stage and estimate his rail rate model, again using only data from the alleged conspiracy period.  Because I use data only from the alleged conspiracy period, the model's coefficients are the estimated relationships between rail rates and the explanatory economic variables during the alleged conspiracy, and the model's rail rate predictions are interpreted as the rail rates that would prevail during a conspiracy.[69] Applying the model's estimated coefficients to the data in the pre-Class Period, I obtain estimates of the rail rates that would have prevailed in the pre-Class Period, *if the alleged conspiracy had existed in that period.*

---

[67]     Using a model as I do here to predict prices during a non-conspiracy period is a commonly used method by economists, and is a well-accepted framework for analyzing damages in antitrust cases.  (*See, e.g.*, American Bar Association, 2010, *Proving Antitrust Damages: Legal and Economic Issues*, 2nd Edition, at 205-206;  Daniel L. Rubinfeld (1985), "Econometrics in the Courtroom," *Columbia Law Review*, **85**(5):1048–1097.)

[68]     Professor Rausser has also estimated this elasticity using only data from the Class Period. (*Rausser Supplemental Class Reply Report* at 50, Figure 4.)  Note that this fuel price elasticity estimate for the Class Period is more than double Professor Rausser's ████ estimate for the Class and pre-Class Periods combined. ████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ Moreover, these elasticities are estimated using only the railroads' cost data and thus, they must not reflect the impact of the alleged conspiracy.  The implication is that the non-conspiracy fuel price elasticity during the Class Period must have risen relative to its level in the pre-Class Period.

[69]     Because this approach involves a linear prediction of rail rates from a log model, I apply a log adjustment (an estimate of E[exp($\varepsilon$)]) to the estimated predicted rail rates.   (Jeffrey M. Wooldridge (2013), *Introductory Econometrics: a Modern Approach*, 5th Edition, Cengage Learning, at 212-213.)

48.     If Professor Rausser's model reliably predicts rail rates, then one should find that the predicted "conspiratorial" rail rates are higher than the actual (non-conspiratorial) rail rates in the pre-Class Period.[70]  In fact, I find the opposite: Professor Rausser's model finds that if the alleged conspiracy had operated in the pre-Class Period, the conspiratorial rail rate would have been ███ percent lower than the actual, non-conspiratorial rail rate.  All else equal, it makes no economic sense for a conspiratorial price to be below a non-conspiratorial price.  This analysis shows that Professor Rausser's model is unreliable for the task of predicting rail rates and estimating the impact of the alleged conspiracy.

49.     This finding follows from Professor Rausser's flawed methodology and the fact that the non-conspiratorial fuel price elasticity is higher in the Class Period than in the pre-Class Period.  Using a higher Class Period fuel price elasticity to predict conspiratorial rail rates in the pre-Class Period (when fuel price elasticity is lower) would be expected to generate predicted (conspiratorial) rail rates that are lower than the actual rail rates.  By the same logic, using a lower fuel price elasticity to predict (non-conspiratorial) rail rates in the Class Period (when fuel price elasticity was higher) would be expected to generate lower non-conspiratorial predicted rail rates than the actual non-conspiratorial rates, and therefore positive damages, during the Class Period.  This is one reason why Professor Rausser's model finds damages during the Class Period.

50.     The figures below demonstrate these points using a simple, illustrative example where the non-conspiratorial rail rate is modeled solely as a function of fuel price.  In Figure 4, as fuel price increases, non-conspiratorial rail rates increase, but the degree of responsiveness of rail rates to fuel prices varies over time.  I have divided the data into two periods: an earlier period with low fuel price elasticity (shown by the blue dots) and a later period with high fuel price elasticity (shown by the red squares).  By construction, there is no conspiracy, but the non-conspiratorial fuel price elasticity is higher in the later period.

---

[70]     A successful conspiracy would raise average prices above the level they would otherwise be, so pre-Class "conspiracy" rail rates—as predicted by Professor Rausser's model estimated only on the alleged conspiracy time period—should be higher than pre-Class actual rail rates.

**Figure 4: Relationship between Rail Rates and Fuel Price, assuming Low Fuel Price Elasticity in Early Period and High Fuel Price Elasiticity in Later Period**



51.     Figure 5 below illustrates graphically that if one uses a high fuel price elasticity from the latter period to predict rail rates in the earlier period (when the fuel price elasticity is lower), then predicted rail rates will be below actual rail rates (the dashed red line lies below the blue dots).

**Figure 5: Using Period of High Fuel Price Elasticity to Predict Rail Rates in Period with Low Fuel Price Elasticity Yields Predicted Rail Rates below Actual Rail Rates**



52.     Similarly, Figure 6 below illustrates that if one uses a low fuel price elasticity from the earlier period to predict rail rates in the later period (when the fuel price elasticity is higher), then predicted rail rates also will be below actual rail rates (the dashed blue line lies below the red squares).  Simply put, using a non-conspiratorial fuel price elasticity from the pre-conspiracy period that is low, *i.e.*, that is below the non-conspiratorial fuel price elasticity in the alleged conspiracy period in which one wants to predict rail rates, leads to an underprediction of non-conspiracy rail rates. ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

**Figure 6: Using Period of Low Fuel Price Elasticity to Predict Rail Rates in Period with High Fuel Price Elasticity Yields Predicted Rail Rates below Actual Rail Rates**



53.     In summary, despite Dr. Leitzinger's defense of Professor Rausser's model, the model yields a nonsensical result when applied to the pre-Class Period: it implies that actual (non-conspiracy) rail rates exceeded the rail rates that would have been in effect if the alleged conspiracy had operated in the pre-Class Period.  This nonsensical result arises from the same mistake that Professor Rausser makes when estimating his damages model for the Class Period, namely, ██████████████████████████████████████████████████ an assumption that is not supported by the data for the time period in which rail rates are predicted. This nonsensical result is further confirmation that Professor Rausser's model is fundamentally flawed and unreliable.

       E.      **DR. LEITZINGER'S BOX-COX ANALYSIS FURTHER UNDERMINES PROFESSOR RAUSSER'S DAMAGES MODEL**

54.     Dr. Leitzinger attempts to defend Professor Rausser's ███████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████ Dr. Leitzinger ignores, however, that his Box-Cox model allows one to test whether Professor Rausser's log-log specification ████████████████████ ████████████████████ [72] As I explain below, the Box-Cox model rejects Professor Rausser's ██████████████████████████

55.     I also explain below that Dr. Leitzinger's Box-Cox model generates fuel price elasticity estimates that are highly suspect since they differ so dramatically from Dr. Leitzinger's own fuel shares.  Dr. Leitzinger then erroneously alters the fuel price elasticity estimates produced by his model.  Both the Box-Cox fuel price elasticities and Dr. Leitzinger's altered fuel price elasticities are so flawed that they cannot be used in Professor Rausser's damages model to produce a reliable estimate of damages.

1.     **Dr. Leitzinger's Box-Cox analysis rejects Professor Rausser's**
████████████████████

56.     Dr. Leitzinger uses an econometric technique, known as a Box-Cox model, as a sensitivity analysis to evaluate whether Professor Rausser's ████████████████████ elasticity is supported by the data.[73]  A Box-Cox model allows the data to determine the functional specification of the equation being estimated, rather than imposing a particular structure on the parameters such as the log-log specification ████████████████████ ██████████ that Professor Rausser uses for his cost equation.  In the Box-Cox model, the functional specification is determined by a parameter, $\lambda$ (lambda), which the model estimates from the data.[74]  As described by Dr. Leitzinger, "[t]his [Box-Cox] approach allows the model to select the lambda that best fits the data.  The special case where $\lambda$ is estimated to be one yields a

---

[71]     *Leitzinger Report*, ¶¶ 137-139.

[72]     For simplicity, I henceforth will refer to this test as a test of ████████████████ ████████

[73]     *Leitzinger Report*, ¶ 137.

[74]     In the Box-Cox model, all continuous variables (*i.e.*, excluding product characteristics) are transformed as follows:

$$f_\lambda = y(\lambda) = \begin{cases} \dfrac{y^\lambda - 1}{\lambda} & for\ \lambda \neq 0 \\ \log y & for\ \lambda = 0 \end{cases}$$

Dr. Leitzinger assumes that the same transformation and the same transformation parameter $\lambda$ apply to all variables.  (*Leitzinger Report*, n. 277.)

standard linear form (no transformation).  <u>The special case where λ is estimated to be zero yields the log transformation</u>."[75]

57.     Professor Rausser *assumes* ███████████████████████████████ ████████ but Dr. Leitzinger's Box-Cox model can be used to *test* whether Professor Rausser's ██████████████████████ is consistent with the data.[76] ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████[77]  This means that the Box-Cox model rejects Professor Rausser's ████████ ██████████████████

58.     Dr. Leitzinger opines in his Expert Report that "I see no basis from which to conclude that ████████████████████████████████████████████████████████ ████████████████████████████ were fundamentally flawed in their specification."[78] But one need look no further than Dr. Leitzinger's own Box-Cox analysis to find such a basis: Dr. Leitzinger's Box-Cox analysis demonstrates that Professor Rausser's model ████████████ ████████████████████ is not consistent with the data and is therefore unreliable. Indeed, when asked in deposition whether his analysis rejected Professor Rausser's ████████ ██████████████████, Dr. Leitzinger testified that his Box-Cox results "support[ ] some movement in elasticity over time, that's correct."[79]

> 2.     **Dr. Leitzinger's Box-Cox fuel price elasticities are unreliable and his alteration of those elasticities is erroneous**

59.     Dr. Leitzinger's motivation in conducting his Box-Cox analysis was to estimate time-varying fuel price elasticities that he could use in Professor Rausser's damages model in order to evaluate the claim that Professor Rausser's damages were the product of ██████████████████

---

[75]     *Leitzinger Report*, n. 277 [emphasis added].

[76]     As described below, Dr. Leitzinger's implementation of the Box-Cox model yields nonsensical fuel price elasticity estimates, which casts doubt on whether the results of the Box-Cox model are at all reliable.

[77]     *See* Dr. Leitzinger's backup materials, "Stage_One.log."

[78]     *Leitzinger Report*, ¶ 140.

[79]     *Leitzinger Deposition* at 227:24-228:9.

███████████████████[80]  In his analysis, however, he does not use the time-varying elasticities estimated in his Box-Cox model.  Instead he alters those estimates in a way that *reverses* the direction in which the estimated fuel price elasticities trend over time.[81]  Neither his Box-Cox fuel price elasticities nor his altered fuel price elasticities are reliable.



60.     The blue line in Figure 7 illustrates the Box-Cox estimated fuel price elasticities, which trend downward over time even though fuel prices were rising.  This downward trend is contrary to Dr. Leitzinger's Report Fuel Shares and Deposition Fuel Shares that rise with increases in fuel prices, and Dr. Leitzinger testified that fuel price elasticities that trend downward were

---

[80]     *Leitzinger Report*, ¶ 137.

[81]     The alteration he applies is $w_t = 2*\mu - x_t$, where $w_t$ is the "altered" elasticity estimate in period t, $x_t$ is his original elasticity estimate in period t, and $\mu$ is the mean of x over time.  (See Dr. Leitzinger's backup materials, Stata program "Figure 3.do.")  This alteration preserves the mean of the estimated elasticities, but reverses the elasticities' trend over time.

unexpected.[82]  Given that the Box-Cox fuel price elasticities do not even trend in the direction that the fuel shares indicate they must, they are not reliable.[83]

61.     In fact, Dr. Leitzinger did not use these Box-Cox fuel price elasticities in his analysis of Professor Rausser's damages regression—he did not even report them in his Expert Report. Instead he applied a mathematical alteration to the elasticities that reversed the trend and resulted in elasticities that increase over time.  Dr. Leitzinger's altered elasticities are shown in the red line in Figure 7.[84]  He offered no explanation or justification for this alteration in his Expert

---

[82]     Dr. Leitzinger testified that the downward trend was puzzling and that he read further about the Box-Cox transformation and learned about the data alteration he used:

> Q.  Just so we're clear, before you  flipped it, the -- the slope of the elasticity  line that you got from  running the Box-Cox transformation, was the mirror image of what you reported in your report, correct?
>
> A.  Correct.
>
> Q.  Okay.  So it appeared to show that as fuel prices were increasing the elasticity was decreasing?
>
> A.  Correct.
>
> Q.  Okay.  And I take it you agree that that doesn't make sense in the context of this case?
>
> A.  I don't know that I would go as far as to say it doesn't make sense, but I -- I -- I do know as we were working with this transformation when I first saw that result, I -- what you get without accounting for the inversion in the data, I scratched my head a little bit.
>
> Q.  And so how did you learn, then, that you could flip it?
>
> A.  Well, in -- in reading further about the use of the transformation which is often applied in situations where the particular pattern over time is -- is in some ways not that important, I came to discover that there is this consequence of the transformation in particular when for certain ranges of lambda and so -- and -- and that result was – is discussed in the literature surrounding the use of Box-Cox and transformations that are ways of accounting for that and undoing that inversion are discussed.

*(Leitzinger Deposition* at 223:18-225:3.)

[83]     I also note that the Box-Cox fuel price elasticities are smaller than estimates of the elasticities based on Dr. Leitzinger's Report or Deposition Fuel Shares and ████████████████████████ ████████████████████████           Dr. Leitzinger's ████████████████████████████████████████ ██████████      Thus Dr. Leitzinger's Box-Cox fuel price elasticities are less than half of his fuel cost elasticities, calculated based on his Report Fuel Shares.

[84]     The altered elasticities are shown in *Leitzinger Report*, Figure 3.

Report.  In his deposition, he cited to one academic paper that he says justifies his alteration.[85]  I have reviewed this paper and find no justification for Dr. Leitzinger's alteration of his elasticities (see Appendix B).[86]  Thus, Dr. Leitzinger erred in altering his Box-Cox elasticities and those elasticities are unreliable as alternative fuel share elasticities to use in Professor Rausser's damages model.

F.      **DR. LEITZINGER ERRS IN SUGGESTING THAT PROFESSOR RAUSSER'S FLAWED FUEL PRICE ELASTICITY IS SOMEHOW OFFSET BY THE MODEL'S FAILURE TO ACCOUNT FOR MARGIN COMPRESSION**

62.      Dr. Leitzinger has proposed a new theory of "margin compression" concerning the pass-through of fuel cost increases into higher rail rates.[87]  In particular, he argues that in the but-for world, as fuel prices increased, Defendants would not have passed on the resulting variable cost increases in full and instead would have earned lower margins.[88]  According to Dr. Leitzinger, Professor Rausser's model does not capture the effect of this margin compression and hence overpredicts the but-for price, resulting in an underestimate of damages.  Thus, according to Dr. Leitzinger, Professor Rausser's model is conservative in its damage estimate—that is, since Professor Rausser's model supposedly does not capture this margin compression, his damages might still be reliable even ████████████████████████████████████████  The only evidence presented by Dr. Leitzinger in support of his margin compression theory is a showing that Defendants' price-cost margins declined during the Class Period.[89, 90]  Dr. Leitzinger

---

[85]      *Leitzinger Deposition* at 453:7-454:3.  The paper Dr. Leitzinger provided in support of his transformation is Jason W. Osborne (2010), "Improving your data transformations: Applying the Box-Cox transformation," *Practical Assessment, Research & Evaluation*, **15**(12):1-9.

[86]      In Appendix B, I show that Dr. Leitzinger appears to have misinterpreted the one article that he cites as support and, as a result, erred in altering his Box-Cox elasticities.  (*Leitzinger Deposition*, at 453:7-454:3.)

[87]      I note that Professor Rausser does not discuss "margin compression" in any of his reports.

[88]      *Leitzinger Report*, ¶¶ 120-124.

[89]      *Leitzinger Report*, ¶ 120 and n. 260.  *See, also, Kalt Merits Report*, ¶¶ 442-444.  The decline of Defendants' actual price-cost margins (as measured by the Lerner Index) during the Class Period compared to the average level in the pre-Class Period is at odds with the impact of the alleged conspiracy estimated by Professor Rausser and defended by Dr. Leitzinger.  In other words, the goal of a price-fixing conspiracy would be to increase profits, and a decline in profit margins runs counter to the hypothesis that the alleged conspiracy was successful in raising rail rates, all else equal.

presents no quantitative estimate of how much "uncaptured margin compression" exists in Professor Rausser's model nor does he present any quantitative estimate of the pass-through rate or the price-cost margin that would have occurred in the but-for world that incorporates his argument about margin compression.

63.     I note first that Dr. Leitzinger's argument appears to suggest that even if Professor Rausser's damages model is mis-specified because of ████████████████████████ ██████████ and thus produces inaccurate results, those results might still be reliable because the model fails to account for uncaptured margin compression.  That is, Dr. Leitzinger assumes that maybe there are other errors in Professor Rausser's model that could offset ████████████ ████████████████████████  Specifically, Dr. Leitzinger ties his margin compression theory to Professor Rausser's model by claiming that one cannot analyze changes to the ████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████[1]  It is illogical to argue that one may not assess the reliability of Professor Rausser's key assumption of a ██████████████ ████████████████████████████████████████████████ ██████████████████████████████  Dr. Leitzinger's argument is that even



---

[90]    In deposition, Dr. Leitzinger also attempted to justify his theory of margin compression by claiming that the conspiracy had the effect of moving Defendants to the elastic portion of the demand curve, though he presents no such evidence.  (*Leitzinger Deposition* at 360:12-361:21.) Even if Dr. Leitzinger's contention that the railroads moved onto the elastic portion of the demand curve were true, his conclusion that this implies margin compression is not supported by economic theory.  Economic theory teaches that the pass-through rate depends on several things, *e.g.*, the curvature of the demand curve, the intensity of competition, the production technology (with constant returns to scale and competition, for example, the pass-through rate is one).  And, in particular, economic theory teaches that the pass-through rate depends on not just the first derivative of demand (which is what the elasticity depends on) but also on the curvature of demand (which depends on the derivative of the elasticity).  (Jeremy I. Bulow and Paul Pfleiderer (1983), "A Note on the Effect of Cost Changes on Prices," *Journal of Political Economy*, **91**(1):182-185.)  Dr. Leitzinger does not discuss the curvature of the demand curve, nor any other factor that affects pass-through, including how those factors may have changed during the Class Period.

[91]    *Leitzinger Report*, ¶¶ 116-117.  To be precise, the second assumption referred to by Dr. Leitzinger ████████████████████████████████████████████████████████ █████████████████████████████████████████

if Professor Rausser's two assumptions[92] are incorrect, they may somehow cancel each other out so that Professor Rausser's model is still reliable.  But Dr. Leitzinger fails to show this.

64.     One piece of evidence regarding whether Professor Rausser's two incorrect assumptions taken as a whole still yields a reliable model is provided by the non-conspiratorial cost pass-through implied by the model.  As discussed previously, Professor Rausser's model yields implausibly low non-conspiratorial pass-through rates for the later years of the alleged conspiracy.  As shown in Table 6, only a fraction of fuel price increases are passed through to rail rates in some years; for example, in 2007, for every $1 increase in fuel cost per ton mile, only ███████ is passed through to rail rates under the STB model.  Thus Dr. Leitzinger's claim— that any error that Professor Rausser makes by ████████████████████████████ may be offset by his failure to account for margin compression—is completely refuted by showing that Professor Rausser's model makes implausible predictions of how rail rates should respond to increases in costs.

65.     The rate of pass-through (the dollar amount by which a firm increases its price in response to a $1 increase in its marginal cost) may, in theory, be equal to 1, less than 1, or greater than 1, depending on a number of factors.[93]  Dr. Leitzinger does not acknowledge that pass-through rates vary according to market conditions, but instead offers an example showing that a hypothetical monopolist facing a linear demand curve would pass through only one-half of an increase in its marginal cost.[94]  This example is not helpful in determining what a reasonable pass-through rate would be in this matter because it is not based on any empirical analysis of the Defendants or the railroad industry.[95]  The railroad industry (but-for any alleged conspiracy)

---

[92]     ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████    ████████████

[93]     These factors include the curvature of the demand function and the degree of competition.  *See* n. 90.

[94]     More precisely, Dr. Leitzinger considers an example where $\frac{\Delta P}{\Delta MC} = \frac{1}{2}$ .  (*Leitzinger Report*, ¶ 121 and Figure 1.)

[95]     Dr. Leitzinger admitted in deposition that his example is not based on any empirical study of the railroad industry.  (*Leitzinger Deposition* at 200:4-201:4.)

would neither be a monopoly[96] nor likely be characterized by a simple linear demand function. Just as Dr. Leitzinger showed that a hypothetical monopolist facing a linear demand curve will pass on one-half of its cost increases, one can show that economic theory predicts that a monopolist facing an iso-elastic demand curve (*i.e.*, a demand function characterized by constant price elasticity) can have a pass-through rate greater than one.[97]  Dr. Leitzinger's hypothetical monopolist example is of no practical value in assessing whether the pass-through rates produced by Professor Rausser's model are reasonable.

66.      Dr. Leitzinger also claims that the pass-through rates allowed in Professor Rausser's model are reasonable because the railroads' operating profit margins would still have been positive during the Class Period even if Professor Rausser's damages were removed from the railroads' revenues.[98]  Dr. Leitzinger calculates that after subtracting the overcharges found by Professor Rausser's STB model, Defendants' operating profit margin as a whole still would have been "roughly ▇ percent of their freight revenues."[99]  It is not economically meaningful to ask how Defendants' operating profit for their entire business would have been affected by the lower but-for rates for just the Class shipments.  Defendants' rail freight businesses include significant traffic that is not part of the Class, including regulated traffic, traffic with no FSC, traffic with a mileage-based FSC, and traffic under a legacy FSC.[100]  Dr. Leitzinger does not offer any calculation of the profitability of only the Class traffic using the costs of serving only that traffic and the but-for rates for that traffic implied by Professor Rausser's STB damages model.  Due to limitations in the data, I do not attempt to correct Dr. Leitzinger's calculation.  But, Dr. Leitzinger's calculation is not informative on the question of whether Professor Rausser's STB damages model generates economically sensible levels of but-for profitability or fuel cost recovery for the Class traffic.  An unreasonably low but-for rate predicted by a damages model

---

[96]      Here I refer to the rail freight industry as a whole, for purposes of general exposition.  I am not suggesting that there is a single national market for rail freight nor do I exclude the possibility that a railroad may be a monopolist on certain routes for some commodities.  Indeed, the economic forces certainly vary from one route/commodity pair to another.

[97]      Jeremy I. Bulow and Paul Pfleiderer (1983), "A Note on the Effect of Cost Changes on Prices," *Journal of Political Economy*, **91**(1):182-185.

[98]      *Leitzinger Report*, ¶¶ 188-89.

[99]      *Leitzinger Report*, ¶ 189.  This calculation uses the damages from Professor Rausser's STB model.  Dr. Leitzinger offers no calculation for the Class & Merits model.

[100]      *See* n. 59 for the Class definition.

does not become reasonable just because, for some reason, the firm could charge the low rate and still make overall positive operating profits because of high profits in other parts of its business.  The mere observation that the enterprise as a whole would remain profitable at the but-for prices—or even the observation that the line of business where damages are alleged to have occurred would remain profitable—is not a test of whether the but-for pass-through rates allowed by a damages model are reasonable.

## IV.   DR. LEITZINGER PERFORMED NO TEST FOR FALSE POSITIVES BUT MY ANALYSIS SHOWS THERE ARE FALSE POSITIVES; DR. LEITZINGER'S CRITICISM OF PROFESSOR KALT'S FALSE POSITIVES IS UNJUSTIFIED AND, IN ONE CASE, IS ACTUALLY A CRITICISM OF PROFESSOR RAUSSER'S DAMAGES MODEL

67.    Under the assumption that a conspiracy to fix prices occurred, a reliable damages model will find damages where the Plaintiffs' theory of harm predicts damages should be found.  A reliable damages model must also find *no* damages where it is *not* plausible that damages should be found under the Plaintiffs' theory of harm.  If a damages model finds damages where none could plausibly have occurred, *i.e.*, if the model generates "false positives," this provides one indication that the model is unreliable.[101]

68.    Notwithstanding the importance of testing for false positives, Dr. Leitzinger has not offered any such test.  He has not applied Professor Rausser's model to any group of shipments that should not have been affected by the alleged conspiracy and shown that the model does not generate false positive damages for such shipments.  In contrast, I have conducted such a test—in particular, I test whether rail rates based on RCAF result in false positives—and I have also reviewed Professor Kalt's findings regarding false positives.  My results confirm Professor Kalt's conclusion that Professor Rausser's model generates false positives.  The evidence of false positives that I discuss here, together with the lack of findings to the contrary from either Professor Rausser or Dr. Leitzinger, provides further confirmation that Professor Rausser's model is unreliable and should be rejected.

---

[101]    Professor Kalt described how one way to test the reliability of a model is to check whether the model predicts effects that could not plausibly have occurred.  (Declaration of Joseph P. Kalt, Ph.D., Errata Corrected May 6, 2014 (hereinafter, *Kalt Remand Report*), ¶ 5 and Section II.A.)

69.     As a preliminary matter, I note that at least part of Plaintiffs' Experts' response to every false positive test offered so far has been to argue that there is some reason to believe that there could be true findings of injury under the tested conditions, so that the false positives provide an invalid test of the reliability of the model.  Professor Rausser and Dr. Leitzinger are therefore making the claim that there is apparently no way to test the model for false positives in order to validate the model's reliability.  Neither Professor Rausser nor Dr. Leitzinger has put forward even one example in which the model correctly finds no damages for a group of shippers who are likely not injured.

70.     This section is structured as follows.  In Section IV.A, I provide a test of false positives based on RCAF pricing.  In Section IV.B, I show that Dr. Leitzinger's and Professor Rausser's dismissal of false positives on legacy contracts based on claims that contracts can be renegotiated or that the model captures stricter enforcement of FSCs are without merit.  In Section IV.C, I discuss how Dr. Leitzinger's criticism of Professor Kalt's false positives based on analysis of the pre-Class Period is really a criticism of Professor Rausser's damages model.

### A.     EVEN IF SHIPPERS HAD PAID RAIL RATES BASED ON RCAF, PROFESSOR RAUSSER'S MODEL STILL WOULD FIND DAMAGES

71.     In one of Professor Kalt's false positive analyses, Professor Kalt finds that Professor Rausser's model would produce positive damages even if the railroads had charged rail rates equal to their variable costs.[102]  Dr. Leitzinger responds that a finding of damages in such a situation is not an unreasonable result because, in an oligopolistic (and non-conspiratorial) environment, rail rates may rise by less than a railroad's full increase in variable costs; thus it is not inconsistent to find damages if a railroad raised rail rates by the full amount of its increase in variable cost.[103]

72.     To address Dr. Leitzinger's concern that Professor Kalt's false positives based on variable cost pricing allow too much pass-through of increased fuel costs, I have conducted another test of the reliability of Professor Rausser's model by determining whether the model finds damages when rates are based on a non-conspiratorial price adjustment mechanism such as

---

[102]     *Kalt Remand Report,* ¶¶ 61-64.

[103]     *Leitzinger Report,* § VII.C.

RCAF.[104]   Testing for false positives using rail rates adjusted by RCAF is appropriate for at least

two reasons.  First, Plaintiffs have suggested in this proceeding that rate adjustments based on

RCAF had been used for decades and were not conspiratorial.[105]  Professor Rausser himself has

acknowledged that RCAF would have been used in the but-for world: [106]

> In my benchmark period, I included all available transaction data, under my
> maintained hypothesis that those transactions traveled during a time free from
> collusion (except for perhaps the few months just prior to the start of the Class
> Period).  During that period of time Defendants used a diverse and wide variety of
> fuel recovery mechanisms, including FSCs, but also including base rate increases
> and other cost escalation mechanisms, such as the RCAF.  This provides 'a good
> indication of what should have happened in the Class Period had the conspiracy
> not occurred.'

73.    Second, Dr. Leitzinger cites RCAF as an example of a pricing practice consistent with

less than full recovery of fuel costs.[107]  Thus my false positive test uses a cost escalation index

that (a) Plaintiffs claim was not tainted by the alleged conspiracy; (b) is what Plaintiffs and

Professor Rausser believe would have been used in place of FSCs in the but-for world; and (c)

does not allow for full recovery of increased fuel costs, which Dr. Leitzinger claims is

appropriate.

74.    My analysis begins with a non-conspiratorial base rate, such as the average rate for a

particular shipment of a commodity in one quarter prior to the Class Period.  I increase that base

---

[104]    RCAF ("Rail Cost Adjustment Factor") is an index of rail costs.  *See* n. 11.

[105]    "The AII and RCAF both included a fuel cost component, and the Defendants had used these
indices for decades to measure fuel-cost increases."  (Second Consolidated Amended Class
Action Complaint, *In re: Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No.
1869, Misc. No. 07-489 (PLF), December 31, 2009, ¶ 74.)

[106]    *Rausser Supplemental Class Reply Report*, at 56 (citing *Rausser Merits Report*, at 166); *see, also*,
Deposition of Dr. Gordon Rausser, September 24, 2010, at 126:18-127:2.  ("Now, with regard to
the but-for world, many of those who were paying the standardized fuel surcharges in the actual
world would not be paying it in the but-for world.  They would be paying some other form,
perhaps the base rates would be responding to RCAF, and they would be paying it through the
base rates."); Deposition of Dr. Gordon Rausser, December 18, 2012, at 423:9-17 ("Q. I am
asking the question as a conceptual matter.  In the but-for world do you think the defendants
would have fully recovered their fuel costs absent the conspiracy?  A. In the but-for world?  Q.
Yeah.  A. Using -- coming back to the RCAF, updating the RCAF on a frequent basis, yes, indeed
they would have.")

[107]    *Leitzinger Report*, n. 260.  ("Dr. Ordover similarly notes BNSF's concern that prior to the Class
Period 'its historical pricing practices (for example, its use of RCAF [rail cost adjustment factor])
were not allowing it to adequately recover its incremental fuel costs.'")

rate over time using the RCAF escalation index.[108]  Thus, starting from my base, I simulate a series of rail rates in each quarter such that the change in the rail rate from quarter to quarter are determined entirely by the cost increases captured in the RCAF index.  Because no conspiratorial actions can be attributed to rail rates generated in this way, a reliable model of damages should not find overcharges if these simulated rates had been charged to shippers.

75.     In my analysis, I use the last calendar quarter prior to the start of the Class Period (2003Q2) as the base period.  Figure 8 below shows the pattern of simulated rail rates using the RCAF-U index (blue line) and the non-conspiratorial rail rates arising from Professor Rausser's damages models estimated using the simulated rates (red lines).  The average rail rates based on RCAF-U always exceed those but-for rail rates.  This means that Professor Rausser's model will find damages if a railroad had charged rates during the Class Period that were escalated using only non-conspiratorial RCAF.[109]

---

[108]     There are two RCAF indexes: RCAF-U, which is not adjusted for productivity and RCAF-A, which is adjusted for productivity.  (Association of American Railroads, "AAR Railroad Cost Indexes," June 2013 at 20.)  I use both indexes in my analysis.

[109]     In the backup materials, I redo Figure 8 where I use Professor Rausser's predicted but-for prices based on his estimated coefficients (not the ones based on RCAF data) to construct the bottom two red lines. The conclusions discussed in the text are unchanged.



76.     Indeed Professor Rausser's model finds damages when it should not.  Table 7 shows the overcharge estimates derived from Professor Rausser's model when rail rates are based on either the RCAF-U index, the RCAF-A index, or the average of the two indices.[110]  In all of these cases, Professor Rausser's model finds that shippers were damaged, even though, by construction, the rail rates were non-conspiratorial.

---

[110]     The measure of non-fuel costs that Professor Rausser uses in his model (AIILF) relies on the same all-inclusive index (AII) that is used to construct RCAF-U.  RCAF-U is then adjusted for productivity to generate RCAF-A.  (Association of American Railroads, "AAR Railroad Cost Indexes," June 2013 at 2, 20, and Tables G through M.)



### B.   DR. LEITZINGER'S CRITICISM OF PROFESSOR KALT'S ANALYSIS OF FALSE POSITIVES BASED ON LEGACY SHIPMENTS WITH RATE-BASED FSCs IS UNFOUNDED

77.   Professor Kalt demonstrates that Professor Rausser's STB model generates damages when applied to shipments during the Class Period with an FSC that was adopted prior to the start of the alleged conspiracy—so-called "legacy shipments."[111]  Professor Kalt's finding of false positives on legacy shipments still holds when he limits the analysis to shipments where the earning power of the FSC formula did not increase (and may have decreased) during the Class Period.[112]

78.   In response to this false positive analysis, Professor Rausser and Dr. Leitzinger claim that although shipments subject to contracts containing FSCs signed prior to the start of the alleged conspiracy are not part of the Class, they cannot serve as a "clean" group[113] to test for false positives because all legacy shippers were harmed by the alleged conspiracy.[114]  According to their theory, these legacy shippers were harmed because, in the absence of the alleged conspiracy, these shippers would have been able to renegotiate their contracts (or obtained waivers or other concessions) in order to pay lower rates.[115]  Thus, Professor Rausser and Dr. Leitzinger claim, even though legacy shippers signed contracts with FSCs prior to the alleged

---

[111]   *Kalt Remand Report*, § II.C.

[112]   *Kalt Remand Report*, ¶¶ 36-38 and Figure 2.

[113]   A "clean" group would be a set of shipments that was not affected by the alleged conspiracy.

[114]   *Leitzinger Report*, ¶¶ 154-155; *Rausser Supplemental Class Reply Report* at 75-76.

[115]   *Id.*

conspiracy, the alleged conspiracy prevented them from obtaining lower rates in the face of higher fuel prices.

79.     Professor Rausser's and Dr. Leitzinger's argument that legacy shippers with FSCs would simply have renegotiated their contracts appears to be equivalent to an argument that contracts are meaningless.  Their theory appears to be that if contracted rail rates exceed spot rail rates, shippers would renegotiate to lower their contracted rates to those spot rates.[116]  Professor Rausser and Dr. Leitzinger have not suggested any reason to think that the ability to renegotiate contracts is asymmetric, however.  This means that under their theory railroads would also renegotiate contracts with shippers whenever contracted rates are less than spot rates or whenever contracts not incorporating FSCs are priced lower than contracts with FSCs.  In Professor Rausser's and Dr. Leitzinger's world, deviations of contracted rail rates from spot rail rates or deviations of contracted rates incorporating an FSC from contracted rates without an FSC should always prompt a renegotiation.  This implies, of course, that spot rates and contracted rates should always be equal,[117] and that rates on contracts with an FSC should equal rates on contracts without an FSC.[118]

80.     In fact, we observe different rates in contracts with and without FSCs.  Although Dr. Leitzinger notes these differences, he ignores the implications of the differences.  He observes that "prior to the Class Period, all-in rates that included FSCs were generally higher (all else equal) than all-in rates that did not include FSCs."[119]  He fails to see that if such differentials existed in the pre-Class Period when no conspiracy is alleged, there is no economic reason to

---

[116]     Dr. Leitzinger testified that there is a large economic literature on parties to a contract renegotiating the terms of their agreement.  (*Leitzinger Deposition* at 398:16-399:16.)  But he ignores the point in that literature that a voluntary renegotiation would occur only in those instances in which it is in each party's interests to renegotiate.  He provides no evidence that, when a shipper's contract rates increased as a result of increases in fuel prices, it would have been in the railroad's interest to renegotiate the contract rates down to the spot rate.

[117]     The literature indicates that contracts can lead to persistent differences between spot prices and contracted prices.  *See, e.g.*, R. Glenn Hubbard (1986), "Supply Shocks and Price Adjustment in the World Oil Market," *Quarterly Journal of Economics*, **101**(1):85-102.  ("Price rigidity is not limited to industrial product markets; certain commodity markets exhibit multiple prices because of contract rigidities, with petroleum being the best known example.")

[118]     At the very least, as long as contracts have any meaning (so that renegotiation is not automatic), one would expect damages to legacy shippers to be smaller than damages to others, but under Professor Rausser's analysis, they are not.  (*See Kalt Remand Report*, ¶ 35 and Figure 1.)

[119]     *Leitzinger Report*, ¶ 150.

believe that such differentials would have disappeared during the Class Period as his and Professor Rausser's theory of renegotiation suggests.

81.     I have conducted a regression analysis to test the hypothesis that spot rates and contract rates are equal, and I find that they are not.[120]  Instead, I find that rates paid under contracts are approximately ███ percent lower than rates paid where no contract is in force.[121]  What this rate differential shows is that contracts in the rail industry are important in determining rates and cannot be assumed to be non-binding or easily renegotiated when they work to the disadvantage of one party.  Put simply, the empirical evidence rejects the notion that contract renegotiations of the kind hypothesized by Professor Rausser and Dr. Leitzinger eliminate price differences between contract and spot rates.  Therefore, their criticism of Professor Kalt's false positive analysis of legacy shipments is unjustified.

82.     Dr. Leitzinger also claims that damages for shipments under pre-existing legacy contracts are not false positives because Professor Rausser's damages model might be reflecting the alleged stricter enforcement of FSCs achieved by the alleged conspiracy.[122]  In other words, Dr. Leitzinger is suggesting that the conspiracy affected the rate of FSC coverage.  There are several flaws in this argument.  First, Professor Rausser's damages model is not a model of coverage, that is, he does not model the likelihood that a particular shipment will be covered by an FSC. Rather than attempt to model coverage in the but-for world, Professor Rausser limits the Class Period sample to shipments with a rate-based FSC while including all shipments (with and without a rate-based FSC) in the pre-Class Period.  Shipments without a rate-based FSC during the Class Period are not studied or explained: they are simply not part of the model.  This is a

---

[120]     In conducting this test, I used data provided by Defendant UP and concentrate on the pre-Class Period from January 2000 to June 2003.  I use only UP's data because, in contrast to the other railroads' data, the UP transaction data allows me to identify which shipments were billed using a contracted rate and which shipments were billed using a spot price.  (*Kalt Merits Report*, ¶¶ 148-150.)

In my analysis, I regressed log rail rate per ton-mile on all of the explanatory variables present in Professor Rausser's Class & Merits Model, excluding the variables measuring the impact of the alleged conspiracy.  (*See Rausser Merits Report* at 170, Table 53.)  I also included as a regressor a dummy variable indicating whether the shipment was billed using a spot price or a contracted price.  The coefficient estimate for the dummy variable provides evidence on the difference in rates for the contract.

[121]     The estimated effect is statistically significant.

[122]     *Leitzinger Report*, ¶¶ 157-158.

methodological flaw because Professor Rausser effectively assumes that the conspiracy successfully elevated coverage to 100 percent, which is inconsistent with the facts. Second, neither Dr. Leitzinger nor Professor Rausser has studied the elevation in coverage that would have occurred in the but-for world, nor proposed a model that would identify the Class members that would not have paid an FSC in the but-for world. In my Merits Report, I conducted such an analysis using data for UP and showed that coverage during the Class Period did not increase, relative to the trend from the pre-Class Period.[123] In short, neither Professor Rausser nor Dr. Leitzinger performed an analysis of enforcement or coverage, and Dr. Leitzinger's assertion that the false positive results from Professor Rausser's model can be explained away by stricter enforcement is unfounded.

### C.   DR. LEITZINGER'S CRITICISM OF PROFESSOR KALT'S ANALYSIS OF FALSE POSITIVES DURING THE PRE-CLASS PERIOD IS IN FACT A CRITICISM OF PROFESSOR RAUSSER'S DAMAGES MODEL

83.    Professor Kalt showed that Professor Rausser's model finds damages in a test limited to only pre-Class Period data.[124] Professor Kalt performs his test for false positives by splitting the pre-Class Period into a hypothetical benchmark period and a hypothetical Class Period. Following Professor Rausser's methodology, he restricts the hypothetical Class Period data to include only shippers with FSCs. He then follows Professor Rausser's methodology and finds damages for all the dates he tests. Because all of the shipments analyzed occurred in the pre-Class Period and their associated rates are therefore non-conspiratorial, there is clearly a flaw in Professor Rausser's model that causes it to find damages where none should exist.

84.    Dr. Leitzinger criticizes Professor Kalt's test by claiming there is nothing surprising about this result. He argues that since Professor Kalt limits his hypothetical Class Period to include only shippers with FSCs, while his hypothetical benchmark period includes all shippers, it would make sense to find damages "inasmuch as FSCs played an important role in pricing."[125] However, Professor Kalt has simply constructed his test to mimic Professor Rausser's definition

---

[123]     *Carlton Merits Report*, ¶¶ 85-102.

[124]     *Kalt Remand Report*, ¶¶ 41-43 and Figure 5.

[125]     *Leitzinger Report*, ¶ 149.

of the pre-Class Period and Class Period shippers.[126]  Thus, the finding of false positives is a further confirmation of the unreliability of Professor Rausser's methodology.

85.     The key observation is that Dr. Leitzinger's criticism of Professor Kalt is in fact a criticism of Professor Rausser.  To the extent that Dr. Leitzinger's criticism has merit, it applies to Professor Rausser's model.  That is, according to Dr. Leitzinger, one would expect contracts with FSCs to pay higher rates than contracts without FSCs, even in a non-conspiratorial period.  This means that, by comparing Class Period shipments with an FSC to pre-Class Period shipments with and without an FSC, Professor Rausser's model will generate damages even in the absence of the alleged conspiracy.  Professor Kalt has made this point,[127] and Dr. Leitzinger's conclusions agree with Professor Kalt's.  By concluding that, because FSC contracts are different than non-FSC contracts, it is improper to mix them together in a benchmark, non-conspiratorial period (which is exactly what Professor Rausser does in his model), Dr. Leitzinger clearly states yet another reason why Professor Rausser's model is unreliable.

## V.     DR. LEITZINGER HAS NOT TESTED WHETHER PROFESSOR RAUSSER'S MODEL FINDS COMMON IMPACT ACROSS SHIPPERS; IT DOES NOT

86.     Dr. Leitzinger has suggested that Professor Rausser's model "also can be used to explore statistically whether (and to what extent) the overcharges vary in some systematic, theoretically plausible manner based upon other shipper characteristics such as type of shipment, distance, or railroad."[128]  One way to analyze whether overcharge estimates differ across shippers is to include in Professor Rausser's model a separate estimate of damages for each shipper and thereby allow Professor Rausser's damage estimate to vary by shipper.  If Professor Rausser and Dr. Leitzinger are correct that the model provides reliable proof of common impact across Class shippers, one would expect such a model to find that individual shippers are universally impacted, *i.e.*, all suffer damages.

---

[126]     *Kalt Remand Report*, n. 65.

[127]     *Kalt Merits Report*, ¶¶ 529-536.

[128]     *Leitzinger Report*, ¶ 185.

87.     I have done such an analysis by estimating Professor Rausser's damages model for the 200 largest shippers found in the Class Period data,[129] allowing for the conspiracy effects to differ across shippers, and I find that shippers accounting for a substantial portion of Class shipments were not damaged.  Of the 200 largest shippers in my analysis, ██ shippers are estimated to have negative damages for the Class Period as a whole, and, of these ██ shippers, ██ shippers (██ percent of the total) have statistically significant negative damages.[130]  In other words, Professor Rausser's model shows tha ██ percent of the top 200 shippers benefitted from the alleged conspiracy by a statistically significant amount, even though they are members of the Class.[131]  These ██ shippers collectively account for ██████ in Class revenues (see Appendix C).

88.     The fact that Professor Rausser's model, when modified to allow separate damage estimates by shipper, finds tha ██ percent of the top 200 shippers were benefitted from the alleged conspiracy by a statistically significant amount is striking given that Professor Rausser's specification biases him to find damages simply as a ████████████████ ████████████.  I have already explained that this incorrect assumption causes him to overestimate damages from the alleged conspiracy.  Yet, even with this incorrect assumption, this modified model finds that ██ percent of shippers benefitted (*i.e.*, have negative damages) as a result of the alleged conspiracy.  If I correct his assumptions about the ████████████ ████████ non-fuel cost elasticity as I describe in Section III.C above, I find a large percentage of uninjured shippers.  As shown in Table 8, when I allow the fuel price and non-fuel

---

[129]   The shippers used in my analysis account for ██ billion in shipment revenue, which is approximately ██ percent of the Class revenues.

[130]   I follow Professor Rausser's overcharge methodology ████████████████████████ ████████████████.  Using Professor Rausser's methodology, the average overcharge could be negative even though there are some weeks where the overcharge percentage is positive.

The test for statistical significance is based on the variance of the cartel effect estimated as $Var(\beta_2 + \beta_3 * \mu_{logHDF})$ where $\mu_{logHDF}$ is the average log HDF fuel price during the Class Period. It is not possible to claim that such findings are due to small data samples or are "statistical anomalies." (*See Leitzinger Report*, ¶¶ 176-177.)  My results are not a result of random statistical error.  The regression uses millions of observations, and even the smallest shipper with negative damages had ████████ in class shipments (*see* Appendix C).

[131]   I am not suggesting that such shippers were, in fact, benefitted by any alleged conspiracy. Rather, the point is that Professor Rausser's damages model is not a reliable means for proving common injury to all or nearly all class members.

cost elasticities to vary, the percentage of benefitted shippers rises to between ▮▮▮ percent (when a separate AIILF coefficient is estimated for each year) and ▮▮▮ percent (when AIILF varies and is equal one (1) minus the fuel elasticity in each year).



89.     Again, I do not claim that my corrections to Professor Rausser's treatment of elasticities fix all of the problems in his model or make it suitable for use as a model of aggregate damages, much less as a model of damages to all class members. Instead, the finding that these corrections result in over half of shippers being benefitted from the alleged conspiracy is further confirmation that Professor Rausser's model, even with more accurate assumptions on elasticities, is unreliable for measuring alleged conspiratorial damages.

_Dennis W Carlton_

Dennis W. Carlton

_7/15/15_

July 15, 2015

**APPENDIX A: RELATIONSHIP OF PROFESSOR RAUSSER'S FUEL PRICE ELASTICITY TO RAILROADS' FUEL SHARE**



92.     The first term on the right hand side is the fuel share calculated by Dr. Leitzinger, *i.e.*, the ratio of the cost of the railroad's fuel consumption (evaluated at the HDF fuel price) to the railroad's total variable cost (evaluated at the railroad's price per gallon of fuel).  The second term on the right hand side is the derivative of the railroad's price per gallon of fuel with respect to the HDF fuel price.

93.     If the fuel price that the railroad faces is identical to the HDF fuel price, then Professor Rausser's fuel price elasticity is just the fuel share:



---

[133]     Hal Varian (1992), *Microeconomic Analysis*, W.W. Norton & Company, at 74.

where TVC* is the total variable cost evaluated using the HDF fuel price.  This fuel share can be calculated from available data.

94.     Alternatively, suppose that the fuel price that the railroad faces, $P_f$, is something other than the HDF fuel price.  Assuming that $\frac{\partial P_f}{\partial P_{HDF}} = 1$ , the required fuel price elasticity is just the fuel share:

$$\epsilon_{P_{HDF}}^{TVC} = \frac{Q_f * P_{HDF}}{TVC} \qquad\qquad (7)$$

where TVC is evaluated using $P_f$, the price per gallon of fuel that the railroad faces.  If $\frac{\partial P_f}{\partial P_{HDF}}$ deviates from 1, then the required fuel price elasticity is given by equation (5) above.

**APPENDIX B: DR. LEITZINGER'S ALTERATION OF THE BOX-COX ELASTICITIES IS ERRONEOUS AND IS NOT SUPPORTED BY THE ACADEMIC LITERATURE**

95.     In Section III.E.2, I described how the fuel price elasticities estimated from Dr. Leitzinger's Box-Cox methodology follow a nonsensical pattern, *i.e.*, they trend downward during the Class Period (when fuel prices were rising) while Dr. Leitzinger's own fuel shares trend upward during that same period.  Before using these fuel price elasticities in Professor Rausser's damages model, Dr. Leitzinger altered them so that they trend upward.  Although he did not provide any explanation or theoretical support for his alteration of the elasticities in his Expert Report,[134] at deposition, Dr. Leitzinger provided one academic paper, Osborne (2010), that he says justifies his alteration of the data.[135]  I explain in this Appendix why Dr. Leitzinger's alteration is erroneous and rejected by the literature.

96.     In deposition, Dr. Leitzinger's testified that the Box-Cox transformation inverts the ordering of the values of a variable if the estimated lambda is less than zero, as is the case in his Box-Cox estimation of Professor Rausser's cost equation where lambda is estimated as -0.21.[136]  Because of this, he testified that he altered the elasticities estimated by the Box-Cox model in order to "undo" the effect of the Box-Cox transformation.[137]  For the proposition that Box-Cox inverts the ordering of the values of a variable when lambda is less than zero, Dr. Leitzinger relies on the Osborne paper which states: "any λ less than 0.00 has the effect of reversing the

---

[134]     In his Expert Report, Dr. Leitzinger reported only the altered elasticities (*Leitzinger Report*, Figure 3) and did not indicate that he had altered the elasticities that his Box-Cox model produced, nor did he provide any justification for such an alteration.  However, the alteration can be discovered by examining his computer program contained among his workpapers.  (*Leitzinger Report* backup, Stata program "Figure 3.do.")

[135]     *Leitzinger Deposition* at 453:7-454:3.  The paper Dr. Leitzinger provided in support of the transformation is Jason W. Osborne (2010), "Improving your data transformations: Applying the Box-Cox transformation," *Practical Assessment, Research & Evaluation*, **15**(12): 1-9.  Dr. Leitzinger testified that this was the only article he had identified that related to his alteration of his Box-Cox elasticities.  (*Leitzinger Deposition* at 500:12-13.)

[136]     Dr. Leitzinger testified as follows: "And that's because when -- when Box-Cox determines that lambda is between zero and one [sic], it has the property of flipping the ordering in the variables and -- and so you -- when you literally plot out that formula, you get something that would look like the inverse picture of that.  And so what Figure 3 is, is what happens if you undo that inversion that is inherent in the -- in the Box-Cox estimation and is one of the things that the -- you see in the literature about the use of Box-Cox."  (*Leitzinger Deposition* at 221:24-222:10.)

[137]     *Leitzinger Deposition* at 224:16-225:3.

order of the data."[138]  Dr. Leitzinger appears to have misinterpreted the author's statement.  If a simple power transformation is used to transform a positive variable, $y$, that is $g_\lambda = y^\lambda$, and if the value of lambda is less than zero, then the transformation inverts the order of the variable.[139] But the Box-Cox transformation is not a simple power transformation.  Instead, the Box-Cox transformation is: $f_\lambda = \frac{y^\lambda - 1}{\lambda}$.[140]  In the Box-Cox transformation, lambda appears in the denominator of the transformed variable, which has the effect of preserving the order of the original variable when lambda is negative.

97.     The mathematical proof is as follows.  Consider a mathematical transformation, B(y), of a positive variable, y.  The transformation B(y) *preserves* order if when $y_1 > y_2$, it is also the case that $B(y_1) > B(y_2)$.  Suppose that B(y) is the Box-Cox transformation: $B(y) = \frac{y^\lambda - 1}{\lambda}$.  To show that the Box-Cox transformation preserves order when lambda is negative, I must show that $B(y_1) > B(y_2)$ if $y_1 > y_2$ and $\lambda < 0$.

98.     Applying the Box-Cox transformation to y₁ and y₂:

$$B(y_1) = \frac{y_1^\lambda - 1}{\lambda} \qquad (1)$$

$$B(y_2) = \frac{y_2^\lambda - 1}{\lambda} \qquad (2)$$

Then, I must show that:

$$B(y_1) > B(y_2) \qquad (3)$$

Or, equivalently:

$$\frac{y_1^\lambda - 1}{\lambda} > \frac{y_2^\lambda - 1}{\lambda} \qquad (4)$$

Multiplying both sides by $\lambda$, which is negative, yields:

$$y_1^\lambda < y_2^\lambda \qquad (5)$$

---

[138]   Jason W. Osborne (2010), "Improving your data transformations: Applying the Box-Cox transformation," *Practical Assessment, Research & Evaluation*, **15**(12): 1-9 at 6.

[139]   For example, if λ=-1, then 10 exceed 9 but 1/10 ($10^{-1}$) is less than 1/9 ($9^{-1}$) so the power transformation inverts the order of the variable.

[140]   *See Leitzinger Report*, n. 277.

Applying the natural logarithm (which is an order-preserving function[141]) to both sides of this equation:

$$\lambda \log(y_1) < \lambda \log(y_2) \qquad (6)$$

Dividing both sides by $\lambda$, which is negative:

$$\log(y_1) > \log(y_2) \qquad (7)$$

Because the natural logarithm is order-preserving,[142] equation (7) implies that $y_1 > y_2$. Thus, even when $\lambda$ is negative, the Box-Cox transformation preserves the order of the values of a variable.[143]

99.     Dr. Leitzinger could have discovered his error if he had examined his data after transforming it using the Box-Cox transformation with a lambda equal to -0.21. I have examined the original and transformed data for Dr. Leitzinger's dependent variable (variable cost) and the HDF price series. In Figure A-1, the untransformed HDF price series is shown by the blue line and the transformed HDF price series (with lambda = -0.21) is shown by the red line. It is clear that the Box-Cox transformation does not change the order of the original variable: the order of any two points on the blue line is the same as the order of the same two points on the red line. Similarly, Figure A-2 shows that Dr. Leitzinger's Box-Cox transformation (with lambda = -0.21) does not alter the order of the variable cost (per ton-mile) variable.

---

[141]     *See, e.g.*, Takeshi Amemiya (1994), *Introduction to Statistics and Econometrics*, Harvard University Press, at 134.

[142]     *Id.*

[143]     *See* Peter J. Bickel and Kjell A. Doksum (1981), "An Analysis of Transformations Revisited," *Journal of the American Statistical Association* **76**(374): 296-311, at 296-297, describing the Box-Cox function as a "strictly monotone increasing transformation."



100.    In summary, Dr. Leitzinger has altered his Box-Cox fuel price elasticities because he claims that the Box-Cox transformation flips the order in the variables.[144]  His claim is incorrect. Therefore, there is no justification for his alteration.

---

[144]    *Leitzinger Deposition* at 221:24-222:10.

**APPENDIX C: SHIPPERS (AMONG TOP 200 SHIPPERS) IDENTIFIED BY PROFESSOR RASUSER'S DAMAGES MODEL AS BENEFITTING FROM THE ALLEGED CONSPIRACY**

| Shipper Name | Class Revenue | Undercharge | T-Stat |
|---|---|---|---|



Note: Analysis was performed on 200 shippers with a total of ▮▮▮▮▮ in Class revenue. The top 200 shippers were chosen based on Class revenue. Shippers with less than 100 observations in either the benchmark period or Class Period were excluded from the analysis. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ was excluded because insufficient data precluded estimation of a conspiracy effect. ▮▮▮▮▮▮▮▮▮▮▮ T-statistic in excess of 2 in absolute value indicates significance at the 5 percent level.

**Exhibit 1**

**Curriculum Vitae and
Testifying Experience of Dennis W. Carlton (July 2011-July 2015)**

**DENNIS WILLIAM CARLTON**                                                July 2015
Senior Managing Director

Business Address:        Compass Lexecon                (312) 322-0215
                         332 South Michigan Avenue
                         Chicago, Illinois  60604

Email Address:           dcarlton@compasslexecon.com

<u>EDUCATION</u>

Ph.D., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts: Economics, 1975.

M.S., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts: Operations Research, 1974.

A.B., HARVARD UNIVERSITY (Summa cum laude): Applied Math and Economics, 1972.

<u>EMPLOYMENT</u>

COMPASS LEXECON (formerly Lexecon), Chicago, Illinois (2008 – present) Senior Managing Director; LEXECON INC., (1977 – 2006), President 1997 – 2001, Senior Managing Director 2003 - 2006

UNIVERSITY OF CHICAGO, Booth School of Business, David McDaniel Keller Professor of Economics (2011 – present); Katherine Dusak Miller Professor of Economics (2008 – 2011); Professor of Economics (1984 – 2008); Law School, Professor of Economics (1980 – 1984); Department of Economics, Assistant Professor (1976 – 1979); Associate Professor (1979).

U.S. DEPARTMENT OF JUSTICE, Washington, District of Columbia (2006 – 2008) Deputy Assistant Attorney General for Economic Analysis, Antitrust Division

MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts, Department of Economics (1975 – 1976) Instructor in Economics

<u>OTHER PROFESSIONAL EXPERIENCE</u>

HARVARD UNIVERSITY, Public Policy Summer Course in Economics (1977), Professor

BELL TELEPHONE LABORATORIES (Summers 1976, 1977)

JOINT CENTER FOR URBAN STUDIES OF M.I.T. AND HARVARD UNIVERSITY, Cambridge, Massachusetts (1974 - 1975)

CHARLES RIVER ASSOCIATES, Cambridge, Massachusetts (Summers 1971, 1972) Research Assistant

<u>FIELDS OF SPECIALIZATION</u>

Theoretical and Applied Microeconomics
Industrial Organization

## ACADEMIC HONORS AND FELLOWSHIPS

Keynote Address, International Industrial Organization Conference, 2014
The 2014 Distinguished Fellow, Industrial Organization Society
Award for Best Antitrust Economist, Global Competition Review, 2014
Keynote Address, Sixth Annual Federal Trade Commission Microeconomics Conference, 2013
Heath Memorial Lecture, University of Florida, 2013
Award (w. Mark Israel) for Best Antitrust Analysis in Litigated Cases, Global Competition Review, 2013
Keynote Address, 21st Annual Workshop of the Competition Law & Policy Institute of New Zealand, 2010
Keynote Address, Japanese Symposium on Competition, sponsored by Japan Fair Trade Commission, 2009
Recipient of Inaugural Robert F. Lanziotti Prize, awarded by the Industrial Organization Society for Best Paper in Antitrust Economics, 2008
Keynote Address to Israel Antitrust Conference, 2008
Lewis Bernstein Memorial Antitrust Lecture, Washington, D.C., 2006
Distinguished Visitor, University of Melbourne, April 2005
Milton Handler Lecture, New York, 2004
Keynote Address to the International Competition Network, Mexico, 2004
Alexander Brody Distinguished Lecture, Yeshiva University, 2000
Ph.D. Thesis chosen to appear in the Garland Series of Outstanding Dissertations in Economics
Recipient of the 1977 P.W.S. Andrews Memorial Prize Essay, best essay in the field of Industrial Organization by a scholar under the age of thirty
National Science Foundation Grant, 1977 - 1985
Recipient of Post-doctoral Grant from the Lincoln Foundation, 1975
National Science Foundation Fellowship, 1972 - 1975
Phi Beta Kappa, 1971
John Harvard Award, 1970
Detur Book Prize, 1969
Edwards Whitacker Award, 1969
M.I.T., National Scholar Award, 1968

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

Appointed Member of the ABA Transition Task Force, Antitrust and Consumer Protection, 2012
Advisory panel to the Department of Justice and the FTC on the merger guidelines, 2010
Co-editor, Journal of Law and Economics, 1980 - present
Visiting Committee, MIT, Department of Economics, 1995 - 2011
Member, Advisory Board, Economics Research Network, 1996 - present
Member, Advisory Board of Antitrust and Regulation Abstracts, Social Science Research Network, 1998 - present
Advisory Board, Massachusetts Institute of Technology, Department of Economics, 1999 - present
Editorial Board, Competition Policy International (CPI), 2010 – present, Co-Editor, Competition Policy International (CPI), 2004 – 2009
Member, Economic Task Force – Antitrust Division, American Bar Association, 2010 – present
Advisory Board, Journal of Competition Law and Economics, 2004- present
Adjunct Scholar, American Enterprise Institute for Public Policy Research, 2007 – present
Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice, 2006 - 2008
Presidential Appointment to the Antitrust Modernization Commission, 2004 – 2007

Invited Panelist at Public Hearing on the Retail Banking Sector Inquiry: Payment Cards, before the European Commission in Brussels, Belgium, July 17, 2006.

Consultant on Merger Guidelines to the FTC, 2003

Professor, George Mason Institute for Judges, October 2001

Chairman, FTC Round Table on Empirical Industrial Organization (September 11, 2001)

Participant in the Round Table on the Economics of Mergers Between Large ILECS before the Federal Communications Commission, February 5, 1999

Member, Steering Committee, Social Science Research Council, Program in Applied Economics, 1997 - 1999

Participant in roundtable discussions on "The Role of Classical Market Power in Joint Venture Analysis," before the Federal Trade Commission, November 19, 1997 and March 17, 1998.

Participant in meetings with Committee of the Federal Reserve on Payment Systems, June 5, 1997

Associate Editor, Regional Science and Urban Economics, 1987 - 1997

Resident Scholar, Board of Governors of the Federal Reserve System, Summer, 1995

Accreditation Committee, Graduate School of Business, Stanford University, 1995

Associate Editor, The International Journal of Industrial Organization, 1991 - 1995

Editorial Board, Intellectual Property Fraud Reporter, 1990 - 1995

Consultant on Merger Guidelines to the U.S. Department of Justice, 1991 - 1992

Member, Advisory Committee to the Bureau of the Census, 1987 - 1990

National Bureau of Economic Research, Research Associate

Member, American Economics Association, Econometrics Society

## BOOKS

Market Behavior Under Uncertainty, Ph.D. Thesis, Massachusetts Institute of Technology (September 1975); Garland Publishing (1984).

Modern Industrial Organization, Scott, Foresman & Co., co-authored with Jeffrey Perloff, first edition (1990), (Chapter 17 of first edition reprinted as "The Economics of Information" for the University of Connecticut, Food Marketing Policy Center (1989)), second edition (1994), translated into Chinese, French, Hungarian and Italian; Addison Wesley Longman, third edition (2000), fourth edition (2005), translated into Chinese (2009).

## RESEARCH PAPERS

"The Equilibrium Analysis of Alternative Housing Allowance Payments," (with Joseph Ferreira) Chapter 6 of Analysis of a Direct Housing Allowance Program, The Joint Center for Urban Studies of M.I.T. and Harvard University, (July 1975).

"Theories of Vertical Integration," presented at Fourth Annual Telecommunications Conference. Appears in a volume of Proceedings of the Fourth Annual Telecommunications Conference, Office of Telecommunications Policy, (April 1976).

"Uncertainty, Production Lags, and Pricing," American Economic Review, (February 1977).

"Selecting Subsidy Strategies for Housing Allowance Programs," (with Joseph Ferreira) Journal of Urban Economics, (July 1977).

"Peak Load Pricing With Stochastic Demand," American Economic Review, (December 1977). (Reprinted in Economic Regulation edited by P.L. Joskow, Edward Elgar Publishing Limited, 1998 and Reprinted in The Economics of Public Utilities edited by Ray Rees, Professor of Economics at the University of Munich, Germany, 2005.)

"The Distribution of Permanent Income," Income Distribution and Economic Inequality, edited by Zvi Griliches, et al.  (Halsted Press, 1978).

"Vertical Integration--An Overview," in Congressional Record Hearings on the Communications Act of 1978.  Bill H.R. 13105, (August 3, 1978).

"Market Behavior with Demand Uncertainty and Price Inflexibility," American Economic Review, (September 1978).

"Vertical Integration in Competitive Markets Under Uncertainty," Journal of Industrial Economics, (March 1979).  Awarded the P.W.S. Memorial Prize for the best essay in the field of Industrial Organization by a scholar under the age of thirty.

"Valuing Market Benefits and Costs in Related Output and Input Markets," American Economic Review, (September 1979).

"Contracts, Price Rigidity and Market Equilibrium," Journal of Political Economy, (October 1979).

"Why New Firms Locate Where They Do:  An Econometric Model," in Studies in Regional Economics, edited by W. Wheaton, (Urban Institute, 1980).

"Benefits and Costs of Airline Mergers:  A Case Study," (with W. Landes and R. Posner) Bell Journal of Economics, (Spring 1980).  (Reprinted in "Air Transport" in Classics In Transport Analysis series, edited by Kenneth Button and Peter Nijkamp, 2001.)

"The Limitations of Pigouvian Taxes as a Long Run Remedy for Externalities," (with G. Loury) Quarterly Journal of Economics, (November 1980).

"The Law and Economics of Rights in Valuable Information:  A Comment," Journal of Legal Studies, (December 1980).

"Price Discrimination:  Vertical Integration and Divestiture in Natural Resources Markets," (with J. Perloff) Resources and Energy, (March 1981).

"The Spatial Effects of a Tax on Housing and Land," Regional Science and Urban Economics, (November 1981).

"Comments on Weicher," Journal of Law and Economics, (December 1981).

Comment, in Sherwin Rosen ed. Studies in Labor Markets, University of Chicago Press, (1981).

"Planning and Market Structure," in The Economics of Information and Uncertainty, edited by J.J. McCall, University of Chicago Press, (1982).

"The Disruptive Effect of Inflation on the Organization of Markets," in Robert Hall, ed. The Economics of Inflation, University of Chicago Press, (1982).

"The Need for Coordination Among Firms With Special Reference to Network Industries," (with J. M. Klamer) University of Chicago Law Review, (Spring 1983).

"A Reexamination of Delivered Pricing," Journal of Law and Economics, (April 1983).

"Futures Trading, Market Interrelationships, and Industry Structure," American Journal of Agricultural Economics, (May 1983).

"The Regulation of Insider Trading," (with D. Fischel), Stanford Law Review, (May 1983), reprinted in J. Macey ed., Classics in Corporate Law and Economics, Edward Elgar Publishing (2008), reprinted in part in Roberto Romano, Foundations of Corporate Law, Oxford University Press (1993), Foundation Press (2010 forthcoming), and Corporate Law Series – Insider Trading, Edward Elgar Publishing (2011 forthcoming).

"The Location and Employment Choices of New Firms:  An Econometric Model with Discrete and Continuous Endogenous Variables," The Review of Economics and Statistics, (August 1983).

"Economic Goals and Remedies of the AT&T Modified Final Judgment," (with W. Lavey), Georgetown Law Review, (August 1983).

"Equilibrium Fluctuations When Price and Delivery Lags Clear the Market," Bell Journal of Economics, (Autumn 1983).

"Energy and Location," Energy Costs, Urban Development, and Housing, Brookings Institution, (1984).

"Futures Markets:  Their Purpose, Their History, Their Growth, Their Successes and Failures," Journal of Futures Markets, (September 1984).  (Reprinted in Futures Markets edited by A.G. Malliaris and W.F. Mullady, Edward Elgar Publishing Limited, 1995; and in Classic Futures: Lessons from the Past for the Electronics Age, edited by Lester Telser, Risk Books, 2000.)

"The Economics of Gray-Market Imports," (with C. DeMuth), written for the Coalition to Preserve the Integrity of American Trademarks (COPIAT), (May 1985).

"The Limitation of Pigouvian Taxes As A Long Run Remedy for Externalities:  Extension of Results," (with G. Loury) Quarterly Journal of Economics, (August 1986).

"The Rigidity of Prices," American Economic Review, (September 1986).

"The Theory and The Facts of How Markets Clear:  Is Industrial Organization Valuable for Understanding Macroeconomics?" in Handbook of Industrial Organization, eds. Schmalensee and Willig, (1989).

"Market Power and Mergers in Durable-Good Industries," (with R. Gertner), Journal of Law and Economics, (October 1989).

"Comments on Vertical Integration and Market Foreclosure," Brookings Papers on Economic Activity: Microeconomics, (1990).

Book Review of Tirole's "The Theory of Industrial Organization", Journal of Political Economy, (June 1990).

"The Genesis of Inflation and the Costs of Disinflation:  Comment," Journal of Money, Credit & Banking, (August 1991, Part 2).

"The Theory of Allocation and its Implications for Marketing and Industrial Structure:  Why Rationing is Efficient," Journal of Law and Economics, (October 1991).

"The Economics of Cooperation and Competition in Electronic Services Network Industries," in Economics of Electronic Service Networks, Wildman Steven ed., Praeger Press, (1992).

"Merger Policy and Market Definition Under the EC Merger Regulation," (with W. D. Bishop). <u>Conference on Antitrust in a Global Economy</u>, Fordham Corporate Law Institute, (1994).

"The Antitrust Economics of Credit Card Networks," (with A. Frankel) <u>Antitrust Law Journal</u>, (Winter 1995).

"Economic Organization and Conflict," <u>Journal of Institutional and Theoretical Economics</u>, (March 1995).

"Antitrust and Higher Education:  Was There a Conspiracy to Restrict Financial Aid?"  (with G. Bamberger and R. Epstein)  <u>The Rand Journal of Economics</u>, (Vol. 26, No. 1, Spring 1995, pp. 131-147).

"The Competitive Effects of Line-of-business Restrictions in Telecommunications," (with K. Arrow and H. Sider), <u>Managerial and Decision Economics</u>, (Vol. 16, pp. 301-321, 1995).  (Reprinted in <u>Deregulating Telecommunications - The Baby Bells Case for Competition</u>, edited by Richard S. Higgins and Paul H. Rubin, John Wiley & Sons Ltd., 1995.)

"The Antitrust Economics of Credit Card Networks:  Reply to Evans and Schmalensee," (with A. Frankel), <u>Antitrust Law Journal</u>, (Spring 1995).

"Antitrust and Payment Technologies," (with A. Frankel), <u>Review</u>, Federal Reserve Bank of St. Louis (November/December 1995).

"Antitrust Policy Toward Mergers When Firms Innovate:  Should Antitrust Recognize the Doctrine of Innovation Markets?"  Testimony before the Federal Trade Commission Hearings on Global and Innovation-based Competition (October, 1995).

"You Keep on Knocking But You Can't Come In:  Evaluating Restrictions on Access to Input Joint Ventures," (with S. Salop), <u>Harvard Journal of Law & Technology</u>, (Volume 9, Summer, 1996). (Reprinted in <u>e-Commerce Antitrust & Trade Practices</u>, Practicing Law Institute, 2001.)

"Comments on Causes and Consequences of Airline Fare Wars," <u>Brookings Papers on Economic Activity: Microeconomics</u>, (1996).

"A Critical Assessment of the Role of Imperfect Competition in Macroeconomics," in <u>Market Behavior and Macro Economic Modeling</u>, Brakman, Van Ees, & Kuipers (eds.), MacMillan Press (1997).

"Price Rigidity," <u>Business Cycles and Depressions</u>, David Glasner ed., Garland Publishing, Inc., (1997).

"Communication Among Competitors:  Game Theory and Antitrust," (with R. Gertner and A. Rosenfield), <u>George Mason Law Review</u>, (1997).  (Reprinted in <u>e-Commerce Antitrust & Trade Practices</u>, Practicing Law Institute, 2001.)

"Comments on Born and Viscusi," <u>Brookings Papers on Economic Activity: Microeconomics</u>, (1998).

"Antitrust and Higher Education:  MIT Financial Aid (1993)," (with G. Bamberger), <u>The Antitrust Revolution</u>, in eds. J. Kwoka and L. White, (Oxford University Press, 3rd edition 1999).

"Market Power and Vertical Restraints in Retailing:  An Analysis of FTC v. Toys 'R' Us," (with H. Sider), <u>The Role of the Academic Economist in Litigation Support</u>, edited by Daniel Slottje, North Holland, (1999).

"The Economics of Religion, Jewish Survival and Jewish Attitudes Toward Competition on Torah Education," (with A. Weiss), Journal of Legal Studies, (2001).  (Reprinted in Essential Readings on Jewish Identities, Lifestyles and Beliefs, edited by Stanford M. Lyman, Gordian Knot Books, 2003).

"A General Analysis of Exclusionary Conduct and Refusal to Deal -- Why Aspen and Kodak are Misguided," Antitrust Law Journal, (2001).  (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"The Lessons from Microsoft," Business Economics, (January 2001).

"Lessons from Halacha About Competition and Teaching," (with A. Weiss), Center for Business Ethics Social Responsibility, http://besr.org/library/competition.html, (March 2001).

"The Choice of Organizational Form in Gasoline Retailing and The Costs of Laws Limiting that Choice," (with A. Blass), Journal of Law and Economics, (October 2001).  Reprinted in Franchise Contracting and Organization, edited by Francine Lafontaine, Elgar Publishing, (2005).

"Should The Merger Guidelines Be Scrapped? Introduction to a Debate," in Symposium On The Antitrust Analysis Of Mergers: Merger Guidelines vs. Five Forces, 33 U. WEST L.A. L. REV. (2001).

"Free Riding and Sales Strategies for the Internet," (with J. Chevalier), The Journal of Industrial Economics, (December 2001).

"The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries," (with M. Waldman), The Rand Journal (Vol. 33, No. 2, Summer 2002).  (Reprinted in B. Klein and A. Lerner eds.   Economics of Antitrust Law, Edward Elgar Publishing Ltd, 2008, and Recent Developments in Monopoly and Competition Policy, The International Library of Critical Writings in Economics, edited by George Norman, Edward Elgar Publishing Ltd, 2008.)

"The Competitive Effects of Fannie Mae," (with D. Gross and R. Stillman) in Housing Matters: Issues in American Housing Policy, Fannie Mae (January 2002, reprinted 2004).

"Intellectual Property, Antitrust and Strategic Behavior," (with R. Gertner), in eds. Adam Jaffee and Joshua Lerner, Innovation Policy and the Economy, Volume 3, MIT Press (2003).

"Airline Networks and Fares," (with G. Bamberger), Handbook of Airline Economics, 2nd ed., Darryl Jenkins, ed., McGraw Hill (2003).

"Contracts that Lessen Competition -- What is Section 27 for, and How Has it Been Used?"  (with David Goddard), in Mark N. Berry and Lewis T. Evans eds., Competition Law at the Turn of the Century: A New Zealand Perspective, Victoria University Press (2003).

Interview, Economists' Roundtable, Antitrust Magazine, (Spring 2003).

"The Relevance for Antitrust Policy of Theoretical and Empirical Advances in Industrial Organization," (Fall 2003), George Mason Law Review.

"The Control of Externalities in Sports Leagues: An Analysis of Restrictions in the National Hockey League," (with A. Frankel and E. Landes), Journal of Political Economy, (February 2004), reprinted in Recent Developments in the Economics of Sport, edited by W. Andreff (forthcoming).

"An Empirical Investigation of the Competitive Effects of Domestic Airline Alliances," (with G. Bamberger and L. Neumann), <u>Journal of Law and Economics</u>, Vol. 47, No. 1, (April 2004, pp. 195-222).

 "Why Barriers to Entry are Barriers to Understanding," <u>American Economic Review</u>, (May 2004).

"Using Economics to Improve Antitrust Policy," Milton Handler Lecture, <u>Columbia Business Law Review</u>, (June 2004).

"The Proper Role for Antitrust in an International Setting," (Keynote address: Second Annual Conference of the International Competition Network (ICN), Merida City, Mexico (June 25, 2003), appears as Appendix to "Using Economics to Improve Antitrust Policy", <u>Columbia Business Law Review</u> (June 2004).

 "Econometric Analysis of Telephone Mergers," (with H. Sider) pp. 373-395 in American Bar Association, <u>Econometrics: Legal, Practical, and Technical Issues</u>, (2005).

"How Economics Can Improve Antitrust Doctrine Towards Tie-in Sales," (with M. Waldman), <u>Competition Policy International</u>, (Spring 2005).

Preface to: "Law and Economics of the Mexican Competition Laws," by Francisco Gonzalez de Cossio (2005).

"Transaction Costs, Externalities and "Two-Sided" Payment Markets," (with A. Frankel), <u>Columbia Business Law Review</u>, No. 3, Vol. (2005).

"Predation and the Entry and Exit of Low-Fare Carriers," (with G. Bamberger), in <u>Advances in Airline Economics: Competition Policy and Antitrust</u>, Darin Lee, ed., (2006).

"Why Tie An Essential Good," (with Michael Waldman), in Hahn R. ed., <u>Antitrust Policy and Vertical Restraints</u>, AEI-Brookings, (July 2006).

"Market Definition:  Use and Abuse," <u>Competition Policy International</u> (Spring 2007)

Interview with Deputy Assistant Attorney General, <u>The Antitrust Source</u> (February 2007)

Separate Statement of Dennis W. Carlton, in <u>The Report of the Antitrust Modernization Commission</u>, (April 2007)

"Does Antitrust Need to be Modernized?," <u>Journal of Economic Perspectives</u> (Summer 2007)

"The Year in Review:  Economics at the Antitrust Division 2006-2007" (with K. Heyer), <u>Review of Industrial Organization</u>, (2007).

"Economic Analysis of Competition Practices in the EU and the U.S.:  A View from Chief Economists," (with M. Salinger), <u>Competition Policy International</u> (Autumn 2007).

"Merger Analysis," <u>Palgrave Dictionary</u>, (with J. M. Perloff), (2008).

"Tying," (with M. Waldman), in W. Collins ed. <u>Issues in Competition Law and Policy</u>, American Bar Association, (2008).

"Barriers to Entry," in W. Collins ed. <u>Issues in Competition Law and Policy</u>, American Bar Association, (2008).

"Product Variety and Demand Uncertainty:  Why Mark-ups Vary with Quality," (with James D. Dana Jr.), Journal of Industrial Economics (2008)

"Regulation, Antitrust, and Trinko," (With H. Sider), in eds. J. Kwoka and L. White, The Antitrust Revolution, (2008).

"A Solution to Airport Delays," (with W. Whalen, K. Heyer and O. Richard), Regulation (2008).

"Should 'Price Squeeze' Be A Recognized Form of Anticompetitive Conduct?," Journal of Competition Law & Economics (2008).

"Safe Harbors for Quantity Discounts and Bundling," (with M. Waldman),  George Mason Law Review (2008).

"Appropriate Antitrust Policy Towards Single-Firm Conduct: Extraction vs. Extension" (with K. Heyer)," Antitrust, (condensed version of subsequent paper), (Summer 2008).

"Extraction vs. Extension: the Basis for Formulating Antitrust Policy Towards Single-Firm Conduct" (with K. Heyer), Competition Policy International, (Autumn, 2008).

"Assessing the Anticompetitive Effects of Multiproduct Pricing," (with P. Greenlee and M. Waldman), Antitrust Bulletin, (Fall, 2008).

"The Need to Measure the Effect of Merger Policy and How to Do It," Antitrust, (condensed version of subsequent paper), (Summer 2008).

 "How to Measure The Effectiveness of US Merger Policy," http://voxeu.org/index.php?q=node/3344, (2009), and a slightly revised version appears as "Measuring the Effectiveness of US Merger Policy" in The Economists' Voice: Vol. 6: Iss. 7, Article 2, (2009).  These are condensed versions of the subsequent paper.

 "Why We Need to Measure the Effect of Merger Policy and How to Do It," Competition Policy International (Spring 2009).

"Competition, Monopoly, and Aftermarkets," (with M. Waldman), Journal of Law, Economics and Organization, (April 2009).

"Competition Policy: Beware of Using It to Harm Competition," Fair Trade, Japan, (Spring, 2009).

"Should Competition Policy Prohibit Price Discrimination?" (with M. Israel), Global Competition Review, (2009).

"Merger Guidelines Revisited?" an interview, Antitrust, American Bar Association, (Fall 2009).

"How Should Economic Evidence be Presented and Evaluated," proceedings of the EU Competition Workshop, Florence, Italy, (June 2009).

"Externalities in Payment Card Networks: Theory and Evidence: A Commentary," The Changing Retail Payments Landscape: What Role for Central Banks?, Federal Reserve Bank of Kansas City (2010).

"Why Tie a Product Consumers Do Not Use?," (with J. Gans and M. Waldman), Recipient of Inaugural Robert F. Lanzilotti Prize, awarded by the International Industrial Organization Society for Best Paper in Antitrust Economics, (2008), <u>American Economic Journal: Microeconomics</u> (2010).

"Mergers in Regulated Industries: Electricity," in <u>Competition Law and Economics: Advances in Competition Policy Enforcement in the EU and North America</u>, A. Mateus and T. Moreira editors, (2010).

"Financial Issues (Comments on Bankruptcy and Clearing Houses)," Chapter X in <u>Competition as Public Policy</u>, American Bar Association, (2010).

"Revising the Horizontal Merger Guidelines," <u>Journal of Competition Law & Economics</u> (2010), also appears in <u>Journal of Competition Law – CADE</u> (Brazil) Vol. 1, No. 23 (2011), also appears in Revista de Direito da Concorrencia, Conselho Administrativo de Defesa Economica, (Brazilian Government Publication), translated into Portuguese by T. Aranovich, p. 83-114 (2011).

"Net Neutrality and Consumer Welfare," (with G. Becker and H. Sider), <u>Journal of Competition Law & Economics</u>, (2010).

"Will The New Guidelines Clarify or Obscure Antitrust Policy?," (with M. Israel), <u>The Antitrust Source</u>, (2010).

"Introduction to Stigler's Theory of Oligopoly," (with S. Peltzman), <u>Competition Policy International</u>, (2010).

"Response to Gopal Das Varma's Market Definition, Upward Pricing Pressure, and the Role of Courts: A Response to Carlton and Israel" (with M. Israel), <u>The Antitrust Source</u>, (2010).

"Use and Misuse of Empirical Methods in the Economics of Antitrust," 3(1) <u>Competition Policy International Antitrust Chronicle</u>, (2011).

"The Economics of Patent Ambush," <u>Concurrences, New Frontiers of Antitrust</u>, (2011).

"Proper Treatment of Buyer Power in Merger Review," (with M. Israel), <u>Review of Industrial Organization</u>, (2011).

"Upgrades, Switching Costs, and the Leverage Theory of Tying," (with M. Waldman), <u>Economic Journal</u>, (2012).

"Brantley Versus NBC Universal: Where's the Beef?," (with M. Waldman), <u>Competition Policy International</u>, (2012).

"The Economics of Cartel Cases and the Use of Experts," (with G. Bamberger and M. Israel), <u>ABA Handbook of Cartel Enforcement</u>, ed S. Cherry (forthcoming)

"An Economic Interpretation of FRAND," (with A. Shampine), <u>Journal of Competition Law & Economics</u>, (2013)

"Economists' Roundtable on Hot Patent-Related Antitrust Issues," <u>Antitrust Magazine</u>, Vol. 27, No. 3, (Summer 2013).

"Identifying Benchmarks for Applying Non-Discrimination in FRAND," (with A. Shampine), <u>Competition Policy International</u>, CPI Antitrust Chronicle, (August 2014).

"Patent Litigation, Standard Setting Organizations, Antitrust and FRAND," (with A. Shampine), University of Texas Intellectual Property Law Journal, (2014).

"Antitrust and Regulation," (with R. Picker) in N. Rose ed., Economics of Deregulation, NBER, (2014).

"Competition Policy and Regulation in Credit Card Markets: Insights from Single-sided Market Analysis," (with R. Winter), Competition Policy International, (2014).

"Robert Bork's Contributions to Antitrust Perspectives on Tying Behavior," (with M. Waldman), Journal of Law & Economics, (2014).

"Buyer Power in Merger Review," (with M. Coleman and M. Israel), Oxford Handbook of International Antitrust Economics, eds. R. Blair and D. Sokol (2015).

"Antitrust, Transaction Costs and Merger Simulation with Non-linear Pricing," (with B. Keating), Journal of Law and Economics, (forthcoming).

"Rethinking antitrust in the presence of transaction costs: Coasian Implications," (with B. Keating), Review of Industrial Organization, (forthcoming).


## UNPUBLISHED PAPERS

"Modeling the Housing Allowance Program," M.A. Thesis, Massachusetts Institute of Technology (September 1974).

"The Cost of Eliminating a Futures Market and The Effect of Inflation on Market Interrelationships," (1984).

"The Empirical Importance of Delivery Lags as an Explanation of Demand," (1984).

"Statistical Supplement to The Antitrust Economics of Credit Card Networks:  Reply to Evans and Schmalensee Comment, 63 Antitrust Law Journal 903 (1995)," (with Alan Frankel), (May 1997).

"Antitrust and Not for Profits; The Case of Hospitals," (with C. Capps, and G. David), mimeo (2010).


## EXPERT TESTIMONIAL EXPERIENCE July 2011-July 2015

ActiveVideo Networks, Inc. v. Verizon Communications Inc. et al.: In the U.S. District Court for the Eastern District of Virginia, No. 2:10cv248 (RAJ/FBS), May 26, 2011 (Deposition), July 25-26, 28, 2011 (Testimony)

DSM Desotech INC. v. 3D Systems Corporation and 3D Systems, Inc. in the United States District Court for the Northern District of Illinois, Docket No. 08C1531, August 26, 2011 (Deposition), November 14, 2011 (Deposition).

HTC Corporation et al. v. IPCOM GMBH & Co., KG in the United States District Court District of Columbia, Case No. 1:08-cv-01897- RMC, August 5, 2011 (Deposition).

 in Re: TFT-LCD (Flat Panel) Antitrust Litigation, in the United States District Court Northern California San Francisco Division, No. C07-1827 SI, MDL No. 1827.

August 17, 2011 (Deposition Concerning Indirect Purchaser Class Action).

April 10, 11, and 12, 2012 (Deposition Concerning the Direct Purchaser Class).

June 25, 2012 (Testimony Concerning the Direct Purchaser Class).

April 4, 2013 (Deposition Concerning the Best Buy Co., Inc., et al. v. Toshiba Corporation, et al, matter).

May 13, 2013 (Direct Testimony Concerning the Costco Wholesale Corporation v. Toshiba Corporation, et al, matter).

October 23, 2012 (Deposition) October 24, 2012 (Testimony Concerning Costco Wholesale Corporation v. Sharp Electronics Corporation, and Sharp Corporation),

June 26, 2014 (Deposition Concerning the State of Washington v. Au Optronics Corporation, et al, matter).

September 23, 2014, (Deposition Concerning the State of Oregon v. Au Optronics Corporation, et al, matter).

October 14, 15, and 21, 2014 (Testimony Concerning Costco Wholesale Corp., v. Au Optronics Corp., et al.).

Apple Inc. and NeXT Software Inc., v. Motorola. And Motorola Mobility Inc., August 15, 2012 (Deposition)

Rail Freight Fuel Surcharge Antitrust Litigation, MDL No. 1869, Misc. No. 07-489 (PLF), May 14, 2013 (Deposition).

Mylan Pharmaceuticals, Inc., Rochester Drug Co-Operative, Inc., Meijer, Inc., Meijer Distribution, Inc., American Sales Company, LLC, Walgreen Co., Safeway Inc., Supervalu Inc., and Heb Grocery Co. LP, et al., v. Warner Chilcott Public Limited Company, et al., In the United States District Court for the Eastern District of Pennsylvania, Civ. No. 12-3824, December 20, 2013 (Deposition).

Polyurethane Foam Antitrust Litigation, in the United States District Court for the Northern District of Ohio, MDL Docket No. 2196, Index No. 10-MD-2196 (JZ), June 11-12, 2014 (Deposition).

Cathode Ray Tube (CRT) Antitrust Litigation, in the United States District Northern District of California San Francisco Division, Case No. 07-5944 SC, MDL No. 1917, Concerning the Viewsonic Corporation v. Chunghwa Picture Tubes, Ltd., et al. matter, September 16, 17, 2014 (Depositions).

Kleen Products LLC, et al. v. Packaging Corporation of America, et al, in the United States District Court for the Northern District Illinois Eastern Division, Case No. 1:10-cv-05711, October 28, 2014 (Deposition)

Hearing on Proposed Comcast-Time Warner Cable-Charter Transaction, Economic Analysis Workshop, before the Federal Communications Commission, January 30, 2015 (Testimony).

The Dial Corporation, et al. v. News Corporation, et al in United States District Court Southern District of New York, Civil Action No. 13-CV-06802 (WHP),  April 28, 2015 (Deposition).

# Exhibit 2

# Materials Relied On

## Legal Documents, Expert Reports, and Depositions

Corrected Expert Report of Dennis W. Carlton, Ph.D., On Behalf of Defendant Union Pacific Railroad Company, February 6, 2013.

Expert Report of Joseph P. Kalt, Ph.D., January 22, 2013.

Declaration of Joseph P. Kalt, Ph.D., Errata Corrected May 6, 2014.

Sur-Reply Declaration of Joseph P. Kalt, Ph.D., July 21, 2014.

Expert Report of Jeffrey J. Leitzinger, Ph.D., April 1, 2015.

Corrected Expert Report of Gordon Rausser, May 27, 2010.

Corrected Expert Reply Report of Gordon Rausser, September 20, 2010.

Expert Report of Gordon Rausser, October 15, 2012.

Expert Reply Report of Gordon Rausser, June 12, 2013.

Supplemental Expert Report of Gordon Rausser, Ph.D., December 19, 2013.

Supplemental Reply Expert Report of Gordon Rausser, Ph.D., May 28, 2014.

Deposition of Jeffery J. Leitzinger, Ph.D., June 25-26, 2015.

Deposition of Dr. Gordon Rausser, September 24, 2010.

Deposition of Dr. Gordon Rausser, December 18, 2012.

Deposition of Dr. Gordon Rausser, March 5, 2014.

49 U.S. Code § 10709.

Opinion and Order, November 26, 2014.

Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion for Leave to File Supplemental Expert Report, July 8, 2015.

Second Consolidated Amended Class Action Complaint, December 31, 2009.

## Articles, Books, Websites, and Other Published Materials

Articles

Laura Padilla Angulo (2013), "Labour Inputs Substitution During Corporate Restructuring: A Translog Model Approach for US Freight Railroads," *Applied Economics*, **45**(18):2547-2562.

Peter J. Bickel and Kjell A. Doksum (1981), "An Analysis of Transformations Revisited," *Journal of the American Statistical Association* **76**(374): 296-311.

John D. Bitzan (2003), "Railroad Costs and Competition: The Implication of Introducing Competition to Railroad Networks," *Journal of Transport Economics and Policy*, **37**(2):201-255.

John D. Bitzan and Theodore E. Keeler (2003), "Productivity Growth and Some of Its Determinants in the Deregulated U.S. Railroad Industry," *Southern Economic Journal*, **70**(2):232-253.

Jeremy I. Bulow and Paul Pfleiderer (1983), "A Note on the Effect of Cost Changes on Prices," *Journal of Political Economy*, **91**(1):182-185.

R. Glenn Hubbard (1986), "Supply Shocks and Price Adjustment in the World Oil Market," *Quarterly Journal of Economics*, **101**(1):85-102.

Jason W. Osborne (2010), "Improving your data transformations: Applying the Box-Cox transformation," *Practical Assessment, Research & Evaluation*, **15**(12):1-9.

Daniel L. Rubinfeld (1985), "Econometrics in the Courtroom," *Columbia Law Review*, **85**(5):1048–1097.

W. Wilson (1997), "Cost Savings and Productivity in the Railroad Industry," *Journal of Regulatory Economics*, **11**(1):21-40.

Laurits R. Christensen Associates, Inc. (2009), "Analysis of Competition, Capacity, and Service Quality," Revised Final Report Prepared for The Surface Transportation Board, Vol. 2.

Books

Takeshi Amemiya (1994), *Introduction to Statistics and Econometrics*, Harvard University Press.

American Bar Association, 2010, *Proving Antitrust Damages: Legal and Economic Issues*, 2nd Edition.

Peter Kennedy (2008), *A Guide to Econometrics*, Sixth Edition, Blackwell Publishing.

James H. Stock and Mark W. Watson (2010), *Introduction to Econometrics*, 3rd Edition, Addison-Wesley.

Hal Varian (1992), *Microeconomic Analysis,* W.W. Norton & Company.

Jeffrey M. Wooldridge (2013), *Introductory Econometrics: a Modern Approach*, 5th Edition, Cengage Learning.

Websites and Other Published Materials

Association of American Railroads, "Rail Cost Adjustment Factor (RCAF)," available at https://www.aar.org/data-center/rail-cost-indexes.

Association of American Railroads, "AAR Railroad Cost Indexes," June 2013.

Reference Guide for the 2008 Surface Transportation Board Carload Waybill Sample, August 31, 2009.

Surface Transportation Board (2010), "Report to Congress Regarding the Uniform Rail Costing System."

**Data**

Rausser Regression Dataset for years 2000-2008 (updated by Professor Kalt to reflect Professor Rausser's Remand datasets). From backup materials to Declaration of Joseph P. Kalt, Ph.D., Errata Corrected May 6, 2014.

UP Transaction Data for years 2000-2008 (processed by Compass Lexecon).

Union Pacific Price Authority Data.

Dr. Leitzinger's backup materials, Stata program "Figure 3.do."

Dr. Leitzinger's backup materials, "Stage_One.log."

Rausser Workpapers, September 2014, "Christensen Time Trend.xlsx."

R-1 Data.

RCAF Data (Association of American Railroads).

Current Waybill Sample (CWS) Data.

U.S. Highway Diesel Fuel Prices, Energy Information Administration.