## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc.  No. 07-489 (PLF)<br><br>**PUBLICLY FILED VERSION** |
| This Document Relates To:<br><br>ALL CASES | Judge: Hon. Paul L. Friedman |

### DEFENDANTS' MOTION & MEMORANDUM OF LAW REGARDING THE INTERPRETATION AND APPLICATION OF 49 U.S.C. § 10706

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ....................................................................................................1

I. COMMUNICATIONS AND AGREEMENTS RELATED TO INTERLINE
TRAFFIC ARE MANDATORY, LAWFUL, AND PRO-COMPETITIVE.....................4

    A.    The Interconnected Rail Freight Industry ...............................................4

    B.    The Adoption Of Section 10706 In The Staggers Rail Act Of 1980 ...................8

    C.    Later Developments Further Encouraged Rail Alliances...........................9

II. SECTION 10706 ENSURES ROBUST INTERLINE COOPERATION BY
PROTECTING INTERLINE ACTIONS AND RELATED CONDUCT ........................11

    A.    Section 10706 Is Intended To Prevent Inferential Conspiracy Claims
Arising From Protected Conduct In Any Antitrust Proceeding ...........................11

    B.    Section 10706 Provides A Clear Framework Prohibiting Any Inference Of
"Conspiracy" From Interline Communications And Related Conduct................12

        1.    Section 10706 Bars Any Inference Of An Unlawful Agreement
From Evidence Of A "Similar Action" On Other Traffic .......................13

        2.    Section 10706 Bars The Admission of Evidence Of A Discussion
Or Agreement That Concerned An Interline Movement, And
Resulting Rates Or Other Actions ...........................................14

    C.    Judicial Decisions Applying Other Evidentiary Protections Support
Application Of Section 10706 In This Case...........................................17

    D.    The Court Should Reject Plaintiff's Scope Arguments .......................18

III. PLAINTIFFS' "CONSPIRACY" THEORY IS BUILT ON LAWFUL
CONDUCT THAT IS PROTECTED BY SECTION 10706 .........................................19

    A.    Interline Concurrence Communications............................................21

    B.    Alliance Meetings .........................................................26

    C.    Inter-Railroad Logistical Discussions Regarding Interline Traffic .....................38

    D.    "Similar Actions" With Respect To Rail Carriers' Other Traffic .......................42

IV. CONCLUSION ......................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ................................................................. 16, 25, 37

*Balt. Gas & Elec. Co. v. United States*,
817 F.2d 108 (D.C. Cir. 1987) ....................................................................... 7

*Canadian Nat'l Ry. Co., Grand Trunk Corp., and Grand Trunk W. R.R. Inc.--*
*Control--Ill. Cent. Corp., Ill. Cent. R.R. Co., Chi., Cent. & Pac. R.R. Co., and*
*Cedar River R.R. Co.*, STB Finance Docket No. 33556, Decision No. 37, 4
S.T.B. 122, 1999 STB Lexis 305 (1999) ............................................................ 15

*Canadian Pac. Ry. Co. – Control – Dakota, Minn. & E. R.R.*
*Corp.*, Docket No. 35081, Decision No. 11, 2008 STB Lexis 549 (Sept. 29,
2008) .......................................................................................................... 1

*Coal Exps. Ass'n of the U.S., Inc. v. United States of America & ICC*,
745 F.2d 76 (D.C. Cir. 1984) ......................................................................... 8

*Demby v. Schweiker*,
671 F.2d 507 (D.C. Cir. 1981) ....................................................................... 12

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ....................................................................... 11

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ......................................................................... 16

*Hyland v. HomeServices of Am.*,
771 F.3d 310 (6th Cir. 2014) ......................................................................... 16

*Interstate Circuit, Inc. v. United States Paramount Pictures Distrib. Co.*,
306 U.S. 208 (1939) ..................................................................................... 11

*Jung v. Ass'n of Am. Med. Colleges*,
339 F. Supp. 2d 26 (D.D.C. 2004), *aff'd*, 2006 U.S. App. LEXIS 14079 (D.C.
Cir. 2006) .................................................................................................. 17

*Loughrin v. United States*,
573 U.S. 351 (2014) ..................................................................................... 19

*Matsushita Electric Industrial Company v. Zenith Radio Corporation*,
475 U.S. 574 (1986) ..................................................................................... 4

*Moore v. District of Columbia,*
  907 F.2d 165 (D.C. Cir. 1990) ........................................................................12

*Morales v. Trans World Airlines, Inc.,*
  504 U.S. 374 (1992) ........................................................................................13

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
  435 U.S. 679 (1978) ........................................................................................11

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  725 F.3d 244 (D.C. Cir. 2013) ..........................................................................5

*Soc'y of Plastics Indus., Inc. v. ICC,*
  955 F.2d 722 (D.C. Cir. 1991) ........................................................................22

*United States v. Braxtonbrown-Smith,*
  278 F.3d 1348 (D.C. Cir. 2002) ......................................................................12

*United States v. Cargo Servs. Stations, Inc.,*
  657 F.2d 676 (5th Cir. 1981) ..........................................................................11

*United States v. Taubman,*
  297 F.3d 161 (2d Cir. 2002) ...........................................................................11

*Winkler v. United States,*
  372 F.2d 74 (5th Cir. 1967) ............................................................................15

## STATUTES

15 U.S.C. § 1 et seq. (Sherman Act)
  § 1 ...................................................................................................................13
  § 37b(a)(1)(E) .................................................................................................17
  § 37b(b)(2) ......................................................................................................17

49 U.S.C. § 10101 et seq. (Staggers Rail Act of 1980)
  § 10102 ............................................................................................................13
  § 10703 ...................................................................................................1, 7, 24
  § 10706 ....................................................................................................*passim*

4R Act of 1976 .........................................................................................................8

Dictionary Act of 1947, 1 U.S.C. § 1 ...................................................................18

Pub. L. No. 96-488, § 208, 94 Stat. 1895 (1980) .................................................18

# RULES

Fed. R. Civ. P.
    11 ................................................................................................................8
    56(c)(1)(B) ...............................................................................................17
    56(c)(2) .....................................................................................................17

# TREATISES

BLACK'S LAW DICTIONARY 1158 (5th ed. 1979) ......................................... 13

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (2002) .............................................. 15

# OTHER AUTHORITIES

Ass'n of Am. Railroads, *Overview of America's Freight Railroads* (Oct. 2018),
    *available at* https://www.aar.org/wp-content/uploads/2018/05/AAR-
    Overview-Americas-Freight-Railroads.pdf ............................................5

*BNSF Press Release, BNSF and NS Team Up to Provide Coast-to-Coast, Non-*
    *Stop Intermodal Service* (April 23, 2001)
    https://www.canadianshipper.com/transportation-and-logistics/bnsf-and-ns-
    team-up-to-provide-coast-to-coast-non-stop-intermodal-service/1000000327/ ..................... 10

H.R. Conf. Rep. No. 96-1430, 1980 WL 13000 (Sept. 29, 1980) ............................... 9, 12, 14, 18

Hearing on H.R. 4570 *Before the Subcommittee on Transportation and Commerce*
    *Committee on Interstate and Foreign Commerce*, House of Representatives,
    96th Cong. 427 (Oct. 23, 1979) (statement of Donald L. Flexner) ...........................7

*Major Rail Consolidation Procedures*, STB Ex Parte No. 582, 2001 STB Lexis
    546 (June 7, 2001) .......................................................................... 9, 27

*Major Rail Consolidation Procedures*, STB Ex Parte No. 582 (Sub-No. 1), Final
    Rules (served June 11, 2001) ..............................................................9

*Public Views on Major Rail Consolidations*, *S.T.B. Decision* STB Ex Parte No.
    582, 4 S.T.B. 560 (served Mar. 17, 2000) .............................................9

U.S. Dep't of Transp., *Freight Facts & Figures 2017*, Table 5-3 (12th ed. 2017),
    *available at*
    https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/FFF_2017.pdf; .......................5

**FIGURE 1**

**National Rail Freight Network and Primary Rail Freight Corridors**



Source: AAR, *National Rail Freight Infrastructure Capacity and Investment Study* (Sept. 2007), Figure 4.1, available at
https://pdfs.semanticscholar.org/56ea/5769b3b0cfed825ee523bc8d0cf9b60e19c8.pdf

# INTRODUCTION

No single railroad's tracks cover the entire country, and Congress therefore *mandated* that rail carriers offer "through routes . . . with each other" and "establish rates and classifications applicable to those routes[.]"  49 U.S.C. § 10703.  To fulfill this directive, and to offer efficient cross-country transportation that is competitive with other options like trucking, individual railroads *must* cooperate and communicate on myriad issues—including complex logistics, marketing, and joint pricing.  Interline traffic (*i.e.*, shipments in which independent railroads cooperate to provide end-to-end service) constitutes between one-third and one-half of Defendants' unregulated shipments, and cooperation is essential to "promote efficiency in the interconnected competitive railroad system."  *Canadian Pac. Ry. Co. – Control – Dakota, Minn. & E. R.R. Corp.*, Docket No. 35081, Decision No. 11, 2008 STB Lexis 549 at *25-26 (Sept. 29, 2008).

But this cooperation also introduces risk for the railroads.  Because rail carriers are sometimes direct competitors for other traffic, their cooperation on interline pricing could lead to unfounded assertions that they unlawfully conspired.  Before the 1980s, Congress addressed this risk through comprehensive regulation of railroad services and broad antitrust immunity for regulated rates.  When Congress partially deregulated the industry in 1980, it passed 49 U.S.C. § 10706(a)(3)(B)(ii) ("Section 10706") to ensure that interline cooperation on deregulated traffic would continue unimpeded by the specter of baseless conspiracy claims.

Section 10706 has two interrelated provisions:

- *Substantive Protection*:  An antitrust conspiracy among railroads "may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic[;]" and

- *Evidentiary Protection*:  "[E]vidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement . . . concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the [antitrust] laws."

*Id.*  This statutory scheme has profoundly impacted the rail industry.  Defendants worked together to grow a national rail network that provides efficient alternatives for thousands of shippers that is highly competitive with trucks and other transportation modes.  Just as Congress hoped and intended, it is one of the great success stories of our modern transportation infrastructure.

Defendants achieved this success *only* through cooperation and agreement on the many issues that affect interline operations, including freight interchanges, interline rates, and—significant to this case—fuel surcharges.  Base rates and other charges, including fuel surcharges, are routinely agreed upon and divided between interline partners many thousands of times each year.  In contrast to other industries where communication between industry participants is rare and therefore may seem suspect, here such cooperation is both legally compelled and absolutely necessary.

Competitive interline transportation cannot exist without cooperation between carriers.  A trucking company, for example, can provide end-to-end, cross-country service using public highways, with no need to interact with others.  Rail carriers are constrained to their individual track networks.  Absent cooperation on interline movements, CSXT could not serve traffic west of the Mississippi, and UP could not ship goods to Virginia.  Rail carriers can only provide a competitive service by communicating and agreeing with interline partners on interchanged traffic.  Defendants must also manage their extensive non-interline "local" traffic, ensuring that those

routes are also competitive with non-rail alternatives. That is precisely why Congress passed Section 10706—to ensure that railroads could safely build necessary interline partnerships, while simultaneously managing their non-interline businesses, free from the fear of unfounded antitrust lawsuits.

This case is exactly what Congress sought to prevent. Plaintiffs' antitrust claim is based on circumstantial evidence related to (1) interline meetings and communications among Defendants, almost entirely between one Eastern and one Western railroad, that sometimes touched on fuel surcharges; and (2) the fact that a defendant may have subsequently engaged in internal discussion about fuel surcharges or changed one of its fuel surcharge formulas for both interline and local traffic. Section III, *infra*. None of this is direct evidence of an illegal agreement, but Plaintiffs seek to *infer* from these discussions and subsequent actions that Defendants unlawfully agreed on fuel surcharges in violation of the antitrust laws. Congress anticipated and sought to guard against precisely this type of claim.

In this Motion, Defendants ask the Court to rule as follows:

*First*, the Court should rule that the following framework applies to evidence in this case:

1. Is the evidence that two or more rail carriers acted together with respect to an interline rate or related matter (including a fuel surcharge) and one or more of those railroads then took similar action on their other traffic? If yes, a conspiracy may not be inferred from that evidence.

2. Is it evidence of a discussion or agreement that concerned an interline movement, or any resulting action? If yes, then that evidence may not be admitted or used as proof of an agreement, conspiracy, or combination—unless that discussion or agreement, considered by itself, would violate the antitrust laws.

*Second*, the Court should apply this framework to particular evidence that Plaintiffs identify as core to their conspiracy claim.  As addressed in Section III below, Plaintiffs' evidence consists of communications and agreements that are protected by Section 10706, and are thus unavailable as proof of an antitrust conspiracy.

Resolving these issues has direct implications for summary judgment, for any potential trial, and ultimately for the ability of the railroads to continue operating an effective national rail network.  Defendants intend to move for summary judgment on the ground that Plaintiffs lack sufficient admissible evidence to meet their burden to prove conspiracy under *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 594 (1986).  The scope of those motions will be significantly affected by the Court's answers to the questions posed here.

## I.      COMMUNICATIONS AND AGREEMENTS RELATED TO INTERLINE TRAFFIC ARE MANDATORY, LAWFUL, AND PRO-COMPETITIVE

This Court will be the first to interpret Section 10706 since Congress enacted it in 1980, as part of a broad overhaul of railroad regulation.  This overhaul was intended to breathe life back into a dying industry nearly bankrupted by excessive regulation and the "advent of the interstate highway system" and the resulting growth of trucking.  *See* Decl. of Christopher Campbell ("CD"), Ex. 1 (Giftos Dep. (CSXT CMO) at 237:23-238:5).  Congress resurrected the rail industry by, among other things, allowing railroads to enter into private contracts with shippers and encouraging continued collaboration between railroads on interline movements to create a seamless and more competitive truck-like service.  That historical context and the need for robust interline cooperation directly informs the scope and meaning of Section 10706.

### A.      The Interconnected Rail Freight Industry

No railroad has ever covered the entire country—for nearly 200 years, each railroad has served a limited geography.  Currently, and during the class period, over 500 freight railroads

operate in the United States, including 7 Class I railroads (the largest railroads by revenue).[1] Defendants' route maps show why interline shipments exist: no single railroad's tracks cover everything. *See* Figure 1, *supra* at v. Interline rail service is essential to U.S. transportation and fulfills the constant demand for cross-country transportation services. Between one-third and one-half of each Defendant's unregulated shipments during the class period were interline. CD Ex. 2 (Rausser Merits Report at 47-48).

Railroads compete with all modes of transportation, particularly trucking, which can reach destinations that no single railroad can on its own. Railroads must collaborate with each other to offer origin-to-destination service on all routes that is similar to what trucks offer—a herculean task of coordination given the volume of traffic at issue. Competitive interline rail service demands more than the product showing up safely and on time. The customer wants this entire process to be seamless, *as if a single railroad is handling each shipment.* After all, that is what the customer enjoys from its trucking partners, which are railroads' "primary source of competition." CD Ex. 3 (Ward Dep. (CSXT CEO) at 40:12-19); *see also* CD Ex. 4 (Anderson Dep. at 35:21-25 ("85 percent of transportation revenue is from trucks. They're a competitor. They're very easy to do business with. And we have to figure out ways to seamlessly work together so that we are more truck like or else we will not get the business.")); CD Ex. 5 (Lanigan Dep. at 144:5-16 (discussing customer concerns about interline bill variation)). Interconnection of tracks and interchange of freight on the rail network requires extensive communication and coordination between carriers. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 247 n.1 (D.C. Cir. 2013)

---

[1] *See* U.S. Dep't of Transp., *Freight Facts & Figures 2017*, at 5-5, Table 5-3 (12th ed. 2017), *available at* https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/FFF_2017.pdf; Ass'n of Am. Railroads, *Overview of America's Freight Railroads* (Oct. 2018), *available at* https://www.aar.org/wp-content/uploads/2018/05/AAR-Overview-Americas-Freight-Railroads.pdf.

("Facilitating interline traffic requires coordination among competing freight railroads over logistics and shipping rates."). Entire teams from each participating railroad must share a plethora of information, such as shipment and equipment details, and routing strategy in light of weather and track conditions, to coordinate the operational aspects of getting carloads from one rail line to another.

Customers also want a single economic package from the interlining railroads, which is what customers receive from trucking companies. Railroads must discuss and ultimately agree on virtually every aspect of their joint economic offering, *e.g.*, who will bill the customer and at what rate, how to divide the rate, and which (if any) fuel surcharge formula will be applied.

Communication and coordination are not limited to discussions of specific shipments for a specific shipper. It would be impossible to individually discuss the total economic offering for each of the interline shipments handled every day.[2] Railroads must discuss a comprehensive interline program so that each can market and provide this expanded service to compete with trucking. These types of coordinating communications are part of a railroad's day-to-day reality. Rail transport would grind to a halt if every aspect of each of the many thousands of daily interline shipments and potential shipments had to be separately negotiated. And it is often the carriers' high-level executives, those with the strategic perspective and ability to drive action, who can best achieve the procompetitive possibilities of interline services. *See*, *e.g.*, CD Ex. 3 (Ward Dep. at 55:9-21, 64:4-12 (explaining his role as a CEO at Alliance meetings)).

---

[2] Millions of interline transactions occurred during the alleged conspiracy, CD Ex. 7 (Rausser Class Reply Report at 94 (████████████████████████████████)); Ex. CD 2 (Rausser Merits Report at 47-48 (████████████████████████), and interline offerings are almost infinite in their variety. They change daily in response to customer demand.

Notably, interlining railroads act as joint venturers in a vertical supply relationship, cooperating publicly in the successful origination, interchange, and safe and timely delivery of goods that cannot be shipped by a single railroad. The communications necessary for partnering railroads to develop and optimize their joint service are therefore procompetitive, output enhancing, and present no antitrust concern. Plaintiffs' expert admits that when carriers like CSXT and UP combine to move interline traffic, they are engaged in a *vertical* relationship, not a horizontal one. CD Ex. 7 (Rausser Dep. (12/18/2012) at 288:23-291:4). As Donald Flexner (acting Deputy Assistant Attorney General, Antitrust Division, DOJ) testified at hearings on the Staggers Rail Act:

> [I]t must be emphasized that in the ordinary situation, when two carriers interline at a particular junction point and provide a through service, *the antitrust laws do not proscribe in any way* the negotiation by the two carriers of a through rate for these movements. Simply stated, these two carriers *do not compete with each other for the carriage of the interline traffic* and, therefore, they *have no reason to fear antitrust liability* in this situation.

CD Ex. 8 (Hearing on H.R. 4570 *Before the Subcommittee on Transportation and Commerce Committee on Interstate and Foreign Commerce*, House of Representatives, 96th Cong. 427 (Oct. 23, 1979) (statement of Donald L. Flexner) (emphasis added)). Similarly, Federal Trade Commission representatives testified that "[n]o one has seriously suggested that antitrust problems are created where railroads are simply end-to-end connectors – *i.e.*, when they interconnect with each other but do not overlap." *Id.* at 513. And Congress recognized the need for cooperation on interline routes by *requiring* rail carriers to offer "through routes" and to establish rates for those routes. 49 U.S.C. § 10703. For customer convenience, and to simplify negotiations and reduce transaction time and costs, rail carriers regularly establish a single "joint rate" for these through routes. *Balt. Gas & Elec. Co. v. United States*, 817 F.2d 108, 110 (D.C. Cir. 1987) ("The rate

charged [for a through route] is a joint rate if it is published as a single tariff . . . divided among all participants. . . .") (footnote omitted).[3]

## B.   The Adoption Of Section 10706 In The Staggers Rail Act Of 1980

In 1980, "[f]aced with railroad bankruptcies and the need to assure railroads of adequate revenues, Congress revamped the structure of railroad regulation in order to restore the industry to health." *Coal Exps. Ass'n of the U.S., Inc. v. U.S. & ICC*, 745 F.2d 76, 81 (D.C. Cir. 1984). In the Staggers Rail Act of 1980 and its predecessor, the 4R Act of 1976, Congress curtailed the use of rate bureaus in favor of flexible, individual railroad pricing with limited regulatory overview. The Staggers Rail Act allowed railroads to compete more effectively with other modes of transportation, particularly on long-haul rail movements that often require interline cooperation. Congress knew that interline partnerships would be crucial to this revitalization effort.

At the same time, Congress reasonably worried about the consequences of mandating extensive coordination among railroads that have some competitive overlaps. It knew that an antitrust plaintiff might misuse legitimate industry communication to draw inferences of conspiracy, thereby chilling the very interline cooperation Congress was trying to encourage. Congress explained its rationale in words that are prophetic of this case:

> Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed. To prevent such a conclusion the Conference substitute provides procedural protections about lawful discussions and resulting rates. The Conferees intend that these protections be construed to insure

---

[3] Shippers and rail carriers also have the option, through an accounting mechanism known as "Rule 11," to develop an individual rate for each portion of a through route, resulting in a separate rate agreement between the shipper and each participating rail carrier. To use Rule 11, shippers must negotiate independently with multiple rail carriers and process and pay multiple invoices for a single move, which is why many shippers prefer negotiating a single joint rate. Even where Rule 11 is used, connecting rail carriers nonetheless must communicate about the traffic because of the need to interchange that traffic across the carriers' connecting networks.

> that remedies for anti-competitive activities remain under existing
> laws.

H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *114 (Sept. 29, 1980) ("Conference Report").

Section 10706 is how Congress sought to avoid such false conclusions and their destructive

chilling effect.

### C.      Later Developments Further Encouraged Rail Alliances

Subsequent regulatory changes increased interline cooperation.  Between 1980 and 2000,

63 Class I railroads merged into the 7 that exist today, including the four Defendants in this case.

However, as shown in Figure 1 above, interlining was still necessary for a vast number of routes

across the country—in particular for shipments from the East to the West, or vice versa, but also

for many routes within a particular region.

In 2000, the STB effectively ended Class I rail consolidation when it instituted a

moratorium on rail mergers and then adopted more stringent merger rules.[4]  The STB expressly

directed the industry to elevate alliances over future mergers:  "The Board believes that other

private-sector initiatives, *such as joint marketing agreements and interline partnerships*, can

produce many of the efficiencies of a merger while risking less potential harm to the public."

*Major Rail Consolidation Procedures*, STB Ex Parte No. 582 (Sub-No. 1), 2001 STB Lexis 546,

at *30 (June 7, 2001) (emphasis added).  These new rules required that merger applicants explain

why the claimed benefits from a proposed merger, such as enhanced service to interline customers,

could not be achieved through marketing alliances or other cooperative arrangements among

independent railroads.  *See* CD Ex. 9 (Expert Report of Linda J. Morgan ("Morgan Report") at 14-

---

[4] *Public Views on Major Rail Consolidations*, *S.T.B. Decision* STB Ex Parte No. 582, 4 S.T.B. 560 (served Mar. 17, 2000);*Major Rail Consolidation Procedures*, STB Ex Parte No. 582 (Sub-No. 1), Final Rules (served June 11, 2001).

17).  In other words, as of 2001, there was a new regulatory focus on encouraging expanded use of joint ventures in lieu of formal structural combinations through merger.

Shortly thereafter, railroads began to face a serious new challenge:  the increasing volatility of fuel prices.  Fuel is one of the biggest costs that railroads incur, particularly for long-haul routes, and fluctuations in fuel prices have a dramatic impact on Defendants' cost structure.  CD Ex. 10 (Rose Dep. at 20:17-21:24).  Increasingly volatile fuel prices compelled interline partners to communicate about how to adjust their interline rates accordingly.  With express authorization from Congress in Section 10706 to engage in these communications, and with the STB promoting greater use of interline agreements, the railroads held alliance meetings to discuss interline movements.  Fuel surcharges were naturally discussed—failure to address such a significant component of the total rate would have rendered any interline rate discussions meaningless.  These meetings were not secret.  Indeed, railroad alliance initiatives long predated 2003, were very public, ramped up after the 2001 STB statement on marketing alliances, and had the stated, public goal of providing efficient service to give shippers a truck-like alternative.[5]

Plaintiffs, however, treat these alliance meetings and related interline communications as if they were inherent violations of antitrust law.  They point to alliance meetings in 2003 and 2004, predominantly bilateral meetings involving one Western and one Eastern carrier and characterize them as "extraordinary," claiming that they were the fulcrum of a conspiracy to agree upon and implement fuel surcharges on all rail traffic.  In fact, these meetings were commonplace and absolutely necessary, and Plaintiffs' claim directly violates Section 10706's protections.

---

[5] *E.g.*, *BNSF Press Release, BNSF and NS Team Up to Provide Coast-to-Coast, Non-Stop Intermodal Service* (Apr. 23, 2001) (new interline service to provide an effective alternative to trucking), available at: https://www.canadianshipper.com/transportation-and-logistics/bnsf-and-ns-team-up-to-provide-coast-to-coast-non-stop-intermodal-service/1000000327/.

## II.   SECTION 10706 ENSURES ROBUST INTERLINE COOPERATION BY PROTECTING INTERLINE ACTIONS AND RELATED CONDUCT

### A.   Section 10706 Is Intended To Prevent Inferential Conspiracy Claims Arising From Protected Conduct In Any Antitrust Proceeding

The concern that railroads could be subject to false inferences of conspiracy rests on a canonical concept in antitrust law:  the ability, in some circumstances, to prove the existence of an unlawful agreement using inferential evidence, rather than direct evidence.

*Direct Evidence*: A plaintiff can, of course, support a claim of unlawful agreement through direct evidence of such an agreement.  For example, the agreement may be conceded or may be reduced to writing.  *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 684 (1978) (defendant "admitted the[se] essential facts").  In such circumstances, the remaining critical question is whether the agreement is illegal.  Similarly, the existence of an agreement may be established by testimony from knowledgeable percipient witnesses.  *See, e.g.*, *United States v. Taubman*, 297 F.3d 161, 165 (2d Cir. 2002) ("direct evidence" of a "conspiracy to fix prices" existed where there was testimony that defendants "had met with one another on several occasions and agreed to, *inter alia*, fix prices"); *United States v. Cargo Servs. Stations, Inc.*, 657 F.2d 676, 680-81 (5th Cir. 1981) (similar "direct evidence of price fixing").

*Inferential Evidence*: A finder of fact may also infer an agreement based on circumstantial evidence of parallel action and other conduct that does not, by itself, violate the antitrust laws, such as communications between competitors.  *See Interstate Circuit, Inc. v. U.S. Paramount Pictures Distrib. Co.*, 306 U.S. 208, 221-27 (1939) (upholding an "inference of agreement" based on parallel conduct and other factors); *cf. Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983) ("[C]ourts have to infer an agreement from indirect evidence in most civil conspiracy cases.").

The difference between direct and inferential evidence is critical to understanding the context in which Congress enacted Section 10706.  Unlike other industries, where contact between

competitors might suggest unlawful behavior, interline communications in the rail industry are procompetitive and required. If interline communications could be used to infer a conspiracy, railroads would risk antitrust liability for doing the very thing Congress sought to encourage when it deregulated the industry and "encourage[d] carriers . . . to make widespread use" of contracts, including interline agreements. Conference Report, 1980 WL 13000, at *98.

Section 10706 solves this problem. In enacting Section 10706, Congress left existing antitrust remedies in place. But Congress also expressly recognized the danger that required communications "about interline movements in which [rail carriers] interchange . . . could falsely lead to conclusions about rate agreements that were lawfully discussed[.]" Conference Report, 1980 WL 13000, at *114.[6] Congress passed Section 10706 to "prevent such a conclusion[.]" *Id.*

Section 10706 ensures that procompetitive interline partnerships function in a robust way, while recognizing that certain rail carriers compete for "local" traffic in parallel to their interline partnerships. Congress recognized that where industry participants both compete in certain respects and must cooperate in others, plaintiffs may misconstrue or mischaracterize lawful interline cooperation. Legitimate interline activity would be chilled without the clear protections in Section 10706.

**B.      Section 10706 Provides A Clear Framework Prohibiting Any Inference Of "Conspiracy" From Interline Communications And Related Conduct**

Turning to the specifics of the statute, we begin, as the law commands, "with the plain language." *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) (citation omitted). Section 10706 protects against "false conclusions" from interline communications via

---

[6] The Conference Report "represents the final statement of terms agreed to by both houses," and, therefore, "next to the statute itself it is the most persuasive evidence of congressional intent." *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981); *see also Moore v. District of Columbia*, 907 F.2d 165, 175 (D.C. Cir. 1990).

two interrelated protections, each of which is discussed below.[7]

> 1.  Section 10706 Bars Any Inference Of An Unlawful Agreement From Evidence Of A "Similar Action" On Other Traffic

Section 10706 begins with a straightforward, substantive protection:

> [P]roof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic.

49 U.S.C. § 10706(a)(3)(B)(ii).  Simply put, there can be no inference of any conspiracy where:

- two or more railroads acted together with respect to rates or related matters for interline traffic, such as by discussing or implementing a fuel surcharge; and

- one or more of the railroads *also* used the same or similar rates or took similar action on other traffic, such as by implementing a similar fuel surcharge on non-interline traffic, or on other interline traffic.[8]

The rationale behind this protection is clear:  a railroad may legitimately and unilaterally apply similar practices to shared interline traffic and to local traffic across its entire network for efficiency.  A standard fuel surcharge formula is a perfect example.  There is no requirement that a particular railroad's fuel surcharge formulas should differ because traffic is local or interline, or

---

[7] Section 10706 applies "[i]n *any proceeding* in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section [including 'the Sherman Act (15 U.S.C. 1, et seq.)'] or of any similar State law." 49 U.S.C. § 10706(a)(3)(B)(ii) (emphasis added).  It is beyond dispute that "any proceeding" includes this litigation, which alleges a violation of Section 1 of the Sherman Act.

[8] The fuel surcharge assessed as part of a customer's rate is unquestionably part of the rate itself. 49 U.S.C. § 10102 (defining "rate" to mean "a rate or charge for transportation[]").  Indeed, the surcharge is part of the overall monetary charge paid by the shipper in exchange for transportation services.  In any event, even if it is not part of the rate, it clearly is a "related matter" to the rate. As the Supreme Court has explained, the ordinary meaning of the term "relating to" is "a broad one – 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with[.]'"  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)).

because a railroad is dealing with one interline partner versus another.  A unified approach is more efficient to administer, and far simpler *for customers* because they are presented with a single fuel surcharge formula.  Adopting standard fuel surcharge formulas that are widely applied to various traffic is therefore perfectly reasonable—and occurred regularly before, during, and after the alleged conspiracy.  Under Section 10706, Plaintiffs are barred from suggesting to a court or jury that this rational approach is evidence of a "conspiracy."

This first part of Section 10706 does not by its own terms lead to the exclusion of particular evidence.  But if such evidence of a "similar act" is introduced, the court and trier of fact cannot use it to infer a conspiratorial agreement.

>     2.      Section 10706 Bars The Admission of Evidence Of A Discussion Or Agreement That Concerned An Interline Movement, And Resulting Rates Or Other Actions

The second sentence of Section 10706 provides a further, prophylactic mechanism to protect against unfounded inferences of conspiracy, and calls for the exclusion of evidence about discussions or agreements that concerned an interline movement.  It provides that "evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible" in any antitrust case "if the discussion or agreement . . . concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the [antitrust] laws."  49 U.S.C. § 10706(a)(3)(B)(ii).  Plaintiffs cannot place evidence of interline agreements or discussions before the trier of fact—particularly a jury—to suggest that Defendants entered into an unlawful agreement, unless that discussion or agreement, considered *by itself*, would violate the law.  This is another "procedural protection[]" from the threat of unwarranted inferences that limits admissible interline communications to those that show direct evidence of conspiracy.  Conference Report, 1980 WL 13000, at *114.

This provision sets out a specific framework that must be applied to each piece of evidence that a plaintiff seeks to use to support antitrust claims against a rail carrier.

***First**, is the evidence about a discussion or agreement that "concerned an interline movement," or about a rate or other action resulting from such a discussion or agreement?* If the answer is "no," this evidentiary rule does not apply. If the answer is "yes," it does apply and the Court must proceed to the second step.

The word "concerned" captures anything "relat[ing] to or refer[ring] to" or "bear[ing] on" interline movements. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (2002); *see also Winkler v. United States*, 372 F.2d 74, 75 (5th Cir. 1967) ("concerned" includes things "involved," "affected" or "having a connecting relation"). Discussions or agreements about fuel surcharges on interline traffic plainly meet this test—*e.g.*, meetings between interline partners about fuel surcharges for shared traffic, and concurrence requests to interline partners about a modified fuel surcharge formula. So do "rates or actions" arising from such discussions, such as the implementation of fuel surcharges for interline traffic. The STB recognizes that such communications about joint rates and revenue are necessary to maintain a functioning interline system. *Canadian Nat'l Ry. Co., et al.*, *STB Finance Docket No. 33556,* Decision No. 37, 4 S.T.B. 122, 1999 STB Lexis 305 (1999) ("STB Finance Docket No. 33556, 1999 STB Lexis 305"), at *52 (rail carriers "regularly," and without the need for STB approval, enter agreements "to facilitate cooperation on an ongoing basis concerning through routes, including quality of service, joint rates and contracts, and revenue divisions for rail movements using these routes").

***Second**, does the discussion or agreement, "considered by itself, violate the [antitrust] laws"?* If the answer is "no," plaintiffs may not offer this evidence. If the answer is "yes," the evidentiary protection does not apply.

Not all evidence of a discussion or agreement that "concern[s] an interline movement" is automatically excluded.  Rather, if the discussion or agreement at issue would, *by itself*, be a violation of the antitrust laws, evidence about it may nonetheless be admitted.  In antitrust parlance, this asks whether the discussion or agreement is "direct evidence" of an antitrust conspiracy—meaning "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999); *see also Hyland v. HomeServices of Am.*, 771 F.3d 310, 318 (6th Cir. 2014) ("[D]irect evidence is 'tantamount to an acknowledgment of guilt' while circumstantial evidence includes 'everything else, including ambiguous statements.'") (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002)); *see also supra*, at 11-12.

Section 10706 strikes a balance.  It generally prevents a plaintiff from using evidence about interline discussions or agreements to prove an unlawful conspiracy among railroads.  But it does not bar the admission of direct evidence that the defendants entered into such a conspiracy.  Because Section 10706 is concerned with improper *inferences* from legitimate interline discussions and agreements and their implementation, it makes sense that Congress would carve out of its protections direct evidence that railroads used the opportunity of an interline communication to strike an unlawful agreement unrelated to their interline business needs.  For example, Section 10706 would not bar direct evidence that, while discussing interline matters, two railroads agreed to raise local rates for routes on which they compete head-to-head.

Importantly, Section 10706 imposes a special procedural protection that applies "[i]n any proceeding before a jury."  49 U.S.C. § 10706(a)(3)(B).  In a proceeding before a jury, the Court must determine—*before* the evidence is introduced—whether Section 10706 has been satisfied.  This bulwark against jury contamination also has implications for summary judgment because

Defendants will be entitled to argue that Plaintiffs do not have sufficient admissible evidence to support facts necessary to their claims.  Fed. R. Civ. P. 56(c)(1)(B), (c)(2).

C.   **Judicial Decisions Applying Other Evidentiary Protections Support Application Of Section 10706 In This Case**

No court has considered the scope and application of Section 10706.  However, this Court considered an analogous antitrust evidentiary provision in *Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26 (D.D.C. 2004), *aff'd*, 2006 U.S. App. LEXIS 14079 (D.C. Cir. 2006).  The statute in that case concerned a graduate medical residency "matching" program and provided that: (1) it is not unlawful under the antitrust laws to sponsor, conduct, or participate in a matching program, and (2) evidence of such conduct is not admissible to "support any claim or action alleging a violation of the antitrust laws."  *See Jung*, 339 F. Supp. 2d at 34-35 (quoting 15 U.S.C. § 37b(b)(2)).  The Court dismissed the complaint, which alleged a "single overarching integrated antitrust conspiracy with the [residency matching program] as its centerpiece," under the evidentiary protection.  *Id.* at 38 (citation omitted).  The Court ruled that Congress prevented courts from even *considering* evidence of match-related conduct in support of an antitrust claim, which doomed the complaint.  *Id.* at 39.  The Court also recognized Congress' intent to protect participants in the match program from the high cost of defending antitrust challenges, which had "'the potential to undermine this highly efficient, pro-competitive, and long-standing process.'"  *Id.* at 44 (quoting 15 U.S.C. § 37b(a)(1)(E).  On appeal to the D.C. Circuit, the Court of Appeals affirmed the ruling and went even further, finding that the complaint was barred by *both* prongs of the statute.  2006 U.S. App. LEXIS 14079 at *11.

*Jung* is instructive, as Section 10706 was similarly motivated by Congress' desire to prevent antitrust lawsuits over conduct that Congress sought to protect and encourage.

17

### D.      The Court Should Reject Plaintiff's Scope Arguments

Plaintiffs do not dispute that much of their evidence implicates interline traffic.  Rather, in past submissions, Plaintiffs contended that implicit limitations built into Section 10706 render it inapplicable to all of the communications they cite.  Plaintiffs' arguments are baseless.

**Regulated vs. Unregulated Traffic**.  Plaintiffs argued that Section 10706 does not apply to unregulated traffic.  *See* Pls. Opp. to Mot. to Exclude ("Pls.' 2010 Opp.") at 11-15 (Sept. 22, 2010), ECF No. 438.  Nothing in the text of Section 10706 reflects or suggests this limitation.  Rather, the statute states that it applies "[i]n any proceeding" to evidence that "two or more rail carriers acted together" on "an interline movement[,]" and makes inadmissible discussions or agreements that "concerned an interline movement."  49 U.S.C. § 10706(a)(3)(B)(ii).  As the Staggers Rail Act itself made clear, interline movements include both regulated *and* unregulated (*e.g.*, "contract") traffic.  *See* SRA, Pub. L. No. 96-448, § 208, 94 Stat. 1895; Conference Report, 1980 WL 13000, at *82 ("This title authorizes *one or more* carriers to enter into contracts with one or more shippers[.]") (emphasis added).  Moreover, for *other* provisions of Section 10706 where Congress wished to limit application to traffic regulated by the STB, it did so explicitly with language limiting application to traffic "subject to the jurisdiction of the Board."  *See, e.g.*, 49 U.S.C. § 10706(a)(2)(A).  Plaintiffs' argument is baseless and should be rejected.

**Single vs. Multiple Interline Movements**.  Plaintiffs have also argued that the language "an interline movement" in Section 10706's evidentiary clause limits its application to discussions about "specific joint-line movements," as opposed to multiple interline movements.  Pls.' 2010 Opp. at 34.  Defendants responded to this argument (Defs. Reply Mem. at 9-16 (Oct. 4, 2010), ECF No. 444), but reemphasize two points.  First, the Dictionary Act of 1947, 1 U.S.C. § 1, states that "unless the context indicates otherwise, words importing the singular include and apply to several persons, parties, or things."  Here, no context "indicates otherwise," and Section 10706's

purpose—protecting robust interline cooperation—is inconsistent with Plaintiffs' limitation. Second, other portions of Section 10706 make clear that when Congress wanted to limit the statute's scope to specific movements, it did so by explicitly referencing a "particular interline movement" or "particular single route."  49 U.S.C. § 10706(a)(3)(A)(ii) and (iii).  The absence of such language in the evidentiary protection at issue indicates that its scope is broader than single interline movements.  *Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presumes that Congress intended a difference in meaning.") (internal citation and alteration omitted).  Again, the Court should reject Plaintiff's argument.

## III.   PLAINTIFFS' "CONSPIRACY" THEORY IS BUILT ON LAWFUL CONDUCT THAT IS PROTECTED BY SECTION 10706

Plaintiffs' case is essentially that Defendants had bilateral meetings with interline partners during which fuel surcharges were discussed; they exchanged concurrence requests regarding interline fuel surcharges; and they then applied similar or identical fuel surcharge formulas to their other traffic.  This is the very sort of evidence barred by Section 10706.

Plaintiffs claim that in "early 2003, Defendants' highest ranking executives began a series of extraordinary meetings about the coordination of their fuel surcharge programs[,]" and that Defendants "agreed to coordinate those programs and apply them as widely a [sic] possible and, as uniformly as possible, and to as many freight shipments as possible, with the express goal of 100% coverage."  CD Ex. 11 (Pls.' 2d Am. Resp. to Defs.' First Set of Interrogs. (May 11, 2011) ("Narrative") ¶ 16).[9]  Plaintiffs have never cited any direct evidence of this supposed industry-wide agreement.  Instead, Plaintiffs seek inferences based on circumstantial evidence, including

---

[9] Plaintiffs' 83-page narrative was provided in an interrogatory response served in May 2011. Plaintiffs describe it as a "Narrative Factual Statement that identifies material facts and evidence supporting Plaintiffs' price-fixing conspiracy claim."  CD Ex. 11 (Narrative at 5).

(1) the various bilateral alliance meetings referenced above; (2) concurrence and other communications between interline partners that mention fuel surcharges; and (3) each rail carrier's decision, at some point in 2003 or 2004, to modify existing fuel surcharge formulas that Plaintiffs concede were adopted unilaterally in 2000, 2001, or 2002, in a way that Plaintiffs characterize as "identical."[10]   *See, e.g.*, *id.* ¶¶ 17-24, 29, 36-38, 45, 48-56 (asserting meetings and other communications regarding fuel surcharges) and *id.* ¶¶ 30-33, 39-42, 57-59 (asserting evidence of changes by railroads to their fuel surcharge formulas).[11]

Plaintiffs rely on inferential links between interline communications and meetings and subsequent fuel surcharge formula changes by Defendants—which Plaintiffs characterize as the implementation of a "conspiratorial" agreement reached during the interline meeting.   Plaintiffs also point to the frequency of communications between the Defendants, pointing back to the same pattern of *interline* communications.   This is exactly what Section 10706 forbids.

Plaintiffs primarily assert four categories of communications and related evidence that are protected by Section 10706.[12]   Defendants ask this Court to rule now that evidence in these four

---

[10] In fact, Defendants' fuel surcharge formulas were not identical.  As plaintiffs concede, CSXT implemented a modified fuel surcharge using the WTI fuel index in March 2003, (Narrative ¶ 31), while UP and BNSF implemented fuel surcharge formulas using a different fuel index (HDF) and each using different trigger thresholds than the other, (*id.* ¶¶ 41-42).  And plaintiffs admit that NS did not implement any new fuel surcharge formula in 2003, and didn't modify its formula until 2004.  *Id.* ¶ 57.  The full facts regarding the ubiquitous use of fuel surcharges before the alleged conspiracy, and the wide variety in fuel surcharges used by the Defendants during the alleged conspiracy, will be addressed at summary judgment.

[11] While this brief primarily cites to documents referenced in the MDL proceedings, the arguments and much of the evidence are equally relevant to *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Company* (No. 11-cv-1049), in which the plaintiff brings a nearly identical price-fixing claim based on the same inferential evidence of conspiracy.

[12] In this section, Defendants address what appear to be the primary communications, events, and related evidence that Plaintiffs asserted as part of their conspiracy narrative.  Defendants cannot predict what specific evidence Plaintiffs will ultimately rely on, so this is not exhaustive.  Defendants reserve the right to object to any other events or evidence that Plaintiffs may assert.

categories—including the specific evidence of acts, discussions, and agreements identified below—cannot be used to prove the alleged fuel surcharge conspiracy.

### A.    Interline Concurrence Communications

A concurrence communication is a request from one joint interline partner to another to agree to some term that will be applied to shared traffic.  Whenever a rail carrier makes changes that impact traffic moving under joint rates, it must seek approval—or "concurrence"—for the change from each rail carrier with which it interchanges such traffic.  There were millions of interline transactions during the alleged class period involving Defendant railroads.  *Supra* at 7, n.3.  UP alone had over 1.2 *trillion* ton miles of shared traffic from 2000 to 2008, which totaled over $33 billion in shipping revenue.  CD Ex. 12 (Carlton Merits Report, Table 3).  44% of that revenue involved joint-line rates in which the interline partners explicitly and lawfully agreed on rates for the shared traffic (including fuel and other surcharges), which required communication and coordination between those rail carriers.  *Id.*  Class period figures for the other railroads are similar.  *See, e.g.*, CD. Ex. 13 (Harris Report, Table 4 (41-47% of NS unregulated revenue was interline)); CD Ex. 14 (Johnson Report ¶ 31 & Exhibit 6 (39% of CSXT unregulated revenue was interline); CD Ex. 15 (Ordover Report, Figure 3 (1/3 of BNSF traffic was exchanged)).

The carrier originating a particular shipment usually communicates with the customer about rates and handles billing.  The originating carrier then seeks concurrence to the proposed rate actions from other participating carriers.  This could include concurrences in periodic rate adjustments, or concurrences by the participating carrier in the originating carrier's fuel surcharge program.  Such an arrangement allows a participating carrier (say, NS) to know when the originating carrier (say, UP) would assess a particular UP fuel surcharge on some group of movements handled jointly with NS; NS then decides whether to concur to that fuel surcharge and, if it does, it receives a division of the surcharge revenues from individual shipments.  Every time

a rail carrier wants to change the fuel surcharge applicable to traffic moving under joint rates, it is required to seek concurrence from its interline partners.

Given the volume and variety of interline traffic, and the technical requirements for tracking the revenues for such traffic, basic efficiency demands that railroads communicate about terms for setting joint rates across whole categories of interline traffic.   While rail carriers sometimes provide specific concurrences relating to a particular shipper and commodity, "general" concurrences that apply to broader categories of shippers and commodities are common, necessary, and perfectly proper.  *See Soc'y of Plastics Indus., Inc. v. ICC*, 955 F.2d 722, 724-25 (D.C. Cir. 1991) (upholding practice of obtaining general concurrences that applied to future adjustments to rates).   There is, in fact, no principled basis to distinguish between the lawfulness of communications and agreements between interline partners on generally applicable terms or formulas for their interline shipments, and communications by those same partners regarding terms and rates for a particular shipment.   In either situation, the interline carriers are partners rather than competitors, and their cooperation does not restrain competition.   Section I.A., *supra*.   And discussions about general rules for interline service "concern an interline movement" just like discussions about specific interline moves, and are therefore protected by Section 10706.

Plaintiffs' misuse of concurrence communications in service of their conspiracy narrative is extensive.   The following are representative examples of actual concurrence requests that Plaintiffs mischaracterize as conspiratorial communications between the Defendants:

- In March 2003, CSXT sent formal concurrence requests to UP, BNSF, and NS regarding a "modified CSX fuel surcharge program on joint-line rates" that CSX proposed to "divide[] in the same proportion as the joint line freight charges."  CD Exs. 16-18 (Rashid Decl., ECF No. 337("RD") Exs. 34, 35, 38).  Internal UP emails from this time also reference

discussions between UP and CSXT regarding their interline business and the expected concurrence request as to the shared traffic.  CD Exs. 19-20 (RD Exs. 30, 31 (UP emails just prior to the formal CSXT concurrence request, stating that CSXT was considering applying its new fuel surcharge formula to UP-CSXT interline traffic)); CD Ex. 21 (RD Ex. 32 (referencing anticipated CSXT "concurrence request on interline biz related to the following CSX announcement today or tomorrow")).  Plaintiffs seek to infer from these communications that a conspiratorial agreement was reached during an earlier alliance meeting between CSXT and UP.  Narrative ¶¶ 30-32 (citing each document above).

- In April 2003, UP sent formal concurrence requests to CSXT, NS, and BNSF stating that UP was modifying its fuel surcharge program for most UP pricing documents and that "[s]urcharge amounts will be shared on the same proportions as associated interline divisions for joint line prices."  CD Ex. 30 (RD 40); *see also* CD Exs. 31-33 (RD Exs. 43, 58, 217 (NS concurrence for "joint line prices")), CD Exs. 34-35 (Hammond Decl., ECF No. 406 ("HD") Exs. 5, 26 (NS concurrence and related discussion)).  Plaintiffs characterize these as "an anticompetitive signaling device" from which they infer an unlawful conspiracy.  Narrative ¶ 33.

- In May 2003, UP sent formal concurrence requests to each of the other rail carriers stating that UP was "revising its carload fuel cost recovery program" and stating that the new "[s]urcharge amounts will be shared on the same proportions as associated interline divisions for joint line prices."  CD Exs. 22-25 (RD Exs. 48-50, 212).  Plaintiffs again argue that UP "immediately informed the other Defendants" of its new fuel surcharge formula and claim (incorrectly) that this brought UP "in synch[]" with BNSF's program, as a basis to infer a conspiracy.  Narrative ¶ 42 (citing RD Exs. 48-50, 212 (CD Exs. 22-25)).

- In January 2004, NS emailed UP regarding a modified fuel surcharge formula that

it was implementing for "NS/UP interline traffic" and sought confirmation that surcharge amounts would be handled "through REN," the electronic system used to settle shared interline revenue. CD Ex. 26 (RD Ex. 79).  Plaintiffs seek to infer from this a conspiratorial agreement following "just two weeks after a 10-hour meeting between top executives of NS and BNSF concerning, among other things, fuel surcharge-related issues" and claim that NS's new program brought it "in synch" with CSXT's program.  Narrative ¶¶ 57 (footnote omitted), 60.

- In December 2004, UP and BNSF exchanged emails regarding a concurrence on coal fuel surcharges for a specific interline customer (████).  CD Ex. 27 (RD Ex. 119). Plaintiffs again seek to infer an unlawful conspiracy, *i.e.*, that "each Defendant continued to pursue the agreed goal of applying the agreed, coordinated fuel surcharges to 100% of freight shipments, including to both new and renewed contracts."  Narrative ¶ 79 (citing RD Ex. 119).

- In April 2006, NS sought concurrence to a new fuel surcharge formula that would be applied to "all public priced interline business originating on the NS."  CD Exs. 28-29 (RD Exs. 133-134).  Plaintiffs again seek to infer from this further support for the alleged conspiracy. Narrative ¶¶ 106-107 (citing RD Exs. 133-134 (CD Exs. 28-29)).

These documents—concurrence requests between interline partners about interline traffic—are at the core of what Congress sought to protect through Section 10706:

1. ***All of these are evidence of a discussion or agreement that "concerned an interline movement," or about a rate or other action resulting from such a discussion or agreement.***  Every concurrence communication above was between interline partners and explicitly concerns rates and surcharges for interline movements.  These are the communications that must occur for rail carriers to carry out their obligation to offer "through routes" and to "establish rates" for such routes.  49 U.S.C. § 10703; *see also STB Finance Docket No. 33556,*

1999 STB Lexis 305, at *52 (1999) (rail carriers must regularly enter into agreements "to facilitate cooperation on an ongoing basis concerning through routes, including quality of service, joint rates and contracts, and revenue divisions for rail movements using these routes").  Internal deliberation by a railroad about a concurrence request is also protected as both evidence of the original interline discussion and as an "action resulting from" the concurrence request.

> **2.      *None of these discussions or agreements, "considered by itself," violates the antitrust laws.***  No concurrence request Plaintiffs cite constitutes direct evidence of an antitrust conspiracy.  *In re Baby Food*, 166 F.3d at 118.  To the contrary, each concerns cooperation on shared interline traffic, the very conduct that both the DOJ and FTC said is not proscribed by the antitrust laws and for which there is "no reason to fear antitrust liability."  *Supra* at 7.  Tellingly, Plaintiffs do not contend that any of these communications is, "considered by itself," a violation of the antitrust laws.[13]

Because these communications are protected by Section 10706, they are not admissible for purposes of proving or creating an inference of an "agreement, conspiracy, or combination" in violation of the antitrust laws.  Period.  For example, in opposing summary judgment on the issue of conspiracy, Plaintiffs cannot rely on any of these documents or argue that they constitute evidence from which it can be inferred that the Defendants entered into an anticompetitive agreement.  Defendants therefore request an order from the Court that all such concurrence communications may not be used to support Plaintiff's conspiracy case, and that the following evidence of those communications shall not be admissible as "proof of an agreement, conspiracy,

---

[13] Beyond the evidentiary protection, Plaintiffs also cannot infer a conspiracy from the fact that rail carriers announced or applied the formulas discussed in these concurrences for both interline traffic and other traffic.  That is the exactly the type of "similar action with respect to a rate or related matter on another route" from which Section 10706 forbids any conspiratorial inference.  Section III.D, *infra*.

or combination":  CD Exs. 16-35 (RD Exs. 34-35, 38, 30-32,  48-50, 212, 79, 119, 133-134, 40,

43, 58, 217; HD Exs. 5, 26).

     **B.**    **Alliance Meetings**

     The second major category of impermissible evidence involves "alliance" and similar

strategic partnership meetings between connecting railroads.  Alliance meetings are critical.  They

allow railroads to bridge the physical separation between their networks to offer continuous service

for existing customers who require interline service, and also to find opportunities to serve new

rail customers.  They enhance efficiency, *e.g.*, through discussion of the innumerable logistics

involved in exchanging shipments.  And they ensure that the interline partners' shared traffic is

competitive with other transportation modes, *e.g.*, through discussion of interline marketing

initiatives and opportunities.  This includes discussion about forward looking opportunities and

commercial strategy for joint traffic—such as the geographies, industries, and customers where

they expect to grow and share traffic in the future, and how they will efficiently handle that

business together on their respective tracks. *See*, *e.g.*, CD Ex. 3 (Ward Dep. at 55:9-21 (the primary

purposes of alliance meetings were "[o]ne, to look for operating efficiencies between our two

railroads to be able to produce the product in a more efficient manner, and, secondly, to work with

our interline partners on how do we grow our joint line business. . . . [W]e would meet to say,

where are there opportunities that we can provide a service that would allow us to grow our joint

business between our two companies to improve our profitability.")); CD Ex. 1 (Giftos Dep. at

237:18-240:24 ("[W]e started with UP . . . looking at common initiatives on how we could grow

our business, perform more effectively as a combined network, simplify our billing process and

work together to grow our respective businesses.")); CD Ex. 4 (Anderson Dep. at 34:19-25).

     Plaintiffs attempt to portray alliance meetings as inherently suspicious meetings between

"competitors," but Congress recognized that rail carriers are often partners rather than competitors.

That is overwhelmingly true for East/West carriers.  CD Ex. 3 (Ward Dep. at 71: 3-74:12 ("[B]y and large our relationship with the Union Pacific Railroad is working as an interline partner to develop products that serve our joint customers. There may be a few circumstances where we and . . . Union Pacific may be competing for a similar piece of business, but those are so small in comparison to the joint line business we do together.")); CD Ex. 1 (Giftos Dep. at 237:14-240:24, 250:24-252:10 ("[W]e hardly [] complete [sic] with UP at all, if at all. . . . UP is a connecting carrier.  They operate essentially west of the Mississippi River and we operate essentially east of the Mississippi River. . . . This is an alliance meeting to improve the quality of our connecting business.")) (discussing June 3, 2003 UP-CSXT Alliance Meeting, *infra* at 32-33).  But it is also true within a region, since no one railroad serves all origins and destinations.  *See, e.g.*, CD Ex. 12 (Carlton Merits Report ¶ 19 (describing significant gaps in overlap between UP and BNSF in the West)).

In fact, alliance meetings are expressly endorsed by the STB.  Recognizing that the efficiency of the nationwide rail network is enhanced when rail carriers communicate broadly about topics that relate to the joint provision of interline service, the STB in 2001 changed its merger guidelines and found that "other private-sector initiatives, *such as joint marketing agreements and interline partnerships,* can produce many of the efficiencies of a merger while risking less potential harm to the public."  *Major Rail Consolidation Procedures*, STB Ex Parte No. 582 (Sub-No. 1), 2001 STB Lexis 546 at *30 (June 7, 2001) (emphasis added).  For this reason, the STB explained that "under our statute alliances and joint ventures that fall short of either common control or pooling do not require our approval."  *Id.* at *28-29.  In addition, Linda Morgan, former Chairman of the STB, confirmed that "the STB specifically encouraged railroads to achieve additional efficiencies through such cooperative efforts short of merger" and the way

to achieve such efficiencies "was through cooperative efforts between interline partners and strategic alliances that would involve joint marketing efforts directed at all sorts of possible interline offerings."  CD Ex. 9 (Morgan Report at 15-16); *see also id.* at 16 ("In this world in which mergers are subject to the test of whether the same efficiencies can be gained through other measures, strategic alliances between interlining railroads are not only expected, they are essential to provide the nation with efficient and effective national rail service."); CD Ex. 1 (Giftos Dep. at 237:18-240:24 (explaining that the STB "said in that moratorium . . . you must first try to accomplish the benefits of that merger through meeting with your . . . connecting railroad and try to form strategic alliances so that you can accomplish the benefits of the merger without all the disruptive effects.")); CD Ex. 10 (Rose Dep. at 145:10-23).

Topics discussed at alliance meetings vary widely, but generally focus on the many detailed issues that two partners must discuss to handle the interchange of thousands of shipments every year.  Most of the discussion focuses on the operational efficiency and marketing of interline traffic.  For example, at an April 1, 2003 alliance meeting between BNSF and CSXT, the topics for discussion included "Business Metrics Review", "Interline Service Measurements", and "Gateway Optimization."  *See e.g.,* CD Ex. 36 (RD Ex. 215).  Other topics include updates on distinct types of shared traffic, such as "Grain", "Intermodal", and "Merchandise" (*i.e.*, non-coal, non-intermodal, non-automotive traffic), CD Ex. 37 (Gooden Dep. at 15:24-16:9), which included an update on "watershed" traffic, "Internet Pricing" and "Fuel Surcharge."  CD Ex. 36 (RD Ex. 215).  Many topics are operational in nature or—as in the reference to "Fuel Surcharge" and "watershed traffic"—a benign but important "update" between two interline partners on the status of their shared business.

Notwithstanding the necessity and propriety of regular meetings between interline partners, Plaintiffs attempt to convert every bilateral alliance meeting after March 2003 into a conspiratorial, smoke-filled room. They are all ordinary alliance meetings directly concerning interline traffic— and as such are protected by Section 10706.

Two general observations about the meetings Plaintiffs cite are critical. First, the main alliance meetings identified by Plaintiffs were all between an Eastern and a Western railroad, and therefore involved two parties who have almost *no* competing traffic. Section I.A., *supra*. These railroads were not horizontal competitors. Rather, these bilateral meetings were between partners whose business dealings were limited to a *vertical* relationship involving their shared shipments and customers. Second, the documents and witness testimony make clear that these meetings all concerned the participants' interline traffic and are protected by Section 10706:

- **March 12-13, 2003 UP (West)-CSXT (East) Alliance Meeting**. Plaintiffs' conspiracy story begins with this meeting between UP (West) and CSXT (East) in March 2003. Plaintiffs cite a proposed agenda circulated in advance between two CSXT executives, which lists a variety of topics. The one topic that mentions fuel surcharges is tied specifically to shared UP-CSXT interline business, stating their intent to discuss "Other Pricing Issues on CSXT/UP *Interline* Business" including "Fuel surcharge methodology" and "bilateral accounting." CD Ex. 38 (RD Ex. 210 (emphasis added)). Plaintiffs infer from this the beginning of the supposed conspiracy, arguing that "[n]o lawyer attended the meeting; no record of the discussion was prepared;" "within a week of that meeting, CSX announced a new standard fuel surcharge program;" and CSX had not even considered that program "prior to the meetings with [UP]." Narrative ¶¶ 24, 29-31 (citing RD Ex. 210 (CD Ex. 38)). This meeting and the discussion of fuel surcharges plainly concerned interline rates and movements, and is protected by Section 10706.

- **March 18, 2003 BNSF (West)-NS (East) Alliance Meeting**.  Plaintiffs next point to this meeting between BNSF (West) and NS (East) and cite an agenda that references the interline topic "General Business Review Discussion" on "*Interline* Volumes by Business Group" with the following question: "BNSF's fuel surcharge is structured differently than NS, CSX, and UP.  Should BNSF's by [sic] synchronized with the other big players in the industry?"  CD Ex. 39 (RD Ex. 208 (emphasis added)).  Every other topic similarly references shared interline traffic, such as whether NS and BNSF had "coal conversion opportunities" in the Powder River Basin (PRB); "strategies for expanding the current network" of NS-BNSF intermodal shipments; how to handle "mechanical issues on trains coming to BNSF" at the "Chicago Gateway"; setting up a "process to review interline service weekly on [Chicago Gateway] trains between BNSF and NS"; resolving "Columbus, OH service problems"; and other interline topics.  *Id.*  Plaintiffs have also cited emails and deposition testimony referencing this same meeting and discussion.  CD Exs. 5, 40-41 (Lanigan Dep.; RD Ex. 216; HD Ex. 7).  The witnesses involved testified that the discussion of surcharges related only to interline traffic.  *See* CD Ex. 5 (Lanigan Dep. at 51:16-52:17 (he and Seale "were to discuss interline fuel surcharges between BNSF and Norfolk Southern. . . . Because we work with the other railroads in order to serve our customers and have to exchange freight in order to serve our customers")); *id.* at 178:9-15 ("I don't recall that we discussed an industry standard at the March 18th meeting.  As I was new to the industry and was learning what was going on, my concern, as I recall it, early in my discussions were making sure that the fuel surcharge as it worked on an interline basis was working efficiently well, et cetera, for both sides."); *id.* at 112:11-115:8.  This meeting is therefore protected by Section 10706, and Plaintiffs cannot use it as a basis to infer an unlawful agreement.  Narrative ¶ 35 (citing RD Ex. 208 (CD Ex. 39)).

- **April 1, 2003 BNSF (West)-CSXT (East) Alliance Meeting**.  Plaintiffs cite this meeting between BNSF (West) and CSXT (East) and an agenda that references various interline topics like "*Interline* volumes by business group" and "*Interline* service measurements."  CD Ex. 36 (RD Ex. 215 (emphasis added)).  Witnesses confirmed that the April 1 BNSF-CSXT meeting concerned interline traffic.  *See* CD Ex. 10 (Rose Dep. at 50:7-50:11 ("Again, when we have alliance meetings with CSXT or any other interline partners and we had fuel surcharge on the agenda, it was in context of the interline agreement.  It was in context of the interline shipments that we operate with that interline partner.")); *id.* at 163:17-168:25, 169:1-169:13 ("[I]f you look at all the agenda [for the April 1 meeting], Alliance Meeting, Gateway, Interline Service Measures, I -- I would just again tell you that this all had to do with interline business. . . I've never had conversations around fuel surcharge that are not around interline agreements."); *see also* CD Ex. 37 (Gooden Dep. at 107:20-110:17 (fuel surcharges were discussed due to a need to agree on method for pricing on carriers' interline business)); CD Ex. 1 (Giftos Dep. at 237:14-240:24 (explaining history and purpose of alliance meetings such as this one)).  Yet again, Plaintiffs wrongfully seek to infer support for the alleged conspiracy from interline discussions.  Narrative ¶ 37 (citing RD Ex. 215 (CD Ex. 36)).

- **May 14, 2003 UP (West)-NS (East) Alliance Meeting**.  Handwritten notes from this alliance meeting reference a discussion about fuel surcharges for interline business and the fact that "uniform application across the industry would be helpful." CD Ex. 42 (UPFSC 0616651-662).  The document explicitly references UP-NS interline traffic, *see, e.g., id.* at 0616658-662, and the note regarding fuel surcharges simply asks if these two major interline partners "NS + UP [can] get closer on this level." *Id.*  Draft minutes from the meeting similarly state that "[d]iscussion followed on fuel surcharges and various application processes as used by different railroads" and

"[c]onsensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers" and that there was a question about how that might be done.  CD Ex. 43 (RD Ex. 204).  This discussion occurred as part of a general discussion of NS-UP interline business, covering topics such as an "Operations Update" on various corridors of shared traffic, and is therefore clearly protected by Section 10706.  *Id.*  Plaintiffs ignore the interline nature of these discussions and cite them as "Defendants' recognition of the need for and benefits of agreement."  *See* CD Ex. 44 (Sept. 2016 Class Cert. Hearing, Rausser Slide 4); Narrative ¶ 47.

- **June 3, 2003 UP (West)-CSXT (East) Alliance Meeting**.  Plaintiffs cite this alliance meeting between UP (West) and CSXT (East), including handwritten notes (CD Ex. 45 (RD Ex. 209)) and typed minutes (CD Ex. 46 (RD Ex. 218)).  The documents describe issues relating to interline routes, such as "network performance," "car management," "Gateways" and other efficiency issues regarding interline traffic.  *See id.*; *see also* CD Ex. 1 (Giftos Dep. at 250:6-252:25 ("This is an alliance meeting to improve the quality of our connecting business [with UP]")), *id.* at 295:5-298:19 (describing interline business opportunities discussed at alliance meetings, *e.g.*, "watershed" business to/from the Mississippi River valley, "gateway" initiatives and required capital expenditures, and a need to discuss broader economic market conditions at such meetings); CD Ex. 47 (McIntyre Dep. at 191:16-193:13 (explaining, of this document, that an alliance meeting is one with "a single partner railroad to find efficiencies to improve efficiencies to improve business  . . . [o]n joint UP-CSX shipments . . . and business")); *id.* at 194:18-196:11; CD Ex. 48 (Eisele Dep. at 129:13-21, 136:17-137:6 (explaining, of this document, that "[i]nterline business was always the topic of our discussion in our [alliance] meetings.  Our business together, that would be the business that we had the ability to improve")).  The railroads also discussed customer reaction to fuel surcharges, a pressing industry issue given the volatility in fuel prices

(one of the railroads' biggest costs).  This evaluation of customer reaction and whether it required a change was so that these interline partners could satisfy customers and maximize opportunities for interline routes.  Following their formulaic approach, however, Plaintiffs allege that "[a]t the June 3 meeting, CSX and UP senior executives assessed the customer opposition the companies were receiving to their efforts to apply their conspiratorial fuel surcharges"; that "CSX and UP then discussed the trigger points . . . for their fuel surcharge programs[]" and "agreed that, if fuel prices stayed high, they might have to consider raising their trigger points."  Narrative ¶¶ 50-51 (citing RD Exs. 209, 218 (CD Ex. 45-46)).  Again, this ignores that this meeting between interline partners about interline traffic is lawful and squarely protected by Section 10706.

- **July 30, 2003 BNSF (West)-NS (East) Alliance Meeting**.  Plaintiffs cite this joint marketing meeting between BNSF (West) and NS (East).  The minutes reflect discussion concerning interline issues including general business review, accounting issues, transport of specific products, and distribution.  CD Ex. 49 (RD Ex. 59); *see also* CD Ex. 50 (RD Ex. 220 (follow-up emails about minutes)).  Witnesses testified that the meeting was about facilitating joint-line service.  *See, e.g.*, CD Ex. 5 (Lanigan Dep. at 135:25-136:4 (the meeting's impetus was "for the marketing counterparts of the two railroads to get together to discuss interline business opportunities and issues")); *id.* at 136:5-136:12.  The attendees discussed how to address customer concerns about processing multiple fuel surcharge formulas applied by various interlining railroads.  *Id.* at 144:5-144:17 (discussion "arose because of interline concerns because many customers had brought up, when I start a load on your railroad, I get one form of fuel surcharge. When I start a load on another railroad, on an interline movement -- we could have a customer that has two plants, one on our railroad, one on [NS's]. They could have freight that originates at the [NS] served plant. They could have freight that originates at the BNSF served plant. And so they

could have movements going between the same two plants starting at opposite ends and have two fuel surcharge programs."); *id.* at 144:19-20 ("the discussions were all around interline and interline efficiencies and issues"). Evidence of this meeting is clearly protected by Section 10706, yet Plaintiffs claim that "[o]n July 30, 2003, top marketing executives of NS and BNSF discussed a 'potential industry position' on fuel surcharges" and that "Defendants, by this time, had already agreed to coordinate their programs and apply fuel surcharges as uniformly as possible, to as many freight shipments as possible, with the express goal of 100% coverage[.]" Narrative ¶¶ 53-54 (citing RD Exs. 59, 220 (CD Exs. 49-50)).

- **Oct. 1, 2003 BNSF (West)-CSXT (East) Alliance Meeting**. Plaintiffs cite this alliance meeting between BNSF (West) and CSXT (East). The tentative agenda does not mention fuel surcharges, but does discuss various interline topics, such as "Interline volumes by Business Group" and "Interline service performance review." CD Ex. 51 (RD Ex. 62). Plaintiffs claim that Defendants "frequently participated in 'Alliance' and other conspiratorial meetings[]" and claim that at meetings like this Defendants did things like "exchange[] coverage statistics" to maintain "[d]iscipline within the conspiracy." Narrative ¶¶ 61, 100, 101 (citing RD Ex. 62 (CD Ex. 51)).

- **Dec. 16, 2003 BNSF (West)-NS (East) Alliance Meeting**. The agenda for this meeting includes ordinary interline topics such as "Operating Plan Developments/Interline Initiatives/Gateway Optimization." CD Exs. 52-53 (RD Exs. 68, 219 (internal agenda discussing interline issues like "interline initiatives," joint commercial success, service issues, "interline carload traffic," and fuel surcharges)); *see also* CD Ex. 54 (RD Ex. 70). But Plaintiffs cite this meeting and argue that "Defendants Agree[d] to Coordinate Their Fuel Surcharges" and that "Defendants discussed Fuel Surcharges with each other regularly." 2010 Class Cert. Mot. at 13, 25-26 (citing RD Ex. 70), ECF No. 337; Narrative ¶ 60 (citing RD Ex. 68 (CD Ex. 52)).

- **May 17, 2004 NS (East)–BNSF (West) Alliance Meeting**.  The proposed topics for discussion related to expanding the alliance for joint-line traffic.  This included, for example, network issues and marketing process improvement related to joint pricing administration, including implementation of fuel surcharges, CD Ex. 55 (RD Ex. 89), and clearly "concerned an interline movement" within the meaning of Section 10706.  Yet Plaintiffs cite this document as support for the conclusory assertion that "[d]iscipline within the conspiracy was maintained by the exchange of these coverage data and regular inter-Defendant discussions concerning fuel surcharges and their uniform application."  Narrative ¶ 101 (citing RD Ex. 89 (CD Ex. 55)).

- **Sept. 8, 2004 NS (East)-BNSF (West) Alliance Meeting**.  The meeting agenda lists items such as operating challenges and "interline review by BNSF," CD Ex. 56 (RD Ex. 96), again clearly marking this as an interline communication protected by Section 10706.  Ignoring that protection, Plaintiffs claim this as support for the notion that "Defendants' senior intermodal executives frequently participated in 'Alliance' and other conspiratorial meetings" and that this meeting (like the others mentioned above) was supposedly part of Defendants' efforts to maintain "[d]iscipline within the conspiracy."  Narrative ¶¶ 61, 100, 101 (citing RD Ex. 96 (CD Ex. 56).

Applying the framework for Section 10706's evidentiary protection:

*1.      Every one of these meetings, and the specific discussions regarding fuel surcharges, "concerned an interline movement" or a rate or other action resulting from such a discussion.*  Every alliance meeting discussed above was between East-West partners, and the documents contain repeated references either to interline business explicitly or to topics that clearly concern interline traffic.  Where fuel surcharges are specifically mentioned, they appear in this interline context and are therefore protected under Section 10706.  Indeed, these are precisely the

types of meetings and agreements that Congress, the STB, and shippers expect and demand to ensure that interline business is robust, efficient, and competitive.

Interline partners also discussed topics of broad industry significance during alliance meetings. For example, minutes and notes from the March 18, 2003 BNSF-NS meeting, the May 14, 2003 UP-NS meeting, and the July 30, 2003 BNSF-NS meeting refer to issues specific to the partners' interline traffic, and also ask whether a uniform approach to fuel surcharges would be beneficial. CD Ex. 39 (RD Ex. 208 (BNSF/NS: "Should BNSF's [fuel surcharge be] synchronized with the other big players in the industry?")); CD Ex. 43 (RD Ex. 204 (NS/UP: "Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers")); CD Ex. 42 (UPFSC 0616651 (NS/UP: "Uniform application across the industry would be helpful")); CD Ex. 49 (RD Ex. 59 (BNSF/NS: referencing possibility of a "discussion of a potential industry position on fuel surcharge positions" at a later meeting)).

These discussions addressed a concern expressed by *shippers* that was directly relevant to the rail carriers' interline partnerships. The multiplicity of Defendants' fuel surcharge formulas made it difficult for shippers to process, monitor, and audit freight bills. During the STB's Rail Fuel Surcharge proceedings, for example, many shippers explicitly voiced support for the STB *imposing* fuel surcharge uniformity across carriers, with some highlighting the amount of interline traffic as cause for doing so. The National Grain & Feed Association "urge[d] the STB to use its authority to push the railroad industry toward more uniformity in surcharges. If the STB would establish an 'official base fuel price' for all carriers, it would assist in minimizing differences in surcharge methodologies across carriers," while noting that "[a]bout one-third of all shipments

move over two or more carriers, which is a large enough segment of total rail business to warrant uniformity." CD Ex. 90, Comments of National Grain & Feed Association, at 4-5.[14]

In bilateral meetings between interline partners, such questions "concern" interline traffic as much as any other topic, as a logistical issue for both railroads (which faced different fuel surcharge formulas for different pools of interline traffic) but also for customers. In fact, BNSF's fuel surcharge mechanism was never "synchronized with the other big players in the industry," the railroads never had "the same process in the eyes of our customers," and the purported "discussion of a potential industry position" never occurred—as Defendants will show on summary judgment. For purposes of this motion, however, it is enough that rail carriers had good reason to discuss such industry issues with interline partners, and the documents cited by Plaintiffs situate those discussions squarely within each partner pair's interline relationship.

**2.     *None of the evidence related to these meetings, "considered by itself, violate[s] the [antitrust] laws."*** Plaintiffs do not cite any direct evidence of an antitrust conspiracy or agreement struck at these meetings. *In re Baby Food*, 166 F.3d at 118. To the contrary, plaintiffs cite meeting agendas and minutes that reference cooperation on shared interline traffic, and Plaintiffs then assert baldly that an "agreement" was struck or that the meeting was a means to implement the "conspiracy." Nor do references in documents to questions of broader industry significance constitute direct evidence of any agreement between two carriers to fix fuel surcharge formulas or coverage for local or other traffic. Minutes from the March 18, 2003 BNSF-NS

---

[14] "Cargill agrees that the STB needs to establish a single, uniform index to measure fuel cost increases." CD Ex. 57, Comments of Cargill Inc., at 4-5. "[R]equiring the use of a uniform index will ensure the availability of accurate cost information, increase transparency, and *provide for ease of administration of fuel surcharges for shippers and for railroads administering fuel surcharge programs on interline movements*." CD Ex. 58, Comments of The Fertilizer Institute, at 3 (emphasis added).

alliance meeting, for example, simply pose as a *question* (not an agreement) whether it would be beneficial for BNSF to adopt a similar fuel surcharge methodology as that of NS and the other railroads.  CD Ex. 39 (RD Ex. 208).  Similarly, minutes from the May 14, 2003 NS-UP alliance meeting state only that "[c]onsensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers," raising only the observation that, *from customers' perspective*, it would be a positive outcome if the industry used a uniform approach. CD Ex. 43 (RD Ex. 204); *see also* CD Ex. 49 (RD Ex. 59 (discussing a "potential industry position", but no agreement)).  None of these or any other document cited by Plaintiffs related to these meetings is, "considered by itself," a violation of the antitrust laws.

Consequently, none of these alliance meetings or the evidence about them that Plaintiffs cite are admissible for purposes of proving or inferring an "agreement, conspiracy, or combination" in violation of the antitrust laws, nor are they available to Plaintiffs in opposing summary judgment on their antitrust claim.[15]  Defendants request an order that these alliance meetings may not be used to support Plaintiff's conspiracy case, and that the following evidence of those meetings shall not be admissible as "proof of an agreement, conspiracy, or combination": CD Exs. 36, 38-43, 45-46, 49-56 (RD Exs. 215, 210, 208, 216; HD Ex. 7; UPFSC 0616651-662; RD Exs. 204, 209, 218, 59, 220, 62, 68, 219, 70, 89, 96).

### C.    Inter-Railroad Logistical Discussions Regarding Interline Traffic

Separate from concurrence requests and alliance meetings, interline partners also need to coordinate in real time on the logistics involved in sharing shipments from one railroad to another

---

[15] Plaintiffs also may not seek any inference of a conspiracy from "similar action" that any carrier took following these meetings, for example CSXT's announcement of a fuel surcharge modification following the March 2003 alliance meeting with UP.  Again, to the extent Defendants "acted together with respect to an interline rate or related matter" and then took similar action on other traffic, any inference of conspiracy is barred.  Section III.D, *infra*.

at different interchange locations.   For example, railroads need to have regular operational communications to discuss challenges that they face at particular interchange locations, such as congestion and backlogs.   Railroads also must discuss what they will charge customers, the surcharges (including fuel) that they will assess, and the traffic on which such surcharges will be applied.

Logistical communications do not violate the antitrust laws and are protected under Section 10706, but Plaintiffs nonetheless attempt to use them improperly to infer a conspiracy:

• Plaintiffs cite a series of documents in which BNSF and NS discussed fuel surcharge coverage (*i.e.*, how much of their interline traffic contained a fuel surcharge) in their respective price authorities (*i.e.*, contracts, tariffs, and other bases for establishing a price) governing the two railroads' joint-line movements.   Narrative ¶ 101 nn.270 & 272 (citing RD Exs. 95, 97, 98, 100-105 (CD Exs. 59-67)); *see also* CD Ex. 68 (RD Ex. 88 (referencing similar NS-BNSF discussions about fuel surcharges)).   They also cite communications between NS and UP about NS's application of fuel surcharges across coal commodities for purposes of coordinating rates for their shared interline traffic.   CD Ex. 69   (HD Ex. 8).   And Plaintiffs cite a handful of other communications that generally discuss the number of shipments by various interline partners that reflected fuel surcharges.   *See, e.g.*, CD Exs. 70-71   (RD Exs. 63-64 (email referencing discussions between BNSF and CSXT about fuel surcharges)).   Communications like these are exactly what one would expect between carriers charging joint rates for interline business, particularly given that the originating carrier typically bills the customer (including the fuel surcharge) and must then divide the revenue with the receiving carrier.   *See* CD Ex. 72 (Morgan Dep. at 68:6-11 (testifying that as STB Chair, Ms. Morgan "envisioned that interline partners would be talking about interline business and all aspects of that business, which would include

fuel surcharges and any other aspects of that business."), 90:10-91:4).  Both carriers need to know whether price authorities will contain a surcharge, so that they know whether, and if so how much, of their fuel costs will be covered.  They may also want to press the other to expand coverage on their interline traffic, to avoid bearing increased fuel costs to move traffic originating on the other rail carrier that has no fuel surcharge.[16]  Yet Plaintiffs twist these communications and assert that "[d]iscipline within the conspiracy was maintained by the exchange of . . . coverage data and regular inter-Defendant discussions concerning fuel surcharges and their uniform application." Narrative ¶ 101.

- Plaintiffs also cite documents between interline partners about the logistics of switching from a rate-based formula to a mileage-based formula.  *See, e.g.*, CD Ex. 73 (RD Ex. 107 (internal BNSF email stating that John Lanigan of BNSF "advised he will be meeting with his counterparts" to explore a mileage-based fuel surcharge)); *see also* CD Ex. 74 (RD Ex. 109 (internal BNSF email discussing "concern[s] about the cost to implement and the potential impact to free cash flow due to" a change to mileage, and referencing discussions with counterparts "to gauge the interline interest/issues")); CD Ex. 75 (RD Ex. 112 (internal BNSF email referencing same issue)), CD Ex. 82 (RD Ex. 120 (referencing opinion that other railroads might not support mileage-based fuel surcharges)); CD Ex. 76 (Ex. 125 (internal NS emails referencing a communication with John Lanigan of BNSF regarding BNSF's "systems work . . . to launch their mileage based FSC at the end of the year")).  Plaintiffs claim that these communications were part

---

[16] *See, e.g.*, CD Ex. 1 (Giftos Dep. 272:23-273:19 ("[R]emember, if [BNSF] were the originating carrier on a piece of business that's terminating on CSX, if it's originating in Portland, Oregon and going to Jacksonville, Florida, it will not have a fuel surcharge unless the [BNSF] imposes one or has an arrangement with the shipper. . . . So we're interested in our partners, our connecting carriers extending the breadth and scope of their fuel surcharge on business that we're going to be moving on our railroad and we're going to be moving it without the benefit of a fuel surcharge, yet we're going to be still troubled by the increased fuel costs.")).

of the alleged conspiracy. Narrative ¶ 97. This ignores the fact that any change to the rate-structure used by two interline partners for shared traffic requires coordination and agreement, particularly where they were considering wholesale changes to the underlying surcharge mechanism.

- Other communications cited by Plaintiffs concern technical discussions about changes to fuel surcharge calculations or the logistics involved in splitting shipment revenues. *See* CD Ex. 77 (RD Ex. 13 (UP-CSXT emails about CSXT's computerized billing system's inability to handle certain UP prices received via REN—the railroads' interline rate system—requiring a manual tabulation method)); CD Ex. 78 (RD Ex. 55 (internal NS emails noting that BNSF had "unilaterally decided to only apply a 2% surcharge" in May 2003 for interline movements covered by the BNSF-NS "revenue agreements")); CD Ex. 79 (RD Ex. 56 (email from CSXT to various railroads about ensuring "billing accuracy" for fuel surcharges in the "CSX rating, billing, and settlement systems")); CD Ex. 80 (RD Ex. 83 (BNSF-UP emails about the logistics and methodology around how fuel surcharges will be communicated by BNSF/UP to REN, the interline settlement system)); CD Ex. 81 (RD Ex. 156 (internal BNSF email discussing logistics of meeting STB deadline regarding mileage-based fuel surcharge for regulated traffic)). These too are standard interline issues, not evidence of conspiracy.

Relatedly, Plaintiffs attempt to turn the alleged "extraordinary" number of interline communications into a basis to infer conspiracy. Narrative ¶¶ 16, 101 (referring to "regular inter-Defendant discussions concerning fuel surcharges"); *id.* ¶ 104. But operating a national rail network requires that Defendants discuss interline traffic continuously. Nothing about those discussions violates the antitrust laws, and just as individual interline discussions cannot be used to infer conspiracy, neither can the number of those discussions be offered for the same purpose.

Applying the Section 10706 framework to these communications:

*1.      All of these logistical communications "concerned an interline movement" or a rate or other action resulting from such a discussion or agreement.*   Many of these communications expressly reference interline traffic, and even those that do not clearly pertain to shared traffic and the multitude of logistical considerations that go into such cooperation.

*2.      None of the discussions or agreements "considered by itself, violate[s] the [antitrust] laws."*   Not one of the documents constitutes direct evidence of an antitrust conspiracy, and most do not mention agreement on any topic at all.   Rather, they are reflective of the operational problem-solving that goes into managing a vast interline relationship, including topics like how to split rates, which shipments will contain a fuel surcharge, and how to accurately account for shared traffic.   Certainly, none of these communications is evidence that "considered by itself" establishes a violation of the antitrust laws.

Therefore, these communications are not admissible to prove an "agreement, conspiracy, or combination" in violation of the antitrust laws.   Defendants request an order from the Court that all such communications may not be used to support Plaintiff's conspiracy case, and that the following evidence of those communications shall not be admissible as "proof of an agreement, conspiracy, or combination":  CD Exs. 59-71, 73-82 (RD Exs. 95, 97-98, 100-105, 88; HD Ex. 8; RD Exs. 63-64, 107, 109, 112, 125, 13, 55, 56, 83, 156, 120).

### D.      "Similar Actions" With Respect To Rail Carriers' Other Traffic

Plaintiffs' conspiracy narrative also violates Section 10706's substantive protection against inferences of conspiracy.   The blueprint for Plaintiff's entire case is an alleged pattern of behavior that mirrors (and directly violates) the first sentence of Section 10706:   communication and coordination between interline partners about fuel surcharges for shared traffic and subsequent changes for other traffic.   The following are key examples:

| Interline Communications | "Similar Action" Announced for Other Traffic | Plaintiffs' Attempt to Infer Conspiracy |
|---|---|---|
| **March 12-13, 2003 Alliance Meeting**: UP-CSXT Alliance Meeting between UP's Jack Koraleski and CSXT's Clarence Gooden regarding, *inter alia*, "Pricing Issues on CSX/UP Interline Business, Fuel surcharge methodology."  CD Ex. 38 (RD 210).<br><br>**March 28, 2003 Interline Concurrence Request**: CSXT-UP email chain seeking "concurrence to the modified CSXT fuel surcharge programs on joint-line rates."  CD Ex. 18 (RD 38).<br><br>**April 4, 2003 Interline Concurrence Request**: UP-BNSF email chain seeking BNSF concurrence to an announced UP fuel surcharge, noting that "[s]urcharge amounts will be shared on the same proportions as associated interline divisions for joint line prices."  CD Ex. 30 (RD 40). | March 20, 2003: CSXT modifies WTI-based FSC; seeks concurrence for interline traffic.  CD Ex. 18 (RD 38).<br><br>April 4, 2003: UP announces WTI-based FSC; seeks concurrence for interline traffic. CD Ex. 30 (RD 40). | "CSX's decision to switch fuel surcharge programs was made by CSX's CEO and chief commercial officer, and no internal records at CSX show that CSX had even considered the escalation formula that it adopted prior to the meetings with [UP's] Mr. Koraleski."  Narrative ¶ 31 (footnotes omitted).<br><br>"Shortly after CSX's announcement, UP announced that it had . . . adopted 'the same approach as the CSX'. . . .'" *Id.* ¶ 32.  "On April 4, 2003, UP informed the other Defendants that it would be applying this new standard fuel surcharge program to both local and interline traffic. . . . [T]his communication was an anticompetitive signaling device in furtherance of the conspiracy." *Id.* ¶ 33 (footnotes omitted). |
| **April 1, 2003 Alliance Meeting**: BNSF-CSXT Alliance Meeting regarding interline business, including action items like "Interline volumes by Business Group" and "Interline Service Measurements."  CD Ex. 36 (RD 215). | May 7, 2003: BNSF announces HDF-based FSC with a $1.25 trigger.  CD Ex. 83 (RD 2). | "On April 1, 2003, . . . BNSF senior executives met with CSX senior executives to discuss fuel surcharges."  Narrative ¶ 37 (footnote omitted).  "[A]s a result of discussions with the other Defendants, BNSF abandoned a mileage approach and continued to apply a fuel surcharge based on a percentage of base rates." *Id.* ¶ 40.  "In |

| Interline Communications | "Similar Action" Announced for Other Traffic | Plaintiffs' Attempt to Infer Conspiracy |
|---|---|---|
| **May 9, 2003 Interline Concurrence Requests**: UP emails asking for BNSF, CSXT, and NS concurrence to new HDF-based FSC, noting that "[s]urcharge amounts will be shared on the same proportions as associated interline divisions for joint line prices." CD Ex. 22 (RD 48 (BNSF)); CD Ex. 23 (RD 49 (CSXT)); CD Ex. 25 (RD 212 (NS)). | May 9, 2003: UP announces HDF-based FSC with a $1.35 trigger. CD Ex. 22 (RD 48). | early May, BNSF, . . . changed its program to make it even more aggressive by decreasing the formula's trigger price[.]" *Id.* ¶ 41.<br><br>"At around the same time BNSF issued its new policy, UP suddenly adopted the BNSF fuel surcharge formula, bringing the two western carriers into direct lockstep. UP immediately informed the other Defendants, including BNSF, of its decision.  UP and BNSF thereafter implemented fuel surcharges that were in synch. . ." *Id.* ¶ 42 (footnotes omitted). |
| **March 18, 2003 Alliance Meeting**: NS-BNSF alliance meeting regarding interline traffic.  CD Ex. 29 (RD 208).<br><br>**May 14, 2003 Alliance Meeting**: NS-UP alliance meeting discussing fuel surcharges for interline business. CD Ex. 42 (UPFSC0616651-662).<br><br>**July 30, 2003 Alliance Meeting**: NS-BNSF alliance meeting discussing various interline issues.  CD Ex. 29 (RD 59).<br><br>**December 16, 2003 Alliance Meeting**: NS-BNSF alliance meeting regarding interline traffic.  CD Ex. 52, 54 (RD Exs. 68, 70). | January 2004: NS announces a change in its WTI-based FSC. CD Ex. 84 (RD 77). | "NS moved somewhat more slowly than the other Defendants in announcing to its customers a new fuel surcharge program, because NS had encoded its original uncoordinated fuel surcharge in 2000 directly into contracts, which hampered its ability to make a rapid change to the new agreed fuel surcharges and prohibited immediate adoption of the new fuel surcharge program. But, as it had planned and prepared from at least March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, the new fuel surcharge program, which was identical to the program announced by CSX in March 2003 and was intended to 'standardize' NS's fuel surcharge program with that of the other Defendants." Narrative ¶ 57 (footnotes omitted). |

Plaintiffs also cite various documents evaluating whether a particular rail carrier would or would not take "similar action" as something previously discussed with an interline partner.  *See, e.g.*, CD Ex. 85 (HD Ex. 6 (NS evaluation of whether to adopt a fuel surcharge formula announced by CSXT and which NS believed would be adopted by UP, a key NS interline partner)); CD Exs.

86-87 (RD Exs. 41, 42 (same)); CD Ex. 88 (HD Ex. 14 (part of the same evaluation, and noting that "The CSX remains the only RR that has specifically requested NS concurrence for a FSC change on joint line traffic")); CD Ex. 89 (RD Ex. 135 (internal BNSF emails discussing whether to adopt a fuel surcharge similar to a "NS proposal" that it was "getting ready to roll out")).

Section 10706's substantive protection **prohibits** the very inference that Plaintiffs wish to draw: that *after* communications or agreements with respect to interline traffic, the fact that Defendants took similar actions with respect to local traffic or other interline traffic is evidence of an anticompetitive conspiracy.   Accordingly, Defendants respectfully request an order barring Plaintiffs from seeking an inference of a conspiratorial agreement from the fact that the railroads engaged in bilateral, interline discussions, and then took the actions detailed in the table above—specifically, CSXT's March 2003 WTI-based fuel surcharge decision and announcement; UP's April 2003 WTI-based fuel surcharge decision and announcement; BNSF's May 2003 HDF-based fuel surcharge decision and announcement; UP's May 2003 HDF-based fuel surcharge decision and announcement; and NS's January 2004 WTI-based fuel surcharge decision and announcement. Defendants further request an Order barring Plaintiffs from seeking an inference of conspiracy from any evidence concerning internal deliberations about these "similar actions" on other traffic. *See, e.g.*, CD Exs. 85-89 (HD Ex. 6; RD Exs. 41-42; HD Ex.14).

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court give Section 10706 the full force that Congress intended.   Plaintiffs should be prevented from relying on evidence and inferences drawn from lawful and necessary interline coordination.   This ruling is critical not only for this case, but to ensure the viability of our national rail network now and in the future.

Dated:  February 21, 2020                    Respectfully submitted,


*/s/ Daniel M. Wall*                          Tyrone R. Childress
Daniel M. Wall                                JONES DAY
Timothy L. O'Mara                             555 South Flower Street, 50th Floor
Christopher B. Campbell                       Los Angeles, CA 90071-2300
LATHAM & WATKINS LLP                          Telephone: (213) 489-3939
505 Montgomery Street, Suite 2000
San Francisco, CA 94111                       Matthew M. Collette (D.C. Bar No. 427617)
Telephone: (415) 391-0600                     MASSEY & GAIL LLP
                                              10001 Maine Ave. SW Ste. 450
Allyson M. Maltas (D.C. Bar No. 494566)       Washington, DC 20024
LATHAM & WATKINS, LLP                         Telephone: (202) 795-3326
555 Eleventh Street, NW
Suite 1000                                    Leonard A. Gail
Washington, D.C. 20004-1304                   MASSEY & GAIL LLP
Telephone: (202) 637-2200                     50 E. Washington St., Ste 400
allyson.maltas@lw.com                         Chicago, IL 60602
                                              Telephone:  (312) 379-0470


*Counsel for Defendant Union Pacific Railroad Company*


*/s/ Kent A. Gardiner*
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  (202) 624-2500


*Counsel for Defendant CSX Transportation, Inc.*

/s/ *John M. Nannes*

John M. Nannes (D.C. Bar. No. 195966)
Tara L. Reinhart (D.C. Bar. No. 462106)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
john.nannes@skadden.com
tara.reinhart@skadden.com

Saul P. Morgenstern
Jennifer B. Patterson
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10075
Telephone: (212) 836-8000
saul.morgenstern@arnoldporter.com
jennifer.patterson@arnoldporter.com

*Counsel for Defendant Norfolk Southern Railway Company*

/s/ *Glenn D. Pomerantz*

Glenn D. Pomerantz
Kuruvilla J. Olasa
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone:  (213) 683-9100

Benjamin J. Horwich
Emily Curran-Huberty
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105
Telephone:  (415) 512-4000

Samuel M. Sipe, Jr. (D.C. Bar No. 256446)
Linda Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone:  (202) 429-3000

Joshua H. Soven (D.C. Bar No. 436633)
WILSON SONSINI GOODRICH &
ROSATI LLP
1700 K Street NW
Washington, DC  20006
Telephone:    (202) 973-8827

Veronica S. Lewis
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201
Telephone:  (214) 698-3100

*Counsel for Defendant BNSF Railway Company*

## CERTIFICATE OF SERVICE

I, Daniel M. Wall certify that on February 21, 2020, I caused a true and correct copy of the foregoing documents, the Declaration of Christopher Campbell in support thereof, and the Proposed Order granting Defendants' Motion to be served (1) by secured transfer on all counsel of record in the above-captioned matter; (2) by secured transfer on counsel for plaintiff in *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Company*, No. 11-cv-1049; and (3) by secured transfer on counsel for plaintiffs in cases consolidated as *In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, MDL No. 2925, No. 1:20-mc-00008, in which an appropriate protective order has been entered."

Dated: February 21, 2020                    Respectfully Submitted,


                                            /s/ *Daniel M. Wall*
                                            Daniel M. Wall
                                            LATHAM & WATKINS LLP
                                            505 Montgomery Street, Suite 2000
                                            San Francisco, CA 94111
                                            Telephone: (415) 391-0600

                                            Allyson M. Maltas (D.C. Bar No. 494566)
                                            LATHAM & WATKINS, LLP
                                            555 Eleventh Street, NW
                                            Suite 1000
                                            Washington, D.C. 20004-1304
                                            Telephone: (202) 637-2200
                                            allyson.maltas@lw.com

                                            *Counsel for Defendant Union Pacific Railroad Company*