**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869 |
| | Miscellaneous No. 07-0489 (PLF/GMH) |
| This Document Relates To: | |
| ALL DIRECT PURCHASER CASES | |
| OXBOW CARBON & MINERALS LLC, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 11-1049 (PLF/GMH) |
| UNION PACIFIC RAILROAD COMPANY, et al., | **PUBLIC VERSION** |
| Defendants. | Judge:  Hon. Paul L. Friedman |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION REGARDING THE INTERPRETATION AND
APPLICATION OF 49 U.S.C. § 10706**

**TABLE OF CONTENTS**

**Page**

GLOSSARY OF TRANSPORTATION TERMS ...................................................... viii

INTRODUCTION ............................................................................................. 1

COUNTERSTATEMENT OF FACTS ................................................................ 5

    A.   All Four Defendants Are Competitors ............................................ 5

    B.   Interline Traffic Does *Not* Compel Defendants To Discuss Fuel Surcharges ................ 7

    C.   Even For Joint-Line Traffic, There Was No Need For Defendants To Agree On Fuel Surcharges ............................................ 9

    D.   Defendants Changed Course In 2003 And Began Conspiring ..................................... 11

    E.   Defendants' Sudden, High-Level Collusion On Fuel Surcharges Was An Effort To Thwart Competition, Not To Benefit Customers Or To Address Fuel Price Volatility ............................................. 13

    F.   Defendants' Congressional Testimony And Internal Antitrust Guidance Clash With Their Current Position ........................................... 14

ARGUMENT ................................................................................................. 16

I.    ALL OF THE EVIDENCE DEFENDANTS ATTEMPT TO EXCLUDE SHOWS AN OVERARCHING CONSPIRACY TO SET FUEL SURCHARGES FOR ALL RATES, INCLUDING SINGLE-LINE RATES .................................. 16

    A.   Defendants Mischaracterize Their Alliance Meetings And Omit Key Details ............. 16

    B.   Defendants Mischaracterize Far-Reaching Conspiratorial Communications Among Competitors As Purported "Concurrence" Communications ......................... 20

    C.   Defendants Mischaracterize Anticompetitive Information Exchanges As "Logistical Communications" ............................................. 22

II.   DEFENDANTS FAIL TO SHOW THAT THIS LITIGATION OR ANY OF THE EVIDENCE SATISFIES THE REQUIREMENTS OF SECTION 10706 ..................... 25

    A.   Section 10706 Does Not Apply To Unregulated Rail Transportation Services And Contracts ............................................. 25

    B.   Section 10706(A)(3)(B)(ii) Is Inapplicable Because Plaintiffs Are Not Inferring An Agreement On Single-Line Rates From An Agreement On Interline Rates ......... 29

        1.   The Defendants did not act together with respect to *an* interline *rate* or related matter. ............................................. 30

        2.   There is no "similar action" here because there is only one action. ........................... 34

        3.   This statutory provision concerns only the inferences that may be drawn, and no jury will be asked to draw such an inference. ...................................... 36

C.    Section 10706(a)(3)(B)(ii)(II) Is Inapplicable Because The Alleged Agreement Does Not Concern An Interline Movement, And The Alleged Agreement Itself Violates The Antitrust Laws ............................................................................. 38

    1.    The agreement does not concern an interline movement. ........................... 38

    2.    The agreement at issue, considered by itself, would violate the antitrust laws. ......... 39

III.    DEFENDANTS IMPROPERLY SEEK ANTITRUST IMMUNITY .............................. 41

A.    Defendants' Arguments Rely Upon An Interpretation Of The Statute That Erroneously Amounts To Immunity ..................................................................... 42

B.    Any Provision for Antitrust Immunity Must Be Construed Narrowly ........................ 44

C.    The Immunity In Section 10706 Is Limited To Board-Approved Agreements As To Rates And Compilation, Publication, Or Distribution Of Rates ............................ 45

CONCLUSION ............................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott Labs. v. Portland Retail Druggists Ass'n,*
425 U.S. 1 (1976) ........................................................................................................ 33

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998) .................................................................................................... 26

*Am. Short Line R.R. Ass'n v. United States,*
751 F.2d 107 (2d Cir. 1984) ....................................................................................... 27

*Angiotech Pharms. Inc. v. Lee,*
191 F. Supp. 3d 509 (E.D. Va. 2016) ......................................................................... 30

*Case-Swayne Co. v. Sunkist Growers, Inc.,*
389 U.S. 384 (1967) .................................................................................................... 44

*Catalano, Inc. v. Target Sales, Inc.,*
446 U.S. 643 (1980) .................................................................................................... 37

*Comm'r v. Driscoll,*
669 F.3d 1309 (11th Cir. 2012) .................................................................................. 30

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962) .................................................................................................... 40

*Fayus Enters. v. BNSF Ry. Co.,*
602 F.3d 444 (D.C. Cir. 2010) .................................................................................... 29

*Gomez v. Mi Cocina Ltd.,*
No. 3:14-CV-2934-L, 2016 WL 11665867
(N.D. Tex. Aug. 22, 2016) .......................................................................................... 16

*Grp. Life & Health Ins. Co. v. Royal Drug Co.,*
440 U.S. 205, 223-33 (1979) ...................................................................................... 44

*Jefferson Cty. Pharm. Ass'n, Inc. v. Abbott Labs.,*
460 U.S. 150 (1983) .................................................................................................... 44

*Jung v. Ass'n of Am. Med. Colleges,*
339 F. Supp. 2d 26 (D.D.C. 2004) .............................................................................. 39

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007) .................................................................................................... 40

*Leonard v. Stemtech Health Scis., Inc.*,
  981 F. Supp. 2d 273 (D. Del. 2013) ........................................................................ 16

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ................................................................................... 37

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ................................................................................ 40

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  587 F. Supp. 2d 27 (D.D.C. 2008) .......................................................................... 13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  287 F.R.D. 1 (D.D.C. 2012) ...................................................................................... 6

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017) ............................................................................ 5

*Rail Gen. Exemption Auth.—Fresh Fruits & Vegetables*,
  361 I.C.C. 211, 219 (1979) ....................................................................................... 2

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ................................................................................... 40

*United States v. Bessemer & Lake Erie R.R. Co.*,
  717 F.2d 593 (D.C. Cir. 1983) ................................................................................ 34

*United States v. Borden Co.*,
  308 U.S. 188 (1939) ............................................................................................... 33

*United States v. Gosselin World Wide Moving, N.V.*,
  411 F.3d 502 (4th Cir. 2005) ................................................................................. 34

*United States v. Graham*,
  83 F.3d 1466 (D.C. Cir. 1996) ............................................................................... 40

*United States v. McKesson & Robbins, Inc.*,
  351 U.S. 305 (1956) ............................................................................................... 37

*United States v. Niagara Frontier Tariff Bureau, Inc.*,
  No. CIV. A. 83-1313C, 1984 WL 879 (W.D.N.Y. June 26, 1984) ......................... 32

## Statutory Authorities

15 U.S.C. § 37b(b)(1)(C) ............................................................................................... 39

1 U.S.C. § 1 ................................................................................................................... 30

49 U.S.C. § 10101 ................................................................................................ 2, 26, 27

49 U.S.C. § 10501(b) ................................................................................................ 29

49 U.S.C. § 10706 .............................................................................................. *passim*

49 U.S.C. § 10706(a)() ................................................................................ 28, 29, 42

49 U.S.C. § 10706(a)(2)(A) .................................................................. 26, 28, 31, 45

49 U.S.C. § 10706(a)(3)(A) .......................................................................... 26, 27, 28

49 U.S.C. § 10706(a)(3)(A)(ii) ........................................................................... 31, 32

49 U.S.C. § 10706(a)(3)(A)(iii) .................................................................... 31, 32, 38

49 U.S.C. § 10706(a)(3)(B) .................................................................. 26, 28, 35, 42

49 U.S.C. § 10706(a)(3)(B)(i) .................................................................................. 37

49 U.S.C. § 10706(a)(3)(B)(ii) ......................................................................... *passim*

49 U.S.C. § 10706(a)(3)(B)(ii)(I) ................................................................. 28, 35, 36

49 U.S.C. § 10706(a)(3)(B)(ii)(II) .................................................................... *passim*

49 U.S.C. § 10706(a)(4) ........................................................................................... 45

49 U.S.C. § 10706(a)(3)(C) ..................................................................................... 27

49 U.S.C. § 10709 ............................................................................................ *passim*

49 U.S.C. § 10709(a) .......................................................................................... 25, 28

49 U.S.C. § 10709(c)(1) ...................................................................................... 25, 29

49 U.S.C. § 10762(b)(2) ........................................................................................... 42

49 U.S.C. § 11908 ................................................................................................ 2, 26

ICC Termination Act, Pub. L. No. 104-88 .............................................................. 42

Pub. L. 96-448, 1926, 94 Stat. 1895 ....................................................................... 26

## Rules and Regulations

Fed. R. Evid. 402 ...................................................................................................... 16

## Legislative Materials

H.R. Rep. No. 96-1430 (1980) .................................................................................. 27

S. Rep. No. 94-499 (1975) ............................................................................................................ 26

## GLOSSARY OF TRANSPORTATION TERMS

| | |
|---|---|
| **Contract Rate** | A rate that applies on **Contract Traffic**. |
| **Contract Traffic** | Railroad transportation under a contract entered into pursuant to 49 U.S.C. § 10709. |
| **Direct Connector** | A railroad that **Practicably Participates**, as defined by the STB, in an **Interline Movement**. A railroad is a Direct Connector if it forms a part of a specific **Interline Movement** route. |
| **Exempt Rate** | A rate that applies on **Exempt Traffic**. |
| **Exempt Traffic** | Railroad transportation that has been exempted in whole or in part from regulation under 49 U.S.C. §10502. |
| **General Rate Increase** | A rate increase, usually in the form of a percentage increase, that railroads applied to all, or most, of their rates. |
| **Interline Movement** | Transportation over the lines of two or more railroads over a specified routing. |
| **Joint-Line Rate** | A single rate railroads agree to charge a customer for their joint service on an **Interline Movement**, sometimes also referred to as a "**Joint-Rate**." Where the carriers do not agree, they charge a **Rule 11 Rate**. |
| **Practicably Participates** | A railroad that "practicably participates in the movement" in the manner set forth at 49 U.S.C. § 10706(a)(1)(C). |
| **Rate Bureau** | An organization of railroads that collectively fixed rail rates pursuant to the terms of an agreement between member railroads. |
| **Rule 11 Rate** | A rate each carrier separately charges a customer for the service each provides on an **Interline Movement**. |
| **Regulated Rate** | A rate that applies on a common carrier rail movement that is subject to STB regulation. |
| **Single-Line Rate** | A rate charged by a carrier that is applicable only over its line on a route where the carrier provides service between the rail traffic origin and destination. |

## INTRODUCTION

Defendants' motion attempts to turn a narrow evidentiary rule into a license for railroads to conspire across *all* rates with impunity.  All of the evidence at issue concerns an agreement on fuel surcharges across all rail freight traffic; none of the evidence suggests the agreement was limited to interline rates.  Thus, Defendants are left with the proposition that anything that is in any way related to interline communications is immune from antitrust scrutiny.  Defendants' position would mean that if two railroads decide to fix prices on all rail freight traffic, some of which happens to be interline, then all evidence of these discussions—as well as the conduct itself—is legally protected.  This astounding new theory, premised on the notion that Defendants' price-fixing was compelled by law and "absolutely necessary," mischaracterizes the evidence Defendants seek to exclude, radically distorts the express language of 49 U.S.C. § 10706, and conflicts with well-established law that limits antitrust immunities.  As a direct result of deregulation, Defendants are unquestionably subject to the antitrust laws; the Staggers Act and related legislative efforts were intended to promote *competition*—not to protect price-fixing among competitors.  Accordingly, Defendants' motion should be denied.

**I.**  Defendants falsely characterize the evidence as concerning an agreement solely as to interline rates (a small percentage of their overall traffic).  The meeting minutes, discussion topics, and inter-Defendant communications at issue reveal wide-ranging and unprecedented fuel-surcharge discussions and actions, including among Defendants' senior executives, that contained no such limitation—and speak instead in terms of an "industry position" across "all roads."  Defendants pull out of context any use of the word "interline" (however unrelated to fuel surcharges), yet none of these discussions were confined to interline rates between the particular carriers for any specific shared interline movement.  Rather, the discussions and actions repeatedly

emphasized the importance of synchronizing and enforcing fuel surcharges on *all* rates, including single-line (also known as "local") rates.   And the evidence demonstrates that Defendants' imposed their fuel surcharges across the board on all rates.   There is simply *no* evidence suggesting that single-line rates were excluded from the agreement to fix fuel surcharges as a means to raise all-in rail freight rates across the board.

**II.**  Section 10706 as a whole is inapplicable to the contract rates (not subject to government rate regulation) that are the subject of these cases.   Defendants' arguments ignore the express language of Section 10709, which states that contract rates are not covered by "this part"— "Part A – Rail" of "Subtitle IV [of Title 49] – Interstate Transportation" — spanning 49 U.S.C. §§ 10101 to 11908 (including Section 10706).   The statutory scheme as a whole also evinces a clear intent that Section 10706 does not cover contract rates.

Regardless, Defendants fail to meet the clear and express requirements of Section 10706(a)(3)(B)(ii) or 10706(a)(3)(B)(ii)(II), and the remainder of the Staggers Act further establishes that these provisions do not create any evidentiary protection for Defendants' alleged price-fixing agreement here.   Rather, both statutory subsections were enacted to provide only narrow protections for specific actions and agreements between interline partners as to a shared movement or rate, which is a far cry from what the evidence shows here.

Section 10706(a)(3)(B)(ii) states that "proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic."   Defendants fail to satisfy this section on three grounds.   *First*, the action at issue does not concern "*an* interline rate."   This phrase clearly indicates that it covers only an agreement for one particular interline rate.   Regardless, it plainly

does not cover an agreement for *all* rates, including single-line, which is what all four Defendants agreed to here.  Notably, Defendants concede (Br. 16) that an agreement on fuel surcharges for single-line rates would be not be protected by Section 10706.  Their argument therefore rests on the untenable suggestion (Br. 25 n.13) that an agreement on single-line rates should be protected if made at the same time as, and together with, an agreement on interline fuel surcharges.  The statute neither says nor implies any such thing.  *Second*, this litigation does not involve unilateral, "similar action with respect to a rate or related matter on another route or traffic" at some later point in time.  Rather, these cases involve one action taken collectively by all Defendants: the conspiracy among Defendants to impose rate-based fuel surcharges on all rates and to no longer compete on that basis.  *Third*, Plaintiffs are not seeking to "infer[]" a conspiracy from an action on an interline rate and some subsequent, unilateral action by one or more of the Defendants.  No inference is required because it is the collusive action with respect to *all* rates that itself *constitutes* the unlawful agreement.  Defendants' contention (Br. 16) that only "direct" evidence of an agreement on single-line rates is admissible—what Defendants describe (Br. 11) as perfect, smoking-gun evidence—has no statutory basis and effectively would create an improper immunity for virtually all agreements to fix prices that cover single-line rates.  Section 10706(a)(3)(B)(ii) prohibits only a particular type of inference that is completely inapplicable here.

Section 10706(a)(3)(B)(ii)(II), meanwhile, prohibits admission of "evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers . . . if the discussion or agreement . . . concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the [antitrust] laws."  The evidence Defendants seek to exclude does not fall under this section for two reasons.  *First*, for the same reasons the agreement at issue here did not concern "*an* interline rate," the agreement at issue here

also did not concern "*an* interline movement."  *Second*, the alleged agreement among Defendants *does* itself violate the antitrust laws.  Defendants mischaracterize Section 10706(a)(3)(B)(ii)(II) by suggesting that *each* document or statement must be separately evaluated to determine if it constitutes an antitrust violation, standing alone.  But the statute makes the evidentiary exclusion inapplicable where "*the agreement*" violates the antitrust laws.  Here, as Plaintiffs have alleged and the evidence shows, there was one, overarching agreement to charge coordinated fuel surcharges on all shipments as a means to raise all-in rates across the board.

**III.**  Defendants seek to exclude evidence of, and thereby immunize, an agreement to use fuel surcharges to impose across-the-board rate increases on shippers nationwide.  But that immunity has no legal or rational basis.  The narrow evidentiary protection of Section 10706 merely describes what inferences can be made and what evidence may be admitted; it does not create an immunity allowing Defendants to reap the benefits of deregulation while evading all of the antitrust obligations that come with it.  Defendants have even agreed (when providing testimony to Congress during this litigation) that, in the railroad industry, "[w]herever economic regulation was removed, antitrust law took its place."

Yet Defendants now assert, for the first time, that collusion on fuel surcharges purportedly is "both legally compelled and absolutely necessary."  Br. 2.  Defendants, however, identify no statutory basis for such purported legal compulsion, and as a factual matter, their contention is absurd.  Before the alleged conspiracy, senior executives never gathered to discuss and agree upon fuel surcharges.  Moreover, there is no need to discuss rates in the Rule 11 interline context (where two railroads physically connect but invoice the customer separately for their respective portions); and for joint-line shipments (which represent a small fraction of total shipments), Defendants had already set up a protocol, before the alleged conspiracy, enabling them to insert fuel surcharges

4

unilaterally.  Defendants also do not claim that this "legally compelled and absolutely necessary" collusion on fuel surcharges continues to this day.  And yet, the sky has not fallen.  Somehow, railroads are able to continue providing "seamless" interline service without price coordination. In any event, at no point did Defendants need to collude and set fuel surcharges across the board for all routes, including single-line routes.

## COUNTERSTATEMENT OF FACTS

The evidence Defendants seek to exclude establishes that Defendants engaged in a conspiracy to levy fuel surcharges for all rail freight traffic, as a means to raise rail freight rates across the board.  They did this for the simple and obvious reason (recorded in internal communications) that they could not successfully impose the fuel surcharges on their own in the face of customer opposition.  They could only do so by eliminating the competition that otherwise exists among the four Defendant railroads.  Defendants' new theory to justify the evidence of their collusion—that they were *required* to collude on fuel surcharges for interline rates—is false:  there was no such requirement, and nothing suggests the conspiracy was limited to interline rates.  Nor can Defendants square their belated assertion that the law has for 40 years compelled the conduct alleged here with the evidence that Defendants abruptly changed their conduct and practices, beginning in 2003, in connection with their agreement on rail freight fuel surcharges.

### A.    All Four Defendants Are Competitors

There is no question that all four Defendants are *competitors*.  Br. 1 (conceding that *all four* rail carriers "are sometimes direct competitors for other traffic"); *see* Br. 9, 11 (same).  NS and CSX (in the east) and UP and BNSF (in the west) compete directly with each other.  But direct competition is not confined to the two halves of the country.  As this Court already found—twice— even a shipper that is served by a single railroad can harness competition among all four railroads to negotiate rates and fuel surcharges.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F.

Supp. 3d 14, 99-100 (D.D.C. 2017) ("*Rail Freight II*") ("captive shippers are subject to competitive forces and therefore can suffer antitrust injury"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 42 (D.D.C. 2012) ("*Rail Freight I*") (court "disagrees with defendants and Dr. Willig that captive shippers are not subject to competitive forces—a claim that is contradicted by the statements of defendants' own executives").[1]

Nowhere is this direct competition among all four Defendants clearer than in the fierce competition on fuel surcharges before the start of the conspiracy.  For many years before the conspiracy, Defendants confronted a long-term, structural decline in rail freight rates, which was brought about by, among other factors, what CSX characterized as "some very vicious historical price wars" and "destructive pricing for rail share."  SRD Ex. 2 (2002 CSX internal analysis), at CSXFSC000199149; *see* SRD Ex. 3 (Giftos Dep.) at 86-87; SRD Ex. 4 (2000 CSX email noting it "[d]oesn't look like a lot of opportunity to push our prices" due to competition).  Between 2000 and early 2003, Defendants took various unilateral actions designed to increase their respective revenue, but their efforts to levy surcharges were impeded by competition.  BNSF succinctly explained the problem it encountered in its unilateral attempts to impose fuel surcharges:

> We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . ***The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it.  We do loose [sic] business because of that*** and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it.

SRD Ex. 5 (May 28, 2002 Enterprise Wide Risk Assessment), at BNSF-0574617 (emphasis added); *see also* SRD Ex. 6, at NS_010072905 (2002 NS email: CSX "appear[s] to be more lax in

---

[1]  Defendants' deposition testimony, statements in other proceedings, and transaction data confirm vigorous competition among all four railroads, at least absent collusion.  *Rail Freight I*, 287 F.R.D. at 42-43; *Rail Freight II*, 292 F. Supp. 3d at 99-100; Decl. of Sami Rashid ("SRD") Ex. 1 (June 12, 2013 Rausser Reply Rpt.) at 45-51.  "CD" refers to the Declaration of Christopher Campbell filed with Defendants' brief.

applying the surcharge to private authorities" and "[t]his does have competitive implications for NS"); SRD Ex. 7, at BNSF-0328866 (2003 BNSF memo: "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive.").  Indeed, after BNSF announced in April 2003 that it was dropping its May carload fuel surcharges to 2% even though its published formula would have commanded 5% (in line with its competitors), *see* SRD Ex. 8, at BNSF-0495601-02, Don Seale of NS acknowledged BNSF's "rollback" of its fuel surcharges and informed his superior that "*[t]he industry is not looking good on this issue and a stable approach has been the best approach*," CD Ex. 78 (emphasis added).  Two days later, Seale met with UP executives and a "[c]onsensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers."  CD Ex. 43, at NS 001000361.  That meeting also included discussion about whether "the industry" could "work together on this opportunity."  *Id.*; *see also* SRD Ex. 9 (Plaintiffs' interrogatory narrative) at 17-45.  Later, when the conspiracy was well underway, BNSF was mindful of the "risk that competitors reverse course on using a fuel surcharge to gain market share," recognizing that "*it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail*."  SRD Ex. 10 (2005 internal BNSF report), at BNSF-0574216 (emphasis added).

   **B.     Interline Traffic Does *Not* Compel Defendants To Discuss Fuel Surcharges**

   Defendants' motion turns on the false (and newly minted) premises that "railroads *must* cooperate and communicate on . . . joint pricing" (Br. 1) and "such cooperation is both legally compelled and absolutely necessary" (Br. 2; *see also* Br. 6, 39).  Both are incorrect.

   As an initial matter, Defendants' argument is rife with inconsistencies.  Prior to 2003, the railroads accomplished millions of interline transactions without price coordination spanning *all* of their respective traffic.  What is more, Defendants previously asserted in this litigation that each of them had a *multiplicity* of fuel surcharges for customers before and during the conspiracy.  *Rail*

*Freight I*, 287 F.R.D. at 57.  Indeed, Defendants previously denied coordination on rates.  *See, e.g.*, Dkt. 106 at 13, 31 (characterizing their behavior as "price matching and follow-the-leader pricing": "one railroad observing the mechanism of another and then, some months later, adopting or switching to it").  Were that not enough, Defendants' assertion of *necessity* is untenable given the STB's condemnation of Defendants' fuel surcharge program as a "misleading and ultimately unreasonable practice."  *Rail Fuel Surcharges*, STB Ex Parte No. 661, Jan. 25, 2007, at 7.

As Defendants admit (Br. 7-8 & n.3), there are two types of interline shipments, "joint-line" and "Rule 11" shipments.  There is no need to discuss pricing in a Rule 11 shipment, because although two railroads physically connect, they invoice the customer separately for their respective portions of the shipment.  *Id.* n.3.  Defendants concede that Rule 11 shipments involve "separate rate agreement[s] between the shipper and each participating rail carrier," each "independently" negotiated.  *Id.* 7-8 n.3.[2]  Clearly, there is no *need* for rate coordination on Rule 11 shipments in which each carrier bills the customer separately.

For a "joint-line" shipment, participating carriers issue a single rate (and invoice) to the customer for the entire movement, which is then divided proportionally among the carriers.  *Id*. at 7-8.  This "joint-line" subset of interline movements is the only potentially appropriate place for discussions between participating railroads about pricing and fuel surcharges, as Defendants' industry expert agrees.  SRD Ex. 11 (Rennicke Dep.) at 224 (*only* "joint-line" rates "require[]

---

[2] *See also* SRD Ex. 42 (Union Pacific:  Shipping in the I-5 Corridor, dated August 2014) (UP advertising its ability to "to unilaterally establish rates [for certain interline movements], skipping the concurrence process"); *Expanded Interline Prices Now Available on CSX.com*, CSX.com (Nov. 18, 2005), https://investors.csx.com/news-and-events/news/news-details/2005/Expanded-Interline-Prices-Now-Available-on-CSXcom/default.aspx (CSX touting the availability, through its website, of "instantaneous interline prices . . . for virtually the entire North American rail system . . . made from a combination of each railroad's independently established price for its portion of the segment").

concurrence" from the connecting railroad).

Notably, most shipments are *not* interline, and fewer still are "joint-line" shipments that might warrant pricing dialogue.  For example, from 2000 to 2008, only 5.9% of UP's total traffic, by ton-mile, derived from "joint-line" shipments with BNSF, NS, or CSX—while 87% of UP's total traffic consisted of "local" (*i.e.*, single-line) shipments (65.7%) or "Rule 11" shipments (21.3%).  SRD Ex. 12 (Feb. 6, 2013 Carlton Rpt.) at 15, Table 3.[3]  Defendants' industry expert William Rennicke testified that across all railroads' carload traffic, only "15 percent [comprising "joint-line" shipments] requires concurrence," while the remaining 85% of carload traffic ("single-line" and "Rule 11" traffic) does not.  SRD Ex. 11 at 224.

### C.     Even For Joint-Line Traffic, There Was No Need For Defendants To Agree On Fuel Surcharges

Before 2003, Defendants were able to ship and bill joint-line traffic without any of the inter-Defendant, executive-level fuel surcharge meetings and dialogues at issue here.  Defendants previously admitted in interrogatory responses that their senior executives ***never jointly discussed fuel surcharges prior to 2003***, despite their earlier, and unsuccessful, attempts to impose fuel surcharges in a competitive environment[4]—undermining Defendants' current assertion that it purportedly was *necessary* to discuss such matters with each other at the highest levels.  *See, e.g.,* SRD Ex. 14  (BNSF interrogatory responses), at Response No. 2.  Indeed, Michael Giftos, CSX's chief marketing officer and self-proclaimed "inventor" of rail fuel surcharges, admitted that he never discussed the fuel surcharge CSX adopted in 2000 with any other railroads prior to

---

[3]  82.5% of BNSF's net revenue (2000-2008) came from single-line (66.6%) or Rule 11 traffic (15.9%), and only 11.4% from joint-line traffic with NS or CSX.  SRD Ex. 13 (Jan. 22, 2013 Ordover Rpt.), at 13, fig. 3.

[4]  *See Rail Freight I*, 287 F.R.D. at 48 ("Before the alleged conspiracy, defendants' differentiated fuel surcharges were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically").

implementation.  *See* SRD Ex. 3 at 31, 69-70.  Moreover, Giftos testified that in the one instance when he briefly discussed fuel surcharges with his counterpart at UP (Jack Koraleski)—a year or two later—Koraleski "was surprised to learn that [CSX] had a fuel surcharge program" even though it had "been in place for some time" and that it was "obviously" known to UP "in the depths of [that] organization."  *See id*. at 197-98.

Defendants' arguments also ignore that prior to 2003, Defendants had already implemented a process to address the administration and limited coordination of fuel surcharges on particular "joint-line" shipments.  In 2000, the Association of American Railroads' ("AAR's") Interline Revenue Management ("IRM") Committee established a "technical advisory group" ("TAG") to ███████████████████████████████████████████████████[5]  Under the protocol adopted by the AAR, each Defendant could implement a "unilateral fuel surcharge" without seeking or receiving concurrence from the participating carrier on a joint-line shipment.[6]  This meant that a railroad could still assess a fuel surcharge where it ███████████████████ ██████████████████████████████ or where one railroad ████████████████████ ███████████████████████████████████████████████████████████ ███████  Moreover, the proportional revenue split of any joint-line fuel surcharges did not require discussion between the participating carriers, because it was ████████████████████ ███████████████████████████████████████████████████████████

---

[5]  *See* SRD Ex. 15 (AAR Committee Structure 2001), at AAR_P_00001429; SRD Ex. 16 (AAR Committee Structure 2004), at UPFSC_0238117; SRD Ex. 17 (Nov. 14, 2000 email chain); SRD Ex. 18 (Dec. 11, 2000 email enclosing minutes from Nov. 16 meeting), at NS_058001092-96.

[6]  *See* SRD Ex. 19 (Fuel Surcharge Processing – Best Business Practices), at NS_024000006; SRD Ex. 20 (AAR 30(b)(6) Dep.) at 176, 179-80.

[7]  *See* SRD Ex. 19, at NS_024000006; SRD Ex. 20 at 179-80.  The protocol states that "the requirements surrounding obtaining concurrence on joint line fuel surcharges should be the same as on joint line prices," and include information such as "at what level of the prices (the price authority, item or rate line level) the fuel surcharge is applicable."  SRD Ex. 19, at NS_024000003.

███████████████ SRD Ex. 15 (AAR Committee Structure 2001); *see also* SRD Ex. 20 (AAR 30(b)(6) Dep.) at 181-183.  Thus, Defendants have no support for their claim of the supposed "necessity and propriety" of executive-level communications between competitors to agree on fuel surcharges.  Br. 29.

### D.   Defendants Changed Course In 2003 And Began Conspiring

This Court already found there is "substantial documentary evidence" showing that before 2003 "defendants had difficulty applying and enforcing fuel surcharges in contracts" and thereafter "that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers."  *Rail Freight II*, 292 F. Supp. 3d at 32, 103.[8]

Prior to the conspiracy, Defendants had difficulty applying and enforcing surcharges in contracts.  *See supra* Part A.  Beginning in 2003, however, Defendants' senior leadership, including CEOs, embarked on an unprecedented series of discussions about fuel-surcharge programs, culminating in an across-the-board agreement extending to all traffic.  The discussions establishing this agreement are the very evidence Defendants seek to exclude.  That evidence makes clear, in Defendants' own words, that their collusion on fuel surcharges applied to all rates.  For example:

- March 18, 2003 BNSF-NS meeting:  "BNSF fuel surcharge is structured differently than NS, CSX, and UP.  Should BNSF's [be] *synchronized with the other big players in the industry*?"  CD Ex. 39 (emphasis added).

- May 14, 2003 NS-UP meeting notes:  CEOs told attendees "Fuel surcharges:

---

[8]  *See also id.* at 102 ("[P]laintiffs' documentary evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges in the class period is substantial.").  In making these findings, the Court did not consider the evidence at issue in this motion.  *Id.* at 51 n.5.

Uniform application **across the industry** would be helpful." CD Ex. 42 (emphasis added).

- June 3, 2003 CSX-UP meeting: Discussion of fuel surcharges not limited to interline traffic, with notes stating: "Fuel surcharge—GIFTOS, CSX has not seen outcry that UP has. CSX may begin a modest hedge program (WARD). Both roads start at a $23 trigger. May have to revisit $23 if stay high." CD Ex. 45.

- July 30, 2003 BNSF-NS meeting: CMOs "John Lanigan and Don Seale agreed to lead a discussion of a potential **industry position on fuel surcharges** at the next N.E.M.C. meeting." CD Ex. 49 (emphasis added).

- October 2003: John Couch of CSX reported that at a meeting with BNSF, "BNSF stated that 82% of their carload and Intermodal business either had a fuel surcharge or an escalator on the revenue." This figure referred to *all traffic*, not interline. CSX's subsequent internal discussion of its coverage was not limited to interline. CD Ex. 70.

- November 2004: Meeting of CMOs from all four Defendants "to judge the appetite for a mileage-based FSC [*i.e.*, fuel surcharge] program." CD Exs. 75, 82.

Out of these meetings came what Defendants referred to as "consensus" on a uniform fuel-surcharge approach. CD Ex. 43 (minutes from May 14, 2003 UP-NS meeting). Defendants agreed to harmonize their fuel-surcharge programs; to eliminate discounting, waivers, and non-enforcement of fuel surcharges; and to apply these rate-based fuel surcharges to all traffic, with the goal of 100% coverage across all rail freight customers. *See* SRD Ex. 9 (Plaintiffs' interrogatory narrative) at 17-88. This was an agreement not to compete on the basis of fuel surcharges, which had previously withered in the face of competition. Pursuant to this agreement, each Defendant sent notifications to the other three competitors at the same time, often with explicit notation that these changes would apply to all traffic. *See infra* at 19-22. Defendants also exchanged detailed fuel-surcharge coverage statistics in service of their shared anticompetitive goal, and these statistics were *not* limited to interline rates. *See infra* at 22-25. For instance, on September 10, 2004, BNSF shared with NS "an estimate of **all traffic (not solely with NS) that moved under the price authority** in the past twelve months." CD Ex. 61 (emphasis added).

**E.    Defendants' Sudden, High-Level Collusion On Fuel Surcharges Was An Effort To Thwart Competition, Not To Benefit Customers Or To Address Fuel Price Volatility**

The evidence establishes unequivocally that customers opposed fuel surcharges and successfully evaded them until the conspiracy alleged here.  As discussed *supra* Part A, until 2003, Defendants were unable to impose fuel surcharges with any consistency.  The contemporaneous documents at issue in this motion also chronicle Defendants' concerns about customer pushback and "outcry" (CD Exs. 43, 45, 46) in response to coordinated rate-based fuel surcharges.  Thus, there is no support for Defendants' assertions now (Br. 5-7, 14) that their actions were merely an attempt to simplify fuel surcharges for the sake of customer convenience.  Indeed, when Defendants imposed their new coordinated fuel-surcharges, customers ultimately *revolted*, including before the STB.  *See Rail Freight I*, 287 F.R.D. at 17.  And this litigation includes hundreds of very large freight shippers, including for example Olin (a named plaintiff from the class action), Oxbow, and many more in MDL 2925.

Defendants' conspiracy also was not a response to what Defendants now claim were "increasingly volatile fuel prices."  Br. 10.  This Court already recognized at the pleading stage the weakness of the "volatility" argument.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 36 (D.D.C. 2008) (Defendants' "argument that in a time of dramatically fluctuating fuel costs, use of the AIILF and monthly fuel surcharges allowed them to adapt their rates to better reflect the changed cost . . . ignores the alleged agreements between the eastern and western railroads, respectively, to use the same fuel surcharge indexes, and it ignores the unique method with which the surcharge was applied—as a multiplier of the total base rate.").

Fuel prices were declining in the first half of 2003, when Defendants' conspiracy began, and fuel prices became increasingly volatile (and significantly higher) only after July 2003:

Figure IV-5A
**Crude Oil (WTI) and Highway Diesel Fuel (HDF) Prices, 1996-2008**

SRD Ex. 21 (Mar. 1, 2013 Kalt Rpt.) ¶ 140, fig. IV-5A.  UP's expert Dr. Dennis Carlton agreed that January 1, 2000 to July 1, 2003 was "a time period when fuel costs were generally ***low and flat***." SRD Ex. 12 (Feb. 6, 2013 Carlton Rpt.) ¶ 148 (emphasis added).  In addition, a key feature of Defendants' conspiracy was the decision to *lower* trigger prices to ensure fuel-surcharge revenue even as fuel prices remained below $28 per barrel (WTI), which is at odds with Defendants' suggestion that each was bracing for increased volatility.   Defendants' contemporaneous documents, meanwhile, show they expected little increase in the costs of fuel at the time of their 2003 meetings.  SRD Ex. 9 (Plaintiffs' interrogatory narrative) at 23-27.

### F.   Defendants' Congressional Testimony And Internal Antitrust Guidance Clash With Their Current Position

In May 2009, as this litigation was underway, Defendants submitted written testimony to Congress, under the banner of the AAR and its member railroads (and signed by J. Michael Hemmer, UP's General Counsel).  SRD Ex. 22 (Hearing Before the Subcommittee on Courts and Competition Policy of the Committee on the Judiciary—House of Representatives, 111th Cong., 1st Sess., Serial No. 111-63 (May 19, 2009)), at 44-73.  Defendants emphasized that historically, in the railroad industry, "[w]herever economic regulation was removed, antitrust law took its

place." *Id*. at 6.  Moreover, Defendants made clear that the railroads are not "exempt" from antitrust scrutiny: "Railroads cannot and do not get together to set prices for competing services. . . . All of those activities would violate the antitrust laws . . . ." *Id.*  Ultimately, "[f]reight railroads are exempt from antitrust laws only where Congress decided that it wanted an agency to pursue those policies in regulating railroads." *Id.* at 7.  Thus, "there is no gap—no yawning hole—where railroad actions are exempt from antitrust laws but free of regulatory oversight." *Id*.  Citing this litigation, Defendants explained: "*We do <u>not</u> assert in that case that we are exempt from the antitrust laws*.  Our defense is that we *complied* with the antitrust laws." *Id*. (emphases added).  According to Hemmer (in stark contrast to Defendants' current arguments before this Court), "Union Pacific did not coordinate its fuel surcharge programs with any other railroad." *Id.*

Defendants' representations to Congress in 2009 square with the internal antitrust guidance each previously provided, but did not heed.  In 2005, UP's Law Department disseminated "[l]egal guidance" that contradicts Defendants' current position:  "No one should contact or communicate with BNSF (or any competitor for that matter) regarding any prices (***other than joint line prices pertaining to shipments in which UP and the railroad being contacted both participate***) . . . or anticipated price actions."  SRD Ex. 23 (emphasis added); SRD Ex. 24, at UPFSC 0675730 (UP Antitrust Compliance presentation).  The other Defendants issued the same guidance internally.[9]

_____

[9]  CSX instructed sales personnel: "**Do** – Make it clear when contacting another railroad that you are talking only about joint line rates with that carrier.  **Don't** – Allow your conversation to wander to generalizations about freight rates 'in the market,' or your single line rates."  SRD Ex. 25, at CSXFSC00676473; SRD Ex. 26, at CSXFSC000001048 ("[l]imit discussion to that joint line rate"); SRD Ex. 27, at NS_002000111 (NS Law Department guidelines prohibiting "discussion of rates or practices in connection with any traffic other than the specific joint-line traffic"); SRD Ex. 28, at BNSF-0817761 (BNSF Code of Conduct:  "Information exchanged . . . regarding pricing of joint-line movements must be limited to essential elements of the specific undertaking with that carrier.  Under no circumstances can pricing plans or pricing policies with respect to single-line rates or charges be discussed with representatives of a competing carrier.  Also, no information concerning a joint-line movement may be provided to carriers not involved in the movement.").

**ARGUMENT**

Defendants have the burden of showing they satisfy the requirements for evidentiary protection in Section 10706.  *See* Fed. R. Evid. 402; *see also Gomez v. Mi Cocina Ltd.*, No. 3:14-CV-2934-L, 2016 WL 11665867, at *7 (N.D. Tex. Aug. 22, 2016) ("The burden is on the party opposed to admission of evidence to show a reason for its exclusion.") (quotation marks omitted); *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013) ("The movant bears the burden of demonstrating that the evidence is inadmissible on any relevant ground, and the court may deny a motion in limine when it lacks the necessary specificity with respect to the evidence to be excluded.").  Defendants cannot satisfy this burden because their theory rests on misstatements of facts and law, and ultimately an unfounded exemption from the antitrust laws.

I.    **ALL OF THE EVIDENCE DEFENDANTS ATTEMPT TO EXCLUDE SHOWS AN OVERARCHING CONSPIRACY TO SET FUEL SURCHARGES FOR ALL RATES, INCLUDING SINGLE-LINE RATES**

Defendants mischaracterize the evidence as concerning interline rates, but all of the evidence at issue concerns a conspiracy regarding *all* rates.  There is not a single piece of evidence showing that Defendants actually limited their fuel-surcharge conspiracy to interline rates.  As such, Defendants cannot meet their burden to exclude any of this evidence.

A.    **Defendants Mischaracterize Their Alliance Meetings And Omit Key Details**

Defendants portray their alliance meetings as incontrovertibly procompetitive (in this *per se* case), a "critical" opportunity to "bridge the physical separation between their networks" and "enhance efficiency," all with the express endorsement of the STB.  Br. 26-27.  Yet Plaintiffs have never questioned the rail carriers' prerogative to exchange logistical information on shared joint-line movements, in concert with the antitrust laws—which again, prior to 2003, was handled by lower-level operational employees and not senior executives.  The STB's encouragement of "joint marketing agreements and interline partnerships," *Major Rail Consolidation Procedures*, STB Ex

16

Parte No. 582 (Sub-No. 1), 2001 STB Lexis 546 at *30 (June 7, 2001), comes with the concomitant guidance that "[a]ny attempts at price-signaling activities for competitive traffic under the guise of interline ratemaking will continue to remain subject to the antitrust laws," *Canadian Nat'l Railway Company – Control – Ill. Central Corp.*, Decision No. 37, 4 S.T.B. 122 at *16 n.79 (1999); *see id.* at *13 (describing alliances as "voluntary" and only for "through routes").

Against this backdrop, many of the alliance-related excerpts that Defendants highlight are irrelevant. For example, Defendants emphasize, at great length, unrelated agenda items and discussion topics that "are operational in nature" (Br. 28), and have nothing to do with fuel surcharges. Elsewhere, Defendants underscore any use of the word "interline" in the documents (however untethered to fuel-surcharge discussions), as if that might categorically preclude broader discussions of *all* traffic. As summarized below, the portions of the meeting minutes and notes that actually relate to fuel surcharges (as well as the chain of events following those meetings) confirm the expansiveness of these discussions. Nor is it persuasive that Defendants' deposition witnesses, who could not recall any specifics of the actual fuel-surcharge discussions, nevertheless suggested that those same discussions "must" have been limited to interline business.[10] The Court

---

[10] (1) March 18, 2003 BNSF-NS senior team meeting: SRD Ex. 29 (Rose Dep.) 140-42 ("I do not remember any specifics from this."); SRD Ex. 30 (Lanigan Dep.) 44-48 (Lanigan claimed not to recall "generally" what he or anyone else said on synchronizing fuel surcharges); SRD Ex. 31 (Seale Dep.) 257 ("I don't recall the specifics of the March 18, 2003, meeting."). (2) March 27, 2003 Seale and Lanigan plan to discuss fuel surcharges at NFTA: SRD Ex. 30 (Lanigan Dep.) 62-63, 81-82 ("I don't recall the substance of discussions I had with Mr. Seale or anyone else at that [NFTA] meeting."); SRD Ex. 31 (Seale Dep.) 258-59 (not recalling whether he met with Lanigan at NFTA meeting). (3) April 1, 2003 BNSF-CSX alliance meeting: SRD Ex. 29 (Rose Dep.) 166-70 ("I don't remember the meeting from 2003."); SRD Ex. 30 (Lanigan Dep.) 69-70 ("I don't recall any specific discussions with Mr. Giftos."); SRD Ex. 3 (Giftos Dep.) 241-42 ("I don't actually remember this meeting . . . ."). (4) May 14, 2003 NS-UP alliance meeting: SRD Ex. 32 (Young Dep.) 229 ("I don't recall much."). (5) June 3, 2003 CSX-UP Alliance Meeting: SRD Ex. 33 (Gooden Dep.) 138-43 ("I do not remember being at this meeting and having a discussion of fuel surcharges."); SRD Ex. 34 (Eisele Dep.) 129-30, 135 (Eisele could not recall attending or discussion on customer reaction to fuel surcharges); SRD Ex. 3 (Giftos Dep.) 253-56.

has every reason to view that self-serving testimony with skepticism.  *See, e.g., Rail Freight I*, 287 F.R.D. at 57 ("The Court agrees with plaintiffs that defendants' executives' declarations are unpersuasive and inconsistent with their later deposition testimony.").

Defendants' inventory of alliance meetings also omits various critical details, a few of which Plaintiffs highlight here (and all of which can be found in the interrogatory narrative included as SRD Ex. 9).  Notably, Defendants omit from their motion NS and CSX's (the eastern railroads') April 2003 meeting to discuss fuel hedging strategies and practices.  SRD Ex. 9 at 34-35.  In addition, UP and CSX's March 12-13, 2003 meeting enabled both carriers to reconcile the widely varying approaches to fuel surcharges each had previously contemplated—and one week later, CSX announced a new standard carload fuel surcharge applicable to *all* of its traffic (single-line and interline, with UP or not).  SRD Ex. 9 at 23-26.  On April 4, 2003, UP likewise notified the other Defendants that it would apply the very same standard fuel surcharge program to *all* of its traffic (single-line and interline).  *Id*. at 27 ("The modified surcharge will continue to apply to most Union Pacific pricing documents ***for local and interline freight movements***.") (emphasis added).  Similarly, the March 18, 2003 BNSF-NS meeting spawned an action item that *was not even limited to the two carriers* in attendance, much less their shared joint-line business: "BNSF's fuel surcharge is structured differently than NS, CSX, and UP.  Should BNSF's b[e] synchronized with *the other big players* in the industry?  (John Lanigan/Don Seale)."  CD Ex. 39, at BNSF-FSC 000643 (emphasis added).  Handwritten notes from the May 14, 2003 UP-NS meeting use similarly sweeping language concerning fuel surcharges across the entire industry (and spanning all traffic), recording discussion that "[u]niform application *across the industry* would be helpful."  CD Ex. 42, at UPFSC 0616652 (emphasis added).  The associated meeting minutes explain further that "[c]onsensus was reached that it would be a positive outcome if *all roads* had the same process

in the eyes of our customers."  CD Ex. 43, at NS 001000361 (emphasis added).[11]  At a June 3, 2003 UP-CSX meeting, the two carriers compared "customer outcry" after announcing fuel surcharges for all traffic and discussed the need potentially to revisit trigger prices, and CSX shared its fuel hedging plans (which it previously discussed with NS)—all without any joint-line boundaries to the discussion.[12]  Finally, in 2006, as customer outrage soared and the STB began scrutinizing their fuel-surcharge practices, Defendants abruptly terminated their alliance meetings.

Try as they might, Defendants cannot now transform their unprecedented and freewheeling discussions of, *e.g.*, fuel surcharge "sychron[ization],""[u]niform application across the industry," an "industry position" on fuel surcharges, coordinated "trigger" prices, and anticipated customer pushback into purported narrow, antitrust-compliant discussions between interline partners as to shared joint-line business.  There were no such limitations, as the documents and related deposition testimony confirm repeatedly.  Defendants' own chart (Br. 43-44) betrays the absurdity of their theory.  According to Defendants, it just so happens that every time they discussed fuel surcharges, the railroads then set fuel surcharges on all rates, but this Court should nevertheless conclude that the discussions concerned only interline rates even where the discussions *never* said the agreement was so limited and made only the most tangential reference to interline.  *See, e.g.*, Br. 43 (claiming April 1, 2003 alliance meeting immunized raising fuel surcharges on all rates because at that meeting, the railroads discussed interline volumes and service).  This Court should reject such an implausible and unsupported theory in the face of overwhelming evidence to the contrary.

---

[11]   Defendants' post-hoc justification that this and other discussions "addressed a concern expressed by *shippers*" (Br. 36), is fanciful and lacks any contemporaneous support: the handful of comments provided by certain shippers to the STB are dated *more than three years later* and come in the context of widespread outrage by shippers over Defendants' fuel-surcharge practices.

[12]   Defendants assert that "[t]his evaluation of customer reaction and whether it required a change was so that these interline partners could satisfy customers and maximize opportunities for interline routes" (Br. 33), but cannot muster any specific support for that enormous assertion.

**B.     Defendants Mischaracterize Far-Reaching Conspiratorial Communications Among Competitors As Purported "Concurrence" Communications**

Defendants' effort to repackage wide-ranging competitor communications as strict concurrence requests (defined as "a request from one joint interline [read: joint-line] partner to another to agree to some term that will be applied to shared traffic," Br. 21) also is misplaced. First, virtually all of these announcements were conveyed to the other three Defendants, CD Exs. 16-18, 22-24, 30, 32, 33, 35, belying Defendants' assertion that Plaintiffs' evidence of conspiracy purportedly is built on communications between "an Eastern and a Western railroad[,] . . . two parties who have almost *no* competing traffic," Br. 29; *see also* CD Ex. 27 (BNSF-UP exchange between Western railroads); CD Ex. 31 (describing NS-CSX exchange between Eastern railroads); CD Ex. 34 (same); *supra* Counterstatement Part A.  Second, the documents evince much broader inter-Defendant discussions, including confirmation that these new fuel surcharges would apply to *all* traffic (including confidential contracts) and not just shared joint-line traffic.  For example:

- Randy Reyff (BNSF) to Jim Lorenz (UP): "[W]e've got executive instruction to apply Fuel Surcharge provisions to essentially everything."  CD Ex. 27, at UPFSC0001437.

- UP sent its ███████████████████████████ to all three co-Defendants and explained that its new fuel-surcharge program will "apply to most Union Pacific pricing documents for ***local and interline*** freight movements . . . ."  CD Ex. 30, at BNSF-FSC 000572 (emphasis added); *see* CD Ex. 31, at NS 001000240-41.

- NS's Pat Glennon reported internally: "CSXT has indicated they will attempt to apply it to *all* rate-publications, public and contract, that are subject to the current Fuel Surcharge.  UP will most likely . . . make the contract changes when renegotiated."  CD Exs. 32-34 (emphasis added).

- After UP met with CSX about fuel-surcharge methodologies in March 2003, UP's Chuck Adams advised internally that "we are changing our fuel surcharge approach [overall].  We will be adopting the same approach as the CSXT outlines below."  CD Ex. 28.

- Alby Pfeiffer (NS) to Kurt Schroeder (UP): "The new [NS] surcharge will be applied March 1 on *all* public prices.  Private prices, both contracts and private quotes will be individually handled . . . ."  CD Ex. 26, at UPFSC0001161 (emphasis added).

- UP notified all defendants of its across-the-board "REVISED FUEL SURCHARGE PROGRAM," without any limitation to traffic moving under joint rates.  CD Exs. 22-24.

These broad purported "concurrence" communications also violated Defendants' own fuel-surcharge communication protocol.  *See supra* Counterstatement Part C.

Defendants further ignore critical documents showing that "concurrence" announcements enabled each Defendant to signal and monitor fuel-surcharge convergence across the industry, spanning all traffic—and in doing so confirm adherence to the conspiracy.  *See, e.g.*, CD Ex. 25, at NS 001000341 (NS recognition that UP's new fuel surcharge "is the same as BNSF program"); CD Ex. 24, at NS 001000354 (NS's Don Seale instructs Pat Glennon to "concur with the UP application" amid recognition that "[t]he revised UP FSC is very similar to the current BNSF formula"); CD Ex. 30 (BNSF internal dialogue after receiving UP "concurrence" request: "This is sweet!!!  Just like the CSXT.").

Other documents likewise cannot legitimately be deemed concurrence communications— even under the criteria Defendants now set forth—because they are inter-Defendant communications about fuel-surcharge programs and policies *before those changes occurred and any actual concurrence requests could issue*.  CD Ex. 19 (UP's Kurt Schroeder reported internally a phone call with Clyde McIntyre, CSX's Director Pricing Services, about a "possible change" at CSX that was still "'tentative'" "to implement a new fuel surcharge formula. . . . [McIntyre] expects that by Tuesday (3/25) of next week he will send us 'formal concurrence request' for CSXT published prices with UP.  He also indicated he was unaware of any CSXT announcement having been already made on this . . . ***seemed surprised I was calling him about it***.") (emphasis added); CD Ex. 20 (UP's Kurt Schroeder reported that he "[s]poke with Clyde McIntyre again this morning.  He said complete 'working details' have not yet been signed off yet").  CSX's Mr. McIntyre acknowledged at his deposition that he spoke to UP's Mr. Schroeder "in advance of the

change of [CSX's fuel surcharge] policy."  SRD Ex. 35 (McIntyre Dep.) 77.  Mr. McIntyre did not

suggest his discussion with Mr. Schroeder was limited to CSX-UP interline movements.  *Id.* 331-

32 ("Q: And what is your best recollection of what you said to Mr. Schroeder on [March 21, 2003]?

A: That CSX was implementing a fuel surcharge, a modified fuel surcharge program.").

Finally, Defendants hope to shroud, as merely a concurrence request "to a new fuel

surcharge formula" (Br. 24), a critical episode in 2006 when, amid the STB proceedings, UP's

CMO Jack Koraleski received a phone call—at night—from NS's CMO Don Seale.  CD Ex. 28.

Seale conveyed to Koraleski that NS intended to "rebase" its fuel surcharge trigger up to $64 per

barrel (roughly the prevailing market price) and increase base rates by 12% (the then-applicable

fuel surcharge under the lower trigger).  The result was a full transfer of the then-applicable fuel

surcharge to the base rate.  Seale disclosed this to Koraleski ten weeks before the effective date,

which was set for "the day before the STB Fuel Surcharge proceeding."  CD Exs. 28-29.  By

contrast with an unremarkable concurrence, Koraleski relayed the news to his team with the subject

line "FUEL SURCHARGE—LATE BREAKING NEWS!!!!"  CD Ex. 28.  UP understood NS's

signal and internally applauded the move as "[s]mart & brave," because it "[a]dd[s] the existing

fuel surcharge to the base rates," "lock[s] in that price permanently in case fuel drops," and "[c]ut's

the 'Your making too much on fuel argument' off at the knees."  *Id.*  Far from a normal

concurrence, this was NS informing a competitor how and when NS intended to modify its fuel

surcharge program to maximize profits and undercut an investigation of Defendants.

### C.    Defendants Mischaracterize Anticompetitive Information Exchanges As "Logistical Communications"

Defendants also inappropriately categorize certain of the communications at issue as

"logistical communications" and "technical communications."  Defendants seek to exclude many

communications in which Defendants shared broad fuel-surcharge coverage information and

statistics, consistent with their goal of 100% coverage under the conspiracy.  Defendants insist that these documents concerned fuel-surcharge coverage for only "the two railroads' joint-line movements" (Br. 39), but that is false.  Many of these communications are information exchanges concerning the *entirety* of each Defendant's business.  *See, e.g.*, CD Ex. 61, at NS 00100778 (BNSF sent Don Seale (NS) data "represent[ing] an estimate of all traffic (not solely with NS) that moved under the price authority in the past twelve months."); CD Ex. 69 (NS to UP: "We only have 1 fuel surcharge mechanism which applies to all commodities.  Our Corporate directive is to stay with the standard language and avoid modifying it."); CD Exs. 70-71, at CSXFSC000000476 ("Clarence, Ward and Giftos [CSX] met with the BNSF last week.  The BNSF stated that 82% of their carload and Intermodal business either had fuel surcharge or an escalator on the revenue."). Viewed against this backdrop, fuel-surcharge coverage statistics, even as to shared interline traffic (including Rule 11 shipments), were helpful to Defendants in monitoring their unlawful agreement and ensuring discipline and compliance.  *See* CD Exs. 59-60, 62-68.

Defendants also attempt to mischaracterize the evidence surrounding BNSF's consideration of a mileage-based fuel surcharge as merely discussions about "logistics."  Br. 40. In doing so, Defendants ignore the relevant history that BNSF had determined that mileage-based fuel surcharges would be in its own self-interest in early 2003, but abandoned that approach after the extraordinary executive-level meetings that led to the uniform fuel surcharges among all Defendants.[13]  Later, in 2004, BNSF re-raised the issue with the three other Defendants, not during bilateral discussions, but at a meeting of all Defendants' chief marketing officers at the NEMC

---

[13]  *See* SRD Ex. 36, at BNSF-0330838 (conclusion from Feb. 2003 meeting that BNSF is "[l]eaning toward Cost Per Mile (CPM) Fuel Surcharge Formula"); SRD Ex. 37 (BNSF presentation recommending mileage-based fuel surcharge); SRD Ex. 29 (Rose Dep.) 132:3-4 (CEO and CMO of BNSF "always had bias toward mileage-based fuel surcharges"); *see also* SRD Exs. 38-39.

committee of the AAR. Specifically, BNSF sought agreement among all Defendants on a mileage-based fuel surcharge at the November 11, 2004 NEMC meeting, where BNSF CMO John Lanigan "shopped the concept [of a mileage-based fuel surcharge] with his counterparts from other roads . . . and they pushed back as expected." CD Ex. 82, at BNSF-FSC 000770; CD Ex. 73, at BNSF-0345996 (Oct. 2004 internal BNSF email noting shippers' resistance to rate-based fuel surcharge program and that Lanigan would "be meeting with his counterparts in the next few weeks and may explore the issues with them"); SRD Ex. 9 (Plaintiffs' interrogatory narrative) at 62-64. Following the meeting, BNSF declined again to broadly implement mileage-based fuel surcharges. *Id.*

Remarkably, Defendants re-cast this effort, *involving all four railroads*, as purportedly restricted to "interline partners for shared traffic," supposedly because "any change to the rate-structure" for fuel surcharges across the board might nevertheless also have an effect on interlining railroads. Br. 41. By that logic, every inter-defendant communication about fuel surcharges, however untethered to joint-line traffic, would be excluded from evidence. As Defendants would have it, an across-the-board agreement among all four Defendants to switch to mileage-based fuel surcharges—even at a particular price—would be shielded because that naked price-fixing agreement would extend to shared joint-line traffic too. That was obviously not Congress's intention, as the STB has long held. *STB Finance Docket No. 33556*, Decision No. 37, 4 S.T.B. 122, 149 n.79 (1999) ("Any attempts at price-signaling activities for competitive traffic under the guise of interline ratemaking will continue to remain subject to the antitrust laws."). Had Congress intended to provide the broad protections Defendants propose, it would have done so expressly.

Finally, Defendants distort a series of inter-Defendant communications about across-the-board fuel-surcharge changes, applicable to all traffic, as merely "technical discussions about changes to fuel surcharge calculations or the logistics involved in splitting shipment revenues."

Br. 41.  In reality, those materials confirm that in 2003, Defendants begin exchanging far-reaching information about each other's fuel surcharges, without any interline limitations.  *See* CD Ex. 77, at UPFSC0000675 (UP to CSX: "The UP 'standard' fuel surcharge program we put into place last month, so far, is applicable only in connection with our tariff & circular prices," attaching a list of all UP linehaul tariffs and circulars while acknowledging that "CSXT very probably is not party to all of these documents"); CD Ex. 78 (NS lamenting, after fuel-surcharge rollback by BNSF in May 2003, that "[t]he industry is not looking good on this issue and a stable approach has been the best approach"); CD Ex. 79, at UPFSC0001065 (CSX informs all railroads in May 2003 that its fuel surcharge will change across the board from 2% to 2.4%); CD Ex. 80, at UPFSC0001181 (BNSF to UP: "It is a BNSF marketing policy to [i]nclude fuel surcharge in all price authorities that BNSF participates in."); CD Ex. 81 (BNSF internal document revealing detailed advance knowledge of each Defendant's intended fuel-surcharge modifications after STB ruling).

## II.   DEFENDANTS FAIL TO SHOW THAT THIS LITIGATION OR ANY OF THE EVIDENCE SATISFIES THE REQUIREMENTS OF SECTION 10706

Defendants' motion should be rejected as a threshold matter because Section 10706 does not apply to privately negotiated contracts.  But the Court need not reach this issue because even if Section 10706 *did* apply to contract rates, Defendants fail on numerous grounds to meet the narrow evidentiary protections afforded by the statute, as set forth below.

### A.   Section 10706 Does Not Apply To Unregulated Rail Transportation Services And Contracts

Under the plain language of the statute, 49 U.S.C. § 10706 does not apply to the privately negotiated contracts at issue in this litigation.  The Staggers Act specified that when rail carriers enter into a contract "with one or more purchasers of rail services," 49 U.S.C § 10709(a), the "contract . . . and transportation under such contract . . . shall not be subject to this part," 49 U.S.C. § 10709(c)(1).  The "part" referenced in Section 10709(c)(1) is "Part A – Rail" of "Subtitle IV [of

Title 49] – Interstate Transportation," and encompasses 49 U.S.C. §§ 10101 to 11908.  Thus, under the clear statutory text, private contracts for rail transportation, such as those the railroads entered into with Plaintiffs, are not subject to Part A of Subtitle IV of Title 49, including Section 10706.

Defendants seize on the phrase "[i]n any proceeding" in Section 10706(a)(3)(B)(ii) to argue (Br. 18) that the evidentiary protections cannot be limited to regulated traffic.  To be sure, the *nature* of the proceeding—whether a suit in district court or an administrative proceeding—does not limit the scope of Section 10706.  But the question is whether Section 10706 applies to *contract* rates.  That question cannot be answered by claiming that "any proceeding" means the statute applies to *any issue* in any proceeding.  Simply put, the type of proceeding is irrelevant if all of Section 10706 is inapplicable to contract rates—which is exactly what Section 10709 says.

The structure and purpose of Section 10706 and the Staggers Act further establish that the entire section, including 49 U.S.C. § 10706(a)(3)(B)(ii), does not apply to contract rates.  Section 10706(a)(3)(B)(ii) was enacted in the Staggers Act under the heading "Rate Bureaus," Pub. L. 96-448, § 219, 94 Stat. 1895, 1926, *i.e.*, the organizations established under agreements approved by the Board, 49 U.S.C. § 10706(a)(2)(A), (a)(3)(A).  Thus, on its face, the section pertains only to regulated ratemaking activities.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (quotation marks omitted)).  Also, when Congress enacted the predecessor to current Section 10706(a)(3)(B), the Senate stated it was to protect railroads in cases related to "joint rate activities" that occurred in "rate bureaus."  S. Rep. No. 94-499 at 56 (1975).

Even in rate bureaus, there are strict requirements for any agreement to receive Board approval: the rail carriers cannot discuss single-line rates; they cannot discuss the rate for an interline movement unless the carrier practicably participates in the movement; and organizations

approved in Section 10706 must keep transcripts or recordings of all meetings.   49 U.S.C. § 10706(a)(3)(A), (C).   But contract rates require no Board approval.   Thus, Defendants' theory would allow a rail carrier to avoid both regulatory scrutiny and the antitrust laws, and thereby have free rein to harm competition.   Congress clearly did not intend to allow this gigantic loophole, in conflict with the express language of Section 10709.[14]

The purpose of the Staggers Act was to protect competition, not collusion.   Congress stated its purpose expressly in the Staggers Act itself:   "In regulating the railroad industry, it is the policy of the United States Government—(1) to *allow, to the maximum extent possible, competition* and the demand for services to establish reasonable rates for transportation by rail; . . . (10) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, *and to limit the use of increases of general applicability* . . . ." 49 U.S.C. § 10101 (emphases added); *see also Am. Short Line R.R. Ass'n v. United States*, 751 F.2d 107, 113 (2d Cir. 1984) ("The purposes of the Staggers Act are clearly enunciated, revealing its dominant procompetitive objectives.").   In addition, the Staggers Act Conference Report clearly states in the section entitled "Contracts" that while contract traffic was exempt from the provisions of Title 49, "existing Federal antitrust laws apply to this section," *i.e.*, to contract rates.   H.R. Rep. No. 96-1430, at 101 (1980) (Conf. Rep.), *as reprinted in* 1980 U.S.C.C.A.N. 4110, 4133.   The purpose of the limited evidentiary protections of Section 10706(a)(3)(B)(ii) was simply to ensure that discussions in rate bureaus were not used improperly to suggest that a conspiracy existed when a rail carrier acted unilaterally for its own single-line rates.   *See id.*; New Plaintiffs' Br. 22-23.

Furthermore, Defendants' theory is irreconcilable with the fact that Sections

---

[14]   Indeed, Congress placed increasing restrictions in Section 10706 to close loopholes exploited by the rail carriers.   *See* New Plaintiffs' Br. 4-8.   It is therefore implausible that the Staggers Act created a much greater loophole to exempt agreements on contract rates from the antitrust laws.

10706(a)(2)(A) and 10706(a)(3)(A) do not apply to contract rates. Section 10706(a)(2)(A) states that "[a] rail carrier providing transportation subject to the jurisdiction of the Board under this part that is a party to an agreement of at least 2 rail carriers that relates to rates . . . shall apply to the Board for approval of that agreement . . . ." 49 U.S.C. § 10706(a)(2)(A); *see also id.* § 10706(a)(3)(A) (placing certain limitations on organizations approved under Section 10706(a)(2)(A)). It is undisputed that an agreement for rates on contract traffic—including the agreements entered into between the railroads here—are not subject to Sections 10706(a)(2)(A) and 10706(a)(3)(A). The explanation is simple: Section 10709 makes Section 10706 inapplicable to contract rates. And there is no plausible interpretation of Section 10709 whereby it applies to Sections 10706(a)(2)(A) and 10706(a)(3)(A), but not to 10706(a)(3)(B).

Defendants argue that Section 10706(a)(2) is inapplicable to contract rates because it supposedly covers only "traffic 'subject to the jurisdiction of the Board.'" Br. 18. However, Section 10706(a)(2) actually covers "[a] rail carrier providing transportation subject to the jurisdiction of the Board under this part . . . ." 49 U.S.C. § 10706(a)(2)(A). Thus, regardless of the nature of the *traffic*, Section 10706 applies to any *rail carrier*, and there is no question that all Defendants are rail carriers that provide transportation subject to the Board's jurisdiction. In any event, the scope of Section 10709 is *exactly* the same as Section 10706(a)(2): it applies to "rail carriers providing transportation subject to the jurisdiction of the Board under this part." *Id.* § 10709(a). Because this clause undisputedly covers contract rates in Section 10709, there is no basis to argue that the very same language excludes contract rates in Section 10706(a)(2). Thus, the only plausible reason why Section 10706(a)(2) does not apply to contract rates is that Section 10709 takes contract rates outside of Section 10706 entirely.[15]

---

[15]   In their prior briefing, Defendants argued that Section 10706(a)(3)(B)(ii)(I), by referring to

Finally, the DOJ, FTC, and ICC/STB all recognized the same limited applicability of Section 10706—before the passage of the Staggers Act, during the hearings leading to its passage, and afterward in interpreting its text. New Plaintiffs' Br. 8-11, 19-21. Even while the conspiracy at issue was occurring, Defendants took the same position, consistently stating through the AAR that the narrow protection offered by Section 10706 was limited to Board-regulated conduct. *See supra* at 14-15; New Plaintiffs' Br. 12. Thus, while Defendants now insist any argument that Section 10706 does not apply to unregulated traffic is "baseless" (Br. 18), it flows from the same common-sense understanding of Section 10706 that Defendants themselves previously advocated.

**B.     Section 10706(A)(3)(B)(ii) Is Inapplicable Because Plaintiffs Are Not Inferring An Agreement On Single-Line Rates From An Agreement On Interline Rates**

Section 10706(a)(3)(B)(ii) states that "proof of an agreement, conspiracy, or combination

---

Board-approved agreements as to rates, suggests agreements not approved by the Board must be covered by Section 10706(a)(3)(B)(ii)(II). However, while a carrier must "apply to the Board for approval" to collectively set non-contract rates, 49 U.S.C. § 10706(a)(2), such rate agreements need not be approved by the Board. Thus, as discussed in New Plaintiffs' brief at 13, Section 10706(a)(3)(B)(ii)(II) addresses situations where rate bureau members take actions under unapproved rate bureau agreements.

In their prior briefing, Defendants also relied upon *Fayus Enterprises v. BNSF Railway Company*, 602 F.3d 444 (D.C. Cir. 2010), but *Fayus* is clearly inapposite. In that case, the D.C. Circuit held that Section 10709 did not override the preemption of state remedies codified in 49 U.S.C. § 10501(b), because it would be nonsensical and inconsistent with congressional intent to read "§ 10709(c)(1) as taking private contracts completely outside the federal regulatory regime *and* as permitting plenary state regulation of freight moving under such contracts," *id.* at 447, and because there was already *pre-existing* preemption that Section 10709 evinced no intent to change, *id.* at 448. Here, in contrast, Section 10706 was plainly *not* intended to cover contract rates, and there was no pre-existing law that applied the principles of Section 10706 to contract rates. Indeed, the pre-existing law was that exempt traffic (which is governed by a separate statute similar to Section 10709) was *not* covered by Section 10706. *See Rail Gen. Exemption Auth.—Fresh Fruits & Vegetables*, 361 I.C.C. 211, 219 (1979); New Plaintiffs' Br. 13-16. Moreover, *Fayus* expressly relied on the conference report's statement that "'[t]he existing Federal antitrust laws apply to this section,'" to imply that *state* laws do not. 602 F.3d at 449. In short, federal law occupies the field for regulating railroads, and Congress's decision to free railroads from regulation for contract and exempt traffic did not open the way for states to regulate those rates. Thus, *Fayus* provides no plausible basis to say that federal antitrust laws do not apply.

may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic."  Thus, this provision applies only to (a) joint actions "with respect to an interline rate or related matter"; and (b) one party's "similar action with respect to a rate or related matter on another route or traffic"; (c) being used to "infer[]" "proof of an agreement, conspiracy, or combination."  Defendants cannot satisfy their burden on any of these elements with respect to the evidence identified in their motion, all of which constitutes an overarching conspiracy to impose fuel surcharges across the board.

### 1. The Defendants did not act together with respect to *an* interline *rate* or related matter.

*First*, the statute refers to "an interline rate," which is singular and plainly refers to one such rate.  *See, e.g.*, *Comm'r v. Driscoll*, 669 F.3d 1309, 1312 (11th Cir. 2012) ("[W]e conclude that 'a' maintains a singular connotation, especially here when the context indicates a singular meaning . . . ." (citation and internal quotation marks omitted)); *Angiotech Pharms. Inc. v. Lee*, 191 F. Supp. 3d 509, 526 (E.D. Va. 2016) (holding that "the reference to 'a product' indicates that an eligible patent must claim *one* product, or at least a *particular* product").

Defendants cite (Br. 18) 1 U.S.C. § 1, which states that singular words can include the plural "unless the context indicates otherwise," but here the context clearly indicates that "*an* interline *rate*" (emphasis added) refers to a *single* interline rate.  The provision states: "[P]roof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to ***an interline rate*** or related matter and that a party to such action took similar action with respect to ***a rate*** or related matter on ***another route or traffic***."  49 U.S.C. § 10706(a)(3)(B)(ii) (emphases added).  The language "a rate . . . on another route or traffic" clearly contemplates that an "interline rate" is referring to a particular rate on a single route.

The context from other parts of the statute further shows that "an interline rate" is singular. Congress used the plural "rates" and "routes" in the very same statute when it intended to apply to more than one such rate or route. *See id.* § 10706(a)(2)(A) (addressing "an agreement of at least 2 rail carriers that relates to rates"), (3)(A)(i) (addressing "broad changes in rates" and "interline movements over two or more routes"). Defendants ignore this context and instead note (Br. 19) that Congress included the word "particular" to refer to a single route. However, the statute uses the word "particular" only when referring to "rates" for particular routes, to make clear that the plural "rates" at issue concern only a single route. *See, e.g.*, 49 U.S.C. § 10706(a)(3)(A)(ii)-(iii). By contrast, the section at issue here, Section 10706(a)(3)(B)(ii), only references the singular term "rate" and thus there was no reason to use the word "particular." *Id.* § 10706(a)(3)(B)(ii). Indeed, if Defendants' theory were correct, then they would receive *greater* protection from the antitrust laws for *unapproved* rate agreements (which they claim would cover an agreement as to all interline rates) than for *approved* rate agreements (which are expressly limited to a particular interline movement in which the carrier practicably participates, *id.* § 10706(a)(3)(A)(ii)). This result is nonsensical and inconsistent with Congress' intent to limit an interline rate agreement between two carriers to a particular interline movement in which both carriers participate. Thus, Defendants' agreement, which applies to many rates without regard to whether the carrier participates in the interline movements, falls outside Section 10706(a)(3)(B)(ii).[16]

***Second***, Defendants' action at issue here is *not* limited to interline rates. Rather, the action is an across-the-board agreement on fuel surcharges that applied to *all rates* and, in fact,

---

[16] At a minimum, Section 10706(a)(3)(B)(ii) should be applied (as is the rest of Section 10706) only to interline movements in which both rail carriers practicably participate. That is also consistent with the language in Section 10706(a)(3)(B)(ii)(II) that the interline movement must be "of the rail carrier." *See infra* at 38. There is no question that the discussions at issue here were not limited to interline rates in which both carriers participate.

overwhelmingly to rates that are *not interline*. *See supra* at 9, 16-25.  An action with respect to all rates is, by definition, not an action with respect to interline rates (let alone "an interline rate").  Where Congress intended to cover all rates, it used the general term "rates."  49 U.S.C. § 10706(a)(3)(A)(ii)-(iii).  The term "interline rate" in Section 10706(a)(3)(B)(ii) is therefore limited, as one would expect, to an *interline* rate.

Defendants suggest that an agreement that includes or subsumes interline rates suffices, regardless of whether the agreement also (or even primarily) applies to single-line rates.  But Defendants cannot enlarge the evidentiary protection in Section 10706(a)(3)(B)(ii) by forming an agreement far broader than what protection covers, and thereby fundamentally alter the limited applicability of Section 10706(a)(3)(B)(ii).  *See United States v. Niagara Frontier Tariff Bureau, Inc.*, No. 83-CV-1313C, 1984 WL 879, at \*6 (W.D.N.Y. June 26, 1984) ("No provision of this decree prohibits communications or agreements between a defendant and any other motor carrier or carriers, including another defendant, for the ***sole purpose*** of achieving interline operations or interline rates." (emphasis added)); *STB Finance Docket No. 33556*, Decision No. 37, 4 S.T.B. 122, at 14, 16, & n.79 (1999) ("*STB Docket 33556*") ("Any attempts at price-signaling activities for competitive traffic *under the guise of interline ratemaking* will continue to remain *subject to the antitrust laws*.").  And Defendants previously recognized that they cannot invoke their alliance meetings to receive antitrust protection for a broader agreement that goes beyond the interline context.  Transcript of Class Certification Hearing Before the Honorable Paul L. Friedman, (Oct. 6, 2010) ("Oct. 6 Hearing Tr.") at 57 (Docket No. 446) ("THE COURT:  . . . In other contexts – for example, in other industries where there are trade association meetings . . . – there are lots of antitrust analyses . . . that say:  Yeah, but you can't use these legitimate meetings and get-togethers and conversations for illegitimate and illegal purposes.  Is that principle just out the window when

it comes to this industry?  MR. WISEMAN:  No.  I mean, they can't show that any of these alliance meetings were a pretext to do something outside of the concept of interline business.").   But Defendants' new theory would grant immunity so long as *any* interline activity was tangentially related to the agreement.  *See infra* Part III.  There is no legal basis for this implausible result, which conflicts with the purpose of the statute:  to protect competition and provide immunity only for Board-approved rate agreements.  *See id.*

More generally, courts consistently reject the idea that an agreement is immune from the antitrust laws if it is any broader than the very specific type of agreement identified by a statute as immune.  For instance, when addressing the Capper-Volstead antitrust exemption for agricultural producers' cooperatives, the Supreme Court held:  "The right of these agricultural producers thus to unite in preparing for market and in marketing their products, and to make the contracts which are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise."  *United States v. Borden Co.*, 308 U.S. 188, 204-05 (1939).  Where the competitors' agreement covered *both* protected conduct and unprotected conduct, it did not satisfy the exemption.  *Id.* at 205; *see also Abbott Labs. v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 14 (1976) (holding that exemption to Robinson-Patman for non-profit hospitals' "purchases of their supplies for their own use" is "a limited one" and "just because it is a nonprofit hospital that is purchasing pharmaceutical products does not mean that all its purchases are exempt").  Defendants violate this principle by attempting to fashion an immunity for across-the-board price fixing from a narrow evidentiary rule for particular interline agreements; this is precisely the sort of bootstrapping courts routinely reject.

In addition, a substantial portion of the traffic covered by Defendants' fuel surcharge agreement here is traffic exempt from government rate regulation, and it is well established that

Section 10706 also does not apply to such exempt traffic.  *See* New Plaintiffs' Br. 13-15.  Thus, Defendants cannot obtain evidentiary protection over an agreement to set fuel surcharges for exempt traffic—just as they cannot do so for single-line traffic—merely by forming the agreement as part of an overarching agreement to set fuel surcharges across the board.

While Defendants focus on the words "concern[]" or "related," those words do not remotely suggest that an agreement on single-line rates is within the scope of Section 10706(a)(3)(B)(ii) simply because it is made together with, or at the same time as, an agreement on interline rates.  *See United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502, 509-10 (4th Cir. 2005) (antitrust exemption for "any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade" requires the entirety of defendants' arrangement—not just one step—to have "some consequence for the foreign inland segment").  Courts have applied that same reasoning to the pre-Staggers Act version of Section 10706, holding that its immunity for agreements approved by the Board "reaches only those actions actually taken 'in conformity with' the rate agreement . . . . ***It does not sweep within it a larger conspiracy*** which utilizes a section 5a rate bureau as a means to an end; it does not legitimize illegal schemes which happen to coincide at points with the legitimate actions of a rate bureau." *United States v. Bessemer & Lake Erie R. Co.*, 717 F.2d 593, 600 (D.C. Cir. 1983) (emphasis added).  This reasoning is equally applicable here.

### 2.      There is no "similar action" here because there is only one action.

Defendants fail to satisfy Section 10706(a)(3)(B)(ii) for the additional reason that there was no "similar action" here.  One action is "similar" to another only if it is separate; "similar" presupposes that it is not exactly the same thing.  Here, there is no "similar action" because there is only one alleged action, as supported by the evidence:  the single agreement to use coordinated fuel surcharges as a means to raise all-in rail freight rates across the board.  Defendants make a

conclusory statement (Br. 25 n.13) that an agreement "for both interline traffic and other traffic" would satisfy the "similar action" requirement, but they provide no explanation as to how a single agreement might be considered a "similar action" to itself.

Moreover, while under the statue the agreement on an interline rate concerns "two or more rail carriers acted together," the similar action concerns only the unilateral conduct of "a party to such action."  49 U.S.C. § 10706(a)(3)(B)(ii).[17]  Because the "similar action" must be the action of "one party," an agreement among Defendants covering both interline and single-line traffic cannot qualify as "a similar action" under the statutory provision.  In any event, as shown in ICC precedent immediately following adoption of the Staggers Act (and never questioned since), Defendants' novel theory would conflict with the clear intent of the provision, which is that an agreement to an interline rate cannot be used to infer an altogether *separate* agreement on another rate.  *See Western Railroads-Agreement*, 364 I.C.C. 635, 657-58 (1981) (Section 10706(a)(3)(B) applies "where carriers first agree on a joint-line rate *and then independently* decide to apply the same rate to their own competing single-line rates" (emphasis added)).

Defendants attempt (Br. 19, 38) to characterize the single agreement on both interline and single-line fuel surcharges as an agreement on interline rates followed by separate decisions on single-line rates.  However, Plaintiffs' theory of the case has always been that there was one conspiracy and one agreement to set fuel surcharges as a means to raise all-in rates across the board.  *See, e.g.*, Consolidated Amended Class Action Compl., Apr. 15, 2008, at ¶¶ 2, 3, 54 (Dkt. Nos. 91-92); Pls. Class Cert. Br. at 3, 31-34, 38-44, 70 (Dkt. No. 337-9); Pls. Class Cert. Reply

---

[17]  As the DOJ explained, the "twin protections [of § 10706(a)(3)(B)(ii)(I) and (II)] allow 'directly connecting' carriers to set rates for joint-line routes collectively and their single line rates independently."  Comments of the United States Department of Justice, *Western Railroads – Agreement*, ICC Docket No. Section 5(b) Application No. 2 (Nov. 26, 1980), at 9.

Br. at 1-2, 13-14, 18, 22-24, 28 (Dkt. No. 406); Pls. Class Cert. Supp. Reply Br. at 6-10.  There is *no evidence* that decisions on fuel surcharges for single-line traffic occurred independent of, or later than, the agreement on fuel surcharges for interline rates.  Rather, all of the evidence shows that the same discussions reflected a single agreement at the same time as to all rates.  Indeed, Defendants' own chart (Br. 44) treats UP's May 9, 2003 email announcing its adoption of BNSF's HDF-based fuel surcharge and requesting concurrences from BNSF, CSX, and NS as both an "interline communication" *and* the announcement of subsequent "similar action"—when it obviously could not have been both.  Furthermore, some of the supposedly "similar actions" identified by Defendants pre-date the supposed "interline communication" (*id.* 43), overtly inconsistent with the statutory provision.

> ### 3.    This statutory provision concerns only the inferences that may be drawn, and no jury will be asked to draw such an inference.

Finally, Section 10706(a)(3)(B)(ii) does not support Defendants' argument for exclusion of evidence.    Unlike Section 10706(a)(3)(B)(ii)**(II)**, discussed *infra* Part II.B, Section 10706(a)(3)(B)(ii)—*i.e.*, the part of that section before the sentence leading to (I) and (II)—does *not* contain an evidentiary exclusion, but rather only the prohibition of a particular *inference*: specifically, the inference of an agreement from collective action as to an interline rate and a separate but similar, unilateral action as to another rate.  Thus, Defendants have no legal basis for exclusion of evidence based on this provision.[18]

Moreover, there is no inference at issue here.  Plaintiffs are not asking a jury to infer an antitrust violation from concerted action on an interline rate and some subsequent, unilateral action.  Plaintiffs have no intention of arguing at trial that there exists a similar, separate agreement

---

[18]  Instead, it would warrant (at most, if anything at all) a jury instruction prohibiting an improper inference, but not an exclusion of evidence, let alone an antitrust immunity.

on single-line rates that occurred at some point after the agreement on interline rates. Rather, Plaintiffs have always argued, and will continue to argue, that the concerted action on all rates itself *constitutes* the unlawful agreement. Thus, there is no separate agreement to infer.

Defendants ignore the statutory language regarding precisely what inference is disallowed, and instead argue broadly (Br. 11-12, 16) that only "direct" evidence is permitted. However, the statute never uses the term "direct" or anything resembling it. Nor does it prohibit all "inferential" evidence. Rather, it prohibits *only* an inference of an agreement from a joint action on an interline rate and unilateral, similar action on another route.[19] In more than ten years of litigation, Plaintiffs have never promoted that sort of inference and will not seek it at trial.

Defendants' definition of "direct"—again, with no basis in the statute—is unduly restrictive. According to Defendants (Br. 11), "direct" means the agreement must be "conceded," "reduced to writing," or explicit and proven by eyewitness testimony. However, allowing evidence only of a written or perfectly explicit agreement would effectively immunize Defendants from the antitrust laws unless a "smoking gun" document is found. Competitors rarely make their unlawful conspiracy perfectly explicit, and that does not immunize price-fixing agreements from antitrust scrutiny. *See United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 310 (1956) ("It makes no difference . . . whether the price fixing is accomplished by express contract or by some more subtle means . . . ."); *see also, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("in many antitrust cases, this type of 'smoking gun' can be hard to come by," but it is not

---

[19]  Defendants attempt (Br. 11) to analogize the scope of the procedural protection in Section 10706(a)(3)(B)(ii) to the limitations of parallel conduct, but these limitations are addressed in Section 10706(a)(3)(B)**(i)** (concerning allegations of votes or agreements in violation of this subsection, which is clearly inapplicable here), not Section 10706(a)(3)(B)**(ii)**.

required for an antitrust violation).  In any event, the evidence here—numerous meetings, actions, and communications among all four Defendants repeatedly expressing support for conforming fuel surcharges across the board (and agreeing to do so, abandoning their previous competition)—is not inferential or indirect; there is no statutory basis to exclude it.[20]

### C.   Section 10706(a)(3)(B)(ii)(II) Is Inapplicable Because The Alleged Agreement Does Not Concern An Interline Movement, And The Alleged Agreement Itself Violates The Antitrust Laws

Section 10706(a)(3)(B)(ii)(II) disallows evidence only where (a) "the discussion or agreement . . . concerned *an interline movement* of the rail carrier"; and (b) "the discussion or agreement *would not, considered by itself, violate the [antitrust] laws*" (emphasis added).  Neither requirement is satisfied here.

#### 1.   The agreement does not concern an interline movement.

For the same reasons that the agreement does not concern "an interline rate," *see supra* Part II.B.1, it also does not concern "an interline movement."  ***First***, this phrase is singular based on the use of "an"; the meaning of "movement" as a "route," which is necessarily singular; and the statute's use of "interline movements over two or more routes" when referring to the plural, as in 49 U.S.C. § 10706(a)(3)(A)(iii).  ***Second***, this sub-section certainly does not cover an agreement as to *all* movements, only a minority of which are interline.  All of the evidence at issue concerns an across-the-board agreement on fuel surcharges not particular to interline movements.

In addition, this sub-section concerns only an interline movement "of the rail carrier."  49 U.S.C. § 10706(a)(3)(B)(ii)(II).  By definition, a movement is not "of the rail carrier" if the rail carrier does not participate in the movement.  Thus, Section 10706(a)(3)(B)(ii)(II) is inapplicable

---

[20]   Defendants conceded in 1980 comments to the ICC that the inference bar is merely a "restatement" of existing law on conscious parallelism, and does not "immunize rail carriers from a finding of conspiracy" where there are plus factors, as there are here.  *See* SRD Ex. 40 at 42-46.

where, as here, the agreement at issue concerns all movements, regardless of whether the rail carrier participates in the movement.

There is no support for Defendants' statement (Br. 24) that the statute applies where the evidence "concerned an interline movement" *or* is "about a rate or other action resulting from such a discussion or agreement."  The former is required under the plain language, 49 U.S.C. § 10706(a)(3)(B)(ii)(II), but the latter is simply not found in the statute at all.  Moreover, Defendants' reliance (Br. 17) on *Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26 (D.D.C. 2004), *aff'd*, 184 F. App'x 9 (D.C. Cir. 2006), is misplaced.  *Jung* is inapposite, because Congress enacted the statute to "eliminate[] the cause of action" in that specific lawsuit and the evidence at issue there was undisputedly the exact evidence barred by the statute; the only question was whether *other* allegations that did not rely on this evidence sufficed to state a claim.  *See id.* at 37-38, 43; *see also Jung*, 184 F. App'x at 11 ("The Act defines the term 'graduate medical education resident matching program' by reference to the very program at issue in the complaint: 'the National Resident Matching Program.'  15 U.S.C. § 37b(b)(1)(C).  It is hard to imagine a more precise fit between the language of a statute and a lawsuit.").  Here, by contrast, the evidence at issue is not barred by the statute for the reasons stated above.

### 2.   The agreement at issue, considered by itself, would violate the antitrust laws.

Defendants fail to meet the evidentiary exclusion of Section 10706(a)(3)(B)(ii)(II) for the independent reason that the alleged agreement at issue here itself constitutes an antitrust violation.  Defendants assert (Br. 25, 38) that Plaintiffs purportedly must show that each "communication[]" or "document," considered by itself, violates the antitrust laws.  But that is not what the statute says; it states that the evidentiary protection applies only where "the discussion *or agreement* would not, considered by itself, violate the [antitrust] laws."  49 U.S.C. § 10706(a)(3)(B)(ii)(II).

Because this phrase uses the disjunctive "or," it does not suffice that the discussion by itself does not violate the antitrust laws. If the agreement, considered by itself, violates the antitrust laws, then evidence of the agreement is admissible. As discussed *infra* Part III, this makes sense because the sub-section was not intended to confer immunity on unlawful agreements. Here, the agreement (as alleged and as supported by the evidence) is one overarching agreement to use fuel surcharges to raise all-in rates for rail freight shipments across the board. Plaintiffs are not relying on any other agreement to establish the antitrust violation. There is one agreement, and that agreement violates the antitrust laws because such a price-fixing conspiracy is *per se* unlawful.

Furthermore, any suggestion by Defendants that there is something other than one, overarching agreement here is legally and factually erroneous. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citation omitted); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152-53 (9th Cir. 2019) (same); *United States v. Apple, Inc.*, 791 F.3d 290, 319 (2d Cir. 2015) (same).[21] In addition, it is a factual issue for the jury to determine whether there was one, overarching conspiracy. *See United States v. Graham*, 83 F.3d 1466, 1472 (D.C. Cir. 1996). Here, the evidence of a single agreement is overwhelming—and there is no legitimate evidence of a separate agreement limited to interline rates.[22]

Finally, Defendants' unexplained attempt (Br. 16) to equate this provision of the statute with "whether the discussion or agreement is 'direct evidence' of an antitrust conspiracy" is

---

[21] The only exception, clearly inapplicable here, is that *vertical* agreements that facilitate horizontal agreements may be examined separately. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).

[22] In any event, as discussed *infra* at 42-43, even the "interline" part of the agreement can violate the antitrust laws where, as here, the agreement was not approved by the Board.

baseless.   Even putting aside the problems with Defendants' proposed "direct"/"inferential" dichotomy discussed *supra* at 37-38, Defendants erroneously conflate two different evidentiary protections of Section 10706.   The one discussed *supra* Part II.A concerns what inferences may be drawn; the one discussed in this Part II.B concerns what evidence may be excluded.   The latter says *nothing* to suggest that whether the evidence is "direct" or "inferential" affects admissibility. If the agreement on its own violates the antitrust laws, then the evidence—of any kind—is admissible.   49 U.S.C. § 10706(a)(3)(B)(ii)(II) ("*[E]vidence* of a discussion or agreement . . . shall not be admissible if . . . (II) . . . the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause." (emphasis added)).

## III.   DEFENDANTS IMPROPERLY SEEK ANTITRUST IMMUNITY

In addition to the numerous, specific failures to meet the statutory requirements, Defendants' theory also fails because it would create an antitrust immunity at odds with the statute. While Defendants do not expressly use the term "immunity" in their motion, Defendants interpret Section 10706 so broadly that a small evidentiary protection, never before invoked, would largely immunize the railroad industry from antitrust scrutiny.   Defendants repeatedly refer (Br. 1, 13, 42, 45) to Section 10706(a)(3)(B)(ii) as a "substantive" protection, despite the fact that the statute refers *only* to what "proof . . . may not be inferred" from particular evidence.   49 U.S.C. § 10706(a)(3)(B)(ii).   More strikingly, Defendants' entire motion proposes a framework under which Plaintiffs would be barred not only from putting forward certain *evidence* of a conspiracy to set fuel surcharges across the board, but also from introducing into evidence *the agreement itself*, providing *no means* to prove its existence.[23]   This sweeping immunity has no legal basis in

---

[23]   To be clear, while Defendants suggest that the exclusion of the evidence here would amount to an immunity, there is in fact strong evidence of an unlawful conspiracy even absent the evidence at issue here, as this Court recognized in its decisions on class certification.   *See supra* at 11 & n.8.

Section 10706 and defies longstanding guidance from the Supreme Court concerning the need to construe antitrust immunities and exemptions as narrowly as possible.  It is also inconsistent with Defendants' statements through the AAR about the limited protection of Section 10706.  *See* New Plaintiffs' Br. 12; SRD Ex. 41 (Jan. 2007 AAR White Paper), at AAR-E-00036549-50.

### A.   Defendants' Arguments Rely Upon An Interpretation Of The Statute That Erroneously Amounts To Immunity

Defendants' theory proceeds in two steps.  It starts with the premise that an agreement on interline rates is legally protected from antitrust scrutiny.  *See, e.g.*, Def. Br. 11, 19, 39.  It then suggests (Br. 16) that an agreement on all rates is immune from antitrust scrutiny if it includes or subsumes interline rates, unless there is "direct" evidence of an agreement on single-line rates.  Both of these steps are inconsistent with the text and purpose of Section 10706.  In discussing Section 10706(a)(3)(B), the Staggers Act Conference Report stated:  "The Conferees intend that these protections be construed to insure that remedies for anticompetitive activities remain under existing laws."  H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *114 (Sept. 29, 1980).

*First*, there is no immunity for interline rates not set under a Board-approved agreement.  According to Defendants (Br. 2), interline rates and attendant fuel surcharges are "routinely agreed upon," and "such cooperation is both legally compelled and absolutely necessary."  As discussed *supra* at 7-11, this statement is factually false, but it is also legally erroneous.  Section 10706(a)(3)(B)(ii) does not compel any action (much less price-fixing across all traffic); it speaks only to "infer[ences] from evidence" and "admissib[ility]."  Indeed, Section 10706(a)(2) requires Board approval if the rail carriers are even discussing such collusion.[24]

---

[24]  Railroads never had any legal obligation to provide or agree on joint-line rates for non-regulated contract service, and, in 1995, Congress abolished the requirement that carriers providing regulated service agree to changes in joint-line rates.  *See* New Plaintiffs' Br. 22 & n.9; ICC Termination Act, Pub. L. No. 104-88 § 102, 109 Stat. at 809 (1995) (repealing former 49 U.S.C. § 10762(b)(2)).

Defendants identify no statutory basis for legal permission (let alone compulsion) to agree upon interline rates and fuel surcharges for those rates.  As discussed *infra* Part III.C, the statute expressly contemplates that an agreement on interline rates, if not approved by the STB, may be unlawful.  Defendants rely (Br. 25, 27) on statements from the DOJ, FTC, and STB (and tellingly, no statute or case law), but none of those statements actually suggest that an agreement on interline *rates*—as opposed to other cooperation like marketing—is exempt from antitrust liability.  Indeed, the government has repeatedly rejected Defendants' expansive theory of immunity.  *Supra* at 29.

Defendants rely (Br. 9) heavily on a 2001 STB decision refusing to permit further railroad mergers amid "substantial concern[s]" over the "declining number of Class I railroads." *Major Rail Consolidation Procedures*, 2001 STB Lexis 546, at *11.  But the STB plainly did not command collusion; rather, it merely observed "joint marketing agreements and interline partnerships" were preferable to increased concentration based on "[p]ublic interest considerations," including the need for "enhanced competition" and the elimination of "anticompetitive effects."  *Id*. at *29-30.  Here, the protection of competition obviously would not support an inference of a legal compulsion to collude on rates.  Indeed, in addressing "The Collusion Issue," the STB declared that "railroads, like other firms, are not permitted to collaborate where they compete.  Such collaboration is not permitted under the antitrust laws, and we may not immunize it from antitrust scrutiny under 49 U.S.C. 10706."  *STB Docket 33556*, at *149.

**Second**, there is obviously no immunity under the statute for price-fixing on single-line rates.  Defendants do not expressly argue for immunity as to single-line rates because that would be facially absurd.  Instead, Defendants concede that "Section 10706 would not bar *direct* evidence that, while discussing interline matters, two railroads agreed to raise single-line rates for routes on which they compete head-to-head" (Br. 16 (emphasis added)); the implication is that non-"direct"

43

evidence purportedly would be barred (*id.*).  However, as discussed *supra* at 37-38, 41, there is no prohibition on non-"direct" evidence, and such a bar would improperly subvert the antitrust laws.

### B.     Any Provision for Antitrust Immunity Must Be Construed Narrowly

Defendants ignore entirely the principle that antitrust exemptions must be strictly confined to their express terms.  "It is well settled that exemptions from the antitrust laws are to be narrowly construed."  *Grp. Life Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979).  "This doctrine is not limited to implicit exemptions from the antitrust laws, but applies with equal force to express statutory exemptions."  *Id.*  The Supreme Court's "cases have repeatedly established that there is a *heavy presumption against implicit exemptions* from the antitrust laws."  *Jefferson Cty. Pharm. Ass'n, Inc. v. Abbott Labs.*, 460 U.S. 150, 157-58 (1983) (emphasis added) (internal quotation marks omitted); *see also Gosselin*, 411 F.3d at 508 ("The Supreme Court has consistently construed the reach of exemptions from antitrust laws narrowly, even when Congress confers these exemptions in terms.  This narrow construction of antitrust immunity is appropriate because the robust marketplace competition that antitrust laws protect is a fundamental national economic policy." (internal quotation marks and citations omitted)).

When dealing with industry-specific exemptions, the Supreme Court has firmly rejected any attempts to enlarge the language of any exemption beyond the express intent of Congress embodied in a particular statute.  For instance, in *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384 (1967), Sunkist asked the Court to expand certain farming protections to cooperatives including middlemen, not just farmers, but the Court declined to write into the Capper-Volstead Act an exception not expressly provided therein: "We deal here with 'special exceptions to a general legislative plan' and therefore *we are not justified in expanding the Act's coverage, which otherwise appears quite plain*."  *Id.* at 393 (emphasis added) (citation omitted); *see also Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 217, 223-33 (1979) (refusing to expand

McCarran-Ferguson protection beyond the "business of insurance" to the "business of insurance *companies*" because "[s]uch a result would be plainly contrary to the statutory language").

### C. The Immunity In Section 10706 Is Limited To Board-Approved Agreements As To Rates And Compilation, Publication, Or Distribution Of Rates

Defendants ignore the well-established rule of narrow construction and the specific provisions in Section 10706 that actually provide for immunity. Under Section 10706(a)(2)(A), for "an agreement of at least 2 rail carriers that relates to rates," a rail carrier "shall apply to the Board for approval," and "[i]f the Board approves the agreement, . . . the Sherman Act [and other antitrust laws] do not apply . . . ." 49 U.S.C. § 10706(a)(2)(A). In addition, under Section 10706(a)(4), "one or more rail carriers may enter into an agreement, without obtaining prior Board approval, that provides solely for compilation, publication, and other distribution of rates," and "[t]he Sherman Act [and other antitrust laws] shall not apply" unless the Board determines that "the parties to such an agreement have exceeded its scope." *Id.* § 10706(a)(4). Defendants do not suggest—nor could they—that they satisfy the terms of these express provisions.

In stark contrast to these provisions, the provisions on which Defendants rely do *not* state that the antitrust laws "shall not apply." Rather, they concern *only* what "proof . . . may not be inferred" from particular evidence and what evidence "shall not be admissible." 49 U.S.C. § 10706(a)(3)(B)(ii). The inferences from and admissibility of evidence plainly do not constitute the "substantive" protection Defendants seek. These provisions merely govern *how* a plaintiff can prove an antitrust violation, not *whether* an otherwise unlawful agreement is immunized. That is clear from both the text and purpose of Section 10706. *See Western Railroads-Agreement*, 364 I.C.C. at 658 ("Congress is providing only procedural protections, not complete immunity.").

### CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated:  April 17, 2020

Respectfully submitted:

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201
Email:  mhausfeld@hausfeldllp.com

Michael P. Lehmann
Seth R. Gassman
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Email: mlehmann@hausfeld.com

*Counsel for Plaintiffs Dakota Granite*
*Company, Donnelly Commodities*
*Incorporated, and Strates Shows, Inc.*

*/s/ Meegan Hollywood*
Hollis Salzman
Meegan Hollywood
Eamon O'Kelly
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@robinskaplan.com

*Counsel for Plaintiffs Oxbow Carbon &*
*Minerals LLC, Oxbow Mining, LLC, Oxbow*
*Midwest Calcining LLC, Oxbow Calcining*
*LLC, and Terror Creek LLC*

*/s/ Stephen R. Neuwirth*
Stephen R. Neuwirth
Sami H. Rashid
Viola Trebicka
David M. Cooper
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile:  (212) 849-7100
Email:  stephenneuwirth@quinnemanuel.com

Paul M. Donovan
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue, N.W. Suite 700
Washington, DC 20036
Telephone:  (202) 298-8100
Facsimile:  (202) 298-8200
E-mail:  paul.donovan@laroelaw.com

*Counsel for Plaintiffs Olin Corporation, US*
*Magnesium LLC, Dust Pro, Inc., and Nyrstar*
*Holdings, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on April 17, 2020, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic filing system, which automatically notifies counsel for all parties of the filing.

*/s/  Sami H. Rashid*