# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF)<br><br>**PUBLICLY FILED VERSION** |
| This document relates to:<br><br>ALL CASES | Judge: Hon. Paul L. Friedman |

## <u>DEFENDANTS' REPLY MEMORANDUM OF LAW REGARDING THE INTERPRETATION AND APPLICATION OF 49 U.S.C. § 10706</u>

# TABLE OF CONTENTS

**Page**

I.    Section 10706(a)(3)(B)(ii) Is Not An "Immunity" From The Antitrust Laws ...................2

II.    Plaintiffs Cannot Evade Their Obligation To Establish The Admissibility Of Evidence Related To Particular Interline-Related Discussions Or Agreements.................7

    A.    Section 10706 Requires An Evaluation Of Evidence Pertaining To Specific Interline-Related Discussions And Agreements .......................................7

        1.    Plaintiffs Bear The Burden Of Proving Their Entitlement To Use Interline-Related Communications; Allegations About The Nature Of The Supposed Conspiracy Are Irrelevant ................................................7

        2.    Section 10706 Applies To All Conspiracy Claims, Including Claims Encompassing Both Interline And Non-Interline Traffic...............9

        3.    Section 10706 Cannot Be Circumvented By Considering Evidence Of Numerous Interline Discussions Together............................................12

    B.    Plaintiffs Do Not Contest That The Evidence "Concerned" Interline Rates And Movements, And Cannot Show That Any Evidence, "Considered By Itself," Violates The Law ..........................................................................................15

        1.    Nothing That Transpired At Any Alliance Meeting Shows, By Itself, Any Unlawful Conspiracy .............................................16

        2.    Plaintiffs' Arguments About Concurrence Requests Are Without Merit...............................................................................................21

        3.    Plaintiffs' Arguments About Logistical Communications Are Wrong ..........................................................................................24

    C.    Plaintiffs Are Seeking Forbidden Inferences From "Similar Action" On Other Traffic ....................................................................................................26

III.    Section 10706(a)(3)(B)(ii) Applies In This Proceeding ................................................27

    A.    Section 10706(a)(3)(B)(ii) Is Not Limited To Rate Bureau Discussions .............27

    B.    Section 10706(a)(3)(B)(ii) Is Not Limited To Regulated Traffic ........................29

    C.    Section 10706(a)(3)(B)(ii)'s Protections Are Not Limited To Discussions Or Actions Regarding A *Single* Rate Or A *Particular* Interline Movement ........32

IV.    Plaintiffs Mischaracterize The Context And Purpose Of The SRA And Section 10706(a)(3)(B)(ii) ......................................................................................................34

    A.    The SRA's Purpose Was To Revitalize The Rail Industry By Reducing Regulatory Burdens ..........................................................................................34

    B.    Congress Curtailed *Collective* Ratemaking In The SRA, But It Protected *Interline* Ratemaking Through Section 10706(a)(3)(B)(ii) ..................................36

i

**1.** Plaintiffs Conflate *Collective* Ratemaking With *Interline* Ratemaking ..................................................................36

**2.** Congress Enacted Section 10706(a)(3)(B)(ii) To Ensure Continued Protection For Interline Coordination .......................................................39

V.   Conclusion ....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACE USA v. Union Pac. R.R.*,
No. 09-2194-KHV, 2011 WL 3610103 (D. Kan. Aug. 15, 2011) ...........................................31

*Am. Short Line R.R. Ass'n v. United States*,
No. 84-4023 (2d Cir. May 25, 1984) .....................................................................................38

*Asphalt Roofing Mfrs. Ass'n v. I.C.C.*,
567 F.2d 994 (D.C. Cir. 1977) ..............................................................................................36

*Bourjaily v. United States*,
483 U.S. 171 (1987) ............................................................................................................7, 8

*Brae Corp. v. United States*,
740 F.2d 1023 (D.C. Cir. 1984) .............................................................................................32

*Brown v. Pro Football, Inc.*,
518 U.S. 231 (1996) ...............................................................................................................39

*Coal Exps. Ass'n of U.S., Inc. v. United States*,
745 F.2d 76 (D.C. Cir. 1984) ...........................................................................................34, 35

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ...............................................................................................................15

*Corley v. United States*,
556 U.S. 303 (2009) ...............................................................................................................28

*Fayus Enters v. BNSF Ry. Co.*,
602 F.3d 444 (D.C. Cir. 2010) .........................................................................................29, 30

*Meister v. Med. Eng'g Corp.*,
267 F.3d 1123 (D.C. Cir. 2001) ...........................................................................................7, 8

*Oak Grove Res., LLC v. Dir., OWCP*,
920 F.3d 1283 (11th Cir. 2019) .............................................................................................33

*Penn. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) ...............................................................................................................29

*Project Vote, Inc. v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016) ..................................................................................10

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   593 F. Supp. 2d 29 (D.D.C. 2008) ...................................................................29, 30

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)...........................................................................................16

*U.S. ex rel. Totten v. Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002)...................................................................31

*United States v. Al-Imam*,
   382 F. Supp. 3d 51 (D.D.C. 2019) ...............................................................7

*United States v. Gosselin World Wide Moving, N.V.*,
   411 F.3d 502 (4th Cir. 2005) ...............................................................10, 11

*United States v. Meserve*,
   271 F.3d 314 (1st Cir. 2001) ........................................................................8

*United States v. Miranda*,
   588 F. Supp. 2d 659 (E.D. Va. 2008) ........................................................10

*United States v. Short*,
   790 F.2d 464 (6th Cir. 1986) .......................................................................8

*W. Railroads-Agreement*,
   364 I.C.C. 635 (1981) ................................................................................38

*Western Railroads-Agreement*,
   364 I.C.C. 1 (1980) ....................................................................................40

*Winkler v. United States*,
   372 F.2d 74 (5th Cir. 1967) .......................................................................10

## STATUTES

1 U.S.C. § 1.........................................................................................................33

46 U.S.C. app. § 1706(a)(4)...............................................................................11

49 U.S.C. § 10501................................................................................29, 30, 32

49 U.S.C. § 10505(a) ..........................................................................................32

49 U.S.C. § 10705a(a)(4).....................................................................................38

49 U.S.C. § 10706 ........................................................................................*passim*

49 U.S.C. § 10706(a)(2)(A).................................................................................28

49 U.S.C. § 10706(a)(3)(B)(ii) ................................................................. *passim*

49 U.S.C. § 10706(a)(3)(B)(ii)(II) .........................................10, 12, 15, 32

49 U.S.C. § 10709 ...............................................................................31

49 U.S.C. § 10709(a) ..........................................................................30

49 U.S.C. § 10709(c)(1) ..........................................................29, 30, 31, 32

49 U.S.C. § 10903 ...............................................................................32

49 U.S.C. § 11501 ...............................................................................32

Reed-Bulwinkle Act of 1948, ch. 491, 62 Stat. 472 (June 17, 1948) .....................28, 37

SRA, Pub. L. No. 96-448, § 219(c)(1)-(2), 94 Stat. 1895 (Oct. 14, 1980) ...................28

SRA § 2 ...........................................................................................35

SRA § 2(5) ........................................................................................35

SRA § 2(6) ........................................................................................35

SRA § 208 .....................................................................................31, 35

SRA § 217 .........................................................................................38

SRA § 219 .....................................................................................28, 29

SRA § 219(a) ......................................................................................37

SRA § 219(c)(3) ...................................................................................28

SRA § 3 ........................................................................................34, 35

SRA § 3(2) ........................................................................................35

Staggers Rail Act of 1980 ........................................................................27

## RULES

Fed. R. Evid. 104 .................................................................................13

Fed. R. Evid. 104(a) ...............................................................................7

## OTHER AUTHORITIES

Comments of the U.S. Dep't of Justice, *Western Railroads–Agreement,* Section
   5b Appl. No. 2 (I.C.C. Nov. 26, 1980) ......................................................40

*Concern,* AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (9th ed. 1996) ..........................10

*Concern,* BLACK'S LAW DICTIONARY 289 (6th ed. 1990) ............................................................10

*Concern,* RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 281 (1995 ed.) ...........................10

*Concern*, WEBSTER'S NEW WORLD DICTIONARY 293 (2d College ed. 1970) .............................10

*Concern,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (Philip
    Babcock Gove, ed. 1966)......................................................................................................10

*Discussion*, BLACK'S LAW DICTIONARY (11th ed. 2019) .......................................................12, 13

Donald L. Flexner & Richard M. Mathias, *Antitrust Immunity, Rate Setting
    Altered by Rail Act*, LEGAL TIMES 10 (Dec. 1, 1980) .............................................................40

H.R. Conf. Rep. No. 96-1430, 1980 WL 13000 (Sept. 29, 1980) ................................5, 31, 35, 39

H.R. Rep. No. 96-1035, 1980 WL 12999 (May 16, 1980) ..........................................32, 35, 36, 39

Legislative History of the ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat.
    803 (Dec. 29, 1995) ............................................................................................................38

S. Rep. No. 96-470 (Dec. 7, 1979).................................................................................... *passim*

William H. Dempsey, *Antitrust and Deregulation: A Railroad Perspective*, 50
    ANTITRUST L.J. 363 (1981)...................................................................................................29

## INTRODUCTION

The railroads' motion has nothing to do with antitrust immunity.  49 U.S.C.

§ 10706(a)(3)(B)(ii) ("Section 10706") does not confer such immunity.  Nor do Defendants

argue that they are entitled to some implied immunity because they must offer "through routes"

and establish joint rates for those routes.  Section 10706 operates in a different way and for a

different purpose.  It is a rule about evidence, embodying a policy judgment that the coordination

required to offer interline service should not be used against carriers in certain ways.  Section

10706 is not a substantive rule either, in the sense that it does not limit what an antitrust plaintiff

may allege or determine what agreements are lawful.  It is a procedural rule, whereby any

plaintiff that wants to *prove* a conspiracy claim based on discussions and agreements that

concern interlining must meet Section 10706's legal standards.

Plaintiffs' Opposition lays bare their intention to use evidence of interline-related

discussions and agreements just as the statute forbids.  The heart of their case is, as it has always

been, the bilateral communications between pairs of interlining railroads that occurred in the

Spring of 2003 when, after years of stability, fuel prices became unstable.  The railroads had

established thousands of joint rates and jointly bore the risk that those rates would be

unprofitable should diesel fuel prices rise.  There is nothing wrong with interline partners

discussing fuel surcharges in that context, and not a single discussion "considered by itself" is an

unlawful agreement or conspiracy.  Plaintiffs therefore combine these lawful, ordinary-course

discussions with other evidence about the interline and local fuel surcharges that carriers

subsequently established and infer from the combination "one conspiracy and one agreement to

set fuel surcharges as a means to raise all-in rates."  Pls.' Opp. Mem. (Apr. 17, 2020), ECF No.

952 ("Opp."), at 35.  Plaintiffs cannot deny this is their formula; their brief doubles-down on

arguments such as "UP and CSX's March 12-13, 2003 meeting [a bilateral East/West alliance

meeting] enabled both carriers to reconcile the widely varying approaches to fuel surcharges each had previously contemplated—and one week later, CSX announced a new standard carload fuel surcharge applicable to all of its traffic (single-line and interline, with UP or not)."  Opp. at 18.  It is cause-and-effect, weaving together an alleged "all rates" conspiracy from bilateral interline discussions and later changes to fuel surcharges.

Plaintiffs assert their entitlement to use such evidence on multiple grounds, ranging from *Section 10706 does not apply at all* to the circular argument that because they *allege* an agreement that includes non-interline traffic, the statute cannot apply to any evidence offered to prove that agreement.  But tellingly, Plaintiffs do not seriously try to defend their evidence on the terms Section 10706 sets for that debate.  They never try to show that evidence of any particular interline *discussion* (such as that March 12-13, 2003 UP/CSXT meeting) or particular interline *agreement* (such as the various concurrence requests they reference, *id*. at 20-22), is admissible because the discussion or agreement is unlawful "considered by itself."  To the contrary, Plaintiffs argue explicitly that they are entitled to aggregate evidence, and ultimately claim that the Section 10706 "considered by itself" standard is to be applied to the entire body of evidence they deem relevant to the alleged conspiracy.  If nothing else, Plaintiffs' aggregation approach simplifies matters because, unless the Court accepts at least one of Plaintiffs' arguments for considering all of the evidence together, Defendants' motion must be granted.  Plaintiffs have not even answered the discussion- and agreement-specific motion Defendants filed.

## ARGUMENT

## I.   SECTION 10706(a)(3)(B)(ii) IS NOT AN "IMMUNITY" FROM THE ANTITRUST LAWS

At every turn, Plaintiffs argue that Defendants seek immunity.  This rhetoric allows Plaintiffs to advance inapposite arguments, such as the claim that Section 10706(a)(3)(B)(ii)

should be interpreted narrowly because "antitrust exemptions must be strictly confined."  Opp. at 44-45 (citing irrelevant cases discussing actual antitrust immunities).  But Plaintiffs also use this theme to suggest a false choice between accepting Plaintiffs' vision of a gutted statute on the one hand and providing railroads with *carte blanche* to conspire on the other.

Section 10706 is not an antitrust immunity.  Full stop.  The statute provides a procedural framework to address the evidence that may be used to support a conspiracy claim and the inferences that may be fairly drawn from that evidence.  Defendants *agree* that "[t]hese provisions merely govern *how* a plaintiff can prove an antitrust violation, not *whether* an otherwise unlawful agreement is immunized."  *Id.* at 45.  In that way, Section 10706 operates like countless other evidentiary rules, such as the rules governing parol evidence, character evidence, and hearsay.  Those rules do not confer immunity, and neither does Section 10706.[1]

Defendants also do not contend that they are entitled to an implied immunity because they were "compelled" to cooperate on interline rates.  *Id.* at 42-43.  The need for interline cooperation in an interconnected rail network is crucial for understanding *why* Congress passed Section 10706(a)(3)(B)(ii), but it does not create an implied immunity.  Nor does Defendants' position leave all antitrust plaintiffs with "*no means* to prove" what they claim, Opp. at 41, resulting in a kind of practical immunity.  To put it bluntly, Section 10706 leaves only *some* antitrust plaintiffs in that position—those, like Plaintiffs here, that are completely dependent on using communications protected by Section 10706 to prove their case.  That is why Plaintiffs try so hard to sell the "effective immunity" theme:  their case is, and has always been, about using inferences from multiple interline communications to prove the alleged conspiracy.

---

[1] Plaintiffs are thus wrong to say that Defendants are contradicting previous statements by their executives that railroads are not "exempt from the antitrust laws."  Opp. at 14-15 (citation omitted).

The extensive discovery in this case left Plaintiffs with no other choice.  There is no evidence of any multilateral conspiracy on fuel surcharges, let alone in the March - May 2003 period when Plaintiffs claim the conspiracy was formed.[2]  There are no documents or witness testimony evidencing any multilateral fuel surcharge agreement, reflecting its terms, or stating how it would be enforced.  So Plaintiffs instead turn to evidence of interline discussions—and inferences from that evidence—to create the mosaic described in their opposition brief.  They combine (a) bilateral discussions during normal interline meetings that refer to fuel surcharges with (b) similar actions taken by individual defendants on other traffic.  A particularly succinct example of this is the description of the purported formation of the conspiracy offered by Plaintiffs' merits expert, Dr. Gordon Rausser—who claimed to have limited himself to evidence not protected by Section 10706.  He wove together fuel surcharge references from five separate bilateral alliance meetings with evidence of supposedly similar fuel surcharge actions taken by individual railroads, and asserted that ███████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████ Reply Declaration of Christopher Campbell ("CRD"), Ex. 1 (Rausser Merits Report at 58-61).

This is *the exact evidentiary formula Congress anticipated and disallowed.*  Congress understood that interlining railroads necessarily would discuss certain issues with interline partners and also make unilateral decisions on the same issues with regard to their single-line traffic.  Congress anticipated that interline coordination would open up railroads to the argument

---

[2] The multilateral meetings Plaintiffs point to are legitimate industry meetings, such as AAR, NFTA, or NEMC meetings, but Plaintiffs do not claim that any one of those meetings by itself proves the alleged agreement.  Rather, Plaintiffs sprinkle those meetings throughout their narrative and assert without basis that they were in furtherance of the overarching "agreement."

that their unilateral decisions weren't unilateral at all, *i.e.*, that "[b]ecause of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange" and "[t]hat requirement could falsely lead to conclusions about rate agreements that were lawfully discussed."  H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *114 (Sept. 29, 1980).

That is precisely what is happening here.  The railroads did not conspire.  At the same time as the ordinary alliance meetings and concurrence requests Plaintiffs cite, each Defendant *also* conducted its own independent fuel surcharge analysis, grappling with different formulas and indices, what shippers might accept, what others were doing, and what might create a competitive advantage.  And then they made *different decisions*.  For example:

- CSXT decided to modify its carload fuel surcharge formula based on West Texas Intermediate ("WTI") prices in late March 2003, after a temporary dip in fuel prices exposed a flaw in its formula's ability to respond to increases in CSXT's fuel costs.  CSXT's CMO made that decision without consultation or discussion with any other railroad.

- While UP initially decided to match CSXT's new fuel surcharge, it changed its mind after customer pushback.  In April and May 2003, UP undertook careful analyses of fuel surcharge options, and adopted an entirely different fuel surcharge based on the Highway Diesel Fuel ("HDF") index.  UP also made its carload fuel surcharge less aggressive than BNSF's by adopting a higher trigger.

- BNSF's published intermodal HDF fuel surcharge formula remained *completely unchanged* from September 2001 through 2008.  And BNSF's published rate-based surcharge for non-intermodal traffic was based on the HDF index (unlike CSXT), and it had a different trigger as compared to UP.  From February 2003 through May 2003, BNSF evaluated switching to a mileage-based formula, but it ultimately retained a rate-based surcharge after hearing customer concerns.

- NS widely applied a fuel surcharge before 2003, and never modified its fuel surcharge mechanism in 2003, when it allegedly joined the conspiracy.  Over a nine-month period, NS engaged in three separate internal reviews of its options.  NS's first two reviews resulted in a decision not to change its existing fuel surcharge mechanism.  NS finally modified its fuel surcharge mechanism in March 2004, only after observing that the difference between CSXT's and NS's surcharge mechanisms over those nine months did not create new business for NS.

Plaintiffs seek to overwhelm this (and more) evidence of unilateral action with evidence of coordination drawn from interline communications.  Section 10706, however, requires an interpretation that respects the world Congress envisioned, where *unilateral action takes place in the midst of permitted interline coordination on the same or similar issues*.  That, in one sentence, is what this motion is about.

This view of Section 10706 does not, as Plaintiffs suggest, allow railroads to funnel any conspiracy through interline communications.  Defendants do not contend that everything discussed in normal interline channels (*e.g.*, at alliance meetings between interline partners) is automatically protected.  Imagine a counterfactual in which a plaintiff had evidence that NS and CSXT executives attended an alliance meeting where topics related to their interline relationship were discussed and, at the same meeting, they separately agreed to each raise their local price by 10% for a customer that each served on a single line basis.  Defendants would not claim that evidence about that separate agreement would be inadmissible.  The evidence relating to the hypothetical agreement would be admissible because, first, the agreement hypothesized does not relate to the separate discussion of interline topics and thus does not "concern[] an interline movement", and second, on these facts the agreement would "considered by itself, violate the [antitrust] laws."  But that is not the case here, where Plaintiffs build their claim on discussions plainly central to the joint business of interlining railroads.  It is inconceivable that interlining railroads would not discuss what to do about suddenly volatile fuel prices that could undermine the profitability of every interline rate they had already established for their joint traffic.

Defendants simply ask that Plaintiffs not be allowed to continue their strategy of using legitimate interline discussions and agreements about fuel surcharges—not one of which proves anything "considered by itself"—to advance their conspiracy claims.

II.     **PLAINTIFFS CANNOT EVADE THEIR OBLIGATION TO ESTABLISH THE
        ADMISSIBILITY OF EVIDENCE RELATED TO PARTICULAR INTERLINE-
        RELATED DISCUSSIONS OR AGREEMENTS**

We turn now to the premise that Plaintiffs ignore:  Section 10706 governs *evidence*
offered as proof that an unlawful agreement existed.  The statute says expressly that "*proof of an
agreement, conspiracy, or combination* may not be inferred from" certain interline actions, and
renders inadmissible "*evidence of a discussion or agreement*" if it concerned an interline
movement and "would not, considered by itself, violate the laws."  49 U.S.C.
§ 10706(a)(3)(B)(ii) (emphasis added).  It therefore needs to be applied to items of evidence, not
*en masse* to entire claims, and least of all based on a plaintiff's self-serving description of the
nature of its claim and allegations.  And yet, Plaintiffs do not engage with the discussion- and
agreement-specific framework Defendants set forth in their Motion.  Plaintiffs do not defend any
piece of evidence on its own, rather than as part of some totality of evidence.  Plaintiffs argue
they do not need to, but their legal arguments are groundless and their factual arguments simply
confirm that they are using interline-evidence exactly as Congress prohibited.

A.      **Section 10706 Requires An Evaluation Of Evidence Pertaining To Specific
        Interline-Related Discussions And Agreements**

1.      Plaintiffs Bear The Burden Of Proving Their Entitlement To Use Interline-
        Related Communications; Allegations About The Nature Of The
        Supposed Conspiracy Are Irrelevant

Contrary to their argument, Plaintiffs, as "[t]he proponent[s] of evidence" at issue, "must
show by a preponderance of the evidence that any necessary prerequisites for admission have
been met."  *United States v. Al-Imam*, 382 F. Supp. 3d 51, 55 (D.D.C. 2019); *see* Fed. R. Evid.
104(a).  The principle that the proponent of evidence must establish its admissibility is well-
accepted.  *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (co-conspirator
testimony); *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001) (expert

testimony); *United States v. Meserve*, 271 F.3d 314, 327 (1st Cir. 2001) (prior conviction);

*United States v. Short*, 790 F.2d 464, 468 (6th Cir. 1986) (confession over a voluntariness

objection).  Plaintiffs have not identified any reason to depart from that principle.[3]

Further, a plaintiff's *allegations* of an agreement's scope or character cannot possibly

determine whether evidence of interline discussions and agreements is protected.  That should be

obvious, but the Opposition is peppered with statements that try to bootstrap Plaintiffs'

*allegations* into conclusions that evidence relevant to those allegations falls outside of Section

10706.  *E.g.*, Opp. at 4 (arguing that because Plaintiffs allege an agreement that "*does* itself

violate the antitrust laws," Section 10706's "evidentiary exclusion [is] inapplicable").  There is

no textual or common sense basis for thinking that the statute operates in this plainly circular

way.  Section 10706 establishes "requirements" before "the introduction of any such [interline-

related] evidence."  Those requirements should be applied like the admissibility requirements

found in other evidentiary rules such as the hearsay exception for coconspirator testimony, *see,*

*e.g.*, *Bourjaily*, 483 U.S. at 175-76,[4] or *Daubert* standards, *see, e.g.*, *Meister*, 267 F.3d at 1127.

Proponents of evidence cannot just *allege* what they are required to *prove*.[5]

---

[3] New Plaintiffs' citation to cases about the attorney-client privilege are inapposite.  *See* Mem. of New Pls.' (Apr. 17, 2020), ECF No. 954 ("New Opp."), at 16.  Defendants do not claim that the statute creates a privilege, and special privilege rules are therefore inapplicable.

[4] *Bourjaily* is closely on point.  There, the admissibility of evidence depended on a disputed fact—the existence of a conspiracy—and the "offering party" had the burden to establish that fact.  *Id.* at 176.  Here, the admissibility of an interline discussion or agreement depends on, *inter alia*, a showing that the particular discussion or agreement is unlawful "considered by itself."  As in *Bourjaily*, the burden of proving this fact and any other prerequisites for admissibility properly rests with Plaintiffs.

[5] Because Section 10706 requires the Court to make certain findings (*e.g.*, that the evidence of a particular discussion "by itself" shows an unlawful conspiracy), Defendants have previously suggested an evidentiary hearing.  The approach Plaintiffs have taken in the Opposition complicates that request, since Plaintiffs did not contest any of the foundational facts that might be examined at an evidentiary hearing.  Thus, resolution of the legal questions and application of

**2.**     Section 10706 Applies To All Conspiracy Claims, Including Claims
Encompassing Both Interline And Non-Interline Traffic

Plaintiffs also argue repeatedly that Section 10706 is "inapplicable" because, according to

Plaintiffs, not all of the discussions and agreements captured in the evidence were expressly

limited to interline traffic.  *See, e.g.*, Opp. at 38 ("[T]his sub-section certainly does not cover an

agreement as to *all* movements, only a minority of which are interline."); *id.* at 32 ("An action

with respect to all rates is, by definition, not an action with respect to interline rates (let alone 'an

interline rate').").  Nothing in Section 10706 limits its applicability that way.

There can be no doubt that Section 10706 is "applicable" here because this case is plainly

a "proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or

combination in violation of a Federal [antitrust] law . . . or of any similar State law[.]"  49 U.S.C.

§ 10706(a)(3)(B)(ii).  That is the only trigger for the statute's application.  Nothing limits its

application to antitrust conspiracy claims of some particular scope.

To find these supposed limitations, Plaintiffs rely on language describing the particular

types of evidence the statute protects, namely the phrases "with respect to an interline rate or

related matter" and "concerned an interline movement of the rail carrier[.]"  *Id.*  There are two

flaws in this argument.  First, while those words are important *in applying* Section 10706—they

describe the relationship that evidence must have to interline matters—they do not limit the

*conspiracy claims to which the statute applies.*  Indeed, those words presume that it does apply,

because otherwise there is no occasion to exclude evidence or limit inferences.

Second, even these phrases do not say that discussions and agreements are protected by

Section 10706 only when the subject of the discussion relates *solely* to interline movements—

Defendants' proposed framework should take many issues off the table.  Regardless, Defendants
remain of the view that an evidentiary hearing would be helpful, particularly if the Court feels a
need to consider additional evidence to determine whether the statute's protections apply.

and conversely *never* protected when discussions concern matters that are germane to interline and local traffic alike.  Section 10706 uses broad, inclusive terms: "with respect to an interline rate or related matter," and "if the discussion or agreement . . . concerned an interline movement of the rail carrier[.]"  There is no basis for reading "with respect to" as "only with respect to," or "concerned" as "concerned solely with."  That would shatter the plain meaning of the words Congress used.  As numerous dictionary definitions make clear, "concern" is a term with a broad meaning.[6]  It naturally encompasses anything in this context with a "relation to" or "bearing on" interline traffic.  *Concern*, WEBSTER'S NEW WORLD DICTIONARY 293 (2d College ed. 1970); *see also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1337 (N.D. Ga. 2016) ("The word 'concern' is a broad term meaning:  'to relate or refer to,' to 'be about,' or 'to have an influence on.'"); *United States v. Miranda*, 588 F. Supp. 2d 659, 662 & n.4 (E.D. Va. 2008) ("The phrase 'in respect to' is not obscure; it has a plain meaning, namely 'relating to' or 'concerning.'").

New Plaintiffs' reliance on *United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502 (4th Cir. 2005), to limit the text's plain meaning is especially misplaced.  *See* New Opp. at 17-18.  To the very limited extent it is relevant, *Gosselin* thoroughly undermines Plaintiffs' interpretation of Section 10706.  First, *Gosselin*'s construction of "concern" supports the *railroads'* construction of Section 10706(a)(3)(B)(ii)(II): "For an agreement or activity to

---

[6] *See, e.g.*, *Concern,* AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (9th ed. 1996) (noting that "concern" is "a very general term"); *Concern,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (Philip Babcock Gove, ed. 1966) (defining "concern" as "relat[ing] to or refer[ing] to" or "bear[ing] on"); *Concern,* BLACK'S LAW DICTIONARY 289 (6th ed. 1990) (defining "concern" as "To pertain, relate, or belong to; be of interest or importance to; have connection with; to have reference to; to involve; to affect the interest of"); *Concern,* RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 281 (1995 ed.) (defining "concerned" as "having a connection or involvement"); *see also Winkler v. United States*, 372 F.2d 74, 75 (5th Cir. 1967) (using dictionary definitions in interpreting the "ordinary and usual" meaning of the term "concerned" in a criminal statute to include each person "involved," "affected," or "having a connecting relation").

'*concern*'" a subject matter, "the parties undertaking the agreement or participating in the activity must have in mind some consequence for [that subject matter] that they intend their behavior to have." *Gosselin*, 411 F.3d at 510 (original alterations omitted) (citation omitted). Nobody denies that Plaintiffs' evidence meets that test—the obvious purpose for the interline communications at issue was that they would have "some consequence for" interline rates. Second, *Gosselin* narrowly construed "concern" because, unlike this case, it was actually about antitrust immunities; it rejected the unlikely argument that a conspiracy among freight forwarders to rig bids for transporting government freight between the United States and Germany was immune from prosecution because of a tangential connection to German inland moving agents. *Id.* at 509 (quoting 46 U.S.C. app. § 1706(a)(4), which exempts from antitrust liability "any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade"). So even a narrow construction of "concerned" supports Defendants' position here.

Plaintiffs' approach also ignores the reality of running a functional, nationwide rail network. This statute exists because many of the issues rail carriers need to discuss as interline partners are *also* significant to their broader operations, including local traffic on which they may compete. There is no better example than fuel volatility and cost recovery, which are simultaneously important to *all* traffic. Should interline partners be denied the ability to discuss fuel surcharges on interline traffic simply because fuel price volatility affects *all* traffic? Is this about adding the word "interline" to every sentence? Are carriers required to pretend that nothing said in interline discussions might be relevant to their other operations? No. Section 10706 *expressly assumes otherwise* by recognizing that carriers will inevitably take "similar action with respect to . . . another route or traffic[]" and protecting them from any inference of

conspiracy based on that fact.  Nothing in the text or legislative history of Section

10706(a)(3)(B)(ii) suggests that interline partners must structure their discussions as Plaintiffs

suggest, lest they lose the protection the statute explicitly provides.

      **3.**      <u>Section 10706 Cannot Be Circumvented By Considering Evidence Of</u>
<u>Numerous Interline Discussions Together</u>

Plaintiffs' Opposition makes no attempt to defend the admissibility of any piece of

evidence, or any set of evidence pertaining to a particular discussion, on the ground that the

discussion would be unlawful "considered by itself."  Instead, Plaintiffs take the position that

they may establish the admissibility of *all* of the evidence Defendants have challenged in one fell

swoop, because all of it relates to the one alleged agreement they contend is unlawful.  In

substance, Plaintiffs advance the syllogism that if (a) all of the evidence they have packaged

together, (b) shows an unlawful agreement, then (c) each piece of evidence is admissible to

prove the agreement.  Opp. at 39-41 ("[i]f the agreement, considered by itself, violates the

antitrust laws, then evidence of the agreement is admissible").

This is an impossible interpretation of a statute which states that "evidence of a

discussion or agreement . . . shall not be admissible" unless the discussion or agreement

"*considered by itself*" violates the law.  49 U.S.C. § 10706(a)(3)(B)(ii)(II) (emphasis added).  The

very least the phrase "considered by itself" tells us is that the Court cannot consider all evidence

together.  There is a smaller unit of analysis that is supposed to be considered "by itself," which

the statute identifies expressly as the particular "discussion" or "agreement" that "concerned an

interline movement."  Under the ordinary meaning of these terms, if a BNSF executive and a NS

executive had a meeting regarding their interline traffic and talked about fuel surcharges, that is a

qualifying "discussion."  *See Discussion*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining

"discussion" as the "act of exchanging views on something").  And if CSXT agreed to UP's

12

request to increase the fuel surcharge on their joint line traffic, that would be a qualifying "agreement." *See id.* (defining "agreement" as "a manifestation of mutual assent by two or more persons" and noting that it is "an expression of greater breadth of meaning and less technicality" than "contract"). The specific body of evidence informing what occurred in a discussion would be "considered by itself," as would the terms of each unique agreement reached.

To be clear, this does not mean that there must be a single piece of "perfect, smoking-gun" evidence of what transpired during a discussion. *See* Opp. at 3. Multiple emails may capture parts of the same "discussion," an offer and acceptance may evidence the same "agreement," and so forth. And under Rule 104, the Court may make reasonable inferences from the evidence that bears on a particular interline discussion or agreement.[7] But the one thing "considered by itself" cannot mean is "considered alongside evidence of *other discussions and agreements*." That is what Defendants explained in their motion about the distinction in antitrust law between direct evidence of a conspiracy (*i.e.*, evidence that on its own proves an unlawful act) and inferential evidence (*i.e.*, evidence that proves an unlawful act only by combining it with other things and drawing inferences). Defs.' Mot. (Feb. 21, 2020), ECF No. 927 ("Mot."), at 11-12. The statute does not allow what Plaintiffs are doing now and have done since this case began, which is to create a mosaic out of bilateral interline meetings, concurrence requests, random interline communications, and railroads' internal communications, not one of which "considered by itself" shows anything unlawful. That is, to be sure, different than the normal practice in antitrust cases, where inferring conspiracy from disparate pieces of circumstantial

---

[7] Section 10706(a)(3)(B)(ii) does restrict one form of inferential evidence directly, by barring any inference of conspiracy from "similar action" on local traffic. There is no reason to think that this inference restriction somehow does not apply to the Court's determination of whether an interline discussion or agreement, considered by itself, violates the law.

13

evidence is common.  Congress disallowed that practice for interline communications.

Plaintiffs distort the statute's disjunctive phrase "discussion or agreement," arguing that so long as "the agreement, considered by itself, violates the antitrust laws, then evidence of the agreement is admissible," including evidence of all "discussions."  Opp. at 40.  This is not credible.  Section 10706 is about the use of certain evidence repeatedly referred to as evidence of "discussion or agreement" and then modified by a reference to interlining.  The disjunctive is meant to ensure that, *first*, "evidence of a *discussion* [related to interlining] shall not be admissible if the discussion . . . would not, considered by itself, violate the laws," and *second*, "evidence of . . . *agreement* [related to interlining] shall not be admissible if the . . . agreement would not, considered by itself, violate the laws. . . ."  The same test applies to evidence of a *discussion* related to interlining and evidence of an *agreement* related to interlining.  Given that consistent phrase "discussion or agreement," it does not, as Plaintiffs' argue, "make[] sense" to treat discussions and agreements differently.  Opp. at 40.  There would have been countless ways for Congress to express that intention, but it enacted language that treats them the same and bars use of *either* type of evidence if it does not meet the "considered by itself" standard.

In all events, the "agreement" is not in some Lewis Carroll-like sense whatever the plaintiff wants it to be.  The statute speaks of an agreement "concern[ing] an interline movement"—an ordinarily lawful agreement from which one is not allowed to infer some *other unlawful* agreement.  Section 10706(a)(3)(B)(ii) starts with a reference to the allegedly unlawful agreement, using the phrase "agreement, conspiracy, or combination."  It then addresses whether evidence of *another kind of agreement*—an interline-related agreement—can be used to prove the unlawful conspiracy.  With that structure and logic, a plaintiff cannot just say that the interline-related agreement and the broader, allegedly unlawful agreement are one and the same.

Plaintiffs' reliance on *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), is deeply misplaced. *Continental Ore* establishes a rule about not "compartmentalizing" *admissible* evidence at trial and in post-trial reviews. *Id*. But at this stage, the question is what evidence Plaintiffs are allowed to use to prove their claim of conspiracy, and more specifically whether certain evidence is inadmissible under Section 10706. As it happens, Section 10706 adopts a rule—the "considered by itself" principle—that is *the exact opposite* of what Plaintiffs contend *Continental Ore* means. Equally meritless is Plaintiffs' argument that *juries* have some role in this process. Opp. at 40. The statute is explicit that juries cannot hear interline evidence unless and until the Court first "determine[s] whether the requirements of [Section 10706] subclause (I) or (II) are satisfied." 49 U.S.C. § 10706(a)(3)(B)(ii)(II).

Section 10706 is simpler than Plaintiffs make it out to be. The statute is about one big thing: not allowing snippets of interline coordination to be assembled like a ransom note into a broader conspiracy narrative. That is why Section 10706 establishes one path to admissibility for evidence of interline discussions and agreements—upon a showing that a *particular* discussion or agreement "considered by itself" violates the law.

**B.      Plaintiffs Do Not Contest That The Evidence "Concerned" Interline Rates And Movements, And Cannot Show That Any Evidence, "Considered By Itself," Violates The Law**

There is no live question about whether the challenged evidence "concerned an interline movement" or is about rail carriers "act[ing] together with respect to an interline rate." Plaintiffs concede the point by arguing again and again that the discussions and alleged agreements at issue concerned *both* interline traffic *and* local traffic. *See, e.g.*, Opp. at 1, 3, 5, 16. The evidence therefore falls within Section 10706's scope, and the only remaining question is whether any of that evidence falls within the exception for evidence of a discussion or agreement that would "considered by itself, violate the laws." 49 U.S.C. § 10706(a)(3)(B)(ii)(II).

Plaintiffs have not tried to establish that this exception is satisfied by any particular evidence, or even by a collection of evidence related to a particular interline discussion or agreement.  Plaintiffs' two-page discussion of the "by itself" principle on pages 39-41 simply repackages Plaintiffs' primary argument that the alleged "overarching agreement" falls outside of Section 10706's protections.  And in the various parts of the Opposition where Plaintiffs address the challenged evidence, they never once claim that some discrete piece of evidence or discrete discussion considered by itself proves a violation of the law.

As a result, Plaintiffs make no evidence-specific arguments within the Section 10706 framework to which Defendants can reply.  Nor, since Plaintiffs disclaim any intention to infer conspiracy from similarity in interline and local fuel surcharge actions, can Defendants reply to arguments about permissible inferences.  Indeed, far from establishing that any discussion proves an unlawful agreement by itself, Plaintiffs' various factual assertions show that Plaintiffs intend to use these discussions exactly in the manner barred by Section 10706.

  **1.** Nothing That Transpired At Any Alliance Meeting Shows, By Itself, Any Unlawful Conspiracy

Plaintiffs construct their narrative around discussions at bilateral alliance meetings that took place from March to May 2003, when Plaintiffs allege the conspiracy was formed.  Plaintiffs do not dispute that these alliance meetings related to interline traffic, Opp. at 16-17, and they never contend—at least openly—that interlining railroads should not discuss fuel surcharges.  Partners in integrated joint ventures always "have the discretion to determine the prices of the products that [the joint venture] sells," *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006), and that is no less true of interlining railroads facing fuel price volatility.  Plaintiffs nonetheless make two basic arguments about why evidence about alliance meetings should be admitted.

First, Plaintiffs try to minimize the interline nature of these discussions, arguing that

references to interline traffic in the discussions at issue are "irrelevant" because (by Plaintiffs' reckoning) they pertain to topics other than fuel surcharges. Opp. at 17 ("Defendants underscore any use of the word 'interline' . . . as if that might categorically preclude broader discussions of *all* traffic."). This ignores the many interline references that appear in direct connection with fuel surcharge discussions. *E.g.*, CD Ex. 38 (March 2003 UP-CSXT alliance meeting stating an intent to discuss "Other Pricing Issues on CSX/UP *Interline* Business" including "Fuel surcharge methodology") (emphasis added); *id.* Ex. 39 (March 2003 BNSF-NS alliance meeting referencing BNSF fuel surcharge in connection with "*Interline* Volumes by Business Group") (emphasis added). In any event, if the evidence and context show that the discussion Plaintiffs want to use "concerned an interline movement," as they clearly do, Mot. at 26-38, the word "interline" need not appear adjacent to every mention of fuel surcharges. Section 10706 protections apply regardless.[8] *All* of the alliance meetings raised in connection with this motion were bilateral meetings involving one Western and one Eastern carrier. Mot. at 26-27, 29-35.[9] The very purpose of these meetings was to discuss interline traffic, as confirmed by the many

---

[8] Plaintiffs argue that it was not "necessary" to discuss fuel surcharges because Defendants' executives "*never jointly discussed fuel surcharges prior to 2003*[.]" Opp. at 9 (citing CSXT's CMO Michael Giftos). That is incorrect. Mr. Giftos confirmed that both before and after 2003, his practice was to unilaterally decide on a fuel surcharge and then communicate with his interline partners to obtain concurrence. *See* SRD Ex. 3 at 73:14-21. Other documents show similar pre-2003 coordination between interline partners on fuel surcharges. *E.g.*, CRD Ex. 2 (CSXFSC000325299) (2000 CSXT-NS fuel surcharge concurrence); Ex. 3 (UPFSC 0344387) (2000 CSXT-UP concurrence); Ex. 4 (UPFSC0000438) (2002 UP-CSXT concurrence).

[9] Plaintiffs argue weakly that "all four Defendants are competitors[,]" Opp. at 5 (emphasis and citation omitted), which like many things they say is at once literally true and highly misleading for the issue at hand. No one denies that CSXT and NS in the East and UP and BNSF in the West are vigorous competitors, nor that there is some competition between Eastern and Western railroads at the margins. But the limited "East/West" competition pales in comparison to relationships Eastern and Western railroads have as interline partners. There is no rational basis for thinking that when Eastern and Western railroads come together in alliance meetings, it is to discuss their minimal competitive relationship.

mentions of interline topics throughout the documentary record.

Second, Plaintiffs argue that Defendants' "inventory of alliance meetings . . . omits various critical details," suggesting that those details prove the alleged agreement. Opp. at 11-12, 18-19. The "details" Plaintiffs supply are nothing more than inferential spin and argument (not evidence) based on combinations of different discussions and agreements, which is exactly what Section 10706 prohibits.

For example, Plaintiffs point to the March 2003 UP-CSXT alliance meeting, for which the agenda expressly includes "Pricing Issues on CSX/UP Interline Business [/] Fuel surcharge methodology." CD Ex. 38. In Plaintiffs' words, this meeting allowed UP and CSXT "to reconcile the widely varying approaches to fuel surcharges each had previously contemplated." Opp. at 18. Plaintiffs cite no evidence for this, but let's assume that is true; "considered by itself," it is not even arguably unlawful for interlining partners to talk about "approaches to fuel surcharges." Therefore, Plaintiffs do not consider this evidence "by itself" but rather try to link the meeting to later concurrence exchanges about fuel surcharges for interline traffic and, ultimately, similar action taken on local traffic. *See* CD Ex. 11 (Narrative ¶¶ 23-33); *see also* CRD Ex. 1 (Rausser Merits Report at 58 (describing this as the first of ███████████ ███████████████████████████████████████████████████████)). So in this instance, the "detail" Plaintiffs add to this legitimate interline discussion is their own argument that the alliance discussion about "Interline Business" actually concerned an agreement covering "all rates, including single-line rates." That is nothing like the analysis the statute requires; rather, it is exactly what Section 10706 bars.

Plaintiffs also mischaracterize a May 14, 2003 NS-UP Alliance meeting, claiming it was part of a "'consensus' on a uniform fuel-surcharge approach[]" that all four Defendants agreed to

18

apply to "all traffic," including local traffic.  Opp. at 11-12 (citation omitted).  The sentences from which Plaintiffs infer the agreement state, in their entirety: "Fuel surcharges → uniform application across the industry would be helpful[,]" CD, Ex. 42 (handwritten meeting notes), and "Discussion followed on fuel surcharges and various application processes as used by different roads.  Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers[,]" CD, Ex. 43 (meeting minutes).  Setting aside all context and starting with just the language itself, *nothing* in these words establishes the multifaceted agreement that Plaintiffs wish to infer about "discounting, waivers, and non-enforcement," applying surcharges to "all traffic," *or* "100% coverage across all rail freight customers."  Opp. at 12.  Just as importantly, there is no mention of local traffic.  Plaintiffs read those terms into this language by combining it with evidence of *other* interline discussions and conduct that they say is consistent with such an agreement, from which they infer a supposed agreement "that all four Defendants should have the same fuel surcharges."  *Id*. at 18-19; CD Ex. 11 (Narrative ¶ 47).  "Considered by itself," the evidence related to this discussion shows no such thing.[10]

Similarly, Plaintiffs cite a single sentence from the minutes of a March 18, 2003 BNSF-NS Alliance meeting (in a section expressly tied to "interline volumes") in which a question was asked:  "Should BNSF's [fuel surcharge be] synchronized with the other big players in the

---

[10] This conversation concerned interline traffic and concerns expressed by shippers—not railroads—about the lack of uniformity of fuel surcharge mechanisms.  Mot. at 32, 36-37.  This related to "interline moves and feedback we were getting from customers, there was some frustration that there were multiple methodologies."  CRD, Ex. 5 (Young Dep. 231:1-15 ("What a customer was trying to understand in many cases is . . . UP had a separate . . . fuel surcharge methodology versus the Norfolk Southern.  And obviously from a customer perspective, they'd wanted it simplified and somewhat standardized on interline moves."), 231:23-25 ("[O]ur discussion always focused on interline moves, what are we hearing from customers in the marketplace.")); *see also id.*, Ex. 6 (BNSF-0617424) (customer rejected a BNSF fuel surcharge and used its own because "it is uniform across all the rail carriers").

industry?"  Opp. at 11 (citing CD Ex. 39).  How is that question unlawful "considered by itself"?

At that time, BNSF was the only Class I railroad calculating fuel surcharges based on the HDF

index.  Why shouldn't interline partners be able to say that it would be easier for customers'

accounting purposes if the surcharges applicable to their joint business used the same index?

That is not remotely the same as the vast alleged conspiracy about "standardizing" surcharge

formulas, eliminating "discounting" and "waivers," increasing "coverage" to 100%, and so on.[11]

We could go on, but the pattern is always the same.  None of the other evidence of

discussions is problematic "considered by itself," and certainly none reflects or describes the

wide-ranging and multifaceted agreement that Plaintiffs claim.  Rather, each reflects discrete and

limited statements about fuel surcharges as part of a broader discussion focused on interline

business.[12]  Plaintiffs therefore take every such statement and add it to the body of evidence from

which they infer that all four Defendants (including those not at the meeting) agreed to "ha[ve]

the same process in the eyes of our customers," CD Ex. 43, "harmonize their fuel-surcharge

programs[,]" Opp. at 12, and so forth.  In a sense this is entirely normal: in ordinary horizontal

---

[11] The rest of the document discusses topics that clearly situate this meeting as about BNSF-NS interline business.  Mot. at 30 (detailing interline references and related testimony).

[12] *See* CD Ex. 45 (notes from a June 3, 2003 CSXT-UP meeting stating:  "Fuel surcharge— GIFTOS, CSX has not seen outcry that UP has"; not mentioning local traffic or any of the supposed terms from the alleged "all rates" agreement); *id.* Ex. 49 (BNSF-NS alliance meeting minutes referencing many interline topics, where the only fuel surcharge reference states, "John Lanigan and Don Seale agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next N.E.M.C. meeting" and witnesses testified that the "discussion" referenced never took place, *see* CRD, Ex. 7 (Lanigan Dep. Ex. 18), Ex. 8 (Seale Dep. at 269:2-12, 273:4-15), Ex. 9 (Gooden Dep. at 161:24-163:2)); *see also* CD Ex. 70 (internal CSXT discussion about trying to "estimate application [of fuel surcharges] on local and received traffic [*i.e.*, interline traffic received from another carrier]" and noting that during a CSXT-BNSF meeting "BNSF stated that 82% of their carload and intermodal business either had [a] fuel surcharge or an escalator on the revenue"); *id.* Ex. 75 (internal BNSF email noting only that John Lanigan of BNSF planned to "visit[] with his railroad counterparts . . . to judge the appetite for a mileage-based FSC program," which as shown below he did with respect to interline traffic); *id.* Ex. 82 (similar email chain).

conspiracy cases, plaintiffs build inferences of conspiracy using just this technique of combining parallel behavior with whatever related discussions they can find, calling them "plus factors." But this is not the normal case.  Section 10706 does not allow interline communications to be used this way unless and until it has been established that a particular discussion or agreement is unlawful "considered by itself"—a standard Plaintiffs don't even try to meet.

### 2.     Plaintiffs' Arguments About Concurrence Requests Are Without Merit

Plaintiffs' attempt to frame interline concurrence requests as not concerning interline movements is even less convincing.  When shippers request rates for interline shipments, the railroad quoting the rates must request the agreement of the connecting railroad to the proposed rates.  Plaintiffs first assert that concurrence requests are somehow not interline related because they were also "conveyed to the other three Defendants."  Opp. at 20.  Of course they were. Each rail carrier has extensive interline business with each of the other three carriers every year, including millions of ton-miles of goods.  CD, Ex. 12 (Carlton Report, Table 3).  It is therefore required that they obtain concurrence from each of the other three *before* changing a term that applies to their shared traffic.[13]  Mot. at 21.

Plaintiffs next mischaracterize concurrence requests about interline traffic as communications concerning "all traffic," and more specifically the alleged "all traffic" agreement.  Opp. at 20.  Their lead example is a situation in which a single BNSF-UP interline customer (███████) requested a specific rate for shipments originating in New Mexico.  BNSF

---

[13] Plaintiffs claim this "bel[ies] Defendants' assertion that Plaintiffs' evidence of conspiracy purportedly is built on communications between 'an Eastern and a Western railroad[.]'"  Opp. at 20.  This is a misquotation.  Defendants' assertion about Eastern and Western railroads pertained to alliance meetings.  All of the alliance meetings challenged in this motion, and nearly every alliance meeting that appears in Plaintiffs' conspiracy narrative, were bilateral meetings between one Eastern and one Western railroad with little competing traffic.  Mot. at 29.

proposed applying either its fuel surcharge or a UP fuel surcharge for that customer's joint-line

shipments, and UP concurred.  CD Ex. 27.  It is hard to imagine a more discrete interline

communication, yet Plaintiffs argue that Section 10706 does not apply because one portion of the

email explains the request by noting that "we've got executive instruction to apply Fuel

Surcharge provisions to essentially everything."  Opp. at 20 (arguing that this confirms "that

these new fuel surcharges would apply to *all* traffic (including confidential contracts")).  Nothing

in this document remotely suggests a discussion about non-interline traffic; the entirety of the

communication concerns a specific interline rate for a specific interline customer for shipments

originating in a single state.  Plaintiffs' attempt to twist even this narrow communication into

support for the alleged conspiracy shows their overarching strategy.

Plaintiffs also point to a UP concurrence request in April 2003 that they concede began in

all caps:  "REQUEST FOR JOINT LINE CONCURRENCE."  Opp. at 20 (citing CD Ex. 30).

Yet Plaintiffs argue that Section 10706 does not apply because one sentence noted that the

surcharge at issue would apply to "most Union Pacific pricing documents for local and interline

freight movements," *id*. at 17, which Plaintiffs say proves that this was not interline related but

rather "an anticompetitive signaling device in furtherance of the conspiracy."  CD Ex. 11

(Narrative ¶ 33).  A document seeking "JOINT LINE CONCURRENCE" cannot reasonably be

interpreted as anything other than a request for concurrence on interline movements.  The note

that the program would apply generally to all pricing authorities ("local and interline") is not a

secret signal, nor does it remove the interline context from this document.  As Plaintiffs know,

that language is pulled verbatim from UP's public press release sent to customers that same day,

and serves only to inform them that the surcharge would be the same whether a customer's

shipment was interline or local—an important consideration given that many customers ship

goods both locally *and* interline, depending on a particular shipment's destination.  CRD Ex. 10 (UPFSC 0000550) (April 4, 2003 UP press release).  Plaintiffs' suggestion that obvious interline communications like these do not concern interline movements, and their attempt to use them as evidence of a supposed conspiracy regarding "all rates," shows how far they will go to subvert Section 10706.  All of the other challenged concurrence requests are similar.  *See* Mot. at 21-26.

Next, Plaintiffs argue that certain documents "cannot legitimately be deemed concurrence communications" because they took place "before those changes occurred and any actual concurrence requests could issue."  Opp. at 21.  But the only examples cited are emails between UP and CSXT *after* CSXT publicly announced a new fuel surcharge, and each concerns whether CSXT would seek concurrence in that program for joint-line rates.  CD Ex. 20 (March 24, 2003 UP email quoting March 20 CSXT press release and noting that CSXT "anticipates sending me concurrence request by tomorrow"); *id.* Ex. 19 ("he will send us 'formal concurrence request'").

Last, Plaintiffs argue that "Defendants hope to shroud, as merely a concurrence request … a critical episode in 2006 when, amid the STB proceedings, UP's CMO Jack Koraleski received a phone call—at night—from NS's CMO Don Seale."  Opp. at 22.  The April 12, 2006 UP email Plaintiffs cite actually states: "I received a call from Don Seale last night.  NS would like our concurrence on the following: On all public priced interline business originating on the NS, they would like to take a 12% price increase on July 1. . . .  They would like our concurrence in order to announce the increase on April 20 [*i.e.*, one week in the future]."  CD Ex. 28.

Plaintiffs mischaracterize essentially every portion of this document.  The document explicitly references "public priced interline business" and "concurrence."  *Id.*  So it is deeply misleading to say "this was NS informing a competitor how and when NS intended to modify its fuel surcharge program to maximize profits . . . ."  Opp. at 22.  Nor is there any basis for

questioning the timing of this call "ten weeks before the effective date." *Id.* In fact, NS was notifying UP *one* week before NS publicly *announced* the program so that UP could evaluate whether to agree to the change for the parties' "interline business." And while Plaintiffs point to UP's internal assessment of NS's planned change as "[s]mart & brave," they do not mention that neither UP nor any other Defendant followed NS's "lead" or "rebased" its fuel surcharge. Considered by itself, this "critical episode" is meaningless.

        **3.**     <u>Plaintiffs' Arguments About Logistical Communications Are Wrong</u>

Plaintiffs similarly mischaracterize documents showing ordinary logistical communications concerning interline traffic. The fact is that none of these communications, considered by itself, is even arguably unlawful.

For example, Plaintiffs point to a BNSF-NS exchange in September 2004 and argue that it is an "information exchange[] concerning the *entirety* of each Defendant's business" (*i.e.*, not just interline). Opp. at 23. To be clear, Plaintiffs are not saying this discrete exchange was unlawful; they are arguing that it provides a modicum of support for their larger conspiracy narrative. That is what Section 10706 disallows. The document is titled "Interline Business Fuel Surcharge Analysis Between Norfolk Southern and BNSF" and states the "Percentage of BNSF Carload Price Authorities with Norfolk Southern Interchange with a Fuel Surcharge Applied." CD Ex. 61. Plaintiffs' only critique of the document is based on the fact that, to estimate that figure for the specific price authorities *for NS-BNSF interchanged traffic*, BNSF apparently used "an estimate of all traffic (not solely with NS)" that moved under those authorities. Opp. at 23. Nothing about that calculation method remotely suggests that BNSF was sharing the information pursuant to an agreed-upon "goal of 100% coverage under the conspiracy." *Id.* Nor would such data even show the "entirety" of BNSF's business, since it was purposefully limited to price authorities "with Norfolk Southern Interchange." CD Ex. 61 at -780. Indeed, as Defendants'

motion explained, carriers need to know whether price authorities will contain a surcharge, so that they know whether, and if so how much, of their fuel costs will be covered.  Mot. at 39-40.

Plaintiffs next argue that they should be entitled to use documents showing that "BNSF sought agreement among all Defendants on a mileage-based fuel surcharge at the November 11, 2004 NEMC meeting," which they characterize as an attempted "across-the-board agreement among all four Defendants to switch to mileage-based fuel surcharges."  Opp. at 23-24. Defendants do not assert interline protection over any multilateral discussion at the November 2004 NEMC meeting.  Rather, Defendants' Motion addressed documents related to BNSF's consideration of a mileage-based fuel surcharge that are either explicitly tied to interline business or that witnesses testified related to bilateral discussions about interline traffic—not all-party discussions at the November 2004 NEMC meeting.  *See, e.g.*, CD Ex. 82 (BNSF email: "Shippers have drafted a proposal [for a mileage-based FSC] that is very similar to what [BNSF] Marketing is thinking. . . We do have some issues with interline and it appears we will start with a per mile surcharge for local traffic and keep the percent of revenue calculation for interline traffic until the other roads feel suitably pressured by shippers."); *id.* Ex. 73 (noting that John Lanigan of BNSF would "be meeting with his counterparts in the next few weeks and may explore the issues with them"); CRD Ex. 11 (Lanigan Dep. 226:9-15) ("I looked at it as the relationship that we had with each individual railroad, and I wanted to talk to each of our interline partners to determine whether or not they could, from a technical perspective and a systems perspective, handle a mileage based fuel surcharge if we chose to move forward with that.").  As a result, Section 10706 applies and Plaintiffs do not bring those discussions—or any of the other challenged discussions—within the exception.

**C.      Plaintiffs Are Seeking Forbidden Inferences From "Similar Action" On Other Traffic**

Plaintiffs' claim that they are not attempting to draw any inferences from "similar action" on non-interline traffic is without merit.  First, Plaintiffs argue that "there is no 'similar action' because there is only one alleged action, as supported by the evidence:  the single agreement to use coordinated fuel surcharges as a means to raise all-in rail freight rates across the board." Opp. at 34.  This is semantics, at best a restatement of Plaintiffs' view that their allegations of one unitary agreement drive the Section 10706 analysis.  But the fact that Plaintiffs *allege* that there was a "single agreement" covering both interline traffic and local traffic begs the question of whether Plaintiffs seek to infer that allegedly unlawful agreement "from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic."  49 U.S.C. § 10706(a)(3)(B)(ii).  Regardless of their legal theory, they cannot do that.

Plaintiffs are in fact seeking to infer "an antitrust violation from concerted action on an interline rate and some subsequent, unilateral action."  Opp. at 36.  They do it in the Opposition, in the Rausser Report, and in their lengthy conspiracy narrative.  For example, Plaintiffs point to the March 12-13 UP-CSXT alliance meeting at which they concede "Interline Business [/] Fuel surcharge methodology" was discussed, CD Ex. 38, and then claim that later unilateral actions by CSXT on March 20 and UP on April 4 were the product of a conspiratorial agreement struck at the earlier meeting.[14]  *See* CD Ex. 11 (Narrative ¶ 31) ("no internal records at CSX show that

---

[14] Contrary to Plaintiffs' suggestion, there is no requirement that a party "took similar action . . . on another route or traffic" at a later time.  Opp. at 30.  Congress could have said "subsequently took" or something similar if that is what it intended, but it did not.  That would have ignored the reality that interline communications and single-line actions occur in real time and are often simultaneous.  Recognizing that a plaintiff might put such an occurrence to inferential use in an antitrust case, Section 10706 bars any inference from such actions.  Nothing about the text of the statute or motivation for enacting it require any particular sequence or timing.

CSX had even considered the escalation formula that it adopted prior to the meetings with [UP's] Mr. Koraleski"); *id.* ¶ 33 (arguing that UP's fuel surcharge announcement "was an anticompetitive signaling device in furtherance of the conspiracy").  This is one example out of many, *see* Mot. at 43-44, and it is *exactly* the inference that Section 10706 prohibits.

## III.    SECTION 10706(a)(3)(B)(ii) APPLIES IN THIS PROCEEDING

Plaintiffs also attempt to short-circuit Section 10706 by inventing technical limitations that, if adopted, would gut the statute.  They assert that the statute's protections (1) apply only in the context of rate bureaus, which are effectively extinct; (2) do not apply to interline discussions regarding contract traffic, which was encouraged by the Staggers Rail Act of 1980 ("SRA"); and (3) apply only to discussions about a single, particular interline movement or rate.  None of these limitations appears in the statutory text, and all are at odds with Congress's purpose in enacting the SRA.  Part IV, *infra*.  The only common thread is their utility to Plaintiffs' litigation position.

### A.    Section 10706(a)(3)(B)(ii) Is Not Limited To Rate Bureau Discussions

New Plaintiffs' contention that Section 10706(a)(3)(B)(ii) applies only "to discussions and agreements to set specific interline rates as part of a regulated rate bureau organization[,]" New Opp. at 11, is flatly inconsistent with Congress's broader goal of *phasing out* rate bureaus and fails upon the plain language of the statute.

Section 10706 states that certain evidence "shall not be admissible" under *either* of two conditions:  if the discussion or agreement "(I) was in accordance with an agreement approved under paragraph (2) of this subsection; or (II) concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause."  Subclause (I) is an explicit reference to approved rate bureaus in the limited form the SRA still permitted.  Subclause (II), the provision relevant to this case, is not about rate bureaus and extends Section 10706(a)(3)(B)(ii)'s evidentiary protection to a

discussion or agreement that "concerned an interline movement of the rail carrier."  New

Plaintiffs' invented "rate bureau" limitation would render subclause (II) meaningless, violating

the basic rule that "a statute should be construed so that effect is given to all its provisions, so

that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*,

556 U.S. 303, 314 (2009) (alterations and citations omitted).

New Plaintiffs contend that their construction does not technically render subclause (II)

superfluous because it would capture discussions pursuant to *unapproved* rate bureau

agreements.  New Opp. at 13; Opp. 28 n.15.  This construction has no textual basis whatsoever.

The statute speaks of discussions or agreements—period—with no particular relationship to rate

bureaus at all.[15]  Moreover, neither Section 10706 nor the SRA generally speaks of a distinct

category of discussions or agreements pursuant to unapproved rate bureau agreements.

New Plaintiffs nevertheless maintain that section 219 of the SRA—the section that

originally enacted Section 10706(a)(3)(B)(ii)'s protections—was titled "Rate Bureaus" and

accordingly one must conclude that "Section 10706 was created to apply to rate bureaus."  New

Opp. at 11.  But Section 10706(a)(3)(B)(ii)'s protections were inextricably intertwined with

Congress's legislation to phase out rate bureaus, making a section otherwise about rate bureaus a

perfectly logical place for these provisions to be found.  Part IV, *infra*.  Section 219 of the SRA

reflects this connection.  *See* SRA, Pub. L. No. 96-448, § 219(c)(1)-(2), 94 Stat. 1895 (Oct. 14,

1980) (limiting scope of rate bureaus); *id.*, § 219(c)(3) (enacting new protections); CRD Ex. 12

---

[15] New Plaintiffs erroneously claim that the AAR previously admitted that Section 10706 applies
only to rate bureau agreements.  New Opp. at 12.  Those discussions concern the antitrust
*immunity* expressly granted to rate bureau activity in the Reed-Bulwinkle Act of 1948, ch. 491,
62 Stat. 472 (June 17, 1948), which is codified in a wholly different portion of Section 10706,
*see* 49 U.S.C. § 10706(a)(2)(A), and have nothing to do with the evidentiary and inferential
*protections* at issue in this litigation.  *See* New Opp. Ex. 27 at 6-8; *id.* Ex. 28 at 63-65; *id.* Ex. 29
at 53-54.

(William H. Dempsey, *Antitrust and Deregulation: A Railroad Perspective*, 50 ANTITRUST L.J. 363, 377 (1981)).  Section 219's title is therefore no basis for robbing the words "discussion or agreement" of their plain meaning.  *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (the title of a statute "cannot limit the plain meaning of the text[,]" and is useful as an interpretive tool "only when it sheds light on some ambiguous word or phrase") (alterations and quotations omitted).

### B.    Section 10706(a)(3)(B)(ii) Is Not Limited To Regulated Traffic

Plaintiffs wrongly contend that Section 10706(a)(3)(B)(ii) applies only to *regulated* traffic.  This sweeping claim would mean that the discussions and agreements relating to the majority of interline traffic today would be unprotected, plainly frustrating Congress's intention to encourage contract traffic.  But once again, the limitation Plaintiffs read into the statute is not found in the text.  Section 10706(a)(3)(B)(ii) applies to actions or discussions concerning a "rate" or an "interline movement"—not just to actions or discussions concerning *regulated* rates or movements.  Moreover, the statute states that its protections apply in "any proceeding"; it does not state that it applies only in proceedings concerning regulated traffic.

Plaintiffs claim that 49 U.S.C. § 10709(c)(1) makes Section 10706(a)(3)(B)(ii) inapplicable by stating that contracts "authorized by this section . . . shall not be subject to this part."  This Court and the D.C. Circuit previously rejected Plaintiffs' flawed interpretation.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 39-40 (D.D.C. 2008), *aff'd*, *Fayus Enters v. BNSF Ry. Co.*, 602 F.3d 444, 448 (D.C. Cir. 2010).  In *Rail Freight*, this Court rejected the identical argument that Section 10501—which preempts state law remedies—could not apply to contract traffic because it is included in the same "part" as Section 10709(c)(1).  The Court explained that "[r]ead in its entirety" Section 10709(c)(1) "makes clear that Congress

intended it to mean only that the STB has no regulatory authority over contract claims[.]" *Rail Freight*, 593 F. Supp. 2d at 39-40.  The D.C. Circuit affirmed.  *Fayus*, 602 F.3d at 448.

Plaintiffs have no answer.  Opp. 28 n.15.  They ignore the central point made by *Fayus* (and this Court) regarding Section 10709(c)(1)'s scope: "The provision merely limits the *Board's* authority over the terms of private contracts."  602 F.3d at 448.  Nor can Plaintiffs reconcile their interpretation of Section 10709(c)(1) with *Fayus*'s holding that Section 10501, which is contained in the same "part" as Section 10709(c)(1), *does* apply to private contracts for rail transportation.  Finally, *Fayus* rejects *the logic* of what Plaintiffs are claiming.  Just as Section 10709(c)(1) does not remove litigation over contract traffic from the preemption provision in Section 10501, it does not remove litigation over contract traffic from the antitrust protections in Section 10706(a)(3)(B)(ii).

The statutory text confirms that Section 10709(c)(1) has nothing to say about the scope of Section 10706(a)(3)(B)(ii).  First, Section 10709(c)(1) establishes only that certain "contract[s]"—those "with one or more purchasers of rail services," 49 U.S.C. § 10709(a)—and "transportation under such contract[s], shall not be subject to [Part A of Title 49, Subtitle IV]." *Id.* § 10709(c)(1).  The statute therefore exempts certain railroad-shipper contracts from the myriad regulations that otherwise apply to the provision of such services.  But this litigation does not challenge a contract *between a rail carrier and a shipper*; Plaintiffs instead allege an unlawful conspiracy *between rail carriers*.  In this context, Section 10706(a)(3)(B)(ii)'s procedural protections—which say nothing about the terms of a rail carrier's contracts with shippers—are not affected by Section 10709(c)(1).

Second, Section 10709(c)(1) establishes that the railroad-shipper contracts at issue shall not be "*subject to*" the provisions of Part A.  *Id.* (emphasis added).  This means only that such

contracts may not be *regulated by* the provisions of Part A.  *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 547 (D.C. Cir. 2002) (noting that something is "'subject to' a [statutory] regime when it is regulated by, or made answerable under, that regime").  The SRA House Conference Report confirms this point.  H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *100 (noting that Section 208, Section 10709's predecessor, was intended to establish a "separate class of rail service" under private contract, and to exempt such rail service "from all *regulation* and all the *requirements* of the Interstate Commerce Act") (emphasis added)).

New Plaintiffs' citations to cases concerning the Carmack Amendment are consistent

Because Section 10706(a)(3)(B)(ii) does not *regulate* railroad-shipper contracts, or any contracts, it is not affected by Section 10709(c)(1).  In *Totten*, for example, an analogous statute that stated that Amtrak "shall not be *subject to* title 31" did not eliminate a cause of action under the False Claims Act, which is housed in title 31.  *Totten*, 286 F.3d at 547 (emphasis added).  The Court of Appeals explained that this claim survived because Amtrak was not "subject to"— *i.e.*, *regulated by*—the False Claims Act.  *Id.*

New Plaintiffs' citations to cases concerning the Carmack Amendment are consistent with this principle.  New Opp. at 15 n.6.  The Carmack Amendment *does* "regulate[]" carrier liability, and thus *does not* apply to contract movements.  Even the decisions Plaintiffs cite say so.  *See, e.g.*, *ACE USA v. Union Pac. R.R.*,  No. 09-2194-KHV, 2011 WL 3610103, at *2 (D. Kan. Aug. 15, 2011) ("The Carmack Amendment regulates the liability of rail carriers.").  But Section 10706(a)(3)(B)(ii) is unaffected because it is not a regulation governing the terms of rail service, but rather an evidentiary provision that protects rail carriers against unfair inferences.

Finally, Plaintiffs' reading of Section 10709(c)(1) would call into question other provisions of Part A that are well understood to apply to railroads, including with respect to routes covered by contracts.  For example, a railroad is still bound by regulatory rules about the

31

abandonment of lines, 49 U.S.C. § 10903, discriminatory tax treatment, *id.* § 11501, and the preemption of state law remedies, *id.* § 10501, with respect to customers and routes that are purely contract—and all of those provisions appear in Part A of Title 49, Subtitle IV.[16]

### C. Section 10706(a)(3)(B)(ii)'s Protections Are Not Limited To Discussions Or Actions Regarding A *Single* Rate Or A *Particular* Interline Movement

Because Section 10706(a)(3)(B)(ii) uses the word "rate" and the article "an," Plaintiffs contend that the statute's inferential protection is inapplicable if the interline agreement, discussion, or action involved more than *one single* interline rate. Similarly, relying on the phrase "an interline movement," Plaintiffs contend that Section 10706(a)(3)(B)(ii)(II)'s evidentiary protection applies only where the discussion or agreement at issue concerned *one single* interline movement.

Plaintiffs' construction would eviscerate the statute and is inconsistent with the practical realities of interline service. When Section 10706(a)(3)(B)(ii) was enacted, approximately 70 percent of the Class I railroads' carloads involved interline service. CRD Ex. 13 (S. Rep. No. 96-470, at 4, 9 (Dec. 7, 1979) ("S. Rep.")); H.R. Rep. No. 96-1035, 1980 WL 12999, at *41 (May 16, 1980). Today, Defendants handle millions of interline shipments each year and these shipments are governed by countless price authorities. Mot. at 6 n.2. Plaintiffs' notion that interline partners could discuss each interline shipment separately—or that Congress insisted on this impractical result—defies common sense and the legislative history. *See* Section IV.B,

---

[16] Plaintiffs and New Plaintiffs are also wrong in arguing that the STB's exemption orders exempt carriers from all provisions of Part A. New Opp. at 14 & n.4; Opp. at 33-34. In fact, the STB lacks such authority. *See Brae Corp. v. United States*, 740 F.2d 1023, 1055 (D.C. Cir. 1984) ("We thus hold that the Commission's power under section 10505(a) is limited to the power to deregulate; to remove regulatory burdens and to allow the marketplace to influence decisions in the rail industry."). Like Section 10709(c)(1), the exemption orders simply exempt the traffic at issue from the *regulations* under Part A.

*infra*; *c.f. Oak Grove Res., LLC v. Dir., OWCP*, 920 F.3d 1283, 1290-91 (11th Cir. 2019) ("We need not leave our common sense at the doorstep when we interpret a statute[.]") (citations omitted).

Even Plaintiffs previously recognized the illogic of the hardline position they now take. In prior briefing on this subject, Plaintiffs conceded that they were "*not suggesting* that two rail carriers may not discuss multiple movements in a single communication." Pls. Resp. to Defs. Objs. Under 49 U.S.C. § 10706(a)(3)(B)(ii), MDL No. 1869 (Sept. 11, 2012), ECF No. 602, at 8 n.23 (emphasis added). But that is precisely the construction they now advance. Opp. 38.

Although the statute does use the singular form, the ordinary presumption under the Dictionary Act is that "unless the context indicates otherwise . . . words importing the singular include and apply to several persons, parties, or things[.]" 1 U.S.C. § 1. Here, the context is the operations of railroad networks, where practical realities strongly support the conclusion that the use of the singular form was not designed to limit the scope of the statute. Section IV.B, *infra*.

Plaintiffs speculate that the use of the plural form in other subsections of Section 10706 suggests that Congress intentionally selected the singular form in Section 10706(a)(3)(B)(ii). But, again, the Dictionary Act warns against drawing any inferences from the use of the plural form: "unless the context indicates otherwise . . . words importing the plural include the singular[.]" 1 U.S.C. § 1. Plaintiffs place far too much weight on the happenstance of whether Congress selected the plural or singular form.[17]

---

[17] The language of Section 10706(a)(3)(B)(ii) confirms that its use of the singular form does not carry any special significance. Section 10706(a)(3)(B)(ii) applies in any proceeding in which it is alleged that "*a* carrier" was party to "*an* agreement" in violation of "*a* Federal [antitrust] law." Plaintiffs' undue focus on the singular form would incorrectly suggest that a lawsuit involving more than one carrier or more than one alleged antitrust violation is not subject to the statute.

Plaintiffs' construction is also inconsistent with the fact that the statute's evidentiary protection applies to a discussion or agreement that "*concerned*" an interline movement, and the protection against inferences applies to an interline rate or "*related*" matter.  A discussion about two interline movements (or recurring interline movements) would always "concern" or "relate to" one interline movement.  And a discussion regarding an interline movement and some other topic would also relate to one interline movement.  The use of the singular tense does not evidence a genuine Congressional purpose to limit the statute as Plaintiffs suggest.

## IV.   PLAINTIFFS MISCHARACTERIZE THE CONTEXT AND PURPOSE OF THE SRA AND SECTION 10706(a)(3)(B)(ii)

Finally, we turn to Plaintiffs' and New Plaintiffs' attempt to rewrite the history of rail regulation and transform the SRA into a statute aimed solely at *limiting* antitrust protections and thereby "protect[ing] competition, not collusion."  Opp. at 1, 27 & n.14; New Opp. at 1-16.  This invented history ignores the express goal written into the text of the SRA itself:  revitalizing the nation's rail system by reducing regulation.  Section 10706(a)(3)(B)(ii) served that goal by allowing Congress to dismantle the rate bureaus Plaintiffs roundly criticize while still preserving the interline cooperation necessary for railroads to offer competitive service.

### A.   The SRA's Purpose Was To Revitalize The Rail Industry By Reducing Regulatory Burdens

The SRA expressly states its overarching purpose:  "to provide for the restoration, maintenance, and improvement of the physical facilities and financial stability of the rail system of the United States."  SRA § 3.  It embodies Congress's attempt to "revamp[] the structure of railroad regulation in order to restore the industry to health[,]" *Coal Exps. Ass'n of U.S., Inc. v. United States*, 745 F.2d 76, 81 (D.C. Cir. 1984), largely by advancing a new vision of railroad deregulation that favored private contracting over the old, highly-regulated rate bureau system.

Plaintiffs are correct that, to achieve its purpose, the SRA sought to encourage "competition," including among railroads. Opp. at 27. But Congress's primary concern was that rail transportation was no longer competitive against other forms of transportation, like trucking. Congress found that "nearly two-thirds of the Nation's intercity freight is transported by modes of transportation other than railroads[]" and that "earnings by the railroad industry are the lowest of any transportation mode." SRA § 2(5) & (6).

Congress identified burdensome regulations as the primary cause of the industry's competitive disadvantages. *See* SRA §§ 2, 3; *Coal Exps.*, 745 F.2d at 81; H.R. Rep. No. 96-1035, at 115 ("The degree to which railroads are regulated adversely affects their ability to compete with other modes of transportation."); S. Rep. No. 96-470, at 4. In particular, while trucks and barges could adjust their rates in response to changing demand, railroads were "completely regulated" and could not change prices "selectively" or "quick[ly]." H.R. Rep. No. 96-1035, at 117. For this reason, railroads did not have the "ability to be price competitive" with other modes of transportation and had difficulty "capturing and retaining traffic." *Id.* at 115. To cure the problem it diagnosed, Congress sought "to reform Federal regulatory policy" towards the rail industry, SRA § 3(2); *Coal Exporters*, 745 F.2d at 81, and grant railroads "substantially more rate freedom." H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *80.

Two significant reforms are relevant here. First, the SRA explicitly authorized railroads to enter into contracts with shippers, which Congress largely exempted from regulatory oversight. SRA § 208. Second, Congress cut back on the use of rate bureaus, "organizations of carriers" that had long engaged in "collective ratemaking," but that were highly regulated by the ICC. S. Rep. No. 96-470, at 21, 27-28. With the flexibility to set prices in response to market demand, Congress believed the railroads should conduct their price setting outside of the rate

bureau's immunized confines.  *See* S. Rep. No. 96-470, at 11 (noting trade-off between "rate

freedom" and rate bureau immunity); Dempsey, *supra*, at 377.  This shift in activity from highly

regulated rate bureaus to private contracts and rate flexibility was designed to make it easier for

railroads to compete with unregulated competitor industries like trucking.  *See* H.R. Rep. No. 96-

1035, at 40, 115; S. Rep. No. 96-470, at 8.

   **B.    Congress Curtailed *Collective* Ratemaking In The SRA, But It Protected
          *Interline* Ratemaking Through Section 10706(a)(3)(B)(ii)**

   Plaintiffs seize on Congress's actions to phase out collective ratemaking in rate bureaus

to suggest that Congress sought to curtail *all* cooperation and negotiation among railroads.  For

example, New Plaintiffs make the sweeping assertion that Congress and federal agencies "long

considered it unacceptable for railroads to discuss . . . general rate increases *of any kind*[.]"  New

Opp. at 10-11 (emphasis added).  This is flatly incorrect.

   New Plaintiffs conflate two different forms of ratemaking that Congress viewed very

differently and therefore treated very differently in the SRA:  (1) *collective ratemaking* and (2)

*interline rate negotiations*.  The SRA discouraged the former but protected the latter.  Indeed, the

whole point of adding Section 10706(a)(3)(B)(ii) was to *protect* interline ratemaking because it

was essential to the viability of the nation's rail freight network.

   **1.    Plaintiffs Conflate *Collective* Ratemaking With *Interline* Ratemaking**

   Before the SRA, *collective* ratemaking in rate bureaus allowed all railroads to jointly set

prices.  *See* S. Rep. No. 96-470, at 21; *Asphalt Roofing Mfrs. Ass'n v. I.C.C.*, 567 F.2d 994, 999

(D.C. Cir. 1977).  This collective ratemaking was truly collective—it was not limited to the

railroads that actually participated in the movement.  A railroad could thus partake in setting

prices on both single-line and joint-line routes *for which it had no traffic*, including general rate

increases that applied broadly across a territory to substantially all carriers and commodities.  *See*

S. Rep. No. 96-470, at 21.  This was lawful by virtue of antitrust immunity and ICC regulation of rate bureau agreements and rates.  *See* Reed-Bulwinkle Act of 1948, ch. 491, 62 Stat. 472 (June 17, 1948); S. Rep. No. 96-470, at 11 (tying rate-bureau immunity to the fact that "railroads were closely regulated and had little flexibility").

In the SRA, Congress curtailed the collective nature of this practice.  It eliminated collective ratemaking for single-line rates (in which, by definition, only one carrier participates), and it limited joint-line ratemaking to those carriers that "practicably participate[d]" in the movement.  SRA § 219(a).  The history that New Plaintiffs rely on concerns this limitation on collective ratemaking by carriers that were not involved in the traffic at issue.  New Opp. at 10-11.  For example, New Plaintiffs cite Mr. Flexner's testimony about the "issue of *collective* ratemaking and rate bureau functions," New Opp. Ex. 13 (Flexner H. Test at 420) (emphasis added), in which he criticizes "[g]eneral rate increases" that result from "the *collective* power of the rate bureau," *id.* at 425 (emphasis added).  Other testimony from DOJ is in accord.  In the 1978 proceedings concerning one of the major rate bureaus, DOJ expressed concern about "'collective action with respect to single-line rates.'"  New Opp. at 6 (quoting DOJ Reply, WRA, at 2 (Jan. 6, 1978)).  In 1983, DOJ opposed delaying the SRA's "'termination of antitrust immunity for *collective* changes in joint rates through general increases for inflation cost recovery.'"  New Opp. at 10 (quoting DOJ Comments, WRA, at 5-6 (Oct. 17, 1983)) (emphasis added).  The concerns echoed by other agencies are similarly leveled at collective action.  *See* New Opp. at 5 (quoting FTC's concern with "collective ratemaking"); *id.* at 6 (quoting the ICC's concern with "the use of general rate increases . . . to set single-line rates").

But *collective* ratemaking must not be confused with joint ratemaking between *actual interline partners*.  Congress sought to curtail the former, but it placed no limits on the latter.

*See* CRD Ex. 14 (Joint Brief for the ICC and United States at 19, *Am. Short Line R.R. Ass'n v.*
*United States*, No. 84-4023 (2d Cir. May 25, 1984) (explaining that while the SRA ended
"collective action on rail rate increases designed to recover inflation-caused rises in costs,"
railroads remained free to "discuss such increases . . . with their 'direct connectors'")).  As the
ICC explained, as long as railroads "are or could be direct connectors," the SRA allowed them to
"set *all* of" their interline "rates at one meeting."  *W. Railroads-Agreement*, 364 I.C.C. 635, 650
(1981) (emphasis added).  No one then or now contends that antitrust law forbids interline
partners—who are in a vertical relationship—from negotiating joint-line rates.  As Mr. Flexner
explained, agreements on "joint-line rates"—unlike collective ratemaking—"do not involve the
kinds of competitive problems that would raise antitrust issues of liability."  New Opp. Ex. 13
(Flexner H. Test at 421).

  For this reason, New Plaintiffs' repeated assertion that "rail carriers cannot discuss
generally applicable rates and surcharges under the guise of interline rate-setting[]" is
misleading.  New Opp. at 3, 16, 18.  They do not cite any authority applying that broad principle
to bilateral interline discussions.  In fact, the SRA recognized that the many unprofitable joint
rates that plagued the industry in 1980 would be addressed, in part, through "rate increases of
general applicability applicable to the joint rate to which such surcharge applies and agreed to by
all other carriers that are party to such joint rate."  SRA § 217 (codified at 49 U.S.C.
§ 10705a(a)(4) (1990)).[18]  This provision dispels any notion that Congress prohibited interline

---

[18] Section 10705a(a)(4) was part of a broader provision that created an alternative way of
addressing unprofitable joint rates, through unilateral surcharges, should negotiations fail.  It was
removed from the law as part of the ICC Termination Act, by which time the problem of
unprofitable joint rates had abated.  Legislative History of the ICC Termination Act of 1995,
Pub. L. 104-88, 109 Stat. 803 (Dec. 29, 1995) (Section 10705a would be removed because it
"has already achieved its purpose (to provide carriers an avenue of relief from unremunerative
joint rates)").

partners from discussing fuel surcharges, or any other rate increase of general applicability.

    **2.**    <u>Congress Enacted Section 10706(a)(3)(B)(ii) To Ensure Continued</u>
                  <u>Protection For Interline Coordination</u>

Even as the SRA curtailed *collective* ratemaking, it explicitly protected *interline* ratemaking through Section 10706(a)(3)(B)(ii). Congress recognized that in the new system it was establishing, interline rate negotiations would be critical to the industry's continued operation. Indeed, since "most of the property transported by rail move[d] over through routes subject to joint rates," H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *111; *see also* S. Rep. No. 96-470, at 12; H.R. Rep. No. 96-1035, at 41, interline coordination would be widespread.

Congress realized that by phasing out rate-bureau antitrust immunity *while* simultaneously encouraging collaboration among interline partners, rail carriers would face a crushing and dangerous risk of antitrust lawsuits based on their interline cooperation. *See* H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *114 ("Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange."). The Conference Report's reference to "false[ ]conclusions about rate agreements that were lawfully discussed[,]" *id*., is about the reality (especially forty years ago) that antitrust cases sometimes get to a jury "upon little more than uniform behavior among competitors[]" combined with "other conduct that in context suggests that each competitor failed to make an independent decision." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) (citing cases and sources from the 1930s through the 1980s). "To prevent" false conclusions from interline coordination, Congress enacted the "procedural protections" in Section 10706(a)(3)(B)(ii). H.R. Conf. Rep. No. 96-1430, 1980 WL 13000, at *114. It is therefore not the case, as Plaintiffs argue, that the elimination of collective ratemaking by rate bureaus implies a Congressional purpose to limit interline coordination as well. Rather, the

39

dismantling of the rate bureau system and a future of increasing interline coordination required Section 10706(a)(3)(B)(ii).  *See* Dempsey, *supra*, at 377 ("While the railroads were willing to trade rate bureau protection for ratemaking flexibility, we did insist that in removing collective ratemaking immunity, some protection had to be found against the application of conscious parallelism plus.").

The DOJ recognized this at the time as well.  In a contemporaneous ICC proceeding known as *Western Railroads-Agreement*, 364 I.C.C. 1, 1 (1980), in which railroads had sought protection from the ICC on the ground that their joint-line discussions exposed them to unwarranted inferences of antitrust liability, the DOJ commented that the additional antitrust protection sought by the railroads was unnecessary because Congress had "specifically and thoroughly addresse[d]" the railroads' antitrust concerns by enacting Section 10706(a)(3)(B)(ii).  New Opp. Ex. 19 (Comments of the U.S. Dep't of Justice, *Western Railroads–Agreement,* Section 5b Appl. No. 2, at 8-9 (I.C.C. Nov. 26, 1980)).[19]

There is, accordingly, no contradiction between SRA deregulation and Section 10706 protections for interline discussions and agreements.  They were intended to go hand-in-hand.

## V.    CONCLUSION

This is not a choice between Plaintiffs' interpretation and "immunity" for the railroads. Defendants' framework is drawn directly from the statute, and merely asks the Court to apply the statute in a straightforward manner that is consistent with the statutory language and Congress's expressed intent.  For the reasons expressed above, Defendants' motion should be granted.

---

[19] Following his departure from DOJ, Mr. Flexner wrote an article to this same effect.  He explained:  "Because carriers need to consult about rates on interline movements in which they interchange, Congress included in the act what is described as a 'procedural protection' for carriers."  CRD Ex. 15 (Donald L. Flexner & Richard M. Mathias, *Antitrust Immunity, Rate Setting Altered by Rail Act*, LEGAL TIMES 10 (Dec. 1, 1980).

Dated:  May 15, 2020                                       Respectfully submitted,


*/s/ Daniel M. Wall*                                       Tyrone R. Childress
Daniel M. Wall                                             JONES DAY
Timothy L. O'Mara                                          555 South Flower Street, 50th Floor
Christopher B. Campbell                                    Los Angeles, CA 90071-2300
LATHAM & WATKINS LLP                                       Telephone: (213) 489-3939
505 Montgomery Street, Suite 2000
San Francisco, CA 94111                                    Matthew M. Collette (D.C. Bar No. 427617)
Telephone: (415) 391-0600                                  MASSEY & GAIL LLP
                                                           10001 Maine Ave. SW Ste. 450
Allyson M. Maltas (D.C. Bar No. 494566)                    Washington, DC 20024
LATHAM & WATKINS, LLP                                      Telephone: (202) 795-3326
555 Eleventh Street, NW
Suite 1000                                                 Leonard A. Gail
Washington, D.C. 20004-1304                                MASSEY & GAIL LLP
Telephone: (202) 637-2200                                  50 E. Washington St., Ste 400
allyson.maltas@lw.com                                      Chicago, IL 60602
                                                           Telephone:  (312) 379-0470


*Counsel for Defendant Union Pacific Railroad Company*


*/s/ Kent A. Gardiner*
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  (202) 624-2500


*Counsel for Defendant CSX Transportation, Inc.*


*/s/ Tara L. Reinhart*
Tara L. Reinhart (D.C. Bar No. 462106)                     Saul P. Morgenstern
SKADDEN, ARPS, SLATE,                                      Jennifer B. Patterson
MEAGHER & FLOM LLP                                         ARNOLD & PORTER KAYE SCHOLER LLP
1440 New York Avenue, N.W.                                 250 West 55th Street
Washington, DC 20005                                       New York, NY 10075
Telephone: (202) 371-7000                                  Telephone: (212) 836-8000
tara.reinhart@skadden.com                                  saul.morgenstern@arnoldporter.com
                                                           jennifer.patterson@arnoldporter.com


*Counsel for Defendant Norfolk Southern Railway Company*

*/s/ Glenn D. Pomerantz*
Glenn D. Pomerantz
Kuruvilla J. Olasa
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone:  (213) 683-9100

Samuel M. Sipe, Jr. (D.C. Bar No. 256446)
Linda Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone:  (202) 429-3000

Veronica S. Lewis
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201
Telephone:  (214) 698-3100

Benjamin J. Horwich
Emily Curran-Huberty
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105
Telephone:  (415) 512-4000

Joshua H. Soven (D.C. Bar No. 436633)
WILSON SONSINI GOODRICH &
ROSATI LLP
1700 K Street NW
Washington, DC  20006
Telephone:     (202) 973-8827

*Counsel for Defendant BNSF Railway Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel M. Wall, certify that on May 15, 2020, I caused a true and correct copy of the foregoing documents and the Reply Declaration of Christopher Campbell in support thereof to be served (1) by secured transfer on all counsel of record in the above-captioned matter; (2) by secured transfer on counsel for plaintiff in *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Company*, No. 11-cv-1049; and (3) by secured transfer on counsel for plaintiffs in cases consolidated as *In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, MDL No. 2925, No. 1:20-mc-00008, in which an appropriate protective order has been entered.

Dated: May 15, 2020                              Respectfully Submitted,


                                                 /s/ *Daniel M. Wall*
                                                 Daniel M. Wall
                                                 LATHAM & WATKINS LLP
                                                 505 Montgomery Street, Suite 2000
                                                 San Francisco, CA 94111
                                                 Telephone: (415) 391-0600

                                                 Allyson M. Maltas (D.C. Bar No. 494566)
                                                 LATHAM & WATKINS, LLP
                                                 555 Eleventh Street, NW
                                                 Suite 1000
                                                 Washington, D.C. 20004-1304
                                                 Telephone: (202) 637-2200
                                                 allyson.maltas@lw.com

                                                 *Counsel for Defendant Union Pacific Railroad Company*