# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | |
| | MDL Docket No. 1869 |
| | Miscellaneous No. 07-00489 (PLF/GMH) |
| This Document Relates To: | |
| ALL CASES | |
| OXBOW CARBON & MINERALS LLC, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 11-1049 (PLF/GMH) |
| UNION PACIFIC RAILROAD CO., et al., | |
| Defendants | Judge: Hon. Paul L. Friedman |

### STATEMENT OF INTEREST FOR THE UNITED STATES IN SUPPORT OF NO PARTY REGARDING THE MEANING OF 49 U.S.C. § 10706(a)(3)(B)(ii)

MAKAN DELRAHIM
*Assistant Attorney General*
*Antitrust Division*
(D.C. Bar No. 457795)

BERNARD A. NIGRO, JR.
*Principal Deputy Assistant Attorney General*
(D.C. Bar No. 412357)

MICHAEL F. MURRAY
*Deputy Assistant Attorney General*
(D.C. Bar No. 1001680)

TAYLOR M. OWINGS
*Counsel to the Assistant Attorney General*
(D.C. Bar No. 1031064)

DANIEL E. HAAR
ROBERT B. NICHOLSON
(D.C. Bar No. 55772)
BRYAN J. LEITCH
(D.C. Bar No. 1016484)
*Attorneys*
*United States Department of Justice,*
*Antitrust Division*

U.S. Department of Justice
950 Pennsylvania Avenue, NW Suite 3224
Washington, DC  20530
Telephone: (202) 335-9366
Email: Bryan.Leitch@usdoj.gov

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... vii

STATUTORY PROVISION ................................................................................................ vii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

ARGUMENT ......................................................................................................................... 5

I.   SECTION 10706(a)(B)(ii) APPLIES "IN ANY PROCEEDING" WHERE
     CARRIERS ALLEGEDLY VIOLATED THE ANTITRUST LAWS—IT IS NOT
     LIMITED TO CASES INVOLVING ONLY REGULATED TRAFFIC ............................... 5

II.  SECTION 10706(a)(B)(ii)(II) EXCLUDES ONLY EVIDENCE OF LAWFUL
     DISCUSSIONS, AGREEMENTS, RATES, AND MATTERS CONCERNING
     INTERLINE TRAFFIC AMONG THE PARTICIPATING CARRIERS .............................. 6

     A.  A Discussion Or Agreement Among Participating Carriers About Their Shared
         Interline Traffic Must Be Limited To That Subject For It To "Concern[] An
         Interline Movement Of The Rail Carrier" .......................................................... 7

         1.  The term "concerned" in this context means "to be about," such that the
             discussion or agreement cannot concern local traffic ................................... 7

         2.  The phrase "an interline movement of the rail carrier" means that the discussion
             or agreement must be limited to the participating carriers' interline traffic .............. 10

     B.  The Statute Requires The Court To Judge The Legality Of The Entirety Of Each
         "Discussion Or Agreement" Shown By The Evidence ..................................... 16

         1.  Evaluating the legality of each item of evidence in isolation would create a
             direct-evidence limitation that contravenes the statutory text and confers a
             de facto antitrust immunity that Congress did not intend ........................... 17

         2.  Even a "discussion or agreement" that "concerned an interline movement of the
             rail carrier" may violate the antitrust laws "by itself" because anticompetitive
             impact cannot be ignored ........................................................................ 20

CONCLUSION.................................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................................. 1

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Chiropractic Association v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) ................................................................. 20

*American Petroleum Institute v. EPA*,
  198 F.3d 275 (D.C. Cir. 2000) ................................................................. 8

*American Short Line Railroad Association v. United States*,
  751 F.2d 107 (2d Cir. 1984).................................................................... 2

*Association of American Railroads v. Surface Transportation Board*,
  237 F.3d 676 (D.C. Cir. 2001) ................................................................. 2

*Babb v. Wilkie*,
  140 S. Ct. 1168 (2020)........................................................................... 17

*Carter v. United States*,
  530 U.S. 255 (2000)................................................................................. 5

*Coal Exporters Association of the United States, Inc. v. United States*,
  745 F.2d 76 (D.C. Cir. 1984) ................................................................... 2

*County of Maui v. Hawaii Wildlife Fund*,
  140 S. Ct. 1462 (2020)............................................................................. 6

*Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*,
  654 F. Supp. 1195 (N.D.N.Y. 1987)........................................................ 3

*Fayus Enterprises v. BNSF Railway Co.*,
  602 F.3d 444 (D.C. Cir. 2010) ................................................................. 6

*Flintkote Co. v. Lysfjord*,
  246 F.2d 368 (9th Cir. 1957) ................................................................. 18

*Georgia v. Pennsylvania Railroad Co.*,
  324 U.S. 439 (1945)............................................................................... 13

*Grecian Magnesite Mining, Industrial & Shipping Co. v. Commissioner IRS*,
  926 F.3d 819 (D.C. Cir. 2019)............................................................... 17

*Hertz Corp. v. Friend*,
  559 U.S. 77 (2010)................................................................................... 9

*In re High Fructose Corn Syrup Antitrust Litigation*,
  295 F.3d 651 (7th Cir. 2002) ................................................................. 18

*In re Pretrial Proceedings in Petroleum Products Antitrust Litigation*,
  906 F.2d 432 (9th Cir. 1990) ................................................................. 19

*In re Montreal Maine & Atlantic Railway, Ltd.*,
  953 F.3d 29 (1st Cir. 2020) ................................................................... 15

*Jefferson County Pharmaceutical Association, Inc. v. Abbott Labs.*,
  460 U.S. 150 (1983) ............................................................................... 19

*Latin America/Pacific Coast Steamship Conference v. Federal Martime Commission*,
  465 F.2d 542 (D.C. Cir. 1972) ................................................................. 4

*Lawlor v. National Screen Service Corp.*,
  349 U.S. 322 (1955) ................................................................................. 4

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ............................................................................... 23

*Logan v. United States*,
  552 U.S. 23 (2007) ................................................................................. 19

*McDonnell v. United States*,
  136 S. Ct. 2355 (2016) ............................................................................ 8

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ............................................................................... 24

*Motor Carrier Bureaus*,
  2007 WL 2946673 (S.T.B. May 4, 2007) ............................................... 16

*National Gerimedical Hospital v. Blue Cross of Kansas City*,
  452 U.S. 378 (1981) ............................................................................... 19

*\*NCAA v. Board of Regents*,
  468 U.S. 85 (1984) ........................................................................... 22, 23

*Nichols v. United States*,
  136 S. Ct. 1113 (2016) .......................................................................... 10

*Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*,
  394 U.S. 700 (1969) ............................................................................... 18

*Northern Pacific Railway Co. v. United States*,
  356 U.S. 1 (1958) .................................................................................... 4

*Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*,
   81 F. Supp. 3d 1 (D.D.C. 2015) .................................................................. 18

*\*Polygram Holding, Inc. v. FTC*,
   416 F.3d 29 (D.C. Cir. 2005) .................................................................... 14

*Radovich v. NFL*,
   352 U.S. 445 (1957) ................................................................................... 4

*Ransom v. FIA Card Services, N.A.*,
   562 U.S. 61 (2011) ..................................................................................... 9

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ................................................................................. 24

*Rotkiske v. Klemm*,
   140 S. Ct. 355 (2019) ................................................................................. 8

*Society of Plastics Industry, Inc. v. ICC*,
   955 F.2d 722 (D.C. Cir. 1992) ................................................................... 2

*Starr v. Sony BMG Music Entertainment*,
   592 F.3d 314 (2d Cir. 2010) ..................................................................... 14

*Stokeling v. United States*,
   139 S. Ct. 544 (2019) ................................................................................. 9

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
   566 U.S. 560 (2012) ................................................................................... 8

*Texaco, Inc. v. Dagher*,
   547 U.S. 1 (2006) ..................................................................................... 14

*Thryv, Inc v. Click-To-Call Technologies, LP*,
   140 S. Ct. 1367 (2020) ............................................................................... 8

*\*United States v. Bessemer & Lake Erie Railroad Co.*,
   717 F.2d 593 (D.C. Cir. 1983) ................................................................. 10

*United States v. Consolidated Packaging Corp.*,
   575 F.2d 117 (7th Cir. 1978) ................................................................... 18

*United States v. Gosselin World Wide Moving, N.V.*,
   411 F.3d 502 (4th Cir. 2005) ................................................................. 7, 9

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ............................................................................. 17, 18

*Validus Reinsurance, Ltd. v. United States*,
  786 F.3d 1039 (D.C. Cir. 2015) ........................................................... 12, 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*,
  139 S. Ct. 361 (2018) ................................................................................. 11

**Statutes**

28 U.S.C. § 517 ................................................................................................ vi

49 U.S.C. § 10703 ........................................................................................... 13

49 U.S.C. § 10706(a) ............................................................................... passim

49 U.S.C. § 10709 .................................................................................. 3, 6, 13

49 U.S.C. § 10701(d) ........................................................................................ 3

**Legislative Materials**

126 Cong. Rec. 28,431 (Sept. 30, 1980) ........................................................ 2

H.R. 1430, 96th Cong., 79-80, 113-14 (1980) ........................... 3, 11, 12, 19

**Other Authorities**

14A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1410c (4th ed. Aug. 2019) ............ 18

Association of American Railroads, AAR Accounting Rules (July 2019),
  https://public.railinc.com/sites/default/files/documents/RAR.pdf ..................................... 14, 15

*Black's Law Dictionary* (5th ed. 1979) ....................................................... 20

13 C.J.S. Carriers § 137 (Mar. 2020) ........................................................... 15

DOJ Comments, *W. Railroads-Agreement*, Section 5b App. No. 2, (I.C.C. Nov. 26, 1980) ....... 11

DOJ & FTC, *Antitrust Guidelines for Collaborations Among Competitors* (2000),
  https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-
  antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf ...................... 23

*Elgin, Joliet & Eastern Railway Co.*,
  No. AB-117, 1993 WL 29280 (I.C.C. DCSS Feb. 2, 1993) ................................... 15

Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* (2016) ................ 10

Russell Pittman, *Options For Restructuring The State-Owned Monopoly Railway*,
  *in* Railroad Economics 182 (2007) ....................................................... 13

*Policy Alternatives to Increase Competition in the Railroad Industry*,
No. 688, 2009 WL 996819 (S.T.B. Apr. 14, 2009) ................................................................ 15

Railinc, Guide For Railroads (Jan. 2018),
https://public.railinc.com/sites/default/files/documents/GuideforRailroads.pdf ............... 14, 15

Railinc, REN Web Certification Manual (Feb. 2013),
https://public.railinc.com/sites/default/files/documents/Ren_WebCertificationGuide.pdf.14, 15

*Webster's Third New International Dictionary* (1976) ........................................................ 7, 20

*Western Railroads-Agreement*, 364 I.C.C. 635, 646-51 (1981) .................................................. 11

22 Wright & Miller, *Federal Practice & Procedure* § 5162.1 (2d ed. April 2020) ..................... 17

## PRELIMINARY STATEMENT

In response to this Court's Order of March 16, 2020, and after consulting with the Federal Trade Commission, the Surface Transportation Board, and the Department of Transportation, the United States submits this statement of interest, pursuant to 28 U.S.C. § 517, to address the meaning of 49 U.S.C. § 10706(a)(3)(B)(ii).  The United States takes no position as to whether the Court should grant or deny defendants' motion invoking that provision in this case.[1]

## STATUTORY PROVISION

The principal statutory provision addressed in this statement of interest is 49 U.S.C. § 10706(a)(3)(B)(ii), which provides that—

> In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic.  In any proceeding in which such a violation is alleged, evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement—
>
> > (I) was in accordance with an agreement approved under paragraph (2) of this subsection; or
> >
> > (II) concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.
>
> In any proceeding before a jury, the court shall determine whether the requirements of subclause (I) or (II) are satisfied before allowing the introduction of any such evidence.

49 U.S.C. § 10706(a)(3)(B)(ii).

---

[1] The United States is willing and able to appear at the hearing scheduled for August 26, 2020, and to participate in what manner the Court may deem useful.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The text, history, and purpose of 49 U.S.C. § 10706 show that subsection (a)(3)(B)(ii) applies in cases involving regulated and unregulated rail traffic alike, and that it excludes only evidence of lawful discussions and agreements among rail carriers, as well as resulting rates and other actions, which concern those carriers' shared interline traffic—conduct that does not directly eliminate competition among substitute routes. This is what the statute means when it says that, "[i]n any proceeding" where rail carriers allegedly violated the antitrust laws, evidence of a "discussion or agreement" will be excluded if the "discussion or agreement concerned an interline movement of the rail carrier" and "would not, considered by itself, violate the [antitrust] laws." 49 U.S.C. § 10706(a)(3)(B)(ii)(II). The statute, therefore, does not protect carriers from evidence that, when viewed in context, shows that they used individual communications about an interline movement to set prices collectively for competing interline and local traffic—concerted action that directly eliminates price competition among potentially substitute movements. A contrary reading of the statute has little to commend it and nothing to compel it.

The critical question is how broadly the court should look to understand the nature of the "discussion or agreement" before deciding whether it is lawful, and therefore subject to exclusion. Defendants urge too narrow a scope (focusing on discrete items of evidence in isolation), whereas plaintiffs look too broadly (focusing on allegations of an industry-wide conspiracy). The correct approach is to determine the scope of the pertinent discussion or agreement based on the evidentiary context of the interline communications at issue. For example, a communication between two carriers limited to their interline traffic, with no indication that it is part of an overarching conspiracy, would likely be an inadmissible "discussion or agreement" under Section 10706(a)(3)(B)(ii)(II). By contrast, if the context of this exchange showed that it advanced

1

a broader conspiracy—whether based on the content of the conversation or its surrounding circumstances—then the exchange may constitute an admissible "discussion or agreement."

Congress enacted Section 10706(a)(3)(B)(ii) in the Staggers Rail Act of 1980,[2] as one of the first steps in a decades-long effort to foster price competition in the rail industry.  Between 1976 and 1995, Congress passed a series of reforms to minimize rate regulation and to require the rail industry to operate like other competitive industries.[3]  *See Ass'n of Am. Railroads v. Surface Transp. Bd.*, 237 F.3d 676, 677-79 (D.C. Cir. 2001).  The Staggers Act was a centerpiece of this effort:  "In enacting the Staggers Act, Congress announced a new rail transportation policy which mandated, in part, that competition and demand for services be allowed to establish rates to the maximum extent possible and that federal regulatory control be minimized."  *Soc'y of Plastics Indus., Inc. v. ICC*, 955 F.2d 722, 729-30 (D.C. Cir. 1992).  Congress intended the Staggers Act not simply "to revitalize the railroad industry," *Coal Exporters Ass'n of U.S., Inc. v. United States*, 745 F.2d 76, 80 (D.C. Cir. 1984), but to do so through "the interaction of competitive forces" and "individual pricing mechanisms, rather than through collective ratemaking," *Am. Short Line R.R. Ass'n v. United States*, 751 F.2d 107, 110-14 (2d Cir. 1984).  As Representative Staggers explained, the Act was "intended to send a message" that "the American railroad industry" should be treated "as any other business, which is best 'regulated' by the marketplace."  126 Cong. Rec. 28,431 (Sept. 30, 1980) (Staggers) (declaring a "new and permanent reliance on competition").

The Staggers Act's reforms were prompted in large part by carriers' complaints that excessive regulation had deprived them of the pricing flexibility needed to compete with other

---

[2] Pub. L. 96-448, § 219(c)(3), 94 Stat. 1927 (Oct. 14, 1980) (originally codified as 49 U.S.C. § 10706(a)(3)(C)(ii) (1980)).

[3] Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), Pub. Law No. 94-210, 90 Stat. 31; ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

modes of transportation.  *See* H.R. Conf. Rep. No. 1430, 96th Cong., at 79-80 (Sept. 29, 1980).

Responding to those concerns, Congress narrowed the authority of federal agencies to invalidate

unreasonable rates, and it authorized carriers to provide service through independent contracts

privately negotiated with shippers.  49 U.S.C. §§ 10701(d), 10709.  In granting flexibility and

independence, however, Congress withdrew much of the antitrust immunity carriers previously

enjoyed to set regulated rates collectively through "rate bureaus."  *See id.* § 10706(a)(3)(A).

Congress made clear that, in the absence of regulatory oversight, carriers' pricing decisions must

be determined by market forces and subject to antitrust scrutiny.  *See Delaware & Hudson Ry. Co.*

*v. Consol. Rail Corp.*, 654 F. Supp. 1195, 1200 (N.D.N.Y. 1987) ("The deregulation contained in

the Staggers Act exposed rail carriers to all kinds of market forces, including the antitrust laws.").

Congress also made clear, at the same time, that carriers would not face antitrust exposure

simply for communicating about lawful interline traffic.  *See* H.R. Conf. Rep. No. 1430, at 113-

14.  In Section 10706(a)(3)(B)(ii), Congress clarified that proof of conspiracy "may not be inferred

from evidence that two or more rail carriers acted together with respect to an interline rate or

related matter and that a party to such action took similar action with respect to a rate or related

matter on another route or traffic."  49 U.S.C. § 10706(a)(3)(B)(ii).

Congress also restricted "evidence of a discussion or agreement between or among such

rail carrier and one or more other rail carriers, or of any rate or other action resulting from such

discussion or agreement," when (I) the discussion or agreement "was in accordance with an

agreement approved under" 49 U.S.C. § 10706(a)(2); or (II) the discussion or agreement

"concerned an interline movement of the rail carrier," and "would not, considered by itself, violate

the [antitrust] laws."  *Id.*  This provision applies "[i]n any proceeding in which it is alleged that a

carrier was a party to an agreement, conspiracy, or combination in violation of [antitrust law]," *id.*,

and is not limited to cases involving only regulated traffic.  Similarly, the statute does not exclude all circumstantial evidence that carriers violated the antitrust laws simply because the evidence reveals a discussion or agreement related in some way to interline traffic.  Congress made clear before the statute's enactment, and the executive branch confirmed soon afterwards, that Section 10706(a)(3)(B)(ii)(II) excludes only lawful discussions or agreements among rail carriers about interline traffic that they directly handle.  Nothing in the statute or its history suggests that it bars circumstantial evidence where the context of the communication shows that carriers fixed rates for local or interline shipments in which they did not participate—and which potentially competed against service over their own lines.

The legal and historical backdrop of the Staggers Act reinforces this analysis.  Recognizing that antitrust law provides "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958), courts have long interpreted statutes and other legal rules to preserve the efficacy of the antitrust laws, *Latin Am./Pac. Coast S.S. v. Fed. Mar. Comm'n*, 465 F.2d 542, 552 (D.C. Cir. 1972) ("[A]mbiguities, if any, should be resolved in favor of free competition."); *see Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328-29 (1955) (rejecting claim preclusion theory that "would in effect confer on [defendants] a partial immunity," contrary to "the public interest in vigilant enforcement of the antitrust laws").  That rule has particular salience here.  An expansive reading of Section 10706(a)(3)(B)(ii)(II) would exclude critical evidence of antitrust violations, giving carriers greater protection from the antitrust laws as their schemes become more complex and multifaceted.  Congress did not unambiguously mandate such protections in Section 10706(a)(3)(B)(ii)(II), and they should not be created by implication.  *See Radovich v. NFL*, 352 U.S. 445, 453-54 (1957) (holding that, because "Congress itself has placed the private

4

antitrust litigant in a most favorable position," courts "should not add requirements to burden the private litigant beyond what is specifically set forth by Congress").

## ARGUMENT

**I.** **SECTION 10706(a)(B)(ii) APPLIES "IN ANY PROCEEDING" WHERE CARRIERS ALLEGEDLY VIOLATED THE ANTITRUST LAWS—IT IS NOT LIMITED TO CASES INVOLVING ONLY REGULATED TRAFFIC**

The text and structure of Section 10706(a)(3)(B)(ii) foreclose plaintiffs' theory that the statute applies only to antitrust cases involving "regulated" traffic, but that it does not apply to suits involving "unregulated" traffic (*i.e.*, contract or exempt traffic). Pls.' Opp'n at 25-29; New Pls.' Opp'n at 11-16.[4] By its terms, Section 10706(a)(3)(B)(ii) applies "[i]n *any* proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of [antitrust law]," which necessarily includes unregulated traffic. 49 U.S.C. § 10706(a)(3)(B)(ii) (emphasis added). The statute, in fact, expressly contemplates application to both regulated and unregulated traffic, covering discussions or agreements about regulated traffic in Subclause (I) (*i.e.*, those "in accordance with an agreement approved under [49 U.S.C. § 10706(a)(2)]"), and covering discussions or agreements about traffic that could be regulated *or* unregulated in Subclause (II) (*i.e.*, those that "concerned an interline movement of the rail carrier" and that "would not, considered by itself, violate the [antitrust] laws"). *Id.*

Plaintiffs' counterarguments lack merit. Section 10706(a)(3)(B)(ii)'s original heading, "Rate Bureaus," cannot change the fact that its plain text unambiguously covers "any proceeding." *See Carter v. United States*, 530 U.S. 255, 267 (2000) ("The title of a statute is of use only when it sheds light on some ambiguous word or phrase in the statute itself." (internal quotation marks,

---

[4] All citations of the parties' filings refer to the redacted, publicly filed versions of those briefs. *See* No. 07-00489, Dkt. 945 (Defs.' Br.); Dkt. 958 (Pls.' Opp'n); Dkt. 964 (Reply Br.); *see also* No. 11-1049, Dkt. 193 (New Pls.' Opp'n).

brackets omitted)).  Nor is Section 10706(a)(3)(B)(ii) limited by Section 10709(c)'s directive that private contracts, and transportation under such contracts, "shall not be subject to" Part A of Subtitle IV of Title 49, where Section 10706 is codified.  49 U.S.C. § 10709(c).  Section 10709(c) "merely limits the *Board's* authority over the terms of private contracts," *Fayus Enterprises v. BNSF Ry. Co.*, 602 F.3d 444, 448 (D.C. Cir. 2010), but it does not exempt *evidence* from Section 10706(a)(3)(B)(ii) simply because it pertains to unregulated contract traffic. Section 10709 would have, in any event, been a remarkably oblique way to achieve the simple goal of limiting Section 10706(a)(3)(B)(ii) to regulated traffic, and Congress generally does not choose such an "indirect route to convey an important and easily expressed message," *Cty. of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020) (internal quotation marks omitted).

## II.    SECTION 10706(a)(B)(ii)(II) EXCLUDES ONLY EVIDENCE OF LAWFUL DISCUSSIONS, AGREEMENTS, RATES, AND MATTERS CONCERNING INTERLINE TRAFFIC AMONG THE PARTICIPATING CARRIERS

Rail carriers must satisfy two requirements to exclude evidence of conspiracy under 49 U.S.C. § 10706(a)(3)(B)(ii)(II).  *First*, they must establish that the evidence shows a discussion or agreement that "concerned an interline movement of the rail carrier."  *Id.*  This condition is not satisfied by evidence of a discussion or agreement about prices for all shipments, without regard to whether the shipments were interline or local and without regard to whether the carriers participated in the shipments.  *Second*, carriers must establish that the evidence shows a "discussion or agreement" that "would not, considered by itself, violate the [antitrust] laws."  *Id.* This condition is not met merely because an individual piece of evidence fails to prove directly the anticompetitive nature of the discussion or agreement on its own.

The statute's text and structure make clear that the burden falls on carriers to satisfy these requirements.  Section 10706(a)(3)(B)(ii) provides that, in jury cases, "the court shall determine

whether the requirements of subclause (I) or (II) are satisfied before allowing the introduction of any such evidence." *Id.* The "requirements" referred to in that provision are requirements for *inadmissibility*, prefaced by the phrase "shall not be admissible if," *id.*, and it would be anomalous to require plaintiffs, as the proponents of the evidence, to prove conditions for inadmissibility. The disjunctive phrase, "subclause (I) *or* (II) are satisfied," supports the same reading. Had Congress intended to place the burden on plaintiffs, it would have demanded a showing that "the requirements of subclause (I) *and* (II) are *not* satisfied." Yet Congress did not write the statute that way, and Section 10706(a)(3)(B)(ii), as enacted, is best read as placing the burden on carriers to justify exclusion of otherwise admissible evidence.

### A.   A Discussion Or Agreement Among Participating Carriers About Their Shared Interline Traffic Must Be Limited To That Subject For It To "Concern[] An Interline Movement Of The Rail Carrier"

#### 1.   The term "concerned" in this context means "to be about," such that the discussion or agreement cannot concern local traffic

To be excluded under Section 10706(a)(3)(B)(ii)(II), the evidence must show a discussion or agreement that "concerned an interline movement of the rail carrier." The statute uses "concerned" in the sense of "about," meaning that a discussion or agreement "concerned an interline movement of the rail carrier" when that was its point or purpose. *Webster's Third New Int'l Dictionary* 470 (1976) (defining "concern" in part as "be about"). A discussion or agreement that involves local traffic or interline traffic where the parties do not interchange—or that is ambiguous and could "concern" either type of traffic—cannot be excluded under the statute. *See United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502, 510 (4th Cir. 2005) (holding that "defendants' collusive effort" did not "*concern*" a "foreign inland segment" because it "was aimed at the entire through transportation market, rather than just the foreign inland segment").

Though "concerned" sometimes means "related to" (*see* Defs.' Br. 15), it has a more precise meaning in this context, as ordinary usage confirms. *See McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) (holding that "context" resolves "competing definitions").  No one ordinarily would say, for example, that a Ponzi scheme "concerned" the payment of money to investors, or that World War II "concerned" a beach in Normandy.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) ("That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense.").  In construing Section 10706(a)(3)(B)(ii)(II), it would be equally unnatural to say that an agreement among rival carriers to fix *all* rates "concerned an interline movement of the rail carrier," even if the former may relate to the latter in theory.  *See* 49 U.S.C. § 10706(a)(3)(B)(ii)(II).  That is particularly so since Congress knew how to say "related to," *see id.* § 10706(a)(3)(A)(ii), and yet chose a narrower term in subsection (a)(3)(B)(ii)(II).  *See Thryv, Inc v. Click-To-Call Techs., LP*, 140 S. Ct. 1367, 1376 (2020) ("[A] departure in language suggests a departure in meaning."); *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.").

Equally pertinent is the regulatory context of this statute.  The rail freight industry involves two, mutually exclusive types of "movements"—interline and local—with different competitive dimensions.  Section 10706(a)(3)(B)(ii)(II) thus addresses a binary subject, and by limiting the statute to discussions or agreements that "concerned an *interline* movement," Congress necessarily excluded discussions or agreements pertaining to *local* movements.  *See Am. Petroleum Inst. v. EPA*, 198 F.3d 275, 278 (D.C. Cir. 2000) ("[I]f Congress makes an explicit provision for apples, oranges and bananas, it is most unlikely to have meant grapefruit.").  Otherwise, the word "interline" serves no purpose; the statute would have the same meaning if it said, "concerned rail

movement[s]."  But that is not how Congress wrote this provision, and courts "must give effect to every word of a statute wherever possible."  *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 65, 70 (2011) (declining to read the phrase "applicable monthly expense amounts" such that Congress "could have omitted the term 'applicable' altogether").

Interpreting "concerned" to mean "*directly* related to" or "*substantially* related to" fares no better.  Besides having no basis in the statutory text, this reading would mire courts in a series of imponderable line-drawing problems about the directness or substantiality of a communication's relation to interline traffic (*e.g.*, would an email chain among rival carriers discussing local rates be sufficiently related to "an interline movement" if it also mentioned interline traffic?).  Such inquiries do not lend themselves to consistent, principled decision-making, and courts do not read unworkable standards into statutes when they are not textually compelled.  *See, e.g.*, *Stokeling v. United States*, 139 S. Ct. 544, 554 (2019) (rejecting reading that created an "indeterminable line-drawing exercise"); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Complex tests produce appeals and reversals, encourage gamesmanship, and, again, diminish the likelihood that results and settlements will reflect a claim's legal and factual merits.").

Here, the only reading of "concerned" that is both textually sound and practicably administrable is one that limits Section 10706(a)(3)(B)(ii)(II) to discussions and agreements that "concerned an interline movement"—but that do not also "concern[]" local traffic.  *See Gosselin*, 411 F.3d at 510 (holding an agreement "concern[s]" a "foreign inland segment" when it involves "*just* the foreign inland segment" (emphasis added)).  Carriers, after all, control the content of their discussions and agreements, and they can ensure that those communications are protected under Section 10706(a)(3)(B)(ii)(II) by limiting them to interline traffic with participating carriers.  But what carriers cannot do is rewrite the statutory language—"concerned an interline movement"—

9

to mean "[related to] [any] interline movement[s] [and/or local traffic]."  That "is not a construction of a statute"; it is "an enlargement of it," which "transcends the judicial function."  *Nichols v. United States*, 136 S. Ct. 1113, 1118 (2016) (internal quotation marks omitted).

The historical context of the Staggers Act bolsters this conclusion.  In construing "concerned," care is needed to prevent Section 10706(a)(3)(B)(ii)(II) from giving carriers greater protection than they would have had under the pre-Staggers Act immunity regime, which did not excuse anticompetitive conduct based on a mere relation to immunized rate-setting.  *See United States v. Bessemer & Lake Erie R.R. Co.*, 717 F.2d 593, 601 (D.C. Cir. 1983).  As the D.C. Circuit explained, although carriers were immune from liability when setting prices through approved rate bureaus, that immunity did "not sweep within it a larger conspiracy which utilizes a section 5a rate bureau as a means to an end"—or any other "illegal schemes which happen to coincide at points with the legitimate actions of a rate bureau."  *Id.* at 595-602 (affirming criminal prosecution of rate-bureau carriers for conspiring to "forego competition among themselves" and "to eliminate or reduce competition from" other sources).  Because Congress passed the Staggers Act to promote rather than reduce competition, reading Section 10706(a)(3)(B)(ii)(II) to exclude evidence "related to" interline traffic would turn the Staggers Act on its head.

### 2. The phrase "an interline movement of the rail carrier" means that the discussion or agreement must be limited to the participating carriers' interline traffic

Under Section 10706(a)(3)(B)(ii)(II), "an interline movement of the rail carrier" means interline traffic in which the carriers involved in the discussion or agreement actually participate.  As a textual matter, "of" is a possessive preposition that links "the rail carrier" to the "interline movement" that the "discussion or agreement" at issue "concerned."  *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 139-41 (2016).  In doing so, "of the rail carrier" functions as an adjectival phrase, limiting the term "interline movement," and confirming

that Section 10706(a)(3)(B)(ii)(II) does not exclude evidence of discussions or agreements about "[all] interline movement[s]" generally, but only a particular type of "interline movement"—those handled only by the carriers involved in the discussion or agreement.  *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) ("Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality.").

The statute does not make sense otherwise, for "an interline movement" cannot be "of" a carrier that does not participate in the movement, and Congress would not have included that limiting phrase if Section 10706(a)(3)(B)(ii)(II) covered communications about *all* rail traffic.  As the legislative history makes clear, the statute addresses "lawful discussions" among carriers "about interline movements *in which they interchange*."  H.R. Conf. Rep., at 114 (protecting "rate agreements that were lawfully discussed" from "falsely lead[ing] to conclusions" of conspiracy) (emphasis added).  The executive branch, moreover, echoed that view soon after the statute's enactment, stating that Section 10706(a)(3)(B)(ii)(II) applied only to certain communications among "'*directly connecting*' carriers," meaning carriers that actually participate in the interline movement.  DOJ Comments, *W. Railroads-Agreement*, Section 5b App. No. 2, at 8-9 (I.C.C. Nov. 26, 1980) (emphasis added); *see W. Railroads-Agreement*, 364 I.C.C. 635, 646-51 (1981) (similar).

Here is how the statute works in practice.  Assume an industry with four interline carriers: A and B (eastern), and C and D (western).  If Carriers A and C discuss or agree on the rates they charge for their shared interline traffic, that might qualify as a discussion or agreement concerning "an interline movement of the rail carrier" because the carriers are discussing traffic in which both participate.  The same could be said of a discussion or agreement involving Carriers A, B, and C, about rates for multi-step interline movements in which all three carriers actually participate.  But if Carriers A and C discuss or agree on their competing local rates, that would not qualify because

11

it does not concern interline traffic, and because Carrier A does not participate in Carrier C's local movements, and vice versa.  Likewise, if Carriers A and C discuss or agree on the rates they charge for interline traffic with Carriers D and B, respectively, that also would not qualify for exclusion, because Carrier A cannot participate in an interline movement executed solely by Carriers C and B, and Carrier C cannot participate in an interline movement executed solely by Carriers A and D. Finally, and most obviously, the statute does not cover a discussion or agreement among all four carriers about interline or local rates when those rates apply to traffic in which at least one of the carriers does not actually participate.

A broader reading of the statute would undermine Congress's objective in the Staggers Act of promoting price competition in the rail industry.  *See* H.R. Conf. Rep. No. 1430, at 114 ("[R]ailroads, shippers, and consumers will benefit from increased rail-to-rail competition.").  Protecting carriers from evidence that they discussed or agreed on rates for "interline movement[s]" in which they do not participate would encourage industry-wide collusion and give carriers little reason to compete on price.   It also would disserve the objectives of Section 10706(a)(3)(B)(ii)(II) itself, since excluding such evidence would provide carriers no additional incentive to engage in the sorts of limited collaborations necessary for interline traffic.  That such untoward results follow from an atextual reading of the statute is all the more reason to reject that construction.  *See Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1045 (D.C. Cir. 2015) (rejecting interpretation "at odds with a clear purpose of the statute").

Construing "of the carrier" to require actual participation in the movement is also well-grounded in the competitive realities of rail traffic.  While interline carriers moving a shipment from New York to San Francisco do not compete as to that shipment, "source competition" also pervades the rail industry, which "occurs when a shipper can send its product to an alternative

destination using a different railroad."  Russell Pittman, *Options For Restructuring The State-Owned Monopoly Railway*, *in* Railroad Economics 182 (2007).  Thus, if a Chicago-based shipper disliked western carriers' rates to San Francisco, it could shop for a lower price and send its product instead to New York on an eastern carrier if a market for its product existed in both cities.  Western and eastern carriers are rivals in this scenario—they are not competitively neutral and they certainly are not partners.  From the shipper's perspective, the carriers are substitutable choices for moving products to a destination where they can be sold.  It follows that when carriers discuss or agree on rates in a way that goes beyond their own interline traffic, that collusive behavior harms competition and consumers just as it would in any other industry.  Section 10706(a)(3)(B)(ii)(II) does not protect carriers from evidence of such wrongdoing.

It is true that Congress has directed carriers to establish interline routes and rates, 49 U.S.C. § 10703, and it has authorized them to do so through unregulated contracts that they negotiate with shippers, *id.* § 10709.  But contrary to defendants' suggestions (*see, e.g.*, Br. 4, 7-8, 12), Congress has never authorized, much less required, carriers to fix unregulated rates for all interline or local shipments.  Rather, the Staggers Act signaled a return to the era in which rate-fixing in the rail industry outside of an approved rate bureau was *per se* unlawful, even though carriers (then as now) had "'to establish reasonable through routes with other such carriers.'"  *Georgia v. Pa. R. Co.*, 324 U.S. 439, 445-57 (1945) (quoting 49 U.S.C. § 1(4) (1940)).  As the Supreme Court explained, the "collaboration contemplated" between interline carriers in setting a through rate was "of a restrictive nature," and "it would be a perversion of those sections to hold that they legalize a ratefixing combination" in all circumstances.  *Id.* at 457-58 (holding that the Sherman Act prohibits railroads from conspiring "to use coercion in the fixing of rates").

Indeed, even if carriers act as "joint venturers" in executing shared interline traffic (Defs.' Br. 7; Reply Br. 16), that does not mean they are free to fix rates with competitors *outside* that venture.  *See Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 37 (D.C. Cir. 2005) ("An agreement between joint venturers to restrain price cutting and advertising with respect to products not part of the joint venture looks suspiciously like a naked price fixing agreement between competitors."). In *Texaco Inc. v. Dagher*, for instance, Texaco and Shell's regional joint venture would not have shielded them from liability had they fixed gas prices nationwide.  *See* 547 U.S. 1, 5-6 (2006) (upholding "pricing policy" that did not involve "competing products"); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) (noting same).  So too here.  Rival carriers cannot bootstrap interline ventures into a basis for fixing all local and interline rates, and there is no textual or competitive justification for protecting carriers from evidence that they engaged in such price-fixing under Section 10706(a)(3)(B)(ii)(II).  *See Polygram*, 416 F.3d at 31-38 (holding that, despite forming a joint venture to distribute a specific recording by "The Three Tenors," record companies violated the antitrust laws by agreeing not to advertise or discount other Three Tenors albums).

Nor does the survival of interline traffic depend on protecting carriers from evidence that they discussed or agreed on rates for traffic in which they do not interchange.  Contrary to defendants' suggestions (*see, e.g.*, Br. 5-6, 21-22, 24), such communications are not functionally inevitable.  The Association of American Railroads ("AAR") has promulgated accounting rules and payment methods that allow carriers to conduct interline traffic without discussing or agreeing on rates with nonparticipating rivals.  *See* AAR Accounting Rules (July 2019)[5]; Railinc, Guide For Railroads (Jan. 2018)[6]; Railinc, REN Web Certification Manual (Feb. 2013).[7]  As defendants

---

[5] https://public.railinc.com/sites/default/files/documents/RAR.pdf
[6] https://public.railinc.com/sites/default/files/documents/GuideforRailroads.pdf
[7] https://public.railinc.com/sites/default/files/documents/REN_WebCertificationGuide.pdf

acknowledge (Br. 8 n.3), one way this happens is through AAR Rule 11, a fixture of the interline rail industry for decades. *See Policy Alternatives to Increase Competition in the R.R. Indus.*, No. 688, 2009 WL 996819, at *5 n.5 (S.T.B. Apr. 14, 2009); *Elgin, Joliet & E. Ry. Co.*, No. AB-117, 1993 WL 29280, at *2 (I.C.C. DCSS Feb. 2, 1993) ("EJ&E notes that in 1991 all lumber shipments moved under Rule 11."). Under Rule 11, each carrier separately negotiates the rate for its portion of an interline movement directly with the shipper, and then collects that rate directly from the shipper with little or no carrier-to-carrier discussion of price. AAR Rules, 9 (explaining that Rule 11 is "intended for use by the rail industry to protect confidential prices").

Interline carriers also can establish a "joint rate" without discussing or agreeing on prices with outside rivals. *Id.* at 61-62. Unlike Rule 11, a "joint rate is a unitary rate determined by agreement between the carriers participating in a through route." 13 C.J.S. Carriers § 137 (Mar. 2020). Particularly with Class I railroads, the originating carrier generally proposes a joint rate and the connecting carrier accepts it using the Interline Settlement System ("ISS")—a "centralized process for the rail industry used to negotiate and agree upon the sharing of revenue generated for a movement." Railinc, Guide, 26. Launched in the mid-1990s, ISS allows carriers to set joint rates, and the portions of the joint rates that each receives (called "divisions"), through a computerized "price management system" that distributes "price (rate and division) information" "among participating carriers." *Id.* at 26-28, 30. The information is distributed through "a web application that enables carriers to enter rates and divisions into the [] system from a web browser," which is then sent electronically only to carriers in that particular route. Railinc, Manual, 1-2. The "synergies" of this "data exchange system eliminate the requirement to send/receive information between numerous companies." Railinc, Guide, 36.

These methods and processes confirm that, despite the logistical complexities of rail traffic, carriers can and do conduct interline business without discussing or agreeing on all rates with their rivals.  A proper reading of Section 10706(a)(3)(B)(ii)(II) will leave those practices undisturbed. *Accord Motor Carrier Bureaus*, 2007 WL 2946673, at *6 (S.T.B. May 4, 2007) ("Advances in technology, the Internet and other communication tools make it easier for carriers and shippers to exchange the information necessary to solicit and generate rate quotes in a timely matter.").

**B.     The Statute Requires The Court To Judge The Legality Of The Entirety Of Each "Discussion Or Agreement" Shown By The Evidence**

Defendants argue incorrectly that Section 10706(a)(3)(ii)(II) requires courts to analyze each item of evidence in isolation and to exclude any such evidence that does not directly prove an antitrust conspiracy.  Reply Br. 15-16; *see* Defs.' Br. 3, 11-12, 15-16, 19, 25, 37, 42.  Properly construed, however, Section 10706(a)(3)(B)(ii)(II) does not limit plaintiffs only to direct evidence, but instead allows the admission of circumstantial evidence in certain instances—namely, when such evidence shows a "discussion or agreement" that could, "considered by itself, violate the [antitrust] laws."  49 U.S.C. § 10706(a)(3)(B)(ii)(II).  The statute does not, however, let in all circumstantial evidence that could partly support an inference of conspiracy.  It would exclude, for example, evidence of lawful interline communications if the only indication of rate-setting beyond the carriers' shared interline traffic is an allegation of parallel action.  The critical question is thus not whether the discussion or agreement is shown by direct or circumstantial evidence; it is whether the discussion or agreement, viewed in its full evidentiary context, could "violate the [antitrust] laws" when "considered by itself." *Id.*

### 1.   *Evaluating the legality of each item of evidence in isolation would create a direct-evidence limitation that contravenes the statutory text and confers a de facto antitrust immunity that Congress did not intend*

Contrary to defendants' assertions, Section 10706(a)(3)(B)(ii)(II) does not relegate plaintiffs to proving conspiracy with only direct evidence.  In referring to a "discussion or agreement" that "would not, considered by itself, violate the [antitrust] laws," the statute describes the *legal effect* of the discussion or agreement, not the *type of evidence* used to prove it.  Ordinarily, "modifiers and qualifying phrases attach to the terms that are nearest."  *Grecian Magnesite Mining, Indus. & Shipping Co. v. Comm'r IRS*, 926 F.3d 819, 824 (D.C. Cir. 2019).  Under that rule, the "considered by itself" phrase modifies the immediately preceding nouns "discussion" and "agreement," rather than reaching back to modify "evidence."  *See Babb v. Wilkie*, 140 S. Ct. 1168, 1173 (2020) (holding that "an adjectival phrase" ("based on age") "modifies the noun" preceding it ("discrimination"), not the provision's subject ("personnel actions")).  This means that the "discussion or agreement" must be "considered by itself," not the "evidence."  *Grecian Magnesite*, 926 F.3d at 824 (holding that "income from any sale of personal property . . . attributable to [a U.S.] office" means that the "sale" must be "attributable to the U.S. office," not the "income").

Section 10706(a)(3)(B)(ii)(II) thus does not call for a granular inspection of each discrete piece of evidence in isolation to determine whether it proves conspiracy "by itself."  It instead requires carriers to show that the "discussion or agreement" at issue—specifically, the one that "concerned an interline movement of the rail carrier"—would not violate the antitrust laws "by itself," which does not depend on whether the evidence is direct or circumstantial.  *See* 22 Wright & Miller, Fed. Prac. & Proc. Evid. § 5162.1 (2d ed. April 2020) ("Circumstantial evidence is not less probative than direct.  Indeed, it can sometimes be more probative than direct evidence." (footnotes omitted)).  After all, an agreement among rival carriers to fix all interline rates violates the antitrust laws "by itself," whether it is inferred or proven by direct evidence.  *See United States*

*v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 177-228 (1940) (holding price-fixing *per se* unlawful without "any formal contract").  The absence of direct evidence does not make price-fixing less harmful, conspirators less culpable, or consumers less injured.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661-62 (7th Cir. 2002) (noting that the "distinction between direct and circumstantial evidence" is "largely if not entirely superfluous").

Aside from finding no support in the statutory text, a direct-evidence limitation is at odds with the legal backdrop of the Staggers Act, which recognized that antitrust law cannot adequately protect competition if conspiracy must be proven only with direct evidence.  When Congress enacted subsection (a)(3)(B)(ii)(II), it was "settled that no formal agreement is necessary to constitute an unlawful conspiracy."  *Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 704 (1969) (internal quotation marks, brackets omitted).  Courts understood that "proof is largely in the hands of the alleged conspirators," *id.*, and that "[s]ecrecy and concealment are essential features of successful conspiracy," *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 127 (7th Cir. 1978) (internal quotation marks omitted).  As a result, direct evidence was "unnecessary" to prove antitrust conspiracy, because "were the law otherwise such conspiracies would flourish; profit, rather than punishment, would be the reward."  *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 374-75 (9th Cir. 1957).

That is precisely what will happen, however, if a direct-evidence limitation is engrafted onto Section 10706(a)(3)(B)(ii)(II).  *See* 14A Areeda & Hovenkamp, *Antitrust Law* ¶1410c (4th ed. Aug. 2019) ("[I]nsistence upon direct proof would remove too many conspiracies from the embrace of the antitrust laws.").  As this Court has recognized, "conspiracies are rarely evidenced by explicit agreements," and "nearly always must be proven through inferences."  *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 11 (D.D.C. 2015) (internal quotations

marks omitted).  Construing Section 10706(a)(3)(B)(ii)(II) to require direct proof of price-fixing

in a single piece of evidence would thus effectively immunize sophisticated, multifaceted rate-

fixing cartels—a result that would both "seriously undercut the effectiveness of the antitrust laws,"

*In re Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990)

(explaining the consequences of requiring "direct evidence" in all cases), and also contradict the

"heavy presumption against implicit exemptions from the antitrust laws," *Jefferson Cty. Pharm.*

*Ass'n, Inc. v. Abbott Labs.*, 460 U.S. 150, 157-58 (1983); *Nat'l Gerimedical Hosp. v. Blue Cross*

*of Kansas City*, 452 U.S. 378, 389-90 (1981) (noting such exemptions are "especially disfavored"

in deregulated industries).  Congress did not intend Section 10706(a)(3)(B)(ii)(II) to impose such

extraordinary limits on antitrust recovery in a statute designed to foster price competition and

curtail antitrust immunity.  *See Logan v. United States*, 552 U.S. 23, 35 (2007) ("We are disinclined

to say that what Congress imposed with one hand . . . it withdrew with the other.").

The legislative history confirms as much.  The committee report's joint explanatory

statement instructs that Section 10706(a)(3)(B)(ii) "be construed to insure that remedies for anti-

competitive activities remain under existing laws."  H.R. Conf. Rep. No. 1430, at 114.  The

committee noted as well that contract traffic must be subject to "existing Federal antitrust laws,"

*id.* at 101, and "that nothing in the bill's protections reduces the availability of the Federal antitrust

laws to protect against" anticompetitive conduct in related contexts, *id.* at 83.  These statements

underscore what the text makes clear:  Section 10706(a)(3)(B)(ii)(II) does not foreclose antitrust

recovery in all but the unusual case where plaintiffs are somehow able to elicit a confession,

unearth a written price-fixing agreement, or find a willing percipient witness.  *See Validus*, 786

F.3d at 1048 ("This court has been skeptical of finding major changes in legislation that have

passed unremarked upon in the legislative history.").

19

Defendants try to limit their theory on reply by arguing that it would not require "a single piece of 'perfect, smoking-gun' evidence." Reply Br. 13. Yet this statement rings hollow in light of defendants' assertion in the same paragraph that Section 10706(a)(3)(B)(ii)(II) displaces "the normal practice in antitrust cases, where inferring conspiracy from disparate pieces of circumstantial evidence is common." *Id.* at 13-14. Indeed, defendants have repeatedly argued that, to be admissible under Section 10706(a)(3)(B)(ii)(II), the "discussion or agreement" must be "'direct evidence' of an antitrust conspiracy—meaning evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." Defs.' Br. 16 (internal quotation marks omitted); *id.* at 3, 11-12. That categorical position cannot be reconciled with a passing concession about "smoking gun" evidence, which is simply a euphemism for direct proof, *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) ("Direct evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'").

### 2. Even a "discussion or agreement" that "concerned an interline movement of the rail carrier" may violate the antitrust laws "by itself" because anticompetitive impact cannot be ignored

Although there is no direct-evidence limitation, the difficulty in judging the admissibility of circumstantial evidence lies in determining which "discussion or agreement" it is evidence of. The ordinary meaning of those terms is exceptionally broad. A "discussion" generally refers to the "consideration of a question," and an "agreement" typically means "a harmonious understanding" or "an arrangement (as between two or more parties) as to a course of action." *Webster's Third New Int'l Dictionary* 43, 648 (1976); *see Black's Law Dictionary* 62 (5th ed. 1979) (defining "agreement" as "a coming together in opinion or determination"). As such, a "discussion" could include a months-long series of email exchanges among competing interline carriers or merely a subset of those communications. Also, depending on the evidence, an "agreement" could be one interline arrangement or industry-wide collusion.

The proper frame of analysis thus depends critically on context, and neither party can dictate the pertinent "discussion or agreement" that must be "considered by itself." Carriers cannot pluck discrete items of evidence from the record and argue, out of context, that the "discussion or agreement" the items appear to relate to must be excluded because the item does not independently prove an antitrust violation. At the same time, plaintiffs cannot claim the relevant "discussion or agreement" is the one they plead in their complaint merely because the evidence could be read together with other acts to infer such a conspiracy. Courts must make a contextual judgment about the proper scope of the "discussion or agreement" at issue, and in doing so they should follow the Supreme Court's admonition that statutes not be applied in a way that would confer antitrust exemptions and immunities without clear congressional mandate. The "discussion or agreement" should be defined, in other words, so that carriers cannot circumvent the antitrust laws by selectively cherry-picking the record to exclude probative evidence of anticompetitive behavior.

The hypothetical from Part II.A provides a useful illustration. Assume that Carrier A (eastern) and Carrier C (western) discuss rates for their interline traffic, and that on the same day at the same time Carrier B (eastern) and Carrier D (western) discuss rates for their interline traffic. Both discussions lead to nearly identical price terms for the carriers' respective interline traffic, yet nothing about those communications suggests that they are anything but separate "discussion[s]" or "agreement[s]"; absent other context, such evidence would be excluded. That a broader agreement hypothetically could be inferred from separate interline discussions does not convert each discussion into admissible evidence of a broader agreement. Otherwise, Section 10706(a)(3)(B)(ii)(II) would do little work. Yet, with additional context, such evidence may be admissible. For example, assume that, in addition to the above-noted conversations, Carriers A and B (the two eastern railroads) met a week earlier and discussed their intent to impose

uniform rates across the entire industry.  That communication may very well provide additional context suggesting that the carriers' subsequent interactions were part of a single industry-wide "discussion or agreement"—evidence of which would not be excluded.

As a practical matter, the "discussion or agreement" that will most often be "considered by itself" under Section 10706(a)(3)(B)(ii)(II) is one that "concerned an interline movement of the rail carrier."  For if the discussion or agreement involved local traffic, or interline traffic in which one of the carriers did not participate, the evidence would be ineligible for exclusion on that basis alone.  *See supra*, Part II.A.  Generally, discussions or agreements among participating carriers limited to their interline business will raise few antitrust issues.  That does not end the analysis, however, because the legality of a discussion or agreement for antitrust purposes cannot be separated from its anticompetitive consequences; to consider one is to consider the other, *see NCAA v. Bd. of Regents*, 468 U.S. 85, 104 (1984) ("Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition.").  To be sure, the "considered by itself" clause indicates that, unless there are contextual clues that the "discussion or agreement" is the conspiracy itself, the antitrust consequences of a discussion or agreement are evaluated separately from the rest of the evidence.  But either way, the statute does not require courts to ignore such considerations.  Rather, by expressly requiring courts to "consider[]" the lawfulness of a "discussion or agreement" "by itself" under the antitrust laws, the statute empowers courts to evaluate the discussion or agreement using the customary analytical tools of antitrust law, which includes an evaluation of anticompetitive effects.  *See* 49 U.S.C. § 10706(a)(3)(B)(ii)(II).

Accordingly, even discussions and agreements among participating carriers about their interline traffic may be admissible, whether or not the carriers are "joint venturers" in a "vertical" relationship (*cf.* Defs.' Br. 7, Reply Br. 16, 38).  It is blackletter law that "joint ventures have no

immunity from the antitrust laws," *NCAA*, 468 U.S. at 113, and "the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 894 (2007).  As the Department of Justice and Federal Trade Commission have explained, "labeling an arrangement a 'joint venture' will not protect what is merely a device to raise price or restrict output" because "the nature of the conduct, not its designation, is determinative."  DOJ & FTC, *Antitrust Guidelines for Collaborations Among Competitors*, at 9 (2000).[8]  Even limited interline discussions and agreements may substantially harm competition by, for example, facilitating collusion through the exchange of competitively sensitive information, or by providing a mechanism to detect and punish competitive price reductions.  *See id.* at 6, 12, 15; *see also id.* at 8 ("The mere coordination of decisions on price, output, customers, territories, and the like is not integration, and cost savings without integration are not a basis for avoiding per se condemnation.").  When the basis of an antitrust claim is that interline discussions and agreements allegedly have such anticompetitive effects, those discussions and agreements may be admissible under Section 10706(a)(3)(B)(ii)(II).

This conclusion follows from the statutory text.  By its terms, the statute requires defendants to show that "the discussion or agreement *would not*, considered by itself, violate the [antitrust] laws."  49 U.S.C. § 10706(a)(3)(B)(ii)(II) (emphasis added).  To be admissible, then, the discussion or agreement need not conclusively violate the antitrust laws.  That is because courts need not find that a discussion or agreement *does* violate the antitrust laws by itself to reject a defendant's assertion that the discussion or agreement *would not* violate such laws.  Otherwise, plaintiffs challenging the competitive effects of interline discussions and agreements would have

---

[8]  https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf

to prove their case at the threshold on a discussion-by-discussion or agreement-by-agreement basis using only evidence handpicked by their adversaries. Congress could not have intended to create such an odd procedural scheme in a provision addressing only the admissibility of evidence.

The proper interpretation of Section 10706(a)(3)(B)(ii)(II) implicates far more than just the outcome of one particular case. "A claim under the antitrust laws is not merely a private matter." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985). To the contrary, "private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979), which is why private antitrust plaintiffs have "been likened to a private attorney-general who protects the public's interest," *Mitsubishi Motors*, 473 U.S. at 635. An unduly broad construction of Section 10706(a)(3)(B)(ii)(II), however, would dramatically undermine that key congressional mechanism for antitrust enforcement.

## CONCLUSION

In sum, 49 U.S.C. § 10706(a)(3)(B)(ii) is not limited to cases involving regulated traffic. Rather, in both regulated and unregulated traffic cases, Section 10706(a)(3)(B)(ii)(II) excludes only evidence of discussions, agreements, rates, and other actions involving participating carriers about the interline traffic executed by those carriers and that would not by themselves violate the antitrust laws. The statute does not, however, exclude evidence that is part of a discussion or agreement by carriers collectively to set local or interline rates generally.

24

July 13, 2020                                Respectfully submitted,


                                            /s/ Bryan J. Leitch

                                            MAKAN DELRAHIM (D.C. Bar No. 457795)
                                            *Assistant Attorney General*
                                            *Antitrust Division*

                                            BERNARD A. NIGRO, JR. (D.C. Bar No. 412357)
                                            *Principal Deputy Assistant Attorney General*

                                            MICHAEL F. MURRAY (D.C. Bar No. 1001680)
                                            *Deputy Assistant Attorney General*

                                            TAYLOR M. OWINGS (D.C. Bar No. 1031064)
                                            *Counsel to the Assistant Attorney General*

                                            DANIEL E. HAAR
                                            ROBERT B. NICHOLSON (D.C. Bar No. 55772)
                                            BRYAN J. LEITCH (D.C. Bar No. 1016484)
                                            *Attorneys*

                                            *United States Department of Justice*
                                            *Antitrust Division*

                                            U.S. Department of Justice
                                            950 Pennsylvania Avenue, NW Suite 3224
                                            Washington, DC  20530
                                            Telephone: (202) 335-9366
                                            Email: Bryan.Leitch@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2020, I electronically filed the foregoing brief by using the CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Bryan J. Leitch
Bryan J. Leitch