UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re RAIL FREIGHT FUEL SURCHARGE** | ) MDL NO. 1869 |
| **ANTITRUST LITIGATION** | ) MISC 07-489(PLF/GMH) |
| | ) |
| CLASS PLAINTIFFS, | ) |
| | ) |
| OXBOW CARBON & MINERALS, LLC, et al., | ) |
| | ) August 26, 2020 |
| Plaintiffs, | ) 10:32 a.m. |
| vs. | ) |
| UNION PACIFIC RAILROAD, et al., | ) Washington, D.C. |
| | ) |
| Defendants. | ) |

_____

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE PAUL L. FRIEDMAN**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

**(Parties appeared via videoteleconference and/or telephonically)**

**FOR CLASS PLAINTIFFS:**

STEPHEN R. NEUWIRTH
Quinn Emanuel
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7237
Email:  Stephenneuwirth@quinnemanuel.com

SATHYA S. GOSSELIN
Hausfeld
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
Email: MHausfeld@hausfeld.com

ALDEN L. ATKINS
Vinson & Elkins
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
(202) 639-6613
Email: Aatkins@velaw.com

**APPEARANCES (Continued):**

**APPEARANCES (Continued)**:


**FOR DEFENDANT UNION PACIFIC:**

        DANIEL M. WALL
        CHRISTOPHER CAMPBELL
        Latham & Watkins LLP
        505 Montgomery Street, Suite 2000
        San Francisco, CA 94111-6538
        (415) 391-0600
        Email: Dan.Wall@lw.com
        Email: Christopher.campbell@lw.com


**FOR DEFENDANT CSX:**

        KENT A. GARDINER
        Crowell & Moring LLP
        1001 Pennsylvania Avenue, NW
        Washington, District of Columbia 20004-2595
        (202) 624-2500
        Email: Kgardiner@crowell.com


**FOR THE GOVERNMENT:**

        BRYAN J. LEITCH
        U.S. Department of Justice
        950 Pennsylvania Avenue NW
        Ste 3314
        Washington, DC 20530
        (202) 353-9366
        Email: Bryan.leitch@usdoj.gov


        Elizabeth Saint-Loth
        Official Court Reporter
        U.S. Courthouse
        Washington, D.C.  20001


      Proceedings reported by machine shorthand,
    transcript produced by computer-aided transcription.


     **PLEASE NOTE:**  This hearing was held telephonically in
compliance with the COVID-19 pandemic telework orders.

1           **P R O C E E D I N G S**

2                  THE DEPUTY:  We have Miscellaneous Action 07-489,

3      In Re, Rail Freight Fuel Surcharge Antitrust Litigation.

4                  For class plaintiffs I have Mr. Stephen Neuwirth,

5      Sathya Gosselin and Alden Atkins.

6                  For defendant Union Pacific I have Mr. Christopher

7      Campbell, I believe.  Is Mr. Campbell on this line?

8                  For defendant CSX Transportation, Incorporated,

9      Mr. Kent Gardiner, Daniel Wall.  And for the United States

10     Mr. Bryan Leitch.

11                 Our court reporter today is Elizabeth Saint-Loth.

12                 All parties are present.

13                 Did I miss anyone?

14                 THE COURT:  Okay.  And this is -- in addition to

15     being Miscellaneous 07-489, it's also Civil Action 11-1049.

16                 MR. GARDINER:  Excuse me, Your Honor.

17                 I am sorry, Your Honor.  This is Kent Gardiner for

18     CSX.  I am not seeing Mr. Wall on the screen here.  I don't

19     know if he's been able to successfully log in.

20                 And just to be clear, Mr. Wall and Mr. Campbell

21     are representing Union Pacific.

22                 THE COURT:  Right.

23                 Well, let's see.  Do we have Mr. Wall yet?

24                 MR. GARDINER:  I am going to email him, Your

25     Honor, and see what's what.

1          THE COURT:  Okay.  Maybe he hasn't gotten out of

2     bed yet?

3          MR. GARDINER:  I have seen some emails this

4     morning, Your Honor.  I think he is up and about.

5          Yes, Your Honor.  It looks like Mr. Wall is having

6     some challenges with the login.

7          (Whereupon, the proceeding pauses to attend to

8     electronic difficulties.)

9          THE COURT:  Maybe he can be on the telephone

10    rather than on the video at this point.

11          MR. GARDINER:  That's fine.

12          THE COURT:  Okay.  Let me just remind everybody

13    what we have agreed is that the defendants will have a total

14    of two hours to present their arguments for both opening and

15    rebuttal, a total of two hours; same with the plaintiffs,

16    that they will have a total of two hours for opening and

17    rebuttal, and the Department of Justice will have 30

18    minutes.

19          The order of argument is the defendants will make

20    their opening argument for however long they decide to take

21    of that two hours, and then we'll take a 15-minute break;

22    then the plaintiffs will make their opening argument.  And

23    we'll take a break, Mr. Neuwirth, around 1:00 or a little

24    after depending upon -- for all I know, you may have

25    finished your opening argument.  But I think we'll need a

 1     break for -- some people may want to eat something, so we'll

 2     take 30 minutes.  And then we will resume in the -- they'll

 3     finish their opening, if they haven't already done so; then

 4     we will hear from the United States.  And when the

 5     United States is finished with theirs, we'll take 15

 6     minutes.

 7             We can modify that slightly if the openings from

 8     each side are shorter than I expect they're going to be.

 9     And then, after the 15-minute break in the afternoon, we'll

10     come back and we'll hear rebuttal arguments from the

11     defendants first and then from the plaintiffs.

12             So does anybody have anything preliminarily, or

13     should we just get started?

14             MR. NEUWIRTH:  Your Honor, this is Stephen

15     Neuwirth.  I believe the plaintiffs are ready to just get

16     started.

17             THE COURT:  Thank you, Mr. Neuwirth.

18             MR. WALL:  Well, other than the fact that you

19     can't see me, I think we can get started.

20             THE COURT:  Sure.  Okay.  Mr. Wall.

21             MR. WALL:  So I will just be calling out when it's

22     appropriate to turn the page on the PowerPoint that we have

23     provided, Your Honor, or to go to a particular document.

24             THE COURT:  There are actually two separate

25     volumes.  One is a thin volume in a binder and the other is

1       a kind of notebook; and I have them both before me.

2               MR. WALL:  Right.  And so I will be almost

3       exclusively -- unless we get into some questions, talking

4       about the slides that we've prepared.  So thank you, Your

5       Honor.

6               This has been a long time coming.  We have been,

7       as you know, proposing this for a while and looking forward

8       to it.  And part of that, Your Honor, is because as you

9       know, for procedural reasons, it takes a long time before

10      you can get to the point in a case where the defendant is

11      actually able to contest the fundamental allegation about

12      whether it did it and because it's assumed during motions

13      and class certification it's a question of whether it's a

14      common issue, not whether it's true or not, and so forth.

15              But since 2011, May 2011, when the defendants

16      received the long interrogatory response that the plaintiffs

17      provided on the facts that supposedly prove the conspiracy,

18      it has been very clear to us that the core, if not the

19      entirety of the plaintiffs' conspiracy case, was evidence of

20      discussions and agreements and actions that took -- that the

21      railroads had taken with regard to interline matters.

22              And when Professor Rausser served his merits

23      report in October of 2012 that was confirmed.  In fact, I

24      will always remember in this case deposing Dr. Rausser and

25      asking him how he determined whether he was going to use a

1    piece of evidence or not given the restrictions of Section

2    10706, and his answer was that he had personally made

3    judgments about what was admissible and what was not, and

4    what inferences were appropriate and what inferences were

5    not.

6          If there were any doubt about it, the briefs in

7    relation to this motion and the slides that were provided

8    the other day by the plaintiffs clinch it because it is, in

9    fact, the case that nearly all of the substantial evidence,

10   if not all of the substantial evidence, that they claim

11   proves this conspiracy as to fuel surcharges consists of

12   things that were said in interline alliance meetings, things

13   that the parties did after the interline alliance meetings,

14   and so forth.  And the purpose of this motion is to sort of

15   address that head on and to see where we are afterwards,

16   because the plaintiffs are going to have to put on a case

17   that can survive summary judgment and that case should be

18   limited to materials that can be used consistent with

19   Section 10706.

20         Turning over to the next page, to the next slide,

21   Your Honor, what I was doing here is just, sort of, making

22   just an introductory practicing point which is if the

23   plaintiffs can prove their case without 10706 material they

24   wouldn't have to swing for the fences the way they are on

25   all sorts of these arguments that are intended to

1    essentially nullify or completely neuter Section 10706 in

2    the very boxes there.  You know, they argue that it doesn't

3    even apply here because of the distinguishing regulated and

4    unregulated traffic.  The idea that it doesn't apply outside

5    of rate bureaus, the idea that it only protects discussions

6    concerning single individual rates, that everything that

7    plaintiffs want to consider that can be lumped together to

8    be considered by itself, that "concern" means exclusively

9    and unambiguously concerned -- these are just not the

10   arguments you make if you are, in fact, in possession of a

11   lot of evidence of the conspiracy that isn't implicated by

12   the statute.  And I just want to give you a couple of

13   illustrations of what it is that concerns us and why we

14   brought this motion.

15           So if you flip over to slide 3, there are a couple

16   of examples of the rhetorical technique that we are dealing

17   with.  So this is a pretty innocuous document; it is the

18   agenda of an alliance between an eastern and western

19   carrier, and it's taking place in April of 2003.  I'll just

20   put that in context, Your Honor.

21           You will remember from the class certification

22   proceedings that between, essentially, December 2002 and

23   March of 2003 the price of diesel fuel went up about 30

24   percent; so it was obviously a very significant issue.  The

25   futures markets were going sideways with oil; it was

1     starting to look very stable.

2            So there is this alliance meeting.  And the piece

3     of evidence here is a two-word reference on the agenda "fuel

4     surcharge," and that's it.  That's -- there was an agenda

5     item on the alliance meeting between an eastern and a

6     western carrier; carriers who have a very, very, very small

7     competitive relationship and a huge interline relationship.

8            And then if you flip over to the next page, which

9     is actually a color mockup, a coded excerpt from

10    Dr. Rausser's report, you can see that what he's done with

11    that two-word reference to "fuel surcharge" is he's used it

12    to link together a number of other events, a March 18th

13    meeting involving NS and BNSF, an internal BNSF directive,

14    changes that BNSF made to its trigger price, things like

15    this that are happening here.  And it is -- this is what I

16    refer to in the brief as, sort of, the ransom note method

17    where you take the document, you see the reference to fuel

18    surcharges, you cut it out, and you paste it into another

19    narrative.

20           Another example of this that you can see on

21    slide 5 -- this is a document that gets a lot of attention

22    from the plaintiffs, it's later in the narrative, it's in

23    2006 at a time when Norfolk Southern's so-called rebased

24    FSCs -- if you remember, that means that it increased the

25    base prices at which a fuel surcharge kicked in, and you

1    have to reset all of the triggers and thresholds to reflect

2    the new base price.  You know, this is at a time when oil is

3    now something -- is at $60 a barrel when the old surcharge

4    was in the low 20s.

5           So NS, which again -- its relationship with UP was

6    overwhelmingly as an interline partner, just marginally

7    significantly as a competitor, calls up and tells its

8    interline partner that it is going to do this, and that's

9    what the document indicates.

10          You flip over to the next page, slide 6, you see

11   how that is used in the plaintiffs' case.  In this case the

12   citation is actually to their opposition brief to this

13   motion where there is a long paragraph that purports to hype

14   this document as if it were a smoking gun; you know, NS

15   informing a competitor how and when it's intending to modify

16   its fuel surcharge program to maximize profits.

17          But just hold on a moment here; these are two

18   railroads who have thousands of joint rates together.  The

19   partner is about to change fundamentally the structure of

20   the fuel surcharge that applies to those rates.  There is

21   nothing even arguably wrong under first principles of

22   antitrust that the joint venture partners would speak to

23   each other about that, inform each other about that; and you

24   would expect that once they do that internally they're going

25   to have various discussions about it.

1          The other thing which is so stark about the use of

2     a document like this is the plaintiffs know very well that

3     no one else rebased their FSC's at this time.  This doesn't

4     even arguably lead to some sort of an agreement, let alone

5     lawful agreement, to rebase FSCs.  There was no such

6     agreement; no one else followed what NS did.  In fact, UP --

7     while it concurred in this as far as NS originated traffic,

8     it maintained its existing fuel surcharges.

9          The next slide is about -- as you know, there is

10    the two-prong exception of 10706, there is the evidentiary

11    rule, and then there is the rule against inferences from

12    similar action; and you are getting all sorts of arguments

13    from the plaintiffs that, well, that's just doubtful because

14    we're not making any arguments based upon actions --

15    interline action followed by a similar action, and that's

16    just completely false; they absolutely are.

17          On the face of the interrogatory response,

18    Dr. Rausser's report, and everything else that they do.  And

19    you don't even have to go past the origin of the alleged

20    conspiracy to see how it is that this works.

21          The starting point for this alleged conspiracy

22    when they tell their narrative is an action that CSXT took

23    in March 2003 in that they made a change to its fuel

24    surcharge.

25          Their allegation then is -- literally it says CSX

1    obtained concurrent from each defendant to the new program,

2    so they are explicitly weaving in the interline concurrences

3    into their narrative.  They say that's evidenced by UP's

4    former concurrence and related communications -- the related

5    communications.  They then say that UP subsequently adopted

6    the same approach.  They now say that in reaction to the

7    concurrence on the interline fuel surcharge UP is adopting

8    the same approach; they forget to mention that then UP

9    changed its mind.  But regardless of that, it continues with

10   sending an interline concurrence request which is styled as

11   an anticompetitive signaling device.

12          Well, Your Honor, it would be hard to identify

13   anything that is more in the heartland of what this

14   inferential protection is about than the argument that

15   interline concurrences were used as signaling devices which

16   therefore led to changes in local surcharges.

17          THE COURT:  Excuse me, Mr. Wall.  Let me ask you a

18   question at this point.

19          MR. WALL:  Sure.

20          THE COURT:  The word "concurrence" as I understand

21   it generally -- and you can tell me whether it's being

22   misused here or what exactly your point is -- the simplest

23   case is, if CSX gets an order from a shipper to ship to the

24   West Coast and they set a rate including a fuel surcharge,

25   say -- or including their standard fuel surcharge, and then

 1    they talk to UP because that's the interline partner in the

 2    particular shipment and they get their concurrence in what

 3    they're going to charge; is that what is typically meant by

 4    a "concurrence"?

 5             MR. WALL:  Well, sure; that would be an example of

 6    a concurrence, Your Honor.  But there are also programmatic

 7    changes that are made to rates all the time and to

 8    components of rates.

 9             A carrier may decide to just increase all of its

10    base rates by a certain amount.  In order for the interline

11    system to work, it then needs to get the connecting

12    carriers' concurrence to that.  So the typical way that

13    that's done -- you see it in the documents before you kind

14    of repeatedly -- is whoever is making the change sends out a

15    communication -- nowadays it's usually an email -- to the

16    various carriers with which it interlines with -- and very

17    often that's not just the ones that are accused of this

18    conspiracy, that's others as well.  And it says we are about

19    to make the following change, and are you going to concur to

20    honor that change in our connecting traffic, in our

21    interline traffic?  And they'll get typically a yes, but

22    they might get a no; and that's documented, and that's how

23    it moves on.

24             So when you see particularly here in this

25    example -- and of course, you know, you can follow the sites

1    to what they say -- to what the particular documents are and

2    see what the underlying documents are.  The reason that

3    they're putting quotation marks around the word

4    "concurrence" in the second bubble that we have put in here

5    is because they are actually citing this formal interline

6    concurrence request.  Likewise, in the next bubble they're

7    talking about UP sending an interline concurrence request.

8         This is the core interline document and action; it

9    is this establishment of the joint rates through the

10   concurrence process.  And I -- just to, sort to, skip to an

11   issue that is kind of an ether here is there are a lot of

12   arguments in the briefs which is that there are other ways

13   that you can form a joint rate.  That is true, there are

14   other ways; but this is a very, very common way.  And it is

15   a way that accounts for tens of billions of dollars of

16   traffic annually, and it is this formal concurrence process.

17        THE COURT:  So it's not -- it's not limited to a

18   particular shipment or even a particular shipper or group of

19   shipments or communication between one -- well, a separate

20   question.  Can it be broader than a communication between

21   one East Coast shipper and one West Coast shipper?

22        MR. WALL:  One East Coast and one West Coast

23   railroad, I am sure, Your Honor.

24        THE COURT:  Railroad, yes.

25        MR. WALL:  Sure.  So it actually -- it very

1    commonly is because of the fact that you need to -- for

2    example, if you are making a programmatic change, that's

3    going to apply to lots of different shippers shipping lots

4    of places.  As a result of that, you sort of have to

5    anticipate what's the connection of railroads that need to

6    concur in this.

7         I know that -- obviously I am most familiar with

8    the UP documents.  It is very common for UP to send its

9    concurrence requests to the three other railroads that are

10   involved in this case, but also Canadian Southern, Canadian

11   National, Canadian Pacific -- you know, maybe one or two

12   others.  It's done in a single communication.  It just --

13   the email that goes out to all of them, it's considered very

14   routine, Your Honor.  It is done all the time.  And it is

15   done both at the level -- now, there is a good example in

16   the record here of one that happens to be about a particular

17   shipper, but more often than not it is the broader more

18   programmatic changes, and particularly with respect to fuel

19   surcharges.

20        It would be crazy -- it would be administratively

21   impossible to decide you are going to change a fuel

22   surcharge and then do shipper-specific concurrence requests

23   for everyone who is affected, thousands of thousands of

24   shippers would be affected by that.

25        So moving on -- if you go to slide 8, I just

1    really want to demonstrate why it is that plaintiffs are

2    able to do what they are doing in terms of creating this,

3    sort of, ransom note of using the interline communication in

4    the middle of their consumer narrative; and I have to go to

5    this thing that you have been told from the beginning of the

6    case I don't know how many times -- and I know you are going

7    to be told again today because there is a slide, plaintiffs'

8    slide 28, which is obviously intended to make this point

9    that there were these extraordinary meetings that occurred

10   at the time of the alleged conspiracy; and this narrative

11   that the facts that they were extraordinary should be

12   persuasive to you and ultimately to a jury because if

13   they're extraordinary, they're suspicious, right?  That's

14   sort of the logic.  It's just complete nonsense.  They're

15   not extraordinary at all.

16        There are continuous meetings, continuous

17   discussions and agreements between interline partners.  And

18   Mr. Gardiner in a moment is going to give some of the

19   business background that explains why that is.

20        But the fact of the matter is that -- what I did

21   in this chart -- again, this is just UP specific because I

22   happen to know these facts better than I do the facts about

23   other carriers.  But I threw this together by simply putting

24   on a timeline the formal alliance meetings -- the actual

25   scheduled alliance meetings which plays such a big part in

1   the plaintiffs' case between UP and its two defendants, East

2   Coast partners, CSX and NS.

3          What you see here is there is nothing

4   extraordinary about an alliance meeting happening at any

5   point in time because they happen regularly.  It happens

6   regularly because in order to offer interline service it

7   takes all of the coordination that a single firm would need

8   to create service except it takes people from two companies

9   to do that.

10          So if you then look at where the red line axis

11   starts there which is the alleged period of conspiracy, you

12   are going to see that surprise-surprise that happens to

13   coincide with the period of time in which there is this

14   four-month 30 percent increase in the price of diesel fuel,

15   the futures markets are going crazy -- and this is the

16   economic principle, Your Honor, that people buy umbrellas

17   when it starts raining; of course they talk about it.  They

18   talk about it because their joint business is affected by

19   it, and it's fundamental to the profitability of hundreds or

20   thousands of joint rates that they have that fuel costs

21   might be going up.

22          So the only thing that is notable about those

23   meetings, hardly extraordinary, is what the issue of the day

24   is.  I guarantee you that if we were all going -- went to

25   look at the agendas in the meetings of the last in-person

1     alliance meetings -- it probably occurred maybe in March or

2     April -- that COVID is on the agenda because COVID was the

3     issue of the day.  There is nothing extraordinary about it,

4     but it puts the railroads in this dangerous position that

5     they're regularly having discussions and agreements --

6     interline agreements with their competitors that could

7     potentially be weaponized against them in antitrust

8     litigation.

9              THE COURT:  So let me ask you a related question

10     about the concept of alliance meetings.

11              Based on this chart and based on the reading of

12     the briefs, you said in your briefs alliance meetings are

13     always between new railroads, an East Coast railroad and a

14     West Coast railroad.  For some reason --

15              MR. WALL:  No, they're not always between east and

16     west.  There are occasionally alliance meetings between

17     western railroads.  There is a different character to them,

18     Your Honor, because they are competitors so people just

19     approach them differently.

20              THE COURT:  Are these like trade association

21     meetings which would include at least these four railroads,

22     or is there some reason that they seem to be always or

23     almost always limited to meetings between only two

24     railroads?

25              MR. WALL:  No, they're very operational.

1          If you look at the -- they're almost always -- I

2     think all of them are between two railroads.  This is one of

3     the distinctive things about the record in this case, Your

4     Honor -- it is more of a summary judgment point than it is

5     for now, but there aren't any multilateral meetings.  They

6     have a couple of documents they like which -- because they

7     suggested that maybe there should be a multilateral meeting

8     on whether the indexes or fuel surcharges should be

9     standardized, they get very excited about that.

10          But the alliance meetings which are the ones

11     they're characterizing as so-called extraordinary meetings

12     are always bilateral.  They're very just nuts-and-bolts

13     meetings.  They're talking about -- I mean, the way I think

14     about it is if you think of an integrated -- if you imagine

15     a single coast-to-coast railroad, Your Honor -- that doesn't

16     exist of course, but if you imagine it -- and every once in

17     a while the western regional manager met with the eastern

18     regional manager to, sort of, work things out -- well, that

19     meeting would still need to occur among interline partners

20     but it occurs between people from two different companies.

21          THE COURT:  Right.

22          MR. WALL:  And so they schedule these things on a

23     somewhat regular basis, as you can see from the chart; and

24     they plan for them, they have agendas, they have minutes.

25     Everybody is very careful about what they do.  But they talk

1    about all of the things that are germane to the management

2    of the underlying business, and fuel surcharges in 2003 were

3    at the top of the list.

4            THE COURT:  Okay.

5            MR. WALL:  All right.  So this is a transitional

6    point where I am going to turn it over to Mr. Gardiner for a

7    while.

8            But the next slide -- we thought it might be a

9    useful service to review the bidding, as it were, where we

10   are on some of the key issues here.  These are not all of

11   the issues in this case.  We are not covering some of the

12   secondary issues about -- things about use of singular

13   versus plural, things like that.

14           But the five major issues that people seem to have

15   joined on are the application in Section 10706 to regulated

16   traffic; the scope of the discussion and agreement, how you

17   figure that out; the meaning of "concerned" interline

18   traffic; the meaning of unlawful considered by itself, and

19   then there is an issue that's been raised about the burden

20   of proof.  This is just a way of saying we're the

21   defendants, the plaintiffs in the oddity of this case.

22           The Department of Justice comes out on these

23   various issues.  I am not going to spend any more time on it

24   now, it's just a useful reference for the future; but it

25   also just tells you a little bit about our outline going

1    forward.  The first thing that we're going to do is just go

2    again, a little bit deeper into the background of the

3    statute; and Mr. Gardiner is going to lead that discussion.

4              THE COURT:  Okay.

5              MR. GARDINER:  Okay, Your Honor.  It's Kent

6    Gardiner.  Good morning again.

7              If you go to slide 10, just a heading slide, the

8    legislative purpose and application.  The purpose here is

9    somewhat connected to some of the questions you have already

10   asked is to pause and reflect on what the Staggers Act was

11   trying to do, how does that relate to interline commerce and

12   how does it relate to the reach of the protection of 10706?

13             So just very briefly, the Staggers Act was aimed

14   principally at revitalizing the railroad industry; it had

15   been rendered completely uncompetitive.  It was largely

16   uncompetitive in the interline space.

17             What was noted at the time was 70 percent of all

18   of railroad commerce was interline and, as such, the

19   railroads were trying to link up with each other -- two

20   companies or more, as Mr. Wall said, instead of one -- but

21   they were trying to compete against single entities,

22   trucking companies -- mainly the barge lines and trucking

23   companies, et cetera.  So Congress was trying to figure out,

24   how do we revitalize this industry?  How do we save it from

25   dying, and how do we promote competition in the interline

 1      business that the railroads were engaged in?

 2              So if you go to the next slide -- just a couple of

 3      backdrop slides, what is interline commerce?  We have

 4      already spoken about it a bit this morning.  We have seen

 5      this map before.  It's just a good reminder that it's a

 6      different kind of industry than many other industries that

 7      have joint ventures or partnerships, or what have you.

 8              There are hard borders here; they are the borders

 9      of the tracks.  In the end, it cannot ship its customers'

10      products to New York without some kind of partnership with

11      an eastern railroad.  NS can't ship products to Seattle

12      without figuring out an interline partnership with one of

13      the western carriers.

14              As Mr. Wall noted, again, the map makes it clear

15      that if you have an eastern carrier, CSX and NS, they are

16      very substantial head-to-head competitors, but even they

17      don't reach everywhere in their regions.  So even they have

18      interline partnerships and, yes, they have meetings to talk

19      about how to put out a joint product to get to places they

20      each don't go in the east.

21              But the vast, vast majority of what we're talking

22      about here in this case is the discussions and product

23      offerings and agreements between one eastern carrier and one

24      western carrier as they're trying to move their products

25      coast to coast or to places they just can't reach across

1     that pretty hard divide.

2              Eastern and western carriers have some small

3     amount of competition between them, mostly along the border

4     of the Mississippi where the tracks touch.  But far and away

5     the vast majority of their relationship with each other is

6     as interline and end-to-end partners, as joint venture

7     partners, and they're trying to essentially replicate what

8     their single-entity competitors are up to.

9              So if you go to the next slide, there is an

10    example of where that rubber meets the road, if you will.

11    They are, as Congress recognized at the time, relentlessly

12    up against trucks.

13             Trucks have it easy compared to railroads, right?

14    A customer calls them up, they put the goods on in New York;

15    they get on the interstate highways which have been paid

16    for, and on they go and off they go.  So you have a single

17    entity that's dealing with all of the operational issues.

18    There is one route, there is no handoff, there is no change

19    of equipment, there is one bill.  If there are problems or

20    delays, one company is dealing with that; a very attractive

21    product to customers.

22             Customers want that one-stop-shop.  And so

23    railroads essentially -- if they're going to offer that,

24    they have to build a train together.  They have to figure

25    out what cars are we going to use, what power, how do we

1    interchange, where do we interchange; where along the

2    Mississippi do we find a place to interchange our traffic?

3    How do we deal with delays?  How do we deal with problems?

4    All -- two companies trying to figure that out, an enormous

5    amount of communication there.  Even more probably, shippers

6    want highly competitive pricing.

7            Your Honor used an example in your question a

8    moment ago to Mr. Wall:  What if a customer calls up and

9    asks one railroad for a rate to go across the country?  That

10   happens; that's a -- think of that as a spot purchase.  But

11   what happens much more often is that there are whole

12   industries that the railroads are trying to serve

13   competitively, take the grain industry or the lumber

14   industry.  And the railroad kind of put together products

15   that are highly competitive to truck pricing.

16           A trucker knows exactly what its costs are; it

17   knows how to cover its costs.  If it has a size interchange

18   in its costs like fuel, as Mr. Wall was saying, it just

19   changes its price to cover its cost.  Back in this time

20   period trucking companies did that by imposing a fuel

21   surcharge.  But railroads coming together to offer interline

22   product, we have to talk to each other about how are we

23   going to cover our costs; where might there be a surcharge,

24   including on fuel; how do we deal with other kinds of

25   constraints?  They also have to do that in an enormous

1    volume.

2           The plaintiffs' expert here, Dr. Rausser,

3    estimated that during the 2003 to 2008 period there was

4    something like 14 million interline routes, and so this is

5    not a casual or episodic thing; it is constant with a very

6    large number of people in each company, including senior

7    executives, trying to figure out where are we going next?

8    What traffic are we capturing next to compete with the

9    trucks?

10          You go to the next slide, the detail -- this is an

11   excerpt from the expert report that Linda Morgan filed in

12   this case; she is the former head of the STB -- chair of the

13   STB from 1994 to 2002.  It illustrates that the STB fully

14   understood this.  They fully understood that interline

15   carriers, particularly east-west, had to talk to each other

16   all the time.  They had to talk to each other about rates,

17   they had to talk about routes, interchange, how to market

18   together in order to be competitive.

19          And her key point on these interline movements,

20   rail carriers act as partners, not competitors.  So the STB

21   fully understood then, understands now, that interline

22   partnerships are a crucial part of these railroads being

23   competitive with each other.

24          But to go to the next slide which is 14, all that

25   communication creates a legal pitfall, that's why we're

1    here -- and we all come to it.  Think about other industries

2    in -- where competitors rarely talk to each other and they

3    won't even act in peril because they are facing different

4    kinds of cost structures, what have you; not so in the

5    railroad industry.  And so here you have got unending

6    communications about the interline offerings.

7            If you go back to 1980 when Staggers came into

8    effect, prevailing antitrust trust doctrine at the time was

9    not quite as nuanced about how to parse between legitimate

10   inferences of collusive behavior and false inferences of

11   collusive behavior.  At the time the prevailing document was

12   greatly suspicious about competitors being together talking

13   about price, talking about competition and potentially

14   acting in similar ways when they weren't involved in some

15   kind of joint venture; this notion of parallel activity.

16   Again, that's changed a bit with the Supreme Court's ruling

17   in the '80s, but it was a very large concern at the time.

18           And so that led to -- if you go to 15 -- the real

19   essence of the debate about 10706.  And there is much in the

20   plaintiffs' presentations about what DOJ was thinking, what

21   it was saying.  But the essence of it when applied to 10706

22   is that there really wasn't a debate about interline

23   partnerships.  We quote here both the DOJ and the FTC

24   saying, look, these are competitively benign.  We don't have

25   a concern about interline discussions, communications,

1    because they are joint ventures; they are end-to-end

2    participants; they are not competitors with each other.  So

3    they should -- as Mr. Flexner said at the time, they should

4    not have anything to fear when they are doing that in terms

5    of antitrust enforcement.

6              Well, the railroads were never worried about that.

7    They were worried about false inferences and so, in a sense,

8    tendered as a debate to costs.  Congress disagreed with the

9    antitrust enforcement agencies.  The agency said they don't

10   really need this much protection because these are

11   competitively benign.  How Congress made a different

12   judgment -- in their conference report they made that

13   completely clear.  This is September 20 of 1980 when

14   Congress says, Because of the requirements that carriers

15   concur in changes to joint rates, carriers must talk to

16   competitors about interline movements in which they

17   interchange.  That requirement could falsely lead to

18   conclusions about rate agreements that were lawfully

19   discussed.

20             So Congress embraced this notion -- this concern

21   by the carriers -- that if they are working together on

22   interline product offerings, trying to be competitive with

23   trucks, that that could lead to false inferences of

24   conclusion; so 10706 is aimed at dealing with that exact

25   issue.

1          If you go to slide 16, it gets into this use of

2    what is it that 10706 was designed to cover.  Was it

3    designed to cover all of the traffic that the carriers were

4    engaged in that touched on interline, that related to

5    interline; that appears to be entirely clear, both from the

6    text of the statute and just from its fundamental logic.

7          So if the DOJ says -- and we quote them here --

8    the text was structured, then 10706 forecloses the

9    plaintiffs' theory.  The plaintiffs' theory is that, no,

10   this only applied to regulated traffic; that the much larger

11   contract traffic that was the whole purpose of Staggers to

12   create an unregulated contract traffic somehow doesn't apply

13   to 10706.  DOJ flatly rejects that.  They say rightly, we

14   agree that the text is clear.  10706 applies to any

15   proceeding in which there is a claim for an antitrust

16   inference which necessarily covers both regulated and

17   unregulated traffic.

18         The statute itself has two parts.  It's completely

19   clear that subsection Roman I, which talks about some

20   residual rate bureaus that might be approved and then says

21   "or"; and at subsection Roman II, which is this

22   antipreceding language.  And so from a statutory

23   construction perspective, we think there is no room for any

24   argument that this applies only to this subset of

25   forward-looking traffic that was going to be regulated.  And

1     from a logical perspective, it just simply underscores the

2     point.  The whole reason for Staggers was to create this new

3     world contract traffic.  As you see from the conference

4     report, Congress was concerned with creating this new world,

5     that they maximum the ability of noncompeting carriers

6     putting out joint line movements and products.

7            It's also completely unworkable.  There is no

8     distinction between regulated and unregulated in terms of

9     day-to-day commerce.  A customer might be -- have some of

10    its traffic moving in a regulated way and some in a contract

11    way.  Those goods may be on the same train.  The idea that

12    the statute is split between those two kinds of traffic

13    makes no sense when the whole purpose of 10706 was to deal

14    with a general antitrust evidentiary issue.

15           So that is sort of a brief overview of how we get

16    to 10706 and its breadth of application to all of the

17    commerce that the railroads were engaged in going forward.

18           THE COURT:  Mr. Wall.

19           MR. WALL:  Thank you.

20           So, Your Honor, what we're going to do is go into

21    what is probably the most interesting contested issue here,

22    which is the meaning of this key phrase about the

23    "discussion or agreement" concerning interline movement of

24    the rail carrier.  This comes from the evidentiary provision

25    and it's just, again, to review -- the plaintiffs are at

1    least arguing that they are not using similar action so this

2    would become more important.

3           Turning over to slide 18, obviously there are a

4    lot of words in this statute.  I will say that for all of

5    the, sort of, interpretive gymnastics that folks have been

6    advocating here, it isn't a statute that this particular

7    part of it -- this (a)(3)(B)(ii) -- is not a statute that

8    uses a lot of jargon.  It uses a lot of common words, words

9    that drive it, words like "discussion or agreement" or

10   "concerning"; and it really comes down to these, sort of,

11   four key principles that we have identified in the red

12   boxes.

13          First, it's just what Mr. Gardiner just mentioned.

14   By its terms, it applies to every antitrust claim which, as

15   the DOJ says, by itself takes care of the issue of whether

16   it applies only to regulated versus unregulated traffic.

17          Then you have the rule against inferences.  This

18   is the more substantive principle, that it is simply

19   improper to make an inference of conspiracy from a

20   combination of what somebody did in their interline business

21   and the similarity of that to what they did in their other

22   local routes.

23          There is the evidentiary provision.  And then

24   there is this important point that has some ramifications to

25   these three things that we will discuss along the way which

1    is in its final sentence; it instructs that any proceeding

2    before a jury the Court shall determine whether the

3    requirements of subclause one or two are satisfied before

4    allowing the introduction of that evidence.

5         We have prepared a couple of flow charts just to

6    try to illustrate how we see the logic of the two different

7    provisions; the first one on slide 19 is the discussion and

8    agreement, the evidentiary provision.

9         What I would submit to you, Your Honor, is I think

10   the core underlying purpose here is to require courts to

11   respect that there is an unusual dynamic that is going to go

12   on in this industry, and that is that unilateral action;

13   anything that is unilateral is nevertheless taking place in

14   light of sometimes at the same time as very similar

15   decisions that are made with respect to interline traffic.

16   And it is that potential catch 22; the idea that you could

17   have the communications that you are having on the interline

18   being used against you for a broader conspiracy which is the

19   core of this evidentiary protection.

20        So you begin with determining what the scope of

21   "discussion or agreement" is; I will cover that in a second.

22   And then you hit the point where you start having yeses and

23   nos; does that discussion or agreement concern interlining.

24   Well, if it doesn't you stop; you don't need to worry, the

25   evidence is going to be admissible.  But if it is, there is

1    a second step that's been built into the statutory

2    formulation here, and that has to do with whether the

3    discussion or agreement would be unlawful considered by

4    itself, and that is something which is of course of

5    considerable debate here.

6            The similar actions diagram on the next page is

7    simpler because it's more or less of a black-and-white rule;

8    you just start by identifying an action that was taken by

9    two or more carriers with respect to their interline

10   business.  And you ask the question here that is being used

11   to try to show that what they did on their local business

12   because it's similar is a product of conspiracy.  If it's

13   not, then there is no issue; nobody has to worry about it,

14   the issue does not even arise if someone is not doing that.

15   But if it is, it can't be done; it's a black-and-white rule.

16   It simply can't be done.

17           I think the purpose of this one is to realize that

18   that is not going to be unusual; it's going to be normal,

19   it's going to be common that decisions that are made about

20   interline business are going to be highly influential on

21   decisions that are basically the same issues that apply for

22   local traffic.  And so you don't want -- again, it's a catch

23   22.  You have made your decision with respect to your

24   interline business.  You don't want people saying, aha,

25   you're doing the same thing in your local business, that's

1    evidence of conspiracy; no, it's not.  It's -- that's the

2    same business; decision-making calculus came up with the

3    same answer.  You may often make those decisions with

4    respect to fuel surcharges, you make those decisions at the

5    same time.  So there is a temporal gap between the interline

6    and the local decision or the local decision and the

7    interline decision; perhaps you are just solving for both at

8    the same time.

9           So the scope of the agreement is an issue as to

10   which we are in substantial agreement with the Department of

11   Justice, and the plaintiffs are in a contrary position.

12           THE COURT:  When you say -- let me stop you, sir.

13           When you say "the scope of the agreement," what

14   you are talking about is the language in the sentence that

15   says:  In any proceeding which a violation is alleged

16   evident of discussion or agreement?  As I understand the

17   difference between you and the plaintiffs, they're saying

18   there is one overall agreement --

19           MR. WALL:  Right.

20           THE COURT:  -- and then you are saying well, no.

21           Again, going back to my simplest -- simplest

22   hypothetical, CSX talks to UP about a particular shipment;

23   that is a discussion.  And if they agree or you get a

24   concurrence on a price, including a fuel surcharge, that is

25   an agreement; and it's an agreement --

```
1                    MR. WALL:  Right.

2                    THE COURT:  -- with respect to that shipment.

3                    Now, it could be a broader agreement --

4                    MR. WALL:  Right.

5                    THE COURT:  -- but it is not the agreement that

6      comes from the phrase "agreement, conspiracy, or

7      combination," nor --

8                    MR. WALL:  Absolutely.

9                    THE COURT:  -- in your view be the agreement that

10     the plaintiffs allege?

11                   MR. WALL:  Yeah.  So I think what's a very helpful

12     thing to do, Your Honor, is if you go back to slide 18 which

13     is where we quoted the statute --

14                   THE COURT:  Yes.  That's what I was just looking

15     at when I asked what I intended as a question.

16                   MR. WALL:  Yes.  So as you just pointed out, the

17     first sentence talks about in any proceeding in which it is

18     alleged that a carrier was a party to an unlawful agreement

19     in violation of antitrust laws -- to simplify what is

20     actually a lot more technical language, okay; so that's a

21     reference to an agreement.

22                   As the statute continues, it references another

23     kind of an agreement, a discussion or agreement that relates

24     to interlining.  Okay?  And I think that the key intuition

25     here is that this is a statute about proving a bad
```

1    agreement, an unlawful agreement, based upon evidence of a

2    benign agreement or an interline agreement, okay; that's the

3    concern.  You shouldn't be able to prove a bad agreement

4    from a benign agreement; that's what it's about, okay.

5             The bottom half of the statute which -- on this

6    page -- is one that defines the evidentiary protection

7    around evidence of a discussion or agreement that concerns

8    the interline movement.  So it's focused on the benign

9    agreement or at least the ordinarily benign agreement,

10   right?  And so there is this preliminary question that I was

11   just getting into which is how broad is that agreement.

12             Now what you made I think is an even more

13   fundamental point which is -- whatever that is, it isn't the

14   unlawful agreement that's the top of the statute; that's a

15   separate thing.  We are now looking at whether there was an

16   interline discussion or agreement that is being used to

17   prove or infer that unlawful agreement; that unlawful

18   agreement can be whatever plaintiff wants it to be.  This is

19   not an immunity statute, it doesn't have any, sort of,

20   substantive limitations on what their theory might be; but

21   it does absolutely regulate the use of evidence of that

22   ordinarily benign interline agreement, and so that's the key

23   point here as we go forward.

24             We are in agreement with the DOJ that -- so we

25   refer to this in the brief as the unit of analysis that one

1    uses in determining whether something first concerns

2    interline and whether it was unlawful considered by itself;

3    so what are you going to look at?

4         There is an awful lot of effort made by the

5    plaintiff and even, in this instance, the DOJ to say that we

6    are trying to look at evidence in isolation, okay; and

7    that's just not true.  What we are trying to say is what DOJ

8    expressly says, which is that unit of analysis is just --

9    whatever the discussion or the agreement was in the real

10   world -- the interline discussion or agreement was in the

11   real world, you take that for what it was and then you

12   analyze does it concern interline and eventually, the second

13   step, was it unlawful considered by itself.

14        I am told, by the way, that I can now be seen

15   somewhere here, so I am going to switch to video.

16             THE COURT:  There you are.

17             MR. WALL:  Can you hear me now?

18        Okay.  Great.  Thank you.

19        You will see that in the period of time when I was

20   invisible I took my jacket off and loosened my tie; I hope

21   that's okay.

22        All right.  Let me get organized.

23        Okay.  So now when we're going to make -- we're

24   going to make this starting point determination that there

25   was an interline discussion or agreement.  And to illustrate

1        our position, we prepared a couple of slides with a

2        hypothetical -- two hypotheticals that are pretty easy.

3                On slide 22, this is the hypothetical about three

4        communications that constitute one discussion, right?

5                We all know that discussions don't always occur at

6        a single point in time; it is common for them to occur in

7        multiple communications.  All you need -- we are not asking

8        for anything more than this, Your Honor -- is we just need

9        some -- what some cases sometimes call cognitive tissue or

10       connective tissue rather, connective tissue; that there is

11       some piece of evidence that actually tells you contextually,

12       factually, that these were one discussion, that these

13       weren't two or three discussions.

14               So in this example we have a situation where on

15       one day there is an invitation to have a conversation, on

16       the next day they have the conversation; and then a couple

17       of days later there is an email sent that evidences what was

18       agreed to during the conversation, okay.  All three pieces

19       of evidence relate to one discussion or agreement.  So you

20       would then ask with respect to that discussion, Does it

21       concern interline?  Was it unlawful considered by itself?

22               Now, if you go over to the next page you get a

23       hypothetical in a lot more -- it's much more like what the

24       plaintiffs are doing in this case; and that's a situation

25       where, on the left side, we have the same example that I

1    used on the previous slide.  It's the same three

2    discussions.

3             But now, two months later, different parties have

4    an alliance meeting that has fuel surcharges on the agenda.

5    As the DOJ says -- and we agree with this -- you need some

6    contextual evidence to connect those.  You need some

7    tangible factual reason to believe that those are one

8    discussion as opposed to two discussions because of the fact

9    that they involve different parties, they're at

10   substantially different times, and so forth.

11            Now, I will note with, frankly, some consternation

12   and frustration that the DOJ's brief spends an awful lot of

13   time on hypotheticals that have nothing to do with this

14   case, that they seem to be solving for another case at

15   another time that they're worried about -- and I guess I

16   understand that from their perspective -- and it's not hard

17   to imagine close cases as to whether conversations are

18   connected into one conversation or are distinct.

19            But you have got to remember one of the most

20   important things about this motion is that these plaintiffs

21   are not making any argument that is below the level of

22   everything considered together; they want to lump everything

23   together.  And despite yeoman efforts on our part to get

24   them to engage at the level of particular discussions or

25   agreements, what they come back to time and time again is

1    some kind of an argument for aggregating everything together

2    which reaches its most absurd heights in connection with

3    the "considered by itself" element of the statute since

4    their position -- it's hard to even say it out loud -- is

5    that everything together should be considered by itself;

6    that's their position.  And they get there in this instance

7    by trying to piggyback off of something that the DOJ said

8    about how context could inform the scope of an interline

9    discussion or agreement; and of course context can inform it

10   in lots of cases.

11        But DOJ was crystal clear that that does not mean

12   that they can aggregate every communication they want under

13   the umbrella of their allegation of one unlawful conspiracy.

14   And when you look at what they do -- and we cite this piece

15   from their response of the DOJ brief at page 17 -- they try

16   to say that by looking at context you can aggregate

17   cumulative evidence, a mountain of expansive interdependent

18   communications over a relatively short period of time which,

19   if taken together, lead to certain conclusions.

20        Well, that is just a flat repudiation of the

21   structure of the statute which is intended to have courts

22   undertaking the analysis of whether it concerns interlining

23   and whether it's unlawful at the level of discrete

24   discussions or agreements.

25        So unless you agree with them -- unless you say

1    that the statute allows what we and DOJ say it does not --

2    to aggregate everything into one holistic piece -- then it

3    makes the disposition of this motion pretty simple because

4    they haven't even met us on the field of battle that is

5    defined as the particular discussion or agreement.

6              Okay.  I am going to turn now then to the concern,

7    unless you have got any concerns on that one.

8              THE COURT:  No.  Go ahead.

9              MR. WALL:  Okay.  So this will be another -- one

10   thing you will hear from me over and over today is, don't

11   over complicate it; things are not as hard as people are

12   trying to make them out to be.  Nowhere is that more clear

13   than with respect to the interpretation of a very common

14   ordinary word, "concerned."

15             You know, I am sure you heard there is now a

16   frequently repeated comment by Justice Kagan that we are all

17   textualists now, and perhaps not --

18             THE COURT:  She got that after she started going

19   shooting with Justice Scalia; I think she came back

20   transformed.

21             MR. WALL:  It was probably an important way to

22   have him not shoot her because we know that's happened

23   before.

24             Look, I think that whether you are a textualist or

25   a pragmatist, the starting point for statutory construction

1    is what is the ordinary public meaning besides this very

2    recent Supreme Court decision in the *Bostock* case.  And we

3    all know what "concern" means; let's not go to great lengths

4    to figure this out.  It means about; it means related to; it

5    means it has consequences for it; it means it concerns it;

6    we all know this.  It is a simple, ordinary word.

7            And in the one case that everybody cites -- and

8    the *Gosselin* case actually defines it in a way that we're

9    completely happy with here which just means that the parties

10   had in mind some consequence for the subject matter.  And,

11   Your Honor, that would just make such easy work of this case

12   because what we're talking about here -- what these

13   discussions all concern is fuel surcharges, okay.  They

14   all -- you can talk about what else they might concern, and

15   we'll have that debate in a moment; but they all concern

16   fuel surcharges.  And let's just put that in context on the

17   next slide.

18           So you know, again, as we noted earlier, there are

19   some east and west discussions.  The vast majority of the

20   communications at issue here are east-west.  So

21   foundationally you are talking about railroads who have

22   very, very small, tiny competitive overlaps but massive

23   connecting businesses, massive connecting businesses.  Their

24   relationship is about their interlining business, not about

25   the small competitive business.  The subject matter is the

1    pricing of their joint product; it's the pricing of their

2    goods.  Again, the context; 30 percent increase in the price

3    of diesel fuel, future markets going sideways.  They have

4    thousands of joint rates in place.  Those joint rates -- as

5    the plaintiffs very often tell us, many of them didn't have

6    fuel surcharges.  So the integrity of those rates is

7    threatened by the possibility of fuel going sideways.  So

8    they talked about it.  Is that even in theory objectionable?

9         Let's assume a world for the moment, Your Honor,

10   without Section 10706; so we're entirely governed by

11   underlying principles of substantive antitrust law; the

12   world that DOJ wanted when they opposed this statute.

13        Well, as they were pointing out at the time, the

14   underlying principles of antitrust law always allow joint

15   venture partners to set price together and to discuss their

16   price together.  In fact, in the Supreme Court's *Texaco*

17   *versus Dagher* decision, they actually elevated pricing

18   discussions into what Justice Thomas called core activities

19   that didn't need to be justified, that didn't need to follow

20   the ancillary restraints doctrine; it was something that

21   joint venture partners always get to discuss.  No one is

22   going to stand up -- as I say that, no one is standing up --

23   no one is going to look into their camera today and tell you

24   that it is illegitimate for interline railroads to discuss

25   fuel surcharges because that would be frivolous; there is no

1     good faith argument.

2             In addition, as you will see in virtually every

3     single one of the documents at issue or the deposition

4     testimony at issue, or whatever there may be, the

5     relationship to interlining is on the face of the document.

6     You don't need to have extraneous evidence to come in and

7     explain that contextually it was about interlining or

8     anything like that.

9             So the question again is, under the ordinary

10    public meaning of the word "concern" how can discussions

11    like that possibly not concern interlining?  How could that

12    possibly be?  So let's just run through a few examples of

13    the kind of documents that we're talking about.

14            Slide 27 is a document that is used in their

15    conspiracy narrative to try to make the point that on

16    March 12th and 13th, 2003, supposedly at the beginning of

17    the conspiracy, UP and CSXT had a discussion about fuel

18    surcharge methodologies; and they did.  They did.  Remember,

19    that occurs as fuel prices had just gone up 30 percent.  It

20    would have been astonishing for them not to discuss that.

21    It would have been negligent for them not to have discussed

22    that, but they did.  And the sole reference to that in this

23    agenda is explicitly under the heading, "Other pricing

24    issues on CSX/UP interline business."  Okay.  So somebody

25    now is going to make an argument to you through interpretive

 1     gymnastics that that document doesn't concern interlining.

 2             Let's go on to the next document.

 3             This is January 2004, an exchange between

 4     employees of Norfolk Southern and Union Pacific; it is

 5     specifically about UP/NS interline transfer.  It has context

 6     in it that makes no sense other than in relation to the

 7     interline traffic, and somebody is going to make an argument

 8     to you that this does not concern interlining.

 9             And in one more example, the next one is actually

10     one of those concurrence requests on a fuel surcharge.  It

11     has a subject matter in all caps, "Request for joint line

12     concurrence."  It talks about how the surcharge amounts will

13     be shared on the same proportions as associated interline

14     divisions for joint line prices; and somebody is going to

15     tell you that that doesn't concern interlining.  And I am

16     going to submit to you that you should be very, very

17     suspicious of any argument that would lead to the conclusion

18     that those documents evidencing those discussions and/or

19     agreements don't concern interlining.

20             So what's the argument?

21             Well, there is an interesting dynamic here.  The

22     plaintiffs now fully embrace the DOJ's argument and reason

23     on this issue.  Their original argument on this point was

24     different.  They made an argument, it was less absolute; it

25     was about a discussion that was mostly or fully about local

1    traffic shouldn't be regarded as about interline traffic,

2    but now they have gone all in on the DOJ's argument.

3         And the DOJ's argument is one that asks you to

4    decide that the only reasonable interpretation of concern in

5    this context is that the discussion or agreement exclusively

6    or solely concerns the interline and has no connection at

7    all to broader issues, local traffic general issues.  So

8    let's just go through statutory interpretation one on one

9    and not make it complicated, okay?

10        "Concerned" is a word courts have construed in all

11   sorts of statutes; and it's not just the one that was at

12   issue in the *Gosselin* case, but a lot of other statutes.  We

13   have a citation in our reply brief -- our first reply, reply

14   to plaintiffs, not DOJ -- in which we cite a variety of

15   cases that consistently interpret "concern" as an inclusive

16   term; a term that means relate to or about, something like

17   that.

18        Now, you could say but Congress may have meant

19   something different.  The normal thing we do is we turn to

20   the legislative history, right?  Let's go to the legislative

21   history.  Let's see what Congress said in the legislative

22   history that informs the meaning of "about."  The principle

23   item of legislative history here is the conference report;

24   and the conference report says that the legislation assesses

25   risks from the fact that, quote, carriers must talk to

1    competitors about interline movements in which they

2    interchange -- about interline movements.  No divergence

3    from the ordinary usage; confirmation of the ordinary usage.

4         Nevertheless, DOJ tries to make this argument that

5    it's somehow awkward to use the word "concern" in a manner

6    that captures more than one thing; and they have these sort

7    of examples about, You wouldn't say that World War II

8    concerned a beach in Normandy.  It's clever.  I mean, look,

9    we're all lawyers; we like this stuff.  We get excited by

10   clever argument like this; but I have got to say, give me a

11   break.

12        You would say that World War II concerned a

13   conflict in Germany, and you would also say that it

14   concerned a conflict in Japan.  And because it concerned a

15   conflict in Japan, you would never say that it didn't

16   concern a conflict in Germany.  There is no mutual

17   exclusivity to the word "concern."  In this conversation --

18   this conversation will concern this part of the statute and

19   then another part of the statute, and then another part of

20   the statute; we do this every day.

21        Baseball concerns hitting, it also concerns

22   pitching.

23        THE COURT:  I don't even watch it anymore.  It

24   doesn't even --

25        MR. WALL:  Sorry about that.

1          But Alex Smith is coming back to the Redskins.

2          THE COURT:  Yes.  No, not to the "Redskins," to

3     the Washington football team.

4          MR. WALL:  Yes, to the Washington football team.

5     Thankfully.  That will sell a lot of merchandise.

6          But it's nothing unusual about saying that a

7     subject matter concerns another when it also concerns a

8     second thing or a third thing.  And it was very surprising

9     to me that DOJ took the position the way they did because of

10    what they do with respect to the Foreign Trade Antitrust

11    Improvement Acts -- which I happen to know about because I

12    very recently argued an appeal on this issue -- and cited a

13    DOJ statement in which they go out and point -- they go out

14    of their way to say that the word "involve" as it's applied

15    to foreign commerce doesn't mean -- doesn't need to be

16    exclusively involved or even mostly involved; it just means

17    that it's involved.

18         So my plea on this one, don't complicate it.

19         If somebody is trying to sell you an abnormal

20    definition of "concern" so they can take those documents

21    like I just showed you that obviously relate to interlining

22    and say that they don't, they're selling something; that's

23    not a -- that's not a fair, by the numbers interpretation of

24    the statute.  It also destroys the structure of the statute,

25    and that's the point of the next slide, Your Honor,

1    slide 31.

2            Because, remember, this admissibility rule

3    proceeds in two steps.  The first is qualifying discussions

4    or agreement for potential protection by virtue of their

5    connection to interlining.  The second step is trying to see

6    whether perhaps the railroads lose those protections because

7    it overstepped, and they talked about other things and

8    improper things.

9            The DOJ now, in plaintiffs' approach, undermines

10   that second step that makes it superfluous because it's

11   inconceivable that a discussion that was exclusively and

12   solely limited to the pricing of interline business could be

13   unlawful considered by itself, which of course was the very

14   point that your neighbor Mr. Flexner -- his colleagues at

15   the antitrust division -- and the Federal Trade Commission

16   were making 40 years ago in the context of the debate over

17   this statute.

18           So let the statute do its work; allow "concerned"

19   to be the inclusive term that it is intended to be.  Every

20   one of these things easily concerns interlining under any

21   ordinary normal definition, and reject these efforts through

22   these linguistic interpretive gymnastics to make "up" turn

23   into "down" and "concern" mean only or exclusively

24   concerned.

25           The final point on this one is, this can't work --

1        the entire premise of this argument is this idea that

2        carriers can very, very neatly separate their communications

3        into interline boxes and noninterline boxes and, Your Honor,

4        that's just not true.  It's just not true.

5               They make decisions every day at interline

6        partners that simultaneously affect the local and the

7        interline business simply because they are managing the same

8        railroad assets.  Every single capacity decision that they

9        make will concern both local and interline traffic

10       inherently because it will affect the amount of capacity

11       that is available for both usages.

12              Fuel surcharges are the best example of that

13       because if you have a problem that fuel is going nuts on

14       you, it's a general problem.  It's not an interline problem,

15       it's not a local problem; it's a general problem.  And

16       you -- there is -- it would be artificial and silly to

17       have -- to force people into saying that they have to speak

18       about these -- this in terms of interline only when this

19       very statute would then say that if they did the exact same

20       thing with respect to their local traffic there could be no

21       inference of conspiracy from that; it doesn't make any sense

22       at all.  So I am going to move on to the next section unless

23       you have any more questions on that.

24              THE COURT:  All right.

25              MR. WALL:  Okay.  So the final part of this is

1       going to be on second step of the admissibility

2       determination, and that's this idea of lawfully considered

3       by itself.  You know, I am just going to begin with slide 34

4       with a question which is, Why is it that the plaintiffs

5       won't meet us on the field of battle here?  Why won't they

6       actually argue about particular discussions or agreements?

7       And the answer goes to something that my partner,

8       Mr. Campbell, once said in connection with the class

9       certification which is everything that the plaintiffs tell

10      you in this case is an unfinished sentence; it creates the

11      impression of what the rest of the sentence might be without

12      actually establishing the rest of the sentence.  And here,

13      this ransom-note technique is taking these interline

14      communications that when you put them all together in the

15      ransom note they look very scary and it's like -- oh, my

16      gosh, these competitors are sure talking a lot about

17      interline -- about fuel surcharges a lot.  But if you

18      actually break it down the way Congress asked you to break

19      it down, every single one of these conversations is

20      innocuous, does not lead to either any agreement at all or

21      certainly not any agreement that would be unlawful

22      considered by itself.

23              It is with respect to this part of the analysis,

24      Your Honor, that the burden of proof becomes significant.

25      There is debate over the burden of proof; it really hardly

1     matters with respect to "concern" because we took it upon

2     ourselves to lay a foundation that everything be objected to

3     concerned interline; and so whether that was gratuitous and

4     we don't actually have the burden or whether it was prudent

5     because we do, we have dealt with it, and it's done.

6           But there is --

7           THE COURT:  Let me say this, Mr. Wall, then, if

8     you and Mr. Gardiner go on to address it, that's fine.

9           I think it's an important question with respect to

10    the statute and whether it is necessary in your view to

11    define -- characterize it in this case.  I am sure that the

12    justice department will take a different view because

13    this -- you know, assuming that no one appeals whatever I

14    decide -- which of course is a fair assumption -- the

15    justice department and other antitrust plaintiffs and

16    prosecutors are going to have to live with what I say.

17          MR. WALL:  Right.  I am going to discuss it right

18    now, Your Honor.

19          And I am sure you realize that when you ask for

20    the views of the Department of Justice on the issue of

21    burden of proof, they're going to be pretty predictable

22    because it's pretty unlikely that a prosecutor is going to

23    take the time to write an amicus brief to say the burden is

24    on me.  Indeed, they did not.  But let's go through it,

25    okay.

1          Once again, I am going to argue for plain vanilla.

2     Burden of proof evidentiary objections is not a novel issue.

3     The general rule is the burden is on the proponent of the

4     evidence.  That there is -- the one exception that I am

5     aware of for that that is significant is with respect to

6     relevance since there is more of a presumption that evidence

7     is relevant.  So if you actually want to say that it's

8     irrelevant, the burden goes on the objecting party.  And

9     that, by the way, was what the little language was that the

10    plaintiffs cited from the Southern District of Texas case;

11    it was about relevance.  And if you read the rest of that

12    decision, it actually is very much within the mainstream of

13    decisions that say:  When evidence is excluded based upon

14    some kind of policy judgment, about the liability or false

15    inferences, or whatever the case may be -- that it is on the

16    person who wants to use that evidence to meet the burden.

17         The Supreme Court dealt with this in

18    the *Bourjaily* -- *Bourjaily* -- one of those ones that I have

19    no idea how to -- I am going to go with *Bourjaily*.  I am

20    sure that anyone here who has a French background is

21    appalled -- but regardless, very analogous circumstances

22    because it's the coconspirator section, right.  The

23    coconspirator exception actually had something in common

24    with Section 10706 which is embedded determination of

25    whether there was an agreement in the coconspirator section;

1    it's the alleged conspiracy.  As I don't need to tell you,

2    the judge needs to find that by a preponderance of the

3    evidence there was a conspiracy; the hearsay declarant was a

4    member of the conspiracy, and a statement was made in

5    furtherance of the conspiracy.

6            THE COURT:  Hold on.  Let me interrupt you to --

7    you are going into rules of evidence and hearsay, and all of

8    that.

9            I have a question about 10706.

10           MR. WALL:  Right.

11           THE COURT:  10706(a) -- 10706(a)(3)(B)(i).

12           MR. WALL:  Right.

13           THE COURT:  Having a proceeding in which a party

14   alleges that a rail carrier voted or agreed on a rate, that

15   party has the burden.  (B)(ii), which is what we're dealing

16   with here, says nothing about burden.

17           If Congress was concerned about burdens, why

18   did -- I mean, Congress explicitly dealt with the question

19   of burden in (b)(i), and in the very next section said

20   nothing about burdens; so why does your reading of the

21   statute follow?

22           MR. WALL:  So, first of all, I disagree that they

23   say nothing about burdens because I think by putting the

24   responsibility on the Court to determine that the conditions

25   of subclause (ii), quote, are satisfied that -- that to me

1    completely takes out this argument that the DOJ tries to

2    make about these sort of indeterminate cases where you can't

3    say one way or the other whether the conversation was

4    unlawful; and they use the burden of proof to say that

5    therefore the party with the burden of proof which they say

6    are railroads would lose -- the statute actually says that

7    the evidence can't come in until the Court says that those

8    requirements are satisfied.

9              Now, you are right --

10             THE COURT:  I agree.  I get that.

11             But you could -- one could suggest that we don't

12   need burden of proof, that courts -- a court will make a

13   determination, or alternatively -- feel free to comment on

14   either of my alternatives here, or both of them --

15             MR. WALL:  Of course.

16             THE COURT:  -- there would be some logic, wouldn't

17   there, to say that plaintiff, as in this case, has told us

18   what documents it's relying on; so we know that.  The

19   defendant is in a better position -- the railroads are in a

20   better position in the antitrust claim to explain why these

21   are interline communications.

22             So why wouldn't it be appropriate to read this

23   statute both because it doesn't say anything about burdens

24   or, if you don't like that because it just makes sense, to

25   say that after the antitrust plaintiff has proffered a bunch

1  of documents, emails, conversations that they want to rely

2  on and prove their conspiracy that then the defendant has to

3  carry the burden with respect to step one and say -- and

4  then go back to your chart; if the answer to interlining is

5  yes, you go this way; and if no, you go that way.  What's

6  wrong with that?

7  MR. WALL:  I don't think there is necessarily

8  anything wrong with that.  There is a principle in the

9  congenital (sic) evidence of law that makes a distinction

10  between, sort of, a coming-forward burden of the person who

11  wants to make the objection, right; tell me why it's

12  hearsay.  Tell me why it's a settlement communication,

13  whatever it is.  I have no problem at all with that part of

14  this being on the objecting party.  I mean, just from an

15  administrative standpoint it sort of has to be, right?  I

16  mean, you have to make the objection, right?  You have to be

17  able to say these are interline communications, and this is

18  why we took this upon ourselves in our papers.

19  Again, it's going to sound like a broken record,

20  but nobody is fighting these at the level of the individual

21  documents or discussions or agreements, right?  It's only

22  these omnibus 50,000-word arguments that make everything not

23  concern interlining that you are dealing with.  So we are

24  absolutely -- I think the only -- the only, sort of, nuance

25  on that is after the DOJ said that something must

1    exclusively concern.

2            The plaintiffs, in their reply to the DOJ, have a

3    page where they list a bunch of documents that they say

4    concern more than interline and would not concern interline

5    under the DOJ theory because they transcend interline and

6    the content in them.

7            I mean, I wouldn't even argue it matters what the

8    burden of proof is at this point because we have a record as

9    to those documents; it's before you.  I don't think

10   anything -- decision that you are going to make here is

11   going to be -- as to "concerned" is substantially going to

12   be affected by who has got the burden of proof; I don't

13   think it matters in the least because these are not pitchers

14   that are hanging on the outside corner of the plate and the

15   umpire's got to make a tight call.  They're all in the

16   middle of the plate somewhere between the knees and the

17   shoulders.  It's only the fact that they're having an

18   argument to change the strike zone which is making that part

19   of this contested, okay.

20           Now -- but, Judge, it matters more significantly

21   if not in this case, in future cases with respect to the

22   second part of the statute, which is whether that

23   discussion -- let's assume now that we have all agreed we

24   have an interline discussion or agreement, and now it turns

25   to whether it's unlawful.  The statute says it must be

1    unlawful considered by itself.

2           So the second part of the burden question is who

3    is required to establish that the communication was either

4    lawful or unlawful, right?  Who does that fall on?  Now,

5    that's a clear analogy to the coconspirator rule, or the

6    Government has to get the coconspirator statement in by

7    establishing the conspiracy that's it's claiming, that is

8    aligned that way, which is essentially the point of the

9    chart that we have on page 35; let's apply that to Section

10   10706 as you suggested because that's what this is about.

11          And the question is, does it make any logical

12   sense to flip that burden?  Well, what the Supreme Court

13   tells us in *Bourjaily* is that the burden should be on the

14   proponent to establish that the legal and policy

15   requirements of using the testimony are established.  So

16   that makes sense, right?  I mean, show me that you can do

17   this consistent with what this rule is supposed to be about.

18          Well, the premise of this statute is that

19   interline communications are ordinarily benign and indeed

20   necessary, although you don't need to go to necessary; but

21   they are ordinarily benign, which was the shared view of the

22   Department of Justice and -- everybody's shared view, that

23   they're ordinarily benign but potentially subject to misuse.

24   So protection is afforded to them based upon a legislative

25   determination that they are ordinarily benign.  However,

1    there are circumstances in which carriers can lose those

2    protections by virtue of having overstepped and gone too far

3    and made an agreement that that's unlawful by itself.  So

4    what we're really talking about is just who has got to do

5    that.  That should also align with the party who is claiming

6    unlawfulness, otherwise what you end up, Your Honor, is with

7    a logical circumstance in which the defendant has to simply

8    justify the underlying presumption of the statute on a

9    discussion-by-discussion basis.

10           Now, does it matter here ultimately as to how you

11   are going to come out?  No, because you are not making any

12   arguments at the level of discussion or agreement.

13           When I turn this over to Mr. Gardiner in a second,

14   you are going to see why; because all of these unfinished

15   sentences don't lead to a plausible argument that this

16   particular discussion, this particular agreement, was

17   unlawful considered by itself; but it never makes sense to

18   put a burden on a party to prove and reprove the premise of

19   a rule, the premise of a legislative enactment.  The DOJ

20   argument is intended to do that.

21           With respect, they don't cite any authority but

22   the *Gosselin* case which defines "concern" as "about."  The

23   one thing that they do say is that there is some magic in

24   whether this has been expressed as conditions for

25   admissibility versus conditions for admissibility (sic).

1    But we have lots of evidentiary rules, some of which are

2    expressed as conditions for admissibility, some of which are

3    expressed as conditions for inadmissibility.  There is

4    absolutely no law, no precedent, that says that distinction

5    matters at all; it matters in the least.

6              What the Supreme Court said in *Bourjaily* is you

7    put the burden on the proponent to establish that the legal

8    and policy issues underlying the rule are satisfied, and

9    that puts the burden of showing unlawfulness on a plaintiff

10   even if the burden of establishing that it concerns

11   interline is on the defendants.

12             Okay.  I am done with that.  I was going to turn

13   it over to Mr. Gardiner.  But if you have any more on burden

14   of proof, I am happy to stick with it.

15             THE COURT:  No, not at this point.

16             Let me say this, in three or four minutes you

17   will -- the two of you will have spoken for an hour and a

18   half.

19             MR. WALL:  Right.  We're basically done.  I will

20   turn it over to him, and then we will conclude and listen to

21   plaintiffs.

22             MR. GARDINER:  Okay.  Your Honor, Kent Gardiner

23   again.

24             So what we're doing here is taking this unlawful

25   considered-by-itself exception and applying it to actual

1    discussions or agreements that have actual meanings; and we

2    thought it would be illustrative to pick what are probably

3    plaintiffs' three favorite meetings, three favorite

4    interactions among these railroads and see whether even they

5    can be the test of unlawful considered by itself.

6             So if you start with page 37, you have got a

7    meeting here, March 2003, between an eastern and western

8    carrier, BNSF and NS.  If you look through the document, it

9    is all about interline, it's about competitiveness, it's

10   about boosting business, it's about improving business all

11   on an interline basis.  And so the question with that -- the

12   language the plaintiffs love -- and we have pulled it out

13   here on this slide -- BNSF's fuel surcharge is structured

14   differently than NS, CSX, and UP.  Should BNSF be

15   synchronized with the other big players in the industry?

16            The question is posited during this interline

17   meeting between BN and NS.  That's one of the plaintiffs'

18   favorite things to quote; they quote it repeatedly.  You

19   will hear it again in their presentation.

20            What happens when you actually take it forward and

21   try to determine does this ripen into something that is

22   unlawful considered by itself?  What's the rest of the

23   evidence?  Plaintiffs don't do this; we can do it really

24   quickly.

25            Is there evidence in the record that this was a

1    legitimate concern for these two interline carriers?  There

2    is.  It's not too long before the customers are in front of

3    STB demanding that there be uniformity among all railroads

4    about their fuel surcharge programs.  So it's a perfectly

5    legitimate customer concern as to whether these interline

6    partners are aligned, and right now they have different fuel

7    surcharges.

8            But even passing that, does this question

9    transform this discussion into something unlawful and true

10   by itself?  Well, the answer there lies in what happened,

11   right?  Did they go off and synchronize?  Did they reach

12   agreement?  Did they reach agreement with other carriers?

13   Did they reach agreement on the competing traffic?  The

14   answer to all of those questions is no.  There is no

15   evidence that BN agrees to synchronize its formula with any

16   other railroad in this document or anywhere else.

17           BN could have agreed with NS and single-line

18   partners to have the same formula, but that never even

19   happened; and there is no evidence of any agreement on any

20   kind of competing traffic.  So the plaintiffs -- their

21   position is they don't need to show that.  They just need to

22   focus on some language or questions posed, and then it just

23   gets lumped into the narrative; that's exactly what the

24   statute is designed to protect, and it's exactly what DOJ

25   rejects as the way the statute works.  This lumping into the

1    broad narrative is not the way to apply the "considered by

2    itself" exception.

3            If you go to 38, it's the same basic thing.  It's

4    a July 2003 meeting, interline meeting, BN western/NS

5    eastern alliance meeting.  Plaintiffs pull out some language

6    "John Lanigan and Don Seale agreed to lead a discussion of a

7    potential industry position on fuel surcharge provisions at

8    the next N.E.M.C. meeting"; that's a branch of the AAR train

9    association.

10           The meeting itself reflected in the document is

11   clearly all about interline.  The question once again

12   becomes:  Does this language transform this meeting, this

13   discussion, into one that's unlawful considered by itself?

14   It's the same analysis.  We know what happens after this,

15   which is that this discussion never occurs in N.E.M.C., that

16   there is no evidence of any discussion of that sort.

17           Again, these two carriers never even have the same

18   index, so there is no antitrust agreement here.  It is

19   antitrust innocuous that this potential is floated at this

20   interline meeting, and so it can be unlawful by itself.

21           Third one, May 14 -- it's 39 -- May 14, 2003 NS-UP

22   alliance meeting; it's the same drill.  The meeting itself

23   is evidenced in this document and not contradicted anywhere

24   else, is that this was clearly about interlining; they are

25   going on and on about the interline business.  The

1    plaintiffs like this document because of the language that

2    is pulled out.  "Discussions followed on fuel surcharges and

3    various application processes used by different roads.

4    Consensus was reached that it would be a positive outcome if

5    all roads had the same process in the eyes of our

6    customers."

7         They love that word "consensus."  But the

8    consensus is that it would be a positive outcome, that's

9    their view -- if their views is railroads, if their view is

10   interline partners.  The question is does that view, that

11   expression of "view" meet the test for the exception

12   "unlawful considered by itself"?  Once again, if you trace

13   it out to the rest of the relevant evidence the answer

14   becomes clear, this goes nowhere.

15        The language that immediately follows in the

16   document is something the plaintiffs never quote.  But if

17   Your Honor looks at it at some point, the discussion

18   continues.  "There was some question as to whether or not

19   the industry can work together on this opportunity, probably

20   through the AAR, or do roads have to handle the opportunity

21   on a bilateral basis."

22        Action item was for the lawyers, and we know that

23   it goes nowhere from there.  There is no discussion in the

24   AAR and there is no agreement; there is no alignment.  There

25   is certainly no agreement on competing traffic which is the

1    heart of this issue.

2              So, once again, is asking a question -- is

3    referring it to the lawyers with no further action something

4    that could be an antitrust violation considered by itself,

5    no; definitionally, no.

6              And yet they -- once again, the plaintiffs want to

7    pick it up, because they like the language, and put it into

8    their narrative; that's what Section 10706 -- that's exactly

9    what Section 10706 prescribes.

10             Last example, because we see it featured

11   prominently in the plaintiffs' presentation, it's pages 47

12   and 48 of their presentation.  But if you can stick with

13   ours and just turn to 53 and then 55, here is an example of

14   where you do see a discussion playing out over more than one

15   piece of evidence.  We are not taking the position that this

16   is pled -- is limited to one document or alliance grouping,

17   but we hold it up as an example because it's an extreme

18   version of what plaintiffs ignore in contextual evidence in

19   pursuit of a sound-bite.

20             So what's their sound-bite?  Their sound-bite

21   is -- here's an internal email, it's talking about

22   mileage-based surcharges.  There is a project going on

23   inside BNSF to think about moving from a rate-based

24   surcharge to a mileage-based surcharge.  Internally it's

25   noted that one of their executives "will be visiting with

1    his railroad counterparts at the upcoming NEMC/SOMC meeting

2    in Kansas City to judge the appetite for a mileage-based FSC

3    program."  So plaintiffs like that and suggest that there is

4    a discussion that's a more generalized trade-association

5    contact.

6            What do we know about this when we actually apply

7    the contextual evidence?  That executive, Mr. Lanigan,

8    testified, Yes, I wanted to talk to each of my interline

9    partners about whether they could and would be interested in

10   going to a mileage-based program.  They don't have -- BN

11   couldn't have an interline mileage-based program if their

12   interline partner had a rate-based program; it just doesn't

13   work.  They don't match when they hand off traffic, so there

14   is your sound-bite.

15           And the question of course, once again, is what

16   happens?  Well, the plaintiffs just ignore what happens

17   because it's inconvenient for their theory.  We know from

18   page 55 exactly what happens and exactly how it bears on

19   this issue of whether this possibility of talking to other

20   railroads relative to anything remotely antitrust sensitive,

21   much less antitrust violative.

22           So if you look at 55 -- and we have typed out an

23   easier to read what was going on, again, internal email at

24   the BN with no reaction to discussions between BN and other

25   carriers about this issue; and the answer is they said no.

1    They just pushed back as we expected.  They said no.

2           But it even goes beyond that because the question

3    would be:  What would be the antitrust concern that some

4    agreement gets reached -- not even parallel traffic; we know

5    that's protected, but on their local competing traffic.

6           But the email goes on to explain what happens if

7    that other carrier just simply says they're just not

8    interested in talking about mileage-based.

9           So what does BN do?

10           BN goes ahead on its own and begins to change its

11    fuel surcharge program on its local single-line traffic to

12    local; completely out of step with what any other carrier

13    does.  They say, well, there is nothing we can do on our

14    interline except to wait to see whether customers put more

15    pressure on the interline partners to move.  So we know what

16    happened here.

17           The contextual evidence leads you to a conclusion

18    in a clear package, which is no agreement -- the antithesis

19    of agreement and, therefore, no way that they can make out

20    their burden of this thing under the law considered by

21    itself.  This is their best efforts, Your Honor.

22           Mr. Wall.

23           MR. WALL:  Yes, Your Honor.

24           The last couple of slides that we have here are

25    just really -- we don't need to go through them right now

1    because they're sort of a tally-up of the relief.

2         There are a number of issues to discuss which

3    are -- we think that you should address, page 41.  And then

4    we have a proposed order in that we are summarizing.  But

5    that proposed order is the more pixelated, you know,

6    discussion-by-discussion, document-by-document request for

7    relief.

8         We'll hang it up right now -- not literally.

9    We'll turn it over to the plaintiffs right now and then look

10   forward to discussing this again with you later on in the

11   day.

12        THE COURT:  Well, let me say this.  We started a

13   little later than I thought.  My original proposal was that

14   we take a 15-minute break now and then let Mr. Neuwirth

15   start, and then we take a 30-minute break for quote-unquote

16   lunch at about one o'clock.

17        If the court reporter can live with this, maybe we

18   should just take a 15-minute break now and come back and

19   hear from Mr. Neuwirth and his colleague and let them do

20   their whole argument in one sitting, and then take another

21   15-minute break before we go to the United States.

22        So if that's all right with Mr. Neuwirth and if

23   it's all right with Miss Saint-Loth and Ms. Johnson, that

24   might be better than getting him started and then just

25   breaking.

```
1                    You are on mute.

2                    THE DEPUTY:  Yes.  It's okay.

3                    Will we still be taking a 30-minute --

4                    THE COURT:  No.  We'll take 15 minutes, then we'll

5       come back and hear from Mr. Neuwirth --

6                    THE DEPUTY:  Okay.  And take another 15 --

7                    THE COURT:  -- for whatever he takes, maybe an

8       hour and a half, and we'll take another 15 minutes.

9                    THE DEPUTY:  Okay.

10                   THE COURT:  Is that all right with you, Stephen?

11                   Steve, you are on mute.

12                   Steve will figure out how to get off of mute by

13      the time we come back.

14                   MR. GOSSELIN:  Your Honor, let me accept on behalf

15      of plaintiffs.  We're fine with that.

16                   THE COURT:  Okay.  It's now like 12:27 our time.

17      Why don't we come back at 12:45, and we'll hear from

18      plaintiffs straight through.

19                   MR. GOSSELIN:  Thank you, Your Honor.

20                   (Whereupon, a recess was taken.)

21                   THE COURT:  All right.  So everybody is here and

22      everybody is ready.

23                   Why don't you go ahead, Mr. Neuwirth.

24                   MR. NEUWIRTH:  Thank you, very much, Your Honor.

25                   I think that it's fair to say that what we heard
```

1     this morning was really an exercise in cherry-picking, both

2     the evidence at issue and of the law at issue.

3            And a good portion of this morning's presentation

4     was devoted to really a discourse about how the railroads

5     purportedly go about their business.  But what I would like

6     to do is focus in my presentation on the language of the

7     statute and the language of the relevant materials that are

8     now being considered by the Court.

9            And I would ask, if we could, just to put this in

10    the proper context, if we can turn to tab 4 -- actually,

11    tab 2 in our binders just to remind ourselves what it was

12    that the defendants said was the reason for the renewal of

13    this motion at this time.  Because as you will recall, Your

14    Honor, in fact, it was at the time of the class

15    certification hearing in 2010, the first class certification

16    hearing, that fact discovery had largely been completed with

17    some limited exceptions.

18           And you will recall that at that time the

19    defendants had made a motion with respect to evidence that

20    they said should be excluded under this 10706 provision, and

21    there was argument about it at the class certification

22    hearing.  At that time what the defendants argued was that

23    under this provision, which they treated as an evidentiary

24    exclusion provision, certain particular evidence should not

25    be considered by the Court.  And you determined at that time

1    that you did not need to reach the motion because you were

2    able to rule on class certification without considering any

3    of the evidence that was the subject of the motion; and you

4    put that in your order.

5            So you will recall that, as we highlight on

6    page 2, at the case management conference in November of

7    2019, Mr. Wall stated that so much of that was activity that

8    we think falls within 10706, that we would identify that;

9    and we would ask the Court to make determination as to

10   whether or not this is an act that falls within the

11   protection of 10706 or not.  And they told you that this is

12   something that should be decided before summary judgment as

13   we highlight on tab 3; and they have maintained that

14   position today, that you should rule now.

15           What they also told us at the November 14th

16   hearing, as we see behind tab 4, was that the reason they

17   needed to supplement their original motion papers and not

18   just get a ruling on the original motion was because they

19   said that what they hadn't addressed earlier was a

20   substantive component of this provision.

21           And as we highlight, in the white box behind

22   tab 4, Mr. Wall said at the hearing expressly there is a --

23   that there is this -- he said what the statute does say is

24   that in any proceeding there is both evidentiary protection

25   and there is this substantive protection.  The summary

1    judgment decision is ultimately going to be, is there enough

2    evidence of nonprotected activity to create a reasonable

3    inference of conspiracy in light of the protected activity?

4          And in their opening memo before you they said

5    they expressly highlighted the phrase "substantive

6    protection."  And they said, An antitrust conspiracy among

7    railroads may not be inferred from evidence that two or more

8    rail carriers acted together with respect to an interline

9    rate or related matter, and that a party to such action took

10   similar action with respect to a rate or related matter on

11   another group or traffic.

12         So they made very clear that what they were

13   suggesting to you was that they had to supplement their

14   earlier motion to say that there was a type of activity that

15   this statute was meant to protect; it wasn't just an

16   evidentiary statute, but it was one that was meant to

17   protect activity.  And this is very important relative to a

18   lot of what we've heard today.

19         But it is also very important to look at this

20   quote, what they defined as the "substantive protection,"

21   because this is all based on a false premise.  They say

22   evidence that two or more rail carriers acted together with

23   respect to an interline rate -- and that a party to such

24   action took similar action with respect to a rate or related

25   matter on another route or traffic.  Well, that's not what

1    this case is about.

2           They have not shown you any evidence, including

3    all of the evidence they went through today where the

4    railroad spoke about an interline rate.  What they argue,

5    and what they have argued repeatedly, including today, is

6    that as long as the discussion concerned interline rates it

7    is protected.  And the fact that it might concern other

8    rates as well or that the scope of the discussion might go

9    beyond those interline rates it is still protected under

10   this statute, that is the real extreme position that's being

11   advocated today; that as long as the discussion included

12   reference to interline rates or interline traffic it is in

13   the protected zone.  That's what we have heard today, and

14   that really is the extreme position that the Government --

15   that the Government -- I'm sorry -- that the defendants have

16   been advocating.

17          Now, as we see behind tab 6, the defendants --

18   even though they have tried in their brief to disavow this

19   type of substantive protection, it's really what we heard

20   today.  Mr. Gardiner and Mr. Wall spoke at length about

21   their views and understanding of how interline business

22   works; and they told you how important it was to have these

23   interline communications.

24          And they said to you:  These interline

25   communications are what Congress was trying to protect.

1   But, in fact, that is not what the statute says.  As we look

2   behind tab 8 -- if we actually look at the language of the

3   statute that's at issue, which is Section 10706

4   (a)(3)(B)(ii), and sub 2, it says, quote, "Evidence of a

5   discussion or agreement between or among such rail carrier

6   and one or more other rail carriers, or of any rate or other

7   action resulting from such discussion or agreement, shall

8   not be admissible if the discussion or agreement concerned

9   an interline movement of the rail carrier, and the

10  discussion or agreement would not, considered by itself,

11  violate the laws referred to in the first sentence of this

12  clause."

13          So the issue here is not the issue that the

14  defendants will have to address on summary judgment which is

15  whether the communications they had violated the antitrust

16  laws.  And lots of what they have been doing today is to try

17  to convince you that what they did didn't violate the

18  antitrust laws, that it was for a legitimate business

19  purpose.

20          But this statute, Your Honor, has a very narrow

21  set of circumstances where evidence would be excluded from

22  the consideration of the case.  The statute clearly does not

23  say that discussions of interline movements in any context

24  are to be excluded.  It doesn't even say the discussion of

25  interline movements generally are supposed to be excluded.

1    It says that what is not supposed to be admissible is a --

2    where the discussion or agreement concerned an interline

3    movement of the rail carrier.

4         So let's look at what the statute says.  If we

5    look behind --

6         THE COURT:  Do you take the position,

7    Mr. Neuwirth, that to be protected a discussion between one

8    East Coast carrier and one West Coast carrier can only

9    involve a single shipment by a single shipper?

10        MR. NEUWIRTH:  Well, we have -- let me give you

11   two points on that.  The first is that the statute certainly

12   refers to an interline movement.  But even accepting the

13   premise that it can refer to a group of interline movements,

14   what the statute makes very clearly is that it has to be

15   either an interline movement or interline movements that

16   these railroads have in the discussion are involved; it has

17   to be an interline movement that they are doing together.

18   You can't have a general discussion about interline

19   movements that transcends a shipment that the railroads

20   themselves would be participating in.

21        And what you also can't do is have a general

22   discussion about all rates.  And clearly this is a case, as

23   we will see today, where the railroads were regularly

24   discussing all rates and not simply interline rates.  And in

25   fact, as we highlight in our papers, interline rates --

 1    interline shipments actually make up a very small percentage

 2    of overall rail freight shipments in this country; most are

 3    local shipments by one railroad.

 4            And so as we will see, most of the discussions at

 5    issue here were ones that did not relate to interline

 6    shipments that involved railroads having the discussion but

 7    that went far beyond that.  And the defendants say that

 8    we're trying to rely on what we allege in the complaint.

 9            What we're relying on is what the evidence shows

10    the defendants were actually discussing, and Mr. Gosselin is

11    going to walk through this in detail.  But the statute

12    itself does not comply with what the defendants are arguing.

13            As we see behind tab 10, the railroads'

14    position -- as they highlight in their reply brief -- as

15    they say, these phrases raised in Section 10706 do not say

16    that discussions and agreements are protected only when the

17    subject of the discussion relates solely to interlining

18    movements and, conversely, never protected when discussions

19    concern matters that are germane to interline and local

20    traffic.

21            Well, there is nothing in the statute that talks

22    about local traffic.  What it says is it concerns an

23    interline movement.  Whether it's one or multiple, it

24    doesn't say anything about discussing local traffic.

25            THE COURT:  What do you do -- what do you do if --

1    let's suppose you are communicating with a client and you

2    are representing him on three or four different matters and

3    you pick up a 40-minute phone conversation and you discuss

4    all of those things, or you have an email which covers more

5    than one matter or more than one issue; you are talking

6    about the damages question versus the liability question --

7    whatever, whatever, whatever.

8              Don't conversations and discussions often include

9    more than one topic when two people get together to --

10   either in person or on the phone or by email?

11             MR. NEUWIRTH:  Of course that's true, Your Honor,

12   but that -- but that is not what this case is about.

13             What this case is about is evidence where the

14   railroads were clearly talking about rates generally and

15   applying fuel surcharges to all rates across the board.

16             What we really had here today was some overt

17   cherry-picking and trying to use the margins of the evidence

18   to define incentive.  What the defendants did was

19   selectively pull a few pieces of evidence that they feel

20   only relate to a particular interline discussion.  But all

21   of this has to be looked at in the context of the far

22   greater number of documents showing that what was happening

23   here was that the railroads were talking to each other about

24   an across-the-board application of fuel surcharges in a

25   context where a very small percentage of overall shipments

 1   are interline.

 2          This was not a circumstance where the railroads

 3   said, Let's talk about fuel surcharges for interline

 4   shipments, and then they gave a decision to go and apply it

 5   to other rates; that's not what happened.

 6          You will see, when Mr. Gosselin walks through the

 7   evidence, multiple examples of the railroads expressly

 8   saying that their purpose was to come up with fuel

 9   surcharges that they could apply across the board; that has

10   been the theory of the case from day 1, and it is what the

11   evidence shows.

12          And so even if it's true that you can have

13   different types of conversations, that is not what happened

14   here.  And what the railroads are trying to do is take the

15   position that as long as any of these conversations about an

16   effective general rate increase apply in some way to

17   interline rates, or as long as those discussions took place

18   at a time when interline rates were being discussed, that

19   should give them protection under this statute, and that is

20   not what the statute says remotely.

21          And as the Government points out on page 9 of the

22   brief -- and we are not characterizing, we are just

23   quoting -- Section 10706 covers only the -- covers

24   discussions and agreements that concern an interline

25   movement but that does not also concern local traffic.

1          THE COURT:  Well, there are two -- two pieces of

2     the statute or two -- the phrase "concerned" does not say

3     solely concerns or exclusively concerns.  And it goes back

4     to what Mr. Wall was saying, what I had just suggested, you

5     have conversations or discussions all the time in which you

6     discuss more than one thing.

7          So are we not -- are you arguing for modifying the

8     word "concerned" by solely or exclusively?  And are you too

9     narrowly wording the order "am," A-M; are you reading that

10    too narrowly under the dictionary act or case law or

11    whatever?

12         MR. NEUWIRTH:  I don't think we're reading

13    anything too narrowly at all.

14         This is a statute that is meant to exclude

15    evidence from consideration in an antitrust case, and there

16    is a long history that these types of exclusions are

17    supposed to be narrowly construed.

18         What the defendants are suggesting is that it

19    should be broadly construed to mean that as long as your

20    conversation touches on an interlining rate you are

21    protected, and that is -- there is nothing in the statute to

22    suggest that.

23         In fact, the whole premise of the Staggers Act was

24    to eliminate the very general rate increases that used to

25    exist when the railroads would go to the ICC and apply for

1    one; and the Staggers Act expressly prevented that type of

2    conduct.  It certainly prevented it with respect to

3    applications to the Government.  And there is no reason to

4    believe that this provision of the statute was meant to

5    allow the railroads to talk about the very type of general

6    rate increases that rate bureaus were no longer allowed to

7    pursue in deregulation.

8              We can also, if we look at slide 13 --

9              THE COURT:  Look where?  I'm sorry.

10             MR. NEUWIRTH:  I'm sorry.  Behind tab 13 there is

11   another factor here which the railroads have largely ignored

12   which is that it has to be for movements in which the

13   carriers participate.  And that language forecloses the

14   reasonable possibility that the statute is meant to allow

15   general discussions about rates across the board because,

16   clearly, there are general rates that particular railroads

17   will adopt that are not limited to the interline movements

18   in which the carriers having the discussion participated.

19             And I think it is important for this purpose to

20   look at the document that was a focus of the discussion this

21   morning which is the document that is highlighted -- I'm

22   sorry.  Let me see if I can just pull it up here.  It's on

23   tab 5.

24             THE COURT:  On your tab 5 or their --

25             MR. NEUWIRTH:  Defendants.  Defendants' tab 5.

1          Now, this shows exactly what the problem is with

2     what the defendants are trying to convince you to do.

3          They look to this document which is Exhibit 28 to

4     the declaration that they submitted -- the Campbell

5     declaration that they submitted with their motion.  And they

6     highlight this and say:  Look at this, this is just an

7     innocent discussion about an interline rate.  "I received a

8     call from Don Seale" -- this is one of the senior people at

9     Norfolk Southern.  They would like our concurrence on the

10    following.  We'd like to have all interline business to have

11    a particular price increase; and coincident with this, they

12    are going to be rebasing their fuel surcharge.  That's what

13    they quote for you.

14         Exhibit 28 shows that, in fact, what this document

15    also says that they left out -- is that the next paragraph

16    in this very section they quote says:  They would like our

17    concurrence in order to announce the increase on April 20th;

18    that would make the effective date on May 10th, which is the

19    day before the STB fuel surcharge proceeding.

20         And you will recall that in 2006 a lot of shippers

21    started to complain to the STB about these fuel surcharges.

22    There was a major hearing in which the STB said they had

23    nothing to do with the price of fuel, and it was therefore

24    an unreasonable practice.  This was a communication about

25    something that could be done in advance of that hearing, and

1    this is what Norfolk Southern and UP were actually talking

2    about.

3              And in fact, an Eric Butler from UP at the top of

4    that page -- look what he says; he says:  Smart and brave.

5    Add the existing fuel surcharge to the base rates which you

6    can argue is still under the March memo because the traffic

7    must not being diverted, and lock in that price permanently

8    in case fuel drops.  Any downside in fuel is gravy.  We base

9    this against higher fuel which protects you from further

10   upside pressures in case the world goes crazy.  Higher rates

11   should minimize the times they're reflecting the surcharge

12   which neutralizes all of the political pressure, plus

13   reduces administrative costs for all.  Constant warning --

14   you're making too much on fuel argument -- off at the knees.

15             This document was a communication that took place

16   in the context of an upcoming STB hearing where these two

17   railroads were talking to each other about a step that they

18   could take to make things look better in a situation that

19   they considered political where railroads were challenging

20   the fuel surcharge practice.

21             And so far from being an innocent communication

22   just about interline traffic, this is a discussion about

23   rates generally across the board, about a change that

24   Norfolk Southern was going to make across the board, and it

25   was being talked about in the context of an upcoming STB

1     hearing, and it was something where UP said, smart and

2     bravo; that was the reaction because of what it would look

3     like in this context.

4          Now, as we see behind tab 13, this is supposed to

5     be limited to movements in which the carriers participated.

6     And it says that -- you know, the defendants almost concede

7     this point where they say, DOJ sets out a likely

8     hypothetical about a railroad agreeing on rates for

9     movements in which it cannot participate, but nobody has

10    ever argued that the statute protects such discussions.  But

11    this is really a slight of hand because what the defendants

12    are arguing is as long as the railroad theoretically could

13    participate in the movement, it's allowed to talk about the

14    rate for it; but that's not what the statute says.

15         It talks about movements in which the carriers

16    participate; and clearly these discussions went far beyond

17    what it was that the railroads were actually doing with each

18    other even in the area of interline shipments.

19         Now, defendants have made a large part of their

20    presentation today that they supposedly have a need for all

21    of these discussions.  And, among other things, they argue

22    that -- they argue that all of the discussions that took

23    place in 2003 -- as Mr. Wall put it, it would have been

24    crazy not to have them because fuel prices were rising

25    during this time; and this is just one example of uncited,

1    unsubstantiated assertions that Mr. Wall and Mr. Gardiner

2    made this morning.

3         In fact, as plaintiffs highlight in their brief in

4    opposition at page 13 and 14, fuel prices were actually

5    declining in the first half of 2003 when this conspiracy

6    began.  And we not only include a chart, but we cite to UP's

7    own expert Dennis Carlton who testified and stated that

8    January 1st, 2000 to July 1st, 2003 was, quote, A time

9    period when fuel costs were generally low and flat.

10        And, in fact, a key feature of defendants'

11   conspiracy was the decision to lower the trigger prices for

12   fuel surcharges being affected, not to raise them; and the

13   fact that they lowered the trigger price is completely

14   inconsistent with the suggestion that the reason this was

15   done was to address some sort of ongoing increase in fuel

16   prices.

17        Moreover, as we highlight behind tab 17 and 18,

18   the suggestion that these types of discussions were critical

19   is also belied by the fact that most of these interline

20   shipments took place under so-called Rule 11 rates where

21   each railroad bills for its portion of the trip separately;

22   and there were also rules in place under the Association of

23   American Railroads that allowed carriers to conduct

24   interline traffic without discussing or agreeing on rates

25   with parties that did not participate in the trip.

1          The fiction that the defendants are trying to

2     create is that these discussions were discussions that were

3     regular and continued before, during, and after this

4     conspiracy; and that is not what happened.  There is very

5     little evidence of these types of discussions before the

6     conspiracy; and then suddenly, during the conspiracy, these

7     so-called alliance meetings suddenly spring up with the most

8     senior executives of the companies participating in them.

9          THE COURT:  Can I ask you -- let me ask you a

10    question that is perhaps kind of basic, but I thought about

11    it the other day; it's prompted by tab 17.

12          Is there a difference between joint line rates and

13    interline rates?  Are those -- I know interline rate is what

14    is used in the statute.  But when you talk here and

15    elsewhere -- and others do -- about joint line rates, is

16    that a synonym; or does it mean something else?  And does it

17    have other implications?

18          MR. NEUWIRTH:  My understanding is that a joint

19    line rate is a Rule 11 rate.  It's where two railroads are

20    participating in a shipment and they each bill separately

21    for their portion of the shipment.

22          THE COURT:  And Rule 11 is -- I mean, maybe you

23    can answer this, maybe the Government or Mr. Wall can.

24          Rule 11 is an accounting device, right, that has

25    been developed by the railroad industry.  But how does it

1    come into play in transporting actual movements of goods or

2    shipments of goods?  And why is it an alternative to actual

3    discussions?

4              MR. NEUWIRTH:  It's an alternative because if one

5    railroad ships from point A to point B, and another railroad

6    ships from point B to point C, and the railroad that does

7    the shipment from point A to point B sends its invoice, and

8    the railroad that ships from point B to point C sends its

9    invoice, there is no need for them to talk to each other

10   about rates because they are not using a single rate for the

11   whole shipment that one railroad or the other will invoice.

12             THE COURT:  But is that -- again, you have all

13   studied this stuff.

14             Is that an unrealistic alternative, and how

15   frequently is it used?  I mean, basically, what you're

16   saying is, We'll ship your goods from Norfolk to

17   San Francisco, and here is your rate for one half of the

18   shipment; and you are going to talk to somebody else about

19   your rate for the other half of the shipment.

20             Isn't it much more typical in the vast majority of

21   the shipments that the initiating carrier sets the rates and

22   gets a concurrence from the West Coast shipper that's taking

23   over the shipment?

24             MR. NEUWIRTH:  Okay.  So, first, I don't believe

25   there is any evidence that that is more common than Rule 11

1    rates at all.

2            Second, I think I misspoke when I said that joint

3    line rates are interline -- Rule 11 rates.

4            Joint line rates refers to shipments that are not

5    the Rule 11 rates.  I'm sorry if I have got that backwards.

6            THE COURT:  So joint line rates are the same as

7    interline?

8            MR. NEUWIRTH:  Well, they are all --

9            MR. GOSSELIN:  Mr. Neuwirth, may I add one

10   clarification?  I am sorry to interrupt.

11           I just want to add, Your Honor, one way of

12   thinking about this is that there is one rate for interline

13   shipments.  And within that, there are Rule 11 shipments and

14   joint line.

15           And at page 8 and 9 of our initial opposition

16   brief, we detailed how Rule 11 shipments are the significant

17   majority of interline shipments and, again, don't require

18   any carrier discussions as Mr. Neuwirth is pointing out.

19           Joint line shipping, for which there was a

20   separate protocol that enabled unilateral fuel surcharge

21   subscription represent a significant minority of interline

22   shipments during this period, a subset of that.  And we'd

23   note that for UP it is the 5.9 percent, of which we've

24   spoken about.

25           Excuse me, Mr. Neuwirth, for interrupting.

1          THE COURT:  The question I have is this -- I have

2     lived with this case for 15 years.  I have never heard of

3     Rule 11 before this line of briefing.

4          I have never heard anybody tell me that a majority

5     of the shipments were joint line.  I thought that these

6     16,000 shippers and these tens and tens of thousands of

7     shipments that have been involved in this case all implicate

8     interline shipments where the parties reached some sort of

9     an understanding by communicating with each other.

10          MR. NEUWIRTH:  Absolutely not, Your Honor.

11          THE COURT:  But it never came up in any earlier

12     briefing.

13          MR. NEUWIRTH:  Well, I apologize if that was not

14     something that you feel was in the briefing.

15          But I believe if you look at the original

16     complaint and at the class certification briefing in 2010

17     and the class certification briefing in 2016 and '17, the

18     theory of this case from day 1 has been that what the

19     railroads did was get together to use fuel surcharges as a

20     means to effectuate an across-the-board rate increase.

21          And we point out in our brief on this motion -- we

22     say, quote, for example, from 2000 to 2008, only 5.9 percent

23     of UP's total traffic by ton mile derived from joint line

24     shipments with BNSF, NS, or CSX, while 87 percent of UP's

25     total traffic consisted of local single-line shipments or --

 1     which were 65.7 percent or Rule 11 shipments, 21.3 percent.

 2          The point that we have been making in this case,

 3     Your Honor, and which the evidence shows -- and Mr. Gosselin

 4     will walk you through it in a minute -- is that what

 5     happened here was that in a context where the railroads

 6     actually did only a very small percentage of their shipments

 7     as interline shipments where there was even a premise to

 8     talk to each other about a rate, they were having

 9     discussions about general fuel surcharge programs that were

10     applying across the board almost namely to shipments that

11     were not interline shipments.  And that is why we have been

12     saying that the notion that this -- that these documents can

13     be viewed as simple discussions about interline shipments is

14     ignoring the reality of what happens here.

15          The evidence shows that the railroads decided in

16     2003 to start having alliance meetings at the highest levels

17     where they were talking expressly about fuel surcharges that

18     would apply to all traffic; and it was in that context that

19     all of these discussions were taking place.

20          Again, we will show you that evidence in one

21     minute.  But one other point that I think is critical to

22     emphasize is that we include in our interrogatory answers

23     behind tab 68 in our book --

24          THE COURT:  Which tab?

25          MR. NEUWIRTH:  It is behind tab 68, the last tab.

1            One of the things that you were told today was

2      that these alliance meetings are so critical they continue

3      until this day -- Mr. Wall said that he bets that even some

4      of the recent alliance meetings were affected by COVID or

5      addressed the COVID crisis.

6            In fact, as we see on page 22 of that response in

7      paragraph 22, the defendants themselves admitted at their

8      depositions that they ceased holding high-level alliance

9      meetings sometime in 2006 after the STB began inquiring into

10     their fuel surcharge practices; and we have the cites from

11     the deposition testimony in footnote 59.  And at the very

12     least, as I point out, they became far less frequent, and

13     lawyers now attended some of them -- which was not the case

14     during the conspiracy period.

15            And what is happening today is exactly what

16     happened at the original class cert hearing where you will

17     recall that you were given a whole set of declarations by

18     business people at the companies who purported to explain

19     their conduct.  And then you found that, once they were

20     deposed, all of these stories crumpled and they had no

21     credibility whatsoever.

22            Now, we don't get to depose Mr. Gardiner and

23     Mr. Wall for all they have said today -- and I hold both of

24     them in the highest regard and mean nothing personal

25     whatsoever.  And I genuinely mean that, when I say I hold

1    them in the highest regard professionally and personally.

2         But I do feel that today what you heard was a lot

3    of unsubstantiated, uncited assertions that, for reasons I

4    have just shown you, are totally inconsistent with the

5    reality of what was happening here and totally

6    irreconcilable with the actual language of the statute.

7         They agree that context matters; they tell you

8    that.  They say it in their reply brief to the Government,

9    and they said it again this morning.  But what they then

10   don't want you to do is look at the actual context of these

11   discussions.

12        I just gave you one perfect example.  They took a

13   snippet of language of a document that referred to a

14   discussion of interline traffic and, in fact, what the

15   discussion was about is how these two companies would be

16   able to tee things up better for an STB hearing about this

17   fuel surcharge program that they have been implementing for

18   four years.

19        Now, I know that we have very limited time, so I

20   want to draw my part of the presentation to a conclusion.

21   But one critical point that we need to address is that there

22   seems to be some confusion here as we highlight behind

23   tab 27 because much of what we heard today, as I said at the

24   beginning, concerned much of -- much of what we heard today

25   concerned arguments about why these discussions should not

1    be considered evidence or proof that there was a conspiracy,

2    that there were legitimate reasons for these discussions.

3    But that is a very different question from whether these

4    documents meet the very narrow specific parameters of the

5    statute for what evidence should be excluded.

6             I believe the defendants are conflating the

7    question of whether these documents prove a conspiracy with

8    the issue of whether they meet very specific limited

9    statutory criteria for being excluded from that

10   consideration at all.

11            And you yourself found, Your Honor, in the class

12   certification period -- you wrote it in your opinion and in

13   your order -- that the evidence of the alleged conspiracy

14   was strong, I believe that was your exact words; and it's in

15   that context that these documents have to be viewed.

16            These are not documents that can be looked at in

17   the type of isolation; and, frankly, I don't -- again, I say

18   this in a nonderogatory way, speechmaking that we heard this

19   morning.  You had barely any reference to evidence.

20            I just gave you the evidence that we cite in our

21   brief and that we have been citing from early in the case,

22   that interlining traffic is a very small portion of what

23   these railroads actually do; but these fuel surcharges apply

24   to all of their traffic, and it applied across the board.

25            So while I believe that there is a lot more I

1    could address, let me just wrap up this portion of the

2    presentation by saying that what's going on here is really

3    the world being turned on its head.  The whole point of the

4    Staggers Act was to prevent the railroads from being able to

5    impose general across-the-board rate increases like they

6    used to do at the ICC.  They were now going to have

7    individual contract negotiations in a free-rate unregulated

8    market; and the defendants, instead, got together and had

9    discussions about a fuel surcharge program that was designed

10   to raise rates across the board.  And it is false to suggest

11   that our position depends in any way whatsoever on the

12   argument that the statute should not apply at all in the

13   context of rate unregulated traffic.  We certainly made that

14   argument, and we think it's correct.  We understand that the

15   Government disagreed with it, but you don't need to reach

16   that point at all, Your Honor.

17         All you have to do is answer the question at this

18   point of whether the evidence that they have identified

19   satisfies the criteria of this statute.  And Mr. Gosselin

20   will now discuss that particular evidence and show you why

21   it does not.

22         THE COURT:  Thank you.

23         MR. GOSSELIN:  Thank you, Mr. Neuwirth.

24         Your Honor, turning to the application of the

25   statute, the defendants have not satisfied their burden, and

1      the motion should be denied.

2              This is emphatically not a case -- as Mr. Neuwirth

3      mentioned -- about joint action on a shared interline rate

4      followed by some separate unilateral action among other

5      interline or single-line rates; nor is this a case about

6      discussion or agreement specifically confined to shared

7      interline movements that would not violate the antitrust

8      laws.

9              Neither of those descriptions, Your Honor, is a

10     faithful characterization of the evidence that we have

11     compiled, a subset of which the defendants have presented

12     here in their motion.

13             Now, Mr. Wall, throughout his presentation this

14     morning, took various potshots at the plaintiffs talking

15     about ransom notes and interpretive gymnastics; and all of

16     that is very colorful, but it's inaccurate.  And I am going

17     to explain, as I go through this presentation and on

18     rebuttal, the way in which Mr. Wall has taken liberties with

19     the evidentiary record.

20             And to begin with, the discussion or agreement in

21     the exhibit shown here is not remotely confined to shared

22     interline movements in which the respective carriers

23     actually participated.  Now, I will talk a little later

24     about why the defendants cannot show that the discussion or

25     agreement would not violate the antitrust laws.

1                 As I get into this, I want to reemphasize some of

2     the things that Mr. Gardiner and the Government mentioned

3     about content, right.  Content matters a great deal.  The

4     Government instructs us -- and rightly so -- to look at the

5     full evidentiary context of the communication at issue, Your

6     Honor.  So a "discussion" as contemplated by this action

7     could include a months-long series of email exchanges among

8     various competitors; an agreement could include the

9     industry-wide collusion depending on the evidence.

10                THE DEPUTY:  Mr. Gosselin.  Mr. Gosselin, I am

11    sorry to interrupt.

12                Our reporter is having problems following you

13    because you're speaking very fast.

14                MR. GOSSELIN:  My apologies.  I was mindful of the

15    clock, and I will slow down.

16                THE DEPUTY:  And there seems to be a glitch on

17    your end with the Wi-Fi because you're going in and out on

18    our end.

19                THE COURT:  Yes.  I find the same thing.  You are

20    going in and out a little bit.

21                MR. GOSSELIN:  Gosh, I don't know how to repair

22    that.  I can try to go audio only for a moment, use less

23    bandwidth.  Is that better?

24                THE COURT:  Why don't you talk for a minute or

25    two, and we'll see.

1           MR. GOSSELIN:  Sure.  My apologizes.

2           Ultimately -- I was mentioning -- the discussion

3    or agreement should be defined so that the carriers cannot

4    evade the antitrust laws by cherry-picking the record

5    to exclude probative evidence of conspiracy.

6           Is this better, Your Honor?

7           THE COURT:  I think so.  I will ask the court

8    reporter and Ms. Johnson to chime in and tell us if they

9    continue to have a problem.

10           THE DEPUTY:  It's the same; he's going in and out.

11           MR. GOSSELIN:  I can see you all fine, and I am

12    not doing anything else with my Wi-Fi.

13           Perhaps I can continue, and you will let me know

14    if it's obstructing your ability to record my words.

15           THE DEPUTY:  It's only the audio portion.  If you

16    can slow down, that will be very helpful for the court

17    reporter.

18           MR. GOSSELIN:  I will do so.

19           As I was saying, Your Honor, we agree with this

20    approach.  In fact, the only principled approach here under

21    the statute is to determine the discussion or agreement with

22    a view to the larger context, paying close attention to the

23    actual fuel surcharge dialogues; the surrounding

24    circumstances and chain of events; and the other

25    contemporaneous communications.  It can't be that the court

1    is required, in this analysis, to blind itself to everything

2    else that was occurring with respect to fuel surcharges

3    among these same actors at roughly the same time.

4         And as we consider content here, we think it is

5    very significant that so much of the evidence derives from a

6    very short period in time, 2003 and 2004.

7         If you tap -- if you turn in our binder to tab 28,

8    what we have done here is clustered together the alliance

9    meeting-related exhibits.  And you will note that they

10   happen to be clustered over a period of about six or seven

11   months; there was a lot going on in this period.  And any

12   contextual consideration has to take into account the

13   numerous and overlapping fuel surcharge exchanges which were

14   occurring within days and weeks of each other.  And that's

15   part of the context, because defendants don't even challenge

16   some of our other evidence of conspiracy, right.

17        Our interrogatory narrative, supplied at Exhibit 9

18   to our opposition brief included at tab 68, as Mr. Neuwirth

19   mentioned, provides the most complete picture of the spring

20   of 2003 and thereafter.

21        If you turn to tab 29, the defendants'

22   witnesses -- the executives who attended these meetings and

23   engaged in these communications -- are unable to provide

24   further context through their deposition testimony because

25   they could not recall the specifics or substance of these

1   critical meetings and exchanges.  And we have here a

2   highlighted list that's included in our briefing, it is also

3   included in other items.  Of all of the times the CEOs and

4   CMOs from the respective carriers could not recall these

5   particular discussions and meetings -- what are masked as

6   meetings.

7          Now, in a few places, the defense have tried to

8   cite to deposition testimony in their briefing; but that

9   testimony is typically about something far broader, such as

10  their views on the purposes of the alliance meetings, what

11  they assume was discussed -- further generalities, as

12  opposed to a reflection of the actual communications and

13  meetings and their scope.

14         But what was actually happening during this

15  period, Your Honor, when viewed in this full evidentiary

16  context, if you turn to tab 30, right -- and consistent with

17  the Court's previous finding, the defendants struggled

18  mightily to impose a unilateral fuel surcharge prior to

19  2003.  They suffered long-term structural decline in their

20  growth rate rates that was characterized as a conspiracy on

21  fuel surcharges.

22         And we have included in here some of the record,

23  right, about the vicious so-called price wars among these

24  same carriers.  Mr. Neuwirth mentioned before, the

25  distinction between Rule 11 and joint line business.  And

1    we'd just note during this period -- and only to the extent

2    of the topics which have been submitted today -- the

3    defendants can assert their uncoordinated theory into

4    interline, into our very discussion, whether it was Rule 11

5    or joint line shipping per the protocol.

6              And ultimately --

7              THE DEPUTY:  Mr. Gosselin.  Mr. Gosselin, I'm

8    sorry to interrupt you again.  We're having difficulty again

9    hearing you.  I am not sure what else to do.  Would it be

10   possible if we can just try the audio and you can call in?

11             MR. GOSSELIN:  Certainly.

12             THE COURT:  Ms. Johnson will tell you how to do

13   that; we did it earlier this morning with Mr. Wall.

14             MR. GOSSELIN:  My apologies, Your Honor.

15             I have no trouble seeing you all or listening to

16   you all all morning.  I will dial in momentarily.

17             (Whereupon, the proceeding pauses to attend to

18   audio difficulties.)

19             MR. GOSSELIN:  Lawyering during the time of COVID,

20   Your Honor.

21             I will pick up where I left off, which is just

22   that during this earlier period the defendants again

23   struggled to impose their fuel surcharges in part because of

24   the tremendous resistance from their customers, and they

25   largely failed amid competition.  And what happened next, at

1    tab 31 -- suddenly, in the spring of 2003 -- the defendants

2    abruptly reverse course.

3          As all of the evidence shows here, in the spring

4    of 2003 the defendants engaged in an extraordinary series of

5    meetings and communications; and I stand by that

6    characterization, not just by what Mr. Wall had to say

7    earlier.  These were among the senior executives from the

8    respective companies who had never previously discussed fuel

9    surcharges with each other.  They spoke in person, by email,

10   and by phone, often within days of each other, knowing full

11   well that each of them was speaking with the other railroads

12   as well.  And they all gathered during the same period too,

13   and we'll talk a little bit about that evidence.

14         Their conversations were explicit in addressing

15   their desire for industrywide synchronization of fuel

16   surcharges and how to ward off customer outcry without any

17   interline limitation, much less the limitation to share

18   interline movements between the carriers and attendants.

19   And ultimately, over a short period of time, they harmonized

20   their fuel surcharge programs across all traffic with

21   full -- 100 percent coverage that they worked towards; and

22   they eliminated the discounting and the waivers and the

23   nonenforcement that had characterized their agreed

24   conspiracy fuel surcharge practices.

25         Thereafter, they routinely prepared fuel surcharge

1   coverage well beyond their shared interline movement.  They

2   discussed fuel surcharge policies, and even contemplated

3   changes across all traffic which, of course, enabled them to

4   monitor their return, and maintain discipline.

5           So as we take a look at some of these materials,

6   we've grouped the evidence using the categories suggested by

7   the defense for convenience; we don't agree with those

8   characterizations, Your Honor.  And we'd also note the

9   overlap among these categories as many of the purported

10  concurrence communications came on the heels of alliance

11  meetings where fuel surcharges were discussed.  We'd

12  highlight a few key examples from each category that we

13  think are representative of the larger body and critically

14  supplied evidentiary context for the other communications.

15          So if you turn the tab to 32, and we start with

16  the alliance meetings which we've --

17          THE COURT:  I think it's actually -- in my

18  notebook it's tab 33.  I don't know whether everybody else

19  is with me or with you when you announce the numbers.

20          I was with you for a while, so unless I've got a

21  blank somewhere along here -- I am at tab 33 which says

22  "alliance meetings."  I don't know if I am the only one

23  there, or why -- I have got the binder; I am not looking at

24  it online.

25          MR. GOSSELIN:  Does that begin, Your Honor, with,

1    "Defendants characterization of alliance meetings"?

2            THE COURT:  It says alliance meetings among senior

3    executives.

4            MR. NEUWIRTH:  Your Honor, I believe there is

5    another alliance meeting exhibit behind tab 32.

6            THE COURT:  All right.  Maybe I missed tab 32.

7    I'm sorry.  I'm sorry.  You are right.

8            MR. GOSSELIN:  No problem.

9            This is really -- tab 32 is really just a lead-in

10   slide subtracting what was actually discussed at these

11   alliance meetings with the defendants' narrow, proposed

12   definition of them.

13           If we turn actually to tab 33, the first of these

14   examples, right, we have, as we started to discuss earlier

15   today, an example of a meeting between BNSF and Norfolk

16   Southern in March of 2003 where they establish an action

17   item, a BNSF fuel surcharge is structured differently than

18   NS, CSX, and UP should BNSF be synchronized with these other

19   big players in the industry.

20           Now, a conversation about industrywide

21   synchronization among all four carriers is not on its face

22   limited to BNSF or NS, and much less than its shared

23   interline traffic.  And it's important to note, too, that

24   less than a week earlier in this moment in time, UP and CSX

25   met over the course of two days to discuss fuel-surcharge

1    methodology; that would be Exhibit 38.

2         Now, I am going to turn to the very substance of

3    the defendants' slides to contrast a little bit, to some of

4    the things that they have to say about these documents.  So

5    if you can turn, Your Honor, to defendants' slide 37 --

6    because I don't have the benefit of video, perhaps you can

7    tell me when you are there.

8         THE COURT:  Yes.

9         MR. GOSSELIN:  The defendants now insist, without

10   any citation, that this discussion was strictly about the

11   fuel index used for the different fuel surcharges, and that

12   it was somehow responsive to customer needs; but, of course,

13   neither of those items are included in those documents.  And

14   when -- I believe it's Mr. Gardiner who made reference to

15   customer complaints, he was actually referring to the STB

16   fuel surcharge proceedings in 2006 and 2007 when customers

17   were outraged about these rate-based fuel surcharge

18   practices and the uniform conduct among rail carriers to

19   impose them.

20        The defendants also point out that this raises a

21   question, right; you've heard, Let's talk about aspirations.

22   And for that reason this can show, as you see here, that

23   BNSF agreed to synchronize its fuel surcharges; and that's

24   really just rehashing our principal legal debate about

25   whether the plaintiffs can use circumstantial evidence to

1    prove their case, or whether they are limited to a single

2    smoking-gun piece of evidence.

3             And, finally, I would just note at the bottom that

4    this really becomes a summary judgment debate about whether

5    the fuel surcharges were synchronized.  But it's a very

6    narrow vision of the world to have that turned on fuel

7    indices alone.  When, in fact, what we saw, in a short

8    period in the spring of 2003, was that the defendants

9    collectively lowered their fuel surcharge trigger prices,

10   aligned precisely to the same numbers or equivalent numbers,

11   as they've admitted in their depositions; and they

12   implemented the very same stairstep increases, as well as

13   the same programs about refusal to discount or provide

14   exceptions.  And they shared all of their coverage

15   information and service in pursuit of their goal of 100

16   percent across customers.

17            So turning back to our slides, if you turn to tabs

18   34 and 35, we have in May 2003, two months later, a meeting

19   at Norfolk Southern and Union Pacific; and we have

20   handwritten notes and official meeting minutes.  The

21   handwritten notes document, quote, Fuel surcharges, uniform

22   application across the industry would be helpful.  Again,

23   application across the industry can't be restricted to

24   Norfolk Southern and Union Pacific, and certainly not at

25   shared interline traffic.

1          At tab 35, the official meeting minutes, the

2     discussion followed on fuel surcharges and various

3     application processes as used by different roads.  Consensus

4     was reached it would be a positive outcome if all roads had

5     the same process in the eyes of our customers.

6          Now, the same point, right; consensus on all roads

7     doesn't contain the interline implication to share interline

8     traffic that's required under the statute, all right.  And

9     at this point in time, it's worth mentioning that all four

10    defendants had discussed across the board fuel surcharge

11    changes on numerous occasions, and all of them had announced

12    a new matching program for all traffic.

13         We turn to the defendants' slide 39 where they

14    talk about this document.  They now scramble to suggest that

15    this had to do with application processes as similar

16    metrics, not the same fuel surcharges; and I frankly don't

17    know what they mean by "similar metrics."  But they don't

18    even attempt to square that with earlier handwritten notes

19    that explicitly tie fuel surcharges to uniform application

20    across the industry.  And they revisited the second bullet

21    point, this idea that this was mere aspiration and, for that

22    reason, there can't possibly be an agreement which, again,

23    rehashes our direct and circumstantial evidence debate.

24         Turning back to our binder, at tab 36 we have

25    June 2003 CSX alliance meetings notes with Union Pacific,

 1   handwritten notes, that talk about -- under the banner of

 2   the "State of the Industry," fuel surcharge, CSX has not

 3   seen outcry that UP has.  There is further discussion about

 4   a hedge program and the possibility of revisiting their

 5   trigger price.  Nothing about this comparison of fuel

 6   surcharge programs or, for that matter, their customer

 7   outcry is confined in any way to their shared interline

 8   traffic, only the defendants didn't mention this in their

 9   slide.

10          At tab 36, in July of 2003, BNSF and NS had

11   created an action, John Lanigan and Don Seale, the

12   respective CMOs of these organizations, agreed to lead a

13   discussion of a potential industry position on fuel

14   surcharges at the next NEMC meeting.  NEMC is the gathering

15   of all four defendants under the auspices of the Association

16   of American railroads.

17          Now, an industry position on fuel surcharges and

18   talk of it among BNSF and NS executives again doesn't have

19   those limitations, all right?  And we know, too, from our

20   interrogatory narrative evidence, cited at page 37, that CSX

21   came to this meeting with a chart comparing the fuel

22   surcharge program to that of all of the other defendants.

23   And during the meeting, as noted here, shared the same fuel

24   hedging information it had already shared with Norfolk

25   Southern just weeks earlier, a competitor in the east.

1          Now, the defendants, turning to their slide 38 --

2          THE COURT:  Which one, I'm sorry?

3          MR. GOSSELIN:  Defendant slide 38, Your Honor.

4          They make a number of flat denials about whether

5     synchronization ever actually occurred, right, whether the

6     NEMC discussion ever happened.  None of that actually gets

7     to the core this particular document which is the

8     contemplation of an industry position on fuel surcharges.

9          The citation to the deposition of John Lanigan is

10    misleading, Your Honor.  The next page of his deposition

11    transcript which the defendants did not include, when

12    pressed about whether this topic arose in the interlining

13    context or the joint line context, he testified we didn't

14    specifically state it one way or another.

15         We also know about this document that following

16    the September 2003 NEMC meeting Mr. Lanigan and Mr. Seale

17    confirmed these earlier July 2003 meeting minutes as

18    accurate and reaffirmed their desire to advance each of

19    these identified projects and action items, and that's our

20    interrogatory narrative at 39.

21         So a few summarizing words about alliance

22    meetings, Your Honor.  None of these contemporaneous records

23    of the defendants' meetings are deserved.  They shared

24    interline limitations required by the statute, and certainly

25    not unambiguously.  Many of these referred to explicitly the

1    industry as a whole, and aren't even limited to the carriers

2    in attendance at these meetings.  It is impossible to

3    reconcile the arguments that they made with the plain

4    language of the contemporaneous materials in the surrounding

5    circumstances which include the needed implementation of

6    coordinated fuel surcharges across the board that track

7    these various discussions.

8              I want to talk about the occurrence of the word

9    "interline" or "gateway"; and Mr. Wall really underscored

10   this, right, in some of these documents.  Often those

11   appearances are divorced from the particular fuel surcharge

12   dialogue; but, in any event, the deployment of the word

13   "interline" somewhere in the document doesn't somehow

14   transform the nature of these exchanges all the more so

15   because the defendants' actual word and their actions

16   weren't limited to shared interline movements.

17             If the defendants could simply invoke the word

18   "interline" to shield broader conduct -- and this is the

19   point that Mr. Neuwirth was making -- the statute would be

20   meaningless; it would actually protect collusion.  As the

21   justice department reminds us, there could be no

22   cherry-picking here among the evidence.

23             I want to turn to defendants' slide 3 briefly,

24   Your Honor, because the defendants accused us of, under

25   their heading, Weaving independent discussions together.

1    But how can that be, right?  There were never previously

2    known fuel surcharge discussions among senior executives

3    and, suddenly, there was an explosion of these conversations

4    explicitly on an across-the-board basis.

5          All right.  So in April of 2003, alliance meeting

6    discussion of fuel surcharges is all the more noteworthy

7    when we consider it against the backdrop of the discussion

8    that all four carriers had earlier in March 2003, and the

9    announcement of matching fuel surcharges across the board

10   from CSX and UP.  And we further -- weaving together related

11   circumstantial evidence is how antitrust plaintiffs prove a

12   conspiracy; it's, too, a rehash of our debate about

13   circumstantial and direct evidence.

14         I also want to mention slide 8; Mr. Neuwirth

15   touched on that.  Alliance meetings and -- here we have

16   "extraordinary meetings," and we have a question mark in the

17   defendants' slide.

18         Now, Mr. Wall offers up all of these UP/CSX

19   meetings without any citations, so it's really difficult to

20   address this.  But we know from the defendants'

21   interrogatory responses, and from all of the record evidence

22   that we have gathered, that there were not previous

23   discussions about fuel surcharges among CEOs and CMOs that

24   addressed explicitly across-the-board action and then

25   resulted in synchronized fuel surcharges; those are the

1    differences with these alliance meetings.  And when we

2    pressed this point in the briefing, Your Honor, that

3    defendants had never before discussed fuel surcharges in

4    this manner at their senior-most levels, they produced three

5    actually routine concurrence communications in response that

6    we believe confirm our story here because those

7    concurrence -- those few concurrence communications from

8    prior to 2003 were, as one might expect, among lower-level

9    executives, right, and didn't implicate CEOs and CMOs.

10           My apologies, Your Honor.  I will give you that

11   citation momentarily.

12           Mr. Neuwirth already mentioned the fuel price

13   situation in this period.  And Mr. Wall was careful to note

14   December 2002 to February 2003, because prices were

15   plummeting thereafter in March 2003, April 2003, and May

16   2003, as we see from our briefing.

17           Mr. Neuwirth also mentioned the discontinuation of

18   the alliance meetings in 2006 as scrutiny built up and then,

19   also, that it makes no sense to lower trigger prices if the

20   expectation was that fuel prices were actually going to

21   increase.

22           I will turn now, Your Honor, to the purported

23   concurrence communications in the record.  Here I am looking

24   at F38.  I can move a little more quickly through some of

25   these, in part, because the defendants have less to say

1    about them.

2             In tab 39, we have in April 2003 -- shortly after

3    UP had met with CSX to discuss fuel surcharge methodology

4    and CSX had announced a $23 gas fuel surcharge, UP announces

5    the very same thing and directs an email to BNSF and CSX

6    announcing the fuel surcharge to the most UP-pricing

7    documents for local and interline freight movements.  There

8    is no reason to be addressing local freight movements; that

9    is, single line movements, in the context of these

10   competitor communications.

11            Paul Anderson from BNSF responds internally, This

12   is sweet.  Just like the CSX fee acknowledging the total

13   parody between these $23 Seattle programs.  And Mr. Wall

14   talks about the appearance of the word "concurrence" in this

15   document; and I will get to that when I summarize all of

16   these concurrence communications.  But it is much like

17   the deployment of the word "alliance" in the alliance

18   meeting which dealt with the word "interline."

19            At tab 40, we have another representative document

20   in April of 2003.  First, Pat Glennon from Norfolk Southern

21   concurs to this new UP fuel surcharge, immediately forwards

22   that correspondence to the NS marketing executive and

23   explains what he had learned privately from the Union

24   Pacific and CSXT about their new across-the-board fuel

25   surcharge policies.

1        Quote, CSXT has indicated that they will attempt

2    to apply it to all rate publications, public and contract,

3    that are subject to the current fuel surcharge.  UP will

4    most likely exclude contracts and instead make the contract

5    changes when renegotiated.  Informally, CSXT told me they

6    intended to apply it to contracts, but admitted it might not

7    stick.

8        At tab 41, Your Honor, after ten months of reading

9    what the other defendants had discussed on fuel surcharges,

10   in person and by email, at the expressed encouragement of

11   BNSF, NS rolled out its rate-based fuel surcharge program

12   for all traffic at $23 WTI, which is identical to CSX's and

13   equivalent to UP and BNSF.  So we provide more detail in our

14   interrogatory narrative, 41 and 42 among them.

15       But this document, right, this one in which Union

16   Pacific confirmed -- asked for confirmation earlier in the

17   chain about Norfolk Southern's new standardized fuel

18   surcharge.  And Norfolk Southern's writes:  Kurt, what you

19   have is correct.  The new surcharge will be applied March 1

20   on all public prices.  Private prices, both contracts and

21   private quotes, will be individually handled either when

22   they expire, are renegotiated, or upon their roll-over

23   dates.

24       This is a discussion of Norfolk Southern's

25   strategy for its new fuel surcharge across the board.

1          At tab 42, BNSF and Union Pacific, two western

2    competitors, have an exchange in which BNSF confirmed in

3    late 2004:  We have got executive instruction to apply a

4    fuel surcharge provision to essentially everything.

5          So with the concurrent communication, the

6    defendants are hoping to exclude far-reaching competitor

7    communications about their fuel-surcharge program across all

8    traffic.  The reality of these materials is that the

9    defendants explicitly used these dialogue as opportunities

10   to learn more about what each was doing across the board and

11   confirm adherence.

12         Now, some of these documents include the word

13   "concurrence," right; but that, too, doesn't automatically

14   transform the substance of these exchanges.  Asking for

15   concurrence at the bottom of an email detailing a rail

16   carrier's overall fuel surcharge changes including

17   single-line traffic doesn't suddenly restrict the scope of

18   the larger exchange, all the more so against the backdrop of

19   these unfounded meetings about fuel surcharges often within

20   days or weeks of each other.  There can be no

21   cherry-picking.

22         Finally, the next few tabs we talk a little about

23   these supposed logistical communications, Your Honor.

24         At tab 44, we have some of these far-ranging

25   exchanges about fuel surcharge coverage where, in October

1    2003, CSX reported internally on a meeting with BNSF where

2    BNSF shared its fuel surcharge coverage information across

3    the entirety of its carload and intermodal business.

4             At tab 45, we have two western railroads, again,

5    in early 2004, with BNSF confirming their marketing policy

6    to include fuel surcharge in all price authorities that BNSF

7    participates in.

8             At tab 46, Norfolk Southern writes to Union

9    Pacific in late October 2005, We only have one fuel

10   surcharge mechanism which applies to all commodities, and

11   that's our corporate directive.

12            Now, finally, at tabs 47 and 48, we have a

13   particularly significant episode in which, in 2004, BNSF

14   traveled to a meeting of all four CMOs, right, to, quote,

15   judge the appetite for a mileage-based fuel surcharge

16   program.  And this wasn't a mileage-based fuel surcharge

17   program restricted in any way to share interline traffic

18   with partners, as Mr. Gardiner suggested but, rather, an

19   across-the-board mileage-based fuel surcharge program.

20            And we learned at the next tab, tab 48, that BNSF

21   failed, right?  John Lanigan shopped the concept with the

22   counterparts from other roads, and they pushed back as

23   expected.  He shopped the concept of a mileage-based fuel

24   surcharge across all traffic, and they pushed back as

25   expected.

1          Now, we know -- and we cite this in our

2     interrogatory note at 63 -- that John Lanigan acknowledged

3     in a subsequent conversation with Clarence Gooden from CSX

4     that nothing prevented CSX from unilaterally adopting a

5     mileage-based fuel surcharge even on interline movements;

6     but BNSF chose not to do so in the face of defendant

7     pushback.  And, extraordinarily, you heard from Mr. Gardiner

8     earlier today that, yes, BNSF actually did have a

9     mileage-based fuel surcharge program.  That did not happen.

10          What happened was that over time, many months

11     later, BNSF slowly adopted a very limited mileage-based

12     program for certain coal and agriculture shipments, a vast

13     minority of its shipments; and only did so to the extent

14     that those mileage-based fuel surcharges were

15     revenue-neutral with the existing programs.  So these are a

16     far cry from logistical discussions about shared interline

17     movement between the carriers that actually participated.

18          These are expansive discussions that confirmed

19     larger across-the-board corporate directives --

20          Excuse me, Your Honor, I just need to waive off my

21     neighbor's -- forgive me one second.  Landscapers.

22          As I was saying, Your Honor, these are really

23     expansive discussions concerning across-the-board

24     corporative directives on all traffic for fuel surcharges.

25          And where does this leave us, at tab 49.

1          Well, against this backdrop -- and I am fleeing to

2     another room -- the defendants cannot satisfy their burden

3     under 10706, right.  Against this backdrop in the context

4     with all of the other evidence, defendants simply cannot

5     establish that the discussion or agreements, when viewed in

6     context with limited interline rates, were movements in

7     which the carriers actually participated, right.

8          The Government reminds us, at page 76 of its

9     brief, that a discussion or agreement that involves

10    single-line traffic or interline traffic where the parties

11    do not interchange or that is ambiguous and concerns

12    different types of traffic cannot be excluded under the

13    statute.  And here we have reams of evidence that, when

14    viewed in context, overwhelmingly demonstrate that the

15    discussion or agreement spanned all rates and all traffic

16    across the board; the defendants said as much.

17         And even if they could satisfy that first

18    requirement, Your Honor, as to some smaller discussion or

19    agreement that was actually confined to shared interline

20    movements, and they cannot.  The defendants still cannot

21    demonstrate that their discussion or agreement was not in

22    the service of a broader conspiracy when viewed in context,

23    right.

24         Again, as the Government tells us, even seemingly

25    narrowly shared interline dialogues can facilitate broader

1    collusion through the exchange of competitively sensitive

2    information or by providing a mechanism to protect and

3    punish, and prevent price reduction.

4            So to hear any hypothetically narrow dialogue when

5    viewed in context also facilitated broader collusion across

6    traffic by providing incremental information to the

7    defendants about their competitors' fuel surcharge program,

8    their policies, their coverage -- which was, of course,

9    helpful because of the collusion it committed across all

10   traffic, including all interline traffic.  So even piecemeal

11   information would not allow for the larger goal outlined in

12   their initial meeting.

13           At a minimum, defendants haven't met their burden

14   to show a discussion or agreement would not violate

15   antitrust laws.  And as Mr. Neuwirth mentioned, plaintiffs

16   don't have an obligation to prove their antitrust violation

17   at this stage.

18           And I will close, Your Honor, for now with a

19   return to the Government's instructive hypothetical, which I

20   believe is around page 20 or 21 of their brief.

21           This is not where we have narrow -- tab 49.  This

22   is not a situation in which we have narrowly confined

23   interline traffic discussions among participating carriers

24   that spawn parallel conduct without more context.  Rather,

25   and quoting from this hypothetical, we have a flurry of

1    interdefendants intercompetitor conversations in 2003 about

2    their intent to impose uniform rates across the entire

3    industry; and it's those communications that provide the

4    additional context, right, showing that the carriers'

5    subsequent interactions were part of a single industrywide

6    discussion or agreement, the evidence of which would not be

7    excluded.

8            And so unless Your Honor has any questions, and

9    with apologies again for the various interruptions that

10   unfortunately are beyond my control, I will turn next to

11   Mr. Atkins for the plaintiff.

12           MR. ATKINS:  Good afternoon, Your Honor.

13           As a reminder, I represent -- I am co-liaison

14   counsel for what we call the new plaintiffs in Judge

15   Howell's MDL.

16           Mr. Wall used a phrased several times, and I think

17   it's a good place to start the discussion; and he referred

18   to incomplete sentences.  And I think that that's an apt way

19   to describe the defendants' arguments as we have just seen

20   because they began their briefing by talking about interline

21   discussions.

22           But now, as we know, as the briefing proceeded,

23   including the brief by the United States, we see that the

24   rest of the sentence is that they say that Section 10706 or,

25   actually, this very small piece of 10706, gives a very

1    special antitrust protection to a discussion of all rates.

2    So that would include a discussion between two railroads of

3    the rates where they interline; the rates where they have

4    single line; the rates where they single line in competition

5    with one another; the rates where they interline with other

6    railroads, perhaps in competition with the two of them and,

7    finally, Rule 11 rates.

8              And so the question here is whether that 5.9

9    percent of the traffic which is interline, as we discussed a

10   moment ago -- whether that 5.9 percent tail wags the dog for

11   all of the rest of the discussions; and even 5.9 percent

12   significantly overstates it.  So, for example, with UP --

13   and the 5.9 percent example we saw was UP; 5.9 percent is

14   UP's interline with all of the railroads.  So when it sits

15   down with Norfolk Southern, it's discussing some small

16   fraction of 5.9 percent; and they're saying that Congress --

17   not just that those aren't unlawful, they're saying that

18   Congress intended to give special antitrust protection to

19   those discussions.

20             If you could turn to tab 50 of our binder, Your

21   Honor, it is inconceivable that Congress intended to give

22   special antitrust protection to those broad-ranging

23   discussions.  As we'll see, the Department of Justice and

24   the FTC actively opposed anything that would give the

25   railroads anything close to that level of protection.  The

1    ICC closed loopholes.  And, in fact, what we will see is

2    that their interpretation is not only internally

3    inconsistent with the statute, it's exactly the opposite of

4    what Congress was trying to achieve.

5         As we turn to tab 51 of our binder, after a long

6    history of 60, 70, 80 years of price fixing and rate

7    bureaus, Congress finally gave the railroads antitrust

8    protection and say that actions taken pursuant to a rate

9    bureau -- a rate approved by the ICC so, in other words,

10   they're acting in conformance with the agreement when there

11   is antitrust immunity.

12        In what's called the 4R Act -- and this is now in

13   1976 -- Congress began the process of deregulating.  What

14   you will see throughout, and what the department of the

15   United States says in their brief quite well I think -- but

16   you will also see in what the Association of American

17   Railroads has said in 2009 to Congress, as Congress

18   deregulated rates, they cut back on antitrust restrictions

19   so there were no antitrust tabs.  Either the rate or

20   agreement or the discussion was protected and regulated by

21   the ICC, or it was subject to the antitrust laws.

22        And what Congress did in the 4R Act was it

23   prohibited railroads from agreeing or voting on single-line

24   rates.  Now we're talking about late bureaus, because that's

25   where railroads had their discussions and agreements about

1     rates.  So eventually Congress -- in putting restrictions on

2     what the railroads could do, it addressed the restrictions

3     where railroads were doing it; this is in the predecessor to

4     what is now 10706.  It prohibited railroads from discussing

5     or agreeing or quoting on single-line rates or agreeing or

6     voting on joint line or interline rates unless the railroads

7     practically participated.  I won't go through all of the

8     regulatory history of where the railroads tried to twist the

9     words "practically participated" beyond their conviction.

10    But suffice it to say, what Congress intended to do was to

11    say that railroads could discuss interline rates only with

12    the railroad with whom they were discussing and not other

13    railroads that might be providing service on the same route.

14          Then what happened, starting in 1976, '77, the

15    railroads had to submit new rate bureau agreements that

16    complied with the 4R Act, and they tried to exploit or

17    perceived loopholes.  The 4R Act prohibited voting or

18    agreeing on single-line rates; in other words, rates charged

19    by your competitor, or discussing or agreeing on joint line

20    rates as part of a proposal with joint line rates, or

21    general rate increases.

22          So what the railroads did was they said, well, the

23    statute prohibits "agreeing," but we can still discuss them

24    in rate bureaus.  And "discuss" doesn't mean passively

25    listening while railroads are discussing; it means while

1    railroad executives are sitting in the room talking about

2    the merits of what each one of them should charge.  You

3    should charge this; I should charge that; no, I think you

4    should charge this.  And they said that was immunized --

5    immunized under the antitrust laws -- because they were not

6    voting or agreeing.

7           So Congress -- DOJ -- well, during those

8    proceedings -- let's turn to tab 53.

9           During those proceedings the Government -- as the

10   ICC was considering what to do with these rate bureau

11   agreements, DOJ and the FTC both describe the railroads as

12   functioning as a cartel because they were discussing and

13   agreeing on rates beyond the interline rates served by those

14   two railroads; and I have some quotes here on tab 53.  The

15   bottom bullet says:  They are a cartel which is designed to

16   minimize price competition and ensure all parties to the

17   cartel benefit from a rate structure which is maintained

18   above competitive levels.

19          And so if we turn to tab 54, here is where we get

20   to where the rubber hits the road today.  The railroads are

21   arguing that they could submit -- they could discuss and

22   agree on rate proposals -- again, this is in rate bureaus

23   because that's where they had the discussions and

24   agreements -- that they could discuss and agree on

25   single-line rates as long as they were simultaneously

1    discussing joint line rates; and that's exactly what the

2    railroads are arguing is protected.

3            You will see here on tab 54, I have a quote from

4    the DOJ reply brief where they describe this argument as

5    torture; that it would render meaningless Congress's clearly

6    expressed intent to promote com- -- price competition.

7            And you will see -- let's turn to tab 55.  The ICC

8    rejected those arguments.  It said that -- the middle bullet

9    there -- the potential that incentive discussions of rate

10   proposals will result in implied agreements is simply too

11   great.

12           In short, what the ICC interpreted the predecessor

13   of the Staggers Act as saying that the railroads could not

14   discuss or agree on single-line rates when simultaneously

15   discussing joint line rates; that was subterfuge to price

16   fixing.

17           So let's go to tab 66.  At the urging of the

18   Department of Justice and the FTC, Congress closed those

19   loopholes.

20           Now, we heard Mr. Wall and Mr. Gardiner talk about

21   how the Staggers Act was intended to promote deregulation;

22   and they're right.  They're completely right.  But with

23   deregulation comes less antitrust protection cutting back

24   significantly on the immunities and protections of 10706.

25           And if you look at what the statute was about,

1   this provision -- the one that we're fighting about, we're

2   discussing today -- is just a tiny part of the larger

3   statute of 10706 which describes what happens in rate

4   bureaus, what they can and cannot do.

5          Now, Your Honor, I won't walk you through what

6   Mr. Flexner and Mr. Wilson said for the Department of

7   Justice and the FTC, but I would invite you to read those as

8   a whole.

9          Now, I have included a slide that I am not going

10  to walk us through today at tab 58 which puts Mr. Flexner's

11  comments in some context; but the point is that they

12  identified the problem that the Staggers Act closed which is

13  not only should railroads be prohibited from agreeing on all

14  of their rates, but they should not even be permitted to

15  discuss it, okay; and those were the problems that

16  Mr. Flexner and Mr. Wilson were discussing.  As you will see

17  here, also on tab 56, while yes, the national transportation

18  policy was to deregulate, it was also clearly stated it was

19  to maximize competition and to minimize the use of general

20  rate increases.

21         So what Congress did -- now I am on tab 57.  What

22  Congress did was to prohibit agreements or discussions of

23  single-line rates, agreements or discussions of joint line

24  rates unless the railroads actually participated in those

25  rates, and it prohibited discussions or agreements of

1     general rate increases, and allows the ICC to determine

2     whether in fact it was infeasible through that prohibition;

3     in other words, infeasible to prohibit railroads from having

4     discussions or agreements of general rate increases.

5             Now, Congress also added this section we're

6     talking about now, this very small part of 10706,

7     (a)(3)(B)(ii).  And it was intended to address the

8     railroads' concerns about antitrust liability if -- if they

9     had -- they were with an interline partner.  And the

10     railroad simultaneously had a single-line rate on the same

11     route where the two interlining railroads had a rate, okay.

12             So let's say that you have got a route that goes

13     from Los Angeles to Denver and two railroads might be --

14     let's say St. Louis; two railroads may be discussing an

15     interline rate but one of the railroads also had a

16     single-line rate.  What the railroads were concerned about

17     was if they agreed on the joint line rate and then

18     independently, outside of their discussions with their

19     interline partner, charged the same rate on a single line

20     for their single-line service on the same route, they were

21     concerned that that parallel conduct could be viewed as an

22     antitrust violation.  And the reason we know that that is

23     what Congress was trying to address is that Mr. Dempsey told

24     us so, that's Exhibit 11 to our brief; and he said that's

25     what their concerns were.

1           But in addition, I will give you some citations to

2   other places that made clear that that's what this provision

3   was intended to address.  We have the Department of

4   Justice's 1980 ICC hearing testimony which is Exhibit 21.

5   Look at Exhibit 7 to our brief at page 5.  Look at Exhibit 9

6   to our brief at pages 18 to 19.  Look at Exhibit 16 to our

7   brief which is at page 14.  All of these say that what this

8   provision was doing was to prevent an inference where two

9   railroads provided joint line service and one of them also

10   provided single-line service.

11           I will also note that this provision uses the

12   words "discussion or agreement"; and that's not accidental

13   because that's what Congress was trying to address.  Those

14   were the words that Congress used in the other amendments to

15   10706.  Those were the words that Congress used when it was

16   trying to restrict the antitrust immunity that otherwise

17   existed under 10706.

18           Let's turn to tab 59 please, Your Honor.

19           I am not going to walk through this, but one of

20   the arguments that the railroads raised to the ICC -- the

21   ICC had proceedings after the Staggers Act did implement.

22   One of the arguments the railroads made was one we hear here

23   today, which is they have these cost increases and they

24   should be allowed to have general rate increases to recover

25   those increased operating costs.  The Department of Justice

1    responded.  This is the bullet at the bottom of the page:

2    Those practical problems are outweighed by the economic harm

3    of continued immunity.  The ICC rejected that.

4              In fact, if we turn to tab 60, Your Honor, this is

5    the brief I was just mentioning; it was signed by

6    then-Deputy Assistant Attorney General Douglas Ginsburg.

7              THE COURT:  I am familiar with him, yes.

8              MR. ATKINS:  I suspected that you would recognize

9    his name.

10             What the Department of Justice wrote was that the

11   railroads were also arguing that they should be permitted to

12   delay the implementation of these restrictions because it

13   was just too difficult.  He says:  In enacting the Staggers

14   Act, Congress determined that the potential welfare loss

15   associated with collusion is greater than the higher

16   transaction costs that may be associated with competitive

17   ratemaking.  Congress therefore created a presumption that

18   the economic harms of collective ratemaking outweigh

19   whatever practical problems exist in making rate changes

20   without antitrust immunity.  Collective cost recovery is

21   harmful because it facilitates collusion on joint rates and

22   discourages adoption of more efficient rate and routing

23   systems.

24             I have another quote there from the brief, but I

25   won't read that as well.

1            One of the arguments the railroads made at the

2     time was the same we've already heard today, was it's just

3     too hard to discuss interline rates separate from

4     single-line rates.  In fact, I think they say today that

5     rail transport would grind to a halt.  Well, they made the

6     same argument back in the 1980s, and the Department of

7     Justice was unpersuaded; and the ICC said no, that's not

8     going to be permitted.

9            In fact, the quote at the bottom of slide 61:  The

10    railroads have become sick and complacent because of years

11    of regulation and protected cartel pricing.

12            So let's go to tab 62.  One of the things that --

13    one of the things that came up during those discussions was

14    the issue today, should the railroads -- should the

15    railroads be permitted to discuss and agree single-line

16    rates including where they compete or, for that matter,

17    interline rates that they compete with other railroads in

18    competition as long as they're discussing with the railroad

19    in the room their joint line rates.  The ICC refused to

20    interpret the Staggers Act to permit that too.

21            The ICC said, We find that our prohibition against

22    single-line rates changes -- changes to the mechanism of

23    general rate increases and broad interchanges has not been

24    shown to be infeasible and should be implemented now.

25            The commission fails to see any valid reason why

1       the rail carriers cannot also separate single-line rates

2       from broad interchanges and general rate increases; and

3       there are some other quotes there as well.

4              On tab 63, the railroads made the arguments then,

5       just as they do now, that they needed antitrust protection.

6       Remember, we are talking about special antitrust protection.

7       We are not talking about arguments that might be made to a

8       jury, but -- no, these discussions don't prove an agreement.

9              We're talking about special antitrust immunities

10      or exemptions given by Congress.  They said that they ought

11      to be given that because it's, quote -- this is on tab 63 --

12      to ensure that railroads can safely build the necessary

13      interline partnerships while simultaneously managing their

14      noninterline business; and the FTC threw cold water on that,

15      as if the railroad industry is the only industry in which

16      competitors compete.  There are lots of industries where

17      competitors compete.  As the FTC said in the quote at the

18      bottom of that page:  All they have to do is be careful and

19      limit their conversations to that which is permissible.

20             Now, tab 64, the railroads say that this was

21      intended to give them broad antitrust protection, the

22      provision we're talking about here (a)(3)(B)(ii).  The DOJ

23      explained -- I guess I should also -- speaking of incomplete

24      sentences, Mr. Gardiner referred to the conference report of

25      Congress when they enacted the provision.  I think you will

1    see -- from the conference report, you will see that, in

2    fact, this provision is mostly an afterthought that

3    otherwise put restrictions on cutting back on antitrust

4    immunity.  Mr. Gardiner used an incomplete sentence.  He did

5    not read the last sentence of the conference report about

6    this provision.

7         It is true that the conference was -- expressed

8    that railroads should be permitted to lawfully discuss joint

9    rates and that a conclusion that Congress ultimately

10   provides procedural protections about lawful discussions and

11   resulting rates.  But here is the sentence that is

12   incomplete, or it was left out:  The conferees contend that

13   these protections be construed to ensure that rates for

14   anticompetitive activities remain under existing laws; and

15   that's exactly what we have said.

16        Your Honor, let's turn to tab 65.

17        Congress -- the defendants' interpretation of this

18   provision is exactly the opposite of what Congress was

19   trying to achieve.  When Congress was deregulating rates, it

20   was also cutting back on the antitrust protections.

21   Congress prohibited in rate bureaus discussions and

22   agreements of single-line rates, general rate increases,

23   interline rates as part of an agreement on joint line rates,

24   or interline rates in which Congress did not participate.

25   But now what the railroads are saying is that Congress

1   intended to permit exactly the same conduct outside the rate

2   bureaus.  If you will turn to tab 67 -- 66, their

3   interpretation would perversely give it two subsections of

4   this provision exactly opposite meanings.

5          If you look at section (a)(3)(B)(ii) -- and there

6   are two clauses there, subclauses, Roman I and Roman II --

7   Roman I refers to:  Discussions and agreement in accordance

8   with an agreement approved under paragraph 2 of this

9   subsection; that's the rate bureau.  So, in other words, if

10  a railroad and a rate bureau discussed prohibited rates,

11  there was no protection.

12         In subsection II which the railroads say applies

13  to discussions outside of rate bureaus, they're saying that

14  the same conduct will be permitted -- not only permitted,

15  that Congress intended to give it special antitrust

16  protection.  So think about that for a second.

17         In subsection I, Congress is intending to prohibit

18  certain conduct in rate bureaus.  And they say in

19  subsection II Congress is intending to give special

20  antitrust protection for exactly the same thing, which is

21  particularly incredible given that 10706 also has special

22  provisions.  They give antitrust oversight to the STB and

23  the Department of Justice for rate bureau activities that

24  they claim -- by providing transcripts of rate bureau

25  meetings; and those same protections obviously do not exist

1    in private conversations, in smoke-filled rooms, golf

2    courses.  So they're saying Congress intended to give more

3    protection where there was less oversight.

4              And, in fact, in the end what they're saying is a

5    roadmap, a roadmap to how railroads can price fix.  The

6    roadmap is that if railroad CEOs are discussing all of their

7    rates, then it's protected by 10706.  So let me go back --

8    you may remember in the 1980s that the CEO of one of the

9    major airlines called up the CEO of another major airline

10   and he said:  If you raise your rates, I will raise mine.

11             So let's make those railroad CEOs.

12             Let's suppose that one railroad CEO calls up

13   another railroad CEO and says:  Let's increase all of our

14   rates -- let's increase all of our interline rates; but

15   we'll also increase all of our other rates, single line,

16   competitive rates, Rule 11, interline, with others.  And

17   what the defendants are telling you is that that

18   conversation -- Congress intended to give that conversation

19   special antitrust protection; and I submit to you that

20   cannot be possible.  Thank you.

21             THE COURT:  All right.  Thank you.

22             So I have got 2:30, or a couple of minutes after

23   2:30.  So why don't we come back at -- is 2:45 all right, or

24   do you want to say 2:50?

25             The Government's up next.

1          MR. LEITCH:  2:45 is fine, Your Honor.  Thank you.

2          THE COURT:  All right.  So we'll come back at 2:45

3    for the Government, and then rebuttal from the defendants

4    and plaintiffs; and we're done for today.  See you then.

5          MR. LEITCH:  Thank you, Your Honor.

6          MR. WALL:  Thank you, Your Honor.

7          MR. GOSSELIN:  Thank you, Your Honor.

8          (Whereupon, a recess was taken.)

9          THE COURT:  So I think that the Government has a

10   half an hour.  I have been trying to keep time.  And I would

11   say that the defendants and the plaintiffs each have

12   somewhere between 20 and 25 minutes for their rebuttal, not

13   30.  I think we can go straight through without another

14   break.

15         So, Mr. Leitch, I am sure you have been listening

16   attentively to all that's been going on.

17         MR. LEITCH:  I have been doing my best, Your

18   Honor.  And I just want to make sure everyone can hear me

19   okay, there is no issue with the audio on my end; that it's

20   good.

21         THE COURT:  Can you speak a little louder?

22         MR. LEITCH:  Yes.  Absolutely.

23         Is that a little better?

24         THE COURT:  Yes.

25         MR. LEITCH:  Thank you, Judge Friedman.

1          May it please the Court.  Bryan Leitch for the

2    United States.

3          The statute in this case provides a limited and

4    narrow evidentiary protection for rail carriers that

5    excludes evidence of lawful discussions and agreements among

6    carriers about the interline traffic in which they actually

7    participate.  So, for example, if carriers A, B, and C were

8    to discuss rates for interline traffic that was only going

9    to be carried out by carriers A and B or B and C, or A and

10   C, that evidence would not be subject to exclusion under

11   this provision because it would not concern an interline

12   movement of a rail carrier within the meaning of the

13   statute.

14         Similarly, if carriers A and B were to discuss

15   interline traffic in a way that it had anticompetitive

16   impact or by itself support a finding of conspiracy, the

17   evidence would not be subject to exclusion.

18         In order for this statute to render the offense

19   admissible, it must be limited to -- discussions must be

20   limited to the participating carriers, they must be limited

21   to sharing interline traffic, and it must be competitively

22   neutral or procompetitive; otherwise, the evidence does not

23   show a lawful discussion or agreement that concerned the

24   interline movement of the rail carrier.

25         Now, there remain a number of disputes, issues

1    about the statutory language in this case, and I am happy to

2    discuss them in the order that Your Honor would prefer.  I

3    think I would begin by discussing the meaning of the word

4    "concern" because I think there has been perhaps a

5    misapprehension of our position.

6            We are not arguing for a solely or exclusively

7    concern standard in this case.  We are not asking the Court

8    to add any words.  We are asking the Court to give meaning

9    to the words that are there and, in particular, the

10   statutory term "interline" in the phrase:  Interline

11   movement of rail carrier.

12           Under our interpretation, "concern" means about,

13   which focuses on the point or purpose of the discussion or

14   agreement at issue.

15           Now, in this statutory and regulatory context,

16   "concerned" means -- concerned interline discussion or

17   interline movement of the rail carrier is really focusing on

18   the types of discussions and agreements that occur among

19   participating carriers that are limited to their shared

20   interline traffic.

21           Now, we acknowledge that there are multiple topics

22   that might come up during interline discussion or agreements

23   among different carriers.  But I think the point we are

24   making is we're not arguing for an exclusively concerned

25   statute; that would mean that carriers couldn't exchange

1    pleasantries, sort of, where they couldn't be free to

2    discuss current events or sports; and that's not the

3    position we're talking.  But there is a categorical

4    difference between discussions about interline traffic and

5    meaningful discussions about local rates or of the

6    significant distinction between those kinds of discussions

7    and general nonspecific discussions that are ambiguous as to

8    what they concern and that don't have a clear connection to

9    the shared interline traffic of the participating carriers.

10          I would submit that that is really one of the key

11   distinctions between our position and defendants, is the

12   treatment of "ambiguous evidence."  I think under their

13   standard, they're trying to say "ambiguous evidence" would

14   be enough.  But, with respect, I don't even think that would

15   satisfy what I understand to be their fallback position

16   which they seem to argue in the alternative for a

17   substantially concern or a genuinely concern standard.

18          But ambiguous evidence, evidence that's not clear

19   what it concerns, I don't believe you can say that that's a

20   substantial concern of interline movement of the rail

21   carrier.

22          So I don't think that there is necessarily a

23   significant difference in some respects between the parties'

24   positions; but I do think there is a significant difference

25   in the application of the rule to evidence that might be

1    ambiguous.

2           THE COURT:  When you talk about evidence that

3    might be ambiguous, or maybe another way to ask the

4    question -- maybe this gets to the "burden" question, maybe

5    it doesn't.  So the Court is supposed to exclude or not

6    admit certain kinds of evidence; and it clearly falls -- the

7    discussion/agreement concerns an interline movement of the

8    rail carrier will reach one conclusion, doesn't reach

9    another conclusion, if it's ambiguous, and it's not clear

10   that it fits within your definition of concerning an

11   interline movement or with respect to a shipment or

12   shipments between participating carriers, does that mean

13   it's admitted or it's not admitted, or it's admitted with

14   some limiting instruction?

15          MR. LEITCH:  Well, I think it would be admitted

16   whether there was a limiting instruction attached to it,

17   like it involves, say, like the first sentence of the

18   statute; I think a lot of the first sentence really can

19   begin with a limiting instruction.  But I think that it

20   would be admitted if it's not shown or the Court finds that

21   it doesn't concern an interline movement of the rail

22   carrier.  If the Court finds it's ambiguous, I think that's

23   a finding that it would not concern interline movement of

24   the rail carrier.

25          It doesn't relieve the burden, but I don't think

1    that the burden is solely on the Court.  I don't think it's

2    an inquisitorial burden of the Court.  I think it does --

3    the text and structure of the statute, as we explained in

4    pages 6 and 7 of our Statement of Interest, are best read,

5    we believe, as placing the burden on the carriers.

6           The statute sets forth conditions for

7    inadmissibility.  The requirements referred to in the last

8    sentence of the statute are requirements for the

9    inadmissibility.  We think it would be quite odd to require

10   the proponents of the evidence to satisfy where a condition

11   (sic) for excluding the evidence they're seeking to offer.

12          I want to be clear, we're not just taking this

13   position because we're enforcing the antitrust law.  We're

14   taking this position because it's the best reading of the

15   statute in our view.

16          The decisions pointed to by defendants really

17   involve entirely different situations.  Originally, in --

18   footnote 1 expressly made it clear it was not saying as a

19   categorical matter that the burden is always on the

20   proponent of the evidence.  It reserved the question of when

21   a burden can appropriately be placed on a nonoffering party.

22   What *Bourjaily* was referring to was a general background

23   rule.  There is no need to rely on a general background rule

24   in this case because we think the text and structure of the

25   statute make it clear who should carry the burden and show

1    that the best reading of the statute is one where the

2    carriers have to satisfy requirements for excluding the

3    evidence they wish to seek.

4           Now, to the extent the Court wishes to look to the

5    background rule for presumption, I think that the

6    appropriate background norm would be the movements as the

7    parties seeking relief from the Court generally carry the

8    burden to establish their entitlement to that relief.

9           No one disputes that 10706 is a statutory

10   protection that flows to carriers.  Like an evidentiary

11   privilege, it would make sense to require carriers to

12   satisfy the preconditions for invoking that specific

13   protection.  I don't think that that is out of the ordinary

14   or contrary to what *Bourjaily* was saying.

15          *Bourjaily* dealt with presumptively inadmissible

16   hearsay evidence.  10706 deals with evidence that we view is

17   otherwise admissible evidence of a conspiracy potentially.

18   So what we have here is the exact opposite of *Bourjaily*, and

19   the other cases cited by defendants have similar

20   distinctions.  But moving from that issue to the issue of

21   concern --

22          THE COURT:  Let me ask you a question before you

23   move on.

24          MR. LEITCH:  Yes, Your Honor.

25          THE COURT:  As I raised this before, just as sort

1    of a practical matter, and that was this -- I think

2    typically -- at least what's happened in this case, and

3    maybe the Justice Department has a different experience

4    where you are the prosecutor or the plaintiff, the proponent

5    of -- if you are out to prove a case, as the plaintiffs are

6    here, they have identified their evidence.

7         Now, maybe we got into that in much more minute

8    detail than we might in some cases because we have been

9    through two class certification hearings, so they have

10   identified what their evidence is going to be.  And it seems

11   to me, as a practical matter, that the railroads would be in

12   the best position to say, well, that document or that email

13   exchange, or whatever, doesn't relate or does relate to an

14   interline movement.

15        But then you get to what's been called step two,

16   whether the discussion/agreement would -- considered by

17   itself -- constitute a violation of the antitrust laws, and

18   who should have the burden on that; is it the person that's

19   trying to say this is the case in which the antitrust laws

20   have been violated, or should it remain with the carrier?

21        MR. LEITCH:  We believe it should remain with the

22   carrier.  I say that for a number of reasons.  One is the

23   statutory text; it makes clear it has to -- that someone has

24   to show that it would not by itself violate the antitrust

25   laws, and that's a condition for excluding the evidence.

1    The Court would have to rewrite that provision in order to

2    assign the burden to the plaintiffs.

3             But, secondly, as Your Honor noted, the carriers

4    in this case, in this situation, really have the first move

5    for advancing because they select the evidence they want to

6    challenge.  Additionally, we know from the conference report

7    Congress wanted to protect lawful discussions and

8    agreements, wanted to prevent false conclusions of a

9    conspiracy.  I think it makes sense that when Congress

10   provides a protection to carriers for lawful discussions and

11   agreements they would require carriers to show that those

12   discussions and agreements are lawful.  Because it's

13   important to note that what carriers are dealing with here

14   is not the ultimate merits question of whether or not there

15   was a broader antitrust conspiracy.  They're still -- we're

16   looking here at discrete discussions and agreements.  They

17   may involve multiple communications, but they are still

18   discussions or agreements that have to be analyzed by

19   themselves unless this were an unusual case where -- I don't

20   want to weigh in on any of the issues in this particular

21   class.  But, hypothetically, there could be a situation in

22   which the only, sort of, reading of the evidentiary context

23   is that there was one unified discussion or agreement.

24            I think the defendants are right in their metaphor

25   about connective tissue.  There has to be some connective

1    tissue among various communications in order for them to

2    comprise a single discussion or agreement.  But we think

3    that it's still appropriate to require carriers to satisfy

4    that second step.

5         I would also like to explain to the Court, if I

6    might, how we envision that sort of burden playing out.  We

7    don't think it will be a substantial burden.  I think it

8    will be relatively minimal in the line of our cases.  What

9    carriers would need to show is that the discussions or

10   agreements were competitively neutral or procompetitive.

11        Now, we acknowledge that, at page 22 of our

12   Statement of Interest, that, generally, limited interline

13   discussions or agreements between carriers about their

14   single-line traffic that -- by and large, those arguments

15   are to be at least competitively neutral.  When carriers are

16   exchanging traffic, they are correct that they are in a,

17   sort of, joint venture-like relationship; and it's

18   appropriate for joint venturers to discuss the price they're

19   going to charge for a service they're providing to

20   customers.

21        So in my line of cases, this will not be a

22   substantial burden on defendants or on carriers.  What

23   they'll both need to show is that there is some sort of --

24   that the discussion or agreement was perhaps reasonably

25   necessary to effectuate the interline traffic or that there

1    was some sort of efficiency in enhancing the outcome; they

2    were able to provide services to the interline services that

3    they weren't -- it might not be able to be provided through

4    truck transportation, for example -- something like that;

5    but it would be a relatively minimal burden.  I think this

6    is a better reading of the statute.

7            We acknowledge that the "considered by itself"

8    clause will do somewhat less work under the statute than it

9    would say under defendants' reading; although, I don't quite

10   know what work it would do under their reading to be honest.

11           But I think that it makes more sense to, sort of,

12   have a strict focus on "concern" at the outset because it

13   will be a more administrable statutory scheme and more

14   administrable statutory framework, rather than having the

15   Court apply antitrust principles to each discussion or

16   agreement, sort of a fresh perspective, and have to sit

17   through all those kinds of issues.  I think it's much easier

18   to determine in context whether or not a discussion or

19   agreement concerned an interline rail carrier under our

20   approach.

21           And so, as noted, we think the burden is most

22   likely best placed on the defendants.  I would note that --

23   again, as I just indicated, this would not result in

24   superfluity for the "considered by itself" prong.  There

25   still could be discussions or agreements that have that an

1    anticompetitive effect, even if limited to shared interline

2    traffic discussions.  For example, if two class 1 carriers

3    decided that they were not going to do -- in their interline

4    business they were not going to do three- or four-part

5    movements with class 2 or class 3 railroads which are

6    smaller competitors; that is an agreement that would be

7    limited to interline traffic, but it would have an

8    anticompetitive effect in a sense it would reduce output and

9    potentially freeze out smaller competitors in the market

10   entries.  So it's not as if the statute doesn't really work

11   under our agreement.

12           What we acknowledge in most instances the burden

13   would be relatively minimal under our reading completely

14   "considered by itself," but I am not sure why the plaintiffs

15   would resist that.  It seems to me that that would be to

16   their benefit.

17           I want to make sure that Your Honor -- if Your

18   Honor has a question --

19           THE COURT:  Go ahead.  Go ahead.

20           MR. LEITCH:  Yes.  Yes.

21           I'd also like to address, if I might, just some of

22   the issues about DOJ's testimony from the legislative

23   history.

24           In varying contexts, Mr. Flexner was testifying in

25   generalities.  He said on 4/27, in his testimony, he was

1    saying, In the ordinary situation, these types of agreements

2    are not going to raise serious anticompetitive concerns;

3    that's perfectly consistent with what we have said in

4    page 22 of our statement.  In other places he sort of made

5    similar caveats.

6              I would note as well that even under the *Texaco*

7    decision -- *Texaco* didn't hold that pricing discussions

8    among joint venturers are per se lawful, but it held that

9    they are not per se unlawful price-fixing agreements.

10             There are still -- almost all combinations in

11   respective trades are subject to a rule of reasonableness.

12   So I don't think that *Texaco*, sort of, supports the idea

13   that there is a categorical immunity for limited discussions

14   or agreements among interline partners.

15             Additionally -- to the extent the Court would like

16   to discuss, we think that the statute -- the phrase "of the

17   rail carrier" requires actual participation rather than just

18   potential participation.  I read footnote 5 in defendants'

19   response as being essentially in agreement with us on that

20   point; although, there are allusions in other places, the

21   idea that this might include potential participants; we

22   don't think that's the correct reading of the phrase "of the

23   rail carrier."

24             Additionally, Your Honor had questions about joint

25   line rates versus Rule 11 rates.  You know, I am happy to

1    answer any questions Your Honor has about that.

2            I wanted to reiterate that joint line rates are

3    different than Rule 11 rates.  Rule 11 rates are generally

4    requested by the shipper.  Carriers don't necessarily have

5    control over whether the Rule -- the rates can be Rule 11.

6    But I think, as defendants acknowledged in footnote 3 of

7    their opening brief, that these types of accounting methods

8    and arrangements don't require rate discussions among

9    carriers.  Now, there may be a need for carriers to still

10   discuss that traffic for safety purposes or other logistical

11   details; but in terms of exchanging information about rates,

12   it wouldn't necessarily require them to have those kinds of

13   discussions.

14           THE COURT:  And you just -- okay.  I get that.

15           So joint line rates -- are joint line rates the

16   same as interline rates, or is it a broader category?

17           MR. LEITCH:  I think it's a broader category than

18   probably interline rates, and joint would be one subset; one

19   way of accomplishing and formulating a joint line rate -- an

20   interline rate.  Excuse me.

21           THE COURT:  Okay.  Because the statute talks about

22   interline movements --

23           MR. LEITCH:  Yes.

24           THE COURT:  -- and I guess it also talks about

25   interline rates -- interline rate or related matter --

```
 1                   MR. LEITCH:  Yes.

 2                   THE COURT:  -- and then talks about interline

 3       movements.  The phrase "joint rate" does not appear in the

 4       statute.

 5                   MR. LEITCH:  Yes, but it's a particular type of

 6       interline rate, a joint line rate.

 7                   THE COURT:  Okay.

 8                   MR. LEITCH:  Yes.  And I think what those types of

 9       arrangements show -- as we explain on pages 14 and 15 of our

10       statement -- is that there really isn't a pressing or a

11       necessary need for carriers to be discussing rates with

12       nonparticipating rivals.  They have formulated ways to

13       discuss and formulate rates into negotiating and settling

14       interline rates without having to talk to nonparticipating

15       rivals as I mentioned; nothing about our approach would

16       deserve that.  And the defendants in their response didn't

17       offer any counterargument.

18                   Now, they're welcome to offer one today, Your

19       Honor, on rebuttal; but I didn't see any in their 30-page

20       response to our point on that.

21                   Additionally, defendants raise points about

22       Gosselin.  I am happy to address any questions the Court has

23       about the Fourth Circuit Gosselin decision, but I also want

24       to make clear that our position in this case is consistent

25       with what we argued in Gosselin.
```

1          In *Gosselin*, the bottomline point that we made

2     there which the court adopted was that a partial

3     relationship between A and B doesn't necessarily mean that A

4     concerns B within the scope of a particular statutory and

5     regulatory regime.

6          *Gosselin* involved an international bid-rigging

7     scheme, the first step of which involved an agreement with

8     local German agents and had an endeavored relationship to a

9     foreign inland segment; but, nevertheless, the court held

10    that the overall scheme was not immunized and did not

11    concern a foreign inland segment, even though the first step

12    of it did.  And what the court said was, If the scheme had

13    stopped at the first step there might be immunity for these

14    defendants, but the problem is there was additional other

15    conduct.  There was conduct that didn't have a relationship

16    to the foreign land segment.  We think a similar analysis

17    should apply in this case to the court's interpretation of

18    the phrase:  Concern with interline movement of the rail

19    carrier.

20          I am also happy to discuss any questions Your

21    Honor has about the, sort of, first issue we addressed in

22    our opening -- our segment of interest which was regulated

23    versus unregulated traffic, and a limitation --

24          THE COURT:  Well, I am not persuaded by

25    plaintiffs' argument.  I think that the argument that this

1    statute doesn't apply at all is just wrong.

2         MR. LEITCH:  Well, we would agree with that

3    submission, Your Honor.  On that point, we'd join the

4    defendants.

5         If Your Honor has no further questions, I think

6    the point I would like to make, Your Honor, is that it's

7    important in this context I think to recognize that while

8    10706 (a)(3)(B)(ii) is an evidentiary provision, it is a

9    provision about inferences and evidence; but, nonetheless,

10   given that provision, an unduly broad instruction similar to

11   what defendants have argued at times we think would create a

12   de facto immunity in the antitrust laws that Congress did

13   not intend.

14        As one of my colleagues on the plaintiffs' side

15   had noted, we'd note from the Congress report Congress

16   wanted this provision to be construed to preserve existing

17   antitrust remedies.  Proposing direct evidence litigation or

18   briefing concern to meet anything related to interline

19   traffic we think would cause a substantial dramatically

20   limiting effect on the ability and antitrust remedies in a

21   way we don't believe Congress intended in the text of the

22   statute, nor is there any indication in the legislative

23   history that it wanted to create, sort of, a backdoor

24   immunity when it was curtailing the antitrust immunity

25   elsewhere in the Staggers Act, and it wanted to foster price

1    competition in the rail market and add rail carriers freely

2    to the greatest extent possible, like other actors in

3    deregulated competitive industries.

4         And with that, we thank the Court for the

5    invitation to file a Statement of Interest and for the

6    ability to participate in today's hearing.

7         THE COURT:  Well, I thank you for participating

8    and for getting before me the views of the Antitrust

9    Division and the Federal Trade Commission and the Surface

10    Transportation Board.  I didn't think it would be

11    appropriate to try to lay out my view as the first judge to

12    actually ever consider this without hearing from you, and I

13    appreciate it very much.

14         MR. LEITCH:  We appreciate your consideration,

15    Your Honor.  Thank you.

16         THE COURT:  Okay.  Thank you.

17         So we then move back to the defendants; I am not

18    sure which I will hear from, Mr. Gardiner or Mr. Wall.

19         MR. GARDINER:  It will be Mr. Wall, Your Honor.

20         THE COURT:  Okay.  Go ahead.

21         MR. WALL:  Sure.  Thank you.

22         I think it would probably be most efficient if I

23    just picked up on the points that the Department of Justice

24    just made.

25         I think that there are a couple of principal

1    differences, but it really has to do with how you reconcile,

2    if one can reconcile, the statement that they're not

3    advocating for a solely or exclusively concerned standard

4    with the statement that was made very shortly after saying

5    that these protections are limited to discussions of shared

6    interline traffic.

7           So what does limited to discussions of shared

8    interline traffic mean?  If that means that it's just

9    factual determination and that the -- there is a predominant

10   aspect, a nontrivial aspect, significant -- I don't care

11   what word it is; if it means that this was related to the

12   management of the interline business and is not some sort of

13   a sham to, instead, talk about the competitive business,

14   then we have no disagreement with them because we have never

15   said -- we were never going to say that we think that this

16   is just some sort of method of laundering conspiratorial

17   communications through interline discussions.

18          What we have said -- and what is the foundation of

19   the statute, it's the legislative premise of the statute --

20   is that carriers need to talk about an awful lot of things

21   that are more or less the same things that -- the same

22   issues that they face with respect to their local traffic.

23   There is a huge overlap.

24          And so here, once again, we're dealing with a

25   situation in which I -- I thank Mr. Leitch for saying so

1    strongly that there is nothing wrong with people who have

2    joint line rates, discussing pricing, and so forth.  But we

3    do have a situation here in which -- in the face of rising

4    fuel costs, people are talking about these things; and

5    they're talking about them in their formal interline

6    alliance meetings, they're talking about them through formal

7    concurrence requests, they are talking about them in various

8    ways, all of which are the normal challenges of

9    communication that railroads use with respect to the

10   management of that interline business and how can that

11   somehow, by interpretation, not concern interline?

12           You know, I agree with the spirit of what the DOJ

13   says in that what we really want to ask -- but I wouldn't

14   put it at the second step of the analysis, I will put it up

15   front -- in deciding what are some of the concerns, does

16   this appear to be that kind of communication that Congress

17   was intending to protect by virtue of the premise of the

18   statute which is the management of the interline business

19   is, if not procompetitive, competitively neutral.  The

20   antitrust boards -- we tend to take the things that promote

21   efficiency are procompetitive, and that discussions among

22   joint venture partners are, sort of, at the heart of that.

23           All of these were -- we're not about bench cases.

24   There was talk during plaintiffs' discussion that we're

25   bringing up bench cases, but we're not bringing up bench

1   cases.  They're not giving you anything at all that doesn't

2   come out of the heartland of the way that carriers

3   coordinate their interline business; it's all from the

4   normal channels of communication, the normal meetings they

5   have.  And they make, respectfully, a sort of secondary or

6   tertiary argument about, well, senior people were at the

7   meeting before.  Well, that doesn't change whether it's an

8   interline communication or not; and there is nothing

9   unlawful to have your interline business attended to by your

10  senior executives, particularly if you have something

11  important to talk about.  So this is talking around the

12  statute.  This is trying to avoid the very simple imperative

13  of the language of the statute to ask whether this concerns

14  an interline movement or related matter -- interline

15  movements, rates, related matter -- several different ways.

16  It's all about is this in some tangible objective way a

17  conversation about the interline business?

18          I think that where we disagree on *Gosselin* --

19  first of all, we adopt the "about" standard which, of

20  course, we agree with the DOJ on the "about" standard.  But

21  I think what Judge Wilkinson took great pains to say was

22  that this inland conduct in Germany -- that the DOJ had not

23  injected into the case -- the DOJ didn't indict about

24  anything having to do with the inland conduct in Germany.

25  And the defendants in this incredibly very cheeky argument

1    are trying to say, hey, wait, I did another thing illegal

2    too; and because that other thing would fall within an

3    immunity, the first thing that I did illegal -- or,

4    actually, it was the second thing, but in first order --

5    that should be immunized.  And you know, quite honestly,

6    that's one of the ones we usually know the law is going to

7    find a way to reject that argument; it's a matter of what

8    the details are going to be.  But there is no way, no how

9    that anybody is ever going to say that two wrongs make a

10   right in that kind of way.

11           In fact, what Judge Wilkinson does in that opinion

12   is not announce just the tripwire approach, because it

13   involved something more than Germany -- that German inland

14   section -- they lost the immunity; but to actually say that

15   there was a clear separation between what had happened in

16   Germany and the through-rate conspiracy, and the German part

17   was not consequential for the through-rate conspiracy.

18   That's -- I'm fine with that.  That's a perfectly normal

19   construction of "concern" that doesn't do violence to the

20   words, that says:  I don't think the thing I charged you

21   with concerns the German inland section, not under a

22   tripwire, but just because if you consider it based on

23   context it just doesn't make any sense.

24           Now, I don't understand the logic of the argument

25   that says the burden is on us -- that Congress went to the

1    trouble to put the burden on the railroads to say that the

2    communications were not unlawful even though it's a trivial

3    burden and would be satisfied just by showing that the

4    communications were -- I think he said "reasonably

5    necessary" to the interline business; I mean, that, in fact,

6    is a statement.  Those words, as counsel knows, are derived

7    from the underlying substantive rule of law about joint

8    ventures that would allow those joint venturers to talk

9    about anything that is reasonably necessary to the creation

10   of the efficiencies of the business.

11        But the point of the statute is that Congress was

12   already convinced about that in the case of the interline

13   communication.  The protection wouldn't exist if Congress

14   was not convinced that that was, in fact, the norm as the

15   DOJ and the FTC had agreed.  So it makes no sense to make

16   you think that you have to re-prove the premise of the

17   statute with respect to every item of evidence.  Rather, the

18   burden should align with what the plaintiff is trying to

19   prove overall, which was that there was unlawfulness.

20        So, again, as I said before, Your Honor, even

21   if -- it wouldn't bother me at all if you were to hold that

22   the railroads have the burden of coming forward with

23   establishing that these communications concern interline;

24   but it makes no sense to put upon the defendants the burden

25   with respect to every interline discussion they have to

1    disprove illegality.

2            I will also note that we are, sort of, at the end

3    of this process.  I have tried -- I have tried to bait

4    people in every way I know how to cite evidence in favor of

5    the proposition that there is an underlying rule of law that

6    burdens turn on whether you have conditions for

7    admissibility versus conditions for inadmissibility, and

8    we're still not getting any citation to anything that adopts

9    that.  What we have is the opinion of the Department of

10   Justice that it makes sense here; and that I would

11   respectfully submit is not a reason to depart from the

12   normal rule that the proponent of the evidence has to

13   establish their right to use the evidence.

14           Now, when we -- turning to some other issues here,

15   I think that -- so going back to the beginning, I just -- I

16   am told we were cherry-picking, told we were saying things

17   that lacked record support; and Mr. Neuwirth even said that

18   we were just not telling the truth about what happened with

19   the fuel prices.  I don't know if this is going to work

20   here, but you do have in this shared screen technology --

21   and I am just going to try to put this up.

22           Can you see this, the "Petroleum and Other

23   Liquids" chart come up?

24           So all of our data about the pricing -- I guess

25   this isn't going to work here.  Let me see if I can try it

1    now.  I don't know if it came up now.  But when I talk

2    about --

3                 THE COURT:  I see it.

4                 MR. WALL:  Great.

5                 These are the prices that we all have been using

6    from the beginning of time here as to what was happening

7    with fuel charges.  Okay?

8                 And, you know, here we are in 2002.  So I will say

9    2003 is about here.  The comment that counsel made about

10   prices were diving or collapsing, or some such word, is

11   referring to that little blip right there.  But come on,

12   from December -- from 2002 on it's on a steady rise.  It's

13   on a steady rise, and that is why people were talking in

14   their alliance meetings about what to do with the fuel

15   surcharges.  And counsel for DOJ, very helpfully,

16   acknowledges -- you know, from the antitrust division no

17   less -- that there is nothing wrong with them discussing

18   that subject matter and what to do about the joint prices

19   that they have together.

20                Now, a lot of the argument that you heard seems to

21   me to be really an effort to read something really wild into

22   the statute, which is some sort of idea that the protections

23   only exist so long as the particular form of interline rate

24   known as the joint line rate -- the one that people like to

25   talk about -- is, what, a substantial part of the business,

1    a majority part of the business?  I am not sure where

2    they're going with that.

3           Well, Your Honor, let me just sort of cut to the

4    chase.  Regardless of whether it's big, medium, or small,

5    Congress enacted the protections around the discussions that

6    deal with the interline rates.  It happens to be that most

7    of the traffic that a lot of these carriers carry is local

8    traffic; and then there are three kinds, generally speaking,

9    of interline traffic.  There is the Rule 11 traffic which is

10   a lot -- there is a lot of that in use.  And if it's the --

11   if the numbers show that it's more than joint line rates, so

12   be it; I don't see why that matters to anything.  And then

13   there is something called A plus B pricing.  And A plus B

14   pricing -- that a shipper has the option to actually talk to

15   one carrier, negotiate a price for that carrier, and then

16   add onto that published price of the interline carrier; so

17   it's something that they can do for the convenience of the

18   shipper.  So there are different ways that this comes about.

19          Regardless, there are tens of billions of dollars

20   of commerce in joint line rate commerce during the relevant

21   time period, during the class period.  I think that the same

22   citation that Mr. Gosselin gave you would take you to

23   Dr. Carlton's chart that shows it was something on the

24   order, I think, of $15 billion, revenue dollars, from joint

25   line business for Union Pacific alone during this period of

 1   time.  So does it matter if it's a majority or whatever?

 2   No.  It's just a bunch.

 3           And Congress was convinced that in the

 4   post-Staggers world it was going to be a significant enough

 5   thing that carriers were going to need to behave in certain

 6   ways, and they were going to need protection from false

 7   inferences that would come out of those discussions,

 8   agreements, and actions on the interline business.

 9           There is no occasion here today to retry the

10   wisdom of the statute; that's not up for grabs here.  The

11   statute is what it is, it uses the language that it uses;

12   and it decided to put these protections in.

13           But Mr. Atkins says Congress was eliminating

14   protections.  How can we have any substantial protection

15   when Congress was in the process of eliminating protections?

16   Well, let's be clear.  They were eliminating rate bureau

17   protection; that's what they were eliminating.

18           Rate bureaus were these organizations in which

19   carriers would collectively decide on all of their rates

20   including nonparticipating carriers.  It's nothing like the

21   interline discussion.  And in contrast, Your Honor, Congress

22   didn't lessen protections for interline discussions, it

23   created them for the first time.  It created them by virtue

24   of this statute.  The statute that plaintiffs are trying to

25   dismiss as unimportant and inconsistent with Staggers.  But

1     there is nothing inconsistent with Staggers because we're

2     transitioning from a regulated world based upon rate bureau

3     discussions in the first instance, followed by extensive

4     regulatory review at the ICC in the second instance.  For a

5     deregulated world with much more independent pricing

6     including, as Congress understood, a substantial component

7     of joint-line pricing and interline pricing that would

8     require discussions and agreements among carriers.  So

9     that's the premise, and those are the protections that come

10    from that.

11          Now, the one thing that I just want -- I don't

12    even see how there can be any reasonable debate about it, is

13    that the plaintiffs' entire argument -- the only game that

14    they have to play is by aggregating different discussions

15    and agreements, by aggregating things together.  And I doubt

16    there is any force in nature that can actually get them to

17    engage with us at the level of particular discussions and

18    agreements through either one of the two logic diagrams that

19    I went through in my opening presentation.

20          And just think about it for a moment.  If you were

21    in the position of the plaintiffs here, don't you think you

22    would at least try to make an argument that you have got

23    something within the scope of this motion that could

24    actually survive scrutiny and be admissible if it went

25    through that analytical process?

1          I mean, what does it say that you have to make all

2     of your arguments for a completely different process that

3     sort of invariably leads to the conclusion that you can use

4     whatever it is that you want to use because amalgamation --

5     which is the one thing that this statute most clearly

6     prohibits -- is, in fact, allowed?

7          I mean, why haven't plaintiffs told you that this

8     motion is no big deal because they have got lots of other

9     non10706 evidence, multilateral discussions, multilateral

10    emails that maybe they actually had the meeting at the NEMC

11    that was just alluded to and that never occurred, that maybe

12    they got together in the hallways of the AAR; why aren't you

13    being told that?  It's because it doesn't exist.  It's

14    because they are all in on interline communications, and

15    they have nothing else.

16          If counsel, Mr. Neuwirth, thinks that I am

17    cherry-picking, then I would be happy to stop right now,

18    turn it over to him, and ask me to talk about any single

19    piece of evidence that is in the scope of our motion; and

20    we'll just take it through the process from the beginning to

21    the end and see whether it concerns interlining and whether

22    it's unlawful considered by itself.  It can't do that

23    because the only evidentiary value of any of this is if you

24    make a mosaic about it and you turn it into that broad

25    narrative that is going to -- intended to make a jury think

1   that, gosh, these competitors talk all the time; not

2   appreciating that they talk all the time because they're

3   interline partners and because interline partners need to

4   talk about all of the same stuff that's at issue in this

5   case.

6           Your Honor --

7           THE COURT:  Well, whether you want to turn it over

8   to Mr. Neuwirth or not, you are going to have to in about

9   five minutes.

10          MR. WALL:  Okay.  Well, I am actually going to

11  quit right here and give Mr. Gardiner an opportunity to say

12  any -- provide any closing thoughts.  I do want to say, Your

13  Honor, thank you very much for affording us the full

14  opportunity to talk about this.

15          THE COURT:  Thank you, Mr. Wall, and everybody

16  else.

17          MR. GARDINER:  Your Honor, the only thing I would

18  add is that this all seems hard to all of us, right, to

19  antitrust lawyers, plaintiffs, defendants, and the Court

20  because we are used to the summary judgment world that's not

21  preceded by this navigation of an inference-limiting,

22  inference-disciplining statute, and so that the instincts

23  are all amalgamated; but that's exactly what this statute

24  was set up to block and set up for all of the procompetitive

25  reasons to which Mr. Wall referred.  So that's why the big

1     pause is necessary.

2            That's why we're so appreciative that Your Honor

3     gave us the procedural opportunity to do this in those steps

4     because it is different from a case without this kind of

5     protection and without this kind of procompetitive platform

6     that Congress was trying to promote.  So it leads back to

7     this task of really getting at the discussion or agreement

8     and finding out that there is a disciplined approach to

9     evidence linking to each other with the connective tissue

10    that we have referred to and the justice department agrees

11    with, that actually links them not by allegation, not by

12    inference, not by speculation, not by just leapfrogging, but

13    by evidence that actually tethers the conversation.  And we

14    have about abated the point of stage to engage on that, and

15    there you have it.

16            Thank you, Your Honor.

17            THE COURT:  All right.  So who is up for the

18    plaintiffs?

19            MR. NEUWIRTH:  I am, Your Honor.

20            THE COURT:  Mr. Neuwirth.

21            MR. NEUWIRTH:  I hope you can hear me.  Thank you.

22            THE COURT:  We don't see you.  At least I don't

23    see you, but I hear you.

24            MR. NEUWIRTH:  Hopefully I can fix that if you

25    give me one second.

1          Is that better?  Can you see me now?

2          THE COURT:  Yes.

3          MR. NEUWIRTH:  Okay.  I'm sorry.  I didn't realize

4     I was off the video.  Thank you, Your Honor.

5          And all of us representing the plaintiffs thank

6     Your Honor for the time and attention that you have given to

7     this matter today.

8          Several questions emerge from the discussion

9     today; the first is, what is this case about?

10          This case, from day 1, has alleged that the

11     railroads in early 2003, after several years of being unable

12     to get fuel surcharges to stick on their own, and after a

13     period of time where they were internally complaining about

14     the revenues and profits that they were earning, seized upon

15     fuel surcharges as a way to implement the type of

16     across-the-board rate increase that they used to be able to

17     get before the Staggers Act of the ICC.

18          And, remember, these were rate-based fuel

19     surcharges.  What happened was they would use a fuel index

20     to come up with a percentage, and then that percentage would

21     be applied to a shipper's base rate; and so this was a

22     way -- if you got a fuel surcharge from that index which was

23     12 percent, you could raise everybody's rates by 12 percent;

24     and this was what the Surface Transportation Board said had

25     nothing to do with the price of fuel and, therefore, was an

1    unreasonable practice.  So that is what this case is about.

2    It is what this case has been about from day 1.  And I

3    believe that both of your class certification opinions

4    recognized that this case was about using these fuel

5    surcharges, applying them to as much rail traffic as

6    possible, and using them as a profit center.  I believe both

7    of your opinions lay that out as what is being alleged.

8         Now, the second question is what does the evidence

9    show?  And Mr. Gosselin spent about 40 minutes -- virtually

10   every minute of his presentation today walking through

11   actual evidence and showing you what the documents say and

12   the connective tissue, if we can use that phrase, in those

13   documents is so clear.  What it shows is that during this

14   period, where Mr. Gosselin showed you there was a sudden

15   concentration of these meetings compared to what happened

16   before and what happened afterwards -- he showed you during

17   that sudden concentration of meetings the railroads were

18   talking directly about applying these fuel surcharges across

19   the board to all traffic.  And he showed you actual

20   documents and evidence.

21        This was not theoretical or speculative.  He laid

22   out for you the exact evidence in the record that

23   demonstrates that the documents that the defendants are

24   seeking to exclude concern discussions that were not limited

25   to an interline rate -- that were not limited to interline

1    rates alone, but that were meant to apply to fuel surcharges

2    across the board.  This was not speculative; he showed you

3    the evidence.  And, notably, not a single piece of that

4    evidence was discussed by the defendants in their rebuttal;

5    not even an example of it.

6         Now, you will recall, Your Honor, that you

7    purposely in your classification certification opinion said

8    that you were not considering any of this evidence that's at

9    issue, which is why you didn't need to determine this

10   earlier in 2010 or in 2017 when you addressed class

11   certification.

12        And in 2017 you -- in 2017, you made the point

13   that the evidence had not changed, that you were looking at

14   the same evidence.  And you said that evidence which is --

15   none of this evidence that we're talking about on this

16   motion, that that evidence of conspiracy was strong.  And so

17   the suggestion here is that we're desperately trying to find

18   a way to get this evidence in because without it we can't

19   prove our case is a fabrication.  We have lots of other

20   evidence that you pointed to in two class certification

21   opinions.

22        But what we have shown you today is that this

23   evidence -- that this evidence has a clear connective tissue

24   that Mr. Gosselin walked you through document by document.

25   And the suggestion now by the defendants that he has shown

1    nothing that we are not willing to engage on the evidence,

2    we have shown you what is wrong with the documents they have

3    cited; they didn't give you any response.  We showed you

4    multiple documents that set forth what the defendants were

5    doing and their connective tissue, no response.  Instead, it

6    was another speech about a view of how the world should

7    operate.

8            Now, let's look again at the statute.  The statute

9    says -- and this is behind our tab 8 -- evidence of a

10   discussion or agreement between or among such rail carrier

11   and one or more other rail carriers, or of any rate or other

12   action resulting from such discussion or agreement, shall

13   not be admissible if the discussion or agreement concerned

14   an interline movement of the rail carrier, and the

15   discussion or agreement would not, considered by itself,

16   violate the laws referred to in the first sentence of this

17   clause.

18           And I think it's critical, Your Honor, that if you

19   look behind tab 26, the defendants have conceded the point

20   that we're making and that the Government is making.

21   They -- in their supplemental brief at page 13, note 4, they

22   say:  Even an agreement that undoubtedly concerns interline

23   traffic can still fail the second step.  For example, if the

24   evidentiary context of the agreement shows that the

25   agreement concerns interline traffic but also includes an

1    illegal agreement on local rates, it would fail the second

2    step; and that is exactly what Mr. Gosselin showed you in

3    document after document is happening today.

4         And if we look behind tab 21, it's critical to the

5    way the statute is drafted.  There is a distinction between

6    the discussion or agreement that has to be -- would violate

7    the laws by itself and the actual pieces of evidence.

8         As we see at the bottom of tab 21, the statute is

9    not written to say that you go piece of evidence by piece of

10   evidence to determine if that in and of itself represented

11   some agreement.  It says that you have to exclude evidence

12   if the discussion or agreement considered by itself does not

13   violate the antitrust laws.  What was the agreement here?

14   It was an agreement to use fuel surcharges as a way to raise

15   all interline rates.

16        Now, there have been a lot of arguments that have

17   been raised today, but you have raised at least two

18   questions; one is, what does the word "concerned" mean,

19   which the Government spent some time addressing; and, two,

20   is the evidence limited to a discussion or agreement

21   regarding interline movements in which the carriers

22   participate?

23        So, first, what does the word "concerned" mean in

24   the statute that we just looked at?

25        Defendants tell you that it means any

1     communication that includes interline movements.

2          We have said and the Government has said that it

3     means communications that are limited to interline movements

4     in which the carriers participated.  Now, it doesn't have to

5     be the only thing that's talked about but, at the very

6     least, it has to be something that the carriers were

7     participating in here.  The statute expressly says that you

8     can't write that language out.

9          And Mr. Gosselin showed you document after

10    document to which there was no answer, where the railroads

11    were not only not talking about interline movements, but

12    they were clearly talking about a broad range of shipments

13    of which they were not both participating in.

14         Now, certainly you can have a semantic debate

15    about what is the definition of the word "concerned" which

16    always depends on the context.  But the critical point is

17    that the defendants' definition is really boiling down to a

18    way that's saying that Section 10706 allows railroads to

19    collude on all rates because all rates include interline

20    rates.  That's essentially what they're saying; they don't

21    use those words.  But what they're saying is as long as

22    we're talking about this important business of interline

23    rates because we're joint venturers the discussion should be

24    immune from antitrust scrutiny; and that is not what is

25    supposed to happen.

1          As the Government said in its presentation,

2     effectively what the defendants are asking for is that

3     immunity with the way they're asking you to interpret the

4     statute.  And clearly there is no ambiguity in the evidence

5     here on whether the railroads were talking about shipments

6     beyond those on which they were themselves participating.

7          Now, the issue came up about "burden."  And if you

8     look behind tab 7 in our binder, the question of whether the

9     defendants have the burden here I think, respectfully, is a

10    little more complicated than the way that Mr. Wall has

11    presented it because the *Bourjaily* case that he has

12    proffered to, that was a case where the issue was:  Could

13    evidence be admitted under exceptions to the hearsay rule.

14         Now, the hearsay rule generally says that evidence

15    cannot be admitted.  So the issue there was whether the

16    plaintiffs could introduce evidence under an exception to

17    that rule.  And so there you can say it made sense that

18    because the plaintiffs were looking to exempt themselves

19    from the rule they should lead to -- they had the burden.

20         Here, though, we're dealing with a different type

21    of statute.  Here we're dealing with a statute that says

22    contrary to the general rule that evidence of communications

23    in antitrust cases will be admitted.  If under -- there are

24    certain narrow circumstances that are narrowly defined in

25    the statute where evidence cannot be used.  And it's the

1    defendants who are arguing that there are pieces of evidence

2    here that fall under that protection.

3         So unlike the situation in *Bourjaily* where the

4    plaintiffs were looking to get around -- to get around an

5    exception -- to find an exception to a rule that barred

6    evidence, here the defendants are seeking to apply a rule

7    that would get around the normal admission of evidence, and

8    they are the ones who should have the burden.  And I think

9    that the Government also has mentioned the other reasons why

10   it makes sense for the defendants to do this.

11        THE COURT:  There is a recent decision by my

12   colleague Judge Cooper which was cited in some of the briefs

13   *Al-Imam.  Now, he does rely on Bourjaily*, but it's not the

14   same.  It may also be a hearsay -- I don't know if it's a

15   hearsay exception, I can't remember.  But he says pretty

16   definitively the proponent of evidence always has the

17   burden.

18        MR. NEUWIRTH:  Well, I think that, respectfully,

19   we would say that under this unique statute which, as you

20   have noted, there is no precedent out there that would have

21   been cited by any judge in that type of context.

22        This is a statute which, as noted, is taking a

23   position that although under the antitrust laws

24   communications are normally admissible, there can be very

25   limited specific circumstances in the context of railroads

1    where the evidence cannot be considered in an antitrust

2    case.  And so it can't be appropriate that under that type

3    of construct the plaintiffs have to come in and for every

4    single piece of evidence prove that it's admissible because

5    the default is that it's admissible.

6            But what the defendants are seeking to do is get

7    out of that default and identify the pieces of evidence

8    that -- identify pieces of evidence that should fall out of

9    the general rule.  And, moreover, I believe that the case

10   you just referenced was also a hearsay case; and so the same

11   type of analysis that we offered for *Bourjaily* I believe

12   would also apply in that case as well.

13           I do just have two final points.  The first is

14   that Mr. Wall's repeated assertion that what was going on

15   here was normal, normal, normal is just -- it's not

16   sustainable.  We cited the defendants' expert who said that

17   fuel prices were flat and low during this period.  Mr. Wall

18   told you he didn't agree with that, but that's what Dennis

19   Carlton, UP's expert -- and UP is Mr. Wall's client -- has

20   said.  We showed you the evidence in our brief that we

21   relied on for that point.

22           Second, Mr. Gosselin showed you that there was a

23   huge change in the number of these alliance meetings and,

24   with no rebuttal whatsoever, we showed you evidence -- the

25   testimony of witnesses in this case that, once the STB

1   proceedings started, these alliance meetings were ended or,

2   at least, tremendously limited from what had been going on

3   during the conspiracy period.  There was nothing normal

4   about that.  And we demonstrated that they also weren't

5   required for the reasons that the Government and we

6   highlighted in our brief about alternative means.

7            And it does matter.  It does matter that interline

8   shipping represented such a small portion of the total

9   amount of shipping.  Why?  Because that shows the

10  significance of the documents Mr. Gosselin highlighted which

11  said that the railroads were talking about all rates.

12           This was not incidental to a discussion about

13  interline shipments.  When you talk about "all rates" the

14  interline shipments are incidental to everything else, and

15  that's why the amount of interline traffic which Mr. Wall

16  just admitted was small is such a critical factor here.

17           At the end of the day though, Your Honor, you

18  don't even need to reach all of the ultimate questions under

19  this statute because here the evidentiary record so

20  compellingly provides the connective tissue that you can

21  make a finding that the defendants cannot meet their burden

22  here of showing -- that they cannot meet the burden of

23  showing that these were discussions among carriers to enter

24  that concern of interline rates of the shipments that the

25  carriers were handling.  And the railroads themselves, as

1      I've shown you, acknowledge that even discussions about

2      interline rates can fail the second step that Mr. Wall

3      defined that the evidentiary -- it was their quote -- that

4      the evidentiary context in the agreement shows that the

5      agreement concerns interline traffic but also includes an

6      illegal agreement on local rates; that is exactly, exactly

7      what we have here.  And to say that we have not met our

8      burden -- we just walked you through.

9           What Mr. Gosselin said was all of the defendants'

10      types of evidence can be put into several categories; and he

11      walked through each category and showed you exactly what the

12      evidence showed that is inconsistent with the statute.

13           All we got from Mr. Wall in response was a speech

14      that he purportedly -- doesn't talk about the evidence.

15      This is turning the world on its head.  So we would

16      respectfully submit that here the Court -- whether it

17      decides to reach the ultimate issues under the statute of

18      how to interpret it or just looks at the evidence, this

19      motion must be denied on the merits.

20           Mr. Wall told you it had to be decided now.  We

21      agree it should be decided now; and we'd respectfully submit

22      that the only appropriate result is to deny the motion.

23           And I would just offer Mr. Gosselin and Mr. Atkins

24      if they have anything else that they would want to add.

25      But, again, I sincerely thank Your Honor for giving us the

1    opportunity to address you today.

2         MR. ATKINS:  Your Honor, this is Alden Atkins.

3         A couple of quick points.  The first is on the

4    subject of burden to show inadmissibility.  In fact, what we

5    are advocating is consistent with the Federal Rules of

6    Evidence.

7         You will recall that Rule 403 says that otherwise

8    admissible evidence may be inadmissible if it meets certain

9    requirements; and to prove it is inadmissible, the burden is

10   on the party opposing the admissibility of the evidence.  I

11   have a citation for that; it's *United States v Tse*, T-S-E,

12   375 F.3d 148; that's by the First Circuit in 2004.  Another

13   case also from the First Circuit is *United States v Valbrun*,

14   V-A-L-B-R-U-N, 877 F.3d 440.  Both say that a party seeking

15   to exclude otherwise admissible evidence bears the burden of

16   proving it can be excluded.

17        Next point, Mr. Wall said that the Staggers Act

18   was unusual because it was the first statute that created

19   antitrust immunity or protections for interline rates;

20   that's simply wrong.  Originally, in the Reed-Bullwinkle

21   Act, all rate discussions and agreements in rate bureaus

22   were immune.  And in the 4R Act, in Section 208(b) --

23   Congress took that back and eliminated antitrust protection

24   except for interline agreements unless worthy -- the

25   railroads practically participated; in other words, the

1    railroads participated.  And so, therefore, the notion of

2    interline protections is not really at all for this

3    provision.

4            Last point.  You will recall that I ended my

5    discussion by saying that they would have a discussion by

6    their CEOs agreeing -- discussing and agreeing on all of

7    their rates as long as they included interline rates, and

8    that they would interpret 10706 for Congress to give special

9    antitrust protection to that, and you heard no answer; and

10   that is what they think -- they argue what 10706 means.

11   Thank you.

12           THE COURT:  Okay.

13           MR. GOSSELIN:  Your Honor, this is Sathya

14   Gosselin.

15           May I have two minutes?

16           THE COURT:  You have two minutes, and then I am

17   going to give Mr. Wall four.

18           MR. GOSSELIN:  I just want to take up Mr. Wall's

19   challenge on multilateral discussion, right.

20           I have walked you through one and actually two of

21   those multilateral discussions during my presentation.  And

22   if you look again in our tabs at 48 and 49, obviously that

23   meeting at NEMC among the four CMOs of the defendants to

24   discuss BNSF's proposal of a mileage-based fuel surcharge

25   where BNSF received pushback was a meeting of all four

1    defendants, right.

2          Similarly, in our interrogatory narrative,

3    beginning around page 30 I believe, we detail a meeting in

4    early April of all four defendants at the NFTA immediately

5    before which, right, the carriers had discussed fuel

6    surcharges and began implementing changes, and immediately

7    after which BNSF ordered for the first time a prohibition at

8    the executive level on any exceptions to the fuel

9    surcharges.

10          We also have in our interrogatory narrative and

11   absent from this motion practice all of the correspondence

12   of meetings through the auspices of the AAR about the

13   removal of fuel from the all-inclusive index, none of which

14   we have been able to discuss over the years.  But those are

15   just some of the multilateral meetings that are here; and,

16   obviously, there is no requirement of multilateral meetings

17   in order to achieve a conspiracy among these four carriers.

18          I also just wanted to emphasize again that we're

19   still hearing from the defendants that their position turns

20   on the notion that they must and are justified in discussing

21   across-the-board fuel surcharge policies and programs, but

22   they never did so before; and this isn't confined to

23   senior-level executives.

24          I have some of those citations for you from my

25   previous presentation.  And our senior VP's declaration,

1    Exhibit 14, is a defendants' interrogatory response in which

2    they concede that these discussions were not previously

3    occurring among senior executives.

4         And the defendants' reply exhibit, 234, are their

5    only response to our contention that this was a change in

6    behavior that this had previously occurred which, again, are

7    lower-level concurrence communications about specific

8    shipments that occurred not among any of those CEOs and

9    CMOs, but among the operational employees.

10        The fuel prices during this period -- and if I can

11   attempt this technology gymnastics that Mr. Wall did -- I

12   would briefly refer to you to recall the defendants' chief

13   expert and his chart about where these fuel prices were

14   during the relevant period that were in whatever chart

15   Dan Wall showed up; and what we're talking about is this

16   period and this decline in 2003.  Again, a period in which

17   Dr. Carlton testified fuel prices were low and flat.

18        Finally -- and hopefully I will stop sharing from

19   my screen -- we really do believe that this comes back to

20   the tail wagging the dog given the reporting of interline

21   shipments to single-line shipments and the subset of

22   interline shipments that are made up of joint line

23   shipments.

24        I will note finally -- and I appreciate the

25   Court's indulgence -- the defendants' antitrust compliance

1    documents that we have heard nothing about from the

2    defendants, they've squared entirely with the requirements

3    of the statute and the restrictions the defendants were

4    under; and we note these here in our opposition brief at

5    page 15 and footnote 9.  And they're really to give -- I

6    will just quote from BNSF here, Information exchanges

7    regarding pricing of joint line movements must be limited to

8    essential elements of this specific undertaking with that

9    carrier, right.

10            There is the other interest of defendants here, so

11   that they can't possibly square the evidence that we have

12   from our industrywide coordination and related discussion

13   with that antitrust compliance guidance that was introduced

14   earlier by the defendants.

15            Thank you, Your Honor.

16            THE COURT:  Okay.  I think, in view of the closing

17   arguments from three different people, I will give Mr. Wall

18   and Mr. Gardiner up to five minutes and Mr. Leitch up to

19   five minutes.

20            MR. WALL:  Okay.  Thank you, Your Honor.

21            So the first thing that I just have to cover, and

22   it's sort of in the category of a point of personal

23   privilege, is Mr. Neuwirth's invocation of this line that

24   Your Honor spoke of in one of your decisions, about how the

25   evidence of conspiracy was strong; his argument that since

1   you said that you weren't going to consider 10706 evidence,

2   when you say that the evidence of conspiracy is strong you

3   must have been concluding that there was non10706 evidence

4   of conspiracy.

5           You never dealt with whether or not there was the

6   conspiracy in this case.  You have dealt with whether there

7   was common evidence of a conspiracy and, of course, you have

8   dealt with allegations early on.

9           But I will tell you in candor that this has been a

10  statement that has always raised a lot of consternation on

11  the railroads because we just didn't think that it should

12  have been made.  Given the fact that Mr. Neuwirth absolutely

13  was using this very same body of interline evidence at the

14  class certification hearing, if you go back to his slides --

15  Mr. Neuwirth's class certification slides that you must have

16  somewhere -- and pick up at tab 17, this is where -- after

17  you had said what you had said about using that 10706

18  evidence, Mr. Neuwirth gives his speech about the common

19  evidence of conspiracy.  And it is exactly the story that we

20  have told you they have been telling that connects interline

21  alliance meetings, interline concurrences, actions taken on

22  local traffic that was similar to interline concurrences.

23  So this is a sensitive subject for us because that

24  statement -- I am telling you, Your Honor, there is nothing

25  else.

1          Mr. Gosselin says he has got trade association

2     meetings and other things; we let him argue that stuff in

3     summary judgment.  We did not move to exclude that stuff; we

4     don't care about that stuff.  Summary judgment is granted in

5     conspiracy cases every day in the face of evidence that

6     people talk about at trade association meetings; that is

7     just a diversion.

8          Now, Mr. Atkins said -- I have something to say

9     about his CEO point.  That's not our position.  Nobody from

10    our side has said that four railroads can get together in

11    some one-off meeting somewhere, and that's going to get

12    Section 10706 protections.  We would have to take that

13    meeting through the statutory structure, and it's probably

14    going to fail at the first step because a four-CEO meeting

15    is unlikely to be just a meeting that concerns interlining

16    for all sorts of reasons.  So if the plaintiffs think that

17    some day that case will come along -- and they don't have

18    anything like that in this case, they are welcome to try to

19    just process it through the statutory structure and make an

20    argument that says that they are able to use it; they might

21    win.

22          This has been one of our frustrations here with

23    everybody wanting to water down this statute and what the

24    statute actually says by putting in new words and qualifiers

25    because of stories they're making up about potential misuse

1    of this.  But the only thing that's at issue are the actual

2    discussions and agreements that these plaintiffs chose to

3    weave into their conspiracy theory that we have identified

4    as concerning narrow.

5        We use their stuff.  So these are not -- these are

6    outside some of the cases that I completely understand why

7    the Department of Justice is concerned about them.  There

8    are hard cases in this world about how this co-conspiracy

9    is -- message about co-conspiracies, things with different

10   kinds of connective tissues.  This case is so easy because

11   all it is is about these railroads talking about those fuel

12   price increases.

13       I can't believe that Mr. Neuwirth and Gosselin are

14   contesting the official government statistics on what is

15   happening with fuel prices during this time.  Fuel was going

16   up, it happened to go up to historic levels; somebody talked

17   about it.  They have statutory protections for those

18   discussions, and I will leave it at that.

19       We wouldn't have done this -- we wouldn't have

20   gone through the trouble if we didn't understand since

21   May 2011 that they don't have the other stuff of any

22   consequence; and the core of their narrative is interline

23   alliance meetings, interline discussions and agreements, and

24   nothing else.

25           THE COURT:  Mr. Gardiner.

1              MR. GARDINER:  Nothing.

2              THE COURT:  Mr. Leitch, do you have anything you

3     want to say?

4              MR. LEITCH:  Nothing further from the United

5     States, Your Honor.

6              THE COURT:  May I ask you question?

7              MR. LEITCH:  Yes, sir.

8              THE COURT:  At the beginning of Mr. Wall's

9     argument right after you spoke -- and you may or may not

10    want to speak to this.  He said we don't have -- the

11    Government has said that they're not arguing for the

12    modifier "solely or exclusively," but they are using the

13    word "limited."  And if the discussions relate to the

14    management of interline business and are not a sham, we

15    don't have a problem with it being so limited -- or

16    something to that effect.

17             Do you have any response to that?

18             MR. LEITCH:  Well, I think what we would say is

19    this, a related-to standard would not be appropriate here,

20    so merely having a relationship between a discussion and the

21    management of interline traffic might not be enough if that

22    was all that there was, you know, but I don't necessarily

23    want to take a position on that.  But I would just urge the

24    Court that our view is that Congress could have used the

25    words "related to," it did elsewhere in 10706; but it chose

1    to use a different word to be used as a narrow connotation

2    in (a)(3)(B)(ii), and the Court should construe the

3    provision in light of those other provisions.

4            Thank you, Your Honor.

5            THE COURT:  Okay.  Let me say this, it's been a

6    long day, so I want to thank all of the lawyers.  Despite

7    some technological problems during parts of the day, it went

8    reasonably smoothly.  I do think that the arguments were

9    really first-rate all around and will help me greatly in

10   resolving the 10706 issue.

11           I also -- because it's been such a long day --

12   want to thank Miss Johnson for all of her work before the

13   hearing, and coordinating things and during the hearing, and

14   providing guidance to counsel and to me; and to

15   Miss Saint-Loth, our court reporter, who has done yeoman's

16   work today.  This has been a very, very long day; and I

17   think, from my experience that, A, we sometimes in court

18   proceedings have more or longer breaks than we do here; and,

19   B, it's actually often easier for a court reporter when we

20   have give and take between lawyers examining witnesses and

21   witnesses responding than when we have straight legal

22   arguments, some of which is -- this is less jargony than

23   some others, but it wasn't -- I am sure it wasn't easy for

24   her; so thank you.  Thank you very much, Miss Saint-Loth.

25           Thank you, everybody.  Stay safe and stay healthy.

1           MR. WALL:  You too, Your Honor.  Thank you, Your

2      Honor.

3           MR. GOSSELIN:  Thank you, Your Honor.

4           (Whereupon, the proceeding concludes, 4:07 p.m.)

5                        **CERTIFICATE**

6

7           I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

8      certify that the foregoing constitutes a true and accurate

9      transcript of my stenographic notes, and is a full, true,

10     and complete transcript of the proceedings to the best of my

11     ability.

12          PLEASE NOTE:  This hearing was held telephonically

13     in compliance with the COVID-19 pandemic stay-at-home orders

14     and is therefore subject to the limitations associated with

15     the use of technology, including but not limited to

16     telephone signal interference, static, signal interruptions,

17     and other restrictions and limitations associated with

18     remote court reporting via telephone, speakerphone, and/or

19     videoconferencing.

20          This certificate shall be considered null and void

21     if the transcript is disassembled in any manner by any party

22     without authorization of the signatory below.

23

       Dated this 31st day of August, 2020.

24

25     /s/ Elizabeth Saint-Loth, RPR, FCRR
       Official Court Reporter

## $

**$15** [1] - 157:24
**$23** [3] - 110:4, 110:13, 111:12
**$60** [1] - 10:3

## '

**'17** [1] - 87:17
**'77** [1] - 120:14
**'80s** [1] - 26:17

## /

**/s** [1] - 185:1

## 0

**07-489** [2] - 3:2, 3:15
**07-489(PLF/GMH** [1] - 1:3

## 1

**1** [7] - 77:10, 87:18, 111:19, 137:18, 143:2, 163:10, 164:2
**10** [2] - 21:7, 75:13
**100** [2] - 99:21, 103:15
**1001** [1] - 2:10
**10010** [1] - 1:15
**10706** [50] - 7:2, 7:19, 7:23, 8:1, 11:10, 20:15, 21:12, 26:19, 26:21, 27:24, 28:2, 28:8, 28:13, 28:14, 29:13, 29:16, 42:10, 52:24, 53:9, 57:10, 64:8, 64:9, 69:20, 70:8, 70:11, 73:3, 75:15, 77:23, 115:3, 117:24, 117:25, 120:4, 122:24, 123:3, 124:6, 125:15, 125:17, 130:21, 131:7, 138:9, 138:16, 148:8, 168:18, 175:8, 175:10, 179:1, 179:17, 180:12, 182:25, 183:10
**10706(a** [1] - 53:11
**10706(a)(3)(B)(i)** [1] - 53:11
**10:32** [1] - 1:6

**10th** [1] - 80:18
**11** [21] - 83:20, 84:19, 84:22, 84:24, 85:25, 86:3, 86:5, 86:13, 86:16, 87:3, 88:1, 97:25, 98:4, 118:7, 124:24, 131:16, 144:25, 145:3, 145:5, 157:9
**11-1049** [1] - 3:15
**12** [2] - 163:23
**12:27** [1] - 68:16
**12:45** [1] - 68:17
**12th** [1] - 43:16
**13** [5] - 79:8, 79:10, 82:4, 83:4, 166:21
**13th** [1] - 43:16
**14** [8] - 25:4, 25:24, 62:21, 83:4, 125:7, 146:9, 177:1
**148** [1] - 174:12
**14th** [1] - 70:15
**15** [8] - 5:5, 26:18, 68:4, 68:6, 68:8, 87:2, 146:9, 178:5
**15-minute** [5] - 4:21, 5:9, 67:14, 67:18, 67:21
**16** [2] - 28:1, 125:6
**16,000** [1] - 87:6
**17** [4] - 39:15, 83:17, 84:11, 179:16
**1700** [1] - 1:18
**18** [4] - 30:3, 34:12, 83:17, 125:6
**1869** [1] - 1:2
**18th** [1] - 9:12
**19** [2] - 31:7, 125:6
**1976** [2] - 119:13, 120:14
**1980** [3] - 26:7, 27:13, 125:4
**1980s** [2] - 127:6, 131:8
**1994** [1] - 25:13
**1:00** [1] - 4:23
**1st** [2] - 83:8

## 2

**2** [5] - 69:11, 70:6, 73:4, 130:8, 143:5
**20** [3] - 27:13, 116:20, 132:12
**2000** [3] - 2:5, 83:8, 87:22
**20001** [1] - 2:19
**20004-2595** [1] - 2:10
**20006** [1] - 1:19

**2002** [5] - 8:22, 25:13, 109:14, 156:8, 156:12
**2003** [39] - 8:19, 8:23, 11:23, 20:2, 25:3, 43:16, 60:7, 62:4, 62:21, 82:23, 83:5, 83:8, 88:16, 96:6, 96:20, 97:19, 99:1, 99:4, 101:16, 103:8, 103:18, 104:25, 105:10, 106:16, 106:17, 108:5, 108:8, 109:8, 109:14, 109:15, 109:16, 110:2, 110:20, 113:1, 117:1, 156:9, 163:11, 177:16
**20037** [1] - 1:23
**2004** [6] - 44:3, 96:6, 112:3, 113:5, 113:13, 174:12
**2005** [1] - 113:9
**2006** [5] - 9:23, 80:20, 89:9, 102:16, 109:18
**2007** [1] - 102:16
**2008** [2] - 25:3, 87:22
**2009** [1] - 119:17
**2010** [3] - 69:15, 87:16, 165:10
**2011** [2] - 6:15, 181:21
**2012** [1] - 6:23
**2016** [1] - 87:17
**2017** [3] - 165:10, 165:12
**2019** [1] - 70:7
**202** [4] - 1:19, 1:23, 2:11, 2:16
**2020** [2] - 1:5, 184:24
**20530** [1] - 2:15
**208(b** [1] - 174:22
**20s** [1] - 10:4
**20th** [1] - 80:17
**21** [4] - 116:20, 125:4, 167:4, 167:8
**21.3** [1] - 88:1
**212** [1] - 1:16
**22** [7] - 31:16, 32:23, 37:3, 89:6, 89:7, 141:11, 144:4
**2200** [1] - 1:22
**22nd** [1] - 1:15
**234** [1] - 177:4
**25** [1] - 132:12
**26** [2] - 1:5, 166:19
**27** [2] - 43:14, 90:23
**28** [4] - 16:8, 80:3, 80:14, 96:7
**29** [1] - 96:21

**2:30** [2] - 131:22, 131:23
**2:45** [3] - 131:23, 132:1, 132:2
**2:50** [1] - 131:24

## 3

**3** [5] - 8:15, 70:13, 107:23, 143:5, 145:6
**30** [9] - 4:17, 5:2, 8:23, 17:14, 42:2, 43:19, 97:16, 132:13, 176:3
**30-minute** [2] - 67:15, 68:3
**30-page** [1] - 146:19
**31** [2] - 48:1, 99:1
**31st** [1] - 184:24
**32** [4] - 100:15, 101:5, 101:6, 101:9
**33** [3] - 100:18, 100:21, 101:13
**3314** [1] - 2:15
**34** [2] - 50:3, 103:18
**35** [3] - 57:9, 103:18, 104:1
**353-9366** [1] - 2:16
**36** [2] - 104:24, 105:10
**37** [3] - 60:6, 102:5, 105:20
**375** [1] - 174:12
**38** [4] - 62:3, 102:1, 106:1, 106:3
**39** [4] - 62:21, 104:13, 106:20, 110:2
**391-0600** [1] - 2:6

## 4

**4** [4] - 69:10, 70:16, 70:22, 166:21
**4/27** [1] - 143:25
**40** [3] - 48:16, 110:19, 164:9
**40-minute** [1] - 76:3
**403** [1] - 174:7
**41** [3] - 67:3, 111:8, 111:14
**415** [1] - 2:6
**42** [2] - 111:14, 112:1
**44** [1] - 112:24
**440** [1] - 174:14
**45** [1] - 113:4
**46** [1] - 113:8
**47** [2] - 64:11, 113:12
**48** [4] - 64:12, 113:12, 113:20, 175:22
**49** [3] - 114:25,

116:21, 175:22
**4:07** [1] - 184:4
**4R** [5] - 119:12, 119:22, 120:16, 120:17, 174:22

## 5

**5** [6] - 9:21, 79:23, 79:24, 79:25, 125:5, 144:18
**5.9** [8] - 86:23, 87:22, 118:8, 118:10, 118:11, 118:13, 118:16
**50** [1] - 118:20
**50,000-word** [1] - 55:22
**500** [1] - 1:22
**505** [1] - 2:5
**51** [2] - 1:15, 119:5
**53** [3] - 64:13, 121:8, 121:14
**54** [2] - 121:19, 122:3
**540-7200** [1] - 1:19
**55** [4] - 64:13, 65:18, 65:22, 122:7
**56** [1] - 123:17
**57** [1] - 123:21
**58** [1] - 123:10
**59** [2] - 89:11, 125:18

## 6

**6** [3] - 10:10, 72:17, 137:4
**60** [2] - 119:6, 126:4
**61** [1] - 127:9
**62** [1] - 127:12
**624-2500** [1] - 2:11
**63** [3] - 114:2, 128:4, 128:11
**639-6613** [1] - 1:23
**64** [1] - 128:20
**65** [1] - 129:16
**65.7** [1] - 88:1
**650** [1] - 1:18
**66** [2] - 122:17, 130:2
**67** [1] - 130:2
**68** [3] - 88:23, 88:25, 96:18

## 7

**7** [3] - 125:5, 137:4, 169:8
**70** [2] - 21:17, 119:6
**76** [1] - 115:8

**8**

**8** [5] - 15:25, 73:2, 86:15, 108:14, 166:9
**80** [1] - 119:6
**849-7237** [1] - 1:16
**87** [1] - 87:24
**877** [1] - 174:14

**9**

**9** [5] - 77:21, 86:15, 96:17, 125:5, 178:5
**94111-6538** [1] - 2:5
**950** [1] - 2:14

**A**

**a)(3)(B)(ii** [5] - 30:7, 73:4, 130:5, 148:8, 183:2
**a)(3)(B)(ii)** [2] - 124:7, 128:22
**a.m** [1] - 1:6
**AAR** [5] - 62:8, 63:20, 63:24, 160:12, 176:12
**aatkins@velaw.com** [1] - 1:24
**abated** [1] - 162:14
**ability** [5] - 29:5, 95:14, 148:20, 149:6, 184:12
**abnormal** [1] - 47:19
**abruptly** [1] - 99:2
**absent** [1] - 176:11
**absolute** [1] - 44:24
**absolutely** [8] - 11:16, 34:8, 35:21, 55:24, 59:4, 87:10, 132:22, 179:12
**absurd** [1] - 39:2
**accept** [1] - 68:14
**accepting** [1] - 74:12
**accidental** [1] - 125:12
**accomplishing** [1] - 145:19
**accordance** [1] - 130:7
**account** [1] - 96:12
**accounting** [2] - 84:24, 145:7

**accounts** [1] - 14:15
**accurate** [2] - 106:18, 184:9
**accused** [2] - 13:17, 107:24
**achieve** [2] - 119:4, 129:19, 176:17
**acknowledge** [5] - 134:21, 141:11, 142:7, 143:12, 173:1
**acknowledged** [2] - 114:2, 145:6
**acknowledges** [1] - 156:16
**acknowledging** [1] - 110:12
**across-the-board** [11] - 76:24, 87:20, 92:5, 108:4, 108:24, 110:24, 113:19, 114:19, 114:23, 163:16, 176:21
**Act** [20] - 21:10, 21:13, 78:23, 79:1, 92:4, 119:12, 119:22, 120:16, 120:17, 122:13, 122:21, 123:12, 125:21, 126:14, 127:20, 148:25, 163:17, 174:17, 174:21, 174:22
**act** [4] - 25:20, 26:3, 70:10, 78:10
**acted** [2] - 71:8, 71:22
**acting** [2] - 26:14, 119:10
**action** [23] - 11:12, 11:15, 11:22, 14:8, 30:1, 31:12, 32:8, 63:22, 64:3, 71:9, 71:10, 71:24, 73:7, 93:3, 93:4, 94:6, 101:16, 105:11, 106:19, 108:24, 166:12
**Action** [2] - 3:2, 3:15
**actions** [7] - 6:20, 11:14, 32:6, 107:15, 119:8, 158:8, 179:21
**actively** [1] - 118:24
**activities** [3] - 42:18, 129:14, 130:23
**activity** [6] - 26:15, 70:7, 71:2, 71:3, 71:14, 71:17
**actors** [2] - 96:3, 149:2
**Acts** [1] - 47:11
**actual** [15] - 16:24,

59:25, 60:1, 85:1, 85:2, 90:6, 90:10, 95:23, 97:12, 107:15, 144:17, 164:11, 164:19, 167:7, 181:1
**add** [8] - 81:5, 86:9, 86:11, 134:8, 149:1, 157:16, 161:18, 173:24
**added** [1] - 124:5
**addition** [3] - 3:14, 43:2, 125:1
**additional** [2] - 117:4, 147:14
**additionally** [4] - 140:6, 144:15, 144:24, 146:21
**address** [15] - 7:15, 51:8, 67:3, 73:14, 83:15, 90:21, 92:1, 108:20, 124:7, 124:23, 125:3, 125:13, 143:21, 146:22, 174:1
**addressed** [6] - 70:19, 89:5, 108:24, 120:2, 147:21, 165:10
**addressing** [3] - 99:14, 110:8, 167:19
**adherence** [1] - 112:11
**administrable** [2] - 142:13, 142:14
**administrative** [2] - 55:15, 81:13
**administratively** [1] - 15:20
**admissibility** [7] - 48:2, 50:1, 58:25, 59:2, 155:7, 174:10
**admissible** [13] - 7:3, 31:25, 73:8, 74:1, 133:19, 138:17, 159:24, 166:13, 170:24, 171:4, 171:5, 174:8, 174:15
**admission** [1] - 170:7
**admit** [1] - 136:6
**admitted** [12] - 89:7, 103:11, 111:6, 136:13, 136:15, 136:20, 169:13, 169:15, 169:23, 172:16
**adopt** [2] - 79:17, 152:19
**adopted** [3] - 12:5, 114:11, 147:2
**adopting** [2] - 12:7,

114:4
**adoption** [1] - 126:22
**adopts** [1] - 155:8
**advance** [2] - 80:25, 106:18
**advancing** [1] - 140:5
**advocated** [1] - 72:11
**advocating** [4] - 30:6, 72:16, 150:3, 174:5
**affect** [2] - 49:6, 49:10
**affected** [6] - 15:23, 15:24, 17:18, 56:12, 83:12, 89:4
**afforded** [1] - 57:24
**affording** [1] - 161:13
**afternoon** [2] - 5:9, 117:12
**afterthought** [1] - 129:2
**afterwards** [2] - 7:15, 164:16
**agencies** [1] - 27:9
**agency** [1] - 27:9
**agenda** [6] - 8:18, 9:3, 9:4, 18:2, 38:4, 43:23
**agendas** [2] - 17:25, 19:24
**agents** [1] - 147:8
**aggregate** [3] - 39:12, 39:16, 40:2
**aggregating** [3] - 39:1, 159:14, 159:15
**ago** [3] - 24:8, 48:16, 118:10
**agree** [17] - 28:14, 33:23, 38:5, 39:25, 54:10, 90:7, 95:19, 100:7, 121:22, 121:24, 122:14, 127:15, 148:2, 151:12, 152:20, 171:18, 173:21
**agreed** [11] - 4:13, 37:18, 53:14, 56:23, 61:17, 62:6, 99:23, 102:23, 105:12, 124:17, 154:15
**agreeing** [13] - 82:8, 83:24, 119:23, 120:5, 120:18, 120:19, 120:23, 121:6, 121:13, 123:13, 175:6
**agreement** [120] - 11:4, 11:5, 11:6, 20:16, 29:23, 30:9, 31:8, 31:21, 31:23, 32:3, 33:9, 33:10, 33:13, 33:16, 33:18,

33:25, 34:3, 34:5, 34:6, 34:9, 34:18, 34:21, 34:23, 35:1, 35:2, 35:3, 35:4, 35:7, 35:9, 35:11, 35:14, 35:16, 35:17, 35:18, 35:22, 35:24, 36:9, 36:10, 36:25, 37:19, 39:9, 40:5, 45:5, 48:4, 50:20, 50:21, 52:25, 56:24, 58:3, 58:12, 58:16, 61:12, 61:13, 61:19, 62:18, 63:24, 63:25, 66:4, 66:18, 66:19, 73:5, 73:7, 73:8, 73:10, 74:2, 93:6, 93:20, 93:25, 94:8, 95:3, 95:21, 104:22, 115:9, 115:15, 115:19, 115:21, 116:14, 117:6, 119:10, 119:20, 125:12, 128:8, 129:23, 130:7, 130:8, 133:23, 134:14, 140:23, 141:2, 141:24, 142:16, 142:19, 143:6, 143:11, 144:19, 147:7, 162:7, 166:10, 166:12, 166:13, 166:15, 166:22, 166:24, 166:25, 167:1, 167:6, 167:11, 167:12, 167:13, 167:14, 167:20, 173:4, 173:5, 173:6
**agreements** [47] - 6:20, 16:17, 18:5, 18:6, 22:23, 27:18, 38:25, 39:24, 44:19, 50:6, 55:21, 60:1, 75:16, 77:24, 115:5, 119:25, 120:15, 121:11, 121:24, 122:10, 123:22, 123:23, 123:25, 124:4, 129:22, 133:5, 134:18, 134:22, 140:8, 140:11, 140:12, 140:16, 140:18, 141:10, 141:13, 142:25, 144:1, 144:9, 144:14, 158:8, 159:8, 159:15, 159:18, 174:21, 174:24,

181:2, 181:23
**agrees** [2] - 61:15, 162:10
**agriculture** [1] - 114:12
**aha** [1] - 32:24
**ahead** [6] - 40:8, 66:10, 68:23, 143:19, 149:20
**aided** [1] - 2:21
**aimed** [2] - 21:13, 27:24
**airline** [1] - 131:9
**airlines** [1] - 131:9
**AI** [1] - 170:13
**al** [2] - 1:5, 1:7
**Al-Imam** [1] - 170:13
**Alden** [2] - 3:5, 174:2
**ALDEN** [1] - 1:21
**Alex** [1] - 47:1
**align** [2] - 58:5, 154:18
**aligned** [3] - 57:8, 61:6, 103:10
**alignment** [1] - 63:24
**all-inclusive** [1] - 176:13
**allegation** [4] - 6:11, 11:25, 39:13, 162:11
**allegations** [1] - 179:8
**allege** [2] - 34:10, 75:8
**alleged** [10] - 11:19, 11:21, 16:10, 17:11, 33:15, 34:18, 53:1, 91:13, 163:10, 164:7
**alleges** [1] - 53:14
**alliance** [45] - 7:12, 7:13, 8:18, 9:2, 9:5, 16:24, 16:25, 17:4, 18:1, 18:10, 18:12, 18:16, 19:10, 38:4, 62:5, 62:22, 64:16, 84:7, 88:16, 89:2, 89:4, 89:8, 96:8, 97:10, 100:10, 100:16, 100:22, 101:1, 101:2, 101:5, 101:11, 104:25, 106:21, 108:5, 108:15, 109:1, 109:18, 110:17, 151:6, 156:14, 171:23, 172:1, 179:21, 181:23
**allow** [6] - 42:14, 48:18, 79:5, 79:14, 116:11, 154:8
**allowed** [5] - 79:6, 82:13, 83:23, 125:24, 160:6
**allowing** [1] - 31:4

**allows** [3] - 40:1, 124:1, 168:18
**alluded** [1] - 160:11
**allusions** [1] - 144:20
**almost** [6] - 6:2, 18:23, 19:1, 82:6, 88:10, 144:10
**alone** [4] - 11:4, 103:7, 157:25, 165:1
**alternative** [5] - 85:2, 85:4, 85:14, 135:16, 172:6
**alternatively** [1] - 54:13
**alternatives** [1] - 54:14
**AM** [1] - 78:9
**amalgamated** [1] - 161:23
**amalgamation** [1] - 160:4
**ambiguity** [1] - 169:4
**ambiguous** [9] - 115:11, 135:7, 135:12, 135:13, 135:18, 136:1, 136:3, 136:9, 136:22
**amendments** [1] - 125:14
**American** [3] - 83:23, 105:16, 119:16
**amicus** [1] - 51:23
**amid** [1] - 98:25
**amount** [6] - 13:10, 23:3, 24:5, 49:10, 172:9, 172:15
**amounts** [1] - 44:12
**analogous** [1] - 52:21
**analogy** [1] - 57:5
**analysis** [9] - 35:25, 36:8, 39:22, 50:23, 62:14, 96:1, 147:16, 151:14, 171:11
**analytical** [1] - 159:25
**analyze** [1] - 36:12
**analyzed** [1] - 140:18
**ancillary** [1] - 42:20
**Anderson** [1] - 110:11
**Angeles** [1] - 124:13
**announce** [3] - 80:17, 100:19, 153:12
**announced** [2] - 104:11, 110:4
**announcement** [1] - 108:9
**announces** [1] - 110:4
**announcing** [1] - 110:6
**annually** [1] - 14:16
**answer** [13] - 7:2,

33:3, 50:7, 55:4, 61:10, 61:14, 63:13, 65:25, 84:23, 92:17, 145:1, 168:10, 175:9
**answers** [1] - 88:22
**anticipate** [1] - 15:5
**anticompetitive** [6] - 12:11, 129:14, 133:15, 143:1, 143:8, 144:2
**antipreceding** [1] - 28:22
**antithesis** [1] - 66:18
**ANTITRUST** [1] - 1:3
**antitrust** [78] - 10:22, 18:7, 26:8, 27:5, 27:9, 28:15, 29:14, 30:14, 34:19, 42:11, 42:14, 48:15, 51:15, 54:20, 54:25, 62:18, 62:19, 64:4, 65:20, 65:21, 66:3, 71:6, 73:15, 73:18, 78:15, 93:7, 93:25, 95:4, 108:11, 116:15, 116:16, 118:1, 118:18, 118:22, 119:7, 119:11, 119:18, 119:19, 119:21, 121:5, 122:23, 124:8, 124:22, 125:16, 126:20, 128:5, 128:6, 128:9, 128:21, 129:3, 129:20, 130:15, 130:20, 130:22, 131:19, 137:13, 139:17, 139:19, 139:24, 140:15, 142:15, 148:12, 148:17, 148:20, 148:24, 151:20, 156:16, 161:19, 167:13, 168:24, 169:23, 170:23, 171:1, 174:19, 174:23, 175:9, 177:25, 178:13
**Antitrust** [3] - 3:3, 47:10, 149:8
**apologies** [4] - 94:14, 98:14, 109:10, 117:9
**apologize** [1] - 87:13
**apologizes** [1] - 95:1
**appalled** [1] - 52:21
**appeal** [1] - 47:12
**appeals** [1] - 51:13
**appear** [2] - 146:3, 151:16

**appearance** [1] - 110:14
**APPEARANCES** [2] - 1:25, 2:1
**appearances** [1] - 107:11
**appeared** [1] - 1:12
**appetite** [2] - 65:2, 113:15
**application** [12] - 20:15, 21:8, 29:16, 63:3, 76:24, 92:24, 103:22, 103:23, 104:3, 104:15, 104:19, 135:25
**applications** [1] - 79:3
**applied** [6] - 26:21, 28:10, 47:14, 91:24, 111:19, 163:21
**applies** [7] - 10:20, 28:14, 28:24, 30:14, 30:16, 113:10, 130:12
**apply** [24] - 8:3, 8:4, 15:3, 28:12, 32:21, 57:9, 62:1, 65:6, 77:4, 77:9, 77:16, 78:25, 88:18, 91:23, 92:12, 111:2, 111:6, 112:3, 142:15, 147:17, 148:1, 165:1, 170:6, 171:12
**applying** [5] - 59:25, 76:15, 88:10, 164:5, 164:18
**appreciate** [3] - 149:13, 149:14, 177:24
**appreciating** [1] - 161:2
**appreciative** [1] - 162:2
**approach** [10] - 12:6, 12:8, 18:19, 48:9, 95:20, 142:20, 146:15, 153:12, 162:8
**appropriate** [10] - 5:22, 7:4, 54:22, 138:6, 141:3, 141:18, 149:11, 171:2, 173:22, 182:19
**appropriately** [1] - 137:21
**approved** [3] - 28:20, 119:9, 130:8
**April** [8] - 8:19, 18:2, 80:17, 108:5, 109:15, 110:2,

110:20, 176:4
**apt** [1] - 117:18
**area** [1] - 82:18
**arguably** [2] - 10:21, 11:4
**argue** [11] - 8:2, 50:6, 52:1, 56:7, 72:4, 81:6, 82:21, 82:22, 135:16, 175:10, 180:2
**argued** [6] - 47:12, 69:22, 72:5, 82:10, 146:25, 148:11
**arguing** [11] - 30:1, 75:12, 78:7, 82:12, 121:21, 122:2, 126:11, 134:6, 134:24, 170:1, 182:11
**argument** [44] - 4:19, 4:20, 4:22, 4:25, 12:14, 28:24, 38:21, 39:1, 43:1, 43:25, 44:7, 44:17, 44:20, 44:22, 44:23, 44:24, 45:2, 45:3, 46:4, 46:10, 49:1, 54:1, 56:18, 58:15, 58:20, 67:20, 69:21, 81:14, 92:12, 92:14, 122:4, 127:6, 147:25, 152:6, 152:25, 153:7, 153:24, 156:20, 159:13, 159:22, 178:25, 180:20, 182:9
**arguments** [24] - 4:14, 5:10, 7:25, 8:10, 11:12, 11:14, 14:12, 55:22, 58:12, 90:25, 107:3, 117:19, 122:8, 125:20, 125:22, 127:1, 128:4, 128:7, 141:14, 160:2, 167:16, 178:17, 183:8, 183:22
**arise** [1] - 32:14
**arose** [1] - 106:12
**arrangements** [2] - 145:8, 146:9
**artificial** [1] - 49:16
**aspect** [2] - 150:10
**aspiration** [1] - 104:21
**aspirations** [1] - 102:21
**assert** [1] - 98:3
**assertion** [1] - 171:14
**assertions** [2] - 83:1, 90:3

**assesses** [1] - 45:24
**assets** [1] - 49:8
**assign** [1] - 140:2
**Assistant** [1] - 126:6
**associated** [5] - 44:13, 126:15, 126:16, 184:15, 184:18
**Association** [3] - 83:22, 105:15, 119:16
**association** [5] - 18:20, 62:9, 65:4, 180:1, 180:6
**assume** [3] - 42:9, 56:23, 97:11
**assumed** [1] - 6:12
**assuming** [1] - 51:13
**assumption** [1] - 51:14
**astonishing** [1] - 43:20
**Atkins** [3] - 3:5, 117:11, 158:13, 173:23, 174:2, 180:8
**ATKINS** [4] - 1:21, 117:12, 126:8, 174:2
**attached** [1] - 136:16
**attempt** [3] - 104:18, 111:1, 177:11
**attend** [2] - 4:7, 98:17
**attendance** [1] - 107:2
**attendants** [1] - 99:18
**attended** [3] - 89:13, 96:22, 152:9
**attention** [3] - 9:21, 95:22, 163:6
**attentively** [1] - 132:16
**Attorney** [1] - 126:6
**attractive** [1] - 23:20
**audio** [5] - 94:22, 95:15, 98:10, 98:18, 132:19
**August** [2] - 1:5, 184:24
**auspices** [2] - 105:15, 176:12
**authorities** [1] - 113:6
**authority** [1] - 58:21
**authorization** [1] - 184:23
**automatically** [1] - 112:13
**available** [1] - 49:11
**Ave** [1] - 1:15
**Avenue** [3] - 1:22, 2:10, 2:14
**avoid** [1] - 152:12
**aware** [1] - 52:5
**awful** [3] - 36:4, 38:12,

150:20
**awkward** [1] - 46:5
**axis** [1] - 17:10

**B**

**b)(i** [1] - 53:19
**B)(ii** [1] - 53:15
**backdoor** [1] - 148:23
**backdrop** [5] - 22:3, 108:7, 112:18, 115:1, 115:3
**background** [7] - 16:19, 21:2, 52:20, 137:22, 137:23, 138:5, 138:6
**backwards** [1] - 86:5
**bad** [2] - 34:25, 35:3
**bait** [1] - 155:3
**bandwidth** [1] - 94:23
**banner** [1] - 105:1
**barely** [1] - 91:19
**barge** [1] - 21:22
**barred** [1] - 170:5
**barrel** [1] - 10:3
**base** [6] - 9:25, 10:2, 13:10, 81:5, 81:8, 163:21
**baseball** [1] - 46:21
**based** [29] - 11:14, 18:11, 35:1, 52:13, 57:24, 64:22, 64:23, 64:24, 65:2, 65:10, 65:11, 65:12, 66:8, 71:21, 102:17, 111:11, 113:15, 113:16, 113:19, 113:23, 114:5, 114:9, 114:11, 114:14, 153:22, 159:2, 163:18, 175:24
**basic** [2] - 62:3, 84:10
**basis** [5] - 19:23, 58:9, 60:11, 63:21, 108:4
**battle** [2] - 40:4, 50:5
**beach** [1] - 46:8
**bears** [2] - 65:18, 174:15
**became** [1] - 89:12
**become** [2] - 30:2, 127:10
**becomes** [4] - 50:24, 62:12, 63:14, 103:4
**bed** [1] - 4:2
**BEFORE** [1] - 1:10
**began** [5] - 83:6, 89:9, 117:20, 119:13, 176:6

**begin** [6] - 31:20, 50:3, 93:20, 100:25, 134:3, 136:19
**beginning** [8] - 16:5, 43:16, 90:24, 155:15, 156:6, 160:20, 176:3, 182:8
**begins** [1] - 66:10
**behalf** [1] - 68:14
**behave** [1] - 158:5
**behavior** [3] - 26:10, 26:11, 177:6
**behind** [17] - 70:16, 70:21, 72:17, 73:2, 74:5, 75:13, 79:10, 82:4, 83:17, 88:23, 88:25, 90:22, 101:5, 166:9, 166:19, 167:4, 166:9
**belied** [1] - 83:19
**below** [2] - 38:21, 184:23
**bench** [3] - 151:23, 151:25
**benefit** [3] - 102:6, 121:17, 143:16
**benign** [11] - 26:24, 27:11, 35:2, 35:4, 35:8, 35:9, 35:22, 57:19, 57:21, 57:23, 57:25
**best** [9] - 49:12, 66:21, 132:17, 137:4, 137:14, 138:1, 139:12, 142:22, 184:11
**bets** [1] - 89:3
**better** [11] - 16:22, 54:19, 54:20, 67:24, 81:18, 90:16, 94:23, 95:6, 132:23, 142:6, 163:1
**between** [48] - 8:18, 8:22, 9:5, 14:19, 14:20, 16:17, 17:1, 18:13, 18:15, 18:16, 18:23, 19:2, 19:20, 22:23, 23:3, 26:9, 29:8, 29:12, 33:5, 33:17, 44:3, 55:10, 56:16, 60:7, 60:17, 65:24, 73:5, 74:7, 84:12, 97:25, 99:18, 101:15, 110:13, 114:17, 118:2, 132:12, 135:4, 135:6, 135:11, 135:23, 136:12, 141:13, 147:3, 153:15, 166:10,

167:5, 182:20, 183:20
**beyond** [9] - 66:2, 72:9, 75:7, 82:16, 100:1, 117:10, 120:9, 121:13, 169:6
**bid** [1] - 147:6
**bid-rigging** [1] - 147:6
**bidding** [1] - 20:9
**big** [6] - 16:25, 60:15, 101:19, 157:4, 160:8, 161:25
**bilateral** [2] - 19:12, 63:21
**bill** [2] - 23:19, 84:20
**billion** [1] - 157:24
**billions** [2] - 14:15, 157:19
**bills** [1] - 83:21
**binder** [7] - 5:25, 96:7, 100:23, 104:24, 118:20, 119:5, 169:8
**binders** [1] - 69:11
**bit** [7] - 20:25, 21:2, 22:4, 26:16, 94:20, 99:13, 102:3
**bite** [4] - 64:19, 64:20, 65:14
**black** [2] - 32:7, 32:15
**black-and-white** [2] - 32:7, 32:15
**blank** [1] - 100:21
**blind** [1] - 96:1
**blip** [1] - 156:11
**block** [1] - 161:24
**BN** [9] - 60:17, 61:15, 61:17, 62:4, 65:10, 65:24, 66:9, 66:10
**BNSF** [32] - 9:13, 9:14, 60:8, 60:14, 64:23, 87:24, 101:15, 101:17, 101:18, 101:22, 102:23, 105:10, 105:18, 110:5, 110:11, 111:11, 111:13, 112:1, 112:2, 113:1, 113:2, 113:5, 113:6, 113:13, 113:20, 114:6, 114:8, 114:11, 175:25, 176:7, 178:6
**BNSF's** [2] - 60:13, 175:24
**Board** [2] - 149:10, 163:24
**board** [27] - 76:15, 76:24, 77:9, 79:15, 81:23, 81:24, 87:20, 88:10, 91:24, 92:5,

92:10, 104:10, 107:6, 108:4, 108:9, 108:24, 110:24, 111:25, 112:10, 113:19, 114:19, 114:23, 115:16, 163:16, 164:19, 165:2, 176:21
**boards** [1] - 151:20
**body** [2] - 100:13, 179:13
**boiling** [1] - 168:17
**bolts** [1] - 19:12
**book** [1] - 88:23
**boosting** [1] - 60:10
**border** [1] - 23:3
**borders** [2] - 22:8
**Bostock** [1] - 41:2
**bother** [1] - 154:21
**bottom** [8] - 35:5, 103:3, 112:15, 121:15, 126:1, 127:9, 128:18, 167:8
**bottomline** [1] - 147:1
**Bourjaily** [13] - 52:18, 52:19, 57:13, 59:6, 137:22, 138:14, 138:15, 138:18, 169:11, 170:3, 170:13, 171:11
**box** [1] - 70:21
**boxes** [4] - 8:2, 30:12, 49:3
**branch** [1] - 62:8
**brave** [1] - 81:4
**bravo** [1] - 82:2
**breadth** [1] - 29:16
**break** [12] - 4:21, 4:23, 5:1, 5:9, 46:11, 50:18, 67:14, 67:15, 67:18, 67:21, 132:14
**breaking** [1] - 67:25
**breaks** [1] - 183:18
**brief** [33] - 9:16, 10:12, 29:15, 35:25, 38:12, 39:15, 45:13, 51:23, 72:18, 75:14, 77:22, 83:3, 86:16, 87:21, 90:8, 91:21, 96:18, 115:9, 116:20, 117:23, 119:15, 122:4, 124:24, 125:5, 125:6, 125:7, 126:5, 126:24, 145:7, 166:21, 171:20, 172:6, 178:4
**briefing** [12] - 87:3, 87:12, 87:14, 87:16, 87:17, 97:2, 97:8, 109:2, 109:16,

117:20, 117:22, 148:18
**briefly** [3] - 21:13, 107:23, 177:12
**briefs** [5] - 7:6, 14:12, 18:12, 170:12
**bringing** [2] - 151:25
**broad** [9] - 35:11, 62:1, 118:22, 127:23, 128:2, 128:21, 148:10, 160:24, 168:12
**broad-ranging** [1] - 118:22
**broader** [13] - 14:20, 15:17, 31:18, 34:3, 45:7, 97:9, 107:18, 115:22, 115:25, 116:5, 140:15, 145:16, 145:17
**broadly** [1] - 78:19
**broken** [1] - 55:19
**brought** [1] - 8:14
**Bryan** [2] - 3:10, 133:1
**BRYAN** [1] - 2:13
**bryan.leitch@usdoj. gov** [1] - 2:16
**bubble** [2] - 14:4, 14:6
**build** [2] - 23:24, 128:12
**built** [2] - 32:1, 109:18
**bullet** [4] - 104:20, 121:15, 122:8, 126:1
**Bullwinkle** [1] - 174:20
**bunch** [3] - 54:25, 56:3, 158:2
**burden** [66] - 20:19, 50:24, 50:25, 51:4, 51:21, 51:23, 52:2, 52:3, 52:8, 52:16, 53:15, 53:16, 53:19, 54:4, 54:5, 54:12, 55:3, 55:10, 56:8, 56:12, 57:2, 57:12, 57:13, 58:18, 59:7, 59:9, 59:10, 59:13, 66:20, 92:25, 115:2, 116:13, 136:4, 136:25, 137:1, 137:2, 137:5, 137:19, 137:21, 137:25, 138:8, 139:18, 140:2, 141:6, 141:7, 141:22, 142:5, 142:21, 143:12, 153:25, 154:1, 154:3, 154:18, 154:22, 154:24,

169:7, 169:9, 169:19, 170:8, 170:17, 172:21, 172:22, 173:8, 174:4, 174:9, 174:15
**burdens** [5] - 53:17, 53:20, 53:23, 54:23, 155:6
**bureau** [9] - 119:9, 120:15, 121:10, 130:9, 130:10, 130:23, 130:24, 158:16, 159:2
**bureaus** [14] - 8:5, 28:20, 79:6, 119:7, 119:24, 120:24, 121:22, 123:4, 129:21, 130:2, 130:13, 130:18, 158:18, 174:21
**business** [43] - 16:19, 17:18, 20:2, 22:1, 30:20, 32:10, 32:11, 32:20, 32:24, 32:25, 33:2, 41:24, 41:25, 43:24, 48:12, 49:7, 60:10, 62:25, 69:5, 72:21, 73:18, 80:10, 89:18, 97:25, 113:3, 128:14, 143:4, 150:12, 150:13, 151:10, 151:18, 152:3, 152:9, 152:17, 154:5, 154:10, 156:25, 157:1, 157:25, 158:8, 168:22, 182:14
**businesses** [2] - 41:23
**Butler** [1] - 81:3
**buy** [1] - 17:16

# C

**CA** [1] - 2:5
**calculus** [1] - 33:2
**camera** [1] - 42:23
**Campbell** [5] - 3:7, 3:20, 50:8, 80:4
**CAMPBELL** [1] - 2:4
**Canadian** [3] - 15:10, 15:11
**candor** [1] - 179:9
**cannot** [17] - 22:9, 82:9, 93:24, 95:3, 115:2, 115:4, 115:12, 115:20, 123:4, 128:1, 131:20, 169:15, 169:25, 171:1,

172:21, 172:22
**capacity** [2] - 49:8, 49:10
**caps** [1] - 44:11
**captures** [1] - 46:6
**capturing** [1] - 25:8
**CARBON** [1] - 1:5
**care** [3] - 30:15, 150:10, 180:4
**careful** [3] - 19:25, 109:13, 128:18
**carload** [1] - 113:3
**Carlton** [3] - 83:7, 171:19, 177:17
**Carlton's** [1] - 157:23
**carried** [1] - 133:9
**carrier** [39] - 8:19, 9:6, 13:9, 22:15, 22:23, 22:24, 29:24, 34:18, 53:14, 60:8, 66:7, 66:12, 73:5, 73:9, 74:3, 74:8, 85:21, 86:18, 133:12, 133:24, 134:11, 134:17, 135:21, 136:8, 136:22, 136:24, 139:20, 139:22, 142:19, 144:17, 144:23, 147:19, 157:15, 157:16, 166:10, 166:14, 178:9
**carrier's** [1] - 112:16
**carriers** [86] - 9:6, 13:16, 16:23, 22:13, 23:2, 25:15, 25:20, 27:14, 27:15, 27:21, 28:3, 29:5, 32:9, 45:25, 49:2, 58:1, 61:1, 61:12, 62:17, 65:25, 71:8, 71:22, 73:6, 79:13, 79:18, 82:5, 82:15, 83:23, 93:22, 95:3, 97:4, 97:24, 99:18, 101:21, 102:18, 107:1, 108:8, 114:17, 115:7, 116:23, 128:1, 133:4, 133:6, 133:7, 133:9, 133:14, 133:20, 134:19, 134:23, 134:25, 135:9, 136:12, 137:5, 138:2, 138:10, 138:11, 140:3, 140:10, 140:11, 140:13, 141:3, 141:9, 141:13, 141:15,

141:22, 143:2, 145:4, 145:9, 146:11, 149:1, 150:20, 152:2, 157:7, 158:5, 158:19, 158:20, 159:8, 166:11, 167:21, 168:4, 168:6, 172:23, 172:25, 176:5, 176:17
**carriers'** [2] - 13:12, 117:4
**carry** [4] - 55:3, 137:25, 138:7, 157:7
**cars** [1] - 23:25
**cartel** [4] - 121:12, 121:15, 121:17, 127:11
**case** [86] - 6:10, 6:19, 6:24, 7:9, 7:16, 7:17, 7:23, 10:11, 12:23, 15:10, 16:6, 17:1, 19:3, 20:11, 20:21, 22:22, 25:12, 37:24, 38:14, 41:2, 41:7, 41:8, 41:11, 45:12, 50:10, 51:11, 52:10, 52:15, 54:17, 56:21, 58:22, 70:6, 72:1, 73:22, 74:22, 76:12, 76:13, 77:10, 78:10, 78:15, 81:8, 81:10, 87:2, 87:7, 87:18, 88:2, 89:13, 91:21, 93:2, 93:5, 103:1, 133:3, 134:1, 134:7, 137:24, 139:2, 139:5, 139:19, 140:4, 140:19, 146:24, 147:17, 152:23, 154:12, 161:5, 162:4, 163:9, 163:10, 164:1, 164:2, 164:4, 165:19, 169:11, 169:12, 171:2, 171:9, 171:10, 171:12, 171:25, 174:13, 179:6, 180:17, 180:18, 181:10
**cases** [17] - 37:9, 38:17, 39:10, 45:15, 54:2, 56:21, 138:19, 139:8, 141:8, 141:21, 151:23, 151:25, 152:1, 169:23, 180:5, 181:6, 181:8

**casual** [1] - 25:5
**catch** [2] - 31:16, 32:22
**categorical** [3] - 135:3, 137:19, 144:13
**categories** [3] - 100:6, 100:9, 173:10
**category** [5] - 100:12, 145:16, 145:17, 173:11, 178:22
**caveats** [1] - 144:5
**ceased** [1] - 89:8
**center** [1] - 164:6
**CEO** [6] - 131:8, 131:9, 131:12, 131:13, 180:9, 180:14
**CEOs** [7] - 97:3, 108:23, 109:9, 131:6, 131:11, 175:6, 177:8
**cert** [1] - 89:16
**certain** [9] - 13:10, 39:19, 69:24, 114:12, 130:18, 136:6, 158:5, 169:24, 174:8
**certainly** [9] - 50:21, 63:25, 74:11, 79:2, 92:13, 98:11, 103:24, 106:24, 168:14
**CERTIFICATE** [1] - 184:6
**certificate** [1] - 184:21
**certification** [17] - 6:13, 8:21, 50:9, 69:15, 69:21, 70:2, 87:16, 87:17, 91:12, 139:9, 164:3, 165:7, 165:11, 165:20, 179:14, 179:15
**certify** [1] - 184:9
**cetera** [1] - 21:23
**chain** [2] - 95:24, 111:17
**chair** [1] - 25:12
**challenge** [3] - 96:15, 140:6, 175:19
**challenges** [2] - 4:6, 151:8
**challenging** [1] - 81:19
**change** [4] - 10:19, 11:23, 13:14, 13:19, 13:20, 15:2, 15:21, 23:18, 56:18, 66:10, 81:23, 152:7, 171:23, 177:5

changed [3] - 12:9, 26:16, 165:13
changes [14] - 9:14, 12:16, 13:7, 15:18, 24:19, 27:15, 100:3, 104:11, 111:5, 112:16, 126:19, 127:22, 176:6
channels [1] - 152:4
character [1] - 18:17
characterization [3] - 93:10, 99:6, 101:1
characterizations [1] - 100:8
characterize [1] - 51:11
characterized [2] - 97:20, 99:23
characterizing [2] - 19:11, 77:22
charge [6] - 13:3, 121:2, 121:3, 121:4, 141:19
charged [3] - 120:18, 124:19, 153:20
charges [1] - 156:7
chart [11] - 16:21, 18:11, 19:23, 55:4, 57:9, 83:6, 105:21, 155:23, 157:23, 177:13, 177:14
charts [1] - 31:5
chase [1] - 157:4
cheeky [1] - 152:25
cherry [7] - 69:1, 76:17, 95:4, 107:22, 112:21, 155:16, 160:17
cherry-picking [7] - 69:1, 76:17, 95:4, 107:22, 112:21, 155:16, 160:17
chief [1] - 177:12
chime [1] - 95:8
chose [3] - 114:6, 181:2, 182:25
Christopher [1] - 3:6
CHRISTOPHER [1] - 2:4
christopher. campbell@lw.com [1] - 2:7
Circuit [3] - 146:23, 174:12, 174:13
circumstance [2] - 58:7, 77:2
circumstances [7] - 52:21, 58:1, 73:21, 95:24, 107:5, 169:24, 170:25

circumstantial [4] - 102:25, 104:23, 108:11, 108:13
citation [8] - 10:12, 45:13, 102:10, 106:9, 109:11, 155:8, 157:22, 174:11
citations [3] - 108:19, 125:1, 176:24
cite [8] - 39:14, 45:14, 58:21, 83:6, 91:20, 97:8, 114:1, 155:4
cited [8] - 47:12, 52:10, 105:20, 138:19, 166:3, 170:12, 170:21, 171:16
cites [2] - 41:7, 89:10
citing [2] - 14:5, 91:21
City [1] - 65:2
Civil [1] - 3:15
claim [5] - 7:10, 28:15, 30:14, 54:20, 130:24
claiming [2] - 57:7, 58:5
Clarence [1] - 114:3
clarification [1] - 86:10
CLASS [2] - 1:4, 1:13
class [23] - 3:4, 6:13, 8:21, 50:8, 69:14, 69:15, 69:21, 70:2, 87:16, 87:17, 89:16, 91:11, 139:9, 140:21, 143:2, 143:5, 157:21, 164:3, 165:10, 165:20, 179:14, 179:15
classification [1] - 165:7
clause [3] - 73:12, 142:8, 166:17
clauses [1] - 130:6
clear [26] - 3:20, 6:18, 22:14, 27:13, 28:5, 28:14, 28:19, 39:11, 40:12, 57:5, 63:14, 66:18, 71:12, 125:2, 135:8, 135:18, 136:9, 137:12, 137:18, 137:25, 139:23, 146:24, 153:15, 158:16, 164:13, 165:23
clearly [14] - 62:11, 62:24, 73:22, 74:14, 74:22, 76:14, 79:16, 82:16, 122:5,

123:18, 136:6, 160:5, 168:12, 169:4
clever [2] - 46:8, 46:10
client [2] - 76:1, 171:19
clinch [1] - 7:8
clock [1] - 94:15
close [4] - 38:17, 95:22, 116:18, 118:25
closed [3] - 119:1, 122:18, 123:12
closing [2] - 161:12, 178:16
clustered [2] - 96:8, 96:10
CMOs [7] - 97:4, 105:12, 108:23, 109:9, 113:14, 175:23, 177:9
co [3] - 117:13, 181:8, 181:9
co-conspiracies [1] - 181:9
co-conspiracy [1] - 181:8
co-liaison [1] - 117:13
coal [1] - 114:12
coast [4] - 19:15, 22:25
Coast [11] - 12:24, 14:21, 14:22, 17:2, 18:13, 18:14, 74:8, 85:22
coast-to-coast [1] - 19:15
coconspirator [5] - 52:22, 52:23, 52:25, 57:5, 57:6
coded [1] - 9:9
cognitive [1] - 37:9
coincide [1] - 17:13
coincident [1] - 80:11
cold [1] - 128:14
collapsing [1] - 156:10
colleague [2] - 67:19, 170:12
colleagues [2] - 48:14, 148:14
collective [2] - 126:18, 126:20
collectively [2] - 103:9, 158:19
collude [1] - 168:19
collusion [7] - 94:9, 107:20, 116:1, 116:5, 116:9, 126:15, 126:21
collusive [2] - 26:10,

26:11
color [1] - 9:9
colorful [1] - 93:16
Columbia [1] - 2:10
COLUMBIA [1] - 1:1
com [1] - 122:6
combination [2] - 30:20, 34:7
combinations [1] - 144:10
coming [5] - 6:6, 24:21, 47:1, 55:10, 154:22
coming-forward [1] - 55:10
comment [3] - 40:16, 54:13, 156:9
comments [1] - 123:11
commerce [8] - 21:11, 21:18, 22:3, 29:9, 29:17, 47:15, 157:20
Commission [2] - 48:15, 149:9
commission [1] - 127:25
committed [1] - 116:9
commodities [1] - 113:10
common [11] - 6:14, 14:14, 15:8, 30:8, 32:19, 37:6, 40:13, 52:23, 85:25, 179:7, 179:18
commonly [1] - 15:1
communicating [2] - 76:1, 87:9
communication [21] - 13:15, 14:19, 14:20, 15:12, 16:3, 24:5, 25:25, 39:12, 55:12, 57:3, 80:24, 81:15, 81:21, 94:5, 112:5, 151:9, 151:16, 152:4, 152:8, 154:13, 168:1
communications [42] - 12:4, 12:5, 26:6, 26:25, 31:17, 37:4, 37:7, 39:18, 41:20, 49:2, 50:14, 54:21, 55:17, 57:19, 72:23, 72:25, 73:15, 95:25, 96:23, 97:12, 99:5, 100:10, 100:14, 109:5, 109:7, 109:23, 110:10, 110:16, 112:7, 112:23, 117:3, 140:17, 141:1,

150:17, 154:2, 154:4, 154:23, 160:14, 168:3, 169:22, 170:24, 177:7
companies [11] - 17:8, 19:20, 21:20, 21:22, 21:23, 24:4, 24:20, 84:8, 89:18, 90:15, 99:8
company [2] - 23:20, 25:6
compared [2] - 23:13, 164:15
comparing [1] - 105:21
comparison [1] - 105:5
compellingly [1] - 172:20
compete [6] - 21:21, 25:8, 127:16, 127:17, 128:16, 128:17
competing [4] - 61:13, 61:20, 63:25, 66:5
competition [11] - 21:25, 23:3, 26:13, 98:25, 118:4, 118:6, 121:16, 122:6, 123:19, 127:18, 149:1
competitive [13] - 9:7, 24:6, 24:15, 25:18, 25:23, 27:22, 41:22, 41:25, 121:18, 126:16, 131:16, 149:3, 150:13
competitively [8] - 24:13, 26:24, 27:11, 116:1, 133:21, 141:10, 141:15, 151:19
competitiveness [1] - 60:9
competitor [6] - 10:7, 10:15, 105:25, 110:10, 112:6, 120:19
competitors [18] - 18:6, 18:18, 22:16, 23:8, 25:20, 26:2, 26:12, 27:2, 27:16, 46:1, 50:16, 94:8, 112:2, 128:16, 128:17, 143:6, 143:9, 161:1
competitors' [1] - 116:7
compiled [1] - 93:11

**complacent** [1] - 127:10

**complain** [1] - 80:21

**complaining** [1] - 163:13

**complaint** [2] - 75:8, 87:16

**complaints** [1] - 102:15

**complete** [3] - 16:14, 96:19, 184:11

**completed** [1] - 69:16

**completely** [14] - 8:1, 11:16, 21:15, 27:13, 28:18, 29:7, 41:9, 54:1, 66:12, 83:13, 122:22, 143:13, 160:2, 181:6

**compliance** [4] - 2:23, 177:25, 178:13, 184:14

**complicate** [2] - 40:11, 47:18

**complicated** [2] - 45:9, 169:10

**complied** [1] - 120:16

**comply** [1] - 75:12

**component** [2] - 70:20, 159:6

**components** [1] - 13:8

**comprise** [1] - 141:2

**computer** [1] - 2:21

**computer-aided** [1] - 2:21

**concede** [2] - 82:6, 177:2

**conceded** [1] - 166:19

**concentration** [2] - 164:15, 164:17

**concept** [3] - 18:10, 113:21, 113:23

**concern** [61] - 8:8, 26:17, 26:25, 27:20, 31:23, 35:3, 36:12, 37:21, 40:6, 41:3, 41:13, 41:14, 41:15, 43:10, 43:11, 44:1, 44:8, 44:15, 44:19, 45:4, 45:15, 46:5, 46:16, 46:17, 46:18, 47:20, 48:23, 49:9, 51:1, 55:23, 56:1, 56:4, 58:22, 61:1, 61:5, 66:3, 72:7, 75:19, 77:24, 77:25, 133:11, 134:4, 134:7, 134:12, 135:8, 135:17, 135:20, 136:21, 136:23, 138:21,

142:12, 147:11, 147:18, 148:18, 151:11, 153:19, 154:23, 164:24, 172:24

**concerned** [34] - 8:9, 20:17, 29:4, 40:14, 45:10, 46:8, 46:12, 46:14, 48:18, 48:24, 51:3, 53:17, 56:11, 72:6, 73:8, 74:2, 78:2, 78:8, 90:24, 90:25, 124:16, 124:21, 133:23, 134:16, 134:24, 142:19, 150:3, 166:13, 167:18, 167:23, 168:15, 181:7

**concerning** [6] - 8:6, 29:23, 30:10, 114:23, 136:10, 181:4

**concerns** [31] - 8:13, 35:7, 36:1, 39:22, 40:7, 41:5, 45:6, 46:21, 47:7, 48:20, 59:10, 75:22, 78:3, 115:11, 124:8, 124:25, 135:19, 136:7, 144:2, 147:4, 151:15, 152:13, 153:21, 160:21, 166:22, 166:25, 173:5, 180:15

**conclude** [1] - 59:20

**concludes** [1] - 184:4

**concluding** [1] - 179:3

**conclusion** [8] - 27:24, 44:17, 66:17, 90:20, 129:9, 136:8, 136:9, 160:3

**conclusions** [3] - 27:18, 39:19, 140:8

**concur** [1] - 13:19, 15:6, 27:15

**concurred** [1] - 11:7

**concurrence** [32] - 12:4, 12:7, 12:10, 12:20, 13:2, 13:4, 13:6, 13:12, 14:4, 14:6, 14:7, 14:10, 14:16, 15:9, 15:22, 33:24, 44:10, 44:12, 80:9, 80:17, 85:22, 100:10, 109:5, 109:7, 109:23, 110:14, 110:16, 112:13, 112:15, 151:7, 177:7

**concurrences** [4] - 12:2, 12:15, 179:21, 179:22

**concurrent** [2] - 12:1, 112:5

**concurs** [1] - 110:21

**condition** [2] - 137:10, 139:25

**conditions** [8] - 53:24, 58:24, 58:25, 59:2, 59:3, 137:6, 155:6, 155:7

**conduct** [14] - 79:2, 83:23, 89:19, 102:18, 107:18, 116:24, 124:21, 130:1, 130:14, 130:18, 147:15, 152:22, 152:24

**conferees** [1] - 129:12

**conference** [10] - 27:12, 29:3, 45:23, 45:24, 70:6, 128:24, 129:1, 129:5, 129:7, 140:6

**confined** [6] - 93:6, 93:21, 105:7, 115:19, 116:22, 176:22

**confirm** [2] - 109:6, 112:11

**confirmation** [2] - 46:3, 111:16

**confirmed** [5] - 6:23, 106:17, 111:16, 112:2, 114:18

**confirming** [1] - 113:5

**conflating** [1] - 91:6

**conflict** [4] - 46:13, 46:14, 46:15, 46:16

**conformance** [1] - 119:10

**confusion** [1] - 90:22

**congenital** [1] - 55:9

**Congress** [69] - 21:23, 23:11, 27:8, 27:11, 27:14, 27:20, 29:4, 45:18, 45:21, 50:18, 53:17, 53:18, 72:25, 118:16, 118:18, 118:21, 119:4, 119:7, 119:13, 119:17, 119:22, 120:1, 120:10, 121:7, 122:18, 123:21, 123:22, 124:5, 124:23, 125:13, 125:14, 125:15, 126:14, 126:17, 128:10,

128:25, 129:9, 129:17, 129:18, 129:19, 129:21, 129:24, 129:25, 130:15, 130:17, 130:19, 131:2, 131:18, 140:7, 140:9, 148:12, 148:15, 148:21, 151:16, 153:25, 154:11, 154:13, 157:5, 158:3, 158:13, 158:15, 158:21, 159:6, 162:6, 174:23, 175:8, 182:24

**Congress's** [1] - 122:5

**connect** [1] - 38:6

**connected** [2] - 21:9, 38:18

**connecting** [4] - 13:11, 13:20, 41:23

**connection** [6] - 15:5, 39:2, 45:6, 48:5, 50:8, 135:8

**connective** [10] - 37:10, 140:25, 162:9, 164:12, 165:23, 166:5, 172:20, 181:10

**connects** [1] - 179:20

**connotation** [1] - 183:1

**consensus** [5] - 63:4, 63:7, 63:8, 104:3, 104:6

**consequence** [2] - 41:10, 181:22

**consequences** [1] - 41:5

**consequential** [1] - 153:17

**consider** [6] - 8:7, 96:4, 108:7, 149:12, 153:22, 179:1

**considerable** [1] - 32:5

**consideration** [5] - 73:22, 78:15, 91:10, 96:12, 149:14

**considered** [37] - 8:8, 15:13, 20:18, 32:3, 36:2, 36:13, 37:21, 38:22, 39:3, 39:5, 48:13, 50:2, 50:22, 57:1, 58:17, 59:25, 60:5, 60:22, 62:1, 62:13, 63:12, 64:4, 66:20, 69:8, 69:25, 73:10, 81:19, 91:1,

139:16, 142:7, 142:24, 143:14, 160:22, 166:15, 167:12, 171:1, 184:21

**considered-by-itself** [1] - 59:25

**considering** [3] - 70:2, 121:10, 165:8

**consisted** [1] - 87:25

**consistent** [6] - 7:18, 57:17, 97:16, 144:3, 146:24, 174:5

**consistently** [1] - 45:15

**consists** [1] - 7:11

**conspiracies** [1] - 181:9

**conspiracy** [59] - 6:17, 6:19, 7:11, 8:11, 11:20, 11:21, 13:18, 16:10, 17:11, 30:19, 31:18, 32:12, 33:1, 34:6, 39:13, 43:15, 43:17, 49:21, 53:1, 53:3, 53:4, 53:5, 55:2, 57:7, 71:3, 71:6, 83:5, 83:11, 84:4, 84:6, 89:14, 91:1, 91:7, 91:13, 95:5, 96:16, 97:20, 99:24, 108:12, 115:22, 133:16, 138:17, 140:9, 140:15, 153:16, 153:17, 165:16, 172:3, 176:17, 178:25, 179:2, 179:4, 179:6, 179:7, 179:19, 180:5, 181:3, 181:8

**conspiratorial** [1] - 150:16

**constant** [2] - 25:5, 81:13

**consternation** [2] - 38:11, 179:10

**constitute** [2] - 37:4, 139:17

**constitutes** [1] - 184:9

**constraints** [1] - 24:25

**construct** [1] - 171:3

**construction** [3] - 28:23, 40:25, 153:19

**construe** [1] - 183:2

**construed** [5] - 45:10, 78:17, 78:19, 129:13, 148:16

**consumer** [1] - 16:4

**contact** [1] - 65:5

**contain** [1] - 104:7
**contemplated** [2] - 94:6, 100:2
**contemplation** [1] - 106:8
**contemporaneous** [3] - 95:25, 106:22, 107:4
**contend** [1] - 129:12
**content** [4] - 56:6, 94:3, 96:4
**contention** [1] - 177:5
**contest** [1] - 6:11
**contested** [2] - 29:21, 56:19
**contesting** [1] - 181:14
**context** [49] - 8:20, 39:8, 39:9, 39:16, 41:16, 42:2, 44:5, 45:5, 48:16, 69:10, 73:23, 76:21, 76:25, 81:16, 81:25, 82:3, 88:5, 88:18, 90:7, 90:10, 91:15, 92:13, 94:5, 95:22, 96:15, 96:24, 97:16, 100:14, 106:13, 110:9, 115:3, 115:6, 115:14, 115:22, 116:5, 116:24, 117:4, 123:11, 134:15, 140:22, 142:18, 148:7, 153:23, 166:24, 168:16, 170:21, 170:25, 173:4
**contexts** [1] - 143:24
**contextual** [5] - 38:6, 64:18, 65:7, 66:17, 96:12
**contextually** [2] - 37:11, 43:7
**continue** [3] - 89:2, 95:9, 95:13
**Continued** [2] - 1:25, 2:1
**continued** [2] - 84:3, 126:3
**continues** [3] - 12:9, 34:22, 63:18
**continuous** [2] - 16:16
**contract** [7] - 28:11, 28:12, 29:3, 29:10, 92:7, 111:2, 111:4
**contracts** [3] - 111:4, 111:6, 111:20
**contradicted** [1] - 62:23
**contrary** [3] - 33:11,

138:14, 169:22
**contrast** [2] - 102:3, 158:21
**control** [2] - 117:10, 145:5
**convenience** [2] - 100:7, 157:17
**conversation** [15] - 37:15, 37:16, 37:18, 38:18, 46:17, 46:18, 54:3, 76:3, 78:20, 101:20, 114:3, 131:18, 152:17, 162:13
**conversations** [12] - 38:17, 50:19, 55:1, 76:8, 77:13, 77:15, 78:5, 99:14, 108:3, 117:1, 128:19, 131:1
**conversely** [1] - 75:18
**conviction** [1] - 120:9
**convince** [2] - 73:17, 80:2
**convinced** [3] - 154:12, 154:14, 158:3
**Cooper** [1] - 170:12
**coordinate** [1] - 152:3
**coordinated** [1] - 107:6
**coordinating** [1] - 183:13
**coordination** [2] - 17:7, 178:12
**core** [7] - 6:18, 14:8, 31:10, 31:19, 42:18, 106:7, 181:22
**corner** [1] - 56:14
**corporate** [2] - 113:11, 114:19
**corporative** [1] - 114:24
**correct** [4] - 92:14, 111:19, 141:16, 144:22
**correspondence** [2] - 110:22, 176:11
**cost** [4] - 24:19, 26:4, 125:23, 126:20
**costs** [11] - 17:20, 24:16, 24:17, 24:18, 24:23, 27:8, 81:13, 83:9, 125:25, 126:16, 151:4
**counsel** [6] - 117:14, 154:6, 156:9, 156:15, 160:16, 183:14
**counterargument** [1] - 146:17

**counterparts** [2] - 65:1, 113:22
**country** [2] - 24:9, 75:2
**couple** [11] - 8:12, 8:15, 19:6, 22:2, 31:5, 37:1, 37:16, 66:24, 131:22, 149:25, 174:3
**course** [17] - 13:25, 17:17, 19:16, 32:4, 39:9, 48:13, 51:14, 54:15, 65:15, 76:11, 99:2, 100:3, 101:25, 102:12, 116:8, 152:20, 179:7
**courses** [1] - 131:2
**Court** [32] - 2:18, 31:2, 41:2, 52:17, 53:24, 54:7, 57:12, 59:6, 69:8, 69:25, 70:9, 133:1, 134:7, 134:8, 136:5, 136:20, 136:22, 137:1, 137:2, 138:4, 138:7, 140:1, 141:5, 142:15, 144:15, 146:22, 149:4, 161:19, 173:16, 182:24, 183:2, 185:1
**Court's** [4] - 26:16, 42:16, 97:17, 177:25
**court's** [1] - 147:17
**Courthouse** [1] - 2:19
**courts** [4] - 31:10, 39:21, 45:10, 54:12
**cover** [7] - 24:17, 24:19, 24:23, 28:2, 28:3, 31:21, 178:21
**coverage** [6] - 99:21, 100:1, 103:14, 112:25, 113:2, 116:8
**covering** [1] - 20:11
**covers** [4] - 28:16, 76:4, 77:23
**COVID** [5] - 18:2, 89:4, 89:5, 98:19
**COVID-19** [2] - 2:23, 184:14
**crazy** [4] - 15:20, 17:15, 81:10, 82:24
**create** [7] - 17:8, 28:12, 29:2, 71:2, 84:2, 148:11, 148:23
**created** [5] - 105:11, 126:17, 158:23, 174:18
**creates** [2] - 25:25, 50:10
**creating** [2] - 16:2, 29:4
**creation** [1] - 154:9
**credibility** [1] - 89:21
**crisis** [1] - 89:5
**criteria** [2] - 91:9, 92:19
**critical** [9] - 83:18, 88:21, 89:2, 90:21, 97:1, 166:18, 167:4, 168:16, 172:16
**critically** [1] - 100:13
**Crowell** [1] - 2:9
**crucial** [1] - 25:22
**crumpled** [1] - 89:20

132:9, 132:21, 132:24, 136:2, 138:22, 138:25, 143:19, 145:14, 145:21, 145:24, 146:2, 146:7, 147:24, 149:7, 149:16, 149:20, 156:3, 161:7, 161:15, 162:17, 162:20, 162:22, 163:2, 170:11, 175:12, 175:16, 178:16, 181:25, 182:2, 182:6, 182:8, 183:5
**Court's** [4] - 26:16, 42:16, 97:17, 177:25
**court's** [1] - 147:17
**Courthouse** [1] - 2:19
**courts** [4] - 31:10, 39:21, 45:10, 54:12
**cover** [7] - 24:17, 24:19, 24:23, 28:2, 28:3, 31:21, 178:21
**coverage** [6] - 99:21, 100:1, 103:14, 112:25, 113:2, 116:8
**covering** [1] - 20:11
**covers** [4] - 28:16, 76:4, 77:23
**COVID** [5] - 18:2, 89:4, 89:5, 98:19
**COVID-19** [2] - 2:23, 184:14
**crazy** [4] - 15:20, 17:15, 81:10, 82:24
**create** [7] - 17:8, 28:12, 29:2, 71:2, 84:2, 148:11, 148:23
**created** [5] - 105:11, 126:17, 158:23, 174:18
**creates** [2] - 25:25, 50:10
**creating** [2] - 16:2, 29:4
**creation** [1] - 154:9
**credibility** [1] - 89:21
**crisis** [1] - 89:5
**criteria** [2] - 91:9, 92:19
**critical** [9] - 83:18, 88:21, 89:2, 90:21, 97:1, 166:18, 167:4, 168:16, 172:16
**critically** [1] - 100:13
**Crowell** [1] - 2:9
**crucial** [1] - 25:22
**crumpled** [1] - 89:20

**cry** [1] - 114:16
**crystal** [1] - 39:11
**CSX** [23] - 2:8, 3:8, 3:18, 11:25, 12:23, 17:2, 22:15, 33:22, 60:14, 87:24, 101:18, 101:24, 104:25, 105:2, 105:20, 108:10, 110:3, 110:4, 110:5, 110:12, 113:1, 114:3, 114:4
**CSX's** [1] - 111:12
**CSX/UP** [1] - 43:24
**CSXT** [5] - 11:22, 43:17, 110:24, 111:1, 111:5
**cumulative** [1] - 39:17
**current** [2] - 111:3, 135:2
**curtailing** [1] - 148:24
**customer** [8] - 23:14, 24:8, 29:9, 61:5, 99:16, 102:12, 102:15, 105:6
**customers** [10] - 23:21, 23:22, 61:2, 63:6, 66:14, 98:24, 102:16, 103:16, 104:5, 141:20
**customers'** [1] - 22:9
**cut** [3] - 9:18, 119:18, 157:3
**cutting** [1] - 122:23, 129:3, 129:20

# D

**D.C** [2] - 1:7, 2:19
**Dagher** [1] - 42:17
**damages** [1] - 76:6
**Dan** [1] - 177:15
**Dan.Wall@lw.com** [1] - 2:6
**dangerous** [1] - 18:4
**Daniel** [1] - 3:9
**DANIEL** [1] - 2:3
**data** [1] - 155:24
**date** [1] - 80:18
**Dated** [1] - 184:24
**dates** [1] - 111:23
**day-to-day** [1] - 29:9
**days** [5] - 37:17, 96:14, 99:10, 101:25, 112:20
**DC** [3] - 1:19, 1:23, 2:15
**de** [1] - 148:12
**deal** [7] - 24:3, 24:24,

29:13, 94:3, 157:6, 160:8

**dealing** [10] - 8:16, 23:17, 23:20, 27:24, 53:15, 55:23, 140:13, 150:24, 169:20, 169:21

**deals** [1] - 138:16

**dealt** [8] - 51:5, 52:17, 53:18, 110:18, 138:15, 179:5, 179:6, 179:8

**debate** [13] - 26:19, 26:22, 27:8, 32:5, 41:15, 48:16, 50:25, 102:24, 103:4, 104:23, 108:12, 159:12, 168:14

**December** [3] - 8:22, 109:14, 156:12

**decide** [6] - 4:20, 13:9, 15:21, 45:4, 51:14, 158:19

**decided** [6] - 70:12, 88:15, 143:3, 158:12, 173:20, 173:21

**decides** [1] - 173:17

**deciding** [1] - 151:15

**decision** [16] - 32:23, 33:2, 33:6, 33:7, 41:2, 42:17, 49:8, 52:12, 56:10, 71:1, 77:4, 83:11, 144:7, 146:23, 170:11

**decision-making** [1] - 33:2

**decisions** [9] - 31:15, 32:19, 32:21, 33:3, 33:4, 49:5, 52:13, 137:16, 178:24

**declarant** [1] - 53:3

**declaration** [3] - 80:4, 80:5, 176:25

**declarations** [1] - 89:17

**decline** [2] - 97:19, 177:16

**declining** [1] - 83:5

**deeper** [1] - 21:2

**default** [2] - 171:5, 171:7

**defendant** [9] - 3:6, 3:8, 6:10, 12:1, 54:19, 55:2, 58:7, 106:3, 114:6

**DEFENDANT** [2] - 2:2, 2:8

**defendants** [98] - 4:13, 4:19, 5:11,

6:15, 17:1, 20:21, 59:11, 69:12, 69:19, 69:22, 72:15, 72:17, 73:14, 75:7, 75:10, 75:12, 76:18, 78:18, 79:25, 80:2, 82:6, 82:11, 82:19, 84:1, 89:7, 91:6, 92:8, 92:25, 93:11, 93:24, 96:15, 97:17, 98:3, 98:22, 99:1, 99:4, 102:9, 102:20, 103:8, 104:10, 105:8, 105:15, 105:22, 106:1, 106:11, 107:17, 107:24, 109:3, 109:25, 111:9, 112:6, 112:9, 115:2, 115:4, 115:16, 115:20, 116:7, 116:13, 131:17, 132:3, 132:11, 135:11, 137:16, 138:19, 140:24, 141:22, 142:22, 145:6, 146:16, 146:21, 147:14, 148:4, 148:11, 149:17, 152:25, 154:24, 161:19, 164:23, 165:4, 165:25, 166:4, 166:19, 167:25, 169:2, 169:9, 170:1, 170:6, 170:10, 171:6, 172:21, 175:23, 176:1, 176:4, 176:19, 178:2, 178:3, 178:10, 178:14

**Defendants** [2] - 1:8, 101:1

**defendants'** [23] - 79:25, 83:10, 96:21, 101:11, 102:3, 102:5, 104:13, 106:23, 107:15, 107:23, 108:17, 108:20, 117:19, 129:17, 142:9, 144:18, 168:17, 171:16, 173:9, 177:1, 177:4, 177:12, 177:25

**defense** [2] - 97:7, 100:7

**define** [2] - 51:11, 76:18

**defined** [1] - 40:5,

71:20, 95:3, 169:24, 173:3

**defines** [1] - 35:6, 41:8, 58:22

**definition** [6] - 47:20, 48:21, 101:12, 136:10, 168:15, 168:17

**definitionally** [1] - 64:5

**definitively** [1] - 170:16

**delay** [1] - 126:12

**delays** [2] - 23:20, 24:3

**demanding** [1] - 61:3

**demonstrate** [3] - 16:1, 115:14, 115:21

**demonstrated** [1] - 172:4

**demonstrates** [1] - 164:23

**Dempsey** [1] - 124:23

**denials** [1] - 106:4

**denied** [2] - 93:1, 173:19

**Dennis** [2] - 83:7, 171:18

**Denver** [1] - 124:13

**deny** [1] - 173:22

**depart** [1] - 155:11

**Department** [18] - 2:14, 4:17, 20:22, 33:10, 51:20, 57:22, 118:23, 122:18, 123:6, 125:3, 125:25, 126:10, 127:6, 130:23, 139:3, 149:23, 155:9, 181:7

**department** [5] - 51:12, 51:15, 107:21, 119:14, 162:10

**deployment** [2] - 107:12, 110:17

**depose** [1] - 89:22

**deposed** [1] - 89:20

**deposing** [1] - 6:24

**deposition** [6] - 43:3, 89:11, 96:24, 97:8, 106:9, 106:10

**depositions** [2] - 89:8, 103:11

**Deputy** [1] - 126:6

**DEPUTY** [9] - 3:2, 68:2, 68:6, 68:9, 94:10, 94:16, 95:10, 95:15, 98:7

**deregulate** [1] -

123:18

**deregulated** [3] - 119:18, 149:3, 159:5

**deregulating** [2] - 119:13, 129:19

**deregulation** [3] - 79:7, 122:21, 122:23

**derived** [2] - 87:23, 154:6

**derives** [1] - 96:5

**describe** [2] - 117:19, 121:11, 122:4

**describes** [1] - 123:3

**descriptions** [1] - 93:9

**deserve** [1] - 146:16

**deserved** [1] - 106:23

**designed** [5] - 28:2, 28:3, 61:24, 92:9, 121:15

**desire** [2] - 99:15, 106:18

**desperately** [1] - 165:17

**despite** [2] - 38:23, 183:6

**destroys** [1] - 47:24

**detail** [5] - 25:10, 75:11, 111:13, 139:8, 176:3

**detailed** [1] - 86:16

**detailing** [1] - 112:15

**details** [2] - 145:11, 153:8

**determination** [7] - 36:24, 50:2, 52:24, 54:13, 57:25, 70:9, 150:9

**determine** [8] - 31:2, 53:24, 60:21, 95:21, 124:1, 142:18, 165:9, 167:10

**determined** [3] - 6:25, 69:25, 126:14

**determining** [2] - 31:20, 36:1

**developed** [1] - 84:25

**device** [2] - 12:11, 84:24

**devices** [1] - 12:15

**devoted** [1] - 69:4

**diagram** [1] - 32:6

**diagrams** [1] - 159:18

**dial** [1] - 98:16

**dialogue** [3] - 107:12, 112:9, 116:4

**dialogues** [2] - 95:23, 115:25

**dictionary** [1] - 78:10

**diesel** [3] - 8:23, 17:14, 42:3

**difference** [5] - 33:17, 84:12, 135:4, 135:23, 135:24

**differences** [2] - 109:1, 150:1

**different** [34] - 15:3, 18:17, 19:20, 22:6, 26:3, 27:11, 31:6, 38:3, 38:9, 38:10, 44:24, 45:19, 51:12, 61:6, 63:3, 76:2, 77:13, 91:3, 102:11, 104:3, 115:12, 134:23, 137:17, 139:3, 145:3, 152:15, 157:18, 159:14, 160:2, 162:4, 169:20, 178:17, 181:9, 183:1

**differently** [3] - 18:19, 60:14, 101:17

**difficult** [2] - 108:19, 126:13

**difficulties** [2] - 4:8, 98:18

**difficulty** [1] - 98:8

**direct** [3] - 104:23, 108:13, 148:17

**directive** [2] - 9:13, 113:11

**directives** [2] - 114:19, 114:24

**directly** [1] - 164:18

**directs** [1] - 110:5

**disagree** [2] - 53:22, 152:18

**disagreed** [2] - 27:8, 92:15

**disagreement** [1] - 150:14

**disassembled** [1] - 184:22

**disavow** [1] - 72:18

**discipline** [1] - 100:4

**disciplined** [1] - 162:8

**disciplining** [1] - 161:22

**discontinuation** [1] - 109:17

**discount** [1] - 103:13

**discounting** [1] - 99:22

**discourages** [1] - 126:22

**discourse** [1] - 69:4

**discovery** [1] - 69:16

**discrete** [2] - 39:23, 140:16

**discuss** [34] - 30:25, 42:15, 42:21, 42:24,

43:20, 51:17, 67:2, 76:3, 78:6, 92:20, 101:14, 101:25, 110:3, 120:11, 120:23, 120:24, 121:21, 121:24, 122:14, 123:15, 127:3, 127:15, 129:8, 133:8, 133:14, 134:2, 135:2, 141:18, 144:16, 145:10, 146:13, 147:20, 175:24, 176:14

**discussed** [15] - 27:19, 43:21, 77:18, 97:11, 99:8, 100:2, 100:11, 101:10, 104:10, 109:3, 111:9, 118:9, 130:10, 165:4, 176:5

**discussing** [24] - 67:10, 74:24, 75:10, 75:24, 83:24, 118:15, 120:4, 120:12, 120:19, 120:25, 121:12, 122:1, 122:15, 123:2, 123:16, 124:14, 127:18, 131:6, 134:3, 146:11, 151:2, 156:17, 175:6, 176:20

**discussion** [121] - 20:16, 21:3, 29:23, 30:9, 31:7, 31:21, 31:23, 32:3, 33:16, 33:23, 34:23, 35:7, 35:16, 36:9, 36:10, 36:25, 37:4, 37:12, 37:19, 37:20, 38:8, 39:9, 40:5, 43:17, 44:25, 45:5, 48:11, 56:23, 56:24, 58:9, 58:12, 58:16, 61:9, 62:6, 62:13, 62:15, 62:16, 63:17, 63:23, 64:14, 65:4, 67:6, 72:6, 72:8, 72:11, 73:5, 73:7, 73:8, 73:10, 73:24, 74:2, 74:7, 74:16, 74:18, 74:22, 75:6, 75:17, 76:20, 79:18, 79:20, 80:7, 81:22, 90:14, 90:15, 93:6, 93:20, 93:24, 94:6, 95:2, 95:21, 98:4, 102:10, 104:2, 105:3, 105:13, 106:6,

108:6, 108:7, 111:24, 115:5, 115:9, 115:15, 115:18, 115:21, 116:14, 117:6, 117:17, 118:1, 118:2, 119:20, 125:12, 133:23, 134:13, 134:16, 134:22, 140:23, 141:2, 141:24, 142:15, 142:18, 151:24, 154:25, 158:21, 162:7, 163:8, 166:10, 166:12, 166:13, 166:15, 167:6, 167:12, 167:20, 168:23, 172:12, 175:5, 175:19, 178:12, 182:20

**discussion-by-discussion** [2] - 58:9, 67:6

**discussion/agreement** [2] - 136:7, 139:16

**discussions** [119] - 6:20, 8:5, 10:25, 16:17, 18:5, 22:22, 26:25, 37:5, 37:13, 38:2, 38:8, 38:24, 39:24, 41:13, 41:19, 42:18, 43:10, 44:18, 48:3, 50:6, 55:21, 60:1, 63:2, 65:24, 73:23, 75:4, 75:16, 75:18, 76:8, 77:17, 77:24, 78:5, 79:15, 82:10, 82:16, 82:21, 82:22, 83:18, 84:2, 84:5, 85:3, 86:18, 88:9, 88:13, 88:19, 90:11, 90:25, 91:2, 92:9, 97:5, 107:7, 107:25, 108:2, 108:23, 114:16, 114:18, 114:23, 116:23, 117:21, 118:11, 118:19, 118:23, 119:25, 121:23, 122:9, 123:22, 123:23, 123:25, 124:4, 124:18, 127:13, 128:8, 129:10, 129:21, 130:7, 130:13, 133:5, 133:19, 134:18, 135:4, 135:5, 135:6,

135:7, 140:7, 140:10, 140:12, 140:16, 140:18, 141:9, 141:13, 142:25, 143:2, 144:7, 144:13, 145:8, 145:13, 150:5, 150:7, 150:17, 151:21, 157:5, 158:7, 158:22, 159:3, 159:8, 159:14, 159:17, 160:9, 164:24, 172:23, 173:1, 174:21, 175:21, 177:2, 181:2, 181:18, 181:23, 182:13

**dismiss** [1] - 158:25

**disposition** [1] - 40:3

**disprove** [1] - 155:1

**disputes** [2] - 133:25, 138:9

**distinct** [1] - 38:18

**distinction** [6] - 29:8, 55:9, 59:4, 97:25, 135:6, 167:5

**distinctions** [2] - 135:11, 138:20

**distinctive** [1] - 19:3

**distinguishing** [1] - 8:3

**District** [2] - 2:10, 52:10

**DISTRICT** [3] - 1:1, 1:1, 1:11

**divergence** [1] - 46:2

**diversion** [1] - 180:7

**diverted** [1] - 81:7

**divide** [1] - 23:1

**diving** [1] - 156:10

**division** [2] - 48:15, 156:16

**Division** [1] - 149:9

**divisions** [1] - 44:14

**divorced** [1] - 107:11

**doctrine** [2] - 26:8, 42:20

**document** [43] - 5:23, 8:17, 9:17, 9:21, 10:9, 10:14, 11:2, 14:8, 26:11, 43:5, 43:14, 44:1, 44:2, 60:8, 61:16, 62:10, 62:23, 63:1, 63:16, 64:16, 67:6, 79:20, 79:21, 80:3, 80:14, 81:15, 90:13, 103:21, 104:14, 106:7, 106:15,

107:13, 110:15, 110:19, 111:15, 139:12, 165:24, 167:3, 168:9, 168:10

**document-by-document** [1] - 67:6

**documented** [1] - 13:22

**documents** [33] - 13:13, 14:1, 14:2, 15:8, 19:6, 43:3, 43:13, 44:18, 47:20, 54:18, 55:1, 55:21, 56:3, 56:9, 76:22, 88:12, 91:4, 91:7, 91:15, 91:16, 102:4, 102:13, 107:10, 110:7, 112:12, 164:11, 164:13, 164:20, 164:23, 166:2, 166:4, 172:10, 178:1

**dog** [2] - 118:10, 177:20

**DOJ** [36] - 26:20, 26:23, 28:7, 28:13, 30:15, 35:24, 36:5, 36:7, 38:5, 39:7, 39:11, 39:15, 40:1, 42:12, 45:14, 46:4, 47:9, 47:13, 48:9, 54:1, 55:25, 56:2, 56:5, 58:19, 61:24, 82:7, 121:7, 121:11, 122:4, 128:22, 151:12, 152:20, 152:22, 152:23, 154:15, 156:15

**DOJ's** [5] - 38:12, 44:22, 45:2, 45:3, 143:22

**dollars** [3] - 14:15, 157:19, 157:24

**Don** [3] - 62:6, 80:8, 105:11

**done** [17] - 5:3, 9:10, 13:13, 15:12, 15:14, 15:15, 32:15, 32:16, 51:5, 59:12, 59:19, 80:25, 83:15, 96:8, 132:4, 181:19, 183:15

**doubt** [2] - 7:6, 159:15

**doubtful** [1] - 11:13

**Douglas** [1] - 126:6

**down** [9] - 30:10, 48:23, 50:18, 50:19, 94:15, 95:16, 118:15, 168:17, 180:23

**downside** [1] - 81:8

**Dr** [6] - 6:24, 9:10, 11:18, 25:2, 157:23, 177:17

**drafted** [1] - 167:5

**dramatically** [1] - 148:19

**draw** [1] - 90:20

**drill** [1] - 62:22

**drive** [1] - 30:9

**drops** [1] - 81:8

**during** [33] - 6:12, 25:3, 37:18, 60:16, 82:25, 84:3, 84:6, 86:22, 89:14, 97:14, 98:1, 98:19, 98:22, 99:12, 105:23, 121:7, 121:9, 127:13, 134:22, 151:24, 157:20, 157:21, 157:25, 164:13, 164:16, 171:17, 172:3, 175:21, 177:10, 177:14, 181:15, 183:7, 183:13

**dying** [1] - 21:25

**dynamic** [2] - 31:11, 44:21

## E

**early** [5] - 91:21, 113:5, 163:11, 176:4, 179:8

**earning** [1] - 163:14

**easier** [3] - 65:23, 142:17, 183:19

**easily** [1] - 48:20

**east** [6] - 18:15, 22:20, 25:15, 41:19, 41:20, 105:25

**East** [5] - 14:21, 14:22, 17:1, 18:13, 74:8

**east-west** [2] - 25:15, 41:20

**eastern** [9] - 8:18, 9:5, 19:17, 22:11, 22:15, 22:23, 23:2, 60:7, 62:5

**easy** [5] - 23:13, 37:2, 41:11, 181:10, 183:23

**eat** [1] - 5:1

**economic** [3] - 17:16, 126:2, 126:18

**effect** [5] - 26:8, 143:1, 143:8,

148:20, 182:16
**effective** [2] - 77:16, 80:18
**effectively** [1] - 169:2
**effectuate** [2] - 87:20, 141:25
**efficiencies** [1] - 154:10
**efficiency** [2] - 142:1, 151:21
**efficient** [2] - 126:22, 149:22
**effort** [2] - 36:4, 156:21
**efforts** [3] - 38:23, 48:21, 66:21
**either** [8] - 50:20, 54:14, 57:3, 74:15, 76:10, 111:21, 119:19, 159:18
**electronic** [1] - 4:8
**element** [1] - 39:3
**elements** [1] - 178:8
**elevated** [1] - 42:17
**eliminate** [1] - 78:24
**eliminated** [2] - 99:22, 174:23
**eliminating** [4] - 158:13, 158:15, 158:16, 158:17
**Elizabeth** [3] - 2:18, 3:11, 185:1
**ELIZABETH** [1] - 184:8
**Elkins** [1] - 1:21
**elsewhere** [3] - 84:15, 148:25, 182:25
**email** [16] - 1:16, 3:24, 13:15, 15:13, 37:17, 64:21, 65:23, 66:6, 76:4, 76:10, 94:7, 99:9, 110:5, 111:10, 112:15, 139:12
**Email** [6] - 1:20, 1:24, 2:6, 2:7, 2:11, 2:16
**emails** [3] - 4:3, 55:1, 160:10
**Emanuel** [1] - 1:14
**embedded** [1] - 52:24
**embrace** [1] - 44:22
**embraced** [1] - 27:20
**emerge** [1] - 163:8
**emphasize** [2] - 88:22, 176:18
**emphatically** [1] - 93:2
**employees** [2] - 44:4, 177:9
**enabled** [2] - 86:20, 100:3

**enacted** [2] - 128:25, 157:5
**enacting** [1] - 126:13
**enactment** [1] - 58:19
**encouragement** [1] - 111:10
**end** [13] - 22:9, 23:6, 27:1, 58:6, 94:17, 94:18, 131:4, 132:19, 155:2, 160:21, 172:17
**end-to-end** [2] - 23:6, 27:1
**endeavored** [1] - 147:8
**ended** [2] - 172:1, 175:4
**enforcement** [2] - 27:5, 27:9
**enforcing** [1] - 137:13
**engage** [4] - 38:24, 159:17, 162:14, 166:1
**engaged** [5] - 22:1, 28:4, 29:17, 96:23, 99:4
**enhancing** [1] - 142:1
**enormous** [2] - 24:4, 24:25
**ensure** [3] - 121:16, 128:12, 129:13
**enter** [1] - 172:23
**entire** [3] - 49:1, 117:2, 159:13
**entirely** [4] - 28:5, 42:10, 137:17, 178:2
**entirety** [2] - 6:19, 113:3
**entities** [1] - 21:21
**entitlement** [1] - 138:8
**entity** [2] - 23:8, 23:17
**entries** [1] - 143:10
**envision** [1] - 141:6
**episode** [1] - 113:13
**episodic** [1] - 25:5
**equipment** [1] - 23:19
**equivalent** [2] - 103:10, 111:13
**Eric** [1] - 81:3
**essence** [2] - 26:19, 26:21
**essential** [1] - 178:8
**essentially** [8] - 8:1, 8:22, 23:7, 23:23, 57:8, 112:4, 144:19, 168:20
**establish** [7] - 57:3, 57:14, 59:7, 101:16, 115:5, 138:8, 155:13
**established** [1] -

57:15
**establishing** [4] - 50:12, 57:7, 59:10, 154:23
**establishment** [1] - 14:9
**estimated** [1] - 25:3
**et** [3] - 1:5, 1:7, 21:23
**ether** [1] - 14:11
**evade** [1] - 95:4
**event** [1] - 107:12
**events** [3] - 9:12, 95:24, 135:2
**eventually** [2] - 36:12, 120:1
**everywhere** [1] - 22:17
**Evidence** [2] - 73:4, 174:6
**evidence** [172] - 6:19, 7:1, 7:9, 7:10, 8:11, 9:3, 31:4, 31:25, 33:1, 35:1, 35:7, 35:21, 36:6, 37:11, 37:19, 38:6, 39:17, 43:6, 52:4, 52:6, 52:13, 52:16, 53:3, 53:7, 54:7, 55:9, 60:23, 60:25, 61:15, 61:19, 62:16, 63:13, 64:15, 64:18, 65:7, 66:17, 69:2, 69:19, 69:24, 70:3, 71:2, 71:7, 71:22, 72:2, 72:3, 73:21, 75:9, 76:13, 76:17, 76:19, 77:7, 77:11, 78:15, 84:5, 85:25, 88:3, 88:15, 88:20, 91:1, 91:5, 91:13, 91:19, 91:20, 92:18, 92:20, 93:10, 94:9, 95:5, 96:5, 96:16, 99:3, 99:13, 100:6, 102:25, 103:2, 104:23, 105:20, 107:22, 108:11, 108:21, 115:4, 115:13, 117:6, 133:5, 133:10, 133:17, 133:22, 135:12, 135:13, 135:18, 135:25, 136:2, 136:6, 137:10, 137:11, 137:20, 138:3, 138:16, 138:17, 139:6, 139:10, 139:25, 140:5, 148:9,

148:17, 154:17, 155:4, 155:12, 155:13, 160:9, 160:19, 162:9, 162:13, 164:8, 164:11, 164:20, 164:22, 165:3, 165:4, 165:8, 165:13, 165:14, 165:15, 165:16, 165:18, 165:20, 165:23, 166:1, 166:9, 167:7, 167:9, 167:10, 167:11, 167:20, 169:4, 169:13, 169:14, 169:16, 169:22, 169:25, 170:1, 170:6, 170:7, 170:16, 171:1, 171:4, 171:7, 171:8, 171:20, 171:24, 173:10, 173:12, 173:14, 173:18, 174:8, 174:10, 174:15, 178:11, 178:25, 179:1, 179:2, 179:3, 179:7, 179:13, 179:18, 179:19, 180:5
**evidenced** [2] - 12:3, 62:23
**evidences** [1] - 37:17
**evidencing** [1] - 44:18
**evident** [1] - 33:16
**evidentiary** [25] - 11:10, 29:14, 29:24, 30:23, 31:8, 31:19, 35:6, 52:2, 59:1, 69:23, 70:24, 71:16, 93:19, 94:5, 97:15, 100:14, 133:4, 138:10, 140:22, 148:8, 160:23, 166:24, 172:19, 173:3, 173:4
**exact** [5] - 27:24, 49:19, 91:14, 138:18, 164:22
**exactly** [22] - 12:22, 24:16, 61:23, 61:24, 64:8, 65:18, 80:1, 89:15, 119:3, 122:1, 129:15, 129:18, 130:1, 130:4, 130:20, 161:23, 167:2, 173:6, 173:11, 179:19
**examining** [1] - 183:20

**example** [25] - 9:20, 13:5, 13:25, 15:2, 15:15, 23:10, 24:7, 37:14, 37:25, 44:9, 49:12, 64:10, 64:13, 64:17, 82:25, 87:22, 90:12, 101:15, 118:12, 118:13, 133:7, 142:4, 143:2, 165:5, 166:23
**examples** [6] - 8:16, 43:12, 46:7, 77:7, 100:12, 101:14
**except** [3] - 17:8, 66:14, 174:24
**exception** [10] - 11:10, 52:4, 52:23, 59:25, 62:2, 63:11, 169:16, 170:5, 170:15
**exceptions** [4] - 69:17, 103:14, 169:13, 176:8
**excerpt** [2] - 9:9, 25:11
**exchange** [6] - 44:3, 112:2, 112:18, 116:1, 134:25, 139:13
**exchanges** [7] - 94:7, 96:13, 97:1, 107:14, 112:14, 112:25, 178:6
**exchanging** [2] - 141:16, 145:11
**excited** [2] - 19:9, 46:9
**exclude** [9] - 78:14, 95:5, 111:4, 112:6, 136:5, 164:24, 167:11, 174:15, 180:3
**excluded** [10] - 52:13, 69:20, 73:21, 73:24, 73:25, 91:5, 91:9, 115:12, 117:7, 174:16
**excludes** [1] - 133:5
**excluding** [3] - 137:11, 138:2, 139:25
**exclusion** [3] - 69:24, 133:10, 133:17
**exclusions** [1] - 78:16
**exclusively** [13] - 6:3, 8:8, 45:5, 47:16, 48:11, 48:23, 56:1, 78:3, 78:8, 134:6, 134:24, 150:3, 182:12
**exclusivity** [1] - 46:17
**excuse** [5] - 3:16,

12:17, 86:25,
114:20, 145:20
**executive** [4] - 65:7,
110:22, 112:3, 176:8
**executives** [13] - 25:7,
64:25, 84:8, 96:22,
99:7, 101:3, 105:18,
108:2, 109:9, 121:1,
152:10, 176:23,
177:3
**exempt** [1] - 169:18
**exemptions** [1] -
128:10
**exercise** [1] - 69:1
**Exhibit** [10] - 80:3,
80:14, 96:17, 102:1,
124:24, 125:4,
125:5, 125:6, 177:1
**exhibit** [3] - 93:21,
101:5, 177:4
**exhibits** [1] - 96:9
**exist** [7] - 19:16,
78:25, 126:19,
130:25, 154:13,
156:23, 160:13
**existed** [1] - 125:17
**existing** [5] - 11:8,
81:5, 114:15,
129:14, 148:16
**expansive** [3] - 39:17,
114:18, 114:23
**expect** [3] - 5:8, 10:24,
109:8
**expectation** [1] -
109:20
**expected** [3] - 66:1,
113:23, 113:25
**experience** [2] -
139:3, 183:17
**expert** [6] - 25:2,
25:11, 83:7, 171:16,
171:19, 177:13
**expire** [1] - 111:22
**explain** [7] - 43:7,
54:20, 66:6, 89:18,
93:17, 141:5, 146:9
**explained** [2] - 128:23,
137:3
**explains** [2] - 16:19,
110:23
**explicit** [1] - 99:14
**explicitly** [8] - 12:2,
43:23, 53:18,
104:19, 106:25,
108:4, 108:24, 112:9
**exploit** [1] - 120:16
**explosion** [1] - 108:3
**expressed** [6] - 58:24,
59:2, 59:3, 111:10,
122:6, 129:7

**expression** [1] - 63:11
**expressly** [8] - 36:8,
70:22, 71:5, 77:7,
79:1, 88:17, 137:18,
168:7
**extensive** [1] - 159:3
**extent** [5] - 98:1,
114:13, 138:4,
144:15, 149:2
**extraneous** [1] - 43:6
**extraordinarily** [1] -
114:7
**extraordinary** [10] -
16:9, 16:11, 16:13,
16:15, 17:4, 17:23,
18:3, 19:11, 99:4,
108:16
**extreme** [3] - 64:17,
72:10, 72:14
**eyes** [2] - 63:5, 104:5

## F

**F.3d** [2] - 174:12,
174:14
**F38** [1] - 109:24
**fabrication** [1] -
165:19
**face** [7] - 11:17, 43:5,
101:21, 114:6,
150:22, 151:3, 180:5
**facilitate** [1] - 115:25
**facilitated** [1] - 116:5
**facilitates** [1] - 126:21
**facing** [1] - 26:3
**fact** [40] - 5:18, 6:23,
7:9, 8:10, 11:6, 15:1,
16:20, 38:8, 42:16,
45:25, 56:17, 69:14,
69:16, 72:7, 73:1,
74:25, 78:23, 80:14,
81:3, 83:3, 83:10,
83:13, 83:19, 89:6,
90:14, 95:20, 103:7,
119:1, 124:2, 126:4,
127:4, 127:9, 129:2,
131:4, 153:11,
154:5, 154:14,
160:6, 174:4, 179:12
**facto** [1] - 148:12
**factor** [2] - 79:11,
172:16
**facts** [4] - 6:17, 16:11,
16:22
**factual** [2] - 38:7,
150:9
**factually** [1] - 37:12
**fail** [4] - 166:23, 167:1,
173:2, 180:14

**failed** [2] - 98:25,
113:21
**fails** [1] - 127:25
**fair** [3] - 47:23, 51:14,
68:25
**faith** [1] - 43:1
**faithful** [1] - 93:10
**fall** [4] - 57:4, 153:2,
170:2, 171:8
**fallback** [1] - 135:15
**falls** [3] - 70:8, 70:10,
136:6
**false** [9] - 11:16,
26:10, 27:7, 27:23,
52:14, 71:21, 92:10,
140:8, 158:6
**falsely** [1] - 27:17
**familiar** [2] - 15:7,
126:7
**far** [12] - 11:7, 23:4,
58:2, 75:7, 76:21,
81:21, 82:16, 89:12,
97:9, 112:6, 112:24,
114:16
**far-ranging** [1] -
112:24
**far-reaching** [1] -
112:6
**fast** [1] - 94:13
**favor** [1] - 155:4
**favorite** [2] - 60:3,
60:18
**FCRR** [2] - 184:8,
185:1
**fear** [1] - 27:4
**feature** [1] - 83:10
**featured** [1] - 64:10
**February** [1] - 109:14
**Federal** [3] - 48:15,
149:9, 174:5
**fee** [1] - 110:12
**fences** [1] - 7:24
**few** [7] - 43:12, 76:19,
97:7, 100:12,
106:21, 109:7,
112:22
**Fi** [2] - 94:17, 95:12
**fiction** [1] - 84:1
**field** [2] - 40:4, 50:5
**fighting** [2] - 55:20,
123:1
**figure** [7] - 20:17,
21:23, 23:24, 24:4,
25:7, 41:4, 68:12
**figuring** [1] - 22:12
**file** [1] - 149:5
**filed** [1] - 25:11
**filled** [1] - 131:1
**final** [4] - 31:1, 48:25,
49:25, 171:13

**finally** [7] - 103:3,
112:22, 113:12,
118:7, 119:7,
177:18, 177:24
**fine** [6] - 4:11, 51:8,
68:15, 95:11, 132:1,
153:18
**finish** [1] - 5:3
**finished** [2] - 4:25, 5:5
**firm** [1] - 17:7
**First** [2] - 174:12,
174:13
**first** [41] - 5:11, 10:21,
21:1, 30:13, 31:7,
34:17, 36:1, 45:13,
48:3, 53:22, 69:15,
73:11, 74:11, 83:5,
85:24, 101:13,
110:20, 115:17,
136:17, 136:18,
140:4, 147:7,
147:11, 147:13,
147:21, 149:11,
152:19, 153:3,
153:4, 158:23,
159:3, 163:9,
166:16, 167:23,
171:13, 174:3,
174:18, 176:7,
178:21, 180:14,
183:9
**first-rate** [1] - 183:9
**fits** [1] - 136:10
**five** [4] - 20:14, 161:9,
178:18, 178:19
**fix** [2] - 131:5, 162:24
**fixing** [3] - 119:6,
122:16, 144:9
**flat** [5] - 39:20, 83:9,
106:4, 171:17,
177:17
**flatly** [1] - 28:13
**fleeing** [1] - 119:7
**Flexner** [5] - 27:3,
48:14, 123:6,
123:16, 143:24
**Flexner's** [1] - 123:10
**flip** [4] - 8:15, 9:8,
10:10, 57:12
**floated** [1] - 62:19
**Floor** [1] - 1:15
**flow** [1] - 31:5
**flows** [1] - 138:10
**flurry** [1] - 116:25
**focus** [4] - 61:22,
69:6, 79:20, 142:12
**focused** [1] - 35:8
**focuses** [1] - 134:13
**focusing** [1] - 134:17
**folks** [1] - 30:5

**follow** [3] - 13:25,
42:19, 53:21
**followed** [6] - 11:6,
11:15, 63:2, 93:4,
104:2, 159:3
**following** [4] - 13:19,
80:10, 94:12, 106:15
**follows** [1] - 63:15
**football** [2] - 47:3,
47:4
**footnote** [5] - 89:11,
137:18, 144:18,
145:6, 178:5
**FOR** [5] - 1:1, 1:13,
2:2, 2:8, 2:12
**force** [2] - 49:17,
159:16
**forecloses** [2] - 28:8,
79:13
**foregoing** [1] - 184:9
**Foreign** [1] - 47:10
**foreign** [4] - 47:15,
147:9, 147:11,
147:16
**forget** [1] - 12:8
**forgive** [1] - 114:21
**form** [2] - 14:13,
156:23
**formal** [5] - 14:5,
14:16, 16:24, 151:5,
151:6
**former** [2] - 12:4,
25:12
**formula** [2] - 61:15,
61:18
**formulate** [1] - 146:13
**formulated** [1] -
146:12
**formulating** [1] -
145:19
**formulation** [1] - 32:2
**forth** [6] - 6:14, 7:14,
38:10, 137:6, 151:2,
166:4
**forward** [9] - 6:7, 21:1,
28:25, 29:17, 35:23,
55:10, 60:20, 67:10,
154:22
**forward-looking** [1] -
28:25
**forwards** [1] - 110:21
**foster** [1] - 148:25
**foundation** [2] - 51:2,
150:18
**foundationally** [1] -
41:21
**four** [19] - 17:14,
18:21, 30:11, 59:16,
76:2, 90:18, 101:21,
104:9, 105:15,

108:8, 113:14, 143:4, 175:17, 175:23, 175:25, 176:4, 176:17, 180:10, 180:14
**four-CEO** [1] - 180:14
**four-month** [1] - 17:14
**four-part** [1] - 143:4
**Fourth** [1] - 146:23
**fraction** [1] - 118:16
**framework** [1] - 142:14
**Francisco** [2] - 2:5, 85:17
**frankly** [3] - 38:11, 91:17, 104:16
**free** [3] - 54:13, 92:7, 135:1
**free-rate** [1] - 92:7
**freely** [1] - 149:1
**freeze** [1] - 143:9
**Freight** [1] - 3:3
**freight** [3] - 75:2, 110:7, 110:8
**FREIGHT** [1] - 1:2
**French** [1] - 52:20
**frequent** [1] - 89:12
**frequently** [2] - 40:16, 85:15
**fresh** [1] - 142:16
**Friedman** [1] - 132:25
**FRIEDMAN** [1] - 1:10
**frivolous** [1] - 42:25
**front** [2] - 61:2, 151:15
**frustration** [1] - 38:12
**frustrations** [1] - 180:22
**FSC** [1] - 65:2
**FSC's** [1] - 11:3
**FSCs** [2] - 9:24, 11:5
**FTC** [8] - 26:23, 118:24, 121:11, 122:18, 123:7, 128:14, 128:17, 154:15
**FUEL** [1] - 1:2
**fuel** [167] - 7:11, 8:23, 9:3, 9:11, 9:17, 9:25, 10:16, 10:20, 11:8, 11:23, 12:7, 12:24, 12:25, 15:18, 15:21, 17:14, 17:20, 19:8, 20:2, 24:18, 24:20, 24:24, 33:4, 33:24, 38:4, 41:13, 41:16, 42:3, 42:6, 42:7, 42:25, 43:17, 43:19, 44:10, 49:12, 49:13, 50:17, 60:13, 61:4, 61:6, 62:7, 63:2,

66:11, 76:15, 76:24, 77:3, 77:8, 80:12, 80:19, 80:21, 80:23, 81:5, 81:8, 81:9, 81:14, 81:20, 82:24, 83:4, 83:9, 83:12, 83:15, 86:20, 87:19, 88:9, 88:17, 89:10, 90:17, 91:23, 92:9, 95:23, 96:2, 96:13, 97:18, 97:21, 98:23, 99:8, 99:15, 99:20, 99:24, 99:25, 100:2, 100:11, 101:17, 101:25, 102:11, 102:16, 102:17, 102:23, 103:5, 103:6, 103:9, 104:2, 104:10, 104:16, 104:19, 105:2, 105:5, 105:13, 105:17, 105:21, 105:23, 106:8, 107:6, 107:11, 108:2, 108:6, 108:9, 108:23, 108:25, 109:3, 109:12, 109:20, 110:3, 110:4, 110:6, 110:21, 110:24, 111:3, 111:9, 111:11, 111:17, 111:25, 112:4, 112:7, 112:16, 112:19, 112:25, 113:2, 113:6, 113:9, 113:15, 113:16, 113:19, 113:23, 114:5, 114:9, 114:14, 114:24, 116:7, 151:4, 155:19, 156:7, 156:14, 163:12, 163:15, 163:18, 163:19, 163:22, 163:25, 164:4, 164:18, 165:1, 167:14, 171:17, 175:24, 176:5, 176:8, 176:13, 176:21, 177:10, 177:13, 177:17, 181:11, 181:15
**Fuel** [2] - 3:3, 103:21
**fuel-surcharge** [2] - 101:25, 112:7
**full** [6] - 94:5, 97:15, 99:10, 99:21, 161:13, 184:10
**fully** [5] - 25:13, 25:14, 25:21, 44:22, 44:25

**functioning** [1] - 121:12
**fundamental** [4] - 6:11, 17:19, 28:6, 35:13
**fundamentally** [1] - 10:19
**furtherance** [1] - 53:5
**future** [3] - 20:24, 42:3, 56:21
**futures** [2] - 8:25, 17:15

## G

**game** [1] - 159:13
**gap** [1] - 33:5
**Gardiner** [25] - 3:9, 3:17, 16:18, 20:6, 21:3, 21:6, 30:13, 51:8, 58:13, 59:13, 59:22, 72:20, 83:1, 89:22, 94:2, 102:14, 113:18, 114:7, 122:20, 128:24, 129:4, 149:18, 161:11, 178:18, 181:25
**GARDINER** [10] - 2:9, 3:16, 3:24, 4:3, 4:11, 21:5, 59:22, 149:19, 161:17, 182:1
**gas** [1] - 110:4
**gateway** [1] - 107:9
**gathered** [2] - 99:12, 108:22
**gathering** [1] - 105:14
**General** [1] - 126:6
**general** [27] - 29:14, 45:7, 49:14, 49:15, 52:3, 74:18, 74:21, 77:16, 78:24, 79:5, 79:15, 79:16, 88:9, 92:5, 120:21, 123:19, 124:1, 124:4, 125:24, 127:23, 128:2, 129:22, 135:7, 137:22, 137:23, 169:22, 171:9
**generalities** [2] - 97:11, 143:25
**generalized** [1] - 65:4
**generally** [10] - 12:21, 73:25, 76:14, 81:23, 83:9, 138:7, 141:12, 145:3, 157:8, 169:14
**genuinely** [2] - 89:25, 135:17

**German** [4] - 147:8, 153:13, 153:16, 153:21
**germane** [2] - 20:1, 75:19
**Germany** [6] - 46:13, 46:16, 152:22, 152:24, 153:13, 153:16
**Ginsburg** [1] - 126:6
**given** [9] - 7:1, 89:17, 128:10, 128:11, 130:21, 148:10, 163:6, 177:20, 179:12
**Glennon** [1] - 110:20
**glitch** [1] - 94:16
**goal** [2] - 103:15, 116:11
**golf** [1] - 131:1
**Gooden** [1] - 114:3
**goods** [6] - 23:14, 29:11, 42:2, 85:1, 85:2, 85:16
**gosh** [3] - 50:16, 94:21, 161:1
**GOSSELIN** [21] - 1:17, 68:14, 68:19, 86:9, 92:23, 94:14, 94:21, 95:1, 95:11, 95:18, 98:11, 98:14, 98:19, 100:25, 101:8, 102:9, 106:3, 132:7, 175:13, 175:18, 184:3
**Gosselin** [31] - 3:5, 41:8, 45:12, 58:22, 75:10, 77:6, 88:3, 92:19, 94:10, 98:7, 146:22, 146:23, 146:25, 147:1, 147:6, 152:18, 157:22, 164:9, 164:14, 165:24, 167:2, 168:9, 171:22, 172:10, 173:9, 173:23, 175:14, 180:1, 181:13
**governed** [1] - 42:10
**Government** [22] - 57:6, 72:14, 72:15, 77:21, 79:3, 84:23, 90:8, 92:15, 94:2, 94:4, 115:8, 115:24, 121:9, 132:3, 132:9, 166:20, 167:19, 168:2, 169:1, 170:9, 172:5, 182:11
**government** [1] -

181:14
**GOVERNMENT** [1] - 2:12
**Government's** [2] - 116:19, 131:25
**grabs** [1] - 158:10
**grain** [1] - 24:13
**granted** [1] - 180:4
**gratuitous** [1] - 51:3
**gravy** [1] - 81:8
**great** [6] - 36:18, 41:3, 94:3, 122:11, 152:21, 156:4
**greater** [2] - 76:22, 126:15
**greatest** [1] - 149:2
**greatly** [2] - 26:12, 183:9
**grind** [1] - 127:5
**group** [3] - 14:18, 71:11, 74:13
**grouped** [1] - 100:6
**grouping** [1] - 64:16
**growth** [1] - 97:20
**guarantee** [1] - 17:24
**guess** [4] - 38:15, 128:23, 145:24, 155:24
**guidance** [2] - 178:13, 183:14
**gun** [2] - 10:14, 103:2
**gymnastics** [5] - 30:5, 44:1, 48:22, 93:15, 177:11

## H

**half** [7] - 35:5, 59:18, 68:8, 83:5, 85:17, 85:19, 132:10
**hallways** [1] - 160:12
**halt** [1] - 127:5
**hand** [2] - 65:13, 82:11
**handle** [1] - 63:20
**handled** [1] - 111:21
**handling** [1] - 172:25
**handoff** [1] - 23:18
**handwritten** [4] - 103:20, 103:21, 104:18, 105:1
**hang** [1] - 67:8
**hanging** [1] - 56:14
**happy** [7] - 41:9, 59:14, 134:1, 144:25, 146:22, 147:20, 160:17
**hard** [9] - 12:12, 22:8, 23:1, 38:16, 39:4, 40:11, 127:3,

161:18, 181:8
**hardly** [2] - 17:23,
50:25
**harm** [1] - 126:2
**harmful** [1] - 126:21
**harmonized** [1] -
99:19
**harms** [1] - 126:18
**hausfeld** [1] - 1:18
**head** [6] - 7:15, 22:16,
25:12, 92:3, 173:15
**head-to-head** [1] -
22:16
**heading** [3] - 21:7,
43:23, 107:25
**healthy** [1] - 183:25
**hear** [14] - 5:4, 5:10,
36:17, 40:10, 60:19,
67:19, 68:5, 68:17,
116:4, 125:22,
132:18, 149:18,
162:21, 162:23
**heard** [18] - 40:15,
68:25, 71:18, 72:13,
72:19, 87:2, 87:4,
90:2, 90:23, 90:24,
91:18, 102:21,
114:7, 122:20,
127:2, 156:20,
175:9, 178:1
**hearing** [21] - 2:23,
69:15, 69:16, 69:22,
70:16, 70:22, 80:22,
80:25, 81:16, 82:1,
89:16, 90:16, 98:9,
125:4, 149:6,
149:12, 176:19,
179:14, 183:13,
184:13
**HEARING** [1] - 1:10
**hearings** [1] - 139:9
**hearsay** [9] - 53:3,
53:7, 55:12, 138:16,
169:13, 169:14,
170:14, 170:15,
171:10
**heart** [2] - 64:1,
151:22
**heartland** [2] - 12:13,
152:2
**hedge** [1] - 105:4
**hedging** [1] - 105:24
**heels** [1] - 100:10
**heights** [1] - 39:2
**held** [4] - 2:23, 144:8,
147:9, 184:13
**help** [1] - 183:9
**helpful** [4] - 34:11,
95:16, 103:22, 116:9
**helpfully** [1] - 156:15

**hereby** [1] - 184:8
**high** [1] - 89:8
**high-level** [1] - 89:8
**higher** [3] - 81:9,
81:10, 126:15
**highest** [3] - 88:16,
89:24, 90:1
**highlight** [10] - 70:5,
70:13, 70:21, 74:25,
75:14, 80:6, 83:3,
83:17, 90:22, 100:12
**highlighted** [5] - 71:5,
79:21, 97:2, 172:6,
172:10
**highly** [3] - 24:6,
24:15, 32:20
**highways** [1] - 23:15
**historic** [1] - 181:16
**history** [9] - 45:20,
45:21, 45:22, 45:23,
78:16, 119:6, 120:8,
143:23, 148:23
**hit** [1] - 31:22
**hits** [1] - 121:20
**hitting** [1] - 46:21
**hold** [7] - 10:17, 53:6,
64:17, 89:23, 89:25,
144:7, 154:21
**holding** [1] - 89:8
**holistic** [1] - 40:2
**home** [1] - 184:14
**honest** [1] - 142:10
**honestly** [1] - 153:5
**honor** [1] - 13:20
**Honor** [124] - 3:16,
3:17, 3:25, 4:4, 4:5,
5:14, 5:23, 6:5, 6:8,
7:21, 8:20, 12:12,
13:6, 14:23, 15:14,
17:16, 18:18, 19:4,
19:15, 21:5, 24:7,
29:20, 31:9, 34:12,
37:8, 41:11, 42:9,
47:25, 49:3, 50:24,
51:18, 58:6, 59:22,
63:17, 66:21, 66:23,
68:14, 68:19, 68:24,
69:14, 73:20, 76:11,
86:11, 87:10, 88:3,
91:11, 92:16, 92:24,
93:9, 94:6, 95:6,
95:19, 97:15, 98:14,
98:20, 100:8,
100:25, 101:4,
102:5, 106:3,
106:10, 106:22,
107:24, 109:2,
109:10, 109:22,
111:8, 112:23,
114:20, 114:22,

115:18, 116:18,
117:8, 117:12,
118:21, 123:5,
125:18, 126:4,
129:16, 132:1,
132:5, 132:6, 132:7,
132:18, 134:2,
138:24, 140:3,
143:17, 143:18,
144:24, 145:1,
146:19, 147:21,
148:3, 148:5, 148:6,
149:15, 149:19,
154:20, 157:3,
158:21, 161:6,
161:13, 161:17,
162:2, 162:16,
162:19, 163:4,
163:6, 165:6,
166:18, 172:17,
173:25, 174:2,
175:13, 178:15,
178:20, 178:24,
179:24, 182:5,
183:4, 184:1, 184:2,
184:3
**HONORABLE** [1] -
1:10
**hope** [2] - 36:20,
162:21
**hopefully** [2] - 162:24,
177:18
**hoping** [1] - 112:6
**hour** [3] - 59:17, 68:8,
132:10
**hours** [4] - 4:14, 4:15,
4:16, 4:21
**Howell's** [1] - 117:15
**huge** [3] - 9:7, 150:23,
171:23
**hundreds** [1] - 17:19
**hype** [1] - 10:13
**hypothetical** [7] -
33:22, 37:2, 37:3,
37:23, 82:8, 116:19,
116:25
**hypothetically** [2] -
116:4, 140:21
**hypotheticals** [2] -
37:2, 38:13

## I

**ICC** [18] - 78:25, 92:6,
119:1, 119:9,
119:21, 121:10,
122:7, 122:12,
124:1, 125:4,
125:20, 125:21,
126:3, 127:7,

127:19, 127:21,
159:4, 163:17
**idea** [11] - 8:4, 8:5,
29:11, 31:16, 49:1,
50:2, 52:19, 104:21,
144:12, 144:21,
156:22
**identical** [1] - 111:12
**identified** [7] - 30:11,
92:18, 106:19,
123:12, 139:6,
139:10, 181:3
**identify** [4] - 12:12,
70:8, 171:7, 171:8
**identifying** [1] - 32:8
**ignore** [2] - 64:18,
65:16
**ignored** [1] - 79:11
**ignoring** [1] - 88:14
**ii** [1] - 53:25
**II** [6] - 28:21, 46:7,
46:12, 130:6,
130:12, 130:19
**illegal** [4] - 153:1,
153:3, 167:1, 173:6
**illegality** [1] - 155:1
**illegitimate** [1] - 42:24
**illustrate** [2] - 31:6,
36:25
**illustrates** [1] - 25:13
**illustrations** [1] - 8:13
**illustrative** [1] - 60:2
**imagine** [3] - 19:14,
19:16, 38:17
**Imam** [1] - 170:13
**immediately** [4] -
63:15, 110:21,
176:4, 176:6
**immune** [2] - 168:24,
174:22
**immunities** [2] -
122:24, 128:9
**immunity** [15] - 35:19,
119:11, 125:16,
126:3, 126:20,
129:4, 144:13,
147:13, 148:12,
148:24, 153:3,
153:14, 169:3,
174:19
**immunized** [4] -
121:4, 121:5,
147:10, 153:5
**impact** [1] - 133:16
**imperative** [1] -
152:12
**implement** [2] -
125:21, 163:15
**implementation** [2] -
107:5, 126:12

**implemented** [2] -
103:12, 127:24
**implementing** [2] -
90:17, 176:6
**implicate** [2] - 87:7,
109:9
**implicated** [1] - 8:11
**implication** [1] - 104:7
**implications** [1] -
84:17
**implied** [1] - 122:10
**important** [14] - 30:2,
30:24, 38:20, 40:21,
51:9, 71:17, 71:19,
72:22, 79:19,
101:23, 140:13,
148:7, 152:11,
168:22
**impose** [5] - 92:5,
97:18, 98:23,
102:19, 117:2
**imposing** [1] - 24:20
**impossible** [2] -
15:21, 107:2
**impression** [1] - 50:11
**improper** [2] - 30:19,
48:8
**Improvement** [1] -
47:11
**improving** [1] - 60:10
**in-person** [1] - 17:25
**inaccurate** [1] - 93:16
**inadmissibility** [5] -
59:3, 137:7, 137:9,
155:7, 174:4
**inadmissible** [3] -
138:15, 174:8, 174:9
**incentive** [2] - 76:18,
122:9
**incidental** [2] -
172:12, 172:14
**include** [13] - 18:21,
76:8, 83:6, 88:22,
94:7, 94:8, 106:11,
107:5, 112:12,
113:6, 118:2,
144:21, 168:19
**included** [8] - 72:11,
96:18, 97:2, 97:3,
97:22, 102:13,
123:9, 175:7
**includes** [3] - 166:25,
168:1, 173:5
**including** [14] - 12:24,
12:25, 24:24, 25:6,
33:24, 72:2, 72:5,
112:16, 116:10,
117:23, 127:16,
158:20, 159:6,
184:16

**inclusive** [3] - 45:15, 48:19, 176:13
**incomplete** [4] - 117:18, 128:23, 129:4, 129:12
**inconceivable** [2] - 48:11, 118:21
**inconsistent** [6] - 83:14, 90:4, 119:3, 158:25, 159:1, 173:12
**inconvenient** [1] - 65:17
**Incorporated** [1] - 3:8
**increase** [13] - 13:9, 17:14, 42:2, 77:16, 80:11, 80:17, 83:15, 87:20, 109:21, 131:13, 131:14, 131:15, 163:16
**increased** [2] - 9:24, 125:25
**increases** [14] - 78:24, 79:6, 92:5, 103:12, 120:21, 123:20, 124:1, 124:4, 125:23, 125:24, 127:23, 128:2, 129:22, 181:12
**incredible** [1] - 130:21
**incredibly** [1] - 152:25
**incremental** [1] - 116:6
**indeed** [2] - 51:24, 57:19
**independent** [2] - 107:25, 159:5
**independently** [1] - 124:18
**indeterminate** [1] - 54:2
**index** [5] - 62:18, 102:11, 163:19, 163:22, 176:13
**indexes** [1] - 19:8
**indicated** [2] - 111:1, 142:23
**indicates** [1] - 10:9
**indication** [1] - 148:22
**indices** [1] - 103:7
**indict** [1] - 152:23
**individual** [3] - 8:6, 55:20, 92:7
**individually** [1] - 111:21
**indulgence** [1] - 177:25
**industries** [5] - 22:6, 24:12, 26:1, 128:16, 149:3

**Industry** [1] - 105:2
**industry** [23] - 21:14, 21:24, 22:6, 24:13, 24:14, 26:5, 31:12, 60:15, 62:7, 63:19, 84:25, 94:9, 101:19, 103:22, 103:23, 104:20, 105:13, 105:17, 106:8, 107:1, 117:3, 128:15
**industry-wide** [1] - 94:9
**industrywide** [4] - 99:15, 101:20, 117:5, 178:12
**infeasible** [3] - 124:2, 124:3, 127:24
**infer** [1] - 35:17
**inference** [8] - 28:16, 30:19, 49:21, 71:3, 125:8, 161:21, 161:22, 162:12
**inference-disciplining** [1] - 161:22
**inference-limiting** [1] - 161:21
**inferences** [11] - 7:4, 11:11, 26:10, 27:7, 27:23, 30:17, 52:15, 148:9, 158:7
**inferential** [1] - 12:14
**inferred** [1] - 71:7
**influential** [1] - 32:20
**inform** [3] - 10:23, 39:8, 39:9
**informally** [1] - 111:5
**Information** [1] - 178:6
**information** [7] - 103:15, 105:24, 113:2, 116:2, 116:6, 116:11, 145:11
**informing** [1] - 10:15
**informs** [1] - 45:22
**inherently** [1] - 49:10
**initial** [2] - 86:15, 116:12
**initiating** [1] - 85:21
**injected** [1] - 152:23
**inland** [6] - 147:9, 147:11, 152:22, 152:24, 153:13, 153:21
**innocent** [2] - 80:7, 81:21
**innocuous** [3] - 8:17, 50:20, 62:19
**inquiring** [1] - 89:9
**inquisitorial** [1] -

137:2
**inside** [1] - 64:23
**insist** [1] - 102:9
**instance** [4] - 36:5, 39:6, 159:3, 159:4
**instances** [1] - 143:12
**instead** [5] - 21:20, 92:8, 111:4, 150:13, 166:5
**instincts** [1] - 161:22
**instruction** [5] - 112:3, 136:14, 136:16, 136:19, 148:10
**instructive** [1] - 116:19
**instructs** [2] - 31:1, 94:4
**integrated** [1] - 19:14
**integrity** [1] - 42:6
**intend** [1] - 148:13
**intended** [20] - 7:25, 16:8, 34:15, 39:21, 48:19, 58:20, 111:6, 118:18, 118:21, 120:10, 122:21, 124:7, 125:3, 128:21, 130:1, 130:15, 131:2, 131:18, 148:21, 160:25
**intending** [4] - 10:15, 130:17, 130:19, 151:17
**intent** [2] - 117:2, 122:6
**interactions** [2] - 60:4, 117:5
**interchange** [8] - 24:1, 24:2, 24:17, 25:17, 27:17, 46:2, 115:11
**interchanges** [2] - 127:23, 128:2
**intercompetitor** [1] - 117:1
**interdefendants** [1] - 117:1
**interdependent** [1] - 39:17
**Interest** [3] - 137:4, 141:12, 149:5
**interest** [2] - 147:22, 178:10
**interested** [2] - 65:9, 66:8
**interesting** [2] - 29:21, 44:21
**interference** [1] - 184:17
**interline** [303] - 6:21,

7:12, 7:13, 9:7, 10:6, 10:8, 11:15, 12:2, 12:7, 12:10, 12:15, 13:1, 13:10, 13:21, 14:5, 14:7, 14:8, 16:3, 16:17, 17:6, 18:6, 19:19, 20:17, 21:11, 21:16, 21:18, 21:25, 22:3, 22:12, 22:18, 23:6, 24:21, 25:4, 25:14, 25:19, 25:21, 26:6, 26:22, 26:25, 27:16, 27:22, 28:4, 28:5, 29:23, 30:20, 31:15, 31:17, 32:9, 32:20, 32:24, 33:5, 33:7, 35:2, 35:8, 35:16, 35:22, 36:2, 36:10, 36:12, 36:25, 37:21, 39:8, 42:24, 43:24, 44:5, 44:7, 44:13, 45:1, 45:6, 46:1, 46:2, 48:12, 49:3, 49:5, 49:7, 49:9, 49:14, 49:18, 50:13, 50:17, 51:3, 54:21, 55:17, 56:4, 56:5, 56:24, 57:19, 59:11, 60:9, 60:11, 60:16, 61:1, 61:5, 62:4, 62:11, 62:20, 62:25, 63:10, 65:8, 65:11, 65:12, 66:14, 66:15, 71:8, 71:23, 72:4, 72:6, 72:9, 72:12, 72:21, 72:23, 72:24, 73:9, 73:23, 73:25, 74:2, 74:12, 74:13, 74:15, 74:17, 74:18, 74:24, 74:25, 75:1, 75:5, 75:19, 75:23, 76:20, 77:1, 77:3, 77:17, 77:18, 77:24, 79:17, 80:7, 80:10, 81:22, 82:18, 83:19, 83:24, 84:13, 86:3, 86:7, 86:12, 86:17, 86:21, 87:8, 88:7, 88:11, 88:13, 90:14, 93:3, 93:5, 93:7, 93:22, 98:4, 99:17, 99:18, 100:1, 101:23, 103:25, 104:7, 105:7, 106:24, 107:9, 107:13, 107:16, 107:18, 110:7, 110:18, 113:17, 114:5, 114:16, 115:6, 115:10, 115:19,

115:25, 116:10, 116:23, 117:20, 118:3, 118:5, 118:9, 118:14, 120:6, 120:11, 121:13, 124:9, 124:15, 124:19, 127:3, 127:17, 128:13, 129:23, 129:24, 131:14, 131:16, 133:6, 133:8, 133:11, 133:15, 133:21, 133:24, 134:10, 134:16, 134:17, 134:20, 134:22, 135:4, 135:9, 135:20, 136:7, 136:11, 136:21, 136:23, 139:14, 141:12, 141:25, 142:2, 142:19, 143:1, 143:3, 143:7, 144:14, 145:16, 145:18, 145:20, 145:22, 145:25, 146:2, 146:6, 146:14, 147:18, 148:18, 150:6, 150:8, 150:12, 150:17, 151:5, 151:10, 151:11, 151:18, 152:3, 152:8, 152:9, 152:14, 152:17, 154:5, 154:12, 154:23, 154:25, 156:23, 157:6, 157:9, 157:16, 158:8, 158:21, 158:22, 159:7, 160:14, 161:3, 164:25, 166:14, 166:22, 166:25, 167:15, 167:21, 168:1, 168:3, 168:11, 168:19, 168:22, 172:7, 172:13, 172:14, 172:15, 172:24, 173:2, 173:5, 174:19, 174:24, 175:2, 175:7, 177:20, 177:22, 179:13, 179:20, 179:21, 179:22, 181:22, 181:23, 182:14, 182:21
**interlines** [1] - 13:16
**interlining** [24] - 31:23, 34:24, 39:22,

41:24, 43:5, 43:7,
43:11, 44:1, 44:8,
44:15, 44:19, 47:21,
48:5, 48:20, 55:4,
55:23, 62:24, 75:17,
78:20, 91:22,
106:12, 124:11,
160:21, 180:15
**intermodal** [1] - 113:3
**internal** [3] - 9:13,
64:21, 65:23
**internally** [6] - 10:24,
64:24, 110:11,
113:1, 119:2, 163:13
**international** [1] -
147:6
**interpret** [5] - 45:15,
127:20, 169:3,
173:18, 175:8
**interpretation** [10] -
40:13, 45:4, 45:8,
47:23, 119:2,
129:17, 130:3,
134:12, 147:17,
151:11
**interpreted** [1] -
122:12
**interpretive** [4] - 30:5,
43:25, 48:22, 93:15
**interrogatory** [12] -
6:16, 11:17, 88:22,
96:17, 105:20,
106:20, 108:21,
111:14, 114:2,
176:2, 176:10, 177:1
**interrupt** [4] - 53:6,
86:10, 94:11, 98:8
**interrupting** [1] -
86:25
**interruptions** [2] -
117:9, 184:17
**interstate** [1] - 23:15
**introduce** [1] - 169:16
**introduced** [1] -
178:13
**introduction** [1] - 31:4
**introductory** [1] - 7:22
**intuition** [1] - 34:24
**invariably** [1] - 160:3
**invisible** [1] - 36:20
**invitation** [2] - 37:15,
149:5
**invite** [1] - 123:7
**invocation** [1] -
178:23
**invoice** [3] - 85:7,
85:9, 85:11
**invoke** [1] - 107:17
**invoking** [1] - 138:12
**involve** [5] - 38:9,

47:14, 74:9, 137:17,
140:17
**involved** [11] - 15:10,
26:14, 47:16, 47:17,
74:16, 75:6, 87:7,
147:6, 147:7, 153:13
**involves** [2] - 115:9,
136:17
**involving** [1] - 9:13
**irreconcilable** [1] -
90:6
**irrelevant** [1] - 52:8
**isolation** [2] - 36:6,
91:17
**issue** [46] - 6:14, 8:24,
14:11, 17:23, 18:3,
20:19, 27:25, 29:14,
29:21, 30:15, 32:13,
32:14, 33:9, 41:20,
43:3, 43:4, 44:23,
45:12, 47:12, 51:20,
52:2, 64:1, 65:19,
65:25, 69:2, 73:3,
73:13, 75:5, 76:5,
91:8, 94:5, 127:14,
132:19, 134:14,
138:20, 147:21,
161:4, 165:9, 169:7,
169:12, 169:15,
181:1, 183:10
**issues** [19] - 20:10,
20:11, 20:12, 20:14,
20:23, 23:17, 32:21,
43:24, 45:7, 59:8,
67:2, 133:25,
140:20, 142:17,
143:22, 150:22,
155:14, 173:17
**item** [5] - 9:5, 45:23,
63:22, 101:17,
154:17
**items** [3] - 97:3,
102:13, 106:19
**itself** [42] - 8:8, 20:18,
28:18, 30:15, 32:4,
36:2, 36:13, 37:21,
39:3, 39:5, 48:13,
50:3, 50:22, 57:1,
58:3, 58:17, 59:25,
60:5, 60:22, 61:10,
62:2, 62:10, 62:13,
62:20, 62:22, 63:12,
64:4, 66:21, 73:10,
75:12, 96:1, 133:16,
139:17, 139:24,
142:7, 142:24,
143:14, 160:22,
166:15, 167:7,
167:10, 167:12

J

**jacket** [1] - 36:20
**January** [2] - 44:3,
83:8
**Japan** [2] - 46:14,
46:15
**jargon** [1] - 30:8
**jargony** [1] - 183:22
**John** [5] - 62:6,
105:11, 106:9,
113:21, 114:2
**join** [1] - 148:3
**joined** [1] - 20:15
**joint** [70] - 10:18,
10:22, 14:9, 14:13,
17:18, 17:20, 22:7,
22:19, 23:6, 26:15,
27:1, 27:15, 29:6,
42:1, 42:4, 42:14,
42:21, 44:11, 44:14,
84:12, 84:15, 84:18,
86:2, 86:4, 86:6,
86:14, 86:19, 87:5,
87:23, 93:3, 97:25,
98:5, 106:13, 120:6,
120:19, 120:20,
122:1, 122:15,
123:23, 124:17,
125:9, 126:21,
127:19, 129:8,
129:23, 141:17,
141:18, 144:8,
144:24, 145:2,
145:15, 145:18,
145:19, 146:3,
146:6, 151:2,
151:22, 154:7,
154:8, 156:18,
156:24, 157:11,
157:20, 157:24,
159:7, 168:23,
177:22, 178:7
**joint-line** [1] - 159:7
**judge** [5] - 53:2, 65:2,
113:15, 149:11,
170:21
**JUDGE** [1] - 1:11
**Judge** [6] - 56:20,
117:14, 132:25,
152:21, 153:11,
170:12
**judgment** [11] - 7:17,
19:4, 27:12, 52:14,
70:12, 71:1, 73:14,
103:4, 161:20,
180:3, 180:4

**judgments** [1] - 7:3
**July** [4] - 62:4, 83:8,
105:10, 106:17
**June** [1] - 104:25
**jury** [4] - 16:12, 31:2,
128:8, 160:25
**Justice** [20] - 2:14,
4:17, 20:22, 33:11,
40:16, 40:19, 42:18,
51:20, 57:22,
118:23, 122:18,
123:7, 125:25,
126:10, 127:7,
130:23, 139:3,
149:23, 155:10,
181:7
**justice** [4] - 51:12,
51:15, 107:21,
162:10
**Justice's** [1] - 125:4
**justified** [2] - 42:19,
176:20
**justify** [1] - 58:8

K

**Kagan** [1] - 40:16
**Kansas** [1] - 65:2
**keep** [1] - 132:10
**KENT** [1] - 2:9
**Kent** [4] - 3:9, 3:17,
21:5, 59:22
**key** [9] - 20:10, 25:19,
29:22, 30:11, 34:24,
35:22, 83:10,
100:12, 135:10
**kgardiner@crowell.
com** [1] - 2:11
**kicked** [1] - 9:25
**kind** [17] - 6:1, 13:13,
14:11, 22:6, 22:10,
24:14, 26:15, 34:23,
39:1, 43:13, 52:14,
61:20, 84:10,
151:16, 153:10,
162:4, 162:5
**kinds** [9] - 24:24, 26:4,
29:12, 135:6, 136:6,
142:17, 145:12,
157:8, 181:10
**knees** [2] - 56:16,
81:14
**knowing** [1] - 99:10
**known** [2] - 108:2,
156:24
**knows** [3] - 24:16,
24:17, 154:6
**Kurt** [1] - 111:18

L

**lacked** [1] - 155:17
**laid** [1] - 164:21
**land** [1] - 147:16
**landscapers** [1] -
114:21
**language** [22] - 28:22,
33:14, 34:20, 52:9,
60:12, 61:22, 62:5,
62:12, 63:1, 63:15,
64:7, 69:6, 69:7,
73:2, 79:13, 90:6,
90:13, 107:4, 134:1,
152:13, 158:11,
168:8
**Lanigan** [7] - 62:6,
65:7, 105:11, 106:9,
106:16, 113:21,
114:2
**large** [4] - 25:6, 26:17,
82:19, 141:14
**largely** [4] - 21:15,
69:16, 79:11, 98:25
**larger** [7] - 28:10,
95:22, 100:13,
112:18, 114:19,
116:11, 123:2
**last** [7] - 17:25, 64:10,
66:24, 88:25, 129:5,
137:7, 175:4
**late** [3] - 112:3, 113:9,
119:24
**Latham** [1] - 2:4
**laundering** [1] -
150:16
**law** [14] - 42:11, 42:14,
55:9, 59:4, 66:20,
69:2, 78:10, 137:13,
153:6, 154:7, 155:5
**lawful** [9] - 11:5, 57:4,
129:10, 133:5,
133:23, 140:7,
140:10, 140:12,
144:8
**lawfully** [3] - 27:18,
50:2, 129:8
**laws** [19] - 34:19,
73:11, 73:16, 73:18,
93:8, 93:25, 95:4,
116:15, 119:21,
121:5, 129:14,
139:17, 139:19,
139:25, 148:12,
166:16, 167:7,
167:13, 170:23
**lawyering** [1] - 98:19
**lawyers** [7] - 46:9,
63:22, 64:3, 89:13,

161:19, 183:6,
183:20
**lay** [3] - 51:2, 149:11,
164:7
**lead** [12] - 11:4, 21:3,
27:17, 27:23, 39:19,
44:17, 50:20, 58:15,
62:6, 101:9, 105:12,
169:19
**lead-in** [1] - 101:9
**leads** [3] - 66:17,
160:3, 162:6
**leapfrogging** [1] -
162:12
**learn** [1] - 112:10
**learned** [2] - 110:23,
113:20
**least** [13] - 18:21,
30:1, 35:9, 56:13,
59:5, 89:12, 139:2,
141:15, 159:22,
162:22, 167:17,
168:6, 172:2
**leave** [2] - 114:25,
181:18
**led** [2] - 12:16, 26:18
**left** [4] - 37:25, 80:15,
98:21, 129:12
**legal** [5] - 25:25,
57:14, 59:7, 102:24,
183:21
**legislation** [1] - 45:24
**legislative** [10] - 21:8,
45:20, 45:21, 45:23,
57:24, 58:19,
143:22, 148:22,
150:19
**legitimate** [5] - 26:9,
61:1, 61:5, 73:18,
91:2
**LEITCH** [20] - 2:13,
132:1, 132:5,
132:17, 132:22,
132:25, 136:15,
138:24, 139:21,
143:20, 145:17,
145:23, 146:1,
146:5, 146:8, 148:2,
149:14, 182:4,
182:7, 182:18
**Leitch** [6] - 3:10,
132:15, 133:1,
150:25, 178:18,
182:2
**length** [1] - 72:20
**lengths** [1] - 41:3
**less** [15] - 32:7, 44:24,
65:21, 89:12, 94:22,
99:17, 101:22,
101:24, 109:25,

122:23, 131:3,
142:8, 150:21,
156:17, 183:22
**lessen** [1] - 158:22
**level** [13] - 15:15,
38:21, 38:24, 39:23,
55:20, 58:12, 89:8,
109:8, 118:25,
159:17, 176:8,
176:23, 177:7
**levels** [4] - 88:16,
109:4, 121:18,
181:16
**liability** [3] - 52:14,
76:6, 124:8
**liaison** [1] - 117:13
**liberties** [1] - 93:18
**lies** [1] - 61:10
**light** [3] - 31:14, 71:3,
183:3
**likely** [3] - 82:7, 111:4,
142:22
**likewise** [1] - 14:6
**limit** [1] - 128:19
**limitation** [3] - 99:17,
147:23
**limitations** [5] - 35:20,
105:19, 106:24,
184:15, 184:18
**limited** [37] - 7:18,
14:17, 18:23, 48:12,
64:16, 69:17, 79:17,
82:5, 90:19, 91:8,
101:22, 103:1,
107:1, 107:16,
114:11, 115:6,
133:3, 133:19,
133:20, 134:19,
141:12, 143:1,
143:7, 144:13,
150:5, 150:7,
164:24, 164:25,
167:20, 168:3,
170:25, 172:2,
178:7, 182:13,
182:15, 184:16
**limiting** [5] - 136:14,
136:16, 136:19,
148:20, 161:21
**Linda** [1] - 25:11
**line** [74] - 3:7, 17:10,
29:6, 44:11, 44:14,
61:17, 66:11, 84:12,
84:15, 84:19, 86:3,
86:4, 86:6, 86:14,
86:19, 87:3, 87:5,
87:23, 87:25, 93:5,
97:25, 98:5, 106:13,
110:9, 112:17,
115:10, 118:4,

119:23, 120:5,
120:6, 120:18,
120:19, 120:20,
121:25, 122:1,
122:14, 122:15,
123:23, 124:10,
124:16, 124:17,
124:19, 124:20,
125:9, 125:10,
127:4, 127:15,
127:19, 127:22,
128:1, 129:22,
129:23, 131:15,
141:8, 141:14,
141:21, 144:25,
145:2, 145:15,
145:19, 146:6,
151:2, 156:24,
157:11, 157:20,
157:25, 159:7,
177:21, 177:22,
178:7, 178:23
**lines** [1] - 21:22
**linguistic** [1] - 48:22
**link** [2] - 9:12, 21:19
**linking** [1] - 162:9
**links** [1] - 162:11
**Liquids** [1] - 155:23
**list** [3] - 20:3, 56:3,
97:2
**listen** [1] - 59:20
**listening** [3] - 98:15,
120:25, 132:15
**literally** [2] - 11:25,
67:8
**LITIGATION** [1] - 1:3
**litigation** [2] - 18:8,
148:17
**Litigation** [1] - 3:3
**live** [2] - 51:16, 67:17
**lived** [1] - 87:2
**LLC** [1] - 1:5
**LLP** [2] - 2:4, 2:9
**local** [31] - 12:16,
30:22, 32:11, 32:22,
32:25, 33:6, 44:25,
45:7, 49:6, 49:9,
49:15, 49:20, 66:5,
66:11, 66:12, 75:3,
75:19, 75:22, 75:24,
77:25, 87:25, 110:7,
110:8, 135:5, 147:8,
150:22, 157:7,
167:1, 173:6, 179:22
**lock** [1] - 81:7
**log** [1] - 3:19
**logic** [6] - 16:14, 28:6,
31:6, 54:16, 153:24,
159:18
**logical** [3] - 29:1,

57:11, 58:7
**login** [1] - 4:6
**logistical** [2] - 112:23,
114:16, 145:10
**long-term** [1] - 97:19
**Look** [1] - 40:24
**look** [42] - 9:1, 17:10,
17:25, 19:1, 26:24,
36:3, 36:6, 39:14,
42:23, 46:8, 50:15,
60:8, 65:22, 67:9,
71:19, 73:1, 73:2,
74:4, 74:5, 79:8,
79:9, 79:20, 80:3,
80:6, 81:4, 81:18,
82:2, 87:15, 90:10,
94:4, 100:5, 122:25,
125:5, 125:6, 130:5,
138:4, 166:8,
166:19, 167:4,
169:8, 175:22
**looked** [3] - 76:21,
91:16, 167:24
**looking** [11] - 6:7,
28:25, 34:14, 35:15,
39:16, 100:23,
109:23, 140:16,
165:13, 169:18,
170:4
**looks** [3] - 4:5, 63:17,
173:18
**loopholes** [3] - 119:1,
120:17, 122:19
**loosened** [1] - 36:20
**Los** [1] - 124:13
**lose** [3] - 48:6, 54:6,
58:1
**loss** [1] - 126:14
**lost** [1] - 153:14
**Loth** [6] - 2:18, 3:11,
67:23, 183:15,
183:24, 185:1
**LOTH** [1] - 184:8
**loud** [1] - 39:4
**louder** [1] - 132:21
**Louis** [1] - 124:14
**love** [2] - 60:12, 63:7
**low** [4] - 10:4, 83:9,
171:17, 177:17
**lower** [4] - 83:11,
109:8, 109:19, 177:7
**lower-level** [2] -
109:8, 177:7
**lowered** [2] - 83:13,
103:9
**lumber** [1] - 24:13
**lump** [1] - 38:22
**lumped** [2] - 8:7,
61:23
**lumping** [1] - 61:25

57:11, 58:7
**lunch** [1] - 67:16

**M**

**machine** [1] - 2:21
**Madison** [1] - 1:15
**magic** [1] - 58:23
**mainstream** [1] -
52:12
**maintain** [1] - 100:4
**maintained** [3] - 11:8,
70:13, 121:17
**major** [4] - 20:14,
80:22, 131:9
**majority** [8] - 22:21,
23:5, 41:19, 85:20,
86:17, 87:4, 157:1,
158:1
**management** [7] -
20:1, 70:6, 150:12,
151:10, 151:18,
182:14, 182:21
**manager** [2] - 19:17,
19:18
**managing** [2] - 49:7,
128:13
**manner** [3] - 46:5,
109:4, 184:22
**map** [2] - 22:5, 22:14
**March** [11] - 8:23,
9:12, 11:23, 18:1,
43:16, 60:7, 81:6,
101:16, 108:8,
109:15, 111:19
**marginally** [1] - 10:6
**margins** [1] - 76:17
**mark** [1] - 108:16
**market** [4] - 25:17,
92:8, 143:9, 149:1
**marketing** [2] -
110:22, 113:5
**markets** [3] - 8:25,
17:15, 42:3
**marks** [1] - 14:3
**masked** [1] - 97:5
**massive** [2] - 41:22,
41:23
**match** [1] - 65:13
**matching** [2] - 104:12,
108:9
**material** [1] - 7:23
**materials** [5] - 7:18,
69:7, 100:5, 107:4,
112:8
**matter** [24] - 16:20,
41:10, 41:25, 44:11,
47:7, 58:10, 71:9,
71:10, 71:25, 76:5,
105:6, 127:16,

137:19, 139:1, 139:11, 145:25, 152:14, 152:15, 153:7, 156:18, 158:1, 163:7, 172:7
**matters** [12] - 6:21, 51:1, 56:7, 56:13, 56:20, 59:5, 75:19, 76:2, 90:7, 94:3, 157:12
**maximize** [2] - 10:16, 123:19
**maximum** [1] - 29:5
**MDL** [2] - 1:2, 117:15
**mean** [27] - 19:13, 39:11, 46:8, 47:15, 48:23, 53:18, 55:14, 55:16, 56:7, 57:16, 78:19, 84:16, 84:22, 85:15, 89:24, 89:25, 104:17, 120:24, 134:25, 136:12, 147:3, 150:8, 154:5, 160:1, 160:7, 167:18, 167:23
**meaning** [9] - 20:17, 20:18, 29:22, 41:1, 43:10, 45:22, 133:12, 134:3, 134:8
**meaningful** [1] - 135:5
**meaningless** [2] - 107:20, 122:5
**meanings** [2] - 60:1, 130:4
**means** [20] - 8:8, 9:24, 41:3, 41:4, 41:5, 41:9, 45:16, 47:16, 87:20, 120:25, 134:12, 134:16, 150:8, 150:11, 167:25, 168:3, 172:6, 175:10
**meant** [8] - 13:3, 45:18, 71:15, 71:16, 78:14, 79:4, 79:14, 165:1
**mechanism** [3] - 113:10, 116:2, 127:22
**medium** [1] - 157:4
**meet** [8] - 50:5, 52:16, 63:11, 91:4, 91:8, 148:18, 172:21, 172:22
**meeting** [44] - 9:2, 9:5, 9:13, 17:4, 19:7, 19:19, 38:4, 60:7, 60:17, 62:4, 62:5, 62:8, 62:10, 62:12, 62:20, 62:22, 65:1,

96:9, 101:5, 101:15, 103:18, 103:20, 104:1, 105:14, 105:21, 105:23, 106:16, 106:17, 108:5, 110:18, 113:1, 113:14, 116:12, 152:7, 160:10, 175:23, 175:25, 176:3, 180:11, 180:13, 180:14, 180:15
**meeting-related** [1] - 96:9
**meetings** [63] - 7:12, 7:13, 16:9, 16:16, 16:24, 16:25, 17:23, 17:25, 18:1, 18:10, 18:12, 18:16, 18:21, 18:23, 19:5, 19:10, 19:11, 19:13, 22:18, 60:3, 84:7, 88:16, 89:2, 89:4, 89:9, 96:22, 97:1, 97:5, 97:6, 97:10, 97:13, 99:5, 100:11, 100:16, 100:22, 101:1, 101:2, 101:11, 104:25, 106:22, 106:23, 107:2, 108:15, 108:16, 108:19, 109:1, 109:18, 112:19, 130:25, 151:6, 152:4, 156:14, 164:15, 164:17, 171:23, 172:1, 176:12, 176:15, 176:16, 179:21, 180:2, 180:6, 181:23
**meets** [2] - 23:10, 174:8
**member** [1] - 53:4
**memo** [2] - 71:4, 81:6
**mention** [3] - 12:8, 105:8, 108:14
**mentioned** [10] - 30:13, 93:3, 94:2, 96:19, 97:24, 109:12, 109:17, 116:15, 146:15, 170:9
**mentioning** [3] - 95:2, 104:9, 126:5
**merchandise** [1] - 47:5
**mere** [1] - 104:21
**merely** [1] - 182:20
**merits** [4] - 6:22,

121:2, 140:14, 173:19
**message** [1] - 181:9
**met** [6] - 19:17, 40:4, 101:25, 110:3, 116:13, 173:7
**metaphor** [1] - 140:24
**method** [2] - 9:16, 150:16
**methodologies** [1] - 43:18
**methodology** [2] - 102:1, 110:3
**methods** [1] - 145:7
**metrics** [2] - 104:16, 104:17
**MHausfeld@ hausfeld.com** [1] - 1:20
**middle** [3] - 16:4, 56:16, 122:8
**might** [28] - 13:22, 17:21, 20:8, 24:23, 28:20, 29:9, 35:20, 41:14, 50:11, 67:24, 72:7, 72:8, 109:8, 111:6, 120:13, 124:13, 128:7, 134:22, 135:25, 136:3, 139:8, 141:6, 142:3, 143:21, 144:21, 147:13, 180:20, 182:21
**mightily** [1] - 97:18
**mile** [1] - 87:23
**mileage** [15] - 64:22, 64:24, 65:2, 65:10, 65:11, 66:8, 113:15, 113:16, 113:19, 113:23, 114:5, 114:9, 114:11, 114:14, 175:24
**mileage-based** [15] - 64:22, 64:24, 65:2, 65:10, 65:11, 66:8, 113:15, 113:16, 113:19, 113:23, 114:5, 114:9, 114:11, 114:14, 175:24
**million** [1] - 25:4
**mind** [2] - 12:9, 41:10
**mindful** [1] - 94:14
**mine** [1] - 131:10
**MINERALS** [1] - 1:5
**minimal** [3] - 141:8, 142:5, 143:13
**minimize** [3] - 81:11, 121:16, 123:19
**minimum** [1] - 116:13

**minority** [2] - 86:21, 114:13
**minute** [5] - 88:4, 88:21, 94:24, 139:7, 164:10
**minutes** [18] - 4:18, 5:2, 5:6, 19:24, 59:16, 68:4, 68:8, 103:20, 104:1, 106:17, 131:22, 132:12, 161:9, 164:9, 175:15, 175:16, 178:18, 178:19
**misapprehension** [1] - 134:5
**MISC** [1] - 1:3
**Miscellaneous** [2] - 3:2, 3:15
**misleading** [1] - 106:10
**Miss** [4] - 67:23, 183:12, 183:15, 183:24
**miss** [1] - 3:13
**missed** [1] - 101:6
**Mississippi** [2] - 23:4, 24:2
**misspoke** [1] - 86:2
**misuse** [2] - 57:23, 180:25
**misused** [1] - 12:22
**mockup** [1] - 9:9
**modifier** [1] - 182:12
**modify** [2] - 5:7, 10:15
**modifying** [1] - 78:7
**moment** [9] - 10:17, 16:18, 24:8, 41:15, 42:9, 94:22, 101:24, 118:10, 159:20
**momentarily** [2] - 98:16, 109:11
**monitor** [1] - 100:4
**Montgomery** [1] - 2:5
**month** [1] - 17:14
**months** [6] - 38:3, 94:7, 96:11, 103:18, 111:8, 114:10
**months-long** [1] - 94:7
**moreover** [2] - 83:17, 171:9
**Morgan** [1] - 25:11
**Moring** [1] - 2:9
**morning** [11] - 4:4, 21:6, 22:4, 69:1, 79:21, 83:2, 90:9, 91:19, 93:14, 98:13, 98:16
**morning's** [1] - 69:3

**mosaic** [1] - 160:24
**most** [17] - 15:7, 29:21, 38:19, 39:2, 75:2, 75:4, 83:19, 84:7, 96:19, 109:4, 110:6, 111:4, 142:21, 143:12, 149:22, 157:6, 160:5
**mostly** [4] - 23:3, 44:25, 47:16, 129:2
**motion** [24] - 7:7, 7:14, 8:14, 10:13, 38:20, 40:3, 69:13, 69:19, 70:1, 70:3, 70:17, 70:18, 71:14, 80:5, 87:21, 93:1, 93:12, 159:23, 160:8, 160:19, 165:16, 173:19, 173:22, 176:11
**motions** [1] - 6:12
**mountain** [1] - 39:17
**move** [8] - 22:24, 49:22, 66:15, 109:24, 138:23, 140:4, 149:17, 180:3
**movement** [25] - 29:23, 35:8, 73:9, 74:3, 74:12, 74:15, 74:17, 75:23, 77:25, 82:13, 100:1, 114:17, 133:12, 133:24, 134:11, 134:17, 135:20, 136:7, 136:11, 136:21, 136:23, 139:14, 147:18, 152:14, 166:14
**movements** [37] - 25:19, 27:16, 29:6, 46:1, 46:2, 73:23, 73:25, 74:13, 74:15, 74:19, 75:18, 79:12, 79:17, 82:5, 82:9, 82:15, 85:1, 93:7, 93:22, 99:18, 107:16, 110:7, 110:8, 110:9, 114:5, 115:6, 115:20, 138:6, 143:5, 145:22, 146:3, 152:15, 167:21, 168:1, 168:3, 168:11, 178:7
**moves** [1] - 13:23
**moving** [4] - 15:25, 29:10, 64:23, 138:20
**MR** [109] - 3:16, 3:24, 4:3, 4:11, 5:14, 5:18, 5:21, 6:2, 12:19,

13:5, 14:22, 14:25, 18:15, 18:25, 19:22, 20:5, 21:5, 29:19, 33:19, 34:1, 34:4, 34:8, 34:11, 34:16, 36:17, 40:9, 40:21, 46:25, 47:4, 49:25, 51:17, 53:10, 53:12, 53:22, 54:15, 55:7, 59:19, 59:22, 66:23, 68:14, 68:19, 68:24, 74:10, 76:11, 78:12, 79:10, 79:25, 84:18, 85:4, 85:24, 86:8, 86:9, 87:10, 87:13, 88:25, 92:23, 94:14, 94:21, 95:1, 95:11, 95:18, 98:11, 98:14, 98:19, 100:25, 101:4, 101:8, 102:9, 106:3, 117:12, 126:8, 132:1, 132:5, 132:6, 132:7, 132:17, 132:22, 132:25, 136:15, 138:24, 139:21, 143:20, 145:17, 145:23, 146:1, 146:5, 146:8, 148:2, 149:14, 149:19, 149:21, 156:4, 161:10, 161:17, 162:19, 162:21, 162:24, 163:3, 170:18, 174:2, 175:13, 175:18, 178:20, 182:1, 182:4, 182:7, 182:18, 184:1, 184:3
**multilateral** [8] - 19:5, 19:7, 160:9, 175:19, 175:21, 176:15, 176:16
**multiple** [6] - 37:7, 75:23, 77:7, 134:21, 140:17, 166:4
**must** [14] - 27:15, 45:25, 55:25, 56:25, 81:7, 133:19, 133:20, 133:21, 173:19, 176:20, 178:7, 179:3, 179:15
**mute** [3] - 68:1, 68:11, 68:12
**mutual** [1] - 46:16

## N

**N.E.M.C** [2] - 62:8, 62:15

**name** [1] - 126:9
**namely** [1] - 88:10
**narrative** [18] - 9:19, 9:22, 11:22, 12:3, 16:4, 16:10, 43:15, 61:23, 62:1, 64:8, 96:17, 105:20, 106:20, 111:14, 160:25, 176:2, 176:10, 181:22
**narrow** [10] - 73:20, 91:4, 101:11, 103:6, 116:4, 116:21, 133:4, 169:24, 181:4, 183:1
**narrowly** [7] - 78:9, 78:10, 78:13, 78:17, 115:25, 116:22, 169:24
**national** [1] - 123:17
**National** [1] - 15:11
**nature** [2] - 107:14, 159:16
**navigation** [1] - 161:21
**nearly** [1] - 7:9
**neatly** [1] - 49:2
**necessarily** [7] - 28:16, 55:7, 135:22, 145:4, 145:12, 147:3, 182:22
**necessary** [9] - 51:10, 57:20, 128:12, 141:25, 146:11, 154:5, 154:9, 162:1
**need** [38] - 4:25, 15:1, 15:5, 17:7, 19:19, 27:10, 31:24, 37:7, 37:8, 38:5, 38:6, 42:19, 43:6, 47:15, 53:1, 54:12, 57:20, 61:21, 66:25, 70:1, 82:20, 85:9, 90:21, 92:15, 114:20, 137:23, 141:9, 141:23, 145:9, 146:11, 150:20, 158:5, 158:6, 161:3, 165:9, 172:18
**needed** [3] - 70:17, 107:5, 128:5
**needs** [3] - 13:11, 53:2, 102:12
**negligent** [1] - 43:21
**negotiate** [1] - 157:15
**negotiating** [1] - 146:13
**negotiations** [1] - 92:7
**neighbor** [1] - 48:14
**neighbor's** [1] -

114:21
**NEMC** [6] - 105:14, 106:6, 106:16, 160:10, 175:23
**NEMC/SOMC** [1] - 65:1
**neuter** [1] - 8:1
**neutral** [5] - 114:15, 133:22, 141:10, 141:15, 151:19
**neutralizes** [1] - 81:12
**neuwirth** [1] - 155:17
**NEUWIRTH** [21] - 1:14, 5:14, 68:24, 74:10, 76:11, 78:12, 79:10, 79:25, 84:18, 85:4, 85:24, 86:8, 87:10, 87:13, 88:25, 101:4, 162:19, 162:21, 162:24, 163:3, 170:18
**Neuwirth** [28] - 3:4, 4:23, 5:15, 5:17, 67:14, 67:19, 67:22, 68:5, 68:23, 74:7, 86:9, 86:18, 86:25, 92:23, 93:2, 96:18, 97:24, 107:19, 108:14, 109:12, 109:17, 116:15, 160:16, 161:8, 162:20, 179:12, 179:18, 181:13
**Neuwirth's** [2] - 178:23, 179:15
**never** [19] - 27:6, 46:15, 58:17, 61:18, 62:15, 62:17, 63:16, 75:18, 87:2, 87:4, 87:11, 99:8, 108:1, 109:3, 150:14, 150:15, 160:11, 176:22, 179:5
**nevertheless** [3] - 31:13, 46:4, 147:9
**new** [14] - 10:2, 12:1, 18:13, 29:2, 29:4, 104:12, 110:21, 110:24, 111:17, 111:19, 111:25, 117:14, 120:15, 180:24
**New** [3] - 1:15, 22:10, 23:14
**next** [32] - 7:20, 9:8, 10:10, 11:9, 14:6, 20:8, 22:2, 23:9, 25:7, 25:8, 25:10, 25:24, 32:6, 37:16, 37:22, 41:17, 44:2,

44:9, 47:25, 49:22, 53:19, 62:8, 80:15, 98:25, 105:14, 106:10, 112:22, 113:20, 117:10, 131:25, 174:17
**NFTA** [1] - 176:4
**NO** [1] - 1:2
**nobody** [4] - 32:13, 55:20, 82:9, 180:9
**non10706** [2] - 160:9, 179:3
**noncompeting** [1] - 29:5
**nonderogatory** [1] - 91:18
**none** [4] - 106:6, 106:22, 165:15, 176:13
**nonenforcement** [1] - 99:23
**nonetheless** [1] - 148:9
**noninterline** [2] - 49:3, 128:14
**nonoffering** [1] - 137:21
**nonparticipating** [3] - 146:12, 146:14, 158:20
**nonprotected** [1] - 71:2
**nonsense** [1] - 16:14
**nonspecific** [1] - 135:7
**nontrivial** [1] - 150:10
**Norfolk** [16] - 9:23, 44:4, 80:9, 81:1, 81:24, 85:16, 101:15, 103:19, 103:24, 105:24, 110:20, 111:17, 111:18, 111:24, 113:8, 118:15
**norm** [2] - 138:6, 154:14
**normal** [13] - 32:18, 45:19, 48:21, 151:8, 152:4, 153:18, 155:12, 170:7, 171:15, 172:3
**normally** [1] - 170:24
**Normandy** [1] - 46:8
**nos** [1] - 31:23
**notable** [1] - 17:22
**notably** [1] - 165:3
**NOTE** [2] - 2:23, 184:13
**note** [22] - 9:16, 16:3, 38:11, 50:13, 50:15,

86:23, 96:9, 98:1, 100:8, 101:23, 103:3, 109:13, 114:2, 125:11, 140:13, 142:22, 144:6, 148:15, 155:2, 166:21, 177:24, 178:4
**notebook** [2] - 6:1, 100:18
**noted** [10] - 21:17, 22:14, 41:18, 64:25, 105:23, 140:3, 142:21, 148:15, 170:20, 170:22
**notes** [7] - 93:15, 103:20, 103:21, 104:18, 104:25, 105:1, 184:10
**noteworthy** [1] - 108:6
**nothing** [30] - 10:21, 17:3, 18:3, 38:13, 47:6, 53:16, 53:20, 53:23, 66:13, 75:21, 78:21, 80:23, 89:24, 105:5, 114:4, 146:15, 151:1, 152:8, 156:17, 158:20, 159:1, 160:15, 163:25, 166:1, 172:3, 178:1, 179:24, 181:24, 182:1, 182:4
**notion** [5] - 26:15, 27:20, 88:12, 175:1, 176:20
**novel** [1] - 52:2
**November** [2] - 70:6, 70:15
**nowadays** [1] - 13:15
**nowhere** [3] - 40:12, 63:14, 63:23
**NS** [20] - 9:13, 10:5, 10:14, 11:6, 11:7, 17:2, 22:11, 22:15, 60:8, 60:14, 60:17, 61:17, 62:21, 87:24, 101:18, 101:22, 105:10, 105:18, 110:22, 111:11
**NS-UP** [1] - 62:21
**nuance** [1] - 55:24
**nuanced** [1] - 26:9
**null** [1] - 184:21
**nullify** [1] - 8:1
**number** [9] - 9:12, 25:6, 67:2, 76:22, 106:4, 133:25, 139:22, 171:23
**numbers** [5] - 47:23,

100:19, 103:10,
157:11
**numerous** [2] - 96:13,
104:11
**nuts** [2] - 19:12, 49:13
**nuts-and-bolts** [1] -
19:12
**NW** [4] - 1:18, 1:22,
2:10, 2:14
**NY** [1] - 1:15

## O

**o'clock** [1] - 67:16
**objected** [1] - 51:2
**objecting** [2] - 52:8,
55:14
**objection** [2] - 55:11,
55:16
**objectionable** [1] -
42:8
**objections** [1] - 52:2
**objective** [1] - 152:16
**obligation** [1] - 116:16
**obstructing** [1] -
95:14
**obtained** [1] - 12:1
**obviously** [8] - 8:24,
15:7, 16:8, 30:3,
47:21, 130:25,
175:22, 176:16
**occasion** [1] - 158:9
**occasionally** [1] -
18:16
**occasions** [1] - 104:11
**occur** [4] - 19:19,
37:5, 37:6, 134:18
**occurred** [6] - 16:9,
18:1, 106:5, 160:11,
177:6, 177:8
**occurrence** [1] - 107:8
**occurring** [3] - 96:2,
96:14, 177:3
**occurs** [3] - 19:20,
43:19, 62:15
**October** [3] - 6:23,
112:25, 113:9
**odd** [1] - 137:9
**oddity** [1] - 20:21
**OF** [2] - 1:1, 1:10
**offense** [1] - 133:18
**offer** [7] - 17:6, 23:23,
24:21, 137:11,
146:17, 146:18,
173:23
**offered** [1] - 171:11
**offerings** [3] - 22:23,
26:6, 27:22
**offers** [1] - 108:18

**Official** [1] - 2:18
**official** [4] - 103:20,
104:1, 181:14, 185:1
**often** [10] - 13:17,
15:17, 24:11, 33:3,
42:5, 76:8, 99:10,
107:10, 112:19,
183:19
**oil** [2] - 8:25, 10:2
**old** [1] - 10:3
**omnibus** [1] - 55:22
**once** [12] - 10:24,
19:16, 50:8, 52:1,
62:11, 63:12, 64:2,
64:6, 65:15, 89:19,
150:24, 171:25
**one** [137] - 5:25, 11:3,
11:6, 14:19, 14:21,
14:22, 15:11, 15:16,
19:2, 21:20, 22:12,
22:23, 23:18, 23:19,
23:20, 23:22, 24:9,
31:3, 31:7, 32:17,
33:18, 35:6, 35:25,
37:4, 37:12, 37:15,
37:19, 38:7, 38:18,
38:19, 39:13, 40:2,
40:7, 40:9, 41:7,
42:21, 42:22, 42:23,
43:3, 44:9, 44:10,
45:3, 45:8, 45:11,
46:6, 47:18, 48:20,
48:25, 50:19, 51:13,
52:4, 52:18, 54:3,
54:11, 55:3, 58:23,
60:17, 62:13, 62:21,
64:14, 64:16, 64:25,
67:16, 67:20, 71:16,
73:6, 74:7, 74:8,
75:3, 75:23, 76:5,
76:9, 78:6, 79:1,
80:8, 82:25, 85:4,
85:11, 85:17, 86:9,
86:11, 86:12, 88:20,
88:21, 89:1, 90:12,
90:21, 100:22,
106:2, 106:14,
109:8, 111:15,
113:9, 114:21,
118:5, 121:2, 123:1,
124:15, 125:9,
125:19, 125:22,
127:1, 127:12,
127:13, 131:8,
131:12, 135:10,
136:8, 138:1, 138:9,
139:22, 140:23,
145:18, 146:18,
148:14, 150:2,
153:6, 156:24,

157:15, 159:11,
159:18, 160:5,
162:25, 166:11,
167:18, 175:20,
178:24, 180:11,
180:22
**one-off** [1] - 180:11
**one-stop-shop** [1] -
23:22
**ones** [6] - 13:17,
19:10, 52:18, 75:5,
153:6, 170:8
**ongoing** [1] - 83:15
**online** [1] - 100:24
**opening** [10] - 4:14,
4:16, 4:20, 4:22,
4:25, 5:3, 71:4,
145:7, 147:22,
159:19
**openings** [1] - 5:7
**operate** [1] - 166:7
**operating** [1] - 125:25
**operational** [3] -
18:25, 23:17, 177:9
**opinion** [4] - 91:12,
153:11, 155:9, 165:7
**opinions** [3] - 164:3,
164:7, 165:21
**opportunities** [1] -
112:9
**opportunity** [6] -
63:19, 63:20,
161:11, 161:14,
162:3, 174:1
**opposed** [4] - 38:8,
42:12, 97:12, 118:24
**opposing** [1] - 174:10
**opposite** [4] - 119:3,
129:18, 130:4,
138:18
**opposition** [5] - 10:12,
83:4, 86:15, 96:18,
178:4
**option** [1] - 157:14
**order** [18] - 4:19,
12:23, 13:10, 17:6,
25:18, 67:4, 67:5,
70:4, 78:9, 80:17,
91:13, 133:18,
134:2, 140:1, 141:1,
153:4, 157:24,
176:17
**ordered** [1] - 176:7
**orders** [2] - 2:23,
184:14
**ordinarily** [6] - 35:9,
35:22, 57:19, 57:21,
57:23, 57:25
**ordinary** [9] - 40:14,
41:1, 41:6, 43:9,

46:3, 48:21, 138:13,
144:1
**organizations** [2] -
105:12, 158:18
**organized** [1] - 36:22
**origin** [1] - 11:19
**original** [6] - 44:23,
67:13, 70:17, 70:18,
87:15, 89:16
**originally** [2] - 137:17,
174:20
**originated** [1] - 11:7
**otherwise** [7] - 58:6,
125:16, 129:3,
133:22, 138:17,
174:7, 174:15
**ought** [1] - 128:10
**ourselves** [3] - 51:2,
55:18, 69:11
**outcome** [4] - 63:4,
63:8, 104:4, 142:1
**outcry** [3] - 99:16,
105:3, 105:7
**outline** [1] - 20:25
**outlined** [1] - 116:11
**output** [1] - 143:8
**outraged** [1] - 102:17
**outset** [1] - 142:12
**outside** [6] - 8:4,
56:14, 124:18,
130:1, 130:13, 181:6
**outweigh** [1] - 126:18
**outweighed** [1] -
126:2
**overall** [6] - 33:18,
75:2, 76:25, 112:16,
147:10, 154:19
**overlap** [2] - 100:9,
150:23
**overlapping** [1] -
96:13
**overlaps** [1] - 41:22
**oversight** [2] - 130:22,
131:3
**overstates** [1] -
118:12
**overstepped** [2] -
48:7, 58:2
**overt** [1] - 76:16
**overview** [1] - 29:15
**overwhelmingly** [2] -
10:6, 115:14
**own** [5] - 66:10, 83:7,
163:12
**OXBOW** [1] - 1:5

## P

**p.m** [1] - 184:4

**Pacific** [12] - 3:6, 3:21,
15:11, 44:4, 103:19,
103:24, 104:25,
110:24, 111:16,
112:1, 113:9, 157:25
**PACIFIC** [2] - 1:7, 2:2
**package** [1] - 66:18
**page** [32] - 5:22, 7:20,
9:8, 10:10, 32:6,
35:6, 37:22, 39:15,
56:3, 57:9, 60:6,
65:18, 67:3, 70:6,
77:21, 81:4, 83:4,
86:15, 89:6, 105:20,
106:10, 115:8,
116:20, 125:5,
125:7, 126:1,
128:18, 141:11,
144:4, 166:21,
176:3, 178:5
**pages** [4] - 64:11,
125:6, 137:4, 146:9
**paid** [1] - 23:15
**pains** [1] - 152:21
**pandemic** [2] - 2:23,
184:14
**papers** [3] - 55:18,
70:17, 74:25
**paragraph** [4] - 10:13,
80:15, 89:7, 130:8
**parallel** [4] - 26:15,
66:4, 116:24, 124:21
**parameters** [1] - 91:4
**parody** [1] - 110:13
**parse** [1] - 26:9
**part** [28] - 6:8, 16:25,
25:22, 30:7, 38:23,
46:18, 46:19, 49:25,
50:23, 55:13, 56:18,
56:22, 57:2, 82:19,
90:20, 96:15, 98:23,
109:25, 117:5,
120:20, 123:2,
124:6, 129:23,
143:4, 153:16,
156:25, 157:1
**partial** [1] - 147:2
**participants** [2] - 27:2,
144:21
**participate** [9] - 79:13,
82:9, 82:13, 82:16,
83:25, 129:24,
133:7, 149:6, 167:22
**participated** [11] -
79:18, 82:5, 93:23,
114:17, 115:7,
120:7, 120:9,
123:24, 168:4,
174:25, 175:1
**participates** [1] -

113:7
**participating** [12] - 74:20, 84:8, 84:20, 116:23, 133:20, 134:19, 135:9, 136:12, 149:7, 168:7, 168:13, 169:6
**participation** [2] - 144:17, 144:18
**particular** [27] - 5:23, 13:2, 14:1, 14:18, 15:16, 30:6, 33:22, 38:24, 40:5, 50:6, 58:16, 69:24, 76:20, 79:16, 80:11, 92:20, 97:5, 106:7, 107:11, 134:9, 140:20, 146:5, 147:4, 156:23, 159:17
**particularly** [6] - 13:24, 15:18, 25:15, 113:13, 130:21, 152:10
**parties** [11] - 1:12, 3:12, 7:13, 38:3, 38:9, 41:9, 83:25, 87:8, 115:10, 121:16, 138:7
**parties'** [1] - 135:23
**partner** [8] - 10:6, 10:8, 10:19, 13:1, 50:7, 65:12, 124:9, 124:19
**partners** [20] - 10:22, 16:17, 17:2, 19:19, 23:6, 23:7, 25:20, 42:15, 42:21, 49:6, 61:6, 61:18, 63:10, 65:9, 66:15, 113:18, 144:14, 151:22, 161:3
**partnership** [2] - 22:10, 22:12
**partnerships** [5] - 22:7, 22:18, 25:22, 26:23, 128:13
**parts** [2] - 28:18, 183:7
**party** [14] - 34:18, 52:8, 53:13, 53:15, 54:5, 55:14, 58:5, 58:18, 71:9, 71:23, 137:21, 174:10, 174:14, 184:22
**passing** [1] - 61:8
**passively** [1] - 120:24
**past** [1] - 11:19
**paste** [1] - 9:18
**Pat** [1] - 110:20
**PAUL** [1] - 1:10

**Paul** [1] - 110:11
**pause** [2] - 21:10, 162:1
**pauses** [2] - 4:7, 98:17
**paying** [1] - 95:22
**Pennsylvania** [3] - 1:22, 2:10, 2:14
**people** [21] - 5:1, 17:8, 17:16, 18:18, 19:20, 20:14, 25:6, 32:24, 40:11, 49:17, 76:9, 80:8, 89:18, 151:1, 151:4, 152:6, 155:4, 156:13, 156:24, 178:17, 180:6
**per** [3] - 98:5, 144:8, 144:9
**perceived** [1] - 120:17
**percent** [20] - 8:24, 17:14, 21:17, 42:2, 43:19, 86:23, 87:22, 87:24, 88:1, 99:21, 103:16, 118:9, 118:10, 118:11, 118:13, 118:16, 163:23
**percentage** [5] - 75:1, 76:25, 88:6, 163:20
**perfect** [1] - 90:12
**perfectly** [3] - 61:4, 144:3, 153:18
**perhaps** [9] - 33:7, 40:17, 48:6, 84:10, 95:13, 102:6, 118:6, 134:4, 141:24
**peril** [1] - 26:3
**period** [31] - 17:11, 17:13, 24:20, 25:3, 36:19, 39:18, 83:9, 86:22, 89:14, 91:12, 96:6, 96:10, 96:11, 97:15, 98:1, 98:22, 99:12, 99:19, 103:8, 109:13, 157:21, 157:25, 163:13, 164:14, 171:17, 172:3, 177:10, 177:14, 177:16
**permanently** [1] - 81:7
**permissible** [1] - 128:19
**permit** [2] - 127:20, 130:1
**permitted** [7] - 123:14, 126:11, 127:8, 127:15, 129:8, 130:14
**person** [7] - 17:25, 52:16, 55:10, 76:10, 99:9, 111:10, 139:18

**personal** [2] - 89:24, 178:22
**personally** [2] - 7:2, 90:1
**perspective** [4] - 28:23, 29:1, 38:16, 142:16
**persuaded** [1] - 147:24
**persuasive** [1] - 16:12
**perversely** [1] - 107:6
**Petroleum** [1] - 155:22
**phone** [3] - 76:3, 76:10, 99:10
**phrase** [10] - 29:22, 34:6, 71:5, 78:2, 134:10, 144:16, 144:22, 146:3, 147:18, 164:12
**phrased** [1] - 117:16
**phrases** [1] - 75:15
**pick** [5] - 60:2, 64:7, 76:3, 98:21, 179:16
**picked** [1] - 149:23
**picking** [7] - 69:1, 76:17, 95:4, 107:22, 112:21, 155:16, 160:17
**picture** [1] - 96:19
**piece** [13] - 7:1, 9:2, 37:11, 39:14, 40:2, 64:15, 103:2, 117:25, 160:19, 165:3, 167:9, 171:4
**piecemeal** [1] - 116:10
**pieces** [7] - 37:18, 76:19, 78:1, 167:7, 170:1, 171:7, 171:8
**piggyback** [1] - 39:7
**pitchers** [1] - 56:13
**pitching** [1] - 46:22
**pitfall** [1] - 25:25
**pixelated** [1] - 67:5
**place** [11] - 8:19, 24:2, 31:13, 42:4, 77:17, 81:15, 82:23, 83:20, 83:22, 88:19, 117:17
**placed** [2] - 137:21, 142:22
**places** [7] - 15:4, 22:19, 22:25, 97:7, 125:2, 144:4, 144:20
**placing** [1] - 137:5
**plain** [2] - 52:1, 107:3
**plaintiff** [8] - 35:18, 36:5, 54:17, 54:25, 59:9, 117:11, 139:4, 154:18
**PLAINTIFFS** [2] - 1:4, 1:13

**plaintiffs** [66] - 3:4, 4:15, 4:22, 5:11, 5:15, 6:16, 7:8, 7:16, 7:23, 8:7, 9:22, 11:2, 11:13, 16:1, 20:21, 29:25, 33:11, 33:17, 34:10, 37:24, 38:20, 42:5, 44:22, 45:14, 50:4, 50:9, 51:15, 52:10, 56:2, 59:21, 60:12, 60:23, 61:20, 62:5, 63:1, 63:16, 64:6, 64:18, 65:3, 65:16, 67:9, 68:15, 68:18, 83:3, 93:14, 102:25, 108:11, 116:15, 117:14, 132:4, 132:11, 139:5, 140:2, 143:14, 158:24, 159:21, 160:7, 161:19, 162:18, 163:5, 169:16, 169:18, 170:4, 171:3, 180:16, 181:2
**Plaintiffs** [1] - 1:6
**plaintiffs'** [16] - 6:19, 10:11, 16:7, 17:1, 25:2, 26:20, 28:9, 48:9, 60:3, 60:17, 64:11, 147:25, 148:14, 151:24, 159:13
**plan** [1] - 19:24
**plate** [2] - 56:14, 56:16
**platform** [1] - 162:5
**plausible** [1] - 58:15
**play** [2] - 85:1, 159:14
**players** [2] - 60:15, 101:19
**playing** [2] - 64:14, 141:6
**plays** [1] - 16:25
**plea** [1] - 47:18
**pleasantries** [1] - 135:1
**PLEASE** [2] - 2:23, 184:13
**pled** [1] - 64:16
**plummeting** [1] - 109:15
**plural** [1] - 20:13
**plus** [3] - 81:12, 157:13
**point** [70] - 4:10, 6:10, 7:22, 11:21, 12:18, 12:22, 16:8, 17:5, 19:4, 20:6, 25:19, 29:2, 30:24, 31:22, 35:13, 35:23, 36:24,

37:6, 40:25, 43:15, 44:23, 47:13, 47:25, 48:14, 48:25, 56:8, 57:8, 59:15, 63:17, 82:7, 85:5, 85:6, 85:7, 85:8, 87:21, 88:2, 88:21, 89:12, 90:21, 92:3, 92:16, 92:18, 102:20, 104:6, 104:9, 104:21, 107:19, 109:2, 123:11, 134:13, 134:23, 144:20, 146:20, 147:1, 148:3, 148:6, 154:11, 162:14, 165:12, 166:19, 168:16, 171:21, 174:17, 175:4, 178:22, 180:9
**pointed** [3] - 34:16, 137:16, 165:20
**pointing** [2] - 42:13, 86:18
**points** [6] - 74:11, 77:21, 146:21, 149:23, 171:13, 174:3
**policies** [4] - 100:2, 110:25, 116:8, 176:21
**policy** [5] - 52:14, 57:14, 59:8, 113:5, 123:18
**political** [2] - 81:12, 81:19
**portion** [7] - 69:3, 83:21, 84:21, 91:22, 92:1, 95:15, 172:8
**posed** [1] - 61:22
**posited** [1] - 60:16
**position** [34] - 18:4, 33:11, 37:1, 39:4, 39:6, 47:9, 54:19, 54:20, 61:21, 62:7, 64:15, 70:14, 72:10, 72:14, 74:6, 75:14, 77:15, 92:11, 105:13, 105:17, 106:8, 134:5, 135:3, 135:11, 135:15, 137:13, 137:14, 139:12, 146:24, 159:21, 170:23, 176:19, 180:9, 182:23
**positions** [1] - 135:24
**positive** [3] - 63:4, 63:8, 104:4
**possession** [1] - 8:10

**possibility** [4] - 42:7, 65:19, 79:14, 105:4
**possible** [4] - 98:10, 131:20, 149:2, 164:6
**possibly** [4] - 43:11, 43:12, 104:22, 178:11
**post** [1] - 158:4
**post-Staggers** [1] - 158:4
**potential** [10] - 31:16, 48:4, 62:7, 62:19, 105:13, 122:9, 126:14, 144:18, 144:21, 180:25
**potentially** [5] - 18:7, 26:13, 57:23, 138:17, 143:9
**potshots** [1] - 93:14
**power** [1] - 23:25
**PowerPoint** [1] - 5:22
**practical** [4] - 126:2, 126:19, 139:1, 139:11
**practically** [3] - 120:7, 120:9, 174:25
**practice** [4] - 80:24, 81:20, 164:1, 176:11
**practices** [3] - 89:10, 99:24, 102:18
**practicing** [1] - 7:22
**pragmatist** [1] - 40:25
**preceded** [1] - 161:21
**precedent** [2] - 59:4, 170:20
**precisely** [1] - 103:10
**preconditions** [1] - 138:12
**predecessor** [2] - 120:3, 122:12
**predictable** [1] - 51:21
**predominant** [1] - 150:9
**prefer** [1] - 134:2
**preliminarily** [1] - 5:12
**preliminary** [1] - 35:10
**premise** [12] - 49:1, 57:18, 58:18, 58:19, 71:21, 74:13, 78:23, 88:7, 150:19, 151:17, 154:16, 159:9
**prepared** [4] - 6:4, 31:5, 37:1, 99:25
**preponderance** [1] - 53:2
**prescribes** [1] - 64:9
**present** [2] - 3:12, 4:14
**presentation** [15] -

60:19, 64:11, 64:12, 69:3, 69:6, 82:20, 90:20, 92:2, 93:13, 93:17, 159:19, 164:10, 169:1, 175:21, 176:25
**presentations** [1] - 26:20
**presented** [2] - 93:11, 169:11
**preserve** [1] - 148:16
**pressed** [2] - 106:12, 109:2
**pressing** [1] - 146:10
**pressure** [2] - 66:15, 81:12
**pressures** [1] - 81:10
**presumption** [4] - 52:6, 58:8, 126:17, 138:5
**presumptively** [1] - 138:15
**pretty** [7] - 8:17, 23:1, 37:2, 40:3, 51:21, 51:22, 170:15
**prevailing** [2] - 26:8, 26:11
**prevent** [4] - 92:4, 116:3, 125:8, 140:8
**prevented** [3] - 79:1, 79:2, 114:4
**previous** [4] - 38:1, 97:17, 108:22, 176:25
**previously** [4] - 99:8, 108:1, 177:2, 177:6
**price** [31] - 8:23, 9:14, 10:2, 17:14, 24:19, 26:13, 33:24, 42:2, 42:15, 42:16, 80:11, 80:23, 81:7, 83:13, 97:23, 105:5, 109:12, 113:6, 116:3, 119:6, 121:16, 122:6, 122:15, 131:5, 141:18, 144:9, 148:25, 157:15, 157:16, 163:25, 181:12
**price-fixing** [1] - 144:9
**prices** [22] - 9:25, 43:19, 44:14, 82:24, 83:4, 83:11, 83:16, 103:9, 109:14, 109:19, 109:20, 111:20, 155:19, 156:5, 156:10, 156:18, 171:17, 177:10, 177:13,

177:17, 181:15
**pricing** [18] - 24:6, 24:15, 42:1, 42:17, 43:23, 48:12, 110:6, 127:11, 144:7, 151:2, 155:24, 157:13, 157:14, 159:5, 159:7, 178:7
**principal** [2] - 102:24, 149:25
**principally** [1] - 21:14
**principle** [4] - 17:16, 30:18, 45:22, 55:8
**principled** [1] - 95:20
**principles** [5] - 10:21, 30:11, 42:11, 42:14, 142:15
**private** [2] - 111:20, 111:21, 131:1
**privately** [1] - 110:23
**privilege** [2] - 138:11, 178:23
**probative** [1] - 95:5
**problem** [12] - 49:13, 49:14, 49:15, 55:13, 80:1, 95:9, 101:8, 123:12, 147:14, 182:15
**problems** [7] - 23:19, 24:3, 94:12, 123:15, 126:2, 126:19, 183:7
**procedural** [3] - 6:9, 129:10, 162:3
**proceeded** [1] - 117:22
**proceeding** [10] - 4:7, 28:15, 31:1, 33:15, 34:17, 53:13, 70:24, 80:19, 98:17, 184:4
**Proceedings** [1] - 2:21
**proceedings** [8] - 8:22, 102:16, 121:8, 121:9, 125:21, 172:1, 183:18, 184:11
**proceeds** [1] - 48:3
**process** [11] - 14:10, 14:16, 63:5, 104:5, 119:13, 155:3, 158:15, 159:25, 160:2, 160:20, 180:19
**processes** [3] - 63:3, 104:3, 104:15
**procompetitive** [6] - 133:22, 141:10, 151:19, 151:21, 161:24, 162:5
**produced** [2] - 2:21, 109:4

**product** [7] - 22:19, 22:22, 23:21, 24:22, 27:22, 32:12, 42:1
**products** [5] - 22:10, 22:11, 22:24, 24:14, 29:6
**professionally** [1] - 90:1
**Professor** [1] - 6:22
**proffered** [2] - 54:25, 169:12
**profit** [1] - 164:6
**profitability** [1] - 17:19
**profits** [2] - 10:16, 163:14
**program** [20] - 10:16, 12:1, 65:3, 65:10, 65:11, 65:12, 66:11, 90:17, 92:9, 104:12, 105:4, 105:22, 111:11, 112:7, 113:16, 113:17, 113:19, 114:9, 114:12, 116:7
**programmatic** [3] - 13:6, 15:2, 15:18
**programs** [8] - 61:4, 88:9, 99:20, 103:13, 105:6, 110:13, 114:15, 176:21
**prohibit** [3] - 123:22, 124:3, 130:17
**prohibited** [7] - 119:23, 120:4, 120:17, 123:13, 123:25, 129:21, 130:10
**prohibition** [2] - 124:2, 127:21, 176:7
**prohibits** [2] - 120:23, 160:6
**project** [1] - 64:22
**projects** [1] - 106:19
**prominently** [1] - 64:11
**promote** [5] - 21:25, 122:6, 122:21, 151:20, 162:6
**prompted** [1] - 84:11
**prong** [2] - 11:10, 142:24
**proof** [12] - 20:20, 50:24, 50:25, 51:21, 52:2, 54:4, 54:5, 54:12, 56:8, 56:12, 59:14, 91:1
**proper** [1] - 69:10
**proponent** [7] - 52:3, 57:14, 59:7, 137:20, 139:4, 155:12,

170:16
**proponents** [1] - 137:10
**proportions** [1] - 44:13
**proposal** [3] - 67:13, 120:20, 175:24
**proposals** [2] - 121:22, 122:10
**proposed** [3] - 67:4, 67:5, 101:11
**proposing** [2] - 6:7, 148:17
**proposition** [1] - 155:5
**prosecutor** [2] - 51:22, 139:4
**prosecutors** [1] - 51:16
**protect** [8] - 61:24, 71:15, 71:17, 72:25, 107:20, 116:2, 140:7, 151:17
**protected** [13] - 66:5, 71:3, 72:7, 72:9, 72:13, 74:7, 75:16, 75:18, 78:21, 119:20, 122:2, 127:11, 131:7
**protection** [40] - 12:14, 21:12, 27:10, 31:19, 35:6, 48:4, 57:24, 70:11, 70:24, 70:25, 71:6, 71:20, 72:19, 77:19, 118:1, 118:18, 118:22, 118:25, 119:8, 122:23, 128:5, 128:6, 128:21, 130:11, 130:16, 130:20, 131:3, 131:19, 133:4, 138:10, 138:13, 140:10, 154:13, 158:6, 158:14, 158:17, 162:5, 170:2, 174:23, 175:9
**protections** [19] - 48:6, 58:2, 122:24, 129:10, 129:13, 129:20, 130:25, 150:5, 156:22, 157:5, 158:12, 158:14, 158:15, 158:22, 159:9, 174:19, 175:2, 180:12, 181:17
**protects** [3] - 8:5, 81:9, 82:10
**protocol** [2] - 86:20,

98:5
**prove** [17] - 6:17, 7:23,
35:3, 35:17, 55:2,
58:18, 91:7, 103:1,
108:11, 116:16,
128:8, 139:5,
154:16, 154:19,
165:19, 171:4, 174:9
**proves** [1] - 7:11
**provide** [6] - 96:23,
103:13, 111:13,
117:3, 142:2, 161:12
**provided** [6] - 5:23,
6:17, 7:7, 125:9,
125:10, 142:3
**provides** [5] - 96:19,
129:10, 133:3,
140:10, 172:20
**providing** [6] - 116:2,
116:6, 120:13,
130:24, 141:19,
183:14
**proving** [2] - 34:25,
174:16
**provision** [27] - 29:24,
30:23, 31:8, 69:20,
69:23, 69:24, 70:20,
79:4, 112:4, 123:1,
125:2, 125:8,
125:11, 128:22,
128:25, 129:2,
129:6, 129:18,
130:4, 133:11,
140:1, 148:8, 148:9,
148:10, 148:16,
175:3, 183:3
**provisions** [4] - 31:7,
62:7, 130:22, 183:3
**prudent** [1] - 51:4
**public** [4] - 41:1,
43:10, 111:2, 111:20
**publications** [1] -
111:2
**published** [1] - 157:16
**pull** [3] - 62:5, 76:19,
79:22
**pulled** [2] - 60:12,
63:2
**punish** [1] - 116:3
**purchase** [1] - 24:10
**purported** [3] - 89:18,
100:9, 109:22
**purportedly** [2] - 69:5,
173:14
**purports** [1] - 10:13
**purpose** [11] - 7:14,
21:8, 28:11, 29:13,
31:10, 32:17, 73:19,
77:8, 79:19, 134:13
**purposely** [1] - 165:7

**purposes** [2] - 97:10,
145:10
**pursuant** [1] - 119:8
**pursue** [1] - 79:7
**pursuit** [2] - 64:19,
103:15
**pushback** [2] - 114:7,
175:25
**pushed** [3] - 66:1,
113:22, 113:24
**put** [23] - 7:16, 8:20,
14:4, 22:19, 23:14,
24:14, 41:16, 50:14,
58:18, 59:7, 64:7,
66:14, 69:9, 70:4,
82:23, 129:3,
151:14, 154:1,
154:24, 155:21,
158:12, 173:10
**puts** [3] - 18:4, 59:9,
123:10
**putting** [6] - 14:3,
16:23, 29:6, 53:23,
120:1, 180:24

## Q

**qualifiers** [1] - 180:24
**qualifying** [1] - 48:3
**questions** [14] - 6:3,
21:9, 49:23, 61:14,
61:22, 117:8,
144:24, 145:1,
146:22, 147:20,
148:5, 163:8,
167:18, 172:18
**quick** [1] - 174:3
**quickly** [2] - 60:24,
109:24
**Quinn** [1] - 1:14
**quit** [1] - 161:11
**quite** [5] - 26:9,
119:15, 137:9,
142:9, 153:5
**quotation** [1] - 14:3
**quote** [24] - 26:23,
28:7, 45:25, 53:25,
60:18, 63:16, 67:15,
71:20, 73:4, 80:13,
80:16, 83:8, 87:22,
103:21, 111:1,
113:14, 122:3,
126:24, 127:9,
128:11, 128:17,
173:3, 178:6
**quote-unquote** [1] -
67:15
**quoted** [1] - 34:13
**quotes** [3] - 111:21,

121:14, 128:3
**quoting** [3] - 77:23,
116:25, 120:5

## R

**rail** [33] - 25:20, 29:24,
53:14, 71:8, 71:22,
73:5, 73:6, 73:9,
74:3, 75:2, 102:18,
112:15, 127:5,
128:1, 133:4,
133:12, 133:24,
134:11, 134:17,
135:20, 136:8,
136:21, 136:24,
142:19, 144:17,
144:23, 147:18,
149:1, 164:5,
166:10, 166:11,
166:14
**Rail** [1] - 3:3
**RAIL** [1] - 1:2
**railroad** [35] - 14:23,
14:24, 18:13, 18:14,
19:15, 21:14, 21:18,
22:11, 24:9, 24:14,
26:5, 49:8, 61:16,
65:1, 72:4, 75:3,
82:8, 82:12, 83:21,
84:25, 85:5, 85:6,
85:8, 85:11, 120:12,
121:1, 124:10,
127:18, 128:15,
130:10, 131:6,
131:11, 131:12,
131:13
**RAILROAD** [1] - 1:7
**railroads** [119] - 6:21,
10:18, 15:5, 15:9,
18:4, 18:13, 18:17,
18:21, 18:24, 19:2,
21:19, 22:1, 23:13,
23:23, 24:12, 24:21,
25:22, 27:6, 29:17,
41:21, 42:24, 48:6,
54:6, 54:19, 60:4,
61:3, 63:9, 65:20,
69:4, 71:7, 74:16,
74:19, 74:23, 75:6,
76:14, 76:23, 77:2,
77:7, 77:14, 78:25,
79:5, 79:11, 79:16,
81:17, 81:19, 82:17,
84:19, 87:19, 88:5,
88:15, 91:23, 92:4,
99:11, 105:16,
113:4, 118:2, 118:6,
118:14, 118:25,
119:7, 119:23,

119:25, 120:2,
120:3, 120:4, 120:6,
120:8, 120:11,
120:13, 120:15,
120:22, 120:25,
121:11, 121:14,
121:20, 122:2,
122:13, 123:13,
123:24, 124:3,
124:11, 124:13,
124:14, 124:15,
124:16, 125:9,
125:20, 125:22,
126:11, 127:1,
127:10, 127:14,
127:15, 127:17,
128:4, 128:12,
128:20, 129:8,
129:25, 130:12,
131:5, 139:11,
143:5, 151:9, 154:1,
154:22, 163:11,
164:17, 168:10,
168:18, 169:5,
170:25, 172:11,
172:25, 174:25,
175:1, 179:11,
180:10, 181:11
**Railroads** [2] - 83:23,
119:17
**railroads'** [2] - 75:13,
124:8
**raining** [1] - 17:17
**raise** [8] - 83:12,
92:10, 131:10,
144:2, 146:21,
163:23, 167:14
**raised** [7] - 20:19,
75:15, 125:20,
138:25, 167:17,
179:10
**raises** [1] - 102:20
**ramifications** [1] -
30:24
**range** [1] - 168:12
**ranging** [1] - 112:24,
118:22
**ransom** [5] - 9:16,
16:3, 50:13, 50:15,
93:15
**ransom-note** [1] -
50:13
**rarely** [1] - 26:2
**rate** [98] - 8:5, 12:24,
14:13, 24:9, 27:18,
28:20, 53:14, 64:23,
65:12, 71:9, 71:10,
71:23, 71:24, 72:4,
73:6, 77:16, 78:20,
78:24, 79:6, 80:7,

82:14, 84:13, 84:19,
85:10, 85:17, 85:19,
86:12, 87:20, 88:8,
92:5, 92:7, 92:13,
93:3, 97:20, 102:17,
111:2, 111:11,
119:6, 119:8, 119:9,
119:19, 120:15,
120:21, 120:24,
121:10, 121:17,
121:22, 122:9,
123:3, 123:20,
124:1, 124:4,
124:10, 124:11,
124:15, 124:16,
124:17, 124:19,
125:24, 126:19,
126:22, 127:23,
128:2, 129:21,
129:22, 130:1,
130:9, 130:10,
130:13, 130:18,
130:23, 130:24,
145:8, 145:19,
145:20, 145:25,
146:3, 146:6,
153:16, 153:17,
156:23, 156:24,
157:20, 158:16,
158:18, 159:2,
163:16, 163:18,
163:21, 164:25,
166:11, 174:21,
183:9
**rate-based** [5] - 64:23,
65:12, 102:17,
111:11, 163:18
**ratemaking** [2] -
126:17, 126:18
**rates** [138] - 8:6,
10:18, 10:20, 13:7,
13:8, 13:10, 14:9,
17:20, 25:16, 27:15,
42:4, 42:6, 72:6,
72:8, 72:9, 72:12,
74:22, 74:24, 74:25,
76:14, 76:15, 77:5,
77:17, 77:18, 79:15,
79:16, 81:5, 81:10,
81:23, 82:8, 83:20,
83:24, 84:12, 84:13,
84:15, 85:10, 85:21,
86:1, 86:3, 86:4,
86:5, 86:6, 92:10,
93:5, 97:20, 115:6,
115:15, 117:2,
118:1, 118:3, 118:4,
118:5, 118:7,
119:18, 119:24,
120:1, 120:5, 120:6,
120:11, 120:18,

120:20, 121:13, 121:25, 122:1, 122:14, 122:15, 123:14, 123:23, 123:24, 123:25, 126:21, 127:3, 127:4, 127:16, 127:17, 127:19, 127:22, 128:1, 129:9, 129:11, 129:13, 129:19, 129:22, 129:23, 129:24, 130:10, 131:7, 131:10, 131:14, 131:15, 131:16, 133:8, 135:5, 144:25, 145:2, 145:3, 145:5, 145:11, 145:15, 145:16, 145:18, 145:25, 146:11, 146:13, 146:14, 151:2, 152:15, 157:6, 157:11, 158:19, 163:23, 165:1, 167:1, 167:15, 168:19, 168:20, 168:23, 172:11, 172:13, 172:24, 173:2, 173:6, 174:19, 175:7
**rather** [7] - 4:10, 37:10, 113:18, 116:24, 142:14, 144:17, 154:17
**Rausser** [3] - 6:22, 6:24, 25:2
**Rausser's** [2] - 9:10, 11:18
**re** [2] - 1:2, 154:16
**Re** [1] - 3:3
**re-prove** [1] - 154:16
**reach** [12] - 21:12, 22:17, 22:25, 61:11, 61:12, 61:13, 70:1, 92:15, 136:8, 172:18, 173:17
**reached** [4] - 63:4, 66:4, 87:8, 104:4
**reaches** [1] - 39:2
**reaching** [1] - 112:6
**reaction** [3] - 12:6, 65:24, 82:2
**read** [9] - 52:11, 54:22, 65:23, 123:7, 126:25, 129:5, 137:4, 144:18, 156:21
**reading** [13] - 18:11, 53:20, 78:9, 78:12,

111:8, 137:14, 138:1, 140:22, 142:6, 142:9, 142:10, 143:13, 144:22
**ready** [2] - 5:15, 68:22
**reaffirmed** [1] - 106:18
**real** [4] - 26:18, 36:9, 36:11, 72:10
**reality** [3] - 88:14, 90:5, 112:8
**realize** [3] - 32:17, 51:19, 163:3
**really** [39] - 16:1, 26:22, 27:10, 30:10, 50:25, 58:4, 60:23, 66:25, 69:1, 69:4, 72:14, 72:19, 76:16, 82:11, 92:2, 101:9, 102:24, 103:4, 107:9, 108:19, 114:22, 134:17, 135:10, 136:18, 137:16, 140:4, 143:10, 146:10, 150:1, 151:13, 156:21, 162:7, 168:17, 175:2, 177:19, 178:5, 183:9
**reams** [1] - 115:13
**reason** [16] - 14:2, 18:14, 18:22, 29:2, 38:7, 44:22, 69:12, 70:16, 79:3, 83:14, 102:22, 104:22, 110:8, 124:22, 127:25, 155:11
**reasonable** [4] - 45:4, 71:2, 79:14, 159:12
**reasonableness** [1] - 144:11
**reasonably** [4] - 141:24, 154:4, 154:9, 183:8
**reasons** [8] - 6:9, 90:3, 91:2, 139:22, 161:25, 170:9, 172:5, 180:16
**rebase** [1] - 11:5
**rebased** [2] - 9:23, 11:3
**rebasing** [1] - 80:12
**rebuttal** [9] - 4:15, 4:17, 5:10, 93:18, 132:3, 132:12, 146:19, 165:4, 171:24
**received** [3] - 6:16, 80:7, 175:25
**recent** [3] - 41:2, 89:4,

170:11
**recently** [1] - 47:12
**recess** [2] - 68:20, 132:8
**recognize** [2] - 126:8, 148:7
**recognized** [2] - 23:11, 164:4
**reconcile** [3] - 107:3, 150:1, 150:2
**record** [14] - 15:16, 19:3, 55:19, 56:8, 60:25, 93:19, 95:4, 95:14, 97:22, 108:21, 109:23, 155:17, 164:22, 172:19
**records** [1] - 106:22
**recover** [1] - 125:24
**recovery** [1] - 126:20
**red** [2] - 17:10, 30:11
**Redskins** [2] - 47:1, 47:2
**reduce** [1] - 143:8
**reduces** [1] - 81:13
**reduction** [1] - 116:3
**Reed** [1] - 174:20
**Reed-Bullwinkle** [1] - 174:20
**reemphasize** [1] - 94:1
**refer** [4] - 9:16, 35:25, 74:13, 177:12
**reference** [9] - 9:3, 9:11, 9:17, 20:24, 34:21, 43:22, 72:12, 91:19, 102:14
**referenced** [1] - 171:10
**references** [1] - 34:22
**referred** [9] - 73:11, 90:13, 106:25, 117:17, 128:24, 137:7, 161:25, 162:10, 166:16
**referring** [4] - 64:3, 102:15, 137:22, 156:11
**refers** [3] - 74:12, 86:4, 130:7
**reflect** [2] - 10:1, 21:10
**reflected** [1] - 62:10
**reflecting** [1] - 81:11
**reflection** [1] - 97:12
**refusal** [1] - 103:13
**refused** [1] - 127:19
**regard** [3] - 6:21, 89:24, 90:1
**regarded** [1] - 45:1

**regarding** [2] - 167:21, 178:7
**regardless** [4] - 12:9, 52:21, 157:4, 157:19
**regime** [1] - 147:5
**regional** [2] - 19:17, 19:18
**regions** [1] - 22:17
**regular** [2] - 19:23, 84:3
**regularly** [4] - 17:5, 17:6, 18:5, 74:23
**regulate** [1] - 35:21
**regulated** [11] - 8:3, 20:15, 28:10, 28:16, 28:25, 29:8, 29:10, 30:16, 119:20, 147:22, 159:2
**regulation** [1] - 127:11
**regulatory** [4] - 120:8, 134:15, 147:5, 159:4
**rehash** [1] - 108:12
**rehashes** [1] - 104:23
**rehashing** [1] - 102:24
**reiterate** [1] - 145:2
**reject** [2] - 48:21, 153:7
**rejected** [2] - 122:8, 126:3
**rejects** [2] - 28:13, 61:25
**relate** [10] - 21:11, 21:12, 37:19, 45:16, 47:21, 75:5, 76:20, 139:13, 182:13
**related** [18] - 12:4, 18:9, 28:4, 41:4, 71:9, 71:10, 71:24, 96:9, 108:10, 145:25, 148:18, 150:11, 152:14, 152:15, 178:12, 182:19, 182:25
**related-to** [1] - 182:19
**relates** [2] - 34:23, 75:17
**relation** [2] - 7:7, 44:6
**relationship** [11] - 9:7, 10:5, 23:5, 41:24, 43:5, 141:17, 147:3, 147:8, 147:15, 182:20
**relative** [2] - 65:20, 71:17
**relatively** [4] - 39:18, 141:8, 142:5, 143:13
**relentlessly** [1] - 23:11
**relevance** [2] - 52:6, 52:11

**relevant** [5] - 52:7, 63:13, 69:7, 157:20, 177:14
**relied** [1] - 171:21
**relief** [4] - 67:1, 67:7, 138:7, 138:8
**relieve** [1] - 136:25
**rely** [4] - 55:1, 75:8, 137:23, 170:13
**relying** [2] - 54:18, 75:9
**remain** [4] - 129:14, 133:25, 139:20, 139:21
**remedies** [2] - 148:17, 148:20
**remember** [10] - 6:24, 8:21, 9:24, 38:19, 43:18, 48:2, 128:6, 131:8, 163:18, 170:15
**remind** [2] - 4:12, 69:11
**reminder** [2] - 22:5, 117:13
**reminds** [2] - 107:21, 115:8
**remote** [1] - 184:19
**remotely** [3] - 65:20, 77:20, 93:21
**removal** [1] - 176:13
**render** [2] - 122:5, 133:18
**rendered** [1] - 21:15
**renegotiated** [2] - 111:5, 111:22
**renewal** [1] - 69:12
**repair** [1] - 94:21
**repeated** [2] - 40:16, 171:14
**repeatedly** [3] - 13:14, 60:18, 72:5
**replicate** [1] - 23:7
**reply** [8] - 45:13, 56:2, 75:14, 90:8, 122:4, 177:4
**report** [13] - 6:23, 9:10, 11:18, 25:11, 27:12, 29:4, 45:23, 45:24, 128:24, 129:1, 129:5, 140:6, 148:15
**reported** [2] - 2:21, 113:1
**reporter** [7] - 3:11, 67:17, 94:12, 95:8, 95:17, 183:15, 183:19
**Reporter** [2] - 2:18, 185:1

**reporting** [2] - 177:20, 184:19
**represent** [2] - 86:21, 117:13
**representative** [2] - 100:13, 110:19
**represented** [2] - 167:10, 172:8
**representing** [3] - 3:21, 76:2, 163:5
**reprove** [1] - 58:18
**repudiation** [1] - 39:20
**request** [4] - 12:10, 14:6, 14:7, 67:6
**Request** [1] - 44:11
**requested** [1] - 145:4
**requests** [4] - 15:9, 15:22, 44:10, 151:7
**require** [9] - 31:10, 86:17, 137:9, 138:11, 140:11, 141:3, 145:8, 145:12, 159:8
**required** [5] - 57:3, 96:1, 104:8, 106:24, 172:5
**requirement** [3] - 27:17, 115:18, 176:16
**requirements** [9] - 27:14, 31:3, 54:8, 57:15, 137:7, 137:8, 138:2, 174:9, 178:2
**requires** [1] - 144:17
**reserved** [1] - 137:20
**reset** [1] - 10:1
**residual** [1] - 28:20
**resist** [1] - 143:15
**resistance** [1] - 98:24
**resolving** [1] - 183:10
**respect** [31] - 15:18, 31:11, 31:15, 32:9, 32:23, 33:4, 34:2, 37:20, 40:13, 47:10, 49:20, 50:23, 51:1, 51:9, 52:5, 55:3, 56:21, 58:21, 69:19, 71:8, 71:10, 71:23, 71:24, 79:2, 96:2, 135:14, 136:11, 150:22, 151:9, 154:17, 154:25
**respectfully** [6] - 152:5, 155:11, 169:9, 170:18, 173:16, 173:21
**respective** [5] - 93:22, 97:4, 99:8, 105:12, 144:11
**respects** [1] - 135:23

**responded** [1] - 126:1
**responding** [1] - 183:21
**responds** [1] - 110:11
**response** [14] - 6:16, 11:17, 39:15, 89:6, 109:5, 144:19, 146:16, 146:20, 166:3, 166:5, 173:13, 177:1, 177:5, 182:17
**responses** [1] - 108:21
**responsibility** [1] - 53:24
**responsive** [1] - 102:12
**rest** [7] - 50:11, 50:12, 52:11, 60:22, 63:13, 117:24, 118:11
**restraints** [1] - 42:20
**restrict** [2] - 112:17, 125:16
**restricted** [2] - 103:23, 113:17
**restrictions** [8] - 7:1, 119:18, 120:1, 120:2, 126:12, 129:3, 178:3, 184:18
**result** [4] - 15:4, 122:10, 142:23, 173:22
**resulted** [1] - 108:25
**resulting** [3] - 73:7, 129:11, 166:12
**resume** [1] - 5:2
**retry** [1] - 158:9
**return** [2] - 100:4, 116:19
**revenue** [2] - 114:15, 157:24
**revenue-neutral** [1] - 114:15
**revenues** [1] - 163:14
**reverse** [1] - 99:2
**review** [3] - 20:9, 29:25, 159:4
**revisited** [1] - 104:20
**revisiting** [1] - 105:4
**revitalize** [1] - 21:24
**revitalizing** [1] - 21:14
**rewrite** [1] - 140:1
**rhetorical** [1] - 8:16
**rigging** [1] - 147:6
**rightly** [2] - 28:13, 94:4
**ripen** [1] - 60:21
**rise** [2] - 156:12, 156:13
**rising** [2] - 82:24,

151:3
**risks** [1] - 45:25
**rivals** [2] - 146:12, 146:15
**road** [2] - 23:10, 121:20
**roadmap** [3] - 131:5, 131:6
**roads** [7] - 63:3, 63:5, 63:20, 104:3, 104:4, 104:6, 113:22
**roll** [1] - 111:22
**roll-over** [1] - 111:22
**rolled** [1] - 111:11
**Roman** [5] - 28:19, 28:21, 130:6, 130:7
**room** [4] - 28:23, 115:2, 121:1, 127:19
**rooms** [1] - 131:1
**roughly** [1] - 96:3
**route** [6] - 23:18, 71:25, 120:13, 124:11, 124:12, 124:20
**routes** [3] - 25:4, 25:17, 30:22
**routine** [2] - 15:14, 109:5
**routinely** [1] - 99:25
**routing** [1] - 126:22
**RPR** [2] - 184:8, 185:1
**rubber** [2] - 23:10, 121:20
**rule** [29] - 11:11, 30:17, 32:7, 32:15, 48:2, 52:3, 57:5, 57:17, 58:19, 59:8, 70:2, 70:14, 135:25, 137:23, 138:5, 144:11, 154:7, 155:5, 155:12, 169:13, 169:14, 169:17, 169:19, 169:22, 170:5, 170:6, 171:9
**Rule** [22] - 83:20, 84:19, 84:22, 84:24, 85:25, 86:3, 86:5, 86:13, 86:16, 87:3, 88:1, 97:25, 98:4, 118:7, 131:16, 144:25, 145:3, 145:5, 157:9, 174:7
**Rules** [1] - 174:5
**rules** [3] - 53:7, 59:1, 83:22
**ruling** [2] - 26:16, 70:18
**run** [1] - 43:12

**S**

**safe** [1] - 183:25
**safely** [1] - 128:12
**safety** [1] - 145:10
**SAINT** [1] - 184:8
**Saint** [6] - 2:18, 3:11, 67:23, 183:15, 183:24, 185:1
**SAINT-LOTH** [1] - 184:8
**Saint-Loth** [6] - 2:18, 3:11, 67:23, 183:15, 183:24, 185:1
**San** [2] - 2:5, 85:17
**Sathya** [2] - 3:5, 175:13
**SATHYA** [1] - 1:17
**satisfied** [6] - 31:3, 53:25, 54:8, 59:8, 92:25, 154:3
**satisfies** [1] - 92:19
**satisfy** [7] - 115:2, 115:17, 135:15, 137:10, 138:2, 138:12, 141:3
**save** [1] - 21:24
**saw** [2] - 103:7, 118:13
**Scalia** [1] - 40:19
**scary** [1] - 50:15
**schedule** [1] - 19:22
**scheduled** [1] - 16:25
**scheme** [4] - 142:13, 147:7, 147:10, 147:12
**scope** [11] - 20:16, 31:20, 33:9, 33:13, 39:8, 72:8, 97:13, 112:17, 147:4, 159:23, 160:19
**scramble** [1] - 104:14
**screen** [3] - 3:18, 155:20, 177:19
**scrutiny** [3] - 109:18, 159:24, 168:24
**se** [2] - 144:8, 144:9
**Seale** [4] - 62:6, 80:8, 105:11, 106:16
**Seattle** [2] - 22:11, 110:13
**second** [25] - 14:4, 31:21, 32:1, 36:12, 47:8, 48:5, 48:10, 50:1, 56:22, 57:2, 58:13, 86:2, 104:20, 114:21, 130:16, 141:4, 151:14, 153:4, 159:4,

162:25, 164:8, 166:23, 167:1, 171:22, 173:2
**secondary** [2] - 20:12, 152:5
**secondly** [1] - 140:3
**section** [9] - 49:22, 52:22, 52:25, 53:19, 80:16, 124:5, 130:5, 153:14, 153:21
**Section** [16] - 7:1, 7:19, 8:1, 20:15, 42:10, 52:24, 57:9, 64:8, 64:9, 73:3, 75:15, 77:23, 117:24, 168:18, 174:22, 180:12
**see** [62] - 3:23, 3:25, 5:19, 7:15, 9:10, 9:17, 9:20, 10:10, 11:20, 13:13, 13:24, 14:2, 17:3, 17:12, 19:23, 29:3, 31:6, 36:19, 43:2, 45:21, 48:5, 58:14, 60:4, 64:10, 64:14, 66:14, 70:16, 72:17, 74:23, 75:4, 75:13, 77:6, 79:22, 82:4, 89:6, 94:25, 95:11, 102:22, 109:16, 117:23, 118:23, 119:1, 119:14, 119:16, 122:3, 122:7, 123:16, 127:25, 129:1, 132:4, 146:19, 155:22, 155:25, 156:3, 157:12, 159:12, 160:21, 162:22, 162:23, 163:1, 167:8
**seeing** [2] - 3:18, 98:15
**seek** [1] - 138:3
**seeking** [6] - 137:11, 138:7, 164:24, 170:6, 171:6, 174:14
**seem** [4] - 18:22, 20:14, 38:14, 135:16
**seemingly** [1] - 115:24
**segment** [4] - 147:9, 147:11, 147:16, 147:22
**seized** [1] - 163:14
**select** [1] - 140:5
**selectively** [1] - 76:19
**sell** [2] - 47:5, 47:19
**selling** [1] - 47:22
**semantic** [1] - 168:14

**send** [1] - 15:8
**sending** [2] - 12:10, 14:7
**sends** [3] - 13:14, 85:7, 85:8
**senior** [12] - 25:6, 80:8, 84:8, 99:7, 101:2, 108:2, 109:4, 152:6, 152:10, 176:23, 176:25, 177:3
**SENIOR** [1] - 1:11
**senior-level** [1] - 176:23
**senior-most** [1] - 109:4
**sense** [19] - 27:7, 29:13, 44:6, 49:21, 54:24, 57:12, 57:16, 58:17, 109:19, 138:11, 140:9, 142:11, 143:8, 153:23, 154:15, 154:24, 155:10, 169:17, 170:10
**sensitive** [3] - 65:20, 116:1, 179:23
**sent** [1] - 37:17
**sentence** [15] - 31:1, 33:14, 34:17, 50:10, 50:11, 50:12, 73:11, 117:24, 129:4, 129:5, 129:11, 136:17, 136:18, 137:8, 166:16
**sentences** [3] - 58:15, 117:18, 128:24
**separate** [8] - 5:24, 14:19, 35:15, 49:2, 86:20, 93:4, 127:3, 128:1
**separately** [2] - 83:21, 84:20
**separation** [1] - 153:15
**September** [2] - 27:13, 106:16
**series** [2] - 94:7, 99:4
**serious** [1] - 144:2
**serve** [1] - 24:12
**served** [2] - 6:22, 121:13
**service** [10] - 17:6, 17:8, 20:9, 103:15, 115:22, 120:13, 124:20, 125:9, 125:10, 141:19
**services** [2] - 142:2
**set** [7] - 12:24, 42:15, 73:21, 89:17,

161:24, 166:4
**sets** [3] - 82:7, 85:21, 137:6
**settlement** [1] - 55:12
**settling** [1] - 146:13
**seven** [1] - 96:10
**several** [5] - 117:16, 152:15, 163:8, 163:11, 173:10
**shall** [4] - 31:2, 73:7, 166:12, 184:21
**sham** [2] - 150:13, 182:14
**share** [3] - 99:17, 104:7, 113:17
**shared** [25] - 44:13, 57:21, 57:22, 93:3, 93:6, 93:21, 100:1, 101:22, 103:14, 103:25, 105:7, 105:23, 105:24, 106:23, 107:16, 113:2, 114:16, 115:19, 115:25, 134:19, 135:9, 143:1, 150:5, 150:7, 155:20
**sharing** [2] - 133:21, 177:18
**shield** [1] - 107:18
**ship** [4] - 12:23, 22:9, 22:11, 85:16
**shipment** [14] - 13:2, 14:18, 33:22, 34:2, 74:9, 74:19, 84:20, 84:21, 85:7, 85:11, 85:18, 85:19, 85:23, 136:11
**shipments** [41] - 14:19, 75:1, 75:2, 75:3, 75:6, 76:25, 77:4, 82:18, 83:20, 85:2, 85:21, 86:4, 86:13, 86:16, 86:17, 86:22, 87:5, 87:7, 87:8, 87:24, 87:25, 88:1, 88:6, 88:7, 88:10, 88:11, 88:13, 114:12, 114:13, 136:12, 168:12, 169:5, 172:13, 172:14, 172:24, 177:8, 177:21, 177:22, 177:23
**shipper** [11] - 12:23, 14:18, 14:21, 15:17, 15:22, 74:9, 85:22, 145:4, 157:14, 157:18
**shipper's** [1] - 163:21

**shipper-specific** [1] - 15:22
**shippers** [5] - 15:3, 15:24, 24:5, 80:20, 87:6
**shipping** [5] - 15:3, 86:19, 98:5, 172:8, 172:9
**ships** [3] - 85:5, 85:6, 85:8
**shoot** [1] - 40:22
**shooting** [1] - 40:19
**shop** [1] - 23:22
**shopped** [2] - 113:21, 113:23
**short** [5] - 39:18, 96:6, 99:19, 103:7, 122:12
**shorter** [1] - 5:8
**shorthand** [1] - 2:21
**shortly** [2] - 110:2, 150:4
**shoulders** [1] - 56:17
**show** [18] - 32:11, 57:16, 61:21, 88:20, 92:20, 93:24, 102:22, 116:14, 133:23, 137:25, 139:24, 140:11, 141:9, 141:23, 146:9, 157:11, 164:9, 174:4
**showed** [14] - 47:21, 164:14, 164:16, 164:19, 165:2, 166:3, 167:2, 168:9, 171:20, 171:22, 171:24, 173:11, 173:12, 177:15
**showing** [7] - 59:9, 76:22, 117:4, 154:3, 164:11, 172:22, 172:23
**shown** [9] - 72:2, 90:4, 93:21, 127:24, 136:20, 165:22, 165:25, 166:2, 173:1
**shows** [12] - 75:9, 77:11, 80:1, 80:14, 88:3, 88:15, 99:3, 157:23, 164:13, 166:24, 172:9, 173:4
**sic** [2] - 55:9, 137:11
**sic)** [1] - 58:25
**sick** [1] - 127:10
**side** [4] - 5:8, 37:25, 148:14, 180:10
**sideways** [3] - 8:25, 42:3, 42:7
**signal** [2] - 184:17
**signaling** [2] - 12:11,

12:15
**signatory** [1] - 184:23
**signed** [1] - 126:5
**significance** [1] - 172:10
**significant** [12] - 8:24, 50:24, 52:5, 86:16, 86:21, 96:5, 113:13, 135:6, 135:23, 135:24, 150:10, 158:4
**significantly** [4] - 10:7, 56:20, 118:12, 122:24
**silly** [1] - 49:16
**similar** [16] - 11:12, 11:15, 26:14, 30:1, 31:14, 32:6, 32:12, 71:10, 71:24, 104:15, 104:17, 138:19, 144:5, 147:16, 148:10, 179:22
**similarity** [1] - 30:21
**similarly** [2] - 133:14, 176:2
**simple** [4] - 40:3, 41:6, 88:13, 152:12
**simpler** [1] - 32:7
**simplest** [3] - 12:22, 33:21
**simplify** [1] - 34:19
**simply** [12] - 16:23, 29:1, 30:18, 32:16, 49:7, 58:7, 66:7, 74:24, 107:17, 115:4, 122:10, 174:20
**simultaneously** [5] - 49:6, 121:25, 122:14, 124:10, 128:13
**sincerely** [1] - 173:25
**single** [48] - 8:6, 15:12, 17:7, 19:15, 21:21, 23:8, 23:16, 37:6, 43:3, 49:8, 50:19, 61:17, 66:11, 74:9, 85:10, 87:25, 93:5, 103:1, 110:9, 112:17, 115:10, 117:5, 118:4, 119:23, 120:5, 120:18, 121:25, 122:14, 123:23, 124:10, 124:16, 124:19, 124:20, 125:10, 127:4, 127:15, 127:22, 128:1, 129:22,

131:15, 141:2, 141:14, 160:18, 165:3, 171:4, 177:21
**single-entity** [1] - 23:8
**single-line** [23] - 61:17, 66:11, 87:25, 93:5, 112:17, 115:10, 119:23, 120:5, 120:18, 121:25, 122:14, 123:23, 124:10, 124:16, 124:20, 125:10, 127:4, 127:15, 127:22, 128:1, 129:22, 141:14, 177:21
**singular** [1] - 20:12
**sit** [1] - 142:16
**sites** [1] - 13:25
**sits** [1] - 118:14
**sitting** [2] - 67:20, 121:1
**situation** [11] - 37:14, 37:24, 81:18, 109:13, 116:22, 140:4, 140:21, 144:1, 150:25, 151:3, 170:3
**situations** [1] - 137:17
**six** [1] - 96:10
**size** [1] - 24:17
**skip** [1] - 14:10
**slide** [39] - 7:20, 8:15, 9:21, 10:10, 11:9, 15:25, 16:7, 16:8, 20:8, 21:7, 22:2, 23:9, 25:10, 25:24, 28:1, 30:3, 31:7, 34:12, 37:3, 38:1, 41:17, 43:14, 47:25, 48:1, 50:3, 60:13, 79:8, 101:10, 102:5, 104:13, 105:9, 106:1, 106:3, 107:23, 108:14, 108:17, 123:9, 127:9
**slides** [9] - 6:4, 7:7, 22:3, 37:1, 66:24, 102:3, 103:17, 179:14, 179:15
**slight** [1] - 82:11
**slightly** [1] - 5:7
**slow** [2] - 94:15, 95:16
**slowly** [1] - 114:11
**small** [14] - 9:6, 23:2, 41:22, 41:25, 75:1, 76:25, 88:6, 91:22, 117:25, 118:15, 124:6, 157:4, 172:8, 172:16

**smaller** [3] - 115:18, 143:6, 143:9
**smart** [2] - 81:4, 82:1
**Smith** [1] - 47:1
**smoke** [1] - 131:1
**smoke-filled** [1] - 131:1
**smoking** [2] - 10:14, 103:2
**smoking-gun** [1] - 103:2
**smoothly** [1] - 183:8
**snippet** [1] - 90:13
**so-called** [5] - 9:23, 19:11, 83:20, 84:7, 97:23
**sole** [1] - 43:22
**solely** [9] - 45:6, 48:12, 75:17, 78:3, 78:8, 134:6, 137:1, 150:3, 182:12
**solving** [2] - 33:7, 38:14
**someone** [2] - 32:14, 139:23
**sometime** [1] - 89:9
**sometimes** [3] - 31:14, 37:9, 183:17
**somewhat** [3] - 19:23, 21:9, 142:8
**somewhere** [7] - 36:15, 56:16, 100:21, 107:13, 132:12, 179:16, 180:11
**sorry** [14] - 3:17, 46:25, 72:15, 79:9, 79:10, 79:22, 86:5, 86:10, 94:11, 98:8, 101:7, 106:2, 163:3
**sort** [44] - 7:14, 7:21, 9:16, 11:4, 14:10, 15:4, 16:3, 16:14, 19:18, 29:15, 30:5, 30:10, 35:19, 46:6, 54:2, 55:10, 55:15, 55:24, 62:16, 67:1, 83:15, 87:8, 135:1, 138:25, 140:22, 141:6, 141:17, 141:23, 142:1, 142:11, 142:16, 144:4, 144:12, 147:21, 148:23, 150:12, 150:16, 151:22, 152:5, 155:2, 156:22, 157:3, 160:3, 178:22
**sorts** [4] - 7:25, 11:12, 45:11, 180:16

**sound** [5] - 55:19, 64:19, 64:20, 65:14
**sound-bite** [4] - 64:19, 64:20, 65:14
**Southern** [13] - 15:10, 44:4, 52:10, 80:9, 81:1, 81:24, 101:16, 103:19, 103:24, 105:25, 110:20, 113:8, 118:15
**Southern's** [4] - 9:23, 111:17, 111:18, 111:24
**space** [1] - 21:16
**spanned** [1] - 115:15
**spawn** [1] - 116:24
**speakerphone** [1] - 184:19
**speaking** [4] - 94:13, 99:11, 128:23, 157:8
**special** [10] - 118:1, 118:18, 118:22, 128:6, 128:9, 130:15, 130:19, 130:21, 131:19, 175:8
**specific** [8] - 15:22, 16:21, 91:4, 91:8, 138:12, 170:25, 177:7, 178:8
**specifically** [3] - 44:5, 93:6, 106:14
**specifics** [1] - 96:25
**speculation** [1] - 162:12
**speculative** [2] - 164:21, 165:2
**speech** [3] - 166:6, 173:13, 179:18
**speechmaking** [1] - 91:18
**spend** [1] - 20:23
**spends** [1] - 38:12
**spent** [2] - 164:9, 167:19
**spirit** [1] - 151:12
**split** [1] - 29:12
**spoken** [3] - 22:4, 59:17, 86:24
**sports** [1] - 135:2
**spot** [1] - 24:10
**spring** [5] - 84:7, 96:19, 99:1, 99:3, 103:8
**square** [2] - 104:18, 178:11
**squared** [1] - 178:2
**St** [1] - 124:14
**stable** [1] - 9:1
**stage** [2] - 116:17,

162:14
**Staggers** [20] - 21:10, 21:13, 26:7, 28:11, 29:2, 78:23, 79:1, 92:4, 122:13, 122:21, 123:12, 125:21, 126:13, 127:20, 148:25, 158:4, 158:25, 159:1, 163:17, 174:17
**stairstep** [1] - 103:12
**stand** [2] - 42:22, 99:5
**standard** [8] - 12:25, 134:7, 135:13, 135:17, 150:3, 152:19, 152:20, 182:19
**standardized** [2] - 19:9, 111:17
**standing** [1] - 42:22
**standpoint** [1] - 55:15
**stark** [1] - 11:1
**start** [7] - 31:22, 32:8, 60:6, 67:15, 88:16, 100:15, 117:17
**started** [9] - 5:13, 5:16, 5:19, 40:18, 67:12, 67:24, 80:21, 101:14, 172:1
**starting** [5] - 9:1, 11:21, 36:24, 40:25, 120:14
**starts** [2] - 17:11, 17:17
**State** [1] - 105:2
**state** [1] - 106:14
**statement** [10] - 47:13, 53:4, 57:6, 144:4, 146:10, 150:2, 150:4, 154:6, 179:10, 179:24
**Statement** [3] - 137:4, 141:12, 149:5
**States** [10] - 3:9, 5:4, 5:5, 67:21, 117:23, 119:15, 133:2, 174:11, 174:13, 182:5
**STATES** [2] - 1:1, 1:11
**static** [1] - 184:17
**statistics** [1] - 181:14
**statute** [127] - 8:12, 21:3, 28:6, 28:18, 29:12, 30:4, 30:6, 30:7, 34:13, 34:22, 34:25, 35:5, 35:14, 35:19, 39:3, 39:21, 40:1, 42:12, 46:18, 46:19, 46:20, 47:24,

48:17, 48:18, 49:19, 51:10, 53:21, 54:6, 54:23, 56:22, 56:25, 57:18, 58:8, 61:24, 61:25, 69:7, 70:23, 71:15, 71:16, 72:10, 73:1, 73:3, 73:20, 73:22, 74:4, 74:11, 74:14, 75:11, 75:21, 77:19, 77:20, 78:2, 78:14, 78:21, 79:4, 79:14, 82:10, 82:14, 84:14, 90:6, 91:5, 92:12, 92:19, 92:25, 95:21, 104:8, 106:24, 107:19, 115:13, 119:3, 120:23, 122:25, 123:3, 133:3, 133:13, 133:18, 134:25, 136:18, 137:3, 137:6, 137:8, 137:15, 137:25, 138:1, 142:6, 142:8, 143:10, 144:16, 145:21, 146:4, 148:1, 148:22, 150:19, 151:18, 152:12, 152:13, 154:11, 154:17, 156:22, 158:10, 158:11, 158:24, 160:5, 161:22, 161:23, 166:8, 167:5, 167:8, 167:24, 168:7, 169:4, 169:21, 169:25, 170:19, 170:22, 172:19, 173:12, 173:17, 174:18, 178:3, 180:23, 180:24
**statutes** [2] - 45:11, 45:12
**statutory** [16] - 28:22, 32:1, 40:25, 45:8, 91:9, 134:1, 134:10, 134:15, 138:9, 139:23, 142:13, 142:14, 147:4, 180:13, 180:19, 181:17
**stay** [3] - 183:25, 184:14
**stay-at-home** [1] - 184:14
**STB** [15] - 25:12, 25:13, 25:20, 61:3, 80:19, 80:21, 80:22, 81:16, 81:25, 89:9,

90:16, 102:15, 130:22, 171:25
**Ste** [1] - 2:15
**steady** [2] - 156:12, 156:13
**stenographic** [1] - 184:10
**step** [18] - 32:1, 36:13, 48:5, 48:10, 50:1, 55:3, 66:12, 81:17, 139:15, 141:4, 147:7, 147:11, 147:13, 151:14, 166:23, 167:2, 173:2, 180:14
**STEPHEN** [1] - 1:14
**Stephen** [3] - 3:4, 5:14, 68:10
**Stephenneuwirth@ quinnemanuel.com** [1] - 1:16
**steps** [2] - 48:3, 162:3
**Steve** [2] - 68:11, 68:12
**stick** [4] - 59:14, 64:12, 111:7, 163:12
**still** [15] - 19:19, 68:3, 72:9, 81:6, 115:20, 120:23, 140:15, 140:17, 141:3, 142:25, 144:10, 145:9, 155:8, 166:23, 176:19
**stop** [5] - 23:22, 31:24, 33:12, 160:17, 177:18
**stopped** [1] - 147:13
**stories** [2] - 89:20, 180:25
**story** [2] - 109:6, 179:19
**straight** [3] - 68:18, 132:13, 183:21
**strategy** [1] - 111:25
**Street** [2] - 1:18, 2:5
**strict** [1] - 142:12
**strictly** [1] - 102:10
**strike** [1] - 56:18
**strong** [4] - 91:14, 165:16, 178:25, 179:2
**strongly** [1] - 151:1
**structural** [1] - 97:19
**structure** [8] - 10:19, 39:21, 47:24, 121:17, 137:3, 137:24, 180:13, 180:19
**structured** [3] - 28:8, 60:13, 101:17

**structures** [1] - 26:4
**struggled** [2] - 97:17, 98:23
**studied** [1] - 85:13
**stuff** [8] - 46:9, 85:13, 161:4, 180:2, 180:3, 180:4, 181:5, 181:21
**styled** [1] - 12:10
**sub** [1] - 73:4
**subclause** [2] - 31:3, 53:25
**subclauses** [1] - 130:6
**subject** [16] - 41:10, 41:25, 44:11, 47:7, 57:23, 70:3, 75:17, 111:3, 119:21, 133:10, 133:17, 144:11, 156:18, 174:4, 179:23, 184:15
**submission** [1] - 148:3
**submit** [9] - 31:9, 44:16, 120:15, 121:21, 131:19, 135:10, 155:11, 173:16, 173:21
**submitted** [3] - 80:4, 80:5, 98:2
**subscription** [1] - 86:21
**subsection** [6] - 28:19, 28:21, 130:9, 130:12, 130:17, 130:19
**subsections** [1] - 130:3
**subsequent** [2] - 114:3, 117:5
**subsequently** [1] - 12:5
**subset** [5] - 28:24, 86:22, 93:11, 145:18, 177:21
**substance** [3] - 96:25, 102:2, 112:14
**substantial** [11] - 7:9, 7:10, 22:16, 33:10, 135:20, 141:7, 141:22, 148:19, 156:25, 158:14, 159:6
**substantially** [3] - 38:10, 56:11, 135:17
**substantive** [9] - 30:18, 35:20, 42:11, 70:20, 70:25, 71:5, 71:20, 72:19, 154:7
**subterfuge** [1] - 122:15

**subtracting** [1] - 101:10
**successfully** [1] - 3:19
**sudden** [2] - 164:14, 164:17
**suddenly** [5] - 84:6, 84:7, 99:1, 108:3, 112:17
**suffered** [1] - 97:19
**suffice** [1] - 120:10
**suggest** [5] - 54:11, 65:3, 78:22, 92:10, 104:14
**suggested** [5] - 19:7, 57:10, 78:4, 100:6, 113:18
**suggesting** [2] - 71:13, 78:18
**suggestion** [4] - 83:14, 83:18, 165:17, 165:25
**Suite** [3] - 1:18, 1:22, 2:5
**summarize** [1] - 110:15
**summarizing** [2] - 67:4, 106:21
**summary** [9] - 7:17, 19:4, 70:12, 70:25, 73:14, 103:4, 161:20, 180:3, 180:4
**superfluity** [1] - 142:24
**superfluous** [1] - 48:10
**supplement** [2] - 70:17, 71:13
**supplemental** [1] - 166:21
**supplied** [2] - 96:17, 100:14
**support** [2] - 133:16, 155:17
**supports** [1] - 144:12
**suppose** [2] - 76:1, 131:12
**supposed** [8] - 57:17, 73:25, 74:1, 78:17, 82:4, 112:23, 136:5, 168:25
**supposedly** [3] - 6:17, 43:16, 82:20
**Supreme** [6] - 26:16, 41:2, 42:16, 52:17, 57:12, 59:6
**SURCHARGE** [1] - 1:2
**surcharge** [78] - 9:4, 9:11, 9:25, 10:3, 10:16, 10:20, 11:24, 12:7, 12:24, 12:25,

15:22, 24:21, 24:23, 33:24, 43:18, 44:10, 44:12, 60:13, 61:4, 62:7, 64:24, 66:11, 80:12, 80:19, 81:5, 81:11, 81:20, 86:20, 88:9, 89:10, 90:17, 92:9, 95:23, 96:13, 97:18, 99:20, 99:24, 99:25, 100:2, 101:17, 101:25, 102:16, 102:17, 103:9, 104:10, 105:2, 105:6, 105:22, 107:11, 108:2, 110:3, 110:4, 110:6, 110:21, 110:25, 111:3, 111:11, 111:18, 111:19, 111:25, 112:4, 112:7, 112:16, 112:25, 113:2, 113:6, 113:10, 113:15, 113:16, 113:19, 113:24, 114:5, 114:9, 116:7, 163:22, 175:24, 176:21
**Surcharge** [1] - 3:3
**surcharges** [63] - 7:11, 9:18, 11:8, 12:16, 15:19, 19:8, 20:2, 33:4, 38:4, 41:13, 41:16, 42:6, 42:25, 49:12, 50:17, 61:7, 63:2, 64:22, 76:15, 76:24, 77:3, 77:9, 80:21, 83:12, 87:19, 88:17, 91:23, 96:2, 97:21, 98:23, 99:9, 99:16, 100:11, 102:11, 102:23, 103:5, 103:21, 104:2, 104:16, 104:19, 105:14, 105:17, 106:8, 107:6, 108:6, 108:9, 108:23, 108:25, 109:3, 111:9, 112:19, 114:14, 114:24, 156:15, 163:12, 163:15, 163:19, 164:5, 164:18, 165:1, 167:14, 176:6, 176:9
**Surface** [2] - 149:9, 163:24
**surprise** [2] - 17:12
**surprise-surprise** [1] -

17:12
**surprising** [1] - 47:8
**surrounding** [2] - 95:23, 107:4
**survive** [2] - 7:17, 159:24
**suspected** [1] - 126:8
**suspicious** [3] - 16:13, 26:12, 44:17
**sustainable** [1] - 171:16
**sweet** [1] - 110:12
**swing** [1] - 7:24
**switch** [1] - 36:15
**synchronization** [3] - 99:15, 101:21, 106:5
**synchronize** [3] - 61:11, 61:15, 102:23
**synchronized** [4] - 60:15, 101:18, 103:5, 108:25
**synonym** [1] - 84:16
**system** [1] - 13:11
**systems** [1] - 126:23

## T

**tab** [71] - 69:10, 69:11, 70:13, 70:16, 70:22, 72:17, 73:2, 75:13, 79:10, 79:23, 79:24, 79:25, 82:4, 83:17, 84:11, 88:23, 88:24, 88:25, 90:23, 96:7, 96:18, 96:21, 97:16, 99:1, 100:15, 100:18, 100:21, 101:5, 101:6, 101:9, 101:13, 104:1, 104:24, 105:10, 110:2, 110:19, 111:8, 112:1, 112:24, 113:4, 113:8, 113:20, 114:25, 116:21, 118:20, 119:5, 121:8, 121:14, 121:19, 122:3, 122:7, 122:17, 123:10, 123:17, 123:21, 125:18, 126:4, 127:12, 128:4, 128:11, 128:20, 129:16, 130:2, 166:9, 166:19, 167:4, 167:8, 169:8, 179:16
**tabs** [5] - 103:17, 112:22, 113:12,

119:19, 175:22
**tail** [2] - 118:10, 177:20
**talks** [10] - 28:19, 33:22, 34:17, 44:12, 75:21, 82:15, 110:14, 145:21, 145:24, 146:2
**tally** [1] - 67:1
**tally-up** [1] - 67:1
**tangible** [2] - 38:7, 152:16
**tap** [1] - 96:7
**task** [1] - 162:7
**team** [2] - 47:3, 47:4
**technical** [1] - 34:20
**technique** [2] - 8:16, 50:13
**technological** [1] - 183:7
**technology** [3] - 155:20, 177:11, 184:16
**tee** [1] - 90:16
**telephone** [3] - 4:9, 184:17, 184:19
**telephonically** [3] - 1:12, 2:23, 184:13
**telework** [1] - 2:23
**temporal** [1] - 33:5
**ten** [1] - 111:8
**tend** [1] - 151:20
**tendered** [1] - 27:8
**tens** [4] - 14:15, 87:6, 157:19
**term** [5] - 45:16, 48:19, 97:19, 134:10
**terms** [6] - 16:2, 27:4, 29:8, 30:14, 49:18, 145:11
**tertiary** [1] - 152:6
**test** [2] - 60:5, 63:11
**testified** [4] - 65:8, 83:7, 106:13, 177:17
**testifying** [1] - 143:24
**testimony** [10] - 43:4, 57:15, 89:11, 96:24, 97:8, 97:9, 125:4, 143:22, 143:25, 171:25
**tethers** [1] - 162:13
**Texaco** [1] - 42:16, 144:6, 144:7, 144:12
**Texas** [1] - 52:10
**text** [7] - 28:6, 28:8, 28:14, 137:3, 137:24, 139:23, 148:21
**textualist** [1] - 40:24
**textualists** [1] - 40:17

**thankfully** [1] - 47:5
**THE** [112] - 1:1, 1:10,
2:12, 3:2, 3:14, 3:22,
4:1, 4:9, 4:12, 5:17,
5:20, 5:24, 12:17,
12:20, 14:17, 14:24,
18:9, 18:20, 19:21,
20:4, 21:4, 29:18,
33:12, 33:20, 34:2,
34:5, 34:9, 34:14,
36:16, 40:8, 40:18,
46:23, 47:2, 49:24,
51:7, 53:6, 53:11,
53:13, 54:10, 54:16,
59:15, 67:12, 68:2,
68:4, 68:6, 68:7,
68:9, 68:10, 68:16,
68:21, 74:6, 75:25,
78:1, 79:9, 79:24,
84:9, 84:22, 85:12,
86:6, 87:1, 87:11,
88:24, 92:22, 94:10,
94:16, 94:19, 94:24,
95:7, 95:10, 95:15,
98:7, 98:12, 100:17,
101:2, 101:6, 102:8,
106:2, 126:7,
131:21, 132:2,
132:9, 132:21,
132:24, 136:2,
138:22, 138:25,
143:19, 145:14,
145:21, 145:24,
146:2, 146:7,
147:24, 149:7,
149:16, 149:20,
156:3, 161:7,
161:15, 162:17,
162:20, 162:22,
163:2, 170:11,
175:12, 175:16,
178:16, 181:25,
182:2, 182:6, 182:8,
183:5
**theirs** [1] - 5:5
**themselves** [6] -
74:20, 89:7, 140:19,
169:6, 169:18,
172:25
**then-Deputy** [1] -
126:6
**theoretical** [1] -
164:21
**theoretically** [1] -
82:12
**theory** [10] - 28:9,
35:20, 42:8, 56:5,
65:17, 77:10, 87:18,
98:3, 181:3
**thereafter** [3] - 96:20,

99:25, 109:15
**therefore** [8] - 12:16,
54:5, 66:19, 80:23,
126:17, 163:25,
175:1, 184:15
**they've** [2] - 103:11,
178:2
**thin** [1] - 5:25
**thinking** [2] - 26:20,
86:12
**thinks** [1] - 160:16
**third** [2] - 47:8, 62:21
**Thomas** [1] - 42:18
**thoughts** [1] - 161:12
**thousands** [6] - 10:18,
15:23, 17:20, 42:4,
87:6
**threatened** [1] - 42:7
**three** [14] - 15:9,
30:25, 37:3, 37:13,
37:18, 38:1, 59:16,
60:3, 76:2, 109:4,
143:4, 157:8, 178:17
**thresholds** [1] - 10:1
**threw** [2] - 16:23,
128:14
**through-rate** [2] -
153:16, 153:17
**throughout** [2] -
93:13, 119:14
**tie** [2] - 36:20, 104:19
**tight** [1] - 56:15
**timeline** [1] - 16:24
**tiny** [2] - 41:22, 123:2
**tissue** [10] - 37:9,
37:10, 140:25,
141:1, 162:9,
164:12, 165:23,
166:5, 172:20
**tissues** [1] - 181:10
**today** [42] - 3:11, 16:7,
40:10, 42:23, 70:14,
71:18, 72:3, 72:5,
72:11, 72:13, 72:20,
73:16, 74:23, 76:16,
82:20, 89:1, 89:15,
89:23, 90:2, 90:23,
90:24, 98:2, 101:15,
114:8, 121:20,
123:2, 123:10,
125:23, 127:2,
127:4, 127:14,
132:4, 146:18,
158:9, 163:7, 163:9,
164:10, 165:22,
167:3, 167:17,
174:1, 183:16
**today's** [1] - 149:6
**together** [32] - 8:7,
9:12, 10:18, 16:23,

23:24, 24:14, 24:21,
25:18, 26:12, 27:21,
38:22, 38:23, 39:1,
39:5, 39:19, 42:15,
42:16, 50:14, 63:19,
71:8, 71:22, 74:17,
76:9, 87:19, 92:8,
96:8, 107:25,
108:10, 156:19,
159:15, 160:12,
180:10
**ton** [1] - 87:23
**took** [16] - 6:20, 11:22,
36:20, 47:9, 51:1,
55:18, 71:9, 71:24,
77:17, 81:15, 82:22,
83:20, 90:12, 93:14,
152:21, 174:23
**top** [3] - 20:3, 35:14,
81:3
**topic** [2] - 76:9,
106:12
**topics** [2] - 98:2,
134:21
**torture** [1] - 122:5
**total** [7] - 4:13, 4:15,
4:16, 87:23, 87:25,
110:12, 172:8
**totally** [2] - 90:4, 90:5
**touch** [1] - 23:4
**touched** [2] - 28:4,
108:15
**touches** [1] - 78:20
**towards** [1] - 99:21
**trace** [1] - 63:12
**track** [1] - 107:6
**tracks** [2] - 22:9, 23:4
**Trade** [3] - 47:10,
48:15, 149:9
**trade** [4] - 18:20, 65:4,
180:1, 180:6
**trade-association** [1]
- 65:4
**trades** [1] - 144:11
**traffic** [103] - 8:4, 11:7,
13:20, 13:21, 14:16,
20:16, 20:18, 24:2,
25:8, 28:3, 28:10,
28:11, 28:12, 28:17,
28:25, 29:3, 29:10,
29:12, 30:16, 31:15,
32:22, 44:7, 45:1,
45:7, 49:9, 49:20,
61:13, 61:20, 63:25,
65:13, 66:4, 66:5,
66:11, 71:11, 71:25,
72:12, 75:20, 75:22,
75:24, 77:25, 81:6,
81:22, 83:24, 87:23,
87:25, 88:18, 90:14,

91:22, 91:24, 92:13,
99:20, 100:3,
101:23, 103:25,
104:8, 104:12,
105:8, 111:12,
112:8, 112:17,
113:17, 113:24,
114:24, 115:10,
115:12, 115:15,
116:6, 116:10,
116:23, 118:9,
133:6, 133:8,
133:15, 133:21,
134:20, 135:4,
135:9, 141:14,
141:16, 141:25,
143:2, 143:7,
145:10, 147:23,
148:19, 150:6,
150:8, 150:22,
157:7, 157:8, 157:9,
164:5, 164:19,
166:23, 166:25,
172:15, 173:5,
179:22, 182:21
**train** [3] - 23:24,
29:11, 62:8
**transaction** [1] -
126:16
**transcend** [1] - 56:5
**transcends** [1] - 74:19
**TRANSCRIPT** [1] -
1:10
**transcript** [5] - 2:21,
106:11, 184:10,
184:11, 184:22
**transcription** [1] -
2:21
**transcripts** [1] -
130:24
**transfer** [1] - 44:5
**transform** [4] - 61:9,
62:12, 107:14,
112:14
**transformed** [1] -
40:20
**transitional** [1] - 20:5
**transitioning** [1] -
159:2
**transport** [1] - 127:5
**transportation** [2] -
123:17, 142:4
**Transportation** [3] -
3:8, 149:10, 163:24
**transporting** [1] - 85:1
**traveled** [1] - 113:14
**treated** [1] - 69:23
**treatment** [1] - 135:12
**tremendous** [1] -
98:24

**tremendously** [1] -
172:2
**tried** [6] - 72:18, 97:7,
120:8, 120:16, 155:3
**tries** [2] - 46:4, 54:1
**trigger** [9] - 9:14,
83:11, 83:13, 103:9,
105:5, 109:19
**triggers** [1] - 10:1
**trip** [2] - 83:21, 83:25
**tripwire** [2] - 153:12,
153:22
**trivial** [1] - 154:2
**trouble** [3] - 98:15,
154:1, 181:20
**truck** [2] - 24:15,
142:4
**trucker** [1] - 24:16
**trucking** [3] - 21:22,
24:20
**trucks** [4] - 23:12,
23:13, 25:9, 27:23
**true** [11] - 6:14, 14:13,
36:7, 49:4, 61:9,
76:11, 77:12, 129:7,
184:9, 184:10
**trust** [1] - 26:8
**truth** [1] - 155:18
**try** [13] - 31:6, 32:11,
39:15, 43:15, 60:21,
73:16, 94:22, 98:10,
149:11, 155:21,
155:25, 159:22,
180:18
**trying** [36] - 21:11,
21:19, 21:21, 21:23,
22:24, 23:7, 24:4,
24:12, 25:7, 27:22,
36:6, 36:7, 39:7,
40:12, 47:19, 48:5,
72:25, 75:8, 76:17,
77:14, 80:2, 84:1,
119:4, 124:23,
125:13, 125:16,
129:19, 132:10,
135:13, 139:19,
152:12, 153:1,
154:18, 158:24,
162:6, 165:17
**Tse** [1] - 174:11
**TSE** [1] - 174:11
**turn** [36] - 5:22, 20:6,
40:6, 45:19, 48:22,
58:13, 59:12, 59:20,
64:13, 67:9, 69:10,
96:7, 96:21, 97:16,
100:15, 101:13,
102:2, 102:5,
103:17, 104:13,
107:23, 109:22,

117:10, 118:20, 119:5, 121:8, 121:19, 122:7, 125:18, 126:4, 129:16, 130:2, 155:6, 160:18, 160:24, 161:7

**turned** [2] - 92:3, 103:6

**turning** [8] - 7:20, 30:3, 92:24, 103:17, 104:24, 106:1, 155:14, 173:15

**turns** [2] - 56:24, 176:19

**twist** [1] - 120:8

**two** [66] - 4:14, 4:15, 4:16, 4:21, 5:24, 9:3, 9:11, 10:17, 11:10, 15:11, 17:1, 17:8, 18:23, 19:2, 19:20, 21:19, 24:4, 28:18, 29:12, 31:3, 31:6, 32:9, 37:2, 37:13, 38:3, 38:8, 48:3, 59:17, 61:1, 62:17, 71:7, 71:22, 74:11, 76:9, 78:1, 78:2, 81:16, 84:19, 90:15, 94:25, 101:25, 103:18, 112:1, 113:4, 118:2, 118:6, 121:14, 124:11, 124:13, 124:14, 125:8, 130:3, 130:6, 139:9, 139:15, 143:2, 153:9, 159:18, 165:20, 167:17, 167:19, 171:13, 175:15, 175:16, 175:20

**two-prong** [1] - 11:10

**two-word** [2] - 9:3, 9:11

**type** [5] - 71:14, 72:19, 79:1, 79:5, 91:17, 146:5, 163:15, 169:20, 170:21, 171:2, 171:11

**typed** [1] - 65:22

**types** [10] - 77:13, 78:16, 83:18, 84:5, 115:12, 134:18, 144:1, 145:7, 146:8, 173:10

**typical** [2] - 13:12, 85:20

**typically** [4] - 13:3, 13:21, 97:9, 139:2

# U

**U.S** [2] - 2:14, 2:19

**ultimate** [3] - 140:14, 172:18, 173:17

**ultimately** [7] - 16:12, 58:10, 71:1, 95:2, 98:6, 99:19, 129:9

**umbrella** [1] - 39:13

**umbrellas** [1] - 17:16

**umpire's** [1] - 56:15

**unable** [2] - 96:23, 163:11

**unambiguously** [2] - 8:9, 106:25

**uncited** [2] - 82:25, 90:3

**uncompetitive** [2] - 21:15, 21:16

**uncoordinated** [1] - 98:3

**under** [47] - 10:21, 39:12, 43:9, 43:23, 48:20, 56:5, 66:20, 69:20, 69:23, 72:9, 77:19, 78:10, 81:6, 83:20, 83:22, 95:20, 104:8, 105:1, 105:15, 107:24, 115:3, 115:12, 121:5, 125:17, 129:14, 130:8, 133:10, 134:12, 135:12, 142:8, 142:9, 142:10, 142:19, 143:11, 143:13, 144:6, 153:21, 169:13, 169:16, 169:23, 170:2, 170:19, 170:23, 171:2, 172:18, 173:17, 178:4

**underlying** [9] - 14:2, 20:2, 31:10, 42:11, 42:14, 58:8, 59:8, 154:7, 155:5

**undermines** [1] - 48:9

**underscored** [1] - 107:9

**underscores** [1] - 29:1

**understood** [4] - 25:14, 25:21, 159:6

**undertaking** [2] - 39:22, 178:8

**undoubtedly** [1] - 166:22

**unduly** [1] - 148:10

**unending** [1] - 26:5

**unfinished** [2] - 50:10, 58:14

**unfortunately** [1] - 117:10

**unfounded** [1] - 112:19

**unified** [1] - 140:23

**uniform** [4] - 102:18, 103:21, 104:19, 117:2

**uniformity** [1] - 61:3

**unilateral** [3] - 31:12, 31:13, 86:20, 93:4, 97:18

**unilaterally** [1] - 114:4

**unimportant** [1] - 158:25

**Union** [11] - 3:6, 3:21, 44:4, 103:19, 103:24, 104:25, 110:23, 111:15, 112:1, 113:8, 157:25

**UNION** [2] - 1:7, 2:2

**unique** [1] - 170:19

**unit** [2] - 35:25, 36:8

**UNITED** [2] - 1:1, 1:11

**United** [10] - 3:9, 5:4, 5:5, 67:21, 117:23, 119:15, 133:2, 174:11, 174:13, 182:4

**unlawful** [32] - 20:18, 32:3, 34:18, 35:1, 35:14, 35:17, 36:2, 36:13, 37:21, 39:13, 39:23, 48:13, 50:21, 54:4, 56:25, 57:1, 57:4, 58:3, 58:17, 59:24, 60:5, 60:22, 61:9, 62:13, 62:20, 63:12, 118:17, 144:9, 152:9, 154:2, 160:22

**unlawfulness** [3] - 58:6, 59:9, 154:19

**unless** [11] - 6:3, 39:25, 40:7, 49:22, 100:20, 117:8, 120:6, 123:24, 140:19, 174:24

**unlike** [1] - 170:3

**unlikely** [2] - 51:22, 180:15

**unpersuaded** [1] - 127:7

**unquote** [1] - 67:15

**unrealistic** [1] - 85:14

**unreasonable** [2] - 80:24, 164:1

**unregulated** [8] - 8:4,

28:12, 28:17, 29:8, 30:16, 92:7, 92:13, 147:23

**unsubstantiated** [2] - 83:1, 90:3

**unusual** [5] - 31:11, 32:18, 47:6, 140:19, 174:18

**unworkable** [1] - 29:7

**UP** [32] - 10:5, 11:6, 12:5, 12:7, 12:8, 13:1, 14:7, 15:8, 16:21, 17:1, 33:22, 43:17, 60:14, 62:21, 81:1, 81:3, 82:1, 86:23, 101:18, 101:24, 105:3, 108:10, 110:3, 110:4, 110:6, 110:21, 111:3, 111:13, 118:12, 118:13, 171:19

**up** [57] - 4:4, 8:23, 10:7, 17:21, 21:19, 23:8, 23:12, 23:14, 24:8, 33:2, 42:22, 43:19, 48:22, 58:6, 64:7, 64:17, 67:1, 67:8, 75:1, 76:3, 77:8, 79:22, 84:7, 87:11, 90:16, 92:1, 98:21, 108:18, 109:18, 127:13, 131:9, 131:12, 131:25, 134:22, 149:23, 151:14, 151:25, 155:21, 155:23, 156:1, 158:10, 161:24, 162:17, 163:20, 169:7, 175:18, 177:15, 177:22, 178:18, 179:16, 180:25, 181:16

**UP's** [6] - 12:3, 83:6, 87:23, 87:24, 118:14, 171:19

**UP-pricing** [1] - 110:6

**UP/CSX** [1] - 108:18

**UP/NS** [1] - 44:5

**upcoming** [3] - 65:1, 81:16, 81:25

**upside** [1] - 81:10

**urge** [1] - 182:23

**urging** [1] - 122:17

**usage** [2] - 46:3

**usages** [1] - 49:11

**useful** [2] - 20:9, 20:24

**uses** [6] - 30:8, 36:1,

125:11, 158:11

# V

**Valbrun** [1] - 174:13

**VALBRUN** [1] - 174:14

**valid** [1] - 127:25

**value** [1] - 160:23

**vanilla** [1] - 52:1

**variety** [1] - 45:14

**various** [11] - 10:25, 13:16, 20:23, 63:3, 93:14, 94:8, 104:2, 107:7, 117:9, 141:1, 151:7

**varying** [1] - 143:24

**vast** [6] - 22:21, 23:5, 41:19, 85:20, 114:12

**venture** [7] - 10:22, 23:6, 26:15, 42:15, 42:21, 141:17, 151:22

**venture-like** [1] - 141:17

**venturers** [4] - 141:18, 144:8, 154:8, 168:23

**ventures** [3] - 22:7, 27:1, 154:8

**version** [1] - 64:18

**versus** [8] - 20:13, 30:16, 42:17, 58:25, 76:6, 144:25, 147:23, 155:7

**via** [2] - 1:12, 184:19

**vicious** [1] - 97:23

**video** [4] - 4:10, 36:15, 102:6, 163:4

**videoconferencing** [1] - 184:20

**videoteleconference** [1] - 1:12

**view** [16] - 34:9, 51:10, 51:12, 57:21, 57:22, 63:9, 63:10, 63:11, 95:22, 137:15, 138:16, 149:11, 166:6, 178:16, 182:24

**viewed** [8] - 88:13, 91:15, 97:15, 115:5, 115:14, 115:22, 116:5, 124:21

**views** [5] - 51:20, 63:9, 72:21, 97:10, 149:8

**Vinson** [1] - 1:21

**violate** [9] - 73:11, 73:17, 93:7, 93:25, 116:14, 139:24,

166:16, 167:6, 167:13
**violated** [2] - 73:15, 139:20
**violation** [6] - 33:15, 34:19, 64:4, 116:16, 124:22, 139:17
**violative** [1] - 65:21
**violence** [1] - 153:19
**virtually** [2] - 43:2, 164:9
**virtue** [4] - 48:4, 58:2, 151:17, 158:23
**vision** [1] - 103:6
**visiting** [1] - 64:25
**void** [1] - 184:21
**volume** [2] - 5:25, 25:1
**volumes** [1] - 5:25
**voted** [1] - 53:14
**voting** [4] - 119:23, 120:6, 120:17, 121:6
**VP's** [1] - 176:25
**vs** [1] - 1:6

# W

**wagging** [1] - 177:20
**wags** [1] - 118:10
**wait** [2] - 66:14, 153:1
**waive** [1] - 114:20
**waivers** [1] - 99:22
**walk** [5] - 75:11, 88:4, 123:5, 123:10, 125:19
**walked** [4] - 165:24, 173:8, 173:11, 175:20
**walking** [1] - 164:10
**walks** [1] - 77:6
**Wall** [6] - 3:9, 3:18, 161:15, 173:2, 177:11, 177:15
**WALL** [39] - 2:3, 5:18, 5:21, 6:2, 12:19, 13:5, 14:22, 14:25, 18:15, 18:25, 19:22, 20:5, 29:19, 33:19, 34:1, 34:4, 34:8, 34:11, 34:16, 36:17, 40:9, 40:21, 46:25, 47:4, 49:25, 51:17, 53:10, 53:12, 53:22, 54:15, 55:7, 59:19, 66:23, 132:6, 149:21, 156:4, 161:10, 178:20, 184:1
**wall** [42] - 3:20, 3:23,

4:5, 5:20, 12:17, 21:20, 22:14, 24:8, 24:18, 29:18, 51:7, 66:22, 70:7, 70:22, 72:20, 78:4, 82:23, 83:1, 84:23, 89:3, 89:23, 93:13, 93:18, 98:13, 99:6, 107:9, 108:18, 109:13, 110:13, 117:16, 122:20, 149:18, 149:19, 161:25, 169:10, 171:17, 172:15, 173:13, 173:20, 174:17, 175:17, 178:17
**wall's** [3] - 171:14, 175:18, 182:8
**Wall's** [1] - 171:19
**wants** [3] - 35:18, 52:16, 55:11
**War** [2] - 46:7, 46:12
**ward** [1] - 99:16
**warning** [1] - 81:13
**wars** [1] - 97:23
**Washington** [8] - 1:7, 1:19, 1:23, 2:10, 2:15, 2:19, 47:3, 47:4
**watch** [1] - 46:23
**water** [2] - 128:14, 180:23
**Watkins** [1] - 2:4
**ways** [8] - 14:12, 14:14, 26:14, 146:12, 151:8, 152:15, 157:18, 158:6
**weaponized** [1] - 18:7
**weave** [1] - 181:3
**weaving** [2] - 12:2, 108:10
**Weaving** [1] - 107:25
**week** [1] - 101:24
**weeks** [3] - 96:14, 105:25, 112:20
**weigh** [1] - 140:20
**welcome** [2] - 146:18, 180:18
**welfare** [1] - 126:14
**west** [4] - 18:16, 25:15, 41:19, 41:20
**West** [7] - 1:22, 12:24, 14:21, 14:22, 18:14, 74:8, 85:22
**western** [10] - 8:18, 9:6, 18:17, 19:17, 22:13, 22:24, 23:2, 60:7, 112:1, 113:4
**western/NS** [1] - 62:4

**whatsoever** [4] - 89:21, 89:25, 92:11, 171:24
**white** [3] - 32:7, 32:15, 70:21
**whole** [11] - 24:11, 28:11, 29:2, 29:13, 67:20, 78:23, 85:11, 89:17, 92:3, 107:1, 123:8
**Wi** [2] - 94:17, 95:12
**Wi-Fi** [2] - 94:17, 95:12
**wide** [1] - 94:9
**wild** [1] - 156:21
**Wilkinson** [2] - 152:21, 153:11
**willing** [1] - 166:1
**Wilson** [2] - 123:6, 123:16
**win** [1] - 180:21
**wisdom** [1] - 158:10
**wish** [1] - 138:3
**wishes** [1] - 138:4
**witnesses** [4] - 96:22, 171:25, 183:20, 183:21
**word** [29] - 9:3, 9:11, 12:20, 14:3, 40:14, 41:6, 43:10, 45:10, 46:5, 46:17, 47:14, 63:7, 78:8, 107:8, 107:12, 107:15, 107:17, 110:14, 110:17, 110:18, 112:12, 134:3, 150:11, 156:10, 167:18, 167:23, 168:15, 182:13, 183:1
**wording** [1] - 78:9
**words** [23] - 30:4, 30:8, 30:9, 91:14, 95:14, 106:21, 119:9, 120:9, 120:18, 124:3, 125:12, 125:14, 125:15, 130:9, 134:8, 134:9, 153:20, 154:6, 168:21, 174:25, 180:24, 182:25
**works** [3] - 11:20, 61:25, 72:22
**World** [2] - 46:7, 46:12
**world** [16] - 29:3, 29:4, 36:10, 36:11, 42:9, 42:12, 81:10, 92:3, 103:6, 158:4, 159:2, 159:5, 161:20,

166:6, 173:15, 181:8
**worried** [3] - 27:6, 27:7, 38:15
**worry** [2] - 31:24, 32:13
**worth** [1] - 104:9
**worthy** [1] - 174:24
**wrap** [1] - 92:1
**write** [2] - 51:23, 168:8
**writes** [2] - 111:18, 113:8
**written** [1] - 167:9
**wrongs** [1] - 153:9
**wrote** [2] - 91:12, 126:10
**WTI** [1] - 111:12

# Y

**years** [7] - 48:16, 87:2, 90:18, 119:6, 127:10, 163:11, 176:14
**yeoman** [1] - 38:23
**yeoman's** [1] - 183:15
**yeses** [1] - 31:22
**York** [3] - 1:15, 22:10, 23:14
**yourself** [1] - 91:11

# Z

**zone** [2] - 56:18, 72:13