**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (No. I)<br><br>This Document Relates To:<br><br>ALL CASES | MDL No. 1869<br>Misc.  No. 07-489 (PLF/GMH)<br><br>**PUBLICLY FILED VERSION**<br><br>**Oral Argument Requested** |

**DEFENDANTS' COMMON MEMORANDUM IN SUPPORT OF
<u>DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iv

I.   INTRODUCTION ...........................................................................................1

II.  Governing Legal Standards............................................................................4

    A.   Defendants' Initial Burden Is Simply to  Offer a Plausible Unilateral
        Explanation for Their Conduct ..............................................................5

    B.   Plaintiffs' Burden Is to Prove There Is a Triable Issue of *Express*
        Conspiracy ............................................................................................7

    C.   "Direct Evidence" of Conspiracy—Evidence that Establishes a Conspiracy
        Unambiguously and Without Inference—Suffices to Meet the Plaintiffs'
        Burden....................................................................................................7

    D.   In the Absence of Direct Evidence, Summary Judgment Must Be Granted
        in a Conspiracy Case Unless the Plaintiffs' Evidence Tends to Exclude the
        Possibility of Independent Action ..........................................................8

    E.   In Concentrated Markets, Plaintiffs Must Negate "Conscious Parallelism"
        as a Non-Collusive Explanation for Parallel Behavior .........................11

    F.   Dispositive Factors.............................................................................14

        1.   Parallel Conduct in Prior, Concededly Non-Conspiratorial Periods .........14

        2.   "Obvious Alternative Explanations" for Parallel Behavior .....................15

        3.   Differentiated (as Opposed to Parallel) Behavior....................................16

        4.   Evidence of Unilateral Decision-Making .................................................17

    G.   Legitimate Communications Cannot Be Used to Infer Unlawful
        Agreement............................................................................................18

III. UNDISPUTED FACTS.................................................................................21

    A.   Fuel Surcharges Are Rational Independent Responses to Fluctuating Fuel
        Prices...................................................................................................22

    B.   *Before* the Alleged Conspiracy, Defendants All Adopted Surcharge
        Formulas that Were *More Alike* than the Surcharge Formulas Plaintiffs
        Claim Resulted from Conspiracy..........................................................24

C.   Defendants Adopted Policies Calling for Widespread Application of Fuel Surcharges Before the Alleged Conspiracy ...........................................26

D.   Each Railroad Made Independent Decisions About Local Fuel Surcharges .........28

E.   Plaintiffs Have Conceded that the Allegedly Conspiratorial Fuel Surcharges Were Not More Aggressive at the Fuel Prices that Prevailed in the Damages Period ....................................................................................34

IV.   ARGUMENT ..................................................................................................36

A.   There Is No Triable Issue of Fact as to the Alleged Conspiracy to Impose More Aggressive Fuel Surcharges on All Shippers ...............................................36

1.   Plaintiffs Lack Direct Evidence of Any Conspiracy...................................36

2.   Plaintiffs' Circumstantial Evidence Does Not Support an Inference of Conspiracy Under *Matsushita* ................................................42

a.   No Inference of Conspiracy Is Possible Because the Railroads Each Reacted in Unilaterally Rational Fashion to the Common Stimulus of Rising Fuel Costs...................................43

b.   The Railroads' Behavior During the Alleged Conspiracy Period Was Neither Unusually Parallel Nor a Break From Historical Practices ........................................................................48

c.   Defendants' Behavior Is Entirely Consistent with Non-Conspiratorial Follow-the-Leader Parallelism ....................52

d.   The Railroads' Independent Internal Decision-Making Processes Supply Non-Conspiratorial Explanations for Their Conduct that Are Not Merely Plausible, but Outright Incompatible with Plaintiffs' Theory.............................................56

e.   The Industry Meetings and Interline Interactions Central to Plaintiffs' Allegations Do Not Permit an Inference of Conspiracy ......................................................................................57

(1)   Plaintiffs' evidence of interline alliance meetings during the alleged conspiracy's formative period is factually and legally insufficient.........................................58

(2)   Plaintiffs' reliance on interline concurrences is misplaced ..........................................................................63

B.   The Arrival of Mileage-Based Fuel Surcharges Limits the Substantive and Temporal Scope of Any Conspiracy....................................................................67

1.      Plaintiffs Must Establish the Scope and Duration of Any
        Conspiracy ................................................................................................67

2.      Mileage-Based Fuel Surcharges Are Not Part of the Alleged
        Conspiracy ................................................................................................69

3.      Plaintiffs Cannot Satisfy Their *Matsushita* Burden to Establish that
        Any Conspiracy Extended After the STB's January 25, 2007
        Decision ....................................................................................................70

C.      Plaintiffs Lack Sufficient Evidence to Establish a Conspiracy Covering
        Intermodal Traffic ................................................................................................74

1.      Plaintiffs' Evidence Does Not Exclude the Possibility that
        Defendants' Intermodal Fuel Surcharge Formulas Were Unilateral ........76

2.      Plaintiffs' Evidence Does Not Tend to Exclude the Possibility that
        Defendants Applied Their Intermodal Surcharges Unilaterally ...............78

V.      Conclusion ............................................................................................................80

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                                     <u>Page</u>

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) ....................................................................................8, 63

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...............................................................................................4, 65

*Anderson News, L.L.C. v. American Media, Inc.*,
    899 F.3d 87 (2d Cir. 2018)....................................................9, 16, 17, 73, 77

**In re Baby Food Antitrust Litig*ation,
    166 F.3d 112 (3d Cir. 1999).................................................................... *passim*

**Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................ *passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
    203 F.3d 1028 (8th Cir. 2000) .......................................................................10

**In re Blood Reagents Antitrust Litigation*,
    266 F. Supp. 3d 750 (E.D. Pa. 2017) ........................................................68, 75

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...........................................................................12, 45

*Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*,
    95 F.3d 593 (7th Cir. 1996) ..........................................................................47

*In re Chocolate Confectionary Antitrust Litigation*,
    999 F. Supp. 2d 777 (M.D. Pa. 2014),
    *aff'd*, 801 F.3d 383 (3d Cir. 2015)...............................................................57

**In re Chocolate Confectionary Antitrust Litigation*,
    801 F.3d 383 (3d Cir. 2015)...................................................................... *passim*

**In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999) ................................................................... *passim*

**City of Moundridge v. Exxon Mobil Corp.*,
    No. 04-cv-940 (RWR), 2009 WL 5385975 (D.D.C. Sept. 30, 2009),
    *aff'd*, 409 F. App'x 362 (D.C. Cir 2011) ................................................... *passim*

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
    158 F.3d 548 (11th Cir. 1998) ......................................................................12

iv

*Clamp-All Corp. v. Cast Iron Soil Pipe Institute*,
    851 F.2d 478 (1st Cir. 1988) ..................................................................53

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*,
    801 F.3d 758 (7th Cir. 2015) .................................................................62

*In re Domestic Airline Travel Antitrust Litigation*,
    221 F. Supp. 3d 46 (D.D.C. 2016) .....................................................8, 36

*Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n*,
    663 F.2d 253 (D.C. Cir. 1981) ..........................................................10, 13

*In re Flat Glass Antitrust Litigation*,
    385 F.3d 350 (3d Cir. 2004)..................................................................13

*Freedom Holdings, Inc. v. Cuomo*,
    624 F.3d 38 (2d Cir. 2010)....................................................................16

*In re Fuel Surcharges*,
    Ex Parte No. 661, 2007 STB Lexis 39 (Jan. 25, 2007).......................23

*Golden Bridge Technology, Inc. v. Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) ...............................................................17

*Hyland v. HomeServices of America, Inc.*,
    771 F.3d 310 (6th Cir. 2014) ............................................................9, 11

*Jung v. Ass'n of American Medical Colleges*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ....................................................64

*Kleen Products LLC v. Georgia-Pacific LLC*,
    910 F.3d 927 (7th Cir. 2018) ......................................................... *passim*

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ...........................................6, 16, 17, 43

*In re LTL Shipping Services Antitrust Litigation*,
    No. 1:08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009)....6, 43, 44, 47, 48

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................... *passim*

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984).......................................................................... *passim*

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) ........................................................................13

*Nypl v. JPMorgan Chase & Co.*,
    No. 15 CIV. 9300 (LGS), 2018 WL 1276869 (S.D.N.Y. Mar. 12, 2018) ........................70

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
    629 F.3d 697 (7th Cir. 2011) ........................................................................11

*Panache Broadcasting of Pennsylvania, Inc. v. Richardson Electronics, Ltd.*,
    No. 90 C 6400, 2001 WL 290408 (N.D. Ill. Mar. 22, 2001) ......................................67, 74

*Pension Benefit Guaranty Corp. v. Asahi Tec Corp.*,
    979 F. Supp. 2d 46 (D.D.C. 2013) ..................................................................67

*Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*,
    No. 08-CV-00042, 2015 WL 4987751 (E.D.N.Y. Aug. 19, 2015) ...........................67, 70

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    587 F. Supp. 2d 27 (D.D.C. 2008) ...............................................................15, 41, 49, 50

*In re Rail Freight Fuel Surcharge Antitrust Litigtion*,
    287 F.R.D. 1 (D.D.C. 2012),
    *vacated*, 725 F.3d 244 (D.C. Cir. 2013) ...............................................................21, 49, 79

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    292 F. Supp. 3d 14 (D.D.C. 2017),
    *aff'd*, 934 F.3d 619 (D.C. Cir. 2019) ............................................................... *passim*

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    934 F.3d 619 (D.C. Cir. 2019) ........................................................................69

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    No. CV 11-1049 (PLF), 2021 WL 663669 (D.D.C. Feb. 19, 2021) ...............19, 20, 21, 65

*In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*,
    No. 1:19-cv-03379 (BAH), 2020 WL 5016922 (D.D.C. Aug. 25, 2020) .............67, 69, 70

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
    971 F.2d 37 (7th Cir. 1992) ........................................................................51

*Stanislaus Food Products Co. v. USS-POSCO Industries*,
    803 F.3d 1084 (9th Cir. 2015) ........................................................................16

*Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*,
    902 F.3d 735 (7th Cir. 2018) ........................................................................15

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) .................................................................................................20, 63

*\*In re Text Messaging Antitrust Litigation*,
    46 F. Supp. 3d 788 (N.D. Ill. 2014),
    *aff'd*, 782 F.3d 867 (7th Cir. 2015) ...........................................4, 8, 17, 36, 57

*\*In re Text Messaging Antitrust Litigation*,
    782 F.3d 867 (7th Cir. 2015) .............................................................. *passim*

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..........................................................................64

*Toys "R" Us, Inc. v. Federal Trade Commission*,
    221 F.3d 928 (7th Cir. 2000) ........................................................................48

*Trudel v. SunTrust Bank*,
    924 F.3d 1281 (D.C. Cir. 2019) .....................................................................4

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) ........................................................................68

*United States v. General Electric Co.*,
    869 F. Supp. 1285 (S.D. Ohio 1994) ............................................................19

*United States v. Nippon Paper Industries Co.*,
    62 F. Supp. 2d 173 (D. Mass, 1999) .............................................................67

*United States v. Inryco, Inc.*,
    No. Y-80-054, 1981 WL 2126 (D. Md. July 28, 1981) .................................68

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ..........................................................13, 14, 36, 48

*Weit v. Continental Illinois National Bank & Trust Co.*,
    641 F.2d 457 (7th Cir. 1981) ........................................................................19

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011) ..........................................................9, 15, 53

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
    815 F.2d 522 (9th Cir. 1987) ....................................................................19, 64

*\*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ..................................................................10, 15, 17

Statutes and Rules

15 U.S.C. § 1 .........................................................................................................4

49 U.S.C. § 10706 ................................................................................................4

49 U.S.C. § 10706(A)(3)(B)(ii) .....................................................................20, 64

49 U.S.C. § 11101(c) .........................................................................................64

Fed. R. Civ. P. 56(a) ...........................................................................................4

49 C.F.R. § 1180.1(c)....................................................................................20, 59

Other Authorities

Phillip E. Areeda & Herbert Hovenkamp,
     *Antitrust Law*, Wolters Kluwer (database updated Sept. 2020) ................................ *passim*

Victor P. Goldberg,
     *Price Adjustment in Long-Term Contracts*, 1985 Wis. L. Rev. 527 ..................................22

H.R. Conf. Rep. No. 96-1430 (1980),
     *reprinted in* 1980 U.S.C.C.A.N. 4110 ..............................................................20

*Major Rail Consolidation Procedures*,
     STB Ex Parte No. 582 (Sub-No. 1),
     5 S.T.B. 539, 2001 WL 648944 (2001) ...............................................................59

William H. Page,
     *Communication and Concerted Action*, 38 Loy. U. Chi. L.J. 405 (2007) ..........................9

*Petroleum & Other Liquids: Cushing, OK WTI Spot Price FOB*,
     U.S. Energy Info. Admin., https://www.eia.gov/dnav/pet/hist/rwtcW.htm
     (last visited May 14, 2021) ........................................................................23

*Petroleum & Other Liquids: Weekly U.S. No 2 Diesel Retail Prices*,
     U.S. Energy Info. Admin.,
     https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EP
     D2D_PTE_NUS_DPG&f=W (last visited May 14, 2021) ..................................................23

U. S. Department of Transportation,
     *Calculation of Bunker Fuel, Currency, and Inland Freight Fuel Price
     Adjustment Factors for USTRANSCOM Commercial Shipping Contracts:
     Final Report* (July 2009), https://rosap.ntl.bts.gov/view/dot/12116 ..............................23

## I.     INTRODUCTION

This Common Memorandum supports Defendants' separate motions for summary judgment on the issue of conspiracy.  Defendants have structured these papers to address efficiently both their individual stories—how and why each railroad adopted its fuel surcharge policies—and Plaintiffs' attempt to weave the four Defendants' separate actions into a single conspiracy.  This Common Memorandum addresses (a) the governing legal standards, (b) the material undisputed facts, and (c) the application of the law to the material undisputed facts.  In separate memoranda, each Defendant provides a more detailed factual statement concerning its adoption of fuel surcharges.  Defendants are also filing a joint Statement of Undisputed Material Facts.  Defendants incorporate those separate memoranda and that statement by reference into this Common Memorandum.

Defendants' motions for summary judgment rest on *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), the landmark cases recognizing that "mistaken inferences" of conspiracy from lawful conduct can harm the competitive process that antitrust law seeks to protect. *Monsanto* and *Matsushita* establish stringent standards that an antitrust conspiracy plaintiff's evidence must meet to create a triable issue of fact where (as here) the alleged conspiracy is based on circumstantial evidence and legitimate, vertical communications between or among the alleged conspirators.  *Monsanto* demands "evidence that tends to exclude the possibility that the [defendants] were acting independently," 465 U.S. at 764, and does not allow an inference of conspiracy from legitimate, vertical communications.  *Matsushita* builds on *Monsanto*, establishing that "antitrust law limits the range of permissible inferences from ambiguous evidence" in a conspiracy case, particularly where parallel but independent behavior (so-called "conscious parallelism") could explain the market outcome.  475 U.S. at 588.  *Matsushita* also

holds that the plaintiff must show that "the inference of conspiracy is reasonable *in light of the competing inferences of independent action*." *Id.* (emphasis added). As a consequence, summary judgment motions in antitrust conspiracy cases are unique: The court does not ask merely whether the plaintiff's evidence could persuade a reasonable jury. Instead, a plaintiff must, first, come forward with some evidence that cannot be reconciled with independent action, and then, even if it does, the plaintiff's proposed inference of conspiracy must be *stronger* than the competing inference of unilateral behavior arising from the record as a whole. *See infra* Section II.D.

In fourteen years of litigation, Plaintiffs' "evidence" of conspiracy has never been tested against the *Monsanto/Matsushita* doctrine. It will be now. And whatever the Court may think of that evidence presented selectively and without rebuttal as "common proof" for class certification, Plaintiffs have *nothing* that "tends to exclude the possibility of independent action" or that, on a complete record, can overcome the competing inference of unilateral behavior.

To begin, Plaintiffs lack "direct evidence" of conspiracy—the sort of evidence one typically sees in price-fixing cases arising from an antecedent criminal price fixing case. Indeed, the Department of Justice looked at these issues but closed its investigation without criminal or civil charges. The interline communications that Plaintiffs cite are *not* direct evidence of unlawful conspiracy. None comes even close to proving the alleged conspiracy by itself—which is why Plaintiffs use interline communications as links in a chain of speculative inferences.

To succeed under *Monsanto* and *Matsushita*, then, Plaintiffs must produce evidence that tends to exclude the possibility that Defendants' fuel surcharges and fuel surcharge policies arose independently. However, the undisputed evidence is that Defendants had unilaterally adopted very similar—*almost identical*—fuel surcharges *before* the alleged conspiracy period. This is

proof positive of what is intuitive anyway:  Imposing fuel surcharges when fuel prices are volatile and rising is rational independent conduct.  An inference of conspiracy is never reasonable when it means "infer[ring] that [defendants] had agreed among themselves to do what was only natural anyway."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007).  Indeed, no court applying the *Monsanto/Matsushita* standards to allegedly collusive parallel conduct *preceded by a history of similar but independent parallel conduct* has denied defendants summary judgment.  *See infra* Section II.F.1.

Plaintiffs' parallel conduct case is feeble anyway.  Their allegation of a single, all-encompassing conspiracy affecting all shippers is groundless, since the Court has already found that the railroads' intermodal fuel surcharges—covering 30-40% of their business—were "*competitively negotiated formulas* established during the pre-class period."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 122-23 (D.D.C. 2017) (emphasis added). But even if "all-encompassing" actually means "just carload," indisputable evidence shows that Defendants' published carload fuel surcharges were *less standardized* and *no more aggressive* at prevailing fuel prices than their pre-conspiracy counterparts.

Moreover, a contemporaneous documentary record shows when, how, and why the railroads first adopted and later modified their fuel surcharges.  Collectively, these documents provide the "competing inferences of independent action," *Matsushita*, 475 U.S. at 588, that Plaintiffs' tale of conspiracy must overcome.  And the competition is no contest at all:  There is a *massive* amount of documentary evidence of internal analysis, debate, proposals and counterproposals, competitive analyses, studies of customer reactions and desires, and so much more.  On this record, believing in a conspiracy means believing that Defendants "creat[ed] a Potemkin village of seemingly independent analyses to lend paper support to each collusive

pricing move." *In re Text Messaging Antitrust Litig.*, 46 F. Supp. 3d 788, 805 (N.D. Ill. 2014), *aff'd*, 782 F.3d 867 (7th Cir. 2015). Such an inference is entirely unreasonable here.

In the end, Plaintiffs must rely on what Defendants said about fuel surcharges in various interline communications. These communications cannot rescue Plaintiffs' case, however. Admissible under 49 U.S.C. § 10706 or not, they are indisputably *vertical* communications between interlining railroads and, as such, are "conduct that is as consistent with permissible competition as with illegal conspiracy," and therefore, "do[] not, without more, support even an inference of conspiracy." *Matsushita*, 475 U.S. at 597 n.21 (citing *Monsanto*). In all events, a patient look at the evidence shows that the interline communications do not establish (either alone or in relation to other evidence) what Plaintiffs claim.

For over a decade Plaintiffs have been falsely claiming that Defendants conspired to impose standardized, more aggressive fuel surcharges on shippers. The *Monsanto/Matsushita* doctrine does not allow this claim to go forward. Summary judgment should be granted.

## II.    GOVERNING LEGAL STANDARDS

Rule 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is material if its resolution 'might affect the outcome of the suit' and genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Trudel v. SunTrust Bank*, 924 F.3d 1281, 1285 (D.C. Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[T]he substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The threshold issue in any Section 1 Sherman Act case is the existence of a "contract, combination . . ., or conspiracy" in restraint of trade. 15 U.S.C. § 1. A plaintiff may prove the

requisite agreement by direct evidence, and where, as here, direct evidence of a conspiratorial

agreement is lacking, circumstantial evidence.  *See City of Moundridge v. Exxon Mobil Corp.*,

No. 04-cv-940 (RWR), 2009 WL 5385975, at *3 (D.D.C. Sept. 30, 2009), *aff'd*, 409 F. App'x

362 (D.C. Cir 2011).  The legal framework for assessing the sufficiency of a plaintiff's

circumstantial evidence at the summary judgment stage is laid out in *Monsanto* and *Matsushita*

and their progeny, and is described in greater detail in the sections that follow.  In summary,

substantive antitrust law—the principle that "antitrust law limits the range of permissible

inferences from ambiguous evidence in a § 1 case," *Matsushita*, 475 U.S. at 588—modifies the

general principle that the plaintiff is entitled to all reasonable inferences on summary judgment,

and in its place establishes a burden-shifting framework:

1. The defendant's initial burden is to provide a plausible justification for its conduct that is consistent with legitimate business practices.

2. The plaintiff must then offer evidence that *tends to rule out* the possibility that the alleged conspirators were acting unilaterally.

3. If there is evidence irreconcilable with independent action, the Court then determines, based on the record as a whole, whether a reasonable jury could find that the existence of the alleged agreement is *more likely than not*.

Countless decisions have applied the *Monsanto/Matsushita* doctrine to summary judgment

motions in antitrust conspiracy cases.  Today, there is a considerable body of law on both general

issues—such as what "tends to exclude the possibility" of independent action means—and about

fact patterns that are effectively dispositive as to the plaintiff's conspiracy claim because they do

*not* tend to exclude the possibility of independent action.  *See infra*, Section II.D-G.

   **A.    Defendants' Initial Burden Is Simply to
           Offer a Plausible Unilateral Explanation for Their Conduct**

Initially, the defendant has the modest burden of asserting that it acted alone and

providing "a plausible and justifiable reason for its conduct that is consistent with proper

business practice." *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999) (citation

omitted); *see also Moundridge*, 2009 WL 5385975, at *4 ("[T]he defendant may deny the

existence of a conspiracy and offer an innocent explanation of the questioned conduct.") (citation

omitted).

Here, imposing fuel surcharges during a time of rising fuel costs is "consistent with

proper business practice." *Citric Acid*, 191 F.3d at 1094. Fuel surcharges spread throughout the

transportation sector in the 2000 to 2003 period in response to volatile fuel prices. *See, e.g.*,

DA00185; DA00164; DA00187.[1] That occurred without conspiracy in many industries, and

indeed Plaintiffs themselves used fuel surcharges with their customers. Plaintiffs do not contest

the unilateral rationality of such conduct. DA07504 at 07 (Rausser 119:3-121:6). And multiple

courts have recognized it is unilaterally rational behavior. *See LaFlamme v. Societe Air France*,

702 F. Supp. 2d 136, 151-53 (E.D.N.Y. 2010) (dismissing complaint concerning airline fuel

surcharges because they were independently rational in 2003-2004); *In re LTL Shipping Servs.*

*Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, *16 (N.D. Ga. Jan. 28, 2009)

(dismissing allegation of alleged conspiracy over fuel surcharges in the trucking industry

beginning in July 2003, where a "comparison of these factual allegations to the price of diesel

fuel for the time periods alleged provides insight into why the LTL carriers may have felt fuel

surcharges were necessary").

Each defendant railroad provides evidence with this Common Memorandum showing

that it unilaterally adopted fuel surcharges before the alleged conspiracy to address fuel price

volatility, and continued to do so unilaterally. This evidence easily shifts the burden to Plaintiffs.

---

[1] For the Court's convenience, Defendants cite to materials contained in Defendants' Appendix
in Support of Defendants' Joint and Individual Motions for Summary Judgment (the "DA").

**B.      Plaintiffs' Burden Is to Prove There Is a Triable Issue of *Express* Conspiracy**

The plaintiff's burden reflects the baseline rule that only "[e]xpress collusion violates antitrust law; tacit collusion does not." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015). *Monsanto* thus holds:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Monsanto*, 465 U.S. at 768. That "conscious commitment to a common scheme" means "a meeting of the minds" based on some form of communication and assurances. *Twombly*, 550 U.S. at 557; *see also id.* at 556 n.4 (an actionable antitrust conspiracy manifests in "the sort of restricted freedom of action and sense of obligation that one generally associates with agreement") (citation omitted). "[F]ormal agreements have never been required for purposes of Sherman Act section 1," but there must be *something* manifesting assent and commitment, lest the line between unilateral, parallel action and conspiracy be lost altogether. *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 936 (7th Cir. 2018) (Wood, C.J.). Courts have come to understand that nearly any plaintiff armed with federal court discovery and parallel conduct can weave a tale *consistent* with conspiracy. The *Monsanto/Matsushita* doctrine demands more. There must be evidence of commitment, *Monsanto*, 465 U.S. at 768, and an inference of commitment cannot be based "on mere conjecture, ambiguous circumstantial evidence, and suspicion." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 138 (3d Cir. 1999).

**C.      "Direct Evidence" of Conspiracy—Evidence that Establishes a Conspiracy Unambiguously and Without Inference—Suffices to Meet the Plaintiffs' Burden**

The straight-line path through summary judgment for an antitrust conspiracy plaintiff is to present "direct evidence" of the agreement. Direct evidence "explicitly demonstrate[s] an

express agreement between defendants." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 59 (D.D.C. 2016). It "would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *Text Messaging*, 782 F.3d at 871. "Such evidence is tantamount to an acknowledgment of guilt; circumstantial evidence, by contrast, is everything else including ambiguous statements." *Text Messaging*, 46 F. Supp. 3d at 803 (citations and quotation marks omitted). Because, by definition, direct evidence proves conspiracy *without any inferences*, it avoids the "false inferences" policy underlying the *Monsanto/Matsushita* doctrine.

We demonstrate below that Plaintiffs lack direct evidence. Nothing they offer stands on its own and establishes an unlawful agreement without the need for inferences about who could have been present, what might have been discussed, who else was involved, or what exactly may have been agreed to. To the contrary, all of Plaintiffs' proffered evidence—including the interline discussions and agreements regarding fuel surcharges on which Plaintiffs put so much weight—requires "inferences to establish the proposition or conclusion being asserted," *i.e.*, that Defendants agreed to impose standardized, more aggressive fuel surcharges. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (citation omitted); *Citric Acid*, 191 F.3d at 1095 (evidence proffered by a plaintiff is *not* direct evidence of conspiracy if it requires "the court to draw an inference in his favor").

**D.    In the Absence of Direct Evidence, Summary Judgment Must Be Granted in a Conspiracy Case Unless the Plaintiffs' Evidence Tends to Exclude the Possibility of Independent Action**

"[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554 (citing *Matsushita*). Case law and commentary explain what this means. Certainly, a plaintiff need not disprove any possibility of independent action altogether. But the Supreme

Court's command that "there *must be* evidence that tends to exclude the possibility of independent action," *Monsanto*, 465 U.S. at 768 (emphasis added), means that there must be some evidence supporting the inference of conspiracy that *can be reconciled only with conspiracy*. Professor William H. Page explains:

> To visualize what this requirement means: imagine two intersecting circles, one representing evidence consistent with independent action and one representing evidence consistent with concerted action. Evidence of consciously parallel conduct is consistent both with independent action and with concerted action and thus lies in the intersection of these sets. That category of evidence is insufficient to carry the plaintiff's burden of production under *Matsushita*. The plaintiff must produce evidence consistent only with concerted action—evidence in the concerted action circle, but not the independent action circle.

William H. Page, *Communication and Concerted Action*, 38 Loy. U. Chi. L.J. 405, 414 (2007) (DA06864-65 at 65). Summary judgment is regularly granted when the plaintiff relies solely on circumstantial evidence that is consistent with both unilateral and concerted action.[2]

Even if there is some evidence only "in the concerted action circle," *id.*, circumstantial evidence does *not* tend to exclude the possibility of independent action unless, taking the record as a whole, the inference of conspiracy is *stronger than the competing inference of unilateral conduct*. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) ("[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff… .");

---

[2] *See, e.g.*, *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (affirming summary judgment where the plaintiffs' circumstantial evidence had not "counter[ed] the conclusion … that the conduct at issue was also consistent with permissible competition"); *White v. R.M. Packer Co.*, 635 F.3d 571, 585 (1st Cir. 2011) (affirming summary judgment where "[p]laintiffs' ambiguous evidence is entirely consistent with permissible conscious parallelism") (citation omitted); *Citric Acid*, 191 F.3d at 1099 (affirming summary judgment where plaintiffs' circumstantial evidence that defendant "participat[ed] in an organization that collected and audited members' production and sales figures" was "as consistent with legitimate behavior as with conspiratorial behavior"); *see also Text Messaging*, 782 F.3d at 879 (affirming summary judgment when "plaintiffs have presented circumstantial evidence consistent with an inference of collusion, but that evidence is equally consistent with independent parallel behavior").

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032 (8th Cir. 2000)

(*en banc*) ("[I]f it is as reasonable to infer from the evidence a price-fixing conspiracy as it is to

infer permissible activity, then the plaintiff's claim, without more, fails on summary judgment.");

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 412 (3d Cir. 2015) (describing

"more likely than not" standard); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301

(11th Cir. 2003) (finding that the circumstantial proof must "remove [the plaintiffs'] evidence

from the realm of equipoise and render that evidence more probative of conspiracy than of

conscious parallelism"); *Kleen*, 910 F.3d at 934 (requiring evidence that would allow one

"rationally to say that the existence of an agreement is more likely than not").[3]  Therefore, in

contrast to normal summary judgment dynamics, a plaintiff cannot avoid summary judgment

simply by contesting details of the statement by which a defendant asserts it acted unilaterally.

Disputes of that nature simply factor into the Court's evaluation of whether the conspiratorial

explanation for the conduct is more plausible than Defendants' unilateral explanation.

Importantly, this is not a procedural rule.  "It is the substantive law … that establishes

what the plaintiff must address," *Kleen,* 910 F.3d at 934, and it is grounded in *Matsushita's*

determination that the error costs of potentially imposing treble damages to punish appropriate

behavior as *per se* unlawful price fixing are unacceptable.  *Matsushita*, 475 U.S. at 595;

*Williamson Oil*, 346 F.3d at 1300 ("Over time, courts have become attuned to the economic costs

---

[3] In *Moundridge*, Judge Roberts addresses this point twice—and with conflicting language.  He states that if a defendant's "innocent explanation" for its conduct "'is plausible and more logical than a theory of concerted action, then a conspiracy may not be found[,]' and summary judgment can be granted."  2009 WL 5385975, at *4 (citations omitted).  Later he states that "the inference [of conspiracy] is warranted only when a theory of rational, independent action is less attractive than that of concerted action."  *Id.* (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 267 (D.C. Cir. 1981)).  The latter statement, requiring the conspiratorial inference to be stronger, is in accord with the weight of authority.

associated with using circumstantial evidence to distinguish between altogether lawful, independent, consciously parallel decision-making within an oligopoly on the one hand, and illegal, collusive price fixing on the other….This recognition is reflected in the summary judgment formulation that is employed in price fixing cases.").  What might pass as strong circumstantial evidence of conspiracy elsewhere often fails under the *Monsanto/Matsushita* standard because, all things considered, the competing inference of unilateral action is equally strong.  *See, e.g.*, *Kleen*, 910 F. 3d at 934 (affirming summary judgment even though plaintiffs were "[a]rmed with bountiful circumstantial evidence"); *Hyland*, 771 F.3d at 322 (affirming summary judgment even when "plaintiffs have come forward with a good deal of circumstantial evidence that supports its theory of collusion"); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706-07 (7th Cir. 2011) (affirming summary judgment, notwithstanding "an extraordinary amount of evidence … the dozen boxes constituting the appellate record in this case, millions of pages of documents and nearly sixty depositions").

### E. In Concentrated Markets, Plaintiffs Must Negate "Conscious Parallelism" as a Non-Collusive Explanation for Parallel Behavior

An offshoot of the *Monsanto/Matsushita* doctrine is an extensive body of law about "conscious parallelism," the net effect of which makes it particularly difficult for a plaintiff to defeat summary judgment in concentrated or "oligopoly" markets.  Plaintiffs contend the railroad industry is "an interdependent oligopoly…."  DA06202 at 25 (Rausser); *see also* DA07536 at 43-44 (Rausser 256:22-257:1); DA07547 at 57 (Rausser 759:13-23).  Accepting this for present purposes, it only complicates Plaintiffs' case.

Conscious parallelism is "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their

interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). It is "follow the leader" pricing without agreement, *Text Messaging*, 782 F.3d at 871, and a "fact of life in oligopolies," *Chocolate Confectionary*, 801 F.3d at 397-98 (citations and internal quotation marks omitted). In *Text Messaging*, Judge Posner gave an especially apt example:

> Competitors in concentrated markets watch each other like hawks. Think of what happens in the airline industry, where costs are to a significant degree a function of fuel prices, when those prices rise….The airline's competitors will monitor carefully the effects of the airline's response to the higher fuel prices afflicting the industry and may well decide to copy the response should the responder's response turn out to have increased its profits.

782 F.3d at 875. Critically, no "agreement" exists for Section 1 purposes when two or more firms consciously, but independently, adopt parallel practices. *Twombly*, 550 U.S. at 553-54; *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1433a, Wolters Kluwer (database updated Sept. 2020) ("*Antitrust Law*") ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy" required by Section 1).

Accordingly, to survive summary judgment a plaintiff's evidence must "tend to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 571 n.35, 572 (11th Cir. 1998); *Text Messaging*, 782 F.3d at 872 ("The challenge… [i]s thus to find evidence that the defendants had colluded expressly—that is, had explicitly agreed to raise prices—rather than tacitly ('follow the leader' or 'consciously parallel' pricing)"); *Moundridge*, 2009 WL 5385975, at *4 (noting that tacit collusion resulting from conscious parallelism "does not create the inference of a conspiracy" required to avoid summary judgment). The parallel conduct at issue must be buttressed by so-called "plus factors" that "indicate the existence of a conspiracy by *ruling out*

12

*the legitimate explanation for parallel behavior*: they suggest that an alleged conspirator's actions are 'inconsistent with independent pursuit of economic self-interest.'" *Id.* (emphasis added) (quoting *Fed. Prescription*, 663 F.2d at 267); *see In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (defining plus factors as "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action").

Again, much has been written about how and when plus factors suffice to meet the plaintiff's *Monsanto/Matsushita* burden.  Early cases tended to emphasize a motive to conspire, market concentration, entry barriers, homogenous products, and transparent pricing—until courts and commentators pointed out that these factors actually state the conditions in which non-collusive parallel pricing is *most likely*.  *See, e.g.*, *Kleen*, 910 F.3d at 935 ("These characteristics make it easier for companies either to form a cartel *or* to follow the leader independently.") (emphasis in original); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (cautioning against counting factors that "largely restate the phenomenon of interdependence"); *Antitrust Law* ¶ 1434c1.  More recent cases require evidence that cannot be squared with competition or interdependence, including "evidence implying a traditional conspiracy," such as suspicious communications in advance of identical price changes, *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017) (citation omitted), highly anomalous parallel behavior, such as a group of firms raising prices in a time of falling costs, *Text Messaging*, 782 F.3d at 870, or a "radical" or "abrupt" change in industry practices, *Valspar*, 873 F.3d at 196; *Chocolate Confectionary*, 801 F.3d at 410 (citation omitted), that cannot be explained by "external market conditions."  *Kleen*, 910 F.3d at 936.

### F.     Dispositive Factors

Circumstantial evidence must be evaluated in context, and on a case-by-case basis.  *See, e.g.*, *Baby Food Antitrust Litig.*, 166 F.3d at 124.  But there are recurring fact patterns, and the case law teaches that some recurring indications of unilateral decision-making are, for practical purposes, dispositive.

### 1.     Parallel Conduct in Prior, Concededly Non-Conspiratorial Periods

A history of parallel conduct in the absence of conspiracy all but forecloses an inference of conspiracy.  *Kleen*, 910 F.3d 937 ("A continuation of a historic pattern—including of parallel price increase announcements—does not plausibly allow one to infer the existence of a cartel."); *Chocolate Confectionary*, 801 F.3d at 410 (affirming summary judgment in part because "[h]istorically, parallel pricing in the U.S. chocolate market has not been at all uncommon").  In *Valspar*, for example, the Third Circuit affirmed summary judgment notwithstanding 31 allegedly parallel price announcements because "public parallel price increase announcements are 'consistent with how this industry has historically operated.'"  873 F.3d at 196 (citation omitted).  Indeed, Defendants know of no case where parallel conduct *similar to pre-conspiracy historical practices* was deemed sufficient to infer conspiracy.  This is an important principle here, because, assuming that the challenged conduct with regard to fuel surcharges was parallel, the unchallenged conduct preceding it was just as parallel; indeed more so.  In other words, the facts here show, at most, a change from one pattern of parallel conduct to another.  *See infra* Section III.B-E.  That defeats, rather than supports, any argument that the parallel behavior witnessed after Spring 2003 can only be explained by conspiracy.[4]

---

[4] In denying Defendants' 2008 Motion to Dismiss, this Court emphasized Plaintiffs' allegations that the allegedly conspiratorial surcharges were "complex and completely new (*see* Compl. ¶¶ 10, 66)—two factors suggested by the Supreme Court in *Twombly* as making an inference of a

## 2.    "Obvious Alternative Explanations" for Parallel Behavior

*Twombly* holds that one cannot even plead, let alone prove, conspiracy based on parallel conduct when there is an "obvious alternative explanation" for the parallel behavior; "there is no reason to infer that [defendants] had agreed among themselves to do what was only natural anyway." 550 U.S. at 566-68; *see Moundridge*, 2009 WL 5385975, at *6 ("[W]here there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn.") (citation omitted). Therefore, courts routinely grant summary judgment, notwithstanding elaborate efforts to justify an inference of conspiracy, where it made sense for the alleged conspirators to do the same thing without needing to conspire. *See, e.g.*, *Kleen*, 910 F.3d 936 (the rising prices for containerboard "may be explained by external factors, such as the emergence from the economic downturn of 2008, which occurred in the middle of the class period"); *White*, 635 F.3d at 579 (affirming summary judgment where each defendant was "likely to reach its own independent conclusion that its best interests involve keeping prices high"); *Williamson Oil*, 346 F.3d at 1311 ("[Defendants'] only viable route back to profitability was to increase prices; that they did so in a parallel manner does not establish collusion.").

The "obvious alternative explanation" for fuel surcharges—rising costs—has come up in numerous cases. We have already mentioned how, in *Text Messaging*, Judge Posner chose to illustrate independent action with hypothetical airlines raising prices because of higher fuel costs. *Text Messaging*, 782 F.3d at 875; *see also Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 738-39 (7th Cir. 2018) ("The rising cost of inputs would provide an obvious innocent explanation for the increase in steel prices."). In *Stanislaus Food Products Co. v. USS-*

---

conspiratorial agreement from parallel behavior more plausible." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 34 (D.D.C. 2008). Both parts of that allegation fell apart in discovery. *See infra* Section III.

*POSCO Industries*, the Ninth Circuit refused to credit evidence of price increases by U.S. Steel where "[t]he cost of making tin was … in flux, and U.S. Steel may have raised tin prices in 2009 to make up for losses caused by skyrocketing material costs a year earlier."  803 F.3d 1084, 1092 (9th Cir. 2015).  In *Freedom Holdings, Inc. v. Cuomo*, the Second Circuit held "[t]hat competitors respond in similar ways to a tax they must all pay does not, by itself, manifest an agreement proscribed by the Sherman Act."  624 F.3d 38, 56 (2nd Cir. 2010).  In *Moundridge*, the court found that "discovery and development costs" and damage caused by natural disasters "provided alternative reasons" for defendants' allegedly anticompetitive decline in production. 2009 WL 5385975, at *8.

And even more on point, in *LaFlamme*, the court dismissed on the pleadings a complaint alleging that airlines conspired to impose fuel surcharges when—*at the same time as this alleged conspiracy*—jet fuel prices skyrocketed.  The court held that "the factual context, and indeed defendants' actions therein, involved rapidly rising jet fuel prices—an obvious potential 'stimuli' and 'discernible reason' aside from collusion that plausibly could have instigated independent decisions by defendants to impose surcharges."  *LaFlamme*, 702 F. Supp. 2d at 152.

### 3.    Differentiated (as Opposed to Parallel) Behavior

Courts also regularly scrutinize the plaintiff's evidence to determine if the parallel conduct was truly so similar and "lockstep" as to be indicative of conspiracy—or if instead differences in substance and timing *undermine* the claim of conspiracy.  *Text Messaging*, 782 F.3d at 877 (affirming summary judgment where "[f]or months on end there were price differences in [defendants'] services"); *Baby Food*, 166 F.3d at 131-32 (time lags of three to six months between pricing moves "refute rather than support" allegations of conspiracy); *Anderson News*, 899 F.3d at 105 ("varying courses of action … undermine[] Anderson's assertion that defendants' 'parallel' conduct supports an inference of a conspiracy…"); *LaFlamme*, 702 F.

Supp. 2d at 151 (casting doubt on parallel conduct claim where defendants' surcharges were adopted "in some instances weeks apart").

Plaintiffs have argued for more than a decade that Defendants' Spring 2003 fuel surcharge moves were parallel.  They gloss over the fact that NS did not adopt CSXT's fuel surcharge formula for a full *nine months* after the alleged conspiracy began, which in no way qualifies as parallel conduct.  *Anderson News*, 899 F.3d at 104 (defining parallel action as "defendants took identical actions within a time period suggestive of prearrangement"); *LaFlamme*, 702 F. Supp. 2d at 151 (remarking that as defendants' surcharges "were divergent … and were not imposed in tandem," it was "dubious" whether the defendants' actions could even "accurately be characterized as 'parallel.'").  They also ignore entirely whether Defendants' fuel surcharges were more parallel than prior to any alleged conspiracy, which they were not.

### 4.    Evidence of Unilateral Decision-Making

As noted above, a unique feature of summary judgment under the *Monsanto/Matsushita* framework is that the plaintiff's concerted action story is *compared* to the defendants' counter narrative to determine if the plaintiff's evidence tends to exclude the possibility of the defendants' non-conspiratorial account.  *See supra* Section II.B.  Competing stories, therefore, do not mean there is a triable issue of fact.  To the contrary, summary judgment is frequently granted (in whole or in part) based on evidence provided by the defendants, including internal documents that "actually reveal disagreement among" the defendants, *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008); show efforts to create differentiated competitive positions, *see Williamson Oil*, 346 F.3d at 1292, 1306-08 (finding a decision to lower prices to maintain market share "highly competitive" and indicative of rational pricing behavior and a lack of express collusion); or evidence unilateral decision-making directly.  *Text Messaging*, 46 F. Supp. 3d at 807-08 ("[T]he undisputed evidence of the reports [analyzing price

17

increases] … and of the internal debates within the carriers about the increases, indicates the carriers had a good deal of time to react to competitors' moves and consider their own.  These analyses, along with the time elapsed between the increases, are as equally suggestive of independent action as collusion; indeed they are more suggestive of independent action.").

### G.    Legitimate Communications Cannot Be Used to Infer Unlawful Agreement

Finally, and of special importance here, the *Monsanto*/*Matsushita* doctrine greatly restricts the use of legitimate communications to infer unlawful conspiracy.  This begins with *Monsanto* itself, where the antitrust plaintiff tried to use communications between a manufacturer and its distributors to infer a conspiracy.  465 U.S. at 762-63.  A terminated Monsanto distributor claimed that Monsanto and other distributors conspired to fix the resale prices of Monsanto herbicides.  *Id.* at 757.  At trial, the plaintiff emphasized that other distributors had complained to Monsanto about the plaintiff's sales practices.  *Id.* at 758-59.  The jury returned a verdict for the plaintiff, and on appeal the Seventh Circuit affirmed on the ground (prevalent at the time) that "proof of termination following competitor complaints is sufficient to support an inference of concerted action."  *Id.* at 758.  The Supreme Court disagreed, emphasizing that "[a] manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market."  *Id*. at 762; *see also id.* at 763-64 ("In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently.").  To prevent "an irrational dislocation in the market," *id.*, the Court held that these normal manufacturer-distributor communications could not sustain the finding of conspiracy.  *See id.* at 763-64; *Matsushita*, 475 U.S. at 597 n.21.

As a result, although evidence of private communications about future pricing can be compelling evidence of conspiracy, exactly the *opposite* is true when there are legitimate,

efficiency-enhancing reasons for the communications. *See Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522, 527 (9th Cir. 1987) (meetings among banks did not support inference of conspiracy where "cooperation is a necessary incident to participation loans"); *Weit v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 641 F.2d 457, 462 (7th Cir. 1981) (finding "the opportunity to conspire evidence lacks significant probative value" in light of normal inter-bank cooperation). This was the central issue in *United States v. General Electric Co.*, the well-known criminal case charging DeBeers and GE with fixing the prices of industrial diamonds. 869 F. Supp. 1285 (S.D. Ohio 1994). The Government's key evidence was that GE was in possession of non-public information that, for the first time in five years, DeBeers was about to raise prices. The court granted a judgment of acquittal, however, because the "exchange" of the planned future price increase occurred in a buyer-seller context, and made its way to GE indirectly. *Id.* at 1301; *see also Antitrust Law* ¶ 1417b ("The ordinary and justifiable contact between rivals, such as those in *Weit* and *General Electric*, do not suggest existence of a conspiracy.").

In this case, Plaintiffs' extensive reliance on interline-related contacts and communications runs headlong into *Monsanto*, *Wilcox*, *Weit*, and *General Electric*. Those communications plainly arise through legitimate, efficiency-enhancing interline cooperation. As this Court has explained, "because no single railroad's tracks cover the entire country, independent rail carriers must cooperate with one another to ship freight cross-country." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. CV 11-1049 (PLF), 2021 WL 663669, at *6 (D.D.C. Feb. 19, 2021) (quotation marks and brackets omitted). "To facilitate the ability of rail carriers to compete with other industries transporting goods, such as trucking, Congress authorized rail carriers to participate in interline traffic, or shared traffic, between or among two or more rail carriers." *Id.* Thus, although "[r]ail carriers generally are competitors with one

19

another," "when two or more rail carriers share an interline movement, they are not in competition as to that movement." *Id.* They are on the same team, entitled as a matter of substantive antitrust law to discuss what joint venturers typically discuss without fear of *per se* price-fixing claims. *Texaco Inc. v. Dagher*, 547 U.S. 1, 7-8 (2006) (*per se* price fixing claims inapplicable to joint venture pricing). Furthermore, while Plaintiffs denigrate alliance meetings, this particular form of cooperation was *encouraged* by the Surface Transportation Board ("STB") because of its determination that "private-sector initiatives, *such as joint marketing agreements and interline partnerships*, can produce many of the efficiencies of a merger while risking less potential harm to the public." 49 C.F.R. § 1180.1(c) (emphasis added). In *Monsanto* terms, interline communications between railroads help "to assure an efficient distribution system," 465 U.S. at 765, and therefore "do[] not, without more, support even an inference of conspiracy." *Matsushita*, 475 U.S. at 597 n.21 (citing *Monsanto*, 465 U.S. at 763-64).

But on top of all this, there is 49 U.S.C. § 10706(a)(3)(b)(ii), which, whatever its contours, was enacted "[t]o prevent rail carriers from facing antitrust exposure for lawful communications about interline traffic." *Rail Freight*, 2021 WL 663669, at *6. Section 10706 rests on a Congressional determination that "[b]ecause of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange." H.R. Conf. Rep. No. 96-1430 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4110, 4147. This case, accordingly, is not just the standard case where inferences of conspiracy are unsound because there are "legitimate reasons to exchange information about … prices." *Monsanto*, 465 U.S. at 762. It is the extraordinary case in which the communications at issue have been *singled out by Congress* for legitimacy and their potential misuse in raising false inferences of horizontal

conspiracy.[5]  It is the poster child for applying safeguards against false inferences from

beneficial competitive behavior.  *Matsushita*, 475 U.S. at 594.  Finally, Section 10706 also

means that there can be no inference of horizontal conspiracy from the combination of an

interline action, such as "two or more rail carriers setting a rate for a shared interline movement,"

and a "similar action" with respect to a rate or related matter on another route or traffic.  *Rail*

*Freight*, 2021 WL 663669, at *5.

## III.    UNDISPUTED FACTS

      Plaintiffs allege the following conspiracy among the four defendant railroads in their

interrogatory responses:

> By no later than May 14, 2003, as a result of this series of meetings, each Defendant
> … had jointly agreed and committed itself to the common goal or "object" of
> raising prices, through the following means: … agreement on … similar "standard"
> fuel surcharge mechanisms applying to their carload business – which was the
> principal, but not exclusive focus of Defendants' conspiracy … [and] applying rate-
> based rail fuel surcharges to as many freight shipments as possible, with the express
> goal of 100% coverage—to all shippers including… to interline and local
> shipments, and to carload and intermodal traffic.

DA06397 at 404-05.[6]  Thus, there are two basic dimensions to the alleged conspiracy:

(1) allegedly "standard," more aggressive carload fuel surcharge *formulas*, and (2) an alleged

agreement to increase fuel surcharge *coverage* overall (including intermodal and coal traffic).

The only formulas at issue are therefore the published carload formulas that CSXT announced

---

[5] Defendants respectfully renew their evidentiary objections to all of the interline-related material
that featured in Defendants' Section 10706 motion.  Moreover, even to the extent the Court has
ruled that Section 10706 does not apply in whole or in part to a particular document, the
communications do not lose their character as legitimate interactions between interline partners.
The documents must be considered in that context.

[6] *See also* DA07416 at 19 (Rausser: "*coordinated and artificially high fuel surcharges* as a
means of raising railroad freight rates across the board."); *In re Rail Freight Fuel Surcharge
Antitrust Litig.*, 287 F.R.D. 1, 48 (D.D.C. 2012) ("'widespread application and enforcement of
*coordinated, and aggressive*, fuel surcharges.'") (second emphasis added) *vacated*, 725 F.3d 244
(D.C. Cir. 2013).

March 20, 2003, BNSF announced May 7, 2003, UP announced May 9, 2003, and NS

announced January 9, 2004.

A short list of undisputed facts undermines any inference that Defendants' 2003 and 2004

changes to their fuel surcharges must have resulted from conspiracy.  Specifically:

- There is no dispute that fuel surcharges are a rational, common pricing mechanism adopted unilaterally by many businesses in response to fluctuating fuel prices.

- Fuel surcharges were unilaterally adopted and applied by Defendants _prior_ to the alleged conspiracy, and the pre-"conspiracy" formulas were in fact _more_ similar than the "conspiracy" formulas.

- Regarding coverage, the Defendants had each adopted default policies calling for the widespread application of fuel surcharges _before_ the alleged conspiracy.

- With regard to the allegedly conspiratorial 2003 and 2004 changes to fuel surcharges, there is extensive, _indisputable evidence of each railroad's internal decision-making_ leading up to those changes that cannot reasonably be reconciled with conspiracy.

- Plaintiffs' experts have conceded that the "conspiratorial" fuel surcharges were _not_ materially more aggressive than prior fuel surcharges at prevailing fuel prices.

A. **Fuel Surcharges Are Rational Independent Responses to Fluctuating Fuel Prices**

No one questions that fuel surcharges and similar cost escalators arise in the absence of

conspiracy.  They are common in fuel-intensive industries, and particularly common for goods or

services that are provided under long-term contracts, as in the railroad industry, because they

provide a mechanism for contractual stability in the face of changing market conditions, and, in

particular, to changing input costs.  Victor P. Goldberg, _Price Adjustment in Long-Term

Contracts_, 1985 Wis. L. Rev. 527, 531 (DA00167 at 71).  A fuel surcharge offers a formulaic

mechanism for a contract price to adjust up if fuel prices rise _and_ adjust down if fuel prices go

back down again, all in relation to an objective measure, a public fuel price index.  This makes

the price adjustments transparent to shippers, easy to administer, and avoids cost-driven price

increases from being permanently baked into base rates.  The STB recognized in its January 25,

2007 fuel surcharge decision that there is a "long history of rate-based fuel surcharges in the rail industry." *In re Fuel Surcharges*, Ex Parte No. 661, 2007 STB Lexis 39, at *22 (Jan. 25, 2007).

The backdrop to this case is that oil prices and price volatility rose in the late 1990s and early 2000s. Between 1996 and December 1999, the price of West Texas Intermediate ("WTI") crude oil averaged $19.13 per barrel.[7] Between January 2000 and March 2003, the price of WTI averaged $27.98 per barrel, an increase of 46%. In the fifteen months just prior to NS's announcement of its 2000 published carload fuel surcharge formula (December 1998 to March 2000), oil prices experienced a sustained increase from $11.00 WTI to over $32.00—a 190.9% increase. The price of diesel fuel, which of course is refined from crude oil, rose from $0.96/gal in February 1999 to $1.42/gal by May 2000.

As fuel prices rose and fuel price volatility increased in the early 2000s, fuel surcharges became widespread across many industries, including the railroad industry. A 2009 Department of Transportation study shows that fuel surcharges were common in the ocean shipping, airline, trucking, and rail industries.[8] Defendants' expert Dr. Joseph Kalt ("Dr. Kalt") compiled from public data sources a list of more than 80 railroads and 50 companies from other industries that

---

[7] The U.S. Energy Information Administration ("EIA") maintains a website with historical information about fuel prices. *See* https://www.eia.gov/dnav/pet/hist/rwtcW.htm (WTI crude oil spot prices) and https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W (HDF diesel fuel prices). Both sides experts have used EIA data in this case, and unless otherwise stated the pricing data presented here is sourced to the EIA.

[8] *See* U. S. Department of Transportation, Calculation of Bunker Fuel, Currency, and Inland Freight Fuel Price Adjustment Factors for USTRANSCOM Commercial Shipping Contracts: Final Report (July 2009), *available at* https://rosap.ntl.bts.gov/view/dot/12116. The study notes that "[s]urcharges, or adjustments, for fluctuations in bunker fuel prices first appeared in the shipping industry following the first oil shock in the mid-1970s." *Id.* at 2. It also states that "an intermodal fuel adjustment factor (FAF) is a fuel surcharge levied by overland common carriers designed to pass risk of fluctuations in fuel prices to shippers," and "was initially developed by U.S. trucking companies." *Id.* at 6.

have used fuel surcharges.  DA00713 at 806-07 (Fig. IV 6A and Fig. IV 6B).  No one claims that all of those fuel surcharges were imposed by conspiracy.

      **B.**    *Before* **the Alleged Conspiracy, Defendants All Adopted Surcharge Formulas that Were *More Alike* than the Surcharge Formulas Plaintiffs Claim Resulted from Conspiracy**

Plaintiffs have long conceded that the railroads all introduced fuel surcharge programs unilaterally prior to the alleged conspiracy.  *See* DA06202 at 27 (Rausser: "Between 2000 and 2002, the Defendants independently implemented carload fuel surcharge programs.").  In fact, prior to the alleged conspiracy (commencing no later than May 14, 2003, according to Plaintiffs), the railroads had each adopted published carload fuel surcharges that were rate-based and had, almost across the entire board, *identical* triggers, slopes, and other terms.  The following table identifies the published carload fuel surcharges of each of the Defendants as of December 1, 2002, when UP—the last of the Defendants to announce a published carload fuel surcharge program—adopted its program, plus the immediately preceding BNSF program.

| Defendant | Effective Date | Benchmark | Trigger Price | Surcharge at Trigger Price | Fuel Increment | Fuel Surcharge Increment | Fuel Index Period |
|---|---|---|---|---|---|---|---|
| NS | June 30, 2000 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| CSXT | October 25, 2000 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| UP | December 1, 2002 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| BNSF | October 1, 2000 | WTI | $28/barrel | 2.0% | $2.50/barrel | 1.0% | Monthly Average |
|  | July 1, 2001 | HDF | $1.30/gallon | 1.0% | $0.05/gallon | 0.5% | Monthly Average |

From this highly parallel—but as Plaintiffs concede non-conspiratorial—starting point, the railroads made changes in 2003 and 2004 that Plaintiffs say evidence conspiracy.  But consider what happened, in the order in which the railroads acted:

- On March 20, 2003, **CSXT** announced that it was reducing its trigger price from $28 to $23.01 WTI; retaining the same slope as it had before, but with the 2.0% surcharge per $5 WTI broken into smaller segments (0.4% per $1 WTI); and switching to the use of monthly average fuel prices.

- **UP**, after first announcing on April 4, 2003, that it would match CSXT, reversed course several weeks later on May 9 and announced it was changing to an HDF surcharge with a trigger price of $1.35/gal, higher than BNSF's $1.30/gal trigger price; adopting a 1.5% surcharge at the trigger price (higher than BNSF's); and matching BNSF's slope ($0.5% additional surcharge per $0.05/gal increase in HDF prices).

- On May 7, 2003, **BNSF** announced that it was reducing its strike price to $1.25 HDF, and assessing a .5% surcharge at that threshold (keeping the same increment formula), which in practical terms meant that BNSF was keeping the same formula, and simply providing for a 0.5% surcharge between $1.25 and $1.30 HDF.

- **NS** did nothing to its published carload fuel surcharge until it decided in December 2003 to adopt the CSXT modified formula, nine months after CSXT had announced its change.  The change was effective March 1, 2004.

As the following chart shows, those changes resulted in _more differentiation and less parallelism_:  From _three_ railroads (UP, CSXT, and NS) with essentially identical formulas prior to the alleged conspiracy, there began a nine-month period at the start of the alleged conspiracy when _no_ railroads had identical formulas (a conspiracy, Plaintiffs say), followed by a period in which only _two_ railroads had identical formulas.

| Def. | Effective Date | Benchmark | Trigger Price | Surcharge at Trigger Price | Fuel Increment | Fuel Surcharge Increment | Fuel Index Period |
|------|----------------|-----------|---------------|-----------------------------|----------------|---------------------------|-------------------|
| **CSXT** | October 25, 2000 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consec. Days |
|  | June 1, 2003 | WTI | $23.01/barrel | 0.4% | $1/barrel | 0.4% | Monthly Average |
| **UP** | December 1, 2002 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consec. Days |
|  | June 1, 2003 | HDF | $1.35/gallon | 1.5% | $0.05/gallon | 0.5% | Monthly Average |
| **BNSF** | July 1, 2001 | HDF | $1.30/gallon | 1.0% | $0.05/gallon | 0.5% | Monthly Average |
|  | June 1, 2003 | HDF | $1.25/gallon | 0.5% | $0.05/gallon | 0.5% | Monthly Average |
| **NS** | June 30, 2000 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consec. Days |
|  | March 1, 2004 | WTI | $23.01/barrel | 0.4% | $1/barrel | 0.4% | Monthly Average |

The loss of parallelism is particularly evident when focusing on the competing Eastern and Western railroads at the times the conspiracy allegedly started.  NS and CSXT had identical published fuel surcharge programs prior to allegedly conspiring, but that changed when CSXT lowered its trigger price and made other changes—actions that supposedly led the conspiracy— but NS did not decide to modify its own formula for nine months.  Meanwhile, UP, which had the same published fuel surcharge as NS and CSXT as of December 1, 2002, did not follow CSXT as Plaintiffs claim, but rather adopted a differentiated version of an HDF surcharge, which BNSF did not match either.

### C.  Defendants Adopted Policies Calling for Widespread Application of Fuel Surcharges Before the Alleged Conspiracy

Plaintiffs' coverage theory is that, prior to the alleged conspiracy, the railroads were largely indifferent to whether fuel surcharges were included in contracts and practicably unable to enforce them, but that changed as a result of conspiracy.  It is true that, prior to 2000, there was a relatively long period of fuel price stability in which railroads and other transportation providers were less focused on including fuel escalators in their contracts.  Then, beginning in the second half of 1999, fuel prices became more volatile and started to rise dramatically.



26

For purposes of this Common Memorandum, the relevant question regarding the existence of a conspiracy is when, *in relation to the fuel price instability that began in 1999*, did the alleged parallelism in the Defendants' coverage policies arise?  In fact, it indisputably arose as each of the Defendants adopted its *pre-2003* published carload fuel surcharge.  Each Defendant decided to make the inclusion of fuel surcharges in new contracts its default policy, and instructed company personnel accordingly.

- When **NS** adopted its published carload fuel surcharge, announced in May 2000, NS product managers were instructed "to add the fuel surcharge note to all new/reissued contracts and private quotes (NSSQs) and all open quotes and tariffs."  DA05612.  In September 2000, Don Seale instructed NS marketing to "secure fuel surcharge increases [on] ALL business."  DA06050.

- **CSXT** implemented its first published carload fuel surcharge later in 2000 and immediately adopted a policy to apply the new surcharge to all existing traffic "moving under tariffs, private price quotes [PPQs] and certain contracts that incorporate those general tariffs," unless they already contained "a price escalator index published by a government entity, such as RCAF," and, for "[n]ew and [r]enewing contracts," to "[a]lways include fuel surcharge language, unless government-based escalator [i.e. RCAF] applies."  DA02851; DA02144 at 58; *see also* DA02834 at 35, (Feb. 2002 Contracts, Private Quotes & Competitive Pricing Document(s) Guidelines: contracts should "always include fuel escalation").

- **BNSF**, which had imposed a rate-based carload fuel surcharge "[s]ince at least the early 1990's," DA03855 at 60, began expanding its surcharge programs in 2000, DA03549 at 49-50.  BNSF announced its HDF carload fuel surcharge in May 2001 (replacing an earlier carload WTI surcharge).  *See* DA03620 at 40; DA03963 at 64.  By February 2002, a year before the alleged conspiracy period, BNSF's internal expectation was that "[e]very contract should include a fuel surcharge clause."  DA04019 at 19-20.  The BNSF separate statement shows ongoing efforts to increase surcharge coverage prior to any alleged conspiracy.

- **UP** was the last Defendant to publish a carload fuel surcharge; it was announced in October 2002, effective December 1, 2002.  Yet even in the few months before the conspiracy allegedly began, UP committed itself to implementing that new published carload surcharge program to all of its traffic unless regulation or pre-existing contracts prevented that.  *See* DA01326 at 61 ("on all new price documents effective immediately"); DA01362 at 66 ("Effective immediately, all new pricing documents and amendments created must now contain the Fuel Surcharge language recently approved by the Marketing and Sales Management team.").  UP also immediately applied FSCs to 100% of circulars, something it could do without seriatim contractual negotiations.  DA00713 at 810-11 ¶ 148.

27

It is therefore not meaningful with respect to inferring collusion that "In the Class Period, Defendants each adopted internal policies directing that Fuel Surcharges would be imposed whenever opportunities arose, including when legacy contracts expired and those contracts were renewed or replaced."  DA06202 at 33 (Rausser).  Those internal policies were *already in place prior to any alleged conspiracy*.

Plaintiffs will respond that Defendants did not really enforce the pre-conspiracy policies, but did so aggressively during the alleged conspiracy.  Of course enforcement efforts increased as fuel prices skyrocketed; conspiracy is not required to explain that.  Nevertheless, the pattern of parallel coverage policies began prior to any alleged conspiracy.  Coverage figures that Plaintiffs' Expert Dr. Gordon Rausser ("Dr. Rausser") provided in response to Dr. Kalt indicate that NS and CSXT already achieved coverage by March 2003 of about 40% (by revenue) of their private traffic with a rate-based fuel surcharge, UP of about 25%, and BNSF of about 30%; two years later in Spring 2005, BNSF and UP had coverage of around 60%, and NS of nearly 80%, while its eastern rival CSXT had grown its coverage to around 50%.  DA06269 at 73-74 (Figs. 66-69), DA06450 at 62 (Rausser 290:23-293:12).  All five plaintiffs were subject to rate-based FSCs in contracts with the Defendants *before* the alleged conspiracy period.[9]

### D.    Each Railroad Made Independent Decisions About Local Fuel Surcharges

Plaintiffs focus on the Spring of 2003, contending that a conspiracy arose over a 10-week span and was formed "no later than May 14, 2003."  DA06397 at 404.  That lengthy period is notable in itself, because Plaintiffs avoid taking a position on when the "conscious commitment"

---

[9] DA06763 at 70 (Aug. 28, 2001 Strates/NS FSC); DA06292 at 98 (RFA 176, Strates admission); DA06802 at 02 (Feb. 8, 2002 USM/UP FSC); DA06292 at 99 (RFA 176, USM admission); DA06292 at 96 (RFA 176, Donnelly admission); DA06598 at 604 (July 30, 2001 Olin/NS FSC); DA06292 at 95 (RFA 176, Olin admission); DA00713 at 813-14 (Fig. IV-8A, Plaintiffs' transactional data).

that defines a conspiratorial agreement actually occurred.  Indeed, Plaintiffs are trying to connect

actions that span *nine months*:

- **CSXT's March 20, 2003** announcement, inter alia, reducing its trigger price from $28 to $23.01.
- **UP's April 4, 2003** statement that it would match CSXT.
- **BNSF's May 7, 2003** announcement lowering its trigger price to $1.25/gal, at which it charged a 0.5% (neither metric matching UP).
- **UP's May 9, 2003** statement that it would not match CSXT after all, but rather adopt an HDF surcharge, which did not match BNSF.
- **NS's January 9, 2004** announcement that it would modify its published carload fuel surcharge formula to adopt the CSXT formula.

The Defendants' separate memoranda explain in detail what actually happened to arrive at those

decisions.  Putting those statements together, the short version is as follows.

*CSXT* was the first railroad to modify its surcharge.  Prior to its March 20, 2003

announcement, CSXT prepared multiple internal analyses of potential modifications to CSXT's

existing fuel surcharge formula.  The most potentially significant change CSXT made, lowering

the trigger price to $23, is plainly evident in CSXT's internal analysis.  *See* DA02286 at 90

(March 11, 2003, draft presentation recommending a 1% charge at $23/barrel and 0.5% over

$2.50 increase in WTI).  However, the immediate impetus for CSXT's change was that a one-

day dip in the WTI price of oil on March 18 meant that CSXT could not raise its surcharge rate

from 2% to 4%, as it planned, even though the WTI index was above CSXT's trigger price for 29

consecutive days.  DA02935; DA07080.

On March 19, 2003, the day after the one-day dip, CSXT's Chief Commercial Officer

Mike Giftos called CEO Michael Ward to ask permission to amend CSXT's fuel surcharge.  A

memo he wrote that day states: "[T]he current program and formula is simply unresponsive to

the dramatic increases in fuel prices.  I have spoken with Michael Ward this morning about a

new program we want to announce immediately."  DA02185 (March 19, 2003 Memorandum

from Mike Giftos Re: Meeting Regarding Fuel Surcharge Program).  CSXT moved swiftly to make specific changes that would address the flaws it identified in its formula.  After it announced its modified carload surcharge on March 20, 2003, CSXT never changed its published carload formula again (until moving to a mileage-based surcharge four years later).

*UP* had just adopted a published carload surcharge in October 2002.  It was identical to CSXT's, with the same requirement that fuel must exceed the trigger price for 30 consecutive days before fuel surcharges increased.  UP therefore also experienced the same inability to raise fuel surcharge rates because of the one-day dip in the WTI.  Internally, UP began considering revising its surcharge so that the same amount of surcharge would be broken up into smaller but more frequent increments, and changes to the surcharge would be based on average prices in the prior month rather than the consecutive day rule.  *See* DA01417 (March 11, 2003).  Then on March 20, 2003, CSXT publicly announced that it was changing its carload fuel surcharge program to adopt average monthly prices, smaller increments, and a $5.00 reduction in the trigger price from $28 to $23.01 WTI.  DA01430.  While Plaintiffs highlight this as evidence of conspiracy, UP's internal documents show evaluation of and concern over CSXT's move.  *See, e.g.*, DA01444 ("Anybody have a better alternative?  I know we don't like what they have proposed, but if that's the case we need to have a better idea.").

UP initially decided to concur with the CSXT change for interline traffic and (as Plaintiffs emphasize) to adopt the same changes to the UP published carload fuel surcharge effective June 1, 2003.  DA01449.  But then UP experienced a strongly negative reaction to the move from customers and its own Industrial Products Group (which primarily serves carload shippers).  This is very well-documented.  *See, e.g.*, DA01453 (April 10, 2003: "a growing number of customers have begun to share their resentment to our planned fuel surcharge

language (and that of CSX)").  If UP were conspiring with CSXT, it presumably would have

ignored customers' complaints, but it did not.  On April 14, 2003, the head of UP's Industrial

Products Group took action to exempt all industrial products customers from the new surcharge,

citing "Negative customer feedback."  DA01457.  UP then went through an extensive review of

its options and decided to change its surcharge—before the version matching CSXT was

effective—to an HDF-based formula structurally similar to the one BNSF had been using for

nearly two years, but with a higher/less aggressive trigger price that would create competitive

advantage over BNSF by forgoing a surcharge at moderate fuel prices.  *See* DA01534 (May 5,

2003 presentation).  UP also based its analysis and in particular its decision to adopt a trigger

price of HDF $1.35/gal on BNSF's published trigger price of HDF $1.30/gal, unaware—as a co-

conspirator would surely know—that BNSF was about to lower its trigger price to a "more

aggressive" $1.25/gal.  In all events, UP made its decision to abandon the CSXT surcharge and

publicly announced its switch to its version of an HDF surcharge on May 9, 2003.  Thereafter,

UP never changed its carload surcharge until switching to a mileage-based surcharge in 2007.

   **BNSF** made one modest change to its existing published carload fuel surcharge during

the key period of time: it lowered its trigger price from HDF $1.30/gal to $1.25/gal, at which it

applied a 0.5% rate-based fuel surcharge.  DA03620 at 40; DA04603 at 03-04.  There is a wealth

of evidence showing that BNSF acted unilaterally in making those changes.  In early March

2003, BNSF had convened a 17-member "Fuel Surcharge Review Team" led by Sam Kyei,

BNSF's Chief Economist.  DA04114 at 14; DA03055 at 60 (Kyei 27:23-28:16); DA04451 at 54.

That team initially focused on a proposal by BNSF's new Chief Marketing Officer to adopt a

mileage-based fuel surcharge, but decided it presented logistical issues and might be too

"radical" a shift for BNSF's customers. DA04240 at 48-50; DA04114 at 14.[10]  It therefore chose to "[c]oncentrate on improving participation rates" (*i.e.,* coverage) and adjustments to its current rate-based formula. DA04261 at 81; *see also* DA04451 at 68. Records cited in BNSF's separate brief document the Review Team's meetings on March 13, 14, 19, 21, 26, and 28, and April 4, culminating in a formal, 28-slide set of recommendations from the BNSF Review Team dated April 14, 2003. The team proposed reducing the "strike price" of BNSF's fuel surcharge to $1.10, which would recover BNSF's fuel cost shortfall, assuming a 100% participation by non-coal customers. DA04451 at 65-66, 68. It also contains a competitive analysis that details the published fuel surcharges of numerous railroads, not just UP, CSXT, and NS.

BNSF then chose *not* to reduce its trigger price to $1.10/gallon. It opted instead for a $1.25/gal strike price that its Chief Economist calculated "reflected the $23 WTI crude price used by UP" in its program announced on April 4. DA04415 at 15-16. BNSF announced this revision to its carload FSC program on May 7, 2003. DA04603 at 03-04. One might have expected UP, as an alleged co-conspirator, to match its closest competitor's "aggressive" trigger price. Instead, two days later UP announced that it was switching to an HDF-based program with a $1.35 trigger. DA01565. That created a gap that caused BNSF's Chief Economist to lament that "[UP] will be very competitive at lower Highway Diesel Fuel (HDF) prices." DA04415.

*NS*, as noted, did not follow the March 20, 2003 announced change of its primary competitor CSXT, even though the two had the same published carload fuel surcharge in place for the prior two and a half years. Instead, NS chose not to modify its published surcharge until

---

[10] BNSF decided to make a mileage-based formula a "possibly long term" project, DA04341 at 56; DA04451 at 68, and in 2005, BNSF ultimately began moving to a mileage-based formula, unlike the other railroads with which it was allegedly conspiring, DA04573 at 73-76.

nine months later. During that time, there was a $4.99 gap in trigger prices between NS and CSXT and NS remained on the 30 consecutive day standard for surcharge adjustments. Inside NS, there were three separate, substantial assessments of whether or not to adopt the CSXT program. *See, e.g.*, DA05087 at 89 (April 7, 2003 email collecting "arguments for and against adopting the CSXT Fuel Surcharge"); DA05557 at 59 (matching the CSXT formula "does not appear to have much support from [NS's] account execs"). Twice NS decided against change. NS documents clearly show a deliberative process inconsistent with conspiracy—even with respect to concurrence on interline traffic. *E.g.*, DA05777 (advocating for concurrence because "I don't see how we can justify the two different systems to our customers"). While NS chose to concur for interline traffic, it spent much of April studying and debating whether to change its own carload fuel surcharge, ultimately deciding on May 1, 2003, not to follow CSXT. DA05820-26; DA05709-16; DA05574-75; DA05008 at 50-51 (Seale 236:10-237:3). Two months later, NS studied the issue again, deciding not to follow CSXT for a second time. DA05717-25; DA05095-124; DA05673 at 75.

NS decided to modify its formula only after a *third* internal analysis conducted in November and December 2003. Don Seale (who Plaintiffs portray as a key conspirator) asked his team to take a "fresh look at the case for and against NS adopting the new CSXT FSC standard" and provide him with a recommendation. DA05647; DA05125. An extensive documentary record shows the internal debate, but this time there emerged "[g]eneral support for a switch" to the CSXT formula. DA05847 at 47-49; DA05648-52. The documents clearly state NS's reasoning, principally that (1) NS's existing formula was unresponsive to incremental price changes of less than $5/barrel, (2) NS was not seeing significant competitive benefit from having a differentiated surcharge, and (3) shippers were complaining about having to track multiple fuel

surcharge formulas.[11]  NS announced the change on January 9, 2004, effective March 1, 2004. DA05527-28; DA05190; DA05576.

E.       **Plaintiffs Have Conceded that the Allegedly Conspiratorial Fuel Surcharges Were Not More Aggressive at the Fuel Prices that Prevailed in the Damages Period**

Finally, the undisputed facts foreclose any argument that the allegedly conspiratorial surcharge formulas must have resulted from conspiracy because they were markedly more "aggressive" than the pre-"conspiracy" formulas.

Plaintiffs' argument starts by ignoring the massive base of intermodal business.  As the Court recognized in denying class certification, intermodal fuel surcharges never changed for the worse.  *Nothing* with respect to intermodal fuel surcharge formulas supports an inference of any conspiracy, let alone some all-encompassing conspiracy.

Even with respect to carload surcharges, Plaintiffs are in a no-win situation.  It is now well-understood that the only way in which the 2003 and 2004 published carload fuel surcharges were more aggressive was with respect to the "trigger" or "strike" prices at which a surcharge would first be charged:  CSXT dropped its trigger from $28 WTI to $23.01, UP dropped its from $28 WTI to $1.35/gal HDF, BNSF dropped its from $1.30/gal HDF to $1.25, and (nine months after CSXT's move) NS dropped its from $28 WTI to $23.01.  The practical effect of these changes is easiest to understand in relation to BNSF's move, which results in a very low 0.5% surcharge at diesel fuel prices $0.05/gal lower than BNSF's old surcharge and *the same schedule of surcharges at all higher fuel prices*.  A change of that magnitude is meaningful in a world in which fuel prices vary within and in proximity to each railroad's new and old triggers.  The

---

[11] DA05008 at 36-37, 62 (Seale 164:23-165:8, 166:12-167:22, 285:25-286:12); DA05676; DA05576-84; DA05936; DA05803 at 03-06.  *See also* DA05574-75; DA06034; DA06043; DA05555-56.

problem, Plaintiffs understand, is that the lower triggers were economically irrelevant during the damages period, because except for a few *days*, fuel prices always exceeded the original "non-conspiratorial" trigger prices.  DA06450 at 59-60 (Rausser 253:22-254:4).  Plaintiffs, therefore, cannot afford to argue that the object of the conspiracy was to lower trigger prices.  That might be the marginally better conspiracy argument, but it results in zero damages for all shippers.

That leaves Plaintiffs with only one damages-generating argument with regard to fuel surcharge formulas: that *other features* of the fuel surcharges utilized during the damages period were more aggressive than the pre-conspiracy fuel surcharge formulas.  On this point, however, the data are irrefutable.  For BNSF, the percentage change in fuel surcharge rates resulting from its change in its published carload formula was *zero*.  For UP, the alleged conspiratorial fuel surcharge generated surcharge rates that average about *0.63% lower* than rates from the prior formula.  For CSXT and NS, their fuel surcharge formulas rose by 1.2% and 0.89%, respectively.  The average increase in earning power for all Defendants between the pre-"conspiracy" and the allegedly collusive formulas is only *0.1%*.  Kalt. Class Decl. ¶ 98, Fig. 18.

Plaintiffs cling to their "more aggressive" narrative, but they have effectively conceded that the allegedly conspiratorial formulas were *not* more aggressive.  They do not contest Dr. Kalt's earning power calculations.  DA06450 at 55-56, 58 (Rausser 53:6-54:23, 62:12-63:3).  Furthermore, Dr. Rausser admitted at deposition that the 1% difference between the NS "conspiracy" formula and its legacy formula was small enough to say that the earning power of the two formulas was "approximately the same."  DA06450 at 53 (Rausser 35:5-37:5).  Plaintiffs' retreat on the "more aggressive" argument reached its zenith during class proceedings, when Plaintiffs began arguing that the "earning power [of an FSC formula] alone tells us *nothing*."  DA00129 at 31 (emphasis added).

## IV.    ARGUMENT

### A.    There Is No Triable Issue of Fact as to the Alleged Conspiracy to Impose More Aggressive Fuel Surcharges on All Shippers

#### 1.    Plaintiffs Lack Direct Evidence of Any Conspiracy

As noted earlier, "direct evidence in … [the antitrust] context is 'explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Domestic Airline Travel*, 221 F. Supp. 3d at 58 (citation omitted).  Evidence is *not* "direct evidence" if it requires "the court to draw an inference in [the plaintiff's] favor." *Citric Acid*, 191 F.3d at 1095.  Here, Plaintiffs have no direct evidence—if they did, they would be the ones moving for summary judgment.  Nothing in the record is "tantamount to an acknowledgement of guilt." *Text Messaging*, 46 F. Supp. 3d at 803 (citation omitted).  There have been no admissions of conspiracy in this case, nor guilty pleas or applications for leniency to the Department of Justice.  Government investigations following the filing of Plaintiffs' class action complaints were closed without action more than twelve years ago.  *See Text Messaging*, 782 F.3d at 875 (noting, in granting summary judgment, that price increase "attracted congressional concern and an investigation by the Justice Department's antitrust division, but neither legislative nor prosecutorial action resulted—only the series of class actions suits consolidated in 2009 in the suit before us"); *Valspar*, 873 F.3d at 202 (contrasting plaintiff's evidence with precedent involving co-conspirator confession and leniency application to the Department of Justice).

In 2011, Magistrate Judge Facciola required Plaintiffs to identify any evidence they contended was "direct evidence" of an illegal agreement.  They identified six "communications [that] 'standing alone,' directly constitutes an agreement that violates the antitrust laws," DA06397 at 399-402, and a seventh in which they claim the "weight of the evidence indicates that an unlawful agreement was reached," *id.* at 399 (n.22).  Only two of those communications

36

occurred before May 14, 2003, the outside date by which Plaintiffs allege all four railroads had agreed to conspire. And regardless, all require layers of speculation and assumptions, disbelieving what was actually being discussed, and ignoring the surrounding context.

*March 12-13, 2003 CSXT-UP Alliance Meeting.* Plaintiffs suggest that a March alliance meeting between CSXT and UP was, if not direct evidence of conspiracy, the start of it all—specifically, the impetus for CSXT's March 20 fuel surcharge modification, and UP's decision to follow CSXT on April 4. DA06369 at 79 (¶ 24).

Going into this meeting, UP and CSXT already had *identical* published carload fuel surcharge formulas, adopted unilaterally. Yet Plaintiffs theorize that UP's Jack Koraleski passed along to CSXT a proposal that was circulating within UP to divide the existing 2% surcharge for every $5 increase in the WTI into a 0.4% surcharge for every $1 increase in the WTI formula, and to use average prices in the prior month rather than a 30 consecutive day rule for adjusting surcharges. *See* DA01417 (March 11, 2003). There is no direct evidence of such a discussion; nothing in the cited documents indicates that UP passed on its internal proposal, or that UP and CSXT reached any agreement at all. Plaintiffs *infer* that such a conversation occurred because "Fuel surcharge methodology" (as part of the topic "Other Pricing Issues on CSX/UP Interline Business") was one item on the meeting agenda, *see* DA02800, and because CSXT's March 20 modification included changes similar to the UP internal proposal.

The problems with this inference begin with the fact that CSXT's most significant change on March 20 was a $5 reduction in the trigger price (to $23.01), but UP's internal proposal was *to keep the existing $28.00 trigger price*. DA01417 at 18 ("Surcharge is implemented at $28.00 and 2%"). Furthermore, the key components of the new surcharge that CSXT announced on March 20, including the lower trigger, are evident in an internal CSXT fuel surcharge

37

recommendation document prepared _before_ this alliance meeting.  *See* DA02286 (March 11 draft, "Fuel Surcharge Merchandise 2003," recommending lowered $23 trigger, use of monthly average, increments of .5% over $2.50 increase in WTI).

As for UP, it is understandable that Plaintiffs emphasize that "CSX[T] and UP *announced* similarly aggressive standard fuel surcharges" following this meeting (DA06397 at 99 (n.2) (emphasis added)), because UP did.  However, UP never *implemented* a matching fuel surcharge program.  UP was uncomfortable with CSXT's announcement from the start.  *See* DA01444 ("I know we don't like what they've proposed….").  UP initially announced it would match, but it plainly did not feel committed to CSXT in any way because on May 9, 2003, it abandoned its initial announcement and instead announced a new HDF-based FSC program that was *less similar* and *less aggressive* than the pre-conspiracy UP and CSXT programs.  The result: throughout the alleged conspiracy period, UP and CSXT *never* had the same carload fuel surcharge.  The March 12-13, 2003 CSXT-UP alliance meeting therefore proves nothing.

***March 18, 2003 BNSF-NS Alliance Meeting.***  Plaintiffs claim that at a March 18, 2003 alliance meeting, BNSF and NS executives "agreed on 'synchroniz[ing]' BNSF's fuel surcharge program with the programs of the other Defendants."  DA06397 at 99.  There is no direct evidence of this.  The document that Plaintiffs quote contains a list of indisputably lawful interline action items resulting from the meeting, and the particular excerpt says on its face that a *question* was posed:  "BNSF's fuel surcharge is structured differently than NS, CSX, and UP. *Should* BNSF's by [sic] synchronized with the other big players in the industry?"  DA04201 (emphasis added).  A question *without an answer* is not direct evidence of anything.  And indisputably, BNSF answered the question "no" by its deeds.

At that time, BNSF's published carload fuel surcharge formula was "structured differently" in that it relied on the HDF index, while as of March 18, 2018, the three other railroads' formulas all used the WTI index and identical carload formulas.  BNSF, in short, was an outlier.  But BNSF's formula remained HDF-based and was never "synchronized" with the WTI-based formulas.  So posing a question BNSF ignored is not evidence of conspiracy.

***May 14, 2003 NS-UP Alliance Meeting.***  Plaintiffs next claim "direct evidence" arising out of a May 14, 2003 meeting between NS and UP—the date by which they claim all four railroads had agreed to conspire:

> Handwritten notes from the May 14, 2003 UP-NS meeting use similarly sweeping language concerning fuel surcharges across the entire industry (and spanning all traffic), recording discussion that "[u]niform application across the industry would be helpful."  The associated meeting minutes explain further that "[c]onsensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers."

DA00124 at 25-26.

Plaintiffs call this direct evidence proving conspiracy, but there is no connection between Plaintiffs' allegations and what the documents actually say and Defendants actually did.  The minutes of the meeting summarize the discussion, and they pose an action item for follow-up:

> Discussion followed on fuel surcharges and various application processes as used by different roads.  Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers.  There was some question as to whether or not the industry can work together on this opportunity, probably through the AAR, or do roads have to handle the opportunity on a bilateral basis.  Follow up: UP - Jack Koraleski/Mike Hemmer, NS - Don Seale/Greg Summy.

DA05216 at 18.  Jack Koraleski and Mike Hemmer were UP's Chief Marketing Officer and General Counsel, respectively, and Don Seale and Greg Summy were NS's Senior Vice President for Marketing Services and In-house Counsel, respectively.  In other words, any follow-up was to include lawyers.

Discussing fuel surcharge process at an alliance meeting makes sense; the contemporaneous evidence shows that customers hated having to deal with different fuel surcharges based on different application processes and indices.[12]  Plaintiffs, however, take this to mean the two railroads agreed that all of the railroads would have the same *surcharge*.  The documents say no such thing.  The minutes on their face reflect a consensus between NS and UP about what "application processes" customers would prefer, not an agreement to *do* anything, except to refer follow-up to in-house counsel.  In any event, there is no evidence that follow-up occurred, whether internally within UP or NS or between the railroads.

Indeed, discussion at the meeting cannot possibly be evidence of an illegal agreement, because neither UP nor NS did anything after this meeting to fall into lockstep.  They *were* in lockstep *before* the alleged conspiracy, but five days before the May 14 meeting, UP announced that it would drop the WTI-based fuel surcharge it had been using and implement a new HDF surcharge instead.  That meant that NS and UP would no longer have the same published carload fuel surcharge.  UP stuck to its plan to switch to an HDF formula; NS stuck to its same "pre-conspiracy" WTI formula for more than nine months, until it eventually adopted the CSXT formula, not UP's.  So, once again, a supposedly key meeting proves nothing.

***June 3, 2003 CSXT-UP Alliance Meeting.***  Plaintiffs identified as "direct evidence" documents related to an alliance meeting between CSXT and UP two weeks after the conspiracy was allegedly formed.  Notes from that meeting state: "Fuel surcharge—GIFTOS, CSX has not

---

[12] DA01454 (customer complaints regarding "the introduction of individual initiatives by each carrier" that apply "different percentages [and] indexes as standards for applying changes in the surcharges."); DA05518 (International Paper proposing a standard fuel surcharge to be used by all of its transportation providers for "easier administration"); DA05786 (Universal Forest Products stating "[i]t would be a lot easier if everyone could use the same [FSC] method, pretty difficult to keep track of when different.").

seen outcry that UP has."  Plaintiffs leap from that notation to a claim that Defendants "agreed to coordinate their fuel surcharge methodologies."  DA06397 at 400.  That makes no sense.  UP and CSXT were discussing customer reaction *to the two paths they had already taken*.  Recall that after first announcing that it would match CSXT, UP reversed course and announced its HDF fuel surcharge on May 9, four weeks before this meeting.  UP and CSXT were thus anything but "coordinate[d] [in] their fuel surcharge methodologies."  Apparently, UP shared some of the negative customer reaction that led it to break with CSXT, and Mr. Giftos said CSXT had not experienced similar reaction.  But *neither changed course after the meeting*. They did nothing consistent with the claim of "agree[ing] to coordinate their fuel surcharge methodologies."  The discussion proves nothing.

    *AIILF-Related Evidence.*  Two items of so-called direct evidence concern an allegation Plaintiffs made much of in their Complaint, but have rarely mentioned since the close of discovery—that Defendants created the All Inclusive Index Less Fuel ("AIILF") "to facilitate their ability to impose fuel surcharges."  DA06397 at 401 (identifying a November 11, 2003 NEMC meeting and December 11-12, 2003 AAR meeting as direct evidence).[13]  In antitrust law, "a 'facilitating practice' is an activity that makes it easier for parties to coordinate price or other behavior in an anticompetitive way."  *Antitrust Law* ¶ 1407b.  But it is not direct evidence of a price-fixing conspiracy.  "[T]he label 'facilitating practice' is only an invitation to further

---

[13] Plaintiffs' allegations concerning AIILF carried the day in this Court's decision denying Defendants' 2008 Motion to Dismiss.  *See Rail Freight*, 587 F. Supp. 2d at 33 ("plaintiffs first identify the 'problem' that coordinated use of the AIILF allegedly solved for defendants" and "Plaintiffs go on to identify specific occasions, in particular during the fall 2003 AAR meetings … where defendants met and allegedly agreed to solve this problem by promulgating the fuel surcharge program that would become the AIILF").  But the allegations never withstood evidentiary scrutiny because the timing is all wrong and discovery did not support a connection between the creation of AIILF and Defendants' fuel surcharge practices.

analysis, not a license for automatic condemnation." *Antitrust Law* ¶ 1407b1.  Thus, presuming the AIILF narrative even matters to Plaintiffs anymore, it is not direct evidence that bypasses *Monsanto* and *Matsushita*.

**November 11, 2004 Discussions at NEMC re Mileage-Based Fuel Surcharges.**  The last piece of supposedly direct evidence relates to a discussion that took place 18 months after a conspiracy was supposedly formed.  It is about a failed attempt by "BNSF's John Lanigan [seeking] the other Defendants' agreement to deploy mileage-based fuel surcharges" instead of rate-based fuel surcharges.  DA06397 at 402.  The incriminating line, Plaintiffs say, is: "John Lanigan shopped the concept [of a mileage-based fuel surcharge] with his counterparts from the other roads at the NEMC (AAR group of Chief Marketing Officers) and they pushed back as expected." *Id.*[14]  From this language, which directly reports *the absence of agreement*, Plaintiffs claim direct evidence that Defendants "agreed to continue to use rate-based fuel surcharges for nearly all of their traffic."  That is absurd on its face, but all the more so given that only four months later—in March 2005—BNSF publicly announced a move to a mileage-based formula, and did so by *itself*.

### 2. Plaintiffs' Circumstantial Evidence Does Not Support an Inference of Conspiracy Under *Matsushita*

Because Plaintiffs have no direct evidence of the alleged conspiracy, the sections that follow apply the *Monsanto/Matsushita* doctrine's demanding standard for determining whether this circumstantial antitrust conspiracy case can survive summary judgment.  It cannot.  We

---

[14] The uncontradicted testimony is that, although the NEMC meeting allowed Lanigan the opportunity to speak with his counterparts in person, the conversations themselves were "[o]n an interline basis, one railroad to one railroad," between Lanigan from BNSF and his counterparts at NS, CSXT, KCS, CN, and CP.  DA03099 at 142 (Lanigan 225:11-228:20).

apply the law as it relates to (1) *when* and *how* each railroad came to its decision to act, (2) *why* each railroad acted, and (3) *what* each railroad did (relative to other railroads and relative to historical practice). Each perspective shows—independently, but certainly together—that the evidence does not "allow an inference that conspiracy is more probable than an inference of independent action." *Antitrust Law* ¶ 308c2.

> a.   *No Inference of Conspiracy Is Possible Because the Railroads Each Reacted in Unilaterally Rational Fashion to the Common Stimulus of Rising Fuel Costs*

Price increases—directly or through fuel surcharges—in the face of substantially increased costs do not require a conspiracy to explain them. As Plaintiffs' expert concedes, "rising fuel costs would naturally increase rates as the railroads' costs increase." DA06202 at 65. Judge Posner *illustrated* conscious parallelism with airlines raising fares because the price of jet fuel rises. *Text Messaging*, 782 F.3d at 875; *see LaFlamme*, 702 F. Supp. 2d at 152 ("the factual context … involved rapidly rising … fuel prices - an obvious potential 'stimuli' and 'discernible reason' aside from collusion that plausibly could have instigated independent decisions by defendants to impose surcharges."); *LTL Shipping Servs.*, 2009 WL 323219, at *16 (granting motion to dismiss where "historical fuel price figures show a clear correlation between the Defendants' activities in assessing fuel surcharges and the increasing price of diesel fuel").

Nobody disputes that rising fuel prices prompted a broad array of industries and companies to create and use fuel surcharges to try to recover such unanticipated costs. As noted earlier, more than 80 railroads have used fuel surcharges, including the three non-defendant Class I railroads, Canadian National (CN), Canadian Pacific (CP), and Kansas City Southern (KCS), each of which adopted and used rate-based fuel surcharges before and during the alleged

conspiracy.[15]  So did a host of trucking companies that compete with Defendants.[16]  Plaintiffs

Olin and Strates entered contracts with other railroads containing such fuel surcharges (with

more aggressive formulas than any of the Defendants'); Olin did the same with trucks.[17]  These

other railroad and trucking companies' self-interested pursuit of similar conduct firmly refutes

Plaintiffs' inference that Defendants' conduct is not consistent with independence.  *Cf. Kleen*,

910 F.3d at 936 (price increases by non-defendants suggests leading-and-following rather than

collusive coordination).

Plaintiffs understand this, and therefore try to say that parallel coverage policies from

2003 to 2008 were not unilaterally rational; that is, they allege that in a break from past practice,

Defendants all insisted on "100%" coverage and ceased negotiating fuel surcharges.  But why

would one think that emphasizing fuel surcharge coverage during a time of rising fuel costs can

only be explained by conspiracy?  That policy makes perfect sense without conspiracy.  This was

the pattern in *LTL Shipping*, where the court held that even though "[w]hen fuel prices were low

and relatively static, the Defendants assessed fuel surcharges only intermittently," it was

unilaterally rational to impose fuel surcharges as fuel prices increased.  2009 WL 323219, at *16;

*see also Kleen*, 910 F.3d at 936-37 (affirming summary judgment because any "change in

business practices" of the defendants "may be explained by external [economic] factors … which

---

[15] DA00713 at 790 (Fig. IV-6A); *see, e.g.*, DA06654 (CN); DA06650 at 52 (CP); DA06562 at 64 (CP); DA03855 at 59 (CP); DA04451 at 61-62 (CN, CP, KCS); DA06866-94 (KCS).

[16] DA04034 at 40 (September 2002 Bear Stearns report concluding that the trucking industry has an "increasing ability to recapture the impact from rising fuel expense through floating fuel surcharge mechanisms"); DA04289 at 300 (February 24, 2003 compilation of rate-based fuel surcharges used by several large trucking companies).

[17] DA07512 at 13, 19 (Olin 194:22-195:5, 261:11-25); DA06494 at 96 (Olin 361:2-11); DA06654; DA06650 at 52; DA06562 at 64; DA06680 at 84; DA06702 at 03; DA06696; DA06698.

occurred in the middle of the [alleged conspiracy] period").  Plaintiffs' expert has also conceded

that unilateral self-interest would lead a railroad to "want broad coverage" once it adopted a fuel

surcharge,[18] and that each railroad had "a unilateral interest in recovering fuel [costs] faster if

fuel costs were rising[.]"[19]  Plaintiffs' refrain about coverage policies during the conspiracy

period is therefore just another example of trying to infer conspiracy from a group of companies

"do[ing] what was only natural anyway."  *Twombly*, 550 U.S. at 556.

Plaintiffs have further argued that Defendants' *success* in imposing surcharges gives rise

to an inference of conspiracy.  But no case infers a conspiracy from the degree of "success" firms

have in achieving some goal that is consistent with individual self-interest.  Here, Defendants'

expanding coverage is a function of time (that allows older contracts to be renegotiated),

constantly rising fuel costs, and the tailwind of an unprecedented rise in demand for their

services during a strong economy.[20]  All of these serve as non-collusive explanations for

expanding coverage.  *See Brooke Grp.*, 509 U.S. at 237 ("Where, as here, output is expanding at

the same time prices are increasing, rising prices are equally consistent with growing product

---

[18] DA06423 at 33 (Rausser 272:20-273:11); DA06412 at 17 (Rausser 281:1-15 (testifying that he would have expected defendants to make every attempt to implement fuel surcharge programs as broadly as possible absent a conspiracy: "In their unilateral self-interest, yes")).

[19] DA06436 at 44 (Rausser 409:4-7).  Dr. Rausser also conceded that the railroads "would have been able to recover 100 percent of their increased fuel costs" regardless of a conspiracy. DA00190 at 192 (Rausser 515:13-17); *see also* DA06436 at 46 (Rausser 423:10-17, 425:1-3); DA07504 at 10 (Rausser 221:19-223:4).

[20] DA06895-96 at 96 ("[D]emand increased by nearly 12 percent and continued to grow through 2007."); DA06897-98 at 98 ("Capacity constraints were common from 2003 through the first half of 2006."); DA06899-903 at 903 (noting "unprecedented surge in demand"); DA06904-909 at 908 ("Railroads are currently serving record volumes"); DA05280 at 83 ("A combination of trends—increasing congestion on the highways, demand for better transportation options in environmental terms, fuel price pressures and regulatory changes affecting the trucking industry—are coming together to result in significantly increased demand for rail freight.").

demand."); *Kleen*, 910 F.3d at 936-37 (pointing to resurgence of demand in the wake of 2008 downturn as a non-collusive explanation for rising prices).

Plaintiffs also suggest that rising costs cannot explain the adoption of *these* surcharges or the increase in coverage because, they claim, the railroads collected incremental fuel surcharges that exceeded their incremental fuel costs. *See* DA06202 at 40-48. Even accepting Plaintiffs' claims of over-recovery, this argument cannot support an inference of conspiracy.

*First*, we now know, and Plaintiffs have conceded, that if there was over-recovery, it was a function of features of the surcharge formulas adopted *before* the alleged conspiracy, and therefore cannot possibly be probative of whether the 2003-2004 changes to fuel surcharges were the product of conspiracy. Plaintiffs' own expert acknowledges that the fuel surcharge rates that resulted from the formulas adopted in 2003 and 2004 were not meaningfully different from the rates under the prior formulas.[21] Indeed, UP adopted a *less* aggressive formula that produced *lower* fuel surcharge rates during the alleged conspiracy.[22] BNSF's "new" formula resulted in surcharges that, at the fuel prices that prevailed from mid-2003 to 2008, were *exactly the same* as under its concededly competitive formula.[23] The formula used by CSXT and later by NS produced surcharges that were "approximately the same" as would have been generated under

---

[21] DA06450 at 53 (Rausser 35:5-37:5) (admitting that between July 2003 and June 2006, the NS class formula raised less than 1% more revenue than its legacy formula would have—a difference so small that Dr. Rausser characterized the revenue generated by the two formulas as "approximately the same."); DA06450 at 58 (Rausser 54:10-23, 62:12-63:3) (admitting that he does not contest Dr. Kalt's earning power calculations); *see also* DA00129 at 131 ("'earning power' [of an FSC formula] alone tells us *nothing*.") (emphasis added).

[22] DA00713 at 902-905 (Figs. IV-24A to IV-24D); DA06450 at 56 (Rausser 54:10-23) (conceding lack of objection to Dr. Kalt's analysis of incremental earning power).

[23] DA00713 at 902-905 (Figs. IV-24A to IV-24D); DA06450 at 56 (Rausser 54:10-23) (conceding lack of objection to Dr. Kalt's analysis of incremental earning power).

their original formula.[24]  This case is not as Plaintiffs have advertised:  there are no inexplicably more aggressive fuel surcharges.

*Second*, the kind of "over-recovery" Plaintiffs claim—prices arguably higher than what costs would justify—is the expected outcome of consciously parallel behavior that arises *without* conspiracy.  For example, summary judgment was appropriate in *Text Messaging* despite "the apparent anomaly of competitors' raising prices in the face of *falling* costs," because "this may be not because they've agreed not to compete but because all of them have determined independently that they may be better off with a higher price."  782 F.3d at 871-72 (emphasis added).  And in *Chocolate Confectionary*, which like this case concerned *rising* costs, the Third Circuit rejected an over-recovery argument that closely resembles Plaintiffs':

> Even if we credit the Plaintiffs' arguments, all they show is that costs—which they acknowledge were increasing—did not justify the price increases observed…. To the Plaintiffs' experts, the fact that cost increases couldn't explain the price increases seems to be enough to show a price-fixing agreement. … But evidence of a price increase disconnected from changes in costs or demand only raises the question: was the anticompetitive price increase the result of lawful, rational interdependence or of an unlawful price-fixing conspiracy?

801 F.3d at 400-01; *see LTL Shipping Servs.*, 2009 WL 323219, at *18 (granting motion to dismiss fuel surcharge claims against trucking industry for same period, notwithstanding allegations of "[i]ncreased profits in a concentrated industry").

Plaintiffs' over-recovery argument is really an effort to conflate high prices and profits with conspiracy.  But "[a] high price is not itself a violation of the Sherman Act."  *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) (Easterbrook, J.).  *Every* capitalist aspires to collect more revenue than its costs, and "Defendants are entitled to generate profits on fuel surcharges by charging more than their incremental increase in fuel costs, so long

---

[24] DA06450 at 53 (Rausser 35:1-37:5).

as the Defendants do not illegally conspire to do so." *LTL Shipping Servs.*, 2009 WL 323219, at

*18.  Conflating profits with conspiracy is an especially serious error to make in the context of

an alleged oligopoly, where consciously parallel behavior often has price effects "approximate

[to] those of express cartels." *Antitrust Law* ¶ 1428; *see also id.* at ¶ 1429b ("Interdependent

decision making can produce the same unhappy results as a cartel…."). Accordingly, that fuel

surcharge formulas over-recovered costs, or that at various points in time personnel from the

Defendants referred to fuel surcharges as "profit centers" or defended "marking-up" fuel costs

like other costs, says nothing probative about conspiracy or how fuel surcharges came about.

Fuel surcharges were adopted to deal with fluctuating fuel costs, and then emphasized to

deal with escalating costs.  Conspiracy is not required to explain that.

> b. *The Railroads' Behavior During the Alleged Conspiracy Period Was Neither Unusually Parallel Nor a Break From Historical Practices*

The particular kind of parallel conduct from which one could infer conspiracy is what

Areeda and Hovenkamp call "[i]ncredible simultaneous parallelism"—parallel action that is not

sequential, as in a follow-the-leader dynamic, and "not a plausible coincidence or an expectable

response to a common business problem." *Antitrust Law* ¶ 1425c.  A change in behavior can

qualify, but "to create an inference of a conspiracy, the shift in behavior must be a 'radical' or

'abrupt' change from the industry's business practices." *Chocolate Confectionary*, 801 F.3d at

410 (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)).  Conversely, because

it would be unnecessary for competitors to agree to continue their historical independent

practices, courts recognize that "continuation of a historic pattern … does not plausibly allow

one to infer the existence of a cartel." *Kleen*, 910 F.3d at 937 (citing *Valspar*, 873 F.3d at 196

("public parallel price increase announcements are 'consistent with how this industry has

historically operated'")); *Chocolate Confectionary*, 801 F.3d at 410.

48

Plaintiffs previously persuaded this Court to deny a motion to dismiss on allegations that the railroads went from varied surcharges before 2003 to a new practice of coordinated surcharges established as a multiplier of the base rate.  *See Rail Freight*, 587 F. Supp. 2d at 34-35.  That was never true, and the argument has long since been abandoned.  It was replaced by the argument the Court credited during class certification—that the conspiracy was about fundamentally different and more aggressive fuel surcharges, *i.e.*, the surcharge formulas "yielded more revenue" at a given cost of fuel than prior surcharges.  *Rail Freight*, 287 F.R.D. at 48-49.  But that is not true either.  To the contrary, in this case the Court is faced with an unusual and extreme circumstance where, indisputably, non-conspiratorial interaction produced nearly identical carload fuel surcharge formulas and coverage policies by not later than October 2002—seven months *before* Plaintiffs say the conspiracy began.  That alone rules out any argument that similar fuel surcharges are "not a plausible coincidence."  For convenience, we repeat Table 1:

| Def. | Effective Date | Bench mark | Trigger Price | Surcharge at Trigger Price | Fuel Increment | Fuel Surcharge Increment | Fuel Index Period |
|------|----------------|------------|---------------|----------------------------|----------------|--------------------------|-------------------|
| CSXT | October 25, 2000 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consec. Days |
| NS | June 30, 2000 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consec. Days |
| UP | December 1, 2002 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consec. Days |
| BNSF | October 1, 2000 | WTI | $28/barrel | 2.0% | $2.50/barrel | 1.0% | Monthly Average |
|  | July 1, 2001 | HDF | $1.30/gallon | 1.0% | $0.05/gallon | 0.5% | Monthly Average |

At one time or another, prior to any alleged conspiracy, all four Defendants had a "standard" carload fuel surcharge based on the WTI index, with a $28/barrel trigger price, and with a 2.0% surcharge at the trigger price.  Three of the four had adopted the same fuel increment, surcharge increment and fuel index period.  Plaintiffs' key pleading-stage "assert[ion]

that it is unlikely that the eastern and western defendants would independently impose identical fuel surcharges," *Rail Freight*, 587 F. Supp. 2d at 34, is false:  During a period in which Plaintiffs concede there was no conspiracy, that is *exactly* what happened.

The striking fact is that Defendants' later, supposedly conspiratorial surcharges *were more differentiated* on the margin.  As explained above, when the Spring 2003 changes were made, the railroads did *not* all have the same fuel surcharge formula, let alone the same formula adopted at the same time.  NS destroyed the perfectly parallel practice it shared with CSXT by not changing its surcharge at the time the conspiracy was allegedly formed, leading to a 20% difference in trigger prices that NS intended to exploit to obtain market share from CSXT.  DA05574; DA05008 at 50-51 (Seale 236:10-237:3).  It eventually followed CSXT's move, but only after three rounds of well-documented internal deliberations over a *nine-month* period.  That is not remotely suggestive of conspiracy; courts have widely regarded much *shorter* intervals as powerful reasons to grant summary judgment.  *Kleen*, 910 F.3d at 936 (finding no evidence of price fixing conspiracy where some purported conspirators allegedly "followed suit over a *month* later" in a price increase) (court's emphasis); *Baby Food*, 166 F.3d 131-32 (time lags of three to six months between pricing moves "refute rather than support" allegations of conspiracy); *Citric Acid*, 191 F.3d at 1101 ("the timing of [the allegedly conspiratorial] decision…does not fit with [Plaintiff's] theory of conspiracy").

UP moved to, and BNSF stayed on, the HDF index (rather than matching CSXT) and adopted clearly differentiated positions vis-à-vis one another.[25]  BNSF and UP's fuel surcharge

---

[25] Although the prices of oil reflected in the HDF and WTI generally moved together given that they relate to the same underlying commodity, the Western railroads each conducted independent analyses that led each to conclude that HDF was superior to WTI for tracking its fuel costs, prompting each to switch separately from using WTI to HDF in 2001 (BNSF) and

would have diverged at low HDF prices, since as of June 1, 2003, there was a ten cent (8%) difference in trigger prices.[26]  And there is extensive evidence of independent decision-making, including the formation and work of the 17-member BNSF Fuel Surcharge Review Team, and the history of UP deciding not to follow CSXT after customer and internal opposition.

Of course, in a broader sense all of these formulas would generate similar revenues in response to similar changes in the cost of fuel.  That is unsurprising, since Defendants (and other railroads) were all solving for the same problem: how to adjust rates when fuel prices go up or down, under very similar cost structures.  One would *expect* similar answers, and expect strong customer opposition to anyone whose formula was anomalous.  That is why courts consistently refuse to infer conspiracy from parallel conduct that is "an expectable response to a common business problem." *Antitrust Law* ¶ 1425c; *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992) ("The fact that a standard product is priced according to a standard formula does not indicate that a conspiracy exists[.]").

A similar pattern exists for Defendants' coverage policies: parallel internal policies and efforts to track surcharges (once railroads had surcharges in place) before the alleged conspiracy period, which continued into that period, with differences at the margins that point away from conspiracy.  The Defendants' Individual Motions go into this in detail, and it is significant how much of the evidence consists of ordinary course implementation documentation, such as BNSF's February 2002 price escalation guidelines that required every contract to include a fuel

---

2003 (UP).  DA03908 at 19-21, 32-34; DA03044 at 48-50 (Jacobowski 57, 61-63, 65-67); DA03055 at 65-66, 68 (Kyei 45, 50-52, 59-60); DA01468-491.

[26] *Compare* DA01534 at 536 *with* DA01573 at 574-75; DA04603 at 03-04; *see also* DA04415 at 15-16 (BNSF's Sam Kyei noting in his July 1, 2003 memo that "[t]his means that UP will be very competitive at lower [HDF] prices").

surcharge,[27] NS's June 2000 instructions to marketing personnel to apply a fuel surcharge to all

carload price authorities (or obtain approval from senior executives for exceptions),[28] NS's

monthly "fuel surcharge tracking report" circulated to marketing executives since 2000,[29] and

CSXT's October 2000 directive requiring every new or renewed contract to include a fuel

surcharge, unless it included an escalation provision based on a government index such as

RCAF.[30]  Evidence like that is not fabricated.  It exists only if the underlying policies are in

place.  The fact that Defendants had parallel coverage policies *before* the conspiracy period

makes it impossible to conclude that later similarities in coverage policies are "[i]ncredible

simultaneous parallelism" that reasonably infers conspiracy.  *Antitrust Law* ¶ 1425c.[31]

c.    *Defendants' Behavior Is Entirely Consistent with*
      *Non-Conspiratorial Follow-the-Leader Parallelism*

As we have seen, the facts here involve independent analysis and sequential action

beginning before the alleged conspiracy period, not simultaneous action that requires a

conspiratorial explanation.  At worst, it is consistent with a follow-the-leader dynamic, from

---

[27] DA03523 at 23-31; DA03549 at 49-57; DA03982 at 82-84; DA03862 at 62-64; DA04019 at 19-21; DA03855 at 55-61; DA04083; DA04084 at 84-85; DA03988 at 988-4018; DA04104 at 05-07; DA04086 at 86-94.

[28] DA05612; DA05613; DA06050; DA05529 at 32; DA05008 at 12, 30-31 (Seale 22:7-23:14; 125:20-127:2;130:19-131:6); DA04996 at 99 (Moorman 195:4-24); DA05638-40; DA05633-37; DA05615-16; DA05621-22; DA05572; DA05619-20; DA05945.

[29] DA05948; DA05986; DA05974.

[30] DA02851; DA02144 at 46, 58; DA01861 at 78, 83 (Giftos 160:6-160:14, 289:11-18); DA01920 at 21 (Piacente 7:14-7:19); DA01886 at 93-94 (Gooden 112:24-113:11).

[31] For the record, there were differences with respect to Defendants' coverage policies during the alleged conspiracy, the most notable being that, for nearly three years of the alleged conspiracy period, CSXT considered a price escalator like RCAF to be an "acceptable alternative" to a fuel surcharge.  *E.g.*, DA02295 at 300 (Apr. 25, 2003 Policy: Fuel Surcharge Application—Contracts, Quotes, and Price Lists: "All private prices are subject to either Fuel Surcharge or 100% of the RCAF(u)"); DA06925 at 30 (June 1, 2005 CSXT Industrial & Agricultural Products Midyear Review: RCAF(u) remained "acceptable as an alternative" to fuel surcharges).  At the same time, CSXT's primary competitor, NS, continued to impose its stricter policy, which required fuel surcharges to be added to all contracts.  DA05812 at 14.

52

which court after court has refused to infer conspiracy. *E.g.*, *Text Messaging*, 782 F.3d at 879 ("We can, …without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it."); *Kleen*, 910 F.3d at 935-36; *White*, 635 F.3d at 586 ("One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.") (quoting *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.)).

The simple chronology of events proves this. As summarized above and recounted in detail in the railroads' separate narrative statements, the move to standard fuel surcharges began in the 2000-2002 period prior to any alleged conspiracy. Turning to the Spring of 2003, CSXT was the first to make a change, in response to an unexpected dip in the WTI Index on March 18 that cost CSXT $9 million in fuel surcharge revenue for the next quarter. CSXT had been analyzing its program extensively in the preceding months, and it moved immediately to adjust its formula, publishing its changes two days later, on March 20, 2003. The new formula used monthly average prices and smaller increments, to specifically correct what CSXT saw as obvious flaws in its formula's ability to respond to volatile fuel prices and its failure to recover higher fuel costs. CSXT also dropped its trigger price, but there is no evidence whatsoever that it got the idea to do that from anyone other than its own employees, much less agreed with another railroad to do so. CSXT did not change its formula *for the next four years*.

UP's pre-existing formula suffered from the same flaws as CSXT's, and just when UP was considering for itself how to address those flaws, CSXT's March 20 announcement arrived. After immediate internal discussion of CSXT's announcement, UP decided to adopt the

approach CSXT had already announced.  UP informed its interline partners on April 4.  That

day, April 4, 2003, would be the closest these facts ever came to parallel conduct.

By that time, BNSF was already several weeks into a thorough and well-documented

internal review of its own fuel surcharge practices, so it took particular note of CSXT's and UP's

announcements.  But it did *not follow* the CSXT and UP announcements; indeed, there is no

evidence that BNSF ever seriously considered reverting to a WTI-based fuel surcharge after

relying on an HDF-based formula for the preceding two years.  BNSF kept studying internally a

different set of options, and ultimately—after a formal internal presentation in mid-April that

surveyed the full landscape of public fuel surcharges (including the fuel surcharges of railroads

that are not defendants here)—BNSF took action entirely consistent with competitive, unilateral

behavior:  It modified its HDF fuel surcharge to have a strike price calibrated to "reflect the $23

WTI crude price used by UP"—BNSF's head-to-head competitor—in the program that UP had

announced on April 4.  BNSF's public announcement came on May 7.

Then something truly impossible to square with conspiracy happened.  UP had been

dealing throughout the balance of April with mounting customer and internal opposition to the

formula it had announced on April 4, and after a month of well-documented internal study and

meetings, UP decided to *reverse course* from its April 4 announcement.  It did not follow CSXT

after all, but rather announced a *less* aggressive, HDF-based surcharge that the internal

documents indicate would create a competitive advantage against its Western rival, BNSF, by

forgoing a surcharge at moderate fuel prices.  UP's announcement came out on May 9, creating a

gap that BNSF's internal documents recognized made BNSF less competitive than UP at low

HDF prices.  That is not conduct consistent with conspiracy.  Indeed, just focusing on CSXT,

BNSF and UP for the moment, their actions in the March-May 2003 period are irreconcilable with a "conscious commitment to a common scheme."  *Monsanto*, 465 U.S. at 768.

NS, meanwhile, watched all these actions and assigned a team to review its own options. After studying CSXT's modifications and assessing the fuel surcharge formulas used by other railroads, on April 29, the review team recommended—no change.  As of May 14, 2003, the date by which all railroads purportedly had agreed to conspire, NS had purposefully, after weeks of analysis, decided not to adopt the allegedly conspiratorial fuel surcharge or make any changes. That meant that NS—CSXT's direct competitor and supposed conspirator—kept its "less aggressive" surcharge in place.  NS again studied the issue that summer, and again decided not to make a change.  Only in December after a third look did NS conclude that it was obtaining no competitive advantage against CSXT by maintaining its pre-existing fuel surcharge and decided to adopt the CSXT modified fuel surcharge.  It announced its change on January 9, 2004, more than nine months after CSXT had made its change.

That chronology reveals sequential competitive actions and reactions, not suspiciously simultaneous actions.  "Sequential parallelism differs from simultaneous action in that one firm's price rise … becomes known to its rivals, who can then choose whether to imitate the move. … No additional fact, such as advance agreement, is needed to explain that process."  *Antitrust Law* ¶ 1425d1.  This is expected in markets with few competitors, *see Text Messaging*, 782 F.3d at 879, and Plaintiffs' expert agreed that one railroad would "take a careful look at any information it can find about [another railroad's] fuel surcharge" before deciding what to do itself.  DA06423 at 32 (Rausser 226:13-19).  Ordinary self-interest and follow-the-leader behavior explain everything about the 2003 and 2004 changes to fuel surcharges.  By contrast, a conspiratorial explanation requires an elaborate plot for CSXT to construct an intricate internal record of swift

decision-making premised on a sudden fuel price drop, for UP to make sham announcements and backtrack on them, for BNSF to keep a 17-member team churning out pointless fuel surcharge analyses, and for NS to deny itself the benefit of supposedly conspiratorial fuel surcharges for the better part of a year.

> **d.** *The Railroads' Independent Internal Decision-Making Processes Supply Non-Conspiratorial Explanations for Their Conduct that Are Not Merely Plausible, but Outright Incompatible with Plaintiffs' Theory*

All these actions were, moreover, the product of extensive and well-documented independent deliberation. Before, during, and well after the formation of the supposed conspiracy, each railroad undertook sophisticated internal fuel surcharge analyses. No summary can do justice to this large body of documentary evidence. Briefly (and for the sake of brevity without citations, all of which are found in Defendant's Individual Motions):

**BNSF** was engaged in regular fuel surcharge reviews and analyses in 2000; then in 2001, when it moved its carload fuel surcharge to the HDF index; and again in 2003, when it slightly adjusted its carload formula and considered changing to a mileage-based fuel surcharge. It did so again in 2004, when it restarted plans for moving to a mileage-based fuel surcharge.

**CSXT** examined potential modifications to its fuel surcharge starting in 2002 into early 2003, and, prompted by an unanticipated fuel price drop, engaged in swift but extensive and independent analysis that resulted in CSXT modifying its surcharge in March 2003.

**NS** engaged in multiple rounds of internal review after CSXT publicly announced its modified carload fuel surcharge formula in March 2003. NS twice decided *not* to change its approach, until December 2003, when it internally determined it had been unsuccessful in taking market share from CSXT by not changing its fuel surcharge.

**UP** internally evaluated its fuel surcharge options as well, including in 2002, before the start of the alleged conspiracy. In March, April, and May 2003, UP independently identified issues with its fuel surcharge formulas; after publicly announcing changes, facing customer backlash, and undertaking further internal analysis, UP switched to the HDF index at a higher trigger than BNSF's. In 2004, UP further studied its carload fuel surcharge after learning through public sources that BNSF was creating a coal-specific fuel surcharge, and it studied, but did not follow, BNSF's eventual move to a mileage-based formula in 2005.

Plaintiffs have no rational explanation for why conspiring railroads would undertake years of analyses, involving dozens of participants, ostensibly making endless choices and creating differentiated competitive positions.  All that work cannot *itself* be some kind of sham, a conspiracy to shroud a conspiracy.  Plaintiffs' theory implausibly "requires the inference of a vast, multifaceted, highly coordinated conspiracy dedicated to creating a Potemkin village of seemingly independent analyses to lend paper support to each collusive pricing move." *Text Messaging*, 46 F. Supp. 3d at 805.  Evidence like this "*negates* the plaintiffs' inference" of conspiracy. *Baby Food*, 166 F.3d at 132 (emphasis added) (affirming summary judgment, partly because defendants' internal "memoranda reveal that the defendants engaged in independent pricing determined by market conditions at the time, profit margins, and the effect of price increases or decreases on sales volume and distribution"); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 796 (M.D. Pa. 2014) (granting summary judgment for defendants where "each [defendant] was actively engaged in internal analyses with respect to whether, when, and by what amount to raise its prices" and the "extensive unilateral discussions reflect[ed] not concerted action but the exercise of independent business judgment"), *aff'd*, 801 F.3d 383 (3d Cir. 2015).

> e.  *The Industry Meetings and Interline Interactions Central to Plaintiffs' Allegations Do Not Permit an Inference of Conspiracy*

We close this discussion addressing the communications between railroads, nearly all of them interline communications, that Plaintiffs have used for a decade to weave their tale of horizontal conspiracy.  Without these, the extensive individual and methodical consideration of fuel price volatility and fuel surcharges described above is indistinguishable from what goes on every day in numerous industries—a very easy case for summary judgment.  But do the interline communications (and to a lesser extent, trade association meetings) really change anything?  It is

black letter law that the mere opportunity to conspire does not, without more, permit the

inference that the opportunity was seized.  And *Monsanto* disallows inferences of conspiracy

from routine communications between parties in collaborative relationships.  So in the end, the

answer is: "No, these overhyped interline discussions of fuel surcharges do not preclude

summary judgment."

> (1)     *Plaintiffs' evidence of interline alliance meetings during the alleged*
> *conspiracy's formative period is factually and legally insufficient*

During the period in which the alleged conspiracy was formed—beginning in March

2003, and completed "[b]y no later than May 14, 2003," Plaintiffs say[32]—there were four

bilateral alliance meetings that Plaintiffs use to infer horizontal conspiracy.[33]  Nothing in the

record suggests anything illegitimate about these meetings.  To the contrary, the STB had

instituted a moratorium on rail mergers and then adopted more stringent merger rules in 2000,

expressly *directing* the industry to elevate alliances over future mergers:  "The Board believes

that other private-sector initiatives, *such as joint marketing agreements and interline*

*partnerships*, can produce many of the efficiencies of a merger while risking less potential harm

---

[32] *See* DA06397 at 404; DA06292 at 93-94 (Pls' Resp. to RFA 27) (admitting that "Plaintiff has
not observed evidence in this litigation that Defendants were involved in the alleged conspiracy
prior to March 2003").

[33] Plaintiffs also refer in passing to some other conversations, meetings, or social contacts
between personnel at two railroads in the first half of 2003.  DA06369-96 at 76, 79, 80-93
(¶¶ 17, 23, 24, 29, 30, 32-38, 40, 42, 44-52).  But there is literally no evidence at all that these
interactions actually addressed fuel surcharges.  Any "inference" of conspiratorial significance
from such interactions would be pure speculation especially when, as explained in the text,
interline partners have abundant reasons to communicate.  Moreover, "evidence of social
contacts and telephone calls among representatives of the defendants [i]s insufficient to exclude
the possibility that the defendants acted independently. … Company personnel do not often
operate in a vacuum or 'plastic bubble'; they sometimes engage in the longstanding tradition of
social discourse."  *Baby Food*, 166 F.3d at 133 (quotation marks and citations omitted).

to the public."[34]  The alliance meetings that Plaintiffs proffer as dens of collusion were preceded

by agendas that went through revisions and extensive logistics planning, were memorialized in

minutes, and resulted in significant action items.  The amount of work that went into these

meetings before, during, and after attests to their legitimacy and necessity.

That the interline partners discussed fuel surcharges at the meetings cannot be a surprise;

fuel price volatility became a serious problem at the end of 2002 and became more pronounced

in the first quarter of 2003.  The railroads (like other transportation industries) were each

evaluating how to respond—and, in the case of their interline service, had to decide how to

respond jointly.  But a discussion of a subject is not the same thing—in fact or in law—as the

"restricted freedom of action and sense of obligation that one generally associates with

agreement" required for violation of Section 1.  *Twombly*, 550 U.S. at 556 n.4 (quotation marks

omitted).  *Monsanto* holds squarely that communications "do not alone show that [firms] are not

making independent pricing decisions" when the firms "have legitimate reasons to exchange

information about the prices and the reception of their products in the market."  465 U.S. at 762.

Moreover, as explained below, the timing and content of these meetings makes them *inconsistent*

with Plaintiffs' conspiracy theory.

**March 12-13, 2003 CSXT-UP Alliance Meeting.**  This alliance meeting is discussed

above.  *See supra* pp. 37-39.  Plaintiffs do not claim it resulted in direct evidence, and neither can

it be used as circumstantial evidence consistent with *Monsanto*.  All Plaintiffs are arguing is that

there was a discussion of "Fuel surcharge methodology," DA02800 (which was part of an

agenda topic of "Other Pricing Issues on CSX/UP Interline Business"), and afterwards CSXT

---

[34] *Major Rail Consolidation Procs.*, STB Ex Parte No. 582 (Sub-No. 1), 2001 WL 648944, at *8
(served June 11, 2001) (adopting 49 C.F.R. § 1180.1(c)); *see id.* at *8 (focusing on whether
"benefits can be achieved through cooperative agreements among carriers short of a merger").

and UP did things consistent with conspiracy.  This is the same *post hoc ergo propter hoc* argument that the Supreme Court disallowed in *Monsanto*, 465 U.S. at 763-64; *see also Matsushita*, 475 U.S. at 597 n.21.  Legitimate communications are not evidence of a conspiracy simply because they precede an act that some plaintiff later claims was due to a conspiracy. *Kleen*, 910 F.3d at 938 ("Especially when companies have legitimate business reasons for their contacts, plaintiffs must offer some evidence that moves beyond speculation about the content of what was conveyed."); *see Moundridge*, 2009 WL 5385975, at *9 ("high level communications by themselves are not enough to create th[e] inference" of a conspiracy).

Furthermore, for purposes of this Common Memorandum, the only fact that matters with respect to this meeting is that each railroad continued to deliberate internally after the meeting, and they indisputably did *not* agree to and implement the same fuel surcharge formulas. Although UP initially matched CSXT, it promptly changed its mind and on May 9 adopted a published carload fuel surcharge that was *less* similar to CSXT's program than what the two railroads had applied before the March meeting.

***"Synchronization" Discussions.***  As noted above, Plaintiffs rely on a March 18, 2003 alliance meeting between BNSF and NS, and a May 14, 2003 alliance meeting between NS and UP.  Notably, at the time of those meetings, the Eastern railroad (NS) was using a WTI-based fuel surcharge, and the Western railroad was using an HDF-based fuel surcharge (BNSF) or had just announced it would switch to one (UP).  In that context, action items following the meeting suggest that the question was posed: "BNSF's fuel surcharge is structured differently than NS, CSX, and UP.  Should BNSF's by [sic] synchronized with the other big players in the industry?" DA04201 at 01-03.  And during the UP-NS alliance meeting, there was discussion that "[u]niform application across the industry would be helpful," and "[c]onsensus was reached that

it would be a positive outcome if all roads had the same process in the eyes of our customers."
The question was posed whether industry participants could work together to achieve this
outcome, with follow-up referred to individuals from both railroads, including lawyers.
DA05216 at 18; *see supra* pp. 39-41.

There is nothing illegitimate about two interlining partners having such a discussion.  It is
entirely reasonable for them to discuss whether it is a wise business decision to impose on
shippers that use a Western and Eastern railroad, together, to transport goods across the U.S.,
different surcharge formulas depending on whether a shipment is BNSF- or UP-originated
heading East, or NS- or CSXT-originated heading West.  But regardless of that, none of the
railroads present at those meetings synchronized with the interline partner at the meeting.  BNSF
did not synchronize with NS.  UP did not either.  And as discussed, NS did nothing to its formula
for many months, and then changed it to match CSXT—not BNSF or UP.  It makes no sense to
infer conspiracy from discussions (especially legitimate discussions) that do not match up with
the parties' later actions.  And "[i]t would not be reasonable to infer that [a defendant] engaged
in illegal activities merely from evidence that an illegal course of action was suggested but
immediately rejected."  *Citric Acid*, 191 F.3d at 1098.

***April 1, 2003 CSXT-BNSF Alliance Meeting.***  Plaintiffs also cite an April 1, 2003
alliance meeting between CSXT and BNSF at which the railroads' representatives discussed fuel
surcharges.  They scarcely say anything more; the full treatment of this meeting in Plaintiffs'
conspiracy narrative is "On April 1, 2003, the day before the Spring 2003 NFTA meeting,
Mr. Lanigan and other BNSF senior executives met with CSX senior executives to discuss fuel
surcharges."  DA06369 at 84 (¶ 37).  That is only because the agenda reflects (under the general
heading "Merchandise Update") items like "Internet Pricing" and "Fuel Surcharge."  DA00160-

61.  One meeting participant testified at length that the agenda item on fuel surcharges concerned "how we're going to administer fuel surcharges on an interline basis"—a "discussion of systems issues and administration of pricing documents on interline movements across the railroads." DA03025 at 35-36 (Garin Dep. 238:12-13, 239:1-3, 241:8-12).

This is not *any kind* of probative evidence of conspiracy, direct or circumstantial, strong or weak.  It does not "nudge the ball" at all, *Kleen*, 910 F.3d at 934, but is rather mundane interline collaboration between two railroads that supply traffic to each other and administer thousands of pricing documents.  "[W]here companies were not only competitors but also among each other's largest suppliers and largest customers, plaintiffs needed to point to a communication that 'suggest[ed] a meeting of the minds to fix prices.'"  *Kleen*, 910 F.3d at 938-39 (quoting *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 763 (7th Cir. 2015)).  The absence of any "meeting of the minds" is also plain since CSXT had already changed its surcharge and BNSF did not follow.

*April 2-6, 2003 NFTA Meeting.*  Finally, Plaintiffs regularly note that a meeting of the National Freight Transportation Association ("NFTA") was held in April 2003.  DA06369 at 84-85 (¶ 38).  Plaintiffs have no evidence that fuel surcharges were actually discussed at this broad gathering of industrial transportation customers, a fact the Court can confirm by reviewing Plaintiffs' conspiracy narrative.  Plaintiffs point to this event only because various railroad executives were in attendance, and because NS Senior Vice President for Marketing Services Seale indicated to BNSF CMO Lanigan that Seale wanted to follow up on "the fuel surcharge issue we discussed in Norfolk" (a reference to the BNSF-NS alliance meeting two weeks prior). DA06369 at 83-85 (¶¶ 36, 38); DA0162-63; DA03099 at 114-15 (Lanigan Dep. 60:3-5, 63:3-11). There is no reasonable basis to make anything of this coincidental, but unimportant, NFTA

meeting.  *See, e.g.*, *Twombly*, 550 U.S. at 567 n.12 (rejecting the contention that the defendants'
membership in trade associations, combined with parallel conduct, plausibly suggests
conspiracy); *Am. Chiropractic*, 367 F.3d at 227 ("mere contacts and communications, or the
mere opportunity to conspire, among antitrust defendants is insufficient evidence [of] an
anticompetitive conspiracy.") (citation omitted).

(2)   *Plaintiffs' reliance on interline concurrences is misplaced*

Plaintiffs also rely on other interline communications between Defendants, largely
concurrence requests or less formal exchanges about the administration of fuel surcharges.
Plaintiffs assert these show that the railroads "intentionally used so-called 'concurrence' or other
communications in order to signal each other about contemplated future pricing actions and to
secure coordination."  DA06369 at 82 (¶ 33 n.88).  This argument too fails because these
communications are entirely consistent with the normal provision of interline services.

*First*, concurrence communications and the like are a paradigmatic example of "ordinary
and justifiable contact between rivals," something that does "not suggest existence of a
conspiracy."  *Antitrust Law* ¶ 1417b.  At the most basic level, the exchange of joint pricing
information is necessary to form the vertical agreement that allows railroads to offer a shipper a
single price for an interline move.  *See* DA00113 at 14-19.  "[T]he business practice" at issue
thus "involve[s] the core activity of the joint venture itself, [namely], the pricing of the very
goods produced and sold by" the interlining railroads, and therefore cannot lead to a finding of a
*per se* unlawful conspiracy.  *Texaco*, 547 U.S. at 7-8.[35]

_____

[35] If Plaintiffs wish to contest that legitimacy, they forfeit the advantages of the *per se* rule and
this case could proceed only under the rule of reason (a case Plaintiffs have consistently
eschewed).  *See, e.g.*, *Texaco*, 547 U.S. at 6 n.1 ("Had [plaintiffs] challenged [the joint venture]

*Second*, in addition to being exchanged between interline partners, fuel surcharge program information was also publicly announced.[36]  The "exchange of readily available public information does not support inference of conspiracy."  *Wilcox*, 815 F.2d at 526.[37]  In fact, concurrence requests were often made by cutting-and-pasting *the requesting railroad's public press release* into an interline email.  *See, e.g*., DA04337 at 37-39; DA01441-43.  And Plaintiffs cannot complain about the need to give modest advance notice to customers of price changes— something that Congress has even *required by law* for common carrier rates.  *See* 49 U.S.C. § 11101(c) (requiring at least 20 days' notice to "increase any common carrier rates or change any common carrier service terms").

*Third*, the reason Plaintiffs rely on these interline concurrences is to invite the inference that, because Defendants agreed to changes to their respective interline fuel surcharges, and made similar changes on local fuel surcharges, Defendants must have *agreed* to change *all* fuel surcharges.  But that is precisely the "similar action" inference that 49 U.S.C. § 10706(A)(3)(B)(ii) prohibits.  As this Court explained, "the existence of an agreement … may not be inferred from evidence that: (1) two or more rail carriers acted together with respect to an

---

itself, they would have been required to show that its creation was anticompetitive under the rule of reason.").

[36] DA02143; DA02193; DA05191; DA01372-75; DA01449-52; DA01624-27; DA01706-45; DA03548; DA03532 at 32-46; DA03659 at 62, 79.

[37] This Court's decision in *Jung v. Ass'n of American Medical Colleges*, 300 F. Supp. 2d 119 (D.D.C. 2004), is not to the contrary.  There, the Court recognized that the public dissemination of pricing information exchanged between competing medical residency programs "d[id] not promote competitive compensation levels" because "prospective residents cannot utilize the information [to evaluating competing offers] because there are no competing offers" under the terms of the residency-matching system.  *Id.* at 167-68.  Here, by contrast, the public dissemination of pricing information about rail transportation is undeniably procompetitive because, to paraphrase the Second Circuit, "access to information may better equip [shippers] to compare [transportation service offerings], rendering the market more efficient."  *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001).

interline rate or related matter, and (2) a party to such action took similar action with respect to a rate or related matter on another route or traffic." *Rail Freight*, 2021 WL 663669, at *25. The Court confirmed that the first criterion is met by evidence of "rail carriers setting a rate for a shared interline movement" (which is what concurrence exchanges are), and the "similar action may include, for example, a single rail carrier (who was a party to the first action) setting a rate for one of its single-line movements." *Id*. at *25-26. The Court is bound to reject the inference that Plaintiffs urge at summary judgment, just as a jury would be bound to reject it at trial. *See Anderson*, 477 U.S. at 254-55 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden," and only "*justifiable* inferences are to be drawn in [the plaintiff's] favor.") (emphasis added).

*Fourth*, the nature of concurrence requests did not change with the alleged formation of the supposed conspiracy. When the railroads publicly announced rate-based fuel surcharge formulas or changes to those formulas, they always applied those formulas across all public rate authorities and never differentiated between local traffic and the interline traffic they originate. The railroads also were clear in their announcements that they sought to apply the formulas where they could to negotiated, private contracts. The railroads requested concurrence broadly, sometimes before they announced the change; other times, after.

For example, after announcing its public carload fuel surcharge formula in May 2000, NS sought concurrence from its interline partners broadly to include the formula in all joint rate authorities. CSXT responded just as broadly, agreeing the surcharge could be applied to "joint NS-CSXT public, private (non-signature) and contract prices." DA05947; DA05618. Similarly, in September 2000, CSXT announced its public carload fuel surcharge formula, the same as NS's. CSXT's concurrence request indicated the formula would apply to "all joint-line traffic

moving under tariffs, public price lists, private price quotes and certain contracts." DA06035 at 36.  BNSF's and UP's concurrence requests and responses were similar.  DA03948 at 48-51; DA03952 at 52-53; DA01378; DA01289.  And Plaintiffs have conceded that none of this is "evidence" of collusion.  DA06292 at 93-94.

During the alleged conspiracy period, the railroads made the same broad concurrence requests and had similar discussions about how the modified surcharges would be applied.  DA05772 at 72-73; DA05785; DA04260; DA04337 at 37-39; DA01565-72.  The railroads' interline partners reacted and responded similarly.  DA05772 at 72-73; DA05777; DA01444; DA06048-49.  And, in some instances, both before and during the alleged conspiracy, the railroads sought concurrence from their interline partners before publicly announcing the new surcharge formula to give their partners time to discuss the change and prepare for it internally.  DA05617; DA01369; DA01677; DA05220-33; DA05192-95.  This is not "evidence that tends to exclude the possibility" that each railroad acted independently.

* * *

Taken together, the railroads' actions are much more naturally explained not as a conspiracy, but as independent (if consciously parallel) responses to a common stimulus, accelerated in some instances by recognition of what other railroads had done, either because that information was public and therefore available to everyone or (far less often) because of legitimate interline communications.  There is no suspiciously parallel behavior in this record— *nothing* like the abrupt, inexplicable change Plaintiffs have alleged for so long.  No reasonable jury could find that Defendants conspired.

66

**B.** **The Arrival of Mileage-Based Fuel Surcharges Limits the Substantive and Temporal Scope of Any Conspiracy**

The foregoing discussion establishes that no conspiracy was formed in 2003, and that determination disposes of these long-running cases in full.  If the Court were to disagree, however, it would need to examine the object and duration of any supposed conspiracy.  As explained below, Plaintiffs do not contend that the conspiracy they allege continued indefinitely, and they concede it did not embrace *mileage-based* fuel surcharges, which came to replace rate-based fuel surcharges following the STB's January 25, 2007 decision ruling that rate-based fuel surcharges on regulated traffic could be an unreasonable practice.  Accordingly, if this Court were not to grant summary judgment in full, it should nonetheless grant partial summary judgment to the effect that any conspiracy (a) did not have the object of imposing mileage-based fuel surcharges, and (b) did not continue beyond the STB's January 25, 2007 decision.  "Rule 56 allows a party to move for summary judgment on part of a claim." *Pension Benefit Guar. Corp. v. Asahi Tec Corp.*, 979 F. Supp. 2d 46, 65 (D.D.C. 2013).

**1.** **Plaintiffs Must Establish the Scope and Duration of Any Conspiracy**

As Chief Judge Howell has recognized, plaintiffs bear the burden of "establish[ing] the length of the conspiracy" with more than "a blanket assertion that because the railroads' post-[2006] conduct 'did not constitute a withdrawal,' the conspiracy continues." *Rail Freight (No. II)*, 2020 WL 5016922, at *26.  Plaintiffs must marshal "specific facts establishing the existence of a conspiracy for the entire time period alleged." *Precision Assocs., Inc. v. Panalpina World Transp. Ltd.*, No. 08-CV-00042, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015) (narrowing alleged conspiracy period by years on motion to dismiss putative class action).  A conspiracy may not be presumed to continue after "its goals … have been affirmatively abandoned." *United States v. Nippon Paper Indus. Co.*, 62 F. Supp. 2d 173, 195 (D. Mass. 1999).  "Nor should the

conspiracy be presumed to continue when the surrounding circumstances have changed

significantly." *Antitrust Law* ¶ 1421b3; *see Panache Broad. of Pa.., Inc. v. Richardson Elecs.,

*Ltd.*, No. 90 C 6400, 2001 WL 290408, at *6 (N.D. Ill. Mar. 22, 2001) (finding it "not reasonable

to assume that [a] conspiracy simply continued" after a consent decree "changed the nature of

[defendants'] conduct"). Similarly, if any conspiracy exists, the Court should "identify with

maximum particularity … the subject matter of [the] conspiracy." *Antitrust Law* ¶ 1409; *see*

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 633 (9th Cir. 1987).

"When a conspiracy ends depends upon the facts of the particular case and the scope of

the agreement involved." *United States v. Inryco, Inc.*, No. Y-80-054, 1981 WL 2126, at *7 (D.

Md. July 28, 1981). Plaintiffs can create a triable issue of fact as to a continuing conspiracy only

by satisfying the *Matsushita* standard as to any later-in-time parallel activities, just as they must

for the initial conspiracy they allege. *See In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d

750, 783 (E.D. Pa. 2017) (granting summary judgment under *Matsushita* as to 2005 and 2008

price increases while denying summary judgment on 2001 price increase in a price-fixing case).

In a concentrated market, "present parallelism is as likely to result from present interdependence

as from a proved conspiracy in the past." *Antitrust Law* ¶ 1421b3. In *Blood Reagents*, for

example, direct purchasers of certain chemicals used in blood testing alleged a price-fixing

conspiracy between the two major suppliers in the market. 266 F. Supp. 3d at 778. The court

denied summary judgment in part, allowing conspiracy claims respecting 2001 activities to go to

the jury. *Id.* But it granted summary judgment on the allegations that the conspiracy continued

in subsequent years and infected price increases in 2005 and 2008. *Id.* The court applied

*Matsushita* to events surrounding the suppliers' activities in 2005 and, separately, in 2008,

concluding that the purchasers' evidence did not tend to exclude the possibility that the later price increases were a product of interdependence.  *Id.* at 778-84.

### 2.  Mileage-Based Fuel Surcharges Are Not Part of the Alleged Conspiracy

Plaintiffs' case has always been about a conspiracy to impose *rate-based* fuel surcharges, not mileage-based fuel surcharges.  For example, they alleged that "pursuant to their conspiracy, Defendants would … apply the supposed fuel cost increase percentage to the entire cost of the freight shipment."  DA00005 ¶ 75 (emphasis omitted); *accord id.* ¶ 14 ("BNSF, UP, CSX and NS maintained their conspiracy during the Class Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate….").  Plaintiffs sought certification of a class of purchasers of transportation services "as to which Defendants assessed a stand-alone rail freight fuel surcharge *applied as a percentage of the base rate* for the freight transport…" DA06850 at 51 (emphasis added).  In discovery, Plaintiffs confirmed their contentions: "Mileage-based fuel surcharges are not, and have never been, part of the alleged conspiracy." DA06397 at 407.  Their expert concurred, affirming that "there is no allegation in this case that mileage-based fuel surcharges were the subject of any conspiracy among defendants."  DA06423 at 26 (Rausser 74:1-4).  This Court, Chief Judge Howell, and the D.C. Circuit have likewise understood Plaintiffs' claims to be limited to rate-based fuel surcharges.[38]  Accordingly, the

---

[38] *See, e.g.*, *Rail Freight*, 292 F. Supp. 3d at 94 ("As plaintiffs describe it, '[t]he claims of the named Plaintiffs … arose out of … Defendants' conspiracy to impose stand-alone, rate-based Fuel Surcharges in order to raise shipping prices across the board.'"), *aff'd*, 934 F.3d 619, 620 (D.C. Cir. 2019) ("The plaintiffs … allege that the railroads conspired to fix rate-based fuel surcharges.…[which] are calculated as a percentage of the base shipping price."); *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, No. 1:19-CV-03379 (BAH), 2020 WL 5016922, at *7, *19 (D.D.C. Aug. 25, 2020) (Howell, C.J.) (rejecting tolling for allegations of "a further conspiracy between defendants to fix mileage-based fuel surcharges in addition to the rate-based fuel surcharges"; "[t]his allegation of a price-fixing conspiracy for a second fixed fuel surcharge that superseded the rate-based fuel surcharge at the heart of the original conspiracy, appears

Court should grant summary judgment to the effect that the object of any alleged conspiracy did not include the imposition of mileage-based fuel surcharges.

> ### 3.   Plaintiffs Cannot Satisfy Their *Matsushita* Burden to Establish that Any Conspiracy Extended After the STB's January 25, 2007 Decision

The shift toward mileage-based fuel surcharges also has consequences for the duration of the conspiracy that Plaintiffs allege.  The Plaintiffs' complaint indicates that the alleged conspiracy ended in June 2007.  *See* DA00005 at ¶¶ 1, 7, 11, 12, 38, 99.  When Plaintiffs filed their operative complaint in 2010, they pointed to only a smattering of statements and events after June 2007, and did not allege that any of those facts supported the existence of a conspiracy after June 2007.[39]  Likewise, Plaintiffs' "Narrative Factual Statement" describes "The Conspiracy" without reference to any facts or events beyond mid-2007.  DA07442 at 43-99 (¶¶ 16–105).  At a minimum, therefore, the Court should grant summary judgment as to any claim of a conspiracy extending beyond June 2007.  In truth, however, the latest possible end date for any conspiracy is January 25, 2007, when the STB issued its decision regarding rate-based fuel surcharges and by which time the railroads were already moving away from the percentage-of-revenue fuel surcharges that Plaintiffs challenge.[40]

---

nowhere in the [*MDL I*] Complaint.… *MDL I* did not provide defendants with adequate notice of plaintiffs' non-rate-based fuel surcharge allegations….").

[39] *See id.* at ¶¶ 10, 11, 18.  Although Plaintiffs allege the conspiracy lasted until "at least" June 2007, *id.* at ¶¶ 1, 7, 11, 12, 38, 99, "[i]n the absence of specific allegations of conspiratorial activity, conclusory statements couched as facts, are not sufficient to raise the inference that the conspiracy extended [past a certain point.]"  *Nypl v. JPMorgan Chase & Co.*, No. 15 CIV. 9300 (LGS), 2018 WL 1276869, at *4 (S.D.N.Y. Mar. 12, 2018) (quoting *Precision Assocs.*, 2015 WL 4987751, at *5 (second brackets in original)).

[40] A distinct question could exist whether events before that date had "lingering effects" even after any conspiracy ended.  *See Rail Freight (No. II)*, 2020 WL 5016922, at *24 ("The parties should not confuse [the conspiracy period] with the possibly different time period for the calculation of damages.") (quotation omitted).  Such issues are beyond the scope of this motion, which addresses only the existence of the alleged conspiracy.  *See* ECF No. 1025.

Like the *Blood Reagents* purchasers, Plaintiffs lack evidence that any conspiracy existed after January 2007.  Plaintiffs all but concede this:  Every time they have described the conspiracy, the story ends just after the STB's January 2007 decision.[41]  By then, BNSF and NS had already begun departing from the rate-based surcharge formulas that Plaintiffs say were collusively adopted in 2003 and 2004, and the STB's decision only catalyzed changes in each railroad's individual approach that were announced and implemented in the weeks and months that followed.

Plaintiffs have identified as evidence of conspiracy in this period four documents ostensibly showing that "Defendants discussed how they would respond to the [January 25, 2007] STB ruling," in February and March of 2007.[42]  Those four documents in fact show *independent action reacting to an external event.*  Plaintiffs cite only: (1) an April 11, 2007 internal BNSF email thread discussing BNSF's unique mileage-based fuel surcharge program and how it planned to expand the program;[43] (2) a February 7, 2007 internal UP email thread entitled "Mileage Based fuel surcharge Timetable," and discussing implementation of UP's new, unique mileage-based fuel surcharge program;[44] (3) a February 16, 2007 internal UP email raising various considerations bearing on the development of UP's revised intermodal fuel

---

[41] *See, e.g.*, DA00005 at ¶¶ 53-98; DA06850 at 54-55; DA07442 at 43-99 (¶¶ 16-105).

[42] DA07442 at 497 (¶ 104 n.288) (identifying BNSF-0535331 (DA04662); CSXFSC000258350 (DA02885); UPFSC 0165409 (DA01688); and UPFSC 0422458 (DA01689)); *see id.* at 500-501 (identifying same document in response to BNSF Interrogatory No. 1).

[43] DA04662 (including as talking points, "Anti-trust regulations do not allow for industry discussions, which means no industry solution—only bi-lateral talks were allowed" and "each railroad has developed different programs").

[44] DA01688 (noting differences in the other railroads' approaches, and potential obstacles for interline movements: CSXT is "going down the PC Miler approach"—a computer program for calculating distance for FSCs—and "NS is planning to do away with the fuel surcharge altogether"); *see* https://www.pcmiler.com/rail/ ("PC*MILER|Rail - The most accurate and complete digital representation of the North American rail network.").

surcharge program;[45] and (4) a bare February 9, 2007 calendar entry for CSXT Executive VP of Marketing Gooden and CSXT attorney Paul Hitchcock, entitled "Discussion w/BNSF re: Fuel Surcharge"[46]—a topic two interline partners would plainly need to address in the wake of the STB's decision.

All of these documents reflect the railroads' internal reaction to the STB's 2007 decision; none evidences conspiracy. Although the STB's decision applied only to regulated traffic, it prompted or accelerated pre-existing moves away from rate-based fuel surcharges. In response to the STB ruling, on April 26, 2007, **UP** officially shifted from using a rate-based fuel surcharge formula to using a mileage-based fuel surcharge formula on regulated traffic, and announced that it intended to transition all of its business to the new surcharge over time. DA01700-705; DA01692-98. **CSXT** began using a mileage-based fuel surcharge formula to price shipments subject to public tariffs on April 23, 2007. DA02201 at 06. It also moved to this mileage-based formula for unregulated shippers subject to private contract or quotes as contracts came up for renewal, but gave contract customers an option in negotiations to remain on the rate-based fuel surcharge formula.[47] **BNSF** had *already* publicly announced plans to move two of its four business units (Agriculture and Coal) to mileage-based surcharges effective more than a year earlier, January 1, 2006. DA04635 at 36; DA04652 at 52-57. By the time of the STB ruling in

---

[45] DA01689 (noting that NS and CSXT indicated their preferred approach, but that "Once we develop our program, we will either wait for other railroads to initiate their action or we will send an announcement with a substantial lead time for customers and industry to follow…").

[46] DA02885; *see* DA01831 at 52, 60 (Couch 140:16-20; 233:15-17) (noting Hitchcock as counsel in connection with conversation on "antitrust concerns"); DA01886 at 97 (Gooden 222:19-23) (identifying Hitchcock's role), 92 (77:17-19) (noting Hitchcock's presence in 2005 discussions with BNSF on mileage-based FSCs).

[47] DA02792 at 95 ("Convert all CSXT [regulated traffic] to mileage-based FSC … on April 23 … [with unregulated] converted at renewal"); DA02201 at 08; DA01927 at 37-38 (Ward 204:8-205:14); DA01886 at 98 (Gooden 259:25-260:19).

January 2007, BNSF had indeed converted to mileage-based fuel surcharges (to the extent contracts allowed) on unregulated local and Rule 11 agricultural and coal shipments. DA04652 at 52-57. BNSF responded to the STB's decision by expanding its existing mileage-based fuel surcharge program to encompass regulated traffic as well. DA03788 at 824-826. **NS**, by contrast, did not convert traffic to mileage-based fuel surcharges, and instead eliminated fuel surcharges on all of its regulated shipments on March 16, 2007, and continued using rate-based fuel surcharges for its unregulated shipments. DA05573. The STB's January 2007 decision catalyzed a major departure from the reliance on rate-based fuel surcharges that sits at the heart of plaintiffs' alleged conspiracy, and all four railroads took distinct approaches going forward.

Under *Matsushita*, nothing about this evidence rules out independent action starting no later than the STB's 2007 decision—"conspiracy" would be an utterly inapt description of such diverse reactions to a major regulatory decision. *First*, Plaintiffs do not contend any direct evidence of a 2007 conspiracy exists.[48] *Second*, it is undisputed that the specific changes that each railroad made to its fuel surcharge program differed, so no parallel conduct resulted from any "discuss[ions]" these documents might evidence. *See Anderson News*, 899 F.3d 105 ("The defendants each reacted in different ways … varying courses of action [] undermines … an inference of a conspiracy …."). *Third*, even if the conduct was parallel in the most general sense—three of the four railroads used mileage-based surcharges in some form—the "obvious alternative explanation" for that parallelism, *Twombly*, 550 U.S. at 567-68, was the STB decision determining that rate-based fuel surcharges were generally inappropriate for regulated traffic, prompting the railroads to take a different approach. *Fourth*, "the surrounding circumstances …

---

[48] *See* DA06397 at 98-99 (response to CSX ROG No. 5, asking Plaintiffs to identify every piece of direct evidence of conspiracy they have, and identifying nothing after 2004).

changed significantly" with the STB's decision, *Antitrust Law* ¶ 1421b3, so the Court must presume it ended the conspiracy absent new "allegations and evidence," *Panache Broad.*, 2001 WL 290408, at *4. Because plaintiffs have no evidence of conspiratorial conduct in 2007, the railroads are entitled to summary judgment as to all post-January 25, 2007 conspiracy claims.

### C. Plaintiffs Lack Sufficient Evidence to Establish a Conspiracy Covering Intermodal Traffic

As an alternate ground for relief, Defendants ask the Court to at least hold that there is no triable issue of fact as to the inclusion of intermodal fuel surcharges within any conspiracy.

The Court has already found, consequentially, that "[e]ach railroad ha[d] a separate and different published fuel surcharge formula for carload and for intermodal traffic," and the railroads' intermodal formulas were "*competitively negotiated formulas* established during the pre-class period." *Rail Freight*, 292 F. Supp. 3d at 122-23 (emphasis added).[49] And yet Plaintiffs reach broadly—presumably to capture as big a damages case as possible—to sweep intermodal fuel surcharges into this case: "Defendants' conspiratorial discussions to coordinate their fuel surcharges and apply them as broadly as possible included Defendants' fuel surcharges applied to intermodal freight traffic." DA07442 at 469-70. Plaintiffs' inclusion of intermodal traffic in the "omnibus" alleged conspiracy underscores the speculative and opportunistic nature of that claim. No all-encompassing conspiracy can exist when the railroads' intermodal surcharges were the product of unilateral conduct. As the Court found previously, "intermodal traffic was a very substantial portion of the class traffic—42% of BNSF's traffic in 2004 and 33% of NS's

---

[49] This was the predicate for one part of the Court's holding that Plaintiffs' "common proof" failed—it generated damages on intermodal traffic notwithstanding competitively negotiated intermodal fuel surcharges.

traffic in 2006." *Rail Freight*, 292 F. Supp. 3d at 123.[50]  It borders on the absurd to claim that an all-encompassing conspiracy did not encompass that much traffic.

But at a minimum, the Court should grant Defendants partial summary judgment on Plaintiffs' allegation that the purported conspiracy extends to intermodal traffic, because Plaintiffs lack sufficient evidence that "tend[s] to rule out the possibility that" Defendants were "acting independently" as to intermodal traffic.  *Twombly*, 550 U.S. at 554; *see Matsushita*, 475 U.S. at 584 & n.7 (considering whether defendants were entitled to summary judgment on plaintiffs' allegation of a conspiracy to monopolize the American market through predatory pricing despite plaintiffs' assertion of "one large conspiracy" involving other alleged conduct); *Blood Reagents*, 266 F. Supp. 3d at 778-79 (granting summary judgment with respect to "the 2005 and 2008 price increases" despite plaintiffs' allegation of a broader conspiracy encompassing price increases in 2001, 2005, and 2008).

Alternatively, the Court could determine that it need not address this issue in *MDL I* at all.  None of the plaintiffs in *MDL I* purchased intermodal shipment services from Defendants; all are carload shippers.  Accordingly, their claims will not be affected by the Court's resolution of this issue.  But if the Court decides not to resolve this issue in *MDL I*, Defendants respectfully request that the Court expressly clarify in its order that it is not addressing whether Defendants participated in a conspiracy regarding intermodal traffic.  That way, the scope of the Court's order will be clear to Defendants, the *MDL II* Plaintiffs, and the *MDL II* Court.

---

[50] *See also* DA07416 at 25, 27, 31 (Fig 7, Fig 9).

### 1.      Plaintiffs' Evidence Does Not Exclude the Possibility that Defendants' Intermodal Fuel Surcharge Formulas Were Unilateral

Intermodal transportation is a "distinct form of rail transportation featuring the movement of containers or trailers loaded onto rail flatcars" and involving the "joint provision of service by more than one transportation provider."  DA07323 at 23-24 (Duggan Decl. ¶ 3).  For example, an intermodal movement can involve the movement of trailers by truck from their origin to a railroad terminal, for further transportation by rail.  *Id.* at 24 (¶ 4).  Each railroad originally created its intermodal formula during a period in which Plaintiffs concede no conspiracy existed.[51]  As the Court noted, "[e]ach railroad ha[d] a separate and different published fuel surcharge formula for carload and for intermodal traffic with, for example, different trigger points and different escalation points."  *Rail Freight*, 292 F. Supp. 3d at 122-23.  Some never changed their intermodal formulas thereafter; others modified their formulas, at different times, and in different ways, from their competitors and supposed conspirators.  In particular:

**BNSF** adopted its fuel surcharge formula for intermodal shipments in March 2000, and revised it in September 2001.  DA03969; DA03985 at 85-87.  BNSF adopted its intermodal formula after extensively researching the trucking industry, reviewing HDF's five-year average, and analyzing the "price levels … [at which] BNSF's fuel costs will be stable."[52]  This formula was unchanged through 2008.[53]  The Court previously described BNSF's intermodal formula as

---

[51] "Prior to 2003…any stand-alone fuel surcharges used…were not the result of coordination among Defendants' senior executives."  DA07435 at 36-37.  "Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003."  DA06292 at 93-94.

[52] DA03055 at 59-60 (Kyei 24:20-25:17); DA03969 at 70, 73-74; DA07082 at 96-97 (BNSF 140:22-141:1).

[53] DA04664 at 664-938 (BNSF intermodal pricing updates); DA06466 at 69-70 (Rausser 394:20-395:7) (acknowledging that BNSF's intermodal fuel surcharge "formula remains identical and has never changed" from September 2001).

a "competitively negotiated formula[] that did not change from 2001 through the end of the class period" in 2008. *Rail Freight*, 292 F. Supp. 3d at 105.

     *NS* began applying fuel surcharges to intermodal traffic in March 2000, without creating a formula. DA07392. In March 2001, NS created a formula for international intermodal traffic to be applied to shipments to and from ocean carriers. DA07387. Once a week, NS reviewed and adjusted the surcharge as necessary based on the prior three weeks' HDF prices. DA07393. Separately, no later than April 2002, NS implemented a different formula for domestic intermodal shipments. DA07564; DA07572 at 73. That domestic formula never changed. Both formulas were based on the HDF index, but with differing components that resulted in different charges.[54] In August 2006, NS began applying the domestic formula to international intermodal traffic. DA07389. Like BNSF's formula, NS's intermodal surcharge formulas were "competitively negotiated." *Rail Freight*, 292 F. Supp. 3d at 105. The Court has previously recognized that NS adopted an intermodal fuel surcharge formula "well in advance" of 2003, and that formula "did not change" through 2008. *Id*.; *see also* DA00354 at 403 (Ex. 29). NS was the only Defendant that maintained separate formulas for its international and domestic intermodal businesses. *See Anderson News*, 899 F.3d at 105 (stating that the defendants' divergent conduct undermined plaintiff's assertion of the existence of a conspiracy).

     *UP* created its intermodal fuel surcharge formula in November 2000. DA01271-72; DA01293. UP's mathematical formula did not change during the alleged conspiracy period, except that UP *reduced* the Fuel Weight component of the formula, which resulted in a *lower*

---

[54] The international formula triggered a 1% surcharge when the HDF index reached $1.30, and went up or down by 1% for every change of $0.10 in the HDF. DA07387. The domestic formula triggered a 1% surcharge when the HDF index reached $1.24, and went up or down by 0.5% for every change of $0.04 in the HDF. DA07561 at 63.

surcharge.  DA01666-68; DA01101 at 212-215.  As the Court noted, "UP actually lowered its intermodal formula during the class period by 3.9%."  *Rail Freight*, 292 F. Supp. 3d at 123.  The fact that UP's intermodal formula became *less aggressive* during the conspiracy period, while its direct competitor (BNSF) held its formula steady, contradicts the notion that BNSF and UP acted in concert with respect to intermodal traffic.  *See Baby Food*, 166 F.3d at 128 (instances in which one "competitor lowered its prices or kept them the same" while another competitor "raised" prices inconsistent with allegation of conspiracy).

*CSXT* "did not provide intermodal service" during the conspiracy period.  *Rail Freight*, 292 F. Supp. 3d at 123.  CSX Intermodal provided intermodal service, but it "was a separate company from CSX[T] during the class period and is not a party to this case."  *Id*. at 123 n.37.  CSX Intermodal created its fuel surcharge formula effective April 2000.  DA02137 at 38.  That April 2000 CSX Intermodal formula used the HDF index.  DA06916 at 18; DA03007.  Four years later, and 18 months after Plaintiffs allege the conspiracy began, CSX Intermodal modified its surcharge formula.  After studying other published formulas, CSX Intermodal decided to modify its formula to be like BNSF's intermodal formula, and that of Pacer, an intermodal marketing company, transportation broker, and CSX Intermodal customer.  DA06916 at 24; DA06840-41.  This matching of BNSF came *more than three years* after BNSF published its formula. *See Kleen*, 910 F.3d at 936 (price increase by firm "over a month later" than an increase by the price leader was not suggestive of conspiracy).

**2.   Plaintiffs' Evidence Does Not Tend to Exclude the Possibility that Defendants Applied Their Intermodal Surcharges Unilaterally**

Plaintiffs are sure to argue that, even if Defendants' intermodal formulas were competitively established, Defendants conspired to increase the amount of traffic covered by their intermodal fuel surcharges.  The Court rejected that theory during class certification, and it

78

should do so again.  *Rail Freight*, 292 F. Supp. 3d at 124-25.  A theory that surcharge formulas were themselves unilateral and competitive, but somehow their application would be conspiratorial, is flatly inconsistent with the conspiracy actually alleged by Plaintiffs and pursued for over a decade.  This Court previously recognized that Plaintiffs' "antitrust claim in this case is not a conspiracy to impose just *any* fuel surcharge; rather, plaintiffs claim that defendants agreed to increase total prices 'by widespread application and enforcement of *coordinated, and aggressive*, fuel surcharges.'"  *Rail Freight*, 287 F.R.D. at 48 (second emphasis added).  Dr. Rausser made this clear in his report: "The Plaintiffs allege that Defendants conspired to use *coordinated and artificially high fuel surcharges* as a means of raising railroad freight rates across the board…"  DA07416 at 19 (emphasis added).  Plaintiffs cannot take the more aggressive formulas out of that theory and pretend it is still the same theory.

Nor would such a theory make economic sense.  If Defendants did not agree to impose "coordinated" intermodal fuel surcharges—that is, fuel surcharge formulas that they agreed on— then what did they agree to impose?  Whatever fuel surcharge each Defendant could competitively negotiate with its customers?  A "conspiracy to compete" is a Sherman Act oxymoron, and not something Plaintiffs have any evidence of anyway.

Moreover, Plaintiffs will be unable to point to evidence that "tend[s] to rule out the possibility," *Twombly*, 550 U.S. at 584, that Defendants' increase in coverage over time was due not to conspiracy but to market factors, such as the dramatically increased price of fuel, the expiration over time of legacy contracts without a fuel surcharge, and the use of fuel surcharges by trucking competitors.  Take BNSF:  Although BNSF adopted its intermodal fuel surcharge program in March 2000, it could not immediately apply the program to all its intermodal traffic because of the existence of long-term contracts.  Intermodal contracts were "relatively long term

(usually about three to five years)."  DA07323 at 27 (Duggan Decl. ¶ 12).  As Dr. Rausser noted, "the existence of 'legacy contracts' that either had no fuel surcharge provision or had an old fuel surcharge provision" required a phased implementation of fuel surcharges.  DA06202 at 35.  Nonetheless, by the fourth quarter of 2002, BNSF was already internally reporting that 40.7% of its intermodal revenue was covered by a fuel surcharge.  DA04086 at 90 (Memo from Chuck Schultz to Matt Rose, dated January 15, 2003).  Under Plaintiffs' theory, BNSF was able to achieve substantial coverage of intermodal traffic before the alleged conspiracy, but somehow required a conspiracy to achieve "100%" coverage.  Occam's razor suggests a simpler explanation, and one that Plaintiffs cannot rule out:  Each railroad began to increase its coverage rate after it adopted an intermodal fuel surcharge program, but increasing coverage takes time, particularly when customers, like intermodal customers, have long-term legacy contracts that must expire.  As fuel prices dramatically spiked, each railroad reasonably took those higher costs seriously and ensured that its new intermodal contracts contained a fuel surcharge provision.  The sustained increase in fuel prices from 2003 onwards was all the motivation that any rational transportation company, acting unilaterally, needed to ensure that re-negotiated intermodal contracts included a fuel surcharge provision.  *See supra* Section III.A.

* * *

For all those reasons, the Court should grant Defendants partial summary judgment on Plaintiffs' allegation that the purported conspiracy extends to intermodal traffic, or else expressly state that it is not reaching this issue.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Defendants.

Dated:   May 14, 2021                           Respectfully submitted,

/s/ Tara L. Reinhart
Tara L. Reinhart (D.C. Bar. No. 462106)          Saul P. Morgenstern
John R. Thornburgh II (D.C. Bar No. 1044137)     Jennifer B. Patterson
Thomas R. Gentry (D.C. Bar No. 1617060)          ARNOLD & PORTER KAYE SCHOLER
SKADDEN, ARPS, SLATE,                            LLP
MEAGHER & FLOM LLP                               250 West 55th Street
1440 New York Avenue, N.W.                       New York, NY 10019
Washington, DC 20005                             Telephone: (212) 836-8000
Phone: (202) 371-7630                            saul.morgenstern@arnoldporter.com
tara.reinhart@skadden.com                        jennifer.patterson@arnoldporter.com
john.thornburgh@skadden.com
thomas.gentry@skadden.com

Ronald K. Wray II
GALLIVAN, WHITE & BOYD P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
Phone: (864) 271-5362
rwray@GWBlawfirm.com

*Counsel for Defendant Norfolk Southern Railway Company*

/s/ Kent Gardiner
Kent A. Gardiner (D.C. Bar No. 432081)           Juan A. Arteaga
Luke van Houwelingen (D.C. Bar No.               CROWELL & MORING LLP
989950)                                          590 Madison Avenue, 20th Floor
CROWELL & MORING LLP                             New York, NY 10022
1001 Pennsylvania Avenue, NW                     Phone: (212) 223-4000
Washington, DC 20004                             Fax: (212) 223-4134
Phone: (202) 624-2500                            JArteaga@crowell.com
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Katie Yablonka
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Phone: (415) 986-2800
Fax: (415) 986-2827
KYablonka@crowell.com

*Counsel for Defendant CSX Transportation, Inc.*

*/s/ Glenn D. Pomerantz*
Glenn D. Pomerantz
E. Martin Estrada
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone: (213) 683-9100
Glenn.Pomerantz@mto.com
Martin.Estrada@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com


Linda S. Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Phone: (202) 429-3000
lstein@steptoe.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Phone: (415) 512-4000
Ben.Horwich@mto.com

Jacobus P. van der Ven (D.C. Bar No. 1644774)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500 East
Washington, DC 20001
Phone: (202) 220-1100
Jacobus.vanderven@mto.com

Joshua H. Soven (D.C. Bar No. 436633)
WILSON SONSINI GOODRICH & ROSATI LLP
1700 K Street NW
Washington, DC 20006
Phone: (202) 973-8827
jsoven@wsgr.com

*Counsel for Defendant BNSF Railway Company*

*/s/ Daniel M. Wall*
Daniel M. Wall
Timothy L. O'Mara
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Phone: (415) 391-0600
dan.wall@lw.com
tim.o'mara@lw.com


Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone: (202) 637-2200
allyson.maltas@lw.com

Tyrone R. Childress
Kelsey S. Bryan (D.C. Bar No. 1034352)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Phone: (213) 489-3939
tchildress@jonesday.com
kbryan@jonesday.com

John M. Majoras (D.C. Bar No. 474267)
Kristen Lejnieks (D.C. Bar No. 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
Phone: (202) 879-3939
jmmajoras@jonesday.com
kalejnieks@jonesday.com

Leonard A. Gail
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com

Matthew M. Collette (D.C. Bar No. 427167)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company*