**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/GMH) |
| This Document Relates To:<br><br>ALL CASES | **PUBLICLY FILED VERSION** |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT**

**Defendants' Statement of Undisputed Material Facts in Support of Defendants' Joint and Individual Motions for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h)(1), Defendants submit this Joint Statement of Undisputed Material Facts in support of their individual and joint motions for summary judgment. Defendants respectfully submit that all facts must be evaluated under the standards set forth in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), because "antitrust law limits the range of permissible inferences from ambiguous evidence" and "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." 475 U.S. at 588 (citing *Monsanto*). "The correct standard is that there must be evidence that tends to exclude the possibility of independent action[.]" *Monsanto*, 465 U.S. at 768.

Defendants respectfully renew their objection to the use, against Defendants, of evidence regarding interline discussions or agreements, which are subject to the protections of 49 U.S.C. § 10706(a)(3)(B)(ii). *See* ECF Nos. 417, 927. Any reference to such evidence is not a waiver of their objection, but instead a recognition that the Court has denied Defendants' motion. *See* ECF No. 1007.

**Material Undisputed Fact No. 1**

**Fuel surcharges are a rational, common pricing mechanism adopted unilaterally by many businesses in response to fluctuating fuel prices, including by other railroads and transportation providers during the alleged conspiracy period.**

Supporting Facts:

1.1 Plaintiffs' expert agreed that "fuel surcharges would have been charged by the defendants during the [alleged conspiracy] period absent a conspiracy," including "the same

kinds of fuel surcharges that were charged prior to [that] period," "standardized fuel surcharges," and "rate based fuel surcharges."[1]

1.2 Other railroads, including the three non-defendant Class I railroads, Canadian National (CN), Canadian Pacific (CP), and Kansas City Southern (KCS), also adopted rate-based fuel surcharges before and during the alleged conspiracy period.[2]

1.3 Trucking, ocean shipping, and airline transportation companies adopted rate-based fuel surcharges before and during the alleged conspiracy period.[3]

1.4 Plaintiff Olin paid rate-based fuel surcharges to [redacted], and to trucking companies before and after March 2003, and Plaintiff Strates Shows paid rate-based fuel surcharges to [redacted] starting in 2002.[4]

---

[1] DA07504 at 07 (Rausser 119:3-121:6).

[2] DA00713 at 806 (Fig. IV-6A); DA06654 (CN); DA06650 at 52 (CP); DA06562 at 64 (CP); DA03855 at 59 (CP); DA04451 at 61-62 (CN, CP, KCS); DA06866 at 66-94 (KCS).

[3] DA00713 at 807 (Fig. IV 6B); U. S. Department of Transportation, Calculation of Bunker Fuel, Currency, and Inland Freight Fuel Price Adjustment Factors for USTRANSCOM Commercial Shipping Contracts: Final Report (July 2009), *available at* https://rosap.ntl.bts.gov/view/dot/12116; DA04034 at 40 (September 2002 Bear Stearns report concluding that the trucking industry has an "increasing ability to recapture the impact from rising fuel expense through floating fuel surcharge mechanisms"); DA04289 at 300 (February 24, 2003 compilation of rate-based fuel surcharges used by several large trucking companies).

[4] DA07512 at 13, 19 (Olin 194:22-195:5, 261:11-25); DA06494 at 96, 98 (Olin 361:2-11, 426:13-427:14); DA06654; DA06650 at 51, 52; DA06562 at 64; DA06680 at 84; DA06702 at 03; DA06696; DA06698.

**<u>Material Undisputed Fact No. 2</u>**

**All five Plaintiffs were subject to rate-based fuel surcharges in contracts with the Defendants before the alleged conspiracy period.**

<u>Supporting Facts:</u>

2.1 Plaintiff Olin paid rate-based fuel surcharges before January 1, 2003.[5]

2.2 Plaintiff Strates Shows paid rate-based fuel surcharges prior to March 1, 2003.[6]

2.3 Plaintiff Donnelly paid rate-based fuel surcharges before January 1, 2003.[7]

2.4 Plaintiff US Magnesium paid rate-based fuel surcharges prior to March 1, 2003.[8]

2.5 Plaintiff Dust Pro was subject to a rate-based fuel surcharge at least as early as 2002, and it paid rate-based fuel surcharges for shipments made before July 1, 2003.[9]

**<u>Material Undisputed Fact No. 3</u>**

**Defendants adopted fuel surcharge programs independently before March 2003.**

<u>Supporting Facts:</u>

3.1 Plaintiffs admit that fuel surcharge programs adopted before March 2003 were adopted independently.[10]

[5] DA06598 at 604; DA06656 at 59-60 (Olin-NS fuel surcharge); DA06292 at 95 (Olin admission).

[6] DA06516 at 17 (Strates 172:11-21); DA06763 at 70; DA06771 at 77-78; DA06292 at 98 (RFA Nos. 176, 177) (Strates admission).

[7] DA06520 at 22 (Donnelly-NS fuel surcharge); DA06292 at 96 (No. 176) (Donnelly admission).

[8] DA06506 at 08 (Kaplan 81:1-83:3); DA06802 at 02 (U.S. Magnesium-UP fuel surcharge); DA06292 at 99 (No. 176) (U.S. Magnesium admission).

[9] DA06511 at 14 (Dust Pro 51:11-52:4); DA00713 at 813-814 (analysis of Dust Pro transaction data); DA06529 (Dust Pro-UP fuel surcharge); DA06292 at 97 (No. 180) (Dust Pro admission).

[10] DA06363 at 66; *see also* DA06202 at 22, 27.

**<u>Material Undisputed Fact No. 4</u>**

**The price of oil generally increased from 2000 to 2008.**

<u>Supporting Facts:</u>

4.1 Spot prices per barrel for West Texas Intermediate ("WTI") crude oil, as recorded by the U.S. Energy Information Administration ("EIA"), generally rose from 2000 to 2008, and are reflected in the following chart and cited data series.[11]




[11] https://www.eia.gov/dnav/pet/hist/rwtcW.htm (WTI crude oil spot prices); DA00713 at 802.

4.2 The weekly retail prices of U.S. No. 2 diesel (commonly referred to as Highway Diesel Fuel ("HDF")), as recorded by the EIA, generally rose from 2000 to 2008, and are reflected in the following chart and cited data series.[12]




**Material Undisputed Fact No. 5**

**At the time the alleged conspiracy was formed, Defendants did not make parallel changes to the trigger prices in their published carload fuel surcharges.**

Supporting Facts:

5.1 Immediately prior to the alleged formation of the conspiracy, UP, NS and CSXT had identical trigger prices of WTI $28 per barrel, and BNSF had a trigger price of HDF $1.30 per gallon.[13]

5.2 CSXT changed its trigger price to WTI $23.01 per barrel.[14]

---

[12] https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W (HDF diesel fuel prices); DA00713 at 802.

[13] *See infra* ¶¶ 8.4 (BNSF), 13.4 (CSXT), 19.2 (NS), 27.1 (UP).

[14] *See infra* ¶ 29.1.

5.3 BNSF changed its trigger price to HDF $1.25 per gallon.[15]

5.4 UP changed its trigger price to HDF $1.35 per gallon.[16]

5.5 NS did not change its trigger price in 2003, remaining at WTI $28 per barrel.[17]

5.6 As of June 1, 2003, no two Defendants had the same trigger price for their published carload fuel surcharges.

**Material Undisputed Fact No. 6**

**During the alleged conspiracy period, the national economy grew more rapidly than in years prior, and Defendants faced increased demands for their services and capacity constraints.**

Supporting Facts:

6.1 U.S. gross domestic product grew in 2003 (2.9%), 2004 (3.8%), 2005 (3.5%), and 2006 (2.9%), which was on average more than twice the growth rate in 2001-2002 (1.0% and 1.7%).[18]

6.2 Defendants faced increasing demand from 2003 through 2007.[19]

---

[15] *See infra* ¶ 10.10.

[16] *See infra* ¶¶ 29.5, 29.9.

[17] *See infra* ¶¶ 22.3, 22.6.

[18] U.S. Bureau of Econ. Analysis, Gross Domestic Product, *available at* https://www.bea.gov/resources/learning-center/what-to-know-gdp (last accessed May 3, 2021).

[19] U.S. Dep't of Transp. Inspector General, *Quality of Service Provided to Rail Shippers, Report No. CR-2011-045*, at 11 (Feb. 15, 2011) (DA06895 at 96) ("Representatives of one railroad noted that they normally plan for 2 to 4 percent in annual growth, but as early as 2003, demand increased by nearly 12 percent and continued to grow through 2007."); Congressional Budget Office, *Freight Rail Transportation: A Review of the 2004 Experience* 2 (May 2005) (DA06899 at 903) (noting "unprecedented surge in demand"); Fed. Highway Admin., U.S. Dep't of Transp., *Financing Freight Improvements* 4 (Jan. 2007) (DA06904 at 08) ("Railroads are currently serving record volumes"); NS 2004 Annual Report (DA05280 at 83) ("A combination of trends—increasing congestion on the highways, demand for better transportation options in environmental terms, fuel price pressures and regulatory changes affecting the trucking industry—are coming together to result in significantly increased demand for rail freight.").

6.3 Defendants faced capacity constraints from 2003 through 2006.[20]

**<u>Material Undisputed Fact No. 7</u>**

**Defendants are in a vertical relationship with each other with respect to their interline business.**

<u>Supporting Facts:</u>

7.1 CSXT and NS are each Class I freight railroads that operate rail freight transportation network with a geographic footprint generally east of the Mississippi River; BNSF and UP are Class I freight railroads that operate networks with geographic footprints generally west of the Mississippi.[21]

7.2 According to Plaintiffs' expert, Dr. Gordon Rausser, "many rail shipments travel on multiple railroads in what are generally described as 'interline' shipments. Such interline traffic involves collaboration between the railroads to develop joint-line rates and customer-servicing technology."[22] Dr. Rausser stated that "[i]nterline traffic represents roughly one-third of all rail freight revenue," and calculated that interline traffic represents more than one-third of each Defendants' unregulated shipments.[23]

7.3 Each of the four Defendants had substantial interline business with each of the other three Defendants both before and during the alleged conspiracy period.[24]

---

[20] U.S. Dep't of Agriculture Agricultural Marketing Serv., *Study of Rural Transportation Issues* 332 (Apr. 2010) (DA06897 at 98) ("Capacity constraints were common from 2003 through the first half of 2006.").

[21] DA06202 at 13.

[22] DA06202 at 21.

[23] DA06202 at 21; *see also* DA00713 at 921.

[24] DA00713 at 921.

7.4 Plaintiffs' expert economist, Dr. Gordon Rausser, testified that railroads working together to provide interline service are in a vertical relationship to each other.[25]

**Material Undisputed Fact No. 8**

**BNSF unilaterally adopted fuel surcharges before the alleged conspiracy.**

Supporting Facts:

8.1 BNSF has had a rate-based fuel surcharge provision for carload traffic since at least the early 1990s.[26]

8.2 BNSF modified its carload fuel surcharge formula, effective April 1, 2000, to "a floating rate based upon the monthly average price of fuel" using the West Texas Intermediate Crude ("WTI") index.[27]

8.3 In April 2001, BNSF's internal Fuel Surcharge Review Team evaluated the correlation between fuel indices and BNSF's fuel costs, finding that the HDF index had a 99% correlation with its fuel costs and the WTI index had a 93% correlation.[28]

8.4 On April 30, 2001, BNSF announced that it would modify its carload fuel surcharge formula by switching from WTI to the HDF index; BNSF also announced a new strike price ($1.30 HDF) and published the new carload fuel surcharge formula in table format. At a strike price of $1.30 HDF, the carload surcharge was 1%, increasing by 0.5% for every 5¢ increase in HDF.[29]

---

[25] DA06436 at DA06439-40 (Rausser 289:8-291:4).

[26] DA03855 at 60.

[27] DA03523 at 23, 26; DA03548.

[28] DA03862 at 62-63; DA03865 at 65-66; DA03055 at 65 (Kyei 45:16-24).

[29] DA03963 at 63-65.

8.5 BNSF announced its fuel surcharge formula change to its interline partners in April 2001 through interline communications and received concurrences from its interline partners about its change.[30]

**Material Undisputed Fact No. 9**

**BNSF unilaterally worked to expand fuel surcharge coverage before the alleged conspiracy.**

Supporting Facts:

9.1 In 2000, top management tasked BNSF employees with determining whether BNSF could "make more prices subject to the [fuel surcharges], to help recover [BNSF's] higher costs."[31]

9.2 Throughout 2000, BNSF expanded coverage of its carload fuel surcharge to additional types of carload traffic.[32]

9.3 By December 1, 2000, 42% of BNSF's intermodal traffic by revenue, including 100% of truckload and IMC traffic, were covered by a fuel surcharge.[33] BNSF's fuel surcharge coverage (by revenue) for other traffic included 25% metals, 21% minerals and machinery, 22% forest, 15% chemicals, and 11% auto.[34]

9.4 By December 2000, 19% of BNSF's total traffic by revenue was covered by a fuel surcharge.[35]

[30] DA03948 at 49; *see* DA03952 at 52-53; DA03954 at 54-62; DA03966 at 66-68.
[31] DA03549 at 49-50.
[32] DA03515; DA03855 at 59; DA03523 at 23-24.
[33] DA03855 at 61.
[34] DA03855 at 61.
[35] DA03855 at 61

9.5 In March 2001, 23% of BNSF's total traffic by revenue was covered by a fuel surcharge.[36]

9.6 In November 2002, BNSF was "making a concerted effort to increase the application of fuel surcharges to Carload documents."[37]

9.7 For 2002, approximately 27% of BNSF's total traffic by revenue was covered by a fuel surcharge.[38]

9.8 By early 2003, BNSF expanded its fuel surcharge coverage to agricultural products and lumber.[39]

9.9 As of March 21, 2003, BNSF's total carload traffic had a 45.2% fuel surcharge participation rate by revenue.[40] Without coal included, BNSF's carload fuel surcharge participation rate in March 2003 was approximately 62%.[41]

9.10 As of January 2003, BNSF's coal traffic was generally subject to "long-term contracts" that did not contain a fuel surcharge.[42]

9.11 In February 2001, BNSF documented "[c]oncerns with some Carload Marketing pricing practices," including "[a]pplying a fuel surcharge on a price authority instead of applying

---

[36] DA03868 at 74.

[37] DA04083 (November 2002 email regarding expansion of fuel surcharge to "293 rate documents that were formerly exempt"); *see* DA04084 at 84-85 (agricultural); DA04095 at 97 (lumber).

[38] DA04086 at 86; DA04104 at 05-07.

[39] DA04084 at 84-85 (November 2002 email regarding adding fuel surcharge to agricultural shipments); DA04095 at 97 (January 2003 notice to lumber customers about implementing fuel surcharge effective March 1, 2003); DA04108 (January 2003 agricultural contract renewal with fuel surcharge).

[40] DA04451 at 72; *see also* DA04286 at 86-87.

[41] DA04451 at 72; *see also* DA04282.

[42] DA03055 at 73 (Kyei 85:1-12).

a price increase, when both should be applied" or "[r]educing rates if the fuel surcharge gets too high to offset the total amount charged to the customer."[43]

9.12 In February 2002, an internal BNSF team recommended that "[e]very contract should include a fuel surcharge clause" and "[a]ny deviation from … policy should require the approval of the Business Unit VP."[44]

9.13 In October 2002, BNSF's internal auditor identified the failure to "consistently include[]" fuel surcharge provisions as a "Key Issue[]," and recommended clarifying "what approvals and review process should exist" for exceptions.[45] As of October 2002 BNSF's "Marketing [group] ha[d] agreed to implement … the approval process for excluding fuel surcharge provisions in contracts," including determining who had the authority for such exceptions.[46]

**Material Undisputed Fact No. 10**

**In 2003, BNSF unilaterally changed the strike price of its carload fuel surcharge formula from $1.30 HDF to $1.25 HDF after extensive internal analysis.**

Supporting Facts:

10.1 In January 2003, John Lanigan joined BNSF as CMO after working in the trucking industry, where he had been involved in developing a fuel surcharge program.[47]

[43] DA03862 at 63-64.
[44] DA04019 at 19-20.
[45] DA04048 at 66, 71.
[46] DA04048 at 80.
[47] DA03099 at 102 (Lanigan 10:20-11:20); DA03099 at 103 (Lanigan 15:24-16:23).

10.2 Starting in February 2003 through March and April of 2003, CMO Lanigan convened a formal review of BNSF's fuel surcharge programs.[48]

10.3 Sam Kyei, BNSF's Chief Economist, led a "Fuel Surcharge Review Team," which included 16 other BNSF employees.[49]

10.4 The Review Team considered a move to a mileage-based fuel surcharge and other fuel surcharge changes such as reducing the strike price.[50]

10.5 By March 28, 2003, BNSF's General Director of Revenue Accounting had identified systems, accounting, and customer issues with a change to a mileage-based fuel surcharge program.[51]

10.6 By March 31, the BNSF Fuel Surcharge Review Team had prepared a draft presentation that recommended that BNSF "[c]oncentrate on improving participation rates" in the "[s]hort term" and "[f]ix systems issues" in the "[l]onger term" before implementing mileage-based programs.[52]

10.7 During the Fuel Surcharge Review Team's review of BNSF's fuel surcharge program, CSXT and UP each announced modifications to their fuel surcharge programs. On March 20, 2003, CSXT publicly announced modifications to its fuel surcharge program.[53] On

[48] DA03055 at 60, 75-76 (Kyei 27:23-28:16, 94:3-99:9); DA04114 at 15-31 (slide decks dated February 24 and March 10, 2003); DA04112 (scheduling "Pre-Meeting" for March 10 meeting); DA04114 (scheduling "two back-to-back meetings" for March 13 and 14); DA04155 (agenda for March 14 meeting); DA04204 (agenda for March 19 meeting); DA04159 at 200 (agenda for March 21 meeting); DA04216 (agenda for March 26 meeting); DA04239 (agenda for March 28 meeting); DA04330 (agenda for April 4 meeting); DA04451 at 53 (Review Team Recommendations dated April 14, 2003); DA03099 at 108-109 (Lanigan 36:16-37:11).

[49] DA04451 at 54; DA03055 at 60 (Kyei 27:23-28:16).

[50] DA04451 at 54; DA03055 at 60 (Kyei 27:23-28:16).

[51] DA04258 at 58-59.

[52] DA04261 at 81.

[53] DA02616 at 16-17.

April 4, 2003, UP issued a "Request for Joint Line Concurrence" for modifications to its WTI-based fuel surcharge program.[54]

10.8 On April 14, 2003, BNSF's Fuel Surcharge Review Team reported its recommendations.[55] The Review Team recommended that BNSF stick with a "percent of revenue basis (short term)" and consider a mileage-based formula as a "possibly long term" project.[56] It also recommended to reduce the "strike price" of BNSF's carload fuel surcharge to $1.10.[57]

10.9 The BNSF Fuel Surcharge Review Team included an analysis of CSXT's and UP's new fuel surcharge programs in its report.[58]

10.10 On May 7, 2003, BNSF reduced its strike price to $1.25 HDF from $1.30 HDF, assessed a .5% surcharge at that threshold, and kept the same increment formula from April 2001, increasing by 0.5% for every 5¢ over the strike price, with an effective date of June 1, 2003.[59]

10.11 At all fuel prices above $1.30 HDF, BNSF's 2003 and 2001 carload formulas would produce an identical surcharge (i.e. 1% plus .5% for every 5¢ over $1.30 HDF).[60]

10.12 At all fuel prices below $1.25 HDF, BNSF's 2003 and 2001 carload formulas would produce an identical surcharge (i.e. 0%).[61]

---

[54] DA04337 at 37-39.
[55] DA04451 at 53-68.
[56] DA04451 at 68.
[57] DA04451 at 68.
[58] DA04451 at 61.
[59] DA03978 at 79.
[60] DA03963 at 65; DA04603 at 03; DA03978 at 79; *see also* DA06450 at 60 (Rausser (Mar. 4, 2014) 254:5-255:14).
[61] DA03963 at 65; DA04603 at 03; DA03978 at 79.

10.13 In a July 1, 2003 memorandum, BNSF Chief Economist Kyei stated that BNSF's $1.25/gal strike price "reflected the $23 WTI crude price used by UP" in the program UP had announced on April 4, 2003 but did not implement.[62]

**Material Undisputed Fact No. 11**

**BNSF unilaterally adopted a mileage-based fuel surcharge program during the period of the alleged conspiracy on rate-based fuel surcharges.**

Supporting Facts:

11.1 In August 2004, BNSF's CMO Lanigan directed Chief Economist Kyei and the BNSF Fuel Surcharge Review Team to develop a mileage-based fuel surcharge.[63]

11.2 In October 2004, BNSF's Review Team provided recommendations on a mileage-based surcharge program.[64] The Review Team found that the change to mileage-based surcharges would require "[a]pplication systems changes," and BNSF's interline partners would "need to modify interline settlement systems to accept fuel surcharge calculated on [mileage] basis."[65]

11.3 On March 29, 2005, BNSF announced "the railroad industry's first mileage-based fuel surcharge program," which BNSF planned to implement on January 1, 2006.[66] This mileage-based fuel surcharge program was to apply to all "movements that originate and terminate on BNSF"; "the BNSF portion of Rule 11 shipments, a type of interline shipment

---

[62] DA04415 at 15-16; DA01449 at 50.
[63] DA03055 at 87 (Kyei 236:15-24); DA04481.
[64] DA04521 at 32-35.
[65] DA04521 at 41, 44.
[66] DA04573 at 75.

where each carrier bills the customer separately"; and "certain movements involving BNSF and one or more short lines."[67]

11.4 BNSF's Review Team found that the majority of BNSF's customers either did "not support the change" to a mileage-based surcharge (45%) or would only "consider the change with adjustments" (27%).[68] The Review Team found that only 28% supported the move as announced.[69]

11.5 On October 20, 2005, BNSF announced that "its mileage-based fuel surcharge program will take effect for Coal and Agricultural Products customers January 1, 2006, as scheduled," but "[a]n effective date for the mileage-based program for intermodal, automotive and other carload customers will be announced later," because "some customers need more time to make adjustments to their own information systems to accommodate the new program."[70]

11.6 BNSF's mileage-based fuel surcharge formula became effective on January 1, 2006 for coal and agricultural customers.[71]

11.7 After the STB's decision in 2007, BNSF extended its mileage-based surcharge to all regulated traffic.[72]

11.8 BNSF expanded its mileage-based surcharge in January 2009 to a broader range of carload traffic.[73]

---

[67] DA04573 at 75.
[68] DA04626 at 28; *see also* DA04605 at 05-06; DA04581 at 81-82.
[69] DA04626 at 28.
[70] DA04635 at 36.
[71] DA03560 at 91-93.
[72] DA04658 at 60-61.
[73] DA04950 at 50-51.

**Material Undisputed Fact No. 12**

**There is no direct evidence that BNSF participated in the conspiracy that Plaintiffs allege.**

Supporting Facts:

12.1 No current or former BNSF employee has testified to participating in the conspiracy alleged by Plaintiffs.

12.2 No current or former employee of any other Defendant has testified that BNSF participated in the conspiracy alleged by Plaintiffs.

12.3 No documents contain a statement by any current or former Defendant employee that BNSF participated in the conspiracy alleged by Plaintiffs.

**Material Undisputed Fact No. 13**

**CSXT unilaterally adopted a rate-based fuel surcharge before the alleged conspiracy.**

Supporting Facts:

13.1 Fuel prices rose from historic levels and became increasingly volatile in 1999-2000, reaching prices of $21-23 per barrel WTI and higher in the summer of 2000,[74] resulting in a substantial increase in CSXT's fuel costs.[75]

13.2 During the summer of 2000, CSXT considered adopting a fuel surcharge, and examined rate-based fuel surcharges adopted earlier that year by BNSF, NS, and CSX Intermodal.[76]

---

[74] Energy Information Admin. (EIA), Petroleum & Other Liquids, Spot Prices, *available at* https://www.eia.gov/dnav/pet/PET_PRI_SPT_S1_D.htm (last accessed May 12, 2021).

[75] DA01945 at 2041 (CSX Corp. 2000 Form 10-K (March 31, 2001): "[S]oaring fuel costs … also affected financial results"), 2058 ("[f]uel expense [in 2000] was $260 million higher than 1999"), 2055-56; DA00513 at 585-586 (Ex. 26); DA02851.

[76] DA02860; DA02134; DA02137 at 38; DA01861 at 63 (Giftos 29:4-31:2).

13.3 In 2000 to 2002, CSXT concurred to requests from other railroads to apply their fuel surcharges to their respective joint-line traffic with CSXT.[77]

13.4 On September 22, 2000, CSXT publicly announced that that it was implementing a rate-based fuel surcharge, effective October 25, 2000.[78] Under its surcharge formula, "[f]or every five dollars the price of West Texas Intermediate oil (the industry standard for tracking oil prices, also know [sic] as WTI) goes above $23 a barrel (for 30 consecutive days), a 2% recovery charge will be added."[79] Thus, CSXT applied a surcharge at WTI $28 per barrel.

13.5 The fuel surcharge went into effect at 2% on October 25, 2000 based on fuel prices at the time.[80]

**Material Undisputed Fact No. 14**

**CSXT's pre-"conspiracy" fuel surcharge formula announced in 2000 was identical to other railroads' fuel surcharge formulas.**

Supporting Facts:

14.1 CSXT's published fuel surcharge formula announced on September 22, 2000 was identical to the rate-based surcharge formula used by NS.[81]

14.2 CSXT's published fuel surcharge formula announced on September 22, 2000 was identical to UP's published carload formula announced on October 31, 2002.[82]

---

[77] DA02900 (NS); DA02880 (BNSF); DA02870 (BNSF); DA06910 at 13 (UP).
[78] DA02851; DA02843.
[79] DA02843 at 47.
[80] DA02867.
[81] DA02137 at 38; DA02843 at 47.
[82] *See* DA01376.

**Material Undisputed Fact No. 15**

**CSXT unilaterally worked to expand fuel surcharge coverage before the alleged conspiracy.**

Supporting Facts:

15.1 CSXT's announced that its new fuel surcharge would "apply to local as well as interline freight movements,"[83] and CSXT sought and obtained concurrence from other railroads to use the surcharge on CSXT-originated joint interline line rates.[84]

15.2 CSXT's fuel surcharge was accompanied by a policy to apply the surcharge to all tariffs and private price quotes, and to all new and renewing contracts "unless government-based escalator [*i.e.* RCAF] applies."[85]

15.3 WTI oil prices fell and generally stayed below $28 from late 2001 until September 2002, which by operation of CSXT's fuel surcharge formula meant no surcharge was assessed in that period.[86]

15.4 The proportion of CSXT's unregulated traffic (by revenue) that paid a rate-based fuel surcharge was above 36% by March 2003.[87]

---

83 DA02851.

84 DA03006 (UP); DA06910 at 12 (UP); DA06035 (NS); DA01908 at 15 (McIntyre 65:20-66:15).

85 DA02144 at 46, 58; DA02851; *see also* DA02834 at 35.

86 EIA, Petroleum & Other Liquids, Spot Prices, *available at* https://www.eia.gov/dnav/pet/PET_PRI_SPT_S1_D.htm (last accessed May 12, 2021); *see* DA02310 at 11.

87 DA06269 at 74 (Rausser, Fig. 68) (revenue-weighted coverage analysis of transaction data); DA06450 at 62 (Rausser 290:23-293:12) (confirming that he did not dispute the "coverage levels, the numbers" reflected in these analyses); DA00513 at 621 (Ex. 34). CSXT's transaction data production in this case starts in April 2001.

**Material Undisputed Fact No. 16**

**CSXT unilaterally modified its existing fuel surcharge formula in 2003.**

Supporting Facts:

16.1 By October 2002, the WTI price again moved and stayed above $28, and CSXT briefly re-applied a 2% fuel surcharge on October 17, 2002.[88]

16.2 CSXT's 2% fuel surcharge was removed on December 11, 2002 when WTI prices again fell below $28 for just over 30 days, before they immediately spiked again, re-triggering the surcharge six weeks later in late January 2003.[89]

16.3 From late 2002 into March 2003, CSXT employees considered changes to its published fuel surcharge formula, including an assessment of formulas used by CSXI and BNSF, and possible modifications to lower the formula's trigger, modify its slope, use smaller increments, change to a different index (*i.e.* HDF, or "On-Highway Diesel Fuel," used in BNSF's and CSXI's fuel surcharge formulas), and the time period for determining whether fuel price changes would prompt a change in the surcharge rate.[90]

16.4 By mid-February 2003, the WTI price had risen above $33 per barrel, the next increment at which CSXT's formula would raise its surcharge rate, and on March 7, 2003, CSXT advised customers that its surcharge might change from 2% to 4% as a result.[91]

---

[88] DA02310 at 11.

[89] DA02669; DA02935; *see also* DA02310 at 11.

[90] DA02713 (Aug. 20, 2002); DA02790-91 (Feb. 25, 2003); DA02167 at 72, 74, 76, 78 (Mar. 3, 2003); DA02286 at 87 (Mar. 11, 2003); DA01831 at 41-42, 45 (Couch Tr. 92:20-94:6, 110:24-111:20).

[91] DA02933-34.

16.5 After twenty-nine consecutive days above $33, the WTI closing price on March 18, 2003 (published in the March 19 Wall Street Journal) dropped to $31.68, such that CSXT's fuel surcharge remained at 2%, instead of increasing to 4%.[92]

16.6 CSXT's Chief Commercial Officer, Michael Giftos, concluded that CSXT's existing fuel surcharge formula was "fundamentally flawed" and needed to be modified, and obtained CEO Michael Ward's permission to do so early on March 19, 2003.[93]

16.7 Mr. Giftos worked with CSXT Director of Market Strategy, John Couch, and others within CSXT through the evening of March 19 and into March 20 to analyze options to change the fuel surcharge formula,[94] ultimately settling on a modification to the existing WTI-based formula over adopting BNSF's HDF-based formula.[95]

16.8 CSXT publicly announced it was modifying its fuel surcharge formula on March 20, 2003, to be effective in June 2003, "[i]n an effort to more quickly respond to changing market conditions and the continued volatility in fuel prices."[96]

16.9 Under the modified formula, (1) the applicable surcharge percentage would be determined each month based on the thirty-day average WTI price, eliminating the requirement that the WTI price be above each incremental trigger for 30 consecutive days for the percentage to change; and (2) the existing 2%/$5 WTI increments were broken out into increments of 0.4% for every $1 increase or decrease in the WTI price.[97]

---

[92] DA02935; DA07080-81; DA01831 at 45 (Couch 112:11-23).

[93] DA01861 at 67-68, 69-70, 75 (Giftos 99:3-101:9, 108:13-110:1, 110:11-112:6, 129:6-23); DA01927 at 33-34 (Ward 124:25-128:22); *see* DA02185.

[94] DA02185; DA02186; DA02640; DA06915; DA02292; DA01831 at 47-48, 52-53 (Couch 118:7-123:22, 138:5-141:25); DA01861 at 75 (Giftos 129:24-131:4).

[95] DA02639 at 39-43; *see* DA01831 at 52 (Couch 139:3-140:13).

[96] DA02616; DA02745.

[97] DA02886 at 90.

16.10 CSXT made no further changes to its published fuel surcharge formula until it switched to a mileage-based fuel surcharge in April 2007.[98]

**<u>Material Undisputed Fact No. 17</u>**

**CSXT unilaterally applied rate-based fuel surcharges during the alleged conspiracy period.**

<u>Supporting Facts:</u>

17.1 CSXT's fuel costs continued to rise along with fuel prices during the alleged conspiracy period.[99]

17.2 CSXT considered RCAF(u) "acceptable as an alternative" to fuel surcharges into 2005.[100]

17.3 The proportion of CSXT's unregulated traffic (by revenue) that paid a rate-based fuel surcharge had reached only around 50% two years into the alleged conspiracy and never reached higher than 65%.[101]

17.4 An analysis by Dr. Rausser of the transaction data for CSXT's unregulated traffic paying fuel surcharges showed that shippers paying rate-based fuel surcharges to CSXT on its local unregulated traffic from July 2003 through 2008 received an average discount of 26.5% off CSXT's March 2003 published fuel surcharge formula.[102]

---

[98] DA02792 at 95, 97; DA02201 at 06.

[99] DA00513 at 585-86 (Exs. 25 & 26); DA00713 at 799-800 (Figs. IV-3 & IV-4).

[100] DA06925 at 30; DA02295 at 300; DA02802; DA01861 at 76 (Giftos 143:24-144:21); *see* DA02672.

[101] DA06269 at 74 (Fig. 68); DA06450 at 62 (Rausser 290:23-293:12); DA00513 at 621 (Ex. 24).

[102] DA06471 at 79-80 (Rausser 814:4-815:19); DA06278 at 81-82 (Tbls. 1 & 2) (comparing CSXT's actual average surcharge rate of 11.9%, Tbl. 1, Column 1 to its "Standard Class Period Formula FSC Rate" of 16.2% in Tbl. 2, Column 1).

17.5 Plaintiff Olin Corporation entered a 3-year contract with CSXT, effective June 2004 through May 2007, which included an RCAF(u) escalation clause and no fuel surcharge.[103]

17.6 Plaintiff Strates Shows entered a new 2-year contract with CSXT in late April 2003, another in May 2005, and two amendments (in February and May 2006) all without a fuel surcharge, before a third amendment in February 2007 included a rate-based fuel surcharge.[104]

**<u>Material Undisputed Fact No. 18</u>**

**There is no direct evidence that CSXT participated in the conspiracy that Plaintiffs allege.**

<u>Supporting Facts:</u>

18.1 No current or former CSXT employee has testified to participating in the conspiracy alleged by Plaintiffs.

18.2 No current or former employee of any other Defendant has testified that CSXT participated in the conspiracy alleged by Plaintiffs.

18.3 No documents contain a statement by any current or former Defendant employee that CSXT participated in the conspiracy alleged by Plaintiffs.

---

[103] DA06627 at 27-28; DA06680 at 84.

[104] DA06719 (Apr. 2003 contract); DA06732, DA06744, DA06747 (May 2005 contract, CSXT 83477; Feb. and May 2006 amendments); DA06761 (Feb. 2007, Amend. 3 to CSXT 83477).

**Material Undisputed Fact No. 19**

**NS unilaterally adopted and applied rate-based fuel surcharges before the alleged conspiracy.**

Supporting Facts:

19.1 NS implemented a rate-based fuel surcharge tied to the WTI crude oil index in June 2000 for its carload traffic (the "2000 NS formula").[105]

19.2 Under the 2000 NS formula, shippers were assessed a surcharge of 2% of their price authority's base rate if the WTI remained above $28 for 30 consecutive "reporting" days, as reported in *The Wall Street Journal*, and triggered an additional 2% each time the WTI remained above successive $5 thresholds for 30 consecutive reporting days.[106]

**Material Undisputed Fact No. 20**

**The 2000 NS formula was identical to other railroads' fuel surcharge formulas.**

Supporting Facts:

20.1 The 2000 NS formula was identical to the CSXT published carload formula from October 2000 until June 2003, and to the UP published carload formula from December 2002 until June 2003.[107]

[105] DA05698; DA05529 at 30-31; DA05940.

[106] DA05623; DA05698; DA05529 at 30-31; DA04957 at 60-61 (Glennon 14:14-15:12, 16:24-17:5).

[107] DA01380 at 80-81; DA02867; *see also* DA02137 at 38.

**Material Undisputed Fact No. 21**

**Before the alleged conspiracy, NS unilaterally established a policy that fuel surcharges should be added to all published rate authorities and into new or renewing contracts.**

Supporting Facts:

21.1 Don Seale, NS's Senior Vice President of Marketing Services, instructed NS's marketing team to "secure fuel surcharge increases [on] ALL business" at least as early as September 2000.[108]

21.2 NS started tracking its fuel surcharge coverage when it implemented the 2000 NS formula.[109]

21.3 NS's tracking documents on February 1, 2003, confirmed that roughly 52% of carload revenue and 82% of carload rate authorities were subject to a fuel surcharge at that point in time.[110]

**Material Undisputed Fact No. 22**

**NS internally reviewed the modified CSXT formula on three occasions in 2003 before unilaterally changing its published carload formula.**

Supporting Facts:

22.1 On March 20, 2003, the day the modified CSXT formula was announced, Don Seale wrote an email to Pat Glennon, NS's Manager of Pricing Systems, and asked whether the

[108] DA06050.

[109] *See, e.g.*, DA05948 (attaching a spreadsheet "containing the status of the fuel surcharge billing for merchandise traffic as of August 1, 2000"); DA05986 (attaching a spreadsheet containing "the fuel surcharge billing for merchandise and coal traffic as of September 1 [2000]"); DA05974 at 74-79 (attaching a spreadsheet containing "the status of the fuel surcharge billing as of December 31, 2001").

[110] DA05765.

modified CSXT formula would be "more complex or 'easier to administer.'"[111] Glennon responded with a list of "Positives" and "Negatives."[112]

22.2 In April 2003, Glennon prepared a memo "recap[ping] the case for and against changing the NS Fuel Surcharge standard in response to the recent action announced by CSXT."[113]

22.3 The NS Group Vice Presidents ("GVPs") were requested to provide a "consensus recommendation" to Don Seale on "the issue of if and when we should change our fuel surcharge process."[114] The recommendation from the team was to "retain the current NS formula."[115] Seale stated on May 9, 2003, "[l]et's … maintain our current FSC program for the time being."[116]

22.4 On June 30, 2003, Seale asked the GVPs to conduct a second review of the 2000 NS formula.[117] NS decided not to modify the 2000 NS formula after the second review.[118]

22.5 On October 31, 2003, Seale asked the GVPs to conduct a third review of the 2000 NS formula.[119] During this third review, the GVPs considered that NS had not been successful

---

[111] DA05769 at 69-70.
[112] DA05769.
[113] DA05820.
[114] DA05709.
[115] DA05574.
[116] DA05670.
[117] DA05843; DA05717 at 17-18.
[118] DA05673 ("Pat Glennon makes some very good points here in favor of *not* modifying our trigger for the FSC at this time. I am inclined to agree."); DA05095 at 95-96.
[119] DA05647; DA05125.

attracting new business due to its lower fuel surcharge,[120] and that fuel prices did not decline as projected in the spring and summer of 2003.[121]

22.6 NS made the decision in December 2003, nine months after CSXT first publicly announced its revised formula, to adopt the modified CSXT formula. On January 8, 2004, Seale informed Chief Marketing Officer Prillaman and CEO Goode that NS would publicly announce the 2004 published carload formula on January 9, 2004, and it would become effective beginning on March 1, 2004.[123]NS implemented the 2004 published carload formula in the same way it implemented its 2000 formula, applying it to public price authorities beginning March 1, 2004, and negotiating with shippers to add the fuel surcharge to new and renewing contracts and price authorities thereafter.[124]

---

[120] DA05008 at 23-24, 30 (Seale 72:22-74:2, 127:13-128:12 ("[W]e had hoped that customers would award more business to us by having a lower fuel surcharge. We did not see that taking place over the course of 2003.")); DA05844 (stating on November 6, 2003 that "[s]o far, I have seen no evidence that our customers are rewarding NS versus CSX for maintaining a more reasonable FSC program."); *see also* DA05641 (August 15, 2003 email from the chemicals GVP proposing that NS stick with its existing fuel surcharge program).

[121] DA05574 (predicting in April 2003 that fuel prices would drop).

[122] DA05477; DA05655; DA05008 at 12-13, 30 (Seale 24:20-25:16; 127:13-128:12).

[123] DA05936.

[124] DA05576 at 77 ("The new FSC will be applied to private authorities as they are renegotiated and reissued by Product Managers."); DA05847 at 48 ("Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation.").

**Material Undisputed Fact No. 23**

**NS used many unique fuel surcharges during the alleged conspiracy period.**

Supporting Facts:

23.1 NS issued 2,172 new rate authorities from July 1, 2003 (more than three months after the modified CSXT formula was announced) through February 2004, when NS's 2004 published carload formula became effective.[125]

23.2 NS did not use the modified CSXT formula in any of these 2,172 rate authorities; instead, NS used different types of fuel surcharges, including the 2000 NS formula.[126]

23.3 From 2003 through 2008, NS used three dozen different fuel surcharge formulas.[127] Thirty of them were created during the alleged conspiracy.[128]

**Material Undisputed Fact No. 24**

**NS's post-December 2003 decision to change its fuel surcharge formula was unilateral.**

Supporting Facts:

24.1 On April 24, 2006, NS announced a new rebased carload fuel surcharge formula.[129] The rebased carload fuel surcharge formula had a trigger price of $64 and would

---

[125] DA00203 at 55.

[126] DA00203 at 55; *see, e.g.*, DA06526 at 27 (Donnelly contract with the 2000 formula written into the text, entered in July 2003 and effective August 1, 2003); DA05406 at 10 ([redacted] contract with the 2000 formula written into its text, entered in January 2004); DA05274 at 76 ([redacted] contract with 2% fuel surcharge triggered when WTI fuel price remained above $38 for 30 consecutive days, entered in January 2004); DA05432 at 50 ([redacted] contract with 2% fuel surcharge triggered when WTI fuel price remained above $37 for 90 consecutive days, entered in July 2003).

[127] DA00203 at 322-324 (Tbl. A-2).

[128] DA00203 at 322-324 (Tbl. A-2).

[129] DA05191.

increase by 0.3% for every $1 increase in average monthly WTI, effective July 1, 2006.[130] Concurrent with this change, NS announced a rate increase of 16.4%, effective July 1, 2006, on published carload rate authorities and sought to increase rates in private authorities as they came up for renewal.[131]

24.2 No other defendant rebased its carload fuel surcharge in response to the NS change.

**Material Undisputed Fact No. 25**

**There is no direct evidence that NS participated in the conspiracy that Plaintiffs allege.**

Supporting Facts:

25.1 No current or former NS employee has testified to participating in the conspiracy the Plaintiffs allege.

25.2 No current or former employee of any other Defendant has testified that NS participated in the conspiracy the Plaintiffs allege.

25.3 No documents contain a statement by any current or former Defendant employee that NS participated in the conspiracy the Plaintiffs allege.

---

[130] DA05191.

[131] DA05707; DA00147 at 50.

**<u>Material Undisputed Fact No. 26</u>**

**Fuel surcharges were unilaterally adopted and applied by UP prior to the alleged conspiracy.**

<u>Supporting Facts:</u>

26.1 By the year 2000 over 1,600 UP carload price documents used the "FMC/Fuel" rate-based surcharge.[132] This applied a 2% surcharge when the WTI per-barrel price was at least $32 for 60 days, and increased the surcharge by 2% for each $7 increase in the WTI price thereafter.[133]

26.2 UP announced its first published carload fuel surcharge program on October 31, 2002, effective December 1, 2002.[134]

**<u>Material Undisputed Fact No. 27</u>**

**UP's pre-"conspiracy" carload formula was identical to other railroads' fuel surcharge formulas.**

<u>Supporting Facts:</u>

27.1 The UP published carload formula announced on October 31, 2002 was identical to the NS and CSXT published carload fuel surcharges in effect at the time, applying a 2% surcharge when the WTI index remained at or above $28 per barrel for 30 consecutive reporting days, and increasing by an additional 2% for each $5 increase in the WTI price.[135]

---

[132] *See* DA01241 at 42 ¶ 3, 47-48 (Ex. 1).
[133] DA01389 at 90-91.
[134] DA01372-375; *see also* DA06202 at 27.
[135] DA01380-84.

**Material Undisputed Fact No. 28**

**UP unilaterally established a "coverage" policy calling for presumptive application of fuel surcharges to all carload traffic prior to the alleged conspiracy.**

Supporting Facts:

28.1 In October 2002, UP committed itself to implementing its new published carload surcharge program to all of its carload traffic unless regulation or pre-existing contracts prevented doing so.[136]

28.2 Coverage of the 2002 UP published carload surcharge escalated rapidly in late 2002 and early 2003, including 100% coverage on all carload shipments that used public tariffs.[137]

**Material Undisputed Fact No. 29**

**UP unilaterally changed its carload fuel surcharge in 2003, no longer following CSXT and NS, and differentiating itself from BNSF.**

Supporting Facts:

29.1 On March 20, 2003, CSXT issued a press release stating that it was changing its carload fuel surcharge program to use a $23.01 WTI trigger price and a 0.4% surcharge increasing an additional 0.4% for each $1 change in the average WTI price for the prior month.[138]

---

[136] DA01326-61 at 61 ("on all new price documents effective immediately"), at 55 (intermodal; "all Union Pacific pricing documents … referring to this publication are subject to a fuel surcharge"); DA01362 at 66 ("Effective immediately, all new pricing documents and amendments created must now contain the Fuel Surcharge language recently approved by the Marketing and Sales Management team."); DA01372-75.

[137] DA07319 at 21 (Fig. 76); DA00713 at 810-811 (Fig. IV-7A).

[138] DA01430-31.

29.2 CSXT sent UP a formal interline concurrence request for this surcharge change on Friday, March 28, 2003.[139]

29.3 UP debated internally whether to agree to the CSXT concurrence request for interline traffic and whether to match that formula for UP local traffic.[140] UP announced its decision to match the CSXT formula in a press release on Friday, April 4, 2003, effective June 1, 2003.[141]

29.4 After announcing the new WTI-based fuel surcharge formula, UP continued to undertake significant internal debate and research about the formula, partly in response to customer complaints about its announcement.[142]

29.5 On May 5, 2003, UP decided to abandon the previously announced $23.01 WTI surcharge and to move instead to a different HDF-based surcharge with a $1.35 trigger price.[143]

29.6 At this time, BNSF had a HDF-based surcharge with a $1.30 trigger price.[144] UP's $1.35 trigger price was less aggressive in that it would not assess a surcharge when diesel fuel was priced between $1.30 and $1.35 per gallon.

29.7 There is substantial internal documentation of UP's analysis of, and rationale for, the change in plans.[145]

---

[139] DA01441-43.

[140] DA01440; DA01444.

[141] DA01449 at 49.

[142] DA01468-491; DA01492-93; DA01494-96; DA01497-517; DA01518-23; DA01524; DA01525-30; DA01534-43; DA01544-53.

[143] DA01531 at 32; DA01534-43; DA01544-53; DA01554-62.

[144] DA01534 at 39-43; DA01554 at 56.

[145] DA01468-491; DA01492-93; DA01494-96; DA01497-517; DA01518-23; DA01524; DA01525-30; DA01534-43; DA01544-53.

29.8 UP announced this change to its published carload fuel surcharge formula on May 9, 2003, effective June 1, 2003.[146]

29.9 On May 7, 2003, BNSF announced it was dropping it trigger price to $1.25.[147] UP kept its trigger price at $1.35 and that formula went into effect on June 1, 2003.[148]

29.10 The published carload fuel surcharge UP implemented on June 1, 2003 was based on an HDF formula, while NS and CSXT both continued to use fuel surcharge formulas based on WTI.

29.11 UP did not make any change to its published carload fuel surcharge at any time between June 1, 2003, and April 26 2007, when it moved to a mileage-based fuel surcharge.[149]

**Material Undisputed Fact No. 30**

**UP's post-June 2003 decisions to change, or not change, its fuel surcharges were unilateral.**

Supporting Facts:

30.1 In the summer of 2004, UP learned from public sources that BNSF had adopted a separate fuel surcharge for coal traffic that increased the fuel surcharge applicable to coal shipments, by lowering the trigger used in BNSF's published carload fuel surcharge from HDF $1.25 to $1.24 and altering the increments from .5% for each 5 cent increase used in the published carload fuel surcharge to .5% for each 4 cent increase.[150]

30.2 UP undertook an analysis of its own fuel surcharge program.[151]

[146] DA01563-64.
[147] DA04603-04.
[148] DA01563-64.
[149] DA01700-05.
[150] DA01599-601.
[151] DA01602-11; DA01612-21.

30.3 On October 1, 2004, UP ultimately adopted a new coal-specific surcharge, but it did not match BNSF's. UP chose an initial trigger of HDF $1.35, $0.11 higher than BNSF. Between HDF $1.35 and $1.60, UP's coal surcharge tracked its published carload surcharge. Beginning at HDF $1.60, it adjusted in increments of .75% for each $.05 change in the HDF price (giving UP a different trigger price and a different slope from the BNSF coal formula).[152]

30.4 In March 2005, UP learned from public sources that BNSF had announced a mileage-based fuel surcharge program.[153]

30.5 UP conducted an internal analysis of BNSF's new mileage-based program when details were posted on BNSF's website in August 2005.[154] UP did not adopt a mileage-based fuel surcharge program at this time.

30.6 In April 2006, NS announced a "rebased" carload fuel surcharge formula that raised its fuel surcharge trigger to $64 WTI and included a rate increase of 16.4% on published carload rate authorities and sought rate increases in private authorities as they came up for renewal.[155] UP did not rebase its rates in response to the NS change.

30.7 In January 2007, the STB ruled that rate-based fuel surcharges were an "unreasonable practice" for regulated traffic.[156]

30.8 On March 21, 2007, UP announced a mileage surcharge that began at HDF $2.30 (rebased to reflect recent fuel prices) and charged $.05 per mile, increasing $0.01 per mile for each $.05 increase in the HDF price.[157]

---

[152] DA01622-23, DA01624-27.
[153] DA01629-32.
[154] DA01648-60; DA01633-47; DA01662-63; DA01661.
[155] DA01677.
[156] *In re Fuel Surcharges*, Ex Parte No. 661, 2007 STB Lexis 39 (2007).
[157] DA01700-05; DA01692-98.

30.9 UP announced at that same time that it intended to transition all of its business to the new surcharge over time.[158]

30.10 UP's response to the STB January 2007 decision differed from the mileage-based surcharge at BNSF which did not involve any rebasing.[159]

**Material Undisputed Fact No. 31**

**There is no direct evidence that UP participated in the conspiracy that Plaintiffs allege.**

Supporting Facts:

31.1 No current or former UP employee has testified to participating in the conspiracy the Plaintiffs allege.

31.2 No current or former employee of any other Defendant has testified that UP participated in the conspiracy the Plaintiffs allege.

31.3 No documents contain a statement by any current or former Defendant employee that UP participated in the conspiracy the Plaintiffs allege.

**Material Undisputed Fact No. 32**

**Defendants' published carload fuel surcharge formulas effective in June 2003 and March 2004 did not generate materially more revenue at fuel prices prevailing during the alleged conspiracy period than would have been generated by Defendants' 2000 to 2002 published formulas.**

Supporting Facts:

32.1 When, effective June 1, 2003, UP changed its October 2002 carload fuel surcharge, it reduced the trigger price from $28 WTI to $1.35/gal HDF. This change was of no

---

[158] DA01700-05; DA01692-98.

[159] DA03788 at 823-826.

consequence during the alleged conspiracy period because (except for a few days) oil and diesel fuel prices were always above both triggers.[160]

32.2 The other changes UP made, principally adopting the HDF index, had the effect of making UP's carload fuel surcharge less aggressive than UP's October 2002 WTI carload fuel surcharge, such that it generated surcharge rates at prevailing fuel prices from July 2003 to April 26, 2007 that were on average 0.63% lower than rates under UP's October 2002 formula.[161]

32.3 When, effective June 1, 2003, BNSF changed its April 2001 carload fuel surcharge, it reduced its strike price to $1.25 HDF from $1.30 HDF, and assessed a 0.5% surcharge at the new threshold rather than 1% at the old threshold. This change was of no consequence during the alleged conspiracy period because fuel prices remained above both strike prices.[162]

32.4 BNSF's 2003 published carload formula, effective June 1, 2003, generated surcharge rates at prevailing fuel prices from July 2003 through 2008 that were exactly the same as under its April 2001 published carload fuel surcharge formula.[163]

32.5 The combination of NS's 2000 published carload fuel surcharge formula (from July 2003 through February 2004) and NS's 2004 published carload formula (from March 2004 through June 2006) generated surcharge rates at prevailing fuel prices from July 2003 through

---

[160] DA06450 at 59-60 (Rausser 253:22-254:4)

[161] DA00142 at 43 (¶ 97, Fig 17); DA00713 at 905 (Fig. IV-24D); DA06450 at 56 (Rausser 54:10-23) (conceding lack of objection to Dr. Kalt's analysis of incremental earning power).

[162] DA00713 at 802 (HDF prices); DA00142 at 143 (Fig 17); DA06450 at 59-60 (Rausser 253:22-254:4); *see also* Class Certification Hearing Tr. at 503:21-25, ECF No. 824 (Sept. 28, 2016) Rausser Cross Examination) (Q. You've testified that because the class period fuel prices were above both the old and new BNSF triggers, that they were, in your words, not relevant to the determination of injury in the class period, correct? A. Once again, ex-post.").

[163] DA00713 at 902 (Fig. IV-24A); DA06450 at 56 (Rausser 54:10-23) (conceding lack of objection to Dr. Kalt's analysis of incremental earning power.)

June 2006 (after which NS rebased its fuel surcharge) that were on average 0.89% higher than under NS's 2000 published carload fuel surcharge formula.[164]

32.6 CSXT's 2003 published fuel surcharge formula, effective June 1, 2003, generated surcharge rates from July 2003 to April 23, 2007 (when it adopted a mileage-based fuel surcharge) that were on average 1.2% higher than under its 2000 published fuel surcharge formula.[165]

32.7 On average, the increase in earning power at prevailing fuel prices from July 2003 through 2008 for all Defendants between their pre-"conspiracy" fuel surcharge formulas and allegedly collusive fuel surcharges was 0.1%.[166]

**<u>Material Undisputed Fact No. 33</u>**

**Defendants unilaterally adopted and applied their intermodal fuel surcharge programs.**

<u>Supporting Facts:</u>

33.1 BNSF published a fuel surcharge formula for intermodal shipments in March 2000,[167] and revised that formula in September 2001.[168]

33.2 BNSF's published intermodal formula remained unchanged from September 2001 through 2008.[169]

---

[164] DA00713 at 904 (Fig. IV-24C); DA06450 at 56 (Rausser 54:10-23) (conceding lack of objection to Dr. Kalt's analysis of incremental earning power.)

[165] DA00713 at 903 (Fig. IV-24B); DA06450 at 56 (Rausser 54:10-23) (conceding lack of objection to Dr. Kalt's analysis of incremental earning power.)

[166] DA00142 at 45 (Fig. 18).

[167] DA03969.

[168] DA06466 at 69-70 (Rausser 394:20-395:7); DA03985 at 86.

[169] DA06466 at 69-70 (Rausser 394:20-395:7).

33.3 In March 2001, NS created a formula for international intermodal traffic to be applied to shipments to and from ocean carriers.[170]

33.4 No later than April 2002, NS implemented a different rate-based fuel surcharge formula for domestic intermodal shipments, which did not change through the relevant period.[171]

33.5 Both of NS's intermodal formulas were based on the HDF index, but with differing components that resulted in different charges.[172]

33.6 In August 2006, NS began applying the domestic formula to international intermodal traffic.[173]

33.7 Beginning in the fall of 2000, UP assessed a rate-based fuel surcharge on intermodal shipments,[174] which was changed later that year to a formula based upon the HDF index.[175]

33.8 UP's intermodal fuel surcharge formula did not change during the alleged conspiracy period, except that UP reduced the Fuel Weight component of the formula, which resulted in a lower surcharge.[176]

33.9 CSX Intermodal, a company that was not named as a defendant in this action, created its intermodal fuel surcharge formula effective April 2000.[177]

---

[170] DA07387.
[171] DA07564; DA07572 at 73.
[172] DA07387; DA07561 at 61, 63.
[173] DA07389.
[174] DA01271-72.
[175] DA01293-294.
[176] DA01666 at 66-68; DA01101 at 212-215, App. B.
[177] DA02137 at 38; DA3007.

33.10 In September 2004, effective October 2004, CSX Intermodal modified its surcharge formula.[178]

33.11 By the fourth quarter of 2002, BNSF internally reported that 40.7% of its intermodal revenue was covered by a fuel surcharge.[179]

33.12 During the relevant period, intermodal contracts were "relatively long term (usually about three to five years)."[180]

33.13 Plaintiffs' expert noted that "the existence of 'legacy contracts' that either had no fuel surcharge provision or had an old fuel surcharge provision" required a phased implementation of fuel surcharges.[181]

**Material Undisputed Fact No. 34**

**Plaintiffs concede that mileage based fuel surcharges are not part of the alleged conspiracy.**

Supporting Facts:

34.1 Plaintiffs have asserted that "Defendants' conspiracy focused on rate-based … fuel surcharges – that is, fuel surcharges applied as a percentage of the base rate."[182]

34.2 During discovery, Plaintiffs stated in an interrogatory response that "[m]ileage-based fuel surcharges are not, and have never been, part of the alleged conspiracy."[183]

---

178 DA030007.
179 DA04086 at 90.
180 DA07323 at 27 (Duggan Decl. ¶ 12).
181 DA06202 at 35.
182 DA06397 at 407; DA00005 at 21 ¶ 75; DA00034 at 35.
183 DA06397 at 407.

34.3 Plaintiffs' expert, Dr. Rausser, testified that "there is no allegation in this case that mileage-based fuel surcharges were the subject of any conspiracy among defendants."[184]

**<u>Material Undisputed Fact No. 35</u>**

**Plaintiffs cannot establish that the alleged conspiracy extended beyond January 25, 2007, or, at a minimum, June 2007.**

<u>Supporting Facts:</u>

35.1 Plaintiffs' complaint does not state affirmatively that the alleged conspiracy extended beyond June 2007.[185]

35.2 Plaintiffs' "Narrative Factual Statement" response to the railroads' interrogatories describes "The Conspiracy" without referencing facts or events beyond mid-2007.[186]

35.3 On January 25, 2007, the Surface Transportation Board issued a decision concluding that rate-based fuel surcharges on regulated traffic could constitute an unreasonable practice.[187]

35.4 On March 21, 2007, UP announced that it would publish new fuel surcharge rates for all regulated traffic—effective April 26, 2007—using a mileage-based fuel surcharge formula.[188]

35.5 CSXT announced that it would begin using a mileage-based fuel surcharge formula to price shipments subject to public tariffs, effective April 23, 2007,[189] and generally

---

[184] DA06423 at 26 (Rausser 74:1-4).
[185] DA00005 at 05, 07, 08-09, 13, 32 (¶¶ 1, 7, 11, 12, 38, 99).
[186] *See* DA07442 at 44-98 (¶¶ 16-105).
[187] *In re Fuel Surcharges*, Ex Parte No. 661, 2007 STB Lexis 39 (Jan. 25, 2007).
[188] DA01700 at 700-705; DA01692 at 92-98.
[189] DA02201 at 06.

applied this mileage-based formula to its unregulated traffic in private price quotes and new and renewing contracts thereafter.[190]

35.6 BNSF publicly announced plans to move two of its four business units (Agriculture and Coal) to mileage-based surcharges effective January 1, 2006, more than a year before the STB's decision.[191]

35.7 By the time of the STB ruling, BNSF had already announced that it had converted to mileage-based fuel surcharges for unregulated local and rule 11 (interline forwarded) agricultural and coal shipments.[192]

35.8 After the STB decision, BNSF expanded its existing mileage-based fuel surcharge program to encompass regulated traffic.[193]

35.9 After the STB decision, NS did not convert traffic to mileage-based fuel surcharges, and instead eliminated fuel surcharges on all of its regulated shipments, on March 16, 2007, and continued using rate-based fuel surcharges for its unregulated shipments.[194]

---

[190] DA02792 at 95 ("Convert all CSXT [regulated traffic] to mileage-based FSC … on April 23 … [with unregulated] converted at renewal"); DA02201 at 08; DA01927 at 37-38 (Ward 204:8-205:14); DA01886 at 98 (Gooden 259:25-260:19).

[191] DA04635 at 36; DA04652 at 52-57.

[192] DA04652 at 52-57.

[193] DA03788 at 824-826.

[194] DA05573.

*/s/ Tara L. Reinhart*
Tara L. Reinhart (D.C. Bar. No. 462106)
John R. Thornburgh II (D.C. Bar No. 1044137)
Thomas R. Gentry (D.C. Bar No. 1617060)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Phone: (202) 371-7630
tara.reinhart@skadden.com
john.thornburgh@skadden.com
thomas.gentry@skadden.com

Saul P. Morgenstern
Jennifer B. Patterson
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
saul.morgenstern@arnoldporter.com
jennifer.patterson@arnoldporter.com

Ronald K. Wray II
GALLIVAN, WHITE & BOYD P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
Phone: (864) 271-5362
rwray@GWBlawfirm.com

*Counsel for Defendant Norfolk Southern Railway Company*

*/s/ Kent Gardiner*
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com

Katie Yablonka
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Phone: (415) 986-2800
Fax: (415) 986-2827
KYablonka@crowell.com

*Counsel for Defendant CSX Transportation, Inc.*

*/s/ Glenn D. Pomerantz*
Glenn D. Pomerantz
E. Martin Estrada
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone: (213) 683-9100
Glenn.Pomerantz@mto.com
Martin.Estrada@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Phone: (415) 512-4000
Ben.Horwich@mto.com

Jacobus P. van der Ven (D.C. Bar No. 1644774)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500 East
Washington, DC 20001
Phone: (202) 220-1100
Jacobus.vanderven@mto.com

Linda S. Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP 1330
Connecticut Avenue, NW Washington,
DC 20036
Phone: (202) 429-3000
lstein@steptoe.com

Joshua H. Soven (D.C. Bar No. 436633)
WILSON SONSINI GOODRICH & ROSATI
LLP
1700 K Street NW
Washington, DC 20006
Phone: (202) 973-8827
jsoven@wsgr.com

*Counsel for Defendant BNSF Railway Company*

*/s/ Daniel M. Wall*
Daniel M. Wall
Timothy L. O'Mara
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Phone: (415) 391-0600
dan.wall@lw.com
tim.o'mara@lw.com

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone: (202) 637-2200
allyson.maltas@lw.com

Leonard A. Gail
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com

Tyrone R. Childress
Kelsey S. Bryan (D.C. Bar No. 1034352)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Phone: (213) 489-3939
tchildress@jonesday.com
kbryan@jonesday.com

John M. Majoras (D.C. Bar No. 474267)
Kristen Lejnieks (D.C. Bar No. 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
Phone: (202) 879-3939
jmmajoras@jonesday.com
kalejnieks@jonesday.com

Matthew M. Collette (D.C. Bar No. 427167)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company*