**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. I) | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/GMH) |
| This document relates to:<br><br>ALL CASES | **PUBLICLY FILED VERSION**<br><br>**Oral Argument Requested** |

**DEFENDANTS' APPENDIX IN SUPPORT OF DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

## Volume 1 of 29


Excerpts from the Consolidated Amended Class Action Complaint, dated April 15, 2008, ECF 91 .......... DA00001

Excerpt from the Second Amended Class Action Complaint, dated February 2, 2010, ECF 324 .......... DA00005

Direct Purchaser Plaintiffs' Opposition in Response to Defendants' Joint Motion to Dismiss, dated July 8, 2008, ECF 118 .......... DA00042

Excerpts from Defendants' Motion & Memorandum of Law Regarding The Interpretation and Application of 49 U.S.C. 10706, dated March 13, 2020, ECF 945 .......... DA00113

Excerpts from Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion Regarding the Interpretation and Application of 49 U.S.C. 10706, dated April 17, 2020, ECF 952 .......... DA00124

Excerpts from Plaintiffs' Supplemental Reply Memorandum of Law in Support of Motion for Class Certification, dated May 28, 2014, ECF 711 .......... DA00129

Excerpts from the Declaration of Joseph P. Kalt, Ph.D., dated March 31, 2014 .......... DA00142

Declaration of David T. Lawson, dated June 25, 2010 .......... DA00147

RD Exhibit 120 .......... DA00157

RD Exhibit 215 .......... DA00160

RD Exhibit 216 .......... DA00162

Banerjee, Neela, "U.S. Economy Feeling Bite of Costlier Oil," The New York Times, December 28, 2002 .......... DA00164

Victor P. Goldberg, "Price Adjustment in Long-Term Contracts," Wisconsin Law Review, 1985 .......... DA00167

Mohl, Bruce, "Despite Drop in Prices, Fuel Surcharges Remain Policy at Airlines, Shipping Firms," The Boston Globe, November 21, 2001 .......... DA00185

Setaishi, Sonoko, "Transportation Cos Raise Fuel Surcharges As Costs Soar," Dow Jones News Service, March 13, 2003 .......... DA00187

Class Certification Hearing Transcript, dated September 28, 2016 .......... DA00190

Trunick, Perry A. (Ed.), "Costs Driving Trucking," Logistics Today, Volume 49, Issue 4, April 2008 ........ DA00193

STB Ex Parte No. 646 (Sub-No. 1), Simplified Standards for Rail Rate Cases (July 26, 2006) ........ DA00200

Corrected Expert Report of Barry C. Harris (March 22, 2013) ........ DA00203

Expert Report of John H. Johnson (January 22, 2013) ........ DA00513

**Volume 2 of 29**

Errata Corrected Expert Report of Joseph P. Kalt (March 1, 2013) ........ DA00713

Corrected Expert Report of Dennis W. Carlton (February 6, 2013) ........ DA01101

Expert Report of Linda Morgan (January 22, 2013) ........ DA01216

Declaration of Charles Adams, dated June 18, 2010 and attachment Exhibit 1 ........ DA01241

Appendix B to Corrected Expert Report of Dennis W. Carlton, Ph.D., dated February 6, 2013 ........ DA01249

**Volume 3 of 29**

Excerpts from the Deposition Transcript of John J. Koraleski, dated December 2, 2010 ........ DA01254

Excerpts from the Deposition Transcript of John J. Koraleski, dated June 6, 2016 ........ DA01256

Excerpts from the Deposition Transcript of James Young, dated August 4, 2010 ........ DA01263

Email from Brad Thrasher to Nobu Teraskai and others, dated March 13, 2003 (UPFSC 0000484) ........ DA01265

Email from Sharon Beschorner to Marty Coalson and others, dated March 22, 2000 (UPFSC 0000487) ........ DA01267

A version of BNSF Rules Book 6100, dated June 1, 2000 (UPFSC 0000990-91) ........ DA01269

Email from Betty Higgins to Randy Blackburn and others, dated September 13, 2000 (UPFSC 0000506) ........ DA01271

Letter from Clyde McIntyre to K. Schroeder, dated September 29, 2000 (UPFSC 0000436) ........ DA01273

Memorandum from C. Adams to Jack Koraleski and others, dated September 29, 2000 (UPFSC 0355353) ........ DA01274

Email from Kathy Eymann to Pam Grayson and others, dated October 4, 2000 (UPFSC 0344386)....DA01289

Email from Nobu Terasaki to Michael Drelicharz, dated October 10, 2000 (UPFSC 0489755)....DA01290

Email from Nobu Terasaki to Randy Blackburn and others, dated October 23, 2000 (UPFSC 0000518)....DA01293

Letter from Tom Jacobowski to Interline Partner, dated April 25, 2001 (UPFSC 0043035)....DA01295

Email from Michael Drelicharz to Kurt Schroeder and others, dated May 25, 2001 (UPFSC 0043878)....DA01297

Email from Nobu Terasaki to Michael Drelicharz and others, dated August 22, 2001 (UPFSC-A 0449276) ....DA01317

Meeting Minutes, dated November 12, 2001 (UPFSC 0195870)....DA01320

Email from Bob Toy to UP Distribution, dated October 3, 2002 (UPFSC 0042871)....DA01323

Presentation Fuel Surcharge Analysis, dated October 15, 2002 (UPFSC 0188733)....DA01326

Email from Greg Sovey to Jack Koraleski and others, dated October 24, 2002 (UPFSC 0000530)....DA01362

Email from Greg Sovey to Jack Koraleski and others, dated October 24, 2002 (UPFSC0000527)....DA01369

Press Release, dated October 31, 2002 (UPFSC 0000540) ....DA01372

Email from Jim Lange to Kurt Schroeder, dated November 12, 2002 (UPFSC 0000438)....DA01376

Email from Jim Lange to Kurt Schroeder, dated November 12, 2002 (UPFSC 0353406)....DA01378

Email from Diane Knutson to Jack Koraleski, dated January 15, 2003 (UPFSC 0000686)....DA01380

Memorandum from Brad King to Dick Davidson, dated January 14, 2003 (UPFSC 0597254)....DA01385

Document titled "Union Pacific Fuel Surcharge Provisions", dated March 1, 2003 (UPFSC 0000726)....DA01389

Presentation CSXT-UP Interline Pricing, dated March 3, 2003 (UPFSC 0674354)....DA01398

Email from Chuck Adams to Kurt Schroeder, dated March 11, 2003 (UPFSC 0075385)....DA01417

Presentation CSXT-UP Interline Pricing, dated March 13, 2003 (UPFSC 0674356)....DA01423

Email from Lee Grimes to Ed Sims and others, dated March 20, 2003 (UPFSC 0102504)....DA01430

Email from Kurt Schroeder to Kathy Eymann, dated March 24, 2003 (UPFSC 0000788)....DA01432

Email from Charley Eisele to Dennis Duffy, dated March 25, 2003 (UPFSC 0004541)....DA01435

Email from Greg Barbe to Jack Koraleski, dated March 25, 2003 (UPFSC 0069867)....DA01440

Email from Clyde McIntyre to Kurt Schroeder, dated March 28, 2003 (UPFSC 0000209)....DA01441

Email from Bob Toy to UP Distribution, dated April 2, 2003 (UPFSC 0000844)....DA01444

Email from Christine Stenger-Bleske to UP Distribution and others, dated April 4, 2003 ....DA01449

Email from Randy Evans to Greg Barbe, dated April 11, 2003 (UPFSC 0046052) ....DA01453

Email from Bob Toy to Bob Maziarz, dated April 16, 2003 (UPFSC 0184793) ....DA01454

Email from Kurt Schroeder to Chuck Adams, dated April 16, 2003 (UPFSC 0355286)....DA01457

Email from Jim Nava to Randy Evans, dated April 18, 2003 (UPFSC 0000594)....DA01459

Email from Rich Mietz to Randy Evans, dated April 21, 2003 (UPFSC 0000598)....DA01461

Letter from National Grain and Feed Association to Richard Davidson, dated April 22, 2003 (UPFSC 0000605) ....DA01466

Email from Harvey Wood to Stephanie Eling, dated April 24, 2003 (UPFSC 0000889)....DA01468

Email from Chuck Adams to Chandra Henley, dated April 25, 2003 (UPFSC 0000959)....DA01492

Email from Diane Knutson to Jack Koraleski, dated April 26, 2003 (UPFSC 0000962)....DA01494

**Volume 4 of 29**

Email from Greg Barbe to Brad Thrasher, dated April 27, 2003 (UPFSC 0000607)....DA01497

Document titled "Fuel Surcharge Analysis", dated April 28, 2003 (UPFSC 0000970)....DA01518

Email from Koe O'Connor to Chandra Henley and others, dated April 28, 2003 (UPFSC 0000993)....DA01524

Memorandum form Chandra Henley and others, dated May 2, 2003 (UPFSC 0000628)....DA01525

Email from Edna Oakman to Vern Davis and others, dated May 2, 2003 (UPFSC 0453757)....DA01531

Email from Jim Nave to Bob Toy, dated May 5, 2003 (UPFSC 0000634)....DA01533

Email from Bob Toy to Craig Collins, dated May 5, 2003 (UPFSC 0042411)....DA01534

Email from Kurt Schroeder to Chuck Adams, dated May 6, 2003 (UPFSC 0183194)....DA01544

Email from Harvey Wood to Diane Knutson, dated May 7, 2003 (UPFSC 0001012)....DA01554

Document titled "Fuel Surcharge", dated May 9, 2003 (UPFSC 0000552)....DA01563

Email from Kathy Eymann to Paul Anderson, dated May 9, 2003 (UPFSC 0001030)....DA01565

Email from Christine Stenger-Bleske to UP Distribution and others, dated May 12, 2003 (UPFSC 0000560)....DA01573

Meeting Minutes, dated June 3, 2003 (UPFSC 0001086)....DA01589

Hand written notes, dated June 3, 2003 (UPFSC 0001088)....DA01591

Email from Eric Butler to Vern Davis and others, dated May 10, 2003 (UPFSC 0001094)....DA01594

Email from Robert Knight to Todd Rynaski, dated January 28, 2004 (UPFSC 0032168)....DA01597

Email from Michael Drelicharz to Linda Brand, dated June 10, 2004 (UPFSC 0001197)....DA01599

**<u>Volume 5 of 29</u>**

Email from Robert Knight to Jack Koraleski, dated August 24, 2004
(UPFSC 0001213)....DA01602

Email from Michael Drelicharz to Robert Knight and others, dated August 25, 2004
(UPFSC 0358197)....DA01612

Email from Jerry Klym to Tina Wehrbein and others, dated September 13, 2004
(UPFSC 0001251)....DA01622

Email from Jerry Klym to UP Distribution, dated October, 1, 2004
(UPFSC 0001272)....DA01624

Email from Mark Draper to Chuck Adams and others, dated November 4, 2004
(UPFSC 0257003)....DA01628

Email from Chuck Adams to Jack Koraleski and others, dated March 29, 2005
(UPFSC 0001463)....DA01629

Email from Kurt Schroeder to Alan Ratcliff and others, dated August 16, 2005
(UPFSC 0001556)....DA01633

Email from Chuck Adams to Chandra Henley, dated August 18, 2005
(UPFSC 0001571)....DA01648

Document titled "Fuel Surcharge Analysis", dated September 1, 2005
(UPFSC 0000640)....DA01661

Email from Kurt Schroeder to Trena Bryan, dated September 12, 2005
(UPFSC 0001629)....DA01662

Email from Chuck Adams to Jack Koraleski and others, dated October 18, 2005
(UPFSC 0001644)....DA01664

Email from Ed Weber to Robert Knight, dated October 19, 2005
(UPFSC 0048842)....DA01666

Email from Brad Thrasher to Eric Butler and others, dated April 12, 2006
(UPFSC 0001667)....DA01669

Email from Paul Borseth to John Kaiser and others, dated April 12, 2006
(UPFSC 0001670)....DA01671

Email from Chuck Adams to Jack Koraleski and others, dated April 12, 2005
(UPFSC 0001674)....DA01673

Email from Nobu Terasaki to John Kaiser and others, dated April 12, 2006
(UPFSC 0001678)....DA01675

Email from Jack Koraleski to John Kaiser and others, dated April 12, 2006 (UPFSC 0423026)....................DA01677

Email from Maria Matukewiez to Eric Butler and others, dated April 13, 2006 (UPFSC 0001680)....................DA01678

Email from Mark Draper to Robert Knight, dated April 13, 2006 (UPFSC 0001684)....................DA01680

Email from Eric Butler to Chuck Adams and others, dated April 17, 2006 (UPFSC 0001693)....................DA01683

Email from Todd Whitman to Eric Butler and others, dated April 18, 2006 (UPFSC 0001701)....................DA01685

Email from Tom Gehl to Chuck Adams, dated February 7, 2007 (UPFSC 0165409)....................DA01688

Email from Nobu Terasaki to Brian McDonald and others, dated February 16, 2007 (UPFSC 0422458)....................DA01689

Document titled "Sales Talking Points", dated March 2007 (UPFSC 0000576)....................DA01692

Email from Tom Gehl to Chuck Adams and others, dated March 11, 2007 (UPFSC 0079608)....................DA01699

Document titled "Customer News", dated March 21, 2007 (UPFSC 0000570-75)....................DA01700

Morgan Stanley 2Q04 Railroad Outlook and 1Q04 Review, dated May 12, 2004 (AAR-E-00026653)....................DA01706

Argus Media, Rail Business, "A 'perfect storm' brewing for rail rate increases," by Escalation Consultants (June 14, 2004) (AAR-E-00026955)....................DA01746

Email from Tom White to numerous recipients, dated April 27, 2006 (AAR-E-00055453)....................DA01756

Memo to Republican Members of the Senate Committee on Commerce, Science, and Transportation from Surface Transportation & Merchant Marine Subcommittee Staff, dated February 14, 2006 (AAR-E-00059670)....................DA01764

Written Testimony of the National Industrial Transportation League to the STB, Ex. Parte No. 658, The 25th Anniversary of the Staggers Rail Act of 1980: A Review and Look Ahead, dated October 12, 2005 (AAR-E-00061617)....................DA01774

**Volume 6 of 29**

Excerpts from the Deposition Transcript of Donna Cerwonka, dated August 13, 2010 ... DA01829

Excerpts from the Deposition Transcript of John Couch, dated August 3, 2010 .............. DA01831

Excerpts from the Deposition Transcript of Michael Giftos, dated February 25, 2010 .... DA01861

Excerpts from the Deposition Transcript of Clarence Gooden, dated July 16, 2010 ........ DA01886

Excerpts from the Deposition Transcript of CSXT 30(b)(6) witness Ed Jenkins, dated July 27, 2011 ........ DA01901

Excerpts from the Deposition Transcript of Clyde McIntyre, dated February 18, 2010 ... DA01908

Excerpts from the Deposition Transcript of Dean Piacente, dated August 13, 2010 ........ DA01920

Excerpts from the Deposition Transcript of Michael Ward, dated February 10, 2011 ..... DA01927

CSX Corporation 2000 SEC Form 10-K, dated March 31, 2001 ........ DA01945

**<u>Volume 7 of 29</u>**

Email from John Tilley to Clyde McIntyre, dated August 31, 2000 (CSXFSC000000039) ........ DA02134

Merchandise Marketing and Sales Presentation, "Fuel Surcharge," dated September 15, 2000 (CSXFSC000000045) ........ DA02137

Press Release, "CSXT to Implement Fuel Cost Recovery Charge," dated September 22, 2000 (CSXFSC000000057) ........ DA02143

Email from Jim Mitchell, Jr. to numerous recipients, dated October 24, 2000 (CSXFSC000000096) ........ DA02144

Email from John Couch to John Jinkner and Vicki Burton, dated March 3, 2003 (CSXFSC000000281) ........ DA02167

Memorandum from Mike Giftos to numerous recipients, dated March 19, 2003 (CSXFSC000000351) ........ DA02185

Email from Kelly Shefelbine to numerous recipients, dated March 19, 2003 (CSXFSC000000357) ........ DA02186

Email from Didi Jarchower to numerous recipients, dated March 20, 2003 (CSXFSC000000366) ........ DA02193

Email from Shirley Farrell to numerous recipients, dated March 2, 2007 (CSXFSC000001040) ........ DA02201

Presentation, "CSX Corporation 2007 Business Plan," dated December 2006 (CSXFSC000014667) ........ DA02211

Email from John Couch to Frank Onimus III attaching presentation, "Fuel Surcharge Merchandise 2003" (CSXFSC000036409) ........ DA02267

Email from John Couch to Frank Onimus III, dated March 11, 2003 (CSXFSC000036491) ........ DA02286

Presentation, "Fuel Surcharge Merchandise 2003" (CSXFSC000036492) ........ DA02287

Email from John Couch to Frank Onimus III, dated March 20, 2003 (CSXFSC000036561) ........ DA02292

Draft Press Release, dated March 20, 2003 (CSXFSC000036562) ........ DA02293

Email from Frank Onimus III to numerous recipients attaching Memorandum, "Policy: Fuel Surcharge Application - Contracts, Quotes, and Price Lists," dated April 25, 2003 (CSXFSC000036670) ........ DA02295

Email from Clyde McIntyre Jr. to John Hart attaching Memorandum, "CSX Fuel Surcharge Status As of April 21, 2003" (CSXFSC000039089) ........ DA02310

Email from Shirley Farrell to John Couch attaching draft for discussion, "Fuel Surcharge Communication Plan" (CSXFSC000039375) ........ DA02313

Email from John Couch to Clarence Gooden, dated January 28, 2003 (CSXFSC000040028) ........ DA02315

Presentation, "CSX Fuel Surcharge Program," dated May 19, 2005 (CSXFSC000077514) ........ DA02458

Bear Stearns Equity Research Report for CSX Corporation, dated January 31, 2003 (CSXFSC000083892) ........ DA02508

CSXT Conference Call Transcript, dated October 24, 2002 (CSXFSC000084307) ........ DA02514

CSXT Conference Call Transcript, dated January 30, 2003 (CSXFSC000084365) ........ DA02570

**<u>Volume 8 of 29</u>**

Press Release, "CSX Transportation Announces Modifications To Its Fuel Cost Recovery Program," dated March 20, 2003 (CSXFSC000084489) ........ DA02616

Email from Edward Wolfe to Ed Wolfe and Tom Wadewitz attaching Bear Stearns Equity Research Report for CSX Corporation, dated January 26, 2005 (CSXFSC000087015) ........................................................................... DA02618

Fax from Mike Giftos to John Couch, dated March. 19, 2003 (CSXFSC000098458) ........................................................................... DA02639

Draft Press Release, dated March 19, 2003 (CSXFSC000098459) ................................ DA02640

Presentation Slides, “The new program - comparison,” dated March 19, 2003 (CSXFSC000098462) ........................................................................... DA02643

Email from Sandy Strok to numerous recipients, dated March 11, 2003 (CSXFSC000098501) ........................................................................... DA02647

Presentation Slides, “Automotive Service Group: Outlook/Review,” dated March 17, 2003 (CSXFSC000098502) ................................................................... DA02648

Email from Tim McNulty to Kyle Hancock Jr. attaching Confidential Contract Proposal with Case Farms, LLC, dated February 25, 2004 (CSXFSC000104109) ........................................................................... DA02663

Customer Alert, “CSX Fuel Surcharge Changes to 0% December 11th Due to Lower Cost,” dated December 10, 2002 (CSXFSC109169) .......................................... DA02669

Email from Clyde McIntyre to Ed Jenkins and Fredrik Eliasson, dated April 25, 2007 (CSXFSC000119958) ........................................................................... DA02670

Email from Clyde McIntyre to numerous recipients attaching Rail Cost Adjustment Factors for 1st Quarter 2006, dated December 21, 2005 (CSXFSC000126737) ........................................................................... DA02672

Email from Clarence Gooden to Clyde McIntyre, dated August 20, 2002 (CSXFSC000128907) ........................................................................... DA02713

Email from Clyde McIntyre to numerous recipients attaching “CSXT Fuel Surcharge Alert and 4th Quarter 2002 Rail Cost Adjustment Factor”, dated October 7, 2002 (CSXFSC000129377) ................................................................... DA02740

Customer Alert, “Effective June 1, 2003, CSXT Fuel Surcharge Is Modified To Be More Responsive To Market Conditions,” dated March 31, 2003 (CSXFSC000132121) ........................................................................... DA02745

Presentation, “Fuel Surcharge Merchandise 2003” (CSXFSC000133783) ...................... DA02747

Email from Clyde McIntyre to Ed Jenkins and Fredrik Eliasson attaching surcharge exceptions as of January 2007, dated January 18, 2007 (CSXFSC000150133) ........................................................................... DA02753

Email from Jeff Goutcher to Dean Piacente and Rich Karn, dated July 6, 2004 (CSXFSC000150902) ....................DA02763

Email from Fredrik Eliasson to numerous recipients, dated February 27, 2003 (CSXFSC000152060) ....................DA02772

Credit Suisse Equity Research, "The impact of rising fuel prices," dated February 27, 2003 (CSXFSC000152061) ....................DA02773

Email from Ken Day to Gary Lewis and Glenn Katz, dated December 5, 2003 (CSXFSC000152574) ....................DA02781

Email from Frank Onimus III to numerous recipients, dated March 13, 2003 (CSXFSC000156928) ....................DA02785

CSXT Merchandise Group Presentation Slides (CSXFSC000156930) ....................DA02787

Email from Bob Gutman to John Couch, dated February 26, 2003 (CSXFSC000165062) ....................DA02790

"Hypothetical CSX vs BNSF Impact on CSX Fuel Surcharge Revenue" (CSXFSC000165063) ....................DA02791

Presentation, "Sales and Marketing Fuel Surcharge Update," dated February 27, 2007 CSXFSC000165096) ....................DA02792

Email from John Couch to Clarence Gooden, dated March 5, 2003 (CSXFSC000165104) ....................DA02800

Presentation, "Contract Escalators June 2003" (CSXFSC000174706) ....................DA02802

Congressional Budget Office Report, "Freight Rail Transportation: A Review of the 2004 Experience," dated May 2005 (CSXFSC000181849) ....................DA02808

Email from James Allan to Fredrik Eliasson and Frank Carbone III, dated April 18, 2006 (CSXFSC000184947) ....................DA02832

Email from Mike Woodall to numerous recipients attaching Memorandum, "Contracts, Private Quotes & Competitive Pricing Document(s) Guidelines" (CSXFSC000195316) ....................DA02834

ExxonMobil and CSXT Meeting Agenda, dated July 14, 2006 (CSXFSC000226424) ....................DA02840

Memorandum from Mike Giftos to CSXT Commercial Team with attachments, dated September 22, 2000 (CSXFSC000247041) ....................DA02843

Email from Debbie Marksberry to Matt Rice and Marshall Bowen, dated November 8, 2000 (CSXFSC000254444) ....................DA02850

Email from Corporate Communications to numerous recipients, dated September 22, 2000 (CSXFSC000254508) ........ DA02851

**Volume 9 of 29**

Email from James Shefelbine to Tom Schoenieben and Clyde McIntyre regarding Presentation, "Merchandise Marketing and Sales: Fuel Surcharge," dated September 15, 2000 (CSXFSC000254516) ........ DA02852

Email from Clyde McIntyre to numerous recipients attaching pricing team meeting documents, dated July 13, 2000 (CSXFSC000254549) ........ DA02860

Memorandum, "Proposed Merchandise Fuel Surcharge Application in Tariff CSXT 8100" (CSXFSC000254552) ........ DA02863

"Notification of Fuel Cost Recovery Charge," dated October 13, 2000 (CSXFSC254613) ........ DA02867

Email from Thomas Jacobowski to Clyde McIntyre, dated October 6, 2000 (CSXFSC000254670) ........ DA02868

Email from Clyde McIntyre to Thomas Jacobowski attaching changes to BNSF Carload Fuel Surcharge Calculation, dated April 30, 2001 (CSXFSC000254681) ........ DA02870

Email from Bill Hogbin to Clyde McIntyre attaching Canadian National Railway, Freight Tariff CN 7400, dated October 20, 2000 (CSXFSC254683) ........ DA02872

Email from Bill Hogbin to Clyde McIntyre attaching letter, dated March 18, 2001 (including attached Letter, "CN Proposed Fuel Surcharge") (CSXFSC000254689) ........ DA02878

Email from Thomas Jacobowski to Clyde McIntyre, dated August 7, 2000 (CSXFSC000254777) ........ DA02880

CSXT Finance Department Fuel Surcharge Analysis, dated August 31, 2000 (CSXFSC000254834) ........ DA02882

Meeting Appointment, "Discussion w/BNSF re: Fuel Surcharge," dated February 9, 2007 (CSXFSC000258350) ........ DA02885

Email from Adam Hollingsworth to numerous recipients regarding Press Release, "CSX Transportation Announces Modifications to Its Fuel Cost Recovery Program," dated March 20, 2003 (CSXFSC000287736) ........ DA02886

Email from Sandi Bryan to numerous recipients, dated March 25, 2003 (CSXFSC000288447) ........ DA02893

Memorandum from Mike Giftos to Michael Ward, dated March 25, 2003 (CSXFSC000288448) ........ DA02894

Press Release, "CSXT Announces Modifications to Its Fuel Cost Recovery Program," dated March 20, 2003 (CSXFSC000296928) ........ DA02896

Email from Wayne Flynn to Kyle Hancock, dated July 28, 2006 (CSXFSC000324673) ........ DA02898

Email from Tom Owen Jr. to numerous recipients, dated May 22, 2000 (CSXFSC000325299) ........ DA02900

Email from Bill Johnson to Tim McNulty and Donna Cerwonka, dated October 17, 2002 (CSXFSC000325698) ........ DA02902

Presentation, "Fuel Surcharge Merchandise 2003" (CSXFSC000326282) ........ DA02905

Memorandum, "Contracts, Private Quotes & Competitive Pricing Document(s) Guidelines" (CSXFSC000327580) ........ DA02911

Internal Memorandum, "Talking Points CSX Transportation Fuel Recovery Charge Program" (CSXFSC000328558) ........ DA02912

Email from Dan Murphy to numerous recipients, dated September 22, 2000 (CSXFSC000328691) ........ DA02915

Email from Clyde McIntyre to numerous recipients attaching CSXT Fuel Cost Recovery Charge letter, dated March 4, 2003 (CSXFSC000350085) ........ DA02933

Email from Clyde McIntyre to numerous recipients, dated March 19, 2003 (CSXFSC350087) ........ DA02935

Email from Louis Muldrow III to numerous recipients regarding Excel Spreadsheet, "2002 CCIO Wins Losses vs. NS" (CSXFSC000412786) ........ DA02936

Argus Media, *Rail Business*, "Rates, rail capacity to be key issues in 2006," dated January 2, 2006 (CSXFSC00047466) ........ DA02945

Email from Steve Lube to Dean Piacente, dated December 18, 2006 (CSXFSC000479548) ........ DA02954

Email from Tim McNulty to numerous recipients, dated Number 19, 2002 (CSXFSC000485180) ........ DA02955

Email from CSX to numerous recipients attaching Amendment 5 to Contract CSXT 68608, effective October 1, 2006 (CSXFSC000531250) ........ DA02957

Email from John Hart to Tammy Duggan, dated September 1, 2004 (CSXFSC000676578) ........ DA03004

Letter from Clyde McIntyre to Kurt Schroeder, dated September 29, 2000 (UPFSC0000436) ........ DA03006

CSX Intermodal Fuel Surcharge Chronology (CSXT 30(b)(6) witness Mike Crawford Deposition Ex. 8) ........ DA03007

Excerpts from the Deposition Transcript of David Garin, dated August 16, 2010. ........ DA03025

Excerpts from the Deposition Transcript of Thomas Jacobowski, dated August 12, 2010 ........ DA03044

Excerpts from the Deposition Transcript of Samuel Kyei, dated March 4, 2010 ........ DA03055

Excerpts from the Deposition Transcript of John Lanigan, dated June 22, 2010 ........ DA03099

Excerpts from the Deposition Transcript of Matthew K. Rose, dated July 16, 2010 ........ DA03155

**Volume 10 of 29**

Expert Report of Janusz A. Ordover, Ph.D., dated January 22, 2013. ........ DA03346

Website Printout of BNSF's FSC Program Details & Table, Intermodal Rules and Policies Guide, marked as Exhibit 2 to the August 13, 2010 George Duggan deposition. . DA03514

BNSF Price Management Memo from Jim Arnett to Bill Carter and others regarding Fuel Surcharge, dated January 7, 2000 (BNSF-0814153) ........ DA03515

Document titled "BNSF Carload Price Change Summary Comparison" (BNSF-0657300) ........ DA03523

Document titled Fuel "Marketing Advisory - Surcharge Information on the Internet," dated July 26, 2000, appending various emails and their attachments (BNSF-0814185) ........ DA03532

Email from Thomas J. Jacobowski to Katie Farmer and others, dated September 13, 2000 (BNSF-0814173) ........ DA03546

Document titled "Pricing Update," directed "To: All BNSF Carload Customers," dated September 21, 2000 (BNSF-0814184) ........ DA03548

Document titled "Carload Fuel Surcharge Meeting October 17, 2000 Agenda" (BNSF-0814211) ........ DA03549

BNSF Memo from Paul B. Anderson to Matt Rose regarding "Price Increases Compared to Fuel Expense Increases", dated November 3, 2000 (BNSF-0368688) ........ DA03558

**Volumes 11 and 12 of 29**

A version of the "BNSF Rules Book 6100-A," the original version of which was issued December 29, 2000 (BNSF-0510003) .......... DA03560

**Volume 13 of 29**

A version of the "BNSF Rules Book 6100-A," the original version of which was issued December 29, 2000 (BNSF-0510131) .......... DA03620

A version of the "BNSF Rules Book 6100-A," the original version of which was issued December 29, 2000 (BNSF-0510326) .......... DA03659

A version of the "BNSF Rules Book 6100-A," the original version of which was issued December 29, 2000 (BNSF-0511719) .......... DA03698

A version of the "BNSF Rules Book 6100-A," the original version of which was issued December 29, 2000 (BNSF-0511809), marked as Exhibit 14 in the June 22, 2010 John Lanigan deposition .......... DA03743

**Volume 14 of 29**

A version of the "BNSF Rules Book 6100-A," the original version of which was issued December 29, 2000 (BNSF-0515743) .......... DA03788

Document titled "Fuel Surcharges Review January 3, 2001 Agenda" (BNSF-0814175) .......... DA03855

Email from Penita L. Lee to Penita L. Lee and others, dated February 15, 2001 (BNSF_LOG0000054) .......... DA03862

Email from Cheri L. Carlson to Thomas J. Jacobowski and others, dated March 6, 2001 (BNSF-0121901) .......... DA03865

Document titled "Review of BNSF Fuel Surcharges April 9, 2001" (BNSF-0328392) .......... DA03868

Document titled "Review of BNSF Fuel Surcharges April 9, 2001" (BNSF-0657324) .......... DA03908

BNSF letter to Interline Partner, dated April 25, 2001 (BNSF-0814220) .......... DA03948

Email from Kurt Schroeder to Thomas Jacobowski attaching UP April 26, 2001 response (BNSF-0814224) .......... DA03952

Email from Grant Ozburn to Thomas Jacobowski attaching short line April 26, 2001 response (BNSF-0814226) .......... DA03954

Documents titled "BNSF Pricing Update April 30, 2001" (BNSF-0016285) .......... DA03963

CSXT April 30, 2001 letter to Thomas Jacobowski (BNSF-0814235) ............................DA03966

Domestic Intermodal Fuel Surcharge, dated May 15, 2001 (BNSF-0070536) ................DA03969

**Volume 15 of 29**

Document titled, "BNSF Intermodal Fuel Surcharge", dated June 7, 2001 (BNSF-0814151)........................................................................................DA03976

Document titled, "BNSF Rule Book 6100-A, Item 3375A - Charge Fuel Surcharge Issued May 1, 2001 Effective July 1, 2001" (BNSF-0330104-)...........................DA03978

BNSF Memo from Paul B. Anderson to Tom Hund regarding First Half 2001 - Revenue Questions from Matt, dated July 12, 2001 (BNSF-0368677)...............................DA03982

Email from Renita L. Lee to Ed. L. Zajac and Mike D. Williamson, dated July 25, 2001 (BNSF-FSC 001702) ...........................................................................DA03985

Presentation titled "Consumer Products Marketing Support," dated January 31, 2002 (BNSF-0069749)........................................................................................DA03988

Memo from Greg Patient to Chuck Shultz regarding Price Escalation General Guidelines, dated February 15, 2002 (BNSF-0337331) ........................................................DA04019

Email from George F. Gillen to Jessie McCabe and Sharon E. Risenbeck attaching BNSF July 2000 announcement of WTI-based fuel surcharge, dated February 20, 2002 (BNSF-0026746)........................................................................................DA04022

Email from Kurt Schroeder to James Arnett, dated May 16, 2002 (BNSF-0010285)........................................................................................DA04030

Email from Thomas N. Hugh to David T. Burr and Matthew W. Feldman, dated September 17, 2002, attaching September 2003 Bear Stearns report (BNSF-0641542)........................................................................................DA04034

Email from George F. Gillen, dated November 1, 2002 attaching document titled "Burlington Northern Sante Fe Corporate Audit Services, October 21, 2002" (BNSF-0544170-) .....................................................................................DA04048

Email from George F. Gillen to Sara A. Thronsedt, dated November 4, 2002 (BNSF-0026907)........................................................................................DA04083

Email from George F. Gillen to David L. Garin, Denis J. Smith, dated November 19, 2002 (BNSF-0026918)................................................................DA04084

BNSF Memo from Chuck Schultz to Matt Rose re Fuel Surcharge Questions, dated January 15, 2003 (BNSF-0328865), marked as Exhibit 1 in the June 22, 2010 John Lanigan deposition...............................................................DA04086

Email from Linda L. Wertz to numerous recipients, dated January 15, 2003 (BNSF-0532267)....DA04095

BNSF Memo from Chuck Schultz to Matt Rose re Fuel Surcharge Questions, dated January 15, 2003 (BNSF-0326121) ....DA04098

CCBN Street Events Final Transcript of BNI-Q4 2002 Burlington Northern Santa Fe Corporation Earnings Conference Call, dated January 21, 2003 (BNSF-0814238)....DA04104

Email from D. Duaine Shaw to various recipients, dated January 27, 2003 (BNSF-0074429) ....DA04108

Document titled, "John Lanigan, 2003 Draft Goals" (BNSF-0387501), marked as Exhibit 2 in the June 22, 2010 John Lanigan deposition ....DA04109

Email from Sam A. Kyei to Sam A. Kyei, dated March 6, 2003 (BNSF_CAL-0005286)....DA04112

Email from Greg Stengem to Cheri Carlson, dated March 11, 2003 (BNSF-FSC 000363). ....DA04113

**Volume 16 of 29**

Email from Sam A. Kyei to recipients, dated March 13, 2003 with attachments (BNSF-0330835), marked in part as Exhibit 8 in the May 4, 2010 Samuel Kyei deposition....DA04114

Fuel Surcharge Review Team, Agenda for March 14, 2003 Meeting attaching "Fuel Surcharges Options" (BNSF-0328753) ....DA04155

"Email from Sam A. Kyei to numerous recipients with attachments, dated March 18, 2003 (BNSF-0330793834), marked in part as Exhibit 5 in the May 4, 2010 Samuel Kyei deposition....DA04159

Document titled "BNSF - NS Senior Team Meeting Agenda March 18, 2003" (BNSF-FSC 000643), marked as Exhibit 4 in the June 22, 2010 John Lanigan deposition. ....DA04201

Fuel Surcharge Review Team, Agenda for March 19, 2003 Meeting (BNSF-0325605)....DA04204

Fuel Surcharge Review Team, Agenda for March 21, 2003 Meeting (BNSF-0325007)....DA04210

Email from Pete Rickershauser to numerous recipients, dated March 21, 2003, attaching Document titled "BNSF - NS Senior Team Meeting Agenda March 18, 2003" (BNSF-0337440)....DA04211

Fuel Surcharge Review Team, Agenda for March 26, 2003 Meeting attaching Proposed Fuel Surcharges Rate Methodology (BNSF-0328505). ........ DA04216

Email from Richard E. Stroot to Matthew K. Rose and others, dated March 27, 2003 attaching document titled "BNSF-CSX Alliance Meeting April 1, 2003", (BNSF-0557167-81), bates number BNSF-0557168 was included as Exhibit 215 to Plaintiffs March 18, 2010 to support their motion for class certification, ECF No. 337, and also marked as Exhibit 36 in the Giftos deposition ........ DA04224

Fuel Surcharge Review Team, Agenda for March 28, 2003 Meeting (BNSF-0014241). ........ DA04239

Fuel Surcharge Review Team, Agenda for March 28, 2003 Meeting (BNSF-0325538). ........ DA04240

**Volume 17 of 29**

Email from Paul M. Anderson to George F. Gillen, dated March 28, 2003 (BNSF-0032321), marked as Exhibit 9 in the June 22, 2010 John Lanigan deposition. ........ DA04252

Email from Loretta J. Long to Sam A. Kyei attaching Risks with implementing fuel surcharge based on miles, dated March 28, 2003 (BNSF-0344646) ........ DA04258

Email from Paul M. Anderson to Pam Grayson, dated March 28, 2003 (BNSF-FSC 000571) ........ DA04260

Presentation titled "BNSF Fuel Surcharges, Fuel Surcharge Review Team Recommendations," dated March 31, 2003 (BNSF-0325512). ........ DA04261

Email from George F. Gillen to John G. Farr and others, dated April 1, 2003 (BNSF-0027647). ........ DA04282

Email from Loretta J. Long to Sam A. Kyei, dated April 2, 2003 (BNSF-0001355). ........ DA04284

Email from David R. Alegria to Sam A. Kyei and George Pacocha, dated April 3, 2003 (BNSF-0027655). ........ DA04286

Spreadsheet titled "BNSF Carload Price Authorities Fuel Surcharge Summary", dated April 3, 2003 (BNSF-0027656) ........ DA04287

Email from Sam A. Kyei to numerous recipients, dated April 3, 2003, attaching document titled "BNSF Fuel Surcharges Cost Recovery Improvements February 24, 2003" (BNSF-0330752) ........ DA04289

Fuel Surcharge Review Team, Agenda for April 4, 2003 Meeting (BNSF-0325504). ........ DA04330

Email from Paul M. Anderson to George F. Gillen, dated April 4, 2003 (BNSF-FSC000572), marked as Exhibit 10 in the June 22, 2010 John Lanigan deposition ....DA04337

Email from James T. Obermiller to George F. Gillen, dated April 10, 2003 (BNSF-0027935)....DA04340

Document titled "BNSF Fuel Surcharges Fuel Review Team Recommendations April 14, 2003" (BNSF-FSC 000047) ....DA04341

**Volume 18 of 29**

Email from George F. Gillen to numerous recipients with attachments, dated April 25, 2003 (BNSF-0570925) ....DA04369

Email from Sam A. Kyei to Nick L. Murray, dated April 30, 2003 (BNSF-0327011), marked as Exhibit 13 in the June 22, 2010 John Lanigan deposition....DA04374

Email from Emily Pate to James Arnett and others, dated May 2, 2003, attaching document titled "REN Task Force Meeting Minutes" (BNSF-0040342)....DA04376

BNSF Memo from Sam Kyei to Steve Bobb regarding Status of BNSF Fuel Surcharge Programs, dated July 1, 2003 (BNSF-0322277)....DA04415

Email from David T. Burr to Thomas N. Hund, dated July 3, 2003 attaching BNSF Memo from Sam Kyei to Steve Bobb regarding Status of BNSF Fuel Surcharge Programs July 1, 2003 (BNSF-0342546)....DA04417

Email from John P. Lanigan to Stevan B. Bobb and others, dated September 11, 2003 attaching document titled "BNSF / NS Joint Marketing Meeting July 30, 2003" (BNSF-0337434)....DA04420

BNSF Memo from Sam Kyei to Matt Rose regarding Fuel Cost Recovery Analysis, dated May 28, 2004 (BNSF-0325449), marked as Exhibit 31 in the May 4, 2010 Samuel Kyei deposition....DA04426

Email from Cheryl L. Simpson to Sam A. Kyei and others with attachment BNSF Fuel Surcharges, Fuel Surcharge Review Team Recommendations, dated August 27, 2004 (BNSF-0354813) ....DA04451

Email from Sam A. Kyei to numerous recipients, dated August 30, 2004 (BNSF-0345532)....DA04481

**Volume 19 of 29**

Email from George F. Gillen to David L. Garin, Denis J. Smith and George T. Duggan, dated September 1, 2004 (BNSF-0028686), marked in part as Exhibit 37 in the May 4, 2010 Samuel Kyei deposition ....DA04482

Email from Eldon Specht to David R. Alegria and others, dated September 7, 2004 (BNSF-0028783), marked as Exhibit 27 in the June 22, 2010 John Lanigan deposition. ....DA04487

Email from Sam A. Kyei to George Pacocha and others, dated September 8, 2004 attaching presentation titled "BNSF Fuel Surcharges: Fuel Surcharge Review Team Recommendations April 14, 2003" (BNSF-0028785). ....DA04489

Email from David T. Burr to Thomas N. Hund, Dennis R. Johnson, dated October 18, 2004 (BNSF-0345959-), marked as Exhibit 28 in the June 22, 2010 John Lanigan deposition ....DA04521

Email from Sam A. Kyei to Cheryl L. Simpson and others, dated November 3, 2004 (BNSF-0327644), marked as Exhibit 41 in the May 4, 2010 Samuel Kyei deposition. ....DA04554

Email from Harry Bognich to George F. Gillen and others, dated January 20, 2005 (BNSF-0327645), marked as Exhibit 30 in the June 22, 2010 John Lanigan deposition ....DA04555

Email from Harry Bonich to George R. Gillen and others, dated January 20, 2005 (BNSF-FSC 000769), marked as Exhibit 42 in the May 4, 2010 Samuel Kyei deposition. ....DA04557

Email from James A. Arnett to Susie Stark with attachments, dated February 24, 2005 (BNSF-FSC 000193-206). ....DA04559

Email from John P. Lanigan to Paul B. Anderson and others, dated March 28, 2005 (BNSF-0329108-14), marked as Exhibit 31 in the June 22, 2010 John Lanigan deposition. ....DA04573

Email from James A. Arnett to MKT DL AG Commodities and others, dated March 29, 2005 (BNSF-0001311) ....DA04580

Spreadsheet titled "BNSF Mileage-Based Fuel Surcharge, Customer Feedback", dated April 4, 2005 (BNSF-0067932) ....DA04581

Email from James Arnett to Kurt Shroeder, dated April 20, 2005 (BNSF-0492599). ....DA04583

Spreadsheet titled "BNSF Carload Price Authorities with UP Interchange", dated April 15, 2005 (BNSF-0492600) ....DA04584

Document titled "BNSF Rules Book 6100 - A - Item 3375C - Charge - Fuel Surcharge, Issued May 7, 2003 - Effective June 1, 2003" (BNSF-0492619) ....DA04603

Spreadsheet titled, "BNSF Mileage-Based Fuel Surcharge Customer Feedback", dated May 6, 2005 (BNSF-0375656) ....DA04605

Document titled "BNSF Railway Mileage Fuel Surcharge Update May 16, 2005" (BNSF-FSC 000235) ....................DA04607

**Volume 20 of 29**

Correspondence regarding Mileage-Based Fuel Surcharge (FSC), dated September 9, 2005 (BNSF-0648777) ....................DA04613

Document titled "Mileage Based Fuel Surcharge Update Marketing Staff Meeting October 17, 2005" (BNSF-FSC 000271)....................DA04626

Email from Linda L. Wertz to various recipients, dated October 20, 2005 (BNSF-0031077)....................DA04635

Email from George F. Gillen to Randy R. Reyff and others attaching Document titled, "Item 3380 - Charge Fuel Surcharge on Coal Unit Train and Trainload Shipments Issued June 8, 2004 Effective July 1, 2004," dated October 24, 2005 (BNSF-0031087)....................DA04638

Document titled, "BNSF Rule Book 6100-A, Item 3375A - Charge Fuel Surcharge Issued May 1, 2001 Effective July 1, 2001," dated June 15, 2010 (BNSF-0657373)....................DA04652

Email from George F. Gillian to Brian A. Large, dated March 12, 2007 (BNSF-0001786)....................DA04658

Email from Paul B. Anderson to Brian A. Large, dated April 11, 2007 (BNSF-0535331)....................DA04662

**Volume 21 and 22 of 29**

Documents titled "Pricing Update - BNSF Fuel Surcharge," with date range starting August 21, 2001 through May 1, 2007 (BNSF-FSC 001421). ....................DA04664

Email from Alyson L. Dodgen to numerous recipients attaching draft BNSF News Release titled "BNSF Announces Expansion of Mileage-Based Fuel Surcharge Program," dated August 4, 2008 (BNSF-0783999) ....................DA04939

BNSF News Release titled, "BNSF Announces Expansion of Mileage Based Fuel Surcharge Program," dated August 5, 2008, marked as Exhibit 34 in the June 22, 2010 John Lanigan deposition. ....................DA04950

**Volume 23 of 29**

Excerpts from the Deposition Transcript of Fred Ehlers, dated June 22, 2011 ....................DA04951

Excerpts from the Deposition Transcript of Patrick Glennon, dated July 20, 2010 ....................DA04957

Excerpts from the Deposition Transcript of David Goode, dated January 13, 2011 ....................DA04984

Excerpts from the Deposition Transcript of Wick Moorman, dated January 7, 2011 .......DA04996

Excerpts from the Deposition Transcript of Donald Seale, dated February 26, 2010 .......DA05008

Excerpts from the Deposition Transcript of Kathleen Smith, dated June 22, 2011...........DA05067

Email from Don Seale to Ike Prillaman, dated April 22, 2003 (NS 001000004) .............DA05087

Letter from Don Seale to Ike Prillaman, dated July 23, 2003 (NS 001000024)................DA05095

Email from Pat Glennon to numerous recipients, dated November 4, 2003
(NS 001000054)........................................................................................DA05125

Email from David Lawson to numerous recipients, dated November 4, 2003
(NS 001000100)........................................................................................DA05171

Email from Thomas Brugman to numerous recipients, dated November 4, 2003
(NS 001000106)........................................................................................DA05177

Email from David Julian to numerous recipients, dated November 5, 2003
(NS 001000109)........................................................................................DA05280

Email from Joe Osborne to numerous recipients, dated November 6, 2003
(NS 001000112)........................................................................................DA05183

Email from David Julian to numerous recipients, dated November 7, 2003
(NS 001000115)........................................................................................DA05186

Email from Don Seale to numerous recipients, dated January 8, 2004
(NS 001000124)........................................................................................DA05190

Document titled "Norfolk Southern To Adjust Fuel Surcharge", dated April 24, 2006
(NS 001000130)........................................................................................DA05191

Email from Pat Glennon to George A. Aspatore and Alby Pfeifer, dated April 25, 2006
(NS 001000146)........................................................................................DA05192

Email from Pat Glennon to numerous recipients, dated March 28, 2003
(NS 001000181)........................................................................................DA05196

Email from Pat Glennon to numerous recipients, dated April 1, 2003
(NS 001000190)........................................................................................DA05202

Email from Pat Glennon to numerous recipients, dated March 24, 2003
(NS 001000215)........................................................................................DA05204

Email from Don Seale to John Lanigan, dated March 27, 2003, which Plaintiffs
filed on March 18, 2010 as Exhibit 216 to the Declaration of Sami H. Rashid,
ECF No. 337 (NS 001000225)...................................................................DA05209

Email from Don Seale to Ike Prillaman, dated May 9, 2003 (NS 001000354) ................DA05210

Email from Doug McNeil to numerous recipients, dated June 30, 2003 (NS 001000360)................................................................................DA05213

Email from David Lawson to numerous recipients, dated June 30, 2003 (NS 001000366)................................................................................DA05216

Email from David Lawson to Don Seale, dated April 18, 2006 (NS 001001159) ............DA05220

Amendment No. 3 to Contract REG-NS-C-17281 by and between Olin Corporation and Norfolk Southern Railway Company, dated January 20, 2006 (NS_003007266)................................................................................DA05234

Amendment No. 10 to Contract REG-SOU-C-0552 by and between Olin Corporation and Norfolk Southern Railway Company, dated April 11, 2006 (NS_003022311)................................................................................DA05240

Appendix A to Master Transportation Contract REG-NS-C-18893, dated Sept. 29, 2003 (NS_003023643)..........................................................DA05246

Amendment No. 1 to Contract DER-NS-C-16468 by and between AK Steel Corporation and Norfolk Southern Railway Company, dated Aug. 8, 2005 (NS_003040803)................................................................................DA05258

Document titled "Transportation Contract", dated January 28, 2004 (NS_003041695)................................................................................DA05274

**<u>Volume 24 of 29</u>**

Document titled "Annual Report 2004", dated February 28, 2005 (NS_003041978)................................................................................DA05280

**<u>Volume 25 of 29</u>**

Amendment No. 3 to Appendix A to Contract REG-NS-C-17052 by and between Cargill, Incorporated and Norfolk Southern Railway Company, dated June 21, 2004 (NS_003043235)................................................................................DA05406

Transportation Contract NS-9168 Amendment Number 2 between Norfolk Southern Railway Company and Ameren Energy Fuels and Services Company, dated October 23, 2006 (NS_003043294)......................................................DA05412

Master Transportation Contract NS-18862 by and between General Motors Corporation and Norfolk Southern Railway Company, dated June 24, 2003 (NS_003043940)................................................................................DA05432

Transportation Contract by and between Norfolk Southern Railway Company and CONSOL Energy Sales Company, CONSOL Pennsylvania Coal Company, LLC, Consolidation Coal Company, and Eighty-Four Mining Company, dated December 31, 2007 (NS_003047271) .......... DA05454

Amendment No. 1 to Appendix A to Master Transportation Contract DER-NS-C-19119 between Domino Foods, Inc. and Norfolk Southern Railway Company, dated January 10, 2007 (NS_003050307) .......... DA05469

Email from Pat Glennon to numerous recipients, dated December 15, 2003 (NS_006000472) .......... DA05477

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated December 19, 2003 (NS_006000475) .......... DA05480

Email from Pat Glennon to numerous recipients, dated February 14, 2006 (NS_007000743) .......... DA05482

Memo from Pat Glennon to David Lawson, dated February 12, 2006 (NS_007000744) .......... DA05483

Spreadsheet titled "Summary FSC Rebase Analysis - IP Revenue Shift to Base Rates", dated February 14, 2006 (NS_007000747) .......... DA05486

Spreadsheet titled "RR FSC Formulas - Historical Comparison", dated February 14, 2006 (NS_007000748) .......... DA05494

Email from Pat Glennon to numerous recipients, dated March 10, 2006 (NS_007000775) .......... DA05498

Spreadsheet titled "Summary FSC Rebase Analysis - IP Revenue Shift to Base Rates", dated March 10, 2006 (NS_007000777) .......... DA05500

Memo from Pat Glennon to David Lawson, dated February 12, 2006 (NS_007000778) .......... DA05515

Email from David Lawson to numerous recipients, dated June 30, 2003 (NS_008003734) .......... DA05518

Email from David Good to numerous recipients, dated May 17, 2003 (NS_008003738) .......... DA05520

Email from David Good to numerous recipients, dated May 17, 2003 (NS_008003738) .......... DA05522

Memo titled "International Paper National Contract Review and Extension", dated February 24, 3003 (NS_008003739) .......... DA05523

Email from Mike Salvino to David Good and Larry Rasche, dated May 14, 2003 (NS_008003741)....DA05525

Email from Don Seale to numerous recipients, dated December 23, 2003 (NS_008003830)....DA05527

Email from Doug McNeil to numerous recipients, dated September 26, 2000 (NS_008005296)....DA05529

Document titled "Fuel Surcharge Addendum to Transportation Contracts", dated September 26, 2000 (NS_008005297)....DA05530

Document titled "Fuel Surcharge Frequently Asked Questions", dated September 26, 2000 (NS_008005299)....DA05532

Spreadsheet titled "West Texas Intermediate Crude Oil Prices 1995-2000", dated September 26, 2006 (NS_008005302)....DA05535

Spreadsheet titled "NS Diesel Fuel Price 1995-2000", dated September 26, 2006 (NS_008005312)....DA05545

Email from Kathleen Smith to David Lawson, dated December 12, 2000 (NS_008005617)....DA05555

Email from Chris R. Neikirk to Charlie Brenner, dated May 14, 2003 (NS_009000074)....DA05557

"Email from Charlie Brenner to numerous recipients, dated April 11, 2005 (NS_009004585)....DA05563

Email from Tom Bayrer to Tom Bayrer, dated January 23, 2007 (NS_010000519)....DA05565

Document titled "image001.jpg", dated January 23, 2007 (NS_010000521)....DA05567

Email from Tom Bayrer to numerous recipients, dated January 19, 2007 (NS_010000522)....DA05568

Document titled "image001.jpg", dated January 19, 2007 (NS_010000523)....DA05569

Email from Thomas Bayrer to Coal Marketing, dated Oct. 13, 2000 (NS_010002508)....DA05570

Email from Connie Vaughn to Thomas Bayrer, dated June 12, 2000 (NS_010002778)....DA05572

Email from Corporate Communications Department to All NS Employee Outlook Users, dated March 16, 2007 (NS_010002959)....DA05573

Email from Pat Glennon to numerous recipients, dated April 29, 2003 (NS_010004393)....DA05574

Email from Pat Glennon to numerous recipients, dated January 8, 2004 (NS_010006317)"....DA05576

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated January 8, 2004 (NS_010006320)....DA05579

Memo from Marketing Services to Merchandise Marketing Commodity Teams, dated March 1, 2004 (NS_010006321)....DA05581

Document titled "Fuel Surcharge Issues and Answers", dated March 1, 2004 (NS_010006322)....DA05582

Email from Tom Bayrer to Danny D. Smith, dated April 20, 2004 (NS_010007409)....DA05585

Email from Dianne Youngblood to Sales Houston, dated August 2, 2006 (NS_010013168)....DA05586

Spreadsheet titled "Combined Pre-Registration NITL-IANA-TIA", dated August 2, 2006 (NS_010013169)....DA05587

Spreadsheet titled "Dinner Guest List Combined Groups", dated August 2, 2006 (NS_010013170)....DA05607

Email from Bob Ingram to numerous recipients, dated April 22, 2000 (NS_010013327) DA05612

Email from Bob Scharpf to numerous recipients, dated May 11, 2000 (NS_010013407)....DA05613

Document titled "9255 Note Number 6766", dated May 11, 2000 (NS_010013408)....DA05614

Email from Thomas Brugman to Pam Lemon, dated May 1, 2000 (NS_010013425)....DA05615

Email from Bob Scharpf to numerous recipients, dated May 24, 2000 (NS_010013467)....DA05617

Email from Bob Scharpf to numerous recipients, dated May 19, 2000 (NS_010013506)....DA05618

Email from Thomas Brugman to numerous recipients, dated June 12, 2000 (NS_010013728)....DA05619

Email from Thomas Brugman to numerous recipients, dated June 9, 2000 (NS_010013754)....DA05621

Email from Charlie Brenner to numerous recipients, dated June 16, 2000 (NS_010013960)" ........ DA05623

Email from Bob Scharpf to numerous recipients, dated March 31, 2000 (NS_010014193) ........ DA05624

Document titled "9255 Note Number 6766", dated March 31, 2000 (NS_010014194) ........ DA05625

Email from Cheryl Manning to numerous recipients, dated January 25, 2000 (NS_010014198) ........ DA05626

Email from Walt Trollinger to numerous recipients, dated January 31, 2000 (NS_010014210) ........ DA05268

Document titled "Fuel Surcharge Implementation Plan", dated January 31, 2000 (NS_010014211) ........ DA05629

Spreadsheet titled "Worksheet to Gauge the Impact of Increases and Decreases in Fuel Costs Based on 1999 Appendix A - Unit Costs", dated January 31, 2000 (NS_010014212) ........ DA05630

Email from Thomas Brugman to Brady Anderson, dated February 24, 2000 (NS_010014249) ........ DA05633

Email from Thomas Brugman to numerous recipients, dated February 16, 2000 (NS_010014264) ........ DA05638

Email from Joe Osborne to Don Seale, dated August 15, 2003 (NS_010032969) ........ DA05641

Spreadsheet titled "Merchandise Traffic 2003 and 2004 Estimated Fuel Surcharge", dated August 15, 2003 (NS_010032971) ........ DA05643

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated August 15, 2003 (NS_010032972) ........ DA05645

Email from Pat Glennon to Don Seale and Alby Pfeifer, dated Oct. 31, 2003 (NS_010033375) ........ DA05647

Email from Pat Glennon to Don Seale, dated November 9, 2003 (NS_010033391) ........ DA05648

Email from Jim Schaaf to Don Seale, dated November 10, 2003 (NS_010033400) ........ DA05653

Email from Pat Glennon to Don Seale and Charlie Brenner, dated December 19, 2003 (NS_010033544) ........ DA05655

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated December 19, 2003 (NS_010033545) ........ DA05656

Email from Don Seale to Joe Osborne, dated March 11, 2004 (NS_010034040)............DA05658

Email from Don Seale to Ike Prillaman, dated July 11, 2004 (NS_010034768)..............DA05661

Spreadsheet titled "Coal Business Group Contracts w/RCAF-U & Fuel Surcharge", dated July 8, 2004 (NS_010034769) ..................................................................DA05662

Email from Thomas Brugman to Don Seale, dated July 12, 2004 (NS_010034794)........DA05664

Email from Don Seale to Joe Osborne, dated August 25, 2004 (NS_010034800)...........DA05666

Email from Joe Osborne to Don Seale, dated August 25, 2004 (NS_010035215)...........DA05667

Email from Don Seale to Ike Prillaman, dated May 9, 2003 (NS_010042309) ...............DA05670

Email from Don Seale to numerous recipients, dated August 4, 2003 (NS_010042559)........................................................................................DA05673

Email from Don Seale to numerous recipients, dated September 25, 2003 (NS_010042677)........................................................................................DA05676

Spreadsheet titled "West Texas Intermediate Crude Oil Price", dated September 25, 2003 (NS_010042678)................................................................DA05677

Email from Don Seale to Ike Prillaman, dated August 27, 2004 (NS_010043506)..........DA05698

Email from Don Seale to numerous recipients, dated April 2, 2005 (NS_010044860) ....DA05699

Chart titled "WTI Crude Oil - Daily Posted Price", dated April 2, 2005 (NS_010044863)........................................................................................DA05702

Chart titled "WTI Crude Oil - Daily Posted Price in 12 previous months", dated April 2, 2005 (NS_010044864)................................................................DA05703

Email from Don Seale to David Julian, dated November 23, 2004 (NS_010047793)........................................................................................DA05704

Email from Pat Glennon to Matthew Bailey, dated April 4, 2005 (NS_010049084)........................................................................................DA05705

Handwritten notes re FSC rebase scenarios, dated April 4, 2005 (NS_010049085)........................................................................................DA05706

Email from Pat Glennon to numerous recipients, dated May 7, 2006 (NS_010054381)........................................................................................DA05707

Email from Charlie Brenner to numerous recipients, dated April 15, 2003 (NS_010058178)........................................................................................DA05709

Memo from Pat Glennon to Don Seale and Charlie Brenner, dated April 7, 2003 (NS_010058179)....DA05710

Spreadsheet comparing NS and CSXT FSC rates and revenues, dated April 15, 2003 (NS_010058184)....DA05715

Email from Pat Glennon to numerous recipients, dated July 3, 2003 (NS_010059084)....DA05717

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated July 3, 2003 (NS_010059086) ....DA05719

Memo from Pat Glennon to Don Seale and Charlie Brenner, dated April 7, 2003 (NS_010059087)....DA05722

Email from Pat Glennon to numerous recipients, dated July 10, 2003 (NS_010059144)....DA05726

Report titled "Global Petroleum Monthly", dated June 2003 (NS_010059145)....DA05727

Email from Joe Osbourne to David Lawson, dated September 29, 2005 (NS_010065294)....DA05755

Spreadsheet titled "Chemical Shippers by 2004 Revenue and Major Contracts 2005", dated Sept. 29, 2005 (NS_010065296)....DA05757

Spreadsheet titled "Chemicals Group Authorities not NS billed without FSC Note Coverage as of Sept. 1, 2005", dated Sept. 29, 2005 (NS_010065296)....DA05759

Email from David Lawson to Joe Osbourne, dated September 28, 2006 (NS_010069291)....DA05762

Email from Pat Glennon to numerous recipients, dated March 26, 2003 (NS_010072625)....DA05765

Spreadsheet regarding fuel notes, carloads, and revenue, dated March 26, 2003 (NS_010072627)....DA05767

Email from Pat Glennon to Don Seale and Charlie Brenner, dated March 20, 2003 (NS_010072632)....DA05769

Email from Pat Glennon to numerous recipients, dated March 28, 2003 (NS_010072678)....DA05772

Letter regarding "Request for NS Concurrence: Effective June 1, 2003, CSXT Fuel Surcharge Is Modified To Be More Responsive To Market Conditions", dated March 28, 2003 (NS_010072680)....DA05774

CSXT Tariff CSXT 8100 Section XII-B Misc. Provisions, dated March 28, 2003 (NS_010072682)....DA05776

Email from Thomas Brugman to Pat Glennon, dated March 31, 2003 (NS_010072737)....DA05777

Email from David Julian to Pat Glennon, dated April 2, 2003 (NS_010072746)....DA05779

CSXT Tariff CSXT 8100 Section XII-B Misc. Provisions, dated March 28, 2003 (NS_010072748)....DA05781

CSXT Tariff CSXT 8100 Section XII-B Misc. Provisions, dated March 28, 2003 (NS_010072750)....DA05783

Email from NS Marketing to Pat Glennon, dated February 28, 2003 (NS_010072806)....DA05784

Email from Pat Glennon to Charlie Brenner, dated March 28, 2003 (NS_010072866)....DA05785

Email from Steve Marshall to Pat Glennon, dated June 3, 2003 (NS_010073009)....DA05786

Email from Pat Glennon to Don Seale, dated July 1, 2003 (NS_010073091)....DA05789

Document titled "The Railroad Week in Review", dated June 27, 2003 (NS_010073094)....DA05792

Email from Pat Glennon to numerous recipients, dated July 3, 2003 (NS_010073115)....DA05794

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated July 3, 2003 (NS_010073117)....DA05796

Memo from Pat Glennon to Don Seale and Charlie Brenner, dated April 7, 2003 (NS_010073118)....DA05799

Email from Pat Glennon to numerous recipients, dated January 8, 2004 (NS_010073840)....DA05803

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates, dated January 8, 2004 (NS_010073843)....DA05806

Memo from Marketing Services to Merchandise Marketing Commodity Teams, dated January 8, 2004 (NS_010073844)....DA05808

Memo titled "Fuel Surcharge Issues and Answers", dated January 8, 2004 (NS_010073845)....DA05809

Email from Pat Glennon to Thomas Brugman, dated March 5, 2004 (NS_010073971)....................DA05812

Email from Jim Schaaf to numerous recipients, dated March 24, 2003 (NS_010075732)....................DA05815

Press Release, "CSX Announces Modifications to its Fuel Cost Recovery Program", dated March 20, 2003 (NS_010075734)....................DA05817

Document titled "CSXT Modified Fuel Cost Recovery Program Index", dated March 24, 2003 (NS_010075736)....................DA05819

Email from Pat Glennon to Don Seale, dated April 7, 2003 (NS_010075745)....................DA05820

Memo from Pat Glennon to Don Seale and Charlie Brenner, dated April 7, 2003 (NS_010075746)....................DA05821

Spreadsheet comparing NS and CSXT FSC rates and revenues, dated April 17, 2003 (NS_010075750)....................DA05825

Email from Brad Yeatts to Alby Pfeifer and Warren Hackett, dated July 18, 2005 (NS_010101174)....................DA05827

Email from Charlie Brenner to numerous recipients, dated June 30, 2003 (NS_010126046)....................DA05843

Email from Joe Osborne to numerous recipients, dated November 6, 2003 (NS_010126889)....................DA05844

Email from Pat Glennon to Don Seale, dated November 7, 2003 (NS_010126905)....................DA05847

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated July 3, 2003 (NS_010126908)....................DA05850

Report titled "Global Petroleum Monthly", dated Oct. 2003 (NS_010126909)....................DA05852

Email from Pat Glennon to numerous recipients, dated July 3, 2003, forwarded November 4, 2003 (NS_010126938)....................DA05881

Spreadsheet comparing NS, CSXT, BNSF, and UP FSC rates and revenues, dated July 3, 2003 (NS_010126940)....................DA05883

Memo from Pat Glennon to Don Seale and Charlie Brenner, dated April 7, 2003 (NS_010126941)....................DA05886

Email from David Lawson to numerous recipients, dated July 19, 2004 (NS_010140571)....................DA05890

Email from Richard Kiley to Pat Simonic, dated June 27, 2005 (NS_010151313) ..........DA05892

Email from Danny Smith to Ron Listwak, dated January 15, 2004 (NS_010159457)..........DA05894

Email from James Wilson to Jim Schaaf, dated January 15, 2007 (NS_010212125)..........DA05895

Spreadsheet titled "US Steel FSC on NS Metals business", dated January 15, 2007 (NS_010212129)..........DA05899

Email from James Wilson to numerous recipients, dated Sept. 11, 2003 (NS_010214878)..........DA05901

Email from Joe Osborne to numerous recipients, dated April 22, 2004 (NS_010227036)..........DA05902

Email from Don Seale to Thomas Brugman, dated January 15, 2004 (NS_010240023)..........DA05903

Email from Don Seale to Thomas Brugman, dated March 18, 2004 (NS_010240025)..........DA05905

Email from Pat Simonic to Thomas Brugman and Ken Yopp, dated March 8, 2004 (NS_010240077)..........DA05906

Email from John Kraemer to David Lawson, dated Sept. 14, 2004 (NS_010259076)......DA05909

Email from Don Seale to Wick Moorman, dated May 3, 2007 (NS_011001461) ............DA05911

Email from David Lawson to John Kraemer, dated Sept. 25, 2006 (NS_013000001)......DA05913

Email from Don Seale to Brenda Quesenberry and attachments, dated September 26, 2003 and marked as Exhibit 18 to the deposition of John Lanigan taken on June 22, 2010 (NS_013005655) ..........DA05914

Email from Don Seale to Thomas Brugman, dated August 8, 2003 (NS_013005684)..........DA05933

Email from Don Seale to numerous recipients, dated January 8, 2004 (NS_015000902)..........DA05936

Email from Brenda Quesenberry to Bob Scharpf, dated May 15, 2000 (NS_018000167)..........DA05937

Email from Bob Scharpf to numerous recipients, dated May 31, 2000 (NS_018000170)..........DA05940

Spreadsheet titled "West Texas Intermediate Crude Oil Price", dated May 31, 2000 (NS_018000172)....DA05942

Letter to customers regarding 2% fuel surcharge, dated May 31, 2000 (NS_018000173)....DA05944

Email from Bob Scharpf to numerous recipients, dated September 12, 2000 (NS_024000022)....DA05945

Memo titled "Fuel Surcharge", dated September 12, 2000 (NS_024000023) ....DA05946

Email from Clyde McIntyre, Jr. to Bob Scharpf, dated May 19, 2000 (NS_024000028)....DA05947

Email from Stacia Minton to Stacia Minton, dated August 4, 2000 (NS_024000029)....DA05948

Spreadsheet titled "Merchandise Fuel Surcharge Tracking Report", dated August 4, 2000 (NS_024000030) ....DA05949

Spreadsheet titled "Merchandise Fuel Surcharge Tracking Report", dated August 4, 2000 (NS_024000031)....DA05951

Email from Stacia Minton to Stacia Minton, dated January 16, 2002 (NS_024000032) ..DA05974

Spreadsheet titled "Fuel Surcharge Tracking Report", dated January 16, 2002 (NS_024000033)....DA05975

Email from Bob Scharpf to Pat Lewis, dated May 17, 2000 (NS_024000047) ....DA05980

Spreadsheet titled "Fuel Surcharge Input Sheet", dated May 17, 2000 (NS_024000051)....DA05984

Email from Bob Scharpf to numerous recipients, dated September 8, 2000 (NS_024000060)....DA05986

Spreadsheet titled "Merchandise Fuel Surcharge Tracking Report", dated September 8, 2000 (NS_024000061)....DA05987

Spreadsheet titled "Coal Fuel Surcharge Tracking Report", dated September 8, 2000 (NS_024000062)....DA05991

**Volume 26 of 29**

Email from Bob Scharpf to Jim Nash, dated September 25, 2000 (NS_024000085) ....DA06013

Letter to customers regarding fuel surcharge increase, dated November29, 2000 (NS_024000087)....DA06015

Spreadsheet titled "Fuel Authorities", dated September 25, 2009 (NS_024000088)........DA06016

Email from Charlie Brenner to Pat Glennon, dated August 15, 2001 (NS_026000150)........DA06034

Email from Bob Scharpf to Brenda Quesenberry, dated October 9, 2000 (NS_026001110)........DA06035

Letter from Clyde McIntyre, Jr. to Bob Sharpf, dated October 9, 2000 (NS_026001111)........DA06036

Email from Bob Scharpf to Brenda Quesenberry, dated December 1, 2000 (NS_026001141)........DA06037

Email from Pat Glennon to Brenda Quesenberry, dated August 7, 2001 (NS_026001162)........DA06038

Email from Brenda Quesenberrry to John Gray, dated June 7, 2001 (NS_026002023)........DA06039

Draft Minutes from NS-UP Alliance Meeting, dated June 4, 2001 (NS_026002024)........DA06040

Email from Alby Pfeifer to Marketing, Sales & Coal, dated March 23, 2003 (NS_057000620)........DA06043

Document titled "Application of 4% Fuel Surcharge", undated (NS_058001055)........DA06044

Email from Pat Glennon to Don Seale, dated October 11, 2002 (NS_058001207)........DA06046

Email from Pat Glennon to numerous recipients, dated April 1, 2003 (NS_058001240)........DA06048

Email from D.V. Corcoran to numerous recipients, dated Sept. 27, 2000 (NS_060000199)........DA06050

Spreadsheet titled "Metals West GRAB Report", dated Step. 27, 2000 (NS_060000201)........DA06052

Email from Chris Luebbers to Jeffrey Heller, dated June 20, 2006 (NS_062109993)........DA06068

Amendment No. 16 to Contract REG-NS-C-13496 by and between Central States Enterprises, Inc. and Norfolk Southern Railway Company, dated December 18, 2002 (NS_003004259)........DA06072

Email from Katie N. Fletcher to Gary Burchette, dated May 8, 2003 (NS_010058333)........DA06087

Document titled "NS Conditions of Carriage #1-E Cancels NS Conditions of Carriage #1-D", dated May 8, 2003 (NS_010058334) ........................................ DA06088

Transportation Contract REG-NS-C-#, dated May 8, 2003 (NS_010058353) ................. DA06107

Spreadsheet titled "Appendix H Summary Sheet Woodpulp", dated May 8, 2003 (NS_010058358) ........................................ DA06112

Spreadsheet titled "Appendix H Rail Shipment Data: Bowater Catawba (2002 and Q1 2003)", dated May 8, 2003 (NS_010058359) ................................ DA06113

Spreadsheet titled "Appendix J Rail Shipment Data: Nuway Benton Harbor (2002 and Q1 2003)", dated May 8, 2003(NS_010058360) ................................ DA06115

Spreadsheet titled "Appendix K Bowater Transit & Variability Comparison 2002 vs. 2001", dated May 8, 2003 (NS_010058361) ........................................ DA06125

Spreadsheet titled "Appendix M Bowater Equipment Standardization Proposal", dated May 8, 2003 (NS_010058362) ........................................ DA06127

Email from Richard Kiley to Scott McGregor, dated December 3, 2004 (NS_010078945) ........................................ DA06128

Document titled "NS Conditions of Carriage #1-E Cancels NS Conditions of Carriage #1-D", dated December 3, 2004 (NS_010078946) ................................ DA06129

Document titled "Reissue of NS Conditions of Carriage 1-D to 1-E", dated December 3, 2004 (NS_010078966) ........................................ DA06149

Email from Greg Harkey to numerous recipients, dated June 11, 2003 (NS_010125879) ........................................ DA06152

Spreadsheet titled "Aggregates Traffic, by year", dated June 11, 2003 (NS_010125880) ........................................ DA06153

Spreadsheet titled "2001 Aggregates by month", dated June 11, 2003 (NS_010125881) ........................................ DA06156

Spreadsheet titled "2001 Aggregates, 48 States, by modes", dated June 11, 2003 (NS_010125882) ........................................ DA06159

Document titled "Construction Business Review", dated June 11, 2003 (NS_010125883) ........................................ DA06161

Document titled "Metals Business Review", dated June 11, 2003 (NS_010125899) ........................................ DA06177

Excerpts from the Corrected Expert Report of Gordon Rausser, Ph.D., dated May 27, 2010 ........................................ DA06194

Excerpts from the Expert Report of Gordon Rausser, Ph.D., dated October 15, 2012 ........ DA06202

Excerpts from the Expert Reply Report of Gordon Rausser, Ph.D., dated June 12, 2013........ DA06269

Excerpts from the Supplemental Reply Expert Report of Gordon Rausser, Ph.D., dated May 28, 2014........ DA06278

Excerpts from Plaintiffs' First Amended Consolidated Objections and Responses to Defendants' Joint First Requests for Admissions, dated February 8, 2011........ DA06292

Excerpts from Plaintiffs' Second Amended Consolidated Objections and Responses to Defendants' Joint First Requests for Admissions, dated May 11, 2011........ DA06363

Excerpts from Plaintiffs' Second Amended Consolidated Objections and Responses to Defendants' First Set of Interrogatories, dated May 11, 2011........ DA06369

Excerpts from Plaintiffs' Supplemental Consolidated Objections and Responses to Defendants' First Set of Interrogatories, dated January 4, 2012........ DA06397

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated June 3, 2010........ DA06412

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated December 11, 2012 ........ DA06423

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated December 18, 2012 ........ DA06436

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated March 4, 2014 ........ DA06450

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated March 5, 2014 ........ DA06466

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated July 31, 2014 ........ DA06471

Excerpts from the Deposition Transcript of Olin 30(b)(6) witness Michael Gilley, dated October 1, 2010........ DA06494

Excerpts from the Deposition Transcript of Olin 30(b)(6) witness Windy Hames, dated May 11, 2011........ DA06502

Excerpts from the Deposition Transcript of Dr. Howard Kaplan, dated March 10, 2010 ........ DA06506

Excerpts from the Deposition Transcript of Dust Pro, Inc. 30(b)(6) witness Louis Snow, dated June 4, 2010 ........ DA06511

Excerpts from the Deposition Transcript of Strates Shows, Inc. 30(b)(6) witness E. Jay Strates, dated April 16, 2010 ........ DA06516

**Volume 27 of 29**

NS Price Authority NSSC 80657, effective August 1, 2002 (DON008730) ........ DA06520

Email from Michael Donnelly to Kevin Donnelly, dated July 3, 2003 (DON025125) ........ DA06523

Email from Michael Donnelly to Kevin Donnelly, dated July 30, 2003 (DON025128) ........ DA06526

UP Detail Freight Bill for Dust Pro Inc., dated July 21, 2003 (Snow Deposition Ex. 2) ........ DA06529

Email from Wesley Smith to Jack Huh, dated November 22, 2002 (OLI053134) ........ DA06562

Email from Bill Southworth to Jack Huh, dated April 25, 2003 (OLI055357) ........ DA06565

Fax from L. G. Ferris to Jack Huh (including attached Contract NS 18492), dated April 11, 2002 (OLI056283) ........ DA06569

Fax from L. G. Ferris to Jack Huh (including attached Amendment No. 9 to NS 14100), dated April 11, 2002 (OLI056324) ........ DA06575

Presentation, "CSX Transportation & Olin Chlor Alkali Products," dated February 24, 2004 (OLI059186) ........ DA06580

Email from Alan Julian to Steve Bahn, dated August 16, 2004 (OLI059488) ........ DA06597

Fax from L. G. Ferris to Jack Huh (including attached Amendment No. 52 to REG-SOU-C-0541), dated July 30, 2001 (OLI059683) ........ DA06598

CSX Price Lists Under Price Authority 43158.1, dated May 10, 2001 (OLI060351) ........ DA06620

Railroad Transportation Contract CSXT-C-82971, effective June 1, 2004 (OLI061119) ........ DA06627

Letter from Jean-Jacques Ruest to Jack Huh, dated January 14, 2002 (OLI061298) ........ DA06641

Fax from Diane Miller to Jack Huh (including attached Amendment No. 3 to Contract CPRS-125964), dated June 12, 2001 (OLI061370) ........ DA06650

Letter from James Foote to Jack Huh, dated September 18, 2002 (OLI062303) ........ DA06654

Fax from L. G. Ferris to Jack Huh (including attached Amendment No. 1 to Contract NS 17996) (OLI062460) ........ DA06656

Amendment No. 4 to Contract REG-NS-C-17996, effective July 1, 2004 (OLI062475) ........ DA06666

Fax from L. G. Ferris to Stephen Bahn (including attached Amendment No. 3 to Contract REG-NS-C-17281), dated July 25, 2006 (OLI063191) ........ DA06670

Amendment No. 10 to Contract REG-SOU-C-0552 (OLI063209) ........ DA06675

Letter from Jody J. Guillory to L&B Customers, dated January 2, 2003 (OLI063290) ........ DA06679

Email from Kirk Steely to Steve Bahn, dated August 8, 2006 (OLI087997) ........ DA06680

Presentation, "Chlor Alkali Division Logistics: Understanding Fuel Surcharges" (OLI087998) ........ DA06681

Email from Doug Lecomte to numerous recipients, dated January 6, 2003 (OLI099274) ........ DA06695

Email from Amanda Davis to Tom Rice, dated July 6, 2006 (OLI099512, Davis Deposition Ex. 9) ........ DA06696

Email from Rosa Henson to numerous recipients, dated April 4, 2003 (OLI132017) ........ DA06697

Memorandum, "Slay Transportation Co., Inc. And Olin Clor Alkali Products Fuel Surcharge Bulk Truck Guidelines," effective October 4, 1999 (OLI139773) ........ DA06698

Email from Amanda Davis to Marvin Osborne and Chris Cusick, dated May 4, 2007 (OLI140905) ........ DA06699

Email from Steve Bahn to numerous recipients, dated April 22, 2004 (OLI161720) ........ DA06700

Fax from Robert Emerson (Canadian Pacific Railway) to Bill Alford (Strates Shows Inc.), dated May 30, 2002 (STR000061) ........ DA06702

Fax from Andrew Lloyd (Canadian Pacific Railway) to Bill Alford and Kimberly Taylor (Strates Shows, Inc.), dated July 11, 2005 (STR000071) ........ DA06705

Strates Shows, Inc. Carnival Movement Contract with CSX Transportation, dated April 25, 2003 (STR001283) ........ DA06719

Strates Shows, Inc. Carnival Movement Contract with CSX Transportation, dated May 15, 2005 (STR001296) .......... DA06732

Amendment No. 1 to Contract CSXT 83477 (STR001334) .......... DA06744

Amendment No. 2 to Contract CSXT 83477 (STR001337) .......... DA06747

Amendment No. 3 to Contract CSXT 93477 (STR001351) .......... DA06761

Fax from L. G. Ferris to William Alford (including attached Contract NS-C-18367), | dated August 28, 2001 (STR001405) .......... DA06763

Fax from L.G. Ferris to William Alford (including attached Amendment No. 2 to REG-NS-C-18367), dated November 7, 2002 (STR001413) .......... DA06771

Fax from L. G. Ferris to William Alford (including attached Amendment No. 1 to REG-NS-C-18367), dated May 7, 2003 (STR001421) .......... DA06779

Fax from L. G. Ferris to William Alford (including attached Amendment No. 1 to REG-NS-C-18367), dated February 3, 2004 (STR001429) .......... DA06787

Fax from L. G. Ferris to William Alford (including attached Contract REG-NS-C-19084-A), dated August 15, 2005 (STR001436) .......... DA06794

UP Detail Freight Bill for US Magnesium, LLC, dated February 7, 2003 (Kaplan Deposition Ex. 3) .......... DA06802

Email from John Gutkowski to numerous recipients, dated March 11, 2005 (USM006753) .......... DA06816

**Volume 28 of 29**

Excerpts from Class Cert. Hearing, October 6-7, 2010 .......... DA06819

Excerpts from ECF No. 534, Memorandum Opinion regarding Defendants' Motion to Compel Answers to Defendants' Interrogatories and Requests for Admissions, dated November 17, 2011 .......... DA06823

Excerpt from Canadian National Railway Company 2005 Annual Report .......... DA06836

Excerpt from Canadian Pacific Railway 2006 Annual Report .......... DA06838

Pacer Stacktrain Electronic Bulletin No. 491, dated April 26, 2004 .......... DA06840

Statement of John B. Ficker, NITL President, Hr'g before Senate Surface Transp. Subcomm., dated June 21, 2006 .......... DA06842

Excerpts from Plaintiffs' Memorandum In Support of Motion for Class Certification, dated March 18, 2010, ECF 337 .......... DA06850

Excerpts from Opinion, dated February 19, 2021, ECF 1008 ........................................DA06858

Page, William, Communication and Concerted Action,
38 Loy. U. Chi, L.J. 405, 414 (2007)........................................................................DA06864

Email from Cookie Gadson to Janice McNeal and others, dated February 28, 2003
(KCS-QE-000001-29)..........................................................................................DA06866

U.S. Dep't of Transp. Inspector General, Quality of Service Provided to Rail Shippers,
Report No. CR-2011-045, at 11 (February 15, 2011) ........................................DA06895

U.S. Dep't of Agriculture Agricultural Marketing Serv., Study of Rural Transportation
Issues 332 (April 2010)..........................................................................................DA06897

Congressional Budget Office, Freight Rail Transportation: A Review of the 2004
Experience 2 (May 2005)........................................................................................DA06899

Fed. Highway Admin., U.S. Dep't of Transp., Financing Freight Improvements 4
(January 2007) ........................................................................................................DA06904

Memorandum from C. Adams to Jack Koraleski and others, dated September 29, 2000
(UPFSC 0355353-67) ..............................................................................................DA06910

Email from John Couch to numerous recipients, dated March 19, 2003
(CSXFSC000153146)..............................................................................................DA06915

Presentation titled "CSX Intermodal Fuel Surcharge Review," dated June 2004
(CSXFSC000065811)..............................................................................................DA06916

Email from Dwight Price to John Couch, dated June 20, 2005, attaching presentation
"Shaping the Future at CSX: Midyear Review, Second Half Outlook and Future
Strategies," dated June 1, 2005 (CSXFSC000042128) .......................................DA06925

STB Ex Parte No. 661, Written Statement of CSX Transportation,
dated April 27, 2006 ..............................................................................................DA07058

Email from Clyde McIntyre to numerous recipients, "CSXT Fuel Cost Recovery Charge
Change to 4%, dated March 17, 2003," attaching Customer Alert, "CSXT Fuel
Surcharge Changes from 2% to 4% March 20th Due to Higher Cost,"
(CSXFSC129100)....................................................................................................DA07078

Email from Dan Murphy to Clyde McIntyre, dated March 19, 2003, attaching press
release "CSXT Fuel Cost Recovery Remains at 2%"
(CSXFSC000129365)..............................................................................................DA07080

Excerpts from the Deposition Transcript of Paul Anderson, 30(b)(6) witness for
Defendant BNSF, dated May 26, 2011. ..................................................................DA07082

**Volume 29 of 29**


Email from James A. Arnett to Harry W. Bognich and Nannette Samuelson, dated December 10, 2002 (BNSF-0027020). ....DA07104

Email from Denis J. Smith to numerous recipients, dated March 14, 2003 (BNSF-0027288-89) ....DA07107

Annual Report of BNSF Railway for the period ending in December 31, 2000 (BNSF 2000 Form 10-K). ....DA07109

Quarterly Report of Burlington Northern Santa Fe Corporation for the quarterly period ending March 31, 2001 (BNSF 2001 Form 10-Q) ....DA07152

Annual Report of BNSF Railway for the period ending on December 31, 2002 (BNSF 2002 Form 10-K). ....DA07169

Annual Report of BNSF Railway for the period ending on December 31, 2003 (BNSF 2003 Form 10-K). ....DA07234

Excerpt from the Expert Reply Report of Gordon Rausser, Ph.D., dated June 12, 2013. ....DA07319

Declaration of George T. Duggan filed in support of Defendants Opposition to Plaintiffs' Motion for Class Certification, dated June 29, 2010, ECF No. 381. ....DA07323

Email from Thomas Brugman to Cheryl Manning, dated February 9, 2000 (NS_010014228) ....DA07332

Spreadsheet titled "Traffic Diversions" (NS_010014229) ....DA07333

Spreadsheet titled "General Merchandise Diversion Trend" (NS_010014230) ....DA07336

Email from Don Seale to Thomas Brugman, dated July 31, 2003 (NS_010032689) ....DA07338

Email from Don Seale to Thomas Brugman, dated August 8, 2003 (NS_010032710) ....DA07340

Email from Pat Glennon to numerous recipients, dated November 4, 2003 (NS_057005766) ....DA07343

Spreadsheet titled "NS CSXT FSC compare 1" (NS_057005769) ....DA07346

Document titled "Global Petroleum Monthly", dated October 2003 (NS_057005770) ....DA07348

Email from Pat Glennon to numerous recipients, dated July 3, 2003 (NS_057005799) ....DA07377

Spreadsheet titled "FSC comparison 1" (NS_057005802) ....DA07380

Memo from Don Seale to Pat Glennon, dated April 7, 2003 (NS_057005803)................DA07383

Email from Chris D. Luebbers to numerous recipients, dated April 2, 2002 (NS_062001315)..........DA07387

Spreadsheet titled "Fuel Calculations", dated August 8, 2002 (NS_062001316) .............DA07388

Email from Augie Eckhardt to Robert Randolph and Greg Friede, dated November 16, 2006 (NS_062021033)..........DA07389

Email from Jeffrey Heller to Jim Bolander, dated Mar. 7, 2000 (NS_062194935) ..........DA07391

Document titled "Norfolk Southern Intermodal News", dated March 7, 2000 (NS_062194936)..........DA07392

Email from Steve S. Stasulis to numerous recipients, dated November 15, 2005 (NS_062171919)..........DA07393

Document titled "Fuel Surcharge Internal 11-14-2005", dated November 14, 2005 (NS_062171920)..........DA07394

Document titled "International FSC Application 11-14-2005", dated November 14, 2005 (NS_062171921)..........DA07395

Excerpts from the Expert Report of Gordon Rausser, Ph.D., dated May 27, 2010. ..........DA07416

Excerpts from Plaintiffs' Consolidated Objections and Responses to Defendants' First Set of Interrogatories, dated November 30, 2010..........DA07435

Excerpts from Plaintiffs' First Amended Consolidated Objections and Responses to Defendants' First Set of Interrogatories, dated February 8, 2011..........DA07442

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated September 24, 2010 ..........DA07504

Excerpts from the Deposition Transcript of Olin 30(b)(6) witness Michael Gilley, dated May 5, 2010..........DA07512

Email from Doug Lecomte to numerous recipients, dated February 18, 2003, attaching ""Chlorine Re-seal letter" and "Surcharge letter" (OLI092020) ..........DA07524

Excerpts from the Deposition Transcript of Amanda Davis, dated July 8, 2010 .............DA07528

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated June 3, 2010..........DA07536

Excerpts from the Deposition Transcript of Gordon Rausser, Ph.D., dated July 31, 2014 ..........DA07547

Email from Andrew Crowe to Jeffrey Heller, dated May 15, 2006 (NS_062102120)......DA07561

Document titled “Norfolk Southern Intermodal Fuel Surcharge Scale”, dated May 15, 2006 (NS_062102122) ....................DA07563

Email from Will Santangelo to numerous recipients, dated November 13, 2003 (NS_037031059)....................DA07564

Document titled “Customers With Large Fuel Surcharge Balances”, dated October 31, 2003 (NS_037031060)....................DA07565

Document titled “Fuel Surcharge Tracking Report”, dated October 31, 2003 (NS_037031062)....................DA07567

Email from Kimberly Thompson to Mike McClellan, dated November 4, 2002 (NS_036014716)....................DA07572

Document titled "Fuel Comparison", dated November 4, 2002 (NS_036014717) ...........DA07573

Excerpts from the Deposition of Richard Davidson, dated February 24, 2011.................DA07578

# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

## Volume 1 of 29

## DA00001 - DA00712

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

**NATURE OF THE ACTION**

1. This is an antitrust class action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action on behalf of themselves and a proposed class of direct purchasers who purchased unregulated rail freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the "Class Period") and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together, "Defendants") conspired to use rail fuel surcharges, which were added to

then conspired to take collective action at the AAR to remove this obstacle. These four defendant railroads control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

9. In the Fall of 2003 at meetings of the AAR, Defendants BNSF, UP, CSX and NS conspired to cause the AAR to develop and publish a new cost escalation index with fuel removed. Pursuant to the agreement and collective action of BNSF, UP, CSX and NS, the AAR in December 2003 announced the establishment of the new cost escalation index, called the All Inclusive Index Less Fuel ("AIILF"). The AAR's official publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying removal of fuel from the AII and RCAF, was the collective action of BNSF, UP, CSX and NS. A senior officer of defendant BNSF, for example, admitted in 2004 that Matthew K. Rose, BNSF's Chairman, President and CEO "led the charge on" the AAR's 2003 adoption of the new index without fuel.

10. Never before in its history had the AAR created a cost escalation index without a fuel cost component. As UP's James R. Young acknowledged in a July 2007 interview, the new Rail Fuel Surcharges as applied to rail freight were "really unique to the railroad industry. Three, four years ago they were really non-existent."

11. The collective action by BNSF, UP, CSX and NS in December 2003 allowed the Defendants to apply the new, separate and artificially high Rail Fuel Surcharges broadly to their customers, since fuel would no longer automatically be covered by standard rate escalation

new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

65. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

66. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF) – that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

Dated: April 15, 2008

| | |
|---|---|
| By: /s/ Stephen Neuwirth<br>Stephen Neuwirth<br>Daniel Brockett<br>Sami H. Rashid<br>QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>(212) 849-7000 | By: /s/ Michael D. Hausfeld<br>Michael D. Hausfeld (D.C. Bar #153742)<br>Benjamin D. Brown (D.C. Bar #495836)<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>1100 New York Avenue NW<br>Suite 500, West Tower<br>Washington, DC 20005<br>(202) 408-4600<br><br>Steig D. Olson<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>150 E. 52nd Street, 30th Floor<br>New York, NY 10022<br>(212) 838-7797 |
| *Interim Co-Lead Class Counsel for the Proposed Direct Purchaser Class* | |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF)<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

**NATURE OF THE ACTION**

1. This is an antitrust class action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action on behalf of themselves and a proposed class of direct purchasers who purchased unregulated rail freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the "Class Period") and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together, "Defendants") conspired to use rail fuel surcharges, which were added to

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 2 of 41

customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits during the four year period of the conspiracy.

3. In the early 2000s, the Defendants sought to increase their revenues by raising prices. However, unlike in the past era of full regulation of the railroad industry, when the railroads could have applied to the Interstate Commerce Commission (the "ICC") for across-the-board rate increases, the railroads now no longer could do so as a result of deregulation that began in the early 1980s with the Staggers Act. Given deregulation, the only practicable way the railroads now could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible.

4. Defendants BNSF, UP, CSX and NS – which together control about 90% of rail freight traffic in the United States – conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. But this plan faced a significant hurdle: as of 2003, the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII") which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF") which is based on the AII) already permitted full recovery by the railroads of actual fuel cost

increases, no matter how large. By weighting different cost factors, the AII and related RCAF accounted accurately for the impact of particular cost increases (e.g., for fuel). James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

5. To overcome this obstacle, Defendants BNSF, UP, CSX and NS devised and embarked on a scheme to remove fuel from the AII, so that a separate "fuel surcharge" could then be applied as a percentage against the total cost of the freight transportation. This permitted these major railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

6. The Defendants implemented their conspiracy through a number of collective actions.

7. In July 2003, the two major western railroads – Defendants BNSF and UP (together, the "Western Railroads") – agreed to implement the same fuel surcharge program, resulting in the exact same fuel surcharges. Up until this time, fuel surcharges had been applied only intermittently, and to the extent surcharges were used at all, the railroads had different fuel surcharge rates, reflecting (among other things) that each railroad had different fuel costs. In July 2003, however, BNSF and UP for the first time agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement, using the HDF Index, and continued to do so through at least mid-2007.

8. Even after BNSF and UP took this collective action, however, a major barrier to widespread use of the fuel surcharges – the existing cost escalation indexes (the RCAF and the AII on which it was based) – remained, as noted above. Defendants BNSF, UP, CSX and NS

then conspired to take collective action at the AAR to remove this obstacle. These four defendant railroads control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

9. In the Fall of 2003 at meetings of the AAR, Defendants BNSF, UP, CSX and NS conspired to cause the AAR to develop and publish a new cost escalation index with fuel removed. Pursuant to the agreement and collective action of BNSF, UP, CSX and NS, the AAR in December 2003 announced the establishment of the new cost escalation index, called the All Inclusive Index Less Fuel ("AIILF"). The AAR's official publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying removal of fuel from the AII and RCAF, was the collective action of BNSF, UP, CSX and NS. A senior officer of defendant BNSF, for example, admitted in 2004 that Matthew K. Rose, BNSF's Chairman, President and CEO "led the charge on" the AAR's 2003 adoption of the new index without fuel.

10. Never before in its history had the AAR created a cost escalation index without a fuel cost component. As UP's James R. Young acknowledged in a July 2007 interview, the new Rail Fuel Surcharges as applied to rail freight were "really unique to the railroad industry. Three, four years ago they were really non-existent."

11. The collective action by BNSF, UP, CSX and NS in December 2003 allowed the Defendants to apply the new, separate and artificially high Rail Fuel Surcharges broadly to their customers, since fuel would no longer automatically be covered by standard rate escalation

clauses. UP's Young admitted, during an October 2004 earnings call, that UP was now "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in areas that historically would have used RCAF." According to Young, by July 2007 approximately "eighty to ninety percent" of UP's business had "some kind of fuel surcharge mechanism that gets passed on to the customer."

12. Almost immediately following the collective action that led to the establishment of the "AIILF" price escalation index without fuel, and in furtherance of the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), which previously had different fuel surcharges, now announced that each would apply identical fuel surcharges based on the West Texas Intermediate (or "WTI") Index (which in early 2004 was at a higher rate than the HDF Index that the Western Railroads simultaneously started to use in July 2003). This announcement by the Eastern Railroads, coming on the heels of the collective action in late 2003 to remove fuel from the AII and RCAF, was the result of their conspiracy with the Western Railroads to impose artificially high Rail Fuel Surcharges in a coordinated fashion. The Eastern Railroads charged the exact same fuel surcharges, through at least mid-2007.

13. With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants BNSF, UP, CSX and NS now each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15 %, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by

Case 1:07-mc-00489-BAH Document 1070-2 Filed 01/11/22 Page 55 of 586

15 % – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

14. BNSF, UP, CSX and NS maintained their conspiracy during the Class Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

15. BNSF, UP, CSX and NS also took other collective actions to enforce the conspiracy and make it effective. For example, pursuant to the conspiracy, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions – making it easier to implement the fuel surcharges, which were adjusted monthly. The Defendants also limited the previously prevailing practice, in circumstances where more than one railroad (usually an eastern and a western railroad) was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, the Defendants, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate bill (and thus each could separately impose its own fuel surcharge). This facilitated each Defendant recouping its share of the supracompetitive profits from the Fuel Surcharge program imposed by the conspiracy. Such a switch to separate invoicing on multi-railroad trips could be accomplished only through collective action of the Defendants. The Defendants also began refusing to negotiate discounts

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 7 of 41

on rail freight rates – even in circumstances where individual railroads had previously been willing to do so.

16. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic that is not within the class alleged here, found that the Defendants' rail fuel surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

17. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

18. Each of the Defendants has disclosed that it has received a state grand jury subpoena and/or state grand jury inquiry concerning the Rail Fuel Surcharges. In an SEC Form

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 8 of 41

10-K dated February 22, 2008, Defendant CSX stated that "[i]n July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate investigations into similar matters." (CSX Corp., 10-K, February 22, 2008 at 99). In an SEC Form 10-K dated February 15, 2008, Defendant BNSF stated that "[t]he Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." (BNSF Railway Company, 10-K, February 15, 2008 at 10). In an SEC Form 10-K dated February 15, 2008, Defendant Norfolk Southern stated that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." (Norfolk Southern, 10-K, February 15, 2008 at K16). And in an SEC Form 10-K dated February 28, 2008, Defendant UP disclosed that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter." (Union Pacific Corp., 10-K, February 28, 2008 at 15).

19. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs and each Class member in their business and property. Plaintiffs and the members of the Class have each paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 15 of 41

District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

37. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**CLASS ACTION ALLEGATIONS**

38. Plaintiffs bring this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated. The proposed "Class" is defined as:

> All direct purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from July 1, 2003 until at least June 30, 2007 (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all federal governmental entities.

39. The Class is numerous and geographically dispersed, and, given the magnitude of the commerce involved, joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are many thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

40. Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all members of the Class directly purchased unregulated rail freight transportation

costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

52. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**THE DEFENDANTS INTRODUCE FUEL SURCHARGES**

53. By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

54. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create and implement the Rail Fuel Surcharges as a means to implement what effectively operate as across-the-board rate increases.

55. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions often tied to the AII and the RCAF (which is based on the AII). Both the RCAF and the AII were published by the AAR, and both indexes included fuel costs as a factor. The AII and RCAF weighted a

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 20 of 41

number of cost factors – labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other expenses – so that the actual impact of particular cost increases (e.g., for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. The indexes, and the weighted factors within them, were designed for this purpose.

56. In 2003, Defendants BNSF, UP, CSX and NS seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. As alleged above, the Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage – and that is precisely what these four railroads proceeded to do.

57. Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges were applied only in isolated instances, and (b) each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. At that time, such surcharges were the exception, with the AII and RCAF indexes widely used to capture fuel costs and other costs. All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system that would allow the widespread use of Rail Fuel Surcharges as a revenue enhancement mechanism.

58. From at least the Spring of 2003 and continuing through the present, the top executives of each of the Defendants met regularly at restaurants, and recreational and

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 21 of 41

conference facilities to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort, in Litchfield Park, Arizona.

59. Within just months of the Spring 2003 NFTA meeting, and as early as July 2003, the two Western Railroads, BNSF and UP, suddenly began to coordinate their Rail Fuel Surcharges. Prior to this time, the UP fuel surcharge had been adjusted monthly based on the WTI Index. The BNSF fuel surcharge had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Class Period.

60. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

61. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 22 of 41

calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

62. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

63. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

64. Even after having agreed to coordinated their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the

widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

65. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

66. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF) – that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

Case 1:07-mc-00489-BAH Document 1070-2 Filed 01/11/22 Page 64 of 586

67. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

68. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

69. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

70. Specifically, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

71. The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

72. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

73. Thus, following the conspiratorial publication of the AIILF, Defendants BNSF, UP, CSX and NS began to apply Rail Fuel Surcharges as a separate item on shippers' bills. The

Case 1:07-mc-00489-BAH Document 1070-2 Filed 01/11/22 Page 66 of 586

Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues in an across the board manner.

74. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

75. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin assessing a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone fuel surcharge as an easy

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 27 of 41

way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

76. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to institute independently its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

77. As a result of the concerted action among BNSF, UP, CSX and NS, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels during the Class Period.

**IMPLEMENTATION OF THE SCHEME: THE FUEL SURCHARGES IMPOSED BY THE DEFENDANTS**

78. As detailed above, Defendants BNSF, UP, CSX and NS agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 28 of 41

79. With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

80. The chart below shows that the Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Class Period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 29 of 41

| MONTH | BNSF | UP |
|---|---|---|
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

81. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Class Period.

82. The chart below shows that the Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in March 2004:

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 30 of 41

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 31 of 41

| MONTH | CSX | NS |
|---|---|---|
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

83. In stark contrast to this uniformity in Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

84. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003).

85. Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the

difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

86. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate. Another reason why Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

87. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than a three-year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been

covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action – i.e., decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

88. In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

**OTHER ELEMENTS OF THE CONSPIRACY**

89. At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants also took other steps in furtherance of the conspiracy. They largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

90. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

91. Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior was hardly routine market conduct.

92. In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable." By way of example, during the relevant period the Archer-Daniels-Midland Company ("ADM") approached individual Defendants to discuss hedging opportunities to allow ADM and the railroads certainty and a method for cost-containment. The railroads, acting against their own individual interests, refused to enter into hedging contracts with ADM.

93. In addition, several national shipper organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program,

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 35 of 41

and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices. The other Defendants refused to address the concerns of their customers.

94. In furtherance of the conspiracy, Defendants also decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, where a shipment requires movement on more than one railroad, the Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment. Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

95. Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates. As demonstrated in the table that follows, Defendants' market shares remained stable following the 2003 agreements.

Case 1:07-mc-00489-BAH Document 1070-2 Filed 01/11/22 Page 76 of 586

| Railroad Market Share: Originated Tons and Carloads 2003 - 2006 [1] | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| 1 AAR Railroad Facts and Analysis of Class I Railroads | | | | |

**THE STB DECISION**

96. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption

Case 1:07-mc-00489-PLF -JMF Document 324 Filed 02/03/10 Page 37 of 41

associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

97. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

98. Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**DEFENDANTS' SUPRACOMPETITIVE PROFITS**

99. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to at least June 30, 2007), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

100. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

Dated: December 31, 2009

<table>
<tr>
<td>/s/ Stephen R. Neuwirth<br>Stephen R. Neuwirth<br>Daniel L. Brockett<br>Marc L. Greenwald<br>Sami H. Rashid<br>Joseph D. Hammond<br>QUINN EMANUEL URQUHART OLIVER<br>& HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Facsimile: (212) 849-7100<br>Email: stephenneuwirth@quinnemanuel.com</td>
<td>/s/ Michael D. Hausfeld<br>Michael D. Hausfeld<br>William P. Butterfield<br>HAUSFELD LLP<br>1700 K Street NW, Suite 650<br>Washington, DC 20006<br>Telephone: (202) 540-7200<br>Facsimile: (202) 540-7201<br>Email: mhausfeld@hausfeldllp.com<br><br>Steig D. Olson<br>HAUSFELD LLP<br>11 Broadway, Suite 615<br>New York, NY 10004<br>Telephone: (212) 830-9850<br>Facsimile: (212) 480-8560<br>Email: solson@hausfeldllp.com</td>
</tr>
<tr>
<td colspan="2">Interim Co-Lead Class Counsel<br>for the Proposed Direct Purchaser Class</td>
</tr>
</table>

# Intentionally Omitted

## DA00034-DA00041

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |

**DIRECT PURCHASER PLAINTIFFS' OPPOSITION IN RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS**

**TABLE OF CONTENTS**


**Page**

PRELIMINARY STATEMENT ........ 1

THE COMPLAINT'S ALLEGATIONS ........ 7

A. The Railroad Industry ........ 7

B. Origins Of The Conspiracy ........ 8

C. Publication of the AIILF and Fixing Surcharge Rates ........ 9

D. The Conspiracy Operates Successfully ........ 12

E. The STB Ruling ........ 14

ARGUMENT ........ 16

I. NO HEIGHTENED PLEADING STANDARDS APPLY ........ 16

II. THE COMPLAINT ADEQUATELY ALLEGES AN UNLAWFUL PRICE-FIXING CONSPIRACY ........ 21

III. THE COMPLAINT'S CONSPIRACY ALLEGATIONS ARE COHERENT AND PLAUSIBLE ........ 29

A. The Creation and Adoption of the AIILF is Probative of the Conspiracy ........ 29

1. Defendants' Creation and Adoption of the AIILF was Key to their Price-fixing Conspiracy ........ 29

2. Defendants' Agreement to Publish and Use the AIILF is Actionable Under the Sherman Act. ........ 31

3. Defendants' *Post Hoc*, Piecemeal Justifications for the AIILF are Unpersuasive ........ 37

B. The Lockstep Fuel Surcharges of the Western and Eastern Railroads are Probative of the Conspiracy ........ 41

1. The Complaint Explains How the Mechanisms and Timing of the Defendants' Lockstep Pricing Fit Within the Allegations of Conspiracy ........ 42

2. Defendants' Years of Lockstep Pricing Cannot Be Explained Away As Unilateral Conduct ........ 45

C. Defendants' Numerous Breaks from Industry Practice Over a Short Period of Time Are Probative of Conspiracy ..... 51

D. The Complaint's Allegations of Defendants' Other Conspiratorial Conduct Further Support the Plausbility of the Alleged Conspiracy ..... 55

1. Industry Communications ..... 56

2. Short-Term Contracts ..... 58

3. Through Rates ..... 59

4. Advance Publication of Fuel Surcharges ..... 60

5. Failure to Negotiate Fuel Surcharges ..... 61

6. Government Investigation ..... 62

7. Market Share Stabilization ..... 63

CONCLUSION ..... 64

## TABLE OF AUTHORITIES

**Page**

### Cases

**Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc*,
525 F.3d 8 (D.C. Cir. 2008) .......... 4, 17, 21, 27, 34, 50

*Am. Column & Lumber Co. v. U.S.*,
257 U.S. 377 (1921) .......... 35

*Am. Tobacco Co. v. U.S.*,
328 U.S. 781 (1946) .......... 36

*In re Automotive Refinishing Paint Antitrust Litig.*,
229 F.R.D. 482 (E.D. Pa. 2005) .......... 57

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d. Cir. 1999) .......... 49, 50

*Babyage.com, Inc. v. Toys "R" Us, Inc.*,
Civ. Action No. 05-6792, 2008 WL. 2120493 (E.D. Pa. May 20, 2008) .......... 28, 55

*Beach v. Atlas Van Lines*,
Civ. Action No. 2:07-764-CWH, Order, (D.S.C. Mar. 31, 2008) .......... 28, 48

*Behrend v. Comcast Corp.*,
532 F. Supp. 2d 735 (E.D. Pa. 2007) .......... 20, 23, 28

**Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) .......... passim

*Brown v. Pro Football, Inc.*,
518 U.S. 231 (1996) .......... 48

*Callahan v. A.E.V., Inc.*,
947 F. Supp. 175 (W.D. Pa. 1996) .......... 43

*In re Carbon Black Antitrust Litig.*,
MDL No. 1543, 2005 WL. 102966 (D. Mass. Jan. 18, 2005) .......... 57

*Cement Mfrs' Protective Ass'n v. U.S.*,
268 U.S.588 (1925) .......... 35

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) .......... 49, 50

**City of Moundridge v. Exxon Mobil Corp.*,
No. 04-940, 2008 WL. 1735856 (D.D.C. April 16, 2008) .......... 19, 20, 23, 25, 28, 38, 47

*Clamp-All Corp. v. Cast Iron Soil Pipe Institute*,
851 F.2d 478 (1st Cir. 1988) .......... 49, 50

*Conley v. Gibson*,
355 U.S. 41 (1957) ........................................................................................... 16

**Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)........................................................................... 5, 17, 36, 38, 56

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990)............................................................................... 61

*In re Copper Antitrust Litig.*,
98 F. Supp. 2d 1039 (W.D. Wis. 2000) .............................................................. 44

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992)............................................................................................ 38

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)................................................................................... 26

**Erickson v. Pardus*,
127 S. Ct. 2197 (2007)..............................................................................4, 7, 16, 27

*Esco Corp. v. U.S.*,
340 F.2d 1000 (9th Cir. 1965)............................................................................. 48

**Fair Isaac Corp. v. Equifax Inc.*,
2008 WL. 623120 (D. Minn. March 4, 2008)..........................................19, 28, 52

*Fed. Trade Comm'n v. Pac. States Paper Trade Ass'n*,
273 U.S. 52 (1927) ............................................................................................. 35

*In re Fine Paper Antitrust Litig.*,
685 F.2d at 822..........................................................................................5, 17, 38

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d. Cir. 2004)............................................................................... 57

**In re Graphics Processing Units Antitrust Litigation*,
540 F. Supp. 2d 1085 (N.D. Cal. 2007) .............................................28, 43, 47, 52

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002)............................................................................... 63

*Hyland v. Homeservices of America, Inc.*,
No. 05-612, 2007 WL. 2407233 (W.D. Ky. Aug. 17, 2007) ..........................20, 28

*In re Hypodermic Prods. Antitrust Litig.*,
MDL No. 1730, 2007 WL. 1959224 (D.N.J. June 29, 2007) ...................18, 23, 28

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
253 F. Supp. 2d 262 (D. Conn. 2003)................................................................. 44

**Jung v. Ass'n of Am. Med. Colls.*,
300 F. Supp. 2d 119 (D.D.C. 2004)..................................................5, 17, 38, 53

*Jung v. Ass'n of Am. Med. Colls.*,
339 F. Supp. 2d 26 (D.D.C. 2004)....................5, 36, 37

*Kendall v. U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008)....................26, 27

*In re Late Fee and Over-limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007)....................27

*In re Linerboard Antitrust Litig.*,
504 F. Supp. 2d 38 (E.D. Pa. 2007)....................38, 48

*Maple Flooring Mfrs.' Ass'n v. U.S.*,
268 U.S. 563 (1925)....................35

*In re Mercedes Benz Antitrust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001)....................26, 44

*Moore v. Boating Indus. Ass'ns*,
819 F.2d 693 (7th Cir. 1987)....................35

*In re Motor Fuel Temperature Sales Practices Litig.*,
534 F. Supp. 2d 1214 (D. Kan. 2008)....................23

*NCAA v. Board of Regents of Univ. of Oklahoma*,
468 U.S. 85 (1984)....................35

*National Soc'y of Prof'l Eng'rs v. U.S.*,
435 U.S. 679 (1978)....................35

*In re Newbridge Networks Sec. Lit.*,
767 F. Supp. 275 (D.D.C. 1991)....................30

**In re OSB Antitrust Litig.*,
No. 06-826, 2007 WL. 2253419 (E.D. Pa. Aug. 3, 2007)....................5, 18, 25, 28, 44, 47, 57, 61

*Poller v. Columbia Broadcasting*,
368 U.S. 464 (1962)....................26

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
971 F.2d 37 (7th Cir. 1992)....................49

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
870 F.2d 397 (7th Cir. 1989)....................35

**In re Southeastern Milk Antitrust Litig.*,
MDL No. 1899, 2008 WL. 2117159 (E.D. Tenn. May 20, 2008)....................5, 17, 20, 23, 28, 38, 53

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
MDL No. 1819, 2008 WL. 426522 (N.D. Cal. Feb. 14, 2008)....................57

*In re Tableware Antitrust Litig.*,
363 F. Supp. 2d 1203 (N.D. Cal. 2005)....................62

*In re Travel Agent Comm'n Litig.*,
MDL No. 1561, 2007 WL. 3171675 (N.D. Ohio Oct. 29, 2007)....................................27, 49

*U.S. v. Container Corp. of America*
393 U.S. 333 (1969) .................................................................................................. 61

*U.S. v. Nat'l Ass'n of Broadcasters*,
536 F. Supp. 149 (D.D.C. 1982)............................................................................ 5, 34

*U.S. v. Patten*,
226 U.S. 525 (1913).................................................................................................. 17

*U.S. v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940).............................................................................................48, 51

*United States v. Yonkers Contracting Co., Inc.*,
706 F. Supp. 296 (S.D.N.Y. 1989) .......................................................................... 44

*In re Vitamins Antitrust Litig.*,
No. 99-197 (TFH), 2000 WL. 1475705 (D.D.C. May 9, 2000).......................................... 44

*In re Western States Wholesale Natural Gas Antitrust Litig.*,
MDL No. 1566, Order, (D. Nev. Feb. 19, 2008)......................................................28, 52, 53

**Statutes**

15 U.S.C. § 1 ............................................................................................................. 16

49 U.S.C. § 10704 ........................................................................................................ 8

49 U.S.C. § 10708 ...................................................................................................... 40

49 U.S.C. § 10709 ........................................................................................................ 8

Interstate Commerce Act, Ch. 104, 24 Stat. 379 (1887) .......................................................... 15

ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (1995).............................................. 15

Staggers Rail Act, Pub. L. No. 96-448, 94 Stat. 1895 (1980).................................................. 7, 8

**Rules**

*Fed. R. Civ. P. 8 ..........................................................................4, 16, 17, 21, 23, 27, 38

**Other Authorities**

*Rail Fuel Surcharges, STB Ex Parte No. 661 (January 25, 2007) ..........14, 15, 16, 39, 46, 47, 53

Direct Purchaser Plaintiffs respectfully submit this memorandum in opposition to the Joint Motion to Dismiss filed on May 30, 2008 by Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together, "Defendants"). For the reasons set forth below, Defendants' motion should be denied.

**PRELIMINARY STATEMENT**

Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint" or "Compl.") sets forth in detail the price-fixing conspiracy orchestrated by the Defendant railroads, who together account for over 90 percent of the nation's rail freight shipments. The Complaint describes how Defendants agreed, and successfully implemented their joint plan, to make unprecedented and widespread use of stand-alone "rail fuel surcharges," which in fact were not correlated to actual fuel costs, as a means to broadly impose supracompetitive price increases for a period of almost four years or more.

The Complaint here is nothing like the complaint dismissed in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) – a complaint the Supreme Court said included no specific allegations of an actual agreement and "proceed[ed] *exclusively* via allegations of parallel conduct," *Twombly*, 127 S. Ct. at 1971 n.11 (emphasis added); *see also id.* at 1970 ("the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs").

Instead, the Complaint here details the specific agreements made by Defendants, when they were made, and why. The Complaint explains that, unlike in the past era of regulation, when railroads could apply to the former Interstate Commerce Commission for across-the-board rate increases, by 2003 the vast majority of rail freight was shipped pursuant to private contracts with individual customers. These private contracts typically included rate-escalation provisions

based on weighted cost-adjustment indexes that already accounted for any actual fuel cost increases. Those indexes were the All Inclusive Index of Railroad Input Costs ("AII"), published by the Association of American Railroads ("AAR") and the related Rail Cost Adjustment Factor ("RCAF"), based on the AII. As noted in the Complaint, Defendant UP's president admitted in 2004 that the RCAF cost-adjustment index "looks at actual costs through the industry."

While at least some of the Defendants had used stand-alone fuel surcharges prior to 2003, these were only used in isolated instances, and the railroads all used different methods of calculating the surcharges. As the Complaint points out, Defendant UP's president admitted that, prior to 2003, stand-alone fuel surcharges "were really non-existent."

The Complaint then sets forth that in mid-2003 the two major Western railroads (BNSF and UP) determined that they could increase profits by moving away from the then-prevailing AII and RCAF indexes (which only adjusted rates based on actual cost increases) and toward widespread use of separate fuel surcharges calculated as a percentage of the total base rate of the freight shipment (and thus not reflecting actual fuel costs). To facilitate this joint plan, BNSF and UP in mid-2003 brought their fuel surcharge programs into lockstep.

As the Complaint explains, however, BNSF and UP still faced a critical barrier to widespread imposition of the stand-alone fuel surcharges that were now in lockstep: the prevailing use in private contracts of the AII and RCAF indexes that already provided for the full recoupment of any actual fuel cost increases. As detailed in the Complaint, the four Defendants conspired together to solve this problem by causing the AAR – which the four Defendants control and dominate – to publish an entirely new cost-adjustment index excluding fuel as one of the weighted factors. During the Fall of 2003, including at AAR board meetings specifically identified by date in the Complaint, Defendants BNSF and UP, along with the two major Eastern

railroads, Defendants CSX and NS, agreed together to make possible the broad imposition of stand-alone fuel surcharges by creating a new All Inclusive Index *Less Fuel* (“AIILF”). The four Defendants used their control and domination of the AAR to cause the AAR to publish the new index in December 2003. The Complaint points out, among other things, BNSF’s public admission in early 2004 that its chairman, president, and chief executive officer “led the charge” at the AAR on adoption of the new index.

Defendants further agreed to impose both the new AIILF and stand-alone fuel surcharges on their customers. Thus, by January 2004, one month after publication of the AIILF through the AAR, all Defendants had publicly announced their intent to begin to impose widely stand-alone fuel surcharges. Freight shipment customers could not refuse, because they had no choice. Defendants simultaneously eliminated any remaining competition in their fuel surcharge rates.

On the heels of the announcement of the new index without fuel, the two Eastern railroads, like the Western railroads before them, moved their stand-alone fuel surcharge rates into lockstep. Both the Eastern and Western railroads used the same complex methods to apply fuel to the overall cost of the freight transport and the same timetable for advance announcement of the fuel surcharges. For instance, Defendants all charged fuel surcharges that were a percentage of the total freight transport cost (and thus independent of actual fuel transportation costs); all established the same two-month time period following an increase to the fuel index to implement rate adjustments; all reported their fuel surcharges on their websites; and all adopted similar mechanisms for determining when and how their fuel surcharges would be calculated. Following adoption of the AIILF, the Eastern and Western railroad freight fuel surcharges remained in lockstep, respectively, through at least mid-2007.

The Complaint also details the Defendants' other collective action to facilitate and enforce implementation of the conspiracy. These include offering more shorter-term contracts than in the past, decreasing the use of so-called "through rates," and refusing to negotiate discounts or make other efforts to compete for market share.

The Complaint thus more than satisfies the applicable notice pleading requirements of Rule 8 – requirements that, as the Supreme Court and D.C. Circuit have both explained, remain unchanged by *Twombly*. *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (under Rule 8(a)(2), the complaint "need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests'") (quoting *Twombly*, 127 S. Ct. at 1964); *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.* ("*Aktieselskabet*"), 525 F.3d 8, 15 (D.C. Cir. 2008) ("We conclude that *Twombly* leaves the long-standing fundamentals of notice pleading intact.").

Defendants do not dispute that the Complaint provides adequate notice. Rather, Defendants employ two improper approaches. The first is overtly to mischaracterize the Complaint, asserting without any basis, for example, that the allegations are purely conclusory. The second is to try to defend particular alleged acts by improperly disaggregating what the Complaint alleges and offering piecemeal, *post-hoc* justifications. For example, Defendants now try to explain away their years of lockstep pricing as a function of "price matching and follow-the-leader pricing," (Defendants' Brief at 13),[1] simply disregarding the clear alleged connection between their lockstep pricing and their joint adoption of the new cost-adjustment index, excluding fuel, at the AAR. Similarly, Defendants' suggestion that they are being charged merely with "participation in trade association activities," (Defendants' Brief at 1), takes their

1 As used herein, "Defendants' Brief" refers to the Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Docket No. 106).

conduct at the AAR out of the context of all of the related activity on fuel surcharges and enforcement of the agreed program.[2]

As this Court has observed, "allegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.'" *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 155 (D.D.C. 2004) (Friedman, J.) (quoting *In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 822 (3d Cir.1982)). *See also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.")[3] And with respect to trade organizations like the AAR, this Court has also noted that if a trade association takes action that is used "as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful." *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d. 26, 37 (D.D.C. 2004). Furthermore, Defendants' additional argument, that the AIILF could not be part of a conspiracy because it was not "mandatory" or coercive, has no legal or factual foundation.[4]

---

[2] Defendants also add to the mix a series of self-serving "factual" arguments that effectively ask this Court not to accept the Complaint's allegations as true – wholly inappropriate at the motion to dismiss stage, and all the more so here where Defendants have successfully argued that discovery should be stayed until this Court has ruled on the motion to dismiss.

[3] As discussed below, post-*Twombly* rulings are to the same effect. *See, e.g., In re Southeastern Milk Antitrust Litig.*, MDL No. 1899, 2008 WL 2117159 at *7 (E.D. Tenn. May 20, 2008) (rejecting defendants' "attempt to parse and dismember the complaints"); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("an antitrust complaint should be viewed as a whole").

[4] *See, e.g., U.S. v. Nat'l Ass'n of Broadcasters*, 536 F. Supp. 149, 163 (D.D.C. 1982) ("it is well established that the parties to an agreement which per se violates the antitrust laws may not defend on the basis that they have applied no coercion to bring about adherence to the combination or to compel obedience to its terms."); *id.* at 164 ("It is, indeed, difficult to see why legal unenforceability or lack of formal sanctions should be considered a valid defense.").

As discussed below, Defendants' motion to dismiss should thus be denied for the following reasons.

*First*, Plaintiffs allege the existence of an unlawful price-fixing conspiracy in considerable detail, providing Defendants ample notice of precisely what they are charged to have done, and satisfying – indeed, far exceeding – all applicable pleading standards. Contrary to Defendants' claims, Plaintiffs' allegations are in no way "conclusory" or incoherent. *See* Points I & II, *infra*.

*Second*, the Complaint's allegations of Defendants' use of the AAR to provide cover for entering into the conspiracy and fulfilling its objectives are fully sufficient to establish liability under the Sherman Act. Defendants are not charged with merely participating in trade association activities, or innocently publishing a purely voluntary index. Rather, Defendants are charged with working collectively through the AAR to implement a price-fixing agreement and agreeing to impose the AIILF and stand-alone fuel surcharges on their customers in a coordinated fashion. *See* Point III.A, *infra*.

*Third*, the Complaint's allegations surrounding Defendants' years of lockstep pricing – which Defendants' own submissions confirm – firmly support the existence and plausibility of the alleged conspiracy. Defendants improperly try to disaggregate their lockstep pricing from other allegations of their conspiratorial conduct. Moreover, their current *post hoc* explanation that they engaged in purposeful "price matching" only underscores the plausibility of the conspiracy, particularly given their simultaneous advance communications of the fuel surcharges and pretextual justifications for their behavior. *See* Point III.B, *infra*.

*Finally*, the Complaint contains numerous additional allegations further supporting the existence and plausibility of the alleged conspiracy that Defendants do not and cannot dispute –

including numerous breaks with industry practice by Defendants over a short period of time made to facilitate and enforce the conspiracy and actions that were against each railroad's independent self-interest, absent a conspiracy. Defendants' *post hoc* attempts to justify their actions disregard the totality of facts alleged in the Complaint and, for that reason and others, are unpersuasive. *See* Points III.C & D, *infra*.

## THE COMPLAINT'S ALLEGATIONS

Plaintiffs bring this action on behalf of themselves and a proposed nationwide class of entities (the "Class") who purchased rate-unregulated freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the "Class Period") and who were assessed a rail fuel surcharge. Plaintiffs seek treble damages arising from Defendants' agreement to fix prices of rail freight transportation services sold during the Class Period.

The Complaint alleges the following facts in detail to support its claim that Defendants engaged in unlawful concerted conduct under Section 1 of the Sherman Act.[5]

### A. The Railroad Industry

For about 100 years, the Interstate Commerce Commission ("ICC") exercised almost total control over carrier rates and practices. (Compl. ¶ 49.) During this era, railroads generally charged only published tariff rates filed with the ICC. When railroads wanted a rate increase, they could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis. (*Id.* ¶¶ 48-49.)

In 1980, Congress passed the Staggers Rail Act ("Staggers Act"). Pub. L. No. 96-448, 94 Stat. 1895 (1980). The Staggers Act substantially deregulated the rail industry, giving railroads greater freedom to price their services and encouraging greater reliance on competition to set

[5] "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 127 S. Ct. at 2200.

rates. Rail regulation today is overseen by the successor to the ICC, the Surface Transportation Board (the "STB"). *See* 49 U.S.C. § 10704. The Staggers Act, however, also for the first time permitted the railroads and their freight shipping customers to enter into private contracts that are not subject to rate review by the STB. 49 U.S.C. § 10709. Today, 80 percent or more of all rail shipments move under the private contracts that are not rate-regulated, or are otherwise exempt from rate regulation. (Compl. ¶ 50.)

Following the Staggers Act, the number of Class I railroads declined from 35 to just seven today (two of which are owned by Canadian entities). (*Id.* ¶ 51.) Four of these railroads – Defendants BNSF, UP, CSX, and NS – operate more than 90 percent of all railroad track in the U.S. (*Id.*) Given the high fixed costs in the railroad industry and the significant barriers to entry, there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible. (*Id.*)

**B. <u>Origins Of The Conspiracy</u>**

By the early 2000's, the railroads could no longer turn to some agency – like the previously-existing ICC or the STB – to obtain a percentage increase across their freight rates. (*Id.* ¶ 54.) Instead, to raise prices across-the-board, they would have to negotiate new rates individually with all of their customers. Recognizing the time and costs involved in such a process, as well as the possibility of losing customers, the railroads opted for a different course. They decided to seize on a percentage-based "rail fuel surcharge" as the means to achieve an across-the-board rate increase on all unregulated traffic. (*Id.*) Defendants recognized, however, that it would be difficult to accomplish imposing the rail fuel surcharges widely if they competed with each other.

### C. Publication of the AIILF and Fixing Surcharge Rates

In July 2003, the two major Western railroads – Defendants BNSF and UP – agreed to impose the exact same fuel surcharges. (*Id.* ¶¶ 7, 58-63.) Indeed, not only did the Western railroads agree to use the same fuel index (the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF")); they agreed to administer that index in precisely the same way. They agreed to add a surcharge of 0.5 percent to the transportation rate for every five cent increase in the HDF index above $1.35 per gallon. (*Id.* ¶¶ 59-60.) The Western railroads also coordinated when they would adjust their fuel surcharge rates: the surcharge would be applied to shipments beginning the second month after the month in which there was a change in the average price calculation. (*Id.* ¶ 61.) That the Western railroads got into lockstep at this time was a notable development, because only shortly before Defendant UP had adopted a different method of calculating fuel surcharges. (*Id.* ¶ 63.)

Notwithstanding this agreement, the railroads still faced a significant barrier to widespread use of fuel surcharges. (*Id.* ¶ 64.) The great majority of rail freight at this time was transported pursuant to private contracts with rate-escalation provisions that already accounted for increases in fuel costs. (*Id.*) These rate-escalation provisions were based on two indexes: (1) the All Inclusive Index ("AII") published by the Association of American Railroads (the "AAR"), a railroad trade organization; and (2) the Related Rail Cost Adjustment Factor ("RCAF"), which was based on the AII. (*Id.* ¶¶ 4, 55.) Both indexes included fuel as a factor and both accounted accurately for increases in the railroads' fuel costs. The president of Defendant UP acknowledged in 2004 that the RCAF "looks at actual costs through the industry." (*Id.* ¶ 4.) As long as these published and widely utilized indexes included fuel as a cost-adjustment component, the Defendants could not, as a practical matter, impose widely a percentage-based, stand-alone fuel surcharge on their freight customers. (*Id.* ¶¶ 8, 64.)

The Complaint alleges that Defendants agreed to solve this problem by using the AAR, which Defendants dominate and control, to create and disseminate to the market a new index that did not include fuel costs. (*Id.* ¶¶ 9, 66.) This would then allow the railroads to impose their new, percentage-based, stand-alone fuel surcharge program in a coordinated fashion across their customer base. (*Id.* ¶ 64.) The Complaint alleges that the agreement to remove fuel from the AII and RCAF took place in the Fall of 2003, and that the AAR, at the Defendants' behest, published the new index, the All Inclusive Index Less Fuel (the "AIILF") in December 2003.

The Complaint alleges in detail how the new AIILF came about, when it was introduced, why the railroads did it, who was involved, and the crucial role the new index played in the implementation of Defendants' price fixing conspiracy. (*Id.* ¶¶ 56 – 77.) BNSF has admitted that it had a leading role in these efforts. (*Id.* ¶ 68.) When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, pointed to the changes made to the RCAF through the AAR. (*Id.*). Referring to Matthew K. Rose – BNSF's chairman, president, and CEO – Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … *So we'll do RCAF less fuel plus a direct fuel surcharge in the future*." (*Id.*) (emphasis added).

The Complaint alleges specific meetings at which Defendants agreed to create and implement coordinated fuel surcharge programs, employing the AIILF. For example, the Complaint alleges that Defendants discussed this strategy at AAR board meetings on October 2-3 and December 11-12 of 2003. (*Id.* ¶¶ 9, 65.) During these meetings and on other occasions, Defendants agreed to cause the AAR to adopt a new index without fuel. (*Id.* ¶¶ 9, 66.)

Defendants further agreed that they would impose their new, stand-alone fuel surcharge on shippers, using the new index, in a coordinated fashion to enhance profits. (*Id*. ¶¶ 64-67.)

As the Complaint describes, the broad use of a stand-alone, rate-based fuel surcharge was a sharp break from past industry practice. Prior to 2003, while some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, these fuel surcharges were applied only in isolated instances, reflecting the widespread use at that time of the AII and RCAF fuel-inclusive indexes. (*Id.* ¶ 57.) The Complaint specifically alleges that these fuel surcharges were the isolated exception, not the rule, and differed for each company, reflecting each railroad's differing efficiencies and fuel costs. (*Id.* ¶¶ 7, 57.) The AAR had never previously published a cost index without fuel, and the railroads had never before applied their fuel surcharges on a coordinated, stand-alone basis as a revenue enhancement mechanism. (*Id.* ¶¶ 10, 67.) As UP's James R. Young acknowledged in a July 2007 interview, the new stand-alone rail fuel surcharges were "really unique to the railroad industry. Three, four years ago they were really non-existent." (*Id.* ¶10.)

By removing fuel from the then-prevailing cost escalation indexes, Defendants could begin assessing stand-alone fuel surcharges on a widespread basis and in a coordinated manner. (*Id.* ¶¶ 11-13, 67, 69, 75.) Defendants could then implement their plan of applying broadly across their various private contracts a fuel surcharge percentage to the entire cost of the freight shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). (*Id.*) Through their collective action, Defendants planned to use the stand-alone fuel surcharge as a way to increase revenue, not simply capture increases in fuel costs (which the AII and RCAF were fully able to capture already), thereby increasing prices far more than any cost increase actually attributable to fuel. (*Id.* ¶¶ 67, 75.)

Almost immediately after the Defendants' joint effort to cause the AAR to publish the AIILF, the Eastern railroad Defendants (CSX and NS), pursuant to their agreement with BNSF and UP, began to charge the exact same surcharges based on the use of a common index – the West Texas Intermediate Crude Oil Index ("WTI"). (*Id.* ¶¶ 12, 69-73.) CSX, which already had a surcharge methodology in place, immediately began to apply the surcharge utilizing the new index. NS announced in January 2004, *the first calendar month after the publication of the AIILF*, that it would be changing its surcharge formulas and unveiled a surcharge formula identical to the CSX surcharge. (*Id.* ¶¶ 71, 82) (explaining that, notwithstanding a two-month lag, both Eastern railroads were assessing identical surcharges within three months of the first publication of the AIILF.)

The Eastern railroads chose the WTI index because in early 2004, following the publication of the AIILF, it was at a higher rate than the HDF Index. (*Id.* ¶12.) As with the Western railroads, the Eastern railroads agreed not only to use the same index but the same trigger points and timing: the surcharges, applied to the entire base rate for the freight transport, would increase 0.4 percent for every $1 that the monthly average price of WTI oil exceeded $23 per barrel and the surcharge would be imposed two calendar months after the WTI Index had adjusted. (*Id.* ¶¶ 71-72.)

**D. <u>The Conspiracy Operates Successfully</u>**

With Defendants' price-fixing conspiracy firmly in place, the surcharges of the Western railroads moved in lockstep – *i.e.*, their customers were charged the exact same surcharges – from July 2003 through at least June 2007. (*Id.* ¶¶ 79-80.) Similarly, the Eastern railroads' surcharges were identical starting in March 2004 and continuing through at least June 2007. (*Id.* ¶¶ 81-82.) Defendants published their surcharge rates on their websites so that the conspirators could monitor adherence to the price-fixing scheme. (*Id.* ¶¶ 14, 61, 71.) Railroad industry

analysts contemporaneously noted and were puzzled by the curious "convergence" in rail fuel surcharge methodologies adopted by the Defendants. (*Id.* ¶ 84.) As one analyst noted, "the way to gain significant market share is to lead the competition rather than following the competition." (*Id.*) The Defendants used the new AIILF to apply stand-alone fuel surcharges in contracts extending over periods of time.

Defendants also agreed not to negotiate discounts on their fuel surcharges and overall contract rates, even though prior to mid-2003 the custom had been for the railroads to do so. (*Id.* ¶¶ 88, 92, 95.) Indeed, when shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, they were told by the railroads that the fuel surcharges were "not negotiable." (*Id.* ¶ 92.) Industry analysts publicly questioned the railroads' refusals to negotiate the fuel surcharges despite the opportunities to gain market share. (*Id.* ¶ 84.)

Defendants also began moving from offering long-term contracts to more prevalent use of contracts that contained 30-day cancellation provisions or that were re-priced as often as monthly, another way to facilitate imposition of the stand-alone fuel surcharges. (*Id.* ¶ 15.) Previously, Defendants had typically preferred long-term contracts ranging up to five years, with rate increases usually governed by the AII or RCAF, that locked in market share. (*Id.* ¶ 89.) Defendants made this switch to more prevalent use of shorter term contracts even though most shippers preferred the former system, which for the freight shipment customer could minimize risk and make costs more predictable. (*Id.* ¶ 91.) Defendants were not deterred from this strategy by the risk of increased competition, because they had been guaranteed by their agreement that their "competitors" would be pursuing identical policies. (*Id.* ¶¶ 88, 95.)

At about the same time, Defendants collectively decreased the use of "through rates," a longstanding practice in which a customer receives a single bill from either the originating or terminating railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). (*Id.* ¶ 94.) Instead, Defendants moved increasingly to having rates billed separately for each railroad involved in a multi-railroad shipment. This provided transparency as to what each railroad was charging on multiple line shipments, and allowed each Defendant to bill separately for its applicable fuel surcharge. (*Id.*)

Defendants also agreed not to undercut each other's pricing or to take market share from each other. (*Id.* ¶¶ 14, 75, 95.) As a consequence, Defendants' market shares remained stable throughout the period of the conspiracy. (*Id.* ¶ 95.) Indeed, despite widespread imposition of unprecedented surcharges and inflexibility in negotiating shipping contracts, Defendants' market shares remained essentially unchanged during the time the conspiracy was in effect. (*Id.* ¶¶ 88, 95.)

As a result of their supracompetitive fuel surcharges, Defendants' profits soared. (*Id.* ¶ 99).

**E. <u>The STB Ruling</u>**

After receiving complaints, the STB conducted a regulatory investigation into Defendants' rail fuel surcharge program. This investigation culminated in a decision issued in January 2007 concluding that Defendants' fuel surcharges were an "unreasonable practice." (*Id.* ¶ 16.) (quoting *Rail Fuel Surcharges*, STB Ex Parte No. 661, January 25, 2007 at 6) (Reinhart Decl., Ex. A ("STB Ruling")). The STB explained that "a fuel surcharge program that increases all rates by a set percentage *stands virtually no prospect of reflecting the actual increase in fuel costs* for handling the particular traffic to which the surcharge is applied." (Compl. ¶ 16.) The STB added that the railroads' fuel surcharge program was "a *misleading* and ultimately

unreasonable practice," finding that "there is no real correlation between the rate increase and the increase in fuel costs for that to which the surcharge is applied." STB Ruling at 7 (emphasis added). *See also id.* at 9 ("For carriers to continue to apply fuel surcharge programs that are calculated as a percentage of the base rate – when practical alternatives are available – would permit them to continue to *mislead* their customers and would be unfair.") (emphasis added). (*See generally* Compl. ¶¶ 16, 96-98). Although the STB decision applied to rate-regulated rail freight traffic only, Defendants also applied the same misleading and unreasonable fuel surcharge practices to the private rail freight transportation contracts and other unregulated freight transport that are at issue in this case. (*Id.* ¶¶ 97-98.)[6]

In their statement of alleged facts, Defendants state that this "STB decision did not suggest, let alone find, any collusion. The STB did not award past damages or restitution for past surcharges, but, rather, explicitly provided a 'rule of general applicability for future conduct.'" (Defendants' Brief at 11.) However, no issues of collusion were before the STB, which does not have jurisdiction to enforce the antitrust laws.[7] As the STB explained in its ruling, it was relying on its authority to "adopt rules of general applicability for future conduct to address an unreasonable practice" rather than addressing a single shipper complaint (which could lead to an award of remedies for past practices). STB Ruling at 8.

Far from condoning or excusing the Defendants' fuel surcharge program, the STB throughout its decision admonished the Defendants for misleading their freight shipment

---

[6] As noted in the Complaint, the STB's decision addressed rate regulated freight traffic only, which is not at issue in the Complaint here. The STB expressly stated that its jurisdiction does not reach the rail freight traffic under private contract, or otherwise exempted from rate regulation, that is the subject matter of this litigation. (Compl. ¶¶ 16, 97.)

[7] The STB is limited by its enabling legislation which is the ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (1995), and the ICC was limited by the Interstate Commerce Act, Ch. 104, 24 Stat. 379 (1887).

customers through unreasonable practices. *See, e.g.*, STB Ruling at 7 ("We believe that imposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied, *is a misleading and ultimately unreasonable practice*.") (emphasis added).[8]

## ARGUMENT

### I. NO HEIGHTENED PLEADING STANDARDS APPLY

Plaintiffs bring a single claim for price fixing under Section 1 of the Sherman Act. 15 U.S.C. § 1. The Supreme Court, with express reference to its *Twombly* decision, has reiterated the governing notice-pleading standard under Rule 8 of the Federal Rules of Civil Procedure:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, []127 S. Ct. 1955, [1959] (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 … (1957)).

*Erickson v. Pardus*, 127 S. Ct. at 2200. The Court has also directed, again with specific reference to *Twombly*, that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (*citing Twombly*, 127 S. Ct. at 1965).

---

[8] *See also id.* at 6 ("Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, *cannot fairly be described as merely a cost recovery mechanism*.") (emphasis added); at 7 ("*This sort of mislabeling* appears designed to avoid the type of response a carrier would likely receive *if it were to honestly inform* a shipper that a higher rate was being imposed to recover not only the increased fuel cost of serving that shipper, but also the increased cost of fuel for another shipper's traffic – which is what would often occur under rate-based fuel surcharges.") (emphasis added); at 9 ("*For carriers to continue to apply fuel surcharge programs* that are calculated as a percentage of the base rate – when practical alternatives are available – *would permit them to continue to mislead their customers and would be unfair*.") (emphasis added). (*See also* Compl. ¶¶ 16, 96-98.)

The D.C. Circuit similarly observed in a recent ruling applying *Twombly* that in evaluating the legal sufficiency of a complaint's allegations, a court "constru[es] the complaint liberally in the plaintiff's favor," *Aktieselskabet*, 525 F.3d at 15 (quoting *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008)), and gives the complaint "the benefit of all reasonable inferences derived from the facts alleged," *id.* (quoting *Stewart v. NEA*, 471 F.3d 169, 173 (D.C. Cir. 2006)).

Allegations in a price-fixing case are to be considered as a whole, and not on a piecemeal basis. *See Jung*, 300 F. Supp. 2d at 155 ("[A]llegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.'") (quoting *In re Fine Paper Antitrust Litig.*, 685 F.2d at 822). *See also Cont'l Ore Co.*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (quoting *U.S. v. Patten*, 226 U.S. 525, 544 (1913)).

Contrary to the implications in Defendants' moving papers, *Twombly* created no new heightened pleading standard for price fixing cases.[9] The D.C. Circuit in *Aktieselskabet* expressly observed that "*Twombly* leaves the long-standing fundamentals of notice pleading intact." *Aktieselskabet*, 525 F.3d at 15.[10]

[9] Nor could the *Twombly* Court have created such a heightened pleading standard. Any change to the applicable standards of Rule 8 would have required amendments to the Federal Rules. *See Aktieselskabet*, 525 F.3d at 16 (rejecting notion that *Twombly* introduced a heightened pleading standard, because any such standard "would have to arise from an amendment of the Federal Rules of Civil Procedure").

[10] Most cartel activity is secretive. If plaintiffs could not proceed to discovery without detailed knowledge of all facets of a price-fixing cartel's conduct, private enforcement of the antitrust laws would be greatly diminished *See, e.g., In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159 at *11 n.7 ("Defendants cannot be faulted for attacking plaintiffs' complaints on the basis of *Twombly*. The level of factual pleading they seek, however, could rarely, if ever,
(continued)

Defendants train their sights narrowly on *Twombly*, in which the Supreme Court considered a question particular to the complaint then before it: "whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition absent some factual context suggesting agreement . . ." *Twombly*, 127 S. Ct. at 1961. Plaintiffs in *Twombly* were two customers of their local telephone company. Their complaint alleged that the major incumbent local exchange carriers had conspired for seven years not to compete with each other for customers outside their respective market areas. The Telecommunications Act of 1996 required the defendants to open their local telephone service monopolies to competition. As factual support for their claim, plaintiffs pointed to the Telecommunications Act's expectation of competition among defendants and the fact that the defendants had not actually engaged in the expected competition.

The Supreme Court made clear that it considered the complaint in *Twombly* to "proceed *exclusively* via allegations of parallel conduct," *id.* at 1971 n.11 (emphasis added), and "not on any independent allegation of actual agreement among the [defendants]," *id.* at 1970. The Complaint alleged parallel practices by the defendants and contained "a few stray statements" of an agreement by defendants to stay out of each other's markets. *Id.* But it made no mention of the "specific time, place, or person involved in the alleged conspiracies." *Id.* at 1970 n.10.

---

be met by a plaintiff in an antitrust case before discovery."); *In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959224, at * 14 (D.N.J. June 29, 2007) ("adequate notice of the particular grounds upon which Plaintiffs' claims rest" is all that is required "particularly given the fact that Plaintiffs have not yet had the benefit of discovery.") (*citing Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746-747 (1976) (explaining that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly")); *In re OSB Antitrust Litigation*, 2007 WL 2253419, at *5 ("*Twombly* does not . . . require plaintiffs to prove their allegations before taking discovery.").

Despite occasional reference in the complaint to an unlawful agreement, "[t]he nub of the complaint . . . is [defendants'] parallel behavior." *Id.* at 1960, 1970-1971.[11]

On these allegations, the Supreme Court in *Twombly* held that the plaintiffs failed to state a claim for relief under Section 1. The Court explained that "*an allegation of parallel conduct and a bare assertion of a conspiracy* will not suffice . . . and a *conclusory allegation of an agreement at some unidentified point* does not supply facts to show illegality." *Id.* at 1966 (emphasis added). A complaint alleging parallel conduct must provide "some setting suggesting the agreement to make out a § 1 claim." According to the Court, "without some further factual enhancement," the complaint in *Twombly* "stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

The Court in *Twombly* emphasized that there was "an obvious alternative explanation" for defendants' alleged agreement not to compete – that the former monopolies were merely doing the same thing they had done before the Telecommunications Act: keeping to their long-held geographical territories and "sitting tight, expecting their neighbors to do the same thing." *Id.* at 1972.[12]

---

[11] Courts have consistently recognized that the allegations in *Twombly* constituted mere parallelism and nothing more. *See, e.g.*, *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2008 WL 1735856, at *3 (D.D.C. April 16, 2008) ("Unlike in *Twombly*, the plaintiffs here do not rely on only bare allegations of parallel behavior, or assume that there is a conspiracy because there is an 'absence of any meaningful competition.'") (citing *Twombly*, 127 S. Ct. at 1970); *Fair Isaac Corp. v. Equifax Inc.*, 2008 WL 623120, at *5 (D. Minn. March 4, 2008) ("The *Twombly* plaintiffs' allegations of an illegal § 1 agreement rested exclusively on the parallel conduct of the defendant regional telecommunications providers.").

[12] This "sitting tight" in furtherance of the phone companies' long-established practice of not invading each other's territories is in marked contrast to the many dramatic changes in the Defendants' conduct in connection with the conspiracy alleged here, including (among other things) the alleged ways in which the railroads ceased competing with each other.

*Twombly* is thus readily distinguishable from the case here, where the plaintiffs make direct and specific allegations of an unlawful agreement independent of parallel behavior. At the same time, nothing in *Twombly* precludes circumstantial allegations from also being considered in an antitrust complaint. Rather, *Twombly* held that a complaint must contain merely "enough factual matter (taken as true) *to suggest* that an agreement was made." *Id.* at 1965 (emphasis added). *Twombly* confirms that a § 1 claim can be made on the basis of circumstantial allegations alone, including allegations of parallel conduct alone under certain circumstances.[13] Indeed, the Court noted that "[a]n allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: *it gets the complaint close to stating a claim*." *Id.* at 1966 (emphasis added). The allegations of parallel conduct must be placed in a factual context that "nudge[s]" the conspiracy claim "across the line from conceivable to plausible." *Id.* at 1974.

[13] Many post-*Twombly* courts have held that circumstantial evidence, including parallel conduct, is still relevant in assessing the viability of antitrust claims. *See, e.g.*, *Hyland v. Homeservices of America, Inc*., No. 05-612, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) ("Plaintiffs . . . have properly put the Defendants on notice of its alleged antitrust claims by setting out facts of an alleged a conspiracy [*sic*] to price-fix between the Defendants, supported by actions of parallel conduct. Accordingly, the Court finds that the Plaintiffs have 'nudged' their claims across the line from conceivable to plausible."); *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159 at *6 ("These complaints, while not answering all specific questions about 'who, what, when, and where,' do put defendants on notice concerning the basic nature of their complaints . . . and the grounds on which their claims exist."); *Behrend v. Comcast Corp.*, 532 F. Supp.2d 735, 741 (E.D. Pa. 2007) ("'[A] complaint warrant[s] dismissal only where it fail[s] 'in toto to render plaintiffs' entitlement to relief plausible' . . . [A]n antitrust complaint would certainly meet the *Twombly* criteria if the complaint constitutes notice to the defendant of the legal claims asserted and includes a statement of the elements of those claims, along with allegations of the defendant's underlying conduct that, if proven, would plausibly demonstrate such elements.") (citations omitted); *City of Moundridge*, 2008 WL 1735856 at *4, *6 ("All inferences are construed in favor of the plaintiffs and, while the claim may rest ultimately on a thin factual reed, the plaintiffs have alleged supporting circumstantial facts and placed their claims 'in a context that raises a suggestion of a preceding agreement,' 'nudg[ing] their claims across the line from conceivable to plausible[.] . . . Because the complaint alleged some circumstantial facts that support an inference of an agreement, the plaintiffs' claim is plausible.") (citations omitted).

Case 1:07-mc-00489-PLF Document 118 Filed 07/10/08 Page 28 of 51

*See also Aktieselskabet*, 525 F.3d at 17 ("*Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim").

In short, *Twombly* reaffirmed that a Section 1 Sherman Act case can be properly pleaded by either (a) sufficient allegations of an actual agreement, or (b) allegations of parallel action placed in a context plausibly suggesting such an agreement. As developed below (*see* pp. 21 – 28, *infra*), the Complaint here does both. The Complaint alleges with detail the existence of an unlawful agreement, including the who, what, when, why, and where of the conspiracy. The Complaint also contains multiple additional facts that more than "nudge" the claim across the plausibility line. The Complaint thus satisfies the governing standard of Rule 8(a)(2) and far exceeds the pleading requirements of *Twombly*.

## II. THE COMPLAINT ADEQUATELY ALLEGES AN UNLAWFUL PRICE-FIXING CONSPIRACY

The Complaint directly alleges Defendants' unlawful concerted conduct, providing Defendants ample notice of the particular unlawful acts with which they are charged. At the same time, the Complaint provides abundant details of the conspiracy and its factual context that firmly support the conspiracy's plausibility. Defendants' repeated assertion that the Complaint's conspiracy allegations are merely "conclusory" or somehow incoherent are wide of the mark.

The Complaint sets forth numerous concrete and specific facts as to the why, who, what, where, when, and how of the conspiracy. The Complaint alleges: (1) why the conspiracy took place, (2) who engaged in what concerted conduct (including the specific companies' concerted actions at particular times and the name of a specific executive who led the charge on crucial conspiratorial conduct), (3) what illegal steps Defendants took in furtherance of the conspiracy, (4) where conspiratorial meetings occurred (*e.g.,* at AAR board meetings), (5) when (including specific dates), and (6) how, in detail, the unlawful concerted conduct was carried out. Thus,

Plaintiffs have alleged – specifically and concretely – the elements of a price-fixing agreement and not merely parallel behavior.

The Complaint alleges unlawful collusive conduct and identifies the specific steps taken by Defendants to implement their price-fixing conspiracy. The Complaint alleges that BNSF and UP agreed in July 2003 to bring their fuel surcharge programs into lockstep. (Compl. ¶¶ 7, 59-62.) It also explains that, at this time, the Defendants still faced a significant barrier to widespread use of stand-alone fuel surcharges – namely, the then-prevailing cost adjustment indexes that already included fuel as a factor. (*Id.* ¶¶ 55-56.) To overcome this hurdle, the Defendants in the Fall of 2003, at meetings and discussions within the AAR board (including on dates specified in the Complaint), agreed to take, and took, collective action to create a new cost-adjustment index without fuel and then to use that index and other collective action to impose broadly stand-alone fuel surcharges that were in virtual lockstep in the Eastern and Western regions, respectively, through at least mid-2007. (*Id.* ¶¶ 65, 68, 73, 76-78, 89-95.) *See also* pp. 2 – 4, *supra.*

The Complaint specifies that an officer of BNSF admitted in early 2004 that it was Matthew K. Rose, BNSF's chairman, president and CEO, who "led the charge" behind the AAR's creation of the new fuel cost index. (*Id.* ¶¶ 9, 68.) And it alleges that, following on the heels of the Defendants' collective action through the AAR to create the new index without fuel, Defendants CSX and NS, the two major Eastern railroads, agreed to coordinate their rail fuel surcharge program so that it would run in lockstep, using the fuel index that would yield the highest rail fuel surcharges at the time. (*Id.* ¶¶ 69-72.) The Complaint explains in detail that while the Eastern and Western railroads moved in lockstep with different indexes, the key aspects of the fuel surcharges in both regions – including applying the surcharge as a percentage

of the total cost of the freight transport – were identical. (*Id.* ¶¶ 59-63; 69-72.) The Complaint also explains why Defendants engaged in this unlawful concerted conduct, and the role their newly-created cost-adjustment index played in facilitating the conspiracy's objective. (*Id.* ¶¶ 67-72.)

Both pre- and post-*Twombly*, these allegations are more than sufficient to plead a price-fixing claim. *See City of Moundridge*, 2008 WL 1735856, at *3 ("Unlike in *Twombly*, the plaintiffs here do not rely on only bare allegations of parallel behavior … [The complaint] identifies the years and locations where the agreement was reached and the defendants who participated."); *Behrend*, 532 F. Supp. 2d at 741 (distinguishing *Twombly* because "we have clear allegations of actual agreements between Comcast and its competitors"); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959224, at *14 (finding the complaint's allegations "to be in sharp contrast with the allegations found insufficient in" *Twombly*, since "the instant [c]omplaint sets forth allegations of specific anti-competitive agreements").[14]

[14] *See also In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159, at *6 ("[Plaintiffs] argue, and it appears rightfully so to this Court, that rather than simply alleging facts from which an inference of an agreement can be drawn, they allege … that actual agreements exist."); *see also id.* ("These complaints, while not answering all specific questions about 'who, what, when and where,' do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist."); *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566, slip op. at 6 (D. Nev. Feb. 19, 2008) (attached as Exhibit A hereto) ("Plaintiffs' allegations go beyond allegations of parallel conduct paired with a bare allegation of conspiracy. … Plaintiffs allege Defendants engaged in wash trades, which, by their nature, involve collusive agreement between two parties."); *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1237 (D. Kan. 2008) ("Unlike *Twombly*, plaintiffs here do not allege parallel behavior with no actual agreement among defendants."). *Compare Twombly*, 127 S. Ct. at 1970 n.10 ("doubt[ing]" that the bare reference to an agreement in the complaint provided the notice "required by Rule 8" since "the pleadings mentioned no specific time, place, *or* person involved in the alleged conspiracies," giving the defendants "no clue" as to which of the defendants "supposedly agreed or when and where the illicit agreement took place") (emphasis added).

Defendants do not – and could not – credibly claim that they lack *notice* of the unlawful concerted conduct with which they are charged. Instead, they caricature the Complaint as consisting only of "conclusory allegations of conspiracy."[15] (Defendants' Brief at 1.) The Complaint's allegations of conspiracy, however, are supported by a detailed account of Defendants' motivation for conspiring, why they conspired in the manner that they did, what steps they took in furtherance of the conspiracy, and when they took them. In *Twombly*, the conspiracy allegations were considered "conclusory" because they merely parroted the language of the Sherman Act. By contrast, the Complaint here alleges specific facts concerning the unlawful concerted conduct in which Defendants engaged. Indeed, here, one key element of the conspiracy is Defendants' *concerted* conduct at the AAR – the collective agreement to publish the AIILF and then use that new index to impose percentage-based, stand-alone fuel surcharges on customers as widely as possible – all of which is alleged in detail and with specificity. Defendants also make the baffling claim that Plaintiffs do not allege a conspiracy at all. For example, they assert: "Plaintiffs … do not present an 'independent allegation of actual agreement' between the Western Railroads or between the Eastern Railroads that suggests a meeting of the minds among any of them." (Defendants' Brief at 26.) Of course, Plaintiffs allege this (in detail) many times over, as explained above. Paragraphs 65 and 67 of the Complaint, for example, very clearly allege such an agreement:

> 65. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants

---

[15] Defendants call the Complaint's allegations of conspiracy "conclusory." However, "conclusory" means "consisting of or relating to a conclusion or assertion for which no supporting evidence is offered." (Merriam Webster's Dictionary of Law.) As Plaintiffs demonstrate herein, any suggestion that the Complaint has not alleged any facts supporting the allegation of an unlawful conspiracy is patently false.

> to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.
>
> 67. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy.

(Compl. ¶¶ 65, 67; s*ee also* Compl. at ¶¶ 56-77 (describing the details of the agreement).)

Defendants also claim that the Complaint's allegations are "lacking in specifics regarding the who, what and when of agreement." (Defendants' Brief at 23.) However, as detailed herein, the Complaint not only identifies the unlawful acts that each company did; it names a specific executive who admittedly played a lead role in crucial conspiratorial conduct on behalf of BNSF. It identifies the time periods in which all the allegedly unlawful conduct took place, and the *specific dates* of meetings at which crucial steps of the conspiracy occurred. This level of detail is rare and more than sufficient to state a price-fixing claim. *See, e.g., City of Moundridge*, 2008 WL 1735856, at *3 (applying *Twombly* and finding that identification of "years and locations where the agreement was reached and the defendants who participated" was sufficient to support conspiracy allegations); *In re OSB Antitrust Litigation*, 2007 WL 2253419, at *1 (applying *Twombly* and considering it sufficient that complaint identified "the approximate time and manner of their agreement.").

Defendants' argument reduces to the assertion that a complaint cannot proceed to discovery unless the complaint pinpoints *every* executive involved and specifies the dates of

Case 1:07-mc-00489-PLF Document 1-18 Filed 11/07/2008 Page 33 of 76

*every* unlawful meeting. But there is no basis in law or common sense for such a requirement.[16] Conspiratorial activity is nearly always secret.[17] The Complaint here reflects more knowledge of the details of this conspiracy than most.[18]

Defendants cite four cases in which courts dismissed complaints that Defendants claim are "similar" to the Complaint in this case. (Defendants' Brief at 18-21.) These cases are distinguishable for multiple reasons – but Defendants' assertion that the complaints in those cases are "similar" to the detailed and comprehensive Complaint in this case is spurious. In *In re Elevator Antitrust Litig.*, the allegations of conspiracy were entirely conclusory. As the Second Circuit noted, quoting the district court: "[T]he complaint enumerates 'basically every type of conspiratorial activity that one could imagine. . . . The list is in *entirely general terms* without *any* specification of *any* particular activities by *any* particular defendant[; it] is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (emphasis added). The allegations here are not remotely similar.

---

[16] As noted above, *Twombly* did not institute any heightened pleading standard that would require, for example, that a plaintiff identify the specific date and attendee of every allegedly collusive meeting *before* discovery begins. Nor could *Twombly* have instituted any such pleading standard, as this would have required amending the Federal Rules.

[17] *See, e.g., In re Mercedes Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 372-73 (D.N.J. 2001) ("[r]egardless of whether concealment is an essential element of price-fixing, secrecy is its natural lair"). For precisely this reason, dismissal prior to discovery in antitrust cases should occur sparingly. *See, e.g., Hosp. Bldg. Co.*, 425 U.S. at 746 ("[I]n antitrust cases where 'the proof is largely in the hands of the alleged conspirators,' ... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (*quoting Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962)).

[18] Moreover, requiring Plaintiffs to identify every executive at the AAR board meetings identified would be a pointless exercise – Defendants *themselves* certainly know who attended the meetings identified.

Likewise, in *Kendall v. U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), even *after* discovery, plaintiffs "simply allege[d]" that the defendants were "coconspirators, without providing *any facts* to support such an allegation, despite having deposed executives from both MasterCard and Visa." *Id.* at 1050 (emphasis in original).[19] And in *In re Late Fee and Over-limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), the plaintiffs' "principal claim in the case" was that "the defendants' late and over-limit fees are excessive 'punitive damages' subject to limitation under the Due Process Clause." *Id.* at 957, 58. The plaintiffs' alternate price-fixing claim was pled in a conclusory manner, providing "*no details* as to when, where, or by whom th[e] alleged agreement was reached." *Id.* at 962 (emphasis added). The plaintiffs did "not identify any actual agreement among the defendants," *id.* at 961, and could not even point to parallel behavior. The "heart of the plaintiffs' antitrust allegations" was a chart demonstrating that the defendants' behavior was "not even roughly in parallel." *Id.* at 962. Similarly, in *In re Travel Agent Comm'n Litig.*, MDL No. 1561, 2007 WL 3171675, at *4 (N.D. Ohio Oct. 29, 2007), the court found that, on a number of occasions, some defendants "entirely" failed to follow other defendants' pricing moves – which is hardly reflective of the lockstep pricing alleged in the Complaint.

These decisions show only that <u>some</u> courts have dismissed <u>some</u> price-fixing complaints after *Twombly* – a point Plaintiffs do not dispute. But these cases have not included the types of allegations here. And many courts have recognized that *Twombly* is no bar to a properly pled

---

[19] The *Kendall* court also premised its decision on the belief that the *Twombly* Court had "specifically abrogated the usual 'notice pleading' rule, found in Federal Rule of Civil Procedure 8(a)(2)…." *Id.* at 1047 n.5. The D.C. Circuit has expressly rejected this reading of *Twombly*, holding that "*Twombly* leaves the long-standing fundamentals of notice pleading intact." *Aktieselskabet*, 525 F.3d 8 at 15. *See also id.* at 16 ("If, despite this clear language, *Twombly* itself left any doubt, the [Supreme] Court subsequently emphasized the continuation of the prior Rule 8(a) standard: '[S]pecific facts are not necessary,' and a complaint need only give the defendant fair notice of the claims." (*quoting Erickson*, 127 S.Ct. at 2200).

and supported antitrust complaint.[20] As one court has observed – in a case where plaintiffs alleged a conspiracy in less detail than the Complaint at issue here:

> Plaintiffs have made specific factual allegations of Defendants' wrongdoing – including actions in furtherance of the conspiracy, Defendants' purported motive, the approximate time and manner of their agreement, and the mechanism by which Defendants fixed prices. ***Twombly* requires no more**.

*In re OSB Antitrust Litig.*, 2007 WL 2253419, at *1 (emphasis added).

Similarly, the Complaint in this case contains at least as much detail, if not more detail, than the complaint recently found to satisfy *Twombly* in this District in *City of Moundridge*, 2008 WL 1735856. Defendants virtually ignore *City of Moundridge*,[21] *OSB,* and the other cases that are far more similar to this case than the cases on which Defendants rely.[22]

---

[20] Indeed, courts have recognized that defendants seek to stretch *Twombly* far beyond its limits. In *In re Southeastern Milk Antitrust Litig.*, for example, the court noted:

> Defendants cannot be faulted for attacking plaintiffs' complaints on the basis of *Twombly*. The level of factual pleading they seek, however, could rarely, if ever, be met by a plaintiff in an antitrust case before discovery. While *Twombly* certainly requires of plaintiffs a degree of pleading that may not be required in other cases, it was not intended as a shield to be used by antitrust defendants to defeat even a meritorious claim. Arguing that plaintiffs have not pleaded sufficient facts appears to have become the mantra of defendants in antitrust cases.

2008 WL 2117159, at *12, n.7.

[21] Defendants state only that the complaint in *City of Moundridge* made allegations "that are not analogous to those in the present Complaint," but do not identify anything specifically about the *City of Moundridge* complaint that is not present in the instant Complaint. (Defendants' Brief at 21.)

[22] *See, e.g.*, *Babyage.com, Inc. v. Toys "R" Us, Inc.*, Civ. Action No. 05-6792, 2008 WL 2120493 (E.D. Pa. May 20, 2008); *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159; *Fair Isaac Corp.*, 2008 WL 623120; *Beach v. Atlas Van Lines,* Civ. Action No. 2:07-764-CWH (D.S.C. Mar. 31, 2008) (order denying motion to dismiss) (attached as Exhibit B); *In re Western States*, MDL No. 1566, slip op., (D. Nev. Feb. 19, 2008) (attached as Exhibit A); *In re Graphics Processing Units Antitrust Litigation*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007); *Hyland*, 2007 WL 2407233; *Behrend*, 532 F. Supp. 2d 735; *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959224.

## III. THE COMPLAINT'S CONSPIRACY ALLEGATIONS ARE COHERENT AND PLAUSIBLE

Plaintiffs' allegations provide a coherent and plausible account of why Defendants desired to begin imposing rail fuel surcharges widely on their customers and how they developed and implemented a plan to do so through unlawful concerted conduct. Defendants attempt to make this account appear incoherent and "implausible," but in each such instance Defendants misapprehend or mischaracterize the Complaint's factual allegations.

### A. The Creation and Adoption of the AIILF is Probative of the Conspiracy

#### 1. Defendants' Creation and Adoption of the AIILF was Key to their Price-fixing Conspiracy

The Complaint alleges that central to Defendants' efforts broadly to impose rail fuel surcharges, set as a percentage of a freight shipment's base rate, was the Defendants' *agreement* to publish, adopt, and use a rate-escalation index with their customers that had the fuel cost component taken out.

Defendants mischaracterize the Complaint by suggesting that their collective creation and publication of the AIILF is not probative of a conspiracy, because the publication of an index without a fuel component was not actually necessary to impose stand-alone fuel surcharges. (Defendants' Brief at 37.) To begin with, Defendants do not explain why, if this were so, BNSF admitted in a call with analysts that its president and CEO "led the charge" on the AAR's publication of the AIILF in order to facilitate BNSF's move toward imposing stand-alone rail fuel surcharges on its customers. (Compl. ¶ 68.)

Defendants assert that the Complaint purportedly shows the AIILF was not necessary, because it alleges that certain Defendants imposed fuel surcharges prior to December of 2003, when the AIILF was created. (Defendants' Brief at 37.) Defendants also assert that their surcharge tables on their websites show that rail fuel surcharges existed before the creation of the

AIILF. (*Id.*)[23] Defendants further assert that the STB has noted that rate-based surcharges dated back to the 1970s. (*Id.* at 38.)

The Complaint explains, however, why none of this is contradictory. Simply put, although some Defendants intermittently imposed rate-based fuel surcharges in isolated instances before 2003, they were not in significant use in Defendants' unregulated private contracts by 2003, because those contracts overwhelmingly used rate-escalation indexes (the AII/RCAF) that already had a component that tracked actual fuel cost increases. (Compl. ¶ 57.) Nothing in the STB's decision contradicts this allegation. The STB referred to the use of fuel surcharges in the mid-1970s; it did not suggest that the fuel surcharges were in active use in Defendants' unregulated contracts by 2003.

Indeed, it is surprising Defendants would even attempt to suggest that the fuel surcharge program was not a new development in late 2003 or early 2004, given that UP executive James

---

[23] Defendants attach and cite to various printouts from their websites listing historical fuel surcharges that predate the alleged conspiracy. (*See* Defendants' Brief at 28-29, & ns.6, 7, 9 (citing, *inter alia*, Ex. C & D).) Defendants argue that those websites have been incorporated by reference and that all documents and data contained in them, including fuel surcharge data that predate the putative class period, must be accepted as true for purposes of their motion to dismiss because the Complaint accuses Defendants of publishing their surcharges on their websites during the relevant period. (*Id.* at n.6.) As a preliminary matter, the existence of fuel surcharges that predate the conspiracy does not contradict the allegations in the complaint. As discussed above, the Complaint explicitly pleads the existence of those earlier surcharges and explains how the conspiracy allowed Defendants to impose fuel surcharges more broadly and to coordinate their imposition to avoid competition. However, Plaintiffs further reject the argument that they have broadly incorporated Defendants' websites and all information presently available thereon. As the Court is aware, Defendants have steadfastly refused to produce any discovery to date and Plaintiffs therefore cannot independently verify any data on those extensive websites. Under these circumstances, a limited reference to websites in a complaint does not incorporate those websites by reference. *See generally In re Newbridge Networks Sec. Lit.*, 767 F. Supp. 275, 279 n.4 (D.D.C. 1991) ("Extraneous material may be considered but only if it is attached to the complaint or incorporated by reference, and limited quotation does not constitute incorporation by reference."). None of Defendants' cited cases support such a broad application of the doctrine of incorporation by reference.

Young acknowledged in a 2007 interview that the new rail freight surcharges were "really unique to the railroad industry. Three, four years ago they were really non-existent." (Compl. ¶ 10.)

In order to begin imposing fuel surcharges widely, therefore, Defendants needed to replace the prevailing indexes with a new index that did not have a fuel component. In order to ensure their goal of across-the-board rate increases, Defendants *agreed* to disseminate this new index (the AIILF) collectively and impose it on their customers widely, along with the rail fuel surcharges. This concerted conduct is not only probative of a conspiracy – it is the central means by which the price-fixing conspiracy was effectuated.

**2. Defendants' Agreement to Publish and Use the AIILF is Actionable Under the Sherman Act.**

As detailed in the Complaint and discussed above, at the time the conspiracy began, most of Defendants' customers' contracts included rate-escalation provisions tied to long-standing cost-adjustment indexes (the AII and RCAF) that adjusted rates over the term of the contract based on actual increases in the railroads' costs. These indexes tracked multiple industry cost components, including fuel. In order to impose stand-alone fuel surcharges widely, Defendants needed to begin using a cost escalation index that did not include fuel costs. They used the cover of the AAR to create and publish such an index (the AIILF) collectively, and agreed to impose it, along with stand-alone fuel surcharges, on their customers. The Complaint alleges that immediately following the publication of the AIILF under the auspices of the AAR, *all* Defendants began immediately imposing that index on their customers along with the inflated

fuel surcharges, which moved in lockstep.[24] These allegations are directly probative of a price-fixing conspiracy.

Defendants claim that their concerted action at the AAR amounted only to the publication of a voluntary index by a trade association, intended to "provid[e] tools for optional use by members." (Defendants' Brief at 36.) According to Defendants, without some "separate allegations indicating that association members were bound to use the index or otherwise were restricted by it; a trade association agreement to create and publish a cost index will not suffice" to confer antitrust liability. (Defendants' Brief at 34-35.) But this assertion is based on a fundamental mischaracterization of the Complaint. In fact, Plaintiffs do allege – repeatedly – that Defendants agreed both to publish the AIILF *and to use it collectively to impose coordinated fuel surcharge programs* on their customers.

This is in certain respects the core of the alleged price-fixing conspiracy: that Defendants agreed to publish *and use* the AIILF so they could apply stand-alone fuel surcharges on their customers. Defendants' assertion that Plaintiffs have alleged "*only*" that the new index "allowed" Defendants to apply stand-alone fuel surcharges (Defendants' Brief at 35) (emphasis added) is thus particularly brazen. The Complaint alleges that the publication of the AIILF "allowed" Defendants to apply stand-alone fuel surcharges, *and* that Defendants *agreed* that they would apply those fuel surcharges, and that they actually did so in a coordinated fashion. Numerous paragraphs, including 5, 13, 65, 67, and 75 – which Defendants' essentially ignore – clearly allege that Defendants agreed to implement coordinated fuel surcharge programs involving stand-alone rail fuel surcharges *using* the AIILF and to impose these programs on their customers in a coordinated manner:

---

[24] *See, e.g.,* Compl. ¶¶ 5, 13, 65, 67, 75.

Case 1:07-mc-00489-PLF Document 1 Filed 01/10/2008 Page 40 of 73

5. To overcome this obstacle [*i.e.*, the widespread use of the AII/RCAF], **Defendants BNSF, UP, CSX and NS devised and embarked on a scheme to remove fuel from the AII, so that a separate "fuel surcharge" could then be applied as a percentage against the total cost of freight transportation**. This permitted these major railroads to achieve their desired, and **mutually agreed**, result: **an effective percentage rate increase that could be broadly applied to rail freight customers**.

13. **With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants BNSF, UP, CSX and NS now each applied the fuel surcharge in the same way**: as a percentage multiplier of the *total* base rate for the rail freight transportation. … This **agreed approach** yielded the Defendants billions of dollars of additional profits.

65. In the fall of 2003, **BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program** that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, **Defendants BNSF, UP, CSX and NS agreed to create *and implement* coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.**

67. **Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges**, applied against the total cost of rail freight transportation, ***and coordinate that practice***. **The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy** – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

> 75. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these **collective actions** was to begin assessing a stand-alone fuel surcharge applied to revenue (*i.e.*, the entire base rate for the freight shipment), not costs; **to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program**. That is, **pursuant to the conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of freight* shipment** (notwithstanding that fuel only accounts for a portion of the costs of the shipment). **Through this collective action**, Defendants BNSF, UP, CSX and NS planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

(Emphases added.) (*See also* Compl. ¶¶ 6, 8, 11, 12, 69, 74, 76, 77.)

As the foregoing exemplary paragraphs reflect, the Complaint alleges that the conspiracy was not limited to the publication of the AIILF, but extended to agreement by the Defendants to act in concert in imposing stand-alone rail fuel surcharges on their customers by *using* the AIILF.[25]

Such agreement is clearly illegal. Defendants do not appear to contest – nor could they – that their agreement to impose coordinated fuel surcharge programs by using the AIILF would violate the Sherman Act, regardless of whether there was any independent restraint requiring them to use the index. As this Court has previously recognized, "it is well established that the parties to an agreement which per se violates the antitrust laws may not defend on the basis that they have applied no coercion to bring about adherence to the combination or to compel obedience to its terms." *National Ass'n of Broadcasters*, 536 F. Supp. at 163; *see also Fed.*

[25] Plaintiffs are, of course, entitled to reasonable inferences concerning their allegations. *See Aktieselskabet*, 525 F.3d at 21 n.8 ("We continue to construe complaints liberally by interpreting ambiguous text in the complaint in the light most favorable to the plaintiff.").

*Trade Comm'n v. Pac. States Paper Trade Ass'n*, 273 U.S. 52, 62 (1927) ("An understanding, express or tacit, that the agreed prices will be followed is enough to constitute a transgression of the law. No provision to compel adherence is necessary."); *Am. Column & Lumber Co. v. U.S.*, 257 U.S. 377, 391, 399 (1921) (noting that the associational plan found to violate Section 1 of the Sherman Act "was optional" for association's members and that the "sanctions" were merely "financial interest, intimate personal contact, and business honor, all operating under the restraint of exposure of what would be deemed bad faith and of trade punishment by powerful rivals").[26]

[26] Notably, in all of the cases Defendants cite in support of their assertion that non-mandatory associational conduct is somehow immune from antitrust scrutiny, courts were assessing associational conduct following either discovery or trial – that is, weighing the evidence and finding it insufficient to support liability. None found that non-mandatory associational conduct "cannot form the basis for antitrust liability," Defendants' Brief at 34, but rather that there was no evidence (after trial or discovery) that the conduct in question did so. *See, e.g.*, *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir. 1989) (noting that "[a]fter a month of trial, the jury disagreed" with plaintiff on liability); *Maple Flooring Mfrs.' Ass'n v. U.S.*, 268 U.S. 563, 566, 585 (1925) (noting that "[t]he oral testimony and documentary evidence have covered a wide range and have reached a great volume which it will be impossible, within the limits of an opinion, to review in detail," and that the court must look to the "peculiar circumstances of each case"); *Cement Mfrs.' Protective Ass'n v. U.S.*, 268 U.S.588, 606 (1925) ("[H]ere the government does not rely upon agreement or understanding, and *this record wholly fails to establish, either directly or by inference*, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement to which we have referred; and it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action.") (emphasis added); *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712-13 (7th Cir. 1987) ("Since there was *no evidence which would on any theory support a verdict for plaintiffs* on the antitrust claim, had proper instructions been given to the jury, there is no necessity nor reason to remand for a new trial . . . [The plaintiff] *presented no evidence of any agreement*, combination, or conspiracy to boycott and refuse to deal.") (emphasis added). The remaining cases cited by Defendants likewise center on highly specific factual and antitrust issues with no bearing on this case at all. *See Schachar*, 870 F.2d at 399 (analyzing disaggregated "market with thousands of providers"); *NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98-120 (1984) (assessing whether a college athletic association's plan for televising games was a *per se* violation of Section 1 of the Sherman Act); *National Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 684-99 (1978) (analyzing professional associations' code of ethics).

In addition, although the point is largely academic in light of the Complaint's allegations that the Defendants agreed to impose stand-alone fuel surcharges in a coordinated fashion using the AIILF, it merits mention that this Court has recognized that antitrust liability can arise even from non-mandatory associational practices. As this Court has explained, if a trade association lawfully publishes pricing information that is used "as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful." *Jung*, 339 F. Supp. 2d at 37 (*quoting Cont'l Ore Co.*, 370 U.S. at 707 ("acts which are in and of themselves legal lose that character when they become constituent elements of an unlawful scheme.")); *see also Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 809 (1946) ("It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").

In *Jung*, this Court assessed motions to dismiss an antitrust suit in which one "prong" of the conspiracy was the publication of a survey by the American Association of Medical Colleges ("AAMC") aggregating its members' compensation levels, which allegedly "facilitat[ed] . . . the anticompetitive agreement" by providing "a mechanism by which compensation levels remain stabilized and depressed." 300 F. Supp. 2d at 126, 166. There was no allegation that members were bound to provide information that formed the basis of the survey. This Court noted that "[a]lthough institutional defendants provide their individual information to the AAMC and the results of the Survey are distributed by the AAMC to its members, *the institutional defendants are not required to provide information in order to receive the Survey*. In fact, the Survey is available to the public at large." *Id.* at 140 (emphasis added).

Notwithstanding the non-mandatory nature of the request for information from the AAMC members, this Court viewed the allegations "through the lens of" the "larger price-fixing charge" and concluded that:

> while plaintiffs have not alleged expressly that the AAMC agreed to join the conspiracy, it is reasonable to infer from the facts and circumstances detailed in the complaint that the AAMC, an organization whose membership includes the institutional defendants, annually collects and disseminates compensation information to its *members in order to facilitate the alleged compensation-fixing agreement* and to allow for internal policing of member co-conspirators.

*Id.* at 166-167 (emphasis added).[27]

Likewise, when the detailed allegations here concerning the AIILF are "viewed through the lens of" the "larger price-fixing charge," *id.* at 166, the role of the AIILF in the fulfillment of Defendants' conspiratorial objectives becomes clear. Far from being innocent, the Defendants' use of the AAR, which Defendants dominate and control, provided the means by which and through Defendants could collectively act to implement their conspiracy.

### 3. Defendants' *Post Hoc*, Piecemeal Justifications for the AIILF are Unpersuasive

Defendants advance several arguments in an effort to defend creation and publication of the AIILF. In so doing, Defendants not only mischaracterize what the Complaint alleges, but also improperly seek to disaggregate their conduct in the AAR in the Fall of 2003 from all of the other conduct alleged in the Complaint. Defendants also face a formidable burden in attempting to give *post hoc* justifications for their conduct.

It is well established that "allegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy

---

[27] This Court later had to enter judgment for the defendants in *Jung* due to the subsequent passage of federal legislation amending the antitrust laws to prevent the consideration of the very evidence related to medical residency programs on which plaintiffs' allegations depended. *Jung*, 339 F. Supp. 2d at 26. The passage of that legislation, however, in no way impacts this Court's cited reasoning.

claim itself.'" *Jung*, 300 F. Supp. 2d at 156 (quoting *Fine Paper*, 685 F.2d at 822); *see also Cont'l Ore Co.*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."). This principle is reflected in post-*Twombly* rulings, where price-fixing defendants failed in trying similar strategies. *See, e.g., In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159, at *7 (rejecting defendants' "attempt to parse and dismember the complaints").

Defendants must do more than give a plausible account of why their alleged conduct was not part of a conspiracy; they must give such a compelling explanation that it renders Plaintiffs' conspiracy allegations implausible. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 59 (E.D. Pa. 2007) (noting that defendants' giving of "one plausible explanation" of their parallel conduct was insufficient to obtain summary judgment); *City of Moundridge*, 2008 WL 1735856, at *4 (holding that "a complaint need not be dismissed where it does not 'exclude the possibility of independent business action,'" as the defendants had argued, because such a requirement "would be counter to Rule 8's requirement of a short, plain statement with 'enough heft to show that the pleader is entitled to relief.'" (*quoting Twombly*, 127 S. Ct. at 1966)); *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159, at * 7 (admonishing defendants for impermissibly parsing the complaint and concluding that defendants' piecemeal justifications were insufficient because "the fact that multiple instances of parallel conduct are alleged makes it far less likely that a business justification exists for all of the acts taken in total").[28]

[28] See *also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468 (1992) ("The Court did not hold [in *Matsushita*] that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment.").

Defendants here argue that publication of the AIILF "could have" been motivated by a "time lag concern" arising from use of the AII/RCAF. (Defendants' Brief at 39.) However, this justification is counter to the allegations in the Complaint (which must be fully credited at this stage of the proceedings). The Complaint alleges that the AII and RCAF could capture all actual fuel cost increases, and quotes the president of Defendant UP, who contemporaneously acknowledged that the RCAF "looks at actual costs through the industry." (Compl. ¶ 4.)

Furthermore, notwithstanding Defendants' suggestion to the contrary, the STB in fact made no finding that there was any valid "time lag concern." All the STB noted with respect to the purported "time lag concern" was that some carriers (*i.e.*, the Defendants) had raised this issue as part of their arguments before the STB. *See* STB Ruling at 4. The STB certainly did not credit such arguments in concluding that the Defendants' fuel surcharges were misleading precisely because they did not reflect actual fuel costs. *Id.* at 7.

More basically, even if (contrary to the Complaint's allegations) there was anything to a "time lag concern," this would not explain why Defendants had to address it collectively. If any individual Defendant had such a concern, it could have calculated its own AIILF and tried to impose it along with stand-alone fuel surcharges unilaterally. There was no legitimate reason why Defendants had to address this supposed concern in a concerted fashion.[29]

Defendants do not give a persuasive explanation for why *the AAR* would need to be involved in offering the AIILF "tool" to its members at all. The Complaint alleges that there was

[29] Defendants' claim that their adoption of the AIILF was justified by the STB's concern with double-dipping is even more far-fetched. (Defendants' Brief at 39.) The STB found that Defendants' (coordinated) fuel surcharge programs were the cause of double-dipping. STB Ruling at 10. The most obvious way for Defendants to avoid "double dipping," of course, would have been to continue using the AII/RCAF indexes, which "already permitted full recovery by the railroads of actual fuel cost increases," without stand-alone fuel surcharges. (Compl. ¶ 4.)

no legitimate reason for the AAR to be involved in publishing the AIILF, even if any individual Defendant had thought such an index was desirable. (*Id.* ¶¶ 74-76.) Indeed, Defendants themselves stress that the AIILF is calculated by using "simple arithmetic" based on an index (the AII) which is "already public." (Defendants' Brief at 36.) If that is the case – and it undoubtedly is – then it is difficult to see why the AAR (*i.e.*, the Defendants) would need to be involved in providing that "tool" at all.[30] If BNSF, for example, wanted such a tool, and was operating in a legitimately competitive fashion, then it could have easily made the arithmetical adjustment to the AII itself, giving *itself* a tool that it could use unilaterally. BSNF did not do this, however – because, as the Complaint alleges, it realized that it would be more successful in *implementing* the revenue-based surcharges widely, and not sporadically as they had been used in the past, if *all Defendants* agreed to use the same approach. (*Id.* ¶¶ 56, 64.)

Defendants also cannot reconcile their *post hoc* explanation for the AIILF with the contemporaneous statement by BNSF that its CEO "led the charge on" the AAR's publication of the AIILF. (Compl. ¶ 68.) This statement is more consistent with the alleged fact that the AIILF was published through the AAR as a means of cover for an unlawful agreement than it is with Defendants' *post hoc* explanation that the AAR innocently decided to create a new "tool" for voluntary use by its members.

Nor can Defendants explain why their concerted actions regarding the AIILF occurred at the same time Defendants took steps to begin the broad imposition of stand-alone fuel surcharges *and* to bring their respective Eastern and Western fuel surcharge prices into lockstep. The timing

[30] The RCAF was established in response to the Staggers Act requirement that a cost-adjustment factor be created and published by the STB. *See* 49 U.S.C. § 10708. The AAR publishes and submits the RCAF, and the AII which underlies it, to the STB for approval. There is no statutory or regulatory reason why the AAR would need also to publish the AIILF. (Compl. ¶ 76.)

of these interrelated events alone supports the plausibility of the alleged conspiracy. Defendants' *post hoc* justifications, based on disaggregating the various contemporaneous actions alleged in the Complaint, cannot explain away the curious convergence of these events – and certainly do not render the alleged conspiracy implausible.

## B. The Lockstep Fuel Surcharges of the Western and Eastern Railroads are Probative of the Conspiracy

The Complaint alleges that, in implementing the alleged price-fixing conspiracy, each Defendant agreed to impose upon its customers the same rail fuel surcharges used by its principal regional competitor. Thus, Plaintiffs allege that during the conspiracy the Western railroads charged their customers the exact same rail fuel surcharges, and the Eastern railroads charged their customers the exact same fuel surcharges. The Western railroads began to charge the same fuel surcharges in July of 2003, shortly before BNSF "led the charge" to the AAR,[31] and the Eastern railroads began to charge the same fuel surcharges right after the AIILF was announced.[32] Defendants' websites bear these allegations out – BNSF and UP charged the exact same fuel surcharges, and NS and CSX charged the exact same fuel surcharges, through at least mid-2007. (*See* Compl. ¶¶ 80-82.)

Defendants argue that they compete with each other only regionally, and not across the entire nation. (*See* Defendants' Brief at 4-5.) But this only further explains why the conspiracy could be effectively implemented with the Eastern and Western railroads, respectively, in lockstep on fuel surcharges. As discussed herein, the fuel surcharge programs of the four

---

[31] The Western railroads began to charge identical fuel surcharges shortly after the Spring 2003 meeting of the National Freight Transportation Association, attended by Defendants' executives. (Compl. ¶ 58.)

[32] The Eastern railroads promptly began to implement the AIILF after they jointly effectuated its publication in December 2003. (Compl. ¶¶ 69, 73.)

Defendants were identical in critical respects. The Eastern Defendants and Western Defendants each implemented the agreed conspiracy in their respective regions.

### 1. The Complaint Explains How the Mechanisms and Timing of the Defendants' Lockstep Pricing Fit Within the Allegations of Conspiracy

Defendants claim that the alleged conspiracy is not "typical" because it "involves the use of two completely different surcharge formulas adopted at widely different times by the Eastern and Western Railroads." (Defendants' Brief at 24.) They also assert that this "undermine[s] any plausible inference of an integrated overall conspiracy." (*Id.*) These claims are untrue. The alleged (and uncontrovertible) facts of Defendants' lockstep pricing fits neatly within the Complaint's detailed account of Defendants' price-fixing conspiracy.

First, the fact that the Western railroads and the Eastern railroads used different fuel indexes for setting their fuel surcharge prices was essentially a historical quirk: when the two Eastern railroads moved into lockstep following publication of the AIILF, they chose to use the fuel index that, at that particular time, would generate higher rail fuel surcharges. (Compl. ¶ 12.)

Defendants claim that the surcharges between the Western and Eastern railroads differed in "almost every possible respect," (Defendants' Brief at 24), but this is significantly overstated. The Western and Eastern railroads took the same approach to setting rate-based fuel surcharges, moving in lockstep and keyed to a fuel index. Indeed, the fuel surcharge programs of the Western and Eastern railroads were largely identical in virtually all of their complex and unprecedented features. (Compl. at ¶¶ 59-62; 69-72.) These features included:

- Setting fuel surcharges as "a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job." (*Id.* ¶ 65.)
- Establishing the *exact same* two-month time period between an increase in the applicable index and the implementation of the adjustment to the surcharge. (*Id.* ¶¶ 61, 71.)

- Adopting other similar mechanisms for calculating when and how surcharges would be administered, including the selection of a trigger point above which a fuel surcharge would be assessed, and the amount of the surcharge (as a percentage) to be applied for each incremental increase in the cost of fuel above the trigger point. (*Id.* ¶¶ 59-62; 69-72.)
- Publicly reporting both historical and future monthly surcharges on Defendants' websites (to monitor adherence to agreed-upon rates). (*Id.* ¶¶ 61, 71.)

Given Defendants' success in imposing supracompetitive rail fuel surcharges widely on their customers – allowing them to price significantly above cost and reap enormous profits (*id.* ¶ 99) – the minor differences in the surcharge rates between the Western and Eastern railroads was of no practical consequence to the conspiracy's operation and success.[33] As the tables of Defendants' fuel surcharges show, the Western railroads' surcharges were similar to the Eastern railroads' surcharges during the entire Class Period. (*Id.* ¶¶ 80, 82.)

Second, Defendants' suggestion that "the timing of the events" in Defendants' adoption of lockstep surcharge mechanisms "is impossible to square with any suggestion of conspiracy" is, again, simply untrue. (Defendants' Brief at 25.) It is true that the Western railroads brought their surcharges into lockstep before the Eastern railroads did. But all this indicates – and what the Complaint alleges – is that the Western railroads may well have been the initiators of the conspiracy.[34] (*Id.* ¶ 65.) A conspiracy is not implausible merely because all of its members do not join at the exact same time. Despite what Defendants may think the "typical" conspiracy

---

[33] *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1095 ("absolute lockstep behavior in all situations" is not necessary to show conspiracy).

[34] It is possible, of course, that evidence obtained through discovery will shed further light on the timing of the early conspiratorial meetings and may even reveal that one or both of the Eastern railroads were involved in conspiratorial meetings from the outset. Because a cartel operates in secret, plaintiffs are not required to identify when every conspiratorial meeting took place or whether agreement was arranged at the outset through multilateral or bilateral meetings. *See, e.g., Callahan v. A.E.V., Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) (observing that in an antitrust action, conspiratorial conduct "is generally covert and must be gleaned from records, conduct, and business relationships").

looks like (Defendants' Brief at 24), conspiracies are rarely cast in stone from the outset, with all participants involved equally and all effects felt simultaneously from the first days of the enterprise. *See, e.g., In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1056 (W.D. Wis. 2000) ("[T]here is, of course, no requirement that each coconspirator participate in every phase of an evolving conspiracy, as long as each was aware that the conspiracy did not begin and end with his own activities." (quoting *United States v. Yonkers Contracting Co., Inc.*, 706 F. Supp. 296 (S.D.N.Y. 1989)).[35]

The timing of the adoption of Defendants' lockstep pricing mechanisms supports the plausibility of the alleged conspiracy. The Western railroads moved their surcharge programs into lockstep but saw that imposing stand-alone rail fuel surcharges widely would be impracticable in light of the prevailing use of the AII/RCAF. They decided to use the cover of the AAR to create a new index and bring all Defendants on board with adopting it and using it with their customers. The Eastern railroads agreed to do so.

[35] Plaintiffs' allegations about the timing of Defendants' actions in furtherance of the conspiracy exceed applicable pleading requirements. Plaintiffs are not required to specify which Defendants led or participated in the various overt actions in furtherance of the conspiracy as long as they have sufficiently pled each Defendant's involvement. *See, e.g.,In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 ("Antitrust conspiracy allegations need not be detailed defendant by defendant.") (citing cases); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 278 (D. Conn. 2003) (plaintiffs not required to "specify individual acts of each defendant" where the complaint identified the co-conspirators and described nature and effect of conspiracy); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d at 375 ("The short answer is that plaintiffs have alleged that all of the named defendants were participants in the conspiracy" and whether "a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator"); *In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2000 WL 1475705, at * 11 (D.D.C. May 9, 2000) ("An overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits.") (quoting *In re Nasdaq Mkt. Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995)).

Following publication of the AIILF, all Defendants began using the new index with their customers, and the Eastern railroads immediately brought their surcharges into lockstep. Thus, the Complaint lays out the time period of the conspiracy and alleges in detail the precise timing of each railroad's imposition of surcharges in relation to the publication of the AIILF. The interrelated timing of these events firmly supports the plausibility of the price-fixing conspiracy alleged.

### 2. Defendants' Years of Lockstep Pricing Cannot Be Explained Away As Unilateral Conduct

Defendants also assert that their years of lockstep pricing in the Eastern and Western regions merely showed that Defendants were engaged in "price matching and follow-the-leader pricing." (Defendants' Brief at 13; *see also id.* at 30 (suggesting that Defendants purposefully "follow[ed] each other in charging the same prices").) Defendants' apparent acknowledgement that they were purposefully following each other's prices, though, actually underscores the plausibility of Plaintiffs' conspiracy allegations.[36]

First, lockstep pricing should not be considered in isolation. It should be considered in light of all of the Complaint's allegations – such as the identification of Defendants' conspiratorial meetings, the publication and collective use of the AIILF, the stabilization of market shares, and the reaping of windfall profits. While "parallelism, *taken alone*, [does not] raise the necessary implication of conspiracy" *Twombly*, 127 S. Ct. at 1968 n.7 (emphasis added), "[a]n allegation of parallel conduct . . . gets the complaint close to stating a claim," and with just "some further factual enhancement," such an allegation will suffice to render the claim

[36] Moreover, Defendants' argument contradicts what is alleged in the Complaint. The Complaint alleges that Defendants met and agreed to fix prices, not that they engaged in unilateral business decisions that led them to follow each other's pricing practices. Indeed, the Complaint alleges that Defendants would not have rationally charged the same prices absent agreement. (*See* Compl. ¶¶ 84, 87, 88.)

plausible. *Id.* at 1966. Such "further factual enhancement" is clearly present here, as discussed at length above. When viewed in the context of Defendants' other conduct alleged in the Complaint, such as the Defendants differing fuel efficiencies and operating costs, (Compl. ¶¶ 83, 86), as well as all of the contemporaneous conduct within the AAR, the Defendants' lockstep pricing clearly supports the plausibility of the conspiracy.[37]

Defendants' suggestion that they engaged in purposeful "price matching and follow-the-leader pricing" contradicts the reasons Defendants gave for their fuel surcharge prices during the Class Period. As the Complaint alleges, and as must be taken as true, Defendants falsely and deceitfully presented their fuel surcharges during the Class Period as a means to "compensate for increases in the cost of fuel." (*See, e.g., id.* ¶¶ 2, 16, 96-98.) As noted above, the STB itself found this "misleading." Thus, Defendants' new explanation shows that the explanation they all gave to their customers for their fuel surcharges was pretextual.

Plaintiffs reiterate that on a motion to dismiss, where the Defendants have moved to stay discovery, it is inappropriate for Defendants to invoke evidence outside the scope of the Complaint. To the extent, however, that Defendants seek to rely on what occurred at the STB (*e.g.*, Defendants' Brief at 9-10 & n.1), it is noteworthy that Defendants explicitly defended their fuel surcharges as a means of cost recovery, not as a matter of follow-the-leader price matching. *See, e.g.*, *Comments of BNSF Railway Co.*, STB Ex Parte No. 661, Filing No. 217709, at 5 (Oct. 2, 2006) ("BNSF is committed to recovering its increased costs of fuel through fuel surcharges

[37] As the Complaint notes, an industry analyst at the time expressed puzzlement at the fact that the Defendants had ceased competing to gain market share in favor of charging the same prices. (Compl. ¶ 84.) It is a reasonable inference that this analyst – fairly expected to be knowledgeable about the industry – was puzzled by the railroads' conduct because it was not in any individual railroad's independent self interest, absent a conspiracy. (*See id.* at ¶¶ 87, 88.) *See also* Section III.D.7, *infra*.

and not to over-collect."); *Comments of Union Pacific Railroad Co.*, STB Ex Parte No. 661, Filing No. 217707, at 4 (Oct. 2, 2006) ("UP's [fuel surcharge] is NOT a profit center. It never has been a profit center. It was never intended to be a profit center. It was and is intended to be an efficient way of recouping rapidly changing fuel costs."); *Summary of BNSF Railway Company's May 11, 2006 Presentation*, STB Ex Parte No. 661, Filing No. 216402, at 1 (Apr. 27, 2006) (bullet point summary of STB hearing presentation, stating "Fuel Surcharge is a cost recovery mechanism"); *Written Statement of CSX Transportation, Inc.*, STB Ex Parte No. 661, Filing No. 216397, at 6-7 (Apr. 27, 2006) (discussing increase in fuel expenses paid by CSX and stating that CSX's "fuel surcharge program is designed to recover this astounding increase in its costs for fuel") (*All available at* http://www.stb.dot.gov/filings/all.nsf/ByDocketNumber).

Post-*Twombly* courts have considered pretextual justifications for coordinated behavior to be highly probative of conspiracy. In *City of Moundridge*, for example, the defendant producers of natural gas had given justifications during the alleged conspiracy period that were alleged to be pretextual. The Court found that these pretextual reasons for their pricing behavior supported the plaintiffs' conspiracy allegations. *See* 2008 WL 1735856, at *3 ("Hurricanes Katrina and Rita should not have affected the market in as the defendants claimed and they were only a pretextual reason to justify withholding market supply to create an artificial shortage.").[38]

---

[38] The *City of Moundridge* court also considered "the allegations that the defendants had reported high profits." *Id.* *See also In re OSB Antitrust Litig.*, 2007 WL 2253419, at *3 (considering relevant the allegation that conspirators achieved "'staggering' profit increases") (internal reference omitted); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1095 (noting allegation that conspirators' "profit margins grew considerably . . . lend[s] more support to plaintiffs' complaint."). Similarly, here, the Complaint alleges that by collectively adopting the AIILF, and by coordinating their fuel surcharge practices "under the guise of rising fuel prices," Defendants were able to reap substantial additional profits, far in excess of any increases in their fuel costs. (Compl. ¶¶ 2, 54.)

Similarly, in *In re Linerboard Antitrust Litigation*, the defendants gave one reason for their parallel conduct during the period of the alleged conspiracy, but attempted to defend their conduct on summary judgment as conscious parallelism. The court held that this evidence of pretext strongly supported the conspiracy claim:

> The Court notes that the simultaneous downtime announcements in this case constitute particularly strong circumstantial evidence because Inland's official position has been that its downtime decision was based on internal inventory levels *rather than conscious parallelism*.

504 F. Supp. 2d at 60 (emphasis added); *see also Beach v. Atlas Van Lines, Inc.*, Civil Action No. 2:07-764-CWH, Order, at 3, 6 n.4 (Docket No. 128) (attached as Exhibit B hereto) (denying motion to dismiss where plaintiffs alleged, *inter alia*, that "defendants computed a fuel surcharge as a percentage of the entire linehaul charge, which has no relationship to the actual increased cost of fuel associated with the movement of goods," and thus that their fuel surcharge practice "was simply a secret revenue enhancer."); *compare* Compl. ¶ 74 (Defendants' "'revenue-based' fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs," and "was not a cost recovery mechanism, but a revenue enhancement measure.").

In addition, although "follow the leader" pricing is not illegal on its own, it is also not competitive and it walks right up to the line of illegality. If consciously parallel pricing is accompanied by improper discussions among competitors or other improper signaling or signs of assent, then it is illegal. *See, e.g., Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) ("Antitrust law … sometimes permits judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable, or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision.") (citing cases) (internal citations omitted); *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 179 (1940) (liability for conspiracy may result from "informal gentlemen's agreement or understanding"); *Esco Corp. v. U.S.*, 340 F.2d

1000, 1006 (9th Cir. 1965) (a price-fixing agreement is not usually accomplished through a "formal signed-and-sealed contract or written resolution"); *id.* at 1007 ("A knowing wink can mean more than words.").

The Complaint alleges that Defendants met and discussed railroad fuel surcharges in the industry at approximately the same time that they were announcing the details of their new fuel surcharge programs. Defendants now indicate that, during this period, they were not pricing independently, but instead purposefully following each other's pricing practices. In light of this, it is (at a minimum) *plausible* that Defendants' discussions at the AAR and otherwise were accompanied by improper communications, signaling, or signs of assent regarding their intentions about rail fuel surcharges. Thus, Defendants' own suggestion that their lockstep pricing was the result of "follow the leader" pricing practices only underscores the plausibility of the price-fixing conspiracy alleged in the Complaint.

The cases Defendants cite do not support dismissal. All but one involved appeals from grants of summary judgment, and thus reflected assessments of evidence and expert opinions. *See, e.g., Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 55 (7th Cir. 1992) (concluding that the plaintiffs "evidence" could not overcome defendants' evidence tending to exclude the possibility they were acting independently).[39] At the pleading stage,

---

[39] *See also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134 (3d. Cir. 1999) (considering testimony and expert evidence in evaluation of 'plus factors'); *In re Citric Acid Litig.*, 191 F.3d 1090, 1106 (9th Cir. 1999) ("All in all, there is no more than a scintilla of evidence that [defendant] was a participant in the citric acid conspiracy" which is insufficient to overcome summary judgment); *Clamp-All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 489 (1st Cir. 1988) ("We can find no concrete evidence in the record that [defendant] acted improperly."). The Defendants reliance on *In re Travel Agent Commission Litigation*, the only non-summary judgment case on which they rely, is also puzzling. As noted above, there the court found that, on a number of occasions, some defendants "entirely" failed to follow other defendants' pricing moves – which is not follow-the-leader pricing by definition. 2007 WL 3171675, at *4.

however, "a court constru[es] the complaint liberally in the plaintiff's favor, accept[ing] as true all of the factual allegations contained in the complaint, with the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet*, 525 F.3d at 15 (citations omitted).

Moreover, the courts in *Citric Acid*, *Clamp-All*, and *Baby Food* (*see* footnote 39, *supra*), cited by Defendants, found merely that the adoption of similar list prices, alone, could not be a basis for sustaining a Section 1 claim. One factor underpinning these decisions was the fact that the defendants competed over the actual prices charged. *See*, *e.g.*, *Citric Acid*, 191 F.3d at 1102 ("[a]lthough there appears to have been little competition in citric acid *list prices*, [defendant] did price aggressively in actual contracts") (emphasis in original).[40] Defendants here did not compete over how rail fuel surcharges were set *or* charged, and agreed not to negotiate discounts on their fuel surcharges and overall contract rates. (*See* Compl. ¶¶ 84, 88, 92, 95.) As Defendants' own websites show (and showed to each other), the Western and Eastern railroads charged the exact same rail fuel surcharges during the conspiracy. The absence of *any* deviation is, indeed, striking.

Finally, Defendants contend that it is unremarkable that they engaged in lockstep pricing "for nearly 38 months" because, after their fuel surcharge formulas were set, monthly surcharge prices did "not reflect separate monthly pricing decisions by Defendants, but, instead, an automated application of the fuel surcharge mechanisms previously put in place." (Defendants' Brief at 32.) Again, it is difficult to see how this undercuts Plaintiffs' conspiracy allegations. Agreeing to use a common formula is an obvious means to implement a price-fixing scheme, and

---

[40] *See also Clamp-All Corp.*, 851 F.2d at 484 (Defendants "often set prices that deviated from their price lists."); *In re Baby Food Antitrust Litig.*, 166 F.3d at 130 ("the evidence shows that the defendants' actual transaction prices moved in different directions more often than not.").

it is illegal. *See, e.g., Socony-Vacuum Oil*, 310 U.S. at 222 ("price-fixing includes more than the mere establishment of uniform prices . . . *prices are fixed* . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, *if by various formulae they are related to the market prices*. *They are fixed because they are agreed upon*.") (emphasis added).

Absent a price-fixing agreement, there is no reason why Defendants were locked into using any particular fuel surcharge mechanism for 38 months or for any other period. Absent a price-fixing agreement, each Defendant was free to adjust its surcharges any time it pleased. Defendants' apparent admission that they *ceased* making "monthly pricing decisions" during the Class Period thus comports with Plaintiffs' conspiracy allegations; it does not undermine them. (Defendants' Brief at 32.)

### C. Defendants' Numerous Breaks from Industry Practice Over a Short Period of Time Are Probative of Conspiracy

The plausibility of the alleged conspiracy can also be seen through the numerous breaks with past industry practice that occurred over a short period of time, and which align with Plaintiffs' account of Defendants' conspiratorial conduct. During the alleged conspiracy period, Defendants took numerous affirmative steps that represented a break with past practice. In particular:

- Defendants created and began using a brand-new rate-escalation index in their contracts (the AIILF), notwithstanding that the indexes in use (the AII/RCAF) were long-standing, widely accepted in the industry, and captured all actual increases in fuel costs;
- The Western and Eastern railroads coordinated their fuel surcharge programs, including not only the index used, but the trigger points, timing of adjustments, and other minute details;
- The Western and Eastern railroads' fuel surcharges moved into lockstep for the first time, and stayed there throughout the Class Period;
- Defendants stopped negotiating rail fuel surcharge rates with any of their customers;

- Defendants collectively moved away from using long-term contracts with their customers;
- Defendants collectively moved away from using "through rates" in interline shipments, facilitating their ability to police compliance with the conspiracy;
- Defendants stabilized their market shares.

As the Supreme Court observed in *Twombly*, "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy." *Twombly*, 127 S. Ct. at 1966 n.4 (internal quotations omitted).

A "marked change in [D]efendants' behavior around the time the conspiracy allegedly started" renders Plaintiffs' conspiracy allegations plausible. *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1096 ("Taken as true, plaintiffs' allegations show that there was a marked change in defendants' behavior in the market around the time the conspiracy allegedly started. … Accordingly, direct-purchaser plaintiffs have pleaded allegations that if true would make an antitrust conspiracy plausible."); *Fair Isaac Corp.*, 2008 WL 623120, at *6 ("In the instant case, the Second Amended Complaint alleges a close temporal proximity between the Credit Bureaus' agreement to jointly create, own, and control VantageScore, and the beginning of the alleged parallel price manipulation and denial of access to the Credit Bureau's data."); *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566 (2:03-cv-01431-PMP-PAL), Order (Docket No. 843) at p. 6 (D. Nev. Feb. 19, 2008) ("Plaintiffs allege a historically unprecedented change in natural gas prices as the result of widespread false reporting of trade information made by multiple competitors during the same time period in the natural gas industry for no discernible reason other than conspiracy. This factual pattern is precisely the type of context *Twombly* recognized as supporting a plausible suggestion of agreement.").

The Complaint alleges that none of these measures were necessary to achieve Defendants' proffered justification of managing rising fuel costs. Because cost-adjustment indexes (the AII and RCAF) that accounted fully for rising fuel costs were already in use, the adoption of the AIILF and the use of separately-assessed fuel surcharges were not needed. (*Id.* ¶¶ 4, 74.) As the STB determined, it was "misleading" for Defendants to suggest that the fuel surcharges they imposed reflected actual fuel costs. To the contrary, as the STB held, Defendants' fuel surcharge programs which "increase[] all rates by a set percentage stand[] *virtually no prospect* of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." (*Id.* ¶ 16) (*quoting* STB Ruling at 6) (emphasis added).[41]

Defendants do not even attempt to explain why the fact that all of this affirmative conduct occurred over a short period of time is not itself suggestive of a conspiracy. They disaggregate certain actions and try to explain them as innocent. This attempt to explain each element in isolation is itself improper. *See Jung*, 300 F. Supp. 2d at 156; *see also In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159 at *7.

Defendants note that the railroads moved into lockstep in the West when UP adopted the fuel surcharge mechanism that BNSF was using, and that the railroads moved into lockstep in the East when NS adopted the fuel surcharge mechanism that CSX was using. (*See* Defendants' Brief at 26-29.) This is true, as the Complaint makes clear. But it is difficult to see why Defendants think this should remove their conduct from suspicion. These changes occurred over

[41] Defendants argue that publication of the AIILF "could have" been motivated by Defendants' concern that use of the AII/RCAF indexes only permitted fuel cost recovery after a significant "lag." (Defendants' Brief at 39.) As discussed above, this justification is counter to the allegations in the Complaint (which must be fully credited at this stage of the proceedings) and counter to the findings of the STB. *See, supra,* at p.39.

a short period of time, grouped around the concerted action by Defendants to publish and adopt a brand-new index, which allowed them to impose that new index and the stand-alone surcharges on all their customers at the same time. These changes also occurred along with Defendants' refusal to negotiate fuel surcharge rates, their move from long-term contracts and through rates, and their stabilization of market shares. Defendants never explain why *all* this conduct was occurring around the same time.

The nearest Defendants come to addressing the close temporal proximity of their numerous breaks with past practice at the outset of and during the conspiracy period is to argue at length that the move into lockstep pricing by the Western and Eastern railroads was not "simultaneous." (Defendants' Brief at 25-30.) Notwithstanding pages of argument on the point, however, it is simply a "red herring." As alleged, when the Western railroads began actively to impose their largely-dormant fuel surcharge programs in July of 2003, they simultaneously brought their fuel surcharge rates into lockstep and kept them there through at least mid-2007, despite changing market conditions, individual factors affecting fuel prices, and customer objections. Similarly, when the Eastern railroads began to impose the AIILF and stand-alone fuel surcharges on their customers, right after Defendants' collectively published the AIILF, they too simultaneously brought their fuel surcharge programs into lockstep and kept them there through at least mid-2007.

Finally, some of Defendants' attempts to suggest that their surcharge programs changed at different times only make their pricing behavior more suspect. Defendants argue, for example, that, "Although the Complaint alleges that Defendants had the 'exact same fuel surcharges … through at least mid-2007,' the website data shows that, effective July 1, 2006, NS modified its WTI Index-based fuel surcharge by significantly increasing the trigger point … and

reduced the increments by which the fuel surcharge is increased." (Defendants' Brief at 29, n.9 (internal complaint citations omitted) (citing Exhibit E to Reinhart Declaration (Doc. No. 106)).) Defendants' historical fuel surcharges, as reported on the websites *they submitted* with their motion, however, show that NS and CSX continued to charge the exact same fuel surcharges *from July 1, 2006 on*. *Compare* Exhibit E to Reinhart Declaration (NS surcharges in, for example, August and September of 2006 were 19.2% and 20.8%) with Exhibit F to Reinhart Declaration (CSX surcharges in August and September of 2006 were 19.2% and 20.8%).

Evidently, this purported change by NS *made absolutely no difference* to its prices at all: they remained in complete lockstep with CSX right up until the last dates reported on the websites. *Compare* Exhibit E (NS surcharge in October of 2007 was 20.0%) with Exhibit F (CSX surcharge in October of 2007 was 20.0%). How is this supposed to undercut the conspiracy's plausibility?

### D. The Complaint's Allegations of Defendants' Other Conspiratorial Conduct Further Support the Plausbility of the Alleged Conspiracy

The Complaint details various additional steps taken by Defendants to perpetuate, and ensure the effectiveness of, their conspiracy. (*See* Compl. ¶¶ 89-95.) As many of these steps would not have been in any Defendant's independent self-interest in the absence of a conspiracy, they further support the plausibility of the alleged conspiracy. *See, e.g., Babyage.com, Inc.*, 2008 WL 2120493, at *4 ("Plaintiffs have alleged that implementing RMP agreements was against each manufacturer's independent self interest. This tends to suggest … the absence of unilateral action.").

Defendants try to divorce Plaintiffs' allegations about these matters from their context, in order to present them as a merely "random assortment" of allegedly unpersuasive allegations. (Defendants' Brief at 40.) But when such allegations are evaluated "by looking at [the

conspiracy] as a whole," *Cont'l Ore Co.*, 370 U.S. at 699, each adds to the plausibility of the inference of conspiracy.

### 1. Industry Communications

As discussed above, the Complaint alleges that Defendants, and their top executives, engaged in numerous meetings throughout the Class Period, including meetings that are alleged to have directly involved conspiratorial conduct. Defendants' assertions that the Complaint is "[b]ereft of any specific allegations" and "does not identify the people who reached the agreement, nor how, when, or where it was reached" (Defendants' Brief at 41) are utterly baseless. Defendants ignore, for example, paragraph 65:

> 65. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of weighted RCAF and AII (which had already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their programs through a variety of means discussed herein.

(*See also id.* ¶ 9.)

Elsewhere, Plaintiffs identify Matthew Rose, chairman, president, and CEO of Defendant BNSF, as an executive directly involved in this unlawful concerted conduct. (*Id.* ¶ 68.) To the extent the Defendants want more names of executives, this is not because of any genuine need for notice. Defendants themselves undoubtedly know the names of their executives who attended the AAR board meetings in October and December of 2003 identified in paragraph 65. Plaintiffs also allege the existence of other locations where Defendants' top executives met

during the Class Period, including the Spring 2003 NFTA meeting, which occurred shortly before the Western railroads began to coordinate their fuel surcharges. (*Id.* ¶¶ 58-59.)

While the identification of such opportunities to discuss, reach, and maintain the unlawful agreement may not be sufficient standing alone to plead a claim, these allegations do not stand alone. They are tiles in a larger evidentiary mosaic, and they further bolster the plausibility of the alleged unlawful conduct. Before *Twombly* and after, numerous courts have recognized that allegations concerning interfirm communications, including those occurring at trade associations, may be considered in assessing whether a conspiracy can be plausibly inferred. *See, e.g.*, *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 (considering allegations of "price-fixing discussions during industry events" in denying motion to dismiss); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, MDL No. 1819, 2008 WL 426522 at *6 (N.D. Cal. Feb. 14, 2008) (rejecting defendants' arguments for dismissal under *Twombly* where plaintiffs' complaint included, *inter alia*, allegations of trade association meetings that provided opportunities to conspire and instances of intercompetitor exchanges of price information).[42]

Finally, Defendants' argument that nothing can be inferred from their *interline* communications is misplaced. (Defendants' Brief at 41.) While the Complaint alleges that Defendants took collective action to end "through rates" on interline freight transportations as a

---

[42] *See also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d. Cir. 2004) (proof of conspiracy can consist of the fact that "defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations or exchanged documents are shown") (citation omitted); *In re Automotive Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482, 492 (E.D. Pa. 2005) ("Evidence of communication and cooperation among Defendants through the aegis of a trade association may also be relevant to establish the existence of a conspiracy or combination, which is a required element of a Section 1 Sherman Act claim."); *In re Carbon Black Antitrust Litig.*, MDL No. 1543, 2005 WL 102966, *8 (D. Mass. Jan. 18, 2005) (considering allegations that "price increases were coordinated through unlawful communication via a third-party conduit and at trade association meetings" and denying motion to dismiss).

means to help effectuate the fuel surcharge conspiracy (*see* Section III.D.3, *infra*), the Complaint does not allege that such interline communications were used in any way with respect to adoption of the AIILF, the establishment of the fuel surcharge programs, or the steps to bring fuel surcharges rates into lockstep in each of the eastern and western regions. (*See, e.g.*, Compl. ¶¶ 8, 9, 58.)

**2. Short-Term Contracts**

The Complaint also alleges that, as one aspect of the conspiracy, Defendants decided collectively to move away from long-term contracts and toward more prevalent use of shorter-term contracts or contracts with 30-day cancellation provisions. (Compl. ¶¶ 15, 89.) This is yet another break with industry practice during the Class Period, and it would not have been in any Defendant's independent self-interest absent a conspiracy. Long-term contracts allow railroads to lock in business, and it is unlikely that all Defendants would have moved away from this practice simultaneously if they had concerns that their competitors would try to take their business.

Defendants rationalize this conduct by asserting that, in a period of high demand and tight capacity, moving to shorter-term contracts is "economically rational behavior." (Defendants' Brief at 43.) The fact that Defendants may have had some economic incentive to move to short-term contracts, however, does not explain why all Defendants did this in tandem at the same time as they took the other alleged steps in the Complaint. A plausible explanation is that the move toward short-term contracts was one means by which Defendants could collectively maximize their profits from the conspiracy, by allowing their rate-based fuel surcharges to be broadly imposed in an era of rising base rates.

Defendants also suggest that the move to shorter-term contracts is at odds with the Complaint's allegations concerning the centrality of the AIILF to the conspiracy. (*Id.*) In fact,

Defendants' use of the AIILF for longer term contracts, and a move to increasing use of shorter-term contracts, were complementary elements of the conspiracy, which was focused on maximizing application of the stand-alone fuel surcharges as a revenue enhancement mechanism. At the time the AIILF was adopted, most freight was transported pursuant to private contracts that included cost-adjustment provisions based on the AII or RCAF indexes that already accounted for actual fuel cost increases. The AIILF was the necessary means to address cost escalation in long-term contracts, which many customers continue to have to this day. The AIILF was thus integral to the conspiracy, while at the same time Defendants increasingly sought to have shorter term contracts.

Thus, in the context of the Complaint's allegations, this collective move toward short-term contracts by Defendants during the Class Period supports the plausibility of the conspiracy.

**3. Through Rates**

The Complaint also alleges that, during the Class Period, Defendants made another break from past industry practice, and one that required joint conduct: moving away from using a single "through rate" for interline shipments, and instead having each railroad bill the customer separately. (Comp. ¶ 94.) The Complaint explains that this change was made to increase pricing transparency in order to monitor compliance with the conspiracy and so that each Defendant could bill separately for its surcharge. This change would not have been consistent with any individual Defendant's independent self interest, absent a conspiracy. In response, Defendants neither deny that the practice marked a new departure from historic rate billing practices, nor offer any reason as to why the new practice was adopted by all Defendants at the same time. Instead, Defendants claim that the move away from through rates would not lead to greater transparency. (Defendants' Brief at 43-44.)

Contrary to Defendants' assertion, their collective movement away from through rates does serve to "provide transparency as to what each railroad was charging on multiple line shipments." (Compl. ¶ 94.)[43]

The elimination of single-factor through rates allowed each Defendant in multi-railroad shipments to transmit its own invoice and collect its own fuel surcharge (typically a separate line item on the invoice), and thus allowed each Defendant to demonstrate to its competitor that it was assessing and collecting the agreed upon surcharge. Policing the fuel surcharge agreement thus became far easier. This shift away from through rates could not have been accomplished without the collective action of the Defendants, and it supports the plausibility of the alleged conspiracy.

#### 4. Advance Publication of Fuel Surcharges

The advance announcement of Defendants' fuel surcharges, and publication of those surcharges on their respective websites, provided each Defendant with a means to detect deviations from the price fixing scheme. (Compl. ¶¶ 14, 61, 71.) Defendants attempt to justify this practice as "customer service" and suggest that they publicly announced their surcharges in order to fulfill their obligation to "provide to any person, *on request*, the carrier's rates and other service terms." (Defendants' Brief at 45 (emphasis added).) These reasons are unpersuasive.

Essentially every business is willing to provide to any customer its rates on request, but not every business publicly announces its rates – to its customers and competitors – and explains

[43] When one railroad enters into a single-factor through rate with another railroad, the division of revenues for each railroad and the fuel surcharge actually being assessed and collected by each railroad cannot be discerned by those railroads' nearest regional competitors. So, for example, if BNSF is shipping freight from the West to East coast, and enters into interchange service with CSX, the through-rate customer's bill will not delineate the division of revenues between BNSF and CSX. If the customer shows that bill to BNSF's and CSX's competitors (NS or UP) during the context of contract negotiations, NS or UP cannot determine if a fuel surcharge is even being charged, let alone the amount of the surcharge.

exactly how they will be computed in the future. Defendants have given no persuasive justification for why they needed to do this, in light of the serious anticompetitive concerns with disclosing one's prices and pricing intentions to one's competitors.[44]

Defendants' justifications aside, publication of prices can be a relevant factor supporting an inference of conspiracy. For example, the *OSB* court, in a post-*Twombly* ruling, found probative of conspiracy an allegation that the defendants published their prices in an "industry periodical," thereby allowing defendants to "monitor their competitors and ensure that no member of the conspiracy 'cheated' by offering significantly different prices." *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *3; *see also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 906 F.2d 432, 449 (9th Cir. 1990) (concluding that the defendants' public posting of prices and discounts "supports a reasonable and permissible inference of an agreement or understanding concerning prices").

### 5. Failure to Negotiate Fuel Surcharges

During the Class Period, Defendants refused to negotiate the rail fuel surcharges they implemented, or even to reconsider their rail fuel surcharge practices, although it had been customary for them to do so previously, when stand-alone fuel surcharges had been used sporadically and only in isolated instances. (Compl. ¶¶ 92-93.) "Shippers from many different

[44] As the Supreme Court observed in *U.S. v. Container Corp. of America*:

> Here all that was present was a request by each defendant of its competitor for information as to the most recent price charged or quoted, whenever it needed such information and whenever it was not available from another source. Each defendant on receiving that request usually furnished the data with the expectation that it would be furnished reciprocal information when it wanted it. That concerted action is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act.

393 U.S. 333, 335 (1969) (footnote omitted).

industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were 'not negotiable.'" (*Id.* ¶ 92.) Defendants' new practice of refusing to negotiate surcharges, which must be accepted as true at this stage, goes to the heart of the conspiracy alleged. This change would clearly not have been consistent with any individual Defendant's independent self-interest, absent a conspiracy. It supports an inference that a conspiracy was plausible.

In response, Defendants assert that because the railroad industry was going through a period of high demand and tight capacity, it is natural that they would all cease negotiating surcharges. (Defendants' Brief at 45.) But this is far from a necessary inference. Even under such conditions, companies can still use negotiation or discounting to increase market share and, therefore, profits. Particularly combined with Plaintiffs' allegations that Defendants' had different fuel efficiencies and operating costs (Compl.¶¶ 83, 86), and that Defendants' market shares remained stable during the Class Period, this allegation further supports the plausibility of the conspiracy.

**6. Government Investigation**

As set forth in the Complaint, Defendants have publicly disclosed that they are the subject of at least one government investigation of their fuel surcharge practices. Every Defendant has received at least one state grand jury subpoena or state grand jury inquiry concerning rail fuel surcharges. (Compl. ¶ 18.) Contrary to Defendants' suggestion, this ongoing governmental investigation also supports the plausibility of the alleged conspiracy. *See, e.g., In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff may surely rely on governmental investigations, but must also, under FRCP 11, undertake his own reasonable inquiry and frame his complaint with allegations of his own design.") The fact

that an Attorney General's office with limited resources to protect the public welfare exercised its discretion to convene a grand jury to investigate these surcharges supports the plausibility of the Complaint's allegations.

**7. Market Share Stabilization**

Plaintiffs also allege that, during the course of their conspiracy, Defendants agreed not to compete for market share and that Defendants' market shares remained stable following the 2003 agreements. (Compl. ¶ 95.) Defendants do not directly address this allegation, which obviously supports the plausibility of a conspiracy. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002) ("that market shares did not fluctuate significantly during the period of the alleged [ ] conspiracy may indicate that the sellers had agreed tacitly or otherwise to share the sales opportunities created by the growth in demand").

As noted above, an industry analyst at the time expressed puzzlement at the fact that the Defendants had ceased competing to gain market share in favor of charging the same prices. (Compl. ¶ 84.) It is a reasonable inference that this analyst was puzzled by the railroads' conduct because it was not in any individual railroad's independent self interest, absent a conspiracy. (*See id.* at ¶¶ 87, 88.)

* * *

Thus, in sum, Plaintiffs have not only directly alleged unlawful concerted conduct by the Defendants in detail, and placed this conduct in a factual setting firmly suggesting the likelihood of conspiracy, but have also alleged additional features of the conspiracy that further bolster its plausibility. The Complaint here does far more than "nudge" this case into the realm of plausible conspiracy. Defendants' characterization of the Complaint's allegations as "conclusory" is baseless and their *post hoc*, piecemeal justifications fall far short of overcoming Plaintiffs' allegations.

## CONCLUSION

For all of the foregoing reasons, Defendants' joint motion to dismiss the direct purchasers' Complaint should be denied.

Dated: July 8, 2008

Respectfully submitted:

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Daniel Brockett
Sami H. Rashid
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

/s/ Michael D. Hausfeld
Michael D. Hausfeld (D.C. Bar #153742)
Benjamin D. Brown (D.C. Bar #495836)
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: mhausfeld@cmht.com

Steig D. Olson
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

*Direct Purchaser Plaintiffs' Interim Co-Lead Class Counsel*

Case 1:07-mc-00489-PLF Document 945 Filed 01/12/12 Page 1 of 54

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF)<br><br>**PUBLICLY FILED VERSION** |
| This Document Relates To:<br><br>ALL CASES | Judge: Hon. Paul L. Friedman |

**DEFENDANTS' MOTION & MEMORANDUM OF LAW REGARDING THE INTERPRETATION AND APPLICATION OF 49 U.S.C. § 10706**

***Second***, the Court should apply this framework to particular evidence that Plaintiffs identify as core to their conspiracy claim. As addressed in Section III below, Plaintiffs' evidence consists of communications and agreements that are protected by Section 10706, and are thus unavailable as proof of an antitrust conspiracy.

Resolving these issues has direct implications for summary judgment, for any potential trial, and ultimately for the ability of the railroads to continue operating an effective national rail network. Defendants intend to move for summary judgment on the ground that Plaintiffs lack sufficient admissible evidence to meet their burden to prove conspiracy under *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 594 (1986). The scope of those motions will be significantly affected by the Court's answers to the questions posed here.

## I. COMMUNICATIONS AND AGREEMENTS RELATED TO INTERLINE TRAFFIC ARE MANDATORY, LAWFUL, AND PRO-COMPETITIVE

This Court will be the first to interpret Section 10706 since Congress enacted it in 1980, as part of a broad overhaul of railroad regulation. This overhaul was intended to breathe life back into a dying industry nearly bankrupted by excessive regulation and the "advent of the interstate highway system" and the resulting growth of trucking. *See* Decl. of Christopher Campbell ("CD"), Ex. 1 (Giftos Dep. (CSXT CMO) at 237:23-238:5). Congress resurrected the rail industry by, among other things, allowing railroads to enter into private contracts with shippers and encouraging continued collaboration between railroads on interline movements to create a seamless and more competitive truck-like service. That historical context and the need for robust interline cooperation directly informs the scope and meaning of Section 10706.

### A. The Interconnected Rail Freight Industry

No railroad has ever covered the entire country—for nearly 200 years, each railroad has served a limited geography. Currently, and during the class period, over 500 freight railroads

operate in the United States, including 7 Class I railroads (the largest railroads by revenue).[1] Defendants' route maps show why interline shipments exist: no single railroad's tracks cover everything. *See* Figure 1, *supra* at v. Interline rail service is essential to U.S. transportation and fulfills the constant demand for cross-country transportation services. Between one-third and one-half of each Defendant's unregulated shipments during the class period were interline. CD Ex. 2 (Rausser Merits Report at 47-48).

Railroads compete with all modes of transportation, particularly trucking, which can reach destinations that no single railroad can on its own. Railroads must collaborate with each other to offer origin-to-destination service on all routes that is similar to what trucks offer—a herculean task of coordination given the volume of traffic at issue. Competitive interline rail service demands more than the product showing up safely and on time. The customer wants this entire process to be seamless, *as if a single railroad is handling each shipment.* After all, that is what the customer enjoys from its trucking partners, which are railroads' "primary source of competition." CD Ex. 3 (Ward Dep. (CSXT CEO) at 40:12-19); *see also* CD Ex. 4 (Anderson Dep. at 35:21-25 ("85 percent of transportation revenue is from trucks. They're a competitor. They're very easy to do business with. And we have to figure out ways to seamlessly work together so that we are more truck like or else we will not get the business.")); CD Ex. 5 (Lanigan Dep. at 144:5-16 (discussing customer concerns about interline bill variation)). Interconnection of tracks and interchange of freight on the rail network requires extensive communication and coordination between carriers. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 247 n.1 (D.C. Cir. 2013)

---

[1] *See* U.S. Dep't of Transp., *Freight Facts & Figures 2017*, at 5-5, Table 5-3 (12th ed. 2017), *available at* https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/FFF_2017.pdf; Ass'n of Am. Railroads, *Overview of America's Freight Railroads* (Oct. 2018), *available at* https://www.aar.org/wp-content/uploads/2018/05/AAR-Overview-Americas-Freight-Railroads.pdf.

("Facilitating interline traffic requires coordination among competing freight railroads over logistics and shipping rates."). Entire teams from each participating railroad must share a plethora of information, such as shipment and equipment details, and routing strategy in light of weather and track conditions, to coordinate the operational aspects of getting carloads from one rail line to another.

Customers also want a single economic package from the interlining railroads, which is what customers receive from trucking companies. Railroads must discuss and ultimately agree on virtually every aspect of their joint economic offering, *e.g.*, who will bill the customer and at what rate, how to divide the rate, and which (if any) fuel surcharge formula will be applied.

Communication and coordination are not limited to discussions of specific shipments for a specific shipper. It would be impossible to individually discuss the total economic offering for each of the interline shipments handled every day.[2] Railroads must discuss a comprehensive interline program so that each can market and provide this expanded service to compete with trucking. These types of coordinating communications are part of a railroad's day-to-day reality. Rail transport would grind to a halt if every aspect of each of the many thousands of daily interline shipments and potential shipments had to be separately negotiated. And it is often the carriers' high-level executives, those with the strategic perspective and ability to drive action, who can best achieve the procompetitive possibilities of interline services. *See*, *e.g.*, CD Ex. 3 (Ward Dep. at 55:9-21, 64:4-12 (explaining his role as a CEO at Alliance meetings)).

---

[2] Millions of interline transactions occurred during the alleged conspiracy, CD Ex. 7 (Rausser Class Reply Report at 94 ([redacted])); Ex. CD 2 (Rausser Merits Report at 47-48 ([redacted]), and interline offerings are almost infinite in their variety. They change daily in response to customer demand.

Notably, interlining railroads act as joint venturers in a vertical supply relationship, cooperating publicly in the successful origination, interchange, and safe and timely delivery of goods that cannot be shipped by a single railroad. The communications necessary for partnering railroads to develop and optimize their joint service are therefore procompetitive, output enhancing, and present no antitrust concern. Plaintiffs' expert admits that when carriers like CSXT and UP combine to move interline traffic, they are engaged in a *vertical* relationship, not a horizontal one. CD Ex. 7 (Rausser Dep. (12/18/2012) at 288:23-291:4). As Donald Flexner (acting Deputy Assistant Attorney General, Antitrust Division, DOJ) testified at hearings on the Staggers Rail Act:

> [I]t must be emphasized that in the ordinary situation, when two carriers interline at a particular junction point and provide a through service, *the antitrust laws do not proscribe in any way* the negotiation by the two carriers of a through rate for these movements. Simply stated, these two carriers *do not compete with each other for the carriage of the interline traffic* and, therefore, they *have no reason to fear antitrust liability* in this situation.

CD Ex. 8 (Hearing on H.R. 4570 *Before the Subcommittee on Transportation and Commerce Committee on Interstate and Foreign Commerce*, House of Representatives, 96th Cong. 427 (Oct. 23, 1979) (statement of Donald L. Flexner) (emphasis added)). Similarly, Federal Trade Commission representatives testified that "[n]o one has seriously suggested that antitrust problems are created where railroads are simply end-to-end connectors – *i.e.*, when they interconnect with each other but do not overlap." *Id.* at 513. And Congress recognized the need for cooperation on interline routes by *requiring* rail carriers to offer "through routes" and to establish rates for those routes. 49 U.S.C. § 10703. For customer convenience, and to simplify negotiations and reduce transaction time and costs, rail carriers regularly establish a single "joint rate" for these through routes. *Balt. Gas & Elec. Co. v. United States*, 817 F.2d 108, 110 (D.C. Cir. 1987) ("The rate

charged [for a through route] is a joint rate if it is published as a single tariff . . . divided among all participants. . . .") (footnote omitted).[3]

### B. The Adoption Of Section 10706 In The Staggers Rail Act Of 1980

In 1980, "[f]aced with railroad bankruptcies and the need to assure railroads of adequate revenues, Congress revamped the structure of railroad regulation in order to restore the industry to health." *Coal Exps. Ass'n of the U.S., Inc. v. U.S. & ICC*, 745 F.2d 76, 81 (D.C. Cir. 1984). In the Staggers Rail Act of 1980 and its predecessor, the 4R Act of 1976, Congress curtailed the use of rate bureaus in favor of flexible, individual railroad pricing with limited regulatory overview. The Staggers Rail Act allowed railroads to compete more effectively with other modes of transportation, particularly on long-haul rail movements that often require interline cooperation. Congress knew that interline partnerships would be crucial to this revitalization effort.

At the same time, Congress reasonably worried about the consequences of mandating extensive coordination among railroads that have some competitive overlaps. It knew that an antitrust plaintiff might misuse legitimate industry communication to draw inferences of conspiracy, thereby chilling the very interline cooperation Congress was trying to encourage. Congress explained its rationale in words that are prophetic of this case:

> Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed. To prevent such a conclusion the Conference substitute provides procedural protections about lawful discussions and resulting rates. The Conferees intend that these protections be construed to insure

[3] Shippers and rail carriers also have the option, through an accounting mechanism known as "Rule 11," to develop an individual rate for each portion of a through route, resulting in a separate rate agreement between the shipper and each participating rail carrier. To use Rule 11, shippers must negotiate independently with multiple rail carriers and process and pay multiple invoices for a single move, which is why many shippers prefer negotiating a single joint rate. Even where Rule 11 is used, connecting rail carriers nonetheless must communicate about the traffic because of the need to interchange that traffic across the carriers' connecting networks.

competitors might suggest unlawful behavior, interline communications in the rail industry are procompetitive and required. If interline communications could be used to infer a conspiracy, railroads would risk antitrust liability for doing the very thing Congress sought to encourage when it deregulated the industry and "encourage[d] carriers . . . to make widespread use" of contracts, including interline agreements. Conference Report, 1980 WL 13000, at *98.

Section 10706 solves this problem. In enacting Section 10706, Congress left existing antitrust remedies in place. But Congress also expressly recognized the danger that required communications "about interline movements in which [rail carriers] interchange . . . could falsely lead to conclusions about rate agreements that were lawfully discussed[.]" Conference Report, 1980 WL 13000, at *114.[6] Congress passed Section 10706 to "prevent such a conclusion[.]" *Id.*

Section 10706 ensures that procompetitive interline partnerships function in a robust way, while recognizing that certain rail carriers compete for "local" traffic in parallel to their interline partnerships. Congress recognized that where industry participants both compete in certain respects and must cooperate in others, plaintiffs may misconstrue or mischaracterize lawful interline cooperation. Legitimate interline activity would be chilled without the clear protections in Section 10706.

### B. Section 10706 Provides A Clear Framework Prohibiting Any Inference Of "Conspiracy" From Interline Communications And Related Conduct

Turning to the specifics of the statute, we begin, as the law commands, "with the plain language." *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) (citation omitted). Section 10706 protects against "false conclusions" from interline communications via

[6] The Conference Report "represents the final statement of terms agreed to by both houses," and, therefore, "next to the statute itself it is the most persuasive evidence of congressional intent." *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981); *see also Moore v. District of Columbia*, 907 F.2d 165, 175 (D.C. Cir. 1990).

two interrelated protections, each of which is discussed below.[7]

1. Section 10706 Bars Any Inference Of An Unlawful Agreement From Evidence Of A "Similar Action" On Other Traffic

Section 10706 begins with a straightforward, substantive protection:

> [P]roof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic.

49 U.S.C. § 10706(a)(3)(B)(ii). Simply put, there can be no inference of any conspiracy where:

- two or more railroads acted together with respect to rates or related matters for interline traffic, such as by discussing or implementing a fuel surcharge; and
- one or more of the railroads *also* used the same or similar rates or took similar action on other traffic, such as by implementing a similar fuel surcharge on non-interline traffic, or on other interline traffic.[8]

The rationale behind this protection is clear: a railroad may legitimately and unilaterally apply similar practices to shared interline traffic and to local traffic across its entire network for efficiency. A standard fuel surcharge formula is a perfect example. There is no requirement that a particular railroad's fuel surcharge formulas should differ because traffic is local or interline, or

---

[7] Section 10706 applies "[i]n *any proceeding* in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section [including 'the Sherman Act (15 U.S.C. 1, et seq.)'] or of any similar State law." 49 U.S.C. § 10706(a)(3)(B)(ii) (emphasis added). It is beyond dispute that "any proceeding" includes this litigation, which alleges a violation of Section 1 of the Sherman Act.

[8] The fuel surcharge assessed as part of a customer's rate is unquestionably part of the rate itself. 49 U.S.C. § 10102 (defining "rate" to mean "a rate or charge for transportation[]"). Indeed, the surcharge is part of the overall monetary charge paid by the shipper in exchange for transportation services. In any event, even if it is not part of the rate, it clearly is a "related matter" to the rate. As the Supreme Court has explained, the ordinary meaning of the term "relating to" is "a broad one – 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with[.]'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)).

Dated: February 21, 2020

Respectfully submitted,


*/s/ Daniel M. Wall*
Daniel M. Wall
Timothy L. O'Mara
Christopher B. Campbell
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
allyson.maltas@lw.com

Tyrone R. Childress
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

Matthew M. Collette (D.C. Bar No. 427617)
MASSEY & GAIL LLP
10001 Maine Ave. SW Ste. 450
Washington, DC 20024
Telephone: (202) 795-3326

Leonard A. Gail
MASSEY & GAIL LLP
50 E. Washington St., Ste 400
Chicago, IL 60602
Telephone: (312) 379-0470

*Counsel for Defendant Union Pacific Railroad Company*

*/s/ Kent A. Gardiner*
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500

*Counsel for Defendant CSX Transportation, Inc.*

*<u>/s/ John M. Nannes</u>*

John M. Nannes (D.C. Bar. No. 195966)
Tara L. Reinhart (D.C. Bar. No. 462106)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
john.nannes@skadden.com
tara.reinhart@skadden.com

Saul P. Morgenstern
Jennifer B. Patterson
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10075
Telephone: (212) 836-8000
saul.morgenstern@arnoldporter.com
jennifer.patterson@arnoldporter.com

*Counsel for Defendant Norfolk Southern Railway Company*

*<u>/s/ Glenn D. Pomerantz</u>*

Glenn D. Pomerantz
Kuruvilla J. Olasa
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone: (213) 683-9100

Benjamin J. Horwich
Emily Curran-Huberty
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Samuel M. Sipe, Jr. (D.C. Bar No. 256446)
Linda Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000

Joshua H. Soven (D.C. Bar No. 436633)
WILSON SONSINI GOODRICH &
ROSATI LLP
1700 K Street NW
Washington, DC 20006
Telephone: (202) 973-8827

Veronica S. Lewis
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100

*Counsel for Defendant BNSF Railway Company*

**CERTIFICATE OF SERVICE**

I, Daniel M. Wall certify that on February 21, 2020, I caused a true and correct copy of the foregoing documents, the Declaration of Christopher Campbell in support thereof, and the Proposed Order granting Defendants' Motion to be served (1) by secured transfer on all counsel of record in the above-captioned matter; (2) by secured transfer on counsel for plaintiff in *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Company*, No. 11-cv-1049; and (3) by secured transfer on counsel for plaintiffs in cases consolidated as *In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, MDL No. 2925, No. 1:20-mc-00008, in which an appropriate protective order has been entered."

Dated: February 21, 2020

Respectfully Submitted,

/s/ *Daniel M. Wall*
Daniel M. Wall
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
allyson.maltas@lw.com

*Counsel for Defendant Union Pacific Railroad Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Miscellaneous No. 07-0489 (PLF/GMH) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER CASES | |
| OXBOW CARBON & MINERALS LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY, et al.,<br><br>Defendants. | Civil Action No. 11-1049 (PLF/GMH)<br><br>**FILED UNDER SEAL**<br><br>Judge: Hon. Paul L. Friedman |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION REGARDING THE INTERPRETATION AND APPLICATION OF 49 U.S.C. § 10706**

has every reason to view that self-serving testimony with skepticism. *See, e.g.*, *Rail Freight I*, 287 F.R.D. at 57 ("The Court agrees with plaintiffs that defendants' executives' declarations are unpersuasive and inconsistent with their later deposition testimony.").

Defendants' inventory of alliance meetings also omits various critical details, a few of which Plaintiffs highlight here (and all of which can be found in the interrogatory narrative included as SRD Ex. 9). Notably, Defendants omit from their motion NS and CSX's (the eastern railroads') April 2003 meeting to discuss fuel hedging strategies and practices. SRD Ex. 9 at 34-35. In addition, UP and CSX's March 12-13, 2003 meeting enabled both carriers to reconcile the widely varying approaches to fuel surcharges each had previously contemplated—and one week later, CSX announced a new standard carload fuel surcharge applicable to *all* of its traffic (single-line and interline, with UP or not). SRD Ex. 9 at 23-26. On April 4, 2003, UP likewise notified the other Defendants that it would apply the very same standard fuel surcharge program to *all* of its traffic (single-line and interline). *Id*. at 27 ("The modified surcharge will continue to apply to most Union Pacific pricing documents ***for local and interline freight movements***.") (emphasis added). Similarly, the March 18, 2003 BNSF-NS meeting spawned an action item that *was not even limited to the two carriers* in attendance, much less their shared joint-line business: "BNSF's fuel surcharge is structured differently than NS, CSX, and UP. Should BNSF's b[e] synchronized with *the other big players* in the industry? (John Lanigan/Don Seale)." CD Ex. 39, at BNSF-FSC 000643 (emphasis added). Handwritten notes from the May 14, 2003 UP-NS meeting use similarly sweeping language concerning fuel surcharges across the entire industry (and spanning all traffic), recording discussion that "[u]niform application *across the industry* would be helpful." CD Ex. 42, at UPFSC 0616652 (emphasis added). The associated meeting minutes explain further that "[c]onsensus was reached that it would be a positive outcome if *all roads* had the same process

in the eyes of our customers." CD Ex. 43, at NS 001000361 (emphasis added).[11] At a June 3, 2003 UP-CSX meeting, the two carriers compared "customer outcry" after announcing fuel surcharges for all traffic and discussed the need potentially to revisit trigger prices, and CSX shared its fuel hedging plans (which it previously discussed with NS)—all without any joint-line boundaries to the discussion.[12] Finally, in 2006, as customer outrage soared and the STB began scrutinizing their fuel-surcharge practices, Defendants abruptly terminated their alliance meetings.

Try as they might, Defendants cannot now transform their unprecedented and freewheeling discussions of, *e.g*., fuel surcharge "sychron[ization],""[u]niform application across the industry," an "industry position" on fuel surcharges, coordinated "trigger" prices, and anticipated customer pushback into purported narrow, antitrust-compliant discussions between interline partners as to shared joint-line business. There were no such limitations, as the documents and related deposition testimony confirm repeatedly. Defendants' own chart (Br. 43-44) betrays the absurdity of their theory. According to Defendants, it just so happens that every time they discussed fuel surcharges, the railroads then set fuel surcharges on all rates, but this Court should nevertheless conclude that the discussions concerned only interline rates even where the discussions *never* said the agreement was so limited and made only the most tangential reference to interline. *See, e.g.*, Br. 43 (claiming April 1, 2003 alliance meeting immunized raising fuel surcharges on all rates because at that meeting, the railroads discussed interline volumes and service). This Court should reject such an implausible and unsupported theory in the face of overwhelming evidence to the contrary.

[11] Defendants' post-hoc justification that this and other discussions "addressed a concern expressed by *shippers*" (Br. 36), is fanciful and lacks any contemporaneous support: the handful of comments provided by certain shippers to the STB are dated *more than three years later* and come in the context of widespread outrage by shippers over Defendants' fuel-surcharge practices.

[12] Defendants assert that "[t]his evaluation of customer reaction and whether it required a change was so that these interline partners could satisfy customers and maximize opportunities for interline routes" (Br. 33), but cannot muster any specific support for that enormous assertion.

Dated: April 17, 2020

Respectfully submitted:


_/s/ Michael D. Hausfeld_
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Michael P. Lehmann
Seth R. Gassman
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Email: mlehmann@hausfeld.com


*Counsel for Plaintiffs Dakota Granite Company, Donnelly Commodities Incorporated, and Strates Shows, Inc.*


_/s/ Meegan Hollywood_
Hollis Salzman
Meegan Hollywood
Eamon O'Kelly
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@robinskaplan.com


*Counsel for Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC*


_/s/ Stephen R. Neuwirth_
Stephen R. Neuwirth
Sami H. Rashid
Viola Trebicka
David M. Cooper
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

Paul M. Donovan
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue, N.W. Suite 700
Washington, DC 20036
Telephone: (202) 298-8100
Facsimile: (202) 298-8200
E-mail: paul.donovan@laroelaw.com


*Counsel for Plaintiffs Olin Corporation, US Magnesium LLC, Dust Pro, Inc., and Nyrstar Holdings, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 17, 2020, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic filing system, which automatically notifies counsel for all parties of the filing.

*/s/ Sami H. Rashid*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER CASES | **FILED UNDER SEAL** |

**PLAINTIFFS' SUPPLEMENTAL REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

conspiracy FSC formulas could simply be extrapolated into the Class Period. *Id.* at 48, 51-52.[36]

Defendants ignore this finding and the evidence, including:

- Defendants recognized that seeking greater FSC revenues in a competitive environment carried enormous risks, including "losing the surcharge altogether,"[37] especially when rates were declining due to competition, *id.* at 47;[38]
- CSX was under "pressure from Sales to lower" its standard FSC program,[39] and devised modifications to that program that would have significantly reduced FSCs, but—after CSX and UP executives met and discussed FSC "methodology"—adopted the more aggressive escalation formula that was being considered by UP;[40]
- Before the Class Period, BNSF gave customers across-the-board discounts to its FSC program in the face of "real world" competition,[41] and UP and CSX considered program-wide reductions to their FSC trigger prices in the face of customer "outcry,"[42]—which they never did in the Class Period; and
- Defendants understood that their more aggressive FSC formulas *and* aggressive FSC enforcement policies depended on coordinated and uniform enforcement.[43]

Because they fail to consider the evidence, defendants' criticisms are unreliable. *See, e.g.*, *In re Elec. Books Antitrust Litig. ("E-Books")*, 2014 WL 1282298, at *9 (S.D.N.Y. Mar. 28, 2014)

---

36 *See* arguments in Defs. Class Cert. Opp'n Br. at 40-41 (Dkt. No. 381); Defs. Supp. *Wal-Mart* Br. at 2, 13-15 (Dkt. No. 524); Defs. Supp. *Wal-Mart* Reply Br. at 7-8, 13-14 (Dkt. No. 526).

37 TD Ex. 87 at NS_010026784; *see* TD Ex. 57 at BNSF-0328866 ("any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive"); TD Ex. 100 at NS_010073466-67 (a more aggressive FSC could "significantly reduce potential FSC yield. . . . [W]e could experience a net decline in revenue.").

38 *E.g.*, TD Ex. 55 at BNSF0574531 ("We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy.").

39 TD Ex. 58 at BNSF-0027276.

40 Pls. Br. at 32 (citing evidence).

41 TD Ex. 66 at BNSF-0495601-02; TD Ex. 2 at UPFSC 0129813. NS's Don Seale complained that such discounting resulted in the "industry . . . not looking good on this issue," (TD Ex. 68 at NS_010042321), and NS raised the issue in a meeting with UP executives days later (TD Ex. 69 at NS 001000361).

42 TD Ex. 70 at UPFSC0001088; *see also* TD Ex. 71 at CSXFSC000000417.

43 *E.g.*, TD Ex. 60 at BNSF_0574216 ("it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail"); TD Ex. 111 at BNSF_0571517 (noting top "[r]isk that competitors reverse course on using a fuel surcharge").

(excluding Dr. Kalt's opinions where he "ignored the evidence" and "relied on unreasonable assumptions unmoored to the record evidence or directly contradicted by it"); *In re High-Tech Emp. Antitrust Litig. ("High-Tech I")*, 2013 WL 5770992, at *40 (N.D. Cal. Oct. 24, 2013) (defendants' "report is conclusory and contrary to the overwhelming evidence").

Defendants argue that—rather than studying all-in rates—Dr. Rausser should have studied the "earning power" of the new formulas compared to the old ones (*i.e.*, how much revenue the formulas would produce if applied at various fuel prices), and that his failure to do so shows "how irrelevant fuel surcharges are" to his model. (Defs. Br. at 5-6; *see id.* at 9, 32, 44.) But "earning power" alone tells us nothing.[44] That two formulas, as a matter of math, are *capable* of producing similar revenues when fuel prices are high[45] says nothing about whether they *in fact would have done so* in the but-for world. Defendants' "earning power" critique ignores the evidence that, absent collusion, they would not have been able to apply and enforce their formulas broadly. The point of the conspiracy was to use FSCs to raise all-in rates, and defendants recognized in 2003 that turning FSCs into a profit center required not just aggressive FSC formulas, but uniform enforcement.[46]

Defendants now impliedly assume that the old formulas, infrequently used in a competitive market, could have been applied absent collusion just as the new ones were applied,

---

[44] *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (fixed price was supra-competitive even though lower than some pre-conspiracy prices); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 644 (D. Kan. 2008) (finding irrelevant that conspiracy prices were lower than pre-conspiracy prices because relevant inquiry is whether conspiracy prices "were fixed or maintained at supracompetitive levels").

[45] In fact, the new formulas had greater "earning power" than the old ones. Rausser Supp. Class Cert. Reply at 32 & Table 2.

[46] TD Ex. 86 at NS_057005733 ("Our challenge is to bill and collect the FSC more than the formula of the surcharge" (emphasis in original)); TD Ex. 95 at NS_010004522 (NS official noting that adoption of more onerous FSC formula "could result in a net reduction in actual yield" if NS was forced to make "moderate concessions" on application).

even when fuel prices increased and FSC rates became much more onerous. There is no basis for that assumption.[47] It ignores that the conspiracy enabled the broad application of FSCs, the very thing defendants recognized they had been unable to achieve independently. Nor is there a legal basis for saying that a damages model must separately quantify the effects of each action defendants took pursuant to the conspiracy.[48] Defendants' focus on formulas gets them nowhere,[49] given that Dr. Rausser "persuasively explain[ed]" that his "'damage methodology pertains to all-in rates, rather than *merely the increase in Fuel Surcharge percentages*, and estimates how much those all-in rates increased as a result of Defendants' conspiratorial conduct.'" 287 F.R.D. at 73 (quoting Dr. Rausser) (emphasis added). For the same reason, defendants' suggestion that Dr. Rausser's model is flawed because it was not developed to predict FSC coverage is also lacking in merit.[50]

Defendants' new argument is especially disingenuous in light of their prior argument, based on the Fifth Circuit's decision in *Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004), that certification was inappropriate because FSCs were only one component of all-in rates. This Court rejected that argument, because "plaintiffs have presented persuasive documentary and expert opinion evidence that is common to the class that shows that the standard fuel surcharges were intended to raise overall prices as a percentage multiplier of the

---

[47] TD Ex. 112, Deposition of Joseph P. Kalt, Ph.D., May 7, 2014 ("Kalt May 7, 2014 Dep."), at 90 ("earning power" of an FSC "has nothing to do with" whether it was "universally applied").

[48] *See* note 34 *supra*.

[49] Rausser Supp. Class Cert. Reply at 36-37 ("A model designed to study FSC formulas, standing alone, would not have captured the full effects of the actual conspiracy (as Dr. Kalt admitted at deposition), and would have shed little light on whether the conspiracy raised all-in prices and caused damages to Class members." (footnote omitted)).

[50] *Id.* at 37-38.

Dated: May 28, 2014

Respectfully submitted,

Michael D. Hausfeld (DC Bar #153742)
Seth R. Gassman (DC Bar #1011077)
Sathya S. Gosselin (DC Bar #989710)
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel L. Brockett
Kyle R. Taylor
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Class Counsel*

**CERTIFICATE OF SERVICE**

I, Kyle R. Taylor, certify that on May 28, 2014, I caused a true and correct copy of the foregoing to be served by email on counsel for defendants.

/s/ Kyle R. Taylor

# Intentionally Omitted

## DA00135-DA00141

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) | MDL No. 1869<br>Misc. No. 07-489 (PLF)<br>Hon. Paul L. Friedman |
| This document relates to: ALL DIRECT PURCHASER CASES | ) | |

**Declaration of**

**Joseph P. Kalt, Ph.D.**

**On Behalf of Defendants**

**BNSF Railway Company**
**CSX Transportation, Inc.**
**Norfolk Southern Railway Company**
**Union Pacific Railroad Company**

March 31, 2014

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Figure 17

**Were Conspiracy FSCs More Onerous?**
**Pre-"Conspiracy" v. "Conspiracy" Published Carload FSCs**




**Source:** Kalt Merits Report Figure IV-1B.

98. The damages generated by Prof. Rausser's models are not plausibly caused by a switch from non-"conspiratorial" FSC formulas to more aggressive, "conspiratorial" FSC formulas. We saw in Figure 3 above that the earning power of Class Period FSCs on local carload class traffic was *less* than the earning power of the pre-"conspiracy" published FSC formulas applied to the local carload class traffic. The same conclusion as to FSC earning power is

---

conspiracy. If we limit Prof. Rausser's STB model to local carload class shipments, the model generates an average overcharge of 11.8%. For such shipments, we can replace the actual FSC with the FSC determined using non-"conspiratorial", pre-"conspiracy" published FSC formulas. All-in rates using the non-"conspiratorial" FSC formulas in place of the Class Period FSC formulas result in a reported overcharge which is slightly higher (12.6%) in the STB model. See Appendix C at C.II.8. This analysis is the basis for the data shown in Figure 3.

evident from Figure 18, which presents the weekly overcharges obtained by applying Prof. Rausser's STB model to his class carload traffic which moved under the purportedly conspiratorial published carload fuel surcharge formulas.[141] For this traffic, Prof. Rausser's STB model finds average weekly overcharges of 12.4% (black line). By comparison, the difference between the published "conspiratorial" FSC and non-"conspiratorial" pre-Class Period FSC formula rates are small and average very close to zero (orange line). An abrupt shift to more onerous Class Period FSC formulas did not occur, and thus Prof. Rausser's damages are not the result of such a shift.[142]

[141] This analysis is limited to class shippers paying one of the Defendant's published carload "conspiratorial" FSCs. A similar analysis, in which we compare pre-"conspiracy" published carload FSC formulas to "conspiracy" published carload formulas finds similar results. See my workpapers.

[142] Similarly, BNSF's intermodal surcharge formula did not change after 2001. Nevertheless, Prof. Rausser's model finds $522 million in damages for BNSF intermodal traffic, and a total of $872 million in damages for all four Defendants' intermodal class traffic. See my workpapers.

Figure 18

**Prof. Rausser's Model Finds Massive Overcharges Even when "Conspiracy" FSCs Are Not Materially Different from Pre-"Conspiracy" FSCs**




**Source:** Rausser Data Updated per Rausser Remand Report.

99. Further demonstration that the FSC formulas of the Class Period did not have greater earning power than pre-Class Period formulas is provided by Figure 19. This figure parallels Figure 3 above and shows each Defendant's actual average FSC rates on local carload traffic, the average FSC rate that would have applied to such traffic if subject during the Class Period to the pre-"conspiracy" published carload FSC provisions (as identified by Prof. Rausser), as well as the resulting difference in FSC payments that the actual and pre-"conspiracy" provisions imply.[143] In the last column of Figure 19, I show the "damages" that Prof.

[143] Data do not permit comparable analyses for interline and intermodal traffic. Thus, the damages figure for the local carload traffic depicted here is much lower than the damages figure for the class traffic as a whole.

Rausser's STB model, using the previously described individual shipper damage calculation method, yields for the subject traffic.

Figure 19

**The STB Model Finds "Damages" Even Though Actual Class FSCs Had Lower Earning Power than Pre-"Conspiracy" Published FSC Formulas**

| Railroad | Actual Class FSC Rate | Pre-"Conspiracy" FSC Rate | Difference (Actual - Pre-"Conspiracy") | Prof. Rausser's "Damages" |
|---|---|---|---|---|
| BNSF | 15.9% | 16.2% | -$4,287,689 | $84,637,793 |
| CSXT | 11.9% | 14.9% | -$54,856,110 | $160,269,709 |
| NS | 9.8% | 10.1% | -$8,349,801 | $100,706,374 |
| UP | 14.1% | 16.3% | -$66,007,315 | $229,477,247 |
| **Total** | **12.5%** | **14.1%** | **-$133,500,915** | **$575,091,122** |

**Source:** Rausser Data updated per Rausser Remand Report.
**Note:** Local carload traffic only. In light of rebasing, data for NS are not incorporated into the analysis after July 1, 2006.

100. As the figure indicates, each Defendant's actual total FSC revenues from Class Members on their local carload traffic were *less* than what those revenues would have been had the published pre-"conspiracy" carload provisions remained in place and been applied to all of Class Members' local carload shipments traffic during the Class Period. That is, the earning power of the purportedly conspiratorial FSC provisions was less than the earning power of the published pre-"conspiracy" provisions. Nevertheless, Prof. Rausser's STB model calculates hundreds of millions in "damages" for each Defendant for such traffic.

➢ **Conspiracy Was Not Needed to Increase the Coverage of Fuel Surcharges**

101. Another pillar of the Plaintiffs' conspiracy theory has been that a conspiracy among the Defendants was required to achieve "widespread" and "across the board" application of

HIGHLY CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 |
| This document relates to: DIRECT PURCHASER CASES | Misc. No. 07-489 (PLF) |

**DECLARATION OF DAVID T. LAWSON**

DAVID T. LAWSON, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury that the foregoing is true and correct:

1. I am the Vice President of Industrial Products for Norfolk Southern Railway Company ("NS"). I have been in that position since February 2005. Industrial Products was formerly included in Merchandise, which also included Automotive. Before that, from 2000 to 2005, I was President of Modalgistics for the Paper, Clay, and Forest Products business group. I have been with NS since 1988. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification. Unless otherwise stated, the statements made in this Declaration are based on my own personal knowledge and relate to Industrial Products.

2. As Vice President of Industrial Products, I am responsible for four marketing groups at NS: Chemicals, Agriculture, Paper Clay & Forest Products, and Metals & Construction. In 2008, Industrial Products moved approximately 2.1 million units, generating over $4.6 billion in revenue, which accounted for 43% of NS's total revenues of $10.6 billion. The range of revenue for the Industrial Products business group during the Class Period (July 1, 2003 to December 31, 2008) was approximately $2.8 billion to $4.2 billion annually.

## A. The U.S. Rail Industry

3. Defendant railroads operate in particular geographic regions, maintain separate tracks and serve different locations. As a result, NS does not generally compete with the two Western Railroads, BNSF and UP. Within those broad geographic regions, competition for the business of individual shippers may be limited by the physical location of each railroad's tracks. Indeed, even within a single city more than one railroad may be present, but only one can physically serve certain customers. This is the case with Olin in Augusta, Georgia: NS has tracks that directly serve the Olin plant; although CSXT also has tracks in Augusta, they are several miles away from the Olin plant and cannot serve it. In fact, for the period from 2006 through 2008 – a representative sample based on NS's internal data – CSXT was unable to compete directly for more than half of the traffic carried by NS: 64% by volume, 74% by revenue.

4. Shippers have their freight transported from a point of origin to a point of destination. Unless both points are served by a single railroad, the movement is interline and will involve the participation of more than one railroad. Railroads must therefore interchange freight every day to move these goods. While much interline cargo moves between regions (*e.g.*, between East and West), railroads also frequently interchange freight within a single region, because no one carrier can serve all of the potential points of origin and destination (O-D) even within the region in which it operates. Today, NS has approximately 130 separate points at which it interchanges traffic with CSXT.

## B. NS Fuel Surcharges and Cost Escalation Provisions

5. In the early 2000s, there was increased volatility and spikes in fuel prices. NS initiated a fuel surcharge mechanism for public carload traffic effective June 2000, in response to volatility in fuel prices. A 2% fuel surcharge applied for every $5 increment by

which the price of West Texas Intermediate ("WTI") crude oil exceeded $28.00 per barrel for thirty consecutive days.

6. As we negotiated contracts with customers, in some cases the NS public carload fuel surcharge was incorporated into contracts. In other cases, negotiations resulted in alternative fuel surcharges.

7. The June 2000 fuel surcharge mechanism remained unchanged for public carload traffic until March 2004. However, over time, we found that this fuel surcharge was not sufficiently responsive to fuel price volatility. It did not apply unless the $28 trigger price (or any additional $5 increment) was exceeded for 30 consecutive days. Thus, if it dipped below $28 (or any other $5 increment) for even one day, the 30 day period would start over.

8. In late 2003, NS changed its public carload fuel surcharge such that a 0.4% fuel surcharge applied for every $1 per barrel by which the WTI monthly average price exceeded $23 per barrel. This fuel surcharge mitigated the problems NS experienced with the $5 increment and 30 consecutive day requirement of the initial NS public carload fuel surcharge. The new NS mechanism was announced in January 2004 and became effective March 1, 2004 for public carload traffic.

9. Before, during and after the Class Period, NS had a number of different mechanisms in its long term contracts for addressing fluctuation in costs. Some contracts of a year or more in duration utilized the Rail Cost Adjustment Factor ("RCAF") adjustment mechanism, some utilized RCAF together with a fuel surcharge mechanism, some utilized a percent-of-RCAF together with a fuel surcharge mechanism (*i.e.*, 80% of RCAF + a fuel surcharge), some utilized more general rate adjustment mechanisms, such as the Consumer Price Index ("CPI"), the Producer Price Index ("PPI"). Alternatively, we used market-based

adjustments such as a fixed-percentage periodic rate change or no annual rate-adjustment mechanism at all.

10. During the Class Period, some NS long term contracts continued to incorporate both RCAF and a fuel surcharge. It was also common, as before the Class Period, for long term contracts with a fuel surcharge to include an annual rate-adjustment mechanism. One of the mechanisms that Industrial Products generally did not utilize was the All Inclusive Index - Less Fuel ("AIILF"). Since the establishment of the AIILF in December 2003, Industrial Products has never had a policy of seeking AIILF provisions in its contracts with shippers and rarely used AIILF during the Class Period.

11. Effective July 1, 2006, NS modified its public carload fuel surcharge mechanism by raising the trigger price from $23 to $64 to reflect the then-prevailing price of crude oil and by decreasing future increments of change by 25% from 0.4% to 0.3%. As contracts expired, NS began the process of negotiating rates with contract customers that in many cases included this new fuel surcharge, and adjusted the base rates both for the fuel surcharge and for market-based changes.

12. NS and its customers also agreed in confidential contracts to different fuel surcharge mechanisms with, for example, different trigger prices, different percentage increases, or a cap. Accordingly, NS had dozens of fuel surcharges during the Class Period applicable to non-intermodal traffic. The public carload fuel surcharges were published on its website but, as mentioned above, many other distinct fuel surcharges were the result of individualized negotiations with customers and remained confidential.

13. Exhibit 1 is a list of the fuel surcharge codes, or "notes," that NS used at any point during the Class Period. As Exhibit 1 shows, NS used 81 different fuel surcharge

notes during the Class Period. The codes given to the fuel surcharges are those used by NS in its ordinary course of business. Each note is associated with particular stand-alone fuel surcharge formula, except for notes G556, M914, N428 and L638, which were used to indicate that no fuel surcharge was added to the base rate. Exhibit 1 also shows the date that each of the fuel surcharge notes was created. Of the 81 fuel surcharge notes listed, 65 were created and used for the first time after July 1, 2003.

14. Several of the fuel surcharge notes describe the same fuel surcharge formula. Some of them describe fuel surcharges applied by other railroads in interline movements in which NS participates. For example, N273 was a note used by the Merchandise group to refer to the public carload fuel surcharge that went into effect on July 1, 2006 (0.3% for every $1 per barrel by which the WTI average price exceeded $64.00 per barrel), and N300 is a note used by the Coal Business Group to refer to the same fuel surcharge formula. Exhibit 2 lists the NS fuel surcharge notes by formula, with duplicative formulas grouped together. Exhibit 2 excludes the notes used to indicate that no fuel surcharge was added to the base rate. Even without the "no fuel surcharge" notes and duplicative notes, NS used 50 different fuel surcharge formulas during the Class Period. *See* Exhibit 2 Rows 1-50.

15. NS also used 9 notes to refer to fuel surcharges applied by other railroads in interline movements in which NS participates. *See* Exhibit 2 Rows 51-59.

16. As Exhibit 2 shows, some fuel surcharges are identified based on the business group that oversaw the negotiation of fuel surcharges (*e.g.*, MDSE, COAL, and AUTO). It also shows that some notes were used for specific customer with whom the fuel surcharge was negotiated, such as [redacted], [redacted], [redacted], and [redacted].

17. The plaintiffs' class would exclude fuel surcharges paid "pursuant to a railroad-shipper contract that was: (i) entered into before July 1, 2003, and (ii) provided for a stand-alone fuel surcharge to be paid under a pre-determined formula specifically set forth in the contract." Determining which NS contracts fall into this exclusion would be a manual effort in part. To the extent shippers paid a fuel surcharge before July 1, 2003, those payments can be identified in the revenue waybill data as waybills with a value in the FUEL field. Many shippers with fuel surcharge mechanisms in their rate authorities did not pay a fuel surcharge for significant portions of time before July 1, 2003, however, because the relatively low price of fuel did not trigger a fuel surcharge. The revenue waybill data does not reflect the existence of a fuel surcharge mechanism in a rate authority unless a fuel surcharge is triggered. As a result, other information must be reviewed to isolate those rate authorities that included a fuel surcharge mechanism before July 1, 2003, that was not triggered.

18. Moreover, the revenue waybill data do not identify which fuel surcharge mechanism was included in the rate authority. If it is necessary to know whether a shipment was subject to NS's public carload fuel surcharge or one of the many other fuel surcharge mechanisms included in contracts and other pricing documents, a review of contracts and/or NS' 9255 rating data would be required. The 9255 rating data identify rate authorities that included fuel surcharges, but the rating data is not reliable to identify all such rate authorities, because as contracts or other pricing documents, such as signatureless contracts and private price quotes, are renewed or amended, new information replaces old information in the database. As a result, a search of the 9255 rating data would isolate some, but not all, contracts or other pricing documents that included a fuel surcharge mechanism before July 1, 2003. To identify all contracts that included fuel surcharge mechanisms before July 1, 2003, it is necessary to look at

the individual contract, and any renewals and amendments, to determine when it first contained a fuel surcharge provision. As for other pricing documents that could constitute contracts, such as signatureless contracts and private price quotes, a review of the anecdotal history of price negotiation with the shipper may be necessary to determine whether a particular rate authority was subject to a fuel surcharge mechanism before July 1, 2003.

## C. Negotiations with NS Customers

19. NS has a variety of types and sizes of customers, ranging from large customers who move thousands of cars per year, to small customers who move fewer than ten cars per year. In the surface freight transportation industry there are thousands of O-D pairs, and the pricing for each one is influenced differently by, among other things, the geographic region, the product being shipped, the customer size, and the available competition from rail, truck or barge.

20. For the period from 2006 through 2008 – a representative sample based on NS's internal data – more than 81% by revenue and 89% by volume of NS's traffic moved under contract. During that period, approximately 80% of NS's revenues were generated from its top 200 customers annually, the vast majority of which moved pursuant to confidential (that is, non-public) contracts. Many shippers are sophisticated businesses that engage in extensive negotiations concerning lane-by-lane rates and other terms for moving a wide range of products, each of which could be subject to its own unique market dynamics. Thus, these contracts are the product of extensive and often protracted negotiations and contain specially-designed terms and conditions.

21. Many NS customers negotiate to achieve the best bottom-line package of price and value. Customers routinely negotiate over all aspects of their contracts in deciding what overall contract terms would be acceptable, including: base rates, escalation provisions,

volume and service, equipment, credit terms, and countless other terms, as well as discussions of fuel surcharge terms.

22. I know based on market intelligence from customers that CSXT also has confidential contracts with many of its customers. Unless it is an interline move to which NS is a party, NS is not privy to the terms of those contracts, including whether or not they provide for fuel surcharges or, if so, the terms of such fuel surcharges.

23. Motor carriers are the dominant force in surface freight transportation. The strength and pervasiveness of motor carrier competition was recognized by the Interstate Commerce Commission when it exempted substantial amounts of rail traffic from regulation. A large amount of NS traffic is "exempt": 63% by volume, 45% by revenue, for the period from 2006 through 2008 – a representative sample based on NS's internal data. There are various competitive options, whether trucks, rail-to-truck transfer, barges, or other railroads, and in each case our marketing personnel must look customer-by-customer, commodity-by-commodity, and lane-by-lane in order to assess the competitive options. Obviously, each move would have to be considered individually, but generally the differential between rail and truck prices is driven by many factors, including service differentials, distance, plant configuration to handle trucks versus rail, physical constraints at origin and destination, and whether the shipper has investments in certain types of equipment. For example, for boxcar competitive traffic and perishables, truck competition is a primary consideration in determining rail prices.

i. [redacted]

24. [redacted] is one of the largest companies that the Industrial Products group deals with. It generated on average over [redacted] in revenue for NS each year during the Class Period. As a result of its size, and its importance to NS as a customer, [redacted] has strong bargaining power in contract negotiations with NS.

25. [redacted] did not pay a fuel surcharge on its contract rates for several years after NS first introduced fuel surcharges. Each time the two companies negotiated over new or renewed contracts, NS would bring up the fuel surcharge, but [redacted] was always opposed.

26. In May of 2005, [redacted] and NS began formal negotiations for a fuel surcharge. NS wanted to reach an agreement that would prospectively have one fuel surcharge rate apply to all [redacted] contracts as they were renewed. NS initially proposed the then-current public carload fuel surcharge of 0.4% for every $1 that WTI exceeded $23. In response, [redacted] proposed fuel surcharge of 0.18% for every $1 that WTI exceeded $31. In addition, [redacted] tied its fuel surcharge proposal to completing negotiations of master oil and grain contracts that were ongoing. NS found this proposal inadequate, and the parties continued to negotiate.

27. Finally, in June 2005, [redacted] and NS reached agreement on a fuel surcharge of 0.22% for every $1 that WTI exceeded $23, which represented almost a 50% discount off of the public carload fuel surcharge at the time. This contract, which is REG-NS-C-18413, covers the majority of [redacted] moves on NS lines. *See* Exhibit 3 ([redacted]-NS contract amendment, at Exh. p. 1).

Executed on June 15th, 2010

David T. Lawson

# Exhibit 120

**From:** Bognich, Harry W <b804449@bnsf.com>
**Sent:** Thursday, January 20, 2005 9:42 AM
**To:** Gillen, George F <s000179@bnsf.com>; Arnett, James A <b915179@bnsf.com>; Alegria, David R <b504859@bnsf.com>; Schroeder, Jack L <b013812@bnsf.com>
**Cc:** TECHSVCS DL RPMS Team <techsvcs dl rpms team@bnsf.com>; Specht, Eldon <b361368@bnsf.com>
**Subject:** RE: Per Mile Fuel Surcharge project.

---

George, Jim, Dave, and Jack (and RPMS team),

It appears, unfortunately, from the email below that the new proposed "per mile fuel surcharge" for Carload might not be supported (at least initially) by the other carriers. To solve this issue, the proposal appears to be that BNSF will "start with a per mile surcharge for local traffic and keep the percent of revenue calculation for interline traffic".

If I understand this correctly, this means that a "BNSF DIRECT" price could be given either the new "per mile" or the existing "revenue calculation" surcharge. But, if the price has an Interline route, then it couldn't have the new surcharge type.

This raises several questions/issues for Marketing/Accounting/RPMS:

1) Currently, Marketing has preferred to use fuel surcharge ONLY at the authority level conditions, not at the price/service/route level, because at the authority level it is more noticeable and more easily maintained than "buried" in each specific price. This might be a more simply a "headache" if the authority must be a mix of local and interline prices. At least, RPMS can support the use of surcharge templates at the price level, BUT ONLY IF the template is static, which is becoming rarer (see #2 next) !!

2) Currently, Marketing uses dynamic (REN) condition templates to easily support fuel surcharge adjustments. This has proved to be extremely successful with Marketing and most authorities now use these dynamic fuel surcharge templates. Authorities without dynamic surcharges are rapidly being converted to them. The issue here is that the RPMS programs support dynamic condition templates for fuel surcharge in the Notebook, etc. ONLY at the authority level. This is the most serious issue of any of the ones in this email if the authority must be a mix of local and interline prices. To move dynamic surcharge templates to the price/service/route level is definitely MAJOR code changes, even though that has been the ultimate goal (something Marketing has always wanted) even before this project began.

3) What is the exact definition of "local" versus "interline" at least for this project? Technically, Local means BNSF is the only carrier in the route. But what if it is only BNSF and a shortline? Or, what if it is BNSF and other carriers, but the other carriers are all getting "zero" for their divisions because BNSF collects all the money and then distributes it? Are there going to be "EXCEPTIONS" to the rule about Local? Any exceptions usually mean LOTS of extra coding/testing, etc.

4) Of course, one "obvious" answer is for Marketing to split all authorities that are going to use dynamic fuel surcharges into authorities that are BNSF only prices and authorities that are BNSF with anyone else. Obvious, but maybe not acceptable?

Certainly not all the issues, since there are lots more (e.g., how do we even capture the "per mile surcharge" in the authority since the existing SURC condition does not have all the values that we will need (e.g., the "basis" of the mileage -- that is, the mileage type code) -- are we going to use a BNSFism? A new industry code?, etc., but the issues above are a start anyway.

Food for thought in preparation for the Requirements Gathering meetings,
Harry

-----Original Message-----
**From:** Ferise, Charles W
**Sent:** Wednesday, January 19, 2005 5:16 PM
**To:** TECHSVCS DL RPMS Team

Kyei
EXHIBIT NO. 42
J. BRANDT, CSR-RMR-CRR

BNSF-FSC 000769

HIGHLY CONFIDENTIAL

BNSF/NJAG
00769
CONFIDENTIAL

Subject: FW: Per Mile Fuel Surcharge project

As info,

Chuck Ferrise
Manager Technology Services
(817) 352-1288

-----Original Message-----
From: Specht, Eldon
Sent: Wednesday, January 19, 2005 5:00 PM
To: Cook, Aaron E; Ross, Kyle W; Grieves, Kevin D; Ferrise, Charles W; Krebs, John J
Cc: Johnson, Greg P (TechSvcs); Boudreaux, Bart J; Specht, Eldon; Elston, Carole J
Subject: Per Mile Fuel Surcharge project

Couple things happening with fuel surcharge:

- John Lanigan shopped the concept with his counterparts from other roads at the NEMC (AAR group of Chief Marketing Officers) and they pushed back as expected.
- Three shipper associations, National Industrial Transp League, Nat'l Grain & Feed Assoc and Forest Products Assoc of Canada have banded together and are pushing on railroads to convert to per mile. They are addressing each road independently at this point.

Appears John Lanigan saw this coming. Shippers have drafted a proposal that is very similar to what Marketing is thinking, a few discrepancies to work through. The fuel surcharge team wants us to begin this project leaving out the rebate functionality, no plan at this time to include that possibility. We do have some issues with interline and it appears we will start with a per mile surcharge for local traffic and keep the percent of revenue calculation for interline traffic until the other roads feel suitably pressured by shippers.

Chuck and Aaron,
Would you please coordinate and schedule a kickoff meeting to review objectives, determine all the players and begin planning processes. Need to invite George Gillen, Ed McNack, Carole Elston, Rick Fagerang and Jolene Miller along with TS team managers. I would recommend after that meeting we schedule a working session with appropriate business and TS team members to review materials developed by Fuel Surcharge team and begin to drive out the detailed requirements. From there we should develop a refined estimate and gap document for anything that the detailed conversation turns up. The original funding for this project was trimmed, however since we are not going to do rebate we should be in the ballpark.

Eldon

BNSF-FSC 000770

HIGHLY CONFIDENTIAL

BNSF/NJAG
00770
CONFIDENTIAL

# Exhibit 215

# BNSF-CSX Alliance Meeting
## Jacksonville, FL
## April 1, 2003

| BNSF | | CSX | |
|---|---|---|---|
| Matt Rose | Chairman, President & CEO | Michael Ward | Chairman & CEO |
| Carl Ice | EVP & COO | Al Crown | EVP & COO |
| John Lanigan | EVP & CMO | Mike Giftos | EVP & CCO |
| Rollin Bredenberg | VP Service Design | Frank Pursley | Sr. VP Service Design |
| Dave Garin | Group VP Industrial Products | Clarence Gooden | Sr. VP Merchandise |
| Pete Rickershauser | VP Network Development | Les Passa | Sr. VP Strategic Planning |

| | CSX | BNSF |
|---|---|---|
| Review 10/11/02 Meeting Action Items | Les Passa | Pete Rickershauser |
| • Gateway: Behind schedule but progressing | | |
| • Grain: Currently negotiating Scoots via Chicago | | |
| • Public Pricing: Scheduling discussions | | |
| Business Metrics Review/Discussion | Mike Giftos | John Lanigan |
| • Interline volumes by Business Group | | |
| Measurement package for future meetings | Frank Pursley | Rollin Bredenberg |
| • Interline Service Measurements | | |
| • Traffic measurements; Intermodal, Carload, Coal, AG, etc. | | |
| Gateway Optimization | | |
| • Operations | Frank Pursley | Rollin Bredenberg |
| • Traffic Shift | Clarence Gooden | Dave Garin |
| • Woodlawn Gateway | Frank Pursley | Rollin Bredenberg |
| Grain Update | Clarence Gooden | John Lanigan |
| Merchandise Update | Clarence Gooden | Dave Garin |
| • Watershed (or other) | | |
| • Other initiatives | | |
| • Internet Pricing | | |
| • Fuel Surcharge | Mike Giftos | John Lanigan |
| Intermodal Update by CSX | Clarence Gooden | |
| Operating Technologies Update by CSX | Al Crown | |
| • CBTM/Simulator/APU | | |
| Future Initiatives | All | |

BNSF Alliance mgt agenda 4-1-03.doc

EXHIBIT
PENGAD 800-631-6989
Gifts
36
2-25-10

# Exhibit 216

EXHIBIT
Seale 43

PENGAD 800-631-6989

**From:** Seale, Don
**Sent:** Thursday, March 27, 2003 6:16 PM
**To:** 'Lanigan, John P'
**Subject:** RE: Your Call

John, thanks for the message below and I too apologize for the phone tag. We had our Board Meeting here this week and I departed on a trip out of town right after its conclusion. I look forward to seeing you at NFTA, and in the interim I will call Dave about the panel at Tahoe. Also, I see we both are on the list for the NIT League Supplier Advisory group, and I would like to talk to you about this during NFTA along with the fuel surcharge issue we discussed in Norfolk. Also, we found some data discrepancies in the carload interchange statistics that we reviewed during our meeting and I will be sending you and Dave a corrected copy. Thanks again for your patience, and I look forward to seeing you next week. Don

-----Original Message-----
From: Lanigan, John P [mailto:John.Lanigan@BNSF.com]
Sent: Tuesday, March 25, 2003 12:25 PM
To: 'dwseale@nscorp.com'
Subject: Your Call

Don,
Sorry that we have been playing phone tag. I just tried to call you again. I was at an offsite meeting yesterday. I am in the office today but am traveling the rest of the week. Unfortunately I am committed to an Asian customer trip during the Lake Tahoe conference. We depart Dallas on Sunday morning the 22nd. I don't know Dave Garin's sked, but he would be a good sub for me. Feel free to contact him directly. I would have enjoyed being on the panel and thanks for thinking of me.
Hopefully we will catch up live this week. We could also certainly catch up next week at NFTA. I enjoyed meeting you last week.
Thanks,
John

# U.S. Economy Feeling Bite Of Costlier Oil

The New York Times

December 28, 2002 Saturday

Late Edition - Final

Copyright 2002 The New York Times Company

**Section:** Section C; Column 5; Business/Financial Desk; Pg. 1

**Length:** 961 words

**Byline:** By NEELA BANERJEE

## Body

With crude oil prices at their highest levels in two years and showing no sign of abating soon, consumers and businesses are starting to feel the pinch as the prices of gasoline, heating oil, and diesel and jet fuel begin to rise.

Industry analysts and economists warn that because of high oil prices, Americans in the coming weeks and perhaps months are likely to be paying more for nearly everything, from fuel to roofing materials to plastics. And the longer prices remain high, the greater the threat they pose to the still-tepid economic recovery, analysts and economists say.

"This would add another weight to the recovery, but not derail it," said Mark M. Zandi, chief economist at Economy.com, a consulting firm in West Chester, Pa. "But it is bad in the sense that we will be struggling to maintain growth."

The price of crude oil has risen by almost $7, or 27 percent, since early November. In New York, crude oil for February delivery rose 23 cents yesterday, to $32.72 a barrel, the highest since November 2000.

Analysts point out that there is a lag of several weeks between an increase in crude oil prices and a commensurate rise in the prices of petroleum products. Just this week, however, the average retail prices of diesel fuel and gasoline rose by 4 cents, or about 3 percent, according to data collected by the Energy Information Administration, the analytical arm of the Energy Department.

"When crude goes up, it's just a matter of time before it hits you at the pump," said Mary Rose Brown, a spokeswoman for Valero Energy, a large independent refining company based in San Antonio. "Our retail guys are saying that an increase of 5 to 10 cents is a reasonable expectation."

That might prove a conservative estimate, some traders and analysts said. The forces that are pushing up prices seem, to oil traders, to be worsening. A general strike in Venezuela against the government of President Hugo Chavez has halted nearly all oil production and reduced exports to a trickle.

Venezuela is the fourth-largest exporter of oil to the United States, accounting for 14 percent of crude oil imports. Although government officials in Venezuela have vowed to restore production soon, oil traders on the global markets are skeptical, said Rick Smid, an energy futures broker at Fimat, a subsidiary of Societe Generale.

The Venezuelan shortfalls have buffeted the market as worries rise again about a possible war between the United States and Iraq and its effect on oil supplies from the Persian Gulf.

For high oil prices to have a great effect on the economy, they have to be sustained for more than a month at $30 a barrel or more, said David Costello, an energy analyst at the Energy Information Administration. That prospect seems increasingly likely, especially as both sides in the Venezuelan dispute retrench.

It takes a month or two for higher crude oil prices to work their way through the refining and retail systems and to be felt by consumers, Mr. Costello said. That explains why price increases on the retail level are only being seen now, he and other analysts said. Conversely, if the Venezuelan conflict were resolved now, it would still take several weeks for retail prices to fall, they noted.

Industries heavily reliant on oil are already feeling the bite, Mr. Zandi and others said. The makers of textiles, paper, chemicals and plastics will be stuck with higher oil bills. "It will affect airlines and trucking significantly," Mr. Zandi said. "The airlines are already hard pressed, and this is one more thing to push them under water."

In the last month, the price of jet fuel at New York Harbor has risen nearly 15 percent, to 87.23 cents a gallon, according to the Energy Information Administration.

The region that relies most heavily on heating oil, the Northeast, may also face sharply higher prices, Mr. Zandi and others said. Heating oil prices are 18 percent higher than they were a year ago, according to the Energy Information Administration.

"New York City will be hit very hard," Mr. Zandi predicted, "much more than a place like Dallas or Southern California."

The effects of higher oil prices may ripple through industries that, at first glance, seem remote from oil. Consider roofing. The best asphalt for roofing comes from "heavy" crude oil produced in Venezuela. With those supplies gone, "people are scrambling already to find supplies," Ms. Brown of Valero said. "The cost of roofing will go up."

If the conflict in Venezuela were resolved and striking workers from the state oil company returned to their jobs, that would certainly bring more crude oil into the market and gradually deflate high prices. But few people believe such an outcome is likely anytime soon.

Instead, industry experts look to the Organization of the Petroleum Exporting Countries, of which Venezuela is a member. Other members said at a meeting earlier this month that the group would make up for shortfalls of Venezuelan exports if the strike continued.

OPEC members like Saudi Arabia and Kuwait are among the few countries that have the spare production capacity to replace the Venezuelan oil. But it remains uncertain what steps OPEC has taken so far. Moreover, it takes about 40 days for oil to be shipped from the Persian Gulf to the United States, which may mean that oil supplies in the Western Hemisphere may only be replenished later in January.

"The key thing now is how quickly and on what scale the other OPEC producers step up their production," said Daniel Yergin, the chairman of Cambridge Energy Research Associates, "and that will determine in a week or 10 days where oil prices will be.

"You could have replacement supplies in late January from the Persian Gulf. But all of that assumes that nothing happens anywhere else."

http://www.nytimes.com

## Graphic

Photo: Tanker trucks being loaded and unloaded yesterday at the Citgo refinery in Lake Charles, La. A general strike in Venezuela has added to the worries of a market already concerned about a possible war with Iraq. (Ricky Hickman for The New York Times)(pg. C14) Chart: "COMMODITIES: Crude Oil: Near-Month Contract"Graph tracks crude oil prices (near-month contract), since July 2001. (Source: Bloomberg Financial Markets). It also lists the 52-week highs and lows of selected commodities, along with their closes yesterday and their changes, yesterday, year to date, and over the past 52 weeks. (pg. C14)

**Load-Date:** December 28, 2002

---

**End of Document**

# PRICE ADJUSTMENT IN LONG-TERM CONTRACTS

VICTOR P. GOLDBERG*

Professor Goldberg provides a framework for analyzing price adjustment in private contracts, arguing that long-term contracts result from businesses seeking the benefits of cooperation, not avoiding risk as usually assumed. Professor Goldberg, an economist, examines incentives for price adjustments in long-term contracts and the variety of price adjustment methods available. He concludes by applying his framework to *Alcoa v. Essex*.

## TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | INTRODUCTION | 527 |
| II. | THE ECONOMICS OF PRICE ADJUSTMENT | 529 |
| | *A. The Benefits of Price Adjustment* | 531 |
| | *B. The Mechanics of Price Adjustment* | 533 |
| III. | ALCOA V. ESSEX | 534 |
| | *A. The Facts* | 534 |
| | *B. The $75 Million Misunderstanding* | 536 |
| | *C. Alcoa's Mistake* | 537 |
| IV. | RESOLUTION OF PRICE ADJUSTMENT DISPUTES | 541 |
| V. | CONCLUDING REMARKS | 542 |


## I. INTRODUCTION

After parties enter into a contract, changed circumstance might result in one of them being dissatisfied with the price. Anticipating this, the parties could include a price adjustment mechanism in the agreement. If the mechanism is imperfect, some dissatisfaction will remain. This dissatisfaction may result in litigation with the dissatisfied party asking the court either to excuse performance or revise the contract

---

* Professor of Law, Northwestern University. Part of the research was completed while the author was an Olin Fellow in Law and Economics at the University of Chicago School of Law. The author would like to thank Zvi Adar, Bob Bennett, Dan Fischel, Tom Merrill, Jeff Perloff, Steve Shavell, Steve Wiggins, Jeff Williams, and the participants at this conference and a seminar at Northwestern University Law School for helpful comments on an earlier draft of the paper.



DA00167

price. For example, large changes in fuel prices since 1973 generated considerable litigation.[1]

In this paper, I suggest a framework for analyzing price adjustment in private contracts. Contrary to most economists and lawyers, I argue that price adjustment problems have little to do with attitudes toward risk. Rather, the problems are those suggested by the "relational exchange" approach to contracts.[2] This argument will be developed in Part II.

A court faced with a claim of changed circumstance must deal with two questions. Is the change sufficient to justify relief, and, if so, what relief should be granted? The court could void the contract and discharge the obligation of the loser, revise the price term as German courts often do,[3] or recognize a duty to renegotiate in good faith, as proposed by my colleague, Richard Speidel.[4]

Contracting parties sometimes invite the courts to rewrite explicit price terms by including open-ended language. Force majeure clauses, for example, are boiler plate terms which discharge performance under conditions that are not always clearly defined. More importantly, long-term contracts sometimes provide for price adjustment to prevent a

---

1. *See* Iowa Elec. Light & Power Co. v. Atlas Corp., 603 F.2d 1301 (8th Cir. 1979); In re Westinghouse Elec. Corp. Uranium Contracts Litigation, No. 235 (E.D. Va. Oct. 27, 1978) (bench opinion); and Missouri Public Service Co. v. Peabody Coal Co., 583 S.W.2d 721 (Mo. App.), *cert. denied*, 444 U.S. 865 (1979). For a discussion of litigation of natural gas contracts, see also *A Stunning Challenge to the Sanctity of Contracts*, BUS. WK., August 22, 1983, at 76-77.

2. *See* Goldberg, *Relational Exchange: Economics and Complex Contracts*, 23 AM. BEHAVIORAL SCIENTIST 337 (1980); Macneil, *Adjustment of Long-Term Economic Relations Under Classical, Neoclassical, and Relational Contract Law*, 72 NW. U.L. REV. 854 (1978); and Williamson, *Transaction-Cost Economics: The Governance of Contractual Relations*, 22 J. LAW & ECON. 233 (1979).

3. *See* Dawson, *Judicial Revision of Frustrated Contracts: Germany*, 63 B.U.L. REV. 1039 (1983) [hereinafter cited as *Frustrated Contracts: Germany*]; Dawson, *Judicial Revision of Frustrated Contracts: The United States*, 64 B.U.L. REV. 1 (1984) [hereinafter cited as *Frustrated Contracts: United States*].

4.

> Assume that after changes occur which upset the balance struck ex ante in a long-term contract, the disadvantaged party initiates negotiations and ultimately proposes an adjustment in the price term. What should the advantaged party do? Under . . . traditional contract law, he may refuse to negotiate or adjust without legal consequences. No duties are imposed upon the advantaged party in the ex post bargaining process. This result is, in my judgment, unsound. At a minimum, the advantaged party should have a legal duty to negotiate in good faith. At a maximum, he should have a legal duty to accept an 'equitable' adjustment proposed in good faith by the disadvantaged party. Breach of these duties constitutes improper conduct in the ex post bargaining setting and justifies appropriate judicial remedies, including a court-imposed price adjustment.

Speidel, *Court-Imposed Price Adjustments Under Long-Term Supply Contracts*, 76 NW. U.L. REV. 369, 404-05 (1981).

"gross inequity", the nature of which is left undefined.[5] The decisions to discharge or adjust could be left to the courts or assigned to a party other than the courts, an arbitrator, for example.

Part III focuses on *Alcoa v. Essex*—the only example of an American court revising the contract price in a long-term supply contract.[6] I am interested in what the parties were trying to accomplish, why the contract worked poorly, and the court's analysis of these issues. I am not particularly concerned with whether the decision was correct, but for what it is worth, in my opinion the court should not have revised the contract.

Part IV considers general problems confronting courts or arbitrators resolving price adjustment disputes. Concluding remarks follow in Part V.

## II. The Economics of Price Adjustment

Economists commonly invoke risk aversion in analyzing contracts.[7] It is an "easy" explanation and it is tempting to end the search

5. Some gross inequity clauses I have seen have included a definition of what constitutes a gross inequity (for example, a contract price more than *X*% away from a specified published price). However, others have been silent on this.

Gross inequity clauses are commonly used in long-term contracts. Of the 21 long-term coal contracts analyzed by Paul Joskow, 13 included gross inequity clauses. Joskow, *Vertical Integration and Long Term Contracts: The Case of Coal-Burning Electric Generating Plants* 1 J. of L., Econ., & Org. 33 (1985). The typical duration of Joskow's contracts was 35 years. For an example of a shorter coal contract (ten years) which included both an arbitration and gross inequity clause, see Georgia Power Co. v. Cimarron Coal Corp., 526 F.2d 101 (6th Cir. 1975), *cert. denied* 425 U.S. 952 (1976).

6. Aluminum Co. of America v. Essex Group, Inc., 499 F. Supp. 53 (W.D. Pa. 1980). ". . . the *Alcoa* opinion is a lonely monument on a bleak landscape, the only instance in which an American judge has tried to dictate entirely different substantive terms (in this instance the price) in a contract that was still being actively performed. This may explain why so much attention has been given to the frustrated venture of a single trial judge whose fancy was unusually free." *Frustrated Contracts: United States, supra* note 3, at 35.

Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc., 664 F.2d 772 (9th Cir. 1981), is arguably another case in which the court revised the price term. However, in that case the revision was not explicit but was couched in terms of interpreting the meaning of the price term, given that during the life of the contract the parties had already modified the price in a manner apparently inconsistent with the contract language.

7. *See* A.M. Polinsky, An Introduction to Law and Economics 57-63 (1983); Harris & Raviv, *Some Results on Incentive Contracts with Applications to Education and Employment, Health Insurance, and Law Enforcement*, 68 Am. Econ. Rev. 20 (1978); Polinsky, *Risk Sharing Through Breach of Contract Remedies*, 12 J. Legal Stud. 427 (1983); Perloff, *The Effects of Breaches of Forward Contracts Due to Unanticipated Price Changes*, 10 J. Legal Stud. 221 (1981); Posner & Rosenfield, *Impossibility and Related Doctrines in Contract Law: An Economic Analysis*, 6 J. Legal Stud. 83 (1977).

at that point.[8] For example, in his analysis of the *Westinghouse* case, Paul Joskow asked: "Why would somebody buy a long-term fixed price contract other than to insure against fluctuations in the price of uranium?"[9] There are, I suggest, a lot of reasons, but risk aversion provides a convenient excuse for not bothering to look.[10]

The recent paper by Jeffrey Perloff[11] provides a good example of how risk aversion can lead one astray. Perloff asks whether it might ever be desirable for a court to excuse a party from performing a contract because of a price increase between the date of contract formation and contract performance. He concludes that discharging the contract might increase social welfare in certain circumstances.

His analysis focuses on a contract for the future delivery of a fungible commodity. The seller (a farmer) is assumed to be risk averse, while the buyer is assumed to be risk neutral. The price at the delivery date is uncertain as is the quantity that the farmer will actually produce. (As is customary in economic modelling, the means of the distributions of price and output are presumed to be known.) Social welfare in this model depends only upon the variance of the seller's income since the expected income cannot be influenced by the variables under the seller's control. (Trust me.) The smaller the variance, the greater is the social welfare. Perloff demonstrates that it is possible that discharging a contract because the price change exceeds a certain level could reduce the variance in the seller's income, and therefore increase social welfare, if the market price and the level of output were negatively correlated.

The model is clever and, I think, elegant. But does it really have anything to do with the question? As Perloff notes,[12] analytically it does not matter whether the price limits are imposed by the parties in their initial contract or by the courts. But that leaves us with the obvious question: if the parties cared about the matter, why would they leave it to the courts to fill in the blank term? After a century or so of experience with courts not discharging such contracts, one would expect to see some evidence of a private response. It is hard to believe that this problem would be too costly for the private sector to handle (with standardized terms or mechanisms devised by trade associations), yet still be solvable by courts.

---

8. While it is an easy explanation it quickly leads the analyst into some hard mathematics. My objection stems in part from the large increased costs of incorporating risk aversion into the analysis given thc miniscule benefits.

9. Joskow, *Commercial Impossibility, the Uranium Market and the Westinghouse Case*, 6 J. LEGAL STUDIES 119, 173 (1977).

10. In his recent study of long-term coal contracts, Joskow has focused on these other reasons. *See* Joskow, *supra* note 5.

11. *See* Perloff, *supra* note 7.

12. *Id.* at 228.

Moreover, Perloff focuses on forward contracts for homogeneous commodities in thick markets. If the seller breaches, the buyer simply buys elsewhere at the market price. These contracts are probably the least interesting as far as price adjustment is concerned. Even in Germany, where courts "seem to assume that the rewriting of frustrated contracts is so beneficial that hesitancy on their part is not needed,"[13] courts will virtually never overturn a contract because of an increase in the market price of a standardized commodity.[14]

### *A. The Benefits of Price Adjustment*

Business firms have ample incentives to include some form of price adjustment mechanism in their contracts even if both parties are risk neutral. Firms do not generally enter into multi-year contracts because of their concern for the future course of prices. Rather, they enter into the agreements to achieve the benefits of cooperation. Having entered into such an agreement, the parties have to make some decision regarding the course of prices during the life of the agreement. That is, price adjustment will probably be ancillary to the main purposes of the agreement.

Price adjustment can be difficult and costly. Why then bother? Why not simply establish a price or a schedule of prices for the duration of the agreement? I will suggest four reasons that might lead business firms to consider using some form of price adjustment. First, if the contract concerns a complex product that will be continuously redefined during the life of the contract, a price adjustment mechanism can price the "amendments" to the original agreement. Examples include cost-plus pricing of sophisticated defense hardware and complex construction projects.[15] Second, to properly coordinate their behavior, the parties want correct price signals. If the price of an input were below the market price (and if the buyer could not resell at a price greater than the contract price) the buyer would have an incentive to use "too much" of the input. Since this should be anticipated at the formation stage, the costs of poor coordination are borne by both parties. This is a pure "moral hazard" problem akin to an insured person consuming too much health care because the post-insurance price is too low.[16]

13. *See Frustrated Contracts: United States*, *supra* note 3, at 23.

14. *See Frustrated Contracts: Germany*, *supra* note 3, at 1079.

15. For an elaboration on this point, see Goldberg, *Regulation and Administered Contracts*, 7 BELL J. OF ECON. 426 (1976).

16. *See* Pauly, *The Economics of Moral Hazard: Comment*, 58 AM. ECON. REV. 531 (1968).

Two other reasons are, analytically at least, more interesting: reduction of pre-contract search and post-agreement jockeying. In both these explanations, the success of price adjustment depends upon its ability to reduce the variance of outcomes. The reduced variance is not, however, valued directly. Rather, it enables the parties to curtail mutually harmful behavior, thereby increasing the value of the agreement to both parties.

A contract establishes gains to be divided between the parties; a fixed-price contract determines the distribution of these gains. The parties could attempt to increase their share of the gains before signing the contract by improving their information on the future course of costs and prices. The more they each spend on this search, the smaller the pie. *Ceteris paribus*, the larger the variance of the outcomes, the more resources would be devoted to this effort. The parties, therefore, have an incentive to incorporate into the initial agreement a device that would discourage this wasteful searching. Price adjustment mechanisms can do precisely that by reducing the value of the special information. This argument applies even for standardized commodities sold in thick markets.

If after the firms enter into a long-term agreement the contract price fails to track changing market conditions, the loser will be reluctant to continue performance. It could breach and suffer the legal and reputational consequences, but other, less severe, alternatives to willing compliance exist. A buyer could, for example, insist upon strict compliance with quality standards. The aggrieved party could read the contract literally—"working to the rules" as in labor disputes or in centrally planned economies. This is a variation on the pure moral hazard story. The incorrect price induces the aggrieved party to expend resources in attempting to renegotiate the terms of the agreement. The costs can arise directly from the effort to renegotiate or indirectly through strategic bargaining. That is, the loser might threaten to engage in acts which impose costs upon the other party but do not constitute a legal breach. These costs are a result of the failure to coordinate behavior in the face of changed circumstances. These costs would be unimportant if the parties had easy access to market alternatives; *ceteris paribus*, the more isolated from alternatives the contracting parties are, the more significant are the potential losses from poor coordination.[17] Again, to the extent that the parties can anticipate these problems at the formation stage, the value of the exchange is reduced. If the probability of wasteful behavior increases as the divergence between contract price

17. *See* Goetz & Scott, *The Mitigation Principle: Toward a General Theory of Contractual Obligation*, 69 VA. L. REV. 967 (1983).

and the opportunity cost of the aggrieved party widens, price-adjustment rules which narrow the gap become increasingly attractive.

### *B. The Mechanics of Price Adjustment*

The easiest way to adjust the price is to index. But what should the parties be indexing? The overall price level? Input costs? Market price? Ideally the parties would index the market price. The payoff from indexing, after all, is from the reduction in the divergence between the contract price and the market price. However, practical exigencies usually lead parties to index other prices as proxies. Indeed, in a long-term contract there often is no unique external market price. The implications of this fact will become clearer in the discussion of *Alcoa v. Essex* below.

Cost changes will be a reasonably good proxy for changes in the market price if demand does not fluctuate too much or if industry supply is very elastic. However, changes in input prices are not necessarily the same as changes in input costs. If the relative prices of inputs change, the firm has an incentive to alter factor proportions to take advantage of the new price relationships. Also, if factor productivity changes, the connection between input prices and costs deteriorates. Nevertheless, indexing to input prices is common.[18]

While indexing would be the easiest price adjustment mechanism to implement, it has the obvious disadvantage of tracking changing conditions imperfectly. The poorer the correlation between the index and what it is supposed to be tracking, the less attractive it will be. Another relatively simple mechanical rule is permitting one party to solicit outside offers with the other party having the right of first refusal. This allows better tracking of that party's opportunity cost, but it discourages making relation-specific investments. That is, the direct costs of price adjustment would be low, but the indirect costs of discouraging entering into a long-term relationship in the first place might be quite high. Cost-plus pricing tracks cost changes more closely, but is more subject to manipulation; it also gives the seller poorer incentives to control costs, and requires that the parties devote more resources to monitoring performance.

Negotiation is, of course, always an option. Even if the contract explicitly utilizes one of the methods mentioned in the previous paragraph or unambiguously states that the contract is a fixed price agree-

18. *See* Goldberg & Erickson, *The Economics of Long-Term Contracts: A Case Study of Petroleum Coke* (1984), (unpublished manuscript). One component of the contract price was indexed to input prices in *Alcoa.*

ment, one party could propose that the price be renegotiated. The contract price, the clarity of the legal rule, and the costs of invoking the legal rule provide the background against which the renegotiation might take place.

Renegotiation allows use of accurate, current information in revising the contract; but reopening the contract could result in cost-generating strategic behavior, especially if one of the parties is vulnerable to the threat of nonrenewal. Renegotiation is not a zero-sum affair with one side's gains offset by the other's loss. In exchange for an increased price, for example, a seller could offer a contract extension and the prospect of not working to the letter of the contract. (A threat, after all, is just a promise with the sign reversed.)

The contract could explicitly establish the conditions under which renegotiation is to take place. It could require renegotiation at fixed intervals or have it triggered by specific events (for example, a rise in a price index of more than 20%). Gross inequity clauses call for renegotiation if the contract price is too far out of line, but typically do not spell out the criteria for determining when a gross inequity exists. The parties could agree to renegotiate in good faith and determine what would happen if the negotiations break down. The failure to negotiate a new price could result in continued performance at the current price, termination, mediation or arbitration, and so forth.

There are, in sum, a lot of mechanisms available for adjusting price within a long-term contract. All are imperfect. Their relative costs and benefits will determine which, if any, the parties should choose.[19]

## III. Alcoa v. Essex

### *A. The Facts*

In 1967, Alcoa and Essex entered into a twenty year agreement in which Alcoa agreed to convert Essex's alumina into molten aluminum at Alcoa's Warrick, Indiana plant.[20] Essex purchased its alumina from an Alcoa subsidiary under a second long-term contract. The trial judge insisted that the two contracts were separate and that by design Alcoa's left hand did not know what the right hand was doing.[21] After conversion the molten aluminum would be loaded into crucibles owned by Essex and taken by truck to Essex's nearby fabricating plant built specifically to receive it. The contract was for 50 million pounds per year

19. For examples of different price adjustment mechanisms and the determinants of their relative efficacy see Goldberg & Erickson, *supra* note 18.

20. The facts in this section of the article are synthesized from the decision and the briefs.

21. I confess to being suspicious.

and included options for three additional blocks of 25 million pounds each. (By 1973, the parties had deleted the last two blocks.) Hence, the contract quantity at the time the litigation arose was 75 million pounds per year.

The initial contract price was 15 cents per pound, composed of a "demand charge" of five cents per pound,[22] and a "production charge". The latter included a fixed component of four cents per pound (which was the "profit" on the plant constructed to fulfill this contract) and three cents each for non-labor (primarily fuel) and labor costs. The former was indexed by the Industrial Component of the Wholesale Price Index and the latter by Alcoa's average hourly labor cost at the Warrick plant. The contract included a ceiling price of 65% of the price of a specified type of aluminum as reported in a trade journal; however, it did not specify a minimum price.

The demand charge was to be paid regardless of whether Essex took any aluminum. In effect, Essex "rented" a portion of Alcoa's Warrick plant at a fixed rate of $7.09 million per ycar ($4.09 million for the demand charge and $3 million for the fixed charge) and paid a service fee of six cents per pound that was indexed.

Problems arose following the large increase in fuel prices in 1973. In the ensuing years the market price of aluminum and the cost of producing it in Warrick increased far more rapidly than did the contract price. By 1979, Essex received aluminum from Alcoa under the contract at 36 cents per pound and resold some of it in the open market at 73 cents. Non-labor production costs rose from 5.8 cents to 22.7 cents in 1973-78, while the wholesale price index less than doubled. Alcoa attempted to renegotiate the price as early as 1975. In 1978, the dispute went to trial.

The trial court ruled in Alcoa's favor. Indexing non-labor production costs to the Wholesale Price Index was deemed a "mutual mistake" because it tracked those costs so badly. The court also accepted Alcoa's alternative theories of impracticability and frustration. The court reformed the contract, since rescission would result in a windfall for Alcoa and deprive Essex of the benefits of its long-term supply contract. The court rewrote the price term of the contract to include a minimum price assuring Alcoa a one cent per pound "profit".

The disputed contract represented only a small part of the business of Alcoa and Essex. Alcoa's sales and total assets in 1979 were each

---

22. Actually, this price was to be adjusted to cover increased construction costs at the Warrick plant when new blocks of aluminum capacity were ordered. The price of the first block (50 million pounds) was 5.27 cents per pound and the price for the second block was 5.82 cents per pound. These prices would remain constant for the life of the contract.

almost $5 billion.[23] By the time of trial, Essex had been acquired by United Technologies, another multi-billion dollar firm. Despite its losses on this contract, Alcoa's overall profits in 1979 were around $500 million; its rate of return on equity in 1978 exceeded 14 percent for the first time in 22 years.[24] This is not, clearly, a case in which a bad contract jeopardized the survival of a firm, as in *Westinghouse*. Rather, it is more instructive to view this contract as a poor performer in the firm's much larger portfolio of contracts, a portfolio which was performing very well overall.

### *B. The $75 Million Misunderstanding*

The court placed considerable emphasis on the fact that projected losses from 1977 to 1987 were in the range of $75 million. This is one of those funny numbers that means nothing, but could end up as a fundamental part of the *Alcoa* doctrine, were one to emerge. Alcoa was excused because they stood to lose $75 million; we won't excuse *X* because it cannot prove that it will lose such a large amount. (As I will note below, the *Alcoa* judge distinguished another case on precisely this ground.) It is, therefore, useful to look at how the court determined the magnitude of the loss.

The "profits" are the revenue minus the actual production costs minus the demand charge (the 5+ cents per pound). The court assumed something (the decision does not make it quite clear what) about future costs and prices for the remaining life of the contract and then added them up. There are three obvious problems with this. First, the future profits are undiscounted. A dollar lost in 1984 is just as important as a dollar lost in 1979. Second, the estimates are based on guesses about the future course of prices; there is nothing wrong with guesses, but time has a way of transforming guesses into facts.[25] But these are quibbles. The most important point is that the estimate, even if done right, is irrelevant.

What does Alcoa lose if it must fulfill the contract? It loses the chance to sell the aluminum to someone else. That is the true measure of the loss, and in this case it is considerably greater than the figure cited by the judge. In the year the suit was brought the loss was over thirty cents per pound, over $20 million. The original cost of construction of the plant is a red herring equivalent to "par value" for a stock, a vestige of the past with no economic content.

---

23. *The Fortune Directory*, FORTUNE, May 5, 1980, pp. 274, 276.

24. *Aluminum's Bosses Are Beuming*, FORBES, Nov. 27, 1978, at 40.

25. In fact, aluminum prices fell sharply in the early 1980's. That price decline undoubtedly facilitated settlement of the dispute.

The error is important. In an earlier case,[26] the court refused to allow Gulf Oil to escape its obligation to deliver jet fuel under a five-year contract despite the fact that the price index utilized had inadequately tracked the course of oil prices. The court held that the cost data presented were insufficient to ascertain how much it cost Gulf to produce a gallon of jet fuel, and, therefore, Gulf had failed to prove that it had suffered losses on the contract. The *Alcoa* judge applied the "negative accounting profit" test in distinguishing this decision from *Alcoa.*

When faced with a claim of changed circumstances, courts or arbitrators should not look to accounting cost data to determine the merits of the claim. The relevant question is whether the difference between the contract price and the aggrieved party's next best option is large enough to warrant relief. An accounting cost or profit standard is an invitation to produce a lot of information with a low expected value.

### *C. Alcoa's Mistake*

In retrospect, of course, Alcoa made a big mistake. However, the mistake singled out by the court to justify reformation of the contract was not the most important one. The failure of the price index to accurately measure the change in fuel prices accounted for only about ten to twelve cents of the difference between the contract price and the market price for aluminum in 1979 (that difference being over 30 cents).[27] The main problem was that the contract did not track changing demand conditions and the demand for aluminum was soaring in the late 1970's.[28]

Moreover, the contract was not designed to adjust to large changes in the overall price level. Sixty percent of the initial contract price (the demand charge plus the fixed "profit") was unadjusted for the life of the contract. A very simple example gives an indication of the type of problem this could cause. Suppose that the price level rises about 7% per year (doubling roughly every ten years); assume that the factors of production remain equally productive and that they continue to be used in the same proportions.[29] The indexed production costs would then rise from six cents per pound to 24 cents per pound in the twentieth year. However, the remaining costs are unindexed, so the final contract price

26. Eastern Air Lines v. Gulf Oil Corp, 415 F. Supp. 429 (S.D. Fla. 1975).

27. Since some of the data were confidential, it is necessary to use rough approximations. For my purposes that causes no difficulties.

28. *See Aluminum Wastes No Time Raising Prices*, BUS. WK., Oct. 15, 1979, at 36; *Shortage In Aluminum*, BUS. WK., Sept. 25, 1978, at 115, 117-18; *Aluminum's Bosses Are Beaming*, FORBES, Nov. 27, 1978, at 40; *Aluminum Makers Exult*, TIME, April 3, 1978, at 55.

29. The assumption of unchanged productivity is a strong one since it implies that real wages cannot grow.

would rise only to (24 + 9 =) 33 cents. To keep the real price of aluminum constant the contract price would have had to increase to 60 cents.

The relevant question is not whether Alcoa made what turned out to be a bad decision. They did. But was it a bad decision at the time they made it? The answer to that is less certain. When I began this project it seemed clear that Alcoa could have, and should have, done better. At a minimum, I thought, they should have indexed the remaining 60% of the costs. However, a more careful look leads me to believe that it is a much closer question.[30]

This long-term contract is in many respects similar to a lease or sale of part of Alcoa's Warrick production capacity to Essex. A fixed rental for long-term leases is not uncommon. Moreover, if one firm sells a durable asset to another, it is the rule rather than the exception, that the price is not to be readjusted after the sale has taken place. It can be argued, then, by analogy, that this component of the long-term contract that looks so much like a lease should also be at a fixed price.

If the contract price of a long-lived asset were to be readjusted to better track the market price, the parties would expend less resources today in pursuit of special information. If this benefit were great, we would expect the parties to incorporate price adjustment arrangements in their sales and leases of assets. However, the benefits will often be very small. Information regarding the future price level, for example, is already incorporated in the term structure of interest rates. It is not necessarily *accurate* information, ex post; however, the key question is whether it is *improvable* information, ex ante. Incorporating a general price index, therefore, need not result in reduced information costs.

The lease/sale analogy, however, has difficulties. A pure lease or sale is similar to a contract for a standardized commodity because further coordination between the two parties is unnecessary; the only issue is whether price adjustment reduces the initial price search. However, the more the outcomes depend upon future coordination by the parties, the less likely they will use a fixed price contract.[31] For example, shopping center leases in which the lessor engages in activities which generate business for the tenants will base at least part of the compensation on a percentage of the gross (which automatically provides for some

30. The question of whether Alcoa had made a mistake is unrelated to the court's finding of mutual mistake. I am only trying to determine whether the price adjustment mechanism in this contract was a reasonable one under the circumstances.

31. This discussion is highly speculative since I am only dimly aware of the adjustment mechanisms actually used in long-term leases. I should note that a common device is to use short-term agreements with fixed prices so that the price can be renegotiated on a regular basis. Such arrangements might also include an expectation, legal or otherwise, of renewal on reasonable terms.

price adjustment). If Alcoa were leasing the plant to Essex and allowing Essex to operate it, the fixed price arrangement would be routine. The fact that operation of the plant was in Alcoa's hands reduced the likelihood that a fixed price would be successful. The increased divergence between the contract price and Alcoa's best alternative would induce Alcoa to engage in strategic behavior, thereby reducing the value of the contract to both parties.

However, it is unlikely that indexing capital costs would result in a more accurate contract price. I would speculate that the pre-1973 experience would confirm that indexing this cost component to the general price level, construction costs, or any other conceivable cost-based measure would have resulted in a poorer fit between the market and contract price.[32]

Instead of using a cost-based price adjustment, the parties could have attempted to track market conditions by, for example, indexing to a particular aluminum price.[33] Using output prices to index is not without problems. First, other goods with published prices that are sufficiently close to the output that we are attempting to index might not exist. Second, the observable external prices are typically list prices, not transaction prices. If these diverge, the index suffers. It is plausible that the two would diverge in a concentrated industry like aluminum since list prices typically change more slowly in such industries.[34] Further, if the contract price were linked to the list price of a type of Alcoa's aluminum, then Alcoa would have an incentive, however modest, to set the list price in excess of the transaction price.

Even if list prices were accurate measures of transaction prices, a more fundamental difficulty remains. The parties do not necessarily confront the same external price. That is, the relevant price to each

---

32. Note that this is a different argument than the one accepted by the court. It emphasized how closely the wholesale price index had tracked one component of costs in the pre-contract period. I am claiming that there did not exist an index that would have closely tracked another, and larger, component of costs.

33. Note that in the previous paragraph I treated the capital cost as a historical cost. Alternatively, we could adjust to reflect the value of the fixed plant as it changes during the life of the structure. Thus, the cost of using the plant to fill this contract must include the opportunity cost of using the plant for other purposes (namely supplying aluminum to someone else). If the capital had a wide variety of other uses (for example, retail space or small vans), such an adjustment might be sensible. If, however, the capital was highly idiosyncratic, as in this case, its value would closely track changing market conditions. If these could be indexed accurately it would almost surely be unproductive to index the market value of capital either instead of or in addition to the market price of the output.

34. For example, in 1979 Business Week reported list prices for ingot of 66 cents per pound while the spot price was 75 cents. This is a bit misleading, however, because of the existence of price controls at the time. *Aluminum Wastes No Time Raising Prices*, BUS. WK., Oct. 15, 1979, at 36.

party is its opportunity cost—the net price it could get from the next best trading partner. In a market for a standardized commodity, the list price and these two opportunity costs would be roughly the same. However, in a long-term contract in which the parties deliberately isolate themselves from the external market, these three prices are more likely to diverge. Generally, the more isolated the contracting parties are from market alternatives, the poorer the relationship between these three prices is likely to be. Thus, while the parties might desire to index their agreement to a published market price, the very nature of a long-term contract makes it likely that the index price would not perform its function adequately. It is, therefore, not at all obvious that indexing the contract to changes in the published price of a particular type of output would be in the interest of the two parties.

In the instant case, Alcoa's opportunity cost is the net price it could receive by using the Warrick capacity to produce ingot for export to other customers. Essex's opportunity cost is the price of delivered aluminum ingot. There is no a priori reason to believe that these will be close to each other. However, for an index to work it is not necessary that the prices be close, only that they move together over time. Whether these two opportunity costs (and the market price for aluminum ingot) move together over time is an empirical question which I intend to explore in a later paper.

Essex chose to incorporate the output price information in the form of a maximum price. Alcoa, however, was not willing to pay (by agreeing to a lower initial contract price) for a price minimum. The failure to do so might well have been a mistake ex ante, but it is at least plausible that a ceiling indexed to published prices would be more valuable to Essex than a similarly indexed floor would have been to Alcoa. Alcoa's superior knowledge of the aluminum industry might make Essex suspicious of the manner in which costs were indexed. A bias in favor of Alcoa, because of Alcoa's superior knowledge, would make a bound on the index relatively more valuable to Essex.

Conceivably, therefore, Alcoa's failure to index plant costs or include a minimum price was not an error ex ante. Looking at the new contract may provide some insight on this issue. We know that the parties rejected the judicially imposed minimum price based on ex ante accounting costs.[35] But we do not know whether that was a reason for rejection and we do not know what replaced it. I would speculate that the new contract includes a minimum and that the minimum depends upon output prices. If so, that would suggest that Alcoa had erred initially.

35. *See Frustrated Contracts: United States*, *supra* note 3.

## IV. Resolution of Price Adjustment Disputes

Suppose that contracting parties assign the task of resolving price adjustment disputes to an outsider (a court or an arbitrator). The outsider can be asked to resolve two very different questions: (a) have conditions changed sufficiently to justify relief; and (b) what form should relief take—what will the new price (or price formula) be? Since the parties bear the costs of producing the evidence, they must reckon the expected costs of producing evidence on production costs, accounting profits, market prices, opportunity costs, and so forth, and weigh these against the expected benefits (in terms of reducing the costs arising from the divergence of contract price from market price). These evidentiary costs provide the backdrop for subsequent renegotiation. Thus, for example, if a standard required that one party spend a lot to produce evidence to forestall price revision, its opposite party could use those potential costs as a bargaining chip in renegotiation.

For determining whether relief is justified, accounting cost data of the sort relied upon by the Alcoa judge are largely beside the point. The relevant question is whether the difference between the contract price and the aggrieved party's next best option is large enough to warrant relief. The requisite price differential would vary across contracts. There is no "magic number": if price goes up by at least *X*% or losses total at least $*Y*, adjust the price. A large divergence between the market and contract price for a standardized commodity, for example, would have little adverse effect on the expected value of a contract; it would, therefore, be unlikely that the parties would benefit from revision. Conversely, if a modest price divergence would generate considerable joint costs, revision could be effective. The problem is complicated by the fact that making relief easy to obtain generates additional joint costs as well. Rational parties might easily find that the potential benefits from price revision come at too high a cost.

This is especially true if there is no obvious standard for determining a new contract price. My initial presumption was that if a reasonable measure of the output price were available, the parties would want the arbitrator to use this to guide his decision. Further consideration has led me to conclude that this might not be very helpful. A simple example illustrates the problem. Suppose that when the contract was written Alcoa would have received 10 cents a pound for its aluminum on the open market, Essex would have paid 20 cents per pound, and the contract price was fifteen cents. When the case is litigated, Alcoa could sell at 50 cents and Essex buy at 70, and the contract price is 35 cents. What should the contract price be? Even if this information were costlessly produced and absolutely accurate, are the parties better off putting the decision in the hands of an arbitrator? What decision rule

would they want him to apply? When the opportunity costs of the buyer and seller diverge, it is not at all clear what should guide the arbitrator in setting a new price. Thus, the possible divergence not only impairs the value of a published price as an index, but makes it more difficult for the parties to rely upon outsiders (arbitrators and judges) to revise the price.

## V. Concluding Remarks

The foregoing provides a framework for analyzing price adjustment in long-term contracts. The analysis downplays risk aversion and instead emphasizes controlling the joint costs arising from the divergence of contract price from the opportunity costs of the parties.

If a unique, easily observable market price existed, the adjustment problem would not be difficult. However, the conditions that make entering into a long-term contract desirable in the first instance make it unlikely that such prices exist. This is obviously true for such things as complex defense hardware and construction of state-of-the-art chemical plants. But it is even a problem in a relatively simple case like *Alcoa v. Essex* where the contract calls for a product (molten aluminum) that appears closely related to an easily observable market price. The problem is that by entering into the long-term contract at least one of the parties deliberately isolated itself from the external market. The relationship between the external price and the opportunity costs of the parties need not be very close.

This argument is, I confess, ex post rationalization. I had originally thought that it was definitely in Alcoa's interest to index the contract to a published aluminum ingot price or at least to include an indexed floor. It had not occurred to me that the opportunity cost and market prices should diverge and that this divergence would have an adverse effect on the value of an index based on output price. The empirical question, which I hope to shed some light upon in a subsequent paper, is the extent of the divergence.

I have deliberately avoided the questions of whether the court was right to revise this contract or, more generally, under what conditions (if any) courts should excuse or reform contracts because of one party's dissatisfaction with the price. I have done so for three reasons. First, any conclusion would be premature—there has been very little analysis of why and how business firms deal with price adjustment problems. Second, I believe that we will make more progress in understanding the economics of contracts if we do not insist upon drawing policy conclusions; in any event, the principle of division of labor suggests that I leave this task to the lawyers. Third, providing an indication of the rela-

tive importance of various factors is more important than putting forth a conclusion embodying an implicit weighting.

For example, in contracts for future delivery of commodities traded in thick markets, parties can rarely impose costs upon each other and the ex ante demand for price adjustment will be low. The parties probably would not choose to include price adjustment mechanisms in their contract; nor would they permit the disadvantaged party to call upon the courts for relief. The more isolated the exchange is from the market, the more likely it is that the parties would find price adjustment efficacious. However, the reasons that make adjustment desirable make it hard to achieve. The case for intervention, if the contract does not explicitly provide for it, is stronger when the costs of a price dispute are high and the costs of settlement would be reduced by giving the disadvantaged party the right to call upon the court to revise the contract, despite the contract's silence. It might well turn out that this is a null set. But even so, the intellectual apparatus will be applicable in cases in which the parties explicitly provide for price revision by outsiders.

DA00183

# DESPITE DROP IN PRICES, FUEL SURCHARGES REMAIN POLICY AT AIRLINES, SHIPPING FIRMS

All Rights Reserved

The Boston Globe

November 21, 2001, Wednesday

,THIRD EDITION

Copyright 2001 Globe Newspaper Company

**Section:** BUSINESS;

**Length:** 918 words

**Byline:** By Bruce Mohl, Globe Staff

## Body

Oil prices are falling and there is even talk of a worldwide petroleum price war, but airlines and shipping companies are clinging to fuel surcharges imposed last year when prices were on the rise.

Most airlines imposed a $40 fuel surcharge on roundtrip tickets last year when the spot price of jet fuel was ranging from 78 cents to $1.02 a gallon. Even though the price has now fallen to about 62 cents a gallon, the surcharges remain in place.

The same goes for package delivery companies. Both Federal Express and United Parcel Service imposed fuel surcharges in August last year when the prices of jet fuel, diesel fuel, and gasoline were on the way up.

Now that prices are plummeting - and the busy holiday travel and shipping period is upon us - the surcharges haven't gone away. Federal Express, in fact, has taken steps effectively to institutionalize its air delivery surcharge by linking it to the price of jet fuel.

"This allows us to respond to market conditions faster," said Carla Richards, a spokeswoman for Federal Express. "It's a more direct reflection of what's happening in the marketplace."

Unless they check the fine print closely, most airline passengers aren't even aware that fuel surcharges are included in the price of their ticket. But customers of shipping companies are reminded of the charges whenever they send a package.

Sam Ellenport, who runs a rare-book bindery in Boston that ships almost 200 packages a week, has followed the sharp drop in oil prices closely. He was surprised when UPS notified him recently that it was not only hiking its shipping rates in January by approximately 3.5 percent but also retaining its fuel charge of 1.25 percent. (Federal Express made a similar announcement yesterday. "I see this as a windfall profit," he said. "That's a huge sum going right to their bottom line."

Not all companies are retaining their fuel surcharges. Many hotel chains imposed energy surcharges earlier this year when the price of electricity skyrocketed. But with electricity prices falling, in part because of the drop in petroleum prices, most of those surcharges have disappeared or will end shortly.

Marriott International did away with its energy surcharges, which had ranged from $3.50 a night in Massachusetts to $5 a night in New York, in August. Wyndham International is moving more slowly. A spokeswoman said the company's Massachusetts hotels will eliminate their $2.50 per night energy charge by the end of next month.

The oil market has gone through a tumultuous period since Sept. 11. With the economy slowing and air travel yet to fully recover, the demand for jet fuel and other petroleum products has fallen sharply. The price of a barrel of US benchmark crude,

which bounced from $22 to $30 a barrel earlier this year, is now down to about $18. From their peak of $1.66 a gallon in May, gasoline prices nationally have fallen about 50 cents, the biggest price swing since the federal government began tracking them on a weekly basis in 1990.

The Organization of Petroleum Exporting Countries recently asked its members to curb production to bring supply and demand more closely into balance, but only if non-OPEC members, specifically Russia, cut their production. Russia initially resisted, raising the prospect of a price war that could send oil prices plummeting much further. OPEC officials yesterday hinted that Russia and Norway had adopted a more conciliatory tone, indicating they might curb production if prices dropped sharply.

Airlines, already in tenuous financial condition in the wake of Sept. 11, have been reluctant to forgo their fuel surcharges, especially with the market so volatile.

Kurt Ebenhoch, a spokesman for Northwest Airlines, said the company is monitoring jet fuel prices closely but currently has no plans to do away with the fuel surcharge.

"It's never fully compensated us for past increases in fuel costs," he said.

The airline fuel surcharges first appeared in January 2000, when all the major airlines imposed a $20 fee on most roundtrip domestic tickets. The fee was doubled to $40 in September 2000. Among the major airlines, only Delta and Southwest failed to go along with the September increase.

Airline industry officials say each dollar drop in the price of oil translates into annual jet fuel savings of $480 million for the airline industry.

Shipping companies began assessing fuel charges in August last year and have given no indication they are planning to eliminate them.

Federal Express is continuing to impose a fixed 1.25 percent fuel surcharge on ground shipments. Its surcharge on air shipments, which had been 4 percent, was linked to jet fuel prices in mid-October and has since dropped to 2 percent.

Federal Express portrayed its indexing approach as a way to adjust the fuel surcharge more quickly to changes in market conditions. But indexing also has the effect of institutionalizing the fuel surcharge, which in its previous incarnations had always been temporary.

UPS, which assesses a 1.25 percent fuel surcharge on all shipments, is taking a different approach. Steve Holmes, a UPS spokesman, said the company is still trying to cope with a volatile and unpredictable oil market. He said oil prices would have to go a good bit lower before the surcharge is removed.

He quickly added, however: "We still consider it to be a temporary fuel surcharge."

Bruce Mohl can be reached by e-mail at mohl@globe.com. SIDEBAR: OIL PRICES DROP, BUT SURCHARGES LINGER PLEASE REFER TO MICROFILM FOR CHART DATA.

## Graphic

CHART

**Load-Date:** November 21, 2001

End of Document

# Transportation Cos Raise Fuel Surcharges As Costs Soar

Dow Jones News Service

March 13, 2003 Thursday 8:58 PM GMT

Copyright 2003 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

Copyright © 2003, Dow Jones & Company, Inc.)

**Length:** 1054 words

**Byline:** By Sonoko Setaishi

## Body

Of DOW JONES NEWSWIRES

NEW YORK -(Dow Jones)- As the drumbeat of war gets louder and energy prices soar, the nation's parcel delivery concerns, trucking firms and air freight companies are rushing to nudge up prices to keep up with higher costs.

And the rising fuel surcharges at these carriers have raw material producers scrambling to pass the added costs on to their customers. The phenomenon signals that the domino effect of higher energy costs will hit consumers before long.

AK Steel Holding Corp. (AKS) and material producers owned by Allegheny Technologies Inc. (ATI) and Airgas Inc. (ARG) have all unveiled fuel surcharges of 2% to 5% in the past month to make up for the higher freight bills charged by their carriers.

Allegheny Ludlum, which makes stainless steel, nickel-based alloys and other specialty materials, is adding a 5% fuel surcharge to all freight bills beginning Monday because its carriers, primarily trucking carriers, are charging the company about as much on its shipments.

Airgas Nitrous Oxide, the largest U.S. producer of nitrous oxide, will put in place a fuel surcharge of about 2% to bulk customers next month to offset higher transportation costs. The Radnor, Pa., company says the surcharge is temporary and will be reversed once its costs subside.

"Everyone is raising fuel surcharges," says Donald Broughton, transportation analyst at A.G. Edwards & Sons Inc. in St. Louis.

As the impact of higher energy prices trickles down the supply chain, it's the consumer who will foot the bill at the end, Broughton says. "Higher energy cost will be paid for by consumers at many more places than the local pump."

Having learned its lesson from volatile energy price movements in the past, nearly every transportation company nowadays has a formula for calculating and adjusting its fuel surcharge. The formula is tied to either energy price statistics released weekly by the Department of Energy or the price of a specific commodity in financial markets.

As energy costs climbed in the last year, capped by a sharp spike since December, so have the surcharges.

United Parcel Service Inc. (UPS), the largest package-delivery company, last week raised its fuel surcharge to 1.5% from 1.25% because of increased costs. But the surcharge "doesn't come close" to covering all of the added expenses, says spokesman Norman Black.

The Atlanta company spent $277 million on fuel last quarter, up 11% from $249 million a year ago.

FedEx Corp. (FDX), the largest overnight delivery company, last week raised its fuel surcharge on air-based shipments to 4.5% from 4%. Its surcharge on parcels hauled on trucks rose to 1.5% from 1%.

By Wednesday, fuel surcharge at trucking company Roadway Corp. (ROAD), which is adjusted weekly, has gone up to 9% for customers filling a whole truck, and to 7% for those filling only part of a truck. That surcharge is just enough to offset the Akron, Ohio, company's fuel costs, says spokesman John Hyre. He says customers accept the surcharge.

"They see what's happening at the pump. They understand the situation."

Corrected March 14, 2003 9:51 ET (1451GMT)

The nation's ailing airlines also recently pushed through a $20 round-trip fuel surcharge on leisure fares to try to keep up with surging jet fuel prices.

The world's major shipping lines also have been steadily raising their fuel surcharges this year.

Despite the frequent adjustments in surcharges, Broughton of A.G. Edwards says transportation companies are unlikely to be able to recoup all the additional fuel expense for the current quarter. That's because energy costs have been steadily rising throughout the period, creating a gap between the actual energy price at any given time and the price on which the fuel surcharge is based.

"The surcharge is always playing a catch-up, and that gap is going to result in minor adjustments to most company's earnings," Broughton says.

Railroad operators such as Union Pacific Corp. (UNP) and Burlington Northern Santa Fe Corp. (BNI) also have felt the pinch of higher fuel prices. But railroads aren't as vulnerable to rising fuel costs as other transportation companies because they are more fuel-efficient, consuming less fuel than others to haul a ton of freight a mile, says Broughton.

Some transportation companies are managing the risk of higher oil prices by buying futures, options or other investment vehicles tied to energy prices, or short-selling certain securities.

UPS has hedged all of its expected fuel requirements for this year at the price equivalents of up to $30 a barrel. FedEx, by comparison, dropped its fuel hedging program when it unveiled its fuel surcharge formula.

Airlines also have fuel hedges in place, but the degree of protection varies from company to company. Low-fare king Southwest Airlines Co. (LUV), the only profitable major carrier, is among the best protected, while United Airlines parent UAL Corp. (UAL), operating under protection from creditors, has no hedges in place for this year.

Some railroad operators are also well-hedged. Norfolk Southern Corp. (NSC) and Canadian National Railway Co. (CNI) have hedged 70% and 45% of their fuel needs for the current quarter, respectively, according to Ken Hoexter, transportation analyst at Merrill Lynch & Co. in New York.

Besides hedging their fuel requirements, some companies are striving to conserve as much fuel as possible.

UPS is instructing its drivers to turn off the engines when they stop for a delivery, "even if you're going to be on your driveway for 15 seconds," says Black, the spokesman. The company also tries to deliver parcels by the most efficient route and is experimenting with liquified natural gas trucks and doing research on hybrid electric vehicles.

While the soaring energy costs will undoubtedly take their toll on the economy, they won't prove to be as catastrophic a shock to the economy as they once were, Broughton predicted. That's because the manufacturing sector has become more energy-efficient, and because the service sector, rather than the manufacturing sector, has been fueling growth these days.

In the 1970s, the U.S. consumed 18 cents' worth of energy, on average, to produce a dollar of gross domestic product. Today, that number is down to 9 cents, the analyst says.

-By Sonoko Setaishi, Dow Jones Newswires; 201-938-4148; sonoko.setaishi@dowjones.com

## Notes

PUBLISHER: Dow Jones & Company

**Load-Date:** December 15, 2004

End of Document

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re: Rail Freight Fuel Surcharge Antitrust Litigation, | ) | Civil Action No. MC 07-489 |
| | ) | CLASS CERTIFICATION |
| | ) | Washington, DC |
| | ) | September 28, 2016 |
| | ) | Time: 9:30 A.M. |
| | ) | MORNING SESSION |

TRANSCRIPT OF CLASS CERTIFICATION
HELD BEFORE
THE HONORABLE JUDGE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Class Plaintiffs:

**Michael David Hausfeld**
HAUSFELD, LLP
1700 K Street, NW
Suite 650
Washington, DC 20006
(202) 540-7200

**Stephen R. Neuwirth**
QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000

**Sami H. Rashid**
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California Street
22nd Floor
San Francisco, CA 94111
(212) 849-7000

For the Defendants:

Union Pacific

**Daniel M. Wall**
**Timothy L. O'Mara**
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-2562
(415) 391-0600

**Thomas Adam Isaacson**
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Suite 326N
Washington, DC 20001
(202) 662-6000

BNSF Railway

**Veronica S. Lewis**
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201-6912
(214) 698-3320

CSX Transportation

**David Daniel Cross**
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006-1888
(202) 887-1500

Norfolk Southern

**John M. Nannes**
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, NW
Washington, DC 20005-2111
(202) 371-7500

**Saul P. Morgenstern**
KAYE, SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter:

Janice E. Dickman, RMR, CRR
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

for the full period, and it began in a formative stage in March of '03 through July. Was it implemented at that point with a later entrant, NS, in March of 2004? And you have to look at the full period.

Yes, there will be instances where there is, in fact, positive damages, but there will be other instances where they're negative. What counts is what is the result for the full class period?

Q. You've testified many times in this case, have you not, that the defendants would have been able to pass through the fuel cost increases they experienced during the class period?

A. Yes.

Q. You've testified at your July 31, 2014 deposition that the defendants would have been able to recover 100 percent of their increased fuel costs during the class period, correct?

A. Yes.

Q. Now, generally speaking, there was profit in the rates that defendants charged prior to the so-called conspiracy, correct?

A. Yes.

Q. As you put it in your report, freight rates never just equal variable costs, correct?

A. Yes.

Q. But the real difference between you and Dr. Kalt on

MH&L Material Handling & Logistics

Outsourced Logistics Com Images Archive Cost

TRANSPORTATION & DISTRIBUTION

# Costs Driving Trucking

When it comes to costs, the motor carrier industry faces its biggest challenge in the area of salaries, wages and benefits, according to a recent report

David Ross

APR 01, 2008

When it comes to costs, the motor carrier industry faces its biggest challenge in the area of salaries, wages and benefits, according to a recent report by equity research firm Stifel Nicolaus. "The LTL Industry"

focuses on the less-than-truckload segment and provides a perspective on current issues affecting the industry and an outlook for the segment.

David Ross, vice president of the Transportation and Logistics Group, offers data reported by a number of carriers which show salaries, wages and benefits account for just under 59% of carriers' cost structure. Operating supplies and expenses (which is where fuel shows up) comes in just under 20%, and purchased transportation is nearly 9%.

The less-than-truckload (LTL) segment is particularly concerned with labor costs because the structure of its operations requires more moves and more handling and, therefore, more labor input.

Non-union carriers have typically enjoyed a more flexible workforce that is not bound by strict job classifications and benefits from slightly lower wages. But, even though most carriers in today's LTL industry operate with 100% non-union labor, underlying wage costs have tended to equalize and, in some cases, the hourly wage rate at some non-union operations is marginally higher than for some union workers.

For unionized carriers, work rules have contributed to inefficiency, requiring more workers to perform functions, thus adding cost and affecting service. One quick example is when a driver arrives at the carrier terminal and there is a shortage of dockworkers. The non-union driver would jump out of the cab and begin assisting dockworkers with loading or unloading. At a union shop, the driver would be constrained by work rules and job descriptions from performing dock work.

The new National Master Freight Agreement (NMFA) between the International Brotherhood of Teamsters and the largest unionized LTL carriers will allow more flexibility through a "utility employee." This flexible (and higher paid) worker is intended to help the national LTL carriers on lanes where they compete with regional carriers.

Improving labor efficiency offers some help, but the largest component of the wage cost is benefits. Union carriers have large underfunded pension plans and must continually increase contributions to make up

Outsourced Logistics Com Images Archive Cost

the deficit. In the end, a union employee costs carriers $22,000 more per year than a non-union employee, based on information supplied by public companies.

The Teamsters are stepping up efforts to organize carriers, and one prime target is UPS Freight. UPS is already the largest employer of Teamsters in the world, accounting for 14% of total Teamster membership. The former Overnite Transportation fought a long and bitter battle to remain non-union, but the mood has changed since the 2005 acquisition by UPS and its integration as UPS Freight.

Other non-union carriers could face the Teamsters if the Employee Free Choice Act (EFCA) is passed. It nearly passed in 2007 and has the support of presidential candidates Barak Obama and Hillary Clinton.

The EFCA greatly simplifies the organizing process. If a majority of employees sign cards stating they prefer union representation, the union would automatically be appointed bargaining agent for the workers. The process does not provide management an opportunity to state its case in

the process. This could become a distraction for non-union management that faces union organizing efforts.

Outsourced Logistics Com Images Archive Cost1

Fuel is another major concern for carriers. The rapid and sustained increases in fuel prices have caused operating costs (and fuel in particular) to capture more of the share of overall costs, biting into some of the percentage labor has represented.

Fuel doesn't just show up in the carrier's operating costs, it is also a component of purchased transportation costs. Long-haul carriers use rail intermodal and truckload for many line haul segments where the carrier can't balance the lanes with backhauls. Fuel is one factor in the purchased transportation costs.

Other purchased transportation costs result from interline moves by regional carriers supplementing a carrier's reach and by cartage agents used for pick up and delivery operations on either end of a line haul move.

In the area of insurance and claims, the LTL industry has an advantage over the truckload side because it typically runs fewer miles. LTL carriers also tend to use equipment longer than truckload carriers and they have a network infrastructure which includes maintenance. Insurance can be lower for LTL carriers because of the depreciation cycle on equipment and the lower risk associated with fewer miles driven, but this is still an area of rising cost for carriers. To counter some of this effect, LTL carriers have increased the amount of risk they self insure against.

At the end of the day, LTL carrier networks require volume to operate efficiently, and not just volume but lane density. More direct loadings without intermediate sorts produce a more cost effective model. This is a strength of regional LTL networks and a challenge for national LTL carriers that operate regional terminals as well as major breakbulk hubs that perform intermediate sorts.

Volumes are expected to pick up, but they should still post negative year-overyear comparisons in the first half of 2008 and only begin showing positive comparisons in the second half. Stifel Nicolaus expects 2009 to be a more normal year of supply and demand with tonnage growth of 1% to 2% likely.

As demand increases, carriers should find it easier to justify pushing price. But LTL pricing is on the upper end of complexity and singular practices. The system based on the National Master Freight Classification system is so entrenched that common practice trumps even the elimination of antitrust immunity for the rate bureaus.

There has been talk for years of moving LTL pricing to a density-based system more like that used by the parcel carriers, but shippers have developed systems that match carrier practices, and the current system has worked, so they see little incentive for change.

Fuel surcharges have been one of the hottest topics in carrier pricing, and the reason is clear. Fuel surcharges are now over 20% of total LTL average shipping costs after the significant rise in diesel fuel prices since 2002. Carriers don't hedge fuel costs, but instead have a separate

surcharge in place based on a percent of revenue to protect themselves from fuel price increases.

For years, when fuel prices were declining- to-stable, they were a predictable cost that was factored into pricing. Fuel represented 4% to 8% of revenues for LTL carriers. Then in 1996, most large LTL carriers implemented a fuel surcharge to recover some of the fuel cost increases they were seeing that year (up 11% yearon- year). Fuel costs roller-coastered to end 2001 below the 1996 level. But, since then, the cost of diesel fuel has skyrocketed from $1.15 per gallon to $3.82 in March 2008, a 232% increase. With that, fuel surcharges rose from about 1% to near 28% of base price. (Fuel surcharges are applied to the shipper's bill after the discount has been applied.)

With fuel surcharges, it's important to note that the surcharge is only part of the rate discussion. Larger shippers often have their own fuel surcharges and some contract negotiations involve fuel surcharge caps. There is often a trade off between fuel surcharges and base rates. The surcharge issue has sparked some litigation by shippers and the US Department of Justice is showing some interest as well (See Legal Briefs, pg. 31).

In general, pricing returns with tonnage, but it is dictated more by supply and demand within the industry. Increased demand, rising operating costs, truck driver recruiting/retention issues, and lack of necessary infrastructure investments should keep the supply/demand relationship relatively tight for the foreseeable future. Capacity is exiting and there could be more carrier bankruptcies over the next quarter or

two to bring the sector closer to an even tighter supply/ demand environment when demand picks up again.

---

**Source URL:** https://www.mhlnews.com/transportation-distribution/article/22044403/costs-driving-trucking

37206
EB

SERVICE DATE – JULY 28, 2006

SURFACE TRANSPORTATION BOARD

DECISION

STB Ex Parte No. 646 (Sub-No. 1)

# SIMPLIFIED STANDARDS FOR RAIL RATE CASES

Decided: July 26, 2006

## TABLE OF CONTENTS

CURRENT RATE REASONABLENESS STANDARDS ........ 4
Regulatory Framework ........ 4
Constrained Market Pricing Guidelines ........ 5
Simplified Guidelines ........ 7

BOARD PROPOSALS ........ 9
I. Methodology for Medium-Size Rail Rate Disputes ........ 9
1. Simplified-SAC ........ 10
A. Objectives of a Simplified-SAC Method ........ 10
B. Methodology ........ 12
2. Jurisdictional Inquiry ........ 14
3. Procedural Schedule ........ 16
4. Discovery ........ 17

II. Methodology for Small Rail Rate Disputes ........ 19
1. Comparison Group – Final Offer ........ 20
2. RSAM Range ........ 21
3. Method To Calculate RSAM And $R/VC_{total}$ ........ 22
4. Rate Reasonableness Determination ........ 25
5. Jurisdictional Inquiry ........ 28
6. Procedural Schedule ........ 29
7. Discovery ........ 30
8. Release of Waybill Sample Data ........ 32

III. Eligibility Criteria ........ 33
1. Proposal ........ 33
2. Explanation ........ 34
3. Eligibility Estimate ........ 37

CONCLUSION ........ 37

APPENDIX A – ROAD PROPERTY INVESTMENT ........ 39

I. Board Proposal ........ 40
1. Land ........ 40
2. Roadbed Preparation ........ 41
3. Track ........ 42
4. Tunnels ........ 43
5. Bridges and Culverts ........ 43
6. Signals and Communication ........ 45
7. Buildings and Facilities ........ 46
8. Public Improvements ........ 47
9. Mobilization, Engineering, and Contingencies ........ 48

APPENDIX B – TOTAL SARR OPERATING EXPENSES ........ 49

I. Background ........ 49

II. Board Proposal ........ 49
1. Calculation of Equipment Expenses ........ 50
2. Specific Modifications to URCS ........ 51
A. Accumulated Deferred Tax Credits. ........ 51
B. Construction Work In Progress - Account 90. ........ 51
C. Dismantling Retired Road Property. ........ 51
D. Equipment Capital Cost. ........ 51
E. Interest During Construction - Account 76. ........ 51
F. Other Elements of Investment - Account 80. ........ 52
G. Road Property Investment. ........ 52
H. Roadway Machines - Property Account 37. ........ 52
I. Shop Machinery Investment - Property Account 44. ........ 52
J. Working Capital. ........ 52
K. 100% Flow Thru Mode. ........ 52
3. Application of a Modified URCS Phase III Program ........ 52

APPENDIX C – DISCOUNTED CASH FLOW ........ 54

I. Background ........ 54
1. Revenue Requirements of the SARR ........ 54
2. Overall Comparison Analysis ........ 55

II. Board Proposal ........ 55

APPENDIX D – CHANGES TO CODE OF FEDERAL REGULATIONS ........ 58

infrastructure.[34] And concerns have been expressed about inadequate rail infrastructure in recent Congressional testimony.[35]

Finally, the amount of revenue shortfall attributed to traffic with an R/VC ratio below 100% cannot provide a reasonable approximation or useful surrogate for other inefficiencies in a carrier's system. Simplified Guidelines, 1 S.T.B. at 1029. And any attempt to measure carrier-specific inefficiencies under the Three-Benchmark method would add undue cost and complexity to an inquiry that must necessarily sacrifice some precision to achieve simplicity.

We are mindful that, when determining whether a rate is reasonable, the Board should give "due consideration" to the amount of traffic transported at revenues that do not contribute to going concern value and the efforts made to minimize such traffic.[36] But we see no feasible way to incorporate such an analysis into a method for resolving small rate disputes without raising litigation expenses and rendering the "simplified" method too expensive. The mere fact that a movement is below URCS variable costs – an intermediate/long-run variable cost measure – does not mean that the revenues from the movement do not contribute to going concern value, which is a short-run cost measure. And we believe that in today's marketplace of tight rail capacity a railroad is not likely to carry any traffic that does not contribute to going concern value. But even if there are some such rare instances, we cannot provide for broad-based discovery on the railroads to unearth evidence of such traffic without adding significant additional costs.

For all these reasons, we propose to publish and use a single, unadjusted RSAM figure.

### 3. Method To Calculate RSAM And $R/VC_{total}$

We also propose to change the way RSAM and $R/VC_{>180}$ are calculated to address a flaw in the existing method. Currently, RSAM is calculated by computing the uniform mark-up above variable cost that would be needed from every shipper of potentially captive traffic (i.e., traffic priced above the 180% R/VC level) "in order for the carrier to recover all of its URCS fixed costs." Simplified Guidelines, 1 S.T.B. at 1027.[37] When a carrier is not "revenue adequate" under the Board's annual calculations, its RSAM figure (what it needs to collect) should be greater than its $R/VC_{>180}$ figure (what it is actually collecting). Conversely, when a carrier is revenue adequate under that determination, its RSAM figure should be lower than its $R/VC_{>180}$ figure.

---

[34] See Joint Petition for Service Order, STB Service Order No. 1518 (STB served Feb. 25, 1998).

[35] E.g., Coal-Based Generation Reliability, Hearing Before the Senate Committee on Energy and Natural Resources, May 25, 2006.

[36] 49 U.S.C. 10701(d)(2)(A); see generally Arkansas Power & Light Co., et al. – Petition to Institute Rulemaking Proceeding – Implementation of Long-Cannon Amendment To The Staggers Rail Act, 365 I.C.C. 983 (1982).

[37] The method for calculating RSAM was explained in detail in the appendices in Rate Guidelines – Non-Coal Proceedings, Ex Parte No. 347 (Sub-No. 2) (ICC served Nov. 16, 1992).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

IN RE: Rail Freight Fuel Surcharge Antitrust Litigation

Case No. 1:07-mc-00489-PLF

# CORRECTED EXPERT REPORT OF BARRY C. HARRIS, Ph.D.

March 22, 2013

**Highly Confidential**

**Pursuant to Protective Order**

# Table of Contents

I. Introduction ........ 4

II. Summary of Conclusions ........ 5

III. Summary of Competitive Conditions Faced by Norfolk Southern. ........ 10

A. Railroad Services are Differentiated ........ 10

B. Markets Served by Railroads ........ 16

C. Differential Pricing by Railroads ........ 20

D. Railroad Interline Movements ........ 24

E. Competition with Other Modes of Transportation ........ 25

F. Rail Competitors of Norfolk Southern ........ 35

IV. Market Conditions During the Class Period ........ 37

V. Norfolk Southern Behavior was Consistent with Its Independent Self-Interest. ........ 44

A. History of Norfolk Southern Fuel Surcharge ........ 45

B. Intermodal Traffic Should Not be in the Class ........ 73

C. Norfolk Southern's and CSXT's Fuel Surcharge Programs Differed in Significant Ways ........ 76

D. Norfolk Southern Carload Fuel Surcharge Also Differed From Those of the Western Railroads. ........ 87

E. Dr. Rausser Does Not Show that Norfolk Southern's Fuel Surcharge Policy was Inconsistent with Its Independent Self Interest. ........ 92

F. Plaintiffs' Assertions of Norfolk Southern "Over-Recovery" Do Not Support an Inference of Conspiracy. ........ 98

VI. Plaintiffs' Theory of Collusion Conflicts with Facts and Would Not Result in Effective Collusion. ........................................ 100

A. Conditions Needed for Successful Collusion ........................................ 100

B. Changes in Market Conditions Complicate Maintenance of Agreements ........... 103

C. Effective Monitoring and Enforcement Mechanisms are not Present for Norfolk Southern. ........................................ 105

D. Collusion Affecting Only the Fuel Surcharge Does Not Make Economic Sense. 108

E. Dr. Rausser's Damages Estimates Have Unreasonable Implications as Applied to Norfolk Southern. ........................................ 114

Appendix A ........................................ 119

Exhibit 1: Curriculum Vitae of Dr. Barry C. Harris ........................................ 126

Exhibit 2: Materials Relied On ........................................ 127

# I. Introduction

1. My name is Barry C. Harris. I am a Principal and the Board Chairman at Economists Incorporated, an independent economic consulting firm in Washington, D.C. I have been employed at Economists Incorporated since 1985, except for the period from October 1992 to January 1993, when I was the chief economist in the Antitrust Division of the United States Department of Justice. My official title at the Department of Justice was Deputy Assistant Attorney General.

2. Prior to joining Economists Incorporated, I was employed by ICF, Inc. as a Project Manager and Senior Economist. Immediately prior to joining ICF, I served as Chief, Rail Cost and Pricing Branch, Office of Policy and Analysis at the Interstate Commerce Commission from the end of 1979 through November 1981. I was asked to join the Commission staff by Chairman Gaskins to assist in preparations for deregulation in anticipation of legislative reforms by Congress and then to implement reforms after the Staggers Rail Act of 1980 was enacted. Prior to holding that position, I was a senior economist in the Economic Policy Office of the Antitrust Division of the United States Department of Justice, where I served from 1974 to 1979. A copy of my curriculum vitae, which lists my publications and past testimony, is included as Exhibit 1 of this report.

3. My areas of specialization are microeconomics and industrial organization, with applications to antitrust and regulation. My educational background includes a Ph.D. in economics, which I earned in 1979 from the University of Pennsylvania, and an M.A. in economics, which I also received from the University of Pennsylvania. I received a B.A. in mathematics from Lehigh University in 1970.

4. In my current position, as well as when I was at ICF, the Interstate Commerce Commission and the Department of Justice, I have analyzed the competitive effects of numerous business practices in a wide range of industries. I have testified as an antitrust expert witness regarding the competitive aspects of various types of conduct and transactions in many of these industries. My previous work also includes analyses of allegations of collusion in many different industries.

5. I have been asked by the Norfolk Southern Railway Company ("Norfolk Southern" or "NS") to review allegations of collusive activity by Norfolk Southern and other Defendant railroads that have been made by Plaintiffs and by their economic expert, Dr. Gordon Rausser. In particular, I have been asked to review whether the behavior of Norfolk Southern during the Class Period was consistent with the behavior of a firm acting unilaterally in its independent self-interest, or whether its behavior indicated it was acting collusively. I also have been asked to review whether Dr. Rausser's theory of collusion is supportable given the economic conditions of the railroad industry. I am being compensated for my time spent on this matter at my customary hourly rate of $850 per hour, plus expenses.

6. Exhibit 2 contains a list of materials on which I relied in preparing my report. The opinions I express are based on materials I have reviewed to date, and I reserve the right to revise my opinions as additional materials become available to me.

## II. Summary of Conclusions

7. Plaintiffs and Dr. Rausser allege that Norfolk Southern participated in a conspiracy starting in 2003 that fixed the prices of rail freight transportation services by agreeing on a standard fuel surcharge to be used and the extent and nature of their application.

8. I have evaluated these and other related allegations and have concluded that Norfolk Southern's behavior during the period of the alleged cartel was not consistent with participation in the conspiracy as alleged by Plaintiffs and instead was consistent with unilateral decision-making. Furthermore, I find that a cartel of the type alleged in the markets in which Norfolk Southern competes is highly unlikely.

9. In arriving at these conclusions, I first consider the actual markets in which Norfolk Southern competes, including consideration of how competition occurs and how railroad rates are established in these markets. For the alleged conspiracy to succeed, the alleged competitors would need to control supply within the context of properly defined antitrust markets for railroad services, otherwise an attempted price increase by the alleged conspiracy would cause customers to turn to competitors outside the alleged cartel, and thus, the cartel would not be

profitable. I find that Dr. Rausser mischaracterizes the nature of the markets in which Defendants compete by suggesting among other things that there is one national rail freight transportation "market." I also find:

a. Railroad services are highly differentiated. There are many different combinations of commodities, origins, and destinations that Norfolk Southern serves, as well as a variety of potential terms and conditions for shipment that may be negotiated by Norfolk Southern and a shipper. Norfolk Southern sets different prices depending upon the market conditions and the different terms and conditions applicable to the movements involved.

b. The prices that railroads can set are also affected by the options that shippers have. Depending on the commodity, origin, destination, and other factors, Norfolk Southern may face competition not only from railroads (including non-Defendant railroads), but also from trucks, barges, and pipelines. Competition from trucks is particularly important for Norfolk Southern because trucks are competitive with rail over distances that correspond to the distances of a significant amount of the traffic Norfolk Southern carries. Dr. Rausser's theory that collusion by railroads would have a uniform price impact is inconsistent with the way in which actual competition from other modes of transportation causes Norfolk Southern to set prices.

c. Dr. Rausser concedes that different shippers have different alternatives to rail transportation, which explain differential pricing by railroads. As Dr. Rausser explains, "Because the relevant transportation substitutes are different across commodity groupings, the railroads *price discriminate*. [Emphasis in original] That is, they charge the shippers of different commodities different prices because some shippers have no option but to ship by rail, while others do have options."[1] His concession contradicts his contention that railroads could price in a way that would have a uniform impact on shippers generally.

10. Plaintiffs' allegation that Norfolk Southern conspired with BNSF Railway Company (BNSF), Union Pacific Railroad Co. (UP), and CSX Transportation Inc. (CSXT) is based on a mischaracterization of the nature of competition among Defendants.

[1] "Expert Report of Gordon Rausser, Ph.D.," In the matter of In Re: Rail Freight Fuel Surcharge Antitrust Litigation, (Hereinafter Rausser Report), October 15, 2012, p.25.

a. Norfolk Southern operates primarily in the Eastern United States, while BNSF and UP operate primarily in the Western United States. Norfolk Southern cannot compete to any meaningful degree with BNSF or UP. Norfolk Southern's primary rail competitor is CSXT, which also operates in the Eastern United States. Consequently, the alleged collusive agreement includes the two western railroads that are minimal competitors for Norfolk Southern yet excludes the trucking companies and water carriers that collectively are significant competitors for much of Norfolk Southern's traffic. Such a conspiracy does not make economic sense.

b. Because Defendants operate in different regions, two in the East and two in the West, they must work with one another to move freight from one region to another. Railroad shipments involving more than one railroad are called interline traffic. From 2000 to 2008, interline traffic accounted for between 41% and 47% of the annual revenues Norfolk Southern received from unregulated traffic. When two railroads interline traffic they are not acting as competitors but, rather, as economic partners in a vertical relationship to provide a service that they could not provide independently.

11. Dr. Rausser contends that Norfolk Southern conspired with the other Defendants by July 2003 to adopt uniform fuel surcharges. Norfolk Southern's conduct, however, was fundamentally inconsistent with the alleged conspiracy and instead is consistent with unilateral self-interest.

a. Norfolk Southern instituted a rate-based fuel surcharge for its carload traffic in 2000, as did the other Defendants at various times prior to 2003. Plaintiffs concede that these fuel surcharge programs were lawful and not the product of collusion.

b. Norfolk Southern did not change its public carload fuel surcharge mechanism at the time of the start of the alleged conspiracy or at the start of the Class Period in July 2003 or at any other time in 2003. Indeed, the carload fuel surcharge programs of the four Defendants were less uniform after the start of the alleged conspiracy than they were before that time.

c. Norfolk Southern changed its public carload fuel surcharge mechanism twice thereafter. In 2004, it changed its public carload fuel surcharge formula to

match the fuel surcharge formula that CSXT had adopted *nine months earlier* and made this change after extensive internal evaluations of its options and reasons to make a change. In 2006, Norfolk Southern again significantly changed its public carload fuel surcharge, but no other carrier, including CSXT, changed its public carload fuel surcharge program in a similar manner.

d. Also in 2007, when the three other Defendants adopted a mileage-based fuel surcharge program for application to their unregulated traffic, Norfolk Southern did not adopt a mileage-based fuel surcharge program. Instead, Norfolk Southern discontinued using a fuel surcharge on public price authorities for carload traffic, including regulated traffic, and continued to apply a fuel surcharge on private price authorities and contracts.

e. Plaintiffs' and Dr. Rausser's contention that Norfolk Southern agreed with the other Defendants to apply to its customers a "standard" and "across-the-board" fuel surcharge – allegedly a fuel surcharge triggered when the price of the WTI crude oil index exceeded $23 – is not supported by the economic evidence.[2] The data establishes that Norfolk Southern applied a variety of fuel surcharge mechanisms, with different trigger prices, surcharge amounts, and timing mechanisms, throughout the Class Period. In fact, the number of so-called non-standard fuel surcharge mechanisms increased after the start of the alleged conspiracy in contradiction of the alleged agreement to apply a single standard fuel surcharge.

12. There is no economic justification for including Norfolk Southern's intermodal fuel surcharge in the class definition or alleging it is part of an unlawful agreement to fix fuel surcharges.

a. Norfolk Southern's fuel surcharge formulas for intermodal traffic were different than its formulas for carload traffic. They were based on a different index, modified at different times, and yielded different surcharge percentages. Norfolk Southern was using its "freight all kinds" (FAK) intermodal fuel surcharges before the start of the Class Period and did not change it for domestic intermodal traffic during the Class Period.

2 Plaintiffs' Supplemental Response to Norfolk Southern Interrogatories 2(e) and 2(f), January 4, 2012, p. 12; Rausser Report, pp. 9, 11.

b. Further, the data shows that a significant share of Norfolk Southern intermodal shippers paid no surcharge, and different surcharges applied to different shippers.

13. Dr. Rausser does not show that Norfolk Southern's efforts to apply fuel surcharges were inconsistent with its independent self-interest. Further, Dr. Rausser's contentions regarding Norfolk Southern's hedging program, which is substantially different from the use of fuel surcharges, do not support Plaintiffs' collusive allegations, because Norfolk Southern's conduct was consistent with independent efforts to address volatility in fuel prices.

14. Economic analysis has identified the conditions necessary for a price-fixing agreement to succeed. I have applied this analysis to the facts and allegations in this case to determine whether market conditions and the types of conduct alleged are sufficient to indicate a price fix.

a. The total cost that a shipper pays for transportation is the combination of the base rate and the fuel surcharge, if any. Dr. Rausser does not contend that the Defendants sought to fix base rates. Indeed, he concedes they would have been unable to do so given the complexities of rail pricing. Without an agreement on base rates, it is difficult as a matter of economics for a price-fixing agreement to succeed because of the inability of the purported conspirators to monitor whether other purported conspirators are adhering to the agreement.

b. Dr. Rausser does not claim that Defendants including Norfolk Southern attempted to implement the mechanisms necessary for a price fix to succeed. To succeed, collusive agreements must find ways to resist the stresses caused by changing market conditions. Monitoring and enforcement mechanisms are particularly important for an agreement to succeed when demand conditions are highly variable. In this industry demand conditions were highly variable, both over the Class Period and for different rail movements. Nonetheless, Dr. Rausser does not identify any mechanisms for setting and monitoring actual rates in confidential contracts and private price authorities or any enforcement mechanisms to assure compliance with the purported conspiracy. He attempts to deflect this critical issue by claiming that knowledge by the railroads of each other's base rates is a technicality. The lack of knowledge of base rates,

however, is not a technicality but rather demonstrates the absence of fundamental knowledge necessary for a successful collusive agreement.

15. Dr. Rausser's damages model provides implausible results for Norfolk Southern.

a. The model finds over $2 million in damages in 2003. Dr. Rausser admits, however, that Norfolk Southern did not implement any changes in its public carload fuel surcharge mechanism until March of 2004.

b. Dr. Rausser estimates damages applicable to Norfolk Southern that exceed Norfolk Southern's entire revenues from all fuel surcharges implemented during the Class Period. Dr. Rausser admits there would be fuel surcharges even without the supposed conspiracy, and he has not alleged that base rates rose due to the conspiracy. Nonetheless, his damages estimate implies a but-for world in which Norfolk Southern has no fuel surcharge revenue and somewhat lower base rates.

c. Dr. Rausser's damages model also has unreasonable implications for Norfolk Southern's profits. Dr. Rausser's estimated damages and his data on Norfolk Southern's operating profit margin indicate that in Dr. Rausser's but-for world, Norfolk Southern would be less profitable in the Class Period than it was in the prior period even though the demand for its services and its volume of traffic increased substantially.

# III. Summary of Competitive Conditions Faced by Norfolk Southern.

## *A. Railroad Services are Differentiated*

16. Norfolk Southern, like all Class I railroads, provides a variety of different services.[3] While all these services involve rail transportation, they are differentiated by a number of factors. Railroad services differ by the origins and destinations served. A shipment from New Orleans to Baltimore is not the same as a shipment from Los Angeles to Chicago, and Norfolk Southern can provide

---

3 Class I railroads are those with operating revenue of at least $272 million in 2002. They are Burlington Northern and Santa Fe (BNSF); CSX Transportation (CSXT); Grand Trunk Corporation, which consists of the U.S. operations of Canadian National (CN), including the former Grand Trunk Western (GTW), Illinois Central (IC), and Wisconsin Central; Kansas City Southern (KCS); Norfolk Southern (NS); the former Soo Line, owned by Canadian Pacific (CP), and Union Pacific (UP). (http://nationalatlas.gov/articles/transportation/a_freightrr.html)

the former but not the latter. As is shown in Figure 1, Norfolk Southern serves origins and destinations that are almost exclusively to the east of the Mississippi River. The farthest western points it serves are Kansas City (and Dallas via a haulage agreement with Kansas City Southern Railway (KCS)). CSX also principally serves the Eastern United States. In contrast, the UP and BNSF principally serve the Western United States.[4]

**Figure 1: Norfolk Southern Route Map[5]**




17. Railroad services also differ based on the commodities hauled. Norfolk Southern carries a wide variety of commodities. Table 1 shows the distribution of Norfolk Southern's traffic by its business groups, which generally are responsible for different commodities. Although different commodities typically use the same

---

4 Based on route maps of the four railroads. The UP's tracks do not go east of Chicago and New Orleans. The BNSF's tracks' most-eastern points are Chicago, Birmingham Alabama, and New Orleans.

5 Source: http://www.nscorp.com/nscportal/nscorp/map.html.

tracks and the same locomotives, they have different handling needs and may require different types of freight cars. For example, assembled automobiles generally travel in auto racks; coal generally travels in hoppers. Chlorine, which Plaintiffs Olin Corp. and U.S. Magnesium ship, is designated a "toxic inhalation hazard" (TIH), so it requires a special railcar and special handling.[6] Many railroad shipments are trailer on flat car/container on flat car (TOFC/COFC) or intermodal, as shown in Table 1.[7] Intermodal shipments move in part by rail and in part by either truck or ship. Typically a truck will bring a container to a rail facility, where it will be loaded on a flat car for transport to another rail facility where it is transferred to another truck for shipment to its final destination. Intermodal shipments also require special facilities to facilitate the transfer between modes.

**Table 1:Norfolk Southern Unregulated Traffic Revenue by Business Group (million dollars)[8]**

| Business Group | Agriculture, Consumer & Government | Auto-motive | Chemicals | Coal, Coke & Iron Ore | Inter-modal | Metals & Construc-tion | Paper, Clay & Forest |
|---|---|---|---|---|---|---|---|
| **2000** | 456.8 | 908.6 | 888.9 | 1,458.8 | 824.7 | 695.8 | 502.6 |
| **2001** | 477.6 | 846.9 | 846.5 | 1,468.2 | 806.8 | 641.9 | 482.9 |
| **2002** | 539.5 | 914.5 | 914.1 | 1,225.5 | 806.8 | 648.3 | 471.2 |
| **2003** | 616.5 | 895.1 | 979.2 | 1,208.6 | 807.3 | 652.3 | 488.7 |
| **2004** | 680.3 | 915.5 | 1,136.7 | 1,357.1 | 983.0 | 757.9 | 521.1 |
| **2005** | 781.3 | 947.5 | 1,277.6 | 1,762.9 | 1,105.7 | 897.9 | 589.1 |
| **2006** | 913.8 | 926.7 | 1,475.3 | 2,226.6 | 1,134.2 | 1,066.9 | 626.0 |
| **2007** | 920.6 | 898.4 | 1,619.1 | 2,223.4 | 1,090.1 | 1,039.9 | 591.8 |
| **2008** | 862.2 | 790.6 | 1,755.5 | 2,966.4 | 1,326.4 | 1,138.0 | 599.0 |
| **Total** | 6,248.6 | 8,043.9 | 10,893.0 | 15,897.6 | 8,885.0 | 7,539.0 | 4,872.4 |
| **Share of Total** | 10% | 13% | 17% | 25% | 14% | 12% | 8% |

18. Railroads commonly carry a wide variety of different products between many different origin-destination pairs, which is a complex endeavor. Norfolk Southern in 2006 moved traffic in approximately 64,000 lanes and carried 1,925 different

6 Gilley Deposition, October 1, 2010, pp. 455-457; Kaplan Deposition, March 10, 2010, pp. 134-135.

7 The term intermodal also can be used more generically to refer to any traffic that moves using two or more modes of transportation or to mean generally other modes of transportation.

8 This table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon. For interline movements, these data include only the revenue received by Norfolk Southern. These data are not net of certain discounts that are not associated with specific shipments.

commodities.[9] Railroad service is also differentiated by a railroad's quality of service, its ability to manage this complexity in order to move freight in an efficient, timely and reliable manner. In some cases shippers pay more for premium service.[10] For example, United Parcel Service, one of Norfolk Southern's largest intermodal customers, pays a premium rate for special on-time delivery guarantees and other service commitments.[11]

19. A significant majority of Norfolk Southern's business is covered by negotiated contracts with shippers.[12] In addition to price differences, non-price terms often differ among contracts. For example, some contracts call for the railroad to provide the freight cars, while others call for the shipper to provide the freight cars.[13] The contracts may also have different terms concerning payments for keeping the equipment longer due to delays in loading or unloading (called demurrage)[14] and payments for renting the freight cars if shipments are delayed.[15] Contracts may have minimum shipment sizes and volume commitments.[16] In addition, there may be terms concerning insurance, damage to cargo, and indemnification for loss.[17] Finally, some NS contracts obligate NS to provide a refund to the shipper or contribute to capital infrastructure improvement.[18]

---

9 NS 001001194, at -208, Seale Deposition Exhibit 3.

10 Government Accountability Office (GAO), "Freight Railroads: Industry Health has Improved, but Concerns About Competition Should be Addressed," GAO-07-94, October 2006, (Hereinafter GAO Report) p.16.

11 Bolander Declaration ¶ 17.

12 Moorman Deposition, p. 23. From 2006 to 2008, an estimated 81% of Norfolk Southern Industrial Products revenue and 89% of Norfolk Southern Industrial Products volume moved under contract. Lawson Declaration, ¶¶ 1 & 20.

13 For example, NS_003023122, at -127 has a contract term calling for the shipper to find the car, as does NS_003036151, at -158. For an example of a contract that calls for the railroad to provide the equipment, see NS_010154076, at -079.

14 See for example, NS_003044659, at -663.

15 For example, see NS_003047118, at -125.

16 For an example of a contract with minimum and maximum shipment sizes, see NS_003047118, at -124. An example of a contract with a volume commitment is Norfolk Southern's contract with [redacted] NS_010226141, at -142. Other examples of contracts with volume commitments are NS_003012445, at -450; NS_003036151, at -153; NS_003036151, at -158; and NS_003023122, at -128. Norfolk Southern made an offer to [redacted] that had [redacted] NS_010235148.

17 For an example of a contract term involving damage to cargo, see NS_010154076, at -081; for an example involving indemnification, see id. at -084; for an example involving insurance, see id. at -085. For an example of negotiations between Norfolk Southern and a major shipper involving insurance and loss and damage provisions of a contract, see NS_010147764-65. For an example of competition between CSXT and Norfolk Southern for the business of a coal shipper, see NS_010159457.

18 NS_003049568, at -569 and -583.

20. Thus, railroad service has many different dimensions, and negotiations between a shipper and a railroad involve these dimensions as well as price. Michael Gilley, the Rule 30 (b) (6) corporate witness for Olin, testified that when Olin negotiated with railroads, volume, the length of the contract, service standards, and safety were among the issues considered.[19] He further testified that it was common in his experience for a railroad to agree to a lower price in exchange for a commitment from the shipper for more volume.[20] Mr. Gilley testified that Olin's decision on freight transportation "sometimes cannot all be about price. It's the things we've been talking about, the product, the nature, what does the customer require, etc."[21]

21. Norfolk Southern not only carries a wide variety of commodities, it also serves a wide variety of shippers. Table 2 reports the top twenty customers by unregulated revenue served by Norfolk Southern during the Class Period, July 1, 2003 to December 31, 2008. Table 2 shows that during the Class Period the largest shipper on Norfolk Southern was [redacted] Other electric utilities, such as [redacted], were also among the largest shippers on Norfolk Southern. [redacted] were among Norfolk Southern's five largest shippers. Other important shippers using Norfolk Southern included paper companies, steel companies, and trucking and shipping companies that participate in intermodal shipments. Norfolk Southern's top 20 customers accounted for approximately 35% of the revenues it received from unregulated traffic. Norfolk Southern's top 200 customers accounted for approximately 77% of its revenues from unregulated traffic.[22]

---

19 Gilley Deposition, October 1, 2010, pp. 444-46. Michael Gilley is Olin's Vice-President for Human Resources. Id. at pp. 371-72.

20 Gilley Deposition, October 1, 2010, pp. 440-42.

21 Gilley Deposition, May 5, 2010, pp. 75-76.

22 This estimate is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon. On interline movements, these data include only the share of revenue received by Norfolk Southern. These data are not net of certain discounts that are not associated with specific shipments.

**Table 2: Norfolk Southern's Unregulated Revenues from Top 20 Customers, July 2003 through December 2008**[23]

| Customer | Unregulated Revenue ($) | Share of Total Unregulated Revenue |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

22. Dr. Rausser contends that Class I railroad freight services to shippers are "homogeneous and interchangeable."[24] Dr. Rausser is wrong. Shippers often have limited or no ability to substitute between different railroads. For example, a utility, like [redacted], that needs [redacted] delivered to one of its [redacted] cannot have the shipment delivered by a railroad that cannot reach that [redacted].

23. There may be cases in which a shipper can substitute rail service with one set of characteristics for a different service. For example, a shipper in Chicago with containerized freight to be exported may be able to send the shipment either to Seattle on BNSF or to Baltimore on Norfolk Southern, and depending on the final destination, both options may be viable. Even in those cases, however, substitution may be limited. Shipping to Seattle is unlikely to be an attractive option for freight from Chicago bound for northern Europe or the east coast of

23 This Table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon. On interline movements, these data include only the share of revenue received by Norfolk Southern. These data are not net of certain discounts that are not associated with specific shipments.

24 Rausser Report, p. 32.

South America. The importance of these differences in evaluating Plaintiffs' claims is that different competitive conditions apply to different shipments, and a successful collusive agreement would need to take these differences into consideration.

### *B. Markets Served by Railroads*

24. Plaintiffs' antitrust claims must be considered in the context of properly defined markets for services provided by Norfolk Southern, and Dr. Rausser has not performed that analysis. An antitrust market is a combination of products or services and geographic locations such that an entity, such as a group of firms engaging in a collusive agreement, that controls the supply of the product or services in those locations could profitably raise prices above competitive levels. The ability to raise prices above the competitive level is called market power. Plaintiffs allege that the defendant railroads conspired to raise the prices of their services. For such a conspiracy to succeed, it would need to control supply within a properly defined antitrust market, otherwise the attempted price increase would not be profitable. Thus, it is important to consider the markets in which railroad services are provided. If the alleged conspiracy did not control supply in a well-defined market, then it could not be expected to profitably raise prices, which would be inconsistent with plaintiffs' allegations that the market is conducive to collusion.

25. In ascertaining whether or not a railroad cartel as alleged by Plaintiffs is possible depends on the competitive conditions faced by the Defendants within properly defined markets. These conditions vary a great deal across markets. In some markets a hypothetical railroad cartel would be highly unlikely or impossible. In other markets, a railroad cartel would have no impact on rates because there would be no railroad competition even without a cartel. A proper economic analysis of Plaintiffs' allegations must consider that the factors that affect competition in the markets in which Defendants compete vary from market to market.

26. Differences among railroad services and limitations that shippers face in substituting between those services have important implications for how these markets function and whether or not the alleged collusion is likely or even possible. The concepts of market definition and market power typically used by

antitrust economists are generally set forth in the Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*. These Guidelines state that "Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service."[25] Thus, a consideration of customers' ability to substitute among different products is crucial for defining markets.

27. A properly defined market has both a product and a geographic dimension. The services or products included in an antitrust market are called a product market; the area is called a geographic market. In the case of railroads, market definition starts with a service a carrier provides, the movement of a particular commodity between a particular origin and destination.[26] Next, consideration is given to whether rail transportation of that commodity could possibly be a product market and whether the origin and destination of the movement could possibly be a geographic market. Because railroads commonly carry a wide variety of different products between many different origin-destination pairs, there are many possible candidate markets to consider.

28. In this case, where the allegation involves an agreement among railroads to increase their prices, the issue for market definition is whether such an agreement would allow the group of railroads by itself to increase price for certain services profitably. Whether this is possible depends in part on the options available to a shipper involved in that movement.[27] For example, in some cases shippers might respond to a price increase by moving shipments to another mode of transportation, such as truck. In that case, the railroad movement is not an antitrust market, because collusion among railroads could not profitably raise price.[28] In

[25] Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010, §4.0, p. 7.

[26] Starting market definition by considering the movement of a particular commodity between a particular origin and destination is a standard practice among economists analyzing antitrust issues involving railroads and the general approach under the *Merger Guidelines*. See Russell W. Pittman, "Railroads and Competition: the Santa Fe/Southern Pacific Merger Proposal," *The Journal of Industrial Economics*, v. 39, no. 1, September 1990, p. 27.

[27] "Market definition in the rail industry begins with a focus on the shipper. . ." American Bar Association, *Market Definition in Antitrust: Theory and Case Studies*, Chicago Illinois, 2012, p. 234.

[28] If railroads raise the price of a service, and profits on the sales lost (because some customers stop using that service by substituting to other transportation modes) exceed the profits gained from the higher prices charged to customers who continue to use the service, then the service is not a

other cases, the shipper may not have a rail option to its current carrier.[29] In that case, collusion among railroads also could not raise price, because rail competition does not determine the rate for the movement. An analysis of competition for such movements needs to consider the options the shipper actually has. Different competitive conditions in different markets will result in different price effects in different markets by a hypothetical cartel.

29. Dr. Rausser admits that he has not conducted any analysis of relevant markets.[30] Rather than consider the different competitive conditions that apply in different markets, Dr. Rausser has grouped the continental United States into one large pseudo "market," even though no defendant railroad has the ability to serve the entire continental United States.[31] He then treats railroad traffic throughout the United States as if it competed in a single market operating under the same competitive conditions. Dr. Rausser's conclusion is largely based on his observation that railroads carry freight that originates in every state of the continental United States. Norfolk Southern's participation as part of a national rail network, however, does not mean that Norfolk Southern is present throughout the network.

30. An analysis of markets must be based on a consideration of shippers' alternatives, not only where firms operate. To take an example, Food Lion operates supermarkets in North Carolina and Delaware, but that does not mean that both those states are in the same geographic market for supermarkets. In fact, because shoppers generally buy groceries from stores that are near where they live, geographic markets for supermarkets generally are local in nature and are usually no larger than a single urban area. Dr. Rausser asserts that market definition is not relevant to his opinions in this case.[32] Without considering market definition, however, he has failed to consider whether competition from other modes would restrain the railroads' ability to raise rates profitably on specific types of traffic

---

market. Barry C. Harris & Joseph J. Simons, "Focusing Market Definition: How Much Substitution is Necessary?," 12 *Research in Law and Economics*, 207, 210 (1989).

29 For example, Mr. Gilley testified that Olin generally is unable to use the possibility of switching to another railroad in contract negotiations because it usually has access to only one railroad. It can, however, sometimes use the possibility of switching to another mode in its negotiations. Gilley Deposition, October 1, 2010, pp. 321-23.

30 Rausser Deposition, December 11, 2012, pp. 82-83.

31 Rausser Report, p. 21.

32 Rausser Deposition, p. 85.

and thus whether it would even make economic sense for railroads to engage in the collusive agreement alleged.

31. Dr. Rausser's observation that the defendant railroads handle freight that originates in all 48 states of the continental United States is irrelevant to market definition.[33] For example, suppose a shipper on a UP line in California wants to move freight to Baltimore, Maryland. The shipper will originate the freight on UP, but at some point UP will have to hand the freight to either CSXT or Norfolk Southern for transportation to its final destination. Norfolk Southern cannot compete with the UP to originate the freight; it has no lines in California. UP cannot compete with Norfolk Southern to terminate the freight; it has no lines in Maryland. Dr. Rausser's argument ignores differences in where railroads can and cannot compete.

32. Furthermore, even though Dr. Rausser acknowledges that railroads "price differently across different commodities," he groups the carriage of all commodities into one market.[34] He then derives market shares and concentration indices based on this market definition, although he has no justification for putting the carriage of different commodities into the same market.[35] He states that Defendants represent "94% of all rail freight revenue in the continental United States. This huge market share gave the Defendants' alleged cartel the ability to set prices in the market."[36] His statement is economically meaningless because the

33 Rausser Report, pp. 12-14.

34 Dr. Rausser's conclusion that railroads compete in a single national market is contradicted by his observation that railroads engage in differential pricing. Differential pricing typically exists because the firm engaging in the differential pricing competes in different markets. See the Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010, §3, p. 6, which addresses the relationship between differential pricing and market definition. The Guidelines explain that: "When examining possible adverse competitive effects from a merger, the Agencies consider whether those effects vary significantly for different customers purchasing the same or similar products. Such differential impacts are possible when sellers can discriminate, e.g., by profitably raising price to certain targeted customers but not to others. The possibility of price discrimination influences market definition (see Section 4), the measurement of market shares (see Section 5), and the evaluation of competitive effects (see Sections 6 and 7)."

35 Rausser Report, pp. 26-29.

36 Rausser Report, p. 5. Even after defining a market in this way, Dr. Rausser finds the Herfindahl-Hirschman Index for the railroad industry is 2263. Rausser Report, p. 29 The Merger Guidelines would classify a market with that HHI to be moderately, not highly, concentrated. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010, §5.3, p. 19. Dr. Rausser states that his calculated HHI is "well above the 1000 HHI trigger point at which the Department of Justice begins to carefully scrutinize mergers." In fact, the Department's Merger Guidelines classify markets with an HHI below 1500 to be unconcentrated and state that "Mergers

measurement of concentration depends on it being made in a properly defined antitrust market.[37] Dr. Rausser has estimated industry concentration, a concept that is not useful in analyzing the alleged collusion, and not market concentration.[38]

### *C. Differential Pricing by Railroads*

33. Railroads charge different prices for different services. A railroad may sell transportation of one commodity between one origin and destination pair for a different price than it sells transportation of another commodity between a different origin and destination, even if the two movements appear similar in terms of characteristics, such as the equipment used to haul the two commodities or the level of priority of the shipment. Also, depending on various factors, railroads may charge different rates to different shippers for hauling the same commodity between the same locations. Most rail traffic moves under private confidential contracts that have been negotiated between railroads and shippers.[39] Thus, railroads are able to engage in differential pricing because they typically negotiate rates that are specific to the shipper.

34. Not only do railroads set different rates on different shipments, they also adjust those rates differently as market conditions change. Norfolk Southern made different changes in its rates for hauling different commodities during the period of the alleged collusion. To measure changes in rates, transactions data supplied by Norfolk Southern were used to calculate the average rate per ton-mile for each shipment, as defined by the 7-digit STCC and the 6-digit standard point location (SPLC) codes where the shipment began and ended.[40] Rates used are all-in rates, which include both base rate and fuel surcharge. Interline shipments were excluded from this analysis. Percentage changes in rates were calculated for 12 month periods starting on July 1, because the Class Period started on July 1, 2003.

---

resulting in unconcentrated markets are unlikely to have adverse competitive effects and ordinarily require no further analysis." *Ibid.*

37 Section 5.2 of the U.S. DOJ/FTC Horizontal Merger Guidelines indicates that market share and concentration should be measured in a properly defined antitrust market.

38 Note also that high market shares or high concentration do not necessarily imply market power or lead to collusion, but the absence of high market shares or concentration suggests a market is not susceptible to collusion.

39 GAO Report, p. 24.

40 Because these rates are averages, there may be significant variation in rates that are not shown in the table.

Weighted average rate increases were determined for each 3-digit STCC, with ton-miles as the weights. Note that because rates can change significantly within 3-digit STCC codes, this procedure understates the variations that occurred in rates. The average rate increases for the 30 3-digit STCC codes with the largest volume are shown in Table 3. Volume was measured by total ton-miles during the 72 months included in the analysis. The analysis shows that different commodities experienced significantly different changes in rates. For example, in the first 12 months of the Class Period, intermodal rates rose 5%, rates on automotive shipments did not change, and rates on shipments of paper product fell.

35. Because railroads engage in differential pricing and respond to differences in demand conditions in different markets, they earn different profit margins on different movements. Prices paid by shippers depend not only on the costs of serving them but also on the options they have to the railroad's service. Railroads could not cover their fixed costs without differential pricing. Railroads have high fixed costs, costs that do not vary with the volume of traffic. In particular, they cannot provide service without a large investment in track and roadbed. If they tried to set rates that earned the same profit margin from all shippers, the shippers with many good transportation options would switch, and the railroads would earn no profits at all on that traffic. The industry's need for differential pricing has been recognized by legislation. According to the Government Accountability Office (GAO):

> "The Staggers Rail Act [of 1980] recognized the need for railroads to use demand-based differential pricing to promote a healthy rail industry and enable it to raise sufficient revenues to operate, maintain, and, if necessary, expand the system in a deregulated environment. Demand-based differential pricing, in theory, permits a railroad to recover its joint and common cost—those costs that exist no matter how many shipments are transported, such as the cost of maintaining track—across its entire traffic base by setting higher rates for traffic with fewer transportation alternatives than for traffic with more alternatives."[41]

41 GAO Report, p. 8.

**Table 3: Average Changes in Norfolk Southern's All-in Rates in Dollars per Ton-Mile for STCC3 Commodities Compared to the Prior 12-Month Period[42]**

| STCC3 Code | STCC3 Code Description | 7/1/03 to 6/30/04 | 7/1/04 to 6/30/05 | 7/1/05 to 6/30/06 | 7/1/06 to 6/30/07 | 7/1/07 to 6/30/08 |
|---|---|---|---|---|---|---|
| 000 | Intermodal | 5% | 8% | 11% | 1% | 7% |
| 011 | Field Crops | 3% | 5% | 10% | 9% | 12% |
| 101 | Iron Ores | 3% | 1% | 13% | 4% | 11% |
| 112 | Bituminous Coal or Lignite | 5% | 11% | 18% | 5% | 12% |
| 142 | Crushed or Broken Stone or Riprap | 3% | 8% | 9% | 4% | 9% |
| 144 | Gravel or Sand | 1% | 9% | 11% | 8% | 9% |
| 147 | Chemical or Fertilizer Minerals | 23% | -9% | 6% | 8% | 23% |
| 204 | Grain Mill Products | 1% | 3% | 7% | 6% | 13% |
| 206 | Sugar, Beet or Cane | 2% | 9% | 7% | 9% | 7% |
| 209 | Miscellaneous Food Preparations | 2% | 5% | 10% | 6% | 10% |
| 241 | Primary Forest Materials | 3% | 9% | 12% | 6% | 10% |
| 242 | Sawmill or Planning Mill Products | 4% | 11% | 10% | 7% | 8% |
| 243 | Millwork or Prefabricated Wood Products or Plywood or Veneer | 4% | 7% | 13% | 7% | 11% |
| 261 | Pulp or Pulp Mill Products | -4% | 13% | 27% | 14% | 9% |
| 262 | Paper exc. Building Paper | -3% | 7% | 8% | 7% | 11% |
| 263 | Fireboard, Paperboard, or Pulpboard exc. Building Insulating Board | -3% | 6% | 11% | 8% | 7% |
| 281 | Industrial Inorganic or Organic Chemicals exc. Pesticides | 3% | 8% | 13% | 10% | 12% |
| 282 | Plastic Materials or Synthetic Fibres, Resins or Rubber exc. Glass | 2% | 9% | 12% | 6% | 15% |
| 287 | Agricultural Chemicals | 2% | 7% | 13% | 7% | 13% |
| 289 | Miscellaneous Chemical Products | 4% | 7% | 9% | 7% | 11% |
| 291 | Products of Petroleum Refining | 6% | 22% | 9% | 7% | 10% |
| 299 | Miscellaneous Coal or Petroleum Products | 3% | 8% | 17% | 10% | 9% |
| 324 | Hydraulic Cement | 4% | 7% | 5% | 2% | 5% |
| 325 | Structural Clay Products | 3% | 13% | 14% | 9% | 6% |
| 327 | Concrete, Gypsum, or Plaster Products | 1% | 16% | 16% | 10% | 7% |
| 329 | Abrasives and Asbestos Products | 3% | 8% | 11% | 9% | 10% |
| 331 | Steel Mill Products | 3% | 12% | 15% | 10% | 12% |
| 371 | Motor Vehicles or Equipment | 0% | 3% | 5% | 3% | 7% |
| 402 | Waste or Scrap exc. Ashes | 4% | 11% | 12% | 9% | 7% |
| 461 | Miscellaneous Mixed Shipments | 1% | -2% | 8% | 4% | 8% |

36. According to the Surface Transportation Board (STB), "the core regulatory principle in the rail industry is that a railroad must be able to engage in some form

42 This Table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon. All-in rates include both base rates and fuel surcharges.

of demand-based differential pricing to have the opportunity to earn adequate revenues."[43] A study done a few years ago for the STB states that "Railroads use differential pricing to recover their total cost."[44]

37. Dr. Rausser admits that railroads engage in differential pricing or price discrimination. He writes, "Because the relevant transport substitutes are different across commodity groupings, the railroads *price discriminate.* [Emphasis in original.] That is, they charge the shippers of different commodities different prices because some shippers have no option but to ship by rail, while others do have options. All else equal, shippers without other transport options will be charged higher rates than other shippers." [Footnote omitted.][45]

38. Dr. Rausser's observation about differential pricing is factually accurate but inconsistent with his theory of collusion. Because of differential pricing, collusion among railroads, were it to take place, would produce different rate increases for different shippers, not the uniform percentage increase alleged by Dr. Rausser and assumed in his damages model. Because different shipments occur under different competitive conditions and are affected differently by competition between railroads, different railroad shipments would also be affected differently by collusion that diminished that competition. Consequently, a hypothetical profit-maximizing railroad cartel would have increased rates on some shipments by greater amounts than it increased rates on other shipments.

39. For example, as Dr. Rausser admits, some shippers can use transport options other than railroads.[46] Collusion among railroads could not result in a large rate increase to shippers with good alternatives to the railroads, because those shippers would respond to the railroad price increase by shifting traffic to other modes. Other shippers may not be able to shift traffic to other modes. Some of those shippers, however, may only be able to use a single railroad. Collusion among railroads also will not increase the rates to shippers able to use only a single railroad, because these shippers did not benefit from competition between railroads either before or

43 "Major Issues In Rail Rate Cases," STB Ex Parte No. 657 (Sub-No. 1), p. 20.

44 Laurits R. Christensen Associates, inc. "A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition," (hereafter Christensen Report). Prepared for the Surface Transportation Board, Washington, D.C., November 2009, p. ES-5.

45 Rausser Report, p. 25.

46 Rausser Report, pp. 22-24.

during the Class Period. Finally, some shippers must rely on rail service but can switch between railroads. For those shippers, a hypothetical collusion could increase rates. Thus, collusion among railroads, were it to take place, would produce different rate increases for different shippers, not the uniform percentage increase alleged by Dr. Rausser.

40. Dr. Rausser makes a variety of arguments as to why railroads compete with each other, even if they do not serve the same two points. Dr. Rausser's arguments do not change the significance of rail competition's differing among different movements. The impact of any hypothetical collusion among railroads logically would also have to differ among different movements.

### *D. Railroad Interline Movements*

41. Railroads that compete against each other on some movements may also jointly provide interline service. Interline service takes place when a shipper wants to move freight from a point on the lines of one railroad to a destination on the lines of another railroad. Because railroads jointly produce many of their movements, railroads providing joint line service must communicate with each other about price and other competitive variables concerning that traffic. There is a statutory requirement in 49 U.S.C. § 10703 that railroads "shall establish through routes" with each other and "shall establish rates . . . rules for their operation . . . and reasonable facilities" for those routes.

42. Interline traffic constitutes a significant part of railroad service. From 2003 to 2008, 37% of the carload traffic and 33% of the intermodal traffic moved by U.S. railroads traveled in interline movements.[47] The importance of interline traffic to Norfolk Southern is shown in Table 4. From 2000 to 2008, interline traffic provided between 41% and 47% of Norfolk Southern's annual revenues received from unregulated traffic.[48]

---

47 These data were provided in an email from William Brennan, Deputy Director of the Office of Economics of the STB, at the request of my staff.

48 Dr. Rausser states that 34% of Norfolk Southern shipments are interlined. Dr. Rausser does not identify the time period used for this calculation nor does he identify whether it is based on ton-miles, revenue, carloads or another measure. Rausser Report, pp. 47-48.

| **Table 4: Interline Traffic Share of Unregulated Revenue for Norfolk Southern, 2000-2008**[49] | | | |
|---|---|---|---|
| Year | Interline Unregulated Revenue | Total Unregulated Revenue | Interline Share |
| | (millions) | | |
| 2000 | $2,434 | $5,736 | 42% |
| 2001 | $2,349 | $5,571 | 42% |
| 2002 | $2,462 | $5,520 | 45% |
| 2003 | $2,617 | $5,648 | 46% |
| 2004 | $2,976 | $6,352 | 47% |
| 2005 | $3,348 | $7,362 | 45% |
| 2006 | $3,738 | $8,370 | 45% |
| 2007 | $3,707 | $8,383 | 44% |
| 2008 | $3,852 | $9,438 | 41% |

### *E. Competition with Other Modes of Transportation*

43. Besides railroads, surface freight transportation is also provided by trucks and water carriers, such as barges. In the United States in 2007, railroads carried 40% of all freight ton-miles shipped, trucks carried 40%, and barges carried less than 5%.[50] An additional 6% moved by a combination of truck and rail and 3% moved by a combination of truck and water carriers.[51] Of the remainder, 1% went by unknown modes, and the rest went by U.S. Postal Service and other parcel carriers or by combinations of modes not including rail. Rail's share is much lower when measured by the value of freight moved (4%) or the tons moved (15%) with trucks making up 71% by value of freight moved and 70% by tons moved. As Dr. Rausser notes, the extent of competition between truck and rail depends on a variety of factors, including the length of haul and the commodity being carried.[52]

44. The significance of competition from other modes, and in particular from trucks, has long been recognized. According to a recently published American Bar Association book on market definition, "In many cases, the shipper may substitute

49 This table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon.

50 U.S. Department of Transportation, "2007 Commodity Flow Survey," available at http://www.bts.gov/publications/ commodity_flow_survey/. Dr. Rausser cites similar figures from the 2002 survey, Rausser Report, p. 23.

51 U.S. Department of Transportation, "2007 Commodity Flow Survey," op. cit.

52 Rausser Report, pp. 37-38.

economically between transportation by rail and transportation by truck."[53] Similarly, the STB notes that ". . .in specific markets railroads operate in a highly competitive environment with vigorous competition from motor and water carriers. . ."[54] The STB considers intermodal competition, competition from other modes of transportation including truck and water competition, in market dominance proceedings[55] and in merger proceedings.[56] The STB's predecessor agency, the Interstate Commerce Commission (ICC), also found competition between modes was very important for some traffic. For example, the ICC stated that "truck competition for the transportation of boxcar commodities is pervasive and limits the railroads' pricing freedom."[57] As the Board explained in the Boxcar Exemption Decision:

> "Virtually anything that can be transported in a boxcar can be transported in a truck. Motor carriage tends to be faster, more accessible, more convenient and sometimes less damaging to freight than rail service, meaning that **boxcar transportation generally must be priced to reflect these service differences to compete successfully**. Thus, the market itself places an effective ceiling on rail rates for boxcar transportation, and regulation is unnecessary to assure that boxcar rates do not rise to unreasonably high levels." 367 I.C.C. at 432 [Emphasis added.]

45. In another decision, the ICC found that competition from trucking prevented railroads from abusing market power over TOFC/COFC (intermodal) traffic.[58]

46. The significance of truck competition was observed by Norfolk Southern senior executives. David Lawson, Vice President of Industrial Products for Norfolk Southern, states, "Motor carriers are the dominant force in surface freight transportation."[59] A Norfolk Southern document calls trucking "rail's primary

53 American Bar Association, *Market Definition in Antitrust: Theory and Case Studies*, Chicago Illinois, 2012, p. 234.

54 Major Rail Consolidation Procedures, 5 S.T.B. 561 (2001).

55 "Market Dominance Determination—Product and Geographic Competition," STB ex parte no. 627, December 10, 1998, p. 937. In this case, "intermodal" means another form of transportation other than rail.

56 STB Finance Docket No. 34178, Dakota, Minnesota & Eastern Railroad Corporation and Cedar American Rail Holdings, Inc. — Control — Iowa, Chicago & Eastern Railroad Corporation, January 31, 2003, p. 14.

57 "Exemption From Regulation -- Boxcar Traffic," 367 I.C.C. 425 p. 441.

58 "Improvement Of TOFC/COFC Regulations," 3 I.C.C. 2d 869 p. 878.

59 Lawson Declaration (Moorman Deposition Exhibit 13), ¶ 23.

competition in the marketplace."[60] Similarly, Charles Moorman testified that trucking is "our primary competitor."[61]

47. Norfolk Southern documents show that it paid close attention to truck competition and this attention was at the level of specific shippers and origin-destination traffic lanes. Norfolk Southern maintained a database that tracked freight lost to or taken from trucks (and also barges and other railroads).[62] Specific groups within Norfolk Southern also kept track of freight lost to or gained from trucks.[63] These groups included the business groups generally: Metals & Construction;[64] Auto;[65] Chemicals;[66] Agriculture;[67] Paper, Clay, Forest;[68] and Intermodal.[69] Data on truck diversions were shared with the CEO and the Board of Directors.[70] In addition, Norfolk Southern's Market Research and Economics Group prepared a quarterly report called "Tracking Trucks" about economic conditions in the trucking industry.[71] There is evidence of competition between Norfolk Southern and trucks for many specific commodities, including automotive products,[72] chemicals,[73] and food products.[74] As a further example, Michael Gilley of Olin testified that Olin at times was able to get a lower railroad rate because of truck competition.[75] Norfolk Southern reports that discuss the movements with the lowest ratios of revenues to costs often refer to truck competition.[76]

48. Competition from trucking is significant, because it limits the extent that collusion among railroads could increase prices for those movements where it exists and

---

60 NS_057008805.
61 Moorman Deposition, p. 63-64.
62 NS_010000120-22; NS_010189033-34; NS_010082504-12.
63 NS_010197156-57; NS_010197187-88; NS_010060700-01 (March 2004); NS_010237329-30 (April 2004); NS_010061383-84 (May 2004); NS_010061629-30 (June 2004); NS_008001150-51 (August 2004); NS_010062150-51 (September 2004); NS_010141224-25 (October 2004); NS_010036281-82 (January 2005); NS_010063332-33 (March 2005)
64 NS_059001598-1600.
65 NS_010139631-32.
66 NS_010258008-09.
67 NS_010239821-41.
68 NS_010088808-10.
69 NS_037036188-95.
70 NS_010037886-89; NS_010012144-48.
71 NS_057000261-62; NS_010175544-45; NS_010146467-68.
72 NS_010139631-32.
73 NS_010258008-09.
74 NS_010006758.
75 Gilley Deposition, May 5, 2010, pp. 223, 227-28; OLI125757, Olin Ex. 6.
76 NS_014000769-786; NS_060000688-714; NS_010004977-5006; NS_010128292-322; NS_010081431-76.

may prevent such price increases at all. As the STB has repeatedly found and Norfolk Southern documents support, trucks can and sometimes do limit the ability of Norfolk Southern to raise rates on specific shipments. Because the significance of trucking competition varies among shippers, it would complicate any collusive effort to set and enforce prices.

49. Dr. Rausser argues that trucking competition is not significant in large part because rail shipments typically travel longer distances than truck shipments.[77] Dr. Rausser is wrong because he looks at the average length of railroad shipments and ignores the distribution of the length of railroad shipments. As described below, if Dr. Rausser had considered the distribution he would have observed many rail shipments with lengths of haul within the range that trucks compete with rail. Consequently, Dr. Rausser's argument does not generally apply to railroads and specifically does not apply to Norfolk Southern.

50. Truck competition is particularly important for Norfolk Southern, because truck is more competitive with rail over shorter shipping distances and Norfolk Southern generally carries freight shorter distances than the western railroads. Dr. Rausser states that Norfolk Southern and CSXT "tend to cover slightly shorter journeys than the western railroads."[78] In fact, his own data, which are summarized in Table 5, show that Norfolk Southern has an average length of haul that is less than half that of the BNSF and UP. This shorter length of haul is particularly significant, because Dr. Rausser contends that truck cannot compete with rail for long-distance shipments, and he cites a 1979 paper by Oum, in support of this proposition.[79] The Oum study finds that various commodity groups, such as petroleum products, fruits and vegetables, and fabricated metal products, truck and rail are competitive at distances similar to the average length of haul for Norfolk Southern.[80]

---

77 Rausser Report, pp. 37-8.

78 Rausser Report, p. 38.

79 Rausser Report, p. 36.

80 Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics*, 10.2 (Autumn, 1979), pp. 463-482. See in particular, Table 4, p. 480.

| Table 5: Average Length of Haul (miles) for Defendant Railroads for Unregulated Traffic From 2000 to 2008[81] | |
|---|---|
| Norfolk Southern | 626 |
| CSXT | 624 |
| UP | 1,303 |
| BNSF | 1,505 |

51. Moreover, while Dr. Rausser presents data on average lengths of haul, in fact the data show large amounts of Norfolk Southern traffic traveled even shorter distances. As Table 6 shows, in the Class Period 64% of Norfolk Southern carload traffic traveled less than 600 miles.

| Table 6: Norfolk Southern Class Period Revenue by Length of Haul: Carload Unregulated Traffic[82] | | |
|---|---|---|
| Miles Traveled | | |
| At Least | But Less Than | Share of Total Revenue |
| 0 | 100 | 7% |
| 100 | 200 | 7% |
| 200 | 300 | 9% |
| 300 | 400 | 13% |
| 400 | 500 | 16% |
| 500 | 600 | 11% |
| 600 | 700 | 8% |
| 700 | 800 | 9% |
| 800 | 900 | 7% |
| 900 | 1000 | 5% |
| 1000 | 1100 | 4% |
| 1100 | 1200 | 2% |
| 1200 | 1300 | 1% |
| 1300 | -- | 1% |

52. The significance of truck competition to Norfolk Southern can also be viewed through the nature of the commodities that it transports. As Dr. Rausser acknowledges, trucks are more competitive for high valued commodities and at a disadvantage for low-valued bulk commodities.[83] Norfolk Southern's traffic includes a significant proportion of higher-valued manufactured commodities. For

81 Rausser Report, pp. 37-38.

82 This table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon.

83 Rausser Report, pp. 37-38.

example, three of Norfolk Southern's five leading customers are auto manufacturers and as is shown in Table 1, 13% of its revenues from 2000 to 2008 came from shipments of automotive products. Norfolk Southern documents describe how its business transporting auto parts faces significant competition from trucks.[84] For that traffic, "Historically truck pricing is the basis for rail pricing (typically 15%-20% below truck). . ."[85] Other documents describe how Norfolk Southern hopes to increase its revenue by capturing traffic from trucks in the automotive, metals, and intermodal sectors.[86]

53. Dr. Rausser states that "Academic studies suggest that beyond certain distances demand for rail freight becomes highly *inelastic*. [Emphasis in original] Rail transport is the most fuel efficient form of land transport and, for long-distance deliveries there are simply no good substitutes for rail for all commodities."[87] He cites a single study, the paper by Oum from 1979, in support of this proposition. As previously noted, the Oum study finds for many commodities there is substantial competition between truck and rail at distances similar to the average length of haul for Norfolk Southern.[88] Dr. Rausser later cites another study, by the National Cooperative Highway Research Program, to suggest that rail and truck do not compete for medium and long-haul traffic.[89] That report in fact says, "There is no hard-and-fast distance that demarcates rail and trucking zones. Trucks provide some transcontinental service, while rail provides some local and regional services."[90] A survey of the academic literature indicates that the significance of truck-rail competition varies from commodity to commodity and with distance, but rail and truck carriers often are found "to be highly competitive."[91] A more recent survey finds evidence that the demand for rail

---

84 NS_010263593, at 595.

85 NS_010263593, at 597.

86 NS_010027488, at 491, 495, and 497.

87 Rausser Report, p. 36.

88 Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics,* 10.2 (Autumn, 1979), pp. 463-482. See in particular, Table 4, p. 480.

89 Rausser Report, p. 37, fn. 64.

90 Bryan, J., Weisbrod, G., Martland, C.D., and Wilbur Smith Associates, Inc., *Rail Freight Solutions to Roadway Congestion – Final Report and Guidebook,* Transportation Research Board, National Cooperative Highway Research Program, 2007.

91 Thomas J. Zlatoper and Ziona Austrian, "Freight Transportation Demand: A survey of recent Econometric Studies," *Transportation,* 16(1), 1989, p. 43.

service is elastic and that the elasticity of that demand varies widely by commodity.[92]

54. In addition to trucks, rail also competes with water transportation. The ABA book on market definition notes that "transport by barge on rivers or lakes may be an economical alternative for some shippers."[93] As noted, the STB also has described how the railroads compete with water carriers.[94] Whereas truck tends to have an advantage for higher valued freight, water transportation is more competitive for low-valued commodities. Dr. Rausser contends that competition from water transportation is "essentially limited to commodities moving in the Central portions of the U.S. where there are navigable waterways, such as the Mississippi, Ohio, and Missouri Rivers."[95] He does not note that all three of those rivers serve cities that are also served by Norfolk Southern. Dr. Rausser makes no attempt to determine if competition from barges on those rivers has any effect on Norfolk Southern's ability to raise prices either on its own or in concert with other railroads. Because barge competition applies to some but not all railroad traffic, Dr. Rausser's theory that collusion by railroads would have a uniform price impact is further discredited.

55. Moreover, while Dr. Rausser identifies only corn and wheat as commodities where barge competes with railroads,[96] there are other examples in the record involving other commodities where Norfolk Southern competes with barge. For example, Norfolk Southern won [redacted] business for shipments of [redacted] from barge.[97]

56. In some cases, barges compete with Norfolk Southern for chemical traffic. Olin's documents indicate that it can convert traffic from rail to barge in some circumstances.[98] Olin utilizes barges for some commodities at its McIntosh, Alabama and Charleston, Tennessee facilities, which are on the Tombigbee River and Hiwassee River, respectively and are also served by Norfolk Southern. Olin

92 The Navigation Economic Technologies Program, "A Survey of the Freight Transportation Demand Literature and a Comparison of Elasticity Estimates," IWR Report 05-NETS-R-01, January 1, 2005, pp. 36, 40.

93 American Bar Association, *Market Definition in Antitrust: Theory and Case Studies,* Chicago Illinois, 2012, p. 236.

94 Major Rail Consolidation Procedures, 5 S.T.B. 561 (2001).

95 Rausser Report, p. 37.

96 Rausser Report, p. 37.

97 NS_027002285.

98 OLI083339, at -362.

admitted that when barge was a viable alternative to Norfolk Southern, it would use barge freight rates to negotiate a better freight rate.[99]

57. Although Dr. Rausser incorrectly states that "[s]hippers of coal have no option but to ship by rail,"[100] barges do compete with Norfolk Southern to deliver coal to a number of power plants.[101] While barges are not an option for all shippers, Dr. Rausser makes no attempt to distinguish between the cases where barge competition would limit the effects of the alleged railroad conspiracy and those where it would not have that effect.

58. Since the elasticities of demand for rail transportation differ among commodities, a profit-maximizing increase in rail rates by the alleged collusive agreement also will differ. Dr. Rausser's alleged collusive agreement, which involves the same percentage price increase for all rail shipments, is implausible, because it ignores these differences in demand elasticities. He also ignores the ways that these varying elasticities make it harder for a collusive agreement among railroads to set and monitor prices.

59. Dr. Rausser argues that the elasticity of demand for rail transportation for any one commodity is very similar to or the same as the elasticity of demand for rail transportation for any other commodity, but this argument is unsupportable.[102] The economics literature contradicts Dr. Rausser's view, as it finds very large differences in the elasticity of demand for rail transportation of different commodities. For example, a survey by Oum and two coauthors finds that the demand for rail transportation for fabricated metal products, iron and steel products, and textiles is highly elastic. By contrast, it finds that the demand for rail transport of chemicals is inelastic.[103] A more recent survey also finds that the elasticity of demand for rail transportation differs by commodity. For example, the demand for transporting refined petroleum products by rail is found to be

99 A. Davis Deposition, July 8, 2010, p. 137-39.
100 Rausser Report, p. 40.
101 Listwak Declaration, ¶ 5.a and Listwak Deposition, p. 68.
102 Rausser Report, p. 39.
103 Tae Hoon Oum, W. G. Waters II, and Jong-Say Yong, "Concepts of Price Elasticities of Transport Demand and Recent Empirical Estimates," *Journal of Transport Economics and Policy*, Volume XXV1, No_2, May 1992, p. 151.

inelastic, while the demand for transporting primary metals and metallic products is found to be elastic.[104]

60. The only basis Dr. Rausser provides for his assertion that the elasticity of demand for rail transportation is not significantly different across commodities is his review of the commodity mixes of the four defendant railroads. He measures the proportion of carloads accounted for by each 3-digit STCC code in 2002, 2004, and 2006 and argues that those proportions are stable despite the alleged price increases.[105] The data provided by Dr. Rausser (even assuming they are accurate) are not sufficient to demonstrate that the relevant elasticities are not significantly different from each other. If the group of railroads had raised all rates by the same percentage amount, there would be a larger effect on the volume of the commodities that were subject to more competition from other modes, and the relative shares of those commodities in the total traffic carried by the railroads would fall. Dr. Rausser argues that the shares of commodities are stable. He then states that that stability means that no commodities are significantly more truck competitive than others. There are five significant flaws with his analysis:

61. First, Dr. Rausser assumes his result that the railroads raised the rates charged for all commodities by the same percentage. Because demand elasticities differ, the stability in commodity share Dr. Rausser reports is inconsistent with the railroads raising the rates on all commodities by the same percentage amount. In fact, as described above, during the period of the supposed collusion, rates on all commodities did not go up by the same percentage amount. It is expected that when demand grows at different rates in different markets prices in those markets will increase by different percentages.

62. Second, Dr. Rausser does not set forth criteria for defining what constitutes a stable commodity share. For example, the share of STCC 461 in Norfolk Southern traffic rises from 30% in 2002, to 32% in 2004, and 33% in 2006, which is an increase of 3 percentage points or 10% of the initial share in four years. In 2008, a year in the Class Period that Dr. Rausser excludes from Figure 9, STCC 461's share rises again to 35%, which is a change of 16% since 2002. Dr. Rausser

---

104 The Navigation Economic Technologies Program, "A Survey of the Freight Transportation Demand Literature and a Comparison of Elasticity Estimates," IWR Report 05-NETS-R-01, January 1, 2005, p. 36.

105 Rausser Report, p. 39-44.

provides no basis for distinguishing between a share that is constantly rising and a share that is considered to be stable. Because of the differences in the elasticities of demand for rail transport of various commodities, to develop criteria for stability, Dr. Rausser would have to measure the likely effect of the increase in railroad rates that he hypothesizes, which he never does. Dr. Rausser also does not attempt to explain why the share of intermodal traffic, which he says is particularly likely to be truck competitive,[106] is increasing when Norfolk Southern supposedly is applying an equal percentage price increase to all traffic.

63. Third, Dr. Rausser's methodology may mask large changes in the volume of commodities shipped. For example, his Figure 9 shows the share of STCC code 331, steel mill products, to be a constant 5% in each of the three years for which he provides data: 2002, 2004, and 2006. The underlying data for Figure 9, however, show that the amount Norfolk Southern carried of that product increased by 10% from 2002 to 2004 and 7% from 2004 to 2006. His methodology masks even larger changes for smaller volume products. For example, his Figure 9 shows the share of STCC code 324, hydraulic cement, to be a constant 1% in 2002, 2004, and 2006. But the underlying data, however, indicate that the amount Norfolk Southern carried of that product category increased by 27% from 2002 to 2004 and 19% from 2004 to 2006. Large changes in the volume carried of specific products appear small in Figure 9, because Dr. Rausser is comparing them to all unregulated traffic of Norfolk Southern. Also a 3-digit STCC code is an aggregation that includes many different commodities.[107] Dr. Rausser ignores all changes to the mix of commodities carried by railroads that take place within 3-digit STCC codes.

64. Fourth, Dr. Rausser does not take into account any other factors that might affect the mix of commodities carried by the railroads. For example, Norfolk Southern's automotive traffic decreases when consumers shift from automobiles produced by factories on its lines to automobiles that are imported through west coast ports or otherwise never travel over Norfolk Southern. More generally, the underlying demand for the products being carried varies over time.

---

106 Rausser Report, p. 139.

107 For example, 371, motor vehicles and equipment, includes passenger cars *and* armored cars with gun turrets, as well as a wide variety of parts, such as brake parts.

65. Fifth, although Dr. Rausser states that Figure 9 in his report is based on carloads shipped,[108] it actually is based on a count of the number of lines in his database with a particular 3-digit STCC code. Count is not a good measure of the volume of traffic, because different lines will often refer to different amounts of traffic. For example, for STCC 112 bituminous coal, an average record in the database referred to $9,051 in revenue in 2004 and $122,690 of revenue in 2008. Dr. Rausser's Figure 9 indicates that in 2006, STCC 112 was less than 1% of the carloads carried by Norfolk Southern. In fact, it was approximately 22% of carloads.[109]

66. In sum, Norfolk Southern engages in differential pricing and faces significant non-rail competition for much of its traffic. Dr. Rausser presents a model of collusion that applies a fixed overcharge to all railroad traffic, but that type of collusion makes no economic sense for a railroad that faces different competitive conditions in different markets, including different demand elasticities for different shipments.

### *F. Rail Competitors of Norfolk Southern*

67. Norfolk Southern's primary rail competitor is CSXT.[110] Like Norfolk Southern, CSXT also serves the Eastern United States.[111] It is slightly larger than Norfolk Southern; in 2007 CSXT had operating revenue of $10,030 million, and Norfolk Southern had operating revenue of $9,432 million.[112] Norfolk Southern actively competes with CSXT and has solicited its traffic.[113] Specific examples of competition between Norfolk Southern and CSXT are discussed in Section V.

---

108 Rausser Report, p. 39.

109 This estimate is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern, BNSF, and UP and then processed by Compass Lexecon.

110 Moorman Deposition, pp. 154-55. See also testimony that the primary rail competitor of CSXT is Norfolk Southern. (Giftos Deposition, p. 74; Ward Deposition, p. 40).

111 The Kansas City Southern, Canadian National, and Canadian Pacific also have lines in the Eastern United States, as do a number of short line railroads.

112 Revenue data are from the Annual Report for 2008 of each company.

113 NS_010065378, dated October 7, 2005 says "we are soliciting CSXT freight." For another example of competition between the two railroads, see NS_010263593, at -594, which recounts how CSXT service problems have prevented it from being a significant threat to Norfolk Southern's auto parts traffic, but that improvements in CSXT service may threaten that business in the future. NS_057007785 is a draft letter that indicates Daimler Chrysler awarded additional traffic to CSXT instead of Norfolk Southern. NS_010240044 announces Norfolk Southern's capture of ethanol business from CSXT.

68. Although Norfolk Southern and CSXT both serve the same general geographic area, neither one is able to serve all the shippers in that area. David Lawson, Norfolk Southern's Vice-President for Industrial Products, states that CSXT cannot compete for over 64% of the volume and 74% of the revenue that is handled by Norfolk Southern.[114] Even where railroads serve the same city, both are not necessarily options for all shippers in that city because service requires access directly to the shipper's facility (unless transloading is an option). For example, both Norfolk Southern and CSXT serve Augusta, Georgia, but the Olin plant in Augusta can be served only by Norfolk Southern, not CSXT.[115] Olin's other transportation options at Augusta are pipeline and truck, depending on the commodity being shipped.

69. UP and BNSF serve the Western United States, and there is very little overlap between the territories they serve and the territory in the Eastern United States served by Norfolk Southern, as is shown in the map of the United States railroad Network, Figure 2. While Norfolk Southern competes with the BNSF and UP to some extent,[116] that competition is very limited. David Lawson, Vice President of Industrial Products for Norfolk Southern, states that "NS does not generally compete with the two Western Railroads, BNSF and UP."[117] Charles Moorman, President, Chief Executive officer, and Chairman of the Board of Norfolk Southern, testified that BNSF and UP compete with Norfolk Southern "only on the margins, on the fringes of the [Norfolk Southern] system."[118] Richard Davidson, the former Chief Executive Officer of the UP testified that he did not view CSX and Norfolk Southern as competitors to UP.[119]

---

114 Lawson Declaration, ¶ 3.
115 Gilley Deposition, October 1, 2010, pp. 452-53.
116 Goode Deposition, pp. 106-07.
117 Lawson Declaration (Moorman Deposition Exhibit 13), ¶ 3.
118 Moorman Deposition, p. 154.
119 Davidson Deposition, pp. 152-53.

**Figure 2: The Railroad Network of the Continental United States**[120]




70. Plaintiffs allege that Norfolk Southern has entered into a collusive agreement with CSXT, BNSF, and UP. The preceding review shows that allegation to be implausible, since such a collusive agreement would include the two western railroads that are minimal competitors for Norfolk Southern yet would exclude the trucking companies that are significant competitors for much of Norfolk Southern's traffic.

## IV. Market Conditions during the Class Period

71. Dr. Rausser's observation that "Defendants' rates increased at the onset of the Class Period"[121] is not evidence of anticompetitive behavior. Norfolk Southern faced a number of market conditions unrelated to any alleged collusion that explains why its rates and the fuel surcharges associated with those rates increased. Significantly, both demand for freight transportation and rail freight costs were increasing during the Class Period. An independent study of railroad

120 This map is from the Association of American Railroads. Only the primary rail freight corridors are highlighted in color.

121 Rausser Report, p. 88.

rates for the period that ended in 2006, and thus included the early years of the Class Period, found that "[t]he increase in railroad rates experienced in recent years is the result of declining productivity growth and increased costs rather than the increased exercise of market power."[122]

72. During the early years of the Class Period, Norfolk Southern experienced increasing demand for its freight transportation service. Figures 3 and 4 show that between 2004 and 2008, Norfolk Southern's unregulated traffic was at levels substantially above those experienced between 2000 and 2003.[123] Figures 3 and 4 also show that between 2001 and 2003, there was less traffic than in 2000, but by 2006 traffic was 16% above the 2000 level as measured in ton-miles or 13% as measured in carloads.

**Figure 3[124]**




122 Christensen study, p. ES-5.

123 In general, if rate increases were due to a successful cartel, the quantity demanded of rail services would decrease.

124 This Figure is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon.

**Figure 4[125]**




73. Demand for railroad freight services depends on the general level of economic activity, and the economy was strong early in the Class Period. Figure 5 shows the percentage changes in quarterly GDP from 2001 to 2008. There was substantial variation in the amount of economic growth throughout the Class Period, with GDP growth being generally strong in 2003 and continuing through 2005, but declining in 2007 and 2008. Nonetheless, the level of traffic on NS was higher in the Class Period than it was in the pre-Class Period.

125 This Figure is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon.

**Figure 5**[126]




74. In addition to general economic growth, demand for rail services is also affected by the specific levels of economic activity in industries that use a large amount of rail services. Production also fluctuated with a generally rising trend in industries of particular importance to Norfolk Southern: automotive, chemical, paper, steel, and coal. Data on changes in production in each of these industries are reported in Table 7, which shows that other than automotive, production in these industries generally rose from 2004 through 2008.[127]

---

126 Based on Federal Reserve Economic Data from the St. Louis Federal Reserve Bank. http://research.stlouisfed.org/fred2/

127 Quarterly data, which are presented in Table A-1 in Appendix A, show that while demand was generally rising, it fluctuated over time.

**Table 7: Changes in Production in Selected Industries that Ship by Rail: 2003 to 2008**[128]

| Year | Automotive | Chemical | Paper | Steel | Coal |
|---|---|---|---|---|---|
| 2003 | 10% | 5% | -2% | 1% | -2% |
| 2004 | -3% | 11% | 3% | 50% | 4% |
| 2005 | -2% | 13% | 4% | 9% | 2% |
| 2006 | -1% | 8% | 4% | 9% | 3% |
| 2007 | 3% | 9% | 5% | 10% | -1% |
| 2008 | -21% | 3% | 1% | 22% | 2% |

75. The demand for Norfolk Southern's rail transportation services also increased as a result of issues affecting the trucking industry. As Dr. Rausser notes, trucking is less fuel efficient than rail,[129] so its relative competitiveness can be affected when fuel prices change.[130]

76. In 2004, the Federal Motor Carrier Safety Administration put new "Hours of Service" regulations for truck drivers into effect,[131] which reduced the productivity and increased the costs of trucks.[132] There was a shortage of truck drivers from late 2003 until 2005, which made it difficult for trucking companies to increase shipments in response to the growing economy. Lastly, there are indications that increasing highway congestion also caused a shift in traffic from truck to rail.[133]

77. NS Chief Marketing Officer, Donald Seale, noted the above factors in a March 2007 presentation. He explained that "[r]ailroads are moving more freight today

---

128 Production for coal is measured in short tons; production for other industries is in nominal dollar terms. Data for industries other than coal are from US Census Bureau's Manufacturers' Shipments, Inventories, & Orders (M3) Survey http://www.census.gov/manufacturing/m3/historical_data/index.html. NAICS codes used for this survey are: U36AVS & U36BVS (automotive), U25SVS (chemical), U22SVS (paper), and U31AVS (steel). For coal, data are from US Energy Information Administration's "December 2012 Monthly Energy Review: Table 6.1, Coal Overview" http://www.eia.gov/totalenergy/data/monthly/#coal.

129 Rausser Report, p. 36. One study has found that the average number of ton-miles hauled is 413 for rail, 395 specifically for Norfolk Southern, and 155 for trucks. Texas Transportation Institute, "A Modal Comparison of Domestic Freight Transportation Effects on the General Public," March 2009, Houston, Texas, pp. 40, 42.

130 NS_057008805. Other documents that discuss the effect of higher fuel costs on trucking include NS_037028936, at -938; NS_013000769, at -788; NS_010263593, at 596; and NS_010065378.

131 NS_037028936, at -938, September 14, 2006, NS_010216016.

132 NS_010216016.

133 NS_010043833, at -849, NS_010264135, at -136.

than ever before" and summarized the factors increasing the demand for Norfolk Southern's services during these years.[134]

- "High fuel costs, which favor the significant energy efficiency advantages that rail has over trucks."[135] [Emphasis in original.]
- "Capacity constraints in the trucking industry driven by the driver shortage, fuel costs, and increasingly congested highways."[136] [Emphasis in original.]
- "Booming international trade."[137] [Emphasis in original.]
- "High natural gas prices, which in turn cause utilities to burn more coal."[138] [Emphasis in original.]
- "A strong domestic economy, which has included an overall increase in industrial production. The economy is producing the goods, and the railroads are moving the goods that move the economy."[139] [Emphasis in original.]

78. The increase in the demand for its services allowed Norfolk Southern to increase its rates. The impact increasing demand had on Norfolk Southern's rates was noted by both Norfolk Southern and its customers. In October 2005, the head of the Intermodal business group, Mike McClellan wrote, "we have been using the upward cost pressure on trucks to crank up pricing and our own FSC. . ."[140] [redacted], a Norfolk Southern shipper, also described how the [redacted].[141]

79. While these factors resulted in increased freight rates across commodity groups, commodity-specific factors also accounted for the increase in certain rail rates.

134 NS_013000769 at -788.
135 NS_013000769 at -788.
136 NS_013000769 at -788.
137 NS_013000769 at -788.
138 NS_013000769 at NS_013000788. Coal is predominantly carried by rail. U.S. Department of Transportation, "2007 Commodity Flow Survey," available at http://www.bts.gov/publications/commodity_flow_survey/, p. 23.
139 NS_013000769 at788.
140 NS_010065378. See also NS_010263593 at -596 and NS_057008805.
141 OLI083352.

Two significant rail-freight commodities (coal and chemicals) are good examples. As shown in Table 3 in Section III.C, Norfolk Southern rates on bituminous coal increased during the Class Period. Part of this increase can be explained by two decisions the STB issued in October 2004 involving coal rates for Duke Energy Corp. and Carolina Power & Light Co.[142] Those shippers had asked the STB to determine a reasonable rate for their coal shipments on Norfolk Southern, and the STB issued a decision that allowed substantially higher rates than the shippers had been seeking. The STB's view of what would be a reasonable rate for coal had an impact on the ensuing negotiations between Norfolk Southern and its utility customers. As was noted within Norfolk Southern, "… the STB's ruling on Duke has certainly enhanced our ability to secure higher value for the services we perform. It appears that we may enjoy the 'multiplier effect' we had anticipated and hoped for with 'post-decision' negotiations."[143] [Emphasis in original.]

80. Commodity-specific factors also influenced rates for industrial chemicals, which Table 3 in Section III.C shows also experienced rate increases during the Class Period. There were three fatal accidents involving rail transportation of chemicals: one involving anhydrous ammonia in 2002 and two involving chlorine, one in 2004 and one in 2005. These accidents led to increased concerns involving the safety of shipping hazardous materials.[144] An Olin document recognizes that Norfolk Southern and CSXT were increasing rates on chlorine "to offset the cost (litigation, insurance, indemnification, etc) of carrying Toxic Inhalation Hazardous (TIH) chemicals."[145] Another Olin document states that among other factors transportation costs for chemicals were rising due to increased safety and security concerns.[146]

81. In addition, commodity-specific factors influenced the rates for shipments of metals and construction products. An "unforeseen rebound in the domestic steel industry during 2004, combined with robust growth in construction markets," enabled Norfolk Southern's Metals & Construction Group to increase rates and

142 NS_010011838; STB Docket No. 42069 Duke Energy Corporation v. Norfolk Southern Railway Company; STB Docket No. 42070 Duke Energy Corporation v. CSX Transportation, Inc.; STB Docket No. 42072 Carolina Power & Light Company v. Norfolk Southern Railway Company, Decided October 20, 2004.

143 NS_028007287.

144 OLI083350. Both chlorine and anhydrous ammonia are included in STCC 281.

145 OLI46226.

146 OLI005535.

the use of fuel surcharges.[147] While Norfolk Southern bases its rates on overall market conditions,[148] rising costs are one factor that would cause it to increase its rates. From 2003 to 2008, the Norfolk Southern's average variable costs per revenue ton mile increased by 30%.[149]

82. Consequently, Norfolk Southern had reasons for raising rates during the Class Period that were consistent with a firm acting in its unilateral self-interest. Rate increases under these circumstances are not evidence of collusion. As noted, Figure 3 shows that the quantity demanded of Norfolk Southern services increased during the Class Period, a result inconsistent with Plaintiff's allegations. A rate increase caused by the establishment of a cartel would cause the quantity demanded of the product or service to decline.[150] While it is possible that other factors could attenuate or eliminate a quantity decline ordinarily caused by a cartel, Dr. Rausser provides no analysis addressing this possibility.

## V. Norfolk Southern Behavior was Consistent with Its Independent Self-Interest.

83. Plaintiffs allege that Norfolk Southern adopted a specific rate-based fuel surcharge mechanism as part of a collusive agreement that it had committed itself to by "no later than May 14, 2003" and that involved CSXT, BNSF, and UP.[151] In

---

147 NS_010129911, at 923-24.

148 Moorman Deposition, p. 49; Lawson Deposition, p. 40-41.

149 Variable costs were estimated by subtracting depreciation from railway operating expenses. Data are from Norfolk Southern's annual reports filed with the Securities and Exchange Commission. Variable costs are used to show the general direction of costs over time. Variable costs are not the same as marginal costs and can sometimes deviate significantly from marginal costs.

150 See the discussion on "The Economics of Market Power", which is contained in Chapter 3 of the ABA Market Power Handbook. As the ABA Handbook explains:

> Output restriction is the key device by which monopolists achieve monopoly pricing. For example, OPEC, a cartel that accounts for about 40 percent of world crude oil output, tries to behave as much like a monopolist as it can. OPEC engages in monopoly conduct by attempting to regulate market output. In another example, the lysine cartel that was active in the 1990s attempted to raise and maintain prices through output restrictions, including sales allocation plans based upon the investment levels and market power of the participants. In the same way, a single-firm monopolist withholds its output from the market to achieve its profit-maximizing price. [Footnotes in original omitted.]

151 Plaintiffs' Supplemental Response to Norfolk Southern Interrogatories 2(e) and 2(f), January 4, 2012, p. 12. Dr. Rausser has testified that the "implementation" or "execution" of the agreement began in July 2003 and so the alleged unlawful understanding had been reached by July. Rausser Deposition, pp. 13, 26, 147, 314-15.

fact, Norfolk Southern adopted a rate-based fuel surcharge in 2000,[152] three years before collusion is alleged to have begun. Plaintiffs do not contend that the fuel surcharge adopted in 2000 was the result of any unlawful agreement.[153] Railroads operating in the United States and not alleged to be involved in the collusion, specifically the [redacted], also had rate-based surcharges.[154] Moreover, Norfolk Southern's behavior concerning the surcharge was very different from that of the other defendant railroads, particularly CSXT, its primary rail competitor and is inconsistent with the plaintiffs' allegations.

84. It is important to understand that the application of a surcharge is consistent with independent behavior and the absence of a conspiracy. Indeed, non-participants in the alleged cartel such as trucking companies employed fuel surcharges, including rate-based fuel surcharges.[155] A fuel surcharge is one way of establishing which party to a contract or other pricing authority bears the risk of changes in fuel costs over the life of the contract. Rates established in part using a fuel surcharge formula may increase or decrease, a result that is unknown at the time the contract is entered into.

### *A. History of Norfolk Southern Fuel Surcharges*

#### a) Introduction by Norfolk Southern of a public carload rate-based surcharge in 2000.

85. In June of 2000, Norfolk Southern instituted a rate-based fuel surcharge for carload traffic.[156] Carload traffic is traffic that moves in rail cars (such as boxcars, hoppers, etc.), as distinguished from traffic that moves in containers or trailers that are loaded onto rail flatcars ("intermodal" traffic). This change was a reaction to the increased volatility of fuel prices and fuel costs' growing share of Norfolk Southern's total costs.[157] Table 8 shows that in 2000 Norfolk Southern's

---

152 Seale Deposition, p. 51; Goode Deposition, p. 46; NS 001001194, at -201-03.

153 Class Hearing transcript, October 6, 2010, p. 90; Plaintiffs' Consolidated Responses to Defendants' Joint First Requests for Admission, May 11, 2011, pp. 61-62.

154 NS_058001235; NS_058001055; NS 001000214.

155 "Yellow Freight System to Implement Fuel Surcharge," Yellow Freight Press Release, July 12, 1999.; CON-WAY Announces Fuel Surcharge Formula, Press Release, Aug. 2, 1999.

156 Seale Deposition, p. 51; Goode Deposition, p. 46; NS 001001194, at -201-03.

157 Seale Deposition pp. 43, 65. See also Goode Deposition, p. 49; NS_008005296, at NS_008005299 (calling FSC a "national emergency provision" to address "spikes" in fuel prices); and NS_018000167 (referring to FSC as a "good insurance policy against a future fuel crisis").

locomotive fuel costs (which do not involve gasoline or other non-diesel fuel costs) as a share of operating expenses rose. While in 1999, fuel costs were 5% of operating expenses, in 2000 they increased by 60% to 8% of operating expenses. After a brief decline due to the recession in 2001, Norfolk Southern's fuel expense as a share of operating expense rose each successive year, from 6% in 2002 to 19% in 2008, more than a threefold increase. Fuel prices remained high and volatile in the early years of the decade. For example, a trucking company used by Olin Corp. informed Olin that it was implementing a rate-based surcharge effective January 15, 2003, because "[t]he transportation industry experienced unprecedented increases in the diesel fuel cost during 2002" and had become a "large percentage of our operating cost."[158] In the later years of the Class Period, fuel costs increased substantially as a share of Norfolk Southern's operating expenses. Thus, Norfolk Southern faced the risk of significant volatility in an increasingly important element of its costs. Dr. Rausser admits that Norfolk Southern had "independently implemented" its fuel surcharge in 2000 "without the benefit of coordination" and that rate-based surcharges would have existed in the Class Period even without collusion.[159]

**Table 8: Norfolk Southern Fuel Expenses**[160]

| Year | Total Locomotive Fuel Expenses ($ in Thousands) | Total Carrier Operating Expenses ($ in Thousands) | Fuel Expenses' Share of Operating Expenses |
|---|---|---|---|
| 1999 | 255,459 | 4,695,931 | 5% |
| 2000 | 477,590 | 5,665,201 | 8% |
| 2001 | 411,565 | 5,332,886 | 8% |
| 2002 | 341,703 | 5,292,680 | 6% |
| 2003 | 380,097 | 5,609,278 | 7% |
| 2004 | 449,010 | 5,814,294 | 8% |
| 2005 | 727,206 | 6,605,305 | 11% |
| 2006 | 976,559 | 7,056,845 | 14% |
| 2007 | 1,044,314 | 7,052,511 | 15% |
| 2008 | 1,489,586 | 7,803,714 | 19% |

86. In June 2000, Norfolk Southern instituted a public carload fuel surcharge. Under this formula, when the price of West Texas Intermediate ("WTI") crude oil

158 Gilley Deposition Exhibit 18; OLI063290.
159 Rausser Report, p. 55; Rausser Deposition, p. 230.
160 This Table is based on data in the R-1 report that Norfolk Southern files with the STB each year.

exceeded $28.00 per barrel for thirty consecutive days as reported in the *Wall Street Journal*, there would be a surcharge equal to 2% of the base freight rate and an additional 2% surcharge for every $5 increment above $28 ("2000 Public Carload FSC").[161] The surcharge would decline in a similar fashion by 2% when the WTI stayed below the price triggers for 30 consecutive WSJ-reported days.

87. The speed with which Norfolk Southern was able to apply its fuel surcharge to specific shipments depended in part on the nature of the price authority that pertained to those shipments. All Norfolk Southern shipments are carried subject to the terms of a price authority, which sets the base rate and all surcharges that apply to the shipment. Norfolk Southern price authorities fall generally into three categories: (i) confidential contracts, which are negotiated between shippers and Norfolk Southern and typically run for one or more years; (ii) private price quotes, which may also be negotiated with shippers and are typically a year or less in duration; and (iii) public price quotes, which include regulated tariffs that are not the subject of this litigation.[162] Rate terms contained in contracts and private price quotes are confidential and are not known by competing railroads.

88. Norfolk Southern had the ability to apply the fuel surcharge to its public price quotes after providing 20 days' notice of the change.[163] The carload fuel surcharge that was publicly posted on the Norfolk Southern website and applied to public price quotes was the "public carload" fuel surcharge. For contracts and private price quotes in effect as of late June 2000, Norfolk Southern had to wait until they expired and were available for renewal to negotiate inclusion of the 2000 Public Carload FSC or some other fuel surcharge. Thus, in 2000 Norfolk Southern began negotiating the inclusion of a fuel surcharge in new and renewed contracts and private price quotes implemented after June 2000.[164]

---

161 Lawson Declaration (Moorman Deposition Exhibit 13), ¶ 5; NS 001001194, at 201-03.

162 Francetta Willet, "The U.S. Producer Price Index for Line-Haul Railroads," September 25, 2005, p. 4. Ms. Willet goes on to note that "most of the domestic rail freight traffic moves under confidential contracts rather than tariffs." Id. p. 5; Moorman Deposition p. 23.

163 Pursuant to 49 U.S.C. § 11101(c): "A rail carrier may not increase any common carrier rates . . . unless 20 days have expired after written or electronic notice is provided . . . ."

164 Seale Deposition, p. 130-31.

**b) Norfolk Southern's public carload fuel surcharge did not change with the start of the Class Period.**

89. Plaintiffs allege the start of the alleged conspiracy coincided with changes to carload fuel surcharge mechanisms made by railroads other than Norfolk Southern. CSXT announced on March 20, 2003, a modified public carload fuel surcharge formula that became effective on June 1, 2003.[165] For traffic subject to this formula, a surcharge of 0.4% would be applied when the monthly average price of the WTI crude oil index exceeded $23 per barrel (the "trigger") and the surcharge was adjusted 0.4% for every dollar by which the WTI price rose above that level.[166] By changing its fuel surcharge to be more responsive to fluctuations in fuel price, CSXT made its fuel surcharge less like the fuel surcharge used by Norfolk Southern.

90. UP decided in May 2003 to change its WTI-based FSC to one based on the HDF.[167] UP's new public carload fuel surcharge had a trigger price of $1.35 per gallon. If the monthly average HDF price was above that level but below $1.40, the surcharge was 1.5%.[168] The fuel surcharge then would increase by an additional 0.5% for every increase of 5 cents in the HDF.[169] By changing its fuel surcharge trigger from the WTI to the HDF, UP made its fuel surcharge less like the fuel surcharge used by Norfolk Southern.

91. On June 1, 2003, the BNSF retained its HDF-based public carload fuel surcharge, but changed its trigger price from $1.30 to $1.25.[170]

92. Before June 1, 2003, CSXT, NS and UP had the same public carload fuel surcharge mechanism.[171] By June 1, 2003, CSXT, UP, and BNSF had changed their public carload fuel surcharge mechanisms, but Norfolk Southern was still using its 2000 Public Carload FSC, which no longer matched the public carload fuel surcharge of CSXT or UP. Furthermore, the public carload fuel surcharge of CSXT and UP no longer matched each other, and UP's and BNSF's mechanisms, though similar, were not identical at the trigger price or initial fuel surcharge

165 CSXFSC000000357 and CSXFSC125923.
166 CSXFSC000084489 (Giftos Deposition Exhibit 10).
167 Rausser Report, pp. 120-21; NS_010131619-20. HDF refers to the On-Highway Diesel Fuel price.
168 Rausser Report, pp. 120-21; NS_010131619-20.
169 NS_010131619-20.
170 BNSF-FSC000486-87, BNSF-0327011-12.
171 NS_010006317.

percentage. Thus, at the start of the Class Period there was less uniformity in the public carload fuel surcharge mechanisms than previously. These facts are inconsistent with the collusion that Plaintiffs and Dr. Rausser allege, which includes claims that railroad services are homogeneous and undifferentiated. If, contrary to fact, railroad services were homogenous and undifferentiated, a collusive agreement is unlikely to allow such a divergence in pricing mechanisms, because small differences in any resulting rail rates would likely have a significant impact on shippers' choice of a carrier.

**c) Norfolk Southern engaged in three distinct internal evaluations regarding whether to change its fuel surcharge.**

93. The record reflects that Norfolk Southern engaged in three independent, internal evaluations of what, if any, change it should make to its public carload fuel surcharge in response to the changes made by CSXT and UP. Dr. Rausser appears to ignore these events in his assessment of the record.

94. The first review began on April 15, 2003, when Industrial Products Vice President Don Seale asked an internal Norfolk Southern "team" to "look at the issue of if and when we should change our fuel surcharge process."[172] On April 29, 2003, the team reported to Mr. Seale that its "consensus was that NS should not adopt the CSXT formula and should, for the time being, retain the current NS formula."[173]

95. Mr. Seale initiated a second, separate internal review of Norfolk Southern's carload FSC formula by calling for a meeting on July 10 to be attended by the Industrial Products Group Vice Presidents.[174] Again, the business decision was not to change its fuel surcharge program.[175]

96. A third review took place in early November.[176] At that time, the review team expressed "[g]eneral support for a switch" to CSXT's fuel surcharge mechanism.[177] After some final consideration by Mr. Seale in December, on

[172] NS_010058178-84.
[173] NS_010004393-94/Seale Deposition Ex. 35. NS_010042309/Seale Deposition Ex. 41.
[174] NS_010126046, NS_010059084-90, Seale Deposition Ex. 37.
[175] NS 001000024-53, Seale Deposition Ex. 39; Seale Deposition Tr. at 249:15-250:3; see also Glennon Tr. at 125:5-11.
[176] NS_010033375 ; NS_057005766-803.
[177] NS_010126905, Glennon Deposition Ex.11, and NS_010033391.

January 8, 2004, he emailed Norfolk Southern senior executives, including Chief Marketing Officer Ike Prillaman and CEO/Chairman David Goode, to inform them that on the following day NS would announce on its website that effective March 1, 2004, there would be a modified public carload fuel surcharge formula for carload shipments.[178]

97. Effective March 1, 2004, Norfolk Southern changed its public carload fuel surcharge program. Under the new carload formula, which matched that of CSXT, a 0.4% surcharge would be applied when the monthly average WTI price exceeded $23.00 per barrel, and a further 0.4% surcharge adjustment (up or down) would apply for each $1 change in the monthly average WTI price above $23.00 ("2004 Public Carload FSC").[179]

98. Norfolk Southern's business records indicated several reasons for this change:

a. Contrary to Norfolk Southern's expectations, fuel prices had risen significantly since mid-2003.[180]

b. The requirement under the 2000 Public Carload FSC that the trigger price be exceeded for thirty consecutive days to trigger the surcharge was problematic, because the price could drop below that level for one day, thus causing there to be no surcharge even if prices generally were above the trigger.[181]

c. "The need for a formula that is more responsive to incremental cost fluctuation."[182]

d. "A better notification process with more lead time for customers."[183]

e. "Standardization of FSC provisions in the East. . . the BNSF, UP, CSXT, CN, CP and NS all maintain unique FSC programs. This fragmentation has led to customer complaints about having to track multiple FCSs [sic] and rate maintenance complexity."[184]

---

178 NS_006000472 and NS_015000902, Seale Deposition Ex. 53.

179 Lawson Declaration (Moorman Deposition Ex. 13), ¶ 8.

180 Fuel price expectations are discussed in NS_010006317. From June 2, 2003 to March 1, 2004, the WTI spot price rose by 20%.

181 Lawson Declaration (Moorman Deposition Exhibit 13), ¶ 7. Norfolk Southern was experiencing "[o]ngoing price volatility in the energy market." NS_010073840 Glennon Deposition, Exhibit 13.

182 NS_010073840, Glennon Deposition Exhibit 13, an email originally dated January 8, 2004.

183 NS_010073840, Glennon Deposition Exhibit 13, an email originally dated January 8, 2004.

184 NS_010073840, Glennon Deposition Exhibit 13, an email originally dated January 8, 2004.

f. Norfolk Southern believed that it was not attracting any significant volume of additional traffic by having a fuel surcharge that was lower than that of CSXT.[185]

99. Norfolk Southern documents indicate that during its review of its fuel surcharge it considered the fuel surcharge policies of the other defendant railroads and also non-defendant railroads, [redacted][186] These documents show Norfolk Southern considered a number of reasons for modifying or not modifying its public carload fuel surcharge formula. These reasons included the reaction of customers, whether the fuel surcharge under consideration improved the "ease of doing business" with Norfolk Southern, projections of future fuel prices, and the amount of revenue for Norfolk Southern that a change could be expected to generate.[187] Nothing in these documents indicates that Norfolk Southern was involved in a conspiracy. The issues considered by Norfolk Southern were all consistent with the decision making of a firm that was acting independently in its unilateral self-interest.

100. Norfolk Southern's repeated review of its fuel surcharge policy is inconsistent with Plaintiffs' allegation that by May 14, 2003, it had agreed with other railroads to adopt a uniform standard fuel surcharge.

101. The reasons considered in these reviews and Norfolk Southern's behavior in 2003 are consistent with the decision making of a firm acting in its independent self-interest. They are also consistent with continued competition in the railroad industry and inconsistent with collusion, because Norfolk Southern is concerned with the reactions of customers and with attempting to use those reactions to win customers from CSXT.

185 Seale Deposition, pp. 73 and 288. Norfolk Southern's belief that its lower fuel surcharge failed to attract additional traffic contradicts Dr. Rausser's view that CSXT and Norfolk Southern were selling an undifferentiated product, in which case even the small price advantage that Norfolk Southern had due to its different fuel surcharge program would shift significant traffic from CSXT to Norfolk Southern.

186 NS 001000004, at 009-10.

187 NS 001000004, at 006-08.

**d) Norfolk Southern's decision to modify its carload fuel surcharge nine months after CSXT implemented its fuel surcharge indicates unilateral conduct.**

102. Norfolk Southern's decision not to change its public carload fuel surcharge until nine months after CSXT changed its surcharge is inconsistent with the economic model of collusion proposed by Dr. Rausser. Dr. Rausser's argument is that Defendant railroads agreed to raise their prices using a specific fuel surcharge mechanism but allowed Norfolk Southern a nine-month delay in implementing the agreement.[188] This delay, however, would have provided Norfolk Southern with lower prices than the other purported participants in the collusive agreement for nine months. Under Dr. Rausser's theory, this pricing differential would have potentially provided, Norfolk Southern with a competitive advantage compared to CSXT, which in turn would have allowed Norfolk Southern to capture traffic from CSXT. This competitive advantage Dr. Rausser's theory ascribes to Norfolk Southern would have been particularly acute if, as Dr. Rausser further claims, rail service is undifferentiated. Clearly, it is not in CSXT's economic interest to agree to increase its rates without also requiring its competitors to increase rates. The economic literature is clear that one of the major hurdles to cartel success is preventing individual members from undercutting the prices of other cartel members. It makes no economic sense for CSXT to agree to allow Norfolk Southern to have a competitive advantage and, thus, is inconsistent with cartel behavior. Dr. Rausser is unable to explain how the nine-month delay is consistent with the collusive agreement he alleges. Rather, Norfolk Southern's decision to adopt the same public carload fuel surcharge used by CSXT nine months after it was adopted by CSXT is indicative of independent behavior by Norfolk Southern.

103. The only response Dr. Rausser has to this passage of time is to state that "Norfolk Southern implemented the new Fuel Surcharges a little later than the other Defendants due to technical issues."[189] Dr. Rausser does not explain how those "technical issues" precluded NS from changing its fuel surcharge if, as Dr. Rausser contends, NS had agreed to do so. Norfolk Southern pricing services manager, Pat Glennon, explained in his deposition that nothing prevented Norfolk Southern from changing its fuel surcharge, had a decision to do so been made: Norfolk Southern "could have applied the new fuel surcharge right away, once the

188 Rausser Deposition, pp. 317-20.
189 Rausser Report, p. 135, n. 361

decision was made to all public authorities, and we could have started applying the change to contracts as they were renegotiated."[190]

104. Dr. Rausser admits that Norfolk Southern did not implement the supposed collusive new fuel surcharge until March of 2004.[191] During the period leading up to March 1, 2004, Norfolk Southern had many opportunities to apply a new fuel surcharge, had a decision been made to do so. From July 1, 2003 through February, 2004, Norfolk Southern issued 2,172 new price authorities.[192] If, as Dr. Rausser asserts, Norfolk Southern had agreed by July 1, 2003 to apply the allegedly conspiratorial $23 WTI fuel surcharge mechanism, then each of these new price authorities presented an opportunity to apply the allegedly conspiratorial fuel surcharge. Dr. Rausser does not explain why or how Norfolk Southern was prevented from applying the allegedly conspiratorial $23 WTI fuel surcharge, rather than the then existing $28 2000 Public Carload FSC, to completely *new* contracts and price authorities either by writing the new fuel surcharge into the contract or incorporating the new fuel surcharge from a separate tariff document. These pricing authorities accounted for $188.2 million in revenue in just the period from July 1, 2003 to March 1, 2004. It would not make economic sense for a conspirator to forgo so many opportunities to implement the conspiracy if there had been one.

105. A review of some of the contracts themselves further contradicts this theory that "technical issues" prevented Norfolk Southern from applying the conspiratorial fuel surcharge. For example, during this period [redacted] agreed to a contract with Norfolk Southern that had the [redacted].[193] Likewise at the start of the Class Period, Norfolk Southern entered into a master contract with [redacted] in which the parties wrote into the contract a fuel surcharge of [redacted].[194] Similarly, Norfolk Southern entered into a

---

190 Glennon Deposition, p. 92.

191 Dr. Rausser testified: "But with regard to the triggering mechanism with regard to NS, I don't recall seeing any fuel charges before March of 2004 that were consistent with the coordinating mechanisms that existed among the other three defendants." Rausser Deposition, pp. 403-04.

192 Based on the database of transactions data for unregulated traffic that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon. New pricing authorities were identified by determining the first time a price authority number appeared in the database associated with a specific customer.

193 NS_003043235-40.

194 NS_003043940.

contract with [redacted][195] It is apparent that no "technical issue" prevented Norfolk Southern from negotiating the application of fuel surcharges in these contracts, and further, from trying to apply the allegedly conspiratorial fuel surcharge to them if, as Dr. Rausser contends, there had been an agreement between Norfolk Southern and the other Defendants to do so.

**e) Norfolk Southern adopted a new public carload fuel surcharge in 2006 that was different from that of any other Defendant.**

106. Norfolk Southern did not continue to use the same public carload surcharge formula as CSXT. In July 2006, Norfolk Southern introduced a new public carload fuel surcharge formula that increased the trigger level and decreased the amount by which the fuel surcharge would change in response to changing WTI prices. At the time, Norfolk Southern expected that the WTI would remain above $60.[196] Under the new public carload fuel surcharge formula, for every $1 increment by which the WTI monthly average price exceeded $64 per barrel, Norfolk Southern would apply a surcharge of 0.3% of revenue ("2006 Public Carload FSC").[197] Figure 6, which compares the 2004 and 2006 public carload surcharges, shows how the different fuel surcharge mechanisms produced different fuel surcharge percentages.

195 NS_003041695.
196 NS 001001194, at - 197, part of Seale Deposition Exhibit 3; NS_009005082; NS001000130.
197 Lawson Declaration (Moorman Deposition Exhibit 13), ¶ 11; NS 001000130.

**Highly Confidential**

**Figure 6**[198]




107. Dr. Rausser admits that such changes to the trigger and slope of the surcharge would indicate independent action.

> Q. If -- if a railroad designed and adopted a fuel surcharge program that was relatively favorable to shippers with respect to a few things such as the strike price and the slope and so forth, would that indicate to you -- would that be an indication to you of independent action?
>
> A. Once again, everything else held constant, that alone, if it was independently designed and implemented, yes.[199]

108. Nonetheless, Dr. Rausser argues that the new fuel surcharge is part of the conspiracy, because Norfolk Southern raised its base rates to offset the effect of

198 Fuel surcharges under the 2006 Public Carload FSC are from www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/NS8003_history.html. Fuel surcharges under the 2004 public Carload FSC are from www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/history_fsc2.html.

199 Rausser Deposition, pp. 247-8.

the higher trigger price on the fuel surcharge.[200] Dr. Rausser is referring to the fact that, when Norfolk Southern changed its fuel surcharge formula, it attempted to incorporate the difference in revenue between the $23 trigger and the $64 trigger into the base rate.[201] Dr. Rausser's dismissal of this change in fuel surcharge as having the "same fundamental consequence in terms of the all-in rate" is incorrect.[202] This change is fundamentally inconsistent with his theory of collusion.

109. Norfolk Southern's adoption of the 2006 Public Carload FSC is inconsistent with collusion, because the resulting differences in the Norfolk Southern and CSXT fuel surcharge formulas meant that their fuel surcharge percentages would be different at virtually any WTI price level. If the WTI price rose above $64, then Norfolk Southern's fuel surcharge rate would increase less relative to that of CSXT, because the Norfolk Southern surcharge increment was smaller: 0.3% for every dollar increase in WTI versus a 0.4% increment in the CSXT public carload fuel surcharge. Thus, the Norfolk Southern fuel surcharge would go up 25% less than CSXT, as would the all-in rate in percentage terms. If the WTI price fell below $63.01, then CSXT's rate would fall relative to Norfolk Southern's rate, because CSXT's fuel surcharge would decline, causing its all-in rate to fall, while Norfolk Southern's fuel surcharge would be zero and there would be no change in Norfolk Southern's base rate. As it turned out, the monthly average price of WTI fell and remained below Norfolk Southern's $64 trigger from September 2006 through May 2007.[203] During that time, some customers complained that Norfolk Southern was less competitive compared to CSXT as a result of the new fuel surcharge and asked Norfolk Southern to adjust its base rates.[204]

110. Dr. Rausser conceded at his deposition that Norfolk Southern's reduction in its surcharge percentage from 0.4% to 0.3% was evidence of "defection" from the alleged cartel.[205] Terming the reduction a defection, however, is a significant

200 Rausser Report, pp. 122-23.

201 The difference between the old trigger of $23 and the new trigger of $64 is $41. The old increase in surcharge for every dollar increase in WTI was .04%. 41*.04%=16.4%.

202 Rausser Deposition, p. 368.

203 WTI prices can be found at http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/wti_daily.html.

204 NS_010212125-28; NS_010000519; NS_010069291-93, NS_013000001; NS_010259076-77; NS_010000522.

205 Rausser Deposition, pp. 252-55. Immediately after this admission there was a break in the deposition, and upon resumption of the deposition, Dr. Rausser added that the rebasing aspect of

understatement, because Norfolk Southern's fuel surcharge change and rebasing differ significantly from what economists usually mean by "defecting" from an agreement to fix price. A defection connotes secretly offering specific customers prices that are lower than the level allegedly set by the agreement. A firm's purpose in defecting (or cheating, as it is sometimes called) is to price below the collusively set rate to increase sales at the expense of other participants in the collusive agreement. By its nature, a firm would not publicly announce an episode of defection from an ongoing agreement, because it is most effective when other participants in an agreement do not know about it and continue to price at the higher levels associated with the agreement. By contrast, Norfolk Southern's 2006 change to its public carload mechanism was announced publicly.

111. Norfolk Southern's 2006 rebasing is also shown to be more than merely a defection from an ongoing agreement, because it is inconsistent with the alleged conspiratorial goal of Norfolk Southern and CSXT of applying the agreed-upon $23 fuel surcharge.[206] Norfolk Southern's rebasing decision differentiated Norfolk Southern from CSXT, as well as the other railroads in the alleged cartel, since no other railroad changed their public carload fuel surcharge mechanism to match Norfolk Southern, and the fuel surcharges resulting from the rebasing differed from the surcharges resulting from any other railroad's fuel surcharge formula. This conduct is fundamentally inconsistent with the inherent aim of the alleged conspiracy to prevent competition. Further, by adding revenue to the base rate, the rebasing is inconsistent with the alleged rationale for using the fuel surcharge as the conspiratorial device so as to avoid having to agree on and monitor base rates. In sum, the Norfolk Southern change is a clear indication of independent action and is inconsistent with the alleged conspiracy. [207]

the fuel surcharge change meant that "it wouldn't be a defection." Rausser Deposition, pp. 255-56. However, as discussed above, that simplistic assertion is not accurate.

206 Plaintiffs' Supplemental Response to Norfolk Southern Interrogatories 2(e) and 2(f), January 4, 2012, pp. 12-13.

207 Likewise, the fact that NS terminated its public carload fuel surcharge on public prices but continued to apply rate-based fuel surcharges on private price quotes and confidential contracts, while the other three Defendants implemented or expanded mileage-based fuel surcharge programs, is another indication of conduct inconsistent with a conspiracy to apply a standard rate-based fuel surcharge mechanism.

#### f) Norfolk Southern's application of numerous different fuel surcharges indicates independent behavior.

112. Plaintiffs' allege that defendants agreed "not to offer any Rail Fuel Surcharge other than the alleged, coordinated fuel surcharge programs."[208] The evidence, however, shows Norfolk Southern charged a wide variety of different fuel surcharges to different customers.[209] The variety of fuel surcharges used by Norfolk Southern is shown by its transactions data in two different ways.[210]

113. One way is to look solely at the waybill data for carload shipments (thus, excluding intermodal shipments) to see if the fuel surcharge revenue is being generated at the percentage level that would be produced by the allegedly conspiratorial carload fuel surcharge mechanism. First, consider Table 9, which shows the variety in fuel surcharges applied to carload traffic by Norfolk Southern. For the week including August 7 in each year in the Class Period, the percent of base revenue for each surcharge level was calculated for all shipments.[211] The results show that throughout the Class Period, a significant number of shipments did not pay a fuel surcharge. In 2005, for example, 23.2% of shipments in the sample week paid no fuel surcharge and in 2007, that figure was 15.5%. Moreover, a variety of different fuel surcharges were assessed. The share of revenue at the allegedly conspiratorial 2004 Public Carload FSC is printed in bold type. In none of these weeks did the percentage of gross revenue subject to the so-called conspiratorial "standard" fuel surcharge mechanism implemented in March of 2004 exceed 39.3%.[212] Phrased differently, years into the alleged conspiracy well over half of that revenue was not subject to what Dr. Rausser contends was the "standard" fuel surcharge mechanism that Norfolk Southern

208 "Plaintiffs' Supplemental Consolidated Response To First Set Of Interrogatories," January 4, 2012, p. 3.

209 Lawson Declaration (Moorman Deposition Exhibit 13), ¶ 12-13; Moorman Deposition, p. 21. See also Seale Deposition, pp. 62, 192-93.

210 The transactions data produced by NS consists of data from its waybills and its rating database, called 9255. The waybill data contains information on specific transactions. The 9255 data contains information the Norfolk Southern used to determine the appropriate rates to charge on shipments.

211 The week including August 7 was selected for each year. That date was chosen because it was the first Monday, and thus the start of the first full week of the second of month the Class Period. The first week of the first month of the Class Period was not chosen because in July 2007, the public carload fuel surcharge under the rebased 2006 Public Carload FSC was zero.

212 In 2006, 39.3% of revenue was billed with a 19% surcharge, which was consistent with the level under the 2004 Public Carload FSC.

supposedly applied virtually without exception.[213] Dr. Rausser asserts that Defendants had "uniform application" of conspiratorial fuel surcharges "with exceptions being insignificant," but the data in Table 9 show that is not true of Norfolk Southern.[214] Table 9 also demonstrates that the variety of fuel surcharges increased during the Class Period, which is inconsistent with plaintiffs' allegation that Norfolk Southern conspired to apply a single "standard" fuel surcharge mechanism during that period.

213 Dr. Rausser treats the rebased 2006 Public Carload FSC as the same as the allegedly conspiratorial 2004 fuel surcharge mechanism, despite the above-discussed significant differences in the mechanisms and their effect. Nonetheless, approximately half of gross revenue in the weeks of August 7, 2007 and August 8, 2008 are still subject to no fuel surcharge or a fuel surcharge that is not one of these two public carload fuel surcharge formulas. And the data reflects a transition to the newer 2006 mechanism, with its lower fuel surcharge increment, from the 2004 mechanism.

214 Rausser Report, p. 127-28.

**Table 9: Norfolk Southern Share of Gross Revenue from Unregulated Carload Shipments by Fuel Surcharge Percent**[215]

**Weeks Containing August 7: 2003 through 2008**

| Fuel Surcharge | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **0%** | 54.9% | 39.3% | 23.2% | 11.2% | 15.5% | 10.7% |
| **1%** | 0.2% | 0.1% | -- | -- | 31.5% | 0.1% |
| **2%** | 44.0% | 6.1% | 0.3% | 10.0% | 0.3% | 0.0% |
| **3%** | 0.6% | 0.2% | 0.0% | -- | 0.9% | 0.1% |
| **4%** | 0.2% | 25.0% | 3.3% | 0.5% | 0.7% | 0.1% |
| **5%** | -- | 4.0% | 0.0% | 0.0% | 2.3% | 0.3% |
| **6%** | -- | **23.5%** | 1.8% | 1.1% | 0.7% | 0.5% |
| **7%** | -- | 0.2% | 1.1% | 0.0% | 0.4% | 0.3% |
| **8%** | -- | 1.4% | 4.4% | 0.0% | 0.6% | 0.4% |
| **9%** | -- | 0.2% | 0.1% | 1.3% | 0.9% | 0.5% |
| **10%** | -- | -- | 12.4% | 2.1% | 2.1% | 0.6% |
| **11%** | -- | -- | 3.5% | 1.8% | 1.7% | 0.6% |
| **12%** | -- | -- | 13.1% | 0.9% | 4.4% | 0.5% |
| **13%** | -- | -- | 0.4% | 2.9% | 0.4% | 1.1% |
| **14%** | -- | -- | **36.3%** | 2.2% | 4.7% | 0.6% |
| **15%** | -- | -- | 0.1% | 1.2% | 2.9% | 2.7% |
| **16%** | -- | -- | 0.1% | 12.0% | 8.7% | 0.4% |
| **17%** | -- | -- | 0.0% | 4.0% | 0.8% | 0.5% |
| **18%** | -- | -- | 0.0% | 7.9% | **19.6%** | 6.7% |
| **19%** | -- | -- | 0.0% | **39.3%** | 0.1% | 1.0% |
| **20%** | -- | -- | -- | 0.2% | 0.7% | 0.4% |
| **21%** | -- | -- | -- | 0.9% | 0.2% | 35.1% |
| **22%** | -- | -- | -- | 0.1% | 0.0% | 0.5% |
| **23%** | -- | -- | -- | 0.3% | -- | 0.2% |
| **24%** | -- | -- | -- | -- | -- | 0.3% |
| **25%** | -- | -- | -- | -- | -- | 0.3% |
| **26%** | -- | -- | -- | -- | -- | 0.6% |
| **27%** | -- | -- | -- | -- | -- | 0.8% |
| **28%** | -- | -- | -- | -- | -- | 1.5% |
| **29%** | -- | -- | -- | -- | -- | 0.0% |
| **30%** | -- | -- | -- | -- | -- | 1.6% |
| **31%** | -- | -- | -- | -- | -- | 2.6% |
| **32%** | -- | -- | -- | -- | -- | 0.2% |
| **33%** | -- | -- | -- | -- | -- | 0.9% |

215 The share of revenue subject to the 2004 Public Carload FSC formula is in bold. A -- indicates that there are no shipments billed at that fuel surcharge percent, 0.0% indicates less than 0.05 percent. Shipments in the row indicating 0% fuel surcharge percent have no fuel surcharge revenue. If a shipment had some fuel surcharge revenue but less than 0.5%, the fuel surcharge percent is rounded to 1%. This table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon.

| | | | | | | |
|---|---|---|---|---|---|---|
| **34%** | -- | -- | -- | -- | -- | 8.0% |
| **35%** | -- | -- | -- | -- | -- | 0.3% |
| **36%** | -- | -- | -- | -- | -- | 0.0% |
| **37%** | -- | -- | -- | -- | -- | 0.0% |
| **38%** | -- | -- | -- | -- | -- | 3.1% |
| **39%** | -- | -- | -- | -- | -- | 1.4% |
| **40%** | -- | -- | -- | -- | -- | 1.4% |
| **41%** | -- | -- | -- | -- | -- | 0.2% |
| **42%** | -- | -- | -- | 0.0% | -- | 2.1% |
| **43%** | -- | -- | -- | -- | -- | 0.1% |
| **44%** | -- | -- | -- | -- | -- | **10.3%** |
| **45%** | -- | -- | -- | -- | -- | 0.0% |
| **46%** | -- | -- | -- | -- | -- | 0.0% |
| **47%** | -- | -- | -- | -- | -- | 0.0% |
| **54%** | -- | -- | -- | -- | -- | 0.0% |
| **58%** | -- | -- | 0.0% | -- | -- | -- |

114. A second method for ascertaining the variety of carload fuel surcharges is to look at the NS 9255 rating database. The 9255 database maintains active rate authority information as well as a portion of, but not all, expired rate authorities during the Class Period. Detailed rating information, including the specific fuel surcharge mechanism that applies, is drawn from 9255 as a means of arriving at the rate posted on the waybill. In 9255, Norfolk Southern identifies each different fuel surcharge provision by an "FSC note." Each note contains the terms of the fuel surcharge mechanism. For example, the note for H315 contains the terms of the 2000 Public Carload FSC, such as the $28 trigger price, the 2% surcharge and the requirement that the WTI price be above the trigger price for 30 consecutive days before a fuel surcharge could be applied to the shipment. Every shipment that is subject to a fuel surcharge should have one of these notes or codes. Table A-2 in Appendix A summarizes the terms of the fuel surcharges indicated by these notes and the date that note was created. Table A-2 also shows the amount of revenue subject to various fuel surcharges. Because 9255 data is not available for a portion of revenue in the waybill data set during the Class Period, the percentages in Table A-2 are based on the gross carload waybill revenue data that can be matched to 9255.[216] Nonetheless, the 9255 data support important conclusions

216 The 9255 database automatically overwrites certain expired rate authorities. As a result, not all waybills during the Class Period have corresponding 9255 entries. Bailey Deposition 27-28, 50, 126-32. See also Rausser Class Reply Report at 36 n.86 (noting the percentage of shipments that could not be linked to 9255 from 2002 through 2008).

about the variety of significantly different fuel surcharge mechanisms used by the Norfolk Southern during the Class Period.

115. The summary of the 9255 data in Table A-2 shows the wide variety of significant fuel surcharges used by Norfolk Southern. During the Class Period the Norfolk Southern created 30 different fuel surcharge mechanisms that were not the public carload fuel surcharge and that each were applied to gross revenue exceeding $1 million, which does not include surcharge mechanisms instituted by other railroads and used by Norfolk Southern on interline traffic. In contrast, during the "competitive" pre-Class Period, NS created only 5 mechanisms that were not the public carload fuel surcharge. These data suggest that Norfolk Southern was willing to offer distinct fuel surcharges.

116. Of the Class Period revenue for which 9255 data can be identified, the allegedly conspiratorial 2004 Public Carload FSC accounted for only 25.0% ($3.3 billion). By contrast, 23.8% ($3.1 billion) of the revenue in the 9255 dataset was not subject to any fuel surcharge and 24.4% ($3.2 billion) moved subject to surcharge mechanisms other than the 2000, 2004, and 2006 mechanisms.[217]

117. Table A-2 also shows the wide variety in the elements of the various fuel surcharge formulas. Trigger prices ranged from $23 to $90. Increments also varied; they ranged from 0.13% to 2%, with the larger increments generally only assessed after larger changes in the WTI. When Norfolk Southern implemented the 2004 Public Carload FSC, it dropped the requirement that the WTI price needed to be above the trigger price for 30 consecutive days in favor of a requirement that the monthly average WTI price be above the trigger price. Nonetheless, Norfolk Southern used the "30 consecutive day" timing requirement in some mechanisms (e.g., M486, H710, N055, and H699) and a 90 day requirement in another (L436). Some mechanisms capped the surcharge at a certain percentage no matter how high the price of WTI rose (H710, L486, N055), while other mechanisms reduced the surcharge increment when WTI reached a higher price (N269, M486). Norfolk Southern agreed in some mechanisms to a negative fuel surcharge if WTI fell below a certain price (L436, 7042).

---

217 The 23.8% includes the 2.7% with an FSC note indicating no fuel surcharge and the 21.1% with "None" as the fuel surcharge note. The 24.4% includes only surcharges that applied to more than $1 million in revenue and thus is slightly underestimated.

118. Table A-2 shows the significance of certain distinct fuel surcharge mechanisms. For example, $168 million was subject to FSC note L856 with a $30 trigger. $394 million was subject to note L837 with a $34 trigger. Notes N269 and M486 together were applied to nearly a half of a billion dollars in revenue. A number of other distinct surcharges accounted for tens of millions of dollars of revenue.

### g) Norfolk Southern's policy on fuel surcharge coverage did not change with the start of the Class Period.

119. Plaintiffs allege that Norfolk Southern and other Defendants agreed to apply "rate-based fuel surcharges to as many freight shipments as possible, with the express goal of 100% coverage."[218] In fact, Norfolk Southern had the goal of increasing its fuel surcharge coverage years before the start of the Class Period. Moreover, Dr. Rausser admits that a desire for "broad coverage" is consistent with the unilateral self-interest of Norfolk Southern.[219]

120. Beginning in 2000, Norfolk Southern's marketing executives instructed marketing personnel to seek a fuel surcharge on all traffic.[220] Both before and during the Class Period, Norfolk Southern tried to apply fuel surcharges to new price authorities and to expiring price authorities as they became available for renewal.[221] Like all elements of price, Norfolk Southern could not impose a fuel surcharge unless the customer agreed to pay it. As Norfolk Southern negotiated with individual customers, it sometimes agreed to a different fuel surcharge or no fuel surcharge at all. As Mr. Seale testified, Norfolk Southern was "seeking general application"[222] of fuel surcharges "[t]o the extent that we could retain the business and be competitive in the marketplace."[223] Mr. Seale also testified, "We

218 Plaintiffs' Supplemental Response to Norfolk Southern Interrogatories 2(e) and 2(f), January 4, 2012, p. 13.

219 Rausser Deposition, pp. 272-73; 341-43.

220 NS_060000199 (NS email dated September 2000 and indicating that Don Seale instructed marketing to "secure fuel surcharge increases [on] ALL business") (Emphasis in original).

221 NS_010013407 (NS email dated May 11, 2000 and stating ". . .it is imperative that we get this [the surcharge] into all new and renegotiated contracts and private quotes. . ."). Mr. Glennon testified that Norfolk Southern applied its fuel surcharge between 2000 and 2003. Glennon Deposition, pp. 16-17 ("[I]t was probably applied to private authorities as they were renegotiating."). See also NS_010013327 (NS email dated April 21, 2000 and stating that "[p]roduct managers should continue to add the fuel surcharge note to all new/reissued contracts and private quotes (NSSQs) and all open quotes and tariffs"); NS_008005299, at -301 (September 2000 memorandum stating that "[w]e need to reach a point where all active rates, public and private, contain this provision . . . .").

222 Seale Deposition, p. 23.

223 Seale Deposition, p. 127.

used the same approach [to the fuel surcharge] in 2003 that we used in 2001 and 2002."[224]

121. I have estimated coverage of Norfolk Southern's fuel surcharge in the first part of the Class Period. Table 10 and Figure 7 show the percent of Norfolk Southern ton-miles and revenue from unregulated traffic that was assessed any fuel surcharge from February 2003 to December 2004. Contrary to Dr. Rausser's assertion that "during the pre-Class Period, unilateral imposition of fuel surcharges failed,"[225] fuel surcharge coverage rose sharply between February 2003 and June 2003, before the start of the alleged "anticompetitive consequences" of agreement in July.[226] Coverage rose each successive month leading into the start of the Class Period in July of 2003. After June, the data reflect no increase in coverage until the end of 2003. The share of traffic with a fuel surcharge is no higher in December 2003 than it was in June 2003. The similarity in coverage immediately before the beginning of the Class Period and in the first months of the Class Period is inconsistent with Plaintiffs' allegations of a "coverage" conspiracy beginning in the spring of 2003. Indeed, the similarity in Norfolk Southern's level of coverage nine months into the Class Period with its level of coverage during a period when there is no allegation of collusive behavior is evidence that Norfolk Southern behaved in its independent self-interest during the Class Period.

224 Seale Deposition, p. 131.
225 Rausser Report, p. 55.
226 Rausser Deposition, p. 13.

**Table 10: Share of Norfolk Southern Traffic with Fuel Surcharge Revenue before and after the Start of the Class Period**[227]

| Month | Ton Miles | Revenue |
|---|---|---|
| 2/1/2003 | 35% | 36% |
| 3/1/2003 | 41% | 39% |
| 4/1/2003 | 43% | 41% |
| 5/1/2003 | 43% | 41% |
| 6/1/2003 | 48% | 45% |
| **Class Period Begins** | | |
| 7/1/2003 | 46% | 45% |
| 8/1/2003 | 47% | 46% |
| 9/1/2003 | 47% | 45% |
| 10/1/2003 | 47% | 45% |
| 11/1/2003 | 46% | 44% |
| 12/1/2003 | 47% | 45% |
| 1/1/2004 | 49% | 46% |
| 2/1/2004 | 49% | 46% |
| 3/1/2004 | 49% | 46% |
| 4/1/2004 | 52% | 50% |
| 5/1/2004 | 55% | 53% |
| 6/1/2004 | 58% | 56% |
| 7/1/2004 | 61% | 60% |
| 8/1/2004 | 62% | 60% |
| 9/1/2004 | 62% | 60% |
| 10/1/2004 | 62% | 61% |
| 11/1/2004 | 64% | 65% |
| 12/1/2004 | 64% | 65% |

227 This Table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon.

**Figure 7**[228]




### h) RCAF was not an Impediment to Norfolk Southern's Use of Fuel Surcharges, and Norfolk Southern did not use the AIILF to get around that Impediment.

122. According to Plaintiffs, the widespread use by Defendants of the RCAF cost-escalation index was an impediment to the imposition by Defendants of their rate-based fuel surcharges, because RCAF contained a fuel component and shippers objected to paying a fuel surcharge in addition to RCAF. Dr. Rausser says: "By removing the fuel component from the AII [All Inclusive Index] and RCAF [Rail Cost Adjustment Factor], the new AIILF index facilitated Defendants' ability to apply their new Fuel Surcharge program to contracts (and other shipments) that had previously being [sic] linked to the RCAF index."[229] Plaintiffs' theory depends on three propositions. First, Defendants made widespread use of RCAF in the pre-conspiracy period. Second, RCAF was an impediment to the widespread use of rate-based fuel surcharges. Third, Defendants substituted AIILF for RCAF to facilitate shipper acceptance by shippers of rate-based fuel surcharges. The data indicate that none those propositions applies to Norfolk Southern.

228 This Figure is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon.

229 Rausser Report, p. 62.

123. Dr. Rausser's assertion of widespread use of RCAF by Norfolk Southern is not supported by the record. As early as 2001, two years before the purported conspiracy, Norfolk Southern was reducing its use of RCAF. One document from that time, discussing the Industrial Products group, the largest group in Norfolk Southern accounting for 59% of revenue in that year,[230] noted "As you are aware, incorporation of index based escalators in contracts has been declining over the past several years. There are less than 200 Merchandise contracts containing index based escalators of any type. Approximately half are foreign line maintained [maintained by a different railroad]."[231] At the start of the Class Period, only an estimated 20% of Norfolk Southern's total carload revenue was subject to RCAF.[232] Furthermore, the use of RCAF was not an "impediment" to NS's use of fuel surcharges. Even in those circumstances in which a contract contained an RCAF provision, Norfolk Southern was usually able to convince shippers to accept a fuel surcharge, because the contract often called for a rate adjustment based on less than the full RCAF amount, in the nature of either a percentage of RCAF (e.g., 75% of RCAF) or a cap on the RCAF-based rate adjustment (e.g. max. 3% RCAF increase).[233] Thus, even when RCAF was used by NS, it was not an "impediment" to application of a fuel surcharge.

124. Dr. Rausser claims that in December 2003, soon after the start of the Class Period, Norfolk Southern, CSXT, BNSF, and UP "collaborated" to create an index of railroad costs called the All Inclusive Index Less Fuel (AIILF).[234] My understanding is that another carrier asked staff of the Association of American Railroads to prepare the index and that Norfolk Southern did not play a significant role in it.[235] Critically, the data are clear that NS made little use of the AIILF.

125. Norfolk Southern has provided a list of the contracts that included the AIILF, and I have calculated the amount of revenue accounted for by those contracts.[236] The use of AIILF in the Class Period was confined to some automotive contracts

230 Based on data in Table 1. The Industrial Products Group includes the Agricultural, Automotive, Chemicals, Metals And Construction, and Paper, Clay, and Forest Groups.

231 NS_026001162, dated August 7, 2001.

232 NS_010073091 (Excludes intermodal, whose figures were not available.)

233 NS_010073091; NS_010051675; Seale Deposition Tr. at 200:7201:22; Smith Deposition Tr. at 114:20-115:6; NS_010065294-96; NS_013006086-87; NS_010056068-69.

234 Rausser Report, p. 62.

235 Smith Deposition, pp. 114, 118. See also Seale Deposition, p. 201. According to a document from the Association of American Railroads (AAR), "The AAR started calculating this index [the AIILF] several years ago because BNSF wanted it." AAR-000402.

236 See "AIILF_Contracts" in my workpapers.

starting in 2005 and less than a dozen coal contracts starting in 2007.[237] Data on the revenue accounted for by contracts using the AIILF are reported in Table 11. As can be seen, these contracts accounted for only 3% of Norfolk Southern's revenue from unregulated traffic from 2005 to 2008. The data are inconsistent with Dr. Rausser's assertion that AIILF "facilitated" Norfolk Southern's application of fuel surcharges.

**Table 11: Share of Norfolk Southern Unregulated Revenue Subject to AIILF by Industry Group**[238]

| | 2005 | 2006 | 2007 | 2008 | 2005 - 2008 |
|---|---|---|---|---|---|
| **Norfolk Southern Unregulated Revenue ($)** | | | | | |
| Total | 7,362,109,522 | 8,369,530,406 | 8,383,388,739 | 9,438,087,547 | 33,553,116,214 |
| Automotive | 947,507,243 | 926,738,248 | 898,409,168 | 790,595,367 | 3,563,250,026 |
| Coal | 1,762,938,426 | 2,226,583,820 | 2,223,393,638 | 2,966,389,825 | 9,179,305,708 |
| **Revenue Subject to AIILF ($)** | | | | | |
| Total | 148,597,459 | 180,337,301 | 228,958,749 | 322,680,594 | 880,574,103 |
| Automotive | 148,597,459 | 180,337,301 | 203,045,953 | 193,751,653 | 725,732,366 |
| Coal | - | - | 25,912,796 | 128,928,941 | 154,841,737 |
| **AIILF Share of Unregulated Revenue** | | | | | |
| Total | 2% | 2% | 3% | 3% | 3% |
| Automotive | 16% | 19% | 23% | 25% | 20% |
| Coal | -- | -- | 1% | 4% | 2% |

**i) The fuel surcharge applied on intermodal traffic is significantly different than the carload fuel surcharge.**

126. The history of Norfolk Southern's fuel surcharges on carload traffic is different in important respects from the history of its surcharge on intermodal traffic. Unlike the carload surcharge, the intermodal surcharge was based on the Department of Energy's index of on-highway diesel fuel costs, the HDF. The HDF index was employed because it was used by trucking companies.[239] Norfolk Southern began seeking fuel surcharges on intermodal traffic in March 2000. Initially, it did not have a set formula for those surcharges.[240]

237 Smith Deposition, p. 155. See also Seale Deposition, p. 201.

238 This table is based on a list of contracts using the AIILF that I was given by Norfolk Southern and on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon.

239 Bolander Declaration, ¶¶ 7-8; Seale Deposition, p. 291.

240 Bolander Declaration, ¶ 9.

127. In March 2001, Norfolk Southern adopted a "freight all kinds" (FAK) formula for international intermodal shipments that applied a 1% surcharge at an HDF value of $1.30. That surcharge rose by 1% for every $0.10 change in the HDF.[241] In April 2002, Norfolk Southern adopted a different FAK formula for domestic intermodal shipments that applied a 1% surcharge at a trigger value of $1.24. That surcharge changed by 0.5% for each $0.04 change in the weekly average HDF price above $1.24.[242] Neither FAK surcharge for intermodal traffic changed around the time of the start of the alleged conspiracy, and there were only two minor changes to the international intermodal mechanism during the whole Class Period. In August 2006, Norfolk Southern began using the domestic formula for international shipments.[243] In August 2007, the period of adjustment in the FAK formula for international shipments was changed from weekly to monthly.[244] The fuel surcharge formula for domestic intermodal shipments has not changed since April of 2002.[245] The supposed start of collusion over fuel surcharges in 2003 was a non-event as far as Norfolk Southern's intermodal fuel surcharges were concerned.

128. Even though Norfolk Southern adopted these FAK formulas, the actual domestic intermodal surcharge was often not set according to the formula. Depending on market circumstances, Norfolk Southern might not reduce its surcharge according to the formula when fuel prices fell[246] or might not increase them according to the formula when fuel prices rose.[247] To set its actual domestic FAK fuel surcharge Intermodal Marketing within Norfolk Southern first reviewed what the formula was expected to yield and then considered the publicly announced intermodal fuel surcharges of other railroads and of [redacted], recent fuel price trends, and what Norfolk Southern charged in the past under similar circumstances. For example, in May of 2004, after fuel prices increased, Norfolk Southern did not raise its domestic intermodal FAK fuel surcharge because "we just raised it to 6.5%."[248]

---

241 The surcharge only rose if the change in the HDF lasted over 3 weeks. Bolander Declaration, ¶ 11.
242 Bolander Declaration, ¶ 10.
243 Bolander Declaration, ¶ 11.
244 Bolander Declaration, ¶ 11.
245 Bolander Declaration, ¶ 10.
246 NS_062129863.
247 NS_037039105.
248 NS_037013908.

129. Moreover, despite the adoption of the FAK formulas, Norfolk Southern's fuel surcharge for different intermodal shipments varied depending on the results of its negotiations with individual shippers.[249]

130. [redacted] did not pay a fuel surcharge to Norfolk Southern before January 2005. [redacted] paid Norfolk Southern revenues of [redacted] from the start of the Class Period until the end of 2004. In 2005, [redacted] agreed to a [redacted], and Norfolk Southern agreed in return to accept [redacted] own fuel surcharge formula, which had a higher trigger ($1.50 HDF) and smaller rate of increase (.25% for every $0.08 increase in the HDF price).[250] For 2006, Norfolk Southern agreed to continue that fuel surcharge, except that the adjustment was based on a smaller change in price ($0.045).[251] [redacted] in revenue to Norfolk Southern in 2005 and 2006.

131. [redacted] and Norfolk Southern have a contract that commits [redacted] to give Norfolk Southern [redacted] of its business and [redacted] of its business on some lanes. In return, Norfolk Southern provides [redacted] with special services, including priority loading and unloading. Moreover, Norfolk Southern does not charge [redacted] a fuel surcharge as such. Instead since 1999, [redacted] has agreed to pay Norfolk Southern a share of the fuel surcharge revenues it receives from its customers.[252] [redacted] paid Norfolk Southern [redacted] in revenue during the Class Period.

132. [redacted], from whom Norfolk Southern received Class Period revenues of [redacted], was able to negotiate a contract with Norfolk Southern that included a lower fuel surcharge, even though [redacted] was a much smaller shipper than [redacted]. Norfolk Southern agreed to a lower fuel surcharge on shipments of building products from Kansas City, so it would not lose the traffic to truck competition.[253]

133. A number of shipping lines, who are international intermodal customers, also negotiated special fuel surcharge provisions. Norfolk Southern documents describe special fuel surcharge notes for [redacted]. For

---

249 Bolander Declaration, ¶ 14.
250 Bolander Declaration, ¶ 17 and Exhibit 1.
251 Bolander Declaration, ¶ 18 and Exhibit 2; NS_053000059-64.
252 Bolander Declaration, ¶ 20.
253 Bolander Declaration, ¶¶ 21-2.

example, [redacted] fuel surcharge was capped at [redacted].[254] [redacted] had a fuel surcharge [redacted] below the international FAK level.

134. The significant variety in fuel surcharges applied to intermodal traffic by Norfolk Southern is shown in Table 12. Table 12 shows the share of total revenue for the week accounted for by carload shipments with each percent level of fuel surcharge. For the week including August 7 in each year in the Class Period, the fuel surcharge as a percent of base revenue was calculated for all shipments.[255] The results show that throughout the Class Period, a significant number of shipments did not pay a fuel surcharge. As late as 2008, over 24% of intermodal shipments in the sample week paid no fuel surcharge. Moreover, a variety of different fuel surcharges were assessed. For example, in 2006, 9 different levels of fuel surcharges applied to at least 1% of traffic. A fuel surcharge of 0% applied to significantly more traffic (39.6%) than did any other fuel surcharge level. Table 12 also demonstrates that the variety of fuel surcharges increased during the Class Period, which is inconsistent with plaintiffs' allegation that Norfolk Southern conspired to apply a single standard fuel surcharge mechanism during that period.

135. The amount of revenue billed a fuel surcharge at the applicable FAK rates, domestic and international, in each year is indicated in bold in Table 12. As can be seen, those rates apply to only a minority of the Norfolk Southern's intermodal traffic. In 2008, the FAK rate applied to only approximately one-quarter of revenue.

---

254 NS_010107430-1.

255 The week including August 7 was selected for each year. That date was chosen because it was the first Monday, and thus the start of the first full week of the second month of the Class Period and because it was the week chosen to analyze carload traffic in Table 9.

| **TABLE 12: Norfolk Southern Share of Gross Revenue by Fuel Surcharge Percent: Intermodal Traffic[256]** | | | | | | |
|---|---|---|---|---|---|---|
| **Weeks Containing August 7: 2003 through 2008** | | | | | | |
| Fuel Surcharge | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| 0% | 58.6% | 52.2% | 38.4% | 39.6% | 35.1% | 24.3% |
| 1% | 2.5% | 0.2% | -- | -- | 0.0% | -- |
| 2% | **7.9%** | 1.8% | 0.0% | 0.1% | 0.7% | -- |
| 3% | **30.8%** | 0.8% | 0.2% | -- | -- | -- |
| 4% | 0.1% | 1.5% | 3.1% | 0.0% | 0.1% | 0.1% |
| 5% | -- | **5.9%** | 0.1% | 0.0% | -- | 0.0% |
| 6% | -- | 0.5% | 0.1% | -- | 0.4% | -- |
| 7% | -- | **35.4%** | 3.3% | 0.0% | 0.1% | -- |
| 8% | -- | 1.7% | 4.9% | 0.2% | 0.2% | -- |
| 9% | -- | 0.0% | 5.7% | 0.2% | 4.1% | -- |
| 10% | -- | -- | 1.9% | 4.4% | 0.7% | -- |
| 11% | -- | -- | **10.3%** | 0.1% | 0.3% | -- |
| 12% | -- | -- | 0.0% | 0.9% | 0.3% | 0.1% |
| 13% | -- | -- | 0.2% | 0.2% | 8.5% | -- |
| 14% | -- | -- | 3.2% | 3.0% | 0.3% | 0.0% |
| 15% | -- | -- | **28.4%** | 0.6% | 2.6% | 0.1% |
| 16% | -- | -- | 0.1% | 3.0% | 12.1% | 0.1% |
| 17% | -- | -- | 0.0% | 8.1% | 0.1% | 0.0% |
| 18% | -- | -- | 0.0% | 5.8% | 4.3% | 0.3% |
| 19% | -- | -- | -- | 3.1% | 0.3% | 2.5% |
| 20% | -- | -- | -- | 0.6% | 1.2% | -- |
| 21% | -- | -- | -- | 4.2% | 14.5% | 0.1% |
| 22% | -- | -- | -- | **11.9%** | **13.9%** | 0.0% |
| 23% | -- | -- | -- | **14.0%** | -- | 0.0% |
| 24% | -- | -- | -- | -- | -- | 0.2% |
| 25% | -- | -- | -- | -- | 0.0% | 0.7% |
| 26% | -- | -- | -- | -- | -- | 0.2% |
| 27% | -- | -- | -- | -- | -- | 0.2% |
| 28% | -- | -- | -- | -- | -- | 0.8% |
| 29% | -- | -- | -- | -- | -- | 0.5% |
| 30% | -- | -- | -- | -- | -- | 0.5% |

256 The shares of revenue at the levels of the FAK fuel surcharges are in bold. In years 2003-2006, domestic and international intermodal groups had different FAK formulas and so two numbers are in bold. The groups used the same FAK formula in 2007 and 2008. FAK surcharges are identified in NS_036002112 for years prior to 2007. FAK surcharges for subsequent years were identified using Norfolk Southern's "Weekly Fuel Surcharge Announcement," of July 31, 2007 and July 29, 2008. A -- indicates that there are no shipments billed that fuel surcharge percent, 0.0% indicates less than 0.05 percent. Shipments in the row indicating 0% fuel surcharge percent have no fuel surcharge revenue. If a shipment had some fuel surcharge revenue but less than 0.5%, the fuel surcharge percent is rounded to 1%. This table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon.

| | | | | | | |
|---|---|---|---|---|---|---|
| 31% | -- | -- | -- | -- | -- | 0.6% |
| 32% | -- | -- | -- | -- | -- | 5.9% |
| 33% | -- | -- | -- | -- | -- | 4.1% |
| 34% | -- | -- | -- | -- | -- | 5.8% |
| 35% | -- | -- | -- | -- | -- | 14.0% |
| 36% | -- | -- | -- | -- | -- | 0.0% |
| 37% | -- | -- | -- | -- | -- | 0.2% |
| 38% | -- | -- | -- | -- | -- | 0.1% |
| 39% | -- | -- | -- | -- | -- | 0.2% |
| 40% | -- | -- | -- | -- | -- | 0.1% |
| 41% | -- | -- | -- | -- | -- | 2.0% |
| 42% | -- | -- | -- | -- | -- | 3.1% |
| 43% | -- | -- | -- | -- | -- | **25.1%** |
| 44% | -- | -- | -- | -- | -- | 7.6% |
| 45% | -- | -- | -- | -- | -- | 0.0% |
| 46% | -- | -- | -- | -- | -- | 0.4% |

### *B. Intermodal Traffic Should Not be in the Class*

136. Norfolk Southern's fuel surcharge formulas for intermodal traffic were adopted well before the alleged conspiracy. They are different in structure and yielded different surcharge percentages than those for carload traffic. Nonetheless, Dr. Rausser uses a damages model that assumes that the percentage increase in rates allegedly due to collusion over fuel surcharges was the same for intermodal and carload traffic. His failure to account for the differences in surcharges is a significant flaw in his analysis.

137. In fact, Dr. Rausser fails to provide a sound justification for including intermodal shippers in the class at all. His section on intermodal shipments makes three arguments, all fallacious.[257]

138. First, Dr. Rausser argues that trucks do not compete with Norfolk Southern on its intermodal shipments, because "for the distances and weights that the Defendants deal with trucking is not an economically viable option for intermodal shippers."[258] He makes the same arguments here as with other rail traffic, and those arguments fail for the same reasons. He further notes in his report that, "half of all BNSF's intermodal shipments in 2005 traveled 2,168 miles or more." [Footnote omitted.] Dr, Rausser further notes that, "Trucking is not competitive

257 Rausser Report, pp. 149-150.
258 Rausser Report, p. 150.

with rail over such distances, a fact confirmed in the academic literature." [Footnote omitted.] Dr. Rausser, however, admits in a footnote that Norfolk Southern lengths of haul are much shorter than those of the BNSF. Dr. Rausser's own data show that half of all Norfolk Southern's intermodal shipments traveled 784 miles or less.[259]

139. Dr. Rausser's claimed confirmation from the academic literature is limited to citations to two studies. One is a paper by Oum that concludes that the length of haul at which rail and truck are competitive varies by commodity. The Oum paper also shows that for several commodity groups, such as petroleum products, fruits and vegetables, and fabricated metal products, truck and rail are competitive at distances traveled by many intermodal shipments on Norfolk Southern.[260] The other study Dr. Rausser cites says, "There is no hard-and-fast distance that demarcates rail and trucking zones. Trucks provide some transcontinental service, while rail provides some local and regional services."[261] Moreover, Dr. Rausser also ignores the finding of the Interstate Commerce Commission that trucks compete with intermodal rail shipments.[262] He also ignores evidence in the record that Norfolk Southern reduced its rates on certain intermodal shipments to avoid losing that traffic to trucking competition. For example, Norfolk Southern agreed to a lower fuel surcharge for CertainTeed and to cut base rates for Excel Transportation to prevent some traffic from moving to truck.[263]

140. Second, Dr. Rausser asserts that Defendants have only "slightly different" surcharge formulas for carload and intermodal traffic.[264] While different fuel prices tend to move somewhat similarly, the HDF and WTI prices actually moved in different directions for short periods. Moreover, as previously described, Norfolk Southern used different formulas for these two surcharges that yielded different surcharge percentages. Dr. Rausser provides no justification for calling these differences slight. In fact, the two surcharges could be, and often were, quite

---

259 Rausser Report, p. 149, fn. 381.

260 Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics,* 10.2 (Autumn, 1979), pp. 463-482. See in particular, Table 4, p. 480.

261 Bryan, J., Weisbrod, G., Martland, C.D., and Wilbur Smith Associates, Inc., *Rail Freight Solutions to Roadway Congestion – Final Report and Guidebook*, Transportation Research Board, National Cooperative Highway Research Program, 2007

262 "Improvement Of TOFC/COFC Regulations," 3 I.C.C. 2d 869 p. 878.

263 Bolander Declaration, ¶¶ 21-23. NS_037036188 describes how Norfolk Southern captured intermodal traffic from trucks.

264 Rausser Report, p. 150.

different. Figure 8 compares the two FAK surcharges with the 2004 and 2006 public carload fuel surcharges with and without rebasing. While the surcharges were sometimes close to each other, they were different in almost every month and were often materially different. For example, in October 2005, the domestic FAK fuel surcharge yielded a fuel surcharge of 23.4%, the intermodal FAK surcharge formula yielded a 17.4% surcharge, while the public carload fuel surcharge was 16.8%. Similarly, in April 2007 the FAK surcharges were both 20.7% and the carload surcharge was 14.8% under the 2004 public carload formula and 0.0% under the 2006 public carload formula.

**Figure 8**[265]




265 The data on which Figure 8 is based are shown in Table A-3 in Appendix A. Carload fuel surcharges under the rebased system are from www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/NS8003_history.html. Carload fuel surcharges under the prior system are from www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/history_fsc2.html. Data on intermodal surcharges are from NS_036002112. Values shown for "Freight All Kinds - Domestic & International" fuel surcharges are actually computed monthly averages from weekly rates. The 2006 public carload fuel surcharge fell to zero during the last few months of the period shown.

141. Dr. Rausser further contends that "Defendants' policies requiring across-the-board Fuel Surcharge coverage applied with equal force to their intermodal lines of business."[266] His support for this contention does not include a single document or any deposition testimony from Norfolk Southern.[267] Moreover, Dr. Rausser's own data indicate that a substantial share of Norfolk Southern's intermodal revenue was not subject to a surcharge. For example, in 2008, Dr. Rausser's data show that 31% of Norfolk Southern intermodal revenue was not subject to a fuel surcharge.[268]

### *C. Norfolk Southern's and CSXT's Fuel Surcharge Programs Differed in Significant Ways.*

#### a) The public carload fuel surcharge mechanisms of CSXT and Norfolk Southern were different for a majority of the Class Period.

142. Plaintiffs and Dr. Rausser argue that Norfolk Southern entered into a collusive agreement with CSXT, BNSF, and UP to fix the prices of rail freight services "throughout the Class Period" by agreeing on specific fuel surcharge mechanisms that yielded identical surcharges for the eastern railroads, CSXT and Norfolk Southern.[269] Norfolk Southern, however, never had the same public carload fuel surcharge as either BNSF or UP and for most of the Class Period did not have the same public carload fuel surcharge as CSXT.

143. Dr. Rausser asserts that the alleged "anticompetitive consequences began in July 2003," which is the start of the Class Period.[270] At the start of the Class Period, CSXT had a public carload fuel surcharge formula with a WTI strike price of $23 and a surcharge of 0.4% for every $1 over that price. CSXT had implemented this formula on June 1, 2003. In contrast, Norfolk Southern continued to use a different public carload fuel surcharge mechanism, which it had adopted in 2000. Norfolk Southern did not follow the surcharge move of CSXT, its primary rail competitor, for nine months.

---

266 Rausser Report, p. 66.
267 Rausser Report, p. 66, footnotes 154 and 155 and Rausser Report, p. 150, footnotes 385 and 386.
268 Based on data from Rausser Report, Figure 47, p. 151. Dr. Rausser only included data from October of each year, and does not explain his choice of that month. His data for other months, however, also show a large share of intermodal traffic with no rate-based fuel surcharge.
269 Plaintiffs Supplemental Response to Norfolk Southern Interrogatories No. 2(e) and (f). Dr. Rausser states that the Defendants' fuel surcharge formulas were "highly similar." Rausser Report p. 114.
270 Rausser Deposition, p. 13.

144. Table 13 compares the fuel surcharges under the Norfolk Southern and CSXT public carload formulas from June 2003 to February 2004, the last month before Norfolk Southern's new formula became effective. In every month, the Norfolk Southern and CSXT public carload fuel surcharge formulas produced different surcharge percentages.

**Table 13: Comparison of Norfolk Southern and CSXT Public Carload Fuel Surcharges**

| **Date** | **Norfolk Southern**[271] | **CSXT**[272] |
|---|---|---|
| Jun-2003 | 2.0% | 2.4% |
| Jul-2003 | 2.0% | 2.4% |
| Aug-2003 | 2.0% | 3.2% |
| Sep-2003 | 2.0% | 3.2% |
| Oct-2003 | 2.0% | 3.6% |
| Nov-2003 | 2.0% | 2.4% |
| Dec-2003 | 2.0% | 3.2% |
| Jan-2004 | 2.0% | 3.6% |
| Feb-2004 | 2.0% | 4.0% |

145. This difference in fuel surcharge rates is significant in evaluating Dr. Rausser's contentions. It makes no economic sense for a conspiracy to create a competitive advantage for some participants in the conspiracy at the expense of other participants. Such a conspiracy would be inherently unstable and unlikely to survive. If the service of the two participants were undifferentiated, as Rausser claims is the case for railroad service, a small price difference would likely cause a significant amount of business to move from CSXT to Norfolk Southern. Such a shift clearly would not be in the interest of CSXT, which is unlikely to participate in a conspiracy that created the rate discrepancy. Norfolk Southern, however, did not believe that such a shift in business from CSXT to Norfolk Southern occurred despite the difference in surcharge percentages, suggesting that Dr. Rausser has incorrectly described competition in this industry.[273] Dr. Rausser's contention that shippers choose railroads based only on price is inconsistent with the facts.[274] (See Section III supra.)

271 www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/fuel_news2.html

272 CSXFSC125923.

273 Seale Deposition, pp. 73 and 288; NS_010033391; NS_010126889.

274 Rausser Report, p. 32-33. Arguably Norfolk Southern might not have seen an increase in traffic if CSXT was not applying its surcharge or changed its base rates to undo the effect of the surcharge, but Dr. Rausser also argues that base rates were not discounted to eliminate the effects of surcharges. Rausser Report, p. 128.

146. Later in the Class Period, in July 2006, Norfolk Southern changed its public carload fuel surcharge program when it increased the trigger price and reduced the surcharge increment. CSXT did not follow this move and continued with the public carload formula it adopted in 2003.

147. Less than a year later, the public carload fuel surcharge mechanisms of the two carriers moved further apart. In January 2007, the STB issued a ruling barring the use of a rate-based fuel surcharge in regulated rates.[275] Norfolk Southern and CSXT responded differently to this decision. As of April 2007, CSXT implemented a mileage-based fuel surcharge for both regulated and unregulated traffic. By contrast, Norfolk Southern responded to the STB decision by ceasing to have a fuel surcharge on regulated rates,[276] and keeping its rate-based fuel surcharge for unregulated rates. (Traffic under regulated rates accounted for only 3% of Norfolk Southern's revenue in 2007.[277])

148. Figure 9 shows the effects of these different policies. CSXT began to move substantial volumes of its traffic to contracts with mileage-based fuel surcharges. By the end of 2008, 40% of CSXT unregulated carloads were billed a mileage-based fuel surcharge. In contrast, Norfolk Southern made minimal use of mileage-based surcharges. At the end of 2008, less than 5% of the unregulated traffic on Norfolk Southern was billed using a mileage-based surcharge and that traffic was generally interline traffic with a connecting carrier that had such a mileage-based surcharge.[278]

---

275 Surface Transportation Board Decision, STB Ex Parte No. 661, Rail Fuel Surcharges Decided: January 25, 2007.

276 NS_010002959.

277 This estimate is based on a database of transactions data that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon.

278 Of the unregulated traffic on which Norfolk Southern billed a mileage-based surcharge in 2007 and 2008, approximately 98% was interline traffic. This estimate is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon.

**Figure 9**[279]




149. For more than half the Class Period, Norfolk Southern and CSXT had different public carload surcharge formulas. The Class Period in this matter includes the 66 months from July 1, 2003 to December 31, 2008. For the first 8 months and the last 30 months of this period, 38 of the total of 66 months, the two eastern railroads had different public carload fuel surcharge formulas. Thus, for the majority of the Class Period, the public carload fuel surcharge programs of CSXT and Norfolk Southern were not the same.

**b) Coverage of rate-based fuel surcharges for Norfolk Southern and CSXT differed significantly.**

150. Norfolk Southern and CSXT also had significantly different surcharge coverage. Table 14 and Figures 10 and 11 show the share of revenue on each railroad that was billed a rate-based fuel surcharge from 2003 to 2008. In each year, the percentage of CSXT's traffic with such a surcharge was much lower than the

279 This Figure is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon. Traffic is measured by carloads in Figure 9.

percentage of Norfolk Southern's traffic with such a surcharge. For example, in 2006, which is in the middle of the Class Period, 82% of Norfolk Southern's revenue was subject to a rate-based fuel surcharge, while only 57% of CSXT revenue was subject to a rate-based surcharge. Moreover, in 2008, the coverage of CSXT fell sharply, as CSXT moved to a mileage-based fuel surcharge, while the rate-based fuel surcharge coverage of Norfolk Southern remained high. As described often in this report, such a divergence makes no economic sense as part of a price-fixing conspiracy, because it reflects a mechanism that created competitive advantages for some participants compared to other participants.

**Table 14: Share of Revenue and Ton Miles on CSXT and Norfolk Southern that Were Billed a Rate-Based Fuel Surcharge**[280]

| | Ton-Miles | | Revenue | |
|---|---|---|---|---|
| | CSXT | NS | CSXT | NS |
| 2003 | 40% | 41% | 38% | 40% |
| 2004 | 44% | 57% | 46% | 56% |
| 2005 | 47% | 72% | 52% | 72% |
| 2006 | 51% | 82% | 57% | 82% |
| 2007 | 50% | 68% | 54% | 67% |
| 2008 | 27% | 80% | 33% | 79% |

280 This Table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and other defendant railroads and then processed by Compass Lexecon. The decrease in the 2007 coverage figure for Norfolk Southern is a result of the months in which revenue subject to the 2006 Public Carload FSC was zero.

**Highly Confidential**

# Figure 10



## Figure 11




151. Furthermore, the data indicate that Norfolk Southern and CSXT often did not charge a rate-based fuel surcharge even on interline movements they provide jointly with each other. Table 15 reports the existence and the type of fuel surcharges applied on NS-CSXT interline shipments with new price authorities (i.e., those first instituted during the Class Period). Although the share of shipments with no surcharge decreased from its level in 2003, in the last year of the class period over one-fifth of all NS-CSXT interline shipments moving under new price authorities still lacked a fuel surcharge. In addition, Table 15 shows the decline in rate-based surcharges beginning in 2007 as a result of CSXT's change to a mileage-based surcharge. By 2008, the share of the traffic with rate-based surcharges fell to under half.

**Table 15: Types of Fuel Surcharges Billed on Norfolk Southern—CSXT Interline Shipments Involving Price Authorities Instituted During the Class Period, by Share of Revenue: July 2003 to December 2008**[281]

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Class Period |
|---|---|---|---|---|---|---|---|
| None | 81% | 58% | 26% | 14% | 31% | 21% | 28% |
| Mileage-based | -- | -- | -- | -- | 15% | 30% | 12% |
| Rate-based | 19% | 42% | 74% | 86% | 54% | 49% | 60% |

152. These results are inconsistent with the allegation that Norfolk Southern and CSXT had collusively agreed to charge the same rate-based fuel surcharge on all traffic. Plaintiffs and Dr. Rausser contend that the motive for the conspiracy was to prevent the competition over fuel surcharges that marked the pre-Class Period.[282] On Norfolk Southern-CSXT interline shipments, Norfolk Southern and CSXT are by definition not competing but jointly providing a service that they could not otherwise provide by themselves. If Defendant railroads had colluded as alleged, the percentage of these interline movements employing a rate-based fuel surcharge would have been, if not almost 100%, than at least much higher. Instead of universal fuel surcharge coverage, the data shows that 58% of the revenue from new price authorities in 2004, more than 6 months after Norfolk Southern and CSXT had allegedly come to an unlawful agreement, did not include a fuel surcharge.

### c) Evidence of competition between Norfolk Southern and CSXT

153. Throughout the Class Period, there is substantial evidence that Norfolk Southern and CSXT competed vigorously for some traffic. A January 19, 2006, document entitled "Diversions from CSXT" notes that in 2004, NS captured over $98 million in traffic from CSXT and lost almost $23 million in traffic to CSXT.[283] In 2005, the NS captured $92 million in revenue from CSXT and lost over $12 million in revenue to CSXT.

281 This Table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon. Intermodal shipments are excluded. The included shipments are those in transaction data provided by Norfolk Southern where CSXT was origin or destination road. Data in the table are limited to price authorities that began during the Class Period. The starting date of a price authority was determined as the first time the combination of that price authority and a specific customer appeared in the database.

282 Rausser Report, pp. 55-58.

283 NS_010037889.

154. In some cases that competition involved waiving or offering different versions of the fuel surcharge. Norfolk Southern lost or was threatened with losing business, because CSXT would waive its fuel surcharge and accept RCAF instead. If Norfolk Southern kept the business, it was by making contract concessions to offset the CSXT's waiving of the surcharge. Some examples follow:

a. Norfolk Southern renewed a contract for [redacted] effective in January 2004 with [redacted] that had no fuel surcharge; that business was "highly competitive" with CSXT.[284] Later in 2004, Norfolk Southern learned of [redacted] interest in shipping [redacted]. Norfolk Southern made a proposal to ship the [redacted] subject to a fuel surcharge, but [redacted] initially declined the offer, telling Norfolk Southern that it had a better offer from CSXT that did not include a fuel surcharge.[285] [redacted] reconsidered Norfolk Southern's proposal and eventually accepted a fuel surcharge on this move after Norfolk Southern offered to count [redacted] moves toward satisfaction of the [redacted] contract's volume commitments, which helped [redacted] avert financial penalties for volume deficiencies.[286]

b. During extensive negotiations with [redacted] to renew an agreement and a two-year private quote, [redacted] told Norfolk Southern that CSXT did not charge a fuel surcharge. Norfolk Southern countered by offering to apply a modified fuel surcharge triggered when WTI prices rose above $35 per barrel.[287] [redacted] agreed to accept the modified fuel surcharge and in exchange Norfolk Southern agreed to a variety of terms favorable to [redacted], including a signing bonus.[288]

c. Norfolk Southern and CSXT competed for the business of [redacted], which had a plant that was open to both railroads. According to a Norfolk Southern document, "We are reasonably sure that CSXT is offering zero FSC for competitive moves."[289]

---

284 NS_010159457.
285 NS_010176311-13.
286 NS_028004759; NS_028000123-25; NS_003048168-174.
287 NS_010214878; NS_010033400-01.
288 NS_003040803-813.
289 NS_010017910. See also NS_010066363 and NS_010200815.

d. Norfolk Southern and CSXT competed for the business of [redacted] in 2004. A Norfolk Southern document states, "[a]pparently, CSXT had already agreed (maybe in CSXT-EM Master Contract) to forego any FSC."[290] CSXT documents confirm the award of "100% of the total [redacted] competitive business" to CSXT in a four year contract in which there was no FSC, only RCAF.[291]

e. Norfolk Southern and CSXT competed for the business of [redacted] In February, 2004, Norfolk Southern executives learn that "[n]early everyone we do business with that has [redacted] on CSXT have told us no surcharges when the contract is covered by URCAF." Agriculture Group VP Tom Brugman tells Mr. Seale that two other Agriculture Group personnel "are projecting the loss of the case [redacted] project to CSXT if we stick with the March 1, FSC policy."[292] In response, Mr. Seale approved of offering a modified FSC.

f. In the second half of 2003, Norfolk Southern received word that CSXT had "exempted [redacted] from their fuel surcharge" in CSXT's bid for [redacted] shipments. To compete with the CSXT proposal, Mr. Seale approved the offering of a "catastrophic fuel provision" that would trigger if WTI was above $34 for 30 consecutive days.[293] [redacted] accepted this contract offer.[294]

g. NS and CSXT competed for shipments of steel pipe by [redacted] In 2004, Norfolk Southern won a contract for an estimated 5,100 carloads and $6.6 million effective between June 1, 2004 and December 31, 2006: "Competition for securing this business was intense and protracted. . . By all reports, CSXT, in cooperation with the BNSF, mounted a strong effort to secure this business."[295] The Norfolk Southern contract included a modified FSC with a 2% surcharge if WTI remained above a $30 trigger for 30 consecutive days and would adjust by 2% for each $5 above the trigger.[296] At the end of 2006,

290 NS_010035215, at 216-7.
291 CSXFSC000226424. See CSXFSX000149469.
292 NS_010240077.
293 NS_013005684.
294 NS_003023643, at 651. See also NS_003023626-33.
295 NS_010224029.
296 NS_010217338.

CSXT captured this business from Norfolk Southern, which a Norfolk Southern document describes as, "a good indicator that CSXT is willing to go low to grab business now that their operations are in better shape."[297]

h. In July 2004, [redacted] notified Norfolk Southern that it would not receive additional shipments of vehicles because [redacted] had accepted an alternative proposal from CSXT.[298]

i. In 2006, Norfolk Southern lost shipments of [redacted] to CSXT.[299] In 2007, however, Norfolk Southern regained the business because, in the words of a CSXT document, "NS has now captured most of their business after presenting [redacted] with extremely low rates."[300] A March 13, 2007 CSXT documents states, 'We just took a $2.5 million hit from the NS undercutting existing price levels with [redacted]'"[301]

j. In 2004, Norfolk Southern lost 500 carloads of [redacted] shipments from [redacted] to CSX. Chemicals GVP Joe Osborne informed Mr. Seale that "[w]hat we learned was that not only did CSX provide aggressive rates, but they also agreed to forego FSC for five years."[302]

155. This evidence of significant competition, including competition involving the fuel surcharge, between Norfolk Southern and CSXT is inconsistent with collusion.

**d) Norfolk Southern and CSXT had different policies on the treatment and use of rate adjustment indexes.**

156. Norfolk Southern and CSXT also had different policies concerning the treatment and use of the RCAF and AIILF.

a. As noted previously, Norfolk Southern did not make substantial use of RCAF during the Class Period. Furthermore, NS did not regard RCAF as an alternative to its fuel surcharge. In tracking its fuel surcharge coverage, Norfolk Southern did not include price authorities that had an RCAF

297 NS_013003690; CSXFSC000105237.
298 NS_057007785.
299 NS_010084487, at -488
300 CSXFSC000248134-5.
301 CSXFS000238662; NS_010071536.
302 NS_010228306; NS_010012148; NS_010034800; CSXFSC000150904.

escalation provision but not a fuel surcharge.[303] By contrast, CSXT treated RCAF as an alternative fuel surcharge mechanism well into the Class Period and used it in many contracts.[304] This difference is inconsistent with Dr. Rausser's collusion theory, not only because it shows a lack of uniformity regarding what constitutes a "fuel surcharge," but also because it would make monitoring of coverage extremely difficult.

b. As also noted previously, Norfolk Southern had no policy directing the use of the AIILF and made little use of it. By contrast, in late 2005 CSXT adopted a policy of using the AIILF with a fuel surcharge in lieu of using the RCAF.[305] Again, the differences between Norfolk Southern and CSXT are inconsistent with Dr. Rausser's collusion theory.

### *D. Norfolk Southern Carload Fuel Surcharge Also Differed From Those of the Western Railroads.*

157. The alleged collusion involves the western railroads, but Norfolk Southern's public carload fuel surcharge formula was fundamentally different from the formula used by the BNSF and UP. The different formulas used different price indexes. While Norfolk Southern used the WTI index when calculating the fuel surcharge on carload traffic, the BNSF and UP used the highway diesel fuel (HDF) index. These different formulas resulted in different surcharges. According to a Norfolk Southern document, the BNSF and UP "have historically produced the lowest published FSC in the industry."[306]

158. Dr. Rausser tries to dismiss the difference by saying that the two different indexes are closely related based on his application of a cointegration test. This test, however, does not show that the differences between the indexes are not significant.[307] A cointegration test may show that two indexes generally move in a similar fashion over time.[308] Even if the price indexes are cointegrated, however, the two different indexes are not equivalent. For example, two indexes that always

303 NS_010057009-13; NS_010047461-62.
304 CSXFSC000090718 and CSXFSC000000571; Giftos Deposition, p.144.
305 Gooden Deposition, p. 190. See also CSXFSC126737; CSXFSC000012574.
306 NS_010049097.
307 Rausser Report, p. 118.
308 William H. Greene, *Econometric Analysis*, Second Edition, Macmillan Publishing, New York, 1993, p. 567. It is not correct, as Dr. Rausser says, that a cointegration test can "confirm that two or more time series are determined by the same factors" (Rausser Report, p. 118, n. 316.)

differ by a constant but competitively significant amount would be perfectly cointegrated. The WTI and HDF indexes, however, did not always differ by a constant amount.

159. The monthly percentage changes in the WTI and HDF are shown in Figure 12. Data on the values of the indexes themselves are in Table A-4 in Appendix A. As this figure shows, the two indexes often change in different ways. In fact, the magnitude of the change is almost always different and, in 10 different months during the Class Period the WTI and HDF indexes actually changed in different directions, one rose while the other fell.[309] This diversion is another example of behavior by Defendant railroads that is inconsistent with the allegations made by Plaintiffs and Dr. Rausser. It is highly unlikely that a conspiracy to fix railroad rates would systematically use a mechanism that would differentiate the rates among participants in the conspiracy.

**Figure 12: Monthly Percent Change in HDF v WTI Prices**




[309] That happened in June 2003, November 2004, January 2005, April 2005, October 2005, December 2005, February 2006, August 2006, August 2007, January 2008, and July 2008. These changes are based on Dr. Rausser's data in his supporting documents.

160. In fact, the different surcharge formulas used by the Norfolk Southern and the western railroads often resulted in significantly different fuel surcharges. The 2004 Public Carload FSC of Norfolk Southern and the public carload surcharge of UP (which is alleged to be the same as the public carload surcharge of BNSF above $1.35 HDF) are compared in Table 16 and Figure 13. Norfolk Southern and UP did not have the same fuel surcharges. In fact, their surcharges were often very different. For example, in January 2008, the fuel surcharge for UP was 7.3 percentage points below the level for Norfolk Southern. I have also included data for the new public carload fuel surcharge implemented by Norfolk Southern in July of 2006.

**Table 16: Comparison of NS 2004 and 2006 Public Carload FSCs and UP Public Carload FSC[310]**

| Fuel Surcharge Effective Date | NS 2004 Public Carload | NS 2006 Public Carload | UP |
|---|---|---|---|
| Jun-03 | -- | -- | 2.0% |
| Jul-03 | -- | -- | 2.5% |
| Aug-03 | -- | -- | 2.0% |
| Sep-03 | -- | -- | 2.0% |
| Oct-03 | -- | -- | 2.5% |
| Nov-03 | -- | -- | 2.5% |
| Dec-03 | -- | -- | 2.5% |
| Jan-04 | -- | -- | 2.5% |
| Feb-04 | -- | -- | 2.5% |
| Mar-04 | 4.8% | -- | 3.5% |
| Apr-04 | 4.8% | -- | 3.5% |
| May-04 | 5.6% | -- | 4.0% |
| Jun-04 | 5.6% | -- | 4.5% |
| Jul-04 | 7.2% | -- | 5.0% |
| Aug-04 | 6.4% | -- | 5.0% |
| Sep-04 | 7.2% | -- | 5.0% |
| Oct-04 | 8.8% | -- | 6.0% |
| Nov-04 | 9.2% | -- | 7.0% |
| Dec-04 | 12.4% | -- | 9.0% |
| Jan-05 | 10.4% | -- | 9.0% |
| Feb-05 | 8.4% | -- | 8.0% |
| Mar-05 | 9.6% | -- | 7.5% |
| Apr-05 | 10.0% | -- | 8.0% |
| May-05 | 12.8% | -- | 10.0% |
| Jun-05 | 12.4% | -- | 10.5% |
| Jul-05 | 10.8% | -- | 9.5% |
| Aug-05 | 13.6% | -- | 10.5% |
| Sep-05 | 14.4% | -- | 11.5% |
| Oct-05 | 16.8% | -- | 13.0% |
| Nov-05 | 17.2% | -- | 16.0% |
| Dec-05 | 16.0% | -- | 18.5% |
| Jan-06 | 14.4% | -- | 13.5% |
| Feb-06 | 14.8% | -- | 12.0% |
| Mar-06 | 17.2% | -- | 12.5% |
| Apr-06 | 15.6% | -- | 12.5% |
| May-06 | 16.0% | -- | 13.5% |
| Jun-06 | 18.8% | -- | 15.0% |

310 Data are from NS FSC Program History: www.nscorp.com/ nscportal/nscorp/Customers/Public-Prices/history_fsc2.html; www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/NS8003_history.html; and UP Carload Rate Based Standard HDF Fuel Surcharge: www.uprr.com/ customers/surcharge/index_revenue.shtml.

| | | | |
|---|---|---|---|
| Jul-06 | 19.2% | 2.1% | 16.5% |
| Aug-06 | 19.2% | 2.1% | 16.5% |
| Sep-06 | 20.8% | 3.3% | 17.0% |
| Oct-06 | 20.4% | 3.0% | 18.0% |
| Nov-06 | 16.4% | 0.0% | 15.5% |
| Dec-06 | 14.4% | 0.0% | 13.0% |
| Jan-07 | 14.8% | 0.0% | 13.0% |
| Feb-07 | 16.0% | 0.0% | 14.0% |
| Mar-07 | 12.8% | 0.0% | 12.5% |
| Apr-07 | 14.8% | 0.0% | 12.5% |
| May-07 | 15.2% | 0.0% | 14.5% |
| Jun-07 | 16.4% | 0.0% | 16.0% |
| Jul-07 | 16.4% | 0.0% | 15.5% |
| Aug-07 | 18.0% | 1.2% | 16.0% |
| Sep-07 | 20.8% | 3.3% | 16.5% |
| Oct-07 | 20.0% | 2.7% | 16.5% |
| Nov-07 | 22.8% | 4.8% | 17.5% |
| Dec-07 | 25.2% | 6.6% | 18.5% |
| Jan-08 | 28.8% | 9.3% | 21.5% |
| Feb-08 | 27.6% | 8.4% | 21.0% |
| Mar-08 | 28.0% | 8.7% | 21.0% |
| Apr-08 | 29.2% | 9.6% | 21.5% |
| May-08 | 33.2% | 12.6% | 26.5% |
| Jun-08 | 36.0% | 14.7% | 28.5% |
| Jul-08 | 41.2% | 18.6% | 32.0% |
| Aug-08 | 44.4% | 21.0% | 34.5% |
| Sep-08 | 44.4% | 21.0% | 35.0% |
| Oct-08 | 37.6% | 15.9% | 31.0% |
| Nov-08 | 32.4% | 12.0% | 28.0% |
| Dec-08 | 21.6% | 3.9% | 23.5% |

**Highly Confidential**

**Figure 13[311]**




### *E. Dr. Rausser Does Not Show that Norfolk Southern's Fuel Surcharge Policy was Inconsistent with Its Independent Self Interest.*

161. Dr. Rausser dedicates a section of his report to addressing his claim that the fuel surcharge was inconsistent with the railroads' pursuing their independent self interest.[312] Dr. Rausser, however, fails to cite any evidence in this section that Norfolk Southern's actions were inconsistent with its independent self-interest.

311 Data are from NS FSC Program History: www.nscorp.com/ nscportal/nscorp/Customers/Public-Prices/history_fsc2.html; www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/NS8003_history.html; and UP Carload Rate Based Standard HDF Fuel Surcharge: www.uprr.com/ customers/surcharge/index_revenue.shtml.

312 Rausser Report, pp. 99-112.

162. Dr. Rausser first argues that railroads have made significant gains in fuel efficiency and that those gains did not lead them to change the fuel surcharge.[313] It is certainly consistent with competitive behavior for firms to improve their efficiency. Whether or not those gains lead to lower prices, however, depends in part on whether these efficiencies are realized only by an individual competitor or by all competitors.[314] Dr. Rausser gives no reason to expect that Norfolk Southern, acting independently in its own self interest, would have responded to improvements in its own efficiency by lowering surcharges or rates by the amount of the improvement. A competitive firm acting in its own best interest has choices and could decide not to lower prices in hopes of increasing profits per unit instead. This choice is particularly applicable where, in the words of NS CEO Charles Moorman, "we don't price to cost, we price to the market."[315]

163. Dr. Rausser next argues that Norfolk Southern's conduct was inconsistent with its unilateral self-interest because he says Norfolk Southern's fuel surcharge program "did not account for the benefits of hedging" and because Norfolk Southern purportedly could have been "well insured" against "huge spike[s] in oil prices," such as in the summer of 2008, through hedging strategies.[316] Dr. Rausser further maintains that Norfolk Southern acted inconsistent with its unilateral self-interest in discussing its hedging program with CSX, because a "firm can use its cost savings from hedging to charge prices just lower than its competitors and thus to win market share."[317] Dr. Rausser's conclusions misrepresent Norfolk Southern's hedging activities and are inconsistent with economic theory.

164. Norfolk Southern engaged in hedging to reduce the risk of volatility in diesel fuel prices and increase the likelihood of meeting budget goals.[318] As routinely

---

313 Dr. Rausser does not measure the gain in fuel efficiency nor provide much evidence that Norfolk Southern has realized such gains. He cites a document that states that Norfolk Southern's Gross Ton Miles per gallon increased by 1.1% from 2003 to 2005, but that measure can be affected by changes in the mix of traffic. NS_011000108-9. He has no evidence that Norfolk Southern specifically increased fuel efficiency after 2005, although he cites testimony that the railroads in general did so. (Rausser Report, p. 102) Mr. Neikirk testifies that Norfolk Southern became "ever so modestly" more fuel efficient primarily because it replaced older locomotives with newer ones. Neikirk Deposition, p. 140. Furthermore, acquiring new locomotives requires capital expenditures, and Dr. Rausser does not account for the cost of capital in his analysis.

314 Paul Yde and Michael G. Vita, "Merger Efficiencies: Reconsidering the 'Passing-On' Requirement," *Antitrust Law Journal*, Vol. 64, No. 3, Spring 1996, pp. 735-747.

315 Moorman Deposition, p. 49. See also Moorman deposition, p. 139 ("We look at market-based pricing not cost based pricing.").

316 Rausser Report, p. 106.

317 Rausser Report, p. 106.

318 NS_030000684; NS_004000502.

disclosed in filings with the Securities and Exchange Commission, Norfolk Southern's hedging program, initiated in 2001, consisted primarily of entering into fuel swaps at particular prices to hedge a percentage of its expected fuel consumption.[319] A swap locks in a fixed price for fuel, but does not guarantee a lower fuel price, and could require Norfolk Southern to pay the hedge provider if market prices fell beneath the hedged price. For example, Norfolk Southern might buy a swap for a million gallons of fuel with a trigger price of 70 cents a gallon.[320] If the price went over 70 cents, Norfolk Southern would receive an amount equal to the actual price minus 70 cents times the quantity. If, for example, the price was 75 cents, Norfolk Southern would receive $50,000 [=(.75-.70)*1,000,000]. If the price went below 70 cents, however, Norfolk Southern would have to pay an amount equal to 70 cents minus the actual price times the quantity. If the price was 65 cents, Norfolk Southern would pay $50,000 [=(.70-.65)*1,000,000].

165. Hedging would protect Norfolk Southern against volatility in the price of fuel over a relatively short period of time but would not prevent long run increases in fuel costs.[321] Norfolk Southern's CFO Henry Wolf explained in a June 2004 article: "People who are buying and selling derivatives, or trading, are trying to beat the market… [It's] like going to Las Vegas. That's not what our [fuel hedging] program does. [Our program is] about trying to reduce the volatility of fuel prices."[322]

---

319 Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 21, 2002); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 24, 2003); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 13, 2004); Norfolk Southern Corp., Annual Report (Form 10-K) (Mar. 2, 2005); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 23, 2006); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 22, 2007); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (May 5, 2001); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Aug. 9, 2001); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Nov. 9, 2001); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 24, 2002); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Aug. 9, 2002); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Nov. 5, 2002); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 30, 2003); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 30, 2003); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 31, 2003); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 28, 2004); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 30, 2004); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 28, 2004); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 29, 2005); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Aug. 1, 2005); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 28, 2005); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 28, 2006); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 28, 2006); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 31, 2006); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 27, 2007).

320 That price is used in the example in NS_004000508.

321 NS_009003388; NS_004000502, at -512; Neikirk Deposition, pp. 116-17, 155-56; Goode Deposition, pp. 70-71; Moorman Deposition, pp. 161-62.

322 CSXFSC000000583.

166. The objective of Norfolk Southern's fuel hedging program was not to achieve lower fuel costs, which involves speculating on how market prices will change. As Trevor Pardee, of Norfolk Southern's finance department, explained in July 2006:

> Our fuel hedging program had two principal objectives: 1) reduce the variability of fuel expenses and 2) provide greater certainty of achieving budgeted fuel prices. [A recent] article implies that the objective of hedging was to reduce fuel expense. Although that is what occurred during the hedging program, that outcome was happenstance and not known in advance. NS risked its capital and could just as easily have lost money on the hedges but would still have achieved the two benefits outlined above….The point here is that the short term financial outcome is unknown-it may be positive, negative or neutral. In the long run, a continuous hedging program should be neutral with equal gains and losses. Therefore, a hedging program can only be justified on the basis of other considerations such as those of NS' program to reduce volatility and provide price certainty. Otherwise it is simple speculation.[323]

In fact, because of the transaction costs involved in acquiring financial derivatives, hedging would be expected to increase "overall fuel costs slightly overtime."[324]

167. Dr. Rausser's conception of fuel hedging as "cost reduction" thus fundamentally misconstrues the objectives of Norfolk Southern's hedging program and is based on the flawed premise that a firm acting in its unilateral self-interest would attempt to speculate on market prices, potentially incurring large losses if it guessed wrong.[325] Dr. Rausser is also looking at the Norfolk Southern program retrospectively, and it is only in hindsight does he know whether there were benefits or losses resulting from the Norfolk Southern hedging program. Some

323 NS_009003388.

324 NS_004000502, at -512. See also NS_009003388 (Norfolk Southern estimated that the hedging program cost about $0.003 or 1/3 of a cent per gallon).

325 CSXFSC000000583 (June 2004 article stating that derivatives trading is "very risky" and has "drawn a lot of attention in the past few years because it exposes the buyers and sellers to potentially significant costs down the road"). A 30(b)(6) witness from Olin disclaimed the use of hedging in the way advanced by Dr. Rausser, stating that hedging is "high risk" and "not a very healthy way to [protect against rising oil prices]." Gilley Deposition, pp. 299-300.

shippers told the STB that any benefits or losses from hedging should remain with the party that is taking the hedging risk, here the railroads.[326]

168. Norfolk Southern recognized that hedging involved significant risk and could result in a net loss,[327] as it experienced in 2001 when its hedging activities increased fuel expenses by $8 million.[328]

169. Northern Southern disclosed detailed information about its hedging program on a regular basis in its securities filings. In particular, those filings detailed: (i) the intent of Norfolk Southern's hedging program—to reduce the "risk of volatility in its diesel fuel costs" and manage "risk exposure to fuel price fluctuations"; (ii) the percentage of Norfolk Southern's expected diesel fuel requirements that had been hedged, the number of gallons hedged, and the average price per gallon; (iii) the mechanics of Norfolk Southern's hedging program, such as the placing of hedges on a monthly basis by competitive bid among selected counterparties.[329]

170. Norfolk Southern placed its last hedges in May 2004, after concluding that having the fuel surcharge and fuel hedging programs at the same time was increasing

326 A representative of the National Grain and Feed Association testified before the STB: "Our perspective from the shipper community is that we're not asking for a refund nor do we want to make an additional payment to cover any losses that may have occurred from a decision to hedge." See Ex Parte No. 661, Transcript of STB Hearing, dated May 11, 2001, pp. 71-2.

327 Neikirk Deposition, pp. 117, 153. See also NS_001000318 (email exchange from April 2003 in which a Norfolk Southern asks, "at some point the expense of hedged positions and the market catch up with us do they not?," and another employee responds by noting that "fuel hedging activity resulted in a net increase in 2001 diesel fuel expense of $8 million.")

328 Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 21, 2002).

329 Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 21, 2002); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 24, 2003); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 13, 2004); Norfolk Southern Corp., Annual Report (Form 10-K) (Mar. 2, 2005); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 23, 2006); Norfolk Southern Corp., Annual Report (Form 10-K) (Feb. 22, 2007); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (May 5, 2001).; Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Aug. 9, 2001); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Nov. 9, 2001); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 24, 2002); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Aug. 9, 2002); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Nov. 5, 2002); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 30, 2003); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 30, 2003); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 31, 2003); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 28, 2004); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 30, 2004); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 28, 2004); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 29, 2005); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Aug. 1, 2005); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 28, 2005); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 28, 2006); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 28, 2006); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Oct. 31, 2006); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (Apr. 27, 2007); Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 27, 2007).

Norfolk Southern's exposure to fuel price volatility by magnifying the impact of changes in fuel prices, contrary to the primary purpose of the fuel hedging program.[330] The increased exposure to volatility was the result of Norfolk Southern's greater coverage of fuel expenses through the fuel surcharge program at this time, which meant a decline in fuel prices risked a simultaneous loss on the hedges and reduction in fuel surcharge revenue.[331] Dr. Rausser has not cited to any evidence—economic or documentary—suggesting that this was anything other than a unilateral decision by Norfolk Southern.

171. For these reasons, a meeting in which Norfolk Southern finance personnel discussed its publicly disclosed hedging program with CSX finance personnel as part of the latter's efforts to develop its own hedging program does not indicate whether or not there was collusion on fuel surcharges.[332] Dr. Rausser does not identify any evidence that fuel surcharges were discussed at this meeting. While hedging may affect Norfolk Southern's overall revenues or costs, hedging has no impact on Norfolk Southern's marginal cost of serving any particular customers. Simply, the cost of serving a particular customer depends on the additional expenditures on fuel required to service that customer. Because hedging has no impact on marginal costs, it also has no impact on the determination of prices. Consequently, this meeting would not affect the setting of Norfolk Southern or CSX freight rates or signal any reduction in Norfolk Southern's willingness to compete with CSX.

172. Dr. Rausser also discusses a decision by BNSF to implement a mileage-based fuel surcharge. He contends that BNSF deferred this decision after "push back from the other Defendants," including Norfolk Southern, even though the decision was in the BNSF's "unilateral self-interest."[333] Dr. Rausser's contention that the BNSF is not acting in its unilateral self-interest conflicts with the view in a Norfolk Southern e-mail, which states ". . .it is clear that BNSF is willing to take commercial and operating actions that benefit them regardless of their impact on

330 NS_009000247, at -249, -258; NS_009000099-113; Neikirk deposition, pp. 34, 153. As Norfolk Southern's existing swaps had two year terms, Norfolk Southern did continue to receive payments from hedges after 2004, with the last swaps expiring in the second quarter of 2006. Neikirk Deposition transcript, p. 55; Norfolk Southern Corp., Quarterly Report (Form 10-Q) (July 28, 2006).

331 NS_009000247, at -248.

332 CSXFSC000000396; Neikirk deposition, pp. 36-45. See also Seale deposition, pp. 78-79; Goode deposition, 165-66; Moorman deposition, pp. 162, 164-67.

333 Rausser Report, p. 107.

the industry or the connecting carrier."[334] Moreover, Dr. Rausser ignores reasons Norfolk Southern had related to interline traffic, and independent of collusion, to be concerned about regarding BNSF's mileage-based surcharge.

173. As described earlier, a large portion of Norfolk Southern traffic is interline traffic. Railroads participating in an interline move are not competing with each other for the customer's business, but rather are providing a joint service to the customer. These railroads have a joint interest in ensuring they earn profits from carrying the traffic. They have conflicting interests, however, in that each wants a greater share of the revenue from the interline movement for itself. Norfolk Southern was concerned that BNSF's introduction of a mileage-based fuel surcharge on interline traffic would increase BNSF's share of interline revenues on traffic that they carried jointly, because BNSF generally carried the freight over longer distances than Norfolk Southern.[335] Norfolk Southern was also concerned that the change would require it to make costly modifications to its accounting systems and also impose administrative burdens on customers, which would make the interline service less attractive and could result in disputes over billing or other objection from shippers.[336] Norfolk Southern also believed that some shippers preferred rate-based fuel surcharges over mileage-based fuel surcharges and thus would object to a change. Norfolk Southern's objections were consistent with its independent interest in maintaining its share of the revenue on interline traffic with BNSF, minimizing its costs and administrative burdens, and avoiding angering its customers.

### *F. Plaintiffs' Assertions of Norfolk Southern "Over-Recovery" Do Not Support an Inference of Conspiracy.*

174. Dr. Rausser also suggests an inference of conspiracy should be drawn from the fact that, in his opinion, defendants' rate-based "Fuel Surcharge program necessarily over-recovered fuel costs."[337]

---

334 NS_001001082, at -183.

335 "In short, it is clear that BNSF sees an advantage in a mileage based FSC due to its greater length of haul, and a corresponding disadvantage for us due to our shorter hauls." NS_001001082.

336 "It [the BNSF plan] would still require significant IT work on the Accounting (rating and billing) side to implement." "Many customers may not be able to administer this program. . . . Unless customers can implement the program in their rating systems, carriers would be in a constant state of compromise on FSC issues." NS_010049042.

337 Rausser Report, p. 77.

175. First, as a matter of economics, pricing a product or service above cost is consistent with a firm acting in its unilateral self-interest. Dr. Rausser acknowledges this point in his discussion of differential pricing.[338] The fuel surcharge is one part of the all-in price for rail freight service. Dr. Rausser agrees that rail freight prices are market driven and not determined strictly by a railroad's costs.[339] Nonetheless, Dr. Rausser and Plaintiffs maintain this market reality does not apply to the fuel surcharge. Dr. Rausser's reasoning reflects a time when railroads were regulated and required to charge rates that were based on costs and ignores that currently unregulated rail rates are based on actual market conditions including levels of demand. With the passage of the Staggers Act, however, railroads were permitted – indeed, encouraged – to price based on market conditions. In fact, as a court correctly noted in a case challenging truck fuel surcharge mechanisms, carriers "are entitled to generate profits on fuel surcharges by charging more than their incremental costs, so long as Defendants do not illegally conspire to do so."[340] That a railroad carrier may have recovered more or less than any fuel surcharges it implemented does not provide information that allows an economist to ascertain whether or not there was collusion.[341]

176. Nonetheless, Dr. Rausser suggests that Defendants, including Norfolk Southern, knew their fuel surcharges over-recovered their fuel costs yet presented a pretextual explanation that their fuel surcharges were devices intended to recover nothing more than their exact incremental increases in fuel costs.[342] To the extent he may be referring to Norfolk Southern, Dr. Rausser only identifies the testimony of Norfolk Southern's Chief Marketing Officer, Don Seale, but that testimony actually contradicts Dr. Rausser's assertion. Mr. Seale explained to the STB in 2006 that Norfolk Southern's fuel surcharge revenues were less than its increased fuel costs in the early years but more than those costs in 2005.[343] Norfolk Southern also explained its view of its fuel surcharge program :

338 Rausser Report, p. 25.

339 Rausser Deposition, p. 133.

340 In re LTL Shipping Services Antitrust Litigation, No. No. 1:08–MD–01895, 2009 WL 323219, at *18 (N.D. Ga. Jan. 28, 2009).

341 Defendants' Joint First Requests for Admissions No. 154: "Admit that the alleged fact that a Defendant generated more revenues than its actual fuel costs, either for an individual movement or all movements in aggregate during a particular time period, through the application of a Rail Fuel Surcharge does not by itself establish that the Rail Fuel Surcharge was the product of a conspiracy between or among Defendants." Plaintiffs' Supp. Consol. Response to RFA No. 154: ". . . admitted."

342 Rausser Report, pp. 16, 97, 129.

343 Seale written STB testimony at 11.

> The fifth point is that we price to the market. We look at market factors in terms of determining our price for all of our services. Fuel is a component of market price.
>
> When I look at our fuel surcharge of Norfolk Southern, speaking just for our company, I see a three-legged stool. First is a partial cost recovery. The second leg is a market-based component that is brought about by negotiations in the marketplace and then the third is it reflects the efficiency of rail. The fuel surcharge has become a reflection of rail's competitive advantage in the marketplace vis-a-vis fuel efficiency.
>
> So, all three of those factors converge into market-based pricing including fuel.[344]

177. Thus, Norfolk Southern told the STB at a public hearing that its fuel surcharge revenues reflected more than only its costs and that it viewed its fuel surcharge as more than a mechanism to recover incremental fuel costs. This public disclosure by Norfolk Southern is inconsistent with Dr. Rausser's attempt to infer the existence of conspiracy from the amount of cost recovery.

## VI. Plaintiffs' Theory of Collusion Conflicts with Facts and Would Not Result in Effective Collusion.

### *A. Conditions Needed for Successful Collusion*

178. Economic analysis has identified the conditions necessary for a price-fixing agreement to succeed. This analysis can be applied to the facts and allegations in this case to determine whether market conditions and the types of contacts alleged are sufficient to achieve a successful price fix. The point is not that a price fix must succeed to be illegal. Rather, the point is that if Norfolk Southern were engaged in price fixing it likely would have established mechanisms that would assist its ability to succeed. Neither Plaintiffs nor their expert Dr. Rausser claim that Norfolk Southern even attempted to establish mechanisms necessary for a price fix to succeed. The absence of evidence indicating that Norfolk Southern attempted to put these necessary mechanisms in place is inconsistent with Norfolk Southern's being part of a conspiracy to raise prices in the first place.

---

344 Ex Parte No. 661, Transcript of STB Hearing, dated May 11, 2006, p. 313.

179. The need to implement these mechanisms is indicated in the economics literature, which shows that there are certain conditions that are necessary, but not sufficient, for a price-fixing agreement to succeed. Firms must coordinate and reach an agreement that, if maintained, will raise prices and distribute the increased profits in a manner acceptable to participants. The participants must monitor the agreement to ensure compliance, because each cartel member has an individual incentive to cheat on the agreement if it can do so without being detected. Agreements must establish a system of rewards and punishments to ensure that participants do not have the incentive to cheat. Also the participants must prevent entry that can disrupt the agreement and upset the agreed equilibrium.[345] Similarly, as Zimmerman and Connor indicate: "Without establishing effective mechanisms for monitoring, control, or self-policing, defections by cartel members will be observed and result in a shorter-lived cartel."[346]

180. This same conclusion is explained in more detail in a recent publication of the Organization for Economic Cooperation and Development (OECD) that includes an overview of economic studies of collusive agreement formation and behavior.[347] The OECD publication states:

> To achieve and maintain over time a successful collusive equilibrium, three conditions must be *cumulatively* present.[348] [Emphasis in original.]
>
> • *First*, the colluding parties must be able to agree on a "common policy" and to monitor whether the other firms are adopting this common policy. It is not enough for each participant to be aware that interdependent market conduct is profitable for all of them, each member must also have a means of knowing whether the other operators are adopting the same strategy and whether they

---

345 Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success," *Journal of Economic Literature*, Vol. XLIV (March 2006), p. 45 (hereinafter, Levenstein and Suslow, 2006). p. 45.

346 Jeffrey E. Zimmerman and John M. Connor, "Determinants of Cartel Duration: A Cross-Sectional Study of Modern Private International Cartels," Draft August 2, 2005.

347 OECD Policy Roundtables: "Information Exchanges between Competitors under Competition Law 2010." The OECD is an organization of 34 countries that "provides a forum in which governments can work together to share experiences and seek solutions to common problems." http://www.oecd.org/about/

348 Footnote 33 in the original OECD publication, which is inserted at this place in the original document, states: "For further details, see Stigler, 1964; Carlton and Perloff, 1990; Phlips, 1995; Ivaldi, Rey, and Tirole, 2003; Scherer and Ross, 1990 and the extensive literature cited in these texts."

are maintaining it. In order to reach terms of coordination and to monitor adherence to them, market transparency is essential.

• *Second*, coordination must be sustainable – i.e., firms need to have an incentive not to depart from the agreed common policy. This in turn requires an effective retaliation mechanism. Thus, collusion is viable in the long-term only if there are adequate credible deterrence and punishment mechanisms that the cartel can put in place to ensure that no one departs from the common policy.

• *Third*, the foreseeable reactions of both customers and competitors must not be such as to undermine the common policy. If the jointly achieved price increase is likely to attract new firms in the market, or if customers are sufficiently strong or sophisticated to resist any attempt to jointly raise prices, it is unlikely that a collusive outcome can be achieved. Thus, reactions of current and future competitors, as well as of consumers, can jeopardize the results expected from the common policy.

181. More generally, Levenstein and Suslow, in an article that is cited by Dr. Rausser,[349] summarize the problems associated with cartel formation and stability as follows:

> Upon its creation, a cartel immediately faces three key problems: coordination, cheating, and entry. Firms must be able to coordinate on an equilibrium—in a situation in which there are often multiple equilibria—which increases prices and allocates reduced output among member firms. The equilibrium must increase profits to cartel members as a group and provide a mechanism for distributing these profits "fairly" to member firms. The cartel must develop an incentive compatible structure—a combination of monitoring, rewards, and punishments—to prevent cheating by members. The cartel must also prevent entry by outsiders. In a dynamic economy, the solution to all these problems will change over time, so successful cartels must develop an organizational structure that allows them to solve these problems continuously.[350]

---

349 Rausser Report, p. 29.

350 Levenstein and Suslow, 2006, at 45 (footnotes omitted). Both the OECD report and the Levenstein and Suslow article indicate that there are multiple ways in which a cartel member can cheat on a cartel agreement. A successful cartel must monitor these multiple methods of cheating. That a railroad's fuel surcharge may be transparent to its competitors is necessary but not sufficient for it to be part of a successful cartel. A successful cartel also would need to know and monitor (among

182. Dr. Rausser also recognizes the importance of collusive agreements' enforcement and coordination mechanisms. In distinguishing between collusion and non-collusive oligopoly behavior, he testifies that "But if you have other sources of information that go to the actual emergence of an understanding, the implementation of the understanding, **the monitoring and enforcement**, that additional information allows you to make the distinction between the actual regime of collusion versus a regime of interdependent oligopolistic behavior."[351] [Emphasis added.] Dr. Rausser admits that contracts between railroads and shippers were and remained confidential.[352]

183. The lessons from the economic literature are that industry-specific factors matter and that mechanisms established and maintained by an alleged collusive agreement are also very important.[353] Price effects from an agreement depend on the specific products involved, the action involved, and the extent to which members are able to develop an organizational structure that can overcome the problems inherent in agreements.

### *B. Changes in Market Conditions Complicate Maintenance of Agreements*

184. Levenstein and Suslow stress that cartel agreements must continuously adapt, because changes in market conditions may necessitate a change in the agreed equilibrium, requiring, in effect, a renegotiation of the agreement. Changes in market conditions also can greatly complicate effective monitoring and the enforcement of agreements. Demand volatility in particular tends to destabilize agreements, because it can affect the long-run collusive equilibrium and also because it can result in sudden, unpredictable changes in prices and quantities sold by participants, creating suspicions of cheating among agreement participants.[354]

---

other things) the overall rail rate actually charged a shipper. Otherwise, cheating on an alleged cartel could easily occur by offering discounts on base rates or other aspects of the rate.

351 Rausser Deposition, pp. 64-5.

352 Rausser Report, p. 45; Rausser Deposition, p. 97-100.

353 "How do cartels survive? There are two answers: both are necessary but neither is sufficient. First, the cartels that survive are located in industries whose endogenous features make collusion easier. Second, cartels that survive organize themselves to address and overcome the problems of coordination, cheating, and entry." (Levenstein and Suslow, 2006, p. 57.)

354 Levenstein and Suslow, 2006, pp. 64-67.

185. Discussing how successful agreements are able to withstand the pressure of changes in market conditions, Levenstein and Suslow explain:

> Successful cartels overcome this fragility through the development of sophisticated and flexible organizations. Cartels must identify a collusive equilibrium, coordinate on it, then continuously update it as demand and costs fluctuate. Cartels develop these organizations over time as a result of organizational learning. When cartels "learn," what are they learning? They learn how to monitor output and prices of individual cartel members in order to detect cheating. They learn how to structure incentives so that collusion is more profitable in the long run than cheating. Successful cartels fashion self-imposed penalties or other compensation schemes for firms that exceed cartel quotas. They learn how to structure cartel-imposed punishments and other disciplinary actions in response to cartel violations. They develop and implement exclusionary practices to prevent entry or expansion by nonmembers. Finally, they develop an elaborate internal hierarchy that allows communication on various levels (executive and middle management) not only to provide flexibility in the details of the agreement, but to build trust as well. Hierarchy and communication are important to cartel success because the world is dynamic and contracts are inherently incomplete.[355]

186. As described in Section IV, demand conditions faced by Defendants changed significantly during the Class Period, making monitoring and enforcement mechanisms particularly important. Levenstein and Suslow also discuss strategies that successful agreements use to overcome the difficulties with coordination, monitoring, and enforcement.[356] Assignment of customers or markets to individual participants is one of the simplest and most common techniques to reduce monitoring costs.[357] Alternatively, many agreements establish mechanisms to monitor compliance with agreed price levels and to monitor sales shares by participants.[358] There is no allegation and, to my knowledge, no evidence that Norfolk Southern participated in an allocation of customers or

355 Levenstein and Suslow, 2006, p. 67.

356 Levenstein and Suslow, 2011, pp. 455- 92.

357 Levenstein and Suslow, 2011, p. 459; George Stigler, "A Theory of Oligopoly," *Journal of Political Economy*, 72(1) pp. 44-61 (1964), at 46.

358 Levenstein and Suslow, 2011, p. 474.

markets or other monitoring device necessary to ensure participants adhered to the alleged agreement in times of volatile demand.

### *C. Effective Monitoring and Enforcement Mechanisms are not Present for Norfolk Southern.*

187. As discussed, a successful collusive agreement operating in a changing market environment must reach an agreement on the terms of the collusive equilibrium and engage in continuous renegotiations to adjust the agreement in response to market changes. The agreement must engage in frequent and detailed monitoring of the terms of the conspiracy. The agreement must also establish a mechanism to ensure enforcement of the price agreements that occur and are continuously renegotiated.

188. Plaintiffs and Dr. Rausser neither allege nor demonstrate that Norfolk Southern and the other Defendant railroads monitored each other's all-in rates in a manner necessary to effect a successful collusive agreement including ensuring that violations of the agreement could be detected and the agreement could be enforced. Dr. Rausser asserts that "Pricing is transparent and easily monitored."[359] Dr. Rausser, however, identifies no evidence that railroads either attempted or were able to learn each others' all-in rates on competitive shipments.

189. Dr. Rausser makes two arguments concerning the transparency of prices. First, he contends that "prices are relatively well defined and easily observed," because railroads must post regulated rates and that those rates are public knowledge.[360] Dr. Rausser, however, does not suggest that much traffic moves pursuant to publicly-available prices or that publicly-available prices influence rates for traffic that moves pursuant to prices that are not publicly available. Traffic that moves pursuant to regulated rates constitutes a small percentage of overall railroad traffic – only about 5% of Norfolk Southern's traffic.[361] The Class in this case consists only of shippers of "rate-unregulated rail transportation services," which moves primarily under private, confidential price authorities and negotiated contracts that are not public by definition. Dr. Rausser concedes that these contracts are

359 Rausser Report, p. 45.
360 Rausser Report, p. 46.
361 Regulated traffic accounted for 5% of Norfolk Southern's revenue from 2003 to 2008. This figure is based on a database of transactions data that was provided by Norfolk Southern and then processed by Compass Lexecon.

confidential.[362] Public tariff rates are not the same as private rates, with publicly posted tariff rates being higher as Steven Bahn from Olin testified.[363] A shipper would not incur the transaction costs of negotiating a private contract if it could not obtain better prices and terms. Dr. Rausser assumes that unregulated, private prices are "well defined and easily observed," but he does not provide any evidence that this is the case with respect to rates generally or fuel surcharges specifically.[364] Further, his suggestion that rates on private price authorities are also easily observed is contradicted by his testimony that base rates and changes in base rates are "much more opaque" than fuel surcharges.[365]

190. Second, Dr. Rausser notes that railroads collaborate to provide interline freight service and thus have reasons to exchange information about interline rates.[366] Interline service, however, is a service that railroads produce jointly, not in competition with each other. For the shipment to move from origin to destination, it must travel over the networks of more than one railroad. Those railroads, Dr. Rausser agrees, are in a vertical relationship to each other for the interline movements.[367] The law recognizes the need for railroads to establish rates on interline routes and that cooperation on interline movements does not involve competition on competing movements.[368] Dr. Rausser provides no evidence that knowledge by two railroads of a rate charged for an interline movement where they do not compete provides them with information that would be useful in setting rates on different routes where they might compete. Rather, he *speculates* that the knowledge gained from joint-line rates could facilitate coordination and price monitoring.

191. Thus, Dr. Rausser presents no evidence that railroads exchange information on or are able to monitor rates, which are necessary to carry out the alleged collusive activity. Dr. Rausser admits that the terms of railroad contracts and railroad private price quotes are "typically kept confidential."[369] When asked at his deposition, he could recall no evidence that railroads exchanged information on confidential rates or fuel surcharges that did not pertain to interline movements,

362 Rausser Report, p. 45; Rausser Deposition, p. 97-100.
363 Bahn Deposition, pp. 92-93.
364 Rausser Report, p. 49.
365 Rausser Deposition, p. 129.
366 Rausser Report, pp. 46-7.
367 Rausser Deposition, pp. 289-91.
368 49 U.S.C. § 10703 and 49 U.S.C. § 10706.
369 Rausser Report, p. 45; Rausser Deposition, p. 97-100.

and he presents no such evidence in his report.[370] Furthermore, he testified that he had no opinion on whether or not railroads could learn each other's base rates.[371]

192. The lack of knowledge of base rates is not a technicality but rather is an absence of knowledge fundamental to the need for a successful agreement to monitor rates accurately. When a cartel member of an agreement deviates from the agreement, it does so by reducing rates in an effort to increase its sales (and profits) at the expense of other members. Without adequate monitoring, such deviations can occur and be effective using non-transparent features of a rate. Ultimately it is the all-in rate (including the base rate) and the associated conditions of the rail service that determine a shipper's choice of a rail carrier. Without effective monitoring of the all-in rate, deviations from an agreement would occur and the agreement is likely to fail.

193. Indeed, as Dr. Rausser also admits, railroads charge different rates to shippers of different commodities.[372] A successful collusive agreement among railroads would need, among other things, to monitor the different rates applicable to different shipments. Dr. Rausser never shows that Norfolk Southern or the other Defendants did or can do that. Alternatively, rather than setting a large number of individual rates, a collusive arrangement might engage in allocating customers. Dr. Rausser neither alleges nor shows that Norfolk Southern or the other Defendants allocated or could allocate customers.

194. To help enforce their agreements, participants often adopt formal compensation schemes, such as a system of side payments, to correct for deviations between expected sales and actual sales.[373] With or without compensation schemes, agreements almost universally include a threat of retaliation, and in many cases the actual implementation of punishment, to deter cheating.[374] Dr. Rausser provides no evidence of side payments or other compensation schemes.

195. Dr. Rausser admits that there is no evidence of any punishment involved with the supposed collusion.[375] This lack of evidence is important, because there are

---

370 Rausser Deposition, p. 99.
371 Rausser Deposition, pp. 96-97.
372 Rausser Report, p. 25.
373 Levenstein, Margaret, and V.Y. Suslow. 2011. "Breaking Up Is Hard to Do: Determinants of Cartel Duration." Journal of Law & Economics, 54(2): 455-492, pp. 475-76.
374 Levenstein and Suslow, 2011, p. 476.
375 Rausser Deposition, p. 379.

abundant examples of Norfolk Southern and other Defendants deviating from the terms of the supposed collusive agreement. Section V identifies a number of cases where Norfolk Southern agreed not to charge shippers the public carload fuel surcharge mechanism, and Dr. Rausser admits that he knows of Norfolk Southern and other railroads negotiating different surcharges with their respective customers.[376] Moreover, as also discussed in Section V, in 2006 Norfolk Southern changed its public carload fuel surcharge in a manner that was substantively different from CSXT, and no other Defendant did the same. Such a change is inconsistent with the alleged conspiracy, and Dr. Rausser admits that it is evidence of defection.[377] Again, despite conduct that is inconsistent with the aims of the alleged conspiracy, there is no evidence of any punishment.

### *D. Collusion Affecting Only the Fuel Surcharge Does Not Make Economic Sense.*

#### a) The price increase due to a fuel surcharge would have been very small had projections of fuel prices been correct.

196. An increase in price due to a fuel surcharge would depend on the increase in the price of fuel, and that price is outside the control of the alleged conspirators and is difficult to predict accurately. For example, in July 2003, the start of the Class Period, Norfolk Southern had a third-party forecast of fuel prices that indicated fuel prices would decline in 2004 and that the WTI would be $23.03 in the second quarter of that year.[378] Based on the fuel surcharge formula that Dr. Rausser claims Norfolk Southern agreed to use in 2003 (but admittedly did not implement until March of 2004), the surcharge in June of 2004, would have been only 0.4% if these forecasts were accurate.[379] Fuel prices, however, increased significantly faster than forecast,[380] and the actual carload fuel surcharge in that month was 5.6%.[381]

---

376 Rausser Deposition, p. 380.

377 Rausser Deposition, p. 254-55. He later states that he believes the change was not material, but as shown in Section V, the change could and did cause significant differences in rates. Rausser Deposition, pp. 366-367.

378 NS_010218297, at NS_010218301. See also NS 001001194, at -199-200, Seale Deposition Exhibit 3. In fact, Dr. Rausser admits that at the start of the Class Period, Norfolk Southern did not expect a large increase in fuel prices. Rausser Report, p. 61, n. 137.

379 NS 001001194, at -204. Note that the surcharge in any June of 2004 would depend on the WTI two months previous, thus the WTI from the second quarter of the year.

380 NS 001001194, at -199-200, Seale Deposition Exhibit 3.

381 See Table A-3.

197. In 2003, however, railroads did not know what would happen to fuel prices in 2004 and 2005. At the time they supposedly agreed to impose a fuel surcharge, fuel prices were not expected to undergo a significant increase. The forecast that Norfolk Southern considered was not an anomaly. In January 2003, the Energy Information Agency (EIA) published a summary of price forecasts, and those forecasts generally did not indicate a significant price increase. The reference price forecast for crude oil in 2005 was $23.27, which would imply a surcharge of 0.4% based on the public carload formula Norfolk Southern adopted in 2004.[382] If the fuel prices had behaved as forecast, the alleged collusive agreement would have resulted in only minimal price increases in mid-2004. It is unlikely that Norfolk Southern and the other Defendants would risk entering into an illegal collusive agreement, which could have significant personal and financial risks, when the expected return from the alleged agreement is so small.[383]

### b) A conspiracy limited to fuel surcharges would allow changes to base rates and all-in rates.

198. At the start of the Class Period, the fuel surcharge was only a small part of the all-in rate. In June of 2003, Norfolk Southern's public carload fuel surcharge was 2%.[384] Consequently, the fuel surcharge was only a small part of the price the customer actually paid, the all-in rate, which is the sum of the base rate and the surcharge. A change in the base rate of slightly less than 2% would have eliminated the effect of the fuel surcharge and resulted in the customer's paying the same rate it would have paid absent the surcharge.[385] Even later, when fuel prices increased and the fuel surcharge grew, the fuel surcharge was a much smaller share of the all-in rate than the base rate was.[386]

---

382 EIA, World Energy Outlook, Washington, D.C., January 2003, p. 96.

383 Some collusive agreements ultimately lead to small or no overcharges, typically because of cheating by participants or other instabilities. This situation is different from the collusion alleged by Plaintiffs and Dr. Rausser where the expected overcharge would be small.

384 See Table 13.

385 Moreover, the railroads also competed on a variety of non-price attributes, and even if the railroads were to agree to a given fuel surcharge, they still could have eliminated the effects of that agreement by increased competition on those attributes.

386 The maximum value of the public carload fuel surcharge during the Class Period was 44.4%, which was less than 31% of the all-in rate. That surcharge pertained in August and September 2008 and was calculated under the 2004 formula, not the 2006 formula that included rebasing. See Tables 16 and A-3.

199. Dr. Rausser argues that the Defendant railroads did not engage in systematic discounting of base rates to eliminate the effects of changes in fuel surcharges, but the data that he presents on this point undermine his position.[387] Dr. Rausser presents data on base rates in 2002, 2004, and 2006 for Norfolk Southern in his Figure 43.[388] He argues that these data show no pattern of base rate changes for truck competitive commodities and no pattern of widespread discounting of base rates.[389] His argument has three significant flaws.

200. First, Dr. Rausser does not consider how the base rates would have changed without a fuel surcharge. As I discuss in Section IV, Norfolk Southern had several reasons to raise rates unilaterally, including changes in demand for its services. Thus, the fact that base rates were increasing does not establish that Defendants did not discount base rates from what they otherwise would have been.

201. Second, the data in Dr. Rausser's Figure 43 are aggregated at the 3-digit STCC level. Thus, they cannot indicate whether there were changes in relative rates of more precisely defined commodities. These data also ignore differences in the distances traveled by various shipments, even though Dr. Rausser elsewhere notes that the distance traveled is an important determinant of the degree of truck competition.

202. Third, Dr. Rausser's claim is that all shippers in the class faced approximately the same percentage increase in rail rates, as they supposedly all paid the same fuel surcharge and relative base rates did not change. Dr. Rausser's data, however, show that relative base rates did change. Even at the level of aggregation used in Rausser Figure 43, it is clear that base rates were not static and changed in different ways. For example, the base rates for STCC 371, Motor Vehicles or Equipment, fell in both 2004 and 2006, as did those for STCC 284, soap and detergents. The rates for STCC 328, cut stone, initially fell and then rose for a net increase. The rates for STCC 461, which Dr. Rausser states includes intermodal shipments, rose in both 2004 and 2006, as did the rates for STCC 203, canned or preserved fruits and vegetables.

---

387 Rausser Report, pp. 137-144.
388 Rausser Report, p. 143.
389 Rausser Report, pp. 137-138.

203. To further explore differences in the behavior of base rates for different commodities, I took the data that Dr. Rausser used to create Figure 43 and identified the changes in base rates. The results are reported in Table 17 and Figure 14. Different commodities experienced significantly different changes in base rates. For example, from 2002 to 2006, base rates on STCC 328, cut stone, increased by 140%. In contrast, base rates for STCC 284, soap and detergents fell by 30%. The base rates for STCC 461, intermodal shipments, rose by 9%; the base rates for STCC 203 canned or preserved fruits and vegetables rose by 16%. Moreover, as shown in Table 3 in Section III of this report, all-in rates for different commodities showed significantly different changes during the Class Period.

**Highly Confidential**

**Table 17: Changes in Norfolk Southern Base Rates for 3-Digit STCC Commodities in Dr. Rausser's Data[390]**

| | | Change From | | |
|---|---|---|---|---|
| **STCC3** | **STCC3 Definition** | **2002 to 2006** | **2002 to 2004** | **2004 to 2006** |
| | | | | |
| 011 | Field Crops | 2% | 7% | -4% |
| 112 | Bituminous Coal or Lignite | -23% | -38% | 25% |
| 203 | Canned or Preserved Fruits, Vegetables or Seafood | 16% | 5% | 11% |
| 204 | Grain Mill Products | -4% | -4% | 0% |
| 208 | Beverages or Flavoring Extracts | 6% | 12% | -6% |
| 209 | Misc. Food Preparations or Kindred Products | 0% | 3% | -3% |
| 239 | Misc. Fabricated Textile Products | 8% | 4% | 3% |
| 241 | Primary Forest or Wood Raw Materials | -3% | -3% | 0% |
| 242 | Sawmill or Planing Mill Products | -3% | -4% | 2% |
| 249 | Misc. Wood Products | 6% | 9% | -3% |
| 261 | Pulp or Pulp Mill Products | 24% | -9% | 37% |
| 262 | Paper | -10% | -6% | -4% |
| 263 | Fibreboard, Paperboard, or Pulpboard | -9% | -11% | 2% |
| 281 | Industrial Inorganic or Organic Chemicals | 10% | -1% | 10% |
| 282 | Plastic Materials or Synthetic Fibres, Resins or Rubber | 8% | 1% | 7% |
| 284 | Soap or Other Detergents | -30% | -24% | -8% |
| 324 | Hydraulic Cement | -19% | -2% | -18% |
| 328 | Cut Stone or Stone Products | 140% | -21% | 204% |
| 329 | Abrasives, Asbestos Products or Misc. Nonmetallic Mineral Products | -3% | -11% | 9% |
| 331 | Steel Works, Rolling Mill, or Other Reduction Plant Products | 15% | 0% | 14% |
| 371 | Motor Vehicles or Equipment | -15% | -12% | -4% |
| 402 | Waste or Scrap | 7% | -2% | 10% |
| 431 | Mail and Express Traffic | -52% | -27% | -34% |
| 461 | Misc. Mixed Shipments | 9% | 5% | 4% |
| 490 | Ammunition* | -5% | -2% | -3% |
| 491 | Chemicals* | 13% | 0% | 12% |
| 492 | Compressed Gases* | 34% | 1% | 33% |
| 493 | Chemicals* | 11% | -5% | 16% |
| 495 | Freight Forwarder Traffic* | -6% | -3% | -3% |
| 496 | Chemicals* | 9% | -6% | 16% |

390 Based on data from ns_unreg_stcc_ptm_clean.xlsx. STCC3 definitions are from Standard Transportation Commodity Code Tariff STCC 6001-V. Note ***** denotes STCC3 Definition was "Manually Created" by Rausser, per his workbook "ns_unreg_stcc_ptm_clean.xlsx"

**Figure 14**




204. Dr. Rausser also argues that "Further evidence that there was no change in the price discrimination across commodity groups from systematic discounting to offset the Fuel Surcharge comes from the extent of variation in prices across commodities. Had there been systematic discounting for certain commodities the dispersion of base rates across commodity groups should have increased throughout the Class Period."[391] It is important to understand that this proposition by Dr. Rausser only applies to a situation where the alleged cartel actually occurred, because otherwise there would be no reason to have other-than-usual discounting to offset the Fuel Surcharge. In the absence of the alleged cartel, fuel surcharges are established competitively and no other-than-usual discounting of base rates is expected. Dr. Rausser measures base price dispersion by the coefficient of variation.[392] He finds that the coefficient of variation of Norfolk Southern's base prices fell by 9% between 2002 and 2004, a period that includes

391 Rausser Report, p. 143.

392 The coefficient of variation of a variable, such as prices, is its standard deviation divided by its average.

the first full year of the alleged collusion. The coefficient of variation then rose by 27% between 2004 and 2008, the last year of the Class Period. Most of this increase came in 2008. Despite these changes Dr. Rausser asserts that the dispersion of base prices did not increase during the Class Period.

205. An additional significant problem with Dr. Rausser's argument is that changes in the dispersion of prices do not indicate the presence or absence of systematic discounting. For example, suppose that Norfolk Southern applied a fuel surcharge that was the same for all shipments and then discounted every base rate by the percentage required to make sure that shippers paid the same all-in rate as would have occurred without a fuel surcharge. Because every base rate declines by the same percentage amount, the coefficient of variation does not change. In this illustrative example, there is systematic discounting of base rates that eliminates the effect of fuel surcharges. Dr. Rausser's measure, however, indicates there was no discounting.

206. In fact, systematic discounting may cause the coefficient of variation to fall, rather than rise as Dr. Rausser assumes. Suppose, for example, that railroads used the same fuel surcharge on all shipments but reduced their highest base rates to prevent shippers paying the highest rates (due to the fuel surcharge) from reducing their volumes, which made these all-in rates closer to the average. In this illustrative example, the dispersion of rates would decline, because the highest rates had been reduced. Nonetheless, discounting would have stopped fuel surcharges from affecting a group of shippers.

### *E. Dr. Rausser's Damages Estimates Have Unreasonable Implications as Applied to Norfolk Southern.*

207. It is my understanding that the Defendant railroads will present another witness to discuss Dr. Rausser's damages analysis at length. Therefore, I limit my discussion of his damage and overcharge estimates to a few points of particular relevance to Norfolk Southern.

208. Dr. Rausser's damages model supposedly is designed to show the effect of a conspiracy to apply fuel surcharges to traffic without changing the base rates, so all subject traffic is assumed to experience the same percentage increase in rates. His model includes two variables that are designed to measure the effects of the

supposed collusion: 1) a dummy variable that has a value of one during the collusive period and has a value of zero otherwise, and 2) an interaction term, which is that dummy variable multiplied by the price of diesel fuel. The coefficient on the dummy variable in his model is negative.[393] Thus, the entire estimated effect of the supposed collusion is due to the interaction term incorporating diesel fuel prices.

209. Dr. Rausser's model is not appropriately designed to determine the effects of Norfolk Southern's fuel surcharge. Norfolk Southern's carload fuel surcharge was not based on the price of diesel fuel, but rather was based on the WTI price, a measure of crude oil prices. As previously discussed, while the price of diesel fuel and the WTI price generally move in a similar manner, they can and do behave quite differently at times.

210. I will not provide a detailed discussion of Dr. Rausser's claim that his model shows a "structural break" in the relationship between freight rates and fuel prices,[394] but I will highlight one issue concerning particular significance to Norfolk Southern. Dr. Rausser argues that the relationship between the price of fuel and railroad rates changes in July of 2003, but he admits that Norfolk Southern did not change its public carload fuel surcharge, the one he alleges was the product of collusion, until March of 2004.[395] Thus, the results of his model cannot be explained by changes in Norfolk Southern's fuel surcharge formula.

211. Moreover, Dr. Rausser's model assumes that Norfolk Southern's rates all change in the same way with the imposition of fuel surcharges. This specification ignores the fact, which was discussed in Section V, that Norfolk Southern's shippers did not all face the same fuel surcharge. For example, Norfolk Southern had a different fuel surcharge for intermodal shippers. (See Table A-3.) In addition, as shown in Table A-2 and Table 9 a number of carload shippers responsible for billions of dollars of Norfolk Southern revenue were able to negotiate different (or no) fuel surcharges in their contracts. Dr. Rausser's model ignores these differences in surcharges.

393 "Average Net Effect and Overcharge 10 13 2012" an Excel spreadsheet in Dr. Rausser's work papers.

394 Rausser Report, pp. 83-84.

395 Rausser Deposition, p. 49.

212. Perhaps for these reasons, Dr. Rausser's damages model provides implausible results for Norfolk Southern. First, the model finds over $2 million in damages in 2003. Dr. Rausser admits, however, that Norfolk Southern did not implement the changes in fuel surcharges that he contends were collusive until after March of 2004.[396] In his deposition Dr. Rausser testified:

> We certainly looked at the contracts with regard to whether, in fact, there was [sic] fuel surcharges. But with regard to the triggering mechanism with regard to Norfolk Southern, I don't recall seeing any fuel charges before March of 2004 that were consistent with the coordinating mechanisms that existed among the other three defendants.[397]

213. Second, in every year from 2005 to 2008, and over the entire period of the alleged conspiracy, Dr. Rausser estimates damages that exceed Norfolk Southern's entire revenues from the fuel surcharge, as shown in Table 18. Recall that Norfolk Southern had a fuel surcharge before the start of the supposed conspiracy, and Dr. Rausser admits there would be fuel surcharges in the Class Period even without the alleged conspiracy.[398] Moreover, Dr. Rausser has not alleged that base rates rose due to the conspiracy. Nonetheless, his damages estimate implies a but-for world in which Norfolk Southern has no fuel surcharge revenue and somewhat lower base rates. This result is highly implausible, especially in light of the higher demand for rail services that occurred during the Class Period.

---

396 He testifies that "the implementation with regard to your client, NS, did not actually take place until March of 2004." Rausser Deposition, pp. 384-385.

397 Rausser Deposition, pp. 403-04.

398 Rausser Deposition, pp. 220-21.

**Table 18: Comparison of Dr. Rausser's Estimated Damages and Fuel Surcharge Revenues For Norfolk Southern**[399]

| Year | Fuel Surcharge Revenues | Rausser Estimated Damages | Ratio of Damages to Fuel Surcharge Revenues |
|---|---|---|---|
| 2003 | $18,375,857 | $2,086,700 | 11% |
| 2004 | $191,228,962 | $169,361,124 | 89% |
| 2005 | $556,837,028 | $604,593,115 | 109% |
| 2006 | $846,192,250 | $911,074,701 | 108% |
| 2007 | $655,610,549 | $830,182,565 | 127% |
| 2008 | $1,384,514,753 | $1,704,825,298 | 123% |
| Total | $3,652,759,399 | $4,222,123,503 | 116% |

214. In addition, Dr. Rausser's damages model has unreasonable implications for Norfolk Southern's operating profits and related margin. In his Figure 20, Dr. Rausser presents data on Norfolk Southern's quarterly operating profit margin.[400] I have taken the data that underlie Figure 20 and calculated Norfolk Southern's annual operating profit margin from 2000 to 2008. I then subtracted Dr. Rausser's estimated damages from Norfolk Southern's operating income in each year to determine Norfolk Southern's operating profit margin in the but-for world associated with Dr. Rausser's damage data and overcharge estimates. The results are reported in Table 19. As can be seen, in Dr. Rausser's but-for world Norfolk Southern would be less profitable by his measure than it was in the years before the Class Period even though, as shown in Figure 3, the demand for its services and its volume of traffic were higher. The but-for margins for 2005-2008 are particularly low, and generally these were years of an expanding economy and increased demand for rail services.[401] These years account for more than 80% of Dr. Rausser's estimated damages. Dr. Rausser's damage and overcharge estimates depend on an accurate estimate of the but-for world, but his but-for world as it

399 Data on estimated damages are from Rausser Report Table 54, p. 172. Fuel surcharge revenues are from the dataset that Dr. Rausser produced to Defendants. The fuel surcharge revenues reported in Table 18 do not include differences due to the change in the trigger price in Norfolk Southern's rebase in its 2006 public carload fuel surcharge. Including the revenues related to the rebase would be inconsistent with the cartel alleged by Dr. Rausser, which is based solely on the fuel surcharge and assumes no change in base rates.

400 Rausser Report, p. 91.

401 These estimates of operating margin reflect average costs and not marginal costs.

pertains to Norfolk Southern includes unrealistic results. Damage and overcharge estimates based on an unrealistic but-for world are fundamentally unreliable.

**Table 19: Dr. Rausser's Estimate of Norfolk Southern's Operating Profit Margin with and without Damage Estimates, 2000-2008**[402]

| Year | Operating Revenues | Net Operating Income | Estimated Damages | Operating Profit Margin | Operating Profit Margin Excluding Damages |
|---|---|---|---|---|---|
| | | (000 $) | | | |
| 2000 | 6,159,055 | 585,562 | -- | 10% | -- |
| 2001 | 6,169,824 | 840,346 | -- | 14% | -- |
| 2002 | 6,269,821 | 911,421 | -- | 15% | -- |
| 2003 | 6,352,805 | 874,751 | 2,087 | 14% | 14% |
| 2004 | 7,311,869 | 1,273,097 | 169,361 | 17% | 15% |
| 2005 | 8,526,827 | 1,607,800 | 604,593 | 19% | 12% |
| 2006 | 9,407,242 | 1,751,599 | 911,075 | 19% | 9% |
| 2007 | 9,432,399 | 1,704,026 | 830,183 | 18% | 9% |
| 2008 | 10,661,340 | 1,978,915 | 1,704,825 | 19% | 3% |

Friday, March 22, 2013

Barry C. Harris

Barry C. Harris, Ph.D.

402 Data are from "Operating Profit Margin.xlsx;" in Dr. Rausser's work papers and Rausser Report, Table 54, p. 172.

# Appendix A

| **Table A-1: Changes in Production in Selected Industries that Ship by Rail: 2003:Q1 to 2008:Q4[403]** | | | | | | |
|---|---|---|---|---|---|---|
| Year | Quarter | Automotive | Chemical | Paper | Steel | Coal |
| 2003 | Q1 | 9% | 2% | -2% | 4% | -4% |
| 2003 | Q2 | -1% | 1% | 0% | 1% | 2% |
| 2003 | Q3 | -8% | 2% | -2% | -5% | 0% |
| 2003 | Q4 | 11% | -1% | -2% | 4% | 1% |
| 2004 | Q1 | 5% | 3% | 2% | 24% | 2% |
| 2004 | Q2 | -7% | 7% | 3% | 20% | 0% |
| 2004 | Q3 | -17% | 1% | 2% | 10% | 3% |
| 2004 | Q4 | 14% | 4% | -1% | 0% | 0% |
| 2005 | Q1 | -3% | 3% | 3% | 7% | 2% |
| 2005 | Q2 | 5% | 6% | 4% | -4% | -2% |
| 2005 | Q3 | -6% | -1% | -5% | -8% | 2% |
| 2005 | Q4 | 7% | 1% | 0% | 3% | -1% |
| 2006 | Q1 | 3% | 3% | 3% | 11% | 3% |
| 2006 | Q2 | 2% | 6% | 4% | 4% | 1% |
| 2006 | Q3 | -23% | -1% | -1% | 1% | -1% |
| 2006 | Q4 | 18% | -2% | 1% | -8% | 1% |
| 2007 | Q1 | 1% | 4% | -1% | 11% | -2% |
| 2007 | Q2 | 10% | 9% | 4% | 8% | 0% |
| 2007 | Q3 | -10% | -2% | 1% | -5% | 0% |
| 2007 | Q4 | 6% | 1% | 0% | 2% | 1% |
| 2008 | Q1 | -8% | 1% | 0% | 15% | 0% |
| 2008 | Q2 | -10% | 7% | 2% | 20% | -2% |
| 2008 | Q3 | -14% | -3% | 2% | 1% | 5% |
| 2008 | Q4 | -2% | -14% | -7% | -34% | 0% |

403 Production for coal is measured in short tons; production for other industries is in nominal dollar terms. Data for industries other than coal are from US Census Bureau's Manufacturers' Shipments, Inventories, & Orders (M3) Survey http://www.census.gov/manufacturing/m3/historical_data/index.html. NAICS codes used for this survey are: U36AVS & U36BVS (automotive), U25SVS (chemical), U22SVS (paper), and U31AVS (steel). For coal, data are from US Energy Information Administration's "December 2012 Monthly Energy Review: Table 6.1, Coal Overview" http://www.eia.gov/totalenergy/data/monthly/#coal.

**Highly Confidential**

| Table A-2: Norfolk Southern Carload Revenue by Fuel Surcharge Type[404] | | | | | | | |
|---|---|---|---|---|---|---|---|
| FSC Note | Trigger Price | FSC % | WTI Increment | Timing to Measure WTI Change | Class Period Revenue ($) | % of Revenue | FSC Note Creation Date |
| **2006 Public Carload Surcharge**[405] | $64 | 0.3% | $1 | Average Monthly | **2,469,714,288** | **18.8%** | NA |
| **2004 Public Carload Surcharge**[406] | $23 | 0.4% | $1 | Average Monthly | **3,278,793,477** | **25.0%** | NA |
| **2000 Public Carload Surcharge**[407] | $28 | 2% | $5 | 30 days | **819,785,722** | **6.3%** | NA |
| **Other Norfolk Southern Fuel Surcharges** | | | | | | | |
| M259 | $28 | 2% | $5 | Average Monthly | 9,753,024 | 0.1% | 4/14/05 |
| H762 | $23 | 0.13% | $1 | Average Monthly | 51,149,978 | 0.4% | 5/7/04 |
| M451 | $23 | 0.22% | $1 | Average Monthly | 140,396,461 | 1.1% | 6/21/05 |
| N269 and M486 | $28/$53 | 2%/1.5% | $5 | 30 days | 488,176,128 | 3.7% | 6/29/05 |
| H751 and L970 | $28 | 0.40% | $1 | Average Monthly | 64,534,909 | 0.5% | 4/29/04 |
| 6975 | $32 | 1% | $4 | 90 days | 2,144,005 | 0.0% | 12/7/00 |
| H710 | $28 | 2% cap | NA | 30 days | 23,411,100 | 0.2% | 3/24/2004 |
| L486 | $28 | 2% (8% cap) | $5 | Average Monthly | 4,876,070 | 0.0% | 7/30/04 |
| N055 | $28 | 2% (10% cap) | $5 | 30 days | 3,214,893 | 0.0% | 1/20/06 |
| O183 | $30 | 0.4% | $1 | Average Monthly | 2,287,385 | 0.0% | 7/9/07 |
| G493 | $30 | 2% | $5 | 30 Days | 8,872,302 | 0.1% | 6/11/02 |
| L856 | $30 | 2%/0.4% | $1 | Average Monthly | 167,913,326 | 1.3% | 11/5/04 |
| 7042 | <$20/>=$33 | -2%/2% | $5 | 30 Days | 104,757,878 | 0.8% | 6/25/01 |

404 None under FSC Note means the data indicate the traffic is not subject to a surcharge. Missing data were excluded from the denominator when percents were calculated. This table is based on a database of transactions data for unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon. Percentages are based on gross carload waybill revenue data that can be matched to 9255.

405 Includes codes N274, N273, N300, O279, O339.

406 Includes codes H577, H584, N392, O565.

407 Includes codes H315, G470, H333, 6766, M259.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| O220 | $33 | 0.3% | $1 | Average Monthly | 10,374,408 | 0.1% | 8/1/07 |
| L491 | $33 | 0.4% | $1 | Average Monthly | 16,971,673 | 0.1% | 8/2/04 |
| H699 | $33 | 2%/1% | $5 | 30 Days | 98,876,677 | 0.8% | 3/15/04 |
| H051 | $33 | 2% | $5 | 30 Days | 41,236,326 | 0.3% | 1/3/03 |
| L837 | $34 | 0.4% | $1 | Average Monthly | 394,184,152 | 3.0% | 11/1/04 |
| H332 | $34 | 2% | $5 | 30 Days | 33,807,821 | 0.3% | 8/1/03 |
| M781 | $35 | 0.4% | $1 | Average Monthly | 2,122,837 | 0.0% | 10/21/05 |
| M450 | $37 | 0.4% | $1 | Average Monthly | 251,019,515 | 1.9% | 6/21/05 |
| L436 | <$15/>$37 | -2%/2% | $5 | 90 Days | 349,758,267 | 2.7% | 7/8/04 |
| L888 and N616 | $38 | 0.4% | $1 | Average Monthly | 84,914,738 | 0.6% | 11/24/04 |
| 6968 | $38 | 2% | $5 | 30 Days | 35,175,020 | 0.3% | 11/15/00 |
| L755 | $48 | 0.4% | $1 | Average Monthly | 38,193,477 | 0.3% | 9/28/04 |
| N762 | $50 | 0.3% | $1 | Average Monthly | 197,912,944 | 1.5% | NA |
| O101 | $55 | 0.3% | $1 | Average Monthly | 12,985,312 | 0.1% | 5/21/07 |
| M922 | $60 | 0.4% | $1 | Average Monthly | 119,502,824 | 0.9% | 12/1/05 |
| N337 | $64 | 0.22% | $1 | Average Monthly | 177,825,760 | 1.4% | 6/2/06 |
| O562 and O418 | $64 | 0.4% | $1 | Average Monthly | 51,654,875 | 0.4% | 11/19/07 |
| O823 | $90 | 0.3% | $1 | Average Monthly | 7,918,575 | 0.1% | 8/1/08 |
| O708, O725, and O709 | $90 | 0.4% | $1 | Average Monthly | 109,862,935 | 0.8% | 5/22/08 |
| O457 | Mileage-based for Ford: $0.02 per mile for each $0.04 that average monthly HDF exceeds $2.80. If HDF is less than $2.80, the fuel refund will be $0.02 per mile for each $0.04 that HDF is less than $2.80. | | | | 5,287,857 | 0.0% | 12/12/07 |
| M287 | "Subject to fuel surcharge as negotiated between Toyota and each carrier." | | | | 2,685,882 | 0.0% | 4/26/05 |
| O394 | NA[408] | | | | 1,192,367 | 0.0% | 11/7/07 |
| M473 | FSC shall 50% of the surcharge in NS Conditions of Carriage 1-E as published Jan. 1, 2005 | | | | 89,918,176 | 0.7% | 6/25/05 |
| **Subtotal of Other Norfolk Southern Fuel Surcharges** | | | | | **3,204,869,877** | **24.4%** | |

408 Price is subject to a 4% FSC.

| | | | |
|---|---|---|---|
| **No Fuel Surcharge[409]** | **356,462,280** | **2.7%** | |
| **Fuel Surcharges Using Other Railroads' Mechanisms** | **195,342,030** | **1.5%** | |
| **Notes with Less than $1 Million in Class Period Revenue** | **24,785,533** | **0.2%** | |
| **None** | **2,763,546,884** | **21.1%** | |
| **Total** | **13,113,300,089** | **100.0%** | |

409 Includes codes G556, M 914, N428, and L638.

| Table A-3: Comparing FAK and Carload Surcharges of Norfolk Southern[410] | | | | |
|---|---|---|---|---|
| | FAK Surcharge | | Carload Surcharge | |
| Date | Domestic | International | 2004 Public Carload | 2006 Public Carload |
| 3/1/04 | 5.1% | 3.4% | 4.8% | -- |
| 4/1/04 | 5.9% | 4.0% | 4.8% | -- |
| 5/1/04 | 6.4% | 4.8% | 5.6% | -- |
| 6/1/04 | 6.5% | 5.0% | 5.6% | -- |
| 7/1/04 | 6.6% | 5.0% | 7.2% | -- |
| 8/1/04 | 7.6% | 5.2% | 6.4% | -- |
| 9/1/04 | 8.8% | 6.0% | 7.2% | -- |
| 10/1/04 | 11.3% | 7.3% | 8.8% | -- |
| 11/1/04 | 12.4% | 8.8% | 9.2% | -- |
| 12/1/04 | 11.3% | 8.8% | 12.4% | -- |
| 1/1/05 | 10.7% | 7.0% | 10.4% | -- |
| 2/1/05 | 11.4% | 7.0% | 8.4% | -- |
| 3/1/05 | 13.0% | 8.3% | 9.6% | -- |
| 4/1/05 | 14.0% | 9.8% | 10.0% | -- |
| 5/1/05 | 13.2% | 10.0% | 12.8% | -- |
| 6/1/05 | 13.9% | 9.3% | 12.4% | -- |
| 7/1/05 | 14.9% | 10.8% | 10.8% | -- |
| 8/1/05 | 16.2% | 11.2% | 13.6% | -- |
| 9/1/05 | 20.4% | 14.0% | 14.4% | -- |
| 10/1/05 | 23.4% | 17.4% | 16.8% | -- |
| 11/1/05 | 17.8% | 15.8% | 17.2% | -- |
| 12/1/05 | 16.0% | 12.3% | 16.0% | -- |
| 1/1/06 | 16.1% | 12.0% | 14.4% | -- |
| 2/1/06 | 16.5% | 12.0% | 14.8% | -- |
| 3/1/06 | 17.3% | 12.5% | 17.2% | -- |
| 4/1/06 | 19.4% | 13.5% | 15.6% | -- |
| 5/1/06 | 21.3% | 15.8% | 16.0% | -- |
| 6/1/06 | 21.4% | 16.3% | 18.8% | -- |
| 7/1/06 | 21.9% | 19.0% | 19.2% | 2.1% |
| 8/1/06 | 23.0% | 22.8% | 19.2% | 2.1% |
| 9/1/06 | 20.0% | 20.0% | 20.8% | 3.3% |
| 10/1/06 | 16.6% | 16.6% | 20.4% | 3.0% |
| 11/1/06 | 17.0% | 17.0% | 16.4% | 0.0% |
| 12/1/06 | 17.9% | 17.9% | 14.4% | 0.0% |
| 1/1/07 | 16.3% | 16.3% | 14.8% | 0.0% |
| 2/1/07 | 16.3% | 16.3% | 16.0% | 0.0% |
| 3/1/07 | 18.8% | 18.8% | 12.8% | 0.0% |
| 4/1/07 | 20.7% | 20.7% | 14.8% | 0.0% |
| 5/1/07 | 20.0% | 20.0% | 15.2% | 0.0% |

[410] Carload fuel surcharges under the rebased system are from www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/NS8003_history.html. Carload fuel surcharges under the prior system are from www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/history_fsc2.html. Data on intermodal surcharges are from NS_036002112. Values shown for "Freight All Kinds - Domestic & International" fuel surcharges are actually computed monthly averages from weekly rates.

**Table A-4: WTI and HDF Price Indexes**[411]

| Date | Cushing, OK WTI Spot Price FOB (Dollars per Barrel) | Nominal Diesel Fuel Retail Price (Dollars per Gallon) |
|---|---|---|
| Mar-03 | 33.51 | 1.708 |
| Apr-03 | 28.17 | 1.533 |
| May-03 | 28.11 | 1.451 |
| Jun-03 | 30.66 | 1.424 |
| Jul-03 | 30.75 | 1.435 |
| Aug-03 | 31.57 | 1.485 |
| Sep-03 | 28.31 | 1.461 |
| Oct-03 | 30.34 | 1.481 |
| Nov-03 | 31.11 | 1.482 |
| Dec-03 | 32.13 | 1.490 |
| Jan-04 | 34.31 | 1.550 |
| Feb-04 | 34.68 | 1.582 |
| Mar-04 | 36.74 | 1.629 |
| Apr-04 | 36.75 | 1.692 |
| May-04 | 40.28 | 1.746 |
| Jun-04 | 38.03 | 1.711 |
| Jul-04 | 40.78 | 1.739 |
| Aug-04 | 44.9 | 1.832 |
| Sep-04 | 45.94 | 1.912 |
| Oct-04 | 53.28 | 2.134 |
| Nov-04 | 48.47 | 2.147 |
| Dec-04 | 43.15 | 2.009 |
| Jan-05 | 46.84 | 1.959 |
| Feb-05 | 48.15 | 2.027 |
| Mar-05 | 54.19 | 2.214 |
| Apr-05 | 52.98 | 2.292 |
| May-05 | 49.83 | 2.199 |
| Jun-05 | 56.35 | 2.290 |
| Jul-05 | 59 | 2.373 |
| Aug-05 | 64.99 | 2.500 |
| Sep-05 | 65.59 | 2.819 |
| Oct-05 | 62.26 | 3.095 |
| Nov-05 | 58.32 | 2.573 |
| Dec-05 | 59.41 | 2.443 |
| Jan-06 | 65.49 | 2.467 |
| Feb-06 | 61.63 | 2.475 |

411 From the Excel workbook, "HDF v WTI Prices" in Dr. Rausser's workpapers.

| | | |
|---|---|---|
| Mar-06 | 62.69 | 2.559 |
| Apr-06 | 69.44 | 2.728 |
| May-06 | 70.84 | 2.897 |
| Jun-06 | 70.95 | 2.898 |
| Jul-06 | 74.41 | 2.934 |
| Aug-06 | 73.04 | 3.045 |
| Sep-06 | 63.8 | 2.783 |
| Oct-06 | 58.89 | 2.519 |
| Nov-06 | 59.08 | 2.545 |
| Dec-06 | 61.96 | 2.610 |
| Jan-07 | 54.51 | 2.485 |
| Feb-07 | 59.28 | 2.488 |
| Mar-07 | 60.44 | 2.667 |
| Apr-07 | 63.98 | 2.834 |
| May-07 | 63.45 | 2.796 |
| Jun-07 | 67.49 | 2.808 |
| Jul-07 | 74.12 | 2.868 |
| Aug-07 | 72.36 | 2.869 |
| Sep-07 | 79.91 | 2.953 |
| Oct-07 | 85.8 | 3.075 |
| Nov-07 | 94.77 | 3.396 |
| Dec-07 | 91.69 | 3.341 |
| Jan-08 | 92.97 | 3.308 |
| Feb-08 | 95.39 | 3.377 |
| Mar-08 | 105.45 | 3.881 |
| Apr-08 | 112.58 | 4.084 |
| May-08 | 125.4 | 4.425 |
| Jun-08 | 133.88 | 4.677 |
| Jul-08 | 133.37 | 4.703 |
| Aug-08 | 116.67 | 4.302 |
| Sep-08 | 104.11 | 4.024 |
| Oct-08 | 76.61 | 3.576 |
| Nov-08 | 57.31 | 2.876 |
| Dec-08 | 41.12 | 2.449 |

# Exhibit 1: Curriculum Vitae of Dr. Barry C. Harris

Economists
INCORPORATED

# Barry C. Harris

## Office

Economists Incorporated
[redacted]

## Home

[redacted]

## Date of Birth

[redacted]

## Education

B.A. Mathematics, 1970—Lehigh University
M.A. Economics, 1972—University of Pennsylvania
Ph.D. Economics, 1979—University of Pennsylvania
Dissertation Title: *The Multidivisional Form Organization: Studies of Its Effects on Performance in Large Corporations.*

## Professional Experience

Principal and Chairman (since 2003), Economists Incorporated
(March 1992 - October 1992; January 1993 - present)

Chief Economist and Deputy Assistant Attorney General Antitrust Division, United States Department of Justice
(October 1992 - January 1993)

Senior Vice President, Economists Incorporated
(April 1990 - March 1992)

Senior Economist, Economists Incorporated
(April 1985 - March 1990)

**Professional Experience (continued)**

Project Manager, ICF, Incorporated
(November 1981 - April 1985)

Senior Economist and Chief, Rail Cost and Pricing Branch, Office of Policy and Analysis, Interstate Commerce Commission
(December 1979 - November 1981)

Economist, Economic Policy Office, Antitrust Division, United States Department of Justice
(October 1974 - December 1979)

**Selected Matters**

Computershare, Ltd. acquisition of BNY Mellon shareholder services assets: Hart-Scott-Rodino review by Department of Justice

Investigation by the Federal Trade Commission of the formation of Urology of Central Pennsylvania

Amerigon, Inc. acquisition of W.E.T. Automotive Systems AG: Hart-Scott-Rodino review by Federal Trade Association

Pilot Corporation acquisition Flying J's Travel Center operations: Hart-Scott-Rodino review by Federal Trade Association

Monopolization investigation by Department of Justice of Covenant Health Partners (Lubbock, Texas)

Alcon, Inc. acquisition of LenSx Lasers, Inc.: Hart-Scott-Rodino review by the Federal Trade Commission

Experian plc acquisition of Mighty Net, Inc: Hart-Scott-Rodino review by the Department of Justice

Represented Equifax Inc., Experian Information Solutions Inc., and TransUnion LLC in defending claims of monopolization by Fair Isaac Corporation

Post-Merger investigation by the Federal Trade Commission of acquisitions of Flex-O-Lite and Cataphate by Potters Industries, Inc.

Integration of Advocate Health Care and Condell Medical Center: Hart-Scott-Rodino review by the Federal Trade Commission

**Selected Matters (continued)**

Acquisition of BioArray Solutions Ltd by Immucor, Inc.: Hart-Scott-Rodino review by the Department of Justice

Represented Ranbaxy Pharmaceuticals Inc. during Federal Trade Commission review of patent settlement with Cephalon, Inc. involving Provigil

Acquisition of Oglebay Norton Company by Carmeuse North America: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of ECO SPA's heat-transfer coil and cooler assets by Luvata: Hart-Scott-Rodino review by the Department of Justice

Merger between Mercy General Health Partners and Hackley Hospital in Muskegon MI: Hart-Scott-Rodino review by the Federal Trade Commission

Advised Board of Directors of Royal Ahold N.V. about antitrust risks associated with different potential purchasers of U.S. Foodservice

Advised Board of Directors of Novelis, Inc. about antitrust risks associated with different potential purchasers of the company

Acquisition of Elk Building Products Inc. by GAF Materials Corporation: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Magella Healthcare Corporation by Pediatrix Medical Group, Inc.: Review by Federal Trade Commission

Acquisition of Core Industries, Inc. by Watts Water Technologies, Inc.: Review by the Department of Justice

Acquisition of Alderwoods, Inc. by SCI, Inc.: Hart-Scott-Rodino review by Federal Trade Commission

Acquisition of Advanced Digital Information Corp. (ADIC) by Quantum Corporation: Hart-Scott-Rodino review by the Department of Justice

Merger of Inco Ltd. and Falconbridge Ltd.: Hart-Scott-Rodino review by the Department of Justice

*Competition in Utah Health Care Markets: Report to the Privately Owned Health Care Organization Task Force of the Utah Legislature*

**Selected Matters (continued)**

Acquisition of steel assets of Dofasco, Inc. by Arcelor, S.A.: Hart-Scott-Rodino review by the Department of Justice

Class Certification issues in *Re Urethane Antitrust Litigation*

Various cases involving allegations against Trading Technologies International, Inc. related to computer software use for electronic trading in futures markets

Acquisition of the industrial valve manufacturing business of Dresser, Inc. by Cooper Cameron Corporation: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Nuance Communications Inc. by ScanSoft, Inc. involving speech recognition software: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Cross Match Technologies Inc. biometric assets by Smiths Group PLC: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Sporlan Valve Company by Parker Hannifin Corporation: Hart-Scott-Rodino review by the Department of Justice

Acquisition of PeopleSoft, Inc. by Oracle Corporation: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Crowley Foods and Marigold Foods by HP Hood Inc.: Hart-Scott-Rodino review by the Department of Justice

Estimation of damages associated with contract dispute between Conrail and AT&T involving fiber optic system

Formation of joint ventures involving mozzarella cheese by Leprino Foods

Federal Trade Commission investigation of Brown & Toland

Acquisition of Wakefield Materials Corporation by Aggregate Industries PLC: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Telemedia, Inc. owned and operated French-Language radio stations by Astral Media Inc.: Review by Canadian Competition Bureau

Acquisition of Aetna Health (NZ) Limited by Southern Cross Medical Care Society: Appeal from decision by the New Zealand Commerce Commission

**Selected Matters (continued)**

Acquisition of Laser Vision Centers, Inc. by TLC Laser Eye Centers, Inc.: Hart-Scott-Rodino review by the Department of Justice

Acquisition of CCN by First Health Group Corporation: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Sensient Technologies Corporation's Red Star Yeast Division by LaSaffre et Cie.: Hart-Scott-Rodino review by the Department of Justice

Assumption/reinsurance transaction between Health Partners of the Midwest and Group Health Plan, Inc., a subsidiary of Coventry Health Care, Inc.: Review by the Missouri Department of Insurance

Acquisition of Hoechst Marion Roussel's Cardizen CD assets by Biovail Corporation International: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Algroup Lonza's polyol assets by SPI Polyols, Inc.: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of soybean processing assets from Cargill, Inc. by Perdue, Incorporated: Hart-Scott-Rodino review by the Department of Justice

Acquisition of ABB/CE's nuclear fuel assets by BNFL/Westinghouse: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Pathmark Stores, Inc. by Royal Ahold NV: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of funeral home and cemetery assets of ECI, Inc. by Service Corporation International (SCI): Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of retail automobile parts assets of Western Auto (Sears) by Advance Auto Parts: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of dairy assets of Nature's Best by Suiza, Inc.: Hart-Scott-Rodino review by the Department of Justice

*American Honda Motor Company, Inc. Dealership Relations Litigation* MDL No. 1069: Case in U.S. District Court involving alleged preferences in the allocation of automobiles to dealers by Honda

**Selected Matters (continued)**

Acquisition of Tidewater Health Care, Inc. by Sentara HealthSystem: Hart-Scott-Rodino review by the Department of Justice

Merger of Bergen Brunswig Corporation and Cardinal Health, Inc.: Hart-Scott-Rodino review by the Federal Trade Commission

Merger of retail grocery store chains Jitney Jungle and Belchamps: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Harrisburg radio stations WWKL, WCMB, and WYMJ from Barnstable Broadcasting, Inc. by Dame Media Corporation: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Healthsource, Inc. by CIGNA Corporation: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of waste disposal assets of Taormina Industries, Inc. by Republic Industries, Inc.: Hart-Scott-Rodino review by the Department of Justice

Acquisition of waste disposal assets of Rainbow Industries, Inc. by Republic Industries, Inc.: Hart-Scott-Rodino review by the Department of Justice

Acquisition of funeral home and cemetery assets of Brookside Funeral Home, Inc. by Service Corporation International (SCI): Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Owen Healthcare, Inc. by Cardinal Health, Inc.: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of American Aggregates Corporation by the Edward C. Levy Co.: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Detroit radio stations WWWW and WDFN from Chancellor Broadcasting Company and WMXD and WJLB from Secret Communications, L.P. by Evergreen Media Corporation: Hart-Scott-Rodino review by the Department of Justice

Formation of alliance of Children's Hospital of New Orleans, Ochsner Foundation Hospital, Pendleton Memorial Methodist Hospital, Slidell Memorial Hospital, St. Tammany Parish Hospital, and Touro Infirmary: Hart-Scott-Rodino review by the Federal Trade Commission

**Selected Matters (continued)**

*Pride Companies, L. P. v. United States of America*: Case in U.S. Court of Claims involving damages associated with a contract to supply jet fuel to the Department of Defense

Acquisition of Tilcon, Incorporated's highway construction assets by Oldcastle, Inc.: Hart-Scott-Rodino review by the Department of Justice

Consolidation of Pennsylvania Blue Shield and Blue Cross of Western Pennsylvania: Review by Pennsylvania Department of Insurance

Merger between Aetna Life and Casualty Company and U.S. Healthcare Inc.: Hart-Scott-Rodino review by the Federal Trade Commission

Affiliation between Miami Valley Hospital (Dayton) and Good Samaritan Hospital and Health Center (Dayton): Hart-Scott-Rodino review by the Federal Trade Commission

Merger of Charlton Memorial Hospital, Inc., St. Luke's Hospital of New Bedford and Tobey Hospital, Inc.: Hart-Scott-Rodino review by the Federal Trade Commission and review by the Commonwealth of Massachusetts

Consolidation of St. Barnabas Health Care System, Community Kimball Health Care System, Newark Beth Israel Medical Center, Irvington General Hospital, Monmouth Medical Center, and Wayne General Hospital: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Bredero Price's pipeline coating assets by Dresser Industries, Inc.: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Vigoro Corporation's potash assets by IMC Global, Inc.: Hart-Scott-Rodino review by the Department of Justice

Consolidation of Owensboro-Daviess County Hospital and Mercy Hospital of Owensboro: Hart-Scott-Rodino review by the Department of Justice

Acquisition of St. Luke's Episcopal-Presbyterian Hospitals by the Institute of the Sisters of Mercy of the Americas, Regional Community of St. Louis: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Continental Medical Systems, Inc. by Horizon Healthcare Corporation: Hart-Scott-Rodino review by the Department of Justice

**Selected Matters (continued)**

Acquisition of Grove Italia S.p.A.'s pipeline valve assets by Dresser Industries, Inc.: Hart-Scott-Rodino review by the Department of Justice

Acquisition of New England Newspaper Group by The Journal Register Company: Hart-Scott-Rodino review by the Department of Justice

Acquisition of funeral home and cemetery assets of Uniservice by Service Corporation International (SCI): Hart-Scott-Rodino review by the Federal Trade Commission

Merger of retail drug store chains Thrifty and Payless: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of HealthTrust, Inc. by Columbia/HCA Healthcare Corporation: Hart-Scott-Rodino review by the Federal Trade Commission

Establishment of worldwide joint venture between Bayer AG and Hoechst AG to produce textile dyes: Various antitrust reviews

Competitive assessment of proposed joint venture between the Canadian Pacific and Canadian National Railroads to serve eastern Canada: Prepared for CP and CN management

Competitive assessment of proposed acquisition of Santa Fe Pacific Corporation by Union Pacific Corporation: Prepared for Board of Directors of Santa Fe Pacific Corporation

Merger between Harvard Health Plan and Pilgrim Health Plan: Hart-Scott-Rodino review by the Federal Trade Commission and review by the Commonwealth of Massachusetts

Acquisition of GenCare Health Systems, Inc. by United HealthCare Corporation: Hart-Scott-Rodino review by the Department of Justice and review by the State of Missouri

Merger between Minneapolis Children's Medical Center and The Children's Hospital (St. Paul, MN): Hart-Scott-Rodino review by the Department of Justice

Consolidation between Providence Health System (Williamsport, PA) and Williamsport Hospital and Medical Center: Hart-Scott-Rodino review by the Department of Justice

**Selected Matters (continued)**

Merger between Northeast Health Systems (Beverly, MA) and Cape Anne Health System (Gloucester, MA): Review by the Commonwealth of Massachusetts

Acquisition of Westinghouse Corporation's Electrical Distribution and Control Unit by The Eaton Corporation: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Ashland Oil, Inc.'s APAC-Arizona Construction Unit by Peter Kiewit Sons', Inc.: Hart-Scott-Rodino review by the Department of Justice

Merger between Columbia Hospital Corporation and Hospital Corporation of America: Hart-Scott-Rodino review by the Federal Trade Commission

Establishment of a joint venture between Service Corporation International (SCI) and McNeal-Loftis, Inc. (MLI) to own and operate funeral homes and cemeteries: Hart-Scott-Rodino review by the Federal Trade Commission

Merger between Elliot Hospital (Manchester, NH) and Catholic Medical Center of Manchester: Hart-Scott-Rodino review by the Department of Justice

Merger between Providence Hospital (Everett, WA) and General Hospital Medical Center of Everett: Hart-Scott-Rodino review by the Department of Justice

Acquisition of the Container Rental Division of Tiphook plc by Transamerica Corporation: Hart-Scott-Rodino review by the Federal Trade Commission

Merger between Columbia Hospital Corporation and Galen Health Care, Inc.: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of American Tourister, Inc. by Astrum International Corp. (Samsonite): Hart-Scott-Rodino review by the Department of Justice

Acquisition of Rugby-Darby Group Companies, Inc. by Marion Merrell Dow, Inc.: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Home Intensive Care, Inc. by W.R. Grace & Co.: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Golden Glades Regional Medical Center (North Dade County, FL) by Ornda, Inc.: Hart-Scott-Rodino review by the Department of Justice

**Selected Matters (continued)**

Establishment of a joint venture between Rohm & Haas and Atochem to produce acrylics: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Humana Hospital-McFarland (Lebanon, TN) by National Medical Enterprises: Hart-Scott-Rodino review by the Federal Trade Commission

Antitrust analysis undertaken for Revco D.S., Inc. addressing the competitive effects of various bankruptcy reorganization plans

Acquisition of NorLight's fiber optics transmission network by MRC: Hart-Scott-Rodino review by the Federal Trade Commission

Merger between Flagler Memorial Hospital and St. Augustine (Florida) General Hospital: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Cross & Trecker, Inc. by Giddings & Lewis, Inc.: Hart-Scott-Rodino review by the Department of Justice

Merger between Children's Hospital of San Francisco and Pacific Presbyterian Medical Center (San Francisco): Hart-Scott-Rodino review by the Federal Trade Commission

*Pocono Artesian Waters Company v. Occidental Chemical Corporation, et al.*: Case in U.S. District Court involving estimation of damages resulting from alleged product defect

Study undertaken for the Edison Electric Institute addressing FERC's acceptance of market-based pricing for long-term energy and power sales

Acquisition of Continental Can's beverage and food can-making assets by Crown, Cork & Seal, Inc.: Hart-Scott-Rodino review by the Department of Justice

*United States v. American Safety Razor Company and Ardell Industries, Inc.*: Case in U.S. District Court involving the acquisition of Ardell's industrial blade making assets

Study undertaken for Jacobs Suchard Ltd. addressing the economic effects of E.J. Brach & Sons' application for a Foreign Trade Zone for its Chicago candy manufacturing plant

**Selected Matters (continued)**

Acquisition of LWD, Inc. by Chemical Waste Management, Inc.: Hart-Scott-Rodino review by the Department of Justice

*The Broker's Assistant v. Williams Real Estate, et al.*: Case in U.S. District Court involving the estimation of damages resulting from alleged conspiracy among New York City commercial real estate firms

*The Dow Chemical Company v. Occidental Chemical Corp.*: Case in U.S. District Court involving estimation of damages resulting from alleged breach of VCM supply contract

*May Department Stores Co. v. First National Supermarkets, Inc., et al.*: Case in U.S. District Court involving estimation of damages resulting from alleged price fixing among Cleveland supermarkets

Establishment of a joint venture by Komatsu Ltd. and Dresser Industries, Inc. for the production of construction equipment: Hart-Scott-Rodino review by the Federal Trade Commission

Study undertaken for the Toyota Motor Company addressing the economic effects of foreign owned automobile assembly plants in the United States

Acquisition of Knoxville Steel Company by Florida Steel Corporation: Hart-Scott-Rodino review by the Department of Justice

Acquisition of American Cigar Corporation by Consolidated Cigar Corporation: Post-acquisition review by the Department of Justice

Acquisition of chemical assets of Diamond Shamrock Corporation by Occidental Petroleum Corporation: Hart-Scott-Rodino review by the Federal Trade Commission

Certificate of Need application by Garden State Surgi-Center: Hearings before State of New Jersey Administrative Law Judge

Acquisition of Tenneco Polymers, Inc. by Occidental Petroleum Corporation: Preliminary injunction hearing in U.S. District Court

Acquisition of chlor-alkali assets of the Goodrich Company by Diamond Shamrock Corporation: Hart-Scott-Rodino review by the Federal Trade Commission

Economists
INCORPORATED

**Selected Matters (continued)**

Variable electrical rate schedule proposed by the Bonneville Power Administration: Hearings before the Bonneville Power Administration

Acquisition of aluminum assets of Atlantic-Richfield Company by Alcan Aluminum Company: Hart-Scott-Rodino review by the Department of Justice

Proposed merger involving Gulf Oil Company and Cities Service Company: Hart-Scott-Rodino review by the Federal Trade Commission

Acquisition of Modesto City Hospital by National Medical Enterprises, Inc.: Merger trial in U.S. District Court

Joint venture between Rolls Royce and United Technologies Corporation to produce jet engines: Hart-Scott-Rodino review by the Department of Justice

Acquisition of Milwaukee Road core assets by Soo Line Railroad Company: Hearings before the Interstate Commerce Commission and U.S. District Court Judge

*Pinney Dock* price fixing cases: Estimation of damages associated with alleged railroad price fixing. Case in U.S. District Court

Proposed acquisition of North American Van Lines, Inc. by Norfolk Southern Corporation: Hearings before the Interstate Commerce Commission

Proposed merger of Southern Pacific Transportation Company and the Atchison, Topeka and Santa Fe Railroad Company: Hearings before the Interstate Commerce Commission

FERC Docket Nos. OR 78-1-014 and OR 78-1-016 (Phase 1Remand)--Trans-Alaska Pipeline System: Hearings before the Federal Energy Regulatory Commission

Construction of a model of decision making under uncertainty for OSHA for use in estimating the induced effects of its Cancer Policy

Construction of an analytical framework for FDA for use in evaluating the effects of its Food Standards

**Testimony**

*In Re TFT-LCD (Flat Panel) Antitrust Litigation*

*Allen Rothpearl, M.D., P.C., v. CareCore National, LLC, et al.*

*Glenn Burton, Jr. v. American Cyanamid Co., et al.*

*Yasmine Clark v. American Cyanamid Co., et al.*

*Stand-Up MRI of Bronx, p.c., Health Diagnostics, LLC, et al. v. CareCore National, LLC, et al.*
*Mercy Medical Center v. Aultman Health Foundation, et al.*

*Powderly et al. v. Blue Cross Blue Shield of North Carolina et al.*

*Park West Radiology, P.C., and Park West Circle Reality, LLC v. CareCore National, LLC, et al.*

*Medical Diagnostic Imaging, PLLC v. CareCore National LLC*

*United States Senate Judiciary Hearings on Consolidation of Highmark, Inc. and Independence Blue Cross*

*Pennsylvania Insurance Department Information Hearings: Proposed Consolidation of Independence Blue Cross and Highmark, Inc.*

*European Union Investigation of Possible Collusive Behavior in the Deep-sea Maritime Transportation of Bulk Liquids (Parcel Tankers)*

*Sun City Hospital, Inc. v. Agency for Health Care Administration, et al.*

*In Re Applications of Highmark, Inc. and Independence Blue Cross regarding the Acquisition of Control of Domestic Insurers*

*Oral Hearing, Case 38.64, Maritime transport of bulk liquids (Deep Sea), Antitrust-Transport and Post Competition Directorate General European Commission*

*Stolt-Nielsen, et al. v. United States of America*

*Nitin Patel, M.D., et al. v. Verde Valley Medical Center, et al.*

*In Re Urethane Antitrust Litigation*

**Testimony (continued)**

*In Re Pineapple Antitrust Litigation*

*Nisus Corporation v. Perma – Chink Systems, Inc.*

*United Healthcare of Illinois, Inc., et al., v. Advocate Health Care Network, et al.*

Statement of Dr. Barry C. Harris concerning the Korea Fair Trade Commission Examiner's Report Relating to Competition for the Provision of Deep-Sea, Parcel-Tanker, Contract Services to Certain Korean Customers

*United States of America and Commonwealth of Kentucky v. Dairy Farmers of America, Inc. and Southern Belle Dairy Co., LLC.*

*J.E. Pierce Apothecary, Inc., et al., v. Harvard Pilgrim Health Care, Inc., Health New England, Inc., CVS Corporation, and PharmaCare Management Services, Inc.*

*Michelle and Jason Hinman, on behalf of all others similarly situated v. Yakima Surgical Associates*

*Joint FTC/DOJ Hearings on Healthcare Case and Competition Law and Policy*

*United States of America v. UPM–Kymmene OYJ, et al.*

*In Re: Gemstar Development Corporation Patent Litigation*

*Greenlawn Funeral Home, Inc. v. Ervin Snapp, Darrell Bearden and Susan Bearden*

*Retractable Technologies, Inc. v. Becton Dickinson and Co., et al.*

*In the Matter of: Chicago Bridge & Iron Co./Pitt-Des Moines, FTC Matter No. D09300*

*Re: AHS New Mexico Holdings, Inc.'s Acquisition of Lovelace Health Systems*

*American Chiropractic Association v. Trigon Healthcare, Inc., et al*

Federal Communications Commission WT Docket No. 00-230: *In the Matter of Promoting Efficient use of Spectum Through Elimination of Barriers to the Development of Secondary Markets*

**Testimony (continued)**

*H.T.E. Inc., v. Tyler Technologies, Inc. HealthAmerica Pennsylvania, Inc., et al. v. Susquehanna Health System Inc., et al.*

*General Electric Company, et al. v. Latin American Imports, S.A., et al.*

*United States of America v. SunGard Data System, Inc., et al.*

*True North Composites, LLC v. Trinity Industries, Inc.*

*The Stop & Shop Supermarket Company v. Blue Cross & Blue Shield of Rhode Island, et al.*

*Alan D. Gordon, M.D., et al. v. Lewistown Hospital*

*Willie L. Hardy, Jr., M.D. v. Mercy Catholic Medical Center, et al.*

*Rocky Mountain Medical Center, Inc. v. Northern Utah HealthCare Corporation d/b/a St. Mark's Hospital*

*Van Waters & Rogers v. Shell Chemical Company*

*Herbert Martello v. Blue Cross/Blue Shield of Maryland, Inc., et al.*

*Emad Kowatli, M.D. v. Russell County Medical Center, et al.*

*Dr. Paul G. Bizzle v. Northern Montana Health Care, Inc., et al.*

*Green Keepers, Inc. v. Softspikes, Inc. and MacNeill Engineering Worldwide, Inc*

Arbitration between Olin Corporation and Troy Chemicals, Inc. under FIFRA

*Burlington Drug Company v. VHA, Inc. and Cardinal Health Inc.*

*Kline A. Price. Jr., M.D. v. Howard County General Hospital, et al.*

*Federal Trade Commission/State of Missouri v. Tenet Healthcare and Poplar Bluff Physicians Group*

*Stephen P. Sugarbaker, M.D. v. SMM Health Care Central Region d/b/a St. Marys Health Center*

*Sisters of Providence Health Systems, Inc. v. Valley Health Systems, Inc.*

**Testimony (continued)**

Surface Transportation Board Finance Docket No. *33388, CSX Corporation and CSX Transportation, Inc., Norfolk Southern Corporation and Norfolk Southern Railway Company--Control and Operating Leases/Agreements--Conrail, Inc. and Consolidated Rail Corporation*

*Iowa Eye, P.C., et al. v. Richard F. Noyes, O.D., et al.*

Affidavits submitted to State Departments of Insurance during review of CIGNA Corporation's acquisition of Healthsource, Inc.

*Donald Freedman, M.D., et al. v. Flagler Hospital, Inc.*

*Thomas J. Berger, M.D., d/b/a Open Heart, Inc. v. Montana Deaconess Medical Center, et al.*

*United States of America v. SKW Metals & Alloys, Inc. and Charles Zak*

*Richard J. Angelico, M.D. v. Lehigh Valley Hospital, Inc., et al.*

*HMO Application of Maine Partners Health Plan (Form A Proceeding)*

*Pride Companies, L.P. v. United States of America*

*Kennon H. Hager v. Venice Hospital, et al.*

*Delaware Health Care v. MCD Holding Company, et al.*

*Anthony J. Mussallem, M.D. v. Flagler Hospital Inc., et al.*

*F. Geoffrey Toonder, M.D. v. Lehigh Valley Hospital, Inc., et al.*

*Re: Proposed Acquisition of the MetraHealth Companies by the United HealthCare Corporation*

*The Clorox Company v. Sterling Winthrop Inc. and Reckitt & Colman Inc.*

Affidavit submitted to the United States Department of Justice during H-S-R review of Owensboro-Daviess County Hospital/Mercy Hospital of Owensboro consolidation

*Seth Paskon, M.D. v. George Bay, et al.*

**Testimony (continued)**

*William Zelman, D.O. v. Brighton Medical Center, et al.*

*Orlando Regional Healthcare System, et al. v. Columbia/ HCA Healthcare Corporation, et al.*

*Anthony Woodward, M.D. v. Carroll County General Hospital*

*Re: Proposed Acquisition of GenCare Health Systems, Inc. by the United HealthCare Corporation*

*Robert S. Mathews, M.D. v. Lancaster General Hospital, et al.*

*Robert S. Mathews, M.D. v. Orthopedic Associates of Lancaster, Ltd.*

*Worrell Enterprises, Inc., d/b/a The Daily Progress v. Real Estate, III, Inc., et al.*

*United States v. Mercy Health Services and Finley Tri-States Health Group, Inc.*

*Swarthmore Radiation Oncology, Inc., et al. v. Melvyn J. Lapes M.D., et al.*

*In Re: Petroleum Recycling Corporation, Debtor*

*Gregory M. Lang, M.D. v. Sze-Ya Yeh, M.D., et al.*

*Home Health Specialists, Inc. v. Liberty Health System, Crozer-Chester Medical Center, et al.*

*Jeffrey K. Rosen, M.D. v. Crozer-Chester Medical Center and Richard Soricelli, M.D.*

Application to vacate consent decree entered in *United States of America v. Agri-Mark, Inc., Agway, Inc. and H.P. Hood, Inc.*

*Stephen A. Friedman, M.D. v. Delaware County Memorial Hospital, et al.*

*Brad M. Cogan, M.D. v. Harford Memorial Hospital, et al.*

*James Farr, M.D. v. HealthEast, Inc., Gnaden Huetten Memorial Hospital, Inc., et al.*

Arbitration between Donna Karan Studio and Erwin Pearl, Inc. *Mary Forsyth, et al. v. Humana, Inc., et al.*

Economists
INCORPORATED

**Testimony (continued)**

*Frank R. Boyer, M.D. and Nancy H. Boyer, M.D. v. Lehigh Valley Hospital Center, Inc., et al.*

*Nice-Pak Products, Inc. v. Packaging Resources, Inc.*

*United States v. Baker Hughes, Inc., et al.*

*Banner Industries, Inc., v. PepsiCo, Inc.*

Federal Energy Regulatory Commission Docket No.CP89-1721-000, *Southern Natural Gas Proposal to Establish a Gas Inventory Charge*

Federal Energy Regulatory Commission Docket No. EC89-5-000 *Proposed Merger of Southern California Edison Company and San Diego Gas & Electric Company*

Arbitration of Multi-employer Pension Plan Withdrawal Liability between Fuqua Industries, Inc. and Teamsters Pension Trust Fund of Philadelphia and Vicinity

*Hilord Chemical Corporation v. Ricoh Electronics, Inc.*

*Drs. Steuer and Latham, et al. v. National Medical Enterprises, Inc., et al.*

*B.L. Bennett, Inc. v. Lenox, Inc., Noritake, Inc., Josiah Wedgewood & Sons, Inc., Fitz and Floyd, Inc., and Doulton & Co., Inc.*

*Vinod C. Bhan, C.R.N.A. v. NME Hospitals, Inc., et al.*

*Metropolitan General Hospital v. National Medical Enterprises, Inc.*

*Garden State Surgi-Center v. New Jersey Commissioner of Health*

*Federal Trade Commission v. Occidental Petroleum Corporation and Tenneco Polymers, Inc.*

Bonneville Power Administration, BPA File VI-86, In the Matter of the Variable Industrial Power Rate Design

Arbitration Proceedings between Escanaba & Lake Superior Railroad Company and Soo Line Railroad Company pursuant to Trackage Rights Agreement dated April 26, 1982

**Testimony (continued)**

Interstate Commerce Commission Finance Docket No. 30400, Santa Fe Southern Pacific Corporation--Control--Southern Pacific Transportation Co.

*United States v. Calmar Inc. and Realex Corporation*

Interstate Commerce Commission Finance Docket No.30500, *Norfolk Southern Corporation--Control--North American Van Lines, Inc.*

Interstate Commerce Commission Finance Docket No. 30214,*Railroad Car Service and Car Hire Pooling Agreement*

Interstate Commerce Commission Finance Docket No. 28640 (Sub-No. 9M), *Chicago, Milwaukee, St. Paul & Pacific Railroad Company--Reorganization--Acquisition by NEWCO, an Affiliate/Subsidiary of Soo Line Railroad Company*

*Peter A. Beck, et al. v. Long Manufacturing N.C., Inc., et al.*

Interstate Commerce Commission Docket Nos. 38184, 38185, and 38186, *Pennsylvania Power & Light Company v. Consolidated Rail Corporation*

*Rudolph Howell, et al. v. Petersburg General Hospital, et al.*

Interstate Commerce Commission, Ex Parte No. 346, *Railroad General Exemption Authority--Fruits and Vegetables*

Interstate Commerce Commission, Ex Parte No. 297 (Sub-No. 4), *National Motor Freight Classification, Section 5a Agreement, Application No. 61*

**Publications**

"Transportation Markets," with Gloria Hurdle, Henry McFarland and Matthew Wright, *Market Definition in Antitrust: Theory and Case Studies*, American Bar Association, Section of Antitrust Law, 2012.

"Hospital and Physician Services," with David Argue, *Market Definition in Antitrust: Theory and Case Studies*, American Bar Association, Section of Antitrust Law, 2012.

"Imperfect Information, Entry and the Merger Guidelines," with Stuart Gurrea and Allison Ivory, *Issues in Competition Law and Policy*, American Bar Association, 2008

**Publications (continued)**

"*FTC v. Evanston Northwestern:* A Change from Traditional Hospital Merger Analysis?," with David Argue, *Antitrust*, Spring, 2006

"Critical Loss Analysis: It's Growing Use in Competition Law," with Cento Valjanovski, *European Competition Law Review*, 2003

"The Merger Guidelines v. Economics: A Survey of Economic Studies," with David D. Smith, *Antitrust Report*, September 1999. Reprinted in *Perspectives on Fundamental Antitrust Theory*, Section of Antitrust Law, American Bar Association, July 2001. Also reprinted in *Competition Rules for the 21st Century*, Ky Ewing, 2003

"Congress and Antitrust Exemptions: Is Statutory Antitrust Relief Necessary for Health Care Reform," with Kathryn M. Fenton, *The Antitrust Bulletin*, Fall 1996

"Survey of Economic Studies," with David D. Smith, presented at the Federal Trade Commission's Hearings on the Changing Nature of Competition in a Global and Innovation-Driven Age, November 1995

"Balancing Efficiencies and Competition in Evaluating Hospital Mergers," with William P. Hall, *Antitrust Health Care Chronicle*, American Bar Association, Summer 1994

"Vertical Integration and Antitrust in Health Care Markets," with Kathryn M. Fenton, presented at the Sixty-Eighth Annual Western Economic Association Conference, June 23, 1993. Reprinted in *The Antitrust Bulletin*, Summer 1994

"Misunderstanding the Role of Competition in Controlling Health Care Expenditures," with David A. Argue, presented at the 1993 Annual Meetings of the American Bar Association, August 9, 1993. Reprinted in *Health Law Litigator*, American Bar Association, Fall 1993

"An Economist's Perspective of the *Kodak* Decision," remarks before the Antitrust Section of the New York State Bar Association, January 1993

"Analyzing Competitive Effects Under the 1992 Horizontal Merger Guidelines: The Role of Factors Other Than Concentration," remarks before the Practicing Law Institute, November 1992

"FERC's Acceptance of Market-based Pricing: An Antitrust Analysis," with Mark Frankena, *The Electricity Journal*, June 1992

**Publications (continued)**

"The Importance of Factors Other than Concentration in Antitrust Merger Analysis," *International Merger Law*, March 1992

"An Economic Perspective on Recent Hospital Merger Decisions," *International Merger Law*, February 1992

"The Often-Forgotten Role of Price-Cost Margins in Antitrust Merger Analysis," with Joseph J. Simons, *International Merger Law*, February 1991

"The Importance of Factors Other than Concentration in Antitrust Merger Analysis," Remarks before the Antitrust Section of the New York State Bar Association, January 1991

"Focusing Market Definition: How Much Substitution is Necessary?" with Joseph J. Simons, *Journal of Research in Law and Economics*, Fall, 1989. Reprinted in *The Journal of Reprints for Antitrust Law and Economics*, 1991. Also reprinted in *Antitrust and Competition Policy*, Andrew N. Kleit (Ed.), 2005

"Recent Railroad Decisions: An Increased Concern About Competition," *Regulatory Reform*, American Bar Association, November 1986

"Organization: The Effect on Large Corporations," UMI Research Press, 1983

"Competition and Mergers," principal author of staff paper presented at ICC Conference on Railroad Mergers, June 24, 1980

"Coal and Regulatory Burdens," principal author of staff paper presented at ICC Conference on Railroad Rates and Coal, March 1980

"Agricultural Cooperatives and Marketing Orders," with Robert T. Masson and Alison Masson, in *Agricultural Cooperatives and the Public Interest*, University of Wisconsin, 1978

**Boards, Task Force and Advisory Committees**

Martindale Center for the Study of Private Enterprise 2009–Present
Cape Cod Healthcare 2008–Present
Economists Incorporated 2003–Present
Lehigh University Department of Economics 2003–Present
American Bar Association, Section of Antitrust Law, Task Force on
Fundamental Theory 2001–2002

**Boards, Task Force and Advisory Committees (continued)**

Walt Whitman High School All-Sports Booster Club 1997–2001
Wood Acres Citizens Association 1988–1989

# Exhibit 2: Materials Relied On

Report and workpapers of Dr. Gordon Rausser.

Databases of transactions data for regulated and unregulated traffic that was provided by Norfolk Southern and then processed by Compass Lexecon.

Plaintiffs' Complaint, interrogatory and request for admission responses of Plaintiffs and Norfolk Southern, the parties' documents produced in discovery, witness declarations and depositions taken.

**Publicly available materials**

United States Government Accountability Office, Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed, GAO-07-94, October 2006.

Route maps of the NS BNSF, UP, and CSXT.

Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010.

Russell W. Pittman, "Railroads and Competition: the Santa Fe/Southern Pacific Merger Proposal," *The Journal of Industrial Economics,* v. 39, no. 1, September 1990.

Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics*, 10.2 (Autumn, 1979), pp. 463-482. See in particular, Table 4, p. 480.

Bryan, J., Weisbrod, G., Martland, C.D., and Wilbur Smith Associates, Inc., *Rail Freight Solutions to Roadway Congestion – Final Report and Guidebook*, Transportation Research Board, National Cooperative Highway Research Program, 2007

American Bar Association, *Market Definition in Antitrust: Theory and Case Studies*, Chicago Illinois, 2012.

American Bar Association, *Market Power Handbook*, Chicago Illinois, 2011.

Barry C. Harris & Joseph J. Simons, "Focusing Market Definition: How Much Substitution is Necessary?," 12 *Research in Law and Economics*, 207, 210 (1989).

"Major Issues In Rail Rate Cases," STB Ex Parte No. 657 (Sub-No. 1), p. 20.

Laurits R. Christensen Associates, inc. "A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition," Prepared for the Surface Transportation Board, Washington, D.C., November 2009.

U.S. Department of Transportation, "2007 Commodity Flow Survey," available at http://www.bts.gov/publications/ commodity_flow_survey/

Major Rail Consolidation Procedures, 5 S.T.B. 561 (2001).

"Market Dominance Determination—Product and Geographic Competition," STB ex parte no. 627, December 10, 1998, p. 937.

STB Finance Docket No. 34178, Dakota, Minnesota & Eastern Railroad Corporation and Cedar American Rail Holdings, Inc. — Control — Iowa, Chicago & Eastern Railroad Corporation, January 31, 2003, p. 14

"Exemption From Regulation -- Boxcar Traffic," 367 ICC 425 p. 441.

"Improvement Of TOFC/COFC Regulations," 3 I.C.C. 2d 869 p. 878.

Ex Parte No. 661, Transcript of STB Hearing, dated May 11, 2006, p. 313

STB Docket No. 42069 Duke Energy Corporation v. Norfolk Southern Railway Company; STB Docket No. 42070

Surface Transportation Board Decision, STB Ex Parte No. 661, Rail Fuel Surcharges Decided: January 25, 2007.

Duke Energy Corporation v. CSX Transportation, Inc.; STB Docket No. 42072 Carolina Power & Light Company v. Norfolk Southern Railway Company, Decided October 20, 2004.

Bryan, J., Weisbrod, G., Martland, C.D., and Wilbur Smith Associates, Inc., *Rail Freight Solutions to Roadway Congestion – Final Report and Guidebook*, Transportation Research Board, National Cooperative Highway Research Program, 2007

Thomas J. Zlatoper and Ziona Austrian, "Freight Transportation Demand: A survey of recent Econometric Studies," *Transportation*, 16(1), 1989, p. 43.

The Navigation Economic Technologies Program, "A Survey of the Freight Transportation Demand Literature and a Comparison of Elasticity Estimates," IWR Report 05-NETS-R-01, January 1, 2005, pp. 36, 40.

American Bar Association, *Market Definition: Issues and Case Studies*, Chicago Illinois, 2011, p. 236.

Major Rail Consolidation Procedures, 5 S.T.B. 561 (2001).

Tae Hoon Oum, W. G. Waters II, and Jong-Say Yong, "Concepts of Price Elasticities of Transport Demand and Recent Empirical Estimates," *Journal of Transport Economics and Policy*, Volume XXV1, No_2, May 1992, p. 151.

The Navigation Economic Technologies Program, "A Survey of the Freight Transportation Demand Literature and a Comparison of Elasticity Estimates," IWR Report 05-NETS-R-01, January 1, 2005, p. 36.

US Census Bureau's Manufacturers' Shipments, Inventories, & Orders (M3) Survey http://www.census.gov/manufacturing/m3/ historical_data/index.html.

US Energy Information Administration's "December 2012 Monthly Energy Review: Table 6.1, Coal Overview" http://www.eia.gov/totalenergy/data/monthly/#coal.

Texas Transportation Institute, "A Modal Comparison of Domestic Freight Transportation Effects on the General Public," March 2009, Houston, Texas.

"More than Half Full," *Progressive Railroading*, December 2004, pp. 22-30.

Francetta Willet, "The U.S. Producer Price Index for Line-Haul Railroads," September 25, 2005.

William H. Greene, *Econometric Analysis*, Second Edition, Macmillan Publishing, New York, 1993.

Paul Yde and Michael G. Vita, "Merger Efficiencies: Reconsidering the 'Passing-On' Requirement," *Antitrust Law Journal*, Vol. 64, No. 3, Spring 1996, pp. 735-747.

In re Less-Than-Truckload Antitrust Litigation, 2009 WL 323219

Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success," *Journal of Economic Literature*, Vol. XLIV (March 2006)

Levenstein, Margaret, and V.Y. Suslow. 2011. "Breaking Up Is Hard to Do: Determinants of Cartel Duration." *Journal of Law & Economics*, 54(2): 455-492.

Jeffrey E. Zimmerman and John M. Connor, "Determinants of Cartel Duration: A Cross-Sectional Study of Modern Private International Cartels," Draft August 2, 2005.

OECD Policy Roundtables: "Information Exchanges between Competitors under Competition Law 2010."

George Stigler, "A Theory of Oligopoly," *Journal of Political Economy*, 72(1) pp. 44-61 (1964), at 46.

EIA, World Energy Outlook, Washington, D.C., January 2003, p. 96.

Standard Transportation Commodity Code Tariff STCC 6001-V.

Annual Reports and 10-K forms of the Norfolk Southern 2002-2008. R-1 forms of the Norfolk Southern 1999-2008.

Norfolk Southern's 10-Q for the first quarter of 2004

Annual Report CSX 2008

**Websites**

http://www.nscorp.com/nscportal/nscorp/map.html

http://nationalatlas.gov/articles/transportation/a_freightrr.html

research.stlouisfed.org/fred2/

www.sourceconsulting.com/blog/wp-content/uploads/2011/04/UPS-and-FedEx-Fuel-Surcharge-History.pdf

www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/wti_daily.html.

www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/NS8003_history.html.

www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/history_fsc2.html.

www.nscorp.com/nscportal/nscorp/Customers/Public-Prices/fuel_news2.html

ns_unreg_stcc_ptm_clean.xlsx.

http://www.oecd.org/about/

www.uprr.com/customers/surcharge/index_revenue.shtml.

**Other materials**

List of AIILF contracts

Descriptions of FSC notes from 9255

Norfolk Southern's "Weekly Fuel Surcharge Announcement," of July 31, 2007 and July 29, 2008.

Interview with David Lawson

# Intentionally Omitted

# DA00354 - DA00512

HIGHLY CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION**

**MDL DOCKET NO. 1869**

# EXPERT REPORT OF DR. JOHN H. JOHNSON, IV

## TABLE OF CONTENTS


I. QUALIFICATIONS....1

II. ALLEGATIONS AND ASSIGNMENT....1

III. SUMMARY OF CONCLUSIONS....4

IV. CSXT, CSXI, AND U.S. FREIGHT TRANSPORTATION....12

V. CSXT'S AND CSXI'S FREIGHT BUSINESS....20

VI. THE NATURE OF COMPETITION FOR CSXT'S AND CSXI'S FREIGHT SERVICES....26
- A. Relationship between CSXT and the Other Defendant Railroads....27
- B. Competition between CSXT and Other Transportation Modes....30
- C. CSXT's Pricing of Rail Freight Services....36
- D. Differences between CSXT's and CSXI's Competitive Environment and Pricing of Rail Freight Services....40

VII. THE EFFECTS OF RISING FUEL COSTS ON CSXT'S AND CSXI'S BUSINESS....42
- A. Prior to 2000, CSXT and CSXI Historically Recovered Fuel Costs in the Base Rates....42
- B. Fuel Prices Nearly Tripled Unexpectedly in 1999 and 2000....44
- C. CSXT's Integration of the Conrail Assets and a Weak Economy Created an Environment of Rising Operational Costs in 2000....48
- D. RCAF(u) Became an Increasingly Ineffective Method for Fuel Recovery as Costs Rose....50
- E. CSXI and CSXT Implemented Different Fuel Surcharge Formulas in 2000....51
- F. The Weak Economy and CSXT Operational Issues Continued Through 2003....57
- G. Deficiencies in the 2000 CSXT FSC Formula Were Corrected in 2003....58
- H. CSXI Modified Its Published FSC Formula in 2004....65
- I. Fuel Costs Rose in an Unprecedented Fashion through the Class Period....66
- J. CSXT Changes to Mileage-Based FSC after STB Decision....72

VIII. SUMMARY OF DR. RAUSSER'S LIABILITY OPINIONS....75

IX. FLAWS IN DR. RAUSSER'S LIABILITY OPINIONS....77
- A. Dr. Rausser's Analysis of Competition and Industry Structure Is Inconsistent with Basic Facts about CSXT's and CSXI's Freight Transportation Business....77
  1. Dr. Rausser Improperly Draws Conclusions about Market Shares, Concentration, and Market Power without Defining a Relevant Antitrust Market....78
  2. Dr. Rausser Misrepresents the Nature of Competition between the Defendants....82
  3. Dr. Rausser Misrepresents the Nature of Inter-Defendant Communications....85
- B. Dr. Rausser's Characterization of the Timing and Structure of the Accused FSC Formulas Is Inconsistent with CSXT's and CSXI's Actual Implementation of FSCs and the Benefits Anticipated from Adoption....89

1. Dr. Rausser Misrepresents the Chronology of Events ..... 89
2. The Nature of the FSC Formulas Is Inconsistent with Dr. Rausser's Characterizations of a "General Price Increase" ..... 93

C. Dr. Rausser Misinterprets FSC Coverage Levels as Proof of Conspiracy ..... 95
1. Dr. Rausser Mischaracterizes CSXT's and CSXI's Implementation of the Accused FSC Formulas ..... 95
2. Goals of CSXT and CSXI with Respect to FSC Coverage ..... 96
3. Quantifying CSXT's and CSXI's FSC Coverage ..... 100
4. CSXT and CSXI Negotiated Discounts and Other Exceptions to the Accused FSC Formulas ..... 107

D. CSXT and CSXI Did Not "Over-Recover" Their Cumulative Incremental Fuel Costs ..... 124
1. Dr. Rausser's Calculations of Fuel-Cost Recovery Are Flawed ..... 125
2. CSXT and CSXI Sought to Avoid "Over-Recovery" of Their Cumulative Incremental Fuel Costs ..... 128

E. Dr. Rausser Misrepresents the Relationship between CSXT's Hedging Activities and Fuel Recovery Programs ..... 132
1. CSXT's Temporary Hedging Program Was an Independent, Economically Rational Response to the Limitations of Its FSCs ..... 133
2. Even When Including the Results of Its Temporary Hedging Program, CSXT and CSXI Did Not "Over-Recover" during the Class Period ..... 134
3. Dr. Rausser's Assertions about CSXT's Hedging Program Are Unsupported ..... 136

F. Dr. Rausser's Conclusions Regarding CSXT and CSXI Fuel Efficiency Gains Are Incorrect ..... 139
1. CSXT's and CSXI's Efficiency Gains Are Not Costless but Rather a Result of Capital Expenditure ..... 140
2. Increases in Fuel Costs More than Offset Efficiency Gains ..... 143

G. CSXT's Use of the AII-LF Index Was Consistent with Its Independent Business Interests ..... 144

X. JOINT COMMUNICATIONS ..... 145

A. Dr. Rausser Ignores the Necessity of Communications between Joint-Line Partners ..... 147
B. The Actual Nature and Context of the Communications Cited by Dr. Rausser ..... 147

XI. COUNTERFACTUAL ANALYSIS ..... 150

A. A Damages Model Must Properly Account for the Counterfactual Scenario ..... 150
B. Dr. Rausser's Model Is Based on the Unreasonable Assumption That Class Members Would Have Paid Essentially Zero Fuel Surcharge But For the Alleged Conspiracy ..... 151
C. Plaintiffs' Assumption about the Counterfactual Scenario Is Inconsistent with Available Benchmarks ..... 153
D. The Accused CSXT and CSXI Published FSC Formulas Were Similar to the Formula Introduced in 2000 ..... 155
E. Dr. Rausser's Model Generates Illogical Results When Applied to Individual Class Members ..... 157

XII. DR. RAUSSER'S ECONOMETRIC DAMAGES MODEL IS FATALLY FLAWED ..... 161

A. Description of Dr. Rausser's Damages Model ..... 161

B. A Single Correction to Dr. Rausser's Damages Model Illustrates That His Model Is Unable to Distinguish between the Alleged Conspiracy and Factors Unrelated to the Conduct at Issue ..... 163

APPENDIX A. CURRICULUM VITAE OF DR. JOHN H. JOHNSON, IV ..... 168

APPENDIX B. MATERIALS RELIED UPON ..... 179

## I. QUALIFICATIONS

1. I am the President and CEO of Edgeworth Economics, L.L.C. ("Edgeworth") and an Affiliated Professor at Georgetown Public Policy Institute. Edgeworth is a consulting firm that provides clients with objective expert economic and financial analysis for complex litigation and public policy debates. Edgeworth's experts work in the areas of antitrust, data management, class certification, intellectual property, and labor and employment. At Georgetown, I teach a course on *Antitrust and Public Policy*, which covers topics including price fixing, monopolization, damages in antitrust cases, and merger analysis. Currently, I am also on the Editorial Board of the *Antitrust Law Journal*.

2. I received my B.A. *magna cum laude* with highest distinction in Economics from the University of Rochester and my Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT"). My areas of specialization at MIT were econometrics—the application of statistics to economics—and labor economics. During my career as a professional economist, I have provided economic analysis in a wide range of litigation matters involving antitrust, labor and employment, damages calculation, and statistics. Prior to my employment as an economic consultant, I was an Assistant Professor of Economics and Labor and Industrial Relations at the University of Illinois at Urbana-Champaign, where I taught courses in labor economics.

3. A substantial portion of both my consulting practice and my academic research focuses on price fixing in antitrust matters and the calculation of damages in cartel matters. I have testified and provided consulting on a wide-range of antitrust matters involving Section 1 and Section 2 allegations and class certification issues. I have also written numerous papers and given many talks on topics related to class certification, scientific standards in litigation, appropriate use of econometrics in litigation, and antitrust damages. My curriculum vitae, which includes a list of my previous expert testimony and publications, is attached as Appendix A to this report. My firm, Edgeworth Economics, is compensated for my work and the work of my staff on this matter on a fixed-fee basis. The fixed fee is $2 million and is not in any way contingent upon the outcome of this litigation.

## II. ALLEGATIONS AND ASSIGNMENT

4. Plaintiffs allege that the four defendant railroads—BNSF Railway Corporation ("BNSF"), Union Pacific Corporation ("UP"), CSX Transportation, Inc. ("CSXT"), and Norfolk Southern Railway Company ("NS") (collectively, the "Defendants")—conspired beginning in the first half of 2003 to fix the prices of rail freight transportation services sold in the United States by coordinating the setting and

implementation of rail freight fuel surcharges ("FSCs") applied as a percentage of the base rate for freight transportation.[1] I understand the Court has certified the following class of direct purchasers:

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").[2]

5. I have been asked by counsel for Defendant CSXT to provide an assessment of the opinions of Plaintiffs' expert Dr. Gordon Rausser.[3] Dr. Rausser's opinions can be summarized as follows:

- Characteristics of the U.S. rail freight industry—including, purportedly, high concentration, high barriers to entry, interchangeable service among the Defendants, inelastic demand, and opportunities to communicate between the Defendants—imply that the industry is "conducive to price fixing."[4]

- The Defendants' behavior—indicated by statements in business documents (as interpreted by Dr. Rausser), the implementation of purportedly similar FSCs and other supposed changes in behavior at the start of the Class Period, a supposed "structural break" in the relationship between freight rates and fuel prices starting at the beginning of the Class Period, and the supposed lack of "economic correspondence" between the FSCs and Defendants' actual fuel costs—"evidences collusion."[5]

- Common evidence and economic analysis—in particular, a single regression equation based on transaction data prior to and during the alleged conspiracy—can be used to determine the

---

[1] Second Consolidated Amended Class Action Complaint, *In Re Rail Freight Fuel Surcharge Antitrust Litigation* ("Complaint"), December 31, 2009, pp. 2-3. I understand Plaintiffs have not alleged any conspiracy with respect to FSCs that were not applied as a percentage of the base rate, such as mileage-based FSCs. [Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs, January 4, 2012 ("January 2012 Supplemental Responses"), p. 15]

[2] Opinion, *In Re Rail Freight Fuel Surcharge Antitrust Litigation* ("Class Opinion"), June 21, 2012, p. 6. Excluded from the class are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal government entities, and (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.

[3] Expert Report of Gordon Rausser, Ph.D., October 15, 2012 ("Rausser Report").

[4] *Ibid*, pp. 5-6.

[5] *Ibid*, pp. 6-8.

impact of the alleged conspiracy on class members. This analysis purportedly indicates that there was no "material" or "systematic" discounting of base rates to offset FSCs and that all class members paid an "overcharge" averaging 13.6 percent during the Class Period.[6]

6. In response to Plaintiffs' allegations and Dr. Rausser's expert report, I have been asked to:

- Analyze and explain the different businesses and conduct of CSXT and CSX Intermodal, Inc. ("CSXI") before and during the Class Period.[7]
- Analyze and explain the basic economic context in which CSXT and CSXI compete in the freight transportation industry.
- Provide the economic contexts for CSXT's and CSXI's respective adoption and implementation of FSCs.
- Assess whether the conduct that Dr. Rausser points to as proof of conspiracy is consistent with the unilateral self-interest of CSXT and CSXI.
- Assess whether CSXT's and CSXI's implementation of FSCs during the Class Period caused "over-recovery" of fuel costs and analyze the economic relevance of any such "over-recovery" to the question of whether either conspired as alleged.
- Assess whether CSXT's and CSXI's respective behavior changed during the Class Period relative to the period prior to the alleged conspiracy in a manner that is inconsistent with unilateral competitive self-interest.
- Explain how economists think about the counterfactual scenario (that is, a hypothetical scenario in which the alleged conspiracy did not exist, assuming the alleged conspiracy actually did exist) and why Dr. Rausser's conclusions do not account for certain economic realities of the actual world as well as actual and counterfactual prices.
- Assess how CSXT's and CSXI's fuel-cost recovery would have been different under alternative or counterfactual fuel recovery formulas posited by Dr. Rausser and Plaintiffs.

[6] *Ibid*, pp. 8-11, 139.

[7] CSXI, which was an intermodal freight service provider during the relevant time period, has not been named as a defendant in the complaint. However, since Dr. Rausser offers opinions implicating CSXI in the alleged conspiracy and finding damages on CSXI shipments subject to revenue-based FSCs during the Class Period, I analyze and address CSXI's conduct and the economic context for its business as well.

- Provide an assessment of the propriety and accuracy, based on economic and statistical principles, of the econometric damages model proposed by Dr. Rausser.
- Otherwise evaluate and respond to Dr. Rausser's analyses and opinions in this case.

7. In preparation of this report, I conducted an economic analysis of the freight transportation industry, including rail freight. As part of my analysis, I interviewed personnel currently or formerly employed by CSXT or CSXI; toured CSXT's Moncrief Rail Yard; visited CSXT's regional dispatch center in Jacksonville, Florida; and reviewed deposition testimony, documents in the record, and publicly available information. I also conducted various analyses of CSXT's and CSXI's data produced in this litigation—including data regarding rail pricing, fuel expenditures, and hedging. In addition, I reviewed and analyzed the reports and back-up materials provided by Plaintiffs' expert Dr. Rausser, as well as transcripts of his depositions. A list of materials which I relied upon to develop my opinions is attached at Appendix B.[8]

## III. SUMMARY OF CONCLUSIONS

8. Based on my analysis to date, I have reached the following conclusions:

9. *Railroads compete not only against other railroads, but also against other surface transportation modes including trucks, barges, and pipelines for the movement of freight.* Competition in the surface freight transportation sector depends in part on the specific location (including origin and destination) of the customer and the commodity being shipped. Depending on these circumstances, examples of competitive options available to shippers may include another one of the Defendant railroads as well as non-Defendant railroads, trucks, pipelines, or barges. Certain shippers under some circumstances also may have the option of changing the origin or destination of the commodity being shipped, or even changing the commodity itself, which could bring other transportation options to bear. Other customers under some circumstances may have no other economically attractive option for freight transportation other than the serving railroad. Thus, any evaluation of competition for freight business must be conducted on a case-by-case basis, taking account of the corresponding circumstances of each case, a view that is confirmed by the route-specific approach taken by the STB in assessing competition in rate disputes and merger reviews.

---

[8] If additional information is provided to me in this litigation, I will analyze it and consider it as part of my opinions and supplement this report, as appropriate.

10. *Pricing of rate-unregulated shipments (those at issue in this case) in the rail freight industry frequently involves individualized, private negotiations, with adjustments to terms, including any FSC, based on customer- and location-specific conditions.* CSXT and CSXI price freight services through both public tariffs and individual negotiations. Individual negotiations can take the form of one-time private price quotes for a single or limited number of shipments or confidential contract negotiations covering shipments over periods as long as several years. Because of the private nature of these discussions, pricing on most of CSXT's and CSXI's unregulated transactions would not have been known to the other Defendants, with the only potential exceptions being joint-line (or "through") rates on CSXT's and CSXI's interline shipments. These would be known only to the connecting Defendant exchanging such shipments with CSXT or CSXI. The Defendants could not monitor and enforce any alleged agreement, since—as Dr. Rausser acknowledges—they did not know the base rates or FSCs, as well as any other contract terms, for the majority of one another's transactions that supposedly were covered by the alleged conspiracy. In addition, the private negotiations reflect the critical role of demand-based differential pricing—i.e., the pricing of unregulated freight differentially by customer—based on the specific requirements of each customer related to, among other possible factors, the commodity type, location of the origin and destination, delivery time requirements, and, more generally, the other transportation options available to that customer given those requirements. CSXT and CSXI frequently adjusted both the base rates and FSC, including waiving an FSC altogether, and made other concessions during the course of negotiations to respond to competitive conditions. Such conduct is consistent with CSXT's and CSXI's unilateral competitive self-interest and inconsistent with the alleged conspiracy.

11. *During the Class Period, CSXT and CSXI operated as separate business entities with different fuel-cost recovery programs.* During the Class Period, CSXI was a separate company from CSXT and the personnel at CSXI with day-to-day decision-making responsibility regarding pricing and FSCs were different from those with the same responsibility for CSXT. There are notable differences between CSXI and CSXT with respect to pricing. First, there is no "rate-regulated price" for intermodal traffic because it is exempt from regulation. Second, for the intermodal business, trucking provides an even stronger competitive constraint. Third, customers for CSXI included third parties who coordinate logistics for end customers. As a result of its dealings with these brokers, CSXI sometimes competed with CSXT (without even knowing it at times) for certain customers. Fourth, I understand that CSXI's contracts tended to be shorter in length. Fifth, CSXI was itself a *customer* of CSXT and paid CSXT for the rail portion of intermodal shipments. In response to the different competitive dynamics facing CSXI and CSXT during the Class Period, the two entities adopted and implemented different FSC formulas at

different times, a clear contradiction to Plaintiffs' assertions about "common" or "uniform" FSC policies across Defendants.

12. *CSXT's 2000 and 2003 published FSC formulas and CSXI's 2000 and 2004 formulas, as well as the companies' policies about coverage, were economically rational, individual responses to the problem of rapidly rising and volatile fuel prices before and during the Class Period.* As fuel prices spiked in 1999 and 2000, CSXT and CSXI each needed a method to recoup short-term increases in costs, since repeatedly adjusting base rates would not be practical (or effective depending on the volatility of fuel prices) and pre-existing cost indices increasingly failed to track the rapidly moving fuel costs. This problem was especially severe during the Class Period when fuel prices reached historically high levels and experienced unprecedented volatility. Base rates and historic cost-recovery mechanisms, such as the Rail Cost Adjustment Factor ("RCAF"), were unable to keep up with rapidly rising and increasingly volatile prices, causing CSXT and CSXI to under-recover actual fuel costs. Since every shipment incurs fuel costs, the companies had unilateral incentives to recover costs on as many shipments as possible, as Dr. Rausser acknowledges. CSXI, in intense competition with trucking, implemented a published FSC in March 2000 based on the Department of Energy's HDF index. Subsequently, in October 2000, CSXT implemented a published FSC based on the WTI index. In the face of even more rapidly rising and increasingly volatile fuel prices in 2003 and 2004, the CSXT and CSXI 2000 FSC formulas proved ineffective at actually recovering incremental fuel costs. CSXT changed its published FSC formula in March 2003 to make it more responsive to increasingly rapid changes in fuel prices with the addition of incremental $1 triggers and basing the FSC on the monthly average WTI index from two months prior. In October 2004, CSXI modified its 2000 published FSC formula by raising the trigger price and adjusting the increments. This history is entirely consistent with independent action by CSXT and CSXI in response to the problem of rapidly rising and increasingly volatile fuel prices.

13. *Dr. Rausser misrepresents the nature of competition in the freight transportation industry.* Dr. Rausser claims that rail freight service is a "highly concentrated" market, that the Defendants collectively have "huge market share," and that services are "interchangeable across Defendants." Dr. Rausser's claims, which are fundamental to his entire analysis and resulting opinions, are belied by the evidence. There is no single national freight rail "market," as Dr. Rausser assumes in his report. In fact, Dr. Rausser disavowed this assumption in his deposition. The Defendants face competition from, at least, other railroads, trucking, waterborne transport, and pipelines, which Dr. Rausser ignores in his claims about a purported "market" in which Defendants allegedly conspired. Furthermore, any ability held by the Defendants to sustain prices above the competitive (i.e., non-conspiratorial) level would

depend on the particular conditions that affect each customer's ability to shift its freight to transport alternatives other than the Defendants. An analysis of the actual competitive environments in which CSXT and CSXI operated demonstrates that those conditions vary customer by customer and even route by route for individual customers, as the Surface Transportation Board ("STB") acknowledges through its analytical framework for assessing competitive conditions affecting freight rates for particular routes. Dr. Rausser's claim that rail services offered by the various Defendants are "interchangeable" ignores the location-specific requirements of many customers, which leave some customers—including all the named Plaintiffs—served by only one of the Defendants. His claim also ignores the nature of interline relationships between the Defendants. Indeed, Dr. Rausser admits that Defendants in fact are *not* interchangeable for all shippers and that certain shippers do not benefit, directly or indirectly, from rail-to-rail competition. Dr. Rausser has not conducted any analysis to identify these shippers among the class members. Dr. Rausser's failure to properly recognize the competitive role of non-Defendant suppliers of freight transportation services and the differences in competitive options available for each customer, which, as a matter of economics, is a prerequisite for an analysis regarding the conduciveness of the "market" to collusion, is fatal to his analyses and renders his opinions economically unsound. The evidence demonstrates that the alleged anticompetitive agreement would have very different effects across class members, including potentially no effect at all, depending on each customer's transportation options. In contrast, the purported agreement asserted by Dr. Rausser and his model of damages are based on a uniform overcharge applied to all CSXT and CSXI customers. Even assuming the presence of a conspiracy as alleged by Plaintiffs, such a model is inconsistent with the realities of the marketplace—and basic economic principles—and would generate inaccurate estimates of damages for this reason, irrespective of its other problems.

14. *Dr. Rausser misrepresents the potential for monitoring and enforcing the alleged agreement among the Defendants.* Dr. Rausser also asserts that "price monitoring [in the freight rail industry] is relatively easy." Dr. Rausser, however, ignores key aspects of the freight rail industry in his analysis, in particular the confidential nature of contract terms—including base rates and FSCs. He acknowledges that confidential rates and FSC's were not exchanged among Defendants (outside of joint-line rates established on a bi-lateral basis between connecting Defendants on their shared interline traffic). Monitoring and enforcing a conspiracy as alleged by Plaintiffs would require constant communications among the Defendants regarding rates and other contract terms on competing routes, requiring transfers of large quantities of information (given the thousands of contracts each Defendant negotiated during the Class Period). Dr. Rausser cites no evidence that the Defendants engaged in such communications. Even assuming such extensive communications were feasible, Dr. Rausser ignores the costs each Defendant would incur to engage in those communications and to conceal them from the public. He

further ignores the costs of potential antitrust liability that would accompany any agreement of the type alleged by Plaintiffs. Dr. Rausser does not quantify these costs and offers no basis for concluding that the benefits of the alleged conspiracy anticipated in the first half of 2003 outweighed the costs (and burdens) of implementing, monitoring, and enforcing such a conspiracy as well as the costs associated with potential antitrust liability.

15. *Dr. Rausser mischaracterizes the history of FSC implementation.* Dr. Rausser's assertion that the Defendants conspired to fix FSC formulas is belied by the fact that even CSXT and CSXI had different formulas in place. When CSXT introduced its published FSC formula in October 2000, CSXI already had a *different* published formula in place. The published formulas changed subsequently at different times and in different ways by different decision makers—consistent with the fact that the two companies were operating independently in and responding unilaterally to distinct competitive environments. Dr. Rausser's claim that the published FSC changes in 2003 and 2004 were "more aggressive" is neither economically meaningful nor factually correct. Furthermore, the nature of CSXT's and CSXI's FSC formulas is inconsistent with Dr. Rausser's characterizations of them as a "general price increase." Neither CSXT's nor CSXI's published FSC formulas were applied "generally" to all customers in a uniform manner. Many CSXT and CSXI customers paid no FSC on certain transactions during the Class Period, while others paid a discounted surcharge that was not common to all other class members. Moreover, based on economic conditions at the time of the alleged formation of the conspiracy in 2003, the Defendants would have had no confidence that the FSC would constitute a "general price increase." Dr. Rausser's own report and testimony characterize the understanding held by the Defendants around the time of the initiation of the alleged conspiracy as expecting fuel costs to remain relatively stable for more than a decade. Given these facts, as alleged by Dr. Rausser, CSXT and CSXI would have had little incentive to engage in the alleged conspiracy. If fuel prices were to remain within the predicted band that Dr. Rausser observes was anticipated in early 2003—prior to the Class Period—the accused FSC formulas would not have resulted in *any* price increase during the Class Period. Finally, the changes in CSXT's FSC formula in 2003 and CSXI's FSC formula in 2004 could have resulted in a *decrease* in revenue, relative to the formula it replaced, depending on the specific trajectory of oil prices.

16. *Dr. Rausser misrepresents FSC coverage levels and ignores actual coverage levels that were inconsistent with the alleged conspiracy.* In support of his claim that "[t]he Defendants' behavior during the Class Period evidences collusion," Dr. Rausser asserts that Defendants "instigated a common rate increase" and "adopted policies to ensure their common goal of achieving 100% Fuel Surcharge coverage." He further claims that "[t]here were dramatic differences in the behavior of the Defendants

between the pre-Class Period and the Class Period, concerning the increased use of Fuel Surcharges and the Defendants' refusal to negotiate with shippers concerning those Fuel Surcharges." Dr. Rausser, however, mischaracterizes the actual history of FSC coverage at CSXT and CSXI. Dr. Rausser acknowledges that CSXT and CSXI each had an independent interest in expanding coverage of FSCs to deal with the problem of rapidly rising and highly volatile fuel prices. Notwithstanding this incentive, neither CSXT nor CSXI implemented a common or universal FSC across all customers during the Class Period. Indeed, coverage never reached more than about 65 percent during the Class Period. Even this figure, however, overstates the extent to which CSXT's and CSXI's respective FSC implementation was "uniform," since each entity negotiated trigger points, discounts, caps, or other adjustments (such as RCAF, other indices, or fixed escalators) to both the accused CSXT and CSXI formulas. Moreover, the data on CSXT's and CSXI's respective FSC coverage indicate no particular change in behavior around the purported start of the conspiracy in July 2003. To the contrary, the data show a slow, consistent increase in coverage beginning prior to and continuing through at least the end of the Class Period. All of this evidence is consistent with independent action by CSXT and CSXI to deal with the continued problem of rising fuel prices throughout the Class Period and provides no basis to conclude that either company engaged in a collusive agreement with the other Defendants.

17. *CSXT and CSXI did not "over-recover" cumulative incremental fuel costs through FSCs; moreover, such "over-recovery," even if evident, would not be inconsistent with independent actions based on unilateral self-interest.* Dr. Rausser claims that the Defendants' accused FSC formulas "did not recover only actual fuel costs" and that there was "[n]o economic correspondence between revenue-based fuel surcharges and any actual increase in fuel prices." Dr. Rausser, however, conducted no direct analysis comparing Defendants' fuel costs to their FSC revenues during the Class Period. The analyses that he presents do not accurately measure actual recovery by the Defendants. I have analyzed the evidence in the record regarding CSXT's and CSXI's design and implementation of the accused FSC formulas with respect to the recovery of fuel costs. I conclude that Dr. Rausser has mischaracterized this information in support of his conclusion about over-recovery. The evidence indicates that CSXT and CSXI sought to avoid "over-recovery" of cumulative incremental fuel costs through FSC revenues. Further, based on my analysis of their contemporaneous estimates of fuel-cost recovery, I find that CSXT and CSXI never did so. I further conclude that the performance of CSXT's and CSXI's FSC formulas provides no evidence that either company engaged in an anti-competitive agreement and is fully consistent with unilateral, competitive action.

18. *Dr. Rausser misrepresents the relationship between CSXT's hedging activities and fuel-cost recovery programs.* Dr. Rausser asserts that the accused FSC formulas "ignored the benefits of hedging

programs some individual Defendants had in place" and provide "further evidence that a collusive agreement [regarding FSCs] was in place." These claims misrepresent the relationship between CSXT's FSC implementation and its hedging activities. CSXT's hedging program, which was implemented for a period of only about one year during the initial stages of the Class Period, was an entirely rational response to the problem of fuel price volatility, from the perspective of CSXT's independent business interests, given the fact that CSXT (and CSXI) were not recovering their incremental fuel costs, even under the existing FSC formulas and other recovery mechanisms. The fact that CSXT had a temporary hedging program for part of the time that it had FSCs in place provides no evidence of a collusive agreement. In fact, several non-Defendant railroads and other transportation companies for which no price fixing has been alleged had both hedging programs and FSCs in place simultaneously. Moreover, although it is my opinion that the performance of CSXT's and CSXI's fuel-cost recovery programs are most reasonably evaluated in isolation from any concurrent hedging activities, I find that CSXT and CSXI did not over-recover incremental fuel costs during the Class Period, even when including the benefits of the hedging program.

19. *Dr. Rausser's claims about efficiency gains do not support allegations of a conspiracy.* Dr. Rausser's claim that Defendants' alleged failure to pass on fuel efficiencies is evidence of collusion is both incorrect and unsupported. Dr. Rausser provides no analysis of how any fuel efficiency improvements (as opposed to general efficiency improvements) would have affected FSC formulas or base rates, no analysis of the magnitude of any fuel efficiency improvements for CSXT or CSXI, and no analysis of whether any of these improvements were reflected in FSC formulas or base rates before the Class Period. During the Class Period, CSXT and CSXI made substantial investments to increase capacity and more efficiently meet rail traffic demand, which were funded in part by financial gains (or savings) from the same efficiency improvements Dr. Rausser claims should have been passed on to shippers through lower FSCs or base rates. Dr. Rausser offers no principled or factual basis for such a claim, nor does he consider—much less account for—the negative impact his claimed approach to efficiency gains would have had on CSXT's and CSXI's operations and infrastructure, and ultimately shippers.

20. *CSXT's use of the All Inclusive Index Less Fuel ("AII-LF"), in conjunction with a rate-based FSC, was consistent with its independent business interests.* Dr. Rausser asserts that the Defendants "conspired" to create the AII-LF through the AAR in order to facilitate the implementation of the new surcharges. Dr. Rausser, however, fails to recognize that use of a cost index that excluded fuel was an economically rational component of a unilaterally implemented fuel-cost recovery strategy. Notwithstanding this problem, Dr. Rausser also ignores the further point that CSXT did not immediately

use the AII-LF and eventually applied it to only a small portion of freight transactions during the class period. At a minimum, this fact suggests that the new index could not have been an essential, or even particularly important, component of CSXT's pricing or fuel-cost recovery initiatives. CSXT's late and limited usage of the AII-LF is inconsistent with any hypothetical agreement among the Defendants to collusively create and adopt the AII-LF.

21. *Observed inter-Defendant communications are consistent with unilateral action, particularly given the requirements and economic incentives of interline partnerships.* Communications by CSXT and CSXI executives with other Defendants are not only consistent with each company's unilateral self-interest, but also are consistent with the legal and regulatory framework in which they operate. Dr. Rausser's conclusion that the Defendants engaged in an illegal conspiracy, which is based primarily on his review and interpretation of interline communications, cannot be based on his expertise as an economist. Specifically, as an economist, Dr. Rausser has no special expertise that allows him to interpret any conduct as proof of an actual conspiracy. An economist can opine only on whether such conduct is consistent with a firm acting in its unilateral self-interest. Based on my review of the documents Dr. Rausser cites, I conclude that they are indeed consistent with CSXT and CSXI acting in their own economic self-interest.

22. *Dr. Rausser's damages model implies an unreasonable counterfactual scenario.* As recognized by Plaintiffs, FSCs, such as those implemented unilaterally by each Defendant prior to the Class Period, generally are legitimate means for railroads to adjust pricing in response to changes in fuel costs. Under these circumstances, an appropriate damages model should predict whether each class member would have been subject to an FSC formula or other fuel recovery mechanism in its rate negotiations with the Defendants during the Class Period and the amount that class member would have paid, but for the alleged conspiracy. Dr. Rausser's model, however, is based on the unreasonable assumption that class members would have paid essentially zero FSCs during the Class Period but for the alleged conspiracy. This assumption is also inconsistent with the fact that the accused CSXT and CSXI formulas were very similar to the ones that existed prior to the alleged conspiracy (or, in the case of the CSXI formula for the first 15 months of the Class Period, identical to that which existed prior to the Class Period). Dr. Rausser's assumption is also inconsistent with the fact that class members paid FSCs that were comparable to (if not less than) those paid by "legacy" customers—i.e., those customers paying a revenue-based FSC pursuant to a contract initiated prior to the Class Period). Finally, the unreasonableness of Dr. Rausser's damages model is perhaps best established by the fact that the damages attributed to CSXT and CSXI exceed—substantially, for much of the Class Period—their respective FSC revenues, which would mean that neither company would have recovered any of its

actual incremental fuel costs in the counterfactual scenario throughout much of the Class Period. Dr. Rausser himself implicitly acknowledges this fatal flaw in his model by conceding that CSXT and CSXI would have recovered their respective incremental fuel costs in the counterfactual scenario.

23. *Dr. Rausser's damages model, when properly specified, yields no damages for Class Members who shipped with CSXT or CSXI.* Dr. Rausser uses a regression model to estimate damages for the class where he compares all-in freight rates in the Class Period with all-in freight rates prior to the Class Period (i.e., the pre-Class Period or the "pre-period") controlling for a number of factors. In order to demonstrate that Dr. Rausser's "before-after" model does not appropriately distinguish between the alleged conspiracy and factors unrelated to the conduct at issue when estimating his overcharge for CSXT and CSXI (which he calculates only on a combined basis), I present a straight-forward extension of Dr. Rausser's damages model—I introduce legacy transactions *in the Class Period* that Dr. Rausser excluded from his regression dataset. The inclusion of these transactions provides an opportunity to control for any non-conspiratorial factors that potentially influenced all-in rates during the Class Period since, as Dr. Rausser acknowledges, these transactions were unaffected by the alleged conduct. When I re-estimate his model simply controlling for these contemporaneous factors that would be expected to have affected both legacy and "affected" contracts, Dr. Rausser's damages estimate for CSXT and CSXI combined is *negative* 3.4 percent, indicating there was no overcharge for the transactions at issue. This result demonstrates that Dr. Rausser's damages model grossly overstates damages for CSXT and CSXI. Further, his regression results provide no support for the conclusions he draws about the existence of a conspiracy or the amount of damages.

## IV. CSXT, CSXI, AND U.S. FREIGHT TRANSPORTATION

24. Defendant CSXT is a U.S. Class I railroad providing rail freight transportation services to its customers.[9] Dating back to the Baltimore and Ohio Railroad in 1827, CSXT has evolved through numerous mergers and consolidations to its present state.[10]

25. CSXT's rail business incorporates a transportation supply chain through a 21,000 mile rail network. As Exhibit 1 shows, CSXT's rail operations lie in the eastern half of the United States—spanning 23 states east of Mississippi as well as the District of Columbia—and the Canadian provinces of Ontario and Quebec. The CSXT rail network reaches 70 ocean, river, and lake ports along the

[9] CSX Corporation Annual Report, 2007, Shareholder letter and p. 117. (A Class I railroad is defined by the STB as having annual revenues over $250 million. [www.stb.dot.gov/stb/faqs.html])

[10] CSX Corporation, "Our Evolution and History," available at www.csx.com/index.cfm/about-csx/our-evolution-and-history (accessed January 16, 2013).

Atlantic and Gulf Coasts, Mississippi River, Great Lakes, and the St. Lawrence Seaway.[11] In 2007, the company operated more than 4,000 locomotives and its average daily fleet of cars-on-line consisted of 222,000 rail cars.[12] In addition, CSXT serves customers through track connections with some 230 independent short-line and regional railroads.[13]

**EXHIBIT 1**
**CSXT RAIL NETWORK**




Source: CSX Corporation 2011 10-K, p. 14.

[11] CSX Corporation 2007 Form 10-K, p. 68.

[12] *Ibid*, p. 14.

[13] *Ibid*, p. 68.

26. CSXI provides intermodal services, which link customers to railroads via trucks and terminals. Containers and trailers are loaded and unloaded from trains on chassis, and trucks provide pickup and delivery between terminals and customers.[14] Intermodal has been the fastest growing rail-related transportation area over the past 25 years, with a current national network of more than 25,000 chassis and 12,000 containers.[15] In 2007, CSXI serviced 51 intermodal terminals in 22 states, with a network that largely overlaps its direct rail network in the eastern U.S.[16] (See Exhibit 2).

[14] *Ibid*, p. 68.

[15] Association of American Railroads, "An Overview of America's Freight Railroads," July 2012, p. 2; and CSX Corporation 2007 Form 10-K, p. 16.

[16] CSX Corporation 2007 Form 10-K, p. 16.

**EXHIBIT 2**
**CSXI CORE NETWORK**




Source: CSXI, "Intermodal Network," available at www.csxi.com/share/csxicustomer/main/docs/Core_2008_08-REF24487.pdf (accessed January 17, 2013).

27. There are presently seven Class I freight railroads in the U.S., including the four Defendants which are the largest of the Class I railroads, plus a number of smaller Class II and regional/local railroads.[17]

[17] Surface Transportation Board, "FY 2011 Annual Report," p. 79. (A Class II railroad is defined by the STB as having annual revenues between $20 million and $250 million in 1991 dollars. [www.stb.dot.gov/stb/faqs.html])

28. Exhibit 3 shows the networks of the four Defendants. As seen in this exhibit, the Defendants' rail footprints represent two pairs of essentially non-overlapping networks: CSXT and NS in the eastern U.S. and BNSF and UP in the western U.S. The two pairs of railroads serve almost completely different sets of locations, with the exceptions being locations in the center of the country (roughly along the Mississippi River from Chicago south to New Orleans) where the two pairs of networks meet. Exhibit 4 shows the other Class I railroad networks in the U.S. As shown here, the territories served by the track networks of these other railroads actually overlap CSXT's territory more directly than do those of BNSF and UP.

HIGHLY CONFIDENTIAL

**EXHIBIT 3**
**DEFENDANTS' RAILROAD NETWORKS**




Source: PC*Miler | Rail.



DA00533

HIGHLY CONFIDENTIAL

## EXHIBIT 4
## OTHER CLASS I RAILROAD NETWORKS




Source: PC*Miler | Rail.



DA00534

29. A variety of transportation modes carry freight—including bulk commodities as well as industrial and consumer products—around the U.S. and compete with CSXT's rail and CSXI's intermodal services. In addition to railroads, the major freight modes include trucks, barges and other forms of water-based transport, pipelines, and aircraft. Exhibit 5, excerpted from Dr. Rausser's report, shows the proportion of U.S. freight shipments in 2002 (measured in ton-miles) for each commodity group. As shown here, measured in ton-miles, rail and truck each comprised about 40 percent of all freight shipments in 2002, with water-based transport and multiple-mode shipments representing the remainder. However, measured in tons, the truck share is 67 percent of freight shipments compared to 16 percent for rail. Measured in the dollar value of shipments, the truck share is 74 percent compared to 4 percent for rail.[18]

30. Exhibit 5 shows that rail competes with many other transportation modes. Rail tends to have a higher share of transport of heavier and/or more hazardous commodities (such as coal, grains, chemicals, stone, and waste), while trucks tend to carry a higher share of lighter and more valuable commodities (agricultural, consumer products, paper, etc.). Rail holds a substantial majority of shipments for only one commodity type: coal. Multiple modes, including trucks and water-based transport, compete with rail for shipments of all other commodities.

[18] U.S. Department of Transportation Bureau of Transportation Statistics; U.S. Department of Commerce, Economics and Statistics Administration; and U.S. Census Bureau, "2002 Commodity Flow Survey," December 2004, p. 1.

**EXHIBIT 5**
**U.S. FREIGHT SHIPMENTS BY COMMODITY AND MODE**




Source: Rausser Report, Figure 4.

## V. CSXT'S AND CSXI'S FREIGHT BUSINESS

31. CSXT offers both unregulated and price-regulated service to its customers. "Local" shipments must both originate and terminate on the CSXT rail network. Since CSXT and other railroads can only carry freight where their tracks are located, the company also partners with other railroads to enable shippers to utilize origins/destinations that the individual railroads (including CSXT) cannot serve through their own rail networks. For these "interline" or "joint-line" shipments, one railroad bills the customer for the entire service and pays the joint-line partner for an agreed-upon share of the total bill.[19] Exhibit 6 shows CSXT's revenue for price-regulated and unregulated shipments during the Class Period. I also include the split between shipments made entirely on CSXT's own tracks, as compared to joint-line shipments. As shown here, during 2003 to 2008, approximately 75 percent of CSXT's

[19] In an alternative arrangement, known as "Rule 11," the interline partners separately set prices and other terms and issue separate bills to the shipper.

revenue was from unregulated shipments. Approximately 35 percent of CSXT's revenues were derived from joint-line shipments (39 percent of unregulated revenues).

**EXHIBIT 6**
**CSXT FREIGHT REVENUE BY SHIPMENT TYPE**
**2003 - 2008**




Source: Transactional data from Dr. Rausser's backup files.

32. CSXI does not have an equivalent "regulated" pricing regime—the prices paid by intermodal customers typically result from private price quotes ("PPQs") and contractual negotiations.[20] CSXI does offer joint-line transport—which requires communications with partner railroads for the offering of through rates. In the intermodal context, a joint-line shipment originates (or terminates) at a CSXI intermodal terminal, is shipped on the CSXT rail network to a transfer point, is transferred to a partner railroad, and ultimately terminates at a partner railroad's intermodal terminal.[21] In Exhibit 7, I show

[20] 49 U.S.C. § 10101; 49 CFR 1090.2.

[21] Interview with Bill Clement, November 20, 2012 ("Clement Interview"); Interview with John Hart, January 4, 2013 ("Hart Interview").

CSXI's revenue for unregulated shipments during the Class Period and the split between shipments made entirely on CSXT's own tracks, as compared to joint-line shipments. Between 2003 and 2008, approximately 33 percent of CSXI's shipments were joint-line.

**EXHIBIT 7**
**CSXI FREIGHT REVENUE BY SHIPMENT TYPE**
**2003 - 2008**




Source: Transactional data from Dr. Rausser's backup files.

33. Both CSXT and CSXI offer interline connections with all the major Class I railroads, including Defendants NS, BNSF, and UP, as well as non-Defendant railroads Canadian Northern ("CN"), Kansas City Southern ("KCS"), and Canadian Pacific ("CP"). Exhibit 8 shows the shares of CSXT's interline revenue (regulated and unregulated) for traffic transferred to or from each of the Defendants, as well as other Class I railroads.

**EXHIBIT 8**
**CSXT INTERLINE FREIGHT REVENUE BY PARTNER RAILROAD**
**2003 - 2008**




Source: Transactional data from Dr. Rausser's backup files.

34. Exhibit 9 shows the shares of CSXI's interline revenue for traffic transferred to or from each of the Class I railroads.

**EXHIBIT 9**
**CSXI INTERLINE FREIGHT REVENUE BY PARTNER RAILROAD**
**2003 - 2008**




Source: Transactional data from Dr. Rausser's backup files.

35. CSXT and CSXI transport many types of commodities. As shown in Exhibit 10, from 2003 through 2008, the largest contributor to CSXT's total freight revenue was shipment of coal—comprising 26 percent of total freight revenue. Transportation equipment, including automobiles, (11 percent) and chemicals (11 percent) also represented significant portions of CSXT's freight business.

**EXHIBIT 10**
**CSXT FREIGHT REVENUE BY COMMODITY TYPE**
**2003 - 2008**




Sources: Transactional data from Dr. Rausser's backup files; U.S. Department of Transportation Federal Highway Administration, "FAF Commodity Classification," available at ops.fhwa.dot.gov/freight/freight_analysis/faf/faf2_reports/report4/rpt4_commodity_class.pdf (accessed January 17, 2013).

36. As shown in Exhibit 11, about 70 percent of CSXI revenue from 2003 to 2008 came from a commodity category titled "Freight All Kinds," with the remainder made up of a variety of product types.

**EXHIBIT 11**
**CSXI FREIGHT REVENUE BY COMMODITY TYPE**
**2003 - 2008**




Sources: Transactional data from Dr. Rausser's backup files; U.S. Department of Transportation Federal Highway Administration, "FAF Commodity Classification," available at ops.fhwa.dot.gov/freight/freight_analysis/faf/faf2_reports/report4/rpt4_commodity_class.pdf (accessed January 17, 2013).

## VI. THE NATURE OF COMPETITION FOR CSXT'S AND CSXI'S FREIGHT SERVICES

37. The nature of competition CSXT and CSXI face for any customer's business varies based on a number of factors. These factors include, among others: (i) the origin and destination of the shipment; (ii) the commodity being shipped; (iii) the type of freight car required; (iv) the particular requirements of the shipper in terms of delivery time, cost, and other logistical factors; and (v) the volume of products being shipped. Depending on the particular circumstances of each customer, examples of competitive options may include one or more of the following options, among others:[22]

[22] See, for example, Association of American Railroads, "Shipper Leverage over Freight Railroads," October 2011.

- another Defendant railroad;
- non-Defendant railroads;
- trucks;
- pipelines;
- barges;
- shipments from an alternative origin or to an alternative destination ("geographic competition"), including potentially shipments of a substitutable commodity ("product competition"); or
- none of the above (i.e., no option for freight transportation other than a single railroad).

### A. Relationship between CSXT and the Other Defendant Railroads

38. Because rail freight shipments must follow the preexisting track networks, competition between the Defendants is constrained by the specific locations of each carrier's network. If a customer requires a shipment between two CSXT-served sites—for example, from a facility in Jacksonville to one in Baltimore—then NS could sometimes be a competitor for that business, but only if the customer had access to NS origin and/or destination facilities (or those of a local railroad which could form an interline partnership with NS) in those same cities. Under no circumstances could BNSF or UP compete with CSXT for that business. In other situations, these Defendants may need to act as partners rather than competitors. If a CSXT customer needs a shipment from a CSXT facility to a location served only by other railroads—for example, a facility in Tampa to one in Los Angeles—then CSXT would need to cooperate with either BNSF or UP and transfer the freight at a facility in a location such as New Orleans or Memphis for westward shipment. The same type of partnership may also be required for shipments entirely within the eastern U.S. If a CSXT customer requires delivery to an eastern destination served only by another railroad—for example an NS facility in Harrisburg, PA—then CSXT would need to partner with NS to complete the shipment. Without cooperation between CSXT and NS, that shipment could not move by rail. Finally, there are some origin-destination pairs for certain commodities which are solely served by CSXT. For example, the STB found that for shipments of

liquid chlorine by E.I. DuPont De Nemours and Company ("DuPont") between a facility in Niagara Falls, NY and a facility in Carneys Point, NJ there were no viable alternatives other than CSXT.[23]

39. Due to the almost complete separation between the networks of the western railroads and those of the eastern railroads, CSXT is rarely in direct competition with either BNSF or UP. There are few freight movements for which BNSF or UP offer services that could substitute for the services offered by CSXT, since BNSF and UP serve almost none of the same origin-destination pairs as CSXT. In contrast, CSXT and NS would more frequently be competitors for deliveries within the eastern U.S., although that would require both railroads to offer service at the origins and destinations accessible by each particular customer. If a customer did not have access to both railroads' locations, then NS and CSXT would not be competitors for that customer's business.

40. To assist shippers with freight movements to or from a location operated by another railroad (or vice versa), CSXT has maintained partnerships with the other major railroads since well before the Class Period, including railroads operating in both the eastern and western regions of the U.S.[24] These partnerships have a clear basis in the competitive economics of freight transportation: marketing, pricing, and executing joint-line shipments become more efficient when the partners communicate regularly and offer a single point of contact for the customer.[25] In fact, I understand that U.S. law requires the Defendants to "establish through routes" with each other and to "establish rates and classifications applicable to those routes."[26] Thus, in order to comply with the statute, the Defendants must communicate to coordinate interline traffic. Customers of CSXT testified that they expected the railroads to communicate to coordinate interline movements.[27]

41. CSXT executives recognize the competitive dynamics with NS as being different from the partnerships with UP and BNSF. For example, Michael Ward, the current Chairman and CEO of CSXT, testified that NS was CSXT's "main rail competition," although he also identified trucking and barge operators as primary competitors in some situations.[28] Similarly, Michael Giftos, Chief

---

[23] Surface Transportation Board, Decision, STB Docket No. 42100, E.I. DuPont De Nemours and Company v. CSX Transportation, Inc., June 27, 2008 ("STB DuPont Decision"), p. 6.

[24] See, for example, CSXFSC000137621-000137740, CSXFSC669616-669629, CSXFSC327985-327987, CSXFSC136087, and CSXFSC413474.

[25] Russell Pittman, "Railway Mergers and Railway Alliances: Competition Issues and Lessons for Other Network Industries," Economic Analysis Group Discussion Paper, Department of Justice, Antitrust Division, May 2009, pp. 6-7.

[26] 49 U.S.C. § 10703.

[27] See, for example, Deposition of Efstrateos Jay Strates, April 16, 2010 ("Strates Deposition"), 170:17-171:7.

[28] Deposition of Michael Ward, February 10, 2011 ("Ward Deposition"), 40:12-22.

Commercial Officer of CSXT from 2000 to 2004, testified that NS was CSXT's "principal rail competitor" and also identified trucking as well as other railroads in the eastern U.S. as additional important competitors.[29] CSXT also competed directly with the Canadian railroads, CN and CP.[30]

42. Contemporaneous CSXT business documents also identify NS as the company's primary rail competitor in the U.S. For example, a 2002 analysis of lost business identified more than $14 million in annual revenue lost to NS, with less than $1 million lost to all other railroads combined.[31] A similar CSXT analysis of 2002 and 2003 business lost to other railroads identified only NS as a source of losses.[32] Business documents produced during the Class Period provide similar indications. For example, a 2007 business plan identified only NS (as well as trucking) as a major source of competitive risk.[33] Another 2007 document addressing competition for automotive business again identified only NS as a competing railroad.[34]

43. In contrast to CSXT's sometimes competitive and sometimes partnership relationship with NS, Michael Ward testified that neither UP nor BNSF constrained CSXT's pricing to its customers, with only very limited exceptions.[35] Clarence Gooden, current Chief Commercial Officer at CSXT, testified that he was not aware of any UP or BNSF routes being competitive with CSXT's.[36] Similarly, CSXT business documents indicate that the company did not "compete head-to-head that often" with BNSF or UP.[37]

44. The documents and statements about the "strategic alliance meetings" that CSXT has held with UP and BNSF since well before the Class Period provide an additional source of information about the relationship between CSXT and those two railroads. These meetings were held periodically to develop

---

[29] Deposition of Michael Giftos, February 25, 2010 ("Giftos Deposition"), 74:6-11.

[30] CSXFSC000327518-000327519.

[31] CSXFSC142482-142488.

[32] CSXFSC412787-412794.

[33] CSXFSC14667-14722.

[34] CSXFSC000110952-000110974.

[35] Ward Deposition, 73:16–74:12 and 76:21–77:5. The limited exception described by Mr. Ward was the situation where a customer delivering coal at a CSXT destination near the Mississippi River could obtain coal from another source to the west, potentially limiting CSXT's pricing for coal delivery from the east. [See also Deposition of Edward D. Jenkins, July 27, 2011 ("Ed Jenkins Deposition"), 74:23–75:2; Ward Deposition, 73:6–77:5; and Giftos Deposition, 251:8-18]

[36] Deposition of Clarence Gooden, July 16, 2010 ("Gooden Deposition"), 148:20–149:2.

[37] CSXFSC479548.

and coordinate interline business.[38] For example, in an April 2002 meeting, CSXT and UP discussed developing cross-country "corridors" to make interline movements more easily marketable and highlighted specific marketing proposals for shippers requiring cross-country freight movements.[39] Another meeting with UP in June 2002 addressed additional logistical issues such as backhaul arrangements and sharing of equipment.[40] A similar meeting between CSXT and BNSF in June 2003 covered topics including freight car management and joint marketing initiatives.[41]

45. Coordination of interline pricing, including fuel surcharges, was an important component of the communication between CSXT and its interline partners, beginning well before the alleged conspiracy. If a CSXT customer requests pricing for a shipment that would require transfer to another railroad, then CSXT would communicate with that railroad to jointly determine the pricing for that movement, in light of competitive conditions, and negotiate allocation of the revenues from the joint-line movement.[42] Fuel surcharges, which are one component of the all-in rate, could be included in such discussions. For example, CSXT discussed interline pricing issues, including fuel surcharges, in communications with connecting railroads during 2000.[43] Joint rate structures were also a topic at strategic alliance meetings. For example, at an April 2002 meeting, CSXT and UP representatives addressed "price simplification" for joint-line shipments.[44] A similar topic arose at a June 2003 meeting between CSXT and BNSF.[45]

### B. Competition between CSXT and Other Transportation Modes

46. Freight railroads compete with trucks, pipelines, barges and other water-based transport modes for freight business from a variety of industries, including but not limited to agricultural, mining, chemicals, wood and paper, durables, and consumer goods.[46] Alternate options available to each CSXT customer depend on the particular circumstances of the origin and destination locations, the characteristics of the commodity being shipped, and other considerations important to the particular shipper. For example, a Florida Department of Transportation study designated each major commodity

---

[38] Gooden Deposition, 135:10-19 and 148:3-16.

[39] CSXFSC290295.

[40] CSXFSC287750-287751.

[41] CSXFSC332534-332535.

[42] See, for example, Deposition of Clyde V. McIntyre, Jr., February 18, 2010 ("McIntyre Deposition"), 53:14–55:4.

[43] McIntyre Deposition, Exhibit 17; and CSXFSC254670-254671.

[44] CSXFSC290295. See also Gooden Deposition, 110:9-17.

[45] CSXFSC332534-332535. See also, CSXFSC198656-198657.

[46] CSXFSC186155.

group by the potential for mode shift away from freight rail, based on analysis of decision factors including cost, delivery time, route flexibility, reliability, and shipment size and other physical attributes. The study found "significant" potential for mode shift for numerous commodities, including chemicals, lumber and paper products, transportation equipment, and others (see Exhibit 12). A similar study conducted for CSXT and CSXI concluded that CSXT's and CSXI's pricing strategies should vary by commodity, due to competitive constraints. The study concluded that CSXT and CSXI should adopt a relatively "weak" pricing strategy for intermodal, lumber and paper products, and automotive, while adopting relatively "strong" strategies for coal, metals, agriculture, and phosphates/fertilizer (see Exhibit 12).

**EXHIBIT 12**
**COMPETITIVE ENVIRONMENTS FOR FREIGHT SHIPMENTS OF DIFFERENT COMMODITIES**

**FDOT Study**

| Mode Shift Potential | Commodity |
|---|---|
| Very Low/None | Waste, Coal, Nonmetallic Minerals |
| Very Small | Petroleum |
| Small/Moderate | Food, Clay, Concrete, Glass |
| Significant | Chemicals, Agriculture, Lumber, Paper, Transportation Equipment, Metal, Metal Products |

**CSX Internal Study**

| Suggested Pricing Strategy | Commodity |
|---|---|
| Strong | Coal, Metals |
| Strong - Moderate | Agriculture, Phosphates & Fertilizer |
| Moderate | Chemicals, Automotive |
| Weak/Moderate - Weak | Paper & Forest, Intermodal |

Sources: Analysis of Freight Movement Mode Choice Factors, Center for Urban Transportation Research at the University of Florida, Report for the Florida DOT, 2002; CSXFSC15482-15491.

47. Evidence from CSXT business documents and statements by CSXT personnel confirm that the company continuously faces competition from other transportation modes, particularly trucking and intermodal (trucking combined with a competitor railroad). As CSXT improved delivery times and reliability in the early 2000s following its merger with Conrail, competition with trucking increased. For example, in 2002 CSXT stated in public filings that it was "increasingly successful in attracting market share from the largest potential source for rail growth, the trucking industry" as a result of becoming "increasingly truck-like in our timeliness and reliability."[47] CSXT has noted that it is particularly competitive with trucks for commodities including metals, food, consumer products, and

[47] CSX Corporation 2002 Annual Report, p. 4.

agricultural products.[48] Moreover, CSXT's competitiveness with trucking increased during the Class Period as fuel costs rose, due to the fact that trucking tends to be less fuel efficient over longer hauls.[49]

48. Internal CSXT documents further illustrate the competition between CSXT and trucking, as well as other transportation modes. For example, a 2002 CSXT presentation identified the potential for gaining $16 million in annual revenues from a Florida electric utility which had been obtaining coal via barge.[50] The same document identified $1 billion in annual revenues that could be gained from "modal conversion" compared to only $200 million from other rail competitors.[51] Similarly, a 2007 CSXT presentation identified limitations in trucking capacity as presenting a favorable opportunity for CSXT.[52] Many other CSXT documents generated before and during the Class Period identify competition for its rail freight business from trucking, barge, and other transportation modes.[53] These documents identify particular instances of business lost or gained to other modes, including even shipments of coal and other commodities that generally represent the *least* likely opportunities for competition away from railroads.

49. Statements and testimony from CSXT personnel confirm the importance of competition between transportation modes. For example, Tim McNulty, CSXT's Director of Marketing for Agricultural identified barge, truck, and intermodal as "significant" competitors and identified specific customers for whom CSXT had made pricing concessions due to the threat of losing traffic to those

---

[48] CSX Corporation 2001 Annual Report, p. 9.

[49] CSXFSC14667-14722; and John Gallagher, "Fueling Intermodal Shift," *Traffic World*, October 11, 2004.

[50] CSXFSC199147-199224. It is my understanding that Plaintiffs allege that one of CSXT's motives to engage in a conspiracy to fix FSCs was to meet their internal "BHAG" profit goals. BHAG is an acronym that stands for "big hairy audacious goal" based on a book called Built to Last by James Collins. Michael Ward explained that the purpose of BHAG was to set a "highly aspirational goal" to "energize the organization." [Ward Deposition, 106:21-22] The specific BHAG for CSXT during the period of question was to increase revenues by $1 billion per year. [Ward Deposition, 106:22-24]

From an economics perspective, setting a revenue goal—even an "audacious" one—is a unilaterally rational action. In a presentation describing the BHAG goals, CSXT states that achieving the goal would require a combination of several factors, including "new traffic, price, the economy, and business retention." [CSXFSC199147-199224] Ultimately, for the purposes of meeting BHAG, Clarence Gooden testified that CSXT "never internally viewed the fuel surcharge program as revenue. It was a cost offset." Mr. Gooden further testified that: "our performance management results was predicated from a revenue standpoint on achieving your line haul revenue" which excluded fuel surcharges. [Gooden Deposition, 49:5–18]

[51] CSXFSC199147-199224.

[52] CSXFSC14667-14722.

[53] See, for example, Deposition of Donna Cerwonka, August 13, 2010 ("Cerwonka Deposition"), Exhibit 6; CSXFSC477828; CSXFSC142482-142488; CSXFSC329549-329590; CSXFSC98486-98496; and CSXFSC000110952-000110974.

alternatives.[54] Several other CSXT executives also described the intermodal competition from trucking, and in some cases barge or pipeline, and identified specific instances where CSXT lost business or reduced its prices in response to such competition:[55]

- *Andrew Strok*: "Another source of strong competition for Automotive Customers' business is from non-rail transportation companies. Trucking companies are always capable of serving Automotive Customers, and barge companies can compete for business that is located near waterways."[56]

- *Donna Cerwonka*: "[W]e were competing against truck, intermodal. Both – in both those circumstances really the situation that we were faced with was making sure that that all-in rate to the customer made sense."[57] "If the total package of the delivered rate for our customer didn't compete with the truck market -- because most of my business competed directly with truck lanes—and so if a trucker wasn't charging their—their total rate, for example, if they charged a thousand dollars a truck and you could fit three truckloads into a boxcar, I could charge $3,000 and whether it was fuel surcharge or base rate, didn't matter. At the end of the day the customer was only going to pay $3,000."[58] "[W]e had quite a few exceptions because in my market, because all of my business is truck competitive."[59] "[W]e had quite a few follow-up conversations about individual lanes where the intermodal rates or the trucking rates made it impossible to take the rates as they were offered…and add fuel surcharge and not lose the business."[60] "[W]e unfortunately lost some business as a result of that because the adding of the fuel surcharge made it noncompetitive and we lost some business to intermodal and truck."[61]

[54] Deposition of Tim McNulty, August 10, 2010 ("McNulty Deposition"), 33:2-19, 117:15-22, 156:10-14, 187:2-17, and 191:14-24; and Declaration of Tim McNulty, June 28, 2010, ¶¶2 and 4.

[55] See also, Cerwonka Deposition, 48:18–49:9, 69:10-70:18, and 86:8–87:1; Deposition of Dean Piacente, August 13, 2010 ("Piacente Deposition"), 106:8-25, and 111:9–112:16; Giftos Deposition, 120:9-18; Deposition of John Couch, August 3, 2010 ("Couch Deposition"), 33:16-21 and 52:8-24; McIntyre Deposition, 334:5–8; Declaration of Christopher Jenkins, June 28, 2010, ¶3.

[56] Declaration of Andrew Strok, June 21, 2010, ¶5.

[57] Cerwonka Deposition, 11:3-7.

[58] *Ibid*, 26:12-21.

[59] *Ibid*, 61:5-7.

[60] *Ibid*, 81:23–82:3.

[61] *Ibid*, 105:2-5.

- *Dean Piacente*: "[T]he transportation marketplace changed dramatically from 2003 to 2005. So we were watching our competitors charge a lot more for freight, whether that's truck, barge, other railroads."[62]
- *Michael Ward*: "[T]here's multiple forms of competition we face. Trucking companies are a primary source of competition. The Norfolk Southern is. In some markets, barge lines are. So—so there's a variety of competition that we face."[63]
- *Clarence Gooden*: "What I think was causing destructive pricing in the marketplace for rail share was not just competition among the railroads, but there had been a big proliferation of truck capacity in this country at the time."[64]

50. In addition to mode shift, some freight rail customers also may have the option of shifting the origin or destination for their traffic, as well as potentially the commodity being shipped, which could introduce competition from other railroads which otherwise could not compete over the same direct route (geographic and product competition).[65] For example, a power company that transports coal from a particular mine to one of its generating stations could switch the source of coal and potentially shift its traffic to another railroad. Alternatively, the power company could choose to reduce generation at that station and increase generation at another station, again potentially shifting traffic across transportation options, thereby reducing the ability of each transport provider to increase rates.[66]

51. Although many rail freight shippers across many industries may consider alternative transportation modes, the factors that affect the decision to switch modes vary based on the unique circumstances for each customer, location, and even the individual shipment. Thus, any evaluation of competition for freight business must be conducted on a case-by-case basis. This view is demonstrated by the approach taken by the STB in assessing competition in rate disputes and merger reviews. For example, in determining whether a rail customer should be entitled to rate relief, the STB separately evaluates each route (origin and destination pair) for each particular customer's competitive alternatives. The STB's general approach is as follows:

---

[62] Piacente Deposition, 10:25–11:3.

[63] Ward Deposition, 40:15-19.

[64] Gooden Deposition, 39:20-24.

[65] See, for example, Association of American Railroads, "Shipper Leverage over Freight Railroads," October 2011.

[66] Interview with Christopher Jenkins, January 3, 2013 ("Jenkins Interview").

> We can consider the reasonableness of a challenged rail rate only if the carrier has market dominance over the traffic involved. Market dominance is "an absence of effective competition from other rail carriers or modes of transportation for the transportation to which a rate applies."…There are two components to the Board's market dominance inquiry. The first component is quantitative. The statute establishes a conclusive presumption that a railroad does not have market dominance if the rate it charges produces revenues that are less than 180% of its variable costs of providing the service…If the quantitative threshold is met, the Board moves to the second component, a qualitative analysis. In this analysis, we determine whether there are any feasible transportation alternatives that could be used for the issue traffic. The Board considers both intramodal competition (from other railroads) and intermodal competition (from other modes of transportation such as trucks, transload arrangements, barges or pipelines).[67]

52. Even in circumstances where shippers assert that there is no effective competition for CSXT's rail service, the STB has found other transportation modes proved competitive constraints to CSXT. Two recent STB decisions highlight the individualized nature of the inquiry necessary to assess competition for a particular customer and route. For example, in September 2012 the STB issued a market dominance ruling in a rate case brought against CSXT by one of its freight customers, M&G Polymers USA, LLC ("M&G").[68] M&G ships polyethylene terephthalate ("PET"), a pelletized plastic product, using CSXT's rail system and was contesting CSXT's rates for 42 rates covering 69 individual "lanes" (origin-destination pairs). In this case, the STB found that no effective direct rail competition existed for any of the contested lanes.[69] The STB then conducted a case-by-case analysis of each rate, considering the cost and availability of direct trucking and truck/rail alternatives, shipment quantities, and other factors. The STB concluded that no effective trucking/intermodal competition to CSXT existed for 18 of the rates, insufficient competition existed for another 18 rates, and effective competition existed for six rates.[70]

53. In another decision, the STB evaluated claims brought by DuPont, a CSXT customer for rail shipment of chlorine.[71] DuPont asserted that CSXT held market dominance in the shipment of chlorine via three separate lanes originating from two DuPont facilities. No other direct rail options existed at any of the locations.[72] The STB concluded that barge transportation offered sufficient competitive

[67] STB DuPont Decision, p. 2.

[68] Surface Transportation Board, Decision, STB Docket No. 42123, M&G Polymers USA, LLC v. CSX Transportation, Inc., September 26, 2012.

[69] *Ibid*, p. 12.

[70] *Ibid*, pp. 20-21.

[71] STB DuPont Decision.

[72] *Ibid*.

discipline to CSXT for one lane, but that insufficient alternatives existed for the other two lanes.[73] Again, the STB's findings demonstrate the fact that CSXT's ability to obtain higher prices in direct customer negotiations varies on a customer-by-customer and even route-by-route basis, and further that some shippers have sufficient non-rail options available (at least under certain circumstances) to defeat any potentially anti-competitive price increase.

### C. CSXT's Pricing of Rail Freight Services

54. Historically, pricing of rail freight services in the U.S. was regulated at the federal level by the Interstate Commerce Commission.[74] This environment, however, led to overcapacity and low productivity across the industry, causing substantial financial problems for major railroads.[75] Congress passed the Staggers Act in 1980 which, in combination with subsequent policies, largely deregulated the railroad industry.[76] Under those policies, which remain in place today, freight rail companies price their services using several different mechanisms. For certain commodities (such as coal, grain, and chemicals) and under certain conditions, public tariff rates remain regulated by the STB. Those prices are posted publicly and are available to all shippers. As shown in Exhibit 6, above, approximately 25 percent of CSXT's revenue during the Class Period was from regulated shipments, which are not included in the class here.

55. The STB has exempted rail freight shipments of a variety of other categories of commodities from rate regulation, including, for example, intermodal, agricultural products (other than grain and a few other commodities), stone, and lumber/paper products.[77] For exempt commodities, there are several potential mechanisms for determining prices: public tariffs, private price quotes ("PPQs"), and negotiated contracts. CSXT sells freight services using each of these pricing methods. First, CSXT publishes public tariffs, available to any customer, for every combination of commodity, origin, and destination. CSXT also negotiates with many of its customers who seek pricing below the published rates. These unregulated shipments, along with those of commodities exempted by the STB, are what

[73] *Ibid*, p. 6.

[74] U.S. Government Accountability Office, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed," GAO-07-94, Oct 6, 2006 ("GAO Report"), p. 6.

[75] *Ibid*, p. 1.

[76] *Ibid*, pp. 1-2.

[77] 49 CFR 1039. The STB retains oversight over rail freight pricing for these commodities in cases where the shipper can demonstrate "market dominance" on the part of the railroad. Under such conditions, determined through a hearing process in which the STB evaluates economic evidence presented by both parties, the STB can limit rates for traffic that otherwise would have been exempt from regulation.

comprise the class in this case. As I discuss in Section IX, CSXT engaged in such private negotiations and reached customized agreements with many of its large customers. Those agreements can be in the form of one-time, confidential PPQs for a single or limited number of shipments or confidential contracts covering shipments over periods as long as several years. Customers transporting regulated commodities also are permitted to negotiate prices below the regulated public rates through these types of negotiations. In such cases, the pricing negotiations are similar to those with shippers of "exempt" commodities. Because of the private nature of these discussions between CSXT and its customers, pricing on CSXT's unregulated transactions would not have been known to the other Defendants, with the only potential exception being joint-line (or through) rates on CSXT's interline shipments, for which some information could be known only to the connecting railroad for each such shipment.

56. The private negotiations between the Defendants and their customers reflect the critical role of demand-based differential pricing—i.e., the pricing of freight differentially by customer—based on the specific requirements of each customer related to the commodity type, location of the origin and destination, delivery time requirements, and, more generally, the other transportation options available to that customer given those requirements. A 2006 report by the U.S. Government Accountability Office characterized differential pricing as follows:

> Demand-based differential pricing, in theory, permits a railroad to recover its joint and common costs—those costs that exist no matter how many shipments are transported, such as the cost of maintaining track—across its entire traffic base by setting higher rates for traffic with fewer transportation alternatives than for traffic with more alternatives. Differential pricing recognizes that some customers may use rail if rates are low—and have other options if rail rates are too high or service is poor. Therefore, rail rates on these shipments generally cover the directly attributable (variable) costs, plus a relatively low contribution to fixed costs. In contrast, customers with little or no practical alternative to rail—"captive" shippers—generally pay a much larger portion of fixed costs. *Moreover, even though a railroad might incur similar incremental costs while providing service to two different shippers that move similar volumes in similar car types traveling over similar distances, the railroad might charge the shippers different rates.*[78]

Thus, differential pricing is a natural outgrowth of a competitive, unregulated industry, such as rail freight, when different customers have different sets of available alternatives and those varied circumstances are known to the seller. Moreover, differential pricing is a necessary tool for railroads in order to be able to fund and maintain highly capital intensive rail networks.[79]

---

[78] GAO Report, p. 8 (emphasis added).

[79] Dr. Rausser also notes that railroads "price discriminate" by offering different prices across commodity types and customers based on varying levels of competitive intensity. [Rausser Report, pp. 24-25]

57. Differential pricing has been an important tool for CSXT's rail freight business before, during, and after the Class Period. CSXT's unregulated freight is governed by PPQs and contracts negotiated with its customers. Through the Class Period, CSXT structured its surface transportation business into several units, which conducted separate negotiations with customers:

- *Merchandise* – CSXT's most diverse segment comprising approximately 49 percent of CSXT's revenue in 2008 and 37 percent of volume, including aggregates (crushed stone, sand and gravel), metal, phosphate, fertilizer, food, and consumer/agricultural/paper/chemical products.[80] Examples of CSXT's merchandise customers include Riviana, Anheuser Busch, Tropicana, Mosaic Company, DuPont, Equistar Chemicals, and International Paper.[81]
- *Coal* – This business unit includes coal, coke and iron ore and accounted for approximately 29 percent of CSXT's revenue in 2008 and 28 percent of volume.[82] Examples of CSXT's coal customers include Alpha Natural Resources, Arch Coal, and CONSOL Energy.[83]
- *Automotive* – This unit delivers finished vehicles and auto parts, and generated approximately 7 percent of CSXT's revenue and 5 percent of the volume in 2008.[84] Examples of CSXT's automotive customers include General Motors, Ford, Subaru of America, and Volkswagen.[85]

58. Negotiations between these CSXT business units and their customers deal with many aspects of rail freight service. Key issues in a negotiation typically include pricing (the base rate as well as fuel surcharges and/or other cost escalators), volume commitments, equipment requirements, and service guarantees/penalties, among many others.[86] Customers evaluate the terms of a transportation deal based on all of these factors simultaneously, weighing the overall cost of the deal—or the "all-in" price—against the cost of available alternatives including, potentially, other rail options, trucking, barge, and

[80] CSX Corporation 2008 Form 10-K, p. 3.

[81] See, for example, Cerwonka Deposition, 8:23–9:1.

[82] CSX Corporation 2008 Form 10-K, p. 4.

[83] "Coal Top 10 Customers," corporate-social-responsibility.csx.com/markets/coal.php, (accessed January 9, 2013.)

[84] CSX Corporation 2008 Form 10-K, p. 4.

[85] CSXFSC000110952-000110974 and "CSX Automotive Top Customers," corporate-social-responsibility.csx.com/markets/merchandise/automotive.php, (accessed January 9, 2013).

[86] See, for example, Piacente Deposition, 35:3-11 and Cerwonka Deposition, 11:2-8.

HIGHLY CONFIDENTIAL

other transport modes.[87] Thus, in negotiations over pricing, base rates are just one among many components of the overall cost-benefit terms of the transaction. For example, Donna Cerwonka, CSXT's Director of Marketing for Food and Consumer Products Group during the Class Period, explained that each individual pricing negotiation is complex, and that "every individual deal is very different."[88] Chris Jenkins, Vice President of the Coal and Automotive Group testified that "the circumstances with almost every negotiation is that there is a – there is a total amount that the customer is willing to pay and still use CSX" and that the negotiation process involves "working with the economic package that the shipper will accept."[89] Tim McNulty testified that CSXT and its agricultural customers would "consider all elements of a deal that contribute to its total value, including the service elements, car availability, competitive circumstances, inventory advantages, base rates and the application of the fuel surcharge."[90]

59. CSXT's rates are not based on a cost-plus markup. Rather, depending on the specific customer and the nature of the product and competitive conditions, the factors that determine the final price paid by a customer vary widely in negotiations. Furthermore, in some negotiations, CSXT adjusted its base rate and fuel surcharge to meet the demands of the customer. Specific examples of negotiations between CSXT business units and its customers during the Class Period demonstrate the range of factors that affected the final price paid by class members, including variations on the published base rates as well as discounts to the published FSC formulas, for example:

- The pricing for shipping a perishable [redacted] food or beverage product with a shelf-life of 30 days, shipped on a refrigerated car will generally be more expensive than the cost to ship french fries that are "stored in a big warehouse and then manufactured and frozen over a long period of time."[91]
- Chemical customers tend to pay higher prices "as a result of the hazardous nature of some of those commodities"[92] and the fact that they "are more reliant on rail … for the safety

[87] See, for example, Deposition of Blair Carter, May 11, 2010 ("Carter Deposition"), 98:11-99:8.

[88] Cerwonka Deposition, 70:25–71:4.

[89] Deposition of Christopher Jenkins, August 24, 2010 ("Christopher Jenkins Deposition) 74:15-18 and 76:11-15.

[90] McNulty Declaration, ¶8.

[91] Cerwonka Deposition, 71:4-13.

[92] Piacente Deposition, 12:6-22.

value we provide or the long distance nature versus other competitive alternatives like truck.'"[93]

- When negotiating with [redacted]—which owns [redacted] in the United States—CSXT must keep its rates "competitive" with rates served offered by other transportation providers that can source their various baking facilities.[94]

- In negotiating an updated contract with [redacted] in 2004, negotiation terms focused not just on rates, but also refunds, billing dispute resolution processes, the maximum weight per carload, and line capacity. [95] At the end of the negotiation, CSXT and [redacted] agreed to a two year contract with initial rate increases of 6.5 percent with no fuel surcharge, but an RCAF(u) adjustment instead.[96]

- In negotiations with [redacted] for the shipment of [redacted] in 2004, CSXT maintained that the extent of a rate change can vary based on what the parties are trying to accomplish. For [redacted], rate increases would be lower if they simply wanted to maintain competitiveness. However, higher rate increases would be needed to achieve reinvestment in the fleet and routes used by [redacted].[97]

I provide additional detailed examples of contract negotiations and particular rate and FSC exceptions in Section IX.C.4.

### D. Differences between CSXT's and CSXI's Competitive Environment and Pricing of Rail Freight Services

60. As I described in Section IV above, the intermodal business transports mainly manufactured consumer goods in containers that are transitioned to and from trucks.[98] CSXI has customers that

---

[93] *Ibid.*

[94] McNulty Declaration, ¶3.

[95] CSXFSC156564.

[96] *Ibid.*

[97] CSXFSC196250-196252.

[98] CSX Corporation 2008 Form 10-K, p. 3.

include domestic private, domestic rail controlled, international, door-to-door, and brokers.[99] Examples of intermodal customers include J.B. Hunt, United Parcel Service (UPS), and Pacer.[100]

61. During the Class Period, CSXI was a separate company from CSXT. Separate decision makers were responsible for decisions regarding pricing and FSCs. CSXI owned terminal buildings, containers, and rail cars. However, CSXI bought—through a transfer pricing agreement with CSXT—locomotive services, track access, and crews. In addition, CSXI paid CSXT for fuel and a franchise fee.[101]

62. There are notable differences between CSXI and CSXT with respect to pricing. First, there is no equivalent "rate-regulated price" for intermodal traffic. Pricing is based on published price quotes and individual private negotiations with the customers. Both contracts and pricing decisions during the Class Period were separate and distinct from CSXT.[102] Second, for the intermodal business, trucking provides an even stronger competitive constraint. The competitive environment for CSXI is such that even a relatively small difference in pricing can result in lost business to trucking.[103] Michael Giftos testified: "[I]ntermodal businesses is our lowest margin business. It's very truck competitive and they switch back and forth from us and trucks on a moment's notice."[104]

63. Third, customers for CSXI included third parties who coordinate logistics for end customers; these intermodal marketing companies ("IMCs") include transportation brokers such as HUB and Pacer. As a result of its dealings with IMCs, CSXI sometimes competed with CSXT (without even knowing it at times) for certain customers.[105] Fourth, I understand that CSXI's contracts tended to be shorter in length.[106]

64. Despite these differences, some of the competitive dynamics that shape the pricing for CSXT are similar for CSXI, including public price quotes and private negotiations with customers focusing on the all-in price and different competitive conditions shaping the final price paid. In addition, just as

---

[99] Deposition of Mike Crawford, July 27, 2011 ("Crawford Deposition"), 44:15–45:16.

[100] "CSX Intermodal Top Customers," corporate-social-responsibility.csx.com/markets/intermodal.php, (accessed January 9, 2013).

[101] Hart Interview.

[102] Hart Interview; Clement Interview.

[103] John Gallagher, "Fueling Intermodal Shift," *Traffic World*, October 11, 2004.

[104] Giftos Deposition, 155:5-7, also 74:11, 104:24-105:5, and 299:9-13.

[105] Hart Interview; Transactional data from Dr. Rausser's backup files.

[106] Interview with Ganson Evans, January 10, 2013 ("Evans Interview").

interline communications are critical for CSXT's business, CSXI also must have interline communications with other railroads to coordinate joint shipments.[107]

## VII. THE EFFECTS OF RISING FUEL COSTS ON CSXT'S AND CSXI'S BUSINESS

65. As with other modes of transportation, fuel expenses are a substantial part of operating cost for rail and intermodal freight carriers. There exist a variety of ways in which railroads and intermodal businesses approach the issue of fuel-cost recovery, and a firm's ability to manage that portion of its cost structure can enhance (or, potentially, restrain) its competitive standing. While the fuel issue was not new to CSXT or CSXI, the unprecedented run-up in prices that began around 2000 revealed that the historic mechanisms were not properly designed to deal with rapid and persistent fuel price growth. As a result, CSXT and CSXI had to reassess their respective approaches to managing their fuel costs in order to maintain competitiveness with other freight carriers.

### A. Prior to 2000, CSXT and CSXI Historically Recovered Fuel Costs in the Base Rates

66. Prior to the implementation of FSCs in 2000, CSXT and CSXI dealt with incremental fuel-cost recovery primarily through long-term escalation of base rates. In the decade leading up to 1999, all costs, including the cost of oil (which constitutes the basis of fuel used by freight locomotives) had been relatively stable. As Exhibit 13 shows, from 1991 through 1998, the price of crude oil—as measured by the West Texas Intermediate ("WTI") index—generally stayed within a relatively narrow range between $10 and $25 per barrel.

[107] Clement Interview.

**EXHIBIT 13**
**WEST TEXAS INTERMEDIATE FUEL PRICE PER BARREL**
**1991 – 1998**




Source: U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W (accessed January 12, 2013).

67. Historically, CSXT generally used long-term contracts that contained cost escalators to allow rates to rise over the lifetime of the contract.[108] These cost escalators could take a number of different forms, based on general price indices (e.g., consumer price index, wholesale producer price indexes), government-published indices specific to railroads, or standard flat-rate increases.[109] One railroad-specific escalator used at the time was the Rail Cost Adjustment Factor (Unadjusted) ("RCAF(u)"), which was published quarterly by the Association of American Railroads ("AAR"). Because this index related specifically to railroad operation costs, before the unexpected increases in fuel prices and volatility, it tended to track the changes in expenses relevant to CSXT's cost structure better than the more general price indices. In September 2000, for example, CSXT recognized the RCAF(u) placed a

[108] Couch Deposition, 168:18-24.

[109] Gooden Deposition, 183:16-23.

greater weight on fuel cost than other general escalators used in contracts.[110] RCAF(u) components include labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses.[111]

68. The fuel component of RCAF(u) was based on "(i) a survey of railroad fuel purchasing officers concerning current price and volume levels, (ii) expectations of railroad purchasing officers based on discussions with their major suppliers, and (iii) a consensus of petroleum industry experts and general business publications."[112] These measures were generally adequate during periods of relatively stable fuel prices. However, during times of unprecedented fuel cost escalation, the RCAF(u) index did not perform well.[113]

### B. Fuel Prices Nearly Tripled Unexpectedly in 1999 and 2000

69. Beginning in January 1999, oil prices began to rise rapidly. In the 21 months through September 2000 (when CSXT announced its published fuel surcharge formula), the WTI index nearly tripled, rising from $11 to $31 (see Exhibit 14). By comparison, the previous "trough-to-peak" cycle saw fuel prices less than double over the course of almost three years.

[110] CSXFSC000328316.

[111] See, e.g., AAR, Quarterly Rail Cost Adjustment Factor, Second Quarter 2003, Ex Parte No. 290 (Sub-No. 5) (2003-2), March 5, 2003. "Other expenses" include purchased services, casualties and insurance, loss and damage, taxes (other than income and payroll), general and administrative expenses, and lease rentals.

[112] *Ibid*, Appendix B.

[113] See Section VII.1.DD.

**EXHIBIT 14**
**WEST TEXAS INTERMEDIATE FUEL PRICE PER BARREL**
**JANUARY 1999 – SEPTEMBER 2000**




Source: U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W (accessed January 12, 2013).

70. The rapid increase in fuel costs in 1999 and 2000 "far exceed[ed] earlier expectations."[114] The potential implications of rising and volatile fuel prices on both the U.S. and global economy were widely discussed.[115] During this time, there were over 30 Congressional hearings related to energy prices, and it was noted that "rising fuel costs have created havoc in all of the transportation sectors and threaten to derail global economic growth."[116] As Exhibit 15 illustrates, during this time, fuel surcharge

---

[114] Giftos Deposition, Exhibit 3.

[115] In fact, as a contemporaneous report from the International Monetary Fund noted, the rising and volatile fuel prices had implications for the growth of the entire global economy. [International Monetary Fund, *The Impact of Higher Oil Prices on the Global Economy*, December 8, 2000]

[116] *The effect of fuel price increases on airlines and passengers: hearing before the Subcommittee on Aviation of the Committee on Transportation and Infrastructure*, House of Representatives, One Hundred Sixth Congress, second session, October 11, 2000.

mechanisms became widespread as a method by which the transportation sector responded to rising fuel prices. Notably, at least four of the named plaintiffs in this litigation had fuel surcharge mechanisms of their own or "essentially just passed it on" (or attempted to pass it on) to their own customers.[117]

**EXHIBIT 15**
**COMPANIES IMPLEMENTING FUEL COST RECOVERY PROGRAMS**
**1999 - 2000**

| Company [a] | Start Date [b] | Industry [c] |
|---|---|---|
| Yellow Freight System | July 1999 | Trucking |
| G. I. Trucking Company | August 1999 | Trucking |
| Con-Way | August 1999 | Trucking |
| Southeastern Freight Lines | September 1999 | Trucking |
| Matson Inc. | October 1999 | Shipping |
| Bulkmatic Transport Company | December 1999 | Trucking |
| Georgia Freightways Corporation | January 2000 | Trucking |
| FedEx | February 2000 | Shipping |
| Peninsula Truck Lines, Inc. | March 2000 | Trucking |
| Waste Management | May 2000 | Waste Management |
| Canadian Pacific Railway | May 2000 | Railroad |
| UPS | August 2000 | Shipping |
| Hoosier Southern Railroad | August 2000 | Railroad |
| Canadian National Railway | October 2000 | Railroad |
| I&M Rail Link | November 2000 | Railroad |
| Dow Chemical Co | December 2000 | Chemical |
| Iowa Interstate Railroad | December 2000 | Railroad |

Sources: Trade press and company websites; BNSF-0028794.

71. In this climate of rising fuel prices, CSXT's and CSXI's fuel costs rose correspondingly. As Exhibit 16 shows, average fuel cost rose by approximately 115 percent, from $0.45 to $0.97 per gallon, in the seven quarters starting at the beginning of 1999.

[117] Nyrstar Taylor Chemicals (Deposition of Betsy Myers, March 11, 2010, 36:22–37:13); Donnelly Commodities (Deposition of Michael Donnelly, March 16, 2010, 108:17–109:8); Dakota Granite (Deposition of William Ruoff, March 25, 2010, 89:9–90:11); and Olin Corporation (Deposition of Michael D. Gilley, October 1, 2010, 347:19–348:5 and Exhibit 10).

**EXHIBIT 16**
**CSXT/CSXI FUEL COST PER GALLON**
**Q1 1999 – Q3 2000**




Note: Includes fuel for inland transportation services provided to CSXI.

Source: CSX Corporation Quarterly Flash Statements.

72. As prices continued to rise, uncertainty about production (and by extension, prices) perpetuated by OPEC, a group of oil-producing countries, led to increased volatility of fuel prices.[118] In fact, as Exhibit 17 shows, the trend in *volatility* of fuel prices had been consistently increasing in the decade leading up 2000. That is, while the run-up in cost was in the early stages at the time CSXT and CSXI implemented their published FSC formulas in 2000, the uncertainty associated with increasing volatility was already a longer-term trend.

118 International Energy Agency, Oil Market Report released 9 August 2000, Prices and Refinery Activity, p. 29.

**EXHIBIT 17**
**WEST TEXAS INTERMEDIATE PRICE VOLATILITY**
**Q2 1991 – Q3 2000**




Note: Volatility calculated quarterly as the standard deviation of daily percent changes in the price over the course of that quarter.

Source: U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W (accessed January 12, 2013).

### C. CSXT's Integration of the Conrail Assets and a Weak Economy Created an Environment of Rising Operational Costs in 2000

73. In addition to rising and increasingly volatile fuel costs, CSXT and CSXI faced a number of other internal and external financial challenges in 1999 and 2000. Internally, CSXT acquired the assets from its Conrail transaction in June 1999.[119] While the integration of the Conrail assets increased operating revenue, it also increased costs and resulted in substantial network congestion.[120] This

[119] CSX Corporation 2000 Form 10-K, p. 17.

[120] *Ibid*, p. 18.

resulted in degradation of CSXT's rail service quality[121] and the company's "cost structure, because of the poor operations, was not what it needed to be."[122] The Conrail integration presented other problems as well, as plans for the incorporation of the newly acquired assets into the CSXT network were made with an underlying assumption of crude oil prices being well below the actual prices experienced in the late 1990s and early 2000s.[123] CSXT Executive Michael Ward noted that "the problem [with Conrail] was occurring was on the expense side of the business" and while revenues were "actually ahead of where we expected to be," the expenses were "out of control."[124]

74. Declining economic conditions, combined with rapid increases in fuel costs had a significant adverse effect on CSX's financial performance, as evident from the company's increasing operating ratio (a metric railroads use to measure financial success calculated as operating expenses divided by revenue).[125] As Exhibit 18 shows, even in the year prior to the beginning of the run-up in fuel costs, CSX's operating ratio was above 85 percent. As fuel costs escalated, however, this ratio reached as high as 99 percent.

[121] Ward Deposition, 113:17-21.

[122] *Ibid*, 25:6-14.

[123] For example, Michael Giftos stated that "[a] lot of economic analysis we developed [in 1997] to justify paying many billion dollars for that were predicated upon oil prices that were in the historic range of between $15 and $18 a barrel." [Giftos Deposition, 28:5-11]

[124] Ward Deposition, 110:10-17. During this time, CSXT was also affected by the aftermath of September 1999 Hurricane Floyd, which resulted in higher personal injury accruals and higher fuel prices in the second half of the year. [CSX Corporation 2000 Form 10-K, p. 18]

[125] Giftos Deposition, 27:7-13. An operating ratio around 80 percent is desirable in order to allow a railroad to conduct necessary maintenance and improvement of its assets.

**EXHIBIT 18**
**CSX CORPORATION OPERATING RATIO**
**Q1 1998 – Q3 2000**




Sources: CSX Corporation 10-Ks and 10-Qs.

### D. RCAF(u) Became an Increasingly Ineffective Method for Fuel Recovery as Costs Rose

75. As fuel prices rose, CSXT came to view price escalators in contracts, including RCAF, as "not a very effective"[126] means for recovering costs. Due to its lagged structure, an RCAF-based charge would under-recover costs of the underlying components (including fuel) during this time of increasing input costs. Numerous CSXT executives have testified about the issue of lag with respect to the RCAF escalator as utilized in CSXT contracts:

[126] Piacente Deposition, 8:15-16 and 9:16-20.

- *Ed Jenkins:* "[O]ne of the characteristics of RCAF program was […] the lag time involved in fuel costs being represented in the indice were greater than we would prefer in that very volatile fuel cost environment."[127]

- *Clarence Gooden:* "It was viewed that there was a fuel escalator provision in RCAFU. There was a debate going on as to the adequacy of that escalator and the fact that it had a tremendous time lag in it."[128] "The RCAFU wasn't working, because it was too slow […] and the costs were going vertical."[129]

- *Michael Giftos:* "So fuel was moving very, very rapidly. It was moving on a daily basis in ways that we hand't seen since the Gulf—first Gulf War and the RCAF was a lagging indicator. It was a lagging index."[130]

- *John Couch*: "[I]n a period of continually rising fuel costs, you don't recover those—you don't recover through the RCAFU, not in the same quarter, but you don't even recover it in the same year. It takes a long time because of that large lag impact."[131]

76. In 2004, CSXT prepared an analysis comparing the RCAF(u) escalator to several other escalators, including the All-Inclusive Index Less Fuel ("AII-LF"), plus an FSC. The conclusion of the analysis was that on $1 billion of business, AII-LF plus an FSC would have recovered $74 million more than RCAF(u).[132]

### E. CSXI and CSXT Implemented Different Fuel Surcharge Formulas in 2000

77. Fuel surcharges were a common method implemented across transportation industries to deal with rapid increases in price levels and volatility.[133] These programs allowed transportation companies, which are commonly linked by their sensitivity to fuel costs, to directly pass along a portion of the

[127] Ed Jenkins Deposition, 216:20–217:1.

[128] Gooden Deposition, 29:12-15.

[129] *Ibid*, 183:23-25.

[130] Giftos Deposition, 49:1-5.

[131] Couch Deposition, 175:2-7.

[132] CSXFSC104022-104024. As I discuss further below, although it would have been in CSXT's unilateral self-interest to offer customers an escalation option that excluded fuel in combination with an FSC, at the time, CSXT had not widely adopted AII-LF.

[133] Giftos Deposition, Ex. 3. See also Exhibit 15, above.

increases to their customers without continuously adjusting base prices.[134] As CSXT began developing its published FSC formula in the second half of 2000, several factors and alternatives were considered.

78. Modes of freight transport that competed with CSXI (such as trucks) and CSXT (such as barges) had well-established fuel surcharges by the time CSXI and CSXT began considering this fuel-cost recovery method in 2000.[135] In fact, as Clarence Gooden testified in deposition, trucking firms could more easily administer fuel surcharges, as rail-based customers' computer systems were not set up to process them.[136]

79. Increasing base prices was not a viable alternative to implementing FSCs for multiple reasons. First, base rate increases would not change with short-term fluctuations in fuel cost. CSXT and CSXI decided to implement FSC formulas under the assumption that the fuel cost spikes were temporary, reasoning that the cost increases "should not be permanently added to […] prices."[137] CSXT did not consider the fuel surcharge to be part of the line-haul rate, or an adjustment to that rate. Rather, it was a separately stated, transitory, and adjustable charge implemented through the CSXT Tariff 8100.[138] Additionally, the administrative burden of managing the large number of existing base rates (spanning various combinations of commodities, shippers, and lanes) made it effectively impossible to adjust rates in response to short-term changes in fuel cost. Ultimately, the decision regarding implementation of FSCs was a culmination of "a debate that's been ongoing for many years" about "the best way to match [fuel recovery to] increased fuel costs, and try to match it in the exact quarter when it's happening."[139] The fuel-cost recovery mechanisms implemented during a period when fuel prices "stayed in a very narrow range" proved ineffective "when they started to go outside of that normal range."[140]

80. While recovering the incremental fuel costs that resulted from rising fuel prices was the goal,[141] implementation of a fuel surcharge was not a foregone conclusion, as any such policy would face organizational and administrative challenges. For example, a fuel surcharge component would need to be added to each contract negotiation, and technological infrastructure, on the CSXT and CSXI side and

---

[134] CSX Corporation 2005 Form 10-K, p.15.

[135] Gooden Deposition, 21:9-20.

[136] *Ibid*, 114:25–115:5.

[137] Couch Deposition, Exhibit 16.

[138] Giftos Deposition, Exhibit 3.

[139] Couch Deposition, 93:15-20.

[140] *Ibid*, 94:1-6.

[141] Piacente Deposition, 7:17-19.

on the customer side, would need to be set up to make the administration of such surcharges possible.[142] Deliberations about the most effective method for recovering rising incremental fuel costs took place ahead of the implementation of the initial published FSC formulas by both CSXT and CSXI in 2000.

81. CSXI, in intense competition with trucking, moved first to develop an FSC formula to help it recover escalating fuel costs. In March 2000, it announced its published FSC formula, which was implemented the following month. This formula was based on the Department of Energy's Highway Diesel Fuel ("HDF") index and went into effect when the index rose above $1.10 per gallon. Calculated from the index on the last Monday of the prior month, the surcharge would change by 0.1 percent for every 1 percent change in the underlying index.[143]

82. CSXT, also aware of the "extraordinary increases in the cost of fuel"[144] during this period, implemented its published FSC formula on October 25, 2000.[145] As of September 2000, CSXT expected its total fuel costs for that year to be $585 million, an increase of more than $250 million over the previous year.[146] Given the escalating fuel costs, CSXT notified its customers that while it was "reluctant to take this action, […] we can not absorb all of the fuel cost increases"[147] and that the steps it was taking were in line with other transportation sectors.[148] The published FSC formula was generally applied to local and interline freight, as well as freight moving under tariffs, private price quotes,[149] and certain contracts incorporating Tariffs 8100 and 8200.[150] The CSXT surcharge was based on the WTI index, which was published daily. The surcharge would "trigger" at 2 percent when the index surpassed $28 per gallon and stayed above that level for 30 consecutive business days. For every $5 increment above $28, the index would increase by 2 percent (a "slope" of 0.4 percent per $1 change in the WTI index). That is, if WTI was above $33 for 30 consecutive business days, the surcharge would be 4

[142] Giftos Deposition, 32:14–33:2.

[143] Crawford Deposition, Exhibit 8.

[144] Giftos Deposition, Exhibit 1.

[145] Executives who designed and implemented the CSXT FSC formula in 2000 were not even aware that FSC's were being used by CSXI. [Giftos Deposition, 104:24–105:5]

[146] CSXFSC369691-369700.

[147] CSXFSC328558.

[148] Giftos Deposition, Exhibit 1.

[149] The published FSC formula applied to newly issued PPQs which stated that "price is not subject to increase" because it was CSXT's position that these were not contracts, as the customer made no commitment. [Giftos Deposition, Exhibit 3]

[150] CSXFSC369691-369700. Contracts that were subject to government-published adjustment mechanisms (e.g., RCAF(u), GDP, CPI, etc.) and contracts which stated that "rate is not subject to any adjustment" were not subject to a fuel surcharge.

percent (at $38 or above, it would be 6 percent, etc.).[151] Conversely, if the price went back down below $28 and stayed at that level for 30 consecutive business days, the surcharge would reduce to zero. The surcharge was applied as a percentage increase to the base rate paid by a customer.[152]

83. The timing and structure of the 2000 CSXT published formula is notable, when compared to the formulas published by other railroads, given that Dr. Rausser and Plaintiffs have conceded that its development and implementation were non-conspiratorial.[153] NS had adopted an FSC formula with identical terms four months earlier.[154] BNSF had adopted a similar FSC formula within the previous six months.[155] The two Canadian Class I railroads (CP and CN, whom the Plaintiffs do not accuse of conspiratorial conduct) also adopted FSC formulas prior to CSXT.[156] In fact, as Exhibit 19 shows, the formulas adopted by both Canadian railroads generated higher FSC rates than the 2000 published CSXT formula.[157]

---

[151] Giftos Deposition, Exhibit 2.

[152] McIntyre Deposition, 50:25–51:9.

[153] Rausser Report, p. 55.

[154] BNSF-0028794.

[155] CSXFSC000000046.

[156] BNSF-0028794; CSXFSC254684-254685.

[157] The CN formula generated a higher FSC rate than the CSXT formula for any WTI price. The CP formula generated an FSC rate higher than or equal to the CSXT rate for any WTI price under $38/bbl.

**EXHIBIT 19**
**COMPARISON OF CSXT, CN, AND CP FSC TRIGGERS**
**2000 FORMULAS**




Source: BNSF-0028794.

84. The established goal of implementing FSCs was to recover incremental fuel costs, a fact to which multiple executives have testified:

- *Clarence Gooden*: "We never internally viewed the fuel surcharge program as revenue. It was a cost offset."[158]

  "[O]n fuel surcharge, you can't count that as price, because it goes up, it goes down, you can get some this week, next week you may not be getting anything. So the fundamental underlying economics are what you're getting in the line haul. Fuel was simply—fuel surcharge was simply an offset to fuel cost."[159]

[158] Gooden Deposition, 49:5-6.

[159] *Ibid*, 62:13-19.

"What you're interested really in knowing is what is your capability of triggering it, because it's only, again, designed to recover costs, not to make money."[160]

- *Michael Ward*: "It's a cost recovery mechanism in our view, but it obviously it increases the total amount of money paid to us by the customer. They may well view that as the price, but it does fluctuate up and down based on the cost of fuel. So I view it as cost recovery versus strictly price, cause there's a base price and then there's a cost recovery element."[161]

  "Q: Okay. And did there come a time when CSX realized more revenue from its fuel surcharge than the increases in fuel costs above the $23 benchmark?
  A: No. We were very conscious that on a cumulative basis we did not over-recover and I was actually quite public with the analysts and saying we would -- had no intention to make money. It was strictly cost recovery and that if we got to the point where cumulatively we had recovered, we would adjust the program.
  Q: And you made statements -- public statements to that effect?
  A: Yes, repeatedly actually."[162]

- *Michael Giftos*: "[O]ur objective was to offset rising fuel costs. The fuel surcharge did that. Presumably another index that – that escalated the prices that we would receive because of increased fuel cost would do it and I was indifferent to what we would have as long as we had something."[163]

  "Our objective was to recapture -- to capture the escalating fuel prices. So if we had a contract with a customer and it had an index that would escalate or adjust the prices up or down, if it had the downward adjustment in it, and that index cap should increase in cost of fuel, then we didn't need -- my instructions to our sales and marketing group were, you did not need to get the fuel surcharge on that particular traffic."[164]

---

[160] *Ibid*, 233:7-10.

[161] Ward Deposition, 212:9-16.

[162] *Ibid*, 206:3-15.

[163] Giftos Deposition, 140:11-17.

[164] *Ibid*, 45:21–46:5.

### F. The Weak Economy and CSXT Operational Issues Continued Through 2003

85. In 2000 and 2001, contemporaneously with its implementation of the initial published FSC formula, CSXT made progress in integrating the Conrail assets into its operations and improved service.[165] However, it still faced a weakening U.S. economy.[166] In the first quarter of 2001, as the U.S. moved into an economic recession, CSXT faced financial challenges that included rising costs, decreasing volume, poor operating performance, and decaying infrastructure in need of repair.[167]

86. The slowing economy led to increased competition for a declining amount of freight traffic. Although its service was improving, this was a difficult environment for CSXT:

> As I said, the customers at this point in time, particularly as we moved into 2001—I mean, our economy was contracting and they were suffering. They were suffering. And, I mean, our whole price increase program was challenged. It's a challenging environment to ask for rate increases because we need real rate increases on—in addition to just cost recovery increases and it was—it was very, very difficult for our sales and marketing organization. Fortunately our service was beginning to improve.[168]

CSXT's financial difficulties extended into 2002 and 2003. In 2002, CSXT still had issues with substantial debt and congestion on the railroad, a slow economy after the terrorist attacks of September 11th, and uncertainty in the fuel markets resulting from the situation in the Middle East.[169] Michael Ward, who became CEO at CSXT in February 2003,[170] described the economic condition of the railroad at the time as follows:

> They were not the best financial times. As I said earlier, our railroad was not operating very well. We were not giving good service to our customers and obviously when you're not running well, your cost profile is not going to be what you would hope it would be.[171]

87. The consistent run-up of fuel prices in 1999 and 2000 abated just as CSXT put in place its published FSC formula. During 2001, the WTI index returned to, and largely remained below, the $28 trigger of the published FSC formula. By the end of 2001, the index had dipped below $20 for a period of six weeks, with the FSC formula adding no additional amount to the base rates. Relief from high fuel

---

[165] CSX Corporation 2000 Annual Report, p. 2.

[166] *Ibid*, p. 19.

[167] Giftos Deposition, 28:19–29:1.

[168] *Ibid*, 68:4–13.

[169] Gooden Deposition, 33:16-22.

[170] Ward Deposition, 6:16-7:5.

[171] Ward Deposition, 104:21–105:1.

costs, however, was temporary. The declining trend reversed in the beginning of 2002. Through 2002 and the first half of 2003, the WTI index fluctuated around the $28 threshold. Exhibit 20 shows the movement of the WTI index before and after the implementation of the 2000 CSXT published FSC formula. By mid-2003, CSXT's fuel costs returned to (and, as it turned out, permanently exceeded) prices reached during the 1999-2000 run-up.

**EXHIBIT 20**
**WEST TEXAS INTERMEDIATE FUEL PRICE PER BARREL AND CSXT 2000 FORMULA TRIGGER**
**JULY 1998 – JUNE 2003**




Source: U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W (accessed January 12, 2013).

### G. Deficiencies in the 2000 CSXT FSC Formula Were Corrected in 2003

88. The design of the 2000 CSXT published fuel surcharge formula was based on a requirement that the underlying index remain above a certain threshold for 30 consecutive business days.[172] This design became problematic for CSXT when fuel prices experienced rapid fluctuation. If the published

[172] CSXFSC000000281-000000298 at 000000283.

WTI price did not stay above the requisite threshold for 30 consecutive days (as was the case several times during this period), the fuel surcharge was not triggered, and CSXT could not recover *any* of the incremental cost resulting from the higher fuel prices. For example, the WTI index spiked in February and March of 2003, reaching levels close to $37. On March 17, 2003, CSXT drafted a press release (set to go out March 19), notifying customers that "the surcharge will change from 2% to 4% effective on shipments having a bill of lading date on and after March 20, 2003."[173] However, two days later (*the day before* the anticipated FSC increase was to go into effect), WTI dropped below the $33 threshold, foreclosing the possibility of an FSC rate increase.[174] A month later, it was back below $28, entirely preventing CSXT from recovering the incremental jump in fuel expenses CSXT had already incurred in the prior months.

89. CSXT determined that it "had a poorly designed program" after the "second time [WTI] missed the $33 by a day or two."[175] The flaw with the design was that the formula was susceptible to short-term volatility and just a one-day price drop below a trigger could undo the buildup caused by the high prices in the prior 29 days. When this exact situation occurred on March 19, 2003, Clyde McIntyre emailed CSXT sales and marketing staff, noting:

> After 29 consecutive days above $33.00 per barrel, the closing price for West Texas Intermediate (WTI) oil published in the March 19, 2003 Wall Street Journal was $31.68. As a result, the CSXT fuel surcharge of 2%, which became effective January 29, 2003, will remain at 2%.[176]

90. The failure of the CSXT published FSC formula to trigger at the 4 percent level because of a price drop below $33 on the last day of the period in March 2003 made the defect of that formula evident. Had the WTI price stayed above $33 for just one more day, CSXT would have been able to capture an additional $6.1 million of its incremental fuel costs through FSC revenue.[177] Instead, this entire cost had to be absorbed by CSXT.

---

[173] CSXFSC129101.

[174] CSXFSC350087. The WTI price closed below $33 on March 18, 2003, which was published in the Wall Street Journal on March 19.

[175] Giftos Deposition, 109:20-23.

[176] CSXFSC350087.

[177] Based on CSXT transactions that included a revenue-based FSC from March 20, 2003 through May 8, 2003 (the date after which the FSC rate would have dropped back down to 2 percent).

91. Having identified the ineffective components of the fuel-cost recovery mechanism, Mr. Giftos and Mr. Couch set out to correct the way in which the formula was applied "almost immediately."[178] The changes were meant to allow the FSC formula to "better match the increased costs that [CSXT was] incurring, because [it was] incurring huge increase in costs without capturing the fuel surcharge offsetting revenue."[179] As Ed Jenkins noted:

> In terms of fuel surcharge, our policy was to try to recover or neutralize what at the time was rising and very volatile fuel prices. And so our policy was to – and to do that in a way that was fair and equitable with the customers. And with those two objectives, we basically expected our marketing groups to try to have some fuel coverage mechanism in the contracts we had with customers, whether that be through an indice [sic] that included fuel in its calculation or whether that was through use of our fuel surcharge program.[180]

92. The new formula had to be more responsive to the "changing market conditions and continued volatility in fuel prices."[181] That is, the fuel surcharge "would be responding in a more real-time basis to the adjustments and the price of oil […] which reflected the price of [CSXT's] diesel fuel."[182] On March 19, 2003, Mr. Giftos wrote a memorandum discussing the problem that had just occurred with the published FSC formula; specifically, that the WTI price falling below the threshold for one day had denied CSXT the higher FSC even though actual fuel prices had increased dramatically. Mr. Giftos called an internal meeting to discuss changes to the terms of CSXT's FSC as published in its 8100 and 8200 tariffs.[183] By the following afternoon, CSXT issued a press release announcing the details of the new fuel surcharge formula that would go into effect on June 1, 2003.[184]

93. CSXT considered a range of possible alternative formulas, including "differences going up, refunds going down […], [changes in] the slope and the trigger point,"[185] as well as how basing the formula on different indices would affect fuel-cost recovery.[186] Other changes were also considered and

---

[178] Giftos Deposition, 109:20-25. Mr. Giftos testified that he "changed our program within 24 hours." [*Ibid*, 148:15]

[179] Couch Deposition, 126:22-25.

[180] Ed Jenkins Deposition, 209:12-22.

[181] Couch Deposition, Exhibit 16.

[182] Giftos Deposition, 114:7-9.

[183] Giftos Deposition, Exhibit 12.

[184] CSXFSC132121-132122.

[185] Couch Deposition, 111:10-20.

[186] Gooden Deposition, Exhibit 2.

ultimately rejected as unnecessary.[187] Fuel surcharge formulas could vary along other parameters as well; for example, Mr. Couch described elements of fuel surcharge methodology as including (i) a trigger point; (ii) the underlying index; (iii) increments at which the FSC is adjusted; (iv) the time frame and method on which the surcharge is based (e.g., averaging or consecutive days); and (v) exception rules.[188] There was a general consensus at CSXT that the requirement for 30 consecutive business days had to change, as short-term volatility would prevent adequate recovery of rapidly escalating prices.[189]

94. By March 20, 2003, the discussions had narrowed to two possible formulas: one that was similar to the contemporaneous published BNSF formula, and the one that CSXT ultimately implemented.[190] Mr. Couch outlined the reasons for selecting the formula including:[191]

- "the CSXT proposed [program] is less aggressive than the BNSF program";
- "[i]t is very similar to our program today";
- "the customer will see the same fuel surcharge bill [at key trigger points—i.e., $28, $33, etc.]";
- "[a]ntitrust concerns are significantly eased as compared to copying another railroad's program";
- "[t]he Fuel Surcharge percentage changes occur at smaller intervals";
- it would be "[b]illed monthly"; and
- it "[w]ill have impact closer to when fuel costs are changing."

95. The published CSXT FSC formula adopted on March 20, 2003 differed from the published formula implemented in October 2000 in two primary ways.[192] The first change to the 2000 FSC formula was meant to directly address the issue Mr. Giftos identified on March 19, 2003. Rather than base the FSC on the fuel price being above a certain threshold for 30 consecutive business days, a

---

[187] Couch Deposition, 122:9-13 and Exhibit 11. Additionally, I understand that a weekly, rather than monthly, calculation was also considered but ultimately rejected.

[188] *Ibid*, 77:8-78:17.

[189] *Ibid*, 112:6-23.

[190] *Ibid*, 139:9-15. Unlike the final CSXT formula, which was based on WTI, BNSF's fuel surcharges were calculated based on the HDF price, with a different strike price and slope.

[191] *Ibid*, Exhibit 12.

[192] CSXFSC132121-132122.

weakness that exposed the formula's susceptibility to fuel price volatility, the calculation was instead based on the monthly average price from two months prior.[193] This change was aimed at insuring that no short-term drop—like the single day drop in March 2003—would prevent CSXT from recovering the otherwise increasing costs of fuel.

96. Second, while the $23 threshold and the 2 percent per $5 slope of the formula were unchanged, new incremental adjustments were added.[194] Specifically, instead of the $5 increments prescribed by the 2000 formula, the increments were reduced to $1 with a corresponding FSC change of 0.4 percent (that is, 2 percent divided by 5).[195] The new formula allowed CSXT to more closely align the FSC rate with actual increases and decreases in fuel costs. Whereas the 2000 formula prescribed the same FSC for any value of the WTI price between $33 and $37, for example, the 2003 formula would allow the FSC to change in smaller steps as the WTI price moved up and down. Exhibit 21 shows a comparison of the triggers and slopes for the two formulas.

---

[193] CSXFSC132121-132122. That is, in April, the FSC would be based on the average WTI price in February of that year. The two month lead time allowed for predictability in advance of implementation (i.e., shippers did not need to wait until the last day of the month to know what they would be paying in the subsequent month).

[194] Couch Deposition, 132:9-13.

[195] CSXFSC132121-132122.

**EXHIBIT 21**
**COMPARISON OF CSXT FSC TRIGGERS AND SLOPES**
**2000 VS. 2003 PUBLISHED FORMULAS**

| WTI Price<br>[a] | 2000 FSC Formula<br>[b] | 2003 FSC Formula<br>[c] |
|---|---|---|
| $23 | 0.0% | 0.0% |
| $24 | 0.0% | 0.4% |
| $25 | 0.0% | 0.8% |
| $26 | 0.0% | 1.2% |
| $27 | 0.0% | 1.6% |
| $28 | 2.0% | 2.0% |
| $29 | 2.0% | 2.4% |
| $30 | 2.0% | 2.8% |
| $31 | 2.0% | 3.2% |
| $32 | 2.0% | 3.6% |
| $33 | 4.0% | 4.0% |
| $34 | 4.0% | 4.4% |
| $35 | 4.0% | 4.8% |
| $36 | 4.0% | 5.2% |
| $37 | 4.0% | 5.6% |
| $38 | 6.0% | 6.0% |
| $39 | 6.0% | 6.4% |
| $40 | 6.0% | 6.8% |
| $41 | 6.0% | 7.2% |
| $42 | 6.0% | 7.6% |
| $43 | 8.0% | 8.0% |

Source: CSXFSC000152803-000152808, at CSXFSC000152808.

97. It is important to note that the 2003 CSXT formula did not necessarily prescribe higher FSC rates than its 2000 predecessor. Rather, the difference was in its responsiveness to fuel price movements. For example, as Exhibit 22 shows, when the WTI price was fluctuating from below $41 to above $57 in late-2004 to mid-2005, the rate prescribed by the 2000 CSXT formula would not have changed at all because the WTI price did not stay above or below any requisite threshold for a long enough period. The 2003 formula, however, adjusted monthly, irrespective of the size of the WTI price movement, allowing the surcharge to account both for upward and downward movements in the short term.

**EXHIBIT 22**
**COMPARISON OF FSC RATES CALCULATED BY 2000 AND 2003 PUBLISHED CSXT FORMULAS**
**NOVEMBER 4, 2004 – APRIL 1, 2005**




Sources: CSXFSC132121-132122; CSXFSC000000281-000000298 at 000000283; and U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W (accessed January 12, 2013).

98. Given the economic conditions at the time of the change, the switch from $5 to $1 increments allowed for greater responsiveness to fuel volatility, reflecting CSXT's unilateral self-interest. In his report, Dr. Rausser observes that in June 2003, oil prices were predicted to stay between $22 and $28 per barrel through 2020.[196] Dr. Rausser took this projection from "an authoritative institutional source of price forecasts" and he explained in his deposition that he cited this particular forecast because the organization—OPEC—"has some control over the marketplace" and "would be actively engaged in maintaining, to the extent that they could control it, that particular price band."[197] Dr. Rausser notes that

[196] Rausser Report, footnote 137. This is the only fuel price projection Dr. Rausser cites in his report.

[197] Deposition of Gordon Rausser, December 11, 2012 ("Rausser Deposition Day 1"), 118:4-9.

Defendants had no unique knowledge of fuel prices,[198] and therefore would have relied on publicly available projections for decisions regarding fuel-cost recovery. Relying on the OPEC projection, Dr. Rausser asserts that "there is nothing in these facts to suggest that Defendants were either experiencing or anticipating a significant rise in fuel costs."[199] By Dr. Rausser's own admission, CSXT could not have foreseen the unprecedented price spikes that were about to occur. Since the expectation was that price fluctuation would occur in a narrow range—specifically, $22 to $28 according to Dr. Rausser—a $5 increment in the FSC formula would be too broad and inflexible. By not triggering the FSC until fuel costs hit $28 per barrel—based on the contemporaneous expected range—CSXT could fail to recover incremental increases in fuel costs within the predicted band. By switching to $1 increments (with the same basis of $23 and the same slope of 2 percent per $5), CSXT ensured that its formula could capture incremental fuel costs within the expected band. Moreover, even if fuel prices exceeded this band, it still would have been in CSXT's unilateral self-interest to adopt the $1 increment for the same reasons.

### H. CSXI Modified Its Published FSC Formula in 2004

99. It is important to note that CSXI did not amend its published fuel surcharge formula between the adoption in 2000 and October 2004, more than a year into the Class Period and some 15 months after the beginning of the alleged conspiracy.[200] This distinction from CSXT is consistent with the fact that the two entities operated independently in different competitive environments, and approached the problem of escalating fuel costs in the context of their own business strategy.[201]

100. At no time did CSXT and CSXI use the same FSC formula. While the two published formulas may have had broadly similar goals of incremental fuel-cost recovery, their structures and applications were significantly different. In fact, unlike the CSXT published formula, which was always based on the WTI index and was changed in mid-2003, the CSXI published FSC formula was always based on the HDF index and remained unchanged until October 2004.[202] The CSXI 2000 FSC formula relied on

[198] *Ibid*, 113:3-6 and 120:12–121:6.

[199] Rausser Report, footnote 137.

[200] The CSXI formula was temporarily discontinued in late 2001 and reinstated in April 2002. [Crawford Deposition, Exhibit 8]

[201] Hart Interview. It is also consistent with, for example, the fact that Mr. Giftos, the architect of the 2000 CSXT formula, was unaware that CSXI had implemented its own published FSC six months prior. [Giftos Deposition, 104:24–105:5]

[202] Crawford Deposition, Exhibit 8.

the HDF price published on the last Monday of each month. The new FSC rate was applied on the first Monday of the subsequent month. This component of the formula was not changed in 2004.[203]

101. CSXI began to consider changes to its published formula in June 2004, weighing the costs and benefits of the various options. The CSXI decision makers considered multiple options for possible changes to the published formula, including published formulas adopted by other railroads and intermodal customers. The intermodal formula adopted by BNSF, which was published on the BNSF website, and by Pacer, was deemed to be the desired choice, with some modifications because it:[204]

- was "transparent";
- began "standardization across the industry" (desirable for interline shippers);
- had proven to be "most effective over last 18 months"; and
- did not alter the timing of billing ("keep it monthly").

CSXI's decision to publish a new formula was announced in September 2004 and the formula went into effect a month later. CSXI increased the trigger for its modified published formula from $1.10 to $1.24.[205] The modified formula changed by 0.5 percent for every four-cent-per-gallon increment (rather than a 0.1 percent change for each 1 percent change in price).[206]

### I. Fuel Costs Rose in an Unprecedented Fashion through the Class Period

102. The oil price increases of the early 2000s were only a precursor to the five-year run up in the middle of the decade (the Class Period), as shown in Exhibit 23 and Exhibit 24.

---

[203] CSXFSC65811-65819 at 65813 and Crawford Deposition, Exhibit 8.

[204] CSXFSC65811-65819 at 65819 and Pacer Stacktrain Electronic Bulletin No. 491, April 26, 2004, available at dnnseotest1.pacer.com/Portals/1/stackfacts/archive/StackFacts_491.pdf.

[205] Crawford Deposition, Exhibit 8. (CSXI noted that there was "little chance of fuel going below $1.24 in short-term." [CSXFSC65811-65819 at 65819])

[206] Crawford Deposition, Exhibit 8.

**EXHIBIT 23**
**WEST TEXAS INTERMEDIATE FUEL PRICE PER BARREL**
**1991 – 2012**




Source: U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W (accessed January 12, 2013).

HIGHLY CONFIDENTIAL

**EXHIBIT 24**
**U.S. NO. 2 DIESEL RETAIL PRICE PER GALLON**
**1994 – 2012**




Source: U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=emd_epd2d_pte_nus_dpg&f=w (accessed January 12, 2013).

103. As Exhibit 25 shows, by mid-2006, CSXT's average fuel cost (per gallon) was twice what it had been only three years earlier. By mid-2008, the price per gallon reached three and a half times what it had been at the start of the Class Period.

**EXHIBIT 25**
**CSXT/CSXI FUEL COST PER GALLON**
**1999 – 2008**




Sources: CSX Corporation Quarterly Flash Statements.

104. Escalating fuel prices had a predictable effect on both CSXT's and CSXI's costs. As Exhibit 26 shows, while fuel expenditure had historically constituted around 6 percent of total expenses, its share rose to 8.2 percent in 2003. In each subsequent year through 2008, the fuel share of total costs increased, peaking at 21.4 percent in 2008.

HIGHLY CONFIDENTIAL

**EXHIBIT 26**
**CSXT/CSXI FUEL SHARE OF TOTAL EXPENSES**
**1991 – 2008**




Sources: CSX Corporation 10-Ks.

105. Like other firms whose business was heavily dependent on fuel, CSXT publicly documented the effects of escalating fuel prices during this time period. Exhibit 27 presents a composite of annual statements made with respect to fuel in CSX's filings with the Securities Exchange Commission.

**EXHIBIT 27**
**PUBLIC STATEMENTS REGARDING FUEL COST IN CSX CORPORATION ANNUAL FILINGS**
**1999 – 2008**

| Year<br>[a] | Result<br>[b] |
|---|---|
| 1999 | Higher fuel prices resulted in a 9% increase in fuel expense on consumption levels that were flat year-to-year. |
| 2000 | Fuel expense was $260 million higher than 1999, $211 million reflecting a 35 cent increase in the average price per gallon for the full year and $49 million as a result of higher fuel consumption with the added Conrail traffic. |
| 2001 | Fuel expense was $52 million or 9% lower in 2001 as compared to 2000. The 6 cent decrease in the average price per gallon of fuel resulted in $34 million of the decrease with $18 million attributable to lower fuel consumption. |
| 2002 | Fuel costs decreased $76 million in 2002, of which $69 million is attributable to lower fuel prices. The net impact on operating income of reduced fuel price was $44 million since $25 million of fuel surcharge revenue was discontinued. Surface Transportation's fuel costs for 2002 were $449 million. |
| 2003 | Fuel expense for surface transportation increased $117 million in 2003, as compard to the prior year. The expense increase is primarily due to $102 million in fuel price increases, while increased volumes were also a factor. The average price per gallon 96 cents per gallon for 2003 compared to 78 cents per gallon for 2002. |
| 2004 | Fuel expenses increased 16% to $656 million in 2004, net of $63 million of fuel hedging benefits, from $566 million in 2003 due principally to the rising price per gallon of diesel fuel. |
| 2005 | Fuel expenses increased 19% to $783 million in 2005, net of $249 million of fuel hedging benefits, due principally to the rising price per gallon of diesel fuel. The average price per gallon of diesel fuel, including benefits from CSX's fuel hedging program, was $1.31 in 2005 versus $1.10 in 2004. |
| 2006 | There was a 13% increase in the average price per gallon of diesel fuel in 2006. This expense increased $329 million primarily due to reduced hedge benefit from the expiration of the fuel hedge program as well as higher fuel prices. |
| 2007 | Fuel expense increased $98 million primarily due to higher fuel prices and prior year hedge benefits that were not repeated during 2007 due to the expiration of the fuel hedge program. |
| 2008 | Fuel expense increased $503 million due to higher fuel prices during most of the year which more than offset increased fuel efficiency. |

Sources: CSX Corporation 10-Ks and Annual Reports.

106. The goal of CSXT's and CSXI's FSC mechanisms was "[t]o be indifferent of fuel price fluctuations above a certain threshold by recovering 100% of incremental fuel expense,"[207] a fact reiterated by CSXT during the Class Period:

- "As you know, we've had this you'll [sic] surcharge program for several years now, and our purpose really in this is to try offset the higher cost of the fuel. And to date, we haven't really done that."[208]
- "The purpose of our fuel surcharge program remains to offset the higher costs of fuel. We will continue to price to the market employing a combination of pure price and fuel surcharge."[209]
- "CSXT's fuel surcharge program is calibrated to recover increased fuel costs—and no more."[210]

From 2003 to 2008, the portion of fuel cost that was not recovered through fuel surcharges remained at approximately $130 million per quarter.[211]

### J. CSXT Changes to Mileage-Based FSC after STB Decision

107. CSXT again began exploring changes to its published FSC formula as early as May 2005, noting that CSXI was doing a better job recovering incremental fuel costs. CSXT also noted that because FSCs were only applied to a segment of CSXI's and CSXT's customer bases, the two formulas combined did not recover the entire increment.[212] Five potential fuel-cost recovery mechanisms were considered at that time:[213]

- "Revenue based, but lower recovery (CN version)"—i.e., based on the Canadian National railroad's published FSC;
- "Mileage based (new BN version)"—i.e., based on BNSF's published FSC;
- "Flat fee based";
- "Adjust current system: start fuel surcharge at $40 per barrel (increase trigger point)"; and

---

[207] CSXFSC077514-077538 at 077515.

[208] CSX Corporation First-Quarter 2006 Earnings Call – Final, April 19, 2006, p. 10.

[209] CSXFSC64532-64540 at 64532.

[210] STB Ex Parte No. 661 Rail Fuel Surcharges (CSXFSC76873-76882, at 76878).

[211] CSXFSC000676724-676725.

[212] CSXFSC77514-77538, at 77517 and 77520.

[213] CSXFSC77514-77538, at 077522.

- "Convert RCAF contracts to fuel surcharge."

108. The pros and cons of each formula were considered, as well as the coverage rates that would be necessary under each in order to achieve complete recovery of incremental fuel costs.[214] CSXT considered the various formulas along a number of criteria, as shown in Exhibit 28.

**EXHIBIT 28**
**COMPARISON OF FSC FORMULAS CONSIDERED BY CSXT IN 2005**

| Criteria | Revenue Based (CN Version) | Mileage Based (BN Version) | Flat Fee | Start at $40 | Convert RCAF |
|---|---|---|---|---|---|
| [a] | [b] | [c] | [d] | [e] | [f] |
| Ease of Administration | Moderate | Moderate | Easy | Moderate | Hard |
| Perceived Fairness From Customer Perspective | Moderate | Fair | Poor | Moderate | Moderate |
| Interline Traffic Administration | Moderate | Moderate | Easy | Moderate | Moderate |
| Ability to Reach Objective | Moderate | Moderate | Moderate | Moderate | Hard |

Source: CSXFSC77514-77538 at 77533.

109. During these preliminary discussions in May 2005, it was determined that between the CSXT and CSXI fuel surcharge formulas, as well as contracts incorporating RCAF(u), only 82 percent of incremental fuel cost was being recovered.[215]

110. On August 3, 2006, the STB issued a notice seeking comment on the adoption of "several measures regarding railroad practices involving fuel surcharges."[216] The STB sought feedback from the railroads regarding potential methods for linking the surcharge directly to fuel costs associated with each shipment, avoiding the potential for overlap with base rate escalators, determining the most relevant single fuel price index, and reporting issues.[217]

111. While the STB's action only affected regulated shipments, CSXT nonetheless voluntarily began considering a comprehensive change to its FSC formulas, including, potentially, adjustments to the published revenue-based formula as well as switching to a mileage-based formula.[218]

---

[214] CSXFSC077514-077538.

[215] CSXFSC077514-077538 at 077520. Notably, it was stated during this discussion that "[w]hatever we do, we need to get to 100% *recovery*." However, a *coverage* goal of 100 percent was not achievable given the competitive environment. [CSXFSC77514-77538 at 77534]

[216] Surface Transportation Board Decision, STB Ex Parte No. 661 – Rail Fuel Surcharges, Decided August 3, 2006, p. 1.

[217] *Ibid.*

[218] CSXFSC312676-312695 at 312681.

112. In its final decision on January 25, 2007, the STB ruled that "computing rail fuel surcharges as a percentage of a base rate is an unreasonable practice" and directed carriers to change this practice.[219] While the ruling required railroads to base their FSC formulas for regulated shipments on metrics that the STB deemed more closely aligned with the actual cost of fuel incurred for each shipment, the STB observed that, for example, "a mileage-based fuel surcharge, although not perfect, more closely tracks changes in fuel costs for an individual shipment than does a rate-based fuel surcharge."[220] The STB also noted the following with respect to a retroactive view on rate-based FSCs:

> In view of the long history of rate-based fuel surcharges in the rail industry, we do not believe that railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible. Indeed, in the mid-1970s, the ICC specifically declined to require carriers to tie their fuel surcharges to mileage. Although conditions have changed since the mid-1970s, railroads may have reasonably relied on that precedent in formulating their fuel surcharge programs.[221]

113. Anticipating that the STB's final decision could require a change to a mileage-based FSC formula for regulated traffic, it is my understanding that CSXT began developing a new formula, identifying mileages for each route, and running scenarios to gauge possible recovery. As a result, CSXT was largely prepared for this decision, noting that "mileage based FSC capabilities have been developed and are being tested."[222] In response to the STB ruling, CSXT customers whose shipments were priced based on public tariffs could be converted to a mileage-based FSC.[223] Those whose pricing was based on contracts and private quotes would be given the choice of a mileage-based FSC formula or a rate-based FSC formula at renewal of any existing contract or PPQ or before entering a new contract or PPQ.[224] I understand that CSXT offered this choice to shippers for unregulated shipments even though it was not—and could not—be required by the STB to abandon or otherwise change its FSCs applicable to unregulated shipments.[225] Starting on April 23, 2007, CSXT implemented a mileage-based FSC formula based on the HDF index. The formula would be triggered at $2.00 and would charge $0.01 per mile for every $0.04 per gallon increase in HDF.[226] The intermodal formula did not change at

---

[219] Surface Transportation Board Decision, STB Ex Parte No. 661 – Rail Fuel Surcharges, Decided January 25, 2007, p. 1.

[220] *Ibid*, p. 9.

[221] *Ibid*, p. 10.

[222] CSXFSC165096-165103 at 165098.

[223] Ward Deposition, 204:8-25.

[224] Gooden Deposition, 259:25-260:19.

[225] Gooden Deposition, 255:18-256:3.

[226] CSXFSC165096-165103, at 165099.

this time, as CSXI was considered to be a "separate company and outside STB's ruling."[227] Moreover, the STB's decision applied only to regulated traffic, and none of CSXI's traffic was regulated.

## VIII. SUMMARY OF DR. RAUSSER'S LIABILITY OPINIONS

114. Plaintiffs' expert Dr. Rausser has inappropriately opined that the alleged conspiracy actually occurred.[228] Dr. Rausser's interpretation and depiction of the freight transportation industry, competition, implementation of FSCs, nature of joint-line communications between Defendants, and empirical analyses are factually inaccurate or incomplete and do not provide any basis for the determination that a conspiracy actually occurred. More specifically, Dr. Rausser opines that he has "observed a number of characteristics of the U.S. rail freight industry that created a business environment conducive to price fixing."[229] The characteristics he identifies include:

- The rail freight industry in the U.S. is highly concentrated. Dr. Rausser further concludes that the Defendants' "huge market share" of 94 percent gave the alleged cartel "the ability to set prices in the market."[230]
- High barriers to entry prevented new railroads or network expansion by smaller railroads which would constrain price fixing actions taken by the Defendants.[231]
- The Defendants deliver goods from origin to destination, an interchangeable service which customers choose based on their price.[232]
- Although there are different transport options for different shippers, the demand for the Defendant's rail freight service is generally inelastic, implying the Defendants would benefit from higher prices through collusion.[233]
- The Defendants had opportunities to communicate with each other and cartel members could monitor each other's behavior easily, facilitating the implementation and operation of a cartel.[234]

---

227 *Ibid*.

228 Rausser Deposition Day 1, 12:15-21.

229 Rausser Report, p. 12.

230 *Ibid*, p. 5.

231 *Ibid*.

232 *Ibid*.

233 *Ibid*.

115. Dr. Rausser further opines that the Defendants' Class Period behavior "evidences collusion."[235] Specifically, Dr. Rausser suggests that statements in business documents and deposition testimony support the allegations in the complaint.[236] Further, he asserts that the implementation of "similar" FSCs and other supposed changes in behavior at the start of the Class Period—including a supposed "structural break" in the relationship between freight rates and fuel prices starting at the beginning of the Class Period and a supposed lack of "economic correspondence" between the FSCs and Defendants' actual fuel cost—was inconsistent with unilateral actions.[237]

116. Dr. Rausser also asserts that common evidence and economic analysis—in particular, a single regression equation based on transaction data prior to and during the alleged conspiracy—can be used to determine the impact of the alleged conspiracy on class members. Dr. Rausser opines that that there was "no material discounting" of base rates to offset fuel surcharges and that all class members paid an overcharge averaging 13.6 percent during the Class Period.[238]

117. He further opines that: [239]

- "The Defendants planned on and each implemented a program of Fuel Surcharges with the same key features."
- "The Defendants instigated coordinated Fuel Surcharge mechanisms well-suited for implementing a general price increase across their customers."
- The Defendants intended that the Fuel Surcharge be applied to all customers and engaged in monitoring activities with the goal of achieving 100% coverage."[240]

---

(. . . continued from previous page)
[234] *Ibid*, pp. 5-6.

[235] *Ibid*, p. 6.

[236] *Ibid*.

[237] *Ibid*, pp. 6-8. In his report, Dr. Rausser bases his analysis on the assumption that the allegedly collusive behavior began at the start of the Class Period, i.e., in July 2003. [*Ibid*, p. 6] However, he does not identify a specific date at which the alleged agreement was implemented, although he testified that he believes an "understanding" between the Defendants began sometime in "early 2003" and was finalized no later than July 2003. [Rausser Deposition Day 1, 25:11-26:16]

[238] Rausser Report, pp. 8-11.

[239] *Ibid*, p. 9.

[240] In his deposition, Dr. Rausser testified that the Defendants did not agree on any specific coverage target. [Deposition of Gordon Rausser, December 18, 2012 ("Rausser Deposition Day 2"), 354:9–355:13]

- "The Defendants' pretextual explanation of the Fuel Surcharge program—that it was intended to recover actual fuel costs—necessitated universal coverage and full application across all shippers, regardless of route and commodity shipped."
- "The [STB] ruled that the revenue based Fuel Surcharge program was unreasonable."

118. Finally, Dr. Rausser presents results from an econometric before-and-after damage model to quantify class-wide damages.[241] Dr. Rausser asserts that in the period prior to the alleged conspiracy, Defendants, acting in a unilateral fashion and without the benefit of coordination, faced difficulties in forcing shippers to accept their original fuel surcharges due to competitive circumstances and the existence of a prevalent and accepted cost index.[242] Dr. Rausser's class-wide regression model estimates an overcharge of 13.6 percent, with class-wide damages of $11.6 billion.[243] Dr. Rausser's model estimates damages of $1.25 billion for CSXT and CSXI together.[244]

## IX. FLAWS IN DR. RAUSSER'S LIABILITY OPINIONS

### A. Dr. Rausser's Analysis of Competition and Industry Structure Is Inconsistent with Basic Facts about CSXT's and CSXI's Freight Transportation Business

119. Understanding the freight transportation options available to each class member is a critical part of assessing whether the competitive environment was conducive to any potential conspiracy as well as the potential impact of the alleged conspiracy. Dr. Rausser claims that rail freight service is a "highly concentrated" market and that services are "interchangeable across Defendants."[245] He proceeds to calculate an anticompetitive "overcharge" that is identical for every shipper in the class.[246] As I demonstrate here, however, Dr. Rausser's asserted characteristics, which are fundamental to his entire analysis, are belied by the evidence. In fact, any ability held by the Defendants to sustain prices above

---

[241] Rausser Report, p. 10.

[242] *Ibid*.

[243] *Ibid*, p. 11.

[244] *Ibid*, p. 172.

[245] *Ibid*, p. 5.

[246] Although Dr. Rausser's damages model estimates a single overcharge across all customers in a given week during the Class Period, in deposition he testified that he expects to calculate damages on a shipper-by-shipper basis in a manner that would result in varying levels of overcharge for each shipment. As I explain later in my report, based on my understanding of this method from his limited description, this methodology would inappropriately attribute any unexplained variation in prices to the conspiracy. Should Dr. Rausser put forward a new model or introduce new calculations, I will analyze any such new analyses and supplement my report, as appropriate.

the competitive (i.e., non-conspiratorial) level to a particular customer would depend on the conditions that affect that customer's ability to shift its freight to transport alternatives other than the Defendants. An analysis of the actual competitive environments in which CSXT and CSXI operated demonstrates that those conditions vary customer by customer and even route by route for individual customers. In some cases, individual customers may have few freight options; in others, non-Defendant railroads and other transportation modes may be available. These differences in competitive circumstances have implications for market definition, concentration, and market power.

### 1. Dr. Rausser Improperly Draws Conclusions about Market Shares, Concentration, and Market Power without Defining a Relevant Antitrust Market

120. In direct contradiction of his conclusion that freight transportation services are "interchangeable across Defendants," in his discussion of the "[g]eographic and product scope of the inquiry," Dr. Rausser notes that the extent of competition between railroads depends on the particular geographic location and further that "viable transport substitutes are different for different commodities."[247] Dr. Rausser further testified that the Defendants are not necessarily "interchangeable" for all shippers and that some shippers have only a single rail option.[248] In his report, he documents the fact that some customers are served by one railroad, while others may be served by two or more.[249] Additionally, he describes in detail how some customers have no transport option other than rail, while others could switch to trucks, barges, pipelines, or some combination of those options.[250] Dr. Rausser notes that railroads price differently to shippers of different commodities and in different regions based on the extent of competition in those limited circumstances.[251] For example, he highlights the fact that the transportation of coal tends to be dominated by railroads, although trucking can compete for short-distance movements.[252] On the other hand, he describes how trucking competes heavily with rail for transport of commodities such as agricultural products and high-value consumer goods.[253]

[247] Rausser Report, pp. 5, 15 and 22.

[248] Rausser Deposition Day 1, 75:3–77:8.

[249] Rausser Report, pp. 15-16.

[250] *Ibid*, pp. 22-24.

[251] *Ibid*, pp. 25 and 36-37.

[252] *Ibid*, pp. 22-24.

[253] *Ibid*.

121. Following that discussion in his report, however, Dr. Rausser repeatedly refers to a single U.S.-wide "market" for rail freight services that ignores the range of competitive options available to shippers in different locations and circumstances, stating:

> The rail freight industry in the U.S. is highly concentrated, with the four Defendants representing 94% of all rail freight revenue in the continental United States. This huge *market share* gave the Defendants' alleged cartel the ability to set prices in the *market*.[254]

and

> [I]t is not reasonably contestable that the U.S. rail freight industry is highly concentrated. The Herfindahl-Hirschman Index (HHI) is the standard measure that the U.S. Department of Justice uses to evaluate market concentration. As the number of Class I railroads dropped significantly from 1978 to 2004, the HHI increased from 589 to 2263. This is well above the 1000 HHI trigger point at which the Department of Justice begins to carefully scrutinize mergers.[255]

122. In deposition, Dr. Rausser testified that he was not referring to a "relevant market," but rather simply to "sales shares" in the Class I "railroad industry," which excludes trucks, barges, smaller railroads, or other competing providers of freight transportation services—even though he states that non-railroad competitors "dominate" certain freight traffic.[256] An "industry," however, is not the same thing as a "market" (or, more specifically, a "relevant antitrust market") which is a specially defined concept in economics that can inform an investigation into the potential market power of particular suppliers. Dr. Rausser admits that he has conducted no analysis to determine the relevant antitrust product or geographic market, stating in deposition: "given my understanding of the legal criteria, it's not required."[257] Notwithstanding his failure to conduct such an analysis, Dr. Rausser's opinions fundamentally rely upon his claims about certain conditions in a purported "market." Specifically, he finds that the "market" was conducive to collusion and he testified that had he not reached this finding, he would not have conducted any further analysis in this case—i.e., he would not have reached any opinions regarding whether the alleged conspiracy actually occurred or whether the challenged conduct injured any shippers and, if so, by how much.[258] Dr. Rausser's failure to properly recognize the competitive role of non-Defendant suppliers of freight transportation services, which is a prerequisite, as

---

[254] *Ibid*, p. 5 (emphasis added).

[255] *Ibid*, p. 28-29.

[256] Rausser Report, p. 24 and Rausser Deposition Day 1, 83:3–84:15.

[257] Deposition of Gordon Rausser, June 3, 2010, 246:6-22.

[258] Rausser Deposition Day 1, 181:9-18.

a matter of economics, for an analysis regarding the conduciveness of the "market" to collusion, is fatal to his analyses and renders his opinions economically unsound.

123. Regardless of whether the Sherman Act requires definition of antitrust markets in cases of alleged price-fixing such as this, Dr. Rausser's opinions here—including his opinion that the alleged conspiracy actually occurred—do require him to define relevant antitrust markets because his opinions are founded upon conclusions about market concentration, market shares, and market power as proof of the alleged conspiracy. For example, he states:

> Economics teaches that industry concentration at the level of the U.S. rail freight industry makes collusion easier, both by simplifying the coordination issues and by increasing the firms' ability to sustain high prices, collectively, without losing *market share* or their *market power*. Participants in a cartel can sustain artificially high prices if they have a large *share of the market* and the "competitive fringe" (i.e., the smaller, non-Defendant railroads) cannot quickly expand capacity. This is precisely the case here.[259]

It is well recognized by economists, however, that before one can draw any valid conclusions about market shares, market concentration, or market power, one must properly define a relevant antitrust market and assess the role of all competitive suppliers of the goods or services at issue.[260]

124. The Merger Guidelines jointly issued by the FTC and DOJ provide a standard framework for defining a relevant market. The Merger Guidelines' market definition methodology is widely accepted by economists for use not only in merger analysis but also in other antitrust matters.[261] The Merger Guidelines use a market definition test known as the Hypothetical Monopolist Test (HMT) which "focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute

[259] Rausser Report, p. 29 (emphasis added).

[260] For example, noted economist Franklin Fisher states, "Let us begin by recalling what the purpose is of market definition. It is the beginning of an analysis of monopoly power." [Franklin M. Fisher, "Diagnosing Monopoly," *Quarterly Review of Economics and Business*, v. 19 (Summer 1979), pp. 7–33 at 13] In a Section I case, as a matter of economics, one does not need to define a relevant antitrust market to draw conclusions about damages. However, the key distinction here is that Dr. Rausser also provides an opinion regarding the existence of a conspiracy and certain conditions of the purported "market" that he claims were conducive to collusion. [Rausser Deposition Day 1, 16:13-19; Rausser report, p. 5.]

[261] In deposition, Dr. Rausser acknowledged that he had not conducted a "full-blown" analysis of competition, as required by the Merger Guidelines to assess market concentration or the ability of competition to constrain pricing. [Rausser Deposition Day 1, 108:13-17 and 109:22–110:8]

away from one product to another in response to a price increase."[262] In other words, its focus is on how likely a buyer is to substitute between products.[263]

125. Data provided by Dr. Rausser himself demonstrate the fallacy of his claim about the supposed conditions affecting CSXT and CSXI during the Class Period. For example, Dr. Rausser cites data showing that railroads transport only about 20 percent of shipments of motor vehicles/parts, with about 70 percent provided by direct trucking.[264] Clearly, the Defendants could not collude successfully to raise prices for these customers without losing share to non-rail competitors. Intermodal rail transport is similarly recognized to be competitive with trucking for all but the longest moves, since the customer always has the option of simply trucking directly from origin to destination, rather than offloading and then onloading at intermodal terminals at either end of the rail shipment.[265]

126. By ignoring the scientifically accepted framework for defining a relevant market, the conclusions Dr. Rausser draws about market share, market concentration, and market power as proof of conspiracy are incomplete, improper, and irrelevant. Furthermore, the conclusions that Dr. Rausser draws about a single "market" are clear misrepresentations of the very same information that he previously cited about the diversity of circumstances facing rail fright shippers. As I describe in more detail above (Section VI.B), it is widely recognized by the STB, among others, that providers of rail freight services operate in distinct product and geographic markets which can be as small as the set of transportation companies servicing a single origin-destination pair.[266] In order to evaluate the ability of those providers to act unilaterally or collectively to restrain competition, each market must be evaluated individually. This is the approach taken by the STB in rate cases and merger reviews. Although I have not conducted an analysis to define the different relevant antitrust markets in this case, it is clear that Dr. Rausser's definition of a single "market" equal to rail freight transport by only Class I railroads across the entire

---

[262] 2010 Horizontal Merger Guidelines, §4.0. Supply-side factors, such as efficiencies or competitor entry that result from a merger, are addressed separately at a later stage.

[263] The types of evidence the Merger Guidelines outline as potentially useful as proof of buyer substitution include: (i) actual data on past customer purchasing behavior in response to price changes, (ii) surveys of expected customer responses to price changes, (iii) a review of actual product characteristics that are important to customers, including geographic locations and switching costs, (iv) the behavior of market participants in response to price or product changes from other market participants and (v) the views of industry experts (recognizing that relevant antitrust markets "are not always intuitive and may not align with how industry members use the term 'market'"). [*Ibid*, §4.0 and §4.1.3]

[264] Rausser Report, p. 23.

[265] See, for example, Giftos Deposition, 155:5-7.

[266] See Section VI.B.

U.S., with the Defendants holding a share of 94 percent, is inconsistent with the basic economic principles underlying the STB's approach to addressing competition issues.

### 2. Dr. Rausser Misrepresents the Nature of Competition between the Defendants

127. Dr. Rausser's characterizations of a single U.S.-wide "market" for rail transport services misrepresents the actual circumstances faced by shippers even in circumstances where the only potentially viable competitors were the Defendants. The nature of these competitive relationships between CSXT or CSXI and the other Defendants has important implications for the assessment of whether CSXT's and CSXI's actions were consistent with its own independent business interests, as opposed to the alleged conspiracy. In particular, it is clear that rail service offered by the Defendants is not "interchangeable" as Dr. Rausser claims.[267]

128. For example, CSXT and CSXI would have little incentive to conspire to raise rates on routes operated by UP or BNSF that are geographically separate from CSXT's network, as those routes could not serve as substitutes for CSXT's own routes, except under very limited circumstances. To the contrary, increasing prices on UP or BNSF routes generally would only serve to reduce demand for interline shipments on CSXT's own routes.

129. Furthermore, even NS and CSXT/CSXI would have little incentive to conspire to raise rates to customers in the eastern part of the U.S. if those customers did not have access to both railroads' facilities. Any agreement between CSXT or CSXI and NS could not benefit CSXT or CSXI in their negotiations with such customers, since NS would not have represented a competitive option in those cases. In fact, raising prices to such customers through an anticompetitive agreement could only reduce CSXT's and CSXI's profits when the customers shifted to other transportation modes, causing CSXT or CSXI to lose direct or interline traffic.

130. In support of his claim that all rail service is "interchangeable," Dr. Rausser cites transaction data that he claims shows that "rail freight customers routinely switch between railroads for shipments along the same routes."[268] For CSXT, Dr. Rausser cites only a single route—Memphis to Jacksonville. He states:

[267] In contrast to his report, in deposition Dr. Rausser acknowledges that services offered by the Defendants are not always interchangeable. [Rausser Deposition Day 1, 75:3–76:16]

[268] Rausser Report, p. 33.

> Of all shippers, 21% purchased rail freight services from both CSX and NS. Of the shippers that made more than 1,000 shipments in the time period, 79% shipped with both railroads. Similarly, 88% of shippers that made more than 5,000 shipments in the time period used both railroads. For the very larger shippers along this route (those with greater than 20,000 shipments), 67% used both railroads.[269]

Dr. Rausser claims this shows that "along these routes the Defendants' customers saw their services as equivalent."[270] Dr. Rausser's conclusion, however, is not supported by the data.

131. By grouping all transactions together by city, Dr. Rausser ignores an important characteristic of CSXT's business in Memphis—specifically, that very little CSXT carload traffic originates in Memphis. In fact, 92.5 percent of unregulated traffic shipped from Memphis to Jacksonville is intermodal.[271] As I discuss above, due to the nature of intermodal business, this traffic is more easily switched between rail carriers than carload traffic. Almost all of the remaining transactions are interline shipments that are not originated by CSXT; only 1 percent of shipments in Dr. Rausser's analysis represent carload traffic originated by CSXT in Memphis and destined for Jacksonville. Of the 10 shippers who originated any freight in Memphis with CSXT, only *one*, [redacted], ever also shipped with NS. Thus, Dr. Rausser's analysis overstates the prevalence of switching by shippers who sought to ship carload freight from Memphis to Jacksonville.

132. However, even if Dr. Rausser's analysis of "city-level" switching is taken at face value, it is clear that his conclusion does not apply to all customers. Dr. Rausser's own calculations show that *79 percent* of the customers who shipped from Memphis to Jacksonville used only a single railroad for those shipments. This would seem to provide no support for his claim that all (or even most) customers viewed the Defendants as interchangeable.

133. Moreover, Dr. Rausser counts a shipper as having used both railroads if it made even a single shipment on each railroad during the nine years from 2000 through 2008. This assumption leads to some incorrect conclusions about "interchangeability." For example, the largest customer on this route, [redacted], made 35,569 shipments on NS and only 19 shipments on CSXT. The second largest shipper on this route was CSXI (apparently providing intermodal transport to its own customers and purchasing the rail portion of that transport from CSXT). Similar to [redacted], CSXI made 33,723 shipments on CSXT and only 28 on NS. Dr. Rausser treats this data as evidence that [redacted] and CSXI view CSXT as "interchangeable" with NS. In deposition, however, Dr. Rausser acknowledged that 30,000 shipments

[269] *Ibid*, p. 34.

[270] *Ibid*.

[271] Transactional data from Dr. Rausser's backup files.

on one railroad and 30 shipments on another "[w]ouldn't be very persuasive" as evidence of routine switching of interchangeability.[272] The third largest shipper, [redacted] made 20,889 shipments on NS and *zero* on CSXT. Together with [redacted] and CSXI, these three shippers alone represent about 45 percent of the total shipments on this route. Overall, I find that a substantial majority of shippers on the Memphis-to-Jacksonville route used only one railroad for essentially all (99 percent or more) of their shipments. I summarize these data in Exhibit 29. These figures refute Dr. Rausser's claim of "interchangeability" of services between the Defendants (CSXT and NS in this case) and his analysis depicted in his Table 6.

**EXHIBIT 29**
**CSXT/CSXI CUSTOMERS FOR MEMPHIS-JACKSONVILLE FREIGHT**
**2001 - 2008**

| Shipper | Number of Shipments by Shipping Railroad: CSX | Number of Shipments by Shipping Railroad: NS | % of Total MEM-JAX Shipments | % of Shipments On Primary Railroad |
|---|---|---|---|---|
| [a] | [b] | [c] | [d] | [e] |
| [redacted] | 19 | 35,569 | 18% | 99.9% |
| | 33,723 | 28 | 17% | 99.9% |
| | 0 | 20,889 | 10% | 100.0% |
| | 13,561 | 432 | 7% | 96.9% |
| | 515 | 12,975 | 7% | 96.2% |
| | 3,479 | 2,572 | 3% | 57.5% |
| | 1,382 | 3,851 | 3% | 73.6% |
| | 5,185 | 7 | 3% | 99.9% |
| | 42 | 4,569 | 2% | 99.1% |
| | 884 | 3,356 | 2% | 79.2% |
| | 2,177 | 754 | 1% | 74.3% |
| | 270 | 2,575 | 1% | 90.5% |
| | 1,400 | 1,020 | 1% | 57.9% |
| | 2,158 | 0 | 1% | 100.0% |
| | 138 | 1,927 | 1% | 93.3% |
| | 518 | 1,323 | 1% | 71.9% |
| | 0 | 1,780 | 1% | 100.0% |
| | 0 | 1,610 | 1% | 100.0% |
| | 158 | 1,318 | 1% | 89.3% |
| | 1,060 | 375 | 1% | 73.9% |
| All Other Shippers | 12,628 | 25,084 | 19% | |
| **All 559 Shippers Identified by Dr. Rausser** | **79,297** | **122,014** | **100%** | |
| **All Shippers with:** | | | | |
| More than 99% of Shipments on Either CSX or NS | 46,316 | 78,831 | 62% | |
| More than 90% of Shipments on Either CSX or NS | 65,515 | 103,025 | 84% | |

Source: Work papers supporting Rausser Report, Table 6.

[272] Rausser Deposition Day 1, 93:2–94:6.

134. Third, Dr. Rausser provides no evidence that a shipper using both railroads frequently for a particular city-to-city route would necessarily view them as "interchangeable." Under some circumstances, that assumption could be false. For example, consider a supplier of aggregates (crushed stone) with two gravel pits in the same city, each with direct access to a different railroad. That customer would not necessarily view the two railroads as "interchangeable," since it could incur substantial costs to truck product between its locations to use the other railroad. That customer would use both CSXT and NS for shipments between the same two *cities* merely because each of the customer's facilities in one of those cities was sole served by either CSXT or NS, thereby requiring the customer to use NS for shipments to and from one facility and CSXT for shipments to and from the other facility. This would not be evidence of "switching" between CSXT and NS for the *same shipments*, as Dr. Rausser suggests in his Table 6, and thus it would not constitute evidence of "interchangeability." Indeed, it would establish the opposite. Yet, Dr. Rausser conducts his "switching" analysis only at the *city* level rather than the actual origin or destination level within each city, and in so doing he, ignores the impact of sole-service on the shipments he includes in his analysis.[273]

135. These factors demonstrate that any alleged anticompetitive agreement could have very different effects on CSXT's (and CSXI's) customers, including potentially none at all, depending on their competitive options. The data do not support Dr. Rausser's claims about conditions supposedly "conducive" to collusion.

### 3. Dr. Rausser Misrepresents the Nature of Inter-Defendant Communications

136. Dr. Rausser asserts that "price monitoring [in the freight rail industry] is relatively easy."[274] He claims that, because of the presence of public tariffs and the sharing of price information between interline partners, the Defendants would have been able to monitor and enforce the alleged conspiracy with little additional cost and without "constant communications" once the initial parameters of the supposed agreement were determined.[275] Although Dr. Rausser acknowledges that inter-defendant communications facilitate joint-line shipments, I find no economic basis for Dr. Rausser's claim that these communications went "above and beyond any vertical relationships with regard to the western and

---

[273] In deposition, Dr. Rausser acknowledged that his analysis did not account for the possibility that a shipper could be sole-served in one or both of the locations that he analyzed. [Rausser Deposition Day 1, 95:19–96:3]

[274] Rausser Report, p. 45.

[275] *Ibid*, pp. 45-49 and 93.

eastern railroads in terms of the services provided."[276] The competitive relationships between CSXT, the other Defendants, and their customers, as evidenced by the factual record, do not comport with his characterizations.

137. First, Dr. Rausser mischaracterizes the nature of private, customer-specific pricing by rail freight companies. The Staggers Act provided for private price quotations and private contracts that, by their very nature, are confidential and not observed by other railroads.[277] Dr. Rausser recognizes this distinction between public tariffs and private transactions, but asserts that the "public tariff[s]…are often incorporated by reference into private contracts and private price quotations. Therefore, abundant Class-wide evidence reveals that there is a very good understanding of pricing in this industry, notwithstanding the extent of private contracting."[278] Dr. Rausser provides no basis for this claim, and no estimate of the fraction of private agreements that reference the public tariffs.[279] In particular, CSXI's intermodal business is entirely unregulated and therefore not covered by public tariffs. Moreover, as I discuss above, many commodities are exempt from carload regulation. For CSXT, public tariffs contain information on "rules, terms and charges for supplemental services and shipment logistics,"[280] so even for those contracts that reference a public tariff, this reference is often used to incorporate standard terms and conditions. Even where a public tariff related to pricing, Dr. Rausser provides no basis to assume that the negotiated private prices were *the same* as (or even similar to) those associated with public tariffs. If they were, the parties would have little need to invest resources into negotiating a private agreement. Indeed, the very purpose of obtaining a PPQ or contract is for a shipper to get a *lower* price than the public price for regulated movements. In sum, even where public pricing is available, it provides no information about private prices in PPQs or contracts.

138. Moreover, a substantial fraction of the class members' transactions with CSXT were governed by PPQs or confidential contracts, and many of CSXT's contracts include negotiated prices, reduced or non-standard surcharges, or other changes relative to the public tariffs.[281] Dr. Rausser cites no evidence that information on private pricing or non-standard terms were shared between the Defendants and

[276] Rausser Deposition Day 2, 292:14-17.

[277] Joel Palley, Office of Policy, Office of Rail Policy and Development, Federal Railroad Administration, "Impact of the Staggers Rail Act of 1980," March 2011.

[278] Rausser Report, pp. 45-46.

[279] Deposition of Gordon Rausser, June 3, 2010, 199:14-201:8.

[280] See www.csx.com/index.cfm/customers/prices-tariffs-fuel-surcharge/tariffs/, (accessed December 30, 2012).

[281] See Section VI.C and Section IX.C.4.

conceded that he does not recall any.[282] Dr. Rausser cites "market intelligence" as providing a mechanism by which the Defendants could monitor private pricing actions for "defections" from the alleged "understanding" regarding a qualitative coverage "target."[283] He refers to "surveys of shippers" as an example of market intelligence, but is not aware of any evidence of such surveys.[284] While CSXT and CSXI may have obtained competitive information from certain shippers during negotiations, it is my understanding that this information was not systematically provided in the negotiation process and, when it was provided, it was typically used to improve the shipper's negotiating position.[285] Even if CSXT and CSXI had been able to systematically collect information from shippers, it would have been in shippers' economic self-interest to understate the price or misrepresent other concessions provided by competitors to obtain a better negotiating position and thereby obtain better contract terms. As a result, this information would have been an unreliable source for monitoring deviations from the alleged agreement. Moreover, "encouraging sales representatives to gather market intelligence would suggest that a collusive agreement does *not* exist; if the defendants were, in fact colluding, it would make little sense to encourage their salespeople to waste time in collecting market intelligence when they could instead be selling the product."[286]

139. Second, Dr. Rausser ignores the fact that the sharing of price information between interline partners relates only to routes for which those railroads would not have competed for business. As Dr. Rausser acknowledges, railroads price every route differently, and even offer varying prices on the same route to different customers.[287] To the extent that the alleged conspiracy would have provided any enhancement of the Defendants' ability to charge anti-competitive rates, it would need to allow the railroads to monitor one another's pricing on routes for which they competed for business. Interline partners, however, to the extent they share information, do so on connecting routes, not competing routes. Dr. Rausser cites no evidence of any Defendant sharing price information with another Defendant for any traffic other than interline traffic between those Defendants.[288]

---

[282] Rausser Deposition Day 1, 99:8–104:5.

[283] *Ibid*, 105:8–106:13 and Rausser Deposition Day 2, 354:14-355:13.

[284] Rausser Deposition Day 1, 103:7-18.

[285] Interview with Dean Piacente, November 19, 2012 ("Piacente Interview").

[286] Roger D. Blair and Jill Boylston Herndon, "Inferring Collusion from Economic Evidence," *Antitrust*, v. 15, n. 17, 2000-2001, p. 19.

[287] Rausser Report, pp. 24-25.

[288] Rausser Deposition Day 1, 99:8–100:6.

140. Finally, Dr. Rausser's characterization of price or coverage monitoring as "relatively easy" is misleading.[289] Consider, for example, CSXT's negotiations with [redacted] in 2006, which applied to more than one hundred distinct base rates and origin-destination/commodity combinations.[290] Based on documents in the record, it appears that CSXT made a renewal offer to [redacted] that was modified at least three times before being accepted.[291] CSXT's revised offer, which was not accepted, included rate reductions and allowances for only 80 percent of the published FSC to be charged on certain routes.[292] The re-revised offer, which was also not accepted, included allowances for 50 percent of the published FSC to be charged.[293] The final terms included rate escalations of 5 percent in the second and third years for specific routes, and 50 percent of the published FSC on certain routes and 100 percent on others.[294] Other terms that were negotiated included: the effective date and term (potentially retroactive); volume commitment; rate adjustment; liquidated damages; payment terms; service performance; storage of railcars, and refunds.[295] The rates, applicable FSC formula, and all of the other terms and conditions listed affected the ultimate cost of shipping for [redacted]. The other Defendants therefore would need to monitor *all* of these factors to identify potential deviations from the alleged understanding. However, neither public tariffs nor interline prices set by connecting Defendants would provide the information necessary to monitor the results of such negotiations and ensure compliance of the alleged conspiracy.

141. While [redacted] provides an example of the complexity involved in monitoring the terms of a negotiation, alone it does not convey the volume of the negotiations that Defendants would have to monitor to detect potential deviations. Specifically, during the Class Period, CSXT and CSXI together entered into more than 1,000 unregulated price authorities per year, each with potentially multiple rates.[296] Each of these price authorities represents a potential deviation from the alleged understanding that, according to Dr. Rausser, would need to be detected either through direct communication between Defendants or through "market intelligence."

---

[289] Rausser Report, p. 45.

[290] CSXFSC227947-227958.

[291] CSXFSC227946.

[292] CSXFSC227947-227958.

[293] *Ibid*. This re-revision constituted an additional rate concession of about $260 thousand over and above the original $573 thousand concession.

[294] *Ibid*; CSXFSC227946.

[295] CSXFSC230372-230373.

[296] Transactional data from Dr. Rausser's backup files.

142. If, as Dr. Rausser acknowledges, a conspiracy to fix base rates would be unworkable, then a conspiracy to charge a common fuel surcharge and avoid discounting base rates would also be unworkable. He provides no support for his claim that "market intelligence" or any other mechanism that would fail to facilitate a conspiracy to fix base rates would then be successful in facilitating the alleged conspiracy. Dr. Rausser also provides no evidence that any of the Defendants was punished for a violation of the alleged conspiracy, or even that one Defendant made any complaint about a potential violation, despite his finding that one or more of the Defendants apparently defected from the alleged conspiracy (for example, BNSF's adoption of mileage-based FSCs for certain commodities).[297]

143. In sum, monitoring and enforcing a conspiracy as alleged by Plaintiffs would require constant communications between the Defendants regarding rates on competing routes, requiring transfers of large quantities of information that otherwise would not be available to competing railroads. Dr. Rausser cites no evidence that the Defendants engaged in such communication and provides no quantification of the substantial cost to the Defendants of monitoring compliance with the alleged understanding. Even Dr. Rausser's alternative monitoring mechanism of collecting "market intelligence" would be unworkable. Moreover, he cannot provide any examples of punishment for deviations from the alleged conspiracy by which to show effective monitoring and enforcement.

### B. Dr. Rausser's Characterization of the Timing and Structure of the Accused FSC Formulas Is Inconsistent with CSXT's and CSXI's Actual Implementation of FSCs and the Benefits Anticipated from Adoption

#### 1. Dr. Rausser Misrepresents the Chronology of Events

144. There are several key features of the CSXT and CSXI published FSC formulas that must be considered when assessing the allegations of collusion in this case. First, the two published formulas were initially implemented in 2000, precipitated by the economic conditions facing CSXT and CSXI at that time.[298] I also have pointed out that the original CSXI and CSXT formulas were developed six months apart, and the CSXT decision maker—Mr. Giftos—was not even aware at the time CSXT adopted its published formula that CSXI already had adopted its own formula. Not surprisingly, the two formulas were different.[299] They were, however, similar to (and in some cases, exactly the same as) formulas adopted by other railroads, notwithstanding the fact that, as Plaintiffs concede, there was no

[297] Rausser Deposition Day 2, 379:14-16.; and Rausser Report, pp. 108-109.

[298] Giftos Deposition, 26:25-28:4; CSXFSC000000281-283; Crawford Deposition, Exhibit 8.

[299] CSXFSC000000281-283; Crawford Deposition, Exhibit 8.

collusion among the Defendants at that time.[300] Lastly, the formulas were changed more than a year apart.[301] Dr. Rausser's account of the development of CSXT and CSXI's published FSC formulas fails to account for all these points.

145. Dr. Rausser's assertion with respect to collusion across railroads to fix FSC formulas is inconsistent with the fact that, even *internally*, CSXT and CSXI had multiple formulas in place. When CSXT introduced its published FSC in October 2000, CSXI already had a *different* formula in place and did not amend it in response to actions taken by CSXT. While the CSXI formula was temporarily discontinued in late 2001, after being reinstated in April 2002 it remained unchanged until October 2004, 15 months after the alleged conspiracy began.[302] This behavior is consistent with the fact that the two entities operated independently in distinct competitive environments and approached the problem of escalating fuel costs in the context of their own business strategies.[303] In contrast, it is not consistent with Dr. Rausser's claims about the terms of the alleged conspiracy.

146. Dr. Rausser further ignores the fact that the changes made to the CSXT published formula around the beginning of the Class Period were minor adjustments to the existing (non-conspiratorial) formula in response to identified flaws, actions that were entirely in CSXT's unilateral self-interest. The rapid pace with which the published 2000 CSXT fuel surcharge formula was redefined on March 19, 2003 belies Dr. Rausser's description of the process.[304] For example, Dr. Rausser stated that "[o]n March 12 and 13, 2003, UP and CSX executives met to discuss 'fuel surcharge methodology.'"[305] While this language does appear at the bottom of "suggested agenda items" for the meeting, Dr. Rausser omits the fact that it is only one of three topics under the heading "Other Pricing Issues on CSX/UP Interline Business."[306] It was not unusual for this and other pricing issues to be discussed with respect to interline business. As I describe above, communication between partnering railroads is an essential,

---

[300] For example, the published formula implemented by CSXT in October 2000 was identical to that implemented by NS in June 2000. In December 2002, UP adopted the same formula as well. [BNSF-0028794] However, Dr. Rausser concedes that these were implemented on the basis of each railroad's unilateral self-interest, stating "these original fuel surcharge programs were apparently designed and implemented by the individual Defendants without agreement or coordination." [Rausser Report, p. 55] Thus, the contemporaneous implementation of identical FSC formulas is apparently not a basis for inferring the existence of a conspiracy.

[301] CSXFSC132121-132122 and Crawford Deposition, Exhibit 8.

[302] Crawford Deposition, Exhibit 8.

[303] Mr. Giftos, the architect of the 2000 CSXT formula, was unaware that CSXI had implemented an FSC six months prior. [Giftos Deposition, 104:24–105:10.]

[304] Giftos Deposition, 110:3-111:25.

[305] Rausser Report, p. 59.

[306] CSXFSC165104.

procompetitive aspect of the interline business, and pricing is one of the key components that was frequently discussed in such communications.

147. Dr. Rausser claims that, as a result of that meeting, CSXT abandoned plans for a formula that "CSX had internally recommended" with a "less onerous" escalator and instead adopted a "more aggressive escalation formula" (i.e., one which generated higher surcharges for a given level of fuel cost).[307] Dr. Rausser, however, misrepresents the facts. The purportedly "less onerous" formula Dr. Rausser characterizes as a "planned change" and which he claims was abandoned as a result of the meeting with UP was prepared by only a single business unit within CSXT and was just one of many suggested versions which had not yet been reviewed by senior executives at CSXT.[308] Mr. Couch noted that in early 2003, CSXT "had so many iterations of the fuel surcharge program being debated" that he did not even remember the one Dr. Rausser claims was abandoned as a result of the meeting with UP.[309] Furthermore, as I showed in Exhibit 22, the formula that was ultimately adopted was not necessarily more "aggressive," as Dr. Rausser claims. Rather, it simply reduced the increments at which the charge would readjust, thereby recovering smaller incremental increases in fuel costs and passing on to customers more frequent incremental decreases in FSCs. In fact, as I describe in more detail in below, the 2003 formula could be more, less, or equally "aggressive," depending on the movements of fuel prices. It is inconsistent with collusive behavior that CSXT or CSXI would adopt a formula which could generate either more or less revenue, depending on the path of fuel prices which the Defendants did not control and about which they had no unique knowledge.[310]

148. Dr. Rausser also represents that CSXT "faced such strong opposition to its program that Mike Giftos, the architect of the program, considered modifying it in various respects."[311] Notwithstanding, Dr. Rausser claims that "UP soon announced it would adopt the same program announced by CSX."[312] This portrayal of events, however, misrepresents the reality of the situation leading up to CSXT's introduction of its new surcharge formula. Ultimately, UP *never actually implemented* the same formula as CSXT. While an announcement was made on April 4, 2003,[313] by May 9, 2003 the UP

---

[307] Rausser Report, p. 59.

[308] Couch Deposition, 110:19-23 and 111:5-7.

[309] *Ibid*, 111:5-7.

[310] Rausser Deposition Day 1, 113:3-6 and 120:12–121:6.

[311] Rausser Report, pp. 59-60.

[312] *Ibid*, p. 60.

[313] UPFSC0000551.

formula had been completely redesigned "in response to customer feedback."[314] Specifically, the formula ultimately implemented by UP was based on the HDF index (rather than the WTI), with a correspondingly different strike price and incremental adjustments.[315] It is important to note that between December 2002 and June 2003, *before* the alleged Class Period, CSXT and UP (along with NS and, in April 2003, KCS) actually had identical fuel surcharge formulas.[316] On June 1, 2003, just as the alleged conspiracy was supposedly about to commence, both railroads implemented new formulas that *diverged* from that common formula.

149. NS, the only other railroad that adopted a formula like CSXT's 2003 published formula, only did so in March 2004, nine months later. This means that on July 1, 2003, the beginning of the alleged conspiracy period, *no other* Defendant had implemented the same FSC formula as CSXT. It is also notable that CSXT was considering adopting BNSF's formula in mid-2003, but chose against doing so, explicitly acting in its own unilateral self-interest.[317] CSXI, which had a distinct (and unique) formula at the time, would make no changes to its pre-Class Period formula for another 15 months.

150. Dr. Rausser's depiction of the events leading up to CSXT's implementation of its 2003 surcharge formula is based on a selective reading of the facts in this case.[318] It does not accurately portray CSXT's internal deliberations on this topic and the rapid acceleration of the process when the surcharge increase trigger was missed on March 18, 2003. In reality, during this time at CSXT, a "broad debate" was going on internally with respect to fuel surcharges.[319]

---

[314] UPFSC0000552. It is important to note that "response to customer feedback" is behavior inconsistent with collusion. The very purpose of implementing collusive pricing mechanisms would be to neutralize customer leverage in order to achieve the desired result. This action by UP is consistent with unilateral conduct reacting to competitive forces, not collusion.

[315] *Ibid*.

[316] BNSF-0028794.

[317] Couch Deposition, Exhibit 12.

[318] For example, when describing the CSXT published FSC formula adopted in 2000, which Dr. Rausser describes as "non-coordinated approaches to fuel surcharges," he cites to Mr. Giftos' deposition testimony. [Rausser Report, pp. 55-56] However, in the same deposition, Mr. Giftos stated that he did not discuss the CSXT formula that was adopted in 2003 with any representative of any other railroad before it was announced, i.e., that it was also "non-coordinated." Dr. Rausser explicitly ignores this portion of the testimony and provides no explanation for why he finds Mr. Giftos' statements credible in one case but not the other. [Rausser Deposition Day 1, 139:22–140:18] Moreover, such credibility assessments are beyond the scope of economic expertise.

[319] Couch Deposition, 103:20–104:2.

### 2. The Nature of the FSC Formulas Is Inconsistent with Dr. Rausser's Characterizations of a "General Price Increase"

151. Dr. Rausser supports his opinion that the Defendants had a rational basis to enter into the alleged conspiracy by asserting that the implementation of the accused FSCs was "by its very nature a general price increase" affecting all customers throughout the Class Period.[320] As I discuss above, when assessed in light of the economic conditions faced by the Defendants at the time the alleged conspiracy was initiated, as well as a variety of other factors, it is clear that this assertion is not true.

152. First, neither CSXT's nor CSXI's published FSC formulas were applied "generally" to all customers in a uniform manner. Many customers paid no FSC on certain transactions during the Class Period, while others paid a discounted surcharge that was not common to all other class members. Thus, the FSC formulas developed in 2003 and 2004 did not "raise rail freight prices across-the-board," as claimed by Dr. Rausser.[321] However, despite the apparent deviations from the alleged conspiracy, Dr. Rausser has identified no evidence that the Defendants agreed to a mechanism to monitor or enforce the alleged agreement or any evidence that any such enforcement occurred. If each Defendant had known at the start of the alleged conspiracy that the others could choose not to comply with the purported agreement for any customer at any time with no consequence, there would have been no incentive to enter into the agreement in the first place. Under such circumstances, unilateral action would achieve the same results, particularly in light of the high costs associated with implementing the alleged conspiracy and the risk of antitrust liability.

153. Dr. Rausser concedes that monitoring and enforcement of a collusive agreement is essential to the rationality and effectiveness of any such agreement as a matter of basic economics. He claims that "the [alleged] collusion was rational since the benefits outweighed the associated costs"[322] and "the Defendants had an incentive to conspire to fix prices, even given the risk of antitrust liability."[323] Dr. Rausser, however, provides no analysis of the costs or risk associated with a finding of antitrust liability which could form a basis for such assertions and, in any case, ignores the possibility that the Defendants could have achieved the same results through unilateral action.[324]

---

[320] Rausser Report, p. 49.

[321] *Ibid*, p. 92.

[322] *Ibid*, p. 6.

[323] *Ibid*, p. 49.

[324] Rausser Deposition Day 1, 125:4-15.

154. Second, based on economic conditions at the time of the alleged formation of the conspiracy in 2003, the Defendants would have had no confidence that the accused FSCs would constitute a "general price increase." As recognized by Dr. Rausser, contemporaneous forecasts, including those developed by OPEC, projected crude oil prices to remain in the mid-$20s through 2020.[325] Thus, CSXT would have expected very low FSCs (at most 2 percent) if oil prices remained in the expected range.

155. Notwithstanding his assertion that the Defendants expected the modified FSC formulas to generate "across-the-board" increases in freight prices, Dr. Rausser's own report and testimony characterize the understanding held by the Defendants around the time of the initiation of the alleged conspiracy as expecting fuel costs to remain relatively stable for more than a decade. This contradiction represents a fundamental problem with his analysis. For example, Dr. Rausser states that "extensive discussions between Defendants' executives in early 2003 occurred *before the precipitous rise in fuel prices was anticipated*" and that "there is *nothing in these facts to suggest that Defendants were either experiencing or anticipating a significant rise in fuel costs* that motivated their adoption of the fuel surcharges."[326] Given these facts, as alleged by Dr. Rausser, CSXT and CSXI would have had little incentive to engage in the alleged conspiracy. If fuel prices were to remain within the predicted band that Dr. Rausser observes was anticipated in early 2003—prior to the Class Period—the accused FSC formulas would not have resulted in *any* price increase during the Class Period. This is because CSXT's published FSC was already at 2 percent as of January 29, 2003.[327] Had fuel prices remained within the anticipated range of $22 to $28, CSXT's FSC rate would have fallen, or at most held constant, during the Class Period.

156. Lastly, the changes in CSXT's published FSC formula in 2003 could have resulted in a decrease in revenue, relative to the formula it replaced, depending on the specific trajectory of oil prices. Adjusting the formula to a monthly average, rather than a 30-consecutive-day requirement tends to generate a higher surcharge when prices are rising, but leads to a lower surcharge when prices are falling.[328] The same is true for the change to the smaller increment for the trigger price ($5 compared to $1). For example, the failure of CSXT's original FSC to trigger in March 2003, during a period of

[325] Rausser Report, footnote 137. See also U.S. Department of Energy, *Annual Energy Outlook 2003*, January 2003, p. 2.

[326] Rausser Report, footnote 137 (emphasis added).

[327] CSXFSC350087.

[328] For example, on January 14, 2005, CSXT noted that some customers operating under the 2000 FSC formula would have received a lower FSC percentage under the 2003 FSC formula for February 1, 2005. [CSXFSC126311]

generally rising oil prices, would have been avoided under the new formula. However, an analogous situation in which prices were generally declining would have resulted in a higher FSC under the original formula, when compared to the new formula introduced in mid-2003.[329] Since there was no expectation that oil prices would experience a consistent upward change over an approximately 5-year period, the Defendants would have had no expectation that changing the FSC formula necessarily would represent a "general price increase" relative to the pre-existing formula. CSXI's 2004 published formula also could have resulted in a decrease in revenue relative to the prior formula.

157. In sum, Dr. Rausser correctly observes that for the alleged conspiracy to be economically rational when he and Plaintiffs contend it was initiated in the first half of 2003, "there needed to be a mechanism that would effectively generate higher prices."[330] Dr. Rausser contends that the accused FSCs were just such a mechanism because "adding a percentage Fuel Surcharge on top of line-haul rates or base rates is by its very nature a general price increase."[331] However, all the evidence Dr. Rausser cites regarding anticipated fuel prices in the first half of 2003 contradicts this contention and instead shows that a general price *decrease* was more reasonably anticipated at that time, as fuel prices were predicted to fall from the then-existing level and remain within a lower range for nearly two decades. Dr. Rausser cites no evidence to suggest CSXT and CSXI did anticipate, or could have anticipated, the level of fuel price increases—and resulting FSC revenues—required to outweigh the anticipated costs (and risks) of the alleged conspiracy.

### C. Dr. Rausser Misinterprets FSC Coverage Levels as Proof of Conspiracy

#### 1. Dr. Rausser Mischaracterizes CSXT's and CSXI's Implementation of the Accused FSC Formulas

158. In support of his claim that "[t]he Defendants' behavior during the Class Period evidences collusion," Dr. Rausser asserts that Defendants "instigated a common rate increase"[332] and "adopted policies to ensure their common goal of achieving 100% Fuel Surcharge coverage."[333] He further claims that "[t]here were dramatic differences in the behavior of the Defendants between the pre- Class Period and the Class Period, concerning the increased use of Fuel Surcharges and the Defendants'

---

[329] For example, suppose that after exceeding the $33 for an extended period in a particular month the WTI index fell below $33 for 29 days, and then rose above $33 on the final day. In this case, the FSC would not decline under the original CSXT formula, but it would under the new formula.

[330] Rausser Report, p. 49.

[331] *Ibid*.

[332] *Ibid*, p. 6.

[333] *Ibid*, p. 7.

refusal to negotiate with shippers concerning those Fuel Surcharges."[334] He contrasts the period prior to the alleged conspiracy when FSCs were supposedly "not applied consistently to all contracts and were often modified or waived"[335] with the Class Period when the conspiracy supposedly "necessitated universal coverage and full application across all shippers, regardless of route and commodity shipped."[336]

159. Dr. Rausser, however, mischaracterizes the actual history of FSC coverage at CSXT and CSXI. Based on my review of the transaction data and documents describing actual rate negotiations between CSXT/CSXI and their customers, I find that neither CSXT nor CSXI implemented a common or universal FSC charge across all customers during the Class Period. Numerous customers paid no surcharge during the Class Period and many others paid a surcharge that differed from the published formulas, based on discounting, capping, or other adjustment. Moreover, the data on CSXT's and CSXI's FSC coverage indicate no particular change in behavior around the purported start of the conspiracy in July 2003. To the contrary, as I demonstrate below, the transaction data shows a relatively gradual increase in coverage of rate-based FSCs beginning prior to and continuing through the early part of the Class Period, until the introduction of CSXT's mileage-based FSC in 2007. In contrast to Dr. Rausser's assertions that CSXT and CSXI agreed with the other Defendants' to a "goal" of achieving 100 percent coverage, CSXT never achieved a rate of coverage for its revenue-based surcharge on unregulated traffic of more than 65 percent during the Class Period. This contradicts Dr. Rausser's assertions about the need for enforcement and the supposedly low costs of monitoring compliance with the alleged conspiracy across the Defendants.[337] To the contrary, all of this evidence is consistent with independent action to deal with the continued problem of rising fuel prices in a competitive environment throughout the Class Period and provides no basis to conclude that CSXT or CSXI engaged in a collusive agreement with the other Defendants.

### 2. Goals of CSXT and CSXI with Respect to FSC Coverage

160. Dr. Rausser asserts that, as part of the alleged conspiracy, the Defendants all developed and coordinated a "policy" of achieving full coverage of the FSCs across all customers.[338] He cites the

---

[334] *Ibid*.

[335] *Ibid*, p. 56

[336] *Ibid*, p. 9.

[337] Rausser Deposition Day 1, 101:11–102:2; Rausser Deposition Day 2, 378:10-13; and Rausser Report, pp. 46-47.

[338] Rausser Report, pp. 58-70.

similar internal policies (with respect to attempting to achieve maximum feasible coverage) of each Defendant as evidence that a conspiracy occurred and that it had a universal effect across every customer. Dr. Rausser, however, has ignored the independent incentives CSXT and CSXI had in attempting to achieve full coverage and the economic context surrounding their decisions.[339]

161. As I describe above, CSXT and CSXI viewed FSCs as a part of their overall fuel-cost recovery strategies. As fuel prices spiked in 1999 and 2000, they each needed a method to recoup short-term increases in costs because repeatedly adjusting potentially millions of base rates would not be practical. Since every shipment entails fuel costs, they each had a unilateral incentive to recover costs on as many shipments as possible.[340] Consistent with this incentive, I understand that CSXT and CSXI attempted to implement an FSC on customer movements whenever economically feasible.[341]

162. As the previously used recovery measures, such as escalators and even the CSXT and CSXI 2000 published FSC formulas, proved ineffective at actually recovering incremental fuel costs, CSXT and CSXI had a further independent incentive to shift customers to the modified FSC formulas. Thus, CSXT's and CSXI's stated "policy" of achieving maximum coverage reflected simply a desire to include a mechanism to recover fuel costs in every negotiation, and is entirely consistent with their independent interest in avoiding losses from rapidly escalating and highly volatile fuel prices.

163. As fuel prices rose more dramatically from 2004 through 2006, obtaining maximum coverage of the FSCs became even more important.[342] Consider, for example, the cost to CSXT of granting a customer an exception from an FSC with a trigger price of $23 when the WTI index reached $33 in January 2003. At that point, CSXT would be absorbing the incremental cost of fuel equivalent to about $10 per barrel. Compare that cost to the cost of granting an exception when the WTI index hit $63 in August 2005. At that point, CSXT would be absorbing an incremental fuel cost equivalent to about $40 per barrel—four times as high as at the earlier date. For this reason, it is clear that CSXT and CSXI each had a unilateral incentive to increase coverage during the Class Period, relative to the period prior. Again, this is consistent with the actual behavior of CSXT and CSXI during this time.

164. Exhibit 30 summarizes some of the testimony from CSXT personnel regarding the intention to achieve maximum coverage levels prior to the Class Period as well as during the Class Period. In each

[339] In deposition, Dr. Rausser acknowledges the unilateral incentive for each Defendant to increase coverage. [Rausser Deposition Day 1, 272:20–273:11]

[340] Ed Jenkins Deposition, 211:1–212:22; Giftos Deposition, 43:1-11; and 159:22–160:14.

[341] Gooden Deposition, 266:6-20.

[342] CSXFSC000672465-672478 and Piacente Deposition, 7:20–11:14 and 51:3-16.

case, the testimony is consistent with the incentives that CSXT and CSXI have faced since the implementation of FSCs in 2000. For example, Mr. Piacente testified that CSXT's goal was always to "improve recovery" and to "get as much coverage as possible," but those conditions (rapidly rising fuel prices) from 2004 through 2006 increased the urgency of achieving those goals. Mr. Gooden testified that CSXT's goal has always been to give exceptions only when necessary, and that policy remained unchanged during the Class Period. Mr. Giftos testified that the FSC was always intended to apply to all potentially coverable freight traffic, since all freight traffic incurs fuel costs. This testimony again is entirely consistent with CSXT's and CSXI's ongoing unilateral incentives to include FSCs in as many transactions as possible, from the first implementation in 2000 though the Class Period.

**EXHIBIT 30**
**CSXT'S COVERAGE POLICIES DID NOT CHANGE BETWEEN PRE-CLASS AND CLASS PERIODS**

| Pre-Class Period [a] | Class Period [b] |
|---|---|
| From 2000, while I was in the role of influence with sales and marketing line responsibilities…our goal was to try and improve coverage. We had a standard fuel surcharge published, but at that time the goal was not to use necessarily that hard and fast. It was to improve the coverage as a whole.[1] | The goal didn't necessarily change. The goal was always to recover as much as possible. The application of fuel surcharges was impressed upon us even more for a couple of reasons.[6] |
| Q: Mr Gooden, from the first time that CSX announced any fuel surcharge at all, which I believe you testified was sometime in 2000, through till to date, has it always been CSX's policy to get a fuel surcharge provision into as many price authorities as it possibly could?<br>A. Yes, ma'am.[2] | Q. Has either—have either of these two policies undergone any changes during your tenure as the chief commercial officer of the company?<br>A. No, ma'am.[7] |
| Q: During the same time frame, has it always been CSX's policy not to give exemptions except where absolutely necessary?<br>A. Yes, ma'am.[3] | I don't think it was as much a change in policy, because you always had to have exception approval. It was a change in what indexes that we were going to be using […] as normal escalators.[8] |
| Again, it's always been our - our goal to try and get as much coverage as possible ever since inception and any discounts to that in our chemical and fertilizer team were - were approved by VPs, were approved by Clarence, depending on the year in that class period.[4] | Because, again, of the escalating cost of fuel, we got much more serious about ensuring we protected ourselves in that 2004, 2006 time frame. So we knew that it was - it was very, very important, especially when it was finally put in our goals. People took it much more seriously.[9] |
| The 2000 FSC was intended to apply to all tariffs, all private price quotes ("PPQs"), and certain contracts. The company believed that it should apply to PPQs, even if the PPQ said the price is not subject to increase, because the PPQ was not a contract and did not include a commitment from the customer. The FSC did not apply to contracts with government index escalators or contracts that specifically prohibit rate adjustments, but did apply to approximately 265 contracts, lists of which were supplied to each market.[5] | Well, all of our traffic moved in trains that were operated by locomotives that were experiencing increased fuel cost, so we wanted -- I wanted to get the broadest possible application that we could accomplish and as rapidly as possible to recoup those escalating costs.[10] |

Sources:
[1] Piacente Deposition, 9:8-15.
[2] Gooden Deposition, 266:6-12.
[3] Gooden Deposition, 266:13-16.
[4] Piacente Deposition, 51:6-11.
[5] Giftos Deposition, Exhibit 3, p. 3.
[6] Piacente Deposition, 10:21-24.
[7] Gooden Deposition, 266:17-20.
[8] Gooden Deposition, 184:18-23.
[9] Piacente Deposition, 51:11-16.
[10] Giftos Deposition, 43:5-11.

165. Finally, despite repeatedly citing CSXT's and the other Defendants' stated "policies" with respect to maximizing coverage which were, in any case, consistent with their independent business interests, Dr. Rausser ignores the fact that CSXT and CSXI did not actually *achieve* 100 percent

coverage during the Class Period or, indeed, anywhere near that level. As I describe next, CSXT and CSXI granted exceptions and adjustments to the published FSC formulas, which is inconsistent with an anticompetitive agreement to implement FSCs "across-the-board," as alleged by Dr. Rausser.

### 3. Quantifying CSXT's and CSXI's FSC Coverage

166. In support of his allegations about changes in the Defendants' behavior during the Class Period, Dr. Rausser presents some data showing the rate of FSC coverage (measured as a percent of revenue included in transactions with a positive FSC) for CSXT's and CSXI's unregulated, non-legacy customers at various points in time. I have excerpted two of his charts in Exhibit 31.[343] The first shows the coverage of CSXT's revenue-based FSCs across unregulated customers (excluding legacy customers), by commodity, during a single month prior to the Class Period (November 2002) and a single month near the end of the Class Period (November 2007). The second shows coverage across CSXI's customers, by year, prior to and during the Class Period. Dr. Rausser claims these charts show that CSXT and CSXI implemented a "common" fuel surcharge in a "uniform" manner across all regions, commodities, and customers with at most "insignificant" exceptions.[344] He also claims they show that CSXT's and CSXI's application of the accused FSC formulas "increased dramatically" during the Class Period.[345] Dr. Rausser's claims, however, are unsupported by the data.

[343] Dr. Rausser's third chart (his Figure 3) is similar to his Figure 36, showing coverage by state rather than commodity.

[344] Rausser Report, pp. 127-128.

[345] *Ibid*, p. 129.

**EXHIBIT 31**
**DR. RAUSSER'S DATA ON CSX'S FSC COVERAGE**






Source: Rausser Report, Figures 36 and 47.

167. First, although Dr. Rausser concludes that Defendants "adopted policies to ensure their common goal of achieving 100% Fuel Surcharge coverage,"[346] and that the conspiracy "[n]ecessitated universal coverage and full application across all shippers, regardless of route and commodity shipped,"[347] the data he uses to support his conclusion are only for non-legacy customers who paid a revenue-based FSC during the Class Period. Dr. Rausser excludes legacy customers and customers who paid a mileage-based FSC from his coverage analysis. While it is appropriate to exclude these transactions from a *damage* calculation, excluding them from an analysis of a key goal of the alleged conspiracy (according to Dr. Rausser) is not appropriate and skews the results of the analysis. As Exhibit 32 shows, customers with legacy contracts and mileage-based FSCs (in 2007) comprised a substantial portion (42 percent) of CSXT's unregulated business, yet were omitted from Dr. Rausser's analysis of the "universal coverage" supposedly required under the alleged agreement.

---

[346] *Ibid*, p. 7.

[347] *Ibid*, p. 9.

EXHIBIT 32
FSC COVERAGE FOR UN-REGULATED CSXT TRANSACTIONS
NOVEMBER 2007




Notes: Dr. Rausser's "coverage" analysis is based only on the transactions represented by the portions shaded in red and blue.

Source: Transactional data from Dr. Rausser's backup files.

168. Exhibit 33 recreates Dr. Rausser's coverage analysis for CSXT. It is evident that the inclusion of legacy transactions significantly reduces apparent "commonality" of FSC coverage, as claimed by Dr. Rausser. Additionally, while there are no mileage-based transactions in 2002, by excluding these in 2007, Dr. Rausser further distorts the picture with respect to the prevalence of the allegedly conspiratorial FSCs.

**EXHIBIT 33**
**FSC COVERAGE FOR UN-REGULATED CSXT TRANSACTIONS**
**NOVEMBER 2002 AND NOVEMBER 2007**




Notes: Coverage is determined by calculating gross revenue on transactions where an FSC was assessed and dividing it by total gross revenue. Transactions that are both defined as legacy and have mileage-based FSCs are presented as legacy. For presentation purposes, this exhibit shows 15 of the 30 commodities presented in Dr. Rausser's analysis.

Sources: Rausser Report, Figure 36 and transactional data from Dr. Rausser's backup files.

169. Second, even taking Dr. Rausser's analyses at face value, his charts do not appear to show "common" or "uniform" application of FSC's during the Class Period. As shown in Dr. Rausser's Figure 36, in November 2007, near the end of the Class Period, when measuring coverage as the percentage of gross revenue on transactions where a revenue based FSC was assessed over total revenue, CSXT's coverage for non-legacy customers ranged from less than 20 percent up to 100 percent, with many commodities in the 50-90 percent range. In his comparison across states, the range extends from about 25 percent up to 100 percent with most states in the 50-70 percent range.[348] As

[348] *Ibid*, p. 21.

shown in Dr. Rausser's Figure 47, CSXI's coverage never exceeded 60 percent during the Class Period. These ranges appear far from "uniform" and demonstrate that CSXT and CSXI never attained anything close to the supposedly agreed upon goal of the alleged conspiracy of "across-the-board" 100-percent coverage.

170. Finally, these charts do not show "dramatic differences in behavior" or "dramatically increasing" coverage beginning at the start of the Class Period relative to the pre-Class Period. This is apparent in Dr. Rausser's chart of intermodal coverage, which shows a substantial increase in coverage in 2001, a slight *decline* in coverage in 2003 when the alleged conspiracy supposedly began, and then consistent increases through the end of the Class Period. With respect to non-intermodal customers, Dr. Rausser's Figure 36 does not show coverage data soon after the start of the Class Period or throughout the period, so it cannot inform an analysis of purported "differences in behavior" that began in July 2003.

171. To address this issue, I calculated CSXT's FSC coverage on a monthly basis from 2001 through 2008, measured again as a percent of revenue included in transactions with a positive FSC. It is important to note that CSXT collected very little FSC revenue through most of 2002 and in January 2003 as fuel prices fell below the trigger point of CSXT's published formula (not because of any known decline in coverage). The transaction data only identifies customers who paid fuel surcharges, given that the formula was triggered, rather than those who had contractual FSC arrangements. As a result, this type of analysis necessarily will understate the true degree of coverage prior to the Class Period where the FSC was not triggered.

172. As shown in Exhibit 34, CSXT's coverage for all unregulated freight increased from 23 percent in early 2001 to 38 percent in June 2003, just before the Class Period, with continuous, gradual increases through the entire Class Period until CSXT introduced its mileage-based formula in April 2007, which began to replace the revenue-based formula. To account for the trigger problem I describe above, I have interpolated total coverage during those months using the dashed line to indicate the approximate level of "coverage" during those months. This chart shows no "dramatic increase" in the coverage of CSXT's revenue-based surcharge at the start of the Class Period or, indeed, at any time during the Class Period. Moreover, this data again demonstrates that a substantial fraction of CSXT's unregulated transactions during the Class Period were not covered by the accused FSCs. Excluding mileage-based FSCs, coverage ranged from about 41 percent in July 2003 to a high of about 65 percent in April 2007. This indicates that, regardless of the company's stated "policy," CSXT did not implement a "common" or "uniform" FSC across all customers; nor were exceptions "insignificant" during the Class Period.

**EXHIBIT 34**
**CSXT FSC COVERAGE FOR UNREGULATED FREIGHT BY MONTH**
**APRIL 2001 – DECEMBER 2008**




Notes: Transactions that are both defined as legacy and have mileage-based FSCs are presented as legacy.

The dashed line represents the implied coverage rate during periods when fuel prices were below the trigger specified by the FSC formula.

Source: Transactional data from Dr. Rausser's backup files.

173. These data contradict Dr. Rausser's claims about "uniform" or "common" coverage and "dramatic" changes in behavior at the start of the Class Period. Even these charts, however, understate the full extent of variation in CSXT's implementation of FSCs during the Class Period. In addition to the large number of transactions that were not covered by any revenue-based FSC during the Class Period, there were also a substantial number of transactions that included a revenue-based FSC which varied from the published formulas. Dr. Rausser's analysis of CSXT's coverage ignores the fact that the company frequently negotiated variations on its published FSC formula during the Class Period, again in contrast to Plaintiffs' allegations about coordinated "uniform" surcharges and a supposed lack of "exceptions." Exhibit 35 compares FSC payments on CSXT class member transactions to the amount of surcharge that would have been due under the published 2003 CSXT formula. As shown here, many

class members who paid a revenue-based FSC in fact paid less than the "common" formula accused by Plaintiffs. The average discount off the published formulas—measured by the space between the red line and the blue shaded area in Exhibit 35—was 19.6 percent during the Class Period. Exhibit 36 shows the average discount off the published CSXT 2003 formula, measured as the difference between FSC payments actually collected from class transactions and what would have been collected if all of those transactions paid 100 percent of the published CSXT 2003 formula, on a monthly basis. The average discount started near zero at the beginning of the Class Period, but rose as high as about 25 percent by the end of the period. These data demonstrate that even class members, who by definition all paid a revenue-based FSC, were not "uniformly" subject to a "common" formula, as asserted by Dr. Rausser.

**EXHIBIT 35**
**FSC REVENUE COLLECTED FROM CSXT CLASS MEMBER TRANSACTIONS**
**COMPARED TO 100 PERCENT OF PUBLISHED CSXT 2003 FORMULA**
**JULY 2003 – DECEMBER 2008**




Source: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

**EXHIBIT 36**
**AVERAGE DISCOUNT OFF CSXT PUBLISHED 2003 FORMULA FOR CSXT CLASS TRANSACTIONS**
**JULY 2003 – DECEMBER 2008**




Source: See Exhibit 35.

### 4. CSXT and CSXI Negotiated Discounts and Other Exceptions to the Accused FSC Formulas

174. Although Dr. Rausser asserts that the allegedly-conspiratorial FSC formulas applied across the Defendants' "entire customer base" in a "uniform"[349] fashion, that claim is clearly contradicted elsewhere in his report (as demonstrated above with respect to Dr. Rausser's Figures 36 and 47) and is precluded by the definition of the class, which excludes all customers who negotiated pricing that excluded an FSC. Furthermore, as I describe below, many CSXT and CSXI customers that paid a revenue-based FSC received a discount relative to the published rate. Dr. Rausser includes such discounted transactions in his damages analysis and applies the same, common overcharge to them that he applies to transactions that included the full published FSC rate. Dr. Rausser, however, provides no

[349] *Ibid*, pp. 49-50.

evidence of any agreement among the Defendants to determine exceptions to the supposed rule of universal, uniform FSC coverage, nor does he even speculate about how such an agreement could have been framed, implemented, monitored, or enforced.

175. In any conspiracy to raise prices, the participants would have an incentive to cheat on the agreement by offering prices below the agreed-upon levels in order to increase market share. A rational conspiracy, therefore, must have a mechanism for monitoring deviations and enforcing some sort of punishment on participants who did deviate. I have already shown that the Defendants did not follow any sort of universal application of the supposedly agreed-upon surcharges. Indeed, private, confidential pricing predominated, especially with the largest, most sophisticated customers, making pricing difficult to monitor. Dr. Rausser, however, cites no evidence that the Defendants disciplined one another for providing exceptions to their customers, nor does he identify any communications among the Defendants regarding exceptions or even a proposed method for allowing exceptions without punishment. A conspiracy that allowed every participant to deviate whenever they felt it necessary to obtain business would be a completely ineffective and irrational one, since the same outcomes could be achieved through unilateral actions.

176. Dr. Rausser asserts that rebasing, the process of increasing the threshold at which the FSC becomes effective while increasing base rates by a corresponding amount, was a mechanism by which the Defendants could "lock in" the revenues from an FSC.[350] However, Dr. Rausser ignores the complications that different FSC thresholds would impose upon the facilitation of an alleged conspiracy and he fails to identify any mechanism by which the Defendants could verify that others' base rates actually were increased. CSXT never implemented a business-wide rebased, revenue-based FSC.[351] Rather, in some customer negotiations, CSXT presented the customer with an option for a rebased FSC or a continuation of their existing FSC. Clarence Gooden explained:

> I'd have to look at it as a case-by-case basis, because it would be depending upon the size of the account, how much I was reducing the base rate by, what was my contribution per car date on that freight, how sustainable was that freight over time, what were the modal competitions to that freight over time. So, I wouldn't have made a decision like that based on any one factor.[352]

---

[350] *Ibid*, pp. 122-123.

[351] I understand that CSXT never published a business-wide rebased, revenue-based FSC.

[352] Gooden Deposition, 194:16-23.

CSXT's goal in the rebasing negotiations was to be "revenue neutral"; that is, it tried to recover the same revenue to offset costs under a rebased system as under existing FSC formulas.[353] However, CSXT also was willing to negotiate discounts with these customers—that is, at times CSXT would increase the base rate by a smaller percent than the amount of the decrease in the rebased FSC. For example, in August 2006, CSXT offered a discount on base rates of up to 3.4 percent to customers who agreed to rebase their FSC.[354] Furthermore, CSXT did not negotiate only a single "rebased" FSC trigger. As shown in Exhibit 37, CSXT negotiated contracts with at least ten different trigger points during the Class Period. Dr. Rausser's assertion that "Defendants implemented common policies aimed at achieving across-the-board application of their Fuel Surcharge" ignores this behavior exhibited by CSXT in negotiating its FSCs.

[353] *Ibid.*, 253:15-23.

[354] CSXFSC235745-235749 at 235749.

HIGHLY CONFIDENTIAL

## EXHIBIT 37
## EXAMPLES OF CSXT CUSTOMERS WITH FSC EXCEPTIONS

| Customer | FSC Formula | | Effective Date | Price Authority |
|---|---|---|---|---|
| | Trigger | Increment | | |
| [a] | [b] | [c] | [d] | [e] |
| | **Non-Standard Increment** | | | |
| [redacted] | $23 | 0.2% | 1/1/2006 | [redacted] |
| | $23 | 0.2% | 1/1/2006 | |
| | $23 | 0.2% | 7/1/2006 | |
| | $23 | 0.2% | 1/1/2007 | |
| | $23 | 0.2% | 1/1/2007 | |
| | $23 | 0.3% | 2/1/2007 | |
| | $23 | 0.2% | 5/15/2007 | |
| | $23 | 0.2% | 1/1/2008 | |
| | **Non-Standard Trigger** | | | |
| [redacted] | $38 | -- | 1/1/2004 | [redacted] |
| | $30 | 0.4% | 12/1/2004 | |
| | $40 | 0.4% | 2/1/2005 | |
| | $32 | 0.4% | 5/16/2005 | |
| | $32 | 0.4% | 6/1/2005 | |
| | $64 | 0.4% | 1/1/2007 | |
| | $64 | 0.4% | 1/1/2007 | |
| | $65 | 0.4% | 7/1/2007 | |
| | $48 | 0.4% | 6/13/2008 | |
| | $114 | 0.4% | 10/1/2008 | |
| | **Non-Standard Increment and Trigger** | | | |
| [redacted] | $28 | 2.0% | 8/1/2006 | [redacted] |
| | $30 | 1.0% | 7/31/2003 | |
| | $64 | 0.2% | 1/1/2007 | |
| | $64 | 0.2% | 1/1/2007 | |
| | $64 | 0.3% | 1/1/2007 | |
| | $64 | 0.3% | 1/1/2007 | |
| | $64 | 0.3% | 1/1/2007 | |
| | $30 | 1.0% | 6/1/2006 | |
| | $64 | 0.3% | 6/1/2008 | |
| | **Standard FSC with Rebate** | | | |
| [redacted] | $23 | 0.4% | N/A | [redacted] |

Notes: [1] The increment is not stated in the letter of agreement; [2] The FSC rate starts at 2% when the trigger is reached; [3] Applies to interline traffic; [4] If the WTI drops $5 dollars or more below the trigger, provided with an FSC credit; [5] The FSC rate increases with every $5 dollar change in WTI; [6] WTI must exceed the trigger for 30 consecutive days. [7] The FSC rate increases with every $4 dollar change in WTI and the FSC rate is capped at 4%; [8] Provided for a semiannual 50% rebate of FSC charges.

Sources: CSXFSC676913-676918; CSXFSC676919-676923; CSXFSC676924-676929; CSXFSC677045-677049; CSXFSC677168-677174; CSXFSC677186-677236; CSXFSC677030-677036; CSXFSC677838-677880; CSXFSC677548-677756; CSXFSC677092-677103; CSXFSC677115-677167; CSXFSC677757-677784; CSXFSC677050-677052; CSXFSC677175-677179; CSXFSC677799-677807; CSXFSC677785-677790; CSXFSC676809-676818; CSXFSC677037-677038; CSXFSC676930-676936; CSXFSC677540-677547; CSXFSC677881-677890; CSXFSC677018-677029; CSXFSC677791-677798; CSXFSC676875-676912; CSXFSC677053-677091; CSXFSC676997-677007; CSXFSC676937-676996; CSXFSC677891-677925.

177. CSXT's approach to rebasing was consistent with its general approach to customer negotiations: where competitive conditions required negotiations, CSXT and its customer often adjusted various types of price-related terms, including both base rate and FSCs. Dr. Rausser's claim that during the Class Period Defendants instituted "strict policies that rendered Fuel Surcharges non-negotiable" and policies "against discounting base rates"[355] is belied by the evidence in the record demonstrating that CSXT had numerous exceptions and alternative applications of FSCs and/or discounting of base rates. Exceptions occurred throughout the Class Period and across every CSXT business unit. These examples were product of intense negotiations over a variety of other elements, such as line-haul rates, term, volume commitments, and service requirements. As Christopher Jenkins explained in his deposition, "the policy was loosely enough enforced that we were allowed to make interpretations as it suited the needs of our business."[356] For example, different CSXT business units had different preferred escalation and fuel recovery mechanisms.[357]

178. To demonstrate the nature of these exceptions, I identified a series of specific customer examples from CSXT and CSXI documents which show the variety of individual economic factors considered in negotiations and the variety of outcomes with respect to FSCs during the Class Period.

**a. [redacted]**

179. [redacted] is a large agricultural customer of CSXT, generating over [redacted] million of revenue for CSXT during the Class Period.[358] [redacted] business consists of procuring, transporting, storing, processing, and merchandising agricultural commodities and products. Throughout the Class Period, [redacted] with CSXT to ship products including [redacted].

180. Many of CSXT's [redacted] were negotiated in the presence of competitive pressures from other railroads that resulted in exceptions to the published FSC formula. For example, internal CSXT correspondence from 2003 noted the following competitive pressures for [redacted].[359]

- [redacted]

[355] Rausser Report, pp. 71-72.

[356] Jenkins Deposition, 32:14-23.

[357] CSXFSC31774, CSXFSC366151, CSXFSC44614, CSXFSC44620, CSXFSC19850, CSXFSC316795, CSXFSC320277, and CSXFSC321073.

[358] Transactional data from Dr. Rausser's backup files.

[359] CSXFSC195971-195972, CSXFSC324678, and CSXFSC324688-324689.

- [redacted]
- [redacted]
- CSXT faced competition from trucks for shipment [redacted].
- Business with [redacted] faced competition from both CN and NS.
- CSXT had lost business [redacted]. A bid to ship [redacted] because CSXT attempted to charge an FSC. Another bid to [redacted] was also lost for the same reason.

181. These competitive pressures led CSXT to make multiple exceptions to its published FSC formulas during its negotiations [redacted].[360] On July 11, 2003 CSXT presented [redacted].[361] [redacted].[362] As a result of the competitive pressures described above, CSXT did not [redacted]. When the contract came up for renewal again the next year, CSXT again did not add any type of FSC.[363]

182. Another example of CSXT not implementing an FSC [redacted] and CSXT faced competition from both NS and trucking.[364] CSXT believed that this competition could result in the loss of this contract, valued at

[360] CSXFSC677427-677535.

[361] CSXFSC195941 and CSXFSC677427-677535.

[362] CSXFSC195941. [redacted] not the only customer that used the negotiating tactic of refusing to pay an FSC. [redacted], among others, initially refused to pay the public fuel surcharge when CSXT announced the new formula. Each customer was able to negotiate an exception to the published formula.

[363] CSXFSC677427-677535.

[364] CSXFSC324688-324689.

$1.1 million.[365] As a result, CSXT agreed to apply a RCAF(u) escalator instead of implementing an FSC.[366]

183. When [redacted], CSXT often had to accept a formula that differed from CSXT's published formula. In [redacted] agreed to an FSC at half the published rate for [redacted].[367] Again, concern about competition with NS and other sources led CSXT to offer a modified formula.[368]

184. The transaction data confirms the results of these negotiations. As Exhibit 38 shows, for the contracts [redacted] agreed to not implement an FSC, no FSC revenues appear in the transactional data during the Class Period.[369] For the contracts [redacted] agreed to a modified FSC, the data show [redacted] well below the published formula levels, despite Dr. Rausser's assertion that the FSC was considered "non-negotiable." Further, as shown in Exhibit 39, the total FSC rate [redacted] for all price authorities across the Class Period was much lower than the alleged conspiratorial FSC.

---

365 *Ibid.*

366 *Ibid.*

367 CSXFSC324673-324674.

368 *Ibid.*

369 The only transactions for contract CSXT 59955 with a fuel surcharge between 2003 and 2005 (when the transaction data end for this contract) are two interline shipments on September 14, 2003. [Transactional data from Dr. Rausser's backup files]

HIGHLY CONFIDENTIAL

## EXHIBIT 38
## [redacted] CONTRACTS COMPARED TO 2003 CSXT PUBLISHED FORMULA




Notes: Includes price authorities containing CSXT, CSXC, and CSXQ prefixes. Transactions that had net revenue less than zero were excluded. FSC rate is calculated as FSC revenue divided by net revenue. Legacy, mileage, regulated, and intermodal transactions were excluded.

Source: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

HIGHLY CONFIDENTIAL

**EXHIBIT 39**

**[redacted] COMPARED TO 2003 CSXT PUBLISHED FORMULA**




Notes: Transactions that lacked a price authority or had net revenue less than zero were excluded. FSC rate is calculated as FSC revenue divided by net revenue. Legacy, mileage, regulated, and intermodal transactions were excluded.

Sources: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

**b. [redacted]**

185. Another example of a customer who negotiated different FSC rates was [redacted] is a leading [redacted] company which transports a variety of materials, including [redacted], on CSXT rails.[370] [redacted] revenue for CSXT during the Class Period.[371] During this period, CSXT faced a variety of competitive pressures for [redacted] and, as a result, offered multiple exceptions to the published FSC formula.

---

[370] [redacted] (accessed January 11, 2013).

[371] Transactional data from Dr. Rausser's backup files.

186. For example, a [redacted] and CSXT that generated approximately $10 million in annual revenue was scheduled to expire on January 31, 2007.[372] During the renewal negotiation, CSXT initially proposed including the published FSC rate for the new contract.[373] However, [redacted] cited several factors that they believed were pertinent to the negotiation, including: [redacted][374] Ultimately, both sides agreed to an FSC at 75 percent of the published formula.[375] I confirmed this result using CSXT's transaction data, as shown in Exhibit 40. Exhibit 41 shows that the overall FSC [redacted] was much lower than the alleged conspiratorial FSC.

---

[372] CSXFSC333754-333761

[373] *Ibid.*

[374] *Ibid.*

[375] *Ibid.*

**EXHIBIT 40**

**[redacted] FOR SPECIFIC CONTRACTS COMPARED TO 2003 CSXT PUBLISHED FORMULA**




Notes: Includes price authorities containing CSXT, CSXC, and CSXQ prefixes. Transactions that had net revenue less than zero were excluded. FSC rate is calculated as FSC revenue divided by net revenue. Legacy, mileage, regulated, and intermodal transactions were excluded.

Sources: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

HIGHLY CONFIDENTIAL

**EXHIBIT 41**
**[redacted] COMPARED TO 2003 CSXT PUBLISHED FORMULA**




Notes: Transactions that lacked a price authority or had net revenue less than zero were excluded. FSC rate is calculated as FSC revenue divided by net revenue. Legacy, mileage, regulated, and intermodal transactions were excluded.

Sources: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

c. [redacted]

187. [redacted] is another example of a customer who negotiated alternative FSC rates throughout the Class Period. [redacted][376] [redacted] via CSXT—including [redacted] for CSXT during the Class Period.[377]

[376] [redacted] 2011 10-K , p. 1.

[377] CSXFSC676772-676778, CSXFSC676728-676771, and transactional data from Dr. Rausser's backup files.

188. CSXT maintained a non-published FSC [redacted] trigger point of $30 per barrel, instead of the $23 figure in the published FSC formula.[378] In addition, this exception was capped at a maximum of 4 percent and provided a discount [redacted] below $20 per barrel.[379] [redacted] an FSC equal to half the published formula. For example, in January 2006 [redacted] with a fuel surcharge at 50 percent of the published rate.[380] Exhibit 42 shows FSC [redacted] for these two contracts compared to the published formula.

189. CSXT also made exceptions on interline [redacted]. In July 2003, CSXT agreed to an interline PPQ for [redacted] $30 WTI trigger point and was capped at 4 percent once the index reached $42.[381] Another example of an interline exception [redacted] September 2006 when CSXT agreed to refund 50 percent of the FSC collected on all interline [redacted], assuming the achievement of certain volume levels.[382] Exhibit 43 shows the overall FSC [redacted] on its CSXT transactions for all price authorities across the Class Period was lower than the allegedly conspiratorial FSC rate.

---

[378] Defendant CSX Transportation Inc.'s Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, Exhibit C.

[379] *Ibid.*

[380] CSXFSC198482-198485, CSXFSC676913- 676918, and CSXFSC676919- 676923.

[381] CSXFSC677540-677547.

[382] CSXFSC86125-86126.

HIGHLY CONFIDENTIAL

**EXHIBIT 42**
**[redacted] RATE FOR SPECIFIC CONTRACTS COMPARED TO 2003 CSXT PUBLISHED FORMULA**




Notes: Includes price authorities containing CSXT, CSXC, and CSXQ prefixes. Transactions that had net revenue less than zero were excluded. FSC rate is calculated as FSC revenue divided by net revenue. Legacy, mileage, regulated, and intermodal transactions were excluded. Includes transactions for [redacted]."

Sources: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

**EXHIBIT 43**

**[redacted] FSC RATE COMPARED TO 2003 CSXT PUBLISHED FORMULA**




Notes: Transactions that lacked a price authority or had net revenue less than zero were excluded. FSC rate is calculated as FSC revenue divided by net revenue. Legacy, mileage, regulated, and intermodal transactions were excluded. Includes transactions for [redacted]

Sources: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

### d. Automotive Customers

190. Many of CSXT's automotive customers, including [redacted] negotiated exceptions to the published FSC formula during the Class Period. [redacted] revenue for CSXT during the Class Period,[383] negotiated contracts during the alleged conspiracy that either applied a negotiated FSC rate or were not subject to an FSC at all. For example, in July 2005, CSXT amended two contracts [redacted] to eliminate FSCs and instead included RCAF(u) escalations to offset fuel expense.[384]

[383] Transactional data from Dr. Rausser's backup files.

[384] CSXFSC323353-323354.

191. Similarly [redacted] worth of revenue for CSXT during the Class Period,[385] negotiated multiple exceptions to the published FSC rate. For example, CSXT had a major vehicle contract [redacted] expired at the end of 2003.[386] When the contract was renegotiated, CSXT documents noted [redacted] "not accept any fuel surcharges, except in the event WTI crude oil becomes equal to or greater than $38 per barrel, CSXT reserves the right to negotiate a fuel surcharge provision."[387] Upon the expiration of that contract on December 31, 2005, the two sides agreed to include an FSC in the new contract; however the threshold to implement the FSC was at $48 per barrel, not $23.[388] [redacted] other contracts during the Class Period that implemented the published 2000 CSXT formula, applying a 2 percent increase for every $5 increase in the WTI, instead of a 0.4 percent increase for every $1 change.[389]

192. [redacted] also negotiated exceptions to CSXT's published FSC formula. In May 2005, [redacted] agreed to consolidate a variety of separate quotes into a single 5-year contract.[390] The contract included a modified FSC (with an initial threshold at $32 per barrel instead of $23) as well as a 5-percent cap on any future rate increases.[391] [redacted] modified FSC into multiple contracts.[392] In addition, [redacted] negotiated a contract with a modified FSC formula in June 2006 with a threshold of $30 per barrel and a 1 percent increase for every $5 change in the WTI index.[393] Exhibit 44 shows the exceptions made in FSC rates for [redacted] compared to the 2003 published CSXT formula.

[385] Transactional data from Dr. Rausser's backup files.

[386] CSXFSC677548-677756.

[387] *Ibid.*

[388] CSXFSC501024-501025 and CSXFSC501144-501146.

[389] CSXFSC150133-150135.

[390] CSXFSC351623.

[391] *Ibid.* The cap was subject to performance measures and could be removed if CSXT exceeded lane specific on-time performance of 80 percent.

[392] CSXFSC150133-150135.

[393] CSXFSC185000-185001.

**HIGHLY CONFIDENTIAL**

**EXHIBIT 44**
**AUTOMOTIVE FSC RATES COMPARED TO 2003 CSXT PUBLISHED FORMULA**




Notes: Transactions that lacked a price authority or had net revenue less than zero were excluded. FSC rate is calculated as FSC revenue divided by net revenue. Legacy, mileage, regulated, and intermodal transactions were excluded.

Sources: Transactional data from Dr. Rausser's backup files and CSXFSC132121-132122.

### e. Coal Customers

193. CSXT's Coal business also made numerous exceptions to the published FSC formula based on customer negotiations. In fact, some customers paid several different FSC formulas in different contracts simultaneously during the Class Period.[394] The following coal customers negotiated modified fuel surcharges:[395]

---

[394] Christopher Jenkins Deposition, Exhibit 1.

[395] *Ibid.*

- [redacted] percentage increases of 0.2 percent rather than 0.4 percent.[396]
- [redacted] percentage increases of 0.26 percent rather than 0.4 percent.
- [redacted] trigger point of above $64/barrel WTI rather than above $23 WTI;[397]
- [redacted] trigger point of above $114/barrel WTI rather than above $23 WTI.[398]
- [redacted] percentage increases of 0.3 percent rather than 0.4 percent and a trigger of above $64 WTI rather than above $23.[399]

#### f. Intermodal

194. CSXI operated on a different FSC formula than CSXT. Moreover, CSXI also granted exceptions to its formula in some situations. Certain customers, such as the [redacted] were completely exempt from FSCs.[400] Other customers negotiated exceptions to the CSXI published formula during the Class Period. For example:[401]

- [redacted] negotiated a cap of 4.5 percent.
- [redacted] negotiated a cap of 8 percent.
- [redacted] negotiated a cap of 21 percent.

### D. CSXT and CSXI Did Not "Over-Recover" Their Cumulative Incremental Fuel Costs

195. Dr. Rausser claims that the Defendants' accused FSCs "did not recover only actual fuel costs" and that there was "[n]o economic correspondence between revenue-based fuel surcharges and any actual increase in fuel prices."[402] His implication is that the accused FSCs allowed CSXT and CSXI to

---

[396] CSXFSC677838-677880.

[397] CSXFSC677175-677179.

[398] CSXFSC677037-677044.

[399] CSXFSC677926-677933, CSXFSC677053-677091, and CSXFSC676875-676912.

[400] CSXFSC83367-83378 at 83372.

[401] *Ibid.*

[402] Rausser Report, p. 74.

"over-recover" relative to actual fuel costs. Dr. Rausser opines that such over-recovery is evidence of an anticompetitive agreement. This conclusion is problematic for multiple reasons.

196. First, Dr. Rausser conducted no analysis comparing the Defendants' actual fuel costs to the revenues attained from the various recovery mechanisms, including FSCs, during the Class Period. The analyses that he presents do not accurately measure actual recovery by the Defendants. I have analyzed the evidence in the record regarding CSXT's and CSXI's design and implementation of their respective accused FSCs with respect to the recovery of fuel costs. I conclude that Dr. Rausser has misinterpreted this information to reach his conclusion that CSXT and CSXI together "over-recovered."

197. Second, the evidence indicates that CSXT and CSXI sought to avoid over recovery of incremental fuel costs through FSCs. Internal documents and testimony show that CSXT and CSXI viewed FSCs as fuel-cost recovery mechanisms, just as they described FSCs externally, before and throughout the Class Period and consciously sought to avoid recovering FSC revenue in excess of their actual cumulative incremental fuel costs. These facts directly contradict Dr. Rausser's unsupported claim that CSXT (and CSXI) viewed FSCs as profit-maximizing tools and used them as a "pretext" for obtaining supra-competitive profits through collusion. Furthermore, based on data regarding actual fuel costs and FSC revenues, I calculate that CSXT and CSXI together *did not* "over-recover" cumulative incremental fuel costs through the end of the Class Period.

198. Third, Dr. Rausser provides no justification for his assumption that any over-recovery, if evident, would necessarily be evidence of an anti-competitive agreement. CSXT and CSXI each had the unilateral incentive to maximize profits; in such an environment, there is no basis to assume that prices would necessarily track fuel costs precisely. Dr. Rausser has performed no analysis of Defendants' financial data which could distinguish the effects of unilateral versus collusive conduct with respect to any purportedly evident over-recovery.

### 1. Dr. Rausser's Calculations of Fuel-Cost Recovery Are Flawed

199. Dr. Rausser does not attempt to calculate recovery directly by comparing FSC revenues or any other measure of fuel-cost recovery to incremental fuel costs. However, he does present some other analyses that he claims support his position that CSXT and CSXI together "over-recovered" fuel costs. Dr. Rausser's first analysis using company-specific data compares changes in fuel costs to changes in gross freight rates (i.e., base rates *plus* FSC revenues). Specifically, he compares changes in Defendants' "gross freight rate," measured in dollars per ton-mile, to changes in the fuel cost during the Class Period. Exhibit 45, taken directly from Dr. Rausser's report, shows his analysis for CSXT/CSXI. Dr. Rausser states that analysis shows that "CSX rates for those customers who paid the Fuel Surcharge

increased much more in dollars per ton-mile than did actual fuel costs in dollars per ton-miles."[403] Dr. Rausser's calculations, however, do not provide an accurate measure of over-recovery, for a variety of reasons.

**EXHIBIT 45**
**DR. RAUSSER'S COMPARISON OF "GROSS FREIGHT RATE" VS. FUEL COSTS FOR CSXT/CSXI**




Source: Rausser Report, Figure 15.

200. First, these calculations exclude transactions during the Class Period for which the CSXT and CSXI customers paid no revenue-based surcharge. Dr. Rausser's chart, therefore, does not provide an accurate picture of the actual fuel costs of CSXT and CSXI and the impact of FSCs to recover those costs across the companies. As I describe above, due to competitive conditions that prevented CSXT and CSXI from applying FSCs to every shipment, including during the Class Period, an FSC assessed on a given shipment may have generated more or less revenue than the actual, incremental cost of fuel needed to transport the shipment. In cases where no FSC was applied, then, of course, no FSC revenue

[403] *Ibid*, pp. 79-80.

was generated by that shipment, even though CSXT or CSXI incurred incremental fuel costs for carrying that shipment, depending on what fuel costs were at the time. Dr. Rausser's exclusion of customers who avoided paying any FSC from his analysis therefore overstates the extent to which CSXT's and CSXI's total revenues increased over and above the fuel costs they incurred. I have corrected this problem by replacing Dr. Rausser's measure of "gross freight rate" with a more appropriate measure which includes all transactions during the Class Period, rather than just those with a revenue-based FSC. As shown in Exhibit 46, the overall "gross freight rate" of CSXT and CSXI increased only modestly faster than its fuel costs during the Class Period; the difference at the end of 2008 is only 0.5 cents per ton-mile, compared to 1.6 cents per ton-mile as shown in Dr. Rausser's calculations.

**EXHIBIT 46**
**COMPARISON OF "GROSS FREIGHT RATE" VS. FUEL COSTS FOR CSXT/CSXI BASED ON CONSISTENT DATA**




Source: Rausser Report, Figure 15 and CSXT Quarterly Financial Reports.

201. Even this difference, however, does not adequately measure "over-recovery" as implied by Dr. Rausser. The difference between the gross rates and fuel costs of CSXT/CSXI is also affected by other factors, such as rising demand, capacity constraints, or costs other than fuel costs. In deposition, Dr. Rausser recognized that economic conditions affecting freight rates, other than fuel costs, changed during the Class Period relative to the prior period.[404] His analysis shown above ignores such factors. In sum, Dr. Rausser's analysis overstates CSXT's and CSXI's recovery of incremental fuel costs and does not provide a reliable measure of whether the accused formulas over-recovered those costs.[405]

### 2. CSXT and CSXI Sought to Avoid "Over-Recovery" of Their Cumulative Incremental Fuel Costs

202. Historically, CSXT and CSXI intended FSCs to be a part of an overall fuel-cost recovery program that would allow the company to be "indifferent" to fluctuations in fuel prices and to recover "100% of incremental fuel expense."[406] However, as I discuss above, prior to implementing the accused CSXT and CSXI FSC formulas in 2003 and 2004, the formulas were failing to generate sufficient revenues to offset increased fuel costs during periods of rising and highly volatile fuel prices. This was due primarily to two factors: 1) the prior formulas did not adequately match movements in fuel prices and 2) CSXT and CSXI had not collected surcharges for a sufficient portion of customer shipments.[407] The changes in the formulas were intended to remedy the first problem.

203. CSXT and CSXI recognized, however, that while the new formulas could help avoid under-recovery problems that occurred using the previous formulas (like failure to trigger when the target index fell below the trigger price on the 30th day), the company would not be able to apply the new formulas to all customers immediately (or possibly ever) due to the existence of long-term contracts.[408] That is, the new FSC formulas would result in differential effects on customers, depending on whether those customers had long-term contracts. As I discuss above, the concept of differential pricing by rail

[404] Rausser Deposition Day 1, 27:7–28:5.

[405] Dr. Rausser also cites to his damages model as support for his assertion that the accused FSCs resulted in "massive over-recovery of actual fuel costs." [Rausser Report, p. 84] In particular, Dr. Rausser cites to the purported "structural break" in Defendants' pricing at the start of the Class Period and the supposed "overcharge" which he calculates to be an average of 13.6 percent during the Class Period. I have identified several key problems with Dr. Rausser's model, however, which demonstrate that his "overcharge" estimate does not represent an accurate measure of over-recovery for CSXT and CSXI. I discuss these issues in Section XII.

[406] CSXFSC77514-77563 at 77515. See also CSXFSC76873-76882; CSXFSC64532-64540; CSXFSC237575-237587; Gooden Deposition, 49:5-6; Ward Deposition, 206:3-15; and Giftos Deposition, 45:21–46:5.

[407] See, for example, CSXFSC153005-153006.

[408] CSXFSC153063-153065, at 153064.

freight companies is a well-established and accepted component of a competitive, de-regulated environment.[409] Since fuel surcharges are simply one component of the overall price paid by customers, differential application of fuel surcharges across customers is a logical and economically rational extension of that concept.[410]

204. Moreover, following implementation of the accused FSC formulas (even when considering that some customers' surcharges would potentially exceed the incremental fuel costs associated with their shipments), CSXT expected that the company as a whole would still under-recover for a period of time,[411] but that coverage could eventually increase to the point where it would begin to fully recover aggregate incremental fuel costs on an ongoing basis.[412] The expectation was that as coverage by the new FSCs eventually expanded to a sufficient portion of the overall customer base, CSXT would reduce the surcharge rates or increase the trigger prices to avoid over-recovery.[413]

205. CSXT and CSXI internally monitored recovery of fuel costs and continuously analyzed the current and cumulative fuel-cost recovery balance.[414] Analyses conducted during the 2004-2006 period indicated that CSXT/CSXI under-recovered in each year from 2002 through 2005, totaling approximately $300 million on a cumulative basis.[415] Exhibit 47 is an example of an internal CSXT business document showing the company's calculation of fuel-cost recovery. CSXT calculated net recovery by starting with gross fuel cost (excluding any offsets from hedging) and then subtracting two recovery components: 1) gross FSC revenue (including both revenue- and mileage-based); and 2) recovery from base rates, using the company's estimate of the fuel cost built into its base rates, estimated at an average of $0.70 per gallon of fuel consumed.[416] This analysis shows that, as expected, CSXT/CSXI had under-recovered through 2005 by approximately $320 million. The same document indicated that the company broke even with respect to incremental fuel costs in the first half of 2006,

---

[409] See, for example, GAO Report, p. 8.

[410] CSXFSC372193-372212 and CSXFSC000333177-333178.

[411] Couch Deposition, Ex. 12; CSXFSC000333177-333178; CSXFSC237575-237587; and CSXFSC372193-372212.

[412] CSXFSC372193-372212; Couch Deposition, Ex. 12; CSXFSC6684, and CSXFSC12334-12338.

[413] *Ibid.*

[414] See, for example, CSXFSC12334-12338.

[415] CSXFSC237575-237587 and CSXFSC12334-12338. CSX analyzed the performance of CSXT's and CSXI's fuel recovery on a combined basis. In my analysis here, I also combine the entities.

[416] I understand that CSX used the estimate of $0.70 per gallon to represent the average recovery from base rates, including the recovery from the various escalators applied to base rates.

and expected to over-recover by $50 million to $100 million in the second half of that year, for a projected cumulative under-recovery of $220 million through the end of 2006.[417]

**EXHIBIT 47**
**2006 CALCULATION OF CUMULATIVE FUEL-COST RECOVERY FOR CSXT/CSXT**




Source: CSXFSC12334-12338 at 12335.

206. I have not seen internal CSXT documents from later than mid-2006 that performed this calculation. However, I obtained data regarding CSXT's and CSXI's fuel expenses and FSC revenue which allow me to perform similar calculations. Exhibit 48 shows the results of those calculations. I find that, for a short period of time in 2006, CSXT and CSXI did begin to fully recover their fuel costs on an incremental basis, based on the company's internal methodology for estimating recovery; however, that pattern was soon reversed and under-recover began again in Q2 2007. Consistent with the analyses performed by CSXT executives at the time, and the testimony by CSXT executives in this case, I find that CSXT/CSXI never over-recovered on a cumulative basis.[418] I calculate that from 2003 through the end of the Class Period (December 2008), CSXT's and CSXI's fuel recovery programs

[417] CSXFSC12334-12338.

[418] Ward Deposition, 206:3-12.

together have generated $488 million less than their cumulative incremental fuel costs incurred during that period.[419]

**EXHIBIT 48**
**RECOVERY OF FUEL COSTS BY CSXT/CSXI**
**2003 – 2008**




Source: CSXFSC000676724-676725.

207. These calculations demonstrate that Dr. Rausser's claim that Defendants "did not recover only actual fuel costs"[420] is false. These results provide no evidence of an anticompetitive agreement or outcome, or of any associated damages, and are fully consistent with unilateral decision-making on the part of CSXT and CSXI.

---

[419] This calculation excludes losses prior to 2003 (such as shown for 2002 in Exhibit 48) and therefore represents a conservative estimate of cumulative recovery through the end of the Class Period. This analysis does not include the net effect of CSXT's hedging program. I address that issue below.

[420] Rausser Report, p. 74.

### E. Dr. Rausser Misrepresents the Relationship between CSXT's Hedging Activities and Fuel Recovery Programs

208. In support of his claims that the accused FSCs were part of an alleged conspiracy, rather than an economically rational, unilateral response to fuel price volatility on the part of each of the Defendants independently, Dr. Rausser cites the fuel-cost hedging programs implemented by the Defendants at various times during the Class Period.[421] He asserts that "the new Fuel Surcharge program…ignored the benefits of hedging programs some individual Defendants had in place."[422] He further claims that customers paid the accused FSCs during 2008 "even though some of the Defendants could have been well insured against such events through their hedging strategies."[423] Finally, Dr. Rausser cites communications between CSXT and NS regarding NS's hedging program as evidence that the companies again "ignored their unilateral self-interest" and provides "further evidence that a collusive agreement [regarding FSCs] was in place."[424]

209. Based on my review of CSXT's temporary hedging program, I find that Dr. Rausser misrepresents the relationship between CSXT's FSCs and its hedging activities. CSXT's hedging program, which was implemented for a period of only about one year after the published 2003 FSC formula was put in place, was an entirely rational response to the problem of fuel price volatility, from the perspective of CSXT's independent business interests, given the limited coverage of FSCs across CSXT's customer base. My conclusions are confirmed by the fact that other railroads which have not been accused by Plaintiffs as being part of the alleged conspiracy also engaged in both FSCs and hedging during the same period as CSXT, including Canadian National, Canadian Pacific, and Kansas City Southern.[425] The fact that CSXT simultaneously implemented FSCs as well as a temporary hedging program provides no evidence of a collusive agreement between CSXT (or CSXI) and the other Defendants.

---

[421] *Ibid*, pp. 103-106.

[422] *Ibid*, p. 104.

[423] *Ibid*, p. 105.

[424] *Ibid*, p. 106.

[425] See, for example, "Other Investor Focus", p. 107, available at www.cn.ca/documents/Investor-Factbook-current/2011-IFB-OtherInvestorFocus-en.pdf; Canadian National, 2000 Annual Report, p.44; Canadian National, 2005 Annual Report, p. 59; "WTI Update Archive," available at www.kcsouthern.com/en-us/Services/Pages/WTIUpdateArchive.aspx (accessed December 31, 2012); Kansas City Southern, Form 2001 10-K, p. 93; Kansas City Southern, 2005 Form 10-K, p. 121; Kansas City Southern, 2011 Form 10-K, p. 90; CSXFSC128970; Canadian Pacific, 2002 Annual Report, p. 38; Canadian Pacific, 2004 Annual Report, p. 2; and Canadian Pacific, 2011 Annual Report, p. 40.

### 1. CSXT's Temporary Hedging Program Was an Independent, Economically Rational Response to the Limitations of Its FSCs

210. In 2003, as CSXT began to recognize that its early attempts to mitigate fuel price volatility were not sufficiently addressing the problem of rising costs, the company considered a variety of options. As I have documented above, CSXT ultimately decided to update its FSC formulas and continued to attempt to increase coverage across its customer base. However, CSXT did not expect full FSC coverage to be reached immediately. The company therefore sought additional short-term measures to address the expected shortfall in protection against fuel price volatility.

211. One additional method considered by CSXT, and eventually implemented for a short time, was a fuel-cost hedging program. Hedging fuel costs involves techniques such as purchasing contracts at a fixed price for future delivery, engaging in "swaps" of a fixed price for a market price, or purchasing options for future delivery. Forward purchases, for example, lock in a guaranteed price for a period of time, thereby insuring against large price increases in the short term. However, this insurance comes at the expense of exposure to losses on the hedging investment if fuel prices decrease in the short term as well as any transaction costs incurred through the process of setting up the hedge.

212. While CSXT considered, and eventually entered into, a program to purchase swaps in order to reduce fuel price volatility, it recognized that hedging in this manner involves transaction costs and also presents the possibility of losses should spot prices decline rather than increase.[426] Furthermore, hedging can only protect against short-term changes in fuel costs. If prices rise, and stay high for more than one or two years, then hedging could provide no protection against CSXT's increased costs.[427] For example, a May 2003 CSXT memo evaluating various options identified the weaknesses of the existing fuel-cost recovery programs and further stated with regard to hedging:

> Is hedging an option? CSXT is reviewing various hedging programs to determine if we can find a structure that works for us and our customers, however hedging isn't necessarily any better. It is true that hedging does reduce a company's vulnerability to would [sic] swings in the market and price volatility…and it does provide a level of predictability. However, to hedge, you must pay a 1% to 2% premium on the price.[428]

213. These problems do not exist with FSC coverage adequate to simply pass increasing incremental fuel costs through to customers. CSXT therefore decided to continue to pursue full FSC coverage, but use hedging as an additional tool to help provide some additional protection against short-term price

---

[426] CSXFSC000333177-333178; CSXFSC66583-66584; CSXFSC279964; and Ward Deposition, 213:15–214:9.

[427] CSXFSC259376-259383 and CSXFSC66583-66584.

[428] Couch Deposition, Exhibit 16.

spikes for the fraction of CSXT's business that was not covered by an FSC.[429] Thus, CSXT designed its hedging program so that the amount of hedging would decline as the implementation of FSCs expanded.[430]

214. Beginning in late-2003, CSXT implemented a series of swap transactions designed to act as a partial hedge against fuel price volatility for periods of as much as 24 months out.[431] Those transactions resulted in coverage for only a small share of CSXT's and CSXI's combined fuel purchases from early 2004 through July 2006: 18 percent in 2004, 48 percent in 2005, and 9 percent in 2006.[432] By mid-2004, however, a combination of factors caused CSXT to cease its hedging activity.[433] In particular, rising fuel prices had reduced the attractiveness of forward purchases (due to the expectation that future declines had become more likely) and increasing FSC coverage had reduced the need for additional protection. CSXT's last fuel hedge contract expired in July 2006.[434] From that point forward, CSXT relied only upon FSCs as protection against fuel price volatility.[435]

215. This history of CSXT's activities during the Class Period demonstrates that the combination of hedging and FSCs was an economically rational response to the problem of fuel price volatility, given the incomplete coverage, and therefore "under-recovery" of increasing incremental fuel costs, provided by FSCs from 2003 forward.

#### 2. Even When Including the Results of Its Temporary Hedging Program, CSXT and CSXI Did Not "Over-Recover" during the Class Period

216. Unlike FSCs, which essentially pass fuel-cost increases through to the customers, a fuel price hedging program cannot improve the long-run cost structure of the company. While hedging can reduce the volatility of net fuel costs, it does not reduce fuel costs on average. In fact, hedging should be expected to *increase* overall costs, since purchasing the contracts adds transaction costs while providing no expectation of a net reduction in fuel expenditures. In addition, while hedging fuel costs can affect a company's overall financial performance, it does not change the marginal cost of providing the product

[429] CSXFSC326228-326230 and CSXFSC459283.

[430] CSXFSC66583-66584, CSXFSC459283, and CSXFSC91307.

[431] CSX Corporation 2003 Form 10-K, p. 26.

[432] CSX Corporation 2006 Form 10-K, p. 48; and CSX Corporation 2004 Form 10-K, pp. 29 and 42.

[433] CSX Corporation 2004 Form 10-K, p. 79; Ward Deposition, 215:8-15; CSXFSC91307; CSXFSC279964; and CSXFSC259376-259383.

[434] CSX Corporation 2006 Form 10-K, p. 97.

[435] CSXFSC186832 and CSX Corporation 2006 Form 10-K, p. 97.

or service at issue, which depends on the market value of the fuel consumed. Pricing decisions therefore should be unaffected by hedging activities, because it is a fundamental economic principle that pricing decisions in a competitive environment are based on the marginal cost of providing the product or service at issue. Consistent with these principles, when CSXT analyzed its fuel-cost recovery programs, it usually evaluated them separately from its hedging activities.[436] I included an example of such an analysis performed by CSXT in Exhibit 47, above.

217. Notwithstanding these reasons to exclude hedging results when evaluating the performance of its fuel-cost recovery programs, when CSXT reviewed its overall financial position, the company did include all activities that it implemented to mitigate volatility, including hedges. For example, the company performed internal analyses of its overall fuel position and described hedging results as part of its overall analysis of fuel expenses in public financial filings.[437] CSXT calculated that its hedging activities generated net benefits of $63 million in 2004, $249 million in 2005, and $55 million in 2006, for a total of $367 million during the January 2004 – July 2006 period.[438]

218. Although I agree with CSXT's view that the performance of its fuel-cost recovery program is most reasonably evaluated in isolation from any concurrent hedging activities, for the purposes of my analysis here I have calculated a second measure of cumulative fuel-cost recovery which includes the impact of hedging. Exhibit 49 shows the results of my calculations. This analysis is similar to that which I present in the previous section (Exhibit 48), but here I include the hedging benefits accrued from 2004 through 2006. I calculate that from 2003 through the end of the Class Period (December 2008), CSXT's and CSXI's fuel-cost recovery programs generated $121 million less than the incremental fuel costs incurred during that period.[439] Thus, CSXT and CSXI did not over-recover incremental fuel costs on a cumulative basis through at least the end of the Class Period, even when including the benefits of the concurrent hedging program.

---

[436] CSXFSC000333177-333178 and Ward Deposition, 213:15–214:9.

[437] CSX Corporation 2006 Form 10-K, p. 35 and CSXFSC35551.

[438] CSX Corporation 2006 Form 10-K, p. 97.

[439] As in my analysis above, which excludes hedging, this calculation excludes losses prior to 2003 and therefore represents a conservative estimate of cumulative recovery through the end of the Class Period.

**EXHIBIT 49**
**RECOVERY OF FUEL COSTS BY CSXT/CSXI, INCLUDING HEDGING**
**2003 – 2008**




Source: CSXFSC000676724-676725.

### 3. Dr. Rausser's Assertions about CSXT's Hedging Program Are Unsupported

219. Dr. Rausser makes a number of statements about the Defendants' hedging programs in support of his claim that the combination of FSCs with hedging necessarily violated their individual business interests and implied a coordinated arrangement. His statements, however, mischaracterize the role of hedging as part of the Defendants' overall fuel-cost management strategy and, particularly for CSXT, misrepresent the actual circumstances faced by the company.

220. For example, Dr. Rausser asserts that the Defendants' implementation of FSCs "ignored the benefits of hedging programs some individual Defendants had in place" and that "[h]edging strategies by their nature help insure railroads against fuel price increases."[440] These statements do not comport

[440] Rausser Report, p. 104.

with the actual circumstances surrounding the implementation of the accused CSXT and CSXI FSC formulas. As I discuss above, during the early part of the Class Period, the FSCs had not yet been implemented sufficiently to compensate for spikes in fuel costs. Hedging provided some additional insurance against those circumstances. By 2006, when FSC coverage by CSXT and CSXI had increased sufficiently to approximately cover ongoing fuel costs, CSXT had completely discontinued any hedging activities.[441] Thus, CSXT did not "ignore" the simultaneous hedging program; to the contrary, the hedging program was designed specifically to act as a complement to the FSCs until coverage had increased sufficiently.

221. In addition, unlike a properly designed FSC program, hedging cannot universally "insure railroads against fuel price increases," as Dr. Rausser claims.[442] CSXT's hedging program was designed to lock in a portion of its fuel costs for a period of up to about two years. As stated in an internal CSXT document, "[t]he fuel hedge doesn't necessarily lower the cost of fuel; all it does is reduce the volatility since you lock in the price of fuel well in advance and over a period of time."[443] If fuel prices rose substantially, and stayed high for an extended time period (more than two years), then hedging would not be a feasible method for recovering those increased costs, whereas FSCs could serve that purpose. Additionally, if fuel prices fell below the hedged cost, then the hedging program actually would generate a loss for the company that would not be recoverable from its customers.[444] In contrast, FSCs could not impose such a loss. The transaction costs associated with hedging also increase the cost of that method for managing volatility, relative to FSCs. For these reasons, CSXT made the independent, economically rational determination that, once FSC coverage had expanded sufficiently, it would discontinue hedging.

222. Dr. Rausser also claims that "the Defendants' corporate officers explicitly barred their organizations from taking hedging into account in setting Fuel Surcharge rates."[445] He cites an internal CSXT document stating that "CSX fuel surcharge mechanism is separate from our fuel hedging program."[446] The cited document also states that the "[s]urcharge is used to share incremental fuel costs with our customers" and that "[h]edging is used to smooth out fuel price volatility and does not lower

---

[441] As I describe above, CSXT purchased 2-year forward contracts during a short period from late-2003 through mid-2004. The last contract expired in July 2006. [CSX Corporation 2006 Form 10-K, p. 97]

[442] Rausser Report, p. 104.

[443] CSXFSC66583.

[444] See, for example, CSXFSC279964.

[445] Rausser Report, p. 105.

[446] *Ibid*, footnote 287, citing CSXFSC000333177-333178.

overall cost over the long run."[447] I find no economic support in these statements for any "bar" regarding consideration of hedging; rather, the document on its face simply recognizes the basic economic facts about hedging that I discuss above—namely, that hedging could not provide a solution to potential long-term increases in fuel costs as a surcharge could. In any case, as I discuss above, a profit-maximizing company *should* make decisions about pricing and hedging independently, since hedging does not affect the incremental cost of providing the service to customers. Therefore it was sensible, from a unilateral business perspective, for CSXT to undertake FSCs independent from its concurrent hedging activities, with the intention that hedging would be discontinued when sufficient FSC coverage was obtained. That is precisely the strategy that CSXT and CSXI implemented.

223. Dr. Rausser further claims that "customers were paying for events such as the huge spike in oil prices in the summer of 2008…even though some of the Defendants could have been well insured against such events through their hedging strategies."[448] That statement is clearly false, at least with respect to CSXT. As I document above, prior to 2006, CSXT's hedging activities were designed to accommodate the limited coverage of its FSCs at that time; the two programs served as complements. The protection provided by CSXT's actual hedging activities was much less than would have been required to fully protect the company against fuel price volatility. Furthermore, even when considering the results of CSXT's hedging activities, the company never over-recovered fuel costs. Finally, CSXT's hedging activities had completely ceased by the end of 2006, so the company was not "insured" against the price spike in 2008 through hedging at all.

224. Finally, Dr. Rausser notes that during the period when CSXT was evaluating various programs to mitigate fuel price volatility the company had approached NS to discuss NS's hedging strategy.[449] He claims that these discussions themselves are evidence of a collusive agreement regarding fuel surcharges. These assertions are unfounded, for a variety of reasons. First, I have seen no evidence that CSXT and NS discussed pricing or fuel surcharges at these meetings or that anyone from CSXT with responsibilities for designing or implementing FSCs or with sales and marketing responsibilities attended the meetings, and Dr. Rausser cites no such evidence. Second, from the perspective of CSXT, it was clearly in the company's independent interest to obtain as much information as possible about hedging programs across a range of industries as it considered implementing such programs itself. Prior to implementing its hedging program in 2003, CSXT conducted a "benchmarking" process whereby the

[447] CSXFSC000333177-333178.

[448] Rausser Report, p. 105.

[449] *Ibid*, p. 106.

company evaluated programs in use at numerous railroads, as well as other transportation industries and one of CSXT's major customers.[450] Moreover, detailed information about hedging by public companies is generally published in their public filings. For example, NS's 2002 10-K included several paragraphs about the company's intentions, operations, and results with respect to its hedging activities.[451]

### F. Dr. Rausser's Conclusions Regarding CSXT and CSXI Fuel Efficiency Gains Are Incorrect

225. Dr. Rausser states that Defendants' "Fuel Surcharge program ignored improvements in fuel efficiency as well as differences in efficiency across Defendants, despite the fact that improvements in efficiency and other factors had led to decreasing freight rates."[452] While it is not clear which "Fuel Surcharge program" Dr. Rausser is referring to (there were many), his interpretation that the failure to pass on fuel efficiencies to customers is evidence of collusion is incorrect and unsupported. Not only has Dr. Rausser failed to quantify CSXT's or CSXI's efficiencies correctly, but he also has failed to conduct a scientific analysis of the relationship between freight rates, pass through, and fuel efficiencies.

226. While he cites "[n]umerous peer-reviewed studies" that link increases in productivity to lower rail rates, Dr. Rausser only actually cites one such study, which makes no mention at all of fuel efficiencies, much less that they were an important factor in realizing lower rates.[453] Rather, the 2000 study that Dr. Rausser cites states that "Class I railroads produced 50 percent more ton-miles using 61 percent fewer employees, 28 percent fewer locomotives, 38 percent fewer track miles, and 23 percent fewer freight cars in service."[454]

227. Notably, Dr. Rausser's statement discusses fuel efficiency in the first instance (suggesting that the FSCs ignored differences between railroads) and more general "improvements in efficiency" in the second instance (referring to factors that led to decreasing freight rates).[455] This difference is important because, as I describe above, CSXT and CSXI did not set their rates based on a cost-plus markup, but rather based on competitive conditions.

---

[450] CSXFSC177093-177108 at 177097; CSXFSC177111-177119; and Ward Deposition, 170:2-11.

[451] NS 2002 Form 10-K, p. 33.

[452] Rausser Report, p. 99.

[453] *Ibid*, pp. 99-100 and footnote 265.

[454] STB, "Rail Rates Continue Multi-Year Decline," Office of Economics, Environmental Analysis, and Administration, December 2000, pp. 4-5.

[455] Rausser Report, p. 99.

### 1. CSXT's and CSXI's Efficiency Gains Are Not Costless but Rather a Result of Capital Expenditure

228. Dr. Rausser acknowledges that gains in efficiency resulted, in part, from substantial capital expenditures by the railroads.[456] However, all of his specific examples of technology that resulted in increased fuel efficiency began before 2003. Dr. Rausser states, "[f]uel efficiency improvements from these and other innovations continued throughout the Class Period,"[457] but provides no analysis of how any fuel efficiency improvements (as opposed to general efficiency improvements) would have ultimately affected FSC formulas or base rates, the magnitude of any fuel efficiency improvements for CSXT or CSXI, and whether any of these improvements were reflected in FSC formulas or base rates either before or during the Class Period. Indeed, CSXT's and CSXI's fuel efficiency fluctuated between 2000 and 2003 (see Exhibit 50), but neither CSXT nor CSXI ever adjusted their FSC formulas to reflect these changes. Thus, Dr. Rausser's conclusion that fuel efficiencies were reflected differently in the pre-Class and Class Periods is not supported by any scientific analysis. Moreover, since Dr. Rausser contends that conduct during his benchmark period (January 2000-July 2003) would have continued through the Class Period, but for the alleged conspiracy, he has no basis for claiming that CSXT and CSXI should have adjusted their FSC formulas to reflect fuel efficiency changes in the Class Period.

[456] *Ibid*, p. 100.

[457] *Ibid*, p. 101.

HIGHLY CONFIDENTIAL

**EXHIBIT 50**
**CSXT/CSXI FUEL EFFICIENCY**
**Q4 2000 – Q2 2003**




Source: CSX Corporation Quarterly Financial Reports.

229. Dr. Rausser also states that "[i]n the pre-conspiracy period, imperfectly competitive regime freight rates in general would have incorporated fuel efficiency improvements as the railroads used these improvements to win business from each other."[458] However, the Auxiliary Power Unit ("APU"), one of the examples of innovations cited by Dr. Rausser that "significantly reduce fuel consumption," was developed by CSXT and marketed to other railroads, including other Defendants, in 2001 (prior to the Class Period).[459] This is inconsistent with Dr. Rausser's conclusion that "fuel efficiency gains…are a key component in railroad competition,"[460] as this improvement was not necessarily used to "win business," but rather to make CSXT's "service partner stronger, because if you think about our joint line

[458] *Ibid*, p. 101.

[459] Ward Deposition, 62:1-18; and CSXFSC000278639-000278690 at 000278657-000278658; and CSX Corporation 2001 10K, p. 5.

[460] Rausser Report, p. 103.

interline movements, you want to have a partner who's running well, very efficient so that you can better serve your enduser customers."[461]

230. CSXT made substantial investments to increase capacity and more efficiently meet rail traffic demand. As the company noted, "in the fourth quarter of 2003 alone CSXT experienced an overall volume growth rate of 5%. Again in 2004, CSXT experienced a 3% growth in volume…[and]…[r]obust demand for rail transportation has continued in 2005."[462] Similarly, "CSXT's most recent volume forecasts for the second half of 2006 (including the Fall Peak), show continued strong traffic levels, especially in coal, intermodal and certain merchandise markets."[463] During the 2004 to 2006 period, CSXT invested in several improvements, including:[464]

- purchased 310 new locomotives;[465]
- accelerated car repair programs;
- completed training for 4,250 newly hired train and engine personnel; and
- completed the St. Louis Gateway (where CSXT connects with BNSF and UP) and increased track capacity on connecting routes.

In total, CSXT invested approximately $1 billion annually in capital improvements between 2000 and 2005, increasing to $1.4 billion in 2006 and $1.7 billion in 2007 and 2008.[466]

---

[461] Ward Deposition, 62:19-24.

[462] "CSX – Fall Peak Planning Letter 2005," available at www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/f5c6de864f7e032185257042004cd923?OpenDocument (accessed December 13, 2012).

[463] "CSX – Fall Peak Planning Letter 2006," available at www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/532f33b73641c735852571b10044af47?OpenDocument (accessed December 13, 2012).

[464] CSX – Fall Peak Planning Letter 2004," available at www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/5fe0dfd3189def388525703d00602eb8?OpenDocument (accessed December 13, 2012); "CSX – Fall Peak Planning Letter 2005"; and "CSX – Fall Peak Planning Letter 2006."

[465] In 2008, CEO Michael Ward noted that over the previous five years CSXT "has invested more than $1 billion to upgrade its fleet with more efficient, low-emission locomotives." [Testimony of Michael J Ward before the United States House of Representatives, March 5, 2008, pp. 6-7] Lead times on locomotive orders range from nine to 18 months. ["CSX – Fall Peak Planning Letter 2007," available at www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/a29f4495887ed7f18525735b0044152b?OpenDocument (accessed December 13, 2012)] Thus, obtaining substantial increases in fuel efficiency by upgrading CSXT's locomotive fleet would take several years.

[466] "CSX – Fall Peak Planning Letter 2006"; "CSX – Fall Peak Planning Letter 2007"; and "CSX – Fall Peak Planning Letter 2008," available at

(continued on next page . . .)

231. These investments were not without risk. In 2004, an article in an industry publication noted that:

> Some railroads tried to expand capacity on the theory that more capacity would improve service, which would draw new business. Those rail executives, however, found themselves pilloried by Wall Street securities analysts and investment banks that demanded a greater cash flow that could be returned to investors.[467]

232. In 2006, Kendell W. Keith, President of the National Grain and Feed Association, testified before the House Transportation and Infrastructure Committee:

> In the past, Wall Street has punished railroads for investing in infrastructure. We think, though, that this current situation is different, as all the transportation systems, water, rail and highway, are at or near capacity. But will railroad management and Wall Street analysts correctly perceive this as an opportunity for railroads to grow their business with new investments, while still maintaining profitability? We have our doubts.[468]

The reactions of Wall Street analysts are important because CSXT must raise substantial capital through this channel.

### 2. Increases in Fuel Costs More than Offset Efficiency Gains

233. Not only does Dr. Rausser fail to show a link between fuel efficiency and rates—and, more specifically to FSCs—but he also fails to demonstrate the relative magnitudes of fuel efficiency gains and fuel price increases. In fact, fuel price increases during the Class Period far outstripped CSXT's and CSXI's increases in fuel efficiency.

234. Between the beginning of 2002 and April 26, 2006, the price of WTI increased from $21.03 per barrel to $71.94 per barrel (242 percent).[469] Fuel prices continued to fluctuate between 2006 and 2008, peaking in July 2008 at $145.31 per barrel, plummeting six months later to $30.28 per barrel and subsequently rising again.[470]

---

(. . . continued from previous page) www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/b9dda3b1c66603bc852574bf005251da?OpenDocument (accessed December 13, 2012).

[467] AAR-E-00028015-00028023, at AAR-E-00028017.

[468] AAR-E-00055453-00055460 at 00055460 and U.S. Rail Capacity Crunch: Hearing before the Subcommittee on Railroads of the Committee on Transportation and Infrastructure, 190th Cong. 46 (2006), p. 46, available at www.gpo.gov/fdsys/pkg/CHRG-109hhrg28281/html/CHRG-109hhrg28281.htm.

[469] CSXFSC372193-372212, at CSXFSC372196.

[470] "Weekly Cushing, OK WTI Spot Price FOB," U.S. Energy Information Administration, available at www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rwtc&f=d (accessed October 19, 2012).

235. During this period, CSXT and CSXI increased fuel efficiency; for example, between 2003 and 2006, fuel consumption fell by 3.3 percent.[471] But even with this improvement, fuel costs rose substantially. For example, between 2003 and 2006, CSXT spent $1.11 billion more on fuel than it would have had the price been stable at $23 per barrel.[472] Clearly, CSXT's and CSXI's improvements in fuel efficiency did little to stem the tide of rising fuel costs. Dr. Rausser's conclusion that the accused CSXT and CSXI FSC formulas "ignored improvements in fuel efficiency" misrepresents the contributions of fuel efficiency improvements to the mitigation of fuel expenses.[473]

### G. CSXT's Use of the AII-LF Index Was Consistent with Its Independent Business Interests

236. Plaintiffs assert that the Defendants "conspired" to create the AII-LF through the AAR in order to facilitate the implementation of the new surcharges.[474] Dr. Rausser also cites the creation of the AII-LF as evidence of the alleged conspiracy, based on the notion that the new index would allow the Defendants to "apply more broadly" the accused FSCs by eliminating customer complaints that the surcharges were unnecessary.[475] Dr. Rausser, however, fails to recognize that use of a cost index that excluded fuel also could be an economically rational component of a unilaterally implemented pricing strategy. Notwithstanding this problem with his allegations, Dr. Rausser ignores the further point that CSXT did not immediately implement the AII-LF after it was first published in 2004,[476] and eventually applied it to only a portion of its freight transactions.[477]

237. As I discuss above, rail freight contracts often include a cost-based price escalator that allows the parties to avoid frequent renegotiation as costs increase over time. When that approach began to fail, due to limitations in the publicly available cost indices in the face of rapidly rising fuel prices, CSXT began to turn to fuel surcharges as a means of passing on the rising cost of fuel to their customers. However, even with fuel surcharges in place, long-term contracts would still require a cost-based index to address changes in non-fuel costs. Historically, CSXT used many different indices for

[471] CSXFSC372193-372212, at CSXFSC372199.

[472] *Ibid*, at CSXFSC372199-372200.

[473] Rausser Report, p. 99.

[474] Complaint, pp. 5-6.

[475] Rausser Report, pp. 52 and 62.

[476] CSXFSC000000621-622.

[477] See, for example, CSXFSC320277, CSXFSC316795, and CSXFSC195850.

this purpose.[478] After the AAR began to publish the AII-LF, CSXT eventually began to adopt it, although it was more than two years before CSXT announced a policy of requiring use of the new index.[479]

238. When viewed in this context, the creation of the AII-LF and CSXT's eventual, limited use of the index provides no evidence of a conspiracy. To the contrary, this history is fully consistent with the company acting in its unilateral business interests. Once CSXT had decided that it would attempt to apply FSCs across as much of its customer base as possible (when it made economic sense to do so), it was inevitable that some customers would push back by claiming that fuel costs were already covered by the available indices. To aid in negotiations, it would make sense for CSXT to be able to offer an alternate index that would ensure fuel price increases were not accounted for twice. An index created by the AAR and made publicly available—like the RCAF in that respect—likely would be more acceptable to customers than a customized or private version created specifically by CSXT. These considerations all are consistent with economically rational, independent action by CSXT, as opposed to the alleged conspiracy described by Plaintiffs and Dr. Rausser. CSXT's actions with respect to the AII-LF therefore provide no evidence of an alleged conspiracy.

239. Additionally, I note that even if creation of the AII-LF and its use by the Defendants could, in principle, provide some basis to infer anti-competitive actions, CSXT's slow introduction and limited use of the new index would appear to contradict Plaintiffs' theories about the alleged conspiracy, at least with respect to CSXT. Although Plaintiffs allege a conspiracy that began at least as early as July 2003, as of August 2004 CSXT had not implemented the new index for even a single contract.[480] CSXT did not announce internally a policy of requiring the incorporation of the new index along with an FSC until December 2005, more than two years after the start of the alleged conspiracy.[481] At a minimum, these facts imply that the new index was not an essential, or even particularly important, component of any hypothetical agreement between the Defendants.

## X. JOINT COMMUNICATIONS

240. Dr. Rausser states, "I'm looking at the communications that took place and an understanding that emerged among the four defendants. So my analysis in terms of my opinion that there in fact was

---

[478] Gooden Deposition, 114:13-21 and 183:13-184:2.

[479] *Ibid*, Exhibit 17.

[480] CSXFSC000000621-622.

[481] Gooden Deposition, Exhibit 17.

coordination, collusion with regard to the implementation of fuel surcharges reflected an understanding that was forged during the year 2003."[482] He goes on to say that "Defendants understood that without such collusion, they would not have been able to eliminate fuel surcharge competition and elevate prices."[483] Moreover, Dr. Rausser asserts, "I'm offering an opinion that the understanding violates regulations [the Sherman Act] with regard to anticompetitive conduct."[484]

241. It has long been recognized, however, that it is inappropriate for an economist to provide a forensic analysis of documents or testimony.[485] For example, Nobel Prize winning economist George Stigler stated that even in the face of a written anticompetitive agreement and meetings between competitors:

> A reasonable man, and often even an economist, would say that the documents seemed to present a conclusive proof of collusive behavior. The economist, however, would have no professional basis for reaching such a conclusion: he has no special skill in reading documents and relating them to actual behavior.[486]

242. Similarly, when discussing why he did not consider the Defendants' views on the risk of antitrust liability in weighing the benefits and costs of the alleged conspiracy, Dr. Rausser notes, "[b]ecause fundamentally, I don't have the data to put myself in the shoes of the defendants, and to look at their degree of risk aversion, and what actual subjective views they had at the time."[487] Despite this testimony, based on a review of documents, Dr. Rausser concludes that the Defendants intended to engage and actually did engage in an illegal conspiracy. I do not have an opinion with respect to the *intent* of the joint communications between the Defendants—which is a question of the state of mind of the individual actors alleged to have conspired—or the actual existence of the alleged conspiracy. However, in my opinion, the economic content of the CSXT and CSXI communications that Dr. Rausser identifies as conspiratorial is, as a matter of economics, no more consistent with collusion than

[482] Rausser Deposition Day 1, 14:4-10.

[483] Rausser Report, p. 58.

[484] Rausser Deposition Day 1, 16:17-19.

[485] Robert A. Milne and Jack E. Pace III, "The Scope of Expert Testimony on the Subject of Conspiracy in a Sherman Act Case," *Antitrust*, Vol. 17, No. 2, Spring 2003, pp. 36-43.

[486] George Stigler, "What Does an Economist Know?" *Journal of Legal Education*, Vol. 33, No. 311, 1983, p. 311.

[487] Rausser Deposition Day 1, 125:9-12.

with behavior in an interdependent oligopoly, which is the market structure that Dr. Rausser believes to apply in this case.[488]

### A. Dr. Rausser Ignores the Necessity of Communications between Joint-Line Partners

243. Dr. Rausser states that "Defendants had many opportunities to communicate with one another on pricing issues" and this "eased the implementation and operation of the cartel."[489] Dr. Rausser, however, provides an improper analysis and interpretation of evidence on joint communications. In particular, Dr. Rausser ignores the economic necessity and legal propriety of communication between railroads about interline shipments.[490] Specifically, he references several documents relating to communications between railroads and states that "Defendants' high-level employees met in person as regularly as once a month."[491] However, given the economic and regulatory framework of the rail freight industry, frequent communications and meetings with interline partners are consistent with CSXT's and CSXI's economic self-interest. Communications between high-level employees can facilitate the establishment of overall strategic and marketing objectives to improve interline rail service and compete effectively with other modes of freight transport.

244. Based on my review of documents in the record, including those Dr. Rausser referenced as examples of communications between CSXT and its interline partners, and CSXI and its interline partners, the behavior evidenced in these documents is, from the perspective of economics, no more consistent with collusion than with behavior in an interdependent oligopoly.

### B. The Actual Nature and Context of the Communications Cited by Dr. Rausser

245. Joint communications with other railroads who are sometimes competitors and sometimes partners are a necessary component of the competitive business environment in which CSXT and CSXI operated.[492] As I describe above, U.S. law requires the Defendants to establish "through routes" for interline shipments, thereby necessitating communication in order to coordinate pricing and execution

[488] *Ibid*, 62:8-12. I have seen evidence from CSXT business documents demonstrating behavior consistent with interdependent oligopoly prior to the Class Period. CSXT attempted to monitor NS's activity, anticipate NS's actions, and plan its own responses. See, for example, CSXFSC246935-246951.

[489] Rausser Report, pp. 5-6.

[490] I do not have any opinions regarding whether the actual communications identified by Dr. Rausser were legally proper. However, as I describe above, I understand that certain types of communications between interline partners are sanctioned—and even required—by statute.

[491] Rausser Report, p. 94.

[492] Giftos Deposition, 205:7-11.

for these routes.[493] Indeed, after the Staggers Act, interline shipments necessitated regular communications between railroads to provide joint-line pricing and logistical coordination.[494] For example, "If a customer called us for a price and it was originated on CSX and was received by Union Pacific, I would have to speak with the Union Pacific representative about agreeing to a price…the divisions and the route and all of the other particulars that go with it."[495] This agreement would have to include the fuel surcharge (if applicable), as it "would apply to the portion of the rate that was applicable to the traffic while it was moving on the foreign carrier's rail line."[496] To provide the customer with seamless service, CSXT would seek concurrence from its rail partners on interline business.[497] These concurrence requests and similar communications were routine in the industry long before the Class Period.[498]

246. To make interline pricing with other carriers a straightforward process for customers, CSXT had a "process designed, developed and implemented whereby those short line carriers could give us their prices for different commodities and different moves, and we would incorporate them into our public pricing."[499] This process allows customers to obtain from CSXT one price for an entire move, including the short-line portion.[500]

---

493 49 U.S.C. § 10703.

494 McIntyre Deposition, 30:16–31:8.

495 *Ibid*. See also Giftos Deposition, 205:7-11, "And the only way a car can move between two railroads is if those two railroads agree on all aspects of it, the equipment, the time, where its going to move, how its going to move, the price, and the fuel surcharge."

496 Giftos Deposition, 71:13-15.

497 Couch Deposition, 55:8-12. Also, "when you're developing interline business there's so many different aspects to a deal you're presenting to a customer. It could be the line haul rate; it could be a supplemental rate; it could be the fuel surcharge. It's – there are so many terms and conditions – the type of equipment used in – across all those characteristics of a deal that's going to be presented to a customer. The individuals from both interline partner carrier railroads would want to concur or agree before presenting that to the customer." [Ed Jenkins Deposition, 65:2-12]

498 Giftos Deposition, 70:17-72:16. See, for example, UPFSC0000436.

499 Couch Deposition, 22:3-7. Since "nobody had the prices for all the moves on their railroads and nobody had the technology for adding those moves together," CN and CSX worked together with other partners to make "A plus B" pricing an industry standard for getting an initial price from the internet. [*Ibid*, 30:16–32:18]

500 *Ibid*, 21:20–22:12.

247. In addition, the STB encouraged railroads to engage in "innovative joint marketing arrangements and other cooperative efforts" to provide better service to customers.[501] For example, CSXT provided better service to customers through alliances with connecting railroads:

> We are now offering service packages with the major Western and Canadian railroads providing dedicated, high speed, reliable, seamless service to and from East and West Coast markets. This has opened up new opportunities for us with time-sensitive customers moving wines and spirits, fruits and vegetables as well as intermodal shipments. We have also established a strong framework for increasing our participation in the growing NAFTA trade and have strengthened our marketing group in Mexico to develop this business in concert with Union Pacific. Alliances such as these leverage our respective networks and are viewed favorably by the Surface Transportation Board, the federal agency overseeing U.S. railroads.[502]

As with any joint-line movements, these alliances require communication and coordination between CSXT and its connecting partners on pricing (including any surcharges), divisions of revenues, and logistics.

248. CSXT also communicates with other railroads about operational issues to provide better service to customers. For example, after Hurricane Katrina caused substantial damage to CSXT's network, NS permitted CSXT to temporarily reroute trains over an NS route, and CSXT shifted traffic interchanged with CN from New Orleans to Mobile.[503] These changes required communication and coordination between CSXT and NS and CSXT and CN, respectively. Such coordination can also allow CSXT to perform track repairs without impairing service. For example:

> With the help of the Norfolk Southern and other railroads, last July we were able to complete a massive track repair and renovation project in a major Southeastern corridor in a highly efficient manner. By rerouting traffic over NS's adjacent track, our engineering department was able to suspend operations on 365 miles of track and deploy 800 employees and 360 pieces of equipment to complete this major undertaking in four days. This project would have taken three months to complete had the work been conducted on a gradual, mile-by-mile basis. The benefits extended to our customers, who experienced no slowdown of service on this important main line.[504]

---

[501] Surface Transportation Board Reports, STB Ex Parte No. 582 (Sub-No. 1), decided March 30, 2000, p. 572. See also Ward Deposition, 54:14-20.

[502] CSX Corporation 2001 Annual Report, p. 5.

[503] Lance R. Grenzeback and Andrew T. Lukmann, "Case Study of the Transportation Sector's Response to and Recovery from Hurricanes Katrina and Rita," p. 21.

[504] CSX Corporation 2001 Annual Report, p. 5.

249. To facilitate interline movements, discuss operational issues, and identify joint marketing opportunities, CSXT conducted "alliance meetings" with its interline partners.[505] CSXT viewed these meetings as "ways that CSX could work with their interline carriers, interline carrier partners, on finding improvements to our service."[506] None of the topics listed in the agendas for these meetings directly reference FSCs on local movements. In fact, the STB supported such meetings "to get it to where you would negotiate ways that you would be easier to do business with on an interline basis. So, when you would see on these agendas for fuel surcharge, it's where we were trying to talk about interline business and how we could simplify, you know, doing business with our customers."[507]

250. Interline meetings were not restricted to the Defendant railroads. CSXT also held meetings with the non-Defendant Class I railroads operating in the U.S. including, for example, meetings with KCS,[508] CN,[509] and CP.[510]

251. Each of these joint communications, and those documents cited by Dr. Rausser appears entirely consistent with CSXT's and CSXI's pursuit of their independent economic self-interest.

## XI. COUNTERFACTUAL ANALYSIS

### A. A Damages Model Must Properly Account for the Counterfactual Scenario

252. When calculating damages resulting from specific anticompetitive conduct, an individual plaintiff can be said to have suffered economic injury if the actual price that plaintiff paid was greater than the price that would have been paid absent the alleged anticompetitive action (the "counterfactual" price). Since counterfactual prices cannot be directly observed, an appropriate method must be developed to estimate them.[511] Assuming liability has been established, damages would be equal to the difference between payments made under actual prices and those that would have been made in a properly specified counterfactual scenario. Preparing an accurate estimate of damages, therefore, requires a rigorous analysis using an appropriate set of benchmarks or controls to isolate the effect of

---

[505] Giftos Deposition, 237:18-240:24. See, for example, CSXFSC287750-287751.

[506] Ed Jenkins Deposition, 160:6-15.

[507] Gooden Deposition, 135:10-19.

[508] See, for example, CSXFSC669616-669629.

[509] See, for example, CSXFSC000137621-000137740.

[510] See, for example, CSXFSC352064.

[511] ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues, 2nd ed., American Bar Association (2010), pp. 3-15 and 53-62.

the alleged conspiracy and to ensure that the counterfactual scenario implied by the damages model is an accurate representation of how the industry would have evolved in the absence of the alleged conspiracy.

253. Plaintiffs and Dr. Rausser recognize that fuel surcharges generally are legitimate means for railroads to adjust pricing in response to changes in fuel prices and that the FSC formulas implemented by CSXT and CSXI, as well as other railroads including Defendants, prior to the Class Period were enacted independently.[512] Therefore, an appropriate damages model should not only predict whether each class member would have been subject to an FSC (or other fuel-cost recovery mechanism) in its rate negotiations with the Defendants during the Class Period but also the amount that class member would have paid, but for the alleged conspiracy.

### B. Dr. Rausser's Model Is Based on the Unreasonable Assumption That Class Members Would Have Paid Essentially Zero Fuel Surcharge But For the Alleged Conspiracy

254. In this case, Plaintiffs have made specific contentions about the counterfactual scenario. They claim that the Defendants' accused FSC formulas in place beginning in mid-2003 "would not have existed *at all*" but for the alleged conspiracy.[513] With regard to the FSC formulas that existed prior to the alleged conspiracy, Plaintiffs contend that "to the extent they did not collapse, [they] would not have resulted in a structural break in the historical relationship between fuel prices and freight rates."[514] Dr. Rausser bases his damages calculations on similar assumptions. Specifically, he assumes that every member of the class who paid a revenue-based FSC during the Class Period experienced an overcharge relative to what that customer would have paid in the absence of the alleged conspiracy.[515] Furthermore, he assumes that the magnitude of the overcharge was identical across all customers—averaging 13.6 percent during the Class Period. These assumptions, however, do not comport with the actual conditions in the freight transportation industry prior to, and during, the Class Period. Rather, they lead to conclusions about the counterfactual scenario that are unreasonable, in light of those conditions.

255. As I describe above, CSXT and CSXI first implemented FSC formulas in 2000 to respond to large increases in fuel prices. They gradually increased the fraction of their respective business that was covered by a surcharge, reaching approximately 30 to 40 percent prior to the beginning of the Class

---

[512] Plaintiffs' Memorandum in Support of Motion for Class Certification, March 18, 2010 ("Plaintiffs' Class Certification Memo"), p. 9; and Rausser Report, p. 55.

[513] January 2012 Supplemental Responses, p. 9.

[514] *Ibid.*

[515] Rausser Report, p. 171.

Period. During the Class Period, fuel prices continued to increase, reaching historical highs in 2008. Thus, CSXT and CSXI had clear, independently rational incentives to continue to increase the coverage of FSCs in rate quotes and negotiations with individual customers throughout the Class Period. As I describe in Section VII, the actual history of implementation of FSCs by CSXT and CSXI through the Class Period is consistent with these independent incentives. FSC coverage across CSXT's and CSXI's unregulated businesses gradually increased before and during the Class Period, showing no particular jump at the time the Plaintiffs claim the alleged conspiracy was initiated.

256. Dr. Rausser's damages model effectively asserts that, but for the alleged conspiracy, payments of FSCs by the class members would have fallen, essentially to zero, during the entirety of the Class Period. Exhibit 51 compares the overcharges calculated by his model to the FSC payments as a percentage of gross base rate, also calculated by his model. As shown here, the results of Dr. Rausser's model indicate that for the majority of the Class Period, the overcharge was greater than the FSC payments actually made. This implies that, but for the alleged conspiracy, the average FSC paid by the class members would have been approximately *zero*, or *less than zero*.[516] Dr. Rausser provides no economic rationale for why in an environment of rapidly rising and volatile fuel prices, CSXT or CSXI would have been unable to continue to implement FSCs (or some other method of incremental fuel cost recovery) across an increasing share of their customer base. This result contradicts Dr. Rausser's own admission that the Defendants would have been able to recover incremental fuel costs during the Class Period through some combination of mechanisms.[517]

[516] In fact, the implication is that the alleged conspiracy increased all-in rates by *more* than the total amount of FSC revenue.

[517] Rausser Deposition Day 1, 31:8-22.

**EXHIBIT 51**
**OVERCHARGE IMPLIED BY DR. RAUSSER'S MODEL VS. HIS CALCULATION OF FSC PAYMENTS AS SHARE OF BASE RATE**
**JULY 2003 – DECEMBER 2008**




Source: File titled "Average Net Effect and Overcharge 10 13 2012.xls" from Dr. Rausser's backup files.

### C. Plaintiffs' Assumption about the Counterfactual Scenario Is Inconsistent with Available Benchmarks

257. Plaintiffs' assertion that class members would have paid essentially no FSCs, or even negative FSCs, during the Class Period but for the alleged conspiracy is reflected in the results of Dr. Rausser's damages model. However, this is inconsistent with the pattern of FSCs paid on non-class transactions—i.e., transactions that Plaintiffs recognize were the result of independent actions by the Defendants. For example, as I document above, approximately 30 to 40 percent of CSXT's unregulated traffic was covered by a revenue-based FSC prior to the beginning of the alleged conspiracy. Dr. Rausser provides no basis for the assumption that this number would decline starting in July 2003, let alone drop to zero. To the contrary, rising fuel prices should have caused CSXT and CSXI to independently continue to expand the use of FSCs.

258. The increasing use of FSCs as an independent response to the problem of increasing fuel prices can also be seen from an examination of "legacy" customer payments. Legacy customers are defined as those who paid a revenue-based FSC pursuant to a contract entered into prior to the beginning of the Class Period. Since legacy customers could not have been affected by the alleged conspiracy, they represent one potential benchmark against which the class members could be compared. Exhibit 52 compares the revenue-based FSC payments made by CSXT legacy customers to the payments made by class members. As shown here, as a percentage of base revenue, the average FSC payment was *lower* for class members than it was for CSXT legacy customers throughout most of the Class Period. In light of this evidence, Plaintiffs' assumption that surcharges would have essentially disappeared, but for the alleged conspiracy, appears to be without basis.

**EXHIBIT 52**
**COMPARISON OF AVERAGE FSC RATES FOR CSXT LEGACY CUSTOMERS AND CLASS MEMBERS**
**JULY 2003 – DECEMBER 2008**




Note: Comparison includes CSXT shipments that were assessed a revenue-based FSC.

Source: Transactional data from Dr. Rausser's backup files.

### D. The Accused CSXT and CSXI Published FSC Formulas Were Similar to the Formula Introduced in 2000

259. Plaintiffs concede that the FSC formulas in place prior to the Class Period represented independent, non-conspiratorial means through which the Defendants could obtain additional revenue in response to increases in fuel costs. Thus, one potential counterfactual scenario would have been one in which at least some class members continued to pay surcharges under the previous formulas. Exhibit 53 and Exhibit 54 compare the FSC rates under the published 2000 CSXT and CSXI formulas (acknowledged by Plaintiffs to be the result of the independent actions) to the published 2003 CSXT and 2004 CSXI formulas, respectively.

**EXHIBIT 53**
**COMPARISON OF PUBLISHED FSC RATES UNDER 2000 AND 2003 CSXT FORMULAS**
**OCTOBER 2000 – DECEMBER 2008**




Source: CSXFSC132121-132122; CSXFSC000000281-298 at 283.

HIGHLY CONFIDENTIAL

**EXHIBIT 54**
**COMPARISON OF PUBLISHED FSC RATES UNDER 2000 AND 2004 CSXI FORMULAS**
**APRIL 2000 – DECEMBER 2008**




Source: Crawford Deposition, Exhibit 8.

260. As these exhibits indicate, both the published 2003 CSXT formula and the published formula introduced by CSXI more than one year after the start of the alleged conspiracy resulted in FSC rates that were similar to those that would have been applied under the published 2000 formulas. Plaintiffs' assumptions about the counterfactual scenario ignore the possibility that at least some class members could have been covered by the previously existing FSC formulas and therefore would have been largely unaffected by the change to the new published formulas in 2003 and 2004, respectively. There is no basis to assume that, but for the alleged conspiracy, no shipments would have been assessed a revenue-based FSC during the Class Period; nor is there any basis to assume that the FSC formulas would have been revised so as to generate *lower* payments in the face of escalating fuel prices, relative to the already existing formulas. Nonetheless, those are the assumptions Plaintiffs and Dr. Rausser have made here.

### E. Dr. Rausser's Model Generates Illogical Results When Applied to Individual Class Members

261. The problem with Plaintiffs' assumptions about the counterfactual scenario become even more apparent when evaluated customer by customer. In particular, many of the class members paid revenue-based surcharges to CSXT or CSXI prior to the Class Period under the previously existing CSXI and CSXT formulas. In the absence of any alleged conspiracy, at a minimum, CSXT and CSXI would have been able to continue to charge revenue-based FSCs to those customers, even if they had been completely unable to expand coverage to other customers or change the formulas used to calculate the FSCs. As examples, in Exhibit 55 through Exhibit 57, I show the revenue-based FSC payments made by three class members from April 2001 through December 2008. The first two customers, [redacted], were covered by CSXT's 2000 published formula, which Plaintiffs have agreed was not conspiratorial, prior to the Class Period. The third customer, [redacted], was covered by CSXI's 2000 published formula, which Plaintiffs have agreed was not conspiratorial, prior to the Class Period. The exhibits also show the amount of FSC revenue that would have been generated if each customer had paid the full rate under the 2000 published formula which, in each case, the customer had been doing prior to the Class Period. In each case, the actual revenues generated by the allegedly conspiratorial formulas during the Class Period were very similar to the revenues that would have been generated if the customer had simply continued to be covered by the 2000 published formula.

262. In these exhibits, I also show the FSC payments that would have been made by these class members in Dr. Rausser's counterfactual scenario. To calculate these figures, I start with actual FSC payments on class transactions and subtract Dr. Rausser's damages on a week-by-week basis.[518] The results show the same problem that I describe above with respect to his aggregate damages amounts—that is, Dr. Rausser's counterfactual scenario implies very little or no FSC payments during the Class Period, even for customers who were previously subject to one of the 2000 published formulas.

263. Exhibit 55 shows that [redacted] paid revenue-based surcharges at least as early as April 2001, and that the amount of payments tracked the published 2000 CSXT formula prior to the Class Period.[519] Furthermore, [redacted] FSC payments during the Class Period *also* tracked the 2000 published formula closely, demonstrating that the new formula generated almost identical FSC rates under the conditions of the Class Period. The amount of [redacted] FSC payments increased

[518] Since Dr. Rausser's damages model calculates an effect on gross rates, his damages could also be interpreted as excess payments in the base rates rather than excess FSC payments. For my purposes here, however, the implications are the same.

[519] This is the earliest date for which CSXT/CSXI transactional data is available.

substantially during the Class Period, relative to the pre-Class period, because fuel prices rose dramatically. That fact, however, sheds no light on whether the alleged conspiracy affected the FSC payments for this customer.

264. [redacted] actually paid $9.0 million in revenue-based FSCs during the Class Period, compared to $8.8 million it would have paid on the same transactions if they had been subject to the undiscounted 2000 published CSXT formula. In contrast, Dr. Rausser's model implies that [redacted] should have paid only $0.4 million in FSCs during the Class Period. Dr. Rausser cites no evidence to support such an extreme view of the counterfactual scenario. On the contrary, the rising fuel prices during the Class Period likely would lead to an increase in the prevalence of FSCs, not a decrease.

**EXHIBIT 55**
**COMPARISON OF [redacted] ACTUAL FSC PAYMENTS TO COUNTERFACTUAL SCENARIOS UNDER THE CSXT 2000 PUBLISHED FORMULA AND DR. RAUSSER'S MODEL**
**APRIL 2001 – DECEMBER 2008**




Notes: Based on unregulated, non-legacy CSXT transactions paying a revenue-based FSC. Dr. Rausser's counterfactual scenario is calculated by subtracting weekly overcharges predicted by his model from actual FSC revenue paid in that week.

Source: Transactional data from Dr. Rausser's backup files and CSXFSC000000281-298 at 283.

HIGHLY CONFIDENTIAL

265. I find similar results for [redacted], as shown in Exhibit 56. The comparison demonstrates that there is no evidence that this class member suffered damage, even assuming that its FSC payments under the 2003 CSXT formula were affected by the alleged conspiratorial agreement, since it would have paid almost identical amounts under the existing 2000 formula. [redacted] actual FSC payments during the Class Period ($15.0 million) were very similar to the amount it would have been made under the undiscounted 2000 CSXT formula ($14.9 million). Dr. Rausser's model implies that, but for the alleged conspiracy, [redacted] would have paid only about $0.6 million in FSCs during the Class Period.

**EXHIBIT 56**

**COMPARISON OF [redacted] ACTUAL FSC PAYMENTS TO COUNTERFACTUAL SCENARIOS UNDER THE CSXT 2000 PUBLISHED FORMULA AND DR. RAUSSER'S MODEL**

**APRIL 2001 – DECEMBER 2008**




Notes: Based on unregulated, non-legacy CSXT transactions paying a revenue-based FSC. Dr. Rausser's counterfactual scenario is calculated by subtracting weekly overcharges predicted by his model from actual FSC revenue paid in that week.

Source: Transactional data from Dr. Rausser's backup files and CSXFSC000000281-298 at 283.

HIGHLY CONFIDENTIAL

266. [redacted], presented in Exhibit 57, is an example of a CSXI customer who made FSC payments prior to the Class Period. Because the 2004 published CSXI formula did increase FSC payments relative to the 2000 published CSXI formula, [redacted] payments subsequent to October 2004 were greater than what would have been paid if the original formula had been maintained. However, even for this customer, the alleged conspiracy would have had a substantially smaller effect than is prescribed by Dr. Rausser's model. Dr. Rausser's damages for [redacted] represent about 77 percent of its actual FSC payments during the Class Period.

**EXHIBIT 57**
**COMPARISON OF [redacted] ACTUAL FSC PAYMENTS TO COUNTERFACTUAL SCENARIOS UNDER THE CSXI 2000 PUBLISHED FORMULA AND DR. RAUSSER'S MODEL**
**APRIL 2001 – DECEMBER 2008**




Note: Based on non-legacy CSXI transactions. Dr. Rausser's counterfactual scenario is calculated by subtracting weekly overcharges predicted by his model from actual FSC revenue paid in that week.

Source: Transactional data from Dr. Rausser's backup files and Crawford Deposition, Exhibit 8.

267. These examples of economically-unsupported results produced by Dr. Rausser's model indicate that his model is flawed and cannot be relied upon as a basis for determining antitrust liability or damages in this case.

# XII. DR. RAUSSER'S ECONOMETRIC DAMAGES MODEL IS FATALLY FLAWED

## A. Description of Dr. Rausser's Damages Model

268. Dr. Rausser uses a regression model to estimate damages for the class where he compares all-in rates in the Class Period with all-in rates prior to the Class Period (i.e., the pre-Class Period or the "pre-period") controlling for a number of factors that purportedly account for "all relevant economic forces."[520] Dr. Rausser claims that the pre-period is an "appropriate benchmark for assessing the impact of the alleged conspiracy" because "the Defendants acted as an interdependent oligopoly unaffected by the type of collusion that determined prices during the Class Period."[521] In order to understand Dr. Rausser's damages framework, it is crucial to understand two aspects of his econometric modeling exercise: (1) the transactions that he relies upon as a benchmark, and (2) his regression specification. Exhibit 58 shows the types of transactions that are included as a benchmark in Dr. Rausser's framework as compared to transactions in the Class Period. The benchmark or pre-period is inclusive of all types of unregulated transactions including those without an FSC and transactions denoted as legacy. By contrast, the transactions included in the Class Period are restricted by the class definition, i.e., transactions with revenue-based FSCs that do not qualify as legacy.

**EXHIBIT 58**
**TRANSACTIONS INCLUDED IN DR. RAUSSER'S DAMAGES MODEL**

| Transaction Type | Pre-Class Period (April 2001 - June 2003) | Class Period (July 2003 - December 2008) |
|---|---|---|
| [a] | [b] | [c] |
| **CSXI** | | |
| Revenue-Based FSC | Yes | Yes |
| No FSC | Yes | No |
| **CSXT** | | |
| Revenue-Based FSC | Yes | Yes |
| No FSC | Yes | No |
| Legacy | Yes | No |

Note: Rate-regulated traffic and traffic with a mileage-based FSC are excluded in the pre-period and Class Period.

Source: Transactional data from Dr. Rausser's backup files.

[520] Rausser Report, p. 162.

[521] *Ibid*, pp. 162-163.

269. To be clear about what constitutes a "legacy" transaction, the Complaint excludes from the class definition "all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003; and, (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract."[522] These legacy transactions are excluded from the class on the basis that the FSCs contained therein were introduced prior to the alleged conspiracy and therefore were not influenced by the alleged conduct at issue. Dr. Rausser acknowledges this as well—he claims that the FSC programs in place prior to the alleged conspiracy "were apparently designed and implemented by the individual Defendants without agreement or coordination."[523] Also, as shown in Exhibit 58, Dr. Rausser relies on legacy transactions among other transactions to form his benchmark for purposes of estimating an overcharge. This is an explicit recognition on Dr. Rausser's part that legacy transactions are an "appropriate benchmark" for analyzing the impact of the alleged conduct.[524]

270. In Dr. Rausser's regression specification, he attempts to explain all-in rates during the pre-period and the Class Period using a number of explanatory variables. Some of these are specific to the transaction or shipment—for example, weight, distance, car type, and commodity type—and some are aggregate variables meant to capture underlying demand and supply factors that may influence all-in rates such as annual state-level GDP, weekly diesel fuel price, and a quarterly index representing non-fuel costs. Having controlled for these variables, Dr. Rausser attempts to capture any unexplained differences between all-in rates in the Class Period relative to the pre-period using two variables: (1) an indicator variable for the Class Period and (2) an interaction term that allows weekly fuel price to have a potentially different effect on all-in rates during the Class Period as compared to the pre-period. Dr. Rausser uses the estimated coefficients on these two variables to derive weekly overcharges during the Class Period.[525] He also reports an average percentage overcharge of 13.6 percent for the Class Period that he derives from the underlying weekly overcharges estimated by his model.[526]

---

522 Class Opinion, pp. 6-7.

523 Rausser Report, p. 55.

524 *Ibid*, p. 162.

525 Dr. Rausser's model is based on the assumption that every shipment in a given week (for all customers) faced the same overcharge percentage. In deposition, however, Dr. Rausser testified that he plans on calculating a separate overcharge for each customer/shipment based not just on his estimated coefficients, but rather by comparing the actual price paid for each shipment with the predicted "but-for" price derived from the regression model. [Rausser Deposition Day 2, 437:3–438:21] As I describe below, Dr. Rausser's model does not capture all aspects of pricing and attributes any omitted effects to the purported conspiracy, rather than to any real, non-conspiratorial effects. This methodology is clearly problematic since it could overstate or understate any true

(continued on next page . . .)

271. According to Dr. Rausser, his finding that the interaction term is positive and statistically significant implies that there was a *change* in the responsiveness of all-in rates to fuel prices in the Class Period as compared to the pre-period. He attributes this differential responsiveness in the Class Period to the alleged conspiracy and claims that it is "consistent with evidence of the conspiracy itself."[527] Using data for CSXT and CSXI, I show that Dr. Rausser incorrectly attributes this differential responsiveness of all-in rates to fuel prices in the Class Period to the alleged conspiracy. His finding is driven by the inability of his model to distinguish between the alleged conspiracy and factors *unrelated* to the conduct at issue that explain this differential responsiveness in the Class Period.

### B. A Single Correction to Dr. Rausser's Damages Model Illustrates That His Model Is Unable to Distinguish between the Alleged Conspiracy and Factors Unrelated to the Conduct at Issue

272. In order to demonstrate that Dr. Rausser's "before-after" model does not appropriately distinguish between the alleged conspiracy and factors unrelated to the conduct at issue, I present a straight-forward extension of his model using legacy transactions *in the Class Period* that Dr. Rausser excluded from his regression dataset.[528] The inclusion of these transactions provides an opportunity to control for any non-conspiratorial factors that potentially influenced all-in rates during the Class Period. Legacy transactions contained FSCs and, as explained above, are excluded from the class definition. Moreover, Dr. Rausser acknowledges that these transactions were unaffected by the alleged conduct.[529] This enables me to analyze the difference in all-in rates in the pre-period relative to the Class Period for the transactions at issue (i.e., transactions with revenue-based FSCs that do not qualify as legacy) and compare that to the difference in all-in rates in the pre-period relative to the Class Period for legacy

---

(. . . continued from previous page)
damages and those errors would vary from customer to customer and shipment to shipment. I expect to respond further to Dr. Rausser's methodology and calculations after reviewing any supplementary filings.

526 Dr. Rausser combines CSXT and CSXI transactions for purposes of estimating an overcharge in his damages model. As I discuss above, however, there are a number of economic reasons for distinguishing between CSXT and CSXI traffic. Dr. Rausser's damages estimate for CSXI traffic is approximately $286 million, which accounts for 23 percent of the total damages he reports for CSXT and CSXI combined.

527 Rausser Report, p. 170.

528 I rely on Dr. Rausser's definition of legacy transactions. Dr. Rausser fails to systematically identify legacy CSXI transactions in his data as produced. This has two implications for Dr. Rausser's damage estimation: (1) his overcharge is estimated by including transactions that are outside the class definition, which is inappropriate given the specification of his model and (2) he mistakenly overestimates the volume of commerce associated with CSXI in the Class Period, which he relies upon to derive his ultimate damages estimate. If supplementary information becomes available on legacy CSXI transactions, I expect to respond further to Dr. Rausser's methodology and calculations.

529 As noted above, Dr. Rausser includes legacy transactions in the pre-period to form the benchmark upon which he relies to derive his estimated overcharge.

transactions. This type of calculation is referred to as a "difference-in-differences" ("DiD") approach where the legacy transactions serve as a "control group" and the transactions at issue form the "treatment group."[530]

273. Exhibit 59 shows a purely illustrative DiD calculation. As this example shows, a DiD calculation involves a comparison of two differences: (1) the difference between all-in rates in the treatment group before and after the alleged conduct, and (2) the difference between all-in rates in the control group before and after the alleged conduct. The difference between these two differences yields an estimate of the "overcharge" due to the alleged conduct. In this illustrative example, both sets of transactions experienced an increase in all-in rates in the Class Period relative to the pre-period, but the smaller increase experienced by the treatment group provides an estimate of the "overcharge" (in this example, a *negative* overcharge) that can be attributed to the alleged conduct, when controlling for factors common to both sets of transactions. This illustrative example also demonstrates that a simple "before-after" approach, which does not account for the behavior of transactions in the control group over time, would not provide a reliable estimate of the overcharge because it fails to account for *all* non-conspiratorial factors that influenced all-in rates over time.

**EXHIBIT 59**
**ILLUSTRATIVE DIFFERENCE-IN-DIFFERENCES CALCULATION**

| | Average All-In Freight Rate per Ton-Mile | | |
|---|---|---|---|
| **Transaction Type** | **Pre-Class Period (April 2001 - June 2003)** | **Class Period (July 2003 - December 2008)** | **Difference** |
| **[a]** | **[b]** | **[c]** | **[d]** |
| **Treatment (Not Legacy)** | $0.037 | $0.044 | 18.9% |
| **Control (Legacy)** | $0.042 | $0.051 | 21.4% |
| | | **Difference-in-Differences ("Overcharge"):** | -2.5% |

Note: Numbers are for illustrative purposes only and do not reflect actual values.

274. I use the transactional data for CSXT and CSXI produced by Dr. Rausser to estimate a DiD model, which as I have described above, is an extension of Dr. Rausser's damage model by including transactions in the Class Period that were unaffected by the alleged conspiratorial conduct. Exhibit 60 shows the regression results. According to the regression estimates, the average difference in all-in rates in the pre-period relative to the Class Period for the transactions at issue (i.e., transactions with

[530] Joshua D. Angrist and Alan B. Krueger, "Empirical Strategies in Labor Economics," in Handbook of Labor Economics, 1st ed., Elsevier (1999), pp. 1277-1366.

revenue-based FSCs that do not qualify as legacy) is approximately 12 percent while the corresponding average difference in all-in rates in the pre-period relative to the Class Period for legacy transactions is approximately 16 percent. The net effect is *negative* 3.4 percent, indicating there was no overcharge for CSXT and CSXI transactions at issue.[531]

[531] This model is estimated using only transactions with positive revenue-based FSCs. I also estimate an alternate version of this DiD model where I include transactions without a revenue-based FSC. The results are consistent with those reported here—the net effect is *negative* 4.2 percent (and statistically significant), indicating no overcharge. I also estimate these DiD models using a revised version of Dr. Rausser's data, and I find very similar results, i.e., a net effect of *negative* 3.5 percent (and statistically significant) using only positive revenue-based FSCs and a net effect of *negative* 4.2 percent (and statistically significant) when I include transactions without a revenue-based FSC.

## EXHIBIT 60
## DIFFERENCE-IN-DIFFERENCES MODEL FOR CSXT AND CSXI TRANSACTIONS

**Dependent Variable: Log (Gross revenue per ton mile)**

| Explanatory Variables | Coefficient | Standard Error |
|---|---|---|
| [a] Log (Mileage) | -0.9707 ** | (0.0008) |
| [b] Log (Net weight) | -0.9541 ** | (0.0005) |
| [c] Log (Diesel Price) | -0.0300 ** | (0.006) |
| [d] Log (GDP) | 0.4848 ** | (0.0049) |
| [e] Log (AII-LF) | 0.3854 ** | (0.0111) |
| [f] Class Period | -1.8331 ** | (0.0304) |
| [g] Not Legacy | -0.0438 | (0.0375) |
| [h] Interaction of Class Period and Not Legacy | 0.1227 ** | (0.0383) |
| [i] Interaction of Class Period and Diesel Price | 0.3707 ** | (0.0062) |
| [j] Interaction of Diesel Price and Not Legacy | 0.0106 | (0.0076) |
| [k] Interaction of Class Period, Diesel Price, and Not Legacy | -0.0295 ** | (0.0078) |
| **Regression Indicators** | | |
| Interline Indicators | | Yes |
| Car Type Indicators | | Yes |
| Commodity Indicators | | Yes |
| Route Indicators | | Yes |
| Seasonality Effects | | Yes |
| Number of Observations | | 2,289,542 |
| $R^2$ | | 0.9032 |

**Difference-in-Differences Calculation**

| | |
|---|---|
| Difference Between Pre-Period and Class Period for Not Legacy:<br>[f] + [h] + ([i] + [k]) * Log (Diesel Price) | 11.96% |
| Difference Between Pre-Period and Class Period for Legacy:<br>[f] + [i] * Log (Diesel Price) | 15.97% |
| Difference-in-Differences (Overcharge):<br>[h] + [k] * Log (Diesel Price) | -3.38% |

Notes: Diesel price, GDP, and AII-LF are in year 2000 dollars.
** Statistically significant at the 99-percent level.

Source: Transactional data from Dr. Rausser's backup files.

275. This analysis demonstrates that Dr. Rausser's damages model is unable to distinguish between the alleged conspiracy and other factors unrelated to the conduct at issue that affected all-in rates and their responsiveness to fuel prices. Dr. Rausser fails to use the evidence at hand to appropriately control

for these other factors and, therefore, incorrectly attributes *any* change in the responsiveness of all-in rates to fuel prices during the Class Period to the alleged conspiracy. When I implement a straightforward extension to Dr. Rausser's model to correct for this issue, I find no support for Dr. Rausser's conclusion and find no overcharge for CSXT and CSXI transactions.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 22nd day of January, 2013 in Washington, DC.

Dr. John H. Johnson, IV

## Appendix A. CURRICULUM VITAE OF DR. JOHN H. JOHNSON, IV

Edgeworth Economics

1225 19th St, NW
8th Floor
Washington, DC 20036
202-559-4388

January 2013

# John H. Johnson, IV
# President and CEO

## EDUCATION

Massachusetts Institute of Technology
Ph.D., Economics, 1999

University of Rochester
BA, *magna cum laude* with Highest Distinction in Economics, 1995
Phi Beta Kappa

## CURRENT EMPLOYMENT

Edgeworth Economics, Washington, D.C.
September 2009-present, President and Chief Executive Officer

Georgetown University, Washington, D.C.
2008-present, Affiliated Professor, Georgetown Public Policy Institute

## EMPLOYMENT HISTORY

Criterion Economics, L.L.C., Washington, D.C.
March 2009-September 2009, President

NERA Economic Consulting, Washington, D.C.
2005-2009 Vice President
2003-2005 Senior Consultant
2001-2003 Consultant

University of Illinois at Urbana-Champaign
1999-2001 Assistant Professor of Economics and of Labor & Industrial Relations

## APPOINTMENTS

*Appleseed Pro Bono Network*
Board of Directors, June 2011-present

*Hawai'i Appleseed Center for Law and Economic Justice*
Board of Directors, January 2013-present

*Antitrust Law Journal*

Associate Editor- June 2011-present
Assistant Editor- June 2010-May 2011

## TEACHING EXPERIENCE

Georgetown University Public Policy Institute Courses
- Antitrust and Public Policy
- Masters in Public Policy Thesis Research Seminar
- The Law and Economics of Labor Discrimination Public Policy

University of Illinois at Urbana-Champaign Courses
- Labor Problems
- Women in the Labor Market
- Graduate Labor Economics

## AWARDS AND HONORS

Pro Bono Innovator Award, Appleseed Pro Bono Network (2012)
Pro Bono Practice Award Recipient, Akin Gump Strauss Hauer and Feld (2012)
Finalist, Competition Economist of the Year, Global Competition Review (2012)
"Top Young Competition Economist", Global Competition Review (2006)

## MEMBERSHIPS

American Economic Association
American Statistical Association
American Bar Association:
- Labor and Employment Section
- Antitrust Section

National Association of Forensic Economists

## TESTIMONY AND EXPERT REPORTS
## PRIOR FOUR YEARS AS OF JANUARY 2013

*James Blakes, Steven Clark, Herman Deckys, Bradley Hunt, Phillipe Porter, Ernest Roberts, Jr., Larry Williams v. Illinois Bell Telephone Company.*
In the United States District Court Northern District of Illinois Eastern Division, Case No. 11-cv-00336.
Expert Report, January 14, 2013.
Expert Report, May 13, 2011.

*In re: Chocolate Confectionary Opt-Out Antitrust Litigation*
In the United States District Court for the Middle District of Pennsylvania, Harrisburg Division
Expert Report August 3, 2012.
Deposition, August 23, 2012.
Declaration, October 21, 2012.

*Pacific Bell Wage and Hour Cases,* In Superior Court of the State of California, County of Alameda
Declaration, October 12, 2012

*Rochelle Cohen v. Bank of New York Mellon Corporation.*
In the United States District Court, Southern District of New York.
Expert Report, May 24, 2012.
Deposition, June 29, 2012.
Rebuttal Expert Report, October 9, 2012

*In re: Wholesale Grocery Products Antitrust Litigation.*
In the United States District Court, District of Minnesota
Expert Report, January 31, 2012.
Daubert Declaration, January 31, 2012.
Deposition, March 2, 2012.
Declaration, April 20, 2012.
Evidentiary Hearing Testimony, May 22, 2012.
Declaration, August 24, 2012
Declaration, October 1, 2012

*Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon, David Moffitt, and Jeff Sopel, on behalf of themselves and all others similarly situated, vs. AT&T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc. and AT&T Services, Inc.* In the United States District Court, Western District of Wisconsin.
Expert Report, September 26, 2012.

*Gabriel Fayerweather v. Comcast Corporation and Comcast Corporation of Contra Costa.* In the Superior Court for the State of California for the County of Contra Costa.
Expert Report, July 13, 2012.
Expert Report, March 24, 2010.
Deposition, October 6, 2011.
Deposition, August 27, 2012.

*James Bowman, as next friend for Jameel Bowman and Melissa Gibson, as next friend for Courtney Anderson on behalf of themselves and other similarly situated v. International Business Machines Corporation, ACS Human Services LLC, Phoenix Data Corporation and Arbor E & T, LLC.*
In the United States District Court Southern District of Indiana, Indianapolis Division.
Expert Report July 6, 2012.
Deposition, August 8, 2012.

*Monique Da Silva Moore, Maryellen O'Donohue, Laurie Mayers, Heather Pierce, and Katherine Wilkinson on behalf of themselves and others similarly situated v. Publicis Groupe SA and MSL Group.*
In the United States District Court Southern District of New York.
Expert Report, March 19, 2012.

*Barbara Gilley v. Eli Lilly and Company.*
In the United States District Court for the Eastern District of Tennessee at Knoxville.
Expert Report, February 6, 2012.

*In re Hostess Brands, Inc. et, al.*
United States Bankruptcy Court, Southern District of New York
Declaration and Expert Report, January 25, 2012.
Rebuttal Expert Report, February 25, 2012.
Deposition, February 28, 2012.
Rebuttal Expert Report, February 29, 2012.
Hearing Testimony, April 18, 2012.
Deposition, May 14, 2012.

*Gerald Paul Bodet, Jr. v. Charter Communications, Inc., Charter Communications Holding Company, LLC and Charter Communications, LLC.*
In the United States District Court, Eastern District of Louisiana
Expert Report, January 24, 2012.
Deposition, April 2, 2012.
Rebuttal Report, May 15, 2012.

*Equal Employment Opportunity Commission v. JP Morgan Chase Bank, N.A.*
In the United States District Court for the Southern District of Ohio, Eastern Division.
Expert Report, December 12, 2011.
Deposition, January 5, 2012.

*Office of Federal Contract Compliance Programs, United States Department of Labor vs. Bank of America*
US Department of Labor, Office of Administrative Law Judges.
Expert Report, December 9, 2011
Rebuttal Report, March 2, 2012
Deposition, June 27, 2012.

*District of Columbia Taxi Cab Commission*, Washington DC
Written Testimony, November 29, 2011

*In Re Wellbutrin XL Antitrust Litigation,* In the United States District Court, Eastern District of Pennsylvania
Expert Report (Direct Purchasers), September 16, 2011
Expert Report (Indirect Purchasers), October 3, 2011

*In Re Chocolate Confectionary Class Antitrust Litigation,* In the United States District Court, Middle District of Pennsylvania, Harrisburg Division
Expert Report, August 12, 2011
Deposition, September 15, 2011
Declaration, November 10, 2011
Rebuttal Declaration, January 6, 2012
Evidentiary Hearing Testimony, November 15-16, 2011

*Letty Hernandez v. Starbucks Coffee Company.*
In the United States District Court Southern District of Florida, Civil Action No.0:09-cv-60073-WPD.
Expert Report, May 20, 2011.

*Margaret Tourtellotte, Karla Krieger, Ashley Hiser and Ana Reyes v. Eli Lilly and Company and Timothy Rowland.* In the United States District Court for the Eastern District of Pennsylvania., Case No. 09-CV-0774.

Expert Reports:
Regarding Economic Loss of Margaret Tourtellotte, March 16, 2011.
Regarding Economic Loss of Karla Krieger, March 16, 2011.
Regarding Economic Loss of Ana Reyes, March 16, 2011.

*Jayme Sanford and Sanford Insurance, Inc. v. Allstate Insurance Company*
District Court, Arapahoe County, Colorado.
Expert Report, November 24, 2010.

*District of Columbia Taxi Cab Commission*, Washington DC
Expert Report (with Kevin Christensen), November 8, 2010

*Louise Knowles c.o.b. as Special Events Marketing v. Arctic Glacier, Inc., Keith E. Corbin, and Reddy Ice Holdings, Inc.* Ontario Superior Court of Justice, Court File No. CV-10-14457.
Affidavit of Dr. John H. Johnson, November 5, 2010.

*United States of America ex. rel. William A. Thomas v. Siemens AG, et al.,* United States District Court Eastern District of Pennsylvania, Case No. 09-4414.
Expert Report, September 13, 2010.
Deposition, October 15, 2010.
Reply Report, November 5, 2010

*Michelle L. Ekstrom v. Wal-Mart Stores, Inc., Andrea Rose, and Gregory J. Sevinsky.* The State of New Hampshire Rockingham, SS. Superior Court. Case No. 08-C-857.
Expert Report, October 12, 2010.

*Nationwide Power Services, Inc. et al v. Eaton Electrical Inc.*, United States District Court Central District of California, Case No. CV 07-0883 JVS (FFMx),
Expert Report, July 2, 2010.

*Affidavit of John H. Johnson, Ph.D. in Support of Motion for Reconsideration of Department of Labor Wage Setting Order No. WD 05-2431*, June 23, 2010.

*Testimony of Dr. John H. Johnson before the District of Columbia Taxi Cab Commission,* Washington, DC.
Oral Testimony, June 16, 2010
Written Testimony (with Kara Gorski), June 24, 2010.

*Equal Employment Opportunity Commission v. Bloomberg, L.P.*
*Jean Patricot, Tanys Lancaster, Janet Loures, and Monica Prestia v. Bloomberg, L.P.*
In the United States District Court, Southern District of New York
Expert Report, December 2, 2009
Reply Report, February 8, 2010
Depositions, December 16, 2009 and February 24, 2010

*In Re Ready Mixed Concrete Antitrust Litigation (Indiana)* In the United States District Court for the Southern District of Indiana, Indianapolis Division
Mediation Report, October 2010

*Univac Dental Corporation and Lactona Corporation v. Dentsply International, Inc.* In the United States District Court for the Middle District of Pennsylvania.

Expert Report, August 17, 2009
Deposition, September 3, 2009

*Joseph Antonio, et al. v. Security Services of America, L.L.C., et al.* In the United States District Court for the District of Maryland (Southern Division).

Expert Reports, July 17, 2009
Deposition, October 7, 2009.
Estimate of Economic Loss for Bulan Jules-Antonio and Joseph Antonio
Estimate of Economic Loss for Carolyn Clark and Michael Clark
Estimate of Economic Loss for Angel Fountain-Cooper and Thomas Cooper
Estimate of Economic Loss for Natalie Gibbs and Gregory Gibbs
Estimate of Economic Loss for George Haley and Yvonne Haley
Estimate of Economic Loss for Dawn Tolson-Hightower and Jacque Hightower
Estimate of Economic Loss for Belinda Jackson and Khari Jackson
Estimate of Economic Loss for Cynthia Patricia Jewett and Andrew Jewett Sr.
Estimate of Economic Loss for Crystal Johnson and Michael Johnson
Estimate of Economic Loss for Keth Kankanamage and Jagath Kankanamage
Estimate of Economic Loss for Takeysha Robinson and Keith Robinson
Estimate of Economic Loss for Terri Rookard and Derrick Potts
Estimate of Economic Loss for Beverly Rowe and Everton Rowe
Estimate of Economic Loss for Sharon Smith and Erik Smith
Estimate of Economic Loss for Evora Swoopes and Leonard Swoopes
Estimate of Economic Loss for Samantha Walker and Kendall Walker

*Bonnie Marcus, et al. v. PQ Corporation.* In the United States District Court, Eastern District of Pennsylvania.

Expert Report, April 8, 2009.
Trial Testimony, July 17, 2009.
Trial Testimony, November 6, 2009.

## PUBLICATIONS
## PRIOR TEN YEARS AS OF JANUARY 2013

Brief of Economists Amici Curiae Before the United States Supreme Court, *Comcast Corporation, et al. vs. Caroline Behrend, et al.* (with Gregory K. Leonard and Laila Haider), August 24, 2012.

"Economic Analysis in Indirect Purchaser Class Actions." *Antitrust Magazine.* Vol. 26, No 1, Fall 2011.

"Systemic Discrimination: Let the Statistics Talk" (with Kara Gorski) *Employment Law 360* (November 2011)

"Rigorous Analysis of Class Certification Comes of Age" (with Gregory Leonard) *Antitrust Law Journal* (2011).

"Antitrust Damages" (with Joseph Ostoyich) in Calculating and Proving Damages. Law Journal Press, New York, NY. 2011.

"Causality and Damages Estimation in Antitrust Litigation: A Case Study" (with Michael Kheyfets and Matthew Milner). *Antitrust Report*. Issue 1, 2011.

"An Economic Analysis of 'Non-Economic' Damages in Labor and Employment Litigation." (with Matthew Miller). Prepared for American Bar Association ABA EEO Labor and Employment Meetings, New Orleans, LA.

"Empirical Evidence and Class Certification in Labor Market Antitrust Cases"
(with Jesse David and Paul Torelli) *Antitrust Magazine.* Fall 2010. Volume 25. Number 1.

"The Increasing Relevance of Expert Testimony in the Wake of *Hydrogen Peroxide"*
(with Boris Vabson and Matthew Milner) *The Antitrust Practitioner,* September 2010.

"The Standards for Class Certification Expert Testimony After *In Re Hydrogen Peroxide Antitrust Litigation*" *Antitrust Report*, Issue 2, 2009.

"In the Eye of the Beholder: Junk Science in Antitrust Class Certification." (with Gregory Leonard) *Antitrust Magazine*. August 2008.

"A Regression Primer for Labor Practitioners." (with Kristin Terris), *Labor and Employment Law,* 2008.

"Frictions and Sticking Points: Applying the Textbook Model to the Analysis of Cost Pass-Through in Indirect Purchaser Class Actions." (with Gregory Leonard) *Antitrust Insights*, Winter 2008.

"Economic Evidence in Criminal Cartel Cases." in *Economics of Antitrust: Complex Issues in a Dynamic Environment*, ed. Lawrence Wu ((New York: National Economic Research Associates, 2007).

"Common Principles of Antitrust Damages Estimation," *The Antitrust Report*. Issue 1, 2007.

"Don't Feed the Trolls" (with Gregory Leonard, Christine Meyer, and Ken Serwin). *Les Nouvelles*, September 2007.

"Economics and the Rigorous Analysis of Class Certification in Antitrust Cases." (with Gregory K. Leonard) *Journal of Competition Law and Economics* 2007; doi: 10.1093/joclec/nhm009

"Separating Fact from Fiction: Recent Trends in Wage and Hours Litigation." *Labor and Employment Law*, Spring 2007, Vol. 35, No. 3.

"Downstream Discovery in Antitrust Class Actions." (with Laila Haider and Ian Simmons). *The Antitrust Practitioner*. July 2006.

"The Economics of Patent Policy: A Review of Recent Empirical Studies" in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh. (New York: National Economic Research Associates, 2005).

"The Use of Event Studies in Intellectual Property Litigation" (with Vinita Juneja) in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh. (New York: National Economic Research Associates, 2005).

"Do Long Work Hours Contribute to Divorce?" *Topics in Economic Analysis & Policy*: Vol. 4: No. 1, Article 24, October 2004.

"The Impact of Federal Overtime Legislation on Public Sector Labor Markets." *Journal of Labor Economics*, January 2003.

## PRESENTATIONS

"Battle of the Experts: A Plaintiff and Defense Lawyer's How To On Working With Economists in Antitrust Cases." The Bar Association of San Francisco, San Francisco, CA July 2012.

"*Wage and Hours Class Actions After Dukes v. Walmart"* ACI Wages and Hours Class and Consumer Action Conference, New York, NY May 2012.

"*Wal-Mart Stores, Inc. v. Dukes and Antitrust Class Actions*" Panel Discussant, American Bar Association Civil and Criminal Procedure Committee, New York, NY, September 2011.

"What's This Case Really Worth?" American Bar Association EEO Labor and Employment Committee Meetings, New Orleans, LA, April 2011.

"The Future of U.S. Antitrust: Do Landmark Changes Portend a Turbulent Future?" ABA SIL International Law Committee Teleconference., with Ethan Litwin and Samuel Miller., November 2010.

District of Columbia National Institute of Trial Advocacy Advanced Trial Advocacy Program, Faculty. Washington, DC. October 2010.

"The Intersection of Economics and Statistics in Employment and Health Care Litigation." Epstein Becker and Green, New York City. September 2010 with Chuck Fields and Matthew Milner.

"Pharmaceutical Patent Litigation: Economic and Data Issues." Duane Morris, Washington, DC September 2010 with Jesse David and Matthew Milner.

"The Influence of Daubert on Expert Testimony." Duane Morris, Philadelphia, PA, September 2010 with Matthew Milner.

"The Evolution of an Expert Report in a Complex Damages Case"
Bingham McCutchen, Los Angeles, CA, January 2010, with Jesse David and Matthew Spitzer
Womble Carlyle, Washington, DC, February 2010, with Paul Torelli and Kara Gorski
Buchanan Ingersol and Rooney, Philadelphia, PA, April 2010 with Matthew Milner, Kara Gorski, and Jesse David.

"Lawyer and Consultant Perspectives on Working Effectively and Efficiently with Testifying and Consulting Experts." Law Seminars International Litigating Employment Class Actions Conference.
Washington, D.C., April 6, 2009 with Carter DeLorme.
San Francisco, CA, July 27, 2009 with Christopher Martin.

"The Economics of Large Corporate Law Firms." Building a Better Legal Profession National Conference of Student Leaders. Stanford University School of Law, Palo Alto, CA, April 3, 2009.

"The Debate Over the Billable Hour: A Rigorous Look at Competing Law Firm Profitability Models," Eighth Annual Legal Malpractice & Risk Management Conference, Chicago, March 5, 2009

"Economic Approaches to Wrongful Termination and Labor Discrimination Litigation," Orrick, Herrington & Sutcliffe, February 17, 2009, with Laila Haider

"Where's the Value: The ACC Model of Law Firm Profitability." with Matthew Milner and Frank Kyei-Manu. Womble Carlyle Sandridge & Rice, PLLC. November 24, 2008.

"Differences in Difference Estimation in Antitrust Cases."
Skadden, Arps, Meager, and Flom, Washington, DC. November 17, 2008
with Gregory Leonard and Fei Deng
Hogan & Hartson, Washington, D.C., February 2009
with Fei Deng

"What's in an Average? Misleading Statistics in Labor and Employment Litigation."
Biltimore Hotel, Los Angeles, California, October 23, 2008
with Kristin Terris, Elizabeth Newlon, and Travis Gemoets

Mayflower Hotel, Washington, DC, November 13, 2008
with Laila Haider and Johnine Barnes

Gibson, Dunn & Crutcher, January 28, 2009
with Laila Haider

"The Economics of Class Actions." with Gregory Leonard and Anne Gron.
Drinker Biddle, Chicago, Illinois, September 2008.
O'Melveny and Myers, October 2008.

"The Supreme Court and Antitrust Economics." NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM. July 2008 (panel moderator).

"Recent Evolution of Class Certification Standards." 56th American Bar Association Antitrust Law Spring Meeting, March, 2008.

"Don't Be Afraid: Statistics for OFCCP Audits." Virginia State Society of Human Resource Management Conference, October 2007.

"Antitrust Econometrics." with Michael Egge. Latham and Watkins Antitrust Academy, Orlando, FL. March 2007.

"Effectively Working with Statistical Experts." Jones Day, Washington, DC. February 2007.

"Antitrust Class Certification" with Laila Haider, Weil, Gotshal, and Manges, New York City, January 2007.

"The Post E-Bay World and Patent Damages" with Lynn Malinoski and Rodger Smith, Law Seminars International Conference on Proving and Calculating Patent Damages, Philadelphia, PA, October 30, 2006.

"Statistical Detection of Cheating: The Chicago Black Sox Scandal of 1919" as panelist on Frameworks for Effectively Presenting and Impeaching Cutting Edge Expert Testimony at the Edward Bennett Williams Inns of the Court, Washington, DC, October 19, 2006.

"Cutting Edge Econometrics in Antitrust Class Certification." NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2006.

"Patent Trolls and Injunctive Relief." NERA Economic Consulting Intellectual Property Practice Presentation. Villard Mansion, New York City, June 2006.
"The Economics of Antitrust Class Certification. Presentations at:
Cadwalader, Wickersham & Taft, New York City, December 2005;
Hogan & Hartson, Washington, DC, January 2006;

O'Melveny & Myers, Washington, DC, February 2006.

"The Economics of Reasonable Royalties." Presentation at Hunton & Williams , Washington, DC, November 2005.

"The Role of Economists in Intellectual Property Litigation." Presentation at Hunton & Williams (with George Korenko), Washington, DC, November 2004.

Panelist, *Special Ethics Concerns in Class Actions*. Federal Trade Commission Conference on Protecting Consumer Interests in Class Actions, Washington, DC, September 2004.

"Class Certification: Theory and Practice." NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2003.

"The Role of Economists in Litigation." CLE Course at Williams and Connolly (with James Jordan), Washington, DC, May 2003.

"The Economics of Antitrust Damage Estimation." Presentation at Wilmer, Cutler and Pickering, Washington, DC, January 2003.

## Appendix B. MATERIALS RELIED UPON

**Court Filings**

Second Consolidated Amended Class Action Complaint, *In Re Rail Freight Fuel Surcharge Antitrust Litigation*, December 31, 2009.

Plaintiffs' Memorandum in Support of Motion for Class Certification, March 18, 2010.

Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs, January 4, 2012.

Defendant CSX Transportation Inc.'s Objections and Responses to Direct Purchaser Plaintiffs' First Set of Interrogatories, January 12, 2012, Exhibit C.

Opinion, *In Re Rail Freight Fuel Surcharge Antitrust Litigation*, June 21, 2012.

Expert Report of Gordon Rausser, Ph.D., October 15, 2012.

**Testimony Transcripts**

Deposition of Blair Carter, May 11, 2010.

Deposition of Donna Cerwonka, August 13, 2010.

Deposition of John Couch, August 3, 2010.

Deposition of Mike Crawford, July 27, 2011.

Deposition of Michael Donnelly, March 16, 2010.

Deposition of Michael Giftos, February 25, 2010.

Deposition of Michael Gilley. May 5, 2010.

Deposition of Michael Gilley, October 1, 2010.

Deposition of Clarence Gooden, July 16, 2010.

Deposition of Christopher Jenkins, August 24, 2010.

Deposition of Edward Jenkins, July 27, 2011.

Deposition of Clyde McIntyre, Jr., February 18, 2010.

Deposition of Tim McNulty, August 10, 2010.

Deposition of Betsy Myers, March 11, 2010.

Deposition of Dean Piacente, August 13, 2010.

Deposition of Gordon Rausser, June 3, 2010.

Deposition of Gordon Rausser, December 11, 2012.

Deposition of Gordon Rausser, December 18, 2012.

Deposition of Craig Rockey, May 18, 2010.

Deposition of William Ruoff, March 25, 2010.

Deposition of Efstrateos Jay Strates, April 16, 2010.

Deposition of Michael Ward, February 10, 2011.

**Declarations**

Declaration of Donna Cerwonka, June 22, 2010.

Declaration of Christopher Jenkins, June 28, 2010.

Declaration of Tim McNulty, June 28, 2010.

Declaration of Dean Piacente, June 22, 2010.

Declaration of Andrew Strok, June 21, 2010.

**Interviews**

Interview with Bill Clement, CSXT Vice President, Intermodal, November 20, 2012

Interview with John Couch, CSX Director of Market Strategy, November 20, 2012

Interview with Frederik Eliasson, CSX Executive Vice President and Chief Financial Officer, November 19, 2012

Interview with Ganson Evans, CSXI Former Senior Vice President, Marketing and Sales, January 10, 2013

Interview with John Hart, CSXT Assistant Vice President, Operations Finance, January 5, 2013

Interview with Lester Passa, CSX Vice President, Strategic Planning, November 19, 2012

Interview with Dean Piacente, CSXT Vice President, Chemicals and Fertilizer, November 19, 2012

Interview with Michael Ward, CSX Chairman, President and Chief Executive Officer, November 19, 2012

**Bates Numbered Documents**

AAR-E-00028015-00028023

AAR-E-00055453-00055460

BNSF-0028794

CSXFSC000000046

CSXFSC000098

CSXFSC000000281-298

CSXFSC000000351

CSXFSC000000621-622

CSXFSC6684

CSXFSC12334-12338

CSXFSC14667-14722

CSXFSC15482-15491

CSXFSC19850

CSXFSC31774

CSXFSC35551

CSXFSC000036491-96

CSXFSC000036975

CSXFSC44614

CSXFSC44620

CSXFSC64532-64540

CSXFSC65811-65819

CSXFSC66583-66584

CSXFSC76873-76892

CSXFSC76878

CSXFSC77514-77563

CSXFSC077514-77538

CSXFSC83367-83378

CSXFSC083367

CSXFSC000084489-90

CSXFSC86125-861126

CSXFSC91307

CSXFSC00093250

CSXFSC000098458

CSXFSC000098459

CSXFSC98486-98496

CSXFSC104022-104024

CSXFSC000110952-000110974

CSXFSC126311

CSXFSC128970

CSXFSC129101

CSXFSC129366

CSXFSC132121-132122

CSXFSC136087

CSXFSC000137621-137740

CSXFSC142482-142488

CSXFSC150133-150135

CSXFSC000152803-000152808

CSXFSC153005-153006

CSXFSC156564

CSXFSC165096-165103

CSXFSC165104

CSXFSC177093-177108

CSXFSC177111-177125

CSXFSC185000-185001

CSXFSC186155

CSXFSC186832

CSXFSC195850

CSXFSC195941

CSXFSC195971-195972

CSXFSC196250-196252

CSXFSC198482-198485

CSXFSC198656-198657

CSXFSC199147-199224

CSXFSC227946

CSXFSC227947-227958

CSXFSC230372-230373

CSXFSC235745-235749

CSXFSC237575-237587

CSXFSC237579

CSXFSC246935-246951

CSXFSC254670-254671

CSXFSC254684-254685

CSXFSC259376-259383

CSXFSC000278639-690

CSXFSC279964

CSXFSC287750-287751

CSXFSC290295

CSXFSC296928-296929

CSXFSC312676-312695

CSXFSC316795

CSXFSC320277

CSXFSC321073

CSXFSC323353-323354

CSXFSC324673-324674

CSXFSC324678

CSXFSC324688-324689

CSXFSC326228-326230

CSXFSC000327518-000327519

CSXFSC327985-327987

CSXFSC000328316

CSXFSC328316

CSXFSC328558

CSXFSC329549-329590

CSXFSC332534-332535

CSXFSC000333177-333178

CSXFSC333754-333761

CSXFSC350087

CSXFSC351623

CSXFSC352064

CSXFSC366151

CSXFSC369691-369700

CSXFSC372193-372212

CSXFSC412787-412794

CSXFSC413474

CSXFSC459283

CSXFSC477828

CSXFSC479548

CSXFSC501024-501025

CSXFSC501144-501146

CSXFSC669616-669629

CSXFSC672465-672478

CSXFSC676724-676725

CSXFSC676724-676725

CSXFSC676726-676727

CSXFSC676728-676771

CSXFSC676772-676778

CSXFSC676809-676818

CSXFSC676875-676912

CSXFSC676913-676918

CSXFSC676919-676923

CSXFSC676924-676929

CSXFSC676930-676936

CSXFSC676937-676996

CSXFSC676997-677007

CSXFSC677018-677029

CSXFSC677030-677036

CSXFSC677037-677038

CSXFSC677039-677044

CSXFSC677045-677049

CSXFSC677050-677052

CSXFSC677053-677091

CSXFSC677092-677103

CSXFSC677115-677167

CSXFSC677168-677174

CSXFSC677175-677179

CSXFSC677186-677236

CSXFSC677427-677535

CSXFSC677536-677539

CSXFSC677540-677547

CSXFSC677548-677756

CSXFSC677757-677784

CSXFSC677785-677790

CSXFSC677791-677798

CSXFSC677799-677807

CSXFSC677838-677880

CSXFSC677881-677890

CSXFSC677891-677925

CSXFSC677926-677933

UPFSC0000436

UPFSC0000438

UPFSC0000551

UPFSC0000552

**CSX Corporation Reports**

CSX Corporation 1993 Form 10-K

CSX Corporation 1994 Form 10-K

CSX Corporation 1995 Form 10-K

CSX Corporation 1996 Form 10-K

CSX Corporation 1997 Form 10-K

CSX Corporation 1998 Form 10-K

CSX Corporation 1999 Form 10-K

CSX Corporation 2000 Form 10-K

CSX Corporation 2001 Form 10-K

CSX Corporation 2002 Form 10-K

CSX Corporation 2003 Form 10-K

CSX Corporation 2004 Form 10-K

CSX Corporation 2005 Form 10-K

CSX Corporation 2006 Form 10-K

CSX Corporation 2007 Form 10-K

CSX Corporation 2008 Form 10-K

CSX Corporation 2011 Form 10-K

CSX Corporation 1998 Q1 Form 10-Q

CSX Corporation 1998 Q2 Form 10-Q

CSX Corporation 1998 Q3 Form 10-Q

CSX Corporation 1998 Q4 Form 10-Q

CSX Corporation 1999 Q1 Form 10-Q

CSX Corporation 1999 Q2 Form 10-Q

CSX Corporation 1999 Q3 Form 10-Q

CSX Corporation 1999 Q4 Form 10-Q

CSX Corporation 2000 Q1 Form 10-Q

CSX Corporation 2000 Q2 Form 10-Q

CSX Corporation 2000 Q3 Form 10-Q

CSX Corporation 2000 Q4 Form 10-Q

CSX Corporation 2001 Q1 Form 10-Q

CSX Corporation 2001 Q2 Form 10-Q

CSX Corporation 2001 Q3 Form 10-Q

CSX Corporation 2001 Q4 Form 10-Q

CSX Corporation 2002 Q1 Form 10-Q

CSX Corporation 2002 Q2 Form 10-Q

CSX Corporation 2002 Q3 Form 10-Q

CSX Corporation 2002 Q4 Form 10-Q

CSX Corporation 2003 Q1 Form 10-Q

CSX Corporation 2003 Q2 Form 10-Q

CSX Corporation 2004 Q1 Form 10-Q

CSX Corporation Annual Report, 1999

CSX Corporation Annual Report, 2000

CSX Corporation Annual Report, 2001

CSX Corporation Annual Report, 2002

CSX Corporation Annual Report, 2003

CSX Corporation Annual Report, 2004

CSX Corporation Annual Report, 2005

CSX Corporation Annual Report, 2006

CSX Corporation Annual Report, 2007

CSX Corporation Annual Report, 2008

CSX Corporation Quarterly Flash Statement, 1999 Q1

CSX Corporation Quarterly Flash Statement, 1999 Q2

CSX Corporation Quarterly Flash Statement, 1999 Q3

CSX Corporation Quarterly Flash Statement, 1999 Q4

CSX Corporation Quarterly Flash Statement, 2000 Q1

CSX Corporation Quarterly Flash Statement, 2000 Q2

CSX Corporation Quarterly Flash Statement, 2000 Q3

CSX Corporation Quarterly Flash Statement, 2000 Q4

CSX Corporation Quarterly Flash Statement, 2001 Q1

CSX Corporation Quarterly Flash Statement, 2001 Q2

CSX Corporation Quarterly Flash Statement, 2001 Q3

CSX Corporation Quarterly Flash Statement, 2001 Q4

CSX Corporation Quarterly Flash Statement, 2002 Q1

CSX Corporation Quarterly Flash Statement, 2002 Q2

CSX Corporation Quarterly Flash Statement, 2002 Q3

CSX Corporation Quarterly Flash Statement, 2002 Q4

CSX Corporation Quarterly Flash Statement, 2003 Q1

CSX Corporation Quarterly Flash Statement, 2003 Q2

CSX Corporation Quarterly Flash Statement, 2003 Q3

CSX Corporation Quarterly Flash Statement, 2003 Q4

CSX Corporation Quarterly Flash Statement, 2004 Q1

CSX Corporation Quarterly Flash Statement, 2004 Q2

CSX Corporation Quarterly Flash Statement, 2004 Q3

CSX Corporation Quarterly Flash Statement, 2004 Q4

CSX Corporation Quarterly Flash Statement, 2005 Q1

CSX Corporation Quarterly Flash Statement, 2005 Q2

CSX Corporation Quarterly Flash Statement, 2005 Q3

CSX Corporation Quarterly Flash Statement, 2005 Q4

CSX Corporation Quarterly Flash Statement, 2006 Q1

CSX Corporation Quarterly Flash Statement, 2006 Q2

CSX Corporation Quarterly Flash Statement, 2006 Q3

CSX Corporation Quarterly Flash Statement, 2006 Q4

CSX Corporation Quarterly Flash Statement, 2007 Q1

CSX Corporation Quarterly Flash Statement, 2007 Q2

CSX Corporation Quarterly Flash Statement, 2007 Q3

CSX Corporation Quarterly Flash Statement, 2007 Q4

CSX Corporation Quarterly Flash Statement, 2008 Q1

CSX Corporation Quarterly Flash Statement, 2008 Q2

CSX Corporation Quarterly Flash Statement, 2008 Q3

CSX Corporation Quarterly Flash Statement, 2008 Q4

CSX Corporation First-Quarter 2006 Earnings Call

**Articles, Books, and Reports**

ABA Section of Antitrust Law, Market Power Handbook: Competition Law and Economic Foundations (2nd ed. 2012)

ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues, 2nd ed., American Bar Association (2010)

Franklin M. Fisher, "Diagnosing Monopoly," Quarterly Review of Economics and Business, v. 19 (Summer 1979)

George Stigler, "What Does an Economist Know?" Journal of Legal Education, Vol. 33, No. 311, 1983

Joel Palley, Office of Policy, Office of Rail Policy and Development, Federal Railroad Administration, "Impact of the Staggers Rail Act of 1980," March 2011.

John Gallagher, "Fueling Intermodal Shift," Traffic World, October 11, 2004.

Jonathan Baker, Market Definition: An Analytical Overview. 2006

Joshua D. Angrist and Alan B. Krueger, "Empirical Strategies in Labor Economics," in Handbook of Labor Economics, 1st ed., Elsevier (1999)

International Energy Agency, Oil Market Report released 9 August 2000, Prices and Refinery Activity

International Monetary Fund, The Impact of Higher Oil Prices on the Global Economy, December 8, 2000

Lance R. Grenzeback and Andrew T. Lukmann, "Case Study of the Transportation Sector's Response to and Recovery from Hurricanes Katrina and Rita,"

Robert A. Milne and Jack E. Pace III, "The Scope of Expert Testimony on the Subject of Conspiracy in a Sherman Act Case," Antitrust, Vol. 17, No. 2, Spring 2003

Roger D. Blair and Jill Boylston Herndon, "Inferring Collusion from Economic Evidence," Antitrust, Vol. 15, No 17, 2000-2001

Russell Pittman, "Railway Mergers and Railway Alliances: Competition Issues and Lessons for Other Network Industries," Economic Analysis Group Discussion Paper, Department of Justice, Antitrust Division, May 2009

Shipper Leverage Over Freight Railroads, Association of American Railroads, October 2011.

U.S. Government Accountability Office, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed," GAO-07-94, Oct 6, 2006

U.S. Rail Capacity Crunch: Hearing before the Subcommittee on Railroads of the Committee on Transportation and Infrastructure, 190th Cong. 46 (2006). (Available at www.gpo.gov/fdsys/pkg/CHRG-109hhrg28281/html/CHRG-109hhrg28281.htm)

**Additional Sources**

49 CFR 1039

49 CFR 1090.2

49 U.S.C. § 10101

49 U.S.C. § 10703

2010 Horizontal Merger Guidelines.

AAR, Quarterly Rail Cost Adjustment Factor, Second Quarter 2003, Ex Parte No. 290 (Sub-No. 5) (2003-2), March 5, 2003

Analysis of Freight Movement Mode Choice Factors, Center for Urban Transportation Research at the University of Florida, Report for the Florida DOT, 2002

Association of American Railroads, "An Overview of America's Freight Railroads", July 2012

Canadian National, 2000 Annual Report

Canadian National, 2005 Annual Report

Canadian Pacific, 2002 Annual Report

Canadian Pacific, 2004 Annual Report

Canadian Pacific, 2011 Annual Report

"CSX – Fall Peak Planning Letter 2004." Available at: http://www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/5fe0dfd3189def388525703d00602eb8?OpenDocument

"CSX – Fall Peak Planning Letter 2005." Available at: http://www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/f5c6de864f7e032185257042004cd923?OpenDocument

"CSX – Fall Peak Planning Letter 2006." Available at: http://www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/532f33b73641c735852571b10044af47?OpenDocument

"CSX – Fall Peak Planning Letter 2007" Available at: http://www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/a29f4495887ed7f18525735b0044152b?OpenDocument

"CSX-Fall Peak Planning Letter 2008." Available at www.stb.dot.gov/peakletters1.nsf/8340d3d43ec3ee0d85256f69006ad899/b9dda3b1c66603bc852574bf005251da?OpenDocument.

International Paper 2011 Form 10-K

Kansas City Southern, 2001 Form 10-K

Kansas City Southern, 2005 Form 10-K

Kansas City Southern, 2011 Form 10-K

NS 2002 Form 10-K

Pacer Stacktrain Electronic Bulletin No. 491, April 26, 2004. Available at dnnseotest1.pacer.com/Portals/1/stackfacts/archive/StackFacts_491.pdf

Surface Transportation Board Ex Parte No. 661, August 3, 2006. Available at www.stb.dot.gov/decisions/readingroom.nsf/UNID/AA662E3D39B2BCAD852571BF006DFD3D/$file/37151.pdf

Surface Transportation Board Ex Parte No. 661, January 25, 2007, p. 1. Available at www.stb.dot.gov/decisions/readingroom.nsf/UNID/0BB8C875F92B1A248525726F00559378/$file/37341.pdf

Surface Transportation Board, Decision, STB Docket No. 42100, E.I. DuPont De Nemours and Company v. CSX Transportation, Inc., June 27, 2008

Surface Transportation Board, Decision, STB Docket No. 42123, M&G Polymers USA, LLC v. CSX Transportation, Inc., September 26, 2012

Surface Transportation Board, "Rail Rates Continue Multi-Year Decline," Office of Economics, Environmental Analysis, and Administration, December 2000. Available at: http://www.stb.dot.gov/stb/docs/RI.pdf

Surface Transportation Board, STB Ex Parte No. 582 (Sub-No. 1), decided March 30, 2000

Surface Transportation Board, FY 2011 Annual Report

Testimony of Charles D. Nottingham, Chairman Surface Transportation Board before the U.S. House of Representatives Committee on Transportation and Infrastructure, September 20, 2007

Testimony of Michael J Ward before the United States House of Representatives, March 5, 2008

The effect of fuel price increases on airlines and passengers: hearing before the Subcommittee on Aviation of the Committee on Transportation and Infrastructure, House of Representatives, One Hundred Sixth Congress, second session, October 11, 2000

U.S. Census Bureau, 2002 Commodity Flow Survey, December 2004

U.S. Census Bureau, 2007 Commodity Flow Survey, December 2009.

U.S. Department of Energy, Annual Energy Outlook 2003, January 2003

U.S. Department of Transportation Federal Highway Administration, FAF Commodity Classification. Available at ops.fhwa.dot.gov/freight/freight_analysis/faf/faf2_reports/report4/rpt4_commodity_class.pdf

**Websites**

Bulkmatic Transport Company, "Bulkmatic Fuel Surcharge." Available at: http://www.bulkmatic.com/bulkmatic_transport_company_news/bulKmatic_transport_company_fuel_surcharge.asp

Canadian Northern, "Other Investor Focus," available at www.cn.ca/documents/Investor-Factbook-current/2011-IFB-OtherInvestorFocus-en.pdf

Canadian Pacific Railway, "CPR Adjusts Fuel Surcharge Policy to Offset Rising Prices." Available at: http://www.progressiverailroading.com/rail_industry_trends/news/CPR-adjusts-fuel-surcharge-policy-to-offset-rising-prices--5264

Con-Way, "Historical Data 1999." Available at: http://www.con-way.com/en/tools_pricing/freight/fuel_surcharge/historical_surcharge_data/fuel_surcharge_historical_data_/

CSXI, "Intermodal Network," available at www.csxi.com/share/csxicustomer/main/docs/Core_2008_08-REF24487.pdf

CSXT, "Tariffs," available at www.csx.com/index.cfm/customers/prices-tariffs-fuel-surcharge/tariffs/

CSX Corporation, "Our Evolution and History," available at www.csx.com/index.cfm/about-csx/our-evolution-and-history

CSX Corporation, "CSX Automotive Top Customers," available at: corporate-social-responsibility.csx.com/markets/merchandise/automotive.php

CSX Corporation, "Coal Top 10 Customers," available at: corporate-social-responsibility.csx.com/markets/coal.php

CSX Corporation, "CSX Intermodal Top Customers," available at: corporate-social-responsibility.csx.com/markets/intermodal.php

Dow Chemical Co, "Dow Will Pass On Fuel Surcharge Costs." Available at: http://secure.gvmg.com/cleanfax/newsprint.asp?print=1&mode=4&N_ID=19105

FedEx, "FedEx Adds Fuel Surcharge." Available at: http://cnnfn.cnn.com/1999/12/30/companies/fedex_fuel/

Georgia Freightways, "Fuel Adjustment Surcharge Index." Available at: http://www.gfwy.com/fsc.aspx

G.I. Trucking Company, "G.I. Trucking Co. Reluctantly Implements Fuel Surcharge." Available at: http://www.thefreelibrary.com/G.I.+Trucking+Co.+Reluctantly+Implements+Fuel+Surcharge.-a055533235

Hoosier Southern Railroad, "Fuel Surcharge." Available at: http://www.narps.org/FTs_F-K/FT_HOS_9500.pdf

I&M Rail Link, "I & M Rail Link to Implement 3 Percent Fuel Surcharge November 1." Available at: http://www.grainnet.com/articles/I___M_Rail_Link_to_Implement_3_Percent_Fuel_Surcharge_November_1-8401.html

Iowa Interstate Railroad, "Iowa Interstate Railroad, Ltd." Available at: http://www.iaisrr.com/sites/iaisrr.com/files/Fuel_Surcharge.pdf

Kansas City Southern, "WTI Update Archive," available at www.kcsouthern.com/en-us/Services/Pages/WTIUpdateArchive.aspx

LyondellBasell,"About Us," available at www.lyondellbasell.com/Aboutus

Matson Inc., "Matson Navigation Lowers Fuel Surcharge." Available at: http://refrigeratedtrans.com/mag/transportation_matson_navigation_lowers/

Peninsula Truck Lines, Inc., "Peninsula Truck Lines, Inc." Available at: http://www.peninsulatruck.com/Rates/FSC.aspx

Southeastern Freight Line, "Southeastern Freight Lines." Available at: http://www.sefl.com/seflWebsite/servlet?action=fuelSurcharge_fuelPageUpdate

Surface Transportation Board, "Frequently Asked Questions," available at www.stb.dot.gov/stb/faqs.html

UPS, "UPS Cuts Fuel Surcharge." Available at: http://www.investors.ups.com/phoenix.zhtml?c=62900&p=irol-newsArticle&ID=232777&highlight=

Waste Management, "Fuel and Environmental Charge." Available at: https://www.wm.com/fec.jsp

Yellow Freight System, "The Motley Fool." Available at: http://boards.fool.com/yellow-fuel-surcharge-11040483.aspx?sort=postdate

**Data**

Transactional data and work papers from Dr. Rausser's backup files.

U.S. Energy Information Administration – Cushing, OK West Texas Intermediate Spot Price FOB. Available at: www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W

U.S. Energy Information Administration – Weekly U.S. No 2 Diesel Prices. Available at: http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=emd_epd2d_pte_nus_dpg&f=w

West Texas Intermediate Crude Oil Prices as published in the Wall Street Journal, available at http://shipcsx.com/public/ec.cpricingpublic/Prices