# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

# Volume 2 of 29

# DA00713 - DA01253

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) | MDL No. 1869<br>Misc. No. 07-489 (PLF)<br>Hon. Paul L. Friedman |
| This document relates to:<br>ALL DIRECT PURCHASER CASES | ) | |

**Expert Report of**
**Joseph P. Kalt, Ph.D.**

**On Behalf of Defendants**
**BNSF Railway Company**
**CSX Transportation, Inc.**
**Norfolk Southern Railway Company**
**Union Pacific Railroad Company**

**Errata Corrected March 1, 2013**

HIGHLY CONFIDEN

EXHIBIT
PENGAD 800-631-6989
Kalt 1
5/28/13

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1
- A. Witness Background and Qualifications ..... 1
- B. Purpose of Analysis ..... 2
- C. Materials Relied Upon ..... 3
- D. Structure of This Report ..... 4

II. PLAINTIFFS' ALLEGATIONS AND OVERVIEW OF MY FINDINGS ..... 5
- A. Plaintiffs' and Their Expert's Claims and Contentions ..... 5
- B. Overview of Findings ..... 8
- C. Defendants' Unilateral Pursuit of Their Economic Interests ..... 12
- D. Contradictions and Inconsistencies in Plaintiffs' Hypothesized Conspiracy ..... 28
- E. Testing Marketplace Outcomes for Evidence of Conspiracy ..... 34
- F. Damages ..... 40
- G. Class-Wide Impact ..... 43

III. BACKGROUND: THE ECONOMICS OF THE FREIGHT TRANSPORTATION INDUSTRY ..... 47
- A. The Modes of Freight Transportation ..... 47
- B. Historical Performance and Regulation of the Railroad Industry ..... 49
- C. Competition and Cooperation in the Railroad Sector ..... 58
- D. Pricing of Unregulated Rail Service ..... 63

IV. ECONOMIC ANALYSIS OF CHALLENGED CONDUCT ..... 68
- A. The Economics of Detecting Conspiracy ..... 68
- B. Are Revenue-Based Fuel Surcharges the Product of Unilateral Conduct? ..... 72
- C. The Economic Function of Fuel Surcharges ..... 79
- D. The Adoption and Spread of Defendants' Non-Conspiratorial, Revenue-Based Fuel Surcharges ..... 93
- E. Was Conspiracy Needed to Overcome, and Did It Overcome, Resistance to Fuel Surcharges? ..... 111
- F. Contradictions in Prof. Rausser's Claim that Expected Benefits of Conspiracy Outweighed the Costs ..... 118
- G. The Parallel Conduct Asserted under Prof. Rausser's Theory of Conspiracy Is Not Observed in the Data ..... 126
- H. The Alleged Scheme to Adopt the AIILF ..... 142
- I. Prof. Rausser's Inference of Conspiracy from Forensic Evidence ..... 146
- J. Testing the Characteristics of the Alleged Conspiracy: Universally Applied? ..... 158
- K. Testing the Characteristics of the Alleged Conspiracy: Uniform and Non-Negotiable? ..... 168
- L. Testing the Characteristics of the Alleged Conspiracy: More Onerous? ..... 175

**V. ASSESSING THE ECONOMIC LOGIC AND FEASIBILITY OF THE ALLEGED CONSPIRACY ........ 191**
- A. The Role of Economic Analysis ........ 191
- B. Market Concentration: Plaintiffs and Prof. Rausser Fail to Properly Identify the Markets in which Defendants Compete ........ 194
- C. Interlining, "Vertical" Relationships among Defendants, and Disparate Incentives ........ 199
- D. The Multiplicity of Markets Means a Multiplicity of Competitors and Competitive Conditions ........ 206
- E. "Same Percentage" Price Changes and Economic Irrationality under the Alleged Conspiracy ........ 215
- F. Economic Rationality and the Benefits and Costs of Purported Conspiracy ........ 219
- G. Methodological Implications for Determination of Facts Common to the Class 225
- H. The Purported Conspiracy Not to Discount Base Rates ........ 236
- I. Monitoring and Enforcement: Price Transparency or Opaqueness? ........ 248
- J. "Cheating" and Its Punishment under the Hypothesized Conspiracy ........ 255
- K. Summary: The Railroad Sector Is Not Conducive to Conspiracy ........ 258

**VI. TESTING THE DATA ON MARKETPLACE OUTCOMES FOR THE PRESENCE OF THE ALLEGED CONSPIRACY ........ 261**
- A. Introduction: Asserted and Predicted Marketplace Outcomes under the Alleged Conspiracy ........ 261
- B. Did Defendants' Prices (All-In Rates) All Change by the Same Percentage Amount? ........ 262
- C. Does Prof. Rausser's Model Show that Rail Rates on Individual Routes Increased by a Common Percentage? ........ 269
- D. Did Defendants' Prices (All-In Rates) for Unregulated Rail Service Rise Above Levels That Are Explained by Normal Supply and Demand Factors? ........ 275
- E. Rail Rates Rose More Slowly than Properly-Measured Increases in Costs ........ 293
- F. Testing Prof. Rausser's Claim that Conspiracy Contributed to Supra-Competitive Increases in Defendants' Profits ........ 308
- G. Testing the Claim that Defendants Stopped Competing and "Stabilized" Their Shares of Traffic during the Class Period ........ 311
- H. Summary ........ 328

**VII. ASSESSMENT OF ASSERTED COMPETITIVE HARM AND DAMAGES TO SHIPPERS FROM THE ALLEGED CONSPIRACY ........ 330**
- A. Introduction ........ 330
- B. Prof. Rausser's Damages Model ........ 331
- C. Errors and Contradictions in Prof. Rausser's Data Construction ........ 333
- D. Prof. Rausser's Model Does Not—and Cannot—Demonstrate Causation ........ 336
- E. Correcting Prof. Rausser's Faulty Competitive Benchmark ........ 345
- F. Prof. Rausser's Damages Model Is Not Capable of Sufficiently Precise Estimation to Reliably Calculate Damages for Individual Shippers ........ 348

G. Prof. Rausser's Model Commonly Finds "Antitrust Damages" in Excess of Revenues from Challenged Fuel Surcharges ........ 359
H. Prof. Rausser's Model Finds Significant "Damages" Even Where Class FSCs Are Not More "Onerous" than Non-Conspiratorial FSCs ........ 361
I. Prof. Rausser's Model Finds Antitrust Damages for Movements of Sole-Defendant-Served and Traffic with Competition from Other Modes ........ 379
J. Analysis of Selected Categories of Customers ........ 382

# I. INTRODUCTION

## A. Witness Background and Qualifications

1. My name is Joseph P. Kalt. I am the Ford Foundation Professor (Emeritus) of International Political Economy at the John F. Kennedy School of Government at Harvard University. The Kennedy School of Government is Harvard's graduate school for public policy and public administration.

2. I joined the faculty at Harvard in 1978, serving first as an Instructor, then as an Assistant Professor and Associate Professor of Economics in the Department of Economics. I joined the faculty of the Kennedy School of Government as a Professor of Public Policy with tenure in 1986. At the Kennedy School, my teaching responsibilities have included economics for public policy; economics of regulation and antitrust; natural resource and environmental policy; and economic development.

3. During 2005-2009, I served as a visiting Professor at the University of Arizona's Eller College of Management. Since 2008, I have been a visiting professor at the University of Arizona's Rogers College of Law and School of Public Administration and Policy (now the School of Government and Public Policy). My teaching at the University of Arizona has included the economics of regulation and antitrust, as well as economic development policy.

4. I am also a senior economist with Compass Lexecon, an economics consulting firm with offices in Boston, MA; Washington, DC; Los Angeles, CA; Chicago, IL; Oakland, CA; Tucson, AZ; Europe; and Latin America. I hold B.A., M.A., and Ph.D. degrees in economics.

5. Throughout my career, I have engaged in extensive research, teaching, and consulting on the economics of regulated markets, as well as on competition economics and policy more generally. In addition to my university teaching, I have taught on such topics in programs for working journalists, state legislators, federal administrative law judges, and business and non-profit sector leaders. Over the last 30 years, I have testified on numerous occasions before state, federal, and international courts, tribunals and commissions, as well as before the US Senate and the US House of Representatives, regarding the economics and policy of competition and regulated industries.

6. Among other areas, I specialize in the economics of competition, regulation, and contracting in a wide variety of industries, including transportation, agriculture, energy, and manufacturing. I have written, taught, consulted, and testified extensively on the economics of these industries. With regard to the railroad sector, I have studied and provided expert testimony before the federal Surface Transportation Board and various federal and international tribunals on matters including major rail mergers, rate making and rate regulation exemptions, competitive access policy, and a number of antitrust

matters. I have also been invited on multiple occasions to provide education on the basic economics of the railroad sector and its regulation to Surface Transportation Board members, congressional staff, and federal administrative law judges.

7. My curriculum vita is attached hereto as Appendix B and lists my prior testimony as an expert, my publications, and my other professional activities. I have been supported in my work on this matter by staff at Compass Lexecon, working under my direction. I am being compensated for my work at the rate of $1350 per hour, and my compensation in no way depends on the outcome of this proceeding.

### B. Purpose of Analysis

8. I have been retained by Defendants in this dispute. Defendants are BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSXT"),[1] Norfolk Southern Railway Company ("NS"), and Union Pacific Railroad Company ("UP").

9. I have been asked by Defendants to examine the economics of Plaintiffs' allegations and assertions in this dispute and to review and assess the reports and depositions of Plaintiffs' expert.[2] Plaintiffs purport to be representative of a class consisting of:

> "All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the 'Class Period') purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as 'rebasing') ('Fuel Surcharge'). Excluded from the Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities; and

---

1 I understand that during the Class Period intermodal transportation service was provided by CSX Intermodal ("CSXI"), which was a separate corporate entity from Defendant CSX Transportation ("CSXT"). I have included CSXI in my analysis because Prof. Rausser has offered opinions implicating CSXI in the alleged conspiracy and attributing damages to CSXI transactions during the Class Period. In this report, I use "CSXT" for non-intermodal traffic, "CSXI" for intermodal traffic, and "CSXT/CSXI" when both intermodal and non-intermodal traffic are included.

2 This report relies upon the opinions and conclusions of Plaintiffs' expert, Prof. Gordon Rausser, as they are presented in his report on liability, impact, and damages as well as his reports and deposition transcripts from the class certification phase of this proceeding. These documents include: Expert Report of Gordon Rausser, Ph.D., October 15, 2012 ("Rausser Merits Report"); Expert Report of Gordon Rausser, Ph.D., March 18, 2010 ("Rausser Class Report"); Expert Reply Report of Gordon Rausser, Ph.D., August 27, 2010 ("Rausser Class Reply"); Videotaped Deposition of Gordon Rausser, Ph.D., June 3, 2010 ("First Rausser Deposition"); Videotaped Deposition of Gordon Rausser, Ph.D., September 24, 2010 ("Second Rausser Deposition"); Videotaped Deposition of Gordon Rausser, Ph.D., December 11 and 18, 2012 ("Rausser Merits Deposition").

(b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract."[3]

10. As explained in detail below, Plaintiffs and their expert assert that Defendants engaged in a conspiracy to fix, raise, maintain and/or stabilize the price of rail freight transportation service through the use of revenue-based fuel surcharges. They claim that this conspiracy led to inflated prices for Class Member shippers which caused harm and quantifiable damages to each Class Member. In this report, I respond to the assertions of Plaintiffs and their expert including their assertions of monetary damages.

### C. Materials Relied Upon

11. In addition to my professional training, my teaching and research, and my prior work experience, I have examined materials and evidence (gathered by me and my staff working under my direction) in the course of my engagement in the matter at hand. Among the items I have relied upon are:

- Legal filings, pleadings, declarations, affidavits, and briefs in this matter;
- Publicly available data and other information pertaining to the analytical issues raised by the parties in this lawsuit;
- Deposition testimony and discovery documents and data from this matter;
- Data and information collected from the parties and third parties to this lawsuit;
- Interviews with railroad industry professionals; and
- The expert reports submitted to date by Plaintiffs.

12. For a more complete listing of the data and materials I have relied upon, see Appendix C. All figures referred to in the report are contained in Appendix A.

13. If and to the extent additional information becomes available in this matter, including as a result of additional expert testimony or depositions, I anticipate that I would supplement this report, as appropriate.

3 Plaintiffs' Memorandum in Support of Motion for Class Certification, March 18, 2010 ("Plaintiffs' Memorandum"), at 1.

### D. Structure of This Report

14. This report consists of seven main sections, including this introduction. Section II presents a summary discussion of the Plaintiffs' claims and the conclusions of Plaintiffs' expert, Prof. Rausser. It also provides a summary of my key findings in this matter. Section III provides an overview of the rail freight transportation sector, including a discussion of the economics, public policy, regulatory structure, and industry practices that are relevant to assessing the merits of Plaintiffs' claims and Plaintiffs' expert's conclusions.

15. In Section IV, I assess whether the challenged conduct of Defendants represents conduct expected of railroads individually pursuing their unilateral business interests or, alternatively, whether it is conduct only coherently explained as railroads participating in an anticompetitive conspiracy as alleged by Plaintiffs. In addition, I subject the claims and descriptions of the purported conspiracy and its attributes to empirical testing to see which, if any, are borne out by the data.

16. In Section V, I investigate the economic underpinnings of Plaintiffs' theories and descriptions of the claimed conspiracy. Specifically, I undertake extensive data analysis to assess whether industry and market conditions are conducive to conspiracy. I also examine the economic logic and consistency of those theories and descriptions in order to determine the plausibility of the alleged conspiracy in light of the interests of Defendants and extant marketplace conditions.

17. Any conspiracy among sellers of a product or service, if it actually exists, should leave evidence of its operation in the outcomes observable in the marketplace. In Section VI, I identify the marketplace outcomes predicted by Plaintiffs' theory of conspiracy. I then use economic analysis to examine whether predicted outcomes, as reflected in prices, traffic shares and the like, are evident in the data.

18. Finally, Section VII assesses Plaintiffs' expert's claims to the effect that he has found and reliably measured damages in the aggregate and to each Class Member. Specifically, I subject Prof. Rausser's modeling and measurement of economic damages to empirical testing and replication in order to determine the reliability of his calculations of the magnitude of injury, if any, purportedly suffered by individual Class Members and the Class as a whole.

## II. PLAINTIFFS' ALLEGATIONS AND OVERVIEW OF MY FINDINGS

### A. Plaintiffs' and Their Expert's Claims and Contentions

19. Plaintiffs in this matter allege that, apparently beginning in mid-March 2003,[4] Defendants met and conspired to use revenue-based fuel surcharges ("FSCs") as a means of fixing prices of rate-unregulated rail freight transportation in the United States.[5] Plaintiffs seek damages for the period from July 1, 2003 through December 31, 2008 for a class including all persons (other than government entities and persons affiliated with Defendants) who, between July 1, 2003 and December 31, 2008, purchased directly from one or more Defendants rail freight service under terms that included a stand-alone rail freight fuel surcharge applied as a percentage of the base rate or where some or all of the fuel surcharge was included in the base rate.[6]

20. Plaintiffs contend that between 2000 and early 2003 Defendants each unilaterally adopted fuel surcharges, but that they were largely unsuccessful in including them in contracts with customers.[7] These fuel surcharges are portrayed by Plaintiffs as being "at low levels" of coverage,[8] varying in type across railroads,[9] commonly waived or "negotiate[d] away",[10] and applied only intermittently[11] to low volumes of traffic.[12]

---

4 Plaintiffs and their expert are not consistent regarding when the conspiracy allegedly began. Prof. Rausser previously testified, without qualification, that his analysis proved it began July 1, 2003 and also proved that the pre-July 2003 conduct was competitive and without anticompetitive coordination. (Rausser Class Report at 3 and 60, Figure 16) He and Plaintiffs now appear to say that the conspiracy had its genesis as early as mid-March 2003, while "the actual execution in terms of anticompetitive consequences began in July of 2003." (Rausser Merits Deposition at 13; Plaintiffs' Reply Memorandum in Support of Motion for Class Certification, August 27, 2010 ("Plaintiffs' Reply Memorandum") at 8-9; Direct Purchaser Plaintiffs' Second Amended Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company ("Defendants"), May 11, 2011 (hereinafter "Narrative") at ¶¶29-39; (Rausser Merits Report at 59-60) I find that Plaintiffs' and Prof. Rausser's claims of conspiracy are not supported by the data and facts whether the purported start date is in March 2003 or July 2003. I present my analyses as much as possible for both March 2003 and July 2003 start dates, and find that the results are essentially the same using either as the presumed start date of the alleged conspiracy.

5 "Unregulated" here refers to rail freight service not subject to Surface Transportation Board-established maximum tariffs.

6 Plaintiffs' Memorandum at 1-2.

7 See, e.g., Narrative at ¶¶5-11.

8 See, e.g., Narrative at ¶5.

9 See, e.g., Second Consolidated Amended Class Action Complaint, December 31, 2009 ("Complaint") at ¶¶7, 12, 57; Narrative at ¶¶5, 6.

10 See, e.g., Complaint at ¶92; Plaintiffs' May 2011 Responses at 111; Narrative at ¶¶82, 84, 113.

11 Complaint at ¶7.

12 Narrative at ¶5.

Plaintiffs attribute Defendants' supposed inability to successfully expand the use of fuel surcharges prior to purportedly conspiring to resistance from customers [13] and competition among the railroads.[14]

21. According to Plaintiffs, but for the alleged conspiracy, the fuel surcharges adopted by Defendants after spring 2003 would have faced a brick wall of customer resistance and "would not have existed *at all*".[15] At most, there might have been quite "modest" fuel surcharges that would have been subject to "collapse", and the fuel surcharges Defendants used prior to the alleged conspiracy would not have spread "widely" absent the conspiracy.[16] Plaintiffs maintain that the conspiracy enabled Defendants to spread FSCs that were "nothing like" the surcharges they had used prior to the alleged conspiracy.[17] The alleged conspiratorial surcharges were purportedly uniform,[18] standardized,[19] and more "onerous"[20] than the FSCs used in the pre-Class Period. Moreover, Plaintiffs allege that Defendants' surcharges purportedly were implemented in "lockstep,"[21] were non-negotiable,[22] and were intended to achieve universal coverage.[23]

22. Echoing Plaintiffs' claims, Prof. Rausser asserts that there was a "trend reversal" in overall railroad rates that corresponded with the alleged onset of the claimed conspiracy, and that "[t]his trend reversal constitutes economic evidence consistent with Plaintiffs' allegation that Defendants conspired to raise freight rates."[24] He goes

---

13 See, e.g., Narrative at ¶¶7, 11.

14 See, e.g., Plaintiffs' Reply Memorandum at 10.

15 Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories Directed to all Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railroad Company, January 4, 2012, ("Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories") at 9 (emphasis in the original).

16 See, e.g., Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories, January 4, 2012, at 9.

17 Plaintiffs' Reply Memorandum Addressing Wal-Mart Stores, Inc. v. Dukes, September 1, 2011, at 7.

18 Complaint at ¶¶79-83, 88, 104; Narrative at ¶¶16, 53, 63, 64, 80, 81.

19 See, e.g., Complaint at ¶104.

20 Narrative at ¶64; and see also ¶11; Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 4, 9, 10, 13, 15.

21 Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 15; see also Complaint at ¶¶7, 12, 14, 57, 59, 61, 62, 64, 65, 71, 72, 83, 91, 99; Narrative at ¶¶42, 44, 60 (footnote 172), 105.

22 Complaint at ¶¶15, 90, 92; Narrative at ¶¶81, 82, 83, 84; Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 2.

23 Plaintiffs' Reply Memorandum at 13.

24 Rausser Merits Report at 89.

on to assert that he has found a "structural break" – starting at the beginning of the Class Period in July 2003 – in the relationship between fuel prices and the overall (or "all-in", base-plus-FSC) rates paid by Class Members.[25] Similar to Plaintiffs, Prof. Rausser opines that although the Defendants' revenue-based FSCs prior to the alleged conspiracy were "designed and implemented by the individual Defendants without agreement or coordination,"[26] they were only "used sporadically" and "were often modified or waived" in the process of negotiating rates because of competition among Defendants.[27]

23. Prof. Rausser opines that, during the Class Period, Defendants' purportedly conspiratorial FSC "program was applied universally";[28] and that Defendants employed a uniform, "industry-standard"[29] approach to fuel surcharges "with identical or near identical features"[30] across Defendants. Moreover, he represents Defendants' FSCs during the Class Period as being non-negotiable,[31] with the purported conspiracy also entailing agreement not to discount base rates so as to prevent the offsetting of FSCs in all-in rates.[32] Prof. Rausser further opines that market conditions were conducive to conspiracy,[33] and that revenue-based FSCs provided a "highly cost-efficient mechanism for collusion."[34] Attempting a conspiracy through base rates, he observes, would be "effectively unmanageable."[35]

24. Prof. Rausser argues that the purported universal coverage and uniformity of Defendants' FSCs, coupled with base rates that he describes as "static",[36] permit him to reliably calculate individual Class Member damages based on "evidence common to the Class" such that "no individual analysis is required".[37] He concludes that the FSCs implemented during the Class Period resulted in a Class-wide common all-in rate increase[38] and a corresponding Class-wide common overcharge of 13.6%.[39] Prof.

25 Rausser Merits Report at 7.

26 Rausser Class Report at 42.

27 Rausser Merits Report at 55-56.

28 Rausser Merits Report at 149.

29 Rausser Merits Report at 58; see also Rausser Class Report at 82.

30 Rausser Merits Report at 6.

31 Rausser Merits Report at 71.

32 Rausser Merits Report at 7, 9, 72, 113-114.

33 Rausser Merits Report at 11-52.

34 Rausser Merits Report at 12; see also Rausser Class Reply at 80-81.

35 Rausser Class Report at 52, footnote 118.

36 Rausser Merits Report at 141.

37 Rausser Merits Report at 126.

38 Rausser Merits Report at 8.

39 Rausser Merits Report at 11.

Rausser bases these conclusions on a model which he maintains shows the asserted upward "structural break" in Class Members' all-in rates at the start of the Class Period. He claims that his model "validates" Plaintiffs' allegations[40] and is, in fact, "evidence of the conspiracy itself."[41]

### B. Overview of Findings

25. I find that the applicable economics and economic evidence do not support, and Plaintiffs' expert's analyses and assertions do not support, inference of the conspiracy alleged by Plaintiffs. Prof. Rausser asserts he finds that the Defendants operate as, and in the market structure of, an "interdependent oligopoly".[42] Economics has not developed accepted and reliable methods of detecting collusion in markets structured as interdependent oligopolies. The reason is that sellers in such a market structure can readily engage in closely parallel conduct and generate fuel surcharge programs that are very similar without engaging in collusion. Indeed, the economics of interdependent oligopoly generally lead us to expect firms in such market structures to engage in similar, or parallel, conduct.[43] In affirmatively asserting that he has detected and concluded that the conspiracy alleged by Plaintiffs in this case "actually occurred",[44] Prof. Rausser is not applying any professionally accepted economic methodology.

26. The tools and methods of economics can be employed, however, to test hypotheses of conspiracy. Specifically, hypotheses of conspiracy are properly rejected: (i) when the conduct alleged to be conspiratorial is, in fact, consistent with the subject parties' unilateral pursuit of their non-conspiratorial economic interests; (ii) when the hypothesized conspiracy is inconsistent with the alleged conspirators' rational interests and/or implausible in light of competitive marketplace forces; and/or (iii) when data analysis demonstrates that the market outcomes are in conflict with the outcomes predicted by the economics of the alleged conspiracy. I find that application of economic analysis and available data to these tests yields results that do not support inference of the conspiracy alleged in this case. As a consequence, no appeal to "conspiracy" is required – or reasonable, as a matter of economics – as explanation for Defendants' pricing or, in particular, their development and use of the challenged fuel surcharge formulas.

---

40 Rausser Class Reply at 101.

41 Rausser Class Report at 120; see also Rausser Merits Report at 7, 170.

42 Rausser Merits Report at 54; Rausser Merits Deposition at 62.

43 See, for example, Harrington, Joseph E., Jr., "Detecting Cartels," in *Handbook in Antitrust Economics*, MIT Press, 2008 (hereinafter "Harrington").

44 Rausser Merits Deposition at 12.

27. In the remainder of this section of my report, I summarize and discuss my primary findings. Briefly, the key conclusions and points of particular relevance are:

- **The Defendants' use of revenue-based fuel surcharges was consistent with the conduct expected of business firms unilaterally pursuing their non-conspiratorial interests.** This was true well before, upon, and after the purported implementation of the alleged conspiracy in July 2003.

    - Revenue-based fuel surcharges arise and stick in the railroad and many other industries as marketplace responses to buyers' and sellers' needs at the time of contracting to ensure that their contractual relations will stay in tune with volatile and uncertain fuel costs.
    - Each Defendant was making very substantial use of revenue-based fuel surcharges long before the purported implementation of conspiracy, and the use of these surcharges spread rapidly leading up to that date.
    - A conspiracy was not needed to continue the spread of FSCs, and there was no acceleration of the use of FSCs upon the purported implementation of conspiracy in July 2003. The bulk of the growth of surcharge use occurred in the period prior to alleged conspiracy.
    - Defendants' "published"[45] surcharge formulas at the point of purported implementation of the alleged conspiracy were not the same, effectively the same or even more similar than the formulas that came before.
    - Over the Class Period, Defendants' fuel surcharges were neither universally applied, uniform nor collectively more onerous than the surcharges employed in the pre-Class Period.

- **Marketplace conditions are not conducive to the alleged conspiracy.**

    - Defendants operate in a multiplicity of markets with markedly diverse conditions of rail-to-rail and rail-to-non-rail competition. This renders uniform collusive coordination both an unrealistic task and contrary to Defendants' own interests in key subsets of those markets (e.g., as when the dominant competitive discipline comes from non-rail alternatives such as trucks).
    - Defendants' services are highly heterogeneous, and the pricing of those services via privately negotiated contracts is not transparent to other Defendants. These are conditions that thwart the striking, monitoring and enforcing of any collusive agreement.
    - The conspiracy hypothesized by Plaintiffs and Prof. Rausser requires, and is asserted to include, a conspiracy governing Defendants' base rates. For

[45] Among the Defendants, NS and UP did not publish surcharge formulas for intermodal service.

reasons of the multiplicity of markets, heterogeneous services and non-transparency of pricing, a base rate conspiracy is "effectively unmanageable".[46]

- Base rates were not fixed and static; they exhibit wide ranges of variation, consistent with individualized negotiations between Defendants and their customers.

- **The marketplace outcomes predicted by Plaintiffs' and Prof. Rausser's theories of the alleged conspiracy are not found in the data.**
  - Extensive data on Defendants' prices (all-in rates) indicates those prices are not consistent with an asserted common fact that conspiracy increased all Class shippers' prices "by the same percentage amount."[47] All-in rates show wide ranges of increases and decreases during the Class Period.
  - Statistical analysis finds no support for the standard predictions that a conspiracy would have raised Defendants' prices, price/marginal cost mark-ups, and profits.
  - Contrary to the economics of a conspiracy, after accounting for the contribution of non-fuel components to Defendants' marginal costs (i.e., the variable costs of providing incremental service), Defendants' all-in rates did not rise enough to also cover the contribution of rising fuel costs to their marginal costs.
  - Data on shares of sales by commodity and route are inconsistent with Plaintiffs' claim[48] that the conspiracy they allege stopped inter-Defendant competition and, thereby, stabilized Defendants' sales shares.

- **Neither a common fact of adverse impact nor reliably measured damages across the individual members of the Class are supported by the data.** Plaintiffs' expert has provided neither the method nor the calculations that reliably demonstrate and measure the magnitude of a common, Class-wide fact of adverse impact.
  - Prof. Rausser's model generates "damages" for legacy transactions which were governed by contracts that Plaintiffs and their expert acknowledge were entered into during a period without collusion and conform to the historic relationship between fuel costs and prices. Indeed, Prof. Rausser's methodology generates "damages" for legacy transactions which are approximately the same as those for the Class of purportedly harmed shippers. A proper damages model should not generate any damages for

---

46 Rausser Merits Report at 52, footnote 94.

47 Rausser Merits Report at 50.

48 Complaint at ¶¶88, 91, 95.

legacy transactions that were entered into in the pre-Class Period and carried over into the Class Period.

- Prof. Rausser's model generates damages that are roughly equal to the collective fuel surcharge paid by all Class shippers during the Class Period. For individual shippers, Prof. Rausser's model often generates damages that are greater than the actual surcharges paid. The implication – that a but-for world would have no surcharge or other mechanism for recovery of incremental fuel costs – is not supportable as a matter of economics and contrary to Prof. Rausser's own description of the but-for world.
- The upward "structural break" as of July 2003 in Defendants' all-in rates that Prof. Rausser attributes causally to conspiracy and that drives his damages calculations is an artifact of faulty modeling. His methodology produces "structural breaks" at every January and July from 2001 through 2007; these cannot plausibly be said to have been caused by the implementation of conspiracy.
- Prof. Rausser's model consistently finds "structural breaks" because its "pre" period benchmark is not valid for recognized and accepted statistical reasons. Prof. Rausser's benchmark represents an era of substantially lower and less volatile oil prices than found in the Class Period. This introduces recognized statistical failings to his analysis. The problems are magnified by Prof. Rausser's inclusion of a mixture of surcharge and non-surcharge rate structures in his pre-Class benchmark period and only surcharge rate structures in the Class Period. The data construction, thus, contributes to the statistical artifact of a "structural break" because the Class Period rates are inherently more sensitive to fuel prices than Prof. Rausser's mixture of rates in his selected benchmark – and fuel price sensitivity drives his damages calculations.
- Staying within Prof. Rausser's overall framework, proper benchmarking entails benchmarking of Class Member rates within the Class Period against rates acknowledged to have been established without the effects of purported conspiracy. Employing legacy transactions acknowledged to have rates set non-collusively, I find that Prof. Rausser's framework yields no evidence that the purported conspiracy resulted in damages to the Class. Application of Prof. Rausser's damages methodology to the individual members of the Class finds the framework unable to accurately identify the fact or the magnitude of claimed damages. After performing statistical analyses that purport to explain how much of customers' prices can be explained by conspiracy and how much can be explained by other, normal supply and demand factors, Prof. Rausser's damages formula attributes what his statistical modeling leaves *unexplained* as conspiratorial damages. This is a violation of basic economic methodology. It results in thousands of Class Members – purportedly subject to a common fact and magnitude of

injury – "suffering" negative damages, and thousands more having their calculated damages artificially magnified.

28. I now turn to an overview of the economic analyses that underlie these conclusions.

### C. Defendants' Unilateral Pursuit of Their Economic Interests

29. I find that the conduct of Defendants which Plaintiffs and Prof. Rausser challenge as conspiratorial, in fact, was consistent with the conduct expected of railroads that were unilaterally pursuing their non-conspiratorial economic interests.

#### 1. Defendants Widely and Successfully Adopted Revenue-Based Surcharges Unilaterally Before the Alleged Conspiracy

30. As I discuss in Sections III and IV below, Defendants and other railroads in the United States had implemented revenue-based fuel surcharges years before the alleged onset of conspiracy. Moreover, Plaintiffs and Prof. Rausser acknowledge that prior to start of the Class Period, the Defendants adopted revenue-based fuel surcharges "independently"[49] – as the product of their unilateral, non-conspiratorial pursuit of their respective business interests. In the period leading up to the spring of 2003, when conspiracy was allegedly struck, Defendants' revenue-based fuel surcharges were spreading rapidly, with no sign of a slowing or of Plaintiffs' claimed brick wall of shipper resistance (see, e.g., Figure IV-10A through IV-10D below). In fact, for each Defendant, more than 65% the non-regulated transactions entered into in the spring of 2003 had revenue-based surcharges. Further, the data do not show any acceleration in the coverage of revenue-based surcharges when the conspiracy was allegedly implemented in July 2003 or thereafter. To the contrary, the bulk of the growth in in the rate of use of revenue-based fuel surcharges occurred prior to alleged conspiracy and slowed during the period after July 2003.

---

49 Rausser Merits Report at 55; see also Narrative at ¶3.

Figure IV-10A

**BNSF: Percent of New Opportunities with Revenue-Based FSC Payments**




**Source:** Defendants' Transaction Data
**Note:** New opportunity defined as the first month a customer price authority appears in the data.

Figure IV-10B

**CSXT/CSXI: Percent of New Opportunities with Revenue-Based FSC Payments**




**Source:** Defendants' Transaction Data
**Note:** New opportunity defined as the first month a customer price authority appears in the data.

Figure IV-10C

## NS: Percent of New Opportunities with Revenue-Based FSC Payments




**Source:** Defendants' Transaction Data
**Note:** New opportunity defined as the first month a customer price authority appears in the data.

Figure IV-10D

**UP: Percent of New Opportunities with Revenue-Based FSC Payments**




**Source:** Defendants' Transaction Data
**Note:** New opportunity defined as the first month a customer price authority appears in the data.

31. Alongside the FSCs implemented in many other industries during periods of highly volatile oil prices (such as the early 2000s), the fuel surcharges of Defendants and other railroads arose and stuck in the marketplace as the products of competitive market forces (e.g., Figures IV-6A through 6D in Section IV below). They were rationally implemented by many sellers and accepted by many customers because they are mechanisms for keeping contractual relationships in tune with market supply and demand conditions.

### 2. Defendants' Fuel Surcharge Formulas Were Neither More Uniform nor More Aggressive During the Class Period

32. As I also report in Section IV, I find that, as Defendants applied FSCs across their many and diverse customers and shipments, their design and use of their respective revenue-based fuel surcharges responded to each Defendant's individualized market circumstances – as would be expected of railroads unilaterally pursuing their own,

specific business interests. In particular, both before and after the alleged onset of conspiracy, the data reveal that the challenged FSCs actually applied by Defendants were decidedly *not* uniform. This holds both within a given Defendant's pricing and across Defendants as a group.

33. Defendants' public surcharge formulas at the point of purported implementation of the alleged conspiracy on July 1, 2003 were not the same, effectively the same or even more similar than the formulas that came before. This can be seen in Figure IV-13B, which shows each Defendant's public carload rates as of July 1, 2003, at alternative oil prices. The formulas are more diverse than immediately preceding the purported onset of conspiracy.

Figure IV-13B

**Public Carload Fuel Surcharge Formulas Immediately before Alleged Conspiracy**




**Public Carload Fuel Surcharge Formulas Upon Start of Alleged Conspiracy**




**Source:** BNSF-0016285-287; BNSF-0511834; CSXFSC152734; CSXFSC328558; NS_01800073; NS_010006317-19; NS_010006321; NS_010006322-24; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000438-439; UPFSC0000552-553
**Note:** BNSF's and UP's formulas are converted into WTI terms using a price relationship of $1.25/gallon HDF = $23/barrel WTI.

34. Figure IV-12C shows expected FSC rates for each Defendant based on the oil prices forecasted at the end of June 2003 by futures prices on the New York Mercantile Exchange ("NYMEX") – the source that Prof. Rausser finds to be the "best available information".[50] The rates differ from each other at all expected oil prices. Moreover, each Defendant's expected surcharge rate declines for the foreseeable future, and two of them drop to zero.

Figure IV-12C

**Carload Surcharges Projected Based on June 30, 2003 NYMEX Forecast**




**Source:** BNSF-000475-84; BNSF-FSC 000485-487; CSXFSC152734; NS_01800073; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000552-553; UPFSC0042411; NYMEX
**Note:** Surcharge rates calculated using each Defendant's public carload formula in effect on purported implementation date of alleged conspiracy.

35. Plaintiffs and Prof. Rausser point to selected changes by some, but not all, Defendants in their public carload surcharges, and Prof. Rausser argues that he properly infers conspiracy because only conspiracy could have resulted in "*de novo* joint

50 Rausser Merits Deposition at 113; see also at 117.

implementation of the same basic programs" in July 2003.[51] In the first instance, there is nothing inherently indicative of conspiracy in parallelism among competitors, in general, nor in the context of this industry, in particular. Nor does Prof. Rausser offer any objective metrics that allow him to define the level of increased parallelism at which he feels conduct crosses into collusion. His analysis thus lacks scientific rigor and cannot be replicated or tested. Methodologically, it is ultimately simply *ipse dixit*.

36. Even if we ignore the foregoing, the data do not support a conclusion that Defendants' actual FSCs became more uniform and less negotiable after the alleged onset of conspiracy (Figures IV-17A-17D; IV-20A-D; IV-21). This is illustrated below for NS in Figure IV-20C. Plaintiffs' and Prof. Rausser's predictions to the contrary are rejected by the data.

---

51 Rausser Merits Deposition at 216 (emphasis added).

Figure IV-20C

**Distribution of Carloads by Revenue-Based Surcharge Rate for New Customer Price Authorities: NS, Carload**




**Source:** Defendants' Transaction Data
**Note:** Results for March 12, 2003 are based on all traffic. Results for subsequent weeks are based on all customer price authorities that had no movements prior to July 1, 2003. NS's public carload formula did not change from March 2004 through June 2006. See Figure IV-1B.

37. Similarly, the data do not indicate that Defendants all coordinated and implemented Class Period revenue-based FSCs that were more aggressive or onerous than pre-Class Period surcharges. To the contrary, for certain Defendants, continued application of pre-Class Period fuel surcharges (which Plaintiffs acknowledge were the product of unilateral, non-conspiratorial decision-making by the Defendants) would have produced somewhat lower FSC rates. For other Defendants, pre-Class Period FSCs would have produced somewhat higher (e.g., generally staying within fractions of a percent over time) surcharge rates. (See Figures IV-22A-22D; VII-12, VII-13, VII-14A through 14D). Comparing public carload formulas during the Class Period to the formulas in place prior to the purported implementation of conspiracy in July 2003, there is no pattern across Defendants of the former systematically exceeding the latter. This is seen in Figures IV-24A-24D below.

Figure IV-24A

**Public Carload Fuel Surcharge Formulas:**
**Pre- "Conspiracy" v. "Conspiracy" Public Carload**
**BNSF**




**Source:** www.bnsf.com/tools/prices/fuelsurcharge/fuel_surcharge_hdf.html

Figure IV-24B

**Public Carload Fuel Surcharge Formulas:**
**Pre- "Conspiracy" v. "Conspiracy" Public Carload**
**CSXT**




**Source**: http://www.csx.com/share/wwwcsx_mura/assets/File/Customers/Price_Lists_Tariffs_Fuel_Surcharge/Fuel_Surcharge/Frequently_Asked_Questions_On_CSXT_Fuel_Surcharge.pdf
**Note:** CSXT implemented a mileage-based public carload FSC formula on April 23, 2007.

Figure IV-24C

**Public Carload Fuel Surcharge Formulas:**
**Pre- "Conspiracy" v. "Conspiracy" Public Carload**
**NS**




**Source:** http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices
**Note:** NS rebased on July 1, 2006.

Figure IV-24D

**Public Carload Fuel Surcharge Formulas:**
**Pre- "Conspiracy" v. "Conspiracy" Public Carload**
**UP**




**Source:** http://www.uprr.com/customers/surcharge/index.shtml, Discovery Documents
**Note:** UP implemented a mileage-based public carload formula on April 26, 2007.

### 3. Revenue-Based Fuel Surcharges Were Not Universally Applied

38. In the same vein, and consistent with individual Defendants unilaterally adapting to their own specific shippers' circumstances, the data provide no support for the Plaintiffs' claims that Defendants fell into "lockstep" uniformity with universally applied, non-negotiable, non-waivable FSCs. Instead, the empirical data on Defendants' actual FSCs during the Class Period indicate that no Defendant ever achieved universal coverage; CSXT/CSXI's coverage, for example, never exceeded approximately 60%. Nor did any Defendant universally apply its revenue-based fuel

surcharges "whenever opportunities arose"[52] during the Class Period. To the contrary, during the Class Period Defendants had thousands of opportunities to apply a revenue-based surcharge yet did not do so. This is represented by the "missed opportunities" seen in Figure IV-18A-D.

39. Moreover, three Defendants made extensive use of mileage-based surcharges during the Class Period in what would have been direct contravention of the agreement alleged by Plaintiffs. Similarly, NS began "rebasing" in 2006, by raising its FSC oil trigger values and reducing applicable FSC rates. This was also a move in contradiction of the alleged conspiracy, since it shifted away from purportedly transparent pricing and uniform surcharges. As a result of these and other developments, three of the Defendants made substantially *less* use of revenue-based surcharges in their 2008 traffic than they did pre-"conspiracy" in the spring of 2003. This is consistent with each Defendant having unilateral business interests and considerations in the use of FSCs, rather than Defendants sharing the claimed coordinated policy of universal application.

### 4. Base Rates Were Not Static and Were Often Discounted

40. Finally, Plaintiffs' and Prof. Rausser's claims to the effect that the purported conspiracy entailed agreement not to discount base rates and that base rates were "static" are also rejected by the data. If both shippers and railroads were unilaterally pursuing their respective non-conspiratorial interests, we would expect them to be focused on negotiating the bottom-line, all-in price that they pay and receive, respectively, for rail service. Accordingly, railroads that are unilaterally pursuing their interests and using an FSC in their rate structures would be expected to negotiate and adjust their base rates – both up and down – as market conditions push them toward increases or reductions, respectively, in all-in rates. This is precisely what we find in the data: Even after organizing by the common factor categories proffered by Plaintiffs' expert as affecting rail rates,[53] Defendants' base rates were neither stable nor static over the Class Period. Instead, thousands of base rates rose by substantial amounts, and similar numbers of base rates went down by substantial amounts, relative to their pre-Class levels. Stasis was the clear exception (Figures V-8A-E and V-9A-C).

---

52 Rausser Merits Report at 62.

53 I.e., taking out the effects on rail rates of factors that might be expected to cause changes in base rates even in the presence of the alleged conspiracy.

Figure V-9B

**Assessing Prof. Rausser's Claim that Base Rates Were "Static": Percentage Change in Base Rates for Top STCCs 2002-2006, Prof. Rausser's Figures 39, 41-43**




**Source:** Rausser Merits Report (Figures 39, 41-43)

41. Under the conspiracy alleged by Plaintiffs and Prof. Rausser, the universal application of a purportedly uniform revenue-based fuel surcharge on top of static base rates would result in "the prices paid by all shippers [increasing] by the same percentage amount."[54] This, prediction, too, is rejected by the data. Instead, even after accounting for and holding constant the effects of the normal, non-conspiratorial "common factors" posited by Prof. Rausser, we find that all-in rates show a wide range of changes across Class shipments (Figure VI-1). In fact, the demonstrable variation in all-in rates for Class shippers and shipments is sometimes larger than the purportedly common rate of overcharge that Prof. Rausser asserts to have found. This variation means that the data are consistent with each Defendant repeatedly and routinely negotiating with individual

54 Rausser Merits Report at 50.

shippers to arrive at mutually agreed-upon prices – all-in rates – that were reflective of supply and demand conditions specific to the traffic at issue. Such conduct is the conduct expected of railroads unilaterally pursuing their interests and is the antithesis of the *fixing* of prices hypothesized by Plaintiffs.

Figure VI-1

**Does Prof. Rausser's Model Accurately Predict Changes in Shippers' All-in Rates? March 2003 v. March 2006**




**Source:** Defendants' Transaction Data
**Note:** Class rates are based on unique combinations of shipper, route, 4-digit STCC, car type, and interline status. Change is measured as percentage change in real dollars.

### D. Contradictions and Inconsistencies in Plaintiffs' Hypothesized Conspiracy

42. As I detail in Section V below, in important respects, the conspiracy hypothesized by Plaintiffs and their expert is internally inconsistent and inconsistent with applicable economic principles of conspiratorial conduct.

### 1. The Alleged Conspiracy Would Require an Agreement on Base Rates; Prof. Rausser Has Rejected the Possibility of Such an Agreement

43. Prof. Rausser acknowledges that a conspiracy on base rates would be "effectively unmanageable."[55] They are not standardized, and they are not transparently observable across competitor railroads. Thus, fixing base rates and ensuring that fellow conspirators stick to putatively fixed base rates is not plausible as an effective means of raising all-in rates. Yet, Plaintiffs' hypothesized conspiracy requires a conspiracy on base rates for the obvious reason that otherwise adjustments to base rates (e.g., discounts or reduced increases) could be used to "cheat" and therefore undermine the purported object of the conspiracy – which was to increase all-in rates. Prof. Rausser acknowledges this by inserting into his claims that he has detected a conspiratorial agreement not to "discount" base rates so as to avoid offsetting the impact of the challenged fuel surcharges on all-in rates.[56]

44. Plaintiffs' and Prof. Rausser's claimed conspiracy not to discount base rates would be no less "unmanageable" than simply directly fixing base rates (and thereby all-in rates in the absence of FSCs). A base rate "discount" would be non-transparent whether it was a reduction from a given level or failure to raise a base rate by a fully conspiratorial amount when market conditions warranted. If a base rate conspiracy is "effectively unmanageable", a conspiracy not to discount base rates also must be "effectively unmanageable". Yet, the conspiracy hypothesized by Plaintiffs requires such a conspiracy. Without it, the adoption of uniform, non-negotiable revenue based FSCs would not translate into common Class-wide impact in which all-in rates are increased for "all shippers by the same percentage amount." This is because, as Prof. Rausser implicitly acknowledges,[57] in the absence of the alleged conspiracy on base rates, shippers would negotiate, according to each shipper's respective leverage, varying discounts off of, or even effective exceptions to, the challenged FSCs through reductions to what the base rates otherwise would be. Indeed, by adding an additional term to contract negotiations on top of non-transparent base rates, the conspiracy hypothesized by Plaintiffs and Prof. Rausser would be even less manageable than the more straightforward base rate conspiracy that Prof. Rausser acknowledges would be unmanageable.

45. The foregoing inconsistencies are magnified when Prof. Rausser argues that the conspiracy was feasible in this case because "Defendants were readily able to monitor

---

55 Rausser Merits Report at 52, footnote 94.

56 Rausser Merits Report at 7, 9, 72, 113-114.

57 Rausser Merits Report at 19-20, 50, 92-93.

each other's pricing behavior."[58] This only holds, however, if Prof. Rausser assumes what he is trying to prove. Concerning the purported ease of monitoring FSCs, while Defendants might publish some of their surcharge formulas, they did not publish all of their formulas (e.g., of the type noted above; see discussion of Figure IV-20C). With respect to the base rates to which fuel surcharges were applied, again, Prof. Rausser acknowledges that a base rate conspiracy is "effectively unmanageable". Among other reasons, it is "unmanageable" because base rates negotiated between a railroad and a shipper for carriage of unregulated traffic are confidential and non-transparent. This means that all-in rates (base rates plus FSCs) are *not* readily monitorable across railroads. Base rates clearly have been the objects of private negotiation during the Class Period. Similarly, all-in rates demonstrably did not all change by "the same percentage amount". (See Figures VI-1 through 2B.) This is illustrated in Figure VI-2A below, which shows a sample from a heavily trafficked intermodal route.

58 Rausser Merits Report at 46.

Figure VI-2A

**Individual Customer All-In Rates for Largest Intermodal Route**
**BNSF: Los Angeles, CA – Chicago, IL**




**Source:** Defendants' Transaction Data
**Note:** Average all-in revenue per carload for each customer are reported in 2000 dollars and values above $2,000/carload not shown.

### 2. The Complex and Varied Nature of the Rail Freight Service Contradicts Prof. Rausser's "One National Market" Approach

46. Prof. Rausser argues that conditions for conspiracy were ripe in this case because Defendants have "an enormous market share in the [US] rail freight market."[59] In doing so, however, he engages in both internal contradiction of his own theories and contradiction of the basic precepts of antitrust economics. As I discuss in Sections III and V below, there is not one, unified national market in "rail freight" such that conspiracy among the four Defendants encompasses enough of the meaningful competition to make conspiracy plausible. Rather, as Prof. Rausser acknowledges,

[59] Rausser Merits Report at 26.

multiple "price discrimination" markets are a "natural characteristic" of the railroad industry.[60]

47. Over large portions of Defendants' (and other railroads') businesses, rail must compete continuously with other modes of freight transportation, including trucks, water-borne carriers, and pipelines (Figure III-1).[61] The strength and prevalence of such non-rail competition varies across commodities and geography, depending on what a shipper wants to ship and from where to where. As Prof. Rausser puts it, "viable transport substitutes are different for different commodities";[62] and barges and trucks are direct competitors to rail for the shippers of certain important commodities.[63] The consequence of this competition is that railroads commonly charge different prices where they face competition from other modes relative to where rail is the only viable option.[64]

48. The most basic of economics teach that the foregoing is a description of Defendants operating in many *different* commodity- and geography-specific markets, not in one all-encompassing US-wide market for a single product called "rail freight".[65] It is effectively acknowledged that railroads like Defendants compete in many different markets with varying viable competitive substitutes which results in and allows the differential pricing noted by Prof. Rausser. By the same token, while it is perhaps rhetorically powerful to refer repeatedly to "enormous" and "huge" market shares of "94%",[66] such assertions constitute basic errors of antitrust economics and the simple mathematics of share and concentration calculations. In properly implemented economics, these mathematics require that the shares of *all* of the competitors in a market be accounted for.

49. Thus, Prof. Rausser errs in asserting "market shares" for *rail* freight service only. Proper analysis requires that he calculate market shares for the multiple, commodity-specific markets that his assertions imply, accounting in his calculations for the "viable substitutes" he acknowledges exist. The arithmetic errors undergirding Prof. Rausser's assertions that market conditions were conducive to the alleged conspiracy mean that, where Prof. Rausser acknowledges Defendants must compete vigorously with viable

60 Rausser Merits Report at 22; see also at 113, 138, 143.

61 Rausser Merits Report at 23, Figure 4.

62 Rausser Merits Report at 22.

63 Rausser Merits Report at 36-37.

64 Rausser Merits Report at 37.

65 US Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010 ("Merger Guidelines").

66 Rausser Merits Report at 26 and 5; see also at 28.

non-rail substitutes, his logic leads to the conclusion that market conditions were *not* conducive to the alleged conspiracy.

50. Indeed, in markets where a Defendant finds itself the only railroad, but competes vigorously with, say, ubiquitous truckers, Plaintiffs and Prof. Rausser have, in effect, hypothesized a conspiracy in which Defendants conspire with the wrong competitors. The result is a theory of conspiracy that contradicts the basic economics of for-profit businesses such as the Defendants'. Plaintiffs and Prof. Rausser maintain that shippers of such multi-modal competitive traffic were subjected by the purported conspiracy to the same "uniform" and "standardized" fuel surcharges, and to the same agreements among Defendants regarding the non-negotiability of FSC terms and non-discounting of base rates. But to purportedly drive Defendants' *rail* rates on multi-modal competitive traffic to "supra-competitive"[67] levels is to price rail service out of the market and to drive customers onto non-rail alternatives. Large volumes of rail traffic are demonstrably subject to multi-modal competition (Figure V-4A), and large volumes of rail traffic have been exempted from federal rate regulation by the federal Surface Transportation Board ("STB"). In large part, the STB's exemption rulings have been the result of findings by the STB that the potency of such non-rail competition in determining rail rates is sufficient to prevent railroads from exercising market power. (See Section III and Figure V-4B.)

51. Similar inconsistencies in Plaintiffs' and Prof. Rausser's theory of conspiracy arise in their treatment of the substantial amount of freight traffic that is sole-served by a single railroad (Figures V-6A and V-6B). Here, the theory would hold that the putative conspirators imposed non-negotiable revenue-based surcharges on their respective sole-served shippers and agreed to not discount base rates to those shippers. Yet, absent any conspiracy, rates for such shippers would be expected to already be set at levels that contributed maximum return to the serving railroad; and research examined in Section V below confirms that railroads are able to realize higher rates when they sole-serve. The hypothesized conspiracy could then only raise rates above the level that maximizes returns, thereby reducing the railroad's profits (e.g., with elevated prices discouraging sole-served shippers' traffic). The result could only be that Defendants would be irrationally leaving profits on the table.

52. In both situations – multi-modal competitive traffic and sole-served rail-only traffic – Defendants would have been acting contrary to their individual and collective interests to enter into the conspiracy that is alleged. In both situations, their individual interests and collective interests would lie in agreeing to allow themselves to discount base rates, waive fuel surcharges, and/or negotiate non-standard, non-uniform FSC terms for multi-modal competitive and sole-served traffic. Such actions would not threaten their

---

67 Complaint at ¶¶52, 77.

conspiracy, since they would enable each Defendant to keep its rates on sole-served and multi-modally competitive traffic at profit maximizing levels without requiring putative fellow conspirators to respond with conspiracy-breaking rate cuts of their own. Indeed, by compelling Defendants to leave profits on the table under the noted conditions, the conspiracy alleged by Plaintiffs and Prof. Rausser would only have weakened the hypothesized collusion by irrationally giving each Defendant incentives to break the purported collusion's requirements of uniformity, non-negotiability, and non-discounting of base rates.

### E. Testing Marketplace Outcomes for Evidence of Conspiracy

53. The conspiracy alleged by Plaintiffs and Prof. Rausser ought to leave telltale signs in the data on marketplace outcomes. As already noted above, the data reject their claims that (i) base rates were "static", (ii) all-in rates changed by the same percentage amount for all shipments, (iii) Class Period FSCs were uniform, standardized, universally "imposed", and non-negotiable, (iv) coverage of revenue-based FSCs had hit a "brick wall" prior to the alleged conspiracy, and (v) the Class Period surcharge formulas were more aggressive or onerous than the pre-Class formula.

54. In addition to those claims, Plaintiffs assert (and Prof. Rausser's "economics" imply) a number of other testable propositions. I have tested each of them.

55. I find that the data on marketplace outcomes quite systematically contradict the asserted and predicted outcomes that purportedly would have been the result of the alleged conspiracy had it actually existed and been effective. Specifically:

    - Plaintiffs allege that Defendants "agreed" that they would not engage in "'stealing' market share" from each other and that "Defendants' market shares remained stable following the 2003 agreements."[68] Defendants' relative shares were not stable during the alleged conspiracy period. Consistent with intense price competition among Defendants, they were highly volatile, routinely doubling and halving in periods of just a few months. (Figures VI-15A-15E; VI-16A-16J; VI-17).

---

68 Complaint at ¶95. See also Complaint at ¶¶88, 91.

Figure VI-15E

**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper: Seattle to Chicago, April 2003-December 2008**




[redacted]

**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** Route chosen based on Prof Rausser's Table 6.

- Plaintiffs claim that the conspiracy entailed the disappearance of long-term contracts;[69] and the reduced use of "through rates" for interlined traffic.[70] Long-term contracts did not disappear from Defendants' commerce.[71] To the contrary, there is no systematic pattern that shows a coordinated and shared change in the

69 See, e.g., Complaint at ¶¶89-90.

70 Complaint at ¶94.

71 In fact, Plaintiffs' claim that the purported conspiracy entailed agreement to cease the use of long-term contracts introduces a further element of inconsistency into their theory. If anything, the alleged conspirators would be expected to have sought greater use of long-term contracts so as to minimize the frequency of opportunities for competition to break out among themselves, and to lock shippers into purportedly "supra-competitive" revenue-based FSCs. See Section V below.

length of contracts after the commencement of the alleged conspiracy, no evidence of a shared movement to shorter contracts upon the alleged onset of conspiracy, and no evidence of coordinated or parallel conduct of any kind with regard to the length of contracts. (Figure V-11). Similarly, through rates for interline service did not disappear.[72] There is no systematic pattern of even a decline (or rise) in the percentage of interline service provided under through rates upon the alleged onset of conspiracy. (Figure V-10)

- Prof. Rausser's theories predict that the spread of revenue-based FSCs in the Class Period would be accompanied by increased use of the All-Inclusive Index Less Fuel ("AIILF") of the Association of American Railroads ("AAR"), as Defendants purportedly used revenue-based FSCs to benefit from rising fuel costs and the AIILF to keep their rates in line with inflation in other non-fuel costs.[73] This, too, is rejected by the data. Available evidence indicates, for example, that the percent of UP's customer price authorities covered by the AIILF never reached higher than 3.3% during the Class Period (Figure IV-16). Levels of coverage for the other Defendants are likewise not consistent with the creation and use of AIILF being an integral element of an agreement to expand FSC coverage. (See Section IV below.)
- Prof. Rausser asserts (albeit, does not test) that the purported conspiracy provides explanation for the noted "trend reversal" in overall rail rates that we see in the data as of approximately 2004. Statistical analysis of Defendants' all-in rates finds no evidence that the spread of purportedly conspiratorial FSCs reflected the exercise of collusion or otherwise led to higher all-in rates. (Figures VI-9.)
- Prof. Rausser asserts that the alleged conspiracy is evidenced by "massive over-recovery of actual fuel costs".[74] The alleged over-recovery of fuel costs does not provide support for the hypothesis of conspiracy. Prof. Rausser's assertions regarding over-recovery of fuel costs are not accompanied by any evidence that over-recovery is a unique feature of conspiratorial fuel surcharges. As discussed above, as the Class Period fuel surcharge formulas were demonstrably unchanged from or very similar to the pre-Class formulas and those admittedly non-conspiratorial formulas yielded surcharge percentages quite comparable to those of the Class Period surcharges, it is apparent that his "over-recovery" measure tells us nothing about whether "over-recovery" is conspiratorial. In fact, Prof. Rausser's purported but-for pricing in his "no-conspiracy" world would have

72 As above, this claim by Plaintiffs introduces yet another element of inconsistency into their theory. Plaintiffs assert that Defendants conspired to quit using through rates and to start using separate carrier rates for interline traffic in order "to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge." Complaint at ¶94. This has the economics backwards: Having each carrier bill separately would reduce, not increase, transparency. See Section V below.

73 Rausser Merits Report at 52.

74 Rausser Merits Report at 84.

resulted in massive *under*-recovery of increased fuel costs over the Class Period. (See Figure VI-13A through 13D.)

Figure VI-13B

**Prof. Rausser's Framework: Increased Fuel Costs v. "Legitimate" Fuel Cost Recovery CSXT/CSXI**




**Source:** Rausser Merits Report (Figures 13-17)
**Notes:** The increase in fuel cost is the difference from July 2003 using Prof. Rausser's railroad-specific fuel price. Prof. Rausser's "legitimate" fuel cost recovery is the increase associated with the increase in fuel price. All values are nominal dollars per 100 ton-miles.

- Prof. Rausser links his representation of "massive over-recovery of actual fuel costs" to "an inflation of Defendants' profits".[75] In so doing, he employs non-economic, accounting measures of profits and profit margins that are professionally recognized (including by Prof. Rausser, himself) as invalid for the purpose to which he puts them. More fundamentally, Prof. Rausser's claims of

[75] Rausser Merits Report at 84.

"massive over-recovery" of fuel costs and inflated profits violate elementary principles of economics.[76] Prices in well-functioning markets are driven by changes in *marginal* costs – i.e., the additions to costs associated with putting incremental supplies of service on the market. As Prof. Rausser acknowledges, rising marginal costs put upward pressure on prices.[77] Moreover, under the conditions of strong demand straining system capacity that we saw in the railroad sector in the heart of the Class Period, marginal costs rise rapidly as railroads struggle, for example, to avoid congestion and maintain train velocities. In doing so, rising marginal costs and the pressure they put on prices outstrip unit, or average, costs. The textbook result then is profits – total revenues that rise more than total costs. Notwithstanding the rhetorical flair, Prof. Rausser's standard of "massive over-recovery" invokes notions of "recovery" and "inflation of profits" that are misleading insofar as he uses them as purported economic evidence in support of his conspiracy hypothesis. They are not.

- The hypothesis of conspiracy carries the prediction that the increased collective market power putatively created by collusion would enable Defendants to raise their rates by even more than their marginal costs were rising. The data reject this prediction. Instead of rising price/marginal cost margins, the Class Period saw each Defendant's marginal costs rise by more than their rates. Overall, Defendants' price/marginal cost mark-ups declined from approximately 30% in 2003 to 15% in 2008 (Figure VI-5A). Statistical analysis confirms that the spread of fuel surcharges was not associated with any increase in price-cost mark-ups. (See Section VI.D.)

---

76 Even accepting Prof. Rausser's accounting data, the data reject a claim of a common pattern of inflated profits during the Class Period. Standard statistical testing finds that the Class Period profit margins were unchanged (BNSF), lower (UP), or higher (CSXT and NS). See Section VI.F.

77 Rausser Merits Report at 53, footnote 97.

Figure VI-11A

**Change in Marginal Cost v. Change in Revenue-Per-Ton-Mile**
**All Defendants; Relative to 2002**




**Source:** R-1 Data; Laurits R Christensen Associates, Inc. Final Report

56. The conclusion to be drawn is that the data on asserted and predicted marketplace outcomes systematically reject the assertions and predictions that emanate from Plaintiffs' and Prof. Rausser's theories of conspiracy. In so doing, the data fail to accept the hypothesis of conspiracy. Indeed, the data present a picture of an industry in which Defendants unilaterally pursued their respective economic self-interest in the face of volatile and dramatically rising fuel costs.

### F. Damages

57. I find that Prof. Rausser's damages methodology and calculations do not constitute "evidence of the conspiracy itself."[78] *First*, a damages model such as Prof. Rausser's can, at most, measure consequences, not causes. Economic models of price increases, even if properly constructed, do not have the diagnostic power that Prof. Rausser ascribes to his damages model. As discussed above, in Prof. Rausser's setting of "interdependent oligopoly", non-collusive conduct by Defendants would be expected to be parallel across Defendants and to yield surcharges and rates similar to those expected under conspiracy. Causally ascribing observed price changes to conspiracy is thus unfounded.

58. *Second*, Prof. Rausser's quantitative measures of damages are artifacts of faulty data construction and modeling. Most critically, Prof. Rausser's damages calculations are driven by modeling in which he benchmarks the passthrough of fuel costs to non-conspiratorial all-in rates based upon a sample of data in the pre-"conspiracy" period. For basic statistical reasons, Prof. Rausser's pre-Class Period is not a proper benchmark. His approach is demonstrably plagued by what is known as "out of sample" data and model estimation. Specifically, fuel prices behaved very differently in the pre-Class and Class Periods. In the Class Period, fuel prices were much higher and more volatile. For example, monthly WTI prices ranged from \$19.64 - \$35.83 during the pre-Class Period and from \$28.31 - \$133.88 during the Class Period.[79] The pre-Class Period prices are not representative of the Class Period prices. As a result, Prof. Rausser's modeling, indeed, detects a "structural break", but the break that is detected is the "break" in oil prices and cannot properly be said to have been caused by conspiracy. That is, the statistical technique employed by Prof. Rausser detects, not conspiracy, but the fact that oil prices in the Class Period turned out to be so much higher overall than in the pre-Class Peirod.

59. This conclusion is evident when we test Prof. Rausser's approach against other possible dates for his (January 2001-June 2003) benchmark. Doing so, I find that his model produces a "structural break" at virtually every January and July between 2001 and 2007, rendering Prof. Rausser's claims that "structural break" is "evidence of the conspiracy itself"[80] baseless. (See Figure VII-3.) That is, Prof. Rausser's assertion that he can *causally* attribute the "structural break" that his modeling finds to the alleged conspiracy would imply that we should conclude that the alleged conspiracy created a "structural break" every January and July from 2001 through 2007. At each breakpoint

---

78 Rausser Class Report at 120; see also Rausser Merits Report at 7, 170.

79 U.S. Energy Information Administration, Cushing, OK WTI Spot Price FOB at http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rwtc&f=m .

80 Rausser Class Report at 120; see also Rausser Merits Report at 7, 170.

tested, subsequent oil prices turned out to be much higher than in the period prior to the breakpoint.

60. I find, also, that Prof. Rausser's damages model generates both repetitive "structural breaks" and substantial, statistically significant "overcharges" and "damages" for *legacy* transactions – i.e., transactions acknowledged to have been free of collusion. This is seen in Figure VII-2. A proper damages model would not generate damages, and certainly not very substantial damages, for rates executed pursuant to admittedly non-conspiratorial contracts that were entered into before the Class Period. In fact, the carryover of such rates into the Class Period permits the use of legacy rates during the Class Period as within-Class Period benchmark of what rates would have been but-for the purported conspiracy. Performing this analysis, I find that when Class Members' all-in rates are properly benchmarked against the fuel-price-sensitive all-in rates paid during the Class Period by non-Class legacy shippers, Prof. Rausser's asserted damages evaporate (Figure VII-6A).

Figure VII-3

**Prof. Rausser's Methodology Cannot Distinguish July 2003 as the Start of Alleged Conspiratorial Impact**

| Date for Test for Break | "Class" Shipments | | Legacy Shipments | |
|---|---|---|---|---|
| | Structural Break? | Calculated "Overcharge" | Structural Break? | Calculated "Overcharge" |
| January 1, 2001 | Yes** | 12.9% | Yes** | 12.5% |
| July 1, 2001 | Yes** | 14.2% | Yes** | 12.9% |
| January 1, 2002 | Yes** | 12.6% | Yes** | 10.8% |
| July 1, 2002 | Yes** | 12.6% | Yes** | 11.1% |
| January 1, 2003 | Yes** | 13.7% | Yes** | 11.8% |
| July 1, 2003 | Yes** | 15.8% | Yes** | 13.8% |
| January 1, 2004 | Yes** | 16.6% | Yes** | 14.9% |
| July 1, 2004 | Yes** | 16.6% | Yes** | 15.8% |
| January 1, 2005 | Yes** | 14.8% | Yes** | 14.9% |
| July 1, 2005 | Yes** | 12.9% | Yes** | 13.6% |
| January 1, 2006 | Yes** | 10.1% | Yes** | 11.5% |
| July 1, 2006 | Yes** | 8.1% | Yes** | 9.8% |
| January 1, 2007 | Yes** | 6.6% | Yes** | 7.8% |
| July 1, 2007 | Yes** | 5.7% | Yes* | 7.0% |

**Source:** Defendants' Transaction Data
**Note:** Pre-period includes all traffic and post-period includes only class (or legacy) traffic that pays a revenue-based FSC. Two asterisks (**) denotes significance at the 99% level; one asterisk (*) denotes significance at the 95% level. "Class" Shipments are non-legacy, non-government, and non-co-defendant movements that pay a revenue-based fuel surcharge after the break. Legacy shipments are based on subsets of the July 2003 legacy definition.

61. Prof. Rausser acknowledges that he did not test his "maintained hypothesis" that the conspiracy was implemented at or about July 1, 2003, by running the same exercise with alternative hypotheses for the conspiracy start date. He claims this was improper, as an economist can never waiver from his "maintained hypothesis".[81] This is methodologically wrong. It is routine and essential to validate the predictive power of the structural break analysis by subjecting the hypothesis that "structural breaks" occur in the data for reasons that cannot be attributed to conspiracy – with candidate reasons including what we find here: The prospect that structural breaks do not reveal conspiracy, but instead reveal out-of-sample effects of much higher Class Period oil prices on rail rates. That is, with oil prices in the later 2000s much higher and more volatile than in the early 2000s, oil prices in the later periods push rates up much more than in any earlier period – and this holds ubiquitously for any January or July breakpoint between 2001 and 2007. When, as here, the structural break always occurs, before and after the maintained hypothesis, it proves nothing other than that the technique is inappropriate for the circumstances.

62. In short, the modeling and data techniques employed by Plaintiffs' expert are incapable of causally identifying the start and duration of any conspiracy, and they are incapable of accurately measuring damages attributable to any conspiracy.

63. As further confirmation of the errors and shortcomings of Prof. Rausser's modeling, I find that Prof. Rausser's calculated damages often exceed what Class Members actually paid in fuel surcharges on Class shipments. This can be seen for example in the case of the Class Representatives, who paid approximately $25 million in surcharges for Class traffic, but for whom Prof. Rausser's damages model generates approximately $33 million of damages – a difference of more than 20% (top panel of Figure VII-11). This is inconsistent with the hypothesized conspiracy: With base rates purportedly "static", it is the paying of purportedly conspiratorial fuel surcharges and only those surcharges, that purportedly drove up Class Members' all-in rates. Any overcharge was thus in the form of the challenged surcharges. Yet, as noted, Prof. Rausser's modeling yields purported damages that are frequently larger than what a shipper paid in fuel surcharges.

---

81 Rausser Merits Deposition at 47-48.

Figure VII-11

**Prof. Rausser's Model Finds "Damages" in Excess of FSC Payments: Class Representatives' Class Traffic**

## Prof. Rausser's Report Method

| Shipper | FSC Payments (Report Method Dataset) | Prof Rausser's Report Method "Damages" | Difference (FSC Payment minus "Damages") |
|---|---|---|---|
| CARTER DISTRIBUTING COMPANY INC | $1,574 | $2,047 | -$472 |
| DAKOTA GRANITE CO | $94,118 | $90,982 | $3,136 |
| DONNELLY COMMODITIES | $46,282 | $60,857 | -$14,576 |
| DUSTPRO | $1,967 | $1,556 | $411 |
| OLIN CORP | $23,908,071 | $31,525,100 | -$7,617,029 |
| STRATES SHOWS INC | $58,828 | $81,582 | -$22,754 |
| US MAGNESIUM | $853,477 | $886,876 | -$33,400 |
| ZINIFEX TAYLOR | $56,097 | $57,593 | -$1,496 |

## Prof. Rausser's Deposition Method

| Shipper | FSC Payments (Deposition Method Dataset) | Prof Rausser's Deposition Method "Damages" | Difference (FSC Payment minus "Damages") |
|---|---|---|---|
| CARTER DISTRIBUTING COMPANY INC | 337 | 278 | 59 |
| DAKOTA GRANITE CO | 96,383 | 13,533 | 82,850 |
| DONNELLY COMMODITIES | 44,732 | 24,872 | 19,860 |
| DUSTPRO | 1,840 | -2,659 | 4,500 |
| OLIN CORP | 22,270,201 | 32,697,827 | -10,427,626 |
| STRATES SHOWS INC | 49,155 | 240,560 | -191,405 |
| US MAGNESIUM | 813,803 | 1,150,037 | -336,234 |
| ZINIFEX TAYLOR | 25,587 | 40,832 | -15,245 |

**Source:** Rausser Merits Report Data with Supplemental UP Data

64. In fact, inspection of "damages" attributed to individual Class Representatives and other individual Class Members readily finds not only that the proffered damages exceed individual Class Members' challenged fuel surcharge payments, but that those payments are frequently less than would have been the case if surcharges had been assessed under admittedly lawful and non-conspiratorial pre-"conspiracy" FSC formulas. In other words, "damages" are assessed even where the challenged fuel surcharge payments turned out to be *less* than the payments that would have been made had Defendants employed pre-"conspiracy", non-conspiratorial FSC formulas during the Class Period (Figures VII-14A through 14D).

### G. Class-Wide Impact

65. My analyses fail to find support for Prof. Rausser's claims to the effect that he has shown or can show by evidence common to the Class that there was Class-wide impact – indeed, uniform Class-wide impact – and that his damages model yields reliable

measures of damages at the level of the individual Class Member. These claims are unsupported and contradicted by the economics and the evidence. Similarly, I find that the data and the evidence reject Prof. Rausser's claims that he has reliably demonstrated and measured both aggregate damages and damages at the level of the individual Class Member.

66. Prof. Rausser's claim that he has demonstrated Class-wide impact follows from a syllogism in which (i) the purported "fact" of uniform conspiratorial fuel surcharges and (ii) asserted non-discounting of base rates combine to mean that the imposition of the challenged FSCs raised all Class shippers' all-in rates "by the same percentage amount". This syllogism is not borne out by his modeling results. Rather, as discussed above, all-in rates during the Class Period change by widely different and varying amounts (Figure VI-1). In fact, testing of his modeling results readily finds that approximately half of the matched Class shippers' shipments' actual all-in rates, *after accounting for the "common factors" that Prof. Rausser posits as affecting rates,* rose during the Class Period by less than the purported uniform same percentage "overcharge". Almost a fifth of the shipments' *actual* all-in rates were less than the rates Prof. Rausser's modeling says would have been paid but for purported conspiracy (Figure VI-1). Notwithstanding Prof. Rausser's syllogism to the effect that the structure of the purported conspiracy meant that all Class shipments suffered a common fact and magnitude of adverse impact (overcharge), under the formula for calculating damages (as proffered by Prof. Rausser in his deposition), "overcharges" and "damages" for these shipments are *negative.*

67. These outcomes of Prof. Rausser's damages modeling and calculations reflect a fundamental error of method. Strictly as a matter of its mathematics, Prof. Rausser's damages formula proffered in his deposition attributes damages to the portions of individual shippers' prices that his modeling finds are *unexplained* by either normal supply and demand factors or by "conspiracy" (Figure VII-10). That is, under his calculations, even portions of shippers' actual prices paid during the Class Period that his modeling fails to attribute to "conspiracy" and that are otherwise unexplained, are imputed as damages to be levied against Defendants. This is a striking violation of proper professional methods.

68. The negative "overcharges" and "damages" that Prof. Rausser's framework generates do not "balance out" for individual shippers such that all shippers are left sharing a common fact and magnitude of demonstrable negative impact. Rather, I find that inspection of Prof. Rausser's modeling results shows that, among the eight Class Representatives for example, one has negative "overcharges" and the rest show the converse (Figure VII-11). The Class Members, thus, do not share a common fact of adverse impact and damage. In fact, over the entire Class Period, approximately 5,300 individual Class Members have negative "damages" under Prof. Rausser's modeling and measurement methodology (Figure VII-8 below). At the same time, thousands of

Class Members have their damages inflated by Prof. Rausser's attribution of what his modeling cannot explain to "damages" (Figure VII-10).

Figure VII-8

**Does Prof. Rausser's Damages Model Measure a Common, Class-Wide Fact of Injury? Thousands of Class Shippers Have Negative "Damages" July 2003-December 2008**




**Source:** Rausser Merits Report Data with Supplemental UP Data; Rausser Merits Deposition at 437
**Note:** Values below -100% are not shown. "Overcharges" are calculated as "damages" divided by actual payments.

69. These contradictory and methodologically unsupportable attributes of Prof. Rausser's modeling and damage calculations do *not* mean that the problems in his framework can be fixed by changing his damages formula. Rather, when the unexplained portions of the prices Class shippers paid so frequently swamp the asserted common, Class-wide overcharge (e.g., 13.6%), the key implication is that Prof. Rausser's modeling and data are unable to reliably isolate and measure the effect, if any, of purported conspiracy on the prices individual Class Members actually paid. In other words, given the data that are available on a common basis, what is left unexplained by normal supply and demand factors cannot reliably be split up between (1) an effect of purported conspiracy and (2) remaining still unexplained portions of the prices actually paid by

individual shippers on individual shipments. When Prof. Rausser's "common factors" and damages modeling tells us that it cannot explain large (relative to the claimed overcharge percentage) portions of changes – up or down – in the prices actually paid by shippers during the Class Period, there is no non-speculative basis for determining the fact and magnitude of overcharges at the individual shipper level.

70. The problem cannot be assumed away since it arises from what the modeling *cannot* explain. Addressing the problem would require the individualized data collection at the level of the individual shipper that Prof. Rausser asserts is unnecessary and that he has not undertaken.[82] We are left with no reliable basis for his claim that "common factors ... predominate" in the determination of the actual question at hand.[83]

[82] Rausser Merits Report at 126.

[83] Rausser Merits Report at 8.

# III. BACKGROUND: THE ECONOMICS OF THE FREIGHT TRANSPORTATION INDUSTRY

## A. The Modes of Freight Transportation

71. Railroads are embedded in the American freight transportation industry. Overall, the industry entails service from railroads, trucks, water-borne carriers, air carriers, and pipelines, with the modes of transportation utilized by freight of different kinds depending on the characteristics of the freight that needs to be moved and the routes over which it needs to move. The transportation modes used to move various kinds of freight are summarized in Figure III-1. As the figure shows, for the majority of commodity groups, trucks (colored red) are a primary source of freight transportation in the US. Railroads (in dark blue) are also used across a wide range of freight commodity types. Pipelines, water-borne carriers, and air carriers are somewhat more specialized.

Figure III-1

**Modal Alternatives by Commodity**
**US Department of Transportation Commodity Flow Survey, 2007**




**Source:** US Department of Transportation Commodity Flow Survey (December 2009)
**Note:** Commodities included are based on 2-digit Standard Classification of Transported Goods codes and measure in ton-miles.

72. Railroads' shares of the nation's freight traffic tend to be higher for heavier, bulkier commodities that must be moved over long distances. Thus, for example, Figure III-1 shows rail's share of commodity movements to be highest for commodities such as coal, grain, and basic chemicals. Each of these types of freight is produced in bulk in fairly geographically confined areas (e.g., coal in Appalachia, Montana, and Wyoming; grain in the Midwest; bulk chemicals along the Gulf Coast), but is used – and hence must be transported – across the wide swath of the country. Trucks are active in the transportation of virtually every category of freight, with their highest shares of freight moved found in commodities such as food products, mixed items of non-bulk products, and non-bulk manufactured products (such as furniture and pharmaceuticals).

73. For obvious reasons, pipelines tend to be concentrated in the transportation of liquid and gaseous commodities, and water carriage is focused on heavy bulk commodities that are in proximity to waterways. Air carriers are not used across a wide range of commodities, but are concentrated in the transportation of smaller shipments, often high priority items such as precision equipment and certain electronic components. Meanwhile, transportation of a wide range of commodities entails the use of multiple modes of carriage as they move from origin to destination (in orange in Figure III-1). This occurs, for example, when freight is carried by a railroad to a barge terminal on the Mississippi River, with barges picking up traffic from there and moving it along the river to, for example, a New Orleans port for export.

74. Figure III-2 is a map of the US rail network. This network consists of more than 560 freight railroads in the US, collectively operating nearly 140,000 miles of track.[84] The majority of this national rail network is owned and operated by the seven largest, "Class I" railroads (as the federal regulatory authority, the Surface Transportation Board, or "STB", terms them). However, smaller regional and shortline carriers are essential to the operation of the overall network by providing access to rail transportation for shippers not directly served by a Class I railroad at origin, destination, or certain intra-route points. The figure shows the routes of the seven Class I rail carriers, as well as the thousands of miles of track owned by smaller shortline and regional railroads. The networks of BNSF, UP, CSXT, and NS are shown in yellow, dark blue, purple, and bright blue, respectively.

---

84 Association of American Railroads ("AAR"), *An Overview of America's Freight Railroads*, July 2012.

Figure III-2

**The US Railroad Network**




**Source:** AAR, National Rail Freight Infrastructure Capacity and Investment Study (Figure 4.1)

75. As can be seen from the figure, BNSF and UP (often referred to as the "Western Railroads") are overwhelmingly located west of the Mississippi River, while the CSXT and NS (commonly referred to as the "Eastern Railroads") networks lie overwhelmingly east of the Mississippi. As discussed in detail below, the facts that no rail carrier's network spans the entire United States, and that shippers often demand transportation that needs the service of two or more railroads to link desired origins and destinations, leads to extensive *interlining* between railroads.

### B. Historical Performance and Regulation of the Railroad Industry

76. For much of the 20th Century, the story of the US railroad sector was one of decline characterized by worsening service, loss of traffic to the other modes of transportation, underinvestment, and technological stagnation. To a very large extent, this poor history was attributable to federal regulatory policies implemented by the Interstate Commerce Commission ("ICC"). The ICC was charged with a number of functions, including regulating the prices (rates) and service terms provided by Class I railroads. Such regulation stifled innovation, made it difficult for railroads to abandon uneconomic

service offerings, and hampered the railroads' ability to respond to competition from each other and from other modes of transportation.[85]

77. The result of this regulation was a railroad industry unable to offer and price its services in a manner that generated revenues sufficient to cover the costs of operating, maintaining, and upgrading its infrastructure. By the 1970s, chronic underinvestment, decrepit equipment, and lack of competitiveness with other modes of transportation pushed numerous railroads to the brink of bankruptcy, with some falling off that brink. Recognizing that regulatory failure threatened the viability of the entire industry, Congress finally stepped in with reforms, most notably the Staggers Rail Act of 1980 ("Staggers Act"). This Act continues to serve as a primary basis of US railroad policy and regulation today.

78. The Staggers Act moved rail regulation away from the heavy-handed, regulator-driven oversight in place prior to 1980 and instead relied on competition and market forces to guide rail policy. Consistent with and reflecting the Staggers Act, the National Rail Transportation Policy articulates the principle at the center of rail regulation in the United States: "In regulating the railroad industry, it is the policy of the United States Government...to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail".[86]

79. The cornerstones of the Staggers Act entail three primary policy principles that govern rail freight service. First, railroads and shippers are afforded broad freedom and flexibility in the negotiation, design, and pricing of rail service. Second, where competition, whether from other railroads or from other modes of transport, is not sufficient to ensure the goals of promoting a healthy and efficient rail sector, shippers are provided protection via regulatory intervention by the STB to control rail pricing. And third, recognizing that railroads are hugely capital intensive networks (see Figure III-3) and that the various kinds of traffic that the railroads ship need to share in generating the revenue needed to build and maintain healthy networks, the Staggers Act policies permit *differential pricing*.[87] Such pricing means that different shipments appropriately make revenue contributions above variable operating costs that constitute

---

85 See, e.g., Clifford Winston, "The Success of the Staggers Rail Act of 1980," AEI-Brookings Joint Center for Regulatory Studies, October 2005, at 2-5.

86 Title 49 – Transportation, Subtitle IV – Interstate Transportation, U.S.C. §10101.

87 Laurits R. Christensen Associates, Inc., A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition: Revised Final Report, prepared for the Surface Transportation Board, November 2009 ("Christensen Report 2009"), Volume 1 at 1-2 to 1-3.

different returns to fixed costs depending on the market and demand conditions that prevail across various shippers and their transportation service needs and alternatives.[88]

Figure III-3

**Capital Expenditures as Percent of Revenue: Selected US Industries, 2000-2009**

| Industry | Percent of Revenue |
|---|---|
| **CLASS I RAILROADS** | **17%** |
| Electric Utilities | 15% |
| Computer & Electr. Product mfg. | 5% |
| Nonmetallic mineral product mfg. | 5% |
| Plastics & rubber products mfg. | 4% |
| Paper | 4% |
| Petroleum & coal products mfg. | 3% |
| Machinery mfg. | 3% |
| Motor vehicles & parts mfg. | 3% |
| Wood product mfg. | 3% |
| Fabricated metal products | 3% |
| Chemicals | 3% |
| Food mfg. | 2% |

**Source:** AAR

80. By embracing market forces where appropriate, rather than relying on regulation to set prices regardless of market conditions, the Staggers Act and other associated reforms have been remarkably successful in turning around an industry that was close to failure. With the new approach embodied in the Staggers Act, railroads made significant changes to their networks, changed their pricing strategies, and introduced more efficient and effective operating rules that allowed them to significantly improve service offerings and to compete more effectively in the freight transportation industry. As seen in Figure III-4, the results have been rising volumes, improved productivity, and lower rates for shippers.

88 U.S. Government Accountability Office, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed", GAO-07-94, October 2006 ("GAO Report"), at 1.

Figure III-4

**Volume, Productivity, and Revenue Per Ton-Mile**
**All Class I Railroads, 1964-2009**




**Source**: AAR

81. The shift away from rate-setting through regulatory fiat and the movement toward reliance on competition wherever feasible has had implications beyond improving the performance of individual railroads. Under the policies of the Staggers Act, railroads and their shippers have had wide scope to enter into private negotiations and resulting agreements for the services demanded by shippers. According to the US Government Accountability Office, privately agreed to and confidential rate and service contracts accounted for 70% of traffic measured in tons and 71% of traffic measured by revenue as of 2004.[89] Defendants' data in the matter at hand indicate that 83% of their combined total traffic (on a revenue basis) moved under private contracts, publicly-

[89] GAO Report at 24.

available terms and other forms of unregulated, or "non-tariff", traffic over 2000-2008.[90]

82. The availability and frequent use of unregulated rate and service agreements has not meant that there is not extensive regulatory oversight of the US rail sector by the Surface Transportation Board. In particular, protection from the exercise of market power has been provided by the ability of shippers to challenge non-contract rates that generate revenues which are more than 180% of a rail service's variable costs if the shipper demonstrates that the transportation at issue is not subject to effective competition from other railroads or other modes of transportation (such as trucks).[91] Under such conditions, the STB considers the rail carrier in question to possess "market dominance" over the traffic. If the STB finds that a railroad possesses market dominance over a challenged rate and that the challenged rate is "unreasonable", then the STB can prescribe maximum reasonable rates.[92]

83. In a substantial number of instances, the STB has employed its mandate to promote the use of competition as the regulator of rail service and rate offerings by exempting various commodities from regulation. The exemption process has routinely entailed extensive quantitative and qualitative analysis into the facts and circumstances of specific commodities' transportation options. Exemptions have been granted when the STB (and the ICC before it) has found that shippers of the subject commodities have viable competitive alternatives in the form of service from other railroads or competing modes of transportation, or access to alternative products or geographic areas that exert competitive discipline on rail rates and service.[93] The nature of the STB's inquiries is seen, for example, in its exempting of rail shipments of nonferrous recyclables from rate regulation:

> "The transportation of nonferrous recyclables is very competitive, as evidenced by the overall [revenue-to-variable-cost ratio] of 98.9 in 1995, the decline in [revenue per ton mile] from 3.9 cents in 1981 to 3.1 cents in 1995, and the general decline in rail market shares. The record also indicates that motor carriers [i.e., trucks] play a significant role in the transportation of these commodity groups. Generally, motor carriers possess advantages of access and speed, and they have become more cost effective as motor trailer

---

90 See my workpapers.

91 Christensen Report 2009, Volume 1 at 2-5.

92 The concept entails the recognition under Staggers Act policies of the need for differential pricing in excess of variable costs as required for aggregate revenue recovery and investment incentives.

93 See, for example, Surface Transportation Board, STB Ex. Parte No. 561, Rail General Exemption Authority—Nonferrous Recyclables, 49 CFR Part 1039, April 10, 1998; Interstate Commerce Commission, Rail General Exemption Authority—Miscellaneous Agricultural Commodities, Ex Parte No. 346 (Sub-No. 14), February 17, 1983; and Interstate Commerce Commission, Ex Parte No. 346 (Sub-No. 15), Exemption from Regulation—Rail Transportation Frozen Food, 367 I.C.C. 859 (1983).

> capacities have grown. Under these circumstances, we find no evidence that rail carriers possess sufficient market power to abuse shippers and, indeed, must operate efficiently to compete for this traffic."[94]

84. Figures III-5 and III-6 show agricultural commodities and other commodities, respectively, that have been exempted from rate regulation by the STB under these forms of inquiry. Both intermodal traffic and boxcar traffic have also been granted exemptions by the STB based on their equipment type.[95]

---

94 Surface Transportation Board, STB Ex. Parte No. 561, Rail General Exemption Authority—Nonferrous Recyclables, 49 CFR Part 1039, April 10, 1998 ("STB Nonferrous Recyclables") at 65.

95 49. C.F.R. § 1090.1 and 1090.2 and 49 C.F.R. § 1039.14.

Figure III-5

## Agricultural Commodities that Are Exempt from Rail Rate Regulation

| STCC No. | Commodity |
|---|---|
| 1 | Farm products, with the exception of grain, soybeans, and sunflower seeds. |
| 9 | Fresh fish and other marine products. |
| 20-11 | Fresh meat. |
| 20-15 | Fresh dressed poultry. |
| 20-17 | Processed poultry. |
| 20-21 | Creamery Butter. |
| 20-23 | Condensed, Evaporated or Dried Milk. |
| 20-25 | Cheese and Special Dairy Products. |
| 20-26 | Processed Whole Milk. |
| 20-141 | Hides and Skins. |
| 20-144 | Animal refuse, tankage, or meat meal. |
| 20-421-27 | Citrus pomace. |
| 20-712-12 | Shelled walnuts. |
| 20-914-25 | Cottonseed hulls. |
| 20-915 | Cotton linters. |
| 20-999-29 | Butter and honey mixed. |
| 20-999-41 | Honey, comb, granulated or strained, or heat treated to retard granulation. |
| 20-999-76 | Freeze-dried poultry. |
| 20-999-77 | Freeze-dried meat. |
| 20-999-78 | Freeze-dried salad ingredients. |
| 20-999-93 | Fresh and salted meat and products mixed, not hung. |
| 20-999-94 | Fresh and salted meat and products mixed, hung and not hung. |
| 21-4 | Stemmed or redried tobacco. |
| 22-811-30 | Cotton, carded, dyed or not dyed, but not spun, woven or knitted, but including cotton lap. |
| 22-911-63 | Mattress felt, nec, cjors, not finished. |
| 22-911-74 | Felts, cotton, nec. |
| 22-971-35 | Wool, nec, scoured. |
| 22-995-22 | Flax fibre. |
| 22-999-26 | Cotton linters, bleached or dyed. |
| 28-423-37 | Beeswax. |

**Source:** GPO US Government Printing Office, Electronic Code of Federal Regulations, Section 1039.10

Figure III-6

## Non-Agricultural Commodities that Are Exempt from Rail Rate Regulation

| STCC No. | Commodity |
|---|---|
| 14 1 | Dimension stone, quarry |
| 14 2 | Crushed or broken stone or riprap |
| 14 411 | Sand (aggregate or ballast) |
| 14 412 | Gravel (aggregate or ballast) |
| 20 | Food or kindred products except: |
| 20 143 | Grease or inedible tallow |
| 20 32 | Canned specialties |
| 20 33 | Canned fruits, jams, jellies, preserves or vegetables |
| 20 4 | Grain mill products |
| 20 6 | Sugar, beet or cane |
| 20 8 | Beverages or flavoring extracts |
| 20 911 | Cottonseed oil, crude or refined |
| 20 914 | Cottonseed cake or meal or by-products |
| 20 92 | Soybean oil or by-products |
| 20 93 | Nut or vegetable oils or by-products |
| 22 | Textile mill products |
| 23 | Apparel or other finished textile products or knit apparel |
| 24 | Lumber or wood products |
| 25 | Furniture or fixtures |
| 26 | Pulp, paper or allied products except: |
| 26 1 | Pulp or pulp mill products |
| 26 211 | Newsprint |
| 26 212 | Ground wood paper, uncoated |
| 26 213 | Printing paper, coated or uncoated, etc |
| 26 214 | Wrapping paper, wrappers or coarse paper |
| 26 218 | Sanitary tissue stock |
| 26 471 | Sanitary tissues or health products |
| 26 6 | Building paper or building board except |
| 26 613 | Wallboard |
| 27 | Printed matter |
| 28 195 22-23 | Iron chloride, liquid |
| 28 195 27-30 | Iron sulphate |
| 28 195 68-69 | Ferrous sulphate |
| 29 914 | Coke produced from coal |
| 29 915 | Distillate or residual fuel oil from coal refining |
| 30 | Rubber or miscellaneous plastics products except |
| 30 111 | Rubber pneumatic tires or parts |
| 31 | Leather or leather products |
| 32 | Clay, concrete, glass or stone products except |
| 32 411 | Hydraulic cement, natural, portland or masonry |
| 32 741 | Lime or lime plaster |
| 32 95 | Nonmetallic earths or minerals, ground or treated in any other manner except |
| 32 952 15 | Cinders, clay, shale expanded shale), slate or volcanic (not pumice stone), or haydrite |
| 33 | Primary metal products, including galvanized |
| 34 | Fabricated metal products except |
| 34 6 | Metal stampings |
| 34 919 40 | Radioactive material shipping containers, etc |

| STCC No. | Commodity |
|---|---|
| 35 | Machinery except |
| 35 11 | Steam engines. turbines, turbine generator sets. or parts |
| 35 85 | Refrigerators or refrigeration machinery or complete air-conditioning units |
| 36 | Electrical machinery. equipment or supplies except |
| 36 12 | Power, distribution or specialty transformers |
| 36 21 | Motors or generators |
| 37 11 | Motor vehicles |
| 37 14 | Motor vehicle parts or accessories |
| 38 | Instruments, photographic goods, optical goods, watches or clocks |
| 39 | Miscellaneous products of manufacturing |
| 41 118 | Used vehicles |
| 14 715 | Rock salt |
| 20 143 | Grease or inedible tallow |
| 28 133 | Carbon dioxide |
| 28 991 | Salt |
| 32-4 | Hydraulic cement |
| 34 912 | Steel shipping containers |
| 40 211 | Iron and steel scrap |
| 33 119 | Blast furnace, open hearth, rolling mill or coke oven products, NEC |
| 20511 | Bread or other bakery products exc. biscuits, crackers, pretzels or other dry bakery products |
| 22941 | Textile waste, garnetted, processed, or recovered or recovered fibres or flock exc. packing or wiping cloths or rags |
| 22973 | Textile fibres, laps, noils, nubs, roving, sliver or slubs, prepared for spinning, combed or converted |
| 22994 | Packing or wiping cloths or rags (processed textile wastes) |
| 24293 | Shavings or sawdust |
| 30311 | Reclaimed rubber |
| 3229924 | Cullet (broken glass) |
| 33312 | Copper matte, speiss, flue dust, or residues. etc |
| 33322 | Lead matte, speiss, flue dust, dross, slag, skimmings, etc |
| 33332 | Zinc dross, residues, ashes, etc |
| 33342 | Aluminum residues, etc |
| 33398 | Misc. nonferrous metal residues, including solder babbitt or type metal residues |
| 40112 | Ashes |
| 40212 | Brass, bronze, copper or alloy scrap, tailings, or wastes |
| 40213 | Lead, zinc, or alloy scrap, tailings or wastes |
| 40214 | Aluminum or alloy scrap, tailings or wastes |
| 4021960 | Tin scrap, consisting of scraps or pieces of metallic tin, clippings, drippings, shavings, turnings, or old worn-out block tin pipe having value for remelting purposes only |
| 40221 | Textile waste, scrap or sweepings |
| 40231 | Wood scrap or waste |
| 40241 | Paper waste or scrap |
| 40251 | Chemical or petroleum waste, including spent |
| 40261 | Rubber or plastic scrap or waste |
| 4029114 | Municipal garbage waste, solid, digested and ground, other than sewage waste or fertilizer |
| 4029176 | Automobile shredder residue |
| 4111434 | Bags, old, burlap, gunny, istle (ixtle), jute, or sisal, NEC |
| 41115 | Articles, used, returned for repair or reconditioning |
| 42111 | Nonrevenue movement of containers, bags, barrels, bottles, boxes, crates, cores, drums, kegs, reels, tubes, or carriers, NEC, empty, returning in reverse of route used in loaded movement, and so certified |
| 42112 | Nonrevenue movement of shipping devices, consisting of blocking, bolsters, cradles, pallets, racks, skids, etc., empty, returning in reverse of route used in loaded movement, and so certified |
| 42311 | Revenue movement of containers, bags, barrels, bottles, boxes, crates, cores, drums, kegs, reels, tubes, or carriers, NEC., empty, returning in reverse of route used in loaded movement and so certified |

**Source:** GPO US Government Printing Office, Electronic Code of Federal Regulations, Section 1039.10

85. Although the STB has determined that shippers of exempted commodities generally have access to competing alternatives, the Board recognizes that the competitive circumstances of an individual shipper may warrant further oversight. Thus, shippers can challenge rates on specific moves, including when the commodity being moved is subject to a blanket exemption.[96] When rates are challenged at the STB, whether or not

96 STB Nonferrous Recyclables.

the STB has jurisdiction to consider the reasonableness of the rates involves a two-step process. First, the STB must establish jurisdiction by quantitatively determining that the challenged rate is above 180% of variable costs. Then, the STB turns to a "qualitative" assessment of market dominance.[97] The investigation is highly individualized to the facts, circumstances, and competitive conditions applicable to the service in question. As the STB describes it:

> "If the quantitative threshold is met, the Board moves to the second component of its market dominance inquiry, a qualitative analysis. In this analysis, the Board determines whether there are any feasible transportation alternatives that could be used for the issue traffic. The Board considers both intramodal competition (from other railroads) and intermodal competition (from other modes of transportation such as trucks, barges, pipelines or transload arrangements). In the qualitative market dominance inquiry, the complainant bears the burden of establishing the absence of effective competition from other rail carriers or other modes of transportation for the traffic to which the challenged rate applies. Even where an alternative mode or modes of transportation exist, a complainant can establish market dominance by demonstrating that the alternate modes of transportation are not effectively constraining the carrier's ability to increase the rates of the issue traffic."[98]

### C. Competition and Cooperation in the Railroad Sector

86. As Figure III-1 and the discussion above suggest, railroads provide their services in varying degrees of broader competition with each other and with other modes of transportation. Depending on the commodity characteristics and location of origins and destinations desired by a shipper, the force of this competition runs across the range from strong and determinative to weak and ineffectual. The former arises when, for example, a shipper can and will readily put its shipments onto, say, trucks, if rail service is overpriced relative to truck service (taking into account the service quality differences between truck service and rail carriage). The product that a freight-shipping customer seeks in the marketplace is transportation from a specific location (commonly referred to as the "origin" of the movement) to another specific location (the "destination" of the movement). Whether a particular shipper is able to satisfy its transportation needs by using another railroad, or another mode of transportation, or

---

97 Surface Transportation Board, Decision, STB Docket No. 42114, US Magnesium, L.L.C., v. Union Pacific Railroad Company, January 27, 2010 ("USM Decision"), at 4.

98 USM Decision at 4-5. A "transload" competitive option arises when, for example, a shipper can give itself a competitive alternative to its immediately nearby railroad by first loading its shipments onto, say, trucks and then trucking those shipments for loading onto a competitive railroad that can reach the desired destination(s).

whether there are alternative geographic areas for a shipment or alternative products to satisfy a need, is entirely dependent on the specific details of a given shipment.

87. Rail transportation is a heterogeneous product, serving many different types of shippers, moving many different commodities, and serving many different geographic locations. It is clear from Figure III-1, numerous STB decisions and regulations of the type noted above, and extensive research,[99] that, *depending on the characteristics of shippers, commodities, and routes*, multimodal competition from non-rail alternatives can be potent and determinative. Similarly, rail-to-rail intramodal competition can range from potent to effectively non-existent. The mere existence of seven Class I railroads in the United States does not mean that the shipper can turn to any one of those railroads to satisfy its shipping needs. Indeed, at a broad level, as shown in Figure III-2, the Mississippi River serves as a natural point of demarcation between the networks of the Eastern Railroads (CSXT and NS) and the Western Railroads (UP and BNSF).

88. At a finer level of granularity, determining whether a particular rail shipment has any viable competitive rail alternatives or, on the other hand, is sole-served by only one realistic rail option is not a question that can be answered without specific knowledge of the origin, destination, and commodity involved in a specific move. Industry studies examining the number of railroads that serve counties or the US Department of Commerce's Bureau of Economic Analysis ("BEA") areas[100] find that 35% to 65% of rail shipments originate or terminate in counties that are served by only one railroad.[101] Thousands of individual freight stations (e.g., where a railroad loading dock is available) have, and have always had, direct connection to but one rail carrier.[102]

89. In some of these cases, depending on individual local facts and circumstances, rail-to-rail competition may be viable through transloading, or by a shipper "building out" rail tracks and/or loading facilities to a not-yet connected railroad, or by a nearby not-yet connected railroad "building in" to a shipper. Rail-to-rail competition may also be introduced by what is termed "geographic" and/or "product" competition. Product competition arises when a shipper can avoid using a railroad by shipping or receiving a

---

99 See, for example, Christensen Report 2009 at ES-25; GAO Report at 23.

100 BEA areas are regional markets surrounding metropolitan or micropolitan statistical areas. The Bureau of Economic Analysis periodically releases updated definitions of these areas to reflect changes in economic growth and population. As of 2004, there were 179 BEAs. Kenneth P. Johnson and John R. Kort, "2004 Redefinition of the BEA Economic Areas," November 2004 at http://www.bea.gov/SCB/PDF/2004/11November/1104Econ-Areas.pdf.

101 Laurits R. Christensen Associates, Inc., A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition: Revised Final Report, prepared for the Surface Transportation Board, November 2009, Volume 2 at 1-2 to 1-3. at 18-13 to 18-14.

102 See discussion of sole-served traffic and locations in Section V below.

substitute product for the one that requires particular rail service. Such conditions might arise, for example, if a rail-served coal-using electric utility can use pipeline-served natural gas in the face of excessive rail rates. Geographic competition is present when a shipper can avoid using a railroad by obtaining the same product from a different source, or by shipping the same product to a different destination that has alternatives to sole-service rail carriage.[103] Such circumstances can apply, for example, when a grain trader can avoid using sole-served rail service to reach export port A by shifting to a port B that is served by multiple railroads or, perhaps, enjoys both rail and barge service.

90. Not surprisingly, various STB decisions have sometimes found, and sometimes not found, that the facts indicate that there are competitively feasible and potent rail alternatives to what is otherwise a sole-serving railroad for particular shippers at particular locales.[104] I discuss at great length in subsequent sections of this report the implications of this for Plaintiffs' and their expert's claims regarding purported "common facts" across the Class with regard to the assertions of a "common" fact and magnitude of injury.

91. It goes without saying that competition among railroads, and between railroads and other modes of freight transportation, is quite generally in the shipping public's interest. At the same time, however, there are clear circumstances in which promotion of the public interest requires cooperation between railroads and between railroads and non-rail transportation service providers. Such conditions arise most directly when a shipper's needs require the use of multiple carriers' systems to link the shipper's desired shipping origin with its desired shipping destinations. Thus, for example, when a Midwestern steel manufacturer needs to move product to Phoenix, it likely will use the interlined services of an eastern railroad that serves its manufacturing facilities to reach desired destination points served by a western railroad, with the eastern railroad "handing off" the steel shipments to the western railroad where the two railroads' systems interchange with each other. Or, an auto manufacturer may find it expeditious to move finished automobiles by rail from its plant to a distant distribution hub, and then employ trucking service to move its autos from hub to dealers.

---

103 Christensen Report 2009, Vol. 3, at 20-12.

104 See, for example, Interstate Commerce Commission, Burlington Northern Inc. and Burlington Northern Railroad Company – Control and Merger – Santa Fe Pacific Corporation and the Atchison, Topeka and Santa Fe Railway Company, Finance Docket No. 32549, August 16, 1995 at 74; Surface Transportation Board, Union Pacific Corporation, Union Pacific Railroad Company, and Missouri Pacific Railroad Company – Control and Merger – Southern Pacific Rail Corporation, Southern Pacific Transportation Company, St. Louis Southwestern Railway Company, SPSCL Corp., and the Denver and Rio Grande Western Railroad Corporation, Finance Docket No. 32760, August 6, 1996, at 195.

92. Interlining between Defendant railroads in the case at hand is extensive. This is evident in Figure III-7. Close to half of NS's business (as measured by revenue) is interlined with another railroad. Corresponding figures for UP, BNSF, and CSXT/CSXI are on the order of 45%, 35%, and 30%, respectively. A great deal of this interlining arises because of the geography of the ownership of the nation's rail network. For example, freight traffic often moves in east-west and west-east directions, but the rail network has ownership structures that create western and eastern railroads with little east-west overlap. The BNSF and UP western systems interchange with the NS and CSXT systems at the four respective system's end points in the middle of the country (Figure III-2).

Figure III-7

**Percent of Unregulated Traffic Revenue that Is from Interline Service**
**All Defendants, 2003-2008**




**Source:** Defendants' Transaction Data

93. Obviously, railroad interlining improves the flow of the nation's freight traffic. Yet, it requires coordination and cooperation among interlining carriers. Not only must the logistics of transferring control of cars and scheduling of traffic be addressed by mutual

consideration, but rates, billing systems, and record keeping commonly must be coordinated. Interlining railroads frequently negotiate a single "through-rate" or "joint rate" (including any surcharges) with the customer for the shipper's entire movement, using "rate divisions" to divide the resulting revenue for the movement among themselves. Shippers can readily find the use of such a single-rate approach to interlined service preferable and administratively efficient. In other cases, two or more railroads may coordinate interline service for a shipper across their systems under what is called "Rule 11." For Rule 11 movements, each of the railroads provides its leg of the haul to the shipper on a separately invoiced basis.

94. In the case of interline movements, interlining railroads have a "vertical" – not "horizontal" – relationship, as Prof. Rausser acknowledges.[105] That is, because neither can provide the service demanded without the other, they are not competitors in what economics refers to as a "horizontal" relationship in which each can separately produce – and compete side-by-side for – the service desired by the shipper who needs interline service. Instead, interlining railroads join their networks together "vertically" to produce a single product – transportation from a given origin to a given cross-system destination – desired by the shipper.[106] The nation's public policies have long understood that the price or rate for the complete through service is not determined by competition between the two interlining carriers, but is, instead, fundamentally determined by the competition between the product those two carriers can provide through their combined and coordinated efforts, on the one hand, and the similar products that other railroads and/or other transport modes can provide to meet the shipper's needs.[107]

95. Accordingly, both the applicable economics and the nation's public policies recognize that cooperation and communication are required among interlining carriers if they are to serve the shipping public's substantial needs for interline service. Indeed, the same holds for railroads and trucking firms when they must coordinate and cooperate to meet shippers' needs for rail-truck interlining (in which it is not uncommon to have, say, truck carriers offering through-rate rail-truck service to shippers). Given that interlining carriers are not competing against one another for the traffic and, if offering a through-rate, must coordinate to offer one price that competes with prices offered by other modes, STB policy provides for railroads to coordinate interline movements in order to enable efficiency, and to establish "division" and "concurrence" as to the

---

105 Rausser Merits Deposition at 289-291.

106 Thus, each railroad's service is an input into production of a jointly produced single service.

107 United States Court of Appeals, District of Columbia Circuit (109 F.3d 782), Western Resources, Inc., Petitioner, v. Surface Transportation Board and United States of America, Respondents, Santa Fe Pacific Corporation, *et al.*, Intervenors ("Western Resources v. STB") at ¶¶14-22.

through-rate that will be charged to the customer.[108] In the ordinary course of business, then, railroads (and railroads and trucking firms) must, and do, meet with each other to discuss and establish the protocols, harmonization of invoicing, operating procedures, and pricing of interline traffic.[109]

### D. Pricing of Unregulated Rail Service

96. As noted above, one of the Staggers Act's major changes was to provide railroads with significant pricing flexibility. In the pre-Staggers Act era, rates were heavily regulated and did not necessarily reflect the needs of individual shippers. The Staggers Act affords shippers and railroads the ability to enter into private negotiations to establish the terms of the service desired by a shipper and the rates to be charged for that service. Such arrangements are termed "unregulated" and comprise the majority of rail shipments.[110] They have permitted the design of vastly improved services that are tailored to shippers' needs and that can be remunerative to the supplying railroads. The results are the types of improvements of the performance of the rail sector that we see in Figure III-4.

97. Pricing by railroads in the Staggers Act era has taken on a number of basic forms. As common carriers, railroads are required to offer transportation service to all comers pursuant to publicly-posted tariff prices. Tariffs quote rates for various commodities, but do not contain any length of term. As noted, the shippers of upwards of 70% of rail traffic choose to purchase their rail service under confidential, privately negotiated terms, conditions, and rates. These entail various forms of private price quotes, long-term contracts, and shorter medium-term contracts.

98. Almost by definition, a shipper entering into private negotiations with a railroad is seeking a better deal than that which is available under the applicable public tariff. One mechanism by which the desired result is achieved is through various discounts that are tied to such measures as a shipper's traffic volume. Thus, for example, railroads are observed offering various levels of volume discounts, which provide shippers with

---

108 See, for example, Title 49 – Transportation, Subtitle IV – Interstate Transportation, U.S.C. §10101 at (5). See also, Surface Transportation Board, Association of American Railroads and American Short Line and Regional Railroad Association – Agreement – Application Under 49 U.S.C. 10706, Docket No. S5R 100, December 9, 1998, at 2.

109 Examples of such "concurrence" and related interline coordination meetings in this case are seen in, for example, CSXFSC000165104; NS 001000431-32; BNSF-FSC 000572-73; NS 010034423-25; CSXFSC219258; Couch Deposition at 207-211; Koraleski Deposition at 119-120, 142, 154-155; Videotaped Deposition of Clarence Gooden, July 16, 2010 at 241-242; UPFSC0000839-41; NS 001000225.

110 In this report, I refer to the documentation of pricing which relates to various forms of pricing as "price authorities". As the Plaintiffs exclude regulated, STB-tariffed traffic from their class, when I refer to "traffic" in this report, I am referring to unregulated traffic unless otherwise noted.

refunds or reductions of rates after those shippers' volumes reach specified volume targets.[111] Such pricing reflects economies that are realized when a shipper can commit and provide larger volumes of business. Depending on the shipper, its chosen origins and destinations, and its position within a railroad's overall network, such economies can arise in the form of more efficient scheduling options for a carrier, the spreading of overhead costs associated with serving a particular shipper's traffic, and the like.

99. In pricing their services, railroads have also long used various price adjustment mechanisms which serve to keep their prices and contracts responsive to market conditions. Thus, for example, especially in long-term contracts it has been important to account for cost inflation; failure to do so can discourage long-term contracting and put long-term contracts which are struck under stress. One example of such a price adjustment mechanism is the Rail Cost Adjustment Factor ("RCAF"). The RCAF was created by the AAR in response to a requirement created by the Staggers Act of 1980 to measure cost changes in railroad inputs, including labor, fuel, materials, equipment rents, depreciation, interest, and other expenses.[112] An All Inclusive Index ("AII") is calculated quarterly, based on forecasts of the input component indices with each component index weighted by its share of cost;[113] and the RCAF is calculated by dividing the AII by 100.[114]

100. Another price adjustment mechanism is the All-Inclusive Index Less Fuel ("AIILF"), which the AAR began publishing in January 2004. Much as the federal government publishes consumer price indexes ("CPIs") with and without fuel and food included – two highly volatile cost items in consumers' budgets – the AIILF is calculated using the same inputs that are used for making RCAF, except that the fuel component is omitted.[115]

101. The railroad sector is one of the most fuel intensive industrial sectors in the economy. This can be seen in Figure III-8, which shows energy costs as a percentage of all input costs for 20 industry groups using data collected by the BEA. Ranked by their energy

---

111 For example, one of Hunt's contracts with NS included a "shipment growth incentive" which provides for NS to make Incentive Payments to Hunt if Hunt "achieve[s] 5% growth in the number of loaded shipments tendered to NS over that tendered to NS during the same dates in the immediately preceding calendar year…." (NS_003044057-71 at 64-65)

112 AAR, Rail Cost Adjustment Factor at https://www.aar.org/StatisticsAndPublications/Rail-Cost-Indexes/Documents/Index_RCAFDescription.pdf

113 Each of the components of the RCAF is a forecast when it is first submitted; two quarters later actual indices are provided to determine the forecast error. See AAR, Rail Cost Adjustment Factor at https://www.aar.org/StatisticsAndPublications/Rail-Cost-Indexes/Documents/Index_RCAFDescription.pdf.

114 AAR, Railroad Cost Indexes, at 21.

115 AAR, Railroad Cost Indexes, at 2, 4.

intensiveness as of 2008, the industries shown in the figure are the 20 most energy-intensive industries out of more than 60 industry groups covered by the BEA.[116] As shown in the figure, transportation industries such as water, air, truck, and rail are the most fuel-intensive industries. As of 2000, the rail sector ranked eighth in energy intensity; by 2008, it had moved up to the fourth most energy intensive sector of the economy.

Figure III-8

**Energy Intensity of Production: Ranking by Industry**

| | 2000 | | 2002 | | 2004 | | 2006 | | 2008 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Industry** | **Energy Cost as Percent of All Input Costs** | **Rank** | **Energy Cost as Percent of All Input Costs** | **Rank** | **Energy Cost as Percent of All Input Costs** | **Rank** | **Energy Cost as Percent of All Input Costs** | **Rank** | **Energy Cost as Percent of All Input Costs** | **Rank** |
| Water transportation | 13.6% | 1 | 13.4% | 1 | 22.2% | 1 | 22.1% | 1 | 29.3% | 1 |
| Air transportation | 12.7% | 2 | 10.1% | 2 | 12.8% | 2 | 18.6% | 2 | 28.9% | 2 |
| Truck transportation | 7.5% | 3 | 6.6% | 4 | 9.6% | 3 | 14.0% | 3 | 18.0% | 3 |
| Rail transportation | 4.1% | 8 | 3.5% | 7 | 5.8% | 5 | 9.3% | 4 | 13.7% | 4 |
| Other transportation and support activities | 5.4% | 7 | 4.6% | 6 | 5.6% | 6 | 9.2% | 5 | 12.4% | 5 |
| Transit and ground passenger transportation | 6.0% | 5 | 5.7% | 5 | 6.9% | 4 | 9.2% | 6 | 9.3% | 6 |
| Farms | 3.3% | 10 | 3.4% | 8 | 4.3% | 8 | 6.1% | 7 | 7.1% | 7 |
| Administrative and support services | 2.4% | 12 | 2.0% | 11 | 3.2% | 10 | 4.3% | 10 | 5.6% | 8 |
| Chemical products | 3.6% | 9 | 3.0% | 9 | 4.9% | 7 | 5.8% | 8 | 5.2% | 9 |
| Petroleum and coal products | 5.4% | 6 | 7.2% | 3 | 1.5% | 15 | 5.2% | 9 | 4.7% | 10 |
| Construction | 2.6% | 11 | 2.6% | 10 | 3.3% | 9 | 4.2% | 11 | 4.5% | 11 |
| Forestry, fishing, and related activities | 1.2% | 15 | 1.1% | 14 | 2.2% | 13 | 2.5% | 14 | 3.4% | 12 |
| Pipeline transportation | 7.2% | 4 | 1.8% | 13 | 2.7% | 11 | 3.4% | 12 | 3.2% | 13 |
| Support activities for mining | 1.7% | 14 | 2.0% | 12 | 2.7% | 12 | 2.8% | 13 | 2.5% | 14 |
| Waste management and remediation services | 2.2% | 13 | 0.8% | 15 | 1.9% | 14 | 2.3% | 15 | 2.3% | 15 |
| Mining, except oil and gas | 0.8% | 16 | 0.7% | 16 | 1.1% | 16 | 1.8% | 16 | 2.2% | 16 |
| Warehousing and storage | 0.4% | 19 | 0.5% | 18 | 0.7% | 19 | 1.1% | 18 | 1.8% | 17 |
| Paper products | 0.5% | 17 | 0.6% | 17 | 1.0% | 17 | 1.2% | 17 | 1.8% | 18 |
| Accommodation | 0.4% | 18 | 0.4% | 20 | 0.8% | 18 | 1.1% | 19 | 1.3% | 19 |
| Wholesale trade | 0.4% | 20 | 0.4% | 19 | 0.7% | 20 | 1.0% | 20 | 1.2% | 20 |

**Source:** US Bureau of Economic Analysis Supplementary Use Tables 2000-2008

102. This fuel intensity is reflected in the economics of the four Defendants in this matter. In the case of CSXT/CSXI, for example, the the 2002 Annual Report stated that

[116] Note that the "Rail Transportation" industry is NAICS code 482. The rail transportation industry is broader than just the Defendants in this case. Businesses that are part of NAICS code 482 include rail transportation of both freight and passengers and include rail networks that operate over an extensive area as well as those that are operate over a much smaller geographic scope. See Bureau of Labor Statistics, Industries at a Glance at http://www.bls.gov/iag/tgs/iag482.htm, accessed January 3, 2013.

increasing fuel costs were a concern and provided context for the impact of fuel cost changes: "A one-cent change in the price per gallon of fuel would impact fuel expense by approximately $6 million."[117] BNSF noted in its 2000 Annual Report that its fuel expenses in 2000 were 33% higher than they had been in 1999.[118] Similarly, NS reported that fuel expenses had increased in 1999 and 2000 by 47% and 87%, respectively, primarily as a result of higher fuel prices.[119] Meanwhile, UP noted in its 2000 Annual Report, that its fuel and utility costs were 62% higher than they had been in 1999.[120]

103. Not surprisingly in light of its dependence on energy costs and the volatility of those costs (see further discussion in Section IV below), the railroad sector has long employed fuel surcharges ("FSCs") as adjustment mechanisms in their pricing. These surcharges have commonly been stated as percentages of the revenues earned from a shipper, triggered as fuel prices rise. Along with other fuel intensive sectors like trucking, railroads have implemented revenue-based fuel surcharges from time to time dating back at least to the 1970s. In fact, the STB has noted "the long history of rate-based fuel surcharges in the rail industry" and reported that "in the mid-1970s, the ICC specifically declined to require carriers to tie their fuel surcharges to mileage [instead of revenue]."[121]

104. It is such rate- or revenue-based fuel surcharges that are now challenged by Plaintiffs in this case. But these FSCs long pre-date the alleged onset (in 2003) of conspiracy in this case. Indeed, the STB has found that, based on the history of rate-based fuel surcharges and the ICC's actions in the 1970s, "we do not believe that railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible."[122] The STB has further emphasized that: "Although conditions have changed since the mid-1970s, railroads may have reasonably relied on that precedent in formulating their fuel surcharge programs."[123]

---

117 CSX Corporation, 2002 Annual Report, at 24.

118 BNSF, 2000 10-K, at 10.

119 "Diesel fuel expenses increased 87% in 2000 and 47% in 1999. In both years, most of the increase resulted from higher prices. In 2000, 86% of the increase resulted from a 61% rise in the average price per gallon, which ranged from 77 cents in January to $1.07 in December. In 1999, 53% of the increase was attributable to a 19% increase in the average price per gallon, due to a sharp rise in the last half of the year." NS, 2000 10-K, at 42.

120 Union Pacific, 2000 Annual Report.

121 Surface Transportation Board, Rail Fuel Surcharges, Decision, STB Ex Parte No. 661, January 26, 2007 ("STB Rail Fuel Surcharges") at 10.

122 STB Rail Fuel Surcharges at 10.

123 STB Rail Fuel Surcharges at 10.

105. Notwithstanding the foregoing, Plaintiffs and their expert, Prof. Rausser, now assert that, in the spring of 2003, Defendants' design and continued use of revenue-based fuel surcharges were the products of anticompetitive conspiracy. Let us now turn to the examination and testing of these claims.

# IV. ECONOMIC ANALYSIS OF CHALLENGED CONDUCT

## A. The Economics of Detecting Conspiracy

106. Absent the overt observation of business firms engaging in the act of striking an anti-competitive conspiratorial agreement, assessment of the validity or even plausibility of a plaintiff's claims of conspiracy requires the testing of *hypotheses* of conspiracy. Economic analysis and evidence can be useful in this regard, within limitations I will address. In employing economic reasoning and data, however, it is important to recognize that economics is not "forensic" in the sense of being able to arbitrate between, say, a plaintiff's representations of a particular document or quotation as demonstrating conspiratorial intent or agreement and a defendant's representations as to alternative interpretations.

107. Rather, the tools and methods of economics are properly confined to assessing such questions as: Presuming that economic actors are rational,[124] has the challenged conduct of an alleged conspirator been consistent with its unilateral, non-conspiratorial pursuit of its self-interest, or can the conduct only coherently be explained as that of a party participating in a conspiracy?; and, Has the conduct of alleged conspirators left evidence in marketplace outcomes – such as observed prices, price/cost mark-ups, market shares, and the like – that would only coherently be expected if, in fact, those alleged conspirators have been engaging in conspiracy?[125]

108. When economists say that they can "detect" a cartel, they are really saying that they can determine whether observed behavior and market outcomes are consistent with independent action. If they are, a hypothesis of conspiracy is properly rejected. On the other hand, if observed behavior and marketplace outcomes are not consistent with independent, non-conspiratorial action, but are consistent with the conduct and outcomes expected of firms participating in a conspiracy, there is some support for a conspiracy hypothesis. However, application of tests such as the foregoing in the context of uncertainty and incomplete data is not capable of "proving" the existence of conspiracy.[126] Support for a hypothesis of conspiracy exists if such tests yield evidence and data that are, first, not consistent with independent conduct, but which are, second, consistent with a coherent hypothesis of conspiracy.[127]

109. Here, I apply economic analysis and data to assess the claims that the hypothesis of unilateral conduct by Defendants can be rejected in favor of inference of the claimed

---

124 I.e., that economic actors reasonably know, or can find out, and then pursue their own interests, such as when a business firm pursues the maximization of its profits.

125 See Harrington.

126 Rausser Merits Deposition at 182.

127 Harrington at 217.

conspiracy. Specifically, I focus on whether the observed conduct of Defendants in implementing the revenue-based fuel surcharges that Plaintiffs and Prof. Rausser portray as conspiratorial requires collusion as explanation or, instead, was consistent with Defendants' legitimate, unilateral pursuit of their respective business interests. Then, in Section V below, I assess the economic logic and coherence of Plaintiffs' and Prof. Rausser's hypothesized conspiracy, with a focus on whether the conduct that it implies on the part of Defendants would, in fact, have made economic sense for them. In Section VI, I assess the data on marketplace outcomes to see whether those data reveal effects predicted by Plaintiffs' and Prof. Rausser's theories of the alleged conspiracy, but that are not predicted as the outcomes of unilateral, non-conspiratorial conduct.

110. In this section, I find that, contrary to Prof. Rausser's claims that conspiracy can be inferred from the type, timing, administration and purported aggressiveness of Defendants' surcharge programs from July 2003 onward, the data that capture the conduct of Defendants do not have the characteristics that purportedly mark Defendants' Class Period fuel surcharges as the product of conspiracy. Specifically, the data do not reveal that Defendants' challenged surcharges were "uniform", [128] "applied universally", [129] "non-negotiable", [130] and more "onerous" [131] than the surcharges they implemented unilaterally in the period preceding the alleged onset of conspiracy in July 2003.[132]

111. In the case at hand, Plaintiffs and Prof. Rausser claim Defendants' conduct with respect to the application of revenue-based fuel surcharges starting in the spring of 2003 was contrary to each Defendant's unilateral economic interest, had no legitimate business purpose, and would not have been undertaken but for the alleged conspiracy.[133] From this, they assert that they have discerned the existence of a conspiracy among

---

128 Rausser Merits Report at 150; see also at 17, 49, 58, 61, 64, 128.

129 Rausser Merits Report at 148-149; see also at 9, 67-68, 72, 112, 114, 127, 145, 148-149.

130 Rausser Merits Report at 72; see also at 7, 70-72, 92.

131 Rausser Merits Report at 59.

132 I am not implying that, were these characteristics present during the Class Period, that would support an inference of conspiracy, as Prof. Rausser contends. Indeed, each of these characteristics could be consistent with each Defendant unilaterally taking actions with respect to its respective fuel surcharges in response to the commonly experienced facts of the unprecedented rise in fuel prices and the volatility of those prices. Prof. Rausser offers no coherent economic evidence or logic for concluding otherwise, as I discuss in this section.

133 See, e.g., Complaint at ¶¶75, 79-83, 88, 104; Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 9; Plaintiffs' Supplemental Consolidated Objections and Responses to Defendants' Joint First Requests for Admissions, January 4, 2012, at 2-3; Narrative at ¶¶16, 53, 63, 64, 80, 81. Rausser Merits Report at 52, 76; Rausser Class Reply at 7; Second Rausser Deposition at 81-88.

Defendants.[134] Indeed, Prof. Rausser affirms that he is offering the opinion in this case that the conspiracy alleged by Plaintiffs "actually occurred";[135] and that "the [Defendants' conspiratorial] understanding violates regulations with regard to anticompetitive conduct."[136] He explains that the "regulation" he contends Defendants' conduct violated is the Sherman Act.[137]

112. In making such assertions, Plaintiffs and Prof. Rausser represent Defendants as operating with a "huge" combined market share in a single Lower-48 national market for rail service.[138] Prof. Rausser characterizes the Defendants as an "interdependent oligopoly" in that market.[139] This ignores the evidence discussed below that demonstrates that Defendants, in fact, operate in a multiplicity of markets with widely varying service offerings and degrees of inter-railroad and non-rail competition. Be that as it may, if we stay within Prof. Rausser's framework of "interdependent oligopoly", we must then confront the fact that there is no generally accepted economic methodology for distinguishing the expected behavior of an interdependent, non-colluding set of oligopolists from the conspiracy he alleges.[140] When it is not methodologically possible to distinguish non-collusive, interdependent oligopoly from conspiracy, proper economic methods do not permit acceptance of a hypothesis of conspiracy over the alternative. On the other hand, when the conduct at issue is inconsistent with conspiracy, or when the alleged characteristics or marketplace outcomes of a hypothesized conspiracy are not found in the data, the hypothesis of conspiracy is properly rejected.

113. In drawing his conclusion of conspiracy here, Prof. Rausser is not applying professionally accepted methods for doing so. If the marketplace setting at issue is the kind of "massively" consolidated,[141] "homogeneous"[142] interdependent oligopoly described by Prof. Rausser, the conduct expected of the market's oligopolists when they are unilaterally and non-collusively responding to market forces of supply and

---

134 See, e.g., Narrative at ¶¶ 90, 99-100; Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 3-7; Rausser Merits Report at, e.g., 6, 8, 10, 12, 15-16, 18, 21-22, 31, 49, 52-54, 62, 76.

135 Rausser Merits Deposition at 12.

136 Rausser Merits Deposition at 16.

137 Rausser Merits Deposition at 16.

138 Rausser Merits Report at 5 (emphasis added). See also Plaintiffs Memorandum at 7: "Together, [the Defendant railroads] possess a 90% *market* share based on track miles and a 94% *market* share based on rail freight revenue." (emphasis added)

139 Rausser Merits Report at 53, 162; Rausser Merits Deposition at 62.

140 See, for example, Harrington at 246-247.

141 Rausser Merits Report at 27.

142 Rausser Merits Report at 32.

demand and to each other is readily expected to be very similar to that expected of firms that are conspiring. In a non-collusive interdependent oligopoly, sellers are fully expected (1) to be aware of certain of each other's practices and policies (particularly where, as here, serving customers' interests routinely requires sellers to communicate and cooperate, as when two railroad must interline to meet shippers' needs), (2) to be concerned that their individual conduct could touch off responses by their competitors that would render otherwise profit-increasing conduct unprofitable, and (3) to adopt parallel business strategies since each seller is subject to the same basic economic forces—all without colluding or conspiring.

114. This undermines the foundation for using economic analysis to identify behaviors or market outcomes that are inconsistent with independent action and only consistent with collusion. As noted, economics has not developed accepted methods which can reliably test for collusion in market settings where a non-collusive interdependent oligopoly is operating. Prof. Rausser has provided no reproducible, verifiable, generally accepted method or metric for his rejection of a non-conspiratorial explanation for Defendants' observed conduct.

115. In asserting that it is his "qualitative"[143] judgment that (what he terms) "the body of evidence"[144] consists of such distinct differences between the conduct expected under the interdependent oligopoly he sees, on the one hand, and the conspiracy he claims to have detected, on the other hand, runs particularly afoul of accepted professional methodologies of analysis and inference in economics. As I show below, in the case at hand, Defendants had revenue-based fuel surcharges as the product of conduct which is acknowledged to be non-collusive and "independent"[145] in the pre-"conspiracy" setting. These surcharges were not less uniform or less parallel than those that the Defendants had in place before they purportedly agreed to and implemented the alleged conspiracy. In fact, Defendants' public fuel surcharges were *more* parallel during Prof. Rausser's admittedly unilateral benchmark period than those in the alleged conspiracy period. Similarly, Defendants' pre-"conspiracy" surcharge programs were accompanied by objectives of broad application with limited exceptions of the same type that Prof. Rausser finds to be conspiratorial from July 2003 onward. And the timing and decision making processes employed by Defendants in designing and making various changes to their FSC programs in the period of claimed conspiracy are not materially different than those seen in the pre-"conspiracy" period and expected of non-conspiring sellers.

---

143 Rausser Merits Deposition at 123-124, 200.

144 Rausser Merits Deposition at 45-49, 179.

145 Rausser Merits Report at 55; see also Narrative at ¶3.

116. Notwithstanding the foregoing lack of differences in the pre-"conspiracy" period and the Class Period, Prof. Rausser's overall "qualitative" assessment[146] is that he has discerned the alleged conspiracy from "the body of evidence" he has examined. But Prof. Rausser's "qualitative" assessment fails a basic criterion of proper expert economic analysis. Specifically, it leaves no basis for another researcher or analyst, such as myself, to be able to perform one of the most basic tasks of the scientific method – i.e., to attempt to reproduce the proffered basis of a finding or opinion. Here, Prof. Rausser may feel that what he sees adds up, in total, to "conspiracy". Yet, in testing his feelings or intuitions in this regard, we have no means of assessing how much of the observed differences in conduct he felt pushed the inference over the line to "conspiracy"; how much weight he gave to the documents he reviewed;[147] how he discerned *as an economist* "what the [discovery] documents demonstrate"[148] as to the meanings, motives, concerns, and understandings purportedly underlying Defendants' decision makers' statements, actions and communication;[149] how and why he accepted some witnesses' statements as "credible"[150] and others' as not; and so on.

117. In short, as discussed below, I find that Prof. Rausser's conclusion that he has discerned conspiracy is methodologically unsupportable in his own framework of interdependent oligopoly (or within any other coherent framework applicable to the facts here). Within the actual world in which Defendants operate across a multiplicity of markets with multiplicity of market structures, I find that Plaintiffs' claims and Prof. Rausser's inference of conspiracy are not supported by the economics or the evidence.

**B. Are Revenue-Based Fuel Surcharges the Product of Unilateral Conduct?**

118. When certain conduct is alleged to be conspiratorial, one important test is to assess whether that conduct is observed in non-conspiracy settings. When it is, that is strong indication that the conduct at issue is the product of normal and legitimate market forces, sticking in the marketplace as the product of the unilateral pursuit of non-conspiring market participants. "Conspiracy" is then not required to explain the conduct, and there is no reliable economic basis for inferring otherwise.

119. Accordingly, in this case, it is highly relevant that each of the Defendants (as well as other non-Defendant railroads) had instituted revenue-based fuel surcharges long before the purported onset of conspiracy in the spring and early summer of 2003. Plaintiffs and Prof. Rausser acknowledge that fuel surcharges in the pre-"conspiracy" period

146 Rausser Merits Deposition at 123-124, 200.

147 Rausser Merits Deposition at 146.

148 Rausser Merits Deposition at 146.

149 Rausser Merits Report at, for example, 49, 58, 68, 95.

150 Rausser Merits Deposition at 138-139.

were not the product of collusive conduct by Defendants or others. They were implemented "independently".[151] Moreover, as I show below, the data indicate that these pre-July 2003, non-"conspiracy" surcharges were not materially different in form, substance or application from the surcharges that Plaintiffs and Prof. Rausser challenge as being the product of conspiracy after June 2003.

120. Prof. Rausser asserts that Defendants' fuel surcharges "could not possibly be explained as a natural competitive reaction".[152] One of the reasons he offers for this opinion is that "the Fuel Surcharge was implemented as a percent of revenue."[153] That is, the fact that the challenged fuel surcharges were revenue-based is evidence, itself, of conspiracy. Such a proposition, however, is methodologically unfounded because we readily find revenue-based surcharges arising in clearly non-conspiratorial settings – including the revenue-based fuel surcharges of Defendants that arose in the pre-Class Period in this case.

121. In fact, revenue-based fuel surcharges are also used in other transportation sectors. For example, revenue-based fuel surcharges have been used by the highly competitive trucking industry.[154] Moreover, revenue-based surcharges have been used historically in the railroad industry. For example, the Surface Transportation Board indicates that the rail industry has a long history of rate-based fuel surcharges:

> "In view of the long history of rate-based fuel surcharges in the rail industry, we do not believe that railroads can be faulted for assuming that fuel surcharges calculated as a percentage of the base rate were permissible. Indeed, in the mid-1970s, the ICC specifically declined to require carriers to tie their fuel surcharges to mileage. Although conditions have changed since the mid-1970s, railroads may have reasonably relied on that precedent in formulating their fuel surcharge programs."[155]

122. Among Defendants, BNSF instituted revenue-based fuel surcharges in the 1990s during the oil turmoil associated with the first Gulf War and Iraq's invasion of Kuwait.[156] By 2000, six of the seven Class I railroads introduced revenue-based fuel surcharges. Figure IV-1A shows the dates in 2000 or later that these railroads introduced public fuel surcharges and the basic characteristics of the surcharges the railroads

---

151 Rausser Merits Report at 55; see also Narrative at ¶3.

152 Rausser Merits Report at 76.

153 Rausser Merits Report at 76.

154 Trunick, Perry A. (Ed.), "Costs Driving Trucking," *Logistics Today*, Volume 49, Issue 4, April 2008.

155 STB Rail Fuel Surcharges at 10 (footnote omitted, emphasis added).

156 BNSF-0033167-168; BNSF-0657303-304. On the price turmoil, see, for example, John A. Tatom, *The 1990 Oil Price Hike in Perspective*, Federal Reserve Bank of St. Louis, November/December 1991 at http://research.stlouisfed.org/publications/review /91/11/Oil_Nov_Dec1991, accessed January 3, 2013.

introduced.[157] Contradicting suggestions that competition blocks the ability of railroads to institute revenue-based FSCs, in 2000 each of the Defendants (and CSXI) instituted surcharges for its intermodal traffic (Figure IV-1D). This traffic entails some of the most competitive conditions railroads face, as a result, for example, of the ubiquity of flexible truck service and as indicated by the STB's investigations leading to the exemption of intermodal service from federal rate regulation. (See Section III above.[158])

Figure IV-1A

**Class I Railroads' Introduction of Public Fuel Surcharges During the Pre-Class Period**

| | | | | Surcharge | | | |
|---|---|---|---|---|---|---|---|
| **Railroad** | **Effective Date** | **Benchmark** | **Trigger Price** | **Fuel Surcharge at Trigger Price** | **Fuel Increment** | **Fuel Surcharge Increment** | **Fuel Index Period** |
| BNSF | March 1, 2000 | HDF | $1.10/gallon | 0.5% | $0.05/gallon | 0.5% | Weekly Average |
| NS | March 20, 2000 | HDF | | | 4% Flat Rate | | Weekly Average |
| CP | May 1, 2000 | WTI | $22/barrel | 3.0% | at or above $30/barrel 6.0% surcharge | | 90 Consecutive Days |
| CN | October 20, 2000 | WTI | $24/barrel | 2.0% | at or above $27/barrel; $5/barrel increments and 2% surcharge increment | | Previous Quarter |
| CSXT | October 25, 2000 | WTI | $28.01/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| UP | Late 2000 | HDF | (HDF of Previous Month/Base HDF Index - 1) * Fuel Intensity Factor | | | | Previous Month |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Source: BNSF-0070536-42, BNSF-0657309-23; BNSF-0814210, CSXFSC000045; NS_01800073; NS[redacted]S 037000994-1002; NS_026001141; NS_058001055; NS_062194936; NS 6/30/2000 FSC Program Status; UPFSC 347611,
Note: BNSF, NS, and UP first introduced FSCs for intermodal shipments.

---

157 Figures IV-1B, C, and D provide formulas for Defendants' public and selected fuel surcharge programs for carload, coal traffic, and intermodal respectively.

158 See also Section V below and, for example, BNSF-000002-026 at 013; UPFSC0000583-585 at 583.

Figure IV-1B

**Public Carload Fuel Surcharge Formulas**

| Defendant | Effective Date | Benchmark | Trigger Price | Surcharge: Fuel Surcharge at Trigger Price | Surcharge: Fuel Increment | Surcharge: Fuel Surcharge Increment | Fuel Index Period |
|---|---|---|---|---|---|---|---|
| **BNSF** | March 15, 2000 | WTI | $28/barrel | [(Previous Month WTI Average/WTI Benchmark)-1)] * Fuel Intensity Factor | | | Monthly Average |
| | October 1, 2000 | WTI | $28/barrel | 2.0% | $2.50/barrel | 1.0% | Monthly Average |
| | July 1, 2001 | HDF | $1.30/gallon | 1.0% | $0.05/gallon | 0.5% | Monthly Average |
| | June 1, 2003 | HDF | $1.25/gallon | 0.5% | $0.05/gallon | 0.5% | Monthly Average |
| | January 1, 2006* | HDF | $1.25/gallon | $0.01/mile | $0.04/gallon | $0.01/mile | Monthly Average |
| | April 25, 2007** | HDF | $1.25/gallon | $0.01/mile | $0.04/gallon | $0.01/mile | Monthly Average |
| **CSXT** | October 25, 2000 | WTI | $28.01/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| | June 1, 2003 | WTI | $23.01/barrel | 0.4% | $1/barrel | 0.4% | Monthly Average |
| | April 23, 2007 | HDF | $2.00/gallon | $0.01/mile | $0.04/gallon | $0.01/mile | Monthly Average |
| **NS** | June 30, 2000 | WTI | $28.01/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| | March 1, 2004 | WTI | $23.01/barrel | 0.4% | $1/barrel | 0.4% | Monthly Average |
| | July 1, 2006 | WTI | $64.01/barrel | 0.3% | $1/barrel | 0.3% | Monthly Average |
| | April 1, 2007 | | NS eliminates fuel surcharges on regulated traffic | | | | |
| **UP** | December 1, 2002 | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| | June 1, 2003 | HDF | $1.35/gallon | 1.5% | $0.05/gallon | 0.5% | Monthly Average |
| | April 26, 2007 | HDF | $2.30/gallon | $0.05/mile | $0.05/gallon | $0.01/mile | Monthly Average |

**Source:** BNSF-0001504-27; BNSF-0016285-287; BNSF-0511834; BNSF-0515745-81; BNSF-0516609-10; BNSF-0814162; BNSF-0814185-98; BNSF-FSC 000280-281; BNSF-FSC 000485-487; CSXFSC152734; CSXFSC165096; CSXFSC328558; NS_01800073; NS_008000728; NS_010006317-19; NS_010006321; NS_010006322-24; NS_010013960; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000438-439; UPFSC0000552-553; UPFSC0000570-575

**Note:** Monthly average is based on either previous month (BNSF from the 21st of prior month to 20th of current month) or average from two months prior. * Local and Rule 11 agricultural shipments only. ** Regulated non-agricultural shipments.

## Figure IV-1C

## Public Coal Fuel Surcharge Formulas

| Defendant | Effective Date | Benchmark | Trigger Price | Surcharge: Fuel Surcharge at Trigger Price | Surcharge: Fuel Increment | Surcharge: Fuel Surcharge Increment | Fuel Index Period |
|---|---|---|---|---|---|---|---|
| **BNSF** | July 1, 2004 | HDF | $1.24/gallon | 0.50% | $0.04/gallon | 0.50% | Monthly Average |
| | January 1, 2006* | HDF | $1.25/gallon | $0.01/mile | $0.06/gallon | $0.01/mile | Monthly Average |
| **CSXT** | | No Public Coal-Specific FSC | | | | | |
| **NS** | | No Public Coal-Specific FSC | | | | | |
| **UP** | November 1, 2004 | HDF | $1.35/gallon** | 1.5% | $0.05/gallon | 0.5% | Monthly Average |
| | | | $1.60/gallon** | 4.25% | $0.05/gallon | 0.75% | Monthly Average |

**Source:** BNSF-000532-33; BNSF-0482725-27; UPFSC0001272-1275
**Note:** Monthly average is based on two months prior. * Local and Rule 11 coal shipments. ** Splined formula: below $1.60 coal formula was equal to the public carload formula.

Figure IV-1D

**Selected Intermodal Fuel Surcharge Formulas**

| | | | | Surcharge | | | |
|---|---|---|---|---|---|---|---|
| **Defendant** | **Effective Date** | **Benchmark** | **Trigger Price** | **Fuel Surcharge at Trigger Price** | **Fuel Increment** | **Fuel Surcharge Increment** | **Fuel Index Period** |
| **BNSF** | March 1, 2000 | HDF | $1.10/gallon | 0.5% | $0.05/gallon | 0.5% | Weekly Average |
| | Late 2001 | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.5% | Weekly Average |
| **CSXI** | April 1, 2000 | HDF | (HDF on last Monday of month - $1.10/$1.10) * 0.10 * 100 | | | | Daily Price |
| | October 4, 2004 | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.5% | Daily Price |
| **NS** | March 20, 2000 | HDF | 4% Flat Rate | | | | Weekly Average |
| | April 1, 2002 | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.5% | Weekly Average |
| **UP** | Late 2000 | HDF | (HDF of Previous Month/Base HDF Index - 1) * Fuel Intensity Factor | | | | Monthly Average |

**Source:** BNSF-FSC 000012; BNSF-FSC001702-04; BNSF-0070536-42; BNSF-0814151; CSXFSC000045; NS_036002111; NS_036002112; NS_037000994-1002; NS_037013908; NS_037014656; NS_062194936; UPFSC0347611; Crawford Deposition, Ex. 8
**Note:** Prior to 2002 NS intermodal surcharge was not based on a formula. NS April 2002 formula for domestic intermodal traffic was not publicly posted. The UP Fuel Intensity Factor was not constant throughout the period or publicly posted.

123. In March 2000, BNSF implemented a revenue-based publicly-posted (or "public") carload fuel surcharge that varied based on the monthly average price of fuel. BNSF's surcharge was initially tied to the price of WTI (with a trigger price of $28 per barrel) and a fuel intensity factor. This fuel surcharge mechanism was applied to various commodities, beginning with perishable carload shipments as of March 2000, and then including industrial products (including chemicals).[159]

124. CSXT adopted a revenue-based publicly-posted carload fuel surcharge program on October 25, 2000, using WTI as the benchmark price index and a trigger price of $28/barrel. CSXT's public carload fuel surcharge was applied to various types of traffic including coal. Course-of-business communications show policies of applying

[159] See BNSF-0814185-98; see also BNSF Rules Book 6100 (BNSF-0657367-70).

fuel surcharges broadly as early as 2000.[160] A significant fraction of CSXT/CSXI's traffic had a fuel surcharge by the end of 2002. According to CSXT/CSXI course-of-business analyses, 40% of total traffic (including intermodal movements) had a fuel surcharge by the end of 2002. This varied by business group – 55% of merchandise traffic and 60% of intermodal traffic had fuel surcharges by the end of 2002, while only 5% of automotive and 10% of coal traffic had surcharges.[161]

125. In early 2000, NS began to consider applying a fuel surcharge to at least some of its traffic and studied the surcharge programs of trucking companies.[162] NS implemented a revenue-based FSC program for intermodal traffic in March 2000, using HDF as the benchmark fuel.[163] In June 2000, NS adopted a revenue-based publicly-posted carload fuel surcharge, with WTI as the benchmark fuel and a trigger price of $28 per barrel. This surcharge applied to various types of carload traffic, including coal.[164]

126. UP instituted a revenue-based intermodal fuel surcharge program in September 2000,[165] and later in 2000 implemented a new intermodal fuel surcharge program with HDF as the benchmark fuel.[166] On October 31, 2002, UP announced a revenue-based public carload fuel surcharge, to become effective December 1, 2002. UP's public carload fuel surcharge program was administered separately from UP's public intermodal FSC program.[167] Course-of-business analysis and communication from October 2002 include recommendations for application of fuel surcharges "on all new price documents effective immediately", "on all existing public, quote and unsigned contracts", and "on all Reg and Dereg signed contracts".[168] Course-of-business communications show that implementation plans included instruction that "[e]ffective

[160] CSXFSC328558-60. "The fuel charge will apply to most customers — except for those whose contracts have specific language prohibiting a change in rates and those customers who already have price escalators included in their contract, i.e., they are already paying for higher fuels costs."

[161] CSXFSC126548.

[162] NS_010014210; NS_010013327; Videotaped Deposition of Donald W. Seale, February 26, 2010 ("Seale Deposition") at 28.

[163] NS_062194935; NS_062194936.

[164] NS_01800073; NS_010013960.

[165] UPFSC0000506-507. Prior to the introduction of public FSCs, UP negotiated private FSCs with individual customers. See UPFSC0000725-33. Fuel surcharges were associated with pricing documents well prior to December 2002. See UPFSC0043878-879: "UP has used [WTI] in certain agreements for almost a decade. Early last summer, as the fuel crisis heighten (*sic*), steps were taken to include WTI in UP standard boiler plate language. Since this July 18, 2000 change, the WTI has been included in more than 1,000 price (sic) documents."

[166] UPFSC 0347611.

[167] UPSFSC0000541-543 at 542.

[168] UPFSC 0188733.

immediately, all new pricing documents and amendments created should incorporate the Fuel Surcharge language."[169]

### C. The Economic Function of Fuel Surcharges

127. Fuel surcharges arise and persist in industries such as railroads because they are a *market-driven* adaptation to energy price volatility.[170] They provide a transparent (to the customer because each customer is aware of its own charges), formulaic means of adjusting prices as underlying costs change. By doing so, fuel surcharges reduce transactions costs, support long-term contracting when market conditions are volatile, and enhance efficiency by determining how the risks of fuel price changes are shared.

128. Fuel costs are commonly a variable or "marginal" cost of providing a good or service; fuel use and costs rise and fall as output rises and falls. For any given level of production and associated fuel use, rising prices of fuel push firms' marginal costs (i.e., the added costs of producing incremental additions to output) upward. Rising marginal costs, in turn, cause upward pressure on the current market price of a good or service as suppliers seek to charge increased prices to cover their increased costs. Conversely, falling marginal costs cause downward pressure on market prices as lower marginal costs induce suppliers to try to capture more business by expanding their sales.

129. When goods are transacted on a "spot" basis (i.e., where each sale is individually negotiated and buyers and sellers have no commitments to each other beyond the immediate transaction), prices typically fluctuate constantly, moving with current supply and demand conditions. Spot pricing efficiently transmits price signals in competitive markets. However, by reducing the certainty that a seller will be available when a buyer needs supplies, or that a buyer will be available when a seller needs to sell its output, exclusive reliance of buyers and sellers on spot transactions heightens

---

169 UPFSC0000530-536 at 532.

170 Fuel surcharges spread throughout the economy in the 2000 to 2003 period in response to volatile fuel prices. See, for example, Mohl, Bruce, "Despite Drop in Prices, Fuel Surcharges Remain Policy at Airlines, Shipping Firms," *The Boston Globe*, November 21, 2001; Banerjee, Neela, "U.S. Economy Feeling Bite of Costlier Oil," *The New York Times*, December 28, 2002; and Setaishi, Sonoko, "Transportation Cos Raise Fuel Surcharges As Costs Soar," Dow Jones News Service, March 13, 2003. Not surprisingly, many of the early adopters of fuel surcharges were in transportation industries that are energy-intensive and that are particularly susceptible to increases in fuel costs. For example, fuel surcharges were commonly used in the highly competitive trucking industry prior to the start of the Class Period. See, for example, UPFSC0102596-99; Oral and Videotaped Deposition of John Lanigan, June 22, 2010 ("Lanigan Deposition") at 15-16. For example, Con-way Trucking had a fuel surcharge back as far as 1999 while Peninsula Truck had a fuel surcharge as far back as March of 2000. (See http://www.conway.com/en/tools_pricing/freight/fuel_surcharge/__historical_surcharge_data/, accessed January 3, 2013 and http://www.peninsulatruck.com/Rates/FSCHistory.aspx, accessed January 3, 2013). In addition, several of the railroads examined trucking fuel surcharges while developing their own programs. See, for example, BNSF-000002-26 at 13.

risk and discourages investment. Consequently, buyers and sellers can often improve the efficiency of their relationship (e.g., encourage investment) by making mutual commitments in longer-term contracts.

130. Despite their benefits, long-term contracts (or other long-lived arrangements, such as regulated price authorities) can come under pressure from buyer or seller when they get out of step with underlying, short-term market conditions. Thus, for example, a seller with commitments to a buyer can find it uneconomic to continue to perform under its contract when volatile variable costs are pushed above contract prices. Similarly, a buyer can find it untenable to continue to buy under a long-term contract if contract prices substantially exceed shorter term spot prices that have been driven down by falling variable costs.

131. Thus, when prices in long-term contracts get out of step with underlying market conditions, one or both of the contracting parties will have incentives to renegotiate. The buyer may attempt to negotiate a lower price or other favorable terms when variable costs fall and newly-struck contracts available elsewhere in the market contain lower prices. Similarly, the seller may seek a higher price or attempt to negotiate other contract terms when variable costs rise beyond levels contemplated at the time of original negotiation. Such renegotiation may undermine the benefits of long-term contracting because the parties' relative negotiating positions may have changed following the initial agreement. The reopening of a contract may lead to opportunism by the party whose negotiating position has improved.[171]

132. When the sources of uncertainty discouraging long-term contracting are well understood, however, the contracting parties will often be able to agree on a characterization of the uncertainty that is useful for adjusting the contract to reflect changing economic conditions. A long-term contract that changes in limited respects by, for example, indexing prices to reflect changing variable costs (and in ways that protect the improved incentives the contract provides), may be easier to negotiate and sustain because the contract can automatically update to reflect changing economic circumstances. Therefore, when buyer and seller reasonably anticipate that key elements of the seller's variable costs are likely to change during a contract term, but are uncertain as to how much and in what direction those costs will change, it can readily be in both the buyer's and the seller's interest *ex ante* to enter into contracts that make prices flexible in response to major factors that drive changes in the seller's marginal cost.

133. These economics, in which it is in both sellers' and buyers' *ex ante* interests to strike contracts that adjust when major drivers of sellers' marginal costs change, are the

---

171 Williamson, Oliver E., "Transaction-Cost Economics: The Governance of Contractual Relations," *The Journal of Law and Economics,* Vol. 22, October 1979 ("Williamson"), at 233-61.

reason fuel surcharges arise and stick in the competitive marketplace. Fuel surcharges enable the adjustment of contract prices in response to energy prices that both buyers and sellers reasonably recognize are likely to be volatile, but to uncertain degrees and directions. By allowing their contracts to reflect changing energy market conditions, fuel surcharges support longer-term contracting and permit parties to obtain the mutual benefits such contracting offers.[172] In this way, fuel surcharges present benefits to both parties when contracting. Those benefits are particularly pronounced in fuel-intensive sectors (such as transportation) which have marginal costs that are substantially made up of energy, and when uncertainty regarding future fuel costs is heightened by volatility in energy markets.

134. Along with other transportation sectors, railroads like Defendants make up one of the most fuel intensive sectors of the economy. This is seen in Figure IV-2, which shows industrial sectors ranked according to the share of energy costs in overall input costs. The railroad sector started the decade of the 2000s ranked eighth in energy intensity among the twenty sectors shown. The strong rise in energy prices over much of the decade pushed railroads to fourth in energy intensity by 2006.

---

172 Williamson at 241. See also Eckblad, Marshall "Corporate News: Chicken Processors Try To Spread Around Cost of Feed", *The Wall Street Journal*, October 31, 2011. As the cost of food, a major input, has become increasingly volatile, chicken processors have been pushing for contracts that adjust with grain markets or signing short contracts.

Figure IV-2

**Energy Intensive Production: Ranking by Industry**

| Industry | 2000 Energy Cost as Percent of All Input Costs | 2000 Rank | 2002 Energy Cost as Percent of All Input Costs | 2002 Rank | 2004 Energy Cost as Percent of All Input Costs | 2004 Rank | 2006 Energy Cost as Percent of All Input Costs | 2006 Rank | 2008 Energy Cost as Percent of All Input Costs | 2008 Rank |
|---|---|---|---|---|---|---|---|---|---|---|
| Water transportation | 13.6% | 1 | 13.4% | 1 | 22.2% | 1 | 22.1% | 1 | 29.3% | 1 |
| Air transportation | 12.7% | 2 | 10.1% | 2 | 12.8% | 2 | 18.6% | 2 | 28.9% | 2 |
| Truck transportation | 7.5% | 3 | 6.6% | 4 | 9.6% | 3 | 14.0% | 3 | 18.0% | 3 |
| Rail transportation | 4.1% | 8 | 3.5% | 7 | 5.8% | 5 | 9.3% | 4 | 13.7% | 4 |
| Other transportation and support activities | 5.4% | 7 | 4.6% | 6 | 5.6% | 6 | 9.2% | 5 | 12.4% | 5 |
| Transit and ground passenger transportation | 6.0% | 5 | 5.7% | 5 | 6.9% | 4 | 9.2% | 6 | 9.3% | 6 |
| Farms | 3.3% | 10 | 3.4% | 8 | 4.3% | 8 | 6.1% | 7 | 7.1% | 7 |
| Administrative and support services | 2.4% | 12 | 2.0% | 11 | 3.2% | 10 | 4.3% | 10 | 5.6% | 8 |
| Chemical products | 3.6% | 9 | 3.0% | 9 | 4.9% | 7 | 5.8% | 8 | 5.2% | 9 |
| Petroleum and coal products | 5.4% | 6 | 7.2% | 3 | 1.5% | 15 | 5.2% | 9 | 4.7% | 10 |
| Construction | 2.6% | 11 | 2.6% | 10 | 3.3% | 9 | 4.2% | 11 | 4.5% | 11 |
| Forestry, fishing, and related activities | 1.2% | 16 | 1.1% | 14 | 2.2% | 13 | 2.5% | 14 | 3.4% | 12 |
| Pipeline transportation | 7.2% | 4 | 1.8% | 13 | 2.7% | 11 | 3.4% | 12 | 3.2% | 13 |
| Support activities for mining | 1.7% | 14 | 2.0% | 12 | 2.7% | 12 | 2.8% | 13 | 2.5% | 14 |
| Waste management and remediation services | 2.2% | 13 | 0.8% | 15 | 1.9% | 14 | 2.3% | 15 | 2.3% | 15 |
| Mining, except oil and gas | 0.8% | 17 | 0.7% | 17 | 1.1% | 16 | 1.8% | 16 | 2.2% | 16 |
| Warehousing and storage | 0.4% | 27 | 0.5% | 21 | 0.7% | 21 | 1.1% | 19 | 1.8% | 17 |
| Federal general government | 0.5% | 21 | 0.8% | 16 | 1.0% | 17 | 1.5% | 17 | 1.8% | 18 |
| Paper products | 0.5% | 20 | 0.6% | 19 | 1.0% | 18 | 1.2% | 18 | 1.8% | 19 |
| Accommodation | 0.4% | 24 | 0.4% | 26 | 0.8% | 20 | 1.1% | 21 | 1.3% | 20 |

**Source:** US Bureau of Economic Analysis Supplementary Use Tables, 2000-2008

135. The relationship between fuel prices and Defendants' operating costs can readily be seen in Figures IV-3 and IV-4. Figure IV-3 shows Defendants' average fuel expense per ton-mile and the average price of WTI for the years 1998 through 2008. The figure indicates that when fuel prices rose, Defendants' cost of fuel per ton-mile rose as well. As fuel costs rose, the share of fuel expense as a share of Defendants' total operating expenses rose as well. Figure IV-4 shows the rise in Defendants' shares of fuel expense as a share of total operating expense. Notwithstanding Prof. Rausser's suggestions that Defendants' improvements in fuel efficiency tended to offset the impact of rising fuel costs by becoming more energy efficient,[173] the evident sharp increases in fuel expense per ton-mile and in fuel intensity represent actual increases experienced and, thus, embody the energy efficiency histories of the Defendants.

173 See, e.g., Rausser Merits Report at 99-102.

Figure IV-3

**Average Fuel Expense Per Ton-Mile**
**Individual Defendants, 1998-2008**




**Source:** AAR R1 Data; U.S. Energy Information Administration

Figure IV-4

**Fuel Expense as a Percentage of Total Operating Expense**




**Source:** Defendants' Annual and Quarterly Filings

136. The timing of Defendants' (as well as other railroads' and other industries' – see discussion below) and their customers' introducing and increasing the use of fuel surcharges in their contracting is consistent with the underlying market rationale for contractual price flexibility noted above. The use of fuel surcharges is clearly related to the importance and volatility of oil prices.

137. To see this, Figures IV-5A shows the prices of West Texas Intermediate ("WTI") crude oil (top panel) and Highway Diesel Fuel ("HDF") (bottom panel). Comparison of the two prices shows the prices of WTI and HDF moved together. This is to be expected because the prices of all crude oils move together in the global crude oil market and crude oil is the primary input into the manufacture (refining) of HDF.

138. Figure IV-5A shows that fuel and oil prices were relatively low and stable in the mid-1990s. However, by 1998, prices began to rise and fall over increasing ranges. WTI prices fell to close to $11 per barrel in early 1999. Then, WTI prices began a period of

increase that lasted for more than one year, more than tripling and reaching approximately $34 per barrel in September of 2000. WTI prices moderated during 2001, but began another sustained increase in 2002. While prices were volatile, prices trended generally upward from 2002 until mid-2008. WTI prices fell in the second half of 2008 as the US and world economies entered recession and as the financial crisis set in, worsening economic conditions. The average price per barrel of WTI was $23.28 during January 1996 - June 2003 and rose to $63.87 per barrel during July 2003 - December 2008.

139. HDF prices exhibited a somewhat different pattern of volatility than WTI prices, but similarly rose from early 2002 through mid-2008. Figure IV-5A shows that the average price of HDF during January 1996-June 2003 was $1.28 per gallon. Clearly, WTI and HDF prices are related. However, differences are also clear. For example the average price of WTI was almost two and three-quarters times higher in July 2003 - December 2008 than during January 1996 - June 2003 ($63.87/$23.28 = 2.74). The average price of HDF rose by closer to a factor of two between the same periods ($2.61/$1.28 = 2.04).

140. While Figure IV-5A shows the increases in WTI and HDF prices over most of the 2000s, energy prices also grew more volatile. Increased volatility implies that prices are becoming less stable and less predictable. Intuitively, this means that prices may rise or fall week to week by increasing amounts over time. The week-to-week changes in prices are called first differences in prices. Thus, for example, if the WTI price rises from $40 to $43 per barrel from week one to the next, the "first difference" is $3 (i.e., $43-$40). Given the intuition above, a good measure of price volatility is the standard deviation of the weekly first-differences in prices.

Figure IV-5A

**Crude Oil (WTI) and Highway Diesel Fuel (HDF) Prices, 1996-2008**




**Source:** U.S. Energy Information Administration

141. Figure IV-5B shows that the annualized standard deviation of changes in HDF and WTI prices rose across three periods: January 1996 through December 1999; January 2000 through June 2003; and July 2003 through December 2008. Consistent with the price variability that is visible in Figure IV-5A, Figure IV-5B shows that the standard deviation of annualized WTI and HDF price changes was much lower during 1996-1999 than during January 2000-June 2003, and that volatility was then even greater over July 2003-December 2008.

Figure IV-5B

**Crude Oil (WTI) and Highway Diesel Fuel (HDF) Price Volatility**
**Period Average Standard Deviation of Price Changes**

| | 1/1/1996-12/31/1999 | 1/1/2000-6/30/2003 | 7/1/2003-12/31/2008 |
|---|---|---|---|
| WTI ($/barrel) | 5.57 | 9.25 | 16.56 |
| HDF ($/gallon) | 0.07 | 0.18 | 0.37 |

**Source:** U.S. Energy Information Administration
**Note:** Volatility measured as annualized value of standard deviation of 24-week rolling history of weekly price changes.

142. Figures IV-5C and 5D show similar patterns to those summarized in Figure IV-5A. In Figure IV-5C we see an estimate of the annualized expected standard deviation of WTI prices based on two alternative measures of volatility. The first is based on recent history of oil price changes at a given time (from the prior 24 weekly price changes). The second measure of volatility is forward-looking and derived from then-current prices of publicly-traded WTI futures and options prices, converted into a dollar per barrel measure based on then-current spot oil prices. Regardless of whether the volatility is measured on recent price experience or derived from forward-looking market prices, the same pattern emerges. In Figure IV-5D, we see the similar calculation for HDF based on the recent 24-week history of HDF price changes. As Figures IV-5C and IV-5D indicate, there was an increase in oil price volatility in 2000. Consistent with the economics of mutually beneficial contracting discussed above, this corresponds to the period in which Defendants and other railroads introduced publicly-posted fuel surcharge mechanisms. Overall, the period of 2000-2008 represented a period of heightened and generally rising oil price volatility relative to the period before 2000. It is not surprising that, in light of the legitimate business purpose they serve for buyers and sellers, fuel surcharges arose and stuck in the railroad sector and many other sectors of the economy.

Figure IV-5C

**Crude Oil (WTI) Volatility**
**Annualized Standard Deviation of Anticipated Price Changes**




**Source:** U.S. Energy Information Administration; Bloomberg CL1 HIVG
**Note:** Historical volatility is measured as annualized value of standard deviation of 24-week rolling history of weekly price changes. Forward-looking market-based volatility is derived from publicly traded options and futures prices and converted into dollars using contemporaneous prices.

Figure IV-5D

**Highway Diesel Fuel (HDF) Volatility**
**Annualized Standard Deviation of Anticipated Price Changes**




**Source:** U.S. Energy Information Administration
**Note:** Volatility measured as annualized value of standard deviation of 24 week rolling history of weekly price changes.

143. Figure IV-6A shows more than 80 railroads that have employed fuel surcharges in the 2000s. These include both U.S. and non-U.S. railroads, and Class I/long-haul railroads as well as numerous shortline carriers. Figure IV-6B provides a sample of the broad range of companies and industries that reported using fuel surcharges between 2000 and 2005. Industries represented range from bus transportation, utilities, and trucking to restaurants, hotels, and pizza and flower delivery. A similar range is seen in Figure IV-6C, which shows a sample of companies and industries reporting use of fuel surcharges during 2010 and 2011. The figure shows that fuel surcharges remain in heavy use, spanning a wide range of industries and sectors, from trucking and public transit to courier services and the Boy Scouts of America (which applies surcharges to

the fuel-intensive transportation of scouts to and from off-site activities[174]). Moreover, fuel surcharges that were utilized in industries in the early 2000s are still in effect in businesses ranging from garbage collection to pizza delivery.[175]

Figure IV-6A

**Selected Railroads that Have Employed Fuel Surcharges**

| | | |
|---|---|---|
| Alabama and Gulf Coast Railway | Florida East Cost Railway | New York, Susquehanna & Western Railway |
| Alaska Railroad Corporation | Fort Worth & Western Railroad | Nomads -Australia Norfolk Southern |
| Appalachian and Ohio Railroad | Gary Railway Company | Norfolk Southern |
| Arkansas and Missouri Railroad Company | Great Southern Rail - Australia | North Carolina and Virginia Railroad |
| Birmingham Southern Railroad Company | Green Mountain Railroad | Paducah & Louisville Railway |
| Buckingham Branch Railroad | Huron and Eastern Railway | Pan Am Railways |
| Buffalo and Pittsburgh Railroad | Hudson Bay Railway Company | Portland and Western Railroad |
| Burlington Northern Santa Fe | Illinois Railway Inc. | Providence And Worcester Railroad |
| Canadian National Railway | Indian Pacific - Australia | Rail America |
| Canadian Pacific Railway | Indiana and Ohio Railway | Rail Link Europe - Europe |
| Cape Brenton and Central Nova Scotia Railway | Indiana Harbor Belt | Rochester and Southern Railroad |
| Carolina Piedmont Railroad | Indiana Rail Road | Saginaw Bay Southern Railway |
| Cedar Rapids and Iowa City Railway Company | Indiana Southern Railroad | South Carolina Central Railroad |
| Central New York Railroad | Iowa Interstate Railroad LTD | Super Fast -Europe |
| Central Oregon and Pacific Railroad | Kansas City Southern | Tacoma Municipal Belt Line Railway |
| Central Railroad of Indiana | Kiamichi Railroad | Texas & Northern Railway Company |
| Central Railroad of Indianapolis | Kinetsu International Express - Japan | The Lake Terminal Railroad |
| CG Railway Incorporated -US Mexico | Kyle Railroad | Toledo, Peoria and Western Railway |
| Chicago Terminal Railroad | Lake State Railway Company | Transnet Freight Rail - South Africa |
| Chicago, Fort Wayne, and Eastern Railroad | Manufacturer's Junction Railway | Twin Cities & Western Railroad Company |
| Claremont Concord Railroad | Mass Coastal Railroad | Union Pacific |
| Clarendon & Pittsford Railroad | McKeesport Connecting Railroad | Union Railroad Company |
| CSX Transportation | Mid-Michigan Railroad | Vermont Railway |
| DB Schenker Rail -UK | Montana Rail Link | Washington County Railroad |
| Delray Connecting Railroad Company | Montreal, Maine and Atlantic Railway | Wheeling and Lake Erie Railway Company |
| Escanaba & Lake Superior Railroad | New England Central Railroad | Wisconsin and Southern Railroad |
| Evansville Western Railway Inc. | New York & Ogdensburg Railway | |

**Source:** Company Websites and Various Trade Press

174 Boy Scouts of America Troop 776 Goddard, Kansas Quivira Council, White Buffalo District, Policies and Procedures, Revised 07/19/2010, at 6.

175 See, for example Waste Management at http://www.recycleamerica.com/fuel/default.asp, accessed December 29, 2012; and Christopher's Grinders at http://www.christophers-grinders.com/, accessed December 29, 2012.

Figure IV-6B

**Examples of Fuel Surcharges in Selected Industries: 2000-2005**

Adirondack Trailways Bus - Ground Transportation
Airgas Inc. - Industrial Gases
AK Steel Holding Corp. - Materials Producer
Allegheny Technologies Inc. - Materials Producer
American Electric Power - Utility
Beaver Express - Delivery Service
Bruno's Pizza - Restaurant
Chi Chi's Mexican Restaurant - Restaurant
Clark Freight Lines Inc. - Trucking
Con-Way - Trucking
Covenant Transport - Trucking
Domino's Pizza - Pizza Delivery
Estes - Trucking
Flowers By Ray and Sharon - Flower Delivery
FreshDirect - Grocery Delivery
Global Delivery Systems - Freight Delivery
Gray Top Cab - Taxicabs
Greyhound Lines Inc. - Ground Transportation
Harris Trucking - Trucking
Hilton Hotels Corp. - Lodging
Hulcher Professional Services, Inc. - Diversified Services
Hyatt Hotels Corp. - Lodging
Langham Corp. - Freight Delivery
Long Island Power Authority - Utility
Marriot International Inc. - Lodging
Metro Heating and Air Conditioning - Heating & Air Conditioning
Nevada Taxicab Authority - Taxicabs
NTC - Trucking
Olympus Bus Service - Ground Transportation
Peninsula Truck Lines, Inc. - Trucking
Pennsylvania Public Utility Commission - Motor Carriers
Peter Pan Bus Lines Inc. - Ground Transportation
Peter's Flowers - Flower Delivery
Roadway Corp. - Trucking
Rumpke - Garbage Collection
SAIA - Trucking
SAS Cargo - Delivery Service
SeaStreak - Over-Water Transportation
Shamrock Delivery, Inc. - Courier Service
Star Cruises - Cruises
Starwood Hotels and Resorts Worldwide Inc. - Lodging
SuperShuttle - Ground Transportation
SureWay Worldwide - Freight Delivery
Tricon Transportation Inc. - Trucking
University of Maine - Education
Waste Management - Garbage Collection
Western Distributing Transportation Corp. - Trucking
Wyndam International - Lodging
Xpress Global Systems - Freight Delivery
Yellow Cab - Taxicabs

**Source:** Company Websites and Various Trade Press

## Figure IV-6C

**Examples of Fuel Surcharges in Selected Industries: 2010-2011**

ABF - Trucking
AirAsia - Airlines
Aloha Air Cargo - Delivery Service
American Airlines - Airlines
American Electric Power - Public Utility
Armellini - Delivery Service
At Home Tech Solutions - Computer Repair
At Your Need Logistics Pty Ltd - Trucking
Atlas Wholesale Food Co. - Wholesale Food
Bavarian Waste Services - Garbage Collection
Beacon - Roofing Materials Distibutor
Beaver Express - Delivery Service
Bonnell Aluminum - Aluminum Manufacturer
Boy Scouts of America - Youth Organization
British Airways - Airlines
Calypso Cruises - Cruises
Cathay Pacific - Airlines
Chattanooga Restaurant Supply - Restaurant Supplies
City of Chicago - Taxicabs
Coffee Distributing Corp., - Coffee
Continental Airlines - Airlines
Con-way - Trucking
Covenant Transport - Trucking
Davis Delivery Service - Delivery Service
DB Schenker - Delivery Service
DC Taxicab Commission - Taxicabs
Delta Airlines - Airlines
DHL - Delivery Service
Dogwood Ceramic Supply - Ceramic Supplies
Drinks Delivered and More - Restaurant Delivery
DuPont Packaging and Graphics - Printing and Graphics
Estes - Trucking
FedEx - Delivery Service
FMC Industrial Chemicals - Chemical Manufacturer
Forward Air - Trucking
Fred Olsen Cruise Lines - Cruises
FWCC Incorporated - Trucking
Groovy Computers & Web Pages - Computer Repair
Guam Power Authority - Public Utility
Harris Trucking - Trucking
Hulcher Professional Services, Inc. - Diversified Services
J&J Tech Services - Computer Repair
Japan Airlines - Airlines
Kaiser Tool Company - Tool Manufacturer
Maryland Ground Covers - Landscape Supplies
Matson Navigation Co - Cargo
MyBike Online - Bike Rental and Repair
Nalco - Water, Energy and Air Products and Expertise
Nestlé Waters North America Inc. - Goods
Nevada Taxicab Authority - Taxicabs
New York - Rental Apartments
Nippon Airways - Airlines
NTC - Trucking
Palma Pasta - Restaurant/ Catering
Peninsula Truck Lines, Inc. - Trucking
Pennsylvania Public Utility Commission - Motor Carriers
Performance Freight Systems, Inc. - Trucking
Philadelphia Parking Authority - Taxicabs
Shenzhen Municipal - Taxicabs
PWP Technologies, Inc. - Computer Repair
Qantas Airways - Airlines
RPJ Waste Services - Garbage Collection
RR Waste Solutions - Garbage Collection
Rumpke - Garbage Collection
SAIA - Trucking
SAS Cargo - Delivery Service
Shamrock Delivery, Inc. - Courier Service
Singapore Airlines - Airlines
Sonoco - Packaging
St. Lawrence County Legislature - Garbage Collection
Times Printing - Printing
Trinity Containers LLC - Container Manufacturing
U.S. Zinc Corp., - Materials Producer
Unisource Worldwide, Inc., - Paper Distribution
UPS - Delivery Service
Utah Transit Authority - Public Transit
Vimco Inc. - Construction Materials
Ward Trucking - Trucking
Waste Management - Garbage Collection
xpedex - Paper Distributor
YRC - Trucking

**Source:** Company Websites and Various Trade Press

144. Finally, Figure IV-6D lists Class Members who report charging fuel surcharges to their own customers. The indicated Class Members span a range of industries, including, steel, electricity generation, trucking, ocean shipping, and paper production. These examples and those in Figures IV-6A through 6C are consistent with the economics that tell us that fuel surcharges arise in response to normal, non-conspiratorial market forces of energy price volatility and the uncertainty that such volatility represents. They represent mutually beneficial adaptations to buyer and seller concerns at the time of entering into longer-term (not spot) contractual relationships. Because of this, they stick and spread in the marketplace, particularly in times of heightened energy price uncertainty.

Figure IV-6D

**Selected Class Members that Charge Fuel Surcharges to Their Own Customers**

| | | |
|---|---|---|
| AK Steel Corp | Hapag-Lloyd America Inc | Schneider National Carriers |
| Alabama Power Co | Hub Group Inc | South Carolina Electric & Gas |
| Alliance Shippers Inc | Hyundai Intermodal Inc | South Carolina Public Svc Auth |
| Ameren Services Company | Interdom Partners Ltd | TDIS |
| APL Logistics Tms | International Paper Co | The Dow Chemical Company |
| C H Robinson | JB Hunt Transport Inc | The Rail-Bridge Corporation |
| China Shipping Hong Kong | Maersk Sealand | United Parcel Service Inc |
| CMA CGM America Inc | Matson Navigation | United States Steel Corp |
| Consumers Energy Co | Mediterranean Shipping Co | US Magnesium |
| Cosco North America Inc | Mitsui O.S.K. Lines | Virgina Power Co |
| Detroit Edison Co | Mittal Steel Usa Inc | Waste Management Inc |
| DTE Coal Services Inc | Mol (America) Inc | Westar Energy |
| Duke Power Co | Northern Indiana Pub Svc Co | Wisconsin Electric Power |
| Entergy Arkansas | Nucor Building Systems | Xcell Energy & Coal Company Llc |
| Evergreen America Corp | Zinifex Taylor | Yang Ming Lines |
| Fedex | Olin Corp | Yellow Transportation |
| FMC Corporation | OOCL (USA) Inc | |
| Georgia Power Co | Pacer Transportation Solutio | |
| Hanjin Shipping Company Ltd | Roadway Express Inc | |

**Source:** Company Websites and Various Trade Press
**Note:** Sample based on review of Class Representatives and top 20 Customers by revenue and type (coal, intermodal, and carload).

145. In light of the applicable economics and the evidence of widespread implementation of fuel surcharges by buyers and sellers across a wide spectrum of generally fuel-intensive industries and companies, including Defendants in the pre-"conspiracy" period, Prof. Rausser's assertion that Defendants' challenged fuel surcharges "could not possibly be explained as a natural competitive reaction"[176] is unfounded.

### D. The Adoption and Spread of Defendants' Non-Conspiratorial, Revenue-Based Fuel Surcharges

146. The foregoing economics of the oil price volatility that Defendants experienced in the early 2000s imply that we should expect to observe Defendants' non-conspiratorial revenue-based fuel surcharges spreading to increasing traffic volumes in the period. This is borne out by the data.

147. Figure IV-7A shows UP's application of revenue-based surcharges to unregulated traffic, broken out by type of transaction. The figure shows the share of revenue for

---

[176] Rausser Merits Report at 76.

each type of transaction covered by surcharges.[177] "Covered" here means that the rate, or price, authority applicable to a particular shipment included a fuel surcharge, independent of whether the shipper paid a surcharge. A shipment may be subject to a fuel surcharge under the applicable price authority, but, for example, that surcharge may go untriggered as volatility in oil prices moves them below the applicable FSC trigger price.

Figure IV-7A

**Percent of Unregulated Traffic with Revenue-Based Fuel Surcharges by Transaction Type: UP, 2000-2008**




**Source:** Defendants' Transaction Data and Genesis Data

177 The UP data indicate shipments that are covered by a fuel surcharge, even when no surcharge is actually paid.

148. Price authorities known as "circulars" or "tariffs" contain terms, conditions, and rates at which railroads offer to move a shipper's goods. These are posted by railroads and are subject to change at the railroad's discretion. Railroads are thus able to introduce fuel surcharges to circulars quickly because they can update them as market conditions dictate. Figure IV-7A[178] shows that surcharges covered more than 90 percent of UP's traffic moving under circulars by December 2002 and virtually 100 percent of traffic moving under circulars by March 2003.[179] This is not surprising since, as noted, UP had expressed recommendations by October 2002—and pursuant to its admittedly non-conspiratorial interests—to apply its FSCs to essentially all of its traffic where doing so was not blocked by regulation or pre-existing contracts.

149. "Private" transactions, sometimes referred to as private price quotes, refer to shorter-term contracts negotiated between railroads and shippers. Figure IV-7A shows that UP included surcharges on private transactions at least as early as January 2000 and that fuel surcharges were applied to an increasing share of traffic moving under private agreements. As shown, with relatively rapid turnover of these shorter-term contracts, the revenue share of private transactions with surcharges increased sharply in 2000, and rose to over 50 percent by the date at which Prof. Rausser purports the alleged conspiracy was being planned and implemented in the spring and early summer of 2003.

150. The third and final category of "contract" transactions refers to traffic that moves under longer-term contracts. Contracts sometimes last many years, and railroads may need to wait for a contract to expire before they can negotiate with the shipper regarding fuel surcharges. Nevertheless, UP negotiated revenue-based fuel surcharges in contracts in 2000 and then applied them to an increasing revenue share of contract transactions over the period prior to the date at which Prof. Rausser purports the alleged conspiracy was being planned and implemented.

151. Figure IV-7B shows a similar analysis of the spread of fuel surcharges to different types of transactions for BNSF. For BNSF, data are not available to measure revenue covered by fuel surcharges. Instead, Figure IV-7B measures the "incidence" of revenue-based fuel surcharges of the three transaction types. Here, "incidence" measures the revenue share of traffic that actually paid fuel surcharges (i.e., because price authorities were covered by fuel surcharges *and* those surcharges were triggered by sufficiently high oil prices). Incidence is thus a conservative measure of the coverage of FSCs in railroads' price authorities.

---

178 Figure IV-7A shows the shares of revenue for the different transaction types that were covered by a fuel surcharge whether or not it was triggered.

179 In many cases shippers will negotiate a rate with a railroad. Therefore, a relatively small share of railroads' total revenue moves under circulars.

Figure IV-7B

**Percent of Unregulated Traffic with Payment of Revenue-Based Fuel Surcharges by Transaction Type: BNSF, 2000-2008**




**Source:** Defendants' Transaction Data

152. The data for BNSF permit identification of the three types of price authorities discussed above. Thus, Figure IV-7B shows that BNSF applied fuel surcharges to the three transaction types[180] as early as 2000. The revenue share of circular (i.e., tariff) and private transactions paying fuel surcharges was subject to variability (e.g., as changing oil prices moved relative to BNSF's FSC trigger values), but reached above 40 percent by late 2001. When oil prices then softened (Figure IV-5A), fewer surcharges were triggered and the incidence of shippers paying fuel surcharges fell sharply, reaching almost zero in the early months of 2002. Coverage, however, was not zero, and the incidence of BNSF's FSCs recovered as oil prices recovered and increasingly triggered

[180] The figure uses the term "circular" for traffic identified as "tariff" in BNSF's transaction data.

fuel surcharges. By the time of purported implementation of conspiracy in July 2003, close to 90% of BNSF's "circular" traffic was paying fuel surcharges. Close to 50% of "private" traffic was paying FSCs, and more than 20% of "contract" traffic was paying surcharges.[181]

153. I have used the transaction database to determine when Class Representatives[182] first paid revenue-based fuel surcharges. Figure IV-8A is a timeline showing when each of the Class Representatives was first covered or, where coverage cannot be determined, first paid a revenue-based fuel surcharge. The figure shows that five of the Class Representatives first agreed to revenue-based fuel surcharges in 2000. The three remaining Class Representatives first agreed to revenue-based fuel surcharges in 2002. Thus, each of the Class Representatives agreed to pay revenue-based fuel surcharges before Prof. Rausser asserts Defendants implemented the asserted conspiracy.[183] The Class Representatives thus demonstrated themselves to be the types of customers who pay revenue-based FSCs in settings acknowledged to be the province of unilateral, non-conspiratorial conduct on the part of Defendants.

154. Figure IV-8A shows that Class Representatives all agreed to pay revenue-based fuel surcharges that Prof. Rausser recognizes as non-conspiratorial.[184] It does not, however, indicate what share of Class Representatives' shipments was subject to such surcharges. Figure IV-8B shows the revenue share of the Class Representatives' traffic that included a revenue-based fuel surcharge in June 2003, immediately prior to the purported implementation of conspiracy. The revenue shares of Class Representatives' traffic covered by revenue-based fuel surcharges range from approximately 20 percent up to 100 percent. Two of the Class Representatives do not appear in the data as purchasing unregulated rail transportation from Defendants in June 2003.

---

181 Similar analyses cannot be performed for NS and CSXT/CSXI because their transaction data do not systematically identify unregulated transaction type.

182 The Class Representatives are Carter Distributing Company, Dakota Granite Company, Donnelly Commodities Inc., Dust Pro, Inc., Zinifex Taylor Chemicals, Inc. ("Nyrstar"), Olin Corporation, Strates Shows, Inc., and US Magnesium LLC; see Complaint at ¶¶21-28.

183 I understand that Plaintiffs represent that these eight Class Representatives are typical of the Class as a whole.

184 Rausser Merits Report at 55.

Figure IV-8A

**Class Representatives' First Movements with Revenue-Based Fuel Surcharges**




**Source:** Defendants' Transaction Data; NS 9255 Data
**Note:** Analysis includes movements covered by a revenue-based FSC for UP and NS and movements paying a revenue-based FSC for BNSF and CSXT/CSXI.

Figure IV-8B

**Percent of Class Representatives' Total Payments to Defendants under Price Authorities with Revenue-Based Fuel Surcharges, June 2003**




**Source:** Defendants' Transaction Data; NS 9255 Data
**Note:** Percent of gross revenue for movements covered by a revenue-based FSC for UP and NS and percent of movements paying a revenue-based FSC for BNSF and CSXT.

155. Class Representatives were not alone in paying revenue-based fuel surcharges prior to the implementation of the asserted conspiracy. The bottom panels of Figures IV-9A through 9D show the share of each Defendant's revenue on which shippers paid revenue-based fuel surcharges. NS and UP data provide additional information showing whether a shipment is covered by a revenue-based fuel surcharge, even if a surcharge is not being paid in a particular month (e.g., because applicable surcharges were not triggered by sufficiently high oil prices.).[185] For these two Defendants,

185 For NS, the information on the coverage of revenue-based fuel surcharges is incomplete because the dataset used for this analysis includes information for only approximately 1%, 4%, and 51% of NS's traffic in 2000, 2001, and 2002, respectively. Between 2003 and 2008 the amount of traffic included in these data range from approximately 71% to 86%. Thus, coverage is understated for NS.

Figures IV-9C and 9D show both the share of revenue on which shippers paid fuel surcharges (light shading) and the share of revenue for price authorities which included revenue-based fuel surcharges but the shippers paid no surcharges (dark shading).

Figure IV-9A

**BNSF: Fuel Prices and Percent of Revenue with Revenue-Based FSCs**




**Source:** BNSF-0016285-287; BNSF-0511834; BNSF-FSC 000485-487; Defendants' Transaction Data; U.S. Energy Information Administration

**Note:** Trigger price for public carload fuel surcharge; dotted line indicates period after implementation of mileage-based fuel surcharges.

Figure IV-9B

**CSXT/CSXI: Fuel Prices and Percent of Revenue with Revenue-Based FSCs**







**Source:** CSXFSC152734; CSXFSC328558; Defendants' Transaction Data; U.S. Energy Information Administration
**Note**: Data not available prior to April 2001. Trigger price for public carload fuel surcharge; dotted line indicates period after implementation of mileage-based surcharges

Figure IV-9C

**NS: Fuel Prices and Percent of Revenue with Revenue-Based FSCs**




**Source:** NS_01800073; NS_010006317-19; NS_010006321; NS_010006322-24; Defendants' Transaction Data; U.S. Energy Information Administration
**Note:** Trigger price for public carload fuel surcharge; dotted line indicates period after rebasing.

Figure IV-9D

## UP: Fuel Prices and Percent of Revenue with Revenue-Based FSCs




**Source:** UPFSC0000438-439; UPFSC0000552-553; Defendants' Transaction Data; U.S. Energy Information Administration
**Note:** UP implemented a WTI formula for carload traffic effective December 1, 2002 until June 2003 when it switched to an HDF formula. Trigger price for public carload fuel surcharge; dotted line indicates period after implementation of mileage-based fuel surcharges.

156. The overall pattern to the spread of each Defendant's revenue-based fuel surcharges reflects growth in the use of FSCs as oil prices rose and their volatility increased, relative to the late 1990s and particularly coming out of the trough in oil prices that occurred in late 2001-early 2002 that is seen in the top panels of Figures IV-9A through 9D. These panels show the trigger prices of the Defendants' public carload formulas and the HDF or WTI price, as appropriate, adjusted for the formula (e.g., the average price from two months prior). Coming into and during the period of purported conspiratorial communication and implementation of the alleged conspiracy (mid-March to July 1, 2003), oil prices moderated somewhat, but generally remained at or above the various Defendants' different trigger prices (top panels of Figures IV-9A through 9D). Each of the Defendants then experienced a corresponding slowing of the spread of the incidence (BNSF and CSXT/CSXI) or incidence and coverage (NS and UP) (bottom panels of Figures IV-9A through 9D).

157. Conservatively, the incidence of observed payment of revenue-based FSCs ranged from a low of more than 30% of BNSF's total unregulated traffic[186] to a high of almost 50% of NS's total unregulated traffic in June 2003. From that point forward, the coverage of the Defendants' respective revenue-based fuel surcharges trended somewhat upward with rising oil prices (top panels) and oil price volatility. (See, e.g., Figures IV-5B through D.)

158. Figures IV-9A through 9D focus on each Defendant's total unregulated traffic and show that revenue-based surcharges spread widely across Defendants' customers, with most of the growth in the use of FSCs coming in the period before alleged conspiracy. This occurred despite the fact that the market forces causing FSCs to spread were impeded at any given moment by the reality of vintages of earlier price authorities that had been instituted with customers in an earlier era and were lacking surcharges. Figures IV-10A through 10D allow us to observe the spread of revenue-based surcharges across price authorities as those authorities came up for renewal or appeared as new business.

159. Such situations constitute new opportunities for FSCs to be implemented, and Figures IV-10A through 10D measure the share of such opportunities that ever either paid (all four Defendants' "incidence") or at least were covered (NS's and UP's "coverage") by revenue-based surcharges. UP's coverage had reached very close to 80% prior to the purported implementation of conspiracy. Both BNSF and NS saw levels of coverage over 70%, and CSXT/CSXI's corresponding share of new opportunities brought under FSCs prior to the alleged implementation of conspiracy had reached approximately 70%. It is clear that revenue-based fuel surcharges arose and spread in the marketplace

186 Course-of-business analysis shows that BNSF's fuel surcharge participation rate was 39.1% by the first half of 2003. BNSF-FSC000475-84 at 82.

as the product of the independent, unilateral pursuit of railroads' non-conspiratorial business interests in the oil price environment of the early 2000s.

Figure IV-10A

**BNSF: Fuel Prices and Percent of New Opportunities with Revenue-Based FSCs**




**Source:** BNSF-0511834; BNSF-0016285-287; BNSF-FSC 000485-487; Defendants' Transaction Data; U.S. Energy Information Administration

**Note:** New opportunity defined as the first month a customer price authority appears in the data. Trigger price for public carload fuel surcharge. Dotted line indicates period after implementation of mileage-based fuel surcharges.

Figure IV-10B

## CSXT/CSXI: Fuel Prices and Percent of New Opportunities with Revenue-Based FSCs




**Source:** CSXFSC152734; CSXFSC328558; Defendants' Transaction Data; U.S. Energy Information Administration
**Note:** New opportunity defined as the first month a customer price authority appears in the data. Trigger price for public carload fuel surcharge. Dotted line indicates period after implementation of mileage-based fuel surcharges.

Figure IV-10C

**NS: Fuel Prices and Percent of New Opportunities with Revenue-Based FSCs**







**Source:** NS_01800073; NS_010006317-19; NS_010006321; NS_010006322-24; Defendants' Transaction Data; U.S. Energy Information Administration
**Note:** New opportunity defined as the first month a customer price authority appears in the data. Trigger price for public carload fuel surcharge. Dotted lie indicates period after rebasing.

Figure IV-10D

**UP: Fuel Prices and Percent of New Opportunities with Revenue-Based FSCs**




**Source:** UPFSC0000438-439; UPFSC0000552-553; Defendants' Transaction Data; U.S. Energy Information Administration
**Note:** UP implemented a WTI formula for carload traffic effective December 1, 2002 until June 2003 when it switched to an HDF formula. Trigger price for public carload fuel surcharge. Dotted line indicates period after implementation of mileage-based fuel surcharges.

160. Finally, Figures IV-10A through 10D do not indicate that, by the time of the purported onset of conspiratorial communications in March 2003, Defendants were experiencing a slowdown in the spread of their fuel surcharges across the new opportunities that were arising. However, they do indicate that, compared to the pre-"conspiracy" period, Defendants experienced slower growth as of the purported implementation of the conspiracy in July 2003, and this slower growth continued through the Class Period. This growth generally tracked the general rise in oil prices in the Class Period.

### E. Was Conspiracy Needed to Overcome, and Did It Overcome, Resistance to Fuel Surcharges?

161. The data of Figures IV-9A through IV-9D and Figures IV-10A through IV-10D are inconsistent with key precepts of Plaintiffs' and Prof. Rausser's theories of the alleged conspiracy. As noted in Section II above, Plaintiffs contend that inter-Defendant competition[187] and customer resistance[188]meant that Defendants' revenue-based FSCs were applied only intermittently[189] and were commonly waived or "negotiate[d] away" in the pre-Class Period.[190] Prof. Rausser similarly opines that Defendants' unilateral, conspiracy-free implementation of revenue-based fuel surcharges "failed", were only used "sporadically", and "were often modified or waived" prior to the purported implementation of conspiracy.[191] Yet, the data clearly indicate that the vast bulk of the spread of Defendants' revenue-based fuel surcharges across new opportunities as they arose occurred prior to the alleged implementation of conspiracy in July 2003.

162. In addition, recall that Plaintiffs claim that "absent the conspiracy, the standard fuel-surcharge programs that Defendants actually imposed pursuant to the conspiracy would not have existed *at all* and that Defendants would not have succeeded in aggressively applying the fuel surcharges across the industry."[192] Prof. Rausser is somewhat vague about the matter, acknowledging that there would have been some level of use of fuel surcharges by Defendants in his hypothesized setting of no conspiracy, but asserting that they would have been different than the actual FSCs that spread across each Defendant's traffic.[193] According to Prof. Rausser, Defendants were motivated to

---

187 See, e.g., Plaintiffs' Reply Memorandum at 10.

188 See, e.g., Narrative at ¶¶7, 11.

189 Complaint at ¶7.

190 See, e.g., Complaint at ¶92; Narrative at ¶¶82, 84, 113, UP Interrogatory No. 1.

191 Rausser Merits Report at 55-56.

192 First Set of Interrogatories at 9 to Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 9 (emphasis in the original).

193 See, e.g., Rausser Merits Deposition at 221.

conspire because they purportedly found "that their ability to successfully implement fuel surcharge policies that actually generated revenues was constrained".[194]

163. Yet, notwithstanding such assertions, not only did the vast bulk of the spread of Defendants' revenue-based fuel surcharges across new opportunities as they arose occur prior to the alleged onset of conspiracy, but the proffered theory of conspiracy implies that, if conspiracy actually existed and its motive and function were to overcome a "brick wall" of resistance to FSCs, we should have seen an acceleration of the spread of revenue-based fuel surcharges across new opportunities when the purported conspiracy was implemented in July 2003. In fact, under Prof. Rausser's claim that the conspiracy he purports to have discerned entailed agreement that conspiratorial FSCs would be applied universally and without exception "whenever opportunities arose",[195] the asserted conspiratorial agreement required no "ramp up" or "phase in" period. The facts of adverse impact are purportedly common across all Class Members and no one Class Member is harder to impose a conspiratorial FSC upon than any other Class Member; with inter-Defendant blocks to the spread of FSCs removed by conspiracy, the hypothesized conspiracy should have produced a jump to full coverage of at least all new opportunities that arose immediately upon implementation in July 2003.

164. Obviously, neither a jump to full coverage, nor even a sharp acceleration of coverage, occurred upon the purported implementation of the alleged conspiracy on July 1, 2003. Rather, as we can see in Figures IV-10A through IV-10D, the spread of fuel surcharges to new customer price authorities falls upon the alleged implementation of conspiracy in the cases of BNSF, CSXT/CSXI and NS, and stays on trend with no acceleration in the case of UP. The respective rates of spread of FSCs in the first three cases subsequently recover somewhat, but, when they do, they merely get back on trend and do not embark on a new trend that is higher than that experienced leading up to the purported undertaking of conspiratorial communications in March 2003.

165. Similar results of substantial growth in the aggregate coverage or incidence of Defendants' revenue-based fuel surcharges in the months leading up to the spring of 2003. Moreover, no pattern of acceleration in the spread of those surcharges upon the purported implementation of conspiracy is evident when we break out Defendants' traffic according to whether it was sole-served, exempt, or non-sole-served and non-exempt. This is seen in Figure IV-11A. The companion results are shown for each of the Defendants individually in Figures IV-11B through 11E.

166. To the extent that Plaintiffs and Prof. Rausser are suggesting that competition between Defendants was inhibiting the spread of FSCs and that the alleged conspiracy solved

194 Rausser Merits Report at 10.

195 Rausser Merits Report at 62.

that problem,[196] inter-Defendant competition would not have inhibited the spread of FSCs where there was no inter-Defendant competition to begin with – i.e., on single Defendant, sole-served traffic. Accordingly, Plaintiffs' and Prof. Rausser's theory of conspiracy would predict that in the aggregate and for each Defendant individually the spread of FSCs on sole-served traffic would outpace and be higher than the spread of FSCs on traffic subject to inter-Defendant competition leading up to the period of purported conspiratorial conduct. By the same token, the conspiracy theory would predict that, beginning July 2003, the spread of FSCs for non-sole-served traffic would accelerate both absolutely and relative to sole-served traffic. The data in Figures IV-11A through 11E do not support such predictions.

Figure IV-11A

**All Defendants: Percent of New Opportunities with Revenue-Based FSCs, by Type of Traffic**




**Source:** Defendants' Transaction Data
**Note**: Sole-served defined as origin or destination county (4-digit SPLC) with 90% of carloads moved by one Defendant.

[196] See, e.g., Plaintiffs' Reply Memorandum at 10; Rausser Merits Report at 55-56.

Figure IV-11B

**BNSF: Percent of New Opportunities with Revenue-Based FSCs, by Type of Traffic**




**Source:** Defendants' Transaction Data
**Note**: Sole-served defined as origin or destination county (4-digit SPLC) with 90% of carloads moved by one Defendant.

Figure IV-11C

**CSXT/CSXI: Percent of New Opportunities with Revenue-Based FSCs, by Type of Traffic**




**Source:** Defendants' Transaction Data
**Note**: Sole-served defined as origin or destination county (4-digit SPLC) with 90% of carloads moved by one Defendant.

Figure IV-11D

**NS: Percent of New Opportunities with Revenue-Based FSCs, by Type of Traffic**




**Source:** Defendants' Transaction Data
**Note**: Sole-served defined as origin or destination county (4-digit SPLC) with 90% of carloads moved by one Defendant.

Figure IV-11E

**UP: Percent of New Opportunities with Revenue-Based FSCs, by Type of Traffic**




**Source:** Defendants' Transaction Data
**Note**: Sole-served defined as origin or destination county (4-digit SPLC) with 90% of carloads moved by one Defendant.

167. Finally, as a causal theory, Plaintiffs' speculation that Defendants were motivated to embark on a conspiracy in the spring and early summer of 2003 because of looming customer resistance to fuel surcharges undergirded by inter-Defendant competition is not supported by the data. Figures IV-9A through IV-11E indicate that Defendants' revenue-based FSCs were spreading rapidly going into the spring of 2003, and whatever perturbations may have caused variations in the rate of spread in the process were certainly not causally distinguishable from prior slowdowns in the spread of FSCs *which had not caused Defendants to enter into a conspiracy.*

168. In short, the data on the spread of Defendants' revenue-based fuel surcharges prior to, upon, and following the implementation of the alleged conspiracy do not support Prof. Rausser's claimed inference of conspiracy. On the other hand, both the observed

existence and spread of Defendants' fuel surcharges have been consistent with the legitimate business role that FSCs play in supporting the use and stability of longer-term contracts between buyers and sellers. As we have seen above, fuel surcharges provide benefits to buyers and sellers when they enter into contracts. This is why fuel surcharges emerge, stick, and spread in non-conspiracy markets. The data applicable to Defendants' challenged FSCs reveal no break in these economics between the pre-Class Period and what the Plaintiffs and their expert label as a Class Period of conspiracy.

### F. Contradictions in Prof. Rausser's Claim that Expected Benefits of Conspiracy Outweighed the Costs

169. In the case at hand, it is perhaps easy to obscure the *ex ante*, time-of-contracting mutual benefits that railroads' fuel surcharges generated for both carriers and shippers in the early 2000s. The reality is that, after the fact, it turned out that oil prices took off and rose quite rapidly and consistently from approximately the second half of 2003 through mid-2008 (see Figure IV-5A). Plaintiffs' expert represents the effects as "massive over-recovery"[197] of costs by Defendants and "significant increases in their revenue and profitability across their operations",[198] *which he assesses only after the fact*, as bases for his purported finding of conspiracy.

170. Prof. Rausser asserts that "the collusion was rational since the benefits outweighed the associated costs".[199] In doing so, however, he acknowledges that he has not quantified the costs of collusion[200] or taken into account all of the actual costs Defendants would have confronted in deciding to engage in and go forward with a conspiracy. Most notably, he has omitted the costs associated with the risk of "antitrust liability" and attendant criminal and civil penalties.[201] At the same time, he acknowledges that any rational assessment of the costs and benefits of conspiring would have to take place before the fact, when Defendants were purportedly contemplating entering into conspiracy,[202] and notes that "[t]here is nothing in these facts [at the time of purportedly entering into conspiracy] to suggest that Defendants were either experiencing or anticipating a significant rise in fuel costs that motivated their adoption of the fuel surcharges."[203]

---

197 Rausser Merits Report at 84.

198 Rausser Merits Report at 58.

199 Rausser Merits Report at 6.

200 Rausser Merits Deposition at 123-124.

201 Rausser Merits Deposition at 124.

202 Rausser Merits Deposition at 124.

203 Rausser Merits Report at 61-62, footnote 137.

171. The "qualitative"[204] picture that Prof. Rausser paints of the before-the-fact costs and benefits confronted by Defendants as they purportedly considered conspiring is not economically plausible. He avers that Defendants would have seen the benefits of conspiring as outweighing the costs because "they were all in the money as the conspiratorial period in July of 2003 began"[205] – i.e., oil prices were above the trigger prices of the Defendants' respective publicly-posted fuel surcharge formulas in July 2003. However, Prof. Rausser notes that contemporaneous course-of-business analyses reflect expectations as of the spring and early summer of 2003 that oil prices would decline. He quotes, for example, contemporaneous NS analyses which employ forecasts from July 2003 in which: "West Texas Intermediate (WTI) is still expected to average around $27/barrel (bbl) for the rest of this year, though trending downwards from current levels as stocks rise and Iraq returns. Fundamentals continue to look bearish for 2004, and we expect WTI to dip below $25/bbl in the first half of next year."[206] As of July 1, 2003, NS's carload formula FSC trigger price was at $28.01 (Figure IV-1B).

172. Thus, in Prof. Rausser's framework, NS is to be inferred to be entering into a conspiracy and agreeing to conspiratorial fuel surcharge formulas as of July 1, 2003 because the benefits that could be expected "outweighed the costs". Yet, in that same framework, NS is represented as not expecting oil prices to rise and generate conspiratorial benefits; instead, NS's purportedly conspiratorial fuel surcharge formula would reasonably have been expected by NS to go untriggered with WTI at $27 per barrel "for the rest of the year" and at least the first half of 2004." Effectively, Prof. Rausser's framework takes NS out of the purported conspiratorial implementation to fuel surcharges for at least that period.

173. Prof. Rausser also cites the contemporaneous price projections of the Organization of Petroleum Exporting Countries ("OPEC") as "an authoritative institutional source of price forecast ... [that] has some control over the marketplace. And [they] would be actively engaged in maintaining, to the extent that they could control it, that particular price band" projected by OPEC.[207] He quotes OPEC as forecasting an "'OPEC price

---

204 Rausser Merits Deposition at 123-124.

205 Rausser Merits Deposition at 112; see also at 130, 221, 225-226.

206 Rausser Merits Report at 61-62, footnote 137. Similar course-of-business analyses showing expectations that oil price could well decline looking out from the spring and early summer are evident in the case of other Defendants. See also BNSF CEO Matt Rose's comments in a January 2003 corporate earnings call: "Because, you know, while we don't believe—and the numbers don't substantiate, when you go out in terms of long fuel prices, they have not moved up like the short fuel prices have. And so we don't subscribe to the fact that fuel is on some sort of upward trend....[W]e believe that fuel will be its highest in the first quarter and then start to moderate some." BNSF-0814238-41 at 40; Seale Deposition at 73; NS_001000024-53 at 25.

207 Rausser Merits Deposition at 118.

band target of US $22-28 per barrel for its Reference Basket of seven crudes' [that] is expected to 'continue to operate successfully' through 2020."[208] To the extent that OPEC prices of $22-28 per barrel translate into comparable WTI prices (and recognizing that WTI was the benchmark for quoting, e.g., "sour", high sulfur Saudi Arabian crude oil into the US until 2009), Prof. Rausser's "authoritative institutional source" would indicate a putative conspiracy that would, at best, turn itself "on" only haphazardly and not uniformly, and perhaps not at all, across Defendants over 2003-2020.

174. Thus, for example, Figure IV-1B shows, as noted, that NS's carload FSC formula's WTI trigger was at $28.01 as of July 1, 2003. Contemporaneous course-of-business analysis equated UP's publicly-posted carload FSC trigger of $1.35 per gallon of HDF as of July 1, 2003 to a WTI value of $25.50 per barrel for UP.[209] Similar course-of-business analysis by BNSF on June 5 and July 1, 2003 equated BNSF's July 1, 2003 publicly-posted carload FSC trigger of $1.25 per gallon to a WTI value of $23.00 per barrel.[210] CSXT's publicly-posted carload FSC WTI trigger was at $23.01 per barrel as of July 1, 2003.[211] With these disparate trigger prices, only with prices at or above the very top of the forecasted band (i.e., with NS not triggering until WTI prices exceed $28 per barrel) would it be likely that all Defendants would be effectively participating and "benefiting" (*per* Prof. Rausser) from the purported conspiracy. At prices toward the bottom of the noted band, none of the alleged conspirators would be benefiting from the alleged conspiracy (e.g., as WTI dropped below CSXT's trigger of $23.01 per barrel and BNSF's $23.00 per barrel HDF-equivalent).

175. As Prof. Rausser acknowledges, forward market price "curves" provide "the best available information" on future oil prices.[212] The New York Mercantile Exchange ("NYMEX") represents a continuously traded, organized exchange market for futures contracts in WTI crude oil. Economic principles recognize that such futures trading effectively constitutes "bets" on what prices will be in the future month being traded. As such, NYMEX futures prices have the character of "putting your money where your mouth is" with respect the forecasting the price of oil in the future; NYMEX futures prices for WTI represent the supply-and-demand balance point between those who think prices will go higher and those who think prices will not go so high. There is no such thing as certainty in predicting future market prices of oil, but in this supply-and-demand sense, NYMEX forward curves are what Prof. Rausser recognizes as "more

208 Rausser Merits Report at 61-62, footnote 137.

209 UPFSC0000552-; UPFSC0042411-12.

210 BNSF-FSC 000485-487 at 86; BNSF-FSC 000475-84 at 84.

211 CSXFSC152734.

212 Rausser Merits Deposition at 113; see also at 117.

objective" than reliance on any particular market participant's or observer's proffered forecast.

176. Figure IV-12A shows selected NYMEX forecasts of WTI prices in the period leading up to the purported implementation of the claimed conspiracy in July 2003. It is clear that there was no general pattern of forecasting rising oil prices, even though actual prices turned out to show an upward trend from late 2001 onward.

Figure IV-12A

**NYMEX WTI Price Projections v. Actual WTI Prices**




**Source:** NYMEX; U.S. Energy Information Administration

177. In Figure IV-12B I have overlaid on the NYMEX price forecasts as of March 15, 2003 and June 30, 2003 the trigger prices contained in each Defendant's respective carload fuel surcharge formula, as these trigger prices existed as of July 1, 2003.[213] NYMEX

[213] For this analysis, I have employed conversion factors which equate HDF prices of $1.25 and $1.35 per gallon to WTI prices of $23.00 and $25.50 per barrel for BNSF's and UP's formulas, respectively. In

curves from March 15, 2003 and June 30, 2003 are selected because they represent the extant forecasts as of the dates of the purported beginning of conspiratorial meetings in mid-March 2003 and the purported implementation of conspiratorial agreement on July 1, 2003. As can be seen, the NYMEX forecasts were projecting declining prices going forward from these dates, consistent with course-of-business analyses of various Defendants indicating, as Prof. Rausser acknowledges, expectations of softer prices going forward.[214] As the figure indicates, both the March 15 and June 30, 2003 NYMEX forecasted prices fall below the purportedly conspiratorial FSC trigger price of NS six months into the alleged conspiracy (January 2004). The NYMEX forecast from March 2003 falls below UP's publicly-posted carload formula trigger by mid-summer 2004, and the June forecast shows prices falling below UP's trigger by late summer 2004. For BNSF and CSXT, NYMEX forecasts keep their carload prices "in the money", albeit just barely. Because the NYMEX futures prices are *forecasts*, they are surrounded by uncertainty: Actual prices could turn out to be higher or lower than the futures prices struck in prior months. This means that, for each Defendant, there was no guarantee that their trigger prices would even be "in the money".

converting BNSF's $1.30/gallon in the top panel of Figure IV-13A to WTI equivalence, I have used the information noted above regarding BNSF's contemporaneous conversion factors and employed a WTI price of $23.92 per barrel (i.e., $1.30 ÷ 1.25 = 1.04, and 1.04 x $23.00 = $23.92).

214 See note 206 above.

Figure IV-12B

**March 14, 2003 and June 30, 2003 NYMEX WTI Price Projections v. FSC Trigger Values**




**Source:** BNSF-000475-84; CSXFSC152734; NS_01800073; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000552-553; UPFSC0042411-12; NYMEX; U.S. Energy Information Administration
**Note:** BNSF and UP triggers based on HDF have been converted using $1.25/gallon equals $23/barrel (BNSF; BNSF-FSC-000475-84), and $1.35/gallon equals $25.5/barrel (UP; UPFSC0042411-12).

178. Within Prof. Rausser's theory of the alleged conspiracy, the implication of the foregoing is a purported conspiracy that would reasonably have been expected *at the time of purported conspiratorial agreement* to turn *off* NS's and UP's participation in the alleged conspiracy quite soon after their purported implementation of the conspiracy. BNSF's and CSXT's publicly-posted carload formulas, meanwhile, would have been reasonably expected to be likely to generate, at most, quite small fuel surcharges if oil prices turned out to be as forecasted. These results are seen in Figure IV-12C. Here, I have applied the carload FSC formula that was in place for each

Defendant as of July 1, 2003 to the June 30, 2003 NYMEX forecast of oil prices.[215] NS's formula shows its fuel surcharges turning off completely in March 2004, and UP's surcharges turn off in December 2004. BNSF's and CSXT's publicly-posted carload formulas, meanwhile, generate forecasted fuel surcharge rates of less than 2% for much of the forecasted period.

Figure IV-12C

**Projected Fuel Surcharges Based on June 30, 2003 NYMEX WTI Forecast**




**Source:** BNSF-000475-84; BNSF-FSC 000485-487; CSXFSC152734; NS_01800073; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000552-553; UPFSC0042411; NYMEX; U.S. Energy Information Administration
**Note:** Surcharge rates calculated using each Defendant's public carload formula in effect on purported implementation date of alleged conspiracy.

179. The foregoing is an untenable description of conspiracy. The Defendants are portrayed as entering into an agreement which "the best available" oil price forecasts at the time of deciding to conspire indicate, quite soon after implementation, will leave at most two

215 Adjusting UP's $1.35/gallon HDF trigger to an equivalent WTI value of $25.50 and BNSF's $1.25/gallon HDF trigger to an equivalent WTI value of $23.00 using the information noted above.

of the conspirators actually implementing what the four conspirators purportedly have agreed upon – oil-price-triggered, revenue-based fuel surcharges. Moreover, the critical entities in control of whether, when and how much putatively conspiratorial fuel surcharges are put in place are not the Defendants, but the nation-state members of OPEC.

180. Defendants cannot hope to have any control of these nation-states, but those entities have stated and known intentions of *not* driving oil prices up to levels at which all conspirators would be assured of at least realizing some benefit from their legally risky, unlawful conduct. In fact, in Prof. Rausser's framework, the Defendants' purported conspiracy is acknowledged to require them to conspire on base rates,[216] which OPEC or other third parties could not directly control. Yet, the Defendants eschew stopping there and purportedly go on to conspire on something they cannot control and that "best available information" indicates will not leave each Defendant actually participating in and benefiting from (i.e., revenue-base fuel surcharges).

181. Finally, notwithstanding these considerations and the fact that any assessment of possible benefits from putative conspiracy would have to be discounted for the risks associated with the inherent uncertainty that pervades even the best available oil price forecasts, each Defendant purportedly saw expected benefits of conspiring as outweighing the costs. Or, at least Prof. Rausser has reached the "qualitative" assessment that each Defendant saw the expected benefits as outweighing the costs. Inference of conspiracy under these circumstances and requirements is rank speculation.

182. If it is acknowledged that "[t]here is nothing in these facts to suggest that Defendants were either experiencing or anticipating a significant rise in fuel costs that motivated their adoption of the fuel surcharges",[217] why would Defendants adopt revenue-based fuel surcharges and continue to use them into the Class Period? The economically coherent explanation is found in the economics underlying the acknowledged unilateral, non-conspiratorial adoption of revenue-based fuel surcharges by buyers and sellers in the pre-"conspiracy" period.

183. As described above, we observed Defendants, other railroads, and firms in many other industries adopting revenue-based FSCs because economic forces generated them as *ex ante* market mechanisms for protecting the value of non-spot contractual arrangements in a world of volatile and, hence, uncertain oil price futures. Throughout the pre-Class Period when Defendants and so many others were adopting revenue-based fuel surcharges, "best available" (i.e., NYMEX) forecasts consistently said that oil prices were most likely to go down. At the same time, however, no rational market

---

216 Rausser Merits Deposition at 128-129.

217 Rausser Merits Report at 61-62, footnote 137.

participant could fail to recognize that any forecasts of oil prices are uncertain. Revenue-based fuel surcharges demonstrably arise as unilaterally rational business responses by buyers and sellers to the risks and associated threats to contractual relations created by that uncertainty.

184. In short, "conspiracy" cannot coherently explain the adoption and use of revenue-based fuel surcharges before the onset of alleged conspiracy or upon the purported implementation of conspiracy. On the other hand, as we have seen, unilaterally rational business behavior by buyers and sellers (including Defendants) does provide economically sound explanation.

### G. The Parallel Conduct Asserted under Prof. Rausser's Theory of Conspiracy Is Not Observed in the Data

185. Prof. Rausser shows no evidence of having considered tests of the foregoing type, tests which follow directly from his theory of conspiracy. Instead, upon acknowledging (1) that but for conspiracy, there would have nevertheless existed fuel surcharges, and (2) that revenue-based fuel surcharges were implemented to some, albeit "failed", degree by Defendants in the normal course of non-conspiratorial conduct prior to July 2003, he opines that he can discern that the Defendants' FSCs in place on July 1, 2003 were the product of conspiracy.

186. Prof. Rausser states that key to his thinking regarding the inference of conspiracy is that conspiracy harmonized Defendants' fuel surcharge programs. As he puts it, conspiracy can be inferred because, he avers, on July 1, 2003 Defendants emerged engaging in conduct that was "common across all four parties. In terms of initiation of their fuel surcharge program, *de novo*, even in an interdependent oligopoly, you wouldn't expect everybody reaching the same point...with regard to that implementation." [218] According to Prof. Rausser, whatever surcharges would have existed in the no-conspiracy world he imagines, those FSCs "would have differed in the sense that they wouldn't have been marching to the same drummer, that there would have been some variation" – i.e., "[t]hey wouldn't all be the same."[219]

187. Economics recognizes that disharmony in the mechanisms of conspiracy employed by individual sellers can produce different price or other inducements to customers; such disharmony and different outcomes can sow the seeds of distrust among conspirators that can destroy their conspiracy; engaging in conspiratorial communication and successfully reaching conspiratorial agreement in a context otherwise characterized by disharmony should be expected to result in greater harmonization. Applied here to

---

218 Rausser Merits Deposition at 153 (emphasis added).

219 Rausser Merits Deposition at 221. See also Rausser Merits Report at 6: "Defendants instigated a common rate increase, implementing Fuel Surcharges with identical or near identical features."

Prof. Rausser's asserted inference of conspiracy, these economics imply quite straightforwardly that, if Defendants engaged in the alleged conspiracy and even if they were otherwise a non-conspiring "interdependent oligopoly", Defendants should have emerged from their purported conspiratorial conduct in the spring and early summer of 2003 with a conspiratorial agreement that left them more, not less, harmonized. They did not.

188. Plaintiffs identify the Defendants' public carload surcharges as the "principal focus" of the asserted conspiracy.[220] Accordingly, Figure IV-13A compares those formulas immediately before Defendants purportedly embarked on the alleged conspiratorial conduct and when they emerged with supposedly "de novo" FSC programs on July 1, 2003. It is clear that the latter are less harmonized than the former.

Figure IV-13A

**Did the Alleged Onset of "Conspiracy" Make Fuel Surcharge Formulas More or Less Uniform? Carload Fuel Surcharge Formulas**

| | | | Surcharge | | | |
|---|---|---|---|---|---|---|
| | **Benchmark** | **Trigger Price** | **Fuel Surcharge at Trigger Price** | **Fuel Increment** | **Fuel Surcharge Increment** | **Fuel Index Period** |
| | | | **Immediately Before Alleged Conspiracy** | | | |
| **BNSF** | HDF | $1.30/gallon | 1.0% | $0.05/gallon | 0.5% | Monthly Average |
| **CSXT** | WTI | $28.01/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| **NS** | WTI | $28.01/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| **UP** | WTI | $28/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| | | | **Upon Alleged Start of Conspiracy** | | | |
| **BNSF** | HDF | $1.25/gallon | 0.5% | $0.05/gallon | 0.5% | Monthly Average |
| **CSXT** | WTI | $23.01/barrel | 0.4% | $1/barrel | 0.4% | Monthly Average |
| **NS** | WTI | $28.01/barrel | 2.0% | $5/barrel | 2.0% | 30 Consecutive Days |
| **UP** | HDF | $1.35/gallon | 1.5% | $0.05/gallon | 0.5% | Monthly Average |

**Source:** BNSF-0016285-287; BNSF-0511834; CSXFSC152734; CSXFSC328558; NS_01800073; NS_010006317-19; NS_010006321; NS_010006322-24; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000438-439; UPFSC0000552-553

189. Prior to purported conspiracy, with respect to these public carload FSCs, only one Defendant (BNSF) was out of step with its three other alleged conspirators in terms of every one of the key elements of FSC formulas – the benchmark (trigger) fuel, the oil

220 Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 12.

trigger price, the FSC percentage rate, the triggering fuel increment, the incremental FSC percentage rate, and the trigger period over which oil prices are calculated. Upon "emergence" from allegedly conspiratorial communication on July 1, 2003,[221] instead of greater harmony in FSC programs, Defendants now have two of themselves on HDF benchmarks and two of them on WTI. The Defendants also now have four different initial oil trigger prices,[222] four different FSC rates, three different triggering fuel increments, four different incremental FSC rates and two different oil price triggering periods. Rather than an increase in uniformity, as Prof. Rausser claims, Defendants' carload fuel surcharge programs actually became measurably *less* uniform as of the date of implementation of their purported conspiracy. This is a contradiction of Prof. Rausser's proffered economics of conspiracy under which the alleged conspiracy in this case should have made Defendants' fuel surcharge programs more, not less, harmonious.

190. Prof. Rausser acknowledges that the actual structures of Defendants' public carload fuel surcharge formulas were not the same.[223] He characterizes differences of the type seen in Figure IV-13A, however, as "effectively identical regime[s]".[224] Specifically, he asserts that Defendants' purportedly conspiratorial fuel surcharge formulas "were all in the money and they were designed at the beginning of the class period to have the same result with respect to the injury suffered by [the] class".[225] By the "same result", Prof. Rausser explains that he means "that the fuel surcharge with regard to its relationship with the underlying [fuel prices] was equivalent across the various mechanisms."[226]

191. As we have seen above, the interaction of the purportedly conspiratorial fuel surcharge formulas of July 1, 2003 and each of the price projections that Prof. Rausser offers as

---

221 Rausser Merits Deposition at 47-48; see also at 13, 26-28, and 45.

222 Even if BNSF contemporaneously viewed its HDF trigger price of $1.25/gallon as equating to $23.00 per barrel of WTI as of July 1, 2003, BNSF would reasonably recognize that as a mechanism of conspiracy going forward, HDF and WTI prices would have a variable relationship. Above HDF prices of $1.35 per gallon, BNSF's and UP's public carload formulas moved together, but, as discussed above, Prof. Rausser notes (and independent data support) that, in the period of March through June 2003, "[t]here is nothing in these facts to suggest that Defendants were either experiencing or anticipating a significant rise in fuel costs that motivated their adoption of the fuel surcharges." (Rausser Merits Report at 61-62, footnote 137). Moreover, NYMEX WTI futures prices at the time projected downward movement in oil prices following purported implementation of conspiracy in July 2003. (Figure IV-12A) Thus, it cannot be said that it would have been reasonable to project at the time that BNSF's and UP's FSCs would trigger and move in parallel.

223 Rausser Merits Deposition at 221-222.

224 Rausser Merits Report at 120.

225 Rausser Merits Deposition at 222.

226 Rausser Merits Deposition at 222.

either based on "authoritative" sources or as the "best available information" does not support Prof. Rausser's assertion that he can discern that the FSC formulas that purportedly emerged from conspiratorial agreement "were all...designed...to have the same result with respect to the injury suffered by [the] class".[227] Rather, in both the case of NYMEX price projections (Figure IV-12C) and the case of OPEC's price projections, the July 1, 2003 formulas of Defendants yield different fuel surcharges, including surcharges of zero for certain Defendants whose formulas would not trigger or would cease triggering under the proffered oil price forecasts.

192. Under Prof. Rausser's theories and assertions, we would have to believe that results such as those seen in Figure IV-12C were the conscious "designing" of disharmony by Defendants. That is, Prof. Rausser's reference to the "design" of purportedly functionally the same fuel surcharge programs is a reference to *conscious* design: He asserts he has determined that Defendants engaged in conspiratorial communications starting in the spring of 2003, and that what Defendants communicated about was harmonizing and spreading their FSC programs. The demonstrable and increased *disharmony* that "emerged" as of July 1, 2003 not only constitutes rejection of Prof. Rausser's theories of the alleged conspiracy; it also constitutes rejection of his claims to have discerned conspiratorial content in the communications he purports were conspiratorial.

193. The disharmonization that "emerged" as of July 1, 2003 is further seen in Figure IV-13B. Prof. Rausser repeatedly offers as illustration of Defendants' supposedly "equivalent"[228] fuel surcharge programs depictions of the various Defendants' FSC rates over broad ranges of fuel prices[229] and across long time periods.[230] The effect is to visually obscure the matter of relevance to his purported inference of conspiracy – i.e., the asserted equivalence of structures upon the "emergence" of conspiracy and under the expectations of Defendants at that time. Moreover, Prof. Rausser does not present examinations of the data to test the hypothesis, following directly from his theory, that conspiracy should have resulted in greater harmonization of Defendants' FSC structures as of July 1, 2003 when the alleged conspirators purportedly "emerged" to implement their conspiratorial agreement. To demonstrate the impact, Figure IV-13B applies Defendants' respective surcharge formulas from the bottom panel of Figure IV-13A over oil prices ranging between $20 and $40 per barrel for WTI.

227 Rausser Merits Deposition at 222.

228 Rausser Merits Deposition at 222, 268.

229 See, e.g., Rausser Merits Report at Figures 31 and 32.

230 Rausser Merits Report at Figure 30.

Figure IV-13B

**Public Carload Fuel Surcharge Formulas Immediately before Alleged Conspiracy**




**Public Carload Fuel Surcharge Formulas Upon Start of Alleged Conspiracy**




**Source:** BNSF-0016285-287; BNSF-0511834; CSXFSC152734; CSXFSC328558; NS_01800073; NS_010006317-19; NS_010006321; NS_010006322-24; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000438-439; UPFSC0000552-553
**Note:** BNSF's and UP's formulas are converted into WTI terms using a price relationship of $1.25/gallon HDF = $23/barrel WTI.

194. Figure IV-13B demonstrates the increased disharmony that "emerged" as of July 1, 2003. The range of $20 to $40 per barrel in WTI prices is intended to capture Prof. Rausser's proposition that the putatively conspiratorial surcharge formulas were put in place "before the precipitous rise in fuel prices [through 2008] was anticipated."[231] The top panel of the figure shows the FSC rates resulting under the individual Defendants' carload fuel surcharge formulas that were in place immediately before purported design of "conspiratorial" formulas. The bottom panel shows the FSC rates resulting under Defendants' July 1, 2003 carload fuel surcharge formulas. The four pre-"conspiracy" public carload fuel surcharge formulas of Defendants yield but two FSC rates over all ranges of oil prices. The four July 1, 2003 formulas of Defendants yield three different points of initial triggering across Defendants and at most price levels three different FSC rates over the ranges of oil prices at which all are triggered. Prof. Rausser might assert that the purportedly conspiratorial rates are still quite close, but this would obscure the point that the asserted purpose of purported conspiracy was to reduce and remove disharmony. It is clear that that is not what occurred. Moreover, the fact that the CSXT, NS, and UP surcharge formulas were identical before the alleged conspiracy confirms that similarity in formulas is not itself indicative of conspiracy.

195. Similar conclusions apply when we examine Prof. Rausser's own data on Defendants' fuel surcharge rates immediately before and then upon purported conspiratorial agreement. In his Figure 30, Prof. Rausser shows Defendants' FSC rates under their carload formulas over June 2002 through December 2009. The illustration shows close parity between BNSF and UP FSC rates and between NS and CSXT FSC rates after approximately March 2004.[232] Oil prices began a sharp and sustained rise to levels far beyond those forecasted at the time of purported conspiracy (see Figure IV-5A) in the spring of 2004. As such, the close parity noted in Prof. Rausser's Figure 30 would not have reasonably served as the basis for purported "design" of Defendants' July 1, 2003 surcharge structures. To provide information of relevance from Prof. Rausser's Figure 30, my Figure IV-13C isolates the data from Prof. Rausser's figure for the period immediately surrounding July 1, 2003. As is evident, the clear consequence is that increased harmonization of Defendants' FSC programs and the purported "equivalence" of their fuel surcharge programs at the onset of the Class Period is rejected by the data.

---

231 Rausser Merits Report at 61-62, footnote 137. Prof. Rausser also discusses "forward price curves" as "a more objective forecast." Rausser Merits Deposition at 117. As shown in Figure IV-12A, the NYMEX curve for WTI as of March 2003 showed prices ranging between $33 and $23 per barrel, and trending downward over time.

232 Prof. Rausser's Figure 30 does not reflect the change in NS's public carload surcharge program as of July 1, 2006.

Figure IV-13C

**Did Defendants Implement the "Same Program" by Conspiring? (Prof. Rausser's Figure 30; June 2002-December 2003)**




**Source:** Rausser Merits Report
**Note**: Public carload surcharges from Prof. Rausser's workpapers.

196. Figure IV-13D presents another analysis of the predicted harmonization and claimed "equivalence" of Defendants' carload fuel surcharge formulas as of July 1, 2003 and the purported implementation of conspiratorial agreement. In this analysis, I have calculated the all-in rate that a shipper would pay to each of the Defendants for a one-carload shipment, assuming the base rate is $1,000 and that the surcharges applied are either from immediately before the start of the alleged conspiracy (top panel) or immediately upon the implementation of the conspiracy on July 1, 2003 (bottom panel). I have calculated these rates over the range of oil prices shown along the horizontal axis of each panel.

Figure IV-13D

**Public Carload Fuel Surcharge Formulas Immediately Before Alleged Conspiracy**




**Public Carload Fuel Surcharge Formulas Immediately Upon Alleged Conspiracy**




**Source:** BNSF-0016285-287; BNSF-0511834; CSXFSC152734; CSXFSC328558; NS_01800073; NS_010006317-19; NS_010006321; NS_010006322-24; NS 6/30/2000 FSC Program Status; NS Original Fuel Surcharge Terms; UPFSC0000438-439; UPFSC0000552-553

197. The top panel of Figure IV-13D shows that CSXT's, NS's and UP's carload formulas tracked each other quite closely in the pre-Class, no-conspiracy period. BNSF's FSC formula did not closely track those of CSXT, NS, and UP. In the bottom panel, we see that Defendants' carload fuel surcharge formulas are still in two distinct groupings, but now BNSF and UP track each other and NS and CSXT track each other. There is no increase in harmonization upon purported implementation of conspiracy, and there is not "equivalence" across the four Defendants in the relationship between their formulas and oil prices.

198. The implication of Figure IV-13D is that the pre-Class Period disruption and competitive advantage that are implied by the disparate FSC rates in the top panel of Figure IV-13D were not eliminated by purported conspiracy. The reason is that the Defendants' carload FSC formulas were not brought into harmony and "equivalence" by the implementation of conspiracy on July 1, 2003 (bottom panel of Figure IV-13D).

199. Figures IV-14A and 14B address whether Defendants' (and CSXI's) intermodal surcharge programs became more harmonized and were made "equivalent" upon the implementation of the alleged conspiracy. As shown in Figure IV-14A, no Defendant (or CSXI) changed the surcharge formula in its intermodal program upon the implementation of the asserted conspiracy. Therefore, it is not possible to find that Defendants' and CSXI's intermodal fuel surcharges were more harmonized following the implementation of the asserted conspiracy than before it. Notwithstanding purportedly facing "failed" fuel surcharge programs prior to purported conspiracy, and notwithstanding assertions that Defendants met and communicated for the express purpose of collusively creating an "agreed-upon mechanism to raise rail freight prices across-the-board"[233] that would apply with "equal force" to intermodal traffic,[234] Prof. Rausser's claimed conspiracy demonstrably produced no "equivalence" and not even improved harmony in Defendants' and CSXI's intermodal fuel surcharge programs. Such conduct does not make economic sense in the context of Prof. Rausser's purported "across-the-board" conspiracy, particularly in light of the importance of intermodal traffic to Defendants. At the time of purported conspiratorial communication and agreement, such traffic accounted for from approximately 15% of revenue in the case of NS to more than 40% of revenue in the case of BNSF. (See Figure V-4A, discussed in Section V below.)

233 Rausser Merits Report at 49.

234 Rausser Merits Report at 66.

Figure IV-14A

## Did the Alleged Onset of "Conspiracy" Make Fuel Surcharge Formulas More or Less Uniform? Intermodal Fuel Surcharge Formulas

| | Benchmark | Trigger Price | Surcharge<br>Fuel Surcharge at Trigger Price | Surcharge<br>Fuel Increment | Surcharge<br>Fuel Surcharge Increment | Fuel Index Period |
|---|---|---|---|---|---|---|
| | | | **Immediately Before Alleged Conspiracy** | | | |
| **BNSF** | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.5% | Weekly Average |
| **CSXI** | HDF | (HDF on last Monday of month - $1.10/$1.10) * 0.10 * 100 | | | | Daily Price |
| **NS** | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.5% | Weekly Average |
| **UP** | HDF | (HDF of Previous Month/Base HDF Index - 1) * Fuel Intensity Factor | | | | Monthly Average |
| | | | **Upon Alleged Start of Conspiracy** | | | |
| **BNSF** | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.5% | Weekly Average |
| **CSXI** | HDF | (HDF on last Monday of month - $1.10/$1.10) * 0.10 * 100 | | | | Daily Price |
| **NS** | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.5% | Weekly Average |
| **UP** | HDF | (HDF of Previous Month/Base HDF Index - 1) * Fuel Intensity Factor | | | | Monthly Average |

**Source:** BNSF-FSC 000012; BNSF-FSC 001702-04; BNSF-0814151; CSXFSC000045; NS_036002111; NS_036002112; NS_037000994-1002; NS_037013908; NS_037014656; UPFSC 0165318; UPFSC0347611
**Note:** BNSF and CSXI based on each company's publicly posted formulas. NS formula for domestic intermodal traffic was not publicly posted. UP's fuel intensity factor was not publicly posted.

Figure IV-14B

**Intermodal Fuel Surcharge Formulas**




**Source:** BNSF-FSC 000012; BNSF-FSC 001702-04; BNSF-0814151; CSXFSC000045; NS_036002111; NS_036002112; NS_037000994-1002; NS_037013908; NS_037014656; UPFSC 0165318; UPFSC0347611, Crawford Deposition, Ex. 8
**Note:** BNSF and CSXI based on each company's publicly posted formulas. NS's intermodal formulas were not publicly posted. UP's fuel intensity factor was not publicly posted.

200. The lack of change in Defendants' (and CSXI's) intermodal fuel surcharges is evident in Figure IV-14B, which presents each Defendant's (and CSXI's) intermodal FSC rates under its respective surcharge formula. Not surprisingly since the pre-Class and Class Period rates are tied to oil prices and oil prices tend to move together (Figure IV-5A), the figure shows that Defendants' (and CSXI's) intermodal FSC rates move closely together both prior to and after the implementation of the alleged conspiracy in July 2003. But focusing on the differences between Defendants' respective rates, the movements of Defendants' fuel surcharges in Figure IV-14B do not support a claim that Defendants' fuel surcharges became more harmonized, much less equivalent, upon the implementation of the alleged conspiracy.

201. Similar findings pertain to coal surcharges before and after the purported implementation of conspiracy. Defendants' treatment of coal FSCs is notably marked

by unilateral, uncoordinated decision making. As shown in Figure IV-1C, BNSF implemented a coal-specific surcharge formula on July 1, 2004, altered that formula in January 2006, moving to a mileage-base fuel surcharge. Meanwhile, in November 2004, UP implemented and then did not subsequently change a coal-specific fuel surcharge formula. NS and CSXT never implemented public surcharge programs for coal that differed from their public carload surcharge programs. The result of this disparate conduct was coal FSC rates that, likewise, were never harmonized or otherwise made equivalent. In fact, as Figure IV-15 shows, coal surcharge rates were less similar following the onset of purported conspiracy.

Figure IV-15

**Coal Fuel Surcharge Formulas**




**Source:** BNSF-000532-33; BNSF-0482725-27; UPFSC0001272-1275
**Note:** Public carload rates shown for CSXT and NS; CSXT and NS did not implement coal-specifc FSCs.

202. Beyond the structures of their surcharge programs, Defendants exhibit important additional examples of disparate conduct not expected of parties to the alleged conspiracy. For example:

- **NS's conduct in 2003:** Course-of-business analyses and communications show that NS evaluated whether to change the structure of its public carload fuel surcharge *after* CSXT announced that it was modifying its public carload fuel surcharge in March 2003. NS analyzed CSXT's and other railroads' changes and did not modify its program.[235] NS further evaluated its fuel surcharges in July 2003 and November of 2003, but again did not modify its fuel surcharge program.[236] Thus, NS made no changes to its FSC program upon purportedly implementing conspiracy at July 1, 2003; and, as we have seen, the other Defendants did not harmonize themselves to NS. Course-of-business communications show that NS analyzed, among a variety of factors, its ability to exploit differences in fuel surcharge structures in the marketplace and whether its fuel surcharge structure enabled it to attract customers.[237] NS announced a new fuel surcharge structure in January 2004, which it implemented in March 1, 2004. This pattern of conduct is the pattern expected of a seller considering its unilateral business interests in light of the conduct of competitors. It is not the "marching to the same drummer" claimed by Prof. Rausser.
- **BNSF's implementation of mileage-based surcharges:** Course-of-business communications show that BNSF analyzed possible implementation of mileage-based fuel surcharges at least as early as February 2003.[238] BNSF continued its revenue-based fuel surcharge program, citing technical difficulties in implementing a mileage-based program across interline partners, the potential for customer dissatisfaction, and the expense of redesigning BNSF's system to be able to accommodate a mileage-based fuel surcharge.[239] After continued analysis, in March 2005 BNSF announced it would apply a mileage-based surcharge to all BNSF local traffic and to the BNSF portion of Rule 11 traffic. Various customers expressed concern about the potential administrative costs and complexities arising from changing over their internal systems to verify the mileage-based charges.[240] Effective January 1, 2006, BNSF implemented a

235 NS_010004393.

236 See Seale Deposition at 72-73 and NS_001000024-253 at 24-25 and 52. Forecasts reviewed by NS in July 2003 suggested that oil would drop back into the range of $22-25 per barrel in 2004. See also NS_010033391-95 at 93.

237 NS_001000024-53 at 24-25; Seale Deposition at 72-74, 127-128.

238 Lanigan Deposition at 36-40; Defendant BNSF Railway Company at 8 to Defendant BNSF Railway Company's Second Supplemental Responses and Objections to Direct Purchaser Plaintiffs' Second Set of Interrogatories to Defendant BNSF Railway Company, May 11, 2011 at 8; BNSF-0635254-271; BNSF-FSC00002-26.

239 Lanigan Deposition 222-223; and, BNSF-FSC 00047-74 at 61-62.

240 Lanigan Deposition at 244-245; and BNSF-FSC 000235-40 and BNSF-FSC 000271-79.

mileage-based fuel surcharge program exclusively for local and BNSF's portion of Rule 11 coal and agricultural products traffic.[241] Changing the structures of its fuel surcharges in these ways is *inconsistent* with Plaintiffs' theory. Mileage-based FSCs are not asserted to be conspiratorial; BNSF's introduction and changes in such FSCs would be "cheating" on the conspiracy under Prof. Rausser's theories.

- **NS's rebasing:** In July of 2006, NS "rebased" the trigger point of its public carload fuel surcharge.[242] It increased the trigger from $23 per barrel to $64 per barrel.[243] At the same time that the new fuel surcharge was applied, NS implemented base rate increases for regulated tariffs that averaged approximately 16.4%.[244] As shown in Figure IV-1B, NS also reduced the surcharge increment from .4% to .3%, meaning that if oil prices increased then the surcharge rate increased at a slower rate than with the previous formula. Base rate changes for unregulated customers, however, were negotiated.[245] Such conduct is *inconsistent* with Plaintiffs' alleged conspiracy in that other Defendants would have no transparent way of monitoring the actual level of adjustments that NS made to base rates upon rebasing.[246] Introduction of disruptive changes such as NS's rebasing is inconsistent with conspiracy. Such conduct sows the seeds of mistrust among conspirators, but is consistent with NS's unilateral pursuit of its business interests.
- **Differences in adoption of mileage-based fuel surcharges:** Course-of-business communications show that each of the other Defendant railroads analyzed the possibility of switching to mileage-based surcharges both before and after BNSF implemented mileage-based fuel surcharges.[247] CSXT and UP did not adopt mileage-based fuel surcharges until April 2007, after the Surface Transportation Board ruled in (January 2007) that while railroads could continue to use fuel surcharges in tariffs for regulated traffic, the fuel surcharges

---

241 BNSF-FSC 000280-81; see also Oral and Videotaped Deposition of Samuel Kyei, March 4, 2010 at 257.

242 Seale Deposition at 179; NS_010084979-84 at 80; Videotaped Deposition of Charles Wickliff Moorman, January 7, 2011 at 187-188.

243 NS_010084979-84 at 80.

244 NS_010054381-382.

245 NS_010084979-984.

246 The transaction data fail to reveal that NS's base rate adjustments upon rebasing were uniform. See my workpapers.

247 UPFSC 000640; UPFSC00001629-30; CSXFSC259443-47; NS notes that "if NS were to adopt an NS mileage based FSC that was statistically revenue neutral on a system wide basis ... the NS mileage charge would have to be much higher than the BNSF's, or else we would face a drastic FSC revenue shortfall." NS_010052723-24. See also NS_009000376-78 for a discussion of technical implementation issues.

had to be based on mileage (or another metric related to fuel consumption), rather than a percent of revenue.[248] The public mileage-based surcharges adopted by CSXT and UP in April 2007 applied to both regulated and unregulated traffic, albeit with different triggers and fuel increments. NS, on the other hand, never implemented mileage-based public fuel surcharges and, in fact, discontinued the use of fuel surcharges for regulated traffic altogether after April 2007, although it continued to use revenue-based FSCs for other traffic. These are descriptions of uncoordinated, unilateral behavior inconsistent with participation in the alleged conspiracy.

203. The processes of decision-making employed by Defendants as they went about studying, designing, implementing, and changing their respective fuel surcharge programs is similarly inconsistent with the conduct expected of participants in a conspiracy. Consider, for example, the uncertainty regarding purported fellow conspirators' conduct that is evident in the course-of-business analyses of individual Defendants' respective fuel surcharge programs: Two days before UP announced its HDF-based carload fuel surcharge that Plaintiffs claim was the product of conspiracy, BNSF disclosed that it was revising the trigger price on its own HDF-based surcharge to $1.25 from $1.30. Course-of-business communications indicate that BNSF made this change to match UP's previously announced change to a $23 trigger price for its WTI-based carload surcharge.[249] However, UP never implemented that $23 WTI trigger price, instead adopting its HDF-based carload surcharge with a $1.35 trigger price (which it viewed, as mentioned above, as roughly equivalent to a WTI price of about $25.50).[250] Course-of-business communications from the time also show that UP staff were unaware of BNSF's plan to move its trigger price to $1.25, instead assuming that the BNSF's trigger price would remain at $1.30.[251] Such lack of awareness by UP and BNSF about the other company's plans is inconsistent with Prof. Rausser's assertions of inter-Defendant communication leading to "equivalent" FSC programs. The purpose of conspiratorial communication and coordination is to prevent such errors and uncertainty.

204. Similar examples of uncertainty, misinformation, and the studying of one's options in response to the actions of competitors that is expected of businesses unilaterally pursuing their non-conspiratorial interests are readily found in the course-of-business analyses and communications of Defendants. For example:

---

248 Surface Transportation Board, STB EP 661, January 25, 2007.

249 Lanigan Deposition, Exhibit 13, BNSF 0327011-12.

250 UPFSC0001012-020.

251 UPFSC 0000972; UPFSC 0000633; UPFSC 0000430; UPFSC 0001014.

- In the heart of the period of purported conspiratorial communication in the spring of 2003, CSXT seeks information that Prof. Rausser's theories would predict it should already have from its fellow conspirators: "Does anyone know why UP went from adopting our fuel surcharge format to BN's?... I'm not too optimistic about Class I's ending up with similar programs, which will just make administration for our customers that much more difficult."[252]

- In June 2004, UP managers learn of BNSF's new coal FSC, not from communication with BNSF, but from BNSF's public website: "Mike - the BNSF website has a new fuel surcharge for Coal. It looks like the On-Highway Diesel fuel surcharge, but with 4 cent increments vs. 5, starting a little sooner. Can you please advise if this matches any logic we know, like RCAF fuel component or something that would validate this surcharge for coal vs other commodities? Looking for logic that you might observe."[253] As noted, UP did not put in place its own, and different, coal-specific FSC until November 2004.

- Again in the heart of the period of purported conspiratorial communication in the spring of 2003, NS studies changes other railroads have made to their FSC programs: "Until the recently announced CSXT Fuel Surcharge (FSC) policy change, all Class One U.S. carriers, except the BNSF, observed the same Fuel Surcharge (FSC) standard. The just announced CSXT policy change undercuts some of the ease-of-doing-business and market competition assumptions supporting the current standard. On the other hand, the CSXT formula would have produced additional $7,083,472 in NS revenue in 2002 and YTD 2003 had it been in effect."[254] NS did not change its FSC formula to the "CSXT standard" or any other carrier's public formula, keeping its FSC program from 2000 in place until 2004.

- On July 1, 2003, BNSF analyzes UP's carload FSC program and whether it is competitively neutral. In doing so, BNSF assesses UP's carload formula in comparison to its own across alternative oil prices (thus, having the analytic character of Figure IV-13B above): "General Carload Program: a) The 1% threshold before charging for fuel will be eliminated starting June 2003. BNSF eliminated the 1% threshold but UP responded with a higher threshold of 1.5%. This means that UP will be very competitive at lower Highway Diesel Fuel (HDF) prices. Effectively, they will not surcharge for fuel below 1.5%. BNSF needs to have a position on this UP action. I suggest that the senior Marketing

---

252 CSXFSC408.

253 UPFSC0001197-1199.

254 NS_057005803.

leadership team should review this soon and broadly communicate our position."[255]

- In May 2003, UP analyzes its attempt to implement a carload FSC formula with a trigger price of $23 per barrel of WTI, citing "customer feedback" as the basis for withdrawing the $23 trigger price and going, instead, with an HDF trigger price of $1.35 per gallon: "In response to customer feedback, we are now making additional revisions to the surcharge program. We are no longer going to base our surcharge off the WTI oil price, using instead the Department of Energy (DOE) On-Highway Diesel Fuel price. With this change, we will also be adopting an initial threshold of $1.35 per gallon. At that level, the surcharge will be 1.5%, with the surcharge increasing by 0.5% for every five cent increase in the fuel price.... The previously announced revision utilizing a $23 WTI price as the initial threshold will not take effect."[256] As we have seen, by responding to customer feedback, UP moved its fuel surcharge program *away* from equivalence with CSXT or NS, and differentiated its carload surcharge from BNSF by adopting a different trigger price. Such conduct is inconsistent with inference of the alleged conspiracy, but is conduct consistent with non-conspiratorial pursuit of unilateral business interests.

205. Examples of conduct of the foregoing type are inconsistent with conduct predicted of participants in the conspiracy alleged by Plaintiffs and their expert. The purpose of conspiracy and conspiratorial communication is to reduce and eliminate uncertainty regarding competitors' competitively relevant actions and motives and the need to study one's responses to competitors' marketplace conduct (i.e., replacing study with pre-agreed conspiratorial actions and responses). The feasibility of a conspiracy is eviscerated when the kind of conduct observed above is not eliminated because uncertainty as to rivals' motives and actions, the need to study unilaterally one's responses and actions, and the like introduce mistrust among would-be conspirators. As I discuss at greater length in Section V below, mistrust encourages unilateral "cheating" on a conspiracy, and spirals of "cheating" destroy conspiracies.

### H. The Alleged Scheme to Adopt the AIILF

206. Prof. Rausser asserts that the basis for inferring the conspiracy he alleges is found in the development and publication of the All Inclusive Index Less Fuel (AIILF) by the Association of American Railroads. According to Prof. Rausser:

> "The four Defendants collectively removed the fuel component from the AII [All Inclusive Index] and RCAF [Rail Cost Adjustment Factor] indices,

---

255 BNSF-FSC 000485-87 (emphasis omitted).

256 UPFSC0001012-1020.

creating the All Inclusive Index Less Fuel ("AIILF") in December 2003. This new index enabled Defendants to apply more broadly their new Fuel Surcharge program to contracts that had previously being (*sic*) linked to the RCAF index, while the AIILF would escalate freight rates for non-fuel cost components";[257]

and

"By removing the fuel component from the AII and RCAF, the new AIILF index facilitated Defendants' ability to apply their new Fuel Surcharge program to contracts (and other shipments) that had previously been linked to the RCAF index. Now the Defendants could apply the AIILF to escalate freight rates for non-fuel cost components, while freely imposing the new (higher) Fuel Surcharges without subjecting themselves to customer complaints that the applicable price escalation formula was already designed to address rising fuel costs."[258]

207. Thus, according to Prof. Rausser, the development and creation of the AIILF by the AAR in December 2003 was a pre-textual effort to avoid appearing to engage in what he calls "double dipping" of recovering fuel costs through the AII or RCAF and to also be implementing fuel surcharges.[259] In support, Prof. Rausser insinuates that the creation of the AIILF and separate use of FSCs served no legitimate business purpose.[260] Similarly, Plaintiffs assert that "[t]here was no legitimate business justification ... for the collective action of BNSF, UP, CSXT and NS to cause the AAR to adopt and publish the AIILF."[261]

208. The railroads contemporaneously analzyed available indexes at the time and found that they had lags and biases built into them that inhibited their abilities to accurately reflect volatile fuel and non-fuel costs.[262] Prof. Rausser does not deny the validity of such attributes to the extant indexes, but argues, instead, that "the railroads could have worked with the STB to calculate the RCAF on a more frequent basis, or... any railroad could have calculated its own RCAF-like index and updated that as frequently as it wished."[263] But by the same token, the railroads could have done what they did: Develop an All Inclusive Index Less Fuel coupled with use of fuel surcharges when

257 Rausser Merits Report at 52.

258 Rausser Merits Report at 62.

259 Rausser Merits Report at 62.

260 Rausser Merits Report at 62.

261 Complaint at ¶74.

262 Course-of-business analysis by BNSF, for example, found that for straightforward mathematical reasons, "on contracts written with RCAF escalators, BNSF does not recover the costs of fuel in volatile times." BNSF-FSC 000363.

263 Rausser Merits Report at 62, footnote 139 (internal quotation omitted).

market conditions and customer negotiations permitted. There is no basis for inferring the alleged conspiracy from such an approach. It is an eminently rational approach to the contractual challenge of dealing with risks associated with cost changes when a particular component of costs – fuel – is particularly important and volatile. Indeed, the limitations of single index mechanisms under such cost conditions undergirds, for example, the US federal government's creation and use of separate consumer price indexes that exclude fuel and food.[264]

209. In short, where we see the use of fuel surcharges, and fuel is an important and volatile component of railroad costs, it would be no contradiction of normal, non-conspiratorial business conduct to see an index which excludes fuel also being used – since fuel price risk is accounted for through the fuel surcharges. Prof. Rausser's assertion to the effect that he has discerned that the railroads' reasons for seeking the development of AIILF were "pretextual"[265] cover-ups of their true motives, and his associated citation to statements by various employees of Defendants to the effect that they saw the development of the AIILF as a beneficial development,[266] provide no basis for rejecting the hypothesis that the railroads would rationally be pleased at having new and additional tools for dealing with both non-fuel and fuel cost risks and inferring, instead, the existence of the alleged conspiracy.

210. The available data and information on the actual use of RCAF (and AIILF) do not bear out that AIILF was "needed" by the alleged conspirators so that they could replace RCAF with combinations of AIILF and FSCs and, thereby, achieve their purported objective of universal application of conspiratorial fuel surcharges. In particular, the use of RCAF and AIILF among the Defendants varied, but overall was quite limited. The use of RCAF was not blocking the use of FSCs such that AIILF had to be applied with "equal force" so as to allow the "across-the-board"[267] implementation of conspiratorial fuel surcharges. This is seen in Figure IV-16.

---

264 See, e.g., International Monetary Fund, "Inflation: Prices on the Rise," at http://www.imf.org/external/pubs/ft/fandd/basics/inflat.htm, accessed January 8, 2013.

265 Rausser Merits Report at 62, footnote 139.

266 Rausser Merits Report at 62.

267 Rausser Merits Report at 66.

Figure IV-16

**Percent of UP Customer Price Authorities Using AIILF and RCAF-U: Unregulated Traffic, 2003-2008**

| Adjustment Mechanism | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| AIILF | N/A | 0.2% | 1.6% | 2.4% | 2.8% | 3.3% |
| RCAF-U | 3.8% | 4.2% | 2.2% | 1.4% | 0.9% | 0.5% |

**Source:** Defendants' Transaction Data and UP Genesis Data

211. The most detailed data on the use of RCAF and AIILF are those available from UP, and the data indicate that UP did not use RCAF-Adjusted in its contracting.[268] UP's use of RCAF-U, however, is shown in the figure, along with the extent of its use of AIILF, between 2003 and 2008. For each year, Figure IV-16 indicates the percentages of price authorities[269] accounted for by each mechanism. The data show, for example, that UP used RCAF-U very little at the beginning of the Class Period, and that its use of RCAF-U was overall quite low and declined during the Class Period. Similarly, the figure shows that the highest level reached for the use of AIILF by UP during the Class Period amounted to application to only 3.3% of the company's unregulated price authorities (in 2008).

212. Evidence from other railroads shows similar patterns. RCAF was not widely used by NS before or during the Class Period, and its use was declining even before the start of the Class Period.[270] Only 66 of the many thousands of BNSF contracts over the Class Period included both AIILF and a fuel surcharge of some type: 43 contracts included a revenue-based surcharge and 23 included a mileage-based surcharge.[271] NS used the AIILF only in a small number of auto contracts through 2006.[272]

213. Thus, Prof. Rausser's "cover-up" interpretation of the development of AIILF and the use of AIILF so that the use of RCAF could be replaced by the use of AIILF plus FSCs is not supported by the data. While inconsistent with the purported existence of

268 UPFSC 0469410.

269 In instances where multiple customers take service pursuant to the same price authority, I treat each customer as a separate price authority.

270 NS 026001162; NS 010073091-93; Videotaped Deposition of Patrick Glennon, July 20, 2010 at 119-120; Videotaped Deposition of Kathleen Smith, June 22, 2011 ("Smith Deposition") at 64-66, 109-111; Oral and Videotaped Deposition of BNSF Railway Company 30(b)(6) Representative Paul Anderson, May 26, 2011 at 107-108; Videotaped Deposition of Chuck Adams, March 4, 2010 at 183.

271 BNSF-00682127 and Defendants' Transaction Data.

272 Smith Deposition at 118-119 and 155.

conspiratorial, blanket policies applying AIILF and revenue-based fuel surcharges with "equal force" "across-the-board", the data on the actual use of RCAF in the pre-Class and Class Periods and the use of AIILF in the Class Period are consistent with economic expectations of outcomes in a non-conspiracy setting. Specifically, the data are consistent with Defendants' negotiating unilaterally with their customers and, in meeting those customers' particular rail transportation needs, sometimes using RCAF with a fuel surcharge, sometimes using AIILF, and sometimes using AIILF together with a fuel surcharge.

### I. Prof. Rausser's Inference of Conspiracy from Forensic Evidence

214. As noted, Prof. Rausser affirmatively opines that he has discerned that an unlawful conspiracy "actually occurred".[273] He bases this assertion on inter-Defendant "communications that took place and an understanding that emerged among the four defendants."[274] He further asserts that he has been able to distinguish Defendants' conduct as conspiratorial and not the non-conspiratorial conduct of "interdependent"[275] firms interacting and responding to each other unilaterally because he believes the "communications" that occurred resulted in Defendants "implementing, in effect, the same programs, *de novo*"[276] on July 1, 2003 that could not plausibly have been the results of non-conspiring firms.[277]

215. We have seen above that Prof. Rausser's proposition that Defendants implemented "in effect the same programs" on July 1, 2003 is rejected by the data. Here, let us consider his "qualitative"[278] methodology and conclusions regarding the "communications" that he proffers as key elements of the "body of evidence" supporting his claim of conspiracy.[279] His analysis in this regard is *forensic*, rather than an application of the methods of economics. That is, his analysis entails inference and conclusions regarding the content, meaning, and motives embedded in unobserved meetings and communications based on circumstantial observation of meetings and communications that are observed.

216. Plaintiffs highlight what they portray as a "series of extraordinary meetings about the coordination of [railroad] fuel surcharge programs."[280] Focusing on a selected subset of

---

273 Rausser Merits Deposition at 12, 16.

274 Rausser Merits Deposition at 14.

275 Rausser Merits Deposition at 152-153.

276 Rausser Merits Deposition at 187 (emphasis added).

277 Rausser Merits Deposition at 152-153.

278 Rausser Merits Deposition at 200.

279 Rausser Merits Deposition at 179-180.

280 Narrative at ¶¶16-17.

these meetings, mostly in 2003, Plaintiffs circumstantially link these meetings to changes in fuel surcharges that they assert were conspiratorial.[281] Prof. Rausser similarly observes the fact of various meetings and communications, links those meetings and communications circumstantially to what he represents (albeit, contrary to the data) as "de novo" implementation of "in effect" the same fuel surcharge programs on July 1, 2003, and concludes that the content of the noted meetings and communications must have been conspiratorial.[282]

217. This is not valid *economic* methodology. Particularly when (1) the observable conduct – e.g., the type and subject matters of meetings and communications cited as "conspiratorial" by Plaintiffs and Prof. Rausser – is conduct observed to be engaged in by Defendants in admittedly non-conspiracy settings, and (2) economic forces would push, as they do here, Defendants (and others) toward parallel use of fuel surcharges, economic analysis provides no basis for inferring that the subject meetings and communications must have been conspiratorial.

218. The meetings and communications at issue focus on two primary issues: interlining and the development of the All Inclusive Index Less Fuel (AIILF). We have already seen that Prof. Rausser's assertions regarding the development of AIILF as "pre-textual" conspiratorial effort are not supported by the data. Then, too, meetings and communications involving Defendants and other railroads (e.g., via the industry trade Association, the AAR[283]) around the development of common, publicly-published indexes that might be useable and unde[illegible] by railroads and their customers is a common function of trade associations.[illegible] Defendants' and others' deciding to participate in such associations and efforts is consistent with unilateral, non-conspiratorial conduct.

219. With regard to inter-Defendant and other participation in meetings and discussions regarding interlining, Plaintiffs characterize such meetings leading up to mid-2003 as "extraordinary"[285] and Prof. Rausser concludes they were mechanisms of conspiracy.[286] Prof. Rausser acknowledges that inter-railroad meetings and communications are

---

281 Narrative at ¶¶ 25, 30, and 32.

282 See, especially, Rausser Merits Report at 58-62.

283 Rausser Merits Report at 61-62.

284 Examples include the AAR's prior development of the *AII* (All Inclusive Index), the American Trucking Association's For Hire Truck Tonnage Index (http://www.truckline.com/pages/article.aspx?id=1067%2F8e1c7279-ed27-4c03-b189-ceee, accessed January 10, 2013); and the National Association of Realtors indexes, such as the Housing Affordability Index (http://www.realtor.org/topics/housing-affordability-index, accessed January 10, 2013).

285 Narrative at ¶¶16-17.

286 Rausser Merits Report at 58-61.

"permissible".[287] After all, interlining between railroads, in particular, cannot realistically be coordinated efficiently without inter-railroad communication, and that coordination quite reasonably and routinely entails joint partners joining together to compete for interline business under rates that include base components and fuel surcharges.[288]

220. Indeed, the railroad industry and Defendants, specifically, are a prime example of a setting in which we would expect to see extensive, non-conspiratorial communications among firms. Railroading is a preeminent example of a *network* industry in which efficient operation of the overall network requires coordination of numerous aspects of multiple railroads' operations, contracting, and even negotiations. Not surprisingly, given the distinct east-west, end-to-end character and absence of overlap of Defendants' systems, interlining is a ubiquitous phenomenon that required inter-railroad communication long before the purported onset of conspiracy.

221. Notwithstanding the foregoing, Plaintiffs portray industry meetings as "extraordinary" because, for example, "fuel surcharges" appear as a topic on meeting agendas and in meeting notes.[289] Similarly, Prof. Rausser sees conspiracy in inter-Defendant communication concerning interlining that occurred beginning in mid-March 2003.[290] He draws his conclusion of conspiracy because he believes that discussion went "beyond" interlining to discuss topics such as "maintaining and expanding the coverage of the fuel surcharge".[291] Yet, interline partner communications of policies such as the use of fuel surcharges are demonstrably products of non-conspiratorial conduct.[292] Hence, they cannot properly be inferred using sound economic methodology to have somehow become conspiratorial in the spring of 2003. Indeed, with the use of fuel surcharges acknowledged to be non-conspiratorial on the rise in the prior period, we should not find it "extraordinary" that interline-related meetings and communications show concomitant increases in the frequency with which FSCs are topics of discussion in the Class Period.

222. How Prof. Rausser concludes from a reference in a discovery document to "base rates" or "fuel surcharge" that any discussion that occurred regarding such topics constituted conspiratorial coordination, rather than the "permissible" discussions that occur when railroads need to combine and price their joint interline product,[293] is not based upon

---

287 Rausser Merits Deposition at 197.

288 See, for example, UPFSC0000438-439.

289 Narrative at ¶¶16-17.

290 Rausser Merits Deposition at 22-23; Rausser Merits Report at 59.

291 Rausser Merits Deposition at 199, 201.

292 See, for example, BNSF-000133032; UPFSC0000438-439 at 438.

293 See, for example, NS_001000422-25; NS_001000360-62; and UPFSC 0616651-62.

information directly available from such references. Instead, Prof. Rausser indicates it is based on his circumstantial *inference* based upon pairing "all the documents" with, ultimately, his aforementioned conclusion that "all four parties" could not possibly have reached the same fuel surcharge program *de novo* at July 1, 2003 without conspiring.[294] But this is assuming what one is trying to prove: Because he has concluded that "equivalent" (*sic*; see above) *de novo* fuel surcharge programs on July 1, 2003 could only be the product of conspiracy, it must be the case that inter-Defendant communications regarding interlining entailed conspiratorial communication and, ultimately, agreement.

223. Consider, for example, Prof. Rausser's insinuation or presumption that multiple pairwise interlining communications between interline partners in 2003 created a "network" over which the four Defendants communicated conspiratorially.[295] From the perspective of proper methodologies in the field of economics, such reasoning is unsupportable. Because each Defendant interlines routinely with each of the other Defendants (as well as non-Defendant railroads), overlapping relationships of the form cited by Prof. Rausser (i.e., NS communicates and coordinates on interlining with UP; UP communicates and coordinates on interlining with CSXT; and so on)[296] have been ubiquitously present in the US rail sector since long before the purported conspiracy period asserted in this case. As such, they only provide bases for inferring that they entailed conspiratorial communication under Plaintiffs' already-reached conclusion that "equivalent" (*sic*) fuel surcharge programs implemented on July 1, 2003 mean that the interlining "network" of communications was employed conspiratorially.

224. In fact, Prof. Rausser commits a basic error of both economic method and logic when, for example, he causally connects events to a meeting a week earlier with no other evidence. We see this for instance, in the following:

> "On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about 'the fuel surcharge issue we discussed in Norfolk.' Following that trade association meeting, a new internal directive was issued at BNSF that 'effective immediately and urgently per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be granted to VP's only (who will also clear with John).'"[297]

This is the *post hoc ergo propter hoc* fallacy (i.e., "after this, therefore because of this").

---

294 Rausser Merits Deposition at 152-153.

295 Rausser Merits Deposition at 152.

296 Rausser Merits Deposition at 152-153.

297 Rausser Merits Report at 60 (internal quotation omitted).

225. Consider, further, Prof. Rausser's insinuation of non-observed causal linkages in the following series of events which he has linked together:

> "On April 1, 2003, BNSF and CSX senior executives also met to discuss fuel surcharges. In early May, BNSF changed its fuel surcharge program to make it more aggressive by decreasing the formula's trigger price, which was based on the per-gallon price of diesel fuel reflected in the HDF index, to $1.25, a number that 'reflected the $23 WTI crude price used by UP.' UP then announced it would adopt the same type of HDF formula used by BNSF. NS announced that it was adopting the CSX fuel surcharge program in January 2004, after preparing to do so since early 2003."[298]

226. The chain of suggestion and innuendo here is outside the scope of proper economic analysis. That is, the tools of economics provide no means for inferring: (1) that *because* two frequent interline partners, BNSF and CSXT, met on April 1, BNSF changed its FSC program in early May; or (2) that because BNSF and CSXT met in early May, BNSF changed to an HDF FSC trigger price to coincide with (what turned out *not* to be [299]) *UP's* trigger price; or (3) that inter-Defendant "network" communication that had caused BNSF's change then caused UP to adopt "the same type of HDF formula" as BNSF (albeit, UP's formula for some reason not explained by conspiracy was not "equivalent" to BNSF, having a trigger 8% higher than BNSF's – Figure IV-13A); or (4) that the preceding chain of purported causation then caused NS to change its carload fuel surcharge program because, while NS had not been spurred to action over the previous six months, it had been "preparing to do so" and the causal force of the preceding chain of purportedly conspiratorial events finally tipped NS into conspiratorial coordination. As we have seen, each one of these links in Prof. Rausser's proffered chain of conspiratorial causation is consistent with the individual parties' unilateral pursuit of their own business interests. Indeed, the noted *disharmony* in the links of the chain makes the conspiratorial explanation of the chain a rejected hypothesis.

227. Like the fact of interline communications and meetings and their dealing with fuel surcharges, the Alliance meetings arose pre-"conspiracy", in response to non-conspiratorial, but shared needs for coordination in the railroad industry.[300] In March 2000, the STB put a moratorium on mergers in the railroad industry as it reconsidered policy issues surrounding rail mergers.[301] When the STB issued new regulations

---

298 Rausser Merits Report at 60-61.

299 See discussion above.

300 Koraleski Deposition at 201.

301 Surface Transportation Board, STB Ex Parte No. 582 (Sub-No. 1), Major Rail Consolidation Procedures, June 7, 2001 ("STB Ex Parte 582 Decision") at 545.

regarding rail consolidations, it encouraged railroads to meet with interline or "connecting" carriers to explore ways to achieve additional benefits and efficiencies that come from more streamlined and coordinated service without a full-scale merger, stating:

> "[W]hen evaluating the public interest, the Board will consider whether the benefits claimed by applicants could be realized by means other than the proposed consolidation. The Board believes that other private-sector initiatives, such as joint marketing agreements and interline partnerships, can produce many of the efficiencies of a merger while risking less potential harm to the public."[302]

228. Thus, the STB encouraged railroads to have the bilateral "Alliance" meetings that Plaintiffs suggest are evidence of conspiracy.[303] Most importantly, the STB's reason for encouraging Alliance meetings illustrates the existence of unilateral interests on the part of Defendants in such meetings – i.e., the promotion of inter-railroad service efficiency through non-merger cooperation and coordination. Alliance meetings were opportunities for interline partners to meet and discuss issues such as attracting new customers and thereby growing business by improving service offerings, attracting specific customers, enhancing efficiency, improving network flow, and simplifying the [illegible]s of d[illegible] with interline traffic.[304] One of those issues is the need to [illegible]e interl[illegible]rtners' fuel surcharges, particularly in light of [illegible]mer desires [illegible]plicity and administerability of FSCs and for through rates [illegible] which FSCs would be one component jointly set by the interlining carriers.[305] [illegible]per economic methodology does not infer conspiracy from Defendants' and other railroads' participation in Alliance and related types of meetings (such as AAR meetings) when [illegible] participation is demonstrably consistent with unilateral conduct.

[illegible] does Prof. Rausser put forward causal conclusions that are outside the scope [illegible]mic methods, he also explicitly performs the forensic task of assessing the [illegible] of various parties' statements. Prof. Rausser states that he relied on CSXT's [illegible]os' statement in his deposition that he (Giftos) did not discuss fuel surcharges with other railroads prior to the period of purported onset of conspiratorial [illegible]ation in 2003.[306] Prof. Rausser relied on Mr. Giftos' testimony to show "with regard to the pre-class period that there was no coordination among the

---

302 STB Ex Parte 582 Decision, June 11, 2001, at 609.

303 STB Ex Parte 582 Decision, June 11, 2001 at 609; see also, Videotaped Deposition of Michael Giftos, February 25, 2010 ("Giftos Deposition") at 239.

304 See Giftos Deposition at 239-240.

305 See, e.g., UPFSC 61536-38; CSXFSC408; Seale Deposition at 35.

306 Rausser Merits Deposition at 137-138.

defendants with regard to their fuel surcharge[s]".[307] However, Prof. Rausser states that he placed no weight on Mr. Giftos' similar testimony that he did not discuss fuel surcharge programs with other railroads during the period of purported conspiratorial communication.[308] Prof. Rausser opines that he bases this judgment on his conclusion that "there would be an issue about [Mr. Giftos'] credibility given all the communications and correspondence that went on among the defendants." [309] Methodologically, this is outside the scope of proper economic analysis and training.

230. Prof. Rausser stresses that he can infer conspiracy from the documents he cites indicating to him that the onset of conspiracy was accompanied by the shift to strict, draconian policies of implementation.[310] According to Prof. Rausser, these included the noted policies of universal application, with "'No exceptions!'",[311] requirements that senior management review and sign off on any exceptions requested,[312] and "policies against discounting base rates".[313]

231. Conspiracy, however, was not needed to enable or encourage railroads such as Defendants to adopt policies and practices that Prof. Rausser asserts show conspiracy. Acting unilaterally in the pre-"conspiracy" setting, such policies had already been adopted by a number of Defendants. Thus, for example:

- BNSF course-of-business communications and analyses indicate efforts to expand the coverage of its revenue-based surcharges across its traffic as early as 2000.[314]
- BNSF analysis from February 2003 indicates the existence of policies to "[s]ignificantly improve participation rates" by applying fuel surcharges "to all shipments automatically" with certain specified exceptions, and stating that "[a]ny other exception should be approved by the Chief Marketing Officer (CMO), Burlington Northern Santa Fe Railway."[315]
- In implementing its publicly-posted carload, UP's October 31, 2002 press release announced that "[t]he new surcharge will apply to most Union Pacific

307 Rausser Merits Deposition at 138.
308 Rausser Merits Deposition at 140.
309 Rausser Merits Deposition at 139.
310 Rausser Merits Report at 71.
311 Rausser Merits Report at 66.
312 Rausser Merits Report at 62-66.
313 Rausser Merits Report at 7.
314 BNSF-0814211-19.
315 BNSF-FSC 000002-26 at 24-25.

pricing documents for local and interline freight movements, with the exception of those which have a fuel surcharge provision or specify otherwise."[316]

- In September 2000, after experiencing a 80% increase in fuel costs in one year, CSXT management informed CSXT's Commercial Team that the railroad was "implementing a fuel cost recovery charge on all local and interline freight moving on our system."[317] The notice prepared for customers informed them that the charge "will be applied to all traffic moving under tariffs, private price quotes and certain contracts that incorporate those general tariffs, except for contracts that contain a price escalator index published by a government entity, such as RCAF."[318] In October 2002, internal assessment by CSXT found that "[a]t this time, there are no known fuel surcharge exceptions to shipments moving under CSXT public price authorities."[319]

- Course-of-business analyses show NS management focusing on the issues of universal application and negotiability of FSCs. For example, a May 31, 2000 list of questions and answers distributed to marketing and sales personnel stated: "We need to reach a point where all active rates, public and private, contain this provision so the full impact of fuel on our expenses is recovered. This, in essence, is a national emergency provison and should seldom be treated as a negotiated clause."[320]

232. Prof. Rausser's selective reliance on parties' statements also entails factual error. For example, Prof. Rausser cites as support for his inference of the alleged conspiracy a claim by a representative of the Association of Automobile Manufacturers (AAM) in 2006 that "[s]urcharges have become 'non-negotiable,' enacted by unilateral decree."[321] Actual data and evidence on the fuel surcharge rates AAM members paid, however, show FSC rates that varied substantially across and within railroads. This indicates that negotiation of fuel surcharges other than "standard" and "uniform" fuel surcharge formulas was common. Thus, the AAM representative may well have believed his statement regarding non-negotiable fuel surcharges, but the statement does not stand up to economic analysis of the relevant data.

233. Course-of-business records that Prof. Rausser does not cite show that AAM member Honda Motor Company, for example, engaged in conduct that can only be described as

---

316 UPFSC0000541-43 at 42.

317 CSXFSC000000058-66.

318 CSXFSC000000058-66 at 60.

319 CSXFSC0000385664-66.

320 NS_018000170-171 at 171; see also NS_010013327; NS_010002508-509; NS_010014264-266.

321 Rausser Merits Report at 71-72.

negotiation.[322] In fact, contrary to Prof. Rausser's assertions, the fuel surcharge that Honda paid to BNSF was not only negotiable, but developed by Honda. Course-of-business analysis of BNSF noted in May 2004 that Honda's "[f]uel surcharge is voluntary, currently 2%."[323] Moreover, March 2007 course-of-business communication from Honda to BNSF indicates that Honda was unilaterally readjusting the mechanics the fuel surcharge, it paid to BNSF, with BNSF noting that "Honda has been paying what they term as a 'voluntary fuel surcharge' and had been doing so without revealing the 'math' behind the program. Honda just recently 'codified' the program which resulted in Honda reducing their fuel payment to us by 5 percentage points (from 10% in Q4, 2006 to 5% in Q1, 2007) for the first quarter of 2007. Given this change, the contractual escalator that (sic) does not allow BNSF to capture the full extent of inflation.... The objective of having this conversation was tohave Honda understand what BNSF is up against with the hopes that we can change the existing economics to a more favorable position for BNSF...."[324]

234. Figures IV-17A through 17D show the revenue-based fuel surcharges paid by the members of the Association of Automotive Manufacturers under their respective fuel surcharge programs to each of the Defendants.[325] The figures show that the Automobile Manufacturers did not pay the same revenue-based fuel surcharge rates at the same time. This indicates that each Defendant reached a different deal with each auto manufacturer. The figure shows that no railroad charged a uniform rate to the automotive manufacturers and the AAM members paid different rates to different railroads. The lack of uniformity of rates across railroads and manufacturers is not consistent with the assertion that Defendants were charging the automotive manufacturers a conspiratorial surcharge rate without the benefit of negotiation.

322 BNSF-0337916-928.

323 BNSF-0325449-473 at 471.

324 BNSF-0337916-928.

325 Figures IV-17A through C show median surcharge rates for BNSF, CSXT, and NS, respectively. Figure IV-17D shows the surcharge rate reported in UP's transaction data.

Figure IV-17A

**Revenue-Based Fuel Surcharges Paid by Members of the Alliance of Automobile Manufacturers for Class Movements of Transportation Equipment: BNSF, July 2003-2008**




**Source:** Defendants' Transaction Data
**Note:** Monthly median surcharges for local Class shipments of Transportation Equipment commodities (STCCs beginning with "37").

Figure IV-17B

**Median Surcharges Paid by Members of the Alliance of Automobile Manufacturers for Class Movements of Transportation Equipment: CSXT, July 2003 - 2008**




**Source:** Defendants' Transaction Data
**Note:** Monthly median surcharges for local Class shipments of Transportation Equipment commodities (STCCs beginning with "37").

Figure IV-17C

**Median Surcharges Paid by Members of the Alliance of Automobile Manufacturers for Class Movements of Transportation Equipment: NS, July 2003 - 2008**




**Source:** Defendants' Transaction Data
**Note:** Monthly median surcharges for local Class shipments of Transportation Equipment commodities (STCCs beginning with "37").

Figure IV-17D

**Median Surcharges Paid by Members of the Alliance of Automobile Manufacturers for Class Movements of Transportation Equipment: UP, July 2003 - 2008**




**Source:** Defendants' Transaction Data
**Note:** Monthly median surcharges for local Class shipments of Transportation Equipment commodities (STCCs beginning with "37").

### J. Testing the Characteristics of the Alleged Conspiracy: Universally Applied?

235. The alleged conspiracy is purportedly marked by a number of key characteristics which Plaintiffs and Prof. Rausser claim allow them to distinguish Defendants' Class Period revenue-based fuel surcharges from the pre-Class Period surcharges and that mark the Class Period FSCs as conspiratorial. Specifically, the Class Period fuel surcharges of Defendants purportedly were "applied universally"[326] with "no exceptions",[327] were

326 Rausser Merits Report at 148-149; see also at 9, 64, 67-68, 72, 112, 114, 127, 145, 148-149.

327 Rausser Merits Report at 64-66, 71, 150; or "with any exceptions being insignificant" (Rausser Merits Report at 128).

"uniform"[328] and "non-negotiable,[329] and were more "onerous"[330] than the surcharges that were implemented unilaterally in the period preceding the alleged onset of conspiracy in July 2003. Below, I test the data for these asserted "markers" of the alleged conspiracy. In each case, I find that the data reject the hypothesized characteristic.

236. Under Prof. Rausser's theory of conspiracy, "Defendants each adopted internal policies directing that Fuel Surcharges would be imposed whenever opportunities arose, including when legacy contracts expired and those contracts were renewed or replaced."[331] Thus, according to Prof. Rausser, the conspiratorial fuel surcharge program was "applied universally". Moreover, he concludes that "it is clear that the Defendants did actually implement their agreed upon Fuel Surcharge strategy across the board…."[332]

237. Whether Defendants actually applied fuel surcharges universally "whenever opportunities arose" is a testable proposition. Using the Defendant transactions database, Figures IV-18A through 18D apply the results we saw in Figures IV-10A through 10D to Prof. Rausser's claim. As noted above, under Prof. Rausser's theory of conspiracy, Class Members share the common fact of having paid a putatively conspiratorial fuel surcharge, and no Class Member is more or less susceptible than another to having to pay an FSC once the opportunity arises. Accordingly, under Prof. Rausser's theory of the conspiracy he alleges, there is no phasing in of the conspiracy and the number of new opportunities not paying revenue-based fuel surcharges in Figures IV-18A through 18D should fall to zero in July 2003. Similarly, each subsequent month's new opportunities should be captured by the conspirators, leaving them all paying conspiratorial surcharges and with "any exceptions being insignificant."[333] In terms of Figures IV-18A through 18D, there should be no cross-hatched area of missed opportunities from July 2003 onward.

---

328 Rausser Merits Report at 150; see also at 17, 49, 58, 61, 128.

329 Rausser Merits Report at 71-72; see also at 7, 70-72, 92.

330 Rausser Merits Report at 59.

331 Rausser Merits Report at 62.

332 Rausser Merits Report at 113; see also at 49, 59, 66, 72, 92, 127-28, 150.

333 Rausser Merits Report at 128.

Figure IV-18A

**BNSF: Percent of New Customer Price Authorities that Ever Included Revenue-Based Fuel Surcharges: 2002-2008**




**Source:** Defendants' Transaction Data

**Note:** Each month includes the count of new customer price authorities that ever paid or were ever covered by an FSC. New customer price authorities are defined as the first time they show up in the data.

Figure IV-18B

**CSXT/CSXI: Percent of New Customer Price Authorities that Ever Included Revenue-Based Fuel Surcharges: 2002-2008**




**Source:** Defendants' Transaction Data
**Note:** Each month includes the count of new customer price authorities that ever paid or were ever covered by an FSC. New customer price authorities are defined as the first time they show up in the data.

Figure IV-18C

**NS: Percent of New Customer Price Authorities that Ever Included Revenue-Based Fuel Surcharges: 2002-2008**




**Source:** Defendants' Transaction Data
**Note:** Each month includes the count of new customer price authorities that ever paid or were ever covered by an FSC. New customer price authorities are defined as the first time they show up in the data.

Figure IV-18D

**UP: Percent of New Customer Price Authorities that Ever Included Revenue-Based Fuel Surcharges: 2002-2008**




**Source:** Defendants' Transaction Data
**Note:** Each month includes the count of new customer price authorities that ever paid or were ever covered by an FSC. New customer price authorities are defined as the first time they show up in the data.

238. Clearly, these predictions of the hypothesized conspiracy are not borne out by the data. Following the implementation of the asserted conspiracy, there remain large numbers of *missed opportunities* (i.e., instances in which Defendants had an opportunity to apply a revenue-based fuel surcharge but did not do so). These missed opportunities are shown by the crosshatched areas at the tops of each graph in Figure IV-18. The graphs also include a line at the level of incidence or coverage in June 2003, just prior to the implementation of the asserted conspiracy. The solid area above the line shows the increased incidence and coverage of revenue-based fuel surcharges relative to the level achieved just before implementation of the asserted conspiracy. The figure shows that for each Defendant, the cross-hatched area – the missed opportunities – in the 18

months following the implementation of the asserted conspiracy far outweigh the increased incidence and coverage of Defendants' surcharges.

239. Each of the "missed opportunities" shown in Figures IV-18A through 18D, which total in the thousands, represents a violation of the predicted universal, non-negotiable application of the alleged conspiracy. In fact, as we noted in connection with Figures IV-10A through 10D above, there is not even a discernible acceleration of new opportunities that are brought under FSCs upon the purported implementation of conspiracy in July 2003. Neither the predicted universal application nor even accelerated application of Defendants' revenue-based fuel surcharges upon implementation of the purported conspiracy is evidenced by the data.

240. Prof. Rausser's conclusion that Defendants "did actually" implement their purported conspiratorial fuel surcharges "across the board" after asserted implementation relies upon flawed analysis. He presents four figures that purport to show the percent of the Defendants' revenue covered by fuel surcharges in November 2002 and November 2007, by state (his Figure 3) and by commodity (his Figures 33 through 36). Based on these figures, he concludes: "In sum, my analysis reveals that, irrespective of the commodity shipped or the geographic region of the shipment, shippers were assessed Fuel Surcharges much more often in the Class Period, than in the pre-Class Period."[334]

241. It is important to note that Prof. Rausser opines here only that his figures show Defendants' challenged fuel surcharges were applied "much more often", not that they were applied universally, across-the-board, or with only insignificant exception following implementation of the alleged conspiracy. His own presentation of his data contradicts his and Plaintiffs' assertions that the conspiracy they allege was designed to achieve, and did actually result in, non-negotiable, universal application of Defendants' Class Period revenue-based fuel surcharges.

242. Even Prof. Rausser's softened interpretation of his data, however, is grossly flawed. By choosing November 2002 as his pre-Class Period benchmark for comparison, he has artificially ignored the very rapid growth in the spread of fuel surcharges that occurred between November 2002 and the purported implementation of the conspiracy in July 2003 (see Figures IV-9A through 9D). By making the pre-Class Period benchmark smaller in this way, the change by November 2007 is artificially made to appear correspondingly larger.

---

334 Rausser Merits Report at 135. See also Rausser Merits Report at 20: "The Defendants' transaction data reveal that Defendants applied Fuel Surcharges commonly across states in the U.S. This is evident from Figure 3, which shows the percentage of gross revenue covered by stand-alone fuel surcharges in November 2002 compared to the same number for November 2007, for each of the top 20 origin states for each Defendant." Rausser Merits Report at 130: "For nearly every commodity presented [in Figures 33 through 36], the percentage of gross revenue with a fuel surcharge was very low in November 2002 and, in contrast, was high in November 2007, and often very close to 100%."

243. In addition, Prof. Rausser's data do not test whether and how fast Defendants' fuel surcharges spread across *new opportunities* as they arose. Instead, in both November 2002 and November 2007, Prof. Rausser's data represent a mixture of shipments that are paying and not paying fuel surcharges, but with all so-called "legacy" traffic dropped from the analysis – i.e., traffic that paid a revenue-based fuel surcharge in the pre-Class Period under price authorities which carried that surcharge over into the Class Period. As a result of dropping such traffic, his data tend to understate the actual coverage of FSCs in both November 2002 and November 2007. Figures IV-19A and 19B illustrate the magnitude of the effect for November 2002 and November 2007, respectively, for the case of UP (whose data come with requisite detail that permits isolation of shipments with and without FSCs). The figures show actual levels of FSC coverage (as percents of gross revenue) in blue and Prof. Rausser's truncated measure of coverage in red.

Figure IV-19A

**Errors in Prof. Rausser's Calculation (Figure 3) of Percentage of Revenue with a Fuel Surcharge: UP, November 2002**




**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** States selected based on Rausser Merits Report (Figure 3). Actual percentage includes legacy traffic and other traffic covered by an FSC as of November 2002.

Figure IV-19B

**Errors in Prof. Rausser's Calculation (Figure 3) of Percentage of Revenue with a Fuel Surcharge: UP, November 2007**




**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** States selected based on Rausser Merits Report (Figure 3). Actual percentage includes legacy traffic and other traffic covered by an FSC as of November 2007.

244. For many of his selected states (Figure IV-19A) and commodities, actual levels of FSC coverage in November 2002 are many multiples of the measure employed by Prof. Rausser. Similar gross errors of measurement apply to November 2007. The net effect, however, is that Prof. Rausser's understatement of coverage in November 2002 is larger than in November 2007. Consequently, his figures *overstate* the growth over November 2002-November 2007 in coverage across most states (his Figure 3) and most commodities (his Figures 33-36). This is seen in my Figures IV-19C and 19D. These corrected results, while still biased by the use of the November 2002 benchmark, are directionally consistent with the data on overall coverage seen, for example, in Figures IV-9A through 9D. There we see that the purported implementation of Defendants' fuel surcharges in July 2003 was not met with an acceleration of coverage and

incidence, but at most was met with a continuation of the trends evident in the months leading up to July 2003.

Figure IV-19C

**How Much Does Prof. Rausser (Figure 3) Overstate the Spread of Revenue-Based Fuel Surcharges: UP, November 2002 v. November 2007**




**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** States selected based on Rausser Merits Report (Figure 3). Actual percentage includes legacy traffic and other traffic covered by an FSC as of November 2002 and November 2007.

Figure IV-19D

**Errors in Prof. Rausser's Calculation (Figure 35) of Percentage of Revenue with a Fuel Surcharge: UP, November 2002 v. November 2007**




**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** STCCs selected based on Rausser Merits Report (Figure 35). Actual percentage includes legacy traffic and other traffic covered by an FSC as of November 2002 and November 2007.

## K. Testing the Characteristics of the Alleged Conspiracy: Uniform and Non-Negotiable?

245. Regarding the purported uniformity of Defendants' Class Period revenue-based fuel surcharges, we saw above that, at the moment of purported onset of the alleged conspiracy and claimed "*de novo* joint implementation of the same basic programs" in July 2003,[335] Defendants' fuel surcharge programs were not the same, effectively the same, or at least more the same (more harmonized) than the purportedly "failed" programs that are asserted to have motivated conspiracy. We also saw above that FSC

335 Rausser Merits Deposition at 216 (emphasis added).

rates paid during the Class Period by members of the Association of Automobile Manufacturers (AAM) were markedly *non*-uniform (Figures IV-17A and IV-17D).

246. Beyond these results, Plaintiffs' and Prof. Rausser's theory of the alleged conspiracy should lead us to find that Defendants charged each new customer the same conspiratorial surcharge during the Class Period. Figures IV-20A through 20D show the distributions of each Defendant's revenue-based surcharge rates paid by shippers for carload traffic immediately before the alleged beginning of conspiratorial conduct in March 2003 and the distributions of such rates on *new* customer-price authorities in the same week in March in subsequent years (until BNSF, CSXT, and UP offered mileage-based FSCs and NS rebased its public carload FSCs).

Figure IV-20A

**Distribution of Carloads by Revenue-Based Surcharge Rate for New Customer Price Authorities in Class Period: BNSF, Carload**




**Source:** Defendants' Transaction Data
**Note:** Results for March 12, 2003 are based on all traffic. Results for subsequent weeks are based on all customer price authorities that had no movements prior July 1, 2003. BNSF's public carload formula did not change from June 2003 through December 2005. See Figure IV-1B.

Figure IV-20B

**Distribution of Carloads by Revenue-Based Surcharge Rate for New Customer Price Authorities in Class Period: CSXT, Carload**




**Source:** Defendants' Transaction Data
**Note:** Results for March 12, 2003 are based on all traffic. Results for subsequent weeks are based on all customer price authorities that had no movements prior July 1, 2003. CSXT's public carload formula did not change from June 2003 through April 2007. See Figure IV-1B.

247. Focusing for discussion purposes on Figure IV-20B for CSXT, the left-most bar in each panel shows the share of traffic (measured by carloads) that did not pay a revenue-based fuel surcharge under a new price authority. Each successive category on the horizontal axis captures a range of fuel surcharge rates spanning two percentage points (i.e., 0-2 percent, 2-4 percent, 4-6 percent, etc.). Each panel in Figure IV-20B also shows the publicly-posted carload fuel-surcharge rate that Prof. Rausser's theories predict would have been levied on each new customer-price authority were the application of carload surcharges universal and uniform. The publicly-posted surcharge rate is indicated by the thin vertical line labeled "Prof. Rausser's Prediction". The height of the line indicates that Prof. Rausser's prediction is that 100 percent of traffic should pay the publicly-posted, "standard" surcharge.

248. Figure IV-20B reveals that most new price authorities did not contain the publicly-posted fuel surcharge rate in any sample week shown for CSXT. Moreover, during the

Class Period, a large number of CSXT shippers with new price authorities continued to pay no revenue-based fuel surcharge at all (the left-most bars). Finally, not only are the FSC rates that new opportunities paid not uniform at any point in time; if anything, they spread out and get less uniform during the Class Period relative to the pre-Class Period. In short, the results contradict Prof. Rausser's assertion that Defendants' fuel surcharges were both universal and uniform following the purported implementation of conspiracy. They were neither.

249. Figures IV-20A, 20C, and 20D show the same information for BNSF, NS, and UP, respectively, during the periods that their carload surcharge formulas were revenue-based.[336] In all cases, there is substantial variation in the rates charged and some shippers with new rate authorities always avoid paying the fuel surcharge that Prof. Rausser asserts Defendants would have charged were negotiation not possible. In no case does Prof. Rausser's prediction that Defendants' fuel surcharges were universally and uniformly applied by all Defendants hold. In each case, if anything, FSC rates spread out and get less uniform during the Class Period relative to the pre-Class Period.

336 Figure IV-20A is limited to the period prior to BNSF's implementation of a mileage-based fuel surcharge program for some carload traffic in 2006. Figure IV-20B is limited to the period prior to CSXT's introduction of mileage-based FSCs in 2007. Figure IV-19C is limited to the period prior to NS's rebasing (July 1, 2006). Figure IV-20D is limited to the period prior to UP's implementation of its mileage-based public carload fuel surcharge program.

Figure IV-20C

**Distribution of Carloads by Revenue-Based Surcharge Rate for New Customer Price Authorities in Class Period: NS, Carload**




**Source:** Defendants' Transaction Data
**Note:** Results for March 12, 2003 are based on all traffic. Results for subsequent weeks are based on all customer price authorities that had no movements prior July 1, 2003. NS's public carload formula did not change from March 2004 through June 2006. See Figure IV-1B.

Figure IV-20D

**Distribution of Carloads by Revenue-Based Surcharge Rate for New Customer Price Authorities in Class Period: UP, Carload**




**Source:** Defendants' Transaction Data
**Note:** Results for March 12, 2003 are based on all traffic. Results for subsequent weeks are based on all customer price authorities that had no movements prior July 1, 2003. UP's public carload formula did not change from June 2003 through April 2007. See Figure IV-1B.

250. Finally, UP's transaction data permit identification of the specific surcharge formulas actually applied by UP to individual waybills (shipment). Figure IV-21 shows the rates UP charged under its top ten (out of more than 80) revenue-based carload fuel surcharge programs employed over 2003-2008. Not only does this multiplicity of surcharge formulas belie claims of conspiratorial uniformity, but the resulting FSC rates actually paid did not lead to uniform results.

Figure IV-21

**UP's Top 10 Carload Revenue-Based FSC Programs**
**2003-2008**




**Source:** Defendants' Transaction Data
**Note:** * Denotes unknown fuel type.

251. The purported attribute of uniformity in Defendants' purportedly conspiratorial FSC formulas plays a critical role in Prof. Rausser's framework. "Across-the-board" imposition of supposedly uniform percent-of-revenue surcharges on top of conspiratorially non-discountable base rates undergirds his assertion that the alleged conspiracy "will have increased the prices paid by all shippers by the same percentage amount".[337] This conclusion, in turn, is the central foundation of Prof. Rausser's assertions that the conspiracy he alleges had the same, common impact (i.e., overcharge) across the Class. As I set out in Sections V and VI below, this chain of

337 Rausser Merits Report at 50.

claims is broken at each of its links. Here we have seen that the first link in the chain – "uniformity" of fuel surcharge formulas and rates – is broken.

### L. Testing the Characteristics of the Alleged Conspiracy: More Onerous?

252. Plaintiffs and Prof. Rausser assert that the fuel surcharges Defendants introduced during the Class Period were more onerous and more aggressive than the fuel surcharges introduced prior to the Class Period.[338] This claim can be interpreted two ways. First, the claim could simply mean that shippers' actual revenue-based fuel surcharge payments were higher during the Class Period than they were before. This claim clearly has no economic merit. The formulas underlying Defendants' fuel surcharges would yield increasing surcharges only *if* fuel or oil prices were to rise. Prof. Rausser agrees that rail rates would naturally rise with increasing fuel costs.[339] Therefore, a claim that fuel surcharges were more onerous because fuel prices rose and thereby made surcharges larger is really just a complaint about fuel prices, which Defendants do not control.[340] It is, of course, the results of *fuel prices* and the fuel-surcharge formulas that determine whether surcharges are more onerous.

253. The second interpretation is that the Class Period fuel surcharge formulas led to higher surcharges than would have been the case under the fuel surcharge formulas in place prior to purported implementation of conspiracy. This is the economically relevant question for assessing the onerousness of Defendants' revenue-based fuel surcharges. I address this question here.

254. To compare fuel surcharge formulas introduced under competitive circumstances to surcharge formulas introduced during the Class Period, we can take advantage of the fact that some contracts negotiated prior to the Class Period (so-called "legacy" contracts) contained revenue-based fuel surcharges and remained in effect during the Class Period. Legacy contracts were negotiated under non-conspiracy conditions and they preserve the benefits of competition for shippers.[341]

255. Prof. Rausser has identified a group of legacy contracts. I use the fuel surcharges included in these contracts, as they were applied by Defendants and paid by shippers during the Class Period, as the competitive benchmark for the analysis of the onerousness of purportedly conspiratorial surcharges applied during the Class Period. By comparing the revenue-based fuel surcharges embedded in competitively negotiated contracts with the revenue-based fuel surcharges during the class period, we can

338 Narrative at ¶¶14, 25, 26, 41, 64; Rausser Merits Deposition at 42.

339 Rausser Merits Report at 165.

340 Rausser Merits Deposition at 112-113.

341 Neither Plaintiffs nor Prof. Rausser assert that these contracts are a source of anticompetitive injury to shippers.

determine whether the Class Period surcharges were more onerous than competitive legacy fuel surcharges.

256. Figures IV-22A through 22D make this comparison.[342] Figures IV-22A through 22D show for each Defendant the differences between the average fuel surcharge rates legacy shipments and Class shipments paid. The figures show that, for each individual Defendant, the average surcharge rate generated by surcharge formulas introduced during the Class Period was very close to the average surcharge rate determined by formulas in competitively negotiated legacy contracts. For example, Figure IV-22A shows the difference between the average Class Period surcharge rate and the average legacy surcharge rate (i.e., average Class Period rate less average legacy rate) for BNSF. If average Class Period surcharge rates are higher than average legacy rates, the line in the bottom panel will be above the horizontal axis, and vice versa. As the figure shows, the average difference between Class and legacy FSC rates for BNSF is 0.13%.[343]

342 The analysis in Figure IV-22C applies the legacy treatment for NS that Prof. Rausser used in his reply report in the Class phase of this proceeding. The analysis in Figure IV-22D incorporates UP legacy data that are missing from Prof. Rausser's analysis. See discussion of errors and inconsistencies in Prof. Rausser's data in Section VII.

343 Note that when comparing legacy revenue-based fuel surcharge rates to Class Period revenue-based fuel surcharge rates, the comparison becomes more volatile as the Class Period progresses. The reason is that the number of legacy contracts falls over time as contracts expire. In addition, Defendants began transitioning to non-challenged mileage-based surcharges during the Class Period. As a result the number of Class rate authorities containing fuel surcharges falls as well.

Figure IV-22A

**Did Class Customers Pay Systematically Higher FSC Rates than Legacy Customers? BNSF**




**Source:** Defendants' Transaction Data
**Note:** Weekly difference calculated as class minus legacy FSC rate.

Figure IV-22B

**Did Class Customers Pay Systematically Higher FSC Rates than Legacy Customers? CSXT/CSXI**




**Source:** Defendants' Transaction Data
**Note:** Weekly difference calculated as class minus legacy FSC rate.

Figure IV-22C

**Did Class Customers Pay Systematically Higher FSC Rates than Legacy Customers? NS**




**Source:** Defendants' Transaction Data
**Note:** Weekly difference calculated as class minus legacy FSC rate. NS rebased on July 1, 2006.

Figure IV-22D

**Did Class Customers Pay Systematically Higher FSC Rates than Legacy Customers?**
**UP**




**Source:** Defendants' Transaction Data
**Note:** Weekly difference calculated as class minus legacy FSC rate.

257. In no case does the evidence support the conclusion that the revenue-based fuel surcharge formulas introduced during the Class Period are uniformly or universally more onerous than those that stuck in the marketplace prior to the asserted conspiracy. For BNSF, the Class Period fuel surcharge rate is, on average 0.13 percent higher than the legacy rate. For UP, the Class Period fuel surcharge rate is 1.79 percent higher, on average, than the legacy rate. This figure is driven by the large uptick in the Class Period rate relative to the legacy rate at the end of the Class Period, which is the result of a few high-priced Class Period contracts that had not been transitioned to mileage-based fuel surcharges. Clearly, the rise in the Class Period surcharge rate relative to the legacy rate at the end of the Class Period could not have been anticipated at the date of implementation of the asserted conspiracy and, therefore, cannot be taken to indicate a conspiracy occurred.

258. For CSXT/CSXI and NS, the difference between the Class Period and the legacy fuel surcharge rates is negative, indicating that Class Period fuel surcharges for these railroads were *less onerous* than legacy surcharges. Of course, if the asserted conspiracy were effective, the predicted outcome would be that all four Defendants would have been able to materially increase the fuel surcharges they collected from class shippers relative to legacy shippers. No such "across-the-board" increase in fuel surcharges occurred.

259. For carload traffic, it is possible to directly compare the formulas and triggers Defendants used to calculate fuel surcharges prior to and during the asserted conspiracy. Figures IV-23A-D shows the revenue-based surcharge levels that result from the formulas used prior to and during the asserted conspiracy for carload traffic. The figure also indicates the dates at which BNSF, CSXT, and UP implemented mileage-based public carload surcharge programs as an alternative or replacement for their revenue-based programs. The figure shows that the formulas from the two periods give very similar results.

Figure IV-23A

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**BNSF**




**Source:** www.bnsf.com/tools/prices/fuelsurcharge/fuel_surcharge_hdf.html

Figure IV-23B

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**CSXT**




**Source:** http://www.csx.com/share/wwwcsx_mura/assets/File/Customers/Price_Lists_Tariffs_Fuel_Surcharge/Fuel_Surcharge/Frequently_Asked_Questions_On_CSXT_Fuel_Surcharge.pdf

**Note:** CSXT implemented a mileage-based public carload formula on April 23, 2007.

Figure IV-23C

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**NS**




**Source:** http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices, http://www.nscorp.com/nscportal/nscorp/ Customers/Public-Prices
**Note:** NS rebased on July 1, 2006.

Figure IV-23D

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**UP**




**Source:** http://www.uprr.com/customers/surcharge/index.shtml,
**Note:** UP implemented a mileage-based public carload formula on April 26, 2007.

260. Figures IV-24A-D show the differences, if any, in fuel surcharge rates from the Class Period relative to those in place before the Class Period. As above, the Class Period rates are higher when the lines in Figure IV-24A-D are above the horizontal axis. Note that the lines indicating the difference in Class Period and legacy fuel surcharge rates stop when the railroads shifted to use of mileage-based surcharges.

Figure IV-24A

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**BNSF**




**Source:** www.bnsf.com/tools/prices/fuelsurcharge/fuel_surcharge_hdf.html

Figure IV-24B

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**CSXT**




**Source:** http://www.csx.com/share/wwwcsx_mura/assets/File/Customers/Price_Lists_Tariffs_Fuel_Surcharge/Fuel_Surcharge/Frequently_Asked_Questions_On_CSXT_Fuel_Surcharge.pdf
**Note:** CSXT implemented a mileage-based public carload FSC formula on April 23, 2007.

Figure IV-24C

## Public Carload Fuel Surcharge Formulas: Pre-"Conspiracy" v. "Conspiracy" Public Carload NS




**Source:** http://www.nscorp.com/nscportal/nscorp/Customers/Public-Prices
**Note:** NS rebased on July 1, 2006.

Figure IV-24D

**Public Carload Fuel Surcharge Formulas:**
**Pre-"Conspiracy" v. "Conspiracy" Public Carload**
**UP**




**Source:** http://www.uprr.com/customers/surcharge/index.shtml
**Note:** UP implemented a mileage-based public carload formula on April 26, 2007.

261. The results of Figures IV-24A-D do not support the contention that putatively conspiratorial Class Period surcharge rates were systematically and collectively across Defendants more onerous than non-conspiratorial pre-Class Period surcharge rates. While BNSF made changes to its public carload surcharge rate on June 1, 2003, its actual surcharge rate during the Class Period was unaffected by the change. Its carload formula FSC rates were the same in the pre-Class Period and Class Period. CSXT's and NS's public carload surcharge rates are slightly higher during the Class Period relative to what they would have been but for the change in their formulas on June 1, 2003 and March 1, 2004, respectively. UP's rate is slightly lower on average during the Class Period relative to what it would have been but for UP's change in its formula on June 1, 2003. The different results for the different Defendants are not consistent

with coordinated conduct yielding significantly higher fuel surcharge rates relative to rates that Prof. Rausser agrees are competitive – i.e., the rates in place prior to the purported implementation of conspiracy.

262. The analyses in this subsection show that the Class Period fuel surcharge formulas did not lead to systematically higher surcharges for all Defendants relative to the earlier formulas negotiated under admittedly competitive circumstances. In fact, the earlier, competitive surcharge formulas generally led to slightly higher surcharge levels than the Class Period surcharge formulas across all Defendants and all traffic. For carload traffic, the Defendants' revenue-based fuel surcharge formulas do not exhibit a common increase in rates for all Defendants as would be expected if Defendants had worked jointly to make their surcharges more onerous during the Class Period relative to the prior period.

263. These results, taken together with the analysis above showing non-universal application of Defendants' revenue-based surcharges following the purported implementation of conspiracy in July 2003, indicate that Class Period fuel surcharges were neither higher nor more widespread than would be expected based on the fuel surcharges in place prior to the asserted implementation date. The findings indicate that shippers did not pay, in the aggregate, more than competitive fuel surcharges. I address this point and its implications for Prof. Rausser's impact and damages analyses more fully in Sections VI and VII below.

# V. ASSESSING THE ECONOMIC LOGIC AND FEASIBILITY OF THE ALLEGED CONSPIRACY

## A. The Role of Economic Analysis

264. As we have seen, economic analysis can be employed to assess the observed *conduct* of alleged conspirators: Is their conduct in the marketplace consistent with their individual and separate pursuit of their unilateral, non-conspiratorial business interests, or is that conduct only economically explained as conspiratorial? In Section IV, we saw that, in the case at hand, the central elements of Defendants' conduct vis-à-vis their fuel surcharge programs did not contradict the conduct expected of non-conspiring railroads; and, in key respects, that conduct was inconsistent with the conduct expected of railroads participating in the conspiracy alleged by Plaintiffs and Prof. Rausser.

265. Economic analysis can also be used to assess the feasibility, likelihood of success, and rationality of participating in an alleged conspiracy. In particular, the "structural" aspects of an industry and the markets in which the industry operates make it either more or less likely that a conspiratorial agreement could be struck and, if struck, whether such an agreement would succeed in achieving the purported conspirators' objectives.[344] By "structural", we mean such matters as the number and variety of sellers in the market, the price and non-price dimensions over which sellers compete for customers, how the inter-seller transparency or opaqueness of the dimensions of competition of pricing make it easier or harder for individual would-be conspirators to get away with "cheating" that attracts customers from fellow conspirators, and the ease or difficulty with which new competitors can enter affected markets in the event a conspiracy tries to elevate prices so as to generate excess profits.

266. Apart from legal penalties that can befall conspirators, the fundamental internal threat to the feasibility of a successful conspiracy is what economics terms "cheating" or "defection". Any attempt at conspiracy is accompanied by incentives for individual conspirators to cheat or defect on their fellow conspirators. The reason is straightforward: If other conspirators are elevating their prices in the attempt to realize supra-competitive profits, any one conspirator can profit by undercutting such efforts with lower prices and/or more attractive non-price inducements, thereby attracting volumes of profitable business away from those who stick to the conspiratorial agreement. In the process, trust among conspirators depreciates and encourages further cheating, portending the unraveling of the conspiracy.

267. To prevent cheating and to maintain trust, an effective conspiracy must be able to monitor and detect defections, distinguishing shifts of business across conspirators that

---

344 See, for example, Pepall, Lynne, Daniel J. Richards, and George Norman, *Contemporary Industrial Organization: A Quantitative Approach*, Wiley, 2010, at 254-264.

are due to cheating from those that occur for normal or benign reasons. And a feasible conspiracy must be able to punish cheaters by imposing losses on them when they are detected defecting on the collusive agreement. All else equal, would-be conspiracies become less feasible as, for example, the number of conspirators needed in an agreement increases. This is because newly entering or already existing non-conspirators can take business from conspirators who attempt to raise prices to supra-competitive levels, because the dimensions of product and service attributes over which competition can occur become more heterogeneous and difficult to monitor, and because the price and non-price inducements that can be used to attract customers are confidential and hard to monitor, detect and punish.

268. The fundamental external threat to the feasibility of a successful conspiracy is competition from firms outside of the asserted conspiracy. A successful conspiracy, by definition, raises prices above competitive levels, inviting entry and expansion by firms who are not part of the conspiracy. Such entry and expansion steal business from the conspirators, which is costly to them and can readily undermine a conspiracy. In the case of the conspiracy Plaintiffs assert here, a large share of the Class shipments are intermodal shipments that are subject to competition from, especially, truck transport. The trucking industry is highly competitive, can expand rapidly, and can deploy trucks on whatever routes are most profitable. Thus, a successful conspiracy involving intermodal shipments or other shipments that, at the margin, could be shifted from rail to truck, would be undermined by the expansion of truck competition.

269. If conspiracy is infeasible or not likely to be successful, it is economically irrational for sellers to undertake conspiratorial conduct. Doing so by, say, artificially raising one's prices only leaves business on the table for non-conspirators (or other, would-be non-complying conspirators) to pick up, with no positive payoff to one's profitability. Canonically, if two wheat farmers among a multiplicity of wheat farmers in a market conspire to elevate and fix their prices, they harm only themselves. Thus, economic analysis can be employed to assess whether an alleged conspiracy is feasible and likely to succeed, or is infeasible or otherwise irrational for would-be conspirators to pursue.

270. In short, the less feasible the conspiracy, or to the extent an alleged conspiracy would entail economically irrational conduct against the self-interest of purported conspirators, the more difficult it will be to reject the hypothesis that marketplace outcomes are the result of non-conspiratorial conduct. Prof. Rausser, in fact, concurs with this framework for economic analysis, indicating that if the industry conditions were not conducive to conspiracy and "didn't pass that test" of feasibility, he "wouldn't

have gone any further" with his analysis.[345] And he further agrees that he "wouldn't entertain a hypothesis of collusion if [he] didn't think it was rational".[346]

271. Obviously, Prof. Rausser did go further with his analysis. He has concluded that: "The U.S. rail freight industry is conducive to price fixing";[347] and that "the [alleged] collusion in connection with Fuel Surcharges was rational" on the part of Defendants.[348] At the same time, Prof. Rausser affirmatively states that a conspiracy on individual base rates without fuel surcharges would have been "extremely complex, very costly, and effectively unmanageable".[349] So, under the conspiracy he hypothesizes, Defendants entered into a conspiracy to implement uniform, universally imposed fuel surcharges applied as a percent of base rates. Moreover, the agreed-upon uniform surcharge program purportedly entailed policies of not giving back surcharge revenues to customers by discounting or negotiating base rates.[350] Under Plaintiffs' hypothesis, with a common surcharge percentage applied uniformly to non-discounted base rates, the conspiracy "will have increased the prices paid by all shippers by the same percentage amount."[351] That is, all Class Members will not only have experienced a common fact of adverse impact, but they will have experienced a common amount of adverse impact (i.e., overcharge).[352]

272. In reaching his conclusion that industry conditions are "conducive to price fixing", Prof. Rausser reports no factors that would tend to make the conspiracy he alleges infeasible. He does argue, however, that high concentration and a "huge market share" for Defendants collectively supported successful price-fixing.[353] He further argues that conditions were conducive to price fixing because of barriers to entry by other railroads; the "homogeneous and interchangeable" nature of rail freight services; inelastic demand for those services; transparency in railroads pricing; and frequent, low cost communications among Defendants.[354] In this, Prof. Rausser echoes the claims of

345 Rausser Merits Deposition at 181.

346 Rausser Merits Deposition at 181.

347 Rausser Merits Report at 5, 26-31.

348 Rausser Merits Report at 49.

349 Rausser Merits Report at 52, footnote 94.

350 Rausser Merits Report at 72-73. In this context, discounting implies agreeing on a base rate below the rate that would be established absent the fuel surcharge.

351 Rausser Merits Report at 50.

352 Prof. Rausser has proposed a method for calculating individual shipper overcharges that will not result in overcharges being a common percentage of each shipper's payments. See Rausser Merits Deposition at 436-438. Thus, Prof. Rausser's position on this subject is internally contradictory.

353 Rausser Merits Report at 5.

354 Rausser Merits Report at 11-45.

Plaintiffs.[355] In addition, Prof. Rausser asserts that he has determined that Defendants' participation in the alleged conspiracy "was rational [because] the benefits outweighed the costs".[356] Prof. Rausser's "cost-benefit" analysis does not take into account the real-world cost of antitrust risk and the associated fines and possible criminal penalties associated with conspiracy.[357]

273. According to Prof. Rausser, the alleged conspiracy took the form of "an understanding that emerged among the four defendants"[358] in the spring and early summer of 2003. I find that, in reaching his conclusions concerning the feasibility and rationality of the conspiracy he hypothesizes, Prof. Rausser is at odds with key determining factors at work in the markets in which Defendants operate. Writing with respect to the emergence of tacit collusive understandings among railroads, the Surface Transportation Board has noted several of these factors:

> "As we explained in the UP/SP [merger] decision affirmed by the court, there are three elements, all of which are present here, that each make tacit collusion unlikely for markets in which two railroads operate. First, tacit collusion cannot flourish where, as in railroading, rate concessions can and are made secretly through confidential contracts. Second, rail services are extremely heterogeneous, making price comparisons for purposes of collusive behavior difficult. Finally, high and declining fixed costs in the rail industry strongly induce carriers to compete for additional traffic through rate concessions."[359]

274. As I discuss below, such attributes of the rail industry, and others, work no less forcefully against the feasibility and rationality of the explicit collusion Plaintiffs allege.

### B. Market Concentration: Plaintiffs and Prof. Rausser Fail to Properly Identify the Markets in which Defendants Compete

275. Consider, for example, claims by Prof. Rausser to the effect that "massive consolidation of the U.S. railway system"[360] through mergers and acquisitions in the post-Staggers Act era have left "[t]he rail freight industry in the U.S. [...] highly concentrated, with

---

355 Narrative at ¶15.

356 Rausser Merits Report at 49.

357 Rausser Merits Deposition at 124.

358 Rausser Merits Deposition at 14.

359 Surface, Transportation Board, STB Finance Docket No. 33556, Canadian National Railway Company, Grand Trunk Corporation, and Grand Trunk Western Railroad Incorporated – Control – Illinois Central Corporation, Illinois Central Railroad Company, Chicago, Central and Pacific Railroad Company, and Cedar River Railroad Company, Decision No. 37, May 21, 1999 ("CN/IC Merger Decision") at 29 (emphasis omitted).

360 Rausser Merits Report at 27.

the four Defendants representing 94% of all rail freight revenue in the continental United States. This huge *market share* gave the Defendants' alleged cartel the ability to set prices in *the market*."[361] This purported ability to set prices was made feasible because "it is not reasonably contestable that the U.S. rail freight industry is highly concentrated... [under] the standard measure that the U.S. Department of Justice uses to evaluate *market concentration*."[362] To make his point, Prof. Rausser then goes on to calculate the "standard measure" of *market* concentration – i.e., the Herfindahl-Hirschman Index (HHI) – and produces a value for market concentration in excess of the Department of Justice Guidelines designating a market as highly concentrated.[363]

276. Referring to the putative national market in rail freight that he sees as "highly concentrated", Prof. Rausser then concludes that, with all Class Members affected by the same supply and demand conditions since they are all in that national market, all Class Members suffered a common fact of antitrust injury when the alleged conspiracy affected supply and demand conditions in that market:

> "Defendants sold rail freight services throughout the U.S., and customers within that market commonly experienced the effects of competition between Defendants before the conspiracy. As a result, customers in all geographic regions would be exposed to paying supracompetitive prices due to the alleged conspiracy."[364]

277. Notwithstanding these assertions, Prof. Rausser now avers that such assertions do not represent his expert opinions regarding *market* concentration in a nationwide market for US freight transportation. Rather, he asserts: "I don't think you see any opinions about relevant markets in my report. And that's not an analysis that I've conducted."[365] Instead, notwithstanding his repeated references to huge *market* shares, setting price in *the market*, HHI measures of *market* concentration, and common Class-wide impact in "that market", and the like, Prof. Rausser now opines that "at the end of the day those are really nothing more than sales shares" for the aggregate US rail *industry*.[366]

---

361 Rausser Merits Report at 5 (emphasis added). See also Plaintiffs Memorandum at 7: "Together, [the Defendant railroads] possess a 90% *market* share based on track miles and a 94% *market* share based on rail freight revenue." (emphasis added).

362 Rausser Merits Report at 28-29.

363 Rausser Merits Report at 28. The HHI is defined as the sum of the squared market shares of all participants in a relevant market, attaining a value of 1,000, for example, when the market consists of ten equal-sized firms (i.e., 10% x 10% = 100, summing to 10x100 = 1,000 across ten firms) and a value of 10,000 in a market with a single firm with a 100% market share (i.e., 100% x 100% = 10,000). Merger Guidelines at §5.3.

364 Rausser Merits Report at 21.

365 Rausser Merits Deposition at 82-83.

366 Rausser Merits Deposition at 83 (emphasis added).

278. Recognizing this conflation of "markets" and "industry" is critical to understanding the nature of Prof. Rausser's analyses and conclusions regarding the feasibility and rationality of the conspiracy he and Plaintiffs hypothesize. Specifically, without undertaking an analysis of the relevant market or markets in which Defendants operate, there is no basis for asserting that the economically relevant inquiry into *market* concentration reveals that *market* structure is conducive to the alleged collusion to fix prices. As discussed at length in Section III above, Defendants operate in a multiplicity of different regional and commodity markets.[367] This is effectively acknowledged by Prof. Rausser in so far as he now acknowledges that, depending on the commodities they ship and the regions in which they operate, customers have access to a diversity of varying rail and non-rail "viable substitutes"; and shippers varying transportation options result in diverse, rather than commonly shared, supply and demand conditions which produce different prices for rail service.

279. Specifically, Prof. Rausser recognizes that:

> "The fact that viable transport substitutes are different for different commodities is consistent with basic economic principles. Clearly, goods that are light weight and typically delivered in small quantities, such as farm produce, can be shipped by truck. By contrast, goods that are heavy and tend to be delivered in large quantities, such as coal deliveries to power plants, can only be economically delivered by rail. Furthermore, some goods can be delivered by water barge and there is significant transportation by this mode in regions that have large enough waterways, such as around the Mississippi River and around the Great Lakes";[368]

and that:

> "The academic literature is unequivocal that the form of transport services purchased by shippers depends upon the particular commodity being shipped. This leads railroads to price differently across commodities, charging higher prices to shippers with less viable transport alternatives on offer. My analysis...shows that this price discrimination was a natural characteristic of

---

367 I have not attempted to define the antitrust markets in this industry with respect to their product and geographic dimensions. However, three conclusions are apparent. First, Prof. Rausser has not done any sort of rigorous analysis of market definition. Second, the analysis that Prof. Rausser has done is contrary to the facts. Third, the characteristics of this industry mean that there are a multiplicity of markets, each with different product and geographic dimensions. Thus, one need not define the precise antitrust markets here to conclude that Prof. Rausser's characterization of a single, natonal rail freight market dominated by Defendants is contrary to the undisputed facts and basic economic principles.

368 Rausser Merits Report at 22.

the rail freight industry that occurred similarly both before the conspiracy and during the conspiracy."[369]

280. In their fundamental economics, these opinions are *de facto* acknowledgement that, both before and after the purported striking of a conspiratorial "understanding", Defendants sell transportation services in many markets defined by commodity types and the routes that shippers find substitutable. Prof. Rausser's recognition that there is price discrimination across shippers and routes directly implies that each market the railroads serve will have its own supply and demand factors that can vary independently over time. Different supply and demand conditions would not produce different rail prices for different commodities on different routes, etc., if those different supply and demand conditions did not operate in different markets.

281. The direct consequence of these economics is that, in purportedly seeking to collude on prices, Defendants would be operating in some markets where concentration is very low (as when trucks are common and are easily entering "viable substitutes"), and in other markets where concentration is very high. In markets with substantial truck competition, for example, basic economics and Prof. Rausser's own framework recognize that collusion and conspiracy would not be feasible or rational. In more highly concentrated markets, the converse can hold if high concentration is not overridden by other factors that generate infeasibility (such as the heterogeneity of service offerings, the non-transparency of pricing under confidential negotiations, and/or the railroads' cost structures noted by the STB, discussed above).

282. These economics are destructive of Prof. Rausser's opinions to the effect that the purported conspiracy would have had the same, common percentage impact on all Class Members. Clearly, shippers purchase rail transport services in different markets, each with its own supply and demand conditions. This means that the impact of any conspiracy to raise prices across markets would have different percentage effects in each market, possibly having little or no effect on some shippers. This arises across and within markets because some shippers may have more options than others, allowing them to avoid the high "conspiratorial" prices. Others may already depend entirely on one railroad for service and pay profit-maximizing prices. In this case, any further price increases would not be in the railroad's interest. Finally, cheating on the hypothetical agreement might take place in some markets and not in others.[370]

283. Presented as measures of Defendants' collective "huge *market* share" of 94% and "standard" HHI measures of *market* concentration, Prof. Rausser's calculations violate the basic economics and arithmetic of proper measurement of market concentration.

[369] Rausser Merits Report at 21-22.

[370] *Econometrics: Legal, Practical, and Technical Issues*, American Bar Association, Section of Antitrust Law, 2005, ("ABA 2005 Monograph") at 204.

Specifically, both market share calculations and HHI calculations require ratios of individual firms' sales and total sales *in a market.* For any given market, the numerators represent the sales (or capacities) of the individual sellers that are viable substitutes in that market, and the denominator is the sum of all those individual sellers' sales (or capacities). Thus, if we are to properly and accurately assess whether or not "viable substitutes" in a market constrain the ability of a subset of sellers to collude to fix prices, all viable substitutes must be accounted for in the denominator of a share calculation and in the numerators and denominators of an HHI calculation.[371] Prof. Rausser's calculations fail these basic requirements because he has not attempted to identify the different markets in which Defendants sell their rail services. As a result, Prof. Rausser's calculations of market share and HHI do not provide economically relevant or meaningful measures of market structure for the railroad industry.

284. Fundamentally, a market encompasses the relevant products (or services) that buyers consider to be viable substitutes and the supplier locations from which buyers of these products (or services) can obtain them.[372] Moreover, different markets with different supply and demand conditions are the sources of the different prices noted by Prof. Rausser.

285. Prof. Rausser's claim that "massive consolidation" and reductions in the total number of railroads in the United States in the post-Staggers era have made conditions of market concentration across the relevant markets more conducive to conspiracy is unfounded. It has always been the case over the history of the railroad industry that a large share, and probably a majority, of locales and shippers at those locales have had only single rail carrier service. Moreover, many of the most important mergers and acquisitions linked rail systems that had very little competitive overlap with one another.[373] The end-to-end aspects of these mergers did not eliminate significant head-to-head, "horizontal" competition between systems. Moreover, interline shippers frequently benefitted because they could use single line service on the merged networks.[374]

---

371 Merger Guidelines at §§4 and 5.2.

372 Viscusi, W. Kip, Joseph E. Harrington, and John M. Vernon, *Economics of Regulation and Antitrust*, 4th ed., 2005 at 156-157. Use of the term "product" here subsumes both products and services.

373 See, for example, Surface Transportation Board, STB Finance Docket No. 33388, CSX Corporation and CSX Transportation, Inc., Norfolk Southern Corporation and Norfolk Southern Railway Company – Control and Operating Leases/Agreements – Conrail Inc. and Consolidated Rail Corporation, Decision No. 89, July 20, 1998 ("Conrail Decision") at 27-44.

374 See, for example, Surface Transportation Board, Finance Docket No. 32760, Union Pacific Corporation, Union Pacific Railroad Company and Missouri Pacific Railroad Company – Control and Merger – Southern Pacific Rail Corporation, Southern Pacific Transportation Company, St. Louis Southwestern Railway Company, SPCSL Corp., and The Denver and Rio Grande Western Railroad Company, Decision No. 44, August 6, 1996 ("UP/SP Merger Decision") at 108-116, and; Robert G. Harris and

286. In addition, with the larger mergers and acquisitions, to the extent there was some horizontal competitive impact, the Surface Transportation Board frequently imposed conditions that preserved existing levels of competition and frequently introduced competitive rail alternatives into locations where no direct rail-on-rail competition had previously existed. Thus, for example, conditions imposed on the Burlington Northern-Santa Fe and the UP-Southern Pacific transactions precluded any shipper currently served by two railroads from losing access to a second serving railroad, and in many cases introduced a second competitive rail option where none previously existed.[375] The Conrail transaction further expanded the competitive options available to many shippers as the transaction created the Conrail Shared Asset Areas in which two railroads, NS and CSXT, both had access to many shippers and locales that previously had access to only one railroad.[376]

### C. Interlining, "Vertical" Relationships among Defendants, and Disparate Incentives

287. Prof. Rausser's "huge market share" and market-concentration calculations are performed at the level of all rail freight services, from unit coal train service out of Wyoming to freight-bearing trailers on flatcars and containers on flatcars ("TOFC/COFC") provided for intermodal service, and across the United States as a whole (or at least the 48 contiguous states). While now asserted to not refer to any relevant market, but only to railroad industry sales, any suggestion in these calculations that there is a single national market in a single product consisting of homogeneous "rail freight service" is unfounded.

288. By the same token, Prof. Rausser's representation that "all four Defendants are *involved* in shipments originating from every state, except Hawaii and Alaska"[377] is misleading. Being "involved" and "competing" against one another are not the same. For example, if UP originates traffic in California and interchanges with NS at Chicago for ultimate delivery to New York, Prof. Rausser would find that both carriers are "involved" in the movement from California to New York. He would attribute NS's ton-miles for the Chicago-to-New York portion of the routing as NS being "involved" in service to California. While NS is, indeed, involved, it does not compete with UP for providing

Clifford Winston, "Potential Benefits of Rail Mergers: An Econometric Analysis of Network Effects on Service Quality," *The Review of Economics and Statistics,* Vol. 65, No. 1, February 1983, at 32-40.

375 Interstate Commerce Commission, Burlington Northern Inc. and Burlington Northern Railroad Company – Control and Merger – Santa Fe Pacific Corporation and The Atchison, Topeka and Santa Fe Railway Company, Finance Docket No. 32549, Decision No. 38, served August 23, 1995, at 161-163, 215-220, 230 ("BN/SF Merger Decision"); UP/SP Merger Decision at 132-160.

376 Conrail Decision at 117. See also Conrail Decision at 49-55 for a more detailed description of each Shared Asset Area.

377 Rausser Merits Report at 13 (emphasis added).

the interline service demand by customers. Prof. Rausser's idiosyncratic attribution of transportation services to carriers who cooperate to provide interline service provides no useful economic basis for analyzing marketplace forces of competition.

289. By analogy, Jet Blue Airways provides service from New York City's Kennedy Airport to numerous US airports; and passengers arriving at Kennedy Airport from outside the US commonly transfer to Jet Blue to reach their final US destinations. Yet, the fact that passengers travelling from Tokyo to Washington, D.C. use Jet Blue for the New York-to-Washington leg of the trip does not mean that Jet Blue's presence in the US is an effective competitive option constraining rates charged by the airlines that provide service from, say, Tokyo to New York.

290. Except for a small number of states in the middle of the country where the rail networks of an eastern and a western Defendant meet or overlap (e.g., Illinois, Alabama, and Louisiana), most states are served by no more than two of the four Defendant railroads. Figures V-1A and V-1B show the rail networks for the two western Defendant railroads, BNSF and UP, and the two eastern Defendant railroads, CSXT and NS, respectively. There is a dividing line between the eastern and western railroads with overlap in Illinois from Chicago to St. Louis, and limited extensions across this line.[378] Apart from limited and specific contractual arrangements, the Defendant railroads cannot directly serve, and do not compete to serve, traffic that is located on another railroad's network. As such, freight travelling on rail across this divide must be interchanged between an eastern and western carrier, often at Chicago, Memphis, or New Orleans.[379]

---

378 Notable exceptions include the BNSF line to Alabama and the NS line to Kansas City.

379 The three other Class 1 US railroads operate primarily in the central part of the country from the Canadian border to Mexico.

Figure V-1A

**Major Freight Railroad Networks: BNSF and UP**




**Source:** http://www.nationalatlas.gov/mld/railrdl.html

Figure V-1B

**Major Freight Railroad Networks: NS and CSXT**




**Source:** http://www.nationalatlas.gov/mld/railrdl.html

291. For most routes, the eastern railroads cannot provide competition in the western region of the country, and *vice versa*. There is no service offering or change in price that CSXT or NS, for example, can offer that provides effective competition to UP or BNSF for transportation of goods from California to Seattle. Likewise, the western railroads cannot compete for traffic that must move between New York and Florida. Indeed, even within east and west, significant portions are served by only one Defendant. We see this, for example, in the west (Figure V-1A), where only BNSF serves North and South Dakota, and all but far southwestern Montana. In the east (Figure V-1B), among Defendants, only CSXT serves Massachusetts and most of Florida. Even where two railroads operate tracks in the same general area, there are many instances where shippers cannot *economically* obtain service from both railroads and must rely on a single railroad.

292. When the east-west and inter-regional geographic spacing of Defendants' systems is combined with certain customers' needs or desires to ship certain commodities from origins on one railroad's system to destinations on another railroad's system, the result is *interlining*. Under such conditions, two railroads must cooperate to provide necessary interline service. Economics then refers to them as operating in a "vertical" relationship, as Prof. Rausser recognizes.[380] They combine pieces of their respective systems to produce a single product – the interline service demanded by a customer. They do not compete with each other: The customer cannot credibly threaten to switch to the origin-serving railroad as a means of getting a lower price from the destination-serving railroad, or *vice versa*, because neither carrier can serve both destination and origin.

293. When two railroads offer a single, joint-line rate, both railroads have incentives to maximize the total price the interline service can command in light of a customer's willingness to pay and the customer's other rail or non-rail alternatives. Their cooperation in providing a service to a customer is not conspiracy; and while they implicitly or explicitly are in tension over their respective shares ("division") of the full rate paid by the customer, there is no competition between them that conspiracy can shut down such that they can charge a higher total rate for the product they jointly provide to the customer.

294. Class Representative Olin Corp. ships product on an interline basis and has recently presented a number of such cases involving its chlorine plants to the Surface Transportation Board.[381] Figure V-2 reproduces a figure submitted by Olin to the STB. This figure shows the location of Olin's McIntosh, Alabama chlorine plant. The plant is sole-served by NS at the origin. To reach Olin's desired destination of La Porte,

---

380 Rausser Merits Deposition at 289-290.

381 Comments Submitted by Olin Corporation, STB Ex parte 705, filed April 11, 2011 at 29.

Louisiana, NS must interline with one or more railroads. The options include BNSF, CSXT, UP and the Alabama and Gulf Coast Railway ("AGR" in Figure V-2). The nearest interline connection is CSXT at Mobile, Alabama, 40 miles away from the McIntosh plant. Notwithstanding these options, Olin describes the consequence of being bottlenecked and having no horizontal competition at its McIntosh origin: Due to a "total lack of competition, [the McIntosh facility] has no alternative other than to ship on the NS at rates dictated by the NS."[382] The facility is sole-served by NS at the plant, and any route "choice" requires the participation of NS regardless of whether shipments are then interlined with CSXT, BNSF, UP, and/or AGR.

Figure V-2

**Rail Service Options from Olin's McIntosh, AL Chlorine Plant to LaPorte, LA**




**Source:** Olin comments filed in STB Ex Parte No. 705

295. In such "bottleneck" situations, a conspiratorial agreement among the competing downstream railroads to fix the prices that they would be willing to accept for their otherwise competitive portion of the joint interline movement would allow one of them to demand a larger division of the through rate. Thus, a conspiracy among the two otherwise competing downstream carriers would be expected to adversely affect the

382 Comments Submitted by Olin Corporation, STB Ex parte 705, filed April 11, 2011 at 26.

division of the through-rate revenue received by the upstream "bottleneck" carrier (NS in this case). Absent conspiracy among the two downstream railroads, the upstream carrier would have the ability to play one downstream carrier off against the other and garner a larger division for itself. Thus, the conspiracy Prof. Rausser asserts would be expected to lead to reductions in competition that would harm other asserted conspirators. Of course, it is not in any Defendant's interest to enter into a conspiracy that puts it at the mercy of fellow conspirators when a customer demands interline service.

296. These fundamental economics relevant to the railroad industry have been widely recognized in fact and theory by economists, antitrust analysts, the STB, and the courts.[383] At play is the so-called "one-lump" principle: There is ultimately only one "lump" of consumer willingness to pay to be captured on a potential interline route, and the bottleneck carrier will, with competition among its potential interline partners, collect the lion's share of that lump.[384] Horizontal price-fixing by the competing alternative partner carriers would tend to raise the price for that portion of the interline movement and re-distribute some of the "one-lump" of surplus from the bottleneck carrier to one or both of the competing interline carriers. An effort to monopolize (e.g., by conspiracy) one portion of the interline movement would not, however, increase the maximum size of the lump available for ultimate capture by the combined interlining railroads.

297. The tension created by a conspiracy affecting competition to complete interline movements would create tension among the asserted conspirators and undermine the cohesion of the asserted conspiracy because Defendants rely to different degrees on interline services for their revenues. The economic significance of interline traffic is shown in Figure V-3. Clearly, there is not balance and equivalent dependence on interline traffic among Defendants. CSXT/CSXI's business entails the least interlining with other Defendants, accounting for 15%-18% of its revenue over 2001-2008. At the other extreme, NS found 25%-30% of its revenue in interline business with other Defendants over 2000-2008. The eastern railroads interline the least with each other, and more with their western counterparts, and vice versa for the western railroads. Both CSXT/CSXI and NS are more dependent on UP than on BNSF for interline

383 See, generally, Western Resources v. STB.

384 "Here, as we have mentioned, the Commission [STB] rejected petitioners' claims based on the one-lump theory, which says that there is only one monopoly profit to be gained from the sale of an end-product or service (here the transportation of coal for use at an electric generating plant). Because a monopolist at the end stage of production is in a position to capture that entire profit, integration backwards upstream, even when accompanied by monopolization of the earlier stages (which hasn't happened here) normally does not enable it to raise the profit-maximizing price and thus inflicts no harm on the ultimate customer." Western Resources v. STB at 4.

business. UP depends more on CSXT/CSXI than on NS, and BNSF shows the opposite pattern.

Figure V-3

**Share of Defendants' Unregulated Revenue from Interline Movements By Partner**

**BNSF**

| | Interline Partners | | | | | |
|---|---|---|---|---|---|---|
| Year | CSXT | NS | UP | Other | Total Defendants | All Partners |
| 2000 | 8% | 10% | 4% | 14% | 22% | 36% |
| 2001 | 8% | 10% | 4% | 13% | 22% | 36% |
| 2002 | 8% | 11% | 4% | 12% | 22% | 34% |
| 2003 | 7% | 11% | 4% | 12% | 22% | 34% |
| 2004 | 6% | 12% | 3% | 12% | 22% | 34% |
| 2005 | 6% | 13% | 3% | 12% | 22% | 34% |
| 2006 | 7% | 13% | 3% | 12% | 22% | 35% |
| 2007 | 6% | 12% | 3% | 12% | 20% | 32% |
| 2008 | 6% | 11% | 2% | 12% | 19% | 31% |

**CSXT**

| | Interline Partners | | | | | |
|---|---|---|---|---|---|---|
| Year | BNSF | NS | UP | Other | Total Defendants | All Partners |
| 2000 | | | | | | |
| 2001 | 4% | 2% | 10% | 10% | 16% | 26% |
| 2002 | 4% | 2% | 9% | 10% | 15% | 25% |
| 2003 | 5% | 2% | 10% | 12% | 17% | 29% |
| 2004 | 5% | 3% | 10% | 15% | 18% | 33% |
| 2005 | 5% | 3% | 9% | 16% | 18% | 33% |
| 2006 | 5% | 3% | 8% | 16% | 16% | 32% |
| 2007 | 4% | 3% | 8% | 15% | 15% | 30% |
| 2008 | 5% | 3% | 7% | 15% | 15% | 30% |

**NS**

| | Interline Partners | | | | | |
|---|---|---|---|---|---|---|
| Year | BNSF | CSXT | UP | Other | Total Defendants | All Partners |
| 2000 | 11% | 4% | 15% | 15% | 30% | 45% |
| 2001 | 11% | 3% | 15% | 15% | 29% | 44% |
| 2002 | 11% | 3% | 16% | 16% | 30% | 46% |
| 2003 | 11% | 3% | 17% | 17% | 31% | 48% |
| 2004 | 14% | 3% | 15% | 17% | 32% | 49% |
| 2005 | 13% | 3% | 14% | 17% | 29% | 46% |
| 2006 | 14% | 3% | 13% | 17% | 29% | 46% |
| 2007 | 13% | 3% | 13% | 17% | 28% | 45% |
| 2008 | 11% | 2% | 11% | 16% | 25% | 41% |

**UP**

| | Interline Partners | | | | | |
|---|---|---|---|---|---|---|
| Year | BNSF | CSXT | NS | Other | Total Defendants | All Partners |
| 2000 | 4% | 11% | 9% | 15% | 24% | 39% |
| 2001 | 4% | 11% | 9% | 16% | 24% | 39% |
| 2002 | 4% | 11% | 9% | 16% | 24% | 40% |
| 2003 | 3% | 9% | 8% | 14% | 20% | 34% |
| 2004 | 4% | 10% | 9% | 18% | 23% | 41% |
| 2005 | 4% | 10% | 9% | 20% | 22% | 43% |
| 2006 | 4% | 10% | 8% | 22% | 22% | 43% |
| 2007 | 4% | 9% | 9% | 22% | 22% | 44% |
| 2008 | 4% | 9% | 9% | 21% | 21% | 42% |

**Source:** Defendant's Transaction Data

298. Imbalance across Defendants in their interline partners and interline business revenues makes collusion among them less feasible. But even if each one of them found the alleged conspiracy in its overall interests, despite losses when subjected to conspiratorial exactions when interlining with other railroad, each would have the incentive individually to "cheat" on the conspiracy when it came to its "bottleneck" interline traffic. For the "bottleneck" Defendant facing conspiring interline partners on such traffic, the clear incentive would be to induce one or both partners to deviate from the conspiracy by offering rate concessions through either base rate reductions and/or modified fuel surcharge terms. Similarly, each of the putatively conspiring partners would have incentives to utilize the confidential nature of interline contract negotiations and concurrences to "cheat" on its fellow conspiring interline candidate. Meanwhile, the Defendant interlining with a "cheater" would realize higher divisions and have no

incentive to reveal, much less punish, the defection from the purported overall conspiratorial agreement. In the process, however, such "cheating" would sow the seeds of mistrust that portend the demise of effective conspiracy.

### D. The Multiplicity of Markets Means a Multiplicity of Competitors and Competitive Conditions

299. Prof. Rausser asserts that the Defendants are "responsible for the vast majority of shipments in every sizeable state in the U.S."[385] This claim is critical to Prof. Rausser's conclusions because if Defendants do not provide a sufficient share of transportation service in a properly defined market, their asserted attempts to raise prices conspiratorially will be undermined by the expansion of competitors competing through other modes. Prof. Rausser's characterization of the Defendants' shipments is clearly incorrect: Rail transportation, by all Defendant and non-defendant railroads taken together, accounts for a minority of the transportation ton-miles in the US. Instead, the vast majority of the ton-miles shipped are transported by truck or other transportation modes. (See Figure III-1 and Rausser Merits Report Figure 4.) As shown in Figure III-1, railroads ship less than 10% of the ton-miles for many commodities, and greater than 50% for only three of the identified commodity groupings—coal, cereal grains, and basic chemicals. Only by incorrectly and artificially excluding all non-rail freight transportation alternatives can Prof. Rausser's statement be rationalized.

300. The Defendant railroads collectively represent a substantial portion of US *rail* ton-miles and of the revenue earned by *railroads* in the United States as a whole. However, this fact on its own does not provide a useful basis for analyzing the effect of an alleged antitrust conspiracy. Neither the United States as a geographic region nor homogeneous rail transportation as a service defines a market in any economically coherent manner useful for analyzing the economic incentives and feasibility of the alleged conspiracy.

301. At an aggregate level, it is evident that the ready availability of non-rail alternatives adds up across markets to intense competition. (See Figure III-1 showing mode of transport by commodity group.) The vast majority of commodities are truck-dominant (i.e., trucks move the majority of shipments), while for a handful of other commodities, rail is the dominant modal choice. Moreover, Figures III-5 and III-6 list types of traffic and commodities that Federal authorities have determined are "exempt" from regulation of rail transportation rates because rate regulation "is not needed to protect shippers from the abuse of market power" by railroads.[386] Under these same principles,

---

[385] Rausser Merits Report at 12.

[386] "Exempt" traffic is that which the Surface Transportation Board (or predecessor Interstate Commerce Commission) has determined that railroad rate regulation "is not needed to protect shippers from the

intermodal transportation consisting of freight-bearing trailers on flatcar and containers on flatcar (TOFC/COFC) that interchange with trucks (or other modes) is also exempt from rate regulation due to the inability of railroads to abuse market power.[387] Similarly, freight travelling in boxcars is also exempt from rate regulation.[388]

302. When considering whether to extend its ruling on revenue-based FSCs to exempt traffic, the STB explains that it first looks at "whether the carrier possesses substantial market power. If it does not, then there is generally no basis for revoking an exemption." The STB explains further: "The exemptions are based on prior findings that there is a sufficiently competitive market for the transportation involved that regulatory protections are not needed. The exemptions permit the traffic involved (including intermodal traffic) to benefit from a competitive marketplace free of regulatory interference." In its 2007 decision, the STB concluded that there is "no evidence that the marketplace has materially changed for any of the exempted categories of traffic since the findings were made to exempt that traffic from regulation."[389]

303. Clearly, large portions of Defendants' traffic are subject to controlling competition from non-rail alternatives. Figure V-4A shows that portion of the unregulated traffic (measured on a revenue basis) for each Defendant[390] that is intermodal—TOFC/COFC—and that competes directly with trucking (and in some cases, waterborne carriage). Figure V-4B shows that portion of exempt traffic that moves on all of the Defendants[391] (inclusive of intermodal). During the Class Period, between 40% and 70% of the unregulated revenues earned by the Defendants was from "exempt" traffic that had been determined to be sufficiently competitive such that exemption from rate regulation was warranted.[392] In the spring and early summer of 2003, when conspiratorial "understanding" purportedly "emerged", the majority of each Defendant's revenues was coming from such traffic.

---

abuse of market power." Title 49 – Transportation, Subtitle IV – Interstate Transportation, U.S.C. §10502 (a)(2)(B).

387 49 CFR §§1039.13 and 1090.

388 49 CFR §1039.14.

389 STB Rail Fuel Surcharges Decision at 12-13.

390 Figure V-4A includes the portion of the combined unregulated traffic of CSXT and CSXI that is intermodal.

391 Figure V-4B includes the portion of the combined unregulated traffic of CSXT and CSXI that is intermodal.

392 Some of the exempt commodities move via intermodal – COFC/TOFC – and are only counted once in Figure V-5.

Figure V-4A

**Intermodal Traffic:**
**Percent of Unregulated Revenue**




**Source:** Defendants' Transaction Data

Figure V-4B

**Exempt Traffic:**
**Percent of Unregulated Revenue**




**Source:** Defendants' Transaction Data
**Note:** Exempt Traffic is identified by commodity or car type.

304. Notwithstanding the foregoing and Prof. Rausser's own recognition that different commodities have different viable non-rail substitutes for Defendants' services, Prof. Rausser repeatedly bases his conclusions regarding the feasibility of the conspiracy he alleges on assessment of rail-only competition. Not only does he turn his purported "huge market share" of Defendants in national *rail* service into the claim that Defendants possessed the collusive ability "to set prices in the market",[393] but he focuses on other railroads as the economically relevant sources of countervailing

---

393 Rausser Merits Report at 5 (emphasis added). See also Plaintiffs Memorandum at 7: "Together, [the Defendant railroads] possess a 90% *market* share based on track miles and a 94% *market* share based on rail freight revenue" (emphasis added).

competitive discipline. Thus, he presents his analysis as: "Economics teaches that *industry* concentration at the level of the U.S. rail freight industry makes collusion easier, both by simplifying the coordination issues and by increasing the firms' ability to sustain high prices, collectively, without losing *market* share or their *market* power. Participants in a cartel can sustain artificially high prices if they have a large share of the *market* and the 'competitive fringe' (*i.e., the smaller, non-Defendant railroads*) cannot quickly expand capacity."[394]

305. From this, and without coherent demonstration or explanation,[395] under Plaintiffs' and Prof. Rausser's theories of conspiracy Defendants need only conspire with each other for conspiracy to be feasible and to have common impact across all Class Members (and the various markets in which they purchase freight transportation from Defendants and other rail and non-rail alternatives). Given the acknowledged differential access to "viable substitutes" depending on particular customers' commodities and locations, this is a straightforward violation of basic economic principles of competition and collusion. As noted above, some buyers may be able to exploit a greater number of options than others to avoid the effects of a conspiracy. Prof. Rausser's noted recognition that different customers shipping different commodities over different routes have different "viable substitutes" brings this proposition into play in the case at hand.

306. Even more generally, Prof. Rausser's recognition of differential access to "viable substitutes" for Defendants' services means that, in circumstances in which trucks are the main source of competition to rail transportation, changes in rail rates over time would reflect changes in truck rates and costs for the competitive routings. Similarly, for conditions in which barge transportation represented a vigorous source of price-constraining competition, the profit-maximizing level of rail rates would depend on the prices and circumstances of competitive barge movements.[396] When such alternatives prevent railroads, including putatively colluding Defendants, from abusing market power, effective conspiracy would be infeasible and adverse impact would be averted. At the very least, the feasibility and impact of the alleged conspiracy would vary with the nature and extent of the acknowledged "viable substitutes". As discussed further below, Prof. Rausser's assertions of a common fact and magnitude of adverse impact on Class Members are inconsistent with his own recognition that competition from other modes of transport constrains the all-in rates Defendants charge when acting unilaterally or conspiratorially (as asserted). Moreover, his assertion that Class

394 Rausser Merits Report at 29 (emphasis added).

395 The explanation offered constitutes only assertion, not evidence, of what needs to be proved ("truck or other forms of competition would not be able to constrain the implementation of those price increases"). Rausser Merits Deposition at 86.

396 See, e.g., Rausser Merits Report at 165.

shippers experience "the same percentage price change" is inconsistent with these economics.

307. Instead of analyzing the implications of the differential access to acknowledged "viable substitutes" to rail transportation across the markets in which the many Class Members find themselves, Prof. Rausser presents aggregate national-level data on the relationship between general rates for rail freight of all kinds and long-distance trucking rates, suggesting that the claimed collusion resulted in rail rates decoupling from truck rates. These data from his Figure 12 are reproduced as the purple and orange lines in the top panel of Figure V-5. Observing the patterns to these lines, Prof. Rausser asserts:

> "Both railroad freight rates and long distance trucking rates followed the same trajectory up until the start of the alleged conspiracy in this case. At around January 2005, as the rail Fuel Surcharge program was well under way, a striking departure between the two rates occurred. Railroad freight rates rose drastically and increased much more than trucking rates."[397]

[397] Rausser Merits Report at 75.

Figure V-5

**Prof. Rausser Compares Overall Railroad Rates to Trucking Rates**




**Trucking and Rail Intermodal Producer Price Index**




**Source:** U.S. Bureau of Labor Statistics; Rausser Merits Report
**Note:** January 2003 is indexed to 100. Trucking PPI includes general freight trucking, long-distance, and truckload. Rail PPI includes line-haul railroads.

308. A comparison of general rail freight rates to trucking freight rates is not a valid test of whether the former are disciplined by the latter. Rather, rail service is not homogeneous and only that rail service which is competitive with truck service would be a candidate for discipline by competition from trucks. Accordingly, in the bottom panel of Figure V-5, I again show Prof. Rausser's measure of long-distance trucking rates, but now this is compared to an index of rail rates for truck-competitive intermodal rail service. It is evident that rail intermodal rates and truck rates track each other much more closely than in Prof. Rausser's representation of general rail rates and trucking rates. Moreover, rather than rising above trucking rates in the period in which conspiracy purportedly took hold, the bottom panel of Figure V-5 indicates that rail intermodal rates started to fall behind trucking rates in the period. They eventually catch up, three years into the Class Period, and then stay at approximate parity. This is wholly consistent with the expectation that truck competition, rather than conspiracy, was disciplining and determining rail intermodal rates. The data do not support the inference of conspiracy. Moreover, Plaintiffs and Prof. Rausser claim the asserted conspiracy had uniform effects across all shippers. The data above are, of course, inconsistent with such a conspiracy.

309. It is not surprising that the alleged conspiracy would not be feasible or effective in rail markets subject to intense truck competition. Long-distance trucking is noted for the absence of barriers to entry and deployment that permit trucking services to respond rapidly to profit opportunities.[398] Moreover, research repeatedly finds that access to non-rail alternatives results in lower rail rates. Thus, for example, a 1991 study of rail rates for North Dakota agricultural commodities found that non-rail competition had significant effects in holding down rail rates.[399] A 2000 study of various commodities found that not being dependent on a single rail carrier – i.e., by having access to a rail or to non-rail alternative – held rail rates down by approximately 21% after accounting

---

398 See, for example, Interstate Commerce Commission, Ex Parte 346 (Sub-No. 15) 'Exemption from Regulation – Rail Transportation Frozen Food, November 30, 1983 (367_ICC_859), at 14; Ex Parte 346 (Sub-No. 14) "Rail General Exemption Authority – Miscellaneous Agricultural Commodities", Interstate Commerce Commission, February 17, 1983 (367_ICC_298) at 11; and Ex parte No. 561, "Rail General Exemption Authority – Nonferrous Recyclables," Surface transportation Board, April 10, 1998 (3_STB_62) at 65. See also, Submission by the United States to the Ibero-American Competition Forum, "Trucking Deregulation in the United States," September 2007.

399 Koo, Won W., Denver D. Tolliver, and John D. Bitzan, "Railroad Pricing in Captive Markets: An Empirical Study of North Dakota Grain Rates," *Logistics and Transportation Review* 29, Number. 2 (1993) at 133-134.

for other rate-influencing factors.[400] Waterborne alternatives, too, are specifically found to discipline rail rates.[401]

310. The findings of the academic economics literature above are consistent with Defendants' experience. Defendants report that when customers have viable non-rail alternatives in the markets where they operate, the customers are fully cognizant of the fact that it is the rail all-in rate versus the alternative non-rail all-in rate(s) that they ultimately care about. Economics principles demonstrate that informed customers will be able to use their credible alternative sources of supply to negotiate lower prices as Defendants describe. Whether a fuel surcharge is contained in the all-in rate or not, threats to move to other viable transportation options compel Defendants to set all-in rates lower for customers holding those options in order to have a reasonable chance of retaining the customer's business. When this occurs, competition, not conspiracy, is determining the prices customers pay.

311. In short, general claims[402] to the effect that conspiracy would be relatively easy to achieve in the case at hand because there are relatively few Class I railroads and Defendants' combined share of Class I railroad traffic is "huge" are methodologically groundless and economically incorrect. The diversity of competitive firms and modes of transportation that a railroad faces across the many markets in which it operates means that a "common fact" of effective, anti-competitive coordination and conspiracy among actual competitors (and particularly the conspiracy alleged by Plaintiffs) across all those markets is implausible.

312. Across the multiplicity of markets in which Defendants operate, Plaintiffs' claimed conspiracy leaves out numerous non-Defendant rail and non-rail participants who demonstrably discipline rail rates and who would counteract would-be attempts to collude or otherwise abuse market power. A "common fact" of effective conspiracy across the relevant markets, and most especially a purported "common fact" of a common magnitude of injury to all Class Members, would require that these other competitors be included in the conspiracy.

---

400 Ellig, Jerry, "Railroad Deregulation and Consumer Welfare," Journal of Regulatory Economics, Vol. 21, No. 2 (2002), at 143-167.

401 Christensen Report 2009, Volume 2 at 12-8 to 12-11, 13-13 to 13-15, 14-7 to 14-9. See also, MacDonald, James M., "Competition and rail rates for the shipment of corn, soybeans, and wheat," RAND Journal of Economics (1987) at 162.

402 See, e.g., Rausser Merits Report at 29.

### E. "Same Percentage" Price Changes and Economic Irrationality under the Alleged Conspiracy

313. As we have seen, Prof. Rausser's claims of a common *fact* of injury across the Class emanate from his (albeit, now disavowed) US-wide market for rail-only service.[403] Prof. Rausser's theory of a common percentage magnitude of injury recognizes the fact of differential pricing across Class Members and maintains that differential pricing within and across markets does not overturn his claim that the alleged conspiracy would have a quantitatively common impact across the Class. Instead, Prof. Rausser acknowledges that differential access to "viable substitutes" gives Class Member customers differential "leverage" in dealing with Defendants and argues that:

> "[B]ecause a percentage Fuel Surcharge is by definition added to the line-haul or base rates otherwise established for particular rail movements by particular customers, prices after the application of the surcharge still reflect the fact that different shippers may have different amounts of leverage in their pricing negotiations with the railroads. That some shippers can negotiate prices lower than those negotiated by other shippers is unaffected by a Fuel Surcharge that increases all shippers' prices by the same percentage amount. Those shippers with greater leverage, due to, for example, more choices of transport alternatives, will still enjoy lower prices than those shippers with less leverage. The conspiracy will have increased the prices paid by all shippers by the same percentage amount."[404]

314. Prof. Rausser's "same leverage, same impact" theory is inconsistent with the basic economics of rational profit maximization by firms such as Defendants. It is also inconsistent with his description of the source of customers' leverage being alternative modes of transportation, for example. The goal of a conspiracy is to *change* the degree of pricing leverage that a shipper has over the putative cartel members by eliminating competition among the cartel's members. In a successful cartel, one member does not provide leverage over another for the cartel's customers. Of course, a cartel can only affect leverage arising from inside the cartel, not from outside the cartel. Thus, customers with varying alternatives to buying from a cartel member do not have the same degree of leverage or even the same relative degrees of leverage before and after a cartel is formed.

315. Prof. Rausser recognizes that sometimes a shipper's alternative to shipping on a Defendant railroad is to ship on another Defendant railroad. Other times, the alternative is to ship on a truck or barge for example. Were Defendants to conspire, customers whose leverage depends on competition between Defendants would have

---

403 Rausser Merits Report at 21.

404 Rausser Merits Report at 50.

their leverage reduced. Customers whose leverage depends on shifting from shipping on a Defendant railroad to shipping on trucks could well not have their leverage affected at all. Thus, the asserted conspiracy affects the price increases that the cartel could achieve from each customer depending on how the asserted conspiracy *changed* each individual customer's leverage in pricing negotiations. Under these circumstances, a constant percentage increase in price makes no economic sense because the effect of the asserted conspiracy is significantly different across customers.

316. For the profit-seeking firm (or firms, collectively, if those firms are conspiring and acting in a collusive manner), the price which maximizes profits depends on how responsive the firm's sales are to changes in price. The responsiveness of sales to price changes is measured by the *elasticity* of demand. We can denote this elasticity by ε, and it is measured by the ratio of the percentage change in quantity demanded to the percentage change in price that causes that change in demand.

317. When demand is not very responsive to changes in price (i.e., the elasticity of demand is small in absolute value), the firm maximizes profits by setting a relatively high mark-up over marginal cost, since its sales volumes suffer little when it does so. On the other hand, if demand is quite elastic (responsive to price), sales volumes drop off by relatively large amounts when prices are raised. The profit-seeking firm must then temper how much it raises price above marginal cost: Higher prices tend to raise profitability for each sale, but lost sales volumes that result when price is raised eat into profitability. Relative to a firm with less elastic demand, the profit-seeking firm facing more elastic demand cannot afford to raise price above marginal cost as much.

318. These economics of profit maximization are summarized by what economics refers to as the *Lerner Index*. Rational profit maximization by a business (or conspiratorially combined price-fixing businesses) is directly described by this Index:

$$Lerner\ Index = \frac{\text{Price} - \text{Marginal Cost}}{\text{Price}} = \frac{1}{\epsilon}$$

where $\epsilon$ represents the elasticity of demand facing the firm (expressed as a positive number) and "marginal cost" represents the incremental variable cost of putting incremental supplies on the market. The intuition behind this result is straightforward: As demand gets less elastic, ε shrinks and 1/ε gets larger. The Lerner Index shows that a firm finds it profitable to raise price relative to marginal cost as demand becomes less responsive to price changes. On the other hand, when demand is more responsive to price (higher ε), the firm sacrifices more volume as it raises its price. Consequently, the price/marginal cost margin that it finds maximizes profit goes down (i.e., as 1/ε goes down).

319. The elasticity of demand a firm faces depends on the responses of its rivals. If one supplier raises its price, its customers will be able to buy similar products from the supplier's competitor(s). If prices increase for all firms in a market, however, customers will not be able to turn to low-priced suppliers and will have to pay the higher price and/or cut back their use of the market's products. Thus, the sensitivity of the overall market's sales to price is lower than the sensitivity of a single supplier facing competitors in the market.

320. To the extent that a collusion of firms successfully eliminates competition among themselves and those firms are able to price cooperatively, the elasticity of demand facing the collusive collective of firms moves toward that of the market as a whole. For example, if the collusive group of firms constitutes the entire supply-side of the market, the elasticity of demand they face will be that of the market as a whole. And as noted, this elasticity is less than those firms face when not colluding or when they do not control the entirety of the market supply. Not surprisingly, then, the Lerner Index tells us that, all else equal, colluding firms will maximize profits by raising prices and thereby their price/marginal cost margins (i.e., as successful collusion lowers $\varepsilon$ for the collusion of firms and raises $1/\varepsilon$ for them).

321. The conspiracy claimed by the Plaintiffs and Prof. Rausser in the present matter purportedly eliminated inter-firm competition among Defendants. If we assume for the sake of discussion that the asserted conspiracy occurred, how would this affect profit-maximizing prices? The answer is "it depends". Specifically, it depends on how the conspiracy affects the elasticity of demand facing the conspirators. Differential pricing depends on more than competition among the assumed conspirators. Contrary to Prof. Rausser's asserted "same leverage" claim, customers' leverage would vary depending on the presence and competitive potency of the "viable substitutes" that Prof. Rausser recognizes are differentially available across the various markets in which Defendants operate and customers find themselves.

322. Consider, first, markets in which two or more Defendants participated prior to purported conspiracy and Defendants constituted the entire supply-side of the market (i.e., there were no "viable substitutes"). In such markets, an effective conspiracy would have shifted profit maximization by the individual Defendants from maximization based on their individually seen elasticities of demand to *collective* profit maximization based on lower market-wide elasticities of demand. The relevant value of $1/\varepsilon$ would have risen in the process, and profit-maximizing prices would have risen as a result of the Lerner Index. *But*, looking across such markets, profit-maximizing prices would not rise by "the same percentage amount" to the extent that Defendants' marginal costs and/or market elasticities of demand vary across such markets. With such variation, a conspiracy that raised all prices by the same percentage amount would be leaving profits on the table.

323. In fact, Defendants' marginal costs and demand elasticities are not plausibly the same across all markets. The different kinds of technologies, for example, ranging from, say, bulk handling of coal via open car unit train service to highly specialized and meticulous handling of hazardous chemicals, necessarily impart differences in marginal cost across services.[405] Moreover, extant research repeatedly finds that elasticities of demand for rail service vary by commodity and range from inelastic to elastic.[406] Broad-brush generalizations by Prof. Rausser to the effect that "[d]emand for rail freight services is inelastic"[407] are both wrong empirically and, by ignoring the multiple markets in which railroads operate and the importance of differences in elasticities across those markets, irrelevant to the question of the feasibility and rationality of the conspiracy he alleges.

324. Consider next those markets where the pre-"conspiracy" setting contained two or more Defendants but where there were also non-Defendants operating as the noted "viable substitutes". In each such market, the demand elasticity relevant to the putatively colluding Defendants would move toward, but not all the way to, the value of the overall market elasticity upon the advent of conspiracy. Even if (implausibly) marginal costs and market demand elasticities were the same across all of these markets, the profit-maximizing prices for Defendants would then not rise by the same percentage amount as in markets populated on the supply side only by Defendants. Rather, the elasticities of demand relevant to putatively conspiring Defendants would have changed by differential amounts depending on how many and what types of "viable substitutes" are present in such markets following the implementation of conspiracy.

325. Variation in how many and in the types of "viable substitutes" are present in such markets means that the effect of the purported conspiracy on customers would vary greatly across those markets. In markets in which rail has a distinct comparative advantage over other modes of transportation, customer "leverage" would be expected to decrease upon elimination of inter-Defendant competition. On the other hand, in markets with strong competition from, say, trucks, shippers' leverage would not be expected to be materially affected. Defendants would have to meet the competition from other modes whether they were conspiring or not. Given the mobility, the

---

405 See, for example, the discussion of the very high cost of hazardous commodity shipping in "Hazmat Transportation by Rail: An Unfair Liability," American Association of Railroads, March 2011.

406 See, for example, Chris Clark, Helen Tammela Naughton, Bruce Proulx, and Paul Thoma, "A Survey of the Freight Transportation Literature and a Comparison of Elasticity Estimates," Army Corps of Engineers, IWR Report 05-NETS-R-01, January 1, 2005. Standard practice in economics terms elasticities which are greater than -1.0 (or, less than 1.0 in absolute value) "inelastic". At a value equal to -1.0, a given percentage increase (or decrease) in price is just offset by the resulting percentage reduction (or increase) in quantity sold. Thus, a percentage increase in price of, say, 10% results in a 10% reduction in quantity sold – i.e., $\varepsilon = -10\% \div 10\% = -1.0$.

407 Rausser Merits Report at 36.

flexibility and responsiveness of trucks to changes in prices, the elasticity of demand faced by putatively conspiring Defendants would not be materially affected. By the terms of the Lerner Index, putatively conspiring Defendants would thus find no change in $\varepsilon$ and, hence, no change in their profit-maximizing price/marginal cost mark-ups and corresponding prices. The conspiracy is not plausible in such markets because the asserted conspirators are not important enough in the overall scheme of competition to successfully raise prices. To nevertheless agree to raise all customers' prices by the same percentage amount would be irrational. It would leave business on the table for non-rail competitors and reduce Defendants' profits in such markets.

326. Finally, consider those markets where the "pre-conspiracy" setting contained only one of the four Defendants. Whether that market was also served by other non-Defendant rail or non-rail competitors, the conspiracy alleged by Plaintiffs and Prof. Rausser would have no effect on inter-Defendant competition. The consequence is that the conspiracy would have no effect on customers' "leverage" and no effect on the elasticity of demand faced by the sole-serving Defendant. Thus, the alleged conspiracy would have no effect on the price/marginal cost mark-up (Lerner Index) and associated price that would maximize that Defendant's profits. Raising prices in these markets by the same percentage amount as in some other market or markets where there were multiple Defendants would leave profits on the table.

### F. Economic Rationality and the Benefits and Costs of Purported Conspiracy

327. The irrationality of the alleged conspiracy is particularly evident in those markets in which Defendants' putative raising of their prices would *take away* profits by pricing Defendants' services excessively high relative to customers' non-Defendant rail and/or multimodal competition. The same holds for single-Defendant-served markets in which agreeing to the alleged conspiracy of "same percentage" rate increases would push prices up even though conspiracy would not eliminate any competition, would not alter customers' "leverage", and would not alter elasticities of demand and profit-maximizing prices and mark-ups for the sole Defendant in such markets.

328. Recall that, according to Plaintiffs and Prof. Rausser, the conspiracy which they allege entailed not only "uniform", "universally applied", "same percentage" fuel surcharges, but also no "discounting" of base rates. The clear implication of the foregoing economics, however, is that it would be both individually and collectively irrational for Defendants to agree to not discount base rates in those markets in which imposition of a conspiratorial price increase would cost them profits. Being able to discount base rates and thereby adjust all-in rates (prices) would enable Defendants to keep conspiracy rates at profit maximizing levels. Moreover, under the conditions described by Prof. Rausser, in which Defendants' base rate and all-in rate changes are "transparent" and "cheating" changes can be distinguished from non-"cheating" changes, agreeing to not

discount base rate changes would not even be needed as an expedient method of preserving overall trust and stability in the alleged conspiracy.

329. That is, under the economics hypothesized by Prof. Rausser, it would pose no material risk to the purported conspiracy, and would be a positive source of capturing otherwise lost profits, for Defendants to agree that they would be able and allowed to discount base rates in at least their multi-modally competitive and sole-Defendant-served markets. Increasing rail rates on shippers that can readily shift to truck transportation when rail rates increase or on customers who are sole-served and dependent on rail and thus are already paying the monopoly price would lower rather than raise profits. In this situation, rather than not discounting rates, even a cartel would want to discount base rates for some customers and thereby adjust all-in rates (prices) to enable Defendants to keep conspiracy rates at profit maximizing levels.

330. Prof. Rausser appears to disregard the foregoing economics of his "same leverage, same percentage price increase" theories. Nevertheless, as noted above, he does indicate that he has somehow determined that, overall, the benefits of the purported conspiracy to Defendants outweighed the costs.[408] While no information on the point has been presented by Prof. Rausser, this might suggest that we should conclude that (i) the profits lost in pertinent markets under Prof. Rausser's "same percentage price increase" theory would be offset by (ii) increased profits achieved in markets where purported conspiracy would have eliminated inter-Defendant competition and raised profit-maximizing price levels (with those levels not being overshot by the putative "same percentage" conspiratorial price increase[409]). Available data, however, do not support such speculation.

331. Figures V-6A and V-6B show each Defendant's shares of revenues in the two categories of traffic – exempt and sole served. We have seen these categories are most obviously susceptible to the irrationality of collusively agreeing to "same percentage" price increases and "no discounting of base rates" – and thereby *losing* profits through conspiracy. In Figure V-6A, I have employed Prof. Rausser's definition of sole-Defendant-served traffic (i.e., based on sole-served Department of Commerce's Bureau of Economic Analysis (BEA) areas). In Figure V-6B, I have employed the definition of sole-served based on *counties*, as recommended by research commissioned by the

408 Rausser Merits Report at 49.

409 As noted above, even where conspiracy reduces the relevant elasticity of demand faced by Defendants and raises profit-maximizing price/marginal cost mark-ups and associated prices, variations across markets in *how much* profit-maximizing prices are raised mean that a "same percentage" price increase conspiracy could readily result in prices that exceed profit-maximizing levels and, thereby, cost purported conspirators profits relative to even non-conspiracy conditions.

Surface Transportation Board.[410] Using either measure, Figures V-6A and V-6B show that at the time of the purported "emergence" of conspiratorial "understanding" in the spring and early summer of 2003, the share of Defendants' revenue which was derived from exempt and sole-served traffic was substantial.

Figure V-6A

**Exempt Traffic and Traffic in Prof. Rausser's Sole-Served Regions: Percent of Unregulated Revenue**




**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** Sole-served BEAs identified in Rausser Merits Report (Figure A.2).

410 As explained in the Christensen Associates study of rail competition commissioned by the STB: "In developing indicators of local competition between railroads, it is desirable that the units of geography be neither too big nor too small. The geographical units should be big enough so that the cost of avoiding railroads that solely serve them is nontrivial without being so large as to encompass railroad options that are, as a practical matter, unavailable to 'captive' shippers. Our view is that the county level balances these two concerns better than other units of geography...." Christensen Report 2009, Volume 2 at 11-13 to 11-14.

Figure V-6B

**Exempt Traffic and Sole-Served Traffic:**
**Percent of Unregulated Revenue**




**Source:** Defendants' Transaction Data
**Note:** Sole-served traffic excludes intermodal and exempt traffic and is defined as movements for which the origin or destination county (4-digit SPLC) has 90% of its carloads moved by one of the Defendants.

332. The top panels of Figures V-6C and V-6D show the average rates (in revenue per ton-mile) associated with the sole-served and exempt traffic revenues represented in Figures V-6A and V-6B, respectively. The bottom panels of each figure show the rates (in revenue per ton-mile) associated with the traffic that is neither exempt nor sole-served. For each Defendant, the rates they receive on average on their exempt and sole-served traffic are higher than on the non-exempt, not-sole-served traffic. Thus, in light of Figures V-6A and V-6B, Defendants each have more of their revenue in higher priced traffic. As we have seen, this is the traffic most obviously susceptible to the irrationality of collusively agreeing to "same percentage price increases" and "no discounting of base rates" – and thereby losing profits through conspiracy. These results provide no support for a conclusion that the benefits of conspiring would have outweighed the costs.

Figure V-6C

## Average Revenue Per Ton-Mile for Exempt Traffic and Traffic in Prof. Rausser's Sole-Served Regions




## Average Revenue Per Ton-Mile for Non-Exempt Traffic Not in Prof. Rausser's Sole-Served Regions




**Source:** Defendants' Transaction Data
**Note:** Sole-served BEAs identified in Rausser Merits Report (Figure A.2).

Figure V-6D

## Exempt Traffic and Sole-Served Traffic: Revenue Per Ton-Mile




## Non-Exempt Traffic and Not-Sole-Served Traffic: Revenue Per Ton-Mile




**Source:** Defendants' Transaction Data
**Note:** Sole-served traffic excludes intermodal and exempt traffic and is defined as movements for which the origin or destination county (4-digit SPLC) has 90% of its carloads moved by one of the Defendants.

333. Not only do these data belie any suggestion that Defendants would blithely ignore negative impacts that their purported conspiracy would have on their profitability in pertinent markets, but the differences the data indicate existed between the Defendants would have represented a significant source of disunity within the alleged conspiracy. All else equal, had Defendants conspired, each of the Defendants would have had strong incentives to "cheat" on the conspiracy's asserted agreement to not adjust all-in rates by discounting base rates. As we have seen such adjustments of rates would enable Defendants to avoid losing profits that would otherwise be sacrificed in those markets where the "same percentage price increase" conspiracy would have no effect on profit-maximizing prices – but the alleged conspiracy purportedly entailed agreement to avoid such adjustments. Moreover, the data indicate that these incentives to "cheat" and destroy the trust required by conspiracy would not be identically felt by each Defendant. For example, all else equal, with its very high dependence on exempt and sole-served revenue (Figures V-6A and 6B), BNSF would be more subjected to such pressures than, say, NS. Inter-conspirator differences in incentives and goals under a conspiracy are key sources of conflict that push conspiracy toward infeasibility.[411] They have been ignored by Prof. Rausser.

334. While Prof. Rausser asserts that the benefits of the conspiracy he alleges outweighed the costs, he actually has not weighed purported benefits against actual costs. He acknowledges that in contemplating the issue he has not considered and taken into account the risks of antitrust liability that Defendants bore under his hypothesized conspiracy. He further acknowledges, at least implicitly, that such risks represent actual costs that rationally conspiring Defendants would take into account in any weighing of benefits and costs. However, he opines that he has "disregarded" such costs "[b]ecause fundamentally, [he doesn't] have the data" required to implement the analysis he would otherwise undertake.[412] Yet, if he does not have the data he would desire, and has not undertaken the associated analysis of relevant costs, then there is no basis for asserting that whatever benefits he sees as emanating from the purported conspiracy *actually* "outweighed the costs".[413] His assertion is speculation in the strict sense; and, as we have seen, not supported by key data pertinent to the matter.

### G. Methodological Implications for Determination of Facts Common to the Class

335. In asserting that the alleged conspiracy will have had the same percentage impact on prices for all Class Shipments, Prof. Rausser implicitly dismisses the noted implications

411 Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, (4th Edition), (New York: Pearson, Addison Wesley, 2005) at Chapter 5, specifically 127-144.

412 Rausser Merits Deposition at 125.

413 Rausser Merits Report at 49.

of differential pricing across customers, the associated demonstrable differences in demand elasticities such pricing indicates, the acknowledged differential access to "viable substitutes", the prevalence of sole-Defendant rail service, the evident widespread intermodal competition, and the like.[414] He accomplishes the dismissal with broad-brush conclusory assertions of the form: "Demand for rail freight services is inelastic";[415] "customers have a choice over which routes to run shipments", notwithstanding acknowledgement of broad regions of sole-service,[416] and, "Defendants themselves have admitted before Congress that 'even where there is only one railroad serving a facility, there are market factors at play.'"[417]

336. Assertions of these types do not resurrect Prof. Rausser's claims of a single, national market in homogeneous rail service or his assertions regarding "same leverage, same percentage price impacts". Indeed, his assertions are contradicted by research and data. Thus, for example, innuendo to the effect that maybe there really are no sole-served markets and that all customers have multiple viable route choices is contradicted by research that finds that prices differ systematically across markets depending on whether or not they are sole-served, have feasible access to multimodal alternatives, and the interaction of such factors and the types of commodities that are being shipped.

337. In this regard, research commissioned by the Surface Transportation Board reports that: "We find generally expected effects on RPTM [revenue per ton-mile] from increasing the number of effective railroad competitors at the origin and from increasing the distance from the origin to the nearest available water transportation. That is, rates tend to be lower given increased competition from other railroads at the origin or from increased proximity of the water alternative, and higher for shippers with more limited railroad and water options."[418] The researchers further find "that rates for counties without railroad competition [i.e., sole-served at the county level] are commonly higher than they would be in the presence of even very limited railroad competition."[419] They observe these effects for both origin and destination locations for coal, at origin and

---

414 Prof. Rausser has proposed a damage methodology that does not yield constant percentage overcharges for shippers purchasing transportation from Defendants at the same time. I address this methodology below in Section VII.

415 Rausser Merits Report at 36.

416 Rausser Merits Report at 17.

417 Rausser Merits Report at 19, quoting testimony of James R. Young, Chairman, CEO and President, Union Pacific Corporation, dated September 25, 2007, United States House of Representatives Committee on Transportation and Infrastructure Hearing on Rail Competition and Service, at 16.

418 Christensen Report 2009, Volume 2 at 11-18.

419 Christensen Report 2009, Volume 2 at 11-18, 12-8 to 12-11, 13-13 to 13-15, 14-7 to 14-9.

destination for wheat, at destination for corn, and at origin and destination for chemicals. Moreover, the noted effects change substantially over time.[420]

338. As one study concluded, there is "strong evidence that captive shippers pay higher rates than non-captive shippers." [421] In the aforementioned study of North Dakota agricultural crops, not only did the research find that competition between modes had significant effects on rates, but also that competition between two railroads as compared to one did as well. [422] Research also finds that an extra railroad competitor makes a substantial difference in holding down rail rates for movement of corn, soybeans, and wheat.[423] In a study of Powder River Basin coal, the researchers report that the "evidence suggests it is likely that direct competition between two rail carriers is sufficient to generate low rates for shippers."[424] Utilizing survey information that identified the specific competitive options for individual shippers of various commodities combined with statistical methods, another study found that being "captive" – i.e., lacking rail or other transportation options – caused rail rates to be 20% higher after controlling for other factors.[425]

339. This evidence tells us that there are, indeed, multiple markets, with multiple and different demand elasticities, at work setting prices. It further tells us that associated profit-maximizing prices for railroad service depend on the availability of "viable substitutes" in the form of other modes of transportation and whether or not customers are actually single-served or not.

340. Another version of Prof. Rausser's broad-brush generalizations proffered in support of his reasoning that there is one national market across which a common fact of adverse impact was spread by conspiracy is that the alleged conspiracy shut down competition stemming from the threat that Defendants (albeit, no one else, not even highly mobile and flexible trucking operations) would otherwise enter and compete "through expansion into each other's territories."[426] According to Prof. Rausser: "In the pre-

---

420 Christensen Report 2009, Volume 2 at 12-8 to 12-11, 13-13 to 13-15, 14-7 to 14-9.

421 Ellig, Jerry, "Railroad Deregulation and Consumer Welfare," Journal of Regulatory Economics Vol. 21, No. 2 (2002): 143-167.

422 Koo, Won W., Denver D. Tolliver, and John D. Bitzan, "Railroad pricing in captive markets: an empirical study of North Dakota grain rates." Logistics and Transportation Review 29, no. 2 (1993) at 133-134.

423 MacDonald, James M. "Competition and rail rates for the shipment of corn, soybeans, and wheat." The RAND Journal of Economics (1987) at 162.

424 Winston, Clifford, Scott Dennis, and Vikram Maheshri. Duopoly Equilibrium over Time in the Railroad Industry, Brookings Institution, Congressional Budget Office, University of Rochester, May 2011at 42.

425 Grimm, Curtis, and Clifford Winston, "Competition in the deregulated railroad industry: Sources, effects, and policy issues," in Peltzman, Sam and Clifford Winston. Deregulation of Network Industries: What's Next? Brookings Institute Press, 2000 at 41-71.

426 Rausser Merits Report at 18.

conspiracy world, the threat of such entry would have had a tendency to keep prices low in remote regions";[427] while other (unspecified) competitors purportedly "did not have the resources" to provide such competitive discipline whether or not conspiracy was present.[428]

341. Prof. Rausser provides no facts or data to support these assertions. To the contrary, he indicates that he has not conducted any empirical analysis and cannot recall any evidence that supports his assertions.[429] The claim to the effect that only Defendants would have the resources to expand into each other's territories is particularly unfounded, since many of the Class Members are larger corporations than the Defendants (including such companies as major oil companies, automakers, and other manufacturers[430]). These firms and others have the resources to undertake expansion of rail networks to obtain the benefits of rail-on-rail competition when such expansions are feasible.

342. There is no material disagreement that long-line railroad expansion is subject to barriers to entry. These come not from the high cost of such expansion, but from the combination of high cost and the fact that, once made, investments in long-line rail expansion are inevitably "sunk" into a network industry with substantial economies of scope and scale that advantage incumbents. That is, once made, such investments are literally bolted to the ground, and it is prohibitively expensive to pull them up and redeploy them if an attempt at entry turns out to be unsuccessful. This deters entry,[431] and particularly across the large portions of Defendants' networks that Prof. Rausser, himself, notes are sole-served (Figure V-7; see also Figures V-1A and 1B).

---

427 Rausser Merits Report at 18.

428 Rausser Merits Report at 18.

429 Rausser Merits Deposition at 81-82.

430 For example, as of 2003, Class Members ExxonMobil, General Motors, and International Paper Company all had assets larger than those of any Defendant. See International Paper, 2003 Annual Report at 37; General Motors Corporation, 2003 Annual Report at 61; Exxon Mobil, 2003 Financial Summary, at 36. See also, BNSF 2003 Railroad Form R-1 at Schedule 200; UP 2003 Railroad Form R-1 at Schedule 200; CSX 2003 Railroad Form R-1 at Schedule 200; and NS 2003 Railroad Form R-1 at Schedule 200.

431 Baumol, William J., and Robert D. Willig "Fixed Costs, Sunk Costs, Entry Barriers, and Sustainability of Monopoly," Quarterly Journal of Economics, August 1981, at 418-420.

Figure V-7

**Prof. Rausser's Sole-Served BEAs**




**Source:** http://www.nationalatlas.gov.mld.railrdl.html; Bureau of Economic Analysis

343. Even more importantly, the barriers to entry of competitors that are relevant for assessing the feasibility of successful conspiracy by Defendants are those that might pertain to localized "build-in or build-out" entry by a competing railroad, and entry or expansion of capacity by non-rail competitors. Here, the inquiries are inherently highly individualized and do not permit broad-brush generalization. Preeminent illustration of this is provided by the named Class Representatives. Class Representatives have stated repeatedly that they do not have access to more than one railroad at many or even all of the locations where they ship.[432]

344. The transportation options available to shippers depend on the nature of the product being shipped and the location of the shipper relative to existing rail facilities. The case of Class Representative U.S. Magnesium ("USM") illustrates the highly fact-specific, individualized inquiry that is appropriate to the question of alternatives to an otherwise solely serving railroad. On May 4, 2009, USM filed a complaint with the STB,

---

432 See, e.g., Videotaped Rule 30(b)6 Deposition of Blair Carter, May 11, 2010 at 76; Videotaped Rule 30(b)6 Deposition of Michael Donnelly, March 16, 2010 at 77-79; Videotaped Rule 30(b)6 Deposition of Nyrstar Taylor Chemicals, Inc. [Betsy L. Myers], March 11, 2010 at 89-90; Videotaped Rule 30(b)6 Deposition of Dr. Howard Kaplan, March 10, 2010 at 31-34.

"seeking the establishment of reasonable railroad rates for the transportation of chlorine from Rowley, Utah to Eloy, Arizona and Sahuarita, Arizona."[433] In its Complaint, USM asserted that UP had market dominance over the transportation covered by the challenged rates, claiming that: "There is no feasible transportation [rail, non-rail, or routing] alternative to UP rail service for the transportation of chlorine from Rowley to Eloy and Sahuarita."[434]

345. USM explained why it lacked rail-on-rail intramodal alternatives as:

> "There is no effective intramodal competition for rail transportation from the Rowley facility to Eloy and Sahuarita because UP is the only railroad with physical access to both the Rowley facility and the Eloy and Sahuarita destinations. More specifically, the Rowley facility is located on the western shore of the Great Salt Lake at the end of a 14-mile line of rail owned by the UP, which connects to the UP main line running east to west through Salt Lake City into Nevada and on to Northern California. The closest connection to another railroad is to track owned by BNSF Railway Company ('BNSF') located in Salt Lake City, approximately 60 miles away.... There are thus no ["build-in", "build-out" or transshipment] railroad alternatives that constrain UP's pricing power over the movement of chlorine from Rowley to Eloy and/or Sahuarita."[435]

346. USM also explained why it lacked non-rail competition:

> "There is also no effective intermodal competition for the issue traffic. Intermodal competition with rail transportation from trucks does not exist for chlorine due to chlorine's status as a toxic by inhalation ('TIH') chemical, a reality prior litigants before this Board have readily conceded and this Board has rightfully acknowledged... There is no waterway that could be used for barge transportation between Rowley and the destination facilities in Eloy and Sahuarita. Similarly, there is no chlorine pipeline that could be used as a substitute for rail transportation."[436]

347. UP conceded in the USM matter "that it could not prevail on the issue of whether there is qualitative evidence of effective competition for the issue movements under the Board's standards." After detailed examination of the facts and circumstances individualized to the specific case, the STB found that "UP has market dominance with

433 Before the Surface Transportation Board, Complaint, U.S. Magnesium, L.L.C., Complainant, v. Union Pacific Railroad Company, Defendant, Docket No. NOR 42114, May 4, 2009, ("USM Complaint"), at 1.

434 USM Complaint at 5.

435 USM Complaint at 5.

436 USM Complaint at 6-7.

respect to the Eloy and Sahuarita movements."[437] Based on the record, the STB granted USM's request for regulatory rate protection and also granted USM reparations.[438]

348. Of relevance here, if the facts of this Class Representative stand for the facts common to the Class, we would conclude that Class shippers with sole-service rail options do not enjoy realistic competitive options from other rail or non-rail alternatives. As we have seen, under such economic conditions, when only one Defendant is a competitively viable provider of freight transportation service for the specific market at issue, the alleged conspiracy would not have removed non-existent inter-Defendant or any other competition. Consequently, the alleged conspiracy would not have altered and affected the profit-maximizing rates UP would rationally charge with or without conspiracy. In fact, as noted, it would have been irrational for UP to enter into the alleged conspiracy because it would have compelled UP to both harm itself and harm USM by causing it to raise rates above the profit maximizing level.

349. Note also that among Defendants, in this instance only UP is present to see and detect the rates being offered to USM. No other Defendant would lose business or have to reduce its rates for the service to USM as a result of UP "cheating" on the purported agreement not to adjust base and associated all-in rates when otherwise profitable to do so. Plaintiffs' critical indicator of "cheating" – "seeing whether or not some shippers that otherwise [other Defendants] would be able to capture, they are losing, because an alleged co-conspirator is discounting the base rate and giving them a lower all-in rate"[439] – would not be triggered. Thus, UP could cheat by discounting rates to USM without material fear of detection. In these circumstances, there is no basis for asserting that UP would raise rates to USM. Finally, the methodologic lesson to be drawn is that assertions to the effect the purported conspiracy had the same effect on customers' "leverage" across all Class Members, and/or that Defendants would compete everywhere, even where they are not physically present, in the absence of conspiracy are unfounded.

350. The USM case also contradicts Prof. Rausser's blanket suggestion to the effect that customers always have route choice because, he avers, even across broad and remote regions, customers benefit, absent conspiracy, from "geographic or source competition."[440] However, he has also acknowledged that not all rail shippers have choice or benefit from rail competition.[441] As discussed in Section III above, geographic and source competition can arise when the combination of a customer's

437 USM Decision at 5.

438 USM Decision at 2.

439 Rausser Merits Deposition at 136.

440 Rausser Merits Report at 18.

441 Rausser Merits Deposition at 71; Rausser Merits Report at 16.

shipping patterns and the layout of the nation's rail network make it possible for a customer to play one railroad off against another by credibly having the ability to access multiple origins served by different railroads and/or deliver to multiple destinations without having to rely on but one railroad.

351. It is clear that such competition can arise, as when, for example, a grain shipper can access alternative ports via separate railroads when seeking to move its grain to downstream markets. At the same time, however, it is clear that determining whether or not the market for particular commodities and particular shippers is subject to geographic or source competition is not susceptible to broad-brush generalization. The matter is inherently context- and fact-specific. In fact, it is noteworthy that the STB adopted policies in 1998 under which it now refuses to consider evidence of geographic and source competition when undertaking market dominance inquiries into specific commodity and customer rate reasonableness. In doing so, the STB cited the substantial cost and effort that the fact-specific nature of such inquiries requires as rationale for its policy.[442]

352. It is telling that, as support for his suggestion that geographic and source competition provide ubiquitous competitive alternatives to Class Members (unless eliminated by putative conspiracy), Prof. Rausser cites an AAR document and a Defendant statement to assert that such competition "can" and "often" does arise.[443] But "can" and "often" do not signify "common facts" across the country and the Class. Just as cases such as USM's Utah-Arizona movement of chlorine does not stand for the proposition that *no* such movements anywhere in the U.S. have viable multi-rail or non-rail alternatives, so Prof. Rausser's citations do not stand for the proposition that all or any specific other movements have access to geographic and source competition in the non-conspiracy setting.

353. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

442 Surface Transportation Board Decision, STB Ex Parte No. 627, Market Dominance Determinations—Product and Geographic Competition, decided December 10, 1998.

443 Rausser Merits Report at 18-19.

[redacted][444]

354. [redacted][445]

[redacted][446] [redacted][447]

444 Videotaped Rule 30(b)6 Deposition of Michael Gilley, May 5, 2010 ("Gilley Deposition") at 67-68.

445 Gilley Deposition at 71-72.

446 Gilley Deposition at 74.

447 Gilley Deposition at 77-78.

355. [redacted]

356. [redacted][448] [redacted][449] [redacted]

357. The inapplicability of blanket generalizations regarding such determinants of the boundaries of competition such as the types and potency of rail-to-rail and rail-to-non-rail competition and geographic and source competition is evident in inquiries routinely undertaken by the STB. Thus, for example, in applying its tests for market dominance in the context of shipper rate protests (described in Section III above), the Board first assesses whether a challenged rate exceeds 180% of the rail carrier's variable cost. If it does, it then proceeds to a highly individualized investigation into "whether there are any feasible transportation alternatives that could be used for the issue traffic."[450] The Board describes its inquiries:

> "Whether certain transportation alternatives are sufficiently competitive to bring market discipline to the carrier's pricing—i.e., whether feasible alternatives constitute competition sufficient to deter the carrier from charging monopoly prices—is a complicated issue to resolve. The preliminary step is to determine the feasibility of any theoretical transportation alternatives that could be used for the issue traffic (considering both intramodal and intermodal alternatives). Within this rubric the Board considers many factors, including, for example, whether and to what extent such alternatives might involve potentially prohibitive transport distances, product integrity concerns, capacity/infrastructure constraints, and the presence of any transportation requirements imposed by the complaining shipper's customers. If an

448 Videotape Rule 30(b)6 Deposition of BNSF through William Ruoff, March 25, 2010 at 28-29.

449 Videotaped Rule 30(b)6 Deposition of Dust Pro, Inc. through Louis Snow, June 4, 2010 at 36.

450 USM Decision at 4-5.

alternative is not feasible, it cannot bring market discipline to a carrier's pricing adequate to restrain rates effectively."[451]

358. In a recent CSXT matter, the STB recognized that, depending on each relevant market's individual facts and circumstances, truck and/or truck-rail service may or may not be effective competition for rail-transportation to sole-rail-served locations. For 26 separate transportation lanes, the STB indicated that the lack of such competition was effectively conceded. After detailed analysis of the remaining 43 lanes, the STB concluded "CSXT lack[ed] market dominance over ... six rates" and found the opposite for the remaining lanes.[452]

359. The USM matter noted above is a representative example of the STB's stated need for individualized inquiry into issues of competition in Defendants' many markets. Under Prof. Rausser's reasoning, on the other hand, no individual inquiry is needed since, as noted, Prof. Rausser asserts that "Defendants sold rail freight services throughout the U.S., and customers within that market commonly experienced the effects of competition" among Defendants.[453] Shippers in Prof. Rausser's framework may be subjected to conspiracy among competing Defendants, but none are sole-served by a dominant railroad, Defendant or otherwise. Rate investigations by the STB are superfluous.

360. Beyond his assertions regarding "entry" by other Defendants into each other's territories, purported ubiquity of customer choice over multiple routes, and geographic or source competition, Prof. Rausser argues that:

> "A [further] reason that competition is pervasive is the opportunity cost a railroad faces when investing in regions where prices are low relative to regions where prices are high. A railroad that operates in a remote region as well as in a region where other railroads drive prices down will have an incentive to divert its own resources (*i.e.*, locomotives and cars) from the region where prices are low to the region where prices are high. With this diversion, it can, at the margin, increase its sales at high prices, while reducing its sales at low prices. Such a diversion increases the supply of locomotives and cars into remote regions, which drives down prices. In this way, the competitive effects in one region influence prices in another region. To the extent that a price fixing conspiracy removes such competitive effects, customers in all regions will suffer some harm."[454]

---

451 Surface Transportation Board, Updated Decision—Public Version, Docket No. NOR 42123, M&G Polymers USA, LLC v. CSX Transportation, Inc., December 7, 2012 ("STB M&G Polymers") at 11-12.

452 STB M&G Polymers at 21.

453 Rausser Merits Report at 21.

454 Rausser Merits Report at 17-18.

361. Prof. Rausser appears to be arguing that as purported conspirators raise rates in regions or services where their conspiracy eliminated rail-to-rail inter-Defendant competition, sole-served locales will have their supplies of locomotives and other equipment drawn to such higher priced opportunities, thereby putting upward supply and demand pressure on prices for service to sole-served locales. In textbook error, this has the economics of the exercise of monopoly power over sole served shippers entirely backwards.

362. If a conspiracy is to raise rates, it must reduce output, raising prices and reducing the quantity of rail service demanded. In so doing, it *frees up* resources since injured shippers ship less (based on the elasticity of their demands). Prof. Rausser's reasoning about the geographic and service reallocation of supply then means that those freed up locomotives and other equipment are available for deployment to conspirators' respective sole-served traffic.[455] This pushing of supplies toward sole-served traffic would tend to *reduce* rates for truly sole-served customers. In short, properly applied, Prof. Rausser's reasoning leaves some Class Members paying higher prices as a result of purported conspiracy, but others paying lower prices. The claims of universal, common injury across the class are thus contradicted. Instead, we are left with some members of the Class harmed and some members of the Class benefited by the alleged conspiracy.

### H. The Purported Conspiracy Not to Discount Base Rates

363. Prof. Rausser opines that Defendants conspired not to discount base rates so as not to offset fuel surcharges through base rate reductions.[456] This plays a critical role in his framework: As I have noted, the putative imposition of "uniform", "universally applied", more "onerous" revenue-based fuel surcharges on top of "static", "non-discountable" base rates sits at the core of Prof. Rausser's assertions that the alleged conspiracy "ensured that Defendants' Fuel Surcharges had a uniform impact across the Class."[457] Moreover, he repeatedly stresses that central evidence of the conspiracy is provided by his conclusion that there was neither "material" nor "systematic"

---

455 Economically, when output is restricted in not-sole-Defendant-served markets that are putatively harmed by the conspiracy's elimination of inter-Defendant competition, the true cost (economics says "opportunity cost") of moving incremental supplies of equipment and service to sole-Defendant-served markets falls: The incremental supplies of resources are no longer needed and used in the not-sole-Defendant-served markets; the returns they could earn there are no longer an opportunity cost of allocating them to solely-served markets. As the Lerner Index indicates, this fall in cost means a fall in the profit-maximizing price/marginal cost margin and associate price in solely-served markets.

456 Rausser Merits Deposition at 128-129.

457 Rausser Merits Report at 128.

discounting of base rates.[458] As discussed at length above, base rates purportedly had to be fixed by conspiracy to make the alleged conspiracy "manageable": As Prof. Rausser's theory effectively acknowledges, if base rates were not effectively frozen, changes in base rates, even with uniform fuel surcharge formulas, would impart changes in all-in rates and an all-in rate conspiracy would be "effectively unmanageable" due to the infeasibility of monitoring and enforcing such a collusion.[459]

364. Indeed, in Prof. Rausser's framework, his conclusion that base rates were "static" means his theory that the problem of making the purported conspiracy "manageable" was solved. And the conclusion that there was neither "material" nor "systematic" discounting of base rates means that the effects of the conspiracy were not unraveled by reductions in base rates that offset purportedly conspiratorial fuel surcharges. Moreover, Prof. Rausser emphasizes that the (claimed) lack of systematic discounting of base rates undergirds his ability to interpret documents and inter-Defendant communications as fitting into an otherwise amorphous "body of evidence" from which he concludes that all-in rates were effectively raised by conspiracy.[460] His "finding" of no systematic discounting of base rates even tells him that Defendants were able to successfully monitor and enforce their conspiracy against "cheating".[461] He reasons that, if there had not been effective monitoring and enforcement of the putative conspiratorial agreement by Defendants, there would have been "cheating" on the conspiracy in the form of material discounting of base rates.[462] Finally, as noted above, it is also important that base rates be "static" in Prof. Rausser's theory of conspiracy. If Defendants' purported agreement permitted upward changes in base rates, the claimed conspiracy would again be rendered "unmanageable" as it would be infeasible in Prof. Rausser's framework to monitor and enforce how much change in base rates—and hence all-in rates—was permissible.

365. To test Prof. Rausser's claims and conjectures about the behavior of base rates it is necessary to develop a dataset in which we pair individual Class Members' "before and after" base rates for common shipments – i.e., the same commodity over the same route for the same customer. To do so, I have employed Prof. Rausser's route and commodity conventions, and I have accounted for his concern that seasonal variation may be present in rates by comparing base rates in March 2003 (immediately before suggestions of purported implementation of the alleged conspiracy) to base rates in March 2006 (in the heart of the Class Period). Thus, the factors controlled for include

[458] Rausser Merits Report at 9, 114, 137-138, 140-144; Rausser Merits Deposition at 132, 248-249, 310-311, 336-337.

[459] Rausser Merits Report at 52, footnote 94.

[460] Rausser Merits Deposition at 44-45, 180, 198-199, 201.

[461] Rausser Merits Deposition at 105-106.

[462] Rausser Merits Deposition at 105-106.

commodity (defined at the 7-digit STCC level), route, interline status, car-type, and season.[463] The results in Figures V-8A through 8E are 7,484 comparison pairs of carload base rates across all Defendants for March 2003 versus March 2006.

Figure V-8A

**Testing Prof. Rausser's Assertion that Base Rates Were "Static": Distribution of Actual Base Rate per Carload Changes, March 2003 v. March 2006 All Defendants**




**Source:** Defendants' Transaction Data
**Note:** * Same customer, commodity (7-digit STCC), route, interline status, and car-type. Base rate is base revenue per carload (2000$).

[463] Rausser Merits Report at 113.

Figure V-8B

**Testing Prof. Rausser's Assertion that Base Rates Were "Static": Distribution of Actual Base Rate per Carload Changes, March 2003 v. March 2006 BNSF**




| | Count | Percent |
|---|---|---|
| Total Equal to Zero | 56 | 4% |
| Total Less than Zero | 401 | 26% |
| Total Greater than Zero | 1,082 | 70% |
| **Total** | **1,539** | **100%** |

**Source:** Defendants' Transaction Data
**Note:** *Same customer, commodity (7-digit STCC), route, interline status, and car-type. Base rate is base revenue per carload (2000$).

Figure V-8C

**Testing Prof. Rausser's Assertion that Base Rates Were "Static": Distribution of Actual Base Rate per Carload Changes, March 2003 v. March 2006 CSXT/CSXI**




**Source:** Defendants' Transaction Data
**Note:** *Same customer, commodity (7-digit STCC), route, interline status, and car-type. Base rate is base revenue per carload (2000$).

Figure V-8D

**Testing Prof. Rausser's Assertion that Base Rates Were "Static": Distribution of Actual Base Rate per Carload Changes, March 2003 v. March 2006**
**NS**




| | Count | Percent |
|---|---|---|
| Total Equal to Zero | 55 | 4% |
| Total Less than Zero | 460 | 38% |
| Total Greater than Zero | 709 | 58% |
| **Total** | **1,224** | **100%** |

**Source:** Defendants' Transaction Data
**Note:** *Same customer, commodity (7-digit STCC), route, interline status, and car-type. Base rate is base revenue per carload (2000$).

Figure V-8E

**Testing Prof. Rausser's Assertion that Base Rates Were "Static": Distribution of Actual Base Rate per Carload Changes, March 2003 v. March 2006 UP**




| | Count | Percent |
|---|---|---|
| Total Equal to Zero | 46 | 2% |
| Total Less than Zero | 915 | 43% |
| Total Greater than Zero | 1,175 | 55% |
| **Total** | **2,136** | **100%** |

**Source:** Defendants' Transaction Data
**Note:** *Same customer, commodity (7-digit STCC), route, interline status, and car-type. Base rate is base revenue per carload (2000$).

366. Support for the hypothesis of a conspiracy to not discount base rates and for the claim of "static" base rates should show up as base rate changes of zero. In Figure V-8A, this would produce a vertical line set at zero on the horizontal axis which measures percentage changes in base rates and rising to a height along the vertical axis of 7,484 shippers.[464] At the very least, according to Prof. Rausser, there should be "no material

464 According to Prof. Rausser, there would be some possibility of modest dispersion to the left of zero, because the conspiracy he alleges would not have been perfect: "While there were, as in all conspiracies, some incentives to deviate through concessions to individual shippers,... there is no evidence that concessions frequently or systematically occurred." Rausser Merits Report at 114.

discounting of base rates", and base rate changes should be tightly clustered around zero in the figure.[465] As we can see, however, Figure V-8A provides no support for Prof. Rausser's claims. The same conclusion holds for each of the Defendants individually, as seen in Figures V-8B through 8E.[466]

367. In Figure V-8A, there is clearly "material" discounting of base rates: Of the 7,484 base rates that can be compared pre- and post-"conspiracy" for March 2003 v. March 2006, fully 35% (2,629) have base rate reductions. Almost 1,100 of the base rate reductions exceed 10%. All of these cases represent base rates that were lower in March 2006, during the heart of the conspiracy, than they were in March 2003, just prior to the purported onset of conspiracy.

368. Similarly, it is clear that base rates were not "static". Not only are more than 2,600 of the base rate changes negative (leaving more than 4,600 positive changes), but the distribution of base rate changes is not tightly clustered around zero. In fact, the distribution of changes in base rates is not centered on zero. The average ("mean") base rate change is +11%. Moreover, the middle two-thirds of the changes lie between -8% and +25%. Thus, fully one third of base rates fell by more than 8% or rose by more than 25%. The "discounting" is material and base rates were not "static".

369. The dispersion of base rates in Figures V-8A thorugh 8E is consistent with the behavior of base rates expected in the absence of conspiracy. In Prof. Rausser's framework, the fact that base rate changes are not "systematically" discounted—i.e., are not entirely or overwhelmingly negative—is only interpretable as somehow being evidence of effective conspiracy and no "cheating" on that conspiracy if there is a conspiracy to "cheat" on in the first place. If there were no conspiracy, we would expect base rate changes to be dispersed over a range of positive and negative values—as they are in Figures V-8A through 8E.

370. Specifically, a dispersion of base rate changes over positive and negative values is consistent with the challenged fuel surcharges being unilateral, non-conspiratorial business responses to market pressures emanating from risks of higher fuel prices. As noted, in that non-conspiratorial setting, applying fuel surcharges on a given base rate in a setting of non-homogeneous commodities, customers and negotiations would be expected to sometimes yield all-in rates that were too high, and to sometimes yield all-in rates that were too low relative to competitive market rates. Non-conspiratorial market forces would then tend to push the former down via reductions in base rates, and to push the latter up in the form of increases in base rates. The changes in base rates in Figures V-8A through 8E have this pattern.

---

465 Rausser Merits Report at 9.

466 This conclusion also holds when the analysis is performed on the basis of revenue per ton-mile. See my workpapers.

371. As evidence for his claim that he finds "no evidence of widespread discounting of base rates",[467] Prof. Rausser opines that "[i]nstead, base rates across the main commodities shipped by Defendants remained largely constant in real terms from the years before the Class Period to the years during the Class Period."[468] Referring to his Figures 39 and 41-44 and focusing on base rate changes over 2002-2006, Prof. Rausser claims that "there was no change in the price discrimination across commodity groups from systematic discounting to offset the Fuel Surcharge".[469] Specifically, he reports that he does not see substantial differences in the median changes in real base rates (measured in inflation-adjusted dollars per ton-mile) for the top thirty commodities (measured at the 3-digit STCC level) for each of the four Defendant railroads.

372. Notwithstanding Prof. Rausser's stated perception of the data, Figures V-9A and 9B examine Prof. Rausser's data on base rate changes for what he presents as each Defendant's top thirty commodities. Figure V-9A shows real base rate changes over 2002-2006 in dollars per ton-mile; Figure V-9B shows these changes in percentage terms. Focusing on the latter for purposes of discussion, for BNSF, the median real base rate of the thirty commodities differed by an average of 10% in 2006 relative to 2002. Eight of the 30 commodities saw median base rate changes of 15% or greater. Prof. Rausser's data indicate that BNSF's median real base rate for STCC 011 (Field Crops, which include corn, wheat and other agricultural commodities) increased 34% between 2002 and 2006. The rate for STCC 241 (Primary Forest Products, consisting of logs, pulp and wood chips) fell over 40%.

467 Rausser Merits Report at 138.

468 Rausser Merits Report at 138.

469 Rausser Merits Report at 143.

Figure V-9A

**Assessing Prof. Rausser's Claim that Base Rates Were "Static": Absolute Base Rate Changes for Top STCCs, 2002-2006, Prof. Rausser's Figures 39, 41-43**




**Source:** Rausser Merits Report (Figures 39, 41-43)

Figure V-9B

**Assessing Prof. Rausser's Claim that Base Rates Were "Static": Percentage Change in Base Rates for Top STCCs, 2002-2006, Prof. Rausser's Figures 39, 41-43**




**Source:** Rausser Merits Report (Figures 39, 41-43)

373. The other railroads show broadly similar swings, but across different commodities. CSXT/CSXI had an average change in median real rates of approximately 10% between 2002 and 2006; NS had an average change of approximately 16%; and, using Prof. Rausser's calculation, UP had an average change of approximately 10%. For UP, 7 of Prof. Rausser's 30 commodities showed changes of 15% or more; for CSX and NS, the number of commodity groups showing changes of 15% or more is 8 and 9 out of 30, respectively.[470]

470 Prof. Rausser excludes one of UP's top 30 commodities, Chemicals & Fertilizer Minerals, purportedly because "it had erroneous values." (Rausser Merits Report at 142, footnote 373)

374. The range of median real base rate swings is quite large for many commodities and railroads. Looking at only the top three commodities for each railroad, the difference in the changes is also economically large. For BNSF, the largest commodity's median real base rate fell by 1% and the second largest commodity's rate fell by 19%, a difference in relative median real base rates of 18%. For CSXT/CSXI, the swing in relative real median rates between 2002 and 2006 among its top three commodities is 29%; for NS the swing is 30%; and for UP, 13%.

375. Figure V-9C summarizes Prof. Rausser's data on base rate changes across all Defendants for those 22 commodity groups where his data cover at least three Defendants. In the majority of the commodity groups, the data indicate not only substantial changes in base rates for each Defendant, but also changes in base rates in which at least one of the Defendants' base rates moved in the opposite direction of other Defendants' base rates. Description of this pattern as "static" is unfounded. The swings and variations within and across Defendants' base rates are not consistent with the railroads maintaining common relative median rates for each commodity. Further, they are not consistent with Prof. Rausser's assertions of a conspiracy to fix base rates such that the application of challenged fuel surcharges would have "increased the prices paid by all shippers by the same percentage amount." They are consistent with base rates that were responsive to non-conspiratorial market forces that differed across commodities, shippers, and Defendants, and that responded to those market forces so as to keep all-in rates at non-conspiratorial levels.

Figure V-9C

**Assessing Prof. Rausser's Claim that Base Rates Were "Static": Percentage Change in Base Rates, 2002-2006, All Defendants**




**Source:** Rausser Merits Report (Figures 39, 41-43)

## I. Monitoring and Enforcement: Price Transparency or Opaqueness?

376. As I have noted, according to Prof. Rausser, a conspiracy to directly fix all-in rates without implementing fuel surcharge programs would have been infeasible: "Defendants could have sought to achieve the same [conspiratorial] objective by fixing each individual price separately. That would have been extremely complex, very costly, and effectively unmanageable."[471] Implementation of a purportedly "uniform" revenue-based fuel surcharge, on the other hand, was an "ideal mechanism for achieving an across-the-board price increase by agreement of the dominant participants

[471] Rausser Merits Report at 52, footnote 94.

in the highly concentrated rail freight industry", according to Prof. Rausser.[472] This reasoning introduces stark internal inconsistency to the proffered theory of conspiracy.

377. At the same time he asserts that revenue-based fuel surcharges were "an ideal mechanism" for implementing a conspiracy to raise all-in rates, Prof. Rausser's theory recognizes that conspiratorial implementation of revenue-based fuel surcharges would not be sufficient to achieve an "across-the-board" increase in prices (all-in rates), since competitive base rate discounting would undo such an increase. Hence, the hypothesized conspiracy also entails a conspiracy to not discount base rates.[473] Yet, if a conspiracy to directly fix all-in rates was "effectively unmanageable" and infeasible, a conspiracy to not discount base rates would be no less unmanageable and infeasible. The same problems with the infeasibility of implementation and monitoring of conspiracy apply to a fuel surcharges conspiracy as apply to a base-rate conspiracy. After all, rail prices (all-in rates) absent a fuel surcharge are simply what Prof. Rausser refers to as "base rates".[474] If it is too complex and costly to strike, monitor and enforce a conspiracy to raise base rates (perhaps by a common percentage) in the absence of fuel surcharges, it would be too costly and complex to strike, monitor and enforce a conspiracy to not discount base rates.

378. A distinction between "raising base rates" and "not discounting base rates" here is a distinction without a difference. If it is infeasible to monitor, detect and punish "cheating" by purported conspirators who fail to fully raise their thousands of all-in rates to agreed-upon levels (or who discount those rates after indicating that they would be raised) under a conspiracy in which those all-in rates are simply base rates without a fuel surcharge "on top"[475] of them, it would be no less infeasible to monitor, detect and punish "cheating" by purported conspirators who fail to hold the line on their thousands of supposedly non-discountable base rates (or who fail to raise those base rates by the full amount dictated by ever-changing normal "common factors") when those base rates have a fuel surcharge on top of them. In fact, monitoring, detection and punishment would be easier in the former case, since it would entail monitoring only one negotiable, potentially discountable item – i.e., base rates. The alleged conspiracy would require monitoring both base rates and fuel surcharges.

379. According to Prof. Rausser, the conspiracy he purports to have discerned was made feasible by (albeit, unspecified and hypothetical[476]) "market intelligence" that permitted

---

472 Rausser Merits Report at 49.

473 Rausser Merits Deposition at 128-129; Rausser Mertis Report at 49 and 129.

474 Rausser Merits Report at 92: "[A]dding a percentage fuel surcharge on top of line-haul rates or base rates is by its very nature a general price increase."

475 Rausser Merits Report at 92.

476 Rausser Merits Report at 95-96.

conspirators to monitor and detect "cheating" via base rate discounting and/or deviations from conspiratorially "uniform" and "universally applied" revenue-base fuel surcharges.[477] Prof. Rausser's theory of monitoring of the conspiracy is, however, internally contradictory. The "market intelligence" that would enable Defendants to monitor and detect cheating via base rate discounting when base rates have a fuel surcharge on top of them is no less comprehensive than the "market intelligence" that would be necessary to monitor a base rate conspiracy. The reality is, though, that monitoring of the many thousands of base rates at issue in either case is not plausibly feasible in the railroad industry. As noted, Prof. Rausser acknowledges that a base rate conspiracy would not be feasible.

380. A significant impediment to the successful monitoring of a conspiracy in the railroad industry is that there are many thousands of rates and each negotiation with a shipper is an opportunity to cheat on an agreement by offering unobservable price concessions. Thus, monitoring a collusive agreement would be extremely costly, and would require significant information on competitors' rates and rate changes. Such changes, however, are frequently secret. As the Surface Transportation Board has correctly noted, "in railroading, rate concessions can and are made secretly through confidential contracts...[and] rail services are extremely heterogeneous, making price comparisons for purposes of collusive behavior difficult."[478]

381. The product heterogeneity identified by the STB is pervasive. Transportation of, say, autos from Detroit to Oklahoma City is not a substitute in either routing or equipment and service for transporting furniture from North Carolina to Minneapolis, or for transporting chlorine from Arizona to Utah. Different shippers have different preferences and make different trade-offs regarding price and other aspects of the service being provided by a railroad. Shippers differ across such dimensions as: willingness to accept price risk (e.g., to what extent do they share in future fuel price and other cost changes); source of railcar supply (does the shipper or the railroad provide the railcars); speed of transit; timeliness of pick-up and delivery; willingness to accept volume risk (e.g., making volume commitments in exchange for price concessions or resource allocations by the railroad); willingness to take on certain costs (e.g., various liability and remediation costs); ability and willingness to self-organize for scheduling (e.g., by pre-blocking or tendering railcars in certain volumes, such as quarter-or half-train units); the need for special handling (as in the case of hazardous, perishable, or fragile materials); and so on across numerous product dimensions.

---

477 Rausser Merits Report at 95-98, 125-128. See also at 46: "Defendants were readily able to monitor each other's pricing behavior."

478 CN/IC Merger Decision at 29.

382. Prof. Rausser's assertions to the effect that the railroad industry is conducive to conspiracy because rail "[f]reight services are homogenous and interchangeable *across Defendants*"[479] are untenable. Each of the many noted kinds of services and service dimensions – across thousands of movements and routings and customers – represents an arena of competition. When they have options of multiple rail carriers, and a *given* set of service attributes offered by those carriers, customers surely concern themselves with those carriers' prices in making their transportation choices. But this observation by Prof. Rausser[480] does not imply that carriers' respective service offerings are immutable and that they cannot and do not compete by tailoring and improving service attributes to customers.

383. Such conditions are markedly *not* conducive to effective conspiracy: Without agreement over the multiple salient dimensions of competition, conspiring over one component of contracting – price – becomes infeasible as a viable means of reaping conspiratorial gain. The hypothetical conspiracy is effectively incomplete. Even if agreement across the salient non-price dimensions of service is hypothesized, monitoring and enforcing any such agreement, particularly in the presence of confidential negotiations and contracting, becomes implausible. As noted in a leading economics textbook, "Firms have more difficulty agreeing on relative prices when each firm's product has different qualities or properties. Each time a product is modified, a new relative price must be established. It is easier for a cartel to spot cheating when all it has to examine is a single price."[481]

384. For customers with private contracts, price-setting happens through confidential negotiations between the customer and the railroad over all aspects of the contract, including the actual rate (the base rate plus applicable fuel surcharges) as well as other non-price contract and service terms. Thus, fuel surcharges cannot be viewed in isolation from the overall agreement that is reached between railroads and customers. When a railroad obtains an agreement that includes a fuel surcharge, it does so in the context of the give-and-take of negotiations that include a wide variety of dimensions including rates, the inclusion of a fuel surcharge, the structure of a fuel surcharge, the volume of traffic, service requirements such as equipment supply and service guarantees, and other terms and conditions.

385. Both within a single railroad and across railroads, even for a single commodity, there is not a single price to "fix" or a single attribute over which agreement would have to be reached, monitored and enforced. In the case at hand, the consequence of private negotiations and service heterogeneity is starkly dispersed and volatile pricing across

479 Rausser Merits Report at 32 (emphasis added).

480 Rausser Merits Report at 32-35.

481 Carlton and Perloff at 135.

customers even on a given route for a given commodity. (See, for example, the discussion of Figures VI-2A and 2B in Section VI below.) As we have seen, even the fuel surcharges and base rates that emanate from Defendants' private contracting and negotiations show the dispersion expected to be present when such transactions take place under non-conspiratorial circumstances (e.g., Figures IV-20A through IV-20D; and Figures V-9A, 9B, and 9C, respectively). Moreover, as we saw in Section III above, more than 70% of all rail industry revenue is generated under confidential rate and service contracts. The result is non-transparency in pricing and service offerings that are distinctly not conducive to conspiracy.

386. Apart from unspecified "market intelligence" and unknown, hypothetical "surveys of shippers",[482] the factors cited by Prof. Rausser in support of his contention that "[p]ricing is transparent and easily monitored"[483] entail references to information available publicly that would not tell Defendants about the contents of their purported co-conspirators' extensive privately negotiated and contracted pricing and service pertinent to the vast majority of their relevant business. He reasons with respect to base rates and all-in rates, for example:

> "Railroads are required to post regulated tariff rates and terms of service, and to provide service to all customers at those posted rates and terms of service. Current and expired tariff publications for each rail carrier are available on the internet, and specify rates for shipments by 7-digit STCC codes, origin, destination, equipment type (including car length, weight, and capacity), equipment owner, and origin/delivering carrier. Tariffs specify all the primary, secondary, and accessorial charges associated with the freight move, including the amount of the switching charge to be paid by shippers and the amount to be absorbed by the railroads. I understand that these public tariff provisions and charges for accessorial services and switching are often incorporated by reference into private contracts and private price quotations. Therefore, abundant Class-wide evidence reveals that there is a very good understanding of pricing in this industry, notwithstanding the extent of private contracting. Thus, Defendants were readily able to monitor each other's pricing behavior."[484]

387. With respect to fuel surcharges themselves, Prof. Rausser asserts that:

> "[A]n agreed-upon surcharge does not require constant communications once the details of the surcharge have been agreed upon. The Defendants implemented common Fuel Surcharges that increased all per car freight rates by a percentage derivable by an agreed-upon formula. The agreed-upon

482 Rausser Merits Deposition at 103.

483 Rausser Merits Report at 45.

484 Rausser Merits Report at 46 (quotations omitted).

formula was applied to publicly available fuel indexes – the Department of Energy's Weekly On-Highway Diesel Fuel Index ("HDF") and the West Texas Intermediate Index for crude oil ("WTI"). There was no need for individual customer agreements to have been shared directly among the Defendants. All a conspirator had to do was pick up the Wall Street Journal, note that month's value for West Texas Intermediate crude or another underlying index and price freight accordingly, with the knowledge that the other railroads were doing the same. Furthermore, the resulting percentage increases were published on each Defendant's website, which provided a ready means to facilitate coordination and detect deviation from the collusive Fuel Surcharge agreement."[485]

388. None of this demonstrates Prof. Rausser's proposition of price transparency.[486] Publicly posted tariffs for regulated traffic do not set negotiated rates for the unregulated traffic at issue in this case. Similarly, publicly posted fuel surcharge terms on websites clearly do not describe the actual diverse set of fuel surcharge terms we see Defendants employing during and before the Class Period. Nor do they tell us the confidential fuel surcharge terms a "cheating" conspirator might turn to in the event it sought to avoid detection in the conspiracy setting. The conspirator who profits by "cheating" does not publish its "resulting percentage increases" or its base rate deviations on its website. Prof. Rausser's assertions of monitoring made easy by price transparency are not supported by the economics or the evidence.

389. Plaintiffs allege that Defendants took affirmative steps to further their conspiracy by enhancing price transparency. In this regard, they assert that the Defendants moved away from use of "through rates" for non-local service, and moved instead to providing service under Rule 11 terms. This was purportedly undertaken "to provide transparency as to what each railroad was charging on multiple line shipments".[487] Plaintiffs then further assert that the Defendants made their pricing "more visible to each other" by collectively moving away from the use of long-term contracts.[488] Neither assertion is supported by the data.

---

485 Rausser Merits Report at 50-51 (quotation omitted).

486 Speculation by Prof. Rausser that Defendants might monitor and detect "cheating" among themselves by "seeing whether or not some shippers that otherwise they would be able to capture they are losing because an alleged co-conspirator is discounting the base rate and giving them a lower all-in rate" are baseless. (See Rausser Merits Deposition at 136.) As demonstrated in Section VI below, Defendants' relative traffic shares are highly volatile. No mechanism exists or has been suggested that would permit a Defendant from distinguishing a loss in share or loss of a particular customer that was the result of "cheating" by a con-conspirator from a loss in share or loss of a particular customer that was the result of normal variations in market conditions, customer shipping patterns and preferences, and the like.

487 Complaint at ¶94; see also Complaint at ¶15.

488 See, e.g., Complaint at ¶¶89-90.

390. With respect to interline movements, Plaintiffs' specific claim is that a movement toward the use of Rule 11 and away from through rates could only happen if the Defendants had collectively agreed to such a change, and that this change both enabled each Defendant to charge its own fuel surcharge and that the use of Rule 11 purportedly increased the transparency of pricing.[489] This claim, however, turns the economics of price transparency on its head. When railroads use through rates for interline traffic, they are required to communicate with each other about the pricing and terms of the movements. This makes pricing terms more visible to interline partners. In contrast, Rule 11 provides for no such communication. Thus, increased use of Rule 11 pricing in place of through-rate pricing would, if anything, tend to make a Defendant's pricing less, not more, transparent to fellow Defendants.

391. In any case, the data (see Figure V-10) do not support Plaintiffs' contention of a collective movement away from the use of through rates. The figure shows the percentage of each Defendant's non-local, interline traffic that was priced using through rates for each year from 2002 through 2008. As shown in the figure, the percentage of non-local traffic that was priced using through rates declined somewhat for BNSF, NS, and UP and increased somewhat for CSXT. There is no observable pattern consistent with a structural change in the use of through rates after the commencement of the alleged conspiracy, no pattern of rising use of Rule 11 by all Defendants, and no evidence of coordinated or parallel conduct of any kind with regard to the use of through rates.

Figure V-10

**Did Defendants Reduce Their Use of Through Rates on Interline Traffic?**
**Share of Interline Traffic Priced with Through Rates, 2002-2008**

| Defendant | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Average (2003-2008) |
|---|---|---|---|---|---|---|---|---|
| BNSF | 58% | 55% | 51% | 50% | 46% | 47% | 55% | 50% |
| CSXT/CSXI | 78% | 83% | 86% | 85% | 84% | 84% | 84% | 84% |
| NS | 60% | 59% | 58% | 58% | 55% | 54% | 56% | 57% |
| UP | 44% | 46% | 47% | 46% | 42% | 42% | 40% | 44% |

**Source:** Defendants' Transaction Data

392. Plaintiffs' additional contention that the Defendants made their pricing "more visible" by a collective movement away from long-term contracts is also unsupported by the data. Figure V-11 shows the percentage of each Defendant's new unregulated contracts

489 Complaint at ¶94.

with durations of six months or less that were entered into each year from 2002 through the first six months of 2008. There is no discernible pattern of a coordinated or collective movement away from long term contracts by Defendants. The percentage of contracts with duration of six months or shorter declined somewhat for BNSF and UP from 2002 to 2003, whereas it increased somewhat for CSXT/CSXI and NS.

Figure V-11

**Percent of Customer Price Authorities with Duration Six Months or Shorter 2002-2008**

| Defendant | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Average (2003-2008) |
|---|---|---|---|---|---|---|---|---|
| BNSF | 84% | 72% | 73% | 74% | 74% | 77% | 85% | 76% |
| CSXT/CSXI | 68% | 71% | 73% | 73% | 74% | 80% | 83% | 76% |
| NS | 63% | 65% | 67% | 68% | 74% | 66% | 80% | 70% |
| UP | 75% | 69% | 75% | 74% | 78% | 82% | 75% | 75% |

**Source:** Defendants' Transaction Data
**Notes:** Start and end of price authority based on first and last movement months in the transaction data.

### J. "Cheating" and Its Punishment under the Hypothesized Conspiracy

393. Because profiting by "cheating" is inherently a problem for a conspiracy, rational conspiracies entail mechanisms for monitoring, detecting *and punishing* "cheating".[490] "Cheating" on a conspiratorial agreement is an example of the well-known "prisoner's dilemma" in which each participant knows that all participants are better off if none "defects" or "cheats", but each participant also knows that (1) it, individually, will be better off if it "cheats" while others adhere to a joint agreement, but (2) it will be worse off if others "cheat" while it adheres to the agreement. The standard, rational strategy of each individual participant is then to "cheat".

394. Suggestions by Prof. Rausser that such incentives and outcomes would not be present under the conspiracy he hypothesizes because of the asserted "huge benefits" of the conspiracy violate these basic economics. In particular, "cheating" and "defection" occur in the prisoner's dilemma setting not because benefits of not doing so are modest or small, but because "cheating" protects the benefits an individual participant can hope to garner when others have incentives to "cheat". Moreover, "cheating" becomes ever more incented when such conduct can go undetected and unpunished. Such conditions mean that any given act of "cheating" does not bear the costs of punishment and does not threaten the trust that can otherwise inhibit touching off "cheating" by others (and thereby touching off the demise of the conspiracy).

490 Carlton and Perloff at 136-144.

395. The conspiracy alleged by Plaintiffs and Prof. Rausser is devoid of any mechanisms or instances of punishment of "cheating" by any Defendant. At the same time, conduct that can only be regarded as "cheating" – and on a widespread scale – under Prof. Rausser's theory of the alleged conspiracy is evident in the data. First, as we have seen in Section IV above, having purportedly agreed upon a uniform, common fuel surcharge, actual fuel surcharges during the Class Period exhibit the wide range of forms and rates that we see in Figures IV-17A through 17D, and IV-20A through 20D, and 21. The demonstrable deviations from putatively agreed-upon "uniform" surcharges would represent trust-destroying "cheating" and would presumably have been detected via "market intelligence" in Prof. Rausser's hypothesized world. Similarly, "market intelligence" would presumably have detected the thousands of substantial deviations of base rates from agreed-upon stasis that we see in Figures V-8A through 8E and Figures V-9A-C. Under Prof. Rausser's theory of the alleged conspiracy, these deviations violated his "same leverage, same percentage change in all-in rates" economics and would have constituted disruptive "cheating" as Defendants altered their all-in rates to attract customers.

396. Another example of Defendants' conduct that could only be regarded as fundamental "cheating" that went to the heart of the alleged conspiracy is the movement by Defendants to mileage-based fuel surcharges in the heart of the Class Period. BNSF initiated this with implementation of mileage-based fuel surcharges beginning in January 2006, and UP and CSXT "defected" to mileage-based surcharges in the spring of 2007 (see Section IV above). These are "defections" from the conspiracy involving large shares of traffic under Prof. Rausser's hypothesized conspiracy in so far as that conspiracy is explicitly represented as taking the form of, and being evidenced by, application of uniform *revenue-based* surcharges. These, it will be recalled, were Prof. Rausser's "ideal mechanism" for conspiracy, providing ease of monitoring and avoiding disruption of underlying relative patterns of customer "leverage" by causing the "same percentage increase" in all affected customers' prices.

397. Having one Defendant showing customers' rates based on mileage-based surcharges while others were showing customers' rates based on revenue-based surcharges would necessarily destabilize the conspiracy, as Prof. Rausser himself claims. This would occur particularly where implementation of a mileage-based surcharge on top of purportedly non-discounted base rates resulted in the "cheating" Defendant's all-in rates being below those of Defendants who stuck by the putative conspiracy by employing revenue-based FSCs. Notwithstanding the obvious "cheating" involved, Prof. Rausser acknowledges that a feasible conspiracy requires mechanisms of

enforcement,[491] but that he knows of no instances of Defendants punishing any "cheating" by fellow co-conspirators.[492]

398. Assuming for the sake of discussion the existence of the alleged conspiracy, other examples of substantial "cheating" include: (1) failures to achieve 100% coverage of revenue-based surcharges, even apart from the use of mileage-based surcharges; (2) rebasing by NS which entails reducing the use of surcharges and increasing reliance on base rates, which violated purported cross-Defendant FSC uniformity and which shifted fuel price risk away from shippers and would have made NS's rates more attractive; and (3) changes in UP's intermodal surcharge to reduce the resulting surcharge percentage.

399. Key attributes of the rail industry enhance the incentives that participants in a price-fixing conspiracy would have to "cheat" on a collusive agreement. Railroads are notable, for example for their very high level of capital intensity and associated high level of sunk and fixed costs relative to variable costs of operation (see Section III, esp. Figure III-3). Moreover, they are subject to the economies of scale and scope discussed above. These attributes mean that, as a railroad is able to expand its traffic, high fixed costs are spread over more service and, thereby bring down unit (average) costs. As noted above, the STB correctly diagnoses the implications for the feasibility of collusion: "[H]igh and declining fixed costs in the rail industry strongly induce carriers to compete for additional traffic through rate concessions."[493]

400. When fixed costs per unit of service are high relative to the variable costs of service, the incentive to make more sales and expand service is particularly strong: So long as prices received cover variable costs, capturing additional sales generates extra revenue that can go to covering fixed costs and providing profits. Each missed opportunity to capture traffic represents system capital sitting idle without paying for itself. If rates have been elevated by conspiracy and fellow conspirators are charging those rates, "cheating" by an individual conspirator by negotiating lower prices with customers and thereby capturing business puts that system's fixed costs to work. Any revenue above variable costs that is realized is then "gravy".

401. The implied incentive to "cheat" on a conspiracy that this "gravy" represents is magnified by the common use of longer-term, non-spot contractual relationships (e.g., see Figure V-11 discussed above). Long-term contracting increases the stakes and payoff associated with landing any given shipper as a customer. If successful, revenue and the associated profit from serving a given shipper as a customer are effectively "locked in" for the term of the transaction. On the other hand, if a railroad fails to

---

491 Rausser Merits Deposition at 378.

492 Rausser Merits Deposition at 379.

493 CN/IC Merger Decision at 29.

capture a long-term contract, the opportunity to serve that customer and capture associated revenue and profit are lost for a defined period. Under such circumstances, railroads can less afford to take a chance on losing a customer, and incentives to offer attractive prices are heightened. That is, in the conspiracy setting, the high payoff to successfully capturing long-term business magnifies incentives to "cheat" on agreed-upon prices and service terms.

402. The payoff to cheating would also be heightened within Prof. Rausser's framework toward the end of the conspiracy when asserted overcharges reach very high percentages.[494] As the asserted overcharge rises, each Defendant would have the incentive to capture incremental business by cutting rates to shippers. Prof. Rausser offers no evidence of increased monitoring or of any instances of punishment for cheating during this period.

### K. Summary: The Railroad Sector Is Not Conducive to Conspiracy

403. I find that Prof. Rausser's assertions to the effect that the railroad industry's structure and attributes make the sector conducive to conspiracy are not supported by the applicable evidence and economics. In setting forth his conclusion that the railroad sector is conducive to conspiracy, Prof. Rausser does not mention the implications – well-known in economics – of such industry attributes as the demonstrable multiplicity of markets in which railroads such as Defendants operate, the widespread use of longer-term contracts, the importance of interlining, railroads' high fixed costs and low variable costs, and the absence of barriers to entry and expansion by non-rail competitors in pertinent markets. Yet, as we have seen, each of these factors contradicts Prof. Rausser's claim regarding the conduciveness of the industry to conspiracy.

404. I also find that, in key respects, Plaintiffs' and Prof. Rausser's hypothesized conspiracy in this case is plagued by logical contradictions, contradictions of Defendants' rational economic incentives, and contrary evidence. Thus, for example, we are confronted with a theory in which a conspiracy on all-in rates alone (i.e., base rates without fuel surcharges on top of them) is represented as "effectively unmanageable". Yet, a conspiracy to fix base rates coupled with a companion conspiracy to apply "uniform" revenue-based fuel surcharges is somehow eminently feasible.

405. The asserted conspiracy is presented as able to cause "the same percentage price increase" across all Class shipments because it purportedly entails the "universal" imposition of "uniform" revenue-based fuel surcharges to "static", conspiracy-controlled base rates. The adverse impacts of this proffered conspiracy are then spread as common facts across all Class Members because Defendants have a "huge market

494 Actually, surcharges rise because oil prices rose extremely rapidly in the period.

share" in a highly concentrated Lower 48 national market for homogeneous rail service and because their putatively collusive conduct adversely affects supply, demand and hence prices across that entire market. Prof. Rausser now disavows his opinions regarding the national *market* he designated, but does not disavow his conclusions regarding the common fact of uniform impact from the conspiracy he alleges. I find that the data indicate that these conclusions are contradicted by ubiquitous variations in Defendants' base rates, fuel surcharges, and all-in rates.

406. Nor does Prof. Rausser account for the reality that railroads like Defendants supply a heterogeneous array of services across a multiplicity of markets in which they encounter a variety of rail and/or non-rail competitors. These demonstrable attributes of Defendants' businesses directly contradict Prof. Rausser's claims of "same percentage price increase" from conspiracy and the conduciveness of the rail industry to conspiracy. Prof. Rausser's theory of conspiracy also contradicts basic economics of rational business conduct. Specifically, Prof. Rausser's theory has Defendants purportedly raising prices and agreeing to a conspiracy to not adjust base rates in sole-served markets and in highly competitive markets with truck competition. The conspiratorial elevation of prices in these markets would reduce Defendants' profits.

407. Prof. Rausser acknowledges that, to be feasible, the alleged conspiracy requires (1) that Defendants deal in a homogeneous, interchangeable service in which only price matters to customers, and (2) that the pricing of Defendants' service has the transparency needed to monitor, detect, and punish "cheating" by conspirators. Yet, the very existence of what he terms as "price discrimination" across customers, commodities, and routings belies the notion that railroads deal in homogeneous, interchangeable service. Instead, the data demonstrate that they deal in heterogeneous services in which, not only price, but multiple attributes of service and transactional quality are dimensions that customers care about and that railroads compete over. Moreover, the thousands of prices (all-in rates) that Defendants employ in dealing with their thousands of customers are demonstrably opaque, rather than transparent. The pricing of the traffic at issue in this proceeding is unregulated and predominately set in confidential private negotiations. Proffered public sources of information do not make such negotiations transparent. The result is a purported conspiracy in which the monitoring and detection of the inherent problem of "cheating" on a conspiracy are not plausibly feasible.

408. Finally, the hypothesized conspiracy lacks requisite means of punishing any "cheating" that might be detected. At the same time, the data reveal multiple examples of conduct by Defendants – including volatile base rates, non-uniform fuel surcharges, and moving away from revenue-based surcharges to mileage-based fuel surcharges – that constitute widespread "cheating" under Plaintiffs' and Prof. Rausser's theory of the alleged conspiracy. Yet, Prof. Rausser acknowledges that while enforcement of agreement is a necessary part of a feasible and rational conspiracy, there are no known instances of

Defendants punishing a "cheating" co-conspirator. Thus, again, the evidence and the economics fail to support the claims of conspiracy.

# VI. TESTING THE DATA ON MARKETPLACE OUTCOMES FOR THE PRESENCE OF THE ALLEGED CONSPIRACY

## A. Introduction: Asserted and Predicted Marketplace Outcomes under the Alleged Conspiracy

409. Economic analysis can be employed to examine economic phenomena for direct evidence of asserted or predicted effects of an alleged conspiracy.[495] An effective conspiracy, by definition, influences market outcomes. Thus, economic methods can be used to assess claims that a particular asserted conspiracy systematically affected such marketplace outcomes as price levels, price-cost mark-ups, or sales shares observed in a purportedly affected market in a manner that would not have occurred absent the conspiracy. The goal is to see if an alleged conspiracy has left evidence of its existence, its tracks so to speak, in marketplace outcomes. If the telltale signs of a claimed conspiracy have not been left in the marketplace, then it is proper to conclude that the data do not support the hypothesis of effective conspiracy.

410. As we have already seen in Section IV above, the central characteristics of the alleged conspiracy are not supported by the evidence. Specifically, the evidence does not support Prof. Rausser's claims that Defendants' fuel surcharges were uniform, non-negotiable, universally applied, and more onerous during the Class Period. Below, I test for key marketplace outcomes that Plaintiffs and Prof. Rausser assert were consequences of the conspiracy they hypothesize. For example, Prof. Rausser claims the alleged conspiracy "will have increased the prices paid by all shippers by the same percentage amount."[496] I find that the data decisively reject this prediction. Similarly, I find that the data do not support claims that the hypothesized conspiracy provides causal explanation for the reversal in the mid-2000s of what had been a long-term downward trend in rail rates that began in the mid-1980s.[497] I also test Prof. Rausser's assertion that the purportedly conspiratorial fuel surcharges resulted in "massive over-recovery of actual fuel costs" in a manner that is inconsistent with non-conspiratorial fuel surcharges.[498] Applying proper economic principles, I find that the data contradict this assertion. The purportedly conspiratorial FSCs resulted in no more recovery than the non-conspiratorial FSCs; the FSCs fail to cover the incremental changes in marginal cost incurred by the railroad; and the all-in rates that Prof. Rausser asserts would have occurred absent the purported conspiracy would have resulted in a gross under recovery of increased fuel costs and rising marginal costs. I also find that the data are

495 See, for example, Harrington at 213–215.

496 Rausser Merits Report at 50.

497 Rausser Merits Report at 88-89.

498 Rausser Merits Report at 84.

inconsistent with Prof. Rausser's companion claim that over-recovery of fuel costs resulted in "an inflation of Defendants' profits."[499] Finally, I test Plaintiffs' assertion that the alleged conspiracy shut down price competition that otherwise drives shippers' choices of rail carriers and, thereby, stabilized Defendants' shares of traffic.[500] This, too, is contradicted by the data. Indeed, looking across these various assertions by Plaintiffs and Prof. Rausser, the data on marketplace outcomes do not support claims of conspiracy, but are consistent with outcomes expected in a marketplace in which individual railroads are unilaterally pursuing their non-conspiratorial interests.

**B. Did Defendants' Prices (All-In Rates) All Change by the Same Percentage Amount?**

411. Under the asserted conspiracy described by Prof. Rausser, base rates are stable and "static",[501] and the conspiracy includes agreement not to discount base rates.[502] Moreover, Prof. Rausser opines: "That some shippers can negotiate prices lower than those negotiated by other shippers is unaffected by a Fuel Surcharge that *increases all shippers' prices by the same percentage amount.*"[503] Thus, in his framework, shippers with little negotiating "leverage" absent conspiracy have the same weak "leverage" in the presence of conspiracy. Shippers with more "leverage" absent conspiracy have the same stronger "leverage" in the presence of conspiracy and will continue to have lower prices than shippers with less leverage.[504]

412. With static base rates that embody whatever "leverage" various shippers have, putting a presumed uniform revenue-based fuel surcharge on top of a given set of initial base rates should raise all Class Members' all-in rates for given traffic in a given commodity on any given route by the same percentage amount. As Prof. Rausser puts it in his report:

> "[B]ecause a percentage Fuel Surcharge is by definition added to the line-haul or base rates otherwise established for particular rail movements by particular customers, prices after the application of the surcharge still reflect the fact that different shippers may have different amounts of leverage in their pricing

---

499 Rausser Merits Report at 84.

500 Complaint at ¶¶88, 91, 95.

501 Rausser Merits Report at 139-141.

502 Rausser Merits Report at 7, 72, 114.

503 Rausser Merits Report at 50 (emphasis added).

504 Rausser Merits Report at 50.

negotiations with the railroads... *The conspiracy will have increased the prices paid by all shippers by the same percentage amount.*"[505]

413. Prof. Rausser does not test his prediction that the conspiracy increased the prices paid by all shippers by the same amount, but this prediction plays an important role in his analysis. Ultimately, it is the underpinning for his assertion that he has demonstrated common impact across the individual shipments and individual members of the Class. We have already seen, however, that the data do not support Prof. Rausser's contentions that base rates are static and that Defendants applied uniform surcharges.[506] Thus, the logic of a uniform fuel surcharge on top of static base rates fails. We can verify this further by directly examining all-in rates and whether they all changed by the same percentage amounts in the Class Period.

414. Using Defendants' transaction data, it is possible to match shipments of a given type (e.g., commodity type, car type, etc.) on a given route for a given shipper from before the purported conspiracy to identically categorized shipments during the purported conspiracy. The categories used are the categories Prof. Rausser has used in his regression analysis of damages. After controlling for shipper, month (season), route, commodity, car type, and interline status, there are 7,249 Class shipments that appear in the data for both March 2003 and March 2006.[507] These matched shipments provide a basis for evaluating whether all-in rates rose by the same percentage amount from March 2003 (just prior to the alleged implementation of conspiracy) to a matched point in the heart of the Class Period (March 2006).

415. Although the matched shipments are the same in commodity, route, car type and interline status, to make the desired comparison, it is necessary to account for the fact that the matched shipments from before and during the asserted conspiracy differ in weight and actual miles traveled, which are the only shipment specific information identified by Prof. Rausser as relevant in determining price.[508] If shipments in March 2006 are systematically heavier than the matched shipments in March 2003, the observed difference in rates could be caused, in part, by this weight difference. Such differences in weights and other factors could cause the observed price changes to not match as Prof. Rausser predicts. To address these differences my analysis uses the

---

505 Rausser Merits Report at 50 (emphasis added). See also, Rausser Merits Deposition at 131: "With regard to the base rates, as my report and my prior reports and my prior deposition testimony explains, the actual base rates and the variations of those base rates within the industry already reflect differentiation in the way — in the form of base rate pricing".

506 See Section IV.

507 Prof. Rausser's damage regression does not incorporate shipper-specific controls, and thus his model does not require matching by shipper. Matching shipments by all the above characteristics except shipper shows very similar results. See my workpapers.

508 Economic conditions, such as diesel prices and GDP, differ by region as well.

"coefficients" (i.e., the model-calculated effects of each factor on rates[509]) in Prof. Rausser's damages model to estimate how the all-in rates will differ based on shipment-specific characteristics that are not identical (such as weight).

416. Prof. Rausser recognizes that supply and demand conditions may vary for transportation of certain goods. Differences in these supply and demand conditions, too, could lead to price changes that are not the same for each shipment. However, Prof. Rausser claims that "there's nothing with regard to demand sources above and beyond state GDP that are systematic with respect to explaining all-in freight rates".[510] Prof. Rausser claims, in addition, that his damages model accounts for other supply and demand changes, as well.[511] As these shipments are matched based on all the other characteristics identified by Prof. Rausser as necessary for capturing the effect of demand and supply on price, within Prof. Rausser's framework, the adjustments that I make to the price changes between March 2003 and March 2006 account for differences in shipment characteristics and changes in supply and demand conditions that Prof. Rausser has identified as relevant.[512]

417. Figure VI-1 presents a histogram of the distribution of actual price changes for the matched Class shipment groups, accounting for shipper and the identified shipment characteristics from Prof. Rausser's model. As indicated in the figure, Prof. Rausser's hypotheses predict that all 7,249 of these Class shipment groups should have experienced a price increase of "the same percentage amount". His damages model indicates that for March 2006 relative to March 2003 this "same percentage amount" is 16.7%. As we can see, Prof. Rausser's prediction that all of the data in Figure VI-1 would lie on top of itself at the point of a 16.7% change in all-in rates is not borne out. Rather, the actual changes in all-in rates for Class shipments (after accounting for Prof. Rausser's noted control factors) in Figure VI-1 span a very wide range. The range that includes 90% of the price changes runs from approximately -22% to approximately 91%.

---

509 For example, if the "coefficient" for the variable measuring, say, diesel prices has a value of 0.2, the model is estimating that a 1% change in diesel fuel prices contributes a 0.2% increase to all-in rates, after accounting for the contribution of all other factors to change in all-in rates.

510 Rausser Merits Deposition at 441.

511 See, e.g., Rausser Merits Deposition at 442-443: "Q: Which indicator variable would pick [up] increases in demand for rail services that exceed the growth in rate in state GDP? A: Increase in demand for shipments for commodities, for example, that there is some increase in demand that takes place that's sourced with commodities, the model would pick up that. With regard to an increase in demand that occurs at different times of the year with regard to seasonality effects, the model would pick that up. With respect to specific type (*sic*) of services with regard to car type and if there is some augmentation of demand that's sourced with that, the model would pick that up."

512 I adjust the price differences for the small effect of changes in rail cost index and state GDP supply and demand variables that he includes in his damage regression. See Section VII.

Figure VI-1

**Does Prof. Rausser's Model Accurately Predict Changes in Shippers' All-In Rates? March 2003 v. March 2006**




**Source:** Defendants' Transaction Data
**Note:** Class rates are based on unique combinations of shipper, route, 4-digit STCC, car type, and interline status. Change is measured as percentage change in real dollars.

418. The large variation in all-in rate changes, instead of the common percentage price change Prof. Rausser predicts, illustrates that supply and demand factors are operating independently on each route and these factors are influencing prices even for the same shipper. Each observation in the matched data in Figure VI-1 represents a separate route and commodity for a shipper (along with car type and whether interline or not). As explained in Section V above, rail traffic is subject to supply and demand forces that vary substantially by geography and commodity, and the supply and demand forces that affect rail transportation prices vary across these shipment characteristics, resulting in widely differing movements in marketplace prices. Prof. Rausser's damages model is not capturing these changes. Moreover, the observed variation is not consistent with

the characteristics of the conspiracy Prof. Rausser indicates he has identified. In particular, if shippers are paying a common fuel surcharge, shippers' base rates must be changing by route, commodity, car type, and so forth. With no restriction on the changes in base rates, the all-in rate for each shipment is free to reach its appropriate market level, even with a purportedly "common" fuel surcharge. Thus, the variability in Figure VI-1 is consistent with what we would expect of a marketplace in which prices are regularly adjusted by Defendants as they set about tailoring their service and pricing to attract the business of – i.e., *compete for* – shippers.

419. The nature of the competitive process is illustrated in Figures VI-2A and VI-2B. Figure VI-2A shows the all-in rates for service to individual shippers (each represented by its own line) on each Defendant's (and CSXI's) largest intermodal route from January 2000 to December 2008. The first panel of Figure VI-2A shows all-in rates for the dozens of shippers who made intermodal shipments on BNSF between Los Angeles and Chicago during this period. As shown, there is a large range of all-in rates, even for a specific type of transportation (i.e., intermodal) on a given route. Rates are volatile and range from as low as approximately $600 per intermodal unit (container or trailer) to over $1,600 per unit on BNSF's Los Angeles-Chicago route in the same month.[513] This variation is consistent with the range of individualized services associated with intermodal transportation (e.g., expedited v. standard times, guarantees, equipment and landside services) and the lack of transparency in prices to customers across railroads.

513 An intermodal unit is a trailer or container.

Figure VI-2A

**Individual Customer All-In Rates for Largest Intermodal Routes**




**Source:** Defendants' Transaction Data
**Note:** Average all-in revenue per carload for each customer is reported in 2000 dollars and values above $2,000/carload not shown.

420. Importantly, the variability of rates does not disappear upon and following the alleged implementation of conspiracy in July 2003. Moreover, shippers' rates are not consistently ordered from lowest to highest. Instead, a given shipper sometimes pays a higher rate and sometimes a lower rate than other shippers. These results contradict Prof. Rausser's theory of shipper leverage and common percentage rate increases. Of course, stable base rates and a uniform conspiratorial fuel surcharge should have led to stable all-in rates. Inspection of Figure VI-2A shows that shippers' all-in rates are not stable.

421. Under the hypothesis that the purported conspiracy should have resulted in all Defendants' prices changing by the same percentage amount over any given time period, Figure VI-2B shows the same price data for the shippers in Figure VI-2A who have movements in July 2003, and indexes each shipper's all-in rates to a value of 100 as of July 2003. Under Prof. Rausser's theory that the purported conspiracy "will have

increased the prices paid by all shippers by the same percentage amount", stable relative leverage would hold shippers' rates stable relative to one another and changes in fuel prices would interact with the conspirators' purportedly uniform FSC rate at any time to cause rates to rise by a common percentage across all shippers.

Figure VI-2B

**Individual Customer All-In Rates for Largest Intermodal Routes Relative to All-In Rate in July 2003**




**Source:** Defendants' Transaction Data
**Note:** All-in revenue per carload for each customer is reported relative to July 2003, values above 250% not shown.

422. In terms of Figure VI-2B, with all shippers' rates indexed to 100, this means that we should expect to see all shippers' indexed rates collapsing into a single line: When one shipper's rates rise by, say, 3%, all shippers' rates should uniformly rise by 3%. When one shipper's rates fall by 2%, all shippers' should uniformly fall by 2% – leaving all shippers tracing out the same line from a common starting index value of 100. From Figure VI-2B, it is clear that this prediction of Prof. Rausser's theory is not borne out. Again, the cross-shipper variability and variation in all-in rates – here, on a given route

for a given type of service – are not consistent with the price fixing alleged by Plaintiffs and Prof. Rausser.[514]

### C. Does Prof. Rausser's Model Show that Rail Rates on Individual Routes Increased by a Common Percentage?

423. Prof. Rausser's characterization of the asserted conspiracy also implies that the changes in all-in rates should be the same across routes: With base rates static and a uniform percentage fuel surcharge purportedly applied to all Class shipments, even across routes, the hypothesized conspiracy would cause all Class shipments' all-in rates to change by the same percentage amount. We can use Prof. Rausser's damages regression model to test this prediction.

424. As I describe more fully in Section VII, below, Prof. Rausser runs his damages regression model on all routes and traffic types at the same time. His specification includes over 265,000 indicators as explanatory variables in the regression to account for *differences* between routes traveled, commodities carried, car type used, whether a shipment was interline, and so forth. By definition, these 265,000 indicator variables account for factors that are *not common* across the shipments that affect rail rates, but are also not able to capture changes in market-specific demand and supply conditions over time.

425. In addition, Prof. Rausser includes explanatory variables for mileage traveled, weight, diesel price, state-level gross domestic product ("GDP"), AIILF (i.e., non-fuel cost components), and "conspiracy" effects. Prof. Rausser's modeling imposes the requirement that the effects of these factors be the same across all routes, commodities, car types, and so forth. Methodologically, this means Prof. Rausser *assumes* the responses of rates to these factors are common across all shipments.[515] However, Prof. Rausser does not *test* whether the estimated effects of changes in the asserted common factors are the same across the different kinds of shipments on different routes.

426. I use the specification of Prof. Rausser's damages regression model to analyze his hypothesis that shipments on different routes have the same percentage overcharge. Specifically, I have selected the 100 largest routes with local containerized intermodal shipments.[516] I run a separate regression for each route. Each regression includes a constant term (the equivalent of the "route" indicator variable), the explanatory variables Prof. Rausser asserts are common, and seasonal indicator variables.

---

[514] Prof. Rausser now proffers a methodology for calculating shipper damages (Rausser Merits Deposition at 437) that contradicts his theory of constant leverage and "same percentage price increase". As I show below in Section VII, this damages methodology yields different percentage "overcharge" amounts for shippers of identical goods on the same route at the same time.

[515] Rausser Merits Report at 164.

[516] These results are unaffected if replicated using Prof. Rausser's data.

427. In these regressions, if the asserted common factors are, in fact, common, the estimated effects (coefficients) of the explanatory variables in each regression (e.g., net weight, diesel price, etc.) should be similar and the estimated effects of the asserted conspiracy should be similar. On the other hand, if the differences in the estimated effects across routes are statistically significant (i.e., the coefficients are not the same based on statistical tests), there is no reliable basis for concluding that the asserted common effects are, in fact, common. In this case, by assuming the effects of causal variables are common, Prof. Rausser's damages regression model effectively "averages" together the effects of the explanatory variables that actually vary across routes, commodities, and so forth, thereby obscuring lack of common effects. When this is the case, such shipments should not be grouped together in a common model.

428. Figure VI-3A shows the coefficients of the 100 regressions graphically. For example, the upper left panel shows the estimated coefficient on the diesel price explanatory variable in Prof. Rausser's damages model as a horizontal line. Against this, the upper left panel shows the 100 coefficients of the diesel price explanatory variable when we estimate Prof. Rausser's model on the 100 largest local containerized intermodal routes separately – i.e., without forcing the regression to *assume* common effects. As the figure shows, when we apply Prof. Rausser's model to individual routes, it finds that the effect of diesel price increases on all-in rates range from strongly negative to strongly positive, with the central 90% of estimates ranging from -.2278 to .3866. The other panels of Figure VI-3A similarly show that each explanatory variable's coefficients span a wide range across the 100 routes. Prof. Rausser's single measured effect of his proffered causal factor is a very poor predictor of the individual route's measured effects. His model's "common effects" are artifacts of his assumption of what needed to be proven. They are rejected when we test them with the data.

Figure VI-3A

**Testing the Ability of Prof. Rausser's Model to Find Common Impact:**
**Does the Model Yield a Single Effect (Regression Coefficient) for Explanatory Factors?**
**Top 100 Intermodal Routes, Local Traffic, Car Type U**




**Source:** Defendants' Transaction Data
**Note:** Y-axes cut at 2 and -2. Values of 0 not shown.

429. Inspection of the results shown in Figure VI-3A indicates that these wide differences in the estimated coefficients for a single explanatory variable can occur on closely related routes and are economically and statistically significant. This can be seen by analysis of intermodal traffic on the Los Angeles-to-Chicago route and intermodal traffic from Chicago-to-Los Angeles. Figure VI-3B shows the estimated coefficients for these two routes vary sharply for many of the explanatory variables. For example, the estimated coefficient on the diesel price variable on the Chicago-to-Los Angeles route is 0.294. The coefficient is quite precisely estimated with a standard error of only 0.04. The 95% confidence interval on the coefficient is 0.215 to 0.373. This interval will thus contain the true coefficient value 95% of the time, if the regression is properly specified. The interpretation of this coefficient is that if the price of diesel fuel were to rise by 10%, rail rates (measured in revenue per ton-mile) would rise by 2.94%.

Figure VI-3B

**Testing the Ability of Prof. Rausser's Model to Find Common Impact: Intermodal, Local Traffic, Car Type U**

| | Los Angeles, CA to Chicago, IL | Chicago, IL to Los Angeles, CA |
|---|---|---|
| *Dependent Variable: Log of Net RPTM* | | |
| **Coefficients** | | |
| 1 Log (Mileage) | -1.083** | -1.584** |
| | *(.086)* | *(.153)* |
| 2 Log (Net weight) | -0.966** | -1.133** |
| | *(.005)* | *(.009)* |
| 3 Log (Diesel price) | -0.125** | 0.294** |
| | *(.021)* | *(.04)* |
| 4 Log (GDP) | -0.180 | 0.458* |
| | *(.129)* | *(.18)* |
| 5 Log (Other Factors Costs Index) | -0.487** | -0.614* |
| | *(.15)* | *(.263)* |
| 6 Effect of Conspiracy | 0.241** | -0.276** |
| | *(.028)* | *(.048)* |
| **(Average Percentage Overcharge)** | **30.2%** | **-6.2%** |
| **Regression Indicators** | | |
| 7 Seasonality Effects | Yes | Yes |
| **Observations** | **10,283** | **10,392** |
| **R-squared** | **0.85** | **0.63** |
| Pre-Class Period: All Movements | | |
| Class Period: Movements with revenue-based FSC payments | | |

**Source:** Defendants' Transaction Data
**Note:** Class Period dummy equals 1 after June 30, 2003 and 0 otherwise. Standard errors indicated in parentheses. Two asterisks (**) denote significance at the 99% level; one asterisk (*) denotes significance at the 95% level.

430. The results on the Los Angeles-to-Chicago route, however, are quite different. On this route, the coefficient on the diesel price variable is -0.125. This coefficient is precisely estimated with a standard error of only .021. The 95% confidence interval on the coefficient is -0.166 to -.084. This interval will contain the true parameter value 95% of the time, if the regression is properly specified. The interpretation of this coefficient is that if the price of diesel fuel were to rise by 10%, rail rates (measured in revenue per ton-mile) would *fall* by 1.25%. Note that the estimated effect of a diesel price increase on the Los Angeles to Chicago route has the *wrong sign* from an economic perspective. That is, it is not consistent with basic economics that, all else equal, a rise in diesel prices would cause rail rates to go down. Moreover, statistically speaking, there is

almost no chance that the true value of the coefficient is positive for this route. These results are telling us that Prof. Rausser's model not only fails to demonstrate common effects across the Class, but also cannot yield reliable results when applied at the level of the Class shipments on an individual route.

431. I have tested statistically whether the two coefficients on the diesel price variable on the Los Angeles-to-Chicago and Chicago-to-Los Angeles routes are equal to one another. I find that the standard statistical test strongly rejects the hypothesis that the coefficients on the diesel price variable are the same on the two routes.[517] The test of the joint equality of all of the regression coefficients Prof. Rausser simply *assumes* are common is rejected still more strongly.[518] These results indicate that the two directions of the Los Angeles-Chicago route respond quite differently to changes in the asserted common economic factors, and that the differences are highly statistically significant.

432. More important than the statistical differences in the estimates are the economic implications of the differences. In one case, a 10% increase in the fuel price leads to an increase in rail rates that is much higher than Prof. Rausser estimates. Prof. Rausser's estimated effect, based on all routes, of a 10% increase in diesel prices absent the purported conspiracy is 0.24%. The corresponding estimated effect for Chicago-Los Angeles is ten times larger at 2.94%. For Los Angeles-Chicago, Prof. Rausser's specification estimates that an *increase* in fuel prices should lead to a *decrease* in rail rates, which makes no economic sense. This result indicates that Prof. Rausser's model fails to capture important supply and demand factors that are unique to the route and is, therefore, incorrectly specified.

433. If Prof. Rausser's specification for his damages model yields such different results for the effect of a change in diesel prices on different but related routes, it is not surprising to find that the estimated effects of the asserted conspiracy are quite different on the different routes as well. The estimated effect of the asserted conspiracy depends on the diesel price in Prof. Rausser's specification, so the asserted effect of the conspiracy changes with time as diesel prices change. In November 2006, the diesel price was about \$2.55 per gallon. Using this value, I find that Prof. Rausser's regression estimates the effect of the asserted conspiracy in November 2006 to be -5.4% on Chicago-Los Angeles and +43.3% on rates for Los Angeles-Chicago for intermodal traffic of the kind described above. Clearly, these estimated effects do not make economic sense. One estimate is that the conspiracy had a *negative* effect on rail rates. The other implies that the alleged conspiracy raised rates by more than 40%. For

[517] The "p-value" of the test is the probability we would observe the difference actually found or greater when the two values are equal. The p-value of this test is much smaller than one in a million. This means we would expect to see a result like the one found only once in more than a million experiments if the two coefficients were, in fact, equal.

[518] This test is statistically significant to an even higher degree than the previous test.

comparison, public carload fuel surcharges – i.e., the purported mechanism that raised all-in rates – were on the order of only 13% when diesel prices were $2.55 per gallon across routes.

434. Figure VI-3C shows the range of estimated effects of the asserted conspiracy for the top 100 intermodal routes. The effects shown are the average effect based on weekly diesel prices during the Class Period. The estimated effects range from -89.5% to 61.4%. Clearly, when not forced by Prof. Rausser's untested "common effects" assumption to generate a common effect of the asserted conspiracy, Prof. Rausser's modeling finds a broad range of effects of the asserted conspiracy.

Figure VI-3C

**Testing the Ability of Prof. Rausser's Model to Find Common Impact: Does the Model Yield "Same Percentage" Overcharges? Top 100 Intermodal Routes, Local Traffic, Car Type U**




**Source:** Defendants' Transaction Data

435. Prof. Rausser asserts "[c]ommon factors such as shipment weight, distance, route and commodity type, among others, predominate over individual factors in the

determination of freight rates."[519] Moreover, he has asserted that his modeling "fits" the data on all-in rates quite well (i.e., explains the variation in all-in rates across Class shipments) in the aggregate.[520] The above analysis of intermodal rates shows that Prof. Rausser's use of statistical estimates that are aggregated across routes obscures the amount of variation of the impact of asserted common factors across routes within Prof. Rausser's specification. As described in Section VII, the "high" explanatory power of Prof. Rausser's regression is the result of his using over 265,000 variables to explain how routes and shipments are different – i.e., *uncommon* factors – rather than from the asserted *common* factors, such as diesel price, mileage, GDP, and so forth. Prof. Rausser's modeling *assumes*, it does not show, that common factors predominate over individual factors. Moreover, as shown in section VII below, these 265,000 factors cannot account for supply and demand factors that change over time, instead Prof. Rausser assumes that weekly diesel prices, a quarterly rail cost index, and annual state GDP levels capture all common and market specific supply and demand changes. Actual testing with the data does not support his assumption.

### D. Did Defendants' Prices (All-In Rates) for Unregulated Rail Service Rise Above Levels That Are Explained by Normal Supply and Demand Factors?

436. Figure III-4 (discussed above) shows trends in a number of economic indicators for rail service between 1964 and 2009.[521] Each of these indicators is indexed to a value of 100 in 1981, coinciding with the major changes in federal rail policy ushered in by the Staggers Act. As we have seen, for more than two decades after 1980, the overall level of railroad rates trended downward. Despite overall rising demand and steadily rising levels of traffic, improved productivity by the railroads was passed through as rate reductions. In approximately 2004-05, however, this trend of declining rail rates was reversed and rates overall in the industry began to turn upward.

437. As explained below, academic researchers and policymakers have attributed these changing economics in the rail sector to a number of factors, notably including sharply rising input costs, the exhaustion of slack capacity after decades of slack capacity, and concomitant increases in the costs of incremental production of ton-miles of service (i.e., increases in *marginal* costs). In contrast, Prof. Rausser sees conspiracy in the reversal of the downward trend in rates in the first half of the 2000s. He examines data on rail industry rates such as those in Figure VI-4 (i.e., industry-wide rates, not merely Defendants' rates) in his Figure 19 and concludes that:

519 Rausser Merits Report at 8.

520 Rausser Class Reply Report at 66-68.

521 Marginal cost are not available after 2008.

"[T]he downward trend in freight rates was reversed during the Class Period. The figure [i.e., Prof. Rausser's Figure 19] shows a sharp upward movement in freight rates that corresponds with the period during which Defendants allegedly conspired to fix prices. This trend reversal constitutes economic evidence consistent with Plaintiffs' allegation that Defendants' conspired to raise freight rates."[522]

Figure VI-4

**Volume, Productivity, Revenue, Marginal Cost and Revenue Per Ton-Mile**
**All Class I Railroads, 1987-2008**




**Source:** AAR R-1 Data; Laurits R Christensen Associates, Inc. Final Report; U.S. Bureau of Economic Analysis

438. Prof. Rausser makes this assertion without providing evidence that he has tested whether factors such as declining productivity, tight capacity, and associated rising marginal costs, rather than the spread of purportedly conspiratorial fuel surcharges,

522 Rausser Merits Report at 89.

might explain the "trend reversal" he sees. Thus, Prof. Rausser's suggestion of conspiracy is economically unsupported.

439. A different analysis by Prof. Rausser contradicts his assertion that the "trend reversal" in railroad rates is an indicator of conspiracy. In fact, his competitive analysis of the railroad industry directly predicts such a reversal in the presence of rising fuel costs. He states:

> "Rising fuel costs would have two effects on railroad freight rates. First, rising fuel costs *would naturally increase rates* as the railroads' costs increase. Second, rising fuel costs would increase the cost of transport substitutes to rail and most likely more so than they would increase the cost of rail itself. All else equal, this would *lessen the competitive pressure* on rail for commodities that can be shipped by other modes, *which would enable railroads to charge higher rates*. Accordingly, for a given commodity travelling along a given route, *fuel costs would be expected to be an important and uncontrollable economic force* influencing the pricing and competition during the benchmark period and the Class Period."[523]

440. Prof. Rausser clearly recognizes that within his competitive framework rising fuel prices would "naturally increase rates".[524] Prof. Rausser also acknowledges the fundamental economics of the transportation industry. Specifically, rising fuel prices would raise the costs of alternative modes of transport "and most likely more so than they would increase the cost of rail", reducing "competitive pressure" on railroad rates.[525] Diminished competitive pressure from alternative modes of transport directly implies that the normal process of competition would allow railroads to *increase* their rates by an amount greater than the railroads' own fuel cost increases without losing business to the now relatively more costly alternative modes of transportation.

441. Thus, within Prof. Rausser's competitive framework, rail rates would rise during the Class Period, and would rise faster than the railroads' fuel costs, *absent any conspiracy*. Thus, the mere existence of rate increases, or rate increases in excess of fuel cost increases, is not diagnostic of conspiracy. Below, I demonstrate that rising marginal costs, driven by fuel prices and other factors, explain rising rail rates during the Class Period, and that the data reject the prediction that conspiracy in the form of spread of purportedly conspiratorial fuel surcharges raised rates relative to marginal costs and allowed Defendants to capture elevated price/marginal cost margins.

442. As described above in Section V, the Lerner Index is equal to a firm's price/marginal cost margin, measured as a percentage of the firm's price. A firm that loses few sales

---

523 Rausser Merits Report at 165 (emphasis added).

524 Rausser Merits Report at 165.

525 Rausser Merits Report at 165; see also at 37.

when it raises its price will be able to charge a high price relative to its marginal costs compared to a firm that loses many sales when it raises its price. Thus, the firm with less elastic demand will have a higher price-cost margin. Of relevance here, the primary goal of a group of colluding firms is to reduce competition among themselves and act collectively, thereby reducing customers' options to divert their purchases from the group. If the colluding firms are successful, they will be able to jointly raise their prices relative to their marginal costs. This will raise their price-cost margins and the Lerner Index. Prof. Rausser's comparison of competitively determined prices to prices set by monopolistic conspiracy recognizes precisely this point.[526]

443. Figure VI-5A presents data by which we can test the prediction of Prof. Rausser's theory of conspiracy – i.e., that the claimed conspiracy raised the Lerner Index applicable to Defendants as a group. In fact, we find that the Lerner Index has been on a distinct downward trend during the Class Period, falling from approximately 30% in the year immediately before the purported start of conspiracy in 2003 to less than 15% by 2008. Thus, Defendants' prices were falling relative to their marginal costs, rather than rising as Prof. Rausser's claims of conspiracy predict. This general trend of declining prices relative to marginal costs has been noted in independent research regarding major railroads (i.e., not just the Defendants in the present matter) produced on behalf of the federal Surface Transportation Board.[527]

---

526 Rausser Merits Report at 53.

527 Christensen Report 2009, Executive Summary at ES-2, ES-22.

Figure VI-5A

**The Lerner Index: Markup of Price over Marginal Cost**
**All Defendants, 1997-2008**




**Source:** Laurits R Christensen Associates, Inc. Final Report

444. Figure VI-5B presents the parallel data on the Lerner Index for each Defendant. While Defendants' Lerner Indexes differ somewhat, each exhibits a downward trend (indicating that Defendant has not been able to raise prices relative to marginal costs) during the time of the alleged conspiracy.

Figure VI-5B

**The Lerner Index: Markup of Price over Marginal Cost**
**Individual Defendants, 1997-2008**




**Source:** Laurits R Christensen Associates, Inc. Final Report

445. The marginal cost values used to calculate the Lerner Index for the Defendants are shown in Figure VI-6. The figure presents inflation-adjusted marginal cost per ton-mile (expressed in constant year 2000 dollars). While the marginal cost histories of each Defendant differ somewhat, they all exhibit strong increases in marginal cost per ton-mile beginning around 2003.

Figure VI-6

**Marginal Cost: Individual Defendants, 1997-2008**




**Source:** Laurits R Christensen Associates, Inc. Final Report

446. Figure VI-7 provides insight into these trends in marginal cost. The figure compares the growth in rail sector productivity with the growth in private business sector productivity for each decade between the 1960s and 2000-2008. The figure shows that the rail sector increased its productivity rapidly relative to the overall private business sector in each decade until 2000-2008. For the years 2000 through 2008, however, productivity growth in the rail sector was only slightly higher than productivity growth in the private business sector. In fact, as discussed above in Section III and seen in Figure VI-4, railroad productivity started to decline in 2004-05.

Figure VI-7

**Productivity Growth Rates:**
**Railroad Industry Average Minus US Private Business Average**




**Source:** Bureau of Labor Statistics
**Note:** Values for 1960-1986 are calculated using historical multifactor productivity data for railroad SIC 4011; values for 1987-2008 are calculated using historical multifactor productivity data for line-haul rail SIC 482111.

447. Declining productivity and rising fuel costs in the 2000s contributed to rising marginal costs.[528] Railroad marginal costs were also affected by the composition of railroad traffic. Some traffic, such as bulk movements of grain, metallic ores, coal, and crushed stone, are not time-sensitive and are relatively low-cost to move. Other traffic, such as certain intermodal traffic, is highly time-sensitive and relatively high-cost to move.

528 Congressional Budget Office, "Freight Rail Transportation: A Review of the 2004 Experience," May 2005 ("CBO 2005") at 6-8.

The rapid growth in intermodal traffic has been widely noted by analysts.[529] Because railroads are networks, changes in cost resulting from changes in one type of traffic tend to have spillover effects on the costs of other types of traffic.

448. In addition, prices for railroad service are affected by changes in the supply of, and demand for, freight transportation. Numerous policymakers, academics, and other researchers who have studied the economics of the rail sector conclude that in the 2000s railroads experienced a "surge in demand"[530] resulting from such factors as increasing imports of container traffic from Asia,[531] increased grain exports,[532] and shortages of truck drivers.[533] This surge in demand, coupled with the "lumpy" nature of railroad capacity,[534] created capacity tightness and congestion in railroad networks.[535] Higher prices are the economically rational and expected response to such supply and demand conditions.[536]

449. It is basic economics that when capacity is strained, the true marginal cost of producing incremental additions to supply rises, sometimes sharply.[537] In the US railroad industry in the mid-2000s as capacity tightened on the rail network, incremental supply became increasingly expensive to "squeeze" out of the system. Much like a traffic jam on a highway network, capacity constraints in the rail sector are manifested as reductions in the velocity of traffic, leaving railroads with increased costs in the form of locomotives and cars tied up in traffic, extra crews needed to relieve delayed crews, increased labor and fuel expenses as trains needed to be routed circuitously around clogs in the system, and the like.

450. Government and academic researchers studying the rail sector find that railroad service, costs, and prices were all affected significantly by congestion at various times in recent years.[538] As summarized by the Congressional Research Service:

---

529 Association of American Railroads, "Rail Intermodal Keeps America Moving," July 2012, at 1; John F. Frittelli, "Intermodal Rail Freight: A Role for Federal Funding?" Congressional Research Service, August 18, 2004, at CRS-4; CBO 2005 at 4.

530 See, e.g., CBO 2005 at 2, 6.

531 CBO 2005 at 6.

532 CBO 2005 at 6.

533 CBO 2005 at 6.

534 See, e.g., USDA Agricultural Marketing Service, Study of Rural Transportation Issues, April 2010 ("AMS") at 310.

535 See, e.g., GAO Report at 3; Christensen Report 2009 at ES 29; AMS at 332. Prof. Rausser's regression analysis does not contain explanatory variables that would account for all of these demand factors. See Section VII.

536 See, e.g., AMS at 305.

537 See, e.g., AMS at 310.

538 See, e.g., Christensen Report, Vol. 3, at 22-3-4; CBO 2005.

"The national rail system generally had substantial excess capacity when the railroad industry was largely deregulated in 1980. The railroads have since brought their capacity and volume of business into alignment by increasing traffic; selling off, leasing, or abandoning surplus track and equipment; and by cutting staff."[539]

The post-deregulation improvements in productivity and declines in marginal costs and rail rates continued into the mid-1990s, even as rail volumes grew. As the volume of traffic continued to grow after the mid-1990s and the excess capacity was absorbed, these trends slowed down and reversed. (See Figures VI-4 and VI-7.)

451. The effects of congestion on the rail system became readily apparent by 2004, leading to numerous hearings and studies.[540] As the president of the largest organization of shippers testified before Congress in 2006:

"The rail industry is laboring under significant capacity constraints for the first time in over 50 years.... We have reached a point where demand has exceeded the industry's capacity to haul all of this traffic. This has caused congestion over significant parts of the national rail system, resulting in a substantial deterioration in service levels."[541]

452. Change in train speed provides a measure of the improved or worsened functioning of the rail network.[542] It also is directly related to the capacity of the rail system: A decrease in train speed implies that more equipment is required to haul the same

---

539 Congressional Research Service, "Rail Transportation of Coal to Power Plants: Reliability Issues," CRS Report to Congress, September 26, 2007 at CRS-25.

540 Christensen Report 2009, Volume 2 at 18-28 to 18-32; Union Pacific 2003 Fact Book at 4; and Union Pacific 2004 Fact Book at 5-6. See, for example, American Association of State Highway and Transportation Officials, "Freight-Rail Bottom Line Report," 2004; CBO 2005; Congressional Budget Office, "Freight Rail Transportation: Long-Term Issues," January 2006; GAO Report; Cambridge Systematics, Inc., "National Rail Freight Infrastructure Capacity and Investment Study: Final Report," September 2007. Hearings were also held by the U.S. House of Representatives, Subcommittee on Railroads of the Committee on Transportation and Infrastructure Senate, "U.S. Rail Capacity Crunch," April 26, 2006; the U.S. Senate, Subcommittee on Surface Transportation and Merchant Marine of the Committee on Commerce, Science, and Transportation, "Economics, Service, and Capacity in the Freight Railroad Industry," June 21, 2006; and the STB, as part of Ex Parte 671, Rail Capacity and Infrastructure Requirements, initiated March 6, 2007.

541 Statement of John B. Ficker, President, The National Industrial Transportation League, in U.S. GPO, "Economics, Service, and Capacity in the Freight Railroad Industry," Hearing before the Subcommittee on Surface Transportation and Merchant Marine of the Committee on Commerce, Science, and Transportation, June 21, 2006 at 65.

542 The average train speed is calculated by dividing train-miles by total hours operated, excluding yard and local trains, passenger trains, maintenance of way trains, and terminal time. http://www.railroadpm.org/Definitions.aspx.

volume of traffic at any time. Between 1999 and 2002, the average speed increased for the Defendants between 2% (UP) and 26% (NS), with a simple average of 14% for the Defendants as a group. From 2002 to 2005, however, Defendants' average train speed fell by 11%, with declines ranging from 6% (NS) to 15% (UP).[543] By 2005, on average for the four Defendants the train speed had declined below that in 2000.

453. Figure VI-8 provides an assessment of the degree of congestion in 2005 along primary rail corridors, based on an analysis of the number of trains and the practical capacity of the rail system, accounting for maintenance and ordinary disturbances. Green indicates the presence of available capacity. The yellow (near capacity), orange (at capacity), and red (above capacity) colors, however, indicate portions of the rail network that lack or have limited ability to accommodate maintenance and recover from incidents (e.g., weather delays or equipment failures) without causing delays and variability in service.[544] While most of the network had available capacity, significant corridors lacked sufficient capacity.

454. Because railroads are networks, this congestion reduced the effective capacity across the system even when the particular points of congestion arose at specific locations and routes on the rail network. Like an air traveler who is waiting in Boston for a flight that will take her to Miami may be delayed by a thunderstorm in Chicago, the effects of localized congestion tends to disturb service, to different degrees, throughout the rail system.[545]

---

543 Christensen Report 2009, Vol. 2 at 18-30 to 18-34.

544 Cambridge Systematics, Inc., "National Rail Freight Infrastructure Capacity and Investment Study: Final Report," September 2007 at 4-1 to 4-10.

545 Christensen Associates Report, Vol. 2, at 16-31: "[S]imilar to localized congestion in other types of networks that causes reductions in output and service levels despite virtually unconstrained capacity throughout the network, congestion at various points or corridors in railroad networks appears to be the major culprit in capacity-related performance issues over the last ten years. While other measures of capacity along a given route may indicate sufficient capacity to meet demand, congestion at terminals or other specific network locations can often become a binding constraint on the utilization of route capacity or network-wide capacity".

Figure VI-8

**Degree and Location of Congestion on US Rail Network**




**Source:** Report by Cambridge Systematics, Inc. for AAR.; National Rail Freight Infrastructure Capacity and Investment Study
**Note:** Volumes are for the 85th percentile day.

455. Railroads facing congestion took a number of steps to relieve that congestion. For example, the Congressional Budget Office notes that the railroads dealt with the record-setting "surge in demand" for rail service in 2004 by taking steps to increase supply (e.g., adding more cars, engines and equipment than previously planned, and hiring and training more engineers and conductors than they had "in many decades"); to raise prices; and to ration supplies by imposing limits on shippers (e.g., requiring shippers to wait for service until they had full carloads). The CBO concludes: "In sum, the ability of railroads to raise rates served as an indicator of a surge in demand, a mechanism for allocating scarce capacity to shippers who valued it most highly, and a signal that more investment is needed to increase capacity."[546]

456. Railroads, as owners and operators of their own networks, were in a position to internalize the effects of congestion and the value of the scarce capital. By raising rates to those customers who would otherwise contribute to network congestion, railroads

[546] CBO 2005, at 12.

could manage congestion and have shippers pay for the economic value of now scarce capacity. Shippers for whom the higher rates were above their next best alternative would no longer purchase rail transportation that used the scarce capacity; others would remain and pay higher rates. As the degree and location of scarce capacity changed, due to actions of the railroads to manage and expand capacity and due to shifts in demand, the rates charged for different services and commodities at different locations would change. Overall, in periods with congestion and tight rail capacity, such as began in late 2003, average rates would be expected to be higher than they would have been were additional capacity available. As explained above, Prof. Rausser provides no means of identifying the differential change in rail rates that result from non-conspiratorial factors. The marked congestion of the rail network that arose in the mid-2000s is one of the factors that Prof. Rausser's modeling does not account for.

457. The upward pressure on marginal costs that came from system congestion, declining productivity and rising fuel costs carries important implications for the issues at hand. Prices set under competitive conditions must be set so as to recover the marginal costs of incremental supply. Otherwise, it makes no economic sense for a business to put incremental supply on the market: If it costs $100 to put incremental supply on the market, but doing so only brings in a price of $90, putting incremental supply on the market is a losing proposition.

458. These considerations indicate that the proper measure of whether prices are recovering costs is based on marginal costs, rather than average total costs or even average variable costs. Indeed, when capacity is strained and marginal cost is rising, marginal cost will *exceed* average total cost and average variable cost of supply. Moreover, with prices rising to reflect rising marginal costs and such prices exceeding the *average* costs of supply, railroads' profits will rise.

459. Thus, textbook economics show that firms producing in competitive market conditions will generate "over-recovery" of average and total costs when shortages like those described above arise.[547] As I discuss in detail below, failure to apply these basic economics underlies Prof. Rausser's error in asserting that Defendants' Class Period fuel cost increases did not "justify" their fuel surcharges.

460. The Lerner Indexes that we see in Figures VI-5A and 5B show downward trends starting some years before the alleged onset of the conspiracy among Defendants claimed by Plaintiffs. It is thus proper to inquire as to whether, after accounting for longer run forces that may be pushing Lerner Indexes downward, the hypothesized conspiracy regarding the spread of FSCs may have slowed the decline of the Lerner Indexes relative to a putative but-for setting with no conspiracy. To test this

547 W. Nicholson and C. Snyder, Intermediate Microeconomics: And Its Applications (Cengage Learning, 2009) at ch. 7.

implication of Plaintiffs' claimed conspiracy, I have used standard economic methods (in particular, statistical regression analysis) to investigate whether the data support an inference that the spread of FSCs over the Class Period was the product of a conspiracy that eliminated inter-Defendant competition and raised price/marginal cost mark-ups relative to what they otherwise would have been. Specifically, by using the Lerner Index, I test whether the data indicate that a conspiracy, in fact, provided Defendants with *collective* market power by shifting Defendants away from basing their price-marginal cost mark-ups on their individual elasticities of demand and toward basing their mark-ups on their less elastic collective demand. The results of this testing are shown in Figure VI-9.

Figure VI-9

**Impact of the Spread of FSCs on Price-Marginal Cost Markups: Accounting for Differences Across Railroads 1987-2008**

| | (1) | (2) |
|---|---|---|
| ***Dependent Variable: Log of RPTM - Log MC*** | | |
| **Coefficients** | | |
| 1 Intercept ( c ) | 0.456** | 0.459 |
| 2 Spread of Challenged FSCs | -0.698** | -0.913** |
| 3 Percent of Traffic that Is Bulk | | -0.326 |
| 4 Percent of Traffic that Is Intermodal | | 0.307 |
| 5 ATSF | 0.203** | 0.155 |
| 6 BN | 0.172** | 0.299** |
| 7 CSXT/CSXI | -0.124* | -0.035 |
| 8 NS | 0.008 | 0.069 |
| 9 UP | -0.012 | -0.005 |
| 10 SP | -0.032 | -0.231 |
| **Observations** | **107** | **95** |
| **R-squared** | **0.466** | **0.574** |
| **Regression Data** | | |
| 1987 through 2008 Annual Data | | |

**Source:** Defendants' Transaction Data; AAR R-1; Laurits R Christensen Associates, Inc. Final Report
**Note**: Spread of Challenged FSCs is revenue from Class shipments over total revenue. Values are in 2000 $. Intermodal data not available before 1989. ** indicates significance at 99% level and * indicates significance at 95% level.

461. Figure VI-9 shows the results of statistical regression analyses testing whether the prediction that the spread of revenue-based FSCs in the Class Period is associated with an increase in the railroads' Lerner Indexes. A rise in the Lerner Index could indicate that rates were rising faster than marginal costs, consistent with the reduction of inter-Defendant competition under the hypothesized conspiracy. The question is whether the spread of the challenged fuel surcharges is associated with evidence of increased market power created by conspiracy. The economics of Plaintiffs' theory of conspiracy imply that the exercise of newly created market power should increase price/marginal cost mark-ups and the corresponding Lerner Indexes.

462. As the formula set out for the Lerner Index in Section V above indicates, the Index depends upon the elasticity of demand for rail transportation. Concerning the elasticity of demand, Prof. Rausser cites, in particular, the type of traffic – intermodally competitive, shorter haul traffic versus longer haul, bulk traffic – as affecting the elasticity of demand that railroads face, with the former representing relatively more elastic demand.[548] As we have seen from the Lerner Index formula, more elastic demand would be expected to result in lower Lerner Index values; and the converse for less elastic demand. That is, as $\epsilon$ goes up, $1/\epsilon$ goes down – and with it, the Lerner Index goes down. And conversely when $\epsilon$ goes down, $1/\epsilon$ goes up – and with it, the Lerner Index goes up. To account for the independent effects that changing intermodal and bulk mixes of traffic could have on the elasticities of demand and the Lerner Index (i.e., independent of the predicted effect that the spread of conspiratorial FSCs would have in raising the Lerner Index), the statistical analyses in Figure VI-9 control for the amount of traffic that is intermodal and the amount that is bulk.

463. The foregoing framework is applied in Figure VI-9 to Defendants' Lerner Index values over 1987-2008. In the first column of numerical values in the figure, I show the results when we measure each Defendant's (and any predecessor's) Lerner Index value. The key finding is the effect that is identified for the spread of revenue-based fuel surcharges during the Class Period. As noted, under Plaintiffs' and Prof. Rausser's theories, the spread of fuel surcharges represented the spread of the mechanism purportedly used to raise prices. Holding constant other factors that could affect the elasticity for demand for rail service, the spread of the fuel surcharges should have had the effect of raising the Lerner Index values if those fuel surcharges were an effective conspiratorial mechanism to raise prices.

464. As indicated by the negative values ("coefficients") for effects of the spread of revenue-based fuel surcharges in the Class Period in Figure VI-9, that spread was *not* associated

548 Rausser Merits Report at 24-26.

with rising price-to-marginal-cost markups (i.e., rising Lerner Index values).[549] Thus, the data do not support Plaintiffs' and Prof. Rausser's theories and claims of conspiracy. Instead, the results of Figure VI-9 are consistent with similar findings in the work of other researchers, showing that the middle 2000s were not characterized by enhanced market power of the Class I railroads.[550]

465. While Prof. Rausser does not undertake analysis of the kind shown in Figure VI-9 when he asserts that the noted upward "trend reversal" in railroad rates in the mid-2000s is consistent with the conspiracy he posits, he does argue that a simple comparison of prices and costs, *as measured by the Rail Cost Adjustment Factor – Adjusted (RCAF-A),*[551] finds that "the gap between industry-wide costs and freight rates widened significantly during the Class Period."[552] His comparison is shown as the top panel of Figure VI-10.

---

549 While the data do not cover a sufficient time period to permit the kind of statistical analysis reported in Figure VI-9, I note that the data on all-in rail rates in newly struck price authorities containing FSCs over 2002-2008 do not show a common pattern of "trend reversal" and upward movement pointed to by Prof. Rausser in his examination of average revenue per ton mile across the Class I railroads (Rausser Merits Report at 88-89). See my workpapers. The consequence is that price/marginal cost markups in such newly struck price authorities would be expected to reveal the same general downward movement of Lerner Indexes over the period that we see above in Figures VI-5A and 5B and that produce the results we see in figure VI-9.

550 See note 540 above.

551 The RCAF-A represents the aforementioned RCAF with adjustment for railroad productivity.

552 Rausser Merits Report at 84-85 and Figure 18.

Figure VI-10

## Prof. Rausser's Comparison of Railroad Rates to RCAF Adjusted Index




## Comparison of Railroad Marginal Cost to Railroad Rates




**Source:** Rausser Merits Report, AAR, STB, and Laurits R Christensen Associates, Inc. Final Report
**Note:** Data are indexed to 1989.

466. Prof. Rausser's analysis, however, is flawed. First, the "widening of the gap"[553] between indexed rail rates and RCAF-A obviously began in the early *1990s*, not at the purported onset of conspiracy in July 2003. Causal attribution of this "widening of the gap" to the alleged conspiracy when it precedes the asserted conspiracy is a straightforward error in economic reasoning. Second, at the level of the most basic of economics, Prof. Rausser's assertions regarding the "widening of the gap" between rates and costs employ an inappropriate concept of "cost".

467. Specifically, as pointed out above, it is textbook economics that, if we are to compare prices to costs to see if prices have been driven by legitimate cost factors, we must look to *marginal costs* – i.e., the costs of putting incremental supply on the market. In any well-functioning competitive market, if prices are not sufficient to attract desired incremental supply into the market, the associated shortage in supply creates upward pressure on prices until prices rise sufficiently to cover the marginal cost of incremental supply. RCAF-A does not measure railroads' marginal costs of supplying rail transportation services. Instead, RCAF-A is based primarily on railroads' reports of their historical accounting costs and incorporates significant lags in reflecting actual expenditures. It cannot capture the marginal cost of an additional movement given the limited remaining economies of scale and scope in the use of an existing network nor can it measure the diseconomies of congestion due to limited existing capacity on portions of the same network.[554]

468. As discussed above, the mid-2000s was a period of notable and noted tightening of capacity in the railroad industry, as steadily and strongly growing demand began to strain the capacity of the system to handle traffic. Such conditions quickly drive marginal costs above average costs. The implications are clear in the bottom panel of Figure VI-10. There I show the same measure of rail rates used by Prof. Rausser (in the top panel of Figure VI-10) and compare these rates to marginal costs of rail freight service. Rather than seeing a "widening gap" between prices and costs, we see that the opposite has been taking place since the mid-1990s, with railroad rates failing to keep pace with rising marginal costs since the late 1990s-early 2000s. Similarly, Prof. Rausser's analysis, which entails comparison of average revenue per unit to average (not *marginal*) variable cost per unit based on accounting measures and arbitrary allocations across traffic and traffic types, cannot properly measure the marginal costs of the incremental expansion of rail transportation services. Prof. Rausser's inference of conspiracy from his comparison of rail prices and costs is methodologically, economically, and evidentiarily unfounded.

---

553 Rausser Merits Report at 84.

554 Association of American Railroads, "Rail Cost Adjustment Factor," Updated November 2001.

### E. Rail Rates Rose More Slowly than Properly-Measured Increases in Costs

469. Prof. Rausser asserts that he can infer conspiracy from the "fact" that Defendants' aggregate fuel surcharge revenues during the Class Period "over-recovered" the aggregate fuel cost increases that they experienced.[555] Prof. Rausser's economic logic is flawed. As noted above, no inference of conspiracy is possible from the asserted fact that Defendants "over-recovered" their increased fuel costs. Prices are not driven by fuel costs. They are driven by marginal costs, of which fuel costs are only a part. While acknowledging these textbook economics of the critical causal link between prices and marginal costs elsewhere in his opinions,[556] Prof. Rausser abandons them when asserting "massive over-recovery" of aggregate fuel costs.[557]

470. Figures VI-11A and VI-11B show Defendants' combined and individual freight rates relative to their marginal costs. The figures show that rail rates did not keep pace with rising marginal costs during the Class Period. In fact, had rates been set at the levels implied to be proper "no-conspiracy", "but-for" rates under Prof. Rausser's damages calculations, Defendants' rates would have lagged even further behind their increasing marginal costs.[558]

---

555 Rausser Merits Report at 77; see also at 8, 78-84.

556 Rausser Merits Report at 53.

557 Rausser Merits Report at 84. In fact, as we have seen in Section IV above, Class FSC rates closely track legacy FSC rates. The implication of Prof. Rausser's argument is therefore that even legacy rates, which are acknowledged to have been established non-conspiratorially, would generate "massive over-recovery" of fuel costs in Prof. Rausser's framework. Prof. Rausser's "over-recovery" hypothesis provides no basis for distinguishing purportedly conspiratorial rates from non-conspiratorial rates.

558 The regression results shown in Figure VI-9 mean that price-cost margins fell as the purportedly conspiratorial FSCs spread. This result does not support a hypothesis that a conspiracy among Defendants at least prevented rates from lagging behind marginal costs to even a greater degree than they did.

Figure VI-11A

**Change in Marginal Cost v. Change in Revenue-Per-Ton-Mile**
**All Defendants; Relative to 2002**




**Source:** Laurits R Christensen Associates, Inc. Final Report

Figure VI-11B

**Change in Marginal Cost v. Change in Revenue-Per-Ton-Mile**
**Individual Defendants; Relative to 2002**




**Source:** Laurits R Christensen Associates, Inc. Final Report

471. Figures VI-12A through 12E evaluate whether observed increases in rail rates covered the increases in incremental ("marginal") costs between 2002 and 2008. The discussion of the Lerner Index above makes it clear that, if a conspiracy in fact existed and was effective in elevating rates, we would expect a rise in price/marginal cost margins. For price/marginal cost margins to rise, Defendants' rates would have to rise by more than the increase in the fuel and non-fuel components of Defendants' marginal costs. We do not find this in the data. In fact, Defendants rates rose by less than the increases in their marginal costs.

Figure VI-12A

**Did Rates Rise Enough over 2002-2008 to Cover Rising Costs?**
**All Defendants**




**Source:** AAR R1 Data; Laurits R Christensen Associates, Inc. Final Report
**Note:** The increase in costs is the increase in the marginal (incremental) cost of moving 1 ton 100 miles. The increase in rates is the increase in the rate for moving 1 ton 100 miles.

Figure VI-12B

**Did Rates Rise Enough over 2002-2008 to Cover Rising Costs?**
**BNSF**




**Source:** AAR R1 Data; Laurits R Christensen Associates, Inc. Final Report
**Note:** The increase in costs is the increase in the marginal (incremental) cost of moving 1 ton 100 miles. The increase in rates is the increase in the rate for moving 1 ton 100 miles.

Figure VI-12C

**Did Rates Rise Enough over 2002-2008 to Cover Rising Costs?**
**CSXT/CSXI**




**Source:** AAR R1 Data; Laurits R Christensen Associates, Inc. Final Report
**Note:** The increase in costs is the increase in the marginal (incremental) cost of moving 1 ton 100 miles. The increase in rates is the increase in the rate for moving 1 ton 100 miles.

Figure VI-12D

**Did Rates Rise Enough over 2002-2008 to Cover Rising Costs?**
**NS**




**Source:** AAR R1 Data; Laurits R Christensen Associates, Inc. Final Report
**Note:** The increase in costs is the increase in the marginal (incremental) cost of moving 1 ton 100 miles. The increase in rates is the increase in the rate for moving 1 ton 100 miles.

Figure VI-12E

**Did Rates Rise Enough over 2002-2008 to Cover Rising Costs?**
**UP**




**Source:** AAR R1 Data; Laurits R Christensen Associates, Inc. Final Report
**Note:** The increase in costs is the increase in the marginal (incremental) cost of moving 1 ton 100 miles. The increase in rates is the increase in the rate for moving 1 ton 100 miles.

472. The light red bar on the left side of Figure VI-12A shows increases in marginal costs over 2003 to 2008 from a 2002 base for all the Defendants in the aggregate, divided between fuel costs and non-fuel marginal costs. Costs are expressed as cents per one hundred ton-miles. The blue bar on the right side of the figure shows the aggregate increase in rates for Defendants, also expressed in cents per hundred ton-miles. As shown, marginal costs increased by 87 cents, including 49 cents for non-fuel costs and 39 cents for fuel costs. Rates increased by 58 cents, leaving a shortfall of 29 cents. Figures VI-12B, C, D, and E show similar analyses for each of the Defendants separately. The shortfall in price relative to marginal cost ranges from approximately 10 cents for NS ($1.20 of increased marginal costs versus $1.10 of increased rate

revenue) to 40 cents for CSXT ($1.08 of increased marginal costs versus 68 cents of increased rate revenue). For UP and BNSF, rate increases fell short of increases in marginal costs by approximately 38 cents and 21 cents, respectively, per one hundred ton-miles.

473. Prof. Rausser claims that we should infer the alleged conspiracy because he asserts that he finds "massive over-recovery" of aggregate (*not* marginal) fuel costs by Defendants.[559] Yet, as I have noted, these claims are inconsistent with basic textbook economic principles of marginal costs and the determinants of pricing. Precisely the same economics result in rejection of Prof. Rausser's claims that Defendants' pricing can be inferred to have been conspiratorial purportedly because the challenged fuel surcharges "ignored Defendants' individual hedging activities".[560] Here, again, his expressed opinions are contrary to basic economics.

474. First, it is relevant that Defendants engaged in both the use of revenue-based fuel surcharges and hedging in the pre-Class Period (acknowledged to be free of conspiracy).[561] Thus, as the demonstrable product of unilateral, non-conspiratorial market forces, the same conduct in the Class Period provides no basis for accepting the conspiracy hypothesis. Second, to the extent that Defendants hedged their fuel costs, they did so by trading financial futures contracts (as on NYMEX; see above in Section IV) or by pre-purchasing fuel through long-term forward "physical" contracts. Either way, they effectively bet on the future price of fuel by locking in a price in the future. Such hedging affects a railroad's *total, aggregate* financial costs, with the effects of hedging playing out over time as a railroad's hedges roll over and futures or forward contract prices turn out to have been good bets or bad bets relative to what going-market prices turn out to be. But hedging does not change the *marginal* cost of supplying rail service to the marketplace. The marginal cost of fuel that impacts the marginal cost of supplying incremental volumes of rail service is determined by the contemporaneous going market prices of diesel fuel.

475. This is most obvious when a railroad is not "fully hedged" – i.e., less than 100% of its fuel needs are covered by its futures or forwards contracts. In that case, volumes needed in excess of hedged volumes must be directly acquired at contemporaneous going-market prices in the diesel fuel marketplace. Even if a railroad is fully hedged, however, the marginal cost of fuel relevant for supply and pricing remains the contemporaneous going-market price (i.e., "spot" price) of diesel fuel: Even if fully hedged, the use of fuel at the margin subjects the railroad to the opportunity cost of that fuel, with that opportunity cost being the going-market price that the railroad gives up

559 Rausser Merits Report at 84; see also at 8, 129.

560 Rausser Merits Report at 103.

561 See, for example, BNSF 2001 10K at 15, 23; UP 2002 10K at 20, NS_009003388-89.

by burning incremental fuel rather than unwinding its futures or forwards contracts at the going-market price. What Prof. Rausser describes as "ignoring" hedging is the rational conduct of a profit-seeking business unilaterally pursuing its interests.[562]

476. The comparison of rate increases to marginal cost increases is the economically appropriate means to determine if Defendants' prices rose by more than is justified by cost alone.[563] Prof. Rausser's asserted "damages" for the exercise of market power should correspond to the amount that Defendants' rates rose above their increases in marginal costs, after accounting for non-conspiratorial competitive changes that might allow such increases.[564] Instead, Prof. Rausser's damages amount to billions of dollars of reductions in rates that did not keep pace with increasing marginal costs. Prof. Rausser acknowledges that Defendants would be able to pass their increased fuel costs on to their shippers in the absence of conspiracy.[565] However, the damages model he employs does not lead to this result. If rates rose in accord with his damages model, Defendants would not be allowed to legitimately recover even their increased fuel costs as calculated by Prof. Rausser, much less to set rates that would keep pace with their rising, full marginal costs.

477. This is seen in Figures VI-13A through IV-13D, which shows Prof. Rausser's calculations of each Defendant's increased fuel costs over the Class Period and compares these amounts to the additional fuel cost recovery resulting from the increased fuel costs that his damages modeling assumes would have been recovered absent the alleged conspiracy.[566] The green line in Figure VI-13A shows Prof. Rausser's measure of increased fuel cost per ton-mile for BNSF for each month from July 2003 through December 2008.[567] The orange line is derived directly from Prof.

---

[562] Smith, Clifford W., "Managing Corporate Risk" in Eckbo, B. Espen, ed., Handbook of Empirical Corporate Finance (Amsterdam, Elsevier B.V.: 2007), ch. 18 at 544: "Basic economics implies that optimal production and pricing occur where marginal cost equals marginal revenue. Relevant costs reflect opportunity cost, and the opportunity cost of the oil is its spot price. For this reason, optimal hedging affects neither the firm's relevant marginal costs nor marginal revenues."

[563] Prof. Rausser acknowledges the role of marginal cost in pricing in non-conspiratorial settings. Rausser Merits Report at 53. As Prof. Rausser recognizes, changes in competitive pressure from other modes of transportation under "no conspiracy" conditions could allow railroads to raise their rates by more than their marginal cost increases. Rausser Merits Report at 165. Thus, without further analysis, there would be no basis for accepting a hypothesis of conspiratorial conduct if rail rates had risen by more than increases in rail marginal cost.

[564] Rausser Merits Report at 165.

[565] Rausser Merits Deposition at 31.

[566] I more fully describe and discuss this modeling below in Section VII.

[567] The fuel costs as calculated by Prof. Rausser do not include costs incurred by the railroads due to the higher fuel prices such as the additional or accelerated investment in fuel-conserving equipment and operational changes to reduce fuel consumption through alternative and/or additional use of labor and materials.

Rausser's damage modeling and represents the average amount by which Prof. Rausser assumes BNSF's prices would have legitimately changed in response to fuel price increases, but for the claimed conspiracy. Similar analyses for the other Defendants are shown in Figures VI-13B through 13D.

478. As shown in Figure IV-13A, in Prof. Rausser's framework, BNSF's purportedly "legitimate" fuel cost recovery consistently lags behind BNSF's actual fuel costs throughout the Class Period. Figures IV-13B through D show similar results for each of the other Defendants. In Prof. Rausser's "no-conspiracy" world, rates do not rise sufficiently to cover Defendants' rising fuel costs. In his "conspiracy" world and economic framework, base rates are "static" and he provides no empirical analysis as to how much fuel cost "recovery" we are to assume is accounted for in base rates. The analysis in Figures VI-13A through 13D indicates that whatever combination of base rate changes and non-conspiratorial fuel surcharges Prof. Rausser imagines in his "no conspiracy" world, his "no conspiracy" all-in rates would not recover the increased fuel costs he measures.

Figure VI-13A

**Prof. Rausser's Framework: Increased Fuel Costs v. "Legitimate" Fuel Cost Recovery BNSF**




**Source:** Rausser Merits Report (Figures 13-17)
**Notes:** The increase in fuel cost is the difference from July 2003 using Prof. Rausser's railroad-specific fuel price. Prof. Rausser's "legitimate" fuel cost recovery is the increase associated with the increase in fuel price. All values are nominal dollars per 100 ton-miles.

Figure VI-13B

**Prof. Rausser's Framework: Increased Fuel Costs v. "Legitimate" Fuel Cost Recovery CSXT/CSXI**




**Source:** Rausser Merits Report (Figures 13-17)
**Notes:** The increase in fuel cost is the difference from July 2003 using Prof. Rausser's railroad-specific fuel price. Prof. Rausser's "legitimate" fuel cost recovery is the increase associated with the increase in fuel price. All values are nominal dollars per 100 ton-miles.

Figure VI-13C

**Prof. Rausser's Framework: Increased Fuel Costs v. "Legitimate" Fuel Cost Recovery NS**




**Source:** Rausser Merits Report (Figures 13-17)
**Notes:** The increase in fuel cost is the difference from July 2003 using Prof. Rausser's railroad-specific fuel price. Prof. Rausser's "legitimate" fuel cost recovery is the increase associated with the increase in fuel price. All values are nominal dollars per 100 ton-miles.

Figure VI-13D

**Prof. Rausser's Framework: Increased Fuel Costs v. "Legitimate" Fuel Cost Recovery UP**




**Source:** Rausser Merits Report (Figures 13-17)
**Notes:** The increase in fuel cost is the difference from July 2003 using Prof. Rausser's railroad-specific fuel price. Prof. Rausser's "legitimate" fuel cost recovery is the increase associated with the increase in fuel price. All values are nominal dollars per 100 ton-miles.

479. In short, economic analysis of Defendants' pricing relative to their marginal costs over the Class Period does not support the hypothesis that Defendants' price/marginal cost mark-ups were elevated relative to what they otherwise would have been but for purported conspiracy. Moreover, Defendants' actual pricing during the Class Period did not result in rail rates rising by more than Defendants' full increases in marginal costs – where "full" is properly recognized to consist of increases in both fuel and non-fuel components of *marginal* costs. In contrast, Prof. Rausser's damages model embodies a relationship between prices and fuel costs that does *not* allow Defendants to recover their incremental fuel costs. This result is inconsistent with Prof. Rausser's

opinion that Defendants would be able to pass through at least their incremental cost of fuel in the absence of conspiracy.[568]

### F. Testing Prof. Rausser's Claim that Conspiracy Contributed to Supra-Competitive Increases in Defendants' Profits

480. As support for his assertion that he has discerned the conspiracy alleged by Plaintiffs, Prof. Rausser claims: "Following the implementation of their Fuel Surcharge program the Defendants reversed the prior trend of declining freight rates, achieved record revenues and increased profitability."[569] He further claims that "growth in Defendants' profit margins" occurred "in tandem" with their increasing use of FSCs.[570] Prof. Rausser uses accounting data collected by the STB to calculate each Defendant's profit margin (in his Figure 20[571]), and also presents an analysis of Class I railroad profit margins from a Senate Staff report (Figure 21).[572]

481. As we have seen, all else equal, the basic economics of conditions of tight capacity in the railroad sector in the mid-2000s would be expected to create increased profitability for railroads as prices and marginal costs increased relative to variable costs. Indeed, Prof. Rausser's analysis of Defendants' profitability does not control for capacity conditions or other factors affecting Defendants' profitability, as would be necessary to isolate the alleged conspiracy as the, or even *a*, cause of the purported increased profitability. Moreover, as I describe above, it is price/marginal cost margins that indicate the degree of market power a firm or asserted conspiratorial group of firms possesses. Prof. Rausser's profitability analyses are based on overall average operating margins. They provide no information on the economically relevant price/*marginal cost* margins.

482. All else equal, profits are readily raised by such factors as the steady growth in demand (at least until late in the Class Period), and the pushing of demand against capacity that occurred in the Class Period. Moreover, the kind of accounting data on operating margins that Prof. Rausser does cite in his Figure 20 are well-known to be subject to confounding factors that render them unrelated to market power.

483. Among the confounding factors that result in this conclusion are the use of accounting rates of depreciation, the treatment of inventory costs, and the distinction between the

568 Rausser Merits Deposition at 31.

569 Rausser Merits Report at 88.

570 Rausser Merits Report at 136: "The increase in Fuel Surcharge imposition also occurred in tandem with growth in Defendants' profit margins discussed in Section V.B.5. These trends corroborate the Class-wide impact of the conspiracy."

571 Rausser Merits Report at 91.

572 Rausser Merits Report at 92.

accounting values (recorded book cost) of productive inputs relative to the actual economic opportunity cost of inputs (including their scarcity values during periods of tightening supply). Thus, the widely cited economic research *On the Misuse of Accounting Rates of Return to Infer Monopoly Profits* notes that "accounting rates of return, even if properly and consistently measured, provide almost no information about economic rates of return."[573] Indeed, Prof. Rausser himself has noted that: "The use of accounting data to make inferences about market power has been criticized in the economics literature for a variety of reasons."[574]

484. More fundamentally, the profit margins Prof. Rausser shows do not support his conclusion. Prof. Rausser's claims that "each Defendant's profit margin grew over the Class Period"[575] are based on visual inspection of his Figure 20. Reproduced below as Figure VI-14, Prof. Rausser's Figure 20 shows no common or sustained pattern of elevated operating margins across Defendants. The data for BNSF, for example, show BNSF's accounting measure of operating margin dipping to its lowest level in the "conspiracy" year of 2004, and never recovering during the Class Period to its high in 2000. In the cases of CSXT and NS, the data show a generally upward trend, punctuated by ups and downs, throughout 2000-2008, with the purported onset of conspiracy in mid-2003 evidencing no "structural break" of note. UP's depicted operating margin carries a somewhat downward trend into the heart of the Class Period, bottoming out in 2005, and then recovering to approximately its pre-Class Period levels by the end of the Class Period.

---

573 Franklin M. Fisher and John J. McGowan, "On the Misuse of Accounting Rates of Return to Infer Monopoly Profits," *The American Economic Review*, March 1983, at 82; see also Dennis W. Carlton and Jeffrey M. Perloff, "Modern Industrial Organization," 2005, at 249.

574 Rausser Class Reply at 41, footnote 99.

575 Rausser Merits Report at 90.

Figure VI-14

**Prof. Rausser's Figure 20: Operating Profit Margin**




**Source:** Rausser Merits Report (Figure 20)

485. Overall the data show no statistically common pattern across Defendants, and they contradict Prof. Rausser's claim that each Defendant's operating margin rose during the Class Period. Standard tests of statistical significance find that, relative to the pre-Class Period, BNSF's Class Period average operating margin was unchanged, UP's was lower, and CSXT's and NS's were higher.[576]

[576] See my workpapers.

### G. Testing the Claim that Defendants Stopped Competing and "Stabilized" Their Shares of Traffic during the Class Period

486. Plaintiffs assert that Defendants "agreed that none of the conspirators would be undercutting agreed pricing or 'stealing' market share by using their increasing revenues to subsidize discounting of underlying rates", and that "Defendants' market shares remained stable following the 2003 agreements."[577] Echoing Plaintiffs, Prof. Rausser similarly asserts that the Defendants' highly competitive conduct prior to the conspiracy, when they each had "an economic incentive to undercut the others and win market share," was in "sharp contrast to their behavior during the Class Period."[578]

487. The economics of Prof. Rausser's assertions also predict that, upon the implementation of the asserted conspiracy, Defendants' traffic shares should stabilize relative to each other. He claims that rail service is interchangeable among the Defendants on a given origin and destination;[579] that shippers select their rail service provider based entirely on price;[580] and that Defendants jointly fixed their prices in a monopoly conspiracy.[581] It follows that the purported price conspiracy should have put an end to customer switching among rail providers and thereby stabilized the Defendants' shares of traffic. Moreover, the stabilization of traffic must occur at the route level to be effective. If one Defendant could steal business on a particular route, its competitors would be free to steal business on other routes. The results would be the breakdown of the asserted conspiracy. I test for evidence supporting Prof. Rausser's opinion that Defendants stopped undercutting each other's rates, and I find that the data do not support his opinion.[582]

488. In order to test whether the Defendants' shares stabilized after the start of the alleged conspiracy, I have analyzed shares of traffic for the routes that Prof. Rausser examines in his Table 6 where he attempts to assess the responsiveness of shippers to

---

577 Complaint at ¶95. See also Complaint at ¶88. Due to the geography of the separate rail networks, overall patterns of traffic and railroad shares of aggregate rail transportation revenue are driven by economic factors of shippers located on the networks, many of whom are sole-served. For example, growth in the demand for Wyoming's Powder River Basin coal has led to increasing shares of coal transportation revenue by the Western railroads relative to the Eastern railroads. In aggregate, the patterns of traffic across the railroads are relatively stable both before and after the beginning of the purported conspiracy and tend to track larger economic forces. See my workpapers. See also Rausser Merits Report at 39-44.

578 Rausser Merits Report at 54. See also Rausser Merits Report at 106.

579 See, e.g., Rausser Merits Report at 5, 32.

580 See, e.g., Rausser Merits Report at 5, 32.

581 See, e.g., Rausser Merits Report at 6.

582 In fact, Prof. Rausser acknowledges that: "Rather, the Defendants' transaction data reveal that rail freight customers routinely switch between railroads for shipments along the same routes, confirming that they see the railroads' services as interchangeable." Rausser Merits Report at 33.

Defendants' prices.[583] Thus, for example, in Figures VI-15A and 15B, I use the Defendants' transaction data to test the claim that Defendants stopped competing and stabilized shares of shipments from Los Angeles to Chicago during the Class Period. Parallel analyses are provided in Figures 15C though 15E for the other routes examined by Prof. Rausser in his Table 6.

Figure VI-15A

**Plaintiffs' Prediction: Defendants Quit Competing and Stabilized Shares of Shippers' Traffic**
**Intermodal Shares by Shipper: LA to Chicago, April 2003-December 2008**




[redacted]

**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** Route chosen based on Prof. Rausser's Table 6.

---

583 Rausser Merits Report at 35, Table 6

Figure VI-15B

**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper: LA to Chicago, April 2003-December 2008**




[redacted]

**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** Route chosen based on Prof. Rausser's Table 6.

Figure VI-15C

**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper: Memphis to Jacksonville, April 2003-December 2008**




[redacted]

Source: Defendants' Transaction Data; Rausser Merits Report
Note: Route chosen based on Prof. Rausser's Table 6.

Figure VI-15D

**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper: LA to Dallas, April 2003-December 2008**




[redacted]

**Source:** Defendants' Transaction Data; Rausser Merits Report
**Note:** Route chosen based on Prof. Rausser's Table 6.

Figure VI-15E

**Defendants' Actual Shares of Shippers' Traffic during the "Conspiracy" Period**
**Intermodal Shares by Shipper: Seattle to Chicago, April 2003-December 2008**




Source: Defendants' Transaction Data; Rausser Merits Report
Note: Route chosen based on Prof. Rausser's Table 6.

489. Focusing on intermodal traffic, Figure VI-15A shows UP's share of revenue for each of the 30 shippers who made intermodal movements on BNSF and/or UP for each month after the start of the alleged conspiracy. Each line indicates the share of a shipper's payments for rail transportation on that route that are paid to UP (rather to BNSF) for such traffic as of March 2003, when the purportedly conspiring companies are asserted to have begun meeting for the purposes of eliminating competition among

themselves.[584] These lines are flat horizontally, corresponding to the prediction of conspiratorially stabilized shares and the end of inter-Defendant price competition that would otherwise spur customer switching among Defendants. Compared to the "flat" shares predicted under Plaintiffs' and Prof. Rausser's theories of conspiracy, how do actual shares behave? The answer is given by Figure VI-15B.

490. The data shown in Figure VI-15B (as well as Figures VI-15C through 15E) do not match the predictions of Plaintiffs' and Prof. Rausser's theories of conspiracy. Instead, UP's share of intermodal traffic relative to BNSF between Los Angeles and Chicago is highly unstable. For example, the black line in Figure VI-15A shows UP's predicted share of Schneider National Carriers' intermodal service from Los Angeles to Chicago to be approximately 29%. The black line in Figure VI-15B shows that Schneider's actual share of payments to UP (rather than BNSF) after March 2003 was volatile and declined to less than 10% by December 2008. Figures VI-15C through D repeat this analysis for the other three routes Prof. Rausser selected for his Table 6. The results consistently reject the hypothesis that Defendants stopped competing for shippers' business and stabilized their shares of shippers' business upon purportedly conspiring.

491. As a further test of whether the Defendants' shares stabilized upon the alleged start of conspiracy, I have analyzed CSXT's share of traffic for commodities and routes where both CSXT and NS provide service.[585] Using the transaction data, I have calculated CSXT's share of traffic for each such route and commodity combination prior to the start of the alleged conspiratorial meetings (i.e., in February 2003) and have then calculated CSXT's share for each subsequent month through December 2008. The results of this analysis for the top ten combinations of non-intermodal commodity type and route in terms of gross revenues are presented in Figures VI-16A through 16J.

---

584 See Section II above. Results reported in Figures 15A-15E are not materially changed if we stabilize predicted shares as of June 30, 2003.

585 For this analysis, I control for route (by 6-digit SPLC) and commodity (by 7-digit STCC). In addition, I limit the analysis to combinations with gross revenues greater than $1 million for the period 2000 through 2008, with at least one quarter with revenue before and after April 2003, at least ten quarters with revenue, and at least 10% of traffic on each of the railroads. The route/commodity combinations in Figure VI-17 include intermodal traffic.

Figure VI-16A

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Ethyl Alcohol Traffic, Chicago, IL to Sewaren, NJ**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

492. In each figure, the dotted line indicates CSXT's share of the traffic in the last month prior to the start of allegedly conspiratorial meetings for which data are available. Figure VI-16A, for example, shows the results for CSXT's share of shipments of ethyl alcohol between Chicago, Illinois and Sewaren, New Jersey. As shown in the figure, prior to the start of the alleged conspiracy, CSXT's share of this traffic was 100%. CSXT's actual share for each month is indicated by the blue line. The hypothesized conspiracy purportedly would shut down inter-Defendant competition and stabilize CSXT's share in the Class period at the pre-conspiracy level (100%). That is, the blue line representing CSXT's actual share should lie on top of the dotted black line showing the predicted share of traffic. As we can see, it does not.

493. The data show that CSXT's share of this traffic ranged from 0% in some months to 100% in other months, and is generally highly volatile. Given the much lower volume

and number of shippers on carload routes, this volatility comes about for multiple reasons. First, shippers switch between railroads where it is possible and economically viable for them to do so, either dividing traffic among the railroads in different proportions or switching from shipping all traffic on one railroad to the other competing railroad. Second, there is volatility in the volume of shipments so that a shipper that uses (mostly) one railroad may have an unusually high or low volume period that will affect the share of revenue. Third, the consignor or consignee will shift the party with which they transact business resulting in a switch across railroads. All of these types of switching are observed in the Defendants' transaction data. Plaintiffs' and Prof. Rausser's prediction of stable shares is not supported by the Defendants' transactions data. Closely parallel findings pertain to the 9 additional route/commodity combinations and are shown in Figures VI-16B through 16J.

Figure VI-16B

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Bituminous Coal Traffic, Chicago, IL to Toledo, OH**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16C

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Pipe or Tubing Traffic, Youngston, OH to East St. Louis, IL**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16D

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Corn Syrup Traffic, Chicago, IL to Morrisville, PA**




**Source:** Defendants' Transaction Data

**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16E

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Sheet Steel Traffic, Rockport, IN to Wayne, MI**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16F

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Sheet Steel Traffic, Butler, IN to Chicago, IL**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16G

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Sheet Steel Traffic, Middletown, OH to Wayne, MI**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16H

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Corn Syrup Traffic, Decatur, IL to Morrisville, PA**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16I

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Sulphur, Zinc Sulphate, and Lead Arsenate Traffic, Chicago, IL to Lee Creek, NC**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

Figure VI-16J

**Did "Conspiracy" Stabilize Shares? CSXT's Share in Head-to-Head Competition with NS Ammonium Sulphate Traffic, Hopewell, VA to Chicago, IL**




**Source:** Defendants' Transaction Data
**Note:** CSXT's share equals CSXT's share of CSXT plus NS traffic revenue. A break in the line indicates no traffic for NS and CSXT.

494. Figure VI-17 presents further analysis of the predicted stability of the Defendants' shares. The figure is based on an analysis of CSXT/CSXI's and NS's entire transaction databases. I have identified route/commodity combinations with gross revenues of at least $1 million and where each railroad has at least a 10% share. For each such combination, I have calculated CSXT/CSXI's share of traffic prior to the start of the alleged conspiracy and then for each quarter between April 2003 and December 2008. I then calculate the average quarterly change in CSXT/CSXI's shares. The bars in the figure represent the percent of such combinations ordered by their average percentage change. For example, the first bar shows that approximately 2% of these combinations show no change in CSXT/CSXI's share. The fourth bar shows that more than 16% of combinations exhibit average changes in share of between 20% and 29%. These data reject the claim that the Defendants' shares of traffic stabilized during the Class Period.

Figure VI-17

**Did "Conspiracy" Stabilize Shares? CSXT/CSXI's Share in Head-to-Head Competition with NS Average of Change in Quarterly Shares Relative to "Pre-Conspiracy" Share**




**Source:** Defendants' Transaction Data
**Note:** Sample includes route and 7-digit STCC combinations with at least $1 million in total gross revenue, traffic from either railroad in at least ten quarters total and at least one quarter prior to and after April 1, 2003, and where each railroad has at least ten percent share of revenue in aggregate. Bars represent the frequency of the absolute value of the average percentage point change in share of revenue. "Pre-Conspiracy" share equals CSXT/CSXI's share in the last quarter with CSXT/CSXI traffic prior to April 1, 2003.

## H. Summary

495. The data on marketplace outcomes fail to support each of the key claims and predictions emanating from Plaintiffs' and Prof. Rausser's theories of the alleged conspiracy. We do not find, for example, that the application of revenue-based fuel surcharges resulted in all shippers' all-in rates for given traffic for given commodities on given routes changing by the same amount. Similarly, the data strongly reject the prediction that the spread of revenue-based fuel surcharges in the Class Period caused or contributed to the "trend reversal" and upward movement of Defendants' rail rates that began after the start of the Class Period.

496. Regarding cost recovery, Prof. Rausser claims that evidence of the purported conspiracy is provided by Defendants' over-recovering the increases in fuel costs they experienced during the Class Period. The data demonstrate, however, that Defendants' rail rates failed to rise at the rate of the increases in their costs when the proper measures of costs are considered. That is, when we examine economically relevant increases in marginal, or incremental, costs of putting additional supply in the marketplace, Defendants' rail rates did not rise by the amount needed to keep pace with those increases in cost. Contrary to the prediction that a conspiracy would have raised Defendants' price/marginal cost margins, such margins declined during the Class Period. In the same vein, there is no methodologically or statistically reliable support for Prof. Rausser's proposition that each Defendant's operating profit margins grew over the Class Period, much less that there was growth in such margins that can properly be attributed in whole or in part to the conspiracy he reports he discerns.

497. Finally, the claim and prediction under the conspiracy hypothesized by Plaintiffs and Prof. Rausser that the shutting down of price competition among Defendants during the Class Period eliminated customers' reasons for picking one Defendant's service over another's and thereby stabilized Defendants' shares of traffic where they compete head-to-head is contradicted by the data. Instead of stable shares, we find that even on the routes selected for examination by Prof. Rausser, Defendants' relative shares of traffic are highly volatile during the Class Period. The extensive, demonstrable and more or less continuous switching of customers from one Defendant to another properly is seen as arising because Defendants did compete against each other for business. Indeed, this is consistent with the reality that Defendants' all-in prices for given traffic did *not* all change by the same amount, but varied constantly and widely over the Class Period. Such patterns are indicative of competitive, not price-fixing, conduct.

# VII. ASSESSMENT OF ASSERTED COMPETITIVE HARM AND DAMAGES TO SHIPPERS FROM THE ALLEGED CONSPIRACY

## A. Introduction

498. Based on the analyses I have reported above, I find that Class Members have not suffered anticompetitive injury. As we have seen, the data and the economics do not provide sound basis for accepting the hypothesis that Defendants conspired to raise rates to Class Members. We do not find evidence of the enhancement of railroad market power, nor an increase in average revenues relative to marginal cost that an effective price-fixing conspiracy would have engendered. In other words, we do not find evidence that the alleged conspiracy elevated prices or injured Class Members.

499. Prof. Rausser, however, claims to have found evidence of a substantial overcharge and billions of dollars of damages to the Class. It is important to understand the basis for these conclusions. As explained below, I find that Prof. Rausser's claimed damages are a statistical artifact of the fundamental methodological flaws inherent in his damages methodology. The methodological flaws in Prof. Rausser's damages calculations render it unreliable for identifying and quantifying the harm (damages), if any, that the Class may have experienced. Prof. Rausser's assertion that his Class-wide damages framework constitutes "a common methodology that also provides the capability to calculate damages suffered by individual Class Members" [586] is similarly and irreparably flawed.

500. I reach three separate, but related, sets of conclusions regarding Prof. Rausser's damage analysis. First, Prof. Rausser's statistical test which purportedly finds a "structural break" is incapable of identifying a change in rail pricing behavior that can properly be asserted to have been caused by conspiracy. Therefore, Prof. Rausser's claim that his identification of a purported structural break is "evidence of the conspiracy itself"[587] and supports his conclusion that a conspiracy, in fact, occurred is unfounded. Second, Prof. Rausser's aggregate damages method does not provide a reliable method for identifying and determining the aggregate level of damages. Third, Prof. Rausser's damage methodology cannot reliably determine damages for individual Class Members.

501. Prof. Rausser has claimed since providing his opinions regarding Class certification that his damage methodology allows him to determine damages suffered by individual Class Members,[588] but he has not yet provided a demonstration of the reliability of any

---

586 Rausser Merits Report at 4.

587 Rausser Class Report at 120.

588 Rausser Class Report at 122; Rausser Merits Report at 171.

calculation of damages for any individual Class Member in any of his reports. I undertake the task here.

502. Prof. Rausser has proposed two methods for calculating individual damages. Therefore, I analyze his two alternative methods for calculating damages for individual Class Members. Prof. Rausser's Merits Report methodology utilizes a single weekly damage percentage for all Class shipments. His Merits Deposition methodology bases individual Class Member calculations derived from his damage regression model and its predictions of individual Class Shipment prices in the hypothesized "no conspiracy" setting.[589] Both alternatives are irreparably flawed and incapable of reliably determining individual Class Member damages.

**B. Prof. Rausser's Damages Model**

503. Prof. Rausser's model purports to measure damages based on identification of differential, "before and after onset of conspiracy" levels of Class Members' all-in rates. The hypothesized effect is represented by a "structural break" in the level and incremental rate of passthrough of fuel prices to rail rates (measured in revenue per ton mile, or "RPTM"). Figure VII-1 recreates Prof. Rausser's analysis, using his model and applying it to three related datasets containing Defendants' transactions with shippers.

504. The first column in Figure VII-1 recreates Prof. Rausser's damages regression using Prof. Rausser's original, Merits Report dataset. These are the results contained in Prof. Rausser's workpapers. The second column reproduces Prof. Rausser's results using Prof. Rausser's original data set including data from UP which are missing from Prof. Rausser's original dataset, but that he has indicated should be included in a proper analysis.[590] The third column applies Prof. Rausser's model using Defendants' transaction database processed to identify relevant information not available in Prof. Rausser's original dataset.

---

589 Rausser Class Report at 122-123; Rausser Merits Report at 171. See also Rausser Merits Deposition at 436-437.

590 Prof. Rausser's original data set did not account for a list of UP legacy customers and supplemental production of UP transactions. Prof. Rausser indicates he intends to incorporate the additional UP data into his analysis. Rausser Merits Deposition at 395-396.

Figure VII-1

**Prof. Rausser's Regression Model of "Damages"**

| | Prof. Rausser's Model | | |
|---|---|---|---|
| | Original Database | Original Database Including Missing UP data | Defendants' Transaction Database |
| *Dependent Variable: Log of Net RPTM* | | | |
| **Coefficients** | | | |
| 1 Log (Mileage) | -0.841** | -0.839** | -0.943** |
| 2 Log (Net weight) | -0.819** | -0.811** | -0.964** |
| 3 Log (Diesel price) | 0.024** | 0.030** | 0.031** |
| 4 Log (GDP) | 0.226** | 0.199** | 0.126** |
| 5 Log (Other Factors Costs Index) | 0.728** | 0.767** | 0.543** |
| 6 Effect of Conspiracy | 0.125 | 0.118 | 0.145 |
| **(Average Percentage Overcharge)** | **13.6%** | **12.8%** | **15.8%** |
| **Regression Indicators** | | | |
| 8 Interline Indicators | Yes | Yes | Yes |
| 9 Car Type Indicators | Yes | Yes | Yes |
| 10 Commodity Indicators | Yes | Yes | Yes |
| 11 Route Indicators | Yes | Yes | Yes |
| 12 Seasonality Effects | Yes | Yes | Yes |
| **Observations** | **15,435,877** | **14,581,029** | **11,331,666** |
| **R-squared** | **0.86** | **0.86** | **0.90** |

**Source:** Rausser Merits Report Data with Supplemental UP Data; Defendants' Transaction Data
**Note:** Two asterisks (**) denotes significance at the 99% level; one asterisk (*) denotes significance at the 95% level.

505. Prof. Rausser's model takes the relationship between the level of rates and fuel costs and certain other factors that would be expected to influence railroad pricing as they were observed in a pre-Class Period (i.e., January 2000 through June 2003) as a no-conspiracy benchmark. Prof. Rausser claims this benchmark is not influenced by collusive activity.[591] The model includes over 265,000 "indicator" variables or "yes/no" variables that indicate route, car type, commodity shipped, and so forth. Together, these indicators describe the "type" of transaction each data point represents. Thus, the commodity indicator for coal is equal to "1" ("yes") for coal shipments and "0" ("no") otherwise. Similarly, the Los Angeles to Chicago route indicator is set to

591 Rausser Merits Report at 162-163: "...the period prior to the Class Period is an appropriate benchmark for assessing the impact of the alleged conspiracy. In the period before the conspiracy, the Defendants acted as an interdependent oligopoly unaffected by the type of collusion that determined prices during the Class Period."

"1" ("yes") for all traffic traveling on this origin and destination pair and "0" ("no") otherwise.

506. These variables are intended to account for the average differences in the normal, non-conspiratorial supply and demand factors for each commodity and on each route, etc., *that do not vary with time*. For example, coal shipments may on average cost more per ton-mile than grain shipments and the coal and grain indicators will capture this average difference across the dataset. The coefficients on these 265,000 variables are not reported, but their presence is indicated in the lower panel of Figure VII-1 showing Prof. Rausser's model's results. I address the implications of Prof. Rausser's use of indicator variables more fully below.

507. To attempt to capture the possible presence and effect of the alleged conspiracy, Prof. Rausser's model introduces a Class Period "indicator" variable. Just as the other indicators pick up the average differences between the rates for different commodities and routes, the Class Period indicator serves as a "catch all" that picks up any average price difference between the pre-Class and Class Periods not captured by his other explanatory factors and indicator variables. In addition, to reflect alleged conspiracy Prof. Rausser introduces a variable which is designed to measure whether changes in diesel fuel prices were passed through to shippers differently during the Class Period than in the benchmark pre-Class Period. In Prof. Rausser's framework, the claimed "overcharge" is then calculated as an average effect over the Class Period of two model results: (1) the effect ("coefficient") of the Class Period dummy variable, and (2) the coefficient reflecting the difference in the passthrough of oil prices to rail rates during the Class Period multiplied by the weekly price of diesel fuel.[592]

508. Regarding modeling results, as noted, Prof. Rausser asserts he has found a "structural break" at the start of the Class Period, with rates abruptly higher and the passthrough of fuel to rates being abruptly higher upon the purported implementation of conspiracy in July 2003. Over the entire Class Period, he reports that he finds rates were 13.6% higher, on average, than they would have been but for the conspiracy he asserts. (See the left-hand column of Figure VII-1.) Prof. Rausser asserts the "structural break" he claims to identify using his regression model is "evidence of the conspiracy itself".[593]

### C. Errors and Contradictions in Prof. Rausser's Data Construction

509. As a result of methodological decisions and apparent programming mistakes, the data used by Prof. Rausser for his reports are plagued by errors and inconsistencies. These errors include items that increase and decrease Class Member shipment revenue subject

592 Prof. Rausser's methodology applies a five week lag to diesel prices.

593 Rausser Class Report at 120. See also Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories at 8-9.

to damages. While not an exhaustive list, examples of errors and inconsistencies in Prof. Rausser's dataset include:

- In identifying shipments for Class Members, Prof. Rausser inappropriately includes billions of dollars of revenue for UP customers that did not pay revenue-based fuel surcharges.

- In summing total purported damages, Prof. Rausser omits Class Member revenue from shipments from the final week of each calendar year.

- Prof. Rausser includes certain BNSF legacy shipments in the Class Period (i.e., shipments that are not part of the Class) in his damage regression model as if they were Class shipments, but then excludes these shipments from the actual calculation of damages.

- Prof. Rausser treats governmental entities, such as the Tennessee Valley Authority ("TVA"), as Class Members despite their exclusion from the Class. (See Figure VII-16 below.) This mistake causes TVA to become one of the largest "Class Members" in terms both of payments to the Defendants and also of damages suffered according to Prof. Rausser's analysis. Similarly, Prof. Rausser does not exclude the UP subsdiary company Union Pacific Distribution ("UPSD") from the Class, and UPSD is found to be one of UP's largest Class customers. (See Figure VII-15D below.)

- Prof. Rausser has not identified any legacy shipments for CSXI despite the fact that CSXI implemented revenue-based fuel surcharges in 2000. (See Figure IV-1D.)

- For both aggregating individual transactions to shipments for determining "overcharge factors" and in calculating damages, Prof. Rausser's method for identifying shipper names for CSXT and NS treats parties who were not, in fact, customers of the railroads and who did not pay FSCs as damaged Class Members. Examples include Powder River Coal Company, Cumberland River Coal Company, and Alliance Coal Corporation.

- In constructing variables for his models, Prof. Rausser's coding results in contradictory values for the same item for the same time period. For example, Prof. Rausser has multiple diesel prices for the same region at the same time. These multiple values are used to estimate "overcharge factors" and to calculate individual Class Member damages. Similarly, his data have different destination state Gross Domestic Product values for a given state at the same time.

510. In addition, Prof. Rausser in his Merits Report uses a method for identifying NS legacy traffic that is contradictory to the method he used in the Class phase of this proceeding. It also contradicts the methods he uses for the other Defendants. This has biased his results to finding substantially larger amounts of Class revenue and larger damages. In his Merits Report, Prof. Rausser relies upon a particular NS database of rate authorities

("9255"), which has only partial data on NS shipments for each year from 2000 through 2008. To identify legacy shipments, Prof. Rausser attempts to pair shipments in the transactional data with rate authorities in the 9255 data. He assumes that any shipment beginning in July 2003 showing fuel surcharge revenues in the transactional data is *not* a legacy shipment unless it can be paired with a pre-July 2003 rate authority that includes a fuel surcharge mechanism. This method is grossly unreliable, however, because, as a result of the functionality of 9255, which routinely overwrites expired rate information, very little pre-Class 9255 data exist.[594] The method also is unreliable because, again as a result of the functionality of 9255, there is no way to ascertain from the 9255 data whether a change to a rate authority indicates a new pricing relationship or is merely an accounting change related to an ongoing contract, such as an automatic rate adjustment.[595]

511. If the data are not present in the dataset in the benchmark period, Prof. Rausser defaults in his Merits Report to treating post-June 2003 shipments with revenue-based FSCs under that price authority as Class shipments. In doing so, because of the historical structure of the 9255 data, Prof. Rausser's data contain no legacy traffic for NS intermodal movements despite the fact that NS implemented intermodal FSCs in 2000. (See Figure IV-1D.) Prof. Rausser's use of the 9255 data is also unreliable because he implicitly interprets any change in a rate authority as indicative of a new pricing relationship, which is incorrect.[596] These choices lead Prof. Rausser to increase the amount of NS's Class revenue by billions of dollars relative to his previous methodology.[597] Moreover, his identification of approximately 2% of traffic with revenue-based FSC payments during the Class Period as legacy traffic is not consonant with his Class phase treatment of NS or with his results for other Defendants' data. I understand that NS informed Plaintiffs in August 2011 that Prof. Rausser's usage of 9255 and results are not correct.[598] Despite the enormous difference in results yielded by his two methods, Prof. Rausser did not test his Merits Report methodology to determine whether it was reliably excluding legacy shipments from the Class.[599]

512. The pervasiveness of the apparent errors in logic and programming preclude the "fixing" of Prof. Rausser's data. Starting early in the process of transforming the Defendant's raw transaction data, including retaining certain information that is lost along the way in Prof. Rausser's data, I have developed my own programs to process

594 Videotaped Deposition Upon Oral Examination of Matthew Alan Bailey, August 24, 2010 ("Bailey Deposition") at 126-132.

595 Bailey Deposition at 76; 116-117.

596 Bailey Deposition at 27-29 and 76.

597 See my workpapers.

598 E-mail from Tara L. Reinhart to Gregory Arenson, Aug. 5, 2011.

599 Rausser Merits Deposition at 394-95.

the transaction data into a form usable for economic analysis.[600] I refer to these data as the Defendants' Transaction Database. It is of the quality and consistency that I routinely employ in my academic research.

513. For much of this section, in analyzing Prof. Rausser's damage analysis, I frequently utilize Prof. Rausser's version of the data in order to highlight the issues consistent with his presentation in the Merits Report. I have supplemented the data in the workpapers to his Merits Report with the UP data that Prof. Rausser did not have available at the time of his Merits Report but that he indicates he will include in his next report, and also the legacy data that were available but that he did use in his analysis.[601] The original version I refer to as Prof. Rausser's Original Merits Report Data, and the version with the addition of the UP data as Prof. Rausser's Merits Report Data with Supplemental UP Data. I have to the extent feasible replicated in my workpapers the analysis in this section for all three versions of the data.

**D. Prof. Rausser's Model Does Not—and Cannot—Demonstrate Causation**

514. Prof. Rausser opines that it is his "maintained hypothesis" that the alleged conspiracy was implemented in July 2003.[602] He also asserts that the "structural break" generated by his modeling is evidence of the maintained hypothesis "itself" (i.e., of conspiracy).[603] These claims are not supported by Prof. Rausser's damages modeling. I show below that Prof. Rausser's damages modeling identifies a "structural break" for legacy shipments transported under rates established prior to any asserted conspiracy and for which there can be no overcharges arising from the asserted conspiracy. I also show that Prof. Rausser's framework generates "structural breaks" ubiquitously at points in time well before and well after the purported implementation of the alleged conspiracy. The framework is thus unable to identify the date proposed by Prof. Rausser as the onset of conspiracy; it cannot distinguish "conspiracy" as the cause of a "structural break" at July 2003, as opposed to the non-conspiratorial causes that generate the many other structural breaks at different times. Prof. Rausser's damages modeling is not capable of diagnosing an asserted conspiracy.

515. As I describe above in Section IV, Defendants applied fuel surcharges to numerous shipments prior to the Class Period. Many of these fuel surcharges were included in long-term contracts that continued into the Class Period. Neither Plaintiffs nor Prof.

---

600 In constructing my data for this matter, I have employed the reasoning regarding NS legacy traffic from Prof. Rausser's Class Reply Report. I have also employed Prof. Rausser's NS legacy definition from his Merits Report in reproducing his damages analysis. My conclusions are robust to either of Prof. Rausser's treatments for NS legacy traffic.

601 Rausser Merits Deposition at 396.

602 Rausser Merits Deposition at 13, 26, 45 and 47.

603 Rausser Merits Report at 170.

Rausser assert that these "legacy" fuel surcharges were the result of collusive conduct. These legacy contracts had the benefits of competition built into their terms. It is not possible for conspiracy to have affected the legacy contracts which were struck when conduct was "unaffected by the type of collusion that determined prices during the Class Period."[604] If Prof. Rausser's damages regression identifies overcharges for the prices in these competitively negotiated contracts, the overcharges the model identifies must be driven by factors other than the asserted conspiracy, such as the change in the pattern of fuel prices.

516. Figure VII-2 shows the results of using the specification of Prof. Rausser's damages regression on legacy traffic only. Each column reports the results for one of the three transaction datasets described above. As shown in line 13 of the figure, Prof. Rausser's damages regression identifies a structural break and associated overcharges of 13.4% to 14.4% for legacy traffic. These "overcharges" are comparable to the results shown in Figure VII-1 for Class traffic.

517. Thus, Prof. Rausser's model finds a "structural break" where it should not. This means that Prof. Rausser's model is susceptible to finding false positives, or identifying structural breaks and overcharges where there are none. Clearly, Prof. Rausser's damages model is unreliable if it finds structural breaks and overcharges where it should not.

604 Rausser Merits Report at 162-163.

Figure VII-2

**Prof. Rausser's Model Finds "Damages" for Non-Class, Legacy Traffic**

| | | | |
|---|---|---|---|
| **Regression Data** | | | |
| *Pre-Class Period Data:* | All Movements | | |
| *Class Period Traffic Data:* | Legacy Movements with Revenue-Based FSC Payments | | |
| | **Original Database** | **Original Database Including Missing UP data** | **Defendants' Transaction Database** |
| ***Dependent Variable: Log of Net RPTM*** | | | |
| **Coefficients** | | | |
| 1 Log (Mileage) | -0.855** | -0.855** | -0.940** |
| 2 Log (Net weight) | -0.846** | -0.858** | -0.968** |
| 3 Log (Diesel price) | 0.029** | 0.019** | 0.032** |
| 4 Log (GDP) | 0.200** | 0.218** | 0.258** |
| 5 Log (Other Factors Costs Index) | 0.550** | 0.529** | 0.584** |
| 6 Class Period | -1.390** | -1.452** | -1.424** |
| 7 Interaction of Class Period and Log (Diesel price) | 0.283** | 0.296** | 0.290** |
| **Regression Indicators** | | | |
| 8 Interline Indicators | Yes | Yes | Yes |
| 9 Car Type Indicators | Yes | Yes | Yes |
| 10 Commodity Indicators | Yes | Yes | Yes |
| 11 Route Indicators | Yes | Yes | Yes |
| 12 Seasonality Effects | Yes | Yes | Yes |
| 13 Average Percentage Overcharge | 13.4% | 14.4% | 13.8% |
| **Observations** | 11,187,362 | 12,202,743 | 12,537,317 |
| **R-squared** | 0.87 | 0.88 | 0.91 |

**Source:** Rausser Merits Report Data with Supplemental UP Data; Defendants' Transaction Data
**Note:** Two asterisks (**) denotes significance at the 99% level; one asterisk (*) denotes significance at the 95% level.

518. Another key test of the validity of Prof. Rausser's damage model is to examine the "structural break" that he finds in his data as of July 2003. This "structural break" indicates that rail rates were systematically higher in the Class Period than in the pre-Class Period. The relevant question is whether this can properly be concluded to have been caused by conspiracy. If it cannot, then whatever it represents is not *damages*. To address the question of what Prof. Rausser's "structural break" may represent, I have tested whether Prof. Rausser's methods and data find "structural breaks" at times not asserted to be and not plausibly being the points at which the conspiracy alleged by Plaintiffs could have been implemented. If his methodology and model setup find structural breaks at times not hypothesized to be the onset of alleged conspiracy, then the proper conclusion is that Prof. Rausser's framework is not capable of isolating breaks due to conspiracy from other casual factors that can generate structural breaks in his statistical modeling.

519. To test Prof. Rausser's conclusions in this manner, I have asked whether the methods and data find "structural breaks" for each January and July from 2001 through 2007. Moreover, I have performed such testing for both Class shipments (where conspiracy is alleged) and legacy shipments (discussed above and where Prof. Rausser has explicitly rejected conspiracy). The results of this analysis are presented in Figure VII-3.

Figure VII-3

**Prof. Rausser's Methodology Cannot Distinguish July 2003 as the Start of Alleged Conspiratorial Impact**

| Date for Test for Break | "Class" Shipments | | Legacy Shipments | |
|---|---|---|---|---|
| | Structural Break? | Calculated "Overcharge" | Structural Break? | Calculated "Overcharge" |
| January 1, 2001 | Yes** | 12.9% | Yes** | 12.5% |
| July 1, 2001 | Yes** | 14.2% | Yes** | 12.9% |
| January 1, 2002 | Yes** | 12.6% | Yes** | 10.8% |
| July 1, 2002 | Yes** | 12.6% | Yes** | 11.1% |
| January 1, 2003 | Yes** | 13.7% | Yes** | 11.8% |
| July 1, 2003 | Yes** | 15.8% | Yes** | 13.8% |
| January 1, 2004 | Yes** | 16.6% | Yes** | 14.9% |
| July 1, 2004 | Yes** | 16.6% | Yes** | 15.8% |
| January 1, 2005 | Yes** | 14.8% | Yes** | 14.9% |
| July 1, 2005 | Yes** | 12.9% | Yes** | 13.6% |
| January 1, 2006 | Yes** | 10.1% | Yes** | 11.5% |
| July 1, 2006 | Yes** | 8.1% | Yes** | 9.8% |
| January 1, 2007 | Yes** | 6.6% | Yes** | 7.8% |
| July 1, 2007 | Yes** | 5.7% | Yes* | 7.0% |

**Source:** Defendants' Transaction Data
**Note:** Pre-period includes all traffic and post-period includes only class (or legacy) traffic that pays a revenue-based FSC. Two asterisks (**) denotes significance at the 99% level; one asterisk (*) denotes significance at the 95% level. "Class" Shipments are non-legacy, non-government, and non-codefendant movements that pay a revenue-based fuel surcharge after the break. Legacy shipments are based on subsets of the July 2003 legacy definition.

520. As shown in the figure, Prof. Rausser's model fails this straightforward testing of his claims that he has detected the onset of conspiracy with his particular "structural break" at July 2003. Prof. Rausser's methods and data analysis find a "structural break" for every one of the tested start dates between January 2001 and July 2007. Moreover, this holds for both Class and legacy shipments. In fact, at many of the "conspiracy implementation" test dates in Figure VII-3, this testing finds "overcharges" (according to Prof. Rausser's definition) that are comparable to the "overcharge" Prof. Rausser calculates for his selected case of a "structural break" at July 2003.

521. These results tell us that Prof. Rausser's methods and data are incapable of identifying and measuring Class Member price changes that are due to conspiracy. If we were to

accept Prof. Rausser's logic that when his methods and data detect a "structural break" we can conclude that the causal reason for that "break" was the existence and onset of the alleged conspiracy, we would then have to conclude that the alleged conspiracy began for both Class Members and legacy shippers at each January and each July between 2001 and 2007. In terms of scientific method, his analysis is riddled with "false positives" – i.e., positive findings of "conspiracy" when no conspiracy is alleged or plausible. In short, Prof. Rausser's claims that the one "structural break" he tested for validates his claims regarding the onset of conspiracy are baseless.

522. Prof. Rausser's "findings" of impact and damage are artifacts of his modeling and his assumptions. For example, his model does not control in any way for the widely noted strains to capacity that were felt in the US railroad industry in the heart of the period covered by his data (see discussion in Section VI above), and it does not measure and adequately control for the demonstrable increases in marginal costs that we observed and that would be expected to drive prices in competitive markets. (See Section VI above.)

523. Prof. Rausser's model also inappropriately compares a benchmark of "apples" with a Class Period of "oranges". Specifically, the Class Period experienced levels and changes in fuel prices (the driving force behind "damages" in Prof. Rausser's model) that were outside of the experience picked up by Prof. Rausser's modeling of the pre-Class benchmark period. (See Figures IV-5A through IV-5D, discussed above.) This creates an apples v. oranges problem, well-known in statistics as the problem of "out-of-sample" data.[605] In this case, Prof. Rausser is using his pre-Class Period as a benchmark upon which to base projections of the relationship between all-in rates and normal supply and demand factors in the Class Period absent conspiracy. In doing so, however, Prof. Rausser's data construction has a Class Period with sensitivity to highly volatile fuel prices, and these fuel prices show levels and changes in the Class Period that go well out of the ranges seen in his pre-Class Period. Monthly WTI prices ranged from $19.64-$35.83 during the pre-Class Period and from $28.31-$133.88 during the Class Period.[606]

524. Thus, the pre-Class Period prices are not representative of the Class Period prices. As a result, Prof. Rausser's modeling, indeed, detects that there is something markedly different (a "structural break") between the pre-Class benchmark period and the Class Period, but that "something different" is the "break" in oil prices and cannot properly be said to have been caused by conspiracy. This conclusion is evident when we test

---

605 Jonathan B. Baker and Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, American Law and Economics Review, 386-435 (1999) at 397 (fn.24) and 415.

606 U.S. Energy Information Administration, Cushing, OK WTI Spot Price FOB at http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rwtc&f=m.

Prof. Rausser's approach against other possible dates for his (January 2001-June 2003) benchmark in Figure VII-3.

525. As noted, we also find that Prof. Rausser's framework finds these repetitive structural breaks even for legacy all-in rates – i.e., rates that were not structurally altered by putative "conspiracy", but that were simply carried forward across into the "conspiracy" period from the pre-"conspiracy" period. The "structural break" affecting these all-in, FSC-sensitive rates was not conspiracy (since they are acknowledged to have been established absent conspiracy), but the structural break in the level and movement of oil prices. Indeed, at each January and July over 2001-2007, we see substantially higher oil prices in the post-break period captured by the modeling. This is seen in Figure VII-4.

Figure VII-4

**Large Increases in Average Fuel Prices Occur at Each Period of "Structural Break" Generated by Prof. Rausser's Methodology**

| Date for Test for Break | Pre-Period Average HDF Price ($/gallon) | Post-Period Average HDF Price ($/gallon) | Increase in Average Fuel Price ($/gallon) | Percent Change in Average Fuel Price |
|---|---|---|---|---|
| January-01 | $1.46 | $1.90 | $0.44 | 30% |
| July-01 | $1.44 | $1.94 | $0.49 | 34% |
| January-02 | $1.40 | $1.98 | $0.58 | 42% |
| July-02 | $1.35 | $2.05 | $0.69 | 51% |
| January-03 | $1.35 | $2.11 | $0.76 | 57% |
| July-03 | $1.36 | $2.17 | $0.82 | 60% |
| January-04 | $1.35 | $2.25 | $0.90 | 66% |
| July-04 | $1.37 | $2.34 | $0.97 | 71% |
| January-05 | $1.41 | $2.41 | $1.01 | 72% |
| July-05 | $1.45 | $2.49 | $1.04 | 72% |
| January-06 | $1.52 | $2.53 | $1.01 | 67% |
| July-06 | $1.57 | $2.59 | $1.01 | 64% |
| January-07 | $1.62 | $2.66 | $1.04 | 64% |
| July-07 | $1.66 | $2.82 | $1.15 | 69% |

**Source:** U.S. Energy Information Administration

526. Prof. Rausser's "structural break" analysis, and his damage calculation, depend on the responsiveness of rail rates to fuel prices. The core concept in this framework is that rail rates in the period after the structural break would supposedly show the same responsiveness to fuel prices as in the before period absent any conspiracy.[607] This implicit assumption is untested and inconsistent with the economics of fuel surcharges

[607] Rausser Merits Deposition at 418-419.

showing they are a unilaterally rational marketplace solution to the problems raised by volatile fuel prices. (See Section IV above.) The assumption of unchanged responsiveness to fuel prices absent conspiracy is contradicted by the results of Figure VII-3, which shows that Prof. Rausser's framework finds a structural break and "overcharges" which are calculated based on fuel price sensitivity for each date tested even when no conspiracy is asserted (e.g., for legacy rates).

527. While Prof. Rausser asserts that the specific break at July 2003 is *caused* ("evidence of the conspiracy itself") by the conspiracy he alleges, his modeling cannot tell (and he has not tested) that hypothesis against the alternative hypothesis that that break is a statistical artifact of the out-of-sample behavior of oil prices. He claims, however, there is no need for such testing, suggesting that, as an economist, he should not waiver from his "maintained hypothesis" of conspiracy.[608] This is methodologically untenable. Again, if the fact of a structural break, with no further testing, were sufficient to allow us to infer the existence of conspiracy, Prof. Rausser's approach would leave us concluding that a conspiracy started up each January and July from 2001 through 2007. This would make no sense in the context of Plaintiffs' hypothesized conspiracy and Prof. Rausser's quite specific assertion that the alleged conspiracy was implemented in July 2003.

528. Accordingly, it is essential to validate the asserted interpretation of the structural break analysis by testing the alternative hypothesis that "structural breaks" occur in the data for reasons that cannot be attributed to conspiracy – with candidate reasons including what we find here. That is, that structural breaks do not reveal conspiracy, but instead reveal out-of-sample effects of much higher Class Period oil prices on rail rates. As a leading scholar of quantitative methods in antitrust economics puts it:

> "It is essential to evaluate the reliability of any estimate of antitrust impact and/or damages. Specifically, one should ask whether the results are unusually sensitive to slight modifications of the assumptions that underlie the model and of the data itself."[609]

529. Examination of the reasons for Prof. Rausser's "structural break" reveals not only that the statistical break which drives his damages calculations is the product of his modeling's inability to properly account for the dramatically different oil prices in the pre-Class versus the Class Period. The modeling also magnifies the "structural breaks" it generates as a result of faulty data construction by Prof. Rausser. Specifically, Prof. Rausser's pre-Class benchmark period is based upon the rates of all unregulated movements reported in Defendants' transactions data. These rates include rates that did

608 Rausser Merits Deposition at 47-48.

609 Daniel L. Rubinfeld, Quantitative Methods in Antitrust, Competition Law and Policy 723 (ABA Section of Antitrust Law 2008) at 741.

not contain FSCs, legacy rates with FSCs that were not triggered because oil prices were relatively low, and legacy rates by FSCs that were triggered as oil prices began to rise. By contrast, during the Class Period, Prof. Rausser's data consist only of Class movements which paid triggered revenue-based fuel surcharges.

530. The results of this data construction are that Prof. Rausser has created a pre-Class Period benchmark which consists of a mixture of fuel-price-sensitive and non-fuel-price-sensitive rates, and compared that benchmark to a Class Period sample of data that consists of only fuel-price-sensitive rates. This can be seen in Figure VII-5. In the figure, we see the relative percentages of traffic that paid and did not pay, respectively, revenue-based fuel surcharges in both the pre-Class benchmark period and the subsequent Class Period. In the pre-Class Period, the dark red area indicates the movements with triggered revenue-based fuel surcharges. The light red area shows the pre-Class Period movements with no surcharges or untriggered surcharges. The pre-Class Period dataset includes 100% of movements (red and light red). In the Class Period, the blue area includes both (i) traffic that did not pay fuel surcharges and (ii) legacy traffic that did pay fuel surcharges. Thus, the red area in the Class Period in Figure VII-5 encompasses only Class traffic which paid triggered revenue-based fuel surcharges. Prof. Rausser includes only this last set of movements, Class movements with a triggered revenue-based fuel surcharge (i.e., the red area), in his dataset. In short, Prof. Rausser' pre-Class Period data are "apples+oranges" whereas his Class Period data consist only of "apples".

Figure VII-5

**Prof. Rausser's Datasets for His Pre-Class and Class Periods**




**Source**: Rausser Merits Report Data with Supplemental UP Data

531. With a method of data construction which provides a pre-Class Period benchmark in which only a relatively small portion of the data consists of fuel-price-sensitive rates, Prof. Rausser is bound to find that his Class Period rates – all of which have been selected by Prof. Rausser to be fuel-price-sensitive, FSC-paying rates – are more sensitive to fuel prices. In his modeling, this greater sensitivity shows up as greater passthrough of generally substantially higher fuel prices in the Class Period. The consequence is to magnify the structural breaks his framework generates and to inflate the damages his "structural break" generates.[610]

532. Prof. Rausser's apples+oranges mixture of rates with FSCs and rates without FSCs makes his pre-Class period implausible as a valid benchmark. The benchmark period is used to generate his version of but-for rates: But for purported conspiracy, Class Period

[610] See my workpapers.

rates would purportedly have responded to fuel prices and other supply and demand factors as they did in the pre-Class Period. This approach has the effect of treating the Class Period in the absence of putative conspiracy as if it would have had the same relative mix of FSC-inclusive and non-FSC rates as, essentially, the average of his pre-Class dataset. As we can see in Figure VII-5, the benchmark period in Prof. Rausser's data consists of a mixture in which only about 10.5% of the revenue in the sample contained rates with fuel surcharges. This average over the benchmark period reflects substantial periods of relatively low oil prices and untriggered FSCs, and it is starkly inconsistent with the reality that the use of fuel surcharges had risen to much higher levels before the alleged onset of conspiracy, with on the order of 70% of opportunities that arose getting FSCs before the conspiracy was purportedly implemented (Figures IV-10A through 10D). Prof. Rausser's benchmark is not a plausible representation of the Class Period in the absence of purported conspiracy.

**E. Correcting Prof. Rausser's Faulty Competitive Benchmark**

533. Prof. Rausser's damages regression uses an incorrect benchmark because it is not appropriate for him to assume that the responsiveness of conspiracy-free rail rates to fuel prices would be the same with low fuel prices in the pre-Class Period and high fuel prices in the Class Period. In fact, as noted above, his own analysis rejects the assertion that the responsiveness would be the same.[611]

534. A solution to Prof. Rausser's faulty data construction and improper benchmarking lies in Prof. Rausser's acknowledgements that, absent putative conspiracy, revenue-based (and other) fuel surcharges would exist in the Class Period[612] and that the revenue-based legacy fuel surcharges applied in the pre-Class Period are not, and cannot be, attributed to conspiracy. Particularly in light of the results reported above regarding the spread of revenue-based FSCs prior to the Class Period (Section IV), the implication is that we can test Prof. Rausser's theory of damages by benchmarking Class Members' fuel-price-sensitive rates in the Class Period against the rates paid by another not-conspiracy-affected type of fuel-price-sensitive traffic – legacy traffic.

535. I perform this benchmarking within Prof. Rausser's framework, using his more than 265,000 indicator variables and the other non-indicator variables in his statistical regression model. I have specified the regression, however, to evaluate how Class Member all-in rates differed from legacy shipper all-in rates. The results of benchmarking Class rates against within-Class Period legacy rates are shown in Figure VII-6A for the three datasets containing Defendants' transactions and treating July 2003 as the point of implementation of the alleged conspiracy. Parallel analyses are

611 Rausser Merits Report at 165.

612 Rausser Merits Deposition at 221; Second Rausser Deposition at 116-117.

found when we treat March 2003 as the start date of alleged conspiracy (Figure VII-6B).

536. As shown in row 13 of Figure VII-6A, when non-conspiratorial legacy rates are used as a benchmark, Prof. Rausser's model finds what his framework labels average "overcharges" for Class traffic ranging from -0.3% for Prof. Rausser's original database plus the aforementioned missing UP data, to 0.3% using Defendants' transaction data, to 0.9% using Prof. Rausser's incomplete original dataset. Based on the two datasets that include all of the Defendants' transaction data, we find that the range of implied damages is -0.3% to 0.3%. This range symmetrically surrounds zero and does not provide a basis for finding that Plaintiffs suffered overcharges and damages. In fact, none of the results in Figure VII-6A provide basis for concluding that Class Members were "overcharged" by any amount that can properly be attributed to conspiracy: Analyses such as those for the Defendants' transaction database generate the multiplicity of "structural breaks" that we have already seen Prof. Rausser's framework generates as "false positive" indicators of conspiracy.[613]

613 See my workpapers.

Figure VII-6A

## Correction of Prof. Rausser's Damages Model through Inclusion of Within-Class Period Legacy Movements (Implementation of "Conspiracy" Starts July 1, 2003)

| | Original Database | Original Database Including Missing UP data | Defendants' Transaction Database |
|---|---|---|---|
| **Regression Data** | | | |
| *Pre-Class Period Data:* | All Movements | | |
| *Class Period Traffic Data:* | Class and Legacy Movements with Revenue-Based FSC Payments | | |
| ***Dependent Variable: Log of Net RPTM*** | | | |
| **Coefficients** | | | |
| 1 Log (Mileage) | -0.854** | -0.854** | -0.943** |
| 2 Log (Net weight) | -0.823** | -0.824** | -0.965** |
| 3 Log (Diesel price) | 0.026** | 0.025** | 0.032** |
| 4 Log (GDP) | 0.713** | 0.727** | 0.555** |
| 5 Log (Other Factors Costs Index) | 0.269** | 0.262** | 0.252** |
| 6 Class Period | -1.395** | -1.429** | -1.455** |
| 7 Interaction of Class Period and Log (Diesel price) | 0.282** | 0.290** | 0.296** |
| 8 Interaction of Class Period and Challenged Traffic Dummy | 0.030** | 0.066** | 0.270** |
| 9 Interaction of Class Period, Challenged Traffic Dummy and Log (Diesel Price) | -0.004** | -0.013** | -0.050** |
| **Regression Indicators** | | | |
| 8 Interline Indicators | Yes | Yes | Yes |
| 9 Car Type Indicators | Yes | Yes | Yes |
| 10 Commodity Indicators | Yes | Yes | Yes |
| 11 Route Indicators | Yes | Yes | Yes |
| 12 Seasonality Effects | Yes | Yes | Yes |
| 13 Average Percentage Overcharge | 0.9% | -0.3% | 0.3% |
| **Observations** | 17,918,618 | 18,079,329 | 16,228,043 |
| **R-squared** | 0.87 | 0.87 | 0.90 |

**Source:** Rausser Merits Report Data with Supplemental UP Data; Defendants' Transaction Data
**Note:** Two asterisks (**) denotes significance at the 99% level; one asterisk (*) denotes significance at the 95% level.

Figure VII-6B

**Correction of Prof. Rausser's Damages Model through Inclusion of Within-Class Period Legacy Movements (Implementation of "Conspiracy" Starts March 1, 2003)**

| | | | |
|---|---|---|---|
| **Regression Data** | | | |
| *Pre-Class Period Data:* | All Movements | | |
| *Class Period Traffic Data:* | Class and Legacy Movements with Revenue-Based FSC Payments | | |
| | **Original Database** | **Original Database Including Missing UP data** | **Defendants' Transaction Database** |
| ***Dependent Variable: Log of Net RPTM*** | | | |
| **Coefficients** | | | |
| 1 Log (Mileage) | -0.858** | -0.861** | -0.942** |
| 2 Log (Net weight) | -0.821** | -0.819** | -0.967** |
| 3 Log (Diesel price) | 0.028** | 0.026** | 0.032** |
| 4 Log (GDP) | 0.709** | 0.726** | 0.569** |
| 5 Log (Other Factors Costs Index) | 0.262** | 0.256** | 0.238** |
| 6 Class Period | -1.341** | -1.415** | -1.446** |
| 7 Interaction of Class Period and Log (Diesel price) | 0.273** | 0.290** | 0.296** |
| 8 Interaction of Class Period and Challenged Traffic Dummy | 0.020** | 0.078** | 0.256** |
| 9 Interaction of Class Period, Challenged Traffic Dummy and Log (Diesel Price) | -0.004** | -0.018** | -0.049** |
| **Regression Indicators** | | | |
| 8 Interline Indicators | Yes | Yes | Yes |
| 9 Car Type Indicators | Yes | Yes | Yes |
| 10 Commodity Indicators | Yes | Yes | Yes |
| 11 Route Indicators | Yes | Yes | Yes |
| 12 Seasonality Effects | Yes | Yes | Yes |
| 13 Average Percentage Overcharge | -0.1% | -1.8% | -0.5% |
| **Observations** | 16,215,387 | 15,757,986 | 14,188,888 |
| **R-squared** | 0.86 | 0.86 | 0.90 |

**Source:** Rausser Merits Report Data with Supplemental UP Data; Defendants' Transaction Data
**Note:** Two asterisks (**) denotes significance at the 99% level; one asterisk (*) denotes significance at the 95% level.

## F. Prof. Rausser's Damages Model Is Not Capable of Sufficiently Precise Estimation to Reliably Calculate Damages for Individual Shippers

537. Even if we ignore the analyses in the foregoing subsections and accept for the sake of discussion Prof. Rausser's claim that his model can measure damages to the Class in the aggregate, I find that Prof. Rausser's methods and modeling are incapable of reliably measuring damages for the individual members of the Class.

538. As shown above in Figure VI-1, the changes in individual shippers' actual all-in rates between March 2003 and March 2006 varied over a broad range, even after taking into account Prof. Rausser's control variables that are intended to explain why shippers' rail

rates change over time. This figure illustrates that Prof. Rausser's theory that all shippers' rates would change by the same percentage amount and that the base rates were static is not supported by data showing the actual changes in shippers' rates. The broad range of price changes shown in Figure VI-1, shows that many of Prof. Rausser's predicted March 2006 prices for many Class Members absent conspiracy were higher than the actual prices Class Members paid in March 2006 *with the asserted conspiracy*. A model that repeatedly predicts but-for, no-conspiracy prices that are *higher* than the actual prices Class Members pay with the asserted conspiracy is not a sound economic model. The figure also illustrates that estimating damages for individual shippers requires taking into account the wide range of changes in rates observed that are inconsistent with Prof. Rausser's claims regarding fixed base rates and constant percentage changes in all-in rates. I address these issues more fully below.

539. Prof. Rausser's Merits Report methodology for calculating damages multiplies the revenue for all Class shipments in a week for a railroad by a single damage percentage for the week.[614] The percentage is the same ("common") for all Class shipments, but varies week-by-week. Prof. Rausser now indicates that he does not intend to use his Report method of damages calculation.[615]

540. Proffered subsequent to his Merits Report, Professor Rausser's Merits Deposition methodology for calculating damages for individual Class Members entails a different approach. He indicates he will compare the actual rate charged on an individual shipment relative to the predicted but-for rate generated for that shipment by his damage regression model.[616] The difference between the actual rate and the model-predicted but-for rate on a shipment, multiplied by the shipment's volume, would be the damage for that shipment. Under this method of calculation, both the absolute and the percentage overcharge would vary shipment by shipment.

541. Under the Merits Deposition method of calculating damages it is readily possible for actual prices to be below the predicted but-for price for a shipment. These instances of actual shipment prices being below but-for prices represent *negative* damages for those shipments. Despite the noted repeated assertions to the effect that his modeling reliably demonstrates and measures impact and damages at the level of the individual Class Member, Prof. Rausser acknowledges that he has not done "enough work" to know how many transactions for a particular shipper result in negative damages.[617] Nevertheless, he states that he has done "enough work to know that the overwhelming

614 See Table 54, Rausser Merits Report at 172.

615 Rausser Merits Deposition at 436-437.

616 Rausser Merits Deposition at 436-437.

617 Rausser Merits Deposition at 439-440.

outcome for a shipper is positive damages"[618] (although he has not presented that work).

542. I now turn to this assertion to the effect that, even if some transactions show negative damages for a shipper, the positives more than balance out and leave a common, Class-wide fact of positive damages for the individual members of the Class. I find that thousands of individual Class shipments and shippers have negative damages under Prof. Rausser's Deposition method. The asserted common "fact" of adverse impact of a common magnitude across the Class is rejected by the data.

543. Let us begin by examining the economics and mathematics of Prof. Rausser's Merits Deposition methodology for calculating individual Class Member damages. According to Prof. Rausser in his Merits Deposition, individual Class Member damages are properly calculated by the following method:

> "I would look at for each of the shippers what are the specific variables that relate to the transactions when that shipper is the counter-party to one of the four defendants. I would specify each of the setting[s] on the variables that enter into the model. That would generate a but-for price for that specific shipper. I would take that but-for price and compare it to the actual price that is reflected on the *actual* transaction – from the transaction database, take the difference between the two and proceed across all the [volume of] transactions that took place for that shipper."[619]

544. In other words, under the Deposition approach, individual Class Member damages on any shipment are to be calculated as the difference between (1) the actual price paid and (2) the "no conspiracy", but-for price predicted by Prof. Rausser's model for that shipment, multiplied by the (3) volume of the shipment. Prof. Rausser's formula for individual Class Member damages is the sum across a given Class Member's shipments:

$$\text{Individual Class Member Damages} = (P_{actual} - P_{but\text{-}for}) \times \text{Volume Shipped}$$

The corresponding percentage overcharge is Damages divided by total revenue payments on volumes shipped:

$$\text{Individual Class Member Overcharge} = \text{Damages} \div (P_{actual} \times \text{Volume Shipped}) = (P_{actual} - P_{but\text{-}for}) \div P_{actual}$$

It is clear here that the driving component of damages and overcharges is the difference between actual and but-for prices: $P_{actual} - P_{but\text{-}for}$. The reliability of this critical piece

618 Rausser Merits Deposition at 440.

619 Rausser Merits Deposition at 437 (emphasis added).

of the Deposition method calculations depends on the reliability of his model's prediction of but-for prices. As noted above, Prof. Rausser says that this but-for price is to be calculated by specifying "each of the setting[s] on the variables that enter into the model [so as to] generate a but-for price." In other words, the but-for price is to be calculated by "turning off" the indicators of "conspiracy" in the model and calculating what the model predicts the price would be absent "conspiracy".

545. Figure VII-7A employs Prof. Rausser's Deposition method and illustrates the percent overcharges for each of the Class Representatives. Note that if $P_{actual}$ is less than $P_{but\text{-}for}$, damages and percentage overcharges are negative – that is, the shipment in question paid an actual price in the purportedly conspiratorial world that was not even as high as the price Prof. Rausser's model predicts would have been paid in the absence of the asserted "conspiracy". In Figure VII-7A, it is evident, first, that the Class Representatives did not share a single, common percentage overcharge amount: the percentage overcharge is highly variable across time and across Class Representatives, including swings from +50% to -50%. Class Representatives such as Olin Corporation show negative overcharges and damages quite consistently until the fall of 2005, when the values turn positive. Class Representative Donnelly Commodities, in contrast, shows highly volatile positive and negative overcharges and damages over the Class Period.

Figure VII-7A

**Class Representatives' "Overcharges", July 2003-December 2008**




**Source:** Rausser Merits Report Data with Supplemental UP Data; Rausser Merits Deposition at 437
**Note:** Individual overcharge calculated as actual revenue minus but-for revenue divided by actual revenue. Axis has been truncated at +/- 100%; '*' indicates truncated "overcharges."

546. Using the Deposition method calculation, Figure VII-7B summarizes the results seen in Figure VII-7A for each Class Representative over the entire Class Period. Rather than sharing a common "fact" and magnitude of impact and injury, purported overcharge amounts vary widely across Class Representatives, and numerous Class shipments show negative damages. Across the group of Class Representatives, the calculated overcharge percentages range from -11.8% to 30.5%. If the facts of the Class Representatives are to stand for the facts common to the Class as a whole, the conclusion generated by Prof. Rausser's own data, modeling and formulas indicates

that the shipments of the members of the Class were not subject to a common fact and magnitude of impact and injury. [620]

Figure VII-7B

**Prof Rausser's Model: Do Class Representatives Show "Common Facts" of Injury and Overcharge? Class Representatives, July 2003-December 2008**

| Shipper | Prof Rausser's Deposition Method "Damages" | Prof Rausser's Class-Period "Overcharge" | Weeks with Negative "Damages" | Weeks with Positive "Damages" |
|---|---|---|---|---|
| CARTER DISTRIBUTING COMPANY INC | $278 | 6.1% | 1 | 2 |
| DAKOTA GRANITE CO | $13,533 | 1.5% | 58 | 78 |
| DONNELLY COMMODITIES | $24,872 | 3.6% | 37 | 63 |
| DUSTPRO | -$2,659 | -11.8% | 4 | 0 |
| OLIN CORP | $32,697,827 | 14.8% | 94 | 192 |
| STRATES SHOWS INC | $240,560 | 30.5% | 3 | 21 |
| US MAGNESIUM | $1,150,037 | 16.1% | 12 | 208 |
| ZINIFEX TAYLOR | $40,832 | 19.4% | 2 | 25 |

**Source:** Rausser Merits Report Data with Supplemental UP Data; Rausser Merits Deposition at 437
**Note:** There were no weeks with zero damages.

547. The wide range of individual shipper overcharges across the entire Class Period is illustrated in Figure VII-8. Here, I have applied Prof. Rausser's formula for Deposition method damages (shown above) to all 28,067 members of the Class that are captured in Prof. Rausser's modeling of but-for prices. Each individual Class Member's damages are calculated by summing the product of its individual weekly shipments and the difference in the actual and the but-for price across the Class Period. I then convert each individual shipper's overcharge into a percent. The height of the S-shaped line in Figure VII-8 shows the cumulative number of shippers with overcharges at or below the value indicated on the horizontal axis.

620 Prof. Rausser's own "common factors" regression analysis shows that, even if the many thousands of shipments accounted for by Defendants at any point in time are subject to common supply and demand factors, the *effects* of those factors are not common across shipments and shippers. Specifically, the "coefficients" (measuring the effects of changes in a specified variable, such as shipment weight or mileage) generated under Prof. Rausser's proffered analysis of Jacksonville, FL; Chicago, IL; and Los Angeles, CA in 2006 (Rausser Merits Report at 159) vary markedly across the three cases he tests. See my workpapers.

Figure VII-8

**Does Prof. Rausser's Damages Model Measure a Common, Class-Wide Fact of Injury? Thousands of Class Shippers Have Zero or Negative "Damages"
July 2003-December 2008**




**Source:** Rausser Merits Report Data with Supplemental UP Data; Rausser Merits Deposition at 437
**Note:** Values below -100% are not shown. "Overcharges" are calculated as "damages" divided by actual payments.

548. It is clear that negatives and positives do not balance out such that *all* Class Members show positive overcharges. Rather, Figure VII-8 indicates that more than 5,300 Class Members have zero or negative "damages" under Prof. Rausser's modeling and formulas.[621] That is, weighted by their various shipments, the actual prices these shippers paid were less than the price that Prof. Rausser's model predicts they would have paid in the absence of the conspiracy he alleges. Prof. Rausser has claimed that all shippers suffered common adverse impact in fact. However, if we interpret individual shippers' calculated overcharges as being causally related to Defendants'

[621] Similar to the case of his Merits Deposition methodology, Prof. Rausser's Merits Report method finds that over 1,500 shippers have negative damages, though in small amounts, totaling approximately $250,000.

conduct, we must reach the conclusion that Defendants' accused conduct helped more than 5,300 shippers over the course of the Class Period. Contrary to Prof. Rausser's claims, detailed analysis of his proposed damages methodology indicates that Prof. Rausser has not demonstrated a common fact of impact and damage across the individual members of the Class.

549. Even beyond these shortcomings, Prof. Rausser's modeling and calculation of Deposition-method damages contains unambiguous methodological error. This is illustrated with the aid of Figure VII-9. As noted, Prof. Rausser's stated formula for damages is the difference between actual prices and predicted but-for prices multiplied by volumes shipped: $(P_{actual} - P_{but\text{-}for})$ x Volumes Shipped. In modeling the effects of purported conspiracy, Prof. Rausser's statistical modeling attempts to explain actual prices during the Class Period by fitting the data on actual prices to his product indicator and time-varying factors (that purportedly control for supply and demand) plus his "structural break" indicators for conspiracy. The result is a "fitted" or "predicted" price in the Class Period that can be explained by (1) normal supply and demand factors and (2) Prof. Rausser's conspiracy indicator variables. This conspiracy-inclusive price does not match actual prices perfectly, leaving a portion of the price for each shipment *unexplained* by either normal supply and demand factors *or* conspiracy.

Figure VII-9

**Prof. Rausser Creates "Damages" *Not* Caused by "Conspiracy"**

Prof. Rausser's Individual Class Member Damages $= (P_{actual} - P_{but\text{-}for}) \times$ Volume Shipped

↑ The price predicted for the world of no "conspiracy" [points to $P_{but\text{-}for}$]

But... $P_{actual} = X + U$

X: The part of $P_{actual}$ explained by "conspiracy" & other, normal factors

↑ Prof. Rausser's Model of "Structural Break" [points to X]

U: The part of $P_{actual}$ not explained by "conspiracy" & other, normal factors

Thus...

Prof. Rausser's Individual Class Member Damages $= (X + U - P_{but\text{-}for}) \times$ Volume Shipped

$= (X - P_{but\text{-}for}) \times$ Volume Shipped $+$ U $\times$ Volume Shipped

↑ The part of $P_{actual}$ not explained by "conspiracy" & other, normal factors [points to U]

**Source:** Rausser Merits Report; Rausser Merits Deposition at 437

550. In other words, as illustrated in Figure VII-9, actual prices end up being broken into two pieces: (1) the part (shown as X in the figure) that can be explained by either normal supply and demand factors or by Prof. Rausser's proposed indicators of conspiracy, and (2) the part (shown as U in the figure) that remains unexplained by either the chosen supply and demand factors or the proposed indicators of conspiracy. The first part here – the predicted "with conspiracy" price, X – is found by specifying "each of the setting[s] on the variables that enter into the model"[622] and "turning on" the conspiracy indicators. The second part – the unexplained, U – is the difference between the actual price and the predicted "with conspiracy" price: $U = P_{actual} - X$. This difference is explained by *neither* normal supply and demand factors *nor* conspiracy. It is just unexplained.

551. Contrary to the most basic of arithmetic and professional methods, Prof. Rausser's proposed damages formula treats price changes that his model does not explain by either normal supply and demand factors or "conspiracy" as nevertheless being

[622] Rausser Merits Deposition at 437.

damages caused by conspiracy. The straightforward arithmetic is shown in Figure VII-9. Since damages are "actual price minus but for price, times volume shipped", and actual price is made up of an explained part and unexplained part, damages become the "explained part of actual price *plus* unexplained part of actual price, times volumes shipped". In other words, the unexplained part of actual prices, *which the modeling tried, but failed, to explain by normal supply and demand factors and conspiracy*, is a part of Prof. Rausser's measure of damages purportedly due to conspiracy. This is a logical contradiction: The subject portion of damages cannot be both caused by "conspiracy" and unexplained by "conspiracy". Prof. Rausser's damages calculations do not qualify as professionally competent.

552. The unexplained portion of damages that Prof. Rausser's method counts as damages (i.e., which are attributed to "conspiracy" despite not being explained by "conspiracy" in his results) can be positive or negative. That is, his modeling of actual prices yields predicted, "conspiracy"-inclusive prices that sometimes exceed actual prices and sometimes are less than actual prices. When actual prices exceed predicted, "conspiracy"-inclusive prices, the unexplained difference (U) is positive and, from Figure VII-9, damages are inflated. Conversely, when predicted, "conspiracy"-inclusive prices exceed actual prices, the unexplained difference (U) is negative and, from Figure VII-9, damages are reduced.

553. This does not mean, however, that positives and negatives somehow balance out when it comes to assessing the fact and magnitude of purported adverse impact and injury *for any individual Class Member*. Some Class Members may have their damages inflated by Prof. Rausser's methodology. In Figure VII-10, I show the impact of Prof. Rausser's improper approach across all individual Class Members over the entire Class Period. The figure shows the cumulative count of Class Members for whom Prof. Rausser's treatment of what he cannot explain as "damages" causes inflation of damages. The left-hand side of the chart shows values where Prof. Rausser's model predicts rates that are less than actual rates and "U" is positive. The height of the S-shaped line is the cumulative count of Class Members for whom the predicted rate falls below the actual rate (across all of the Class Member's shipments) by the percentage shown on the horizontal axis. This means that Class Members on the left-hand side of the chart have had their damages inflated by Prof. Rausser's methods. As the figure indicates, Prof. Rausser is inflating damages for almost 14,500 of the 28,067 Class Members captured by his data and modeling. Moreover, the inflation of damages is spread over a large range of values for the percent of the actual price that is unexplained by his modeling (along the horizontal axis of the figure).

Figure VII-10

**Prof. Rausser Treats What He <u>Cannot</u> Explain by "Conspiracy" as Damages Caused by the "Conspiracy"**
**July 2003-December 2008**




**Source:** Rausser Merits Report Data with Supplemental UP data; Rausser Merits Deposition at 437
**Note:** Values above 100% are not shown.

554. While some Class Members have their overcharges inflated by Prof. Rausser's methods, others have their overcharges deflated. The error introduced into these damages measures is also large (shown to the right of 0% in Figure VII-10). As shown, the number of Class Members with "deflated" overcharges is smaller than the number whose overcharges are inflated by Prof. Rausser's methods.

555. The noted methodological flaws and contradictory results that pervade Prof. Rausser's modeling and damage calculations do *not* mean that the problems can be fixed by changing his damages formula within his current regression framework. Rather, when the unexplained portions of the prices Class shippers paid are so frequently larger than the Class-wide overcharge claimed by Prof. Rausser (e.g., his 13.6% asserted

overcharge), the conclusion to be drawn is that his modeling and data yield unreliable results for the individual members of the Class.

556. Given the data that are available on a common basis, the portion of prices individual Class Members pay that the model cannot explain by normal supply and demand factors cannot reliably be split up between an effect of purported conspiracy and remaining still-unexplained portions of the prices actually paid. Prof. Rausser's damages modeling tells us that there are large (relative to claimed overcharge percentages) changes – up or down – in the prices actually paid by shippers that it cannot explain by conspiracy or other factors. In this circumstance, there is no reliable mechanism in his framework for determining whether (a) this is because the purported conspiracy had no, less, or more impact than the asserted "common" overcharge, or (b) there was a "common" overcharge and the remaining unexplained changes in all-in rates were simply normal variation due to factors that the modeled "common factors" could not account for.

557. The problem is fundamental and arises from what Prof. Rausser's regression model *cannot* explain about individual Class Members' prices. Moreover, as we have seen, the prediction errors in Prof. Rausser's model results do not somehow balance out for individual shippers such that each has adverse impact and positive damages on net. Remedying the problem so as to create more reliable and accurate measures of damages would require the individualized data collection at the level of individual shippers, routes, and commodities that Prof. Rausser asserts is unnecessary.[623] When I test his assertion that "common factors ... predominate" in the determination of the fact and magnitude of purported injury to individual Class Members,[624] I find the data reject the claim. His modeling is unreliable for purposes of determining impact and damages at the level of individual Class Members.

### G. Prof. Rausser's Model Commonly Finds "Antitrust Damages" in Excess of Revenues from Challenged Fuel Surcharges

558. As noted, under Plaintiffs' and Prof. Rausser's theories of the conspiracy they claim, base rates are stable and "static".[625] All-in rates were raised not by an "unmanageable"[626] conspiracy to raise such rates by raising base rates. Instead, under their theories of conspiracy, Class Members' all-in rates were raised by a conspiracy to impose fuel surcharges which were more "onerous," "aggressive", and "non-negotiable" than the conspiracy-free surcharges which preceded July 2003. In other

623 Rausser Merits Report at 126.

624 Rausser Merits Report at 8.

625 Rausser Merits Report at 139-141.

626 Rausser Merits Report at 52, footnote 94.

words, putative conspiratorial price elevation was purportedly achieved through the collection of elevated fuel surcharges. Notwithstanding these economics of Plaintiffs' and Prof. Rausser's claims, Prof. Rausser's model frequently yields individual damages that are greater than the surcharges Class Members paid.[627]

559. Figure VII-11 presents summary data for each of the Class Representatives for their Class movements. The top panel of the figure shows the total FSC payments each Class Representative made for Class traffic as identified by Prof. Rausser, the total damages Prof. Rausser's model estimates for each Class Representative using the single-weekly-percentage Report method, and the difference between these values. When the difference is negative, Prof. Rausser's damages estimate is larger than the sum of fuel surcharges the Class Representative paid.

560. In the case of Class Representative Carter Distributing Company, Inc., for example, the revenue-based fuel surcharges it paid on Class movements totaled $1,574. Yet, Prof. Rausser's model purports to find "damages" of $2,047 for these same Class movements. In other words, Prof. Rausser's model finds purported "damages" caused by the conspiracy based on fuel surcharges which are 30% higher than the actual challenged surcharge payments that his theory says were the source of overcharges. In the case of Class Representative Strates Shows, Inc., the model measures purported "damages" ($81,582) which are 39% higher than the surcharge payments ($58,828) Strates Shows paid. Overall, Prof. Rausser's model finds "damages" in excess of surcharge payments for all but two of the Class Representatives, and "damages" for the Class Representatives in the aggregate of $32,706,594. This is 30% more than the Representatives' total surcharge payments of $25,020,414.

627 Suggestions by Prof. Rausser (Rausser Class Reply at 97) that these results are fully consistent with his expectations because he believes that damages can emanate not only directly from fuel surcharges but also when "a portion of the Fuel Surcharge has been moved into the base rate" are *ad hoc*. Prof. Rausser has provided no demonstration that the alleged conspiracy operated by such a mechanism. He simply assumes that NS's rebasing was a conspiratorial act, while citing no communications or other principles that would support the conclusion that NS was conspiring by raising base rates. Indeed, Prof. Rausser has argued that a base rate conspiracy is "effectively unmanageable" (Rausser Merits Report at 52, footnote 94). In fact, he has represented base rates as inflexible vis-à-vis negotiations over fuel surcharges.

Figure VII-11

**Prof. Rausser's Model Finds "Damages" in Excess of FSC Payments: Class Representatives' Class Traffic**

## Prof. Rausser's Report Method

| Shipper | FSC Payments (Report Method Dataset) | Prof Rausser's Report Method "Damages" | Difference (FSC Payment minus "Damages") |
|---|---|---|---|
| CARTER DISTRIBUTING COMPANY INC | $1,574 | $2,047 | -$472 |
| DAKOTA GRANITE CO | $94,118 | $90,982 | $3,136 |
| DONNELLY COMMODITIES | $46,282 | $60,857 | -$14,576 |
| DUSTPRO | $1,967 | $1,556 | $411 |
| OLIN CORP | $23,908,071 | $31,525,100 | -$7,617,029 |
| STRATES SHOWS INC | $58,828 | $81,582 | -$22,754 |
| US MAGNESIUM | $853,477 | $886,876 | -$33,400 |
| ZINIFEX TAYLOR | $56,097 | $57,593 | -$1,496 |

## Prof. Rausser's Deposition Method

| Shipper | FSC Payments (Deposition Method Dataset) | Prof Rausser's Deposition Method "Damages" | Difference (FSC Payment minus "Damages") |
|---|---|---|---|
| CARTER DISTRIBUTING COMPANY INC | 337 | 278 | 59 |
| DAKOTA GRANITE CO | 96,383 | 13,533 | 82,850 |
| DONNELLY COMMODITIES | 44,732 | 24,872 | 19,860 |
| DUSTPRO | 1,840 | -2,659 | 4,500 |
| OLIN CORP | 22,270,201 | 32,697,827 | -10,427,626 |
| STRATES SHOWS INC | 49,155 | 240,560 | -191,405 |
| US MAGNESIUM | 813,803 | 1,150,037 | -336,234 |
| ZINIFEX TAYLOR | 25,587 | 40,832 | -15,245 |

**Source:** Rausser Merits Report Data with Supplemental UP Data

561. A damages model that finds damages that are greater than the entire payments made under the fuel-surcharge mechanism Prof. Rausser asserts was the instrument of conspiratorial price elevation makes no economic sense. This conclusion is only strengthened by Prof. Rausser's claim that base rates were static, which implies that fuel surcharges were the tool of purported conspiratorial price elevation.

### H. Prof. Rausser's Model Finds Significant "Damages" Even Where Class FSCs Are Not More "Onerous" than Non-Conspiratorial FSCs

562. As noted, Plaintiffs and Prof. Rausser assert that the challenged revenue-based fuel surcharges in the Class Period were more "onerous" than the admittedly non-conspiratorial revenue-based surcharges implemented by Defendants in the pre-Class Period. As I show in Section IV, the Defendants' transaction data reject this claim. Moreover, Class Representatives showed their willingness to pay revenue-based fuel surcharges long before the alleged onset of conspiracy and across broad portions of their shipments (Section IV). Nevertheless, Prof. Rausser's modeling purports to find

significant "damages" even where Class Members' surcharge payments were comparable or even less than the payments that would have been made under Defendants' competitive pre-Class surcharge formulas. It is economically illogical for damages to be large when the asserted mechanism purportedly used to extract overcharges from customers is comparable to or lower than a no-conspiracy benchmark.

563. [redacted]

564. [redacted]

Figure VII-12

**FSC Formulas v. "Non-Conspiratorial" Carload FSC Rate**

[redacted]

Source: [redacted]

**Note:** Each symbol represents a unique FSC formula rate

565. To determine whether Class Members paid more or less under Class-Period Fuel surcharge formulas relative to pre-Class non-conspiratorial formulas, it is possible to calculate the fuel surcharges that Class Members would have paid under the pre-Class formulas by adjusting actual fuel surcharge rates to equal rates calculated using pre-Class non-conspiratorial fuel surcharge formulas. However, Defendants' transaction datasets contain different data elements, and the actual fuel surcharge rate is not generally available in Defendants' transaction data.

566. UP's transaction data include both the fuel surcharge rate and the dollar amount of the fuel surcharge.[628] Thus, it is possible to determine what a shipper's fuel surcharge would be if a different rate were charged using the UP transactions data.[629] The other Defendants' transactions data do not contain comprehensive information on the rate of the fuel surcharge. The data also do not generally provide the exact amount of the base rate on which the fuel surcharge was calculated. It is possible, however, to use long division to calculate the "observed" fuel-surcharge rate on a shipment.[630] Fuel surcharges are typically applied to a base rate before adding other surcharges or applying any discounts. Therefore, depending on the non-fuel surcharges and discounts applied to a shipment, this "observed" fuel-surcharge rate can be higher or lower than the actual rate applied to the shipment's base revenue.

567. The accuracy of the long-division method of calculating the fuel surcharge rate can be tested by using UP data to compare the weighted-average reported rate to the weighted-average rate resulting from the "long-division" method. This comparison is shown in Figure VII-13 for UP's top 30 carload shippers.[631] For each of UP's top-30 shippers, Figure VII-13 shows the weighted-average surcharge rate calculated using the long-division method (first column) and the reported surcharge rate (second column). The third data column shows the difference between the two surcharge rates. The differences are quite small and almost always less than 1%. The average difference across the top 30 UP shippers is less than one-tenth of one percent. This comparison shows that the long-division method leads to fuel surcharge rates that are, on average, extremely close to the actual rates used in the calculations. Thus, the long-division method can be used as a basis for the adjustment of actual fuel surcharges to the amounts they would have been had pre-Class non-conspiratorial fuel surcharge formulas been in effect during the Class Period.

---

628 This information is only available in the "Defendants' Transactions Data" version of the transactions data. Prof. Rausser's versions of the transactions data do not maintain this information.

629 If the fuel surcharge rate were 6% on a shipment and the total amount of the surcharge were $12, simple algebra shows that if the surcharge were, say, 8%, the fuel surcharge would be $16 ($16 = $12*8%/6%).

630 Prof. Rausser has endorsed this method. (E.g., Rausser Merits Report at 137, Figure 38) The fuel surcharge is levied on base rates before discounts and surcharges, which are not observed in the data. The transactions data includes net revenue. If there are no non-fuel surcharges and discounts, the surcharge rate is FSC/(net revenue – FSC).

631 The calculations are limited to local Class shipments.

Figure VII-13

**UP: Comparison of Long-Division FSC and Reported FSC Percentages**

| Shipper | FSC Rate Calculated | FSC Rate Calculated Using | Difference (FSC Rate Calculated Using Rate Reported in Data minus FSC Rate |
|---|---|---|---|
| [redacted] | | | |

**Source:** Defendants' Transaction Data
**Note:** Data limited to local traffic where a reported FSC rate is observed Top 30 chosen by FSC payments

568. Figures VII-14A through 14D compare Defendants' top-30 carload shippers' actual fuel surcharge rates to the rates they would have paid had Defendants' pre-Class non-conspiratorial fuel surcharge formulas remained in effect. Figure VII-14A shows that the fuel surcharges UP's top-30 shippers actually paid during the Class Period were lower than the rates they would have paid had UP retained its pre-Class fuel surcharge formula. This result is shown in the third column of data in the figure, where all of the values are negative. Negative values indicate that the actual Class Period surcharge rate is below the rates from UP's pre-Class surcharge formula.

Figure VII-14A

**Top 30 UP Customers: Average FSC Paid v. Average FSC Under Non-Conspiratorial Formula**

| [redacted] | [redacted] | Average FSC Under Non- [redacted] | Difference (FSC Paid minus FSC Under Non-Conspiratorial [redacted] |
|---|---|---|---|
| [redacted] | | | |

**Source:** Defendants' Transaction Data
**Note:** Data limited to local traffic Top 30 chosen by FSC payments

569. Figures VII-14B through 14D repeat the above analysis for the other Defendants. The figures show that fuel surcharge rates would have been little changed for most shippers had Defendants retained their pre-Class non-conspiratorial fuel surcharge formulas. The actual Class Period fuel surcharges are generally comparable to and often lower than the rates calculated from each Defendant's pre-Class non-conspiratorial fuel surcharge formulas. There is no basis to find that the four Defendants raised surcharge rates relative to the rates calculated by their pre-Class fuel surcharge formulas.

Figure VII-14B

**Top 30 BNSF Customers: Average FSC Paid v. Average FSC Under Non-Conspiratorial Formula**

Average FSC Under Non-

Difference (FSC Paid minus FSC Under Non-Conspiratorial

[redacted]

**Source:** Defendants' Transaction Data
**Note:** Data limited to local traffic Top 30 chosen by FSC payments

Figure VII-14C

**Top 30 CSXT Customers: Average FSC Paid v. Average FSC Under Non-Conspiratorial Formula**

| Shipper | Average FSC Paid | Average FSC Under Non-Conspiratorial Formula | Difference (FSC Paid minus FSC Under Non-Conspiratorial Formula) |
|---|---|---|---|
| [redacted] | | | |

**Source:** Defendants' Transaction Data
**Note:** Data limited to local traffic Top 30 chosen by FSC payments

Figure VII-14D

**Top 30 NS Customers: Average FSC Paid v. Average FSC Under Non-Conspiratorial Formula**

| | | Average FSC Under Non- | Difference (FSC Paid minus FSC Under Non-Conspiratorial |
|---|---|---|---|
| [redacted] | | | |

**Source:** Defendants' Transaction Data
**Note:** Data limited to local traffic Class Period data limited to July 1, 2003 to June 30, 2006 Top 30 chosen by local, class FSC payments.

570. Of course, Prof. Rausser has argued that Defendants' fuel surcharge programs were the mechanisms Defendants used to conspiratorially raise all-in rail rates. However, if fuel surcharges did not become more onerous, there is no basis within Prof. Rausser's description of the asserted conspiracy to find significant overcharges. Nevertheless, Prof. Rausser regularly finds overcharges comparable to or higher than the total fuel surcharges Class Members paid. Figures VII-15A through 15D show actual fuel surcharges, Prof. Rausser's estimated damages using his Report method, and the difference between these figures for each Defendants' top-30 carload customers.

571. For example, Figure VII-15D shows that Prof. Rausser's Report method identifies significant damages for each of UP's top-30 shippers.[632] For more than half of UP's top-30 shippers Prof. Rausser's damages estimate is greater than the total amount of fuel surcharges the shipper paid to UP. The conclusions to be drawn from Figures VII-15A through 15C are the same. Each figure shows Prof. Rausser's Report method overcharges for each Class Member are comparable to and frequently higher than the total fuel surcharges each Class Member paid.

Figure VII-15A

**BNSF: Top 30 Carload Customers**

**FSC Payments and Prof. Rausser's Report Method "Damages"**

| Shipper | FSC Payments (Report Method Dataset) | Prof Rausser's Report Method "Damages" | Difference (FSC Payment minus "Damages") |
|---|---|---|---|

[redacted]

**Source:** Rausser Merits Report Data with Supplemental UP Data
**Note:** Top 30 chosen by FSC payments

632 For this calculation I use Prof. Rausser's original database supplemented by the missing UP data.

Figure VII-15B

**CSXT: Top 30 Carload Customers**
**FSC Payments and Prof. Rausser's Report Method "Damages"**

| | FSC Payments | Prof Rausser's | Difference (FSC Payment minus |
|---|---|---|---|

[redacted]

**Source:** Rausser Merits Report Data with Supplemental UP Data
**Note:** Top 30 chosen by FSC payments

Figure VII-15C

**NS: Top 30 Carload Customers**
**FSC Payments and Prof. Rausser's Report Method "Damages"**

| | FSC Payments | Prof Rausser's | Difference (FSC Payment minus |
|---|---|---|---|

[redacted]

**Source:** Rausser Merits Report Data with Supplemental UP Data
**Note:** Top 30 chosen by FSC payments. Class Period data limited to July 1, 2003 to June 30, 2006

Figure VII-15D

**UP: Top 30 Carload Customers**
**FSC Payments and Prof. Rausser's Report Method "Damages"**

| [redacted] | FSC Payments [redacted] | Prof Rausser's [redacted] | Difference (FSC Payment minus [redacted] |
|---|---|---|---|
| [redacted] | | | |

**Source:** Rausser Merits Report Data with Supplemental UP Data
**Note:** Top 30 chosen by FSC payments.

572. I now turn to similar analyses for Prof. Rausser's Deposition method overcharge estimates. Prof. Rausser's Deposition method overcharge estimates for Class Members are comparable to and frequently higher than the fuel surcharges the Class Members paid.[633] This comparison is shown for Defendants in Figures VII-15E through 15H. These figures show the relevant measure of actual fuel surcharges the customer paid,

---

633 The calculated fuel surcharges for each customer are different for Prof. Rausser's Deposition method overcharges than for his Report method overcharges because it is only possible to calculate Deposition method damages for those transactions with sufficient information to be included in the regression database. Thus, the relevant measure of fuel surcharges for each customer is the total surcharge amount paid on the shipments included in the damages analysis.

Prof. Rausser's estimate of Deposition method overcharges, and the difference between fuel surcharges and estimated overcharges for each Defendants' top-30 carload customers. Estimated Deposition method overcharges for a Class Member are frequently higher than actual fuel surcharges paid, as indicated by the negative values in the right-hand column of Figures VII-15E through 15H. Where there is no evidence that fuel surcharges were above their non-conspiratorial level, estimated overcharges of this level are unfounded.

Figure VII-15E

**BNSF: Top 30 Carload Customers**
**FSC Payments and Prof. Rausser's Deposition Method "Damages"**

| | | FSC Payments | Prof Rausser's Deposition Method | Difference (FSC Payment minus |
|---|---|---|---|---|
| [redacted] | | | | |

Source: Rausser Merits Report Data with Supplemental UP Data
Note: Top 30 chosen by FSC payments.

Figure VII-15F

**CSXT: Top 30 Carload Customers**
**FSC Payments and Prof. Rausser's Deposition Method "Damages"**

| | FSC Payments | Prof Rausser's Deposition Method | Difference (FSC Payment minus |
|---|---|---|---|
| [redacted] | | | |

**Source:** Rausser Merits Report Data with Supplemental UP Data
**Note:** Top 30 chosen by FSC payments.

Figure VII-15G

**NS: Top 30 Carload Customers**
**FSC Payments and Prof. Rausser's Deposition Method "Damages"**

| [redacted] | FSC Payments [redacted] | Prof Rausser's Deposition Method [redacted] | Difference (FSC Payment minus [redacted] |
|---|---|---|---|
| [redacted] | | | |

Source: Rausser Merits Report Data with Supplemental UP Data
Note: Top 30 chosen by FSC payments. Class Period data limited to July 1, 2003 through June 30, 2006

Figure VII-15H

**UP: Top 30 Carload Customers**
**FSC Payments and Prof. Rausser's Deposition Method "Damages"**

| | FSC Payments | Prof Rausser's Deposition Method | Difference (FSC Payment minus |
|---|---|---|---|
| [redacted] | | | |

**Source:** Rausser Merits Report Data with Supplemental UP Data
**Note:** Top 30 chosen by FSC payments.

573. As I have described at length above, Defendants each implemented fuel surcharges prior to the Class Period and any assertions of conspiracy. Moreover, each Class Representative and most of the largest Class Members agreed to pay Defendants' competitive fuel surcharges prior to the asserted conspiracy. Figure VII-16 provides information on the 100 largest Class Members and their payments of fuel surcharges. For each of the 100 largest Class Members, Figure VII-16 shows the date of the Class Member's first movement with a fuel-surcharge payment, the incidence of fuel surcharges on the customers' traffic in June 2003, the fuel surcharges paid by the Class Member and Prof. Rausser's Report method overcharges. As in the figures above,

Prof. Rausser's estimated Report method fuel surcharges are typically comparable to each Class Members' total fuel surcharge payments. This is not a sensible result given that Defendants' challenged fuel surcharges are comparable to pre-Class, non-conspiratorial fuel surcharges.

Figure VII-16

**100 Largest Class Customers**

| pper | First Move with | June 2003 Incidence of FSC | (Report | FSC Payments | port | Prof. Rausser's | Difference (FSC Payment minus ") |
|---|---|---|---|---|---|---|---|

[redacted]

**Source:** Rausser Merits Report Data with Supplemental UP Data

Figure VII-16 (cont.)

100 Largest Class Customers

| | First Move with | June 2003 Incidence of FSC | | FSC Payments | | Prof Rausser's | Difference (FSC Payment minus |
|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | |

**Source:** Rausser Merits Report Data with Supplemental UP Data

### I. Prof. Rausser's Model Finds Antitrust Damages for Movements of Sole-Defendant-Served and Traffic with Competition from Other Modes

574. In light of Class Representatives' own representations that they are sole-served at some or all of their origin and destination locations, it is basic economics that an inter-railroad conspiracy to limit inter-railroad competition would have no effect on competitive conditions for sole-served shipments lacking competitively viable alternative railroad options. Similarly, for traffic with disciplining competition from

other modes, whether sole-rail served or not, the purported rail-only conspiracy would not fundamentally alter the competitive discipline under which a Defendant would have to price its service.

575. As noted in Section V above, even if putatively conspiring Defendants found it procedurally convenient to impose conspiratorial FSCs on all traffic, including their sole-served traffic and traffic with competition from other modes, the profit-maximizing prices for such traffic would not be altered by the purported conspiracy. The direct implication, as discussed above, is that all Defendants would share the incentive to rationally adjust their all-in rates back to those profit-maximizing levels upon implementing putatively conspiratorial FSCs, and doing so would not threaten the viability of the conspiracy alleged by Plaintiffs. Accordingly, it would be expected that a credible damage model of all-in rates that was capable of isolating the impact of the conspiracy on individual shipments and individual Class Members would find that sole-served and Class Members who ship goods with significant competition from other modes did not suffer antitrust-related harm from the alleged conspiracy. Prof. Rausser's modeling fails this test.

576. As discussed in Section V, Prof. Rausser now acknowledges that some shippers can choose between rail alternatives and some cannot,[634] and that some shipments are subject to competition from other modes and some are not.[635] Indeed, Prof. Rausser's own designation of BEAs that are sole-served indicates that there are thousands of Class shippers who are in his sole-served BEAs. Some of these Class shippers are shown in Figure VII-17. Nevertheless, without separately testing the matter, Prof. Rausser assigns equivalent overcharges to all traffic, whether or not it is sole-rail-served and whether or not it is subject to non-rail competition.

634 Rausser Merits Deposition at 75-76.

635 Rausser Merits Report at 23-27.

Figure VII-17

**Sample of Class Shippers in Prof. Rausser's Sole-Served BEAs**

| Customer Name | | | |
|---|---|---|---|
| 2016596 ONTARIO INC | A&A FERTILIZER, LTD. | ABITIBIBOWATER INC | ADISSEO USA |
| 3D CORPORATE SOLUTIONS | A&K RAILROAD MATERIALS INC | ABRASIVES INC | ADKINS ASSOCIATES |
| 3D CORPORATE SOLUTIONS LLC | A&M RELOAD INC | ABSOLUTE LOGISTICS | ADM ALLIANCE NUTRITION |
| 3M ARCH STREET | A.P.M. | ACC RECYCLING | ADM BIOPRODUCTS |
| 3M ROAD | ABASTECEDORA DE ACEROS MAQUI | ACC RECYCLING CORP | ADM CORN PROCESSING |
| 3UNKLELBR | ABB | ACE STORAGE INC | ADM EDIBLE BEAN SPECIALTIES |
| 3V INC | ABB POWER TRANSFORMER | ACEROS CAMESA | ADM GRAIN |
| 400 FREIGHT SERVICES INC | ABC COKE | ACEROS CORSA | ADM GROWMARK |
| 400 GROUP | ABC RECYCLING | ACEROS CORSA SA DE CV | ADM INDUSTRIAL OILS |
| 419 METAL & AUTO RECYCLING CTR | ABENGOA BIOENERGY | ACF INDUSTRIES | ADM MILLING |
| 4311485 CANADA INC | ABF FREIGHT SYSTEM | ACKERMAN BEARDSLEY BENNETT | ADM PACKAGED OILS |
| 56 INDUSTRIES | ABF FREIGHT SYSTEM INC | ACM | ADM PROCESSING |
| 791615 ONTARIO LTD | ABF FREIGHT SYSTEMS INC | ACME BRICK | ADM SOUTHERN CELLULOSE |
| 84 LUMBER COMPANY LP | ABITIBI | ACME CHEMICAL MARKETING | ADM-BENSON QUINN |
| 99 CENT ONLY UP AVE | ABITIBI BOWATER | ACME HARDESTY | ADOLPH COORS CO |
| A & L POTATO CO | ABITIBI CONSOLIDATED | ACME METALS & STEEL SUPPLY | ADVANCE STEEL |
| A A FERTILIZER LTD | ABITIBI CONSOLIDATED CIE OF CA | ACME SCRAP INC | ADVANCE STEEL COMPANY INC |
| A B B INC | ABITIBI CONSOLIDATED INC | ACME STRUCTURAL INC | ADVANCED ENVIROMENTAL RECY |
| A C H FOOD | ABITIBI CONSOLIDATED SALES COR | ACONCAGUA TIMBER | ADVANCED ENVIRONMENTAL REC |
| A F G INDUSTRIES LTEE | ABITIBI LP ENGINEERED WOOD INC | ACOUSTICS SPECIALTIES | ADVANCED ENVIRONMENTAL RECYC |
| A G P GRAIN LTD | ABITIBI RECYCLING | ACS MKT | ADVANCED LOGISTICS & DISTR |
| A GURDA PRODUCE | ABITIBI-CONSOLIDATED | ACTAGRO | ADVANCED STEEL RECOVERY |
| A J C INTERNATIONAL | ABITIBI-CONSOLIDATED COMPANY O | ACTIVE MINERALS INTERNATIONAL | ADVANTAGE METALS MANCHESTER |
| A J PRODUCE | ABITIBI-CONSOLIDATED INC | ADAMS BROTHERS PRODUCE | ADVANTAGE TRANSPORTATION |
| A K RAILROAD MATERIALS | ABITIBI-CONSOLIDATED INC. | ADAMS GROUP | AE STALEY MANUFACTURING CO |
| A K STEEL | ABITIBI-CONSOLIDATED SALES | ADAMS STEEL | AERT |
| A L TRUCKING | ABITIBI-CONSOLIDATED SALES COR | ADAMS VEGETABLE OILS | AES DEEPWATER |
| A LACROIX ET FILS GRANIT L | ABITIBI-CONSOLIDATED SALES CORP | ADELPHIA METALS | AFA FOREST PRODUCTS INC |
| A TRADING | ABITIBIBOWATER CANADA INC | ADELPHIA METALS INC | **6,596 OTHERS** |

**Source:** Rausser Merits Report Data with Supplemental UP Data; Rausser Merits Report (Figure A.2)

577. As seen in Figure VII-18 and contrary to the applicable economics of rational conduct by purported conspirators, Prof. Rausser's model does, in fact, generate "overcharges" for Class Representatives at those locations that these Plaintiffs themselves describe as lacking the benefit of competition from multiple railroads. Specifically, the figure shows the locations where the Class Representatives describe themselves as "captive" to one of the Defendants, and indicates the "damages" that Prof. Rausser's model finds for these movements. The figure also shows Plaintiff's total fuel surcharge payments for movements that included these locations as destination or origin.

Figure VII-18

**Prof. Rausser's Model Finds "Damages" in Excess of FSC Payments: Class Representatives' Sole-Served Cities**

| | | FSC Payments | Prof Rausser's | Difference (FSC Payment minus |
|---|---|---|---|---|
| [redacted] | | | | |

**Source:** Rausser Merits Report Data with Supplemental UP Data
**Note:** For routes with sole-served origin and destination cities, amount reported by origin city

578. The first row of Figure VII-18 shows, for example, that Prof. Rausser's modeling finds that Carter Distributing purportedly suffered $1,854 of Report method "damage" on its Class movements involving its sole-served Chattanooga, TN traffic. As noted, this is contrary to the results expected of a credible model of damages. Compounding the shortcomings of Prof. Rausser's modeling, the purported "damages" exceed the dollar value of the mechanism of purported overcharge – i.e., revenue-based fuel surcharges. In the case of Carter Distributing's traffic, these surcharges amounted to only $1,355 over the Class Period. Similar findings of "damages" where damages are not predicted and findings of "damages" which exceed actual FSC payments are pervasive across Class Representatives' sole-served traffic in Figure VII-18.

### J. Analysis of Selected Categories of Customers

579. Prof. Rausser calculates asserted damages for all Class Member shippers. I have been asked to calculate the impact on Prof. Rausser's analysis of his decision to include certain categories of traffic. These include traffic with:

- Price authorities entered following the aforementioned Surface Transportation Board ruling regarding the application of revenue- versus mileage-based fuel surcharges, issued on January 27, 2007;
- Price authorities entered following the filing of the first class action suit in the present matter on May 15, 2007;
- Non-defendant FSCs that are included in Prof. Rausser's data;
- Non-carload FSCs;
- Non-public FSCs;[636]
- Any FSCs other than public carload FSCs;[637]
- Interline shipments;
- Shippers with FSCs on any lane pre-3/15/2003;
- CSX Intermodal shipments.

580. The results of my isolation of the foregoing types of traffic in Prof. Rausser's damage modeling are presented in Figure VII-19. In each case, the figure indicates the amount of total gross payments and total FSC payments for Class movements as designated by Prof. Rausser and also damages from Prof. Rausser's model for each of the subject categories of traffic.

636 For this calculation, I employ Prof. Rausser's methodology for calculating FSC rates to identify shipments with FSC rates within 1% of the public public carload, coal, or intermodal surcharge rates reported in Section IV, as appropriate. For NS, I use two carload rates after rebasing.

637 For this calculation, I employ Prof. Rausser's methodology for calculating FSC rates to identify shipments with FSC rates within 1% of the public carload surcharge rates discussed in Section IV. For NS, I use two carload rates after rebasing.

Figure VII-19

## FSC Payments and Prof. Rausser's Damages for Selected Categories of Shippers

| Category | Gross Class Revenue (Million $) | FSC Payments (Million $) | Prof. Rausser Report Method "Damages" (Million $) |
|---|---|---|---|
| Price Authorities Entered Post-STB Decision on Jan 27, 2007 | $11,347 | $1,788 | $2,039 |
| Price Authorities Entered Post Filing of First Class Action Suit on May 15, 2007 | $4,259 | $711 | $824 |
| Non-Defendant FSCs | $3,385 | $360 | $424 |
| Non-Carload FSCs | $35,147 | $5,863 | $5,043 |
| Non-Public FSCs | $33,823 | $4,691 | $4,866 |
| Anything other than Public Carload FSCs | $38,284 | $5,462 | $5,415 |
| Interline Shipments | $35,159 | $4,555 | $4,704 |
| Shippers with FSCs on Any Lane Prior to March 15, 2003 | $51,675 | $7,057 | $6,840 |
| CSX Intermodal | $2,315 | $311 | $272 |

**Source:** Rausser Merits Report Data with Supplemental UP Data

Prof. Joseph P. Kalt
March 1, 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) ) ) ) ) | MDL No. 1869<br>Misc. No. 07-489 (PLF)<br>Hon. Paul L. Friedman |
| This document relates to:<br>ALL DIRECT PURCHASER CASES | ) ) ) ) | |

**Corrected Expert Report of Dennis W. Carlton, Ph.D.**

**On Behalf of Defendant Union Pacific Railroad Company**

**February 6, 2013**

HIGHLY CONFIDENTIAL

# Table of Contents


I. **INTRODUCTION.....1**

A. QUALIFICATIONS.....1

B. SUMMARY OF LITIGATION.....2

1. Plaintiffs' allegations.....2

2. Court findings.....5

C. ASSIGNMENT.....5

D. SUMMARY OF CONCLUSIONS.....7

II. **BRIEF BACKGROUND ON THE RAILROAD INDUSTRY.....9**

A. GEOGRAPHIC STRUCTURE OF RAILROAD COMPETITION.....9

B. RELEVANT CATEGORIZATIONS OF RAILROAD SHIPMENTS.....16

III. **AS A MATTER OF BASIC ECONOMIC THEORY, THE CONSPIRACY ALLEGED BY PLAINTIFFS IS ILLOGICAL, RENDERING PROFESSOR RAUSSER'S CONCLUSION AS TO THE EXISTENCE OF THE CONSPIRACY INHERENTLY UNRELIABLE.....19**

A. AN EFFECTIVE CONSPIRACY WOULD REQUIRE A MECHANISM TO CONTROL BASE RATES IN ADDITION TO FUEL SURCHARGES.....20

B. PROFESSOR RAUSSER'S OPINION PROVIDES NO ECONOMICALLY PLAUSIBLE MECHANISM FOR THE CONTROL OF BASE RATES.....23

1. Professor Rausser's opinion that there was an agreement not to discount base rates is not reliable, and it contradicts his opinion that a conspiracy on base rates is unmanageable.....24

2. The complexity of railroad pricing further undermines Professor Rausser's opinion that there was an agreement not to discount base rates.....26

(a) During the Class Period, the majority of UP's base rates were set via private negotiations.....27

(b) UP's base rates are highly variable across transactions and over time.....28

C. USING THE FUEL PRICE EXPECTATIONS AS OF THE START OF THE ALLEGED CONSPIRACY, THE CHALLENGED SURCHARGES WOULD NOT HAVE GENERATED ANY SIGNIFICANT OR SUSTAINED PRICE INCREASES.....34

**IV. ECONOMIC EVIDENCE PROVIDES NO SUPPORT FOR PLAINTIFFS' ALLEGED CONSPIRACY ....35**

A. THE USE OF RATE-BASED (AS OPPOSED TO MILEAGE-BASED) FUEL SURCHARGES DOES NOT SUPPORT PLAINTIFFS' ALLEGATION OF A SUCCESSFUL CONSPIRACY ....37

1. Rate-based surcharges are common—including in the railroad industry prior to the alleged conspiracy—for individually rational reasons....37

2. UP's 2007 adoption and widespread use of a mileage-based surcharge is not consistent with an alleged conspiracy based on rate-based surcharges ....39

B. TRENDS IN RATE-BASED FUEL SURCHARGE COVERAGE DO NOT SUPPORT PLAINTIFFS' ALLEGATION OF A SUCCESSFUL CONSPIRACY ....39

1. UP adopted rate-based fuel surcharges well before the start of the alleged conspiracy....40

2. Economic theory explains the growth in fuel surcharges as an individually rational response to the increased volatility of fuel prices ....41

3. Contrary to Plaintiffs' allegations, RCAF was not widely used by UP prior to the beginning of the alleged conspiracy, and therefore, contrary to Professor Rausser's opinion, RCAF could not have hindered the broad adoption of fuel surcharge by UP ....43

4. Contrary to Plaintiffs' allegations, there is no evidence of faster growth in UP's rate-based fuel surcharge coverage as of the start of the alleged conspiracy....46

(a) Trends in the percentage of UP shipments covered by fuel surcharges ....47

(b) Trends in the percentage of new UP contracts covered by fuel surcharges ....52

5. Contrary to an implication of Plaintiffs' theory, there is no evidence of an unusually large increase in fuel surcharge coverage growth on routes facing competition from other Defendants following the start of the alleged conspiracy ....53

C. THE ALLEGED UNIFORMITY OF PUBLIC FUEL SURCHARGE TERMS ADOPTED BY DIFFERENT DEFENDANTS DOES NOT SUPPORT PLAINTIFFS' ALLEGATIONS OF A SUCCESSFUL CONSPIRACY ....55

1. Even if Plaintiffs were correct that public fuel surcharges across railroads were uniform, this would not support an inference of conspiratorial behavior....56

2. Contrary to Plaintiffs' allegations, UP and BNSF did not adopt uniform public fuel surcharge terms ....................57

D. THE OBSERVED CHANGES IN THE MAGNITUDES OF FUEL SURCHARGES DO NOT SUPPORT PLAINTIFFS' ALLEGATIONS OF A SUCCESSFUL CONSPIRACY ....................59

E. FROM AN ECONOMIC PERSPECTIVE, THE EVIDENCE THAT PROFESSOR RAUSSER RELIES ON CANNOT ESTABLISH HIS CLAIM THAT THERE WAS AN AGREEMENT NOT TO DISCOUNT BASE RATES ....................64

1. The documentary evidence to which Professor Rausser points cannot establish his claim that UP adhered to any agreement not to discount base rates ....................64

2. Professor Rausser's exhibits on changes in average base rates cannot establish his claim that Defendants adhered to any agreement not to discount base rates ....................66

3. Evidence on sales shares cannot establish Professor Rausser's claim that Defendants adhered to any agreement not to discount base rates ....................67

F. TRENDS IN ECONOMIC PROFITS AND PRICE-COST MARGINS AFTER THE START OF THE ALLEGED CONSPIRACY DO NOT SUPPORT PROFESSOR RAUSSER'S CONCLUSION THAT THERE WAS A SUCCESSFUL CONSPIRACY ....................68

1. Professor Rausser's measures of operating profit margin show that UP's profits were lower in the Class Period, and Bloomberg's measure of economic profit also shows lower UP profits during the Class Period ....................69

2. A study of economic price-cost margins in the railroad industry finds that margins fell during the Class Period ....................72

**V. PROFESSOR RAUSSER'S FINDING THAT THE ALLEGED CONSPIRACY GENERATED LARGE OVERCHARGES IS BASED ON A FUNDAMENTALLY FLAWED THEORY AND METHODOLOGY ....................73**

A. OVERVIEW OF PROFESSOR RAUSSER'S OVERCHARGE MODEL ....................73

B. PROFESSOR RAUSSER'S CONCLUSIONS DEPEND ON THE DEMONSTRABLY FALSE ASSUMPTION THAT HIS MODEL IS "STRUCTURALLY STABLE" ....................74

1. Professor Rausser assumes that his model is structurally stable ....................74

2. Professor Rausser's structural stability assumption is demonstrably false ....................75

3. Adjusting Professor Rausser's model to deal with the lack of stability substantially changes his overcharge estimates, demonstrating that his results are not reliable ....................76

C. PROFESSOR RAUSSER'S METHODOLOGY YIELDS NONSENSICAL RESULTS ....................76

1. Professor Rausser's methodology implies that shippers who paid non-conspiratorial fuel surcharges were somehow harmed by the conspiracy ....77

2. Professor Rausser's methodology implies that, in a non-conspiratorial setting, UP would have been able to raise rates by only an unreasonably small amount in response to fuel price increases ....79

D. USING UP FUEL SURCHARGES THAT ARE KNOWN TO BE NON-CONSPIRATORIAL AS BENCHMARKS, PROFESSOR RAUSSER'S MODEL YIELDS NO UP OVERCHARGES ....81

**VI. CONCLUSIONS ....83**

# I. INTRODUCTION

## A. QUALIFICATIONS

1. My name is Dennis W. Carlton. I am the David McDaniel Keller Professor of Economics at the Booth School of Business of The University of Chicago. I received my A.B. in Applied Mathematics and Economics from Harvard University and my M.S. in Operations Research and Ph.D. in Economics from the Massachusetts Institute of Technology. I have served on the faculties of the Law School and the Department of Economics at The University of Chicago and the Department of Economics at the Massachusetts Institute of Technology.

2. I specialize in the economics of industrial organization. I am co-author of the book *Modern Industrial Organization*, a leading text in the field of industrial organization, and I also have published over 100 articles in academic journals and books. In addition, I serve as Co-Editor of the *Journal of Law and Economics*, a leading journal that publishes research applying economic analysis to industrial organization and legal matters; serve on the Editorial Board of *Competition Policy International*, a journal devoted to competition policy; and serve on the Advisory Board of the *Journal of Competition Law and Economics*. I have also served as an Associate Editor of the *International Journal of Industrial Organization* and *Regional Science and Urban Studies*, and on the Editorial Board of *Intellectual Property Fraud Reporter*.

3. In addition to my academic experience, I served as Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice from October 2006 through January 2008. I also served as a Commissioner of the Antitrust Modernization Commission, created by Congress to evaluate U.S. antitrust laws. I have served as a consultant to the Department of Justice and Federal Trade Commission on the Horizontal Merger Guidelines, as a general consultant to the Department of Justice and Federal Trade Commission on antitrust matters, and as an advisor to the Bureau of the Census on the collection and interpretation of economic data.

4. I also am a Senior Managing Director of Compass Lexecon, a consulting firm that specializes in the application of economics to legal and regulatory issues and for which I served as President (of Lexecon) for several years. I have provided expert testimony before various U.S., state and federal courts, the U.S. Congress, a variety of state and federal regulatory

agencies and foreign tribunals. My curriculum vitae, which includes a list of my testifying experience, is attached as Exhibit 1.

## B. SUMMARY OF LITIGATION

### 1. Plaintiffs' allegations

5. The Plaintiffs in this matter—a class of direct purchasers of rail freight transportation services—allege that the four Defendant railroads—BNSF Railway Company (BNSF), CSX Transportation (CSX), Norfolk Southern Railway Corporation (NS), and Union Pacific Railway Company (UP)—conspired, beginning in mid-2003, to fix the prices of rail freight transportation services via the use of fuel surcharges that were applied as a percentage of the base rate for those services.[1]

6. Among the key features of Plaintiffs' allegations are:

- Plaintiffs allege that, starting in July 2003, BNSF and UP "agreed to coordinate their fuel surcharges and base them on U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the 'HDF Index')."[2] At his most recent deposition, Plaintiffs' Expert Professor Gordon Rausser slightly modified this alleged timing, offering the opinion that beginning "in March of 2003, there was active communication with regard to establishing the understanding" among Defendants, and that the conspiratorial fuel surcharges had "actual anticompetitive consequences beginning in July 1st of 2003."[3] Plaintiffs do not specify when, if ever, the alleged conspiracy ended, but Professor Rausser concludes that the alleged elevation of prices continued at least through the end of the Class Period (December 31, 2008).[4]

---

1 Second Consolidated Amended Class Action Complaint, *In re Rail Freight Fuel Surcharge Antitrust Litigation*, December 31, 2009 (hereinafter, *Complaint)*, ¶¶ 2, 4, and 7.

2 *Complaint,* ¶ 7.

3 Deposition of Gordon Rausser, Ph.D., December 11, 2012 and December 18, 2012 (hereinafter, *Rausser Merits Deposition*) at 19-22 and 47.

4 Professor Rausser testified that he has no opinion on whether the elevation of prices continued after December 2008 because the discovery record and data available to him only go through December 2008. (*Rausser Merits Deposition* at 40.)

- Plaintiffs allege that, as of the start of the conspiracy, the "great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index (the 'AII') [and a related index based on AII called the Rail Cost Adjustment Factor (RCAF)] which was published by the railroad trade organization known as the Association of American Railroads (the 'AAR')."[5] Plaintiffs further allege that, in December 2003, in order to "apply the new, separate and artificially high Rail Fuel Surcharges broadly to their customers," BNSF, CSX, NS, and UP conspired to replace the RCAF and AII with a new rate escalation index, the All Inclusive Index Less Fuel (AIILF), calculated using the same methods as the AII except that fuel costs were excluded.[6]

- Plaintiffs allege that, prior to July 2003, BNSF and UP had different fuel surcharge rates, but that, due to the alleged conspiracy, "BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement."[7] This allegation relates only to the so-called "standard" or "public" surcharge for carload traffic.[8] Plaintiffs do not make any explicit allegations regarding changes by UP in its surcharges for intermodal traffic or coal traffic.

- Plaintiffs allege that a central feature of the conspiracy was that the Defendants agreed to apply the fuel surcharges "as a percentage multiplier of the *total* base rate for the rail freight transportation."[9] Plaintiffs further allege that "BNSF, UP, CSX, and NS maintained their conspiracy during the class period by uniformly

---

5 *Complaint,* ¶ 4.

6 *Complaint,* ¶ 9.

7 *Complaint,* ¶ 7.

8 I use "traffic" or "shipments" generally to refer to the provision of rail services. When measuring "traffic" or "shipments," I use one of three commonly used units of measurement: carloads, ton-miles, or revenue. I attach as Appendix B a description of the public fuel surcharges adopted by UP and BNSF for carload, coal, and intermodal traffic.

9 *Complaint,* ¶ 13 [Emphasis in original].

computing the surcharges as a percentage of the rail freight transport base rate…."[10]

- Plaintiffs allege that the ultimate effect of the conspiracy was to raise the total price paid by shippers.[11] Specifically, the *Complaint* alleges that "[p]laintiffs and the members of the Class have each paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein."[12]

- Plaintiffs do not allege an agreement with respect to the level of base rates on individual commodities but, inconsistent with the failure to allege such an agreement, Plaintiffs do allege that Defendants agreed not to discount base rates.[13] Professor Rausser's treatment of base rates is similarly inconsistent. He concludes that an agreement on base rates would be unmanageable,[14] yet he also finds that, "in furtherance of their agreement," the Defendants each had adopted a policy not to discount base rates.[15]

7. Many of the Plaintiffs' allegations are subject to empirical testing. One can ask, for example, whether fuel surcharge coverage and rates increased after July 2003 (relative to earlier trends); whether "the great majority of rail freight transportation agreements" before the Class Period actually relied on RCAF while the majority in the Class Period relied on AIILF; whether UP and BNSF really did charge "the exact same fuel surcharges" during the Class Period; and whether all Defendants actually relied on surcharges computed "as a percentage of the rail

---

10 *Complaint,* ¶ 14.

11 In this report, "base price" refers to the price net of discounts and excluding fuel surcharges; and "total price" refers to the sum of base price and fuel surcharges.

12 *Complaint,* ¶ 19.

13 According to Plaintiffs, "Defendants also agreed that none of the conspirators would be undercutting agreed pricing or 'stealing' market share by using their increasing revenues to subsidize discounting of underlying rates." (*Complaint*, ¶ 95.)

14 Professor Rausser opined that as an alternative to allegedly conspiring over fuel surcharges, "…the Defendants could have sought to achieve the same objective by fixing each individual price separately. That would have been extremely complex, very costly, and effectively unmanageable." (Expert Report of Gordon Rausser, Ph.D., *In re Rail Freight Fuel Surcharge Antitrust Litigation*, October 15, 2012 (hereafter, *Rausser Expert Report*), note 94.)

15 *Rausser Expert Report* at 7.

freight transport base rate" throughout the Class Period—and, if not, whether the use of non-rate-based fuel surcharges led to any change in the effect of the alleged conspiracy or to any reactions by alleged conspirators. And, of course, one can ask whether the net effect of the alleged conspiracy was that shippers paid more for shipping than they otherwise would have paid. I undertake such tests below.

2. **Court findings**

8. In June 2012, the Court certified a direct purchaser class consisting of:[16]

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").
>
> Excluded from this Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities, and (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.

9. Notably, the Court also held that "[b]ecause the alleged antitrust violation involves only a component of the total price, at trial plaintiffs will be required to prove in fact (1) that they paid a fuel surcharge because of the alleged conspiracy and (2) that, as a result they paid more for shipping than they otherwise would have paid."[17]

C. **ASSIGNMENT**

10. I have been asked by counsel for UP to analyze, from an economic perspective, the following matters, with particular focus on UP:

- whether the conspiracy UP is alleged to have joined, as described by Plaintiffs, is economically logical;

---

16 Opinion, *In re Rail Freight Fuel Surcharge Antitrust Litigation*, June 21, 2012 (hereinafter, *Class Cert Opinion*) at 6-7.

17 *Class Cert Opinion* at 78.

- whether, applying generally accepted economic theory, the facts regarding fuel surcharging and pricing in the railroad industry, particularly regarding UP, are consistent only with Professor Rausser's conclusions regarding the existence of a conspiracy;
- whether, applying generally accepted economic theory, the facts regarding fuel surcharging and pricing in the railroad industry, particularly regarding UP, are consistent with individually rational, profit maximizing, non-conspiratorial behavior by the Defendant railroads;
- whether the relevant empirical patterns in the data are consistent with the existence of a successful price-fixing conspiracy that generated a significant increase in total prices paid by shippers;
- whether the econometric overcharge model presented by Professor Rausser forms a reliable basis from which to conclude that the alleged conspiracy generated significant overcharges.

11. To carry out this assignment, I have relied on my experience as an economist who has spent more than 35 years studying the nature of competition, including the results of attempts by competitors to form cartels to restrict output and raise prices. The materials that I and my staff have relied on in the preparation of this report are listed in Exhibit 2. These materials include: the *Rausser Report* at the merits phase of this proceeding as well as Professor Rausser's two reports at the class certification phase of this proceeding; court filings made by the Plaintiffs and Defendants in this case; depositions taken in this matter; documentary evidence produced in this matter; other documents including academic literature, reports produced by third parties, and publically available information on the financial performance of UP and other Defendant railroads; and transaction data (including data on shipment-specific revenues, fuel surcharge revenues, and shipment characteristics) produced by UP and other Defendant railroads. With regard to the transaction data, I rely on the data processing performed by Joint Defendants' Expert, Professor Joseph Kalt and his Compass Lexecon support team. I use the dataset produced by Professor Kalt for my analyses of transaction data, unless otherwise noted. This dataset is described in Appendix A. Compass Lexecon bills for my time at my hourly rate, which is currently $1,350. My compensation does not depend on the outcome of this litigation.

### D. SUMMARY OF CONCLUSIONS

12. Based on the analysis presented in the remainder of this report, I reach the following main conclusion: *taken together, economic theory and evidence render Professor Rausser's opinion—that the Defendants implemented a successful conspiracy to raise total rail shipment prices by conspiring on rate-based fuel surcharges—unreliable.*

13. My main conclusion is supported by the following specific conclusions:

- *As a matter of economic theory, the conspiracy alleged by Plaintiffs is illogical. The failure to articulate a coherent theory for the conspiracy casts substantial doubt on Plaintiffs' claim that the alleged conspiracy existed.* A central feature of Plaintiffs' theory is that conspiring to fix fuel surcharges is an effective way to raise prices to shippers generally. However, a cartel based on fuel surcharges alone could not raise total price systematically. Rather, a mechanism to control base rates would be required to prevent the alleged conspirators from offsetting fuel surcharges by setting base rates below the level that would have been set in the absence of fuel surcharges. Neither Plaintiffs nor Professor Rausser has pointed to a plausible mechanism to control base rates. Indeed, the private nature of most railroad prices and the complexity of such pricing make the existence of such a mechanism unlikely and therefore make the existence of a successful cartel unlikely. (Section III)

- *The economic evidence provides no support for—and in many cases directly contradicts—Plaintiffs' alleged conspiracy.* Professor Rausser appears to claim that he can determine whether Defendants were conspiring by examining whether Defendants behaved in a similar manner to one another. I disagree. Firms behave similarly in many industries and such behavior does not imply that there must be a conspiracy. Professor Rausser also argues that the economic evidence supports his claim that there was a conspiracy that raised prices. Again, I disagree. Together with the lack of a coherent economic conspiracy theory, the lack of economic evidentiary support for the key allegations on which Professor Rausser relies leads to the conclusion that Defendants did not implement a successful

conspiracy to raise all-in prices by conspiring on rate-based fuel surcharges. (Section IV)

In particular:

- *The use of rate-based (as opposed to mileage-based) fuel surcharges does not imply the existence of a successful conspiracy*. To the contrary, UP (like firms in other industries) adopted rate-based fuel surcharges before the start of alleged conspiracy. (Section IV.A)

- *Trends in rate-based fuel surcharge coverage do not support Plaintiffs' allegation of a successful conspiracy*. Instead, contrary to Plaintiffs' allegations, rate-based fuel surcharge coverage growth began before the alleged conspiracy and did not increase at the start of the alleged conspiracy. (Section IV.B)

- *The alleged uniformity of fuel surcharge terms adopted by UP and other Defendants does not support Plaintiffs' allegations of a successful conspiracy*. First, any observed similarities in fuel surcharges cannot support an inference of conspiratorial behavior as opposed to parallel oligopolistic behavior. Second, contrary to Plaintiffs' allegations, the public fuel surcharges adopted by different Defendants were not, in fact, uniform. (Section IV.C)

- *The observed changes in the magnitudes of fuel surcharge terms do not support Plaintiffs' allegations of a successful conspiracy*. To the contrary, the fuel surcharge terms adopted after the start of the conspiracy were not systematically higher (and in many cases, were lower) than those adopted pre-conspiracy, which is not consistent with Plaintiffs' allegation that the Defendants increased a shipper's total price by increasing fuel surcharges. (Section IV.D)

- *The evidence that Professor Rausser presents to support his claim that Defendants adhered to an agreement not to discount base rates cannot support this claim.* For the same reasons that it would not be reasonable to

conclude that Defendants successfully conspired to fix base rates (a position Professor Rausser agrees with), it is not reasonable to conclude that they successfully conspired not to discount base rates. (Section IV.E)

  - *The decline in economic profits and price-cost margins after the start of the alleged conspiracy is inconsistent with Plaintiffs' allegations of a successful conspiracy.* Among the most basic predictions of economic theory regarding successful price-fixing conspiracies is that they increase economic profits and margins, all else constant. In this case, however, UP's margins and profits fell after the start of the alleged conspiracy, a pattern that would not be expected had the alleged conspiracy been successfully implemented. (Section IV.F)

- *Despite the inconsistency between the economic evidence and the existence of a successful conspiracy, Professor Rausser's econometric model produces large overcharges; the reason for these large overcharges is that there are fundamental flaws in Professor Rausser's methodology.* These flaws include his assumption that the same pricing model applies to all shipments by all Defendants throughout the time-period he studies and his use of unreliable benchmarks to determine prices but-for the alleged conspiracy. Correcting only the most basic errors in Professor Rausser's damage model produces no overcharges for UP. (Section V)

## II. BRIEF BACKGROUND ON THE RAILROAD INDUSTRY

14. In this section, I summarize briefly some key features of the railroad industry, describing how those features bear on my analysis of Plaintiffs' allegations and Professor Rausser's analysis.

### A. GEOGRAPHIC STRUCTURE OF RAILROAD COMPETITION

15. Plaintiffs allege that all four Defendant railroads—UP, BNSF, CSX, and NS—participated in a single conspiracy affecting a single market:[18]

> Defendants BNSF, UP, CSX and NS – which together control about 90% of rail freight traffic in the United States – conspired in 2003 to use an artificially high

[18] *Complaint*, ¶¶ 4 and 19.

> surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits….
>
> As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services….

Plaintiffs' Expert, Professor Rausser, claims that "there is much overlap of the Defendants' rail networks, which would ensure that, absent the conspiracy, railroad customers would benefit from competition between the railroads."[19]

16. Competition in the railroad industry, however, is more complex than the picture painted by Plaintiffs and Professor Rausser. These complexities are important for understanding whether some of the allegations in this case are economically sensible, and they allow me to test economic implications of various aspects of Plaintiffs' and Professor Rausser's theory of the conspiracy.

17. In particular, competition between the Defendant railroads is best described as occurring primarily between pairs of Defendants operating in geographically distinct areas. In particular, BNSF and UP operate primarily west of the Mississippi river (thus, I refer to them as the "Western railroads") and compete with one another on many western routes, while CSX and NS operate primarily east of the Mississippi river (the "Eastern railroads") and compete with one another on many eastern routes. There is limited direct competition between the Eastern and Western railroads. This route structure is illustrated in Figure 1, which also shows the non-Defendant Class I railroads and other railroads.[20, 21]

---

19 *Rausser Expert Report* at 15.

20 Van Alen Institute and Association of American Railroads, "U.S. Freight Rail Network," *available at* http://www.vanalen.org/lasr/theneedforspeed, *site visited* January 20, 2013.

21 Class I railroads are defined by the U.S. Surface Transportation Board (STB) as those with annual operating revenues of $250 million or more, measured in 1991 dollars. In 2011, Class I railroads were those with at least $398.7 in operating revenue, measured in current dollars. (Association of American Railroads, "Class I Railroad Statistics," May 10, 2012, *available at:* https://www.aar.org/StatisticsAndPublications/Documents/AAR-Stats-2012-05-10.pdf, *site visited* January 20, 2013.

**Figure 1: Primary Routes Operated by U.S. Class I Railroads**




18. Given this route structure, UP and BNSF are best characterized as primarily horizontal competitors, while UP has primarily a vertical relationship with CSX and NS. That is, the Eastern railroads provide an input into the Western railroads' services—transportation for that part of a shipment that a Western railroad cannot cover with its own network—and *vice versa*.[22]

19. Although this characterization of the Defendant railroads as horizontal competitors within distinct geographic regions is useful, it is also important to recognize that the route maps of the two Eastern railroads do not overlap completely; nor do the route maps of the two Western railroads overlap completely. Although Professor Rausser states that "the Defendants' network

22 As Professor Rausser notes, in some situations a Western railroad and an Eastern railroad could constrain one another's pricing on a route even where the railroads do not compete directly on that route. For example, there can be product competition in which a rail customer receiving a product from the West might switch to an alternative product that comes from the East. As another example, there can be geographic competition in which a rail customer has multiple facilities and shifts production among them. In both examples, a customer effectively shifts demand for rail services between a route served by an Eastern railroad and a route served by a Western railroad. However, Professor Rausser offers no empirical study of the extent of such product or geographic competition to show that it affects a sufficiently large portion of shipments so as to transform the Eastern and Western railroads into primarily horizontal competitors such that the level of competition between Eastern and Western railroads is of the same constraining character as the level of competition between UP and BNSF.

of railroads overlaps significantly,"[23] a close examination shows that the overlap of UP and BNSF is not as extensive as Professor Rausser seems to claim. I measure the extent to which a railroad provides service in a given geographic area using the percentage of total Defendant shipments, measured by revenue, originating in that area that is carried by that railroad.[24] Using the Economic Areas (BEAs) defined by the U.S. Department of Commerce,[25, 26] it is evident that the overlap of UP and BNSF is far from complete. For example, as illustrated in Table 1, in 2004, the first full year of the alleged conspiracy, UP originated the majority (65.6 percent) of its revenue in the 44 BEAs where its share exceeded 50 percent. Of those 44 BEAs, the BNSF share of total originating revenue was below 15 percent in 25—more than half—of them.[27, 28]

**Table 1: UP and BNSF Overlap in 2004, Economic Areas**

| Pct. of Origination Traffic | Economic Areas | Pct. of UP Revenues |
|---|---|---|
| UP > 50% | 44 | 65.6% |
| UP > 50% and BNSF > 15% | 19 | 50.5% |
| UP > 50% and BNSF < 15% | 25 | 15.1% |

Note: Includes all unregulated traffic except those customers identified as government or codefendant
Source: Transaction data processed by Compass Lexecon

20. Using an alternative, smaller geographic area—the SPLC—reveals the lack of complete overlap between UP and BNSF far more starkly.[29] For example, as shown in Table 2, there are 1,609 SPLCs where UP originated more than half of the revenue in 2004, accounting for about

---

23 *Rausser Expert Report* at 15.

24 I use only traffic of the four Defendants because that is the only data available to me.

25 The Department of Commerce's Bureau of Economic Analysis defines 179 different Economic Areas within the U.S. (*See*, U.S. Department of Commerce, Bureau of Economic Analysis, "BEA Economic Areas (EAs)," *available at* http://www.bea.gov/regional/docs/econlist.cfm, *site visited* January 20, 2013.)

26 Professor Rausser uses these BEAs in his analysis. (*Rausser Expert Report* at 15.)

27 Those 25 BEAs account for about 23 percent of UP revenue earned in the 44 BEAs (15.1/65.6).

28 Unless otherwise noted, *e.g.*, for calculations related to profits and hedging, I use only rate-unregulated traffic for all of my analyses of the transaction data.

29 Standard Point Location Codes (SPLCs) are widely used in the railroad industry to identify geographic locations. (*See*, National Motor Freight Traffic Association, Inc., "Standard Point Location Codes," *available at* http://www.nmfta.org/pages/splc.aspx, *site visited* January 20, 2013.)

80 percent of UP's total revenue. Of these 1,609 SPLCs, BNSF originated less than 15 percent of revenues in 1,531 SPLCs, (*i.e.*, in over 95 percent of them).[30]

**Table 2: UP and BNSF Overlap in 2004, SPLCs**

| Pct. of Origination Traffic | # of SPLCs | Pct. of UP Revenues |
|---|---|---|
| UP > 50% | 1,609 | 80.4% |
| UP > 50% and BNSF > 15% | 78 | 14.5% |
| UP > 50% and BNSF < 15% | 1,531 | 65.9% |

Note: Includes all unregulated traffic except those customers identified as government or codefendant
Source: Transaction data processed by Compass Lexecon

21. Several important implications, which help to guide analysis in the remainder of this report, arise from this geographic structure of railroad competition.

22. First, the variation across routes in the extent of competition among railroads has implications for the patterns of fuel surcharges that would be expected if Plaintiffs' alleged conspiracy actually had occurred. Whether defined using Economic Areas or SPLCs, there are routes on which UP faces direct competition from one or more other Defendants (generally BNSF) and other routes on which it does not face direct competition from other Defendants. As a matter of basic economics, because a price-fixing conspiracy serves to eliminate or weaken competition among market participants, such a conspiracy would have a greater effect (all else equal) on routes where a Defendant faced direct competition from one or more alleged co-conspirators than on routes where a Defendant did not face direct competition.

23. Second, the structure of competition casts doubt on Plaintiffs' claims about the motivation for the conspiracy. Standard economic theory explains that, all else equal, a firm that purchases inputs prefers *greater* competition between providers of those inputs because greater competition tends to reduce the price of the inputs. In this case, this means that CSX and NS, which can be thought of as purchasing inputs from both UP and BNSF, would prefer *greater* competition between UP and BNSF in order to lower the price of UP's and BNSF's transportation services. Likewise, UP and BNSF, which can be thought of as purchasing inputs from both CSX and NS, would prefer *greater* competition between CSX and NS in order to

30 These 1,531 SPLCs account for about 82 percent of the UP revenues from the 1,609 SPLCs (65.9/80.4).

lower the price of CSX's and NS's transportation services. Thus, Plaintiffs' claim that the Eastern railroads participated in a conspiracy to *reduce* competition between the Western railroads, and the Western railroads participated in a conspiracy to *reduce* competition between the Eastern railroads is inconsistent with these incentives.

24. Finally, the vertical structure of the industry provides a business rationale for some inter-railroad communications regarding pricing. Because no single railroad covers all routes, railroads must provide joint service, exchanging traffic with one other to reach unique endpoints. This process of jointly providing service by exchanging traffic is called "interlining," and is expressly authorized by Federal law.[31] A key implication of the need to exchange traffic is that, in some cases, railroads also need to exchange some pricing information—including information about fuel surcharges—for legitimate business reasons. In fact, for the class of interline shipments known as "joint-line shipments," railroads explicitly agree with each other on the rates and terms (including surcharges) that apply to the shipments.[32]

25. I summarize UP's interline traffic in Table 3. Between 2000-2008, nearly two-thirds (65.7 percent) of UP's ton-miles were carried as "local traffic," meaning the shipments were carried entirely on UP's rail network, with the other one-third (34.3 percent) carried as interline traffic, meaning the shipments were exchanged between UP and another railroad at some point between origin and destination. Roughly 21 percent of UP ton-miles (about 62 percent of all interline shipments) were carried as "Rule 11" shipments, for which UP and the other railroad set prices separately with the shipper receiving a separate bill from each railroad and roughly 13 percent of all UP ton-miles (just over 38 percent of all interline shipments) were carried as joint-line shipments, for which UP and the other railroad jointly priced the service with the shipper receiving a single bill.

---

31 I understand that this authorization is provided under 49 U.S.C. § 10706, and that railroads are required to provide "through routes ... with each other" and to "establish rates and classifications applicable to those routes." (49 U.S.C. § 10703.) UP has relationships with over 200 short-line railroads and Class I railroads that it can use to serve customers it cannot directly reach. (Union Pacific, "Where Can I Ship?," *available at* http://www.up.com/customers/prospective/where/index.shtml, *site visited* January 20, 2013.)

32 For a more detailed description of these inter-railroad communications, *see* Defendant Union Pacific Railroad Company's Objections And Supplemental Responses To Direct Purchaser Plaintiffs' Second Set Of Interrogatories, *In re Rail Freight Fuel Surcharge Antitrust Litigation*, February 8, 2010 at 9-12.

26. As seen in Table 3, 6.1 percent of UP's traffic—representing more than 46 percent of UP's joint-line traffic—was exchanged with a non-Defendant railroad. In contrast, just 2.4 percent of UP's total traffic was joint-line traffic with BNSF.

**Table 3: UP Traffic, by Movement Type, 2000-2008**

| Type of Traffic | Ton-Miles (Millions) | Pct.of Total Ton-Miles | Net Revenue (Millions) | Pct. of Total Net Revenue |
|---|---|---|---|---|
| Total UP Traffic | 3,704,263 | 100.0% | $82,258 | 100.0% |
| Local | 2,431,906 | 65.7% | $48,877 | 59.4% |
| Interline | 1,272,357 | 34.3% | $33,381 | 40.6% |
| Rule 11 | 787,320 | 21.3% | $18,594 | 22.6% |
| Joint Line | 485,038 | 13.1% | $14,787 | 18.0% |
| With BNSF[1] | 87,579 | 2.4% | $2,031 | 2.5% |
| With NS[2] | 67,790 | 1.8% | $2,261 | 2.7% |
| With CSX[2] | 64,382 | 1.7% | $1,946 | 2.4% |
| With Other Railroads[3] | 224,672 | 6.1% | $7,326 | 8.9% |
| With Multiple Railroads (excl. BNSF)[4] | 40,614 | 1.1% | $1,224 | 1.5% |

[1] Joint Line Traffic with BNSF comprises all traffic where BNSF was identified as the origin and/or destination railroad

[2] Joint Line Traffic with NS and CSX comprises all traffic where UP was one out of the origin or destination railroad and NS or CSX (respectively) was identified as the other railroad

[3] Joint Line Traffic with Other Railroads comprises all traffic where UP was one out of the origin or destination railroads and the other railroad was not BNSF, CSX or NS

[4] Joint Line Traffic with Multiple Railroads (excl. BNSF) comprises all traffic where neither UP nor BNSF were identified as the origin or destination railroads

Note: Includes all unregulated traffic except those customers identified as government or codefendant

Source: Transaction data processed by Compass Lexecon

27. Professor Rausser has identified certain inter-railroad communications and concluded that the communications "facilitated and furthered any agreement among the Defendants with respect to the collusive design and implementation of rate-based Fuel Surcharges uniformly employed during the Class Period."[33] As a matter of economic theory, Professor Rausser is wrong for three reasons. First, as explained more fully below, Professor Rausser has not put forward a coherent economic theory of conspiracy (or "agreement"). Second, as I have just explained, certain communications regarding interline shipments serve legitimate business purposes and so cannot be characterized as anticompetitive without further analysis, including empirical analysis of the ultimate impact on prices. Third, as I explain more fully below,

[33] *Rausser Expert Report* at 61.

interpreting a particular communication—that can have a legitimate business justification—in order to determine whether the communication facilitates an anticompetitive "agreement" is not something that economists are trained to do.[34] Instead, any such determination requires an empirical analysis.

### B. RELEVANT CATEGORIZATIONS OF RAILROAD SHIPMENTS

28. In addition to distinctions regarding whether a route has multiple Defendant railroad competitors or not and between interline/Rule 11 and local traffic, railroad shipments can be distinguished by several other characteristics. These distinctions are relevant because they can influence the relationship between rail prices and other variables such as fuel costs. For example, if a shipper can choose between rail and truck, and fuel prices rise, then even if the railroads want to use fuel surcharges to raise rail prices by more than the increase in the price of fuel, competition from truck can prevent them from doing so. Moreover, even in the absence of any alleged conspiracy, fuel prices may affect rail costs differently than truck costs, and so the ability of railroads to pass along fuel prices may be affected by the presence of truck competition. This means that the relationship between the rail prices and fuel price may be different for shipments where truck competition is effective and those where it is not. In his econometric model, however, Professor Rausser assumes that the relationship between price and other variables (including, for example, fuel costs) does not change based on these types of distinctions. Below, I test this assumption and show that it is false; in this section, I simply describe a few such distinctions and indicate how they are relevant to the analysis in the remainder of the report.

29. First, traffic can be split into coal traffic, general carload traffic (which excludes coal traffic), and intermodal traffic. The distinction between carload, coal, and intermodal traffic is particularly relevant to this case because surcharge formulas for carload, coal, and intermodal shipments were implemented—and the formulas changed—at different points in time. The June/July 2003 UP and BNSF surcharges that Plaintiffs point to in claiming that UP and BNSF "agreed to implement the same fuel surcharge program" applied only to non-intermodal

---

34 Dennis W. Carlton, Robert H. Gertner, and Andrew M. Rosenfield (1997), "Communication Among Competitors, Game Theory and Antitrust," *George Mason Law Review* 5(3): 423-440.

shipments.[35] As described in more detail below, for UP in particular, the public intermodal fuel surcharge using an HDF-based formula was adopted well before the start of the alleged conspiracy (in November 2000) and was changed on at least two occasions in ways that were favorable to shippers. (See Section IV.B.1.) In addition, UP had no separate coal fuel surcharge until November 2004, several months after BNSF adopted its separate (and different) coal fuel surcharge, although some coal shipments were subject to the public carload fuel surcharge before that. Table 4 shows the percentage of UP shipments accounted for by carload, coal, and intermodal by year from 2000-2008.

**Table 4: UP Shipments, by Shipment Type and Year**

| | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | *Total* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ton-Miles (Millions) | Carload | 40.9% | 38.4% | 39.9% | 40.3% | 40.7% | 40.9% | 40.4% | 38.9% | 34.4% | ***39.5%*** |
| | Coal | 42.5% | 46.0% | 44.8% | 44.8% | 43.9% | 42.7% | 41.3% | 40.7% | 45.8% | ***43.6%*** |
| | Intermodal | 16.6% | 15.6% | 15.3% | 14.9% | 15.4% | 16.5% | 18.3% | 20.4% | 19.7% | ***16.9%*** |
| | ***Total*** | ***385,057*** | ***399,615*** | ***423,719*** | ***429,946*** | ***441,788*** | ***439,805*** | ***417,973*** | ***391,328*** | ***375,031*** | ***3,704,263*** |
| Net Rev. (Millions) | Carload | 55.8% | 54.5% | 56.0% | 56.2% | 56.6% | 57.1% | 57.6% | 56.7% | 53.2% | ***56.0%*** |
| | Coal | 21.8% | 23.8% | 22.4% | 22.1% | 21.0% | 19.9% | 18.2% | 17.9% | 21.8% | ***20.8%*** |
| | Intermodal | 22.3% | 21.7% | 21.7% | 21.7% | 22.3% | 23.0% | 24.2% | 25.5% | 25.0% | ***23.2%*** |
| | ***Total*** | ***$7,699*** | ***$7,811*** | ***$8,156*** | ***$8,372*** | ***$8,918*** | ***$9,571*** | ***$10,280*** | ***$10,438*** | ***$11,014*** | ***$82,258*** |

Note: Includes all unregulated traffic except those customers identified as government or codefendant
Source: Transaction data processed by Compass Lexecon

30. Second, different commodities have different competitive shipping alternatives and thus, as a matter of economics, are likely to have prices that are described by different economic relationships (with or without the alleged conspiracy). As Professor Rausser explains:[36]

> The academic literature is unequivocal that the form of transport services purchased by shippers depends on the particular commodity being shipped. This leads to railroads pricing differently across commodities, charging higher prices to shippers with less viable transport alternatives…goods that are light weight and typically delivered in small quantities, such as farm produce, can be shipped by truck. By contrast, goods that are heavy and tend to be delivered in large quantities, such as coal deliveries to power plants, can only economically be delivered by rail. Furthermore, some goods can be delivered by water barge…

It is inconsistent with this statement for Professor Rausser to rely on a single econometric overcharge model that assumes, without testing, that the effect of variables such as mileage, state-level GDP, fuel prices, and other costs on total price is the same across different

35 *Complaint*, ¶ 7.

36 *Rausser Expert Report* at 21- 22.

commodities.[37] I test this assumption and show that it is false, thus invalidating Professor Rausser's econometric methodology for computing overcharges.

31. Table 5 below provides a breakdown of annual revenue for UP's top ten commodities carried over the 2000-2008 period. For this analysis, I use the Standard Transportation Commodity Codes (STCCs) at the two-digit level.[38] In this classification scheme, a single STCC comprises the coal category, and a single STCC comprises the intermodal category; the coal and intermodal STCCs account for the largest shares of UP revenue. The other STCCs listed (and smaller commodities not shown in the table) comprise the carload category.

**Table 5: UP Revenue by STCC and Year**

| STCC | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | *Total* |
|---|---|---|---|---|---|---|---|---|---|---|
| 00 - Intermodal | 22.3% | 21.7% | 21.7% | 21.7% | 22.3% | 23.0% | 24.2% | 25.5% | 25.0% | ***23.2%*** |
| 11 - Coal | 21.8% | 23.8% | 22.4% | 22.1% | 21.0% | 19.9% | 18.2% | 17.9% | 21.8% | ***20.8%*** |
| 28 - Chemicals or allied products | 14.3% | 13.6% | 13.2% | 13.4% | 13.6% | 13.5% | 13.0% | 14.5% | 14.9% | ***13.8%*** |
| 37 - Transportation equipment | 12.1% | 11.8% | 12.7% | 12.3% | 11.7% | 10.9% | 11.6% | 11.7% | 9.9% | ***11.6%*** |
| 20 - Food and kindred products | 5.4% | 5.7% | 6.0% | 6.1% | 6.0% | 6.8% | 6.8% | 5.6% | 5.3% | ***6.0%*** |
| 24 - Lumber or wood products, excluding furniture | 4.7% | 4.7% | 4.8% | 5.2% | 5.4% | 6.0% | 5.6% | 4.7% | 3.9% | ***5.0%*** |
| 01 - Farm products | 4.2% | 4.0% | 4.9% | 4.8% | 5.2% | 5.2% | 5.5% | 4.6% | 2.7% | ***4.5%*** |
| 14 - Nonmetallic ores, minerals, excluding fuels | 3.2% | 3.3% | 3.2% | 3.2% | 3.1% | 3.3% | 3.4% | 3.4% | 3.7% | ***3.3%*** |
| 32 - Clay, concrete, glass, or stone products | 2.3% | 2.4% | 2.3% | 2.4% | 2.4% | 2.3% | 2.5% | 2.4% | 2.2% | ***2.4%*** |
| 33 - Primary metal products | 2.3% | 2.0% | 2.0% | 2.0% | 2.2% | 2.1% | 2.4% | 2.7% | 2.9% | ***2.3%*** |

Note: Includes all unregulated traffic except those customers identified as government or codefendant
Source: Transaction data processed by Compass Lexecon

32. Finally, shipments can be distinguished by the characteristics of the shipper. A total of 10,377 different shippers appear in the UP transaction data between 2000 and 2008. As shown in Table 6, UP's shippers vary markedly in their volume of commerce with UP, with the median shipper having $29,103 in total revenue with UP during the period 2000-2008, while ten percent

37 To be precise, the continuous variables in Professor Rausser's model are measured in natural logarithms, and Professor Rausser assumes that the effect of a one unit change in the natural logarithm of each continuous variable in his model (*e.g.*, mileage, fuel prices, net weight, and state-level GDP) on the natural logarithm of total price is the same for all commodities (as well as all buyers, all Defendants, and all routes) in each week. Although Professor Rausser indicates that he can use his model to compute overcharges separately for each transaction (*Rausser Expert Report* at 171), the basis for Professor Rausser's class-wide damages calculations is the same underlying regression model (with the same coefficients) applied to each observation.

38 The Association of American Railroads publishes Standard Transportation Commodity Codes (STCCs), which classify materials transported by rail and motor carriers into 39 broad groupings of commodities (*e.g.*, "11-Coal," "28-Chemicals or Allied Products") and more than 400 individual commodities (*e.g.*, "11111-Raw Anthracite," "11211-Raw Bituminous Coal," "28132-Acetylene," "28133-Carbon Dioxide").

of shippers had at least $3,222,600 in revenue between 2000-2008, and ten percent of shippers had less than $2,359 in revenue with UP between 2000-2008.[39] Despite these enormous differences, Professor Rausser's econometric overcharge model assumes—with no justification—that the same pricing relationships apply to each of these shippers. As with his assumption of a common model across commodities, I show below that Professor Rausser's assumption of a common model across shippers is demonstrably false, thus invalidating Professor Rausser's econometric methodology for estimating damages.

**Table 6: Size Distribution of UP Shippers, 2000-2008**

[redacted]

Note: Includes all unregulated traffic except those customers identified as government or codefendant
Source: Transaction data processed by Compass Lexecon

## III. AS A MATTER OF BASIC ECONOMIC THEORY, THE CONSPIRACY ALLEGED BY PLAINTIFFS IS ILLOGICAL, RENDERING PROFESSOR RAUSSER'S CONCLUSION AS TO THE EXISTENCE OF THE CONSPIRACY INHERENTLY UNRELIABLE

33. In this section, I explain why a conspiracy to raise total prices (base rates plus fuel surcharges) for rail shipments by manipulating only fuel surcharges is economically illogical.

- I explain why, as a matter of fundamental economic theory, *fixing fuel surcharge terms alone cannot raise prices systematically*. Rather, a mechanism to control the level of base rates would also be required. Plaintiffs have provided no plausible mechanism for control of base rates. Indeed, the complexity in base rates makes it highly unlikely that Defendants could have successfully controlled base rates, particularly using the

39 Data in the table are based on net revenue, inclusive of any FSC revenue and cover the full period of the data, 2000-2008. Government and co-Defendant (shipper) transactions are excluded, but all other transactions are included.

mechanisms alleged to have been used as part of the conspiracy, including an alleged agreement not to "discount" base rates.

- I then explain that using the expectations as of the time the conspiracy was allegedly discussed and launched, the fuel surcharge formulas adopted would not have generated significant revenue, further demonstrating why such fuel surcharges are an unlikely vehicle for a price-fixing conspiracy.

34. A simple takeaway from this section is that, as a matter of economic theory, the imposition of a fuel surcharge—even a rate-based fuel surcharge that is similar across Defendants—is not, on its own, the effective way to raise prices that Professor Rausser claims it is. To the contrary, conspiratorial imposition of a fuel surcharge will not by itself successfully raise total rail shipment prices. Furthermore, for much of the conspiracy period, when fuel costs were well above the "trigger price" in the fuel surcharge formula (described more fully below), making total prices more sensitive to fuel costs via a fuel surcharge would have the effect of causing total prices to *fall* if fuel prices were to fall.

### A. AN EFFECTIVE CONSPIRACY WOULD REQUIRE A MECHANISM TO CONTROL BASE RATES IN ADDITION TO FUEL SURCHARGES

35. Professor Rausser opines that use of a fuel surcharge to increase prices above base rates is "an ideal mechanism for achieving an across-the-board price increase" because "adding a percentage Fuel Surcharge on top of line-haul rates or base rates is by its very nature a general price increase."[40] The implication is that the Defendants could simply agree to raise total prices by applying a fuel surcharge and thus implement a conspiratorial price increase with no need to agree on the literally thousands of different base rates charged by different Defendants to different buyers to move different commodities on different routes.

36. The idea that firms may agree to fix fuel surcharges *in order to avoid the need to fix base rates* is incorrect as a matter of basic economics. There is no way to increase the total price that a buyer pays without somehow conspiratorially manipulating base rates as well.

37. A simple example illustrates the point. Suppose you have been trying to sell a bicycle to someone for $500, and that the buyer explains that he will pay $400 but no more. You might

---

40 *Rausser Expert Report* at 49.

attempt to "repackage" that price as a "base rate" of $400, plus a $100 "handling surcharge," thus meeting the buyer's desire for a $400 "price" and your goal to make $500 on the transaction. However, such an attempt would fail, as the buyer would recognize that the total price of the bicycle is $500, no matter how the individual components of price are specified. Confronted with your repackaged offer, the buyer would simply restate his insistence on a $400 price by insisting on a base rate of $300 plus the $100 handling fee. In the language of economics, one cannot change the "equilibrium price (P)" of a negotiation over P by redefining P as A + B and increasing B; A will simply adjust to achieve the equilibrium price.

38. The fact that the fuel surcharges at issue in this case were set in a multiplicative fashion (P = A*B with B as the fuel surcharge) does not change this logic. In this multiplicative example, you could ask the buyer for $400 plus a 25 percent handling surcharge, meaning $400 * 1.25 = $500. Once again, this cannot alter the equilibrium price. The buyer could simply restate his demand as a base price of $320, thus achieving the total price of $400 ($320*1.25). In the language of economics, one cannot change the equilibrium of a negotiation over P by redefining P as A*B and increasing B; A will simply adjust to achieve the equilibrium price.

39. Nothing about this logic changes if there are multiple potential sellers of bicycles, with the potential buyer using competition to enforce his demand for a price of $400 (which implies that another seller must be willing to sell him the bicycle for $400). Suppose that you and the other bicycle sellers met and agreed that none of you would sell a bicycle without imposing a 25 percent handling charge. The problem is that, even if you are certain that the other sellers will impose the handling charge, this does not give you the ability to insist on the price of $500. If another seller had been willing to sell the bicycle for $400, he can now do so by sticking to the agreed 25 percent handling fee, but setting a base rate of $320. In the language of economics, firms cannot change the equilibrium price (whether it be in a market with perfect competition or oligopolistic competition) by redefining P as A*B and reaching an agreement on B because A can—and as a matter of economic theory, absent some means of preventing A from changing, will—adjust to achieve the equilibrium price.

40. Returning to the specifics of the current case, Professor Rausser argues that fuel surcharges are "an efficient tool for increasing freight rates across shippers without having to renegotiate individual contracts," which seems to suggest that the presence of long-term

contracts changes the logic developed thus far in this section. It does not. To add a fuel surcharge to a contract during its term or upon renewal requires agreement to new contractual terms, which must also include an (explicit or implicit) agreement on a new base rate. Even if the contract specifies that the fuel surcharge is to be determined and paid later, the base price negotiated for that contract can still adjust to offset any effect of the fuel surcharge. As a matter of economics, the only way a fuel surcharge could change the total price arising from a negotiation would be if it were somehow tacked on at the end, as a surprise, after the Defendant railroad and the shipper had already fixed a base price. Indeed, Plaintiffs' theory of the case appears to be that the fuel surcharge was simply tacked on as an extra surprise on a pre-set base price, a notion that may sound simple but that is nonsensical when one considers the actual process of negotiation between buyers and sellers of rail services.

41. If the amount of the fuel surcharge is uncertain as of the time the contract is signed—to be determined later according to prevailing fuel prices—this simply means that the base price will adjust to offset the *expected* surcharge as of the time of the transaction.[41] In this case, the point is that firms cannot change the *expected value* of the price they will receive by manipulating a fuel surcharge absent some way conspiratorially to manipulate the base rate.

42. Finally, the fact that the fuel prices that actually come to pass may be higher or lower than those that were expected at the time of the transaction does nothing to change the logic developed thus far. The logic advanced by Professor Rausser is that the Defendants engaged in a price-fixing conspiracy in early 2003, because they believed "the benefits outweighed the costs…even given the risk of antitrust liability" and that these benefits derived from "achieving an across-the-board price increase."[42, 43] Hence, under Plaintiffs' theory, Defendants must have expected to achieve an across-the-board increase in total price, but this could not occur if base rates adjusted to offset any expected increase in fuel surcharges due to higher fuel prices.

---

41 For simplicity, I ignore time discounting and risk aversion. Their introduction does not alter the fundamental point that base rates adjust to the imposition of a fuel surcharge.

42 *Rausser Expert Report* at 49.

43 Moreover, as explained below (Section III.C), Professor Rausser finds that the communications allegedly forming the basis of the agreement occurred at a time when fuel prices were not expected to rise substantially, if at all. (*Rausser Expert Report*, n. 137).

43. To be clear, the economic incoherence of the alleged conspiracy does not prove that it did not occur. But, as an economist, I proceed from the standard assumption that firms are unlikely to pursue conspiracies that have little chance of accomplishing the conspiratorial objective. Here, for the alleged conspiracy to make economic sense, it could not have manipulated only fuel surcharges but would have also required some mechanism (in economics, a method of coordinating economic activity) to control base rates. In the remainder of this section, I examine the conspiratorial mechanisms alleged by the Plaintiffs.

### B. PROFESSOR RAUSSER'S OPINION PROVIDES NO ECONOMICALLY PLAUSIBLE MECHANISM FOR THE CONTROL OF BASE RATES

44. Professor Rausser appears to recognize, at least sometimes, that a successful conspiracy would have required some mechanism to control base rates and that such a mechanism would be challenging to implement.[44] In particular, he makes several internally contradictory claims.

- First, he notes that "a cartel creates an incentive for each participant to cheat by cutting prices to increase its market share," and that, to succeed, conspiring firms must "coordinate and monitor the pricing of other conspirators to ensure that they are not deviating from the price-fixing agreement."[45] I agree that a successful cartel must limit the amount of deviation from the cartel price.

- Second, he acknowledges that a conspiracy to control base rates directly would be "unmanageable." In particular, in the *Rausser Expert Report*, he states that "[a]lternatively, the Defendants could have sought to achieve the same objective by fixing each price separately. That would have been extremely complex, very costly, and effectively unmanageable."[46] In his deposition, he explained that this

---

44 Although the discussion in this section focuses on base rates, there are other opportunities for Defendants to compete with one another that would need to be controlled in a successful conspiracy. For example, a Defendant could also improve service guarantees and performance, provide rebates, or take other steps that would advantage the shipper without reducing the base rate.

45 *Rausser Expert Report* at 45.

46 *Rausser Expert Report*, n. 94.

is because "…the cost of observing the base rates and how they change is much more opaque."[47] Again, I agree.

- Third, given the need to ensure that alleged cartel members "are not deviating from the price-fixing agreement" (including deviating by offering base rates that are lower than they would be in the absence of the alleged conspiracy) and the fact that direct manipulation of base rates is "effectively unmanageable," Professor Rausser appears to fall back on a claim that Defendants agreed not to discount base rates.[48] In particular, his claim seems to be that Defendants could somehow get around the issues that would render an agreement on base rates unmanageable simply by agreeing not to discount those base rates, whatever they may happen to be. I disagree.

In the remainder of this section, I explain why an agreement not to discount rates directly contradicts Professor Rausser's claim that a conspiracy on base rates is not feasible.

#### 1. Professor Rausser's opinion that there was an agreement not to discount base rates is not reliable, and it contradicts his opinion that a conspiracy on base rates is unmanageable

45. Professor Rausser and I agree that a conspiracy to set base rates would be unmanageable in light of the complexity of conspiring to fix thousands of rates that are heterogeneous and vary over time.[49] One firm could not know the myriad of base rates that its rival is charging. But Professor Rausser claims that, despite this difficulty, the conspiracy worked by simply adding the fuel surcharge to the base rates *that would otherwise have been in effect absent a fuel surcharge.* But it makes no economic sense to assume that one firm knows whether its rival is discounting its base rate if the firm does not know the rival's base rate, let alone the base rate that would otherwise have prevailed in the absence of the fuel surcharge.[50]

---

47 *Rausser Merits Deposition* at 129:20-22.

48 *See, Rausser Expert Report* at 72; *Rausser Merits Deposition* at 128:16-129:13.

49 Of course, although I focus here on base rates, other contract terms also may be both unknowable and a means to unravel the impact of a conspiratorial increase in fuel surcharges.

50 Moreover, even if UP adopted and was able to enforce such a policy internally, there is nothing about a company policy not to discount prices that, on its own, allows one to infer conspiracy.

46. Returning to the analogy of selling a bicycle helps to illustrate the point. Suppose bicycle sellers wish to conspire to increase the prices at which they can sell bicycles. They determine, however, that it is too difficult to conspire on the "base rate" of the bicycles directly. Rather, they impose a rule that no one may offer a discount off the base rate. Absent an enforceable agreement about the level of base rates, an agreement not to discount base rates is plainly meaningless. A seller willing to sell a bicycle to a given buyer for $360 can accomplish this either via a base rate of $400 and a ten percent discount or via a base rate (set in the contract for that particular buyer) of $360. Such distinctions in the names assigned to the components of price are economically irrelevant.

47. Professor Rausser's theory—that a surcharge coupled with an agreement not to discount base rates can effectively raise total price—might make more sense in an industry with base rates that are simple, stable, and generally known to all firms, where the only way to deviate from the base rate is via a "discount" off the standard base rate (as opposed to a lower base rate). However, Professor Rausser acknowledges that these conditions do not describe the railroad industry, where changes in base rates are "opaque," something I illustrate in more detail below. Even more fundamentally, if these conditions did hold, then a direct agreement on base rates is likely to be feasible in the first place. If these conditions do not hold, then not only is an agreement on base rates not plausible, as Professor Rausser states, but an agreement not to discount provides no way around this difficulty, as firms can simply adjust the opaque base rates without the need for discounting. If rivals cannot raise total price through a conspiracy on base rates, as Professor Rausser claims, then it makes no sense to assume that they can raise the total price by conspiring not to discount the base rates that rivals cannot monitor.

48. In the language of economics, in order to know whether a Defendant is offering a discount off of the base rate that would have held but-for the alleged conspiracy, one needs to know the but-for base rates. And Professor Rausser provides no basis whatsoever to conclude that Defendants knew those but-for rates, particularly given the variability of railroad pricing across transactions and over time. Indeed, the extensive use of private contracts implies that, in many cases, other Defendants are unlikely to know *either* the actual *or* the but-for price.

49. As one illustration of the difficulty in determining whether discounts were applied, consider a shipper that entered a four-year contract, with no fuel surcharge, in late 2001. When

that contract came up for renegotiation in 2005, the marketplace had changed. Suppose that the 2005 contract contained a rate-based fuel surcharge and raised the base rate by five percent. Professor Rausser's analysis assumes that:

- Other Defendants could somehow determine this new base rate, despite the fact that contracts are confidential; and
- Other Defendants could determine what the alleged fuel surcharge would have been but-for the alleged conspiracy *and* what the associated base rate would have been given this non-conspiratorial version of the fuel surcharge, so that they could determine whether the actual base rate matches the but-for base rate and thus whether any discount was applied.

50. The problems with Professor Rausser's assumptions are readily apparent. Even if other Defendants could guess the new base rate—a proposition that is itself implausible given the private nature of most contracts—how would another Defendant know whether, absent the fuel surcharge, the base rate would have increased substantially more than five percent? Professor Rausser does not explain how another Defendant railroad could have sufficient insight into such a negotiation process to isolate the actual new base rate and confirm that it is the same as the base rate that would have been applied absent that fuel surcharge. Even the participants in such a negotiation might not be able to define precisely how a negotiation would have ended had there been no surcharge (or a different surcharge) on the table.

#### 2. The complexity of railroad pricing further undermines Professor Rausser's opinion that there was an agreement not to discount base rates

51. Professor Rausser himself acknowledges that base rates are "opaque," and he provides no indication how Defendants could have determined what the but-for price would have been or whether a discount from that but-for price was offered on a given transaction. In the remainder of this section, I provide some additional evidence confirming the private nature and complexity of UP's pricing.

(a) During the Class Period, the majority of UP's base rates were set via private negotiations

52. During the Class Period, the vast majority of UP's prices were set via private negotiation, and Professor Rausser cannot explain how, given such private negotiations, Defendants could determine even the actual price charged by its rival, let alone the but-for price reflecting the presence or absence of a discount.[51] In particular, UP offers unregulated rail service primarily under three different pricing practices—publically posted pricing circulars, private price quotes that generally apply only for a relatively short time period, and confidential contracts that can have very long durations. Professor Rausser admits that the latter (*i.e.*, confidential contracts) are "privately negotiated agreements between the carrier and the shipper" that are "typically kept confidential."[52] As shown in Table 7, 67.8 percent of UP's unregulated ton-miles (53.2 percent of revenue) during the Class Period were covered by confidential contracts, and 24.4 percent of ton-miles (36.2 percent of revenues) were subject to private price quotes. Hence, about 90 percent of UP's unregulated ton-miles were priced according to private price negotiations, with only roughly eight percent of UP's unregulated ton-miles (eleven percent of revenues) priced based on public circular pricing.

---

[51] Indeed, I understand that 49 USC § 11904 actually makes it unlawful for a railroad to disclose "information about the contents of a contract authorized under section 10709 of this title"—meaning a private contract.

[52] *Rausser Expert Report* at 45.

**Table 7: Annual Unregulated Shipments by Pricing Document Type**

| | Shipment Type | Document Type | 2003H2 | 2004 | 2005 | 2006 | 2007 | 2008 | *Total* |
|---|---|---|---|---|---|---|---|---|---|
| Ton-Miles | Coal | Circular | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | ***0.0%*** |
| | Coal | Contract | 99.2% | 99.2% | 99.2% | 96.5% | 95.7% | 95.8% | ***97.6%*** |
| | Coal | Private | 0.8% | 0.8% | 0.8% | 3.5% | 4.3% | 4.2% | ***2.4%*** |
| | Carload | Circular | 11.2% | 13.1% | 20.5% | 25.8% | 27.1% | 26.3% | ***21.2%*** |
| | Carload | Contract | 37.8% | 36.9% | 35.4% | 35.8% | 34.2% | 33.1% | ***35.4%*** |
| | Carload | Private | 51.1% | 50.0% | 44.1% | 38.4% | 38.7% | 40.6% | ***43.4%*** |
| | Intermodal | Circular | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.0% | ***0.1%*** |
| | Intermodal | Contract | 55.7% | 56.0% | 58.0% | 60.4% | 63.4% | 64.7% | ***60.2%*** |
| | Intermodal | Private | 44.3% | 43.9% | 41.9% | 39.5% | 36.5% | 35.3% | ***39.7%*** |
| | ***Total*** | ***Circular*** | ***4.1%*** | ***4.9%*** | ***7.8%*** | ***9.7%*** | ***9.9%*** | ***8.8%*** | ***7.8%*** |
| | ***Total*** | ***Contract*** | ***69.9%*** | ***68.6%*** | ***67.8%*** | ***66.7%*** | ***66.3%*** | ***68.4%*** | ***67.8%*** |
| | ***Total*** | ***Private*** | ***26.0%*** | ***26.5%*** | ***24.4%*** | ***23.6%*** | ***23.8%*** | ***22.8%*** | ***24.4%*** |
| Net Revenue | Coal | Circular | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | ***0.0%*** |
| | Coal | Contract | 98.8% | 98.7% | 98.0% | 91.4% | 90.0% | 90.9% | ***94.2%*** |
| | Coal | Private | 1.2% | 1.3% | 2.0% | 8.6% | 10.0% | 9.1% | ***5.8%*** |
| | Carload | Circular | 10.3% | 12.2% | 19.0% | 23.7% | 23.8% | 23.7% | ***19.7%*** |
| | Carload | Contract | 42.0% | 40.4% | 37.8% | 37.1% | 35.1% | 32.7% | ***37.0%*** |
| | Carload | Private | 47.7% | 47.4% | 43.3% | 39.2% | 41.2% | 43.6% | ***43.3%*** |
| | Intermodal | Circular | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | ***0.1%*** |
| | Intermodal | Contract | 47.1% | 48.5% | 50.6% | 53.3% | 55.7% | 58.5% | ***53.0%*** |
| | Intermodal | Private | 52.8% | 51.5% | 49.3% | 46.5% | 44.2% | 41.4% | ***46.9%*** |
| | ***Total*** | ***Circular*** | ***5.5%*** | ***6.6%*** | ***10.3%*** | ***12.9%*** | ***12.8%*** | ***12.2%*** | ***10.6%*** |
| | ***Total*** | ***Contract*** | ***56.2%*** | ***55.1%*** | ***53.8%*** | ***52.0%*** | ***51.2%*** | ***52.8%*** | ***53.2%*** |
| | ***Total*** | ***Private*** | ***38.3%*** | ***38.2%*** | ***35.9%*** | ***35.1%*** | ***36.1%*** | ***35.0%*** | ***36.2%*** |

Note: Includes unregulated traffic except those customers identified as government or codefendant; excludes PAs not present in UP price authority data
Source: Transaction data processed by Compass Lexecon; UP price authority data

(b) UP's base rates are highly variable across transactions and over time

53. Professor Rausser argues that, despite the predominance of confidential pricing, the Defendants could effectively control discounts off of base rates due to an "environment in which rail freight pricing is well defined and well understood."[53] I have already explained the logical inconsistency of his claim that a conspiracy on base rates is not possible but that a conspiracy not to discount off of but for base rates occurred. Here, I use the UP data to show that the *actual* pricing "environment" was characterized by extensive variability in prices set by shipper, commodity, route, and time. Professor Rausser provides no indication how Defendants in this environment could have determined but for rates and whether discounts off of those rates occurred.

[53] *Rausser Expert Report* at 45.

54. One illustration of the complexity of UP's pricing comes by observing how many different pricing documents are required to capture UP's prices. In particular, UP's prices are set via documents called "price authorities," which are simply documents that specify pricing terms for a given transaction or set of transactions. UP shipments in the Class Period alone were covered by more than 28,000 distinct price authorities. Even if one restricts attention to price authorities covering the most revenue, it takes more than 1,800 price authorities to cover 95 percent of UP's revenue.[54]

55. The base rates specified by these price authorities are highly variable. As a simple illustration of this, Table 8 presents the statistical distribution of base rates per ton-mile across all transactions in the UP data. From the first percentile (near the bottom of the pricing distribution) to the 99th (near the top of the pricing distribution), base rates vary by a factor of roughly 15, from less than one cent per ton-mile to more than nine cents. Even between the 1st and 50th percentile (median), base rates vary by a factor of nearly three, while between the 75th and 99th percentile, base rates vary by a factor of nearly 3.5.[55]

**Table 8: Base Rate per Ton-Mile, Unregulated Transactions, 2000-2008**

| [redacted] | Gross Rate per Ton-Mile |
|---|---|
| [redacted] | |

Note: Includes all unregulated traffic except those customers iden ified as government or codefendan percentiles weighted b ton mil gross rate per ton-mile excludes FSC revenue
Source: Transaction data processed by Compass Lexecon

56. In his analysis of whether there was "widespread discounting of base rates," Professor Rausser relies on average base rates by commodity, perhaps suggesting that he believes that the

54 Of the price authorities that account for 95 percent of UP's revenues, 77 percent are labeled in the data as "private" or "contract."

55 Although the table shows only carload shipments in the bottom half, and coal shipments are present only in the top half, that is a product of the specific percentiles displayed. In fact, all of coal, carload, and intermodal are represented both in the bottom half and the top half of the distribution.

prices within a given commodity are relatively homogenous.[56] They are not. To demonstrate the heterogeneity even within commodity, I compare the base rate per ton mile for every transaction in the UP data to the median base rate per ton mile (between 2000-2008) for the relevant commodity (defined by four digit STCC code).[57] Figure 2 plots the percentage of ton-miles in various categories, based on how far the price for the corresponding transaction[58] is from the median price for the commodity: within 5 percent of the median, 5-15 percent away from the median (meaning 5-15 percent above the median or 5-15 percent below the median), 15-25 percent away from the median, or more than 25 percent away from the median. As seen in the figure, even within detailed commodity types, there is substantial variation in base rates, as roughly 40 percent of ton-miles have base rates that differ from the median for the commodity by more than 25 percent, and nearly 60 percent have base rates that differ from the median by more than 15 percent.

56 *See Rausser Expert Report*, Figures 39, 41-43.

57 Note that Professor Rausser's Figures 39 and 41-43 use three-digit STCC code. I use even more disaggregated codes and still show substantial variation for each commodity.

58 A transaction here is a customer-route-week combination for a given commodity.

**Figure 2: Distribution of Base Rate Relative to Commodity Median, 2000-2008**




Source: Transaction data processed by Compass Lexecon

57. Similar variation is seen on other relevant dimensions. For example, as seen in Figure 3, comparing prices paid by transaction to the median for a given UP customer shows substantial variation. In this case, nearly 30 percent of ton-miles have base rates that are more than 25 percent away from the median for the customer, with more than 40 percent being more than 15 percent away from the median. I also note that to offer a shipper base rates attractive enough to offset any alleged fuel surcharge conspiracy, a Defendant railroad would need to change only some of the base rates charged to the shipper, increasing the difficulty associated with monitoring the pricing behavior of any given Defendant selling to any given buyer.

**Figure 3: Distribution of Base Rate Relative to Customer Median, 2000-2008**




Source: Transaction data processed by Compass Lexecon

58. Even focusing on specific route/commodity/shipper combinations, there remains significant variation in UP's base rates over time. For example, consider Figure 4, which plots the monthly average base rate per 100 ton-miles for the top 25 carload and intermodal route/commodity/shipper combinations.[59] If Professor Rausser were correct that base rates were stable, the colored lines would be close to flat. Instead, as seen in the figure, base rates vary significantly over time—with observed fluctuations often greater than the 10-15 percent base rate reduction that would fully offset Professor Rausser's average overcharge percentage—and in quite different ways for different route/commodity/shipper combinations. Professor Rausser has not established how Defendants could have ensured that these fluctuations did not represent discounts to offset conspiratorial fuel surcharges or, more generally, how Defendants could have

[59] The graph contains the top 25 route/commodity/shipper combinations among carload and intermodal shipments; with the caveat that no more than five commodity/route combinations are included for a single shipper.

implemented a meaningful rule not to discount base rates against a backdrop of such volatile base rates.

**Figure 4: Monthly Average Base Rate (Price per 100 Ton-Miles), Top Carload and Intermodal Route/Commodity/Shippers**




Source: Transaction data processed by Compass Lexecon

59. Professor Rausser also refers to "a history of regulation and published price tariffs [sometimes referred to as "circulars"] in the rail freight industry [which] created an environment in which rail freight pricing is well defined and well understood and price monitoring is relatively easy."[60] But he provides no indication of how knowledge of regulated or public prices allows inferences about actual prices, but-for prices, discounts for privately negotiated, unregulated prices, or any other aspect of privately-negotiated agreements.[61]

60 *Rausser Expert Report* at 45.

61 None of this is to say that a pricing conspiracy could never work in a setting where complex prices are set by private contract. For example, the vitamins cartels had elaborate monitoring mechanisms, unlike those that Professor Rausser has claimed, that allowed them to raise price.

### C. USING THE FUEL PRICE EXPECTATIONS AS OF THE START OF THE ALLEGED CONSPIRACY, THE CHALLENGED SURCHARGES WOULD NOT HAVE GENERATED ANY SIGNIFICANT OR SUSTAINED PRICE INCREASES

60. As noted above, Plaintiffs allege that the Defendants relied on conspiratorial fuel surcharge terms (with no change in but-for base rates) to raise total prices for rail shipments. To evaluate further whether the alleged conspiracy makes economic sense as an explanation for observed behavior, I consider whether, at the time that the alleged conspiracy started, the alleged conspiratorial arrangement would even have been deemed likely to generate significant fuel surcharge revenue, assuming that the fuel price expectations at the initiation of the conspiracy had materialized.[62]

61. As shown below, at the start of the alleged conspiracy, fuel prices were actually expected to fall; hence, if fuel prices had followed their expected path, the challenged fuel surcharge terms would have generated little or no revenue.[63] This means that the alleged conspiracy makes little economic sense, as it implies that, if expectations at the initiation of the alleged conspiracy materialized, the Defendants would have subjected themselves to the risk of civil and criminal antitrust penalties only to select fuel surcharge terms that would generate little revenue.

62. To identify the expectations of fuel prices, I rely on data from the well-established futures market in oil prices (based, for example, on the price of West Texas Intermediate crude oil (WTI)), in which people can make investments based on the expected price of oil on specific future dates. By using the futures contract prices for specific future "expiration dates," one can trace out the market's expectation as to future oil prices. For example, as of December 31, 2002, one can observe the price of the WTI futures contract for contracts expiring on December 31, 2003; December 31, 2004; and so on, with each of those prices revealing market participants' current expectation of oil prices as of the specific future date.

63. In Table 9, I show the future oil price expectations as of December 2002, March 2003, (when Plaintiffs allege Defendants began communicating), and July 2003 (when the conspiracy allegedly was first implemented). I then map these expectations for WTI prices into expectations

---

(Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th ed., Boston: Pearson/Addison-Wesley, at 142-43.)

62 *Complaint*, ¶ 14.

63 Professor Rausser reaches a similar conclusion. (*Rausser Expert Report*, n. 137.)

for the Highway Diesel Fuel Index (HDF) used in UP's public carload surcharge, based on a simple regression analysis linking the two price series.[64] The implied expectations for HDF are also shown in Table 9.

64. As a final step, I convert the expected HDF values into surcharge percentages, based on UP's public carload surcharge formula. As can be seen in Table 9, with the exception of expectations as of March or June 2003 for the remainder of 2003—where a small positive surcharge would result had expectations materialized as predicted—the path of expected HDF prices would have led to *no surcharges based on the carload surcharge formula adopted by UP*.

**Table 9: WTI and HDF Price Expectations and Implied UP Carload FSC**

| | Expectations as of December 31, 2002 | | | Expectations as of March 31, 2003 | | | Expectations as of June 30, 2003 | | |
|---|---|---|---|---|---|---|---|---|---|
| | WTI Price Expectations Seen in Futures Contracts | HDF Expectations Implied by WTI Futures Prices | UP Expected Carload Percentage Surcharge | WTI Price Expectations Seen in Futures Contracts | HDF Expectations Implied by WTI Futures Prices | UP Expected Carload Percentage Surcharge | WTI Price Expectations Seen in Futures Contracts | HDF Expectations Implied by WTI Futures Prices | UP Expected Carload Percentage Surcharge |
| 2003 | $24.650 | $1.334 | 0.00% | $26.380 | $1.389 | 1.50% | $28.410 | $1.454 | 2.50% |
| 2004 | $23.050 | $1.283 | 0.00% | $24.230 | $1.321 | 0.00% | $25.040 | $1.347 | 0.00% |
| 2005 | $22.870 | $1.277 | 0.00% | $23.930 | $1.311 | 0.00% | $24.240 | $1.321 | 0.00% |
| 2006 | $22.720 | $1.273 | 0.00% | $23.950 | $1.312 | 0.00% | $24.110 | $1.317 | 0.00% |
| 2007 | $22.600 | $1.269 | 0.00% | $23.970 | $1.312 | 0.00% | $24.050 | $1.315 | 0.00% |
| 2008 | $22.570 | $1.268 | 0.00% | $23.990 | $1.313 | 0.00% | $24.010 | $1.314 | 0.00% |

Note: Futures prices are for the December WTI contract as of the valuation date
Source: Bloomberg L.P., Energy Information Administration

65. Note also that, as of December 31, 2002, March 31, 2003, or June 30, 2003, the HDF level expected to hold for most of the Class Period was between $1.27 and $1.35. At such expected HDF levels, the difference between UP's $1.35 trigger price and BNSF's $1.25 trigger price is a competitively relevant distinction.

## IV. ECONOMIC EVIDENCE PROVIDES NO SUPPORT FOR PLAINTIFFS' ALLEGED CONSPIRACY

66. In this section, I move on from the discussion of the theoretical flaws in Plaintiffs' alleged conspiracy—which themselves render Professor Rausser's opinions about the alleged conspiracy unreliable—to a review of the economic evidence on whether the alleged conspiracy was, in fact, successfully implemented. I consider evidence on:

64 In particular, I ran a regression of HDF on WTI (for the 1994-2008 time period), yielding an $R^2$ of 0.98 and an equation of: HDF = .549 +.0318*WTI. Details are available in my backup materials.

- Use of rate-based vs. mileage-based surcharges before and during the alleged conspiracy (Section IV.A);
- Trends in the level of rate-based fuel surcharge coverage that UP was able to achieve before and during the alleged conspiracy (Section IV.B);
- The uniformity and magnitude of surcharge terms before and during the alleged conspiracy (Section IV.C and IV.D);
- Whether there existed discounting of base prices in a way that could offset any increase in fuel surcharges (Section IV.E);
- Defendants' economic profits and price-cost margins before and during the alleged conspiracy (Section IV.F).

In each case, I explain (i) why the evidence relied on by Plaintiffs and Professor Rausser would not support the inferences they draw from it even if the evidence were correct, and (ii) why the evidence they rely on is, in fact, incorrect.

67. Before turning to a detailed review of the economic evidence, it is important to be clear about the limitation on the inferences one can draw from economic evidence, particularly with regard to the existence of a price-fixing conspiracy. The economic literature makes clear that interdependent behavior of firms in an oligopoly can lead to parallel behavior, including parallel pricing behavior, even in the absence of a conspiracy. Such parallel behavior therefore cannot be used to infer the existence of a price-fixing conspiracy because the behavior is also consistent with non-conspiratorial explanations. Professor Rausser applies no reliable economic analysis that allows him to distinguish the behavior he cites as evidence of anticompetitive conspiracy from evidence of non-conspiratorial oligopoly behavior.

68. Similarly, trying to characterize a particular information exchange as facilitating an anticompetitive "agreement," as Professor Rausser appears to do, is not something that economists are trained to do, because "[t]here is, in general, no *economic* theory of the meaning of 'agreement'…."[65, 66] Instead, when considering practices that are ambiguous as to their effect,

[65] Dennis W. Carlton, Robert H. Gertner, and Andrew M. Rosenfield (1997), "Communication Among Competitors, Game Theory and Antitrust," *George Mason Law Review* 5(3): 423-440 at 424-425.

economists should rely on empirical evidence on the actual effects of the alleged agreement on marketplace outcomes, including prices and profit-margins, in order to determine whether the practices harmed competition. As I show in the remainder of this section, the empirical evidence on fuel surcharge coverage, fuel surcharge levels, total prices, profits, and price-cost margins *do not* support Plaintiffs' allegations of a successful price-fixing conspiracy.

## A. THE USE OF RATE-BASED (AS OPPOSED TO MILEAGE-BASED) FUEL SURCHARGES DOES NOT SUPPORT PLAINTIFFS' ALLEGATION OF A SUCCESSFUL CONSPIRACY

### 1. Rate-based surcharges are common—including in the railroad industry prior to the alleged conspiracy—for individually rational reasons

69. Professor Rausser claims that the use of rate-based fuel surcharges and BNSF's alleged delay in broadly adopting mileage-based fuel surcharges relative to when it first considered them, support an inference of conspiracy.[67] Professor Rausser agreed in his deposition that mileage-based fuel surcharges are not alleged by Plaintiffs to be part of any conspiracy.[68] Presumably, then, if Defendants had instituted mileage-based surcharges from the outset, Plaintiffs would not have brought this lawsuit. However, the facts of rate-based and mileage-based fuel surcharges undercut an attempt to infer anticompetitive conspiracy from Defendants' adoption of one particular form of fuel surcharges.

70. First, the use of simple, rate-based fuel surcharges is consistent with previous practice in the railroad industry. Rate-based fuel surcharges were used in the past and I understand that government regulators have not previously objected to their use. In its 2007 decision regarding the use of rate-based fuel surcharges for regulated traffic, the Surface Transportation Board took

---

66 As George Stigler said, "A reasonable man, and often even an economist, would say that the documents seem to present a conclusive proof of collusive behavior. The economist, however, would have no professional basis for reaching such a conclusion: he has no special skill in reading documents and relating them to actual behavior. In particular his skill in document interpretation is on average inferior to that of a lawyer." (George J. Stigler (1983), "What Does an Economist Know?" *Journal of Legal Education* 33(): 311-313 at 311.)

67 *Rausser Expert Report* at 108.

68 *Rausser Merits Deposition* at 174:1-4.

note of "the long history of rate-based fuel surcharges in the rail industry," also stating that in the 1970s, "the ICC specifically declined to require carriers to tie their fuel surcharges to mileage."[69]

71. Second, simple pricing systems (such as rate-based fuel surcharges that mark up the total bill by a percentage amount) are often used by firms in many industries, even when those pricing systems do not recover from each individual customer the costs exactly incurred in providing service to that customer. For example, the price of sending a first-class letter in the U.S. mail is the same whether the recipient is across town or across the country; many local mass transit systems charge a flat rate to passengers whether the purchased trip is three blocks or three miles; and shipping companies such as UPS and Federal Express have adopted fuel surcharges from time to time that are implemented as a percentage of the base price of shipping.[70, 71]

72. Although simple pricing systems such as rate-based surcharges may not retrieve actual costs from each individual customer, they have the virtue of being simple to implement and understand. In addition, even several years after the beginning of the alleged conspiracy, UP did not believe that its own or its customers' billing systems could accommodate a mileage-based fuel surcharge.[72] In the face of these facts, it is not possible to infer a conspiracy from the adoption of a particular form of fuel surcharge (rate-based rather than mileage-based).

---

69 Surface Transportation Board, *Rail Fuel Surcharges*, STB Ex Parte No. 661, January 26, 2007 at 10.

70 *See*, United Parcel Service, "Fuel Surcharge," *available at* http://www.ups.com/bridge/fuelsurcharge.html, *site visited* January 20, 2013; Federal Express, "Fuel Surcharges," *available at* http://www.fedex.com/us/services/fuelsurcharge.html#historical, *site visited* January 20, 2013.

71 Rate-based fuel surcharges have been used in the trucking industry. (*See*, Perry A. Trunick, "Costs Driving Trucking," *Logistics Today*, April 2008, pp. 18-20.)

72 Union Pacific, "Fuel Surcharge Analysis," September 1, 2005, UPFSC0000640. ("Customer systems do not currently support the existing process well let alone a mileage based system."); A UP customer survey in 2006 showed that nearly 40 percent of UP's responding customers said that they could not process mileage-based surcharges at that time. ("Comments of Union Pacific Railroad Company, Before the Surface Transportation Board, STC Ex Parte No. 661, October 2, 2006, UPFSC0000343-282 at UPFSC0000359.)

#### 2. UP's 2007 adoption and widespread use of a mileage-based surcharge is not consistent with an alleged conspiracy based on rate-based surcharges

73. Not only were rate-based fuel surcharges common in the railroad industry *prior* to the start of the alleged conspiracy, they were not uniformly applied by Defendant railroads *during* the alleged conspiracy, with many Defendants shifting to mileage-based surcharges for at least some of their business during the Class Period. For example, in March 2007, UP announced that it would shift to a mileage-based surcharge for non-intermodal traffic beginning in late April, 2007. Because the majority of UP's traffic is non-intermodal (*see*, Table 4), this had the potential to affect significant amounts of UP's traffic. Indeed, as seen in Figure 6 (*see*, Section IV.B.4, below), UP's use of rate-based surcharges declined substantially after April 2007.

74. UP's application of mileage-based fuel surcharges and decline in the use of rate-based fuel surcharges is directly contrary to the alleged conspiratorial agreement, which Plaintiffs claim was meant to maximize the use of rate-based surcharges.[73] Nevertheless, neither Plaintiffs nor Professor Rausser concludes that the conspiracy ended at this point. Nor do they attempt to reconcile this action by UP with the alleged terms of the conspiracy: In particular, if the alleged conspiracy existed and was ongoing past this point, one would expect some effect from UP's adoption of a surcharge program that clearly violated the terms of the agreement as alleged by Plaintiffs. Professor Rausser cites no examples of a decline in prices or other Defendants reacting to UP's action through punishments, despite the fact that a shift to mileage-based fuel surcharges is contrary to a core element of the conspiratorial agreement alleged by Plaintiffs.[74]

### B. TRENDS IN RATE-BASED FUEL SURCHARGE COVERAGE DO NOT SUPPORT PLAINTIFFS' ALLEGATION OF A SUCCESSFUL CONSPIRACY

75. As economic evidence that supports their inference of a successful conspiracy, Plaintiffs and Professor Rausser point not only to the use of rate-based surcharges, but also to the

---

[73] When switching to mileage-based fuel surcharges, UP and BNSF chose different triggers: UP adopted an HDF trigger of $2.30 when it began switching to mileage-based in April 2007, and BNSF used the same trigger as for its rate-base fuel surcharge, HDF at $1.25, when it began switching to mileage-based in January 2006. (Union Pacific Customer News, "Union Pacific Mileage Based Fuel Surcharge Program Effective 4/16/2007," March 21 2007, UPFSC0000571-570 at UPFSC0000570; Union Pacific email re: BNSF Mileage Based Fuel Surcharge, August 18, 2005, UPFSC0001558-570.)

[74] *Complaint*, ¶ 13.

expansion in the percentage of shipments and contracts covered by rate-based surcharges. In this section, I explain that this inference is not valid for several reasons. First, rate-based fuel surcharge coverage was growing prior to the start of the alleged conspiracy so there is no need to rely on conspiracy to explain its growth. Second, growth in fuel surcharge coverage is explained by increasing volatility of fuel prices with no need to turn to conspiratorial explanations. Third, contrary to Plaintiffs' allegations, the use of RCAF in contracts did not hinder fuel surcharge adoption at UP to any significant degree. Fourth, contrary to Plaintiffs' allegations, there was no increase in the growth of fuel surcharge coverage at the start of the alleged conspiracy. Finally, contrary to an implication of Plaintiffs' theory, there was no increase in the growth of fuel surcharge coverage on competitive routes in particular.

#### 1. UP adopted rate-based fuel surcharges well before the start of the alleged conspiracy

76. Plaintiffs allege that the railroads began conspiring over rate-based carload fuel surcharges in 2003 and that, by July 2003, the prices shippers were paying had increased as a result of the alleged conspiracy. UP, however, had a history of rate-based fuel surcharges that began long before the alleged conspiracy.

- UP adopted a public rate-based fuel surcharge for intermodal shipments in September 2000,[75] nearly three years before Plaintiffs and Professor Rausser claim that the alleged conspiracy had any impact, and internal UP documents indicate that UP had used rate-based fuel surcharges in pricing documents going back a decade earlier.[76] The initial public intermodal surcharge adopted in September 2000 was set at one percent or four percent of base rates, depending on whether the shipper had been assessed a base rate increase (related to fuel costs) earlier in 2000.[77] Very shortly thereafter, UP announced an intermodal fuel surcharge that was based on the HDF fuel price index and that

[75] Union Pacific, Intermodal Group Bulletin No. 2000-093, September 13, 2000, UPFSC0000506-507.

[76] Union Pacific email re: West Texas Intermediate Crude Oil Surcharge, December 4, 2000, UPFSC0057756. In addition, Union Pacific's Chief Executive testified that fuel surcharges were relatively common for intermodal traffic even prior to 2002 because fuel surcharges are "pretty common in the trucking sector" and intermodal is a "truck competitive business" (*Young Deposition* at 145 and 157.)

[77] Union Pacific, Intermodal Group Bulletin No. 2000-093, September 13, 2000, UPFSC0000506-507.

therefore would increase or decrease as fuel prices rose and fell.[78] Internal UP documents indicate that this formulaic approach was chosen in order to "stay competitive" with BNSF.[79]

- On October 31, 2002, UP announced a public, rate-based carload fuel surcharge program, which became effective on December 1, 2002.[80] Professor Rausser acknowledges that this public carload surcharge was "apparently designed and implemented …without agreement or coordination."[81]

### 2. Economic theory explains the growth in fuel surcharges as an individually rational response to the increased volatility of fuel prices

77. The adoption of fuel surcharges in the early 2000s is not surprising and certainly cannot support an inference of conspiratorial behavior. Instead, the use of fuel surcharges is a rational economic response to increased volatility of fuel prices.

78. The HDF fuel price index shows that retail fuel costs were more volatile leading up to the beginning of and during the alleged conspiracy than in prior years. A common measure of volatility is the coefficient of variation, which is the ratio of the standard deviation of a variable to its mean. Figure 5 shows this measure of volatility for the HDF price index over time.[82] Compared to the 1990s, volatility increased in the early 2000s (leading up to the alleged conspiracy) and remained high during the alleged conspiracy. HDF volatility measured over the time period March 1994-December 1998 was 7.1 percent; from January 1999 – June 2003 volatility rose to 13.2 percent; and during the Class Period, July 2003 – December 2008, volatility increased sharply to 31.0 percent. From an economic perspective, in the face of volatility, it makes sense for UP's price to the customer to vary with the costs that the customer imposes on UP. Testimony from a UP executive indicates that UP was concerned about the

---

78 Union Pacific, Intermodal Group Bulletin No. 2000-112, November 8, 2000, UPFSC0347641.

79 Union Pacific email re: Intermodal Fuel Surcharge, November 13, 2000, UPFSC0052815-817 at UPFSC0052815.

80 Union Pacific email re: Fuel Surcharge Announcement-Final Press Release/Web Site, October 31, 2002, UPFSC0000541-543.

81 *Rausser Expert Report* at 55.

82 In Figure 5, I calculate volatility at each date as the coefficient of variation over the 52 weeks prior to that date.

impact of fuel price volatility on earnings, and that fuel surcharges were used to mitigate the impact of unexpected fuel price fluctuations by shifting the risk of fuel price fluctuations to customers.[83]

**Figure 5: 52-Week Volatility, HDF Index Retail Prices, Mar. 13, 1995 - Dec. 31, 2008**




79. Professor Rausser argues that the Defendants used hedging strategies to mitigate fuel price risk and that the use of surcharges when railroads have hedged against the risk of fuel price increases demonstrates that "the Defendants ignored their unilateral self-interest, which is further evidence that a collusive agreement was in place."[84] This conclusion is inconsistent with basic economic theory. A firm's price is determined, in part, by the firm's marginal economic costs. Hedging against fuel cost increases by, for example, purchasing futures contracts to buy a fixed amount of fuel at a set price does not change a railroad's marginal cost of fuel because the use of

83 *Young Deposition* at 69-70.

84 *Rausser Expert Report* at 106.

financial transactions to reduce risk does not change the market price of fuel that the railroad actually buys.[85] Because hedging does not change the marginal cost of fuel to UP, it would not be expected to eliminate UP's individual economic incentives to have the price to the customer vary with the true economic cost of the fuel. Thus, the fact that UP was hedging part of its fuel costs (and the amount hedged is admittedly quite low in any event, 13 percent in 2003, according to Professor Rausser and less in later years),[86] does not indicate that UP's use of fuel surcharges was against its individual interests. No inference of a conspiratorial agreement can be made from these facts because the simultaneous use of both a hedging strategy and fuel surcharges is consistent with the economic theory of pricing in a non-conspiratorial market. Indeed, in the admittedly non-conspiratorial period, UP simultaneously used hedging and fuel surcharges.[87]

### 3. Contrary to Plaintiffs' allegations, RCAF was not widely used by UP prior to the beginning of the alleged conspiracy, and therefore, contrary to Professor Rausser's opinion, RCAF could not have hindered the broad adoption of fuel surcharge by UP

80. Although Defendants certainly adopted rate-based fuel surcharges prior to the start of the alleged conspiracy, Plaintiffs claim that the broad use of RCAF to escalate prices in long-term contracts was an impediment that prevented the railroads from adopting other, higher fuel surcharges.[88] As summarized by the Court:[89]

---

85 In referring to futures contracts to buy fuel, I am not suggesting that UP actually obtained fuel this way.

86 *Rausser Expert Report* at 106. UP's hedging activity declined over time and UP did not enter into any fuel hedges after fiscal year 2004. UP's fuel hedging activity declined from approximately thirteen percent of its fuel consumption in 2003 to approximately nine percent of its fuel consumption in 2004 (Union Pacific Corp. 12/31/2004 Form 10-K, at 19) and had no fuel hedging activity from 2005 to 2008 (Union Pacific Corp. 12/31/2006 Form 10-K, at 35; Union Pacific Corp. 12/31/2007 Form 10-K, at 39; no mention of fuel hedges in Union Pacific Corp. 12/31/2008 Form 10-K.) UP had two fuel basis swaps for the period August 2006 through July 2008. These swaps increased UP's fuel expense for 2007 by $1 million and reduced fuel expense for 2006 by $3 million. (*See*, Union Pacific Corp. 12/31/2007 Form 10-K, at 39.)

87 UP used fuel surcharges in 2002 and hedged approximately 42% of its fuel consumption for that year. (*See*, Union Pacific Corp. 12/31/2003 Form 10-K, at 26.)

88 Indeed, Plaintiffs allege that "the great majority of rail freight transportation agreements" used RCAF (based on AII) to adjust rail prices. *Complaint*, ¶ 4.

89 *Class Cert Opinion* at 10, citing *Plaintiffs' Memorandum in Support of Motion for Class Certification*, March 18, 2010, at 11.

> According to plaintiffs, wide use of the RCAF impeded broad application of fuel surcharges because defendants "recognized that imposing a stand-alone fuel surcharge where fuel price increases were already covered by the RCAF would be perceived by shippers as double dipping."

Plaintiffs further allege that Defendants conspired to create the AIILF index, which was adopted by the Association of American Railroads in December 2003,[90] as a means to "permit separate 'fuel surcharges' to be widely applied."[91] Professor Rausser also concludes (based on a review of documentary and deposition evidence) that RCAF was an "important obstacle" to the application of fuel surcharges and that "freight rates in rail contracts *typically* had automatic escalators that increased the rate as rail costs increased, including the All-Inclusive Index ("AII") and the related Rail Cost Adjustment Factor ("RCAF")."[92] [Emphasis added.]

81. If Plaintiffs' allegations were accurate, I would expect to see that RCAF covered a significant portion of UP's traffic prior to the beginning of the alleged conspiracy, and during the Class Period, UP would make widespread use of AIILF combined with a rate-based fuel surcharge. UP's use of RCAF and AIILF, however, does not display these patterns. In stark contrast to Plaintiffs' allegations, UP's use of RCAF in the pre-Class Period was not widespread, and its use of AIILF in the Class Period also was not widespread.

82. Table 10 below shows the percentage of UP's ton-miles and net revenue shipped under price authorities that contained an RCAF or AIILF cost escalation clause, beginning in mid-2003.[93] A UP internal document shows that about 15 percent of both gross and net revenues that did not have a fuel surcharge (in the period from September 2002 through August 2003) were shipped under terms that contained RCAF provisions.[94] After the beginning of the alleged conspiracy, the data show that the use of RCAF did decline (*see*, Table 10); but the key point for Plaintiffs' and Professor Rausser's claim is that RCAF did not apply broadly to UP shipments.

---

90 *Complaint*, ¶ 66.

91 *Complaint*, ¶ 56; see also, *Rausser Expert Report* at 61-62.

92 *Rausser Expert Report* at 95 [Emphasis added].

93 This table includes shipments whether or not they are covered by a price authority with a fuel surcharge. In an analysis of pricing documents with a fuel surcharge, UP has shown that very few price authorities incorporated RCAF or AIILF. (*See*, Declaration of Charles M. Adams, June 18, 2010, esp. Exhibit 4.)

94 UPFSC 0276428-9 and UPFSC 0276430.

Professor Rausser's claim that RCAF was an "important obstacle" to the adoption of fuel surcharges because it was "typically" in railroad contracts is directly contrary to the evidence shown in the UP data.

83. Table 10 also shows that use of the AIILF was never widespread among UP shippers after the beginning of the alleged conspiracy. Even five years after its adoption by AAR, only 7.7 percent of UP's net revenues were earned under price authorities with an AIILF adjustment clause. AIILF never rose above three percent of revenues until 2007, when UP was already switching to mileage-based fuel surcharges that Plaintiffs have not alleged to be conspiratorial.

**Table 10: UP Shipments with RCAF or AIILF Adjustment Terms**

| | Shipment Type | Adjustment | 2003H2 | 2004 | 2005 | 2006 | 2007 | 2008 | *Total* |
|---|---|---|---|---|---|---|---|---|---|
| Ton-Miles | Coal | Neither | 71.2% | 80.3% | 86.7% | 91.5% | 86.9% | 86.5% | ***84.7%*** |
| | Coal | AIILF | 0.0% | 0.0% | 0.6% | 1.6% | 3.5% | 8.2% | ***2.4%*** |
| | Coal | RCAF | 28.8% | 19.7% | 12.7% | 6.9% | 9.6% | 5.2% | ***12.9%*** |
| | Carload | Neither | 89.7% | 88.9% | 90.0% | 88.9% | 83.9% | 82.1% | ***87.3%*** |
| | Carload | AIILF | 0.0% | 0.1% | 2.0% | 3.5% | 8.5% | 11.7% | ***4.3%*** |
| | Carload | RCAF | 10.3% | 11.0% | 8.1% | 7.6% | 7.6% | 6.3% | ***8.4%*** |
| | Intermodal | Neither | 92.2% | 90.0% | 90.0% | 89.3% | 92.7% | 99.9% | ***92.4%*** |
| | Intermodal | AIILF | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | ***0.0%*** |
| | Intermodal | RCAF | 7.8% | 10.0% | 10.0% | 10.6% | 7.2% | 0.1% | ***7.6%*** |
| | ***Total*** | ***Neither*** | ***81.3%*** | ***85.1%*** | ***88.5%*** | ***90.1%*** | ***87.1%*** | ***87.8%*** | ***87.1%*** |
| | ***Total*** | ***AIILF*** | ***0.0%*** | ***0.0%*** | ***1.0%*** | ***2.0%*** | ***4.6%*** | ***7.7%*** | ***2.7%*** |
| | ***Total*** | ***RCAF*** | ***18.7%*** | ***14.8%*** | ***10.5%*** | ***7.9%*** | ***8.3%*** | ***4.5%*** | ***10.2%*** |
| Net Revenue | Coal | Neither | 68.2% | 77.2% | 82.4% | 88.4% | 84.2% | 82.7% | ***81.6%*** |
| | Coal | AIILF | 0.0% | 0.0% | 1.4% | 3.2% | 5.6% | 11.7% | ***4.2%*** |
| | Coal | RCAF | 31.8% | 22.8% | 16.2% | 8.4% | 10.2% | 5.6% | ***14.2%*** |
| | Carload | Neither | 91.8% | 90.5% | 91.1% | 90.4% | 83.8% | 85.3% | ***88.5%*** |
| | Carload | AIILF | 0.0% | 0.1% | 1.6% | 3.1% | 10.0% | 9.6% | ***4.5%*** |
| | Carload | RCAF | 8.2% | 9.5% | 7.3% | 6.5% | 6.2% | 5.1% | ***7.0%*** |
| | Intermodal | Neither | 93.7% | 92.1% | 91.9% | 91.3% | 94.3% | 99.9% | ***94.0%*** |
| | Intermodal | AIILF | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | ***0.0%*** |
| | Intermodal | RCAF | 6.3% | 7.9% | 8.1% | 8.7% | 5.6% | 0.0% | ***6.0%*** |
| | ***Total*** | ***Neither*** | ***86.8%*** | ***87.9%*** | ***89.5%*** | ***90.2%*** | ***86.7%*** | ***88.3%*** | ***88.4%*** |
| | ***Total*** | ***AIILF*** | ***0.0%*** | ***0.0%*** | ***1.2%*** | ***2.3%*** | ***6.4%*** | ***7.7%*** | ***3.3%*** |
| | ***Total*** | ***RCAF*** | ***13.2%*** | ***12.0%*** | ***9.4%*** | ***7.5%*** | ***6.8%*** | ***4.0%*** | ***8.3%*** |

Note: Includes unregulated traffic except those customers identified as government or codefendant; excludes PAs not present in UP price authority data
Source: Transaction data processed by Compass Lexecon; UP price authority data

84. Thus, UP's use of RCAF and AIILF are not consistent with Plaintiffs' allegations that prior to the alleged conspiracy the widespread use of RCAF was a barrier to the adoption of fuel

surcharges and that the Defendants needed to conspire to remove fuel from the price index (*i.e.*, adopt AIILF) in order to pave the way for the adoption of conspiratorial fuel surcharges.

#### 4. Contrary to Plaintiffs' allegations, there is no evidence of faster growth in UP's rate-based fuel surcharge coverage as of the start of the alleged conspiracy

85. As a more general version of the claim that the use of RCAF slowed the growth of rate-based fuel surcharge coverage, Professor Rausser concludes that "[p]rior to the Class period, Defendants, acting in a unilateral fashion and without benefit of coordination, faced difficulties in forcing shippers to accept their original fuel surcharges…"[95] He further concludes that due to conspiratorial efforts, there was a "remarkable increase" in fuel surcharge coverage during the Class Period.[96]

86. Professor Rausser's claims regarding fuel surcharge coverage can be tested using empirical evidence. In particular, one can test whether, although Defendants had individual fuel surcharge programs prior to the Class Period, the growth in shipments covered by rate-based fuel surcharges was slow prior to the start of the alleged cartel (including in late 2002 and early 2003, just prior to the start of the alleged cartel) and then increased after the Defendants allegedly began to conspiratorially coordinate their fuel surcharge programs.

87. Although Professor Rausser is somewhat vague on precisely when the coordination between Defendants began, the most natural date to consider is the start of the Class Period in July 2003, when Plaintiffs and Professor Rausser claim that the Defendants' alleged conspiratorial agreement became effective. Alternatively, one might consider March, 2003, the date of the first meeting between Defendants to which Professor Rausser cites (notably a meeting between an Eastern railroad (CSX) and a Western railroad (UP) rather than between direct competitors).[97] Hence, the natural empirical test of Professor Rausser's claim is to test empirically whether the growth in rate-based fuel surcharges was slow prior to March or July of 2003, and then accelerated afterwards.

---

95 *Rausser Expert Report* at 55. However, Professor Rausser also testified that Defendants had not encountered a "brick wall" to their increased coverage of surcharges before the class period. (*Rausser Merits Deposition* at 353-34.)

96 *Rausser Expert Report* at 68.

97 *Rausser Expert Report* at 59.

88. Notably, a comparison that *does not* make sense as a test of effects from the alleged conspiracy is to compare fuel surcharge coverage in November 2002 to fuel surcharge coverage after November 2002, which is the "test" that Professor Rausser performs.[98] First, there is no allegation of conspiratorial behavior as early as November 2002. And second, UP announced its own public carload fuel surcharge program on October 31, 2002 and it became effective on December 1, 2002. Professor Rausser acknowledges that these pre-2003 surcharges were "apparently designed and implemented by the individual Defendants without agreement or coordination."[99] Yet, by basing coverage comparisons on a start date of November 2002, Professor Rausser necessarily misattributes any increase in coverage due to this unilateral fuel surcharge program to an effect of the alleged conspiracy. Professor Rausser's approach is inherently flawed and misleading.

(a) Trends in the percentage of UP shipments covered by fuel surcharges

89. To study changes in UP's rate-based fuel surcharge coverage growth, I first study the percentage of UP's shipments in a given month that were covered by fuel surcharges. In particular, I study whether the growth in the percentage of UP's shipments covered by rate-based fuel surcharge coverage changed following: (i) UP's December 2002 unilateral adoption of its public carload fuel surcharge, an admittedly non-conspiratorial event; (ii) the March, 2003 meeting between UP and CSX cited by Plaintiffs, (iii) July 2003, when the conspiracy is alleged to have become effective in raising prices, and (iv) UP's April 2007 shift to mileage-based surcharges. The dataset used for this analysis combines Professor Kalt's transaction dataset covering unregulated shipments by the four Defendants with data on the specific price authority applicable to each UP shipment, including whether that price authority contained a rate-based fuel surcharge. Focusing on UP's data allows me to examine whether a particular shipment was *covered by* a fuel surcharge, not just whether the shipment actually paid a fuel surcharge because fuel prices were above the relevant trigger.

90. The results of my empirical test reject Professor Rausser's conclusions. Figure 6 depicts the evidence graphically, showing UP's fuel surcharge coverage—measured as the number of

98 *See e.g.*, *Rausser Expert Report*, Figure 3.

99 *Rausser Expert Report* at 55.

UP ton-miles shipped pursuant to contracts with fuel surcharge terms as a percentage of all UP ton-miles shipped—for each month between January 2000 and December 2008. Following UP's adoption of its public carload fuel surcharge, effective December 2002—which Professor Rausser acknowledges was "apparently designed and implemented by the individual Defendants without agreement or coordination"— UP's fuel surcharge coverage increased rapidly, which refutes a claim that UP was unable to implement fuel surcharges on its own. Even more notably, in early 2003, following the March meeting between UP and CSX and the July start of the alleged conspiracy, there is no additional spike up, as one would expect if the alleged conspiracy created greater ability to expand coverage. In fact, after the start of the alleged conspiracy, growth in fuel surcharge coverage *slowed* from the rate prevailing between December 2002 and February 2003, returning to a trend similar to that experienced before December 2002. Then, in early 2007, when UP implemented mileage-based fuel surcharges for non-intermodal traffic, the coverage of rate-based fuel surcharges declined rapidly. By the end of 2008, UP's rate-based fuel surcharge coverage was below the level it was in July 2003. This pattern does not support a claim that the alleged conspiracy enabled UP to accelerate the growth of fuel surcharge coverage.

**Figure 6: UP Rate-Based Fuel Surcharge Coverage as Percentage of Total Ton-Miles**




Source: Transaction data processed by Compass Lexecon

91. To confirm the patterns apparent in Figure 6, I also implement a regression analysis to test statistically for differences in the growth of fuel surcharge coverage at different points in time. In particular, I specify a regression model to explain the level of fuel surcharge coverage (again measured as the number of UP ton-miles with price pursuant to contracts with fuel surcharge terms as a percentage of all UP ton-miles shipped) in each month between January 2000 and December 2008. I build my regression around both the patterns observed in Figure 6 and the facts and allegations in this matter, meaning that:

- As my main explanatory variable, I include a "time trend" to account for the clear growth in fuel surcharge coverage throughout the time period.
- To test Professor Rausser's conclusions, I allow the time trend to vary over time (specifying the time trend as a first-order spline function). In particular, I include

variables that allow the baseline (pre-December 2002) rate of fuel surcharge coverage growth to change in each of the following time periods:

- o December 2002 - February 2003—the period following UP's adoption of its own public carload surcharge (which Professor Rausser acknowledges was implemented unilaterally);
- o March - June 2003—the period after the initial meeting between Defendants cited by Professor Rausser but before the start of the alleged conspiracy;
- o July 2003 - March 2007—the period following the start of the alleged conspiracy but prior to UP's shift to mileage-based fuel surcharges for non-intermodal unregulated traffic, which became effective on April 26, 2007;[100]
- o April 2007 - December 2008—the period when UP shifted to mileage-based surcharges.

- I also include an explanatory variable equal to the level of fuel surcharge coverage in the prior month. This lagged-surcharge term adjusts for the obvious "serial correlation" in the data (meaning that fuel surcharge coverage in a given month is highly predictive of fuel surcharge coverage in the next month).[101]

92. The results of this regression analysis, presented in Table 11 sharply contradict Professor Rausser's opinions about the timing of growth in UP's rate-based fuel surcharge coverage. Each value reported in the first row of the table indicates the difference in the trend of fuel surcharge coverage growth in a given time period, relative to the trend before December 2002. Values in the second row give the probability that a difference in trend of the reported magnitude would be seen by "statistical chance"—with a probability below 0.05 implying that the observed change in

---

100 *See*, Union Pacific Customer News, "Union Pacific Mileage Based Fuel Surcharge Program Effective 4/16/2007," March 21 2007, UPFSC0000571-570 at UPFSC0000570. BNSF began using mileage-based fuel surcharges in January 2006 for certain local coal and agricultural traffic. (Union Pacific email re: BNSF Mileage Based Fuel Surcharge, August 18, 2005, UPFSC0001558-570.)

101 I do not separately report the results for this term in the tables below, but it is positive and highly statistically significant across all my specifications.

trend (relative to the trend before December 2002) is "statistically significant" at conventional levels (*i.e.*, the 5 percent significance level).

93. As seen in the table, the growth in UP's rate-based fuel surcharge coverage increased by a statistically significant amount in December 2002, following UP's adoption of its own, non-conspiratorial public carload surcharge, with the month on month growth in fuel surcharge coverage during this period 2.3 percentage points higher than in the pre-December 2002 period.[102] This contradicts any claim that UP was unable to expand coverage of rate-based fuel surcharges on its own. However, following the first alleged meeting of Defendants, in March 2003, the growth in fuel surcharge coverage fell back to a level not statistically distinguishable from growth in the pre-December 2002 period. *Most strikingly, during the conspiracy period itself, the growth in fuel surcharge coverage remained at a level effectively identical to that in the pre-December 2002 period*. Then, following UP's shift to mileage-based fuel surcharges in April 2007, UP's rate-based fuel surcharge coverage began to fall, as seen by the significant reduction in the trend relative to the pre-December 2002 level.

94. Overall, then, the regression confirms the pattern apparent in Figure 6. Any spike in fuel surcharge coverage growth came from the non-conspiratorial public carload surcharge implemented unilaterally by UP, with growth in fuel surcharge coverage during the allegedly conspiratorial period not measurably higher than that in the period before the adoption of the public carload surcharge.

**Table 11: Regression Estimates of Trend in Rate-Based Fuel Surcharge Coverage**
**All Routes: Coverage Defined Based on Shipped Ton-Miles**

| Routes Included | | Incremental Effect Relative to Jan-00 to Nov-02 | | | |
|---|---|---|---|---|---|
| | | Dec-02 to Feb-03 | Mar-03 to Jun-03 | Jul-03 to Mar-07 | Apr-07 to Dec-08 |
| All | Effect | 2.3% *** | -0.1% | 0.0% | -1.2% *** |
| | *P-Value* | *0.0000* | *0.7260* | *0.2568* | *0.0000* |

*** p<0.01, ** p<0.05, * p<0.1

102 I use Newey-West robust standard errors in order to allow for the possibility of heteroskedasticity and time dependence among the regression errors. *See*, Whitney K. Newey; Kenneth D. West (1987), "A Simple, Positive Semi-definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix," *Econometrica* 55(3): 703-708.

(b) Trends in the percentage of new UP contracts covered by fuel surcharges

95. An alternative to the shipment-based analysis of fuel surcharge coverage growth presented thus far is to consider the extent to which new contracts adopted by UP and its customers contain fuel surcharge terms. In particular, rather than ask what percentage of ton-miles shipped in a given month are covered by rate-based fuel surcharges, one might ask what percentage of ton-miles associated with new contracts adopted in each month have rate-based fuel surcharges. The rationale for this analysis is that new contracts reflect the results of new negotiations, while an analysis based on all shipments includes the outcomes of both new and old negotiations. The terms of an old contract may have been set prior to the conspiracy, in which case its terms are not relevant to asking whether the conspiracy affected contract terms. I present such an analysis of new contracts in this section.

96. Available data from UP do not precisely identify the start date of a "new contract." So, as a proxy, I define a new contract as starting whenever a particular customer starts shipping under a price authority not previously applied to that customer (including new price authorities or existing price authorities newly applied to a given customer) *or* whenever a particular customer/price-authority combination adds or subtracts any of UP's various fuel surcharge programs.[103] I define the number of ton-miles associated with each new contract as the number of ton-miles shipped by that customer/price authority combination over the next three months. I then compute, for each month, the percentage of UP's new contract ton-miles on contracts with rate-based fuel surcharges (relative to all new contract ton-miles for that month).[104]

97. My conclusion that coverage did not spike up with the start of the alleged conspiracy is confirmed when defining coverage as the percentage of UP's new contract ton-miles on contracts with rate-based fuel surcharges (relative to all new contract ton-miles for that month). Table 12 presents the results of a regression similar to that reported in Table 11, except that it uses the percentage of new contract ton-miles (rather than the percentage of shipped ton-miles) as the

---

103 Details of the determination of new contracts using this method are available in my backup materials.

104 I have also conducted all analyses in this section when including only price authorities known to be private price quotes or confidential contracts, rather than public circulars. All substantive results are confirmed.

dependent variable. All substantive conclusions are confirmed. The growth in rate-based fuel surcharge coverage spikes in December 2002; falls back to a level indistinguishable from the pre-December 2002 level after March 2003; *actually falls below the pre-December 2002 trend after July 2003*; and then declines further as rate-based fuel surcharges declined following the shift to mileage-based fuel surcharges after April 2007.

**Table 12: Regression Estimates of Trend in Rate-Based Fuel Surcharge Coverage**
**All Routes: Coverage Defined Based on New Contract Ton-Miles**

| Routes Included | | Incremental Effect Relative to Jan-00 to Nov-02 | | | |
|---|---|---|---|---|---|
| | | Dec-02 to Feb-03 | Mar-03 to Jun-03 | Jul-03 to Mar-07 | Apr-07 to Dec-08 |
| All | Effect | 5.0% * | 0.1% | -0.8% *** | -3.9% *** |
| | *P-Value* | *0.0531* | *0.9064* | *0.0069* | *0.0000* |

*** p<0.01, ** p<0.05, * p<0.1

### 5. Contrary to an implication of Plaintiffs' theory, there is no evidence of an unusually large increase in fuel surcharge coverage growth on routes facing competition from other Defendants following the start of the alleged conspiracy

98. The analysis of coverage to this point has paid no attention to the level of competition on a given route. But economic theory explains that the primary function of a conspiracy is to overcome competition between participants. Hence, if there had been a successful conspiracy to increase fuel surcharge coverage, the evidence for an increase in fuel surcharge coverage after the start of the alleged conspiracy would be expected to be largest on routes on which UP faced the most direct competition from other Defendants and would show up as an increase in the growth of coverage on these routes during the alleged conspiracy compared to that growth prior to the alleged conspiracy.

99. However, if one focuses only on shipments occurring on routes on which UP faced direct competition from other Defendants, there is no evidence for an increase in fuel surcharge coverage growth following the start of the alleged cartel. To demonstrate this, I analyze separately shipments on routes on which UP faced direct competition from other Defendants and shipments on routes on which UP faced no such competition. I define UP as facing direct competition from other Defendants on a given route if Defendants other than UP have at least ten percent of the share of ton-miles in both the origin SPLC and destination SPLC over the 2000-

2008 period (taken as a whole).[105] Using this definition, I separately calculate monthly coverage for "competitive routes" (those where UP faced Defendant competition) and "sole-served routes" (those where UP did not face such competition).

100. Figure 7, below, shows UP's rate-based fuel surcharge coverage for shipments made on routes facing direct competition from other Defendants. The basic pattern seen for all shipments continues to hold—fuel surcharge coverage grew fairly steadily prior to December 2002, spiked up starting in December 2002, and then returned to slower growth rates by early 2003, with no observed spike at the start of the alleged cartel.

**Figure 7: UP Rate-Based Fuel Surcharge Coverage and Payments as a Percentage of Total Ton-Miles, Routes with Defendant Competition**




Source: Transaction data processed by Compass Lexecon

105 This is analogous to the definition used by Professor Rausser, who defines a railroad as facing competition in a given BEA if other railroads have more than ten percent share in that BEA. See *Rausser Expert Report*, Appendix G and associated work product (program "06_identify_single_serve_areas.sas").

101. Next, I run the regression analysis described in Section IV.B.4(a) separately for competitive routes and sole-served routes. Table 13 shows these regression results. Contrary to what one would expect under a cartel that overcame competitive forces, the patterns are similar across the two types of routes, with an increase in coverage growth as of December 2002, which fades back toward the pre-December 2002 level after the first meeting in March 2003. Notably, the trend in coverage growth is not statistically significantly different from the pre-December 2002 trend for either competitive routes or sole-served routes during either the March 2003 – June 2003 period or the July 2003 – March 2007 period.

**Table 13: Regression Estimates of Coverage in Different Time Periods, All Routes and Routes with Defendant Competition and Sole Served Routes**

| Routes Included | | Incremental Effect Relative to Jan-00 to Nov-02 | | | |
|---|---|---|---|---|---|
| | | Dec-02 to Feb-03 | Mar-03 to Jun-03 | Jul-03 to Mar-07 | Apr-07 to Dec-08 |
| Sole-Served | Effect | 2.3% *** | -0.2% | 0.0% | -1.2% *** |
| | *P-Value* | *0.0000* | *0.4356* | *0.5303* | *0.0000* |
| Competitive Routes | Effect | 1.2% *** | 0.2% | 0.0% | -0.7% *** |
| | *P-Value* | *0.0000* | *0.6756* | *0.4123* | *0.0000* |

*** p<0.01, ** p<0.05, * p<0.1

102. Put simply, far from the prediction of economic theory—that a successful cartel would have the biggest effect on growth in coverage on routes on which UP faced direct competition from other Defendant—any measured increase in coverage growth on competitive routes following the start of the alleged conspiracy was both statistically insignificant and no larger than the measured increase in coverage growth on sole-served routes. Given that basic economic theory indicates that price-fixing conspiracies operate by weakening (or eliminating) competition between the conspirators, the absence of any evidence of a relative increase in the growth of coverage on competitive routes is inconsistent with Professor Rausser’s conclusions.

### C. THE ALLEGED UNIFORMITY OF PUBLIC FUEL SURCHARGE TERMS ADOPTED BY DIFFERENT DEFENDANTS DOES NOT SUPPORT PLAINTIFFS’ ALLEGATIONS OF A SUCCESSFUL CONSPIRACY

103. Plaintiffs allege:[106]

106 *Second Amended Complaint*, ¶ 7.

> In July 2003, the two major western railroads – Defendants BNSF and UP (together, the "Western Railroads") – agreed to implement the same fuel surcharge program, resulting in the exact same fuel surcharges. Up until this time, fuel surcharges had been applied only intermittently, and to the extent surcharges were used at all, the railroads had different fuel surcharge rates, reflecting (among other things) that each railroad had different fuel costs.

In this section, I explain that: (i) even if Defendants had actually set the same or similar surcharges, this would not support an inference of conspiracy; and (ii) Defendants did not, in fact, set identical fuel surcharges.

#### 1. Even if Plaintiffs were correct that public fuel surcharges across railroads were uniform, this would not support an inference of conspiratorial behavior

104. Plaintiffs and Professor Rausser emphasize the similarity in fuel surcharges adopted by the Defendant railroads, pointing to the public carload fuel surcharge programs adopted by both UP and BNSF in mid-2003 and claiming that UP and BNSF "agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the 'HDF Index'). BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement."[107] Professor Rausser asserts that "[t]he Defendants instigated a common rate increase, implementing Fuel Surcharges with identical or near identical features."[108]

105. Adoption of similar pricing systems for fuel surcharges, without more, does not permit an inference of conspiracy, especially where the particular surcharges at issue were public.[109] As explained above, parallel behavior alone (including responding to a competitor's pricing structure by adopting a similar pricing structure) can be consistent with non-conspiratorial oligopoly behavior and therefore cannot be used to infer a conspiracy.

---

107 *Complaint*, ¶ 7.

108 *Rausser Expert Report* at 6.

109 Some pricing information in the railroad industry is publicly available. For example, railroads publish information on publically available prices, *i.e.*, prices at which any customer can ship their product, even without a negotiated contract with a railroad. UP (and others) make this information available on their publicly-accessible websites. Although these prices are publicly available, prices of individually negotiated contracts are not.

### 2. Contrary to Plaintiffs' allegations, UP and BNSF did not adopt uniform public fuel surcharge terms

106. Plaintiffs' specific allegation regarding the adoption of identical fuel surcharges concerns the public carload fuel surcharge programs adopted by UP and BNSF in mid-2003. Professor Rausser asserts that the Defendant's fuel surcharges (not restricted to carload fuel surcharges) were very similar.[110] Although UP and BNSF both adopted public carload and intermodal fuel surcharge programs that applied to many shippers and that were similar in many respects, the formulas used were not, in fact, identical even at the start of the alleged conspiracy, and then UP changed its intermodal formula over time. Moreover, the surcharge formulas adopted by UP and BNSF for coal shipments (both of which were adopted well after the start of the alleged conspiracy) differed substantially. Finally, many shippers had fuel surcharge terms that were not governed by these public fuel surcharge programs.

107. **Carload**: UP and BNSF both had public carload fuel surcharges before the start of the alleged conspiracy. In June 2003, UP and BNSF both made changes to their public carload surcharge programs but not only were the trigger level and initial surcharge selected by UP different from those selected by BNSF, but also, BNSF's new carload surcharge program featured a trigger level and initial surcharge that was more dissimilar from UP's than they would have been under BNSF's old carload surcharge program. BNSF had previously used a trigger of HDF at $1.30 and an initial surcharge of 1.0 percent. The new program implemented in June 2003 featured a lower trigger, HDF at $1.25 and an initial surcharge of 0.5 percent. The public carload surcharge program implemented by UP in the same month featured a trigger of HDF at $1.35 and an initial surcharge of 1.5 percent. The UP fuel surcharge thus had a higher trigger than the new BNSF carload surcharge.[111] As shown above in Table 9, at the time of these changes, the difference between UP's and BNSF's new triggers is a competitively relevant distinction, which Professor Rausser ignores.

---

110 *Rausser Expert Report* at 137.

111 These differences between the UP and BNSF fuel surcharges cannot be dismissed as irrelevant just because the realized path of fuel prices kept those prices above the trigger levels for both railroads. Rather, the differences in formulas would have to be evaluated at the time of their adoption before it was known that the triggers would be exceeded.

108. **Intermodal**: Both UP and BNSF had public intermodal fuel surcharges in place well before the start of the alleged conspiracy, and the formulas used were not identical. Neither UP nor BNSF made changes to those programs at the start of the alleged conspiracy. After the start of the alleged conspiracy, UP changed its intermodal fuel surcharge program twice (in the Spring of 2005 and the Fall of 2006) to lower the weight of fuel in the formula, which had the effect of reducing the fuel surcharge.[112] In discussing the UP and BNSF intermodal fuel surcharges, Professor Rausser fails to note the two reductions in fuel weight that lowered UP's fuel surcharge, and does not note that the UP fuel surcharge had a higher slope (that is, the UP formula implied a larger increase in the fuel surcharge for a given increase in fuel prices) than the BNSF fuel surcharge.[113]

109. **Coal**: The public coal rate-based surcharge formulas adopted by UP and BNSF differed substantially. BNSF's public coal rate-based surcharge, adopted in July 2004, incorporated an HDF trigger price of $1.24 and an initial surcharge rate of 0.5 percent, and the surcharge increased by 0.5 percentage points for every $0.04 increase in the HDF index. UP's public coal rate-based surcharge was adopted later, in November 2004. It also was based on the HDF index, but had a higher trigger price and the surcharge increased more steeply with increases in the HDF index. These differences led to growing differences in the realized surcharges applied by UP and BNSF as fuel costs rose. Figure 8 shows the percentage difference between UP and BNSF's rate-based coal surcharge in each month. Because of the time path of fuel prices, combined with the differences in the UP and BNSF formulas, the UP surcharge was between two percent and 17 percent higher than the BNSF formula, depending on the month.

---

112 *See*, Union Pacific email re: Comparison of Intermodal FSC Program to Standard HDF Program, October 18, 2005, UPFSC0078793; Union Pacific email re: Comparison of Intermodal FSC Program to Standard HDF Program, October 18, 2005, UPFSC0078793-795 at UPFSC0078795; Union Pacific email re: Intermodal FSC Change Issues, September 12, 2006, UPFSC0418186.

113 *See*, *Rausser Expert Report* at 125-26.

**Figure 8: Percentage Difference between UP and BNSF Coal Rate-Based Surcharges, December 2004-December 2008**




110. Finally, not all shippers paid a fuel surcharge governed by the public (and therefore widely known) fuel surcharge formulas. As shown further below in Table 14, 74.8 percent of UP's rate-based fuel surcharge revenue in the Class Period was collected under one of its public fuel surcharge formulas. The remainder—25.2 percent of UP's fuel surcharge revenue—was collected under other fuel surcharge programs (at least some of which were individually negotiated with specific shippers)[114] that would not generally have been known to other Defendants.

### D. THE OBSERVED CHANGES IN THE MAGNITUDES OF FUEL SURCHARGES DO NOT SUPPORT PLAINTIFFS' ALLEGATIONS OF A SUCCESSFUL CONSPIRACY

111. Given that neither trends in coverage nor claims about the uniformity of fuel surcharges can support an inference that Defendants implemented a successful conspiracy based on fuel surcharges, one might ask whether the conspiracy as alleged by Plaintiffs succeeded in raising

---

114 Deposition of John J. Koraleski, December 2, 2010, at 95-96 and 278.

more money from fuel surcharges than would have been raised under the fuel surcharge clauses from the non-conspiratorial period.[115] Simply stated, to support Plaintiffs' allegations, the fuel surcharges collected from the Class should be substantially higher than those that would have been collected in the absence of the alleged conspiracy—otherwise there was no payoff to the Defendants from allegedly coordinating on the surcharge formulas. If there is no clear evidence that fuel surcharges were raised by a significant amount—which turns out to be the case—one cannot rationally view the surcharges implemented during the Class Period as an effective tool for conspiracy.

112. To test the hypothesis that the alleged conspiracy led to fuel surcharges substantially higher than what they otherwise would have been, I use fuel surcharge formulas set prior to the beginning of the alleged conspiracy to measure what shippers might have paid in a but-for world without the alleged conspiracy and compare them to fuel surcharges actually paid by Class Members.[116] I examine UP fuel surcharge levels for carload, coal, and intermodal shipments separately, and then aggregate the analysis across all class shippers. My analysis does not support the hypothesis that the alleged conspiracy raised fuel surcharges to UP shippers across-the-board and by a significant amount, as claimed by Plaintiffs and Professor Rausser. To the contrary, my analysis indicates that UP shippers may have paid *less* under the alleged conspiracy than they otherwise would have paid.

113. For this analysis, I use only UP Class Members who paid one of the public fuel surcharges that was adopted or changed during the Class Period, *i.e.*, carload shippers who paid the HDF-based public carload surcharge, coal shippers who paid the HDF-based public carload surcharge or one of the HDF-based public coal surcharges, and intermodal shippers who paid the

115 It is possible that the railroads could have lowered the fuel surcharge and raised base prices in such a way as to harm shippers, but that would be directly contrary to the Plaintiffs' theory of how the alleged conspiracy worked. In this section, I adopt Plaintiffs' claim that the mechanism used by Defendants allegedly to raise prices is the fuel surcharge, and I test whether it appears that fuel surcharge levels were in fact elevated relative to admittedly non-conspiratorial fuel surcharges.

116 In this section, I assume that all shippers who paid a fuel surcharge would also have paid a fuel surcharge in the but-for world. Issues of coverage are discussed in Section IV.B above.

public intermodal surcharge.[117] Table 14 shows that this group of shippers used in this analysis captures nearly three-quarters of the UP fuel surcharge revenue in the class.

**Table 14: Share of UP FSC Revenue Accounted for by Public FSC Surcharge Formulas**

| | | 2003H2 | 2004 | 2005 | 2006 | 2007 | 2008 | *Total* |
|---|---|---|---|---|---|---|---|---|
| Carload | Total rate-based FSC revenue in Class | $3,643,280 | $53,172,856 | $207,796,915 | $365,359,110 | $441,030,157 | $404,571,600 | ***$1,475,573,918*** |
| | FSC Revenue used in Analysis | $2,605,101 | $34,852,305 | $150,096,528 | $274,891,081 | $341,583,603 | $277,556,313 | ***$1,081,584,931*** |
| | *Share of FSC Revenue used in analysis* | 71.5% | 65.5% | 72.2% | 75.2% | 77.5% | 68.6% | ***73.3%*** |
| Coal | Total rate-based FSC revenue in Class | $190,388 | $4,504,465 | $30,017,343 | $73,687,885 | $89,407,142 | $94,118,209 | ***$291,925,433*** |
| | FSC Revenue used in Analysis | $23,993 | $1,749,110 | $24,344,016 | $67,094,821 | $82,625,040 | $63,313,216 | ***$239,150,197*** |
| | *Share of FSC Revenue used in analysis* | 13% | 39% | 81% | 91% | 92% | 67% | ***81.9%*** |
| Intermodal | Total rate-based FSC revenue in Class | $695,475 | $10,611,657 | $36,525,298 | $128,068,457 | $192,048,968 | $397,341,142 | ***$765,290,998*** |
| | FSC Revenue used in Analysis | $673,133 | $8,119,846 | $32,273,710 | $103,741,505 | $145,399,497 | $285,070,243 | ***$575,277,933*** |
| | *Share of FSC Revenue used in analysis* | 96.8% | 76.5% | 88.4% | 81.0% | 75.7% | 71.7% | ***75.2%*** |
| ***Total*** | ***Total rate-based FSC revenue in Class*** | ***$4,529,142*** | ***$68,288,977*** | ***$274,339,557*** | ***$567,115,453*** | ***$722,486,267*** | ***$896,030,952*** | ***$2,532,790,349*** |
| | ***FSC Revenue used in Analysis*** | ***$3,302,227*** | ***$44,721,261*** | ***$206,714,255*** | ***$445,727,406*** | ***$569,608,139*** | ***$625,939,773*** | ***$1,896,013,061*** |
| | ***Share of FSC Revenue used in analysis*** | ***72.9%*** | ***65.5%*** | ***75.3%*** | ***78.6%*** | ***78.8%*** | ***69.9%*** | ***74.9%*** |

114. For each type of shipper, I can identify a public fuel surcharge program that was used prior to the beginning of the alleged conspiracy and thus with a formula not "contaminated" by the alleged conspiracy. Professor Rausser has stated that fuel surcharges adopted prior to the start of the conspiracy were "apparently designed and implemented by the individual Defendants without agreement or coordination."[118] For carload and coal shippers, I use the WTI-based public carload surcharge formula, as adopted in December 2002.[119] For intermodal shippers, I use the HDF-based intermodal public fuel surcharge formula, as adopted in November 2000.[120,121]

---

117 The included FSC programs are the following: Carload: HIGHWAY DIESEL FUEL AVERAGE PRICE; Coal: HIGHWAY DIESEL FUEL AVERAGE PRICE, HDF6 ENERGY FUEL SURCHARGE STANDARD, and HDF7 ENERGY FUEL SURCHARGE STANDARD; Intermodal: INTERMODAL STANDARD FUEL SURCHARGE and INTERMODAL WEEKLY FUEL SURCHARGE. (*See*, UPFSC 0000079-102.)

118 *Rausser Expert Report at 55.*

119 This fuel surcharge program is WTI1 FUEL SURCHARGE STANDARD. (*See*, UPFSC 0000079-102.) Although this surcharge was applied primarily to carload shippers, I use it as the but-for surcharge for coal shippers because some coal shippers paid the WTI carload fuel surcharge prior to the establishment of the coal-specific fuel surcharge.

120 This fuel surcharge program is INTERMODAL STANDARD FUEL SURCHARGE. (*See*, UPFSC 0000079-102.)

121 During the alleged conspiracy, the formula used in the public intermodal fuel surcharge was revised three times. Two of those changes involved reductions in the fuel weight used in the standard rate calculation, which had the effect of reducing the public intermodal fuel surcharge percentage below what it would otherwise have been. (*See*, note 112, above.) (My analysis is conservative because UP made further idiosyncratic adjustments to lower the fuel surcharge

115. For each carload, coal, and intermodal class shipper included in my analysis, I calculate the total FSC revenue paid under the allegedly conspiratorial formula and the total FSC revenue that would have been paid under the admittedly non-conspiratorial formula.[122] It makes little sense for an alleged conspiratorial action to have reduced the price of the component on which the railroads allegedly conspired. And yet, on average, shippers in my analysis paid *lower* fuel surcharges under the allegedly conspiratorial rate than under the admittedly non-conspiratorial rate.

116. Table 15 summarizes my analysis. Carload shippers subject to the allegedly conspiratorial HDF-based rate would have paid $950 million in fuel surcharges over the Class Period, according to the formula;[123] had they paid the admittedly non-conspiratorial WTI-based fuel surcharge instead, they would have paid $993 million. Thus, the carload shippers in my analysis would have paid $44 million *less* in fuel surcharges under the allegedly conspiratorial

---

percentage that are not captured here. *See*, Union Pacific email re: Comparison of Intermodal FSC Program to Standard HDF Program, October 18, 2005, UPFSC0078793-795 at UPFSC0078795; Union Pacific email re: October Fuel Surcharge, September 28, 2006, UPFSC0237104-105; Union Pacific email re: Intermodal FSC Change Issues, September 12, 2006, UPFSC0418186.) The third change allowed the fuel surcharge percentage to adjust on a weekly basis rather than a monthly basis.

122 For Carload and Coal calculations, I use the fuel surcharge percentages in each month reported on UP's website, as follows:

Admittedly non-conspiratorial WTI (used for Carload and Coal)
http://www.uprr.com/customers/surcharge/wti.shtml

Allegedly conspiratorial HDF Carload
http://www.uprr.com/customers/surcharge/index_revenue.shtml

Allegedly conspiratorial HDF Coal
http://www.uprr.com/customers/surcharge/surcharge_coal_archive.shtml

For Intermodal calculations, I use the intermodal formula, as follows:

Admittedly non-conspiratorial
Intermodal formula adopted in November 2000, with "base rate" from October 2001, but excluding any changes implemented after the beginning of the alleged conspiracy. (*See*, Appendix B.)

Allegedly conspiratorial
Intermodal formula adopted in November 2000, with "base rate" from October 2001, and including changes to fuel weight and shift from monthly to weekly calculation. (*See*, Appendix B.)

123 These fuel surcharge amounts are calculated by applying the relevant formula to the base revenue calculated from the UP transaction data for the shippers included in the analysis.

fuel surcharge program than in the but-for world with no conspiracy; this $44 million represents an undercharge of 0.7 percent of base revenues. Coal shippers would have paid more under the allegedly conspiratorial formula: 5.3 percent of base revenues over the entire time period. Intermodal shippers would have paid *less* under the allegedly conspiratorial fuel surcharge formula; the undercharge for intermodal shippers was 4.6 percent of base revenues. Across all shippers, the allegedly conspiratorial fuel surcharge formulas resulted in lower fuel surcharges, with an aggregate undercharge of 1.0 percent of base revenues.

**Table 15: Comparison of Actual Fuel Surcharges to But-For Fuel Surcharges: But-for Rates based on Admittedly non-Conspiratorial Formulas**

| | | 2003H2 | 2004 | 2005 | 2006 | 2007 | 2008 | *Total* |
|---|---|---|---|---|---|---|---|---|
| Carload | FSC Revenue | $2,276,064 | $30,727,398 | $129,017,106 | $236,661,491 | $295,536,952 | $255,634,140 | ***$949,853,150*** |
| | But-For Surcharge Revenue | $1,919,028 | $23,730,304 | $128,523,805 | $257,031,161 | $297,170,166 | $285,082,417 | ***$993,456,881*** |
| | Difference | $357,036 | $6,997,094 | $493,301 | -$20,369,670 | -$1,633,215 | -$29,448,277 | ***-$43,603,731*** |
| | Base Rev. | $95,951,388 | $610,860,646 | $1,151,452,833 | $1,602,948,671 | $1,967,486,780 | $997,597,317 | ***$6,426,297,635*** |
| | Difference (Pct. of Base Rev.) | 0.4% | 1.1% | 0.0% | -1.3% | -0.1% | -3.0% | ***-0.7%*** |
| Coal | FSC Revenue | $23,893 | $1,518,989 | $19,872,298 | $60,410,621 | $77,781,962 | $60,690,777 | ***$220,298,540*** |
| | But-For Surcharge Revenue | $21,071 | $1,067,522 | $15,042,106 | $47,279,937 | $56,181,351 | $48,277,218 | ***$167,869,206*** |
| | Difference | $2,821 | $451,467 | $4,830,192 | $13,130,684 | $21,600,611 | $12,413,559 | ***$52,429,334*** |
| | Base Rev. | $1,053,567 | $25,644,951 | $136,496,576 | $294,597,705 | $370,812,896 | $156,230,051 | ***$984,835,746*** |
| | Difference (Pct. of Base Rev.) | 0.3% | 1.8% | 3.5% | 4.5% | 5.8% | 7.9% | ***5.3%*** |
| Intermodal | FSC Revenue | $605,951 | $7,595,198 | $33,049,390 | $108,630,533 | $148,311,526 | $274,515,639 | ***$572,708,236*** |
| | But-For Surcharge Revenue | $605,951 | $7,595,198 | $35,597,527 | $120,751,418 | $174,040,488 | $339,086,802 | ***$677,677,383*** |
| | Difference | $0 | $0 | -$2,548,137 | -$12,120,885 | -$25,728,962 | -$64,571,164 | ***-$104,969,147*** |
| | Base Rev. | $17,788,117 | $88,618,019 | $182,173,480 | $513,100,647 | $694,594,131 | $795,899,962 | ***$2,292,174,356*** |
| | Difference (Pct. of Base Rev.) | 0.0% | 0.0% | -1.4% | -2.4% | -3.7% | -8.1% | ***-4.6%*** |
| ***Total*** | ***FSC Revenue*** | ***$2,905,907*** | ***$39,841,584*** | ***$181,938,794*** | ***$405,702,645*** | ***$521,630,440*** | ***$590,840,556*** | ***$1,742,859,926*** |
| | ***But-For Surcharge Revenue*** | ***$2,546,050*** | ***$32,393,024*** | ***$179,163,438*** | ***$425,062,516*** | ***$527,392,005*** | ***$672,446,437*** | ***$1,839,003,470*** |
| | ***Difference*** | ***$359,857*** | ***$7,448,561*** | ***$2,775,356*** | ***-$19,359,871*** | ***-$5,761,565*** | ***-$81,605,882*** | ***-$96,143,544*** |
| | ***Base Rev.*** | ***$114,793,071*** | ***$725,123,616*** | ***$1,470,122,890*** | ***$2,410,647,023*** | ***$3,032,893,808*** | ***$1,949,727,329*** | ***$9,703,307,736*** |
| | ***Difference (Pct. of Base Rev.)*** | ***0.3%*** | ***1.0%*** | ***0.2%*** | ***-0.8%*** | ***-0.2%*** | ***-4.2%*** | ***-1.0%*** |

Source: Transaction data processed by Compass Lexecon

117. I am unaware of any economic logic that would support the conclusion that buyers who paid lower fuel surcharges as a result of the alleged conspiratorial actions suffered damages from the alleged conspiracy. Yet, my analysis based on non-conspiratorial formulas indicates that for carload and intermodal shippers in my analysis, which together account for 87.4 percent of Class Member fuel surcharge revenue in my analysis, the surcharges put in place after the beginning of the alleged conspiracy reduced the surcharges owed by these two groups, compared to what they would have paid under the admittedly non-conspiratorial formulas.

118. A finding of positive—and extremely large—damages when the fuel surcharges paid were only slightly higher—or perhaps even lower—than what they would have been in the absence of the alleged conspiracy makes no economic sense. Table 16 summarizes the "excess"

amounts that carload, coal, and intermodal shippers paid as a result of UP's alleged conspiratorial fuel surcharge, as I calculated above, relative to the amount of damages Professor Rausser claims these groups suffered. Rather than Professor Rausser's estimate of an average 18.2 percent overcharge on the Class Members included in my analysis, my formulaic analysis implies *negative* overcharges across these shippers equal to -1.0 percent.

**Table 16: Comparison of Professor Rausser's Damages and what UP Shippers would have Paid under FSC Formulas Established Prior to the Alleged Conspiracy**

| | Carload | | Coal | | Intermodal | | *Total* | |
|---|---|---|---|---|---|---|---|---|
| Year | Formula as Benchmark | Rausser Damages | Formula as Benchmark | Rausser Damages | Formula as Benchmark | Rausser Damages | *Formula as Benchmark* | *Rausser Damages* |
| 2003H2 | 0.4% | 3.4% | 0.3% | 3.6% | 0.0% | 3.6% | ***0.3%*** | ***3.4%*** |
| 2004 | 1.1% | 7.7% | 1.8% | 8.3% | 0.0% | 8.4% | ***1.0%*** | ***7.8%*** |
| 2005 | 0.0% | 13.9% | 3.5% | 15.1% | -1.4% | 15.5% | ***0.2%*** | ***14.2%*** |
| 2006 | -1.3% | 17.0% | 4.5% | 18.7% | -2.4% | 18.2% | ***-0.8%*** | ***17.4%*** |
| 2007 | -0.1% | 17.4% | 5.8% | 18.9% | -3.7% | 18.5% | ***-0.2%*** | ***17.8%*** |
| 2008 | -3.0% | 26.0% | 7.9% | 31.3% | -8.1% | 28.3% | ***-4.2%*** | ***27.3%*** |
| ***Total*** | ***-0.7%*** | ***16.9%*** | ***5.3%*** | ***19.7%*** | ***-4.6%*** | ***21.3%*** | ***-1.0%*** | ***18.2%*** |

Source: Transaction data processed by Compass Lexecon

## E. FROM AN ECONOMIC PERSPECTIVE, THE EVIDENCE THAT PROFESSOR RAUSSER RELIES ON CANNOT ESTABLISH HIS CLAIM THAT THERE WAS AN AGREEMENT NOT TO DISCOUNT BASE RATES

119. The discussion thus far has focused on evidence regarding coverage and terms of fuel surcharges themselves. Of course, the ultimate question is not about fuel surcharges *per se* but about the bottom line effect on rail shipment prices. Hence, it is also important to consider the evidence regarding Professor Rausser's claim that there was a successful agreement not to discount base rates from their but-for levels in a manner that could offset any conspiratorial increases in fuel surcharges. I have described above why this claim is illogical as a matter of economic theory; here, I explain why the evidence that Professor Rausser presents in support of this claim cannot support it.

### 1. The documentary evidence to which Professor Rausser points cannot establish his claim that UP adhered to any agreement not to discount base rates

120. In support of his claim of a successful agreement not to discount base rates from their but-for levels, Professor Rausser presents several statements by Defendants listing general policies against discounting or urging salespeople not to offer discounts in exchange for

acceptance of fuel surcharges. Of course, such statements by themselves cannot serve as a basis to infer a conspiracy, as all firms would like to make sales at higher prices and saying so provides no unusual information that would by itself be useful in a conspiracy. Notably, none of the Defendant statements cited by Professor Rausser involves any *quid pro quo* in which one firm offers to raise prices if another firm does, a characteristic that could indicate conspiratorial communications.[124] In addition, none of the documents cited by Professor Rausser involves (i) an analysis by one Defendant of whether another Defendant has cheated on the alleged agreement by reducing the (but for) base rate below what it otherwise would have been or (ii) a complaint to another Defendant resulting from such an analysis.

121. As to the UP-related communications that Professor Rausser does point to:

- I understand that the UP statement that Professor Rausser cites as evidence of cross-Defendant communication not to discount base rates was a general concurrence request for interline traffic made to NS (and also made to other railroads).[125] Moreover, although I defer to legal experts to interpret the precise language, the statement appears to say that "freight charge(s)" for interline traffic would not be "reduced below Base Freight Charge(s) as a result of the application of this item," meaning that surcharges would not go negative, not, as Professor Rausser claims, that the Base Freight Charge(s) could never be lowered due to the imposition of a surcharge. This same language concerning freight charges not dropping below Base Freight Charges as a result of the application of a fuel surcharge was also present in interline communications that occurred prior to any allegation of conspiracy.[126]

- The one other communication involving UP that Professor Rausser cites is the statement of UP's Jack Koraleski at the May 15, 2006 alliance meeting with NS that "UP's strategy

---

124 Dennis W. Carlton, Robert H. Gertner, and Andrew M. Rosenfield (1997), "Communication Among Competitors, Game Theory and Antitrust," *George Mason Law Review* 5(3): 423-440.

125 *Rausser Expert Report* at 73; UPFSC0001030-035. The documents indicate [redacted]currence [redacted]ilroads, including BNSF, CSX, [redacted] A concurrence request is simply a request from one railroad to another to reach an agreement on the price that will be charged on a shipment on a route that neither railroad can serve on its own and where the railroads will price jointly.

126 *See*, Union Pacific email re: Fuel Surcharge – CSXT concurrence, November 12, 2002, UPFSC0000438-439 at UPFSC0000439; Union Pacific email re: NS Fuel Surcharge Proposal – Project 1101, June 5, 2000, UPFSC0000490-492 at UPFSC000492.

is to bring all traffic up to today's market prices." That statement says nothing about not discounting base rates or about a conspiracy with other railroads, so I do not understand Professor Rausser's reliance on this document.

### 2. Professor Rausser's exhibits on changes in average base rates cannot establish his claim that Defendants adhered to any agreement not to discount base rates

122. Professor Rausser presents a series of exhibits (Figures 39 – 43) as evidence that there was an agreement not to discount base rates from what they would have been but for the alleged conspiracy.[127] He claims to show no systematic discounting of base rates. Even if Professor Rausser's exhibits could reveal whether there was discounting (systematic or otherwise) relative to but-for rates (which they cannot, for the reasons laid out below), an observation that there was no systematic discounting is completely consistent with there being no conspiracy and thus no need for discounting because rail shipment prices were not conspiratorially elevated.

123. Via his exhibits, Professor Rausser purports to show that average base rates by commodity did not "systematically" fall for any Defendant between 2002 and 2006. However, such exhibits prove nothing about the relevant question of whether there was an agreement not to discount base rates from their "but for" levels: The average prices he depicts by commodity *do* change across the years,[128] and Professor Rausser provides no way to conclude that the observed changes would have been the same but for the alleged conspiracy. Moreover, patterns in average base rates by commodity cannot reveal whether discounts were granted to specific buyers. As shown above, the more relevant variation—in prices paid for a given shipper/route/commodity combination—does show substantial variation over time, making it difficult for a member of the alleged conspiracy to determine if the observed changes over time are the same as those that would have occurred but-for the alleged conspiracy. In summary, the evidence that Professor Rausser presents to support his assumption of an agreement not to discount the "but for" rate does not establish that such an agreement existed or that if such an agreement did exist that it succeeded in preventing discounts.

---

127 *Rausser Expert Report*, Figures 39, 41-43.

128 For example, of the three largest commodities for UP, intermodal (461) base rates increased between 2002 and 2006, whereas base rates for coal (112) and automobiles (371) decreased between 2002 and 2006.

### 3. Evidence on sales shares cannot establish Professor Rausser's claim that Defendants adhered to any agreement not to discount base rates

124. Finally, Professor Rausser argues that railroads could monitor "whether or not some shippers that otherwise they would be able to capture, they are losing, because an alleged co-conspirator is discounting the base rate, and giving them a lower all in rate."[129] In the light of this comment by Professor Rausser, it is notable that on routes where both UP and BNSF were present, UP lost substantial share to BNSF over the Class Period.[130] (See Table 17.)

**Table 17: UP Share of Traffic, Economic Areas where both UP and BNSF Provided Service**

| Year | UP | BNSF | CSX | NS |
|---|---|---|---|---|
| 2003H2 | 51.5% | 43.3% | 3.0% | 2.1% |
| 2004 | 48.2% | 46.9% | 2.8% | 2.1% |
| 2005 | 48.0% | 46.9% | 2.8% | 2.3% |
| 2006 | 45.6% | 49.1% | 2.9% | 2.4% |
| 2007 | 43.6% | 50.8% | 3.0% | 2.5% |
| 2008 | 43.2% | 51.0% | 3.1% | 2.6% |

Note: Includes all unregulated traffic except those customers identified as government or codefendant
Source: Transaction data processed by Compass Lexecon

125. Such variation in sales shares contradicts Professor Rausser's claim that overall shares were stable. Moreover, the variation on individual routes is even greater than the variation in aggregate shares.

126. To confirm that the share shifts observed above apply to shippers/routes on which Defendants competed, Table 18 replicates Table 17 after limiting the data to transactions involving shipper/route combinations that were served by more than one Defendant during the Class Period.[131] The pattern of declining UP share during the Class Period remains present for this set of "at risk" shipper/route combinations.

129 *Rausser Merits Deposition* at 136: 4-7.

130 The analysis in this table includes all Economic Areas in which UP and BNSF each have origin (or destination) traffic in the Economic Area at any time during the Class Period. I include all unregulated traffic in this analysis, whether or not a fuel surcharge was assessed.

131 Route is defined here as an origination-BEA to destination-BEA combination.

**Table 18: UP Share of Traffic, Shipper-Routes Served by More than One Defendant**

| Year | UP | BNSF | CSX | NS |
|---|---|---|---|---|
| 2003H2 | 49.1% | 46.6% | 2.6% | 1.8% |
| 2004 | 45.0% | 50.7% | 2.5% | 1.8% |
| 2005 | 45.3% | 50.1% | 2.7% | 1.9% |
| 2006 | 44.5% | 50.8% | 2.8% | 1.9% |
| 2007 | 42.9% | 51.8% | 3.1% | 2.2% |
| 2008 | 43.7% | 50.7% | 3.3% | 2.3% |

Note: Includes all unregulated traffic except those customers identified as government or codefendant
Source: Transaction data processed by Compass Lexecon

### F. TRENDS IN ECONOMIC PROFITS AND PRICE-COST MARGINS AFTER THE START OF THE ALLEGED CONSPIRACY DO NOT SUPPORT PROFESSOR RAUSSER'S CONCLUSION THAT THERE WAS A SUCCESSFUL CONSPIRACY

127. As a final, summary measure of whether the alleged conspiracy had any measurable effect, I consider changes in Defendants' profitability and price-cost margins after the start of the alleged conspiracy. Among the most basic predictions of economics is that successful price-fixing conspiracies raise economic profits and price-cost margins, all else constant. Indeed, Plaintiffs and Professor Rausser agree with this. Plaintiffs allege that the four Defendant railroads "conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits."[132] Plaintiffs go on to claim that by conspiring to raise prices, the railroads earned profits that Plaintiffs described as "supracompetitive" and "excessive."[133] Professor Rausser claims that "…Defendants implemented coordinated Fuel Surcharges starting in early 2003, through which they were able to achieve significant increases in their revenue and profitability across their operations."[134]

128. If Defendants successfully implemented a coordinated fuel surcharge in 2003 that recovered costs in excess of their incremental fuel costs, and did not compete away the incremental profit by lowering base rates, then I would expect to see evidence that economic profits and economic price-cost margins (defined as price minus marginal cost divided by price)

---

132 *Second Amended Complaint*, ¶ 4.

133 *Second Amended Complaint*, ¶¶ 64 and 99.

134 *Rausser Expert Report* at 58.

rose significantly at the start of the conspiracy.[135] Of course, economic profits and margins are affected by many factors other than an alleged conspiracy. But, without further explanation, a finding that economic profits and margins did not increase is *inconsistent* with a story of conspiracy. A proper analysis of UP's data, however, indicates that the onset of the alleged conspiracy was not associated with an increase in UP's economic profits or price-cost margins.

#### 1. Professor Rausser's measures of operating profit margin show that UP's profits were lower in the Class Period, and Bloomberg's measure of economic profit also shows lower UP profits during the Class Period

129. Professor Rausser calculates operating profit margin for each Defendant, and claims that "each Defendant's profit margin grew over the Class Period."[136] As I will explain below, Professor Rausser uses an incorrect measure of profits, but even ignoring that issue, Professor Rausser's characterization of these profit margins is misleading with respect to UP. Figure 9 below shows just the data for UP from Professor Rausser's Figure 20, which I have re-created from the same data source that he used. To say that UP's profit margin "grew over the Class Period" does not accurately capture the relevant facts concerning UP's operating profit margin. UP's operating profit margin had been declining at the beginning of the alleged conspiracy period, and continued to decline for another two years past the beginning of the alleged conspiracy. Thereafter, UP's operating profit margin did increase, but the data certainly don't evidence an improvement in operating profits coinciding with the start of the alleged conspiracy. In addition, although UP's operating profit margin grew in the latter part of the Class Period, UP's average operating profit margin was lower during the Class Period than it was in the years prior to the start of the alleged conspiracy for which Professor Rausser's Figure 20 provides data. From the first quarter of 2000 through the second quarter of 2003, UP's operating profit margin averaged 12.9 percent, while during the Class Period, UP's operating profit margin averaged

135 I am assuming that UP profits prior to the beginning of the alleged conspiracy would be a good benchmark for expected UP profits after the beginning of the alleged conspiracy, but for the conspiracy itself.

136 *Rausser Expert Report* at 90 and Figure 20. Calculations in this section are not confined to the class members.

11.2 percent.[137] Thus the data offered by Professor Rausser do not point to an improvement in UP's operating profit margin during the alleged conspiracy compared to the earlier period.

**Figure 9: UP's Operating Profit Margin, Three-Quarter Moving Average (Rausser Figure 20)**




130. Professor Rausser's operating profit measure excludes capital costs and therefore suffers from well-known problems as a measure of economic profit. In a capital-intensive industry such as the railroad industry, profit measures that ignore the cost of that capital are incomplete. In addition to operating costs and capital costs, a railroad must also satisfy the demands of its investors for a return on their investment. Although Professor Rausser acknowledges the capital intensive nature of the railroad industry, he ignores it when presenting his "profit margin" which is based only on operating costs.[138]

---

137 The figure shows the unweighted average of the operating profit in each quarter for 1Q2000-2Q2003 and 3Q2003 – 4Q2008.

138 Professor Rausser implicitly acknowledges that operating profits do not depict the actual profitability of Defendants when he notes, "Class I Railroads incur high fixed costs and low

131. Measures of economic profit accounting for the cost of capital are publicly available. For example, Bloomberg, a leading provider of financial data, calculates the return on invested capital and then subtracts the weighted average cost of capital (WACC) to define its measure of "Economic Value Added Spread."[139] As shown in Figure 10 below, Bloomberg's measure of economic profit shows that UP's profits fell sharply in 2004, the first full year of the alleged conspiracy, and remained negative throughout the Class Period.

variable costs because they, unlike water and trucking carriers, own and maintain their network and terminals. As a result, a large capital investment is required for infrastructure…." (*Rausser Expert Report* at 31.) He states further, "[m]aintaining existing track is extremely costly as well." (*Rausser Expert Report* at 32.) UP's chief executive, James Young, testified that during this period of record revenues and increased net income, UP also was facing increased demand for capital investment due to tightening capacity. (Deposition of James Young, August 4, 2010, at 111:14-23, 114:25-115:9.) Mr. Young also testified that despite higher revenues and income measures, UP was failing to meet its cost of capital, a factor that must be considered when justifying such investments. (Deposition of James Young, August 4, 2010, at 53:4-9, 81:7-21, 290:16-21.)

139 Economic Value Added equals NOPAT - WACC*Total Invested Capital, where NOPAT equals Net Operating Income minus Cash Operating Taxes; EVA Spread equals EVA/Total Invested Capital. Bloomberg provides detailed calculations in its WACC Analysis function. For Union Pacific, this is available by entering UNP Equity WACC <GO> on a Bloomberg terminal.

**Figure 10: Bloomberg Economic Value Added Spread, UP, 2000-2011**




Source: Bloomberg L.P.

### 2. A study of economic price-cost margins in the railroad industry finds that margins fell during the Class Period

132. The standard prediction of economic theory is that a conspiracy increases the economic price-cost margin.[140] Professor Rausser has not examined what happened to economic price-cost margins during the alleged conspiracy. A study conducted on behalf of the STB, however, indicates that the economic price-cost margin in the railroad industry fell after the start of the alleged conspiracy.[141] Christensen Associates derived marginal costs from an econometric estimate of the variable cost function in the railroad industry.[142] The study then calculated the

---

140 *See*, Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th ed., Boston: Pearson/Addison-Wesley, at 123-25.

141 Laurits R. Christensen Associates, Inc. (2010), "An Update to the Study of Competition in the U.S. Freight Rail Industry, Final Report," prepared for the Surface Transportation Board (hereinafter *Christensen Associates Study*).

142 *Christensen Associates Study* at 3-19 - 3-21.

Lerner Index ([revenue per ton-mile – marginal cost] / revenue per ton-mile) for the industry, and found that price-cost margins declined every year from 2002 through 2008. Thus, at the same time that Professor Rausser claims industry operating profit margins grew, economic price-cost margins were falling. Since economic theory predicts that an effective conspiracy should raise economic price-cost margins, Professor Rausser's evidence does not support an inference of conspiracy. Indeed, as stated by Christensen Associates, the falling economic price cost margin suggests that market power was declining over the period of the alleged conspiracy.[143]

## V. PROFESSOR RAUSSER'S FINDING THAT THE ALLEGED CONSPIRACY GENERATED LARGE OVERCHARGES IS BASED ON A FUNDAMENTALLY FLAWED THEORY AND METHODOLOGY

133. In his report, Professor Rausser presents an econometric regression model, with which he claims to demonstrate that the alleged cartel generated overcharges averaging 13.6 percent over the "gross rate per ton mile" (which Professor Rausser defines as including the fuel surcharge amount but deducting customer discounts and refunds) that would have held but-for the alleged conspiracy.[144] This finding is at odds with the lack of theoretical or evidentiary support for Plaintiffs' allegations that the Defendants implemented a successful price-fixing conspiracy, as illustrated thus far. This tension is not due to any unique insights generated by Professor Rausser's econometric model, but rather reflects fundamental flaws in Professor Rausser's model, which render it incapable of supporting any conclusion, including that the alleged cartel generated overcharges.[145] In this section, I do not attempt to catalog all of the numerous flaws in Professor Rausser's approach, but rather highlight some of the most fundamental flaws, with a particular focus on the estimated overcharge for UP.

### A. OVERVIEW OF PROFESSOR RAUSSER'S OVERCHARGE MODEL

134. Professor Rausser's model is built as a single "regression equation," which he assumes explains the price of *all* unregulated railroad shipments—including all Defendants, all commodities, all routes, and all buyers—for the period January 2000 – December 2008.

143 *Christensen Associates Study* at 4-6.

144 *Rausser Expert Report*, Table 53.

145 Professor Kalt has made corrections to the dataset of Defendant shipments used by Professor Rausser. Unless otherwise noted, I use Professor Kalt's corrected dataset throughout this section.

Professor Rausser's regression equation specifies the gross rate per ton-mile as a function of the net weight of the shipment, the regional weekly price of no. 2 diesel fuel, a quarterly index of rail costs other than fuel, the annual GDP of the destination state, and indicator variables for interline shipments, the AAR car type, the commodity of the shipment, the route of the shipment, and the quarter of the year (to allow for seasonality).[146] For all shipments made after July 1, 2003, Professor Rausser sets a "Class Period" indicator variable equal to one. He includes this Class Period indicator both on its own and interacted with fuel prices: In this way, Professor Rausser allows the model to predict different prices during the Class Period than before the Class Period and allows this difference to depend on the current fuel price. He measures overcharges in a given week using the estimated effect of the Class Period indicator variables (the indicator on its own and interacted with fuel prices) on gross rates per ton-mile—thus expressing overcharges as the estimated percentage by which gross rates were elevated over the but-for level.

## B. PROFESSOR RAUSSER'S CONCLUSIONS DEPEND ON THE DEMONSTRABLY FALSE ASSUMPTION THAT HIS MODEL IS "STRUCTURALLY STABLE"

### 1. Professor Rausser assumes that his model is structurally stable

135. Professor Rausser's methodology is built on the assumption that it is "structurally stable," meaning that the same econometric model applies to every one of the shipments in his data, including shipments of all commodities on all routes, by all Defendants to all buyers in all time periods. As one important example of the "structural stability assumption," Professor Rausser assumes that the relationship he estimates between fuel costs and rail shipment prices applies to each shipment (e.g., regardless of the share of total costs made up of fuel costs for that shipment). As such, he assumes that the only variation in the relationship between fuel costs and prices is due to the alleged cartel.

136. If Professor Rausser's structural stability assumption is false, then Professor Rausser's model is not reliable and its results should be rejected. In particular, if the relationship between fuel costs and rail shipment prices actually varies over time, across Defendants, across commodities, across routes, or across buyers, then the stability assumption fails and the results should be rejected. Given such variation, there would be no reason to assume that the same

146 Professor Rausser uses the phrase "gross rate" in the same way I use "total price," to refer to prices net of discounts but including fuel surcharges. Also, in his analysis, all non-indicator variables are transformed into their natural logarithms.

relationship between fuel costs and prices would hold in the Class Period as in the pre-Class Period and thus no basis to assume that any variation in the relationship—as captured by Professor Rausser's indicator variable for the Class Period—is due to the effects of the alleged conspiracy rather than other variation in the shipments included in the two time periods.

### 2. Professor Rausser's structural stability assumption is demonstrably false

137. Professor Rausser's structural stability assumption fails standard empirical tests. In particular, I run a series of tests in which I test whether, in contrast to the assumption in Professor's Rausser's model of a common effect of fuel costs on prices, the actual effect of fuel costs on prices (that is, the actual pass through rate) varies along the following dimensions:

- across the four Defendants
- by type of shipment (carload, coal, or intermodal),
- by half-year (within the benchmark period or within the Class Period),
- by route length (with routes divided as 0-1000 miles, 1000-2000 miles, 2000-3000 miles, 3000-4000 miles, 4000-5000 miles, or more than 5000 miles)
- by customer size (with customers divided by total revenue observed in the data, in buckets of less than $1 million, $1 million - $10 million, $10 million - $100 million, $100 million - $1 billion, or more than $1 billion).

As seen in Table 19, in each case, the results reject Professor Rausser's stability assumption: The relationship between fuel costs and prices varies on each of these dimensions and Professor Rausser's model does not allow for this, meaning that Professor Rausser's model can be rejected statistically.

**Table 19: Structural Stability Tests on Professor Rausser's Model**

| | Structural Stability Test | |
|---|---|---|
| **Fuel Effect Allowed to Vary** | **P-Value** | **Test Result** |
| By Defendant | <.0001 | Reject |
| By Time | <.0001 | Reject |
| By Commodity Type | <.0001 | Reject |
| By Customer Size | <.0001 | Reject |
| By Route Length | <.0001 | Reject |

Note: Detailed results provided in backup materials
Source: Transaction data processed by Compass Lexecon

### 3. Adjusting Professor Rausser's model to deal with the lack of stability substantially changes his overcharge estimates, demonstrating that his results are not reliable

138. Given the lack of structural stability of Professor Rausser's model, one natural step might be to divide the data into appropriate sub-groups and to estimate the model separately by sub-group.[147] Of course, for this to solve the structural stability problem, one would need to define sub-groups within which the model is stable. I do not attempt to "fix" Professor Rausser's model for him in this way. Instead, I simply provide evidence that sub-groups of the data may yield substantially different results than those found by Professor Rausser, thus further demonstrating that his results are not reliable. Estimating the model for UP alone, I find overcharges of only 11.4 percent, substantially lower than the 16.0 percent using all Defendants.[148]

139. Given this evidence for differences in overcharge percentages across Defendants, I focus attention in the remainder of this section on UP-specific overcharges.

## C. PROFESSOR RAUSSER'S METHODOLOGY YIELDS NONSENSICAL RESULTS

140. I have shown that statistical tests reject Professor Rausser's assumption of structural stability. That means that Professor Rausser has not produced a reliable methodology to estimate damages. In this section, I provide another way to illustrate that Professor Rausser's

[147] Note that the lack of structural stability is not fixed by estimating damages separately for each transaction. The key is that the regression model itself is not stable across sub-groups, so different regression equations with different coefficients are required.

[148] The overcharge reported here for all Defendants differs from that reported by Professor Rausser because I rely on the dataset produced by Professor Kalt, which corrects many errors in Professor Rausser's data processing.

methodology is unreliable: I present several ways in which the results of Professor Rausser's model are nonsensical and inconsistent with his claim that he has measured the effects of the conspiracy alleged by Plaintiffs.

### 1. Professor Rausser's methodology implies that shippers who paid non-conspiratorial fuel surcharges were somehow harmed by the conspiracy

141. One appropriate question to ask of an econometric overcharge model is whether it finds overcharges only for buyers who were plausibly injured by the alleged conspiracy, not for buyers who were not plausibly injured. Otherwise, if the model finds overcharges for buyers who were not plausibly injured, then what the model calls "overcharges" cannot be correct and must instead represent some other economic factors not appropriately captured by the model and thus wrongly attributed as an effect of the alleged conspiracy.

142. Professor Rausser's model fails this test. In particular:

- *Professor Rausser's model finds "overcharges" for legacy shipments—shipments made after July 2003 but with prices (including the base price and the fuel surcharge) set prior to the alleged conspiracy.* Such legacy shipments are explicitly excluded from the Plaintiffs' class definition and have prices based on contracts that Professor Rausser has acknowledged were "apparently designed and implemented by the individual Defendants without agreement or coordination."[149] Hence, the prices for such contracts are non-conspiratorial and one should not find damages from the alleged conspiracy on such legacy shipments.

- *Professor Rausser's model finds "overcharges" for the shippers to which UP charged mileage-based fuel surcharges.* As noted above, Plaintiffs allege that a central feature of the conspiracy was that the Defendants agreed to apply the fuel surcharges "as a percentage multiplier of the total base rate for the rail freight transportation." And Professor Rausser agreed in his deposition that mileage-based fuel surcharges are not alleged by Plaintiffs to be part of any conspiracy."[150]

---

149 *Rausser Expert Report* at 55.

150 *Rausser Merits Deposition* at 174:1-4.

Yet, in March 2007, UP announced that it would shift to a mileage-based surcharge for non-intermodal traffic beginning in late April 2007. A reasonable conclusion would be that the alleged conspiracy ended with this shift to mileage-based surcharges by UP. At a minimum, a reliable overcharge model should not find overcharges on shipments subject to such mileage-based surcharges.

143. In fact, as seen in Table 20, Professor Rausser's model does find "overcharges" on legacy shipments and shipments subject to mileage-based surcharges. Indeed, these measured "overcharges" are ***larger*** for these shipments than for the shipments in the class:

- Modifying Professor Rausser's model so that it drops the class shipments and uses the legacy shipments in their place, the model produces overcharges of 15.6 percent for UP's legacy shipments, higher than the 11.4 percent it generates for UP's class shipments.
- Modifying Professor Rausser's model so that it drops the class shipments and uses both the legacy shipments and the shipments subject to mileage-based surcharges in their place, the model produces overcharges of 15.1 percent for UP's legacy and mileage-based shipments, again higher than the 11.4 percent it generates for UP's class shipments.[151]

The implication is clear: Whatever Professor Rausser's model is measuring, it is not overcharges due to allegedly conspiratorial pricing, as the model yields UP "overcharges" that are larger for UP's legacy and mileage-based shipments than the "overcharges" for UP's class shipments.

**Table 20: Comparison of Professor Rausser's Damages Estimates for Class, Legacy (non-Class), and Mileage-Based (non-Class) Shipments**

| | Pct. Overcharge |
|---|---|
| Rausser Model: Class Shipments | 11.4% |
| Rausser Model: Legacy (non-Class) Shipments | 15.6% |
| Rausser Model: Legacy (non-Class) and Mileage-Based (non-Class) Shipments | 15.1% |

Source: Transaction data processed by Compass Lexecon

151 Replacing the class shipments with just the mileage-based shipments, one again finds damages on mileage-based shipments higher than Professor Rausser finds on the class shipments.

### 2. Professor Rausser's methodology implies that, in a non-conspiratorial setting, UP would have been able to raise rates by only an unreasonably small amount in response to fuel price increases

144. Professor Rausser has testified that the railroads would have raised price to cover any incremental fuel costs absent a conspiracy.[152] Consistent with this, another test of Professor Rausser's model is to determine how much it predicts prices would have risen as a result of increased fuel costs during the alleged conspiracy period if there had been no conspiracy.

145. The results from Professor Rausser's overcharge model yield the unreasonable implication that, in a non-conspiratorial setting, changes in fuel prices would have had effectively no effect on prices, with a ten percent increase in fuel prices yielding an implausibly low 0.24 percent increase in rail shipment prices.[153] To see what such a low pass-through rate implies, note that, on average, fuel costs represented 11.0 percent of UP's operating revenues during the 2000-2003 pre-Class Period,[154] meaning that if fuel costs were 100 percent passed through to prices, a ten percent increase in fuel costs would yield a greater than one percent increase in rail shipment prices. Hence, the implication of Professor Rausser's model—that but-for the alleged conspiracy, a ten percent increase in fuel costs would have generated only a 0.24 percent increase in prices—violates Professor Rausser's own deposition testimony, in which he agreed that he would "expect in [his] counterfactual world that the Defendants would also recover their incremental fuel costs through some variety of mechanisms."[155]

146. Figure 11 illustrates the implications of Professor Rausser's implausible estimate of the non-conspiratorial relationship between fuel costs and prices. It considers a hypothetical rail shipment from the Gulf Coast states, for which the total price as of January 1, 2003 was $100. Holding all other factors constant, the figure plots the change in price due to observed changes in fuel costs in the Gulf Coast states under two assumptions—100-percent pass-through of fuel

---

152 *Rausser Merits Deposition* at 31.

153 *Rausser Expert Report* at Table 53.

154 Based on UP 10-Ks for the 2000-2003 period.

155 *Rausser Merits Deposition* at 31. See also *Rausser Class Deposition* at 177-78 ("In the but-for world … you would expect the prices to reflect that incremental cost change."). As a matter of economic theory, in models that deviate from perfectly competitive behavior, pass-through rates of above or below 100% are possible.

costs or Professor Rausser's much smaller estimated pass-through of fuel costs.[156] As seen in the figure, while 100-percent pass-through of fuel costs yields price increases of as much as $25 in 2008, Professor Rausser's estimated relationship implies that prices would only have increased by roughly $5. Critically, when Professor Rausser finds a much higher estimated relationship between fuel costs and prices during the conspiracy period, he assumes this represents "damages" due to the conspiracy rather than the fact that his baseline relationship between fuel costs and prices is implausibly low.

**Figure 11: Effect of Increase Fuel Costs on Prices, Rausser Estimates vs. 100-Percent Pass-Through**




156 As of January 1, 2003, for a shipment priced at $100, I assume that fuel costs were $11.60, based on the fact that, according to its 2003 10-K, UP's fuel costs equaled 11.6 percent of its revenues. (Union Pacific Corporation, 10-K Annual Report For the Fiscal Year Ended December 31, 2005. Retrieved October 17, 2012 from SEC EDGAR website.) From this base, I compute the change in fuel costs over time based on the Regional Weekly No. 2 Diesel Retail Price (as used by Professor Rausser in his model) for the Gulf Coast states. I then compute the implied increase in rail shipment prices given such fuel cost increases, assuming either 100-percent pass through or Professor Rausser's estimated pass-through percentage.

147. As seen in Table 21, below (focusing on estimates for UP, and using Professor Rausser's methodology and Professor Kalt's data), Professor Rausser's total claimed damages on UP class shipments are only slightly smaller than the total amount of fuel surcharges collected on those shipments by UP. As seen in the table, Professor Rausser's overcharges for UP are $2.46 billion, relative to the $2.53 billion of rate-based surcharges that were actually collected, meaning that Professor Rausser claims that more than 97 percent of all fuel surcharge collections represent damages.[157] The reason is that, as demonstrated in this section, Professor Rausser's model predicts that very little of any increased fuel costs should be reflected in higher rates.

**Table 21: UP Fuel Surcharges vs. Rausser Damages**

| Actual FSC Revenue | Rausser Overcharges | Rausser Overcharges as % of FSC Revenue |
|---|---|---|
| $2,532,790,349 | $2,459,634,239 | 97.1% |

Note: FSC revenues and overcharges based on class shipments
Source: Transaction data processed by Compass Lexecon

### D. USING UP FUEL SURCHARGES THAT ARE KNOWN TO BE NON-CONSPIRATORIAL AS BENCHMARKS, PROFESSOR RAUSSER'S MODEL YIELDS NO UP OVERCHARGES

148. One potential explanation for the nonsensical results from Professor Rausser's model is that the differential pricing behavior that Professor Rausser attributes to the conspiracy actually reflects a different relationship between fuel prices and rail prices during the Class Period, perhaps driven by the fact that fuel prices during the Class Period were higher and more volatile than at any point during the pre-Class Period. In particular, as noted above, Professor Rausser estimates an unreasonably small relationship between fuel costs and rail prices for the pre-Class Period, perhaps because this relationship is based on a time period when fuel costs were generally low and flat, making it difficult to determine the relationship that should have held in the post-July 2003 period when fuel prices were higher and more volatile. One (at least partial) solution to this problem is to include in the non-conspiratorial benchmark shipments made in the

157 Note that it would be inconsistent with his conspiracy theory for Professor Rausser to claim that higher fuel costs were recovered via higher base rates, so that all of the surcharges represent damages. His entire analysis is premised on the assumption that base rates do not adjust to the presence or absence of a fuel surcharge.

post-July 2003 period but with prices known to be non-conspiratorial. In this section, I explore two such benchmarks, both implemented on a UP-only version of Professor Rausser's model.

149. In particular, I follow the logic developed in Section V.C.1, which explains that shipments priced according to legacy contracts or contracts with mileage-based surcharges provide appropriate non-conspiratorial benchmarks. Professor Rausser drops such observations during the Class Period because they are not part of the class.[158] In fact, there is no difficulty in including these legacy and mileage-based shipments in the econometric estimation of the model but not attributing damages to them. Indeed, because the legacy and mileage-based fuel surcharges are known to be non-conspiratorial, such shipments are appropriately considered as part of the benchmark sample, and because some of these shipments made pursuant to legacy contracts and contracts with mileage-based surcharges were made in later years, they provide useful information about the non-conspiratorial relationships between fuel costs and rail prices in periods with high, volatile fuel costs.

150. Following this logic, Table 22 reports results for two alternative benchmarks (each implemented on a UP-only version of Professor Rausser's model):

- *Alternative Benchmark 1*: Include shipments made pursuant to legacy contracts as part of the benchmark (non-conspiratorial) sample, but make no other changes to Professor Rausser's model;
- *Alternative Benchmark 2:* Include shipments made pursuant to legacy contracts or contracts with mileage-based fuel surcharges as part of the benchmark (non-conspiratorial) sample, but make no other changes to Professor Rausser's model.

151. As seen in Table 22, using either of these appropriate alternative benchmarks makes estimated UP overcharges negative. For example, including both legacy and mileage-based shipments as benchmarks yields an estimated UP overcharge of -4.0 percent (-1.3 percent if only legacy shipments are included as benchmarks).[159] The appropriate interpretation of this finding is that a properly modified version of Professor Rausser's model cannot support an inference of positive overcharges from the alleged conspiracy.

158 *Rausser Expert Report* at 166.

159 Adding only shipments with mileage-based surcharge to the benchmark also produces a negative overcharge estimate.

**Table 22: Professor Rausser's Model with Alternative Benchmarks**

| | Pct. Overcharge |
|---|---|
| Rausser Model | 11.4% |
| Treat Legacy as Benchmark | -1.3% |
| Treat Legacy and Per-Mile FSCs as Benchmark | -4.0% |

Source: Transaction data processed by Compass Lexecon

## VI. CONCLUSIONS

152. Based on the analysis presented in this report, I reach the following main conclusion: *taken together, economic theory and evidence render Professor Rausser's opinion—that the Defendants implemented a successful conspiracy to raise total rail shipment prices by conspiring on rate-based fuel surcharges—unreliable*.

153. My main conclusion is supported by the following specific conclusions:

- *As a matter of economic theory, the conspiracy alleged by Plaintiffs is illogical. The failure to articulate a coherent theory for the conspiracy casts substantial doubt on Plaintiffs' claim that the alleged conspiracy existed.* A central feature of Plaintiffs' theory is that conspiring to fix fuel surcharges is an effective way to raise prices to shippers generally. However, a cartel based on fuel surcharges alone could not raise total price systematically. Rather, a mechanism to control base rates would be required to prevent the alleged conspirators from offsetting fuel surcharges by setting base rates below the level that would have been set in the absence of fuel surcharges. Neither Plaintiffs nor Professor Rausser has pointed to a plausible mechanism to control base rates. Indeed, the private nature of most railroad prices and the complexity of such pricing make the existence of such a mechanism unlikely and therefore make the existence of a successful cartel unlikely.

- *The economic evidence provides no support for—and in many cases directly contradicts—Plaintiffs' alleged conspiracy*. Professor Rausser appears to claim that he can determine whether Defendants were conspiring by examining whether Defendants behaved in a similar manner to one another. I disagree. Firms behave

similarly in many industries and such behavior does not imply that there must be a conspiracy. Professor Rausser also argues that the economic evidence supports his claim that there was a conspiracy that raised prices. Again, I disagree. Together with the lack of a coherent economic conspiracy theory, the lack of economic evidentiary support for the key allegations on which Professor Rausser relies leads to the conclusion that Defendants did not implement a successful conspiracy to raise all-in prices by conspiring on rate-based fuel surcharges.

In particular:

- *The use of rate-based (as opposed to mileage-based) fuel surcharges does not imply the existence of a successful conspiracy*. To the contrary, UP (like firms in other industries) adopted rate-based fuel surcharges before the start of alleged conspiracy.
- *Trends in rate-based fuel surcharge coverage do not support Plaintiffs' allegation of a successful conspiracy*. Instead, contrary to Plaintiffs' allegations, rate-based fuel surcharge coverage growth began before the alleged conspiracy and did not increase at the start of the alleged conspiracy.
- *The alleged uniformity of fuel surcharge terms adopted by UP and other Defendants does not support Plaintiffs' allegations of a successful conspiracy*. First, any observed similarities in fuel surcharges cannot support an inference of conspiratorial behavior as opposed to parallel oligopolistic behavior. Second, contrary to Plaintiffs' allegations, the public fuel surcharges adopted by different Defendants were not, in fact, uniform.
- *The observed changes in the magnitudes of fuel surcharge terms do not support Plaintiffs' allegations of a successful conspiracy*. To the contrary, the fuel surcharge terms adopted after the start of the conspiracy were not systematically higher (and in many cases, were lower) than those adopted pre-conspiracy, which is not consistent with Plaintiffs' allegation that the Defendants increased a shipper's total price by increasing fuel surcharges.

- *The evidence that Professor Rausser presents to support his claim that Defendants adhered to an agreement not to discount base rates cannot support this claim.* For the same reasons that it would not be reasonable to conclude that Defendants successfully conspired to fix base rates (a position Professor Rausser agrees with), it is not reasonable to conclude that they successfully conspired not to discount base rates.
- *The decline in economic profits and price-cost margins after the start of the alleged conspiracy is inconsistent with Plaintiffs' allegations of a successful conspiracy*. Among the most basic predictions of economic theory regarding successful price-fixing conspiracies is that they increase economic profits and margins, all else constant. In this case, however, UP's margins and profits fell after the start of the alleged conspiracy, a pattern that would not be expected had the alleged conspiracy been successfully implemented.

- Despite the inconsistency between the economic evidence and the existence of a successful conspiracy, Professor Rausser's econometric model produces large overcharges; the reason for these large overcharges is that there are fundamental flaws in Professor Rausser's methodology. These flaws include his assumption that the same pricing model applies to all shipments by all Defendants throughout the time-period he studies and his use of unreliable benchmarks to determine prices but-for the alleged conspiracy. Correcting only the most basic errors in Professor Rausser's damage model produces no overcharges for UP.

Dennis W Carlton 2/6/13

Dennis W. Carlton February 6, 2013

# Exhibit 1

# Curriculum Vitae of Dennis W. Carlton

# and

# Testimony, January 2009-January 2013

**DENNIS WILLIAM CARLTON** January 2013
Senior Managing Director

Business Address: [redacted]

Email Address: [redacted]

## EDUCATION

Ph.D., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts: Economics, 1975.

M.S., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts: Operations Research, 1974.

A.B., HARVARD UNIVERSITY (Summa cum laude): Applied Math and Economics, 1972.

## EMPLOYMENT

COMPASS LEXECON (formerly Lexecon), Chicago, Illinois (2008 – present) Senior Managing Director; LEXECON INC., (1977 – 2006), President 1997 – 2001, Senior Managing Director 2003 - 2006

UNIVERSITY OF CHICAGO, Booth School of Business, David McDaniel Keller Professor of Economics (2011 – present); Katherine Dusak Miller Professor of Economics (2008 – 2011); Professor of Economics (1984 – 2008); Law School, Professor of Economics (1980 – 1984); Department of Economics, Assistant Professor (1976 – 1979); Associate Professor (1979).

U.S. DEPARTMENT OF JUSTICE, Washington, District of Columbia (2006 – 2008) Deputy Assistant Attorney General for Economic Analysis, Antitrust Division

MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts, Department of Economics (1975 – 1976) Instructor in Economics

## OTHER PROFESSIONAL EXPERIENCE

HARVARD UNIVERSITY, Public Policy Summer Course in Economics (1977), Professor

BELL TELEPHONE LABORATORIES (Summers 1976, 1977)

JOINT CENTER FOR URBAN STUDIES OF M.I.T. AND HARVARD UNIVERSITY, Cambridge, Massachusetts (1974 - 1975)

CHARLES RIVER ASSOCIATES, Cambridge, Massachusetts (Summers 1971, 1972) Research Assistant

## FIELDS OF SPECIALIZATION

Theoretical and Applied Microeconomics
Industrial Organization

## ACADEMIC HONORS AND FELLOWSHIPS

Panelist, Concurrences "New Frontiers of Antitrust" Conference, Paris, February 2011.
Presenter, MIT "Economics of Antitrust" Symposium, January 2011
Keynote Speaker, 21st Annual Workshop of the Competition Law & Policy Institute of New Zealand, 2010
Keynote Speaker, Japanese Symposium on Competition, sponsored by Japan Fair Trade Commission, 2009
Recipient of Inaugural Robert F. Lanzilotti Prize, awarded by the International Industrial Organization Society for Best Paper in Antitrust Economics, 2008
Keynote Address to Israel Antitrust Conference, 2008
Lewis Bernstein Memorial Antitrust Lecture, Washington, D.C., 2006
Distinguished Visitor, University of Melbourne, April 2005
Milton Handler Lecture, New York, 2004
Keynote Address to the International Competition Network, Mexico, 2004
Alexander Brody Distinguished Lecture, Yeshiva University, 2000
Ph.D. Thesis chosen to appear in the Garland Series of Outstanding Dissertations in Economics
Recipient of the 1977 P.W.S. Andrews Memorial Prize Essay, best essay in the field of Industrial Organization by a scholar under the age of thirty
National Science Foundation Grant, 1977 - 1985
Recipient of Post-doctoral Grant from the Lincoln Foundation, 1975
National Science Foundation Fellowship, 1972 - 1975
Phi Beta Kappa, 1971
John Harvard Award, 1970
Detur Book Prize, 1969
Edwards Whitacker Award, 1969
M.I.T., National Scholar Award, 1968

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

Appointed Member of the ABA Transition Task Force, Antitrust and Consumer Protection, 2012
Advisory panel to the Department of Justice and the FTC on the merger guidelines, 2010
Co-editor, Journal of Law and Economics, 1980 - present
Visiting Committee, MIT, Department of Economics, 1995 - 2011
Member, Advisory Board, Economics Research Network, 1996 - present
Member, Advisory Board of Antitrust and Regulation Abstracts, Social Science Research Network, 1998 - present
Advisory Board, Massachusetts Institute of Technology, Department of Economics, 1999 - present
Editorial Board, Competition Policy International (CPI), 2010 – present, Co-Editor, Competition Policy International (CPI), 2004 – 2009
Member, Economic Task Force – Antitrust Division, American Bar Association, 2010 – present
Advisory Board, Journal of Competition Law and Economics, 2004- present
Adjunct Scholar, American Enterprise Institute for Public Policy Research, 2007 – present
Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice, 2006 - 2008
Presidential Appointment to the Antitrust Modernization Commission, 2004 - 2007
Invited Panelist at Public Hearing on the Retail Banking Sector Inquiry: Payment Cards, before the European Commission in Brussels, Belgium, July 17, 2006.
Consultant on Merger Guidelines to the FTC, 2003
Professor, George Mason Institute for Judges, October 2001
Chairman, FTC Round Table on Empirical Industrial Organization (September 11, 2001)

Participant in the Round Table on the Economics of Mergers Between Large ILECS before the Federal Communications Commission, February 5, 1999
Member, Steering Committee, Social Science Research Council, Program in Applied Economics, 1997 - 1999
Participant in roundtable discussions on "The Role of Classical Market Power in Joint Venture Analysis," before the Federal Trade Commission, November 19, 1997 and March 17, 1998.
Participant in meetings with Committee of the Federal Reserve on Payment Systems, June 5, 1997
Associate Editor, Regional Science and Urban Economics, 1987 - 1997
Resident Scholar, Board of Governors of the Federal Reserve System, Summer, 1995
Accreditation Committee, Graduate School of Business, Stanford University, 1995
Associate Editor, The International Journal of Industrial Organization, 1991 - 1995
Editorial Board, Intellectual Property Fraud Reporter, 1990 - 1995
Consultant on Merger Guidelines to the U.S. Department of Justice, 1991 - 1992
Member, Advisory Committee to the Bureau of the Census, 1987 - 1990
National Bureau of Economic Research, Research Associate
Member, American Economics Association, Econometrics Society

## BOOKS

Market Behavior Under Uncertainty, Ph.D. Thesis, Massachusetts Institute of Technology (September 1975); Garland Publishing (1984).

Modern Industrial Organization, Scott, Foresman & Co., co-authored with Jeffrey Perloff, first edition (1990), (Chapter 17 of first edition reprinted as “The Economics of Information” for the University of Connecticut, Food Marketing Policy Center (1989)), second edition (1994), translated into Chinese, French, Hungarian and Italian; Addison Wesley Longman, third edition (2000), fourth edition (2005), translated into Chinese (2009).

## RESEARCH PAPERS

"The Equilibrium Analysis of Alternative Housing Allowance Payments," (with Joseph Ferreira) Chapter 6 of Analysis of a Direct Housing Allowance Program, The Joint Center for Urban Studies of M.I.T. and Harvard University, (July 1975).

"Theories of Vertical Integration," presented at Fourth Annual Telecommunications Conference. Appears in a volume of Proceedings of the Fourth Annual Telecommunications Conference, Office of Telecommunications Policy, (April 1976).

"Uncertainty, Production Lags, and Pricing," American Economic Review, (February 1977).

"Selecting Subsidy Strategies for Housing Allowance Programs," (with Joseph Ferreira) Journal of Urban Economics, (July 1977).

"Peak Load Pricing With Stochastic Demand," American Economic Review, (December 1977). (Reprinted in Economic Regulation edited by P.L. Joskow, Edward Elgar Publishing Limited, 1998 and Reprinted in The Economics of Public Utilities edited by Ray Rees, Professor of Economics at the University of Munich, Germany, 2005.)

"The Distribution of Permanent Income," Income Distribution and Economic Inequality, edited by Zvi Griliches, et al. (Halsted Press, 1978).

"Vertical Integration--An Overview," in Congressional Record Hearings on the Communications Act of 1978. Bill H.R. 13105, (August 3, 1978).

"Market Behavior with Demand Uncertainty and Price Inflexibility," American Economic Review, (September 1978).

"Vertical Integration in Competitive Markets Under Uncertainty," Journal of Industrial Economics, (March 1979). Awarded the P.W.S. Memorial Prize for the best essay in the field of Industrial Organization by a scholar under the age of thirty.

"Valuing Market Benefits and Costs in Related Output and Input Markets," American Economic Review, (September 1979).

"Contracts, Price Rigidity and Market Equilibrium," Journal of Political Economy, (October 1979).

"Why New Firms Locate Where They Do: An Econometric Model," in Studies in Regional Economics, edited by W. Wheaton, (Urban Institute, 1980).

"Benefits and Costs of Airline Mergers: A Case Study," (with W. Landes and R. Posner) Bell Journal of Economics, (Spring 1980). (Reprinted in "Air Transport" in Classics In Transport Analysis series, edited by Kenneth Button and Peter Nijkamp, 2001.)

"The Limitations of Pigouvian Taxes as a Long Run Remedy for Externalities," (with G. Loury) Quarterly Journal of Economics, (November 1980).

"The Law and Economics of Rights in Valuable Information: A Comment," Journal of Legal Studies, (December 1980).

"Price Discrimination: Vertical Integration and Divestiture in Natural Resources Markets," (with J. Perloff) Resources and Energy, (March 1981).

"The Spatial Effects of a Tax on Housing and Land," Regional Science and Urban Economics, (November 1981).

"Comments on Weicher," Journal of Law and Economics, (December 1981).

Comment, in Sherwin Rosen ed. Studies in Labor Markets, University of Chicago Press, (1981).

"Planning and Market Structure," in The Economics of Information and Uncertainty, edited by J.J. McCall, University of Chicago Press, (1982).

"The Disruptive Effect of Inflation on the Organization of Markets," in Robert Hall, ed. The Economics of Inflation, University of Chicago Press, (1982).

"The Need for Coordination Among Firms With Special Reference to Network Industries," (with J. M. Klamer) University of Chicago Law Review, (Spring 1983).

"A Reexamination of Delivered Pricing," Journal of Law and Economics, (April 1983).

"Futures Trading, Market Interrelationships, and Industry Structure," American Journal of Agricultural Economics, (May 1983).

"The Regulation of Insider Trading," (with D. Fischel), Stanford Law Review, (May 1983), reprinted in J. Macey ed., Classics in Corporate Law and Economics, Edward Elgar Publishing (2008), reprinted in part in Roberto Romano, Foundations of Corporate Law, Oxford University Press (1993), Foundation Press (2010 forthcoming), and Corporate Law Series – Insider Trading, Edward Elgar Publishing (2011 forthcoming).

"The Location and Employment Choices of New Firms: An Econometric Model with Discrete and Continuous Endogenous Variables," The Review of Economics and Statistics, (August 1983).

"Economic Goals and Remedies of the AT&T Modified Final Judgment," (with W. Lavey), Georgetown Law Review, (August 1983).

"Equilibrium Fluctuations When Price and Delivery Lags Clear the Market," Bell Journal of Economics, (Autumn 1983).

"Energy and Location," Energy Costs, Urban Development, and Housing, Brookings Institution, (1984).

"Futures Markets: Their Purpose, Their History, Their Growth, Their Successes and Failures," Journal of Futures Markets, (September 1984). (Reprinted in Futures Markets edited by A.G. Malliaris and W.F. Mullady, Edward Elgar Publishing Limited, 1995; and in Classic Futures: Lessons from the Past for the Electronics Age, edited by Lester Telser, Risk Books, 2000.)

“The Economics of Gray-Market Imports,” (with C. DeMuth), written for the Coalition to Preserve the Integrity of American Trademarks (COPIAT), (May 1985).

"The Limitation of Pigouvian Taxes As A Long Run Remedy for Externalities: Extension of Results," (with G. Loury) Quarterly Journal of Economics, (August 1986).

"The Rigidity of Prices," American Economic Review, (September 1986).

"The Theory and The Facts of How Markets Clear: Is Industrial Organization Valuable for Understanding Macroeconomics?" in Handbook of Industrial Organization, eds. Schmalensee and Willig, (1989).

"Market Power and Mergers in Durable Good Industries," (with R. Gertner), Journal of Law and Economics, (October 1989).

“Comments on Vertical Integration and Market Foreclosure,” Brookings Papers on Economic Activity: Microeconomics, (1990).

Book Review of Tirole's “The Theory of Industrial Organization”, Journal of Political Economy, (June 1990).

"The Genesis of Inflation and the Costs of Disinflation: Comment," Journal of Money, Credit & Banking, (August 1991, Part 2).

"The Theory of Allocation and its Implications for Marketing and Industrial Structure: Why Rationing is Efficient," Journal of Law and Economics, (October 1991).

"The Economics of Cooperation and Competition in Electronic Services Network Industries," in Economics of Electronic Service Networks, Wildman Steven ed., Praeger Press, (1992).

"Merger Policy and Market Definition Under the EC Merger Regulation," (with W. D. Bishop). Conference on Antitrust in a Global Economy, Fordham Corporate Law Institute, (1994).

"The Antitrust Economics of Credit Card Networks," (with A. Frankel) Antitrust Law Journal, (Winter 1995).

"Economic Organization and Conflict," Journal of Institutional and Theoretical Economics, (March 1995).

"Antitrust and Higher Education: Was There a Conspiracy to Restrict Financial Aid?" (with G. Bamberger and R. Epstein) The Rand Journal of Economics, (Vol. 26, No. 1, Spring 1995, pp. 131-147).

"The Competitive Effects of Line-of-business Restrictions in Telecommunications," (with K. Arrow and H. Sider), Managerial and Decision Economics, (Vol. 16, pp. 301-321, 1995). (Reprinted in Deregulating Telecommunications - The Baby Bells Case for Competition, edited by Richard S. Higgins and Paul H. Rubin, John Wiley & Sons Ltd., 1995.)

"The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee," (with A. Frankel), Antitrust Law Journal, (Spring 1995).

"Antitrust and Payment Technologies," (with A. Frankel), Review, Federal Reserve Bank of St. Louis (November/December 1995).

"Antitrust Policy Toward Mergers When Firms Innovate: Should Antitrust Recognize the Doctrine of Innovation Markets?" Testimony before the Federal Trade Commission Hearings on Global and Innovation-based Competition (October, 1995).

"You Keep on Knocking But You Can't Come In: Evaluating Restrictions on Access to Input Joint Ventures," (with S. Salop), Harvard Journal of Law & Technology, (Volume 9, Summer, 1996). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"Comments on Causes and Consequences of Airline Fare Wars," Brookings Papers on Economic Activity: Microeconomics, (1996).

"A Critical Assessment of the Role of Imperfect Competition in Macroeconomics," in Market Behavior and Macro Economic Modeling, Brakman, Van Ees, & Kuipers (eds.), MacMillan Press (1997).

"Price Rigidity," Business Cycles and Depressions, David Glasner ed., Garland Publishing, Inc., (1997).

"Communication Among Competitors: Game Theory and Antitrust," (with R. Gertner and A. Rosenfield), George Mason Law Review, (1997). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"Comments on Born and Viscusi," Brookings Papers on Economic Activity: Microeconomics, (1998).

"Antitrust and Higher Education: MIT Financial Aid (1993)," (with G. Bamberger), The Antitrust Revolution, in eds. J. Kwoka and L. White, (Oxford University Press, 3rd edition 1999).

"Market Power and Vertical Restraints in Retailing: An Analysis of FTC v. Toys 'R' Us," (with H. Sider), The Role of the Academic Economist in Litigation Support, edited by Daniel Slottje, North Holland, (1999).

“The Economics of Religion, Jewish Survival and Jewish Attitudes Toward Competition on Torah Education,” (with A. Weiss), Journal of Legal Studies, (2001). (Reprinted in Essential Readings on Jewish Identities, Lifestyles and Beliefs, edited by Stanford M. Lyman, Gordian Knot Books, 2003).

“A General Analysis of Exclusionary Conduct and Refusal to Deal -- Why Aspen and Kodak are Misguided,” Antitrust Law Journal, (2001). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

“The Lessons from Microsoft,” Business Economics, (January 2001).

"Lessons from Halacha About Competition and Teaching," (with A. Weiss), Center for Business Ethics Social Responsibility, http://besr.org/library/competition.html, (March 2001).

"The Choice of Organizational Form in Gasoline Retailing and The Costs of Laws Limiting that Choice," (with A. Blass), Journal of Law and Economics, (October 2001). Reprinted in Franchise Contracting and Organization, edited by Francine Lafontaine, Elgar Publishing, (2005).

"Should The Merger Guidelines Be Scrapped? Introduction to a Debate," in Symposium On The Antitrust Analysis Of Mergers: Merger Guidelines vs. Five Forces, 33 U. WEST L.A. L. REV. (2001).

"Free Riding and Sales Strategies for the Internet," (with J. Chevalier), The Journal of Industrial Economics, (December 2001).

“The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries,” (with M. Waldman), The Rand Journal (Vol. 33, No. 2, Summer 2002). (Reprinted in B. Klein and A. Lerner eds. Economics of Antitrust Law, Edward Elgar Publishing Ltd, 2008, and Recent Developments in Monopoly and Competition Policy, The International Library of Critical Writings in Economics, edited by George Norman, Edward Elgar Publishing Ltd, 2008.)

"The Competitive Effects of Fannie Mae," (with D. Gross and R. Stillman) in Housing Matters: Issues in American Housing Policy, Fannie Mae (January 2002, reprinted 2004).

"Intellectual Property, Antitrust and Strategic Behavior," (with R. Gertner), in eds. Adam Jaffee and Joshua Lerner, Innovation Policy and the Economy, Volume 3, MIT Press (2003).

"Airline Networks and Fares," (with G. Bamberger), Handbook of Airline Economics, 2nd ed., Darryl Jenkins, ed., McGraw Hill (2003).

"Contracts that Lessen Competition -- What is Section 27 for, and How Has it Been Used?" (with David Goddard), in Mark N. Berry and Lewis T. Evans eds., Competition Law at the Turn of the Century: A New Zealand Perspective, Victoria University Press (2003).

Interview, Economists’ Roundtable, Antitrust Magazine, (Spring 2003).

“The Relevance for Antitrust Policy of Theoretical and Empirical Advances in Industrial Organization,” (Fall 2003), George Mason Law Review.

"The Control of Externalities in Sports Leagues: An Analysis of Restrictions in the National Hockey League," (with A. Frankel and E. Landes), Journal of Political Economy, (February 2004), reprinted in Recent Developments in the Economics of Sport, edited by W. Andreff (forthcoming).

"An Empirical Investigation of the Competitive Effects of Domestic Airline Alliances," (with G. Bamberger and L. Neumann), Journal of Law and Economics, Vol. 47, No. 1, (April 2004, pp. 195-222).

"Why Barriers to Entry are Barriers to Understanding," American Economic Review, (May 2004).

"Using Economics to Improve Antitrust Policy," Milton Handler Lecture, Columbia Business Law Review, (June 2004).

"The Proper Role for Antitrust in an International Setting," (Keynote address: Second Annual Conference of the International Competition Network (ICN), Merida City, Mexico (June 25, 2003), appears as Appendix to "Using Economics to Improve Antitrust Policy", Columbia Business Law Review (June 2004).

"Econometric Analysis of Telephone Mergers," (with H. Sider) pp. 373-395 in American Bar Association, Econometrics: Legal, Practical, and Technical Issues, (2005).

"How Economics Can Improve Antitrust Doctrine Towards Tie-in Sales," (with M. Waldman), Competition Policy International, (Spring 2005).

Preface to: "Law and Economics of the Mexican Competition Laws," by Francisco Gonzalez de Cossio (2005).

"Transaction Costs, Externalities and "Two-Sided" Payment Markets," (with A. Frankel), Columbia Business Law Review, No. 3, Vol. (2005).

"Predation and the Entry and Exit of Low-Fare Carriers," (with G. Bamberger), in Advances in Airline Economics: Competition Policy and Antitrust, Darin Lee, ed., (2006).

"Why Tie An Essential Good," (with Michael Waldman), in Hahn R. ed., Antitrust Policy and Vertical Restraints, AEI-Brookings, (July 2006).

"Market Definition: Use and Abuse," Competition Policy International (Spring 2007)

Interview with Deputy Assistant Attorney General, The Antitrust Source (February 2007)

Separate Statement of Dennis W. Carlton, in The Report of the Antitrust Modernization Commission, (April 2007)

"Does Antitrust Need to be Modernized?," Journal of Economic Perspectives (Summer 2007)

"The Year in Review: Economics at the Antitrust Division 2006-2007" (with K. Heyer), Review of Industrial Organization, (2007).

"Economic Analysis of Competition Practices in the EU and the U.S.: A View from Chief Economists," (with M. Salinger), Competition Policy International (Autumn 2007).

"Merger Analysis," Palgrave Dictionary, (with J. M. Perloff), (2008).

"Tying," (with M. Waldman), in W. Collins ed. Issues in Competition Law and Policy, American Bar Association, (2008).

"Barriers to Entry," in W. Collins ed. Issues in Competition Law and Policy, American Bar Association, (2008).

"Product Variety and Demand Uncertainty: Why Mark-ups Vary with Quality," (with James D. Dana Jr.), Journal of Industrial Economics (2008)

"Regulation, Antitrust, and Trinko," (With H. Sider), in eds. J. Kwoka and L. White, The Antitrust Revolution, (2008).

"A Solution to Airport Delays," (with W. Whalen, K. Heyer and O. Richard), Regulation (2008).
"Should 'Price Squeeze' Be A Recognized Form of Anticompetitive Conduct?," Journal of Competition Law & Economics (2008).

"Safe Harbors for Quantity Discounts and Bundling," (with M. Waldman), George Mason Law Review (2008).

"Appropriate Antitrust Policy Towards Single-Firm Conduct: Extraction vs. Extension" (with K. Heyer)," Antitrust, (condensed version of subsequent paper), (Summer 2008).

"Extraction vs. Extension: the Basis for Formulating Antitrust Policy Towards Single-Firm Conduct" (with K. Heyer), Competition Policy International, (Autumn, 2008).

"Assessing the Anticompetitive Effects of Multiproduct Pricing," (with P. Greenlee and M. Waldman), Antitrust Bulletin, (Fall, 2008).

"The Need to Measure the Effect of Merger Policy and How to Do It," Antitrust, (condensed version of subsequent paper), (Summer 2008).

"How to Measure The Effectiveness of US Merger Policy," http://voxeu.org/index.php?q=node/3344, (2009), and a slightly revised version appears as "Measuring the Effectiveness of US Merger Policy" in The Economists' Voice: Vol. 6: Iss. 7, Article 2, (2009). These are condensed versions of the subsequent paper.

"Why We Need to Measure the Effect of Merger Policy and How to Do It," Competition Policy International (Spring 2009).

"Competition, Monopoly, and Aftermarkets," (with M. Waldman), Journal of Law, Economics and Organization, (April 2009).

"Competition Policy: Beware of Using It to Harm Competition," Fair Trade, Japan, (Spring, 2009).

"Should Competition Policy Prohibit Price Discrimination?" (with M. Israel), Global Competition Review, (2009).

"Merger Guidelines Revisited?" an interview, Antitrust, American Bar Association, (Fall 2009).

"How Should Economic Evidence be Presented and Evaluated," proceedings of the EU Competition Workshop, Florence, Italy, (June 2009).

"Externalities in Payment Card Networks: Theory and Evidence: A Commentary," The Changing Retail Payments Landscape: What Role for Central Banks?, Federal Reserve Bank of Kansas City (2010).

"Why Tie a Product Consumers Do Not Use?," (with J. Gans and M. Waldman), Recipient of Inaugural Robert F. Lanzilotti Prize, awarded by the International Industrial Organization Society for Best Paper in Antitrust Economics, (2008), American Economic Journal: Microeconomics (2010).

"Mergers in Regulated Industries: Electricity," in Competition Law and Economics: Advances in Competition Policy Enforcement in the EU and North America, A. Mateus and T. Moreira editors, (2010).

"Financial Issues (Comments on Bankruptcy and Clearing Houses)," Chapter X in Competition as Public Policy, American Bar Association, (2010).

"Revising the Horizontal Merger Guidelines," Journal of Competition Law & Economics (2010), also appears in Journal of Competition Law – CADE (Brazil) Vol. 1, No. 23 (2011), also appears in Revista de Direito da Concorrencia, Conselho Administrativo de Defesa Economica, (Brazilian Government Publication), translated into Portuguese by T. Aranovich, p. 83-114 (2011).

"Net Neutrality and Consumer Welfare," (with G. Becker and H. Sider), Journal of Competition Law & Economics, (2010).

"Will The New Guidelines Clarify or Obscure Antitrust Policy?," (with M. Israel), The Antitrust Source, (2010).

"Introduction to Stigler's Theory of Oligopoly," (with S. Peltzman), Competition Policy International, (2010).

"Response to Gopal Das Varma's Market Definition, Upward Pricing Pressure, and the Role of Courts: A Response to Carlton and Israel" (with M. Israel), The Antitrust Source, (2010).

"Use and Misuse of Empirical Methods in the Economics of Antitrust," 3(1) Competition Policy International Antitrust Chronicle, (2011).

"The Economics of Patent Ambush," Concurrences, New Frontiers of Antitrust, (2011).

"Antitrust and Regulation," (with R. Picker) in N. Rose ed., Economics of Deregulation, NBER, (forthcoming).

"Proper Treatment of Buyer Power in Merger Review," (with M. Israel), Review of Industrial Organization, (August 2011).

"Upgrades, Switching Costs, and the Leverage Theory of Tying," (with Michael Waldman), Economic Journal, (June 2012).

"The Economics of Cartel Cases and Use of Experts," (with G. Bamberger and M. Israel), in Manual on Cartel Enforcement, (forthcoming).

"Buyer Power in Merger Review," (with M. Coleman and M. Israel), in Oxford Handbook of International Antitrust Economics, (forthcoming).

UNPUBLISHED PAPERS

"Modeling the Housing Allowance Program," M.A. Thesis, Massachusetts Institute of Technology (September 1974).

"The Cost of Eliminating a Futures Market and The Effect of Inflation on Market Interrelationships," (1984).

"The Empirical Importance of Delivery Lags as an Explanation of Demand," (1984).

"Statistical Supplement to The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee Comment, 63 Antitrust Law Journal 903 (1995)," (with Alan Frankel), (May 1997).

“Antitrust and Not for Profits; The Case of Hospitals,” (with C. Capps, and G. David), mimeo (2010).

EXPERT TESTIMONIAL EXPERIENCE, 2009-2013

BoDeans Cone Company, et. al. v. Norse Dairy Systems; Interbake Foods, LLC, in the US District Court for the Northern District of Iowa Western Division, No. 5:09-CV-4014, August 27, 2009 (Deposition).

Chicago Board Options Exchange, Incorporated, Dow Jones & Company, Inc., and the McGraw- Hill Companies, Inc., v. International Securities Exchange, LLC and the Options Clearing Corporation in the Circuit Court of Cook County, Illinois County Department, Chancery Division, No. 06 CH 24798, January 29, 2010 (Deposition).

in Re: Delta/Airtran Baggage Fee Antitrust Litigation, in the United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action File Number 1:09-Md-2089-Tcb, February 24, 2011 (Deposition).

ActiveVideo Networks, Inc. v. Verizon Communications Inc. et al., In the U.S. District Court for the Eastern District of Virginia, No. 2:10cv248 (RAJ/FBS), May 26, 2011 (Deposition), July 25-26, 28, 2011 (Testimony).

DSM Desotech INC. v. 3D Systems Corporation and 3D Systems, Inc. in the United States District Court for the Northern District of Illinois, Docket No. 08C1531, August 26, 2011 (Deposition), November 14, 2011 (Deposition).

HTC Corporation et al. v. IPCOM GMBH & Co., KG in the United States District Court District of Columbia, Case No. 1:08-cv-01897- RMC, August 5, 2011 (Deposition).

in Re: TFT-LCD (Flat Panel) Antitrust Litigation, in the United States District Court Northern California San Francisco Division, No. C07-1827 SI, MDL No. 1827, August 17, 2011 (Deposition), April 10-12, 2012 (Deposition), June 25, 2012 (Testimony).

American Airlines, Inc., vs. Travelport Inc., Sabre, Inc., Sabre Holdings Inc., and Sabre Travel International Ltd., in the District Court of Tarrant County, 67th District Court, Cause No. 67-249214-10, September 12, 2012 (Deposition).

Apple Inc. and NeXT Software Inc., v. Motorola Inc. and Motorola Mobility Inc., August 15, 2012 (Deposition).

Costco Wholesale Corporation v. Sharp Electronics Corporation, and Sharp Corporation, ICDR Case No. 50 155 T 00912 11, October 23, 2012 (Deposition), October 24, 2012 (Testimony).

# Exhibit 2

# Materials Relied On

**Legal Documents, Expert Reports, and Depositions**

Second Consolidated Amended Class Action Complaint, In re Rail Freight Fuel Surcharge Antitrust Litigation, December 31, 2009

Defendant Union Pacific Railroad Company's Objections And Supplemental Responses To Direct Purchaser Plaintiffs' Second Set Of Interrogatories, In re Rail Freight Fuel Surcharge Antitrust Litigation, February 8, 2010

Corrected Expert Report of Gordon Rausser, Ph.D., In re Rail Freight Fuel Surcharge Antitrust Litigation, May 27, 2010 (submitted May 28, 2010)

Declaration of Charles M. Adams, June 18, 2010

Deposition of James Young, August 4, 2010

Expert Report of Gordon Rausser, Ph.D., In re Rail Freight Fuel Surcharge Antitrust Litigation, September 20, 2010

Deposition of Jack Koraleski, June 11, 2011 and December 2, 2011

Opinion, In re Rail Freight Fuel Surcharge Antitrust Litigation, June 21, 2012

Expert Report of Gordon Rausser, Ph.D., In re Rail Freight Fuel Surcharge Antitrust Litigation, October 15, 2012

Deposition of Gordon Rausser, Ph.D., December 11, 2012 and December 18, 2012

**Articles, Books, and Websites**

Articles

Dennis W. Carlton, Robert H. Gertner, and Andrew M. Rosenfield (1997), "Communication Among Competitors, Game Theory and Antitrust," *George Mason Law Review* 5(3): 423-440

George J. Stigler (1983), "What Does an Economist Know?" *Journal of Legal Education* 33(): 311-313

Laurits R. Christensen Associates, Inc. (2010), "An Update to the Study of Competition in the U.S. Freight Rail Industry, Final Report," prepared for the Surface Transportation Board

Perry A. Trunick (2008), "Costs Driving Trucking," *Logistics Today*, pp. 18-20

Whitney K. Newey; Kenneth D. West (1987), "A Simple, Positive Semi-definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix," *Econometrica* 55(3): 703-708

Books

Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th ed., Boston: Pearson/Addison-Wesley

Websites

Association of American Railroads, “Class I Railroad Statistics,” May 10, 2012, available at https://www.aar.org/StatisticsAndPublications/Documents/AAR-Stats-2012-05-10.pdf

Federal Express, “Fuel Surcharges,” available at http://www.fedex.com/us/services/fuelsurcharge.html#historical

National Motor Freight Traffic Association, Inc., “Standard Point Location Codes,” available at http://www.nmfta.org/pages/splc.aspx

Union Pacific, “Price And Document Inquiry System,” available at https://c02.my.uprr.com/pic/jas/index.jas

Union Pacific, “Where Can I Ship?,” available at http://www.up.com/customers/prospective/where/index.shtml

United Parcel Service, “Fuel Surcharge,” available at http://www.ups.com/bridge/fuelsurcharge.html

UP_ 2012 West Texas Intermediate Crude Oil (WTI) Prices, available at http://www.uprr.com/customers/surcharge/wti.shtml

UP_ Carload Rate Based Standard HDF Fuel Surcharge, available at http://www.uprr.com/customers/surcharge/index_revenue.shtml

UP_ Fuel Surcharge Applied for Coal Trains, available at http://www.uprr.com/customers/surcharge/surcharge_coal_archive.shtml

U.S.C. Title 49, Chapter 107, § 10706 and § 10703, January 03, 2012, available at http://uscode.house.gov/download/title_49.shtml

U.S. Department of Commerce, Bureau of Economic Analysis, “BEA Economic Areas (EAs),” available at http://www.bea.gov/regional/docs/econlist.cfm

Van Alen Institute and Association of American Railroads, available at http://www.vanalen.org/lasr/theneedforspeed

**Data**

Bloomberg Economic Value Added Spread, Union Pacific, 2000-2010, Bloomberg L.P.

Defendants' Transaction Data for years 2000-2008 (processed by Compass Lexecon)

Highway Diesel Fuel Index Futures Prices, 2003-2008, Energy Information Administration

Union Pacific Price Authority Data

West Texas Intermediate Crude Oil Futures Prices, 2003-2008, Bloomberg L.P.

**Bates-Numbered Documents**

UPFSC0000079-102

UPFSC0000343-282

UPFSC0000438-439

UPFSC0000490-492

UPFSC0000506-507

UPFSC0000518-519

UPFSC0000541-543

UPFSC0000553

UPFSC0000570-575

UPFSC0000571-570

UPFSC0000640

UPFSC0001030-035

UPFSC0001274-75

UPFSC0001558-570

UPFSC0052815-817

UPFSC0057756

UPFSC0078792-5

UPFSC0276428-9

UPFSC0276430

UPFSC0347641

UPFSC0362818

UPFSC0362818

UPFSC0418186

UPFSC0552636

**Non-Bates-Numbered Documents**

Master Intermodal Transportation Agreement, Union Pacific Exempt Circular MITA 2-A

Surface Transportation Board, Rail Fuel Surcharges, STB Ex Parte No. 661, January 26, 2007

Union Pacific Corporation Form 10-K for fiscal years ended December 31, 2000-December 31, 2008

# Appendix A

# Description of Defendant Data

## TRANSACTION DATA PROCESSED BY COMPASS LEXECON

The transaction dataset that I refer to in my report was prepared by Compass Lexecon, in support of the Joint Defendants' Expert Professor Joseph Kalt. Compass Lexecon assembled the data using waybill and fuel surcharge information from BNSF, CSX, NS, and UP. The dataset contains the unregulated traffic served by each carrier at the weekly level. The raw data files provided by BNSF, NS, and UP cover the period from January 2000 through December 2008; CSX's data covers the period from April 2001 through December 2008. It includes fields that designate the railroad, the customer, the price document under which the shipment was made, the type of commodity transported, the movement type, the railcar type, the origin and destination of the shipment, the net and gross revenues associated with shipment, and fuel surcharge revenue. The dataset has also been supplemented with additional information provided by Defendants that identifies legacy shipments. For UP, data from its Genesis system was used to determine which movements were covered by fuel surcharge terms (regardless of whether a fuel surcharge was actually paid).

## UP PRICE AUTHORITY DATA

For several analyses contained in my report, I supplement the information on UP price authorities in the transaction data with additional UP data. This data was extracted from UP's Genesis system and provides a monthly snapshot of non-FSC adjustment terms for the PAs contained in the system. This database also provides the information to determine whether a PA is privately negotiated or is a publicly-available circular.

# Appendix B

# UP and BNSF Public Fuel Surcharges

## UP and BNSF Public Carload Fuel Surcharge Timeline

| Railroad | Effective Month | Benchmark Index | Threshold | FSC at Threshold | Fuel Price Increment | Fuel Surcharge Increment | Calculation Method | Adjustment | Lag |
|---|---|---|---|---|---|---|---|---|---|
| UP | Dec-02 | WTI | $28/Barrel | 2.0% | $5/barrel | 2.0% | The price of WTI must equal or exceed a given bracket for thirty (30) consecutive published days for the surcharge under that bracket to be applicable. | | |
| UP | Jun-03 | HDF | $1.35/Gallon | 1.5% | $.05/gallon | 0.5% | If the average price of HDF is at or exceeds $1.35 per gallon then an initial fuel surcharge of 1.5% will be applied. For every $0.05 per gallon increase in HDF, an additional 0.5% fuel surcharge will be applied. | Monthly | Two Months |
| UP | Apr-07 | HDF | $2.30/Gallon | $.05/mile | $.05/gallon | $.01/mile | The Mileage based fuel surcharge will apply when the HDF monthly average price reaches or exceeds $2.30 per gallon. The initial rate at the strike price will be $.05/mile, and increasing by $.01/ mile for every $.05/gallon increases in HDF. Mileages will be calculated using rail miles contained in the ALK Technologies' PC*MILER Rail program. | Monthly | Two Months |
| BNSF | Apr-00 | WTI | $28/Barrel | 2.10% | Continuous based on Formula | Continuous based on Formula | FSC Calculated as: ((WTI/$23.5)-1)*10.7. | Monthly | One Month |
| BNSF | Oct-00 | WTI | $28/Barrel | 2.0% | $2.50/barrel | 1.0% | When the average price of WTI crude oil exceeds $28 per barrel an initial fuel surcharge of 2% will be applied. After the Initial surcharge, there will be a 1% surcharge for every $2.50 per barrel increase in the price of crude oil. | Monthly | One Month |
| BNSF | Jul-01 | HDF | $1.30/gallon | 1.0% | $0.05/gallon | 0.5% | When the average price of Highway Diesel Fuel (HDF) equals or exceeds $1.30 per gallon, an initial surcharge of 1% will applied. For every $.05 per gallon increase in HDF, a 0.50% fuel surcharge will be applied. | Monthly | Two Months |
| BNSF | Jun-03 | HDF | $1.25/gallon | 0.5% | $.05/gallon | 0.5% | When the average price of Highway Diesel Fuel (HDF) equals or exceeds $1.25 per gallon, an initial surcharge of 0.5% will applied. For every $.05 per gallon increase in HDF, a 0.5% fuel surcharge will be applied. | Monthly | Two Months |
| BNSF | Jan-06 | HDF | $1.25/gallon | $.01/mile | $.04/gallon | $.01/mile | When the average price of Highway Diesel Fuel (HDF) equals or exceeds $1.25 per gallon, an initial surcharge of $.01 per mile will be applied. For every $.04 per gallon increase in HDF, a $.01 per mile fuel surcharge will be applied. This surcharge applies to Local and Rule 11 Agriculture items only. | Monthly | Two Months |

Sources: BNSF-0657303-304, BNSF- 0516245, BNSF- 0516609, BNSF- 0516610, BNSF-0511811, BNSF0657373-75, UPFSC0000079-101 at UPFSC0000100, UPFSC0000553, UPFSC0001558-1570, UPFSC0000570-575

Highly Confidential

## UP and BNSF Public Coal Fuel Surcharge Timeline

| Railroad | Effective Month | Benchmark Index | Threshold | FSC at Threshold | Fuel Price Increment | Fuel Surcharge Increment | Calculation Method | Adjustment | Lag |
|---|---|---|---|---|---|---|---|---|---|
| UP | Nov-04 | HDF | 1.35/Gallon | 1.5% | $0.05/ gallon | 0.5% | If the average monthly price of HDF is greater than or equal to $1.35 per gallon, an initial fuel surcharge of 1.5% will be applied. For every $.05 per gallon increase in HDF, an additional fuel surcharge of 0.5% will be applied until the threshold reaches $1.60. At the $1.60 per gallon threshold, a fuel surcharge of 0.75% will applied for every $.05 per gallon increase in HDF. | Monthly | Two Months |
| | | | 1.60/Gallon | 4.25% | $0.05/ gallon | 0.75% | | | |
| BNSF | Jul-04 | HDF | $1.24/Gallon | 0.5% | $.04/gallon | 0.5% | When the average monthly price of HDF is at or exceeds $1.24 per gallon, a fuel surcharge of 0.5% will be applied. For every $.04 per gallon increase in HDF, an additional 0.5% fuel surcharge will be applied. | Monthly | Two Months |
| | Jan-06 | HDF | $1.25/Gallon | $.01/mile | $.06/gallon | $.01/mile | If the average price of Highway Diesel Fuel is at or exceeds $1.25 per gallon, a $.01 per mile surcharge will be applied. For every $.06 per gallon increase in HDF, an additional $.01 per mile surcharge will be applied. | Monthly | Two Months |

Sources: BNSF-0031091-92 UPFSC0001274 -75, UPFSC0001558-1570

## UP and BNSF Public Intermodal Fuel Surcharge Timeline

| Railroad | Effective Month | Benchmark Index | Fuel Weight | Base Rate | FSC Formula | Frequency | Lag |
|---|---|---|---|---|---|---|---|
| UP | Nov-00 | HDF | 20.0% | 1.292 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Oct-01 | HDF | 20.0% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Apr-05 | HDF | 18.5% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Oct-06 | HDF | 16.5% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Jan-07 | HDF | 16.5% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Weekly | One Month |

| Program | Effective Month | Benchmark Index | Threshold | FSC at Threshold | Fuel Price Increment | Fuel Surcharge Increment | Frequency | Lag |
|---|---|---|---|---|---|---|---|---|
| BNSF | Mar-00 | HDF | $1.10/gallon | 0.50% | $.05/gallon | 0.5% | Weekly (every Wednesday) | One week |
| | Sep-00 | HDF | $1.24/gallon | 1.0% | $.04/gallon | 0.5% | Weekly (every Wednesday) | One week |

Sources: BNSF-FSC 001705-708, UPFSC0078792-95, UPFSC 0362818, UPFSC 0418186, Master Intermodal Transportation Agreement (MITA) pg. 97-98, UPFSC0552636, UPFSC0000518-519

**EXPERT REPORT**
**OF**
**LINDA J. MORGAN, Esq.**

**In the matter of**

**IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION**
**USDC, District of Columbia**

**MDL Docket No. 1869**
**Misc. No. 07-489 (PLF/AK/JMF)**

**January 22, 2013**

## TABLE OF CONTENTS


I. Expert Qualifications .......... 2

II. The Freight Transportation Industry Pre-Staggers Act .......... 4

III. The Staggers Act and the Freight Transportation Industry Post-Staggers .......... 5

IV. The Responsibility of the Surface Transportation Board to Implement the Framework Established in the Staggers Act .......... 7

V. Events Leading To The STB's 2000 "Merger Moratorium" .......... 8

VI. Strategic Alliances and Other Cooperative Efforts Between Interline Partners .......... 14

VII. Conclusion .......... 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This document relates to:<br><br>ALL CASES | |

# EXPERT REPORT OF LINDA J. MORGAN

I have been retained in *In Re: Rail Freight Fuel Surcharge Antitrust Litigation* to provide information to the Court and the fact-finder regarding certain aspects of the freight transportation industry ("industry"). My testimony is based upon my more than three decades of experience working with the industry, first as counsel for the U.S. Senate Committee on Commerce, Science and Transportation ("Senate Commerce Committee") during the deliberations and ultimate passage of the Staggers Rail Act of 1980 ("Staggers Act"), and then as a Commissioner and ultimately Chairman of the Interstate Commerce Commission ("ICC") and its successor, the Surface Transportation Board ("STB"), the federal economic regulator of the freight rail industry. Though I may refer in this report to various laws and regulations, I will not be offering as an expert any testimony as to legal conclusions regarding the proper scope, application or interpretation of any laws and regulations in connection with this case. Rather, my testimony is intended to provide important factual background and context, particularly regarding the importance of strategic alliances and other cooperative efforts between railroads to the efficient and effective operation of our national freight transportation network.

## I. EXPERT QUALIFICATIONS

A full copy of my *curriculum vitae* is attached to this report as Exhibit A. I also have provided below a summary of my relevant positions and experience.

I am currently a partner at the law firm of Nossaman, LLP, where I specialize in providing legal and strategic advice on transportation issues. Specifically, I represent clients before the STB, assist clients in securing project authorization from federal, state, and local transportation authorities, and advise clients on legislative and regulatory activities affecting the transportation industry. Before joining Nossaman, I was a partner at Covington & Burling, LLP, where I provided similar legal and strategic counsel for the transportation industry.

Prior to beginning my career in private law practice in Fall of 2003, I served in the public sector for 25 years. After graduating from law school, I worked for 15 years from Fall of 1978 through Spring of 1994 as counsel to the Senate Commerce Committee, including 7 years as General Counsel. During my tenure with the Committee, I was responsible for numerous legislative initiatives affecting the economic and safety regulation and funding of the freight and passenger transportation industries. In particular, I was directly involved in the development, deliberations and enactment in 1980 of the Staggers Act, which significantly streamlined the economic regulation of the freight rail industry to allow it to operate more in the marketplace with less governmental intervention. This law established the national rail policy that I later had responsibility for implementing as Chairman of the ICC and the STB.

I left the Senate Commerce Committee to join the ICC in early 1994 after being nominated and confirmed as an ICC Commissioner. In early 1995, I was designated ICC Chairman. Upon passage of the ICC Termination Act of 1995, which dissolved the ICC and created the STB as its successor agency, I became Chairman of the newly established STB. I

remained in this position from January 1996 to the end of 2002, at which point I became an STB Commissioner until my departure from the agency before Summer of 2003.

As Chairman of the STB, my responsibilities included overseeing the disposition by the agency of its docket, which included numerous rulemakings and adjudications involving rail rates and service and rail line restructuring matters as well as a variety of non-rail surface transportation matters affecting the motor carrier, water carrier and pipeline sectors. In particular, I presided over the imposition in 2000 of a rail merger moratorium and the development of new rail merger rules as embodied in the proceeding entitled *Major Rail Consolidation Procedures*, STB Ex Parte No. 582, which became effective in 2001. I left the STB before the initiation of the proceeding related to freight rail fuel surcharges, *Rail Fuel Surcharges*, STB Ex Parte No. 661.

My experience working for the U.S. Senate and at the ICC and the STB has provided me with specialized knowledge regarding the freight transportation industry, including the genesis and objectives of the national rail transportation policy, the evolution of the national rail network in accordance with this policy from a heavily regulated industry to one allowed to operate more in the marketplace, and the unique challenges faced by privately-funded railroads that must operate in a highly networked industry, earn revenues sufficient to maintain and improve their infrastructure, and compete effectively with other modes of surface transportation, including trucks, barges, and pipelines. My career also has provided me with a regulator's perspective regarding the relationship between rail carriers and their customers and the balancing of their respective interests. This Report, and my expert testimony more generally, is based on this specialized knowledge, experience, and expertise.

## II. THE FREIGHT TRANSPORTATION INDUSTRY PRE-STAGGERS ACT

In the years leading up to enactment in 1980 of the Staggers Act, policymakers became increasingly concerned with the declining financial health of the freight rail industry. Rail car derailments were occurring with greater frequency because of inadequately maintained track, resulting in poor service and unsafe conditions. Rail customers were complaining with increasing intensity and frequency about unresponsive service, in particular about cars that were arriving chronically and significantly late, if at all, for shipment pickup and delivery. Railroads continued to lose more and more market share to a maturing trucking industry and highway system. Rail revenues continued to decline. The downward financial spiral exacerbated the bankruptcy trend that had started in the early 1970s with the massive bankruptcy of the Penn Central, resulting in the bankruptcy of both the Milwaukee and the Rock Island Railroads, which because of their geographic reach caused significant disruption for rail customers, communities and employees particularly in the Midwest. In short, the private freight rail industry was hemorrhaging financially.

Faced with this deteriorating financial trend, the very real prospect that a freight rail industry could not survive without a massive infusion of government funds, and the grim reality of an overloaded highway system that would require significant expenditures of tax dollars to accommodate the additional traffic, policymakers initiated an intensive multi-year examination to assess the cause of the decline and options for restoring the freight rail industry to financial health and sustainability as a private enterprise. The analyses were conclusive. The industry was overly regulated, and thus unable to operate in a cost-effective and efficient manner and earn revenues sufficient to cover all the costs associated with the operation of the rail network. No rate could be charged without the approval of a tariff by the ICC. Approved rates did not accurately reflect the marketplace in which the railroads operate or account for the contribution

that the price charged for a particular movement must make to covering the costs of maintaining the network. Rail carriers and customers were not able to enter into private contracts concerning rates and services that would be outside of the regulatory process and more tailored to the specific interests of the parties involved. No rail line could be abandoned without extensive review, even if it were consistently losing money. No merger or consolidation could occur without years of regulatory examination. The freight rail industry was not able to respond quickly to shifts in the marketplace and changing customer needs, nor were the railroads able to price to the market. The net result was an industry unable to compete with the more nimble trucking industry, earn revenues sufficient to maintain and enhance its privately owned and financed rail infrastructure, and provide efficient and cost-effective service to its customers.

## III. THE STAGGERS ACT AND THE FREIGHT TRANSPORTATION INDUSTRY POST-STAGGERS ACT

Congress passed the Staggers Act in 1980 in direct response to the financial struggles facing the freight rail industry. As counsel for the Senate Commerce Committee, I was directly involved in the drafting and consideration of this legislation, which ushered in a new era for freight rail transportation by eliminating unnecessary governmental regulation, allowing more rates to be set by the operation of the marketplace, and promoting service more tailored to the needs of rail customers – all policy objectives specifically set forth in the law. In particular, the new law, still in place today, allowed rail carriers to enter into privately negotiated contracts with shippers that included rates which could be priced to the market and established by the parties, not the government. These contracts also included other terms more tailored to the needs of the particular customer, such as service levels, equipment availability, and minimum volume guarantees. To minimize unnecessary regulation, the law provided for rate review only where there is ineffective competition by requiring a threshold showing of market dominance by the

railroad before a shipper complaint could be considered. The law also provided for the exemption of a particular person, type of transaction or service from regulation if the regulation is not necessary to carry out the rail transportation policy and either the matter under review is limited in scope or application of the regulation is not needed to protect shippers from an abuse of market power. The law also streamlined the process for obtaining abandonment and consolidation authority to facilitate the reduction in excess and unnecessarily duplicative capacity. To improve the financial health of the industry, the law set as a specific policy goal the need for the industry to earn revenues sufficient to attract capital for reinvestment in its infrastructure. With this goal in mind, the ICC was directed to adopt a rate review process that reflected the need for the industry to be able to set rates to ensure sufficient contribution to coverage of network costs as well as the incremental costs associated with individual movements. These and other changes were intended to reduce governmental interference in the operations of the freight rail industry, promote better and more cost-effective service, enhance the ability of the railroads to invest in their infrastructure, and ensure the viability of a national freight rail network that could compete effectively and safely with other modes of transportation without the need for government subsidies.

Looking back on the thirty years that followed, the results were even more positive than anyone had envisioned. Privately negotiated contracts proliferated. With the law's loosening of regulation over mergers and other restructuring, rail carriers were able to reduce excess capacity and substantially improve the timeliness and efficiency of their service. The outcome was more business and more revenues available for investment in maintaining and improving the infrastructure. Capital investment increased for the first time in years. The net result was an industry better able to compete and provide service more responsive to its customers. The

Staggers Act was successful in reversing the industry's downward financial spiral and putting the freight rail industry on a sounder financial footing, to the benefit of rail customers and the national freight transportation network as a whole.

## IV. THE RESPONSIBILITY OF THE SURFACE TRANSPORTATION BOARD TO IMPLEMENT THE FRAMEWORK ESTABLISHED IN THE STAGGERS ACT

The STB is the independent regulatory agency responsible for administering the economic regulatory principles and framework established in the Staggers Act. The agency was created as the successor to the ICC in the ICC Termination Act of 1995. Although administratively affiliated with the Department of Transportation, the STB is decisionally independent. It serves as both an adjudicatory and a regulatory body. The agency has jurisdiction over railroad rate and service issues and rail restructuring transactions (mergers, line sales, line construction, and line abandonments), as well as certain trucking company, moving van, and non-contiguous domestic water trade rate matters; certain intercity passenger bus company structural and operational matters; and rates and services of certain pipelines not regulated by the Federal Energy Regulatory Commission.

A key responsibility of the STB is to balance the interests of rail customers and railroads. Railroads clearly need to earn enough money to ensure that we do not return to the days of financial distress that led to the passage of the Staggers Act. Stated differently, the railroads must have the opportunity to operate profitably to cover all the costs of maintaining their networks and to be able to reinvest in their infrastructure. At the same time, rail customers and the nation's transportation system in general clearly have an interest in reasonable rates and responsive service. If the competitive forces of the marketplace are not effective in protecting these interests, the STB has the power to step in if a complaint is filed.

The goal of balancing the interest of the railroads in earning adequate revenues with the interests of rail customers in reasonable rates and service is reflected throughout the statute that the STB implements. The STB only has jurisdiction to review a rail rate that is above a certain revenue to variable cost ratio and where the railroad has market dominance over the movement at issue. Once that threshold is met, the STB then examines whether the rate is reasonable, taking into account whether the rate covers the incremental costs of a particular movement and a reasonable contribution to the costs of maintaining the network from which this particular movement benefits.

The STB also is responsible for enforcing the common carrier obligation, which provides that a railroad shall provide transportation or service on reasonable request, with respect to certain traffic. In addition, the STB has the authority to enforce the railroad's obligation to establish reasonable rules and practices in connection with such traffic. To promote continued and improved service and cost efficiencies, the STB facilitates new rail line construction, the spinoff of lines from larger railroads to smaller ones, and the abandonment of lines that are losing money unless the burden on the railroad to continue operating the line is far outweighed by the interest in continued rail service on the part of the community and affected customers. The STB is responsible for approving merger applications and imposing conditions that are in the public interest, after finding that there are clearly identifiable public benefits particularly in terms of improved and more cost-effective service that outweigh any potential harm from the consolidation.

## V. EVENTS LEADING TO THE STB'S 2000 "MERGER MORATORIUM"

By the mid 1990s, contemporaneous with my assuming the Chairmanship of the ICC, the freight rail industry had undergone significant realignment as envisioned when the Staggers Act was passed. Major consolidation had occurred and a significant number of duplicative and

unprofitable lines had been shed. Around this time, the ICC began to hear complaints from customers about deteriorating service and responsiveness on the part of the railroads, which customers viewed as a fallout from all the restructuring that had occurred.

Also during this time frame, the ICC and its successor the STB approved an additional round of major consolidation among larger railroads, which was more significant in scope and effect than prior mergers. This particular round began with the merger of the Burlington Northern and Santa Fe railroads, which led in the West to the merger of the Union Pacific (UP) and the Southern Pacific (SP) railroads. These two mergers resulted in the two major railroads that exist today in the West, BNSF and UP. The consolidation in the West was then followed in the East by the dissolution of Conrail, the railroad that had been created from the bankruptcy of the Penn Central, and its division between the CSX and Norfolk Southern (NS) railroads. This consolidation added more competition in the region because as a result of the merger both CSX and NS now serve areas where only Conrail had operated before the merger. In addition to these mergers, Illinois Central was merged into Canadian National (CN), creating a more consolidated North-South rail system in the middle of the country. The rail network that we have today, which is comprised of 7 Class 1 railroads – BNSF and UP in the West, CSX and NS in the East, CN, Canadian Pacific and Kansas City Southern – was the result of that round of major mergers. As Chairman of the ICC and then the STB, I presided over the regulatory review of this major round of mergers.

In reviewing and ultimately approving these major mergers, the ICC and the STB found that significant cost and service efficiencies would result from the single-line service that would be created and that competition would be preserved. However, these efficiencies were not immediately realized because the implementation of this round of mergers proved to be more

difficult than had been envisioned. The difficulties stemmed in large measure from the scope of the integration, which far exceeded any consolidation in the past. And the economy began to grow at the same time that these mergers were being implemented. This meant that more freight was being placed into the system before the merged networks were ready to handle it. The result was massive computer system breakdowns that sent cars in the wrong direction and severely congested rail yards that brought operations in the area to a complete standstill. The situation as the UP/SP merger was being implemented became so dire that the STB took the unprecedented step of issuing an emergency service order in 1997 directing among other actions that competitor carriers step in to help with the unclogging of the Houston rail terminal. Indeed, operational problems in one area of the country can have significant ripple effects throughout the entire rail transportation system. The STB has authority and responsibility to ensure that railroads cooperate with each other in order to assure the continued effective operation of the highly interdependent rail transportation system.

The net result was a groundswell of concern voiced by the customer community and public officials about the state of the freight rail industry. These concerns prompted the agency in February 1998 to initiate STB Ex Parte No. 575, a proceeding entitled *Review of Rail Access and Competition Issues*, to examine the industry and the service it was providing. In connection with this proceeding, the agency among other actions directed the railroads to enhance certain of their collaborative efforts to improve operations, such as through enhanced technology and joint dispatching initiatives. It also directed the industry to establish more robust avenues of communication with its customers to discuss service concerns. In addition, the STB assigned specific agency employees who would be available to bring railroad and shippers together to

resolve informally disputes concerning the service that the customers were receiving. This agency initiative became known as the Rail Consumer Assistance Program.

Rail customers blamed the escalating poor service and lack of responsiveness on the proliferation of mergers. Even the investment community began to question the wisdom from a financial perspective of pursuing mergers of this size and scope, urging extreme caution about any future consolidation as the excess capacity that had existed was largely eliminated with this last round of mergers.

It is against this backdrop that the merger of the BNSF and CN was proposed in late 1999. It was clear to me that another merger of this scope would further exacerbate the disruption that had occurred and still existed as a result of the prior round of mergers. I also believed that this proposed merger would trigger a final round of major rail restructuring that would ultimately result in two large transcontinental railroads in the United States. The wisdom of such further consolidation was being seriously questioned by carriers, shippers, investors and public officials, and I did not believe that the STB merger rules in effect at that time were adequate for a full review of these critical questions.

To address this concern, the STB initiated proceedings in early 2000 to take public comment on the general subject of major rail consolidations and the present and future of the North American railroad industry. Based on extensive written statements submitted in the proceeding as well as oral testimony received during 4 days of hearings, the STB concluded that the freight rail sector was not in a position to undertake what would likely be the final round of major consolidation of the freight railroad industry in North America, and that the merger rules existing at the time were not adequate to address the broad concerns associated with reviewing any proposals that would likely lead to such a final restructuring. The STB therefore announced

that it would revise its merger rules. Because it made no sense to develop new merger rules applicable to the final round of mergers in the middle of what would likely be the beginning of the final round, the STB also announced that it would decline for a 15-month period to accept further filings involving a major transaction until new merger rules were in place. This became known as the "merger moratorium".

Shortly thereafter, the agency issued an advanced notice of proposed rulemaking seeking comment on possible modifications to its merger rules. As part of that decision, the STB specifically indicated that the original goal of the merger policy reflected in the existing merger rules, which was to rationalize the rail system by reducing excess capacity through consolidation, had been largely achieved. The STB further indicated the view expressed in connection with the recent hearings that the benefits of more efficient and cost-effective service that had been derived from the increased single-line service created from mergers could be better achieved, short of a merger, through innovative joint marketing arrangements and other cooperative efforts between rail carriers. The STB specifically sought comment on the proposal suggested during the hearings that, as part of any new rules, merger applicants should be required to show that any claimed synergies or other public benefits could not be achieved by means short of merger, through marketing alliances or cooperative operating practices.

This extensive rulemaking process culminated in the issuance of new merger rules in June 2001 that essentially raised the bar for future merger approvals. The focus of the new merger regulations was to: (1) prevent the service and financial problems associated with the last round of rail mergers; (2) address the competitive concerns with further consolidation; and (3) ensure that future mergers add value and provide benefits that clearly outweigh any potential harm. In issuing these new rules, the agency was particularly focused on the best way to

continue to achieve a key original goal of the merger policy, which was to enhance the service the railroads provided to their customers. With this goal in mind, the agency did include in its final rules the requirement proposed earlier in the proceeding that merger applicants must show that any claimed public benefits such as enhanced service could not be achieved other than by mergers, such as through alliances or other cooperative efforts among the railroads. For the first time, the merger rules explicitly suggested that cooperative efforts between railroads could achieve the same positive results in terms of customer service that mergers had in the past but without the potential harm that could be created by further consolidation.

Overall the new rules reflected a significantly restructured rail industry that was no longer faced with excess capacity but rather constrained capacity occasioned by growing demand for rail transportation. Going forward, it would be crucial for the carriers to work together to make the most efficient use of existing infrastructure to ensure continued service enhancement for rail customers. As I wrote in my separate expression accompanying the final rules:

> [I]t is essential for the railroads to continue to focus on effectively and creatively running, day-to-day, the businesses that they now have, with a view toward more efficient operations, improved service, increased cooperation among themselves, and better customer and employee relations, all of which are necessary for the rail sector to thrive. While mergers have their place, recent events have shown that no major merger takes place in isolation, and that, once a round of mergers begins, it can be all-consuming, distracting, and disruptive, to the detriment of the nation's transportation system, rail shippers, rail employees, and communities across the country. Important progress has been made during the Board-imposed 15-month moratorium in stabilizing the rail network, enhancing service reliability, pursuing alliances and other cooperative arrangements among railroads, and promoting more positive relationships with rail workers, rail users, and others. We must be careful not to undo the important progress that has been made, and we must continue to promote an environment in which that progress can be furthered.

With the issuance of the new merger rules, the agency intended for the rail carriers to continue to find ways short of merger to improve service to their customers by focusing on operating their existing systems better and working together more effectively.

## VI. STRATEGIC ALLIANCES AND OTHER COOPERATIVE EFFORTS BETWEEN INTERLINE PARTNERS

Because we have stopped short of the final round of rail consolidation, no one carrier owns track that crosses over the entire United States from one coast to another. Therefore, many shipments must often travel on at least two railroad lines. This is called "interline traffic." Interline movements are necessary throughout the United States to move goods across the country and can involve both larger and smaller railroads. All commodities – coal, grain, chemicals, construction materials and consumer goods, to name a few – move by interline at one point or another. Interlining is common with, although not exclusive to, movements from the eastern United States to the western United States or vice versa, as the four biggest U.S. rail carriers generally operate on one side of the Mississippi River or the other (CSX and NS in the East, BNSF and UP in the West).

On interline movements, rail carriers operate as partners, not competitors. For such interline movements to be effectuated effectively, railroads not only must discuss, and agree upon, rates to charge customers for interline services (unless Rule 11 pricing is requested), but also must work together to create efficient routes, coordinate the exchange of goods from one railroad to another, communicate about the most efficient use of terminal areas where exchanges between carriers often occur, ensure the optimal safety and efficiency of the interline movement, and together market these services to customers who can benefit from such interline service offerings. Operational and marketing cooperation and a professional working relationship between interlining carriers are clearly necessary in order to successfully and efficiently

complete interline movements and thereby fulfill the needs of shippers. To achieve this needed cooperation, the interlining railroads must be able to discuss all aspects of their joint business, particularly as they try to penetrate new markets and compete more effectively with trucks, barges and pipelines.

One of the themes that clearly emerged during the proceedings that led to the new merger rules was the persistent complaint by rail customers that rail carriers were not cooperating and working together efficiently. In particular, customers complained that, on movements involving more than one railroad, shippers would often be left needing to talk to each interline carrier separately in order to work out the specific details of the move, rather than being able to talk to one carrier that then could work cooperatively with the interline partner regarding the details of the move. With this concern in mind, I viewed the merger moratorium as an important opportunity for railroads to turn their attention away from mergers and toward their existing systems, and to enhancing service to their customers by operating their existing network more efficiently. I believed that one way to achieve additional efficiencies would be with greater cooperation among railroads, through interlining of traffic, joint dispatching initiatives to move trains through congested terminal areas, joint marketing agreements and strategic alliances that encompassed interline moves across a broad geographic area. The term "strategic alliances" had been used in the industry for years, and at the STB we had seen examples of how these alliances increased and improved service offerings and interline efficiency across the industry.

Accordingly, as noted above, when the STB announced that we would decline to accept further merger filings until new merger rules were put in place, the STB specifically encouraged railroads to achieve additional efficiencies through such cooperative efforts short of merger. My decision to pursue a merger moratorium and new merger rules was a reminder to the railroads

that mergers do not have to be the first choice or the only choice when they are considering ways to strengthen and improve their networks, particularly given the great risks associated with further consolidation. I wanted the railroads instead to focus on ways to achieve the same type of efficiencies that can be realized from the single-line service created by mergers but without the potential harm that could result from more consolidation. The way in my view to achieve such efficiencies short of a merger was through cooperative efforts between interline partners and strategic alliances that would involve joint marketing efforts directed at all sorts of possible interline offerings. Stated differently, such alliances could produce the benefits of single-line service because by cooperating broadly the interline partners would be acting as one for the purposes of marketing and providing the service to the customers involved.

What became clear from the record compiled in the proceeding leading to the adoption of new merger rules was that railroads and rail customers alike were pushing for and ready to embrace a world without more mergers, and a world with more cooperation between railroads. The merger moratorium, the new merger rules that emphasized benefits short of a merger that could be realized through strategic alliances and other cooperative efforts, and the clear message from the STB that the carriers were to focus on the existing network and how to improve its efficiency were clearly in line with what the rail community had urged. In this world in which mergers are subject to the test of whether the same efficiencies can be gained through other measures, strategic alliances between interlining railroads are not only expected, they are essential to provide the nation with efficient and effective national rail service. In accordance with the STB's encouragement, cooperative efforts and strategic alliances between interline partners have become common across all railroads (not just the four involved in this case), and

those efforts have helped achieve the system efficiencies that the STB envisioned when it originally encouraged them.

## VII. CONCLUSION

The objective of the Staggers Act was to improve the financial viability of the freight rail industry and the service that it could provide by eliminating unnecessary regulation and allowing the industry to operate more in the marketplace. The merger moratorium and the new merger rules approved by the STB, which encouraged strategic alliances and other joint efforts between interlining railroads, promoted this important objective, ushering in a new era in which there would be less focus on consolidation and more attention to getting the most out of the existing system for the benefit of shippers and carriers alike. The industry is stronger today because of this shift in focus, and to the benefit of railroads and shippers alike.

Respectfully submitted,

Linda J. Morgan

Linda J. Morgan

# Exhibit A

## *Curriculum Vitae* and Publications of Linda J. Morgan, Esq.

# Exhibit A
## *Curriculum Vitae* and Publications of Linda J. Morgan, Esq.

**Linda J. Morgan**
Partner, Nossaman LLP
1666 K Street, N.W.
Suite 500
Washington, D.C. 20006
Email: lmorgan@nossaman.com
Tel: 202-887-1429
Fax: 202-466-3215

January 2013

## Professional Positions

Partner, Nossaman LLP, September 2011 – Present: I specialize in providing legal and strategic advice on transportation issues, representing clients before the Surface Transportation Board (STB), assisting clients in securing project authorization from federal, state, and local transportation authorities, and advising clients on legislative and regulatory activities affecting the transportation industry.

Partner and Of Counsel, Covington & Burling LLP, September 2003 – July 2011: As chair of the transportation practice and co-chair of the governmental affairs practice, I provided counsel on a broad array of regulatory and legislative transportation issues, including representation of clients before the STB, the Department of Transportation, and Congress.

Chairman and Commissioner, the Surface Transportation Board and its predecessor the Interstate Commerce Commission (ICC), April 1994 – June 2003: During my 10-year tenure, I oversaw as the last Chairman of the ICC the winding down of the agency pursuant to the ICC Termination Act of 1995. As the first chairman of the STB, I was responsible for putting in place the new agency. As agency Chairman, I presided over numerous regulatory proceedings, including rail rate and service matters and railroad merger cases of unprecedented national scope and complexity. I also testified before Congress on numerous occasions about the policies embodied in the Staggers Rail Act of 1980 and the ICC Termination Act of 1995.

General Counsel and Staff Counsel, U.S. Senate Committee on Commerce, Science and Transportation, September 1978 – March 1994: During this 15-year period, I was responsible for numerous legislative initiatives affecting the economic and safety regulation and funding of the freight and passenger transportation industries, much of which established the framework for today's transportation system. In particular, I was directly involved in the development and enactment of the Staggers Rail Act of 1980, which significantly streamlined the economic regulation of the freight rail industry.

## Education

Georgetown University Law Center, J.D., 1976

Vassar College, A.B., 1973

Graduate of Program for Senior Managers in Government, Harvard University, John F. Kennedy School of Government, 1991

## Admissions

District of Columbia
United States Supreme Court
U.S. District Court for the District of Columbia

## Professional Affiliations

Canadian Pacific Railway, Member of the Board of Directors

Georgetown University Law Center, Member of the Board of Visitors

Northwestern University's Transportation Center, Member of the Business Advisory Committee

## Awards and Honors

Selected as a leading lawyer nationally in the area of Transportation (Rail) by Chambers and Partners, 2004 – 2012

Recognized in Best Lawyers in America as one of the top transportation lawyers in the country, 2009 to 2013

Named a Washington DC "Super Lawyer" in the area of Transportation/Maritime Law in 2010, 2011, and 2012

Presidential Award, Association of Transportation Law Professionals, 2008

Honored by Georgetown University Law Center for contributions to the legal profession and society in general, 1999 and 2006

Person of the Year in Transportation, University of Maryland's Robert H. Smith School of Business, 2003

One of the five "People to Watch" named by the Washington Post, 1998

## Recent Presentations

Speaker, "Post Election Outlook and the Transportation Agenda," Association of Transportation Law Professionals Transportation Forum, Washington, D.C., November 9, 2012

Speaker, "STB's Shared Use Dispute Authority and Implications for Passenger and Freight Rail," Railway Age Passenger Trains on Freight Railroads Conference, Washington, D.C., October 10, 2012

Speaker, "The Legislative Landscape and its Implications for the Transportation Sector," Association of Transportation Law Professionals Annual Meeting, Chicago, Illinois, June 14, 2012

Speaker, "Regulatory and Legislative Developments Affecting the Railroad Industry," Wolfe Trahan & Co. Investors Conference, New York, New York, May 22, 2012

Speaker, "Today's Rail Transportation Environment," National Industrial Transportation League Public Policy Forum, Washington, D.C., May 8, 2012

Speaker, "Pending Regulatory and Legislative Matters Affecting the Transportation Sector," J.P. Morgan Investors Conference, New York, New York, March 15, 2012

Speaker, "Overview of the Economic and Policy Landscape for Transportation Project Financing," The Bond Buyers Conference Keynote Address, Chicago, Illinois, November 11, 2011

## Recent Publications

Co-Author, "Positive Train Control Still on the Front Burner," *Nossaman E-Alert*, December 18, 2012

Co-Author, "MAP-21: Public Transportation Safety," *Nossaman E-Alert,* August 9, 2012

Author, "DesertXpress High-Speed Passenger Rail Line Receives Construction and Operating Authority From STB," *Infra Insight Blog,* October 26, 2011

While at Covington & Burling LLP, I also authored and contributed to several e-alerts reviewing the general legislative agenda pending in Congress at the time. I have not retained copies of these publications.

## Deposition and Trial Testimony in the Last Four Years

None

## Hourly Rate

$760/hr.

# Exhibit B

## Materials Relied Upon by Linda J. Morgan, Esq.

# Exhibit B
# Materials Relied Upon by Linda J. Morgan, Esq.

- *Review of Rail Access and Competition Issues*, STB Ex. Parte 575.
- *Major Rail Consolidation Procedures*, STB Ex. Parte No. 582, 4 S.T.B. 570 (Mar. 30, 2000).
- *Major Rail Consolidation Procedures*, STB Ex. Parte No. 582, 2000 WL 1535932 (S.T.B. Sept. 25, 2000).
- *Major Rail Consolidation Procedures*, STB Ex. Parte No. 582, 2001 WL 648944 (S.T.B. June 7, 2001).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF)<br>Hon. Paul L. Friedman |
| This document relates to:<br>ALL CASES | |

**DECLARATION OF CHARLES M. ADAMS**

I, Charles M. Adams, declare as follows:

1. On March 31, 2010, I retired from defendant Union Pacific Railroad. At the time of my retirement I was the senior director of revenue and information management in the Marketing & Sales Department of Union Pacific. I have personal knowledge of the matters set forth herein.

2. I held the above position since approximately July 1991. In that position my responsibilities included overseeing Union Pacific's Genesis database which captures customer information, including the terms of the customer's applicable pricing documents (*e.g.*, contract, tariff, or other public pricing document). Assisted by personnel working under my direction, I was responsible for generating reports and other information on a wide variety of topics including price, volume, and types of pricing documents.

3. Attachment 1 identifies each stand-alone fuel surcharge used by Union Pacific for non-regulated traffic at any time during the years 2000 through 2008. The information contained in Attachment 1 is derived from the Genesis database. As it shows, Union Pacific had 90 different fuel surcharges during 2000 to 2008. The names of the fuel surcharges are those used by Union Pacific in its ordinary course of business.

A. Attachment 1 also identifies, by year, the number of different pricing documents which used each fuel surcharge. Thus, for example, in 2006 Union Pacific had 32 different fuel surcharges for non-regulated traffic and, of those fuel surcharges, 25 appeared in more than one pricing document in effect that year.

B. As Attachment 1 shows, some fuel surcharges are identified based on the specific customer with whom the fuel surcharge was negotiated. Those include fuel surcharges for customers such as ADM, ConocoPhillips, DaimlerChrysler, ExxonMobil, GE, etc. Of the fuel surcharges listed on Attachment 1, more than two dozen carry the name of a specific customer and were created and negotiated for that customer.

C. The numbers shown in Attachment 1 are based on a single-day snapshot. I used that approach because the number of pricing documents using a particular fuel surcharge may vary from day-to-day over the course of a year, especially for the more common fuel surcharges. I chose December 24 as the date for measuring the number of pricing documents containing a fuel surcharge because it is a date when there are few, if any, changes in pricing documents. Thus, for example, the number of pricing documents containing a specific fuel surcharge for 2005 is based on the number of pricing documents containing that fuel surcharge on December 24, 2005.

D. Attachment 1 uses the same definition of "pricing document" as used by UP in its ordinary course of business. Each public circular, contract, quote, etc., in existence on December 24 is counted as a pricing document. Thus, a single pricing document, such as a public circular, may apply to several customers and, conversely,

some customers may be governed by more than one pricing document. The latter may occur, for example, when a customer has multiple lines of business and the customer separately negotiates for rail freight transportation on each line of business.

E. I sought to exclude from Attachment 1 pricing documents governing regulated traffic based on whether the document had a "TS" sub-reference qualifier indicating it was governed by a regulated public tariff. Beyond this designation in the database, I have not further investigated whether the particular pricing documents listed on Attachment 1 are limited to non-regulated traffic.

F. Attachment 1 excludes pricing documents applicable to shipments by the Federal Government, which I understand are excluded from the plaintiffs' class. In general, shipments for the Federal Government are handled pursuant to a government tender. Such tenders are not recorded on Union Pacific's Genesis database and, therefore, are not included in the attachments to this declaration. The Genesis database does, however, include pricing documents for Tennessee Valley Authority. I excluded those from Attachment 1. The TVA had its own fuel surcharge, so including the TVA would have increased the number of unique fuel surcharges.

G. Attachment 1 designates with an asterisk any fuel surcharges that were not applied as a percentage of the base rate.

4. Attachment 2 shows the number of pricing documents for non-regulated traffic which contained a rate-based stand-alone fuel surcharge by month from January 2000 through December 2008. As with Attachment 1, it uses a single day – here, the 15th day of each month – as the measuring day. As Attachment 2 shows, Union Pacific had 3687 such pricing documents on July 15, 2002 (roughly a year before the July 1, 2003 start date of the alleged conspiracy), 6137 such pricing documents on January 15, 2003 (six months before the alleged conspiracy), 7385 such pricing documents on June 15, 2003 (the last month before the alleged conspiracy), and 8025 such pricing documents on July 15, 2004 (a year after the alleged conspiracy began). Thus, the trend

toward the use of such pricing documents within Union Pacific began long before the July 2003 start of the alleged conspiracy – increasing considerably in December 2002 when Union Pacific adopted its public carload fuel surcharge – and that trend did not grow faster in the months after July 2003. Union Pacific's use of such pricing documents began to decline quite sharply in late 2007 as Union Pacific moved toward mileage-based fuel surcharges.

5. Attachment 3— also generated from the Genesis Database—lists the terms of the ten fuel surcharges that appear with the most frequency during the period 2000 to 2008. As Attachment 3 shows, each of those fuel surcharges contains different terms and is not merely a different name for the same fuel surcharge.

6. Attachment 4— also generated from the Genesis Database—identifies, for each year 2000 to 2008, the 21 different adjustment provisions and categorizes the number of pricing documents which contain a fuel surcharge by the particular adjustment provision. These 21 different adjustment provisions correspond to the categorization used by Union Pacific in its ordinary course of business. An adjustment provision refers to the method, if any, for adjusting prices in the document. For example, some pricing documents are adjusted based on RCAF ("Rail Cost Adjustment Factor"). Like Attachment 1, the data in Attachment 4 are based on a snapshot as of December 24 of each year. For each year 2000 to 2008, the following percentage of pricing documents containing a fuel surcharge and meeting the criteria of Attachment 1 (*i.e.*, non-regulated traffic with a stand-alone fuel surcharge) were based on AIILF ("All Inclusive Index Less Fuel"):

| Year | Percentage Of Pricing Documents Containing A Fuel Surcharge Which Used AIILF |
|---|---|
| 2000 | 0% |
| 2001 | 0% |
| 2002 | 0% |
| 2003 | 0% |
| 2004 | 1.0% |
| 2005 | 2.6% |
| 2006 | 2.3% |
| 2007 | 3.4% |
| 2008 | 4.1% |

7. Attachment 5 identifies the top 25 customers, based on revenues in 2006, for each of the six groups into which Union Pacific organizes its rail freight: agriculture, autos, chemicals, energy, industrial products and intermodal. It also lists the percentage of total revenues for each group accounted for by the top 25 customers. For autos, only the 19 customers with more than $1 million in revenue are listed. I have limited the data to non-regulated traffic and the Tennessee Valley Authority using the same approaches in paragraphs 3.E. and 3.F., respectively. I have also limited the data to customers that actually paid a fuel surcharge in 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of June 2010, in Omaha, Nebraska.

Charles M Adams

Charles M. Adams

# Exhibit 1

(Adams Declaration)

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Fuel Surcharge Provision | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | TOTAL |
| 2 | ADM MODIFIED PLATTS 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| 3 | ADM PLATT GULF FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 3 |
| 4 | ANSAC FUEL SURCHARGE * | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 1 | 1 | 11 |
| 5 | CAL/FUEL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| 6 | CHEMICALS HDF SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 3 |
| 7 | CONOCOPHILLIPS (MANUAL) | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 5 |
| 8 | COSCO MANUAL FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 |
| 9 | CPCHEM FUEL SURCHARGE | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 |
| 10 | CS FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 11 | DAIMLERCHRYSLER DE MEXICO FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 3 | 6 |
| 12 | EXXON MOBIL 65% HDF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 7 | 15 |
| 13 | FMC/FUEL | 1,629 | 2,480 | 2,110 | 718 | 505 | 420 | 346 | 218 | 72 | 8,498 |
| 14 | FMC/FUEL 60 PUBLISHED DAYS | 0 | 0 | 0 | 84 | 97 | 104 | 99 | 101 | 57 | 542 |
| 15 | FMC/FUEL 90 PUBLISHED DAYS | 0 | 0 | 0 | 2 | 11 | 2 | 0 | 0 | 0 | 15 |
| 16 | FMC/FUEL 90 PUBLISHED DAYS $38 FLOOR | 9 | 10 | 13 | 25 | 30 | 17 | 6 | 2 | 0 | 112 |
| 17 | FMC/FUEL SURCHARGE 36 NONSTANDARD | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| 18 | FMC=FUEL | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 19 | FMCFUEL1 | 2 | 2 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 10 |
| 20 | FORMOSA FUEL SURCHARGE STANDARD | 0 | 0 | 0 | 0 | 1 | 4 | 10 | 4 | 0 | 19 |
| 21 | FORMOSA MANUAL FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 22 | 18 | 62 |
| 22 | FS20-2.1 | 1,723 | 27 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,750 |
| 23 | FS20-2.2 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| 24 | FS20-2.4 | 135 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 139 |
| 25 | FS20-2.5 | 20 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30 |
| 26 | FS20A2.4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 27 | FS20B2.4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 28 | FS20C2.4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 29 | FS20D2.4 | 0 | 48 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48 |
| 30 | FS20E2.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 31 | FS20EA24 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 32 | FS20H2.4 | 0 | 1,163 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1,165 |
| 33 | FS20I2.4 | 0 | 4 | 43 | 2 | 0 | 0 | 0 | 0 | 0 | 49 |
| 34 | FS20J2.4 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| 35 | FS20K2.4 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| 36 | FS2AC2.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 37 | FS2BC2.4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 38 | FUEL SURCCHARGE | 0 | 1 | 9 | 5 | 0 | 1 | 3 | 3 | 0 | 22 |
| 39 | FUEL SURCHARGES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 40 | FUEL++FALKCRLDREN * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 41 | FXE NON REN FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 42 | GE FUEL SURCHARGE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 43 | GM AVG 3 MONTH FS | 0 | 0 | 0 | 0 | 0 | 1 | 16 | 10 | 7 | 34 |
| 44 | GP WTI CAP FUEL SURCHARGE | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| 45 | GBP/FUEL | 6 | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| 46 | HANJIN FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 4 |
| 47 | HDF5 HIGHWAY DIESEL MONTHLY AVERAGE | 0 | 0 | 0 | 9 | 12 | 12 | 41 | 55 | 15 | 144 |
| 48 | HDF6 ENERGY FUEL SURCHARGE STANDARD | 0 | 0 | 0 | 20 | 3 | 3 | 2 | 2 | 1 | 31 |
| 49 | HDF7 ENERGY FUEL SURCHARGE STANDARD | 0 | 0 | 0 | 0 | 49 | 84 | 91 | 47 | 16 | 287 |
| 50 | HDF8 ENERGY INTERCARRIER * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| 51 | HDF8 ENERGY MILEAGE FUEL SURCHARGE * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 16 | 30 |
| 52 | HIGHWAY DIESEL FUEL AVG PRICE | 0 | 0 | 0 | 4,052 | 5,124 | 5,091 | 5,286 | 3,625 | 191 | 23,369 |
| 53 | HYUNDAI FUEL SURCHARGE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 54 | INTERCARRIER MILEAGE HDF * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,275 | 1,275 |
| 55 | INTERMODAL 3.5 FUEL SURCHARGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 56 | INTERMODAL FSC | 60 | 61 | 51 | 0 | 0 | 0 | 0 | 0 | 0 | 172 |
| 57 | INTERMODAL FSC2 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 58 | INTERMODAL FUEL SURCHARGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 59 | INTERMODAL STANDARD FUEL SURCHARGE | 0 | 0 | 1,068 | 1,281 | 743 | 735 | 801 | 117 | 104 | 4,849 |
| 60 | INTERMODAL WEEKLY FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 608 | 1,225 | 1,840 |
| 61 | IP FUEL FOR ROCK | 0 | 0 | 0 | 0 | 112 | 0 | 0 | 0 | 0 | 112 |
| 62 | IPA HDF FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 |
| 63 | IPFUEL | 4 | 8 | 49 | 88 | 22 | 11 | 6 | 4 | 0 | 192 |
| 64 | KLINE NONSTANDARD FUEL | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 2 | 7 |
| 65 | MILEAGE HDF * | 0 | 0 | 0 | 0 | 0 | 1 | 12 | 1,856 | 3,712 | 5,581 |
| 66 | MITSUI FUEL SURCHARGE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 67 | MMA NON REN FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 4 |
| 68 | NISSAN WTI FUEL SURCHARGE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 69 | NOVA FUEL SURCHARGE | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| 70 | OBSOLETE MILEAGE HDF * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 230 | 17 | 247 |
| 71 | OI/FUEL | 0 | 0 | 0 | 1 | 3 | 3 | 3 | 2 | 0 | 12 |
| 72 | OI/FUEL SURCHARGE NON-STANDARD | 0 | 0 | 0 | 3 | 3 | 3 | 4 | 3 | 0 | 16 |
| 73 | OOCL DISCOUNT FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 74 | OXBWFUEL | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| 75 | P&G/FUEL | 1 | 3 | 19 | 1 | 0 | 0 | 0 | 0 | 0 | 24 |
| 76 | P&GFUEL2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| 77 | PLATT'S GULF COAST (MONTHLY AVG) FUEL SURCH. | 0 | 0 | 0 | 0 | 29 | 23 | 8 | 6 | 1 | 67 |

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Fuel Surcharge Provision | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | TOTAL |
| 78 | PLUS/MINUS FUEL SURCHARGE (NONSTANDARD) | 0 | 0 | 0 | 8 | 21 | 23 | 10 | 7 | 0 | 69 |
| 79 | PONL FUEL SURCHARGE | 0 | 0 | 0 | 0 | 2 | 2 | 2 | 2 | 2 | 10 |
| 80 | SCHNEIDER FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 7 | 0 | 13 |
| 81 | SGFUEL | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 82 | SNLU FUEL SURCHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 83 | SPDFUEL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 84 | TESTFUEL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 85 | TOYOTA FUEL SURCHARGE | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| 86 | WTI FUEL SURCHARGE MONTHLY AVG | 0 | 0 | 0 | 38 | 29 | 8 | 4 | 3 | 2 | 84 |
| 87 | WTI1 FUEL SURCHARGE STANDARD | 0 | 0 | 2,647 | 1,554 | 1,042 | 524 | 255 | 106 | 45 | 6,173 |
| 88 | WTI6 ENERGY FUEL SURCHARGE STANDARD | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| 89 | WTIFSC1 | 16 | 36 | 60 | 23 | 0 | 0 | 0 | 0 | 0 | 135 |
| 90 | WTIFSC2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 91 | (Entered Condition Code Only - No Provision Name) | 0 | 0 | 1 | 2 | 6 | 6 | 0 | 0 | 2 | 17 |
| 92 | TOTAL | **3,623** | **3,871** | **6,097** | **7,937** | **7,861** | **7,038** | **7,051** | **7,074** | **6,800** | |
| 93 | | | | | | | | | | | |
| 94 | * An asterisk indicates that the fuel surcharge is not based on a percentage of the base rate. | | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) | MDL No. 1869<br>Misc. No. 07-489 (PLF)<br>Hon. Paul L. Friedman |
| This document relates to:<br>ALL DIRECT PURCHASER CASES | ) | |

**Corrected Expert Report of Dennis W. Carlton, Ph.D.**

**On Behalf of Defendant Union Pacific Railroad Company**

**February 6, 2013**

HIGHLY CONFIDENTIAL

# Appendix B

# UP and BNSF Public Fuel Surcharges

## UP and BNSF Public Carload Fuel Surcharge Timeline

| Railroad | Effective Month | Benchmark Index | Threshold | FSC at Threshold | Fuel Price Increment | Fuel Surcharge Increment | Calculation Method | Adjustment | Lag |
|---|---|---|---|---|---|---|---|---|---|
| UP | Dec-02 | WTI | $28/Barrel | 2.0% | $5/barrel | 2.0% | The price of WTI must equal or exceed a given bracket for thirty (30) consecutive published days for the surcharge under that bracket to be applicable. | | |
| UP | Jun-03 | HDF | $1.35/Gallon | 1.5% | $.05/gallon | 0.5% | If the average price of HDF is at or exceeds $1.35 per gallon then an initial fuel surcharge of 1.5% will be applied. For every $0.05 per gallon increase in HDF, an additional 0.5% fuel surcharge will be applied. | Monthly | Two Months |
| UP | Apr-07 | HDF | $2.30/Gallon | $.05/mile | $.05/gallon | $.01/mile | The Mileage based fuel surcharge will apply when the HDF monthly average price reaches or exceeds $2.30 per gallon. The initial rate at the strike price will be $.05/mile, and increasing by $.01/ mile for every $.05/gallon increases in HDF. Mileages will be calculated using rail miles contained in the ALK Technologies' PC*MILER Rail program. | Monthly | Two Months |
| BNSF | Apr-00 | WTI | $28/Barrel | 2.10% | Continuous based on Formula | Continuous based on Formula | FSC Calculated as: ((WTI/$23.5)-1)*10.7. | Monthly | One Month |
| BNSF | Oct-00 | WTI | $28/Barrel | 2.0% | $2.50/barrel | 1.0% | When the average price of WTI crude oil exceeds $28 per barrel an initial fuel surcharge of 2% will be applied. After the Initial surcharge, there will be a 1% surcharge for every $2.50 per barrel increase in the price of crude oil. | Monthly | One Month |
| BNSF | Jul-01 | HDF | $1.30/gallon | 1.0% | $0.05/gallon | 0.5% | When the average price of Highway Diesel Fuel (HDF) equals or exceeds $1.30 per gallon, an initial surcharge of 1% will applied. For every $.05 per gallon increase in HDF, a 0.50% fuel surcharge will be applied. | Monthly | Two Months |
| BNSF | Jun-03 | HDF | $1.25/gallon | 0.5% | $.05/gallon | 0.5% | When the average price of Highway Diesel Fuel (HDF) equals or exceeds $1.25 per gallon, an initial surcharge of 0.5% will applied. For every $.05 per gallon increase in HDF, a 0.5% fuel surcharge will be applied. | Monthly | Two Months |
| BNSF | Jan-06 | HDF | $1.25/gallon | $.01/mile | $.04/gallon | $.01/mile | When the average price of Highway Diesel Fuel (HDF) equals or exceeds $1.25 per gallon, an initial surcharge of $.01 per mile will be applied. For every $.04 per gallon increase in HDF, a $.01 per mile fuel surcharge will be applied. This surcharge applies to Local and Rule 11 Agriculture items only. | Monthly | Two Months |

Sources: BNSF-0657303-304, BNSF- 0516245, BNSF- 0516609, BNSF- 0516610, BNSF-0511811, BNSF0657373-75, UPFSC0000079-101 at UPFSC0000100, UPFSC0000553, UPFSC0001558-1570, UPFSC0000570-575

Highly Confidential

## UP and BNSF Public Coal Fuel Surcharge Timeline

| Railroad | Effective Month | Benchmark Index | Threshold | FSC at Threshold | Fuel Price Increment | Fuel Surcharge Increment | Calculation Method | Adjustment | Lag |
|---|---|---|---|---|---|---|---|---|---|
| UP | Nov-04 | HDF | 1.35/Gallon<br>1.60/Gallon | 1.5%<br>4.25% | $0.05/ gallon<br>$0.05/ gallon | 0.5%<br>0.75% | If the average monthly price of HDF is greater than or equal to $1.35 per gallon, an initial fuel surcharge of 1.5% will be applied. For every $.05 per gallon increase in HDF, an additional fuel surcharge of 0.5% will be applied until the threshold reaches $1.60. At the $1.60 per gallon threshold, a fuel surcharge of 0.75% will applied for every $.05 per gallon increase in HDF. | Monthly | Two Months |
| BNSF | Jul-04 | HDF | $1.24/Gallon | 0.5% | $.04/gallon | 0.5% | When the average monthly price of HDF is at or exceeds $1.24 per gallon, a fuel surcharge of 0.5% will be applied. For every $.04 per gallon increase in HDF, an additional 0.5% fuel surcharge will be applied. | Monthly | Two Months |
| | Jan-06 | HDF | $1.25/Gallon | $.01/mile | $.06/gallon | $.01/mile | If the average price of Highway Diesel Fuel is at or exceeds $1.25 per gallon, a $.01 per mile surcharge will be applied. For every $.06 per gallon increase in HDF, an additional $.01 per mile surcharge will be applied. | Monthly | Two Months |

Sources: BNSF-0031091-92 UPFSC0001274 -75, UPFSC0001558-1570

# UP and BNSF Public Intermodal Fuel Surcharge Timeline

| Railroad | Effective Month | Benchmark Index | Fuel Weight | Base Rate | FSC Formula | Frequency | Lag |
|---|---|---|---|---|---|---|---|
| UP | Nov-00 | HDF | 20.0% | 1.292 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Oct-01 | HDF | 20.0% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Apr-05 | HDF | 18.5% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Oct-06 | HDF | 16.5% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Monthly | One Month |
| | Jan-07 | HDF | 16.5% | 1.253 | (HDF/Base Rate -1)*Fuel Weight | Weekly | One Month |

| Program | Effective Month | Benchmark Index | Threshold | FSC at Threshold | Fuel Price Increment | Fuel Surcharge Increment | Frequency | Lag |
|---|---|---|---|---|---|---|---|---|
| BNSF | Mar-00 | HDF | $1.10/gallon | 0.50% | $.05/gallon | 0.5% | Weekly (every Wednesday) | One week |
| | Sep-00 | HDF | $1.24/gallon | 1.0% | $.04/gallon | 0.5% | Weekly (every Wednesday) | One week |

Sources: BNSF-FSC 001705-708, UPFSC0078792-95, UPFSC 0362818, UPFSC 0418186, Master Intermodal Transportation Agreement (MITA) pg. 97-98, UPFSC0552636, UPFSC0000518-519