# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

## Volume 6 of 29

## DA01829 - DA02133

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION

MDL No. 1869

Misc. No. 07-489-(PLF/AK/JMF)
This Document Relates To:
ALL DIRECT PURCHASER CASES

* * * * * * * * * * * * * * * * * * * * * * * * * *
DESIGNATED AS
HIGHLY CONFIDENTIAL

VIDEOTAPED
DEPOSITION OF: DONNA CERWONKA
DATE TAKEN: FRIDAY, AUGUST 13, 2010
TIME: 8:32 A.M.
PLACE: 50 NORTH LAURA STREET, SUITE 3900
JACKSONVILLE, FLORIDA

REPORTED BY: CARMEN THOMAS, REGISTERED
PROFESSIONAL REPORTER AND
NOTARY PUBLIC

* * * * * * * * * * * * * * * * * * * * * * * * * *



APPEARANCES:
Appearing on Behalf of the Plaintiff:
JOSEPH D. HAMMOND, ESQUIRE
and
MARC L. GREENWALD, ESQUIRE
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010
Appearing on Behalf of the Defendant,
CSX and the Witness:
DAVID D. CROSS, ESQUIRE
and
LUKE VAN HOUWELINGEN, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595

Appearing on Behalf of the Defendant,
CSX:
ERIN O. O'BRIEN, ESQUIRE
500 Water Street, J150
Jacksonville, Florida 32202

KHALID EL-MUSRATI, VIDEOGRAPHER



I N D E X


TESTIMONY OF DONNA CERWONKA
Direct Examination by Mr. Hammond 5
Cross Examination by Mr. Cross 126
Redirect Examination by Mr. Hammond 129
CERTIFICATE OF OATH 132
CERTIFICATE OF REPORTER 133
ERRATA SHEET 134


E X H I B I T S


| Exhibit Number | Page Marked |
|---|---|
| Exhibit 1 - E-mail dated August 11, 2005 | 13 |
| Exhibit 2 - E-mail dated August 25, 2006 | 27 |
| Exhibit 3 - E-mail dated February 16, 2006 | 42 |
| Exhibit 4 - E-mail dated February 12, 2006 | 52 |
| Exhibit 5 - Declaration of Donna Cerwonka | 68 |
| Exhibit 6 - E-mail dated May 23, 2006 | 109 |
| Exhibit 7 - E-mail dated May 23, 2006 | 118 |




THE VIDEOGRAPHER: We are now on the record in the matter of Rail Freight Fuel Surcharge Antitrust Litigation. Today's date is August 13, 2010. The time is 8:32.

This is the videotaped deposition of Donna Cerwonka being taken at 50 North Laura Street, Suite 3900, Jacksonville, Florida 32202.

My name is Khalid El-Musrati. I am the camera operator representing Merrill Legal Solutions located at 225 Varick Street, New York, New York 10014. The court reporter is Carmen Thomas with Merrill Legal Solutions.

Will counsel please introduce themselves.

MR. HAMMOND: Joseph Hammond, Quinn Emanuel Urquhart & Sullivan for the plaintiff.

MR. GREENWALD: Mark Greenwald, Quinn Emanuel Urquhart & Sullivan also for plaintiff.

MR. CROSS: David Cross of Crowell Moring for CSXT and the witness.

MS. O'BRIEN: Erin O'Brien for CSX.

MR. VAN HOUWELINGEN: Luke Van Houwelingen also Crowell Moring for CSXT.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

Whereupon,

Page 45

MR. HAMMOND: Okay. Let's take a break and change the tape.

THE VIDEOGRAPHER: The time is 9:28. This concludes videotape number one. We are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 9:39. This begins videotape number two. We are on the record.

BY MR. HAMMOND:

Q Ms. Cerwonka, I believe you referred earlier to pricing recommendations at CSXT as opposed to policies?

A Well, I -- I -- policies, recommendations, from my perspective, even if -- the reason I say recommendations is because there was never anything hard and fast. In other words, if I had a reason to make an exception to a recommendation or a policy that came as this is what we'd like to do if -- if you made the business case we would make an exception.

So the reason I use that term is just because every individual deal we did we'd handle differently. I mean, we'd look at what the different pieces of the offering were and if there was a need to make an exception to the recommended policy, we would do it. So

Page 46

that's why I say -- because sometimes people hear policy and they think that means that you never -- you never defer from that.

Q Well, in fact, there was a policy that exceptions could not be made at certain levels of the organization?

A Well, I couldn't sign contracts. I mean, there certainly are requirements around -- from the standpoint of just good business, there certainly were rules about who could approve what things. There were contract limitations. Any contract above a certain dollar value, I couldn't approve either. I still negotiated the terms of the deal or worked with the salesperson to negotiate the terms of the deal with the customer and made recommendations to my boss who I'm sure shared that with Clarence about what we were recommending --

Q And --

A -- so that's consistent with -- with how we ran our business.

Q But the policy of what you could approve and what you could not was not a recommendation, that was a requirement?

A That was a -- well, that was a policy, but I went to my boss with recommendations where we not use

Page 47

the policy and that we make an exception to policy. So that's why I say recommendation.

Whenever -- whenever I had a salesperson who came to me saying that a customer needed to do something different, so, for example, when we were negotiating a [redacted] wanted to use a different fuel surcharge, they did not want to use the standard fuel surcharge, we actually did an analysis for them and compared the two fuel surcharges and asked [redacted] said, you tell us which one you want.

So we -- we made exceptions and those would be recommended to my boss, to Kyle, and to Clarence ultimately if it was a big enough contract that Clarence had to sign it.

Q With regard to [redacted] CSXT was -- did not have a preference as to which option you just referred to [redacted] chose for fuel surcharges?

A For the purposes of [redacted] I didn't have a preference because they had a specific contract. They had their own individual contract that was unique to [redacted] It included, you know, service understandings about size of trains, about number of trains per week. So it was a personally drafted contract that's a little different than some other customers. So for the purposes of [redacted] that --

Page 48

the terms that got included, one or the other didn't -- didn't matter to me. I think they ended up choosing the one -- there wasn't a huge difference between the two of them. When we looked at the analysis and we asked them which one they wanted and they made the choice.

Q When you said there wasn't a huge difference between the two of them, you were referring to the alternative -- two alternatives for a fuel surcharge that CSXT offered to [redacted]?

A Well, the two that they had, [redacted] actually had different -- they had multiple contracts that we were rolling into one and they had -- they had one contract that had the old fuel surcharge. They had a contract that had the new fuel surcharge. They had multiple -- excuse me -- different terms that we were rolling into one. So we asked them which one they would prefer to use.

Q So the two alternatives were the old fuel surcharge or the new fuel surcharge?

A In this case they were. However, [redacted] is -- is kind of a unique customer of ours because their -- their business is so service sensitive and it's very truck competitive and they originate -- all of the traffic specifically in this contract comes out of Florida and truck rates out of Florida tend to be very

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE )
ANTITRUST LITIGATION )
) MDL No. 1869
) Misc. No. 07-489
This Document Relates To: ) (PLF/AK/JMF)
)
DIRECT PURCHASER CASES )
_________________________________)

"HIGHLY CONFIDENTIAL"
VIDEOTAPED DEPOSITION OF
JOHN COUCH

Taken on behalf of the Plaintiffs

DATE TAKEN: Tuesday, August 3, 2010
TIME: 8:32 a.m. - 5:01 p.m.
PLACE: McGuire Woods
50 North Laura Street
Suite 3300
Jacksonville, Florida

REPORTED BY: Cindy D. McClary, RPR, CRR



APPEARANCES FOR THE PLAINTIFFS

JOSHUA D. SNYDER, ESQUIRE
JOANNE ZACK, ESQUIRE (Via Telephone)
JOANNE G. NOBLE (Via Telephone)
Boni & Zack, LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
610.822.0203
jsnyder@bonizack.com
- and -
MATTHEW P. McCAHILL, ESQUIRE
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6305
215.875.3079
mmccahill@bm.net

APPEARANCES FOR DEFENDANT CSX AND THE WITNESS

KATHRYN D. KIRMAYER, ESQUIRE
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
202.624.2774
kkirmayer@crowell.com
dcross@crowell.com
- and -
ERIN O. O'BRIEN, ESQUIRE
CSX Transportation
500 Water Street, J150
Jacksonville, FL 32202
904.359.3103
erin_o'brien@csx.com



APPEARANCES, Continued

APPEARANCES FOR DEFENDANT NORFOLK SOUTHERN
KRISHA A. CERILLI, ESQUIRE (Via Telephone)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7839
krisha.cerilli@skadden.com

ALSO PRESENT
Ashley Holt, Videographer



INDEX
Videotaped deposition of John Couch


PAGE
Direct Examination by Mr. Snyder . . . . . . . . 11
Cross Examination by Mr. Cross . . . . . . . . .237
Certificate of Oath. . . . . . . . . . . . . . .241
Certificate of Reporter. . . . . . . . . . . . .242

- - -

EXHIBITS INDEX


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Ex. 1 | E-mail from John Couch, 1/28/03 Subject: RCAFU, CSXFSC000135841 | 58 |
| Ex. 2 | E-mail string from Clyde McIntyre, 1/28/03 with attachments, Fuel Surcharge Provisions CSXFSC000245563 to CSXFSC000245568 | 62 |
| Ex. 3 | E-mail from Clyde McIntyre, 4/4/03 and attachment, Fuel Surcharge Analysis - Trigger.xls CSXFSC000039192 to CSXFSC000039195 | 67 |
| Ex. 4 | E-mail from John Couch, 2/10/03 Subject: Reminder CSXFSC000036650 | 69 |
| Ex. 5 | E-mail from Leslie Trescot, 2/24/03 Subject: One follow-up item from today's Price Plan Review CSXFSC000289956 | 72 |
| Ex. 6 | E-mail from Kyle Hancock, 2/28/03 Subject: FW: CSXT Contracts having no fuel surcharge and no RCAFU adjustment. CSXFSC000328374 | 75 |

Page 21

A Okay. It's otherwise known as tariff pricing or internet pricing, where anybody can go to the internet, put in origin, destination, commodity and get back a price.
Q And this was more or less a new initiative in 2001 at CSX?
A No, it had been ongoing for years.
Q Ongoing for years?
A Right.
Q Okay. And any -- are there any other ways in which your responsibilities related to pricing in this 2001 period?
A Other than the public pricing?
Q Yeah.
A Not that I can think of.
Q Okay. And did you have any -- I guess this may ask about a subset of what you were just talking about, but did any of your responsibilities at that time, the 2001 period, concern interline pricing?
A Well, depending -- yes, okay. So, the technical definition of interline pricing is pricing with any other rail carriers. And a lot of my -- excuse me. A lot of my responsibility was dealing with the short lines. We connect with approximately 225 small railroad carriers in the eastern US, and we

Page 22

try to make it as easy and seamless for the customers to ship on us and in conjunction with them on an interline basis. So, we had a whole process designed, developed and implemented whereby those short line carriers could give us their prices for different commodities and different moves, and we would incorporate them into our public pricing. So, as a -- as a customer, or someone who's new to the rail industry, can go to CSX.com, pick out origins/destinations in the east, including the short line carriers, and they would see one price for the entire movement.
Q Okay. And in addition to the short line railroads you were working with, did you have any -- any responsibilities that involved the other Class I railroads?
A Yes, a lot of other responsibilities.
Q And what would those -- a sort of a summary of those responsibilities?
A Well, we -- as part of the alliance initiatives? As part of the alliance initiatives?
Q Yeah, we can talk about those.
A Yeah, that's -- yeah, so it was a lot of responsibility to work on the different alliances we had with all the -- most of the major Class I, you

Page 23

know, railroads.
Q And were there -- when you refer to alliance initiatives, were there meetings held in connection with the alliance initiatives?
A Oh, absolutely, a lot of meetings.
Q And did you attend some of those meetings?
A Yes, I did.
Q Many?
A Many.
Q Many meetings?
A Many.
Q Over -- when you say you were attending meetings, what time period are we talking about?
A My recollection is they would've started a couple years after I came back from Jacksonville, so maybe 2003 to 2007, kind of time frame.
Q And was there a time -- was there a time when you stopped going to alliance meetings?
A No, they kind of matured and just slowed down, and we got done, you know, what we wanted to get done in those alliance meetings.
Q Were you ever informed that there would no longer be alliance meetings?
A No.
Q But you haven't had any since 2007?

Page 24

A No, there's been some.
Q There's been some?
A Uh-huh.
Q Some that you've attended?
A Yes. And I don't know if -- you know, I mean, the definition of what's an alliance meeting and what's not an alliance meeting is very loose, okay. So, we had a lot of meetings where we were working on routing guides and gateway optimization of service design type things, and then we had a lot of meetings that were joint interline marketing meetings on a bilateral basis.
Q So, a lot of meetings?
A (Nods head.)
Q Meetings with UP?
A Yes.
Q BNSF?
A Yes, those are -- if I were to rank the -- how many meetings we had, you know, by carrier, I'd say UP was highest, BNSF was second, close -- close tie was CN, and then very little with CP, a few with NS and a few with KCS.
Q And when you were attending these alliance meetings, were there different -- were there different sets of personnel from CSX that you would go to the

meeting with?
A Yes, there were.
Q And do you view there having been different levels of alliance meetings?
A Oh, absolutely. So, for example, with the Union Pacific, we would have joint working group meetings. Usually we met in New Orleans, kind of halfway between, neutral ground. And there was -- I'd say there's probably 20 people in the room, half UP, half CSX, maybe even more. And we would address a number of working initiatives, gateway optimization being the primary, but there were a lot of other ones, car utilization, asset utilization, locomotive utilization, those types of things. A lot of service design related -- mostly service design related initiatives, very few marketing, but there were some marketing initiatives. And then the working teams would report back to our respective senior management teams, and then they would hold less frequent meetings where their senior team would come here or I think ours went there a couple of times, I'm not positive.
Q And that -- what you were describing, was that a general description or are you talking specifically about Union Pacific?
A That was the Union Pacific one.



Q And if you could go through a similar description for BNSF --
A The BNSF was more -- we did a lot of work specifically on the routing guide, and so we had our respective service design teams, you know, smaller group. And then we did more marketing alliance type work, where we would get our marketing teams together and talk about partnership and interline moves and what could we do more, better, different, to grow the business. So there was more of a marketing slant to the BNSF meetings.
Q And how about with the NS?
A The NS was a very small -- it was basically Doug McNeil, who's my counterpart -- or was my counterpart, myself, and then we'd have one or two of our operations research service design people, and they would have the same, and we were totally solely focused on the routing, trying to come up with a routing guide, which was very complex.
Q And you mentioned that you would report back to -- I might not have the exact term that you used, but senior management at CSX about the working group?
A For the UP specifically.
Q Specifically for the UP?
A Right.



Q My question is, when you're referring to the senior management, who are you referring to?
A For the UP alliance work?
Q Yes.
A It was the executive team. So, Michael Ward and his direct reports.
Q And understanding that this might change over time, when you say Mr. Ward's direct reports, who --
A Right.
Q -- do you have in mind?
A Well, initially, it would've been Mike Giftos, right, and then whoever the operating person was at the time and whoever the service design person was and the finance person.
Q And you also mentioned that there were these top -- or higher level top level alliance meetings. Did you ever personally attend any of those meetings with the UP?
A My -- for the most part, no. I was a -- I think I came in once or twice for an hour or half hour to talk about the specific work I was doing with the routing guys.
Q And were those meetings held in Jacksonville?



A I think most of them were, because if you had your choice of Omaha or Jacksonville, Florida, I think there's an obvious answer, right? Especially in the winter.
Q Right.
A Nothing against Omaha. Omaha's a beautiful place.
Q And do you recall who was at the top level meetings when you came in for half an hour or an hour?
A The one I came in to, actually, no, I don't -- I think it was Clarence Gooden and Michael Ward, and I think it was before Tony Ingram, so whoever would've been head of operations. I don't recall all the people.
Q You used the word "counterpart."
A Right.
Q Do you consider yourself to have a counterpart at each of the Class I railroads?
A No. No, there's people that do similar things, they may have different titles and there's -- you know, for example, I always say that my six direct reports I almost have six different departments, six different functions that I'm managing, and there's nobody that has the exact same work in another railroad. There's people that have comparable things

we were proposing marketing programs. And then we would do -- we were Flynn's presentation team. And then we also did market share studies for Flynn.
Q And could you just elaborate briefly on what you mean by Flynn's presentation team?
A Okay. So, almost like an admin. So, Bill would have a bunch of presentations he did all over the country, and we did all his presentations. And I say "we," it was Marco Turra, M-A-R-C-O, and his last name is T-U-R-R-A. Marco and I would develop -- provide thought leadership and do the actual presentation slides for Bill Flynn.
Q And did any of those relate -- that you recall, relate to fuel surcharges?
A Not that I recall.
Q Did your responsibilities include -- include going to trade association meetings?
A Trade association meetings. If the NIT League is considered a trade association, then that -- yes, that was the only one that I went to, that I remember going to.
Q And you would go to -- you would go to NIT League meetings?
A I went once or twice.
Q Once or twice.



A Twice.
Q And do you recall when those were -- when it was that you went to the one or two NIT League meetings?
A It's been several years, so it's probably 2004 to '7, somewhere in there I went to a couple of meetings.
Q And why did you go to those meetings?
A Derrick Smith asked me to come to the one, and I think we were -- I think one of them was to talk about routing guides. And then another one might've been the first mile/last mile local service initiative. I think they were both service -- service related, is my recollection.
Q Have you ever been to an AAR meeting?
A I have.
Q How many times?
A I think I've only been once, and that was when we were trying to design the mandated mileage-based fuel surcharge from the STB.
Q What time period is this?
A It would've been right before we implemented the mileage base, so I'm thinking it was November of -- I think it was in the fall of '07, but I'm not positive.



Q And are you familiar with, and I'm not talking about the Free Trade Agreement, NFTA?
A Am I familiar with it?
Q Are you familiar with NFTA?
A From what the newspapers -- yeah, I'm familiar with it.
Q Not the -- not the Free Trade Agreement, the --
A Oh.
Q -- association.
MR. McCAHILL: N-F-T-A.
THE WITNESS: N-F-T-A. Yeah, I've heard about it, I haven't been to --
BY MR. SNYDER:
Q Have you ever -- you've never been to a NFTA meeting?
A Not that I recall. I'm sure I haven't been to one.
Glad we got that confusion clarified. I think we always called it N-F-T-A, that's why I wasn't familiar with NFTA.
Q Oh, N-F-T-A, good.
A Yeah.
Q So, if we could carve out A plus B pricing, common language, instantaneous interline pricing,



understanding I'm doing an injustice by grouping them all together, do your responsibilities relate to interline pricing in any way?
A Well, in the short line pricing I mentioned before.
Q I'm sorry, I should add short line to the --
A Right.
Q Other than short line and the list I gave, do your responsibilities relate to interline pricing?
A Not that I can think of. I mean, there's certain things where there'll be some, certainly, interline pricing initiatives going on, where my team will get involved, for example. As part of the UP alliance meeting, we had something called the watershed initiative. And the watershed initiative was to try to capture business that's just west of the Mississippi River moving just east of the Mississippi River, kind of short haul, 3-, 400 mile type of move that we weren't -- that our market share studies showed there was a ton of business moving by truck, and we had very little of that business. And there might've been some pricing, interline pricing scales-type pricing developed as part of that initiative.
Q Are you familiar with a concurrence process?

A I am, uh-huh.
Q And are you -- do you have any involvement with the concurrence process?
A Typically, the concurrence process goes to our director of marketing services, which for years was Clyde McIntyre. And Clyde and I both report to the same boss. And Clyde would come to me for guidance and my opinions on things.
Q And are there -- are there best practices with respect to the concurrence process?
MS. KIRMAYER: Objection.
BY MR. SNYDER:
Q You can answer.
A Okay.
MS. KIRMAYER: When I object, just go ahead and answer if you can.
THE WITNESS: Okay. The -- I don't know if there's best practices. There's practices that we try -- I try to follow.
BY MR. SNYDER:
Q There's --
A It's all very situational. Can I give you an example?
Q Maybe if we get to it in my questions.
A Okay. All right.



Q Would it be part of your common practice to discuss -- let me start over.
If you're having -- well, let me ask a foundational question.
Is there a common practice as to how these communications should occur, by e-mail, in writing, telephone?
A No, I don't think there is.
Q And whatever medium you're communicating in, is it a best practice or common -- whatever -- I'll start over.
Whatever medium you're communicating in, is it common practice to not discuss -- to not discuss any aspects of interline moves other than the two carriers that are involved in the discussion?
A I don't even know where to begin, that was so broad a question.
Q Well, you -- there are -- you said it's situational, but there are -- across situations, there are some common threads to what practices are for the concurrence process. Do you agree with that?
A Common -- I'm not sure what -- no, I'm not sure what I'm agreeing to.
Q Well, are you saying within any given situation, anything is possible in terms of interline



discussions?
MS. KIRMAYER: Objection.
A That's so broad, yeah, I don't know how to answer that.
Q Well, we -- we referred to a concurrence process. What's your understanding of the process part of that term, concurrence process?
A Okay. You basically reach out to an interline partner and you say, I want to do this, that, and the other thing in conjunction with our business together, do you agree with that, do you concur.
Q And that can be by phone, by e-mail --
A Uh-huh.
Q -- by letter?
A Uh-huh.
Q And typically, that's a discussion with Mr. -- with Mr. McIntyre that you might have input into?
A It can be at any level, with anybody. The most typical is the day-to-day market managers and salespeople calling one another and saying, we have this opportunity, do you agree.
Q So, you say it can go on at any level?
A Uh-huh.



Q Other than -- other than your discussions with Mr. McIntyre, do you have firsthand knowledge of discussions at higher levels?
A Firsthand knowledge like was I in the room?
Q That would be one way. Were you in the room?
A Sure. Absolutely.
THE VIDEOGRAPHER: Five minutes on video.
THE WITNESS: What's that?
MS. KIRMAYER: She's just saying there's five minutes left on the videotape.
THE WITNESS: Okay.
MR. SNYDER: Since we have to change a tape in a minute --
MS. KIRMAYER: Take a break?
MR. SNYDER: -- might be a good time for a break.
THE VIDEOGRAPHER: Off record at 9:28.
(Brief recess.)
THE VIDEOGRAPHER: Going back on record at 9:45. This is beginning of Videotape No. 2.
BY MR. SNYDER:
Q Mr. Couch, before the break, you referred to a time in 2003 where you worked with Mr. Giftos for a day on fuel surcharge issues?

A I don't think I did.
Q Did you see a PowerPoint from that presentation?
A I don't remember whether -- I think I would've wanted to. I don't know if I got it or not.
Q Does this e-mail refresh your recollection that Mr. Gooden was focusing on fuel surcharge issues in late January 2003?
MS. KIRMAYER: Objection.
A No.
Q Do you know whether Mr. Gooden was focusing on fuel surcharge issues in late 2003?
A No, I don't.
Q You don't know one way or another?
A I don't remember.
Q Did you have frequent interactions with Mr. Gooden?
A Yes, I went to the weekly staff meetings and other things.
Q And were -- prior to this time, late January 2003, do you recall fuel surcharges being discussed at staff meetings with Mr. Gooden?
A No, I don't recall.
Q You don't recall them being discussed or you don't recall one way or another?



A I don't -- I don't recall them being discussed. I think prior to this time, it was Bill Flynn who -- I think this is early on when Clarence became chief -- not even -- he was head of marketing, head of merchandise marketing, and I think this was soon after Bill Flynn had left.
Q Okay. Did you attend Mr. Flynn's staff meetings?
A I don't -- I don't -- seems to me I -- yeah, I guess I did. Yeah, I did attend his staff meetings, now that I think about it.
Q Were fuel surcharges discussed at Mr. Flynn's staff meetings?
A Not that I -- I don't remember them being discussed. If they were, they were a very minor topic. We talked about business volumes, what happened last week, what's the volumes going to be looking forward, and what's going on with each of the commodity groups.
Q You can put this one aside.
A Give it back to you?
(Couch Exhibit No. 2 marked for identification.)
Q We've marked as Couch Exhibit 2 an e-mail with attachment, CSXFSC000245563 through 68.



A Okay.
Q Have you seen this e-mail before, Mr. Couch?
A Which one? The top one?
Q Any of it?
A Well, the top one, it's sent to me, so I must've seen it, don't recall it per se. And the other ones that you've attached, I don't really remember them.
Q I'm sorry, I didn't hear your last response.
A I don't remember them.
Q You don't remember. Well, if we look at the e-mail January 28th of 2003, 1:29 p.m., you write to Mr. McIntyre: Do you have any economic studies on our extra costs as a company due to higher fuel costs;
Does that refresh your recollection that you were requesting economic studies concerning extra costs?
A No, not really. You know, Clyde was not known as one of the analytical types within the company.
Q Then why were you asking Mr. McIntyre for economic studies?
A I think it was because he had just sent the prior e-mail.
Q So, you were interested in this issue and



you followed up with Mr. McIntyre?
A Apparently so.
Q Even though Bob Gutman had been working on it for days, according to the last e-mail?
A I don't think I knew about that at that time, did I?
Q You may -- looking at the time, you may not have.
And who's Mr. John Tilley?
A John Tilley's a director in finance.
Q So, he's not in your -- not in your group?
A No, he's not.
Q And Mr. McIntyre forwards Mr. Tilley's study to you, correct?
A Apparently so. I don't recall it.
Q You don't recall it?
A (Shakes head.)
Q Do you recall any other -- receiving any other economic studies from Mr. McIntyre on extra costs?
A I don't.
Q Are you aware of any other economic studies from this time on extra fuel costs?
A I think the finance department had been studying it ongoing.

Page 65

Q But you didn't -- you didn't request those?
A I might have.
Q Do you recall the contents of any of those studies?
A I don't.
Q If we could look at the page ending in 65, please.
A I'm sorry?
Q The page ending in 6 -- Bates No. 65.
A Where's the numbering?
MS. KIRMAYER: Bates numbers are on the lower right.
BY MR. SNYDER:
Q In the lower right.
A Okay. Okay.
Q The start of the second full paragraph?
A Okay.
Q There's a reference to C&EA.
A C&EA, cost and economic analysis.
Q And that's the finance group?
A It is.
Q And if you look at the third full paragraph.
A Okay.
Q The finance group has concluded -- if you look at what's bolded and underlined -- a 1.1 percent

Page 66

increase for each $5 increase in fuel price per barrel -- let me start over.
The C -- C&EA group, am I saying that correctly?
A Uh-huh.
Q Has looked at the issue of increases in fuel prices per barrel and how they're related to total costs --
A Right.
Q -- correct? And they look at that issue based on different trigger prices, correct?
A I assume so.
Q And when they refer to a 33 per barrel trigger, do you understand the $33 number to refer to the WTI index?
A I do.
Q And what's the WTI index?
A West Texas Intermediate price for crude oil.
Q And that -- is that an index that is used by CSX in determining fuel surcharge percentages?
A It had been.
Q It had been. And was it at this time in 2000 -- early 2003?
A It was.
MS. KIRMAYER: Objection. This document's

Page 67

from August of 2000.
MR. SNYDER: But the -- your objection's noted.
BY MR. SNYDER:
Q Was it in -- and based on -- just according to the document, based on a $33 per barrel trigger and an 80 percent operating ratio, each $1 increase in the price per barrel would result in a .22 percent increase in our total costs, so about 1.1 percent increase for each $5 increase in fuel price per barrel. Do you have any recollection of that analysis --
A I don't.
Q -- having seen this document now?
A No, I don't.
Q No recollection?
A And I would just add, I think it's a very crude estimate, no pun intended.
Q And there's some backup for that -- for that analysis?
A Yeah.
(Couch Exhibit No. 3 marked for identification.)
Q Let's go to the next -- put that aside. We're marking as Couch Exhibit 3, CSXFSC00003912 (sic)

Page 68

through 39195. If you could take a moment, my questions on this one will be general.
A We already saw this first one, didn't we?
Q Well, that was going to be my question.
A No, I mean, in these prior documents. Here it is right here (indicating).
Q Right. So, this appears to be --
A Oh, it's a little different. Oh, no, it's --
MS. KIRMAYER: Why don't you wait for the question.
THE WITNESS: Sorry.
BY MR. SNYDER:
Q Mr. Couch, does the e-mail dated August 31st, 2000, and the attachments to that, to the e-mail, appear to be the same as in the prior exhibit, Couch Exhibit 2?
A It does.
Q And this is Mr. McIntyre sending a cost department analysis to you for the second time, correct?
A I guess. Okay. So, they were three years apart.
Q Well, I'm only looking at the John Tilley e-mail being forwarded to you.

Page 77

A I don't.
Q Were there dis -- in these meetings with Mr. Gooden, whether they were staff meetings or similar meetings, were there discussions of changing CSX's fuel surcharge methodology?
A There were. I'm not sure as to the time frame, whether it was during this time frame or later.
Q And I should back up, to make sure we're consistent with our terms. When I refer to -- what does the phrase "fuel surcharge methodology" mean to you?
A The process by which we charge our fuel surcharge.
Q And -- okay. Maybe we should distinguish between a methodology and a formula. Do you make that distinction?
A I don't.
Q Okay. So, the methodology could include the trigger point?
A Uh-huh.
Q Could include what index is used?
A That's right.
Q It could include the increments at which the fuel surcharge is adjusted?
A That's right.

Page 78

Q How it's adjusted, whether averaging or consecutive dates?
A Right.
Q Could include all those things?
A It could, uh-huh.
Q Is there anything else it could include?
A Well, yeah, a lot of different things.
Q Any come to mind specifically?
A Well, let's see, we talked about time frame, trigger, slope. Did we talk about the type of -- whether it's WTI or --
Q Index, right?
A -- highway diesel, the lag, you know, what time frame by which you average the fuel prices over, whether the program is laid out in a tariff that's all encompassing or it's in individual contracts, where the exception process is, et cetera, et cetera.
Q Okay. That's all I have on that exhibit. We'll hand you what was marked previously as Giftos Exhibit 9, which is CSXFSC000036620.
A Okay.
Q Focusing on the February 28th, l0:05 a.m. e-mail at the bottom --
A Right.
Q -- PMG refers to Mr. Giftos, correct?

Page 79

A Yes.
Q And Mr. Giftos -- Mr. Giftos, through his assistant, is requesting a discussion of fuel surcharge at his staff meeting, correct?
A Apparently so.
Q And you're not listed on this -- on that e-mail, correct?
A Correct.
Q And the e-mail is forwarded to you by Mr. Onimus?
A Right.
Q And Mr. Onimus is your -- the person to whom you reported at this time --
A Right.
Q -- correct? And would you have discussions about Mr. Giftos's staff meeting with Mr. Onimus on a -- on a regular basis?
A Not regular basis. When something came up that would involve me.
Q Right. So this -- does this e-mail chain -- was this e-mail forwarded to you because it concerned the fuel surcharge discussion?
A I don't know. It might've -- might've been because of the customer communication plan. I would be involved in helping Frank with that.

Page 80

Q Customer communication plan includes press releases?
A Not necessarily. It could be --
Q What's the communication plan?
A It depends on the topic. This one says: Shipment management and quality release. So, this one, I'm assuming, was more targeted to a targeted audience, to where we'd have to go find the customer information out of various databases and come up with a list of customers and addresses and contacts.
Q I see. Okay. And then, just so that I'm clear, the top e-mail in the chain doesn't have anything to do with --
A Correct.
Q -- with the staff -- okay.
Next -- next exhibit was previously marked as Gooden Exhibit 2.
Just to move things along, I probably won't be asking detailed questions about the attachment. If I do, I'll point you to what I'm referring to.
A Okay.
Q Okay. Do you recall -- do you recall this e-mail and its attachment? Do you recall seeing it before?
A Yeah, it definitely looks like my work.

Page 81

Q Looks like your work? You prepared these slides and the attachment?
A Uh-huh.
Q And if we looked at the cover e-mail, it's from you to Ms. Burton, who's one of your reports, correct?
A Right.
Q And who's the other person on the To line --
A John Jinkner, J-I-N-K-N-E-R. He reports to me as well.
Q And what's -- does he have a specific area of responsibility or expertise in reporting to you?
A Well, John was heavily used later on when we changed to the mileage-based fuel surcharge. My recollection was I sent this to them as part of their -- just keeping them in the loop, part of their development.
Q Okay. And the document is titled -- the presentation is titled Fuel Surcharge Overview Clarence 03.ppt. And that's a PowerPoint, correct?
A Uh-huh.
Q And Clarence referred to in the title is Mr. Gooden?
A Yes.
Q And did Mr. Gooden request you to prepare

Page 82

this presentation?
A I'm not sure if he did or my boss or whomever. A lot of times I'll develop presentations and suggest that we get on the staff meeting.
Q Was this presentation for a staff meeting?
A At noon to the commercial leadership team. I'm not sure if this one went -- we had -- sometime during this time frame, we would have lunch meetings with Clarence's direct reports, with Clarence not there, to discuss issues, this being one of them potentially.
Q Who would be included in the commercial leadership team referred to in your e-mail?
A Well, let's see, this was 2003, so it would've been Clarence and -- it would've been Clarence's direct report, so it would've been the merchandise team, so it would've been -- I'm trying to remember. I think it would've been Kyle Hancock, Derrick Smith. I think Dean was -- it might not have been Dean, it might've been Glenn Katz. So, one of those two --
Q Okay.
A -- for chemicals. And then Fredrik Eliasson for finance.
Q And that would've been the noon

Page 83

presentation. You also made a presentation in the morning?
A Well, these were -- we had a series of lunch meetings and then we also had the normal 7:00 a.m. staff meeting. This could've been one of those noon lunch meetings or it could've been more of a staff meeting with Clarence. I don't recall.
Q But it refers to two presentations, as I read the e-mail; is that right?
A This was my presentation this morning and, again -- yeah, it does, it does refer to it.
Q And the morning presentation would've been in one of Mr. Gooden's staff meetings?
A Probably, I assume.
Q And you indicated that this was a presentation that you prepared?
A Yes.
Q What would you have done to have gathered the information that's included in the presentation?
A Would've done some research, maybe some spreadsheet analysis. You'll see in the presentation it's got a comparison to the BNSF program. That would've been off the internet, off the BNSF's website, their fuel surcharge program. And then I think we did some history of fuel prices and -- so,

Page 84

kind of a standard analysis.
Q And your objective is to give an overview of CSX use of fuel surcharges at this time?
A I believe that was my objective, just kind of a general overview.
Q To provide -- to provide background to Mr. Gooden and others?
A To the leadership team.
Q And was that -- was the purpose of providing background to facilitate a discussion of possible changes to CSX's fuel surcharge methodology?
A We had a lot of debate at that -- I'm not sure if it was exactly that time, but I remember Glenn Katz specifically, when we were discussing changes to the fuel surcharge program, Glenn wanted to provide a discount if fuel prices went below $18 per barrel, and we had a lot of debate on that. And we expected fuel prices would go back down in the teens again, and most of the team did not want to give a discount to offset the surcharge if prices did go down. So, I do recall quite a bit of debate on that.
Q And Mr. Katz is a vice president of what area?
A He had chemicals --
Q Chemicals and fertilizer?

A -- and fertilizer.
(Couch Exhibit No. 7 marked for identification.)
Q That's all I have on this document. You can put this one aside.
We're marking as Couch Exhibit 7 CSXFSC000153005 through 024.
My questions on the attachments will be pretty general.
A Okay.
Q So, if we look at the e-mail -- are you ready to look at the e-mail?
A I am.
Q If we look at the first e-mail in the chain, March 10th, 2003, 12 -- 12:15 --
MS. KIRMAYER: Where are you, I'm sorry?
MR. SNYDER: First e-mail in the chain.
MS. KIRMAYER: So, it's the second page of the document?
MR. SNYDER: Second page of the document.
THE WITNESS: Okay.
BY MR. SNYDER:
Q Do you know who Jay Romans -- Jay Roman is?
A I know who Escalation Consultants is.
Q And do you recall seeing a report from



Escalation Consultants on March 10th that railroads were making -- this is according to the report, railroads are making a large amount of profit from fuel surcharges?
A I don't recall this one per se, but I recall many Escalation Consultants putting out really flawed analysis. They're known for it, in fact.
Q Well, that wasn't --
A Maybe --
Q -- wasn't exactly my question, Mr. Couch.
So, you don't recall the March 10th report --
A Not this one specifically, but I do recall plenty of these types of flawed analysis coming out of this team.
Q So, you'd get reports from Escalation Consultants and you would prepare a response?
A No. Customers -- customers buy their flawed reporting and then try to use it with us during negotiations.
Q So, you would indirectly prepare a response by way of response to customers to raise the Escalation Consultant work?
A Not on a systematic basis.
Q But occasionally?



A Occasionally.
Q Do you recall preparing a response to this March 10th report?
A I don't. I'm not sure if this talking points came from me. It might have.
Q You don't recall if you prepared the document, talking points?
A It looks like something I might've written. I don't recall writing it per se.
Q And what in there makes you think it looks like something you might've written?
A Just some of the wording, but I don't know. I don't know if I did or not.
Q What -- when you say "some of the wording," what wording are you referring to?
A That last two. No, not that. I'm not sure. I really don't know. This -- I know this is from Matt Tobin. Matt was also -- that wording might've been Matt Tobin's, the last part of it.
Q What last? "Not with CSXT"?
A Yeah.
Q And look at -- if we could look at the two paragraphs above that, "CSXT is considering," is where it starts. Do you see that paragraph?
A Uh-huh.



Q And it refers to a possible change in the fuel surcharge increments of .5 percent for 2.50. Do you see that?
A Yeah, I don't remember that.
Q You don't remember that?
A No.
Q Would the 2.50 change, would that be a change in the WTI index?
A I presume so.
Q And would that have been -- let's -- if we could just leave this out for one moment, I'd like to show you another document. Actually, if we could turn two pages ahead to the page ending in 09.
A Ahead or behind?
Q Oh, well, keep flipping.
A Okay.
Q It's the slide titled Fuel Surcharge Background.
A Right.
Q Are you with me?
A Uh-huh.
Q And does this slide -- does this slide describe the CSX fuel surcharge program that was in place in early -- in early March 2003?
A The one that started in 2000 -- in October

or -- yeah, October 25th, 2000.
Q Yeah. Could we call this, for sake of a common term, the 2000 program?
A Sure.
Q So, this 2000 program is still in place on March 10th, 2003?
A I don't remember the exact date but, yes, I presume so.
Q And if we look at the talking point response?
A Right.
Q Again, that refers to the .5 percent for 2.50 change in the price per oil?
A Right.
Q And that would -- and if we look back at the page ending in 09 --
A Right.
Q -- that .5 per 2.50 would've been half of the rate of change compared to the 2000 program?
A Right.
Q Correct?
A It appears to be that way, yeah.
Q Okay. And do you -- let's -- I may have more on this, but I'd like to move on --
A Okay.



Q -- to the next document for now.
We're marking as Couch Exhibit 8 CSXFSC000133925 through 927.
A Okay.
(Couch Exhibit No. 8 marked for identification.)
Q And does this e-mail chain refresh your recollection that you were tasked with preparing a response to the customer Nestle Ralston?
MS. KIRMAYER: Objection. Lack of foundation.
BY MR. SNYDER:
Q You can answer, Mr. Couch.
A I don't -- I don't recall specifically, no. I may have, but I don't recall specifically.
Q If we look at the chain, again, this relates to the Escalation Consultants study, correct?
A Their flawed study, yeah.
Q And this -- the study is passed on to CSX by the Nestle customer, correct?
A Apparently so. I don't know what this NPPC is.
Q And who's Mr. Hancock at this -- what's his position at CSX at this time?
A Vice president of industrial and



agricultural products.
Q And on March 10th, he asks you to help us with the response to Nestle Ralston?
A Apparently so.
Q And Mr. Gooden is copied on this e-mail, correct?
A Uh-huh.
Q Do you recall discussing the response to Nestle Ralston with Mr. Gooden?
A I don't.
Q With Mr. Hancock?
A I don't.
Q Let's see. Let's do this one.
MR. SNYDER: If we could maybe take a five-minute break.
MS. KIRMAYER: Sure.
MR. SNYDER: It's not quite an hour, I don't think, but...
MS. KIRMAYER: Okay.
THE VIDEOGRAPHER: Off record at 10:40.
(Brief recess.)
THE VIDEOGRAPHER: Going back on record at 10:57. This is the beginning of Videotape No. 3.
BY MR. SNYDER:
Q Mr. Couch, if you could flip through your



exhibits with me for a moment, starting with Exhibit 4. Look at Exhibit 4, 5, 6.
A 4, 5 and 6.
Q And then Giftos 9 --
A Giftos 9?
MS. KIRMAYER: It should probably be the next one in the pack.
BY MR. SNYDER:
Q Should be in order.
A Okay.
Q Should be after --
A Okay.
Q Yeah. And then Gooden -- do you have a Gooden 2?
A Okay.
Q And if we look back at those, they refer to a series of meetings, 1, 2, 3, 4, and two presentations that you gave.
A Okay.
Q Putting those exhibits together, does that remind you that fuel surcharge issues were increasingly important at CSX at this time period?
A I don't know if --
Q I mean, the late January, February, March, early March period.

A When did we change the fuel surcharge, the infamous all day meeting with Mike Giftos?
Q You don't remember?
A No.
Q If I told you the press release was dated March 20th --
A Okay.
Q -- would that sound accurate?
A Then I would say, yeah, there was probably some prep work that occurred prior to that change.
Q But we're looking at meetings going back to -- in the February, even late January period. So, it's a process happening over a period of weeks, correct?
A No, I think it was a process that went over a period of years. I think we've been constantly looking at the best way to match our fuel recovery to our increased fuel costs, and try to match it in the exact quarter when it's happening, and it's been a debate that's been ongoing for many years.
Q But you testified earlier that prior to late January or February period, it wasn't a topic, or if it was, it was a minor topic at the staff meetings, correct?
A Yeah.



MS. KIRMAYER: Objection.
THE WITNESS: If you look at what happened with fuel prices, they stayed in a very narrow range, for many, many, many years. And then during this time frame is when they started to go outside of that normal range.
BY MR. SNYDER:
Q My -- respectfully, my question called for a yes or no.
A Repeat the question.
MS. KIRMAYER: Objection. He can answer the question any way he sees fit, and he just did.
MR. SNYDER: Well, he's --
MS. KIRMAYER: You can't tell him how to answer a question.
MR. SNYDER: Well, if the question fairly calls for yes or no. In fairness, can you answer --
MS. KIRMAYER: He'll answer it as best as he can.
BY MR. SNYDER:
Q -- it yes or no?
MS. KIRMAYER: What was the question?
MR. SNYDER: Would you read back my prior question.



(Record read by reporter.)
MS. KIRMAYER: Objection. Lack of foundation. Go ahead and answer.
THE WITNESS: So, as I mentioned previously, it had been an ongoing topic for many years, trying to match fuel recovery to associated fuel increases.
BY MR. SNYDER:
Q You can't answer my question with a yes or no?
A Sure, I could, but I don't think it's quite that simple.
Q You won't answer my question with a yes or no?
A Like I said, I don't think it's that simple.
Q It's not that simple because you feel the need to give an explanation and not to answer straightforwardly, correct?
A No.
MS. KIRMAYER: I'm going to object. You're berating the witness. Just move on.
MR. SNYDER: I'm trying to have a clear record, Counsel.
MS. KIRMAYER: He's explaining --
MR. SNYDER: And we're not getting it.



MS. KIRMAYER: -- how he's answering your questions. He's explaining that his answer is not as simple as yes or no. You're going to have to live with that. That's the answer to your question.
MR. SNYDER: Well, I'll move on. I'll move on for now, but I think the record speaks for itself.
MS. KIRMAYER: It certainly does.
THE WITNESS: So, I can put these back in the stack?
MR. SNYDER: Yeah.
(Couch Exhibit No. 9 marked for identification.)
BY MR. SNYDER:
Q We're marking as Couch Exhibit 9 CSXFSC00032677 through 79. And after you've had a moment to look at the attachment, if we could -- if you could leave that out and also take out Exhibit -- Couch Exhibit 7, and turn to the first attachment in Couch Exhibit 7.
MS. KIRMAYER: Sorry.
THE WITNESS: That's okay. Thanks for helping.
MS. KIRMAYER: I thought I was helping.

analyses that you performed?
A Yeah, sure, uh-huh.
Q And were those recommendations embodied in presentations that you made to others at CSX?
A Absolutely.
Q And were those recommendations made before March 20th, 2003, after or both?
A I don't know about that exact date. I can tell you for a five-year period, I'd been making -- I had been making recommendations, maybe even six years, for multiple changes to the fuel surcharge program.
Q And when you refer to a recommendation, would that include a discussion you might have with another coworker, or are you talking about something more formal?
A Both. So, I would typically be discussing it with the director of finance. We'd be going back and forth. We'd be talking to some of the directors in marketing. We'd have meeting with marketing -- meetings with marketing directors, going over, you know, thoughts, proposals, get their feedback, try to get an estimate of how -- of how customers are going to react. So, all of the above.
Q And how many times has Mr. Gooden asked you to make a recommendation about changing the fuel



surcharge program?
A I don't think he would specifically ask me to make a recommendation. He would say, hey, let's work with the team and debate it, discuss it, think about it. And we've looked at multiple iterations of changes to the fuel surcharge program over the years.
Q Has he ever asked you directly to recommend changes to the fuel surcharge program?
A Individually? On my own?
Q Individually.
A I'd say probably not. He might ask my opinion.
Q Might ask your opinion?
A Yeah, he wouldn't expect me to come up with a change.
Q Never came to your office and asked you to put together a presentation about recommended changes to the fuel surcharge program?
A Physically coming to my office?
Q Let's start there, physically come to your office.
A He's been on the third floor a half dozen times. And did he ever actually walk in my office? I don't recall him ever doing that.
Q Call you on the phone one-on-one and say,



will you make a recommendation?
A I don't think so, no.
Q Send you an e-mail?
A He might send me an e-mail and copy people and so forth. He occasionally will just send me an e-mail, very rare. It's usually -- I think it's when he's traveling and on his Blackberry or whatnot.
Q Well, in -- in February/early March -- when I say early March here, I mean before March 10th, 2003, were you assigned by anyone to make a recommended changes -- let me start -- poor question.
In the February to March 10th, 2003 time period, were you assigned by anyone to make a recommendation about changes to the CSX fuel surcharge program?
A I don't specifically recall so during that time frame. I've been asked many times to review the program, get with the teams, get ideas, get the consensus around ideas, and formulate some changes.
Q Okay. Are other people at CSX similarly asked to make recommendations about changes to CSX's fuel surcharge program or is it just you?
A I'm sure other people are asked, yeah. Finance people, you know, different VPs of sales marketing. I mean, that would be very common for --



for there to be pretty broad debate with a lot of people.
Q And you participated in these debates?
A A lot of them.
Q And has Mr. Giftos ever specifically -- did Mr. Giftos ever specifically ask you to make recommendations about changes to the CSX fuel surcharge program?
A Probably the most specific he got was when he called me that day or day before we made the change and we spent a lot of time together talking about how to change the program.
Q Well, we looked at -- if we -- we may not even need to turn to it, but we looked at a PowerPoint presentation that you prepared giving background on fuel surcharges. Do you recall other background PowerPoint presentations you prepared on fuel surcharges?
A Yeah, if you look at my drive where I save these presentations, there's probably 20 or 30 of them.
Q And those were prepared -- well, it seems that you have a specific recollection of meeting with Mr. Giftos and working for a day?
A I sure do.

Page 105

Q So if we could focus on events before that day, that would be helpful, because I understand -- I recognize it's hard to know the exact date.
So, let's focus on that time period backward, before the day with Mr. Giftos. How many presentations did you make about fuel surcharges prior to that date?
A I have no idea. I'm assuming it would be multiple. It's been an ongoing discussion. And as fuel prices started to spike, it became more and more ongoing.
Q And prior to that -- prior to that date, did you prepare multiple presentations with recommendations about changing CSX's fuel surcharge program?
A I may have.
Q And these would be formal -- forget the word formal. These would be PowerPoint presentations?
A Primarily.
Q Earlier, we looked at the PowerPoint presentation that was attached to a March 3rd, 2003 e-mail.
A Which exhibit?
Q That would be Gooden 2.
A Okay.

Page 106

Q And if you need to look at this again -- if you need to look at this again, that's okay, but is there any recommendation in this exhibit as to changes --
A Well, I definitely would have to look at it if you want me to answer that. Background, options, options, history, BNSF, advantages, intermodals. I don't see a recommendation.
Q Right. So this refers to options to the --
A Yeah, typically, I would not have been the one to recommend a change. I would've said, here's a bunch of things we should consider, and then Clarence and the VPs or Giftos or whomever would consider it all, they'd all debate it, get with finance, do a background analysis, and I'm more of the kicking off the process.
Q So, on March 3rd, you're looking at options, you're discussing options?
A Or background. Or background.
Q Background or options, okay.
A Uh-huh.
Q We're handing you an exhibit previously marked as Gooden 3, which has -- starts with a Bates No. CSXFSC000036491.
A Okay.

Page 107

Q Have you seen this document before, Mr. Couch?
A Yeah, it's definitely my work.
Q I couldn't hear you. Pardon me?
A It is my work.
Q It is your work. And what do you remember -- what do you remember -- start over.
What, if anything, do you remember about preparing this document?
A It's one of many iterations we discussed.
Q Many iterations of what?
A Fuel surcharge recommended changes.
Q So, you believe you made many recommendations prior to this document?
A We discussed -- we had a lot of debate.
Q Well, let's put aside discussion and debate and focus on the preparation of the document. Do you recall preparing a document recommending changes prior to this one?
A As I said, I made many documents recommending changes.
Q Prior to making this one?
A Well, I don't remember the time -- the sequential timing of the recommendations.
Q Well, did you make any recommendations that

Page 108

would've been embodied in a presentation in 2001 or 2002?
A Maybe.
Q Maybe?
A Maybe.
Q But you don't recall any specific?
A I don't.
Q Do you recall discussing this presentation with Mr. Gutman?
A No, I don't.
Q Do you recall discussing this presentation with Mr. McIntyre?
A No, not -- not per se. It looks like I got input from them, but I don't recall what it was.
Q And the input from Mr. McIntyre may have been the Tilley economics data we looked at earlier, correct?
A Probably not. Most likely the Clyde input would've been the mechanics of implementing the program, because that's what his role in the organization is. The Gutman input would've been on financial -- the financial aspects to the program.
Q Okay. So, there may have been input from Mr. Gutman and Mr. McIntyre. Who else may have had input into this presentation?

Page 109

A As I've said before, the VPs, the directors. I mean, when we -- when we make a change, we're very careful and methodical about it. We get input from all, you know, all the internal constituents.
Q Okay. So, you were being careful and methodical in coming up with your recommendation?
A In all -- in all the discussions, in all the iterations, which there were many, we were always careful and methodical. And this is one of many iterations.
Q And in being careful and methodical, you would've looked at any existing economic studies of CSX's fuel costs, correct?
A Absolutely.
Q And other than the Tilley -- the Tilley study we looked at, do you recall cost studies you looked at in connection with this presentation?
A There would've been many and there would've been ongoing. And as I've mentioned before, I thought his study was rather rudimentary.
Q Well, the cover e-mail is sent -- shows a document being sent to Mr. Onimus?
A Uh-huh.
Q Were you working on the recommendation of Mr. Onimus at this time?

Page 110

A Not so much, it was more with the VPs and the directors, and Frank wasn't that heavily involved.
Q And when you say the directors, are you referring to Mr. Gooden?
A No. No, the directors of sales and marketing, my level.
Q Your level, okay.
A Uh-huh.
Q But the e-mail refers to Mr. Gooden, correct?
A It does.
Q And it doesn't refer to any of the directors except for Mr. McIntyre, correct?
A Yeah, but we wouldn't -- we wouldn't get Clarence's blessing on something that hadn't been thoroughly vetted up the chain, so the implication here is if Clarence is okay, then the VPs and the directors have discussed it as well.
Q So, this is a thoroughly vetted document?
A No, I wouldn't say that. You know, I mean, it's a document that a lot of work went into, but, again, I think it was one potential of many that were considered at the time.
Q Okay. So, a lot of work went into the document. Was that a lot of your work?

Page 111

A Sure, yeah.
Q You put a lot of thought into your recommendation?
A We put a lot of thought in all the recommendations. And I got to tell you, we've had so many iterations of the fuel surcharge program being debated, that I don't even remember this one.
Q Well, can you remember any other iterations that were being discussed as of March 11th, 2003?
A Not that time frame, but I can -- you know, I've already referenced the ones that were probably around that time frame, where Glenn Katz wanted to have, in addition to differences going up, he wanted refunds going down. And so that was one of many I remember.
Q Anything besides Mr. Katz's refund program?
A We had a lot of discussion about the slope and the trigger point.
Q Slope and trigger point?
A Uh-huh.
Q If we could turn to Page -- the page ending in 494.
A Okay.
Q And this is your recommendation with input from others, correct?

Page 112

A Correct. Well, I don't know if I'd call it my recommendation. I think it's a consensus recommendation at that time.
Q And if we could turn to the next page, 95.
A Uh-huh.
Q So, the consensus at the time was to go to an average of two months; is that correct? I'm sorry, an average of two months prior to the 15th of the last month?
A I guess. Yeah, that's what it says, yeah.
Q Consensus had been reached on the averaging?
A Uh-huh.
Q And the actual program, the October 2000 program, was based on consecutive days, correct?
A Uh-huh.
Q So, there was a consensus to change that aspect of the program?
A Yes, because we had gone through a period where we had rapidly escalating prices, and then one day it dropped below the change, and that delayed the whole increase in the fuel surcharge, and we were spending a lot of money in increased fuel costs and not recovering it.
Q There had been, as you described it, discussion and debate about the slope of the fuel

surcharge --
A Right.
Q -- correct? And here you recommend half percent increase for every 2.50 increase in WTI?
A Uh-huh.
Q That was the consensus that had been reached?
A That was one of the opinions at that point in time, which we -- I think we came to later realize was flawed.
Q Well, it's one of the opinions, but it's the opinion you're putting forth in this document, correct?
A Which we later found to be flawed. Based on that -- it may have been based on that rudimentary study of John Tilley. But either way, it was flawed thinking, and we recognized that at some point.
Q So, you may have been looking at Mr. Tilley's study when you put this together?
A Like I said, I may or may not have been, and it was rudimentary at the time and it still is today and this was -- this is not what we ended up rolling out, because it would've under recovered.
Q Well, it was rudimentary, in your words?
A Right.



Q But it was the one that you, by all indications, you looked to in making this recommendation, correct?
A I'm not sure of that. I wouldn't make -- I wouldn't jump to that conclusion.
Q Well, does this document suggest you were looking at any other studies?
A Doesn't say -- suggest we're looking at any studies.
Q But it just happens to follow the same figures as in the Tilley study?
A No, it doesn't at all. A .1 percent difference -- the Tilley study's 1.1, this is 1 percent. A .1 percent difference is 10 percent of fuel surcharge. And when you're looking at a $100 million, that's pretty big money. So I wouldn't say that that matches at all.
Q The Tilley study also discusses different trigger points, correct?
A I don't recall.
Q Well, we can take a look.
A Okay. Which document?
Q We are at Exhibit 2.
A Couch 2?
Q Couch 2.



A $33 per barrel trigger, is that what you're referring to?
Q Right. I'm just asking whether the Tilley study references different trigger -- trigger points?
A It references 33 per barrel and 30 per barrel, so it references two.
Q Are you -- other than the Tilley -- the Tilley study we're looking at in Exhibit 2, can you point me to any specific studies of trigger points that you looked at in preparing this document?
A I think we would've looked at a number of trigger points. And if I had, you know, my shared drive where I could look at all the different analysis I did, I could definitively answer that, but I'm pretty confident we looked at a bunch of different trigger points.
Q Well, I understand you're looking at different trigger points, but that's not my question. My question is, can you point me to any studies, other than the Tilley study, that analyzed different trigger points?
A Can I right now?
Q Can you right now?
A No, but I know I have them. In fact --
Q And is one of those studies the basis for



the $23 trigger point?
A I don't know. No, the $23 trigger point, I believe, was the original fuel surcharge had 28 as when it first started, but it started at 23, and I think it was a -- it's just a continuation of the original program that started in 2000.
Q So, it was based on a continuation of the original program as opposed to supported by any study?
A Well, there was a program, I'm sure, was supported by multiple studies. And, in fact, looking back, fuel prices had been at the 13 to $18 a barrel range for decades, and they started to get out of that normalized range, and 23 felt like a place where that was abnormal and above where our pricing had taken into consideration fuel prices. So, it wasn't --
Q Looking at -- looking at Gooden 3 --
A Go ahead.
MS. KIRMAYER: Go ahead and finish your answer.
THE WITNESS: Well, I was just going to say, it wasn't a scientific number, it was a bunch of people looking at what's normal and what's clearly abnormal, and 23 felt like a range that was considered that both internally and we thought customers would be accepting that as

being an abnormal aberration change in fuel price.
BY MR. SNYDER:
Q Looking at Gooden Exhibit 3.
A Okay. Just a sec. Okay.
Q The last sentence: We may want him to bless before giving it to Leslie. Leslie is Mr. Giftos's assistant?
A Uh-huh.
Q And want him to bless, you're talking about Mr. Gooden, correct?
A Correct, uh-huh.
Q What does it mean to have something blessed?
A To have -- to have him say it's okay to give it to his boss.
Q Okay.
A It's straightforward. Bless is probably --
Q I don't have any --
A -- not a great word.
Q We're handing you what's been previously marked as Gooden Exhibit 4, starting with CSXFSC000156699.
A When you say "previously marked," what do you mean?
Q At another exhibit -- at another deposition.



A Oh, okay.
Q Mr. Gooden's deposition in this case.
A Okay.
Q My question is simply whether you were at the budget meeting referred to in this e-mail?
A I don't recall whether I was there or not.
Q Okay. Let's turn to -- we'll hand you what was previously marked as Giftos Exhibit 12.
Have you seen this document before, Mr. Couch?
A I don't recall it, but it's basically -- I think this is the day that Mike and I spent together.
Q You spent the 19th together?
A I don't know if it was that specific day, but the day we decided to change it was after -- you know, my recollection was, yesterday, the prior day, the price of oil dropped on the 29th, the 30th day, and Mike Giftos woke up mad about it, and -- because we weren't going to get -- be able to recover our increased costs and it was going to impact our performance, and he wanted to change the program.
Q And the day that you worked with Mr. Giftos, were you in your office, his office, a conference room, where were you working?
A I was in all of the above.



Q All of the above?
A He wasn't in my office, I don't think. I don't recall him being in my office, but I did a lot of the -- we'd meet, I go back to my office, do analysis, we'd meet. We met in his office, we met in Adam Hollingsworth's office, who was -- spent a lot of time in his office. He was our communications, external communications person. And so all of the above.
Q All of the above. And you think you had this meeting referred to in the memo and then worked all day with Mr. Giftos?
A Yes. I don't remember this meeting, but I remember working all day with Mr. Giftos.
Q Well, if I could direct you to the second full paragraph.
A Okay.
Q Mr. Giftos writes, as the author of the memo: I have spoken with Michael Ward this morning about a new program and want to announce immediately.
Had Mr. Giftos already decide upon -- decided upon a new program when this meeting was held?
A No. He knew we needed to modify it. He woke up mad, called Michael, said, we're changing the program and we're going to try to make it more



responsive to change in the fuel price.
Q Other than this -- what's stated in this memo, do you have any way of knowing that Mr. Giftos spoke with Mr. Ward?
A Yeah, my recollection, he told me he did.
Q During this meeting or during the day --
A During the day.
Q -- he told you he had spoken with Mr. Ward?
A Uh-huh.
Q And you continued working through the day, into the night?
A I did.
Q And did you take -- did you take any notes during the course of the day and the night?
A I think I did most of the work in Excel, which I would've saved those documents.
Q And --
A There might've been some Word -- later on in the day, there might've been some Word documents on internal communications, maybe even external. In fact, I think that's why we were in Adam Hollingsworth's office, was to talk about the communication plan.
Q Mr. Hollingsworth is a press -- press officer?

A Uh-huh.
Q Did Mr. Giftos also indicate he had spoken with Mr. Gooden?
A I don't recall Clarence being involved.
Q Were you working with Mr. Giftos -- well, I believe you testified that you were sometimes working with Mr. Giftos in his office, sometimes you were working by yourself in your office, sometimes in a conference room?
A And in Adam's office.
Q And in Adam's office, right?
A Uh-huh.
Q So you weren't with Mr. Giftos continuously throughout the day and the night?
A No, there were breaks.
Q And he would've had opportunity -- an opportunity to call Mr. Gooden, correct?
A He would've had opportunity to do a lot of things.
Q Right. Could've called a lot of people?
A Could've done anything.
Q Could've done anything.
A Could've gone out for a fancy lunch.
Q And you don't know what he was doing when you weren't with him, obviously?



A No, he's a busy man, he has a lot to do.
Q So, on the -- on the 19th, Mr. Giftos is beginning with the simple idea that he wants to change the program; is that your understanding?
MS. KIRMAYER: Objection.
A It's a complex idea.
Q A complex idea. But he hasn't arrived at a new formula for the program; is that your testimony?
A He knew that he wanted to -- I think he knew that morning that he wanted to use average instead of consecutive days, but as far as other changes to the program, we debated and discussed a lot of different changes.
Q And the average, there had already been a consensus reached on the averaging issue, right?
A No.
Q That's not what you -- there was no consensus that went into your recommendation as to averaging?
A Oh, no, there was a consensus, as that previous document showed, to one of many different options, and that averaging is just one of many different options.
Q Okay. But there was a consensus as to the averaging component of that recommendation?



A Yeah, I don't think anybody was against that.
Q Okay. What -- what happens after this meeting? Did you go to Mr. Giftos's office and start working with him?
A I don't recall the meeting, and I just recall working with Mike to talk about different options to change the program.
Q Different options. And among those different options, you're discussing -- well, let me back up.
Did you just have a broad discussion or does he look to you for a recommendation as to what changes to put into place?
A Maybe a little bit of recommendation, but more of a discussion of options and the pros and cons of the different options and then what would be the revenue, estimated revenue impacts and how would they associate with cost impact, so we tried to do an awful lot in one day. And that's why I was there with him, was to try to give him, you know, the answers to those difficult questions.
Q If we could -- we may come back to this one, but if we could mark a new exhibit.
Oh, I'm sorry, it's already been marked as



Gooden Exhibit 5, begins with the Bates Stamp CSXFSC000152802.
A Okay.
Q And if we look at -- this is a March 19th, 2003 e-mail with two attachments. If we look at the first attachment, does this appear to be the same Fuel Surcharge Background PowerPoint presentation we looked at previously today?
A With some significant changes.
Q Well, the first -- correct. Okay. This is a -- this is a new version of the presentation?
A Correct.
Q And you prepared this on the 19th?
A Is that what the date is of this e-mail?
Q It is.
A So, it would've been the 18th or 19th, yeah. Oh, yeah, probably would've been the 19th probably. Is that the day after the Giftos e-mail?
Q It's the same day.
A I guess I did. Okay.
Q Well, you testified it was a busy day, so --
A It was, uh-huh.
Q And the subject is fuel surcharge change, correct?
A Correct.

Page 125

Q And who are the -- what are the positions of the people in the To line?
A So, Kyle -- I'm trying to remember here. Okay. At that time, I think Kyle might've been -- let's see, Mike Woodall had metals; Jim had paper and forest products, Jim Howarth; Glenn Katz had chemicals; Bill Kenwell had sales; and I think Kyle Hancock might've had transflo back then. Okay. So, it was basically Clarence Gooden's direct reports.
Q Right. And if we look at the first paragraph, it says: A press release will go out today; correct?
A Correct.
Q And did a press release go out on March 19th --
A I think it might've gone out the next day, but I'm not sure. It might've gone out that night.
Q And are these the changes that were -- if we look at the Items 1, 2, 3, 4 --
A Right.
Q -- are those the changes that were discussed by you and Mr. Giftos?
A I don't remember No. 4, but apparently -- apparently, they were. Because No. 4 didn't actually make it into the program, I don't believe. Another

Page 126

iteration of the program.
Q But with the exception of No. 4, the other -- the other items were included in the program?
A I believe so.
Q If we could just stay with this for a moment. This is an e-mail that you sent to the direct reports of -- I'm sorry, Mr. Giftos or Mr. Gooden?
A Gooden.
Q Mr. Gooden. And since you're sending it to all of Mr. Gooden's reports, you would've taken care in drafting your e-mail?
A Absolutely.
Q And if -- and you note that this is -- you state: It is actually a large increase in fuel surcharge billings?
A That's correct.
Q Is that based on an analysis you had performed?
A Yes.
Q Was that the objective of the changes, to increase fuel surcharge billings?
A To better match the increased costs that we were incurring, because we were -- we were incurring huge increase in costs without capturing the fuel surcharge offsetting revenue.

Page 127

THE VIDEOGRAPHER: Five minutes left on the video.
MR. SNYDER: Shall we go off the record?
MS. KIRMAYER: Sure.
THE VIDEOGRAPHER: Off record at 11:53.
(Brief recess.)
THE VIDEOGRAPHER: Going back on record at 12:09. This is beginning of Videotape No. 4.
MR. SNYDER: Thank you.
BY MR. SNYDER:
Q Mr. Couch, before the break, we were focusing on the March 19th, the day of March 19th, 2003. Do you recall that?
A Which one, the Giftos?
Q Just -- well, we could look at the exhibit, but I'm just asking generally.
A Is that the day -- the infamous day?
Q Yeah.
A Okay.
Q That's the day of the Giftos memo.
A Right.
Q And the memo requests a meeting at 10:00 in the morning, correct?
A Uh-huh.
Q And what -- Mr. Giftos has decided that

Page 128

there will be changes to the fuel surcharge program by the time of that meeting, correct?
A Prior to the meeting, that morning, he woke up and said, we're going to change the program.
Q Prior to --
A Called Michael Ward and said, we're going to change the program.
Q What was it that Mr. Giftos said had prompted him to want to make changes to the program?
A The prior day, having the 29th consecutive day have the price of fuel dip.
Q So, the price of fuel dips, and Mr. Giftos is mad and wants to change the program?
A Yeah, because that one-day dip ended up in us not being able to implement another, whatever it was, 2 percent fuel surcharge, and that delayed even further some recovery from escalating fuel costs.
Q Tell me everything you remember Mr. Giftos saying about why he wanted to change the program.
A I think I just did. It was the -- it was that consecutive day thing was why he wanted to change it.
Q Well, if we look back at the staff meeting memo, which was Giftos 12 --
A Okay.

Q -- the memo states that this is the second time -- second time in the last four months that the trigger was stopped on the 30th day.
A Right.
Q And it didn't -- the first time didn't prompt any changes; is that correct?
A No, it made him mad, and the second time was like, I'm not gonna let that happen again.
Q Well, how do you know it made him mad?
A Because I -- I -- my recollection is there was discussion about that.
Q But no changes were made the first time it dipped below on the last day?
A No, we're very careful and methodical when we make changes.
Q So, Mr. Giftos is mad on the 19th, he convenes a meeting, and after the meeting, you begin working with Mr. Giftos?
A I'm not sure it was after the meeting, but, yeah --
Q Well, clearly, sometime after?
A During that day.
Q Maybe not immediately after --
A Right.
Q -- but sometime after.



Other than yourself, Mr. Giftos, and Mr. Hollingsworth, who was involved in making the -- in considering the changes on March 19th?
A I don't really recall anybody else being involved.
Q So, the three of you?
A Uh-huh.
Q And were you -- you said that you were doing analyses on the day of the 19th?
A Right.
Q You weren't requesting analyses from other -- from your reports?
A I think for the most part I did them.
Q You did them. And you weren't requesting analyses from the cost department?
A I may have. I don't recall doing that.
Q But by and large, it's the press officer, Mr. Giftos, and yourself?
A (Nods head.)
Q And you can't recall specifically anyone else working on the changes?
A That's correct.
Q Let's look at the -- give me a moment -- the Exhibit Gooden 5, please.
A Okay.



Q Should be near the top. And as noted in the cover e-mail, there are four primary changes to the program, according to the e-mail, correct?
A Correct.
Q And the fourth may not have happened?
A It did not happen.
Q Did not happen. The first one is the average versus consecutive day?
A Correct.
Q How did that -- what's your -- what do you recall about that change being decided upon on the 19th?
A We had been talking about that for a significant amount of time with Clarence and the rest of the team, and we all felt that that was a more -- a more equitable way of capturing fuel price changes.
Q And next area is the $23 per barrel?
A Uh-huh.
Q How did that change come about on the 19th?
A That was essentially taking the prior program and instead of having 2 percent for every $5 increase, dissecting that into $1 increases and .4 percent. So, it's essentially the same thing, it's just making the increments smaller. So, the slope and the trigger, in my mind, didn't change one bit.



Q And 3, no surcharge for $13 to $23?
A That's --
Q That's not a change?
A That's not a change.
Q And that refers to the WTI --
A Right.
Q -- price per barrel and the WTI --
A Yes.
Q -- index. Looking at No. 2, how did the -- how did the change to .4 -- the .4 percent increments come about on the 19th?
A You take the 2 percent from the prior program and you divide it by five $1 increments.
Q And whose -- whose idea was that?
A I think it might've been Mike's.
Q Mr. Giftos's idea?
A Correct, uh-huh. Or it might've been one of our recommendation -- one of my -- I don't remember.
Q Or you may have recommended it?
A May have, I don't remember.
Q And when you say you may have recommended it, would that have been in -- you're talking about on the 19th?
A Correct.
Q And would that have been just orally

recommended to Mr. Giftos?
A Verbally. I think it was more trying to take the current program and make as few changes as possible, but yet make it more equitable to both us and the customers. And I think that's how we came up -- across that change. And it's as simple as take the old program, instead of $5 increments, make it dollar increments, take the old percent, divide it by five. That simple. So, the slope and trigger really don't change.
Q So, the concept is the slope and the trigger don't change?
A They don't change. They don't change.
Q Whose concept was that? Was that yours or Mr. Giftos's?
A I think -- I think we wanted to -- we had been hearing from customers, don't make a lot of changes, and so, this -- this was not a lot of changes.
Q Well, do you remember that being a concept you told Mr. Giftos about or a concept that he told you about?
A I don't remember.
Q Don't remember either way?
A No.



(Couch Exhibit No. 10 marked for identification.)
Q Let's look at -- let's mark a new exhibit. Marking as Couch Exhibit 10 an e-mail dated CSX -- with a Bates Stamp CSXFSC000153146.
A So, that's the same day at 8:54 at night.
Q And you're informing others at CSX that the changes you had previously e-mailed them about may be changed or delayed, correct?
A Uh-huh.
Q Was that your decision to change or -- to possibly change or delay the announcement?
A My decision? No, I wouldn't make that decision myself.
Q Whose decision was that?
A Someone on the team, whether it be Mike Giftos or Clarence Gooden. Probably Mike Giftos and the team. And my bet is, is that Item No. 4, but I don't know for sure.
Q How did you learn that the changes may be changed or delayed?
A I don't recall, to be honest with you.
Q Was Mr. Giftos in the office at this point? It's almost 9:00 at night.
A I betcha he probably -- within 20 minutes of



that e-mail probably.
Q Within 20 minutes?
A I remember being there late, and I remember going to my office after we broke, and that's about all I remember.
Q Do you remember sending any fax communications to Mr. Giftos on the 19th?
A I don't remember. I might have, but...
Q You may have sent fax communications on the 19th about the surcharge changes?
A I don't remember.
(Couch Exhibit No. 11 marked for identification.)
Q We're marking as Couch Exhibit 11 a document starting with CSXFSC000098459.
Have you ever seen this document before, Mr. Couch?
A Just a minute. I remember we looked at going to the highway diesel and then ultimately we didn't go that route, so, I mean, I didn't realize we had gone as far as drafting a press release with that other program, but it looks familiar.
Q If I could direct your attention to the top left-hand corner. It bears the date March 19th, 2003.
A Okay.



Q Seeing this document, does it refresh your recollection that you were sending faxes to Mr. Giftos on the 19th?
A No, it doesn't. I thought he was in the office. I'm not saying I didn't do it. My recollection was he was in the office late with me, but I don't recall.
Q Okay. Might this have been a fax to Mr. Gooden?
A I mean, you can draw any infer -- whatever the right word, that you want from that.
Q We can put that one aside.
A Okay.
Q If I could just ask one more. You don't recall preparing this draft press release, correct?
A Not per se, but that's definitely -- that's my table (indicating). So, I don't -- no, I don't recall doing it, but I could've easily have done it.
Q But the language of the press release, you don't recall drafting?
A The language I clearly -- if I had this on my drive and was working on it, I clearly had a lot of help from Adam Hollingsworth.
Q And you've -- you mentioned you've seen the table before, you prepared it, but --

A Right.
Q -- do you recall seeing any other parts of this press release before now?
A Some of the wording seems -- seems somewhat familiar.
Q The wording, fair enough, but this document as a whole, do you recall seeing it before now?
A No. If you had asked me did we do a press release based on a mileage based -- or not mileage, an HDF-based fuel surcharge, I would've said no, we considered it, I didn't remember doing that.
Q And if you could look on the second page, there's a handwritten number, appears to be a phone number?
A Right.
Q Is that -- is that your handwriting?
A No, it is not.
Q Is that Mr. Giftos's handwriting?
A I have no idea whose handwriting that is. It looks like a CSX number, though. Our exchange is 359.
Q Right.
A So, it looks like that's an internal -- well, internal number; I don't know whether it's fax or phone or what it is.



Q But you don't know whose handwriting it is?
A I don't, just it's not mine.
(Couch Exhibit No. 12 marked for identification.)
Q Handing you a document marked as Couch Exhibit 12, which is CSXFSC000098458. Thank you.
A Thank you. Okay.
Q Do you recall seeing this document before, Mr. Couch?
A Not specifically, but it's clearly my writing.
Q And there's a telephone number on the top of the page. Is that your fax number?
A I have no idea.
Q Well, it's a 359 exchange we were talking about, so it's a CSX number?
A Or Times Union.
Q Or Times Union?
A (Nods head.)
Q You don't think this document --
A Probably not from the Times Union --
Q -- was faxed by the Times Union?
A -- nor to the Times Union.
Q So you may have faxed it?
A May have.



Q You just don't remember?
A That's right.
Q And -- but this appears to be your writing?
A It is.
Q Do you remember preparing this document?
A Not specifically, but I certainly remember all the points and what it says and the arguments behind the points that are made.
Q And were you -- were you having continuing discussions on the evening of the 19th with Mr. Giftos about possible changes to the CSX fuel surcharge program?
A Yeah, we had narrowed it down to the two -- the one that was finally implemented and the program that is similar to the BNSF program.
Q And you're pointing out the merits of the -- of the program CSX actually went to in this document, correct?
A Correct.
Q If we look at the third to the bottom paragraph, it's just half a line: The .2 percent changes would be lower than the rest of the industry. What are you referring to there?
A I'm not sure.
Q You don't know what the .2 percent is



referring to?
A No, I don't. It may have been one of the options we were considering. I don't remember. Because ultimately, at the end, we were comparing the .4 percent change to the BNSF-type program, and you know where we ended up.
Q A point -- there's six points in the middle of the text. If I could direct your attention to those.
A Uh-huh.
Q Point 3 -- and to be clear, this is a document you drafted and sent to Mr. Giftos?
A Uh-huh.
Q Point 3 discusses antitrust concerns?
A Uh-huh.
Q Do you -- what do you recall about your discussions with Mr. Giftos on the 19th as they related to antitrust concerns?
A We had -- Paul Hitchcock from our law department was involved in some of the discussions.
MS. KIRMAYER: I'm going to stop you for a minute and instruct you not to disclose the substance of any communications with Mr. Hitchcock.
THE WITNESS: Because that's privileged.

MS. KIRMAYER: Privileged, right.
THE WITNESS: Okay.
MS. KIRMAYER: But you can answer without disclosing those.
THE WITNESS: Okay. So, basically, I mean, it's pretty self-explanatory, if you copy another railroad's program verbatim, people might infer whatever they might infer from that, whereas if you take your current program that your customers are used to and you make minor modifications, nobody would infer that any improper things might've occurred.
BY MR. SNYDER:
Q And that was a discussion you had -- without getting into the substance of the discussion with Mr. Hitchcock, you had a discussion with Mr. Hitchcock on the 19th?
MS. KIRMAYER: You can answer that yes or no.
A Yes.
Q Yes. And was Mr. Giftos involved in that discussion?
A I don't recall.
And it's routine for us to include our counsel in any decisions like this.



Q Did you speak -- do you recall speaking with Mr. Giftos after sending this fax?
A I don't recall. So, that would've been at 7:09. As you can see from the other documents, I was working several hours beyond that.
Q Do you believe this is the last communication you had with Mr. Giftos on the 19th?
A I don't know if it was or wasn't.
MR. SNYDER: That's all I have on that one. And we had talked about maybe 20 minutes before lunch. I think it's been about that, ballpark.
MS. KIRMAYER: Do you want to break for lunch now?
MR. SNYDER: Yeah.
MS. KIRMAYER: Okay. For what, 45 minutes?
MR. SNYDER: That sounds fine, yeah.
THE VIDEOGRAPHER: Off record at 12:33.
(Lunch break.)
THE VIDEOGRAPHER: Going back on record at 1:37.
MS. KIRMAYER: Before we start up again, I just want to, on behalf of CSX and pursuant to the protective order in this case, designate this transcript as highly confidential, subject to later downgrading.



MR. SNYDER: We reserve our rights under the protective order, but I understand that's been the practice, which will continue.
BY MR. SNYDER:
Q Good afternoon, Mr. Couch.
A Good afternoon.
Q I will hand you an exhibit, which is a press release previously marked as Giftos 10.
A Okay. Okay.
Q And having reviewed the document, does it refresh your recollection that on March 20th, CSX issued a press release concerning its fuel surcharge program?
A Yes.
Q And it announces several changes to the program?
A Minor modifications.
Q And it quotes Mr. Giftos?
A Uh-huh.
Q Do you recall seeing this in March 2003?
A I'm sure, I'm sure I saw it many times.
Q Did you help prepare this press release?
A Maybe a little bit, but it was -- it would mostly have been Adam Hollingsworth and Dan Murphy.
Q And the press release states that CSX's



surcharge, quote: Will be adjusted up or down 0.4 percent for every dollar increase or decrease in oil prices above $23 per barrel.
A What paragraph are you on?
Q I'm in the second paragraph --
A Okay.
Q -- second full paragraph.
A All right. I see it.
Q And do you recall that that -- that those new increments were, in fact, implemented by CSX?
A Yes.
Q And do you recall when those changes went into effect?
A No, I don't.
Q Does June 2003 sound --
A Sounds reasonable.
Q -- sound reasonable? And if we, just for the sake of having a common phrase, refer to these changes as the June 2003 program --
A Okay.
Q -- will we be on the same page?
A Yes.
(Couch Exhibit No. 13 marked for identification.)
Q Okay. Thank you. That's all I have on that

Page 153

Q Okay. Do you know if others at CSX used your [redacted] response as a starting point --
A I don't.
Q -- in responding?
If we look at the e-mail to Mr. Ward at the bottom of the chain in Couch 15 --
A The e-mail to Mr. Ward?
Q To Mr. Ward --
A Go ahead.
Q -- correct. [redacted] states: [redacted] Do you see that?
A Uh-huh, I see that.
Q Was that a recurring complaint, that CSX was using its fuel surcharge program to arbitrarily announce price increases?
A No, this -- this particular e-mail -- [redacted] as a customer is one of the more radical customers, as far as objecting to things that other customers don't object to. And, in fact, when you read that sentence, [redacted] that's ludicrous, because [redacted] is trading in

Page 154

agricultural business and they do that every day. Prices go up and they take their prices up; the market goes down, they take their prices down. And they do pass them on to their customers. So, it's just -- when you read through this, this particular complaint, and nothing against [redacted] it's not one of the most articulate ones I've ever seen.
Q If you look at Couch 14, the sentence we had focused on a minute ago: It also has been changed to be more equitably responsive, rather than the previous slow, large steps?
A Right.
Q The phrase -- and this is attached to the e-mail you sent?
A Right.
Q So when you say "equitably responsive," to whom are you referring? In other words, to whom is the fuel surcharge program more equitably responsive?
A Okay. So, when I use the term equitable for me personally, since I drafted it and we're talking about that word there, it involves two parties, okay? So the concept there I was trying to get across is that when you have big changes in the fuel surcharge over big increments, over long periods of time, you're essentially -- so, if we were stuck with a $5 program,

Page 155

and next quarter it changed, it would be a big increment, and it would be trying to recapture some of the increases that happened this quarter going up to -- into next quarter. And so, you're basically taking increase in costs and banking them and then getting them back through a higher surcharge in the following quarter or month, or whatever time frame you want to choose.
In this case, by reducing the $5 to $1 and making smaller increments, the changes in our costs were passed along to the customer at the same time that they happened, and so that was more equitable for both us and for the customer.
Q Well, you lost me at the last --
MS. KIRMAYER: You need a good analogy involving a cart and an elastic...
BY MR. SNYDER:
Q You lost me at the last part about how it's more equitable --
A For the customers?
Q -- for the customer. And I can see that -- I can see an argument that that would be true when fuel prices are decreasing. But when fuel prices are increasing, how is it more equitable to the customer?
A Maybe equitable isn't the perfect choice of

Page 156

words, but essentially what it's doing is getting the fuel cost recovery in the same time frame as the fuel costs were incurred, and that's good for us and it's good for the customers, because it smooths out the customers' payments and puts them into the actual quarter when the costs were incurred.
Q Well, you collected -- you collected customer complaints in a structured way, as you were asked to. Did you collect any praise for the fuel surcharge changes from customers?
A There were one or two customers, I don't know if praise is what I -- as I would have termed it, but I recall seeing one or two documents where customers thought this was a better program or -- and they had -- there were a couple of documents prior to the change where customers were asking for some of the things we did in that change.
(Couch Exhibit No. 16 marked for identification.)
Q Did you make any -- strike that.
Handing you Couch Exhibit 16, starts at CSXFSC000036975.
A Okay.
Q Who is -- who is Peggy Collins?
A I think Peggy Collins followed Leslie

Michaelis as Mike Giftos's support person for a couple, three months. She didn't stay in that role for very long.
Q Okay. When you say support person, do you mean a secretarial-type role or something --
A No, more of a -- more than -- more than an administrative assistant, someone who -- I'm trying to think what the proper term would be. Someone -- Michael Ward had one for a while, Frank Lonegro, who was an attorney -- is an attorney. So, it's more of someone who can help move projects along and coordinate and set appointments and meetings and gather information for Mike.
Q And did Mr. Giftos have another assistant in addition to Ms. Collins at this time, more of an administrative assistant?
A Yeah. What was her name, Sandi Bryan.
Q Ms. Bryan?
A Uh-huh.
Q So Ms. Collins writes -- refers to the high level distribution list?
A Uh-huh.
Q Do you recall who was the audience for this document?
A I don't.



Q Do you recall reviewing this document?
A I don't recall it per se, no. There's nothing in it that's really a surprise, I don't think.
Q Do you recall other talking documents -- or talking point documents on fuel surcharges?
A Not specifically.
Q If we look three paragraphs from the bottom, there's two --
A Of Page 1?
Q -- asterisks -- Page 1, correct.
A Okay.
Q Starts: UP just announced changes to their fuel surcharge program. Do you see that?
A Yeah.
Q Do you recall UP announcing changes to their fuel surcharge program in spring of 2003?
A I don't.
Q You have no recollection of UP announcing changes in spring 2003?
A I still don't. You've got to understand, all the railroads modified their programs over time, so there's been a lot of changes. And to remember them all is just not practical, at least not for me.
Q In the second -- second line, there's a reference to geopolitical events, like instability in



the Middle East. Do you see that?
A Uh-huh.
Q Is that referring to any specific events?
A I think it's referring to the '70s, the gasoline crisis in the mid '70s.
Q Okay. Do you recall -- you don't recall reviewing this document?
A Not per se, no. I'm not surprised that I would've reviewed it.
Q And since you don't recall reviewing it, you don't recall giving any feedback on it?
A I don't, but I wouldn't be surprised if I did.
Q Would you have suggested changes to this document?
A Potentially.
Q Are there specific changes you have in mind, reading it today?
A I don't know if I would've referred to geopolitical events and instability in the Middle East.
Q Anything else?
A I'd have to spend some time reviewing it. You want me to?
Q Sure.



A It's a little hard because the right -- the right side is cropped up -- off, so I have to guess at some of the words. That's okay?
Q That's fine.
A This historical pricing wording, I would've changed that a little bit, just because it's a little confusing. Shall I keep reading?
Q Anything else on the first page --
A No.
Q And it doesn't refresh your recollection as to any changes --
A No.
Q -- you actually suggested at the time?
A No.
Q Okay. If we could look back at -- what's that?
If we look back at Exhibit 9, Mr. Couch.
A Couch 9?
Q Yeah, Couch 9.
A Okay.
Q We've looked at this earlier. Do you recall getting a complaint about fuel surcharges from [redacted]?
A Not per se. I mean, I wouldn't recall specific customer names.

Q So, this may be one you received, you just don't recall it specifically?
A Uh-huh.
Q And if I could direct you to the response. To your e-mail to Mr. Onimus, July 23rd, 7:44 a.m.
A Is that on the first page?
Q It's on the first page.
A Okay.
Q And you write: I'm not sure what extra fuel costs were and we would have to determine the baseline. Do you see that?
A Okay.
Q Reading this today, does that refresh your recollection you had not determined the baseline for fuel costs?
A What do you mean?
Q Well, that's your term, "determine the baseline."
A So, what are you asking me again, if you don't mind?
Q Well, you write: We would have to determine the baseline. Does that refresh your recollection that you would not -- you had not determined the baseline at this time?
A Well, I think that goes back to our previous



conversation/testimony where there was not a scientific method for determining the baseline, trigger, whatever you want to call it, and, you know, there had been a long period of time where fuel prices had been in the 13 to $18 range. And so, what do you call normal, a normalized fuel price? There's no scientific way for coming up with that, so you just kind of pick one. And that's what I was referencing here, is we could pick one and try to calculate the variance in cost and try to argue it to [redacted] but that would be a pretty fruitless thing to do because they would just pick a different baseline and come up with different numbers to try to refute that.
Q So, your advice to Mr. Onimus was just to avoid the cost argument with [redacted] correct?
A Correct.
THE VIDEOGRAPHER: Five minutes on tape.
Q Do you recall a 4.3 cent diesel tax that CSX and others were subject to?
A 4.3 cent?
Q Per gallon diesel tax that CSX was subject to?
A I don't recall it.
Q You don't recall the repeal of the 4.3 cent tax?



A No.
Q Okay. Let's do this one.
A So I'm done with 9 for now?
(Couch Exhibit No. 17 marked for identification.)
Q Yes.
We're handing you Couch Exhibit 17, which starts at CSXFSC000044580.
A Okay.
Q I may need your help with the pronunciation, so I'll ask you, who sent the e-mail in the bottom of the chain to you on the first page?
A Susan Pokorny.
Q Ms. Pokorny?
A Uh-huh.
Q And is she one of your reports?
A No, she's a director -- was a director of sales at the time, I think, in Columbus, or somewhere in Ohio.
Q And she forwards you some information provided by a customer, correct?
A I assume that's what it was.
Q And you respond with some advice to Ms. Pokorny, correct?
A Correct.



Q And one of your -- one of your points, and this is a point -- well, you make three points in your e-mail, correct?
A Uh-huh.
Q And those three points are your advice on how to respond to the customer, correct?
A Uh-huh.
Q And one point is: Our program is very similar to other railroads in truck and intermodal; correct?
A Uh-huh.
Q And "our program" is CSX's fuel surcharge program?
A Correct.
Q And would that be the June 2003 program?
A It would be, I think. This is February 2006, so, three years later, yeah, I think it would be.
Q And you're making the point that it's very similar to intermodal, correct?
A Uh-huh, yeah.
Q And when you refer to intermodal, are you referring to CSX Intermodal?
A I am.
MR. SNYDER: Okay. Why don't we change the

Page 193

Mr. Koraleski?
A Supposedly.
Q Mr. Gooden didn't relay any information from that discussion to you?
A I don't recall per se.
Q And your focus with Mr. Toy was not on fuel surcharge, but it was on the common language initiative, correct?
A And the CN/CSX initiative, which is A plus B.
Q Okay.
A That's what that's referring to.
Q So the CNS -- CN, dash -- or, slash, CSX initiative is A plus B?
A A plus B.
Q Just maybe didn't have that name yet?
A That's right.
Q Okay.
A Or, I think it probably did, we just -- well, I don't know, maybe it didn't.
Q Well, regardless of whether it had the name or not, you -- you were going to be meeting with Mr. -- Mr. Toy on common language and A plus B type issues?
A We had been, yes.

Page 194

Q You had been?
A Uh-huh.
Q And were -- from this agenda, were you going to meet with Mr. Gooden and Mr. Koraleski about fuel surcharge as well?
A That's what was on the agenda, this initial draft. I don't know if it made the final agenda or not.
Q Do you recall Mr. Toy and Mr. Koraleski coming to Jacksonville March 2003?
A I recall them coming, I don't know when it was. And, in fact, it wasn't just Bob and Jack -- it might've just been the two of them. I thought there were others, but anyways.
Q And then Mr. Toy's e-mail is asking about essentially what the plans are for Wednesday evening and Thursday morning --
A Right.
Q -- correct?
A Uh-huh.
Q And you write to Mr. Gooden, do you want to have dinner with Mr. Koraleski, and then, also, should we offer them golf; correct?
A Uh-huh.
Q Did you offer them golf?

Page 195

A I don't remember what happened.
Q Did you have dinner with Mr. Toy or Mr. Koraleski?
A I don't recall.
Q You don't recall one way or another?
A No.
Q Have you ever had dinner with Mr. Toy?
A I believe so, yeah. For sure I have.
Q And have you ever --
A Multiple times.
Q And have you ever had dinner with Mr. Koraleski?
A I don't remember.
Q You don't remember one way or another?
A No. I would guess not, but I don't remember for sure. I've done about 500 to a thousand dinners over my 20 years with the railroad in this type of thing, so there's just so many of them, I don't remember them all.
Q Well, based on these many dinners that you had over the years, would it have been likely that Mr. Gooden and Mr. Koraleski would've had dinner --
A Yeah.
Q -- without you?
A Sure.

Page 196

Q On the 12th?
A They could've, yeah.
Q Do you know if that happened?
A No, I don't.
Q Do you know if they played golf?
A I kind of doubt it.
Q Why do you doubt it?
A Clarence is not a big golfer.
Q Not a big golfer. Did you prepare any materials for the March 12th or March 13th meeting?
A I don't recall specifically, but I almost always did. And, typically, what I would prepare is the -- a synopsis of our interline traffic for the last year compared to the prior year by lines of business and just kind of have a, you know, a document to show Clarence and our team where we're at.
Q And would Mr. Toy have prepared materials?
A He likely would've prepared something similar.
Q And would those have been saved somewhere?
A Sure, yeah, they'd be in the shared drive that I've referenced. Mine would be, my documents that I prepared.
Q And if Mr. Toy or Mr. Koraleski had prepared any hard copy documents, would those be saved

somewhere?
A If someone decided to put them in a file. I typically don't bother.
Q So they may have brought materials with them and they weren't kept?
A Sure. It's possible.
Q Do you remember whose idea it was to have this meeting in early March?
A No.
Q Were you trying to set up a number of meetings with Mr. Gooden in early March 2003?
A I don't remember.
MS. KIRMAYER: Objection.
THE WITNESS: I have no idea. I don't know.
BY MR. SNYDER:
Q Well, did you often get involved in scheduling with Mr. Gooden --
A Yeah, with -- yeah, all the alliance meetings, yeah, absolutely.
Q So, you would consider this to be an alliance meeting?
A Yeah, for the most part, yes, uh-huh.
Q And you believe this meeting took place, correct?
A I don't know if it did or didn't.



Q Don't know if it did or didn't. You don't have any specific recollection of this meeting?
A No.
Q You don't have any recollection of dinner with Mr. Toy or Mr. Koraleski?
A No.
Q What was Mr. Koraleski's involvement with A plus B pricing in March 2003?
A I don't know about March 2003. I would just say that Jack Koraleski, his opinion on A plus B pricing was pretty much what Bob Toy would tell him his opinion should be. And Bob Toy and myself had a lot of debate over A plus B pricing versus common language initiative: Which one would solve the problem, which one would be more effective, were they mutually exclusive or not, did one negate the need for the other. And it -- there was a -- the debate was ongoing for years.
Q We can put that one aside.
A Okay.
(Couch Exhibit No. 23 marked for identification.)
Q We are up to Couch Exhibit 23.
A Okay.
Q CSXFSC000162547.



THE VIDEOGRAPHER: I've got five minutes left on video.
A Okay.
Q And who is Mr. Barry Russell?
A Barry Russell was a general director of marketing and did a lot of similar things that I do with my team.
Q And if we look at the February 20 -- 20th, 2003 e-mail?
A Okay, 6:00 p.m.?
Q Below that, 10:17 a.m.
A It's on the second page?
Q Yeah, well, it starts on the first.
A Okay.
Q You're e-mailing Mr. Russell?
A Right.
Q And you ask him: Will March 12th-13th work for a face-to-face meeting with Gooden/Garin --
A Right.
Q -- correct? And Garin is who?
A Dave Garin is their vice president of non-trainload business, which I think is comparable to what Clarence had. We call it merchandise business or carload, whatever you want to call it.
Q And Mr. Garin's with the BN?



A Right.
Q And Mr. Russell responds: March 12th-13th work for Dave Garin, correct?
A Yeah.
Q Do you recall you were trying to set up a meeting with -- with the BN on March 12th and 13th, along with the UP?
A Along with the UP?
Q Well, that's the date of the meeting we were just looking at.
A No, they were totally disconnected, had no -- nothing -- nothing in common.
MR. SNYDER: Let's go off the record. The tape.
THE VIDEOGRAPHER: Off record at 3:39.
(Brief recess.)
THE VIDEOGRAPHER: Back on record at 3:51. This is the beginning of Videotape No. 6.
(Couch Exhibit No. 24 marked for identification.)
BY MR. SNYDER:
Q We're handing you Couch Exhibit 24, which starts with the Bates Stamp CSXFSC000243651.
A Okay.
Q Have you seen the draft agenda that's the

Q Could you just clarify or elaborate?
A I'd be happy to. Okay. So, typically, when you're doing an interline concurrence, it's only between the carriers involved in the interline move. So, typically, it would be 99 percent of the time. There'll be on occasion an operating change, something that happens, where you might have to ask another carrier how it might impact them, and that's why I used the trackage rates, haulage rates example, but it's very rare, very unusual. The normal way of doing concurrences is on a bilateral basis.
Q The normal way is on a bilateral basis?
A Right.
Q And from what I understood, the conference call was between BNSF and CSX?
A Correct.
Q And then there was some subsequent discussion and communication. And what I'm still hoping you'll fill me in on is where a carrier other than CSX or BNSF fits into this line of --
A There was not another carrier involved.
Q Okay. So, that wasn't an example of a general comment that concerned a carrier outside of the two involved in the --
A Right.



Q -- discussion?
A We would not have involved another carrier.
Q Okay. And would you -- I believe you said that there may have been a general comment that you made at some point that related to a carrier not involved in the move or the price --
A Right.
Q -- is that correct? Can you recall what that comment or statement you made would've been?
A I think I might've said to Denis, well, one of your competitors -- you know, you're the only ones doing it this way, and it has a net impact on the -- a negative impact on our revenue of, you know, about 3 percent. And you're the only one doing it this way. So, when we're competing, you're competing for business, by dividing the fuel surcharge on miles, you may be at a disadvantage.
Q Okay. And when you say "doing it this way," you're talking about fuel surcharges?
A The percentage -- using instead of percent of revenue, percent of miles to divide the receipt, has no impact on what the customer's paying.
Q And you weren't -- you weren't discussing -- you weren't discussing the fuel surcharges -- anything having to do with UP's fuel surcharges --



A No.
Q -- for example, or NS's --
A No.
Q -- fuel surcharges. Or how about UP's prices?
A No.
Q Or any other carriers' --
A Correct.
Q -- prices? And would you have avoided, as a matter of your practice, discussion of a third carrier's fuel surcharges?
A Yes.
Q And have you ever deviated from that practice?
A Not that I recall.
(Couch Exhibit No. 31 marked for identification.)
Q I show you -- this is Couch 31, CSXFSC000274162.
A Thank you. Okay.
Q And do you recall seeing this e-mail before?
A I don't -- I don't remember it per se.
Q And Mr. Smith is, we can tell from his BNSF e-mail address, you've already testified, with BNSF, correct?



A Vice president marketing.
Q Vice president marketing. Marketing. And would he have been reporting to Mr. Lanigan?
A He reported to Dave Garin, who reported to Lanigan.
Q Okay. So, indirectly he reported to Mr. Lanigan?
A Uh-huh.
Q And do you recall, having seen this e-mail, your discussion with Mr. Smith that -- that gave rise to this e-mail?
A No, I don't recall the conversation, no.
Q You don't recall anything about the conversation?
A No.
(Ms. Kirmayer leaves the deposition.)
Q Well, if we look at the e-mail you sent to Mr. Smith, you indicate that you to need to clarify the prior conversation?
A That's what it says.
Q What did you need to clarify?
A What's written there.
Q So, you had a broader discussion in April?
A No, I don't think so. I don't -- I don't recall what the conversation was.

Q Did you have -- did you have many conversations with Mr. Smith about rebasing?
A No. No, we wouldn't talk about rebasing.
Q So, this was an unusual call from Mr. Smith?
A No, nothing unusual about it. We're -- this was part of changing the fuel surcharge to the mileage-based fuel surcharge. And when we did that, we converted from WTI to HDF, and we tried to pick a highway diesel fuel rate, and I say rate, a fuel price that was -- matched the current market base price for fuel, so that we wouldn't have ongoing high levels of fuel surcharge. We wanted to have the fuel surcharge start at a higher level and have it be in the rate and not in the fuel surcharge.
Q And who's Mr. Hitchcock? He's copied on your e-mails.
A Attorney, CSX attorney. Works with Erin.
Q When you write: CSXT will be using our new mileage-based fuel surcharge program for new and renewal traffic, contract, quotes and tariffs, on interline CSXT/BNSF moves when we are the publishing carrier, in paren, all commodities except intermodal -- do you see that statement?
A Uh-huh.
Q Had you notified customers that CSXT would



be moving to a mileage-based surcharge program at the time you're e-mailing Mr. Smith?
A I don't remember.
Q You don't remember one way or another?
A No. I think customers knew we were moving towards a mileage-based, because STB mandated it. And I think the date for the mandate was right around this time, but I don't recall for sure.
Q You can put that document aside.
A Okay.
Q And without asking you to reveal any substance of the meeting, did you meet with counsel to prepare for your deposition today?
A Yes.
Q And how many times?
A I believe it was three times.
Q And approximately how long in total?
A Four hours, three hours, and two hours.
Q That seems more than approximate. Is that pretty close?
A That's my memory.
Q That's your memory. And other than your attorneys, did you speak with anyone about your deposition --
A No.



Q -- today?
A No.
Q No one within --
A Nothing substantial.
Q When you say "nothing substantial," what do you -- we may not have the same --
A Like this morning --
Q -- agreement of "substantial."
A This morning, as I was leaving, I said to a secretary, a director of marketing, and a person who works for me, standing by the coffee shop, I'll be gone all day, I'm going to be in fuel surcharge antitrust deposition. And they said, oh that sounds like fun, wish we could come. And I said, we'd love to have you there.
Q And did you speak to anyone within CSX --
A No.
Q -- about your deposition today?
A No.
Q And you mentioned that the -- going way back to the beginning, you mentioned you've been deposed before?
A Uh-huh.
Q How many times?
A There was one personal deposition this year



and then there was a deposition, a business deposition, maybe 15 years ago that involved a coal case. I don't even remember what it was.
Q Okay. And the personal deposition, I'm not trying to pry, but that was a family law matter perhaps?
A Right, correct.
Q Okay. And have you ever, other than a deposition, given sworn testimony before today or the couple of times you mentioned?
A I don't think so.
Q In other words, testimony under oath?
A It seems to me I have, but I can't recall what form it would've been. Maybe not. I can't recall what it was. If there had been.
Q Would that -- would what you're referring to have any -- anything to do with fuel surcharges?
A No.
Q And it was more than five years ago?
A I don't recall.
Q But it had nothing to do with pricing or fuel surcharges?
A Correct.
Q How are you compensated by CSX?
A Salary, bonus, long-term incentive program.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION

MDL No. 1869

Misc. No. 07-489-(PLF/AK/JMF)
This Document Relates To:
ALL DIRECT PURCHASER CASES

* * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED
DEPOSITION OF: MICHAEL GIFTOS
DATE TAKEN: THURSDAY, FEBRUARY 25, 2010
TIME: 9:06 A.M.
PLACE: 501 WEST BAY STREET
JACKSONVILLE, FLORIDA

REPORTED BY: CARMEN THOMAS, REGISTERED
PROFESSIONAL REPORTER AND
NOTARY PUBLIC

* * * * * * * * * * * * * * * * * * * * * * * * *

HIGHLY CONFIDENTIAL



APPEARANCES:
Appearing on Behalf of the Plaintiff:
DANIEL L. BROCKETT, ESQUIRE
SAMI H. RASHID, ESQUIRE
and
KYLE R. TAYLOR, ESQUIRE
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010

Appearing on Behalf of the Defendant,
Union Pacific:
PETER A. BARILE, III, ESQUIRE
Howrey, LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004-2402
Appearing on Behalf of the Defendant,
CSX and the Witness:
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595

Appearing on Behalf of the Defendant,
CSX and the Witness:
KENT A. GARDINER, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595
Appearing on Behalf of the Defendant,
CSX:
ERIN O. O'BRIEN, ESQUIRE
500 Water Street, J150
Jacksonville, Florida 32202
Appearing on Behalf of the Defendant,
Norfolk Southern:
SEAN M. TEPE, ESQUIRE
Skadden Arps Slate Meagher & Flom
Four Times Square
New York, New York 10036



Appearing on Behalf of the Witness:
CHARLES M. TRIPPE, ESQUIRE
Moseley Prichard Parrish Knight & Jones
501 West Bay Street
Jacksonville, Florida 32202
Appearing on Behalf of the Defendant,
BNSF Railway:
ADAM WEISKITTEL, ESQUIRE
2500 Lou Menk Drive, AOB-3
Fort Worth, Texas 76131

Appearing on Behalf of the Defendant,
BNSF Railway Company:
GARY A. WINTERS, ESQUIRE
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006-1101
SEAN LANE, VIDEOGRAPHER



INDEX


TESTIMONY OF MICHAEL GIFTOS
Direct Examination by Mr. Brockett 7
Cross Examination by Mr. Gardiner 290
CERTIFICATE OF OATH 301
CERTIFICATE OF REPORTER 302


EXHIBITS


| Exhibit Number | Page Marked |
|---|---|
| Exhibit 1 | 34 |
| Exhibit 2 | 37 |
| Exhibit 3 | 52 |
| Exhibit 4 | 75 |
| Exhibit 5 | 77 |
| Exhibit 6 | 81 |
| Exhibit 7 | 92 |
| Exhibit 8 | 102 |
| Exhibit 9 | 106 |
| Exhibit 10 | 110 |
| Exhibit 11 | 127 |
| Exhibit 12 | 130 |
| Exhibit 13 | 143 |
| Exhibit 14 | 146 |
| Exhibit 15 | 151 |
| Exhibit 16 | 153 |
| Exhibit 17 | 156 |
| Exhibit 18 | 158 |
| Exhibit 19 | 163 |
| Exhibit 20 | 165 |
| Exhibit 21 | 166 |
| Exhibit 22 | 169 |
| Exhibit 23 | 171 |
| Exhibit 24 | 173 |
| Exhibit 25 | 178 |
| Exhibit 26 | 181 |
| Exhibit 27 | 200 |
| Exhibit 28 | 209 |
| Exhibit 29 | 218 |
| Exhibit 30 | 220 |
| Exhibit 31 | 224 |
| Exhibit 32 | 226 |

probably late 2003. Although, I still retained my title and I still was at the office most of the time until my actual retirement date, which I think we agreed was April 1, 2004.
Q Did you have any disagreements with CSX that led to your retirement?
A No.
Q Were you asked to leave?
A No.
Q Was it a voluntarily decision on your part?
A It was my decision.
Q Okay. So what have you been doing since your retirement?
A Well, that's -- that's a good question. I serve as a director of two public companies. I -- I play a little bit of golf. I'm not very good. I haven't become any better. I'm an avid reader. I nurture my friendships. I travel. I visit my 90-year old mother once a quarter. She lives in Maine. My days are full.
Q What are the name of the two public companies on whose board you sit?
A Alpha Natural Resources. ANR is its symbol. And PACR International as a company. P-A-C-R is its symbol.



Q Those are both public companies?
A Both publicly traded companies, yes.
Q Have you served in a consulting role to CSX at any point since April of 2004?
A No.
Q Do you have any ongoing financial arrangements of any kind with CSX since April of 2004?
MR. TRIPPE: Objection. You can answer.
THE WITNESS: I have a pension.
BY MR. BROCKETT:
Q Okay.
A And I participate in a deferred compensation program that I was eligible to participate in back in the mid '80s. I have retiree health insurance. I think that's it.
Q Okay. Let's -- let's focus on the time when you were the chief commercial officer of CSX Corporation.
What is a -- a fuel surcharge, as you understand that term, in the railroad industry at or about that time?
A Well, I'm not sure I understand your question.
Q Okay. I'll rephrase it.
When was the first time that you began to



have discussions about adding a fuel surcharge to CSX's freight transportation bills?
MR. TRIPPE: Objection. Go ahead and answer.
THE WITNESS: Well, about the time I became chief commercial officer CSX was in trouble. We were in trouble financially.
Railroads use a metric that talk about their financial success. We call it the operating ratio. It's the ratio of expenses to total revenues and to -- to be able to maintain your plant, you need an operating ratio around 80 and ours, after the merger with Conrail in the late '90s, had drifted up to 93.
So we weren't earning enough money really to reinvest in our plants and maintain -- maintain the equipment that's critical to serve industries that really run the American economy. And we had a management team in place that was new that included some of the Conrail people we hired.
The operations were suffering. Our -- our velocity of our trains and the movement of our equipment was stagnating and our stock price was suffering and we were in very serious trouble, and coupled with our -- our poor operating performance, our poor financial performance, all



of the sudden, shocking to everybody in this room, oil prices started to drift to unimaginable levels, like $21 a barrel for West Texas Intermediate crude oil, $22, $23.
In 1997 when we were analyzing our acquisition of Conrail the price of crude oil was $13 a barrel. It hit as low as $13 a barrel.
A lot of economic analysis we developed to justify paying many billion dollars for that were predicated upon oil prices that were in the historic range of between 15 and $18 a barrel.
So we had a -- we had some significant managerial changes. Michael Ward took over operations. I became responsible for sales and marketing. Part of John Snow's decision to transition from the company and pick one of us to ultimately lead it. And when I moved into that department, I was challenged on the revenue side.
We also -- through my misfortune, we began -- the country started moving into an economic recision. So we were losing volume. We were facing rising costs because of our poor operating performance. We weren't earning our cost of capital. Our capital budget was strained. Our plant needed more work. And I knew we had to

increase prices. And so I began to think about pricing strategies with the company and what we could do to increase prices.

And then on top of all of that our fuel bill started going up and it went up very, very significantly. I can't remember the exact numbers, but if in 1999 we paid three or $400 million for fuel, our fuel bill was escalating up to $500 million. It was going up. And those are huge numbers for us then.

So I can remember going into staff meetings and seeing surprises all over the place on our financial performance. Our revenues were declining because traffic was leaving and our performance was poor. Our costs were escalating in ways that we didn't expect because of fuel and poor performance and consequently our operating income was suffering and we had to do something about it.

This occurred mult -- we had these staff meetings once a week and we'd review our financial performance on a regular basis, and I can remember two key issues that occurred almost simultaneously to me.

One was our customers were delaying the



payment of their bills. It was drifting up to 30, 32, 33, 34, $35 a day would be days outstanding for sales and I said, gee, why don't we -- why don't we impose an interest rate on overdue bills, a concept that was novel to the rail industry, and we did that. We -- we introduced an interest rate charge. It wasn't well received by the customer but we began to -- I don't remember what the trigger was, 15 days or 18 days or 30 days. So where we could do that, we imposed interest on overdue charges.

And Bill Flynn who ran -- was responsible for the merchandise sector that I described earlier, I can remember him suggesting to me with respect to these escalating fuel costs that we ought to have a fuel surcharge and, boy, that struck me as a novel and intelligent idea. Fuel prices are going up. It's essentially a huge cost for us.

Fuel on railroads, as I recall back then, represented about seven percent of our costs and were -- when seven percent of your cost were escalating the way fuel was, it was a significant number.

So I asked Bill to think about a program and get back to me. I can't remember the exact time



frame of that, but it was -- it was fairly soon after I became the chief commercial officer.

BY MR. BROCKETT:

Q Prior to that time, to your knowledge, had CSX ever discussed or imposed any kind of fuel surcharge on its freight bills?

MR. TRIPPE: Objection.

THE WITNESS: Not -- not that I know of. I had -- I had never heard of one myself. It may have had one. It may have discussed one. I -- at the time I thought the idea was frankly unique to Bill Flynn and me.

BY MR. BROCKETT:

Q Do you believe that you, Mike Giftos, were the inventor of the -- of the fuel surcharge --

A I do.

Q -- in the railroad industry?

A Took real pride in that.

Q Had you ever heard prior to this time of any other railroad using a fuel surcharge in -- in your industry?

A No, I hadn't.

Q Okay. So we're talking in the time when you first became the chief commercial officer and you've indicated to me that you had some discussions about a



rail fuel surcharge.

Did those discussions then eventually lead to USX (sic) establishing a fuel surcharge program that involved the adding of a fuel surcharge to your freight bills?

MR. TRIPPE: Objection.

MR. GARDINER: Object to the form. You said USX.

THE WITNESS: CSX you mean.

BY MR. BROCKETT:

Q Did I say USX?

A It's a steel company, right.

Q I'll rephrase the question.

Did the discussions you've identified eventually lead to CSX establishing a formal surcharge program?

A Yes.

Q Do you recall when that program first came in to being?

A I don't recall the exact date. But it was I believe towards the end of the summer. It was -- it was a challenge organizationally to get it in place. I mean, I was relatively new, as you know, to the commercial area. And the way we built customers and the technology, the customer interfaces all were impacted by

people to adjust their respective technologies and acquire the ability to communicate with each other and make appropriate adjustments.

MR. BROCKETT: Okay. Let's mark as the next exhibit -- we'll call it Giftos Exhibit 2. It's a one page document that bears Bate stamp number CSX 00060.

THE WITNESS: Are we finished with this?

MR. BROCKETT: Yeah.

(Exhibit 2 was marked for identification.)

BY MR. BROCKETT:

Q Mr. Giftos, this is a -- this purports to be a draft customer letter bearing your signature that describes the fuel surcharge program that CSX was proposing to implement in or about this time; is that accurate, sir?

MR. GARDINER: Object to the form.

MR. TRIPPE: Objection.

THE WITNESS: That's what it looks like.

BY MR. BROCKETT:

Q Do you recall drafting or having someone draft for you a letter that you intended to send to customers in advance of the program becoming effective?

A No, I don't. I don't recall drafting it, but I do recall that -- communicating this program,



communicating with our customers, the key constituent was a very important part of it, so our corporate communications group was working with our various sales and marketing organizations, the merchandise, coal, the intermodal and the auto groups to make sure we had a very robust communication strategy in place so that we would articulate our objectives and be prepared to address customer concerns. So this letter, I'm guessing, was part of what they prepared for that communication initiative.

Q Now, the second line of this letter says that the recovery charge will apply to local as well as interline freight movements. Do you see that, sir?

A I do.

Q What is your understanding of an interline freight movement?

A Well, if you think about the CSX rail network, fixed set of rails, largely covering the eastern half of the United States, from the Mississippi River to the Atlantic Ocean, there's traffic that operates solely within our network. That's called local freight. It's local to our network, but a huge percent of it and most of it operates on one or more railroads. So if we are moving a carload of freight from Houston, Texas to Atlanta, Georgia, we don't get to Houston,



Texas. We have to interline or connect with one of the western railroads, either the Burlington Northern, Union Pacific, so.

And, again, we can interline in the east. We can connect with Norfolk Southern or a short line railroad in the east. So interline is traffic moving over one or more railroads, and local is traffic moving solely on our CSX network.

Q Do you know at or about this time what percentage of CSX's freight traffic was local as opposed to what percentage was interline?

A Well, percentage in terms of volume or percentage in terms of rev -- actually the answer to your question is I don't.

Q I actually intended by my question to be either or both, volume or revenue.

A I don't. I don't know the percentage.

Q Now, this document, if you look in the middle of it, also gives a description of the fuel cost recovery charge that's described in the letter. Do you see that, sir?

A Yes, I do.

Q Okay. Now, as I understand it, the -- the fuel surcharge program was going to use the WTI index; is that right?



A West Texas Intermediate crude oil prices, a well known popular metric that a lot of industrial America is familiar with.

Q I appreciate your answer, sir, but when I ask you a question, could I please see if I could get a yes or no answer?

MR. TRIPPE: Objection.

BY MR. BROCKETT:

Q Okay. When it calls for a yes or no, will you agree to do that for me?

MR. TRIPPE: Objection.

MR. GARDINER: Objection.

THE WITNESS: If I -- if I can give a yes or no answer and be clear I'll -- I will.

BY MR. BROCKETT:

Q I'll let you explain your answer, but if my question calls for a yes or no answer, I'd like to see if you can give me one. Okay?

A Okay.

MR. GARDINER: Objection.

MR. TRIPPE: Objection.

BY MR. BROCKETT:

Q So the -- the fuel surcharge program used the WTI index; is that correct, sir?

A Yes.

Q And it imposed a surcharge as long as the price of WTI oil was above -- at $28 a barrel or above for 30 consecutive days; is that correct?
MR. TRIPPE: Objection.
THE WITNESS: I believe that's -- that's -- that's correct. It didn't -- it didn't -- the fuel surcharge required the price of crude oil to move in $5 increments before you'd get to the next level of the fuel surcharge.
BY MR. BROCKETT:
Q Right.
A So I think the first two percent fuel surcharge required that you go between 23 and 28. Could have started at 21, but once it got above 28 for -- and I believe it was 30 consecutive either business days or actual days, that would -- that would trigger the first two percent fuel surcharge.
Q Okay. Well, as I understand it -- and you tell me if I'm wrong -- it was actually 30 days published in the Wall Street Journal; is that correct?
A As I -- I -- 30 -- 30 business days. Okay. I believe that's correct.
Q And am I correct, as reflected in this letter, if the price of WTI oil was between 23 and $27 a barrel, during any 30-day period, there would be no fuel



surcharge added; is that correct?
A I believe that's correct. It had to -- it was one of the problems with the program. We had to have the price stay above the trigger point, $28 for 30 consecutive days. So if it was -- if it was at 29 for 28 consecutive days and then dropped down below 28, it literally reset the clock.
Q All right. And you, Mike Giftos, was the architect of this fuel surcharge program, correct?
MR. TRIPPE: Objection.
MR. GARDINER: Object to the form.
THE WITNESS: Well, architect is probably not quite accurate. I was responsible for implementing it. Bill Flynn and his group and there were -- I mean, I don't know how many people worked on it and how they developed it, but it was presented to me as -- as a program for consideration and I -- I accepted it.
BY MR. BROCKETT:
Q Okay. And was your approval of this program required before CSX could announce it or implement it?
A Yes.
Q And you did give your approval to this program, correct?
A That's correct.



Q And it was CSX's intention to apply this fuel surcharge program to both to local and interline freight movements; is that correct, sir?
MR. TRIPPE: Objection.
THE WITNESS: Well, all of our traffic moved in trains that were operated by locomotives that were experiencing increased fuel cost, so we wanted -- I wanted to get the broadest possible application that we could accomplish and as rapidly as possible to recoup those escalating costs.
BY MR. BROCKETT:
Q Could I please get a yes or a no to my question, sir?
MR. GARDINER: Object to the form.
MR. TRIPPE: Objection.
THE WITNESS: Yes.
BY MR. BROCKETT:
Q Let me show you what we previously marked Exhibit 1 -- McIntyre Exhibit 1.
Mr. Giftos, do you recognize this as a press release that CSX issued on or about September 22nd of 2000 announcing the new fuel surcharge program?
MR. GARDINER: Object to the form.
MR. TRIPPE: Objection.



THE WITNESS: I'd have to -- I'd have to read this. I don't -- this doesn't look to me like the form of a CSX press release. It may be the words that would contain -- contained in the press release.
BY MR. BROCKETT:
Q Sure. Okay. This is an e-mail -- looks to be an e-mail communication, does it not, sir?
A It does.
Q From corporate communications to a number of people?
A That's what it is, yes.
Q And it states that the following press release was issued today and then there is language below reflecting the content of the press release. Do you see that, sir?
A I do.
Q Okay. Now, would you have approved a press release of this kind before it would have been issued?
MR. GARDINER: Object to the form.
THE WITNESS: I would expect that the press releases surrounding fuel surcharge program would require my approval.
BY MR. BROCKETT:
Q Now, it says --

Page 73

procedures, including agreeing on the rates for the interline movement, agreeing on a service package and essentially partnering with your connecting railroad.
Q Okay. And so it's true to say that the CSX had an agreement, reached an agreement with all of the other three major class one railroads to apply the CSX fuel surcharge on interline business with those other railroads?
MR. WINTERS: Object to the form.
MR. TRIPPE: Objection.
MR. GARDINER: Object to the form.
BY MR. BROCKETT:
Q You can answer.
A CSX had adopted its fuel surcharge program and for originating traffic starting on CSX and moving to either the Burlington Northern for termination or the Union Pacific for termination or the Norfolk Southern for termination, we were going to apply our fuel surcharge to capture the cost -- our increasing costs and we would present that proposal to our interline connecting carrier for their concurrence.
Now, I don't know what happens if they don't concur. I think they concur. I don't -- I don't -- I mean, that world of nonconcurrence I'm not just that familiar with it.

Page 74

Q Did you have discussions in the fall of 2000 about -- with any representative from any other rail carrier, class one railroad, about applying the CSX fuel surcharge on local traffic?
A No.
Q Who is CSX's main railroad competitor?
A Well, we probably have some competition with everybody, but the eastern half of the United States, the principal rail competitor would be Norfolk Southern. In Florida we compete with the Florida East Coast somewhat. Our principal competitor is the trucks.
Q Okay. Would you agree with the statement that the NS has the power to seriously erode margins on a considerable portion of your business base?
MR. GARDINER: Object to the form.
THE WITNESS: I -- I probably would not agree with that. On some of our business that they can but on -- on a -- you have to define considerable portion.
BY MR. BROCKETT:
Q Strike that.
Do you know an individual by the name Noel Perry?
A Yes.
Q Would you consider Noel Perry to be a

Page 75

competent person?
MR. TRIPPE: Objection.
THE WITNESS: I like Noel. He was a little bit eccentric. He was -- I'm not exactly sure what he did. He was a good -- he was a robust thinker. He did some economic analysis, but I'm -- he was fairly competent. I usually respected what he said.
MR. BROCKETT: Okay. Let's mark as Exhibit 4 a document produced by CSX. It is Bate stamp number 246324 through 246339.
(Exhibit 4 was marked for identification.)
BY MR. BROCKETT:
Q I'm interested really in just focusing your attention on the first -- the first page of this document, sir.
MR. TRIPPE: You want him to read whole document?
MR. BROCKETT: No.
BY MR. BROCKETT:
Q You see this is to Mike Giftos and staff from Noel Perry?
A I do.
Q Okay. And it concerns a Norfolk Southern competitive analysis?

Page 76

A That's what it says, uh-huh.
Q And the date is July 17th of 2000?
A Correct.
Q And in this memo Mr. Perry reported to you -- and I'm reading from the first paragraph of the report -- that CSX is your principal competitor and it is one who has the power to seriously erode margins on a considerable portion of our business base. Do you see that, sir?
MR. TRIPPE: Objection.
MR. GARDINER: Object to the form. Lack of foundation.
THE WITNESS: I -- I do see that.
BY MR. BROCKETT:
Q Now, when you received this from Mr. Perry did you call him up and tell him, no, I don't agree with that statement?
MR. GARDINER: Objection. Lack of foundation.
MR. TRIPPE: Objection.
THE WITNESS: Well, I don't -- I don't recall seeing this. I do see that it was a proposal from Norbridge. Norbridge is -- I believe they're Boston based consulting group. There were a couple of principals there that I had a lot of

action they reasonably could to try to help close gaps and improve performance.
Q Okay. Well, in fact, times were tough, were they not, sir?
A Times were tough.
Q And CSX needed to take immediate action to impact '02 earnings, correct?
MR. GARDINER: Object to form.
THE WITNESS: It is '02 or '03?
BY MR. BROCKETT:
Q '03.
A We had to take action in '02 as well, so.
Q And Mr. Ward challenged everyone in that budget meeting to identify specific initiatives to get more revenue for the company, correct?
MR. GARDINER: Object to the form.
THE WITNESS: Well, no, I don't think he challenged everyone to get additional revenue for the company. I mean, our -- as I recall, our -- some of our biggest problems were on the cost side. So he would -- most of the people in that meeting effected what I would call the cost side, the cost of operations.
So I'm sure he challenged the operating group to look at your train operations, look at what you



can consolidate.
He didn't have to suggest what they should do. These were very sophisticated individuals. He just had to ask them to redouble their efforts and they knew where to look. They knew where they might have opportunities and like manner, he looked at me and said, Mike, the cost guys have to do their share and you need to look at your revenue and see what opportunities are out there, what -- we have all these BHAG initiatives, are there some we can accelerate, that we can grow and things like that, so.
And we had costs too. I mean, we had -- in the spring of the year, is -- I mean, something I frankly was very surprised to learn about was the extent to which we had customer functions.
There were this big function call NFTA where the National Fleet Transportation Association would have a gathering. There would be thousands and thousands and thousands of customers. It was very, very expensive. So I looked at how many people were going and how we could scale back because we were cutting costs everywhere and we couldn't have ten people going to customer events when maybe one would do. So there were things we



could do.
BY MR. BROCKETT:
Q And one of the -- one of the initiatives that you looked at in response to Mr. Ward's challenge was to see how you could get some incremental revenue from the fuel -- fuel surcharge?
MR. TRIPPE: Objection.
MR. GARDINER: Object to the form.
BY MR. BROCKETT:
Q Is that correct, sir?
A I never -- I don't recall thinking about it that way. This was a tough time with our fuel surcharge program. As you may recall, our fuel surcharge program required that the price of West Texas Intermediate crude oil be at or above $28 for 30 consecutive days to allow us to charge a two percent fuel surcharge, and then it had to go above $33 for 30 consecutive days before we could then add an additional two percent fuel surcharge.
If the price of fuel, which was a huge cost for CSX, was at $32, $1 below that trigger point, our costs would be going up significantly, but the fuel surcharge program was constructed in a way that didn't allow us to recapture from our customers revenue to offset those costs.
And I do recall, I believe it was in 2003 at



one of the budget meetings, we had been -- it may have been late 2002, but it was at one of the meetings in late 2002 or early 2003 where the price of fuel was at -- at -- was above the $33 amount for 25 days and then 26th day and 27th day, and we were counting on it staying there because our costs had gone up and we hadn't been able to increase our fuel surcharge because of the architecture of the plan and then shockingly or disappointingly on the 27th or 28th day it closed at $4.50 above 28 and it reset the clock. So we were not able to implement the additional two percent fuel surcharge.
That happened -- that happened once and it was very, very disappointing. It happened a second time and I believe it happened a second time just prior to or just after a budget meeting. We had had a budget meeting like one of these -- it may have been this one for all I know, but there was a budget meeting and we were looking at revenues and I pointed out that fuel has been above and I think it was the $33 for 25 or 26 or 27 days, a number of days, and that if it stays above that for the 30th day, we can adjust our fuel surcharge from two to $4. It may have been four to six but it was an additional two percent.
And we -- we all at that meeting said, wow,

Page 101

this would be terrific. We'll add an additional 13 or $14 million to help offset the escalating fuel bill. And for the second time I think it was on the 28th day it closed below 33 and it reset the clock and I was personally furious and very, very upset and disappointed because the plan that I so proudly created was fundamentally flawed. It wouldn't allow us to capture those increased costs and times were tough. So we -- we -- me, I redesigned the program.

Q Okay. Mr. Giftos, I appreciate that you have a lot of knowledge that you want to impart here --

A Well, I think this is -- this is the time frame that you're -- I think this is the time frame where this was occurring that's why I --

Q I appreciate you have a lot of knowledge and that you have a lot you want to say but I'm going to ask you again to please try to limit your answer to responding to my question.

A Okay.

MR. TRIPPE: Objection.

MR. GARDINER: Object to the form. He's entirely responsive to your question.

MR. BROCKETT: Let's mark as Exhibit 8 a two page e-mail chain bearing Bates 156697 through 156698.

Page 102

(Exhibit 8 was marked for identification.)

BY MR. BROCKETT:

Q I'm interested, in particular, in the e-mail that starts at the bottom of the first page that was -- it's from Mike Giftos to five people, including Clarence Gooden and Chris Jenkins. Do you see that, sir?

A I do see that.

Q And the text of the e-mail's on the second page and it's entitled a follow-up from MJW budget meeting. Do you see that?

A I do.

Q And that is a reference to the budget meeting with Mr. Ward?

A Is this the same budget meeting that we just referenced in the prior exhibit?

Q I'm asking you, sir.

A Well, I -- I'd have to see the -- I see what this says here.

Q Okay. Well, this reference -- this e-mail concerns a budget meeting involving Mr. Ward sometime on or before March 18th of 2003, correct?

A Correct.

Q Okay. Now, and you state in the e-mail in the third paragraph --

MR. GARDINER: Here's the prior exhibit that

Page 103

you asked for.

THE WITNESS: Thank you.

BY MR. BROCKETT:

Q Strike that.

Let's look at the second paragraph. You say you would like each of you to identify a specific initiative and associated value for increasing revenues and or reducing expenses in the second quarter. You see that?

A Yes.

Q And this is you writing to your chief lieutenants, Mr. Gooden, Jenkins, Blumenfeld and others, correct?

A Yes.

Q Okay. And you say, some examples might include, and first example you give is incremental revenue from fuel surcharge changes. Do you see that?

A I see that.

Q Those were your words, right, sir?

A It's my memo, yes.

Q Okay. And you also see in the fourth paragraph here you write, times are tough and we must take immediate actions to impact second quarter earnings, right?

A Yes.

Page 104

Q Those were your words, right, sir?

A That's what it says here, yes.

Q Well, those were your words, were they not, sir?

A Oh, they were, yes.

Times -- times were tough and I would expect all of my team to get behind our chairman, Mr. Ward, and do what we could. We didn't have a hundred percent fuel surcharge coverage, so it's -- it's what a leader does.

Q Right. And so one of the things that you did as leader at or about this time, March of 2003, was to put on the table the proposition that CSX should change the fuel surcharge program that was put in place back in the fall of 2000, isn't that right?

A I -- I -- I see the word change there. My guess is it means charges, additional revenue from fuel surcharges. Our coal group -- our coal group, as I recall, had relatively poor coverage and that's in part because it had huge long term contracts and we were renegotiating those a little more slowly.

So if we could get some additional revenue by increasing the fuel surcharge coverage on coal, let's get it.

The intermodal group actually had a separate fuel surcharge program. I didn't know this. I was

frankly surprised to learn about it. It was -- it was based on the price of diesel fuel. It had been in place actually before the one that I thought I invented and it makes sense because intermodal is more truck competitive business. Trucks move diesel -- use diesel fuel and -- and so they had their program in place and if there were adjustments there, let's -- let's adjust it and make sure we're doing stuff on time and I also emphasized in this memo, you know, look at your costs because, you know, costs are just as important as revenue.

Q Okay. So just so I understand your testimony, so one of the first things you did in -- in these times that were tough was to look to see if you could apply the fuel surcharge to a more broader group of customers; is that fair?

A It's one of the things.

Q Okay. That's one of the things.

And you did do that, right?

A I don't know if we picked up any additional customers being covered by the fuel surcharge because of this or not, but I certainly said do that.

Q All right. And that was one of the things that you asked your group to do, right, in order to help the company meet its BHAG goals?

A Well, in this case to meet our budget, yes.



Q Well, the budget was part of the BHAG, wasn't it? It's part of the overall financial performance of the contract?

A Well, not exactly. We had -- we had a goal by the end of 2004 to grow by a billion dollars. We had -- we also had a specific budget for each calendar year and the business plan. So -- and it had specific revenue targets for every single month and -- and we had expense goals for every month.

Q Okay. Let's look at Exhibit 9 --

MR. BROCKETT: What are we at, 8 -- 9. Exhibit 9's a one page e-mail. It bears Bates CSX 36620. It's an e-mail chain.

(Exhibit 9 was marked for identification.)

THE WITNESS: By the way, I now remember the name of that book where BHAG came from. It's called Built to Last, and everybody read the book. It's a good book, called Built to Last and in it, it talks about a variety of things, why companies like Johnson & Johnson last and why others don't. And it talks a lot about culture and goals.

BY MR. BROCKETT:

Q Great. Thank you.

Now, sir, this is an e-mail chain and the e-mail -- the first e-mail at the bottom is from Sandy



Kirkland to a number of people. And the subject is March 3rd PMG staff meeting. First of all, who is Sandy Kirkland?

A I believe Sandy Kirkland was a staff assistant to -- who worked and helped Leslie Trescot. And Leslie Trescot was one of my key administrative assistants.

Q Okay. And the reference to the March 3rd PMG staff meeting, is that a reference to a staff meeting that you chaired?

A Looks like that, yes.

Q Okay. The body of the e-mail says, just a reminder that PMG wants to discuss fuel surcharge at our staff meeting on Monday. Is that a reference to you?

A That -- that's what this appears to be, yes.

Q And it goes on to say that he would like for us to aggressively look at more broadly applying the fuel surcharge; is that -- you see that?

A I do see that.

Q And that confirms what you just told me, it's one of the things that you did, was direct your lieutenants to try to see if you could get greater coverage on the fuel surcharge, right?

A Yeah. This was -- this is a February 28th memo, which predated the prior memos we were looking at,



but from the time I implemented -- the CSX implemented its fuel surcharge program, I was always interested in getting the broadest possible coverage we could -- we could get.

So that's -- that's Leslie -- Leslie who -- among her responsibilities was to get me prepared for security analyst meetings and they always ask this question, how were you doing with fuel cost recovery. She would -- she -- she knew what I wanted and she was sort of my right-hand person and she would be constantly reminding the group that would be talking to me to be prepared to discuss how they were doing.

Q Okay. Now, at the same time as you asked your people to look at expanding the coverage of the existing fuel surcharge program, you also, did you not, ask people to begin working on a new and different fuel surcharge program that CSX would implement?

MR. GARDINER: Object to the form.

MR. TRIPPE: Objection.

THE WITNESS: No, that's absolutely not true at all. The -- there was only one person that I know of that thought about and change the fuel surcharge program and it happened almost within a 24-hour period and that person was me and that was after -- after the second month in a few month

Page 109

period, we failed to achieve the 30 consecutive day period and consequently the clock reset.
It was -- it was a poorly designed program. I took full responsibility of that and once I saw the consequences of that, I fixed it.
Now, frankly I thought fuel prices were going down. I mean, we had $13 oil three years before. In fact, I had one -- one of my sales and marketing fellows in the auto group proudly got a fuel surcharge with General Motors, our largest customer, but it didn't apply until fuel went to something like 38 -- oil went to $38 a barrel and -- but he included a provision in it that allowed a rebate if oil went below $18. And I almost fired him because -- and I did bet him $50 that it would go below 18 before it would ever get to 38. Well, he was -- another mistake on my part and we all know what happened to oil. It went to a hundred 50.
So I had a poorly designed program. We never talked about its design before this as a group in fixing it until the second time it missed the $33 by a day or two, and when that happened I fixed it. And I fixed it almost immediately there, within hours with the assistance of John Couch in

Page 110

my office and talking with Michael Ward.
BY MR. BROCKETT:
Q Okay. Let's look at a press release that's dated March 20, 2003. It bears Bates 084489 through 084490.
(Exhibit 10 was marked for identification.)
BY MR. BROCKETT:
Q This is Exhibit 10.
You can take a moment just to take a quick gander through that, sir.
What is this document, sir?
A Well, this is a press release announcing a change to the CSX fuel surcharge program.
Q Okay. And the date of this is March 20th of 2003, correct?
A It is.
Q Okay. And is this the date to your recollection that CSX announced changes to its fuel surcharge program?
A Well, I recall it now. Now -- now that I see this date, which I did not recall in our earlier testimony, we -- we had that budget meeting that you showed me, you -- you showed me exhibit referencing the March 18th budget meeting and it was at that budget meeting that I was anticipating having the new -- the

Page 111

old fuel surcharge program reset at four percent from two percent because crude oil would have stayed above the $33 for several -- for the 30 consecutive days.
I think on the 19th or the end of the 18th it closed below that. It reset the clock. I went home on that night after that meeting -- or after I saw that the price of crude closed below the reset trigger and that evening working with John Couch, he and I designed this program.
And at 7:30 in the morning, I remember calling Michael Ward -- Michael was traveling. I got him on his cellphone -- I said, Michael, we're not going to get the additional two percent on the fuel surcharge because the price of oil dropped below $33. I need to fix that program, and I designed something.
Typically at CSX commercial people don't do that by themselves. You bring in the finance department and the technology department and you have meetings and Michael is a very teamy person. He really believes in team work, which is critically important. I told him, if we waited for the team to act on this it could be another month. I want to do it in the morning and I want your permission. He said go ahead, and we did it. And that's why you see this announcement right after that budget meeting --

Page 112

Q Okay. Who is --
A -- and I don't -- I don't know -- if you looked at the price of crude oil we could see the day, if we looked at historic records, that it dropped below $33 and I'm guessing it was the 18th or 19th, that night.
Q Who is John Couch?
A John Couch was -- I don't -- I don't know exactly know John's background. He was somebody that -- I mean, I -- I tended to reach around the organization and found people I liked and respected. He was very, very bright guy, very quick, very good with numbers. I think he was in the finance department. He may have been in the cost and economics group of the sales and marketing department. But on fuel matters I work with John and he's the guy that assisted me on this. And for this period of time he spent more time in my office over the course of a day and a half than he probably had in the prior two years.
Q Okay. Can you describe for us exactly what changes this new program made to the existing fuel surcharge program?
A Well, it was really very simple, but significant. The old program was to level set, required for 30 days price stay $5 -- the price of West Texas

Intermediate crude oil close on the New York Stock Exchange $5 above -- above a stated level. $5 above 33 or above -- at or above 38 for 30 days you'd get a two percent fuel surcharge.

If the price was between 28 and 33, there were no changes. It had to be above -- at or above 33 for 30 consecutive days, then the fuel surcharge would go from two to four percent.

And then it would have to be above $38 for an additional two percent. If the price was within that range, two things happened. One was bad. The bad was that our fuel bill was going up and we couldn't offset it. And the other thing that was bad is we couldn't adjust our fuel surcharge.

So what we did is, we said, we need a responsive program; we need to look back at the actual price of fuel and we need to make an adjustment. If it was at $32 or $33, we shouldn't wait for these cliffs because we're not -- we're not really being fair to our company. We're experiencing increased fuel -- fuel costs without corresponding increases in our fuel surcharge.

So what we did is we -- we looked back at the prior 30 days and if the price averaged -- I'll make the number up -- $32, for example, that wouldn't have done



anything under the old program but we'd make an incremental adjustment and apply it the following month.

So at -- at $33 -- if it stayed at $33 the change would be exactly the same as the old one. It went up the two percent, four percent, six percent, eight percent, but it could go up in increments but effectively it would be responding in a more realtime basis to the adjustments and the price of oil which -- which reflected the price of our diesel fuel.

Q Okay. So as I understand it, there were two basic changes, one you were taking the average of the 30 day --

A I believe --

Q -- monthly period?

A -- it was the average of the 30 days.

Q That was one change was to go from the average rather than requiring the price to be above for a consecutive 30 day period of time, right?

A That's correct.

Q And the other change was that it was no longer two percent for every $5 barrel change, instead the surcharge was adjusted four tenth -- .04 percent for every dollar increase above $23 a barrel; is that correct?

A Yeah. And five -- if you had $5, five times



that .4 percent would be two percent. So you -- you would just get to the two percent in increments rather than waiting for, in essence, a cliff, which you could either cross or fall off if it fell below it, so.

It was fundamentally a flawed design in the old -- old program that we corrected.

Q Now, did you do an analysis before you made this change as to what, if any, additional revenue these changes would -- would bring in for the company?

A No. No, I didn't. Somebody may have, but I didn't.

Q Did you ask anyone to do that?

A I -- I don't -- I don't believe I -- I did. I may have said if we add -- if we had had -- if it was at $32 instead of 33 and we had -- we were getting a portion of it, but I'm just speculating now. I don't recall asking for analysis. All I wanted to do was fix the flaw in the old program.

And I did ask John Couch when -- when we saw that the price of crude oil closed below 33 and, therefore, we weren't going to get the additional two percent, I called him into my office -- it was probably at 5:00. The market had closed -- and I said, we got to fix this and I -- we started thinking together. We need do this in increments and I asked him to look at the



other fuel surcharge programs. They were posted on the internets of the various railroads and filed in public tariffs as required by the -- by the STB and I know we looked at some various programs.

I don't believe anybody had a program like ours. It may have been somewhat similar to one of the Canadian programs, but I don't recall. He and I essentially designed this also that night. I agreed to it. And didn't have a lot of documents with me. I -- it wasn't anytime to calculate how much of our past revenues we would have been subject to an increase fuel surcharge at that point in time.

I suspect after we had it developed the finance department, as supposed to do, started looking at the impact of a more responsive fuel surcharge on our revenues and offsetting our increasing fuel costs.

Q All right. I want to talk some more about the new program. Before we do that though I want to ask you a couple other questions before we move forward.

Did you, as the chief commercial officer, generally follow analyst reports, what analysts were saying about CSX?

A Oh, yes.

Q And do you remember at or about this time, first quarter of 2003, analysts were writing that your,

Page 117

quote, new pricing parodyne never did materialize?
A Some did. There was one -- there was one analyst in particular that was really skeptical about our ability to increase rates. I thought we could increase rates. And that was a big part of, frankly, why John Snow asked me to assume responsibility for sales and marketing.
And I talked about it constantly with my sales and marketing group. I shared -- I shared my -- my pricing goals with our customers. They knew that I wanted to do that. It was hard, hard work. Railroads hadn't done it.
It was made doubly hard by the fact that we were in a recession and fuel costs were -- were going up, but I believed we could do it and all my security analyst presentations every quarter when CSX announced earnings, I presented our revenue performance and I always showed graphs that showed volume and revenue trends and my volume was going down, but my revenue was going up, not much, but we were offsetting revenue declines through rate increases and I was -- I was proud of that. Wasn't hitting our goals.
There was one analyst, I think it was Scott Flowers, that said, you know, railroads have never increased price. He just didn't believe it would ever

Page 118

happen. He was very, very negative about it and the second year in the program the -- you know, the Giftos strategy, there was some skepticism because we had lost some traction, largely, in my opinion, because of the economy and softness in the economy, and I was regularly asked, what will it take you to get back some of that pricing growth that you talked about. And I said, well, my customers can't be suffering. It's hard to go into a chemical customer and say, I need a six percent rate increase when -- you know, when his revenues are down and he's suffering. We're -- you know, we're partners in the distribution chains.
So I need a little bit of help from the economy, which we got and the pricing program largely after I left gained far more attraction, but it required -- it's easier to raise prices in a growing economy than it is in a shrinking economy.
Q Did you know at this time that inflation adjusted rail rates had declined every year except one from 1985 through --
A Well, it didn't --
Q -- through the 19 -- 2003?
A I -- I as -- sitting from my perspective as a lawyer, I had to hold my tongue but I didn't always do a good job. I was really surprised at our rate behavior.

Page 119

We had -- we had a rate case that was finally filed involving Duke Energy. And the Duke Energy rate case filed with the STB because we wanted to increase our rates and they -- they objected and they went to our regulator and said, they're charging too much. Their rates in 1980 or '81 or '82 were $8 a ton to move coal for Duke Energy.
When we filed the rate case it was still at $8 a ton. We had gone through 20 years of inflation without adjusting our rates at all and that was the story of railroads. I believe -- you know, your electric utility rates hadn't stayed constant for 20 years. The salaries of the utilities hadn't stayed constant, the stock prices, but the railroad service rate was the same. And I would not be satisfied -- I told my group, I'm not going to be satisfied as a chief commercial officer until I have rate cases filed and we had one, maybe two filed my first couple years. I think Shell Oil also filed one. That may have been settled.
Our rates had been essentially flat, very, very, very little rate increases. Our product was better. Our capital needs were greater. We had -- we survived by taking huge costs out of the network but it was time for the commerce department to step up and start to get paid a fair return for the product we were

Page 120

providing. And I thought there were pricing opportunities there. Coupled with the fact -- let me finish this. I can go on forever on this --
Q I'd like you just to answer my question, if you could --
A Just this one last thing --
Q Can you answer my question, sir?
MR. GARDINER: Objection.
THE WITNESS: -- coupled with the fact, coupled with the fact that our principal competitor, trucks, trucks -- fuel represents 28 percent of a trucker's cost. Fuel prices are going up. Our competitive advantage is growing. The federal government was regulating truckers' hours of services. Their costs were going up far faster than ours. So we had a wonderful opportunity, a wonderful window to both increase our rates and gain market share from trucks.
BY MR. BROCKETT:
Q I believe my question asked, sir, whether you knew at this time that inflation adjusted rail rates had declined in every year but one from 1985 through 2003?
A I didn't know specifically that, but I knew they had adjusted for inflation. As said earlier, I gave you a live example with Duke, rates essentially

were flat and inflation adjusted basis they were down.
Q And you, Paul Giftos, chief commercial officer --
A Mike -- Michael. Peter -- P stands for Peter, but that's okay.
Q Peter. I'm sorry. Did I say --
A It's Michael Giftos.
Q Michael Giftos. Forgive me.
A Couple of times. That's all right. No problem.
Q You, Mike Giftos, were frustrated at this time because you couldn't raise rates in the way that you wanted, isn't that fair?
MR. GARDINER: Object to the form.
THE WITNESS: Oh, I -- I'm not sure I was frustrated. I mean, I knew -- I was really, frankly, thrilled at the opportunity to lead this initiative. And I had a lot of confidence that over time we would reverse our rate behavior with our customers and get rate increases.
When the economy declined, I was frustrated for a couple of reasons. I thought -- first of all, I mean, I was competing with Michael Ward to succeed John Snow and -- and from my perspective, when we saw the volume decline, our service picked



up, our service improved, but it didn't reflect terribly well on me. Reflected better on him. So I -- I -- I would have liked to have seen a stronger environment early in my career as chief commercial officer so my -- I could have had a better chance at succeeding with my rate strategy.
The economy was what it was. It was -- it was tough. It was tougher with my organization. I mean, a lot of sales and marketing people best friends, godparents to the children of our customers. They ski with them. They play golf with them. They do all kinds of things. I had to change an organization that was not used to going in and asking for a rate increase. It didn't do that in the rail -- in the rail industry.
BY MR. BROCKETT:
Q I like --
A So I was a little frustrated by that, but I don't think I -- frustrated is the -- I wouldn't characterize my feeling as frustrated. Realistic, confident --
Q Can we agree to this --
A -- committed.
Q -- and I want a yes or no answer to this. Okay.



Can we agree that by the -- by March of 2003, okay, you were not able to raise rates to the level that you were going to be able to achieve your BHAG goals as of that time; is that fair, sir?
MR. GARDINER: Object to the form.
MR. TRIPPE: Objection.
THE WITNESS: The BHAG -- the BHAG -- the billion dollars essentially had three components. One component was new business. One component -- you know, brand new business, trucks off the highway largely.
A second component was growing business with existing customers. And the third component was rates. And we were tracking our performance in all three areas.
The single biggest frustration to the BHAG goal was volume decline. Volume, during the time I was there, declined six percent. Six percent is a huge, huge percent for the railroad.
Our revenues went up during that same period by one percent. So our prices more than offset our volume decline. You know, it would have been a very different world if we had been able to increase our volume by six percent and our revenue by eight percent or nine percent, that would have



put us right on track.
The economy did recover and we actually achieved the BHAG by the end of 2004 because of the bubble economy that -- the bubble that popped a year or two ago. It gained real traction and we achieved the goal.
BY MR. BROCKETT:
Q Can I get a yes or no answer to my question, sir?
MR. TRIPPE: Objection.
MR. GARDINER: Objection.
THE WITNESS: Well, I don't think I can answer your question yes or no, because you said I was frustrated because I wasn't increasing rates. I was increasing rates. Not as fast as I would like.
I'm not sure anybody who has a commitment to increasing prices achieves them as fast as he or she would like, but we were making decent progress but because of the economy, the volume side of our BHAG, the volume component wasn't gaining traction as -- or didn't have any traction, was going the wrong way.
BY MR. BROCKETT:
Q Now, the new surcharge program that you

Page 125

announced on March 20th of 2003, did you discuss that program with any representative of any other railroad before it was announced by CSX?
A No.
Q And did CSX seek the concurrence of the other class one railroads to apply the new surcharge program with respect to interline or joint rates?
MR. TRIPPE: Objection.
MR. GARDINER: Object to form.
THE WITNESS: After the program was announced on -- on the 20th of March it was a change to our old program and the -- the people that are responsible for interline traffic and interline billing would have had to have notified our connecting carriers that our program has changed and asked for them to concur and agree with it.
BY MR. BROCKETT:
Q Okay. And are those -- is that typically done by a concurrence letter?
A I -- I don't know if it's a letter or fax, a telephone call. I don't exactly know how they -- how they do it.
Q That's not something you personally dealt with?
A No, I never -- I never would deal with that.

Page 126

That's -- there's departments that deal with that, have expertise in the area. I just know it roughly has to occur.
Q Did CSX intend that the -- the new program announced on March 20th of 2003 apply to both local and interline rates?
A It was our new fuel surcharge program. The old one was gone. This was our new one. So it applied as broadly as it possibly could, subject to the -- the exceptions that we had agreed to. If you had RCAF or another indices or an exception that I or a senior vice president may have made.
Q Okay. Now, is it true, Mr. Giftos, that the changes you made to the fuel surcharge program on March 20th of 2003 actually resulted in a hundred percent increase in the fuel surcharge revenue that you expected to realize?
MR. GARDINER: Object to the form.
THE WITNESS: I don't -- I don't know if it was that effective, but it would -- it would clearly have been more responsive and as long as prices were going up and not hitting other triggers, it would have -- it would have been far more effective in offsetting our costs, but I don't know if it was a hundred percent.

Page 127

BY MR. BROCKETT:
Q All right. Let's look at Exhibit 11 here, which is an e-mail chain with an attachment. It's CSX 000357 through 000363.
(Exhibit 11 was marked for identification.)
BY MR. BROCKETT:
Q So I'm interested in focusing on the e-mail chain on the cover page of this, in particular the e-mail at the bottom that's written by John Couch to a number of people. Do you see that?
A I do see that.
Q Okay. And John Couch is someone you said that you believed he was smart and you respected him?
A I did. I mean, John Couch was the person that worked on the fuel surcharge changes with me, and I didn't -- I didn't work with him as a salesperson, but in the capacity I worked with him, I had a lot of respect and confidence in John.
Q So in the body of the e-mail he describes four of the changes that were made. Do you see that?
A I do.
Q Okay. Then below that he says, and I quote, while the above seems somewhat benevolent it is actually a large increase in fuel surcharge billings, maybe as much as 100 percent. Do you see that?

Page 128

A I do see that.
Q Now, do you have any facts, as you sit here today, to dispute that statement?
MR. GARDINER: Object to the form.
THE WITNESS: I don't have any -- I don't have any facts to confirm or deny it. It would have -- you know, we were right around $33 a barrel, right around going from two to four. But we never got there. So if this would have allowed us to get much, much closer to the four percent, it -- it doesn't -- the analytics of it don't surprise me, but I have no -- I have no basis to either confirm or deny that -- that number's accurate.
BY MR. BROCKETT:
Q Now, Mr. Giftos, you expected additional customer resistance to this new change, did you not?
A I did.
Q In fact, that's something you were quite concerned about, is it not?
A Well, I'm in charge of sales and marketing. Customers are important to me and I -- I was concerned about that.
Q And this would have necessitated an amending the 8,100 and 8,200 tariffs in order to achieve the

Page 129

change?
A Well, to file it, we had to file our -- our tariffs to put it in place, publicize in accordance with the -- you know, the laws that govern how we do these things.
Q Okay. Do you remember convening a meeting of your -- of your direct reports on March 19th of 2003, a day before the announcement?
A Yeah. The sequence I can remember was, we had that budget meeting that we talked about earlier. We were pretty confident we were going to stay above 33. We didn't. That reset the clock.
I was very upset. I called John in my office on the -- I guess it was the 18th and said, John, we're going to fix this. We worked quite late into the evening.
I got Michael Ward's permission to go ahead with it without negotiating through the -- through the bureaucracy of CSX. When that was done I called my direct reports in and announced it was done. So told them -- I mean, they knew -- they knew there was a lot of activity because my door was closed and the lights were on till pretty late at night.
Q Let's look Exhibit 12, one page document, memo from Mike Giftos to a bunch of people. It's got a

Page 130

Bate stamp number 000351.
(Exhibit 12 was marked for identification.)
BY MR. BROCKETT:
Q Okay. Can you describe this document, sir.
A Well, it was a letter that was sent over my signature, may have been prepared by me or my -- one of my assistants, to notifying a number of people. And as I look at those people, they were either senior people in different departments, very senior people. Ellen Fitzsimmons was the head of the law department. Hers is the second name there. The rest of the folks look like they're either direct reports to me, as would Chris Jenkins, Andrew Strok be, or work for people as their administrative assistants. They probably may have been out of town.
And I'm advising them that -- that we had to make a change because the old program failed. It was designed improperly and wanted them to get together in the morning to get their input.
Q And you say in here --
A Some of these people -- excuse me. I apologize for interrupting you.
I see that Adam Hollingsworth's name there. Adam was in corporate communications. And this would require another one of those communications efforts to

Page 131

communicate to the right stakeholders, the appropriate federal authorities, the customers obviously, the sales and marketing group, the entire 35,000 person organization.
Q Sure.
The second paragraph, the first sentence reads, the fuel surcharge is relatively new to the industry.
Now, that -- that is a true statement, these fuel surcharges were still relatively new to the rail industry as of this time in March of 2003, isn't that true?
A I'd been -- CSX had one now for close to a couple years, so that's -- by railroad standards that's new.
Q You also mention in the second paragraph that you -- you realize we will meet with customer resistance to this program. Do you see that?
A I do see that.
Q Okay. And, in fact, it's true, is it not, that you received a lot stronger customer resistance to this modified program than you did to the original program announced in the fall of 2000?
MR. TRIPPE: Objection.
MR. GARDINER: Object to the form.

Page 132

THE WITNESS: I -- I -- I don't -- I don't know if it was stronger than the first one. It was some customer resistance. I mean, our customers -- our customers looked at the clock the same way we did.
They were looking at that clock going through the 25th, 26th, 27th day, 28th day fearing that they would have to go in and tell their boss that our rates just went up two percent. And they were thrilled when it didn't. So they were happy. But they knew that it was fundamentally unfair and I think that while there were some initial noise, partly because it would be -- it was changing more frequently than the old one, I think that with the -- with the -- with a few exceptions, with a few exceptions the noise, you know, it dissipated after a few months and there were a few noisy people, but like a lot of these things, it became accepted.
The fairness of it was accepted and it wasn't as -- it wasn't as bad after a few weeks as I had thought it would be. And I don't know that it was better or worse than the initial fuel surcharge, which I -- as you can see in the second paragraph, which I thought -- I was proud that we were the

A Well, RCAF -- I was told RCAF had some problems. I didn't -- I don't know all the components that go into RCAF. I know it was a lagging index. Our old fuel surcharge program, our first one lagged and it presented problems. So -- but it -- it -- if fuel prices ever went down, it would -- it would allow you, in essence, to catch up, because the decline in RCAF would lag, the actual decline in your costs.

Unfortunately during the time I was in, the period we're talking about, they just went straight up until the last couple of years.

So we knew what we had with the CSX designed fuel surcharge program. You had two percent and when it was changed you had the incremental realtime capture of fuel costs and that felt good. That felt like it made sense.

I didn't know how good RCAF was. I was also -- I had also seen and heard about enough contracts where we compromised collecting a hundred percent of RCAF. We'd cap it at 80 percent or we'd cap it at no more than three percent or we'd waive the first one percent. So there was a rich history of waiving RCAF.

You couldn't waive the fuel surcharge or modify it very easily without coming to me. That was the rule anyway. It may have happened, but that was the



rule of the company. The CSX program required either my permission or one of my direct reports permission to waive it.

Q The RCAF adjusted only quarterly; is that right?

MR. GARDINER: Objection. Lack of foundation.

THE WITNESS: I know it was a periodic adjustment. It may have been quarterly or semiannual. I -- I don't -- I don't exactly recall at this time.

BY MR. BROCKETT:

Q Did there come a time when you articulated the policy for CSX that the company preferred to seek contracts with the modified fuel surcharge over contracts that had the RCAF or other government index?

A I -- it wouldn't surprise me if you showed me something where I said that because I probably felt that way, because it was a realtime response to rapidly adjusting and -- and volatile fuel prices. So I -- I'm sure I felt that way, but I recognized the world I lived in, if you had an escalator, I was willing to live with it.

MR. BROCKETT: Let's -- 13, Exhibit 13. Exhibit 13 is an e-mail, one page e-mail. It has



a Bate stamp 0153033.

(Exhibit 13 was marked for identification.)

BY MR. BROCKETT:

Q Now, the original e-mail on this document is from a gentleman by the name of [redacted] Do you see that?

A I see [redacted] name here, yes.

Q Do -- do you know him?

A I may have met him at one of the numerous customer events that the industry has. I don't -- I wouldn't recognize him if he walked in the door today.

Q And he -- he in this e-mail, which is dated April 9th of 2003, is talking about a letter he received from Glenn Katz regarding fuel surcharges. Do you see that?

A I do.

Q Okay. In the third paragraph he writes, [redacted] Do you see that?

A I do.

Q Okay. Now, does that refresh your recollection that by this time, April of 2003, you were



pushing the fuel surcharge as the preferred method of adjustment in contracts over the RCAF or other government escalation indexes?

MR. TRIPPE: Objection.

MR. GARDINER: Object to the form.

THE WITNESS: Well, as I said, I don't believe I was pushing anything. I liked our fuel surcharge program, but we had just announced it in March. And when we announced it, I believe we said in the announcement, certainly we said internally, that if a contract contains an escalator, you did not need to get the CSX fuel surcharge program.

Now, whether or not I preferred it, I don't recall having -- you know, I don't recall saying, you got to get this versus RCAF. I did like the fact that it was a realtime response to our -- to the behavior of our fuel prices. But as long as a contract had something in it that allowed us to capture the increase costs we were exposed to that was acceptable to me and it was our policy.

BY MR. BROCKETT:

Q How do you respond, sir, to the charge that was made by many of the customers that the new fuel surcharge program was an effort to make a windfall

Page 145

profit?
MR. GARDINER: Object to the form.
MR. TRIPPE: Objection.
THE WITNESS: I just would disagree with that. I mean, they could look at it -- they did -- they may or may not have -- I didn't get that -- that accusation or charge to me directly, and I met with a lot of customers.
They -- customers will say an awful lot to our sales and marketing people. They'd been 25 years, as you pointed out earlier, of rates not going up, and a typical meeting with a customer would begin as follows. You walk in and the customer would complain about rates being way too high and service being horrible and we apologetically would go there and hope we could keep rates where they were. So our customers have been beat down for years.
I fortunately haven't been exposed to all that abuse and -- and I rarely got it. When I met with customers -- shortly after this, whether it was one of those NFTA functions, I don't recall customers -- they may have jokingly said, well, you got your fuel surcharge fixed or a comment like that, but there was not a lot of horang that

Page 146

came at me from customers about the program.
And it wasn't -- it wasn't abusive. It was simply recapturing tremendous escalations in our costs.
MR. BROCKETT: What do you want to do for lunch?
MR. TRIPPE: It's up to you.
MR. BROCKETT: Well, more up to Mr. Giftos.
MR. TRIPPE: Shorter the better. We don't need lunch.
MR. BROCKETT: You don't need lunch?
THE WITNESS: Well, I may need a bite to eat.
MR. TRIPPE: You want lunch?
MR. GARDINER: How about a relatively short break?
MR. BROCKETT: Sure. There's nothing in the building to eat, huh? We have to go out somewhere?
MR. TRIPPE: You have to go out.
MR. BROCKETT: Let me just go through some letters real quickly here, see if we get these in and maybe 15 minutes we'll take a break.
Exhibit 14 is an e-mail chain. It has a Bates number 153214 to 153215.
(Exhibit 14 was marked for identification.)

Page 147

BY MR. BROCKETT:
Q Mr. Giftos, this is an e-mail chain. I want to direct your attention first to the e-mail from [redacted] sent on March 20th of 2003. Do you see that?
A 2:49 to Matt Tobin?
Q Yes.
A Yes, I see.
Q And it's -- the subject is the Mike Giftos fuel surcharge program. You see that?
And in this letter you see [redacted] complaining about the -- what he calls the Mike Giftos fuel surcharge program. Do you see that?
A I do.
Q Do you remember this letter?
A I've -- I've seen this letter couple of times, yes.
Q And [redacted] --
A I see that -- I see that that -- the first time I saw it, I never realized it was the Mike Giftos program, but that's fair to say it was. I invented it, so.
Q And [redacted] was a fairly significant customer of CSX, was it not, sir?
A They're all -- they're all important.

Page 148

Q Now, in the e-mail chain at the top of this document is from John Couch to Matt Tobin, Glenn Katz and Gary Lewis. Do you see that?
A I do.
Q Okay. And he writes, I'm not surprised by this type of reaction. Mike Giftos knew when he changed the program that we were changing the rules during the game. You see that?
A I do.
Q Do you agree with that statement?
MR. GARDINER: Object to the form.
MR. TRIPPE: Objection.
THE WITNESS: I -- I do agree with the point. We did change our program very, very -- we had changed our program within 24 hours. Frankly, something that's unusual for railroads. They're very slow and ponderous, but we changed it because we had a flawed program. And it was -- it's going to require customer adjustment and they weren't going to like it. They liked the old one because they were the beneficiaries of the flaws.
We were -- we suffered because of the flaws. We didn't recapture our costs. So they sort of got a windfall. They knew it. Some were more vocal and -- and Glenn Katz, as I indicated

Page 157

company [redacted] has drawn a line in the sand on the fuel surcharge program. Do you see that?
A I don't see that yet. Let's see. Oh, I do see, [redacted]
Q And that was on May 20th of 2003?
A Correct.
Q And that's two months after the program had been announced?
A That's correct.
Q And if we look up to the e-mail at the top of the page from Glenn Katz to you and others, he says, hot off the press. As I explained to you today, we have several customers that have threatened to stop paying fuel surcharge even though they paid under the old program because of their objections to the new program. You see that?
A I see that.
Q And that is also being written two months after the new program had been announced, right, sir?
A Yes. Again, this is --
Q Is that a yes or no?
A This is -- this is -- this is Glenn Katz who runs the chemical group, relatively new. He clearly was able to be reached by the chemical customers. Glenn -- Glenn -- the -- the number of opponents of this thing,

Page 158

the level of opposition the chemical group is grossly disproportionate to what I've seen in other areas and I think it's because of Glenn Katz.
If they drew a line in the sand, my guess is they subsequently paid or they were exposed to the interstate program that I had implemented when I came in as chief commercial officer.
Q Well, you don't mean to suggest that Mr. Katz was somehow misrepresenting to you what these customers were saying to him?
MR. TRIPPE: Objection.
THE WITNESS: Oh, absolutely not. Mr. Katz wouldn't -- wouldn't do that. He's telling me what he said to them. Mr. Katz's problem was that he listened too long to the customers and didn't draw his own line in the sand soon enough. That's my opinion today.
BY MR. BROCKETT:
Q Okay. Let's look at Exhibit 17 -- 18, 18, some more e-mails. This one bears Exhibit (sic) 153211 through 153212.
(Exhibit 18 as marked for identification.)
BY MR. BROCKETT:
Q I'm interested in drawing your attention to the e-mail at the top of the page from Mr. Katz to Bruce

Page 159

Kuzma and some others where he references -- and this is dated May 21st of 2003. Do you see that?
A I'm looking at the top of it, yes.
Q Yeah. Okay. And Mr. Katz writes as follows, I spoke to Giftos yesterday and didn't make much ground on trying to modify the program to be more responsive to customer concerns. You see that?
A I do see that.
Q And that you've testified about, that Katz came to you and you didn't -- you weren't willing to budge in making modifications to the program, right?
A CSX -- CSX has thousands of customers and I could be in the business of having a fuel surcharge program or if I listened to every customer, I could have thousands of fuel surcharge programs. I was firm. I thought the program was fair. The changes we made were responsive to a design flaw in it.
I expected the complaints. I expected my sales and marketing representatives to stand up to them. Glenn had a harder time with a few chemical customers and it took a while for him to get there.
Q And it was your intention, Mike Giftos' intention, to have this new program, this new fuel surcharge program apply to as many customers of CSX as possible, right?

Page 160

MR. TRIPPE: Objection.
MR. GARDINER: Objection.
THE WITNESS: Well, I absolutely -- all of our customers are moving their product on trains. Trains are burning more fuel. More fuel is -- the fuel is costing more. So we needed to recover from as broad a base as we possibly could.
Again, if we had an index in the contract that allowed us to recapture or capture the price of increase -- increase fuel prices, that was fine. If not, I fully expected my sales and marketing staff to impose the fuel surcharge -- or get the fuel surcharge in the contract or on that business.
BY MR. BROCKETT:
Q Was [redacted] one of the customers over whom Glenn Katz had responsibility?
A He was in the chemical area. [redacted] is largely chemicals. They have some other lines of business that -- but it was in the -- largely a chemical customer.
Q Okay.
MR. TRIPPE: Do you want to take a break at this time?
THE WITNESS: Yeah, I could. I think it's a

good time.
MR. BROCKETT: That's fine. Yeah. Sure.
THE WITNESS: Take our lunch.
MR. TRIPPE: How long do you need?
THE WITNESS: How fast can you get a sandwich up here? Are we off the record?
THE VIDEOGRAPHER: Going off the record. The time is approximately 12:37 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: And we're back on the record. The time is approximately 1:32 p.m.
BY MR. BROCKETT:
Q Good afternoon, Mr. Giftos. You understand that you're still under oath, sir?
A I do.
Q Okay. Now, Mr. Giftos, we have a lot of subjects that we have to cover this afternoon. I need you to agree that you will give me directly -- answers that directly respond to my question. Will you agree to do that this afternoon, sir?
MR. GARDINER: Objection.
MR. TRIPPE: Objection. He's responded to your questions adequately and properly in my opinion.
THE WITNESS: I intend to always be



responsive to your questions and sometimes they need context to -- to make sure they're not misleading answers or inaccurate answers or incomplete answers. So I'll be as concise as I reasonably can.
BY MR. BROCKETT:
Q Will you agree to give responsive answers to my questions without making speeches, sir?
MR. TRIPPE: Objection.
MR. GARDINER: Object to the form.
THE WITNESS: As I just said, I'll -- I'll answer your questions and where I feel you need a little texture or context to make sure the answer's fully understood or as complete in my mind I feel like I need to do that.
BY MR. BROCKETT:
Q All right. Where we left off, we were talking about customers that complained about the changes that you made to the fuel surcharge program in March of 2003. You recall that discussion, sir?
A I do.
Q Okay. We talked about [redacted] I want to show you a few documents on [redacted]
MR. BROCKETT: Let's mark as Exhibit 19 some e-mails produced by CSX. They bear a Bate stamp



152847 through 152848, Exhibit 19.
(Exhibit 19 was marked for identification.)
BY MR. BROCKETT:
Q Now, Mr. Giftos, I want to direct your attention to the e-mail at the top of the first page of the exhibit. You with me?
A I am.
Q Okay. This is an e-mail from Glenn Katz to you dated June 4, 2003?
A It is.
Q And the subject is the CSXT fuel surcharge?
A That's the subject, yes.
Q Mr. Katz writes to you in this e-mail, quote, as you know, [redacted] has been one of the most vocal customers about the change in our fuel surcharge.
Now, [redacted] is the individual from [redacted] is that correct?
A Yes.
Q Mr. Katz goes on to say, in his last letter that I forwarded to you he, [redacted] specifically mentioned that he intended on making the fuel surcharge a deciding factor in awarding new business. Do you see that?
A I do see that.
Q He goes on to say, the NS still has a program



that resembles our old program and doesn't start attaching a surcharge until $28 and then at a two percent rate. One of [redacted] main points is that he disagrees with our $23 trigger and he feels the $28 trigger is more appropriate. Do you see that?
A I do see his letter.
Q Do you remember getting this e-mail from Mr. Katz?
A I -- I don't remember getting it.
Q Mr. Katz closes by saying that he would like to talk to you about making a few very limited exceptions to the CSX policy for customers like [redacted] Do you see that?
A I do see that.
Q Okay. Now, you indicated this morning that CSX did make an exception for [redacted] and agreed to a cap on [redacted] fuel surcharge. Do you re -- recall that?
A I don't recall exactly the exception or the adjustment we made. I do recall there being one -- there may have been another one, but I recall there being one customer and I believe it was [redacted] where we made an exception to a rather, you know, clear, unambiguous, rigid policy.
Q And were there any other customers that you could identify, as you sit here today, for which you

Q Okay. Did either Jack or Clarence report to you about the subject of their discussions on fuel surcharge methodology?
MR. TRIPPE: Objection.
MR. GARDINER: Object to form.
THE WITNESS: I don't know if this meeting occurred. I don't have any recollection of a report to me about -- about that.
MR. BROCKETT: 36. All right. Exhibit 36, it's a one page document. It's produced by BNSF. Has Bate stamp 0557168.
(Exhibit 36 was marked for identification.)
BY MR. BROCKETT:
Q Okay. Now, do you see this document refers to a BNSF CSX alliance meeting in Jacksonville on April 1st of 2003?
A I do see that.
Q Okay. Now, first of all, what is the BNSF CSX alliance meeting?
A Well, that's probably a longer answer than you would like, but I'm going to have to give it to you to make sure you understand it.
As I think you may understand from some of my earlier testimony that if you go back not too many years, there were literally hundreds of railroads in the



United States and most of them with the advent of the interstate highway system started to face so much truck competition they went bankrupt and ultimately they started merging together and mergers were always disruptive to our customers.
In 1980 when the Staggers Act was passed that deregulated railroads, they really -- they contained provisions to facilitate and promote mergers, because at that time, railroads were facing such extreme financial pressure because of the loss of business and excess capacity that they -- consolidation process was really encouraged.
CSX was formed about that time, which was combining the Seaboard system in the south and Chessie in the north. Chessie itself had been a product of the merger of Baltimore and Ohio, Chesapeake and Ohio and Western Maryland railroad. So these railroads started combining, and whenever there was a merger, you had huge customer opposition.
The last couple were very, very disruptive. In the early '90s -- and this will get directly responsive to your question -- in the early '90s, the Union Pacific acquired the Southern Pacific and with all due deference to anybody here that's representing the Union Pacific, it nearly brought the nation's railroad



system to a halt. And it -- it was catastrophic for all of us. Shippers complained and it was just a very, very difficult time to be in the railroad business, the complexity of bringing two operating networks together.
Shortly after that, the Burlington Northern proposed a merger or agreed to a merger with the Canadian National, and the federal government stepped in. The Interstate Commerce Commission, the STB by then, stepped in and -- and disallowed the merger. They issued a moratorium prohibiting mergers. And they said in that moratorium, before you can ever apply for a merger again, you must first try to accomplish the benefits of that merger through meeting with your connecting align -- connecting railroad and try to form strategic alliances so that you can accomplish the benefits of the merger without all the disruptive effects. So it was really an outgrowth of the STB moratorium on mergers in the mid '90s that gave birth really to this alliance process.
So we started meeting and we met first and most frequently with the Union Pacific for the obvious reason that they were our single largest connecting carrier. We had more business flowing between our two networks with the UP than anybody else and the question was, how could you grow that; how could you improve the



quality of the flow; how could you -- there's the type of business we call watershed business.
If you think of the Mississippi River as the boundary between the CSX railroad and UP, we had very, very little incentive to pick up a car that's 200 miles from the Mississippi River and interchange it with the UP because we wouldn't make any money. But they wanted the longer haul.
If the traf -- if the traffic was going from Springfield, Illinois to Los Angeles, they'd get a great haul. We'd have a short haul. So we would meet and we literally forced our sales and marketing groups to meet together to look at short haul traffic on one railroad that would give a long haul to the other and a variety of things that you wouldn't ordinarily look at as separate carriers and this was largely in response to the STB moratorium, the directive to look at the alliance process.
So we started with UP and we had meetings with all of our railroads, not as many as the others, looking at common initiatives on how we could grow our business, perform more effectively as a combined network, simplify our billing process and work together to grow our respective businesses.
Q Okay. Thank you.

Page 249

know, our programs were in place and I don't know what all the other railroads had. We had ours. They had theirs. We had a little noise when we changed ours but they were largely in place and it wasn't -- it wasn't something that -- with the exception of those few chemical customers shortly after we changed, it wasn't something that was dominating my agenda, the program.

As long as we were collecting a fuel surcharge and expanding its coverage, that's all I really cared about, expanding its coverage. I was -- I was content and I didn't address it, instruct by organization to pursue changes in any way.

Q Did you ever have a conversation on the topics mentioned in this document with Mike Hemr?

A No, I don't -- I don't -- none that I recall.

Q How about with Don Seale?

A No.

Q Do you know who Greg Summy is?

A He's an NS, Norfolk Southern, lawyer.

Q Did you ever have a conversation on these topics with Greg Summy?

A No.

Q All right.

MR. BROCKETT: 40?

THE COURT REPORTER: 39.

Page 250

MR. BROCKETT: Okay. Exhibit 39 is a document produced by UP. It's Bates 0011067 through 0011069, Exhibit 39.

(Exhibit 39 was marked for identification.)

BY MR. BROCKETT:

Q So this an e-mail and then there's a draft agenda for CSX UP alliance meeting in Omaha, Nebraska on June 3, 2003. Do you recall that?

A I don't specifically recall that meeting, but I don't doubt that it occurred.

Q Okay. So on -- if you look at the second page, the draft agenda here, indicates that you were at this meeting, right?

A Yes.

Q And your counterpart at UP, Mr. Koraleski, was also there, correct?

A That would be the case.

Q And it indicates that Mr. Ward was there, your CEO?

A Yes.

Q And Mr. Davidson, was he the CEO of UP at the time?

A Yes, he was.

Q Okay. So can we agree this is another instance in which the senior executives of the CSX met

Page 251

with the senior executives of one of its competitors to discuss topics of interest --

MR. GARDINER: Objection.

BY MR. BROCKETT:

Q -- affecting your businesses?

MR. TRIPPE: Objection.

MR. GARDINER: Object to the form.

THE WITNESS: Well, I -- I couldn't agree with that characterization at all, because UP is not -- we hardly complete with UP at all, if at all. I don't -- UP is a connecting carrier. They operate essentially west of the Mississippi River and we operate essentially east of the Mississippi River.

There may be a teeny bit of traffic, there may be, going from New Orleans to a point north that could move on CSX and UP, but we're connecting carriers.

This is an alliance meeting to improve the quality of our connecting business. Never think of them as a competitor. I always think of them as a partner.

And the prior page memo really had not much to do with this agenda. It was -- it was referring to the process that Jack and I had set

Page 252

up where we'd bring our respective commercial organizations together, usually telephonically, and we'd have the CSX person who was working with the UP person on a particular piece of business that would be operating on our two railroads discuss the status of their -- of their progress and we had a realtime line -- a very robust process by this point in time to look at those alliance initiatives, the commercial initiatives that would help us each grow our business.

BY MR. BROCKETT:

Q Okay. And is one of those commercial initiatives that would help you each grow your business the subject of fuel surcharges?

A No, not -- that -- that wouldn't grow our business at all, the fuel surcharge. The fuel surcharge would be allowing us to, you know, place a surcharge on our -- on our revenue.

Now, we were -- if the UP didn't have a fuel surcharge in place on interline revenue and it was originating on its line, then, of course, I'd be interested in knowing about that. And I was also interested in knowing the extent to which they would have coverage, but I could get that from our interline service management group and a variety of ways.

requires the railroads to agree upon their -- their portion of the price in advance, right?
MR. GARDINER: Object to the form.
MR. TRIPPE: Objection.
THE WITNESS: In most instances, under that theoretical thing that Jim Foote was proposing -- I don't know where it stands today -- you'd have your half or third or portion of the run priced and at a rate that was acceptable to you.
MR. BROCKETT: Why don't we take a short break and let me powwow.
THE VIDEOGRAPHER: Going off the record. The time is approximately 4:51 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record and the time is approximately 4:54 p.m.
BY MR. BROCKETT:
Q Okay. Just a couple follow-up questions from some of the subjects we've talked about.
Would it be accurate to say, sir, that following the announcement of the modified fuel surcharge program on March 20th of 2003 that CSX's fuel surcharge program essentially became nonnegotiable with respect to customers?
MR. GARDINER: Object to the form.



MR. TRIPPE: Objection.
THE WITNESS: Well, I always hoped it would be considered nonnegotiable, but in the real world we live in, there were times you had to make changes or consider alternatives and we've discussed one exception that I can recall.
My -- the people that reported to me, my direct reports, they were senior vice presidents and they had authority to make exceptions. I'm unaware of any they did make.
BY MR. BROCKETT:
Q So, as you sit here today, apart from [redacted] which the documents showed was a short-term accommodation, can you identify any other customer who received an accommodation or an exception of any kind following announcement of the fuel surcharge modifications on March 20th of 2003?
MR. TRIPPE: Objection.
MR. GARDINER: Object to form.
THE WITNESS: Other than those municipal utilities that we talked about before, which it didn't apply to, because of the concern about the False Claim Act I don't recall any.
BY MR. BROCKETT:
Q Now, when you left CSX, did you have any



documents in your possession relating to the work you did at the company?
A I -- I don't -- I don't believe so. I had a few mementos but -- lucites from transactions when we sold hotels and oil and gas companies, but I didn't take a bunch of documents. I had -- I had a retirement -- a document reflecting the terms of my retirement and some stuff regarding the benefit programs but I didn't -- I didn't take any of my --
Q What about a laptop, did you take your laptop --
A I didn't have --
Q -- that would have your e-mails on it?
A I didn't have a laptop then. I had a fixed desktop computer at my home and I have a laptop now.
Q Okay. So the fixed laptop computer -- sorry -- the fixed desktop computer at your home, after you retired, did you retain that with all of the e-mails reflecting your work at the company?
MR. TRIPPE: Objection.
THE WITNESS: I don't think that -- I don't think I'd have my work at the company on there. I had my office computer. Maybe I confused you. There was a computer in my office. That stayed in my office. I never took that home. I had a



computer at my house that I used for personal business and looking at stocks and bonds and reading the news in the internet and things like that. Communicating with my children.
I may have received a communication on the e-mail from one of my business associates. I don't recall. It would have been rare. They would have picked up the phone and called me more likely than sent something there, so.
BY MR. BROCKETT:
Q Okay. Okay. So, as you sit here today, you have no documents, electronic or otherwise, under your possession, custody, control that would relate to your work at CSX?
A No, no.
Q Were you asked to play any role for CSX in connection with the STB hearings in 2006 and 2007 regarding fuel surcharges?
A No, I wasn't.
Q Do you know at the time you retired from the company, or can you give us a reliable estimate, of how many of CSX customers, what percentage had a -- had your fuel surcharge being applied to them --
MR. GARDINER: Objection.
BY MR. BROCKETT:

Q -- at the time you left?
MR. GARDINER: Objection. Lack of foundation.
MR. TRIPPE: Objection.
THE WITNESS: Pure speculation, not much more accurate than John Couch, but between fuel surcharge, RCAF, other indices, my guess is we were getting up into the 60 to 70 percent, someplace in that range.
BY MR. BROCKETT:
Q And am I correct that your goal -- the CSX's goal as of the time you left on April 1st of 2004 remained 100 percent coverage?
MR. GARDINER: Object to the form.
THE WITNESS: Well, again, either a -- the fuel surcharge or an index and a contract that would allow us to capture the rapidly escalating price of fuel.
BY MR. BROCKETT:
Q And that was CSX's goal, 100 percent coverage of either one of those alternatives?
A It was -- it was my goal when I was there and presumably it didn't change after I left.
MR. BROCKETT: Nothing further.
MR. GARDINER: Let's take five minutes. I



may have some questions.
THE VIDEOGRAPHER: Going off the record. The time is approximately 5:01 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record and the time is approximately 5:04 p.m.
CROSS EXAMINATION
BY MR. GARDINER:
Q Mr. Giftos, you were asked by plaintiff's counsel some questions about something called A plus B pricing, which I understood you to say was a form of interline pricing; is that correct?
A That's correct.
Q To your knowledge, was that the kind of interline pricing arrangement that was suitable for all interline traffic?
MR. BROCKETT: Objection to the form. Calls for a legal conclusion.
THE WITNESS: Well, I mean, the railroad is very complex and some traffic on CSX that you have to pick up and move to a switching yard and then it has to get into a different train and one of the challenges on the CSX network, particularly the merchandise business, is most moves on the single system require one or two switches. They



don't just simply move from point A to a connecting carrier.
And anytime you're going to have the complexity of different moves within the system where it has to meet another train and switching, I can't imagine how you can get all those factors into a simple formula for those -- those thousands of moves.
I think where it would work is probably in the intermodal business that tends to move from places like New York to Chicago or from, you know, Atlanta to -- to St. Louis, anything which is an awful lot of our business that has complexity, multiple moves, switching, I just can't imagine how you can come up with a formula to capture -- capture all those pieces and have a simple price.
BY MR. GARDINER:
Q And did those thousands of other moves require dialogue between connecting carriers to work out an appropriate interline arrangement?
A Well, it required analysis on the part of CSX to first come up with a price and hence the delay which was what Jim Foote was trying to avoid. We'd have to come up with our -- with our price and it wasn't instantaneous. We had to see if we had trains that



would work and what we could really do before we committed a price to a customer because the cost of moving that, if it had multiple switches in it, could be well in excess of a simple arithmetic formula that -- which is what Jim was looking for.
Q You were asked whether after you changed CSX's fuel surcharge program on March 20th there were exceptions made to the applicability of CSX's fuel surcharge program with customers and I believe you gave your testimony about that.
And my question is whether looking more broadly than the fuel surcharge itself whether you're aware of situations in which there were negotiations between CSX and its customers regarding the overall price to the customer that would include the fuel surcharge plus the other terms of the price like the base rate?
A I'm not aware of specific discussions like that, but I'm sure there were. I mean, the customer, they're sophisticated negotiators and they'd probably want to bundle everything in and say, no, look, I don't want to talk about fuel surcharge. I don't want to talk about switching charges. I don't want to talk about various ancillary charges. I want to know what my rate is and have predictability.

E R R A T A   S H E E T

IN RE: In Re: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

DEPOSITION OF: MICHAEL GIFTOS TAKEN: 2/25/10

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 32 | 24 | built | to billed |
| 33 | 4 | to this | to as this |
| 145 | | our customers | to the railroad's customer service representatives |

145: 17 change "our customer" to "the railroad's customer service representative"

32: 24 change "built" to "billed"

33: 4 change "to this" to "as this"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE )
ANTITRUST LITIGATION )
) MDL No. 1869
) Misc. No. 07-489
This Document Relates To: ) (PLF/AK/JMF)
)
DIRECT PURCHASER CASES )
____________________________________)

"HIGHLY CONFIDENTIAL"
VIDEOTAPED DEPOSITION OF
CLARENCE GOODEN

Taken on behalf of the Plaintiffs

DATE TAKEN: Friday, July 16, 2010
TIME: 8:34 a.m. - 4:13 p.m.
PLACE: McGuire Woods
50 North Laura Street
Suite 3300
Jacksonville, Florida

REPORTED BY: Cindy D. McClary, RPR, CRR



APPEARANCES FOR THE PLAINTIFFS
DANIEL L. BROCKETT, ESQUIRE
AMOS E. FRIEDLAND, ESQUIRE
KYLE R. TAYLOR, ESQUIRE
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
212.849.7000
danbrockett@quinnemanuel.com
amosfriedland@quinnemanuel.com
kyletaylor@quinnemanuel.com

APPEARANCES FOR DEFENDANT CSX AND THE WITNESS

KATHRYN D. KIRMAYER, ESQUIRE
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
202.624.2774
kkirmayer@crowell.com
dcross@crowell.com
- and -
ERIN O. O'BRIEN, ESQUIRE
CSX Transportation
500 Water Street, J150
Jacksonville, FL 32202
904.359.3103
erin_o'brien@csx.com



APPEARANCES, Continued

APPEARANCES FOR DEFENDANT NORFOLK SOUTHERN
SEAN M. TEPE, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036
212.735.2718
sean.tepe@skadden.com

APPEARANCES FOR DEFENDANT BNSF RAILWAY
REBECCA VALENTINE, ESQUIRE
Mayer Brown
1999 K Street, N.W.
Washington, D.C. 20006-1101
202.263.3208
rvalentine@mayerbrown.com

APPEARANCES FOR DEFENDANT UNION PACIFIC
GRANT T. MANDSAGER, ESQUIRE
Howery, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-6941
202.383.6941
mandsagerg.@howery.com

ALSO PRESENT
Ashley Holt, Videographer



INDEX
Videotaped deposition of Clarence Gooden


| | PAGE |
|---|---|
| Direct Examination by Mr. Brockett . . . . . . . . | 9 |
| Cross Examination by Ms. Kirmayer. . . . . . . . | 266 |
| Certificate of Oath. . . . . . . . . . . . . . . | 268 |
| Certificate of Reporter. . . . . . . . . . . . . | 269 |


\- - -

EXHIBITS INDEX


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Ex. 1 | E-mail from Sandi Bryan, 2/4/03 and attachment. Subject: Memo from PMG CSXFSC000232745 to CSXFSC000232748 | 44 |
| Ex. 2 | E-mail from John Couch, 3/3/03 and attachment, Fuel Surcharge Overview Clarence CSXFSC000000281 to CSXFSC000000298 | 52 |
| Ex. 3 | E-mail from John Couch, 3/11/03 and attachment, Fuel Surcharge Merchandise 2003, CSXFSC000036491 to CSXFSC00036496 | 62 |
| Ex. 4 | E-mail string from Clarence Gooden 3/18/03. Subject: Memo From PMG To Direct Reports Re Budget Meeting CSXFSC000156699 to CSXFSC000156700 | 88 |
| Ex. 5 | E-mail from John Couch, 3/19/03 and attachments, Fuel Surcharge - New Program; Fuel Surcharge CSXFSC000152802 to CSXFSC000152823 | 96 |
| Ex. 6 | E-mail from Richard Stroot, 3/27/03 and attachments, 4/1/03 Agenda and Digest CSX doc, BNSF-0557167 to BNSF-0557181 | 107 |

rate. I'm just not sure.
Q Well, if someone had presented this document to you as the vice president -- senior vice president of merchandise and you thought there was some inaccurate statement in it, you would've pointed that out, wouldn't you, sir?
A Well, I'm sure there would've been a debate, because I was just looking on the next page here where it says options to change the program. So, I've got -- I'm doing options on one page to expand the application rate, so I'm not sure what written policy applies there. Then I'm looking at the next page on options to change the program. And then I'm looking, three or four pages over, and it's looking at published programs from other railroads.
Q Mr. Gooden, I appreciate that you have things you want to say, but I really am going to ask you to answer my question, okay?
A Okay.
Q My question is very simple. It says to you, if you had reviewed this document as the senior vice president in charge of merchandise, and you found something that was inaccurately stated here, you would've pointed that out --
A I would've --



Q -- would you not have?
A I would have.
Q Do you remember pointing out that this statement about needing a written policy was inaccurate?
A I don't remember the document.
Q Now, if you'll look on Page 14. This is titled Current Fuel Surcharge Application. Do you see that, sir?
A I see that.
Q Now, does this -- does this page set forth what was then the policy about the fuel surcharge applications?
A I think that it does with one exception, and that was that in order to have an exception to the -- to the fuel surcharge application, you had to have either a vice president or my approval to do that, senior vice president's approval.
Q Okay. But that's not stated here, is it?
A That's not stated here.
Q Okay. But what is stated here is that the fuel surcharge does not apply to contracts that already include government published price escalators, correct?
A That's what it says.



Q And that would include RCAFU, correct?
A That would include RCAFU.
Q And it also does not apply to exempted contracts and contracts that don't include fuel surcharge wording. Do you see that?
A I see that.
Q Okay. And that set forth the company's policy as of early March of 2003, correct?
A That's correct.
Q Now, one of the things that you discussed, starting in March of 2003, was ways to change the fuel surcharge program to generate more revenue for the company; isn't that correct, sir?
A No, I think what we started to discuss is, I told you earlier, my recollection was that we had a clause in it that said essentially it took 30 consecutive business days to raise the -- for the triggers to kick in, and that's my recollection of it, and that was the big change that had to be made in, I guess, March of 2003.
Q All right. Did you participate in discussions, sir, about changing the fuel surcharge program --
A No.
Q -- in March 2003?



A No, I did not.
Q You did not?
A (Shakes head.)
Q All right. You were the senior vice president for one of the major divisions of the company and --
A Right.
Q -- you did not participate in discussions --
A No.
Q -- about a change?
A No. I was on vacation when the decision was made. It was made, as far as I know, by Mike Giftos. He did call me on my phone, cell phone, and inform me that the decision was being made.
Q I'll get to that. I'm talking about now early March of 2003, the conversations that led up to the change. Did you participate in those at all?
A Yes, I participated in those that led up to the change.
Q Okay. And who else participated?
A All of Mike's direct reports, our finance people, several of our lower ranking marketing people who were actually doing the mathematical computations.
Q And who is the one who initiated these conversations?

A Mike Giftos.
Q And did Mike say why that he felt it appropriate to reevaluate the fuel surcharge program?
A Yes, because we missed the trigger as published in the Wall Street Journal twice, back to back, I think it was, I could be wrong on that, but I think it was twice back to back, by one day. And the fuel costs at the time, as you know, were just escalating out the roof, and we were hemorrhaging from the -- from what -- you know, money from what was happening here.
So Mike was a strong -- he was the strong advocate for this.
Q What was your position?
A Well, my position was, if we made a mistake here by putting in consecutive business days as opposed to consecutive days, we ought to fix the mistake.
Q During these discussions, did anyone state that the company's inability up to that point to meet its BHAG revenue goals was one factor in changing the fuel surcharge program?
A No, as I told you earlier, we had the separate reporting for line haul revenue and for what was then externally reported revenue. The BHAG was



only applicable to the line haul revenue. We viewed fuel surcharge then and now as an offset against cost.
Q Okay. So, if I understand you correctly, when you report -- when CSX reported revenues to the public, it included revenues from fuel surcharge?
A That's correct.
Q But when you kept your revenues internally, you separated out line haul revenue from fuel surcharge revenue?
A That's correct.
Q And why did you do that?
A Because, one, we wanted to see what the true pricing power of the business was, and on fuel surcharge, you can't count that as price, because it goes up, it goes down, you can get some this week, next week you may not be getting anything. So the fundamental underlying economics are what you're getting in the line haul. Fuel was simply -- fuel surcharge was simply an offset to fuel cost.
Q All right. Now, let me show you what we'll mark as Giftos 3.
MS. KIRMAYER: Gooden 3.
MR. BROCKETT: Gooden 3, sorry.
(Exhibit No. 3 marked for identification.)
BY MR. BROCKETT:



Q Okay. Now, Mr. Gooden, this is an e-mail dated March 11th of 2003, from John Couch to Frank Onimus. And attached to it is a document called Fuel Surcharge Merchandise 2003. Do you see that?
A I see that.
Q All right. Now -- and again, you were the senior --
A I don't see that.
Q No, that's the attachment I'm referring to, sir.
A It says -- mine just says Fuel Surcharge.
Q No, if you look at the attachment to the e-mail, it's called Fuel Surcharge Merchandise 2003, right?
A That's correct.
Q Okay. And you were the senior vice president in charge of merchandise at this time, correct?
A That's correct.
Q Now, did you prepare this attachment?
A I did not.
Q All right. Was this prepared by someone on your staff?
A It -- obviously, it was. It looks to me like it was done by John Couch.



Q Okay. And would it be fair to say that a document like this would not have been circulated throughout the company at this time without the approval of the senior vice president for merchandise?
A Let me see what's in the document.
Q Well, you can take all the time you want to look through it, but I believe what's in here is some proposals to change the program, the fuel surcharge program.
A Well, it could've been circulated without my approval, because it could've been circulated as: This is our recommendations, let's debate them.
Q Okay. But wouldn't it be fair to say at some point the senior vice president of merchandise would've looked at and had input on a document of this kind?
A That would be fair to say.
Q Now, if you look at the first -- the first substantive page of the attachment, Page 2. Are you with me?
A Not yet. Okay.
Q The second bullet point says, quote: Need a written policy that fuel surcharge will apply on all new moves, even those with RCAFU. Do you see that?
A I see that.

Q So, what was being discussed at this time, at least, was a change in policy such that the fuel surcharge would apply to movements and contracts that contained RCAFU, correct?
A That's correct.
Q And as we've seen before, that would be a change in the policy that had existed with the old fuel surcharge up to this point in time, correct?
A Well, it looks to me --
Q Answer my question, sir.
MS. KIRMAYER: Excuse me. He was trying to answer your question. If you want him to answer your question, give him an opportunity to do so.
MR. BROCKETT: It's a yes or no question.
MS. KIRMAYER: No, he can answer it any way he chooses.
Read the question back, please, so the witness can have an opportunity to answer it.
(Record read by reporter.)
MR. TEPE: Objection. Form.
MS. KIRMAYER: Go ahead and answer it.
THE WITNESS: It looks to me like what this Page 2 is, is a series of proposals for -- for changes.
BY MR. BROCKETT:



Q Okay. And one of the proposed changes was to apply the fuel surcharge even to those contracts that had RCAFU in them, correct?
A I would say -- I would word it slightly different. I'd say that one of the possible suggestions is to change it.
Q Okay.
A Because it continues on down to this last bullet point, which says, hey, you can continue to exempt those with an RCAFU.
Q Okay. And one of the other proposed changes was to make exceptions only those that were approved by the senior vice president, correct?
A That's right. And I think I mentioned to you earlier that on another document you had shown me, that we had instructions out at the time you either needed a vice president or a senior vice president's, you know, approval.
Q Now, look at Page 4. There's some bullet points here about a proposed new fuel surcharge program. Is that fair, sir?
A Yes, that's correct. Details of a new program --
Q And --
A -- that's being proposed.



Q That's being proposed, right. Now, some of the terms mentioned here was to start the trigger point at $23 a barrel, correct?
A That's right.
Q And that would've been a change from the prior program that triggered at $28 a barrel, correct?
A That's right.
Q Okay. Now, one of the other proposed changes here was a half percent increase for every 2.50 increase in WTI. Do you see that?
A I see that.
Q Now, that's not the program that was actually implemented in June of 2003, is it?
A I don't know.
Q You don't know?
A No, I'd have to see the program implemented.
Q Okay. Well, we'll take a look at that.
A Okay.
Q But as you look at this -- the information on Page 4, can you tell me whether this was the program that was implemented in June of 2003 or a different program?
A I just don't know. I'll say this. At the time that this document was being done, there was also a tremendous amount of debate going on about where was



the future of oil prices going. And everybody and his brother was an expert at the time. And regression analysis were being done, historical looks. You showed me a document earlier, that I just glanced through, that had graphs in there showing the historical performance of oil. And there was a strong belief, in fact, held by Mike Giftos, that eventually, one day, oil would be back under $17 a barrel. And the current joke at the time, when Mike said it was going to $17 a barrel, was, let's everybody put $100 in a hat and figure out what the price would be in a year. And nobody went with 17.
Q All right. Let's look back at the e-mail on the cover sheet to this document, Mr. Gooden. Now, this is Mr. Couch writing to Mr. Onimus, correct?
A That's correct.
Q And it's on March 11th, 2003, right?
A Right.
Q And Mr. Couch says: Revised based on input from Gutman and Clyde. Who are Gutman and Clyde?
A Bob Gutman was a finance person and Clyde McIntyre worked for Frank Onimus and ran marketing services.
Q And then the next sentence says: I believe Clarence is okay as well. Do you see that?

A I see that.
Q Now, does that refer to the fact that you had reviewed the proposed new fuel surcharge program contained on the attachment and you were okay with it?
A I don't have a clue what John was talking about, because in the next sentence he says: We may want him to bless it before giving it to Leslie. So, that to me implies that I hadn't seen it, or he wouldn't be wanting me to look at it. But I just don't know.
Q Do you recall reviewing this program and blessing it?
A I don't recall reviewing this paper.
Q Well, what basis would he have to say that "Clarence is okay as well," unless you had reviewed it and given him some input?
A I don't know. Because why would he make the next sentence, "we may want him to bless it before giving it"? I mean, I just don't know what the man was thinking.
Q Would your approval be required before a new fuel surcharge program of this kind could be implemented by the company at this time?
A I would not have had the authority to implement this, only Mike Giftos would've had



authority. So these would've been suggestions, recommendations, from the merchandise group going to Mike.
Q And you were the senior vice president of merchandise at this time, right?
A That's right.
Q So, any recommendations that would've gone from merchandise to Mr. Giftos at this time certainly would've had your approval, correct?
A Eventually, I would've had to see it and say it's okay to go.
Q Okay. Do you recall being asked to bless or approve the proposed new fuel surcharge program that's reflected in this exhibit?
A I do not remember this exhibit.
Q Now, this document is dated March 11th of 2003, right?
A That's correct.
Q Do you remember the next day, March 12th of 2003, playing golf with Jack Koraleski at UP?
A I do not.
Q Do you know Mr. Koraleski at UP?
A I do know Mr. Koraleski.
Q And what was his position at this time?
A I think Jack was -- Koraleski was Mike



Giftos's counterpart.
Q And did you play -- have you ever played golf with Mr. Koraleski?
A One time.
Q When was that?
A I don't know the date, but I know the location.
Q Where was it?
A Selma -- I guess Selma's in Illinois. Selma, Illinois.
Q What was the occasion on which you played golf with --
A There was a retirement for a guy named Chuck Schultz, and we went to his retirement.
Q Let's mark as -- what we've marked as Giftos Exhibit 35.
Okay. If we look at the top, this is an e-mail from John Couch to you, right?
A Right.
Q Dated March 5th of 2003, correct?
A Right.
Q And in it, Mr. Couch writes, quote: Do you want to have dinner with Jack on Wednesday, the 12th? Do you see that?
A I see that.



Q Should we offer them golf or tours in the afternoon of the 12th since we are scheduled for meeting on the 13th? Do you see that?
A That's right.
Q Okay. Now, did you, in fact, play golf with Mr. Koraleski on March 12th of 2003?
A I don't think so, because we've only played one time, and this was -- this was here.
Q What did you do on March 12th of 2003? Does this e-mail refresh your recollection in any way?
A No. That's seven years ago.
Q Okay. Well, do you remember having meetings with UP on March 13th of 2003?
A Not specifically, no.
Q Well, this e-mail suggests that you met with Mr. Koraleski on March 13th of 2003, correct?
A That's what it says.
Q Do you have any doubt that this is -- that meeting occurred?
A No, I believe it's true.
Q Do you recall what you did, if anything, with Mr. Koraleski on the 12th, if you didn't play golf?
A I don't. I just don't recall the meeting.
Q In an e-mail below this, it's an e-mail from

someone at UP to John Couch, and it states: For our discussion tomorrow, here are suggested agenda items for next week. One of the adjusted agenda items is fuel surcharge methodology. Do you see that?
A I see that.
Q And in brackets it states: Believe Jack and Clarence talked on this. Do you see that?
A I see that.
Q Now, did you have a conversation with Jack Koraleski at UP at any point before March 5th of 2003 about fuel surcharge methodology?
A I don't recall having a conversation with Jack about fuel surcharge methodology.
Q When you say you don't recall, are you saying that the conversation could've occurred, you just don't recall it, or are you affirmatively saying it didn't occur?
A Well, here's what I'm saying. I saw a document yesterday for the first time that said I was in a meeting in Omaha in which getting effective fuel surcharge recovery was discussed. I had just been asked a question had I ever talked about that, and I said no to the answer to that. And that document was given to me. I then recalled the fact that I was in a meeting where that had been discussed and getting



broad coverage. And that's the only time I can remember ever talking with the UP about the fuel surcharge recovery.
Q Okay. When was this meeting in Omaha?
A Oh, Lord, I don't know. Don't remember.
Q Who was there?
A Michael Ward. There was about 15 people.
Q Was this one of these alliance meetings between the UP and CSX?
A Yes, it was.
Q And do you recall when it was?
A No.
Q Was it in 2003?
A I think it was after that. It was around -- I don't know. I don't want to give you a date and I'd be wrong.
Q All right. Well, we're going to come to that. I want to take these chronologically, if I could.
A Okay.
Q This e-mail states that you and Clarence had talked about fuel surcharge methodology, correct?
THE VIDEOGRAPHER: Excuse me. I'm sorry. I'm sorry. I don't know if we had a power surge or what, but...



THE VIDEOGRAPHER: We are back on the record at 10:17.
You might want to repeat the last question.
MR. BROCKETT: All right.
MS. KIRMAYER: I'll object to the question unless you can rephrase it, because it doesn't state that, it states that the author believed that Jack and Clarence talked on this. So I think you're mischaracterizing the document.
BY MR. BROCKETT:
Q Well, on this e-mail, at the bottom, somebody from UP writes to John Couch and he includes a draft agenda for next week's meeting. Do you see that?
A I see that.
Q And that was a meeting that was to take place between senior executives of the UP and senior executives of CSX, correct?
A That's correct.
Q And the meeting was to take place on March 13th of 2003, correct?
A That's what it says.
Q And one of the agenda items is fuel surcharge methodology, correct?
A That is correct.



Q And the writer of this e-mail states next to that in brackets, quote: Believe Jack and Clarence talked on this. Do you see that?
A I do see that.
Q All right. Now my question to you is, at any point prior to March 5th of 2003, did you have a discussion with Jack Koraleski about fuel surcharge methodology?
A Not that I recall. In fact, that same writer, in the e-mail just above there, says that he's not sure if Jack and Clarence have talked about anything, more specific. So this guy don't know.
Q Well, this e-mail suggests that one of the agenda items for your meeting with the UP is going to be fuel surcharge methodology; do you see that?
A I see that.
Q Okay. Did you attend this meeting on the 13th?
A I do not recall.
Q You don't know one way or another whether you even attended?
A I don't.
Q Did you make it a practice to attend senior executive meetings between CSX and UP?
A Yes.

Page 77

Q Are there any that you missed?
A None that I know of.
Q So, as you sit here today, you can't tell us whether you attended this meeting, correct?
A I have no recollection of it.
Q And you can't tell us what you discussed about fuel surcharge methodology, if anything, correct?
A I can't -- I don't have any recollection of it.
Q Have you ever had a conversation with any representative of another railroad, apart from the UP, about fuel surcharges?
A Yes, I've had a conversation with John Lanigan of the BNSF, that involved the BNSF proposal to put fuel surcharges on a mileage basis. I got a call from his office to -- to set up a meeting, that he wanted to do this. I had our attorney, Paul Hitchcock present. He had -- John Lanigan had their attorney, whose name I cannot remember, present. We did it on a telephone call. John made his proposal. I declined his proposal. The reason I declined it was that eastern railroads have shorter hauls than do western railroads, and so if we did it on a strict mileage prorated basis, we, CSX, would lose the

Page 78

ability to offset some of our fuel costs there because BNSF would collect a larger proportion of that fuel surcharge.
And the way that system works is that the originating carrier's fuel surcharge governs. So, John Lanigan knew at the time that he could implement it on eastbound shipments. He could not implement it on westbound shipments. And that's what subsequently ended up happening.
I had one conversation where I had a telephone call from Don Seale in the Norfolk Southern to change the fuel surcharge on our interline business that was tariff based and rebase to $64. I told Don at the time that I needed to think about that. I turned it over to Clyde McIntyre, who was head of marketing services, whose responsibility is to manage those tariffs. I said, you get with the finance people, determine if this is the right change to make, and whatever you guys agree to, call your counterpart on the NS and tell them what we agreed to.
Ultimately, what Clyde's team decided was that we didn't think $64 rebasing was a good thing. There was a lot of internal debate about that. It turned out in hindsight that we didn't do it, and thank goodness we didn't, because oil dropped below

Page 79

$60 right after that.
Q When was the conversation with Mr. Lanigan?
A I don't know if it's the truth, but I'm going to tell you 2005, '6 time frame.
Q And who was on the call?
A Paul Hitchcock and myself, John Lanigan, and an attorney for the BNSF, and I don't recall his or her name.
Q And when was the call with Mr. Seale?
A I want to say it was 2005 or '6, somewhere in that same time frame.
Q And who was on the call with Mr. Seale, just you and him?
A Yeah.
Q It was a telephone call?
A Yeah, he called and I answered the phone.
Q Have you ever had any conversations with any other representatives of other railroads about fuel surcharges apart from the two phone calls you've just mentioned?
A Well, as I told you, we had the meeting in Omaha where the fuel surcharge came up with the UP.
Q And, again, you don't know when that was?
A Not off the top of my head.
Q All right. Any other conversations about

Page 80

fuel surcharges?
A No.
Q Have you ever had a face-to-face meeting with another representative of another railroad about fuel surcharge?
A Face-to-face -- well, when I was in Omaha, obviously, I was face-to-face.
Q Any other face-to-face?
A None that I know -- I'm aware of.
Q All right. I'm going to come back to all of these conversations, we're going to go over these in detail, but I want to proceed chronologically here. And I want to keep you on the time frame of the first two weeks of March of 2003 right now.
Okay. When did you first meet Jack Koraleski; do you know?
A I don't know.
Q Was this meeting on March 13th of 2003, was that the first time you had met him?
A Oh, no, I've known Jack -- if I was guessing, and that's all I'm doing is guessing, I've known Jack since 2000, 2001. I've known of him before that, but not really know him. Met him, you know, just physically met him.
Q When you say you've known him, is that in

Page 109

A I see that.
Q Do you know if that discussion occurred?
A I don't -- I don't remember. I don't recall.
Q Did you participate in any such discussion at this meeting?
A That, I don't recall.
Q Do you remember being at this meeting?
A Actually, I don't remember being at the meeting.
Q Do you remember a meeting at all between BNSF and CSX on April 1st, 2003, after you got back from vacation?
A No, I don't remember about the specific meeting. I know that we were having strategic alliance meetings periodically.
Q All right. Do you have any facts, as you sit here today, to suggest that you didn't attend this meeting?
A No, I don't.
Q And was it your practice to attend all of the CSX/BNSF alliance meetings?
A I tried to, yes.
Q Did you have any conversation with Mr. Giftos after this meeting in which he reported to

Page 110

you on what he discussed with Mr. Lanigan about fuel surcharges?
A I don't recall it.
Q Okay. As you sit here today, do you have any facts about what Mr. Giftos and Mr. Lanigan may have discussed concerning fuel surcharges at this meeting?
A I do not.
Q Do you know why they'd be discussing fuel surcharges at this meeting?
A The only thing I can imagine is, is that we do a lot of interline business with the UP, both coal, intermodal and merchandise, so, again, it gets back to you've got to get them to -- on their eastbound pricing, you have to agree on their methodology, and on your westbound pricing, you need to agree. And it's simple if you agree to the same things.
Q I don't see any lawyers attending this meeting, according to this agenda, do you?
A I don't see any on here, but it was our practice, whoever the host was, had to have a lawyer at the meeting as a rule of thumb.
Q Okay. Now, this meeting on April 1 of 2003 with the BNSF came about two weeks after the CSX had announced its new fuel surcharge program on

Page 111

March 20th, correct?
A That's right.
Q Did you have discussions with anyone about fuel surcharges at this meeting?
A Not that I recall.
Q Now, Mr. Gooden, prior to the time that CSX announced its fuel surcharge, new fuel surcharge on March 20th of 2003, at any point prior to that meeting, did you have a discussion with anyone outside of CSX about fuel surcharges?
A Prior to?
Q The announcement on March 20th, 2003.
A Not that I recall.
Q Did you have discussions with anyone from the UP about fuel surcharges prior to March 20th, 2003?
A Not that I recall.
Q Did you have any conversations with anyone from the Norfolk Southern about fuel surcharges prior to March 20th, 2003?
A No, sir, not that I recall. You've got to remember what I said earlier. Mike Giftos was handling this.
Q I understand. And prior to March 20th of 2003, did you have any conversations with anyone from

Page 112

BNSF about fuel surcharges?
A Not that I recall.
Q And when you say you don't recall, are you saying that you could've had discussions but you just don't remember or are you affirmatively saying no such discussions ever occurred?
A I'm saying two things, actually, in my mind: One is I'm under oath here, so I don't want to -- I've already learned in practicing for this deposition that I can't remember what went on every day in 2003. Just like when you asked me exactly when was I on vacation. I mean, I've got a general idea. So, I don't want to say something emphatically and then you produce a document that says, well, here you were, and I can't remember that. So that's how I'm answering it.
Q All right. So when you say you don't recall any discussions with other railroads prior to March 20th --
A Right.
Q -- you could've had such discussions, you just don't remember?
A Could've possibly, but I would highly doubt it. Highly doubt it.
Q Did you have discussions with Mr. Giftos prior to March 20th of 2003, in which Mr. Giftos

shared with you what he had discussed with other railroads about fuel surcharges?
A No. Essentially, when Mike and I would talk about the fuel surcharge, it was more from the standpoint of are you getting -- are you, Clarence Gooden and your team, getting proper coverage for this thing, make sure that you're not making any allowances, you know, exceptions here in this policy, you need to be disciplined in your approach to this thing, those type of things. But not as to whether or not he had negotiated something with another railroad.
Q Did you ever participate in a discussion about whether there should be an industry standard fuel surcharge?
A I have never participated in that.
Q Did you ever discuss that with anyone internally at CSX?
A I have discussed that internally at CSX.
Q With whom?
A With both Frank Onimus, Ed Jenkins, John Couch, Fredrik Eliasson.
Q When did that take place?
A Oh, Lord, when it -- we first started coming out with fuel surcharges.
Q This would be the new -- the new fuel



surcharge in March?
A This would probably be back in 2000, 2001, '2, '3, somewhere in there.
Q And what was said on the subject of an industry standard fuel surcharge back then?
A Wouldn't it be nice if the STB could just come out and dictate what the fuel surcharge would be and then everybody just comply with that, and we compete on service, we compete on line haul rates, we compete on value added, things that we could give to the customers, and nobody have these different surcharges.
Frankly, a problem that we were having at the time was everybody had their different fuel surcharge, we had different demurrage agreements internally at CSX, we had different rate escalators at CSX and it was becoming an administrative nightmare trying to keep all these different plans and programs separated. Our back office expense was out the roof. And we were trying to get it standardized, if anything.
Q And did you believe at the time that having an industry standard fuel surcharge would benefit the industry?
A No, I thought it would have simplified work



for the customers myself, because they had the same problem in reverse. Most -- most of the rail-based customers did not have the ability to process fuel surcharges in their computer systems, whereas, the truck-based guys did.
Q So you thought it would be a good thing if an industry standard fuel surcharge were to be imposed?
A It would've been -- that would've been administered and put out and determined by the STB.
Q And did you express that view in your conversations back in 2000/2001?
A I'm sure I did.
Q Did anyone express a different view?
A There were so many views in 2000/2001, I'm sure somebody did.
Q Did you have discussions about an industry standard fuel surcharge in the spring of 2003?
A I don't recall having one.
Q Let me show you what's previously been marked as Kyei Exhibit 6.
Now, Mr. Gooden, I know that this is not a document that you've probably seen. It's produced by BNSF. So, let me ask you first, do you know a gentleman by the name of Tom Jacobowski from BNSF?



A Not off the top of my head.
Q Okay. Look down at the bottom of this. There's an e-mail there that talks about a minutes of a meeting and attendance where a bunch of people, and then there's a thing that says: New action items are in bold. All right?
And one of the action items was as follows: Tom J. provided feedback from rail carriers regarding the concept of establishing an industry-wide fuel surcharge formula. Rail carriers unanimously chose not to act on an industry standard fuel surcharge. Do you see that?
A I see that.
Q And this is in the spring of 2001. I'm sorry, the spring of 2000. Do you see that?
A No, it's in the spring of 2001.
Q Well, but these are minutes from a meeting in the spring of 2000.
A So, a guy wrote minutes in March of 2001 --
Q You may be right. There may be a problem with the date here. Okay. Let's go with spring of 2001. That looks like the date, you're correct. Yeah, it's a typo on the e-mail.
All right. But my question to you is this, do you recall that rail carriers all sent

been before that even.
Q But when you enacted the new fuel surcharge in March of 2003, the company's policy was to apply that fuel surcharge as broad as possible; isn't that correct?
A That was the policy, to apply it as broad as possible.
Q And you wanted to include that published fuel surcharge in as many of your shipper contracts as possible, correct?
A That is correct.
Q And you wanted to apply that fuel surcharge to as many shipments, as many carload shipments as possible, right?
A Oh, if we applied it to as many shippers, it would've applied to as many carloads.
Q And you wanted to apply that fuel surcharge that was announced on March 20th of 2003, to apply to as much as your revenue as possible, right?
A I don't understand.
Q Okay. Well, it was --
A If I'm applying it to all my customers, I'm de facto applying it to all the cars and revenues, right?
Q Okay. Well, I don't know that that's true.



A Why wouldn't it be?
Q For lots of reasons, but we don't need to debate it. Okay. So -- and then, when the AIILF was promulgated, it became your policy to apply the AIILF with a fuel surcharge instead of the RCAFU; is that correct?
A That's correct.
(Exhibit No. 18 marked for identification.)
Q All right. Now, let's look at our next exhibit, Exhibit 18. It's a one-page e-mail bearing Bates 000108545.
Do you recognize this as an e-mail from Kyle Hancock to a number of people within CSX?
A Yes, I agree with that.
Q Okay. And Mr. Hancock was the vice president of industrial and agricultural products, right?
A That's right.
Q And he writes in this e-mail what he understands to be the company's policy with respect to pricing. Do you see that?
A That's right.
Q And he states: No one is authorized to approve a renewal with an increase of less than 10 percent. Do you see that?



A I see that.
Q Okay. Does that accurately state the policy as of this time?
A I think it does, because if you'll notice in Dean's e-mail that he sent out, he had to approve 10 percent and I had to approve 8 percent. And that's the same thing Kyle is in effect saying here is, no one is -- can do it for less than 10 percent, what he's implying there, is without Kyle okaying it, then Kyle would have to come to me if it was less than 8.
Q And then he states the policy to be: No one is authorized to approve a deal without a fuel surcharge?
A That's right.
Q And any exception to that had to come through you, correct?
A That's right.
Q And it was your intention to have very, very few exceptions; isn't that correct?
A I was going to try to have zero as my goal.
Q And were exceptions created?
A They were.
Q How frequently?
A Very infrequently.
Q So, is it fair to say that from the time



this policy was announced with respect to the new fuel surcharge, that CSX applied this fuel surcharge to a substantial number of its customers and very, very few exceptions were allowed?
MS. KIRMAYER: Objection.
BY MR. BROCKETT:
Q Is that fair?
A Well, we applied it to as many of our customers as we had contracts that were coming up for renewal.
Q I understand.
A And we tried to limit the number of exceptions that we granted, where we could, but there were exceptions granted or partial fuel surcharges that were granted.
Q Can you remember how many exceptions you approved?
A Not an exact number, no.
Q Would it be less than ten?
A I'm not sure, but it would be a small number.
Q And you were the one who established these policies in consultation with Mr. Ward; is that fair?
A No, actually not. We established most of these policies -- if you'll notice in Kyle's e-mail,

Page 193

he talks about the fact that he and his peers had agreed, so we would do this in a round table-type discussion, give and take and debate, and we also had our finance people and our marketing services people involved in this.

Q Okay.

A But you've got to remember at this time, CSX had gone through a series of changes. And if you'll recall in one of the exhibits that you gave me about in Giftos's world there was the flavor of the month. CSX was notorious over the past, back in the '90s, about changing frequently. There had been ten chief commercial officers in the decade that preceded myself coming into the job. And so, the company was trying to stable things -- stabilize things. We were also trying to change culture at the time. And that culture was that in order to get things across, policies across, that needed to be done and implemented, you had to discuss that and communicate that with people seven times in seven different ways to get them to understand that this is what we're going to do. We're going to try to maintain pricing discipline and discipline in the administrative areas.

Q Thank you. Now, did you also instruct the marketing people or discuss with them that they should

Page 194

not trade off base rate for the fuel surcharge?

A I don't understand the question.

Q Well, did you instruct them that they should not go lower the base rate in exchange for the customer agreeing to a fuel surcharge? Such that if the fuel surcharge is 16 percent, they lower the base rate by 16 percent, you've nullified the effect of the surcharge, right?

A I don't recall ever specifically having that conversation with anybody, but you're -- in my world, you would be correct in that, why would you do that.

Q Okay. You didn't -- in your mind, it was not permissible for salespeople to reduce the base rate in exchange for getting a shipper to agree to a fuel surcharge?

A I'd have to look at it as a case-by-case basis, because it would be depending upon the size of the account, how much I was reducing the base rate by, what was my contribution per car date on that freight, how sustainable was that freight over time, what were the modal competitions to that freight over time. So, I wouldn't have made a decision like that based on any one factor.

Q Well, your policy from the middle of '03 till '08 was to increase the base rate, to the extent

Page 195

you could, for all shippers; isn't that fair?

A My policy has always been to increase the base rate to whatever the market conditions would get me to.

Q And do you -- can you recall any instance from 2003 to 2008 where CSX agreed to reduce the baseline haul rate of a shipper in a contract?

A Off the top of my head, I can't.

Q Okay. And you would have to certainly have approved that, would you not?

A I would. And I'm sure that there's those that I approved, I just -- you asked me if I could recall a specific one, the answer is I've seen too many of them over the last, you know, ten years to remember all of them, but I'm sure that I did.

Q Can you give me an estimate of how many instances you approved of a shipper getting a reduction in his base rate based on a renewal during this period?

A More than once, more than a few, multiple times.

Q A dozen?

A I don't know how many.

Q But can we agree it would've been against your policy to make such an exception?

Page 196

A It would've been against the policy for anybody other than me to make the exception, it wouldn't have been against my policy for me to do it. It would've been against my principles.

Q Can you think of any instance, as you sit here today, when someone came to you and said, Mr. Gooden, we want to reduce the base rate so that we can get this surcharge imposed?

(Exhibit No. 19 marked for identification.)

A No.

Q Let's mark as our next exhibit -- what are we up to -- Gooden 19, some e-mails bearing Bates 86200 through 86202.

Now, the first page of this is an e-mail from Dean Piacente to a number of people, including yourself. Do you see that?

A I see that.

Q And it's dated June 5th, 2006, right?

A That's right too.

Q And Mr. Piacente's writing to you, and he says: Clarence, we have very clear instructions with our team to pursue fuel surcharge. Right? Do you see that?

A Yeah, I see that.

Q And that's the fuel surcharge that the

with you, correct?
A That is correct.
Q Does looking at this e-mail help you date when you had that call with Mr. Lanigan?
A No.
Q Okay. To your best of your recollection, when did you receive this call from Mr. Lanigan?
A I hate to hazard a guess, because I just don't remember it.
Q Can you give me a year?
A Yeah. If you told me it was in the year 2005 or if you told me it was in the year 2006, I wouldn't argue with you on either year.
Q All right. Now, how did this call come about?
A He called my office and asked my secretary if we could set up a time that he could call, or I guess maybe his secretary called, I'm not sure who called. My secretary said John wanted to set up a time to talk to me about some changes that he wanted to propose in the fuel surcharge. So, she gave him the time. I called our attorneys, Paul Hitchcock and --
MS. KIRMAYER: Don't -- okay. Go ahead. Sorry. I was just going to instruct you not to



disclose communications with Mr. Hitchcock. Maybe you weren't going to, and I'm sorry.
THE WITNESS: No, I was just going to say I had the lawyer --
MS. KIRMAYER: Go ahead.
THE WITNESS: -- in the room.
BY MR. BROCKETT:
Q Okay. So then, am I hearing you correctly that you called him back with your lawyer?
A Actually, he called me with his lawyer.
Q And that was at the time you set up for this call?
A That's right.
Q Okay. So, this call included yourself, right?
A Right.
Q Mr. Lanigan?
A That's correct.
Q And who was the lawyer you had at the meeting -- at the call?
A Paul Hitchcock.
Q Who's he?
A He's a lawyer for CSX.
Q And did Mr. Lanigan have a lawyer on the phone?



A Right.
Q Who was that?
A I don't recall their name.
Q Okay. And what was discussed at this meeting, this call?
A John Lanigan wanted to go to a mileage-based fuel surcharge and we didn't want to do that.
Q What did Mr. Lanigan say to you on this call?
A We'd like to go to a mileage-based fuel surcharge. Are you guys agreeable to that? I responded no. And there was an awkward silence. He said, you know, we can put it in on our westbound -- on our eastbound shipments unilaterally. I said, yes, I know that. He said, then that's what we're going to do and you guys will keep the -- your current fuel surcharge on your westbound origination. I said, that's fine with me. We hung up the phone, and that was the extent of the conversation.
Q How long did it last?
A Not long. Not longer than what I just did.
Q And do you recall him saying anything else?
A No. I mean, it was a polite, professional conversation, but, you know, he had to know what our position was going to be before he called, because



that would've been his position had the shoes been reversed.
Q And you didn't want a mileage-based fuel surcharge because your routes are shorter than the BNSF routes; is that correct?
A That's right.
Q Was that the sum and substance of the conversation?
A That was it.
Q Did the lawyers say anything on the phone?
A No.
Q Did you have any further discussions with Mr. Lanigan about this concept?
A Not ever since that day.
Q And, again, you don't recall the subject even ever coming up at NEMC?
A I don't.
Q Did you have any conversations with Mr. Lanigan about fuel surcharges of any kind outside this -- of this conversation?
A Let me think about that just a second.
I saw a document yesterday in which I was at a meeting in which the question was brought up by the BNSF that -- whatever their percentage of fuel surcharge coverage was. In that document there was no

Page 257

program's in place. We also have a few limited ones, with [redacted] contract being one, that has the old WTI basis in it. And in the case of [redacted] it's high. And then we have a few legacy contracts still left around in coal now that's got $23, but they're sort of dying out.

Q Okay. So, to wrap up this point, am I hearing you correctly that there was never a change in the fuel surcharge to a $64 trigger, right? Is that correct?

A That's right.

Q There was never any formal plan about rebasing rates and changing fuel surcharge, right?

A There was a plan.

Q But it was never implemented?

A Never implemented.

Q Okay. But you, Clarence Gooden, did allow certain rebase contracts as limited exceptions?

A To try them out, see how it worked.

Q And when you did that, you tried to make sure that the rebase contracts were revenue neutral?

A Absolutely.

MR. BROCKETT: Okay. All right. Well, we're almost done. Let's have another break. I'm sorry about this, just want to powwow with

Page 258

these guys.

THE VIDEOGRAPHER: Off record at 3:51.

(Brief recess.)

THE VIDEOGRAPHER: Back on record at 4:01.

MR. BROCKETT: Mark as Exhibit 27 the documents produced by CSX, CSX 78 through CSX 87.

(Exhibit No. 27 marked for identification.)

BY MR. BROCKETT:

Q Okay. Now, this is an e-mail dated March 2nd, 2007, sent to all sales and marketing people; is that correct?

A That's right.

Q And who is Shirley Farrell?

A She also works in marketing services.

Q Okay. Now, this is an announcement of fuel surcharges as a result of the STB decision; is that correct?

A Well, let me read it real quick. Yes.

Q And among the documents are, one, a customer letter, right?

A That's right.

Q And if you turn to the last attachment in this whole packet, at the end, there's a customer letter, a draft customer letter, dated March 2nd, 2007, right?

Page 259

A That's right.

Q Okay. And if you look in the second paragraph, it states that -- at the last sentence: As a result of these efforts, CSXT will be converting all its public freight rates to a new fuel surcharge based on rail miles effective April 23rd, 2007. Right?

A Right.

Q Now, does that refresh your recollection that the new fuel surcharge program that was announced at this time, as announced applied only to public freight rates?

A Let me read this letter.

Because -- it doesn't refresh my memory, because when I get into the pages that are before that, it looks to me like what we're also saying on our question and answers internally for our people is that, you know, if we quote new interline rates, that we'll use the new fuel surcharge.

Q Well, let me ask you this. Did this surcharge that's announced as a result of the STB decision, this didn't supplant the fuel surcharge program for private contracts that had been in effect since June 1st of 2003, did it?

A Not until the contract expired.

Q So, when the contract expired, it's your

Page 260

testimony that the only fuel surcharge program you then had was this one announced here, you didn't have the old program anymore?

A I think -- I'm doing this from memory, but I think you could -- you had to go to the new one, or if you elected to, you could keep the old one. You had to make that decision.

Q You the customer?

A You the customer.

Q Okay. So, the old program, the old 23 WTI announced on June -- effective June 1 of 2003, remained an option for customers to use, even after the STB decision, correct?

A And for some people, it was rebased to $46, yes.

Q Okay. But it remained available, rebased or original form, to customers even after the STB decision?

A That's my memory.

(Exhibit No. 28 marked for identification.)

Q All right. Now, I want to show you a document produced by CSX that has a Bates stamp 000153185?

A Now, this one is dated 2003; is that correct?

Page 261

Q Correct. Yeah. It's from John Couch, dated March 17th, 2003. This is back to that March 2003 time period, okay. Are you with me?
A I'm with you.
Q And this is some e-mails about an article that came out about how fuel surcharges were resulting in big railroad profits. Do you remember that?
A I don't remember it, but I see it's from Escalation Resources, so, it would make sense that's what it is.
Q Who's Escalation Resources?
A They're an outfit, I think that's in Gaithersburg, Maryland, that does this kind of work.
Q What kind of work?
A Bad work. Their numbers are always wrong.
Q Well, I just want to direct your attention to on the third page in this exhibit, someone's put together some talking points here about how to respond to Escalation Resources. Do you see that?
MS. KIRMAYER: I'm just going to lay an objection on the record, Counsel, because I've been looking for any indication -- and I see that the Bates numbers are consecutive, but I'm looking for some indication in the cover e-mail that this actually was an attachment, and I'm not

Page 262

finding one. I know you've presented all these documents as a single document, and I don't have a basis to believe that or not believe it, but I indicate -- as I indicated, there's no indication that there's an attachment to the e-mail chain.
BY MR. BROCKETT:
Q Are you with me on the third page? Someone's put together these talking points?
A Right.
Q Okay. And one of the talking points here is that: Studies have shown that, in aggregate, captive shippers don't pay higher prices than noncaptive shippers. Do you see that?
A I see that.
Q Are you aware of those studies?
A I'm aware of some studies that have been --
Q Has that been -- I mean, you're a guy that's been in this business 40 years. Has it been your experience that captive shippers really don't pay higher prices than noncaptive shippers?
A It's been my experience that not as many of our shippers are captive as people perceive that there's captive shippers. People have alternatives. We have a shipper right across the river over here right now that has us in a rate case that is making a

Page 263

case that there's no viable mode of transportation to go to a power plant that's right down this river here less than ten miles, yet they run navigable ocean barges up and down this river every day. The power plant's located on the bank of the river that's 11 miles wide. So, we've got that all the time.
Q Sure. So your experience in 40 years in this industry suggests that there really aren't that many captive shippers, or at least not as many as the shippers want to say?
A Right.
Q And what about the pricing, has it been your experience from 40 years in this industry that captive shippers really don't pay higher prices than noncaptive shippers; is that true?
A I don't think they pay -- across the board, I wouldn't say they pay any more than noncaptive shippers.
Q And can you give us an estimate, based on your 40 years in the industry, of how many shippers CSX has that you believe are truly captive?
A Oh, Lord. Not off the top of my head, not with any degree of accuracy. It changes all the time.
Q But is it a very small -- would you characterize it as a small number of shippers?

Page 264

A Significantly less than half.
Q 20 percent?
A Don't know.
MR. BROCKETT: Okay. All right. So you wanted to substitute 13, which is a redacted version of this. So, let me show him this exhibit and we'll substitute this for 13.
(Exhibit No. 13 marked for identification.)
MS. KIRMAYER: Can we put a new sticker on it? Did you want to put a new --
MR. BROCKETT: There is a sticker on it.
MS. KIRMAYER: Oh, there is? I'm sorry. No, there's not.
MR. BROCKETT: It's in the right corner.
MS. KIRMAYER: Oh, the one you have.
MR. BROCKETT: Right here. Let me have that one.
MS. KIRMAYER: Okay.
MR. BROCKETT: I don't have --
MS. KIRMAYER: Can I have one? Okay.
BY MR. BROCKETT:
Q So, this is Exhibit 13, redacted. I haven't shown you this before, but this is a BNSF/NS senior team meeting agenda on March 18th, 2003. Do you see that?

# ERRATA SHEET:

Case Name: In re: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION
Dep. Date: July 16, 2010
Deponent: CLARENCE GOODEN

## CORRECTIONS:

| Pg. | Ln. | From | To | Reason |
|---|---|---|---|---|
| 18 | 15 | merging | emerging | Incorrect Transcription |
| 37 | 10-15 | $5B | $1B | Incorrect Transcription |
| 37 | 22 | $5B | $1B | Incorrect Transcription |
| 39 | 21 | insert "as those words are used in this document" after "rail share" | | Clarity |
| 55 | 2 | the second "is" | are | Correction |
| 76 | 12 | don't | doesn't | Incorrect Transcription |
| 126 | 16 | ending and | end-to-end | Incorrect Transcription |
| 126 | 18 | insert "I" after "I think" | | Incorrect Transcription |
| 175 | 5 | ALLLF | AIILF | Incorrect Transcription |
| 182 | 14 | in | on | Correction |
| 186 | 25 | AL-ALIIF | AIILF | Incorrect Transcription |
| 211 | 1 | got | have | Correction |
| 212 | 17 | fuels | fuel | Incorrect Transcription |
| 254 | 11 | was | were | Correction |
| 266 | 8-9 | to date | today | Incorrect Transcription |

Subscribed and sworn to before

me this ___ day of ____________, 20___.

Clarence Gooden

CLARENCE GOODEN

Clarence Gooden

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT SURCHARGE MDL No. 1869
ANTITRUST LITIGATION
Misc. No.
07-489 (PLF/AK/JMF)

This Document Relates To:
ALL DIRECT PURCHASER CASES

VIDEOTAPED DEPOSITION OF CSX TRANSPORTATION, INC., by and through its designated corporate representative,
EDWARD D. JENKINS
Taken on behalf of Plaintiffs

DATE TAKEN: July 27, 2011
TIME: 9:26 a.m.
PLACE: McGuireWoods LLP
50 North Laura Street, Suite 3300
Jacksonville, Florida 32202

Examination of the witness taken before:
Bobbie A. Umstead
Registered Professional Reporter
Florida Professional Reporter
- - -
"HIGHLY CONFIDENTIAL"



A P P E A R A N C E S

ERIC L. CRAMER, Esquire
-and-
MATTHEW P. McCAHILL, Esquire
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
ecramer@bm.net
mmccahill@bm.net
215-875-3000
-and-
STEIG D. OLSON, Esquire
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
steigolson@quinnemanuel.com
212-849-7000
Appearing on behalf of Plaintiffs.

DAVID D. CROSS, Esquire
-and-
LUKE van HOUWELINGEN, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue N.W.
Washington, D.C. 20004-2595
202-624-2500
dcross@crowell.com
lvanhouwelingen@crowell.com
Appearing on behalf of
Defendant CSX Transportation, Inc.,
and the witness.



A P P E A R A N C E S (C O N T I N U E D)

TARA L. REINHART, Esquire
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue N.W.
Washington, D.C. 20005
202-371-7630
tara.reinhart@skadden.com
Appearing on behalf of
Defendant Norfolk Southern.

ALSO PRESENT:

ERIN O'BRIEN, Esquire, CSX Transportation

KHALID EL-MUSRATI, Videographer, Legalink Manhattan



I N D E X


Deposition of EDWARD D. JENKINS Page No.
Direct Examination By Mr. Cramer.............. 7
Cross-Examination By Mr. Cross................ 237
Reporter's Certificate........................ 247
Certificate of Oath........................... 248
Errata Sheet (to Be Forwarded Upon Execution).. 249


CSX EXHIBITS INDEX


| No. | | Page No. |
|---|---|---|
| Exhibit 1 | Plaintiff's Revised Notice of Deposition under Rule 30(b)(6) to Defendant CSX Transportation, Inc. | 11 |
| Exhibit 2 | Defendant CSX Transportation, Inc.'s Supplemental Objections and Responses to Direct Purchaser Plaintiffs' Second Set of Interrogatories | 35 |
| Exhibit 3 | Document titled "Ed Jenkins, AVP Market Strategy & E-Business," bearing Bates stamps CSXFSC000200606 through 608 | 49 |
| Exhibit 4 | CSX Code of Ethics | 100 |

Calls for privileged information.
BY MR. CRAMER:
Q Are you going to follow the direction of your counsel and not answer that question?
A Yes.
Q How long was your conversation with counsel about the substance of the deposition during the break?
A Again, just -- no answer.
Q How long was it?
MR. CROSS: You can -- I'm sorry. You can answer how long it was.
THE WITNESS: Okay.
Just three or four minutes.
BY MR. CRAMER:
Q Let's talk about the antitrust compliance policy again.
A Yes, sir.
Q Were there -- did CSX have limitations on the types of communications that CSX employees could have with other railroads pursuant to that policy?
A Well, CSX clearly -- you know, there's -- CSX expects its employees to follow the law, so it would clearly outline that to agree on price with a competitor for a specific price for a move that we're competing on is clearly something you don't do, clearly a violation



of antitrust.
On the flip side is is employees, when engaged in dialogue for the purpose of developing interline business, you know, know that there's an area that's allowed and an area that's not allowed.
Q Explain that last statement, that there's -- when you're having a communication about potential interline business, there's discussions that are allowed and discussions that are not allowed?
A No. I'm just saying that what is allowed is to have the appropriate dialogue, dialogue around interline communications, as opposed to the first area that I described to you.
Q So CSX policy is that its employees are allowed to communicate with other railroads about price only when it pertains to a particular interline movement?
MR. CROSS: Object as misstates testimony.
BY MR. CRAMER:
Q Okay. So tell me where that's wrong.
A Could you ask your question again? I don't --
Q Does CSX policy limit communications between CSX employees and other railroads to only those communications that pertain to a particular interline movement in which both railroads could practically



participate?
MR. CROSS: Object as vague, "practically participate," and as to "interline movement."
BY MR. CRAMER:
Q Go ahead and answer.
A There was a lot you put in there. So you're asking me what -- there was a lot you threw into the question. So you're asking me what CSX employees are allowed to do or not allowed to do, I guess?
Q Well, I'm trying to figure out the dividing line between --
A Right.
Q -- what CSX employees are allowed to do under the policy with regard to communications about price with other railroads and what they're not.
MR. CROSS: And this is the '02/'04 time frame.
MR. CRAMER: Yes.
THE WITNESS: Yeah, in '02.
Well, as I said, what they're not allowed to do is talk with a competitor about a specific move and agree on -- to agree on a price for a specific move that you're competing for with a competitor railroad.
What they are able to do is talk with an



interline railroad partner about price and other elements of price for the purpose of interline business development.
BY MR. CRAMER:
Q Is the fuel surcharge an element of price, according to CSX policy?
A Yes.
Q Now, the -- the railroads with whom CSX employees would be communicating are both operating competitor movements and also potentially interline movements; right?
MR. CROSS: Objection, misstates facts.
THE WITNESS: Could you ask that question again?
BY MR. CRAMER:
Q For example, if CSX is communicating with NS about a potential interline movement, CSX also competes against NS; correct?
MS. REINHART: Objection, vague and overbroad.
BY MR. CRAMER:
Q On other movements.
MS. REINHART: Same objection.
BY MR. CRAMER:
Q Can you answer the question?
A Sir, could you ask the question one more time?

Because I -- I want to make sure I --
Q All right. Let me --
A -- answer as you asked it. There were objections, so --
Q Let me ask it a different way. Did CSX's policy during this period permit its employees to communicate with other railroads -- strike that.
Did CSX's policy during this period allow CSX's employees to have generalized discussions of fuel surcharges with other railroads?
MR. CROSS: Object as vague, "generalized discussions."
THE WITNESS: All right. CSX -- CSX employees, when engaged in interline business development discussions, are able to talk about price, fuel surcharge, as it applies to that interline business development.
BY MR. CRAMER:
Q Only as it applies to a particular interline business development; is that right?
MR. CROSS: Objection, misstates testimony, also vague.
BY MR. CRAMER:
Q Well, let me rephrase the question. CSX policy is that CSX employees can communicate with other



railroads about price or an element of price only when it pertains to a particular interline business?
A No, CSX -- see, there's a number of -- I'm trying to be responsive, but there's like a lot of words that I kind of take issue with.
CSX policy allows our employees to talk with competing railroads -- I mean, with -- excuse me -- with partner railroads, not competing railroads -- for the subject of interline business development. And those discussions may be a specific move; they may be more general opportunity as you're looking into a market that you're trying to develop. So it may not always be on a specific move.
Q Now, the -- you mentioned partner railroads. What are those?
A We call it -- partner railroads meaning interline partner railroads. When I think of UP and BN, you have two networks that match up end to end. So as I view both of those railroads, I -- in every way that I think about them, I think of them as interline partner railroads, whereby what we do in working with them is usually on joint line business.
I actually can't think of a move, although I'm sure it could exist -- but sitting here today, I can't think of a move where we're competitors, because BN and



UP are western railroads. We are partner -- interline partners in the business that we work on together.
So that's what -- an interline partner is someone that you joint line work together with for an entire movement for our customers.
Q Can you be an interline partner with a railroad that you compete against, under CSX policy?
A Well, there's two -- you're asking me a question about can -- CSX policy and whether a railroad can compete and be a partner with a railroad is really two different things. So can -- if you look in the eastern U.S., CSX and NS compete on a lot of moves, but we also have traffic that moves interline where we both are part of the movement on behalf of the customer. So does that answer that question?
Q Okay. So NS, in your view, is both a competitor and a potential interline partner?
MR. CROSS: Object as vague and overbroad.
THE WITNESS: Depending on the move and the customer you're talking to, CSX can be -- NS could be competing on that move, but there also can be examples of where CSX and NS are working as interline partners to put together a service and a move on behalf of the customer.
BY MR. CRAMER:



Q All right. So let's talk about CSX policy with regard to communications about price or elements of price with NS.
A (Nodding head.)
Q What are the limitations that CSX policy sets on communications about price or an element of price between CSX employees and NS employees?
A Well, it would really be the same answer as I gave you earlier regardless of the railroad, is that CSX policy is that employees should not agree on price with a competitor railroad on a specific move for which we're competing, direct head-to-head competing. CSX employees are able to talk to the employees on another railroad, of another -- and call it interline partner railroad -- for the purposes of interline business development.
Q And --
A And whether that's price or components of price. And that -- so that applies whether you're applying it to NS or UP, BN, the other roads that we've mentioned.
Q So the policy is that a CSX employee can talk to an NS employee about price or an element of price only when that discussion relates to potential or actual interline movements; is that right?
MS. REINHART: Objection, misstates his

**ERRATA SHEET:**

Case name: In re: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

Dep. Date: July 27, 2011

Deponent: **30(b)(6) (Edward Jenkins)**

**CORRECTIONS**

| Page | Line | Change | Reason |
|---|---|---|---|
| 14 | 6-7 | Insert "including" and "and other documents produced in this case" and delete "that show --" and "I guess": "materials including some prior exhibits that have been used in previous depositions and other documents produced in this case." | Correction |
| 18 | 18:21-23 | Change "No. They were pretty much all exhibits within the materials that counsel was able to provide me" to "Yes. The documents within the materials that counsel provided me included exhibits to prior depositions and other documents produced in this case." | Correction |
| 19 | 2-15 | See correction on page 18. | Correction |
| 23 | 15 | Change "prepared [sic]" to "provided" | Correction |
| 28 | 1 | Change "expert" to "fact" | Correction |
| 29 | 21-22 | Change "NEMSI [phonetic spelling] - NEMSI" to "NEMC" | Clarity/transcription error |
| 34 | 25 | Remove "-- he --" and change "expert" to "fact" | Clarity/correction |
| 57 | 16 | Insert, after "website": "and with Electronic Data Interchange (EDI)" | Clarity/correction |

| Page | Line | Change | Reason |
|---|---|---|---|
| 57 | 19 | Insert, after "website": "and with EDI" | Clarity/correction |
| 65 | 18-19 | Replace first "that" with "on what" and delete "in conjunction with": "with the interline carrier on what that price is before you implement it" | Clarity |
| 75 | 1 | Replace "partner" with "partners" | Clarity/correction |
| 87 | 19 | Change "tag" to "Technical Advisory Group (TAG)" | Transcription error/clarity |
| 94 | 1 | Delete "They can talk about vague -- " | Clarity |
| 113 | 4 | Insert "a": "provided on a day-to-day basis" | Clarity/transcription error |
| 120 | 25 | Insert "was": "complete meaning was that would be in there" | Clarity |
| 143 | 15 | Change "tag" to "TAG" | Transcription error |
| 146 | 8 and 14 | Change "tag" to "TAG" | Transcription error |
| 151 | 12 | Change "he was" to "he, and his department, were" | Clarity/correction |
| 152 | 4 | Change "would" to "could" | Correction |
| 152 | 15 | Insert "certain" after "would be" | Clarity/correction |
| 152 | 24-25 | Delete "is" and insert "is" after "to", and change "tag" to "TAG": "the concurrence here being typically referred to is in the guise of the IRM TAG" | Clarity/correction/ transcription error |
| 165 | 23 | Insert "the": "As I've said earlier, the two" | Clarity |

| Page | Line | Change | Reason |
|---|---|---|---|
| 170 | 6 | Delete "in-distant time," | Transcription error/clarity |
| 209 | 6 | Change "indice [sic]" to "index" | Correction |
| 209 | 20 | Change "indice" to "index" | Correction |
| 211 | 24 | Change "indice" to "index" | Correction |
| 212 | 9 and 22 | Change "indice" to "index" | Correction |
| 212 | 15 | Delete "-- in latter years, once -- in latter years," | Clarity |
| 216 | 12 | Change "to" to "than" | Correction |
| 216 | 24 | Change "indice" to "index" | Correction |
| 232 | 6 | Change "indice" to "index" | Correction |
| 234 | 6 | Change "clients have" to "Clarence has" | Transcription error |
| 236 | 8 and 16 | Change "indice" to "index" | Correction |
| 239 | 1 | Change "NEMSI" to "NEMC" | Transcription error |
| 243 | 4-6 | Change "So, no, I would say that pretty much this -- you know, No. 1 only had to do with discussion with inside counsel" to "I also asked Andy Strok about antitrust training. He told me that everyone in the Automotive Services Group is expected to participate in CSX's ethics training and mandatory antitrust training, and he knows of no exceptions to that in his group." | Correction |
| 243-244 | 243:21-244:2 | See correction on page 243. | Correction |

| | | | |
|---|---|---|---|
| 244 | 15 | Delete "indice or" | Clarity |

EDWARD JENKINS

9/12/11

DATE

HIGHLY CONFIDENTIAL; For Attorney's Eyes Only
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re:

RAIL FREIGHT FUEL SURCHARGE MDL No. 1869

ANTITRUST LITIGATION Misc No. 07-489(PLF/AK/JMF)

------------------------------/

VIDEOTAPED DEPOSITION OF

CLYDE V. McINTYRE, JR.

Taken on behalf of the Plaintiffs

DATE TAKEN: Thursday, February 18, 2010
TIME: 9:09 a.m. - 6:24 p.m.
PLACE: 50 North Laura Street, Suite 3900
Jacksonville, Florida

Examination of the witness taken before:

Luan G. Wilson, Registered Professional Reporter
Florida Professional Reporter

Revised Transcript



HIGHLY CONFIDENTIAL; For Attorney's Eyes Only
APPEARANCES:

For the Plaintiffs:

ERIC L. CRAMER, Esquire

Berger, Montague
1622 Locust Street
Philadelphia, Pennsylvania 19103
215.875.3009
ecramer@bm.net

PAUL M. DONOVAN, Esquire

LaRoe, Winn Moerman & Donovan
1250 Connecticut Avenue NW, Suite 200
Washington, D.C.
202.298.8100
paul.donovan@laroelaw.com

DANIEL BROCKETT, Esquire

Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
51 Madison Avenue, 22nd floor
New York, New York 10010
212.849.7000
stephenneuwirth@quinnemanuel.com

For the Defendant CSXT:

KENT GARDINER, Esquire and
JOHN L. CUDDIHY, Esquire
Crowell & Moring, P.A.
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.624.2779
JCuddihy@crowell.com
ERIN O'BRIEN, Esquire
Senior Counsel
CSX Transportation, Inc.
500 Water Street J-150
Jacksonville, Florida 32202
904.359.3101



HIGHLY CONFIDENTIAL; For Attorney's Eyes Only
APPEARANCES (Continued):

For the Defendant BNSF Railway Company:

GARY A. WINTERS, Esquire

Mayer Brown, LLP
1999 K Street, NW
Washington, D.C. 20006
202.263.3273
gwinters@mayerbrown.com

DAVID PRYOR, Esquire

BNSF Railway Company
2650 Lou Menk Drive, AOB-3
Fort Worth, Texas 76131
817.352.2286
david.pryor@bnsf.com

For the Defendant Norfolk Southern Railway Company:

SEAN M. TEPE, Esquire

Skadden, Arps, Slate, Meagher & Flom, LLP

Four Times Square
New York, New York 10036
212.735.2718
sean.tepe@skadden.com

For the Defendant Union Pacific Railway Company:

ALAN M. WISEMAN, Esquire

Howrey
1299 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.6638
wisemana@howrey.com

ALSO PRESENT: Ashley Holt, Video Operator

- - -



HIGHLY CONFIDENTIAL; For Attorney's Eyes Only
I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| CLYDE V. McINTYRE, JR. | | | |
| By Mr. Cramer | 7 | | 335 |
| By Mr. Gardiner | | 329 | |


- - -

E X H I B I T S


| PLAINTIFFS' | FOR IDENTIFICATION |
|---|---|
| No. 1 | 63 |
| No. 2 | 69 |
| No. 3 | 83 |
| No. 4 | 101 |
| No. 5 | 111 |
| No. 6 | 126 |
| No. 7 | 160 |
| No. 8 | 162 |
| No. 9 | 167 |
| No. 10 | 169 |
| No. 11 | 171 |
| No. 12 | 173 |
| No. 13 | 174 |
| No. 14 | 182 |
| No. 15 | 189 |
| No. 16 | 191 |
| No. 17 | 196 |

Page 25

Q And what was were your responsibilities when you started with the B & O?
A I was in the engineering department. I was in the bridge and building department, drafting bridges and buildings and calculating stress and all that kind of stuff.
Q And for how long were you in that position?
A Two years.
Q And then what did you do?
A Then I went to the pricing department of the B & O Railroad.
Q And for how long were you in that position?
A 12 years.
Q What were your responsibilities, just generally, during that period?
A Making rates, negotiating with other railroads and customers and developing the business market price for a piece of business.
Q When you say making rates, what does that mean?
A That means if a customer calls you for a price to cover a piece of business, then you would look at the market conditions and establish a price, or offer a price.
Q Offer a price to the customer. All right.

Page 26

So you're in the pricing department of the B & O Railroad for 12 years, and then what did you do?
A I was a systems designer in the technology group.
Q What did you do as a systems designer?
A Design systems.
Q What kinds of systems?
A There were accounting systems. There were all kinds of systems.
Q Okay. And was this with the B & O Railroad?
A This was at that time it was called the Chessie System, the B & O Railroad, the C & O Railroad and the Western Maryland Railroad.
Q How do you spell Chessie?
A C-h-e-s-s-i-e like the Chessie cat.
Q Okay. So the Chessie System -- and you were a systems designer for the Chessie System. Approximately what year are we now?
A '79 to '82, somewhere in there.
Q '79 to '82. And then what did you do?
A Then I went back into the sales and marketing department as an assistant manager of pricing.
Q This was in the mid '80s?
A Mid '80s.
Q And this is still with the Chessie System?

Page 27

A Yes.
Q And what did you do in that position?
A I was a market manager.
Q What does that mean?
A Or assistant manager of pricing. What I did was the same thing that I had done before, but I was the manager of it in the chemical business group.
Q So you're in the chemical business group --
A Yes.
Q -- and you're involved in establishing prices to customers?
A Deals, yes, putting together deals, contracts or whatever.
Q And I believe you said in your past job, you had conversations both with your customers and with your fellow railroads.
A Fellow railroads as a partners in a joint-line move.
Q And what does that mean to be partners in a joint-line move?
A That means that we share revenue. We create a through-rate that has both more than one carrier in the route, and we agree on what the rate itself, and we agree upon how much revenue each railroad got of that deal.

Page 28

Q So a joint-line move is a move where cargo starts at one place, it moves on one railroad, and then switch to another railroad and gets to its final destination.
A Yes. I'll give you an example. There was a shipment of chlorine from Jacksonville, Florida to Omaha. On the Union Pacific, it would move CSX to Chicago; UP to Omaha.
Q And so during the course of your work in the sales and marketing department at the Chessie System, you would have regular communications with your fellow railroads in order to establish joint-line rates?
A Yes.
MR. GARDINER: Object to the form.
THE WITNESS: And they would be individual conversations with the railroad on the deal at hand, particularly after the Staggers Act of 1980.
BY MR. CRAMER:
Q And what was your understanding of the Staggers Act of 1980?
MR. GARDINER: Objection; lacks foundation.
BY MR. CRAMER:
Q Well, you raised the Staggers Act of 1980 and you said you did something particularly after the enactment of the Staggers Act.

Page 29

A Well --
Q -- what were you referring to?
MR. GARDINER: So let him finish.
THE WITNESS: Okay.
BY MR. CRAMER:
Q What were you referring to when you said that?
A The business practices of the railroads changed after the Staggers Act because of deregulation.
Q And in your -- from your understanding, what changed?
A Well, we were able to do contracts.
Q What does that mean, able to do contracts?
A Private deals with customers.
Q So prior to the Staggers Act you -- it was your understanding that the railroads couldn't make private agreements with customers, but after the Staggers Act, it is your understanding that the railroads could do that?
MR. GARDINER: Before you answer, I'm going to object generally to this line as calling for legal conclusions.
MR. CRAMER: I am just trying to get his understanding.
MR. GARDINER: You can answer.

Page 30

MR. CRAMER: He raised it. I'm just trying to get your understanding.
THE WITNESS: What was your question again?
BY MR. CRAMER:
Q Yeah. My question was, prior to the Staggers Act, it was your understanding that at a railroad you couldn't enter into a private contract with a shipper?
MR. GARDINER: Objection; calls for a legal conclusion.
BY MR. CRAMER:
Q Is that right?
A I have no idea.
Q Okay. Well, what was it that you think the Staggers Act did that changed how you in the pricing department did business?
A When I was in the pricing department prior, I did not do any contracts.
Q Okay.
A Everything was done in a public tariff.
Q And what is a public tariff?
A It was something that was filed with the Interstate Commerce Commission and 20 or 30 days' notice to the public.
Q So it was your understanding that prior to the Staggers Act, in order to set a rate you would

Page 31

establish the rate and then file it with the federal regulatory agency.
A That's correct.
Q Okay. And then after the Staggers Act, you began entering into contracts with private rates with shippers.
A Correct.
Q Okay. And in or about that time you began to have regular communications with your fellow railroads to establish the rates that would be charged on a joint-line move.
MR. GARDINER: Object to the form.
BY MR. CRAMER:
Q Is that right?
A What was the question again?
Q After the Staggers Act, you began to have regular communications with your fellow railroads in order to establish the rates that you would charge shippers for a joint-line move; is that right?
MR. GARDINER: Object to the form.
BY MR. CRAMER:
Q You can answer.
A If a customer called us for a price and it was originated on CSX and was received by Union Pacific, I would have to speak with the Union Pacific

Page 32

representative about agreeing to a price.
Q And you would speak with your counterpart at Union Pacific.
A That's correct.
Q And you would jointly get together and agree to the price for that joint-line move?
A The price, the divisions and the route and all of the other particulars that go with it.
Q So you would agree on exactly where that shipment would go.
A The type of equipment, who would own the equipment, the service, all kinds of things.
Q And then you would agree on the price that you jointly would charge?
A That's correct.
Q And then you would agree on how you would split the bill, the money that came in, as between the two railroads?
A That is correct.
Q And you had those -- you had conversations like that regularly since 1980; is that right?
A Yes, with railroads one on one.
Q And you said with railroads one on one. Why did you add that?
A As you know, whichever railroad was needed to

be a participant.
Q All right. So we're still in the, I think, the sales and marketing department at the Chessie System.
A Yes.
Q I'm trying to go back to your career.
A Yes.
Q How long were you in that department?
A From that point on.
Q From that point on. And when did the Chessie System become CSX?
A 1987, '86, '87.
Q Were there -- did the Chessie System become something else before it became CSX?
A No.
Q What is CSX?
A Actually, it merged with the Seaboard Railroad Company, Seaboard Airline.
Q S-e-a-b-o-r-d?
A Seaboard, yes.
Q Seaboard. And when did that happen?
A I'm not sure.
Q Okay. It happened prior to 1987?
A Well, after. Well, somewhere in that vicinity.



Q Okay. What does CSX stand for; do you know?
A No.
Q And since that time, you remained in the sales and marketing department.
A Yes.
Q And did your position change in that department?
A Yes.
Q Okay. What was the next position that you held?
A Manager of tariff publications or price publications, manager of price publications.
Q And approximately what years did you have that position.
A From '85 until 1990.
Q And what were your responsibilities as manager of price publications?
A Implementing the prices, developing systems, the industry reference files.
Q When you say implementing prices, what does that mean?
A That means putting them on the piece of paper, the contract documents, putting them in systems so that they can be accounted for and be available for quoting or for whatever accounting, and distributing,



communicating those prices to the involved customers.
Q During this period from 1985 to 1990, you had communications with customers about prices?
A Yes.
Q And did you also have communications with your fellow railroads about prices?
A Yes.
Q And would those communications relate to interline or joint-line rates?
A Only to joint-line.
Q What is the difference between interline and joint-line?
A Same thing.
Q They're the same thing?
A Yes.
Q Okay. So it's your understanding that joint-line and interline are interchangeable terms.
A Yes.
Q All right. So you had that position from 1985 to 1990. Who did you report to at that time; do you recall?
A John Paylor.
Q How do you spell his last name?
A P-a-y-l-o-r.
Q And approximately how many people reported to



you during this period 1985 to 1990, if any?
A Fifty.
Q Fifty. All right. In 1990, you changed positions?
A Yes, I became the director of the group.
Q What was your responsibility as director of the group?
A Overseeing my former position, the duties of that, doing supplemental pricing, the industry reference files, and the industry initiatives to -- that oversee the industry reference files and the rate EDI network.
Q What is supplemental pricing you referred to?
A Supplemental pricing is like switching charges. You know, it's only on CSX -- a customer wants to switch from one side of his plant to the other, a rail car, or from one part of town to the other part of town, weighing of cars, changing of bills of lading, things like that.
Q What are industry reference files?
A Industry reference files are very important to the rail industry. They are the geography. For instance, CSXT has 5,000 stations overall. I believe the rail industry has close to 50,000 stations. So we all have to be singing, so to speak, from the same

A Yes.
Q And it was a percentage of the base rate?
A At times the fuel surcharge was a percentage, yes.
Q And at times it was some other arrangement.
A It was some other arrangement.
Q Right. And what were the other arrangements that CSX had with regard to fuel surcharges other than as a percent?
A During what period of time are you talking about?
Q Well, let's say, prior to 2000.
A Prior to 2000, we did not have a fuel surcharge.
Q And then from about late 2000 to 2006 or '07, you had a fuel surcharge as a percentage of the base rate?
A That's correct.
Q And then after that, you did it based on mileage for some customers?
A Yes.
Q At some point in time, did the railroad agree on a common definition of the term fuel surcharge so that you could all understand what you meant when you use that phrase?



MR. GARDINER: Object to the form.
BY MR. CRAMER:
Q You can answer if you understand.
A Not that I'm aware of.
Q Were there discussions at the AAR or Railinc about what a fuel surcharge was?
MR. GARDINER: Object to the form.
THE WITNESS: Not about what it was.
BY MR. CRAMER:
Q Okay. So you don't recall discussions about how we're-- how the railroads are jointly going to define the term fuel surcharge?
A Not specifically. My interest was not in defining the term but in processing the administrative work associated with it.
Q Fair enough. But in order to -- it was more efficient if all of the railroads understood fuel surcharge to have a common definition so you-all understand what you were talking about when you use that phrase?
MR. GARDINER: Object to the form.
THE WITNESS: That is how CSX.
BY MR. CRAMER:
Q Right.
A That's what CSX called it. That's what I



knew it at as.
Q When you used the term fuel surcharge with your colleagues and fellow railroads, you assumed that they were using it to mean the same thing you did; right?
MR. GARDINER: Object to the form; calls for speculation.
THE WITNESS: I don't know what they were --
BY MR. CRAMER:
Q You don't know?
A I'm not in their mind so I don't know what they were thinking. I think we were all interested in recovering fuel costs.
Q Right. And it's fair to assume that when you had a conversation with your counterpart at a fellow railroad and you were talking about fuel surcharges, you were talking about the same thing; right?
A We were talking about the CSXT fuel surcharge or their particular fuel, whatever they called it.
Q Right. They had a different fuel surcharge policy, but it was for both railroads that you were talking about -- talking with. It was a supplemental charge on top of the base rate; right?
A Yes.
Q CSX implemented a new fuel surcharge program



in or around late 2000?
A Yes.
Q And that policy involved assessing shipments with fuel surcharges as a percentage of the base rate?
A It wasn't a policy. What we put in place was a tariff at the time to -- if the price of fuel was five dollars over $28 -- I believe that's what it was -- we would assess a fuel surcharge to the base rate.
Q Okay. And when you say a tariff, what does that mean?
A A tariff is a public pricing document which would have spelt out the CSXT fuel surcharge arrangement or formula.
Q Prior to that period, CSX had no fuel surcharge?
A That's correct.
Q Do you recall who made the decision to come out with this new fuel surcharge tariff program?
A Who made the decision?
Q Who made the decision.
A I think it was Mike Giftos.
Q Were you involved in the decision-making process?
A I was involved -- no, not in the

Page 53

decision-making process but involved in the workup toward the decision.
Q What does that mean?
A That means when we became aware that they were many spikes in the price of fuel and that we were not recovering the cost, that additional cost, we had several meetings to see -- you know, to determine what our alternatives, business alternatives, were to do, you know, how to fix it.
MR. CRAMER: Why don't we take a five-minute break?
THE WITNESS: Sure.
THE VIDEOGRAPHER: Off the record at 9:52.
(Brief recess from 9:52 a.m. to 10:03 a.m.)
THE VIDEOGRAPHER: Going back on the record at 10:03. Videotape No. 2.
BY MR. CRAMER:
Q I want to jump back for one second to something we talked about a little bit earlier, just to clarify or confirm for me. You said, I think, that a joint-line rate was a rate that was established between two railroads in which each participate in that shipment; is that right?
A That is correct.
Q Okay.

Page 54

A Jointly.
Q Jointly.
A Yes.
Q So that the railroads agree on that joint rate?
A That is correct.
Q Okay. And it's your understanding that the communications between the railroads relating to that joint rate in which each carrier participates relate to that rate and that shipment; is that right?
A That rate -- well, yes. Pricing to cover that particular origin destination pair that's involved by an agreed-upon route.
Q Right. And is it your understanding that the communications that you had relating to the agreed-upon route and the pricing and other particulars of the joint shipment relate only to those particulars on that joint rate in which both railroads can participate; is that right?
MR. GARDINER: Object to the form.
THE WITNESS: If -- let me give an example. A customer will call us and say that they want to ship chlorine from Jacksonville to Omaha, and they would like a rate of 5,000, you know, or let's call it a thousand dollars per car. We will

Page 55

consider it if it's cost efficient for our account, and we look at, you know, different factors. And we think that the divisions with Union Pacific should be 50/50, then we would get $500; Union Pacific would get $500.
And we think that rate is market competitive or it's a good business deal for CSX, then we would call Union Pacific and say a customer has requested a price on a new move, a new piece of business for us. We would like to establish a rate of a thousand dollars because -- tell them what the particulars were -- via Chicago with divisions of 50/50. Do you concur?
If they concur, then the market manager would have given me in my most recent capacity, my team, a request to implement that price in which we would enter the price into the computer from Jacksonville to Chica- or to Omaha via Chicago, and with divisions of a rate of a thousand dollars, 500 for CSX and 500 for UP, enter it into the computer.
The computer would have created a contract document which have been electronically sent to the customer. It would also create an electronic document, contract document, to send to UP, and it

Page 56

would also sent electronic codes representing that contract to UP with all the particulars so that in their database, if they would happen to be the billing road.
BY MR. CRAMER:
Q Thank you. That's helpful. That clarifies it for me.
And the conversation in which CSX communicates with UP and asks for concurrence relates to the joint-line movement that you are talking about, that particular joint-line movement; right?
A That's correct.
Q Right. And the conversation doesn't relate to other aspects of pricing or other movements; is that right?
MR. GARDINER: Object to the form.
BY MR. CRAMER:
Q Or might it sometimes?
A It would -- if there were any other conversations, it would only be on joint-line business between CSX and UP. And, you know, that was the restrictions that we had for communicating or talking business deals.
Q So you understood you had some restrictions on these communications; is that fair?

BY MR. CRAMER:
Q And why did you become more cautious over time?
MR. GARDINER: Objection; asked and answered.
THE WITNESS: Because of my higher level of responsibility.
BY MR. CRAMER:
Q Were you more cautious in 2005 than you were in 2000?
MR. GARDINER: Objection.
THE WITNESS: I don't recall my level of cautiousness.
BY MR. CRAMER:
Q Do you believe that your conservative approach to discussions with competitors became more conservative from 2000 to 2005?
MR. GARDINER: Objection.
BY MR. CRAMER:
Q It evolved over time?
MR. GARDINER: Objection; calls for speculation.
THE WITNESS: Repeat the question.
BY MR. CRAMER:
Q So that -- you mentioned that you believed that some of the things that were implicit in your



communications with your competitors became explicit over time; right?
A Correct.
MR. GARDINER: Objection.
BY MR. CRAMER:
Q Did that happen from 2000 through 2005, did that change occur from that 2000 to 2005?
A I don't think so.
Q Do you remember in your mind when what you say was implicit became explicit?
A After I became the director of the price marketing services department.
Q In 1990.
A Yes.
Q Okay. And when you say you became more conservative, you are talking about you became more conservative in your written communications with your competitive railroads; right?
MR. GARDINER: Object to the form.
BY MR. CRAMER:
Q Because you were worried about how the e-mails might be interpreted.
MR. GARDINER: Object to the form.
THE WITNESS: I had some communications reviewed by my law department before they were



released, yes.
BY MR. CRAMER:
Q Did that happen more often in 2003 than it did in 2000?
MR. GARDINER: Object to the form; calls for speculation.
THE WITNESS: Depends on the subject matter.
BY MR. CRAMER:
Q Let's say about fuel surcharges.
A In the development and in the implementation of the fuel surcharge, CSXT's fuel surcharge program, there was legal counsel at all meetings, plus oversight of communications.
MR. CRAMER: All right. I have premarked as Exhibit 1 to the deposition one of these e-mails you have been talking about. I'm giving a copy to the witness, to counsel, and I have copies for most of the people in the room.
(Plaintiffs' Exhibit No. 1 was marked for identification.)
BY MR. CRAMER:
Q For the record, this is an e-mail bearing the Bates stamp CSXFSC000254508. It says from corporate communications sent Friday, September 22, 2000, sent to several people including Mr. McIntyre, and the subject



is fuel cost recovery charge. Do you see that?
A Yes.
Q Do you recall receiving this e-mail?
A Let me read it.
MR. GARDINER: Read it.
BY MR. CRAMER:
Q Take your time.
A This e-mail has not been altered from the original?
Q This is as it was produced to the plaintiffs.
A Okay.
Q Okay. You received this in the regular course of your business, Mr. McIntyre.
A Yes.
Q This is a press release that CSX issued; is that right?
A Yes.
Q Who is corporate communications?
A Corporate communications is a department of CSX which handles communications to the public.
Q And this press release announces CSX -- it's dated September 22, 2000, and announces a fuel surcharge program that CSX was planning to implement; is that correct?
A That's correct.

Q And the second paragraph says, "The recovery charge will be effective October 25 and will apply to local as well as interline freight movements."
What does that mean?
A That means it would apply to movements which were CSX direct, from one CSX customer to another CSX customer, and it would also apply to interline freight movements from CSX to another railroad. And what is not stated here is the fact that our fuel surcharge only applied on pricing documents that CSXT issued.
Q What does that mean?
A That means if it -- usually, 99.98 percent or 99 percent, the originating railroad will do the pricing documents. If it originates on CSX, CSX will do the pricing document. And each one of CSX pricing documents -- what this is saying it would apply -- the way this thing reads will apply to local as well as interline freight movements, local CSX, published by CSX.
Q Okay. So CSX had, as of October 2000, a fuel surcharge program and on those rates that CSX published and issued, there would be a fuel surcharge but if there was a joint-line movement from a railroad that did not have a fuel surcharge there would be no fuel surcharge on that movement, on that shipment?



A If it originated on CSX and it was a joint movement to another -- every other railroad, we reached out to the other railroad on an interline basis and said individually -- we reached out to each one individually and said we were going to apply this as a business practice, and they could agree or not agree to join in with us.
Q Right. And they all agreed?
A Not all, no.
Q Not all. Okay. Who did not agree?
A There were various short-line railroads that did not agree.
Q All the Class I railroads agree.
A All the Class I railroads -- well, yes, yes on interline shipments.
Q So, but if a shipment started at UP and went to CSX, if UP did not have a fuel surcharge program, would there be a fuel surcharge on that shipment if there were interline?
A No.
Q So it would only have -- an interline movement originating at another railroad would only have a fuel surcharge if that other railroad also had a fuel surcharge program; is that right?
A Yes, technically. Now, let me explain the



way the tariffs worked. And this fuel surcharge when it was implemented did not apply on all of CSXT's business. CSX published public documents, public prices, that were available to all customers. It also did contracts.
The public documents were subject to incorporate where we published the fuel surcharge in the CSXT 8100 tariff which was our supplemental tariff. And we published that. And in each public pricing document, we incorporated charges that were in the 8100 tariff. So it automatically was attached to the public documents.
Contracts, however, we had to read through all the different contracts to see whether or not it was subject to the 8100 or had different language and -- and, you know, not all contracts were subject to the fuel surcharge at this time.
Q Right. So in or about October 2000, the fuel surcharge was applied to certain shipments originating from CSX and not to others, depending upon what the contract said; is that right?
A That is correct, in CSXT pricing documents.
Q Okay. And if you look at the last sentence of the second paragraph, it says, Contracts that contain a prices escalator index published by



government entity, such as RCAF, will not be included.
What is that referring to?
A The RCAF is a government-approved, SBT-approved railroad index based on railroad statistics. Rail cost from one period to another. They issue it quarterly and it tells -- it's an index of costs going up or down. And part of that index includes a component of fuel.
And we thought, you know, at the time when we were negotiating the business, you know, the business practice, you know, the best business decision was we did not need to cover the fuel that was already being covered by the RCAF(u).
Q So when you initially implemented the fuel surcharge, you did not implement it with respect to contracts that already recovered at some level for fuel costs through the RCAF; is that right?
A That was our practice, yes.
Q Right. And when you initially implemented the fuel surcharge program in 2000, you did not apply the fuel surcharge to contracts that did not refer to the tariff or that did not refer to that public tariff; is that right?
MR. GARDINER: Object.
THE WITNESS: That's correct. The CSXT 8100

MR. GARDINER: Object to the form.
MR. WISEMAN: Object to the form.
THE WITNESS: I did not -- when I spoke with the individual railroads, I do not recall talking to them about our problems with recovering fuel. I, in no case whatsoever, did I have any discussions with them about revenue issues or anything like that.
BY MR. CRAMER:
Q Well, the record will reflect what you said, but I thought you were -- you had said that when you called them up -- you were talking to your counterparts at the other railroads at this period about CSX's contemplating changing the fuel surcharge program; right?
MR. GARDINER: Object to the form.
THE WITNESS: About -- we -- I spoke individually to a railroad on joint shipments that had the CSXT fuel surcharge, that we were going to change the format of our program.
BY MR. CRAMER:
Q But you said moments ago that you talked to some of these people before you had made the decision to change the program; right?
MR. GARDINER: Object to the form;



mischaracterizes his testimony.
MR. CRAMER: What's that --
THE WITNESS: Okay.
MR. GARDINER: Then let's read it back.
MR. CRAMER: Let's not --
MR. GARDINER: Read his testimony back.
MR. CRAMER: All right. I'm just trying to get an understanding of what these communications were about so. So you were about to answer.
THE WITNESS: What was the question?
BY MR. CRAMER:
Q The question is, you had some conversations with Mr. Schroeder and other counterparts at other railroads, when CSX had not yet fully decided to implement the new fuel surcharge program but you were contemplating implementing the fuel surcharge program; right?
MR. GARDINER: Object.
BY MR. CRAMER:
Q So you had conversations about the contemplation of implementing the new program.
MR. GARDINER: Object to the form; mischaracterizes his testimony.
BY MR. CRAMER:
Q Okay. You can tell me what the conversations



were about.
A I discussed with my counterpart individually at different railroads the fact that CSX was going to change its program and the way it had to be administratively processed.
Q Will Mr. Schroeder recall the same conversations the same way as you just testified about?
MR. GARDINER: Objection; calls for speculation.
THE WITNESS: I don't know what he will recall.
MR. CRAMER: Do you recall -- all right.
I am marking the next document as Plaintiffs' Exhibit 3.
(Plaintiffs' Exhibit No. 3 was marked for identification.)
BY MR. CRAMER:
Q This is an e-mail with an attachment, but for now I am just going to ask you about the cover e-mail. And the cover e-mail bears the Bates range CSXFSC 357, and with the attachment, it takes it through 363.
And the cover e-mail is dated March 19, 2003, from Kelly Shefelbine and goes to Donna Cerwonka, Tim McNulty, John Spaulding, Wayne Flynn. And the attachment, it's subject is fuel surcharge change.



And then there's a below e-mail from John Couch dated March 19, 2003 to, among others, Mr. McIntyre. Do you recall receiving this, at least the below parts of this e-mail?
A Yes.
Q Okay. Is this one of the documents you looked at yesterday or the day before?
A Yes.
Q Did it refresh your -- what did this document refresh your recollection about, if anything?
MR. GARDINER: I'm sorry. Do you want him to read -- look through the whole thing?
MR. CRAMER: Let's just talk about the cover e-mail for now.
MR. GARDINER: Okay.
BY MR. CRAMER:
Q Did the cover e-mail refresh your recollection about anything?
A Yes, about the dates that we made the change in the specific program.
Q Does this e-mail accurately state or summarize the changes to the program that were announced in March of 2003?
A What are you specifically talking about?
Q Well, let's -- I will just point you directly

Page 85

to the e-mail from Mr. Couch. Who's Mr. Couch?
A Mr. Couch was our market research director.
Q Okay. Did he report to you?
A No.
Q Who did he report to?
A Ed Jenkins.
Q Same person you reported to?
A Yes.
Q Okay. And --
A No. Frank Ominus. Frank Onimus was still there.
Q So Mr. Couch and you both at that time reported to Frank Onimus?
A Yes.
Q And the document says.
"A press release will go out today stating that CSXT will be changing the fuel surcharge program to better capture the changes to our costs of fuel. Details of the new program will not be released until next week. The new program will be effective May 1.
"The changes are..." and then it lists four changes.
Do you see that?
A Yes.
Q All right. The first change is "Based on

Page 86

prior months' average, not 30 consecutive days."
What is that referring to?
A That is saying we will now take one month's WTI per barrel per day -- what the price is per day, closing price per day -- we will average it by the number of days that it was published and that average will be used as the trigger for the next month's fuel surcharge instead of 30 consecutive WTI publication dates in the Wall Street Journal.
Q Okay. And No. 2 says, "Starts at $23 a barrel. For every dollar change, fuel surcharge goes up .4 percent. This equals the current 2 percent for every $5 change."
What is that referring to?
A That is saying for every dollar change over 23 or beginning at 23, the fuel surcharge will be four-tenths of 1 percent. I don't know what the second statement means.
Q Well, it is referring to the current, the program that was in existence at the time of this e-mail; right?
A It does but I don't know what this equals means.
Q Well, if the new program goes up .4 percent for every dollar, and the old program goes up 2 percent

Page 87

for every $5 -- if it goes up $5 --
A Four times five, right. Okay. That's what it means.
Q So the new program is starting at a lower strike price at 23 and 28 -- instead of 28.
A Right.
Q So it kicks in earlier.
A Right.
Q And it goes up on more regular levels.
A Yes.
Q Okay. No. 3 says, "No fuel surcharge for $13 to $23."
A That's correct. I understood that.
Q And do you know why it was, the band of 13 to $23 was chosen for no fuel surcharge?
A Because we -- the base rate had reflected whatever fuel was in place at that time.
Q So CSX at the time was basically establishing its rates based upon some historical band of WTI prices between 13 and $23?
MR. GARDINER: Object to the form; lacks foundation.
THE WITNESS: I'm not sure if it was -- I'm not sure because I'm not an economics person.

Page 88

BY MR. CRAMER:
Q Right.
A You know, but it was based on some sort of cost --
Q Right.
A -- or when the price was established or something like that.
Q Okay.
A There was some sort of consideration, economic consideration.
Q Okay. But your understanding is that the economic consideration is that when fuel was between 13 and $23, the base rate would recover the cost of fuel.
MR. GARDINER: Object to the form --
THE WITNESS: That's --
MR. GARDINER: -- lacks foundation.
BY MR. CRAMER:
Q No. 4 says --
(Off-the-record discussion)
MR. GARDINER: You have to go slower so I can make an objection.
MR. CRAMER: I think he had already -- he said that's correct.
THE WITNESS: What was the question again? Let's repeat the question.

Page 237

aside. I'm showing you Plaintiffs' Exhibit 25. Again, this is another internal UPFSC document, UPFSC 788 through 790. And it's some e-mails attaching something from -- a press release from CSX to its website.

(Plaintiffs' Exhibit No. 25 was marked for identification.)

BY MR. CRAMER:

Q The only thing I want to ask you about is the e-mail from Mr. Schroeder to Mr. Sovey dated March 4, 2003. Do you see that?

A Yes.

Q It says, "Spoke with Clyde McIntyre again this morning. He said complete, quote, working details, close quote, still have not been signed of yet. However, he anticipates sending the concurrence request by tomorrow, March 25."

Do you see that?

A Yes.

Q Do you recall having a second conversation with Mr. Schroeder in or about this time?

A I don't recall, but I may or may not have.

Q Do you doubt having had this conversation?

MR. GARDINER: Object to the form.

THE WITNESS: I don't have an opinion one way

Page 238

or the other.

BY MR. CRAMER:

Q All right. Do you know Mr. Schroeder to be a reliable person?

MR. GARDINER: Object to the form.

THE WITNESS: What's your definition of reliable? In what regard?

BY MR. CRAMER:

Q Is Mr. Schroeder someone who, the day he had a phone call with somebody, when he wrote it down explaining what happened in the phone call, would try to be as accurate as possible? Is that something you know about Mr. Schroeder?

MR. GARDINER: Object to the form. This is just a way to get him to testify about this document. That's what you said you wouldn't do. This was supposed to be a device to refresh. It hasn't refreshed. You shouldn't now be getting him to decide whether these words are accurate.

MR. CRAMER: That's not what I'm trying to do. What I'm trying to do is I'm trying to refresh his recollection, and one way to do that is to try to understand what Mr. McIntyre's view of Mr. Shroeder's reliability is.

MR. GARDINER: That is not a proper refresh

Page 239

question, and you know it.

MR. CRAMER: All right. You can put the document aside.

MR. WISEMAN: You're not going to point out that the press release is March 20?

MR. CRAMER: This is my deposition.

MR. WISEMAN: I know it's your deposition, but you totally misled the witness with a UP document that he had never seen that is dated March 21 and the press release is March 20.

MR. CRAMER: I object to your speaking objection, and I object to your characterization of what I did.

MR. WISEMAN: Well, I object to misleading the witness with a UP document trying to get him to affirmatively testify on it when you have another document that shows that CSX announced it --

MR. CRAMER: You know, this is my deposition.

MR. GARDINER: -- March 20.

MR. CRAMER: If you want to ask questions of Mr. McIntyre at the end of the deposition, you are free to do so, and I object to your characterizing what I did as misleading anyone.

I asked him about a voice -- about a

Page 240

conversation that Mr. Schroeder says he had with Mr. McIntyre, and I'm going to move on.

May I have Document 49, please.

MR. DONOVAN: Sorry.

BY MR. CRAMER:

Q While you are getting that out, let me ask you a question about A plus B pricing. What is that?

A A plus B pricing is our public local prices. One of the market strategies that we have was to build a system that could combine local prices of another Class I carrier to make a through price, from one railroad to another.

Q So instead of setting a joint rate you can have two separate rates: One for one railroad and one for the other railroad?

A Within the system, CSX would put its local price requirement. UP or BN would put its local price requirement. When the customer asked for a rate from UP to CSX or CSX to UP, the system would reply to the customer with a price that combined the two behind the scenes. It was a system which added factors together to present to a customer a -- one price for the joint-line movement.

Q And with A plus B pricing, there would be no need for an agreement between the two railroads on the

interline rate; correct?
MR. GARDINER: Object to the form.
THE WITNESS: The agreement came to combine -- upfront to combine this in this process, the factors.
BY MR. CRAMER:
Q Right. But if you use A plus B pricing, there's no need for you to get a concurrence from Mr. Schroeder, for example, on a rate that would apply to the entire shipment.
A That is correct. It created efficiency in creating joint-line prices and at a market level and it -- when the price was provided, it also provided the customer, you know, a way to say that, hey, market conditions won't allow this price.
Q Is that the same thing as Rule 11 pricing or is that different?
A Rule 11 pricing is when there is no joint price and the billing road needs to get its money for its part of the haul, it could decide that there was no price in place, and I'm going to charge my local rate to a joint-line ship.
Q If A plus B pricing was needed you wouldn't need to do with your -- you wouldn't need to do concurrences that we look at with your counterparts; is



that correct?
A That's correct.
Q When did A plus B pricing come into effect?
A I can't remember the exact date. It would be five years ago.
Q Was it about 2004?
A It may have been later.
Q What percentage of CSX's business -- I'm sorry -- revenues comes from interline as opposed to non-interline?
A Interline is approximately 40 percent.
Q What's everything else, local, or is there some other category?
A Local.
MR. DONOVAN: 49 is Exhibit 3.
MR. CRAMER: Exhibit 3. Can we show him Exhibit 3 from this morning, please?
Q Before you look at Exhibit 3 again, let me just ask you a question. So the new fuel surcharge program that CSX implemented in June of 2003, one goal of that new program was to try to apply the fuel surcharges where they had not previously been opposed?
MR. GARDINER: Object to the form.
THE WITNESS: I do not believe that that was the case, if you're talking about what deals it



applied on.
BY MR. CRAMER:
Q One program internal to CSX was to try to impose the fuel surcharge on contracts as they expired, for example.
MR. GARDINER: Object to the form.
BY MR. CRAMER:
Q Is that right?
A One of the policies that CSX sales and marketing group had that if a contract did not have a fuel surcharge arrangement, upon its renewal, the policy was to obtain a fuel surcharge or an RCAF(u) at that period of time.
Q When did that policy go into effect?
A Around that period of time.
Q 2003?
A Yes.
MR. CRAMER: You can put that aside for now. I'm going to come back to it but -- in a moment. Just told it out for one second. I appreciate it. Thank you.
MR. DONOVAN: 61 is 26 -- will be.
BY MR. CRAMER:
Q As a result, in part of the policy you just identified that went into effect in mid 2003, some CSX



customers that had no fuel surcharge previously began incurring a fuel surcharge under the new policy.
A If the market manager could agree to -- with the customer for that to be in the contract. There were many exceptions.
MR. CRAMER: I am showing you what I have marked as Plaintiffs' Exhibit 26. This is a slide deck entitled Commercial Prices Escalators, May 2004 with the Bates numbers CSXFSC 569 through 574.
(Plaintiffs' Exhibit No. 26 was marked for identification.)
BY MR. CRAMER:
Q Have you seen this before?
A No.
Q Do you know who created them?
A I have not seen it before. I do not know who created it.
Q Look at Page 3 of the document. It says, "Current Fuel surcharge policy." Do you see that?
A Yes.
Q It says, "All freight moving under tariffs and private price quotes."
A Yes.
Q Is it fair to say that the fuel surcharge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION

MDL No. 1869

Misc. No. 07-489-(PLF/AK/JMF)
This Document Relates To:
ALL DIRECT PURCHASER CASES

* * * * * * * * * * * * * * * * * * * * * * * * * *

DESIGNATED AS
HIGHLY CONFIDENTIAL

VIDEOTAPED
DEPOSITION OF: DEAN PIACENTE
DATE TAKEN: FRIDAY, AUGUST 13, 2010
TIME: 1:03 P.M.
PLACE: 50 NORTH LAURA STREET, SUITE 3900
JACKSONVILLE, FLORIDA

REPORTED BY: CARMEN THOMAS, REGISTERED
PROFESSIONAL REPORTER AND
NOTARY PUBLIC

* * * * * * * * * * * * * * * * * * * * * * * * * *



APPEARANCES:

Appearing on Behalf of the Plaintiff:
MARC L. GREENWALD, ESQUIRE
and
JOSEPH D. HAMMOND, ESQUIRE
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010

Appearing on Behalf of the Defendant, CSX and the Witness:
DAVID D. CROSS, ESQUIRE
and
LUKE VAN HOUWELINGEN, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595

Appearing on Behalf of the Defendant, CSX:
MORGAN A. SULLIVAN, ESQUIRE
500 Water Street, J150
Jacksonville, Florida 32202

KHALID EL-MUSRATI, VIDEOGRAPHER



INDEX


TESTIMONY OF DEAN PIACENTE
Direct Examination by Mr. Hammond 5
CERTIFICATE OF OATH 116
CERTIFICATE OF REPORTER 117
ERRATA SHEET 118


EXHIBITS

| Exhibit Number | Page Marked |
|---|---|
| Exhibit 1 - Declaration of Dean Piacente | 22 |
| Exhibit 2 - Document titled 2007 Goals | 37 |
| Exhibit 3 - E-mails labeled CSXFCS 00031757 | 53 |
| Exhibit 4 - E-Mail dated September 18, 2006 | 57 |
| Exhibit 5 - E-mails labeled CSXFCS 00008620 through 202 | 59 |
| Exhibit 6 - E-mails labeled CSXFCS 00021293 through 938 | 70 |
| Exhibit 7 - E-mails labeled CSXFCS 00065941 through 412 | 85 |
| Exhibit 8 - E-mails labeled CSXFCS 00032027 | 89 |
| Exhibit 9 - E-mails labeled CSXFCS 00032112 through 126 | 97 |



THE VIDEOGRAPHER: We are now on the record in the matter of Rail Freight Fuel Surcharge Antitrust Litigation. Today's date is August 13, 2010. The time is 1:03 p.m.

This is the videotaped deposition of Dean Piacente being taken at 50 North Laura Street, Suite 3900, Jacksonville, Florida.

My name is Khalid El-Musrati. I am the camera operator representing Merrill Legal Solutions located at 225 Varick Street, New York, New York 10014. The court reporter is Carmen Thomas with Merrill Legal Solutions.

Will counsel please introduce themselves.

MR. GREENWALD: Yes. Marc Greenwald and Joseph Hammond on behalf of Quinn Emanuel Urquhart & Sullivan on behalf of plaintiffs.

MR. CROSS: David Cross of Crowell Moring on behalf of CSXT and the witness.

MS. SULLIVAN: Morgan Sullivan of CSX Transportation.

MR. HOUWELINGEN: Luke Houwelingen of Crowell Moring on behalf of CSXT.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

Whereupon,

DEAN PIACENTE,
having been first duly sworn to tell the truth, was examined, and testified upon his oath as follows:
THE WITNESS: Yes.
DIRECT EXAMINATION
BY MR. GREENWALD:
Q Good morning.
A Good morning.
Q Or good afternoon.
A Good afternoon.
Q Have you ever been deposed before?
A First time.
Q This is your first time?
A Yes.
Q There are just a couple of rules I want to go over. I'm going to ask you a questions and if you would wait until I finish the question before you start to answer, and I'll do my best to wait till you finish your answer before I start my next question. Do you understand that?
A Okay. Yes.
Q And all your answers need to be out loud with words. The court reporter's taking everything down, but she can't take down nods of the head or -- or anything that's not in words. Do you understand that?



A Yes.
Q From time to time, your -- your attorney, Mr. Cross, may and I expect will make objections to my questions. His objections are for the record, and as long as you understand my question, you should answer it unless Mr. Cross directs you not to. Do you understand that?
A Yes.
Q And finally, if you don't understand my question at any time, you should tell me and ask me to clarify it or rephrase and I'll do my best to do so. If you don't ask me to clarify or rephrase, I'm going to believe that you understood the question I asked.
A Okay.
Q Now, what is your present position?
A Vice president of sales and marketing for CSX Transportation in the chemical and fertilizer group.
Q And how long have you been the vice president in the chemical and fertilizer?
A Since mid-2004.
Q And during your time as the vice president for chemical and marketing, was it CSXT's goal to increase fuel surcharge coverage?
A During my time, it has -- it's always been our goal, before my time as vice president and still



currently is, that we try to get full coverage on our fuel costs.
Q And that -- and to do so, the goal is to apply the -- the standard or published CSX fuel surcharge?
A And when you say standard, you mean what is in the CSXT 8100?
Q Would you understand that to be the standard CSXT fuel surcharge?
A I would understand that to be the standard. It was always our goal to try and accomplish that, but we didn't always achieve that goal. There were numerous discounts to the fuel program.
Q The goal was to get a hundred percent coverage of the standard fuel surcharge at CSXT, correct?
A The goal was to try and recover our fuel costs in some type of a mechanism. Didn't necessarily always have to be the standard fuel surcharge program.
Q Well, I understand that the results may not have always been the application of the standard, but was the goal in each case to get the standard fuel surcharge for each contract?
MR. CROSS: Objection to form. Asked and answered for the third time. You can answer it



again, Mr. Piacente.
THE WITNESS: We had a goal to try and improve our coverage. I can't say that we always had a goal to hit the exact standard fuel surcharge in the 8100 because every customer situation was different.
We strove -- we strived to achieve that, yes. We strived to achieve that, but the standards by which we were -- we were going by and it changed from year -- from one year to another year. It went from predominantly WTI coverage to predominantly HDF coverage, but early on in the program with many of our -- at least our chemical customers and our fertilizer customers, we used RCAF-U as a surrogate, not a very effective surrogate, early on to recover costs, but it was an early on surrogate.
BY MR. GREENWALD:
Q And you said during your last answer, we strove to increase that. What was the "that" you were referring to?
A Increase our fuel recovery mechanism, revenue mechanism.
Q Through the application of the standard fuel surcharge coverage?

MR. CROSS: Objection. Asked and answered again. He's trying his best. Give him that, Dean.

You don't have change your answer just because he's asked it several times.

THE WITNESS: Different for different years. So I'll -- I'll restate it again.

From 2000, while I was in the role of influence with sales and marketing line responsibilities, prior to my role in transflow, our goal was to try and improve coverage. We had a standard fuel surcharge published, but at that time the goal was not to use necessarily that hard and fast. It was to improve the coverage as a whole.

As fuel prices escalated in the marketplace, in 2003, 2004 to 2006, it became very apparent that one of the mechanisms that was used, RCAF-U, was not very effective and had a significant lag effect. So we attempted to try and apply the published document -- the published fuel program which, again, from in the early years was WTI, very difficult with our chemical customers as they typically are higher revenue per car customers. So the percentage was -- was a pretty significant



number. We did not always achieve that, but we felt satisfied that we were collecting fuel revenues -- fuel surcharge revenues and what we didn't collect from those customers we received some quid pro quo from the customer in terms of new business or retention of business that was at risk.

When the STB came long and suggested that WTI was not acceptable, I think that was 2007, we made an attempt to try and move our customers to HDF fuel as contracts came up for renewal. We have been largely successful with that with our customers. And we would today attempt to try and put them on the published fuel surcharge program.

BY MR. GREENWALD:

Q Let me follow-up some of the things in -- in your answer.

The -- so it was your experience that the goal in terms of fuel surcharge application changed in or around 2003 for CSXT?

A The goal didn't necessarily change. The goal was always to recover as much as possible. The application of fuel surcharges was impressed upon us even more for a couple of reasons.

One was, the transportation marketplace



changed dramatically from 2003 to 2005. So we were watching our competitors charge a lot more for freight, whether that's truck, barge, other railroads, what they published publicly, and we watched the price of fuel go up dramatically and we recognized that we couldn't afford that risk. And so there was a more significant effort to try and get better coverage on fuel in a better application other than RCAF-U.

But what we found was in the early years -- because that transportation marketplace had not changed, we were finding that many customers were able to exercise their leverage and as a result we were discounting off of, you know, a fuel recovery mechanism, whether that was RCAF-U or other mechanisms.

Q So when you just said "in the early years" you were referring to prior to 2003?

A Prior to 2004, generally speaking. I can't speak to prior 2004. Between the years of 2002 and 2004 I wasn't in a line responsibility, but prior to 2004 the marketplace was a lot different and, again, we couldn't -- we couldn't leverage our customers into higher all-in prices. That was -- the ultimate goal was to try and increase your prices overall.

Q Now, in your previous answers you used the terms WTI and HDF. What did you mean by those terms?



A Western Texas Intermediate Crude Oil as published publicly. We used that as part of our fuel surcharge mechanism and highway diesel fuel we use as part of our fuel surcharge mechanism in terms of an index that we follow.

Q And when you were referring to WTI, I think you said something about the chemical customers because of their higher base rates resisted WTI; is that accurate?

A I referred to that, yes. Because -- because of differential pricing, we typically have customers that are more reliant on rail, chemical customers, whether it's for the safety value we provide or the long distance nature versus other competitive alternatives like truck. And as a result the hazardous nature of some of those commodities we reflect that in our prices. So as we implemented WTI that all-in price as we looked at the competitive economics, when you use the percentage base on a higher revenue per car, because of the charges to our customers, they were higher costs --

Q So the --

A -- so they resisted that.

Q And it wasn't -- well, was it your understanding that the resistance came from using the WTI index rather than the HDF index?

12 a year?
A Say the time frame again.
Q 2005, '6 and '7.
A 2005 and '6 and '7. On order of magnitude that's -- that would be directionally correct, but without a list showing the exact exceptions, I couldn't say definitively.
Q So there were becoming fewer exceptions as we get from 2004 to 2005 to 2006?
A That's correct. Fewer exception as each year went on.
Q And, now, your -- your declaration provides four examples of customers with -- with which CSXT agreed to a discounted fuel surcharge, correct?
A That's correct. I used examples that came readily to mind while I was in my role. I couldn't speak, you know, prior to my role exactly what had occurred. But during my tenure the ones that came to mind most were the examples I show here: [redacted] Those were very difficult negotiations with our customers or in terms of risk or we had a lot to gain with some of these customers.
So, again, case by case basis what we did and these were the examples that came really to mind and I thought they were representative of our -- our chemical



customers. Some of them are very small. [redacted] smaller customers. Some of them are very large, with [redacted]
Q You mentioned [redacted] in that answer. [redacted] actually CSXT did not agree to a discounted fuel surcharge with [redacted] correct?
A When I say discounted fuel surcharge, what I would refer to a discount is if we had a cap on RCAF-U as well. So with [redacted] I believe we had a two percent cap or a three percent cap -- I'd have to look at the exact contract back in 2004 -- in return for control over a lot of their competitive business.
They have a very sizable amount of competitive traffic that could have gone to Norfolk Southern and as a result we gave them a favorable escalator which capped our -- which was capped and we gave them a multiyear deal which was not a usual thing for us to do. It was a concession.
Q But then [redacted] agreed in the renegotiation of that deal to pay CSXT's public fuel surcharge, correct?
A In 2000 -- I think it was 2006 or 2007, we actually renewed this contract one year early, which we felt was very important for us to try and keep it away from the Norfolk Southern and -- and we also felt



strongly about including some fuel mechanism that was compensatory with the wide -- again, going back to the wide fluctuations in -- in fuel and so we had a negotiation.
They wanted additional years on their contract. So that was the quid pro quo, because they knew that the transportation marketplace had changed as well. So they were interested in multiyear deal where we wouldn't be able to come back in 2008 and 2009 and face risk of higher price increases than what was in the contract.
Q Now, the -- your declaration refers to the [redacted] contract in paragraph nine, correct?
A That's correct.
Q And it refers to a contract effective 2004 with the RCAF capped, correct?
A That's correct.
Q And then it refers to in the second year of that agreement you began negotiating an amendment to the contract?
A That's correct.
Q So that would be in 2005, correct?
A That would be in 2006. This was a midyear contract. So 2004 to 2005 was one year term. 2005 to 2006 was the second year term.



Q So the negotiation took place in 2006 and the result of that negotiation, [redacted] agreed to pay CSXT's standard fuel surcharge, correct?
A [redacted] agreed to pay CSXT's HDF publicly published fuel surcharge program, that's correct.
Q So I -- going back -- and they -- there was no discount to that fuel surcharge that [redacted] agreed to pay upon the renegotiation of the contract described in paragraph nine, correct?
A There was no discount in that fuel surcharge program, that's correct.
Q So now I was -- when we were talking about paragraph seven, we were talking about customers with whom CSXT agreed to a -- a discounted fuel surcharge program. And there are four examples listed in your declaration, correct?
A I believe there are five -- five including [redacted] Again, I would refer to a capped RCAF-U as a discount.
Q When was that contract with the capped RCAF-U signed?
A 2004.
Q Okay. So there are five examples, one from 2004, and are the other four from 2006?
A I believe two -- I believe [redacted] may have been

2007, if I recall. We may have negotiate -- began negotiating it in 2006 but 2007. And those -- again, those were the examples that came to mind because that was a very tough period of negotiation for us. Chemical and fertilizer customers had typically been part of three and five-year deals. So we had a lot of negotiations going on. And as we sought to get fuel coverage increased in these years, we had a lot of renewals come up.

We went from a period of negotiating 45 percent of our contracts every year to a period of negotiating 65 and 70 percent of our contracts. So there were lots of renewals. These are the ones that came to mind because, again, of risk and of potential gain for them.

Q Now, sitting here today, can you think of any other chemical customers who in the class period agreed -- CSXT agreed to a discounted fuel surcharge on their movements?

A [redacted] had a -- had a cap on their RCAF-U. Do I cite -- I cited [redacted] in here. [redacted] And, again, without seeing a list of those exceptions, there -- there are numerous other ones as well. I just can't recall those right now.

Q All exceptions to the fuel -- to the standard



fuel surcharge program had to be approved by Mr. Gooden; is that correct?

A All exceptions to not getting some form of fuel recovery had to be approved by a VP or -- depending on the year, or Mr. Gooden. And that -- that changed I think 2005 but I can't recall exactly.

Q You -- you -- you answered a slightly different question.

My question's, all exceptions to not getting the full published fuel surcharge had to be approved by Mr. Gooden, correct?

MR. CROSS: Objection as to time.

THE WITNESS: Any exceptions that we gave our customers -- any discounts we gave our customers off of the published fuel surcharge program or any discounts we gave our customers to RCAF-U in terms of a cap or a percentage off of RCAF-U had to be approved by either a VP or by Clarence. In recent years it has been Clarence.

BY MR. GREENWALD:

Q And when did it start being Clarence Gooden?

A I -- I can't recall the exact time frame on that. It may have been 2005, 2006.

Q And --

A It -- it -- it -- it certainly was 2007 when



we handed in our goals, but it may have been a year or two earlier than that.

Q And that indicated to you that exceptions to the published fuel surcharge program should be very rare, right?

A Again, it's always been our -- our goal to try and get as much coverage as possible ever since inception and any discounts to that in our chemical and fertilizer team were -- were approved by VPs, were approved by Clarence, depending on the year in that class period. Because, again, of the escalating cost of fuel, we got much more serious about ensuring we protected ourselves in that 2004, 2006 time frame.

So we knew that it was -- it was very, very important, especially when it was finally put in our goals. People took it much more seriously.

Q And -- and just the requirement that it be approved by Mr. Gooden indicated that it's not something that should happen very often, correct?

MR. CROSS: Objection to form.

THE WITNESS: I can't say it's -- again, case by case, customer by customer, depending on the negotiation. If the negotiation warranted it, we made the case to Mr. Gooden.

BY MR. GREENWALD:



Q Mr. Gooden's not the most accessible person to you, is he?

MR. CROSS: Object to the form.

THE WITNESS: He's as accessible as he needs to be for me. I never had a problem getting to Mr. Gooden.

BY MR. GREENWALD:

Q The --

A Whether it's phone, e-mail, text messaging or an in-person meeting or through his assistant.

Q Did you communicate to your team that you didn't want to bring too many exceptions to Mr. Gooden?

A I commune to my -- communicated to our team that we had to get as much coverage as possible, again, to protect our -- ourselves from the fluctuating price of fuel and I told them if it made sense, again, on -- on a customer by customer basis, contract by contract basis we would make that case. I didn't discourage it.

There's -- there's nothing to be afraid of if the competitive marketplace requires you to make a case for a discount on any portion of the contract.

We go to Mr. Gooden for a number of different concession reasons, whether it be capital, extended terms, service requirements.

Q Let's mark --

reaching out to Clarence and asking for some different aspect of the deal.

Now, I will tell you that, you know, there are -- there are deals where there's an occasion where we don't get Clarence's approval. That happens from time to time if we can't reach Clarence.

I may give the approval, again, case by case, depends on the urgency of the deal and the magnitude of the deal.

There are -- there are, you know, smaller revenue deals where we may make a decision and not go to Clarence because the magnitude wasn't that significant, so -- but we would follow-up usually and tell Clarence, here's what's happening in the marketplace.

(Exhibit 4 was marked for identification.)

BY MR. GREENWALD:

Q Show you what's marked as Piacente Exhibit 4. Do you recognize Piacente Exhibit 4?

A Let me read this.

I don't specifically recall this.

Q And it's an e-mail from Steve Lube --

Is that how you pronounce his name?

A Lube.



Q It's an e-mail from Mr. Lube to you dated September 18, 2006, correct?

A That's correct.

Q And what is Mr. Lube's position?

A He is a director of chemicals marketing.

Q He reports to you?

A And he reports to me.

Q Do you see the second to last sentence says, overall I think he's going to be very selective on deals he approves for an exception to fuel?

A I see that.

Q Did you have an understanding of who Mr. Lube was talking about?

A I can't specifically say what -- who Mr. Lube was referring to and I can't recall this, but I'm assuming -- I guess I would just be guessing because I don't know who he was referring to -- that it would be Clarence Gooden. Steve's addressing this to me and he's talking about he, and Mr. Lube was probably referring to Clarence Gooden but, again, I'd just be guessing.

Q And in or about September of 2006, was it your experience that Mr. Gooden was very selective on deals he approved for an exception to fuel?

A I can't recall any deal that Clarence has not approved if we made the right case.



Q But --

A So if we made the -- if we made a case, I can't recall any deal where Clarence said no.

Q Do you recall him being very selective?

MR. CROSS: Objection to form. Asked and answered.

THE WITNESS: I -- I don't -- I don't recall.

BY MR. GREENWALD:

Q Did your understanding from Mr. Lube affect the -- the quality of deals you brought to Mr. Gooden to seek an exception?

MR. CROSS: Objection to form. Vague as to quality.

THE WITNESS: Again, I'll repeat what I said before, that we always put together a good case on when we need discount to fuel and we never had a problem presenting that case to Mr. Gooden if -- if the competitive situation presented itself.

So there was never a concern with bringing a deal to Mr. Gooden.

Certainly as you're bringing a -- a -- a deal to Mr. Gooden, you're going to have your ducks in a row to present to the chief commercial officer. So we did our due diligence with any deal.

(Exhibit 5 was marked for identification.)



BY MR. GREENWALD:

Q Showing you what's been marked as Piacente Exhibit 5. Do you recognize this document?

A I can't say that I specifically recognize it, no.

Q Is the -- the top e-mail is an e-mail from you to Clarence Gooden and others dated June 5, 2006?

A That's correct.

Q And it -- the -- it's -- were you writing directly to Mr. Gooden by starting it "Clarence"?

A Let me look back on this here. (Pause.)

This appears to be a -- a note I drafted back to Clarence Gooden as sort of a reply all chain from Clarence that came out originally on June 2nd to his direct reports and it was -- it appears to be me referring to what the chemical and fertilizer team would be doing to try and improve our fuel coverage.

Q And did you give the instructions to your team that are listed in one, two and three in the body of the e-mail?

A I can't recall if I gave all of these instructions. I know the first two in terms of including some fuel mechanism were given.

The last one, number three, I can't recall if we actually implemented that, because we had a lot of

customer opposition to not including new prices in existing contracts and I know with -- with a few customers we actually did not do this.
Q Let me start by -- with the question, did you give the instructions to your team as of June 2006 for the three items in the body of the e-mail?
A This was re -- reinforced instructions to our team that we must continue to always try and find a way to have some fuel recovery mechanism in our contracts as they renew and we would -- we would have very few exceptions to those instructions.
Q Well, not some fuel recovery mechanism, because RCAF wasn't an appropriate fuel recovery mechanism under these instructions, correct?
A That's -- that's correct. At this point in time, again, because the transportation marketplace had changed, we felt as though we had the opportunity to include all or a portion of CSXT's publicly published fuel surcharge mechanism.
So at this point I believe in 2006 we were still, in our chemical and fertilizer group, attempting to achieve WTI percentage-based fuel in our renewals.
Q And, now, the e-mail to Mr. Gooden says, here are some specific directions we've given the team.
Do you see that?



A Yes.
Q So does -- do you recall whether you had already given these instructions when you drafted this e-mail?
A I don't recall, but I'm assuming, based on the comment, that we've given the team -- the answer's yes, but I don't recall specifically. And when I refer to "we've" I'm referring to the chemical and fertilizer group and it would be my direct reports.
Q And, now, you focused on direction number three and that says, any new prices for customers with master contracts that don't renew in the near term should be added to a different price vehicle for that customer. The new price vehicle should incorporate our FSC program, even though these master contracts likely have an RCAF component.
Do you see that?
A I see that.
Q What did you mean with that instruction?
A Some con -- some customers are multiyear contracts that went two, three, four, five years out and in some case it was even longer than that, and as customers request prices for new lanes of traffic, we would tell the customer we will publish those new prices in a new price vehicle, not the existing master contract



that goes multi-years where we might be limited to RCAF-U or some other escalator, maybe no escalator. So it was our attempt to try and put those in a new price vehicle and get some type of fuel coverage on brand new lanes of business.
Q And you testified a little bit earlier that there was some resistance to this practice?
A There was, yes. Customers admin -- I'm sorry. Customers administratively prefer to have all their prices in master contracts if they have such a structure with us.
Q Do you remember if this was successful for any customers?
A I don't recall that. I don't recall.
Q Now --
A I don't negotiate, you know, the prices. I just try to give some guidance to the team. So whether they were able to achieve that or not, I can't recall.
Q So it's -- it's possible there are customers who had multiyear contracts that weren't expiring in 2007 -- 2006 or 2007 who were paying, on some traffic, the standard fuel surcharge program?
A It is possible that some customers had multiyear deals, received a new contract for new lanes of business and were paying fuel surcharge for those new



lanes of traffic.
Q Even if the multiyear deal didn't contain a fuel escalator?
A On different lanes of traffic, that's correct.
Q And, now, just going to your e-mail number two, it says, any multiyear deals must include FSC in the out years.
Do you see that?
A I see that.
Q And what did you mean by that instruction?
A That if we were doing a contract that was beyond one year, we had to have some fuel recovery mechanism to protect us from the fluctuating prices of fuel and so we -- we attempted to put in multiyear deals some type of a fixed increase escalator plus -- or -- or an index, plus our WTI or HDF program. And, again, 2006 it would have been predominantly WTI.
Q So is this instruction that any multiyear deal must include the -- the published program?
A This instruction suggests that it must include some fuel recovery mechanism, but, again, we may have had some that had a discount for concessions in the contract, for -- for quid pro quo in the contract. There were very -- I can't recall contracts in 2006 or

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION

MDL No. 1869

Misc. No. 07-489-(PLF/AK/JMF)

This Document Relates To:
ALL DIRECT PURCHASER CASES

*************************

DESIGNATED AS
HIGHLY CONFIDENTIAL

VIDEOTAPED
DEPOSITION OF: MICHAEL WARD
DATE TAKEN: THURSDAY, FEBRUARY 10, 2011
TIME: 8:47 A.M.
PLACE: 50 NORTH LAURA STREET, SUITE 3300
JACKSONVILLE, FLORIDA

REPORTED BY: CARMEN THOMAS, REGISTERED
PROFESSIONAL REPORTER AND
NOTARY PUBLIC

*************************

Page 2

APPEARANCES:

Appearing on Behalf of the Plaintiff:
DANIEL L. BROCKETT, ESQUIRE
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010

Appearing on Behalf of the Plaintiff:
KYLE R. TAYLOR, ESQUIRE
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010

Appearing on Behalf of the Defendant, Union Pacific:
CAROLYN WOODSON, ESQUIRE
Howrey, LLP
55- South Hope Street, Suite 1100
Los Angeles, California 90071-2627

Appearing on Behalf of the Defendant, CSX and the Witness:
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595

Appearing on Behalf of the Defendant, CSX and the Witness:
KENT A. GARDINER, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595

Appearing on Behalf of the Defendant, CSX:
ERIN O. O'BRIEN, ESQUIRE
500 Water Street, J150
Jacksonville, Florida 32202

Page 3

Appearing on Behalf of the Defendant, Norfolk Southern:
TARA L. REINHART, ESQUIRE
Skadden Arps Slate Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC 20005

Appearing on Behalf of the Defendant, BNSF Railway:
LINDA S. STEIN, ESQUIRE
Steptoe & Johnson
1330 Connecticut Avenue, NW
Washington, DC 20036-1795

KHALID EL-MUSRATI, VIDEOGRAPHER

Page 4

I N D E X


TESTIMONY OF MICHAEL WARD
Direct Examination by Mr. Brockett 6
Cross Examination by Mr. Gardiner 220
Redirect Examination by Mr. Brockett 224
CERTIFICATE OF OATH 226
CERTIFICATE OF REPORTER 227


E X H I B I T S

| Exhibit Number | Page Marked |
|---|---|
| Exhibit 1 | 35 |
| Exhibit 2 | 91 |
| Exhibit 3 | 95 |
| Exhibit 4 | 96 |
| Exhibit 5 | 97 |
| Exhibit 6 | 97 |
| Exhibit 7 | 97 |
| Exhibit 8 | 97 |
| Exhibit 9 | 97 |
| Exhibit 10 | 97 |
| Exhibit 11 | 108 |
| Exhibit 12 | 111 |
| Exhibit 13 | 178 |
| Exhibit 14 | 183 |
| Exhibit 15 | 185 |
| Exhibit 16 | 198 |
| Exhibit 17 | 207 |
| Exhibit 18 | 212 |

Page 37

Q What does that mean, do you know?
A I didn't name the list, but I can tell you what these are, are basically opportunities where we can both become more efficient, serve the customers better and improve both of our cost structure. They're largely operating related activities.
Q Right. Okay. So attached to this e-mail is a -- is a six, seven page list of potential business opportunities pertaining to operations between CSX and Norfolk Southern; is that fair?
MR. GARDINER: Object to the form.
THE WITNESS: These are basically around operations and operating efficiency, yes, I would say.
BY MR. BROCKETT:
Q But they're -- they're talking about potential business collaboration between your company and the Norfolk Southern on the matters listed here, isn't that correct?
MR. GARDINER: Object to form.
THE WITNESS: Yes, they are, re -- regarding how do we become more efficient and serve our customers better.
Actually we had a -- around Cincinnati, Ohio we both have rail lines there and we had reached

Page 38

agreements some years ago that we would use their line in one direction and we would use ours in the other direction which created some operating efficiencies and better service for the customers. So we said, let's examine to see if there's other places we can do similar things.
You'll also notice some of these have to do with technologies on locomotive fuel consumption, train communication systems. So some of them were operating efficiencies in a given geography. Others were technologies and -- and methods to improve reliability of equipment.
BY MR. BROCKETT:
Q All right. And am I -- when you say, to serve our customers, you're referring to customers of both the Norfolk Southern and the CSX, correct?
A Well, I was referring to my customers when I meant that comment.
Q Are these all subjects -- the matters listed on this attachments, are these all subjects that you discussed with Mr. Goode on September 11, 2003 or some other time?
MR. GARDINER: Objection. Asked and answered.
THE WITNESS: Well, it's hard for me to

Page 39

answer that since I said I had no recollection of that conversation.
BY MR. BROCKETT:
Q Looking at this attachment, which is called the Ward-Goode list, does this refresh your recollection, in fact, you had discussions with the then CEO of Norfolk Southern about a whole variety of matters in which your businesses could collaborate?
A I would be highly surprised if that's what the conversation was. If -- my supposition would be we said, there may be opportunities for us to find ways to improve our operating efficiencies and maintenance of our equipment, let's get our teams together to create a list of those opportunities.
I would not have the detailed knowledge of all these areas to even list them of my own knowledge.
Q Well, okay. Fair enough.
Looking at this e-mail and at this exhibit called the Goode-Ward list, does this shake your memory that, in fact, you had a meeting with Mr. Goode about these or other subjects sometime in September of 2003?
A Well, the 2003 September, because of the cover letter, I would agree. And I do have some recollection we agreed to see if there was operating efficiencies available between our two companies.

Page 40

Q Okay. And these were operating efficiencies that you and Mr. Goode felt both of your companies could benefit from; is that fair?
A I would say it was more, we should explore to see whether there are those opportunities.
One of the challenges in doing anything like this with the Norfolk Southern is, we're fierce competitors and there's a high level of distrust between the two of us and my recollection is most of these never came to fruition because of that distrust of one another.
Q When you say you're fierce competitors, am I correct that the Norfolk Southern is the main competitor of the CSX?
A No, I would not say that. I -- I would say there's multiple forms of competition we face. Trucking companies are a primary source of competition. The Norfolk Southern is. In some markets, barge lines are. So -- so there's a variety of competition that we face.
Q Would you consider the Norfolk Southern to be your main competition -- main rail competition?
A They would be our main rail competition, yes.
Q Is the Norfolk Southern also an interline partner with the CSX?
A They are.

Q How much of your business is interline -- interline shipments with the Norfolk Southern?
A I don't know that detail. Mr. Gooden could probably answer that question.
Q Do you have any estimate as you sit here today?
A I do not. I know we have more interchanges with them than any other railroad and I know we do interchange traffic with them, but I -- the proportion I do not know.
Q Okay. Now, the e-mail also says -- talks about Les's debriefing from Michael Ward.
Do you see that?
A Yes.
Q Do you recall Les Passa interviewing you or speaking to you about your meeting with Michael Ward?
A I do not.
Q Can we agree that that seems to be what that's referring to; namely, that Mr. Passa was debriefing you about the meeting you had with Mr. Ward?
A No. It would actually be the other way around. And my supposition would be that I spoke with Les saying we want to see if there's projects we can improve our efficiency with the Norfolk Southern, get with your counterpart and develop a list.



Q Okay. Now, the e-mail in the second paragraph says as follows: Also of note from the meeting: The chairman agreed to meet more frequently, every 90 to 120 days rather than every six months.
Do you see that?
A I do.
Q Is that an agreement that you made with Mr. Goode in September of 2003, sir, on the frequency and timing of your meetings?
A Again, I have no recollection of that. I can read the words here as well as you can.
Q Okay. Well, does it refresh your recollection that you and Mr. Goode agreed to meet every 90 to 120 days starting in September of 2003?
A That could have well happened for this reason. I don't know whether you've ever worked in business before or not. Have you?
Q It's the rules here, sir, that I get to ask the questions and -- and you have to answer --
A Well -- well, let me --
Q -- and I'll be happy to answer any questions you have for me off the record.
A I will -- I will be glad to explain something to you then.
Q Okay, sir.



A In large corporations many times, people are very busy and they have many different projects they're working on and one of the techniques we found in our own company that's very helpful is when you give people assignments and projects to work on, if you make them come and report to the high level -- in our company it's called the executive team -- every three to six months, things get done and it's a -- actually a quite interesting pattern. Because the flurry of work will happen before they have to report to the executives and progress will be made. Then after the meeting they go back to their other duties and projects and then before the next reporting, another flurry of activity occurs and it's just, I think, human nature.
So my supposition would be, we said we need to have these meetings every so often to make sure that these projects are progressing.
Q Okay. Well, did you, in fact, meet with Mr. Goode every 90 to 120 days during the period that he was the chief executive officer of Norfolk Southern?
A My recollection would be no. And you may have other records to show differently, but I -- I think we did not meet on a regular basis on these projects.
As I indicated earlier, because of the distrust between our two companies, these projects



really never got off the ground.
In my quick review of them after you gave me this document I don't think we did any of these projects.
Q Can we agree that at least according to this memo you made an agreement or reached an understanding with Mr. Goode in September of 2003 that you would meet with him to discuss matters of mutual interest every 90 to 120 days?
MR. GARDINER: Objection to the form.
MS. REINHART: Objection. Asked and answered.
THE WITNESS: If I look at the memo, it looks to me like we agreed we would meet to keep these operating efficiency projects moving forward.
BY MR. BROCKETT:
Q And that you were going to meet with him every three to four months; is that correct, sir?
MR. GARDINER: Object to the form.
THE WITNESS: Well, it actually says here every 90 to 120 days.
BY MR. BROCKETT:
Q That's every three to four months, is it not?
A Roughly.
Q All right. Now, do you know Matt Rose from

We talked about places where we had lines that ran parallel to one another, did it make sense to do -- run one direction on one of us and one on the other to improve efficiencies. So those would be the kind of discussion we would have with the Norfolk Southern.

BY MR. BROCKETT:

Q So when I ask you a question, I'd appreciate if you can answer yes or no to my question. If you need to explain, that's fine, but let me ask again, because I -- I think I'm entitled to yes or no answer.

MR. GARDINER: No. You're entitled to his full answer.

BY MR. BROCKETT:

Q When you --

MR. BROCKETT: I'm entitled to yes or no answer first.

BY MR. BROCKETT:

Q When you had alliance meetings with the Norfolk Southern, am I correct that you discussed operating efficiencies that went beyond any interline business you had with the Norfolk Southern?

MS. REINHART: Objection. Asked and answered.

THE WITNESS: Do I have to give a yes or no



answer?

MR. GARDINER: You give the answer you feel is responsive to his --

BY MR. BROCKETT:

Q You have to give a responsive answer to my question. My question calls for yes or no.

MR. GARDINER: That's your opinion. It's not -- but he's entitled to give the answer he feels is appropriate to your question.

MR. BROCKETT: It's not my opinion. It's a fact.

THE WITNESS: Could you repeat your question, please.

BY MR. BROCKETT:

Q When you had alliance meetings with the Norfolk Southern, am I correct that you discussed with the Norfolk Southern operating efficiency issues that went beyond your joint line business?

MS. REINHART: Objection. Asked and answered.

MR. GARDINER: Object to form.

THE WITNESS: My answer is, the operating efficiencies we discussed with the Norfolk -- Norfolk Southern could have both interline and local benefits because they were how you run the



railroad.

BY MR. BROCKETT:

Q Do you consider UP to be a competitor of the CSX?

A I consider the UP to be a valuable partner to CSX.

Q Okay. Let me ask my question again and I think I need to hear a yes or no.

Do you consider UP to be a competitor of the CSX?

A I know you like to have yes and no answers. The world is not that simple. I'm sorry.

So by and large our relationship with the Union Pacific Railroad is working as an interline partner to develop products that serve our joint customers. There may be a few circumstances where we and the Norfolk -- Union Pacific may be competing for a similar piece of business, but those are so small in comparison to the joint line business we do together.

Q Can you quantify in any way the circumstances in which you compete with the UP for -- for shipments?

A I cannot, but I can give you examples.

Q Give me an example, please.

A So an example would be a utility company that's located on the river system, either the



Mississippi or Ohio River system, might have a choice of where they would receive their coal from. So there's -- in the east there's bituminous coal. It's in Central Appalachian that we serve.

Out west there's a coal field called the Powder River Basin. It's a sub-bituminous coal.

And in addition -- so both of those coals could potentially reach the river system and then be delivered by water to a given utility company.

In addition, besides the Union Pacific, there are some mines that locate on the railroad just directly on the river and sometimes coal is trucked to the river for those kind of movements.

So there could be four potential ways that a utility located on the river system could obtain its coal. In that case we and the Union Pacific both may be vying to have our sources be the one to supply that coal in that -- to that particular customer, but those kinds of circumstances are actually not that often or common.

Q If I'm a shipper and I want to ship merchandise from Kansas City to Chicago, can I get a competitive quote from both, one of the western railroads and from the CSX?

A We don't go to Kansas City.

Q So the answer's, no, I couldn't get a

Page 73

competitive quote from the CSX on that?
A That's correct. If we don't go there, it's a little hard to move the business --
Q What about --
A -- it's impossible actually.
Q What about a shipment from Louisiana to Chicago, could I get a competitive quote on that from CSX and from one of the western carriers?
A Louisiana to Chicago, I don't think any railroad, except for the Canadian National, has a route that directly goes between those two. Probably either one of us could maybe come up with a highly circuitous route that may be able to serve that, but I don't know of any customer that wants to move stuff from Louisiana to Chicago.
Q Does the -- does the presence of the UP in the market in any way constrain the prices that CSX can charge for its services --
MR. GARDINER: Objection.
BY MR. BROCKETT:
Q -- in your view?
A No. I think our local business that's only on our railroad is really not impacted by the -- the Union Pacific to any -- even a minor extent and most of our dealings with the Union Pacific is, we interchange a

Page 74

lot of business between the two of us to jointly serve the customers. And that's our primary relationship with them.
Q Again, but let me make sure you've answered my question. Does the presence of the Union Pacific in the market in any way act as a constraint or a break on the amount that the CSX can charge its shippers for its services?
MR. GARDINER: Object the form.
BY MR. BROCKETT:
Q In your view?
A I would say no.
Q Do you consider the BNSF to be -- strike that.
When you meet with the Union Pacific, do you discuss -- strike that.
When you have alliance meetings with the Union Pacific, do you discuss with the Union Pacific prices for local shipments?
A No, we'd have no reason to discuss the prices for local business. Our discussion would be about our joint line business where we're both serving the same customer.
Q Okay. But if you don't consider the UP to be a competitor, do you believe it would be inappropriate

Page 75

to have a discussion with the UP about pricing on your local business?
MR. GARDINER: Object to the form. Calls for a legal conclusion.
THE WITNESS: I believe that there's no business reason to have a discussion with them about their local business because what we're talking about is joint line rates. What they do on their local basis has nothing to do with our business.
BY MR. BROCKETT:
Q Okay. Would you have any -- can you think of any business reason for CSX and the UP to discuss fuel surcharges on your local business and on the UP's local business?
A We would have reason to discuss fuel surcharges on our joint line business. Once again, there would be no business reason to have a discussion of what either carrier's doing on their local business.
Q Do you consider the BNSF to be a competitor of CSX?
A I consider the BNSF to be primarily a business partner running joint line business with the Burlington Northern Santa Fe.
Q I'm going to ask you the same questions I

Page 76

asked you with respect to UP.
Are there any circumstances in which the CSX competes with the BNSF for shipper dollars?
A There maybe some very minor places where that might happen. Let me give you a specific example. If a utility coal served by the river system has many options of where they can receive their coal. In the east we serve the Central Appalachian coal fields where there's bituminous coal. Out west there's coal field called the Powder River Basin. Both of those coals potentially could be burned in a utility's boilers to meet their needs of their customers to elec -- generate electricity.
In addition coal can sometimes be trucked to the river and some mines are located on the river. So there may be some specific minor examples where there's potentially source competition between the Burlington Northern out of the PRB and us out of the Central Appalachian coal fields, but those are few and far between.
Q Do you believe that the presence of the BNSF in the marketplace in any way constrains the prices that CSX can charge its shippers for its services?
A Except for an example as I cited that are rare, the marketplace is generally what determines what

Page 77

we can charge to our customer. Since by and large we are business partners with the B&O joint line movements and very rarely are we competing on a source basis, I would say by and large they have no real influence on our local pricing.

Q Do you -- can you -- can you articulate any business reason why the CSX and the BNSF would discuss prices on your local rates and shipments at an alliance meeting between your two companies?

A At the alliance meetings we would have -- what we would be discussing is, how do we grow the market and what prices should we be charging for that joint line business. And that's entirely appropriate.

There would be no business reason whatsoever to discuss what our pricing is in the local business because we're there to discuss growing our joint line business.

Q Can you articulate any business reason why executives of your company and the executives of the BNSF would have a discussion about fuel surcharges that would be applicable to your respective local rates?

A Our top executives would only have reason to talk about our joint line rates that we're establishing for our jointly served customers where we have to determine what fuel surcharge program, if any, that

Page 78

customer would have for that movement.

What we charged on a local basis would not be any business reason.

Now, you did ask I think about our top executives. There are administrative people that have to administer these tariffs and make these things work. They have to have some discussions at that lower level to make sure that the customer gets a seamless bill that's -- that works for them.

Q I think you answered my question, but let me just make sure.

Can you articulate any business reason why executives from your company and executives from the BNSF would have reason to discuss fuel surcharges that are applicable to your respective local business?

MR. GARDINER: Objection. Asked and answered. Are you -- and, again, clarification. You just said executives. So are -- are you talking top executives or he just referenced more midlevel executives.

MR. BROCKETT: Talking about any executives.

MR. GARDINER: You're going to get a much longer answer than you probably want.

THE WITNESS: Executives has a meaning to me, so I will give you an answer in the context of

Page 79

what I understand.

So if I think about executives, I think about a person like Clarence Gooden who's a top sales and marketing official or perhaps one of the key market vice presidents, those type of individuals the only conversations they would have with Burlington Northern Santa Fe would be deciding for our joint line customers that we're serving together what would be the appropriate fuel surcharge mechanism for those particular movements.

We have administrative people within our company as well, in our case it was largely a fellow named Clyde McIntyre, who administratively had to figure out how to apply these surcharges in a way that the customer got seamless billing and he also administered what is called our tariffs.

In our business we have both public tariffs that are required to be filed for movements that anyone can use, which are public documents that Clyde was responsible for.

We also, in our industry, have the ability to enter in contracts, private contracts with customers. There would be reason for Clyde and his counterpart, who I have no idea what that

Page 80

person's name would be on the Burlington Northern Santa Fe, to discuss those administrative details of the joint line movements.

BY MR. BROCKETT:

Q Okay. Again, I'm not -- I'm not asking about joint line prices. I'm asking about fuel surcharges on local rates. Fuel surcharges that your company applies to its local rates and fuel surcharges that BNSF applies to its local rates.

My question is, would Clarence Gooden or any senior executive of your company have any business reason to discuss those fuel surcharges with any senior executive of the BNSF?

A They would have no business reason to do that.

Q Now, let me ask you about the NS.

The senior executives of your company have any business reason to discuss fuel surcharges applicable to local rates with any senior executives of the Norfolk Southern?

A The senior executives of our company would have reason to discuss joint line rates, but they would have no business reason to discuss local sur -- fuel surcharge programs.

Q Can you articulate any business reason why

Do you see that?
A I do.
Q Okay. And it refers to a follow-up from MJW budget meeting.
Do you see that?
A Yes, I do.
Q Is that reference to a budget meeting that you chaired?
A I don't know if I chaired the meeting but it looks like the regular budget meeting that we have.
Q Okay. And MJW, that's your initials?
A They are my initials.
Q When you say regular budget meeting, is that a budget meeting that happened every month?
A My recollection of the times we would have a budget meeting once a month.
Q Okay. Now, Mr. Giftos states in his e-mail that in yesterday's budget meeting, Michael Ward challenged us to identify opportunities for closing the second quarter operating income gap.
Do you see that?
A I do.
Q He goes on to state that the second quarter operating income gap is currently projected to be 61 million below plan and 41 million below prior year.



Do you see that?
A It says 40 million below prior year.
Q 40 million below prior year.
A Yes.
Q Now, do you recall this budget meeting?
A I do not.
Q Do you recall challenging your management team to come --
A I challenge my management team all the time. That's my job.
Q Do you recall particularly challenging your management team in this budget meeting to come up with ways to close the -- the operating income gap referred to in this e-mail?
A I don't recall that, but this memo intimates that I did.
Q Does this reflect that their budget meeting would have been on March 17th of 2003?
A If I look at the document, it's dated March 18th and it said, yesterday's budget meeting, so one would have to assume it would have been March 17th meeting.
Q And one of the things that Mr. Giftos refers to on the second page of the e-mail for impact of the second quarter operating income is incremental revenue



from fuel surcharge.
Do you see that?
A It says from fuel surcharge changes.
Q Yes.
A Yes. It also talks about incremental price -- intermodal prices, new traffic opportunities and finding ways to avoid costs.
Q One of the things it mentions is incremental revenue from fuel surcharge changes, correct?
A Among others, yes.
Q Okay. Now, was -- do you recall this budget meeting being particularly tense or particularly heated?
MR. GARDINER: Objection. He already testified he didn't recall the meeting.
THE WITNESS: My answer is, I have no recollection of this meeting.
BY MR. BROCKETT:
Q Now, let me show you Giftos 10. Showing you what we previously marked as Mr. Giftos 10.
You recognize this as a press release?
A May I read it, please?
Q Yeah. Go ahead.
THE VIDEOGRAPHER: Sorry to interrupt. There's about three minutes left on the tape. Would you like me to go ahead and change it now?



MR. BROCKETT: Let's finish up the questions on this, if we can, and then we'll go.
THE WITNESS: Okay.
BY MR. BROCKETT:
Q Now, is this a press release issued by the CSX Corporation?
A Yes, it is.
Q And is it a press release in which CSX announces modifications to its fuel surcharge program?
A Yes.
Q And this is dated on March 20th of 2003; is that correct?
A That is correct.
Q And that's three days after the budget meeting that's referred to in the prior exhibit; is that correct?
A If we're correct on our supposition that Mr. Giftos was correct on March 18th saying yesterday's budget meeting, yes.
Q Okay. Now, did CSX make changes in its fuel surcharge program between the time of the budget meeting on March 17th of 2003 and the date of this press release on March 20th of 2003?
A I'm sorry. Could you repeat that question.
Q Sure. Did CSX make changes to its fuel

surcharge program between March 17th of 2003, the date of the budget meeting in which you challenged your senior management, and March 20th of 2003, the date of this press release?
A I'm confused by the question, but the 20th of March by this press release, yes, we did change our fuel surcharge program.
Q Okay. And who made that decision and when?
A Mr. Giftos -- here's my recollection --
Q Okay. Before you go into that, we might want to change the tape because I think you're going to get cut off. I don't mean to cut you off.
A No. That's fine.
MR. BROCKETT: Let's change the tape.
THE VIDEOGRAPHER: The time is 11:53 a.m. This concludes videotape number three. We are off the record.
(A recess was taken.)
THE VIDEOGRAPHER: The time is 11:54 a.m. This begins videotape number four. We are on the record.
BY MR. BROCKETT:
Q You can answer.
A My recollection is that this change was not driven so much by the budget meeting, but by the



operation of the prior program. Under the prior program, the price of the fuel had to be $5 above the -- the benchmark for 30 consecutive days in order for the surcharge to hit. I forget whether it's on the 28th, 29th or 30th day where it had been above the level that would have kicked in the fuel surcharge, it dropped down.
And I do recall a call from Mr. Giftos I believe -- well, he was on the road. He called me and was very upset that it had dropped off like that and said he would like to modify the program as described here and I told him go ahead.
Q Did he describe to you the ways in which he was going to modify the program?
A He didn't necessarily give me every specific but he said he was going to make it where instead of the $5 hurdle, it would be $1 increments, but that at $5 it would be the same amount of surcharge, so it would make smaller increments and that it would be on 30 days average, not 30 days above a hurdle, but he didn't give me more detail than that.
Q Okay. Can you -- can you explain as you sit here today the differences between the new program as described to you by Mr. Giftos in this phone call and the fuel surcharge program that CSX had in place up to



that point in time?
A I will do my best to describe it. As we discussed earlier, Mr. Giftos was given a lot of leeway in these commercial arenas.
The old program, as I understood it, was a $23 benchmark. If the fuel price -- and I forget what the basis of the fuel price is I think -- okay. West Texas Intermediate was above -- $5 above or 28 or more for 30 consecutive days, there would be a fuel surcharge of two percent applied.
The new program, with the same $5 increment would also apply a two percent, but what it did is looked at smaller increments. So each one dollar increase would get a four-tenths of a percent surcharge. And secondly rather than have to be consecutive days above that price, it was the average of the 30 days before.
Q Okay. Now, you say Mr. Giftos called you on the road and explained this to you?
A Yes.
Q Where was he? Do you know?
A I don't know where he was.
Q And how is it that you can remember that Mr. Giftos called you from the road?
A Because he was upset that the way this had



dropped off because he thought that we were going to be able to apply that two percent surcharge and my memory serves me properly, it's the second time that had happened to where it almost went 30 days and dropped off at the very end. So I remember him being disappointed at that and saying we need to immediately change this.
Q What does that have to do with Mr. Giftos being on the road?
A He was on the road when it dipped down on that day to eliminate the possibility of a surcharge. When he found out about that, he immediately called me to inform me of that and his desire to change the program.
Q Okay. What did you say to him?
A Sounds good to me.
Q That's all you said?
A I don't remember exactly what I said in the conversation.
Q Did you give him authority to -- to go forward and change the program?
A I agreed with his recommendation to move forward.
Q Well, can we agree that by March 20th of 2003, the date of this press release, you were the chief executive officer --

Page 141

A Again, I don't know whether this -- these tariffs apply to interline rates or only local rates. So I can't answer your question.
Q But as you sit here today, can you articulate or identify any fuel surcharge that CSX adopted that applied only to interline rates or only to local rates?
MR. GARDINER: Objection. Asked and answered.
THE WITNESS: You're asking me questions on tariffs. I'm not a tariff expert, so I can't answer your question.
BY MR. BROCKETT:
Q You don't know the answer?
A I don't know the answer.
Q All right. All right. Do you have any facts as you sit here today to suggest that the meeting that's referred to in this exhibit on March 13th of 2003 did not take place?
A I have no knowledge of this meeting, whether it occurred or not.
Q And do you have any facts to suggest that Mr. Koraleski and Mr. Gooden didn't meet and talk about fuel surcharges on March 13th of 2003?
A I have no facts relating to this meeting.
Q And when Mr. Giftos reported that he was

Page 142

going to change the fuel surcharge program, am I correct that he did not mention to you that Mr. Koraleski had paid a visit to your company on March 13th of 2003 --
MR. GARDINER: Objection. Asked and answered.
BY MR. BROCKETT:
Q -- is that correct?
A I think I answered before, I have no recollection of that in our discussion.
Q Let me show you what's previously marked as Gooden Exhibit 3.
A Okay.
Q Okay. Now, the cover to this is an e-mail from John Couch to Frank Onimus (phonetic) --
A Yes.
Q -- on March 11th of 2003, correct?
A That's correct.
Q Now, who is John Couch?
A John Couch is a fellow that I think at this time was working down in the tariff section of the company, publishes the tariffs.
Q Okay. And the attachment to this e-mail is a presentation regarding some changes -- or recommended changes to the fuel surcharge program, right?
A For the merchandise business.

Page 143

Q For the merchandise business?
A Yes.
Q Okay. And the -- the e-mail says, based -- revised based on input from Gutman and Clyde.
Who are Gutman and Clyde?
A Gutman is Bob Gutman who was I think at the time in the finance section and Clyde McIntyre was certainly in the tariff publication. That's where he spent most -- I think all of his career.
Q Then it also states, I believe Clarence is okay as well.
Do you see that?
A I do.
Q Okay. Now, do you understand that to mean that -- that Gutman, Clyde and Clarence have at least all -- those three have approved the changes to the fuel surcharge program that are reflected in the attachment?
MR. GARDINER: Objection. Lack of foundation.
THE WITNESS: My interpretation, based on these words, were that there was input given by Gutman and Clyde. Not saying whether they approved or disapproved. It did say I believe Clarence is okay. I'm just reading the words.
BY MR. BROCKETT:

Page 144

Q Okay. Now, if you look to page four of this called details of the new program.
You see that?
A Yes.
Q One of the bullets here says, starts at $23 a barrel.
You see that?
A Yes.
Q And that's exactly what the new fuel surcharge program that I just showed you in the press release dropped the trigger point from 28 to 23, correct?
A No. I think the -- the old one had the same base, $23 I believe.
Q Okay.
A I think the difference is when the surcharge kicks in. My recollection is that in both cases 23 was the start point.
Q Okay. Fair enough.
And as you understand it, the -- the slope, if you will, the levels at which it kicks in under the new program was that if it went up to $28 a barrel, you would impose a two percent fuel surcharge?
A My understanding is that what was instituted, the slope was the same in both cases but at a $5

Page 145

increase there would be a two percent surcharge. The differences in the new program, each dollar had a four -- .4 percent change versus having to get all the way up to $28, but the slope, my understanding, was exactly the same.

Q Right. Okay. But if you look at the bullet point on page four here in the next bullet point where it says, half percent increase for every $2, $50 (sic) increase in WTI.

You see that?

A I do.

Q So under that idea, the increase would only be one percent for every $5 increase in the WTI, correct?

A You're asking me to interpret a document I didn't create or have not seen before. So I would not even know how to interpret those two comments in conjunction with one another.

Q That's what it says, isn't it, sir?

A Those are the words --

MR. GARDINER: Object to the form.

THE WITNESS: -- I'm saying I don't know how to interpret it.

BY MR. BROCKETT:

Q Well, this says, half percent increase for

Page 146

every 250 increase in WTI. You don't think that's clear?

MR. GARDINER: Object to the form. You don't have to answer the question. That's not a question.

THE WITNESS: Okay.

BY MR. BROCKETT:

Q Well, let me ask you this -- look at the next page.

A Okay. I'm looking at it. From what I can tell, this is not the program that was instituted.

Q Right. That's my point.

A So --

Q That's all I'm asking you to --

A People regularly do multiple analyses before they make a decision.

Q I understand --

A Okay.

Q -- completely.

All I'm trying to -- to understand is, the program that's described in this exhibit that you're looking at now is not the -- exactly the same program that was announced on March 20th of 2003, isn't that fair?

A Yes, I would agree with that.

Page 147

Q So the question that I have to you is, what happened between March 11th, the date of this document, and March 20th, okay, 2003, when the new program was announced to -- to effect the changes that were effected?

MR. GARDINER: Objection.

THE WITNESS: I have no knowledge of that in any way, shape or form. I wasn't involved in these analyses, discussion and scenario planning.

BY MR. BROCKETT:

Q Okay. Let me show you what's previously marked as Gooden Exhibit 7.

A Okay.

Q Okay. So I know -- understand, you're not a recipient of this document, at least on an e-mail chain, but can you recognize this as a e-mail from someone at UP to a number of people -- strike that.

Just looking at this exhibit, can you -- you -- you see there's an entry here called, request for joint line concurrence?

Do you see that?

A Yes.

I must say I take offense to your earlier comment that I was not on the e-mail chain, but I'm -- implying somehow I may have gotten a copy of this.

Page 148

Q I wasn't suggesting that at all.

A Your words did imply that.

Q Well, I didn't intend to do that. I apologize if I did. I wasn't suggesting at all you got a copy of this.

But let me ask you, did you receive a copy of this?

A No.

Q All right. There's a statement in here that Union Pacific is announcing today that it's modifying its current fuel surcharge fuel cost recovery program to more closely reflect increases and decreases in fuel prices in a volatile market.

Do you see that?

A I do.

Q Okay. Then it goes on to describe the fuel surcharge program that the UP is announcing, does it not?

A That's what it appears to do.

Q Okay. And can you identify the description of the UP program that's being announced as a program that is identical to the one that the CSX announced on March 20th of 2003 that we already looked at?

A I'm not quite sure, because I don't know all the details of this, but if I look at the exhibit, at

Page 201

lines of business, except for intermodal, my guess would be that would be a uniform policy.
Q Show you what previously was marked as Cerwonka Exhibit 4.
A Donna Cerwonka. Okay.
Q Now, this is an e-mail by a Kyle Hancock?
A Yes.
Q And at this time Mr. Hancock was vice president of industrial and agricultural products?
A Yes.
Q Okay. And Mr. Hancock in this e-mail is also setting out some pricing guidelines, correct?
A That's correct.
Q And one of the guidelines he states is, no one is authorized to approve a deal without fuel surcharge?
A That is correct.
Q Okay. And that did reflect the policy of the company at this time, did it not?
A They can -- lower level people cannot approve it without approval of Clarence.
Q Okay. Well, it says here, no one is authorized to approve a deal without fuel surcharge. And you're saying that that means no one except Clarence?

Page 202

A But it also says below that, I am not saying I won't fully agree with a need for exceptions, but they must be discussed prior to moving forward.
Q All right. So the policy was that all contract renewals had to have a fuel surcharge unless Clarence granted an exception?
A Yes. Clarence -- I don't know. On the -- it's in the prior document, the price increase was ten percent for the vice president, eight percent for Clarence. I would think -- and I don't know this for sure -- the fuel surcharge was Clarence only, but he may have given some of that authority to the vice presidents. I -- I don't know.
Q And, again, did you, as the chief executive officer, participate in discussions under which these fuel surcharge policies were formulated?
A As I answered before, I have no recollection of those discussions, but I know I would discuss items like this with Mr. Gooden.
Q And am I correct that the company's goal with reference to fuel surcharges was to have fuel surcharges in all customer contracts and no exceptions?
A That was the goal, but there was also a recognition in the marketplace that might not always accept that and there may be reason to have exceptions,

Page 203

but the goal was to have them all with a fuel surcharge.
Q Did you ever have conversations with anyone about a mileage-based fuel surcharge?
A I did not get involved in discussions about mileage-based surcharge. I know there was an STB proceeding on that and I'm sure our marketing people were involved in those discussions and proceedings but I did not get involved with them.
Q Did you ever have an internal discussion with Mr. Gooden or anyone else about a mileage-based fuel surcharge?
A I have a vague recollection that when they were evaluating mileage-based versus revenue-based, I don't know if it was before or after the STB decision, but they did come into what we call the executive team, which is me and my top five direct reports, to discuss the differences between the two.
Q Okay. And did you participate in those discussions?
A I was there for it. Whether I spoke up, I don't have a specific rec --
Q Do you remember what was said on those discussions?
A I do not.
Q Did -- did anyone ever tell you that John

Page 204

Lanigan from the BNSF was shopping the concept of a mileage-based fuel surcharge to the other railroads?
MR. GARDINER: Object to the form.
THE WITNESS: Not to my knowledge.
I think the STB ultimately did require it though.
BY MR. BROCKETT:
Q And to -- to your knowledge, did CSX eventually go from a revenue-based fuel surcharge to a mileage-based fuel surcharge --
A We had to. The Surface Transportation --
Q Well --
A -- Board said we had to.
Q Right, but let me finish my question.
Did you make that switch with reference to traffic that's regulated by the STB?
A We had to make it by traffic regulated by the STB. That's the -- that's the law.
Q Right. But how about contract traffic?
A My recollection is we offered the customers that were under contract their choice of which two methodologies they would prefer.
Q And is that the current state of affairs today --
A I don't --

Q -- customers have an offer -- an option to choose?
A I don't know.
Q So you don't know what the fuel surcharge that the company has in place today is; is that correct?
A No. I think the program's the same one that was announced in '03 -- no. Wait. I think it's -- I have not paid attention of late. I think it's the same one that we've had all along.
What we're offer -- as I remember it, when the STB decision came down, we gave the customers the choice of whether they wanted to switch to mileage-based or keep what they had. I don't know what Clarence's current posture on that is.
Q Did you view the fuel surcharge as a price increase?
A I viewed it as a cost recovery. Obviously doing a cost recovery increased the price in total that the customer paid, but I viewed it as a cost recovery mechanism.
Q And when you say cost recovery, recovery of what specific cost?
A Of the increase in fuel cost.
Q And increasing fuel costs, by that you mean the cost of fuel above the $23 WTI benchmark?



A I think that's what we used as the -- the benchmark, yes.
Q Okay. And did there come a time when CSX realized more revenue from its fuel surcharge than the increases in fuel costs above the $23 benchmark?
A No. We were very conscious that on a cumulative basis we did not over-recover and I was actually quite public with the analysts and saying we would -- had no intention to make money. It was strictly cost recovery and that if we got to the point where cumulatively we had recovered, we would adjust the program.
Q And you made statements -- public statements to that effect?
A Yes, repeatedly actually.
Q Did you ever do a study about whether you would have exceeded the incremental fuel expense above the surcharge trigger if the fuel surcharge had applied to a hundred percent of your traffic?
A I don't remember any analysis like that. We more -- what I was more concerned with is were we on our cumulative over-recovery. I don't remember any studies what it would have been at a hundred percent, but I know we would have adjusted the program to not over-recover.
Q Well, did you -- did you do studies to



determine whether the fuel surcharge that you were charging those customers who were paying the fuel surcharge, okay, with respect to those customers, whether you were recovering more of the incremental fuel -- fuel cost above what it cost you to operate trains for those particular customers?
A I don't recall any such studies and that's a highly complicated issue to try to look at the various terrain -- train configuration of what the particular fuel consumption was for a given customer. So we viewed it as overall fuel expense for the corporation and about -- we have a -- about 75 percent of our business on a year-over-year basis is with the same origin-destination pair specifically and a lot of our customers were repeat customers, so we -- we didn't have the ability nor feel the need to do that kind of analysis.
Q Show you an e-mail -- internal CSX e-mail Bates 86525 through 86526.
THE COURT REPORTER: Do you want to mark it?
MR. BROCKETT: Yeah, it will be Exhibit 17.
(Exhibit 17 was marked for identification.)
THE WITNESS: Okay.
BY MR. BROCKETT:
Q Have you read this e-mail exchange?



A I just read it now, yes.
Q All right. Who is Erik Palm?
A Erik Palm is a gentleman in the finance department.
Q Was he a senior person in finance?
A No. He was an -- an analyst.
Q An analyst. All right.
Now, Mr. Palm writes an e-mail on June 3 of 2004 to John Couch and Dean Piacente and others, does he not?
A Yes.
Q Okay. And in this e-mail he gives an analysis of whether the company is recovering its incremental fuel cost, correct?
A Yes.
Q And he states that currently approximately 36 percent of CSXT revenue is covered by fuel surcharge. At this level, we recover about 70 percent of our incremental fuel expense above the surcharge trigger of $23 barrel WTI. If we had 100 percent fuel surcharge coverage, we would actually be recovering twice the incremental fuel expense above the fuel surcharge trigger point.
Do you see that?
A I do see that.

pretty big because we have a lot of regulatory issues, as well as normal litigation type issues, but I can't tell you how many people we have in the law department.
Q Did you go to a meeting called the NFTA spring meeting at the Wigwam in Arizona in April 2003?
A I have no idea.
Q Do you know anything about CSX implementing a rebasing program?
A I know there was discussion in -- in the sales and marketing group about whether that made sense or not. I don't know whether we actually ended up doing it or not.
Q Were you asked to give any kind of approval or blessing to a rebasing program?
A Not to my recollection.
Q Do you know anything further about whether CSX did or did not implement a rebasing program?
A I know it was discussed but I don't know whether it was done or not.
Q Did you ever testify in front of Congress?
A I have.
Q And on what subjects?
A It was on -- I think it was twice. Once there was a -- a hearing before the Rail Transportation Infrastructure Committee about a hedge firm that was



involved with CSX and then I think I gave testimony on some regulatory matter before the STB. I don't recall specifically, but I think it may have been some sort of re-regulation hearing.
Q Have you ever told Congress that CSX competes with UP and BNSF?
A I don't recall whether I did or not. You probably can tell me here in a minute.
As I discussed earlier, there are limited spots where we do compete with them.
Q So you would consider BNSF and UP to be your competitor in certain limited areas?
A Certain limited areas, but largely view them as an interchange partner to -- to grow the business.
Q So they're both a competitor and a partner?
A They're largely a partner and limited circumstances a competitor.
MR. BROCKETT: Why don't we take a short recess and come back.
THE INTERPRETER: Sure.
THE VIDEOGRAPHER: The time is 3:12. This concludes videotape number six. We are off the record.
(A recess was taken.)
THE VIDEOGRAPHER: Time is 3:23 p.m. This



begins videotape number seven. We are on the record.
BY MR. BROCKETT:
Q Mr. Ward, do you recall how it was that you first learned that CSX had been sued for price fixing relative to fuel surcharges?
A I do not.
Q And did -- there did come a time when you were informed that the company had been sued for price fixing over fuel surcharges, right?
A Yes.
Q And after you learned that, did you call Mr. Gooden in your office and ask him whether these charges were true?
A No, I didn't.
Q Did you have -- did you talk to anyone in your company and ask them whether the charges were true?
A I asked our general counsel, Ellen Fitzsimmons, because they reviewed the documents and she said --
MR. GARDINER: You're not -- I'm going to instruct you not to get into any discussions with any lawyers.
BY MR. BROCKETT:
Q Yeah. I'm not asking what you said to your



general counsel.
I'm asking, did you call any of your executive team into a meeting without lawyers and ask them whether the allegations were true?
A No, because I felt no need to. I'm very comfortable that we did nothing to violate the law.
Q Do you recall a meeting in April of 2007 in Washington, DC where you and the other CEOs of the Class I railroads were present, along with Mr. Hamberger and Lou Warchot for a meeting?
A I don't.
Q Okay. And this would have been a meeting about whether the AAR would file with the STB a request for a 60 day extension for implementing mileage-based fuel surcharges.
A I don't recall that meeting.
Q You don't recall that meeting at all?
A No.
Q Okay. Did you ever have occasion to speak with Mr. Giftos about his deposition?
A No. He was retired at the time.
MR. BROCKETT: Thank you. Nothing further.
MR. GARDINER: Just a couple of questions, Mr. Ward.
CROSS EXAMINATION

Page 221

BY MR. GARDINER:
Q I believe you testified that you were not involved in the -- in CSX's decision to create a fuel surcharge program in 2000?
A That's correct. I was running operations at the time.
Q Do you understand it to be the case that the fuel surcharge program that was created in 2000 was a rate-based fuel surcharge program?
MR. BROCKETT: Objection. Leading.
BY MR. GARDINER:
Q You can answer.
A Okay. That was my understanding, because the precedent at the STB on prior surcharges like this, it was a rate-based, so we followed the precedent of the STB.
Q And then I believe you testified that in -- in 2003 changes were made to the fuel surcharge program; is that correct?
A That is correct.
Q After those changes were made, was it still a rate-based surcharge program or was it changed to something else?
A It was still rate-based. It was basically the same slope, but the triggers were sooner, smaller

Page 222

increments of both kicking in the fuel surcharge and application of the surcharge, but the same basic slope of the program and it was still based on rates until the STB proceeding.
Q I believe you testified that the decision to make those changes to the formula in March of 2003 was made in the form of Mike Giftos making a recommendation to you and you agreeing with his recommendation --
A That is correct.
Q -- correct?
Was any other executive at CSX required to be in on the decision making process with regard to that change?
A No. He and I had the authority to make that change.
Q And in connection with your decision to make that change, did you have any discussions with any other railroad executives regarding that change?
A I did not.
Q Did you reach any agreements with any other carriers about that change?
A No, I did not.
Q Did Mr. Giftos communicate to you that he had had any discussions with any other carriers in connection with his recommendation?

Page 223

A He did not.
Q Do you have any reason to believe that he entered into any kind of agreement with any other carrier regarding that change?
MR. BROCKETT: Objection. Lack of foundation.
THE WITNESS: No, I -- no, I don't.
BY MR. GARDINER:
Q Okay. Did you believe, as the chief executive of the company, that that change was a rational business decision for CSX to make on its own?
A Especially -- I do and especially since it -- I think it was the second time we had just missed on that 30-day hurdle and we were suffering from the increase fuel costs, it was a very rational business decision.
Q Okay. Between the time that CSX made that change in March of 2003 and then I believe the testimony was in January of 2004 that the Norfolk Southern announced a change in its program, did you have any conversations whatsoever about fuel surcharge issues with anyone from the Norfolk Southern?
A I did not.
Q Do you have any knowledge of anyone else in the organization having such discussions?

Page 224

A I have no knowledge of that.
MR. GARDINER: Okay. That's all I have.
MR. BROCKETT: I have one or two more questions.
REDIRECT EXAMINATION
BY MR. BROCKETT:
Q Is it fair to say that you made a change from the fuel surcharge program that had been in place in 2000 in March of 2003 because the earlier program had flaws?
A Yes. The problem was the trigger, was a $5 increment sustained for 30 consecutive days, and it was really not effectively allowing us to recover our costs. So they took the program at $5, it was the still the same two percent, but it made smaller bites and averaged 30 days rather than being above the hurdle for 30 days.
Q Okay. And my only point is that you made that change because you perceived the prior program to be ineffective in recovering your fuel cost?
A That is correct.
MR. BROCKETT: Okay. That's all. Nothing further.
MS. REINHART: One administrative matter. An objection for one is an objection for all, the usual stipulation?

**ERRATA SHEET:**

Case name: In re: RAIL FREIGHT FULE SURCHARGE ANTITRUST LITIGATION

Dep. Date: February 10, 2011
Deponent: **MICHAEL WARD**

**CORRECTIONS**

| Page | Line | Change | Reason |
|---|---|---|---|
| 14 | 16 | Insert "the": "I think we've done a pretty good job of **the** chronology here." | Clarity/correction |
| 15 | 8 | Change "to get to" to "at the" | Correction |
| 15 | 24 | Change "about" to "with" | Correction |
| 16 | 16 | Delete "my --" | Clarity/correction |
| 25 | 12-14 | Insert "that" in line 12 and delete "correct --" in lines 13 and 14: "So we needed to correct **that** so we could serve our customers as they deserve to be served." | Clarity/correction |
| 28 | 19 | Insert "to": "What I'm saying is that **to** the best of my recollection," | Clarity/correction |
| 31 | 14 | Insert "is": "I have - my recollection **is** really none." | Clarity/correction |
| 34 | 3 | Change first "to" to "no" | Transcription error/correction |
| 39 | 24 | Change "was" to "were" | Correction |
| 40 | 16 | Change "there's" to "there are" | Correction |
| 41 | 23 | Change "there's" to "there are" | Correction |
| 49 | 7 | Change first "as" to "at" | Transcription error/correction |

| Page | Line | Change | Reason |
|---|---|---|---|
| 55 | 17 | Change "were --" to "are where traffic" | Clarity/correction |
| 56 | 12 | Change "was" to "were" | Correction |
| 62 | 23 | Change "efficient" to "efficiently" | Correction |
| 62 | 24 | Change "enduser" to "end user" | Transcription error/correction |
| 62 | 25 | Change "efficiency's" to "efficiencies" | Transcription error/correction |
| 63 | 1 | Delete "dis --" | Clarity/correction |
| 66 | 7 | Delete "obvious --" | Clarity/correction |
| 68 | 8 | Change "what" to "how" | Clarity/correction |
| 71 | 17 | Delete "Norfolk --" | Clarity/correction |
| 75 | 23-24 | Change "the Burlington Northern Santa Fe" to "CSXT" | Correction |
| 77 | 2 | Change "B&O" to "BNSF" | Correction |
| 78 | 2 | Insert "For" and "there": "**For** what we charged on a local basis **there** would not be any business reason." | Clarity/correction |
| 80 | 23 | Delete "sur --" | Clarity/correction |
| 84 | 6 | Delete "'s --" from "that's --" | Clarity/correction |
| 87 | 10 | Change "disband" to "disbanded" | Correction |
| 94 | 20 | Delete "any" and change "association" to "associations": "I think that's the way most association**s**" | Clarity/correction |
| 105 | 9 | Change "higher" to "lower" | Correction (see page 105:10-11) |

| Page | Line | Change | Reason |
|---|---|---|---|
| 105 | 19 | Change "enduser" to "end user" | Transcription error/correction |
| 106 | 14 | Change "year" to "years" | Correction |
| 108 | 22 | Change "date" to "data" | Correction |
| 117 | 20 | Insert "the": "As you alluded to earlier, after **the** Staggers Act," | Clarity/correction |
| 121 | 15 | Insert "is": "My recollection of the times **is** we would have a" | Clarity/correction |
| 127 | 8 | Insert "$" before "28": "Texas Intermediate was above -- $5 above or **$**28 or more" | Correction |
| 135 | 1 | Insert "of": "no discussion **of** Mr. Koraleski" | Clarity/correction |
| 140 | 18 | Change "81" to "8100" | Correction |
| 142 | 14 | Delete "(phonetic)" | Correction ("Onimus" is spelled correctly in transcript) |
| 171 | 3 | Insert "it": "have no reason not to think I did know about **it**." | Clarity/correction |
| 172 | 8 | Insert "the": "We never benchmarked on **the** customer side," | Clarity/correction |
| 175 | 12 | Change "movement" to "movements" | Transcription error/correction |
| 180 | 8 | Change "spec --" to "expect" | Clarity/correction |
| 181 | 9 | Change "reduce" to "report" | Correction |
| 185 | 4 | Change "myo" to "myop" | Correction |
| 187 | 23 | "boughs" to "bowels" | Transcription error/correction |
| 196 | 19-20 | Insert "it": "In answer to your question, **it** does not aid my recollection." | Clarity/correction |

| Page | Line | Change | Reason |
|---|---|---|---|
| 197 | 1 | Insert "a": "It was just **a** no objection item." | Clarity/correction |
| 197 | 23 | Change "to" to "no" | Transcription error/correction |
| 202 | 24 | Change "in" to "that" and delete original "that" so that testimony reads: "there was also a recognition that the marketplace might not always accept that" | Clarity/correction |
| 209 | 13 | Change "reach" to "reached" | Correction |
| 210 | 2 | Insert "in": "increase **in** fuel expenses." | Clarity/correction |
| 212 | 14 | Change "cause" to "because" | Clarity/correction |
| 214 | 3 | Change "poor" to "poorly" | Correction |
| 214 | 5 | Insert "out": "to take **out** the erratic moves of the spiking fuel" | Correction |
| 214 | 21 | Change "cause" to "because" | Clarity/correction |
| 216 | 23 | Insert "it": "knowledge of **it**." | Clarity/correction |
| 218 | 16 | Insert "in": "They're largely a partner and **in** limited" | Clarity/correction |

Michael Ward
MICHAEL WARD

3-28-11
DATE

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

**[ X ] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 29, 2000

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from __________ to __________

*Commission File Number 1-8022*

# CSX CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Virginia<br>(State or other jurisdiction of incorporation or organization) | 62-1051971<br>(I.R.S. Employer Identification No.) |
| 901 East Cary Street, Richmond, Virginia<br>(Address of principal executive offices) | 23219-4031<br>(Zip Code) |

(804) 782-1400
(Registrant's telephone number, including area code)
Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of exchange on which registered |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Exhibit Index can be found on page 6.

On January 26, 2001, the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $4.2 billion (based on the New York Stock Exchange closing price on such date).

On January 26, 2001, there were 212,982,301 shares of Common Stock outstanding.

| Documents Incorporated by Reference | Portion of Form 10-K into which Documents are Incorporated |
|---|---|
| 1. Portions of the Registrant's Annual Report to Shareholders for the fiscal year ended December 29, 2000 ("Annual Report") | Part I, II & IV |
| 2. Portions of the Registrant's Definitive Proxy Statement to be filed with respect to its annual | Part III |

meeting of shareholders scheduled to be held on May 1, 2001 ("Proxy Statement")

# PART I

## Item 1. Business

In response to this Item, the information set forth on page 1 under the caption "Financial Highlights", page 6 for Rail Operations, page 8 under the captions "CSX Intermodal", "CSX Lines", "CSX World Terminals", and pages 15-27 under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" of the Annual Report is incorporated herein by reference.

## Item 2. Properties

In response to this Item, the information set forth on pages 15-27 under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations", page 32 under the caption "Properties" and page 38 under the caption "Note 10. Properties." of the Annual Report is incorporated herein by reference.

## Item 3. Legal Proceedings

In response to this Item, the information set forth on pages under the captions "New Orleans Tank Car Fire Litigation" and "Environmental Management", page 25 under the captions "New Orleans Tank Car Fire" and "ECT Dispute" and pages 44 and 45 under the captions "Environmental" and "Other Legal Proceedings" of the Annual Report is incorporated herein by reference.

## Item 4. Submission of Matters to a Vote of Security Holders

There were no matters submitted to a vote of security holders in the fourth quarter of 2000.

## Executive Officers of the Registrant

Executive officers of CSX Corporation are elected by the CSX Board of Directors and hold office until the next annual election of officers. Officers of CSX business units are elected annually by the respective Boards of Directors of the business units. There are no family relationships or any arrangement or understanding between any officer and any other person pursuant to which such officer was selected.

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| John W. Snow, 61 | Chairman, President and Chief Executive Officer of CSX since February 1991. |
| Paul R. Goodwin, 58 | Vice Chairman and Chief Financial Officer of CSX since April 2000. Prior to April 2000, Mr Goodwin served as CSX Executive Vice President-Finance and Chief Financial Officer. |
| Mark G. Aron, 58 | Executive Vice President-Law and Public Affairs of CSX since April 1995. |
| Andrew B. Fogarty, 56 | Senior Vice President-Corporate Services of CSX since September 1997. Prior to September 1997, Mr. Fogarty served as Senior Vice President-Finance and Planning, Sea-Land, from June 1996 to August 1997; and prior thereto as CSX Vice President-Audit and Advisory Services |



DA01947

| | |
|---|---|
| Lester M. Passa, 46 | Senior Vice President - Strategic Planning of CSX since November 2000. Prior to November 2000, Mr. Passa served as President and CEO of CSX Intermodal from November 1997 to November 2000; CSXT Vice President-Commercial Integration from July 1997 to November 1997; and prior thereto as an officer of Conrail Inc. as Senior Vice President-Automotive Service Group from February 1997 to July 1997; and prior thereto as Vice President-Logistics & Corporate Strategy. |
| Jesse R. Mohorovic, 58 | Group Vice President-Corporate Communications and Investor Relations since April 1998. Prior to April 1998, Mr. Mohorovic served as CSX Vice President-Corporate Relations. |
| James L. Ross, 62 | Vice President and Controller of CSX since April 1996. Prior to April 1996, Mr. Ross served as CSX Vice President-Special Projects. |
| Michael J. Ward, 50 | President of CSXT since November 2000. Prior to November 2000, Mr Ward served as an officer of CSXT as Executive Vice President - Operations, from April 2000 to November 2000; Executive Vice President-Coal Service Group from August 1999 to April 2000; Executive Vice President-Coal & Merger Planning from October 1998 to August 1999; Executive Vice President-Finance and Chief Financial Officer from June 1996 to October 1998; and prior thereto as Senior Vice President-Finance. |
| P. Michael Giftos, 54 | Executive Vice President and Chief Commercial Officer of CSXT since April 2000. Prior to April 2000, Mr. Giftos served as CSXT Senior Vice President and General Counsel. |
| Frederick J. Favorite, Jr., 47 | Senior Vice President-Finance of CSXT since February 2000. Prior to February 2000, Mr. Favorite served as Vice President-Finance, CSXT, from December 1998 to January 2000; as Vice President-Planning, CSXT, from September 1996 to December 1998; and prior thereto as Vice President-Finance, Sea-Land. |
| Robert J. Grassi, 54 | President and Chief Executive Officer of CSX World Terminals since June 1999. Prior to June 1999, Mr. Grassi served as an officer of Sea-Land as Senior Vice President-Finance and Planning from August 1997 to June 1999; Senior Vice President-Atlantic, AME Services from June 1996 to August 1997; and prior thereto as Senior Vice President - Finance and Planning. |

| | |
|---|---|
| Charles G. Raymond, 57 | President and Chief Executive Officer of CSX Lines since June 1999. Prior to June 1999, Mr. Raymond served as an officer of Sea-Land as Senior Vice President and Chief Transportation Officer. |

## PART II

### Item 5. Market for Registrant's Common Equity and Related Stockholder Matters

In response to this Item, the information set forth on page 50, "Shareholder Information", and page 51, "Corporate Information", of the Annual Report is incorporated herein by reference.

### Item 6. Selected Financial Data

In response to this Item, the information set forth on page 1 of the Annual Report under the caption "Financial Highlights" is incorporated herein by reference.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

In response to this Item, the information set forth on pages 15-27 of the Annual Report under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" is incorporated herein by reference.

### Item 7A. Quantitative and Qualitative Disclosures about Market Risk

In response to this Item, the information set forth on page 21 of the Annual Report under the caption "Market Risk" is incorporated herein by reference.

### Item 8. Financial Statements and Supplementary Data

In response to this Item, the information set forth on pages 28-48 and page 49 under the caption "Quarterly Financial Data (Unaudited)" of the Annual Report is incorporated herein by reference.

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## PART III

**Item 10. Directors and Executive Officers of the Registrant**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement, except for the information regarding the executive officers of the Registrant which is included in Part I of this report under the caption "Executive Officers of the Registrant."

**Item 11. Executive Compensation**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 12. Security Ownership of Certain Beneficial Owners and Management**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 13. Certain Relationships and Related Transactions**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

## PART IV

**Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K**

(a) (1) Financial Statements

The following consolidated financial statements and independent auditor's report, which appear on pages 28-48 of the Annual Report, are incorporated herein by reference:

Consolidated Statement of Earnings for the Fiscal Years Ended Dec. 29, 2000, Dec. 31, 1999, and Dec. 25, 1998

Consolidated Statement of Cash Flows for the Fiscal Years Ended Dec. 29, 2000, Dec. 31, 1999, and Dec. 25, 1998

Consolidated Statement of Financial Position at Dec. 29, 2000 and Dec. 31, 1999

Consolidated Statement of Changes in Shareholders' Equity for the Fiscal Years Ended Dec. 29, 2000, Dec. 31, 1999, and Dec. 25, 1998

**Notes to Consolidated Financial Statements**

**Report of Independent Auditors**

The following financial statement footnote was not
included in the Annual Report.

**Note 20. Summarized Consolidating Financial Data - CSX Lines (formerly Sea-Land )**

During 1987, Sea-Land entered into agreements to sell and lease back by charter three new U.S. -built , U.S. -flag, D-7 class container ships. The ships were not included in the sale of international liner assets to Maersk in December 1999 and the related debt remains an obligation of CSX Lines. CSX has guaranteed the obligations of CSX Lines pursuant to the related charters which, along with the container ships, serve as collateral for debt securities registered with the Securities and Exchange Commission (SEC). The 2000 consolidating schedules reflect CSX Lines as the obligor and the 1999 and 1998 consolidating schedules reflect Sea-Land as the obligor. In accordance with SEC disclosure requirements, consolidating financial information for the parent and guarantors are as follows: (amounts in millions)

Consolidating Statement of Financial Position — 2000

| | CSX Corporate | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Assets | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 285 | $ (94) | $ 493 | $ - | $ 684 |
| Accounts Receivable | 33 | 65 | 926 | (174) | 850 |
| Materials and Supplies | - | 15 | 230 | - | 245 |
| Deferred Income Taxes | - | - | 121 | - | 121 |
| Other Current Assets | 12 | 12 | 248 | (126) | 146 |
| Total Current Assets | 330 | (2) | 2,018 | (300) | 2,046 |
| Properties | 29 | 455 | 17,355 | - | 17,839 |
| Accumulated Depreciation | (25) | (276) | (4,896) | - | (5,197) |
| Properties, net | 4 | 179 | 12,459 | - | 12,642 |
| Investment in Conrail | 364 | - | 4,304 | - | 4,668 |
| Affiliates and Other Companies | - | 164 | 227 | (29) | 362 |
| Investment in Consolidated Subsidiaries | 13,184 | - | 386 | (13,570) | - |
| Other long-term assets | (205) | - | 2,097 | (1,119) | 773 |
| Total Assets | $13,677 | $ 341 | $21,491 | $(15,018) | $20,491 |
| Liabilities | | | | | |
| Current Liabilities | | | | | |
| Accounts Payable | $ 102 | $ 88 | $ 1,036 | $ (147) | $ 1,079 |
| Labor and Fringe Benefits Payable | 5 | 21 | 379 | - | 405 |
| Payable to Affiliates | - | - | 127 | (127) | - |
| Casualty, Environmental and Other Reserves | 1 | 3 | 242 | - | 246 |
| Current Maturities of Long-term debt | 60 | - | 112 | - | 172 |
| Short-term Debt | 749 | - | - | - | 749 |
| Income and Other Taxes Payable | 1,346 | 12 | (986) | - | 372 |
| Other Current Liabilities | 39 | 25 | 219 | (26) | 257 |
| Total Current Liabilities | 2,302 | 149 | 1,129 | (300) | 3,280 |
| Casualty, Environmental and Other reserves | - | 4 | 751 | - | 755 |
| Long-term Debt | 4,594 | 54 | 1,162 | - | 5,810 |
| Deferred Income Taxes | 118 | (16) | 3,282 | - | 3,384 |
| Long Term Payable to Affiliates | 396 | 14 | 707 | (1,117) | - |
| Other Long-term Liabilities | 250 | 43 | 982 | (30) | 1,245 |
| Total Liabilities | 7,660 | 248 | 8,013 | (1,447) | 14,474 |
| Shareholders' Equity | | | | | |
| Preferred Stock | - | - | 396 | (396) | - |
| Common Stock | 213 | - | 209 | (209) | 213 |
| Other Capital | 1,467 | 98 | 8,958 | (9,056) | 1,467 |
| Retained Earnings | 4,337 | (5) | 3,915 | (3,910) | 4,337 |
| Accumulated Other Comprehensive Loss | - | - | - | - | - |
| Total Shareholders' Equity | 6,017 | 93 | 13,478 | (13,571) | 6,017 |
| Total Liabilities and Shareholders' Equity | $13,677 | $ 341 | $21,491 | $(15,018) | $20,491 |

Consolidating Statement of Financial Position

| 1999 | CSX Corporate | Sea-Land | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Assets | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ (141) | $ 553 | $ 567 | $ (5) | $ 974 |
| Accounts Receivable | 38 | 38 | 1,348 | (289) | 1,135 |
| Materials and Supplies | - | 16 | 204 | - | 220 |
| Deferred Income Taxes | - | (3) | 138 | - | 135 |
| Other Current Assets | 7 | 13 | 146 | (67) | 99 |
| Total Current Assets | (96) | 617 | 2,403 | (361) | 2,563 |
| Properties | 29 | 600 | 16,897 | - | 17,526 |
| Accumulated Depreciation | (24) | (339) | (4,906) | - | (5,269) |
| Properties, net | 5 | 261 | 11,991 | - | 12,257 |
| Investment in Conrail | 385 | - | 4,278 | - | 4,663 |
| Affiliates and Other Companies | - | 282 | 128 | - | 410 |
| Investment in Consolidated Subsidiaries | 13,141 | - | - | (13,141) | - |
| Other long-term assets | 191 | 129 | 1,237 | (730) | 827 |
| Total Assets | $13,626 | $1,289 | $20,037 | $(14,232) | $20,720 |
| Liabilities | | | | | |
| Current Liabilities | | | | | |
| Accounts Payable | $ 71 | $ 104 | $ 1,193 | $ (171) | $ 1,197 |
| Labor and Fringe Benefits Payable | 7 | 60 | 369 | - | 436 |
| Payable to Affiliates | - | 68 | 108 | (176) | - |
| Casualty, Environmental and Other Reserves | - | 9 | 262 | - | 271 |
| Current Maturities of Long-term debt | 254 | - | 95 | - | 349 |
| Short-term Debt | 574 | - | - | - | 574 |
| Income and Other Taxes Payable | 1,044 | 14 | (834) | - | 224 |
| Other Current Liabilities | 36 | 134 | 268 | (16) | 422 |
| Total Current Liabilities | 1,986 | 389 | 1,461 | (363) | 3,473 |
| Casualty, Environmental and Other reserves | - | 93 | 674 | - | 767 |
| Long-term Debt | 5,054 | - | 1,142 | - | 6,196 |
| Deferred Income Taxes | 359 | (91) | 2,959 | - | 3,227 |
| Long Term Payable to Affiliates | - | 434 | 291 | (725) | - |
| Other Long-term Liabilities | 474 | 284 | 546 | (3) | 1,301 |
| Total Liabilities | 7,873 | 1,109 | 7,073 | (1,091) | 14,964 |
| Shareholders' Equity | | | | | |
| Common Stock | 218 | - | 182 | (182) | 218 |
| Other Capital | 1,525 | 803 | 8,275 | (9,078) | 1,525 |
| Retained Earnings | 4,034 | (617) | 4,498 | (3,881) | 4,034 |
| Accumulated Other Comprehensive Loss | (24) | (6) | 9 | - | (21) |
| Total Shareholders' Equity | 5,753 | 180 | 12,964 | (13,141) | 5,756 |
| Total Liabilities and Shareholders' Equity | $13,626 | $1,289 | $20,037 | $(14,232) | $20,720 |

Consolidating Statement of Earnings

| 2000 | CSX Corporate | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Income | | | | | |
| Operating Revenue | $ - | $666 | $ 7,546 | $ (21) | $8,191 |
| Operating Expense | (222) | 666 | 6,963 | (21) | 7,386 |
| Operating Income(Loss) | 222 | - | 583 | - | 805 |
| Other Income and Expense | | | | | |
| Other Income | 813 | (1) | 191 | (988) | 15 |
| Interest Expense | 556 | 7 | 157 | (177) | 543 |
| Earnings | | | | | |
| Earnings before Income Taxes | 479 | (8) | 617 | (811) | 277 |
| Income Tax Expense | (11) | (3) | 105 | - | 91 |
| Earnings before Discontinued Operations and | 490 | (5) | 512 | (811) | 186 |
| Earnings from Discontinued Operations, Net of Tax | - | - | 14 | - | 14 |
| Gain on Sale of Discontinued Operations, Net of Tax | 2 | - | 363 | - | 365 |

| | | | | | |
|---|---|---|---|---|---|
| Earnings before Cumulative Effect of Accounting Change | 492 | (5) | 889 | (811) | 565 |
| Cumulative Effect on Prior Years of Accounting Change | - | - | - | - | - |
| Net Earnings (Loss) | $ 492 | $ (5) | $ 889 | $(811) | $ 565 |

Consolidating Statement of Earnings

| | 1999 | | | | |
|---|---|---|---|---|---|
| | CSX Corporate | Sea-Land | Other | Eliminations | Consolidated |
| Operating Income | | | | | |
| Operating Revenue | $ - | $ 3,809 | $6,584 | $ (18) | $10,375 |
| Operating Expense | (287) | 4,054 | 6,053 | (18) | 9,802 |
| Operating Income(Loss) | 287 | (245) | 531 | - | 573 |
| Other Income and Expense | | | | | |
| Other Income | 174 | (95) | 172 | (199) | 52 |
| Interest Expense | 526 | 63 | 20 | (88) | 521 |
| Earnings | | | | | |
| Earnings before Income Taxes | (65) | (403) | 683 | (111) | 104 |
| Income Tax Expense | (5) | (127) | 204 | - | 72 |
| Earnings before Discontinued Operations and | (60) | (276) | 479 | (111) | 32 |
| Earnings from Discontinued Operations, Net of Tax | - | - | 19 | - | 19 |
| Earnings before Cumulative Effect of Accounting Change | (60) | (276) | 498 | (111) | 51 |
| Cumulative Effect on Prior Years of Accounting Change | - | (49) | - | - | (49) |
| Net Earnings (Loss) | $ (60) | $ (325) | $ 498 | $(111) | $ 2 |

Consolidating Statement of Earnings

| | 1998 | | | | |
|---|---|---|---|---|---|
| | CSX Corporate | Sea-Land | Other | Eliminations | Consolidated |
| Operating Income | | | | | |
| Operating Revenue | $ - | $3,916 | $5,607 | $ (33) | $9,490 |
| Operating Expense | (237) | 3,821 | 4,808 | (33) | 8,359 |
| Operating Income(Loss) | 237 | 95 | 799 | - | 1,131 |
| Other Income and Expense | | | | | |
| Other Income | 701 | (127) | 381 | (836) | 119 |
| Interest Expense | 516 | 53 | 24 | (87) | 506 |
| Earnings | | | | | |
| Earnings before Income Taxes | 422 | (85) | 1,156 | (749) | 744 |
| Income Tax Expense | (3) | (15) | 242 | - | 224 |
| Earnings before Discontinued Operations and | 425 | (70) | 914 | (749) | 520 |
| Earnings from Discontinued Operations, Net of Tax | - | - | 17 | - | 17 |
| Earnings before Cumulative Effect of Accounting Change | 425 | (70) | 931 | (749) | 537 |
| Cumulative Effect on Prior Years of Accounting Change | - | - | - | - | - |
| Net Earnings (Loss) | $ 425 | $ (70) | $ 931 | $(749) | $ 537 |

Consolidating Statement of Cash Flows

| | 2000 | | | | |
|---|---|---|---|---|---|
| | CSX Corporate | CSX Lines | Other | Eliminations | Consolidated |
| Operating Activities | | | | | |
| Net Cash Provided by Operating Activities | $ 224 | $ (24) | $ 870 | $(360) | $ 710 |
| Investing Activities | | | | | |
| Property Additions | - | (16) | (897) | - | (913) |
| Net Proceeds from Sale of Assets | 673 | - | (23) | - | 650 |
| Investment in Conrail | (1) | - | 1 | - | - |
| Short-term Investments-net | 96 | - | (181) | - | (85) |
| Other Investing Activities | (103) | (1) | (804) | 919 | 11 |
| Net Cash Used by Investing Activities | 665 | (17) | (1,904) | 919 | (337) |
| Financing Activities | | | | | |
| Short-term Debt-Net | 175 | - | (400) | - | (225) |
| Long-term Debt Issued | 400 | - | 188 | - | 588 |

| | | | | | |
|---|---|---|---|---|---|
| Long-term Debt Repaid | (1,054) | - | 303 | - | (751) |
| Cash Dividends Paid | (267) | - | (235) | 240 | (262) |
| Preferred Stock Issued | - | - | 396 | (396) | - |
| Common Stock Issued | 94 | - | (56) | (38) | - |
| Common Stock Retired | (80) | - | 80 | - | - |
| Common Stock Reacquired | - | - | (42) | - | (42) |
| Other Financing Activities | 365 | (69) | 22 | (365) | (47) |
| Net Cash Provided (Used) by Financing Activities | (367) | (69) | 256 | (559) | (739) |
| Net Increase (Decrease) in Cash and Cash Equivalents | $ 522 | $(110) | $ (778) | $ - | $(366) |
| Cash and Cash Equivalents at Beginning of Year | $(475) | $ 16 | $1,085 | $ - | $ 626 |
| Cash and Cash Equivalents at End of Year | $ 47 | $ (94) | $ 307 | $ - | $ 260 |

Consolidating Statement of Cash Flows

| | 1999 | | | | |
|---|---|---|---|---|---|
| | CSX Corporate | Sea-Land | Other | Eliminations | Consolidated |
| Operating Activities | | | | | |
| Net Cash Provided by Operating Activities | $ 154 | $ 62 | $ 1,125 | $ (270) | $ 1,071 |
| Investing Activities | | | | | |
| Property Additions | - | (86) | (1,431) | - | (1,517) |
| Net Proceeds from Sale of International Container-Shipping Assets | - | - | 751 | - | 751 |
| Investment in Conrail | 2,084 | - | (2,086) | - | (2) |
| Short-term Investments-net | 94 | - | - | - | 94 |
| Other Investing Activities | (2,090) | 712 | (545) | 2,015 | 92 |
| Net Cash Used by Investing Activities | 88 | 626 | (3,311) | 2,015 | (582) |
| Financing Activities | | | | | |
| Short-term Debt-Net | 187 | - | - | - | 187 |
| Long-term Debt Issued | - | - | 284 | - | 284 |
| Long-term Debt Repaid | - | (18) | (108) | - | (126) |
| Cash Dividends Paid | (266) | (14) | (252) | 270 | (262) |
| Other Financing Activities | 38 | (241) | 2,167 | (2,015) | (51) |
| Net Cash Provided (Used) by Financing Activities | (41) | (273) | 2,091 | (1,745) | 32 |
| Net Increase (Decrease) in Cash and Cash Equivalents | $ 201 | $ 415 | (95) | $ - | $ 521 |
| Cash and Cash Equivalents at Beginning of Year | $ (676) | $ 139 | 642 | $ - | $ 105 |
| Cash and Cash Equivalents at End of Year | $ (475) | $ 554 | 547 | $ - | $ 626 |

Consolidating Statement of Cash Flows

| | 1998 | | | | |
|---|---|---|---|---|---|
| | CSX Corporate | Sea-Land | Other | Eliminations | Consolidated |
| Operating Activities | | | | | |
| Net Cash Provided by Operating Activities | $ 269 | $ 63 | $ 1,203 | $(535) | $ 1,000 |
| Investing Activities | | | | | |
| Property Additions | (1) | (54) | (1,424) | - | (1,479) |
| Net Proceeds from Conveyance of Barge Subsidiary | - | - | 628 | - | 628 |
| Investment in Conrail | - | - | (13) | - | (13) |
| Short-term Investments-net | 6 | - | - | - | 6 |
| Other Investing Activities | (245) | (13) | (113) | 359 | (12) |
| Net Cash Used by Investing Activities | (240) | (67) | (922) | 359 | (870) |
| Financing Activities | | | | | |
| Short-term Debt-Net | 60 | - | 1 | - | 61 |
| Long-term Debt Issued | 987 | - | 166 | - | 1,153 |
| Long-term Debt Repaid | (1,059) | (1) | (72) | - | (1,132) |
| Cash Dividends Paid | (267) | (55) | (475) | 535 | (262) |
| Common Stock Reacquired | (103) | - | - | - | (103) |
| Other Financing Activities | 57 | 50 | 259 | (359) | 7 |
| Net Cash Provided (Used) by Financing Activities | (325) | (6) | (121) | 176 | (276) |
| Net Increase (Decrease) in Cash and Cash Equivalents | $ (296) | $ (10) | $ 160 | $ - | $ (146) |
| Cash and Cash Equivalents at Beginning of Year | $ (380) | $ 149 | $ 482 | $ - | $ 251 |

| | | | | | |
|---|---|---|---|---|---|
| Cash and Cash Equivalents at End of Year | $ (676) | $ 139 | $ 642 | $ - | $ 105 |

(2) Financial Statement Schedules

The information required by Rule 3-09 is included in the Annual Report in Note 3 to the consolidated financial statements, "Investment in and Integrated Rail Operations with Conrail" and the Audited Consolidated Financial Statements of Conrail Inc., filed herewith as exhibit 99.1. The information required by Schedule II is included in the Annual Report in Note 11 to the consolidated financial statements, "Casualty, Environmental and Other Reserves." All other financial statement schedules are not applicable.

(3) Exhibits

| | |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3 to the Registrant's Annual Report on Form 10-K dated February 15, 1991) |
| 3.2 | Bylaws of the Registrant, as amended (incorporated herein by reference to Exhibit 3.2 to the Registrant's Annual Report on Form 10-K dated March 7, 2000) |
| 4.1(a) | Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant's Form SE dated September 7, 1990) |
| 4.1(b) | First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant's Form SE, dated May 28, 1992, filed with the Commission) |
| 4.1(c) | Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form S-4 (Registration No. 33-28523) filed with the Commission on June 5, 1997) |
| 4.1(d) | Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Commission on May 12, 1998) |

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant's long-term debt securities, where the long-term debt securities authorized under each such instrument do not exceed 10% of the Registrant's total assets, have been

omitted and will be furnished to the Commission upon request.

| | |
|---|---|
| 10.1 | CSX Stock Plan for Directors, as amended (incorporated herein by reference to Appendix A to the Definitive Proxy Statement dated March 18, 1997)** |
| 10.2 | Corporate Director Deferred Compensation Plan, as amended (incorporated herein by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K dated February 18, 1998)** |
| 10.3 | CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K dated March 4, 1994)** |
| 10.4 | CSX Directors' Matching Gift Plan, as amended (incorporated herein by reference to Exhibit 10.5 to the Registrant's Annual Report on Form 10-K dated March 14, 1997)** |
| 10.5 | Form of Agreement with J. W. Snow, and R.J. Grassi (incorporated herein by reference to Exhibit 10.6 to the Registrant's Annual Report on Form 10-K dated March 3, 1995)** |
| 10.6 | Form of Amendment to Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K dated March 14, 1997)** |
| 10.7 | Form of Retention Agreement with A. R. Carpenter (incorporated herein by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K dated February 28, 1992)** |
| 10.8 | Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.9 to the Registrant's Annual Report on Form 10-K dated March 4, 1994)** |
| 10.9 | Amendment to Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.11 to the Registrant's Annual Report on Form 10-K dated March 14, 1997)** |
| 10.10 | Amendment to Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.12 to the Registrant's Annual Report on Form 10-K dated February 18, 1998)** |
| 10.11 | Agreement with R. J. Conway (incorporated herein by reference to Exhibit 10.11 to the Registrants Annual Report on Form 10K dated March, 7, 2000)** |
| 10.12 | Employment Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.12 to the Registrants Annual Report on Form 10K dated March, 7, 2000)** |
| 10.13 | Employment Agreement with A. R. Carpenter (incorporated herein by reference to Exhibit 10.13 to the Registrants Annual Report on Form 10K dated March, 7, 2000)** |
| 10.14 | Employment Agreement with R. J. Conway (incorporated herein by reference to Exhibit 10.14 to the Registrants Annual Report on Form 10K dated March, 7, 2000)** |
| 10.15* | Employment Separation and Consulting Agreement with R. J. Conway** |
| 10.16* | Form of Employment Agreement with A. R. Carpenter, P. R. Goodwin and M. G. Aron** |
| 10.17* | Form of Stock Option Agreement** |
| 10.18 | CSX Market Value Cash Plan (incorporated herein by reference to Exhibit 10.13 to the Registrant's Annual Report on Form 10-K dated March 3, 1999)** |
| 10.19 | Stock Purchase and Loan Plan, as amended (incorporated herein by reference to Exhibit 10. 14 to the Registrant's Annual Report on Form 10-K dated March 3, |

| | |
|---|---|
| | 1999)** |
| 10.20 | 1987 Long-Term Performance Stock Plan, as Amended and Restated Effective April 25, 1996 (as Amended through September 8, 1999)-(incorporated by reference to Exhibit 10.18 to the Registrant's Annual Report on Form 10-K dated March 7, 2000)** |
| 10.21 | 1985 Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies, as amended (incorporated herein by reference to Exhibit 10.16 to the Registrant's Annual Report on Form 10-K dated February 18, 1998)** |
| 10.22 | Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies, as Amended and Restated January 1, 1995 (as Amended through September 8, 1999)-(Incorporated by reference to Exhibit 10.20 to the Registrant's Annual Report on Form 10-K dated March 7, 2000)** |
| 10.23* | Special Retirement Plan of CSX Corporation and Affiliated Companies, as Amended and Restated January 1, 1995 (as Amended through June 27, 2000)** |
| 10.24* | Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies, as Amended and Restated January 1, 1995 (as Amended through June 27, 2000)** |
| 10.25 | Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement dated March 17, 2000)** |
| 10.26 | CSX Omnibus Incentive Plan (incorporated by reference to Appendix A to the Registrant's Definitive Proxy Statement dated March 17, 2000) |
| 10.27 | 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as Amended through September 8, 1999)-(Incorporated by reference to Exhibit 10.24 to the Registrants Annual Report on Form 10-K dated March 7, 2000)** |
| 10.28* | CSX Long Term Incentive Cash Program** |
| 10.29 | CSX 2000 Stock Reacquisition Plan (incorporated by reference to Exhibit 99 to the Registrant's Registration Statement on Form S-8 (Registration No. 33-48896 filed with the Commission on October 30, 2000)** |
| 10.30 | Amended and Restated Credit Agreement (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 4, 1997) |
| 10.31 | Transaction Agreement (incorporated herein by reference to Exhibit 10 to the Registrant's Current Report on Form 8-K filed with the Commission on July 8, 1997) |
| 10.32 | Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC. (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.33 | Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings, LLC. (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.34* | Amendment No. 3, dated as of August 1, 2000, to the Transaction Agreement by and among CSX Corporation,CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC. |
| 10.35 | Operating Agreement, dated as of June 1, 1999, by and between New York Central Lines LLC and CSX Transportation, Inc. (incorporated herein by reference to |

| | |
|---|---|
| | Exhibit 10.3 to the Registrant's Curren Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.36 | Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.37 | Shared Assets Area Operating Agreement for Southern Jersey/Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.38 | Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.39 | Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC, and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.40* | Agreement with Bank of America for limited guaranty of loan to A.R. Carpenter** |
| 10.41* | Agreement with Bank of America for limited guaranty of loan to J.W. Snow** |
| 12* | Computation of Ratio of Earnings to Fixed Charges |
| 13* | Annual Report to Shareholders*** |
| 21* | Subsidiaries of the Registrant |
| 23.1* | Consent of Ernst & Young LLP |
| 23.2* | Consent of Ernst & Young LLP and KPMG LLP, Independent Auditors |
| 23.3* | Consent of PricewaterhouseCoopers LLP, Independent Accountants |
| 24* | Powers of Attorney |
| 99.1* | Audited Consolidated Financial Statements of Conrail Inc. for the Years Ended Dec. 31, 2000,1999, and 1998 |

* Filed herewith ** Management Contract or Compensatory Plan or Arrangement *** Except for those portions of the Annual Report which are expressly incorporated by reference in this Form 10-K, the Annual Report is furnished for the information of the Securities and Exchange Commission only and is not to be deemed "filed" as part of this Form 10-K.

(b) Reports on Form 8-K

Form 8-K filed on January 31, 2001 to restate prior-period financial statements to reflect the contract logistics segment as a discontinued operation.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.
CSX CORPORATION

(Registrant)

By: /s/JAMES L. ROSS
James L. Ross
Vice President and Controller
(Principal Accounting Officer)

Dated: February 28, 2001

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on February 28, 2001.

| Signature | Title |
|---|---|
| /s/ JOHN W. SNOW* | Chairman of the Board, President, |
| John W. Snow | Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ PAUL R. GOODWIN* | Executive Vice President-Finance and |
| Paul R. Goodwin | Chief Financial Officer (Principal Financial Officer) |
| /s/ ELIZABETH E. BAILEY* | Director |
| Elizabeth E. Bailey | |
| /s/ H. FURLONG BALDWIN* | Director |
| H. Furlong Baldwin | |
| /s/ CLAUDE S. BRINEGAR* | Director |
| Claude S. Brinegar | |
| /s/ ROBERT L. BURRUS, JR.* | Director |
| Robert L. Burrus, Jr. | |

| | |
|---|---|
| */s/ BRUCE C. GOTTWALD** <br> *Bruce C. Gottwald* | *Director* |
| */s/ JOHN R. HALL** <br> *John R. Hall* | *Director* |
| */s/ E. BRADLEY JONES** <br> *E. Bradley Jones* | *Director* |
| */s/ ROBERT D. KUNISCH** <br> *Robert D. Kunisch* | *Director* |
| */s/ JAMES W. MCGLOTHLIN** <br> *James W. McGlothlin* | *Director* |
| */s/ SOUTHWOOD J. MORCOTT** <br> *Southwood J. Morcott* | *Director* |
| */s/ CHARLES E. RICE** <br> *Charles E. Rice* | *Director* |
| */s/ WILLIAM C. RICHARDSON** <br> *William C. Richardson* | *Director* |
| */s/ FRANK S. ROYAL, M.D.** <br> *Frank S. Royal, M.D.* | *Director* |

*By: /s/ ELLEN M. FITZSIMMONS

*Ellen M. Fitzsimmons*
*Attorney-in-Fact*

**Exhibit 10.15**

PRIVILEGED AND CONFIDENTIAL MATERIAL PREPARED IN CONNECTION WITH SETTLEMENT DISCUSSIONS

June 21, 2000

Mr. Ronald J. Conway
P.O. Box 1702
Ponte Vedra Beach, FL 32004

**Employment Separation and Consulting Agreement**

Dear Ron:

As used in this Agreement, the "Companies" will mean CSX Corporation ("CSX") and CSX Transportation, Inc. ("CSXT"), and each reference to "the Companies" will include CSX, CSXT and their respective affiliates. This Agreement sets forth the agreement between you and the Companies with respect to your separation from employment with the Companies.

1. Resignation. Effective April 10, 2000, you voluntarily resigned from your position as President of CSXT. Effective April 10, 2000, you ceased to have any executive, operational or managerial duties with the Companies, and through December 30, 2000, CSX will employ you as a consultant of the Companies upon the terms and conditions set forth herein (the "Consultancy"). As of December 30, 2000 or the date you accept other full-time employment, whichever is earlier (the "Separation Date") you will voluntarily resign or retire from your employment with the Companies.

2. Consulting Duties. During the Consultancy, you will be available to the Companies' executive officers and their designees upon reasonable notice and subject to your agreement to specific assignments. During any such assignments, you will be reimbursed for reasonable and customary expenses in accordance with the Companies' Travel and Expense Reimbursement policies and procedures.

3. Compensation. For your commitments and undertakings in this Agreement, the Companies will pay you the amounts set forth in this Section 3.

a. Monthly Payments. For approximately eight and one-half months of the Consultancy, the Companies will pay you at an annualized rate of Five Hundred Fifty Thousand Dollars ($550,000), payable in monthly installments of approximately Forty Five Thousand Eight Hundred Eighty Three Dollars ($45,883) per month (the "Consulting Pay") for the periods ending May 1,

2000

Mr. Ronald J. Conway
June 21, 2000



and June 1, 2000, with the balance, approximately Three Hundred Twenty Thousand Eight Hundred Thirty Three Dollars ($320,833), being paid in a lump sum as soon as practicable. The Companies will attempt to make such payment on or before June 30, 2000 and will make such payment before July 15, 2000. The amounts described in this Section 3(a) are referred to herein as the "Monthly Pay."

b. General Ineligibility for Stock Options, Performance Shares,
Bonuses, Etc. Except as specifically set forth below, you will not be eligible for any award or new grant of stock options or other stock compensation under the CSX Corporation 1987 Long Term Performance Stock Plan (the "1987 Plan"), the CSX Corporation Stock Purchase and Loan Plan (the "SPLP") or any other stock compensation, bonus or similar or substitute program of the Companies (a "Stock Plan").

c. Performance Shares. You will receive approximately 9,490 performance shares for the 1998 through 2000 performance share cycle as soon as practicable. The Companies will attempt to make such payment on or before June 30, 2000 and will make such payment before July 15, 2000. The value of such shares on the date awarded will be included in your year 2000 compensation for purposes of calculating the bonus described in Section 3(d).

You will receive approximately 9,490 performance shares for the 1999 through 2001 performance share cycle. The Companies will attempt to make such payment on or before June 15, 2000 and will make such payment before July 15, 2000. The value of such shares on the date awarded will not be included in your year 2000 compensation for purposes of calculating the bonus described in Section 3(d).

d. One-Time Bonus. You will receive a one-time bonus equal to the difference between $1 million and the total of $550,000 and the value paid to you of 9,490 CSX shares representing performance share buyout for the 1998 through 2000 cycle as soon as practicable. The Companies will attempt to make such payment on or before June 30, 2000 and will make such payment before July 15, 2000.

Mr. Ronald J. Conway
June 21, 2000



e. Options. All CSX options previously granted to you will expire, vest or be exercisable in accordance with their terms.

f. Employment Agreement. With respect to the Employment Agreement between you and CSX dated June 15, 1999 (the "Employment Agreement"), will be treated as described on Exhibit A hereto, and the Employment Agreement will hereby be rendered null and void in all respects.

g. Health Care Coverage. You and your wife will continue coverage under the CSX Corporation Medical, Dental and Vision Plan, including related prescription drug benefits, through December, 2004, as if you were an active employee. After that date, as a retiree of CSX, you and you wife will continue coverage under the CSX Corporation Medical, Dental and Vision Plan, including related prescription drug benefits, to the same extent as other retirees of CSX. The Companies will pay for you to have an annual physical at the Mayo Clinic, Jacksonville, Florida, during the year 2000.

h. Lump Sum Option for Certain Benefits. The Companies will make available to you the lump sum option for the Supplemental and Special Retirement Plans when, and to the extent, that option becomes available to executives of the Companies; provided, however, that if the Companies approve a policy before December 31, 2000 that provides for a lump sum option for the Supplemental and Special Retirement Plans, you will receive your lump sum payment no later than December 31, 2000, and the Companies will use its best efforts to deliver such payment to you on or about December 1, 2000.

i. Tax. The Companies will withhold applicable taxes, including

F.I.C.A., railroad retirement, federal, state and local with respect to the payments arrangements described in this outline. The Companies will work with your tax advisor to assist him in you financial planning work.

j. Pension Enhancement. Your benefits under the Companies' pension and similar plans will be calculated substantially as described in Exhibit B, which includes an additional five years of credited service that will

provide you a pension benefit that is approximately 15 percent over that you otherwise would have received. Such Exhibit B does not reflect reduction in monthly payments that would result from your electing to take the lump sum option described in Section 3(h).

Mr. Ronald J. Conway
June 21, 2000



k. Other Benefits and Perquisites through the Separation Date.
During the Consultancy, you will continue to participate in (i) the CSX Corporation Medical, Dental and Vision Plan; (ii) the CSX Corporation Supplementary Savings and Incentive Deferral Plan and (iii) any other benefits or perquisites that you participated in as of April 10, 2000.

l. Other Benefits and Perquisites after Separation Date. From and after the Separation Date, except for the rights you then may have under Section 3(g) of this Agreement providing for extended health care coverage and as a former employee or retiree under (i) the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies, (ii) the CSX Corporation Supplementary Savings and Incentive Award Deferral Plan; (iii) the CSX life insurance programs; (iv) the CSX Market Value Cash Plan; (v) the 1987 Plan; or (vi) COBRA or any similar or successor law, you will not be entitled to receive or accrue any benefits or perquisites. You will be entitled to the benefits of other plans to the same extent as are other retirees of the Companies.

m. Club Membership.

(i) Pablo Creek. You will resign your membership in the Pablo Creek Club (the "Club") on or before September 1, 2000. Within twenty (20) days of receipt of the payment from the Club evidencing your equity membership in the Club, you will pay to the Companies a sum equal to the amount of the equity investment returned to you by the Club minus a sum calculated by Ernst & Young equal to 20% of the Gross-Up for the taxes incurred by you on the equity investment in the Club.

(ii) TPC. You will transfer the TPC membership either to the

Companies or to an individual designated by the Companies on or before September 1, 2000.

n. Transition Payment. You will receive a one time cash payment to cover transition expenses of you choosing in an amount up to $10,000.

o. Plan Amendments. YOU ACKNOWLEDGE AND AGREE THAT IF ANY BENEFIT OR

**PERQUISITE PLANS OR POLICIES ARE AMENDED OR TERMINATED, YOU WILL BE SUBJECT TO SUCH AMENDED OR TERMINATED PLANS OR POLICIES.**

Mr. Ronald J. Conway
June 21, 2000



p. Death. If you were to die prior to the Separation Date, your designated beneficiary would be entitled to the payments contemplated by Section 3 of this Agreement when, and to the extent, such payment would otherwise have been payable hereunder.

4. Waiver and Release. In exchange for the compensation and benefits promised herein, you hereby waive and release the Companies from any and all claims you may have against them, except for claims relating solely to the performance of their obligations under this Agreement, and further agree to execute the Waiver and Release attached hereto as Exhibit C at the time of execution of this Agreement to more completely set forth the parties' understanding, and to execute an additional Waiver and Release in the same form upon the Separation Date. Notwithstanding any failure by you to deliver such additional Waiver and Release, your obligations under this Agreement, including those under this Section 4, will remain in full force and effect.

5. Confidential Information.

a. Confidential Information Defined. The parties recognize that during your employment, you have learned trade secrets and other information confidential to the Companies and that the Companies would be substantially injured if the confidentiality of such information were not maintained. For the purposes of this Section 5, "Confidential Information" means and includes every item of and all the contents of any discussions, documents, information, technology, procedures, customer lists, business plans, employee compensation data, pricing information, strategies, software, financial data, ideas and assumptions and all other material relating to or in connection with your prior employment or future consulting work for the Companies and their property, business methods and practices, suppliers and customers, other than that which is generally known to the public. To the extent that the Confidential Information comprises any written material or other material in a reproducible form by any means whatsoever, whether manual, mechanical or electronic, you will not copy, extract or reproduce the same by any means whatsoever, nor provide nor otherwise make such material available to any third party, nor use such Confidential Information for your own purposes.

b. Restriction on Use. You agree not to disclose to third persons such documents or Confidential Information without the prior consent of the Companies, whether for compensation or otherwise. You further agree not to use such documents or Confidential Information for any purpose detrimental to the Companies. You will at all times use your best possible efforts to ensure that any person to whom the Confidential Information is disclosed pursuant to this

Mr. Ronald J. Conway
June 21, 2000



Agreement keeps the same secret and confidential and observes an obligation of confidentiality in relation thereto.

c. Non-Competition. You specifically agree that you will advise any future employer or client of yours that meets any of the following criteria of these confidentiality restrictions and will secure the written agreement of such employer or client, and make it available to the Companies upon request, that your provision of services will not violate these provisions. Such advice and agreement shall be required for any employer or client that is (i) engaged in the railroad or intermodal transportation business; (ii) a customer representing more than 1% of the revenues of either CSXT or CSX Intermodal, Inc.; or (iii) affiliated with the Norfolk Southern Corporation. You further agree not to work for, or provide services, directly or indirectly, to any entity that meets any of these criteria before January 1, 2001, without the prior written consent of the Companies. The covenant in this Section 5(c) will expire on January 1, 2001, and after that date, you are free to work anywhere.

d. Restriction on Trading. You acknowledge that you may be deemed to be an "officer" of CSX for purposes of Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules promulgated thereunder up until October 10, 2000. Accordingly, you agree to comply with the reporting requirements of the Exchange Act and the Companies' policies governing trading of such officers for the period after cessation of your reporting obligations contemplated by Rule 16a-2 promulgated under the Exchange Act. You acknowledge that these reporting and related short-swing profit liabilities are solely your responsibility.

e. No Waiver of Legal Rights. You hereby acknowledge that none of the provisions of this Agreement, including, without limitation, the provisions of this Section 5 will be deemed or construed to reduce the protections afforded the Companies by common law, statute or regulation.

f. Perpetual Restriction. You acknowledge that notwithstanding the expiration of the provisions of Section 5, including your ability to work anywhere on or after January 1, 2001, your obligations with respect to Confidential Information are perpetual.

Mr. Ronald J. Conway
June 21, 2000



6. Private Agreement. It is the desire and in the interest of all parties affected by this Agreement that the terms hereof be maintained in strictest confidence. To that end, you and the Companies covenant and agree to maintain each and every term of this Agreement in the strictest confidence, and to neither release nor divulge either orally or in writing any term, covenant or condition hereof to any person, firm or entity provided, however:

a. that the Companies or you may disclose as required pursuant to a lawful subpoena or court order;

b. that the Companies or you may disclose in accordance with a prepared written statement approved in advance by the Chief Executive Officer of CSXT; or

c. that the Companies may disclose to employees or advisors, including counsel, determined to have a need to know;

d. that you may disclose to your spouse, counsel, tax advisor, and estate planner, whom you will instruct to preserve confidentiality;

e. that you may disclose the existence of the Consultancy and the confidentiality provisions.

7. Governing Law. This Agreement will be governed, construed and interpreted under the laws of the Commonwealth of Virginia.

8. Injunctive Remedy. You acknowledge that any breach or threatened breach of the covenants set forth in this Agreement would cause irreparable injury to the Companies and that money damages alone would not provide an adequate remedy to the Companies. The parties agree that any reviewing court will have the authority to reform this provision to conform to applicable law, provided that it is the intent of the parties that this Section 8 be given full effect in all respects.

9. Adequate Consideration. You acknowledge and agree that the compensation and benefits reflected herein and which you have already received fully satisfy all obligations of the Companies arising from your employment or the termination thereof and that the Companies are not required to provide the special severance and other termination benefits reflected in this Agreement under the terms of any personnel policy or benefit plan or contract. You further acknowledge that you have signed this Agreement in exchange for consideration in excess of any to which you were otherwise

Mr. Ronald J. Conway
June 21, 2000



entitled and that such consideration is satisfactory and adequate for the covenants made by you herein.

10. Parties' Intent; Mutual Cooperation. The parties mutually agree to conduct themselves with a spirit of harmony and mutual cooperation, and to refrain from and avoid any disparaging or defamatory comments or statements to any third parties after execution hereof that would reflect negatively on the business, person or professional reputation of any parties hereto. You acknowledge and agree that the foregoing applies only to the executive officers of the Companies and that your remedy with respect to any breach of the foregoing shall be solely to seek an injunction.

11. Litigation. You agree to cooperate and provide information and assistance to the Companies in any dispute, proceeding, arbitration or litigation involving the Companies of which you have knowledge or involvement as a result of your employment with the Companies. During any such activity, you will be reimbursed for reasonable and customary expenses in accordance with the Companies' Travel and Expense Reimbursement policies and procedures.

The Companies hereby confirm that notwithstanding your status as a consultant, retiree or former employee, for acts on behalf of the Companies occurring during your tenure as an officer of the Companies, or one of their affiliates, you will be entitled to indemnity and advances for expenses afforded officers under the CSX Articles of Incorporation to the extent permitted by the Virginia Stock Corporation Act.

12. Dispute Resolution. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or validity hereof, except an injunction proceeding under either Section 5 or 8, shall be finally settled through binding arbitration by a sole, disinterested arbitrator in accordance with the Rules of the American Arbitration Association. The arbitrator shall be jointly selected by you and the Companies but, if you and the Companies do not agree on an arbitrator within thirty days after demand for arbitration is made by a party, the arbitrator shall be designated by the American Arbitration Association. The award of the arbitrator shall be final and conclusive, and the arbitration shall be concluded within six months of its commencement. Each party to the arbitration shall pay the compensation, costs, fees and expenses of its own witnesses, experts and counsel, and the compensation and any costs and expenses of the arbitrator shall be borne equally by the parties.

13. Other Agreements. In exchange for the compensation and benefits promised herein, you hereby waive and release the Companies from any and all claims you may have with respect to (a) the offer of employment dated June 11, 1998; (b) the acceptance of such offer dated June 19, 1998; and (c) the Employment Agreement, and

you acknowledge that this Agreement shall supersede and render null and void in all respects the foregoing agreements.

14. Entire Agreement. This Agreement, together with the Waiver and Release Agreement, reflects the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior discussions or understandings between the parties. The terms of this Agreement may not be amended, deleted or modified except by prior written agreement signed by you and the Companies.

15. Successors and Assigns. You and the Companies have read this Agreement and understand its contents. You and the Companies further acknowledge satisfaction with the terms of this Agreement and agree that the Agreement will be binding upon your and the Companies' respective attorneys, heirs, personal representatives, successors and assigns.

Very truly yours,

**CSX CORPORATION**

*/s/ Andrew B. Fogarty*
*By: ______________________________*
*Andrew B. Fogarty*
*Senior Vice President-*
*Corporate Services*

**CSX TRANSPORTATION, INC.**

*/s/ William J. Ryan*
*By: ______________________________*
*William J. Ryan*
*Senior Vice President-*
*Human Resources*

Reviewed, approved and
agreed as of the 26th day of
June, 2000:

/s/ Ronald J. Conway

Ronald J. Conway

**EXHIBIT A**

**Employment Agreement**

The Employment Agreement will be treated as described below and, as provided in Section 3(f), will be rendered null and void in all respects.

1. Immediate Vesting. The Companies will pay you 100,000 CSX shares and will attempt to make such payment on or before June 30, 2000 and will make such payment before July 15, 2000.

2. Total Shares. Assuming that 41% of the 100,000 share award were to be withheld for tax payments, you would then have 59,000 remaining. Your total number of shares would be an estimated 159,000 (the "Shares") from (a) your initial 100,000 purchase and (b) the 100,000 share award, less shares sold for withholding.

3. Interest Coverage. The Companies will pay or reimburse your Loan interest from the inception of the Loan to date and through the period the Loan is outstanding to the extent your dividend payments on the Shares (estimated at $1.20 per share) do not equal such interest. A Gross-Up Payment as defined below will be paid with respect to this payment (the "Interest Spread Payment").

4. Past Interest. In addition, the Companies will pay you a lump sum amount of $304,419 for the Interest Spread and the related Gross-Up Payments for the four interest payments you made through April 2000. The Companies will attempt to ensure that such payment is made on or before June 30, 2000 and will make such payment before July 15, 2000.

1. Principal Coverage. The Companies will hold you harmless from any loss on the loan principal in your approximately $4.99 million NationsBank credit facility dated May 6, 1999 (the "Loan"), after deducting the amount of your proceeds from the sales of the Shares (the "Principal Spread Payment"). A Gross Up Payment will be paid with respect to the Principal Spread Payment. You represent that the principal balance on the Loan is approximately $4.99 million and agree that you will not make any further borrowings under the Loan. You acknowledge and agree

that

a. Before June 15, 2001, you will not sell any Shares or repay any Loan principal unless:

(i) you have the prior written consent of the Companies; or

(ii) NationsBank has declared the Loan in default for a reason other than your failure to deliver information or payments when due, and you have given the Companies notice within five (5) business days of your receiving notice of such default and at least five (5) business days before any sale of Shares.

b. After June 15, 2001, you may sell any or all of the Shares if:

(i) you give the Companies five (5) days prior written notice; and

(ii) you immediately remit proceeds from the sale of such Shares to NationsBank in satisfaction of your obligations under the Loan.

5. Loan Compliance. You will use your best efforts to avoid any default of the Loan, including, without limitation, promptly seeking a waiver of any default that could arise in connection with your serving as a Consultant with the Companies or retiring from the Companies. The Companies will cooperate with you in seeking such a waiver.

6. Direct Payments of Loan. You agree to promptly pay Interest Spread Payments to NationsBank. You further agree that the Companies may make Interest Spread Payments to NationsBank directly, in the Companies' sole discretion, and that the Company will make Principal Spread Payments to NationsBank directly.

7. Gross-Up Payments. You will be entitled to receive additional payments ("Gross-Up Payments") in an amount such that after payment by you of all taxes, including income taxes, imposed with respect to the Interest Spread Payments and the Principal Spread Payment, you retain an amount of the Gross-Up Payment equal to the taxes imposed upon the payments.

8. Payment Mechanics. To receive any Interest Spread, Principal Spread or

**Gross-Up Payment:**

a. You will send Ernst & Young or such other certified public accounting firm as may be agreed upon by you and the Companies (the "Accountant") timely notice that the interest payment is due to NationsBank, including your interest invoice, if applicable. You agree to provide the Companies or the Accountants with any other supporting documentation reasonably requested by either of them to permit verification and calculation of the Gross-Up Payments.

b. The Accountant will review and provide detailed supporting calculations both to the Companies and to you within fifteen (15) business days of receipt of the materials from you.

c. Within seven (7) business days of receipt of the Accountant's work, the Company will pay you the Interest Spread, Principal Spread or Gross-Up Payment, as the case may be, as calculated by the Accountant.

9. Companies' Early Termination Right. Notwithstanding Section 5.a. of this Exhibit A, the Companies will have the option to require you to sell the Shares and repay the Loan at any time. If the Companies were to exercise such right, they would make the Principal Spread and Gross-Up Payments promptly.

10. Securities Requirements. You and the Companies will work together on the disposition of the Shares to help ensure that securities law requirements are satisfied.

11. Housing Assistance. During the period the Loan is outstanding, the Companies will assist you with respect to the refinancing of your North Carolina residence. Specifically, the Companies will either (a) provide acceptable assurances to your mortgage lender or (b) provide a bridge

loan.

**Exhibit 10.16**

DRAFT: 10/30/00

**EMPLOYMENT AGREEMENT**

AGREEMENT by and between CSX CORPORATION, a Virginia corporation (the "Company"), and ____________________ (the "Executive"), dated as of the first day of November, 2000.

The Board of Directors of the Company (the "Board"), has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of the Executive, notwithstanding the possibility, threat or occurrence of a Change of Control (as defined below) of the Company. The Board believes it is imperative to diminish the inevitable distraction of the Executive by virtue of the personal uncertainties and risks created by a pending or threatened Change of Control and to encourage the Executive's full attention and dedication to the Company currently and in the event of any threatened or pending Change of Control, and to provide the Executive with compensation and benefits arrangements upon a Change of Control which ensure that the compensation and benefits expectations of the Executive will be satisfied and which are competitive with those of other corporations. Therefore, in order to accomplish these objectives, the Board has caused the Company to enter into this Agreement.

**NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:**

1. Certain Definitions.

a. The "Effective Date" shall mean the first date during the Term (as defined in Section l(b)) on which a Change of Control (as defined in Section 2) occurs. Anything in this Agreement to the contrary notwithstanding, if a Change of Control occurs, and the Executive's employment with the Company is terminated by the Company without Cause prior to the date on which the Change of Control occurs or the Executive ceases to be an officer of the Company, and if it is reasonably demonstrated by the Executive that such termination of employment or cessation of status as an officer (i) was at the request of a third party who has taken steps reasonably calculated to effect such Change of Control or (ii) otherwise arose in connection with or anticipation of such Change of Control, then, in each such case, for all purposes of this Agreement the "Effective Date" shall mean the date immediately prior to the date of such termination of employment or cessation of status as an officer.

b. The "Term" shall mean the period commencing on the date hereof

and ending on the earlier to occur of (i) the third anniversary of such date or (ii) the first day of the month next following the Employee's normal retirement date ("Normal Retirement Date") under the principal pension plan in which the Executive participates (the "Retirement Plan");

provided, however, that commencing on the date one year after the date hereof, and on each annual anniversary of such date (such date and each annual anniversary thereof shall be hereinafter referred to as the "Renewal Date"), unless previously terminated, the Term shall be automatically extended so as to terminate three years from such Renewal Date, unless at least 60 days prior to the Renewal Date the Company shall give notice to the Executive that the Term shall not be so extended; and

provided, further, that the Term shall end on an earlier date if the Company gives the Executive at least one year's advance written notice thereof.

2. Change of Control. For the purpose of this Agreement, a "Change of Control" shall mean:

a. Stock Acquisition. The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or
(ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Company, (ii) any acquisition by the Company, (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 2; or

b. Board Composition. Individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

c. Business Combination. Approval by the shareholders of the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or its principal subsidiary (a "Business Combination") that is not subject, as a matter of law or contract, to approval by the Surface Transportation Board or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency"), in each case, unless, following such Business

**Combination:**

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from

such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or its principal subsidiary or all or substantially all of the assets of the Company or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

d. Regulated Business Combination. Consummation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 2; or

e. Liquidation or Dissolution. Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company or its principal subsidiary.

If any Change of Control is a Regulated Business Combination, but its implementation involves another "Change of Control" that is not a Regulated Business Combination within the meaning of this Section 2, then for all purposes of this Agreement, such Change of Control shall not be deemed to be a Regulated Business Combination, the provisions governing a Regulated Business Combination shall not apply, and the provisions governing such other Change in Control shall apply.

3. Employment Period.

a. Generally. Subject to Section 3(b), the Company hereby agrees to continue the Executive in its employ, and the Executive hereby agrees to remain in the employ of the Company subject to the terms and conditions of this Agreement, for the period commencing on the Effective Date and ending on the third anniversary of such date (the "Employment Period").

b. Regulated Business Combination. Notwithstanding the foregoing, in the case of a Change of Control that is a Regulated Business Combination, then for all

purposes of this Agreement, the "Employment Period" shall mean the longer of (i) the period commencing on the Effective Date and ending on the third anniversary of such date or (ii) the period commencing on the Effective Date and ending thirteen months from the effective date of a final decision by the Agency on the proposed Regulated Business Combination ("Final Regulatory Action"), provided, however, that (x) if the Final Regulatory Action is a denial of the Regulated Business Combination then for all purposes of this Agreement the "Employment Period" shall end upon the sixtieth (60th) day following such Final Regulatory Action and (y) if the Final Regulatory Action is an approval of the Regulated Business Combination, but the Regulated Business Combination is not consummated by the first anniversary of the Final Regulatory Action, then for all purposes of this Agreement the "Employment Period" shall end upon such first anniversary, of the Final Regulatory Action.

4. Terms of Employment.

a. Position and Duties. (i) During the Employment Period: (A) the Executive's position (including status, offices, titles and reporting requirements), authority, duties and responsibilities shall be at least commensurate in all material respects with the most significant of those held, exercised and assigned at any time during the 120-day period immediately preceding the Effective Date, and (B) the Executive's services shall be performed at the location where the Executive was employed immediately preceding the Effective Date or any office or location less than 35 miles from such location.

(ii) During the Employment Period, and excluding any periods of vacation and sick leave to which the Executive is entitled, the Executive agrees to devote reasonable attention and time during normal business hours to the business and affairs of the Company and, to the extent necessary to discharge the responsibilities assigned to the Executive hereunder, to use the Executive's reasonable best efforts to perform faithfully and efficiently such responsibilities. During the Employment Period it shall not be a violation of this Agreement for the Executive to (A) serve on corporate, civic or charitable boards or committees, (B) deliver lectures, fulfill speaking engagements or teach at educational institutions and (C) manage personal investments, so long as such activities do not significantly interfere with the performance of the Executive's responsibilities as an employee of the Company in accordance with this Agreement. It is expressly understood and agreed that to the extent that any such activities have been conducted by the Executive prior to the Effective Date, the continued conduct of such activities (or the conduct of activities similar in nature and scope thereto) subsequent to the Effective Date shall not thereafter be deemed to interfere with the performance of the Executive's responsibilities to the Company.

b. Compensation. (i) Base Salary. During the Employment Period, the Executive shall receive an annual base salary ("Annual Base Salary"), which shall be paid at a monthly rate, at least equal to twelve times the highest monthly base salary paid or payable, including any base salary which has been earned but deferred, to the

Executive by the Company and its affiliated companies in respect of the twelve-month period immediately preceding the month in which the Effective Date occurs. During the Employment Period, the Annual Base Salary shall be reviewed no more than 12 months after the last salary increase awarded to the Executive prior to the Effective Date and thereafter at least annually. Any increase in Annual Base Salary shall not serve to limit or reduce any other obligation to the Executive under this Agreement. Annual Base Salary shall not be reduced after any such increase, and the term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased. As used in this Agreement, the term "affiliated companies" shall include any company controlled by, controlling or under common control with the Company.

(ii) Annual Bonus. In addition to Annual Base Salary, the Executive shall be eligible to earn, for each fiscal year ending during the Employment Period, an annual bonus (the "Annual Bonus") in cash, at a minimum, target and maximum level not less favorable (in terms both of dollar amounts and difficulty of achievement) to the Executive than the Executive's opportunity to earn such annual cash bonuses under the Company's annual incentive plans, or any comparable bonus under any predecessor or successor plan, for each of the last three full fiscal years prior to the Effective Date (annualized in the event that the Executive was not employed by the Company for the whole of such fiscal year). (The highest of the actual amounts of such bonuses, as so annualized, for each of such three full fiscal years is hereafter referred to as the "Recent Annual Bonus".) Each such Annual Bonus shall be paid no later than the end of the third month of the fiscal year next following the fiscal year for which the Annual Bonus is awarded, unless the Executive shall elect to defer the receipt of such Annual Bonus.

(iii) Incentive, Savings and Retirement Plans. During the Employment Period, the Executive shall be entitled to participate in all incentive, savings and retirement plans, practices, policies and programs applicable generally to other peer executives of the Company and its affiliated companies, but in no event shall such plans, practices, policies and programs provide the Executive with incentive opportunities (measured with respect to both regular and special incentive opportunities, to the extent, if any, that such distinction is applicable), savings opportunities and retirement benefit opportunities, in each case, less favorable, in the aggregate, than the most favorable of those provided by the Company and its affiliated companies for the Executive under such plans, practices, policies and programs as in effect at any time during the 120-day period immediately preceding the Effective Date or if more favorable to the Executive, those provided generally at any time after the Effective Date to other peer executives of the Company and its affiliated companies.

(iv) Welfare Benefit Plans. During the Employment Period, the Executive and/or the Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, practices, policies and programs provided by the Company and its affiliated

companies (including, without limitation, medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs) to the extent applicable generally to other peer executives of the Company and its affiliated companies, but in no event shall such plans practices, policies and programs provide the Executive with benefits which are less favorable, in the aggregate, than the most favorable of such plans, practices, policies and programs its effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, those provided generally at any time after the Effective Date to other peer executives of the Company and its affiliated companies.

(v) Expenses. During the Employment Period, the Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by the Executive in accordance with the most favorable policies, practices and procedures of the Company and its affiliated companies in effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

(vi) Fringe Benefits. During the Employment Period, the Executive shall be entitled to fringe benefits, including, without limitation, tax and financial planning services, payment of club dues, and, if applicable, use of an automobile and payment of related expenses, in accordance with the most favorable plans, practices, programs and policies of the Company and its affiliated companies in effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

(vii) Office and Support Staff. During the Employment Period, the Executive shall be entitled to an office or offices of a size and with furnishings and other appointments, and to exclusive personal secretarial and other assistance, at least equal to the most favorable of the foregoing provided to the Executive by the Company and its affiliated companies at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive, as provided generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

(viii) Vacation. During the Employment Period, the Executive shall be entitled to paid vacation in accordance with the most favorable plans, policies, programs and practices of the Company and its affiliated companies as in effect for the Executive at any time during the 120-day period immediately preceding the Effective Date or, it more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

5. Termination of Employment.

a. Death or Disability. The Executive's employment shall terminate automatically upon the Executive's death during the Employment Period. If the Company determines in good faith that the Disability of the Executive has occurred during the Employment Period (pursuant to the definition of Disability set forth below), it may give to the Executive written notice in accordance with Section 13(b) of this Agreement of its intention to terminate the Executive's employment. In such event, the Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by the Executive (the "Disability Effective Date"), provided that, within the 30 days after such receipt, the Executive shall not have returned to full-time performance of the Executive's duties. For purposes of this Agreement, "Disability" shall mean the absence of the Executive from the Executive's duties with the Company on a full-time basis for 180 consecutive business days as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the Executive or the Executive's legal representative.

b. Cause. The Company may terminate the Executive's employment during the Employment Period for Cause. For purposes of this Agreement, "Cause" shall mean:

(i) the willful and continued failure of the Executive to perform substantially the Executive's duties with the Company or one of its affiliates (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for substantial performance is delivered to the Executive by the Board or the Chief Executive Officer of the Company which specifically identifies the manner in which the Board or Chief Executive officer believes that the Executive has not substantially performed the Executive's duties, or

(ii) the willful engaging by the Executive in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company.

For purposes of this provision, no act or failure to act, on the part of the Executive, shall be considered "willful" unless it is done, or omitted to be done, by the Executive in bad faith or without reasonable belief that the Executive's action or omission was in the best interests of the Company. Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or upon the instructions of the Chief Executive Officer or a senior officer of the Company or based upon the advice of counsel for the Company shall he conclusively presumed to be done, or omitted to be done, by the Executive in good faith and in the best interests of the Company. The cessation of employment of the Executive shall not be deemed to be for Cause unless and until there shall have been delivered to the Executive a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters of the entire membership of the Board at a meeting of the Board called and held for such purpose (after reasonable notice is provided to the Executive and the Executive is given an

opportunity, together with counsel, to be heard before the Board), finding that, in the good faith opinion of the Board, the Executive is guilty of the conduct described in subparagraph (i) or (ii) above, and specifying the particulars thereof in detail.

c. Good Reason. The Executive's employment may be terminated by the Executive during the Employment Period for Good Reason. For purposes of this Section 5(c), any good faith determination of "Good Reason" made by the Executive shall be conclusive. For purposes of this Agreement, "Good Reason" shall mean:

(i) the assignment to the Executive of any duties inconsistent in any respect with the Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 4(a) of this Agreement, or any other diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Executive;

(ii) any failure by the Company to comply with any of the provisions of Section 4(b) of this Agreement, other than an isolated, insubstantial and inadvertent failure not occurring in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Executive;

(iii) the Company's requiring the Executive to be based at any office or location other than as provided in Section 4(a)(i)(B) hereof or the Company's requiring the Executive to travel on Company business to a substantially greater extent than required immediately prior to the Effective Date;

(iv) any purported termination by the Company of the Executive's employment otherwise than as expressly permitted by this Agreement; or

(v) any failure by the Company to comply with and satisfy
Section 12(c) of this Agreement.

Anything in this Agreement to the contrary notwithstanding, a termination by the Executive for any reason shall be deemed to be a termination for Good Reason for all purposes of this Agreement if such termination occurs
(i) in the case of a Change of Control that is a Business Combination but not a Regulated Business Combination, during the 30-day period beginning on the 180/th/ day following the day on which the Business Combination is consummated, (ii) in the case of any other Change of Control that is not a Regulated Business Combination, during the 30-day period beginning on the 180/th/ day following the Effective Date, and (iii) in the case of a Change of Control that is a Regulated Business Combination consummated pursuant to Final Regulatory Action, during the 30-day period immediately following the first anniversary of the Final Regulatory Action (it being understood that the Executive will have no rights under this paragraph in the case of a Change of Control that is a Regulated Business Combination denied by the Agency).

d. Regulated Business Combination. Notwithstanding the foregoing, in the case of a Change of Control that is a Regulated Business Combination, then for all purposes of this Agreement, during that portion of the Employment Period prior to Final Regulatory Action, the Executive may not exercise his rights to terminate his employment under this Agreement for "Good Reason." The Executive may only terminate his employment under this Agreement if he is "Constructively Terminated" by the Company. Moreover, except to the extent expressly set forth in the definition of "Constructive Termination," the Executive shall have no remedy for any breach by the Company of the provisions of Section 4; provided, however, that any failure of the Company to comply in any material respect with the provisions of Section 4 shall create a rebuttable presumption that a Constructive Termination has occurred.

For purposes of this Agreement, a "Constructive Termination" shall mean:

(i) substantial diminution of the Executive's duties or responsibilities as contemplated by Section 4(a) of this Agreement, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Executive;

(ii) a reduction in the Executive's Annual Base Salary;

(iii) a failure by the Company to comply with Section 4(b)(ii) regarding the Annual Bonus;

(iv) a reduction in the Executive's other incentive opportunities, benefits or perquisites described in Section 4(b) unless the Executive's peer executives suffer a comparable reduction;

(v) the Company's requiring the Executive to be based at any office or location other than as provided in Section 4(a)(i)(B) hereof; or

(vi) any purported termination by the Company of the Executive's employment otherwise than for Cause.

During that portion of the Employment Period after Final Regulatory Action, the Executive may terminate his Employment under this Agreement for "Good Reason."

e. Notice of Termination. Any termination by the Company for Cause, or by the Executive for Good Reason or Constructive Termination, shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 13(b) of this Agreement. For purposes of this Agreement, a "Notice of Termination" means a written notice which (i) indicates the specific termination provision in this Agreement relied upon,
(ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated, and (iii) if the Date of Termination (as defined below) is other than the date of receipt of such notice, specifies the termination date (which date shall be not more than thirty days after the giving of such notice). The

failure by the Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason, Cause or Constructive Termination shall not waive any right of the Executive or the Company, respectively, hereunder or preclude the Executive or the Company, respectively, from asserting such fact or circumstance in enforcing the Executive's or the Company's rights hereunder.

f. Date of Termination. "Date of Termination" means (i) if the Executive's employment is terminated by the Company for Cause, or by the Executive for Good Reason or Constructive Termination, the date of receipt of the Notice of Termination or any later date specified therein, as the case may be, (ii) if the Executive's employment is terminated by the Company other than for Cause or Disability, the Date of Termination shall be the date on which the Company notifies the Executive of such termination and (iii) if the Executive's employment is terminated by reason of death or Disability, the Date of Termination shall be the date of death of the Executive or the Disability Effective Date, as the case may be.

6. Obligations of the Company upon Termination.

a. Good Reason or Constructive Termination: Other Than for Cause,
Death or Disability. If, during the Employment Period, the Company shall terminate the Executive's employment other than for Cause or Disability or the Executive shall terminate employment for Good Reason or Constructive Termination, then the Company shall provide the following payments and benefits:

(i) The Company shall pay to the Executive in a lump sum in cash within 30 days after the Date of Termination the aggregate of the following amounts:

A. the sum of (1) the Executive's Annual Base Salary through the Date of Termination to the extent not theretofore paid, (2) the product of (x) the higher of (I) the Recent Annual Bonus and (II) the Executive's most recently established target Annual Bonus (annualized for any fiscal year consisting of less than twelve full months or during which the Executive was employed for less than twelve full months) (such higher amount being referred to as the "Highest Annual Bonus") and (y) a fraction, the numerator of which is the number of days in the current fiscal year through the Date of Termination, and the denominator of which is 365 and (3) any compensation previously deferred by the Executive (together with any accrued interest or earnings thereon) and any accrued vacation pay, in each case to the extent not theretofore paid (the sum of the amounts described in clauses (1), (2), and (3) shall be hereinafter referred to as the "Accrued Obligations"); and

B. the amount equal to the product of (1) three and (2) the sum of (x) the Executive's Annual Base Salary and (y) the Highest Annual Bonus; and

C. an amount equal to the excess of (a) the actuarial equivalent of the benefit under the Company's qualified defined benefit retirement plan (the "Retirement Plan") (utilizing actuarial assumptions no less favorable to the Executive than those in effect under the Company's Retirement Plan immediately prior to the Effective Date), and any excess or supplemental retirement plan in which the Executive participates (together, the "SERP") which the Executive would receive if the Executive's employment continued for three years after the Date of Termination assuming for this purpose that all accrued benefits are fully vested, and, assuming that the Executive's compensation in each of the three years is that required by Section 4(b)(i) and Section 4(b)(ii), over (b) the actuarial equivalent of the Executive's actual benefit (paid or payable), if any, under the Retirement Plan and the SERP as of the Date of Termination;

provided, that if the Executive shall have previously so elected in accordance with any nonqualified deferred compensation plan of the Company in which the Executive is eligible to participate, some or all of such cash payments may be deferred under such plan.

(ii) for three years after the Executive's Date of Termination, or such longer period as may be provided by the terms of the appropriate plan, program, practice or policy, the Company shall continue benefits to the Executive and/or the Executive's family at least equal to those which would have been provided to them in accordance with the plans, programs, practices and policies described in Section 4(b)(iv) of this Agreement if the Executive's employment had not been terminated or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies and their families; provided, however, that if the Executive becomes reemployed with another employer and is eligible to receive medical or other welfare benefits under another employer provided plan, the medical and other welfare benefits described herein shall be secondary to those provided under such other plan during such applicable period of eligibility; and provided, further, that the period during which the Executive and his family are eligible for health continuation coverage under Section 4980B of the Code by reason of the Executive's termination of employment shall be determined in accordance with the same principles as are applicable under the Company's general severance plan or policy. For purposes of determining eligibility (but not the time of commencement of benefits) of the Executive for retiree benefits pursuant to such plans, practices, programs and policies, the Executive shall be considered to have remained employed until three years after the Date of Termination and to have retired on the last day of such period.

(iii) The Company shall, at its sole expense as incurred, provide the Executive with outplacement services the scope and provider of which shall be selected by the Executive in his sole discretion, but at a cost not in excess of $20,000.

(iv) The provisions of this Section 6.a.(iv) shall apply with respect to each option to acquire stock of the Company and/or its affiliated companies, whether vested or unvested, that has been granted to the Executive before the Effective Date, remains outstanding immediately before the Date of Termination, and terminates, expires, or is forfeited without having been exercised (an "Unexercised Option"); provided, that this Section 6.a.(iv) shall not be applicable if the Change of Control transaction referred to in Section 1.a. hereof is intended to be eligible for pooling-of- interests accounting under APB No. 16, and would, but for this Section 6.a.(iv), be eligible for such accounting treatment. The Company shall pay to the Executive, upon the termination, expiration or forfeiture of an Unexercised Option, a cash lump sum equal to the value of such Unexercised Option, determined as of the day before the Date of Termination, using the Black-Scholes method of valuation, determined based upon the terms and conditions that would have governed such Unexercised Option if the Executive's employment had not terminated.

(v) To the extent not theretofore paid or provided, the Company shall timely pay or provide to the Executive any other amounts or benefits required to be paid or provided or which the Executive is eligible to receive under any plan, program, policy or practice or contract or agreement of the Company and its affiliated companies, including earned but unpaid stock and similar compensation (such other amounts and benefits shall be hereinafter referred to as the "Other Benefits").

b. Death. If the Executive's employment is terminated by reason of the Executive's death during the Employment Period, this Agreement shall terminate without further obligations to the Executive's legal representatives under this Agreement, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits. Accrued Obligations shall be paid to the Executive's estate or beneficiary, as applicable, in a lump sum in cash within 30 days of the Date of Termination. With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 6(b) shall include, without limitation, and the Executive's estate and/or beneficiaries shall be entitled to receive, benefits at least equal to the most favorable benefits provided by the Company and affiliated companies to the estates and beneficiaries of peer executives of the Company and such affiliated companies under such plans, programs, practices and policies relating to death benefits, if any, as in effect with respect to other peer executives and their beneficiaries at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive's estate and/or the Executive's beneficiaries, as in effect on the date of the Executive's death with respect to other peer executives of the Company and its affiliated companies and their beneficiaries.

c. Disability. If the Executive's employment is terminated by reason of the Executive's Disability during the Employment Period, this Agreement shall terminate without further obligations to the Executive, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits. Accrued Obligations shall be paid to the Executive in a lump sum in cash within 30 days of the

Date of Termination. With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 6(c) shall include, and the Executive shall be entitled after the Disability Effective Date to receive, disability and other benefits at least equal to the most favorable of those generally provided by the Company and its affiliated companies to disabled executives and/or their families in accordance with such plans, programs, practices and policies relating to disability, if any, as in effect generally with respect to other peer executives and their families at any time during the 120-day period immediately preceding the Effective Date or, if more favorable to the Executive and/or the Executive's family, as in effect at any time thereafter generally with respect to other peer executives of the Company and its affiliated companies and their families.

d. Cause; Other than for Good Reason or Constructive Termination.
If the Executive's employment shall be terminated for Cause during the Employment Period, this Agreement shall terminate without further obligations to the Executive other than the obligation to pay to the Executive (x) his Annual Base Salary through the Date of Termination, (y) the amount of any compensation previously deferred by the Executive, and
(z) Other Benefits, in each case to the extent theretofore unpaid. If the Executive voluntarily terminates employment during the Employment Period, excluding a termination for Good Reason or Constructive Termination, this Agreement shall terminate without further obligations to the Executive, other than for Accrued Obligations and the timely payment or provision of Other Benefits. In such case, all Accrued Obligations shall be paid to the Executive in a lump sum in cash within 30 days of the Date of Termination.

7. Non-exclusivity of Rights. Nothing in this Agreement shall prevent or limit the Executive's continuing or future participation in any plan, program, policy or practice provided by the Company or any of its affiliated companies for which the Executive may qualify, nor, subject to Section 13(f), shall anything herein limit or otherwise affect such rights as the Executive may have under any contract or agreement with the Company or any of its affiliated companies; provided, that any amounts payable to the Executive pursuant to Section 6(a) hereof shall not be eligible for deferral by the Executive. Amounts which are vested benefits or which the Executive is otherwise entitled to receive under any plan, policy, practice or program of or any contract or agreement with the Company or any of its affiliated companies at or subsequent to the Date of Termination shall be payable in accordance with such plan, policy, practice or program or contract or agreement except as explicitly modified by this Agreement.

8. Full Settlement. The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against the Executive or others. In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement and such amounts shall not be reduced whether or not the Executive obtains other employment. The Company agrees to pay as incurred, to the full extent permitted by law, all legal fees and expenses which the Executive may reasonably incur as a result of any contest regardless of the outcome thereof by the Company, the Executive or others of the validity or enforceability of, or

liability under, any provision of this Agreement or any guarantee of performance thereof (including as a result of any contest by the Executive about the amount of any payment pursuant to this Agreement), plus in each case interest on any delayed payment, at the applicable Federal rate provided for in Section 7872(f)(2)(A) of the Internal Revenue Code of 1986, as amended (the "Code"); provided, that the Executive shall repay to the Company all such amounts paid by the Company, and shall not be entitled to any further payments hereunder, in connection with a contest originated by the Executive if the trier of fact in such contest determines that the Executive's claim was not brought in good faith or was frivolous.

9. Certain Additional Payments by the Company.

a. Anything in this Agreement to the contrary notwithstanding and except as set forth below, in the event it shall be determined that any payment or distribution by the Company to or for the benefit of the Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, but determined without regard to any additional payments required under this Section 9) (a "Payment") would be subject to the excise tax imposed by Section 4999 of the Code or any interest or penalties are incurred by the Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then the Executive shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by the Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, the Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments. Notwithstanding the foregoing provisions of this Section 9(a), if it shall be determined that the Executive is entitled to a Gross-Up Payment, but that the Executive, after taking into account the Payments and the Gross-Up Payment, would not receive a net after-tax benefit of at least $50,000 (taking into account both income taxes and any Excise Tax) as compared to the net after- tax proceeds to the Executive resulting from an elimination of the Gross-Up Payment and a reduction of the Payments, in the aggregate, to an amount (the "Reduced Amount") such that the receipt of Payments would not give rise to any Excise Tax, then no Gross-Up Payment shall be made to the Executive and the Payments, in the aggregate, shall be reduced to the Reduced Amount.

b. Subject to the provisions of Section 9(c), all determinations required to be made under this Section 9, including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by Ernst & Young or such other certified public accounting firm as may be designated by the Executive (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Executive within 15 business days of the receipt of notice from the Executive that there has been a Payment, or such earlier time as is requested by the Company. In the event that the Accounting Firm is serving as accountant or auditor for the individual, entity or group effecting the Change of Control, the Executive shall appoint another nationally recognized accounting firm to make the determinations

required hereunder (which accounting firm shall then be referred to as the Accounting Firm hereunder). All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 9, shall be paid by the Company to the Executive within five days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Executive. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to Section 9(c) and the Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Executive.

c. The Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten business days after the Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. The Executive shall not pay such claim prior to the expiration of the 30-day period following the date on which it gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies the Executive in writing prior to the expiration of such period that it desires to contest such claim, the Executive shall:

(i) give the Company any information reasonably requested by the Company relating to such claim,

(ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company,

(iii) cooperate with the Company in good faith in order effectively to contest such claim, and

(iv) permit the Company to participate in any proceedings relating to such claim;

provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 9(c), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or

forgo any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct the Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that if the Company directs the Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Executive, on an interest-free basis and shall indemnify and hold the Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; and further provided that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to which such contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and the Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

d. If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 9(c), the Executive becomes entitled to receive any refund with respect to such claim, the Executive shall (subject to the Company's complying with the requirements of Section 9(c)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by the Executive of an amount advanced by the Company pursuant to
Section 9(c), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and the Company does not notify the Executive in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid.

10. Confidential Information. The Executive shall hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliated companies, and their respective businesses, which shall have been obtained by the Executive during the Executive's employment by the Company or any of its affiliated companies and which shall not be or become public knowledge (other than by acts by the Executive or representatives of the Executive in violation of this Agreement). After termination of the Executive's employment with the Company, the Executive shall not, without the prior written consent of the Company or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Company and those designated by it. In no event shall an asserted violation of the provisions of this Section 10 constitute a basis for deferring or withholding any amounts otherwise payable to the Executive under this Agreement.

11. Arbitration. The Company and the Executive agree that all disputes, controversies and claims arising between them concerning the subject matter of this Agreement,

other than Sections 9 and 10 hereof, shall be settled by arbitration in accordance with the rules and procedures of the American Arbitration Association of Virginia in Richmond, Virginia in accordance with the laws of the Commonwealth of Virginia. If the parties to any such dispute, controversy or claim are unable to agree upon an arbitrator or arbitrators, then three arbitrators or two arbitrators and one umpire shall be appointed by the American Arbitration Association of Virginia, as it may determine, in accordance with the rules and practices, then obtaining, of such association. If the parties to any such dispute, controversy or claim shall agree upon two arbitrators, but such parties or such arbitrators shall be unable to agree upon a third arbitrator or upon an umpire, then such third arbitrator or umpire shall be appointed as aforesaid by the said American Arbitration Association. Any arbitration pursuant to this Section shall be final and binding on the parties, and judgment upon the award rendered in any such arbitration may be entered in any court, state or federal, having jurisdiction. The parties expressly acknowledge that they are waiving their rights to seek remedies in court, including without limitation the right (if any) to a jury trial.

12. Successors.

a. This Agreement is personal to the Executive and without the prior written consent of the Company shall not be assignable by the Executive otherwise than by will or the laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Executive's legal representatives.

b. This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.

c. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

13. Miscellaneous.

a. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without reference to principles of conflict of laws. The captions of this Agreement are not part of the provisions hereof and shall have no force or effect. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives; provided, that the Company may unilaterally amend Exhibit A hereto from time to time, but only to the extent it determines, upon the advice of counsel, to be necessary to comply with the legal requirements to obtain a valid release.

b. All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

**If to the Executive:**

**If to the Company:**

CSX Corporation
One James Center
Richmond, Virginia 23219

Attention: General Counsel

or to such other address as either party shall have furnished to the other in writing in accordance herewith. Notice and communications shall be effective when actually received by the addressee.

c. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

d. The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

e. The Executive's or the Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right the Executive or the Company may have hereunder, including, without limitation, the right of the Executive to terminate employment for Good Reason or Constructive Termination pursuant to Section 5 of this Agreement, shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

f. The Executive and the Company acknowledge that, except as may otherwise be provided under any other written agreement between the Executive and the Company, the employment of the Executive by the Company is "at will" and, subject to Section 1(a) hereof, prior to the Effective Date, the Executive's employment may be terminated by either the Executive or the Company at any time prior to the Effective Date, in which case the Executive shall have no further rights under this Agreement. From and after the Effective Date this Agreement shall supersede any other agreement between the parties with respect to the subject matter hereof.

14. Waiver and Release with Respect to Prior Agreements. In exchange for the compensation and benefits promised herein, the Executive hereby waives and releases the Company and its affiliates from any and all claims he ever had or may have arising from or in

connection with the letter agreement dated November 14, 1988, as the same may be amended to the date hereof, between the Company and the Executive and the Employment Agreement dated _____________, 19__, between the Company and the Executive (together, the "Prior Agreements"), and the Executive acknowledges that this Agreement supersedes and renders null and void in all respects the Prior Agreements.

15. Other Agreements Unaffected. Except for the Prior Agreement, or as otherwise expressly provided herein, this Agreement shall have no effect on any other agreement between the Executive and the Company or any of its affiliates, and any such agreement is ratified and confirmed in all respects and shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the Executive has hereunto set the Executive's hand and, pursuant to the authorization from its Board of Directors, the Company has caused these presents to be executed in its name on its behalf, all as of the day and year first above written.

---

**CSX CORPORATION**

**By_______________________________**

**Exhibit 10.17**

**CSX OMNIBUS INCENTIVE PLAN**
**Notice of Non-Qualified Stock Option Grant**

((FirstName))((LastName)) Grant Date: April 27, 2000
((Address1)) Options Granted: ((Shares_Granted))
((Address2)) Option Price: $21.25 ((Address3)) Expiration Date: April 26, 2010
((City)),((State))((PostalCode)) Grant Number: ((Number)) SSN: ((SSN))

CSX Corporation ("CSX") has granted to you non-qualified stock options ("Options") to purchase CSX common stock. Your grant has been made pursuant to CSX's Omnibus Incentive Plan (the "Plan"), which, together with the terms contained in this Notice, sets forth terms and conditions of your grant and is incorporated herein by reference. A copy of the Plan is available on the CSX intranet (http://csxnet) under "Incentive Plans." You should review the terms of this Notice and the Plan carefully. The capitalized terms used in this Notice are defined in the Plan. Unless you notify the CSX Corporate Secretary in writing that you do not accept the Option, you will be deemed to have agreed to the terms of this Notice and the terms of the Plan. CSX reserves the right to terminate, change or amend the Plan at any time. Receipt of this grant does not obligate CSX to make any additional grants to you.

Vesting:
The Options may be exercised only when vested. Subject to the terms of the Plan, the Options will become vested according to the following schedule:

| Date of Vesting | Shares Vested | Expiration Date |
|---|---|---|
| April 27, 2003 | ((Shares_Period1)) | April 26, 2010 |
| April 27, 2004 | ((Shares_Period2)) | April 26, 2010 |
| April 27, 2005 | ((Shares_Period3)) | April 26, 2010 |

In the case of a Change in Control, the Options will become fully vested immediately. In the event of your Retirement, Disability or death, the Options will become vested at the dates listed above as if you had continued employment. Additionally, the Options will vest on the dates listed above as if you had continued employment if (i) your employer is involved in a Divisive Transaction, or (ii) your employment is terminated, with the consent of the Company, as a result of a business transaction, a reduction in force or any other circumstances approved by the Compensation Committee.

Employment Requirements and Exercisability:
If you separate from employment for any reason other than Retirement, Disability or death, you will have 30 days after your separation from employment to exercise any Options that are vested on your separation from employment. If your employment is terminated for Cause, however, all your rights under the Options shall be null and void.

In the event of your separation from employment due to Disability or death, you or your Beneficiary or estate will have five years (but not later than the expiration date) to exercise any vested Options. Beneficiary designation forms may be obtained upon request from the CSX Corporate Secretary's Office. If your separation from employment is because of Retirement, you will have until the expiration date to exercise any vested Options. If your employer is involved in a Divisive Transaction or your employment is terminated with the consent of the Company as a result of a business transaction, a reduction in force, or any other circumstances approved by the Compensation Committee, you will have until the later of three years from the event or one year from the applicable date of vesting to exercise the Options.

Exercise:
You may exercise these Options, in whole or in part, to purchase a whole number of vested shares at any time by following the exercise procedures established by CSX. All exercises must take place before the expiration date, or such earlier dates as established by this Notice or the Plan. An exercise of Options generates federal and applicable state income and employment tax withholding obligations. The full purchase price of the shares being purchased through exercise of Options and the related withholding taxes for federal, state or local jurisdictions must be paid to CSX at the time of an exercise of Options. For further information regarding procedures for exercising Options, you should contact the CSX Corporate Secretary's Office at 804-782-1436 (RNX 422).

Restrictions on Exercise:
Your ability to exercise the Options is subject to any restrictions or

requirements imposed by law or by CSX.

**Exhibit 10.23**

# SPECIAL RETIREMENT PLAN
# OF CSX CORPORATION AND AFFILIATED CORPORATIONS

**As Amended and Restated January 1, 1995**
(As Amended through June 27, 2000)

TABLE OF CONTENTS

| | | |
|---|---|---|
| Section I - | INTRODUCTION | 1 |
| Section II - | PARTICIPATION | 2 |
| Section III - | CREDITABLE SERVICE | 2 |
| Section IV - | COMPENSATION AND AVERAGE COMPENSATION | 3 |
| Section V - | SPECIAL RETIREMENT ALLOWANCES | 3 |
| Section VI - | FUNDING METHOD | 5 |
| Section VII - | ADMINISTRATION OF SPECIAL PLAN | 6 |
| Section VIII - | MODIFICATION, AMENDMENT AND TERMINATION | 7 |
| Section IX - | NON-ALIENATION OF BENEFITS | 8 |
| Section X - | MISCELLANEOUS PROVISIONS | 8 |
| Section XI - | CHANGE OF CONTROL | 8 |
| Section XII - | CONSTRUCTION | 11 |

APPENDIX I PARTICIPANTS GRANTED ADDITIONAL CREDITABLE SERVICE PURSUANT TO SECTION V(4)(b)

**Special Retirement Plan**

**of CSX Corporation and Affiliated Corporations**

**As Amended and Restated January 1, 1995**
(As Amended through June 27, 2000)

Section I - INTRODUCTION

1. The purpose of this retirement plan, hereinafter called the "Special Plan," is to provide an incentive for corporate officers comprising a select group of management or highly compensated employees to exert maximum efforts for the Company's success and to remain in the service of the Company until retirement.

2. The Special Plan as provided herein was originally effective as of March 1, 1983, and supersedes the Employees' Special Pension Plan of The Chesapeake and Ohio Railway Company and the Plan for Additional Annuities for Qualifying Members under the Supplemental Pension Plan of The Baltimore and Ohio Railroad Company, hereinafter called the "Former Plans."

3. The "Company" as used herein means CSX Corporation and such other of its affiliated corporations as shall adopt this Special Plan with the approval of the Compensation Committee and by action of their boards of directors for the benefit of corporate officers who are covered or may become covered by the Special Plan.

4. The term "Compensation Committee" means the Compensation Committee of the Board of Directors of CSX Corporation (the "Board of Directors").

5. "Benefits Trust Committee" means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement ("The Benefits Assurance Trust").

6. The Company's "Independent Accountant" means an independent accountant or actuary engaged by the Company and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

7. The incentives under the Special Plan shall consist of special retirement allowances provided by the Company at retirement to certain employees, hereinafter referred to as "Participants," who shall participate as provided herein (eligibility for participation is set forth in Section II).

8. The Special Plan shall, where appropriate, refer to and have meanings consistent with all of the relevant terms of any other regularly maintained pension plan which currently provides or did provide immediately prior to March 1, 1983, retirement benefits for non-contract employees of the Company and is or was maintained by CSX Corporation or any of its affiliated corporations whose officers participate in the Special Plan. Such existing regularly maintained pension plans which provided benefits immediately prior to March 1, 1983 for employees of the Company, and covered periods of service granted in subsections 4(a) and 4(b) of Section V, or those which may be established hereafter, as amended from time to time, shall be referred to herein as the "Pension Plans." Accordingly, regardless of formal differences which may exist between the Special Plan and the Pension Plans in the use of terminology, the definitions and principles which are set forth in the Pension Plans with respect to compensation, average compensation, credited service, and similar terms shall be applied and construed hereunder in a manner consistent with the purposes of the Special Plan and the Pension Plans. In any instance in which the male gender is used herein, it shall also include persons of the female gender in appropriate circumstances.

Section II - PARTICIPATION

1. Every person who was a Participant in the Former Plans as in effect immediately prior to March 1, 1983, shall continue as a Participant in the Special Plan on and after such date for the purpose of any applicable provisions hereof.

2. On and after March 1, 1983, Participants shall include any employees who participate in the Pension Plans and who are entitled to benefits provided under Section V, Subsection 8 hereof; provided, however, that the only benefit that such employees shall be eligible to receive under this Special Plan shall be the benefit provided in accordance with such Subsection unless they are otherwise entitled to benefits under other provisions of this Special Plan.

3. On and after March 1, 1983, additional persons eligible to be Participants shall be those specified in Section V, Subsection 4(c).

Section III - CREDITABLE SERVICE

1. Creditable service under the Special Plan shall have the same meaning and apply in the same manner as creditable service under the Pension Plans, except that it shall also include any additional creditable service which may have been or which may be granted to a Participant in accordance with the provisions of Section V, Subsections 3 and 4. Provided, however, notwithstanding any provisions of the Pension Plans to the contrary, a Participant in the Special Plan who is in the employ of the Company and who does not receive compensation in any calendar month due to amounts deferred under the Company's Deferred Compensation Program, Supplementary Savings and Incentive Award Deferral Plan, and any other amounts of compensation deferred under any other arrangement approved by the Compensation Committee nevertheless shall receive creditable service under the Special Plan.

2. Notwithstanding any other provisions of this Special Plan or the Pensions Plans to the contrary, effective January 1, 1989:

(a) Prior to January 1, 1992, a Participant must have been continuously employed by the Company for a period of not less than 10 years to become entitled upon retirement to receive payment of a special retirement allowance from this Special Plan in respect of any additional creditable service, pension supplement, pension or benefit granted under Section V, Subsections 3(a) or 3(b) of this Special Plan. After December 31, 1991, this Subsection (a) shall only apply to Section V, Subsection 3(b); and,

(b) Prior to January 1, 1992, a Participant must have been continuously employed by the Company for a period of not less than 5 years to become entitled to receive payment of a special retirement allowance from this Special Plan in respect of any additional creditable service granted under Section V, Subsection 4(d), of this Special Plan; provided, however, a person who has already attained age 60 when he first becomes employed by the Company, and who also becomes and continuously remains a Participant from his first date of employment until attainment of age 65, shall become entitled upon retirement to receive payment of a special retirement allowance from this Special Plan in respect of any additional creditable service granted under
Section V, Subsection 4(d) of this Special Plan; and

(c) After December 31, 1991, a Participant must have been continuously employed by the Company for a period of not less than 10 years and must have attained age 55 to become entitled to receive a special retirement allowance from this Special Plan in respect to any additional creditable service accrued after December 31, 1991, granted under Section V, Subsection 4(d), of this Special Plan or a pension or benefit granted after December 31, 1991 under Section V, Subsection 3(a) of this Special Plan; provided, however, a Participant who has at least 5 years of continuous service and who dies while actively employed shall be entitled to the additional creditable service accrued after December 31, 1991; and, provided further, a Participant who terminates employment because of a Divisive

Transaction or a workforce downsizing or with the consent of the Chief Executive Officer of CSX Corporation ("Chief Executive Officer") prior to age 55 with 10 years of continuous service shall be entitled to the additional creditable service accrued after December 31, 1991. For purposes of this Section III, Subsection 2(c), "Divisive Transaction" shall mean a transaction in which the Participant's employer ceases to be a subsidiary of CSX Corporation or there is a sale of substantially all of the assets of the subsidiary.

(d) Prior to a Change of Control, in no event shall a Participant be eligible to receive a payment in respect of any benefits granted under Section V, Subsections 3(a), 3(b) or 4(d) of this Special Plan before such date as the Participant attains the earliest retirement age specified in the particular Pension Plan in which the Participant also participates, unless an earlier payment from the Special Plan is specifically authorized by the Compensation Committee. The Compensation Committee shall have full authority and sole discretion to interpret and administer the foregoing rules, and any decision made by the Compensation Committee shall be final and binding. Following a Change of Control, the same rules apply except that the Benefits Trust Committee shall have full authority and sole discretion to interpret and administer the foregoing rules. Any such decision made by the Benefits Trust Committee shall be final and binding.

(e) In the event of a Change of Control, as defined in Section XI, the age 55 and length of service requirements contained in Section III, Subsection (2)(c), shall be waived for those Participants who are employed by the Company at the time of the Change of Control.

Section IV - COMPENSATION AND AVERAGE COMPENSATION

Compensation and average compensation under the Special Plan shall have the same meanings and apply in the same manner as those terms do under the Pension Plans, except as provided in Section V, Subsection 3(b); provided, however, that amounts deferred under the Company's Deferred Compensation Program, Supplementary Savings and Incentive Award Deferral Plan, and any other amounts of compensation deferred under any other arrangement approved by the Compensation Committee shall be included in the determination of compensation and average compensation; and further provided, that compensation and average compensation hereunder shall not be limited to the amount of $150,000, or such other amount as adjusted by regulation, as imposed by Sections 401(a)(17) and 415(d) of the Internal Revenue Code.

Section V - SPECIAL RETIREMENT ALLOWANCES

1. All of the provisions, conditions, and requirements set forth in the Pension Plans with respect to the granting and payment of retirement benefits thereunder shall be equally applicable to the granting of the special retirement allowances hereunder to Participants in the Special Plan and to the payment thereof from the Company's general assets or from the Benefits Assurance Trust. Except as otherwise may be provided in this Special Plan, whenever a Participant's rights under the Special Plan are to be determined, appropriate reference shall be made to the particular Pension Plan in which such person is also a participant. Notwithstanding the preceding sentence, if a special retirement allowance under the Special Plan shall be paid to a surviving spouse in conformance with the provisions of the Pension Plans, the final installment payment hereunder shall be made only to the estate of such surviving spouse and shall not be otherwise paid, regardless of any different provision for such payment which may be prescribed in the Pension Plans.

2. All special retirement allowances being paid on March 1, 1983, under the Former Plans as they existed immediately prior to such date shall be continued and be paid hereunder, and, persons participating under the Former Plans shall continue to participate hereunder in accordance with the terms and conditions of the Former Plans and any applicable provisions of this Special Plan.

3. The Compensation Committee, upon the recommendation of the Chief Executive Officer, may grant to an officer of the Company the following benefits under the Special Plan:

(a) Additional creditable service, pensions or benefits hereunder other than as provided in the Pension Plan, in recognition of previous service deemed to be of special value to the Company.

(b) A pension supplement hereunder in a particular instance as determined by the Compensation Committee, to be calculated on the basis of specific instructions which may depart only for such purpose from any of the terms, conditions or requirements of the Pension Plans, notwithstanding the provisions of Section I, Subsection 5, and Section V, Subsection 1, hereof.

4. The following additional creditable service under the Special Plan shall be granted by the Company at retirement under the Pension Plans:

(a) To those Participants of the "Former Plans," creditable service equal to that accrued under Section V, Subsection 4 of The Employees' Special Plan of The Chesapeake and Ohio Railway Company or under paragraphs 1, 2 and 3 of the Plan for Additional Annuities for Qualifying Members Under the Supplemental Pension Plan of the Baltimore and Ohio Railroad Company, provided that, effective upon a Participant's retirement on or after March 1, 1983, creditable service under the Special Plan and Pension Plans shall not exceed 44 years.

(b) To those Participants in the Special Plan who are listed in Appendix I, and who are also participants in the Pension Plans, additional creditable service under the Special Plan will be granted as indicated for each individual as shown in Appendix I, provided that additional creditable service under the Special Plan and credited service under the Pension Plans at retirement shall not exceed 44 years.

(c) On and after March 1, 1983, new admissions into the class of persons who may become Participants in the Special Plan to receive additional creditable service hereunder shall only include participants in the Pension Plans who are appointed by the Chief Executive Officer or his designee.

(d) In addition to the additional creditable service granted to Participants under (a) or (b) above, beginning March 1, 1983, one year of additional creditable service shall be granted for each year of actual service (with allowances for months less than twelve) between ages 45 and 65 during which a person is a Participant. Those who become qualified as provided in (c) above shall have one year of additional credited service granted, beginning no earlier than the date they are both a Participant and at least age 45, for each year of actual service (with allowances made for months less than twelve) during which they remain a Participant, but only up to age 65. Additional creditable service granted under the Special Plan shall be combined with credited service under the Pension Plan (but only if credited service under the Pension Plans does not exceed 44 years), to result in total credited service and additional creditable service under the Pension Plans and the Special Plan which shall not exceed a maximum of 44 years. The position, compensation, and other conditions upon which a non-contract employee's participation herein is based shall be determined from time to time in the absolute discretion of the Compensation Committee. Effective December 31, 1993, there shall be no new admissions into the class of persons who may receive additional benefits pursuant to this subsection 4(d); provided, however, the Chief Executive Officer may, by express agreement, offer the additional benefits pursuant to this subsection 4(d) to selected individuals.

(e) Anything to the contrary notwithstanding, any Participant in the Special Plan receiving additional creditable service under this Subsection 4, and whose responsibilities and compensation are reduced, may, in the discretion of the Compensation Committee or the Chief Executive Officer, cease to receive any further additional creditable service hereunder.

(f) A Participant's accrual of additional creditable service as provided herein shall not be subject to termination except as provided in subparagraph (e) above, or upon retirement or termination of employment.

(g) Prior to January 1, 1992, a Participant who receives benefits under a Salary Continuance and Long-Term Disability Plan of the Company shall continue to accrue additional creditable service hereunder subject to the same rules that are applicable in such instances under the Pension Plans.

(h) It is the intent of this Section V that, for the purpose of the Special Plan, the additional creditable service provided hereunder when added to credited service under the Pension Plans or otherwise, shall not in any case exceed 44 years in the aggregate.

(i) To those Participants who become qualified as provided in (a), (b) or
(c) above, a special retirement allowance shall be payable under the Special Plan to such Participants or their surviving spouses equal to any amount due under the Pension Plans which is not paid in full under the Pension Plans.

(j) Notwithstanding the preceding, following a Change of Control, any additional service or benefits granted under Article V, Subsection 4 shall be subject to the approval of the Benefits Trust Committee.

5. The Company shall accrue and pay under this Special Plan as an additional supplemental benefit any annual pension benefits that would have been payable under the Pension Plans as in effect on September 1, 1974, or thereafter, if Sections 415(b) and 401(a)(17) of the Internal Revenue Code, and any other relevant provisions of law that impose limitations or have the effect of limiting the accrual of benefits under the Pension Plans, had not been enacted into law, unless such additional supplemental benefit is provided by the Company through another plan created for that purpose.

6. The Company shall accrue reserves to the credit of the Special Plan in advance to cover the costs of any additional creditable service, pensions or benefits granted under Subsections 3 and 4 hereof, and such pensions or benefits or special retirement allowances reflecting such credit shall be paid under the Special Plan. Where additional creditable service is granted, upon retirement in accordance with the provisions of the Pension Plans, the Participant shall receive a special retirement allowance equal to the difference between the retirement allowance computed under the Pension Plans and the amount which would be payable if the additional credit granted hereunder had been included with the actual credited service in the computation of the retirement allowance payable under the Pension Plans. Where a pension or other benefit is granted to a Participant, such pension or benefit shall be payable as a special retirement allowance from the Special Plan.

7. Notwithstanding any other provision of this Special Plan to the contrary, the Chief Executive Officer of the Company (the "CEO") may designate certain senior executives of the Company or its affiliates as eligible to elect, prior to the commencement of their retirement benefits under the Company's qualified pension plan, to receive (or for a beneficiary to receive in the event of the executive's death) the actuarial present value of their benefits under this Special Plan in a lump sum. Such election shall be made in accordance with rules established by the Plan Administrator and shall not be effective until six months after it is made. An election may be changed at any time prior to commencement of retirement benefits, but such change shall not be effective until six months after it is made. For purposes of this subsection 7, "actuarial present value" shall be determined as of the date of the payment of the benefit using the UP 1994 Mortality Table, set back one year, and a discount rate of 5%, or other such rate as the Compensation Committee may establish from time to time. A Participant as to whom a lump sum distribution has been elected may also elect to lock in, by notifying the Plan Administrator in writing, the applicable discount rate for three calendar years beyond the year in which the election to do so is made (or such longer or extended period as the CEO may from time to time approve). At least six (6) months advance notice will be provided with respect to any proposed change in the manner or basis in which the discount rate to be used to calculate lump sums is determined. Further, in the event of a Change of Control, the Benefits Trust Committee shall assume all responsibilities of the CEO and the Chairman of the Compensation Committee under this subsection.

8. The Company shall accrue and pay under this Special Plan any annual pension benefit which otherwise would have been payable under the Pension Plans but for the Participant's deferral of compensation under the Company's Deferred Compensation Program, Supplementary Savings and Incentive Award Deferral Plan, or under any other deferred compensation arrangement approved by the Compensation Committee.

9. The obligations of the Company or any of its affiliated corporations and the benefit due any Participant, surviving spouse or beneficiary under this Plan shall be reduced by any amount received in regard thereto under the Benefits Assurance Trust or any similar trust or other vehicle.

Section VI - FUNDING METHOD

1. The benefits provided under the Special Plan shall be financed by the Company and no contribution shall be required of Participants. The Company shall accrue reserves on its books as follows:

(a) As of March 1, 1983, an amount shall be calculated with respect to the Former Plans which shall be the actuarially determined present value as of that date of all special retirement allowances payable under the Former Plans and, under a schedule approved by the Company's Independent Accountant, the reserve previously accrued will be adjusted.

(b) As of March 1, 1983, the actuarially determined present value as of that date of all special retirement allowances payable under Section V, Subsection 4(b) shall be calculated and, under a schedule approved by the Company's Independent Accountant, a reserve equal to that amount established.

(c) During the year 1983, there shall be accrued the amount required to allow regular interest on the adjusted reserve provided in (a) and (b) above. Each year thereafter there shall be accrued the amount required to allow regular interest on the average reserves standing to the credit of the Special Plan during the preceding year.

(d) Each year the reserves shall be adjusted to reflect the payment of special retirement allowances during the year.

(e) Such additional reserves shall be accrued from time to time as may be required in accordance with Section V, Subsections 3 and 4, on account of grants thereunder made after March 1, 1983.

(f) There shall be accrued from time to time, as required, additional reserves on account of benefits pursuant to Section V, Subsection 6.

(g) At such times as the Plan Administrator shall recommend, the reserves accrued to the credit of the Special Plan shall be adjusted on the basis of actuarial valuations to reflect the experience under the Special Plan, or amendments thereto, or changes in the rate of regular interest, or any other actuarial assumptions.

2. The Company shall provide all funds required for the administration expenses of the Special Plan.

3. The Company has established the CSX Corporation and Affiliated Companies Benefits Assurance Trust ("Trust"). Except as provided in Section XI, the Company is not obligated to make any contribution to the Trust.

4. The Special Plan is intended to be unfunded for tax purposes and for purposes of Title I of ERISA. Participants in the Special Plan have the status of general unsecured creditors of the Company, and the Special Plan constitutes a mere promise by the participating employer to make benefit payments in the future.

5. To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Special Plan shall be joint and several.

Section VII - ADMINISTRATION OF SPECIAL PLAN

1. Prior to a Change of Control, the Plan Administrator for the CSX Pension Plan shall be responsible for the general administration of the Special Plan and for carrying out its provisions.

2. Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Plan Administrator as to the Special Plan. Additionally, following a Change of Control, any and all benefits determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under this Special Plan shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

Section VIII - MODIFICATION, AMENDMENT AND TERMINATION

1. The Special Plan represents a contractual obligation heretofore entered into by the Company in consideration of services rendered and to be rendered by Participants covered under the Special Plan. Prior to a Change of Control, the Company reserves the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this Special Plan, or to terminate this Special Plan; provided, however, prior to December 1, 1991, no modification or amendment shall be made to this Special Plan unless there have been modifications or amendments to correlative provisions of the Pension Plans, and any modifications or amendments to this Special Plan shall coincide with the modifications or amendments of the Pension Plans (except nonconforming revisions to administrative provisions shall be permitted); and provided, further, that this Special Plan shall only be terminated if the Pension Plans are terminated, subject to the following limitations:

(a) In the event any modification or amendment adversely affects the benefits to be received by a retired Participant and the designated surviving spouse of a retired Participant, they shall be entitled to receive for life the special retirement allowance they would have received had the Special Plan not been modified or amended, and each designated surviving spouse of a retired Participant shall become entitled to receive for life the special retirement allowance that such designated surviving spouse would have received had the Special Plan not been modified or amended.

(b) In the event of the termination of this Special Plan, each retired Participant and designated surviving spouse of a retired Participant shall be entitled to receive for life the special retirement allowance they would have received had the Special Plan not been terminated, and each designated surviving spouse of a retired Participant shall become entitled to receive for life the special retirement allowance that such designated surviving spouse would have received had the Special Plan not been terminated.

(c) In the event any modification or amendment adversely affects the benefit which an active Participant would have been entitled to receive if such amendment or modification had not been made, such active Participant shall, so long as he remains in the active service of the Company, only continue to accrue creditable service and benefits prospectively in accordance with the provisions of the Special Plan as so modified or amended, unless the Participant shall earlier cease to receive any additional creditable service as provided in Section V, Subsection 4(e).

(d) In the event this Special Plan is terminated, each active Participant, in consideration of his continued service to the Company until the date of his termination from active employment by retirement or otherwise, shall be entitled to retain his accrued additional service, or pension or benefits as granted hereunder to such Participant, in accordance with the provisions of this Special Plan in effect on the day prior to the date of termination, unless the Participant shall earlier cease to receive any additional creditable service as provided in Section V, Subsection 4(e).

(e) In lieu of paying special retirement allowances in accordance with the foregoing provisions, the Plan Administrator, at its election, may direct the discharge of all obligations to retired Participants, designated spouses of retired Participants, and active Participants by cash payments of equivalent actuarial value or through the provision of immediate or deferred annuities or other periodic payments of equivalent actuarial value, as it shall in its sole discretion determine, provided that following a Change of Control, the authority to make such decisions shall rest solely with the Benefits Trust Committee.

2. Following a Change of Control, this Special Plan may not be amended or terminated without the approval of the Benefits Trust Committee.

Section IX - NON-ALIENATION OF BENEFITS

1. No benefit under the Special Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to do so shall be void, except as specifically provided in the Special Plan, nor shall any benefit be in any manner liable for or subject to the debt, contracts, liabilities, engagements, or torts of the person entitled to such benefit; and in the event that the Plan Administrator shall find that any active or retired Participant or designated spouse or spouse under the Special Plan has become bankrupt or that any attempt has been made to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge any of his benefits under the Special Plan, except as specifically provided in the Special Plan, then such benefits shall cease to accrue and shall be determined, and in that event, the Plan Administrator shall hold or apply the same to or for the benefit of such active or retired Participant or spouse, in such manner as the Plan Administrator may deem proper.

2. Notwithstanding the preceding, following a Change of Control, the Plan Administrator shall not implement such action without the consent of the Benefits Trust Committee.

Section X - MISCELLANEOUS PROVISIONS

1. Anything in the Special Plan to the contrary notwithstanding, prior to a Change of Control, if the Plan Administrator finds that any retired Participant or spouse is engaged in acts detrimental to the Company or is engaged or employed in any occupation which is in competition with the Company, and if after due notice such retired Participant or spouse continues to be so engaged or employed, the Plan Administrator shall suspend the special retirement allowance of such person, which suspension shall continue until removed by notice from the Plan Administrator; provided, however, that if such suspension has continued for one year, the Plan Administrator shall forthwith cancel such Participant's or spouse's special retirement allowance. Furthermore, if the Plan Administrator finds that any Participant has been discharged for having performed acts detrimental to the Company, then regardless of any other provision in the Special Plan, no benefit shall be payable to or on account of any such Participant's coverage under this Special Plan. Notwithstanding the preceding, following a Change of Control, the Plan Administrator shall not implement such action or make such determination without the consent of the Benefits Trust Committee.

2. The establishment of the Special Plan shall not be construed as conferring any legal rights upon any employee for a continuation of employment, nor shall it interfere with the rights of the Company to discharge any employee and to treat him without regard to the effect which such treatment might have upon him as a Participant in the Special Plan.

Section XI - CHANGE OF CONTROL

1. If a Change of Control has occurred, the Company shall contribute to the Trust within 7 days of such Change of Control, a lump sum contribution equal to the greatest of:

(a) the aggregate value of the amount each Participant would be eligible to receive under subsection (2), below;

(b) the present value of accumulated Plan benefits based on the assumptions the Company's independent actuary deems reasonable for this purpose, as of a Valuation Date, as defined in subsection (6), below, coinciding with or next preceding the date of Change of Control, to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section XI shall be determined by the Company's independent actuaries. Thereafter, the Company's independent actuaries shall annually determine as of a Valuation Date for each Participant not receiving a lump sum payment pursuant to subsection (2), below, the greater of:

(i) the amount such Participant would have received under subsection
(2) had such Participant not made the election under subsection
(3), below, if applicable; and

(ii) the present value of accumulated benefits based on assumptions the actuary deems reasonable for this purpose. To the extent that the value of the assets held in the Trust relating to this Special Plan does not equal the amount described in the preceding sentence, at the time of the valuation, the Company shall make a lump sum contribution to the Trust equal to the difference; or

(c) the amount determined under Section 1(h) of the Benefits Assurance Trust attributable to liabilities relating to this Plan.

2. In the event a Change of Control has occurred, the trustee of the Benefits Assurance Trust shall, within 45 days of such Change of Control, pay to each Participant not making an election under subsection (3), a lump sum payment equal to the actuarial present value of the aggregate special retirement allowance each Participant (or any beneficiary of a Participant) has accrued as of the Valuation Date preceding the date of such Change of Control pursuant to the terms of Section V of this Special Plan. If a Participant's benefit has not commenced as of such date, such lump sum shall be determined assuming that:

(a) The Participant's benefit would commence at the earliest date he would qualify for early or normal retirement under the Plan, were his employment with the Company to continue, but in no event earlier than the later of age 55 or the date of such Change on Control.

(b) The Participant would qualify for an early (or normal) retirement benefit as of the date determined in (a).

(c) If married, the Participant would receive his benefit under the 50% Joint and Survivor form of payment with the spouse as beneficiary; if not married, the benefit would be payable in the form of a single life annuity.

"Actuarial present value" shall be determined using the UP 1994 Mortality Table, set back one year, and a discount rate of 5%, or other such rate as the Compensation Committee may establish from time to time, or, where applicable and, if lower, the "lock in rate" elected by a Participant pursuant to Subsection 7 of Section V and in effect. Discount rates producing lower lump sums not in effect for at least six (6) months at the time of a Change of Control shall be disregarded.

3. Each Participant may elect in a time and manner determined by the Compensation Committee, but in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of this Special Plan as if a Change of Control had not occurred. New Participants in the Plan may elect in a time and manner determined by the Compensation Committee, but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of this Special Plan as if a Change of Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

4. Notwithstanding anything in this Special Plan to the contrary, each Participant who has made an election under subsection (3), above, may elect within 90 days following a Change of Control, in a time and manner determined by the Compensation Committee, to receive a lump sum payment calculated under the provisions of subsection (2), above, determined as of the Valuation Date next preceding such payment, except that such amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to the Company by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit under the Special Plan. Payments under this subsection (4) shall be made not later than 7 days following receipt by the Company of the Participant's election. The Compensation Committee shall, no later than 7 days after a Change of Control has occurred,

cause written notification to be given to each Participant eligible to make an election under this subsection (4), that a Change of Control has occurred and informing such Participant of the availability of the election.

5. As used in this Plan the term "Change of Control" shall mean:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control:
(i) any acquisition directly from the Company; (ii) any acquisition by the Company; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section XI(5); or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Company of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Company or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business

**Combination:**

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or its principal subsidiary or all or substantially all of the assets of the Company or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Company of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section XI(5); or

(e) Liquidation or Dissolution. Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company or its principal subsidiary.

6. For purposes of this Section XI, the term "Valuation Date" means the last day of each calendar year and such other dates as the Plan Administrator deems necessary or appropriate to value the Participant's benefits under this Special Plan, except that following a Change of Control, the Benefits Trust Committee shall have final approval of any date selected other than the last day of each calendar year.

Section XII - CONSTRUCTION

The special Plan and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the Commonwealth of Virginia.

**APPENDIX I**

**PARTICIPANT'S GRANTED ADDITIONAL CREDITABLE SERVICE**

**PURSUANT TO SECTION V(4)(b)**

**Exhibit 10.24**

Supplemental Retirement Benefit Plan

of CSX Corporation and Affiliated Corporations

**As Amended and Restated January 1, 1995**
(As Amended through June 27, 2000)

Section I - INTRODUCTION

1. The purpose of this plan, hereinafter called the "Supplemental Plan", is to provide benefit payments to individuals who are participants (or members, as the case may be) in funded, tax-qualified defined benefit pension plans maintained by CSX Corporation (the "Company") and certain of its affiliated corporations (whose participation in the Supplemental Plan is approved by the Compensation Committee of the Board of Directors of the Company ("Compensation Committee")) and which adopts this Supplemental Plan by action of its board of directors and whose benefits would otherwise be reduced by Section 415 of the Internal Revenue Code ("Code") of 1986, as amended ("Code") which imposes limitations on benefits which may be accrued under such plans ("Code Limitations"). Notwithstanding the preceding, following a Change of Control, an affiliated corporation may not become a participating employer in this Supplemental Plan without the approval of the Benefits Trust Committee.

2. This Supplemental Plan preserves and continues in effect all provisions for accruals based upon limitations of benefits imposed by Code Limitations, heretofore credited to Participants under Section V, paragraph (subsection) 5, of the Special Retirement Plan of CSX Corporation and Affiliated Corporations ("Special Plan"), the Supplemental Benefits Plan of Sea-Land Corporation and Participating Companies, and the American Commercial Lines Benefit Restoration Plan ("Predecessor Plans").

Section II - DEFINITIONS

1. Supplemental Benefit means the benefit described in Section IV of this Supplemental Plan.

2. The Supplemental Plan shall, where appropriate, refer to and have meanings consistent with all of the relevant terms of the CSX Pension Plan and any other regularly maintained funded, tax-qualified defined benefit pension plan of any other corporation affiliated with the Company whose participation in the Supplemental Plan as a participating employer is approved by the board of directors of any such affiliated corporation and by the Compensation Committee. Such existing regularly maintained defined benefit pension plans which provided benefits for employees of the Company or its affiliates prior to the Effective Date of this Supplemental Plan document, or those which may be established hereafter, as amended from time to time, shall be referred to herein as the "Pension Plan."

3. Regardless of formal differences which may exist between the Supplemental Plan and the Pension Plan or the Predecessor Plans in the use of terminology, the definitions and principles which are set forth in the Pension Plan or the Predecessor Plans with respect to compensation, average compensation, credited service and similar terms shall be construed and applied hereunder in a manner consistent with the purposes of this Supplemental Plan and the Pension Plan or the Predecessor Plans. In

any instance in which the male gender is used herein, it shall also include persons of the female gender in appropriate circumstances.

4. "Benefits Trust Committee" means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement (the "Benefits Assurance Trust").

5. Any reference to the "Company's independent actuary", "independent actuaries", "actuary" or "Actuary" means the independent actuary engaged by CSX Corporation and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

Section III - MEMBERSHIP

1. Every person who previously participated in a Predecessor Plan shall automatically be a Participant in this Supplemental Plan on and after the Effective Date.

2. Each employee who is a Participant in a Pension Plan on or after the Effective Date shall participate in this Supplemental Plan to the extent of the benefits provided herein.

3. A Participant's participation in this Supplemental Plan shall terminate coincident with the termination of such individual's participation in the Pension Plans; provided, however, in the event that the Participant shall be reassigned or transferred into the employ of the Company or any of its affiliates which also is a participating employer in this Supplemental Plan, the Participant's participation shall be continued.

Section IV - SUPPLEMENTAL BENEFITS

1. All of the provisions, conditions and requirements set forth in the applicable Pension Plan with respect to the granting and payment of retirement benefits thereunder shall be equally applicable to the payment of supplemental benefits hereunder to affected Participants in the Supplemental Plan and to the payment thereof from the employer's general assets. Whenever an individual Participant's rights under the Supplemental Plan are to be determined, appropriate reference shall be made to the particular Pension Plan in which such person is also a participant. Notwithstanding the preceding sentence, if a supplemental benefit under this Supplemental Plan shall be paid to a surviving spouse or other surviving designated beneficiary in conformance with the provisions of the Pension Plans, the final installment payment hereunder shall be made to the estate of the surviving spouse or other surviving designated beneficiary.

2. Each Participant shall receive a Supplemental Benefit under this Supplemental Plan in an amount equal to the difference, if any, between (i) the Participant's monthly retirement income benefit under the provisions of the particular Pension Plan in which such person is also a participant calculated before the application of any Code Limitations and (ii) the Participant's monthly retirement income benefit determined after application of the Code Limitations.

3. Notwithstanding any other provision of this Supplemental Plan to the contrary, a Supplemental Benefit shall not be determined or paid which would duplicate a payment of benefit provided to a Participant under the Pension Plan, the Predecessor Plans or any other unfunded or funded retirement plan of the Company or any of its affiliated corporations. Further, the obligations of the Company or any of its affiliated companies and the benefit plan due any Participant, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto from the Benefits Assurance Trust or any similar trust or other vehicle.

4. A Supplemental Benefit payable under the provisions of this Supplemental Plan shall be paid in such forms and at such times as shall be consistent with the payment of the Participant's retirement income benefit under the particular Pension Plan in which such person is also a participant. Notwithstanding the foregoing, prior to a Change of Control, the Company may delay payment of a Supplemental Benefit under the Supplemental Plan to any Participant who is determined to be among the top five most highly paid executives for the year that the Supplemental Benefit payment would otherwise be paid; provided, however, if a Participant's payment is delayed, that will not decrease the total Supplemental Benefit to which he is entitled. Notwithstanding the preceding, following a Change of Control, the authority to delay payment of a Supplemental Benefit rests solely with the Benefits Trust Committee.

5. Notwithstanding any other provision of this Supplemental Plan to the contrary, the Chief Executive Officer of the Company (the "CEO") may designate certain senior executives of the Company or its affiliates as eligible to elect, prior to the commencement of their retirement benefits under the Company's qualified pension plan, to receive (or for a beneficiary to receive in the event of the executive's death) the actuarial present value of their benefits under this Supplemental Plan in a lump sum. Such election shall be made in accordance with rules established by the Plan Administrator and shall not be effective until six months after it is made. An election may be changed at any time prior to commencement of retirement benefits, but such change shall not be effective until six months after it is made. For purposes of this subsection 5, "actuarial present value" shall be determined as of the date of the payment of the benefit using the UP 1994 Mortality Table, set back one year, and a discount rate of 5%, or other such rate as the Compensation Committee may establish from time to time. A Participant as to whom a lump sum distribution has been elected may also elect to lock in, by notifying the Plan Administrator in writing, the applicable discount rate for three calendar years beyond the year in which the election to do so is made (or such longer or extended period as the CEO may from time to time approve). At least six (6) months advance notice will be provided with respect to any proposed change in the manner or basis in which the discount rate to be used to calculate lump sums is determined. Further, in the event of a Change of Control, the Benefits Trust Committee shall assume all responsibilities of the CEO and the Chairman of the Compensation Committee under this subsection.

Section V - FUNDING METHOD

1. The Supplemental Benefit shall be paid exclusively from the general assets of the applicable employers participating in the Supplemental Plan or from the Benefits Assurance Trust which has been established to secure the payment of the obligations created herein. No Participant or other person shall have any rights or claims against the assets of the employers or against the Benefits Assurance Trust which are superior to or different from the right or claim of a general, unsecured creditor of any participating employer.

2. The Supplemental Plan is intended to be unfunded for tax purposes and for purposes of Title I of ERISA, and constitutes a mere promise by the participating employer to make benefit payments in the future.

3. The employers participating in the Supplemental Plan shall provide all funds required to pay benefits accrued and to administer this Supplemental Plan.

4. To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Supplemental Plan shall be joint and several.

Section VI - ADMINISTRATION OF PLAN

1. Prior to a Change of Control, the Plan Administrator of the CSX Pension Plan shall be the "Plan Administrator" of this Supplemental Plan and shall be responsible for the general administration of the Supplemental Plan, claims review and for carrying out its provisions. Administration of this Supplemental Plan shall be carried out consistent with the terms and conditions of the Pension Plan and the Supplemental Plan.

2. Following a Change of Control, the Benefits Trust Company may remove and/or replace the Plan Administrator.

3. The Plan Administrator shall have sole and absolute discretion to interpret the Plan, determine eligibility for and benefits due hereunder. Decisions of the Plan Administrator regarding participation in and the calculation of benefits under this Supplemental Plan, shall at all times be binding and conclusive on Participants, their beneficiaries, heirs and assigns.

4. Notwithstanding Subsection 3 above, following a Change of Control, final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under this Supplemental Plan shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

Section VII - CERTAIN RIGHTS AND OBLIGATIONS

1. (a) Prior to a Change of Control the Compensation Committee may terminate the Supplemental Plan upon the termination of one or more of the Pension Plans. Prior to a Change of Control the Board of Directors of CSX Corporation may terminate the Plan at any time for any reason in any manner not prohibited by law. Following a Change of Control, this Supplemental Plan may not be terminated without the approval of the Benefits Trust Committee.

(b) Prior to a Change of Control, the Board of Directors of the Company may terminate an affiliated corporation's participation as a participating employer in this Supplemental Plan for any reason at any time. Following a Change of Control, an affiliated corporation may not be terminated from participation as a participating employer without the consent of the Benefits Trust Company.

(c) Prior to a Change of Control, an affiliated corporation's board of directors may terminate that affiliated corporation's participation as a participating employer for any reason at any time. Following a Change of Control, an affiliated corporation's participation as a participating employer may not be terminated without the consent of the Benefits Trust Committee.

2. The participating employers agree in the event that the Supplemental Plan is terminated:

(a) Each retired Participant, surviving spouse of a retired Participant or surviving designated beneficiary of a retired Participant shall be entitled to receive the Supplemental Benefit they would have received had the Supplemental Plan not been terminated, and each surviving spouse or surviving designated beneficiary of a deceased Participant shall become entitled to receive for life the Supplemental Benefit that such surviving spouse or surviving designated beneficiary would have received had the Supplemental Plan not been terminated; and

(b) Each active Participant shall be entitled to receive for life the Supplemental Benefit he or she would have received had the Supplemental Plan not been terminated, calculated on the basis of the Supplemental Benefit which had accrued at the time of termination; provided, however, that the Participant shall become entitled to such Supplemental Benefit only at the time and in accordance with the provisions of the Supplemental Plan had it continued in effect.

(c) In lieu of paying a Supplemental Benefit in accordance with the foregoing provisions, the Plan Administrator, at its election, may direct the discharge of all obligations to retired Participants, surviving spouses or surviving designated beneficiaries of deceased Participants, and active Participants by cash payment of equivalent actuarial value or through the provision of immediate or deferred annuities or such other periodic payments of equivalent actuarial value, as it shall in its sole discretion determine. Notwithstanding the preceding, any such action taken by the Plan Administrator following a Change of Control is subject to the approval of the Benefits Trust Committee.

3. Anything in the Supplemental Plan to the contrary notwithstanding, if the Plan Administrator finds that any Participant, retired Participant or spouse is engaged in acts detrimental to the Company or any of its affiliated corporations, and if after due notice such Participant, the retired Participant or spouse continues to be so engaged or employed, the Plan Administrator shall suspend the Supplemental Benefit of such person, which suspension shall continue until removed by notice from the Plan Administrator; provided, however, that if such suspension has continued for one year, the Plan Administrator shall forthwith cancel such Participant's or spouse's Supplemental Benefit. Furthermore, if the Plan Administrator finds that any Participant had been discharged for having performed acts detrimental to the Company or any of its affiliated corporations, then regardless of any other provision in the Pension Plan or the Supplemental Plan, no benefit shall be payable to or on account of any such Participant's coverage under this Supplemental Plan. Notwithstanding the preceding, following a Change of Control, the Plan Administrator shall not implement such action without the consent of the Benefits Trust Committee.

4. The establishment of the Supplemental Plan shall not be construed as conferring any legal rights upon any employee for a continuation of employment, nor shall it interfere with the rights of an employing corporation to discharge any employee and to treat him without regard to the effect which such treatment might have upon him as a Participant in the Supplemental Plan.

Section VIII - NON-ALIENATION OF BENEFITS

To the extent permitted by applicable law, no benefit under the Supplemental Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt so to do shall be void, except as specifically provided in the Supplemental Plan, nor shall any benefit be in any manner liable for or subject to the debts, contracts, liabilities, engagements, or torts of the person entitled to such benefits; and in the event that the Plan Administrator shall find that any active or retired Participant, surviving spouse or surviving designated beneficiary under the Supplemental Plan has become bankrupt or that any attempt has been made to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge any of his benefits under the Supplemental Plan, expect as specifically provided in the Supplemental Plan, then such benefits shall cease, and in that event, the Plan Administrator shall hold or apply the same to or for the benefit of such active or retired Participant, surviving spouse or surviving designated beneficiary, in such manner as the Plan Administrator may deem proper. Notwithstanding the preceding, following a Change of Control, the Plan Administrator shall not implement such action without the consent of the Benefits Trust Committee.

Section IX - AMENDMENTS

The Supplemental Plan represents a contractual obligation entered into by a participating employer in consideration of services rendered and to be rendered by Participants covered under the Supplemental Plan, and

1. Any Participant in this Supplemental Plan who remains in the active service of a participating employer shall not be deprived of his or her participation or benefit which shall accrue under the Supplemental Plan except as provided hereunder.

2. No modification or amendment may be made which shall deprive any Participant, the surviving spouse of a Participant or the surviving designated beneficiary of a Participant, without the consent of such Participant, surviving spouse of a Participant or the surviving designated beneficiary of a Participant, of any Supplemental Benefit under the Supplemental Plan to which he or she would otherwise be entitled by reason of the Supplemental Benefit standing to his or her credit to the date of such modification or amendment, and in the event of any modification or amendment which adversely affects such Supplemental Benefit, the amount of all reserves required to be accrued on the books of a participating employer shall thereupon be determined and accrued, if the same has not already been done, and such Supplemental Benefit shall become and remain a fixed liability of the participating employers for the payment of such benefits accrued to the date of such modification or amendments.

3. Subject to the foregoing, prior to a Change of Control, the Board of Directors of the Company on the recommendation of the Compensation Committee, reserves the right at any time and from time to time to modify or amend in whole or in part any or all of the Supplemental Plan. Following

a Change of Control, all amendments to this Supplemental Plan are subject to the approval of the Benefits Trust Committee.

Section X - CHANGE OF CONTROL

1. If a Change of Control has occurred, the Company and its participating affiliates shall contribute to the Benefits Assurance Trust within 7 days of such Change of Control, a lump sum contribution equal to the greatest of:

(a) the aggregate value of the amount each Participant would be eligible to receive, under Subsection (2), below;

(b) the present value of accumulated Plan benefits based on the assumptions the Company's independent actuary deems reasonable for this purpose, as of the Valuation Date, as defined in subsection (6), below, coinciding with or next preceding the date of Change of Control, to the extent such amounts are not already in the Benefits Assurance Trust. The aggregate value of the amount of the lump sum to be contributed to the Benefits Assurance Trust pursuant to this
Section X shall be determined by the Company's independent actuaries. Thereafter, the Company's independent actuaries shall annually determine as of a Valuation Date for each Participant not receiving a lump sum payment pursuant to subsection (2), below, the greater of:

(i) the amount such Participant would have received under subsection
(2) had such Participant not made the election under subsection
(3), below, if applicable; and

(ii) the present value of accumulated benefits based on assumptions the actuary deems reasonable for this purpose. To the extent that the value of the assets held in the Benefits Assurance Trust relating to this Supplemental Plan does not equal the amount described in the preceding sentence, (and the value of other liabilities held in the applicable segregated account of the Benefits Assurance Trust), at the time of the valuation, the Company shall make a lump sum contribution to the Benefits Assurance Trust equal to the difference.

(c) the amount determined under Section 1(h) of the Benefits Assurance Trust attributable to liabilities relating to this Supplemental Plan.

2. In the event a Change of Control has occurred, the trustee of the Benefits Assurance Trust shall, within 45 days of such Change of Control, pay to each Participant not making an election under subsection (3), a lump sum payment equal to the actuarial present value of the aggregate supplemental benefit each Participant (or any beneficiary of a Participant) has accrued as of the Valuation Date preceding the date of such Change of Control. If a Participant's benefit has not commenced as of such date, such lump sum shall be determined assuming that:

(a) The Participant's benefit would commence at the earliest date he would qualify for early or normal retirement under the Plan, were his employment with the Company to

continue, but in no event earlier than the later of age 55 or the date of such Change of Control.

(b) The Participant would qualify for an early (or normal) retirement benefit as of the date determined in (a).

(c) If married, the Participant would receive his benefit under the 50% Joint and Survivor form of payment with the spouse as beneficiary; if not married, the benefit would be payable in the form of a single life annuity.

"Actuarial present value" shall be determined using the UP 1994 Mortality Table, set back one year, and a discount rate of 5%, or other such rate as the Compensation Committee may establish from time to time, or, where applicable and, if lower, the "lock in rate" elected by a Participant pursuant to Subsection 5 of Section IV and in effect. Discount rates producing lower lump sums not in effect for at least six (6) months at the time of a Change of Control shall be disregarded.

3. Each Participant may elect in a time and manner determined by the Compensation Committee but, in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of this Supplemental Plan as if a Change of Control had not occurred. New Participants in the Plan may elect in a time and manner determined by the Compensation Committee, (or, after a Change of Control, the Benefits Trust Committee) but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of this Supplemental Plan as if a Change of Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

4. Notwithstanding anything in this Supplemental Plan to the contrary, each Participant who has made an election under subsection (3), above, may elect within 90 days following a Change of Control, in a time and manner determined by the Benefits Trust Committee, to receive a lump sum payment calculated under the provisions of subsection (2), above, determined as of the Valuation Date next preceding such payment, except that such amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to the Company or the applicable participating employer by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit under the Supplemental Plan. Payments under this subsection (4) shall be made not later than 7 days following receipt by the Benefits Trust Committee of the Participant's election. The Benefits Trust Committee shall, no later than 7 days after a Change of Control has occurred, cause written notification to be given to each Participant eligible to make an election under this subsection (4), that a Change of Control has occurred and informing such Participant of the availability of the election.

5. As used in this Section X, a "Change of Control" shall mean:

(a) Stock Acquisition. The acquisition by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then

outstanding shares of common stock of the Company (the "Outstanding Company Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Company;
(ii) any acquisition by the Company; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this
Section X(5); or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individuals whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Company of a reorganization, merger or consolidation, or sale or other disposition of all or substantially all of the assets of the Company or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or its principal subsidiary or all or substantially all of the assets of the Company or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Company of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section X(5); or

(e) Liquidation or Dissolution. Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company or its principal subsidiary.

6. For purposes of this Section X, the term "Valuation Date" means the last day of each calendar year and such other dates as the Plan Administrator deems necessary or appropriate to value the Participants' benefits under this Supplemental Plan. Following a Change of Control, the selection of a date other than the last day of the calendar year is subject to the approval of the Benefits Trust Committee.

Section XI - CONSTRUCTION

The Supplemental Plan and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the Commonwealth of Virginia.

Section XII - EFFECTIVE DATE

The Effective Date of this Supplemental Benefit Plan shall be January 1, 1989.

**Exhibit 10.28**

**CSX**

**LONG TERM INCENTIVE CASH PROGRAM**

**Performance Period 2000-2002**

1. Purpose. The CSX Long Term Incentive Cash Program (the "Program") for the 2000-2002 Performance Period is intended to provide long term cash incentives to select management employees to improve CSX's financial performance, and to reward such employees with a cash payment if CSX's performance pursuant to the terms of the Program are met. The Program shall be operated as Performance Grants under the provisions of Section 8 of the CSX Omnibus Incentive Plan.

2. Definitions. As used in the Program, the following terms have the meanings indicated below. All other capitalized terms have the definitions in the CSX Omnibus Incentive Plan:

(a) "Award Matrix" means a matrix which contains the Performance Goals selected by the Committee for the Performance Period and other objective factors necessary to determine the amount, if any, of the Long Term Award for the Performance Period.

(b) "Cash Unit" means a unit with a value of $1.00 that is designated as part of a Long Term Grant.

(c) "Long Term Award" means a payment of cash at the end of the Performance Period based on the terms of the Long Term Grant.

(d) "Long Term Grant" means a grant of Cash Units to a Participant under the Program.

(e) "Participant" means any employee of CSX or a Subsidiary who receives a Long Term Grant under the Program.

(f) "Peer Group" means a group of public companies that the Committee determines to be appropriate competitors of CSX for purposes of performance comparison. During a Performance Period, the Peer Group shall be adjusted as the Committee determines is required due to mergers or other corporate events affecting companies in the Peer Group.

(g) "Performance Period" means a three fiscal-year period. The Performance Period shall commence on January 1, 2000.

(h) "Performance Rank" means a ranking of CSX in comparison to the Peer Group with respect to one or more Performance Criteria for the Performance Period.

(i) "Plan" means the CSX Omnibus Incentive Plan.

(j) "Program" means the CSX Long Term Incentive Cash Program for the 2000-2002 Performance Period.

3. Participation.

(a) All present and future management employees of CSX or a Subsidiary shall be eligible to receive Long Term Grants under the Program. The Committee shall have the power and complete discretion to select eligible employees to receive Long Term Grants and to determine for each employee the terms and conditions of each Long Term Grant.

(b) A person who becomes eligible to participate at any time after the commencement of a Performance Period or a Participant whose employment terminates during a Performance Period because of death, Retirement, or Disability shall be eligible to receive a pro rata Long Term Grant based on the ratio that the Participant's number of full months of participation during the Performance Period bears to the number 36. A Participant who is removed from the original position held when the Long Term Grant was made or whose employment terminates during the Performance Period for reasons other than death, Retirement, Disability, or involuntary separation for reasons other than Cause shall forfeit any outstanding Long Term Grant, unless otherwise provided by the Committee.

(c) A Participant in this Program shall be eligible to participate in other cash incentive or profit sharing plans established or maintained by CSX or any Subsidiary. No award under any other incentive or profit sharing plan maintained by CSX may be made contingent, in whole or in part, on the Participant not receiving payment of a Long Term Award under this Program.

4. Determination of Awards.

(a) Before or within ninety days of the beginning of each Performance Period, the Committee will select one or more Performance Criteria, the appropriate Performance Goals for the Performance Criteria, and number of Cash Units for each Participant with respect to which a Long Term Grant may be made. The Committee's determinations shall be set forth in an Award Matrix. The Committee shall consult with senior management executives of CSX to the extent deemed appropriate by the Committee. Performance Criteria may be used singularly or in combination, as the Committee determines. The Award Matrix will fix the objective components for determining whether a Long Term Award will be paid and, if so, the amount of the Long Term Award. Long Term Awards shall be based on a percentage of each Participant's Cash Units for the Performance Period if and to the extent the Performance Goal is achieved. The amount payable to a Participant for the Performance Period will be determined from the Award Matrix as a percentage of the Cash Units if the actual performance under a Performance Goal is within the range fixed by the Committee for the Performance Period

to generate a payment under the Award Matrix. As determined by the Committee, Performance Criteria shall be calculated in accordance with public financial statements of CSX and the Peer Group

(b) The Committee may establish such threshold requirements for the payment of a Long Term Award as the Committee shall deem appropriate. Once fixed, the Performance Criteria and Performance Goals for a Performance Period may not be modified as to a Covered Employee, except as provided in
Section 4(d).

(c) Before any Long Term Award may be paid for a Performance Period, the Committee shall certify in writing that the Performance Goals and any other requirements of the Program have been satisfied for the Performance Period.

(d) Even though the Performance Goals have been met, the Committee may reduce or eliminate entirely any Long Term Award to a Participant if the Committee determines that such action is in the best interests of CSX. Any action by the Committee under this Section 4(d) shall be conclusive and binding on CSX and the Participant.

(e) It is the intent of the Committee that this Program and any Long Term Grant satisfy, and be interpreted in a manner to satisfy, the applicable requirements of Code Section 162(m) with respect to a Covered Employee. If any provision of this Program or if any Long Term Grant would otherwise conflict with the expressed intent of this Section 4(e), that provision shall be interpreted so as to avoid such conflict to the extent possible.

5. Payment of Long Term Awards. All Long Term Grants will be paid in cash.

6. Administration. The Committee shall administer the Program under the terms and conditions of the Plan.

7. Effective Date of the Program. The effective date of the Program is January 1, 2000.

8. Amendment and Termination. This Program shall continue until the end of the 2002 fiscal year. The Program may be amended or terminated as provided under the Plan.

**Exhibit 10.34**

**AMENDMENT NO. 3**

to the

**TRANSACTION AGREEMENT**

by and among

**CSX CORPORATION,**

**CSX TRANSPORTATION, INC.,**

**NORFOLK SOUTHERN CORPORATION,**

**NORFOLK SOUTHERN RAILWAY COMPANY,**

**CONRAIL INC.,**

**CONSOLIDATED RAIL CORPORATION**

and

**CRR HOLDINGS LLC**

**Dated as of June 10, 1997**

**AMENDMENT NO. 3**

THIS AMENDMENT NO. 3 dated as of August 1, 2000, is by and among by and among CSX CORPORATION, a Virginia corporation ("CSX"), CSX TRANSPORTATION, INC., a Virginia corporation, for itself and on behalf of its controlled Subsidiaries (collectively, "CSXT"), NORFOLK SOUTHERN CORPORATION, a Virginia corporation ("NSC"), NORFOLK SOUTHERN RAILWAY COMPANY, a Virginia corporation, for itself and on behalf of its controlled Subsidiaries (collectively, "NSR"), CONRAIL INC., a Pennsylvania corporation, for itself and on behalf of its controlled Subsidiaries (collectively, "CRR"), CONSOLIDATED RAIL CORPORATION, a Pennsylvania corporation ("CRC"), and CRR HOLDINGS LLC, a Delaware limited liability company ("CRR Parent"). CSX, CSXT, NSC, NSR, CRR, CRC and CRR Parent have entered into that certain Transaction Agreement dated as of June 10, 1997, as amended (the "Agreement"). The parties to the Agreement have determined to amend the Agreement to increase the size of the Board of Directors of CRC under the Agreement as set forth herein. Accordingly, the parties agree as follows:

SECTION 1. Definitions. Capitalized terms used in this Amendment and not defined herein shall have the meanings assigned to such terms in the Agreement.

SECTION 2. Amendments of the Agreement. The Agreement is hereby amended pursuant to and in compliance with Section 11.1 by deleting the text of subsection 4.2(a) in its entirety and substituting the following therefor:

"Following the Control Date, the business and affairs of CRC shall be managed under the direction of the CRC Board consisting of ten persons divided into two classes of five directors. Five directors shall be designated by CSX (the "CSX Directors") and five directors shall be designated by NSC (the "NSC Directors")."

SECTION 3. Effectiveness. This Amendment shall become effective as of August 1, 2000 (the "Amendment Date").

SECTION 4. Integration; Confirmation. On and after the Amendment Date, each reference in the Agreement to "this Agreement," "herein," "hereunder" or words of similar import, and each reference in any Note or other document delivered in connection with the Agreement shall be deemed to be a reference to the Agreement as amended by this Amendment, and the Agreement as so amended shall be read as a single integrated document. Except as specifically amended by this Amendment, all other terms and provisions of the Agreement shall continue in full force and effect and unchanged and are hereby confirmed in all respects.

SECTION 5. Counterparts. This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 6. Governing Law. This Amendment shall be construed in accordance with and governed by the law of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

*CSX CORPORATION*

*By: /s/ Paul R. Goodwin*
*Name: Paul R. Goodwin*
*Title: Vice Chairman and Chief Financial Officer*

*CONRAIL INC. (for itself and on behalf of its controlled Subsidiaries)*

*By: /s/ Timothy T. O'Toole*
*Name: Timothy T. O'Toole*
*Title: President*

*CSX TRANSPORTATION, INC. (for itself and on behalf of its controlled Subsidiaries)*

*By: /s/ Michael J. Ward*
*Name: Michael J. Ward*
*Title: Executive Vice President - Operations*

*CONSOLIDATED RAIL CORPORATION*

*By: /s/ Timothy T. O'Toole*
*Name: Timothy T. O'Toole*
*Title: President and Chief Executive Officer*

*NORFOLK SOUTHERN CORPORATION*

*By: /s/ Henry C. Wolf*
*Name: Henry C. Wolf*
*Title: Vice Chairman and Chief Financial Officer*

*CRR HOLDINGS LLC*

*By: /s/ Paul R. Goodwin*
*Name: Paul R. Goodwin*
*Title: Vice President*

*NORFOLK SOUTHERN RAILWAY COMPANY (for itself and behalf of its controlled Subsidiaries)*

*By: /s/ William J. Romig*
*Name: William J. Romig*
*Title: Vice President and Treasurer*

Exhibit 10.40

Bank of America, N.A.

Date September 22, 2000

LIMITED GUARANTY

| BANK: | GUARANTOR: |
| --- | --- |
| Bank of America, N.A.<br>Banking Center:<br><br>Private Bank<br>1111 East Main Street<br>Richmond, Virginia 23219 | CSX Corporation<br>901 East Cary Street<br>Richmond, VA 23219<br>Attn: Corporate Secretary |

"BORROWER": Alvin R. Carpenter

1. GUARANTY. FOR VALUE RECEIVED, and to induce Bank of America, N.A. (Attn: Private Bank) ("Bank") to make loans or advances or to extend credit or other financial accommodations or benefits, with or without security, to or for the account of Borrower, the undersigned "Guarantor", if more than one, then each of them jointly and severally, hereby becomes surety for and irrevocably and unconditionally guarantees to Bank prompt payment in an amount as provided herein, when due, whether by acceleration or otherwise, of any Liabilities of Borrower to Bank. This Guaranty is cumulative to and does not supersede any other guaranties.

Notwithstanding any provision of this Guaranty to the contrary, this Guaranty is limited to the amount of $7,929,500.51 dollars principal plus interest incurred by Borrower pursuant to that certain promissory note or other Loan Documents from Borrower to Bank, dated September 22, 2000 in the principal amount of

$7,929,500.51 dollars, including, without limitation, all principal plus interest owing at any time thereunder whether arising by renewal or advance of additional principal which may accrue or be incurred with respect to said promissory note or other Loan Documents, plus attorney's fees, cost of expenses of collection incurred and/or the cost of the enforcement of rights in enforcing this Guaranty (including, without limitation, any liability arising from failure to comply with any state or federal laws, rules and regulations concerning the control of hazardous waste or substances at or with respect to any real estate securing any loan guaranteed hereby), plus interest on such attorney" fees and cost of collection.

Except to the extend limited above, Guarantor unconditionally guarantees the faithful, prompt and complete compliance by Borrower with all Obligations (as hereinafter defined). The undertakings of Guarantor hereunder are independent of the Liabilities and Obligations of Borrower and a separate action or actions for payment, damages or performance may be brought or prosecuted against Guarantor, whether or not an action is brought against Borrower or to realize upon the security for the Liabilities and/or Obligations, whether or not Borrower is joined in any such action or actions, and whether or not notice is given or demand is made upon Borrower.

Bank shall not be required to proceed first against Borrower, or any other person or entity, whether primarily or secondarily liable, or against any collateral held by it, before resorting to Guarantor for payment, and Guarantor shall not be entitled to assert as a defense to the enforceability of the Guaranty any defense of Borrower with respect to any Liabilities or Obligations.

2. PARAGRAPH HEADINGS, GOVERNING LAW AND BINDING EFFECT. Guarantor agrees that the paragraph headings in this Guaranty are for convenience only and that they will not limit any of the provisions of this Guaranty. Guarantor further agrees that this Guaranty shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia and applicable United States federal law. Guarantor further agrees that this Guaranty shall be deemed to have been made in the Commonwealth of Virginia at Bank's address indicated above, and shall be governed by, and construed in accordance with, the laws of the Commonwealth of Virginia, or the United States courts located within the Commonwealth of Virginia, and is performable in the Commonwealth of Virginia. This Guaranty is binding upon Guarantor, his, their or its executors, administrators, successors or assigns, and shall inure to the benefit of Bank, its successors, indorsees or assigns. Anyone executing this Guaranty shall be bound by the terms hereof without regard to execution by anyone else.

3. DEFINITIONS.

A. "Guarantor" shall mean Guarantor or any one or more of them.

B. "Liability" or "Liabilities" shall mean without limitation, all liabilities, overdrafts, indebtedness, and obligations of Borrower and/or Guarantor to Bank, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, contractual or tortious, liquidated or

unliquidated, arising by operation of law or otherwise, now or hereafter existing, or held or to be held by Bank for its own account or as agent for another or others, whether created directly, indirectly, or acquired by assignment or otherwise, including but not limited to all extensions or renewals thereof, and all sums payable under or by virtue thereof, including without limitation, all amounts of principal and interest, all expenses (including reasonable attorney's fees and cost of collection) incurred in the collection thereof or the enforcement of rights thereunder (including without limitation, any liability arising from failure to comply with state or federal laws, rules and regulations concerning the control of hazardous waste or substances at or with respect to any real estate securing any loan guaranteed hereby), whether arising in the ordinary course of business or otherwise. If Borrower is a partnership, corporation or other entity the term "Liability" or "Liabilities" as used herein shall include all Liabilities to Bank of any successor entity or entities.

C. "Loan Documents" shall mean all deeds to secure debt, deeds of trust, mortgages, security agreements and other documents securing payment of the Liabilities and all notes and other agreements, documents, and instruments evidencing or relating to the Liabilities and Obligations.

D. "Obligation" or "Obligations" shall mean all terms, conditions, covenants, agreements and undertakings of Borrower and/or Guarantor under all notes and other documents evidencing the Liabilities, and under all deeds to secure debt, deeds of trust, mortgages, security agreements and other agreements, documents and instruments executed in connection with the Liabilities or related thereto.

4. WAIVERS BY GUARANTOR. Guarantor waives notice of acceptance of this Guaranty, notice of any Liabilities or Obligations to which it may apply, presentment, demand for payment, protest, notice of dishonor or nonpayment of any Liabilities, notice of intent to accelerate, notice of acceleration, and notice of any suit or the taking of other action by Bank against Borrower, Guarantor or any other person, any applicable statute of limitations and any other notice to any party liable on any Loan Document (including Guarantor).

Each Guarantor also hereby waives any claim, right or remedy which such Guarantor may now have or hereafter acquire against Borrower that arises hereunder and/or from the performance by any other Guarantor hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of Bank against Borrower or against any security which Bank now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

Guarantor also waives the benefits of any provision of law requiring that Bank exhaust any right or remedy, or take any action, against Borrower, any Guarantor, any other person and/or property including but not limited to the provisions of the Virginia Code (S)49-25 and the Virginia Code (S)49-26, as amended, or otherwise.

Bank may at any time and from time to time (whether before or after revocation or termination of this Guaranty) without notice to Guarantor (except as required by law), without incurring responsibility to Guarantor, without impairing, releasing or otherwise affecting the Obligations of Guarantor, in whole or in part, and without the indorsement or execution by Guarantor of any additional consent, waiver or guaranty: (a) change the manner, place or terms of payment, or change or extend the time of or renew, or change any interest rate or alter any Liability or Obligation or installment thereof, or any security therefor;
(b) loan additional monies or extend additional credit to Borrower, with or without security, thereby creating new Liabilities or Obligations the payment or performance of which shall be guaranteed hereunder, and the Guaranty herein made shall apply to the Liabilities and Obligations as so changed, extended, surrendered, realized upon or otherwise altered; (c) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Liabilities or Obligations and any offset there against; (d) exercise or refrain from exercising any rights against Borrower or others (including Guarantor) or act or refrain from acting in any other manner; (e) settle or compromise any Liability or Obligation or any security therefor and subordinate the payment of all or any part thereof to the payment of any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; (f) release or compromise any Liability of Guarantor hereunder or any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; or (g) apply any sums from any sources to any Liability without regard to any Liabilities remaining unpaid.

5. SUBORDINATION. Upon demand of Bank, Guarantor agrees that it will not demand, take or receive from Borrower, by set-off or in any other manner, payment of any debt, now and at any time or times hereafter owing by Borrower to Guarantor, unless and until all the Liabilities and Obligations shall have been fully paid and performed, and any security interest, liens or encumbrances which Guarantor now has and from time to time hereafter may have upon any of the assets of Borrower shall be made subordinate,

junior and inferior and postponed in priority, operation and effect to any security interest of Bank in such assets.

6. WAIVERS BY BANK. No delay on the part of Bank in exercising any of its options, powers or rights, and no partial or single exercise thereof, shall constitute a waiver thereof. No wavier of any of its rights hereunder, and no modification or amendment of this Guaranty, shall be deemed to be made by Bank unless the same shall be in writing, duly signed on behalf of Bank; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Bank or the obligations of Guarantor to Bank in any other respect at any other time.

7. TERMINATION. This Guaranty shall be binding on each Guarantor until written notice of revocation signed by such Guarantor or written notice of the death of such Guarantor shall have been received by Bank, notwithstanding change in name, location, composition or structure of, or the dissolution, termination or increase, decrease or change in personnel, owners or partners of Borrower, or any one ore more of Guarantors. No notice of revocation or termination hereof shall affect in any manner rights arising under this Guaranty with respect to Liabilities or Obligations that shall have been committed, created, contracted, assumed or incurred prior to receipt of such written notice pursuant to any agreement entered into by Bank prior to receipt of such notice. The sole effect of such notice of revocation or termination hereof shall be to exclude from this Guaranty, Liabilities or Obligations thereafter arising that are unconnected with Liabilities or Obligations theretofore arising or transactions entered into theretofore.

In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Liabilities existing at the date of death, and any renewals or extensions thereof, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Liabilities existing at that time, but also as to Liabilities thereafter incurred by Borrower to Bank.

8. PARTIAL INVALIDITY AND/OR ENFORCEABILITY OF GUARANTY. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision herein and the invalidity or unenforceability of any provision of any Loan Document as it may apply to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

In the event Bank is required to relinquish or return the payments, the collateral or the proceeds thereof, in whole or in part, which had been previously applied to or retained for application against any Liability, by reason of a proceeding arising under the Bankruptcy Code, or for any other reason, this Guaranty shall automatically continue to be effective notwithstanding any previous cancellation or release effected by Bank.

9. CHANGE OF STATUS. Guarantor will not merge into or consolidate with any other entity, or permit any other entity to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) unless (a) the surviving corporation in such transaction (whether the Guarantor or another entity, the "Surviving Corporation") shall be a corporation organized and existing under the laws of the United States of America, any state thereof or the District of Columbia, and the Surviving Corporation shall expressly assume all of the Guarantor's obligations under this Guaranty and any other Loan Document to which Guarantor is a party in writing,
(b) immediately after giving effect to such transaction, no default (or any event described in Section 12 of this Guaranty) shall have occurred hereunder or under any other Loan Document to which Guarantor is a party, and (c) immediately after giving effect to any such transaction, the Net Worth of the Surviving Corporation, calculated in accordance with generally accepted accounting principles, shall be equal to or greater than the Net Worth of Guarantor as of the last day of the immediately preceding fiscal quarter of Guarantor, and the Surviving Corporation shall deliver to Bank such certificates of financial officers and opinions of counsel and other documents as Bank may request to confirm compliance with all of the foregoing conditions. Guarantor further agrees that this Guaranty shall be binding, legal and enforceable against Guarantor in the event Borrower changes its name, status or type of entity.

10. FINANCIAL AND OTHER INFORMATION. Guarantor agrees to furnish to Bank any and all financial information and any other information regarding Guarantor and/or collateral requested in writing by Bank within ten (10) days of the date of the request. Guarantor has made an independent investigation of the financial condition and affairs of Borrower prior to entering into this Guaranty, and Guarantor will continue to make such investigation; and in entering into this Guaranty Guarantor has not relied upon any representation of Bank as to the financial condition, operation or creditworthiness of Borrower.

Guarantor further agrees that Bank shall have no duty or responsibility now or hereafter to make any investigation or appraisal of Borrower on behalf of Guarantor or to provide Guarantor with any credit or other information which may come to its attention now or hereafter.

11. NOTICES. Notice shall be deemed reasonable if mailed postage prepaid at least five (5) days before the related action to the address of Guarantor or Bank, at their respective addresses indicated at the beginning of this Guaranty, or to such other address as any party may designate by written notice to the other party. Each notice, request and demand shall be deemed given or made, if sent by mail, upon the earlier of the date of receipt or five (5) days after deposit in the U.S. Mail, first class postage prepaid, or if sent by any other means, upon delivery.

12. GUARANTOR DUTIES. Guarantor shall upon notice or demand by Bank promptly and with due diligence pay all Liabilities and perform and satisfy all Obligations for the benefit of Bank in the event of (a) the occurrence of any default under any Loan Documents; (b) the failure of any Borrower or Guarantor to perform any obligation or pay any liability or indebtedness of any Borrower or Guarantor to Bank, or to any affiliate of Bank, whether under any Note, Guaranty, or any other agreements, now or hereafter existing, as and when due (whether upon demand, at maturity or by acceleration); (c) the failure of any Borrower or Guarantor to pay or perform any other liability, obligation or indebtedness of any Borrower or Guarantor to any other party; (d) the death of any Borrower or Guarantor (if an individual); (e) the resignation or withdrawal of any partner or a material owner/Guarantor of Borrower, as determined by Bank in its sole discretion; (f) the commencement of a proceeding against any Borrower or Guarantor for dissolution or liquidation, the voluntary or involuntary termination or dissolution of any Borrower or Guarantor or the merger or consolidation of any Borrower or Guarantor with or into another entity; (g) the insolvency, or the business failure of, or the appointment of a custodian, trustee, liquidator or receiver for or of any of the property of, or the assignment for the benefit of creditors by, or the filing of a petition under bankruptcy, insolvency or debtor's relief law or the filing of a petition for any adjustment of indebtedness, composition or extension by or against any Borrower or Guarantor; (h) the sole determination by Bank that any representation or warranty to Bank in any Loan Document or otherwise to Bank was untrue or materially misleading when made; (i) the failure of Guarantor or Borrower to timely deliver such financial statements including tax returns and all schedules, or other statements of condition or other information, as Bank shall request from time to time; (j) the entry of a judgment against Borrower or Guarantor which Bank deems to be of a material nature in the sole discretion of Bank; (k) the seizure or forfeiture of any of Borrower or Guarantor's property, or the issuance of any writ of possession, garnishment or attachment, or any turnover order; (l) the sole determination by Bank that Guarantor or Borrower jointly or severally, has suffered a material adverse change in its financial condition; (m) the determination by Bank that for any reason it is insecure; (n) any lien or additional security interest being place upon any collateral which is security for any Loan Document; or (o) the failure of Borrower's business to comply with any law or regulation controlling the operation of Borrower's business.

13. REMEDIES. Upon the failure of Guarantor to fulfill its duty to pay all Liabilities and perform and satisfy all Obligations as required hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law, and without limiting the generality of the foregoing, Bank may, at its option and without notice or demand: (a) declare any Liability due and payable at once; (b) take possession of any collateral pledged by Borrower or Guarantor wherever located, and sell, resell, assign, transfer and deliver all or any part of said collateral of Borrower or Guarantor at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale, and Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of said collateral to be sold, free from and discharged of all trusts, claims rights or redemption and equities of Borrower or Guarantor whatsoever; Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and (c) set-off against any or all liabilities of Guarantor all money owed by Bank or any of its agents or affiliates in any capacity to Guarantor whether or not due, and also set-off against all other Liabilities of Guarantor to Bank all money owed by Bank in any capacity of Guarantor, and if exercised by Bank, Bank shall be deemed to have exercised such right of set-off and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

Bank shall have a properly perfected security interest in all of Guarantor's funds on deposit with Bank to secure the balance of any Liabilities and/or Obligations that Guarantor may now or in the future owe Bank. Bank is granted a contractual right of set-off and will not be liable for dishonoring checks or withdrawals where the exercise of Bank's contractual right of set-off or security interest results in insufficient funds in Guarantor's account. As authorized by law, Guarantor grants to Bank this

contractual right of set-off and security interest in all property of Guarantor now or at anytime hereafter in the possession of Bank, including but not limited to any joint account, special account, account by the entireties, tenancy in common, and all dividends and distributions now or hereafter in the possession or control of Bank.

14. ATTORNEY FEES, COST AND EXPENSES. Guarantor shall pay all costs of collection and reasonable attorney's fees, including reasonable attorney's fees in connection with any suit, mediation or arbitration proceeding, out of Court payment agreement, trial, appeal, bankruptcy proceedings or otherwise, incurred or paid by Bank in enforcing the payment of any Liability or defending this agreement.

15. PRESERVATION OF PROPERTY. Bank shall not be bound to take any steps necessary to preserve any rights in any property pledged as collateral to Bank to secure Borrower and/or Guarantor's Liabilities and Obligations as against prior parties who may be liable in connection therewith, and Borrower and Guarantor hereby agree to take any such steps. Bank, nevertheless, at any time, may (a) take any action it deems appropriate for the care or preservation of such property or of any rights of Borrower and/or Guarantor or Bank therein; (b) demand, sue for, collect or receive any money or property at any time due, payable or receivable on account of or in exchange for any property pledged as collateral, to Bank to secure Borrower and/or Guarantor's Liabilities to Bank;
(c) compromise and settle with any person liable on such property; or (d) extend the time of payment or otherwise change the terms of the Loan Documents as to any party liable on the Loan Documents, all without notice to, without incurring responsibility to, and without affecting any of the Obligations or Liabilities of Guarantor.

16. ARBITRATION AND WAIVER OF JURY TRIAL.

(a) This paragraph concerns the resolution of any controversies or claims between Guarantor and Bank, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this Guaranty (including any renewals, extensions or modifications); or
(ii) any document related to this Guaranty (collectively a "Claim").

(b) At the request of Guarantor or Bank, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, United States Code) (the "Act"). The Act will apply even thought this Guaranty provides that it is governed by the law of a specified state.

(c) Arbitration proceedings will be determined in accordance with the Act, the applicable rules and procedures for the arbitration of disputes of JAMS or any successor thereof ("JAMS"), and the terms of this paragraph. In the event of any inconsistency, the terms of this paragraph shall control.

(d) The arbitration shall be administered by JAMS and conducted in any U.S. state where real or tangible personal property collateral for this Guaranty is located or if there is no such collateral, the Commonwealth of Virginia. All Claims shall be determined by one arbitrator, however, if Claims exceed Five Million U.S. Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within 90 days of the demand for arbitration and close within 90 days of commencement, and the award of the arbitrator(s) shall be issued within 30 days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional 60 days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and enforced.

(e) The arbitrator(s) will have the authority to decide whether any Claim is barred by the statute of limitations and, if so, to dismiss the arbitration on that basis. For purposes of the application of the statute of limitations, the service on JAMS under applicable JAMS rules of a notice of claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s). The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this Guaranty.

(f) This paragraph does not limit the right of Guarantor or Bank to: (i) exercise self-help remedies, such as but not limited to, setoff, (ii) initiate judicial or nonjudicial foreclosure against any real or personal property collateral, (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g) The filing of a court action is not intended to constitute a waiver of the right of Guarantor or Bank, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h) By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to

limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This provision is a material inducement for the parties entering into this Guaranty.

17. CONTROLLING DOCUMENT. To the extent that this Limited Guaranty conflicts with or is in any way incompatible with any other Loan Document concerning this Obligation, any promissory note shall control over any other document, and if such promissory note does not address an issue, then each other document shall control to the extent that it deals most specifically with an issue.

18. EXECUTION UNDER SEAL. This Guaranty is being executed under seal by Guarantor.

19. NOTICE OF FINAL AGREEMENT. THIS WRITTEN LIMITED GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed under seal on this 22nd day of September, 2000.

```
WITNESSED BY:                         GUARANTOR:

   /s/Pamela W. Nichols               CSX CORPORATION
 --------------------------------
                                      By:    /s/Gregory R. Weber
                                           ------------------------------

(Seal)
   Pamela W. Nichols                  Name: G. R. Weber
 --------------------------------          ------------------------------
 Staff Assistant
 Print Name and Title                 Title: Vice President & Treasurer
                                             ----------------------------


                                         /s/Rachel E. Geiersbach
                                       ----------------------------------
                                       Attest (If Applicable)

                                               [Corporate Seal]

CORPORATE ACKNOWLEDGEMENT

State of Virginia  )
                   )
```

**City of Richmond )**

This instrument was acknowledged before me on September 25, 2000, by G. R. Weber, Vice President & Treasurer of CSX Corporation, a Virginia corporation, on behalf of said corporation.

```
                                        /s/Diana B. Flowers
                                       ---------------------------------
                                       Notary Public
 (Seal)                                in and for the State of Virginia


August 31, 2003                      Diana B. Flowers
----------------------               --------------------------------
My Commission Expires                Print Name of Notary
```

**EXHIBIT 10.41**

**Date September 22, 2000**

**LIMITED GUARANTY**

---

| BANK: | GUARANTOR: |
|---|---|
| Bank of America, N.A.<br>Banking Center:<br>Private Bank<br>1111 East Main Street<br>Richmond, Virginia 23219 | CSX Corporation<br>901 East Cary Street<br>Richmond, VA 23219<br>Attn: Corporate Secretary |

"BORROWER": John W. Snow

1. GUARANTY. FOR VALUE RECEIVED, and to induce Bank of America, N.A. (Attn: Private Bank) ("Bank") to make loans or advances or to extend credit or other financial accommodations or benefits, with or without security, to or for the account of Borrower, the undersigned "Guarantor", if more than one, then each of them jointly and severally, hereby becomes surety for and irrevocably and unconditionally guarantees to Bank prompt payment in an amount as provided herein, when due, whether by acceleration or otherwise, of any Liabilities of Borrower to Bank. This Guaranty is cumulative to and does not supersede any other guaranties.

Notwithstanding any provision of this Guaranty to the contrary, this Guaranty is limited to the amount of $13,347,006.49 dollars principal plus interest incurred by Borrower pursuant to that certain promissory note or other Loan Documents from Borrower to Bank, dated September 22, 2000 in the principal amount of

$13,347,006.49 dollars, including, without limitation, all principal plus interest owing at any time thereunder whether arising by renewal or advance of additional principal which may accrue or be incurred with respect to said promissory note or other Loan Documents, plus attorney's fees, cost of expenses of collection incurred and/or the cost of the enforcement of rights in enforcing this Guaranty (including, without limitation, any liability arising from failure to comply with any state or federal laws, rules and regulations concerning the control of hazardous waste or substances at or with respect to any real estate securing any loan guaranteed hereby), plus interest on such attorney" fees and cost of collection.

Except to the extend limited above, Guarantor unconditionally guarantees the faithful, prompt and complete compliance by Borrower with all Obligations (as hereinafter defined). The undertakings of Guarantor hereunder are independent of the Liabilities and Obligations of Borrower and a separate action or actions for payment, damages or performance may be brought or prosecuted against Guarantor, whether or not an action is brought against Borrower or to realize upon the security for the Liabilities and/or Obligations, whether or not Borrower is joined in any such action or actions, and whether or not notice is given or demand is made upon Borrower.

Bank shall not be required to proceed first against Borrower, or any other person or entity, whether primarily or secondarily liable, or against any collateral held by it, before resorting to Guarantor for payment, and Guarantor shall not be entitled to assert as a defense to the enforceability of the Guaranty any defense of Borrower with respect to any Liabilities or Obligations.

2. PARAGRAPH HEADINGS, GOVERNING LAW AND BINDING EFFECT. Guarantor agrees that the paragraph headings in this Guaranty are for convenience only and that they will not limit any of the provisions of this Guaranty. Guarantor further agrees that this Guaranty shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia and applicable United States federal law. Guarantor further agrees that this Guaranty shall be deemed to have been made in the Commonwealth of Virginia at Bank's address indicated above, and shall be governed by, and construed in accordance with, the laws of the Commonwealth of Virginia, or the United States courts located within the Commonwealth of Virginia, and is performable in the Commonwealth of Virginia. This Guaranty is binding upon Guarantor, his, their or its executors, administrators, successors or assigns, and shall inure to the benefit of Bank, its successors, indorsees or assigns. Anyone executing this Guaranty shall be bound by the terms hereof without regard to execution by anyone else.

3. DEFINITIONS.

A. "Guarantor" shall mean Guarantor or any one or more of them.

B. "Liability" or "Liabilities" shall mean without limitation, all liabilities, overdrafts, indebtedness, and obligations of Borrower and/or Guarantor to Bank, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, contractual or tortious,

liquidated

or unliquidated, arising by operation of law or otherwise, now or hereafter existing, or held or to be held by Bank for its own account or as agent for another or others, whether created directly, indirectly, or acquired by assignment or otherwise, including but not limited to all extensions or renewals thereof, and all sums payable under or by virtue thereof, including without limitation, all amounts of principal and interest, all expenses (including reasonable attorney's fees and cost of collection) incurred in the collection thereof or the enforcement of rights thereunder (including without limitation, any liability arising from failure to comply with state or federal laws, rules and regulations concerning the control of hazardous waste or substances at or with respect to any real estate securing any loan guaranteed hereby), whether arising in the ordinary course of business or otherwise. If Borrower is a partnership, corporation or other entity the term "Liability" or "Liabilities" as used herein shall include all Liabilities to Bank of any successor entity or entities.

C. "Loan Documents" shall mean all deeds to secure debt, deeds of trust, mortgages, security agreements and other documents securing payment of the Liabilities and all notes and other agreements, documents, and instruments evidencing or relating to the Liabilities and Obligations.

D. "Obligation" or "Obligations" shall mean all terms, conditions, covenants, agreements and undertakings of Borrower and/or Guarantor under all notes and other documents evidencing the Liabilities, and under all deeds to secure debt, deeds of trust, mortgages, security agreements and other agreements, documents and instruments executed in connection with the Liabilities or related thereto.

4. WAIVERS BY GUARANTOR. Guarantor waives notice of acceptance of this Guaranty, notice of any Liabilities or Obligations to which it may apply, presentment, demand for payment, protest, notice of dishonor or nonpayment of any Liabilities, notice of intent to accelerate, notice of acceleration, and notice of any suit or the taking of other action by Bank against Borrower, Guarantor or any other person, any applicable statute of limitations and any other notice to any party liable on any Loan Document (including Guarantor).

Each Guarantor also hereby waives any claim, right or remedy which such Guarantor may now have or hereafter acquire against Borrower that arises hereunder and/or from the performance by any other Guarantor hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of Bank against Borrower or against any security which Bank now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

Guarantor also waives the benefits of any provision of law requiring that Bank exhaust any right or remedy, or take any action, against Borrower, any Guarantor, any other person and/or property including but not limited to the provisions of the Virginia Code (S)49-25 and the Virginia Code (S)49-26, as amended, or otherwise.

Bank may at any time and from time to time (whether before or after revocation or termination of this Guaranty) without notice to Guarantor (except as required by law), without incurring responsibility to Guarantor, without impairing, releasing or otherwise affecting the Obligations of Guarantor, in whole or in part, and without the indorsement or execution by Guarantor of any additional consent, waiver or guaranty: (a) change the manner, place or terms of payment, or change or extend the time of or renew, or change any interest rate or alter any Liability or Obligation or installment thereof, or any security therefor;
(b) loan additional monies or extend additional credit to Borrower, with or without security, thereby creating new Liabilities or Obligations the payment or performance of which shall be guaranteed hereunder, and the Guaranty herein made shall apply to the Liabilities and Obligations as so changed, extended, surrendered, realized upon or otherwise altered; (c) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Liabilities or Obligations and any offset there against; (d) exercise or refrain from exercising any rights against Borrower or others (including Guarantor) or act or refrain from acting in any other manner; (e) settle or compromise any Liability or Obligation or any security therefor and subordinate the payment of all or any part thereof to the payment of any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; (f) release or compromise any Liability of Guarantor hereunder or any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; or (g) apply any sums from any sources to any Liability without regard to any Liabilities remaining unpaid.

5. SUBORDINATION. Upon demand of Bank, Guarantor agrees that it will not demand, take or receive from Borrower, by set-off or in any other manner, payment of any debt, now and at any time or times hereafter owing by Borrower to Guarantor, unless and until all the Liabilities and Obligations shall have been fully paid and performed, and any security interest, liens or encumbrances which Guarantor now has and from time to time hereafter may have upon any of the assets of Borrower shall be made subordinate,

junior and inferior and postponed in priority, operation and effect to any security interest of Bank in such assets.

6. WAIVERS BY BANK. No delay on the part of Bank in exercising any of its options, powers or rights, and no partial or single exercise thereof, shall constitute a waiver thereof. No wavier of any of its rights hereunder, and no modification or amendment of this Guaranty, shall be deemed to be made by Bank unless the same shall be in writing, duly signed on behalf of Bank; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Bank or the obligations of Guarantor to Bank in any other respect at any other time.

7. TERMINATION. This Guaranty shall be binding on each Guarantor until written notice of revocation signed by such Guarantor or written notice of the death of such Guarantor shall have been received by Bank, notwithstanding change in name, location, composition or structure of, or the dissolution, termination or increase, decrease or change in personnel, owners or partners of Borrower, or any one ore more of Guarantors. No notice of revocation or termination hereof shall affect in any manner rights arising under this Guaranty with respect to Liabilities or Obligations that shall have been committed, created, contracted, assumed or incurred prior to receipt of such written notice pursuant to any agreement entered into by Bank prior to receipt of such notice. The sole effect of such notice of revocation or termination hereof shall be to exclude from this Guaranty, Liabilities or Obligations thereafter arising that are unconnected with Liabilities or Obligations theretofore arising or transactions entered into theretofore.

In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Liabilities existing at the date of death, and any renewals or extensions thereof, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Liabilities existing at that time, but also as to Liabilities thereafter incurred by Borrower to Bank.

8. PARTIAL INVALIDITY AND/OR ENFORCEABILITY OF GUARANTY. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision herein and the invalidity or unenforceability of any provision of any Loan Document as it may apply to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

In the event Bank is required to relinquish or return the payments, the collateral or the proceeds thereof, in whole or in part, which had been previously applied to or retained for application against any Liability, by reason of a proceeding arising under the Bankruptcy Code, or for any other reason, this Guaranty shall automatically continue to be effective notwithstanding any previous cancellation or release effected by Bank.

9. CHANGE OF STATUS. Guarantor will not merge into or consolidate with any other entity, or permit any other entity to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) unless (a) the surviving corporation in such transaction (whether the Guarantor or another entity, the "Surviving Corporation") shall be a corporation organized and existing under the laws of the United States of America, any state thereof or the District of Columbia, and the Surviving Corporation shall expressly assume all of the Guarantor's obligations under this Guaranty and any other Loan Document to which Guarantor is a party in writing,
(b) immediately after giving effect to such transaction, no default (or any event described in Section 12 of this Guaranty) shall have occurred hereunder or under any other Loan Document to which Guarantor is a party, and (c) immediately after giving effect to any such transaction, the Net Worth of the Surviving Corporation, calculated in accordance with generally accepted accounting principles, shall be equal to or greater than the Net Worth of Guarantor as of the last day of the immediately preceding fiscal quarter of Guarantor, and the Surviving Corporation shall deliver to Bank such certificates of financial officers and opinions of counsel and other documents as Bank may request to confirm compliance with all of the foregoing conditions. Guarantor further agrees that this Guaranty shall be binding, legal and enforceable against Guarantor in the event Borrower changes its name, status or type of entity.

10. FINANCIAL AND OTHER INFORMATION. Guarantor agrees to furnish to Bank any and all financial information and any other information regarding Guarantor and/or collateral requested in writing by Bank within ten (10) days of the date of the request. Guarantor has made an independent investigation of the financial condition and affairs of Borrower prior to entering into this Guaranty, and Guarantor will continue to make such investigation; and in entering into this Guaranty Guarantor has not relied upon any representation of Bank as to the financial condition, operation or creditworthiness of Borrower.

Guarantor further agrees that Bank shall have no duty or responsibility now or hereafter to make any investigation or appraisal of Borrower on behalf of Guarantor or to provide Guarantor with any credit or other information which may come to its attention now or hereafter.

11. NOTICES. Notice shall be deemed reasonable if mailed postage prepaid at least five (5) days before the related action to the address of Guarantor or Bank, at their respective addresses indicated at the beginning of this Guaranty, or to such other address as any party may designate by written notice to the other party. Each notice, request and demand shall be deemed given or made, if sent by mail, upon the earlier of the date of receipt or five (5) days after deposit in the U.S. Mail, first class postage prepaid, or if sent by any other means, upon delivery.

12. GUARANTOR DUTIES. Guarantor shall upon notice or demand by Bank promptly and with due diligence pay all Liabilities and perform and satisfy all Obligations for the benefit of Bank in the event of (a) the occurrence of any default under any Loan Documents; (b) the failure of any Borrower or Guarantor to perform any obligation or pay any liability or indebtedness of any Borrower or Guarantor to Bank, or to any affiliate of Bank, whether under any Note, Guaranty, or any other agreements, now or hereafter existing, as and when due (whether upon demand, at maturity or by acceleration); (c) the failure of any Borrower or Guarantor to pay or perform any other liability, obligation or indebtedness of any Borrower or Guarantor to any other party; (d) the death of any Borrower or Guarantor (if an individual); (e) the resignation or withdrawal of any partner or a material owner/Guarantor of Borrower, as determined by Bank in its sole discretion; (f) the commencement of a proceeding against any Borrower or Guarantor for dissolution or liquidation, the voluntary or involuntary termination or dissolution of any Borrower or Guarantor or the merger or consolidation of any Borrower or Guarantor with or into another entity; (g) the insolvency, or the business failure of, or the appointment of a custodian, trustee, liquidator or receiver for or of any of the property of, or the assignment for the benefit of creditors by, or the filing of a petition under bankruptcy, insolvency or debtor's relief law or the filing of a petition for any adjustment of indebtedness, composition or extension by or against any Borrower or Guarantor; (h) the sole determination by Bank that any representation or warranty to Bank in any Loan Document or otherwise to Bank was untrue or materially misleading when made; (i) the failure of Guarantor or Borrower to timely deliver such financial statements including tax returns and all schedules, or other statements of condition or other information, as Bank shall request from time to time; (j) the entry of a judgment against Borrower or Guarantor which Bank deems to be of a material nature in the sole discretion of Bank; (k) the seizure or forfeiture of any of Borrower or Guarantor's property, or the issuance of any writ of possession, garnishment or attachment, or any turnover order; (l) the sole determination by Bank that Guarantor or Borrower jointly or severally, has suffered a material adverse change in its financial condition; (m) the determination by Bank that for any reason it is insecure; (n) any lien or additional security interest being place upon any collateral which is security for any Loan Document; or (o) the failure of Borrower's business to comply with any law or regulation controlling the operation of Borrower's business.

13. REMEDIES. Upon the failure of Guarantor to fulfill its duty to pay all Liabilities and perform and satisfy all Obligations as required hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law, and without limiting the generality of the foregoing, Bank may, at its option and without notice or demand: (a) declare any Liability due and payable at once; (b) take possession of any collateral pledged by Borrower or Guarantor wherever located, and sell, resell, assign, transfer and deliver all or any part of said collateral of Borrower or Guarantor at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale, and Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of said collateral to be sold, free from and discharged of all trusts, claims rights or redemption and equities of Borrower or Guarantor whatsoever; Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and (c) set-off against any or all liabilities of Guarantor all money owed by Bank or any of its agents or affiliates in any capacity to Guarantor whether or not due, and also set-off against all other Liabilities of Guarantor to Bank all money owed by Bank in any capacity of Guarantor, and if exercised by Bank, Bank shall be deemed to have exercised such right of set-off and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

Bank shall have a properly perfected security interest in all of Guarantor's funds on deposit with Bank to secure the balance of any Liabilities and/or Obligations that Guarantor may now or in the future owe Bank. Bank is granted a contractual right of set-off and will not be liable for dishonoring checks or withdrawals where the exercise of Bank's contractual right of set-off or security interest results in insufficient funds in Guarantor's account. As authorized by law, Guarantor grants to Bank this

contractual right of set-off and security interest in all property of Guarantor now or at anytime hereafter in the possession of Bank, including but not limited to any joint account, special account, account by the entireties, tenancy in common, and all dividends and distributions now or hereafter in the possession or control of Bank.

14. ATTORNEY FEES, COST AND EXPENSES. Guarantor shall pay all costs of collection and reasonable attorney's fees, including reasonable attorney's fees in connection with any suit, mediation or arbitration proceeding, out of Court payment agreement, trial, appeal, bankruptcy proceedings or otherwise, incurred or paid by Bank in enforcing the payment of any Liability or defending this agreement.

15. PRESERVATION OF PROPERTY. Bank shall not be bound to take any steps necessary to preserve any rights in any property pledged as collateral to Bank to secure Borrower and/or Guarantor's Liabilities and Obligations as against prior parties who may be liable in connection therewith, and Borrower and Guarantor hereby agree to take any such steps. Bank, nevertheless, at any time, may (a) take any action it deems appropriate for the care or preservation of such property or of any rights of Borrower and/or Guarantor or Bank therein; (b) demand, sue for, collect or receive any money or property at any time due, payable or receivable on account of or in exchange for any property pledged as collateral, to Bank to secure Borrower and/or Guarantor's Liabilities to Bank;
(c) compromise and settle with any person liable on such property; or (d) extend the time of payment or otherwise change the terms of the Loan Documents as to any party liable on the Loan Documents, all without notice to, without incurring responsibility to, and without affecting any of the Obligations or Liabilities of Guarantor.

16. ARBITRATION AND WAIVER OF JURY TRIAL.

(a) This paragraph concerns the resolution of any controversies or claims between Guarantor and Bank, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this Guaranty (including any renewals, extensions or modifications); or
(ii) any document related to this Guaranty (collectively a "Claim").

(b) At the request of Guarantor or Bank, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, United States Code) (the "Act"). The Act will apply even thought this Guaranty provides that it is governed by the law of a specified state.

(c) Arbitration proceedings will be determined in accordance with the Act, the applicable rules and procedures for the arbitration of disputes of JAMS or any successor thereof ("JAMS"), and the terms of this paragraph. In the event of any inconsistency, the terms of this paragraph shall control.

(d) The arbitration shall be administered by JAMS and conducted in any U.S. state where real or tangible personal property collateral for this Guaranty is located or if there is no such collateral, the Commonwealth of Virginia. All Claims shall be determined by one arbitrator, however, if Claims exceed Five Million U.S. Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within 90 days of the demand for arbitration and close within 90 days of commencement, and the award of the arbitrator(s) shall be issued within 30 days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional 60 days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and enforced.

(e) The arbitrator(s) will have the authority to decide whether any Claim is barred by the statute of limitations and, if so, to dismiss the arbitration on that basis. For purposes of the application of the statute of limitations, the service on JAMS under applicable JAMS rules of a notice of claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s). The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this Guaranty.

(f) This paragraph does not limit the right of Guarantor or Bank to: (i) exercise self-help remedies, such as but not limited to, setoff, (ii) initiate judicial or nonjudicial foreclosure against any real or personal property collateral, (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g) The filing of a court action is not intended to constitute a waiver of the right of Guarantor or Bank, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h) By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to

limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This provision is a material inducement for the parties entering into this Guaranty.

17. CONTROLLING DOCUMENT. To the extent that this Limited Guaranty conflicts with or is in any way incompatible with any other Loan Document concerning this Obligation, any promissory note shall control over any other document, and if such promissory note does not address an issue, then each other document shall control to the extent that it deals most specifically with an issue.

18. EXECUTION UNDER SEAL. This Guaranty is being executed under seal by Guarantor.

19. NOTICE OF FINAL AGREEMENT. THIS WRITTEN LIMITED GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed under seal on this 22nd day of September, 2000.

*WITNESSED BY:*

*/s/Pamela W. Nichols*

*(Seal)*
*Pamela W. Nichols*

*Staff Assistant*
*Print Name and Title*

*GUARANTOR:*

*CSX CORPORATION*

*By: /s/Gregory R. Weber*

*Name: G. R. Weber*

*Title: Vice President & Treasurer*

*/s/Rachel E. Geiersbach*

*Attest (If Applicable)*

*[Corporate Seal]*

*CORPORATE ACKNOWLEDGEMENT*

*State of Virginia )*
*)*

**City of Richmond )**

This instrument was acknowledged before me on September 25, 2000, by G. R. Weber, Vice President & Treasurer of CSX Corporation, a Virginia corporation, on behalf of said corporation.

*/s/Diana B. Flowers*

*Notary Public*
*in and for the State of Virginia*

*(Seal)*

August 31, 2003
My Commission Expires

Diana B. Flowers
Print Name of Notary

**Exhibit 12**

Computation of Earnings to Fixed Charges
CSX Corporation
Ratio of Earnings to Fixed Charges
(Millions of Dollars)

| | FOR THE FISCAL YEARS ENDED | | | | |
|---|---|---|---|---|---|
| | DEC. 29, 2000 | DEC. 31, 1999 | DEC. 25, 1998 | DEC. 26, 1997 | DEC. 27, 1996 |
| Earnings: | | | | | |
| Earnings Before Income Taxes | $ 277 | $ 104 | $ 744 | $ 1,159 | $ 1,299 |
| Interest Expense | $ 543 | $ 521 | $ 506 | $ 451 | $ 249 |
| Amortization of debt discount | $ 1 | $ - | $ 1 | $ 4 | $ 2 |
| Interest Portion of Fixed Rent | $ 109 | $ 151 | $ 183 | $ 196 | $ 188 |
| Undistributed earnings of unconsolidated subsidiaries | $ (18) | $ (58) | $ (238) | $ (150) | $ (6) |
| Earnings, as Adjusted | $ 912 | $ 718 | $ 1,196 | $ 1,660 | $ 1,732 |
| Fixed Charges: | | | | | |
| Interest Expense | $ 543 | $ 521 | $ 506 | $ 451 | $ 249 |
| Capitalized Interest | $ 6 | $ 8 | $ 9 | $ 3 | $ 5 |
| Amortization of Debt Discount | $ 1 | $ - | $ 1 | $ 4 | $ 2 |
| Interest Portion of Fixed Rent | $ 109 | $ 151 | $ 183 | $ 196 | $ 188 |
| Fixed Charges | $ 659 | $ 680 | $ 699 | $ 654 | $ 444 |
| Ratio of Earnings to Fixed Charges | 1.4 x | 1.1 x | 1.7 x | 2.5 x | 3.9 x |

On Track

**CSX CORPORATION**

**[PICURE APPEARS HERE]**

Annual
Report
2000

CSX
CORPORATION

2000 ANNUAL REPORT

Contents

1 __________ Financial Highlights

2 __________ Chairman's Message

6 __________ Review of Operations

10 __________ Safety, Environmental and Public Policy

13 __________ Financial Information

50 __________ Shareholder Information

51 __________ Corporate Information

52 __________ Board of Directors and Officers

# FINANCIAL HIGHLIGHTS

| (Millions of Dollars, Except Per Share Amounts) | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|
| Earnings from Continuing Operations | | | | | |
| Operating Revenue | $ 8,191 | $ 10,375 | $ 9,490 | $ 10,232 | $ 10,220 |
| Operating Expense | 7,386 | 9,802 | 8,359 | 8,673 | 8,715 |
| Operating Income | $ 805 | $ 573 | $ 1,131 | $ 1,559 | $ 1,505 |
| Net Earnings from Continuing Operations | $ 186 | $ 32 | $ 520 | $ 785 | $ 844 |
| Earnings Per Share from Continuing Operations | $ .88 | $ .15 | $ 2.47 | $ 3.74 | $ 4.05 |
| Earnings Per Share, from Continuing Operations Assuming Dilution | $ .88 | $ .15 | $ 2.43 | $ 3.66 | $ 3.97 |
| Financial Position | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 684 | $ 974 | $ 533 | $ 690 | $ 682 |
| Working Capital Deficit | $ (1,234) | $ (910) | $ (616) | $ (532) | $ (685) |
| Total Assets | $ 20,491 | $ 20,720 | $ 20,427 | $ 19,957 | $ 16,965 |
| Long-term Debt | $ 5,810 | $ 6,196 | $ 6,432 | $ 6,416 | $ 4,331 |
| Shareholders' Equity | $ 6,017 | $ 5,756 | $ 5,880 | $ 5,766 | $ 4,995 |
| Other Data Per Common Share | | | | | |
| Cash Dividends | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.08 | $ 1.04 |
| Book Value | $ 28.28 | $ 26.35 | $ 27.08 | $ 26.41 | $ 23.04 |
| Market Price-- High | $ 33.44 | $ 53.94 | $ 60.75 | $ 62.44 | $ 53.13 |
| -- Low | $ 19.50 | $ 28.81 | $ 36.50 | $ 41.25 | $ 42.25 |
| Employees/(a)/ | | | | | |
| Rail | 35,496 | 31,952 | 28,358 | 27,864 | 28,559 |
| Other | 9,859 | 16,998 | 17,789 | 19,047 | 18,755 |
| Total | 45,355 | 48,950 | 46,147 | 46,911 | 47,314 |

See accompanying Consolidated Financial Statements (All periods have been restated to reflect contract logistics as a discontinued operation)

Significant non-recurring items include the following:
1999 - A loss on the sale of international container-shipping assets and a related benefit from discontinuing depreciation of those assets from the date they were classified as "held for sale." The net effect of the loss and the depreciation benefit reduced earnings by $360 million before tax, $271 million after tax, $1.27 per share.
- A charge to recognize the cost of a workforce reduction program at the company's rail and intermodal units that reduced earnings by $55 million before tax, $34 million after tax, 16 cents per share.
- A gain on the sale of the company's Grand Teton Lodge resort subsidiary that increased earnings by $27 million before tax, $17 million after tax, 8 cents per share.

1998 - A net investment gain, primarily from the conveyance of American Commercial Lines LLC, the company's wholly owned barge subsidiary, to a joint venture. The gain increased earnings by $154 million before tax, $90 million after tax, 42 cents per share.
- A restructuring credit to reverse certain separation and labor protection reserves established by the company's rail unit as part of a 1995 restructuring charge. The restructuring credit increased earnings by $30 million before tax, $19 million after tax, 9 cents per share.

/(a)/ Employee counts are based on annual averages.

**[PHOTO]**

**CHAIRMAN'S MESSAGE**

2000 marked a turning point for our company. Important actions taken this past year have prepared us to start realizing the substantial benefits of a series of long-term strategic decisions and investments. We have reshaped the company and built a strong, rail-based platform for sustainable earnings growth. A new, more productive CSX is now ready to seize opportunities, compete aggressively and consistently increase shareholder value.

Our decision to acquire a large portion of the former Conrail operations in 1997 significantly strengthened the CSX rail franchise. We view this investment from a long-term perspective and remain convinced that it will produce very gratifying returns for shareholders. Weaving Conrail into our existing network and meshing different operating philosophies and cultures has been hard work and, frankly, taken longer than expected. But that hard work has been done over the past 18 months, and we are just now beginning to seize the inherent market opportunities and capture the sizable synergies.

Getting to this point has not been easy for the company and our shareholders. Earnings have fallen for several years as we dealt with a wide range of issues resulting from the far-reaching steps being taken. In the first half of 2000, we passed through what I believe was a trough, or low point, in earnings. Managing through the complexities of the difficult Conrail transaction and the associated operating problems were the major obstacles to overcome and put behind us. Some start-up issues at CSX Lines, soaring fuel costs, uncertain markets and management issues also affected financial results. By year end, however, a revitalized CSX was operating very much on track and delivering a level of performance that was most encouraging.

During this very challenging year, CSX Corporation has become a clearly focused railroad company. Railroading has always been our core business; now it is overwhelmingly dominant. Going forward, the railroad should account for approximately 90% of our total revenues and earnings. We are no longer constrained by the capital requirements of the international container shipping business.

Today CSX is not only stronger and better positioned, but we have developed a harder, more competitive edge. Our company is "Back to Basics," focused on railroad operating fundamentals and driving to improve service sharply. Our customers are starting to see the difference, are recognizing that integration problems are behind us, and they are telling us that we will get more of their business as we continue to improve. Historically, rail rates have fallen 50% in real terms since 1980, but we have learned that we can raise rates as our service ratchets up. Internally, we are looking at costs through a more finely ground lens and finding ways to run much leaner. We have a dynamic, talented and very closely aligned railroad management team that knows the network intimately, understands customer requirements and shares a common vision for success. Our 36,000 employees have always been the best in the railroad industry.

Larger trends also favor our company. Our nation's rail network remains the most efficient means for transporting large volumes of the commodities and manufactured goods that form the backbone of our economy. We are a big part of that. The CSX rail infrastructure - the 23,000 miles of track and owned rights of way, terminals, locomotives and rolling stock - is an extremely valuable and vital legacy. Railroading is fundamentally safer, much more economical for customers and much more environmentally friendly than our major competitor, the trucking industry. And we have the incentive to grow and prosper -- the Staggers Act, which largely deregulated our industry in 1980, remains in place despite ill-conceived re-regulation challenges that have emerged from some quarters.

The U.S. freight railroad network is the envy of other industrialized countries. Major sectors - coal, autos, agriculture, chemicals, steel, minerals, waste products, lumber and paper, and manufactured goods -- depend heavily on us. Our intermodal services link major American markets to global trade and support the fast

growing small package business. Through these challenging times, CSX has strengthened its market position and expanded its network substantially, emerging as the largest railroad in the eastern half of the nation, connecting virtually all major markets and carrying more freight to a wider range of customers than ever before.

Here in 2001, I feel very positive about our railroad, the way it is performing, and the drive throughout the organization to improve in all areas.The hardest times are now behind us and a foundation for a sustained earnings turnaround is in place. We are seeing clear signs of that already this year. Barring a deep and prolonged slump in the economy, this will be the year we demonstrate that we can build upon the improvements achieved in the latter half of 2000 and should mark the beginning of an extended period of growth and prosperity.

**The Year in Review**

2000 net income from continuing operations was $186 million, or 88 cents per share, compared to 32 million, or 15 cents per share, in 1999. Results for 1999 include a number of one-time adjustments. 2000 results were below our expectations and are not indicative of the earning power of our company. Cash flow was positive, and shareholders received the regular annual dividend of $1.20 per share in 2000.

Despite a strong economy, the railroad struggled in the early part of the year. We were not able to recover from the after-effects of Hurricane Floyd in 1999, and our network was choked and coping poorly with winter conditions. Troubled by these developments, dissatisfied with measures being taken as well as the pace of improvement, and seeing a sharp decline in service and earnings, railroad senior management was changed. In April, I assumed duties as railroad Chief Executive Officer and named Michael J. Ward and P. Michael Giftos, both seasoned executives with a thorough knowledge of our network and its complexities, to head operations and commercial activities. This was immediately followed by a series of other top level organizational changes.

The new team responded. Focus was immediately placed on the fundamentals of basic, day-to-day railroading. Core issues and problems were uncovered quickly, analyzed and solutions developed for restoring network fluidity. This "Back to Basics," or "Railroading 101," operating philosophy was promulgated throughout the organization with great vigor. A series of 14 critical operating metrics were defined, including safety standards, train velocity, cars-on-line, terminal dwell times, locomotive productivity and on-time performance. Each of these measures was given a clear, 90-day target for improvement. Performance against these targets was measured on a daily basis and communicated immediately throughout the organization. Progress was reported to regulatory agencies, and our customers were kept closely informed about the priority being placed on delivering appropriate levels of service.

Good results ensued. The network quickly became more fluid and efficiency increased. Morale improved -hard working railroad people take it personally when things are going wrong, especially when their long hours in the field are frustrated by factors outside their control. As standards were raised and new metrics established, customers began to respond favorably to better service. Volumes increased and in the second half of 2000 we were able to implement selective rate increases and fuel surcharges to partially offset the sudden and very sharp spike in diesel fuel costs.

Reflecting operating progress and better service to customers, earnings consistently improved during the second half of the year. Fourth quarter rail and intermodal operating income accounted for $205 million of the year's $713 million total. This result, while still well below our potential and near-term goals, was encouraging, particularly in light of soaring fuel costs and the sudden, unforeseen dip in the economy. In fact, the usual fall peak - or surge in traffic reflecting harvest volumes and unusually high demand in other markets
- never materialized in 2000.

By the end of the year, the network was operating at peak efficiency levels. In recognition of this impressive performance turnaround and sustained, quantifiable improvement, Michael Ward was named President of CSX Transportation in December. Mike Giftos, who has revitalized our marketing and sales organizations, continues to work closely with him as Executive Vice President and Chief Commercial Officer. Both of these highly capable leaders are now backed by a strong team of operating, marketing and financial executives, who share a common vision and understand the railroad property, customer requirements and need to conserve capital and reduce costs in this important stage of our company's development. We also have strong leadership at our key units - CSX Lines, CSX World Terminals and The Greenbrier. Supported by a dedicated and talented corporate staff led by Paul R. Goodwin, Chief Financial Officer; Mark G. Aron, Executive Vice President for Law and Public Affairs; and Andrew B. Fogarty, who oversees human resources, audit and administration, CSX is in very capable hands. Importantly, I would like to pay special tribute to Vice chairman A.R.

"Pete" Carpenter, who led CSX Transportation in its great years in the 1990s and retired in January 2001 after 38 years of illustrious service.

Late in 1999, we completed the sale of our international container shipping business, eliminating our exposure in this business which, while fast growing, continues to suffer from chronic supply/demand imbalances and cutthroat competition. Anticipated capital requirements were formidable in this business. Remaining with CSX after the Sea-Land sale are two related but very different business units, CSX World Terminals and CSX Lines.

Both companies were launched as independent entities in 2000. CSX World Terminals, which operates major container handling terminals in China and other overseas locations, had an excellent year, exceeding earnings projections and producing returns well in excess of its cost of capital. World Terminals is fast building a global reputation as a highly efficient, innovative operator, and we plan to invest in this business very selectively, focusing on areas where container throughput growth rates should exceed industry norms.

CSX Lines, which carries containers from the east and west coasts of the U.S. to domestic markets - Alaska, Hawaii/Guam and Puerto Rico - is protected by the Jones Act, which limits these trades to U.S. companies deploying American-built ships and crews. As such, it is not exposed to conditions prevailing in the international arena. CSX Lines struggled with higher than usual costs in its start-up year. From the commercial standpoint, a poor economy in Puerto Rico and over-capacity in this trade offset otherwise good performance in Alaska and Hawaii/Guam, where the company has relatively much stronger market positions. The company is working hard to reduce its cost base and is exploring service options in Puerto Rico. Results for 2001 should be much improved.

With some regret, we made the decision to sell CTI Logistx in September 2000 for $650 million to a large Dutch-based logistics organization, TNT Post Group N.V. CTI, an extremely well managed company, had prospered under the CSX umbrella and emerged as an undisputed leader in its field. Given our rail-based strategic direction and the significant premium offered for the company, however, we believe shareholder interests were best served by this sale.

The Greenbrier, America's premier resort, benefited from a strong economy and enjoyed a record year in both room occupancy and earnings. It stands as a source of pride for our company and represents a commitment to the highest standards of excellence, much appreciated by our business friends, shareholders and tens of thousands of annual guests.

**The Year Ahead**

All of our business units are poised to improve earnings in 2001. Railroad performance, of course, will be critical, driving our cash flow and shareholder value. The state of the economy is an important issue and will have a significant influence on our financial results. As of this writing, a clear picture of how the economic scenario will unfold is difficult to determine. We are reasonably sure that the first and second quarters will show a sharp year to year decline in industrial output and other leading indicators. Beyond that, the outlook is unclear. We are encouraged, however, by a growing body of opinion that projects recovery in the second half of the year.

While affected by cyclical factors, our railroad has some insulation and may be less vulnerable to a downturn than might appear at first glance. For the first time in several years, coal demand is relatively strong as utilities need to replenish stockpiles following prolonged, cold winter weather. Coal is the single largest commodity we carry, and our unit train service has been exceptionally good so far this year, providing a boost to earnings. Even more heartening is the longer-term coal outlook. Coal-fired utility plants provide 56 percent of the nation's electricity and represent a clear bargain for consumers when compared to oil or natural gas. Today, readily available and plentiful coal can be burned cleanly, and we believe that utility planners and enlightened public officials will support its continued usage as our primary source of electric generation.

The lights will stay on, and it is also worth noting that a faltering economy has a less than pronounced impact on some other key commodities we carry. The harvests will come in and feed lots we serve in the Southeast will keep producing chickens, turkeys and hogs. Urban solid waste has become more important for us, and road-building materials will continue to move. We should also be able to increase our share of the highly service-sensitive intermodal business this year. But we are facing a sharp downturn in the auto industry, which has enjoyed two years of record production and unit sales. Chemicals, steel, forest and paper products are also key commodities for us, and here, too, the outlook is not good.

Total capital expenditures will be $885 million this year, with $800 million allocated to the railroad, primarily

for track and infrastructure. We also have a comprehensive set of contingency plans in place to keep the network and our assets in line with emerging demand and are curbing expenses in all areas. While outside of our control and not factored in our budget, a reduction in the average price of fuel to 1999 levels would be a major plus, lowering our costs by more than $200 million.

I would like to note, however, that the high fuel prices we have been experiencing could have longer term implications that benefit our company. Broader recognition of the vital role played by coal to generate electric power is a gratifying development. I am hopeful that policy makers and energy planners will more carefully consider the benefits of increased coal usage going forward.

However the economy turns out in 2001, we are prepared to compete vigorously. In past years, poor rail service has conceded too much business to the far more costly and less fuel efficient trucking industry, which now has more than ten times the freight revenues of the railroad industry. Better, more consistently reliable service will put some of this business back on to the rails where it belongs. Customers are fully prepared to make this switch to realize the substantial savings offered by rail transportation as our industry continues to improve its service reliability.

We look forward to working with the new Administration that took office in January. The Bush Administration's efforts to lower taxes, address tort reform and develop a sound national energy policy are strongly supported by CSX. At the Department of Transportation, Secretary Norm Mineta brings a wealth of knowledge and experience to the important issues facing us. In early 2000, the Surface Transportation Board showed courage and foresight in delaying the proposed 2000 merger of the Burlington Northern Santa Fe and Canadian National railroads, giving our industry the breathing room we needed to effectively implement the series of railroad mergers undertaken in the latter part of the last decade. We are hopeful that current STB deliberations on rulemakings dealing with future mergers will give full weight to railroad requirements in determining the public interest. And we will continue to work hard with Republican and Democratic leadership in the Congress to thwart self-serving efforts by industry opponents to re-regulate railroads, which would cripple our ability to produce satisfactory returns and reinvest in our infrastructure.

**[PICTURE]**

Much is owed to many people who have carried us through the difficulties of the past several years and give us reason now to look to the future with optimism. I want to especially thank our thousands of customers, large and small, for supporting CSX during a difficult transaction. The CSX Board of Directors has been a source of great strength, providing management with wise counsel and guidance on complex issues. Most importantly, I commend our managers and employees who have worked extremely hard and are dedicated to achieving ambitious goals. They are truly the best. In closing, I want to express my deep appreciation to our shareholders and many friends in the communities we serve for your ongoing support.

*/s/ John W. Snow*
*----------------*
*John W. Snow*
*Chairman and Chief Executive Officer*

**[PICTURE]**

2000 proved to be a pivotal year for CSX Transportation

Having completed the operational integration of acquired Conrail lines in 1999, the company focused on dramatically improving service reliability on the largest railroad in the eastern half of the United States: a 23,000 route-mile network with more than 3,500 locomotives and 98,000 freight cars. The expanded railroad, which serves every major market east of the Mississippi River and more ports than any other railroad in the country, has an excellent opportunity to grow in coming years by fully meeting the emerging needs of our customers.

The overriding goal in 2000 was to strengthen the foundation for achieving the benefits promised by the Conrail acquisition - cost synergies and revenue growth-and enhancing service to customers.

Under the leadership of Michael J. Ward, named President of CSX Transportation in 2000, CSX sharply focused the entire organization on accelerating the pace of operational improvements to make CSXT the safest railroad possible and deliver the level of service customers want and need.

The railroad adopted a "Back to Basics" approach to running the business, dubbed "Railroading 101," which emphasized an intense focus on 14 key safety/service performance measures. Here are some important examples:

. Federal Railroad Administration (FRA) Personal Injuries: a measurement of FRA-reportable injuries for all crafts.

. FRA Derailments: a measurement of FRA-reportable train accidents.

. Cars-on-Line: measuring cars registered in the Association of American Railroads database, which provides a tool for both internal and external agencies to gauge the railroad's fluidity.

. Velocity-All Trains: measuring the miles between scheduled terminals for each train, divided by hours between departure and arrival of that train at the terminals. This gauges the railroad's efficiency and the impact of trains held out of terminals or stopped on the line of road.

. Terminal Dwell Time: a major measurement of terminal performance, tracking the length of time departing cars spend in rail yards since their arrival there.

. On-Time Originations (+ 2 hours): Scheduled trains that depart early to two hours late are tracked to determine how well the yard meets its commitment to the schedule, yard fluidity and dock-to-dock effectiveness.

As in the past, CSX employees throughout the organization - both union and non-union - rose to the challenge and used these measurements as a catalyst for making CSX much more efficient in 2000. Aggressive targets for service improvements, along with specific dates for achieving them, were outlined on an internal "scorecard," and progress was communicated weekly to employees throughout the organization via the company-wide e-mail system.

As the second quarter closed, CSXT met or exceeded most of the established targets and set new, more challenging targets for each of the categories to prepare the railroad for the fall traffic peak. By year-end, cars-on-line went from 273,500 to 246,700; terminal dwell time from 34.5 hours to an average of less than 30 hours; train velocity increased from 17 m.p.h. to more than 20 m.p.h.; and on-time originations from 50 percent to nearly 75 percent. FRA injuries remained too high, and much more intense focus is being directed on this critical area.

The railroad is now running at a very high level of efficiency. Most encouraging has been the positive feedback CSXT is receiving from customers. With growing confidence that CSXT is "on track" and that service is better and reliability is increasing, customers are beginning to give CSXT more business - not only freight that was diverted when the railroad experienced service difficulties following the integration, but new business that has never before been carried on CSXT.

But there is still more to be done to deliver the optimum service customers deserve and, in the process, increase shareholder value. Providing consistent, reliable service while lowering operating costs are central goals for 2001. To achieve them, CSXT is implementing specific action plans to increase productivity, introduce new service initiatives and lower costs through revitalized Performance Improvement Teams and the Six Sigma initiative - a fact-based methodology used by major companies to improve processes and drive out costs. At the same time, the company is concentrating efforts to improve safety by emphasizing training, safety compliance and accident prevention at the local level.

**[PICTURES]**

[LOGO OF CSX INTERMODAL] CSX Intermodal is the nation's only transcontinental intermodal service provider serving every region of the country and offering shippers single line, non-stop services between the Midwest and New York and New England. CSXI also serves more container ports than any railroad - including the West Coast - and offers the industry's fastest and most reliable service between New York and Florida, two of the nation's largest consuming markets.

In 2000, CSXI completed a $130 million program to nearly double its terminal capacity nationwide and reorganized its network to accelerate growth. Trailer service was reduced in the Southeast and the Northeast to allow increased capacity for domestic and international container business of greater profitability. New terminals in Philadelphia, Chicago, Cleveland and Atlanta also are designed to expedite the movement of freight to maximize equipment and yard utilization, thereby expanding capacity.

Also in 2000, service performance on intermodal trains improved dramatically as operating procedures were refined to absorb the acquired Conrail territory into the existing CSX network. CSXI expects to accelerate the introduction of new services and product offerings to more fully realize the potential of its expanded network and improved transit consistency. The company plans to expand service from the Midwest to the Mid-Atlantic and from auto parts manufacturers in the upper Midwest to Mexican assembly plants. CSXI also will continue to pursue alliances with other rail carriers to achieve service efficiencies and attract higher margin volumes.

CSX expects intermodal to remain an expanding segment of its business, and it will continue to implement procedures that increase transit reliability and customer responsiveness.

[LOGO OF CSX LINES] CSX Lines provides domestic ocean-liner service. The carrier operates 16 U.S. flag vessels and 27,000 containers along six service routes between the continental United States and Alaska, Guam, Hawaii and Puerto Rico. CSX Lines also operates port terminals in Anchorage, Kodiak, and Dutch Harbor, Alaska; Honolulu, Hawaii; San Juan, Puerto Rico; and Apra, Guam. The company is headquartered in Charlotte, N.C., with 20 offices throughout the continental United States, Alaska, Hawaii, Guam and Puerto Rico.

CSX Lines faced a number of challenges in its first year, including sharply higher fuel prices and market softness in Puerto Rico, which exacerbated competitive pressures. The company made strategic deployment adjustments throughout the year, including downsizing the five-vessel Puerto Rico deployment to four and adding a third service in the Hawaii trade. In addition, the four-vessel deployment in Puerto Rico was modified in November, resulting in market-share increases. Business environments in Hawaii/Guam and Alaska are considerably more stable than Puerto Rico, and volumes to those locations have been strong throughout the year.

An important accomplishment in 2000 was the introduction of a number of Internet-based customer-service products, including self-service for booking, tracking and tracing shipments, and for submitting shipping instructions. CSX Lines is the only domestic liner company with comprehensive services in all domestic offshore markets, known as "Jones Act" trades. Its schedule reliability in its first year of operations was the best in the industry.

[LOGO OF CSX WORLD TERMINALS] Headquartered in Charlotte, N.C., CSX World Terminals (CSXWT) consists of 16 business units that form a unique network of marine container terminals and related warehousing, logistics and transportation companies. CSXWT's performance in 2000 exceeded expectations as strong trade growth, efficiency improvements, cost reductions, and successful new business ventures all contributed to the positive results.

Two new projects highlight CSX World

**[PICTURE]**

Terminals' successful development efforts in 2000 and provide a platform for increased future earnings. Asia Container Terminals (ACT), a joint venture in which CSX World Terminals Hong Kong is a shareholder and operator, started construction on a new container terminal in Hong Kong, the world's largest container port. ACT expects to begin operations in 2003. In addition, CSX World Terminals formed a joint venture to develop and manage a state-of-the-art container-handling terminal in Punta Caucedo in the Dominican Republic. This facility, which is destined to meet the high-growth demands of the Dominican Republic, will be operational by mid-2002.

Two new businesses that leveraged the company's core competencies started in 2000 and contributed to both revenue and operating income. CSX World Crane Services provides a full scope of crane maintenance and specialized engineering services. Terminal Management Resources delivers terminal operations, as well as civil and industrial engineering solutions. Both units expect to increase CSX World Terminals' market presence and profitability.

The outlook for the container terminal business is positive, as forecasted global container throughput growth exceeds 8 percent per year. Many of the rapidly growing regions have annual growth rates in excess of 10 percent. The container-terminal industry remains fragmented with no single operator holding more than a 9 percent market share. These market fundamentals create an excellent opportunity for the expansion of CSX World Terminals' core business in terminal development operations and management as well as the expansion of additional ancillary business opportunities in logistics and advanced terminal automation technology systems.

CSX World Terminals is well positioned to capitalize on these opportunities and continue to grow. The company earned more than its cost of capital in 2000, and is expected to do so in 2001.

[LOGO OF THE GREENBRIER] CSX's non-transportation holdings include The Greenbrier resort in White Sulphur Springs, W. Va., one of the world's premier destination resorts. During 2000, the famed resort achieved record guest days and earnings, with more than 90,000 guests from around the globe enjoying its accommodations, activities and amenities. The resort remains the preferred destination for business meetings and conferences, hosting such prestigious groups as The Business Council and The Council of Insurance Agents & Brokers.

The Greenbrier received the coveted AAA Five-Diamond Award for the 25th consecutive year as well as earning awards for every facet of its operation. A major expansion -The Greenbrier Spa - is scheduled to open in 2001. In addition, the resort initiated a joint venture real estate development, The Greenbrier Sporting Club, with Dolan, Pollak and Schram, LLC, which is projected to develop 500 home sites and private club amenities on the property over the next five years.

**Safety, Environmental & Public Policy**

## SAFETY

Safety and environmental stewardship go hand-in-hand at CSX. The company strongly believes it has a responsibility to protect its employees and the communities in which it operates.

Safe operations are emphasized through hands-on training programs. All new hires receive this training and take part in further sessions on an annual basis. Training is supplemented with a committee structure providing forums for representatives from management and labor to examine compliance with regulations, and to discuss problems and solutions.

CSXT maintains conductor training schools in Cleveland, Atlanta and Cincinnati. Conductors receive one week of course work followed by 12 weeks of field training. Before being hired by CSXT, prospective candidates attend railroad conductor training (a five week program) offered by several colleges. CSXT also conducts locomotive engineer training at Cumberland, Md., which involves 26 weeks of intensive classroom and field training.

In addition, CSXT participates in a partnership with the Brotherhood of Locomotive Engineers and United Transportation Union to ensure safe switching operations. Following a cooperative analysis of fatalities in the rail industry, the Federal Railroad Administration (FRA) and labor developed a plan for awareness and prevention that CSXT quickly implemented. Managers and labor participated in educational meetings and training sessions to complete the Switching Operations Fatality Analysis program.

The result of all this: a reduction in FRA-reportable injuries by 63 percent since 1989, and a reduction in FRA-reportable train accidents by nearly 39 percent during the same period. The company's goal is zero injuries and accidents.

### Environmental Stewardship/Hazardous Materials Safety

CSXT's emphasis on environmental protection is demonstrated by actions to promote environmental compliance, recycle where possible, and to improve hazardous materials handling and emergency response procedures. In 2000, the rail company:

. Conducted an Environmental Certification Program for more than 14,000 employees and a Mechanical Shop Certification Program for 47 shops;

. Recycled 2.4 million gallons of used oil and 490,000 pounds of batteries;

. Conducted 22 crisis simulation drills involving 940 participants from local, state and federal agencies;

. Distributed 780 Community Awareness Planning Guides to local emergency planning committees in the 23 states in which CSXT operates;

. Conducted 114 hazmat compliance inspections at rail yards and facilities.

In addition, CSXT continues to be a partner in the American Chemistry Council Responsible Care(R) Program, which focuses on continuous improvement in the safe handling and transport of chemicals.

### CSX Intermodal

CSXI upholds the industry standard in the safe transportation of hazardous materials. Even with hazardous materials customer growth in the year 2000, as well as increased business from the Conrail acquisition, CSXI is maintaining its less-than-one-percent accident/release ratio of such shipments. CSXI's training program has grown to include Risk Management and Safety (RM&S) Regional Field Managers. This affords a more watchful eye over CSXI facilities to address hazardous materials incidents efficiently. The year 2000 saw a reduction in the number of such incidents, which can be attributed to the working relationship between CSXI's RM&S Regional Managers and the Federal Railroad Administration.

To enhance safety performance in operations, CSXI has implemented an incentive program that rewards the safe practices of field personnel. In 2000, CSXI awarded $328,000 to field personnel. More than 97 percent of the CSXI workforce is injury-free.

**CSX Lines and CSX World Terminals**

CSX Lines and CSX World Terminals are recognized within their industries as the benchmarks for commitment to safety and environmental compliance. In 2000, CSX World Terminals consolidated its safety programs to introduce consistency in process and reporting activities, which resulted in a 40 percent reduction in safety claims during the second half of the year.

CSX Lines' safety programs contributed to overall injury rate improvement of 18 percent in 2000, and the shipboard injury rate decreased by 28 percent. CSX Lines handles nearly 50,000 shipments of hazardous materials a year with less than 0.05 percent leading to Department of Transportation-reportable incidents. The carrier also has met compliance requirements of the International Safety Management Code, an international law that sets safety and environmental standards for the operation of ships.

**PUBLIC POLICY**

**Bush Administration**

The election of George W. Bush as the 43rd President of the U.S. should be generally viewed as a positive development for CSX and the rest of the business community. The President's focus on less government regulation, reduced taxes, trade, energy and tort reform is indicative of a more business-friendly Administration. Additionally, the appointment of Norman Mineta as Secretary of Transportation, with his vast knowledge of transportation issues and prior support of the 1980 Staggers Rail Act, which partially deregulated America's railroad industry, should bode well for CSX and the rail industry.

**Greater Government Re-regulation Continues to Threaten Rail Industry's Future**

The Staggers Rail Act laid the foundation for a railroad renaissance that has made our nation's rail freight system the envy of the world. As a result, market forces - not the government - now generally set the rates charged customers, thereby giving railroads the opportunity to earn sufficient revenues to improve their market position. Since 1980, rail productivity has nearly tripled, inflation-adjusted rates have been reduced by more than half, and employee safety has improved by two-thirds. Notwithstanding this great American success story, efforts continue in Washington, led by some shippers and other interests, to undo the regulatory balance struck by Congress - a move that could very well cripple America's freight railroads. While CSX does not believe the new Administration would support these efforts, CSX remains extremely concerned by the heightened level of activity in this area, particularly the numerous pieces of legislation that were given some level of consideration during the past year. Any one of these proposals would have drastically affected the business principles by which CSX and the rest of the nation's railroads operate. Re-regulation would increase the government's role in relationships between railroads and their customers. Additionally, proponents of re-regulation seek to force access - in effect mandate that one railroad be granted access onto another rail carrier's privately-owned right of way. Re-regulation would be ill-advised and ill-conceived transportation policy, leaving in its wake a weakened rail industry plagued by reduced investment in track and equipment. It would lead to decreased safety, diminished service, loss of market share to the trucking industry and dismal returns on investment.

Federal Government to Unveil New Merger Rules - Future Consolidation May Prove Increasingly Difficult

The Surface Transportation Board (STB), the federal agency charged with reviewing and approving rail mergers, remains engaged in a rulemaking process designed to change the standard by which future rail mergers will be judged. In an earlier decision related to the process, the STB emphasized the need for railroads to justify future mergers on the basis of whether a rail merger enhances competition, rather than the existing standard of whether a rail merger harms competition. This major shift in reviewing railroad mergers, if adopted into final rules, would make the process of future railroad consolidation more difficult. CSX, which has been and continues to be an active participant in the process, recognizes that new rules are necessary for the industry to continue to regain the confidence of customers, but believes that the industry should not be judged by rules harsher than those which apply to other industries. The STB plans to issue its final rules by June 11, 2001.

**Reforming the Railroad Retirement System Remains a Priority**

Rail labor and management are again joining forces in an attempt to reform the existing railroad retirement system. Specifically, the coalition continues to pursue legislation designed to modernize the financing of the existing railroad retirement system to enhance retirement benefits for railroad employees, retirees and their beneficiaries, while reducing costs for CSX and other railroads. This effort comes on the heels of last year's aggressive yet unsuccessful attempt by rail labor and management to enact legislation to modernize the industry's retirement system. While legislation passed the House of Representatives by a significant margin and had widespread support in the Senate, objections to various provisions in the bill were raised by several key senators. Also contributing to the unsuccessful effort was the fact that the Clinton Administration failed to include the bill on last year's list of must-pass legislation. CSX strongly urges Congress and the new Administration to support reform of the railroad retirement system.

**Onerous Deficit Reduction Tax Must Be Repealed**

Originally enacted in 1993, the 4.3 cents-per-gallon fuel tax was levied on highway users, the rail and barge industries, and two years later, the airline industry, to help reduce government budget deficits. However, since 1997, neither the airline nor the trucking industry - the railroads' main competitor - pay a deficit reduction tax, leaving the railroad and barge industries to bear the brunt of this unnecessary tax. This point, combined with the fact that the government now enjoys a growing surplus, cries out for repeal of this onerous tax. CSX will continue to vigorously pursue legislation to repeal the 4.3 cent tax, which would result in significant savings for the company.

**Federal Court Decision Continues to Cast Cloud on Coal Industry**

The future of mountaintop mining remains very much at risk as a result of a 1999 federal district court decision declaring mountaintop coal mining in West Virginia - a mining process whereby tops of mountains are cleared - to be in violation of the Federal Clean Water Act. At issue is the disposal of by-products, including rock and other fill material. The decision, if left to stand, would very likely have a negative effect on similar operations in CSX-served states beyond West Virginia, including Ohio and Kentucky. Particularly troublesome is the prospect that an estimated 100,000 jobs could be at risk if this decision remains in effect. An appeal of this decision by a coalition comprised of labor and management representatives from the negatively affected industries, including rail, is pending in the U.S. Fourth Circuit Court in Richmond. CSX will continue to lobby hard for a legislative or administrative resolution to this issue.

**Embarking on a New Strategy for Improved Rail Infrastructure**

CSX and other railroads are evaluating potential opportunities to enhance rail capacity through public and private partnerships for funding of rail infrastructure projects such as the construction of new track and signal systems. This strategy could have significant application along heavily traveled rail lines on which both freight and passenger trains operate on the same track, such as the I-95 rail corridor where numerous bottlenecks exist. Upgrading the rail infrastructure along heavily traveled rail corridors would significantly improve the safety, efficiency and reliability of train operations while providing significant environmental and other societal benefits.

**Efforts to Reform the Nation's Legal System Continue**

CSX remains committed to modifying the nation's civil justice system, and is encouraged by the Bush Administration's position on the need for tort reform. This is a significant and costly issue for CSX and many other concerned companies, which unsuccessfully sought some form of class action and asbestos litigation reform during the previous administration. CSX will continue to assign tort reform a top priority, actively pursuing legislation at both the federal and state levels.

**FINANCIAL INFORMATION**

Financial Policy........................................................ 14

Management's Discussion and Analysis of
Financial Condition and Results of Operations............................ 15

Consolidated Statement of Earnings....................................... 28

Consolidated Statement of Cash Flows..................................... 29

Consolidated Statement of Financial Position............................. 30

Consolidated Statement of Changes in Shareholders' Equity................ 31

Notes to Consolidated Financial Statements............................... 32

Report of Ernst & Young LLP, Independent Auditors........................ 48

## FINANCIAL POLICY

### CSX's Financial Principles

The management of CSX Corporation reports the company's financial condition and results of operations in an accurate, timely and conservative manner in order to give shareholders the information they need to make investment decisions about the company. In this section of our annual report, financial information is presented to assist you in understanding the sources of earnings, the financial resources of the company and the contributions of the various business units.

Our key objective is to increase shareholder value by improving the return on invested capital and maximizing free cash flow. To achieve these goals, managers use the following guidelines in conducting the financial activities of the company:

. Capital -- CSX business units are expected to earn returns in excess of the CSX cost of capital. Business units that do not earn a return above the CSX cost of capital and do not generate an adequate level of free cash flow over an appropriate period of time will be evaluated for sale or other disposition.

. Taxes -- CSX will pursue all available opportunities to pay the lowest federal, state and foreign taxes, consistent with applicable laws and regulations and the company's obligation to carry a fair share of the cost of government. CSX also works through the legislative process for lower tax rates.

. Debt Ratings -- The company will strive to maintain its investment grade debt ratings, which allow cost-effective access to financial markets. The company will manage its business operations in a manner consistent with meeting this objective, ensuring adequate cash to service its debt and fixed charges.

. Dividends -- The cash dividend is reviewed regularly in the context of providing the highest value to shareowners. Competitive yield levels, tax efficiency and financial flexibility are the factors balanced in such reviews.

CSX cannot always guarantee that its goals will be met, despite its best efforts. For example, revenue and operating expenses are affected by the state of the economy and the industries the company serves. In addition, changes in regulatory policy can drastically change the cost and feasibility of certain operations. Factors such as these, along with the uncertainty involved in predicting future events, should be kept in mind when reading company projections or forward-looking statements in this report.

### Management's Responsibility for Financial Reporting

The consolidated financial statements of CSX have been prepared by management, which is responsible for their content and accuracy. The statements present the results of operations, cash flows and financial position of the company in conformity with accounting principles generally accepted in the United States and, accordingly, include amounts based on management's judgments and estimates.

CSX and its subsidiaries maintain internal controls designed to provide reasonable assurance that assets are safeguarded and transactions are properly authorized by management and are recorded in conformity with generally accepted accounting principles. Controls include accounting tests, written policies and procedures and a code of corporate conduct routinely communicated to all employees. An internal audit staff monitors compliance with and the effectiveness of established policies and procedures.

The Audit Committee of the board of directors, composed solely of outside directors, meets periodically with management, internal auditors and the independent auditors to review audit findings, adherence to corporate policies and other financial matters. The firm of Ernst & Young LLP, independent auditors, has been engaged to audit and report on the company's consolidated financial statements. Its audit was conducted in accordance with auditing standards generally accepted in the United States and included a review of internal accounting controls to the extent deemed necessary for the purpose of its report, which appears on page 48.

Management's Discussion and Analysis of Financial Condition and Results of Operations

(All references to earnings per share assume dilution)

**Description of Business**

CSX Corporation (CSX), headquartered in Richmond, Va., operates the largest rail network in the eastern United States and also provides intermodal transportation services across the United States and into key markets in Canada and Mexico. CSX's goal, advanced at each of its business units, is to provide efficient, competitive transportation and related services for customers and to deliver superior value to the company's shareholders.

**CSX Transportation Inc.**

CSXT is the largest rail network in the eastern United States, providing rail freight transportation over a network of more than 23,400 route miles in 23 states, the District of Columbia and two Canadian provinces. Headquartered in Jacksonville, Fla., CSXT accounted for 74% of CSX's operating revenue and 76% of operating income in 2000.

**CSX Intermodal Inc.**

CSXI is the nation's only transcontinental intermodal transportation service provider, operating a network of dedicated intermodal facilities across North America. The CSXI network runs approximately 500 dedicated trains between its 49 terminals every week. CSXI accounted for 14% of CSX's operating revenue and 12% of operating income in 2000. Its headquarters are located in Jacksonville, Fla.

**CSX Lines LLC**

CSX Lines was formed in 1999 to operate the domestic liner business of Sea- Land Service Inc. (Sea-Land), consisting of a fleet of 16 vessels and 27,000 containers serving the trade between ports on the United States mainland and Alaska, Guam, Hawaii and Puerto Rico. The domestic container-shipping business was retained by CSX when Sea-Land's international container-shipping operations were sold to A.P. Moller-Maersk Line (Maersk) in December 1999. CSX Lines accounted for 8% of CSX's operating revenues and broke even on operating income in 2000. CSX Lines is headquartered in Charlotte, N.C.

**CSX World Terminals LLC**

CSX World Terminals, formed in 1999, operates container-freight terminal facilities at 12 locations in Hong Kong, China, Australia, Europe, Russia and the Dominican Republic. These operations, located in areas expected to benefit from the continuing growth in world trade, also were retained by CSX when Sea- Land's international liner business was sold to Maersk. CSX World Terminals accounted for 4% of CSX's operating revenues and 9% of operating income in 2000. CSX World Terminals is headquartered in Charlotte, N.C.

**Non-Transportation**

Resort holdings include the AAA Five-Diamond hotel, The Greenbrier, in White Sulphur Springs, W.Va. In December 1999, The Greenbrier was named "Resort of the Century" by Andrew Harper's Hideaway Report. CSX Real Property Inc. is responsible for sales, leasing and development of CSX-owned properties. CSX also holds a majority interest in Yukon Pacific Corporation, which is promoting construction of the Trans-Alaska Gas System to transport Alaska's North Slope natural gas to Valdez for export to Asian markets.

## Results of Operations

### Net Earnings
(Millions of Dollars, Except Per Share Amounts)

| Description (all amounts after tax) | 2000 Amount | 2000 Per Share | 1999 Amount | 1999 Per Share | 1998 Amount | 1998 Per Share |
|---|---|---|---|---|---|---|
| Net Earnings Before Non-recurring Items | $ 186 | $ 0.88 | $ 320 | $ 1.50 | $ 411 | $ 1.92 |
| Loss on Sale, Net of Depreciation Benefit | -- | -- | (271) | (1.27) | -- | -- |
| Workforce Reduction Program | -- | -- | (34) | (.16) | -- | -- |
| Net Investment Gain | -- | -- | 17 | .08 | 90 | .42 |
| Restructuring Credit | -- | -- | -- | -- | 19 | .09 |
| Cumulative Effect of Accounting Change | -- | -- | (49) | (.23) | -- | -- |
| Discontinued Operations | 379 | 1.79 | 19 | .09 | 17 | .08 |
| Net Earnings as Reported | $ 565 | $ 2.67 | $ 2 | $ .01 | $ 537 | $ 2.51 |

**AVERAGE RETURN ON ASSETS AVERAGE RETURN ON EQUITY**
(percent) (percent)

| | |
|---|---|
| '96 | 5.9 |
| '97 | 4.3 |
| '98 | 2.7 |
| '99 | - |
| '00 | 2.7 |

| | |
|---|---|
| '96 | 18.9 |
| '97 | 15.2 |
| '98 | 9.2 |
| '99 | - |
| '00 | 9.6 |

2000

| Operating Income (Millions of Dollars) | Surface Transportation Rail | Surface Transportation Intermodal | Surface Transportation Total | Marine Services Container Shipping | Marine Services International Terminals/(a)/ | Marine Services Total | Elim./ Other | Total |
|---|---|---|---|---|---|---|---|---|
| Operating Revenue | $ 6,075 | $ 1,168 | $ 7,243 | $ 666 | $ 305 | $ 971 | $ (23) | $ 8,191 |
| Operating Expense | | | | | | | | |
| Labor and Fringe Benefits | 2,498 | 67 | 2,565 | 212 | 71 | 283 | 10 | 2,858 |
| Materials, Supplies and Other | 1,380 | 193 | 1,573 | 222 | 106 | 328 | 8 | 1,909 |
| Conrail Operating Fee, Rent and Services | 377 | -- | 377 | -- | -- | -- | -- | 377 |
| Building and Equipment Rent | 519 | 131 | 650 | 45 | 10 | 55 | -- | 705 |
| Inland Transportation | (387) | 648 | 261 | 95 | 21 | 116 | (19) | 358 |
| Depreciation | 496 | 29 | 525 | 20 | 7 | 27 | -- | 552 |
| Fuel | 577 | 2 | 579 | 72 | -- | 72 | -- | 651 |
| Miscellaneous/(a)/ | -- | -- | -- | -- | 19 | 19 | (43) | (24) |
| Loss on Sale | -- | -- | -- | -- | -- | -- | -- | -- |
| Workforce Reduction Program | -- | -- | -- | -- | -- | -- | -- | -- |
| Restructuring Credit | -- | -- | -- | -- | -- | -- | -- | -- |
| Total Expense | $ 5,460 | $ 1,070 | $ 6,530 | $ 666 | $ 234 | $ 900 | $ (44) | $ 7,386 |
| Operating Income (Loss) | $ 615 | $ 98 | $ 713 | -- | $ 71 | $ 71 | $ 21 | $ 805 |
| Operating Income (Loss) as Adjusted/(c)/ | $ 615 | $ 98 | $ 713 | -- | $ 71 | $ 71 | $ 21 | $ 805 |
| Operating Ratio | 89.9% | 91.6% | 90.2% | 100.0% | 76.7% | 92.7% | | |
| Operating Ratio as Adjusted(c) | 89.9% | 91.6% | 90.2% | 100.0% | 76.7% | 92.7% | | |
| Average Employment | 35,496 | 1,230 | 36,726 | 1,618 | 1,240 | 2,858 | | |
| Property Additions | $ 822 | $ 18 | $ 840 | $ 16 | $ 8 | $ 24 | | |

(a) Marine Services includes minority interest expense which is reclassified to other income in eliminations and other. Marine services 1999 and 1998 operating expenses have been restated to conform to 2000 presentation.

(b) On June 30, 1998, CSX conveyed its wholly owned barge subsidiary to a joint venture in which it holds a 32% common ownership interest. Due to the reduction in ownership percentage, CSX has accounted for its investment in the barge company under the equity method retroactive to the beginning of fiscal year 1998.

(c) Excludes loss on international container-shipping asset sale (net of depreciation benefit) and surface transportation workforce reduction program in 1999. Excludes rail restructuring credit in 1998.

2000 vs. 1999.

CSX follows a 52/53-week fiscal calendar. Fiscal year 2000 consisted of 52 weeks compared with 53 weeks in fiscal 1999. The company reported net earnings for 2000 of $565 million, $2.67 per share. Earnings for the prior year were $2 million, $.01 per share. Net earnings include the results of the Company's wholly-owned logistics subsidiary, CTI Logistx, Inc. which was sold on September 22, 2000 for $650 million and resulted in a gain of $570 million before tax, $365 million after tax, $1.73 per share in 2000. CTI Logistx, Inc. also contributed $14 million, $.06 per share from its discontinued operations in 2000 compared to $19 million, $.09 per share in 1999. Operating revenues, expenses and income for all periods have been restated to reflect the logistics segment as a discontinued operation. Operating income for 2000 totaled $805 million, compared with $573 million in 1999. Operating revenue of $8.2 billion was 21% lower and operating expense of $7.4 billion was 25% lower than the prior year primarily because 1999 included 11.5 months of revenues and expenses from the Company's international container-shipping operations which were sold in December 1999. The reductions in revenue and expense levels were offset by the effects of the expansion of the company's rail and intermodal businesses in June 1999 with the integration of Conrail lines in the Northeast and Midwest.

Financial results for 1999 included several significant non-recurring items. The 1999 results included a loss on the sale of assets comprising the company's international container-shipping business, a charge to recognize the cost of a workforce reduction program at the rail and intermodal units, a gain on the sale of the company's Grand Teton Lodge resort subsidiary, and an adjustment to record the cumulative effect of adopting a new accounting rule related to workers' compensation second injury funds. These non-recurring items are discussed in greater detail in other sections of Management's Discussion and Analysis, and their effect on the company's net earnings and earnings per share is outlined in the "Net Earnings" table on page 16. Net earnings from continuing operations were $186 million, $.88 per share in 2000 vs. net earnings, exclusive of the above mentioned special items of $320 million, $1.50 per share, in 1999. Operating income totaled $805 million for 2000, vs. $988 million exclusive of the above mentioned special items in 1999.

| 1999 | | | | | | 1998 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Surface Transportation | | | | | | Surface Transportation | | | | | |
| Rail | Inter-modal | Total | Marine Services/(a)/ | Elim./ Other | Total | Rail | Inter-modal | Total | Marine Services/(a)/ | Elim./ Other/(b)/ | Total |
| $ 5,623 | $ 959 | $ 6,582 | $ 3,809 | $ (16) | $ 10,375 | $ 4,956 | $ 648 | $ 5,604 | $ 3,916 | $ (30) | $ 9,490 |
| 2,244 | 64 | 2,308 | 983 | -- | 3,291 | 1,974 | 50 | 2,024 | 959 | -- | 2,983 |
| 1,279 | 150 | 1,429 | 1,217 | 5 | 2,651 | 1,057 | 117 | 1,174 | 1,285 | -- | 2,459 |
| 280 | -- | 280 | -- | -- | 280 | -- | -- | -- | -- | -- | -- |
| 496 | 123 | 619 | 546 | -- | 1,165 | 382 | 81 | 463 | 596 | -- | 1,059 |
| (285) | 513 | 228 | 707 | (17) | 918 | (159) | 348 | 189 | 734 | (30) | 893 |
| 469 | 24 | 493 | 90 | -- | 583 | 450 | 18 | 468 | 130 | -- | 598 |
| 317 | 1 | 318 | 154 | -- | 472 | 251 | 1 | 252 | 141 | -- | 393 |
| -- | -- | -- | 23 | (37) | (14) | -- | -- | -- | 34 | (30) | 4 |
| -- | -- | -- | 401 | -- | 401 | -- | -- | -- | -- | -- | -- |
| 53 | 2 | 55 | -- | -- | 55 | -- | -- | -- | -- | -- | -- |
| -- | -- | -- | -- | -- | -- | (30) | -- | (30) | -- | -- | (30) |
| $ 4,853 | $ 877 | $ 5,730 | $ 4,121 | $ (49) | $ 9,802 | $ 3,925 | $ 615 | $ 4,540 | $ 3,879 | $ (60) | $ 8,359 |
| $ 770 | $ 82 | $ 852 | $ (312) | $ 33 | $ 573 | $ 1,031 | $ 33 | $ 1,064 | $ 37 | $ 30 | $ 1,131 |
| $ 823 | $ 84 | $ 907 | $ 48 | $ 33 | $ 988 | $ 1,001 | $ 33 | $ 1,034 | $ 37 | $ 30 | $ 1,101 |
| 86.3% | 91.4% | 87.1% | 108.2% | | | 79.2% | 94.9% | 81.0% | 99.1% | | |
| 85.4% | 91.2% | 86.2% | 98.7% | | | 79.8% | 94.9% | 81.5% | 99.1% | | |
| 31,952 | 1,090 | 33,042 | 8,923 | | | 28,358 | 786 | 29,144 | 8,690 | | |
| $ 1,298 | $ 63 | $ 1,361 | $ 86 | | | $ 1,212 | $ 99 | $ 1,311 | $ 54 | | |

1999 VS. 1998.

CSX follows a 52/53-week fiscal calendar. Fiscal year 1999 consisted of 53 weeks compared with 52 weeks in fiscal 1998. The company reported net earnings for 1999 of $2 million, 1 cent per share. Net earnings for 1998 were $537 million, $2.51 per share. Net earnings include the results of the Company's wholly-owned logistics subsidiary, CTI Logistx, Inc. which was sold in 2000. Operating revenues, expenses and income for all periods have been restated to reflect the logistics segment as a discontinued operation. Operating income for 1999 totaled $573 million, compared with $1.1 billion in 1998. Operating revenue of $10.4 billion was 9% higher than 1998, while operating expense of $9.8 billion was 17% higher. The higher revenue and expense levels were primarily due to the expansion of the company's rail and intermodal businesses in June 1999 with the integration of Conrail lines in the Northeast and Midwest.

As noted above, financial results for 1999 included several significant non- recurring items. The 1998 results included a net investment gain, primarily from the conveyance of the company's barge subsidiary to a joint venture, and a restructuring credit at the rail unit. These non-recurring items are discussed in greater detail in other sections of Management's Discussion and Analysis, and their effect on the company's net earnings and earnings per share is outlined in the "Net Earnings" table on page 16. Net earnings exclusive of these items totaled $320 million, $1.50 per share, in 1999 vs. $411 million, $1.92 per share in 1998. Operating income excluding the non-recurring items totaled $988 million for 1999, compared with $1.1 billion for 1998.

As previously mentioned, the year-over-year increases in operating revenue and expense were due primarily to the June 1999 integration of the company's allocated portion of the Con-rail rail and intermodal operations (see "Investment in and Integrated Rail Operations with Conrail"). Earnings for 1999 were adversely effected by costs related to preparation and start-up of the Conrail integration and significant costs and lost revenue due to network congestion experienced after the integration. The impact of Hurricane Floyd, higher personal injury accruals and higher fuel prices in the second half of the year also decreased earnings. Spending on Year 2000 preparations was lower in 1999 as the company completed key phases of its readiness plan near the end of the third quarter.

Business Segment Results
Surface Transportation Results
Rail Traffic by Commodity*

| | Carloads (Thousands) | | | Revenue (Millions of Dollars) | | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 2000 | 1999 | 1998 |
| Merchandise | | | | | | |
| Phosphates & Fertilizer | 486 | 527 | 539 | $ 316 | $ 318 | $ 304 |
| Metals | 346 | 319 | 268 | 414 | 367 | 307 |
| Food & Consumer Products | 161 | 150 | 135 | 224 | 184 | 148 |
| Paper & Forest Products | 523 | 505 | 457 | 657 | 600 | 508 |
| Agricultural Products | 361 | 326 | 277 | 483 | 442 | 380 |
| Chemicals | 598 | 545 | 444 | 993 | 913 | 750 |
| Minerals | 439 | 422 | 396 | 398 | 386 | 353 |
| Government | 11 | 11 | 6 | 28 | 28 | 16 |
| Total Merchandise | 2,925 | 2,805 | 2,522 | 3,513 | 3,238 | 2,766 |
| Automotive | 586 | 553 | 412 | 869 | 760 | 540 |
| Coal, Coke & Iron Ore | | | | | | |
| Coal | 1,660 | 1,614 | 1,651 | 1,546 | 1,476 | 1,503 |
| Coke | 46 | 55 | 60 | 47 | 51 | 53 |
| Iron Ore | 49 | 61 | 50 | 30 | 38 | 27 |
| Total Coal, Coke & Iron Ore | 1,755 | 1,730 | 1,761 | 1,623 | 1,565 | 1,583 |
| Other Revenue | -- | -- | -- | 70 | 60 | 67 |
| Total Rail | 5,266 | 5,088 | 4,695 | $ 6,075 | $ 5,623 | $ 4,956 |

* Certain amounts have been restated to conform to the 2000 presentation.

2000 vs. 1999

**Rail**

CSXT earned $615 million of operating income in 2000 vs. $823 million in 1999, excluding its $53 million portion of the workforce reduction charge in 1999. Operating revenue was 8% higher, at $6.1 billion. Operating expense rose 14% to $5.5 billion, excluding the prior year workforce reduction charge. The 2000 results included twelve months of integrated Conrail operations, distorting comparisons to 1999 results which included only seven months.

As mentioned above, overall volumes were higher for 2000 as the Conrail integration impacted all of 2000 as compared to seven months of 1999. The increase in revenues and carloads resulting from the full twelve months activity was offset by lower demand in the second half of 2000, when signs of a weakening economy began appearing. The 14% increase in rail operating expense reflects the expense associated with the new Conrail traffic, as well as significant increases in fuel costs and contract labor costs in 2000. In addition, there were higher costs associated with operational initiatives that began in the second quarter of 2000 that accelerated the pace of operational and service recovery and prepared the network for seasonally higher traffic demand typically experienced in the fall. The railroad has seen steady and significant improvement in most operating measures since these initiatives were implemented, but the fall peak did not materialize to levels seen in previous years. Fuel expense was $260 million higher than 1999, $211 million reflecting a 35 cent increase in the average price per gallon for the full year and $49 million as a result of higher fuel consumption with the added Conrail traffic.

**Intermodal**

CSXI earned $98 million of operating income in 2000 vs. $84 million in 1999, excluding its $2 million portion of the work-force reduction charge in 1999. The increase was primarily due to the significant growth in intermodal volume attributable to a full year of Conrail operations. Revenue for 2000 totaled $1.2 billion vs. $959 million in the prior year. Operating expense totaled $1.1 billion compared with $875 million in 1999 excluding the $2 million workforce reduction charge.

1999 vs. 1998

**Rail**

Excluding its $53 million portion of the workforce reduction charge in 1999 and the $30 million restructuring credit in 1998, CSXT earned $823 million of operating income in 1999 vs. $1.0 billion in 1998. Operating revenue was 13% higher, at $5.6 billion. Operating expense rose 22% to $4.8 billion, excluding the workforce reduction charge. The 1999 results included seven months of integrated Conrail operations, distorting comparisons to 1998.

Overall volumes increased due to the addition of former Conrail traffic and relatively strong demand across most service groups. The largest revenue increase was in automotive (up 41%) due to the new Conrail traffic, strong vehicle production in 1999, and the strike at major General Motors plants that adversely affected 1998 revenue. Merchandise revenue increased 17% largely due to the new Conrail traffic. Added coal revenues from the former Conrail territory were offset by continued weakness in export coal volume, resulting in a net revenue decrease of 2%. The 24% increase in rail operating expense reflects the expense associated with the new Conrail traffic, as well as significant costs incurred in starting up combined operations and addressing post-integration congestion and operating problems. In addition, Hurricane Floyd disrupted operations for up to 10 days on key portions of the CSXT system in North Carolina and New Jersey, resulting in repair costs and lost revenue. Fuel expense was $66 million higher than 1998, reflecting a 2 cent increase in the average price per gallon for the full year, and higher fuel consumption with the added Conrail traffic.

**Intermodal**

Excluding its $2 million portion of the workforce reduction charge, CSXI reported 1999 operating income of $84 million, compared with $33 million in 1998. The increase was primarily due to the significant growth in intermodal volume attributable to the new Conrail operations. Strengthening international business and improved rail service in the Western half of the country also benefited 1999. Revenue for 1999 totaled $959 million vs. $648 million in 1998. Operating expense totaled $875 million without the workforce reduc-

**FIXED CHARGE COVERAGE**

| | |
|---|---|
| '96 | 3.9 |
| '97 | 2.5 |
| '98 | 1.7 |
| '99 | 1.1 |
| '00 | 1.4 |

**RAIL OPERATING REVENUE**
(millions of dollars)

| | |
|---|---|
| '96 | $4,909 |
| '97 | $4,989 |
| '98 | $4,956 |
| '99 | $5,623 |
| '00 | $6,075 |

**RAIL OPERATING EXPENSE**
(millions of dollars)

| | |
|---|---|
| '96 | $3,782 |
| '97 | $3,760 |
| '98 | $3,925 |
| '99 | $4,853 |
| '00 | $5,460 |

. Restructuring credit in 1998 was $30 million. Workforce reduction charge in 1999 was $53 million.

**INTERMODAL OPERATING REVENUE**
(millions of dollars)

| | |
|---|---|
| '96 | $ 660 |
| '97 | $ 669 |
| '98 | $ 648 |
| '99 | $ 959 |
| '00 | $1,168 |

tion charge, compared with $615 million in 1998. The expanded operations over portions of the former Conrail system accounted for the significant revenue and expense increases in 1999. While CSXI realized margin improvements through economies of scale, rail congestion led to lost revenue as shippers diverted some traffic to trucks.

**Marine Services Results**

Following the sale of its international container-shipping liner business in 1999, CSX has redefined the retained portions of its container-shipping business to consist of a Domestic Container Shipping segment and an International Terminals segment. These segments are being managed as separate businesses, and operating results for 2000 are presented separately for each segment. It is not practicable to provide results for these segments for 1999 and 1998. For reporting purposes, these businesses are also viewed in the aggregate as Marine Services. 1999 and 1998 results for the Marine Services grouping include the two retained businesses and the international liner business that was sold. The Domestic Container Shipping unit operates 16 vessels and 27,000 containers along six service routes between the continental United States and Alaska, Guam, Hawaii, and Puerto Rico. The International Terminals unit operates container freight terminals at 12 locations in Hong Kong, China, Australia, Europe, Russia, and the Dominican Republic.

2000 vs. 1999

Revenue from Marine Services operations totaled $971 million for 2000, vs. $3.8 billion for 1999. Operating expenses totaled $900 million, compared to $3.8 billion in the prior year. Operating income for 2000 was $71 million, compared to $48 million in 1999 before the $360 million one-time net charge related to the sale of the international liner business. The significant declines in revenue, expense and operating income reflect the international liner sale. That transaction also accounted for the improvement in operating ratio as the international business had operated at a low margin prior to the sale.

1999 vs. 1998

Although the sale of Sea-Land's international liner business to Maersk did not close until mid-December, the unit lost significant business late in the fourth quarter of 1999 as international shippers shifted cargo bookings in anticipation of the transaction. As a result, those operations incurred an operating loss for the quarter that exceeded earnings from the retained domestic shipping and terminal management businesses. Operating results for the first nine months of the year showed marked improvement over 1998 as Pacific container volumes recovered and significant rate increases in the Asia-to-U.S. trade more than offset weakness in the Atlantic and Americas trade lanes. Despite the fourth quarter loss, 1999 operating income of $48 million, excluding a loss on the international liner sale net of a related depreciation benefit, was 30% higher than the $37 million earned in 1998.

Fiscal 1999 revenue of $3.8 billion was 3% lower than 1998, reflecting the international liner disposition three weeks prior to year end and the pre- closing runoff in shipments. Similarly, operating expense of $3.8 billion, excluding the net loss on sale, was 3% lower than 1998; although higher fuel prices resulted in a 9% increase in fuel expense on consumption levels that were flat year-to-year.

**2000 Results**

**Domestic Container Shipping**

The domestic container shipping unit reported operating revenue of $666 million in its first year of existence as a stand-alone company. However, operating income associated with this revenue was break even in 2000. Traffic demand remained strong in the Alaska and Hawaii-Guam trade lanes, but weakness in the Puerto Rico trade due to competitive pressures and a slower Puerto Rican economy negatively impacted earnings for 2000.

**International Terminals**

The international terminals unit reported operating income of $71 million for 2000 on operating revenue of $305 million. International trade remained robust, with ongoing growth in world trade and the continued rebound of Asian economies. In addition to strong container traffic through its Hong Kong terminal, the unit benefited from continued productivity enhancements and improved capacity utilization at that facility.

**Liquidity and Capital Resources**

**Operating Activities**

Cash provided by operations for 2000 totaled $710 million, down $361 million from 1999, due principally to significant changes in the organizational structure of the company, including the sale of the contract logistics segment and the international liner business. Cash provided by operations totaled $1.1 billion and $1.0 billion in 1999 and 1998, respectively.

**Investing Activities**

Net cash used by investing activities in 2000 totaled $337 million vs. $582 million in 1999 and $870 million in 1998. Included in the 2000 total is $650 million in net proceeds from the sale of the contract logistics segment. Included in the 1999 total is $751 million in net proceeds from the sale of international container-shipping assets and $49 million from the sale of the Grand Teton Lodge resort. The 1998 total included $628 million from the conveyance of the company's barge subsidiary to a joint venture.

Property additions totaled $913 million in 2000 and $1.5 billion in 1999 and 1998. The higher levels in 1999 and 1998 are largely due to rail and intermodal spending for locomotives and capital improvements to service the additional traffic resulting from the Conrail integration.

Significant projects related to Con-rail included investments in technology, a major upgrade to the B&O line between Chicago and Cleveland, and a new inter-modal terminal in Chicago. Property additions for the coming

fiscal year are expected to be under $900 million, reflecting a consistent normal spending level on the combined rail network.

**Financing Activities**

Financing activities used net cash of $739 million in 2000 compared with providing $32 million in 1999, and use of $276 million of cash in 1998. In 2000, the proceeds from the Sea-Land and CTI sales were used to pay down debt. In 1998, the barge subsidiary proceeds were initially used to reduce short-term debt, but borrowings were increased over the second half of the year to fund a portion of the capital spending to prepare for the Conrail integration.

During 2000, CSX issued $400 million of floating rate notes, bearing interest at rates based on LIBOR and having a two-year maturity. These financings were intended to supplement the company's existing commercial paper program. In 1999, CSX issued $400 million of floating rate notes having a one- year maturity which were to supplement the company's commercial paper program and ensure liquidity over year end 1999. In 1998, CSX issued approximately $1 billion of fixed-rate debt, principally to refinance commercial paper borrowings classified as long-term debt in the company's statement of financial position. The placement of this fixed-rate debt allowed the company to take advantage of a favorable interest rate environment to reduce the overall floating-rate exposure in its debt portfolio.

CSX repaid $751 million of long-term debt in 2000, vs. $126 million in 1999, and $1.1 billion in 1998 (including the commercial paper refinancings). Long-term debt at Dec. 29, 2000, totaled $5.8 billion, down $386 million from year-end 1999, largely reflecting the reclassification of long-term commercial paper to short-term debt. The ratio of debt to total capitalization at the end of 2000 was 50%, compared with 53% at the end of 1999.

In January 2001, CSX filed an $800 million shelf registration statement with the SEC. The Company's working capital deficit at Dec. 29, 2000 was $1.2 billion. A working capital deficit is not unusual for CSX and does not indicate a lack of liquid-ity. CSX maintains adequate resources to satisfy current liabilities when they come due and has sufficient financial capacity to manage its day-to-day cash requirements.

Cash dividends paid per common share were $1.20 for 2000, 1999, and 1998. Total cash dividends of $262 million were paid each year in 1999, 1998 and 1997.

**Market Risk**

CSX does not currently use derivative financial instruments, although the company may from time to time employ them as part of its risk management program. If used, the objective is to manage specific risks and exposures, not to trade such instruments for profit or loss.

CSX manages its overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within its debt portfolio over time. At Dec. 29, 2000, CSX had approximately $1.1 billion of floating-rate debt outstanding. A 1% increase in interest rates would increase annual interest expense by approximately $11 million. While the company's container-shipping terminal management subsidiary does business in several foreign countries, a substantial portion of its revenue and expenses are transacted in U.S. dollars. For this reason, CSX does not believe its foreign currency market risk is significant.

**Investment In and Integrated Rail Operations with Conrail**

**Background**

CSX and Norfolk Southern Corporation (Norfolk Southern) completed the acquisition of Conrail Inc. (Conrail) in May 1997. Conrail owns the primary freight railroad system serving the northeastern United States, and its rail network extends into several mid-western states and into Canada. CSX and Norfolk Southern, through a jointly owned acquisition entity, hold economic interests in Conrail of 42% and 58%, respectively, and voting interests of 50% each. CSX and Nor-folk Southern received regulatory approval from the Surface Transportation Board (STB) to exercise joint control over Conrail in

**CASH PROVIDED BY OPERATIONS**
(millions of dollars)

```
'96  -  $1,440
'97  -  $1,558
'98  -  $1,000
'99  -  $1,071
'00  -  $  710
```

**PROPERTY ADDITIONS**
(millions of dollars)

```
'96  -  $1,223
'97  -  $1,125
'98  -  $1,479
'99  -  $1,517
'00  -  $  913
```

**PROPERTY ADDITIONS by SEGMENT**
(millions of dollars)

Rail - $ 822
Intermodel - $ 18
Domestic Shipping - $ 16
Other - $ 49
International Terminals - $ 8

August 1998 and subsequently began integrated operations over allocated portions of the Conrail lines in June 1999.

The rail subsidiaries of CSX and Norfolk Southern operate their respective portions of the Conrail system pursuant to various operating agreements that took effect on June 1, 1999. Under these agreements, the railroads pay operating fees to Conrail for the use of right-of-way and rent for the use of equipment. Conrail continues to provide rail service in certain shared geographic areas for the joint benefit of CSX and Norfolk Southern for which it is compensated on the basis of usage by the respective railroads.

**Accounting and Financial Reporting Effects**

CSX and Norfolk Southern assumed substantially all of Con-rail's customer freight contracts at the June 1999 integration date. CSX's rail and intermodal operating revenue since that date include revenue from traffic previously moving on Conrail. Operating expenses reflect corresponding increases for costs incurred to handle the new traffic and operate the former Con-rail lines. Rail operating expenses after the integration also include an expense category, "Conrail Operating Fee, Rent and Services," which reflects payment to Conrail for the use of right-of-way and equipment, as well as charges for transportation, switching, and terminal services in the shared areas Conrail operates for the joint benefit of CSX and Norfolk Southern. This expense category also includes amortization of the fair value write-up arising from the acquisition of Conrail, as well as CSX's proportionate share of Conrail's net income or loss recognized under the equity method of accounting. Prior to integration, CSX recorded its share of Conrail's net income, less amortization of the fair value write-up, and acquisition and transition expenses, in other income (expense) in the Consolidated Statement of Earnings.

Conrail's Results of Operations
2000 vs. 1999.

Comparisons of Conrail's operating results for 2000 and 1999 are affected by the significant changes in its business that occurred with the integration with CSX and Norfolk Southern in June 1999. Revenues and expenses for the first five months of 1999 were derived principally from freight linehaul operations over the entire Conrail network. Beginning in June 1999, financial results reflect Conrail's post-integration business, with revenues consisting primarily of operating fees, equipment rents, and shared area usage fees derived from CSX and Norfolk Southern, and expenses consisting of salaries and wages, rents, depreciation, and other costs reflective of the new operations.

Conrail reported net income of $170 million for 2000, compared with $26 million for 1999. Operating revenues were $985 million for 2000 vs. $2.2 billion for 1999, primarily reflecting the change in operations. As noted above, comparisons reflect five months of freight linehaul operations in 1999 prior to the integration. Conrail's results for 2000 benefited from a non-recurring gain on the sale of property of $61 million, $37 million after-tax. Operating expenses totaled $749 million in 2000 compared to $2.0 billion in 1999. The 1999 operating expenses include net charges of $180 million, $121 million after tax, principally to reflect the method of settlement of certain casualty liabilities based on the agreement between CSX, Norfolk Southern, and Conrail, to adjust certain litigation and environmental reserves related to settlements and completion of site reviews, and to reflect the assumption of a lease obligation by CSX. Conrail's operating expenses also included transition-related costs of $60 million in 1999, principally employee training and technology integration expenses.

1999 vs. 1998.

Conrail's results of operations for 1999 were significantly impacted by the changes in its business resulting from the integration with CSX and Norfolk Southern. Through May 31, 1999, Conrail's earnings included freight linehaul revenues and related expenses. Effective June 1, 1999, its major sources of revenue were derived from CSX and Norfolk Southern and consist principally of operating fees, equipment rent, and shared area usage fees. The nature of Conrail's operating expenses also has changed to reflect the new operations. As a result, meaningful comparisons of 1999 and 1998 results are difficult.

Conrail reported net income of $26 million for 1999, compared with $267 million for 1998. Operating revenues were $2.2 billion for 1999 vs. $3.9 billion for 1998, primarily reflecting the change in operations and a 2% decline in freight revenue for the five-month period prior to integration. Operating expenses totaled $2.0 billion in 1999 and $3.3 billion in 1998. The decrease reflected the change in operations in June, partially offset by higher casualty and other claims expenses. The 1999 operating expenses include net charges of $180 million, $121 million after tax, principally to reflect the method of settlement of certain casualty liabilities based on the agreement between CSX, Norfolk Southern, and Conrail, to adjust certain litigation and environmental reserves related to settlements and completion of site reviews, and to reflect the assumption of a lease obligation by CSX. Operating expenses in 1998 included a charge of $170 million, $105 million after tax, for severance benefits covering non-union employees, and other charges and reserves totaling $132 million, $82 million after tax. Conrail's operating expenses also included transition-related costs of $60 million in 1999, principally employee training and technology integration expenses, and $149 million in 1998, principally employee retention bonuses and technology integration costs.

**Financial Condition and Liquidity.**

Conrail's operating activities provided cash of $362 million in 2000, compared with $396 million in 1999 and $727 in 1998. The decline in cash provided by operations reflected lower operating income resulting from Conrail's post- integration structure and operations, as well as significant payments of one- time items owed to CSX and Norfolk Southern in the early

part of fiscal 2000. The decrease between 1999 and 1998 was principally due to the change in the company's operations. Cash generated from operations is the principal source of liquidity and is primarily used for debt repayments and capital expenditures. Debt repayments totaled $318 million, $112 million and $119 million in 2000, 1999 and 1998, respectively. Capital expenditures were $220 million, $176 million and $537 million in 2000, 1999 and 1998, respectively.

Conrail's working capital was $85 million at December 29, 2000, compared with a deficit of $194 million at December 31, 1999 and $202 million in 1998. The working capital deficit at December 31, 1999 included slightly more than $300 million in long-term debt maturities, the majority of which was paid in the second quarter of 2000 and required CSX and Norfolk Southern to repay some of their borrowings from Conrail under the related party advance arrangements. Conrail expects to have sufficient cash flow to meet its ongoing obligations.

**Divestitures and Joint Venture Investment**

**Sale of Contract Logistics Segment**

On September 22, 2000, CSX completed the sale of CTI Logistx, Inc., its wholly owned logistics subsidiary, for $650 million. The contract logistics segment is now reported as a discontinued operation, and all prior periods in the statement of earnings have been restated accordingly. Revenues from the contract logistics segment were $335 million, $484 million, and $408 million for 2000, 1999, and 1998, respectively. CSX recorded a gain of $570 million before tax, $365 million after tax, $1.73 per share, on the sale.

**Sale of International Container-Shipping Assets**

In December 1999, CSX sold certain assets comprising Sea-Land's international liner business to Maersk . The international liner business operated approximately 75 container vessels and 200,000 containers in worldwide trades and comprised a majority of CSX's container-shipping revenue. In addition to vessels and containers, Maersk acquired certain terminal facilities and various other assets and related liabilities of the international liner business. The operating revenue associated with the assets sold was approximately $2.8 billion in 1999 and $3.0 billion in 1998.

In accordance with FASB Statement No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," CSX classified the international liner assets as "held for sale" in July, 1999 when the agreement with Maersk was signed. The company recorded a $315 million asset impairment charge in the third quarter to adjust the book value of the related property, equipment and other long-lived assets to their fair value less cost to sell. In addition, in accordance with the provisions of Statement No. 121, no depreciation was recorded on these assets after their classification as "held for sale." Based on subsequent accounting for the completed transaction, including adjustments to reflect asset allocations agreed to at closing, the company determined that the loss on sale was approximately $86 million higher than the third quarter charge. The final loss on sale of $401 million, net of a $41 million benefit from the lower depreciation expense, reduced 1999 earnings by $360 million, $271 million after tax, $1.27 per share. The agreement with Maersk provides for a post-closing adjustment to the sales price based on the change in working capital, as defined in the agreement, between June 25, 1999, and December 10, 1999. The loss recorded includes the estimated costs to terminate various contractual obligations of the company. These matters will affect the determination of the final loss on sale. The company has recorded a receivable of approximately $60 million in connection with the post-closing adjustment and this amount is currently in dispute. The matter has been submitted to arbitration. Management is not yet in a position to assess fully the likely outcome of this process but believes it will prevail in the arbitration. Net of purchase price adjustments and cash balances conveyed to Maersk at closing, the company received cash proceeds of $751 million on the sale.

CSX retained the container-shipping business serving the U.S. domestic trade and part of the company's international terminal operations and manages them separately. Management reporting and performance measures for these businesses have been developed for fiscal year 2000. The company revised its disclosures under FASB Statement No. 131, "Disclosures about Segments of an Enterprise and Related Information," for fiscal 2000 to report these as separate business segments; however, it is not practicable to provide comparative segment disclosures for prior years.

**Sale of Grand Teton Lodge Subsidiary**

In June 1999, CSX completed the sale of its Grand Teton Lodge resort subsidiary, located in Jackson Hole, Wyo., to Vail Resorts. The transaction resulted in a net investment gain of $27 million, $17 million after tax, 8 cents per share. CSX received net cash proceeds of $49 million.

**Conveyance of Barge Unit**

In June 1998, CSX conveyed its barge unit, American Commercial Lines (ACL), to a venture formed with Vectura Group Inc. (Vectura). CSX received cash proceeds of $695 million from the transaction, $67 million of which were used to repay certain outstanding debt and other obligations of ACL and to pay expenses of the transaction. As part of the transaction, NMI Holdings LLC, a wholly owned barge subsidiary of Vectura, was combined with ACL. CSX holds a 32% common interest in the venture. Operating results for 1998 include a net investment gain of $154 million, $90 million after tax, 42 cents per share, primarily from the ACL transaction.

**Other Matters**

Workforce Reduction
2000

In October 2000, the company communicated to employees plans to review functions and staffing levels throughout the non-union workforce at its rail and intermodal units, its corporate headquarters, and its technology subsidiary. The objective of the review is to identify unnecessary or redundant work, or otherwise revise or restructure work in a manner that will allow a meaningful reduction in the workforce. The process will result in involuntary terminations of employees over the next twelve to fourteen months. While the company has established separation benefits to be paid to employees affected by this review, the number of employees to be terminated has not yet been determined. Formal decisions on terminations will be made on a departmental basis. The company anticipates incurring expense for termination benefits. Substantially all termination benefits will be paid from CSX's defined benefit pension plan in the form of a lump-sum payment or an enhancement to employees' normal retirement benefits. This workforce reduction did not have a material effect on the Company's 2000 earnings and is not expected to significantly affect 2001 earnings.

1999

CSX recorded a charge of $55 million, $34 million after tax, 16 cents per share, in the fourth quarter of 1999 to recognize the cost of a program to reduce the non-union workforce at its rail and intermodal units by approximately 800 positions. A voluntary early retirement program completed in December accounted for approximately 680 of the position reductions, with the remainder achieved through a combination of involuntary terminations and normal attrition. Approximately 75% of the retirements and separations occurred by the end of the year, and the remainder occured over the first half of fiscal year 2000. Early retirement benefits offered under the voluntary program accounted for $24 million of the charge and were paid from CSX's pension and postretirement benefit plans. Separation benefits were paid from cash generated by operations. Approximately half of the separation benefits were paid in 1999 with the remainder paid in 2000.

**Federal Railroad Administration Track Audit**

In March 2000, the Federal Railroad Administration (FRA) released a draft report of the results of a two-week audit of track conditions on CSX's rail system. The audit identified track defects on certain portions of the system, the nature of which led the FRA to question the effectiveness of the quality control procedures in CSX's track maintenance and inspection programs. CSX responded to the findings immediately by making necessary track repairs and by restricting train speeds on certain portions of track until repairs could be completed.

As a result of the audit, CSX and the FRA entered into a Safety Compliance Agreement in April 2000 that includes measures to improve the railroad's track inspection and maintenance processes. Under the agreement, which is effective through May 1, 2001, CSX has increased the frequency of automated track inspections, enhanced management oversight of track inspection and large scale maintenance operations, and implemented a new track inspection procedures manual developed in a joint effort with the FRA and Brotherhood of Maintenance of Way Employees. CSX estimates that it incurred approximately $20 million to $30 million in additional costs during fiscal year 2000 to address the issues raised in the audit and the commitments made in the Safety Compliance Agreement. A portion of these costs were charged to operating expenses in fiscal 2000 and a portion were capital expenditures to be depreciated over the useful life of the related track improvements.

Surface Transportation Board Moratorium on Rail Merger Applications and Proposed New Rules for Rail Mergers

In March 2000, the Surface Transportation Board (STB) issued a decision establishing a moratorium on rail merger applications for a 15-month time period. The STB's deliberations on this matter were prompted by significant public concerns expressed following the December 1999 announcement by the Burlington Northern Santa Fe (BNSF) and Canadian National (CN) railroads of plans to merge and combine their respective rail systems. The moratorium was instituted to allow the STB time to address the potential downstream effects that a rail merger might have on the railroad industry at the present time, and to consider changes in the rules by which future rail mergers will be evaluated. In October 2000, the STB issued proposed new rules for rail mergers that would require companies to demonstrate how future mergers would enhance competition and make companies more accountable for claimed merger benefits and service. After considering public comments on the proposed new rules, the STB anticipates issuing final rules in June 2001.

**Federal Court Decision Affecting Coal Mining Operations**

In October 1999, a federal district court judge ruled that certain mountaintop coal mining practices in West Virginia were in violation of the federal Clean Water Act and the federal Surface Mining and Control Reclamation Act. The decision, which is currently under appeal, could adversely affect CSX's coal traffic and revenues if upheld.

**Investment In Yukon Pacific Corporation**

CSX is currently reviewing strategic alternatives with respect to its investment in Yukon Pacific Corporation as part of its ongoing review of core business holdings. Yukon Pacific is a majority-owned subsidiary whose business objective is to promote construction of the Trans-Alaska Gas System to transport

natural gas from Alaska's North Slope to the port of Valdez for export principally to Asian markets. As part of the strategic review, management has decided to maintain the investment at its current status.

**New Orleans Tank Car Fire Litigation**

In September 1997, a state court jury in New Orleans, Louisiana returned a $2.5 billion punitive damages award against CSX Transportation, Inc. (CSXT), the wholly-owned rail subsidiary of CSX. The award was made in a class-action lawsuit against a group of nine companies based on personal injuries alleged to have arisen from a 1987 fire. The fire was caused by a leaking chemical tank car parked on CSXT tracks and resulted in the 36-hour evacuation of a New Orleans neighborhood. In the same case, the court awarded a group of 20 plaintiffs compensatory damages of approximately $2 million against the defendants, including CSXT, to which the jury assigned 15 percent of the responsibility for the incident. CSXT's liability under that compensatory damages award is not material, and adequate provision has been made for the award.

In October 1997, the Louisiana Supreme Court set aside the punitive damages judgment, ruling the judgment should not have been entered until all liability issues were resolved. In Feb-ruary 1999, the Louisiana Supreme Court issued a further decision, authorizing and instructing the trial court to enter individual punitive damages judgments in favor of the 20 plaintiffs who had received awards of compensatory damages, in amounts representing an appropriate share of the jury's award. The trial court on April 8, 1999 entered judgment awarding approximately $2 million in compensatory damages and approximately $8.5 million in punitive damages to those 20 plaintiffs. Approximately $6.2 million of the punitive damages awarded were assessed against CSXT. CSXT then filed post-trial motions for a new trial and for judgment notwithstanding the verdict as to the April 8 judgment.

The new trial motion was denied by the trial court in August 1999. On November 5, 1999, the trial court issued an opinion that granted CSXT's motion for judgment notwithstanding the verdict and effectively reduced the amount of the punitive damages verdict from $2.5 billion to $850 million. CSXT believes that this amount (or any amount of punitive damages) is unwarranted and intends to pursue its full appellate remedies with respect to the 1997 trial as well as the trial judge's decision on the motion for judgment notwithstanding the verdict. The compensatory damages awarded by the jury in the 1997 trial were also substantially reduced by the trial judge. A judgment reflecting the $850 million punitive award has been entered against CSXT. CSXT has obtained and posted an appeal bond in the amount of $895 million, which will allow it to appeal the 1997 compensatory and punitive awards, as reduced by the trial judge.

A trial for the claims of 20 additional plaintiffs for compensatory damages began on May 24, 1999. In July 1999, the jury in that trial rendered verdicts totaling approximately $330 thousand in favor of eighteen of those twenty plaintiffs. Two plaintiffs received nothing; that is, the jury found that they had not proved any damages. Management believes that this result, while still excessive, supports CSXT's contention that the punitive damages award was unwarranted.

In 1999, six of the nine defendants in the case reached a tentative settlement with the plaintiffs group. The basis of that settlement is an agreement that all claims for compensatory and punitive damages against the six defendants would be compromised for the sum of $215 million. That settlement was approved by the trial court in early 2000.

In 2000, the City of New Orleans recently was granted permission by the trial court to assert an amended claim against CSXT, including a newly asserted claim for punitive damages. The City's case was originally filed in 1988, and while based on the 1987 tank car fire, is not considered to be part of the class action.

Oral argument in the Louisiana Court of Appeal for the Fourth Circuit with regard to CSXT's appeal was held on Janu-ary 12, 2001. A ruling is expected some time this year. Any review beyond that court is by discretionary writ.

CSXT continues to pursue an aggressive legal strategy. At the present time, management is not in a position to determine whether the resolution of this case will have a material adverse effect on the Company's financial position or results of operations in any future reporting period.

**ECT Dispute**

Recently, CSX received a claim amounting to approximately $180 million plus interest from Europe Container Terminals bv (ECT), owner of the Rotterdam Container Terminal previously operated by Sea-Land prior to its sale to Maersk in December 1999. ECT has claimed that the sale of the international liner business to Maersk resulted in a breach of the Sea-Land terminal agreements. ECT has refused to accept containers at the former Sea-Land facility tendered by Maersk and is seeking compensation from CSX relating to the alleged breach. CSX has advised Maersk that CSX holds them responsible for any damages that may arise from this case. Management's initial evaluation of the claim indicates that valid defenses exist, but at this point management cannot estimate what, if any, losses may result from this case.

**Environmental Management**

CSX generates and transports hazardous and nonhazardous waste in its current and former operations, and is subject to federal, state and local environmental laws and regulations. The company has identified 234 sites at which it is or may be liable for remediation costs associated with alleged contamination or for alleged violations of environmental requirements. Approxi-

mately 116 of these sites are or may be subject to remedial action under the federal Superfund statute or similar state statutes. Certain federal legislation imposes joint and several liability for the remediation of identified sites. Consequently, CSX's ultimate environmental liability may include costs relating to other parties, in addition to costs relating to its own activities at each site.

A liability of $41 million has been accrued for future costs at all sites where the company's obligation is probable and where such costs can be reasonably estimated. However, the ultimate cost could be higher or lower than the amounts currently provided. The liability includes future costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties (PRPs), and existing technology, laws and regulations. CSX believes it has made adequate provision for its ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine with certainty because of the number of PRPs involved, site-specific cost-sharing arrangements with other PRPs, the degree of contamination by various wastes, the scarcity and quality of data related to many of the sites, and/or the speculative nature of remediation costs. The majority of the year-end 2000 environmental liability is expected to be paid out over the next five to seven years, funded by cash generated from operations. Total expenditures associated with protecting the environment and remedial environmental cleanup and monitoring efforts amounted to $36 million in 2000, compared with $35 million in 1999 and $34 million in 1998. During 2001, the company expects to incur preventive and remedial environmental expenditures in the range of $35 million to $40 million. Future environmental obligations are not expected to have a material impact on the results of operations or financial position of the company.

**Business Outlook for 2001**

The main challenge in 2000 was to turn the railroad's operating performance around - that was accomplished. In 2001, the challenge will be to turn the financial performance of the railroad around. This will be accomplished through continued service improvements, aggressive cost cutting initiatives and taking full advantage of revenue synergy opportunities from the Conrail transaction. Despite an economy that is showing clear signs of at least a short-term slow down, if not a contraction, CSX expects to produce full year earnings that will show an increase from previous years. First quarter will be a difficult challenge. Automotive volumes are dramatically down year over year and other commodity groups such as Phosphates & Fertilizer and Paper & Forest products are also experiencing lower year over year volumes as companies adjust their inventories due to the slowing economy. The coal unit is expected to offset a portion of this reduction in volume. Once these adjustments to inventory levels are completed, CSX is hopeful that the second half of 2001 will produce some year over year increases in rail volumes. On the cost side, the impact of higher fuel costs is expected to have a negative impact on cost comparisons during the first part of the year. Some of the planned productivity improvements, such as locomotive and car utilization and labor productivity, are expected to be realized in the first and second quarter but most of the cost reduction is expected to be realized during the second half of the year.

CSX World Terminals is expected to produce both earnings and cash flow levels above 2000's results. The company's main terminal in Hong Kong is continuing to produce very strong and stable cash flow. Some of the smaller terminals in China and Ger-many will produce some earnings improvement in 2001 but are not expected to meet their full potential until 2002 and beyond.

CSX Lines had a very difficult 2000. The company's results were hampered by both start-up issues and ongoing competitive pressures, especially in the Puerto Rico trade-lane. For 2001 the company will benefit from cost cutting initiatives that were implemented in the later part of 2000 and the re-deployment of vessels to more profitable trade lanes.

**Forward-looking Statements**

Estimates and forecasts in Management's Discussion and Analysis and in other sections of this Annual Report are based on many assumptions about complex economic and operating factors with respect to industry performance, general business and economic conditions and other matters that cannot be predicted accurately and that are subject to contingencies over which the company has no control. Such forward-looking statements are subject to uncertainties and other factors that may cause actual results to differ materially from the views, beliefs, and projections expressed in such statements. The words "believe," "expect," "anticipate," "project," and similar expressions signify forward-looking statements. Readers are cautioned not to place undue reliance on any forward-looking statements made by or on behalf of the company. Any such statement speaks only as of the date the statement was made. The company undertakes no obligation to update or revise any forward-looking statement.

Factors that may cause actual results to differ materially from those contemplated by these forward-looking statements include, among others, the following possibilities: (i) costs and operating difficulties related to the integration of Conrail may not be eliminated or resolved within the time frame currently anticipated; (ii) revenue and cost synergies expected from the integration of Conrail may not be fully realized or realized within the time frame anticipated; (iii) general economic or business conditions, either nationally or internationally, an increase in fuel prices, a tightening of the labor market or changes in demands of organized labor resulting in higher wages, or increased benefits or other costs or disruption of operations may adversely affect the businesses of the company; (iv) legislative or regulatory changes, including possible enactment of initiatives to reregulate the rail industry, may adversely affect the businesses of the company; (v) possible additional consolidation of the rail industry in the near future may adversely affect the operations and business of the company; and (vi) changes may occur in the securities and capital markets.

## Consolidated Statement of Earnings

(Millions of Dollars, Except Per Share Amounts)

| | Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 29, 2000 | Dec. 31, 1999 | Dec. 25, 1998 |
| **Operating Income** | | | |
| Operating Revenue | $ 8,191 | $ 10,375 | $ 9,490 |
| Operating Expense | 7,386 | 9,802 | 8,359 |
| Operating Income | 805 | 573 | 1,131 |
| **Other Income And Expense** | | | |
| Other Income | 15 | 52 | 119 |
| Interest Expense | 543 | 521 | 506 |
| **Earnings** | | | |
| Earnings from Continuing Operations Before Income Taxes | 277 | 104 | 744 |
| Income Tax Expense | 91 | 72 | 224 |
| Earnings before Discontinued Operations and Cumulative Effect of Accounting Change | 186 | 32 | 520 |
| Earnings from Discontinued Operations,Net of tax of $10, $15 and $12 | 14 | 19 | 17 |
| Gain on Sale of Discontinued Operations, Net of Tax of $205 | 365 | -- | -- |
| Earnings before Cumulative Effect of Accounting Change | 565 | 51 | 537 |
| Cumulative Effect on Prior Years of Accounting Change for Insurance-related Assessments, Net of Tax of $29 | -- | (49) | -- |
| Net Earnings | $ 565 | $ 2 | $ 537 |
| **Per Common Share** | | | |
| Earnings Per Share: | | | |
| Before Discontinued Operations and Cumulative Effect of Accounting Change | $ .88 | $ .15 | $ 2.47 |
| Earnings from Discontinued Operations | .07 | .09 | .08 |
| Gain on Sale of Discontinued Operations | 1.73 | -- | -- |
| Cumulative Effect of Accounting Change | -- | (.23) | -- |
| Including Discontinued Operations and Cumulative Effect of Accounting Change | $ 2.68 | $ .01 | $ 2.55 |
| Earnings Per Share, Assuming Dilution: | | | |
| Before Discontinued Operations and Cumulative Effect of Accounting Change | $ .88 | $ .15 | $ 2.43 |
| Earnings from Discontinued Operations | .06 | .09 | .08 |
| Gain on Sale of Discontinued Operations | 1.73 | -- | -- |
| Cumulative Effect of Accounting Change | -- | (.23) | -- |
| Including Discontinued Operations and Cumulative Effect of Accounting Change | $ 2.67 | $ .01 | $ 2.51 |
| Average Common Shares Outstanding (Thousands) | 210,942 | 210,616 | 210,860 |
| Average Common Shares Outstanding, Assuming Dilution (Thousands) | 211,314 | 212,696 | 214,196 |
| Cash Dividends Per Common Share | $ 1.20 | $ 1.20 | 1.20 |

See accompanying Notes to Consolidated Financial Statements.

**Consolidated Statement of Cash Flows**

(Millions of Dollars)

| | Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 29, 2000 | Dec. 31, 1999 | Dec. 25, 1998 |
| Operating Activities | | | |
| Net Earnings | $ 565 | $ 2 | $ 537 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided | | | |
| Cumulative Effect of Accounting Change | -- | 49 | -- |
| Depreciation | 600 | 621 | 630 |
| Deferred Income Taxes | 152 | (19) | 296 |
| Gain on Sale of Logistics Subsidiary | (365) | -- | -- |
| Loss on Sale of International Container-Shipping Assets | -- | 401 | -- |
| Workforce Reduction Program | -- | 55 | -- |
| Net Investment Gains | -- | (27) | (154) |
| Equity in Conrail Earnings - Net | (4) | 2 | (141) |
| Other Operating Activities | (13) | 8 | (78) |
| Changes in Operating Assets and Liabilities | | | |
| Accounts Receivable | 351 | (621) | 19 |
| Other Current Assets | (93) | 41 | (82) |
| Accounts Payable | (114) | 301 | 55 |
| Other Current Liabilities | (369) | 258 | (82) |
| Net Cash Provided by Operating Activities | 710 | 1,071 | 1,000 |
| Investing Activities | | | |
| Property Additions | (913) | (1,517) | (1,479) |
| Net Proceeds from Divestitures and Sale of Assets | 650 | 751 | 628 |
| Investment in Conrail | -- | (2) | (13) |
| Short-term Investments - Net | (85) | 94 | 6 |
| Other Investing Activities | 11 | 92 | (12) |
| Net Cash Used by Investing Activities | (337) | (582) | (870) |
| Financing Activities | | | |
| Short-term Debt - Net | (225) | 187 | 61 |
| Long-term Debt Issued | 588 | 284 | 1,153 |
| Long-term Debt Repaid | (751) | (126) | (1,132) |
| Cash Dividends Paid | (262) | (262) | (262) |
| Common Stock Reacquired | (42) | -- | (103) |
| Other Financing Activities | (47) | (51) | 7 |
| Net Cash Provided (Used) by Financing Activities | (739) | 32 | (276) |
| Net Increase (Decrease) in Cash and Cash Equivalents | (366) | 521 | (146) |
| Cash, Cash Equivalents And Short-term Investments | | | |
| Cash and Cash Equivalents at Beginning of Year | 626 | 105 | 251 |
| Cash and Cash Equivalents at End of Year | 260 | 626 | 105 |
| Short-term Investments at End of Year | 424 | 348 | 428 |
| Cash, Cash Equivalents and Short-term Investments at End of Year | $ 684 | $ 974 | $ 533 |
| Supplemental Cash Flow Information | | | |
| Interest Paid - Net of Amounts Capitalized | $ 546 | $ 523 | $ 498 |
| Income Taxes Paid | $ 14 | $ 58 | $ 154 |

See accompanying Notes to Consolidated Financial Statements.

**Consolidated Statement of Financial Position**

(Millions of Dollars)

| | Dec. 29, 2000 | Dec. 31, 1999 |
|---|---|---|
| Assets | | |
| Current Assets | | |
| Cash, Cash Equivalents and Short-term Investments | $ 684 | $ 974 |
| Accounts Receivable | 850 | 1,135 |
| Materials and Supplies | 245 | 220 |
| Deferred Income Taxes | 121 | 135 |
| Other Current Assets | 146 | 99 |
| Total Current Assets | 2,046 | 2,563 |
| Properties | 17,839 | 17,526 |
| Accumulated Depreciation | (5,197) | (5,269) |
| Properties - Net | 12,642 | 12,257 |
| Investment in Conrail | 4,668 | 4,663 |
| Affiliates and Other Companies | 362 | 410 |
| Other Long-term Assets | 773 | 827 |
| Total Assets | $20,491 | $20,720 |
| Liabilities | | |
| Current Liabilities | | |
| Accounts Payable | $ 1,079 | $ 1,197 |
| Labor and Fringe Benefits Payable | 405 | 436 |
| Casualty, Environmental and Other Reserves | 246 | 271 |
| Current Maturities of Long-term Debt | 172 | 349 |
| Short-term Debt | 749 | 574 |
| Income and Other Taxes Payable | 372 | 224 |
| Other Current Liabilities | 257 | 422 |
| Total Current Liabilities | 3,280 | 3,473 |
| Casualty, Environmental and Other Reserves | 755 | 767 |
| Long-term Debt | 5,810 | 6,196 |
| Deferred Income Taxes | 3,384 | 3,227 |
| Other Long-term Liabilities | 1,245 | 1,301 |
| Total Liabilities | 14,474 | 14,964 |
| Shareholders' Equity | | |
| Common Stock, $1 Par Value | 213 | 218 |
| Other Capital | 1,467 | 1,525 |
| Retained Earnings | 4,337 | 4,034 |
| Accumulated Other Comprehensive Loss | - | (21) |
| Total Shareholders' Equity | 6,017 | 5,756 |
| Total Liabilities and Shareholders' Equity | $20,491 | $20,720 |

See accompanying Notes to Consolidated Financial Statements.

**Consolidated Statement of Changes in Shareholders' Equity**

(Millions of Dollars)

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| Balance Dec. 26, 1997 | 218,310 | $ 218 | $ 1,552 | $ 4,019 | $ (23) | $ 5,766 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | -- | -- | -- | 537 | -- | 537 |
| Adjustment of Minimum Pension Liability, Net of $54 Income Taxes | -- | -- | -- | -- | (94) | (94) |
| Other - Net | -- | -- | -- | -- | (3) | (3) |
| Comprehensive Earnings | | | | | | 440 |
| Dividends | -- | -- | -- | (262) | -- | (262) |
| Common Stock Issued (Repurchased) -- Net | (1,191) | (1) | (63) | -- | -- | (64) |
| Balance Dec. 25, 1998 | 217,119 | 217 | 1,489 | 4,294 | (120) | 5,880 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | -- | -- | -- | 2 | -- | 2 |
| Adjustment of Minimum Pension Liability, Net of $56 Income Taxes | -- | -- | -- | -- | 99 | 99 |
| Comprehensive Earnings | | | | | | 101 |
| Dividends | -- | -- | -- | (262) | -- | (262) |
| Common Stock Issued (Repurchased) - Net | 1,325 | 1 | 36 | -- | -- | 37 |
| Balance Dec. 31, 1999 | 218,444 | 218 | 1,525 | 4,034 | (21) | 5,756 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | -- | -- | -- | 565 | -- | 565 |
| Adjustment of Minimum Pension Liability, Net of $8 Income Taxes | -- | -- | -- | -- | 15 | 15 |
| Other - Net | -- | -- | -- | -- | 6 | 6 |
| Comprehensive Earnings | | | | | | 586 |
| Dividends | -- | -- | -- | (262) | -- | (262) |
| Stock Purchase and Loan Plan Exchange | (5,505) | (5) | (29) | -- | -- | (34) |
| Common Stock Issued (Repurchased) - Net | (201) | -- | (29) | -- | -- | (29) |
| Balance Dec. 29, 2000 | 212,738 | $ 213 | $ 1,467 | $ 4,337 | $ -- | $ 6,017 |

See accompanying Notes to Consolidated Financial Statements.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 1. Significant Accounting Policies.

#### Nature of Operations

CSX Corporation (CSX) is a freight transportation company with principal business units providing rail, intermodal, domestic container-shipping, and international terminal operations. Rail transportation services are provided principally throughout the eastern United States and accounted for 74% of the company's 2000 operating revenue. Intermodal services are provided through a dedicated network of terminals and facilities across North America and accounted for nearly 14% of operating revenue in 2000. Domestic container shipping services trade between ports on the United States mainland and Alaska, Guam, Hawaii and Puerto Rico and accounted for 8% of operating revenues in 2000. International Terminal Operations are found in 12 locations in Hong Kong, China, Australia, Europe, Russia and the Dominican Republic and accounted for 4% of operating revenues in 2000.

Rail shipments include merchandise traffic, automobiles and related products, and coal, coke and iron ore. Merchandise traffic comprised nearly 58% of rail revenue in 2000, while automotive traffic accounted for nearly 15% and coal, coke and iron ore accounted for slightly more than 27%. Merchandise traffic includes chemicals, paper and forest products, agricultural products, minerals, metals, phosphates and fertilizer, and food and consumer products. Coal shipments originate principally from mining locations in the eastern United States and primarily supply domestic utility and export markets.

#### Principles of Consolidation

The Consolidated Financial Statements include CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Investments in companies that are not majority-owned are carried at either cost or equity, depending on the extent of control.

#### Fiscal Year

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2000 consisted of 52 weeks. Fiscal years 1999 and 1998 consisted of 53 and 52 weeks, respectively. A 52-week fiscal year consists of four 13-week quarters; a 53-week year reports an extra week in the first quarter.

#### Earnings Per Share

References to earnings per share in the Notes to Consolidated Financial Statements assume dilution.

#### Cash, Cash Equivalents and Short-term Investments

Cash in excess of current operating requirements is invested in various short- term instruments carried at cost that approximates market value. Those short- term investments having a maturity of three months or less at the date of acquisition are classified as cash equivalents.

#### Materials and Supplies

Materials and supplies consist primarily of fuel and items for maintenance of property and equipment, and are carried at average cost.

#### Properties

All properties are stated at cost, less an allowance for accumulated depreciation. Main-line track on the rail system is depreciated using a composite straight-line method. All other property and equipment is depreciated on a straight-line basis over estimated useful lives of three to 50 years.

Regulations enforced by the Surface Transportation Board (STB) of the U.S. Department of Transportation require periodic formal studies of ultimate service lives for all railroad assets. Resulting service life estimates are subject to review and approval by the STB. For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) is charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of depreciable assets of non-rail businesses, and for all dispositions of land, gains or losses are recognized at the time of disposal. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets. Where impairment is indicated, the assets are evaluated for sale or other disposition, and their carrying amount is reduced to fair value based on discounted net cash flows or other estimates of fair value.

#### Revenue and Expense Recognition

Surface transportation (rail and intermodal) revenue and expense are recognized proportionately as freight moves from origin to destination. Marine transportation (container-shipping) revenue and a corresponding accrual for the estimated cost to complete delivery are recorded when cargo first sails from its port of origin.

#### Environmental Costs

Environmental costs are charged to expense when they relate to an existing condition caused by past operations and do not contribute to current or future revenue generation. Liabilities are recorded when CSX's responsibility for environmental remedial efforts is deemed probable and the costs can be reasonably estimated. Generally, the timing of these accruals coincides with the completion of a feasibility study or the company's commitment to a formal plan of action.

**Stock-based Compensation**

The company records expense for stock-based compensation in accordance with the provisions of Accounting Principles Board (APB) Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations. Disclosures required with respect to the alternative fair value measurement and

recognition methods prescribed by Financial Accounting Standards Board (FASB) Statement No. 123, "Accounting for Stock-Based Compensation," are presented in Note 15 - Stock Plans.

Prior-year Data
Certain prior-year data have been reclassified to conform to the 2000 presentation.

**Use Of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain revenues and expenses for each fiscal year and certain assets and liabilities at the end of each fiscal year. Actual results may differ from those estimates.

**Comprehensive Earnings**

CSX reports comprehensive earnings (loss) in accordance with FASB Statement No. 130, "Reporting Comprehensive Income," in the Consolidated Statement of Changes in Shareholders' Equity. Accumulated other comprehensive loss at Dec. 31, 1999 consists of minimum pension liability adjustments of $15 million and foreign currency translation adjustments and other of $6 million.

**Accounting Pronouncements**

The FASB has issued Statement No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities." Statement No. 138 requires companies to record derivatives on the statement of financial position, measured at fair value. The statement also sets forth new accounting rules for gains or losses resulting from changes in the values of derivatives. CSX does not currently use derivative financial instruments, and its historical use of such instruments has not been material. The company will adopt this statement in the first quarter of 2001 to the extent it may apply at that time.

The FASB has issued Statement No. 140, " Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities." Statement No. 140 replaces the earlier Statement No. 125 in its entirety. While the new statement revises certain accounting guidance for transfers of financial assets, most of the provisions of Statement No. 125 have been carried over without reconsideration. Statement No. 140 is effective for transfers and servicing of financial assets occurring after March 31, 2001, but requires certain disclosures relating to securitizations for fiscal years ending after December 15, 2000. The company has adopted the disclosure provisions of Statement No. 140 as of its fiscal year ending December 29, 2000. The accounting provisions of Statement No. 140 will not impact the company's financial statements.

**Note 2. Change in Method of Accounting for Insurance-Related Assessments.**

CSX adopted the American Institute of Certified Public Accountants' Statement of Position No. 97-3, "Accounting by Insurance and Other Enterprises for Insurance-Related Assessments," (SOP No. 97-3) effective as of the beginning of fiscal year 1999. SOP No. 97-3 requires companies to accrue assessments related to workers' compensation second injury funds and is applicable to CSX with respect to certain assessments incurred by the company's container-shipping unit. The assessments relate to employees who have experienced second injuries over periods dating back to the 1970s and are receiving a disability benefit. Previously, the assessments were charged to expense in the fiscal year they were paid. As a result of adopting SOP No. 97-3, the company recorded a non-cash charge of $78 million, $49 million after tax, 23 cents per share, to reflect the cumulative effect on prior years of the accounting change. Had the accounting change been applied retroactively, the effect on net earnings and related per share amounts would not have been material to any period presented.

**Note 3. Investment in and Integrated Rail Operations with Conrail.**

**Background**

CSX and Norfolk Southern Corporation (Norfolk Southern) completed the acquisition of Conrail Inc. (Conrail) in May 1997. Conrail owns the primary freight railroad system serving the northeastern United States, and its rail network extends into several midwestern states and into Canada. CSX and Norfolk Southern, through a jointly owned acquisition entity, hold economic interests in Conrail of 42% and 58%, respectively, and voting interests of 50% each. CSX and Norfolk Southern received regulatory approval from the Surface Transportation Board (STB) to exercise joint control over Conrail in August 1998 and subsequently began integrated rail operations over allocated portions of the Conrail lines in June 1999.

The rail subsidiaries of CSX and Norfolk Southern operate their respective portions of the Conrail system pursuant to various operating agreements that took effect on June 1, 1999. Under these agreements, the railroads pay operating fees to Conrail for the use of right-of-way and rent for the use of equipment. Conrail continues to provide rail service in certain shared geographic areas for the joint benefit of CSX and Norfolk Southern for which it is compensated on the basis of usage by the respective railroads.

**Acquisition Accounting By The Jointly Owned Entity And CSX**

The jointly owned entity has accounted for the acquisition of Conrail as a purchase business combination effective as of the August 1998 control date. At that time, its investment in Conrail was approximately $10.2 billion, consisting of the original $9.8 billion purchase price plus equity in Con-rail's earnings, net of purchase price amortization, since the May 1997 acquisition date.

This amount has been allocated to reflect the fair values of Conrail's assets and liabilities as follows (in millions):

| | |
|---|---|
| Current Assets | $ 879 |
| Property and Equipment, Net | 17,832 |
| Other Assets | 1,122 |
| Current Liabilities | (1,279) |
| Long-term Debt | (1,891) |
| Deferred Income Taxes | (5,595) |
| Other Liabilities | (868) |
| Total | $ 10,200 |

The jointly owned entity's purchase price allocation included a provision of $280 million for the cost to Conrail of separating non-union employees whose positions were eliminated as a result of the acquisition. CSX separately recorded liabilities totaling approximately $400 million to provide for other acquisition-related obligations it is required to fund, including separation and relocation costs for Conrail union employees, relocation costs for Conrail non- union employees, and costs associated with the closure of certain Conrail facilities. CSX increased its investment in Conrail on the statement of financial position as a result of recording these separate obligations.

Under STB restrictions, CSX and Norfolk Southern did not have complete access to Conrail's properties and records and also were prevented from negotiating labor implementing agreements prior to the August 1998 control date. As a result, the amounts initially recorded by the jointly owned entity and by CSX for separation costs and other acquisition-related obligations were preliminary and were adjusted to reflect refinements identified as CSX and Norfolk Southern completed their integration of the Conrail network. These adjustments did not have a significant effect on the purchase price allocation.

**Conrail Financial Information**

Summarized financial information for Conrail for its fiscal years ended Dec. 31, 2000, 1999 and 1998 is as follows:

| | Years Ended Dec. 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| Income Statement Information:- | | | |
| Revenues | $ 985 | $2,174 | $3,863 |
| Income from Operations | $ 236 | $ 128 | $ 515 |
| Net Income | $ 170 | $ 26 | $ 267 |

| | Dec. 31, | |
|---|---|---|
| | 2000 | 1999 |
| Balance Sheet Information: | | |
| Current Assets | $ 520 | $ 669 |
| Property and Equipment and Other Assets | 7,540 | 7,714 |
| Total Assets | 8,060 | 8,383 |
| Current Liabilities | 435 | 863 |
| Long-term Debt | 1,229 | 1,302 |
| Total Liabilities | 4,078 | 4,564 |
| Stockholders' Equity | 3,982 | 3,819 |

Comparisons of Conrail's operating results for 2000 and 1999 are affected by the significant changes in its business that occurred with the integration with CSX and Norfolk Southern in June 1999. Revenues and expenses for five months of 1999 were derived principally from freight linehaul operations over the entire Conrail network. Beginning in June 1999, financial results reflect Conrail's post-integration business, with revenues consisting primarily of operating fees, equipment rents, and shared area usage fees derived from CSX and Norfolk Southern, and expenses consisting of salaries and wages, rents, depreciation, and other costs reflective of the new operations.

Conrail's results for 2000 benefited from a non-recurring gain on the sale of property of $61 million, $37 million after tax. Results in 1999 included non- recurring expenses of $254 million, $168 million after tax. These charges were recorded principally to increase certain components of Conrail's casualty reserves based on the method of settlement of casualty liabilities agreed to between CSX, Norfolk Southern and Conrail, and to adjust certain litigation and environmental reserves based on settlements and completions of site reviews. Certain of these items were considered by the joint acquisition entity in its fair value allocation of Conrail's assets and liabilities and, accordingly, were excluded in determining the equity in Conrail's net income recorded by CSX.

Conrail's operating results for the years ended Dec. 31, 1998 included certain charges related to the acquisition. The 1998 charges totaled $187 million on an after-tax basis and reflected the accrual of separation costs for non-union employees below the executive level. The jointly owned entity accounted for these costs as part of the fair value allocation and CSX accordingly excluded them in determining its equity in Conrail's net income. Excluding the charges, Conrail's net income totaled $454 million for the year ended Dec. 31, 1998.

CSX'S Accounting for its Investment in and Integrated Rail Operations with Conrail

Upon integration, substantially all of Conrail's customer freight contracts were assumed by CSX and Norfolk Southern. As a result, beginning June 1, 1999, CSX's rail and intermodal operating revenue includes revenue from traffic previously moving on Conrail. Operating expenses reflect corresponding increases for costs incurred to handle the new traffic and operate the former Conrail lines. Effective June 1, 1999, rail operating expenses also include a new expense category, "Conrail Operating Fee, Rent and Services," which reflects payments to Conrail for the use of right-of-way and equipment; as well as charges for transportation, switching, and terminal services provided by Conrail in the shared areas operated for the joint benefit of CSX and Norfolk Southern. The new expense category also includes amortization of the fair value write-up arising from the acquisition of Conrail, as well as CSX's proportionate share of Conrail's net income or loss recognized under the equity method of accounting. Prior to the June 1, 1999 integration, CSX recorded its share of Conrail's net income, less amortization of the fair value write-up, and acquisition and transition expenses, in other income in the Consolidated Statement of Earnings.

**Transactions With Conrail**

The agreement under which CSX operates its allocated portion of the Conrail route system has an initial term of 25 years and may be renewed at CSX's option for two five-year terms. Operating fees paid to Conrail under the agreement are subject to adjustment every six years based on the fair value of the underlying system. Lease agreements for the Conrail equipment operated by CSX cover varying terms. CSX is responsible for all costs of operating, maintaining, and improving the routes and equipment under these agreements. Future minimum payments to Conrail under the operating, equipment and shared area agreements total $261 million for 2001, $258 million for 2002, $254 million for 2003, $261 million for 2004, $253 million for 2005 and $4 billion for years after 2005.

At Dec. 29, 2000 and Dec. 31, 1999, CSX had $26 million and $53 million in amounts receivable from Conrail, respectively, principally for reimbursement of certain capital improvement costs. Conrail advances its available cash balances to CSX and Norfolk Southern under variable-rate demand loan agreements. At Dec. 29, 2000 and Dec. 31, 1999 respectively, Conrail had advanced $40 and $93 million to CSX under this arrangement at an interest rate of 5.9% and 5.6% respectively. CSX also had amounts payable to Conrail of approximately $127 and $105 million respectively, representing expenses incurred under the operating, equipment, and shared area agreements.

**Note 4. Divestitures and Joint Venture Investment.**

**Sale of Contract Logistics Segment**

On September 22, 2000, CSX completed the sale of CTI Logistx, Inc., its wholly-owned logistics subsidiary, for $650 million. The contract logistics segment is now reported as a discontinued operation, and all prior periods in the statement of earnings have been restated accordingly. Revenues from the contract logistics segment were $335 million, $484 million, and $408 million for 2000, 1999, and 1998, respectively. CSX recorded a gain of $570 million before tax, $365 million after tax, $1.73 per share, on the sale.

**Sale of International Container-Shipping Assets**

In December 1999, CSX sold certain assets comprising Sea-Land's international liner business to A. P. Moller-Maersk Line (Maersk). The international liner business operated approximately 75 container vessels and 200,000 containers in worldwide trades and comprised a majority of CSX's container-shipping revenue. In addition to vessels and containers, Maersk acquired certain terminal facilities and various other assets and related liabilities of the international liner business. The operating revenue associated with the assets sold was approximately $2.8 billion in 1999 and $3.0 billion in 1998.

In accordance with FASB Statement No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," CSX classified the international liner assets as "held for sale" in July 1999 when the agreement with Maersk was signed. The company recorded a $315 million asset impairment charge in the third quarter to adjust the book value of the related property, equipment and other long-lived assets to their fair value less cost to sell. In addition, in accordance with the provisions of Statement No. 121, no depreciation was recorded on these assets after their classification as "held for sale." Based on subsequent accounting for the completed transaction, including adjustments to reflect asset allocations agreed to at closing, the company determined that the loss on sale was approximately $86 million higher than the third quarter charge. The final loss on sale of $401 million, net of a $41 million benefit from the lower depreciation expense, reduced 1999 earnings by $360 million, $271 million after tax, $1.27 per share. The agreement with Maersk provides for a post-closing adjustment to the sales price based on the change in working capital, as defined in the agreement, between June 25, 1999, and December 10, 1999. The loss recorded includes the estimated costs to terminate various contractual obligations of the company. These matters will affect the determination of the final loss on sale. The company has recorded a receivable of approximately $60 million in connection with the post-closing adjustment and this amount is currently in dispute. The matter has been submitted to arbitration. Management is not yet in a position to assess fully the likely outcome of this process but believes it will prevail in the arbitration. Net of purchase price adjustments and cash balances conveyed to Maersk at closing, the company received cash proceeds of $751 million on the sale.

CSX retained the container-shipping business serving the U.S. domestic trade and part of the company's international terminal operations and manages them separately. Management reporting and performance measures for these businesses have been developed for fiscal year 2000. The company revised its disclosures under FASB Statement No. 131, "Disclosures about Segments of an Enterprise and Related Information," for fiscal 2000 to report these as separate business segments; however, it is not practicable to provide comparative segment disclosures for prior years.

**Sale of Grand Teton Lodge Subsidiary**

In June 1999, CSX completed the sale of its Grand Teton Lodge resort subsidiary, located in Jackson Hole, Wyo., to Vail Resorts. The transaction resulted in a net investment gain of $27 million, $17 million after tax, 8 cents per share. CSX received net cash proceeds of $49 million.

**Conveyance of Barge Subsidiary To Joint Venture**

On June 30, 1998, CSX conveyed its wholly-owned barge subsidiary, American Commercial Lines LLC (ACL), to a venture formed with Vectura Group Inc. (Vectura). As part of the transaction, NMI Holdings LLC, a wholly-owned barge subsidiary of Vectura, was combined with ACL. CSX received cash proceeds of $695 million from the transaction, $67 million of which were used to repay certain outstanding debt and other obligations of ACL and to pay expenses of the transaction. Operating results for the year ended Dec. 25, 1998, include a net investment gain

of $154 million, $90 million after tax, 42 cents per share, primarily from the ACL transaction.

CSX has a 32% common ownership in the new venture. Due to the reduction in its ownership interest, CSX accounts for its investment in the venture under the equity method for the fiscal years ended Dec. 25, 1998, Dec 31, 1999, and Dec. 29, 2000.

**Note 5. Workforce Reduction Program.**

CSX recorded a charge of $55 million, $34 million after tax, 16 cents per share, in the fourth quarter of 1999 to recognize the cost of a program to reduce the non-union workforce at its rail and intermodal units by approximately 800 positions. A voluntary early retirement program completed in December accounted for approximately 680 of the position reductions, with the remainder achieved through a combination of involuntary terminations and normal attrition. Approximately 75% of the retirements and separations occurred by the end of 1999, and the remainder occured over the first half of fiscal year 2000. Early retirement benefits offered under the voluntary program accounted for $24 million of the charge and were paid from CSX's pension and postretirement benefit plans. Separation benefits were paid from cash generated by operations. Approximately half of the separation benefits were paid in 1999,

**Note 6. Operating Expense.**

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Labor and Fringe Benefits | $ 2,858 | $ 3,291 | $ 2,983 |
| Materials, Supplies and Other | 1,885 | 2,637 | 2,463 |
| Conrail Operating Fee, Rent and Services | 377 | 280 | -- |
| Building and Equipment Rent | 705 | 1,165 | 1,059 |
| Inland Transportation | 358 | 918 | 893 |
| Depreciation | 552 | 583 | 598 |
| Fuel | 651 | 472 | 393 |
| Loss on Sale of International Container-Shipping Assets | -- | 401 | -- |
| Workforce Reduction Program | -- | 55 | -- |
| Restructuring Credit | -- | -- | (30) |
| Total | $ 7,386 | $ 9,802 | $ 8,359 |
| Selling, General and Administrative Expense Included in Above Items | $ 549 | $ 946 | $ 1,142 |

**Note 7. Other Income.**

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Interest Income | $ 53 | $ 47 | $ 52 |
| Income from Real Estate and Resort Operations(a) | 60 | 74 | 47 |
| Net Investment Gain(b) | -- | 27 | 154 |
| Net Losses from Accounts Receivable Sold | (36) | (31) | (30) |
| Minority Interest | (42) | (40) | (35) |
| Net Loss from Investment in Conrail | -- | (42) | (39) |
| Equity(Loss) Earnings of Other Affiliates | (7) | 17 | 27 |
| Miscellaneous | (13) | -- | (57) |
| Total | $ 15 | $ 52 | $ 119 |

(a) Gross revenue from real estate and resort operations was $191 million, $204 million and $194 million in 2000, 1999, 1998, respectively.

(b) The $27 million net investment gain recognized in 1999 was attributable to the sale of the Grand Teton Lodge Company. The $154 million net gain in 1998 was primarily attributable to the conveyance of the company's cargo subsidiary to a joint venture. See Note 4.

**Note 8. Income Taxes.**

Earnings from domestic and foreign operations and related income tax expense are as follows:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Earnings from Continuing Operations Before Income Taxes: | | | |
| -- Domestic | $ 191 | $ 58 | $ 543 |
| -- Foreign | 86 | 46 | 201 |
| Total Earnings from Continuing Operations Before Income Taxes | $ 277 | $ 104 | $ 744 |

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Income Tax Expense (Benefit): | | | |
| Current -- Federal | $ (53) | $ 65 | $ (103) |
| -- Foreign | 13 | 26 | 34 |
| -- State | 20 | 1 | (6) |
| Total Current | (20) | 92 | (75) |
| Deferred -- Federal | 111 | (75) | 262 |
| -- Foreign | (1) | 3 | 2 |
| -- State | 1 | 52 | 35 |
| Total Deferred | 111 | (20) | 299 |
| Total Income Tax Expense | $ 91 | $ 72 | $ 224 |

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | 2000 | | 1999 | | 1998 | |
|---|---|---|---|---|---|---|
| Tax at Statutory Rates | $ 97 | 35% | $ 37 | 35% | $ 260 | 35% |
| State Income Taxes | 8 | 3 | 6 | 6 | 18 | 2 |
| Equity in Conrail Net Income | (6) | (2) | (4) | (4) | (49) | (7) |
| Loss on Sale of International Container-Shipping Assets | -- | -- | 43 | 41 | -- | -- |
| Foreign Operations | (11) | (4) | (1) | (1) | 1 | -- |
| Other Items | 3 | 1 | (9) | (8) | (6) | -- |
| Income Tax Expense | $ 91 | 33% | $ 72 | 69% | $ 224 | 30% |

The significant components of deferred tax assets and liabilities include:

| | Dec. 29, 2000 | Dec. 31, 1999 |
|---|---|---|
| Deferred Tax Assets: | | |
| Productivity/Restructuring Charges | $ 121 | $ 133 |
| Employee Benefit Plans | 274 | 309 |
| Other | 725 | 502 |
| Total | 1,120 | 944 |
| Deferred Tax Liabilities: | | |
| Accelerated Depreciation | 3,583 | 3,256 |
| Other | 800 | 780 |
| Total | 4,383 | 4,036 |
| Net Deferred Tax Liabilities | $ 3,263 | $ 3,092 |

with the remainder in 2000.

The sale of certain assets comprising the international liner business increased the effective deferred state income tax rate in 1999 which is applied to the company's cumulative temporary differences.

In addition to the annual provision for deferred income tax expense, the change in the year-end net deferred income tax liability balances included the income tax effect of the changes in the minimum pension liability in 2000 and 1999, the income tax effect of the transfer of certain assets and obligations from Conrail's primary defined benefit pension plan to the CSX pension plan in 1999, and the income tax effect of accruing assessments related to workers compensation second injury funds in accordance with SOP No. 97-3 in 1999.

The company has not recorded domestic deferred or additional foreign income taxes applicable to undistributed earnings of foreign subsidiaries that are considered to be indefinitely reinvested. Such earnings amounted to $229 million and $172 million at Dec. 29, 2000 and Dec. 31, 1999, respectively. These amounts may become taxable upon their remittance as dividends or upon the sale or liquidation of these foreign subsidiaries. It is not practicable to determine the amount of net additional income tax that may be payable if such earnings were repatriated.

The company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1990. Returns for 1991 through 1996 are currently under examination. Management believes adequate provision has been made for any adjustments that might be assessed.

**Note 9. Accounts Receivable.**

The company sells revolving interests in its rail accounts receivable to public investors through a securitization program and to financial institutions through commercial paper conduit programs. The accounts receivable are sold, without recourse, to a wholly-owned, special-purpose subsidiary, which then transfers the receivables, with recourse, to a master trust. The securitization and conduit programs are accounted for as sales in accordance with FASB Statement No. 125 "Accounting for Transfers and Servicing of Financial Assets and

Extinguishments of Liabilities." Receivables sold under these arrangements are excluded from accounts receivable in the consolidated statement of financial position. At Dec. 29, 2000, the agreements provide for the sale of up to $350 million in receivables through the securitization program and $250 million through the conduit programs. At Dec. 31, 1999, the agreements provide for the sale of up to $350 million in receivables through the securitization program and $50 million through the conduit prog

grams. At Dec. 29, 2000, the company had sold $547 million of accounts receivable; $300 million through the securitization program and $247 million through the conduit programs. At December 31, 1999, $347 million of accounts receivable were sold, $300 million through the securitization program and $47 million through the conduit programs. The certificates issued under the securitization program bear interest at 6% annually and mature in June 2003. Receivables sold under the conduit programs were increased by $200 million during September 2000 and require yield payments based on prevailing commercial paper rates (6.64% at December 29, 2000) plus incremental fees. The Company's retained interests in the receivables in the master trust were appoximately $450 million at December 29, 2000 and are included in accounts receivable. As the receivables are collected in approximately one month, the fair value of the retained interests approximates book value. Losses recognized on the sale of accounts receivable totaled $36 million, $31 million and $30 million in 2000, 1999, and 1998, respectively. The company has retained the responsibility for servicing accounts receivable transferred to the master trust. The average servicing period is approximately one month. No servicing asset or liability has been recorded since the fees the company receives for servicing the receivables approximate the related costs.

The company maintains an allowance for doubtful accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Allowances for doubtful accounts of $90 million and $81 million have been applied as a reduction of accounts receivable at Dec. 29, 2000 and Dec. 31, 1999, respectively.

**Note 10. Properties.**

| | Dec. 29, 2000 | | | Dec. 31, 1999 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Depreciation | Net | Cost | Accumulated Depreciation | Net |
| Rail: | | | | | | |
| Road | $ 10,694 | $ 2,418 | $ 8,276 | $ 10,643 | $ 2,641 | $ 8,002 |
| Equipment | 5,532 | 2,093 | 3,439 | 5,243 | 1,983 | 3,260 |
| Total Rail | 16,226 | 4,511 | 11,715 | 15,886 | 4,624 | 11,262 |
| Other | 1,613 | 686 | 927 | 1,640 | 645 | 995 |
| Total | $ 17,839 | $ 5,197 | $ 12,642 | $ 17,526 | $ 5,269 | $ 12,257 |

Note 11. Casualty, Environmental and Other Reserves.

Activity related to casualty, environmental and other reserves is as follows:

| | Casualty and Other Reserves/(a)(b)/ | Environmental Reserves/(a)/ | Separation Liabilities/(a)(c)/ | Total |
|---|---|---|---|---|
| Balance Dec. 26, 1997 | $ 562 | $ 99 | $ 348 | $ 1,009 |
| Charged to Expense | 309 | 3 | -- | 312 |
| Restructuring Credit | -- | -- | (30) | (30) |
| Payments and Other Reductions | (318) | (27) | (18) | (363) |
| Balance Dec. 25, 1998 | 553 | 75 | 300 | 928 |
| Charged to Expense | 417 | 3 | -- | 420 |
| Cumulative Effect of Accounting Change | 78 | -- | -- | 78 |
| Payments and Other Reductions | (333) | (25) | (30) | (388) |
| Balance Dec. 31, 1999 | 715 | 53 | 270 | 1,038 |
| Charged to Expense | 287 | -- | -- | 287 |
| Payments and Other Reductions | (298) | (12) | (14) | (324) |
| Balance Dec. 29, 2000 | $ 704 | $ 41 | $ 256 | $ 1,001 |

(a) Balances include current portions of casualty and other, environmental and separation reserves, respectively, of $216 million, $15 million, and $15 mil-lion at Dec. 29, 2000;$236 million, $20 . million and $15 million at Dec. 31, 1999; $244 million, $20 million and $19 million at Dec. 25, 1998.

(b) Casualty reserves are estimated based upon the first reporting of an accident or personal injury. Liabilities for accidents are based upon field reports and liabilities for personal injuries and occupational claims are based upon the type and severity of the injury or claim and the use of current trends and historical data. The company has recorded liabilities in sufficient amounts to cover identified claims and an estimate of incurred, but not reported, claims. Future liabilities for certain occupation al hazards are not subject to reasonable estimation.

(c) Separation liabilities at Dec. 29, 2000, relate to productivity charges recorded in 1991 and 1992 to provide for the estimated costs of implementing workforce reductions, improvements in productivity and other costs reductions at the company's major transportation units. The remaining liabilities are expected to be paid out over the next 15 to 20 years. The remaining liability for separation costs incurred in connection with the 1999 workforce reduction program is included in "Labor and Fringe Benefits Payable" (See Note 5).

The company increased casualty and other reserves by $78 million at the beginning of fiscal year 1999 to record the cumulative effect on prior years of adopting a new accounting rule (SOP No. 97-3) related to assessments by workers' compensation second injury funds. The assessments relate to disability benefits received by former employees of the container shipping business and previously were charged to expense in the fiscal year they were paid.

During 1998, CSXT recorded a restructuring credit of $30 million, reflecting the reversal of certain separation and labor protection reserves established as part of a 1995 restructuring charge. These reserves were associated with planned work-force reductions that did not occur as a result of a new telecommunications contract CSXT entered into in July 1998.

Note 12. Debt and Credit Agreements.

| Types and Maturity Dates | Average Interest Rates at Dec. 29, 2000 | Dec. 29, 2000 | Dec. 31, 1999 |
|---|---|---|---|
| Commercial Paper | -- | $ -- | $ 800 |
| Notes (2002-2032) | 7.39% | 4,765 | 4,558 |
| Equipment Obligations (2000-2014) | 7.16% | 1,038 | 940 |
| Mortgage Bonds (2002-2003) | 3.16% | 55 | 56 |
| Other Obligations, including Capital Leases (2000-2010) | 7.88% | 124 | 191 |
| Total | 7.32% | 5,982 | 6,545 |
| Less Debt Due Within One Year | | 172 | 349 |
| Total Long-term Debt | | $ 5,810 | $ 6,196 |

CSX maintains a $2.5 billion bank credit agreement to provide financing for a portion of the Conrail acquisition and for general working capital needs. Under the agreement, the company may borrow directly from the participating banks or utilize the credit facility to support the issuance of commercial paper. Direct borrowings from the participating banks can be obtained, at the company's option, under a competitive bid process among the banks or under a revolving credit arrangement with interest either at LIBOR plus a margin determined by the company's credit rating or at an alternate base rate, as defined in the agreement. The company pays annual fees to the participating banks that may range from .06% to .15% of the total commitment, depending upon its credit rating. The credit agreement, which expires in November 2001, also includes certain covenants and restrictions, such as limitations on debt as a percentage of total capitalization and restrictions on the disposition of certain assets. At Dec. 29, 2000, CSX had commercial paper borrowings supported by the credit facility of $703 million, all classified as short-term debt. At Dec. 31, 1999, CSX had commercial paper borrowings supported by the credit facility of $1.4 billion, of which $800 million was classified as long-term debt based on the company's ability and intent to maintain this debt outstanding for more than one year. Short-term debt totaled $749 million at a weighted-average interest rate of 7.18% at Dec. 29, 2000, and $574 million at a weighted-average interest rate of 5.39% at Dec. 31, 1999.

CSX issued other debt during 2000 and 1999. In 2000, $400 million of floating rate notes with a two-year maturity were issued to supplement the company's commercial paper borrowings. In 1999, $400 million of floating rate notes with a one-year maturity were issued to ensure adequate liquidity over year end in the event that financial markets experienced disruption from Year 2000 issues.

In January 2001, CSX filed a shelf registration statement with the Securities and Exchange Commission that provides for the issuance of up to $800 million in debt securities and warrants, common stock, preferred stock, depository shares, or warrants for common or preferred stock. The company has long-term debt maturities for 2001 through 2005 aggregating $172 million, $997 million, $327 million, $405 million and $160 million, respectively. Certain of CSX's rail unit properties are pledged as security for various rail-related long-term debt issues.

**Note 13. Common and Preferred Stock.**

The company has a single class of common stock, $1 par value, of which 300 million shares are authorized. Each share is entitled to one vote in all matters requiring a vote. At Dec. 29, 2000, common shares issued and outstanding totaled 212,737,613.

The company also has total authorized preferred stock of 25 million shares, of which 250,000 shares of Series A have been reserved for issuance, and 3 million shares of Series B have been reserved for issuance under the Shareholder Rights Plan discussed below. All preferred shares rank senior to common shares both as to dividends and liquidation preference. No preferred shares were outstanding at Dec. 29, 2000.

On May 29, 1998, the board of directors adopted a Shareholder Rights Plan. Pursuant to the Plan as amended on June 27, 2000, each outstanding share of common stock also evidences one preferred share purchase right ("right"). Each right entitles shareholders of record to purchase from the company, until the earlier of June 8, 2008, or the redemption of the rights, one one-hundredth of a share of Series B preferred stock at an exercise price of $180, subject to certain adjustments or, under certain circumstances, to obtain additional shares of common stock in exchange for the rights. The rights are not exercisable or transferable apart from the related common shares until the earlier of 10 business days following the public announcement that a person or affiliated group has acquired 10% or more of the company's outstanding common stock; or 10 days following the

commencement or announcement of an intention to make a tender offer or exchange offer, the consummation of which would result in the ownership by a person or group of 10% or more of the outstanding common stock. The board of directors may redeem the rights at a price of one cent per right at any time prior to the acquisition by a person or group of 20% or more of the outstanding common stock.

**Note 14. Earnings Per Share.**

The following table sets forth the computation of earnings per share and earnings per share, assuming dilution.

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Numerator: | | | |
| Net Earnings from Continuing Operations | $ 186 | $ 32 | $ 520 |
| Denominator (thousands): | | | |
| Average Common Shares Outstanding | 210,942 | 210,616 | 210,860 |
| Effect of Potentially Dilutive Common Shares, Principally Employee Stock Plans | 372 | 2,080 | 3,336 |
| Average Common Shares Outstanding, Assuming Dilution | 211,314 | 212,696 | 214,196 |
| Earnings Per Share, from Continuing Operations | $ .88 | $ .15 | $ 2.47 |
| Earnings Per Share from Continuing Operations, Assuming Dilution | $ .88 | $ .15 | $ 2.43 |

Certain potentially dilutive securities outstanding at Dec. 29, 2000, Dec. 31, 1999, and Dec. 25, 1998, were not included in the computation of earnings per share, assuming dilution, since their exercise prices were greater than the average market price of the common shares during the period and their effect is antidilutive. These shares totaled 18.6 million at a weighted-average exercise price of $42.23 per share for 2000, 15.6 million at $45.80 per share for 1999, and 9.6 million at $48.84 per share for 1998.

**Note 15. Stock Plans.**

The company maintains several stock plans designed to encourage ownership of its stock and provide incentives for employees to contribute to its success. Expense for stock-based compensation under these plans is based on the intrinsic value accounted for under the principles of APB Opinion No. 25 and related Interpretations. The company recognized compensation expense of $12 million in 2000, $6 million in 1999 and a net credit of $4 million in 1998.

Had compensation expense been determined based upon fair values at the date of grant, consistent with the methods of FASB Statement No. 123, the company's net earnings and earnings per share would have been reduced to the pro forma amounts indicated below.

| | | 2000 | 1999 | 1998 |
|---|---|---|---|---|
| Net Earnings | -- As Reported | $ 565 | $ 2 | $ 537 |
| | -- Pro Forma | $ 545 | $ (22) | $ 481 |
| Earnings Per Share | -- As Reported | $ 2.68 | $ .01 | $ 2.55 |
| | -- Pro Forma | $ 2.58 | $ (.11) | $ 2.28 |
| Earnings Per Share, Assuming Dilution | -- As Reported | $ 2.67 | $ .01 | $ 2.51 |
| | -- Pro Forma | $ 2.58 | $ (.11) | $ 2.24 |

The pro forma fair value method of accounting was applied only to stock-based awards granted after Dec. 30, 1994. Because all stock-based compensation expense for 2000, 1999 and 1998 was not restated and because stock-based awards granted may vary from year to year, the resulting pro forma compensation cost may not be representative of that to be expected in future years.

**Stock Purchase and Loan Plan**

The Stock Purchase and Loan Plan provided for the purchase of common stock and related rights by eligible officers and key employees of the company and entitled them to obtain loans with respect to the shares purchased. There were no shares issued under the Stock Purchase and Loan Plan in 2000, 1999 or 1998. In November 2000, substantially all participants of the Stock Purchase and Loan Plan exchanged their share balances in this plan for forgiveness of their loan balances and certain participants were issued shares relating to the equity in their respective accounts. Approximately 6.7 million shares were withdrawn or cancelled in 2000 and approximately 600 thousand shares were issued in exchange for the equity in participant accounts. In conjunction with this transaction, the deferred tax benefits of approximately $34 million were charged to paid in capital.

In consideration for shares purchased, participants have provided down payments of not less than 5% nor more than 25% of the purchase price in the form of cash, recourse notes or equity earned in the Plan. The remaining purchase price is in the form of non-recourse loans secured by the shares issued. At Dec. 29, 2000 and Dec. 31, 1999, loans outstanding totaled $3 million and $261 million, respectively, at weighted-average interest rates of 6.6% for both years. All non-recourse loans under the Plan were

originally subject to certain adjustments after a vesting period based upon targeted increases in the market price of CSX common stock. Certain of the market price thresholds were met prior to 1998, resulting in forgiveness of interest (net of dividends applied to interest) plus a portion of the principal balances of the notes.

At Dec. 29, 2000, there were 3 participants in the Plan. Transactions involving the Plan are as follows:

| | Shares (000's) | Average Price/(a)/ |
|---|---|---|
| Outstanding at Dec. 27, 1996 | 8,111 | $ 46.26 |
| Issued | 138 | $ 59.43 |
| Exchanged, Canceled or Withdrawn | (581) | $ 22.48 |
| Outstanding at Dec. 26, 1997 | 7,668 | $ 45.74 |
| Exchanged, Canceled or Withdrawn | (503) | $ 45.13 |
| Outstanding at Dec. 25, 1998 | 7,165 | $ 45.75 |
| Exchanged, Canceled or Withdrawn | (349) | $ 47.50 |
| Outstanding at Dec. 31, 1999 | 6,816 | $ 46.93 |
| Exchanged, Canceled or Withdrawn | (6,746) | $ 47.00 |
| Outstanding at Dec. 29, 2000 | 70 | $ 40.27 |

/(a)/ Represents average cost to participants, net of cumulative note forgiveness.

**Stock Options and Awards**

CSX has various stock option and award plans. These plans currently provide awards primarily in stock options, but have previously also awarded Stock Appreciation Rights (SARs), Performance Share Awards (PSAs), Restricted Stock Awards (RSAs) and Incentive Compensation Program Shares (ICPs) to eligible officers and employees. Awards granted under the various plans are determined by the board of directors based on financial performance of the company.

At Dec. 29, 2000, there were 3,229 current or former employees with grants outstanding under the various plans. A total of 26,636,796 shares were reserved for issuance under the plans of which 6,453,067 were available for new grants. The remaining shares are assigned to outstanding stock options and stock awards.

The majority of stock options have been granted with 10-year terms and vest at the end of one year of continued employment. The exercise price for options granted equals the market price of the underlying stock on the date of grant. A summary of the company's stock option activity and related information for the fiscal years ended Dec. 29, 2000, Dec. 31, 1999 and Dec. 25, 1998 follows:

| | 2000 | | 1999 | | 1998 | |
|---|---|---|---|---|---|---|
| | Shares (000s) | Weighted-average Exercise Price | Shares (000s) | Weighted-average Exercise Price | Shares (000s) | Weighted-average Exercise Price |
| Outstanding at Beginning of Year | 18,310 | $ 42.57 | 16,288 | $ 41.73 | 16,171 | $ 40.49 |
| Granted | 2,742 | $ 23.57 | 3,226 | $ 43.96 | 2,674 | $ 48.43 |
| Exchanged, Canceled or Expired | (469) | $ 41.16 | (521) | $ 48.89 | (1,505) | $ 52.82 |
| Exercised | (457) | $ 18.47 | (683) | $ 24.19 | (1,052) | $ 23.80 |
| Outstanding at End of Year | 20,126 | $ 38.69 | 18,310 | $ 42.57 | 16,288 | $ 41.73 |
| Exercisable at End of Year | 9,405 | $ 38.82 | 10,038 | $ 37.94 | 10,447 | $ 36.96 |
| Fair Value of Options Granted | $ 6.36 | | $ 10.92 | | $ 11.22 | |

On Dec. 14, 1998, 1,297,595 stock options granted in April 1998 at an exercise price of $52.66 per share were exchanged for 1,038,076 new options at an exercise price of $41.78 per share.

The following table summarizes information about stock options outstanding at Dec. 29, 2000:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Excercise Price | Number Outstanding (000s) | Weighted-average Remaining Contractual Life | Weighted-average Exercise Price | Number Exercisable (000s) | Weighted-average Exercise Price |

| | | | | | |
|---|---|---|---|---|---|
| $ 15 to $19 | 445 | 0.3 | $ 19.91 | 445 | $ 19.91 |
| $ 20 to $29 | 2,695 | 9.3 | $ 23.60 | - | - |
| $ 30 to $39 | 4,528 | 2.4 | $ 35.54 | 4,528 | $ 35.54 |
| $ 40 to $49 | 8,718 | 6.4 | $ 43.62 | 3,845 | $ 42.94 |
| $ 50 to $57 | 3,740 | 6.1 | $ 54.14 | 587 | $ 51.43 |
| Total | 20,126 | 5.7 | $ 40.55 | 9,405 | $ 38.82 |

The fair value of options granted in 2000, 1999 and 1998 was estimated as of the dates of grant using the Black-Scholes option pricing model with the following weighted-average assumptions used for grants in 2000, 1999 and 1998, respectively: risk-free interest rates of 6.6%, 5.2% and 5.2%; volatility factors of 27%, 24% and 23%; dividend yields of 3.2%, 2.6% and 2.4%; and expected lives of 6 years, 6 years and 5 years.

Prior to 2000, CSX awarded PSAs to employees, the value of which is contingent on the achievement of performance goals and completion of certain employment requirements over a three year period. In 2000, the Company's board of directors approved discontinuation of these awards. In 1999 and 1998, 256,000 and 518,500 PSAs were granted to employees. The weighted average fair value of those shares was $41.52 for 1999 and $52.00 for 1998.

At Dec. 29, 2000, 400,000 RSAs were outstanding. The RSAs vest over a three or four year employment period and are contingent on the achievement of certain financial performance goals. The fair value of RSAs was $41.77 as of the date of grant.

In 2000, 1999 and 1998, respectively, 56,024, 130,116 and 77,556 SARs were exercised at a weighted average exercise price of $16.84, $16.77 and $15.58. There are no outstanding SARs at Dec. 29, 2000 and no SARs were granted in 2000, 1999 or 1998.

**Stock Purchase and Dividend Reinvestment Plans**

The 1991 Employees Stock Purchase and Dividend Reinvestment Plan provides a method and incentive for eligible employees to purchase shares of the company's common stock at market value by payroll deductions. To encourage stock ownership, employees receive a 17.65% matching payment on their contributions in the form of additional stock purchased by the company. Each matching payment of stock is subject to a two-year holding period. Sales of stock prior to the completion of the holding period result in forfeiture of the matching stock purchase. Officers and key employees who qualify for the Stock Purchase and Loan Plan are not eligible to participate in this Plan. At Dec. 29, 2000, there were 501,525 shares of common stock available for purchase under this Plan. Employees purchased 43,857 shares in 2000, 38,989 shares in 1999 and 37,403 shares in 1998 under the plan at weighted-average market prices of $23.46, $41.53 and $46.63 for 2000, 1999 and 1998 respectively.

The company also maintains the Employees Stock Purchase and Dividend Reinvestment Plan, adopted in 1981, under which all employees may purchase CSX common stock at the average of daily high and low sale prices for the five trading days ending on the day of purchase. To encourage stock ownership, employees receive a 5% discount on all purchases under this program. At Dec. 29, 2000, there were 627,979 shares reserved for issuance under this Plan. The company also maintains the Shareholder Dividend Reinvestment Plan under which shareholders may purchase additional shares of stock. At Dec. 29, 2000, there were 4,626,035 shares reserved for issuance under this plan.

**Stock Plan for Directors**

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers are paid. A minimum of 40% of the retainers must be paid in common stock of the company. In addition, each director may elect to receive up to 100% of the remaining retainer and fees in the form of common stock of the company. In 1997, shareholders approved amendments to the Plan that would permit additional awards of stock or stock options. In 2000, 52,000 stock options were granted with an exercise price of $26.40. In 1999, 13,000 stock options were granted with an exercise price of $35.31. In 1998, 13,000 stock options were granted with an exercise price of $41.25. The Plan permits each director to elect to transfer stock into a trust that will hold the shares until the participant's death, disability, retirement as a director, other cessation of services as a director, or change in control of the company. At Dec. 29, 2000, there were 747,270 shares of common stock reserved for issuance under this Plan.

**Note 16. Fair Value of Financial Instruments.**

Fair values of the company's financial instruments are estimated by reference to quoted prices from market sources and financial institutions, as well as other valuation techniques. Long-term debt is the only financial instrument of the company with a fair value significantly different from its carrying amount. At Dec. 29, 2000, the fair value of long-term debt, including current maturities, was $6.04 billion, compared with a carrying amount of $5.98 billion. At Dec. 31, 1999, the fair value of long-term debt, including current maturities, was $6.44 billion, compared with a carrying amount of $6.55 billion. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon the company's current incremental borrowing rates for similar types of financing arrangements.

**Note 17. Employee Benefit Plans.**

The company sponsors defined benefit pension plans, principally for salaried personnel. The plans provide eligible employees with retirement benefits based principally on years of service and compensation rates near retirement. Plan assets consist primarily of common stocks, corporate bonds and cash and cash equivalents.

In addition to the defined benefit pension plans, the company sponsors three plans that provide medical and life insurance benefits to most full-time salaried employees upon their retirement. The postretirement medical plans are contributory, with retiree contributions adjusted annually. The life insurance plan is non-contributory. The company's current policy is to fund the cost of the postretirement medical and life insurance benefits on a pay-as-you-go basis, as in prior years.

The company uses a plan year of Oct. 1 through Sept. 30 to value its pension and postretirement plans on an actuarial basis.

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| Change in Benefit Obligation | | | | |
| Benefit Obligation at Beginning of Plan Year | $ 1,540 | $ 1,615 | $ 308 | $ 315 |
| Service Cost | 40 | 51 | 8 | 9 |
| Interest Cost | 119 | 102 | 23 | 20 |
| Transfer of Benefit Obligation from Conrail Plan | -- | 42 | -- | -- |
| Impact of Plan Changes/Business Dispositions | 18 | -- | 6 | -- |
| Plan Participants' Contributions | -- | -- | 7 | 4 |
| Actuarial (Gain) Loss | 8 | (170) | 39 | (3) |
| Benefits Paid | (115) | (100) | (37) | (37) |
| Benefit Obligation at End of Plan Year | 1,610 | 1,540 | 354 | 308 |
| Change in Plan Assets | | | | |
| Fair Value of Plan Assets at Beginning of Plan Year | 1,604 | 1,273 | -- | -- |
| Actual Return on Plan Assets | 116 | 155 | -- | -- |
| Asset Transfers | (5) | 260 | -- | -- |
| Employer Contributions | 19 | 16 | 31 | 33 |
| Plan Participants' Contributions | -- | -- | 6 | 4 |
| Benefits Paid | (115) | (100) | (37) | (37) |
| Fair Value of Plan Assets at End of Plan Year | 1,619 | 1,604 | -- | -- |
| Funded Status | 9 | 64 | (354) | (308) |
| Unrecognized Actuarial (Gain) Loss | (33) | 29 | 62 | 23 |
| Unrecognized Prior Service Cost | 20 | 10 | (1) | (2) |
| Fourth Quarter Activity: | | | | |
| Special Termination Benefits - Workforce Reduction Program | (6) | (23) | -- | (1) |
| Employer Contributions to Pension Plans | 5 | 5 | -- | -- |
| Net Postretirement Benefits Paid | -- | -- | 8 | 8 |
| Net Amount Recognized in Statement of Financial Position | $ (5) | $ 85 | $ (285) | $ (280) |
| Amount Recognized in Statement of Financial Position Consists of: | | | | |
| Prepaid Benefit Cost | $ 219 | $ 215 | $ -- | $ -- |
| Accrued Benefit Liability | (238) | (161) | (285) | (280) |
| Intangible Asset | 14 | 7 | -- | -- |
| Accumulated Other Comprehensive Loss | -- | 24 | -- | -- |
| Net Amount Recognized in Statement of Financial Position | $ (5) | $ 85 | $ (285) | $ (280) |
| Weighted-average Assumptions: | | | | |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | 7.75% | 6.50% | 7.75% | 6.50% |
| Benefit Obligation at End of Plan Year | 7.75% | 7.75% | 7.75% | 7.75% |
| Rate of Compensation Increase | 5.00% | 5.00% | 5.00% | 5.00% |
| Expected Return on Plan Assets | 9.50% | 9.50% | n/a | n/a |

For plans with a projected benefit obligation in excess of plan assets at Dec. 29, 2000, the aggregate projected benefit obligation was $434 million and the aggregate fair value of plan assets was $272 million. For plans with an accumulated benefit obligation in excess of plan assets at Dec. 29, 2000, the aggregate accumulated benefit obligation was $162 million and the aggregate fair value of plan assets was $40 million.

The net postretirement benefit obligation was determined using the assumption that the health care cost trend rate for medical plans was 8.0% for 2000-2001, decreasing gradually to 5.5% by 2005 and remaining at that level thereafter. A 1% change in the assumed health care cost trend rate would have the following effects:

| | 1% Increase | 1% Decrease |
|---|---|---|
| Effect on postretirement benefits service and interest cost | $ 3 | $ (2) |
| Effect on postretirement benefit obligation | 22 | (19) |



DA02089

| | Pension Benefits | | | Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 2000 | 1999 | 1998 |
| Components of Net Periodic Benefit Cost | | | | | | |
| Service Cost | $ 40 | $ 51 | $ 39 | $ 8 | $ 9 | $ 8 |
| Interest Cost | 119 | 102 | 98 | 23 | 20 | 21 |
| Expected Return on Plan Assets | (145) | (118) | (101) | -- | -- | -- |
| Amortization of Transition Obligation | -- | -- | 6 | -- | -- | -- |
| Amortization of Prior Service Cost | 2 | 1 | 1 | (1) | (1) | (4) |
| Recognized Net Actuarial (Gain) Loss | (9) | 22 | 12 | -- | -- | (1) |
| Net Periodic Benefit Cost | 7 | 58 | 55 | 30 | 28 | 24 |
| Special Termination Benefits - Workforce Reduction Program/Curtailments | 2 | 23 | -- | 6 | 1 | -- |
| Net Periodic Benefit Cost Including Special Termination Benefits | $ 9 | $ 81 | $ 55 | $ 36 | $ 29 | $ 24 |

During 1999, certain assets and obligations of Conrail's primary defined benefit pension plan were transferred to the pension plans of CSX and Norfolk Southern. The CSX plan received $260 million of plan assets at fair value and assumed $42 million of benefit obligations.

In December 1999, pursuant to a workforce reduction initiative that offered a retirement benefit enhancement to employees electing early retirement, the company recorded a non-recurring charge that included $23 million of special termination pension benefits and $1 million of special termination postretirement benefits.

As a result of the 1999 workforce reduction initiative and the sale of assets comprising the international liner business of Sea-Land, a significant number of employees participating in pension and postretirement benefit plans sponsored by CSX have terminated active employment and the plans have experienced a curtailment. Because both curtailment events occurred after the Sept. 30, 1999 measurement date, the effect of the curtailment was not recognized in the company's financial statements until fiscal year 2000. CSX recorded a net pre-tax curtailment loss on pension postretirement liabilities of approximately $2 million in the first quarter of 2000. In addition, the company recorded a $6 million charge in the 4th quarter of 2000, related to an additional workforce reduction plan initiated in September 2000.

During 2000 and 1999, CSX recorded changes in its minimum pension liability. These changes did not affect net earnings, but are a component of accumulated other comprehensive loss on an after-tax basis. In 2000 the minimum pension liability decreased by $23 million. In 1999, the minimum pension liability decreased by $158 million, principally due to the transfer of assets from Conrail's pension plan and to higher interest rates, which increased the discount applied to pension obligations.

**Other Plans**

The company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $14 million, $28 million, and $20 million for 2000, 1999 and 1998, respectively.

Under collective bargaining agreements, the company participates in a number of union-sponsored, multiemployer benefit plans. Payments to these plans are made as part of aggregate assessments generally based on number of employees covered, hours worked, tonnage moved or a combination thereof. Total contributions of $250 million, $247 million and $235 million were made to these plans in 2000, 1999 and 1998, respectively.

**Note 18. Commitments and Contingencies.**

**Lease Commitments**

In addition to the agreements covering routes and equipment leased from Conrail (See Note 3), the company leases equipment from other parties under agreements with terms up to 21 years. Non-cancelable, long-term leases generally include options to purchase at fair value and to extend the terms. At Dec. 29, 2000, minimum building and equipment rentals under these operating leases totaled approximately $228 million for 2001, $190 million for 2002, $180 million for 2003, $169 million for 2004, $121 million for 2005 and $1.1 billion thereafter. Rent expense on operating leases, exclusive of the Conrail agreements, totaled $730 million in 2000, $1.2 billion in 1999 and $1.1 billion in 1998. These amounts include net daily rental charges on railroad operating equipment of $369 million, $381 million and $258 million in 2000, 1999 and 1998, respectively.

**Contingencies**

**Guarantees**

The company and its subsidiaries are contingently liable individually and jointly with others as guarantors of long-term debt and obligations principally relating to leased equipment, joint ventures and joint facilities. These contingent obligations were not material to the company's results of operations and financial position at Dec. 29, 2000. CSX also remains contingently liable for certain lease obligations assumed by Maersk as part of its purchase of the international liner business. CSX believes that Maersk will fulfill its contractual commitments with respect to such leases and that CSX will have no further liability for those obligations.

**New Orleans Tank Car Fire**

In September 1997, a state court jury in New Orleans, Louisiana returned a $2.5 billion punitive damages award against CSX Transportation, Inc. (CSXT), the wholly-owned rail subsidiary of CSX. The award was made in a class-action lawsuit against a group of nine companies based on personal injuries alleged to

have arisen from a 1987 fire. The fire was caused by a leaking chemical tank car parked on CSXT tracks and resulted in the 36-hour evacuation of a New Orleans neighborhood. In the same case, the court awarded a group of 20 plaintiffs compensatory damages of approximately $2 million against the defendants, including CSXT, to which the jury assigned 15 percent of the responsibility for the incident. CSXT's liability under that compensatory damages award is not material, and adequate provision has been made for the award.

In October 1997, the Louisiana Supreme Court set aside the punitive damages judgment, ruling the judgment should not have been entered until all liability issues were resolved. In February 1999, the Louisiana Supreme Court issued a further decision, authorizing and instructing the trial court to enter individual punitive damages judgments in favor of the 20 plaintiffs who had received awards of compensatory damages, in amounts representing an appropriate share of the jury's award. The trial court on April 8, 1999 entered judgment awarding approximately $2 million in compensatory damages and approximately $8.5 million in punitive damages to those 20 plaintiffs. Approximately $6.2 million of the punitive damages awarded were assessed against CSXT. CSXT then filed post-trial motions for a new trial and for judgment notwithstanding the verdict as to the April 8 judgment.

The new trial motion was denied by the trial court in August 1999. On November 5, 1999, the trial court issued an opinion that granted CSXT's motion for judgment notwithstanding the verdict and effectively reduced the amount of the punitive damages verdict from $2.5 billion to $850 million. CSXT believes that this amount (or any amount of punitive damages) is unwarranted and intends to pursue its full appellate remedies with respect to the 1997 trial as well as the trial judge's decision on the motion for judgment notwithstanding the verdict. The compensatory damages awarded by the jury in the 1997 trial were also substantially reduced by the trial judge. A judgment reflecting the $850 million punitive award has been entered against CSXT. CSXT has obtained and posted an appeal bond in the amount of $895 million, which will allow it to appeal the 1997 compensatory and punitive awards, as reduced by the trial judge.

A trial for the claims of 20 additional plaintiffs for compensatory damages began on May 24, 1999. In July 1999, the jury in that trial rendered verdicts totaling approximately $330 thousand in favor of eighteen of those twenty plaintiffs. Two plaintiffs received nothing; that is, the jury found that they had not proved any damages. Management believes that this result, while still excessive, supports CSXT's contention that the punitive damages award was unwarranted.

In 1999, six of the nine defendants in the case reached a tentative settlement with the plaintiffs group. The basis of that settlement is an agreement that all claims for compensatory and punitive damages against the six defendants would be compromised for the sum of $215 million. That settlement was approved by the trial court in early 2000.

In 2000, the City of New Orleans recently was granted permission by the trial court to assert an amended claim against CSXT, including a newly asserted claim for punitive damages. The City's case was originally filed in 1988, and while based on the 1987 tank car fire, is not considered to be part of the class action.

Oral argument in the Louisiana Court of Appeal for the Fourth Circuit with regard to CSXT's appeal was held on Janu-ary 12, 2001. A ruling is expected some time this year. Any review beyond that court is by discretionary writ.

CSXT continues to pursue an aggressive legal strategy. At the present time, management is not in a position to determine whether the resolution of this case will have a material adverse effect on the Company's financial position or results of operations in any future reporting period.

**ECT Dispute**

Recently, CSX received a claim amounting to approximately $180 million plus interest from Europe Container Terminals bv (ECT), owner of the Rotterdam Container Terminal previously operated by Sea-Land prior to its sale to Maersk in December 1999. ECT has claimed that the sale of the international liner business to Maersk resulted in a breach of the Sea-Land terminal agreements. ECT has refused to accept containers at the former Sea-Land facility tendered by Maersk Sea-Land and is seeking compensation from CSX related to the alleged breach. CSX has also advised Maersk that CSX holds them responsible for any damages that may result from this case. Management's initial evaluation of the claim indicates that valid defenses exist, but at this point management cannot estimate what, if any losses may result from this case.

**Self-Insurance**

Although the company obtains substantial amounts of commercial insurance for potential losses for third-party liability and property damage, reasonable levels of risk are retained on a self-insurance basis. A portion of the insurance coverage, $25 million limit above $100 million per occurrence from rail and certain other operations, is provided by a company partially owned by CSX.

**Environmental**

CSXT is a party to various proceedings involving private parties and regulatory agencies related to environmental issues. CSXT has been identified as a potentially responsible party (PRP) at 234 environmentally impaired sites that are or may be subject to remedial action under the Federal Superfund statute (Superfund) or similar state statutes. A number of these proceedings are based on allegations that CSXT, or its railroad predecessors, sent hazardous substances to the facilities in question for disposal. Such proceedings arising under Superfund or similar state statutes can involve numerous other waste generators and disposal companies and seek to allocate or recover costs associated with site investigation and cleanup, which could be substantial.

CSXT is involved in a number of administrative and judicial proceedings and other clean-up efforts at 116 sites, including the sites addressed under the Federal Superfund statute or similar state statutes, where it is participating in the study and/or clean-up of alleged environmental contamination. The assess-

ment of the required response and remedial costs associated with most sites is extremely complex. Cost estimates are based on information available for each site, financial viability of other PRPs, where available, and existing technology, laws and regulations. CSXT's best estimates of the allocation method and percentage of liability when other PRPs are involved are based on assessments by consultants, agreements among PRPs, or determinations by the U.S. Environmental Protection Agency or other regulatory agencies.

At least once each quarter, CSXT reviews its role, if any, with respect to each such location, giving consideration to the nature of CSXT's alleged connection to the location (i.e., generator, owner or operator), the extent of CSXT's alleged connection (i.e., volume of waste sent to the location and other relevant factors), the accuracy and strength of evidence connecting CSXT to the location, and the number, connection and financial position of other named and unnamed PRPs at the location. The ultimate liability for remediation can be difficult to determine with certainty because of the number and credit- worthiness of PRPs involved. Through the assessment process, CSXT monitors the creditworthiness of such PRPs in determining ultimate liability.

Based upon such reviews and updates of the sites with which it is involved, CSXT has recorded, and reviews at least quarterly for adequacy, reserves to cover estimated contingent future environmental costs with respect to such sites. The recorded liabilities for estimated future environmental costs at Dec. 29, 2000 and Dec. 31, 1999, were $41 million and $53 million, respectively. These recorded liabilities, which are undis-counted, include amounts representing CSXT's estimate of unasserted claims, which CSXT believes to be immaterial. The liability has been accrued for future costs for all sites where the company's obligation is probable and where such costs can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. The majority of the Dec. 29, 2000, environmental liability is expected to be paid out over the next five to seven years, funded by cash generated from operations.

The company does not currently possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters will not materially affect its overall results of operations and financial condition.

**Other Legal Proceedings**

A number of legal actions are pending against CSX and certain subsidiaries in which claims are made in substantial amounts. While the ultimate results of environmental investigations, lawsuits and claims against the company cannot be predicted with certainty, management does not currently expect that resolution of these matters will have a material adverse effect on CSX's consolidated financial position, results of operations or cash flows. The company is also party to a number of actions, the resolution of which could result in gain realization in amounts that could be material to results of operations in the quarter received.

**Note 19. Business Segments.**

The company operates in four business segments: Rail, Intermodal, Domestic Container Shipping, and International Terminals. The Rail segment provides rail freight transportation over a network of more than 23,400 route miles in 23 states, the District of Columbia and two Canadian provinces. The Inter-modal segment provides transcontinental intermodal transportation services and operates a network of dedicated inter-modal facilities across North America. The Domestic Container Shipping segment consists of a fleet of 16 ocean vessels and 27,000 containers serving the trade between ports on the United States mainland and Alaska, Guam, Hawaii and Puerto Rico. The International Terminals segment operates container freight terminal facilities at 12 locations in Hong Kong, China, Australia, Europe, Russia and the Dominican Republic. Prior to the sale of its international liner operations in December 1999 (see Note 4), Marine Services (formerly known as the Container Shipping segment) provided global transportation services via a fleet of 91 container ships and more than 220,000 containers. The company's segments are strategic business units that offer different services and are managed separately based on the differences in these services. Because of their close interrelationship, the Rail and Intermodal segments are viewed on a combined basis as Surface Transportation operations and the Domestic Container Shipping and International Terminals segments are viewed on a combined basis as Marine Services operations.

The company evaluates performance and allocates resources based on several factors, of which the primary financial measure is business segment operating income, defined as income from operations, excluding the effects of non- recurring charges and gains. The accounting policies of the segments are the same as those described in the summary of significant accounting policies (Note 1), except that for segment reporting purposes, CSX includes minority interest expense on the international terminals segment's joint venture businesses in operating expense. These amounts are reclassified in CSX's consolidated financial statements to other income. Intersegment sales and transfers are generally accounted for as if the sales or transfers were to third parties, that is, at current market prices.

Business segment information for fiscal years 2000, 1999 and 1998 is as follows:

| | Surface Transportation | | | Marine Services | | | |
|---|---|---|---|---|---|---|---|
| Fiscal year ended Dec. 29, 2000 | Rail | Intermodal | Total | Domestic Container Shipping | International Terminals | Total | Total |
| Revenue from External Customers | $ 6,075 | $ 1,148 | $ 7,223 | $ 666 | $ 302 | $ 968 | $ 8,191 |
| Intersegment Revenue | -- | 20 | 20 | -- | 3 | 3 | 23 |
| Operating Income | 615 | 98 | 713 | -- | 71 | 71 | 784 |
| Assets | 12,945 | 423 | 13,368 | 341 | 781 | 1,122 | 14,490 |
| Depreciation Expense | 496 | 29 | 525 | 20 | 7 | 27 | 552 |
| Property Additions | 822 | 18 | 840 | 16 | 8 | 24 | 864 |

| | Surface Transportation | | | | |
|---|---|---|---|---|---|
| Fiscal year ended Dec. 31, 1999 | Rail | Intermodal | Total | Marine Services | Total |
| Revenue from External Customers | $ 5,623 | $ 943 | $ 6,566 | $ 3,809 | $ 10,375 |
| Intersegment Revenue | -- | 16 | 16 | -- | 16 |
| Operating Income | 823 | 84 | 907 | 48 | 955 |
| Assets | 12,985 | 401 | 13,386 | 1,290 | 14,676 |
| Depreciation Expense | 469 | 24 | 493 | 90 | 583 |
| Property Additions | 1,298 | 63 | 1,361 | 86 | 1,447 |

| | Surface Transportation | | | | |
|---|---|---|---|---|---|
| Fiscal year ended Dec. 25, 1998 | Rail | Intermodal | Total | Marine Services | Total |
| Revenue from External Customers | $ 4,956 | $ 618 | $ 5,574 | $ 3,916 | $ 9,490 |
| Intersegment Revenue | -- | 30 | 30 | -- | 30 |
| Operating Income | 1,001 | 33 | 1,034 | 37 | 1,071 |
| Assets | 11,897 | 217 | 12,114 | 2,453 | 14,567 |
| Depreciation Expense | 450 | 18 | 468 | 130 | 598 |
| Property Additions | 1,212 | 99 | 1,311 | 54 | 1,365 |

A reconciliation of the totals reported for business segments to the applicable line items in the consolidated financial statements is as follows:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Revenue: | | | |
| Revenue from External Customers for Business Segments | $ 8,191 | $ 10,375 | $ 9,490 |
| Intersegment Revenue for Business Segments | 23 | 16 | 30 |
| Elimination of Intersegment Revenue | (23) | (16) | (30) |
| Total Consolidated Revenue | $ 8,191 | $ 10,375 | $ 9,490 |
| Operating income: | | | |
| Operating Income for Business Segments | $ 784 | $ 955 | $ 1,071 |
| Reclassification of Minority Interest Expense | 42 | 40 | 34 |
| Loss on Sale, Net of Depreciation Benefit | -- | (360) | -- |
| Workforce Reduction Program | -- | (55) | -- |
| Restructuring Credit | -- | -- | 30 |
| Unallocated Corporate Expenses | (21) | (7) | (4) |
| Total Consolidated Operating Income | $ 805 | $ 573 | $ 1,131 |
| Assets: | | | |
| Assets for Business Segments | $ 14,490 | $ 14,676 | $ 14,567 |
| Investment in Conrail | 4,668 | 4,663 | 4,798 |
| Elimination of Intercompany Receivables | (186) | (32) | (36) |
| Non-segment Assets/(a)/ | 1,563 | 1,413 | 1,098 |
| Total Consolidated Assets | $ 20,535 | $ 20,720 | $ 20,427 |
| Depreciation Expense: | | | |
| Depreciation Expense for Business Segments | $ 552 | $ 583 | $ 598 |
| Non-segment Depreciation/(a)/ | 48 | 38 | 32 |
| Total Consolidated Depreciation Expense | $ 600 | $ 621 | $ 630 |

| | | | |
|---|---|---|---|
| Property Additions: | | | |
| Property Additions for Business Segments | $ 864 | $ 1,447 | $ 1,365 |
| Non-segment Property Additions/(a)/ | 49 | 70 | 114 |
| Total Consolidated Property Additions | $ 913 | $ 1,517 | $ 1,479 |

Marine Services includes minority interest expense which is reclassified to other income in eliminations and other. Marine Services 1999 and 1998 operating expenses have been restated to conform to 2000 presentation.

(a) Non-segment assets include corporate cash and cash equivalents and assets of non-transportation businesses and discontinued operations. Non-segment depreciation and property additions are primarily attributable to non- transportation businesses and discountinued Operations. Principal non- transportation businesses include real estate and resort operations and information technology subsidiaries serving multiple segments.

Included in the consolidated financial statements are the following amounts related to geographic locations:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Revenues:/(b)/ | | | |
| United States | $ 7,895 | $ 8,141 | $ 7,266 |
| Asia | 249 | 1,378 | 1,239 |
| Europe | 24 | 516 | 668 |
| Other | 23 | 340 | 317 |
| Total Consolidated Revenues | $ 8,191 | $ 10,375 | $ 9,490 |

(b) Revenues are attributed to geographic locations based on port of origin for container-shipping operations and the location of the service provided for all other operations.

More than 95% of the company's long-lived assets are located in the United States. The company does not have a single external customer that represents 10% or more of its consolidated revenue.

**Report of Ernst & Young LLP, Independent Auditors**

**To the Shareholders and Board of Directors of CSX Corporation**

We have audited the accompanying consolidated statements of financial position of CSX Corporation and subsidiaries as of December 29, 2000 and December 31, 1999, and the related consolidated statements of earnings, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 29, 2000. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 29, 2000 and December 31, 1999 and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 29, 2000, in conformity with accounting principles generally accepted in the United States.

As discussed in Note 2 to the Consolidated Financial Statements, in 1999 the company changed its method of accounting for insurance-related assessments.

**Ernst & Young LLP**

Richmond, Virginia
February 14, 2001

Quarterly Financial Data (Unaudited)

| Year | 2000 | | | | 1999 | | | |
|---|---|---|---|---|---|---|---|---|
| Quarter | 1st | 2nd | 3rd | 4th | 1st | 2nd | 3rd | 4th |
| Operating Revenue | $2,034 | $2,071 | $2,039 | $2,047 | $2,433 | $ 2,509 | $2,807 | $2,626 |
| Operating Expense | 1,860 | 1,882 | 1,815 | 1,829 | 2,165 | 2,246 | 2,797 | 2,594 |
| Operating Income | 174 | 189 | 224 | 218 | 268 | 263 | 10 | 32 |
| Other Income and Expense | | | | | | | | |
| Other Income | (5) | 24 | 3 | (7) | (35) | 23 | 17 | 47 |
| Interest Expense | 134 | 139 | 140 | 130 | 133 | 127 | 133 | 128 |
| Earnings from Continuing Operations Before Income Taxes | 35 | 74 | 87 | 81 | 100 | 159 | (106) | (49) |
| Income Tax Expense | 10 | 26 | 28 | 27 | 30 | 52 | 12 | (22) |
| Earnings before Discontinued Operations and Cumulative Effect of Accounting Change | 25 | 48 | 59 | 54 | 70 | 107 | (118) | (27) |
| Earnings from Discontinued, Operations, Net of Tax | 4 | 7 | 3 | - | 5 | 7 | 5 | 2 |
| Gain on Sale of Discontinued Operations, Net of Tax | | | 365 | | - | - | - | - |
| Earnings before Cumulative Effect of Accounting Change | 29 | 55 | 427 | 54 | 75 | 114 | (113) | (25) |
| Cumulative Effect on Prior Years of Accounting Change for Insurance-Related Assessments, Net of Tax | - | - | - | - | (49) | - | - | - |
| Net Earnings | $ 29 | $ 55 | $ 427 | $ 54 | $ 26 | $ 114 | $ (113) | $ (25) |
| Per Common Share | | | | | | | | |
| Earnings Per Share: | | | | | | | | |
| Before Discontinued Operations and Cumulative Effect of Accounting Change | $ .12 | $ .23 | $ .28 | $ .26 | $ .34 | $ .51 | $ (.57) | $ (.13) |
| Earnings from Discontinued Operations | .02 | .03 | .01 | - | .02 | .03 | .03 | .01 |
| Gain on Sale of Discontinued Operations | - | - | 1.73 | - | - | - | - | - |
| Cumulative Effect of Accounting Change | - | - | - | - | (.24) | - | - | - |
| Including Discontinued Operations and Cumulative Effect of Accounting Change | $ .14 | $ .26 | $ 2.02 | $ .26 | $ .12 | $ .54 | $ (.54) | $ (.12) |
| Earnings Per Share, Assuming Dilution: | | | | | | | | |
| Before Discontinued Operations and Cumulative Effect of Accounting Change | $ .12 | $ .23 | $ .28 | $ .26 | $ .34 | $ .50 | $ (.57) | $ (.13) |
| Earnings from Discontinued Operations | .02 | .03 | .01 | - | .02 | .03 | .03 | .01 |
| Gain on Sale of Discontinued Operations | - | - | 1.73 | - | - | - | - | - |
| Cumulative Effect of Accounting Change | - | - | - | - | (.24) | - | - | - |
| Including Discontinued operations and Cumulative Effect of Accounting Change | $ .14 | $ .26 | $ 2.02 | $ .26 | $ .12 | $ .53 | $ (.54) | $ (.12) |
| Dividends Per Share | $ .30 | $ .30 | $ .30 | $ .30 | $ .30 | $ .30 | $ .30 | $ .30 |
| Market Price | | | | | | | | |
| High | $33.44 | $24.56 | $27.63 | $27.69 | $45.50 | $ 53.94 | $51.63 | $43.56 |
| Low | $20.25 | $19.50 | $21.00 | $20.06 | $36.00 | $ 36.81 | $41.44 | $28.81 |

All periods have been restated to reflect contract logistics as a discontinued operation.

(a) First quarter 1999 consists of 14 weeks; all other quarters presented consist of 13 weeks.

(b) Third and fourth quarters of 1999 reflect pretax charges of $298 million and $62 million, respectively, to recognize a loss on the sale of international container-shipping assets, net of a benefit from discontinuing depreciation on those assets from the date of the agreement to sell. The charges reduced net earnings by $236 million, $1.11 per share, and $35 million, 16 respective cents per share,in the quarters.

(c) Fourth quarter 1999 includes a $55 million pretax charge for a work-force reduction program. The charge reduced net earnings by $34 million, 16 cents per share.

(d) Second the quarter 1999 includes a pretax gain of $27 million on the sale of the company's Grand Teton Lodge resort subsidiary. The gain increased on the net earnings by $17 million, 8 cents per share.

(e) First quarter 1999 includes a $49 million after-tax charge to recognize the cumulative effect on prior years of adopting a new accounting rule related to workers' compensation second injury fund assessments. The charge reduced earnings per share for the quarter by 24 cents.

Shares Outstanding as of Jan. 26, 2001: 212,982,301 Common Stock Shareholders as of Jan. 26, 2001: 49,083

**Shareholder Information**

---

**Shareholder Services**

Shareholders with questions about their accounts should contact the transfer agent at the address or telephone number shown below.

**Transfer Agent, Registrar and Dividend Disbursing Agent**

Computershare Investor Services LLC
Attn: Shareholder Communications
2 North LaSalle Street
P.O. Box A3504
Chicago, IL 60690-3504 (800) 521-5571
e-mail: web.queries@computershare.com

CSXDirectInvest(sm)
P. O. Box A3309
Chicago, IL 60690-3309
(888) 261-6800 for enrollment information
(800) 521-5571 for all other calls e-mail: web.queries@computershare.com

General questions about CSX or information contained in company publications should be directed to Corporate Communications at the address or telephone number shown below.

**Corporate Communications**

Elisabeth J. Gabrynowicz
Director-Corporate Communications
CSX Corporation
P. O. Box 85629
Richmond, VA 23285-5629
(804) 782-6775
e-mail: Elisabeth_Gabrynowicz@csx.com

Security analysts, portfolio managers or other investment community representatives should contact Investor Relations at the address or telephone number shown below.

**Investor Relations**

Fredrik J. Eliasson
Director of Financial Planning and Investor Relations CSX Corporation
50 N. Laura St., J-100
Jacksonville, FL 32202
(904) 359-3305
e-mail: Fred_Eliasson@csx.com

**Shareholder Services**

Karen L. Kennedy
Administrator-Shareholder Services
CSX Corporation
P. O. Box 85629
Richmond, VA 23285-5629
(804) 782-1465
e-mail: Karen_Kennedy@csx.com

CSX provides dividend reinvestment and stock purchase plans for employees, shareholders and potential shareholders as a convenient method of acquiring CSX shares through direct purchase, dividend reinvestment and optional cash payments.

CSXDirectInvest(SM) permits the purchase and sale of shares directly though Computershare, our transfer agent. Through this plan, no service charges or brokerage commissions apply to share purchases, and sales can be made with minimal charges and commissions. Initial investment for a non-shareholder is $500 plus a $10 one-time enrollment fee. You do not need to own shares of CSX stock to enroll in this plan. However, if you are a current shareholder, the initial investment and enrollment fee are waived.

Other benefits of CSXDirectInvest(SM) include the ability to:

. Reinvest dividends automatically in CSX common stock without payment of any brokerage commissions or service charges, or you may receive dividend payments on some or all of your shares.

. Make optional cash investments with as little as $50 per month, or up to $10,000 per month, without any charges or commissions.

. Make gifts of CSX shares to others through the plan, and present them with a gift memento if desired.

To obtain a prospectus or other information regarding CSXDirectInvest(SM), please call or write the Computershare Dividend Reinvestment Department at the phone number or address above. Or, if you prefer, please visit our web site at www.computershare.com.

**Stock Held in Brokerage Accounts**

When a broker holds your stock, it is usually registered in the broker's name, or "street name." We do not know the identity of shareholders holding stock in this manner. We know only that a broker holds a certain number of shares that may be for any number of customers. Any stock held in a street-name account is not eligible to participate in CSXDirectInvest(SM) (see above). For shares held in a street-name account, you will receive dividend payments, annual reports and proxy materials through your broker. Please notify your broker, not Computer- share, if you wish to eliminate unwanted, duplicate mailings.

**Lost or Stolen Stock Certificates**

If your stock certificates are lost, stolen or in some way destroyed, notify Computershare in writing immediately.

**Multiple Dividend Checks and Duplicate Mailings**

Some shareholders hold their stock on CSX records in similar but different names (e.g. John A. Smith and J.A. Smith). When this occurs, we are required to create separate accounts for each name. Although the mailing addresses are the same, we are required to mail separate dividend checks to each account.

**Consolidating Accounts**

If you want to consolidate separate accounts into one account, contact Computershare for the necessary forms and instructions. When accounts are consolidated, it may be necessary to reissue the stock certificates.

**Dividends**

CSX pays quarterly dividends on its common stock on or about the 15th of March, June, September and December, when declared by the board of directors, to shareholders of record approximately three weeks earlier. CSX offers direct deposit of dividends to shareholders that request it. If you are interested, please contact Computershare at the address or phone number shown above.

**Replacing Dividend Checks**

If you do not receive your dividend check within 10 business days after the payment date or if your check is lost or destroyed, notify Computershare so payment can be stopped and a replacement check issued.

## Corporate Information

### Headquarters

One James Center
901 East Cary Street
Richmond, VA 23219-4031
(804) 782-1400
www.csx.com

### Market Information

CSX's common stock is listed on the New York, London and Swiss stock exchanges and trades with unlisted privileges on the Midwest, Boston, Cincinnati, Pacific and Philadelphia stock exchanges. The official trading symbol is "CSX."

### Description of Common and Preferred Stocks

A total of 300 million shares of common stock are authorized, of which 212,737,613 shares were outstanding as of Dec. 29, 2000. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre- emptive rights. At Dec. 29, 2000, there were 48,995 registered common stock shareholders.

A total of 25 million shares of preferred stock are authorized. Series A consists of 250,000 shares of $7 Cumulative Convertible Preferred Stock. All outstanding shares of Series A Preferred Stock were redeemed as of July 31, 1992.

Series B consists of 3 million shares of Junior Participating Preferred Stock, none of which has been issued. These shares will become issuable only when the rights distributed to holders of common stock under the Shareholder Rights Plan adopted by CSX on May 29, 1998, become exercisable.

### Annual Shareholder Meeting

10 a.m., Thursday, May 1, 2001
The Greenbrier
White Sulphur Springs, W.Va.

### Shareholder House Parties at The Greenbrier

Throughout the year, The Greenbrier offers Shareholder House Parties featuring discounted rates and special activities. Shareholder House Parties in 2001 are scheduled for:

Easter - April 12-16
Annual Meeting - April 29-May 2
Labor Day - August 31-September 4

For information on shareholder parties, contact Maryann Sanford, Reservations Department, The Greenbrier, 300 W. Main Street, White Sulphur Springs, WV 24986, or phone toll-free (800) 624-6070 or e-mail to:

**The_Greenbrier@greenbrier.com.**

Again in 2001, The Greenbrier is pleased to extend to all shareholders a 10 percent discount on their Modified American Plan rates, applicable to one visit per year. Reservations will be accepted on a space-available basis. This offer does not apply during CSX House Parties, when rates are already discounted, or if a shareholder is attending a conference being held at The Greenbrier.

### FORM 10-K

A copy of the company's annual report to the Securities and Exchange Commission (Form 10-K) will be furnished without charge to any shareholder upon written request to Shareholder Relations, CSX Corporation, P. O. Box 85269, Richmond, Va. 23285-5629. The Form 10-K also is available on the company's web site at www.csx.com.

**Board of Directors and Officers**

**Board of Directors**

Elizabeth E. Bailey/(1,2,5)/
John C. Hower Professor of Public Policy and Management, The Wharton School,
University of Pennsylvania, Philadelphia, Pa.

H. Furlong Baldwin/(2)/
Chairman
Mercantile Bankshares Corporation,
Baltimore, Md.

Claude S. Brinegar/(5)/
Retired Chief Financial Officer and
Vice Chairman
Unocal Corp., Menlo Park,Calif.

Robert L. Burrus Jr./(4,5)/
Partner and Chairman
McGuireWoods LLP
Richmond, Va.

Bruce C. Gottwald/(1,3,4)/
Chairman and CEO
Ethyl Corporation, Richmond, Va.

John R. Hall/(3,5)/
Former Chairman of Arch Coal Inc. and
Retired Chairman and CEO
Ashland Inc., Ashland, Ky.

E. Bradley Jones/(4)/
Consultant
Former Chairman and CEO
LTV Steel Company, Pepper Pike, Ohio

Robert D. Kunisch/(3,5)/
Special Partner ABS Partners and
Senior Adviser and Former Vice Chairman
CendantCorporation, Hunt Valley, Md.

James W. McGlothlin/(2,4)/
Chairman and CEO
The United Company, Bristol, Va.

Southwood J. Morcott/(2,4)/
Retired Chairman of the Board
Dana Corporation, Toledo, Ohio

Charles E.Rice/(1,3)/
Chairman, Mayport Venture Partners LLC
and Retired Vice Chairman Corporate
Development, Bank of America,
Jacksonville, Fla.

William C. Richardson/(1,5)/
President and CEO
W.K. Kellogg Foundation, Battle Creek, Mich.

Frank S. Royal, M.D./(2,3)/
Physician and Health Care Authority
Richmond, Va.

John W. Snow/(1)/
Chairman, President and CEO
CSX Corporation, Richmond, Va.

Key to committees of the board

1 - Executive, 2 - Audit, 3 - Compensation,
4 - Pension, 5 - Nominating and Organization

**Corporate Officers**

John W. Snow*
Chairman, President and CEO

Paul R. Goodwin*
Vice Chairman and Chief Financial Officer

Mark G. Aron*
Executive Vice President-Law and Public Affairs

Ellen M. Fitzsimmons
Senior Vice President-Law

Andrew B. Fogarty*
Senior Vice President-Corporate Services

Kenneth H. Johnson
Senior Vice President-E-Business

Lester M. Passa*
Senior Vice President-Strategic Planning

William J. Ryan, Jr.
Senior Vice President-Human Resources

Peter J. Shudtz
Senior Vice President-Regulatory Affairs and Washington Counsel

Jesse R. Mohorovic*
Group Vice President-Corporate
Communications and Investor Relations

David A. Boor
Vice President and Treasurer

Asok K. Chaudhuri
Vice President-Financial Planning

Arnold I. Havens
Senior Vice President-Government Affairs

William F. Miller
Vice President-Audit and Advisory Services

James P. Peter
Vice President-Taxes

James L. Ross*
Vice President and Controller

Alan A. Rudnick
Vice President-General
Counsel and Corporate Secretary

Michael J. Ruehling
Vice President-State Relations

James A. Searle Jr.
Vice President-Administration

* Executive officers of the corporation.

**Unit Officers**

CSX Transportation Inc.
Michael J. Ward*
President

Alan F. Crown
Executive Vice President-Transportation

P. Michael Giftos*
Executive Vice President and
Chief Commercial Officer

W. Michael Cantrell
Senior Vice President-Mechanical and
Engineering

James W. Fallon
Senior Vice President-Transportation

Frederick J. Favorite, Jr.*
Senior Vice President-Finance

William J. Flynn
Senior Vice President-Merchandise Service Group

Christopher P. Jenkins
Senior Vice President-Coal Service Group

Howard J. Levy
Senior Vice President-Supply and Services

Franklin E. Pursley
Senior Vice President-Service Design

**CSX Intermodal Inc.**

Clarence W. Gooden
President and CEO

**CSX Lines LLC**

Charles G. Raymond*
President

**CSX World Terminals LLC**

Robert J. Grassi*
President and CEO

CSX Technology Inc.
Charles J. O. Wodehouse, Jr.
President

**The Greenbrier**

Ted J. Kleisner
President and Managing Director

**Yukon Pacific Corporation**

Jeff B. Lowenfels
President and CEO

* Executive officers of the corporation.

**CSX Corporation**

One James Center / 901 East Cary Street / Richmond, VA 23219-4031
(804) 782 1400 / www.csx.com

**CSX Transportation Inc.**

500 Water Street / Jacksonville, FL 32202
(904) 359 3100 / www.csxt.com

**CSX Intermodal Inc.**

301 West Bay Street / Jacksonville FL 32202
(904) 633 1000 / www.csxi.com

**CSX Lines LLC**

2101 Rexford Road / Suite 350 West / Charlotte, NC 28211
(704) 973 7000 / www.csxlines.com

**CSX World Terminals LLC**

2101 Rexford Road / Suite 250 West / Charlotte, NC 28211
(704) 973 7200 / www.csxworldterminals.com

**The Greenbrier**

300 West Main Street / White Sulphur Springs, WV 24986
(304) 536 1110 / www.greenbrier.com

**Yukon Pacific Corporation**

1049 West 5th Avenue / Anchorage, AK 99501
(907) 265 3100 / www.csx.com/business/ypc

**[CSX CORPORATION LOGO]**

**Subsidiaries of the Registrant Exhibit 21**

As of December 29, 2000, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation Inc. (a Virginia corporation), S-L Service Inc. (a Delaware corporation), CSX Rail Holding Corporation (a Delaware corporation) CSX Intermodal, Inc. (a Delaware Corporation) and CSX Northeast Holding Corporation (a Delaware corporation)

As of December 29, 2000, the other subsidiaries included in the Registrant's consolidated financial statements, both individually and in the aggregate, did

not constitute a significant subsidiary.

**EXHIBIT 23.1**

**Consent of Independent Auditors**

We consent to the incorporation by reference in this Annual Report (Form 10-K) of CSX Corporation and subsidiaries (CSX) of our report dated February 14, 2001, included in the 2000 Annual Report to Shareholders of CSX.

We also consent to the incorporation by reference in each Form S-3 Registration Statement or Post-Effective Amendment (Registration Nos. 33-2084 and 333-54700) and in each Form S-8 Registration Statement (Registration Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41736, 33-57029, 333-09213, 333-73427, 333-73429, 333-32008, 333-43382, and 333-48896) of our report dated February 14, 2001, with respect to the consolidated financial statements of CSX incorporated by reference in this Annual Report (Form 10-K) for the fiscal year ended December 29, 2000.

Our audits also included Note 20 to the consolidated financial statements of CSX listed in Item 14(a). Note 20 is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, Note 20 to the consolidated financial statements referred to above, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

*/s/ ERNST & YOUNG LLP*

*Richmond, Virginia*

*February 28, 2001*

**EXHIBIT 23.2**

**Consent of Independent Auditors**

We consent to the use of our report dated January 23, 2001, with respect to the consolidated financial statements of Conrail Inc. and subsidiaries as of December 31, 2000 in this Annual Report (Form 10-K) of CSX Corporation and subsidiaries (CSX).

We also consent to the incorporation by reference in each Form S-3 Registration Statement or Post-Effective Amendment (Registration Nos. 33-2084 and 333-54700) and in each Form S-8 Registration Statement (Registration Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41736, 33-57029, 333-09213, 333-73427, 333-73429, 333-32008, 333-43382 and 333-48896) of our report dated January 23, 2001, with respect to the consolidated financial statements of Conrail Inc. and subsidiaries as of December 31, 2000 included in this Annual Report (Form 10-K) of CSX for the fiscal year ended December 29, 2000.

| | |
|---|---|
| */s/ ERNST & YOUNG LLP* | */s/ KPMG LLP* |
| *Richmond, Virginia* | *Norfolk, Virginia* |
| *February 27, 2001* | *February 27, 2001* |

**Exhibit 23.3**

**CONSENT OF PRICEWATERHOUSECOOPERS LLP, INDEPENDENT ACCOUNTANTS**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (Nos. 33-2084 and 333-54700), and in the Registration Statements on Form S-8 (Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41736, 33-57029, 333-09213, 333-32008, 333-43382, 333-48896, 333-73427, and 333-73429) of CSX Corporation of our report dated January 19, 1999 relating to the consolidated statements of income, of stockholders' equity and of cash flows of Conrail Inc. and subsidiaries for the year ended December 31, 1998, which appears in the Annual Report on Form 10-K of CSX Corporation for the fiscal year ended December 29, 2000.

*/s/ PRICEWATERHOUSECOOPERS LLP*
*PRICEWATERHOUSECOOPERS LLP*
*Philadelphia, Pennsylvania*

*February 28, 2001*

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D.C., a Form 10-K (Annual Report), hereby constitutes and appoints Paul R. Goodwin and Ellen M. Fitzsimmons his true and lawful attorneys-in-fact and agents, for him and in his name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this 14th day of February, 2001.

| | |
|---|---|
| /s/ Elizabeth E. Bailey<br>Elizabeth E. Bailey | /s/ James W. McGlothlin<br>James W. McGlothlin |
| /s/ H. Furlong Baldwin<br>H. Furlong Baldwin | /s/ Southwood J. Morcott<br>Southwood J. Morcott |
| /s/ Claude S. Brinegar<br>Claude S. Brinegar | /s/ Charles E. Rice<br>Charles E. Rice |
| /s/ Robert L. Burrus, Jr.<br>Robert L. Burrus, Jr. | /s/ William C. Richardson<br>William C. Richardson |
| /s/ Bruce C. Gottwald<br>Bruce C. Gottwald | /s/ Frank S. Royal<br>Frank S. Royal |
| /s/ John R. Hall<br>John R. Hall | /s/ John W. Snow<br>John W. Snow |
| /s/ E. Bradley Jones<br>E. Bradley Jones | /s/ Paul R. Goodwin<br>Paul R. Goodwin |
| /s/ Robert D. Kunisch<br>Robert D. Kunisch | /s/ James L. Ross<br>James L. Ross |

**REPORT OF MANAGEMENT**

The Stockholders
Conrail Inc.

Management is responsible for the preparation, integrity and objectivity of the Company's financial statements. The financial statements are prepared in conformity with generally accepted accounting principles and include amounts based on management's best estimates and judgment.

The Company maintains a system of internal accounting controls and procedures, which is continually reviewed and supported by written policies and guidelines and supplemented by internal audit services. The system provides reasonable assurance that assets are safeguarded against loss from unauthorized use and that the books and records reflect the transactions of the Company and are reliable for the preparation of financial statements. The concept of reasonable assurance recognizes that the cost of a system of internal accounting controls should not exceed the benefits derived and also recognizes that the evaluation of these factors necessarily requires estimates and judgments by management.

The Company's financial statements are audited by its independent accountants. Their audit is conducted in accordance with auditing standards generally accepted in the United States and includes a study and evaluation of the Company's system of internal accounting controls to determine the nature, timing and extent of the auditing procedures required for expressing an opinion on the Company's financial statements.

The Company's Board of Directors, which is comprised of an equal number of directors from Norfolk Southern Corporation ("NSC") and CSX Corporation ("CSX"), pursues its oversight responsibilities for the financial statements and corporate conduct through periodic meetings with and written reports from the Company's management.

Timothy T. O'Toole
President and Chief
Executive Officer

John A. McKelvey
Senior Vice President-
Finance & Administration

January 23, 2001

**INDEPENDENT AUDITORS' REPORT**

The Stockholders and Board of Directors
Conrail Inc.:

We have audited the accompanying consolidated balance sheets of Conrail Inc. and subsidiaries as of December 31, 2000 and 1999, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2000. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. The consolidated financial statements of Conrail Inc. and subsidiaries as of December 31, 1998, and the accompanying related consolidated statements of income, stockholders' equity and cash flows for the year then ended were audited by other auditors whose report thereon dated January 19, 1999, expressed an unqualified opinion on those statements.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Conrail Inc. and subsidiaries as of December 31, 2000 and 1999, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States of America.

KPMG LLP Ernst & Young LLP Norfolk, Virginia Richmond, Virginia

January 23, 2001

**REPORT OF INDEPENDENT ACCOUNTANTS**

The Stockholders and Board of Directors
Conrail Inc.

In our opinion, the accompanying consolidated statements of income, of stockholders' equity and of cash flows for the year ended December 31, 1998 present fairly, in all material respects, the results of operations and cash flows of Conrail Inc. and subsidiaries for the year ended December 31, 1998, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion. We have not audited the consolidated financial statements of Conrail Inc. and subsidiaries for any period subsequent to December 31, 1998.

*/s/ PRICEWATERHOUSECOOPERS LLP*

*PRICEWATERHOUSECOOPERS LLP*
*Philadelphia, Pennsylvania*

*January 19, 1999*

## CONRAIL INC.
## CONSOLIDATED STATEMENTS OF INCOME

| ($ In Millions) | 2000 | 1999 | 1998 |
|---|---|---|---|
| | Years ended December 31, | | |
| Revenues - NSC/CSX (Note 2) | $ 886 | $ 549 | $ - |
| Revenues - Third parties | 99 | 1,625 | 3,863 |
| Total operating revenues | 985 | 2,174 | 3,863 |
| Operating expenses (Note 3) | | | |
| Compensation and benefits | 195 | 645 | 1,489 |
| Fuel | 10 | 63 | 163 |
| Material, services and rents | 162 | 590 | 909 |
| Depreciation and amortization | 331 | 328 | 310 |
| Casualties and insurance | 33 | 228 | 230 |
| Other | 18 | 192 | 247 |
| Total operating expenses | 749 | 2,046 | 3,348 |
| Income from operations | 236 | 128 | 515 |
| Interest expense | (124) | (150) | (153) |
| Other income, net (Note 10) | 155 | 67 | 72 |
| Income before income taxes | 267 | 45 | 434 |
| Income taxes (Note 7) | 97 | 19 | 167 |
| Net income | $ 170 | $ 26 | $ 267 |

See accompanying notes to the consolidated financial statements.

# CONRAIL INC.
# CONSOLIDATED BALANCE SHEETS

| ($ In Millions) | December 31, 2000 | 1999 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 50 | $ 22 |
| Accounts receivable | 33 | 51 |
| Due from NSC/CSX (Note 2) | 232 | 196 |
| Notes receivable from NSC/CSX (Note 2) | 91 | 216 |
| Material and supplies | 9 | 29 |
| Deferred tax assets (Note 7) | 96 | 149 |
| Other current assets | 9 | 6 |
| Total current assets | 520 | 669 |
| Property and equipment, net (Note 4) | 6,996 | 7,143 |
| Other assets | 544 | 571 |
| Total assets | $8,060 | $8,383 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Current maturities of long-term debt (Note 6) | 61 | 319 |
| Accounts payable | 68 | 59 |
| Due to NSC/CSX (Note 2) | 31 | 159 |
| Wages and employee benefits | 42 | 43 |
| Casualty reserves | 127 | 136 |
| Accrued and other current liabilities (Note 5) | 106 | 147 |
| Total current liabilities | 435 | 863 |
| Long-term debt (Note 6) | 1,229 | 1,302 |
| Casualty reserves | 189 | 311 |
| Deferred income taxes (Note 7) | 1,938 | 1,817 |
| Other liabilities | 287 | 271 |
| Total liabilities | 4,078 | 4,564 |
| Commitments and contingencies (Note 11) | | |
| Stockholders' equity (Notes 3 and 9) | | |
| Common stock ($1 par value; 100 shares authorized, issued and outstanding) | - | - |
| Additional paid-in capital | 2,222 | 2,229 |
| Unearned ESOP compensation | (20) | (20) |
| Retained earnings | 1,780 | 1,610 |
| Total stockholders' equity | 3,982 | 3,819 |
| Total liabilities and stockholders' equity | $8,060 | $8,383 |

See accompanying notes to the consolidated financial statements.

## CONRAIL INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Unearned ESOP Compensation | Common Stock | Additional Paid-in Capital | Retained Earnings | Treasury Stock |
|---|---|---|---|---|---|
| Balance, January 1, 1998 | $ (155) | $ 6 | $ 3,006 | $ 1,324 | $ (742) |
| Net income | | | | 267 | |
| Common dividends | | | | (7) | |
| Common shares reclassified as unissued (Note 9) | | (6) | (736) | | 742 |
| Allocation of unearned ESOP compensation | 80 | | | | |
| Other | | | 21 | | |
| Balance, December 31, 1998 | (75) | - | 2,291 | 1,584 | - |
| Net income | | | | 26 | |
| Transfer of portion of prepaid pension assets to NSC and CSX (Note 8) | | | (54) | | |
| Allocation of unearned ESOP compensation | 55 | | | | |
| Other | | | (8) | | |
| Balance, December 31, 1999 | (20) | - | 2,229 | 1,610 | - |
| Net income | | | | 170 | |
| Other | | | (7) | | |
| Balance, December 31, 2000 | $ (20) | $ - | $ 2,222 | $ 1,780 | $ - |

See accompanying notes to the consolidated financial statements.

**CONRAIL INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| ($ In Millions) | 2000 | 1999 | 1998 |
|---|---|---|---|
| | Years ended December 31, | | |
| Cash flows from operating activities | | | |
| Net income | $ 170 | $ 26 | $ 267 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Transition and acquisition-related charges (Note 3) | | | 368 |
| Depreciation and amortization | 331 | 328 | 310 |
| Deferred income taxes | 101 | 48 | (30) |
| Gains from sales of property | (70) | (6) | (21) |
| Pension credit | (12) | (45) | (63) |
| Dividends from affiliated companies | 55 | | |
| Changes in: | | | |
| Accounts receivable | 18 | 529 | 33 |
| Accounts and wages payable | 8 | (431) | (33) |
| Due from NSC/CSX | (36) | (196) | |
| Due to NSC/CSX | (128) | 159 | |
| Other | (75) | (16) | (104) |
| Net cash provided by operating activities | 362 | 396 | 727 |
| Cash flows from investing activities | | | |
| Property and equipment acquisitions | (220) | (176) | (537) |
| Notes receivable from NSC/CSX | 125 | (216) | |
| Proceeds from disposals of properties | 86 | 6 | 19 |
| Other | (7) | (14) | (32) |
| Net cash provided by (used in) investing activities | (16) | (400) | (550) |
| Cash flows from financing activities | | | |
| Payment of long-term debt | (318) | (112) | (119) |
| Other | | | (17) |
| Net cash used in financing activities | (318) | (112) | (136) |
| Increase(decrease) in cash and cash equivalents | 28 | (116) | 41 |
| Cash and cash equivalents | | | |
| Beginning of year | 22 | 138 | 97 |
| End of year | $ 50 | $ 22 | $ 138 |

See accompanying notes to the consolidated financial statements.

## CONRAIL INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. Summary of Significant Accounting Policies

**Description of Business**

Conrail Inc. ("Conrail") is a holding company whose principal subsidiary is Consolidated Rail Corporation ("CRC"), the major freight railroad in the Northeast. Norfolk Southern Corporation ("NSC") and CSX Corporation ("CSX"), the major railroads in the Southeast, jointly control Conrail through their ownership interests in CRR Holdings LLC ("CRR"), whose primary subsidiary is Green Acquisition Corporation, which owns Conrail. NSC and CSX have equity interests in CRR of 58% and 42%, respectively, and voting interests of 50% each. From May 23, 1997, the date NSC and CSX completed their acquisition of Conrail stock, until June 1, 1999, Conrail's operations continued substantially unchanged while NSC and CSX awaited regulatory approvals and prepared for the integration of their respective Conrail routes and assets to be leased to their railroad subsidiaries, Norfolk Southern Railway Company ("NSR") and CSX Transportation, Inc. ("CSXT"). The operations of CRC substantially changed beginning June 1, 1999, when NSC and CSX began operating a portion of the Conrail properties under operating agreements (the "Closing Date") (Note 2).

Beginning June 1, 1999, Conrail's major sources of operating revenues are operating fees and lease rentals from NSC and CSX. The composition of CRC's operating expenses also reflects this change in operations. As a result, Conrail's 1999 results reflect the freight railroad operations of CRC through May 31, 1999, and reflect Conrail's new structure and operations that commenced on the Closing Date (Note 2).

**Principles of Consolidation**

The consolidated financial statements include Conrail and majority-owned subsidiaries. Investments in 20% to 50% owned companies are accounted for by the equity method.

**Cash Equivalents**

Cash equivalents consist of commercial paper, certificates of deposit and other liquid securities purchased with a maturity of three months or less, and are stated at cost which approximates market value.

**Material and Supplies**

Material and supplies consist of maintenance material valued at the lower of cost or market.

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Property and Equipment**

Property and equipment are recorded at cost. Additions to properties, including those under lease, are capitalized. Maintenance expense is recognized when repairs are performed. Depreciation is provided using the composite straight-line method over estimated service lives. In 2000, the overall depreciation rate averaged 3.0% for all roadway and equipment. The cost (net of salvage) of depreciable property retired or replaced in the ordinary course of business is charged to accumulated depreciation and no gain or loss is recognized.

**Asset Impairment**

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Expected future cash flows from the use and disposition of long- lived assets are compared to the current carrying amounts to determine the potential impairment loss.

**Revenue Recognition**

Revenue prior to June 1, 1999, was recognized proportionally as a shipment moved on the Conrail system from origin to destination. Beginning June 1, 1999, the Company's major sources of revenues are from NSC and CSX, primarily in the form of rental revenues and operating fees which are recognized when earned. Conrail continues to have third party revenues, which are recognized when earned, related to the operations of Indiana Harbor Belt Railroad Company, a 51% owned terminal railroad subsidiary.

**New Accounting Standards**

There were no new accounting standards issued during 2000 which the Company believes will have a material impact on its consolidated financial position, results of operations or cash flows.

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Reclassifications**

Certain prior year data have been reclassified to conform to the 2000 presentation.

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

2. Related Parties Transactions

**Background**

On May 23, 1997, NSC and CSX completed their joint acquisition of Conrail stock. On June 17, 1997, NSC and CSX executed an agreement which generally outlines the methods of governing and operating Conrail and its subsidiaries ("Transaction Agreement"). On July 23, 1998, the Surface Transportation Board ("STB") issued a written opinion that permitted NSC and CSX to exercise operating control of Conrail beginning August 22, 1998. On June 1, 1999, NSC and CSX began to operate over certain Conrail lines.

**Commencement of Operations by NSR and CSXT**

On June 1, 1999, the majority of CRC's routes and assets were segregated into separate subsidiaries of CRC, Pennsylvania Lines LLC ("PRR") and New York Central Lines LLC ("NYC"). PRR and NYC entered into separate but identical operating and lease agreements with NSR and CSXT, respectively, (the "Operating Agreements") which govern substantially all nonequipment assets to be used by NSR and CSXT and have initial 25-year terms, renewable at the options of NSR and CSXT for two 5-year terms. Payments made under the Operating Agreements are based on appraised values that are subject to adjustment every six years to reflect changes in such values. NSR and CSXT have also leased or subleased certain equipment assets at rentals based on appraised values for varying term lengths from PRR and NYC, respectively, as well as from CRC.

NSC and CSX have also entered into agreements with CRC governing other Conrail properties that continue to be owned and operated by Conrail ("the Shared Assets Areas"). NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas plus a profit factor.

Payments made by NSR to Conrail under the Shared Assets agreements were $117 million and $45 million during 2000 and 1999, respectively, of which $17 million and $7 million, were minimum rents. Payments made by CSXT to Conrail under the Shared Assets agreements were $107 million and $43 million during 2000 and 1999, respectively, of which $12 million and $5 million, were minimum rents.

Payments from NSR under the Operating Agreements and lease agreements to PRR amounted to $346 million and $167 million during 2000 and 1999, respectively. Payments from CSXT under the Operating Agreements and lease agreements to NYC amounted to $249 million and $124 million during 2000 and 1999, respectively. In addition, costs necessary to operate and maintain the related assets under these agreements, including leasehold improvements, will be borne by NSR and CSXT. Future minimum lease payments to be received from NSR/CSXT are as follows:

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| $ in Millions | NSR To PRR | NSR To CRC | CSX To NYC | CSX To CRC | Total |
|---|---|---|---|---|---|
| 2001 | $ 304 | $ 24 | $ 244 | $ 17 | $ 589 |
| 2002 | 315 | 27 | 239 | 19 | 600 |
| 2003 | 322 | 30 | 233 | 21 | 606 |
| 2004 | 327 | 32 | 238 | 23 | 620 |
| 2005 | 317 | 34 | 229 | 24 | 604 |
| 2006 and Beyond | 5,005 | 652 | 3,626 | 473 | 9,756 |
| Total | $6,590 | $799 | $4,809 | $577 | $12,775 |

## Related Party Balances and Transactions

"Due from NSC/CSX" at December 31, 2000 and 1999, is primarily comprised of amounts due for the above-described operating and rental activities. Also included in "Due from NSC/CSX" in 1999, are amounts paid by Conrail for separation payments to CRC's agreement employees that were reimbursed by NSC and CSX as required by the Transaction Agreement. As of December 31, 2000 and 1999, the accrued balances due from NSC were $105 million and $91 million, respectively; and the accrued balances due from CSX were $127 million and $105 million, respectively.

PRR and NYC have interest-bearing notes receivable, payable on demand from NSC and CSX of $51 million and $40 million, respectively, at December 31, 2000, included in the "Notes receivable from NSC/CSX" line item on the balance sheet. The notes receivable balances due from NSC and CSX were $123 million and $93 million, respectively, at December 31, 1999. The interest rates on the notes receivable from NSC and CSX are variable and were both 5.9% at December 31, 2000. Interest income related to the PRR and NYC notes receivable was $10 million and $4 million, in 2000 and 1999, respectively.

CRC has entered into service provider agreements with both NSC and CSX, for such services as accounting and administrative processing, personal injury and environmental case handling and other miscellaneous services ("Service Provider Agreements"). Payments made to NSC and CSX under these Service Provider Agreements in 2000 were $44 million and $2 million, respectively, and are included within the various line items of operating expenses. Payments made to NSC in 1999 under the Service Provider Agreements were $5 million. CRC also paid NSC and CSX $8 million and $4 million, respectively, for the rental of locomotives and other equipment during 2000. In addition, CRC paid a subsidiary of CSX $5 million in 2000 and 1999, for rental of various facilities which it occupied subsequent to May 31, 1999. During 2000, CRC also made payments to NSC and CSX of $86 million and $122 million, respectively, related to completing various 1999 capital projects.

"Due to NSC/CSX" includes $29 million and $2 million, to NSC and CSX, respectively, for the services described above for 2000; and $64 million and $29 million to NSC and CSX, respectively, for such services during 1999.

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

In 1999, "Due to NSC/CSX" also included $42 million and $24 million payable to NSC and CSX, respectively, for CRC's vacation liability related to the portion of its work force that became NSC and CSX employees subsequent to May 31, 1999. CRC paid these amounts in 2000.

From time to time, NSC and CSX, as the indirect owners of Conrail, may need to provide some of Conrail's cash requirements through capital contributions, loans, or advances, none of which took place as of December 31, 2000.

Prior to the Closing Date, the Company interchanged freight with both NSC and CSX for transport to destinations both within and outside of Conrail's service region. The Company shares ownership interests with either one or both railroads in various transportation-related entities, all of which are immaterial to the Company's operating results and financial position.

3. Transition, Acquisition-Related and Other Items

During the first quarter of 2000, the Company completed a significant property sale and recognized a gain of $61 million on the sale ($37 million after income taxes), which is included in "Other income, net" (Note 10).

During 1999, the Company recorded net expenses of $138 million ($85 million after income taxes) for adjustments to certain litigation and environmental reserves related to settlements and completion of site reviews and, in accordance with the Transaction Agreement, for the method of settlement of certain casualty liabilities based on an actuarial study and for the assumption of a lease obligation by a subsidiary of CSX. The effects of these adjustments are reflected in the "Casualties and insurance" and "Other" operating expense line items of the income statement for 1999.

During the third quarter of 1998, the Company recorded charges totaling $302 million ($187 million after income taxes), primarily for severance benefits of $170 million covering certain non-union employees, and $132 million of other costs, such as the effect of changing to an actuarial method of valuing certain components of the Company's casualty reserves, primarily included in the "Compensation and benefits" and "Casualties and insurance" operating expense line items of the 1998 income statement, respectively.

The charge for non-union separation benefits represents termination payments made to approximately 1,300 non-union employees whose non-executive positions were eliminated as a result of the joint acquisition of Conrail. Most of these termination payments have been made in the form of supplemental retirement benefits from the Company's overfunded pension plan. During 2000, 1999 and 1998, termination payments of $50 million, $77 million and $9 million were

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

made, respectively. The remaining amount of this liability is expected to be paid out within the next year.

During 1998, the Company recorded charges totaling $66 million ($41 million after income taxes) representing amounts paid to certain non-union employees as incentive to continue their employment with the Company through August 22, 1998, the effective date of the STB approval of the joint acquisition of Conrail, and the subsequent transition period. All of these amounts were subsequently paid out.

In 1997, the Company recorded a long-term liability of $221 million related to the Non-union Employee Stock Ownership Plan ("ESOP") termination, which has not required use of the Company's cash for settlement. Such liability, the balance of which is $20 million at December 31, 2000, is being reduced as the cash proceeds, held by the ESOP as a result of selling its ESOP preferred stock in the joint tender offer, are allocated to eligible ESOP participants.

In 1997, the Company recorded a long-term liability of $110 million in connection with employment "change in control" agreements with certain executives, which became operative as a result of the joint acquisition of Conrail. A portion of the benefits under these agreements, $68 million, was paid in 1998 from the Employee Benefits Trust ("EBT"). The remaining amount will be paid out at the discretion of the executives participating in this program.

4. Property and Equipment

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| | (In Millions) | |
| Roadway | $ 7,500 | $ 7,410 |
| Equipment | 1,573 | 1,573 |
| Less: Accumulated depreciation | (2,340) | (2,154) |
| | 6,733 | 6,829 |
| Capital leases (primarily equipment) | 645 | 696 |
| Accumulated amortization | (382) | (382) |
| | 263 | 314 |
| | $ 6,996 | $ 7,143 |

Substantially all assets are leased to NSR or CSXT (Note 2).

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

5. Accrued and Other Current Liabilities

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| | (In Millions) | |
| Property and corporate taxes | $ 51 | $ 97 |
| Operating leases | 38 | 36 |
| Other | 17 | 14 |
| | $ 106 | $ 147 |

6. Long-Term Debt and Leases

Long-term debt outstanding, including the weighted average interest rates at December 31, 2000, is composed of the following:

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| | (In Millions) | |
| Capital leases | $ 262 | $ 331 |
| Notes payable, 9.75%, due 2000 | - | 250 |
| Debentures payable, 7.88%, due 2043 | 250 | 250 |
| Debentures payable, 9.75%, due 2020 | 550 | 550 |
| Equipment and other obligations, 6.90% | 228 | 240 |
| | 1,290 | 1,621 |
| Less current portion | (61) | (319) |
| | $1,229 | $1,302 |

Interest payments were $121 million in 2000, $149 million in 1999 and $153 million in 1998.

**Leases**

The Company's noncancelable long-term leases generally include options to purchase at fair value and to extend the terms. Capital leases have been discounted at rates ranging from 3.09% to 14.26% and are collateralized by assets with a net book value of $263 million at December 31, 2000.

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Minimum commitments, exclusive of executory costs borne by the Company, are:

| | Capital Leases | Operating Leases |
|---|---|---|
| | (In Millions) | |
| 2001 | $ 63 | $ 70 |
| 2002 | 59 | 63 |
| 2003 | 54 | 52 |
| 2004 | 56 | 53 |
| 2005 | 38 | 59 |
| 2006 - 2010 | 89 | 422 |
| Total | 359 | $ 719 |
| Less interest portion | (97) | |
| Present value | $ 262 | |

Equipment and other obligations mature in 2001 through 2043 and are collateralized by assets with a net book value of $238 million at December 31, 2000. Maturities of long-term debt other than capital leases are $21 million in 2001, $19 million in 2002, $20 million in 2003, $21 million in 2004, $20 million in 2005 and $927 million in total from 2006 through 2043.

Operating lease rent expense was $75 million in 2000, $120 million in 1999 and $121 million in 1998.

7. Income Taxes

The provisions for income taxes are composed of the following:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| | (In Millions) | | |
| Current | | | |
| Federal | $ (5) | $ (30) | $173 |
| State | 1 | 1 | 24 |
| | (4) | (29) | 197 |
| Deferred | | | |
| Federal | 81 | 52 | (27) |
| State | 20 | (4) | (3) |
| | 101 | 48 | (30) |
| | $ 97 | $ 19 | $ 167 |

Reconciliations of the U.S. statutory tax rates with the effective tax rates are as follows:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | 4.2 | 4.2 | 3.2 |
| Nondeductible transition and acquisition-related costs | | 23.9 | |
| Other | (2.9) | (20.9) | .3 |
| Effective tax rate | 36.3% | 42.2% | 38.5% |

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company has reached final settlements with the Internal Revenue Service ("IRS") related to all of the audits of the Company's consolidated federal income tax returns through fiscal year 1995. The Company's consolidated federal income tax returns for April 30, 1996, December 31, 1996 and May 23, 1997, are currently being examined by the IRS. Federal and state income tax payments were $3 million in 2000, $38 million in 1999 and $196 million in 1998.

Significant components of the Company's deferred income tax liabilities (assets) are as follows:

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| | (In Millions) | |
| Current assets | $ 29 | $ (8) |
| Current liabilities | (117) | (133) |
| Miscellaneous | (8) | (8) |
| Current deferred tax asset, net | $ (96) | $ (149) |
| Noncurrent liabilities: | | |
| Property and equipment | 2,049 | 1,977 |
| Other long-term assets (primarily prepaid pension asset) | 93 | 89 |
| Other (mostly equipment obligations) | 117 | 88 |
| | 2,259 | 2,154 |
| Noncurrent assets: | | |
| Nondeductible reserves and other liabilities | (204) | (221) |
| Tax benefit transfer receivable | (36) | (36) |
| Other (mostly equity investments) | (81) | (80) |
| | (321) | (337) |
| Deferred income tax liabilities, net | $1,938 | $1,817 |

8. Pension and Postretirement Benefits

The Company and its subsidiaries sponsor several qualified and nonqualified pension plans and other postretirement benefit plans for its employees.

During 1999, the Company transferred approximately $350 million and $260 million of pension assets to NSC and CSX, respectively. NSC and CSX also assumed certain pension obligations related to former Conrail employees. The net effect on Conrail's financial statements as detailed in the table below, was to reduce pension assets by $89 million. This transfer resulted in a $35 million reduction of deferred tax liabilities and is reflected as a capital distribution of $54 million.

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company's pension plan was amended during 1998 to include certain enhanced benefits for qualifying Conrail employees. The effect of the amendment was to increase the Conrail plan's projected benefit obligation by $59 million. The Company's pension plan was also amended during 1998 to allow for payment of non- union supplemental retirement benefits to the extent consistent with applicable IRS Tax Code provisions. Both of these liabilities are accrued as offsets to the prepaid pension asset which is included in "Other assets" in the balance sheet (Note 3).

The following tables provide a reconciliation of the changes in the plans' benefit obligations and fair value of assets over the two-year period ending December 31, 2000, and a statement of the funded status as of December 31 of both years:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| (In Millions) | 2000 | 1999 | 2000 | 1999 |
| Change in benefit obligation | | | | |
| Net benefit obligation at beginning of year | $ 739 | $ 834 | $ 44 | $ 56 |
| Pension obligation transferred to NSC and CSX | - | (89) | - | - |
| Service cost | 4 | 10 | - | - |
| Interest cost | 51 | 53 | 3 | 3 |
| Plan amendments | - | - | (1) | - |
| Curtailment (gains) losses | - | (15) | - | (4) |
| Actuarial (gains) losses | 5 | (100) | (5) | (7) |

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | | | | |
|---|---|---|---|---|
| Incorporation of special pension benefit reserves | - | 176 | - | - |
| Gross benefits paid | (112) | (130) | (4) | (4) |
| Net benefit obligation at end of year | $ 687 | $ 739 | $ 37 | $ 44 |
| Change in plan assets | | | | |
| Fair value of plan assets at beginning of year | $ 791 | $1,441 | $ 8 | $ 9 |
| Pension assets transferred to NSC and CSX | - | (610) | - | - |
| Actual return on plan assets | 39 | 88 | 1 | - |
| Gross benefit payments | (110) | (128) | (1) | (1) |
| Fair value of plan assets at end of year | $ 720 | $ 791 | $ 8 | $ 8 |
| Funded status at end of year | $ 33 | $ 52 | $ (29) | $ (36) |
| Unrecognized transition asset | (2) | (3) | - | - |
| Unrecognized prior service cost | 9 | 10 | (1) | - |
| Unrecognized actuarial (gains)losses | 8 | (26) | (12) | (8) |
| Net amount recognized at year end | $ 48 | $ 33 | $ (42) | $ (44) |

The following amounts have been recognized in the balance sheets as of December 31:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| (In Millions) | 2000 | 1999 | 2000 | 1999 |
| Prepaid pension cost | $ 92 | $ 74 | - | - |
| Accrued benefit cost | (44) | (41) | $ (42) | $ (44) |

All of the Company's plans for postretirement benefits other than pensions have no plan assets except for the retiree life insurance plan which had $8 million of assets in both 2000 and 1999. The aggregate benefit obligation for the postretirement plans other than pensions was $37 million and $44 million at December 31, 2000 and 1999, respectively.

The projected benefit obligations and accumulated benefit obligations for pension plans with accumulated benefit obligations in excess of plan assets were both $45 million in 2000; and $54 million and $38 million, respectively, in 1999. The plans had no assets in either 2000 or 1999.

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The assumptions used in the measurement of the Company's benefit obligation are as follows:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| Discount rate | 7.50% | 7.75% | 7.50% | 7.75% |
| Expected return on plan assets | 9.00% | 9.00% | 8.00% | 8.00% |
| Rate of compensation increase | 5.00% | 5.00% | 5.00% | 5.00% |

A 7% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2001, gradually decreasing to 6% by the year 2007.

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. The effect of a one percentage point increase and (decrease) in the assumed health care cost trend rate on the accumulated postretirement benefit obligation is $1 million and $(1) million, respectively, and would have an immaterial effect on the net periodic postretirement benefit cost for 2000.

The components of the Company's net periodic benefit cost for the plans are as follows:

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| (In Millions) | 2000 | 1999 | 1998 | 2000 | 1999 | 1998 |
| Service cost | $ 4 | $ 10 | $ 13 | $ - | $ - | $ - |
| Interest cost | 51 | 53 | 53 | 3 | 4 | 4 |
| Expected return on assets | (70) | (94) | (109) | (1) | (1) | (1) |
| Curtailment (gain) loss | - | 19 | - | - | (4) | - |
| Amortization of: | | | | | | |
| Transition asset | (1) | (11) | (18) | - | - | - |
| Prior service cost | 1 | 4 | 4 | - | - | - |
| Actuarial (gain)loss | 1 | (8) | (5) | (1) | - | (1) |
| | $ (14) | $ (27) | $ (62) | $ 1 | $ (1) | $ 2 |

**Savings Plans**

The Company and certain subsidiaries provide 401(k) savings plans for union and non-union employees. Under the Company's current non-union savings plan, 50% of employee contributions are matched for the first 6% of a participating employee's base pay and 25% of employee contributions are matched in excess of 10% of a participating employee's base pay. Savings plan expense related to the current non-union



DA02130

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

savings plan was $1 million in 2000 and 1999. The Company had no non-union savings plan in 1998. There is no Company match provision under the union employee plan except for certain unions which negotiated a Company match as part of their contract provisions.

9. Stockholders' equity

**Common Stock**

On May 23, 1997, the NSC-CSX joint tender offer for the remaining outstanding shares of Conrail's common and preferred stock was concluded, and on June 2, 1997, Conrail became the surviving corporation in a merger with Green Merger Corp. and remained the only subsidiary of Green Acquisition Corp., an entity jointly-owned by NSC and CSX. As a result, the remaining outstanding capital stock of Conrail was acquired by NSC and CSX and Green Acquisition was issued 100 shares of Conrail's common stock.

**Treasury Stock**

As a result of the acquisition of Conrail, the remaining 6,320,249 shares of treasury stock at December 31, 1997, were recorded as canceled and retired during 1998.

**Undistributed Earnings of Equity Investees**

"Retained earnings" includes undistributed earnings of equity investees of $157 million, $188 million and $173 million at December 31, 2000, 1999 and 1998, respectively.

10. Other Income, Net

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| | (In Millions) | | |
| Interest income | $ 21 | $ 19 | $ 7 |
| Rental income | 45 | 37 | 42 |
| Property sales | 70 | 6 | 21 |
| Other, net | 19 | 5 | 2 |
| | $ 155 | $ 67 | $ 72 |

11. Commitments and Contingencies

**Environmental**

The Company is subject to various federal, state and local laws and regulations regarding environmental matters. CRC is a party to

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

various proceedings brought by both regulatory agencies and private parties under federal, state and local laws, including Superfund laws, and has also received inquiries from governmental agencies with respect to other potential environmental issues. At December 31, 2000, CRC has received, together with other companies, notices of its involvement as a potentially responsible party or requests for information under the Superfund laws with respect to cleanup and/or removal costs due to its status as an alleged transporter, generator or property owner at 24 locations. However, based on currently available information, the Company believes CRC may have some potential responsibility at only 21 of these sites. Due to the number of parties involved at many of these sites, the wide range of costs of possible remediation alternatives, the changing technology and the length of time over which these matters develop, it is often not possible to estimate CRC's liability for the costs associated with the assessment and remediation of contaminated sites.

Although the Company's operating results and liquidity could be significantly affected in any quarterly or annual reporting period if CRC were held principally liable in certain of these actions, at December 31, 2000, the Company had accrued $80 million, an amount it believes is sufficient to cover the probable liability and remediation costs that will be incurred at Superfund sites and other sites based on known information and using various estimating techniques. The Company anticipates that much of this liability will be paid out over five years; however some costs will be paid out over a longer period. The Company believes the ultimate liability for these matters will not materially affect its consolidated financial condition.

The Company spent $9 million in 2000 and 1999, and $10 million in 1998 for environmental remediation and related costs. In addition, the Company's capital expenditures for environmental control and abatement projects were approximately $1 million in 2000 and 1999, and $8 million in 1998.

**Other**

The Company is involved in various legal actions, principally relating to occupational health claims, personal injuries, casualties, property damage and damage to lading. The Company has recorded liabilities in amounts it believes are sufficient to cover the expected probable payments for such actions.

CRC had 1,750 employees at December 31, 2000; approximately 86% of who are represented by 12 different labor organizations and are covered by 16 separate collective bargaining agreements. The Company was engaged in collective bargaining at December 31, 2000 with labor organizations representing approximately 83% of its labor force.

CRC currently guarantees the principal and interest payments in the amount of $36 million on Equipment Trust Certificates for Locomotive

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Management Services, a general partnership of which CRC holds a fifty percent interest.

12. Fair Values of Financial Instruments

The fair values of "Cash and cash equivalents," "Accounts receivable," "Notes receivable from NSC/CSX" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments.

Using current market prices when available, or a valuation based on the yield to maturity of comparable debt instruments having similar characteristics, credit rating and maturity, the total fair value of the Company's long-term debt, including the current portion, but excluding capital leases, is $1,150 million and $1,367 million at December 31, 2000 and 1999, respectively, compared with carrying values of $1,028 million and $1,290 million at December 31, 2000 and 1999, respectively.



SEC Filings provided by EDGAR Online, Inc.